1  DEBRA J. CARFORA
2  U.S. Department of Justice
   Environmental Defense Section
3  P.O. Box 7611
   Washington, D.C. 20044
4  Tel: (202) 514-2640
   Fax: (202) 514-8865
5  Email: debra.carfora@usdoj.gov

6  *Attorney for Defendants*

7

8              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
9              **SAN FRANCISCO DIVISION**

10

11  FOOD & WATER WATCH, INC., et al.,

12               Plaintiffs,                Case No. 3:17-cv-02162 EMC

13         v.                               **DECLARATION OF DEBRA J.**
                                            **CARFORA IN SUPPORT OF**
14  UNITED STATES ENVIRONMENTAL            **MOTION TO ENLARGE TIME FOR**
    PROTECTION AGENCY, et al.,              **LIMITED DISCOVERY**
15
                 Defendants.
16

17         I, Debra J. Carfora, submit the following declaration in support of Defendants' motion to enlarge

18  time for limited discovery:

19         1.      I am a trial attorney within the Environment and Natural Resources Division of the United

20  States Department of Justice. I am lead counsel for Defendants ("EPA") in the above-captioned case.

21         2.      On June 27, 2019, the parties exchanged initial expert disclosures pursuant to Federal

22  Rule of Civil Procedure 26(a). Plaintiffs disclosed two "non-retained" experts, Howard Hu and Bruce

23  Lanphear. Plaintiffs disclosed, *inter alia*, that Dr. Hu was expected to testify regarding the methods and

24  findings of his studies of fluoride and neurodevelopment in certain birth cohorts in Mexico known as the

25  Early Life Exposures in Mexico to Environmental Toxicants (ELEMENT) project. Plaintiffs disclosed

26  that Dr. Hu was also expected to testify regarding the effects of fluoride exposure "that are common in

27  the general population." Plaintiffs disclosed, *inter alia*, that Dr. Lanphear was expected to testify

28  regarding the methods and findings of his studies of fluoride and IQ in a birth cohort in Canada known

as the Maternal-Infant Research on Environmental Chemicals (MIREC) project. Plaintiffs' June 27, 2019 disclosures are attached as **Exhibit A**.

3.     Although Plaintiffs asserted that Drs. Hu and Lanphear were not required to submit Rule 26(a)(2)(B) reports, Plaintiffs attached to the June 27, 2019 disclosures signed "expert reports" for Drs. Hu and Lanphear, with various scientific papers attached. Dr. Hu's June 27, 2019 expert report, without the accompanying attachments, is attached as **Exhibit B**. Dr. Lanphear's June 27, 2019 expert report, without the accompanying attachments, is attached as **Exhibit C**.

4.     On July 11, 2019, EPA objected by letter to Plaintiffs' disclosures with respect to the two "non-retained" experts, Drs. Hu and Lanphear. EPA's position was that Drs. Hu and Lanphear appeared to be retained witnesses and the "expert report" that they provided failed to satisfy the requirements of Rule 26(a)(2)(B) or, assuming they were not required to provide expert reports, Rule 26(a)(2)(C)(ii). Correspondence reflecting EPA's objections is attached as **Exhibit D**.

5.     On July 16, 2019, Plaintiffs responded by letter to EPA's objections and concurrently served Amended Expert Disclosures that purported to provide more specificity as to Dr. Hu's expected testimony. Correspondence reflecting Plaintiffs' response to EPA's objections is attached as **Exhibit E**. Plaintiffs' Amended Expert Disclosures are attached as **Exhibit F**.

6.     On July 19, 2019, EPA responded to Plaintiffs' July 16, 2019 letter and explained that Plaintiffs' attempt to correct their disclosures compounded the problem and potential prejudice to EPA by adding vague representations that Dr. Hu will offer testimony regarding how his studies of the Mexican birth cohort can be extrapolated to show effects "in the general population." To resolve the dispute, EPA proposed that Plaintiffs stipulate that any testimony offered by Dr. Hu or Dr. Lanphear shall be limited to the expressly stated design, conduct, and findings of their individual research studies attached to the disclosures that Plaintiffs provided. EPA's July 19, 2019 letter is attached as **Exhibit G**.

7.     Counsel for the parties continued to exchange email correspondence and to meet and confer in an attempt to resolve the dispute by agreeing to stipulation language but were unsuccessful. A copy of the correspondence is attached as **Exhibit H**.

8.     On August 9, 2019, EPA served on Plaintiffs' counsel EPA's portion of a letter brief

1    seeking an order that Plaintiffs must amended their expert disclosures with respect to Drs. Hu and

2    Lanphear. EPA advised that the letter brief should be filed on August 16, 2019 consistent with Magistrate

3    Judge Westmore's general standing order. A copy of the correspondence transmitting EPA's portion of

4    the letter brief is attached as **Exhibit I**.

5         9.       On August 9, 2019, after EPA served its portion of the letter brief, I met and conferred

6    with Plaintiffs' counsel, who advised that Plaintiffs may consider amending their disclosures to avoid

7    the disruption of the letter-briefing process. I represented that EPA would likely seek a stay of the

8    litigation if the issue were not resolved by early September.

9         10.      The next day, August 10, 2019, Plaintiffs' counsel advised by email that Plaintiffs will

10   voluntarily provide the additional disclosures requested for Drs. Hu and Lanphear and would endeavor

11   to provide the additional disclosures by August 26, 2019. Plaintiffs' counsel asked that EPA confirm no

12   later than September 4, 2019 whether it will depose Drs. Hu and Lanphear.

13        11.      On August 15, 2016, I confirmed to Plaintiffs' counsel that EPA was amenable to

14   Plaintiffs' counsel's proposal, advised that EPA would not guarantee it would confirm the depositions

15   by September 4, 2019, and provided a stipulation for consideration reflecting the agreement.

16   Correspondence reflecting the agreement is attached as **Exhibit J**. The stipulation was filed on

17   August 16, 2019, and so-ordered by the Court the same day. ECF No. 109.

18        12.      On August 19, 2019, JAMA Pediatrics published "Association Between Maternal

19   Fluoride Exposure During Pregnancy and IQ Scores in Offspring in Canada" by Rivka Green, et al.

20   ("Green study), a study Dr. Lanphear had provided with his June 27, 2019 expert report in pre-

21   publication form. Dr. Angeles Martinez-Mier, a non-retained expert the EPA disclosed on September 18,

22   2019, is a co-author of the Green study, as well as every other study that Dr. Hu and Dr. Lanphear

23   attached to their June 27, 2019 "expert reports."

24        13.      On August 26, 2019, counsel for Dr. Richard Hornung, another co-author of the Green

25   study served responses and objections to an August 9, 2019 subpoena that counsel for EPA had issued

26   in an attempt to learn more about the Green study. Counsel for EPA met and conferred with

27   Dr. Hornung's counsel regarding Dr. Hornung's objections. Dr. Hornung, however, rested on his

28

1   objections and was unwilling to produce documents in response to the subpoena.

2       14.     On August 27, 2019, Plaintiffs served Second Amended Expert Disclosures and a

3   Supplemental Summary of Facts for Dr. Hu, a copy of which is attached as **Exhibit K**. Plaintiffs' counsel

4   advised in the transmittal email that Plaintiffs were working to complete Dr. Lanphear's supplemental

5   summary and would extend the time for EPA to decide whether it will depose Dr. Lanphear

6   commensurate with the additional time Plaintiffs took to complete the summary.

7       15.     On August 30, 2019, Plaintiffs served a Supplemental Summary of Facts for

8   Dr. Lanphear and, due to the delay in providing the supplement, offered to extend the time for EPA to

9   decide whether it will depose Dr. Lanphear to September 9, 2019. A copy of the correspondence and

10  Supplemental Summary of Facts for Dr. Lanphear is attached as **Exhibit L**.

11      16.     On September 9, 2019, EPA advised Plaintiffs' counsel that it will depose Drs. Hu and

12  Lanphear. *See* Exhibit J. Counsel for the parties agreed to another stipulation to allow EPA to depose

13  Drs. Hu and Lanphear on September 24 and 25, 2019, one week after the close of expert discovery,

14  September 18, 2019. The Court so-ordered that stipulation on September 13, 2019. ECF No. 112.

15      17.     On September 11, 2019, my colleague Brandon N. Adkins, a trial attorney with the U.S.

16  Department of Justice and counsel of record in this case, spoke to Dr. Martinez-Mier on the phone. This

17  was the first contact counsel for EPA had with Dr. Martinez-Mier. Dr. Martinez-Mier requested that we

18  send her questions by email because she was preparing to leave the country for a conference. As she

19  requested, we sent questions to Dr. Martinez-Mier regarding her fluoride studies, including the Green

20  study, on September 12, 2019.

21      18.     On September 17, 2019, Mr. Adkins again contacted Dr. Martinez-Mier because we had

22  not (and have not) received responses to the questions we sent to her by email. Dr. Martinez-Mier agreed

23  to serve as a non-retained expert in the case.

24      19.     On September 18, 2019, EPA served a supplement to their expert disclosures and

25  designations that identified Dr. Martinez-Mier as an additional witness EPA may use at trial, a copy of

26  which is attached as **Exhibit M**.

27      20.     On September 16, 2019, EPA was invited to join a telephonic briefing to take place on

28

DECLARATION OF DEBRA J. CARFORA
Case No. 3:17-cv-02162 EMC

September 19, concerning the draft *Monograph* by the National Institute of Environmental Health Sciences' ("NIEHS") National Toxicity Program ("NTP") arranged by Dr. John Bucher, senior NTP scientist.  A copy the calendar invitation for the telephone conference is attached as **Exhibit N**.  Neither myself, nor EPA has seen or received a draft of the NTP *Monograph*.

21.     On September 18, 2019, I spoke with Dr. Bucher about the status of the NTP *Monograph*, and the possibility of making a draft available for public review. Dr. Bucher represented that the draft NTP *Monograph* was submitted to the National Academies of Sciences ("NAS") for peer review on September 16, 2019, and that a draft of the *Monograph* will be made publically available pursuant to the practices of the NAS—ten-days prior to the NAS peer review meeting tentatively scheduled for November 6–7, 2019.

22.     On September 18, 2019, while information on the NTP *Monograph* and the possibility of Dr. Martinez-Mier offering an opinion in this matter were still being investigated, I attempted to initiate a telephone conference with Plaintiffs' counsel. A copy of the correspondence is attached as **Exhibit O**.

23.     On September 19, 2019, counsel for the parties met and conferred telephonically. Before the call, EPA provided a proposed stipulation to modify deadlines. On the call, Plaintiffs' counsel refused to agree to any change in the schedule and represented that he will oppose EPA's motion to enlarge time. Further, Plaintiffs' counsel represented that this issue amounts to a discovery dispute that should be resolved via letter brief.  However, I am unaware of any existing discovery dispute between the parties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 19th, 2019, in Washington, DC.

*/s/ Debra J. Carfora*
Debra J. Carfora
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

5

# EXHIBIT A

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## AT SAN FRANCISCO

| | | |
|---|---|---|
| FOOD & WATER WATCH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Civ. No. 17-CV-02162-EMC |
| | ) | |
| U.S. ENVIRONMENTAL PROTECTION | ) | **PLAINTIFFS' EXPERT** |
| AGENCY, et al. | ) | **DISCLOSURES** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs hereby provide the following expert disclosures.

> **Jacqueline Calderon Hernández, PhD**
> **Universidad Autonoma de San Luis Potosi**
> **Avenida Sierra Leona No. 550, CP 78210**
> **Colonia Lomas Segunda Seccion, San Luis Potosi, SLP, Mexico**
> **Tel: (52-444) 826 2300 ext 8459**

Dr. Calderon Hernández is an environmental health scientist who has studied fluoride's impact on cognitive development in children for the better part of the past 20 years. Consistent with her report, Dr. Calderon Hernández will testify, *inter alia*, that (1) her studies of Mexican communities support, and are consistent with, fluoride being a neurotoxicant that causes cognitive deficits; (2) fluoride's effects on cognition can occur in the absence of demonstrable IQ loss; (3) the developing brain during the *in utero* period has a heightened sensitivity to environmental toxicants, including fluoride; and (4) the doses

commonly experienced by pregnant women in communities with fluoridated drinking water are associated with significant cognitive deficits in her prospective cohort data. Dr. Calderon Hernández's report, curriculum vitae, and list of publications from the previous 10 years are enclosed as Exhibit 1. This is the first time that Dr. Calderon Hernández has agreed to serve as an expert in litigation. The exhibits that Dr. Calderon Hernández intends to use at trial are included in her report, and the documents cited therein. Dr. Calderon Hernández's hourly rate for deposition and trial testimony is $250.

**Ole Fejerskov, DDS, PhD, Dr.Odont**
**Institute of Biomedicine**
**Aarhus University**
**Høegh-Guldbergs Gade 10**
**DK-8000 Aarhus C**
**Denmark**
**Tel: +45 40372027**

Dr. Fejerskov is a dental researcher who has written and edited 10 international textbooks on fluoride and dental caries, and has published hundreds of research papers on fluoride and oral health issues in peer-reviewed scientific journals. Since 1973, Dr. Fejerskov's research has focused on how fluoride affects the mineralization of teeth, including the development of caries and dental fluorosis. Consistent with his report, Dr. Fejerskov will testify, *inter alia*, that: (1) ingesting fluoride is an unnecessary and ineffective way of controlling caries because fluoride's beneficial effects come from topical contact with teeth, not ingestion; (2) the evidence on the beneficial effects of individual-use topical fluoride products, like toothpaste, is much stronger than the evidence for water fluoridation; (3) caries has declined significantly throughout the developed world in communities with and without water fluoridation, with little demonstrable difference in caries rates between communities that add fluoride to water and communities that do not; (4) fluoride exposure during the *in utero* and early infancy period is contraindicated for oral health purposes, and (5) in light of current data on the relationship between waterborne fluoride, caries, and dental fluorosis, adding fluoride to water is no longer justified from an oral health perspective.

Dr. Fejerskov's report, curriculum vitae, and list of publications from the previous 10 years are enclosed as Exhibit 2. This is the first time that Dr. Fejerskov has agreed to serve as an expert in litigation. The exhibits that Dr. Fejerskov intends to use at trial are included in his report, and the documents cited

PLAINTIFFS' EXPERT DISCLOSURES

therein. Dr. Fejerskov's hourly rate for deposition and trial testimony is $500.

**Philippe Grandjean, MD, DMSc**
**Harvard T.H. Chan School of of Public Health**
**Building 1 1312A**
**665 Huntington Ave**
**Boston, Massachusetts 02115**
**Tel: 617-331-3317**

Dr. Grandjean is a physician, environmental epidemiologist, and professor at the Harvard School of Public Health, who has published extensively on the impact of early life exposures to chemicals on the developing brain, including fluoride. Dr. Grandjean has been involved with fluoride research since the 1980s, has authored criteria documents on fluoride for the World Health Organization and European Commission, was an invited peer-reviewer of the National Research Council's (NRC) authoritative 2006 report on fluoride toxicology, and has published studies on the effect of fluoride on childhood IQ, including a meta-review of the epidemiological evidence.

Consistent with his report, Dr. Grandjean will testify, *inter alia*, that (1) the neurotoxicity of fluoride is supported by studies of occupationally exposed workers, laboratory animals, and communities exposed to elevated levels of fluoride in water and polluted air; (2) recent prospective cohort studies of prenatal fluoride exposure and IQ, funded by the National Institutes of Health, are high quality studies that leave little doubt that developmental neurotoxicity is a serious risk associated with elevated fluoride exposure; (3) fluoridated drinking water is associated with IQ losses that are substantial and of economic and societal concern; and (4) application of the benchmark dose (BMD) method to the new prospective data shows that the levels of fluoride added to water in fluoridation programs exceed the science-based limit needed to protect against developmental neurotoxicity.

Dr. Grandjean's report, curriculum vitae, list of publications from the previous 10 years, and list of cases in which he has provided testimony in the past four years, are enclosed as Exhibit 3. The exhibits that Dr. Grandjean intends to use at trial are included in his report, and the documents cited therein. Dr. Grandjean's hourly rate for deposition and trial testimony is $500.

**Howard Hu, MD, MPH, ScD**
**University of Washington School of Public Health**
**12544 42nd Avenue NE**
**Seattle, WA 98125**
**Tel. 206-685-2378**

Dr. Hu is a physician-scientist trained in internal medicine, occupational/environmental medicine, epidemiology and general public health who has held leadership positions in science and academia for over 2 decades. Dr. Hu has published extensively on the impact of environmental chemicals, including fluoride, on neurodevelopment. Currently, Dr. Hu is the Principal Investigator of an ongoing study that is examining the impact of early-life exposures to fluoride on neurobehavioral development in a cohort in Mexico City known as the Early Life Exposures in Mexico to Environmental Toxicants (ELEMENT) project. ELEMENT is a pregnancy and birth cohort that Dr. Hu co-founded in 1993; it has been continuously funded since 1993 by grants from the U.S. National Institute for Environmental Health Sciences (NIEHS). Since its inception, ELEMENT has evolved into a highly successful, award-winning project involving collaborators at various academic institutions throughout North America.  It has generated over 70 high-impact publications and has provided evidence contributing towards health policies around the world.

Dr. Hu has agreed to provide testimony (as a non-retained expert) about his prospective study of fluoride and neurodevelopment in the ELEMENT cohort. Although not required to prepare a report, Dr. Hu has produced a report explaining the scope and basis of his testimony. Consistent with this report, Dr. Hu will explain for the Court the rigorous design, conduct, and findings of the ELEMENT study. As detailed in the papers attached to Dr. Hu's report, prenatal fluoride exposure is associated with large and significant effects on IQ and ADHD symptoms in the ELEMENT cohort at levels of exposure that are common in the general population.

Dr. Hu's report, curriculum vitae, list of publications from the previous 10 years, and list of cases in which he has provided testimony in the past four years, are enclosed as Exhibit 4. The exhibits that Dr. Hu intends to use at trial are included in his report, and the documents cited therein.

1

**Bruce Lanphear, MD, MPH**
**Simon Fraser University**
**Blusson Hall**
**8888 University Dr.**
**Burnaby, British Columbia V5A 1S6**
**Canada**
**Tel: 778-387-3939**

2

3

4

5   Dr. Lanphear is a clinician scientist and epidemiologist who has published extensively on the impact

6   of environmental chemicals on the developing brain. Dr. Lanphear's research on the cognitive deficits

7   caused by low levels of lead is widely considered seminal in the field, and has helped shape public health

8   policies in the United States and abroad. Dr. Lanphear is currently the Co-Principal Investigator of an NIH-

9   funded prospective study of the MIREC cohort in Canada that is investigating the neurodevelopmental

10  effects of early-life exposures to fluoride. Dr. Lanphear has agreed to provide testimony (as a non-retained

11  expert) about the methods and findings of his studies of fluoride and IQ in the MIREC cohort. Although

12  not required to produce a report, Dr. Lanphear has produced a report explaining the opinions he will offer,

13  along with the published and unpublished manuscripts that form the basis of his opinions. Dr. Lanphear

14  has asked that the unpublished manuscripts be treated as confidential because premature public disclosure

15  could jeopardize their publication. The unpublished manuscripts should not be publicly distributed and

16  should only be used for purposes of this litigation.

17  Consistent with his report, and the data upon which it is based, Dr. Lanphear will testify, *inter alia*,

18  that: (1) pregnant women living in fluoridated regions in Canada have almost two times the amount of

19  fluoride in their urine as women living in non-fluoridated regions, (2) the average urinary fluoride

20  concentration for pregnant women living in Canadian communities with fluoridated drinking is almost the

21  same as those of the ELEMENT cohort being studied by Dr. Hu; (3) the study of fluoride and IQ in the

22  MIREC cohort significantly enhances the quality of data related to fluoride's neurotoxicity because the

23  study employs a prospective design that includes multiple measures of fluoride exposure during pregnancy

24  (including biomonitoring data) and IQ outcomes that have been evaluated in one of the world's most

25  comprehensively characterized and geographically diverse birth cohorts; (4) consistent with Dr. Hu's study

26  of the ELEMENT cohort,  Dr. Lanphear has found that prenatal fluoride exposure is significantly associated

27  with lower intellectual abilities in 3-4 year old children, and these associations remain large and significant

28  when controlling for relevant covariates; (5) based on the convergent results from the MIREC and

5

ELEMENT cohorts, the *in utero* period is likely a susceptible period of life vis-à-vis fluoride toxicity; (6) it is advisable and prudent for pregnant women to begin taking steps to reduce their fluoride intake, including but not limited to reducing their consumption of fluoridated water; (7)  exposure to fluoridated water in infancy, particularly among formula fed infants, is associated with diminished intellectual abilities in the MIREC cohort; and (8) the association between infant exposure to fluoridated water and reduced IQ in the MIREC cohort remains significant after controlling for fetal fluoride exposure and other relevant covariates, suggesting that the susceptibility to fluoride's adverse neurological effects extends into infancy.

Dr. Lanphear's report, curriculum vitae, list of publications from the previous 10 years, and list of cases in which he has provided testimony in the past four years, are enclosed as Exhibit 5. The exhibits that Dr. Lanphear intends to use at trial are included in his report, and the documents cited therein. Dr. Lanphear will not be charging a fee for his deposition or trial testimony.

> **Kathleen M. Thiessen, PhD**
> **Oak Ridge Center for Risk Analysis**
> **102 Donner Dr.**
> **Oak Ridge, TN 37830**
> **Tel. 865-483-6111**

Dr. Thiessen is a risk assessment scientist at the Oak Ridge Center for Risk Analysis with thirty years of experience evaluating exposures, doses, and risks to human health from trace levels of contaminants in the environment, including fluoride. Dr. Thiessen has been an invited panelist for several of the National Research Council's (NRC) reviews of fluoride's hazards, including the NRC's report *Fluoride in Drinking Water: A Scientific Review of EPA's Standards*, which the Centers for Disease Control and EPA both consider an authoritative summary of fluoride's hazards. Dr. Thiessen has also authored health assessments for the EPA, including a Health Issue Assessment for fluorides.

Consistent with her report, Dr. Thiessen will testify, *inter alia*, that: (1) based on the hazard identification principles set forth in EPA's *Guidelines for Neurotoxicity Risk Assessment*, there is sufficient evidence to conclude that neurotoxicity is a hazard of fluoride exposure; (2) convergent data from experimental animal studies and epidemiological studies of human populations, alongside considerations of pharmacokinetics and biological plausibility, strongly indicate that neurotoxicity is a more sensitive effect of fluoride exposure than the effect EPA assumes to be the most sensitive (i.e., severe dental fluorosis); (3) identifiable subsets of the population have heightened susceptibility to the risk of harm from

PLAINTIFFS' EXPERT DISCLOSURES

fluoridation chemicals, including: the fetus; bottle-fed infants; the elderly; individuals with nutrient deficiencies, kidney disease, and/or high-water intake; and populations with specific genotypes; (4) EPA's current reference dose (RfD) for fluoride (0.08 mg/kg/day) is not protective against neurotoxicity, including loss of cognitive function; (5) EPA's current RfD is based on improper risk management (vs. risk assessment) considerations and an outdated understanding of fluoride's anti-caries mechanism; and (6) fluoridation chemicals present an "unreasonable risk" of neurotoxic effects, including IQ loss, if assessed under the same analytical framework that EPA uses in its risk evaluations of other chemicals under the Toxic Substance Control Act.

Dr. Thiessen's report, curriculum vitae, and list of publications from the previous 10 years, are enclosed as Exhibit 6. Dr. Thiessen has not served as an expert witness in the previous four years. The exhibits that Dr. Thiessen intends to use at trial are included in her report, and the documents cited therein. Dr. Thiessen's hourly rate for deposition and trial testimony is $300.

**Christine R. Wells, PhD**
**UCLA Statistical Consulting Group**
**79 Maynard Ave.**
**Newbury Park, CA  91320**
**Tel. 805-469-4726**

Dr. Wells is a statistical consultant and senior member of the Statistical Consulting Group for the University of California Los Angeles (UCLA). Dr. Wells has assisted more than 1,000 researchers on a wide array of data analysis projects, and has co-authored peer-reviewed publications involving statistical analyses of public health data, including data related to fluoride and teeth. Consistent with her report, Dr. Wells will explain the results of her bivariate and multivariate analyses of a 17-year prospective cohort study funded by the National Institute of Health (NIH). The study, known as the Iowa Fluoride Study (IFS), is the only study to prospectively investigate the effect of total daily fluoride ingestion (from birth to adolescence) on the development of caries. Dr Wells will testify that the IFS data shows no significant effect of pre-eruptive fluoride ingestion on caries, and that the IFS study supports the view that pre-eruptive ingestion of fluoride is an ineffective means of preventing caries.  Dr. Wells's report, curriculum vitae, and list of publications from the previous 10 years, are enclosed as Exhibit 7. This is the first time that Dr. Wells has agreed to serve as an expert in litigation. The exhibits that Dr. Wells intends to use at trial are

included in her report, and the documents cited therein. Dr. Wells's hourly rate for deposition and trial testimony is $200.

Dated:   June 27, 2019                          Respectfully submitted,

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Civil Procedure 5 and the mutual consent of the parties that email to counsel will constitute proper service of discovery, I served a copy of the foregoing *Plaintiff's Expert Disclosures* upon Defendants on June 27, 2019 via email to the following counsel:

Debra J. Carfora
John T. Do
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC. 20044-7611
debra.carfora@usdoj.gov
john.do@usdoj.gov

*Attorneys for Defendants*

Dated:   June 27, 2019

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

# EXHIBIT B

# APPENDIX 4:
**Expert Report of Howard Hu, MD, MPH, ScD**

**FLUORIDE & IQ -- FINDINGS FROM THE ELEMENT COHORT**
**Expert Report of Howard Hu, MD, MPH, ScD**
June 25, 2019

I am a physician-scientist trained in internal medicine, occupational/environmental medicine, epidemiology and general public health who has held leadership positions in science and academia for over 2 decades. A summary of my qualifications and publications can be found in my Curriculum Vitae, which is attached in **Appendix A.** I am also the Principal Investigator of ongoing research that is examining the impact of early-life exposures to fluoride on neurobehavioral development in the offspring participating in the Early Life Exposures in Mexico to Environmental Toxicants (ELEMENT) project.

ELEMENT is a pregnancy and birth cohort that I co-founded in 1993 in partnership with the Instituto Nacional de Salud Publica (INSP—the National Institute of Public Health in Mexico) and that has been continuously funded since 1993 by grants from the U.S. National Institute for Environmental Health Sciences (NIEHS). It has had the general aim of understanding the impact of early life environmental exposures on developmental outcomes. Since its inception, ELEMENT has evolved into a highly successful, award-winning project involving collaborators at INSP, the University of Michigan[1], and other academic institutions in the U.S. and Mexico. It has generated over 70 high-impact publications and provided evidence contributing towards environmental health policies around the world.

Our project on fluoride and neurobehavioral development began in 2012, leveraging the unique ELEMENT resources of archived biological samples and data to measure the prenatal and postnatal exposures of ELEMENT offspring to fluoride and relate those measurements to rigorously measured neurobehavioral outcomes taken at multiple points of time.

In response to a request from counsel representing Plaintiffs, I have agreed to provide expert testimony in this matter, but only in the capacity as a non-retained expert. I am not retained and have not been provided any compensation nor employed in any capacity by any party.

If permitted to testify, I intend to discuss, for the Court, the design, conduct, and findings of our ELEMENT research on fluoride as they pertain to the three studies we have published in the peer-reviewed scientific literature so far, i.e., Thomas et al., 2016, Bashash et al. 2017, and Bashash et al. 2018. Copies of these publications are provided in **Appendix B.**

A complete list of cases in which I have provided testimony in the previous 4 years is attached as **Appendix C**.

Howard Hu
June 25, 2019

**References:**

Bashash M, Thomas D, Hu H, Martinez-Mier EA, Sanchez BN, Basu N, Peterson KE, Ettinger AS, Wright R, Zhang Z, Liu Y, Schnaas L, Mercado-Garcia A, Téllez-Rojo MM, Hernández-Avila M.

[1] See: https://sph.umich.edu/cehc/element/element.html

Prenatal Fluoride Exposure and Cognitive Outcomes in Children at 4 and 6-12 Years of Age in Mexico. Environ Health Perspec 2017  Environ Health Perspect. 2017 Sep 19;125(9). doi: 10.1289/EHP655. PubMed PMID: 28937959.

Bashash M, Marchand M, Hu H, Till C, Martinez-Mier EA, Sanchez BN, Basu N, Peterson KE, Green R, Schnaas L, Mercado-García A, Hernández-Avila M, Téllez-Rojo MM. Prenatal fluoride exposure and attention deficit hyperactivity disorder (ADHD) symptoms in children at 6-12 years of age in Mexico City. Environ Int. 2018 Dec;121(Pt 1):658-666. doi: 10.1016/j.envint.2018.09.017. Epub 2018 Oct 10. PubMed PMID: 30316181.

Thomas DB, Basu N, Martinez-Mier EA, Sánchez BN, Zhang Z, Liu Y, Parajuli RP, Peterson K, Mercado-Garcia A, Bashash M, Hernández-Avila M, Hu H, Téllez-Rojo MM.  Urinary and plasma fluoride levels in pregnant women from Mexico City. Environ Res. 2016 Oct;150:489-95. doi: 10.1016/j.envres.2016.06.046. PubMed PMID: 27423051.

# EXHIBIT C

# APPENDIX 5:

## Expert Report of Bruce Lanphear, MD, MPH

**FLUORIDE & IQ -- FINDINGS FROM THE MIREC COHORT**
**Expert Report of Bruce Lanphear, MD, MPH**
June 27, 2019

Along with my colleague Dr. Christine Till, I am the Co-Principal Investigator of an ongoing study that is examining the impact of early-life fluoride exposures on intellectual abilities in a cohort of mothers and offspring from Canada known as the MIREC[1] cohort. Our study of fluoride and IQ in the MIREC cohort has been funded, in part, by grants from the National Institute of Environmental Health Sciences (NIEHS). A summary of my qualifications and a list of my publications are attached as **Appendix A**.

In response to a request from counsel representing Plaintiffs, I have agreed to provide expert testimony in this matter, but only in the capacity as a non-retained expert. I am not retained and have not been provided any compensation nor employed in any capacity by any party.

If permitted to testify, I intend to offer opinions for the Court regarding the methods and findings of our MIREC study. The opinions I intend to offer are as follows:

(1) Pregnant women living in fluoridated regions in Canada have almost two times the amount of fluoride in their urine as women living in non-fluoridated regions (Till et al. 2018).

(2) The average urinary fluoride concentration for the MIREC pregnant women living in Canadian communities with fluoridated drinking was almost the same as those of the ELEMENT pregnant women living in Mexico City where fluoride is added to salt (Till et al. 2018; Bashash et al. 2017).

(3) Our MIREC study (Green et al., in press) significantly enhances the quality of data related to the neurotoxicity of fluoride because it employs a prospective design that includes multiple measures of fluoride exposure during pregnancy (including biomonitoring data) and IQ outcomes that have been evaluated in one of the world's most comprehensively characterized and geographically diverse birth cohorts.

(4) As with the ELEMENT study (Bashash et al. 2017), we found that prenatal fluoride exposure was significantly associated with lower intellectual abilities in 3-4 year old children. These associations remain large and significant when controlling for relevant covariates.

(5) Based on the convergent results from the MIREC and ELEMENT cohorts, the *in utero* period appears to be a susceptible period of life vis-à-vis fluoride toxicity. In light of these findings, I believe it is advisable and prudent for pregnant women to begin taking steps to reduce their fluoride intake, including but not limited to reducing their consumption of fluoridated water.

(6) In the MIREC cohort, exposure to fluoridated water in infancy, particularly among formula-fed infants, was associated with diminished intellectual abilities in young children (Till et al., in review). This association remained significant after controlling for fetal fluoride exposure and other relevant covariates, suggesting that the susceptibility to fluoride's adverse neurological effects may extend into infancy.

My opinions, which I hold to a reasonable degree of scientific certainty, are based on (1) my own experience, education, and training, including my prior research on the impact of environmental chemicals on the developing brain (Lanphear 2015); as well as (2) my team's analyses of the MIREC cohort, including one paper that has been published (Till, et al. 2018, attached as **Appendix B**), one paper

---

[1] MIREC stands for Maternal-Infant Research on Environmental Chemicals. Information about MIREC can be found online at http://www.mirec-canada.ca/en/

that has been accepted for publication (Green et al. in press, attached as **Appendix C**), and one paper that is currently in review (Till et al, in review, attached as **Appendix D**). Please note that Appendix C and D are both confidential documents, and should not be publicly distributed or used for any purpose beyond this litigation.

A complete list of cases in which I have provided testimony in the previous 4 years is attached as **Appendix E**.

Bruce Lanphear
June 27, 2019

**References:**

Bashash M, et al. Prenatal fluoride exposure and cognitive outcomes in children at 4 and 6-12 Years of age in Mexico. Environ Health Perspect 2017; 125(9):097017.

Lanphear B. The impact of toxins on the developing brain. Annu. Rev. Public Health 2015; 36:211-30.

Green R, et al. Association between maternal fluoride exposure during pregnancy and IQ scores in offspring in Canada. Accepted (10 April 2019).

Till C, et al. Community water fluoridation and urinary fluoride concentrations in a national sample of pregnant women in Canada. Environ Health Perspect 2018; 126(10):107001.

Till C, et al. Fluoride exposure from infant formula and child IQ in a Canadian birth cohort. In review (submitted 10 May 2019).

# EXHIBIT D



**U.S. Department of Justice**

Environment and Natural Resources Division

BNA
N.D. Cal. case no. 3:17-cv-02162-EMC

*Environmental Defense Section*                                     *Telephone (202) 616-9174*
*P.O. Box 7611*                                                     *Facsimile (202) 514-8865*
*Washington, DC  20044*

July 11, 2019

*VIA EMAIL*
Michael P. Connett
Waters Kraus & Paul
222 N. Pacific Coast Highway, Suite 1900
El Segundo, CA 90245
mconnett@waterskraus.com

Re: Objections to Plaintiffs' June 27, 2019 Expert Designations and Disclosures

Dear Michael,

I am writing to bring to your attention deficiencies in Plaintiffs' Expert Designations and Disclosures served on June 27, 2019. Plaintiffs disclosed two purportedly "non-retained" experts who intend to provide testimony, Howard Hu and Bruce Lanphear. Plaintiffs' statements that Drs. Hu and Lanphear are "not required to produce a report" appear incorrect. And the "reports" you provided for Drs. Hu and Lanphear fail to satisfy the requirements of the Federal Rules.

Rule 26(a)(2)(B) requires that expert disclosures "must be accompanied by a written report . . . if the witness is one retained or specially employed to provide expert testimony in the case." Your claim that Drs. Hu and Lanphear are "non-retained" experts appears to be wholly based on your representation that they will not be charging fees for giving deposition or trial testimony. Whether an expert witness must provide a report pursuant to Rule 26(a)(2)(B) does not turn on whether the witness is paid, and we are not aware of any authority to the contrary. In fact, Drs. Hu and Lanphear appear to be retained experts in every respect other than compensation. You have repeatedly offered dates on behalf of Drs. Hu and Lanphear when they can give deposition testimony and even noticed depositions for those witnesses pursuant to Rule 30 without an accompanying third-party subpoena. Finally, during our meet and confer on July 10, 2019, you agreed to accept service of subpoenas on behalf of Dr. Lanphear.

The "reports" you provided for Drs. Hu and Lanphear fail to satisfy the requirements of Rule 26(a)(2)(B) because, *inter alia*, they do not contain a "complete statement of all opinions the witness will express and the basis and reasons for them." For example, Dr. Hu's one-page report states that he "intend[s] to discuss, for the Court, the design, conduct, and findings of our ELEMENT research on fluoride as they pertain to the three studies we have published in the peer-reviewed scientific literature so far" and attached three studies. Therefore, even if Drs. Hu and Lanphear are not required to provide a report pursuant to Rule 26(a)(2)(B), Plaintiffs' Expert

Disclosures would still be deficient because, *inter alia*, they fail to state "a summary of the facts and opinions to which [Drs. Hu and Lanphear are] expected to testify. *See* Fed. R. Civ. P. 26(a)(2)(C)(ii). These deficiencies make it impossible for Defendants to prepare adequately for Dr. Hu's or Dr. Lanphear's intended testimony.

    Please supplement Plaintiffs' expert disclosures to cure these identified deficiencies.


    Sincerely,

Brandon N. Adkins

cc:    Charles Andrew Waters (email)
       Christopher Thomas Nidel (email)
       Debra J. Carfora (email)
       John Thomas H. Do (email)

# EXHIBIT E

**waterskrauspaul**

PARTNERS

C. Andrew Waters (CA,DC,MO,OR,TX)

Peter A. Kraus (CA,H,MO,TX,VA)

Charles S. Siegel (PA,TX)

Michael L. Armitage (CA,LA)

Gary M. Paul (CA)

Leslie C. MacLean (PA,TX)

Michael B. Gurien (CA)

Jonathan A. George (CA,PA,FX,VA)

Kevin M. Loew (CA)

Gibbs C. Henderson (IL,TX)

Joy Sparling (IL)

Susannah B. Chester-Schindler (LA,TX)

ASSOCIATES

Caitlyn Silhan (FA,TX)

Erin M. Wood (TX)

Susan M. Ulrich (LA,MA,WA)

Rajeev K. Mittal (CA)

Patrick J. Wigle (TX)

Michael P. Connett (CA,PA)

Charles P. Stern (PA,TX)

Rachel A. Gross (CA)

Christopher L. Johnson (PA,TX)

Alexandra B. Ascione (LA)

Elizabeth A. Post (CA)

Nancy C. Marcus (CA,DC,OH)

Taryn E. Ourso (TX)

Sam I. Iola (TX)

Earl J. Washington (TX)

Jillian Rice-Loew (CA)

Shawna Forbes-King (CA)

OF COUNSEL

B. Scott Kruka (PA,TX)

Wm. Paul Lawrence II (TX,VA)

William Galerston (IL,TX)

Randall L. Iola (IL,OK,TX)

Kay Gunderson Reeves (TX,WA)

Steven M. Gruber (AL,MN,TX)

Lawrence G. Gettys (LA,TX)

July 16, 2019

*Via Email*

Debra Carfora
Brandon Adkins
Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044

       Re: EPA's Objections to Plaintiffs' June 27, 2019 Expert Designations and
Disclosures

Dear Debra & Brandon,

Thank you for bringing to my attention your objections to Plaintiffs' Expert Disclosures, to which I will now respond.

First, we stand by our assertion that Drs. Hu and Lanphear are neither retained nor specially employed experts (i.e., "non-retained"). The non-retained status of Drs. Hu and Lanphear does not rest solely on the fact that they have received no compensation, although this is certainly an important consideration. *Huffman v. City of Conroe, Texas*, No. H-07-1694, 2008 WL 11391360, at *2 (S.D. Tex. July 10, 2008) ("[T]he Court holds that a witness is 'retained' if she is to provide expert opinion and testimony in exchange for a fee."). Another critical distinction between a retained and non-retained expert is whether the expert's opinions were formed in anticipation of litigation, or whether they are based solely on the expert's percipient knowledge and experience. *See, e.g., Trulove v. D'Amico*, No. 16-cv-050, 2018 WL 1090248, at *3 (N.D. Cal. Sept. 27, 2007 (quoting *Cantu v. United States*, No. 14-00219, 2015 WL 12743881, at *5 (C.D. Cal. 2015 Apr. 6, 2015)); *Ferring Pharmaceuticals, Inc. v. Braintree Laboratories, Inc.*, 215 F. Supp. 3d 114, 124-25 (D. Mass. 2016); *Amos v. W.L. Plastics, Inc.*, No. 14-00219, 2009 WL 3854980, at *2 (D. Utah Nov. 17, 2009).

Here, as set forth in Plaintiffs' expert disclosures and designations, the opinions of Drs. Hu and Lanphear will be based entirely on their own percipient knowledge and experience, not on information provided by counsel and/or information reviewed in anticipation of trial. Specifically, Drs. Hu and Lanphear are the principal investigators of two landmark NIH-funded prospective birth cohort

**WATERS KRAUS & PAUL** ATTORNEYS AND COUNSELORS

**LOS ANGELES:** 222 N PACIFIC COAST HIGHWAY  SUITE 1900  EL SEGUNDO, CALIFORNIA  90245  **TEL** 310 414 8146  **FAX** 310 414 8156

**DALLAS:** 3141 HOOD ST  SUITE 700  DALLAS, TEXAS  75219  **TEL** 214 357 6244  **FAX** 214 357 7252

**MOLINE:** 1530 3RD AVENUE A  2ND FLOOR  MOLINE, ILLINOIS  61265  **TEL** 800 226 9880  (by appointment)

**BATON ROUGE:** 9191 SIEGEN LANE  BLDG 7  BATON ROUGE, LOUISIANA  70810  **TEL** 225 308 2617  **FAX** 225 769 5101

Debra Carfora & Brandon Adkins
July 16, 2019
Page 2

studies on fluoride and IQ, which provide an integral factual foundation for the question that the Court will be asked to decide. It is thus appropriate for Drs. Hu and Lanphear to provide testimony about these studies as non-retained experts.

Second, you imply that the non-retained status of Drs. Hu and Lanphear is somehow inconsistent with Plaintiffs offering dates for their depositions and not serving third-party subpoenas when we initially noticed their depositions. Your letter does not provide legal authority to support this proposition, and I am not aware of any such authority. My willingness to communicate with Drs. Hu and Lanphear to coordinate the dates of their depositions was an act of professional courtesy to assist the scheduling process and make it more convenient for all. Drs. Hu and Lanphear have *voluntarily* agreed to provide testimony because they consider it their public duty to do so; deposition subpoenas were thus not necessary.

Third, because Drs. Hu and Lanphear are non-retained experts, they are not obligated to produce a report pursuant to Rule 26(a)(2)(B). As a pure matter of courtesy, however, Drs. Hu and Lanphear did voluntarily agree to produce reports in which they, *inter alia*, summarize the testimony they intend to offer, and cite or attach all of the facts and data upon which their opinions will be based. In total, Dr. Hu attached 27 pages of supporting data, while Dr. Lanphear attached 86 pages. Although not obligated to do so, we believe that Drs. Hu and Lanphear have more than satisfied the requirements of Rule 26(a)(2)(B).

Fourth, in your letter, you take specific issue with the way in which Dr. Hu summarized his intended testimony. While not agreeing with your conclusion, Plaintiffs are concurrently serving, in the spirit of cooperation and full transparency, Amended Expert Disclosures wherein we provide greater specificity as to the opinions we anticipate Dr. Hu will provide. The Amended Disclosures state that: "Dr. Hu will testify that his prospective cohort studies of fluoride's neurodevelopmental effects are methodologically rigorous studies that provide scientifically reliable and robust results. Dr. Hu will further testify that the results of his studies are consistent with and support the conclusion that fluoride is a developmental neurotoxicant at levels of exposure seen in the general population." Pursuant to Rule 26, Plaintiffs will not be eliciting any opinions from Dr. Hu at trial that go beyond the scope of the Amended Disclosure. We trust, therefore, that this Amended Disclosure provides you the clarity that you seek.

Finally, during our conference call last Wednesday, EPA agreed that – if it were to take the depositions of Drs. Hu and Lanphear – it would do so during the week of August 5 in Seattle, as the parties will already be there for the deposition of

Debra Carfora & Brandon Adkins
July 16, 2019
Page 3

Charlotte Lewis. Subsequent to our conversation, I informed you that Dr. Hu would be available for a deposition on August 6, and Dr. Lanphear would be available for a deposition on August 9. I would appreciate if you could confirm by July 19, whether EPA intends to take Dr. Hu's and/or Dr. Lanphear's depositions. Please note that Plaintiffs may elect to notice their depositions on these dates should you choose not to do so.

Yours sincerely,

Michael Connett

# EXHIBIT F

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, et al., ) | |
| ) | |
| Plaintiffs, ) | Civ. No. 17-CV-02162-EMC |
| vs. ) | |
| ) | |
| U.S. ENVIRONMENTAL PROTECTION ) | **PLAINTIFFS' AMENDED EXPERT** |
| AGENCY, et al. ) | **DISCLOSURES** |
| ) | |
| Defendants. ) | |
| ) | |

     Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs hereby provide the

following amended expert disclosures.

     **Jaqueline Calderon Hernández, PhD**
     **Universidad Autonoma de San Luis Potosi**
     **Avenida Sierra Leona No. 550, CP 78210**
     **Colonia Lomas Segunda Seccion, San Luis Potosi, SLP, Mexico**
     **Tel: (52-444) 826 2300 ext 8459**

     Dr. Calderon Hernández is an environmental health scientist who has studied fluoride's impact on

cognitive development in children for the better part of the past 20 years. Consistent with her report, Dr.

Calderon Hernández will testify, *inter alia*, that (1) her studies of Mexican communities support, and are

consistent with, fluoride being a neurotoxicant that causes cognitive deficits; (2) fluoride's effects on

cognition can occur in the absence of demonstrable IQ loss; (3) the developing brain during the *in utero*

period has a heightened sensitivity to environmental toxicants, including fluoride; and (4) the doses

commonly experienced by pregnant women in communities with fluoridated drinking water are associated with significant cognitive deficits in her prospective cohort data. Dr. Calderon Hernández's report, curriculum vitae, and list of publications from the previous 10 years are enclosed as Exhibit 1. This is the first time that Dr. Calderon Hernández has agreed to serve as an expert in litigation. The exhibits that Dr. Calderon Hernández intends to use at trial are included in her report, and the documents cited therein. Dr. Calderon Hernández's hourly rate for deposition and trial testimony is $250.

**Ole Fejerskov, DDS, PhD, Dr.Odont**
**Institute of Biomedicine**
**Aarhus University**
**Høegh-Guldbergs Gade 10**
**DK-8000 Aarhus C**
**Denmark**
**Tel: +45 40372027**

Dr. Fejerskov is a dental researcher who has written and edited 10 international textbooks on fluoride and dental caries, and has published hundreds of research papers on fluoride and oral health issues in peer-reviewed scientific journals. Since 1973, Dr. Fejerskov's research has focused on how fluoride affects the mineralization of teeth, including the development of caries and dental fluorosis. Consistent with his report, Dr. Fejerskov will testify, *inter alia*, that: (1) ingesting fluoride is an unnecessary and ineffective way of controlling caries because fluoride's beneficial effects come from topical contact with teeth, not ingestion; (2) the evidence on the beneficial effects of individual-use topical fluoride products, like toothpaste, is much stronger than the evidence for water fluoridation; (3) caries has declined significantly throughout the developed world in communities with and without water fluoridation, with little demonstrable difference in caries rates between communities that add fluoride to water and communities that do not; (4) fluoride exposure during the *in utero* and early infancy period is contraindicated for oral health purposes, and (5) in light of current data on the relationship between waterborne fluoride, caries, and dental fluorosis, adding fluoride to water is no longer justified from an oral health perspective.

Dr. Fejerskov's report, curriculum vitae, and list of publications from the previous 10 years are enclosed as Exhibit 2. This is the first time that Dr. Fejerskov has agreed to serve as an expert in litigation. The exhibits that Dr. Fejerskov intends to use at trial are included in his report, and the documents cited

therein. Dr. Fejerskov's hourly rate for deposition and trial testimony is $500.

**Philippe Grandjean, MD, DMSc**
**Harvard T.H. Chan School of Public Health**
**University of Southern Denmark**
**J. B. Winsløws Vej 17, 2. sal.**
**5000 Odense C**
**Denmark**
**Tel: 617-331-3317**

Dr. Grandjean is a physician, environmental epidemiologist, and professor at the Harvard School of Public Health, who has published extensively on the impact of early life exposures to chemicals on the developing brain, including fluoride. Dr. Grandjean has been involved with fluoride research since the 1980s, has authored criteria documents on fluoride for the World Health Organization and European Commission, was an invited peer-reviewer of the National Research Council's (NRC) authoritative 2006 report on fluoride toxicology, and has published studies on the effect of fluoride on childhood IQ, including a meta-review of the epidemiological evidence.

Consistent with his report, Dr. Grandjean will testify, *inter alia*, that (1) the neurotoxicity of fluoride is supported by studies of occupationally exposed workers, laboratory animals, and communities exposed to elevated levels of fluoride in water and polluted air; (2) recent prospective cohort studies of prenatal fluoride exposure and IQ, funded by the National Institutes of Health, are high quality studies that leave little doubt that developmental neurotoxicity is a serious risk associated with elevated fluoride exposure; (3) fluoridated drinking water is associated with IQ losses that are substantial and of economic and societal concern; and (4) application of the benchmark dose (BMD) method to the new prospective data shows that the levels of fluoride added to water in fluoridation programs exceed the science-based limit needed to protect against developmental neurotoxicity.

Dr. Grandjean's report, curriculum vitae, list of publications from the previous 10 years, and list of cases in which he has provided testimony in the past four years, are enclosed as Exhibit 3. The exhibits that Dr. Grandjean intends to use at trial are included in his report, and the documents cited therein. Dr. Grandjean's hourly rate for deposition and trial testimony is $500.

**Howard Hu, MD, MPH, ScD**
**University of Washington School of Public Health**
**12544 42nd Avenue NE**
**Seattle, WA 98125**
**Tel. 206-685-2378**

Dr. Hu is a physician-scientist trained in internal medicine, occupational/environmental medicine, epidemiology and general public health who has held leadership positions in science and academia for over 2 decades. Dr. Hu has published extensively on the impact of environmental chemicals, including fluoride, on neurodevelopment. Currently, Dr. Hu is the Principal Investigator of an ongoing study that is examining the impact of early-life exposures to fluoride on neurobehavioral development in a cohort in Mexico City known as the Early Life Exposures in Mexico to Environmental Toxicants (ELEMENT) project. ELEMENT is a pregnancy and birth cohort that Dr. Hu co-founded in 1993; it has been continuously funded since 1993 by grants from the U.S. National Institute for Environmental Health Sciences (NIEHS). Since its inception, ELEMENT has evolved into a highly successful, award-winning project involving collaborators at various academic institutions throughout North America.  It has generated over 70 high-impact publications and has provided evidence contributing towards health policies around the world.

Dr. Hu has agreed to provide testimony (as a non-retained expert) about his prospective study of fluoride and neurodevelopment in the ELEMENT cohort. Although not required to prepare a report, Dr. Hu has produced a report explaining the scope and basis of his testimony. Consistent with this report, Dr. Hu will explain for the Court the rigorous design, conduct, and findings of the ELEMENT study. As detailed in the papers attached to Dr. Hu's report, prenatal fluoride exposure is associated with large and significant effects on IQ and ADHD symptoms in the ELEMENT cohort at levels of exposure that are common in the general population.  Dr. Hu will testify that his prospective cohort studies of fluoride's neurodevelopmental effects are methodologically rigorous studies that provide scientifically reliable and robust results. Dr. Hu will further testify that the results of his studies are consistent with and support the conclusion that fluoride is a developmental neurotoxicant at levels of exposure seen in the general

4

population.

Dr. Hu's report, curriculum vitae, list of publications from the previous 10 years, and list of cases in which he has provided testimony in the past four years, are enclosed as Exhibit 4. The exhibits that Dr. Hu intends to use at trial are included in his report, and the documents cited therein. Dr. Hu has asked for a reasonable fee for his testimony in this case, which the federal rules permit for non-retained experts. Typically, Dr. Hu charges $1,000 an hour for depositions, but since he is providing testimony in this case as a public service, he is willing to drop his rate to $300 per hour.

**Bruce Lanphear, MD, MPH**
**Simon Fraser University**
**Blusson Hall**
**8888 University Dr.**
**Burnaby, British Columbia V5A 1S6**
**Canada**
**Tel: 778-387-3939**

Dr. Lanphear is a clinician scientist and epidemiologist who has published extensively on the impact of environmental chemicals on the developing brain. Dr. Lanphear's research on the cognitive deficits caused by low levels of lead is widely considered seminal in the field, and has helped shape public health policies in the United States and abroad. Dr. Lanphear is currently the Co-Principal Investigator of an NIH-funded prospective study of the MIREC cohort in Canada that is investigating the neurodevelopmental effects of early-life exposures to fluoride. Dr. Lanphear has agreed to provide testimony (as a non-retained expert) about the methods and findings of his studies of fluoride and IQ in the MIREC cohort. Although not required to produce a report, Dr. Lanphear has produced a report explaining the opinions he will offer, along with the published and unpublished manuscripts that form the basis of his opinions. Dr. Lanphear has asked that the unpublished manuscripts be treated as confidential because premature public disclosure could jeopardize their publication. The unpublished manuscripts should not be publicly distributed and should only be used for purposes of this litigation.

Consistent with his report, and the data upon which it is based, Dr. Lanphear will testify, *inter alia*, that: (1) pregnant women living in fluoridated regions in Canada have almost two times the amount of fluoride in their urine as women living in non-fluoridated regions, (2) the average urinary fluoride concentration for pregnant women living in Canadian communities with fluoridated drinking is almost the

same as those of the ELEMENT cohort being studied by Dr. Hu; (3) the study of fluoride and IQ in the MIREC cohort significantly enhances the quality of data related to fluoride's neurotoxicity because the study employs a prospective design that includes multiple measures of fluoride exposure during pregnancy (including biomonitoring data) and IQ outcomes that have been evaluated in one of the world's most comprehensively characterized and geographically diverse birth cohorts; (4) consistent with Dr. Hu's study of the ELEMENT cohort,  Dr. Lanphear has found that prenatal fluoride exposure is significantly associated with lower intellectual abilities in 3-4 year old children, and these associations remain large and significant when controlling for relevant covariates; (5) based on the convergent results from the MIREC and ELEMENT cohorts, the *in utero* period is likely a susceptible period of life vis-à-vis fluoride toxicity; (6) it is advisable and prudent for pregnant women to begin taking steps to reduce their fluoride intake, including but not limited to reducing their consumption of fluoridated water; (7)  exposure to fluoridated water in infancy, particularly among formula fed infants, is associated with diminished intellectual abilities in the MIREC cohort; and (8) the association between infant exposure to fluoridated water and reduced IQ in the MIREC cohort remains significant after controlling for fetal fluoride exposure and other relevant covariates, suggesting that the susceptibility to fluoride's adverse neurological effects extends into infancy.

Dr. Lanphear's report, curriculum vitae, list of publications from the previous 10 years, and list of cases in which he has provided testimony in the past four years, are enclosed as Exhibit 5. The exhibits that Dr. Lanphear intends to use at trial are included in his report, and the documents cited therein. Dr. Lanphear will not be charging a fee for his deposition or trial testimony.

**Kathleen M. Thiessen, PhD**
**Oak Ridge Center for Risk Analysis**
**102 Donner Dr.**
**Oak Ridge, TN 37830**
**Tel. 865-483-6111**

Dr. Thiessen is a risk assessment scientist at the Oak Ridge Center for Risk Analysis with thirty years of experience evaluating exposures, doses, and risks to human health from trace levels of contaminants in the environment, including fluoride. Dr. Thiessen has been an invited panelist for several of the National Research Council's (NRC) reviews of fluoride's hazards, including the NRC's report *Fluoride in Drinking Water: A Scientific Review of EPA's Standards*, which the Centers for Disease Control and EPA both consider an authoritative summary of fluoride's hazards. Dr. Thiessen has also authored

health assessments for the EPA, including a Health Issue Assessment for fluorides.

Consistent with her report, Dr. Thiessen will testify, *inter alia*, that: (1) based on the hazard identification principles set forth in EPA's *Guidelines for Neurotoxicity Risk Assessment*, there is sufficient evidence to conclude that neurotoxicity is a hazard of fluoride exposure; (2) convergent data from experimental animal studies and epidemiological studies of human populations, alongside considerations of pharmacokinetics and biological plausibility, strongly indicate that neurotoxicity is a more sensitive effect of fluoride exposure than the effect EPA assumes to be the most sensitive (i.e., severe dental fluorosis); (3) identifiable subsets of the population have heightened susceptibility to the risk of harm from fluoridation chemicals, including: the fetus; bottle-fed infants; the elderly; individuals with nutrient deficiencies, kidney disease, and/or high-water intake; and populations with specific genotypes; (4) EPA's current reference dose (RfD) for fluoride (0.08 mg/kg/day) is not protective against neurotoxicity, including loss of cognitive function; (5) EPA's current RfD is based on improper risk management (vs. risk assessment) considerations and an outdated understanding of fluoride's anti-caries mechanism; and (6) fluoridation chemicals present an "unreasonable risk" of neurotoxic effects, including IQ loss, if assessed under the same analytical framework that EPA uses in its risk evaluations of other chemicals under the Toxic Substance Control Act.

Dr. Thiessen's report, curriculum vitae, and list of publications from the previous 10 years, are enclosed as Exhibit 6. Dr. Thiessen has not served as an expert witness in the previous four years. The exhibits that Dr. Thiessen intends to use at trial are included in her report, and the documents cited therein. Dr. Thiessen's hourly rate for deposition and trial testimony is $300.

**Christine R. Wells, PhD**
**UCLA Statistical Consulting Group**
**79 Maynard Ave.**
**Newbury Park, CA  91320**
**Tel. 805-469-4726**

Dr. Wells is a statistical consultant and senior member of the Statistical Consulting Group for the University of California Los Angeles (UCLA). Dr. Wells has assisted more than 1,000 researchers on a wide array of data analysis projects, and has co-authored peer-reviewed publications involving statistical analyses of public health data, including data related to fluoride and teeth. Consistent with her report, Dr. Wells will explain the results of her bivariate and multivariate analyses of a 17-year prospective cohort

study funded by the National Institute of Health (NIH). The study, known as the Iowa Fluoride Study (IFS), is the only study to prospectively investigate the effect of total daily fluoride ingestion (from birth to adolescence) on the development of caries. Dr Wells will testify that the IFS data shows no significant effect of pre-eruptive fluoride ingestion on caries, and that the IFS study supports the view that pre-eruptive ingestion of fluoride is an ineffective means of preventing caries.  Dr. Wells's report, curriculum vitae, and list of publications from the previous 10 years, are enclosed as Exhibit 7. This is the first time that Dr. Wells has agreed to serve as an expert in litigation. The exhibits that Dr. Wells intends to use at trial are included in her report, and the documents cited therein. Dr. Wells's hourly rate for deposition and trial testimony is $200.

Dated:  July 16, 2019                          Respectfully submitted,

                                               */s/ Michael Connett*
                                               MICHAEL CONNETT
                                               Attorney for Plaintiffs

PLAINTIFFS' AMENDED EXPERT DISCLOSURES

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5 and the mutual consent of the parties that email to counsel will constitute proper service of discovery, I served a copy of the foregoing *Plaintiff's Amended Expert Disclosures* upon Defendants on July 16, 2019 via email to the following counsel:

Debra J. Carfora
John T. Do
Brandon Adkins
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC. 20044-7611
debra.carfora@usdoj.gov
john.do@usdoj.gov
brandon.adkins@usdoj.gov

*Attorneys for Defendants*

Dated:   July 16, 2019

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

PLAINTIFFS' AMENDED EXPERT DISCLOSURES

# EXHIBIT G



**U.S. Department of Justice**

Environment and Natural Resources Division

BNA
N.D. Cal. case no. 3:17-cv-02162-EMC

*Environmental Defense Section*                                                    *Telephone (202) 616-9174*
*P.O. Box 7611*                                                                    *Facsimile (202) 514-8865*
*Washington, DC  20044*

July 19, 2019

*VIA EMAIL*
Michael P. Connett
Waters Kraus & Paul
222 N. Pacific Coast Highway, Suite 1900
El Segundo, CA 90245
mconnett@waterskraus.com

Re: Objections to Plaintiffs' Expert Designations and Disclosures

Dear Michael,

I write in response to your letter of July 16, 2019, which responded to our objections to Plaintiffs' June 27, 2019 Expert Designations and Disclosures that we lodged in a letter to you of July 11, 2019, and Plaintiffs' July 16, 2019 Amended Expert Designations and Disclosures ("Plaintiffs' Amended Disclosures"). Unfortunately, your July 16 letter did not resolve our objections, and Plaintiffs' Amended Disclosures have only compounded the problem.

None of the cases you cite in your July 16 letter stands for the proposition that an expert witness is not required to provide a written report under Rule 26(a)(2)(B) simply because he or she will not receive compensation. Thus, that Howard Hu and Bruce Lanphear have "voluntarily agreed" with you to provide testimony, as you state in your July 16 letter, does not necessarily excuse them from providing a written report under Rule 26(a)(2)(B).

In fact, the non-binding case on which you entirely rely for this proposition in your July 16 letter, *Huffman v. City of Conroe, Texas*, No. H-07-1964, 2008 WL 11391360 (S.D. Tex. July 10, 2008), appears to support why Drs. Hu and Lanphear must provide a written report. In determining whether proposed experts were "retained" or "specially employed" such that they must provide written reports, the *Huffman* court held that a witness who is paid a fee is "retained" under Rule 27(a)(2)(B) (the court did not hold that a witness who offers her services for free is automatically *not* "retained," as you suggest), and that "a witness is 'specially employed' if she has no personal involvement in the facts giving rise to a case and is instead engaged specifically by a party to provide opinions and testimony bearing on the particulars of a case, without monetary payment for those services." 2008 WL 11391360, at *2. Drs. Hu and Lanphear appear not to have personal involvement in the case and are offered to provide testimony bearing on central issues to the case.

Nor are Drs. Hu or Lanphear excused from providing a written report because their testimony will be "based entirely on their own percipient knowledge and experience," as you state in your July 16 letter. In *Goodman v. Staples The Office Superstore, L.L.C.*, a premises-liability action, the Ninth Circuit considered when a treating physician, which is generally not considered "retained or specially employed to provide expert testimony," is required to provide a written report under Rule 26(a)(2)(B). 644 F.3d 817, 824–26 (9th Cir. 2011). The court held that a treating physician is excused from the written report requirement only when his or her opinions were formed during the course of treatment, but when the physician's testimony goes beyond the scope of the treatment rendered, he or she must provide a written report. *Id.* at 826. *Amos v. W.L. Plastics, Inc.*, No. 2:07-cv-49, 2009 WL 3854980 (D. Utah Nov. 17, 2009), a case you cite in your July 16 letter, illustrates this principle outside the context of the treating-physician exception. There, the plaintiffs offered testimony from a voluntary witness regarding industry standards but not whether the defendant breached those standards. The court determined that if the witness were to go beyond the stated limitation, the witness would have been required to submit an expert report. *Id.* at *2.

Plaintiffs' Amended Disclosures further confound your position because they suggest that Dr. Hu, and presumably also Dr. Lanphear, will offer testimony beyond the scope of the studies they attached to their "reports," what you appear to claim is their "percipient knowledge." For example, in one of the studies Dr. Hu attached to his "report," *Prenatal Fluoride Exposure and Cognitive Outcomes in Children at 4 and 6–12 Years of Age in Mexico*, he states, "our ability to extrapolate our results to how exposures may impact on the general population is limited given the lack of data on fluoride pharmacokinetics during pregnancy. There are no reference values for urinary fluoride in pregnant women in the United States." Yet, in attempting to respond to our objections, which used Dr. Hu's "report" as an example, Plaintiffs have now amended their disclosures to add vague representations that Dr. Hu will offer testimony regarding how his studies can be extrapolated to show effects "in the general population." This is exactly the kind of litigation-by-surprise tactic that the Federal Rules are designed to prevent. *See* Fed. R. Civ. P. 26 (advisory committee's note to 1993 Amendment); Fed. R. Civ. P. 1.

Even if Drs. Hu and Lanphear are not required to provide a written report under Rule 26(a)(2)(B)—they are—the "reports" you provided for them fail even to satisfy the requirements of Rule 26(a)(2)(C) for the reasons stated in our July 11 letter. Attaching numerous, co-authored scientific reports is not a substitute for the "summary of the facts and opinions to which [Drs. Hu and Lanphear are] expected to testify that Rule 26(a)(2)(C)(ii) requires. And you have provided no authority to the contrary. Rather, Plaintiffs' Amended Disclosures demonstrate the inherent unfairness of your position because they now propose testimony that goes beyond the scope of the studies you provided. These deficiencies make it impossible for Defendants to prepare adequately for Dr. Hu's or Dr. Lanphear's intended testimony.

By asserting that Drs. Hu and Lanphear will speak only to their "percipient knowledge" regarding the contents of the written studies attached to the "reports" you provided for them, you appear to contend that they are fact witnesses. *Cf. Ferring Pharmaceuticals, Inc. v. Braintree Labs., Inc.*, 215 F. Supp. 3d 114, 125 (D. Mass. 2016) (permitting disclosure under Rule 26(a)(2)(C) where expert involved in underlying studies would be offered as fact witness). Thus, in an effort to compromise, and notwithstanding the fact that fact discovery is closed in this case, please stipulate that any testimony offered by Dr. Hu or Dr. Lanphear shall be limited to the expressly stated design, conduct, and findings of their individual research studies attached to the disclosures provided. If you refuse to so stipulate, we reserve our right to seek a protective

order to that effect or to take other appropriate action under the Federal Rules. Please advise whether you will agree to such a stipulation and, if not, whether you are available to meet and confer. We are available to meet and confer on this issue on July 22 or 23, 2019, from 12:00 p.m. to 5:00 p.m. EDT, or July 24, 2019 from 12:00 p.m. to 2:30 p.m. EDT.

We responded to your inquiry regarding deposition schedules in separate correspondence.

Sincerely,

Brandon N. Adkins

cc:    Debra J. Carfora (email)
        John Thomas H. Do (email)

# EXHIBIT H

| | |
|---|---|
| **From:** | Adkins, Brandon (ENRD) |
| **To:** | Michael Connett |
| **Cc:** | Carfora, Debra (ENRD); Do, John Thomas (ENRD) |
| **Subject:** | Re: Stipulation regarding testimony of Howard Hu and Bruce Lanphear, Food & Water Watch v. EPA, No. 17-cv-2162 |
| **Date:** | Friday, August 2, 2019 6:55:38 PM |

We disagree with your characterization. Rather, your response clarified for us that ambiguity in the disclosures and "reports," which you highlighted in your response on Thursday evening, prevents us from getting the comfort we hoped to get with the language you had proposed.

_____

**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
O: (202) 616-9174 | M: (202) 598-9562
brandon.adkins@usdoj.gov

On Aug 2, 2019, at 6:24 PM, Michael Connett <mconnett@waterskraus.com> wrote:

> Brandon,
>
> I am perplexed because on Wednesday you wrote:
>
> "Do you intend to ask Dr. Hu or Dr. Lanphear his opinion with respect to artificial water fluoridation in the United States? If not, and Plaintiffs will so stipulate, Defendants will not move to compel Plaintiffs to amend their disclosures to include a written report under Rule 26(a)(2)(B) for Dr. Hu or Dr. Lanphear…"
>
> I emailed you yesterday to say that we would agree to this stipulation, which I thought would end the matter. But based on your email just now, it seems EPA is backtracking to its earlier proposal, which I told you we could not accept.
>
> We remain willing to accept your proposal from Wednesday, but if that is no longer acceptable to EPA (despite being EPA's proposal), I will let Dr. Lanphear know that the deposition will not be moving forward.
>
> Michael
>
> <image001.jpg>
> **Michael P. Connett | Attorney**
> 222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
> Toll Free 800-226-9880 | Phone 310-414-8146
> Fax 310-414-8156
> mconnett@waterskraus.com | www.waterskrauspaul.com
>
> _____
>
> **From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
> **Sent:** Friday, August 02, 2019 3:10 PM
> **To:** Michael Connett <mconnett@waterskraus.com>
> **Cc:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>; Do, John Thomas (ENRD)

<John.Do@usdoj.gov>
**Subject:** Re: Stipulation regarding testimony of Howard Hu and Bruce Lanphear, Food & Water Watch v. EPA, No. 17-cv-2162

Michael,

We attempted to resolve these objections with stipulated language that was tied to the express methodology and findings of their studies. To repeat our proposed language, "Plaintiffs hereby stipulate that any testimony offered by Howard Hu and Bruce Lanphear shall be limited to the expressly stated design, conduct, and findings of their individual research studies attached to the disclosures provided in this case." We were willing to so stipulate because, as I explained in my letter of July 19, 2019, you appear to be treating those studies as Dr. Hu's and Dr. Lanphear's "percipient knowledge," and we were willing to go forward on that basis if you stipulated to the scope of their testimony. We are unwilling, however, to stipulate based on vague statements listed in the disclosures and their "reports," because they fail to state in any meaningful way a "summary of the facts and opinions" to which Dr. Hu and Dr. Lanphear are expected to testify, which would be required of Plaintiffs to provide under Rule 26(a)(2)(C)(ii) if we were to assume for the sake of resolving this dispute that Dr. Hu and Dr. Lanphear are not required to submit Rule 26(a)(2)(B) written reports. So, unless you are willing to agree to stipulated language tied only to their underlying studies as we proposed, I do not believe there are further modifications you can make to your proposal that would alleviate our concerns.

_____
**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
O: (202) 616-9174 | M: (202) 598-9562
brandon.adkins@usdoj.gov

On Aug 2, 2019, at 4:56 PM, Michael Connett <mconnett@waterskraus.com> wrote:

> Brandon – I'm unclear as to why this doesn't address your objections. Can you explain? Is there a modification that could be made to what I wrote that would resolve your remaining concerns?
>
> Sent from my iPhone
>
> _____
>
> **From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
> **Sent:** Friday, August 2, 2019 12:45:21 PM
> **To:** Michael Connett <mconnett@waterskraus.com>
> **Cc:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>; Do, John Thomas (ENRD) <John.Do@usdoj.gov>
> **Subject:** RE: Stipulation regarding testimony of Howard Hu and Bruce Lanphear, Food & Water Watch v. EPA, No. 17-cv-2162

Thank you, Michael. Unfortunately, your proposed stipulation does not adequately address our objections. We are not intending to depose Dr. Lanphear based upon the circumstances as we understand them today.

———
**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
O: (202) 616-9174 | M: (202) 598-9562
brandon.adkins@usdoj.gov

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Thursday, August 1, 2019 6:01 PM
**To:** Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Cc:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>; Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>
**Subject:** RE: Stipulation regarding testimony of Howard Hu and Bruce Lanphear, Food & Water Watch v. EPA, No. 17-cv-2162

Thank you Brandon. We will stipulate that we will not ask Drs. Hu or Lanphear for their opinion about artificial water fluoridation in the United States (unless EPA opens the door to that issue by inquiring first). To be clear, we do intend to elicit each of the opinions set forth in the Amended Disclosures, which includes Dr. Lanphear's opinion that pregnant women should limit their exposure to fluoride, including fluoridated water.

Please let me know if this provides you the clarity that you seek. If it does, I would appreciate if you could let me know by tomorrow whether EPA will be taking Dr. Lanphear's deposition next week.

Thanks,
Michael

<image001.jpg>
**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

---

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Sent:** Wednesday, July 31, 2019 5:03 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>; Do, John Thomas (ENRD) <John.Do@usdoj.gov>
**Subject:** RE: Stipulation regarding testimony of Howard Hu and Bruce Lanphear, Food & Water Watch v. EPA, No. 17-cv-2162

Michael,

Thank you for your letter. We appreciate your attempt to clarify through correspondence the opinions to which you expect Drs. Hu and Lanphear to testify. We would like to clarify what you mean in your letter by, "Plaintiffs will not seek to elicit any opinions about these studies that are not identified in our disclosures so long as EPA does not open the door to other areas of inquiry." Do you intend to ask Dr. Hu or Dr. Lanphear his opinion with respect to artificial water fluoridation in the United States? If not, and Plaintiffs will so stipulate, Defendants will not move to compel Plaintiffs to amend their disclosures to include a written report under Rule 26(a)(2)(B) for Dr. Hu or Dr. Lanphear, without prejudice to or waiver of Defendant's right to move to exclude Dr. Hu's or Dr. Lanphear's testimony on other grounds.

Best,
Brandon
_____

**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
O: (202) 616-9174 | M: (202) 598-9562
brandon.adkins@usdoj.gov

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Wednesday, July 31, 2019 3:01 PM
**To:** Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Cc:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>; Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>
**Subject:** RE: Stipulation regarding testimony of Howard Hu and Bruce Lanphear, Food & Water Watch v. EPA, No. 17-cv-2162

Brandon - Please find attached Plaintiffs' response to EPA's proposed stipulation, as well as to issues raised in your July 19, 2019 letter.

<image001.jpg>
**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

---

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Sent:** Tuesday, July 30, 2019 1:07 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>; Do, John Thomas (ENRD) <John.Do@usdoj.gov>
**Subject:** RE: Stipulation regarding testimony of Howard Hu and Bruce

Lanphear, Food & Water Watch v. EPA, No. 17-cv-2162

Michael,

I understand you spoke to Debbie this afternoon regarding a concern you have with the proposed stipulation language that I sent last night. Please let me know if the following language is acceptable.

> Plaintiffs hereby stipulate that any testimony offered by Howard Hu and Bruce Lanphear shall be limited to the expressly stated design, conduct, and findings of their individual research studies attached to the disclosures provided in this case. Defendants will not move to compel Plaintiffs to amend their disclosures to include a written report under Rule 26(a)(2)(B) for Dr. Hu or Dr. Lanphear. This stipulation is without prejudice to or waiver of Defendant's right to move to exclude Dr. Hu's or Dr. Lanphear's testimony on other grounds.

I understand that Dr. Lanphear advised you that he is willing to accept service of subpoenas by email and that you would like to be copied on any correspondence to Dr. Lanphear. We are amendable to that. Would you please confirm this understanding and provide the email address for Dr. Lanphear?

Thank you.

Best regards,
Brandon
_____
**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
O: (202) 616-9174 | M: (202) 598-9562
brandon.adkins@usdoj.gov

---

**From:** Adkins, Brandon (ENRD)
**Sent:** Monday, July 29, 2019 8:26 PM
**To:** mconnett@waterskraus.com
**Cc:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>; Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>
**Subject:** Stipulation regarding testimony of Howard Hu and Bruce Lanphear, Food & Water Watch v. EPA, No. 17-cv-2162

Dear Michael,

Further to our discussion on July 25, 2019, and my letter of July 19, 2019, please advise by responding to this email whether Plaintiffs agree to the following stipulation:

Plaintiffs hereby stipulate that any testimony offered by
Howard Hu and Bruce Lanphear shall be limited to the
expressly stated design, conduct, and findings of their
individual research studies attached to the disclosures
provided in this case. This stipulation is without prejudice to
or waiver of Defendant's right to move to exclude Dr. Hu's or
Dr. Lanphear's testimony.

Thank you very much.

Best regards,
Brandon

_____

**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
O: (202) 616-9174 | M: (202) 598-9562
brandon.adkins@usdoj.gov

# EXHIBIT I

| | |
|---|---|
| **From:** | Adkins, Brandon (ENRD) |
| **To:** | Michael Connett |
| **Cc:** | Carfora, Debra (ENRD); Do, John Thomas (ENRD) |
| **Subject:** | Objections to Plaintiffs" June 27, 2019 Expert Designations and Disclosures |
| **Date:** | Friday, August 9, 2019 1:02:00 AM |
| **Attachments:** | Letter brief regarding Plaintiffs" Expert Disclosures.docx |

Michael,

Since first identifying deficiencies in Plaintiffs' expert disclosures on July 11, 2019, we have exchanged letter and email correspondence and met and conferred by phone. While those efforts have helped to narrow our disagreement, we remain at impasse. Please find attached our portion of a letter brief that we will file on Friday, August 16, 2019, consistent with Judge Westmore's general standing order. Please provide your portion of the letter brief by noon on Friday, August 16.

Best regards,
Brandon

_____
**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
O: (202) 616-9174 | M: (202) 598-9562
brandon.adkins@usdoj.gov

# EXHIBIT J

| | |
|---|---|
| **From:** | Adkins, Brandon (ENRD) |
| **To:** | Michael Connett |
| **Cc:** | Do, John Thomas (ENRD); Carfora, Debra (ENRD) |
| **Subject:** | RE: EPA"s Request for Additional Disclosures |
| **Date:** | Thursday, September 12, 2019 9:13:00 AM |

Agreed. We will consider the subpoenas served.

_____

**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
O: (202) 616-9174 | M: (202) 598-9562
brandon.adkins@usdoj.gov

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Wednesday, September 11, 2019 9:28 PM
**To:** Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Cc:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>; Carfora, Debra (ENRD)
<DCarfora@ENRD.USDOJ.GOV>
**Subject:** Re: EPA's Request for Additional Disclosures

Thanks Brandon. For purposes of convenience, I am happy to accept service, but only on the
condition that EPA will not cite this courtesy as a basis to challenge the non-retained status of
either expert. If EPA agrees to this, then you can consider service complete. Please let me
know.

I will draft up a stipulation reflecting the terms of our agreement and circulate tomorrow
morning for your review.

Michael

Sent from my iPhone

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Sent:** Wednesday, September 11, 2019 8:35:52 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>; Carfora, Debra (ENRD)
<Debra.Carfora@usdoj.gov>
**Subject:** RE: EPA's Request for Additional Disclosures

Michael,

I'm writing to confirm the agreement we reached during our in-person meet-and-confer on this
issue today.

With respect to the depositions of plaintiffs' non-retained experts, Howard Hu and Bruce
Lanphear, we agreed to depose Dr. Hu on September 24 in Seattle and to depose Dr. Lanphear
on September 25 in Bellingham. We agreed to extend expert discovery to September 25 for
the purpose of completing their depositions. With respect to the briefing schedule for our

motion for summary judgment, we agreed (1) to extend the dispositive motions cut-off date to October 9, (2) that the deadline for plaintiffs' opposition will be October 18, and (3) that the deadline for defendants' reply will be October 24. The hearing date of November 7, 2019, will remain unchanged.

We will await your draft of a stipulation reflecting this agreement.

Please find attached subpoenas for the depositions of Howard Hu and Bruce Lanphear. Will you accept service on their behalf?

Best,
Brandon

**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
O: (202) 616-9174 | M: (202) 598-9562
brandon.adkins@usdoj.gov

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Tuesday, September 10, 2019 5:08 PM
**To:** Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Cc:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>; Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Subject:** Re: EPA's Request for Additional Disclosures

Brandon,

I cannot agree to extending the hearing deadline. I previously agreed to extend the motion and hearing dates in a manner that would accommodate Debbie's vacation schedule, and in turn had to re-schedule a family vacation to Hawaii. After settling on these new dates, I booked non-refundable tickets to Hawaii for Nov 8th, including lodging. It would be an enormous personal expense for me to cancel these tickets. Further, depending on the Court's schedule, moving the hearing date may affect other aspects of the schedule, including the trial date, which causes me major concern.

As an additional matter, I don't believe there is any compelling need to push these other dates back, as neither witness should have any bearing on a MSJ, and even if they did, you would have over a week to incorporate their testimony. This is standard fare in litigation, and no basis for altering the schedule.

I have repeatedly provided dates for both witnesses—first in July, then in early August, and then on Sept 16/18. I remain open to agreeing to rescheduling these depositions to Sept 24/25,

but it would be unfair for Plaintiffs to be penalized for this accommodation. I hope, therefore, that you will reconsider your position on the motion/hearing date.

Alternatively, we can maintain the current date for Dr. Lanphear's deposition (Sept 18), and do Dr. Hu's deposition on Sept 24, which will give you additional time to incorporate this testimony into your motion.

I am available to meet and confer on this should you wish to discuss further.

Sent from my iPhone

---

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Sent:** Tuesday, September 10, 2019 3:52 PM
**To:** Michael Connett
**Cc:** Do, John Thomas (ENRD); Carfora, Debra (ENRD)
**Subject:** Re: EPA's Request for Additional Disclosures

Michael,

Thanks again. We will agree to take Drs. Hu's and Lanphear's depositions a week later on September 24 and 25 as long as we can agree to extend the motions date and hearing date commensurate with the extension.

Best,
Brandon

———

**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
O: (202) 616-9174 | M: (202) 598-9562
brandon.adkins@usdoj.gov

On Sep 9, 2019, at 6:44 PM, Michael Connett <mconnett@waterskraus.com> wrote:

> Brandon:
>
> Per our conversation just now, Dr. Hu was not able to keep Sept 16 available, but
> he will make himself available on Sept 24 (in Seattle). Further, in light of your

interest in doing the depositions back-to-back, I asked Dr. Lanphear if he might be available for a Sept 24/25 deposition. He stated that he could do Sept 25, but he will still need to do the deposition in Bellingham (which is a relatively short, 2-hour car ride from Seattle).

I thus propose that we schedule Dr. Hu's deposition for the 24th, and Dr. Lanphear's for the 25th. Further, as I mentioned, Dr. Hu's schedule is very busy right now, and continually filling up - so it will be important to finalize the dates ASAP, and hopefully by tomorrow, so as to secure them.

Lastly, if you do decide to do the depositions on the 24/25th, we will need to work out a stipulation. As I mentioned during our call, I suggest we draft a narrow stipulation that extends expert discovery to the 25th for the sole purpose of completing Hu's and Lanphear's deposition. (We did something similar for fact discovery, where we extended the deadline for certain enumerated purposes.)

Please let me know how EPA would like to proceed.

Michael



**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

---

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Sent:** Monday, September 9, 2019 2:41 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>; Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Subject:** RE: EPA's Request for Additional Disclosures

Michael,

Thank you for supplementing Plaintiffs' disclosures regarding Drs. Hu and Lanphear. We would like to take their depositions.

I called and left a message to inquire whether it would be feasible to depose Drs. Hu and Lanphear on the same date, with an option to carry the second deposition into the next day if necessary (e.g., if you need significant time in addition to EPA's time questioning the witness that extends the total time of the deposition). If doing so is not feasible, can you please double-check whether Dr. Lanphear will make himself available in Seattle?

I'm available to discuss if easier. My mobile number is in my signature block.

Thanks very much.

Best regards,
Brandon

——

**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
O: (202) 616-9174 | M: (202) 598-9562
brandon.adkins@usdoj.gov

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Thursday, August 15, 2019 5:40 PM
**To:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Cc:** Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>; Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>
**Subject:** Re: EPA's Request for Additional Disclosures

Thank you Debbie. I am fine with the modified language that you've proposed so you have my consent to sign and file. We will endeavor to get you the disclosures no later than Aug 26.

Sent from my iPhone

---

**From:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Sent:** Thursday, August 15, 2019 5:17 PM
**To:** Michael Connett
**Cc:** Adkins, Brandon (ENRD); Do, John Thomas (ENRD)
**Subject:** RE: EPA's Request for Additional Disclosures

Michael,

EPA is amenable to your proposal.  Please note, the sooner Plaintiffs serve amended disclosures for Dr. Hu and Dr. Lanphear, the sooner EPA can confirm the potential depositions.  Additionally, should Plaintiffs serve the amended disclosures after August 26, EPA does not guarantee it can confirm the depositions on or before Sept 4.

Attached is a slightly modified draft stipulation for filing.  Please confirm your authorization to sign and file.

Thanks,

DEBRA J. CARFORA, Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division
202.514.2640

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Saturday, August 10, 2019 7:38 PM
**To:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Cc:** Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>; Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>
**Subject:** re: EPA's Request for Additional Disclosures

Debbie,

Pursuant to our conversation yesterday, I am writing to confirm that - in the spirit of cooperation, and in the interests of avoiding the scheduling disruptions that a discovery letter brief may create - Plaintiffs will voluntarily provide you the additional disclosures that you have requested for Drs. Hu and Lanphear (i.e., to provide a more detailed summary of the facts upon which each opinion is based). So that our willingness to do this is not misconstrued, I wish to make clear that we stand by our position that these disclosures are neither necessary nor required.

In July, EPA had stated that, if it were to depose Drs. Hu and Lanphear, it would do so during the week of August 5th, while the parties were in Seattle for the Lewis deposition. Both experts (who had previously made themselves available for the week of July 22) made themselves available for this week, but EPA

ultimately declined to take their depositions.

During our conversation yesterday, you indicated that EPA may still seek to depose Hu and/or Lanphear.  IN order to avoid any further disputes about this, we will not object to finding an additional date for their deposition should you choose to depose them. I communicated with both experts yesterday, and Dr. Hu stated that he can make himself available in**Seattle on Sept 16th**, and Dr. Lanphear stated he can make himself available in**Bellingham on Sept 18th.**

You had mentioned that EPA will likely need a week upon receiving the disclosures to determine if it will elect to take Hu's or Lanphear's depositions. As such, Plaintiffs will endeavor to get you the amended disclosures by **August 26**. In exchange, we ask that you confirm no later than**Sept 4th**if you will take the deposition(s).

In light of the above, I suggest we file a stipulation with the Court on Monday asking for an extension to the expert cut-off to Sept 18. I have attached a draft (modified from the version you sent yesterday) for your review.

If you would like to discuss any of the above, I will be available by cell at 802-355-0999.

Michael

**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

---

**From:** Michael Connett
**Sent:** Friday, August 9, 2019 9:46 AM
**To:** Debra Carfora <debra.carfora@usdoj.gov>
**Cc:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>; Do <john.do@usdoj.gov>
**Subject:** Meet and confer re-cap

Debbie: Per our discussion just now:

(1) The parties are in agreement that, for expert depositions, questions about communications between experts and counsel will be limited to the 3 exceptions to trial preparation communications set forth in FRCP 26. All questions that go beyond this scope are privileged.

(2) I proposed that we pick a date in Sept where we exchange our respective reimbursable expert expenses (deposition fees; airfare, hotel, etc), and that we identify the timeframe for payment. (I also stated that I could send you the receipts I already have if that would help speed up the process.) You stated that you will check with DOJ to clarify the timeframe in which you can make the payment. I asked that it be two weeks from the time of exchange, but you stated that you were not sure if this would be possible, and would seek to give me clarification by Monday.

(3) We discussed the scheduling implications of EPA's proposed letter brief. You stated that, if the Court has not made its decision by early Sept, EPA would likely move to stay the litigation. I stated that Plaintiffs will consider voluntarily providing (despite the fact that we do not believe they are in any way necessary or required) the additional disclosures that you seek so as to avert the significant scheduling problems that the letter brief could create.

Michael

Sent from my iPhone

# EXHIBIT K

| | |
|---|---|
| **From:** | Michael Connett |
| **To:** | Carfora, Debra (ENRD); Do, John Thomas (ENRD); Adkins, Brandon (ENRD) |
| **Subject:** | Plaintiffs" Second Amended Expert Disclosures |
| **Date:** | Tuesday, August 27, 2019 12:29:10 AM |
| **Attachments:** | Plaintiffs 2nd Amended Expert Disclosures_FINAL.pdf |
| | Hu_Supplemental Summary of Facts.pdf |

Counsel: Please find attached Plaintiffs' Second Amended Expert Disclosures, along with a Supplementary Summary of the Facts upon which Dr. Hu's opinions will be based. We are still working expeditiously to complete Dr. Lanphear's report, and will be providing it ASAP. As a courtesy, we will extend the deadline for your decision on Lanphear's deposition proportionate to the length of time it takes us to produce the supplemental summary.

**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

1
2
3
4
5
6

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

7
8
9

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### AT SAN FRANCISCO

10
11
12
13
14
15
16

| | |
|---|---|
| FOOD & WATER WATCH, et al.,     ) | |
|     ) | |
| Plaintiffs,     ) | Civ. No. 17-CV-02162-EMC |
| vs.     ) | |
|     ) | **PLAINTIFFS' SECOND AMENDED** |
| U.S. ENVIRONMENTAL PROTECTION     ) | **EXPERT DISCLOSURES** |
| AGENCY, et al.     ) | |
|     ) | |
| Defendants.     ) | |
|     ) | |

17
18

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs hereby provide their Second Amended Expert Disclosures.

19
20
21
22

**Jaqueline Calderon Hernández, PhD**
**Universidad Autonoma de San Luis Potosi**
**Avenida Sierra Leona No. 550, CP 78210**
**Colonia Lomas Segunda Seccion, San Luis Potosi, SLP, Mexico**
**Tel: (52-444) 826 2300 ext 8459**

23
24
25
26
27
28

Dr. Calderon Hernández is an environmental health scientist who has studied fluoride's impact on cognitive development in children for the better part of the past 20 years. Consistent with her report, Dr. Calderon Hernández will testify, *inter alia*, that (1) her studies of Mexican communities support, and are consistent with, fluoride being a neurotoxicant that causes cognitive deficits; (2) fluoride's effects on cognition can occur in the absence of demonstrable IQ loss; (3) the developing brain during the *in utero* period has a heightened sensitivity to environmental toxicants, including fluoride; and (4) the doses

1

commonly experienced by pregnant women in communities with fluoridated drinking water are associated with significant cognitive deficits in her prospective cohort data. Dr. Calderon Hernández's report, curriculum vitae, and list of publications from the previous 10 years were produced on June 27, 2019. This is the first time that Dr. Calderon Hernández has agreed to serve as an expert in litigation. The exhibits that Dr. Calderon Hernández intends to use at trial are included in her report, and the documents cited therein. Dr. Calderon Hernández's hourly rate for deposition and trial testimony is $250.

**Ole Fejerskov, DDS, PhD, Dr.Odont**
**Institute of Biomedicine**
**Aarhus University**
**Høegh-Guldbergs Gade 10**
**DK-8000 Aarhus C**
**Denmark**
**Tel: +45 40372027**

Dr. Fejerskov is a dental researcher who has written and edited 10 international textbooks on fluoride and dental caries, and has published hundreds of research papers on fluoride and oral health issues in peer-reviewed scientific journals. Since 1973, Dr. Fejerskov's research has focused on how fluoride affects the mineralization of teeth, including the development of caries and dental fluorosis. Consistent with his report, Dr. Fejerskov will testify, *inter alia*, that: (1) ingesting fluoride is an unnecessary and ineffective way of controlling caries because fluoride's beneficial effects come from topical contact with teeth, not ingestion; (2) the evidence on the beneficial effects of individual-use topical fluoride products, like toothpaste, is much stronger than the evidence for water fluoridation; (3) caries has declined significantly throughout the developed world in communities with and without water fluoridation, with little demonstrable difference in caries rates between communities that add fluoride to water and communities that do not; (4) fluoride exposure during the *in utero* and early infancy period is contraindicated for oral health purposes, and (5) in light of current data on the relationship between waterborne fluoride, caries, and dental fluorosis, adding fluoride to water is no longer justified from an oral health perspective.

Dr. Fejerskov's report, curriculum vitae, and list of publications from the previous 10 years were produced on June 27, 2019. This is the first time that Dr. Fejerskov has agreed to serve as an expert in litigation. The exhibits that Dr. Fejerskov intends to use at trial are included in his report, and the documents

cited therein. Dr. Fejerskov's hourly rate for deposition and trial testimony is $500.

**Philippe Grandjean, MD, DMSc**
**Harvard T.H. Chan School of Public Health**
**University of Southern Denmark**
**J. B. Winsløws Vej 17, 2. sal.**
**5000 Odense C**
**Denmark**
**Tel: 617-331-3317**

Dr. Grandjean is a physician, environmental epidemiologist, and professor at the Harvard School of Public Health, who has published extensively on the impact of early life exposures to chemicals on the developing brain, including fluoride. Dr. Grandjean has been involved with fluoride research since the 1980s, has authored criteria documents on fluoride for the World Health Organization and European Commission, was an invited peer-reviewer of the National Research Council's (NRC) authoritative 2006 report on fluoride toxicology, and has published studies on the effect of fluoride on childhood IQ, including a meta-review of the epidemiological evidence.

Consistent with his June 27, 2019 report, Dr. Grandjean will testify, *inter alia*, that (1) the neurotoxicity of fluoride is supported by studies of occupationally exposed workers, laboratory animals, and communities exposed to elevated levels of fluoride in water and polluted air; (2) recent prospective cohort studies of prenatal fluoride exposure and IQ, funded by the National Institutes of Health, are high quality studies that leave little doubt that developmental neurotoxicity is a serious risk associated with elevated fluoride exposure; (3) fluoridated drinking water is associated with IQ losses that are substantial and of economic and societal concern; and (4) application of the benchmark dose (BMD) method to the new prospective data shows that the levels of fluoride added to water in fluoridation programs exceed the science-based limit needed to protect against developmental neurotoxicity.

Dr. Grandjean will also be providing the opinions set forth in his August 14, 2019 rebuttal report.

Dr. Grandjean's reports, curriculum vitae, list of publications from the previous 10 years have been previously produced.. The exhibits that Dr. Grandjean intends to use at trial are included in his reports, and the documents cited therein. Dr. Grandjean's hourly rate for deposition and trial testimony is $500.

**Howard Hu, MD, MPH, ScD**
**University of Washington School of Public Health**
**12544 42nd Avenue NE**
**Seattle, WA 98125**
**Tel. 206-685-2378**

Dr. Hu is a physician-scientist trained in internal medicine, occupational/environmental medicine, epidemiology and general public health who has held leadership positions in science and academia for over 2 decades. Dr. Hu has published extensively on the impact of environmental chemicals, including fluoride, on neurodevelopment. Currently, Dr. Hu is the Principal Investigator of an ongoing study that is examining the impact of early-life exposures to fluoride on neurobehavioral development in a cohort in Mexico City known as the Early Life Exposures in Mexico to Environmental Toxicants (ELEMENT) project. ELEMENT is a pregnancy and birth cohort that Dr. Hu co-founded in 1993; it has been continuously funded since 1993 by grants from the U.S. National Institute for Environmental Health Sciences (NIEHS). Since its inception, ELEMENT has evolved into a highly successful, award-winning project involving collaborators at various academic institutions throughout North America.  It has generated over 70 high-impact publications and has provided evidence contributing towards health policies around the world.

Dr. Hu has agreed to provide testimony (as a non-retained expert) about his prospective study of fluoride and neurodevelopment in the ELEMENT cohort. Although not required to prepare a report, Dr. Hu produced a report on June 27, 2019 explaining the scope and basis of his testimony. Consistent with this report, Dr. Hu will explain for the Court the rigorous design, conduct, and findings of the ELEMENT study. As detailed in the papers attached to Dr. Hu's report, prenatal fluoride exposure is associated with large and significant effects on IQ and ADHD symptoms in the ELEMENT cohort at levels of exposure that are common in the general population.   Dr. Hu will testify that his prospective cohort studies of fluoride's neurodevelopmental effects are methodologically rigorous studies that provide scientifically reliable and robust results. Dr. Hu will further testify that the results of his studies are consistent with and support the conclusion that fluoride is a developmental neurotoxicant at levels of exposure seen in the

general population.

Dr. Hu's report, curriculum vitae, list of publications from the previous 10 years, and list of cases in which he has provided testimony in the past four years were disclosed on June 27, 2019. Further, pursuant to the parties' recent meet and confers, Plaintiffs are producing concurrently with these Second Amended Expert Disclosures a report that further summarizes the facts upon which Dr. Hu's opinions will be based.

Dr. Hu has asked for a reasonable fee for his testimony in this case, which the federal rules permit for non-retained experts.   Typically, Dr. Hu charges $1,000 an hour for depositions, but since he is providing testimony in this case as a public service, he is willing to drop his rate to $300 per hour.

**Bruce Lanphear, MD, MPH**
**Simon Fraser University**
**Blusson Hall**
**8888 University Dr.**
**Burnaby, British Columbia V5A 1S6**
**Canada**
**Tel: 778-387-3939**

Dr. Lanphear is a clinician scientist and epidemiologist who has published extensively on the impact of environmental chemicals on the developing brain. Dr. Lanphear's research on the cognitive deficits caused by low levels of lead is widely considered seminal in the field, and has helped shape public health policies in the United States and abroad. Dr. Lanphear is currently the Co-Principal Investigator of an NIH-funded prospective study of the MIREC cohort in Canada that is investigating the neurodevelopmental effects of early-life exposures to fluoride. Dr. Lanphear has agreed to provide testimony (as a non-retained expert) about the methods and findings of his studies of fluoride and IQ in the MIREC cohort. Although not required to produce a report, Dr. Lanphear produced a report on June 27, 2019 that explains the opinions he will offer, along with the published and unpublished manuscripts that form the basis of his opinions. At that time, Dr. Lanphear asked that the unpublished manuscripts be treated as confidential because premature public disclosure could jeopardize their publication. Subsequent to the disclosure, one of the manuscripts has been published in the *Journal of the American Medical Association – Pediatrics*. The remaining unpublished manuscript should continue to be treated as confidential, not publicly distributed, and only to be used for purposes of this litigation.

Consistent with his June 27, 2019 report, and the data upon which it is based, Dr. Lanphear will testify, *inter alia*, that: (1) pregnant women living in fluoridated regions in Canada have almost two times the amount of fluoride in their urine as women living in non-fluoridated regions, (2) the average urinary fluoride concentration for pregnant women living in Canadian communities with fluoridated drinking is almost the same as those of the ELEMENT cohort being studied by Dr. Hu; (3) the study of fluoride and IQ in the MIREC cohort significantly enhances the quality of data related to fluoride's neurotoxicity because the study employs a prospective design that includes multiple measures of fluoride exposure during pregnancy (including biomonitoring data) and IQ outcomes that have been evaluated in one of the world's most comprehensively characterized and geographically diverse birth cohorts; (4) consistent with Dr. Hu's study of the ELEMENT cohort,  Dr. Lanphear has found that prenatal fluoride exposure is significantly associated with lower intellectual abilities in 3-4 year old children, and these associations remain large and significant when controlling for relevant covariates; (5) based on the convergent results from the MIREC and ELEMENT cohorts, the *in utero* period is likely a susceptible period of life vis-à-vis fluoride toxicity; (6) it is advisable and prudent for pregnant women to begin taking steps to reduce their fluoride intake, including but not limited to reducing their consumption of fluoridated water; (7) exposure to fluoridated water in infancy, particularly among formula fed infants, is associated with diminished intellectual abilities in the MIREC cohort; and (8) the association between infant exposure to fluoridated water and reduced IQ in the MIREC cohort remains significant after controlling for fetal fluoride exposure and other relevant covariates, suggesting that the susceptibility to fluoride's adverse neurological effects extends into infancy.

Dr. Lanphear's report, curriculum vitae, list of publications from the previous 10 years, and list of cases in which he has provided testimony in the past four years, were produced on June 27, 2019. Further, pursuant to the parties' recent meet and confers, Plaintiffs will be be producing a report that further summarizes the facts upon which Dr. Lanphear's opinions will be based.

Dr. Lanphear will not be charging a fee for his deposition or trial testimony.

PLAINTIFFS' SECOND AMENDED EXPERT DISCLOSURES

**Kathleen M. Thiessen, PhD**
**Oak Ridge Center for Risk Analysis**
**102 Donner Dr.**
**Oak Ridge, TN 37830**
**Tel. 865-483-6111**

Dr. Thiessen is a risk assessment scientist at the Oak Ridge Center for Risk Analysis with thirty years of experience evaluating exposures, doses, and risks to human health from trace levels of contaminants in the environment, including fluoride. Dr. Thiessen has been an invited panelist for several of the National Research Council's (NRC) reviews of fluoride's hazards, including the NRC's report *Fluoride in Drinking Water: A Scientific Review of EPA's Standards*, which the Centers for Disease Control and EPA both consider an authoritative summary of fluoride's hazards. Dr. Thiessen has also authored health assessments for the EPA, including a Health Issue Assessment for fluorides.

Consistent with her June 27, 2019 report, Dr. Thiessen will testify, *inter alia*, that: (1) based on the hazard identification principles set forth in EPA's *Guidelines for Neurotoxicity Risk Assessment*, there is sufficient evidence to conclude that neurotoxicity is a hazard of fluoride exposure; (2) convergent data from experimental animal studies and epidemiological studies of human populations, alongside considerations of pharmacokinetics and biological plausibility, strongly indicate that neurotoxicity is a more sensitive effect of fluoride exposure than the effect EPA assumes to be the most sensitive (i.e., severe dental fluorosis); (3) identifiable subsets of the population have heightened susceptibility to the risk of harm from fluoridation chemicals, including: the fetus; bottle-fed infants; the elderly; individuals with nutrient deficiencies, kidney disease, and/or high-water intake; and populations with specific genotypes; (4) EPA's current reference dose (RfD) for fluoride (0.08 mg/kg/day) is not protective against neurotoxicity, including loss of cognitive function; (5) EPA's current RfD is based on improper risk management (vs. risk assessment) considerations and an outdated understanding of fluoride's anti-caries mechanism; and (6) fluoridation chemicals present an "unreasonable risk" of neurotoxic effects, including IQ loss, if assessed under the same analytical framework that EPA uses in its risk evaluations of other chemicals under the Toxic Substance Control Act.

Dr. Thiessen will also be providing the opinions set forth in her August 1, 2019 rebuttal report.

Dr. Thiessen's reports, curriculum vitae, and list of publications from the previous 10 years, have been previously produced. Dr. Thiessen has not served as an expert witness in the previous four years. The exhibits that Dr. Thiessen intends to use at trial are included in her report, and the documents cited therein.

Dr. Thiessen's hourly rate for deposition and trial testimony is $300.

**Christine R. Wells, PhD**
**UCLA Statistical Consulting Group**
**79 Maynard Ave.**
**Newbury Park, CA  91320**
**Tel. 805-469-4726**

Dr. Wells is a statistical consultant and senior member of the Statistical Consulting Group for the University of California Los Angeles (UCLA). Dr. Wells has assisted more than 1,000 researchers on a wide array of data analysis projects, and has co-authored peer-reviewed publications involving statistical analyses of public health data, including data related to fluoride and teeth. Consistent with her June 27, 2019 report, Dr. Wells will explain the results of her bivariate and multivariate analyses of a 17-year prospective cohort study funded by the National Institute of Health (NIH). The study, known as the Iowa Fluoride Study (IFS), is the only study to prospectively investigate the effect of total daily fluoride ingestion (from birth to adolescence) on the development of caries. Dr Wells will testify that the IFS data shows no significant effect of pre-eruptive fluoride ingestion on caries, and that the IFS study supports the view that pre-eruptive ingestion of fluoride is an ineffective means of preventing caries.  Dr. Wells will also be providing the opinions set forth in her August 1, 2019 rebuttal report.

Dr. Wells's reports, curriculum vitae, and list of publications from the previous 10 years, have been previously produced. This is the first time that Dr. Wells has agreed to serve as an expert in litigation. The exhibits that Dr. Wells intends to use at trial are included in her report, and the documents cited therein. Dr. Wells's hourly rate for deposition and trial testimony is $200.


Dated:   August 26, 2019                                Respectfully submitted,


                                                        */s/ Michael Connett*
                                                        MICHAEL CONNETT
                                                        Attorney for Plaintiffs

PLAINTIFFS' SECOND AMENDED EXPERT DISCLOSURES

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5 and the mutual consent of the parties that email to counsel will constitute proper service of discovery, I served a copy of the foregoing *Plaintiff's Amended Expert Disclosures* upon Defendants on August 26, 2019 via email to the following counsel:

Debra J. Carfora
John T. Do
Brandon Adkins
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC. 20044-7611
debra.carfora@usdoj.gov
john.do@usdoj.gov
brandon.adkins@usdoj.gov

*Attorneys for Defendants*

Dated:   August 26, 2019

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

## SUMMARY OF THE FACTS AND OPINIONS TO WHICH DR. HOWARD HU IS EXPECTED TO TESTIFY

**(1) The ELEMENT prospective cohort studies of fluoride's neurodevelopmental effects are methodologically rigorous studies that provide scientifically reliable and robust results.**

ELEMENT (Early Life Exposures in Mexico to Environmental Toxicants) is a pregnancy and birth cohort that Dr. Hu co-founded in 1993 in partnership with the Instituto Nacional de Salud Publica (INSP—the National Institute of Public Health in Mexico) and that has been continuously funded since 1993 by grants from the U.S. National Institute for Environmental Health Sciences (NIEHS). It has had the general aim of understanding the impact of early life environmental exposures on developmental outcomes. Since its inception, ELEMENT has evolved into a highly successful, award-winning project involving collaborators at INSP, the University of Michigan, and other academic institutions in the U.S. and Mexico. It has generated over 70 high-impact publications and provided evidence contributing towards environmental health policies around the world. For example, as noted in a joint publication by NIEHS and EPA, "evidence from ELEMENT has informed U.S. and Mexican lead exposure guidelines, including the 2010 CDC "Guidelines for the identification and Management of Lead Exposure in Pregnant and Lactating Women," among others. (NIEHS/EPA 2017).

Dr. Hu's project on fluoride and neurobehavioral development began in 2012, leveraging the unique ELEMENT resources of archived biological samples and data to measure the prenatal and postnatal exposures of ELEMENT offspring to fluoride and relate those measurements to rigorously measured neurobehavioral outcomes taken at multiple points of time. As NIEHS and EPA have recognized, "archives of biological samples from birth cohort studies . . . provide critical information on the prenatal and childhood determinants of adult disease." (NIEHS/EPA 2017).

The ELEMENT cohort consists of mother-child pairs in which the mothers were enrolled before or during early pregnancy.  All were attending several maternity hospitals in Mexico City. Samples of maternal urine taken during pregnancy which had been archived were analyzed for fluoride content.  Urine fluoride is a biomarker of total fluoride exposure from all sources.  Socio-demographic and health information had also been collected from the women.  Other factors that could be associated with neurodevelopmental outcomes were also measured, including maternal age, maternal education, maternal IQ, birth order, birth weight, gestational age at delivery, maternal smoking, quality of the children's home environment (HOME score), and maternal exposure to known neurotoxins such as lead and mercury.

All urine analyses were conducted rigorously, with documented QC/QA procedures described in the published papers, as discussed further below.  The neurocognitive (IQ) tests and measures of ADHD were conducted blind to the fluoride exposure level of the mother and child, and used widely accepted assessment methods for measuring neurocognitive and neurobehavioral function.  Other covariates, such as Pb and Hg were measured using similarly rigorous and widely accepted methods.

1

Thus far, Dr. Hu's team have published two studies on fluoride's neurodevelopmental effects, both of which were peer-reviewed in leading scientific journals.  Extensive details of methods and analyses were included in both papers, as discussed herein.

<u>Methods of 2017 Study on IQ (Bashash, et al 2017)</u>

### *Participants*

Of the four ELEMENT cohorts that have been described elsewhere (Afeiche et al. 2011), Cohort 1 and Cohort 2B recruited participants at birth and did not have archived maternal-pregnancy urine samples required for this analysis; they were thus excluded. Mothers for Cohort 2A (*n* = 327) and 3 (*n* = 670) were all recruited from the same three hospitals in Mexico City that serve low- to moderate income populations. Cohort 2A was an observational study of prenatal lead exposure and neurodevelopmental outcomes in children (Hu et al. 2006). Women who were planning to become pregnant or were pregnant were recruited during May 1997-July 1999 and were considered eligible if they consented to participate; were < 14 wk of gestation at the time of recruitment; planned to stay in the Mexico City study area for at least 5 y; did not report a history of psychiatric disorders, high- risk pregnancies, gestational diabetes; did not report current use of daily alcohol, illegal drugs, and continuous prescription drugs; and were not diagnosed with preeclampsia, renal disease, circulatory diseases, hypertension, and seizures during the index pregnancy.

Cohort 3 mothers were pregnant women (<14wk of gestation) recruited from 2001 to 2003 for a randomized trial of the effect of calcium supplementation during pregnancy on maternal blood lead levels (Ettinger et al. 2009). Eligibility criteria were the same as for Cohort 2A, and 670 agreed to participate.

### *Exposure Assessment*

By virtue of living in Mexico, individuals participating in the study have been exposed to fluoridated salt (at 250 ppm). A study by Martinez-Mier (2005) analyzed 48 samples of the most popular brands of salt, obtained from supermarkets in Mexico City.  The samples had a mean fluoride content of 232 ppm, which is within the range recommended for fluoridated salt in Mexico.

Exposure to fluoride in drinking water was likely minimal, as a recent study by Dr. Hu's team found that the average concentration of fluoride in tap water and bottled water in Mexico City is 0.14 ppm and 0.16 ppm, respectively. (Cantoral, et al. 2019). Salt fluoridation programs are designed to produce "optimal" daily fluoride exposures that approximate the exposures that are found in areas with artificially fluoridated drinking water.

Mother-child pairs with at least one archived urine sample from pregnancy and measures of neurocognitive function in the offspring were included in this study. In terms of when the archived samples were collected, the pregnant mothers were invited for assessments with the collection of samples during trimester 1 (13.6 ±2.1 wk for Cohort 3 and 13.7 ± 3.5 wk for Cohort 2A), trimester 2 (25.1 ± 2.3 wk for Cohort 3 and 24.4 ± 2.9 wk for Cohort 2A), and trimester 3 (33.9 ± 2.2 wk for Cohort 3 and 35.0 ± 1.8 wk for Cohort 2A).

2

A spot (second morning void) urine sample was targeted for collection during each trimester of pregnancy of ELEMENT mothers as well as the offspring children at the time of their measurements of intelligence at 6-12 y old. The samples were collected into fluoride-free containers and immediately frozen at the field site and shipped and stored at -20°C at the Harvard T. H. Chan School of Public Health (HSPH), and then at -80°C at the University of Michigan School of Public Health (UMSPH).

A procedure for urine analysis of fluoride described elsewhere (Martinez-Mier et al. 2011) was adapted and modified for this study. The fluoride content of the urine samples was measured using ion-selective electrode-based assays. Quality control measures included daily instrument calibration, procedural blanks, replicate runs, and the use of certified reference materials (Institut National de Sante Publique du Quebec, Cat #s 0910 and 1007; NIST3183, Fluoride Anion Standard). Urinary fluoride concentrations were measured at the UMSPH and the Indiana University Oral Health Research Institute (OHRI) as previously described (Thomas et al. 2016). A validation study comparing measures taken by the two labs in the same samples revealed a between-lab correlation of 0.92 (Thomas et al. 2016).

There were a total of 1,484 prenatal samples measured at the UMSPH lab. All of these samples were measured in duplicate. Of these, 305 (20%) of them did not meet the quality control criteria for ion-selective electrode-based methods (i.e., RSD<20% for samples with F level <0.2 ppm or RSD<10% when F level >0.2 ppm) (Martinez-Mier et al. 2011). Of these 305, 108 had a second aliquot available and were successfully measured at the OHRI lab in Indiana (sufficient urine volume was not available for the remaining 197 samples). The OHRI lab in Indiana also measured an additional 289 samples. Of the 397 total samples measured at the OHRI lab in Indiana, 139 (35%) were measured in duplicate, for which >95% complied with the quality control criteria above; thus, all 139 values were retained. The remaining 258 (65%) were not measured in duplicate because of limitations in available urine volume, but were included in the study given the excellent quality control at the OHRI lab. In total, there were 1,576 prenatal urine samples with acceptable measures of fluoride.

Of these 1,576 urine samples, 887 also had data on urinary creatinine and were associated with mother-offspring pairs who had data on the covariates of interest and GCI or IQ in the offspring. The urinary creatinine data were used to correct for variations in urine dilution at the time of measurement (Baez et al. 2014). Creatinine-adjusted urinary fluoride concentrations were obtained for each maternally derived sample by dividing the fluoride concentration (MUF) in the sample by the sample's creatinine concentration (MUC), and multiplying by the average creatinine concentration of samples available at each trimester (MUCaverage). The values of average creatinine concentration used for the MUCaverage at each trimester were derived from the larger pool of trimester-1, -2, and -3 samples from Cohorts 2A and 3 examined in a previous report on maternal fluoride biomarker levels (Thomas et al. 2016): 100.81, 81.60, and 72.41 (mg/L), respectively. For each woman, an average of all her available creatinine-adjusted urinary fluoride concentrations during pregnancy (maximum three samples and minimum one sample) was computed and used as the exposure measure (MUFcr). For children, as creatinine measurements were not available, urinary fluoride values (CUF) were corrected for specific gravity (SG) using the formula $CUF_{sg} = CUF (1.02 - 1)/(SG-1)$ (Usuda et al. 2007).

3

After calculating MUFcr for the 887 urine samples noted above, 10 values of MUFcr were identified as extreme outliers (>3.5SDs) and were dropped, leaving 877 measures of MUFcr. These 877 measures of MUFC1 stemmed from 512 unique mothers. Of these 512, 71 participants had measurements from each of the three trimesters; 224 had measurements from two of the three trimesters (74, T1 and T2; 131, T1 and T3; and 19, T2 and T3); and 217 had measurements from only one of the trimesters (159, Tl; 34, T2; and 24, T3).

### *Measurement of Outcomes*

At age 4 years, neurocognitive outcomes were measured using a standardized version of McCarthy Scales of Children's Abilities (MSCA) translated into Spanish (McCarthy 1991). MSCA evaluates verbal, perceptual-performance, quantitative, memory, and motor abilities of preschool-aged children, and it has previously been successfully used in translated versions (Braun et al. 2012; Julvez et al. 2007; Kordas et al. 2011; Puertas et al. 2010). For this analysis, Dr. Hu's team focused on the General Cognitive Index (GCI), which is the standardized composite score produced by the MSCA (McCarthy 1991). For children 6-12 y old a Spanish-version of the Wechsler Abbreviated Scale of Intelligence (WASI) (Wechsler 1999) was administered. WASI includes four subtests (Vocabulary, Similarities, Block Design, and Matrix Reasoning), which provide estimates of Verbal, Performance, and Full-Scale IQ (Wechsler 1999). Both tests were administered by a team of three psychologists who were trained and supervised by an experienced developmental psychologist (L.S.). This team of three psychologists applied all of the McCarthy tests as well as the WASI-FSIQ tests. At the time of follow-up visits (age 4 and 6-12 y), each child was evaluated by one of the psychologists who was blind to the children's fluoride exposure. The inter-examiner reliability of the psychologists was evaluated by having all three psychologists participate in assessments on a set of 30 individuals. For these 30, the inter-examiner reliability of the psychologists was evaluated by calculating the correlation in GCI scores by two of the psychologists with the scores of a third psychologist whom they observed applying the test in all three possible combinations with 10 participants for each observers-examiner pair (i.e., psychologist A (applicant) was observed by psychologist B and psychologist C; psychologist B (applicant) was observed by psychologist A and psychologist C; and psychologist C (applicant) was observed by psychologist A and psychologist B). The mean observer-examiner correlation was 0.99. All raw scores were standardized for age and sex (McCarthy 1991). Inter-examiner reliability was not examined on the WASI test.

### *Measurement of Covariates*

Data were collected from each subject by questionnaire on maternal age (and date of birth), education, and marital status at the first pregnancy visit; on birth order, birth weight, and gestational age at delivery; and on maternal smoking at every prenatal and postnatal visit. Gestational age was estimated by registered nurses. Maternal IQ was estimated using selected subtests of the Wechsler Adult Intelligence Scale (WAIS)-Spanish (Information, Comprehension, Similarities, and Block Design), which was standardized for Mexican adults (Renteria et al. 2008; Wechsler et al. 1981). Maternal IQ was measured at the study visit 6 mo after birth or at the 12-mo visit if the earlier visit was not completed.

4

The quality of the children's individual home environments was assessed using an age-appropriate version of the HOME score. However, the measure was not available for all observations because it was only added to on-going cohort evaluation protocols beginning in April 2003, when a version of the HOME score instrument that is age-appropriate for children 0-5 y old was adopted, following which a version of the HOME score instrument that is age-appropriate for children >6y old was adopted in September 2009 (Caldwell and Bradley 2003). Thus, the study adjusted for HOME score using the measures for 0- to 5-y-old children in the subset of children who had this data in analyses of GCI, and adjusted for HOME score using the measures for >6-y-old children in the subset of children who had this data in analyses of IQ.

### *Statistical Analyses*

Univariate distributions and descriptive statistics were obtained for all exposure variables, outcome variables, and model covariates. For each variable, observations were classified as outliers if they were outside the bounds of the mean±3.5 SDs. Primary analyses were conducted with exposure and outcome outliers excluded. Statistical tests of bivariate associations were conducted using chi-square tests for categorical variables and analysis of variance (ANOVA) to compare the means of the outcomes or exposure within groups defined according to the distribution of each covariate. Spearman correlation coefficients were used to measure the correlation between MUFcr and CUFsg. Regression models were used to assess the adjusted associations between prenatal fluoride and each neurocognitive outcome separately. Generalized additive models (GAMs) were used to visualize the adjusted association between fluoride exposure and measures of intelligence [SAS statistical software (version 9.4; SAS Institute Inc.)]. Because the pattern appeared curvilinear, and because GAMs do not yield exact p-values for deviations from linearity, a Wald *p*-value of a quadratic term of fluoride exposure was used to test the null hypothesis that a quadratic model fit the data better than the model assuming a linear relationship, and thus obtained a p-value for deviation from linearity of the fluoride-outcome associations. Residual diagnostics were used to examine other model assumptions and identify any additional potentially influential observations. Visual inspection of default studentized residual versus leverage plot from SAS PROC REG did not identify potential influential observations. Visual inspection of the histogram of the residuals did not indicate lack of normality; however, a fanning pattern in the residual versus predicted value plot indicated lack of constant variance (data not shown). Hence, robust standard errors were obtained using the "empirical" option in SAS PROC GENMOD.

The overall strategy for selecting covariates for adjustment was to identify those that are well known to have potential associations with either fluoride exposure or cognitive outcomes and/or are typically adjusted for as potential confounders in analyses of environmental toxicants and cognition. All models were adjusted for gestational age at birth (in weeks), birthweight (kilograms), birth order (first born yes vs. no), sex, and child's age at the time of the neurocognitive test (in years). All models were also adjusted for maternal characteristics including marital status (married vs. others), smoking history (ever-smoker vs. never-smoker), age at delivery, IQ, and education (itself also a proxy for socioeconomic status). Finally, all models adjusted for potential cohort effects by including indicator variables denoting from which cohort (Cohort 2A, Cohort 3 + Ca supplement, and Cohort 3 -placebo) the participants came. Dr. Hu's team used 0.5 mg/L, which was close to the interquartile range of MUFcr for the analyses of both GCI (IQR = 0.45)

5

and IQ (IQR = 0.48), as a standard measure of incremental exposure. SAS statistical software (version 9.4; SAS Institute Inc.) was used for all data analyses described.

### Sensitivity Analyses

Models were further adjusted for variables that relate to relatively well-known potential confounders (but for which a significant amount of data was missing) and variables that were less-well known but possible confounders. The HOME scores were subject to sensitivity analyses because, as noted in the "Methods" section, they were not added to the subject evaluation protocols until 2003, resulting in a significantly smaller subsample of participants with this data. Models of the association between prenatal fluoride exposure (MUFcr) and IQ at 6-12 y old were also adjusted for the child's urine fluoride concentration at 6-12 y of age (CUFsg), a measure that was collected in a significantly smaller subset of individuals, to evaluate the potential role of contemporaneous exposure. Associations between prenatal fluoride exposure (MUFcr) and GCI at 4 y old could not be adjusted for contemporaneous fluoride exposure because urine samples were not collected from children when the MSCA (from which the GCI is derived) was administered. Maternal bone lead measured by a 109-Cd K-X-ray fluorescence (KXRF) instrument at 1 month postpartum, a proxy for lead exposure from mobilized maternal bone lead stores during pregnancy (Hu et al. 2006), was included in the model to test for the possible confounding effect of lead exposure during pregnancy. Dr. Hu's team focused on the subset of women who had patella bone lead values because these were found to be most influential in a previous prospective study of offspring cognition (Gomaa et al. 2002). Average maternal mercury level during pregnancy was also tested for being a potential confounder (Grandjean and Herz 2011). Mercury was measured as total mercury content in the subsample of women who had samples of archived whole blood samples taken during pregnancy with sufficient volume to be analyzed using a Direct Mercury Analyzer 80 (DMA-80, Milestone Inc., Shelton, CT, USA) as previously described (Basu et al. 2014).

To address the potential confounding effect of socioeconomic status (SES), Dr. Hu's team conducted sensitivity analyses that adjusted their model for SES (family possession score). The socioeconomic questionnaire asked about the availability of certain items and assets in the home. Point values were assigned to each item, and SES was calculated based on the sum of the points across all items (Huang et al. 2016). Given that the calcium intervention theoretically could have modified the impact of fluoride, in examining their results, Dr. Hu's team repeated the analyses with and without the Cohort 3 participants who were randomized to the calcium intervention to omit any potential confounding effect of this intervention. Another sensitivity test was performed to examine the potential effect of the psychologist who performed the WASI test by including tester in the regression model. The information about psychologists who performed the WASI was available for 75% of participants, as recording this data was added later to the study protocol. Dr. Hu's team also re-ran models with exposure outliers included as a sensitivity step. Finally, Dr. Hu's team ran models that focused on the cross-sectional relationship between children's exposure to fluoride (reflected by CUFsg) and IQ score, unadjusted; adjusting for the main covariates of interest; and adjusting for prenatal exposure (MUFcr) as well as the covariates of interest.

6

Methods of 2017 Study on Fluoride & ADHD Symptoms (Bashash, et al 2018)

***Study population***

In this study, Dr. Hu's team included mother-child pairs from two of the four ELEMENT cohorts (cohorts 2A and 3) for which maternal urinary samples during trimesters of pregnancy were available. Participants in cohort 2A were recruited between 1997 and 1999 whereas participants in cohort 3 were recruited between 2001 and 2003. Dr. Hu's team included participants if they had at least one archived urine sample from pregnancy, were <14 weeks of gestation at the time of recruitment, and their children underwent behavioral testing between the ages of 6 and 12, as described in Dr. Hu's 2017 study. Participants were excluded if they reported a history of psychiatric disorder(s), if there were medical complications (i.e. high- risk pregnancy, gestational diabetes, pre-eclampsia, renal disease, circulatory diseases, hypertension, continuous use of prescription drugs, or seizures during the index pregnancy), or if there was known maternal alcohol or illegal drug use during pregnancy. The study procedures were approved by the Institutional Review Boards of the National Institute of Public Health of Mexico, University of Michigan, Indiana University, University of Toronto, and Harvard School of Public Health, as well as participating clinics. Written informed consent was obtained from all participating families prior to study evaluation.

***Fluoride measurements***

Concentration of fluoride measured in maternal urinary samples was used as biomarker of prenatal fluoride exposure. Urine has been described as a suitable biomarker for fluoride since it serves as the main pathway through which fluoride is eliminated from the body and excretion is proportional to the total fluoride intake, but modified by factors like diet and various systemic conditions, such as recent fluoride exposure and urinary pH, as well as variation in creatinine excretion by muscle mass, age, sex, and other factors (Barr et al., 2005; Aylward et al., 2015). Ideally, overnight fasting or 24-hour urine samples are considered to be the optimal dosimeter for measuring chronic fluoride exposure in order to limit diurnal variations and the influence of diet associated with spot samples (Petersen et al., 2014). Because 24-hour urinary samples were not available in the sample, Dr. Hu's team used spot samples that were corrected for urinary dilution using urinary creatinine, as described elsewhere (Petersen et al., 2014). Each woman in the study provided at least one spot (second morning void) urine sample (Thomas et al., 2016) during pregnancy (range: 10 to 38 weeks). Dr. Hu's team then calculated the average of all available creatinine-adjusted maternal urinary fluoride (MUF) concentrations, using the same method described in Dr. Hu's 2017 study.

Further information regarding participant recruitment, data collection methods, as well as methods for fluoride sample shipping, storage, and analysis are described in Dr. Hu's 2017 study.

***Attention outcomes***

Behaviors associated with ADHD were assessed using the Spanish version of the Conners' Rating Scales-Revised (CRS-R) (Conners, 1997), which has been validated for the evaluation of ADHD (Ortiz-Luna and Acle-Tomasini, 2006). The CRS-R contains three ADHD scales that correspond with the Diagnostic and Statistical Manual of Mental Disorders - 4th edition (DSM-

IV) criteria for ADHD: 1) DSM-IV Inattention Index, 2) DSM-IV Hyperactive-Impulsive Index, and 3) DSM-IV Total Index (inattentive and hyperactive-impulsive behaviors combined). It also examines seven types of behavior problems that were derived through factor analysis, including: Oppositional, Anxious-Shy, Cognitive Problem/Inattention, Hyperactivity, Perfectionism, Psychosomatic, and Social Problems. In addition, the CRS-R contains four index scores that were derived based on theory and prior research: Conners' ADHD Index; Conners' Global Index (CGI): Restless-Impulsive; CGI: Emotional Lability, and CGI. For the purpose of the study, Dr. Hu's team examined the three DSM-IV ADHD scales as the primary outcomes because these scales are intended to screen for ADHD, and are commonly used to study the association between diverse environmental contaminants and ADHD-behavior problems (Huang et al., 2016; Perera et al., 2018). Dr. Hu's team also examined outcomes from two behavior scales (Cognitive Problem/ Inattention and Hyperactivity) and two index scores (Conners' ADHD Index and CGI: Restless-Impulsive), as done in Dr. Hu's prior work with lead (Huang et al., 2016). The Conners' ADHD Index, in particular, has been shown to exhibit favorable specificity and sensitivity in ADHD assessment (Chang et al., 2016). In addition, Dr. Hu's team assessed sustained attention and inhibitory control using the Conners' Continuous Performance Test (CPT-II, 2nd Edition), a computer-administered signal detection paradigm (Conners, 2000). Using the CPT-II, Dr. Hu's team measured errors of omission and commission, and hit reaction time (response latency). Mothers completed the CRS-R at the same follow-up visits that the child completed the CPT-II. All measures were standardized for age- and sex. Higher T-scores (mean of 50, SD of 10) indicate poorer performance. All psychometric tests were applied under the supervision of an experienced psychologist (LS).

### *Measurement of covariates*

Covariate data were individually obtained throughout the duration of the study. During the first pregnancy visit, questionnaires were used to collect information concerning maternal age, maternal education, history of smoking, and marital status. At delivery, information regarding birth weight, child sex, birth order, and gestational age (calculated by nurses) was obtained. Mothers also responded to a socioeconomic status questionnaire (Bashash et al., 2017) during the visit when the psychometric tests were administered. Individual items on this questionnaire assess the ability of households to meet the needs of its members in terms of housing, health, energy, technology, prevention and intellectual development; an overall score was derived by summing across each item. The Home Observation for Measurement of the Environment (HOME) Inventory, a semi-structured interview that measures quality and quantity of the caregiving environment, was administered in a subset of participants at approximately the same time as the visits for the neurobehavioral tests.

### *Data analysis*

Univariate statistics, appropriate transformations, and graphical displays were obtained for all variables before bivariate analyses. Bivariate analysis of the data included Chi-square tests for categorical variables and analysis of variance (ANOVA) to compare the continuous outcomes or exposure within groups defined according to the distribution of each covariate. In initial fully adjusted linear regression models, the outcomes demonstrated highly skewed residuals (with the exception of CPT-II commission score and hit reaction time). Thus, to address the skewness of the

residuals, gamma regression was used to examine the adjusted association between prenatal fluoride and each neurobehavioral outcome instead of log transformation, which may obscure model interpretation. In the gamma regression, Dr. Hu's team selected an identity link, so that the interpretation for the regression coefficients is the same as the linear regression (i.e., absolute difference in the mean of the outcome per unit change in predictor). All statistical analyses were performed in SAS software version 9.4.

Covariates were selected a priori based on their theoretical relevance or observed associations with fluoride exposure, and/or the analyzed neurobehavioral outcomes. As such, models were adjusted for the following maternal characteristics: age at delivery (continuous, in years), years of education (continuous, in years), marital status (married vs. others), and smoking history (ever- smoker vs. non-smoker). Models were further adjusted for the following child characteristics: gestational age at birth (continuous, in weeks), age at neurobehavioral measurement (continuous, in years), sex (female vs. male), and birth order (first born vs. others), and socioeconomic status through a continuous measure based on reported possessions and household assets (Thomas et al., 2016). Lastly, models adjusted for potential cohort and Ca intervention effects through inclusion of a variable denoting from which study the participants originated (cohort 2 - A, an observational cohort), cohort 3 subjects who were randomized to the calcium supplement (cohort 3 - Ca+), and cohort 3 subjects who were randomized to the placebo (cohort 3 - Placebo) (Bashash et al., 2017).

Other potential confounders that were examined in sensitivity analyses involving subsets of participants included the home environment (i.e. HOME score) assessed at the time of outcome measurement, child contemporaneous fluoride exposure measured by child urinary fluoride adjusted for specific gravity (CUFsg), as well as maternal blood mercury and maternal bone lead levels (a proxy for prenatal lead exposure to the fetus) given that both are established neurodevelopmental toxicants. This was done through identifying and including the subset of cases with data on each respective variable. In each subset, results were then compared between the model adjusting for that variable and the model not adjusting for that variable.

Model diagnostics were used to assess for violations of the model assumptions and for identification of remaining influential observations. Cook's D identified three exposure observations as potentially influential to the model results, and models were run with and without these observations (Supplementary Fig. SI). Generalized additive models (GAMs), estimated via cross validation in the R software, were used to visualize the adjusted association between fluoride exposure and measures of attention to examine potential non-linearity. Non-linearity of the fluoride-outcome association was tested through the inclusion of a quadratic term in the model, and found to be significant in four out of ten of the models (see Fig. 2 and Supplementary Fig. 1). Dr. Hu's team applied the Benjamini-Hochberg false discovery rate (FDR) procedure to address multiple testing corrections, using a false discovery rate of $Q = 0.05$ and $m = 10$ tests to determine significance (Benjamini and Hochberg, 1995).

General Considerations for Both Studies Regarding Arsenic and Iodine

Two factors that were not adjusted for in Dr. Hu's two studies on fluoride and neurodevelopment were arsenic and iodine.  However, since fluoridated salt rather than naturally elevated fluoride in drinking water was the main source of fluoride exposure in the ELEMENT cohort, it is unlikely that arsenic could have confounded the relationships that were found between fluoride and neurological outcomes.  Fluoridated salt is unlikely to contain appreciable arsenic, so the main source of fluoride is unlikely to have any association with arsenic.  Further, arsenic contamination of water has not been reported in Mexico City, nor is there evidence that arsenic in Mexico City is correlated with the (relatively minimal) levels of fluoride.

In Mexico, a major source of iodine for many women is iodized salt and studies have found it provides adequate iodine to pregnant women [Garcia-Solis et al 2011].  Iodized salt is usually fluoridated as well, and fluoridated salt was the main source of fluoride in the ELEMENT cohort.  Therefore, women with higher fluoride intake would also likely have higher iodine intake.  Since iodine is considered protective against loss of IQ, lack of adjustment for iodine intake would have been more likely to attenuate the loss of IQ from fluoride, rather than spuriously inflate it.

Summary of Methodological Strengths

Both of Dr. Hu's published ELEMENT cohort studies on fluoride and neurodevelopment are methodologically rigorous epidemiological studies. Specifically:

- The studies use a longitudinal cohort design, with all exposure, outcome, and covariate data measured at the individual level. This is the strongest study design for investigating health effects from environmental chemicals.
- Exposures were measured and expressed on a continuous or ratio scale allowing dose-response relationships to be derived.
- Detailed explanation of the statistical methods used were provided, sufficient to allow replication of the analyses.  The validity of the statistical methods was carefully vetted during and extensive peer review.
- Participant inclusion criteria are thoroughly described so that the risk of selection bias can be evaluated.  Participants were selected before fluoride exposures or outcomes could be known and it is unlikely that fluoride exposure could have influenced drop-out rates since the mothers would have been unaware of their level of fluoride exposure.  Furthermore, the mothers' fluoride exposures would presumably not have any direct effects on the mothers' health or behavior that could influence drop-out rates of the mothers.  As for drop out of their children, if prenatal fluoride has a true effect on neurobehavioral outcomes, that might affect their drop out rates but the result would be a bias toward the null for the final results, not bias to create a spurious effect. That is because the drop outs were caused by F exposure rather than an extraneous third factor.  Therefore, no confounding would occur.  Based on these considerations, there is very low risk of upwardly biased results due to selection bias or participant drop out.

10

- The neurobehavioral outcome measures used in Bashash 2017 have been extensively validated, and are standard measures used in the field, commonly known as IQ tests. Outcome measures were the General Cognitive Index (GCI) from the McCarthy Scales of Children's Abilities (MSCA, Spanish language edition) and Wechsler Abbreviated Scale of Intelligence, Full Scale Intelligence Quotient (WASI-FSIQ, Spanish language edition). All tests were administered by trained psychologists who were blind to the F exposure of the children. An assessment of inter-examiner reliability found 99% correlation.
- For Bashash 2018, the neurobehavioral outcome measures were components of the Spanish version of the Conners' Rating Scales-Revised (CRS-R) (Conners, 1997), which has been validated for the evaluation of ADHD. Dr. Hu's team separately assessed sustained attention and inhibitory control using the Conners' Continuous Performance Test (CPT-II, 2nd Edition). An experienced psychologist supervised both tests.
- All outcome measures were validated.
- A large number of potential confounders were considered in the study, and where deemed appropriate, controlled for. Potential confounders were considered based on prior epidemiological evidence with fluoride neurotoxicity and neurotoxicity from other agents.
- Loss to follow-up. Loss to follow-up is also called drop-out. As described above, there is little chance that drop-outs from the ELEMENT study design could cause bias so that the results are overestimates of effect or a spurious effect when no true effect exists.
- Minimum follow-up time. There may be some delays in the ability to measure neurotoxic harm. However, since these studies found statistically significant effects, they can be considered to have had a sufficient follow-up time. Only if they had not detected a significant effect could they be downgraded for possible insufficient follow-up time.
- Quality of the exposure measurement methods. These studies used maternal urine as the fluoride exposure measure. They corrected for dilution using creatine adjustment or specific gravity. Although slightly more accurate measures have been suggested, the only study which has used potentially more accurate measures is the Green 2019 study. The Green study was restricted to women who had urine F measures for each of the three trimesters, and averaged those 3 values. In the ELEMENT cohort, for each woman, an average of all her available creatinine-adjusted urinary fluoride concentrations during pregnancy (maximum three samples and minimum one sample) was computed and used as the exposure measure (MUFcr). While this exposure metric inevitably introduces imprecision into the exposure estimate, this imprecision will be random and thus bias the results toward the null.
- Detailed information on exposure variability was reported.
- Individual-level continuous exposure information for every subject.

11

- Specificity of the exposure indicator: Urine F is highly specific to internal exposure and is likely the most specific for fetal exposure too because blood F is difficult to measure accurately and varies rapidly over a matter of minutes.
- Blinded exposure assessment: All exposure assessments were completely blinded to outcomes or any other subject characteristics.
- Blinded health outcome assessment: Testing was done blinded to fluoride exposure.
- Sensitivity analyses and comparisons of unadjusted and adjusted models provide insight into the potential for systematic error.  Based on extensive consideration and control of potential confounders, the risk of systematic error is low in both studies.

**(2) The results of the ELEMENT prospective cohort studies are consistent with and support the conclusion that fluoride is a developmental neurotoxicant at levels of exposure seen in the general population of the USA.**

Neurodevelopmental Findings – Intelligence

In the ELEMENT cohort, higher prenatal exposure to fluoride (as indicated by average creatinine-adjusted maternal urinary fluoride concentrations during pregnancy) was associated with lower GCI scores in children at approximately 4 years old, and with lower Full-Scale IQ scores at 6-12 years old. Estimates from adjusted linear regression models suggest that mean GCI and IQ scores were about 3 and 2.5 points lower in association with a 0.5 mg/L increase in prenatal exposure, respectively. This is a notably large effect size, particularly when considering that more than 25% of pregnant women in artificially fluoridated areas have urinary fluoride levels exceeding 1.0 mg/L, with approximately 5% having in excess of 2 mg/L. (Till, et al. 2018, Table S4).

The associations with GCI appeared to be linear across the range of prenatal exposures, but there was some evidence that associations with IQ may have been limited to exposures above 0.8 mg/L. In general, the negative associations persisted in sensitivity analyses with further adjustment for other potential confounders, though the results of sensitivity analyses were based on subsets of the population with available data.

As Dr. Hu's team explained in their 2017 paper, the IQ results are generally consistent with the findings of cross-sectional studies from endemic fluorosis areas (Choi, et al. 2012; Choi, et al. 2015), as well as a previous prospective birth cohort study from Mexico (Valdez-Jimenez, et al. 2017).

Neurodevelopmental Findings – Symptoms of ADHD

In Dr. Hu's 2018 study, higher prenatal fluoride exposure, as measured by MUFcr, corresponded to more ADHD-like symptoms on the CRS-R, particularly related to inattention as indicated by the strong association with the following two scales: Cognitive Problem/Inattention, and DSM-IV Inattention. In contrast, MUFcr during pregnancy did not predict child performance on any of the hyperactivity measures (i.e. Restless-Impulsive; Hyperactivity; DSM-IV Hyperactivity-Impulsivity) nor the CPT-II outcomes.

12

In general, a 0.5 mg/L higher MUFcr (approximately the IQR) corresponded to higher scores on the CRS-R for DSM-IV Inattention (2.84 points) and Cognitive Problems and Inattention (2.54 points). Consistency in these results across both of these outcome measures strengthens the conclusion that inattention appears to be associated with prenatal exposure to fluoride. These two scales contribute to the global ADHD Index and the DSM-IV Total scores, which were also associated with higher levels of prenatal fluoride exposure; a 0.5 mg/L increase in MUFcr corresponded to a 2.38 higher point score on the DSM-IV ADHD Total Index and a 2.47 higher point score on the ADHD Index. The observed association of MUFcr and CRS-R seemed to demonstrate a ceiling effect, suggesting that higher levels of urinary fluoride concentration did not substantially increase risk of ADHD-like symptoms.

As Dr. Hu's team discussed in their paper, the association between MUFcr and symptoms of inattention are consistent with the growing body of evidence showing dose-response relationships between early-life exposure to fluoride and attention outcomes. Animal studies (Mullenix et al., 1995) reported fewer behavioral initiations and less time exhibiting exploration behaviors among male and female rats exposed to 100 or 125 ppm fluoride as weanlings (21 days postnatal) and among male rats whose mothers were injected with 0.13 mg/L of sodium fluoride on gestational days 17–19. These particular behavioral effects are suggestive of hypoactivity. In human studies, high exposure to fluoride, as reflected by the presence of moderate to severe dental fluorosis in primary teeth of children living in southern Sichuan, China, was associated with poor working memory, but not with other cognitive domains that were assessed (Choi et al., 2015). Working memory is linked with the ability to control attention and it is common for youth with ADHD to have weaknesses in working memory (Kasper et al., 2012).

Taken together, Dr. Hu's studies on the effects of prenatal fluoride exposure on childhood intelligence and symptoms of ADHD are consistent with, and support, the conclusion that fluoride is a developmental neurotoxicant.

Applicability of Findings to Communities with Artificial Water Fluoridation

As discussed in Dr. Hu's 2018 study, the maternal urine fluoride levels in the ELEMENT cohort covered a range that overlaps the range of maternal urine fluoride content found in Canada in the MIREC cohort (Thomas et al 2016, Till et al 2018). The MIREC cohort included pregnant women from across Canada of which about 40% lived in communities with fluoridated water at a concentration of about 0.6 mg/L, slightly less than the concentration currently used in most fluoridated communities in the USA, which is 0.7 mg/L. The dose-response relationship found in 4-year olds of the ELEMENT cohort, demonstrates a mean loss of about 3 IQ points in children whose mothers were in the upper 25% of exposure compared to those in the lowest 25% of exposure. This is a range that is encompassed by the range of maternal urinary fluoride content in areas with artificially fluoridated water.

The main source of fluoride in the Mexico City ELEMENT cohort was fluoridated salt rather than fluoridated water or water with a naturally elevated fluoride level. This was confirmed in a recent paper by Dr. Hu's group (Cantoral et al 2019). The Cantoral 2019 study found that the average tap water and bottled water fluoride concentration in Mexico City was less than 0.17 mg/L,

13

demonstrating the relatively low contribution from fluoride in water to total fluoride intake. An earlier study of Mexico City tap water fluoride took 172 samples from throughout the city, from locations representative of the population, and found a mean concentration of 0.22 mg/L fluoride [Martinez-Mier et al 2005].

In Mexico City, the level of fluoride added to salt is intended to produce a similar total intake as people would get if their fluoride intake came mainly from fluoridated water. Consistent with this, the mean maternal urine F concentration of 0.9 mg/L in the ELEMENT cohort was only slightly higher than that of Canadian women of the MIREC cohort (0.87 mg/L urine F) who lived in areas with artificial water fluoridation (Thomas et al 2016, Bashash et al 2017, Till et al 2018). Thus, despite different sources of fluoride, the Mexico City women had similar total fluoride intake as the Canadian women in fluoridated areas, as assessed by urine F concentration.

There is no identified reason to believe that the neurotoxic effects of fluoride would differ by the source of exposure, be it fluoridated salt or fluoridated water. Once inside the body the source of the fluoride is immaterial. The levels of F exposure found in the ELEMENT cohort are thus presumptively applicable to the levels likely to be found in communities with artificial water fluoridation.

**References:**

Afeiche M, Peterson KE, Sánchez BN, Cantonwine D, Lamadrid-Figueroa H, Schnaas L, et al.2011. Prenatal lead exposure and weight of 0- to 5-year-old children in Mexico City. Environ Health Perspect119(10):1436–1441, PMID: 21715242, doi:10.1289/ehp.1003184.

Baez R, Petersen PE, Marthaler T. 2014. Basic Methods for Assessment of Renal Fluoride Excretion in Community Prevention Programmes for Oral Health. Geneva, Switzerland:World Health Organization.

Bashash M, Thomas D, Hu H, Angeles Martinez-Mier E, Sanchez BN, Basu N, Peterson KE, Ettinger AS, Wright R, Zhang Z, Liu Y. Prenatal fluoride exposure and cognitive outcomes in children at 4 and 6–12 years of age in Mexico. Environmental health perspectives. 2017 Sep 19;125(9):097017.

Bashash M, Marchand M, Hu H, Till C, Martinez-Mier EA, Sanchez BN, Basu N, Peterson KE, Green R, Schnaas L, Mercado-García A. Prenatal fluoride exposure and attention deficit hyperactivity disorder (ADHD) symptoms in children at 6–12 years of age in Mexico City. Environment international. 2018 Dec 1;121:658-66.

Basu N, Tutino R, Zhang Z, Cantonwine DE, Goodrich JM, Somers EC, et al.2014. Mercury levels in pregnant women, children, and seafood from Mexico City. Environ Res135:63–69, PMID: 25262076, doi:10.1016/j.envres.2014.08.029.

Benjamini, Y., Hochberg, Y., 1995. Controlling the false discovery rate: a practical and powerful approach to multiple testing. J. R. Stat. Soc. Ser. B Methodol. 57, 289–300.

14

Braun JM, Hoffman E, Schwartz J, Sanchez B, Schnaas L, Mercado-Garcia A, et al.2012. Assessing windows of susceptibility to lead-induced cognitive deficits in Mexican children. Neurotoxicology33(5):1040–1047, PMID: 22579785, doi:10.1016/j.neuro.2012.04.022.

Cantoral A, Luna-Villa LC, Mantilla-Rodriguez AA, Mercado A, Lippert F, Liu Y, Peterson KE, Hu H, Téllez-Rojo MM, Martinez-Mier EA. Fluoride Content in Foods and Beverages From Mexico City Markets and Supermarkets. Food and nutrition bulletin. 2019 Jul 25:0379572119858486.

Chang  L.-Y. , M.-Y. Wang, P.-S. TsaiDiagnostic accuracy of rating scales for attention-deficit/hyperactivity disorder: a meta-analysis Pediatrics, 137 (2016)

Ettinger AS, Lamadrid-Figueroa H, Téllez-Rojo MM, Mercado-García A, Peterson KE, Schwartz J, et al.2009. Effect of calcium supplementation on blood lead levels in pregnancy: a randomized placebo-controlled trial. Environ Health Perspect117(1):26–31, PMID: 19165383, doi:10.1289/ehp.11868.

García-Solís P, Solís-S JC, García-Gaytán AC, Reyes-Mendoza VA, Robles-Osorio L, Villarreal-Ríos E, Leal-García L, Hernández-Montiel HL. Iodine nutrition in elementary state schools of Queretaro, Mexico: correlations between urinary iodine concentration with global nutrition status and social gap index. Arquivos Brasileiros de Endocrinologia & Metabologia. 2013 Aug;57(6):473-82.

Gomaa A, Hu H, Bellinger D, Schwartz J, Tsaih SW, Gonzalez-Cossio T, et al.2002. Maternal bone lead as an independent risk factor for fetal neurotoxicity: a prospective study. Pediatrics110(1):110–118, PMID: 12093955.

Grandjean P, Herz KT. 2011. Methylmercury and brain development: imprecision and underestimation of developmental neurotoxicity in humans. Mt Sinai J Med78(1):107–118, PMID: 21259267, doi:10.1002/msj.20228.

Hu H, Téllez-Rojo MM, Bellinger D, Smith D, Ettinger AS, Lamadrid-Figueroa H, et al.2006. Fetal lead exposure at each stage of pregnancy as a predictor of infant mental development. Environ Health Perspect 114(11):1730–1735, PMID: 17107860, doi:10.1289/ehp.9067.

Huang S, Hu H, Sánchez BN, Peterson KE, Ettinger AS, Lamadrid-Figueroa H, et al.2016. Childhood blood lead levels and symptoms of attention deficit hyperactivity disorder (ADHD): a cross-sectional study of Mexican children. Environ Health Perspect124(6):868–874, PMID: 26645203, doi:10.1289/ehp.1510067.

Julvez J, Ribas-Fito N, Torrent M, Forns M, Garcia-Esteban R, Sunyer J. 2007. Maternal smoking habits and cognitive development of children at age 4 years in a population-based birth cohort. Int J Epidemiol 36(4):825–832, PMID: 17550944, doi:10.1093/ije/dym107.

Kordas K, Ettinger AS, Bellinger DC, Schnaas L, Téllez Rojo MM, Hernández-Avila M, et al.2011. A dopamine receptor (DRD2) but not dopamine transporter (DAT1) gene polymorphism

15

is associated with neurocognitive development of Mexican preschool children with lead exposure. J Pediatr 159(4):638–643, PMID: 21592505, doi:10.1016/j.jpeds.2011.03.043.

Martínez-Mier EA, Cury JA, Heilman JR, Katz BP, Levy SM, Li Y, et al.2011. Development of gold standard ion-selective electrode-based methods for fluoride analysis. Caries Res45(1):3–12, PMID: 21160184, doi:10.1159/000321657.

Martínez-Mier EA, Soto-Rojas AE, Buckley CM, Zero DT, Margineda J. 2005. Fluoride concentration of bottled water, tap water, and fluoridated salt from two communities in Mexico. Int Dent J55(2):93–99, PMID: 15880964.

McCarthy D. 1991. Manual for the McCarthy Scales of Children's Abilities. Spanish, User's Guide [in Spanish]. Madrid, Spain:TEA Ediciones.

Mullenix PJ, Denbesten PK, Schunior A, Kernan WJ. 1995. Neurotoxicity of sodium fluoride in rats. Neurotoxicol Teratol17(2):169–177, PMID: 7760776.

J.A. Ortiz-Luna, G. Acle-Tomasini. Differences in the way parents and teachers identify the symptoms of attention deficit hyperactivity disorder in Mexican children. Rev. Neurol., 42 (2006), pp. 17-21

Puertas R, Lopez-Espinosa MJ, Cruz F, Ramos R, Freire C, Pérez-García M, et al.2010. Prenatal exposure to mirex impairs neurodevelopment at age of 4 years. Neurotoxicology31(1):154–160, PMID: 19818364, doi:10.1016/j.neuro.2009.09.009.

Thomas DB, Basu N, Martinez-Mier EA, Sánchez BN, Zhang Z, Liu Y, et al.2016. Urinary and plasma fluoride levels in pregnant women from Mexico City. Environ Res150:489–495, PMID: 27423051, doi:10.1016/j.envres.2016.06.046.

Usuda K, Kono K, Shimbo Y, Fujihara M, Fujimoto K, Kawano A, et al.2007. Urinary fluoride reference values determined by a fluoride ion selective electrode. Biol Trace Elem Res119(1):27–34, PMID: 17914216, doi:10.1007/s12011-007-0044-6.

Valdez Jiménez L, López Guzmán OD, Cervantes Flores M, Costilla-Salazar R, Calderón Hernández J, Alcaraz Contreras Y, et al.2017. In utero exposure to fluoride and cognitive development delay in infants. Neurotoxicology59:65–70, PMID: 28077305, doi:10.1016/j.neuro.2016.12.011.

Watanabe M, Kono K, Orita Y, Ydote T, Usuda K, Takahashi Y, et al.1994. Influence of dietary fluoride intake on urinary fluoride concentration and evaluation of corrected levels in spot urine. In: Proceedings of the XXth Conference of the International Society for Fluoride Research, Beijing, China. Beijing, China:Ministry of Public Health of People's Republic of China, 246–247.

Wechsler D. 1999. Wechsler Abbreviated Scale of Intelligence. San Antonio, TX:Psychological Corporation.

Wechsler D, Jorge M, Velaco A. 1981. WAIS-Español: Escala de Inteligencia para Adultos: El Manual Moderno [in Spanish]. México, DF:El Manual Moderno, S.A.

16

Zohouri F, Swinbank C, Maguire A, Moynihan P. 2006. Is the fluoride/creatinine ratio of a spot urine sample indicative of 24-h urinary fluoride? Community Dent Oral Epidemiol 34(2):130–138, PMID: 16515677, doi:10.1111/j.1600-0528.2006.00269.x.

# EXHIBIT L

| | |
|---|---|
| **From:** | Michael Connett |
| **To:** | Carfora, Debra (ENRD); Do, John Thomas (ENRD); Adkins, Brandon (ENRD) |
| **Subject:** | Re: Plaintiffs" Second Amended Expert Disclosures |
| **Date:** | Friday, August 30, 2019 9:39:31 PM |
| **Attachments:** | Lanphear_Supplemental Summary of Facts.pdf |

Counsel: Please find attached the Supplemental Summary of the Facts upon which Dr. Lanphear's opinions will be based upon. I apologize that this took longer to complete than anticipated. In light of the delay, we will extend the previously agreed-upon date for determining whether you will elect to depose Dr. Lanphear. We had previously agreed upon Sept 4th as the cut-off, but we will agree to extend that 4 days commensurate with the delay in sending you the attached summary. Accordingly, please let me know by Monday, Sept 9th, whether you will be taking Dr. Lanphear's deposition. He remains available for the September 18th date in Bellingham, WA.

**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

---

**From:** Michael Connett
**Sent:** Monday, August 26, 2019 9:28 PM
**To:** Debra Carfora <debra.carfora@usdoj.gov>; Do <john.do@usdoj.gov>; Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Subject:** Plaintiffs' Second Amended Expert Disclosures

Counsel: Please find attached Plaintiffs' Second Amended Expert Disclosures, along with a Supplementary Summary of the Facts upon which Dr. Hu's opinions will be based. We are still working expeditiously to complete Dr. Lanphear's report, and will be providing it ASAP. As a courtesy, we will extend the deadline for your decision on Lanphear's deposition proportionate to the length of time it takes us to produce the supplemental summary.

**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

## Summary of the facts and opinions to which Dr. Bruce Lanphear is expected to testify

Introduction

As discussed by Dr. Lanphear in his 2015 review *The Impact of Toxins on the Developing Brain*:

> The causes of death and disability in children have shifted over the past century (Lanphear 2015). Concerted public health efforts to control tuberculosis, cholera, typhoid, and other infectious agents in the early twentieth century led to a dramatic reduction in child mortality, followed by a rise in life expectancy. By the end of the twentieth century, the 'new morbidities of childhood'—attention deficit hyperactivity disorder (ADHD), autism, asthma, obesity, and preterm birth—had emerged. Learning disabilities and mental disorders are now two of the most prevalent morbidities in children. About 7.6% of US children are estimated to have a parent-reported learning disability, and 13% are estimated to have a mental disorder, including anxiety, autism, conduct disorder, depression, or ADHD. . . . These data indicate that we are in the midst of an epidemic of brain-based disorders (Lanphear 2015).

The high reported prevalence of learning disabilities and mental disorders has fueled research to better understand the role of environmental chemicals, including through use of prospective cohort studies that collect individualized biomarkers of exposure to environmental toxins. As Dr. Lanphear noted in his 2015 review, "Biologic markers, or biomarkers, of exposure, which can enhance our ability to quantify an individual's internal dose of a contaminant, are revolutionizing the study of environmental toxins in the same way genetic tests are revolutionizing the study of heritability" (Lanphear 2015).

One prospective cohort that has been developed for this purpose is the Maternal-Infant Research on Environmental Chemicals (MIREC) in Canada. Background information about MIREC was summarized by Arbuckle, et al. (2013):

> The Maternal-Infant Research on Environmental Chemicals (MIREC) Study was established to obtain Canadian biomonitoring data for pregnant women and their infants, and to examine potential adverse health effects of prenatal exposure to priority environmental chemicals on pregnancy and infant health.

> Women were recruited during the first trimester from 10 sites across Canada and were followed through delivery. Questionnaires were administered during pregnancy and post-delivery to collect information on demographics, occupation, life style, medical history, environmental exposures and diet. Information on the pregnancy and the infant was abstracted from medical charts. Maternal blood, urine, hair and breast milk, as well as cord blood and infant meconium, were collected and analysed for an extensive list of environmental biomarkers and nutrients. Additional biospecimens were stored in the study's Biobank. . . .

1

The MIREC Study is an interdisciplinary collaboration between Health Canada scientists and clinical and academic researchers, and was funded by Health Canada, the Ontario Ministry of the Environment, and a grant from the Canadian Institutes of Health Research.

A major aim of the MIREC Research Platform is to study the potential role of environmental chemicals on the health of pregnant women and their children.

The U.S. EPA and National Institute of Environmental Health Sciences (NIEHS) have recognized that "archives of biological samples from birth cohort studies . . . provide critical information on the prenatal and childhood determinants of adult disease" (NIEHS/EPA 2017).

In light of the consistent association between elevated fluoride and IQ reported in cross-sectional studies (Choi, et al. 2012), Dr. Lanphear's team received a grant from the NIEHS to study the association between prenatal/early-life measures of fluoride and IQ in children in the MIREC cohort. This has thus far resulted in three papers, one of which was published in *Environmental Health Perspectives* in 2018 (Till, et al. 2018), one of which was published in *JAMA Pediatrics* on August 19, 2019 (Green, et al. 2019), and one which is still in review (Till et al. in review).

## (1) Pregnant women living in fluoridated regions in Canada have almost two times the amount of fluoride in their urine as women living in non-fluoridated regions.

In the 2018 study, Dr. Lanphear's team reported maternal urinary fluoride levels among pregnant women in the MIREC cohort (Till et al 2018). The study included only women who provided spot samples across all three trimesters. Women were recruited from prenatal clinics during their first trimester to participate in a longitudinal birth cohort study and provided written informed consent after the study was described to them. Participants were included if they could provide consent, communicate in English or French, were older than 18 y of age, and were at <14wk of gestation. Participants were excluded if there was a known fetal abnormality, if they had any medical complications (i.e., cancer, renal disease, heart disease), or if there was known maternal alcohol or drug abuse during pregnancy. Participant recruitment and further demographic details and birth outcomes on the cohort are provided by Arbuckle et al. 2013. Health Canada's Research Ethics Board and all participating recruitment sites approved the MIREC Study. Dr. Lanphear's study also received ethics approval from the York University Research Ethics Board in Toronto.

*Measure of Fluoride*

Fluoride concentrations were assessed in archived spot urine samples obtained from Trimester 1 at $11.57\pm1.57$ [mean±standard deviation(SD)] wk (n=1,885), Trimester 2 at $19.11\pm2.39$ wk (n=1,738), and Trimester 3 at $33.11\pm1.50$ wk (n=1,660) of gestation. Fluoride concentration was analyzed using a modification of the hexamethyldisiloxane (HMDS) micro-diffusion procedure of Taves (1968), as modified by Martínez-Mier et al. (2011). Reference standard solutions were monitored daily by a quality assurance (QA) officer for stability; technicians reanalyzed, on a rotating basis, one of three standards daily. In addition, urine-based certified reference materials were analyzed every 200–300 samples. Finally, the QA officer checked for errors in the sample numbers, recorded results and cell formula errors, and checked

2

results in millivolt readings on source documents versus Microsoft Excel spreadsheets. In neutral solutions, fluoride concentrations can be measured down to 0.02mg/L fluoride. This method has been shown to yield the highest recoveries of fluoride for undiluted samples. The precision and validity of this analysis technique has been reported elsewhere (Martínez-Mier et al. 2011). Compared with the total sample of spot urines that were available for fluoride analysis, only 0.002% (two samples) of readings was removed at the first trimester due to readings being higher than that of the highest concentration standard. No observations were removed in subsequent trimesters.

*Measure of Urinary Creatinine*

Urinary creatinine [CRE; in grams (g creatinine)] was measured using colorimetric end-point tests. Analyses of creatinine levels for Trimester 1 and 2 urines were conducted at an internationally recognized toxicology lab (Institut National de Santé Publique du Québec), which is accredited by the Standards Council of Canada under ISO 17025. Analyses of creatinine levels for Trimester 3 urines were conducted by another lab overseen by a Health Canada scientist. Both labs completed CRE analyses for Trimester 1, and there was a very high level of agreement between the values from each lab ($r=0.95$, $p<0.01$, $n=1,477$); because of the consistency of CRE levels across the two labs, Dr. Lanphear's team chose to use the available Trimester 3 CRE results analyzed by this separate lab.

*Correction for Variations in Urine Dilution*

To account for variations in urine dilution at the time of measurement, MUF concentrations were adjusted for either CRE or specific gravity (SG). Different methods were used to correct for hydration status because there is no established standard for estimating fluoride exposure among pregnant women. The study used the average MUF concentration taken over all three trimesters for all adjustment methods. The three primary correction methods included adjustment for specific gravity ($MUF_{SG}$) and two methods of adjustment for creatinine ($MUF_{CRE\_1}$ and $MUF_{CRE\_2}$).

*Measurement of Municipal Drinking-water Fluoride*

Municipal drinking-water reports were solicited from each city that was included in the MIREC Study. For each city included in the study, water treatment plant (WTP) boundary regions were determined and then linked the first three letters of the postal code for each participant [as reported in Trimester 3 (note that postal codes were identical between Trimester 1 and 3 for 89% of the participants)]. In some cases, participants were linked with multiple WTPs because water distribution boundaries may overlap.

Fluoridation was defined according to current national drinking-water guidelines (Health Canada 2010), which are implemented by drinking-water authorities in the affected jurisdiction. A range of 0.6–0.8mg/L fluoride in water is recommended by the Ministry of Health and Long-Term Care in Ontario (consistent with Health Canada's recommendation of 0.7mg/L). In practice, fluoridated water levels may correspond to a wider range, with a maximum acceptable concentration of 1.5mg/L (Health Canada 2010). The present study defined a nonfluoridated site as having water fluoride levels (both adjusted and natural fluoride levels) of <0.3mg/L.

3

Dr. Lanphear's team calculated each participant's average fluoridated drinking-water value for the duration of their pregnancy by taking the average of three quarterly means. For example, births in Quarter 1 (January, February, March) were calculated by computing the average of Quarters 3 and 4 of the year before birth and Quarter 1 of the birth year. Geometric means (GMs) were calculated given the large range of water fluoride values. For participants who received water from more than one WTP, the fluoridated drinking-water value was calculated by computing the average of the three quarterly GMs from each relevant WTP (Till, et. al. 2018, Table S2). Some cities (e.g., Montreal) had both fluoridated and nonfluoridated zones (see sample map showing distributions for each WTP in Figure S2). Participants living in each region were coded accordingly. Finally, for cities that reported fluoride concentrations that were equivalent to the limit of detection (LOD), an imputed value of the LOD divided by the square root of 2 (Hornung and Reed 1990) was used to calculate the water fluoride level. Average water fluoride levels reported by the municipal WTPs during the years that the participants were in the study are provided in Table S3.

*Fluoride Intake*

Dr. Lanphear's team estimated fluoride intake via drinking-water habits and consumption of beverages that are known to be high in fluoride content by assessing MIREC data on daily water and tea (black or green) consumption. Black and green tea leaves have both been identified as natural sources of fluoride via absorption through the soil (Fung et al. 1999; Malinowska et al. 2008). Participants were asked at the first and third trimester the following question: "Since the beginning of your pregnancy, how much did you drink the following: water (number of glasses; 1 glass=8 oz); regular tea (cups); green tea (number of cups; 1 cup=6 oz)?" Participants could answer "none" or insert a number of glasses/cups and select a frequency (day/week/month).

*Statistical Analyses*

Dr. Lanphear's team performed statistical analyses for women who had all three urine samples corresponding to each trimester using RStudio (version 1.1.383) and SAS (version 9.3; SAS Institute Inc.). A two-sided $\alpha=0.05$ was used for hypothesis testing. Because the distributions of the MUF levels were right-skewed, values were log10-transformed to obtain a more normal distribution.

Covariates of interest were based on literature review (Buzalaf and Whitford 2011; Buzalaf et al. 2015) and consultation with fluoride experts on factors that may influence fluoride metabolism and intake or creatinine (Gerchman et al. 2009). These variables included prepregnancy BMI, maternal age, mother's smoking status (current smoker vs. former or never smoked), alcohol consumption (no alcohol, <1 alcoholic beverage per month, $\geq 1$ alcoholic beverage per month), caffeine consumption ($\geq 1$ caffeinated beverage per day vs. did not drink caffeinated beverage), time of urine sample and time since last void (data only available for Trimesters 1 and 3), maternal education (high school or less, some college, college university degree), annual household income (less than vs. more than $70,000 Canadian), and race (white vs. other). Covariates were chosen based on inclusion criteria where p values fell below 0.2 or changed the regression coefficient by more than 10% for the association between the covariate and MUF.

4

Covariates that reached these criteria were prepregnancy BMI (available for 99% of the total sample), maternal age, and mother's smoking status. Pearson correlations were used to examine the associations between average $log_{10}$-transformed MUF concentration and these three covariates. Pearson correlations were also used to examine the associations between numbers of glasses of water and cups of green and black tea consumed (using averaged data collected at Trimesters 1 and 3) with average $log_{10}$-transformed MUF concentration. These variables were included in the final models because they are sources of fluoride. Pearson correlations were used to examine the relationship between MUF $log_{10}$-transformed values (both averaged and trimester-specific) and time-dependent spot sampling variables (i.e., time since last void and time at void). Next, one-way analysis of covariance (ANCOVA) was used to test differences in average log10-transformed MUF by residential CWF status, adjusted for covariates. To ensure that multivariate interactions between covariates were not contributing to the findings, a propensity score matching algorithm was used in a supplemental analysis (Rosenbaum and Rubin 1983) to match the two groups on the covariates and any multivariate interactions that may exist. This approach used logistic regression to first predict the probability of all people belonging to one group. Then, a second step matched individuals from one group to those in the other based on the probability scores. Thus, individuals that contribute to an unequal match between groups were removed and the n between groups was equated. Given the large sample size, the reduction in n between groups was not a concern. It was more important to show that this procedure and the analyses including everyone provided converging evidence for the conclusions.

Finally, linear regression analyses were used to examine the association between the average $log_{10}$-transformed MUF concentrations and sources of fluoride-related variables (e.g., WTP fluoride levels, number of cups of tea drunk), with and without covariates. Hierarchical regression was first used to assess the relative contribution of WTP fluoride concentrations on MUF concentration after controlling for all covariates and the other sources of fluoride. Next, forward regression was conducted to examine whether any variables other than water fluoride concentrations were contributing significantly to the model. Separate regression models were run for each method of accounting for urinary dilution of MUF concentration. Secondary analyses adjusted for urinary dilution were also conducted by modeling urinary creatinine and SG at each trimester as a time-dependent covariate. The best dilution standard was deemed to be the one that had the highest partial $R^2$ value and beta coefficient for WTP fluoride levels regressed on the MUF level.

*MUF levels as a function of fluoridated versus nonfluoridated status.*

Mean MUF levels were almost two times higher among women living in fluoridated than nonfluoridated communities (Till, et al. 2018, Figure 3; see also Table S4), even after controlling for covariates (Table 2) or using propensity score matching on the covariates (Till, et al. 2018, Table S5). The pattern was consistent across all three methods used to adjust for dilution status, but the mean values were highest using the creatinine correction adjustment methods, particularly $MUF_{CRE\_1}$.

Factors that could contribute to fluoride exposure or metabolism were examined, including women's age, prepregnancy BMI, education, income level, water and tea consumption, and

fluoride level of the woman's drinking-water supply. Older age was associated with higher urinary fluoride concentration, consistent with prior findings showing higher fluoride content in bone with increasing age in women (Mostafaei et al. 2015). Higher education was weakly and positively associated with urinary fluoride concentration (r<0.10), whereas income level and prepregnancy BMI were not associated. The strongest correlate of $MUF_{SG}$ and $MUF_{CRE}$ concentration was water fluoride level, indicating that artificially fluoridated drinking water is a major source of fluoride intake. Specifically, for every 0.5−mg/L increase in water fluoride level, urinary fluoride concentration was estimated to increase by 74–82%. These findings are consistent with prior studies showing that fluoride levels in drinking water are closely related to those in urine in adults (Paez and Dapas 1983), children and adults (Zipkin et al. 1956), and pregnant women (Opydo-Szymaczek and Borysewicz-Lewicka 2005).

**(2) The average urinary fluoride concentration for pregnant women living in Canadian communities with fluoridated drinking water is almost the same as those of the ELEMENT cohort being studied by Dr. Hu.**

In their 2018 study (Till et al. 2018), Dr. Lanphear's team found that pregnant women who lived in fluoridated communities in Canada had creatinine-adjusted urinary fluoride concentrations that fall within the same range as the creatinine-adjusted levels reported among pregnant women from the ELEMENT cohort in Mexico City (Thomas et al. 2016). When measured using the same dilution adjustment method (MUF_2), the MIREC cohort women had a mean urine fluoride level of 0.87 mg/L with a Standard Deviation of 0.50 and a range of 0.14 – 3.38 mg/L (Till et al 2018, Table 2). The ELEMENT cohort's mean maternal urine fluoride level was 0.88 mg/L with a Standard Deviation of 0.34 and a range of 0.02 – 2.36 mg/L (Bashash et al 2017, Table 1).

The similarity in MUF concentrations between the Canadian and Mexican pregnancy cohorts is of scientific and public health relevance given the findings from the ELEMENT cohort showing an inverse association between prenatal fluoride exposure and child IQ at 4 years of age and between 6 and 12 years of age in nearly 300 mother–child pairs (Bashash et al. 2017), and a significant association with increased symptoms of ADHD (Bashash, et al. 2018). At the time of the publication of the first paper by Bashash et al., there were no available data on urinary fluoride exposure of pregnant women exposed to fluoridated water to assess the applicability of their findings. The results of Dr. Lanphear's study in 2018 therefore provided a comparison point to assess the public health relevance of the ELEMENT cohort findings.

**(3) The study of fluoride and IQ in the MIREC cohort significantly enhances the quality of data related to fluoride's neurotoxicity because the study employs a prospective design that includes multiple measures of fluoride exposure during pregnancy (including biomonitoring data) and IQ outcomes that have been evaluated in one of the world's most comprehensively characterized and geographically diverse birth cohorts.**

The longitudinal design of the MIREC cohort study, which follows pregnant women over their pregnancy through to the birth of their baby and then follows the children up through age 4 years and beyond, is considered the strongest type of observational epidemiological study design. This study design can provide strong evidence of cause and effect because the exposure clearly

precedes the outcome. The comprehensive characterization of the participants in the cohort allows for detailed control of potentially confounding factors. Fluoride exposures, neurocognitive outcomes, and all covariates were measured at the individual level, further strengthening the study. As described above, fluoride exposure was measured at all three trimesters of pregnancy using dilution-adjusted urine fluoride concentration, an individualized biomarker that reflects total fluoride exposure from all sources. The MIREC cohort subset that Dr. Lanphear's team studied came from 6 Canadian cities, including Toronto, Hamilton, Halifax, Montreal, Vancouver, and Kingston. About 40% of the MIREC women lived in fluoridated areas and 60% in nonfluoridated areas (Green et al 2019, Table 1).

While spot samples of maternal urinary fluoride data offers a less precise measurement of fluoride exposure than might have been possible with 24-hour urine samples, this random (i.e., non-differential) imprecision would be expected to bias any association with neurocognitive outcomes towards the null, rather than cause a spurious result. Dr. Lanphear's team took steps to minimize the random error that is introduced by use of spot samples by (1) controlling for creatinine/specific gravity; (2) using the average of three spot samples for each participant; and (3) controlling for time since last void in the IQ analyses to account for possible short term increases in urine fluoride caused by recent fluoride intake.

A limitation with using a three-trimester average for the maternal urinary content is that, if there is an age-specific timeframe during pregnancy when fluoride causes neurocognitive harm, this age-specific window would tend to be obscured by use of a three-trimester average. Again, however, this would increase random error in the fluoride measurement, and thereby be expected to bias the results towards the null.

Importantly, Dr. Lanphear's team controlled for a large number of potential confounders, including: maternal education, maternal age, quality of the child's home environment (HOME), child sex, gestational age, parity, mother's race, city, and, in some models, self-reported exposure to secondhand smoke. The study also controlled for a wide range of other known developmental neurotoxins, including lead, mercury, manganese, perfluoro-octanoic acid, and arsenic. Short of intentionally dosing pregnant mothers with fluoride, Dr. Lanphear's team maximized the power of environmental epidemiology to investigate whether early-life fluoride exposure has a causal relationship to neurocognitive harm.

As noted in the commentary by Bellinger that accompanied Dr. Lanphear's study in JAMA Pediatrics (Bellinger 2019):

> No doubt aware of the close scrutiny their study will receive, Green et al. considered numerous potential threats to the validity of the findings. Analyses were adjusted for important covariates (eg, maternal education, race, quality of the home environment), including other chemicals (lead, mercury, manganese, perfluorooctanoic acid, or arsenic). Fluoride concentrations in the spot maternal urine samples were adjusted for dilution using both specific gravity (primary analyses) and creatinine levels, with similar results. Regression models were evaluated for collinearity, influential observations, and outliers.

The distributions of residuals and plots of residuals vs fitted values were examined to confirm that model assumptions were met. Spline regression was used to assess whether the association between the dose and effect was nonlinear. The results appear to be robust. (Bellinger 2019).

Dr. Lanphear's team assessed children's intellectual abilities with the Wechsler Preschool and Primary Scale of Intelligence, Third Edition. Full Scale IQ (FSIQ), a measure of global intellectual functioning, was the primary outcome. Verbal IQ (VIQ)—representing verbal reasoning and comprehension—and performance IQ (PIQ)—representing nonverbal reasoning, spatial processing, and visual-motor skills—were also assessed.

Three metrics of fluoride exposure were analyzed.

*Maternal Urinary Fluoride*: Maternal fluoride urine was analyzed using the same methods described above for the 2018 study.

*Water Fluoride*: Average water fluoride level was calculated for each person using the methods described above for the 2018 study.

*Daily Maternal Fluoride Intake from Beverages*: Information on consumption of tap water and other water-based beverages (tea and coffee) was available from a self- report questionnaire completed by mothers during the first and third trimesters. This questionnaire was used in the original MREC cohort, and Dr. Lanphear's team developed a method to calculate fluoride intake. One limitation with this analysis is that neither the MIREC questionnaire nor the fluoride intake method have yet been validated. To estimate fluoride intake from tap water consumed per day (milligrams per day), each woman's consumption of water and beverages was multiplied by her water fluoride concentration (averaged across pregnancy). Because black tea contains a high fluoride content (2.6 mg/L; USDA 2005; Waugh 2017), the amount of fluoride consumed from black tea was estimated by multiplying each cup of black tea by 0.52 mg (mean fluoride content in a 200-mL cup of black tea made with deionized water) and added this to the fluoride intake variable. Green tea also contains varying levels of fluoride; therefore, the study used the mean for green teas listed by the US Department of Agriculture (1.935 mg/L, USDA 2005). Each cup of green tea was multiplied by 0.387 mg (fluoride content in a 200-mL cup of green tea made with deionized water) and added this to the fluoride intake variable.

**(4) Consistent with Dr. Hu's study of the ELEMENT cohort,  Dr. Lanphear has found that prenatal fluoride exposure is significantly associated with lower intellectual abilities in 3-4 year old children, and these associations remain large and significant when controlling for relevant covariates.**

Dr. Lanphear's study of prenatal fluoride exposure and IQ (Green, et al. 2019) was published in *JAMA Pediatrics* on August 19, 2019, along with important editorials from an external expert and the editor of the journal (highly regarded JAMA Pediatrics). The study found large, statistically significant decreases in IQ in children of mothers with higher fluoride exposures during pregnancy for all three measures of exposure (maternal urinary fluoride; total fluoride intake from beverages; water fluoride concentration) (Green, et al. 2019, Table 2, Figure 3, eTable

4). Overall, there was relatively high consistency between fluoride exposure and FSIQ overall, and PIQ specifically, across all of the exposure measures, showing good convergent validity.

After controlling for covariates, a 1-mg/L increase in MUFSG was associated with a 4.49-point lower IQ score (95%CI, −8.38 to −0.60) in boys, but there was no statistically significant association with IQ scores in girls (B = 2.40; 95%CI, −2.53 to 7.33); a 1-mg higher daily intake of fluoride among pregnant women was associated with a 3.66 lower IQ score (95%CI, −7.16 to −0.14) in boys and girls; and a 1 mg/L higher water fluoride concentration was associated with a 5.29 lower IQ score (95%CI, −10.39 to−0.19). To put these findings in perspective, a pooled analysis of 7 cohorts involving over 1,300 children found that an increase in low-level, concurrent blood lead concentrations, from <1 to 10 µg/dL (<10 ppb to 100 ppb), was associated with a 6.9 IQ point decrement (Lanphear 2015, p. 814).

Dr. Lanphear's study discusses reasons for the possible sex-specific effect that was found with maternal urinary fluoride. As the study notes, "boys have a higher prevalence of neurodevelopmental disorders such as ADHD, learning disabilities, and intellectual disabilities. Adverse effects of early exposure to fluoride may manifest differently for girls and boys, as shown with other neurotoxicants." (Green, et al. 2019). In addition, the other two exposure measures (where no sex-specific difference was found) may better correlate with postnatal exposure and thereby reflect distinct risks. Sex differences by timing of exposure have been found in at least one animal study, in which males had greater deficits from prenatal exposure and females greater deficits from postnatal exposure (Mullenix et al 1995).

Dr. Lanphear's team examined the data for possible collinearity, outliers, and influential points and none were found. To quote:

> Regression diagnostics confirmed that there were no collinearity issues in any of the IQ models with MUF$_{SG}$ or fluoride intake (variance inflation factor <2 for all covariates). Residuals from each model had approximately normal distributions, and their Q-Q plots revealed no extreme outliers. Plots of residuals against fitted values did not suggest any assumption violations and there were no substantial influential observations as measured by Cook distance (Green, et al. 2019).

Dr. Lanphear's team also addressed the possibility of non-linear dose-response relationships by conducting sensitivity analyses using quadratic and natural log effects models. As noted in the paper, these did not significantly improve the regression models so linear regression was used because it was considered easier to interpret. Similarly, models with 2 linear splines were tested to check for non-linearity and threshold effects, but none were found. To quote:

> we examined separate models with 2 linear splines to test whether the MUFSG association significantly differed between lower and higher levels of MUFSG based on 3 knots, which were set at 0.5mg/L (mean MUFSG), 0.8mg/L (threshold seen in the Mexican birth cohort), and 1 mg/L (optimal concentration in the United States until 2015). For fluoride intake,

9

knots were set at 0.4 mg (mean fluoride intake), 0.8mg, and 1mg (in accordance with MUFSG) (Green, et al. 2019).

As would be expected, Figure 3 in Dr. Lanphear's study shows a large degree of scatter in the plotted IQ points across the cohort. These are the "raw data" (i.e., unadjusted observed values) and do not take into account the multivariable regression model analyses which simultaneously adjust for all the factors entered in the models and give a more valid picture of the true relationship between F exposure and IQ. The dose-response regression line is also plotted in these graphs, along with its 95% confidence interval. These lines and shaded areas depict the regression model results and indicate relatively narrow confidence intervals and relatively large effects. Additional perspective can be obtained for the degree of scatter and degree of variance explained by fluoride in these graphs by comparing them to similar published results for studies of lead and IQ.

**(5) Based on the convergent results from the MIREC and ELEMENT cohorts, the *in utero* period is likely a susceptible period of life vis-à-vis fluoride toxicity.**

The significant association between prenatal fluoride and IQ in the MIREC cohort (Green, et al., 2019) is convergent with the findings from the ELEMENT cohort (Bashash, et al. 2017, 2018). In Dr. Lanphear's MIREC study, an analysis was done using the same urinary dilution method as used in the ELEMENT study (Green, et al. 2019, eTable 2). Model C in eTable 2 shows a loss of 4.96 IQ points in 3-4 year old boys in the MIREC cohort for every 1 mg/L increase in maternal urine F exposure. In the ELEMENT cohort, each 1 mg/L increase in maternal urine was associated with a statistically significant loss of 6.3 IQ points (measured as GCI points) (Bashash et al 2017, Table 4). Thus, the magnitude of the effect in the ELEMENT cohort and the MIREC cohort are similar and consistent with each other. By contrast, childhood measures of urinary fluoride (at ages 6-12) in the ELEMENT cohort did not significantly correlate with IQ (Bashash, et al. 2017).

As noted by Bellinger (2019): "The effect size seen in boys [in the MIREC analysis] . . . is generally consistent with the effect sizes reported in the Mexico City study . . . and in a 2018 Chinese study (5.3 points per 1-mg/L increase in children's urinary fluoride concentration)."

The comparability of the MIREC and ELEMENT findings is enhanced by the fact that urinary fluoride content exposure was analyzed at the same fluoride lab and was adjusted identically for urinary dilution in both cohorts. Moreover, maternal urinary fluoride levels in Mexico City and Canadian women living in a fluoridated region were essentially the same, and IQ scores were measured at approximately the same age (3 to 4 years).

The consistency of findings between two prospective cohort studies, in two different populations, provides good evidence that prenatal fluoride exposure is a risk factor for neurocognitive harm, particularly when considered in the context of the previous cross-sectional studies of fluoride and IQ, and general knowledge about the vulnerability of the developing brain. As Dr. Lanphear explained in his 2015 review in the *American Journal of Public Health*, "The developing brain is particularly vulnerable to environmental toxins. The blood–brain barrier of the

10

developing brain is not fully formed, and it is more permeable to toxins than is the mature brain" (Lanphear 2015).

**(6) It is advisable and prudent for pregnant women to begin taking steps to reduce their fluoride intake, including but not limited to reducing their consumption of fluoridated water.**

As Dr. Lanphear noted in his 2015 review, "Once a toxin is disseminated in the environment, it requires a Herculean effort to disentangle its effects from other prevalent and modifiable risk factors for brain-based disorders. There are likely to be many risk factors because brain-based disorders represent an array of behaviors or deficits that exist on a continuum." (Lanphear 2015). As a result, "there is an endless litany of potential confounders to consider, a limitation of observational studies that is often used to thwart efforts to regulate environmental toxins despite compelling evidence from human and laboratory studies" (Lanphear 2015).

Based on the convergent findings of the MIREC and ELEMENT studies of prenatal fluoride/IQ (Bashash, et al. 2017, 2018; Green, et al. 2019), coupled with general knowledge about the vulnerability of the fetal brain to environmental toxins (Lanphear 2015) and absence of caries preventive benefits from prenatal fluoride exposure (Green, et al. 2019, citing Limeback 1999; Takahasi, et al. 2017), it is Dr. Lanphear's professional medical opinion that pregnant women should take steps to reduce their fluoride intake, including minimizing their exposure to fluoridated water. In a *JAMA Pediatrics* podcast accompanying the publication of Dr. Lanphear's study, a *JAMA Pediatrics* editor (Christakis) expressed his agreement with this recommendation.

**(7) Exposure to fluoridated water in infancy, particularly among formula fed infants, is associated with diminished intellectual abilities in the MIREC cohort.**

An extension of the MIREC cohort study which is currently in review, has focused on postnatal fluoride exposure in infants (Till et al in review).  In particular, this study compares the effect on IQ in infants fed formula made up with fluoridated water compared to infants fed formula made up with nonfluoridated water. An additional comparison is made with infants predominantly breastfed, who either live in areas with fluoridated or nonfluoridated water.  Breastmilk contains very low levels of fluoride, regardless of how much fluoride exposure the mother receives.

*Methods*

Of the 610 children in the MIREC cohort who were recruited to participate in the developmental follow-up phase of the study (MIREC-Child Development Plus), 601 completed all testing. Children were recruited from six of the cities in the original cohort (Vancouver, Toronto, Hamilton, Halifax, Kingston, Montreal); approximately half of the children lived in non-fluoridated areas and half lived in fluoridated cities. This study received ethics approval from Health Canada, York University, and Indiana University.

*Infant Feeding Assessment*

When children were between 30 and 48 months of age, mothers completed a questionnaire asking, "How old was your baby when you ceased breastfeeding exclusively?" Women who breastfed exclusively for six months or longer were included in the breastfeeding (BF) group; those who reported introducing formula within the first six months (never breastfed or partial

11

breastfeeding) were included in the formula-feeding (FF) group.

Dr. Lanphear's team dichotomized feeding status at six months because the Canadian Pediatric Society and American Academy of Pediatrics both recommend exclusive breastfeeding for six months[19] [20]. Moreover, formula-fed infants who are younger than six-months derive most of their nutrition from formula, placing this group at highest risk of exceeding the upper limit (0.7 mg/d) for fluoride. Finally, fluoride intake differences become less evident when other dietary sources of fluoride are introduced at around six months.

*Infant Fluoride Exposure*

Fluoride concentrations in drinking water were measured used the same method described above. The study excluded participants who reported that their primary drinking source was from a well or 'other' (e.g. bottled water) (Till, et al in review, Table SI).

To obtain a continuous fluoride exposure measure collapsed across the BF and FF groups, infant fluoride intake (IFI in mg F/day) was estimated by multiplying water fluoride concentration by the amount of time that the infant was not exclusively breastfed in the first year using the following equation:

$$IFI= (water\_F mg/L) *(l - \#mo\_excl\_BF/ll.\ 99) *0.80L/day$$

where *water_F mg/L* refers to the average water fluoride concentration and *1- #mo_excl_BF/11.99* represents the proportion over the 12-month period the infant was not exclusively breastfed. A value near one indicates that an infant was primarily formula-fed over the 12 months whereas a value near zero indicates an infant primarily breastfed. IFI was estimated based on a daily consumption of 0.80 L of water used to reconstitute powdered formula as suggested by an infant food diary completed for infants in a prior study. Because the type of formula used (i.e. soy- or milk-based) was not known, Dr. Lanphear's team did not add fluoride from formula to its IFI estimate.

*Fetal Fluoride Exposure*

Maternal urinary fluoride (MUF) adjusted for specific gravity was used as a proxy of fetal fluoride exposure. MUF, which was derived by averaging three spot samples collected across all three trimesters of pregnancy, was considered the most reliable measure of exposure. Urinary fluoride concentrations were analyzed at the Indiana University School of Dentistry using a modification of the hexamethyldisiloxane described above.

*Intelligence Assessment*

Children's intellectual abilities were assessed between ages 2.5 and 4.0 years with the Wechsler Preschool and Primary Scale of Intelligence-III using United States population-based normative data *(mean=* 100, SD=15). Outcomes included Full-Scale IQ (FSIQ), a measure of global intellectual functioning, Verbal-IQ (VIQ), a measure of verbal reasoning, and Performance-IQ (PIQ), a measure of non-verbal reasoning and visual-motor coordination skills.

*Covariates*

Dr. Lanphear's team adjusted for potential confounding by selecting covariates *a priori* that have been associated with fluoride, breastfeeding, and children's intellectual abilities. Final

12

covariates included child's sex and age, maternal education (dichotomized as either a bachelor's degree or higher versus trade school diploma or lower), maternal race (white or not), second-hand smoke in the home (yes, no), and quality of the child's home environment (measured at time of testing using the Home Observation for Measurement of the Environment (HOME)-Revised Edition38). For each analysis, a covariate was retained in the final model if its *p*-\alue was <.20 and its inclusion changed the regression coefficient of water fluoride concentration or IFI by more than 10%39.

*Statistical analyses*

Linear regression was used to model differences in child IQ by water fluoride concentration while controlling for covariates. In one model, feeding status (BF or FF) was examined to see if it modified the detrimental impact of water fluoride. In a second model, the association between IFI and child IQ was estimated. Potential confounders were controlled for by including them simultaneously with predictors.

In secondary analyses, MUF during pregnancy was controlled for in both models to account for fetal exposure. Sex-specific effects were also tested for because of the previous findings that MUF concentration is associated with diminished FSIQ in males (Green, et al. 2019).

Regression diagnostics indicated no assumption violations pertaining to linearity, normality, or homogeneity of variance. Specifically, QQ-plots of residuals were consistent with a normal distribution and revealed no extreme outliers. Plots of residuals against fitted values did not suggest any assumption violations and there were no substantial influential observations (i.e., Cook's distance). Finally, variance inflation factors indicated no concerns with excessive multicollinearity.

To aid interpretation, all regression coefficients were divided by two so that they represent the predicted IQ difference per 0.5 mg/L of fluoride in tap water; 0.5 mg/L corresponds to the approximate difference between mean water fluoride level in fluoridated versus non-fluoridated regions. For consistency, the IFI regression coefficients were also divided by two to represent the predicted difference in IQ per 0.5 mg of fluoride intake per day.

The main measure of F exposure was the tap water F concentration in units of mg/L. Mothers who did not report drinking tap water were excluded from analyses.

The results for infants categorized as at least partly formula fed in the first 6 months of life (rather than exclusively breast-fed), was a statistically significant 4.40 point drop in IQ for every 0.5 mg/L increase in the water F concentration. This translates to an 8.80 point drop in IQ for every 1.0 mg/L increase in water F concentration. This effect was found in both boys and girls and was after controlling for a variety of covariates. For exclusively breast-fed infants the drop in IQ was only 1.34 IQ points for every 0.5 mg/L increase in water F concentration (or 2.68 IQ points for every 1.0 mg/L increase in water F), but this effect was not statistically significant.

13

**(8) The association between infant exposure to fluoridated water and reduced IQ in the MIREC cohort remains significant after controlling for fetal fluoride exposure and other relevant covariates, suggesting that the susceptibility to fluoride's adverse neurological effects extends into infancy.**

When adjustment was made for prenatal fluoride exposure by including MUF during pregnancy as a covariate, the loss of IQ in formula-fed infants was slightly less than without this adjustment, but still very large (7.16 IQ points lost per 1.0 mg/L increase in water F). The effect, however, was no longer statistically significant. This result was for Full Scale IQ (FSIQ). FSIQ is derived from two separate components known as Performance IQ (PIQ) and Verbal IQ (VIQ). Analyses of the effect of F on PIQ found more than twice the loss of points compared to FSIQ, and results for all subanalyses, including those adjusted for prenatal maternal urine F were statistically significant. The loss of PIQ in formula-fed infants was 9.26 points for every 0.5 mg/L increase in water F; a very large drop. About 50% of infants in the MIREC study were formula-fed for at least part of the first 6 months rather than exclusively breast-fed.

The mean VIQ scores increased with increasing water fluoride, but none of the increases were statistically significant, and none of the increases were large enough to counteract the much larger PIQ deficits associated with water fluoride in all models.

Based on these results, Dr. Lanphear and his team recommended that steps be taken to limit exposure to fluoride during the first six months of life, particularly in light of evidence indicating no benefit to teeth during this lifestage. The study concludes:

> In summary, fluoride intake among infants younger than 6 months may exceed the tolerable upper limits if they are fed exclusively with formula reconstituted with fluoridated tap water. After adjusting for fetal exposure, we found that fluoride exposure during infancy predicts diminished non-verbal intelligence in children. In the absence of any benefit from fluoride consumption in the first six months, it is prudent to limit fluoride exposure by using non-fluoridated water or water with lower fluoride content as a formula diluent (Till, et al., in review).

**References:**

Arbuckle TE. Are there sex and gender differences in acute exposure to chemicals in the same setting? 2006. Environmental Research 101(2):195-204.

Arbuckle TE, Fraser WD, Fisher M, Davis K, Liang CL, Lupien N, Bastien S, Velez MP, von Dadelszen P, Hemmings DG, Wang J, Helewa M, Taback S, Sermer M, Foster W, Ross G, et al. 2013. Cohort profile: the maternal-infant research on environmental chemicals research platform. Paediatric and Perinatal Epidemiology 27(4):415-425.doi:10.1111/ppe.1206114.

Bashash M, Thomas D, Hu H, Martinez-Mier EA, Sanchez BN, Basu N, Peterson KE, Ettinger AS, Wright R, Zhang Z, Liu Y, Schnaas L, Mercado-García A, Téllez-Rojo MM, Hernández-Avila M. 2017. Prenatal Fluoride Exposure and Cognitive Outcomes in Children at 4 and 6-12 Years of Age in Mexico. Environmental Heath Perspectives 125(9):097017.

Bashash M, Marchand M, Hu H, Till C, Martinez-Mier EA, Sanchez BN, Basu N, Peterson KE, Green R, Schnaas L, Mercado-García A, Hernández-Avila M, Téllez-Rojo MM. 2018. Prenatal fluoride exposure and attention deficit hyperactivity disorder (ADHD) symptoms in children at 6-12 years of age in Mexico City. Environment International 121(Pt 1):658-666.

Bellinger DC. 2019. Is Fluoride Potentially Neurotoxic? JAMA Pediatrics Published online August 19, 2019 doi:10.1001/jamapediatrics.2019.1728

Boyle CA, Boulet S, Schieve LA, Cohen RA, Blumberg SJ, Yeargin-Allsopp M, Visser S, Kogan MD. 2011. Trends in the prevalence of developmental disabilities in US Children, 1997–2008. Pediatrics 127(6):1034-42.

Buzalaf MAR, Whitford GM. 2011. Fluoride intake, metabolism and toxicity. In: Fluoride and the Oral Environment. Vol.22. Buzalaf MAR, ed.Basel, Switzerland: Karger, 20–36.

Buzalaf CP, Leite ADL, Buzalaf MAR. 2015. Fluoride Metabolism. In Fluoride: Chemistry, Analysis, Function and Effects. Preedy VR, ed. Cambridge, UK: Royal Society of Chemistry, 54–72.

Cantoral A, Luna-Villa LC, Mantilla-Rodriguez AA, Mercado A, Lippert F, Liu Y, Peterson KE, Hu H, Téllez-Rojo MM, Martinez-Mier EA. 2019. Fluoride Content in Foods and Beverages From Mexico City Markets and Supermarkets. Food and Nutrition Bulletin [Epub ahead of print].

Choi AL, Sun G, Zhang Y, Grandjean P. 2012. Developmental fluoride neurotoxicity: a systematic review and meta-analysis. Environmental Health Perspectives 120(10):1362-1368. doi:10.1289/ehp.11049127.

Christakis DA. 2019. Decision to Publish Study on Maternal Fluoride Exposure During Pregnancy. JAMA Pediatrics Published online August 19, 2019. doi:10.1001/jamapediatrics.2019.3120

Desrochers-Couture M, Oulhote Y, Arbuckle TE, Fraser WD, Séguin JR, Ouellet E, Forget-Dubois N, Ayotte P, Boivin M, Lanphear BP, Muckle G. 2018. Prenatal, concurrent, and sex-specific associations between blood lead concentrations and IQ in preschool Canadian children. Environment International 121(Pt 2):1235-1242.

Evans SF, Kobrosly RW, Barrett ES, Thurston SW, Calafat AM, Weiss B, Stahlhut R, Yolton K, Swan SH. 2014. Prenatal bisphenol A exposure and maternally reported behavior in boys and girls. Neurotoxicology 45:91-99.

Fung KF, Zhang ZQ, Wong JWC, Wong MH. 1999. Fluoride contents in tea and soil from tea plantations and the release of fluoride into tea liquor during infusion. Environmental Polluttion 104(2):197–205, https://doi.org/10.1016/S0269-7491(98)00187-0.

Gerchman F, Tong J, Utzschneider KM, Zraika S, Udayasankar J, McNeely MJ, et al. 2009. Body mass index is associated with increased creatinine clearance by a mechanism independent of body fat distribution. The Journal of clinical endocrinology and metabolism 94(10):3781–3788,PMID: 19584179, https://doi.org/10.1210/jc.2008- 2508.

15

Gochfeld M. 2017. Sex differences in human and animal toxicology. Toxicologic Pathology. 45(1):172-189.

Green R, Lanphear B, Hornung R, Flora D, Martinez-Mier EA, Neufeld R, Ayotte P, Muckle G, Till C. 2019. Association Between Maternal Fluoride Exposure During Pregnancy and IQ Scores in Offspring in Canada. JAMA Pediatrics Published online August 19, 2019 doi:10.1001/jamapediatrics.2019.1729 [Epub ahead of print]

Health Canada. 2010. "Guidelines for Canadian Drinking Water Quality: Guideline Technical Document —Fluoride." Catalogue No. H128-1/11-647E-PDF. Ottawa, ON, Canada: Her Majesty the Queen in Right of Canada.

Lamphear BH. 2015. The Impact of Toxins on the Developing Brain. Annual Review of Public Health 36:211-30.

Limeback H. A re-examination of the pre-eruptive and post-eruptive mechanism of the anti-caries effects of fluoride: is there any anti-caries benefit from swallowing fluoride? Community Dent Oral Epidemiol. 1999;27(1):62-71. doi:10.1111/j.1600-0528.1999.tb01993.x

Malinowska E, Inkielewicz I, Czarnowski W, Szefer P. 2008. Assessment of fluoride concentration and daily intake by human from tea and herbal infusions. Food and Chemical Toxicology 46(3):1055–1061,PMID: 18078704, https://doi.org/10.1016/j.fct.2007.10.039.

Martínez-Mier EA, Soto-Rojas AE, Buckley CM, Zero DT, Margineda J. 2005. Fluoride concentration of bottled water, tap water, and fluoridated salt from two communities in Mexico. International dental journal 55(2):93-9.

Martínez-Mier EA, Cury JA, Heilman JR, Katz BP, Levy SM, Li Y, Maguire A, Margineda J, O'Mullane D, et al. 2011. Development of gold standard ion-selective electrode-based methods for fluoride analysis. Caries Research 45(1):3–12, PMID: 21160184, https://doi.org/10.1159/000321657.

Mostafaei F, McNeill FE, Chettle DR, Wainman BC, Pidruczny AE,Prestwich WV. 2015. Measurements of fluorine in contemporary urban Canadians: a comparison of the levels found in human bone using in vivo and ex vivo neutron activation analysis. Physiological Measurement 36(3):465–487, PMID: 25669130, https://doi.org/10. 1088/0967-3334/36/3/465.

Mullenix PJ, Denbesten PK, Schunior A, Kernan WJ. 1995. Neurotoxicity of sodium fluoride in rats. Neurotoxicology and Teratology 17(2):169-77.

NIEHS/EPA. 2017. NIEHS/EPA Children's Environmental Health and Disease Prevention Centers – Impact Report. EPA/600/R-17/407.

Opydo-Szymaczek J, Borysewicz-Lewicka M. 2005. Urinary fluoride levels for assessment of fluorideexposure of pregnant women in Poznan, Poland. Fluoride. 38(4):312-317.15.

Paez D, Dapas O. 1983. Biochemistry of fluorosis X—comparative study of the fluoride levels in biological fluids. Fluoride 15(2):88–96.

Rosenbaum PR, Rubin DB. 1983. The central role of the propensity score in observational studies for causal effects. Biometrika 70(1):41–55, https://doi.org/10. 1093/biomet/70.1.41.

Takahashi R, Ota E, Hoshi K, et al. Fluoride supplementation (with tablets, drops, lozenges or chewing gum) in pregnant women for preventing dental caries in the primary teeth of their children. Cochrane Database Syst Rev. 2017;10(10):CD011850. doi:10.1002/14651858.CD011850.pub2

Thomas DB, Basu N, Martinez-Mier EA, Sánchez BN, Zhang Z, Liu Y, Parajuli RP, Peterson K, Mercado-Garcia A, Bashash M, Hernández-Avila M, Hu H, Téllez-Rojo MM. 2016. Environmental Research 150:489-495.

Thomas D, Sanchez B, Peterson K, Basu N, Martinez-Mier EA, Mercado-Garcia A, Hernandez-Avila M, Till C, Bashash M, Hu H, Tellez-Rojo MM. 2018. OP V – 2 Prenatal fluoride exposure and neurobehavior among children 1–3 years of age in Mexico. Occupational & Environmental Medicine 5:A10 (Abstract).

Till C, Green R, Grundy JG, Hornung R, Neufeld R, Martinez-Mier EA, Ayotte P, Muckle G, Lanphear B. 2018. Community Water Fluoridation and Urinary Fluoride Concentrations in a National Sample of Pregnant Women in Canada. Environmental Health Perspectives 126(10):107001.

USDA Nutrient Data Laboratory Beltsville Human Nutrition Research Center Agricultural Research Service. USDA National Fluoride Database of Selected Beverages and Foods. http://www.ars.usda.gov/SP2UserFiles/Place/80400525/Data/Fluoride/F02.pdf. Published 2005. Accessed May 18, 2017.

Valdez Jiménez L, López Guzmán OD, Cervantes Flores M, Costilla-Salazar R, Calderón Hernández J, Alcaraz Contreras Y, Rocha-Amador DO. 2017. In utero exposure to fluoride and cognitive development delay in infants. Neurotoxicology 59:65-70.

Waugh DT, Potter W, Limeback H, Godfrey M. Risk Assessment of fluoride intake from tea in the Republic of Ireland and its implications for public health and water fluoridation. Int J Environ Res Public Health. 2016;13(3):259. doi:10.3390/ijerph13030259

Zipkin I, Likins RC, McClure FJ, Steere AC. 1956. Urinary fluoride levels associated with use of fluoridated waters. Public Health Reports 71(8):767–772,PMID: 13350471, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2031051/pdf/pubhealthreporig00152-0045.pdf

17

# EXHIBIT M

1  DEBRA J. CARFORA
2  JOHN THOMAS H. DO
   BRANDON N. ADKINS
3  U.S. Department of Justice
   Environment & Natural Resources Division
4  Environmental Defense Section
   P.O. Box 7611
5  Washington, DC. 20044-7611
6  Tel.    (202) 514-2640 (Carfora)
          (202) 514-2593 (Do)
7          (202) 616-9174 (Adkins)
8  Fax     (202) 514-8865
   debra.carfora@usdoj.gov
9  john.do@usdoj.gov
   brandon.adkins@usdoj.gov
10
11 *Attorneys for Federal Defendants*

12
13            **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
14               **SAN FRANCISCO DIVISION**

15

16  FOOD & WATER WATCH, INC., et al.,          No. 3:17-cv-02162-EMC

17                                             **FEDERAL DEFENDANTS'**
18              Plaintiffs,                    **SUPPLEMENT TO THEIR EXPERT**
          v.                                   **DISCLOSURES AND DESIGNATIONS**
19                                             **(SEPTEMBER 18, 2019)**
    U.S. ENVIRONMENTAL PROTECTION
20  AGENY, et al.,

21              Defendants.
22

23

24          Pursuant to Federal Rule of Civil Procedure 26(a)(2) and (e), Federal Defendants hereby

25  supplement their expert disclosures and designations by disclosing the identity of an additional

26  witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705:

27

28

1  E. Angeles Martinez-Mier, DDS, PhD, MSD, Chairperson – Cariology, Operative

2  Dentistry and Dental Public Health, Professor, Indiana University School of Dentistry, Oral Health

3  Research Institute, 415 Lansing Street, Indianapolis, IN 46202.

4  Dr. Martinez-Mier is not required to provide a written report pursuant to Federal Rule of

5  Civil Procedure 26(a)(2)(B). The subject matter on which Dr. Martinez-Mier is expected to present

6  evidence under Federal Rule of Evidence 702, 703, or 705 is the scientific evidence of fluoride's

7  potential neurotoxic effects based on her research of birth cohorts in the Early Life Exposure in

8  Mexico to Environmental Toxicants (ELEMENT) project and the Mother-Infant Research on

9  Environmental Chemicals (MIREC) project in Canada. The following is a summary of the facts

10 and opinions to which Dr. Martinez-Mier is expected to testify:

11 Dr. Martinez-Mier is a co-author of several studies of birth cohorts of the ELEMENT and

12 MIREC projects concerning potential impact of fluoride exposure on neurobehavioral

13 development, including every study on which Plaintiffs' "non-retained" experts are expected to

14 testify and that Plaintiffs attached to their expert disclosures and designations. Those studies are:

15
16  1.  Urinary and plasma fluoride levels in pregnant women from Mexico City (Thomas, et al. 2016)

17  2.  Prenatal fluoride exposure and cognitive outcomes in children at 4 and 6–12 years of age in Mexico (Bashash, et al. 2017)

18
19  3.  Prenatal fluoride exposure and attention deficit hyperactivity disorder (ADHD) symptoms in children at 6–12 years of age in Mexico City (Bashash, et al. 2018)

20
21  4.  Community water fluoridation and urinary fluoride concentrations in a national sample of pregnant women in Canada (Till, et al. 2018)

22  5.  Association between maternal fluoride exposure during pregnancy and IQ scores in offspring in Canada (Green, et al. 2019)

23  6.  Fluoride exposure from infant formula and child IQ in a Canadian birth cohort (Till, et al., in press)

24
25 Dr. Martinez-Mier will testify to the design and findings of her studies of birth cohorts of the

26
27
28

1   ELEMENT and MIREC projects, the comparability of the MIREC and ELEMENT studies'

2   findings, and whether the findings of any of the listed studies are generalizable to the United States.

3   The facts on which Dr. Martinez-Mier's opinion will be based are the listed studies on which she

4   was a co-author with Plaintiffs' "non-retained" experts and the absence of sufficient data regarding

5   comparative sources of fluoride exposure.

6

7   Dated:   September 18, 2019                      Respectfully submitted,

8                                                    /s/ *John Thomas H. Do*

9                                                    DEBRA J. CARFORA
                                                     JOHN THOMAS H. DO
10                                                   Brandon N. Adkins
                                                     U.S. Department of Justice
11                                                   Environment & Natural Resources Division
                                                     Environmental Defense Section
12                                                   P.O. Box 7611
                                                     Washington, DC 20044
13                                                   Tel: (202) 514-2640
14                                                   Emails:      john.do@usdoj.gov
15                                                                debra.carfora@usdoj.gov
                                                                  brandon.adkins@usdoj.gov
16

17                                                   *Attorneys for Federal Defendants*

18

19

20

21

22

23

24

25

26

27

28

3

Federal Defendants' Supplement to Expert Disclosures and Designations
*Food & Water Watch, Inc., et al. v. U.S. Environmental Protection Agency, et al.*, No. 3:17-cv-02162-EMC (N.D. Cal.)

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing was served by electronic mail and U.S. Postal Service on September 18, 2019 on Michael P. Connett, 222 N Pacific Coast Highway, Suite 1900, El Segundo, CA 90245, 310-414-8146, mconnett@waterskraus.com.


*/s/ John Thomas H. Do*

JOHN THOMAS H. DO

4

# EXHIBIT N

## DePasquale, Daniel

| | |
|---|---|
| **Subject:** | FW: Teleconference Briefing |
| **Start:** | Thu 9/19/2019 4:00 PM |
| **End:** | Thu 9/19/2019 5:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Accepted |
| **Organizer:** | bucher@niehs.nih.gov |

-----Original Appointment-----
**From:** Bucher, John (NIH/NIEHS) [E] <bucher@niehs.nih.gov>
**Sent:** Monday, September 16, 2019 10:31 AM
**To:** Bucher, John (NIH/NIEHS) [E]; Henry, Tala; Donohue, Joyce; Ohanian, Edward; Swartz, Christina; Wilber, Eric; wolfe@niehs.nih.gov; Taylor, Kyla (NIH/NIEHS) [E]; Rooney, Andrew (NIH/NIEHS) [E]
**Subject:** Teleconference Briefing
**When:** Thursday, September 19, 2019 4:00 PM-5:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:**

Hi,

Thanks for your interest in a briefing on an upcoming draft NTP monograph developed by our Office of Health Assessment and Translation (OHAT) literature analysis program. We have scheduled this short teleconference briefing for 4 PM, Sept 19th. Please call 888-790-2425 and use passcode 2720621#.

Best,
John Bucher

# EXHIBIT O

| | |
|---|---|
| **From:** | Do, John Thomas (ENRD) |
| **To:** | Michael Connett |
| **Cc:** | Carfora, Debra (ENRD); Adkins, Brandon (ENRD) |
| **Subject:** | RE: Fluoride: Request for Attorney Conference |
| **Date:** | Thursday, September 19, 2019 12:51:00 PM |
| **Attachments:** | ENV_DEFENSE-#877560-v1-Fluoride_DRAFT_Stip_Schedule.DOCX |

In advance of our call, please consider the attached.

Conference Line: 866-410-9426 / Pass code: 1726941

---

**From:** Do, John Thomas (ENRD)
**Sent:** Wednesday, September 18, 2019 5:33 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Subject:** Re: Fluoride: Request for Attorney Conference

Michael,


We are disappointed that you are no longer available to confer on the schedule today.  Nonetheless, we will send a proposed stipulation for your review and make ourselves available at 1:30 ET tomorrow. Please ensure that you will be able to confer with any other co-counsel or client tomorrow.  If the parties are unable to agree on a revised schedule, EPA intends to move the Court for an extension of the deadlines by the close of business tomorrow.

Regards,
JT

On Sep 18, 2019, at 5:14 PM, Michael Connett <mconnett@waterskraus.com> wrote:

> I will not be able to meet today, but will be available any time after 1:30 pm EST tomorrow. Let me know what time works best for you.
>
>
> <image001.jpg>
> **Michael P. Connett | Attorney**
> 222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
> Toll Free 800-226-9880 | Phone 310-414-8146
> Fax 310-414-8156
> mconnett@waterskraus.com | www.waterskrauspaul.com
>
> ---
>
> **From:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>
> **Sent:** Wednesday, September 18, 2019 1:52 PM
> **To:** Michael Connett <mconnett@waterskraus.com>
> **Cc:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>; Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
> **Subject:** RE: Fluoride: Request for Attorney Conference

Michael,

In advance of our call, we would like to inform you of two new developments which merit reconsideration of the present scheduling order.  First, under separate cover, we are supplementing our expert disclosures and designations.  Second, we just learned that NTP has submitted its systematic review of fluoride exposure and neurodevelopmental health effects to the National Academy of Sciences.  It is our understanding that review will be made public in October.  On our call, we'd like to discuss adjusting the scheduling order to accommodate these new developments.

**Please confirm whether we are proceeding with the call at 5 ET or 6 ET**.  We understand that you may need to confer with folks afterwards, particularly if we stick with 5 ET.

Regards
JT

---

**From:** Do, John Thomas (ENRD)
**Sent:** Wednesday, September 18, 2019 4:51 PM
**To:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Subject:** RE: Fluoride: Request for Attorney Conference

Michael,

In advance of our call, we would like to inform you of two new developments which merit reconsideration of the present scheduling order.  First, under separate cover, we are supplementing our expert disclosures and designations.  Second, we just learned that NTP has submitted its systematic review of fluoride exposure and neurodevelopmental health effects to the National Academy of Sciences.  It is our understanding that review will be made public in October.  On our call, we'd like to discuss adjusting the scheduling order to accommodate these new developments.

**Please confirm whether we are proceeding with the call at 5 ET or 6 ET**.  We understand that you may need to confer with folks afterwards, particularly if we stick with 5 ET.

Regards
JT

---

**From:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>

**Sent:** Wednesday, September 18, 2019 2:43 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Subject:** RE: Fluoride: Request for Attorney Conference

I understand.  Based on your parameters, it's likely the call will have to wait until tomorrow.  But I will do my best to obtain the necessary information by 4pm.

DEBRA J. CARFORA, Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division
202.514.2640

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Wednesday, September 18, 2019 2:39 PM
**To:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Cc:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Subject:** RE: Fluoride: Request for Attorney Conference

I can meet at 5 pm EST, but I will need to know more about these developments before I can meet, as I will need to get input from my team. If you can't provide those details before 4 pm EST, I will need to push back to 6 pm EST.

<image001.jpg>
**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

**From:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Sent:** Wednesday, September 18, 2019 11:36 AM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>; Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Subject:** RE: Fluoride: Request for Attorney Conference

There are a couple of developments that warrant adjusting the deadlines in this case, one of which I'm working through now in an effort to obtain further information hopefully that I can share with you on our call.  Unfortunately, that's the best I can offer right this minute.  My intent in setting up the conference so quickly is to work through these developments in the most efficient manner.

Please confirm, you mean 5pm eastern?

Thanks,

Debra J. Carfora, Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division
202.514.2640

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Wednesday, September 18, 2019 2:23 PM
**To:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Cc:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Subject:** RE: Fluoride: Request for Attorney Conference

Will do. In the meantime, can you please tell me what the issue is so that I can gather input from my team prior to the call?

<image001.jpg>
**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

---

**From:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Sent:** Wednesday, September 18, 2019 11:22 AM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>; Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Subject:** RE: Fluoride: Request for Attorney Conference

Yes.  Please call the conference line at 5pm.

Debra J. Carfora, Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division
202.514.2640

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Wednesday, September 18, 2019 2:20 PM
**To:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Cc:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Subject:** RE: Fluoride: Request for Attorney Conference

Ooops – I forgot I have another meeting at 3:30. Can we do 5 instead?

<image001.jpg>
**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

---

**From:** Michael Connett
**Sent:** Wednesday, September 18, 2019 11:18 AM
**To:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Cc:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>; Adkins, Brandon (ENRD)
<Brandon.Adkins@usdoj.gov>
**Subject:** RE: Fluoride: Request for Attorney Conference

What's the issue??

<image001.jpg>
**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

---

**From:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Sent:** Wednesday, September 18, 2019 11:18 AM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>; Adkins, Brandon (ENRD)
<Brandon.Adkins@usdoj.gov>
**Subject:** RE: Fluoride: Request for Attorney Conference

I'm referring to the most recent stipulation and order concerning expert discovery and
summary judgment briefing.  Please use the following conference line at 3:30:

Conference Line: 866-410-9426 / Pass code: 1726941

Thanks,

DEBRA J. CARFORA, Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division
202.514.2640

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Wednesday, September 18, 2019 2:13 PM
**To:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Cc:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD)

<BAdkins@ENRD.USDOJ.GOV>
**Subject:** RE: Fluoride: Request for Attorney Conference

I'm available at 3:30, but what scheduling order are you referring to? I saw the order in the asbestos case, but I haven't seen anything in the fluoride case.

<image001.jpg>
**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

---

**From:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Sent:** Wednesday, September 18, 2019 11:11 AM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>; Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Subject:** Fluoride: Request for Attorney Conference

Michael,

Are you available this afternoon for an attorney conference concerning the scheduling order?  There are two issues we would like to discuss with you via telephone conference prior to EPA filing something with the Court.  We are available any time after 3:30 eastern today.

Thanks,

_____
Debra J. Carfora, Trial Attorney
Environmental Defense Section | Environment and Natural Resources Division | U.S. Department of Justice
Phone | office 202.514.2640 | cell 202.598.3835 | fax 202.514.8865
4 Constitution Square, 150 M Street NE, Room 4.1114, Washington DC 20001