C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, et al.,<br><br>  Plaintiffs,<br><br>vs.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.<br><br>  Defendants. | Civ. No. 17-CV-02162-EMC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO ENLARGE TIME FOR LIMITED EXPERT DISCOVERY** |

Plaintiffs oppose EPA's motion to derail the entire schedule of this case (which EPA *stipulated to just one week before its motion*) based on a *draft* review that EPA has known about for years, and an unjustified, last-minute disclosure of an expert whom EPA knew about since at least June 27, 2019.

## I. NTP's *Draft* Review Does Not Justify Derailing the Entire Schedule

EPA has been aware of the NTP's review (i.e., "monograph") for the entirety of this litigation. EPA is not only a member of NTP's Executive Committee, but provided comments to the NTP about the review prior to the review's commencement in late 2016. Connett Decl. ¶¶ 2-3. At no point, however, during the 2+ years of this litigation has EPA expressed any concern that the NTP review could affect the scheduling of this case. *Id.* ¶ 4. The parties have engaged in numerous meet and confers for more than two years and not once has EPA raised this as a potential issue. *Id.* Similarly, in the six Joint Case Management Statements and six scheduling stipulations that the parties have filed with the Court—including a stipulation filed *just 7 days prior to the instant motion*—EPA has never flagged the draft NTP review as posing a potential threat to the schedule. ECF Nos. 23, 49, 55, 59, 69, 72, 84, 87, 97, 104, 108, 111.

If EPA is professing surprise that NTP is releasing its draft review this fall, such surprise has little credibility because it requires one to believe that the EPA is more ignorant than citizen groups of the activities of a federal health organization *which EPA works with and helps oversee*. Specifically, the Plaintiff citizen groups in this case were informed by several scientists early this year that NTP would be releasing its draft report in 2019. Connett Decl. ¶ 5. EPA, as a member of NTP's Executive Committee, should have *at least* as much knowledge of NTP's activities as citizen groups.

But, assuming *arguendo* that EPA was truly caught by surprise to learn of NTP's intention to release the draft report this fall, the release of a *draft* review provides no justification for derailing the entire schedule, including the trial date. Federal courts have long recognized the reduced trustworthiness of draft government reports, holding them inadmissible under Federal Rule of Evidence 803.[1] Further, NTP

---

[1] *E.g.*, *Toole v. McClintock*, 999 F.2d 1430, 1434–35 (11th Cir. 1993) ("[T]he FDA report is not the kind
Continued on the next page

specifically warns about the potential for its draft findings to be modified during the review process; the cover page for all draft NTP reports provides the disclaimer that the draft "*does not represent and should not be construed to represent any NTP determination or policy*." Connett Decl. ¶ 6. EPA entirely ignores this disclaimer and inappropriately characterizes the NTP draft review as a "completed" report in its motion.[2] Mot. at 1:21. NTP's draft will undergo 12 months of peer review by the National Academy of Sciences, Connett Decl. ¶ 7, and will be subject to extensive public comments which "are an integral part of the process." *Synthetic Organic Chem. Mfrs. Ass'n v. Sec'y, Dep't of Health & Human Servs.*, 720 F. Supp. 1244, 1250–51 (W.D. La. 1989). The conclusions of the draft review, therefore, will not necessarily reflect the conclusions in the final report. Indeed, in NTP's previous review of fluoride neurotoxicity, the conclusions contained in the draft report were materially changed in the final document after receiving input from interested parties, including EPA. Connett Decl. ¶¶ 8-10.

Even if the NTP was releasing a final report in October (it is not), this would still not provide a justification for undoing the entire schedule. The NTP review is just that: a *review*; it is not a study generating new data. Both parties' experts have already reviewed the same scientific literature that the NTP reviewed. Moreover, if NTP's draft assessment of this literature is worthy of consideration, this can be accomplished through far less costly and disruptive means than issuing new expert reports, re-deposing experts, and derailing the entire schedule. For example, if the NTP's draft report challenges any of the experts' opinions, the NTP's draft report can be used as a source for cross-examination at trial. The Court can then give the NTP report whatever due weight it deems appropriate.

---

of trustworthy report described in Rule 803. By its own terms, the FDA report contained only 'proposed' findings. The report invited public comment and forecasted the issuance of a 'final' document after more study."); *City of New York v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981) ("As an interim report subject to revision and review, the report did not satisfy the express requirement of the Rule that the proffered evidence must constitute the "findings" of an agency or official."); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1147 (E.D. Pa. 1980) ("[W]e believe that where the proffered findings are preliminary . . . and are not only subject to extensive reconsideration, but are highly susceptible to modification or reversal, they cannot be deemed trustworthy.").

[2] The word "draft" is conspicuously absent from EPA's description of the NTP report.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO ENLARGE TIME FOR LIMITED EXPERT DISCOVERY

**2. EPA's Unjustified, Last-Minute Disclosure of an Expert Does Not Justify Derailing the Schedule**

EPA's *voluntary* decision not to contact Dr. Martinez-Mier until the eve of the expert cut-off date is *not* a permissible basis for EPA to derail the schedule of this case. This conclusion flows not only from basic principles of *fairness*, but also the letter and spirit of Rule 37 of the Federal Rules of Civil Procedure.

Rule 37 provides that "If a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence on a *motion*, at a hearing, or at a trial, unless the failure was *substantially justified* or is *harmless*." Fed. R. Civ. Proc 26(c)(1) (emphases added). EPA's motion fails to provide any intelligible justification for its last-minute disclosure of Dr. Martinez-Mier, nor does it even attempt to demonstrate the harmlessness of its conduct. Under Rule 37, therefore, EPA should be prohibited from using Dr. Martinez-Mier as an expert in this case.

First, EPA's last-minute attempt to find and disclose a new expert violated not just one, but two, Court orders that were entered pursuant to the parties' stipulations. As set forth by Court order (ECF No. 98), the deadline for disclosing experts was **June 27** (for initial disclosures) and **August 1** (for rebuttal disclosures). Further, pursuant to the stipulation that EPA entered into *less than one week before its motion* (ECF No. 112), the cut-off for expert discovery was set at **September 18**. Despite these Court orders, EPA waited until September 11 to *contact*, and September 18 to disclose, Dr. Martinez-Mier.

Second, there is no substantial justification for EPA's violations of the Court's orders. The closest EPA comes to articulating any justification is the nebulous assertion that Dr. Martinez-Mier will be testifying on an issue (i.e., "the generalizability of the Mexico and Canada birth cohorts to the United States") that EPA "has been trying to seek clarity" on via its objections to Plaintiffs' disclosures. Mot. at 4:21-28. In making this assertion, EPA apparently wishes to be treated as a technically unsophisticated entity, rather than an institution with expertise in scientific matters. The basis for the generalizability of the Mexican birth cohort study (which is the only cohort study that EPA asked questions about regarding the generalizability of the findings) is readily apparent from the studies that Dr. Hu and Dr. Lanphear

attached to their June 27 reports. Connett Decl. ¶¶ 11-13. Further, in a teleconference call on July 25 and follow-up letter on July 31,[3] Plaintiffs specifically identified the relevant portion of Dr. Hu's study that addresses the basis for relating the cohort findings to the general population (i.e., the urinary fluoride levels in the cohort are in the same range as the levels seen in general population studies). *Id.* ¶¶ 14-15.

Even if we credulously assume that EPA needed an explanation from Plaintiff's counsel before it could understand the relevance of the Mexican cohort findings to the general population, there is no justification for EPA waiting **42 days** from the time of the July 25 teleconference call before first attempting to even *contact* Dr. Martinez-Mier. As EPA notes in its motion, Dr. Martinez-Mier is listed as a co-author on each of the birth cohort studies that Drs. Hu and Lanphear attached to their June 27 reports. Mot. at 4:22-23. Further, these studies repeatedly reference Martinez-Mier's research in the exposure analysis sections of their papers. Connett Decl. ¶¶ 16-17. To the extent, therefore, that EPA believes Dr. Martinez-Mier has relevant testimony to provide on the generalizability of the Mexican and Canadian birth cohorts, EPA had everything it needed to *contact* her as of June 27.

In its motion, EPA inexplicably burdens the Court with over 100 pages of unnecessary documentation related to the parties' dispute over the adequacy of the Plaintiffs' initial disclosures. EPA fails to explain why any of this documentation is necessary for the Court to decide this motion, particularly since these documents *were generated prior to EPA's stipulation on September 12 to close expert discovery*. In other words, EPA's decision to enter into the stipulation on September 12 is an admission that nothing which happened prior to that date justifies the extraordinary relief that EPA now seeks.

If EPA is arguing that the August 19 publication of Dr. Lanphear's study in *JAMA Pediatrics* and/or the supplemental disclosures for Dr. Hu and Lanphear on August 26 and 30 justify an extension to the cut-off, this argument is meritless. Plaintiffs provided EPA a final pre-publication copy of the *JAMA Pediatrics* study as part of the *initial* disclosures, and the supplemental disclosures merely repeat and summarize the

---

[3] EPA's motion makes no mention of either of these communications, and omits the July 31 letter in its entirety, despite the fact that it's a direct response to the July 19 letter that EPA attached as Exhibit G.

methods and findings of the studies that were attached to these same initial disclosures. Connett Decl. ¶¶ 18-20. No *new* information, therefore, was provided by the *JAMA* publication or supplemental disclosures.

Finally, EPA's decision to serve a subpoena in early August on *Dr. Richard Hornung* provides no justification for EPA's failure to contact *Dr. Martinez-Mier*. Indeed, the decision to subpoena Dr. Hornung begs the question why EPA did not serve Dr. Martinez-Mier with the same subpoena, or at least contact her at the same time to see if she would provide the information voluntarily. (A copy of the subpoena is attached herein as Exhibit N.) EPA has thus failed to provide any justification, let alone a *substantial* one, for its voluntary decision to *not even contact* Dr. Martinez-Mier until the end of discovery.[4]

**3. EPA's Requested Relief Is Prejudicial to Plaintiffs**

Over the past month and a half, EPA has repeatedly threatened to derail the schedule of this litigation; in each instance—except for EPA's (option-less) demand to extend the cut-off on the last day of discovery—Plaintiff citizen groups have worked to accommodate EPA's professed concerns in order to keep this case on track. Connett Decl. ¶ 22. Having repeatedly accommodated EPA's concerns, Plaintiffs are now faced with the same prospect (i.e., derailment of the schedule) that Plaintiffs have repeatedly made compromises to avoid. The so-called "limited" 65-day extension to the expert cut-off that EPA now requests would result in substantial expenses for the budget-wary Plaintiff citizens, including re-deposing multiple experts (at a cost of over $5,000 per deposition), and paying Plaintiffs' experts (at a rate of $225 to 300/hour) to supplement their reports so as to not be at a disadvantage vis-à-vis EPA. Connett Decl. ¶¶ 23-24. EPA's requested relief will also inherently vacate the trial date, which therein invites uncertainty as to whether Plaintiffs' experts will all be available on the future replacement date. For the foregoing reasons, Plaintiffs respectfully request that the Court deny EPA's meritless motion.

---

[4] If the Court allows Dr. Martinez-Mier to testify at trial, Plaintiffs respectfully request that the Court (1) prohibit EPA from using any testimony from her deposition as support for its dispositive motion in order to eliminate any impact on the motion briefing schedule, and (2) order EPA to pay the costs of the deposition. These would be justified sanctions under Rule 37(c), and would avoid the perverse situation where EPA *benefits* from its disregard of the Court's orders.

September 23, 2019                    Respectfully submitted,

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by Notice of Electronic Filing this 23rd day of September, 2019, upon all ECF registered counsel of record using the Court's CM/ECF system.

*/s/ Michael Connett*
MICHAEL CONNETT