Exhibit B

Henry Declaration

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

FOOD & WATER WATCH, INC., et al.,

    Plaintiffs,

  v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

    Defendants.

Case No. 3:17-cv-02162 EMC

**DECLARATION OF
TALA R. HENRY**

   I, Tala R. Henry, Ph.D., submit the following declaration in support of Defendants' Motion for Summary Judgment:

**Dr. Henry's Experience at EPA and Risk-Assessment Expertise**

   1.  I am currently the Deputy Director of the Office of Pollution Prevention and Toxics ("OPPT") at the U.S. Environmental Protection Agency ("EPA") and former Director of the Risk Assessment Division of OPPT.

   2.  I am a toxicologist with over 25 years of technical and managerial experience at EPA. I received a Ph.D. in Pharmacology from the University of Minnesota in 1994 and completed post-doctoral research in Toxicology at the University of Wisconsin in 1996.

   3.  During my 25 years at EPA, I have provided toxicology and risk-assessment expertise and guidance, oversight and daily programmatic management to multiple chemical management programs, and leadership of science policy development and implementation across EPA, with other

1    federal agencies and in several international fora.

2         4.     My most recent toxicology and risk assessment experience at EPA has been in OPPT,

3    which is responsible for implementing the Toxic Substances Control Act ("TSCA"), including to

4    interpret statutory provisions, develop policy and implementation strategies, and execute the 2016

5    amendments to TSCA.

6         5.     During my tenure in OPPT, I have also represented EPA and the U.S. Government in a

7    number of international chemical assessment and management venues, including task forces and expert

8    panels and fora such as the Organization for Economic Cooperation and Development, the Helsinki

9    Chemicals Forum, and the United Nations Persistent Organic Pollutants Review Committee for the

10   Stockholm Convention.

11        6.     For eight years, from 2004 to 2012, I was nominated, selected for, and served on EPA's

12   Risk Assessment Forum. The Risk Assessment Forum is a standing committee of senior EPA scientists

13   established to promote Agency-wide consensus on difficult and controversial risk-assessment issues and

14   to ensure that this consensus is incorporated into appropriate Agency risk-assessment guidance. The

15   Forum assembles Agency risk-assessment experts in a formal process to study and report on a range of

16   issues from an Agency-wide scientific perspective. Major Forum guidance documents are developed in

17   accordance with the Agency's regulatory and policy development process and become Agency policy

18   upon approval by EPA's Science Advisor. Risk Assessment Forum products include: risk-assessment

19   guidelines, technical panel reports on special risk assessment issues, and peer consultation and peer

20   review workshops addressing controversial risk-assessment topics.

21        7.     I am one of the primary EPA authors of the response to the petition submitted by the

22   Fluoride Action Network in November 2016. Therefore, much of the technical basis for EPA's response

23   reflects my expert opinion regarding approaches and methods used in applying scientific evidence within

24   the context of EPA's risk-assessment guidance for supporting regulatory decision-making.

25   **Critical Steps in TSCA Risk Evaluations**

26        8.     "Risk evaluation" is a specialized term under TSCA.

27        9.     "Risk evaluation" is the process contemplated by TSCA section 6(b)(4) for determining

28

2

whether a chemical substance presents an unreasonable risk of injury to health or the environment under the conditions of use.

10. TSCA describes the requisite components of a TSCA risk evaluation, most of which are components of risk assessment as established in National Academy of Sciences (NAS)/National Research Council (NRC) reports and described in EPA guidance. Risk assessment is a process that evaluates available scientific information on the properties of an agent and its effects in biological systems to provide an evaluation of the potential harm as a consequence of environmental exposure.

11. Congress delegated to EPA the authority to establish, by rule, a specific process to conduct the risk evaluations required by TSCA section 6(b)(4). 15 U.S.C. § 2605(b)(4)(B).

12. EPA promulgated a rule describing the process for conducting TSCA risk evaluations under TSCA. *Procedures for Chemical Risk Evaluation Under the Amended Toxic Substances Control Act ("Risk Evaluation Rule")*, 82 Fed. Reg. 33,726 (July 20, 2017). The rule sets forth the risk-evaluation process, which includes the scientifically accepted tenets of risk assessment, culminating in an ultimate determination of whether a chemical substance presents an unreasonable risk of injury to health or the environment (or a "risk determination") under the conditions of use.

13. Together, the components of EPA's risk-assessment process, coupled with the ultimate risk determination, constitute a "risk evaluation" under TSCA.

14. The first step of a TSCA risk evaluation is the development of the scope. The scope is a critical step in the process of defining what will be assessed, i.e., the conditions of use, which in turn inform which exposures and hazards need to be evaluated. Based on my work responding to the petition from plaintiffs, the condition of use has been identified by plaintiffs as the addition of fluoridation chemicals in public drinking water. Identification of conditions of use, exposures, and hazards inform the types and quantities of data and types of scientific methods (e.g., models, statistics, etc.) that are necessary to conduct the TSCA risk evaluation.

15. A key component of a TSCA risk evaluation is hazard assessment. As established by the National Research Council, a hazard assessment includes two components: hazard identification; and dose-response assessment. Hazard identification is the determination of whether a particular chemical is

or is not causally linked to a particular health effect. Dose-response assessment is the determination of the relation between the magnitude of exposure and the probability of occurrence of the health effects in question. This step requires identification, evaluation, and synthesis of information to describe the health effects of individual chemicals or chemical mixtures.

16.     In the dose-response assessment, the relationship between the exposure or dose of a contaminant and the occurrence of health or environmental effects or outcomes is assessed. The response assessed might be incidence of some endpoint or outcome or it might describe the magnitude of a response. The approaches employed for these components, including, for example, the level of detail and complexity of quantitative aspects may vary across different risk assessments. TSCA subsections 26(h) and (i) require that all information used in a TSCA assessment be reviewed in a manner consistent with reliance on the "best available science" and "weight of the scientific evidence" approach, as described in detail below.

17.     Another key component of a TSCA risk evaluation is exposure assessment. An exposure assessment includes information on chemical-specific factors, including but not limited to physical-chemical properties and environmental fate and transport parameters. An exposure assessment includes some discussion of the size, nature, and types of individuals or populations exposed to the agent, as well as discussion of the uncertainties in this information. Exposure can be measured directly, but in my experience, it is rare that such data—specific to a particular assessment or all of the exposure scenarios within any given assessment—are available. When data are unavailable, they are estimated indirectly through use of measured chemical concentrations in the environment, models of chemical transport and fate in the environment, and estimates of human contact or intake or environmental exposure over time.

18.     TSCA requires that EPA, where relevant, "take into account the likely duration, intensity, frequency, and number of exposures under the conditions of use in an exposure assessment." 15 U.S.C. § 2605(b)(4)(F)(iv).

19.     Another key component of a TSCA risk evaluation is risk characterization. A risk characterization conveys the risk assessor's informed, professional judgment as to the nature and presence or absence of risks, along with information about how the risk was assessed, where assumptions

and uncertainties  exist, and where policy choices will need to be made. TSCA requires that a risk evaluation "integrate and assess available information on hazards and exposures." 15 U.S.C § 2605(b)(4)(F).

20.     As defined in TSCA, risk characterization identifies and assesses uncertainty and variability in each step of the risk evaluation; discusses considerations of data quality such as the reliability, relevance, and whether the methods utilized were reasonable and consistent; explains any assumptions used; and discusses information generated from independent peer review. 15 U.S.C. § 2625(h). Thus, each component of the risk evaluation (e.g., hazard assessment, dose-response assessment, exposure assessment) has an individual characterization written to carry forward the key findings, assumptions, limitations, and uncertainties. The set of these individual characterizations provide the informational basis to write an integrated risk characterization. The final, overall risk characterization thus consists of the individual component characterizations plus an integrative analysis. Each risk evaluation will quantitatively or qualitatively estimate and characterize risk for the identified receptors (human or ecological).

21.     The final step of a TSCA risk evaluation is determination of unreasonable risk. Under TSCA section 6(b), EPA must undertake a risk-evaluation process to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment. Prior to the 2016 amendments to TSCA, chemical substance risk assessments did not include a determination of unreasonable risk. Instead, the determination of "unreasonable risk" was made as part of the risk management rulemaking process. The amended statute now requires that a TSCA risk evaluation include a risk assessment as well as the EPA's determination of unreasonable risk, and, most significantly, requires that this determination be independent of consideration of cost or other non-risk factors.

22.     In its final Risk Evaluation Rule, EPA did not promulgate a definition of unreasonable risk. This approach was finalized after overwhelming public comment supporting EPA's decision that it would not be scientifically appropriate to define "unreasonable risk" given the uniqueness of each chemical-specific TSCA risk evaluation. EPA reasoned that defining specific risk measures for use in all TSCA risk evaluations would be inappropriate to capture the broad set of health and environmental

risk measures and information that might be relevant to chemical substances. In addition, a single definition would not account for the number of different risk characterization approaches or for changes in the scientific understandings of chemical hazards, exposures, and risk.

23.     EPA has explained that, in general, it may weigh a variety of factors in determining unreasonable risk. In making this determination, EPA considers relevant risk-related factors, including, but not limited to: the effects of the chemical substance on health and human exposure to such substance under the conditions of use; the effects of the chemical substance on the environment and environmental exposure under the conditions of use; the population exposed (including any potentially exposed or susceptible subpopulations); the severity of hazard (including the nature of the hazard, the irreversibility of the hazard); and uncertainties.

24.     EPA takes into consideration the Agency's confidence in the data used in the risk estimate. This includes an evaluation of the strengths, limitations, and uncertainties associated with the information used to inform the risk estimate and the risk characterization. The factors EPA may consider are the subject of considerable scientific complexity and policy debate.

25.     Agency deliberations and decisions regarding these types of issues can be informed by a variety of stakeholders through the public comment process and this is a compelling reason not to have promulgated a rigid and static definition.

26.     Finally, TSCA requires that EPA publish a draft risk evaluation for the purpose of soliciting public comment prior to finalizing the risk evaluation.

**Scientific Standards Required by TSCA**

27.     TSCA section 26 requires that EPA decisions based on science are based on the best available science and on the weight of the scientific evidence. 15 U.S.C. § 2625(h)-(i).

28.     Based on my experience with risk assessments, these factors are important to consider in assessing the risks of chemicals, not only because they are required by the statute, but because consideration of these factors adds transparency regarding the evidence and logic incorporated into TSCA risk evaluations, which in turn provides the opportunity for meaningful exchange of scientific views and input by experts and interested parties from outside the Agency during peer review and public

comment. This type of exchange is an integral part of the process to vet scientific assessments.

29.  <u>Reasonably Available Information</u>. TSCA section 26(k), 15 U.S.C. 2625(k), requires that EPA consider information that is "reasonably available," without defining that term. EPA defines "reasonably available information" to mean information that EPA possesses, or can reasonably obtain and synthesize for use in TSCA risk evaluations, considering the deadlines for completing the evaluation. EPA will seek to generally ensure that sufficient information to complete a TSCA risk evaluation exists and is available to the Agency prior to initiating the evaluation.

30.  <u>Best Available Science</u>. Section 26(h) lists factors to consider, as applicable, in employing best available science. These are: (1) the extent to which the scientific information, technical procedures, measures, methods, protocols, methodologies, or models employed to generate the information are reasonable for and consistent with the intended use of the information; (2) the extent to which the information is relevant for the Administrator's use in making a decision about a chemical substance or mixture; (3) the degree of clarity and completeness with which the data, assumptions, methods, quality assurance, and analyses employed to generate the information are documented; (4) the extent to which the variability and uncertainty in the information, or in the procedures, measures, methods, protocols, methodologies, or models, are evaluated and characterized; and (5) the extent of independent verification or peer review of the information or of the procedures, measures, methods, protocols, methodologies, or models.

31.  The best available science requirement is an integral component of TSCA risk evaluations. EPA incorporated a definition of the term in the Risk Evaluation Rule. 82 Fed Reg. 33,726 (July 20, 2017); 40 C.F.R. § 702.33. The first part of the definition originates from the Safe Drinking Water Act ("SDWA"), 42 U.S.C. 300f et seq., and is also included in the EPA's Information Quality Guidance. The SDWA definition was cited by a number of commenters, and EPA agreed this definition, already in use at the Agency, is appropriate. The second part of the definition is taken directly from TSCA section 26(h), which identifies mandatory approaches to fulfilling the science standards under TSCA.

32.  By basing its definition of best available science on these two sources, EPA is remaining

consistent with the current approach already used Agency-wide, while also acknowledging the specific standards under TSCA. The Risk Evaluation Rule defines best available science as science that is reliable and unbiased. This involves the use of supporting studies conducted in accordance with sound and objective science practices, including, when available, peer reviewed science and supporting studies and data collected by accepted method or best available methods (if the reliability of the method and the nature of the decision justifies use of the data).

33.    Weight of the Scientific Evidence. Application of weight of the scientific evidence analysis is an integrative and interpretive process. It is more than a simple tallying of the number of positive and negative studies. There are certain principles of weight of the scientific evidence that are universal, including foundational considerations, such as objectivity and transparency, and the general process.

34.    This process starts with assembling relevant information, evaluating the information for quality and relevance, and synthesizing and integrating the different lines of evidence to support conclusions. With this recognition and understanding and based on public comment requesting transparency, EPA codified a definition of weight of the scientific evidence in the Risk Evaluation Rule to provide transparency regarding the processes for how the Agency reviews scientific information used in TSCA risk evaluations.

35.    In the Risk Evaluation Rule, EPA promulgated a definition of weight of the scientific evidence as: "[w]eight of the scientific evidence means a systematic review method, applied in a manner suited to the nature of the evidence or decision, that uses a preestablished protocol to comprehensively, objectively, transparently, and consistently identify and evaluate each stream of evidence, including strengths, limitations, and relevance of each study and to integrate evidence as necessary and appropriate based upon strengths, limitations, and relevance." 40 C.F.R. § 702.33.

36.    This definition of weight of the scientific evidence requires the use of a systematic review method that is applied in a manner suited to the nature of the evidence or decision. The systematic review method must use a pre-established protocol to evaluate the evidence, including the strengths and limitations of the information used in a TSCA risk evaluation.

37.     Section 26(l)(5) of TSCA requires EPA to develop guidance to assist interested persons in submitting draft TSCA risk evaluations. In accordance with TSCA, the guidance shall, at a minimum, address the quality of the information submitted and the process to be followed in developing draft TSCA risk evaluations. External parties are encouraged to follow the key factors and TSCA risk evaluation process laid out in this guidance to foster predictability and transparency in making a risk determination under TSCA. This guidance incorporates the science requirements of the amended statute, including best available science and weight of the scientific evidence requirements.

38.     Key elements of systematic review, which EPA has incorporated into its process for risk evaluation under TSCA, include:

a.     A clearly stated set of objectives (defining the question);

b.     Developing a protocol which describes the specific criteria and approaches that will be used throughout the process;

c.     Applying the search strategy criteria in a literature search;

d.     Selecting the relevant papers using predefined criteria;

e.     Assessing the quality of the studies using predefined criteria;

f.     Analyzing and synthesizing the data using the predefined methodology; and

g.     Interpreting the results and presenting a summary of findings.

**Dr. Thiessen and Dr. Grandjean Failed to Conduct Systematic Review**

39.     I have reviewed the expert reports submitted by Plaintiffs' experts Kathleen Thiessen and Phillipe Grandjean, who offered opinions on the methods for conducting risk assessments, in particular the methods for conducting risk evaluation under TSCA. Due to fundamental and significant flaws in approach, neither Dr. Thiessen's nor Dr. Grandjean's conclusion regarding unreasonable risk of neurotoxic effects of fluoride are supported.

40.     Both Dr. Thiessen and Dr. Grandjean failed to demonstrate that the key tenets of systematic review were applied to their analyses. Among other deficiencies, Dr. Grandjean and Dr. Thiessen failed to conduct a systematic review, a critical and required method for consideration of the weight of the scientific evidence.

41.     Scientifically acceptable systematic review methods use a pre-established protocol to evaluate the evidence, including the strengths and limitations of the information used in a TSCA risk evaluation.

42.     To make risk determinations under TSCA, regulations require all components of a TSCA risk evaluation and all streams of evidence to have been systematically reviewed to ensure that risk determinations are based on the weight of the scientific evidence. Not only is a properly conducted systematic review required under TSCA, but it is the necessary course of action when making a risk determination that is based on the best available science and weight of the scientific evidence.

43.     In his expert report, Dr. Grandjean claimed to have followed the general approaches used and applied by the World Health Organization's International Agency for Research on Cancer (IARC) (IARC, 2006) and EPA when evaluating scientific information. However, Dr. Grandjean's statement was not supported by his presentation of the scientific information, which lacks the key elements of systematic review.

44.     For example, Dr. Grandjean stated that his expert report focused on the evidence that "carries the greatest weight"; however, Dr. Grandjean did not describe the principles and methods used, the reliability of the principles and methods used, nor how he reliably applied the principles and methods with evaluating or "weighing" the quality, reliability, and relevance of the cited scientific information.

45.     In his report, Dr. Grandjean stated that he did not "necessarily cite all reports that may be relevant," and that he considered it "beyond the present report to evaluate" fourteen studies published on fluoride and intelligence since publication of his 2012 meta-analysis, Choi et al.

46.     Dr. Grandjean summarized studies on fluoride and childhood IQ testing, but did not state the principles and methods that he used and applied when identifying the cited literature, evaluating the quality of the individual studies, and stating why specific studies were included or excluded from his review.

47.     Dr. Grandjean's superficial analysis of the scientific literature suggests that his review is not be based on sufficient facts or data and that he did not utilize reliable principles and methods that would ensure a comprehensive gathering and evaluation of that information.

48.     Dr. Grandjean provided an opinion on fluoride neurotoxicity in humans that he asserts is based on the "weight of epidemiological evidence," however, nowhere in his report did he describe the methods and criteria he used to review studies or to conduct a weight-of-evidence analysis.

49.     Therefore, Dr. Grandjean's "weight of evidence" assertion is not credible because it fails to demonstrate foundational considerations, such as objectivity and transparency, in the process. Rather, Dr. Grandjean selectively cited literature, including data from his own publications, to support biased and pre-conceived conclusions about the neurotoxicity of fluoride.

50.     Similarly, Dr. Thiessen does not appear to have conducted literature searches for critical components of TSCA risk evaluation (i.e., exposure assessment), nor did Dr. Thiessen provide quality and relevancy reviews using systematic review methods for hazard data—for both animals and humans.

51.     Omission of exposure information is a critical limitation because, to make an unreasonable risk finding under TSCA, regulations require all components of a TSCA risk evaluation and all streams of evidence to have been systematically reviewed to ensure that risk determinations are based on the weight of the scientific evidence.

52.     Not only is a properly conducted systematic review required under TSCA, but it is a necessary course of action to demonstrating reliance on the best available science and weight of the scientific evidence.

53.     Additionally, Dr. Thiessen's report focused primarily on only one component of a TSCA risk evaluation, the hazard assessment. Even within this limited domain, Dr. Thiessen's report failed to document that systematic review methods or approaches were applied in reviewing the literature she identified to support her hazard assessment. Instead, Dr. Thiessen's report focused on the quantity of studies and did little to address the quality of studies used to make conclusions based on the weight of the scientific evidence. As such, Dr. Thiessen's ad hoc "weight of evidence" assertion is not credible because it fails to demonstrate foundational considerations, such as objectivity and transparency, in the process.

54.     Therefore, neither Dr. Thiessen nor Dr. Grandjean identified the minimum components that should be included in a TSCA risk evaluation of any chemical substance. Due to these fundamental

1   and significant flaws in approach, neither Dr. Thiessen's nor Dr. Grandjean's conclusion regarding

2   unreasonable risk of neurotoxic effects of fluoride are supported.

3   **Dr. Thiessen erroneously relies on TSCA section 5 in her opinion regarding unreasonable risk**

4         55.    In her report, Dr. Thiessen asserts several factors EPA considers in determining

5   unreasonable risk. These assertions, however, are based on risk determinations made for new chemicals

6   under section 5 of TSCA rather than for existing chemicals under section 6.

7         56.    Dr. Thiessen's error discredits her opinion regarding whether fluoride presents an

8   unreasonable risk under the conditions of use.

9         57.    Section 5 of TSCA provides the statutory authority and requirements for assessing and

10   managing new chemicals (i.e., chemicals not currently in commerce). Fluoride chemicals appear on the

11   TSCA inventory, meaning they are existing chemicals as defined by TSCA, and therefore the statutory

12   requirements governing TSCA risk evaluation and risk management for fluoride chemicals are those

13   defined in TSCA section 6. Indeed, the plaintiffs' petition for rulemaking specifically requested that

14   EPA take action under TSCA section 6.

15         58.    The framework EPA applies in conducting risk assessments under TSCA section 5, while

16   based on widely accepted fundamental risk assessment principles and the National Research Council's

17   (NRC) risk assessment paradigm, identify methods and assumptions are necessarily different than

18   considerations for actions under section 6 due to: (1) substantial differences in the quantity and types of

19   data typically available for new chemicals; and (2) the short timeframe (i.e., 45 to 90 days) TSCA

20   imposes for completing new chemical reviews including both the assessment and associated risk

21   management.

22         59.    Additionally, Dr. Thiessen's report used the TSCA section 5 screening analysis, which

23   was designed to support a rapid hazard assessment for the purpose of efficiently binning chemical

24   assessments into those which require additional and often more detailed or refined analysis (for high or

25   moderate hazard chemicals) and those which conservative screening indicate are of low hazard and do

26   not warrant detailed or refined analysis.

27         60.    This classification scheme is based on dose/concentration values from standardized,

28

guideline animal toxicity tests. As such, the approach was neither intended nor envisioned to be used with human studies. This is because human toxicity data are rarely, if ever, available for new chemicals.

61.     In conducting risk evaluations of existing chemicals under TSCA section 6, EPA generally does not deploy rapid screening or 'binning' of a chemical to inform the level of analysis that will be required, but rather EPA performs a much more intensive literature review and systematic review process as described in Application of Systematic Review under TSCA.

62.     This more robust process is appropriate in making risk determinations on existing chemicals, like water fluoridation chemicals.

63.     Hence, Dr. Thiessen's entire analysis regarding this issue is flawed in that she claims to support an unreasonable risk determination using risk assessment approaches and a regulatory framework that EPA uses for new chemicals rather than for existing chemicals.

64.     Therefore, Dr. Thiessen's conclusion regarding unreasonable risk of neurotoxic effects of fluoride is not supported for this additional fundamental and significant flaw in approach.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 8, 2019, in Washington, DC.

Dr. Tala R. Henry
U.S. Environmental Protection Agency