C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, et al., | ) |
| Plaintiffs, | ) Civ. No. 17-CV-02162-EMC |
| vs. | ) **DECLARATION OF MICHAEL** |
| | ) **CONNETT IN SUPPORT OF** |
| U.S. ENVIRONMENTAL PROTECTION | ) **PLAINTIFFS' MOTION FOR** |
| AGENCY, et al. | ) **SUMMARY JUDGMENT AND** |
| | ) **PARTIAL SUMMARY JUDGMENT** |
| Defendants. | ) |
| | ) |

I, Michael Connett, submit the following declaration in support of Plaintiffs' Motion for Summary Judgment and Partial Summary Judgment.

1.      I am lead counsel for Plaintiffs in the above-captioned case.

2.      **Exhibit 1** is a true and correct copy of the cover letter to Plaintiffs' November 22, 2016 Citizen Petition.

3.      **Exhibit 2** is a true and correct excerpt of the deposition of EPA's 30(b)(6) representative in this case, Dr. Edward Ohanian. This deposition and all other depositions attached to this declaration were taken in this litigation.

4.      **Exhibit 3** is a true and correct copy of an October 8, 2019 declaration from Plaintiffs' expert, Dr. Kathleen Thiessen, along with a copy of Dr. Thiessen's June 27, 2019 expert report.

5.      **Exhibit 4** is a true and correct excerpt of the deposition of EPA scientist, Dr. Joyce

Donohue.

6.      **Exhibit 5** is a true and correct excerpt of a Department of Health and Human Services 1991 report entitled *Review of Fluoride: Risks and Benefits*. I personally scanned these pages from a hard copy of the DHHS report.

7.      **Exhibit 6** is a true and correct excerpt of the deposition of retired EPA scientist, Dr. John William Hirzy.

8.      **Exhibit 7** is a true and correct of an internal EPA memorandum that I personally received from Dr. Robert Carton, a retired EPA scientist.

9.      **Exhibit 8** is a true and correct excerpt of a May 1, 1999 report entitled *Why EPA's Headquarters Union Opposes Fluoridation* written by Dr. John William Hirzy. Dr. Hirzy authenticated this document during his deposition in this case. See Ex. 7 at 91:22-92:22.

10.     **Exhibit 9** is a true and correct excerpt of the deposition of Dr. Joyce Tsuji, an expert retained by EPA in this litigation.

11.     **Exhibit 10** is a true and correct excerpt of a 2010 EPA report that I downloaded from EPA's website entitled *Fluoride: Dose-Response Analysis for Non-Cancer Effects*.

12**.     Exhibit 11** is a true and correct excerpt of the deposition of CDC's 30(b)(6) representative in this case, Casey Hannan.

13.     **Exhibit 12** is a true and correct excerpt of the deposition of CDC's 30(b)(6) representative in this case, Casey Hannan.

14.     **Exhibit 13** is a true and correct excerpt of the deposition of Plaintiffs' expert, Dr. Kathleen M. Thiessen.

15**.     Exhibit 14** is a true and correct excerpt of the deposition of Plaintiffs' expert, Dr. Phillipe Grandjean.

16.     **Exhibit 15** is a true and correct excerpt of a 2016 report that I downloaded from the National

DECLARATION OF MICHAEL CONNETT

Toxicology Program's (NTP) website entitled *Systematic Literature Review on the Effects of Fluoride on Learning and Memory in Animal Studies.*

17.    **Exhibit 16** is a true and correct copy of an October 8, 2019 declaration from Plaintiffs' expert, Dr. Philippe Grandjean, along with a copy of Dr. Grandjean's two expert reports.

18.    **Exhibit 17** is a true and correct excerpt of a paper co-authored by Plaintiffs' expert, Dr. Philippe Grandjean, entitled *Neurobehavioural Effects of Developmental Toxicity*, which EPA's counsel introduced as Exhibit 335 during Dr. Grandjean's deposition.

19.    **Exhibit 18** is a true and correct excerpt of an EPA report that I downloaded from EPA's website entitled: *NIEHS/EPA Children's Environmental Health and Disease Prevention Research Centers Impact Report*.

20.    **Exhibit 19** is a true and correct excerpt of the deposition of EPA scientist, Dr. Kristina A. Thayer.

21.    **Exhibit 20 i**s a true and correct excerpt of the deposition of Plaintiffs' non-retained expert, Dr. Howard Hu.

22.    **Exhibit 21** is a true and correct excerpt of the deposition of Plaintiffs' non-retained expert Dr. Bruce Lanphear

23.    **Exhibit 22** is a true and correct copy of a Declaration from Frederick Hyman, dated November 5, 2018, which the Food and Drug Administration (FDA) provided to Plaintiffs in this case in response to a 30(b)(6) deposition subpoena.

24.    **Exhibit 23** is a true and correct copy of the parties' "Stipulation Regarding Manufacturers of Fluoridation Chemicals."

25.    **Exhibit 24** is a true and correct excerpt of the deposition of NSF International's 30(b)(6) representative in this case, Amanda Phelka.

26.    **Exhibit 25** is a true and correct copy of Defendants' Response to Plaintiffs' First Set of

Request for Admissions, dated  July 12, 2018.

27.    **Exhibit 26** is a true and correct excerpt of Defendants' Response to Plaintiffs' First Set of Interrogatories, dated  July 12, 2018.

28.    **Exhibit 27** is a true and correct excerpt of the deposition of EPA's expert, Dr. Ellen Chang.

29.    **Exhibit 28** is a true and correct excerpt of the deposition of EPA's expert, Dr. Charlotte Lewis.

30.    **Exhibit 29** is a true and correct excerpt of the deposition of EPA's expert, Dr. Gary Slade.

31.    **Exhibit 30** is a true and correct copy of an October 8, 2019 declaration from Plaintiffs' expert, Dr. Ole Fejerskov, along with a copy of Dr. Fejerskov's expert report.

32.    **Exhibit 31** is a true and correct excerpt of the deposition of Plaintiffs' expert, Dr.   Ole Fejerskov.

33.    **Exhibit 32** is a true and correct excerpt of the deposition of EPA's non-retained expert, Dr. Tala Rae Henry.

34.    **Exhibit 33** is a true and correct excerpt of a 1998 EPA report that I downloaded from EPA's website entitled *Guidelines for Neurotoxicity Risk Assessment.*

35.    **Exhibit 34** is a true and correct excerpt of a 2008 EPA report that I downloaded from EPA's website entitled:  *Toxicological Review Of 2,2',4,4'-Tetrabromodiphenyl Ether (BDE-47).*

36.    **Exhibit 35** is a true and correct excerpt of a 2009 EPA report that I downloaded from EPA's website entitled: *Toxicological Review of 2-Hexanone.*

37.    **Exhibit 36** is a true and correct excerpt of a 2013 EPA report that I downloaded from EPA's website entitled: *Toxicological Review of Methanol.*

38.    **Exhibit 37** is a true and correct excerpt of a 1983 NRC report that I downloaded from the National Academy of Science's website entitled: *Risk Assessment in the Federal Government: Managing the Process.*

39.     **Exhibit 38** is a true and correct excerpt of a document that I downloaded from EPA's website entitled: *About Riske Assessment*

40.     **Exhibit 39** is a true and correct excerpt of a document that I downloaded from EPA's website entitled: *The NRC Risk Assessment Paradigm.*

41.     **Exhibit 40** is a true and correct excerpt of a document that I downloaded from EPA's website entitled: *Conducting a Human Health Risk Assessment.*

42.     **Exhibit 41** is a true and correct excerpt of the July 14, 1976 House Report on the Toxic Substances Control Act, which I downloaded from Westlaw.

43.     **Exhibit 42** is a true and correct excerpt of a 1994 NRC report that I downloaded from the National Academy of Science's website entitled: *Science and Judgment in Risk Assessment.*

44.     **Exhibit 43** is a true and correct excerpt of a 2009 NRC report that I downloaded from the National Academy of Science's website entitled: *Science and Decisions: Advancing Risk Assessment*.

45.     **Exhibit 44** is a true and correct excerpt of a 2002 EPA report that I downloaded from EPA's website entitled: *A Review Of The Reference Dose And Reference Concentration Processes.*

46.     **Exhibit 45** is a true and correct excerpt of EPA's Reregistration Eligibility Decision for Sodium Fluoride, dated December 20, 2007, which I downloaded from EPA's website.

47.     **Exhibit 46** is a true and correct copy of an October 8, 2019 declaration from Plaintiffs' expert, Dr. Christine Wells, along with a copy of Dr. Wells' June 27, 2019 expert report.

48.     **Exhibit 47** is a true and correct excerpt of a document that EPA provided to Plaintiffs which summarizes the rebuttal opinions EPA's non-retained expert, Dr. Tala Henry, is expected to provide, and the facts upon which she will base them.

49.     **Exhibit 48** is a true and correct excerpt of Dr. Ellen Chang's Expert Rebuttal Report.

50.     **Exhibit 49** is a true and correct excerpt of  Dr. Joyce Tsuji's Expert Rebuttal Report.

51.     **Exhibit 50** is a true and correct copy of EPA's initial Expert Disclosures and Designations,

dated June 27, 2019.

52.     The following URL links to an August 19, 2019 podcast by the editors of JAMA Pediatrics, wherein the editors discuss the study on prenatal fluoride and IQ co-authored by Dr. Bruce Lanphear: https://bit.ly/2p996AE (last accessed on October 9, 2019).

53.     Plaintiffs served 30(b)(6) deposition subpoenas on Centers for Disease Control; the Food & Drug Administration; JR Simplot Company; Mosaic Company; Solvay Fluoride, LLC; and NSF International; requesting *inter alia* any data that these organizations have with respect to the neurological safety of fluoridation chemicals.

54.     Some of the exhibits that are attached to this declaration have highlighting and/or pen marks. All of these highlights and writings are my own, with the exception of the pen marks in Exhibit 41, which were on the document I downloaded from Westlaw.

55.     To the extent that the dental benefits of fluoride are not excluded from consideration at trial, Plaintiffs have identified two experts who will provide opinions on this issue: Dr. Ole Fejerskov and Dr. Christine Wells. Dr. Fejerskov's expert report is enclosed in Exhibit 30. Dr. Wells's expert reports are enclosed in Exhibit 46.

56.     EPA has identified two experts to address the dental benefits of fluoride: Dr. Charlotte Lewis and Dr. Gary Slade.

57.     Plaintiffs provided EPA a copy of the ELEMENT cohort study on prenatal fluoride and IQ ("Bashash 2017") during fact discovery in 2018, more than 6 months before Dr. Grandjean produced his initial expert report on June 27, 2019. Plaintiffs provided EPA an accepted, pre-publication copy of the MIREC cohort study on prenatal fluoride and IQ ("Green 2019") during expert discovery on July 3, 2019, more than a month before Dr. Grandjean produced his supplemental report on August 14, 2019.

I declare under penalty of perjury that the foregoing is true and correct.

DECLARATION OF MICHAEL CONNETT

Executed on October 9, 2019, in Ventura, California.

/s/ Michael Connett
MICHAEL CONNETT
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
Tel: (310) 414-8146
Email: mconnett@waterskraus.com

DECLARATION OF MICHAEL CONNETT

# Exhibit 1

  

  

November 22, 2016

Gina McCarthy, Administrator
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460

Dear Administrator McCarthy:

Pursuant to section 21 of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2620, the Fluoride Action Network, Food & Water Watch, Organic Consumers Association, American Academy of Environmental Medicine, International Academy of Oral Medicine and Toxicology, Moms Against Fluoridation, and undersigned individuals (collectively, "Petitioners") hereby petition the U.S. Environmental Protection Agency to protect the public and susceptible subpopulations from the neurotoxic risks of fluoride by banning the addition of fluoridation chemicals to water.

Under Section 6 of TSCA, EPA is invested with the authority to prohibit the "particular use" of a chemical substance if the use presents an unreasonable risk to the general public or susceptible subpopulations.  15 U.S.C. § 2605(a).  EPA has recognized that its authority to regulate chemical substances under TSCA includes the authority to prohibit *drinking water additives*.

EPA should exercise its authority under TSCA to prohibit fluoridation additives because application of the Agency's own *Guidelines for Neurotoxicity Risk Assessment* to the existing database on fluoride shows that (1) neurotoxicity is a hazard of fluoride exposure, and (2) the reference dose that would reasonably protect against this hazard is incompatible with the doses now ingested by millions of Americans in fluoridated areas.  In fact, the amount of fluoride now regularly consumed by many people in fluoridated areas *exceeds* the doses *repeatedly* linked to IQ loss and other neurotoxic effects; with certain subpopulations standing at elevated risk of harm, including infants, young children, elderly populations, and those with dietary deficiencies, renal impairment, and/or genetic predispositions.

The risk to the brain posed by fluoridation additives is an unreasonable risk because, *inter alia*, it is now understood that fluoride's predominant effect on tooth decay comes from *topical* contact with teeth, not *ingestion*.  Since there is little benefit in *swallowing* fluoride, there is little justification in exposing the public to *any* risk of fluoride neurotoxicity, particularly via a source as essential to human sustenance as the public drinking water and the many processed foods and beverages made therefrom.  The addition of fluoridation chemicals to water thus represents the very type of unreasonable risk that EPA is duly authorized to prohibit pursuant to its powers and responsibilities under Section 6 of TSCA, and Petitioners urge the Agency to exercise its authority to do so.

# **Exhibit 2**

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      AT SAN FRANCISCO

4   - - - - - - - - - - - x

5   FOOD & WATER WATCH, et al.,

6            Plaintiffs,

7       v.                              Civil No.:

8   U.S. ENVIRONMENTAL PROTECTION       17-CV-02162-EMC
    AGENCY, et al.,
9
             Defendants.
10  - - - - - - - - - - - x

11                        Monday, October 15, 2018

12                        Washington, D.C.

13  Videotaped Deposition of

14            EDWARD OHANIAN, Ph.D.,

15  the 30(b)(6) corporate representative, called for

16  examination by counsel for the plaintiffs, pursuant

17  to notice, held at the Department of Justice, 601

18  D Street, N.W., Room 8502, Washington, D.C. 20579,

19  beginning at 10:09 a.m., before Kelly Susnowitz, a

20  Notary Public, when were present on behalf of the

21  respective parties:

**ORIGINAL**

1        MR. DO:  John Thomas Do, with the Department

2  of Justice.  Also here with EPA is --

3        MR. WILBER:  Eric Wilber.

4        MS. MESSIER:  Dawn Messier.

5        MR. DO:  And I believe we have someone on the

6  phone.

7        MR. WATERS:  Andy Waters, for the plaintiffs,

8  on the telephone.

9        THE VIDEOGRAPHER:  Will the court reporter

10 please swear in the witness and then we can proceed?

11                S T I P U L A T I O N S

12        It is hereby stipulated and agreed by and

13 between counsel present at this deposition and by

14 the deponent that the reading and signing of this

15 deposition is not waived.

16 Thereupon;

17            EDWARD OHANIAN, Ph.D.,

18 the 30(b)(6) corporate representative, called for

19 examination by counsel for the plaintiffs and after

20 having been first duly sworn by the Notary Public,

21 was examined and testified as follows:  I will.

1      A.  Yes.

2      Q.  And if I ask any questions today, that are

3  in any way unclear to you, just let me know and

4  I'll rephrase, to make it clear.  Okay?

5      A.  Yes.

6      Q.  So you are appearing today as a

7  representative of the United States Environmental

8  Protection Agency, correct?

9      A.  Correct.

10      Q.  And we're here today to talk about EPA

11  safety standards for fluoride.  Do you understand

12  that?

13      A.  Yes.

14      Q.  And this includes the maximum contaminant

15  level goal that EPA established for fluoride in

16  1985, correct?

17      A.  Correct.

18      Q.  And this also includes the reference dose

19  that EPA established for fluoride in 2010,

20  correct?

21      A.  Correct.

1      Q.  And we're here today to talk about the

2    health effects that these standards were designed

3    to protect against.  Do you understand that?

4      A.  I do, yes.

5      Q.  And EPA has designated you, as its

6    representative, to address questions about these

7    safety standards, correct?

8      A.  Correct.

9      Q.  So before discussing these standards, I'd

10   like to start by asking you about your own

11   personal background and what you did to prepare

12   for today's deposition.  Okay?

13     A.  Okay.

14     Q.  So I see, and I'll introduce as Exhibit 1,

15   your CV that we received today.

16         (Deposition Exhibit Number 1 was marked

17    for identification.)

18  BY MR. CONNETT:

19     Q.  Which I will hand to you.

20     A.  Okay.

21     Q.  And in looking at your CV, I see that you

1    ingesting too much fluoride during childhood,

2    correct?

3        A.  Correct.

4        Q.  And severe dental fluorosis is a

5    disfiguring condition that causes extensive

6    staining and pitting of the enamel, correct?

7        A.  Correct.

8            (Deposition Exhibit Number 2 was marked

9    for identification.)

10   BY MR. CONNETT:

11       Q.  And I'm going to hand you a photograph

12   here of the picture of severe dental fluorosis,

13   which we'll mark as Exhibit 2.

14       A.  Okay.

15           MR. DO:  Counsel, do you know Bates

16   numbers of these that have been previously

17   produced?

18           MR. CONNETT:  This document has not been

19   produced.  It's a photograph.

20   BY MR. CONNETT:

21       Q.  Now, this is a -- you've seen this

1        A.   Could you repeat the question, I'm sorry?

2        Q.   In your personal capacity, as a scientist,

3    who has spent decades studying the effects of

4    chemicals on the human body and what effects are

5    adverse or not, would you agree that this

6    condition, that we see here, with extensive

7    staining and pitting of the enamel, that that

8    could cause pretty profound effects on a child's

9    self-esteem?

10        A.   It may.

11        Q.   And something that can cause profound

12    effects on a child's self-esteem may result in

13    some psychological issues, would you agree with

14    that?

15            MS. CARFORA:   Objection, are you asking

16    him in his personal capacity?

17   BY MR. CONNETT:

18        Q.   In your personal capacity.

19        A.   That, I can't tell.

20        Q.   You don't have an opinion, one way or the

21    other, on that?

1        A.   No, I cannot tell how the child will

2    foresee that kind of a problem as inducing

3    psychological impact.

4        Q.   Would you agree that this condition would

5    lead to some pretty severe embarrassment for the

6    child?

7            MS. CARFORA:  Objection, as to form.  Are

8    you asking him in his personal capacity?

9            MR. CONNETT:  Yes.

10           THE WITNESS:  It may, sure.

11   BY MR. CONNETT:

12       Q.   Okay.  So if you look at the next

13   paragraph on this page, from the EPA's Federal

14   Register Notice, the EPA writes that, "In response

15   to the National Drinking Water Advisory Council's

16   recommendation, the EPA, with the assistance of

17   the National Institute of Mental Health, convened

18   an ad hoc panel of behavioral scientists, to

19   evaluate the potential psychological effects of

20   objectionable moderate and severe fluorosis."  Did

21   I read that correctly?

1    not merely discoloration and pitting, but

2    fracturing, caries, and tooth loss, as well."  Did

3    I read that correctly?

4         A.  Correct.

5         Q.  And then, if you turn to the third page,

6    the last page of the memo --

7         A.  Okay.

8         Q.  -- you see the highlighted portion of that

9    page?

10        A.  Correct.

11        Q.  Victor Kimm wrote here that, "We have some

12   color photos of fluorotic teeth, which shows the

13   kind of chipping, pitting, and fracturing,

14   individuals exposed to high fluoride levels must

15   endure.  It is difficult to examine such photos

16   and conclude that such effects are not adverse."

17   Did I -- did I read that correctly?

18        A.  Correct.

19        Q.  So that was Victor Kimm's assessment of

20   the issue, in July 1984, correct?

21             MS. CARFORA:  Objection as to form.

1   human health, correct?

2        A.   I don't know what you mean by downgraded.

3   I mean, the Agency's position, following certain

4   activities was to declare that dental fluorosis

5   adverse health effect -- I'm sorry, the cosmetic

6   effect, is that what it is, the question?  I'm

7   sorry, just --

8        Q.   Well, let me ask it another way.  Despite

9   the conclusions of Victor Kimm, who was the

10  director of the Office of Drinking Water, and

11  despite the recommendations by the National

12  Drinking Water Advisory Council, and the National

13  Institute of Mental Health, the EPA concluded that

14  severe dental fluorosis is not an adverse health

15  effect, correct?

16       A.   Correct.

17       Q.   Now, one of the consequences of that

18  decision, to change the classification of severe

19  dental fluorosis, is that EPA was able to increase

20  the MCLG to a higher level, right?

21       A.   I don't understand the question, I'm

1   for the primary, we had to identify an adverse

2   health effect, to be able to fit under the

3   national primary drinking water regulations,

4   that's what we did.

5       Q.  And as a result of that, EPA increased the

6   MCLG by, roughly, double the level that it was

7   previously, right?

8       A.  What do you mean, increased?

9       Q.  Well, the interim standard that we were

10  talking about before --

11      A.  Yes.

12      Q.  -- was 1.4 to 2.4 parts per million,

13  right?  And after EPA concluded that severe dental

14  fluorosis is not an adverse health effect, EPA

15  increased the standard of the MCLG to four parts

16  per million, right?

17      A.  It's not increased per se.  It's the

18  adverse health effect that the MCLG was based on.

19  One has to do with the earlier one, the '75 had to

20  do with dental effects; and later on, when the

21  decision was made, the fact that that's esthetic

1    effect, then we had to designate an adverse health

2    effect, to be able to generate our MCLG, and

3    that's what it was; therefore, the value generated

4    had to do with the adverse effect that we had to

5    use in our risk assessment to support the MCLG.

6        Q.   Okay.  And so, the new MCLG that EPA

7    enacted was four parts per million, right?

8        A.   Correct.

9        Q.   Okay.  And at that concentration, the data

10   available to the EPA, at that time, showed that up

11   to 22 percent of kids would develop severe dental

12   fluorosis, right?

13       A.   I don't recall the numbers, I'm sorry.

14       Q.   Okay.  Well, if you can turn back to the

15   May 1985 Federal Register Notice?

16       A.   May 1985 -- oh, May 1985.

17       Q.   It's Exhibit 2 -- Exhibit 3.

18       A.   Exhibit 3, okay.

19       Q.   And if you turn to page 2169 --

20       A.   Twenty-one, sixty-nine, okay.

21       Q.   -- and you see table eight there, on the

1      Q.  Do you see that?

2      A.  Oh, I see, okay.  Yes, I do.

3      Q.  Okay.  So in some of the communities --

4   well, I see there's one community here, with 3.9

5   parts per million, where 22.8 percent of the kids

6   were found to have severe dental fluorosis, right?

7      A.  Correct.

8      Q.  So the MCLG, as enacted, would permit

9   that -- would permit up to 22 percent of kids to

10  develop severe dental fluorosis?

11     A.  MCLG.  But the basis, for the MCLG adverse

12  health effect, was not dental fluorosis.  I just

13  want to clarify that.

14     Q.  Right.  And because the basis of the MCLG

15  was not severe dental fluorosis --

16     A.  Yes.

17     Q.  -- EPA would allow up to 22 percent of

18  kids to develop severe dental fluorosis?

19     A.  According to the table.

20     Q.  Yeah.  Okay.  Now, the new MCLG was based

21  on, as you mentioned, a different health effect,

1       right?

2          A.  Correct.

3          Q.  It was based on crippling skeletal

4       fluorosis, right?

5          A.  Correct.

6          Q.  Now, skeletal fluorosis is a disease of

7       the bones caused by too much fluoride, right?

8          A.  Crippling skeletal fluorosis.

9          Q.  Okay.  And skeletal fluorosis has various

10      stages of severity, right?

11         A.  Correct.

12         Q.  And crippling skeletal fluorosis is the

13      most severe form of skeletal fluorosis?

14         A.  Correct.

15         Q.  Just so that we are clear about what this

16      disease is, I'm going to hand you an excerpt from

17      a document I believe you have read before.

18             (Deposition Exhibit Number 6 was marked

19      for identification.)

20  BY MR. CONNETT:

21         Q.  Which is a 1991 review by the Department

1   of Health and Human Services, titled Review of

2   Fluoride, Benefits and Risks.  First, am I correct

3   that you are familiar with this document?

4       A.  Yes, but I haven't read it lately.  I

5   mean, not recently.

6       Q.  So if you turn to the other side, you see

7   here that it provides the various stages of

8   skeletal fluorosis?

9       A.  Correct.

10      Q.  There's a preclinical phase, a clinical

11  phase one, a clinical phase two, and then, phase

12  three, crippling -- crippling fluorosis, correct?

13      A.  Correct.

14      Q.  Okay.  So EPA's MCLG was designed to

15  prevent the phase three, crippling skeletal

16  fluorosis, right?

17      A.  Correct.

18      Q.  But not to prevent clinical phase two,

19  right?

20      A.  Correct.

21      Q.  And it wasn't designed to prevent clinical

1    phase one either, right?

2         A.  No.

3         Q.  Okay.  So I'd like to read what the

4    Department of Health and Human Services said about

5    clinical phase two fluorosis.  Okay?

6         MS. CARFORA:  Objection, it's not related

7    to EPA's findings.

8    BY MR. CONNETT:

9         Q.  Okay.  The Department of Health and Human

10   Services summarized clinical phase two fluorosis

11   as having chronic joint pain, arthritic systems,

12   slight calcification of ligaments, increased

13   osteosclerosis cancellous bones, with or without

14   osteoporosis of long bones.  Did I read that

15   correctly?

16        A.  Correct.

17        Q.  But again, EPA's MCLG was not designed to

18   prevent that effect; is that a no?

19        A.  No.

20        Q.  So the effect that the MCLG was designed

21   to prevent, was crippling skeletal fluorosis,

1    which I will read the summary here of what that

2    is.

3              MS. CARFORA:   Objection, as to form.

4  BY MR. CONNETT:

5        Q.   According to the Department of Health and

6    Human Services, crippling fluorosis produces

7    limitation of joint movement, calcification of

8    ligaments, neck, vertebrae column, crippling

9    deformities of the spine and major joints, muscle

10   wasting, neurologic defects, and compression of

11   the spinal cord.  Did I read that correctly?

12       A.   Correct.

13       Q.   And according to EPA's MCLG, crippling

14   skeletal fluorosis is the critical adverse effect

15   of fluoride exposure, right?

16       A.   Correct.

17       Q.   Okay.  And critical adverse effect means

18   the effect of a substance that occurs at the

19   lowest dose, right?

20       A.   Correct.

21       Q.   Okay.  So according to EPA, the first

1    critical, about EPA's decision to increase the

2    MCLG to four parts per million?

3              MS. CARFORA:  Objection.  Are you asking

4    him in his personal capacity or --

5              MR. CONNETT:  In this question, I'm asking

6    in his personal capacity, yes.

7              MS. CARFORA:  You can answer if you know.

8              THE WITNESS:  Yes, we were aware of, yes.

9    BY MR. CONNETT:

10        Q.  You were aware that there were scientists

11   at EPA, who vigorously objected to EPA's decision,

12   to increase the MCLG?

13        A.  Yes.

14             MS. CARFORA:  You're asking him in his

15   personal capacity?

16             MR. CONNETT:  Yes.

17             MS. CARFORA:  You can answer.

18             THE WITNESS:  Yes.

19   BY MR. CONNETT:

20        Q.  You're -- you know who Robert Carton is?

21        A.  Yes.

1      that the union of EPA scientists and professionals

2      filed on behalf and in support of the NRDC's

3      lawsuit against EPA.  Now, you've been working

4      with EPA, as a scientist, for about 37 years or

5      so?

6           A.  Plus, yes.

7           Q.  In your 37-year career at EPA, can you

8      recall a single instance, where scientists, at the

9      EPA, filed a brief in support of an environmental

10     organization, challenging EPA's own position?

11              MS. CARFORA:  Objection as to form.

12              THE WITNESS:  Go ahead?  No, as I recall,

13     no, I don't.

14     BY MR. CONNETT:

15          Q.  You would agree that's a pretty dramatic

16     measure for scientists at the EPA to take?

17          A.  I can say it's unusual.

18          Q.  To -- because what they're doing here is

19     they're going public --

20          A.  Yes.

21          Q.  -- and saying in court, that EPA got it

1        A.   That's the value that we have.

2        **Q.   Right.**

3        A.   Anything else that would come in, we have

4    to compare what it is.  Now, if, whatever is

5    coming in, if I will use a reference does, which

6    will be lower, that's a different story then.

7        **Q.   Now, as a risk assessment scientist --**

8        A.   Yes.

9        **Q.   -- at the EPA, if you were asked to**

10   **determine what the safe level is for neurotoxic**

11   **effects of fluoride, you would need to do a new**

12   **risk assessment, you couldn't rely upon the risk**

13   **assessment that was done in the 1980s, for the**

14   **MCLG, correct?**

15            MS. CARFORA:  Objection to form.

16            THE WITNESS:  Can I go?  The endpoints

17   are -- I'm sorry, maybe I'm not clear.  The

18   endpoints are different that you're selecting your

19   reference dose.

20   BY MR. CONNETT:

21       **Q.   And because they're different --**

1          A.   Yes.

2          Q.   -- you would need to do a new risk

3     assessment, to find out what the reference dose

4     would be, correct?

5          A.   For neurotox.

6          Q.   Correct.  And you agree with that, right?

7               MS. CARFORA:  Objection to form.

8               THE WITNESS:  Or --

9     BY MR. CONNETT:

10         Q.   Or?

11         A.   Or you look at the new effect levels that

12    you have in your MCLG calculation, you look at the

13    new effect level that you have in your neurotox,

14    and you compare it that way too.

15         Q.   Right.  But in order to do that analysis,

16    you would need to do a new assessment -- a new

17    risk assessment to look at what the NOEL is for

18    neurotoxicity, correct?

19         A.   Correct.

20         Q.   And if you don't do that analysis, you can

21    never make a determination as to what the safe

1    level is for neurotoxicity?

2            MS. CARFORA:  Objection as to form.

3            THE WITNESS:  Can I just correct one

4    thing?  The word safe does not apply.  It's not,

5    acceptable risk.

6  BY MR. CONNETT:

7        Q.  Acceptable risk --

8        A.  Accept means without risk.

9        Q.  So in order to determine what the

10   acceptable risk level is, for fluoride

11   neurotoxicity, you couldn't just rely on the MCLG

12   that's already in existence, you would need to do

13   a new risk assessment, correct?

14       A.  Correct.

15       Q.  Okay.  Okay.  So in -- subsequent to the

16   MCLG being enacted in 1985, as is often the case,

17   there were a number of new studies that were

18   published on fluoride toxicity over the years,

19   correct?

20       A.  Yeah, correct.

21       Q.  And in order to assess those studies, the

1    studies that it recommends being done, correct?

2        A.  Excuse me?

3        Q.  This page here identifies several studies

4    that the NRC believes should be done, correct?

5        A.  Correct.

6        Q.  And the first study it talks about --

7    well, strike that.  It starts by saying, "The

8    possibility has been raised, by the studies

9    conducted in China, that fluoride can lower

10   intellectual abilities; thus, studies of

11   populations, exposed to different concentrations

12   of fluoride, in drinking water, should include

13   measurements of reasonability, problem solving,

14   IQ, and short- and long-term memory."  Did I read

15   that correctly?

16       A.  Correct.

17       Q.  So NRC is recommending that studies be

18   done on fluoride and IQ?

19       A.  I'm sorry?

20       Q.  The NRC was recommending that studies be

21   done on fluoride and IQ, correct?

```
 1              MS. CARFORA:  Objection.

 2              THE WITNESS:  Yes.

 3   BY MR. CONNETT:

 4       Q.  And in the next paragraph, "NRC recommends

 5   that studies of populations exposed to different

 6   concentrations of fluoride should be undertaken to

 7   evaluate neurochemical changes that may be

 8   associated with dementia."  Did I read that

 9   correctly?

10       A.  Correct.

11       Q.  So NRC was recommending that studies be

12   done to examine the relationship between fluoride

13   and dementia, correct?

14              MS. CARFORA:  Objection.

15              THE WITNESS:  Correct.

16   BY MR. CONNETT:

17       Q.  And sir, just to be clear, again, this

18   is -- this report that NRC wrote was at the

19   request of EPA, correct?

20       A.  Correct.

21       Q.  Okay.  So these recommendations that NRC
```

1            MR. CONNETT:  So we've been going a little

2       over five minutes now and, if you can't find it,

3       just let me know.

4            THE WITNESS:  I know I saw it.  I saw it.

5   BY MR. CONNETT:

6       **Q.  Okay.**

7       A.  It was like a graph like this, on fluoride

8   concentration, and there were definitely the ages,

9   and I cannot now put my fingers on it.

10      **Q.  Okay.**

11      A.  Fine.

12      **Q.  Breast milk contains very little fluoride,**

13  **right?**

14      A.  Yes.

15      **Q.  In fact, it contains about six micrograms**

16  **of fluoride, right?**

17           MS. CARFORA:  Objection, form, foundation.

18  BY MR. CONNETT:

19      **Q.  Basically -- well, let me strike that.**

20  **You would agree that a breastfed baby receives**

21  **virtually no fluoride?**

```
 1        A.   Correct.

 2             MS. CARFORA:  Objection, form, foundation.

 3   BY MR. CONNETT:

 4        Q.   Well, to address the foundation objection,

 5   let's look at what the EPA said about this in

 6   their risk assessment.  So if you can turn to page

 7   32?

 8        A.   Okay.  Thirty-two?

 9        Q.   Thirty-two.  And the second paragraph,

10   above the section titled Pathological Conditions.

11        A.   Okay.

12        Q.   And I'm looking here at the last sentence

13   of that paragraph, which begins as an example; do

14   you see that?

15        A.   Uh-huh.

16        Q.   An infant's fluoride intake, through

17   consumption of 800 milliliters of breast milk,

18   containing .4 micro mole fluoride per liter,

19   would be 0.006 milligrams, correct?

20        A.   Uh-huh.

21        Q.   So according to Whitford, a breastfed baby
```

1    would receive .006 milligrams of fluoride per day,

2    right?

3        A.   Correct.

4        Q.   And .006 milligrams of fluoride equals six

5    micrograms, correct?

6        A.   Correct.

7        Q.   Okay.  Now, Whitford contrasts that dose

8    of what a baby would conceive, if consuming the

9    same volume of liquids, but with formula prepared

10   with fluorinated water, correct?

11       A.   Correct.

12       Q.   Okay.  And Whitford provides a dose

13   estimate of .80 milligrams, per day, for the

14   formula-fed baby, correct?

15       A.   Correct.

16       Q.   And that amounts to 800 micrograms of

17   fluoride, correct?

18       A.   Eight hundred ML.

19       Q.   Well .08 milligrams is 800 micrograms,

20   correct?

21       A.   Correct.

1      Q.  So according to Whitford's data, a baby

2  that's formula-fed, with fluorinated water,

3  receives over 100 times more fluoride than a

4  breastfed baby?

5      A.  Yeah, according to this, yes.

6      Q.  And this is the data that the EPA has

7  cited and relied upon in its risk assessment; is

8  that correct?

9      A.  Which risk -- I mean --

10     Q.  EPA has cited --

11     A.  Yeah.

12     Q.  -- risk data from Whitford, correct?

13     A.  Yes.

14     Q.  And it's fair to say, if it's citing this

15 data from Whitford, it's relying on it, correct?

16     A.  Not for the variation of the RFD.

17     Q.  But it's relying on it for --

18     A.  Informational purposes.

19     Q.  So did -- would you agree that, in light

20 of this information, it would be important to know

21 what percentage of the children in Dean's study

1          MS. CARFORA:  Objection.  Are you asking

2     him in personal capacity or on behalf of EPA?

3          MR. CONNETT:  I'm asking him on behalf of

4     the EPA.

5          THE WITNESS:  Is that from the Dean's

6     study to figure that out?

7   BY MR. CONNETT:

8        **Q.  Yes.  The question is, based on Dean's**

9     **data, you cannot draw any conclusions about the**

10    **risks of developing severe dental fluorosis,**

11    **amongst children with kidney disease, drinking**

12    **water with less than two parts per million; is**

13    **that correct?**

14       A.  No, I cannot.

15       **Q.  You cannot make conclusions based on**

16    **Dean's data?**

17       A.  No, because the study did not actually

18    generate information per se.  What we have, pretty

19    much, has to do with how much they drank and the

20    level of fluorosis.

21       **Q.  Okay.  Now, in EPA's risk assessment, it**

1   provides data showing that African-American

2   children suffer from higher rates of dental

3   fluorosis than white children, at the same

4   concentration of fluoride in water, correct?

5       A.   Correct.

6       Q.   In fact, EPA cites data, from the 1940s

7   and 1950s, that shows that African-American

8   children had over double the rate of dental

9   fluorosis as white children, at the same water

10  fluoride concentration, correct?

11      A.   Correct.

12      Q.   Did Dean examine any children, any

13  African-American children, in his study?

14      A.   No.

15      Q.   In fact, Dean's study was based

16  exclusively on white children, correct?

17      A.   Caucasian, yes, that was one of the --

18  yes.

19      Q.   Now, sir, do you stand by your prior

20  statement that Dean's study examined the most

21  vulnerable children to the development -- strike

 1   role that it plays, because some individual may

 2   retain fluoride.  I mean, that's one of the --

 3   will it retain that?  As you can see, it's almost

 4   like a theory of risk assessment and that's why

 5   the EPA focused on this particularly study and I

 6   stand behind it.  I stand 100 percent -- actually

 7   150 percent behind the study.

 8            MR. CONNETT:  I understand that and move

 9   to strike the nonresponsive portions.

10   BY MR. CONNETT:

11       Q.  So just so we're clear, EPA has cited data

12   that African-American children suffer from higher

13   rate of dental fluorosis, correct?

14       A.  Yes.

15       Q.  And yet, Dean's study did not look at a

16   single African-American child, correct?

17       A.  Correct.

18       Q.  Okay.  EPA has cited data in its report

19   showing that infants, who are breastfed, receives

20   dramatically less fluoride than a formula-fed

21   child drinking fluorinated water, correct?

1     Q.   I understand you believe there's a benefit

2   to ingesting fluoride, but EPA recognizes that

3   fluoride is not an essential nutrient, correct?

4     A.   That's right.

5     Q.   Okay.   Now, EPA has also recognized that

6   fluoride's primary benefit to the teeth comes from

7   topical contact with the enamel, correct?

8     A.   It has been mentioned about intake,

9   itself, has played a key roll in preventing dental

10  cavities.

11    Q.   But EPA, itself, has recognized that

12  fluoride's primary benefit for caries prevention

13  purposes, comes from topical contact with the

14  outside of the tooth, correct?

15    A.   In this document?

16    Q.   Yes.

17    A.   Yes.

18    Q.   It has recognized that?

19    A.   Yes.

20    Q.   Okay.   So you, as a representative, of the

21  United States Environmental Protection Agency,

1    agree that fluoride's primary benefit to teeth is

2    topical?

3              MS. CARFORA:  Objection, form.

4              THE WITNESS:  Yes.

5    BY MR. CONNETT:

6        Q.  Okay.  Now, one thing I'm trying to

7    understand is, if fluoride's primary benefit is

8    topical, why do we need to swallow it?

9              MS. CARFORA:  Objection, scope, form,

10   foundation.

11             THE WITNESS:  May I say why?

12   BY MR. CONNETT:

13       Q.  Yeah.

14       A.  Because of individual social economic

15   cases, they might not be able to afford topical,

16   therefore, the only way they would be able to get

17   their fluoride would be from their drinking water,

18   that's why.

19       Q.  Okay.  Okay.  And -- but you would agree

20   that even when fluoride is added to the drinking

21   water, that the benefit of the fluorinated water

1    **for teeth comes from its topical contact with the**

2    **teeth, not from ingestion, correct?**

3            MS. CARFORA:  Object, scope, form,

4    foundation.

5            THE WITNESS:  Ingestion does play a role

6    too, in addition of topical, because of physiology

7    that you're going to go back, dissolving the

8    tooth, crystallization and so forth.

9  BY MR. CONNETT:

10           **Q.  But EPA recognizes that the predominant --**

11           A.  Predominant.

12           **Q.  -- predominant effect, even a fluorinated**

13    **drinking water is a topical effect on the outside**

14    **of the tooth, correct?**

15           MS. CARFORA:  Objection, scope, form,

16    foundation.

17           THE WITNESS:  Right.

18  BY MR. CONNETT:

19           **Q.  So we talked earlier about the Hong study.**

20    **Do you remember that?**

21           A.  Yes.

```
1              CERTIFICATE OF NOTARY PUBLIC

2        I, Kelly Susnowitz, the officer before whom

3   the foregoing deposition was taken, do hereby

4   certify that the witness whose testimony appears

5   herein was duly sworn by me; that the testimony of

6   said witness was taken by me in shorthand and this

7   transcript was typed under my direction; that said

8   transcript is a true record of the testimony given

9   by said witness; that I am neither counsel for,

10  related to, nor employed by any of the parties to

11  the action in which this deposition was taken;

12  and, further, that I am not a relative or employee

13  of any attorney or counsel retained by the parties

14  hereto, nor financially or otherwise interested in

15  the outcome of the action.

16        _____

17        Notary Public in and for the

18        State of Maryland

19

20        My commission expires:

21        June 13, 2020
```

# **Exhibit 3**

1  C. ANDREW WATERS, ESQ., CA Bar No. 147259
   MICHAEL CONNETT, ESQ., CA Bar No. 300314
2  WATERS, KRAUS & PAUL
   222 N. Pacific Coast Hwy, Suite 1900
3  El Segundo, CA 90245
   310-414-8146 Telephone
4  310-414-8156 Facsimile

5  *Attorneys for Plaintiffs*

6              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
7                    AT SAN FRANCISCO

8

9  FOOD & WATER WATCH, et al.,                     )  Civ. No. 17-CV-02162-EMC
                                                   )
                          Plaintiffs,              )
10                                                 )  **DECLARATION OF**
           vs.                                     )  **KATHLEEN THIESSEN, PhD**
11                                                 )
   U.S. ENVIRONMENTAL PROTECTION                   )
   AGENCY, et al.                                  )
12                                                 )
                          Defendants.              )
13                                                 )
                                                   )
14                                                 )

15

16     I, Kathleen Thiessen, declare that:

17     1.     I have agreed to appear as an expert in this case, and have prepared an expert report which

18  summarizes the opinions that I intend to offer if called to testify at trial. A true and correct copy of my

19  expert report (without the appendices) is attached herein as **Exhibit A**.

20     2.     I am a risk assessment scientist at the Oak Ridge Center for Risk Analysis in Oak Ridge,

21  Tennessee. For more than 30 years, I have been involved in the evaluation of exposures, doses, and risks

22  to human health from trace levels of contaminants in the environment, including fluoride, and in the use of

23  uncertainty analysis for environmental and health risk assessment. In the course of my work as a risk

24  assessment scientist, I have done work for the U.S. Environmental Protection Agency (EPA), the U.S.

25  Department of Energy, the Centers for Disease Control and Prevention, the U.S. Nuclear Regulatory

26  Commission, the National Cancer Institute, and the National Institute for Occupational Safety and Health,

27

28

as well as a number of other government and private clients.

3.     I have authored several reports for the EPA on the health effects of specific environmental contaminants, including a Health Issue Assessment of fluorides (hydrogen fluoride and related compounds). More recently, I served on two subcommittees of the National Research Council's (NRC) Committee on Toxicology, one which was asked by EPA to review the toxicologic literature on fluoride (which resulted in the 2006 publication Fluoride in Drinking Water: A Scientific Review of EPA's Standards), and one dealing with guidance levels for air contaminants (including hydrogen fluoride) in submarines. A further discussion of my qualifications is provided on pages 3-4 of my expert report.

4.     In this case, I conducted a risk assessment on the neurotoxicity of fluoride in accordance with *EPA's Guidelines on Neurotoxicity Risk Assessment* (hereafter, *Guidelines*). Pursuant to the Guidelines, I started my analysis by conducting a **Hazard Assessment** (pp. 5-27), in which I assessed: (1) the animal studies on neuroanatomical, neurochemical, and functional effects (pp. 10-14); (2) case reports, including clinician observations of occupationally exposed workers (pp. 15-16); (3) human epidemiology studies on fluoride and cognitive deficits, including the recent prospective birth cohort studies (pp.16-20); (4) the literature on fluoride's neuroendocrine effects (pp. 20-21); (5) animal and human research on possible modes of action (direct and indirect) by which fluoride affects the brain (pp. 21); (6) dose-response data on fluoride and neurotoxic outcomes in animal and epidemiological studies (pp. 21-22); (7) the pharmacokinetics of fluoride, including data on placental transfer and uptake into the brain (pp. 23-24); and (8) *in vitro* studies investigating fluoride's effects on brain cells, including several that used low concentrations (p. 24). Based on my assessment of this literature, I concluded to "a high degree of confidence" that neurotoxicity is a hazard of fluoride exposure (p. 26).

5.     As I discuss in my report, the *Guidelines* provide that a reference dose should be derived to protect against the neurotoxicity hazard if it is found to be the "critical effect"—i.e., "the effect occurring at the lowest dose level" (p. 28). EPA's current position is that severe dental fluorosis is the critical effect

DECLARATION OF KATHLEEN THIESSEN, PhD

of fluoride exposure. Accordingly, in the second part of my analysis, I examined whether neurotoxicity is a more sensitive effect than severe dental fluorosis, and concluded that "the collective data . . . strongly support the conclusion that neurotoxicity is a more sensitive effect . . . ." (pp. 28-32 & 51-62).

6.      Since neurotoxicity is a hazard of fluoride exposure, I turned to the second step of an EPA risk assessment: **Quantitative Dose Response** (pp. 51-62). In a quantitative dose-response analysis, a "Point of Departure" (POD) is identified from the available animal and human data in order to derive a dose that will be without appreciable risk (e.g., a reference dose) (pp. 51-55). For my analysis, I focused on the animal data as I understood that Dr. Grandjean had already calculated a BMDL from the human data (p. 54). Further, I focused my dose-response assessment on the animal studies that had examined prenatal exposure, as that is a life stage of heightened susceptibility (pp. 55).

7.      Rather than identify just one POD from the animal data, I identified the full range of possible PODs that can be justified. This range of PODs included "Lowest Observed Adverse Effect Levels" (LOAELs) ranging from 5 to 45 mg/L, and "No Observed Adverse Effect Levels" (NOAELs) ranging from 11 to 20 mg/L (pp. 57-58). After converting these water fluoride concentrations into dosages and converting them to Human Equivalent Doses (HED), I applied different combinations of uncertainty factors (from non-conservative to conservative). As I discuss in my report, whatever POD is selected from the animal data, the resulting reference dose is well below EPA's current RfD (0.08 mg/kg/day), and well below the exposures people receive in fluoridated areas, particularly bottle-fed infants (pp. 40-43 & 60). This remains the case even if the highest POD is used (NOAEL of 20 mg/L) and only two uncertainty factors are applied (for intra-species and inter-species variability) (p. 60 & 62; *see* Table 7, Column I).

8.      Consistent with the *Guidelines*, I also conducted an **Exposure Assessment** to assess the extent of exposure to fluoridated water. My exposure assessment focused on potentially susceptible and highly exposed populations, with a particular emphasis on bottle-fed infants (pp. 40-43, 47, 65-67).

9.      Finally, I conducted a **Risk Characterization** analysis, which is the final step of a risk

3

assessment under the *Guidelines* (pp. 63-69, *see also* 33-50). In my risk characterization, I considered the hazard ranking criteria that EPA uses in risk evaluations of new chemicals under Section 5 of TSCA (pp. 63-64), but I did not stop there. I also conducted a "Margin of Exposure" analysis, which is a method recommended by the *Guidelines*, and which EPA uses in its risk evaluations of existing chemicals under Section 6 of TSCA (pp. 64-67).  In one of my Margin of Exposure calculations, I selected a 20 mg/L NOAEL from the animal literature as the Point of Departure,[1] and used a Benchmark MOE of 30 (based on an uncertainty factor of 3 for intraspecies variability, and an uncertainty factor of 10 for interspecies variability).  As can be seen in Table 8, the "Calculated MOE" for multiple segments of the human population, including bottle-fed infants, was well below the Benchmark MOE of 30 for this Point of Departure (p. 67). By EPA's own standards, this represents an unacceptable risk.

10.    In addition to conducting a Margin of Exposure analysis, my Risk Characterization assessment also considered the extent of exposure to fluoridation chemicals in the U.S., including the potential for sensitive, highly susceptible, or highly exposed populations (pp. 33-50, & 64). As discussed in my report, over 200 million Americans have municipal water to which fluoridation chemicals are directly added, and the rest of the population living in "non-fluoridated areas" will routinely consume fluoridation chemicals in processed beverages and foods (e.g., sodas, soups, etc.) made with fluoridated water (p. 64). As I note in my report, "because of the massive reach of water fluoridation, millions of highly susceptible individuals are being exposed" (p. 64). Each year, approximately 2.9 million children will be exposed to fluoridation chemicals in the womb, and 1.2 million infants will consume fluoridation chemicals in formula every day for their first 6 months (p. 64).  To put the massive extent of this exposure in perspective, after I completed my expert report, EPA issued a draft Section 6 risk evaluation for 1-Bromopropane (1-BP). In this draft evaluation, EPA made unreasonable risk determinations based on Margin of Exposure analyses[2]

---

[1] As explained in my report, I converted the 20 mg/L NOAEL into a Human Equivalent Dose using EPA's bodyweight scaling method.

[2] As with my Margin of Exposure analyses for fluoridation chemicals, the Point of Departures for EPA's 1-BP analyses were based on toxic effects, including neurotoxicity, in animals.

4

of conditions of use involving just hundreds to thousands of occupationally-exposed workers. The number of people exposed to fluoridation chemicals among *susceptible subsets of the general population* is orders of magnitude higher than the number of *occupational* exposures at issue in the evaluation of 1-BP.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 8, 2019, in Oak Ridge, Tennessee.


*Kathleen M. Thiessen*
KATHLEEN THIESSEN, PhD

DECLARATION OF KATHLEEN THIESSEN, PhD

# **<u>Exhibit A</u>**

# Assessment of the Neurotoxicity of Fluoride

Kathleen M. Thiessen, Ph.D.
June 27, 2019

Food & Water Watch et al. v. Environmental Protection Agency
No. 17-cv—02162

Oak Ridge Center for Risk Analysis, Inc.
102 Donner Drive
Oak Ridge, TN 37830



*Food and Water Watch v. EPA*                                                      *Thiessen Report*

# TABLE OF CONTENTS

I.      Introduction ................................................................................................. 3

        A.      Assignment ....................................................................................... 3

        B.      Qualifications .................................................................................. 3

        C.      Summary of Opinions ....................................................................... 4

        D.      Updates and Reservation ................................................................. 4

        E.      Compensation and Prior Litigation Work ........................................ 4

II.     Opinions ....................................................................................................... 5

        A.      Neurotoxicity is a hazard of fluoride exposure ................................ 5

        B.      Neurotoxicity is a more sensitive effect of fluoride exposure
                than severe dental fluorosis .............................................................. 28

        C.      Identifiable subsets of the population have heightened susceptibility
                to the risk of harm from fluoridation chemicals ............................... 33

        D.      The current EPA reference dose for fluoride is not
                protective against neurotoxicity ....................................................... 51

        E.      Fluoridation chemicals present an "unreasonable risk" of neurotoxicity,
                as defined by EPA .............................................................................. 63

III.    Conclusions .................................................................................................. 69

IV.     References .................................................................................................... 70


Appendix A:  Recent animal studies of fluoride neurotoxicity (Tables A-1 and A-2) ................. 99

Appendix B:  Studies associating fluoride exposure with cognitive deficits in humans ............. 112

Appendix C:  Figures ........................................................................................... 119

Appendix D:  Adequacy of EPA's 2010 RfD with respect to the knowledge then
             available to EPA ................................................................................. 123

Appendix E:  Lack of effectiveness of community water fluoridation in improving
             dental health ...................................................................................... 137

Appendix F:  Resume of Kathleen M. Thiessen, Ph.D. ........................................... 144



## I.     INTRODUCTION

### A.     Assignment

I was asked to apply risk assessment frameworks used by the Environmental Protection Agency (EPA) to the current scientific literature on fluoride neurotoxicity to determine whether neurotoxicity is a hazard of fluoride exposure, and whether this hazard is a risk at the levels of fluoride added to drinking water for fluoridation (0.7 mg/L).

### B.     Qualifications

I am a risk assessment scientist at Oak Ridge Center for Risk Analysis in Oak Ridge, Tennessee. For more than 30 years, I have been involved in the evaluation of exposures, doses, and risks to human health from trace levels of contaminants in the environment, including fluoride, and in the use of uncertainty analysis for environmental and health risk assessment.  In the course of my work as a risk assessment scientist, I have done work for the U.S. Environmental Protection Agency (EPA), the U.S. Department of Energy, the Centers for Disease Control and Prevention, the U.S. Nuclear Regulatory Commission, the National Cancer Institute, and the National Institute for Occupational Safety and Health, as well as a number of other government and private clients.

I have authored several reports for the EPA on the health effects of specific environmental contaminants, including Health Issue Assessments of fluorides (hydrogen fluoride and related compounds) and mercuric chloride.  More recently, I served on two subcommittees of the National Research Council's (NRC) Committee on Toxicology, one which was asked by EPA to review the toxicologic literature on fluoride (which resulted in the 2006 publication *Fluoride in Drinking Water:  A Scientific Review of EPA's Standards*), and one dealing with guidance levels for air contaminants (including hydrogen fluoride) in submarines.

As part of my work, I contributed to the development of a risk-based screening approach to prioritize further investigation of chemical and radioactive contaminants and exposure situations in various assessment contexts.  I led in the application of risk-based screening techniques for the reconstruction of doses and health risks associated with releases of chemicals and radionuclides from the U.S. Department of Energy's Oak Ridge (Tennessee) facilities.  I also led in the analysis of human exposures, doses, and health risks to off-site individuals associated with historic releases of radionuclides to the Clinch River from the Oak Ridge facilities.

Currently, I lead the Working Group on Assessment of Exposures and Countermeasures in Urban Environments for the International Atomic Energy Agency's (IAEA's) program on Development, Testing and Harmonization of Models and Data for Radiological Impact Assessment (MODARIA II).  In addition, I currently serve on a committee for the revision of the IAEA's Safety Report Series No. 19, "Generic Models for Use in Assessing the Impact of Discharges of Radioactive Substances to the Environment," and have been involved in the preparation of an IAEA guidance document on implementation of remediation strategies following accidental releases of radioactivity.

Throughout my career, I have authored or contributed to a number of open literature publications in peer-reviewed journals such as *Health Physics*, *Environmental Science and Technology*, *Environmental Pollution*, *Atmospheric Environment*, *Journal of Environmental Radioactivity*, and the *International Journal of Occupational and Environmental Health*.  I have also served as a peer reviewer for journals such as *American Journal of Preventive Medicine*, *Environment International*, *Environmental Pollution*, *Risk Analysis*, *Science of the Total Environment*, *Environmental Health Perspectives*, and *Journal of*



*Environmental Radioactivity*, among others.  My formal education is in biomedical sciences, with a concentration in the field of genetics, and I remain interested in the effect of genetic background on individual response to chemical or radiation exposures.  A list of my publications and technical reports is included in my resume, which is included herein as Appendix F.

### C.      Summary of Opinions

For the reasons described herein, I have reached the following conclusions to a reasonable degree of scientific certainty:

1. Based on the hazard identification principles set forth in EPA's *Guidelines for Neurotoxicity Risk Assessment*, there is sufficient evidence to conclude that neurotoxicity is a hazard of fluoride exposure.
2. Convergent data from experimental animal studies and epidemiological studies of human populations, alongside considerations of pharmacokinetics and biological plausibility, strongly indicate that neurotoxicity is a more sensitive effect of fluoride exposure than severe dental fluorosis.
3. Identifiable subsets of the population have heightened susceptibility to the risk of harm from fluoridation chemicals.  These populations include the fetus; bottle-fed infants; the elderly; individuals with nutrient deficiencies, kidney disease, and/or high-water intake; and populations with specific genotypes.
4. The current EPA reference dose (RfD) for fluoride (0.08 mg/kg/day) is not protective against neurotoxicity, including loss of cognitive function.
5. Fluoridation chemicals present an "unreasonable risk" of neurotoxic effects, including IQ loss, if assessed under the same analytical framework that EPA uses in its risk evaluations of other chemicals under the Toxic Substance Control Act (TSCA).

### D.      Updates and Reservation

The opinions expressed in this report are my own and are based on the data, documents, and facts available to me at the time of writing.  Should additional relevant or pertinent information become available, I reserve the right to supplement the discussion and findings in my report.

### E.      Compensation and Prior Litigation Work

The hourly rate for my work in this case has been $225 to $300.  I have not been deposed in the last four years.  My hourly rate for depositions is $300.



## II.      OPINIONS

## A.      Neurotoxicity Is a Hazard of Fluoride Exposure

1.   Historic Background

The early epidemiological studies in the U.S. that claimed to establish the safety of waterborne fluoride[1] (fluoride concentrations ranging from 1 to 8 mg/L in drinking water) did not address the potential for fluoride to cause neurological effects, including IQ loss.[2]  The primary focus of these early studies was, instead, on skeletal health.  Although largely overlooked, some of the early studies of occupationally exposed workers,[3] as well as some of the early studies of fluoride-exposed animals,[4] reported central nervous system effects from fluoride exposure.  In a 1953 study of monkeys, Wadhwani and Ramasway reported that monkeys with chronic fluorosis "did not conduct themselves with intelligence and agility of mind normally associated with them.  There was a significant lack of co-ordination in their behaviour."[5] These early observations, some of which remained unpublished,[6] were largely ignored.  In 1985, when EPA proposed a Maximum Contaminant Level Goal (MCLG) for fluoride of 4 mg/L for fluoride, the Agency did not consider this early literature on neurotoxicity and did not consider neurotoxicity to be a potential hazard of fluoride exposure.[7]

The first known study of fluoride and intelligence in humans was published in 1989 by Ren and colleagues in China.[8]  A flurry of similar studies were published in China in the 1990s.[9]  Most of these studies were published in Chinese, and they remained largely unknown outside of China until English translations started to become available after 2000.

2.   NRC Report

In 2006, the NRC concluded that "fluorides have the ability to interfere with the functions of the brain and the body by direct and indirect means."[10]  The NRC reached this conclusion based on the

---

[1] This report deals with "fluoride" generally.  For some epidemiological studies, this means naturally occurring fluoride in drinking water, usually without discussion of other mineral content in the water.  For laboratory studies in rodents, this usually means NaF.  For epidemiological studies in artificially fluoridated areas, this means "fluoridation chemicals," which usually include NaF, $Na_2SiF_6$, and $H_2SiF_6$ (NRC 2006, pp. 52-53; the latter two chemicals are known as silicofluorides).  Exposure to aluminum fluorides is also common (NRC 2006, pp. 51-52).  For any epidemiological studies, total fluoride exposure (which might or might not be addressed) includes exposure to fluoride from drinking water, beverages or foods prepared with tap water, tea, toothpaste and other dentifrices, and other sources.  See Chapter 2 of NRC (2006) for more information on fluoride exposure.  This report assumes that any effect attributable to NaF (e.g., in animal studies) will also be a risk for exposure to "fluoridation chemicals" (including silicofluorides) and aluminum fluorides; in addition, both silicofluorides and aluminum fluorides may pose risks beyond those associated with NaF (NRC 2006, pp. 51-53).
[2] Call et al. (1965); Leone et al. (1954; 1955a; 1955b); McCauley and McClure (1954); McClure (1944); Schlesinger et al. (1956a; 1956b); Stevenson and Watson (1957).
[3] Roholm (1937); Popov et al. (1974).
[4] Wadhwani and Ramasway (1953); Lu et al. (1961); Rice and Lu (1963); Sadilova et al. (1968).
[5] Wadhwani and Ramasway (1953).
[6] See, for example, a Manhattan Project memo by Ferry (1944).
[7] Neurotoxicity was not included in a 1985 draft Criteria Document prepared for the EPA (ICAIR 1985) or in the proposed and final versions of EPA's National Primary Drinking Water Regulations for fluoride (Federal Register 1985a; 1985b).
[8] Ren et al. (1989).
[9] Qin et al. (1990); Chen et al. (1991); Guo et al. (1991); Lin et al. (1991); Sun et al. (1991); An et al. (1992); Li et al. (1994); Xu et al. (1994); Yang et al. (1994); Duan et al. (1995); Li et al. (1995); Wang et al. (1996); Yao et al. (1996; 1997); Zhao et al. (1996).
[10] NRC (2006), p. 222.



histological, biochemical, and molecular findings from animal studies published in the 1990s and early 2000s. These findings included reduced protein and phospholipid content in the brains of fluoride-treated animals; inhibition of acetylcholinesterase; interference with neurotransmitters; increased production of free radicals in the brain (i.e., oxidative stress); neuronal deformations; increased uptake of aluminum; and enhancement of reactive microglia.[11]

As part of its report, the NRC also reviewed the few studies on fluoride and intelligence that were then available in English.[12]  Various methodological limitations were identified with these studies, but the NRC concluded that the consistency of the results (i.e., reduced intelligence among children exposed to elevated fluoride) warranted further epidemiological research into the potential of fluoride to lower IQ.  The NRC also reviewed several behavioral studies in animals, including two that examined the impact of fluoride on learning and memory, but the data were not yet sufficient to draw conclusions.[13]  The NRC did, however, recommend that additional animal studies be conducted to evaluate cognitive effects of fluoride exposures.[14]

Of additional relevance to the neurotoxic potential of fluoride exposures, the NRC reviewed the toxicologic literature on fluoride's effects on the endocrine system, including the thyroid gland. The NRC concluded that fluoride is an endocrine disrupting chemical which can alter thyroid function at estimated average intakes as low as 0.01 to 0.03 mg/kg/day in individuals with iodine deficiency.[15] The NRC recognized the potential relevance of fluoride's endocrine effects to neurotoxicity, noting that depressed thyroid function during pregnancy can lower the IQ of the offspring.[16]

The NRC's findings on the neurotoxic potential of fluoride have been accepted as an accurate summary of the hazard by the EPA and other federal agencies, including the CDC.[17]  It is important to recognize, however, that much additional research on fluoride's neurotoxicity has been published since the NRC's report. As discussed below, the evidence of fluoride neurotoxicity is much stronger today than when the NRC conducted its review.

3.   Application of EPA's Guidelines for Neurotoxicity Risk Assessment

The EPA has established guidelines for neurotoxicity risk assessment ("Guidelines") which the Agency has stated it "will follow in evaluating data on potential neurotoxicity associated with exposure to environmental toxicants."[18]  Under the Guidelines, the risk assessor must make a qualitative determination as to whether a hazard for neurotoxicity "could exist."[19]  "A single adverse endpoint from a well-conducted study" is "sufficient evidence" under the Guidelines to establish that "a hazard for neurotoxicity could exist."[20]  If no individual study is sufficient to establish a hazard, "the total available data may support such a conclusion."[21]

---

[11] NRC (2006), pp. 221-222.
[12] Li et al. (1995); Zhao et al. (1996); Lu et al. (2000); Xiang et al. (2003a; 2003b).
[13] NRC (2006), pp. 215-216, 221.
[14] NRC (2006), p. 223.
[15] NRC (2006), pp. 262-263, 266.
[16] NRC (2006), p. 263.
[17] EPA (2010b), p. i; Federal Register (2015), p. 24940; USDHHS Panel (2015), p. 322; Deposition of Casey Hannan at 115:4-125:3 & 136:21-140:1.
[18] EPA (1998a), p. 1; Federal Register (1998), p. 26927.
[19] EPA (1998a), pp. 53, 55-56; Federal Register (1998), pp. 26945-26946.
[20] EPA (1998a), p. 55; Federal Register (1998), p. 26946.
[21] EPA (1998a), p. 56; Federal Register (1998), p. 26946.



*Animal Studies – General Considerations*

Under the Guidelines, the hazard determination "can be based on either human or animal data."[22] EPA has a preference for using human data if suitable data exist;[23] in practice, however, animal data are almost always used.[24]  EPA has expressly applied the Guidelines in 10 risk assessments.[25]  Based on these assessments, EPA established reference doses (RfDs; summarized in Table 1) and/or reference concentrations (RfCs) to protect against neurotoxicity for 9 chemicals or groups of chemicals.[26]  In each of these assessments, EPA relied on animal data to establish the RfD or RfC.  One reason that EPA uses animal studies is that they "provide more precise exposure information, and control environmental factors better."[27]  Another reason is that human data are rarely available:  for 6 of the 9 chemicals for which EPA established RfDs or RfCs based on neurotoxicity endpoints, there were *no* human data on neurotoxicity (Table 1).

Neurotoxic endpoints in animal studies fall into several categories, including neuroanatomical (e.g., neuropathological), neurochemical, neurophysiological, behavioral and neurological, and developmental.[28] Neuroanatomical endpoints include gross changes to the brain, such as reduced brain weight, as well as changes to brain cells that are detectable under a microscope (i.e., "histological").[29]  Neurochemical effects include alterations in synthesis, release, uptake, or degradation of neurotransmitters; alterations in second-messenger activities; and alterations or inhibition of enzymes or proteins.[30]  Neurophysiological effects include alterations in nerve conduction or electroencephalographic patterns.[31]  Behavioral and neurological changes include alterations to motor activity, changes in sensory abilities or motor coordination, seizures, and impairments in learning, memory, and attention.[32]  Developmental endpoints include both changes in timing of the appearance of behaviors during development and changes in growth or organization of the nervous system.[33]  In its risk assessments to date, EPA has established reference doses based on both neuroanatomical and behavioral effects, including axonal swelling in peripheral nerves (2-Hexanone),[34] reduced brain weight (Methanol),[35] reduced pain sensitivity (Trimethylbenzenes),[36] and impairment in

[22] EPA (1998a), p. 11; Federal Register (1998), p, 26931.
[23] EPA (2018a), p. 2-1.
[24] EPA (1998a), p. 20; Federal Register (1998), p. 26934.
[25] See EPA (2018b), pp. 4-5.  These 10 risk assessments were performed for BDE-47 (EPA 2008a), BDE-99 (EPA 2008b), BDE-153 (EPA 2008c), BDE-209 (EPA 2008d), Chlorine Dioxide and Chlorite (EPA 2000b), 2-Hexanone (EPA 2009c), Methanol (EPA 2013a), RDX (EPA 2018a), Trimethylbenzenes (EPA 2016), and Hydrogen Sulfide (EPA 2003).
[26] Reference doses or reference concentrations were based on neurological endpoints for BDE-47 (EPA 2008a), BDE-99 (EPA 2008b), BDE-153 (EPA 2008c), BDE-209 (EPA 2008d), Chlorine Dioxide and Chlorite (EPA 2000b), 2-Hexanone (EPA 2009c), Methanol (EPA 2013a), RDX (EPA 2018a), and Trimethylbenzenes (EPA 2016).  For Hydrogen Sulfide, the risk assessment was based on a non-neurologic endpoint but was specifically expected to be protective for the neurological endpoints (EPA 2003, pp. 45-46).
[27] EPA (1998a), p. 20; Federal Register (1998), p. 26934.
[28] EPA (1988a), pp. 20-21; Federal Register (1998), pp. 26934-26935.
[29] EPA (1998a), p. 21; Federal Register (1998), p. 26934.
[30] EPA (1998a), pp. 21, 30-32; Federal Register (1998), pp. 26934, 26938-26939.
[31] EPA (1998a), p. 21; Federal Register (1998), pp. 26934-26935.
[32] EPA (1998a), p. 21; Federal Register (1998), p. 26935.
[33] EPA (1998a), p. 21; Federal Register (1998), p. 26935.
[34] EPA (2009c), p. 60.
[35] EPA (2013a), pp. 5-6, 5-16, 5-17.  The inhalation RfC for methanol was derived from a neurological endpoint.  An oral RfD for methanol was derived from the same inhalation studies, but was based on a non-neurological endpoint (p. 5-28); therefore methanol is not included in Table 1.
[36] EPA (2016), pp. xxv, xxvi, 2-22, 2-23, 2-35.



spontaneous motor activity, learning, memory, and habituation (BDE-47, BDE-99, BDE-153, and BDE-209).[37]

In considering the relevance of these endpoints to humans, the Guidelines provide four default assumptions. First, EPA assumes that "an agent that produces detectable adverse neurotoxic effects in experimental animal studies will pose a potential hazard to humans."[38] Second, EPA assumes that neuroanatomical, neurochemical, neurophysiological, and behavioral changes "are of concern."[39] Third, EPA assumes that "the neurotoxic effects seen in animal studies may not always be the same as those produced in humans" due to "species-specific differences in maturation of the nervous system, differences in timing of exposure, metabolism, or mechanisms of action."[40] Fourth, EPA assumes that "humans are as sensitive as the most sensitive animal species tested."[41] Each of these four assumptions is "plausibly conservative," meaning that "they are protective of public health and are also well founded in scientific knowledge about the effects of concern."[42]

Finally, the principal studies which EPA has used to establish RfDs or RfCs have not been "perfect" studies. In fact, in most of the neurotoxicity risk assessments, EPA has identified a number of methodological limitations with the studies. Some of the principal studies did not conform to EPA's testing guidelines for animal studies, some used relatively small numbers of animals (e.g., 10 per group), and the principal studies that investigated effects from prenatal exposures did not control for litter effects. As a result, EPA had "low" confidence in the principal study it used to set the RfD for BDE-209,[43] "low-to-medium" confidence in the principal study for Trimethylbenzenes,[44] and "medium" confidence in the principal studies for Chlorine Dioxide/Chlorite[45] and 2-Hexanone[46] (Table 1). This did not stop EPA from establishing RfDs for these chemicals.

In 2011 and 2014, the National Academy of Sciences (NAS) recommended that EPA implement certain changes with respect to how its Integrated Risk Information System (IRIS) conducts risk assessments—not with respect to neurotoxicity specifically, but risk assessments in general. The thrust of the NAS recommendations was that EPA should implement more transparent and systematic procedures for determining which studies and endpoints to consider.[47] The NAS also encouraged EPA to move away from selection of a single principal study upon which to derive RfDs,[48] and to make greater use of physiologically based pharmacokinetic (PBPK) modelling data when extrapolating animal findings to humans.[49]

---

[37] EPA (2008a), p. 43; EPA (2008b), pp. 57-58; EPA (2008c), p. 32; EPA (2008d), pp. 51, 55.
[38] EPA (1998a), p. 6; Federal Register (1998), p. 26929.
[39] EPA (1998a), p. 6; Federal Register (1998), p. 26929.
[40] EPA (1998a), p. 7; Federal Register (1998), p. 26929.
[41] EPA (1998a), p. 7; Federal Register (1998), p. 26929.
[42] EPA (1998a), p. 7; Federal Register (1998), p. 26929.
[43] EPA (2008d), p. 66.
[44] EPA (2016), pp. 2-26, 2-36.
[45] EPA (2000b), p. 40.
[46] EPA (2009c), p. 79.
[47] NAS (2011), pp. 4, 164; NAS (2014), pp. 137-138.
[48] NAS (2014), p. 118.
[49] NAS (2014), p. 33.



*Food and Water Watch v. EPA*                                                    *Thiessen Report*

Table 1.  Chemicals with oral RfDs based on neurological endpoints, assessed according to EPA's Guidelines for Neurotoxicity Risk Assessment.[a]

| Name of Chemical | Human Neurotoxicity Data?[b] | Principal Study | Confidence in Principal Study | Known Mode of Action? | Effect | Reference |
|---|---|---|---|---|---|---|
| BDE-47 | No | Animal | Not given[c] | Inadequate data | Changes in spontaneous motor activity and habituation | EPA (2008a) |
| BDE-99 | No | Animal | Not given[d] | Inadequate data | Neurobehavioral developmental effects; changes in motor activity | EPA (2008b) |
| BDE-153 | No | Animal | Not given[e] | Inadequate data | Spontaneous behavior, learning and memory | EPA (2008c) |
| BDE-209 | No | Animal | Low | Inadequate data | Changes in spontaneous behavior and habituation | EPA (2008d) |
| Chlorine Dioxide and Chlorite | No | Animal | Medium | No | Neurodevelopmental delay; lowered auditory startle amplitude | EPA (2000b) |
| 2-Hexanone | No | Animal | Medium | Yes | Axonal swelling in peripheral nerves | EPA (2009c) |
| RDX | One cross-sectional study, 16 case reports | Animal | High | Yes | Convulsions | EPA (2018a) |
| Trimethylbenzenes | Occupational studies of solvent mixtures, controlled experiments with healthy adults | Animal | Low to Medium | Tentative, based on structurally similar compounds | Decreased pain sensitivity | EPA (2016) |

[a] EPA (1998a); Federal Register (1998).

[b] Human studies of neurotoxicity endpoints, based on oral exposure.

[c] Confidence in the principal study was not stated, but the "overall confidence in the RfD assessment of BDE-47 is low" (EPA 2008a, p. 48).

[d] Confidence in the principal study was not stated, but the "overall confidence in the RfD [for BDE-99] is low" (EPA 2008b, p. 67).

[e] Confidence in the principal study was not stated, but the "overall confidence in the RfD assessment for BDE-153 is low" (EPA 2008c, p. 37).



Subsequent to the NAS's recommendations, EPA has issued two neurotoxicity risk assessments, for trimethylbenzenes (2016)[50] and RDX (2018).[51]  As with the prior risk assessments, both of these new risk assessments utilized animal data as the basis for the respective RfDs, as there were few human data available for either chemical.  For trimethylbenzenes, EPA identified a small number of occupational studies involving mixtures of solvents, as well as some controlled exposures of healthy adult volunteers (which generally showed little or no nervous system effects); these human data were considered inadequate for establishing an RfD.[52]  Similarly, with RDX, EPA identified three small-scale occupational studies and sixteen case reports of neurological effects associated with acute RDX exposures.  The human data on RDX were also considered inadequate to establish an RfD.[53]

For several of EPA's neurotoxicity risk assessments, including the 2018 risk assessment for RDX, EPA established an RfD despite a relatively small number of animal studies.  In the RDX risk assessment, EPA identified 16 (repeated dose) animal studies, only two of which had been published.  EPA characterized the animal studies as showing "consistent evidence" of neurotoxicity on the grounds that 11 of the 16 studies reported neurological effects,[54] and the effects were generally dose-related (although inconsistencies existed across the studies in terms of the doses that produced the effects).[55]  EPA's risk assessment of RDX highlights that "consistency" of the evidence is not synonymous with unanimity.

*Animal Studies on Fluoride Neurotoxicity*

The animal research on fluoride neurotoxicity was sufficient to permit the NRC to conclude, in 2006, that fluoride interferes with the functions of the brain.[56]  Many animal studies have been published since the NRC review, and the database is now stronger than it was when NRC issued its report.

A search of the National Library of Medicine's online database PubMed was conducted to identify studies published since the NRC's 2006 review.  The following search terms were used:  "fluoride and brain," "fluoride and learning," and "fluoride and memory."[57]  The titles of all studies published since 2006 were reviewed to identify potentially relevant studies, and, among potentially relevant primary studies, abstracts were reviewed to verify relevance.  Reviews, studies in Chinese for which translations were not available, and *in vitro* studies were excluded.  Full-text copies of all relevant studies were obtained.

In total, the search identified 110 papers.[58]  Papers that appeared to be reporting effects from the same underlying rodent experiment were treated as one study,[59] leaving 105 distinct studies.  This is not an exhaustive list of the studies published since 2006, as it does not reflect studies that were not indexed in PubMed (e.g., studies published in the journal *Fluoride* or in certain Chinese-language journals such as the *Chinese Journal of Endemiology*).  In addition, the search terms probably did not identify all relevant studies available on PubMed.  Nevertheless, this list should provide a reasonably representative sample of the

---

[50] EPA (2016).

[51] EPA (2018a).

[52] EPA (2016), pp. xxiii-xxiv, 1-5 to 1-7, 1-66.

[53] EPA (2018a), pp. xxxix-xl, 1-13, 1-80.

[54] EPA (2018a), p. 1-23.

[55] EPA (2018a), pp. 1-12, 1-18.

[56] NRC (2006), p. 222.

[57] These search terms are expected to identify many neurotoxicity studies, but not necessarily all studies that examined neurotoxic effects.  For example, studies of neuroanatomical or neurochemical effects might not be identified with these search terms.

[58] Summarized in Appendix A, with the exception of papers excluded for the reasons discussed below.

[59] Adedara et al. (2017a; 2017b); Akinrinade et al. (2015a; 2015b); Basha et al. (2011a; 2011b); Basha and Sujitha (2012a; 2012b); and Zhu et al. (2011) and Zhang et al. (2011).



recent literature, and there is no apparent reason to believe that studies listed on PubMed would be skewed towards finding adverse effects. According to the NAS, "PubMed searches are critical for identifying the literature on risks to health."[60]

Of the recent studies identified, all but 4 reported associations between fluoride exposure and neurotoxic outcomes.[61] Table A-1 in Appendix A provides data from the 89 animal studies which investigated "structural" (e.g., neuroanatomical and neurochemical) endpoints, and Table A-2 provides data from the 37 animal studies which investigated the "functional" effects of learning and memory. Thirty studies investigated both types of effects and are in both lists. To facilitate comparisons across these studies, Tables A-1 and A-2 exclude 2 studies of non-rodents[62] as well as four studies in which the fluoride exposure was part of a mixture involving other potentially neurotoxic chemicals,[63] one study involving exposure by a route other than ordinary ingestion,[64] and two behavioral studies with endpoints that did not specifically involve learning and memory.[65]

As can be seen in Table A-1, rodent studies published since the NRC review have continued to document structural (e.g., neuroanatomical and neurochemical) changes in the brains of fluoride-treated rodents. These changes include oxidative stress, neuronal degeneration, mitochondrial disturbances, reductions in nicotinic receptors, impaired synaptic plasticity, and neuroinflammation.

Among the recent studies that have investigated both structural and functional effects of fluoride, the former have sometimes (but not always) occurred at lower exposures, suggesting that fluoride can cause cellular and biochemical changes in the brain prior to the manifestation of outwardly demonstrable deficits.[66] Put another way, deficits in learning and memory likely represent a relatively advanced stage of fluoride neurotoxicity. Nevertheless, both structural and functional harms have repeatedly been observed in rodents at water fluoride concentrations between 5 mg/L and 23 mg/L (corresponding to 10 to 50 mg/L NaF). As with the RDX literature,[67] there are some inconsistencies across the studies in the reported doses that can cause certain types of harm; these differences likely result, at least in part, from differences in study design, including differences in timing of exposure, duration of exposure, and strain and sex of animal.

Finally, it bears considering that most of the animal studies to date have used subchronic exposure scenarios, which would tend to understate the effect from lifetime exposure. EPA's testing guidelines define a chronic exposure study in rodents as one that lasts at least 12 months.[68] None of the recent learning studies have lasted 12 months, and only 1 of the recent structural studies has lasted 12 months or more.[69]

---

[60] NAS (2011), p. 26.

[61] Negative results were reported by Whitford et al. (2009), Pulangan et al. (2018), McPherson et al. (2018), and Jia et al. (2019). These studies are discussed later in this report.

[62] Khatun et al. (2018) used fruit flies (*Drosophila melanogaster*), and Mukhopadhyay et al. (2015) used zebrafish (*Danio rerio*).

[63] Gui et al. (2010) used fluoride-polluted corn that had been dried by burning high-fluoride coal. Ranpariya et al. (2011) used aluminum fluoride ($AlF_4^-$). Nalagoni and Karnati (2016) used a mixture of $AlCl_3$ and NaF. Hussien et al. (2018) used a mixture of aluminum, cadmium, and fluoride.

[64] Cao et al. (2019) used daily intragastric administration.

[65] Bartos et al. (2015) examined the effect of fluoride on the functional outcomes of anxiety and depression, but not learning and memory. Kinawy and Al-Eidan (2018) used $AlCl_3$, NaF, and a mixture of the two; disturbed locomotor behavior and alterations in some hormone levels were observed in rats treated with fluoride alone or in combination with aluminum.

[66] See, for example, Agustina et al. (2018); Ma et al. (2015); Niu et al. (2018a); Sun et al. (2018); Wang et al. (2018a); Zhang et al. (2019); Zhao et al. (2019).

[67] EPA (2018a).

[68] EPA (1998b), p. 1.

[69] Teng et al. (2018).



This takes on added interest when considering that, among studies that have tested animals at multiple points in time, the effects have tended to worsen with time, with some effects not appearing at all until 3 to 6 months of chronic exposure.[70]  Most of the studies on fluoride neurotoxicity have lasted no longer than 3 months (See Tables A-1 and A-2).

*NTP Reviews*

In 2015, the National Toxicology Program (NTP) completed a systematic review of the animal literature on fluoride neurotoxicity and submitted a report to the Australian government.[71]  The NTP limited its review of the literature to the minority of studies that have measured learning, memory, and other behavioral effects.[72]  The NTP identified the studies through searches of PubMed, BIOSIS, EMBASE, Scopus, Web of Science, PsycINFO, and several other specialized databases.[73]  In total, the NTP identified 44 studies of learning and memory, 14 of which were excluded due to risk of bias from lack of randomization, lack of blinding at outcome assessment, or other design deficiencies.[74]  From the remaining 30 studies, NTP concluded that there was "a moderate level-of-evidence for a pattern of findings suggestive of an effect on learning and memory in rats treated during development or adulthood."[75]  Moderate level of evidence is the second highest level of evidence under NTP's 5-grade classification criteria.[76]

In 2016, the NTP published an updated version of its systematic review.[77]  In the updated review, NTP identified an additional four studies on learning and memory, two of which were excluded for bias, resulting in a total of 32 studies for its analysis.[78]  NTP maintained its conclusion that a "moderate" level of evidence exists for learning and memory deficits in fluoride-treated adult animals, but downgraded its conclusion for developmental exposures to "low."[79]  NTP had less confidence in the developmental studies due to their general failure to control for litter effects, as well as the relatively few developmental studies that used fluoride concentrations lower than 25 mg/L in drinking water.[80]  Further, in contrast to NTP's 2015 report, the 2016 updated report considered the absence of animal studies using 0.7 mg/L (the current recommended fluoride concentration for human drinking water[81]) to be an important limitation in the research in terms of its relevance to human exposure levels.[82]

The NTP identified several common methodological limitations with the learning and memory studies, including failure to rule out fluoride-induced motor effects as the cause of the apparent cognitive deficits; failure to control for "litter effects" in the developmental studies; and lack of reported information on the study conditions, including the purity of the fluoride added to the water and the concentrations of

---

[70] For example, Güner et al. (2016); Liu et al. (2011); Yang et al. (2018a); Zhang et al. (2015a).

[71] NTP (2015a).

[72] NTP (2015a), pp. 1, 28.  "Studies assessing thyroid function or brain-related cellular, morphometric or histological endoints were considered beyond the scope of this analysis" (p. 1).  By limiting its review to studies investigating learning and memory, the NTP did not consider the much larger number of studies that have investigated neuroanatomical and neurochemical effects.

[73] NTP (2015a), pp. 1, 4.

[74] NTP (2015a), p. 1.

[75] NTP (2015a), p. 1.

[76] NTP (2015a), p. 11.  Under NTP's Hazard Identification Scheme, a chemical that has a moderate level of evidence of neurotoxicity in animals and a moderate level of evidence of neurotoxicity in humans is a "presumed" neurotoxicant (NTP 2015b, p. 67, Figure 8).

[77] NTP (2016).

[78] NTP (2016), p. vi.

[79] NTP (2016), p. 55.

[80] NTP (2016), p. 57.

[81] USDHHS (2015); Federal Register (2015).

[82] NTP (2016), pp. 55, 58.



fluoride in the rodent chow. Many of the limitations identified by the NTP (e.g., lack of information on the purity of the fluoride compounds) would not be expected to skew the results in a consistent direction across laboratories. Similarly, litter effects can produce false negatives as well as false positives,[83] and thus it is questionable whether they would skew the results of multiple studies in a consistent direction. Moreover, some of the limitations that NTP identified (e.g., lack of statistical power due to a small number of animals), as well as limitations that NTP did not identify (e.g., in develomental studies, the absence of neonatal exposures that are comparable to those experienced by formula-fed infants[84]), would actually tend to bias the results toward the null. Finally, the suggestion by NTP that rodent studies should use fluoride concentrations of 0.7 mg/L in order to be relevant to human exposures is at odds with longstanding tenets of risk assessment,[85] as explained later in this report; humans are considered much more sensitive to fluoride (and other chemicals) than are rats and mice.[86]

NTP also expressed concern that effects on learning and memory could not be definitively distinguished from effects on motor or sensory function that could have affected an animal's ability to perform adequately on the learning and memory tests.[87] NTP did not mention that both kinds of effects are adverse effects, even if the precise nature of the effect is not clear. In addition, as mentioned above, by limiting its review to studies investigating learning and memory, the NTP did not consider the much larger number of studies that have investigated neuroanatomical and neurochemical effects, endpoints that are more sensitive and also potentially less susceptible to bias associated with outcome assessment.

Subsequent to the NTP's review, 11 additional developmental studies have reported learning and memory outcomes.[88] Ten of these studies found deficits in the fluoride-treated groups. Notably, the Bartos et al. studies, which controlled for litter effects, found impairments in learning and memory at a fluoride concentration of just 5 mg/L. While the other studies (with the exception of McPherson et al.) did not control for litter effects, this limitation does not preclude use of the research for setting an RfD. As noted above, EPA has previously selected developmental studies that did not control for litter effects as principal studies for establishing neurotoxicity-based RfDs for other chemicals.

---

[83] Zorrilla (1997), p. 144; Lazic and Essioux (2013), p. 3.

[84] Fluoride concentrations in mammalian milk are very low in comparison to the mother's fluoride intake, even when the mother's fluoride intake is quite high (NRC 2006, pp. 33, 36; Drinkard et al. 1985). In the animal studies described in this report that included maternal exposure to fluoride during lactation, the fluoride intake of the offspring during that period would have been low or negligible. In contrast (as described later in this report), formula feeding of infants produces some of the highest fluoride exposures experienced by humans. NTP (2016, p. 122) alludes to the difference in fluoride intakes between formula-fed and breastfed infants, but is not up to date on the minimal effect of maternal fluoride intake on the fluoride concentration in milk and does not discuss the reduced relevance of animal studies of maternal fluoride exposure during lactation with respect to formula-fed human infants.

[85] The principal author of the NTP study, Kristina Thayer, testified at her deposition that she is no longer comfortable with the assumption of a 1-to-1 equivalence between fluoride exposures in animals and humans; Thayer testified that she would approach the issue differently today, with greater attention to the principles of toxicokinetics and toxicodynamics. (Thayer Deposition at 151:9-152:3, 302:21-303:23).

[86] NTP (2016) discusses the differences in chronic fluoride exposure needed to reach similar fluoride concentrations in bone or plasma (pp. 122-123), and they provide an estimate of the water fluoride concentrations (7-9 mg/L, p. 56, footnote 14) needed to reach intakes in rats comparable to those in humans from 0.7 mg/L, allowing for allometric scaling between humans and rats. Thus NTP should be aware that insisting on animal studies of exposures to 0.7 mg/L is inappropriate.

[87] NTP (2016), p. 55.

[88] Bartos et al. (2018; 2019); Chen et al. (2018a); Cui et al. (2017); Ge et al. (2018); McPherson et al. (2018); Sun et al. (2018); Wang et al. (2018a); Zhao et al. (2019); Zhu et al. (2017); Zhou et al.(2019).



*No-effect Studies in Animals*

McPherson et al. (2018) is the one developmental study that did not find adverse effects on learning and memory subsequent to NTP's review.  Several features of the study may help to explain this result.[89] For example, McPherson et al. used Long Evans Hooded rats.  Elliott suggested as far back as 1967 that the Long Evans Hooded rat may have lower sensitivity to fluoride than other strains,[90] and McPherson's study is consistent with this finding.  In total, three studies have examined the effect of fluoride on learning in Long Evans rats, and all three have failed to find an effect.[91]  Other research has found that Long Evans Hooded rats have different sensitivities to teratogenic substances *in utero* than Sprague-Dawley rats,[92] which adds plausibility to possible strain-specific differences between Long Evans Hooded rats and the rats more commonly studied in fluoride studies to date.  Secondly, in contrast to most of the other developmental studies, McPherson et al. did not start the exposure until the 6th day of gestation.[93]  As pregnancy in rats lasts approximately 21 days, any effects due to exposures during the first trimester are unlikely to have been detected by McPherson's study design.  Finally, as discussed above, although the mother rats were exposed through the lactation period, and the offspring rats continued at the same level of exposure after weaning, exposure of the offspring during most of the pre-weaning period would have been minimal, as the fluoride content of rat milk (as with milk of other mammals) is very low in comparison to the mother's fluoride intake.  Thus the major exposure of the offspring rats was limited to the later gestational period and the post-weaning period, and important periods of potential susceptibility (early gestation and the neonatal period) were missed.  As with most other developmental studies in rodents, exposures comparable to those received by formula-fed human infants in fluoridated areas have been completely neglected.

Three additional studies listed in Tables A-1 and A-2 also reported no neurotoxic effects from fluoride exposure.[94]  The studies by Whitford et al. study and Pulungan et al. started with adult animals, and the study by Jia et al. started at gestational day 9; thus part or all of the gestational period was missed in these studies.  Jia et al. looked for an effect of fluoride in conjunction with intrauterine inflammation; comparison of fluoride-treated vs. control groups without intrauterine inflammation was not provided for most endpoints.[95]  Pulungan et al. found non-significant effects on the prefrontal cortex, a part of the brain not examined in very many other studies.[96]  Whitford et al. did not specifically mention whether the outcome assessment was blinded, although both the treatment allocation and the selection of animals for tissue sampling were randomized.[97]  As described in the Guidelines, four studies with apparent no effect, for a small set of endpoints, cannot be expected to disprove a much larger number of studies and endpoints that have shown a neurotoxic hazard from fluoride ingestion.  "To judge that an agent is unlikely to pose a hazard for neurotoxicity, the minimum evidence would include data from a host of endpoints that revealed no neurotoxic effects."[98]

*Human Studies*

---

[89] See also comments by Spencer and Limeback (2018).
[90] Elliott (1967).
[91] Elliott (1967); Varner et al. (1994); McPherson et al. (2018).
[92] Kang et al. (1986).
[93] McPherson et al. (2018).
[94] Whitford et al. (2009); Pulungan et al. (2018); Jia et al. (2019).
[95] Jia et al. (2019).
[96] Pulungan et al. (2018).
[97] Whitford et al. (2009).
[98] EPA (1998a), pp. 55-56; Federal Register (1998), p. 26946.



The Guidelines recognize several types of human studies that can inform the hazard identification analysis, including case reports and epidemiological studies.[99]  In contrast to the 9 chemicals for which EPA has established RfDs or RfCs pursuant to the Guidelines (most of which did not have *any* human studies available), both categories of human studies are available for fluoride, including the most reliable kind of epidemiological study, prospective cohort studies.

I have become familiar with the human epidemiological data on fluoride neurotoxicity, both through my work for the National Research Council, and through my ongoing review of the literature.  A systematic review of the human literature was not considered necessary nor particularly helpful, since systematic reviews have already been conducted,[100] and those few studies reporting no effects are well known to people familiar with fluoride research.[101]  As those familiar with the literature know, there are many more studies reporting associations of fluoride exposure with neurotoxic outcomes than the reverse. The number of studies reporting no association between fluoride and neurotoxic outcomes is quite small, and, as such, a systematic review was not considered necessary to identify and address them.  Each of these "no effect" studies is addressed below.  To ensure that there are no additional no-effect studies, I reviewed the results of my PubMed searches for "fluoride and brain," "fluoride and learning," and "fluoride and memory," and conducted additional PubMed searches for "fluoride and intelligence" and "fluoride and IQ." These searches did not retrieve any additional no-effect studies, although they did retrieve additional studies reporting adverse effects.  Due to the sheer magnitude of studies reporting associations with neurotoxic outcomes, I have not sought to review each of them.  For purposes of completeness, however, I have attached a reference list of all epidemiological studies of which I am aware that have reported associations between fluoride exposure and cognitive deficits.[102]

*Case Reports:*  As noted in the Guidelines, "the first type of human data available is often the case report or case series," including clinician observations of occupationally exposed workers.[103]  This statement holds true for fluoride.  Decades before the first study of fluoride and IQ was published, case reports and clinician surveys of occupationally exposed workers identified neurological symptoms among fluoride-exposed individuals, including general malaise, fatigue, headaches, and difficulties with concentration and memory.[104]  As the NRC noted, "[t]here are numerous reports of mental and physiological changes after exposure to fluoride from various routes (air, food, and water) and for various time periods."[105]

While case reports are generally not sufficient, by themselves, to establish a hazard, the Guidelines consider them "useful when corroborating epidemiological data are available."[106]  Moreover, several of the case reports could be characterized as "experimental studies," since they involved "individuals who underwent withdrawal from their source of fluoride exposure and subsequent re-exposures under 'blind' conditions.  In most cases, the symptoms disappeared with the elimination of exposure to fluoride and

---

[99] EPA (1998a), p. 15; Federal Register (1998), p. 26932.
[100] See for example Tang et al. (2008); Choi et al. (2012); Duan et al. (2018).
[101] Aggeborn and Öhman (2017); Barberio et al. (2017); Broadbent et al. (2015); Morgan et al. (1998); Shannon et al. (1986).
[102] Appendix B contains a list of 67 studies associating fluoride exposures with cognitive deficits in humans.
[103] EPA (1998a), p. 15; Federal Register (1998), p. 26932.
[104] Roholm (1937), pp. 138-140, 178; Spittle (1994).
[105] NRC (2006), p. 208.
[106] EPA (1998a), p. 15; Federal Register (1998), p. 26932.



returned when exposure was reinstated."[107]  The NRC recommended that further research be conducted to follow up on these findings from the case study literature.[108]

   *Cross Sectional Studies*:  In cross-sectional studies, "both the disease and suspected risk factors are ascertained at the same time, and the findings are useful in generating hypotheses."[109]  In the case of fluoride, there are a large number of cross-sectional studies reporting neurotoxic outcomes, including impaired performance on the neurobehavioral core test battery,[110] impaired performance in the Rey-Osterreith Complex Figure Test,[111] and effects on infant neurodevelopment as measured by the Neonatal Behavioral Neurological Assessment.[112]  IQ is the primary neurological endpoint that has been studied,[113] but it bears considering that IQ is actually a relatively insensitive measurement of neurotoxicity, meaning that other neurological effects can occur prior to a measurable reduction in IQ.[114]

   While cross sectional studies do not "allow the investigator to determine whether the disease or the exposure came first,"[115] this limitation is lessened when there is "a stable population where water supplies and fluoride concentrations have remained unchanged for many years."[116]  Many of the cross-sectional studies on fluoride and IQ have limited the study population to children who have lived in the same area since birth.[117]  In this context of stable populations and stable water fluoride levels, measurement of exposure at the time of the study can be a reasonable, albeit imperfect, proxy for exposure from the prenatal period onward.

   The NRC report discussed the first several English-language IQ papers to become available.[118] Each of the studies that NRC reviewed found significant associations between fluoride exposure and reduced IQ.  While the studies lacked sufficient detail for the NRC to draw conclusions, the NRC found that "the consistency of the collective results warrant[s] additional research on the effects of fluoride on intelligence."[119]

   In 2012, Choi et al. conducted a meta review of 27 studies, and found that "children in high fluoride areas had significantly lower IQ scores than those who lived in low-fluoride areas."[120]  Children in the high-fluoride areas had lower IQs by a standardized weighted mean difference of 7 IQ points (-0.45 SD).[121] Many of the studies included in the Choi review found reduced IQ at water fluoride levels between 2 and 4 mg/L, with one study reporting effects at 0.9 ppm among children with iodine deficiency.  While recognizing that some of the studies suffered from various deficiencies, including failure to report key information and failure to control for potential confounders, Choi concluded that "our results support the

---

[107] NRC (2006), pp. 208-209.
[108] NRC (2006), p. 221.
[109] EPA (1998a), p. 16; Federal Register (1998), p. 26932.
[110] Guo et al. (2001); Yazdi et al. (2011).
[111] Rocha Amador et al. (2009).
[112] Li et al. (2004).
[113] NRC (2006); Choi et al. (2012).
[114] Rocha Amador et al. (2009), p. 1150.
[115] EPA (1998a), p. 16; Federal Register (1998), p. 26932.
[116] Choi et al. (2012), p. 1367.
[117] Chen et al. (1991); Choi et al. (2015); Ding et al. (2011), Karimzade et al. (2014a; 2014b); Khan et al. (2015); Lu et al. (2000); Nagarajappa et al. (2013); Rocha Amador et al. (2007); Seraj et al. (2012); Sudhir et al. (2009); Wang et al. (2007); Yao et al. (1996; 1997); Zhang et al. (2015b).
[118] Lin et al. (1991); Li et al. (1995); Zhao et al. (1996); Lu et al. (2000); Xiang et al. (2003a; 2003b).  See NRC (2006), pp. 205-208, 231.
[119] NRC (2006), p. 221.
[120] Choi et al. (2012), p. 1362.
[121] Choi et al. (2012; 2013).



possibility of an adverse effect of fluoride exposures on children's neurodevelopment."[122]   Choi et al. recommended that future research "formally evaluate dose-response relationships based on individual level measures of exposure over time, including more precise prenatal exposure assessment."[123]   As discussed below, several such studies have now been conducted, and these studies add substantial confidence to the hazard assessment.

A more recent meta-analysis by Duan et al. has also reported a significant association between higher fluoride concentrations in water and lower intelligence in children, even allowing for country, sex, age, fluoride concentration, and type of intelligence assessment used.[124]   Duan et al. focused on studies published through November 2016 that examined the effects of waterborne fluoride exposures and which provided data on the water fluoride levels.  Each of the 26 studies that met Duan's inclusion criteria found lower IQs in the high-fluoride community when compared against the control.[125]   In a majority of these studies, the high-fluoride community had less than 4 mg/L in the water, including three studies which found significant effects at concentrations between 1 and 2 mg/L.[126]   The authors concluded that "Greater exposure to high levels of fluoride in water was significantly associated with reduced levels of intelligence in children."[127]   Analysis of dose-response trends in the data suggested the possibility of a ceiling effect in which effect sizes appeared to flatten at exposures above 4 mg/L.  If this effect is real, the dose-response curve for fluoride may be steeper at the lower end of the dose range, a possibility that gains further support from the recent findings of Bashash et al.,[128] discussed below.

*Recent Prospective Cohort Studies*:  EPA's Guidelines recognize that prospective cohort studies are "invaluable for determining the time course for development of dysfunction."[129]   In a prospective cohort, "a healthy group of people is assembled and followed forward in time and observed for the development of dysfunction."[130]   This study design "allows the direct estimate of risks attributed to a particular exposure, since toxic incidence rates in the cohort can be determined."[131]   A "major strength" of the prospective cohort design "is that it allows the calculation of rates to determine the excess risk associated with an exposure."[132]   Further, "biases are reduced by obtaining information before the disease develops."[133]   While bias can be introduced into the design if either the subject or examiner is aware of the exposure status, this bias can be eliminated through double-blinding.[134]   In short, EPA's Guidelines recognize that prospective cohort studies are the strongest type of epidemiological study for identifying neurotoxicity hazards in humans.  The Director of EPA's IRIS Division concurred with this assessment, explaining that prospective cohort studies are the "ideal study design" for investigating the impact of environmental chemicals on human health.[135]

---

[122] Choi et al. (2012), p. 1367.
[123] Choi et al. (2012), p. 1367.
[124] Duan et al. (2018).
[125] Duan et al. (2018), Figure 2.
[126] Duan et al. (2018), Figure 2.
[127] Duan et al. (2018).
[128] Bashash et al. (2018).
[129] EPA (1998a), p. 17; Federal Register (1998), p. 26933.
[130] EPA (1998a), p. 17; Federal Register (1998), p. 26933.
[131] EPA (1998a), p. 17; Federal Register (1998), p. 26933.
[132] EPA (1998a), p. 17; Federal Register (1998), p. 26933.
[133] EPA (1998a), p. 17; Federal Register (1998), p. 26933.
[134] EPA (1998a), p. 17; Federal Register (1998), p. 26933.
[135] Thayer Deposition at 162:19-163:7.



Unfortunately, because prospective cohort studies "can be very time-consuming and costly," they are rarely available for neurotoxicity risk assessments.[136]  At the times of their respective assessments, none of the 10 chemicals that EPA has assessed under the Guidelines had been studied using a prospective cohort. In the case of fluoride, however, there are five prospective cohort studies, including four with individualized measurements of fluoride exposure.[137]  Notably, each of the prospective studies that collected individual measurements of fluoride exposure found that fluoride exposure predicted significant IQ loss.  By contrast, the one study that did not have individual measurements (Broadbent et al.), did not detect a measurable effect on IQ.[138]

Several differences in study design may help to explain why the study by Broadbent et al. did not detect an effect.[139]  First and foremost, in the Bashash and Green studies, fluoride exposure was measured by testing the pregnant mother's urine;[140] their analyses were thus focused on the impact of a likely vulnerable age-specific window, the prenatal period.  By contrast, Broadbent did not collect information on prenatal exposures, focusing instead on exposures after birth.  This is an important limitation, particularly in a country like New Zealand, where adults consume large quantities of fluoride-containing tea.[141]  Substantial overlap in the prenatal exposures in Broadbent's fluoridated and "non-fluoridated" cohorts is thus likely.

Second, most of the children in the non-fluoridated area in Broadbent's study used fluoride supplements and fluoride toothpaste, and, as such, were not a true "control" population.  In a follow-up letter, Broadbent et al. estimated that the difference in average exposure between the fluoridated and "non-fluoridated" population was just 0.3 mg/day.[142]  Given this likely substantial overlap in childhood exposures, the power of Broadbent's study to detect statistically significant differences in outcome is thus questionable, particularly given the relatively low number of children in the "non-fluoridated" group (n = 93).

Finally, as EPA's Guidelines recognize, bias may be introduced into prospective cohort studies if the examiner is aware of the subject's exposure status.[143]  Because of this, the Guidelines provide that "more credence should be given to those studies in which both observer and subject bias are carefully controlled (e.g., double-blind studies)."[144]  The Bashash and Green studies were both double-blinded studies,[145] but the only blinding mentioned in the Broadbent paper is that the examiner at the age 38 exam was blind to the subjects' previous IQ scores.  The lack of blinding in the Broadbent study is a potential source of bias, because the principal measure of fluoride exposure in the study (community water fluoride concentration) may have been available to the examiner.

---

[136] EPA (1998a), p. 17; Federal Register (1998), p. 26933.

[137] Bashash et al. (2017; 2018); Broadbent et al. (2015); Green (2018); Valdez Jiménez et al. (2017).

[138] Broadbent et al. (2015).

[139] See also Menkes et al. (2014).

[140] Bashash et al. (2017; 2018) and Green (2018) utilized spot urine samples, rather than first morning or 24 hour collection.  Spot samples are an imprecise metric of chronic exposure, and thus would have introduced some exposure error into the study.  This imprecision, however, would bias the results to the null.

[141] Waugh et al. (2017).

[142] Broadbent et al. (2016).

[143] EPA (1998a), pp. 17, 19; Federal Register (1998), pp. 26933-26934.

[144] EPA (1998a), pp. 17, 19; Federal Register (1998), pp. 26933-26934.

[145] In the Bashash et al. (2017; 2018) and Green (2018) studies, the cognitive tests were performed before the archived urine samples had been tested for fluoride, and thus neither the examiner nor the subject could have known the fluoride status.



*No-Effect Retrospective Studies:*  Two early and two recent retrospective studies have failed to identify significant effects of fluoridated water on neurological parameters, including lost IQ, learning disorders, and behavior problmes.[146]

The first epidemiological study to examine the effect of fluoridated water on behavior was published by Shannon et al. in 1986.[147]  The study used data from 1,028 children in the Christchurch Child Development Study in New Zealand to investigate the relationship between residence in fluoridated communities during the first 7 years of life and maternal and teacher ratings of childhood behavior.  The authors found that duration of residence in fluoridated areas had no effect on behavioral outcomes.  Severe shortcomings in the exposure assessment, however, limit the weight that can be given to this finding.  The authors had no individualized data on exposure, including no data on urinary or plasma fluoride levels, no data on water intake patterns (including during gestation and infancy), and no data on non-water sources of fluoride exposure, including toothpaste and supplements.  The only metric of exposure that the authors had was residence in a community with fluoridated water, which will result in substantial exposure misclassification and thereby bias the results to the null.  Timing of exposure to fluoridated water was not examined, only the number of years resident in a fluoridated area.  Prenatal exposures (e.g., residence of the mother during pregnancy) and neonatal exposures (e.g., breastfeeding vs. formula feeding) were not examined.

Morgan et al. studied dental fluorosis and behavioral scores (from parent information) for a sample of 197 children (ages 7-11) recruited in a suburb of Boston.[148]  They reported no significant associations between behavioral scores and fluorosis or fluoride exposure, except for an assocation of behavior problems with both the use of topical fluoride betwen ages 3 and 6 years and the use of fluoride toothpaste between ages 1 and 2 years.  They also reported that an association between fluoride exposure and behavior problems could not be definitively excluded by their study.  The study sample had a high prevalence of fluorosis (69%), and it seems likely that the children varied more in timing of fluoride exposure (e.g., timing of use of fluoride toothpaste or other topical fluorides) than in total exposure.  This could have produced differences in fluorosis without producing differences in other endpoints, especially if the behavioral endpoints might have been affected by prenatal or early postnatal fluoride exposures, which were not addressed in this study.  In particular, no information on breastfeeding vs. formula feeding was mentioned, nor were differences in prenatal fluoride exposure addressed.

In the study by Aggeborn and Öhman, the authors analyzed mental health data (both cognitive and non-cognitive) from the military enlistment tests of a large number of Swedish military recruits (n = 80,000).[149]  No consistent relationship was found between the results of the recruitment tests and the recruits' prior exposure to fluoride in drinking water.  A strength of the study is that the authors had complete residential history for each recruit.  A major weakness, however, is that the authors had no individualized data on actual exposure.  The authors did not have data on the actual fluoride levels in the recruits' water, nor did they have any individual data on water intake patterns, biomonitoring data (e.g., urinary fluoride, serum fluoride), or exposures to non-water sources of fluoride at any time point in life.  To estimate exposure, the authors used available data on water fluoride distribution in Sweden[150] to retrospectively estimate the water fluoride level for each subject.  This analysis involved several

[146] Shannon et al. (1986); Morgan et al. (1998); Aggeborn and Öhman (2017); Barberio et al. (2017).

[147] Shannon et al. (1986).

[148] Morgan et al. (1998).

[149] Aggeborn and Öhman (2017).

[150] Water fluoride in Sweden is entirely natural (Aggeborn and Öhman, 2017); no information was provided on other mineral content in the water that might have varied with the fluoride content.



assumptions which could have introduced some degree of exposure misclassification as to water fluoride level, especially given a fairly narrow total range of fluoride concentrations in drinking water.  The study had no data on individual exposure patterns during the *in utero* and infancy periods, and thus it provides no information on the impact of fluoride exposures during the prenatal and early life period.

A 2017 study by Barberio et al. analyzed the relationship between urinary fluoride levels and reported learning disabilities among 3- to 12-year-old children from two cycles of the Canadian Health Measures Survey (CHMS).[151]  Unadjusted urinary fluoride was significantly correlated with an increased incidence of learning disabilities, but the relationship was no longer significant after adjusting for creatinine and specific gravity.  The authors conclude:  "Overall, there did not appear to be a robust association between fluoride exposure and parental or self-reported diagnosis of a learning disability among Canadian children."  As with Aggeborn, the Barberio study did not have data on the exposures during the *in utero* or early infancy periods; the study thus provides no information about the impact of such exposures.  The authors themselves point out that "reported learning disability diagnosis could have preceded measured fluoride exposure." [152]   An effect of prenatal or neonatal exposure to fluoride could have been missed given a fluoride exposure based on a urine sample obtained between ages 3 and 12.

*Neuroendocrine Effects*

EPA's Guidelines recognize the relevance of a chemical's ability to alter the function of the thyroid gland.[153]  According to the Guidelines, "the development of the nervous system is intimately associated with the presence of circulating hormones such as thyroid hormone."[154]  A thyroid disturbance during a specific developmental period may cause a "nervous system deficit," which could include cognitive dysfunction, altered neurological development, or visual deficits, [depending] on the severity of the thyroid disturbance and the specific developmental period when exposure to the chemical occurred."[155]  Elsewhere, EPA has recognized that "thyroid hormones are essential for normal brain development in humans and that hypothyroidism during fetal and early neonatal life may have profound adverse effects on the developing brain."[156]  The NRC made a similar observation.[157]  This admonition is significant in the context of fluoride, as the NRC concluded that fluoride is an "endocrine disrupter" which may lower thyroid function.[158]  The NRC reported that fluoride can lower thyroid function at estimated average intakes of 0.05-0.13 mg/kg/day in humans with adequate iodine intake, and at estimated average intakes as low as 0.01 to 0.03 mg/kg/day in individuals with iodine deficiency.[159]  Put differently, fluoride affects thyroid function at lower doses in people with iodine deficiency than in those with optimal intake of iodine. Consistent with this, Malin et al. reported a relationship between urinary fluoride and elevated TSH (thyroid stimulating hormone) among iodine-deficient adults in Canada, but not in the general population as a whole (excluding those with known

[151] Barberio et al. (2017).

[152] Barberio et al. (2017).

[153] EPA (1998a), p. 50; Federal Register (1998), p. 26944.

[154] EPA (1998a), p. 50; Federal Register (1998), p. 26944.

[155] EPA (1998a), p. 50; Federal Register (1998), p. 26944.

[156] EPA (2008a), p. 40, citing Morreale de Escobar et al. (2000) and Haddow et al (1999).  See also EPA (2008b), p. 54, citing Morreale de Escobar et al. (2000).  EPA's Science Advisory Board in 2013 found that "the most sensitive life stages are the fetus, neonates and infants because these are the stages when thyroid-dependent brain development occurs" (EPA 2013b, cover letter, p. 2).

[157] NRC (2006), p. 263.

[158] NRC (2006), pp. 262-263.  Fluoride has actually been used as a therapeutic agent for lowering thyroid activity in cases of hyperthyroidism (Galletti and Joyet 1958), and fluoride exposure has been associated with hypothyroidism in both animal and human studies (Hillman et al. 1979; Peckham et al. 2015; Yang et al. 2019).

[159] NRC (2006), pp. 262-263.



thyroid disease and excluding pregnant individuals).[160]  Elevated TSH is indicative of a decrease in thyroid function.  Malin's findings are of particular concern when considering that more than 10% of women of child-bearing age in the US are iodine deficient.[161]

### Mode of Action

EPA's Guidelines recognize that hazard identification is strengthened by, but not dependent upon, an identifiable mechanism by which the chemical can exert neurotoxic effects.[162]  For most of the chemicals for which EPA has established RfDs pursuant to the Guidelines, the mode of action has not been known (see Table 1).  As noted recently by the NAS, "solid conclusions about causality can be drawn without mechanistic information, for example, when there is strong and consistent evidence from animal or epidemiology studies."[163]  The NAS added that "mechanistic frameworks today could probably be completed for only a few chemicals."[164]

Several plausible mechanisms—both indirect and direct—have been identified that could help explain the neurotoxicity of fluoride.  Thyroid depression is likely a principal indirect mechanism and could account for some of the neurotoxic effects reported in the literature.  A thyroid mechanism is particularly plausible as a cause of IQ loss among offspring born to women with suboptimal iodine intakes.  Another plausible indirect mechanism of fluoride neurotoxicity is the association of fluoride exposure with increased exposure to lead (Pb), a known neurotoxic agent.  Water fluoridation, and especially the use of silicofluorides as the fluoridation chemical, is associated both with higher concentrations of lead in the drinking water (due to increased leaching of lead from pipes and plumbing fixtures) and with higher blood lead in children.[165]  Rat studies have shown increased lead in blood and calcified tissues from coexposures to lead and fluoride, as well as increased dental fluorosis due to combined exposure.[166]

In terms of direct mechanisms of fluoride neurotoxicity, a recent study by Zhao et al. provides *in vitro*, *in vivo*, and epidemiological data that, together, suggest that disturbances in hippocampal mitochondrial dynamics (marked by fission inhibition and fusion promotion) play an important role in fluoride-induced cognitive loss.[167]  The hippocampus is an important region in the brain for learning and memory, and many of the studies investigating the neuroanatomical and neurochemical effects of fluoride exposure have identified adverse effects in this region (see Table A-1).  Other potential modes of action have also been identified, including signaling disruption, oxidative stress, and selective reductions in nicotinic receptors.[168]

### Dose response

The Guidelines recognize that "determining a hazard often depends on whether a dose-response relationship is present,"[169] and thus "dose-response evaluation is a critical part of the qualitative characterization of a chemical's potential to produce neurotoxicity."[170]  Because "human studies covering

---

[160] Malin et al. (2018).
[161] CDC (2008), Chapter 4a, pp. 91-100; see also Pearce (2015); Caldwell et al. (2011).
[162] EPA (1998a), pp. 10, 53; Federal Register (1998), pp. 26930, 26945.
[163] NAS (2018), p. 9.
[164] NAS (2018), p. 9.
[165] Maas et al. (2007); Coplan et al. (2007).
[166] Sawan et al. (2010); Leite et al. (2011).
[167] Zhao et al. 2019.
[168] Bartos et al. (2018); Chen et al. (2003; 2018a); Gao et al. (2008); Liu et al. (2010); Long et al. (2002); Shan et al. (2004); Zhang (2017b); Zhu et al. (2017).
[169] EPA (1998a), p. 2; Federal Register (1998), p. 26927.
[170] EPA (1998a), p. 50; Federal Register (1998), p. 26944.



a range of exposures are rarely available," the Guidelines state that the dose-response evaluation will typically be limited to animal data.[171]

Unlike the case for numerous other chemicals, there is an abundant supply of dose-response data for fluoride, from *both* animal *and* human data. While there are some inconsistencies, and while there is some indication of a ceiling effect or nonlinearities,[172] and potentially a non-linear threshold effect for some endpoints,[173] the data generally show that the incidence and/or severity of nervous system deficits increase as fluoride exposure increases.

In animal studies, a prerequisite for dose-response analysis is that there be multiple treatment groups with different exposures to the test substance. Many of the animal studies on fluoride have used multiple treatment doses, and thus permit evaluation of dose response. Of the studies published since the NRC review (summarized in Table A-1), 1 used four treatment doses, 19 used three treatment doses, and 20 used two treatment doses. The vast majority of these studies show visually apparent dose-response trends for at least one of the effects being investigated.

In the human studies, dose-response trends have been observed in both the cross-sectional and prospective cohort studies. In the cross-sectional studies, dose response trends have been reported for analyses of IQ as a function of childhood urine and serum fluoride levels.[174] An important limitation with the urine and serum data from the cross-sectional studies is that the levels are measured after the effect (reduction in IQ) has occurred. The data, however, are not without value, as current exposures can be reflective of developmental exposures in areas with stable populations and stable water fluoride concentrations. While the Cui and Ding studies do not provide information on the residential history of the subjects, most of the children in the Zhang study had been living in the same household and drinking from the same wells since birth.[175] Similarly, in the studies by Xiang, children who had lived in another village for more than 2 years of their lives were specifically excluded from the study.[176] In the Xiang and Zhang studies, therefore, the dose response relationships found between current water/urine/blood levels and reduced IQ could be seen as a rough but reasonable proxy of developmental exposures.

More significant than the cross-sectional studies, however, are the dose-response trends observed in the prospective cohort studies, because, for the reasons discussed above, prospective cohort studies provide greater confidence in ascribing a causal relationship between the exposure and effect. As can be readily seen in the published figures, significant linear relationships were found for maternal fluoride and IQ at ages 3-4 in both the Bashash and Green studies,[177] while an apparent non-linear effect for IQ was observed by Bashash et al. for the 6-12 year olds: i.e., a possible threshold of 0.8 ppm fluoride in the maternal urine, followed by a significant linear reduction in IQ at maternal urinary fluoride concentrations above 0.8 ppm.[178] In Bashash's analysis of ADHD outcomes, a significant linear increase was found (with no apparent threshold), although a possible ceiling effect was suggested at the higher concentrations.[179]

---

[171] EPA (1998a), p. 50; Federal Register (1998), p. 26945.
[172] Bashash et al. (2018); Duan et al. (2018). See also Chen et al. (2018a), Figure 1d; Chouhan et al. (2008), Figure 3a; Wang et al. (2018a), Figure 4b,c; Yuan et al. (2019), Figure 3.
[173] Bashash et al. (2017).
[174] Cui et al. (2018); Ding et al. (2011); Xiang et al. (2011); Zhang et al. (2015b).
[175] Zhang et al. (2015b), p. 4.
[176] Xiang et al. (2003a), p. 85.
[177] Bashash et al. (2017), Figure 2; Green (2018), Figures 5-6.
[178] Bashash et al. (2017), Figure 3.
[179] Bashash et al. (2018), Figure 2.



*Pharmacokinetics*

Under the Guidelines, consideration should be given to the pharmacokinetics of the compound with "particular importance" given to the pharmacokinetics of the blood-brain barrier.[180]  Studies of human cadavers have found markedly elevated concentrations of fluoride in the pineal gland (a gland located between the two hemispheres of the brain which is not protected by the blood-brain barrier).[181]  Further, recent radioactive tracer studies in humans, using radioactive sodium fluoride to identify metastatic growths, have confirmed that fluoride can get past the blood-brain barrier and into the brain,[182] as been reported for several animal studies.[183]

The extent of fluoride uptake into brain remains unclear and likely depends on the route and timing (acute or chronic) of administration; the timing of the measurements is probably important as well. Whitford has postulated that the concentration of fluoride in brain tissue fluid will be approximately 20% of the concentration in plasma,[184] but several studies, including one by Whitford himself, have found substantially higher ratios.[185]  Whitford's early estimate was derived from short-term term exposures in healthy animals;[186] his later data from a chronic study show brain-to-plasma ratios for fluoride of about 0.2 to 0.3.[187]  In contrast, chronic exposure data from McPherson et al. would give brain-to-plasma ratios for fluoride of about 10 to 200.[188]  Data are lacking for uptake of fluoride into brain during life stages when the blood-brain barrier has limited effectiveness (i.e., the prenatal period, infancy, and old age).[189]

Both the early and late stages of human life are characterized by an inadequate blood-brain barrier. From EPA's risk assessment for 2-hexanone:  "The developing brain is distinguished by the absence of a blood-brain barrier.  The development of this barrier is a gradual process, beginning in utero and complete at approximately 6 months of age.  Because the blood-brain barrier limits the passage of substances from blood to brain, in its absence, toxic agents can freely enter the developing brain."[190]  Increased permeability of the blood-brain barrier is associated with ordinary aging, as well as with diseases such as Alzheimer's and Parkinson's, both of which are common among elderly people.[191]  Passage of fluoride into the brain can be expected to be higher when the blood-brain barrier is underdeveloped or impaired.  There is also some indication in the literature that different portions of the brain may retain different concentrations of fluoride.[192]  For example, a recent rodent study with radioactive fluoride ion found higher radioactivity in the ventral hippocampus than in the whole brain, although the radioactivity was (predictably) much higher in the skull than in the brain.[193]

[180] EPA (1998a), p. 47; Federal Register (1998), p. 26943.
[181] Luke (2001).
[182] Gori et al. (2015); Jones and Iagaru (2014); Li et al. (2011); Salgarello et al. (2016); Sheth and Colletti (2012); Thenkondar et al. (2017); Wu et al. (2013).
[183] For example, Whitford and Pashley (1979); Geeraerts et al. (1986); Mullenix et al. (1995); Zhang et al. (2013c); Niu et al. (2015b).
[184] NRC (2006), p. 91.
[185] NRC (2006), p. 91; Whitford and Pashley (1979), pp. 203, 205-206.
[186] Carlson et al. (1960); Whitford and Pashley (1974).
[187] Whitford et al. (2009).
[188] McPherson et al. (2018).
[189] NRC (2006), p. 91; Rodier (1995); Zeevi et al. (2010).
[190] EPA (2009c), p. 58.
[191] For example, see Mooradian (1994); Zeevi et al. (2010); Rosenberg (2014); and Pan and Nicolazzo (2018).
[192] Mullenix et al. (1995).
[193] Tipre et al. (2006).



A second important consideration with respect to the pharmacokinetics of fluoride is that the placenta is not an effective barrier to fluoride transfer. A number of studies in humans have demonstrated that fluoride crosses the placenta and reaches the fetus.[194] In general, measured concentrations of fluoride in umbilical cord blood and in blood of neonates are similar to concentrations in maternal blood.[195] However, with higher maternal intakes of fluoride, the placenta may act as a partial barrier, with a maximum observed reduction of about 40%.[196] Fluoride is taken up by the bones of the developing fetus, with some being excreted by the fetal kidney into the amniotic fluid. After birth, maternal fluoride intake no longer contributes to exposure of the infant, apart from very small amounts in the milk. However, fluoride in the infant's bones can act as a continuing source of fluoride to the infant's blood and organs when intake of fluoride from breast milk or formula is low. For example, a recent pharmacokinetics study by Zohoori et al. found that breastfed infants had a negative fluoride balance, meaning that they were excreting more fluoride (presumably of prenatal origin) than they were ingesting.[197]

Overall, there appears to be little question that fluoride gets through both the blood-brain barrier and the placenta, and, while questions remain about the extent of the uptake, the greatest rates of accumulation likely occur during the prenatal and early infancy stages of life, while the greatest net accumulations (especially in bone) probably exist during old age.

### In Vitro Studies

EPA's Guidelines also provide guidance on how to consider *in vitro* data. While positive *in vitro* data are not sufficient, by themselves, to demonstrate a neurotoxic hazard in humans, the existence of such data helps enhance the reliability of *in vivo* data.[198] Fluoride's ability to damage brain cells has been documented in *in vitro* experiments. While most of these studies have used high concentrations that are unlikely to be present in the human brain, several studies have examined environmentally realistic fluoride concentrations. Gao et al. found increased lipid peroxidation and reduced α7 nicotinic acetylcholine receptors in SY-SY57Y cells at fluoride concentrations from 0.5 μmol/L (9.5 μg/L) to 5 μmol/L [95 μg/L]),[199] and others have reported increases in inflammatory markers.[200] Under the Guidelines, these data do not necessarily demonstrate a hazard in humans, but they do enhance the reliability of the animal studies, as similar effects have been reported in fluoride-treated rodents.[201]

### Validity of the Database

Under the Guidelines, the validity of the database should be evaluated by assessing the content validity, construct validity, concurrent validity, and predictive validity of the data.[202]

---

[194] See for example, Feltman and Kosel (1961); Gedalia et al. (1964); Blayney and Hill (1964); Armstrong et al. (1970); Hanhijärvi et al. (1974); Forsman (1974); Shen and Taves (1974); Ron et al. (1986); Malhotra et al. (1993); Gupta et al. (1993); Brambilla et al. (1994); Shimonovitz et al. (1995).
[195] Feltman and Kosel (1961); Gedalia et al. (1964); Hudson et al. (1967); Armstrong et al. (1970); Hanhijärvi et al. (1974); Ron et al. (1986); Malhotra et al. (1993); Gupta et al. (1993); Shimonovitz et al. (1995).
[196] Gupta et al. (1993); Gedalia et al. (1964).
[197] Zohoori et al. (2019). Zohoori et al. also state that renal function in humans does not reach its full capacity until about age 2 years, indicating that excretion of fluoride is likely less during infancy and early childhood, compared with older ages.
[198] EPA (1998a), p. 49; Federal Register (1998), p. 26944.
[199] Gao et al. (2008), Figures 1A, 3A.
[200] Goschorska et al. (2018).
[201] Bartos et al. (2018); Dong et al. (2015); Yang et al. (2018a); Yan et al. (2016); Zhao et al. (2019).
[202] EPA (1998a), pp. 10-11; Federal Register (1998), pp. 26930-26931.



*Content validity* addresses "whether the effects result from exposure."[203] This factor weighs decisively in favor of a neurotoxicity hazard determination for fluoride. As explained by the Director of EPA's IRIS Division, "experimental animal studies are designed to let you draw causal inferences."[204] The large number of animal studies reporting neurotoxic effects (both structural and functional) following fluoride exposure thus gives confidence in the content validity of the data. Based on the structural effects, NRC concluded that fluoride interferes with the brain.[205] Similarly, Dr. Thayer, who served as the principal author of the NTP systematic review on fluoride's learning effects, agreed that the animal studies show that "at some level of exposure fluoride can damage the brain."[206] In addition to the animal studies, four prospective birth cohort studies have associated prenatal fluoride exposure in humans with adverse effects.[207] Prospective studies are the optimal form of epidemiological study for ascribing causality between chemical and disease.[208]

*Construct validity* addresses whether the neurologic effects that have been observed "are adverse or toxicologically significant."[209] This factor is satisfied in the fluoride database. Among other things, the animal studies have linked fluoride to learning and memory deficits, which EPA has used as the adverse effect upon which to establish reference doses for other chemicals (e.g., BDE-153).[210] Further, the human epidemiological data have linked fluoride with IQ detriments, including an approximate 5 to 6 point drop in IQ as maternal urinary fluoride increased from 0 to 1 mg/L.[211] EPA has recognized that a loss of a single IQ point is associated with loss in lifetime earnings in the range of at least $8,760 to $12,512,[212] and has stated that "an IQ loss on the order of one to two IQ points [should] be prevented in all but a small percentile of the population."[213]

*Concurrent Validity* addresses "whether there are correlative measures among behavioral, physiological, neurochemical, and morphological endpoints.[214] Studies have correlated fluoride's cognitive effects in animals with various neurochemical and neuroanatomical changes,[215] and a few studies have correlated fluoride-associated cognitive loss in humans with increased TSH and alterations in mitochondrial dynamics.[216] For example, Zhao et al.[217] reported lower circulating levels of a mitochondrial protein (fission-related protein-1, Fis1) in children from high fluoride areas (compared with children in low fluoride areas), and higher circulating levels of a second mitochondrial protein (mitofusin-2, Mfn2) in the same

---

[203] EPA (1998a), pp. 10-11; Federal Register (1998), pp. 26930-26931.
[204] Thayer Deposition at 270:23-25.
[205] NRC (2006), p. 222.
[206] Thayer Deposition at 225:8-15, 226:13-16.
[207] Bashash et al. (2017; 2018); Green (2018); Valdez Jiménez et al. (2017).
[208] While the prospective study from New Zealand (Broadbent et al. 2015) failed to detect an association between fluoride and IQ, this can be explained by certain limitations with the study design, including the absence of individualized exposure data and the failure to consider exposures during the prenatal period.
[209] EPA (1998a), pp. 10-11; Federal Register (1998), pp. 26930-26931.
[210] EPA (2008c), p. 36. Effects on memory were also noted in the RfD determination for BDE-99 (EPA 2008b, p. 27).
[211] Bashash et al. (2017); Green (2018).
[212] EPA (2008e), p. 5-28.
[213] Cited by a member of the CASAC Lead Review Panel in its peer review of the EPA's Policy Assessment for the Review of the Lead National Ambient Air Quality Standards (External Review Draft – January 2013), p. A-15. [https://yosemite.epa.gov/sab/sabproduct.nsf/E2554E264EEF8CCB85257B80006B3014/$File/EPA-CASAC-13-005+unsigned.pdf]
[214] EPA (1998a), pp. 10-11; Federal Register (1998), pp. 26930-26931.
[215] For example, see Bartos et al. (2018); Zhao et al. (2019); Zhou et al. (2019).
[216] For example, Zhang et al. (2015b); Zhao et al. (2019).
[217] Zhao et al. (2019).



children.  The levels of circulating Fis1 were positively associated with children's IQ scores, while the levels of circulating Mfn2 were negatively associated with the IQ scores.

*Predictive validity* addresses "whether the effects are predictive of what will happen under various conditions."[218]   The condition of perhaps greatest interest with respect to prediction of fluoride neurotoxicity is exposure during the prenatal period.  Studies in both animals and humans have, with one exception,[219] reported neurologic effects following prenatal exposure.  The database, therefore, does have some degree of predictive validity, although further research remains necessary to determine to what extent other conditions (e.g., nutrition, genetics, neonatal exposure, and kidney function) may modify or predict outcomes.  Exposure during the early postnatal period also requires further research.

### Sufficiency of the Evidence

Under the Guidelines, the purpose of the hazard identification analysis is to determine from the collective data whether a neurotoxicity hazard "could exist" for the chemical.[220]  The Guidelines provide that "the minimum evidence sufficient would be data on a single adverse endpoint from a well-conducted study."[221]  In the case of fluoride, the toxicological evidence was sufficient as of 2006 to permit the NRC to conclude that fluoride interferes with the brain.[222]  Since that time many additional animal and epidemiological studies have been published, including four prospective cohort studies correlating prenatal fluoride exposure with adverse neurological outcomes in offspring.[223]  Prospective cohort studies are considered the ideal study design for determining the impact of environmental chemicals on human health, and thus the four prospective cohort studies are arguably sufficient by themselves to reach the hazard determination.  The prospective studies are most compelling, however, when viewed in the context of the animal data, the cross-sectional studies, the neuoroendocrine literature showing depression in thyroid function, and the pharmacokinetic data showing placental transfer to the fetus.  Taken together, these data provide more than sufficient evidence of a neurotoxic hazard under EPA's Guidelines, with a high degree of confidence.

The Guidelines go on to point out that, in contrast, to conclude that a chemical is unlikely to pose a neurotoxic hazard, "the minimum evidence would include data from a host of endpoints that revealed no neurotoxic effects,"[224] in particular, "human data from appropriate studies that could support a conclusion of no evidence of a neurotoxic effect."[225]  As discussed elsewhere in this report, very few neurotoxicologic studies of fluoride exposures in humans have reported no evidence of effects, while the vast majority report a neurotoxic hazard to humans from exposure to fluoride.

### Data Gaps

EPA's Guidelines point to the need to address "significant data gaps."[226]  Although there are enough data available to conclude that neurotoxicity is a hazard of fluoride exposure, certain data gaps do remain.  One of the major data gaps is the lack of research on the impact of fluoride during the neonatal and early infancy period.  EPA has recognized that the neonatal period represents a critical window of

---

[218] EPA (1998a), pp. 10-11; Federal Register (1998), pp. 26930-26931.
[219] McPherson et al. (2018).
[220] EPA (1998a), pp. 53, 55; Federal Register (1998), pp. 26945-26946.
[221] EPA (1998a), p. 55; Federal Register (1998), p. 26946.
[222] NRC (2006), p. 222.
[223] Bashash et al. (2017; 2018); Green (2018); Valdez Jiménez et al. (2017).
[224] EPA (1998a), p. 56; Federal Register (1998), p. 26946.
[225] EPA (1998a), p. 56; Federal Register (1998), p. 26946.
[226] EPA (1998a), p. 12; Federal Register (1998), p. 26931.



vulnerability to neurotoxicants,[227] yet most developmental rodent studies do not address neonatal exposures to fluoride (due to exclusive breastfeeding of the rat or mouse pups and absence of gavage exposures), and no epidemiological study has yet investigated the impact of fluoridated water in infant formula on neurologic outcomes. Other data gaps include the absence of long-term animal studies, and the scarcity of epidemiological research into fluoride's neurologic effects in the elderly. Data gaps also remain with respect to how the dose which causes neurologic effects varies across susceptible subsets of the population, including those with nutrient deficiencies, genetic polymorphisms, kidney disease, and the elderly. These data gaps, and resulting uncertainties, are discussed further in later parts of this report.

*Summary*

As described above, the overwhelming body of evidence, from both animal studies and human studies, supports the existence of neurotoxic effects from exposure to fluoride. This is especially important for exposures during development, i.e., during gestation and the neonatal period. Of particular significance is the lack of animal studies that include neonatal exposures comparable to those received by human infants who are fed formula prepared with fluoridated water.

---

[227] See for example, EPA (2008a), p. 42.



## B.   Neurotoxicity Is a More Sensitive Effect of Fluoride than Severe Dental Fluorosis

According to the Guidelines, "if data are considered sufficient for risk assessment, and if neurotoxicity is the effect occurring at the lowest dose level (i.e., the critical effect), an oral or dermal RfD, or an inhalation RfC, based on neurotoxic effects, is then derived."[228]  At present, EPA assumes severe dental fluorosis to be the critical effect of fluoride exposure.[229]  This assumption, however, has no identifiable biological or empirical justification, and it is at odds with substantial animal and epidemiological evidence.

### A)   Background

The EPA, in its 2010 report, established a Reference Dose (RfD)[230] of 0.08 mg/kg/day, based on keeping the percentage of children with severe dental fluorosis below 0.5%.[231]  EPA considered this RfD to also be protective against a fluoride-related increase in bone fractures in adults[232] and presumably also of Stage II skeletal fluorosis.  EPA stated that the "Office of Water (OW) accepted the NRC (2006) findings as the summary of hazard for inorganic fluoride."[233]  However, the EPA ignored or failed to consider any adverse health effects other than severe dental fluorosis, stage II skeletal fluorosis, or bone fractures, even though the NRC (2006) discussed a number of additional adverse health effects due to fluoride exposure.[234]  As discussed earlier, the NRC concluded that fluoride is an endocrine disruptor,[235] and it can interfere with the brain by both direct and indirect means.[236]  EPA's representative in this litigation (Edward Ohanian) recognized that NRC's concerns about potential neurotoxicity in humans justified application of an uncertainty factor to account for a "database deficiency."[237]  However, EPA did not apply any uncertainty factors, due to concerns about interfering with caries-prevention programs.[238]

### B)   Biological Considerations

In its risk assessment, EPA did not address the biological or empirical justification for assuming that severe dental fluorosis is a more sensitive effect of fluoride exposure than neurotoxicity.  Instead, EPA treated the scarcity of quantitative dose response data on neurotoxicity as evidence that neurotoxicity is a less sensitive effect.  EPA's assumption ignores the different windows of susceptibility for fluoride-induced neurotoxicity and fluorosis.  As discussed earlier, there are distinct pharmacokinetics (e.g., known placental transfer, lack of an effective blood-brain barrier) during the *in utero* period that will render the organism more vulnerable to fluoride's neurological effects than during the childhood years.  Consistent with this, recent prospective cohort studies, as well many animal studies, have identified the prenatal period as a

---

[228] EPA (1998a), p. 2; Federal Register (1998), p. 26928.

[229] EPA (2010b), pp. i, 87, 94.

[230] Reference Dose (RfD): An estimate (with uncertainty spanning perhaps an order of magnitude) of a daily oral exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime. It can be derived from a NOAEL, LOAEL, or benchmark dose, with uncertainty factors generally applied to reflect limitations of the data used. Generally used in EPA's noncancer health assessments. EPA (2009a).

[231] EPA (2010b), pp. xiv, 103.

[232] EPA (2010b), pp. xv, 105.

[233] EPA (2010b), p. i.

[234] NRC (2006), pp. 8, 12, 222-223, 266-267.

[235] NRC (2006), p. 266.

[236] NRC (2006), p. 222.

[237] Ohanian Deposition at pp. 200:4-202:2, 206:9-19.

[238] Ohanian Deposition at pp. 205:6-16, 206:14-19, 329:3-7.  See also EPA (2010b), pp. 105-106:  "the total uncertainty factor applied was 1" (p. 105) and "1 is the chosen value for each of the following uncertainty factors used in this estimate of the fluoride oral RfD:  $UF_H$, $UF_A$, $UF_S$, $UF_L$.  The composite UF is also equal to 1" (p. 106).



window of vulnerability for fluoride neurotoxicity. By contrast, prenatal fluoride exposure is *not* considered a risk factor for dental fluorosis.[239] In its risk assessment, EPA considered the window of vulnerability for severe dental fluorosis to be the period between 6 months and 14 years of age.[240] Severe dental fluorosis thus has a later window of vulnerability than fluoride neurotoxicity, and EPA's representative has admitted that one cannot rely on the current reference dose for severe dental fluorosis "to protect against potential effects that could occur in *in utero*."[241]

C) Evidence from Animal Studies

Animal studies provide some guidance as to the respective sensitivity of neurotoxicity and severe dental fluorosis following fluoride exposure. Several of the studies that have investigated the neurological effects of fluoride in rodents have examined the teeth for signs of fluorosis.[242] In these studies, measurable nervous system deficits were identified in animals with only mild forms of fluorosis. Based on these findings, Niu et al. concluded that fluoride "can influence spontaneous behaviors and lower the learning ability of rats before the appearance of dental lesions."[243] The applicability of these animal findings to humans is complicated by the fact that, unlike in humans, rat incisors never stop growing. Nevertheless, the results are consistent with what has been observed in human populations.

D) Evidence from Prospective Cohort Studies

A prospective cohort study by Green reported significant reductions in IQ among children born to women living in fluoridated areas of Canada.[244] In this study, each 1 mg/L of fluoride in the pregnant mother's water significantly correlated with a loss of 6.25 IQ points in young children. Notably, this would include exposure levels below the concentration that can cause severe dental fluorosis, according to EPA. In its 2010 risk assessment, EPA selected a threshold for severe dental fluorosis of approximately 1.87 mg/L.[245] The Green study thus indicates that fluoride exposure reduces IQ at levels that are lower than those which can cause severe fluorosis. Bashash et al. reported similar findings for IQ[246] and for ADHD.[247]

E) Evidence from Cross Sectional Studies

Consistent with the recent prospective cohort studies, many of the cross sectional studies have reported fluoride-related IQ reductions among children *without* severe dental fluorosis. Some studies have reported clear dose responses between fluoride exposure or dental fluorosis and IQ.

---

[239] Ohanian Deposition at pp. 339:2-340:11. EPA (2010b; p. 96) indicates that "the period of greatest sensitivity to severe enamel fluorosis [is] the time from six months through 14 years of age" for their assessment.

[240] EPA (2010b), p. 96. EPA itself (EPA 2010b, p. 96) also states that mineralization of the permanent incisors begins at about $6 \pm 2$ months, which means that their analysis of fluoride exposure should start no later than 4 months of age. Dental fluorosis is, in fact, associated with fluoride exposures during the first 6 months of life as well as later periods (Hong et al. 2006a; 2006b). Both Forsman (1977) and Walton and Messer (1981) report more fluorosis in children who were bottle-fed rather than breastfed (with consequent higher fluoride ingestion) during their first few months of postnatal life.

[241] Ohanian Deposition at p. 340:12-341:3.

[242] For example, Chioca et al. (2008); Liu et al. (2011); Niu et al. (2008); Pereira et al. (2011).

[243] Niu et al. (2008).

[244] Green (2018), p. 40.

[245] EPA (2010b), p. 90. A water fluoride concentration of 1.87 mg/L is the lower bound of the benchmark dose (BMDL) predicted to correspond to a response of 0.5% severe dental fluorosis.

[246] Bashash et al. (2017).

[247] Bashash et al. (2018).



A 1995 paper by Li et al.[248] reported significantly lower mean IQ in children (ages 8-13 years) in areas with medium or severe dental fluorosis (dental fluorosis index = 2.5 and 3.2, respectively; see Figure 1 in Appendix C). In addition, the distributions of IQ were also different between areas with no or slight dental fluorosis and areas with medium or severe dental fluorosis (Figure 2 in Appendix C): in areas with either medium or severe dental fluorosis, significantly more children had low IQs (< 70 and 70-79) and significantly fewer children had mid-range IQs (90-109). Thus, even from this early study, it was apparent that protecting against severe dental fluorosis is inadequate to protect against neurotoxic effects.

Khan et al.[249] have shown a clear dose response (a significant negative correlation) between dental fluorosis category (normal to severe) in children ages 6-11 and both mean IQ score (Figure 3 in Appendix C) and percentage of poor IQ grades (Figures 4-5 in Appendix C). As dental fluorosis increases in severity, the IQ measure becomes significantly worse (lower mean IQ and higher IQ grade, where a higher IQ grade corresponds to lower IQ). Children with normal teeth had a mean IQ score of 110.1; mean IQ decreased consistently with increasing severity of dental fluorosis (Figure 3 in Appendix C), even for very mild dental fluorosis. The shift in the distribution of IQ grade from mostly high IQ (IQ grades 1-2) with normal teeth, to mostly average IQ (IQ grade 3) with very mild and mild fluorosis, to mostly low IQ (IQ grades 3-5 for moderate fluorosis and grade 5 for severe fluorosis) is readily apparent (Figures 4-5 in Appendix C).

Das and Mondal[250] reported significant negative correlations between IQ and both dental fluorosis and urinary fluoride in children (ages 6-18). While children with normal teeth, questionable fluorosis, and very mild fluorosis had mean IQ scores of 108.3, 103.2, and 107.7, respectively, children with mild, moderate, and severe fluorosis had mean IQ scores of 92.83, 84.51, and 85.91, respectively.

Ding et al.[251] reported a much higher percentage of children (ages 7-14) with IQ < 89 among children with moderate fluorosis than among children with normal teeth, questionable fluorosis, very mild fluorosis, or mild fluorosis (21.4% among children with moderate fluorosis vs. 5-16% in other groups).[252] Ding et al. also reported an inverse association of IQ with urinary fluoride (decreased IQ with increased urinary fluoride) *in a population with no severe dental fluorosis*. Thus, even in the absence of severe dental fluorosis, there was still a dose-dependent decrease in IQ with increased urinary fluoride concentration, and moderate fluorosis was associated with a higher fraction of children with low IQ.

Dong et al.[253] reported decreased IQ with increasing prevalence of dental fluorosis and with increasing severity of dental fluorosis in children ages 8-12 years. Children in a non-endemic fluorosis village (2% with dental fluorosis) had a mean IQ of 108.7, while children in endemic fluorosis villages (prevalence 16.3%, 29.8%, and 61.0%) had mean IQs of 102.5, 101.7, and 93.5, respectively. Of the children in the endemic fluorosis villages, children with normal teeth had a mean IQ of 105.9, while children with suspected, slight, mild, moderate, and severe dental fluorosis had mean IQs of 102.9, 98.8, 93.3, 91.9, and 90.5, respectively. In addition, the percentage of children with IQ < 89 increased from 2.3% (normal teeth) to 21.4% (slight fluorosis), 30% (mild fluorosis), and 50-60% (moderate and severe fluorosis). Deficits in IQ were apparent with even mild and moderate dental fluorosis.

Shivaprakash et al.[254] reported a significantly lower IQ among children (ages 7-11) with dental fluorosis (mild, moderate, or severe; considered separately and together) than among children with no

---

[248] Li et al. (1995).
[249] Khan et al. (2015).
[250] Das and Mondal (2016).
[251] Ding et al. (2011).
[252] Ding et al. (2011), Table 4.
[253] Dong et al. (2018), especially Tables 2 and 3.
[254] Shivaprakash et al. 2011.



fluorosis. For even mild fluorosis, the mean IQ of the children was significantly lower than that of children with no fluorosis. Among children with fluorosis, 72.5% had borderline or extremely low IQ (IQ = 70-79 or IQ < 70, respectively), only 1.25% had high average IQ (110-119), and none had superior IQ (IQ = 120-129). Among children with no fluorosis, 47.5% had borderline or extremely low IQ, and 5% had high average or superior IQ. Thus, the distribution of IQ scores was shifted toward the lower scores for children with dental fluorosis, in comparison with children with no fluorosis (Figure 6 in Appendix C).

Sudhir et al.[255] reported significantly more intellectually impaired children (ages 13-15) with increased fluoride concentration in the drinking water used during ages 0-10. The distribution of IQ grades (where grade 1 corresponds to the highest intelligence and grade 5 to the lowest intelligence; no children in this study were in grade 1, and only 4 of 1000 were in grade 2) clearly shifted toward worse IQ (more intellectual impairment) with increasing dental fluorosis index (increasing severity of dental fluorosis) (Figures 7-8 (in Appendix C).

Pang et al.[256] reported significantly lower IQ in children (ages 8-12 years) in an endemic fluorosis area (dental fluorosis prevalence > 30%) than in a non-endemic fluorosis area (dental fluorosis prevalence < 30%). In the non-endemic fluorosis area, mean IQs were 98.85 in males and 94.67 in females; in the endemic fluorosis area, mean IQs were 93.24 in males and 91.75 in females. The overall distribution of IQs was shifted to the left (more individuals with lower IQs) in the endemic fluorosis area, and the rate of mental retardation (IQ < 69) was greater in the endemic fluorosis area.

Yu et al.[257] reported that moderate levels of fluoride exposure were associated with increased likelihood of dental fluorosis and negatively associated with intelligence scores. In particular, excellent intelligence was less likely with increased fluoride exposure and with increased severity of dental fluorosis; the odds ratio for developing excellent intelligence (IQ ≥ 130) decreased by 30% with each level of increased severity of dental fluorosis.

As part of a larger study of fluoride effects on mitochondrial function, Zhao et al.[258] compared children in areas with "normal" and "high" fluoride concentrations[259] and found lower IQ scores in the children from areas with high fluoride. In addition, Zhao et al. found lower circulating levels of a mitochondrial protein (fission-related protein-1, Fis1) in the children from the high fluoride areas, and higher circulating levels of a second mitochondrial protein (mitofusin-2, Mfn2) in the same children. The levels of circulating Fis1 were positively associated with children's IQ scores, while the levels of circulating Mfn2 were negatively associated with the IQ scores. The authors concluded that impairments of mitochondrial fission and fusion were "associated with intellectual decline of children with long-term fluoride exposure."

<u>Evidence from Case Reports and Occupational Surveys</u>

Spittle reviewed case reports and occupational surveys of fluoride-exposed individuals, dating back to Roholm's seminal treatise on fluoride intoxication.[260] Many of the case reports and occupational surveys

---

[255] Sudhir et al. (2009), especially Tables 2 and 3.

[256] Pang et al. (2018).

[257] Yu et al. (2018).

[258] Zhao et al. (2019). This study included experiments with human neuroblastoma cells and with rats, as well as observations in children with different fluoride exposures.

[259] Mean (standard deviation) fluoride concentrations were 0.50 (0.27) mg/L in areas with "normal" fluoride concentrations and 2.00 (0.75) mg/L in areas with "high" fluoride concentrations, as summarized by Yu et al. (2018), Table 1. (Personal communication from S. Zhang, June 11, 2019.)

[260] Spittle (1994).



identified mental problems, including "difficulties with concentration and memory." The exposures in the reports occurred during adulthood, and, as such, the neurological effects would have occurred in the absence of dental fluorosis.

<u>Summary</u>

In summary, adverse effects of fluoride exposure on children's intelligence and other neurological parameters are observed in the absence of severe dental fluorosis. In other words, protection against severe dental fluorosis does not indicate protection against loss of IQ points or other neurological effects. The collective data thus strongly support the conclusion that neurotoxicity is a more sensitive effect of fluoride exposure than severe dental fluorosis.



### C.      Identifiable Subsets of the Population Have Heightened Susceptibility to the Risk of Harm from Fluoridation Chemicals

The EPA, in its Guidelines, says that an "important part of this [risk assessment] effort is a description of the nature of the exposed population and the potential for sensitive, highly susceptible, or highly exposed populations."[261]   EPA identifies pregnant or lactating women, infants, and children as important subpopulations in terms of critical periods of exposure[262] (i.e., during development of the infants and children), and the elderly as a population "at particular risk  because of the limited ability of the nervous system to regenerate or compensate to neurotoxic insult."[263]   The Guidelines also recognize that factors such as nutrition, pre-existing disease (e.g., diabetes), and genetic polymorphisms "may predispose some individuals to be more sensitive to the neurotoxic effects of specific agents."[264]

Consistent with the general principles discussed in the Guidelines, there are identifiable subsets of the population that will be more susceptible to the neurotoxic effects of fluoride than the general population. The NRC identified several population subgroups that are generally at increased risk from the adverse effects of fluoride.[265]   These high-risk groups include people with higher than average exposures (e.g., bottle-fed infants, athletes, outdoor workers, people with high occupational or industrial exposures), people with higher than average retention of fluoride (e.g., people with renal impairment), and people in vulnerable stages of life (e.g., infants and children during the developmental period, elderly persons with long-term accumulation of fluoride).   Research published subsequent to the NRC report further supports the NRC's conclusions and confirms that the increased susceptibility to fluoride exposure extends to neurological hazards.

The data set that EPA used in deriving its RfD included only white children;[266] as I commented to EPA in 2011,[267] the Centers for Disease Control and Prevention (CDC) reports higher rates of dental fluorosis in the black population than the white population.[268]   EPA itself described at least two studies that reported higher rates of dental fluorosis among blacks than whites.[269]   People with renal impairment and consequent reduced clearance of fluoride from the body could be sensitive to adverse health effects at lower levels of intake than typical,[270] and these people are not known to have been included in the study population.

#### A)  <u>Developmental Period – General Considerations</u>

The developmental period (the period between conception and sexual maturity[271]) is reasonably expected to be a vulnerable stage for neurotoxicity in humans.[272]   A variety of animal studies have shown "functional deficits" at "dose levels below those at which other indicators of developmental toxicity are evident" or that would be minimally toxic in adults,[273] and therefore EPA requires testing for developmental

---

[261] EPA (1998a), p. 63; Federal Register (1998), p. 26948.
[262] EPA (1998a), p. 65; Federal Register (1998), p. 26949.
[263] EPA (1998a), p. 65; Federal Register (1998), p. 26949.
[264] EPA (1998a), p. 65; Federal Register (1998), p. 26949.
[265] NRC (2006), pp. 350-351.  See also pp. 30-33.
[266] Dean (1942), pp. 28, 29, 31.
[267] Thiessen (2011).
[268] CDC (2005), Table 23.
[269] EPA (2010b), pp. 33-34.
[270] NRC (2006), p. 351.
[271] EPA (1998a), p. 44; Federal Register (1998), p. 26942.
[272] EPA (1998a), p. 44, 65; Federal Register (1998), pp. 26942, 26949; Grandjean and Landrigan (2014).
[273] EPA (1998a), p. 44; Federal Register (1998), p. 26942.



neurotoxicity when available information indicates that potential.[274]   From EPA's Guidelines for Neurotoxicity Risk Assessment:  "It is a well-established principle that there are critical developmental periods for the disruption of functional competence, which include both the prenatal and postnatal periods to the time of sexual maturation, and the effect of a toxicant is likely to vary depending on the time and degree of exposure."[275]   In its risk assessment for BDE-153, EPA based its Reference Dose (RfD) on a neurotoxicity endpoint in neonates, stating that "there are a wide variety of brain structures that have very limited critical windows during development.  These short critical windows translate to susceptible periods of exposure that can be very short."[276]   EPA considered it a demonstrated concept that exposure to a neurotoxic chemical during critical periods of development "can induce functional neurological effects later in development."[277]   In its risk assessment for BDE-47, EPA states that a "population subgroup is susceptible if exposure occurs during a period of sensitivity"[278] and then describes the neonatal stage as "a period of rapid development of the nervous system and . . . a critical window of development."[279] In its noncancer risk assessment for methanol, EPA stated that brain effects from postnatal exposure are relevant to humans "given that, in humans, gross measures of brain growth increase for at least 2-3 years after birth, with the growth rate peaking approximately 4 months after birth."[280]

B)  Fetus

Evidence from both animal and human populations indicates that the fetal period is a critical period of susceptibility to fluoride's neurotoxic effects.  First, it should be recognized that fluoride's capacity to harm the developing brain in utero is biologically plausible, and as described below, adverse effects have been reported in both human and animal fetuses.  As discussed earlier, fluoride crosses the placenta and reaches the fetus.[281]  Further, the fluoride that reaches the fetus will have ready access to the brain.  As noted by EPA, "The development of [the blood-brain barrier] is a gradual process, beginning in utero and complete at approximately 6 months of age.  Because the blood-brain barrier limits the passage of substances from blood to brain, in its absence, toxic agents can freely enter the developing brain."[282] Fluoride is known to cross the blood-brain barrier,[283] especially when concentrations of fluoride in blood are transiently high,[284] and passage of fluoride into the brain can be expected to be higher when the blood-brain barrier is underdeveloped or impaired.  Thus, some of the fluoride ingested by the mother will make its way into the brain of the fetus.  Additionally, fluoride has the capacity to lower thyroid function, particularly among individuals with low iodine intakes, and EPA has recognized that alterations to thyroid function (e.g., reductions in thyroid hormone concentrations) during pregnancy can cause cognitive

[274] EPA (1998a), p. 45; Federal Register (1998), p. 26942.
[275] EPA (1998a), p. 46; Federal Register (1998), p. 26943.
[276] EPA (2008c), p. 33.
[277] EPA (2008c), p. 33.
[278] EPA (2008a), p. 42.
[279] EPA (2008a), p. 42.
[280] EPA (2013a), p. 5-4.
[281] See for example, Feltman and Kosel (1961); Gedalia et al. (1964); Blayney and Hill (1964); Hudson et al. (1967); Armstrong et al. (1970); Hanhijärvi et al. (1974); Forsman (1974); Shen and Taves (1974); Ron et al. (1986); Malhotra et al. (1993); Gupta et al. (1993); Brambilla et al. (1994); Shimonovitz et al. (1995).
[282] EPA (2009c), p. 58; Rodier (1995).
[283] Niu et al. (2015b); Geeraerts et al. (1986).  See also Gori et al. (2015); Jones and Iagaru (2014); Li et al. (2011); Salgarello et al. (2016); Sheth and Colletti (2012); Thenkondar et al. (2017); Wu et al. (2013).
[284] Mullenix et al. (1995).



disorders and other neurological harm to the child.[285]  Of paramount concern are the many women of childbearing age in the United States who have insufficient iodine intakes, as discussed further below.

*Prospective Cohort studies*

Four recent prospective cohort studies have found that prenatal fluoride exposure correlates with adverse neurological effects in the offspring.[286]  As part of a large study of maternal fluoride exposure and child outcomes in Canada (assessed between ages 3 and 4 years), Green reported that higher maternal urinary fluoride concentrations (average for all three trimesters) were significantly associated with lower IQ scores in male children.[287]  An increase in maternal urinary fluoride concentration by 1.0 mg/L corresponded to a decrease in Full-Scale IQ (FSIQ) of 4 1/2 points.[288]  Mean maternal urinary fluoride concentrations were significantly higher in fluoridated areas than non-fluoridated areas.[289]  For the mother-child pairs for which drinking water information was available, higher fluoride concentration in drinking water was associated with lower IQ scores in children of both sexes.[290]  An increase in water fluoride concentration of 1 mg/L corresponded to a decrease of 6.25 IQ points in the children.[291]  Higher estimated maternal fluoride intake was also associated with lower IQ in children of both sexes.[292]  An increase in maternal fluoride exposure of 1 mg/L corresponded to a decrease of about 4 IQ points in their children.[293]  The study controlled for a number of covariates,[294] including various maternal and paternal characteristics, sex of the child, and prenatal exposures to lead, mercury, and arsenic (assessed from maternal blood and urine samples[295]).

Bashash et al., in a study in Mexico City, reported findings similar to those of Green in Canada:  an increase in maternal urinary fluoride of 0.5 mg/L corresponded to a decrease in the General Cognitive Index (GCI) of 3.15 in 4-year-old children (with no threshold) and a decrease of 2.50 in Full-Scale IQ in 6- to 12-year-old children (with a possible threshold of approximately 0.8 mg/L).[296]  The mean maternal urinary fluoride concentration was 0.90 mg/L.[297]  In the same cohort, higher maternal urinary fluoride also corresponded to significantly higher scores for inattention and attention deficit hyperactivity disorder (ADHD) for 6- to 12-year-old children.[298]  Thus, in this cohort in Mexico City, fluoride exposures during the prenatal period are associated with both lower cognitive function and increased ADHD scores in children some years later.  The studies by Bashash et al. controlled for a large number of covariates,

---

[285] EPA (1998a), p. 50; ; Federal Register (1998), p. 26944; EPA (2008a), p. 40; EPA (2008b), p. 54; EPA (2013b), cover letter, p. 2.  See also Rodier (1995); Zoeller and Rovet (2004); Patel et al. (2011); Suárez-Rodríguez et al. (2012); Modesto et al. (2015); Bellinger (2018).
[286] Green (2018), Bashash et al. (2017; 2018); Valdez Jiménez et al. (2017).  The two papers by Bashash et al. (2017; 2018) describe separate neurodevelopmental endpoints measured in subsets of the same cohort.
[287] Green (2018), p. 29, Full-Scale IQ (FSIQ); p. 31, Performance IQ (PIQ); n = 512.
[288] Green (2018), p. 35.
[289] Green (2018), p. 27 (0.69 mg/L vs. 0.40 mg/L for n = 512); p. 32 (0.92 mg/L vs. 0.30 mg/L for n = 369).  Fluoridated drinking water was defined as 0.6-0.8 mg/L (p. 20).
[290] Green (2018), p. 33 (FSIQ); p. 34 (PIQ); n = 369.
[291] Green (2018), p. 40.
[292] Green (2018), p. 34 (FSIQ, PIQ); n = 369.
[293] Green (2018), p. 40.
[294] Green (2018), pp. 22-24.
[295] Green (2018), p. 28.
[296] Bashash et al. (2017).
[297] Bashash et al. (2017).
[298] Bashash et al. (2018).



including maternal characteristics, possible prenatal exposure to mercury and lead, and the possible modification of fluoride effects by calcium supplementation.[299]

In a separate birth cohort in a different part of Mexico, Valdez Jiménez et al. evaluated the neurodevelopment of 65 infants ages 3-15 months (average, 8 months).[300]  Mothers were recruited early in pregnancy, and maternal urinary fluoride measurements were made during each trimester (all 65 mothers provided 1st trimester samples; 46 and 29 provided samples during the 2nd and 3rd trimesters, respectively). Fluoride was also measured in samples of drinking water (bottled or tap water).  An increase of 1 mg/L fluoride in maternal urine corresponded to a decrease in Mental Development Index (MDI) of 19.5 points. The average MDI in the cohort was 91.6 (range, 60-135), with 38.5% scoring less than 85, indicating possible developmental delay.  Corresponding testing for the Psychomotor Development Index found an average of 90.9 (range, 54-131), with 20.9% of infants below a score of 85 (indicating possible developmental delay); a correlation with maternal urine fluoride was not found.  This study was carried out in an area with relatively high water fluoride concentrations (at least 80% of tap water samples with fluoride concentrations in excess of 1.5 mg/L); however, measured fluoride concentrations ranged as low as 0.5 mg/L for tap water and 0.01 mg/L for bottled water.  Valdez Jiménez et al. also reported a significantly higher rate of prematurity (births between 28 and 36 weeks gestation, with a birth weight < 2.5 kg) of 33.8%, compared with 7.3% for Mexico generally.[301]

*Fetal Brain Studies*

Several Chinese studies of human fetuses exposed to fluoride via maternal intake of contaminated food[302] have reported a variety of structural changes in fetal brains as well as alterations in neurotransmitters and their receptors.  Reported effects include significant alterations in subcellular structure in the cerebral cortexes (e.g., swollen mitochondria, reduced synapses containing fewer mitochondria and microtubules, and dilated rough endoplasmic reticulum),[303] changes that are consistent with retarded growth and cell division in the cerebral cortex.  Additional reported effects include changes in neuronal densities and abnormal disorganization of Purkinje cells,[304] significant alterations in several neurotransmitters,[305] and significant reduction in a neurotransmitter receptor (the $\alpha_1$-receptor) and alterations in that receptor's affinity with its ligand.[306]

While the potential confounding of other chemicals in polluted air limits the conclusions that can be drawn from the human fetal brain studies, prenatal studies of fluoride-treated rats have found similar effects.[307]  Table 2 summarizes several studies retrieved from PubMed that have investigated the neuroanatomical and neurochemical effects of prenatal fluoride exposures. The vast majority of these studies found changes in the brain of the treated animals.

---

[299] Bashash et al. (2017; 2018).  Part of the cohort participated in a randomized study of the effect on blood lead levels of calcium supplementation during pregnancy.

[300] Valdez Jiménez et al. (2017).

[301] Valdez Jiménez et al. (2017).

[302] Household use of coal in parts of China results in fluoride contamination of air and food, including corn roasted in smoke from coal burning (Dong et al. 1997; He et al. 1989).

[303] He et al. (1989).

[304] Du et al. (1992).

[305] Yu et al. (1996); Dong et al. (1997).

[306] Yu et al. (1996).

[307] Basha et al. (2011a; 2011b); Jiang et al. (2014b); Dong et al. (2015); Zhang et al. (2017b); Bartos et al. (2018); Ge et al. (2018); Zhao et al. (2019).



Table 2.  Examples of reported neuroanatomical and neurochemical effects of prenatal fluoride exposures in animal studies.

| Species and strain | Exposure conditions | Concentration or dose | Exposure duration | Effects | Reference |
|---|---|---|---|---|---|
| Rats (Wistar albino) | Drinking water | Group I (control), < 1 ppm F; Group II, 100 ppm F; Group III, 200 ppm F | Gestation of 1st generation through 3rd generation; apparently healthy animals used to produce succeeding generations; measurements made at 21 days old. | Overt toxicity (decreased feed and water consumption; decreased litter size, decreased birth weight and brain somatic index, increased mortality of pups) with increased dose and with each generation.  Increased levels of malondialdehyde; decreased activities of catalase, superoxide dismutase, glutathione peroxidase, and glutathione S-transferase; and decreased levels of glutathione in brain regions, with increased dose and with each generation. | Basha et al. (2011a) |
| Rats (Wistar albino) | Drinking water | Group I (control), < 1 ppm F; Group II, 100 ppm F; Group III, 200 ppm F | Gestation of 1st generation through 3rd generation; measurements made at 1 month old.  Possibly the same breeding animals and litters as in Basha et al. (2011a), but not stated. | Increased fluoride concentrations in brain regions with increased dose and with each generation; decreased thyroid hormones with fluoride exposure; decreased acetylcholinesterase activity with increased dose and with each generation; histopathological changes (necrosis, hyperchromasia, disintegrated cytoplasm, vacuoles, eosinophilia, decreased number of granular cells, degenerating neurons) with increased dose and generation; poorer performance in memory and learning test. | Basha et al. (2011b) |
| Rats (Sprague-Dawley) | Drinking water | Control, 0.34 mg/L F; 25, 50, and 100 mg/L NaF (11.3, 22.6, and 45.2 mg/L F) | Gestation to 2 months old. | PET/CT and MRI done only in females.  Reduced body weights and brain weights with increased dose.  Poorer performance on water maze test (damaged learning and memory abilities).  For MRI, differences in ventricles of rats in 100 mg/L group (probably due to neurodegenerative changes or brain atrophy).  Acute degeneration of neurons in 50 and 100 mg/L groups, with apparent interstitial edema and (in 100 mg/L group) partial demyelination.  Decreased glucose utilization and increased brain-derived neutrophic factor (PET/CT). | Jiang et al. (2014b) |

*Table continued next page*



*Food and Water Watch v. EPA*                                                                 *Thiessen Report*

Table 2.  Examples of reported neuroanatomical and neurochemical effects of prenatal fluoride exposures in animal studies - *Continued*

| Species and strain | Exposure conditions | Concentration or dose | Exposure duration | Effects | Reference |
|---|---|---|---|---|---|
| Rats (Sprague-Dawley) | Drinking water | Control (< 0.5 ppm F); 50 ppm F | 10 months for initial generation, plus time for gestation and lactation; up to 28 days for offspring (postnatal days 1, 7, 14, 21, 28). | All treated rats showed dental fluorosis, but no controls did.  For initial generation and offspring, decreases in M1 and M3 muscarinic acetylcholinesterase receptors (mAChRs) and in M1 and M3 mAChR mRNAs in brains.  Increased reactive oxygen species (ROS), decreased superoxide dismutase and glutathione peroxidase in adult brains.  Correlations of decreased M1 and M3 mAChR and increased ROS with worse performance on learning and memory tests (adults and 28-d offspring). | Dong et al. (2015) |
| Rats (Sprague-Dawley) | Drinking water | Females:  Control (< 0.2 ppm F; 0.79% Ca in feed); F (45 ppm F; 0.79% Ca in feed); LCa (< 0.2 ppm F; 0.063% Ca in feed); F + LCa (45 ppm F; 0.063% Ca in feed); F + HCa (45 ppm F; 7% Ca in feed).  Males: < 0.2 ppm F; 0.79% Ca in feed. | Diets started at weaning; mated 3 months later; study involved offspring at birth, 14 d, 28 d. | Synaptic density significantly decreased for F group at 14 d (females) and 28 d (males and females) and for F + low Ca (F + LCa) group at birth, 14 d, and 28 d.  Structural differences (decreased synaptic active zone, increased synaptic gap width, decreased thickness of postsynaptic density) for F group (significant in most cases) and F + LCa group (significant in all cases), at birth, 14 d, and 28 d.  Changes prevented or lessened in F + high Ca (F + HCa) group. | Zhang et al. (2017b) |
| Rats (Wistar) | Drinking water | Control (filtered tap water); 5 and 10 mg/L F. | Gestational day 0 to postnatal day 21.  Female offspring studied at postnatal day 90. | Significant difference in 24-hour memory test for 5 mg/L group; significant difference in 90-minute and 24-hour memory tests for 10 mg/L group.  Significant decrease in $\alpha$7 nicotinic acetylcholinesterase receptor (nAChR) mRNA in 10 mg/L group.  Significant decrease in catalase activity in both 5 mg/L and 10 mg/L groups. | Bartos et al. (2018) |

*Table continued next page*



Table 2.  Examples of reported neuroanatomical and neurochemical effects of prenatal fluoride exposures in animal studies - *Continued*

| Species and strain | Exposure conditions | Concentration or dose | Exposure duration | Effects | Reference |
|---|---|---|---|---|---|
| Mice (ICR) | Drinking water | Control (distilled water); 50 and 100 mg/L F. | 1 month before pregnancy, through gestation, to 90 days after birth; offspring fed same concentration of fluoride in water as their parents | Decreased spatial learning and memory capabilities of offspring at 60 d in treated groups (Morris water maze test).  Reduced body weights in treated groups.  Histopathological changes in brain (cerebral cortex) at 60 d and 90 d in treated groups (reduced number and size of pyramidal cells, karyorrhexis).  Reduced expression (mRNA and protein) of microtubule-associated protein 2 (MAP2), synaptophysin (SYP), developmentally regulated brain protein (Dbn), and glutamate receptor (N-methyl-D-aspartate receptor, NMDAR). | Ge et al. (2018) |
| Rats (Sprague-Dawley | Drinking water | Control; 4.52, 22.6, and 45.2 mg/L fluoride (10, 50, and 100 mg/L NaF). | 2 months before pregnancy, through gestation, to 2 months after birth (postnatal day 60) | Impaired learning and memory in offspring (Morris water maze test).  Mitochondrial abnormalities in hippocampal neurons of offspring.  Decreased levels of mitochondrial fission-regulating molecules, increased levels of mitochondrial fusion-regulating molecules, in hippocampus of offspring, leading to disruption of mitochondrial fission and fusion, defective autophagy, and excessive apoptosis in the hippocampus.  (Similar effects on two mitochondrial regulating molecules with respect to fluoride exposure were reported in children, correlated with decreased IQ in fluoride exposed children.) | Zhao et al. (2019) |
| Rats (Wistar) | Drinking water | Control (filtered tap water); 5 and 10 mg/L F. | Gestational day 0 to postnatal day 21.  Offspring studied at postnatal day 45. | Impaired short-term and long-term memory in female offspring (both treatment groups) and in male offspring (lower treatment group), in a step-down inhibitory avoidance test.  Altered biochemical markers of oxidative damage in brain sections (prefrontal cortex, striatum, hippocampus), including reduced catalase, glutamate oxaloacetate transaminase, and glutamate pyruvate transaminase, in both females and males. | Bartos et al. (2019) |
| Rats (Sprague-Dawley) | Drinking water | Control (< 0.5 mg/L F); 10, 50, and 100 mg/L NaF) | 2 months before pregnancy, through gestation, to 6 months after birth. | Impaired learning and memory of offspring, decreased neuronal number, suppressed autophagy and enhanced apoptosis in hippocampus. | Zhou et al. (2019) |



Most of the prenatal studies in rats involved fluoride exposures to the mothers during both gestation and lactation (Table 2). However, since the fluoride concentrations in rat milk are substantially below the concentrations in the mother's drinking water,[308] early postnatal fluoride exposure via the milk is unlikely to have been important in comparison with prenatal exposure. In contrast, bottle-fed human infants, if their formula is prepared with fluoridated water, are likely to have higher postnatal fluoride exposures than prenatal exposures, and typical postnatal fluoride exposures from formula-feeding are among the highest typical human exposures for a given water fluoride concentration (discussed below). I am not aware of any studies of neurotoxicity in rats or mice that have attempted to reproduce the postnatal fluoride exposures experienced by human infants through feeding of formula prepared with fluoridated water.

Thus, both animal and human research on prenatal fluoride exposure supports the conclusion that fluoride poses a significant neurological hazard during the *in utero* period.

C)  Bottle-fed infants

EPA recognizes that susceptibility to a chemical may be "intrinsic" (biological, e.g., life stage) or "extrinsic" (acquired, e.g., lifestyle).[309] A bottle-fed infant has *both* intrinsic *and* extrinsic susceptibility to fluoridated water. The intrinsic factor is an early "life stage" of development which, as discussed above, renders the infant more vulnerable to neurotoxic insults;[310] the extrinsic factor is a "lifestyle" (receiving formula instead of breastmilk) that dramatically increases the infant's exposure to fluoridated water. The combination of these two factors makes bottle-fed infants a clearly identifiable, highly susceptible subset of the population.

Infants have the highest intake of fluid per unit body weight of any age group among humans, given their mostly liquid diet at that age. According to EPA's survey on water intakes, approximately 5% of individuals less than 6 months old have a daily intake of water from community sources of at least 189 mL per kg body weight, and approximately 5% of infants between 6 and 12 months old and of children < 2 years old have a daily intake of water from community sources of at least 126 mL per kg body weight.[311] The EPA did not distinguish between nursing (breastfed) infants, who typically have a low intake of water, and non-nursing (bottle-fed) infants, who probably constitute the high end of EPA's distribution of water intake. Consistent with the high fluoride intakes of many bottle-fed infants, development of dental fluorosis in permanent teeth is associated with fluoride exposures before age 6 months as well as with exposure during later periods of infancy and childhood.[312] For example, Forsman found that infants fed water-diluted formula from an early age had more fluorosis than those who were breastfed at least their first few months.[313] Walter and Messer reported that children who were formula-fed from birth or breastfed less than 3 months had more fluorosis than children who were breastfed at least their first 3 months.[314]

According to the CDC, for U.S. children born in 2015, about 83% were ever breastfed, 58% were still breastfed at 6 months old, and 25% were exclusively breastfed through the first 6 months.[315] Data vary by ethnicity, with Hispanics, whites and Asians having breastfeeding rates similar to or greater than the national averages and blacks having substantially lower rates. Breastfeeding rates in the U.S. tend to be

---

[308] Drinkard et al. (1985). Fluoride concentrations in rat milk were 0.044, 0.349, and 0.401 mg/L, compared with fluoride concentrations in the mother's drinking water of 0, 50, and 100 mg/L, respectively.
[309] EPA (2017b).
[310] EPA (2008a), p. 42; EPA (2013a), p. 5-4.
[311] EPA (2004b), p. E-55; see also EPA (2000a) and NRC (2006), p. 426, Table B-8.
[312] Hong et al. (2006a; 2006b); Forsman (1977); Walton and Messer (1981); Fomon and Ekstrand (1999); Fomon et al. (2000).
[313] Forsman (1977).
[314] Walton and Messer (1981).
[315] CDC (2018; n.d.).



highest for higher family income and maternal education levels.  Looked at from the opposite perspective, close to 17% of U.S. infants in 2015 were never breastfed, 42% were not breastfed for their entire first 6 months, and 75% did not have exclusive breastfeeding for their entire first 6 months.  Breastfeeding rates in the U.S. have increased substantially in recent years from a low point in the early 1970s (less than 30% of babies ever breastfed, and less than 10% breastfed for more than 3 months).[316]  While increased breastfeeding rates are to be encouraged for a number of reasons, it is important to remember that for many infants in the U.S., breastfeeding is not an option; these include cases of infant adoption or fostering, as well as cases of death or illness of the mother.

Fluoride concentrations in human milk, as with the milk of other mammals, are very low, regardless of the fluoride intake of the mother.[317]  Thus fluoride intakes by infants fed primarily breast milk are very low, as are fluoride intakes by infants fed primarily cow's milk.[318]  However, fluoride intakes by infants fed commercially prepared formula reflect the fluoride concentrations in the water used to prepare the formula, either at the manufacturing plant, in the home, or both, and fluoride intakes can be in excess of 0.1 mg/kg/day.[319]  Since 1979, commercial producers of infant formula have used low fluoride water in the manufacture of infant formula, even when this means removing fluoride from the local municipal water before using it to make the formula.[320]  The result is that ready-to-feed formula (no water added in the home) is now much lower in fluoride content, but still higher than breast milk or cow's milk.[321]  Other commercial formulas, either in powder form or concentrated liquid form, still require addition of water before they can be fed to infants, and therefore the fluoride concentration in the formula depends primarily on the fluoride concentration of the water used to prepare the formula.[322]  For infants fed formula prepared with fluoridated tap water, the fluoride intake can be quite high, even for infants fed formula only as a supplement to breastfeeding.[323]  Fomon et al. recommended the use of low-fluoride water (< 0.3 mg/L) for home-preparation of infant formula, as well as no fluoride supplementation for infants.[324]

Most commercial infant formula, historically and currently, has been in powder form, for which the cost is approximately half that of ready-to-feed formula, per unit volume of formula as fed.[325]  Fomon (2000), based on industry data, indicated that approximately 80% of formula sales in 1998 were for powder form, and 10% or less for ready-to-feed form.[326]  Based on national data collected during 2005-2007, the CDC reported that approximately 26% of neonates and 10-15% of infants ages 2-12 months are fed at least some ready-to-feed formula, 7-12% of infants are fed formula prepared from liquid concentrate, 3-6% are fed formula prepared from single serving packages of powder, and 83-93% are fed formula prepared from powder from cans.[327]  For approximately 70-78% of infants in the same national survey, formula is reconstituted with tap water at least some of the time; for 46-52% of infants, formula is reconstituted with

---

[316] DHEW (1979), pp. 2-6, especially Tables A and B.  See also Fomon and Ekstrand (1999), Figure 1.

[317] Reviewed by NRC (2006), pp. 33, 36.  See also Fomon and Ekstrand (1999) and Fomon et al. (2000).

[318] Fomon et al. (2000), Table 2.

[319] Fomon et al. (2000).

[320] Fomon and Ekstrand (1999); Fomon et al. (2000).

[321] Fomon et al. (2000).

[322] Fomon and Ekstrand (1999); Fomon et al. (2000).

[323] Fomon et al. (2000).

[324] Fomon et al. (2000).

[325] O'Connor (2009).

[326] Fomon (2001), Figure 4.

[327] CDC (2017), Table 3.16.  (Infants could be fed more than one type of formula, so the sum of the raw percentages exceeds 100%.).  Survey dates (May 2005-June 2007) are from Fein et al. (2008).  Harriehausen et al. (2019) reported use of powdered infant formula for 92.1% of formula-fed infants, based on a survey in Houston.  (The date of the Houston survey is not given, but appears to have been approximately 2015.)



bottled water at least some of the time.[328]  The CDC data are not considered representative of the U.S. population; in particular, participation was likely biased toward women and infants with higher socioeconomic status (who tend to have higher breastfeeding rates, as described above), and minority groups were underrepresented.[329]  Thus, the actual rates of formula feeding and use of tap water for formula preparation may be higher than observed in the survey.

Based on the available information, it can reasonably be assumed that the majority of formula-fed infants in the U.S. are fed powdered formula reconstituted with water, often or usually tap water.  Especially for low-income homes (where breastfeeding is less likely), it is reasonable to assume that many or most infants are fed formula prepared from powder using tap water, which in much of the country is fluoridated.  In addition, for approximately 20% of infants, tap water is boiled before it is used to prepare formula;[330] if this tap water is fluoridated, the resulting fluoride concentration in the formula will be higher than if the water had not been boiled.[331]

Fomon et al. estimated that infants consuming powdered formula prepared with fluoridated water (1 mg/L) will ingest between 0.116 and 0.164 mg/kg/day.[332]  If Fomon's estimate is adjusted to account for the lower concentration of fluoride now added to water (0.7 mg/L), the result is a daily intake of 0.08 to 0.115 mg/kg/day, which is 80 to 115 times higher than the amount that Fomon et al. estimated for breast-fed infants (0.001 mg/kg/day).[333]  Thus by Fomon's estimates, essentially all formula-fed infants will exceed EPA's RfD for fluoride (0.08 mg/kg/day), if their formula is prepared with fluoridated tap water.

Fomon's estimates agree well with recent data from Harriehausen et al., who surveyed 114 parents in Houston to determine brand and type of formula, total volume of formula consumed over 24 hours, and infant weight.[334]  Most of the parents in the study (corresponding to 92.1% of the infants) reported using powdered formula, which is consistent with the literature described above.  Fluoride content in various brands of formula ranged from 0.035 to 0.175 mg/L when reconstituted with deionized water.[335]  Harriehausen et al. estimated the total amount of fluoride that the infants would consume if fluoridated water (0.7 mg/L) were to be used to reconstitute the formula (Table 3).  Estimated average fluoride intakes from formula would exceed 0.1 mg/kg/day during the first 4 months of life (0.110 mg/kg/day at 2 months; 0.112 mg/kg/day at 4 months), with more than 50% of infants estimated to have intakes exceeding 0.1 mg/kg/day (Table 3).  At 6 months, the estimated average fluoride intake from formula would be 0.09 mg/kg/day, still above EPA's RfD (0.08 mg/kg/day), with one-third of infants estimated to have intakes exceeding 0.1 mg/kg/day (Table 3).  At 9 and 12 months, 14% and 9% of infants, respectively, would be estimated to have intakes exceeding 0.1 mg/kg/day (Table 3).

---

[328] CDC (2017), Table 3.97.  (Formula for a given infant could be prepared with more than one water source, so the sum of the raw percentages exceeds 100%.)  Harriehausen et al. (2019) indicate 70-75% of parents reconstituting infant formula with tap water, based on the same CDC survey; their own survey in Houston reported only 3.5% of infants fed formula reconstituted with tap water, suggesting that there may be regional or temporal variations in use of tap water for reconstituting infant formula.

[329] Fein et al. (2008); Grummer-Strawn et al. (2008).

[330] CDC (2017), Table 3.98.

[331] For example, see Juárez-López et al. (2011).

[332] Fomon et al. (2000), Table 2.  These estimates are based on intake volumes (amount of formula consumed) from 0.12 to 0.17 L/kg/day.

[333] Fomon et al. (2000), Table 2.

[334] Harriehausen et al. (2019).  These estimates are based on intake volumes (amount of formula consumed) from 0.07 L/kg/day at 12 months to 0.154 L/kg/day at 2 months, with an overall average of 0.12 L/kg/day (calculated from data in Table 1 of Harriehausen et al. 2019).

[335] Harriehausen et al. (2019), Table 2.



The estimates from both Harriehausen and Fomon are consistent with the findings from the Iowa Fluoride Study (IFS).[336] Estimates of fluoride intake (from all sources) were determined for more than 600 infants at 1.5, 3, 6, 9, and 12 months of age, based on parental questionnaires. The IFS did not report fluoride intake data separately for formula-fed infants, and so does not represent the exposure distribution among formula-fed infants. Twenty-five per cent of the infants in the study ingested at most 0.002 to 0.007 mg/kg/day at ages 1.5 and 3 months, respectively,[337] an exposure consistent with exclusively breastfed babies. However, the IFS data also confirm that many infants consume large amounts of fluoride. Approximately 25% of infants in the study consumed $\geq$ 0.093 mg/kg/day at age 6 months of life, with 10% consuming $\geq$ 0.127 mg/kg/day and 5% consuming $\geq$ 0.147 mg/kg/day.[338] At age 1.5 months, 25% of infants in the study consumed at least 0.095 mg/kg/day, 10% at least 0.159 mg/kg/day, and 5% at least 0.188 mg/kg/day; at age 3 months, 25% of infants consumed at least 0.099 mg/kg/day, 10% at least 0.142 mg/kg/day, and 5% at least 0.166 mg/kg/day.[339] These intake estimates were obtained prior to the reduction in recommended fluoridation levels to the current 0.7 mg/L; however, even if these estimates are adjusted downward by approximately 30% to account for the change in fluoridation levels, many infants would still exceed the current RfD of 0.08 mg/kg/day.

Table 3. Estimated fluoride ingestion from infant formula, assuming fluoridated water at 0.7 mg/L.[a]

| Category | Age | | | | |
|---|---|---|---|---|---|
|  | 2 months | 4 months | 6 months | 9 months | 12 months |
| Number of infants | 32 | 23 | 27 | 21 | 11 |
| Predicted fluoride intake |  |  |  |  |  |
|     Mean (mg/kg/day) | 0.110 | 0.112 | 0.090 | 0.066 | 0.053 |
|     Variance | 0.0033 | 0.0016 | 0.0018 | 0.0012 | 0.0009 |
|     Standard deviation[b] | 0.057 | 0.040 | 0.042 | 0.035 | 0.03 |
| Distribution of fluoride intake |  |  |  |  |  |
|     > 0.1 mg/kg/day (%) | 59.4 | 56.5 | 33.3 | 14.3 | 9.1 |
|     < 0.1 mg/kg/day (%) | 40.6 | 43.5 | 66.7 | 85.7 | 90.9 |

[a] Data from Harriehausen et al. (2019), Table 3.
[b] Calculated from the variance reported by Harriehausen et al. (2019), Table 3.

---

[336] Appendix 2 of Levy et al. (2003).
[337] Appendix 2 of Levy et al. (2003).
[338] Appendix 2 of Levy et al. (2003).
[339] Levy et al. (2003), Appendix 2. Maximum reported fluoride intakes were 0.401 mg/kg/day at age 1.5 months, 0.346 mg/kg/day at age 3 months, and 0.343 mg/kg/day at age 6 months. For ages 9-72 months (9 months to 6 years), maximum intakes ranged from 0.136 to 0.307 mg/kg/day.



*Impacts of formula feeding on IQ*

While studies have not yet specifically addressed the impact on IQ of feeding formula prepared with fluoridated water, reported associations of cognitive impairment or lower IQ with formula feeding during infancy[340] are consistent with the high exposures of these infants to fluoride in the water used to prepare the formula and consequent susceptibility of the formula-fed infants to neurotoxic effects of fluoride. Specific differences in brain activation and regional volumes of gray matter have even been reported, indicating developmental changes in formula-fed children in comparison with breastfed children.[341] Such effects (and other adverse effects of formula-feeding compared with breastfeeding, especially compared with exclusive breastfeeding for at least the first several months) could, in principle, be due to loss of the enhanced mother-child bonding associated with breast-feeding,[342] to deficiency of an essential nutrient (e.g., long-chain saturated fatty acids) in the formula,[343] to the presence of a toxic contaminant (e.g., fluoride, lead) in the water used to prepare the infant formula,[344] or to some combination of these factors.

In its Guidelines, EPA considers it important to include postnatal exposure that might involve an interaction of a toxic agent with milk composition.[345] EPA's context is animal studies, but the principle would apply to human studies: Replacement of the mother's milk with a substitute that contains a toxic agent would be an extremely important source of postnatal exposure of infants and children to the toxic agent. Few, if any, animal studies reproduce the effect of formula-feeding of human infants, in terms of a water-based formula, together with any contaminants in the water, being substituted for the mother's milk; thus this very important developmental period is routinely missed in most animal studies.

D)   Elderly

The elderly have also been identified as an at-risk group for fluoride toxicity by both the NRC and the EPA.[346] There are at least six factors which support an increased vulnerability to fluoride's neurological effects among the elderly. First, as would be expected, studies have found that water fluoridation significantly increases the level of fluoride in bone, and these levels increase with age.[347] Second, the fluoride that is taken into bone is not stored there forever; as bones begin to break down in the postmenopausal and elderly years, some of the fluoride stored in the tissue is released back into the bloodstream.[348] Third, renal function declines with age, and thus the elderly kidney can be expected to be less efficient in clearing fluoride from the bloodstream. Fourth, the increased circulating fluoride will have proportionally greater access to the brain due to age-related increases in the permeability of the blood-brain barrier.[349] Fifth, the EPA has recognized that the elderly brain is at "particular risk" to neurotoxicants "because of the limited ability of the nervous system to regenerate or compensate to neurotoxic insult."[350]

---

[340] For example, see Fomon (2001); Wolf 2003; Belfort et al. (2013); Horta et al. (2015; 2018); Victora et al. (2015; 2016); Kanazawa (2015); Boutwell et al. (2018). Many studies have controlled for possible confounders such as maternal IQ, maternal education, and family income.

[341] Ou et al. (2016).

[342] Horta et al. (2018).

[343] Horta et al. (2018).

[344] Goyer (1995).

[345] EPA (1998a), p. 46; Federal Register (1998), p. 26943.

[346] NRC (2006), p. 351; EPA (1998a), p. 65; Federal Register (1998), p. 26949.

[347] Alhava et al. (1980); Arnala et al. (1985); Eble et al. (1992); Chachra et al. (2010).

[348] Itai et al. (2010).

[349] For example, see Mooradian (1994); Zeevi et al. (2010); Rosenberg (2014); and Pan and Nicolazzo (2018).

[350] EPA (1998a), p. 65; Federal Register (1998), p. 26943.



Sixth, the elderly have increased likelihood of co-morbidities and nutritional deficits, which can further increase susceptibility to harm.

While epidemiological data on fluoride and cognition in the elderly remains relatively sparse, Li reported a very high rate of cognitive impairment (81.1%) in an endemic fluorosis area.[351] Li did not find a linear relationship between urinary fluoride and the severity of cognitive impairment in the endemic fluorosis area, but urinary fluoride levels among those with any form of cognitive impairment were significantly higher than those with normal cognition.[352] Russ et al. described a longitudinal study involving nearly all people born in Scotland in 1921, who were passively followed for diagnoses of dementia after 2004.[353] Residential locations after age 60 (or at death or at time of diagnosis of dementia) were used to estimate exposure to aluminum and fluoride (separately) in drinking water. The authors concluded that "even these relatively low levels of aluminium and fluoride are associated with deleterious effects on dementia risk" and suggested further research.[354]

The NRC has described the possible relationship of fluoride exposure, especially exposure to aluminum fluoride complexes, to the development of Alzheimer's disease.[355] Goschorska et al. have reviewed the likely role of fluoride in the initiation and progression of Alzheimer's disease.[356] Consistent with other findings, Cao et al., in a study of mice genetically prone to degenerative brain changes including amyloid pathology, found that exposure of adult mice to fluoride for 3 months produced more severe changes and earlier changes, including enhanced deficits in learning and memory.[357] "The result suggests that prolonged exposure to fluoride may accelerate the neuropathological lesions that occur in such APP mice."[358]

E) <u>Nutritional Deficiencies</u>

Nutritional deficiencies can contribute to increased susceptibility to fluoride toxicity.[359] Calcium deficiency and iodine deficiency are expected to be particularly important in terms of vulnerability to neurotoxic effects of fluoride, but deficiencies of magnesium, vitamin C, protein, and other nutrients have also been associated with increased susceptibility to effects of fluoride exposure.

Dairy product consumption and corresponding calcium intakes have decreased markedly in the last several decades in the U.S.[360] Therefore, bioavailability of fluoride to infants and children is probably higher now.[361] As discussed later in this section, lactose intolerance (real or perceived) in some minority populations is associated with significantly lower calcium intake.[362] Substitution of tap water or tap water-based beverages for milk in the diet may result in both decreased calcium intake and increased fluoride intake.[363] Fluoride exposure also tends to exacerbate calcium deficiencies,[364] which can lead to various

---

[351] Li et al. (2016), p. 59.
[352] Li et al. (2016), Figure 2, Table 3.
[353] Russ et al. (2019).
[354] Russ et al. (2019).
[355] NRC (2006), pp. 210-212.
[356] Goschorska et al. (2018).
[357] Cao et al. (2019).
[358] Cao et al. (2019).
[359] See for example, NRC (2006). p. 265; Pandit et al. (1940); Marier (1977).
[360] Fomon et al. (2000); Bayless et al. (2017).
[361] Fomon et al. (2000).
[362] Jackson and Savaiano (2001); Jarvis and Miller (2002); Byers and Savaiano (2005); Fulgoni et al. (2007); Nicklas et al. (2009; 2011); Brown-Riggs (2016); Bayless et al. (2017).
[363] NRC (2006), p. 52.
[364] NRC (2006), pp. 250-251.



adverse health effects, including increased susceptibility to lead toxicity.[365]  Zhang et al. reported that effects of fluoride on synapse development in the hippocampus of rat pups were exacerbated by calcium deficiency and reversed by high calcium intake.[366]

The NRC reported that high fluoride intake appears to exacerbate the effects on thyroid function of low iodine intake in both animals and humans.[367]  Stated differently, reduced thyroid function in humans occurs at lower fluoride intakes in the presence of iodine deficiency.  Malin et al. reported that among iodine-deficient adults in Canada, an increase in urinary fluoride was associated with an increase in thyroid stimulating hormone (TSH), indicating a decrease in thyroid function.[368]  Of particular concern is that impaired thyroid function (including hypothyroxinemia and subclinical hypothyroidism) in pregnant women is associated with reduced IQ and other neurological effects in the offspring.[369]  Lavado-Autric et al. demonstrated in rats that proper migration of neurons does not occur in the developing offspring of hypothyroid or hypothyroxinemic mothers, leading to permanent alterations of brain architecture.[370]  Similarly, Auso et al. reported that "moderate and transient maternal hypothyroxinemia" during early gestation causes "irreversible alterations of brain development" in the offspring.[371]  The CDC considers the average iodine status (median urinary iodine concentration) of women of childbearing age (12-19 years and 20-39 years) in the U.S. to be in the "adequate intake" range, but the 10th percentiles by ethnicity and for the total population are in the "insufficient intake" range, indicating that more than 10% of women of childbearing age in the U.S. are deficient in iodine.[372]  Caldwell et al. report that 35% of pregnant women and 38% of nonpregnant women in the U.S. have urinary iodine concentrations below the level considered adequate.[373]  In addition, the CDC notes that even higher intakes of iodine are required for pregnant and lactating women; thus an even greater percentage of American women are likely to be deficient in iodine with respect to the demands of pregnancy and lactation.[374]  Pearce suggests that iodine deficiency in the U.S. may be becoming more prevalent, especially among pregnant women.[375]

F)  Kidney disease

It is well recognized that people with renal impairment (kidney disease) are less able to excrete fluoride, resulting in higher concentrations of fluoride in the body and greater susceptibility to adverse health effects from fluoride exposure.[376]  The World Health Organization states that it "is known that persons suffering from certain forms of renal impairment have a lower margin of safety for the effects of fluoride than the average person."[377]  In addition, a number of papers report an association between renal

---

[365] NRC (2006), pp. 250-251; Goyer (1995); Bruening et al. (1999).

[366] Zhang et al. (2017b).

[367] NRC (2006), pp. 227, 234, 262.

[368] Malin et al. (2018).

[369] For example, see Haddow et al. (1999); Pop et al. (1999; 2003); Morreale de Escobar et al. (2000; 2004); Klein et al. (2001); Vermiglio et al. (2004); LaFranci et al. (2005); Kooistra et al. (2006); Roman (2007); Zoeller and Rovet (2004); Patel et al. (2011); Suárez-Rodríguez et al. (2012); Modesto et al. (2015); Moleti et al. (2016).

[370] Lavado-Autric et al. (2003); Zoeller (2003).

[371] Ausó et al. (2004).

[372] CDC (2008), Chapter 4a, pp. 90-100.

[373] Caldwell et al. (2011).

[374] CDC (2008), Chapter 4a, pp. 90-100.

[375] Pearce (2015).

[376] For example, see Marumo and Iwanami (2001); NRC (2006), pp. 30, 292, 351; Ibarra-Santana (2007); Schiffl (2008).

[377] WHO (2004), p. 6.



impairment and reduced IQ or other cognitive impairment,[378] which is consistent with higher fluoride retention (and often higher water intake and consequent higher fluoride intake).

G) Populations with High Water Intake

The NRC identified population subgroups whose water intake "is likely to be substantially above the national average for the corresponding sex and age group" as susceptible subpopulations with respect to fluoride exposure.[379]  According to the NRC, "these subgroups include people with high activity levels (e.g., athletes, workers with physically demanding duties, military personnel); people living in very hot or dry climates, especially outdoor workers; pregnant or lactating women; and people with health conditions that affect water intake."[380] Health conditions that affect water intake include "diabetes mellitus, especially if untreated or poorly controlled; disorders of water and sodium metabolism, such as diabetes insipidus; [and] renal problems resulting in reduced clearance of fluoride."[381]  The NRC estimated that athletes and others with high physical activity and consequent high (but not upper bound) water consumption would ingest 0.05 mg/kg/day of fluoride from drinking water with 0.7 mg/L fluoride.[382]  Adults with diabetes mellitus could have similar fluoride intakes (0.05 mg/kg/day, while children with diabetes mellitus could have fluoride intakes of 0.07 mg/kg/day.[383]  For children and adults with nephrogenic diabetes insipidus, NRC estimated waterborne fluoride intakes of 0.11 mg/kg/day from water containing 0.7 mg/L.[384]  Consistent with this, case reports have documented moderate to severe dental fluorosis among children with diabetes insipidus who drank water with 0.5 to 1 mg/L.[385]  Based on EPA's estimates of water consumption by individuals who actually consume water from community sources and a water fluoride concentration of 0.7 mg/L, 10% of infants < 6 months old would be expected to have a fluoride intake of at least 0.12 mg/kg/day, 5% would have an intake of at least 0.14 mg/kg/day, and 1% would have a fluoride intake of at least 0.17 mg/kg/day.[386]

H) Genetic susceptibility

A number of studies have shown associations between specific genetic arrangements and a greater susceptibility to effects of fluoride exposure,[387] including dental fluorosis, occupational fluorosis,[388] and alterations to reproductive hormones.[389]  Additional studies have identified differences in dental fluorosis rates among ethnic subpopulations with similar fluoride exposures, consistent with genetic differences among the subpopulations.[390]  Genes for which associations with differing susceptibility to fluoride

[378] For example, see Madero et al. (2008); Mendley et al. (2015); Chen et al. (2018b).

[379] NRC (2006), p. 30.

[380] NRC (2006), p. 30.

[381] NRC (2006), p. 30.

[382] NRC (2006), p. 35, Table 2-4.

[383] NRC (2006), p. 35, Table 2-4.

[384] NRC (2006), p. 35, Table 2-4.

[385] NRC (2006), p. 33.

[386] NRC (2006), pp. 431-433, Tables B-12, B-12, and B-14, based on EPA (2000a).

[387] Reviewed by Pramanik and Saha (2017).  See also Lavryashina et al. (2003); Tu et al. (2011); Liu et al. (2006); Huang et al. (2008); Ba et al. (2011); Zhao et al. (2015); Zhou et al. (2016); Zhang et al. (2013b); Pei et al. (2017); Jiang et al. (2015); Zhang et al. (2015b); Cui et al. (2018); Küchler et al. (2018); Bhagavatula Naga (2009).

[388] Tu et al. (2011) list clinical symptoms of occupational fluorosis as back and limb pain, neurasthenia syndrome, gastrointestinal symptoms, joint movement limitation, bone deformities, and nerve compression symptoms.

[389] Zhao et al. (2015); Zhou et al. (2016); Ma et al. (2017); An et al. (2019).

[390] Wu et al. (2015); Yang et al. (2016); Pei et al. (2017); Li et al. (2017); Yang et al. (2018b).



exposure have been identified include various blood groups and leukocyte genes, group-specific complement (Gc), calcitonin receptor (CTR), insulin-related growth factor 1 (IGF1), collagen type 1 alpha 2 (COL1A2), estrogen receptor (ESR or ERα), follicle stimulating hormone receptor (FSHR), myeloperoxidase (MPO), vitamin D receptor (VDR), matrix metallopeptidase-2 (MMP-2), and various genes involved in enamel formation. Most studies have examined particular genes considered to be candidates with respect to differences in development of dental fluorosis or other possible fluoride effects, while a few studies addressed larger panels of genes. In addition to different effects of fluoride on different genetic variants, effects of fluoride on gene regulation or epigenetic mechanisms have also been reported.[391] While a complete picture of the relationship between genes, gene regulation, and adverse effects of fluoride exposure remains to be developed, it is already quite clear that some people or groups of people are inherently more vulnerable than others to adverse effects of fluoride exposure and require a greater level of protection from fluoride exposures. Two specific studies addressing genetics, fluoride exposure, and impaired intelligence are discussed in more detail below.

Zhang et al., in a study of 180 Chinese children ages 10-12 years, reported decreasing IQ scores with increasing serum or urinary fluoride.[392] For each 1 mg/L increase in urinary fluoride, the IQ score decreased by 2.42 points. As a group, the children with higher water fluoride concentrations had higher levels of thyroid stimulating hormone (TSH, statistically significant) and lower levels of thyroxine (T4, not quite statistically significant) than the children with lower water fluoride concentrations;[393] these are indicators of impaired thyroid function, which, while probably subclinical, is nevertheless associated with impaired neurodevelopmental outcomes.[394]

The study by Zhang et al. also examined the association of IQ scores with the genotype of catechol-O-methyltransferase (COMT), a gene whose product controls degradation of dopamine.[395] Two functional alleles are commonly found (rs4680 polymorphism), with either a valine (Val) or a methionine (Met) at codon 158. The Met form of the gene product has lower enzymatic activity than the Val form, resulting in slower degradation and corresponding higher availability of dopamine. Zhang et al. found that for children with the Val/Val form of the enzyme (faster degradation and lower availability of dopamine), each 1 mg/L increase in urinary fluoride was associated with a decrease of 9.67 IQ points, a statistically significant finding after covariates were controlled for.[396] Thus, the genotype corresponding to the Val/Val form of the COMT enzyme demonstrated a substantially higher susceptibility to fluoride with respect to decreased IQ in children. Frequencies of this genotype range from 18% (Finland) to 58% (Africa); reported frequencies of this genotype in U.S. populations include 46.6% for African Americans, 22.8% for European Americans, 34.4% for people of Mexican ancestry living in Los Angeles, 35.6% for Puerto Ricans in Puerto Rico, 30.3% for Utah residents with northern and western European ancestry, and 35.0% for Gujarati Indians living in Houston.[397]

---

[391] For example, Zhang et al. (2017a) report that gene methylation was inversely associated with fluoride exposure (urinary fluoride concentration). Bone changes in the study group were associated with methylation status rather than genotype, for the specific gene investigated.

[392] Zhang et al. (2015b). See Figure 1 and corresponding text.

[393] Zhang et al. (2015b). Given reduced T4 concentrations in the children, one suspects that maternal T4 was likely to have been low as well. Reduced maternal T4 (thyroxine) is associated with impaired neurodevelopment in the children (see discussion elsewhere in this report).

[394] Discussed elsewhere in this report.

[395] Zhang et al. (2015b).

[396] Zhang et al. (2015b).

[397] rs4680 (SNP) Population Genetics, Ensembl release 95 (January 2019). The genotype of rs4680 coding for the Val/Val form of COMT is referred to as GG in this summary of gene and genotype frequencies.



Cui et al., in a school-based study of Chinese children ages 7-12 years, reported a small but significant decrease in IQ with an increase in urinary fluoride concentration.[398] This relationship held when the results were adjusted for up to 30 covariates (e.g., age of the child, mother's education, mother's age at delivery). For children with the TT genotype (homozygous for the variant allele) of the dopamine receptor gene DRD2 Taq 1A polymorphism (rs1800497),[399] a strongly significant inverse relationship was seen, while for the other genotypes (CC and CT, considered together), the relationship was still negative (decreasing IQ with increasing urinary fluoride) but non-significant. Among the TT genotype subgroup, individuals with urinary fluoride concentrations less than 1.1 mg/L had IQs 6 or 7 points (medians of the 1st and 2nd quintiles, approximately 1/2 the standard deviation) above the average of the whole subgroup (mean IQ = 113.9; standard deviation = 12.4), while individuals with urinary fluoride concentrations above 1.5 mg/L had IQs 3 or 7 points (medians of the 4th and 5th quintiles, up to approximately half the standard deviation) below the average of the whole subgroup.

The fraction of the study group with the TT genotype was 13.6%.[400] Frequencies of the TT genotype in various populations range from about 3% to about 24%; reported frequencies relevant to U.S. populations include 11.1% for African Americans, 3.8% for European Americans, 15.6% for people of Mexican ancestry living in Los Angeles, 5.8% for Puerto Ricans in Puerto Rico, 5.1% for Utah residents with northern and western European ancestry, and 8.7% for Gujarati Indians living in Houston.[401]

The findings of Zhang et al. and Cui et al., together with the available information on genotype frequencies, thus indicate that a substantial number of Americans, especially Americans belonging to some minority populations, are expected to have a genotype shown to have a strong association between urinary fluoride concentration and decreased IQ.

I)   <u>Minority populations in the United States</u>

Various studies have documented an increased prevalence and severity of dental fluorosis among African Americans, which is consistent with an increased extrinsic or intrinsic susceptibility to fluoride during the developmental years.[402] As described above, several minority populations in the U.S. can be expected to include a number of individuals with genotypes associated with decreased IQ in connection with fluoride exposure. Many minority populations are also characterized by socioeconomic disparities, which can often mean a higher likelihood of nutritional deficiencies as well as higher rates of formula use for feeding infants. As described earlier, use of infant formula prepared with tap water, a common practice in lower economic groups, can result in extremely high fluoride intakes by the infants if fluoridated tap water is used to prepare the formula. Some minority populations also have elevated rates of kidney disease and diabetes, which can also contribute to higher fluoride exposure or increased vulnerability to fluoride exposure.[403]

---

[398] Cui et al. (2018).

[399] Other sources indicate that the rs1800497 polymorphism is actually downstream of the DRD2 gene, in the ANKK1 (ankyrin repeat- and kinase domain-containing protein 1) gene, but very closely linked to the DRD2 gene. See Neville et al. (2004) and OMIM (2018). However, the main finding remains, that an identifiable genetic subgroup shows a very strong decrease in IQ with an increase in urinary fluoride concentration.

[400] Cui et al. (2018).

[401] rs1800497 (SNP) Population Genetics, Ensembl release 94 (October 2018). The TT genotype of rs1800497 in Cui et al.'s paper is referred to as AA in this summary of gene and genotype frequencies.

[402] EPA (2010b), pp. 33-34; Exhibit 34 to Casey Hannan Deposition; CDC (2005), Table 23.

[403] NRC (2006), pp. 30-35, 292, 350-351.



Some minority populations also have lower intakes of milk by children and adults (due in part to higher rates of real or perceived lactose intolerance), with consequent lower calcium intake.[404] Substitution of tap water or tap water-based beverages for milk in the diet may result in both decreased calcium intake and increased fluoride intake.[405] Fluoride exposure tends to exacerbate calcium deficiencies,[406] which can lead to various adverse health effects, including increased susceptibility to lead toxicity.[407] An estimated 12% of the U.S. population self-report lactose intolerance, including about 8% of European Americans, 20% of African Americans, and 9-10% of Hispanic Americans.[408] Jackson and Savaiano estimated 29% lactose maldigesters in the U.S. population (based on 1990 census data), including 100% of Asian Americans and Native Americans, 75% of African Americans, 60 % of Hispanic Americans, and 20% of the U.S. white population.[409] Storhaug et al., in a review of reported prevalence data throughout the world, estimated the prevalence of lactose malabsorption in the U.S. to be 33-39% of the population of adults and children aged 10 years or older.[410] The review by Storhaug et al. included studies of lactose malabsorption or lactase persistence identified by various objective tests and excluded studies of self-reported lactose intolerance.[411]

J)   Summary

As described above, there are a number of identifiable subsets of the population that are expected to be at higher risk of harm from fluoridation chemicals. This may be due to higher sensitivity due to life stage, nutritional deficiency, or genetic factors. This may also be due to higher intake of water and consequent higher intake of fluoride. High-risk population subgroups include unborn and newborn children, especially infants fed formula prepared with fluoridated water; the elderly; people with nutritional deficiencies; people with kidney disease; people with high water intake; people with genetic susceptibilities; and members of minority populations.

---

[404] Jackson and Savaiano (2001); Jarvis and Miller (2002); Byers and Savaiano (2005); Fulgoni et al. (2007); Nicklas et al. (2009; 2011); Brown-Riggs (2016); Bayless et al. (2017).
[405] NRC (2006), p. 52.
[406] NRC (2006), pp. 250-251.
[407] NRC (2006), pp. 250-251; Goyer (1995); Bruening et al. (1999).
[408] Nicklas et al. (2009; 2011).
[409] Jackson and Savaiano (2001).
[410] Storhaug et al. (2017).
[411] Storhaug et al. (2017).



**D.      The Current EPA Reference Dose for Fluoride Is Not Protective Against Neurotoxicity**

A) <u>Background</u>

If a chemical is identified as posing a neurotoxic hazard, EPA's Guidelines call for a quantitative dose-response analysis to determine the reference dose (RfD). The RfD is "an estimate (with uncertainty spanning perhaps an order of magnitude) of a daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime."[412]  The Guidelines provide that the RfD can be determined by either a LOAEL/NOAEL or BMD analysis.  While the Guidelines favor a BMD analysis, EPA used the NOAEL analysis for 3 of the oral RfDs that the Agency established pursuant to the Guidelines (Chlorine Dioxide/Chlorite, BMD-153, and BMD-209).[413]

Consistent with EPA's general risk assessment procedures as described in its "Preamble to IRIS Toxicological Reviews,"[414] the Guidelines indicate that "uncertainty factors" (UFs) should be applied to the point of departure (POD) to ensure that the resulting RfD is protective of health.[415]  Uncertainty factors are applied to account for differences in susceptibility between animals and humans (UF$_A$, interspecies variability), variations in susceptibility among humans (UF$_H$, intraspecies variability), and, where applicable, differences in the length of exposure between the study and human conditions (UF$_S$, subchronic to chronic), research gaps in the overall database (UF$_D$, database deficiency), and converting from a LOAEL to a NOAEL.[416]  These uncertainty factors are "typically multiples of 10," although they can be reduced to factors of 3 or 1 if warranted by the available information.[417, 418]

*Intraspecies Variability (UF$_H$)*:  EPA recognizes that susceptibility to toxic substances is not uniform across the human population, and that because of differences in *toxicokinetics* and/or *toxicodynamics*, some subsets of the population will be more vulnerable to harm than others.[419]  *Toxicokinetics* refers to the "processes which determine the extent and duration of exposure of the target organ or site of toxicity to the active chemical species," while *toxicodynamics* refers to the "processes involved in the translation of such exposure of the target organ or site of action into the generation of a toxic effect."[420]  Put more simply, toxicokinetics governs how much of the chemical gets to the target site (i.e., access), while toxicodynamics governs how much of the chemical is necessary at the target site to cause the adverse effect (i.e., sensitivity).  If there are no chemical-specific data on toxicokinetics and toxicodynamics, EPA uses a default UF$_H$ of 10.[421]  This default factor of 10 is "considered to be appropriate in the absence of convincing data to the contrary"[422] and is comprised of two co-equal factors of 3.16, one

---

[412] EPA (1998a), p. 57; Federal Register (1998), p. 26946.  See also EPA (2009a).

[413] EPA (2000b; 2008c; 2008d).

[414] For the "Preamble to IRIS Toxicological Reviews," see EPA (2018a), pp. xvii-xxiv; EPA (2016), pp. xv-xxi.  See especially Section 7, "Deriving Toxicity Values" (EPA 2018a, pp. xxi-xxii; EPA 2016, pp. xviii-xx).

[415] EPA (1998a), pp. 58-59; Federal Register (1998), p. 26947.

[416] EPA (1998a), p. 59; Federal Register (1998), p. 26947; EPA (2018a), p. xxii; EPA (2016), pp. xix-xx.

[417] EPA (1998a), p. 59; Federal Register (1998), p. 26947; EPA (2018a), p. xxii; EPA (2016), p. xix.

[418] Lehman and Fitzhugh (1954) proposed a factor of 100 (a 100-fold margin of safety) between the highest "safe dose" of a chemical in animals and the maximum amount permitted for human exposure.  This safety factor was intended to allow for both higher sensitivity of humans than animals and also variation within the human population.  Martin et al. (2013) describe the history of uncertainty factors since the time of Lehman and Fitzhugh, pointing out that the default factors do not represent worst-case situations; they cannot be safely assumed to be adequately protective of the most exposed individuals or the most susceptible individuals, nor can they be safely assumed to be protective for effects of mixtures of chemicals.

[419] EPA (2011b), p. 14; EPA (2016), p. 2-15; EPA (2018a), p. 2-12.

[420] Renwick (1993), p. 276.

[421] EPA (2018a), pp. 2-12, 2-13.

[422] EPA (2013a), p. 5-17.



for toxicokinetics and one for toxicodynamics.[423]  Consistent with this, EPA has used a $UF_H$ of 10 in each of the nine risk assessments where it has established an RfD or RfC pursuant to the Guidelines (Table 4).

*Interspecies Variability (UF$_A$)*:  EPA recognizes that susceptibility to toxic substances can differ across species.  As with intraspecies variability, interspecies variability is rooted in principles of both toxicokinetics and toxicodynamics.  With respect to the kinetics component, EPA has developed a hierarchical framework of approaches that are geared towards ascertaining the "human equivalent dose" (HED).[424]  EPA's "optimal" approach for determining the HED is to use a physiologically based toxicokinetic model (PBTK).[425]  Where a PBTK model is not available, the "intermediate" approach is to use chemical-specific information that, while falling short of a full PBTK model, provides some reliable guidance.[426]  Where there is no reliable chemical-specific information on kinetics, EPA uses a default allometric scaling method.[427]

Allometric scaling is "scaling of physiological rates or quantities to relative growth and size (mass or volume) of one animal species relative to another species."[428]  Body weight scaling to the 3/4 power is EPA's default method for allometric scaling (hereafter referred to as the BW¾ Method).[429]  As shown in Table 5, the HED of a 10 mg/kg dose given to mice is 1.4 mg/kg, while the HED of the same dose given to rats is 2.4 mg/kg.[430]  Put another way, mice and rats need to be given 10 mg/kg of a chemical to achieve the human equivalent of 1.4 and 2.4 mg/kg, respectively.  The HED is thus 14% of the dose given to mice, and 24% of the dose given to rats.

The BW¾ Method "predominantly addresses factors involved in estimating toxicokinetics, as well as some toxicodynamic factors."[431]  EPA thus maintains a residual default UF of 3 (3.16 rounded down to 3) to allow for residual uncertainty from either toxicokinetics or toxicodynamics, unless there is chemical-specific information available.[432]  Under EPA's default approach to interspecies variability, therefore, a dose of 10 mg/kg/day in mice is treated as the equivalent of 0.47 mg/kg/day in humans, while a dose of 10 mg/kg/d in rats is treated as the equivalent of 0.8 mg/kg/day.

*Subchronic-to-Chronic (UF$_S$)*:  Where EPA bases an RfD on a study that does not investigate the effect of long-term (chronic) exposure, EPA will use an uncertainty factor of 3 to 10. EPA defines a chronic study in rodents as one which lasts "at least 12 months."[433]  If the study lasts less than 12 months, therefore, an uncertainty factor is applied.  In the derivation of the RfC for 2-Hexanone, for example, EPA applied an uncertainty factor of 10 because the principal study lasted only six months.[434]

---

[423] EPA (2016), p. 2-15.
[424] EPA (2011b), pp. 18-21; EPA (2018a), p. 2-10.
[425] EPA (2011b), p. 19.
[426] EPA (2011b), p. 19.
[427] EPA (2011b), p. 19.
[428] EPA (2011b), p. 1.
[429] EPA (2011b).
[430] EPA (2011b), p. 29, Table A-1; EPA (2018a), p. 2-12.
[431] EPA (2011b), p. 17.
[432] EPA (2011b), p. 21; EPA (2016), p. 2-15;  EPA (2018a), pp. 2-12, 2-13.
[433] EPA (1998b), p. 1.
[434] EPA (2009c), p. 74.



Table 4.  Summary of RfDs or RfCs developed in compliance with EPA's Guidelines for Neurotoxicity Risk Assessment.

| Chemical | LOAEL | NOAEL | UF$_H$ | UF$_A$ | UF$_S$ | UF$_D$ | Composite | RfD or RfC[a] | Reference |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| BDE-47 | 10.5 mg/kg | 0.7 mg/kg | 10 | 10 | 3 | 10 | 3000 | 0.1 µg/kg/day | EPA (2008a) |
| BDE-99 | 0.8 mg/kg | 0.4 mg/kg | 10 | 10 | 3 | 10 | 3000 | 0.1 µg/kg/day | EPA (2008b) |
| BDE-153 | 0.9 mg/kg | 0.45 mg/kg | 10 | 10 | 3 | 10 | 3000 | 0.2 µg/kg/day | EPA (2008c) |
| BDE-209 | 20.1 mg/kg | 2.22 mg/kg | 10 | 10 | 3 | 1 | 300 | 7 µg/kg/day | EPA (2008d) |
| Chlorine Dioxide and Chlorite | 6 mg/kg/day | 3 mg/kg/day | 10 | 10 | 1 | 1 | 100 | 0.03 mg/kg/day | EPA (2000b) |
| 2-Hexanone | 143 mg/kg/day | Not observed | 10 | 10 | 1 | 10 | 1000 | 0.005 mg/kg/day | EPA (2009c) |
| Methanol | 1000 ppm (1310 mg/m$^3$) | 500 ppm (655 mg/m$^3$) | 10 | 3 | 1 | 3 | 100 | 20 mg/m$^3$ | EPA (2013) |
| RDX | 8 mg/kg/day | 4 mg/kg/day | 10 | 3 | 1 | 10 | 300 | 0.004 mg/kg/day | EPA (2018a; 2018j) |
| Trimethylbenzenes | 492 mg/m$^3$ | 123 mg/m$^3$ | 10 | 3 | 3 | 3 | 300 | 0.01 mg/kg/day | EPA (2016) |

[a] Where EPA established both an RfD (mg/kg/day) and an RfC (mg/m$^3$) for a chemical, the RfD is presented.

Table 5.  Comparison of BW$^{1/1}$ and BW$^{3/4}$ in estimating oral exposure in humans from a 10 mg/kg exposure to rats, mice, and a dog.[a]

| Absolute animal intake or administered dose | Species | BW(h)/BW(a) | Scaling = BW$^{1/1}$ | | Scaling = BW$^{3/4}$ | |
|---|---|---|---|---|---|---|
| | | | BW scaling factor | BW scaled human intake or oral dose (mg/kg) | BW scaling factor | BW scaled human intake or oral dose (mg/kg) |
| 0.25 mg / 0.025 kg | mouse | 70 / 0.025 = 2800 | $2800^{1/1}$ = 2800 | (2800 × 0.25 mg = 700 mg) 700 mg / 70 kg = 10 mg/kg | $2800^{3/4}$ = 385 | (385 × 0.25 mg = 96 mg) 96 mg / 70 kg = 1.4 mg/kg |
| 2.5 mg / 0.25 kg | rat | 70 / 0.25 = 280 | $280^{1/1}$ = 280 | (280 × 2.5 mg = 700 mg) 700 mg / 70 kg = 10 mg/kg | $280^{3/4}$ = 68 | (68 × 2.5 mg = 170 mg) 170 mg / 70 kg = 2.4 mg/kg |
| 120 mg / 12 kg | dog | 70 / 12 = 5.8 | $5.8^{1/1}$ = 5.8 | (5.8 × 120 mg = 700 mg) 700 mg / 70 kg = 10 mg/kg | $5.8^{3/4}$ = 3.7 | (3.7 × 120 mg = 444 mg) 444 mg / 70 kg = 6.4 mg/kg |

[a] Taken from Table A-1 in EPA (2011b), p. 29.



*Database Deficiency (UF$_D$)*:  EPA regularly applies an uncertainty factor of 3 to 10 to account for important research gaps in the literature, or when there are indications of other toxic effects that have not been adequately studied.  According to EPA, "If there is concern that future studies may identify a more sensitive effect, target organ, population, or life stage, a database uncertainty factor reflects the nature of the database deficiency."[435]  In the 2-Hexanone risk assessment, for example, EPA applied a UF$_D$ of 10 because of both (a) the absence of multigenerational and developmental studies, and (b) the existence of studies which "suggest the possibility" of reproductive and immunological toxicity.[436]

*Composite uncertainty factors:*  As summarized in Table 4, the composite uncertainty factors that EPA has applied in its 9 neurotoxicity risk assessments under the Guidelines range from 100 to 3,000.  Three of these risk assessments (those for Methanol, RDX, and Trimethylbenzenes[437]), were published after EPA's adoption (in 2011) of its current hierarchical framework for determining HEDs from animal data.[438]  Prior to adoption of this method, UF$_A$ for interspecies variability had a value of 10 for each of the risk assessments; thereafter it has had a value of 3.  As a practical matter, however, the adjustment is similar across the two periods of time, because the point of departure now starts at a lower dose under EPA's current approach, due to derivation of the HED prior to application of uncertainty factors.

## B)  Identifying LOAEL/NOAELs for Fluoride Neurotoxicity from Animal Studies

EPA prefers to use human data for identifying a POD in the rare instances where such data are available.[439]  The recent prospective cohort studies[440] with individual-level biomonitoring data provide sufficient human data to establish a POD for fluoride neurotoxicity.  I understand that Dr. Philippe Grandjean has conducted an analysis of human data to establish a POD for fluoride neurotoxicity, and that he has calculated a BMDL of 0.1 mg/L (maternal urinary fluoride during pregnancy) based on a Benchmark Response (BMR) of 1 lost IQ point from prospective cohort data reported by Bashash et al.[441]  I understand that Dr. Grandjean has not attempted to establish an RfD, but a BMDL of 0.1 mg/L in maternal urine would result in an RfD well below the intake levels in fluoridated communities, particularly after the application of appropriate uncertainty factors.

To avoid duplication of Dr. Grandjean's analysis, and to determine whether his BMDL is consistent with potential RfDs derived from animal data, I sought to determine the range of RfDs that are supported by the current animal experimental data.  My purpose was not to derive a single value for the RfD, but to assess the approximate range of RfD values that would be obtained if EPA's ordinary risk assessment procedures are applied to examples selected from the fluoride database.  Of primary interest to this analysis is whether RfDs derived from neurotoxicity data would be greater than, equal to, or less than the current RfD of 0.08 mg/kg/day.

In light of the human data now available, animal data would no longer be the preferred source of the POD for fluoride neurotoxicity.[442]  However, several considerations could justify use of animal data to establish an RfD for fluoride.  First, EPA has used animal research as the principal study for each of the

---

[435] EPA (2018a), p. xxii.
[436] EPA (2009c), pp. 74-75.
[437] EPA (2013a; 2016; 2018a).
[438] EPA (2011b).
[439] EPA (2018a), p. 2-1.
[440] Bashash et al. (2017; 2018); Valdez-Jiménez et al. (2017); Green (2018).
[441] Bashash et al. (2017).
[442] EPA (2018a), p. 2-1.



neurotoxicity risk assessments that it has thus far conducted under the Guidelines.  Second, EPA has used impairment in learning and memory in rodents as the adverse effect upon which to base the RfD for other chemicals,[443] thus this is an accepted endpoint to use in deriving an RfD.  Third, a substantial number of animal studies of fluoride neurotoxicity have used 2 or 3 treatment groups, and EPA has found this to be sufficient for establishing the POD in most of its Guideline-compliant risk assessments (BDE-47, BDE-153, BDE-209, Chlorine Dioxide/Chlorite, and 2-Hexanone),[444] including animal studies with as few as 10 rats per group (2-Hexanone).[445]

For purposes of simplicity and clarity, I have selected the NOAEL/LOAEL method for example RfD calculations.  Although EPA now prefers using the BMD method, in this case either method will serve because, as shown below, whatever point one chooses in the range of observations in the identified studies, the resulting RfDs are each well below 0.08 mg/kg/d.

C)  Candidate PODs from the Animal Data on Fluoride Neurotoxicity

In the literature review discussed earlier, 37 rodent studies were identified that have investigated fluoride's impact on learning and memory since the NRC report (Table A-2).  All but 3 of these studies found adverse effects in the fluoride-treated rodents, including 16 of the 17 studies that investigated prenatal fluoride exposures.  Since the prenatal period represents a point of heightened vulnerability to neurotoxicants, the prenatal studies are a logical candidate for the point of departure.

To avoid studies at high risk of bias, the three studies that did not specifically mention using a randomization procedure were excluded from further consideration.[446]  Further, in order to focus the analysis on those studies best suited for a NOAEL/LOAEL analysis, four studies that only used one treatment dose were excluded.[447]

Table 6 summarizes the 10 prenatal studies that remained for LOAEL/NOAEL consideration.  Most of the studies used a similar dosing regimen with 2 or 3 treatment groups, and at least 10 rodents per group, which is consistent with several of the principal studies that EPA has previously used to establish an RfD.  Notably, 9 of the 10 studies found dose response trends for one or more effects, thus adding confidence to a causative role of the fluoride treatment.[448]  Additional confidence comes from the fact that the vast majority of other rodent studies have found demonstrable affects on learning as well.

---

[443] For example, BDE-153 (EPA 2008c, p. 36).
[444] EPA (2000b; 2008a; 2008c; 2008d; 2009c).
[445] EPA (2009c).
[446] Bera et al. (2007); Basha et al. (2011b); Ge et al. (2018).
[447] Niu et al. (2014); Banala and Karnati (2015); Dong et al. (2015); Zhu et al. (2017).
[448] See for example, Jiang et al. (2014b), Table 3; Cui et al. (2017), Table 3; Chen et al. (2018a), Figure 1d,e; Sun et al. (2018), Tables 2 and 3; Wang et al. (2018a), Figure 4b,c; Zhao et al. (2019), Figure 5e.



*Food and Water Watch v. EPA*                                              *Thiessen Report*

---

Table 6.  Examples of rodent studies of prenatal exposure to fluoride that could provide LOAELs or NOAELs for neurotoxicity.

| Study | Animal | Exposure period | [F⁻] in drinking water[a] (mg/L) | Number of animals per group (n) | Learning and memory LOAEL (mg/L) | Learning and memory NOAEL (mg/L) | Neuroanatomical or neurochemical effects LOAEL (mg/L) | Neuroanatomical or neurochemical effects NOAEL (mg/L) |
|---|---|---|---|---|---|---|---|---|
| Zhou et al. (2019) | Rats, Sprague-Dawley | Prenatal[b] + 6 months | 4.5, 23, 45 | 6 | 23 | 4.5 | 23 | 4.5 |
| Zhao et al. (2019) | Rats, Sprague-Dawley | Prenatal[b] + 60 days | 4.5, 23, 45 | 5 | 23 | 4.5 | 4.5 | None |
| Bartos et al. (2019) | Rats, Wistar (female) | Prenatal + 21 days | 5, 10 | 9-10 | 5 | None | 5 | None |
| Wang et al. (2018a) | Mice, ICR (female) | Prenatal (from day 7) + 21 days | 11, 23, 45 | 15 | 23 | 11 | 11 | None |
| Sun et al. (2018) | Mice, Kunming | Prenatal + 21 days | 11, 23, 45 | 6 | 23 | 11 | 11 | None |
| McPherson et al. (2018) | Rats, Long Evans Hooded (male) | Prenatal (from day 6) + 90 days | 10, 20[c] | 11-23 | None | 20 | None | 20 |
| Chen et al. (2018a) | Rats, Sprague-Dawley | Prenatal[b] + 6 months | 4.5, 23, 45 | 6 | 23 | 4.5 | 4.5 | None |
| Bartos et al. (2018) | Rats, Wistar (female) | Prenatal + 21 days | 5, 10 | 9-10 | 5 | None | 5 | None |
| Cui et al. (2017) | Rats, Sprague-Dawley | Prenatal[b] + 60 days | 4.5, 23, 45 | 12 | 4.5 | None | N/A | N/A |
| Jiang et al. (2014b) | Rats, Sprague-Dawley | Prenatal[b] + 2 months | 11, 23, 45 | 12 | 11 | None | 11 | None |

[a] Treatment groups in addition to the control group.
[b] Exposure of the mother began before pregnancy.
[c] Animals were given 0, 10, or 20 mg/L fluoride in drinking water, plus 3.24 ppm fluoride in feed.  An additional control group had 0 mg/L fluoride in drinking water plus 20.5 ppm fluoride in feed (McPherson et al. 2018).



While only three of the studies specifically mention controlling for litter effects,[449] the failure to control for litter effects does not bias the results in any consistent direction and can lead to either a false positive or a false negative in an individual study.[450] Thus it is questionable whether this would lead to a consistent bias across several studies. Further, several of the principal studies that EPA has used to establish an RfD in the past did not control for litter effects,[451] and thus this factor does not preclude selection of a study as the principal study.

**LOAEL of 5 mg/L**:  The lowest observed adverse effect levels in the studies were fluoride concentrations of 4.5 and 5 mg/L. Of the six studies that used this concentration, three found adverse effects on learning at this concentration,[452] and two of the other three studies, which did not find statistically significant effects on learning at this level, *did find alterations in the brain.*[453]  Other studies have also found alterations in the brain at $\leq$ 5 mg/L.[454]  Further, since Bartos et al. specifically controlled for litter effects, the failure to do so in other studies is unlikely to explain the findings of adverse effects at this level. A reasonable case can be made, therefore, for selecting a 5 mg/L LOAEL as the Point of Departure (POD) for learning impairment from prenatal fluoride exposure.

**LOAEL of 23 mg/L**:  Seven of the 10 studies used 23 mg/L as one of the treatment doses, and six of these studies found *both* an adverse impact on learning *and* changes in the brain, either at this dose or a lower dose. It is hard, therefore, to reach any other conclusion than that 23 mg/L is an "Observed Adverse Effect Level," particularly in light of the five studies discussed above, which found adverse effects at $\leq$ 5 mg/L. While the McPherson study did not find an effect at 20 mg/L, McPherson et al. used Long Evans Hooded Rats, and there is some indication in the earlier literature that this strain may be less sensitive to behavioral effects from fluoride exposure.[455]  Further, McPherson only tested males, and did not begin exposure until the 6th day of gestation, thus limiting exposure to the rats during the first trimester. The McPherson study is unlikely, therefore, to have captured the full potential sensitivity to prenatal fluoride exposure and therefore does not provide a basis for negating a LOAEL of 23 mg/L as the POD.

**LOAEL of 45 mg/L**:  In this group of studies, 45 mg/L is unquestionably an "observed adverse effect level," as it has been in many other animal studies on fluoride neurotoxicity. However, it would not be justified to use 45 mg/L from these data for derivation of an RfD, as it is the *highest* observed adverse effect level, not the lowest.  Nevertheless, for purposes of illustration, the RfD calculation below will include an assumed LOAEL of 45 mg/L as one of the PODs.

**NOAEL of 11 mg/L**:  Four of the prenatal studies used 10 or 11 mg/L for the low-dose group.[456] The two studies of mice failed to find a significant effect on learning at this level,[457] and thus 11 mg/L could conceivably be selected as a NOAEL.  The fact that the two studies that did not find effects at 11 mg/L found them at higher concentrations (23 and 45 mg/L) would be a factor weighing in favor of this choice, as the animal models were sensitive enough to find an effect.  However, the two studies finding no effects

---

[449] Bartos et al. (2018; 2019); McPherson et al. (2018).

[450] Zorrilla (1997), p. 144; Lazic and Essioux (2013), p. 3.

[451] See for example EPA (2008a), pp. 44, A-4; EPA (2008b), pp. 59, A-3; EPA (2008c), pp. 32, A-3.

[452] Cui et al. (2017); Bartos et al. (2018; 2019).  In the Chen study (which had only six rats per group), there is some indication of an effect on learning in the 4.5 mg/L group, albeit not statistically significant (Chen et al. 2018a, Figure 1).

[453] Chen et al. (2018a); Zhao et al. (2019).

[454] Liu et al. (2010; 2011); Zhang et al. (2015a); Niu et al. (2018a); Yu et al. (2019).

[455] Elliott (1967); Varner et al. (1994).

[456] Wang et al. (2018a); Sun et al. (2018); McPherson et al. (2018); Jiang et al. (2014b).

[457] Sun et al. (2018); Wang et al. (2018a).



on learning at 11 mg/L did find changes in the brain at this level,[458] consistent with 11 mg/L being a LOAEL, rather than a NOAEL.  But, for purposes of illustration, the RfD calculation below will include an assumed NOAEL of 11 mg/L as one of the PODs.

**NOAEL of 20 mg/L**:  The highest possible NOAEL that could be selected from these prenatal studies is the 20 mg/L no-effect finding from McPherson et al.[459]  While it is difficult to justify reliance on McPherson et al.'s study for the RfD analysis (due to strain of rat used, single sex, and lack of first-trimester exposure[460]), an RfD calculation will be done below using 20 mg/L as an assumed NOAEL, in order to highlight the upper bound RfD that would be permitted by the current animal data.

### *Conversion of fluoride concentration to intake per unit body weight*

Before RfDs can be calculated for the selected LOAELs or NOAELs, the unit of measurement has to be converted from a water fluoride concentration (mg/L) to an intake rate or dose (mg/kg/day).  The 2016 NTP review provides data that facilitate this analysis.[461]  In its review, the NTP estimated the doses for dozens of rodent studies by using EPA's default water consumption rates and body weight data for the species, strain, and sex of the animals studied.[462]  A review of NTP's data in Appendix 20 shows that the average ratio of fluoride concentration (mg/L) to intake rate or dose (mg/kg/day) is 6.8, while a review of NTP's data in Appendix 19 shows that the range of this ratio is generally higher for rats (typically 6 to 10) than for mice (typically 3.8 to 5).  For purposes of this analysis, I chose the low end of this range for each species (6 for rats, 3.8 for mice); this results in probable overestimates of the actual intake rates of fluoride by the animals, thereby overestimating the resulting PODs and inflating the RfDs derived from them.[463]

### D) Selection of Uncertainty Factors

The next step in deriving an RfD from animal data is to decide which uncertainty factors are applicable and to determine what the value of each uncertainty factor should be.

*Intraspecies Variability (UF$_H$)*:  As noted earlier, EPA applies a UF$_H$ of 10 to account for variability among humans unless there is "convincing data to the contrary."[464]  In the case of fluoride, the available evidence (summarized in Section 2 above) confirms that susceptibility varies greatly across the population.  While the magnitude of the variability is difficult to quantify, the available evidence does not provide any justification for using a lower value than the default of 10.  Therefore, UF$_H$ was assigned a value of 10.

*Interspecies Variability (UF$_A$)*:  A full PBTK model has not yet been developed for fluoride that would allow for the calculation of HEDs from doses given to animals.  As such, EPA's preferred approach for controlling for interspecies toxicokinetics is not available.  There is, however, some chemical-specific information for fluoride that could support application of EPA's intermediate approach.  As discussed by the NRC, rats require higher levels of fluoride in their water to achieve the same level of fluoride in their

---

[458] Sun et al. (2018); Wang et al. (2018a).

[459] McPherson et al. (2018).

[460] See also the review of McPherson et al. (2018) by Spencer and Limeback (2018).

[461] NTP (2016), Appendix 19.

[462] NTP (2016), p. 118.

[463] Using this method gives an intake rate of 0.83 mg/kg/day for rats for the 5 mg/L fluoride concentration (Table 7).  However, Bartos et al. (2018; 2019) give an estimate of 0.6 mg/kg/day for their rats and this fluoride concentration.  Using the same approach described below with Table 7 for a LOAEL of 5 mg/L, equivalent to an intake rate of 0.6 mg/kg/day, gives an RfD of 0.00005 (all four UFs) or 0.0005 (only UF$_H$ and UF$_A$), compared with 0.00007 and 0.0007 in Table 7.

[464] EPA (2013a), pp. 5-17.



blood.[465]  Dunipace estimated that rats require about 5 times more fluoride in water than humans to reach the same plasma concentration of fluoride,[466] while Den Besten's team has reported a larger margin for mice, with a difference of about a factor of 10.[467]  The data from Dunipace and Den Besten would thus support a toxicokinetics adjustment of 5 for rats and 10 for mice.  These adjustments are slightly higher, but roughly consistent with, the adjustments under the default BW^3/4 Method (4.16 for rats, 7.14 for mice).  For purposes of this analysis, I have used the BW^3/4 Method.

With respect to toxicodynamics, it has long been recognized that rodents are less susceptible (more resistant) to toxic effects from fluoride ingestion than are humans.[468]  Rats, for example, have been reported to require 10 to 25 times more fluoride than humans to develop dental fluorosis.[469]  Differences in kinetics undoubtedly contribute to rodents being less sensitive to fluorosis, but the differences appear larger than would be expected if they were due solely to kinetics.  The fluorosis data thus support the existence of differential toxicodynamics between rodents and humans.  It is unclear, however, if this difference would apply to neurotoxicity.  Accordingly, I have used EPA's default uncertainty factor of 3 for the toxicodynamic component of $UF_A$.

*Subchronic-to-Chronic ($UF_S$)*:  One of the limitations of the prenatal fluoride studies is that they have relatively short postnatal exposures.  The longest of the studies treated the rats for 6 months after birth; the remainder lasted 21 days to 3 months.  None of the studies, therefore, addresses the potential additive impact of chronic exposure.  (EPA defines a chronic exposure in rodents as one lasting at least 12 months.)[470]  Studies that have tested animals at multiple points in time have found that the effects of fluoride on the brain tend to worsen with time, with some effects not appearing at all until 3 to 6 months of exposure.[471]  By failing to reflect the real world "cradle-to-grave" exposure that humans living in fluoridated areas experience, the prenatal studies likely do not account for the full potential risk.  A subchronic-to-chronic uncertainty factor would thus be justified.  A non-conservative value of 3 was therefore selected for $UF_S$ for the RfD calculations below.

*Database Deficiency ($UF_D$)*:  There are several significant research gaps in the current database.  First, none of the animal studies on fluoride and learning have attempted to reproduce the effect of formula-feeding of human infants during what is likely a critical period of vulnerability and is definitely a period of high fluoride intake for many infants.  Specifically, in the fluoride and learning studies that have involved the pre-weaning period, the rats or mice receive their caloric intake entirely from their mother's milk, which will have substantially lower fluoride concentrations than the mother's drinking water.[472]  The rodent studies on learning thus do not provide any information on the potential impact of formula feeding.  Second, there is a dearth of chronic studies, with only one study on fluoride/learning lasting more than 12 months.[473]  The available studies thus do not reflect the risk to the elderly brain of lifetime fluoride intake and accumulation.  Taken together, these research gaps create uncertainty as to the applicability of current animal data to two potentially critical life periods of vulnerability, neonates and the elderly.  As such, it

[465] NRC (2006), pp. 98-99; pp. 442-446, Appendix D; NRC (2009), pp. 88-89.
[466] NRC (2006), pp. 98, 442.
[467] Zhang et al. (2014).
[468] Roholm (1937), pp. 265, 318; Lehman and Fitzhugh (1954), p. 33; Angmar-Mansson and Whitford (1982), p. 339.
[469] Roholm (1937), pp. 265, 318; Angmar-Mansson and Whitford (1982), p. 339.
[470] EPA (1998b), p. 1.
[471] For example, see Güner et al. (2016); Liu et al. (2011); Yang et al. (2018a); Zhang et al. (2015a).
[472] See Drinkard et al. (1985).  Measured fluoride concentrations in rat milk were 0.044, 0.349, and 0.401 mg/L, compared with fluoride concentrations in the mother's drinking water of 0, 50, and 100 mg/L, respectively.
[473] Teng et al. (2018).




would be justified to add an uncertainty factor to account for deficiencies in the database. A non-conservative UF$_D$ of 3 was chosen for the RfD calculations below.

E)  <u>RfD Calculations from Animal Data</u>

Table 7 summarizes the RfD calculations for each of the five Points of Departure (POD) listed above. Using all four uncertainty factors as described above (composite UF = 300) with the most sensitive POD (LOAEL = 5 mg/L) gives a calculated RfD value (Column J of Table 7) of 0.00007 mg/kg/day, 3 orders of magnitude less than EPA's current RfD of 0.08 mg/kg/day for severe dental fluorosis. As can be seen, even if the least conservative LOAEL (45 mg/L) or least conservative NOAEL (20 mg/L) is used as the POD, the resulting RfDs (0.0007 and 0.003 mg/kg/day; Column J in Table 7) are still well below EPA's current RfD (0.08 mg/kg/day). Further, even if no uncertainty factors are used for UF$_S$ and UF$_D$ (composite UF = 30 from UF$_H$ and UF$_A$), the resulting RfDs (0.0007 to 0.03 mg/kg/day; Column I of Table 7) are all still below the current RfD, even when using the least conservative POD. Thus, while reasonable debate can be had as to which of these PODs would be most appropriate to use, the essential point is that, *whatever POD is used, the respective RfDs fall well below EPA's current RfD*. Accordingly, the animal data are consistent with the human data (as analyzed by Grandjean) in showing that EPA's current RfD is not protective against fluoride neurotoxicity. This in turn provides further evidence that neurotoxicity is a more sensitive effect of fluoride exposure than severe dental fluorosis.

F)  <u>Additional Considerations Regarding EPA's Current Reference Dose</u>

As described above, EPA's current RfD is above (less protective than) the level that would be necessary to protect against fluoride neurotoxicity. One of the reasons that the current RfD is so high is that EPA made a policy decision to keep the RfD above the purported "adequate" (i.e., "optimal") intake of fluoride (0.05 mg/kg/day) for caries prevention.[474] There are two fundamental problems with this policy decision: <u>first</u>, it improperly conflated risk assessment with risk management, and <u>second</u>, it relied upon an outdated understanding of fluoride's mechanism of action in preventing caries.

*Risk assessment vs. risk management*

In its risk assessment, EPA stated that "Any drinking water intakes (mean or percentile) that resulted in doses that were less than or equal to the 0.05 mg/kg/day IOM AI value associated with optimal, anticaries protection were eliminated from consideration as doses causing severe dental fluorosis."[475] Moreover, EPA's representative in this litigation, Edward Ohanian, testified that EPA did not apply any uncertainty factors in its RfD calculations because doing so would have caused the RfD to be lower than the purported optimal dose.[476]

By letting considerations of a perceived benefit shape its assessment of the risk, EPA inappropriately inserted a risk management decision into a risk assessment—a violation of more than 25 years (at that time) of risk assessment guidance and practice. The National Research Council's 1983 risk assessment report states that "Even the perception that risk management considerations are influencing the conduct of risk assessment in an important way will cause the assessment and regulatory decisions based on them to lack credibility."[477] Later in the same report: "If risk management considerations (for example,

---

[474] Ohanian Deposition at pp. 203:19-205:16, 206:13-19, 329:3-7. See also EPA (2010b), pp. xv, 98, 101, 103.

[475] EPA (2010b), p. 98. See also p. 101, where an intake of 0.06 mg/kg/day was excluded from consideration. See also p. 103, in reference to a "beneficial dose of 0.05 mg/kg/day." See also p. xv in the Executive Summary: "Any doses that were less than or equal to the 0.05 mg/kg/day were eliminated from consideration as the threshold dose for severe dental fluorosis."

[476] Ohanian Deposition at pp. 203:19-205:16, 206:13-19, 329:3-7.

[477] NRC (1983), p. 49. See pp. 18-19, 48-49, 151-153.



the economic or political effects of a particular control action for a particular chemical) are seen to affect either the scientific interpretations or the choice of inference options in a risk assessment, the credibility of the assessment inside and outside the agency can be compromised, and the risk management decision itself may lose legitimacy."[478]  EPA's 1998 Guidelines, citing NRC (1983), recommend that Federal regulatory agencies establish guidelines "to promote consistency and technical quality in risk assessment, and to ensure that the risk assessment process is maintained as a scientific effort separate from risk management."[479]  One of the reviewers of EPA's 2010 dose-response (RfD) report[480] specifically pointed out this shortcoming: "the assumption that 0.05 mg/kg/day is a required amount of fluoride and that dose estimates must be above this level could be considered a weakness because the purpose of U.S. EPA's analysis was to determine risk, not to conduct risk benefit analyses."[481]

*Fluoride's Mechanism of Action for Caries Prevention*

A second fundamental problem with EPA's analysis is that it accepts the outdated premise that fluoride needs to be ingested to prevent caries.  CDC's representative in this litigation, Casey Hannan, agreed that "there is now overwhelming evidence that the primary caries-preventive mechanisms of action of fluoride are <u>post eruptive</u> through <u>topical</u> effects for both children and adults."[482]  EPA actually acknowledges this in its risk assessment, noting that fluoride's "primary" benefit comes from topical contact with the teeth.[483]  Despite this, EPA made no attempt to address research showing that the *ingestion* of fluoride has no meaningful effect on caries prevention.  Although EPA relied extensively on the Iowa Fluoride Study (IFS) to understand the relationship between fluoride ingestion and dental fluorosis,[484] EPA failed to consider IFS data showing that fluoride ingestion has no significant relationship to tooth decay.[485]

Ultimately, the most obvious problem with EPA's assumption of a benefit is that it assumes that all age groups in the population, including *infants* and *adults*, need to ingest fluoride to get the benefit.  This is at odds with current scientific understanding.  As CDC's Casey Hannan noted at his deposition, the CDC is unaware of any evidence to indicate that fluoride ingestion provides any benefit to teeth during the first 6 months of life.[486]  Hannon further testified that CDC is unaware of any benefit from prenatal fluoride exposure.[487]  Further, *any* benefit from ingesting fluoride would be limited to the period of time when the teeth are actually developing.[488]  Despite this, EPA's RfD operates on the premise that both adults and children need to ingest 0.05 mg/kg/day for caries prevention.  No biological justification is provided for this premise of a systemic benefit in adults.

---

[478] NRC (1983), p. 152.
[479] EPA (1998a), p. v; Federal Register (1998), p. 26926.
[480] EPA (2010b).
[481] EPA (2010c), p. 20.  This reviewer also pointed out that EPA's method assumed that severe dental fluorosis occurred in children with excess exposure to fluoride, rather than possibly in children who were more susceptible to adverse effects from fluoride intake.  Also see pp. 11, A-13, A-14, and B-13 of the April 2009 Peer Review Report that is included in the 2010 report (EPA 2010c).
[482] Hannan Deposition at p. 198:21-25.
[483] EPA (2010b), p. 3.
[484] EPA (2010b), pp. 21, 33, 102-103.
[485] For example, Warren et al. (2009).  See also Appendix E of this report.
[486] Hannan Deposition at pp. 224:8-11, 233:12-17.
[487] Hannan Deposition at pp. 213:19-214:3, 217:3-19.
[488] Hannan Deposition at pp. 207:10-24, 209:5-22.



Table 7.  Calculation of the RfD from the selected Points of Departure (POD), based on the studies summarized in Table 6.

| A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|
| Observation | Intake rate | POD$_{HED}$ | NOAEL | UF$_H$ = 10 | UF$_A$ = 3 | UF$_S$ = 3 | UF$_D$ = 3 | RfD(1) | RfD(2) |
| LOAEL or NOAEL from Table 6 | Column A / 6 (rats) or 3.8 (mice) | Column B × 0.24 (rats) or 0.14 (mice) | Column C / 10 (LOAEL) or 1 (NOAEL) | Column D / 10 | Column E / 3 | Column F / 3 | Column G / 3 | Column F | Column H |
| mg/L | mg/kg/day | mg/kg/day | mg/kg/day | mg/kg/day | mg/kg/day | mg/kg/day | mg/kg/day | mg/kg/day | mg/kg/day |
| 5 mg/L, LOAEL (rats) | 0.83 | 0.20 | 0.020 | 0.0020 | 0.00067 | 0.00022 | 0.000073 | 0.0007 | 0.00007 |
| 23 mg/L, LOAEL (rats) | 3.8 | 0.91 | 0.091 | 0.0091 | 0.0030 | 0.0010 | 0.00033 | 0.003 | 0.0003 |
| 45 mg/L, LOAEL (rats) | 7.5 | 1.8 | 0.18 | 0.018 | 0.0060 | 0.0020 | 0.00067 | 0.006 | 0.0007 |
| 11 mg/L, NOAEL (mice) | 2.9 | 0.41 | 0.41 | 0.041 | 0.014 | 0.0047 | 0.0016 | 0.01 | 0.002 |
| 20 mg/L, NOAEL (rats) | 3.3 | 0.79 | 0.79 | 0.079 | 0.026 | 0.0087 | 0.0029 | 0.03 | 0.003 |

Column A:  The observed LOAEL or NOAEL from Table 6.

Column B:  The observed LOAEL or NOAEL converted from mg/L to an intake rate (dose) in mg/kg/day.  For rats, the LOAEL or NOAEL is divided by 6; for mice, the NOAEL is divided by 3.8 (see explanation in text).

Column C:  The intake rate for rats or mice converted to a human equivalent dose (HED) using the BW$^{3/4}$ method (see explanation in text).  The HED = 24% of the intake rate for rats or 14% of the intake rate for mice.

Column D:  NOAEL as already obtained (NOAEL / 1) or as estimated from a LOAEL (LOAEL / 10).

Column E:  The estimated NOAEL after application of an intraspecies uncertainty factor (UF$_H$), where UF$_H$ = 10.  The NOAEL from Column D is divided by UF$_H$ (i.e., NOAEL / 10).

Column F:  The estimated NOAEL after application of an additional uncertainty factor for interspecies variability (UF$_A$), where UF$_A$ = 10.  The adjusted NOAEL from Column E is divided by UF$_A$ (i.e., NOAEL / 3).

Column G:  The estimated NOAEL after application of an additional uncertainty factor for use of a subchronic study (UF$_S$), where UF$_S$ = 3.  The adjusted NOAEL from Column F is divided by UF$_S$ (i.e., NOAEL / 3).

Column H:  The estimated NOAEL after application of an additional uncertainty factor for database deficiencies (UF$_D$), where UF$_D$ = 3.  The adjusted NOAEL from Column G is divided by UF$_D$ (i.e., NOAEL / 3).

Column I:  The value of the Reference Dose (RfD) obtained with only UF$_H$ and UF$_A$.  RfD(1) = the NOAEL value in Column F, rounded to 1 significant digit.

Column J:  The value of the Reference Dose (RfD) obtained with UF$_H$, UF$_A$, UF$_S$, and UF$_D$.  RfD(2) = the NOAEL value in Column H, rounded to 1 significant digit.



**E.  Fluoridation Chemicals Present an "Unreasonable Risk" of Neurotoxicity, as Defined by EPA**

In determining whether a chemical presents an "unreasonable risk" to human health[489] under the Toxic Substances Control Act (TSCA), EPA considers (1) the human health hazard of the chemical, (2) the extent of human exposure to the chemical, and (3) the estimated margin between the toxic effect level and human exposure.[490]   As discussed below, each of these three factors supports the conclusion that fluoridation chemicals pose an unreasonable risk to human health.  Some of the following discussion is based on EPA's P2 Framework Manual,[491] which is intended to expedite the review of new industrial chemicals proposed for manufacture or import.[492]  The general approach is based on NRC's 1983 risk assessment report[493] and is intended to identify chemicals not requiring regulation (e.g., they do not present an unreasonable risk to human health or the environment) and chemicals that do require regulation (e.g., they may present an unreasonable risk to human health or the environment, or there may be substantial human exposure).[494]  "Low hazard chemicals are dropped from further review because by their nature they will not result in risk,"[495] but a "complete risk assessment is necessary if the hazard concern is identified as high or moderate."[496]

A)  <u>Human Health Hazard of Fluoride</u>

According to EPA, "Human health hazard is relevant to whether a new chemical substance is likely to present an unreasonable risk because the significance of the risk is dependent upon both the hazard (or toxicity) of the chemical substance and the extent of exposure to the substance."[497]  EPA has established a framework for determining whether a chemical substance has a "low," "moderate," or "high" human health hazard.[498]

Under the EPA framework, a chemical "is considered to have low human health hazard if effects are observed in animal studies with a No Observed Adverse Effect Level (NOAEL) equal to or greater than 1,000 mg/kg/day." [499]

A chemical "is considered to have moderate human health hazard if effects are observed in animal studies with a NOAEL less than 1,000 mg/kg/day." [500]

Lastly, a chemical is "considered to have high human health hazard if there is evidence of adverse effects in humans or conclusive evidence of severe effects in animal studies with a NOAEL of less than or equal to 10 mg/kg/day." [501]

Under this framework, fluoride has a "high human health hazard."   <u>First</u>, as discussed earlier, adverse effects on IQ have been repeatedly observed in humans, including results from high-quality prospective cohort studies.  This is sufficient, by itself, to establish fluoride as a high human health hazard

---

[489] TSCA requires that EPA protect against unreasonable risks to "human health and the environment."  Since the focus here is on human health, risk to the environment will not be addressed.
[490] EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).
[491] EPA (2012b).
[492] EPA (2012b), p. 1-1.
[493] NRC (1983); see EPA (2012b), p. 2-2.
[494] EPA (2012b), pp. 1-6 to 1-7.
[495] EPA (2012b), p. 8-8.
[496] EPA (2012b), p. 8-8.
[497] See for example EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).
[498] EPA (2012b), pp. 8-7 and 13-9; also see, for example, EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).
[499] EPA (2012b), pp. 8-7 and 13-9; also see, for example, EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).
[500] EPA (2012b), pp. 8-7 and 13-9; also see, for example, EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).
[501] EPA (2012b), pp. 8-7 and 13-9; also see, for example, EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).



under EPA's criteria.  <u>Second</u>, there is clear evidence of adverse neurotoxic effects in animals, with *LOAELs*, not just NOAELs, below 10 mg/kg/day.  As discussed above, the LOAELs for impairment in learning and memory in rodents, and concurrent changes to the brain, range from 0.75 mg/kg/day to 6.1 mg/kg/day,[502] while the NOAELs range from 0.75 to 3.3 mg/kg/day.[503]  Fluoride thus readily qualifies as a "high human health hazard" by EPA's criteria.

### B)  Human Exposure to Fluoridation Chemicals

In its TSCA risk evaluations, EPA has recognized that "the significance of the risk is dependent upon both the hazard (or toxicity) of the chemical substance and the extent of exposure to the substance."[504] This second criterion weighs strongly in favor of an unreasonable risk finding for fluoridation chemicals, as the extent of human exposure is nothing short of massive.  Approximately 210 million Americans, or nearly 3/4 of the population, have municipal water to which fluoridation chemicals have been added.[505] Further, most of the 73 million people living in "non-fluoridated" areas will routinely consume fluoridation chemicals in processed beverages and foods, as many beverages and foods are produced in fluoridated areas.[506]

Because of the massive reach of water fluoridation, millions of highly susceptible individuals are being exposed.  By way of example, there were approximately 3.9 million children born in the U.S. in 2017.[507]  Of these children, approximately 2.9 million will have been exposed to fluoridation chemicals in the womb.  Further, since 42% of infants in the U.S. are exclusively formula-fed during the first 6 months of life,[508] approximately 1.2 million infants each year will consume fluoridation chemicals every day for their first six months.  With such widespread exposure, even small risks can amount to widespread harm.

### C)  Margin of Exposure (MOE)

Finally, in assessing whether a chemical poses an unreasonable risk under TSCA (as well as under the Guidelines[509]), EPA uses the "margin of exposure" (MOE) method.[510]  The MOE "is a ratio of the toxicity effect level to the estimated exposure dose."[511]  "The lower the MOE (margin between the toxicity effect level and the exposure dose), the more likely a chemical is to pose an unreasonable risk."[512]

---

[502] From Table 6, LOAELs for fluoride range from 4.5 to 23 mg/L in rat studies and from 11 to 23 mg/L in mouse studies.  As discussed in the previous section, these values correspond to ranges of 0.75 to 3.8 mg/kg/day in rats and 2.9 to 6.1 mg/kg/day in mice, with these values representing probable overestimates.

[503] From Table 6, NOAELs for fluoride range from 4.5 to 20 mg/L in rat studies and 11 mg/L in mouse studies, with several studies having no NOAEL (effects were found at the lowest doses used).  As discussed in the previous section, these values correspond to a range of 0.75 to 3.3 mg/kg/day in rats and a value of 2.9 mg/kg/day in mice, with these values representing probable overestimates.

[504] See for example EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).  See also EPA (2012b), p. 8-8.

[505] CDC (2016).

[506] See, for example, Kiritsy et al. (1996); Turner et al. (1998); Heilman et al. (1999).

[507] Centers for Disease Control. Births and Natality.  [Available at: https://www.cdc.gov/nchs/fastats/births.htm].

[508] CDC (2018; n.d.).

[509] EPA (1998a), pp. 65-66; Federal Register (1998), pp. 26949-26950.

[510] Although EPA has described the MOE method as "just one of several approaches to risk characterization" that may be used under TSCA (Federal Register 2017, p. 33735), a review of its risk evaluations shows that, *in practice*, the Agency almost always uses this method.

[511] EPA (2012b), p. 13-8.

[512] EPA (2012b), p. 13-8.



An acceptable margin between toxicity and human exposure is called an "acceptable MOE"[513] or a "benchmark MOE."[514]  If the calculated MOE "is equal to or exceeds the benchmark MOE, the new chemical substance is not likely to present an unreasonable risk."[515]

*Benchmark MOE*

The benchmark (or acceptable) MOE is generally 100 for a risk assessment based on a NOAEL from animal data and 1000 for a risk assessment based on a LOAEL from animal data.[516]  The benchmark MOE accounts for the variation in sensitivity among the human population ($UF_H = 10$), extrapolation between animals and humans ($UF_A = 10$), and (for use of a LOAEL) the LOAEL-to-NOAEL extrapolation ($UF_L = 10$).[517]  In other words, EPA will conclude that no risk exists if human exposure to the chemical is at least 100 times lower than the NOAEL or at least 1000 times lower than the LOAEL.  Where allometric scaling is used to derive the effect level, UFH is reduced to 3, for a benchmark MOE of 30 or 300 (for assessments based on a NOAEL or LOAEL, respectively).[518]

*Exposure Assessment*

In estimating human exposure to a chemical, EPA's Guidelines state that the assessment should consider "highly exposed individuals or highly sensitive or susceptible individuals."[519]  Consistent with this, EPA's MOE analyses under TSCA generally consider the highest-exposed group in the population (usually occupationally-exposed workers).[520]  In addition, when dealing with chemicals that may be present in drinking water, EPA's MOE analyses under TSCA separately consider the exposure of members of the public, both adults and infants.[521]  The separate treatment of infants in the MOE analysis is supported by the fact that infants have the highest intake of water, by body weight, of any age group in the population.[522]  Finally, "EPA considers consumers of specific products to be a potentially exposed or susceptible subpopulation on the basis of greater exposure potential compared to the general population who do not use specific products."[523]

*Human Exposure to Fluoride*

Consistent with EPA's risk evaluations under TSCA, the example exposure estimates described here (summarized in Table 8) consider a range of exposures, representing the general adult population along with highly exposed population subgroups, including bottle-fed infants and individuals with high water intakes (for example, due to medical conditions or to physical exertion).  All estimates are based on a water fluoride concentration of 0.7 mg/L.  For the general adult population, I have combined NRC's estimates for adult consumers of municipal water, ages 20-24 and 25-54 years (0.011 mg/kg/day).[524]  As an example of elderly adults (ages 65+), I have included the 90th percentile of adult consumers of municipal water (0.022

---

[513] EPA (2012b), p. 13-8.

[514] See for example EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).

[515] See for example EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).

[516] See for example EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019); EPA (2012b), p. 13-8.

[517] See for example EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).  The benchmark MOE does not include the other two uncertainty factors that are typically used (UF$_S$ for subchronic-to-chronic studies and UF$_D$ for database adequacy).

[518] See for example EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).

[519] EPA (1998a), p. 3; Federal Register (1998), p. 26928.

[520] See for example EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).

[521] See for example EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).

[522] See for example EPA (2000a; 2004b).

[523] See for example EPA (2018c; 2018d; 2018e; 2018f; 2018g; 2018h; 2019).

[524] NRC (2006), p. 430, Table B-11.



mg/kg/day).[525]  To account for individuals with high water intakes, I have used the NRC's waterborne fluoride intake estimates (at 0.7 mg/L) for adult athletes and physical laborers (0.05 mg/kg/day), children with diabetes mellitus (0.07 mg/kg/day), and individuals with nephrogenic diabetes insipidus (0.1 mg/kg/day).[526]  For bottle-fed infants with high exposure, I have used the 95th percentile of infant consumers of municipal water, ages < 6 months (0.14 mg/kg/day).[527]  Note that none of these exposure estimates, even those labeled "high," can be considered an upper bound or maximum exposure.

For infants, an estimate of typical exposure can be derived from Fomon et al.[528] and Harriehausen et al.[529]  As discussed above, based on estimates by Fomon et al., infants consuming powdered formula prepared with fluoridated water (0.7 mg/L) will typically ingest between 0.08 to 0.115 mg/kg/day.[530]  Consistent with this, Harriehausen et al. estimated that infants consuming formula reconstituted with fluoridated water will ingest an average of 0.11 mg/kg/day at ages 2 and 4 months and 0.09 mg/kg/day at age 6 months.[531]  For purposes of this analysis, therefore, infant exposure to fluoridation chemicals is non-conservatively placed at 0.1 mg/kg/day, the same value as used for children and adults with nephrogenic diabetes insipidus.  It is important to stress that this represents a *typical* exposure among bottle-fed infants, it does *not* represent the upper bound.

Table 8 provides the MOEs for the above-mentioned populations, for each of the LOAELs and NOAELs previously considered (Tables 6 and 7).  As can be seen, the observed MOEs are below the benchmark MOE (300 for LOAELs and 30 for NOAELs) for each group and every POD, with the exception of adults when using the NOAEL-based PODs (for which the benchmark MOE = 30).  Under EPA's own criteria, therefore, a risk of fluoride neurotoxicity could exist for each and every one of these populations, particularly infants.  By way of comparison, Table 9 provides examples of recent EPA risk evaluations that separately considered adults and infants in the MOE analysis.  For these chemicals, the MOEs greatly exceeded the benchmark MOEs in nearly all cases.

D)  <u>Summary of Unreasonable Risk Analysis</u>

As demonstrated above, fluoridation chemicals qualify as an unreasonable risk under the criteria that EPA has used in its TSCA risk evaluations.  First, fluoride is a "high human health hazard" under EPA's framework for hazard classification, given both that observed LOAELs and NOAELs are very low and that high-quality studies in humans have repeatedly shown neurotoxic effects.  Second, there is unquestionably widespread human exposure to fluoridation chemicals among both the general population and susceptible subsets of the population.  Third, the margins of exposure between the toxicity levels in animals and the exposure levels in humans are far below the benchmark MOEs.

Consistent with this analysis, recent prospective birth cohort studies have found significant reductions in IQ at maternal urinary fluoride levels that are widely exceeded by pregnant women living in fluoridated areas.[532]  Thus, the animal and human data are consistent in demonstrating a risk of neurotoxic harm from current exposure levels to fluoridation chemicals.

---

[525] NRC (2006), p. 431, Table B-12.
[526] NRC (2006), p. 35, Table 2-4.
[527] NRC (2006), p. 432, Table B-13.
[528] Fomon et al. (2000).
[529] Harriehausen et al. (2019).
[530] Fomon et al. (2000), Table 2.
[531] Harriehausen et al. (2019).
[532] Bashash et al. (2017); Till et al. (2018); Green (2018).



Table 8.  Calculated Margins of Exposure (MOEs)[a] for selected human population subgroups for the NOAELs and LOAELs for fluoride in Section 4.

| Observation[b] | Intake rate[c] | Human Equivalent Dose (HED)[d] | Estimated human exposures[e] | | | | | |
|---|---|---|---|---|---|---|---|---|
| LOAEL or NOAEL | LOAEL or NOAEL | LOAEL or NOAEL | Adults (average) | Elderly adults (90th percentile) | Athletes and laborers (high) | DM patients (high) | Bottle-fed infants (typical) NDI patients (high) | Bottle-fed infants (high) |
| mg/L | mg/kg/day | mg/kg/day | 0.011 mg/kg/day | 0.022 mg/kg/day | 0.05 mg/kg/day | 0.07 mg/kg/day | 0.1 mg/kg/day | 0.14 mg/kg/day |
| 5 mg/L, LOAEL (rats) | 0.83 | 0.20 | 18 | 9.1 | 4.0 | 2.9 | 2.0 | 1.4 |
| 23 mg/L, LOAEL (rats) | 3.8 | 0.91 | 83 | 41 | 18 | 13 | 9.1 | 6.5 |
| 45 mg/L, LOAEL (rats) | 7.5 | 1.8 | 163 | 82 | 36 | 26 | 18 | 13 |
| 11 mg/L, NOAEL (mice) | 2.9 | 0.41 | 37 | 19 | 8.2 | 5.9 | 4.1 | 2.9 |
| 20 mg/L, NOAEL (rats) | 3.3 | 0.79 | 72 | 36 | 16 | 11 | 7.9 | 5.6 |

[a] A Margin of Exposure (MOE) is equal to the LOAEL or NOAEL (mg/kg/day) divided by an estimated human exposure (mg/kg/day).  Usually, the benchmark MOE = 1000 for assessments based on a LOAEL and 100 for assessments based on an NOAEL.  Since allometric scaling between animals and humans has been used to obtain the Human Equivalent Dose, the benchmark MOE is 300 for LOAELs and 30 for NOAELs.  An MOE greater than the benchmark MOE indicates a significant chance that an exposure will reach the level associated with a toxic effect.

[b] These LOAEL and NOAEL values (mg/L) for fluoride are described in Section 4 (summarized in Table 6).

[c] The intake rates (mg/kg/day) in this column correspond to the LOAELs and NOAELs in the first column (mg/L), converted to intake rates (mg/kg/day) as described in Section 4 (summarized in Table 7).  For rats, the intake rate equals the LOAEL or NOAEL divided by 6.  For mice, the intake rate equals the NOAEL divided by 3.8.

[d] The Human Equivalent Dose (HED) is calculated from the intake rate for rats or mice as described in Section 4 (summarized in Table 7).  The HED = the intake rate for rats × 0.24 or the intake rate for mice × 0.14.

[e] The estimated human exposures are for fluoride exposures from drinking water alone, assuming a fluoride concentration of 0.7 mg/L in the drinking water.  Sources are as follows:
Adults (average), NRC (2006), p. 430, Table B-11, average consumers ages 20-54;
Elderly adults (90th percentile), NRC (2006), p. 431, Table B-12, 90th percentile consumers ages 65+;
Athletes and laborers (high), NRC (2006), p. 35, Table 2-4, high consumers (but not upper bound);
DM patients (high), NRC (2006), p. 35, Table 2-4, patients with diabetes mellitus, high consumers (but not upper bound);
Bottle-fed infants (typical), based on Fomon et al. (2000) and Harriehausen et al. (2019); see details in the text.
NDI patients (high), NRC (2006), p. 35, Table 2-4, patients with nephrogenic diabetes insipidus, high consumers (but not upper bound);
Bottle-fed infants (high), NRC (2006), p. 432, Table B-13, infants < 0.5 years old, 95th percentile consumers (but not upper bound).



Table 9.  Examples of MOE analyses from recent TSCA risk evaluations (Premanufacture Notices) for exposures of the general public from drinking water.

| Chemical | MOE Benchmark | MOE Adults | MOE Infants | Effect | Reference |
|---|---|---|---|---|---|
| Alkylsilsesquioxane, ethoxy-terminated | 100 | 155,280 | 37,237 | Developmental | EPA (2018c) |
| Substituted carbomonocycle, polymer with alkyl alkenoate, alkenyl substituted carbomonocycle, substituted alkanediol, heteropolycycle, alkylene glycol and alkenoic acid, compd. with alkylamino alkanol | 1,000 | 9,764,671 | 2,324,921 | Reproductive/ Developmental | EPA (2018d) |
| Polysiloxane-polyester polyol carboxylate | 100 | 8,772 | 2,104 | Developmental | EPA (2018e) |
| Glycerides, soya mono- and di-, epoxidized, acetates (CASRN: 2097734-14-8) | 100 | 65,400 | 15,600 | Kidney/Liver | EPA (2018f) |
| Glycerides, C16-18 and C18-unsatd. mono- and di-, epoxidized, acetates (CASRN: 2097734-15-9) | 100 | 65,400 | 15,600 | Kidney/Liver | EPA (2018f) |
| Diisocyanate polymer blocked with alkoxyamine. | 100 | 355,000 | 84,600 | Kidney/Adrenal | EPA (2018g) |
| Polyglycerol reaction product with acid anhydride, etherified | 1,000 | 170,000 | 42,000 | Systemic toxicity | EPA (2018h) |
| Butanedioic acid, polymer with 2-ethyl-2-(hydroxymethyl)-1,3-propanediol, 2,5-furandione and 1,3-propanediol, 3a,4,5,6,7,7a-hexahydro-4,7-methano-1H-inden-5(or 6)-yl ester | 100 | 2,198 | 523 | Reproductive/ Developmental | EPA (2019) |



## III.  CONCLUSIONS

As described above, the evidence that fluoride presents a hazard of neurotoxicity to humans is sufficient according to EPA's risk assessment principles and practices, in keeping with EPA's *Guidelines for Neurotoxicity Risk Assessment* and other EPA reports.  This evidence comes from controlled animal studies and from epidemiological studies in human populations.  Both kinds of evidence demonstrate that neurotoxicity is a more sensitive endpoint of fluoride exposure than is severe dental fluorosis, and there are identifiable windows of susceptibility, in terms of life stages that are more vulnerable to fluoride effects, especially the fetus and infants.  Certain identifiable subsets of the human population have increased susceptibility to harm from fluoridation chemicals, with respect to elevated exposures, higher sensitivities, or both.  These populations include the fetus, bottle-fed infants whose formula is prepared with fluoridated water, the elderly, individuals with nutrient deficiencies or kidney disease, individuals with high water intake, and populations with specific genotypes.  The current EPA reference dose (RfD) for fluoride (0.08 mg/kg/day) is not protective against neurotoxicity, and it is routinely exceeded by many individuals in fluoridated communities, especially bottle-fed infants whose formula is prepared with fluoridated water. Finally, if the same procedures and standards used by EPA in its risk evaluations of other chemicals under TSCA are employed for fluoride, it is readily apparent that fluoridation chemicals present an "unreasonable risk" of neurotoxic effects, including IQ loss.

*Kathleen M. Thiessen*
_____
Kathleen M. Thiessen
June 27, 2019



## IV.      REFERENCES

ADA (American Dental Association). 2005. Fluoridation facts. Chicago, IL: American Dental Association. [Available:  http://www.ada.org/sections/professionalResources/pdfs/fluoridation_facts.pdf]

Adair, S.M., C.M. Hanes, C.M. Russell, and G.M. Whitford.  1999.  Dental caries and fluorosis among children in a rural Georgia area.  Pediatr. Dent. 21(2):81-85.

Adebayo, O.L., Shallie, P.D., Salau, B.A., Ajani, E.O., and Adenuga, G.A. 2013. Comparative study on the influence of fluoride on lipid peroxidation and antioxidants levels in the different brain regions of well-fed and protein undernourished rats. Journal of Trace Elements in Medicine and Biology 27(4):370-4.

Adedara, I.A., Abolaji, A.O., Idris, U.F., Olabiyi, B.F., Onibiyo, E.M., Ojuade, T.D., and Farombi, E.O. 2017a. Neuroprotective influence of taurine on fluoride-induced biochemical and behavioral deficits in rats. Chemico-Biological Interactions 261:1-10.

Adedara, I.A., Olabiyi, B.F., Ojuade, T.D., Idris, U.F., Onibiyo, E.M., and Farombi, E.O. 2017b. Taurine reverses sodium fluoride-mediated increase in inflammation, caspase-3 activity, and oxidative damage along the brain–pituitary–gonadal axis in male rats. Canadian Journal of Physiology and Pharmacology 95(9):1019-1029.

Aggeborn, L., and Öhman, M. 2017. The Effects of Fluoride in the Drinking Water. Institute for Evaluation of Labour Market and Education Policy, Uppsala, Sweden (Working Paper 2017:20, ISSN 1651-1166).

Agustina, F., Sofro, Z.M., and Partadiredja, G. 2018. Subchronic administration of high-dose sodium fluoride causes deficits in cerebellar Purkinje cells but not motor coordination of rats. Biological Trace Element Research [Epub ahead of print].

Akinrinade, I.D., Memudu, A.E., Ogundele, O.M., and Ajetunmobi, O.I. 2015a. Interplay of glia activation and oxidative stress formation in fluoride and aluminium exposure. Pathophysiology 22(1):39-48.

Akinrinade, I.D., Memudu, A.E., and Ogundele, O.M. 2015b. Fluoride and aluminium disturb neuronal morphology, transport functions, cholinesterase, lysosomal and cell cycle activities. Pathophysiology 22(2):05-15.

Alarcón-Herrera, M.T., Martín-Domínguez, I.R., Trejo-Vázquez, R., and Rodriguez-Dozal, S. 2001. Well water fluoride, dental fluorosis, and bone fractures in the Guadiana Valley of Mexico. Fluoride 34:139-149.

Alhava, E.M., Olkkonen, H., Kauranen, P., and Kari, T. 1980. The effect of drinking water fluoridation on the fluoride content, strength and mineral density of human bone. Acta Orthopaedica Scandinavica 51(3):413-20.

Alvarez, J.O. 1995. Nutrition, tooth development, and dental caries.  Am. J. Clin. Nutr. 61S:410S-416S.

Alvarez, J.O., and Navia, J.M.  1989.  Nutritional status, tooth eruption, and dental caries:  a review.  Am. J. Clin. Nutr. 49:417-426.

Ameeramja, J., Raghunath, A., and Perumal, E. 2018. Tamarind seed coat extract restores fluoride-induced hematological and biochemical alterations in rats. Environmental Science and Pollution Research International 25(26):26157-26166.

An, J., Mei, S., Liu, A., Fu, Y., Wang, Q., Hu, L., and Ma, L. 1992. The effects of high fluoride on the level of intelligence of primary and secondary students. Chinese Journal of Control of Endemic Diseases 7(2):93-94.

An, N., Zhu, J., Ren, L., Liu, X. Zhou, T., Huang, H., Sun, L., Ding, Z., Li, Z., Cheng, X., and Ba, Y. 2019. Trends of SHBG and ABP levels in male farmers: Influences of environmental fluoride exposure and ESR alpha gene polymorphisms. Ecotoxicology and Environmental Safety 172:40-44.



Angmar-Mansson, B., and Whitford, G.M. 1982. Plasma fluoride levels and enamel fluorosis in the rat. Caries Research 16:334-339.

Armstrong, W.D., Singer, L., and Makowski, E.L. 1970. Placental transfer of fluoride and calcium. Am. J. Obstet. Gynecol. 107(3):432-434.

Arnala, I., Alhava, E.M., and Kauranen, P. 1985. Effects of fluoride on bone in Finland. Histomorphometry of cadaver bone from low and high fluoride areas. Acta Orthopaedica Scandinavica 56(2):161-6.

Atmaca, N., Atmaca, H.T., Kanici, A., and Anteplioglu, T. 2014. Protective effect of resveratrol on sodium fluoride-induced oxidative stress, hepatotoxicity and neurotoxicity in rats. Food and Chemical Toxicology 70:191-97.

ATSDR (Agency for Toxic Substances and Disease Registry). 2003. Toxicological Profile for Fluorides, Hydrogen Fluoride, and Fluorine. U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, Atlanta, GA, September 2003.

ATSDR (Agency for Toxic Substances and Disease Registry). 2018. Minimal Risk Levels (MRLs) for Professionals (June 21, 2018). (https://www.atsdr.cdc.gov/mrls/index.asp; accessed November 29, 2018).

Ausó, E., Lavado-Autric, R., Cuevas, E., Escobar del Rey, F., Morreale de Escobar, G., and Berbel, P. 2004. A moderate and transient deficiency of maternal thyroid function at the beginning of fetal neocorticogenesis alters neuronal migration. Endocrinology 145(9):4037-4047.

Ba, Y., Zhang, H., Wang, G., Wen, S., Yang, Y., Zhu, J., Ren, L., Yang, R., Zhu, C., Li, H., Cheng, X., and Cui, L. 2011. Association of dental fluorosis with polymorphisms of estrogen receptor gene in Chinese children. Biol. Trace Elem. Res. 143:87-96.

Balaji, B., Kumar, E.P., and Kumar, A. 2015. Evaluation of standardized Bacopa monniera extract in sodium fluoride induced behavioural, biochemical, and histopathological alterations in mice. Toxicology and Industrial Health 31(1):18-30.

Banala, R.R., and Karnati, P.R. 2015. Vitamin A deficiency: an oxidative stress marker in sodium fluoride (NaF) induced oxidative damage in developing rat brain. International Journal of Developmental Neuroscience 47(Pt B):298-303.

Banji, D., Banji, O.J., Pratusha, N.G., and Annamalai, A.R. 2013. Investigation on the role of *Spirulina platensis* in ameliorating behavioural changes, thyroid dysfunction and oxidative stress in offspring of pregnant rats exposed to fluoride. Food Chemistry 140(1-2):321-31.

Barberio, A., Quiñonez, C., Hosein, F.S., and McLaren, L. 2017. Fluoride exposure and reported learning disability diagnosis among Canadian children: Implications for community water fluoridation. Can. J. Public Health 108(3):e229-e239.

Barnes, D.G., and Dourson, M. 1988. Reference Dose (RfD): Description and use in health risk assessments. Regulatory Toxicology and Pharmacology 8:471-486.

Bartos, M., Gumilar, F., Bras, C., Gallegos, C.E., Giannuzzi, L., Cancela, L.M., and Minetti, A. 2015. Neurobehavioural effects of exposure to fluoride in the earliest stages of rat development. Physiol. Behav. 147:205-212.



Bartos, M., Gumilar, F., Gallegos, C.E., Bras, C, Dominguez, S., Mónaco, N., Esandi, M.D.C., Bouzat, C., Cancela, L.M., and Minetti, A. 2018. Alterations in the memory of rat offspring exposed to low levels of fluoride during gestation and lactation: Involvement of the α7 nicotinic receptor and oxidative stress. Reproductive Toxicology 81:108-114.

Bartos, M., Gumilar, F., Gallegos, C.E., Bras, C., Dominguez, S., Cancela, L.M., and Minetti, A. 2019. Effects of perinatal fluoride exposure on short- and long-term memory, brain antioxidant status, and glutamate metabolism of young rat pups. International Journal of Toxicology (doi: 10.1177/1091581819857558. [Epub ahead of print].

Basha, P.M., and Madhusudhan, N. 2010. Pre and post natal exposure of fluoride induced oxidative macromolecular alterations in developing central nervous system of rat and amelioration by antioxidants. Neurochemical Research 35(7):1017-28.

Basha, P.M., Rai, P., and Begum, S. 2011a. Evaluation of fluoride-induced oxidative stress in rat brain: a multigeneration study. Biological Trace Element Research 142(3):623-37.

Basha, P.M., Rai, P., and Begum, S. 2011b. Fluoride toxicity and status of serum thyroid hormones, brain histopathology, and learning memory in rats: a multigenerational assessment. Biological Trace Element Research 144(1-3):1083-94.

Basha, P.M., and Sujitha N.S. 2012a. Combined influence of intermittent exercise and temperature stress on the modulation of fluoride toxicity. Biological Trace Element Research 148(1):69-75.

Basha, P.M., and Sujitha, N.S. 2012b. Combined impact of exercise and temperature in learning and memory performance of fluoride toxicated rats. Biological Trace Element Research 150(1-3):306-13.

Basha, P.M., and Saumya, S.M. 2013. Suppression of mitochondrial oxidative phosphorylation and TCA enzymes in discrete brain regions of mice exposed to high fluoride: amelioration by *Panax ginseng* (Ginseng) and *Lagerstroemia speciosa* (Banaba) extracts. Cellular and Molecular Neurobiology 33(3):453-64.

Bashash, M., Thomas, D., Hu, H., Martinez-Mier, E.A., Sanchez, B.N., Basu, N., Peterson, K.E., Ettinger, A.S., Wright, R., Zhang, Z., Liu, Y., Schnaas, L., Mercado-García, A., Téllez-Rojo, M.M., and Hernández-Avila, M. 2017. Prenatal fluoride exposure and cognitive outcomes in children at 4 and 6-12 years of age in Mexico. Environmental Health Perspectives (https://doi.org/10.1289/EHP655).

Bashash, M., Marchand, M., Hu, H., Till, C., Martinez-Mier, E.G., Sanchez, B.N., Basu, N., Peterson, K.E., Green, R., Schnaas, L., Mercado-García, A., Hernández-Avila, MN., and Téllez-Rojo, M.M. 2018. Prenatal fluoride exposure and attention deficit hyperactivity disorder (ADHD) symptoms in children at 6-12 years of age in Mexico City. Environment International 121:658-666.

Bassin, E.B., Wypij, D., Davis, R.B., and Mittleman, M.A. 2006. Age-specific fluoride exposure in drinking water and osteosarcoma (United States). Cancer Causes Control. 17(4):421-428.

Bayless, T.M., Brown, E., and Paige, D.M. 2017. Lactase non-persistence and lactose intolerance. Curr. Gastroenterol. Rep. 19:23.

Belfort, M.B., Rifas-Shiman, S.L., Kleinman, K.P., Guthrie, L.B., Bellinger, D.C., Taveras, E.M., Gillman, M.W., and Oken, E. 2013. Infant feeding and childhood cognition at ages 3 and 7 years: Effects of breastfeeding duration and exclusivity. JAMA Pediatr. 167(9):836-844.

Bellinger, D.C. 2018. Environmental chemical exposures and neurodevelopmental impairments in children. Pediatric Medicine (http://dx.doi.org/10.21037/pm.2018.11.03).



Bera, I., Sabatini, R., Auteri, P., Flace, P., Sisto, G., Montagnani, M., Potenza, M.A., Marasciulo, F.L., Carratu, M.R., Coluccia, A., Borracci, P., Tarullo, A., and Cagiano, R. 2007. Neurofunctional effects of developmental sodium fluoride exposure in rats. European Review for Medical and Pharmacological Sciences 11(4):211-24.

Bhagavatula Naga, P. 2009. Fluorosis in the early permanent dentition: Evaluating gene-environment interactions. Master of Science thesis, University of Iowa, Iowa City, Iowa.

Bharti, V.K., and Srivastava, R.S. 2009. Fluoride-induced oxidative stress in rat's brain and its amelioration by buffalo (Bubalus bubalis) pineal proteins and melatonin. Biological Trace Element Research 130(2):131-40.

Bharti, V.K., and Srivastava, R.S. 2011. Effect of pineal proteins at different dose level on fluoride-induced changes in plasma biochemicals and blood antioxidants enzymes in rats. Biological Trace Element Research 141(1-3):275-82.

Bharti, V.K., Srivastava, R.S., Anand, A.K., and Kusum, K. 2012. Buffalo (Bubalus bubalis) epiphyseal proteins give protection from arsenic and fluoride-induced adverse changes in acetylcholinesterase activity in rats. Journal of Biochemical and Molecular Toxicology 26(1):10-5.

Blayney, J.R., and Hill, I.N. 1964. Evanston Dental Caries Study. XXIV. Prenatal fluorides—value of waterborne fluorides during pregnancy. J. Am. Dental Association 69:291-294.

Boutwell, B.B., Young, J.T.N., and Meldrum, R.C. 2018. On the positive relationship between breastfeeding & intelligence. Developmental Psychology 54(8):1426-1433.

Brambilla, E., Belluomo, G., Malerba, A., Buscaglia, M., and Strohmenger, L. 1994. Oral administration of fluoride in pregnant women, and the relation between concentration in maternal plasma and in amniotic fluid. Archs. oral Biol. 39(11):991-994.

Broadbent, J.M., Thomson, W.M., Ramrakha, S., Moffitt, T.E., Zeng, J., Foster Page, L.A., and Poulton, R. 2015. Community water fluoridation and intelligence: Prospective study in New Zealand. American. Journal of Public Health 105(1):72-76.

Broadbent, J.M., Thomson, W.M., Moffitt, T.E., and Poulton R. 2016. Broadbent et al. Respond. American Journal of Public Health 106(2):213-4.

Brown-Riggs, C. 2016. Nutrition and health disparities: The role of dairy in improving minority health outcomes. International Journal of Environmental Research and Public Health 13:28.

Bruening, K., Kemp, F.W., Simone, N., Holding, Y., Louria, D.B., and Bogden, J.D. 1999. Dietary calcium intakes of urban children at risk of lead poisoning. Environmental Health Perspectives 107(6):431-435

Byers, K.G., and Savaiano, D.A. 2005. The myth of increased lactose intolerance in African-Americans. J. American College of Nutrition 24(6):569S-573S.

Caldwell, K.L., Makhmudov, A., Ely, E., Jones, R.L., and Wang, R.Y. 2011. Iodine status of the U.S. population, National Health and Nutrition Examination Survey, 2005-2006 and 2007-2008. Thyroid 21(4):419-427.

Call, R.A., Greenwood, D.A., LeCheminant, W.H., Shupe, J.L., Nielsen, H.M., Olson, L.E., Lamborn, R.E., Mangelson, F.L., and Davis, R.V. 1965. Histological and chemical studies in man on effects of fluoride. Public Health Reports 80(6):529-538.

Cao, K., Xiang, J., Dong, Y.T., Xu, Y., Song, H., Zeng, X.X., Ran, L.Y., Hong, W., and Guan, Z.Z. 2019. Exposure to fluoride aggravates the impairment in learning and memory and neuropathological lesions in mice carrying the APP/PS1 double-transgenic mutation. Alzheimer's Research & Therapy 11:35.



Carlson, C.H., Singer, L., and Armstrong, W.D. 1960. Radiofluoride distribution in tissues of normal and nephrectomized rats. Proceedings of the Society for Experimental Biology and Medicine 103:418-20.

CDC (Centers for Disease Control and Prevention). 1993. Fluoridation Census 1992. Atlanta, GA, U.S. Department of Health and Human Services.

CDC (Centers for Disease Control and Prevention). 2001. Recommendations for Using Fluoride to Prevent and Control Dental Caries in the United States. Morbidity and Mortality Weekly Report 50(RR-14). Atlanta, GA: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention.

CDC (Centers for Disease Control and Prevention). 2005. Surveillance for Dental Caries, Dental Sealants, Tooth Retention, Edentulism, and Enamel Fluorosis—United States, 1988-1994 and 1999-2002. Morbidity and Mortality Weekly Report 54(SS3):1-43. Atlanta, GA: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention.

CDC (Centers for Disease Control and Prevention). 2008. Trace Elements: Iodine. In: National Report on Biochemical Indicators of Diet and Nutrition in the U.S. Population 1999-2002. National Center for Environmental Health, NCEH Pub. No. 08-2982c (July 2008).

CDC (Centers for Disease Control and Prevention). 2016. Water Fluoridation Data & Statistics. Division of Oral Health, September 7, 2016. (https://www.cdc.gov/fluoridation/statistics/index.htm; retrieved December 15, 2018).

CDC (Centers for Disease Control and Prevention). 2017. Results: Breastfeeding and Infant Feeding Practices: Infant Feeding Practices Study II and Its Year Six Follow-Up. Chapter 3. Infant Feeding. (https://www.cdc.gov/breastfeeding/data/ifps/results.htm#ch3; last reviewed December 5, 2017; retrieved February 11, 2019).

CDC (Centers for Disease Control and Prevention). 2018. Results: Breastfeeding Rates. Breastfeeding among U.S. Children born 2009-2015, CDC National Immunization Survey. (https://www.cdc.gov/breastfeeding/data/nis_data/results.html; last reviewed August 1, 2018; retrieved February 6, 2019).

CDC (Centers for Disease Control and Prevention). Not dated. Rates of Any and Exclusive Breastfeeding by Socio-demographics among Children Born in 2015. (https://www.cdc.gov/breastfeeding/data/nis_data/rates-any-exclusive-bf-socio-dem-2015.htm; retrieved February 6, 2019).

Chachra, D., Limeback, H., Willett, T.L., and Grynpas, M.D. 2010. The long-term effects of water fluoridation on the human skeleton. Journal of Dental Research 89(11):1219-23.

Chauhan, S.S., Ojha, S., and Mahmood, A. 2013. Effects of fluoride and ethanol administration on lipid peroxidation systems in rat brain. Indian Journal of Experimental Biology 51:249-55.

Chen, Y., Han, F., Zhou, Z., Zhang, H., Jiao, X., Zhang, S., Huang, M., Chang, T., and Dong, Y. 1991. Research on the intellectual development of children in high fluoride areas. Chinese Journal of Control of Endemic Diseases 6 Suppl. 99-100. (Republished in Fluoride 2008, 41(2):120-124.)

Chen, J., Shan, K.R., Long, Y.G., Wang, Y.N., Nordberg, A., and Guan, Z.Z. 2003. Selective decreases of nicotinic acetylcholine receptors in PC12 cells exposed to fluoride. Toxicology 183(1-3):235-42.

Chen, J., Niu, Q., Xia, T., Zhou, G., Li, P., Zhao, Q., Xu, C., Dong, L., Zhang, S., and Wang, A. 2018a. ERK1/2-mediated disruption of BDNF–TrkB signaling causes synaptic impairment contributing to fluoride–induced developmental neurotoxicity. Toxicology 410:222-230.



Chen, K., Didsbury, M., van Zwieten, An., Howell, M., Kim, S., Tong, A., Howard, K., Nassar, N., Barton, B., Lah, S., Lorenzo,m J., Strippoli, G., Palmer, S., Teixeira-Pinto, A., Mackie, F., McTaggart, S., Walker, A., Kara, T., Craig, J.C., and Wong, G. 2018b. Neurocognitive and educational outcomes in children and adolescents with CKD: A systematic review and meta-analysis. Clin. J. Am. Soc. Nephrol. 13(3):387-397.

Cheng, K.K., Chalmers, I., and Sheldon, T.A. 2007. Adding fluoride to water supplies. BMJ 335:699-702.

Chioca, L.R., Raupp, I.M., Da Cunha, C., Losso, E.M., and Andreatini, R. 2008. Subchronic fluoride intake induces impairment in habituation and active avoidance tasks in rats. European Journal of Pharmacology 579(1-3):196-201.

Choi, A.L., Sun, G., Zhang, Y., and Grandjean, P. 2012. Developmental fluoride neurotoxicity: A systematic review. Environmental Health Perspectives 120(10):1362-1368.

Choi, A.L., Grandjean, P., Sun, G., and Zhang, Y. 2013. Developmental fluoride neurotoxicity: Choi et al. respond. Environmental Health Perspectives 121(3): A70.

Choi, A.L., Zhang, Y., Sun, G., Bellinger, D.C., Wang, K., Yang, X.J., Li, J.S., Zheng, Q., Fu, Y., and Grandjean, P. 2015. Association of lifetime exposure to fluoride and cognitive functions in Chinese children: A pilot study. Neurotoxicology and Teratology 47:96-101.

Chouhan, A., and Flora, S.J.S. 2008. Effects of fluoride on the tissue oxidative stress and apoptosis in rats: biochemical assays supported by IR spectroscopy data. Toxicology 254(1-2):61-7.

Chouhan, S., Lomash, V., and Flora, S.J. 2010. Fluoride-induced changes in haem biosynthesis pathway, neurological variables and tissue histopathology of rats. Journal of Applied Toxicology 30(1):63-73.

Coplan, M.J., Patch, S.C., Masters, R.D., and Bachman, M.S. 2007. Confirmation of and explanations for elevated blood lead and other disorders in children exposed to water disinfection and fluoridation chemicals. NeuroToxicology 28:1032-1042.

Cote, S., P. Geltman, M. Nunn, K. Lituri, M. Henshaw, and R.I. Garcia. 2004. Dental caries of refugee children compared with US children. Pediatrics 114:e733–e740. [Available at www.pediatrics.org/cgi/doi/10.1542/peds.2004-049]

Cui, Y.S., Zhong, Q., Li, W.F., Liu, Z.H., Wang, Y, Hou CC. 2017. The influence of fluoride exposure on the changes of thyroid hormone levels and the intellectual impairment of offspring rats. Zhonghua Lao Dong Wei Sheng Zhi Ye Bing Za Zhi (Chinese Journal of Industrial Hygiene and Occupational Diseases) 35(12):888-892.

Cui, Y., Zhang, B., Ma, J., Wang, Y., Zhao, L., Hou, C., Yu, J., Zhao, Y., Zhang, Z., Nie, J., Gao, T., Zhou, G., and Liu, H. 2018. Dopamine receptor D2 gene polymorphism, urine fluoride, and intelligence impairment of children in China: A school-based cross-sectional study. Ecotoxicology and Environmental Safety 165:270-277.

Das, K., and Mondal, N.K. 2016. Dental fluorosis and urinary fluoride concentration as a reflection of fluoride exposure and its impact on IQ level and BMI of children of Laxmisagar, Simlapal Block of Bankura District, W.G., India. Environ. Monit. Assess. 188:218.

Dean, H.T. (1942). The investigation of physiological effects by the epidemiological method. In: *Fluorine and Dental Health*, Publication of the American Association for the Advancement of Science, No. 19 (Moulton, F.R., editor), pp. 23-31.



*Food and Water Watch v. EPA*                                                                   *Thiessen Report*

Dec, K., Łukomska, A., Skonieczna-Żydecka, K., Kolasa-Wołosiuk, A., Tarnowski, M., Baranowska-Bosiacka, I., and Gutowska, I. 2019. Long-term exposure to fluoride as a factor promoting changes in the expression and activity of cyclooxygenases (COX1 and COX2) in various rat brain structures. Neurotoxicology 74:81-90.

Desai, V.K., Solanki, D.M., and Bansal, R.K. 1993. Epidemiological study on goitre in endemic fluorosis district of Gujarat. Fluoride 26:187-190.

DHEW (Department of Health, Education, and Welfare). 1979. Trends in Breast Feeding Among American Mothers. Data from the National Survey of Family Growth, Series 23, No. 3. Hyattsville, MD, DHEW Publication No. (PHS) 79-1979.

Ding, Y., Gao, Y., Sun, H., Han, H., Wang, W., Ji, X., Liu, X., and Sun, D. 2011. The relationships between low levels of urine fluoride on children's intelligence, dental fluorosis in endemic fluorosis areas in Hulunbuir, Inner Mongolia, China. Journal of Hazardous Materials 186:1942-1946.

Dong, Z., Wan, C., Zhang, X., and Liu, J. 1997. Determination of the contents of amino acid and monoamine neurotransmitters in fetal brains from a fluorosis endemic area. Journal of Guiyang Medical College 18(4):241-245.

Dong, Y.-T., Wang, Y., Wei, N., Zhang, Q.-F., and Guan, Z.-Z. 2015. Deficit in learning and memory of rats with chronic fluorosis correlates with the decreased expressions of M1 and M3 muscarinic acetylcholine receptors. Archives of Toxicology 89(11):1981-1991.

Dong, L., Yao, P., Chen, W., Li, P., and Shi, X. 2018. Investigation of dental fluorosis and intelligence levels of children in drinking water-related endemic fluorosis area of Xi'an. Chinese Journal of Endemiology 37(1):45-48.

Drinkard, C.R., Deaton, T.G., and Bawden, J.W. 1985. Enamel fluoride in nursing rats with mothers drinking water with high fluoride concentrations. J. Dent. Res. 64(6):877-880.

Du, L., Wan, C., Cao, X., and Liu, J. 1992. The effect of fluorine on the developing human brain. Chinese Journal of Pathology 21(4):218-220. English translation (2008) in Fluoride 41(4):327-330.

Duan, J., Zhao, M., Wang, L., Fang, D., Wang, Y., and Wang, W. 1995. A comparative analysis of the results of multiple tests in patients with chronic industrial fluorosis. Guizhou Medical Journal 18(3):179-80.

Duan, Q., Jiao, J., Chen, X., and Wang, X. 2018. Association between water fluoride and the level of children's intelligence: A dose-response meta-analysis. Public Health 154:87-97.

Eble, D.M., Deaton, T.G., Wilson, F.C. Jr., and Bawden, J.W. 1992. Fluoride concentrations in human and rat bone. Journal of Public Health Dentistry 52(5):288-91.

Elliott, L. 1967. Lack of effect of administration of fluoride on the central nervous system of rats. Acta pharmacol. et toxicol. 25:323-328.

Ensembl release 94. 2018. rs1800497 (SNP) Population Genetics, October 2018. (http://www.ensembl.org; accessed December 27, 2018).

Ensembl release 95. 2018. rs4680 (SNP) Population Genetics, January 2019. (http://www.ensembl.org; accessed January 30, 2019).

EPA (Environmental Protection Agency). 1987. Fluorine (Soluble Fluoride) (CASRN 7782-41-4). Integrated Risk Information System, U.S. Environmental Protection Agency (last updated January 31, 1987). Retrieved May 26, 2009, from http://www.epa.gov/ncea/iris/subst/0053.htm. Retrieved November 20, 2018, from https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=53.



EPA (Environmental Protection Agency). 1989. Risk Assessment Guidance for Superfund, Volume I, Human Health Evaluation Manual (Part A), EPA/540/1-89/002 (December 1989).

EPA (Environmental Protection Agency). 1998a. Guidelines for Neurotoxicity Risk Assessment, EPA/630/R-95/001F (April 1998). Also published as Federal Register (1998) 63(93):26926-26954.

EPA (Environmental Protection Agency). 1998b. Health Effects Tests Guidelines. OPPTS 870.4100 Chronic Toxicity, EPA 712-C-98-210 (August 1998).

EPA (Environmental Protection Agency). 2000a. Estimated Per Capita Water Ingestion and Body Weight in the United States, EPA-822-R-00-008 (April 2000).

EPA (Environmental Protection Agency). 2000b. Toxicological Review of Chlorine Dioxide and Chlorite (CAS Nos. 10049-04-4 and 7758-19-2), EPA/635/R-00/007 (September 2000).

EPA (Environmental Protection Agency). 2001a. Summary of Toxicity Information for Chemicals Listed in IRIS. Fluorine (soluble fluoride). Date of screening-level review: 05/01/2001. (Retrieved from EPA-IRIS website, July 24, 2003.)

EPA (Environmental Protection Agency). 2001b. Screening-level review of the IRIS Database Phase I. Evaluation of the Recent Literature and Determination of Currency for: Fluorine (CAS No. 7782-41-4). (Retrieved from EPA-IRIS website, July 24, 2003.)

EPA (Environmental Protection Agency). 2002. A Review of the Reference Dose and Reference Concentration Processes, EPA/630/P-02/002F (December 2002).

EPA (Environmental Protection Agency). 2003. Toxicological Review of Hydrogen Sulfide (CAS No. 7783-06-4), EPA/635/R-03/005 (June 2003).

EPA (Environmental Protection Agency). 2004a. 2004 Edition of the Drinking Water Standards and Health Advisories, EPA 822-R-04-005 (Winter 2004).

EPA (Environmental Protection Agency). 2004b. Estimated Per Capita Water Ingestion and Body Weight in the United States—An Update, EPA-822-R-00-001 (October 2004).

EPA (Environmental Protection Agency). 2005. Perchlorate ($ClO_4^-$) and Perchlorate Salts. Chemical Assessment Summary (February 18, 2005).

EPA (Environmental Protection Agency). 2006. 2006 Edition of the Drinking Water Standards and Health Advisories, EPA 822-R-06-013 (August 2006).

EPA (Environmental Protection Agency). 2008a. Toxicological Review of 2,2',4,4'-Tetrabromodiphenyl Ether (BDE-47) (CAS No. 5436-43-1), EPA/635/R-07/005F (June 2008).

EPA (Environmental Protection Agency). 2008b. Toxicological Review of 2,2',4,4',5-Pentabromodiphenyl Ether (BDE-99) (CAS No. 60348-60-9), EPA/635/R-07/006F (June 2008).

EPA (Environmental Protection Agency). 2008c. Toxicological Review of 2,2',4,4',5,5'-Hexabromodiphenyl Ether (BDE-153) (CAS No. 68631-49-2), EPA/635/R-07/007F (June 2008).

EPA (Environmental Protection Agency). 2008d. Toxicological Review of Decabromodiphenyl Ether (BDE-209) (CAS No. 1163-19-5), EPA/635/R-07/008F (June 2008).

EPA (Environmental Protection Agency). 2008e. Proposed Lead NAAQS Regulatory Impact Analysis (June 2008). [https://www3.epa.gov/ttnecas1/docs/ria/naaqs-lead_ria_proposal_2008-06.pdf]

EPA (Environmental Protection Agency). 2009a. Integrated Risk Information System (IRIS), IRIS Glossary. (http://www.epa.gov/ncea/iris/help_gloss.htm, retrieved May 26, 2009).



EPA (Environmental Protection Agency). 2009b. 2009 Edition of the Drinking Water Standards and Health Advisories, EPA 822-R-09-011 (October 2009).

EPA (Environmental Protection Agency). 2009c. Toxicological Review of 2-Hexanone (CAS No. 591-78-6), EPA/635/R-09/008F (September 2009).

EPA (Environmental Protection Agency). 2010a. Fluoride: Exposure and Relative Source Contribution Analysis. EPA-820-R-10-015. Office of Water, U.S. Environmental Protection Agency. December 2010.

EPA (Environmental Protection Agency). 2010b. Fluoride: Dose-Response Analysis for Non-cancer Effects. EPA-820-R-10-019. Office of Water, U.S. Environmental Protection Agency. December 2010.

EPA (Environmental Protection Agency). 2010c. Comment-Response Summary Report for the Peer Review of the *Fluoride: Dose-Response Analysis for Non-cancer Effects* Document. EPA-820-R-10-016. Office of Water, U.S. Environmental Protection Agency. November 2010. [This document includes the April 2009 Peer Review Report.]

EPA (Environmental Protection Agency). 2011a. 2011 Edition of the Drinking Water Standards and Health Advisories, EPA 820-R-11-002 (January 2011).

EPA (Environmental Protection Agency). 2011b. Recommended Use of Body Weight[3/4] as the Default Method in Derivation of the Oral Reference Dose, EPA 100-R11-0001.

EPA (Environmental Protection Agency). 2011c. EPA to develop regulation for perchlorate and toxic chemicals in drinking water. News Release (February 2, 2011).

EPA (Environmental Protection Agency). 2012a. 2012 Edition of the Drinking Water Standards and Health Advisories, EPA 822-S-12-001 (April 2012).

EPA (Environmental Protection Agency). 2012b. Sustainable Futures/P2 Framework Manual, EPA-748-B12-001. [https://www.epa.gov/sustainable-futures/sustainable-futures-p2-framework-manual]

EPA (Environmental Protection Agency). 2013a. Toxicological Review of Methanol (Noncancer) (CAS No. 67-56-1), EPA/635/R-11/001Fa (September 2013).

EPA (Environmental Protection Agency). 2013b. SAB Advice on Approaches to Derive a Maximum Contaminant Level Goal for Perchlorate, EPA-SAB-13-004 (May 29, 2013).

EPA (Environmental Protection Agency). 2016. Toxicological Review of Trimethylbenzenes: Executive Summary (CASRNs 25551-13-7, 95-63-6, 526-73-8, and 108-67-8), EPA/635/R-16/161Fa (September 2016).

EPA (Environmental Protection Agency). 2017a. Technical Fact Sheet - Perchlorate, EPA 505F-17-003 (November 2017).

EPA (Environmental Protection Agency). 2017b. Exposure Assessment Tools by Lifestages and Populations - Highly Exposed or Other Susceptible Population Groups (November 29, 2017). [https://www.epa.gov/expobox/exposure-assessment-tools-lifestages-and-populations-highly-exposed-or-other-susceptible]

EPA (Environmental Protection Agency). 2018a. Toxicological Review of Hexahydro-1,3,5-trinitro-1,3,5-triazine (RDX) (CASRN 121-82-4), EPA/635/R-18/211Fa (August 2018).

EPA (Environmental Protection Agency). 2018b. Defendants' second supplemental response to plaintiffs' first set of interrogatories (October 9, 2018).

EPA (Environmental Protection Agency). 2018c. TSCA Section 5(a)(3) Determination for Premanufacture Notice (PMN) P-18-0137 (October 15, 2018).



EPA (Environmental Protection Agency). 2018d. TSCA Section 5(a)(3) Determination for Premanufacture Notice (PMN) P-18-0212 (November 30, 2018).

EPA (Environmental Protection Agency). 2018e. TSCA Section 5(a)(3) Determination for Premanufacture Notice (PMN) P-17-0281 (December 4, 2018).

EPA (Environmental Protection Agency). 2018f. TSCA Section 5(a)(3) Determination for Premanufacture Notice (PMN) P-18-0007-0008 (December 11, 2018).

EPA (Environmental Protection Agency). 2018g. TSCA Section 5(a)(3) Determination for Premanufacture Notice (PMN) P-19-0006 (December 20, 2018).

EPA (Environmental Protection Agency). 2018h. TSCA Section 5(a)(3) Determination for Premanufacture Notice (PMN) P-18-0221 (December 21, 2018).

EPA (Environmental Protection Agency). 2018i. Perchlorate in Drinking Water (https://www.epa.gov/dwstandardsregulations/perchlorate-drinking-water; retrieved November 2, 2018).

EPA (Environmental Protection Agency). 2018j. Toxicological Review of Hexahydro-1,3,5-trinitro-1,3,5-triazine (RDX) (CASRN 121-82-4), Supplemental Information, EPA/635/R-18/211Fb (August 2018).

EPA (Environmental Protection Agency). 2019. TSCA Section 5(a)(3) Determination for Premanufacture Notice (PMN) P-18-0020 (February 25, 2019).

Featherstone, J.D.B. 2000. The science and practice of caries prevention. JADA 131:887-899.

Federal Register. 1985a. Environmental Protection Agency, 40 CFR Part 141, National Primary Drinking Water Regulations; Fluoride. [Proposed Rules.] Federal Register 50(93):20164-20175.

Federal Register. 1985b. Environmental Protection Agency, 40 CFR Part 141, National Primary Drinking Water Regulations; Fluoride. [Rules and Regulations.] Federal Register 50(220):47142-47155.

Federal Register. 1998. Environmental Protection Agency, Guidelines for Neurotoxicity Risk Assessment. Federal Register 63(93):26926-26954.

Federal Register. 2011. Proposed HHS Recommendation for Fluoride Concentration in Drinking Water for Prevention of Dental Caries. Federal Register 76(9):2383-2388, January 13, 2011.

Federal Register. 2015. Department of Health and Human Services, Public Health Recommendation for Fluoride Concentration in Drinking Water for Prevention of Dental Caries. Federal Register 80(84):24936-24947.

Federal Register. 2017. Environmental Protection Agency, Procedures for Chemical Risk Evaluation Under the Amended Toxic Substances Control Act. Federal Register 82(138):33726-33753.

Fein, S.B., Labiner-Wolfe, J., Shealy, K.R., Li, R., Chen, J., and Grummer-Strawn, L.M. 2008. Infant Feeding Practices Study II: Study methods. Pediatrics 122:S28-S35.

Feltman, R., and Kosel, G. 1961. Prenatal and postnatal ingestion of fluorides—Fourteen years of investigation. Final report. J. Dent. Med. 16:190-198.

Ferry, J.L. 1944. Memo to Col. Stafford L. Warren, U.S. Engineer Office, Oak Ridge, Tennessee (April 29, 1944).

Finn, S.B. 1952. Prevalence of dental caries. In: A Survey of the Literature of Dental Caries. Washington, DC: National Academy of Sciences, Publication 225, pp. 117-173.

Finn, S.B., and R.C. Caldwell. 1963. Dental caries in twins. I. A comparison of the caries experience of monozygotic twins, dizygotic twins and unrelated children. Archives of Oral Biology 8:571-585.



Flora, S.J., Mittal, M., and Mishra, D. 2009. Co-exposure to arsenic and fluoride on oxidative stress, glutathione linked enzymes, biogenic amines and DNA damage in mouse brain. Journal of the Neurological Sciences 285(1-2):198-205.

Flora, S.J., Mittal, M., Pachauri, V., and Dwivedi, N. 2012. A possible mechanism for combined arsenic and fluoride induced cellular and DNA damage in mice. Metallomics 4(1):78-90.

Fomon, S.J. 2001. Infant feeding in the 20th century: Formula and beikost. J. Nutrition 131:409S-420S.

Fomon, S.J., and Ekstrand, J. 1999. Fluoride intake by infants. J. Public Health Dent. 59(4):229-234.

Fomon, S.J., Ekstrand, J., and Ziegler, E.E. 2000. Fluoride intake and prevalence of dental fluorosis: Trends in fluoride intake with special attention to infants. J. Public Health Dent. 60(3):131-139.

Forsman, B. 1974. Dental fluorosis and caries in high-fluoride districts in Sweden. Community Dent. Oral Epidemiol. 2:132-148.

Forsman, B. 1977. Early supply of fluoride and enamel fluorosis. Scand. J. Dent. Res. 85:22-30.

Fulgoni, V., III, Nicholls, J., Reed, A., Buckley, R., Kafer, K., Huth, P., DiRienzo, D., and Miller, G.D. 2007. Dairy consumption and related nutrient intake in African-American adults and children in the United States: Continuing Survey of Food Intakes by Individuals 1994-1996, 1998, and the National Health and Nutrition Examination Survey 1999-2000. J. American Dietetic Association 107:256-264.

Galetti, P.M., and Joyet, G. 1958. Effect of fluorine on thyroidal iodine metabolism in hyperthyroidism. The Journal of Clinical Endocrinology and Metabolism 18(10):1102-10.

Gao, Q., Liu, Y.J., and Guan Z.Z. 2008. Oxidative stress might be a mechanism connected with the decreased alpha 7 nicotinic receptor influenced by high-concentration of fluoride in SH-SY5Y neuroblastoma cells. Toxicology in Vitro 22(4):837-43. Erratum in: Toxicology in Vitro 22(7):1814.

Ge, Y., Niu, R., Zhang, J., and Wang, J. 2011. Proteomic analysis of brain proteins of rats exposed to high fluoride and low iodine. Archives of Toxicology 85(1):27-33.

Ge, Y., Chen, L., Yin, Z., Song, X., Ruan, T., Hua, L., Liu, J., Wang, J., and Ning, H. 2018. Fluoride-induced alterations of synapse-related proteins in the cerebral cortex of ICR offspring mouse brain. Chemosphere 201:874-883.

Gedalia, I., Brzezinski, A., Zukerman, H., and Mayersdorf, A. 1964. Placental transfer of fluoride in the human fetus at low and high F-intake. J. Dent. Res. 43(5):669-671.

Geeraerts, F., Gijs, G., Finné, E., and Crokaert, R. 1986. Kinetics of fluoride penetration in liver and brain. Fluoride 19(3):108-112.

Gori, S., Inno, A., Lunardi, G., Gorgoni, G., Malfatti, V., Severi, F., Alongi, F., Carbognin, G., Romano, L., Pasetto, S., and Salgarello, M. 2015. 18F-Sodium fluoride PET-CT for the assessment of brain metastasis from lung adenocarcinoma. Journal of Thoracic Oncology 10(8):e67-e68.

Goschorska, M., Baranowska-Bosiacka, I., Gutowska, I., Metryka, E., Skórka-Majewicz, M., and Chlubek, D. 2018. Potential role of fluoride in the etiopathogenesis of Alzheimer's disease. Int. J. Molecular Sciences 19:3965.

Goyer, R.A. 1995. Nutrition and metal toxicity. Am. J. Clin. Nutr. 61(suppl):646S-650S.

Grandjean, P., and Landrigan, P.J. 2006. Developmental neurotoxicity of industrial chemicals. Lancet 368:2167-2178.

Grandjean, P., and Landrigan, P.J. 2014. Neurobehavioural effects of developmental toxicity. Lancet Neurology 13:330-338.



Green, R. 2018. Prenatal fluoride exposure and neurodevelopmental outcomes in a national birth cohort. Master of Arts thesis, York University, Toronto, Ontario.

Grummer-Strawn, L.M., Scanlon, K.S., and Fein, S.B. 2008. Infant feeding and feeding transitions during the first year of life. Pediatrics 122:S36-S42.

Gui, C.Z., Ran, L.Y., Li, J.P., and Guan Z.Z. 2010. Changes of learning and memory ability and brain nicotinic receptors of rat offspring with coal burning fluorosis. Neurotoxicology and Teratology 32(5):536-41.

Güner, S., Uyar-Bozkurt, S., Haznedaroglu, E., and Mentes, A. 2016. Dental fluorosis and catalase Immunoreactivity of the Brain Tissues in rats exposed to high fluoride pre-and postnatally. Biological Trace Element Research 174(1):150-157.

Guo, X., Wang, R., Cheng, C., Wei, W., Tang, L., Wang, Q., Tang, D., Liu, G., He, G., and Li, S. 1991. A preliminary investigation of the IQs of 7-13 year old children from an area with coal burning-related fluoride poisoning. Chinese Journal of Endemiology 10(2):98-100 (republished in Fluoride 2008; 41(2):125–28).

Guo, Z., He, Y., and Zhu, Q. 2001. Research on the neurobehavioral function of workers occupationally exposed to fluoride. Industrial Health and Occupational Diseases 27(6):36-8. (English translation published in Fluoride 2008, 41(2):152-155.)

Gupta, S., Seth, A.K., Gupta, A., and Gavane, A.G. 1993. Transplacental passage of fluoride. The Journal of Pediatrics 123(1):139-141.

Haddow, J.E., Palomaki, G.E., Allan, W.C., Williams, J.R., Knight, G.J., Gagnon, J., O'Heir, C.E., Mitchell, M.L., Hermos, R.J., Waisbren, S.E., Faix, J.D., and Klein, R.Z. 1999. Maternal thyroid deficiency during pregnancy and subsequent neuropsychological development of the child. NEJM 341(8):549-555.

Hamasha, A.A., J.J. Warren, S.M. Levy, B. Broffitt, and M.J. Kanellis. 2006. Oral health behaviors of children in low and high socioeconomic status families. Pediatr. Dent. 28(4):310-315.

Hamza, R.Z., El-Shenawy, N.S. and Ismail, H.A. 2015. Protective effects of blackberry and quercetin on sodium fluoride-induced oxidative stress and histological changes in the hepatic, renal, testis and brain tissue of male rat. Journal of Basic and Clinical Physiology and Pharmacology 26(3):237-51.

Han, H., Du, W., Zhou, B., Zhang, W., Xu, G., Niu, R., and Sun, Z. 2014. Effects of chronic fluoride exposure on object recognition memory and mRNA expression of SNARE complex in hippocampus of male mice. Biological Trace Element Research 158:58–64.

Hanhijärvi, H., Kanto, J., and Ruponen, S. 1974. Human free ionized plasma fluoride concentrations during pregnancy, toxemia, and lactation. Fluoride 7(3):143-146.

Harriehausen, C.X., Dosani, F.,Z., Chiquet, B.T., Barratt, M.S., and Quock, R.L. 2019. Fluoride intake of infants from formula. J. Clinical Pediatric Dentistry. 43(1):34-41.

Hassan, H.A., and Abdel-Aziz, A.F. 2010. Evaluation of free radical-scavenging and anti-oxidant properties of black berry against fluoride toxicity in rats. Food and Chemical Toxicology 48(8-9):1999-2004.

He, H., Cheng, Z., and Liu, W.Q. 1989. Effects of fluorine on the human fetus. Chinese Journal of Control of Endemic Diseases 4(3):136-138. English translation (2008) in Fluoride (41(4):321-326.

Heilman, J.R., Kiritsy, M.C., Levy, S.M., and Wefel, J.S. 1999. Assessing fluoride levels of carbonated soft drinks. JADA 130:1593-1599.

Heller, K.E., Eklund, S.A., and Burt, B.A. 1997. Dental caries and dental fluorosis at varying water fluoride concentrations. J. Public Health Dentistry 57(3):136-143.



Hillman, D., Bolenbaugh, D.L., and Convey, E.M. 1979. Hypothyroidism and anemia related to fluoride in dairy cattle. Journal of Dairy Science 62(3):416-23.

Hirtz, D., Campbell, C., and Lanphear, B. 2017. Targeting environmental neurodevelopmental risks to protect children. Pediatrics Perspectives 139(2):e20162245.

Hodge, H.C. 1950. The concentration of fluorides in drinking water to give the point of minimum caries with maximum safety. J. Am. Dental Association 40(4):436-439.

Hong, L., Levy, S.M., Broffitt, B., Warren, J.J., Kanellis, M.J., Wefel, J.S., and Dawson, D.V. 2006a. Timing of fluoride intake in relation to development of fluorosis on maxillary central incisors. Community Dent. Oral Epidemiol. 34:299-309.

Hong, L., Levy, S.M., Warren, J.J., Broffitt, B., and Cavanaugh, J. 2006b. Fluoride intake levels in relation to fluorosis development in permanent maxillary central incisors and first molars. Caries Research 40:494-500.

Horta, B.L., de Mola, C.L., and Victora, C.G. 2015. Breastfeeding and intelligence: A systematic review and meta-analysis. Acta Paediatrica 104:14-19.

Horta, B.L., de Sousa, B.A., and de Mola, C.L. 2018. Breastfeeding and neurodevelopmental outcomes. Curr. Opin. Clin. Nutr. Metab. Care 21(3):174-178.

Huang, H., Ba, Y., Cui, L., Cheng, X., Zhu, J., Zhang, Y., Yan, P., Zhu, C., Kilfoy, B., and Zhang, Y. 2008. COL1A2 gene polymorphisms (*Pvu* II and *Rsa* I), serum calciotropic hormone levels, and dental fluorosis. Community Dentistry and Oral Epidemiology 36:517-522.

Hudson, J.T., Stookey, G.K., and Muhler, J.C. 1967. The placental transfer of fluoride in the guinea pig. Archives of Oral Biology 12(2):237-46.

Hussien, H.M., Abd-Elmegied, A., Ghareeb, D.A., Hafez, H.S., Ahmed, H.E.A., and El-Moneam, N.A. 2018. Neuroprotective effect of berberine against environmental heavy metals-induced neurotoxicity and Alzheimer's-like disease in rats. Food and Chemical Toxicology 111:432-444.

Ibarra-Santan, C., Ruiz-Rodríguez, M. del S., Fonseca-Leal, M. del P., Gutiérrez-Cantú, F.J., and Pozos-Guillén, A. de J. 2007. Enamel hypoplasia in children with renal disease in a fluoridated area. J. Pediatric Dentistry 31(4):274-278.

ICAIR. 1985. Drinking water criteria document on fluoride. Preliminary draft prepared for the U.S. Environmental Protection Agency, TR-832-5, October 21, 1985.

Iheozor-Ejiofor, Z., Worthington, H.V., Walsh, T., O'Malley, L., Clarkson, J.E., Macey, R., Alam, R., Tugwell, P., Welch, V., and Glenny, A.M. 2015. Water fluoridation for the prevention of dental caries. Cochrane Database of Systematic Reviews Issue 6, Article No. CD-01856.

Iida, H., and Kumar, J.V. 2009. The association between enamel fluorosis and dental caries in U.S. schoolchildren. JADA 140:855-862.

Inkielewicz-Stepniak, I., and Czarnowski, W. 2010. Oxidative stress parameters in rats exposed to fluoride and caffeine. Food and Chemical Toxicology 48(6):1607-11.

Itai, K., Onoda, T., Nohara, M., Ohsawa, M., Tanno, K., Sato, T., Kuribayashi, T., and Okayama, A. 2010. Serum ionic fluoride concentrations are related to renal function and menopause status but not to age in a Japanese general population. Clinica Chimica Acta 411(3-4):263-6.

Jackson, K.A., and Savaiano, D.A. 2001. Lactose maldigestion, calcium intake and osteoporosis in African-, Asian-, and Hispanic-Americans. J. American College of Nutrition 20(2):198S-2078S.



Jarvis, J.K., and Miller, G.D. 2002. Overcoming the barrier of lactose intolerance to reduce health disparities. J. National Medical Association 94(2):55-66.

Jetti, R., Raghuveer, C.V., and Mallikarjuna, R.C. 2016. Protective effect of ascorbic acid and Ginkgo biloba against learning and memory deficits caused by fluoride. Toxicology and Industrial Health 32(1):183-7.

Jia, B., Zong, L., Lee, J.Y., Lei, J., Zhu, Y., Xie, H., Clemens, J.L., Feller, M.C., Na, Q., Dong, J., McLane, M.W., Jones-Beatty, K., and Burd, I. 2019. Maternal supplementation of low dose fluoride alleviates adverse perinatal outcomes following exposure to intrauterine inflammation. Scientific Reports 9(1):2575.

Jiang, S., Su, J., Yao, S., Zhang, Y., Cao, F., Wang, F., Wang, H., Li, J., and Xi, S. 2014a. Fluoride and arsenic exposure impairs learning and memory and decreases mGluR5 expression in the hippocampus and cortex in rats. PLoS One 23;9(4):e96041.

Jiang, C., Zhang, S., Liu, H., Guan, Z., Zeng, Q., Zhang, C., Lei, R., Xia, T., Wang, Z., Yang, L., Chen, Y., Wu, X., Zhang, X., Cui, Y., Yu, L., and Wang, A. 2014b. Low glucose utilization and neurodegenerative changes caused by sodium fluoride exposure in rat's developmental brain. Neuromolecular Med. 16(1):94-105.

Jiang, M., Mu, L., Wang, Y., Yan, W., Jiao, Y. 2015. The relationship between *Alu* I polymorphisms in the calcitonin receptor gene and fluorosis endemic to Chongqing, China. Medical Principles and Practice 24:80-83.

Jiang, P., Li, G., Zhou, X., Wang, C., Qiao, Y., Liao, D., and Shi, D. 2019. Chronic fluoride exposure induces neuronal apoptosis and impairs neurogenesis and synaptic plasticity: Role of GSK-3β/β-catenin pathway. Chemosphere 214:430-435.

Jones, R.P., and Iagaru, A. 2014. 18F NaF brain metastasis uptake in a patient with melanoma. Clinical Nuclear Medicine 39(10):e448-50.

Jooste, P.L., Weight, M.J., Kriek, J.A., and Louw, A.J. 1999. Endemic goitre in the absence of iodine deficiency in schoolchildren of the Northern Cape Province of South Africa. Eur. J. Clin. Nutr. 53:8-12.

Juárez-López, M.L.A., Huízar-Álvarez, R., Molina-Frechero, N., Murrieta-Pruneda, F., and Cortés-Aguilera, Y. 2011. Fluorine in water and dental fluorosis in a community of Queretaro State Mexico. J. Environ. Protection 2:744-749.

Kanazawa, S. 2015. Breastfeeding is positively associated with child intelligence even net of parental IQ. Developmental Psychology 51(12):1683-1689.

Kang, Y.J., Zolina L., and Manson, J.M. 1986. Strain differences in response of Sprague-Dawley and Long Evans Hooded rats to the teratogen Nitrofen. Teratology 34:213-23.

Karimzade, S., Aghaei, M., and Mahvi, A.H. 2014a. Investigation of intelligence quotient in 9-12-year-old children exposed to high- and low-drinking water fluoride in West Azerbaijan province, Iran. Fluoride 47(1):9-14.

Karimzade, S., Aghaei, M., and Mahvi, A.H. 2014b. IQ of 9–12-year-old children in high- and low-drinking water F areas in West Azerbaijan province, Iran: further information on the two villages in the study and the confounding factors considered. Letter to the editor; Fluoride 47(3):266-271.

Kaur, T., Bijarnia, R.K., and Nehru, B. 2009. Effect of concurrent chronic exposure of fluoride and aluminum on rat brain. Drug and Chemical Toxicology 32(3):215-21.

Khan, S.A., Singh, R.K., Navit, S., Chadha, D., Johri, N., Navit, P., Sharma, A., Bahuguna, R. 2015. Relationship between dental fluorosis and Intelligence Quotient of school going children in and around Lucknow District: A cross-sectional study. J. Clinical and Diagnostic Research 9(11):ZC10-ZC15.



Khan, A.M., Raina, R., Dubey, N., and Verma, P.K. 2018. Effect of deltamethrin and fluoride co-exposure on the brain antioxidant status and cholinesterase activity in Wistar rats. Drug and Chemical Toxicology 41(2):123-127.

Khatun, S., Mandi, M., Rajak, P., and Roy, S. 2018. Interplay of ROS and behavioral pattern in fluoride exposed *Drosophila melanogaster*. Chemosphere. 209:220-231.

Kim, F.M., Hayes, C., Williams, P.L., Whitford, G.M., Joshipura, K.J., Hoover, R.N., Douglass, C.W., and the National Osteosarcoma Etiology Group. 2011. An assessment of bone fluoride and osteosarcoma. J. Dent. Res. 90(10):1171-1176.

Kinawy, A.A. 2019. Synergistic oxidative impact of aluminum chloride and sodium fluoride exposure during early stages of brain development in the rat. Environmental Science and Pollution Research International [Epub ahead of print].

Kinawy, A.A., and Al-Eidan, A.A. 2018. Impact of prenatal and postnatal treatment of sodium fluoride and aluminum chloride on some hormonal and sensorimotor aspects in rats. Biological Trace Element Research 186(2):441-448.

Kiritsy, M.C., Levy, S.M., Warren, J.J., Guha-Chowdhury, N., Heilman, J.R., and Marshall, T. 1996. JADA 127:895-902.

Klein, R.Z., Sargent, J.D., Larsen, P.R.,, Waisbren, S.E., Haddow, J.E., and Mitchell, M.L. 2001. Relation of severity of maternal hypothyroidism to cognitive development of offspring. J. Med. Screen. 8:18-20.

Ko, L., and Thiessen, K.M.   2015.   A critique of recent economic evaluations of community water fluoridation.  International Journal of Occupational and Environmental Health 21(2):91-120.

Komárek, A., Lesaffre, E., Härkänen, T., Declerck, D., and Virtanen, J.I.  2005.  A Bayesian analysis of multivariate doubly-interval-censored dental data.  Biostatistics 6(1):145-155.

Kooistra, L., Crawford, S., van Baar, A.L., Brouwers, E.P., and Pop, V.J. 2006. Neonatal effects of maternal hypothytroxinemia during early pregnancy. Pediatrics 117(1):161-167.

Küchler, E.C., Bruzamolin, C.D., Omori, M.A., Costa, M.C., Antunes, L.S., Pecharki, G.D., Trevilatto, P.C., Vieira, A.R., and Brancher, J.A. 2018. Polymorphisms in nonamelogenin enamel matrix genes are associated with dental fluorosis. Caries Research 52:1-6.

LaFranchi, S.H., Haddow, J.E., and Hollowell, J.G. 2005. Is thyroid inadequacy during gestation a risk factor for adverse pregnancy and developmental outcomes? Thyroid 15(1):60-71.

Landrigan, P.J., Kimmel, C.A., Correa, A., and Eskenazi, B. 2004. Children's health and the environment: Public health issues and challenges for risk assessment. Environmental Health Perspectives 112(2):257-265.

Lanphear, B.P. 2015. The impact of toxins on the developing brain. Annu. Rev. Public Health 36:211-230.

Lanphear, B.P. 2017. Low-level toxicity of chemicals: No acceptable levels? PLoS Biol. 15(12):e2003066.

Lavado-Autric, R., Ausó, E., García-Velasco, J.V., Arufe, M.del C., Escobar del Rey, F., Berbel, P., and Morreale de Escobar, G. 2003. Early maternal hypothyroxinemia alters histogenesis and cerebral cortex cytoarchitecture of the progeny. J. Clin. Invest. 111(7):1073-1082.

Lavryashina, M.B., Uljanova, M.V., Druzhinin, V.G., and Tolochko, T.A. 2003. A study of the genetic basis of susceptibility to occupational fluorosis in aluminum industry workers of Siberia. Russian Journal of Genetics 39(7):823-827.

Lazic, S.E., and Essioux, L. 2013. Improving basic and translational science by accounting for litter-to-litter variation in animal models. BMC Neuroscience 22;14:37.



Lehman, A.J., and Fitzhugh, O.G. 1954. 100-fold margin of safety. Association of Food & Drug Officials of the United States, Quarterly Bulletin XVIII(1):33-35.

Leite, G.A.S., Sawan, R.M.M., Teófilo, J.M., Porto, I.M., Sousa, F.B., and Gerlach, R.F. 2011. Exposure to lead exacerbates dental fluorosis. Archives of Oral Biology 56(7):695-702.

Leone, N.C., Shimkin, M.B., Arnold, F.A., Stevenson, C.A., Zimmermann, E.R., Geiser, P.B., and Lieberman, J.E. 1954. Medical aspects of excessive fluoride in a water supply. Public Health Reports 69(10):925-36.

Leone, N.C., Arnold, F.A. Jr.., Zimmermann E.R., Geiser P.B., and Lieberman, J.E. 1955a. Review of the Bartlett-Cameron survey: a ten year fluoride study. Journal of the American Dental Association 50(3):277-81.

Leone, N.C., Stevenson, C.A., Hilbish, T.F., and Sosman, M.C. 1955b. A roentgenologic study of a human population exposed to high-fluoride domestic water; a ten-year study. The American Journal of Roentgenology, Radium Therapy, and Nuclear Medicine 74(5):874-85.

Levy, S.M., Warren, J.J., and Broffitt, B. 2003. Patterns of fluoride intake from 36 to 72 months of age. Journal of Public Health Dentistry 63(4):211-20.

Li, Y., Li, X., and Wei, S. 1994. Effects of high fluoride intake on child mental work capacity: Preliminary investigation into the mechanisms involved. Journal of West China University of Medical Sciences 25(2):188-91 (English translation in Fluoride 2008; 41:331-35).

Li, X.S., Zhi, J.L., and Gao, R.O. 1995. Effect of fluoride exposure on intelligence in children. Fluoride 28:189-192.

Li, J., Yao, L., Shao, Q.L., and Wu, C.Y. 2004. Effects of high fluoride level on neonatal neurobehavioral development. Chinese Journal of Endemiology 23(5):463-5. English translation in Fluoride 41(2):165-170 (2008).

Li, Y., Tafti, B.A., Shaba, W., and Berenji, G.R. 2011. Extraosseus uptake of F-18 fluoride in the primary malignancy and cerebral metastasis in a case of non-small-cell lung cancer. Clinical Nuclear Medicine 36(7):609-11.

Li, M., Gao, Y., Cui, J., Li, Y., Li, B., Liu, Y., Sun, J., Liu, X., Liu, H., Zhao, L., and Sun, D. 2016. Cognitive impairment and risk factors in elderly people living in fluorosis areas in China. Biological Trace Element Research 172(1):53-60.

Li, B.-Y., Yang, Y.-M., Liu, Y., Sun, J., Ye, Y., Liu, X.-N., Liu, H.-X., Sun, Z.-Q., Li, M., Cui, J., Sun, D.-J., and Gao, Y.-H. 2017. Prolactin rs1341239 T allele may have protective role against the brick tea type skeletal fluorosis. PLoS One 12(2):e0171011.

Li, X., Zhang, J., Niu, R., Manthari, R.K., Yang, K., and Wang, J. 2019. Effect of fluoride exposure on anxiety- and depression-like behavior in mouse. Chemosphere 215:454-460.

Lin, F.F., Aihaiti, Zhao, H.X., Lin, J., Jiang, J.Y., Maimaiti, and Aiken. 1991. The relationship of a low-iodine and high-fluoride environment to subclinical cretinism in Xinjiang. IDD Newsletter 7:24-25.

Liu, J., Xia, T., Zhang, M., He, W., He, P., Chen, X., Yang, K., and Wang, A. 2006. Screening of environmental response genes related to dental fluorosis. Fluoride 39(3):195-201.

Liu, Y.J., Gao, Q., Wu, C.X., and Guan, Z.Z. 2010. Alterations of nAChRs and ERK1/2 in the brains of rats with chronic fluorosis and their connections with the decreased capacity of learning and memory. Toxicology Letters (3):324-329.



Liu, Y.J., Guan, Z.Z., Gao, Q., and Pei, J.J. 2011. Increased level of apoptosis in rat brains and SH-SY5Y cells exposed to excessive fluoride–a mechanism connected with activating JNK phosphorylation. Toxicology Letters 204(2-3):183-189.

Liu, F., Ma, J., Zhang, H., Liu, P., Liu, Y.P., Xing, B., and Dang, Y.H. 2014. Fluoride exposure during development affects both cognition and emotion in mice. Physiology & Behavior 124:1-7.

Long, Y.-G., Wang, Y.-N., Chen, J., Jiang, S.-F., Nordberg, A., and Guan, Z.-Z. 2002. Chronic fluoride toxicity decreases the number of nicotinic acetylcholine receptors in rat brain. Neurotoxicology and Teratology 24:751-757.

Lou, D.D., Guan, Z.Z., Liu, Y.J., Liu, Y.F., Zhang, K.L., Pan, J.G., and Pei, J.J. 2013. The influence of chronic fluorosis on mitochondrial dynamics morphology and distribution in cortical neurons of the rat brain. Archives of Toxicology 87(3):449-57.

Lu, F.C., Mazurkiewicz, I.M., Grewal, R.S., Allmark, M.G., and Boivin, P. 1961. The effect of sodium fluoride on responses to various central nervous system agents in rats. Toxicology and Applied Pharmacology 3:31-8.

Lu, Y., Sun, Z.R., Wu, L.N., Wang, X., Lu, W., and Liu, S.S. 2000. Effect of high-fluoride water on intelligence of children. Fluoride 33:74-78.

Luke, J. 2001. Fluoride deposition in the aged human pineal gland. Caries Research 35:125-128.

Luo, G., Niu, R., Sun, Z., Zhang, J., Wang, J., Wang, C., and Wang, J. 2011. Reduction of CAMKII expression in the hippocampus of rats from ingestion of fluoride and/or lead. Fluoride 44(2):63–69.

Ma, J., Liu, F., Liu, P., Dong, Y.Y., Chu, Z., Hou, T.Z., and Dang, Y.H. 2015. Impact of early developmental fluoride exposure on the peripheral pain sensitivity in mice. International Journal of Developmental Neuroscience 47(Pt B):165-171.

Ma, Q., Huang, H., Sun, L., Zhou, T., Zhu, J., Cheng, X., Duan, L., Li, Z., Cui, L., and Ba, Y. 2017. Gene-environment interaction: Does fluoride influence the reproductive hormones in male farmers modified by ERa gene polymorphisms? Chemosphere 188:525-531.

Maas, R.P., Patch, S.C., Christian, A.-M., and Coplan, M.J. 2007. Effects of fluoridation and disinfection agent combinations on lead leaching from leaded-brass parts. NeuroToxicology 28:1023-1031.

Madero, M., Gul, A., and Sarnak, M.J. 2008. Cognitive function in chronic kidney disease. Seminars in Dialysis 21(1):29-37.

Malhotra, A., Tewari, A., Chawla, H.S., Gauba, K., and Dhall, K. 1993. Placental transfer of fluoride in pregnant women consuming optimum fluoride in drinking water. J. Indian Soc. Pedo. Prev. Dent. 11:1-3.

Malin, A.J., Riddell, J., McCague, H., and Till, C. 2018. Fluoride exposure and thyroid function among adults living in Canada: Effect modification by iodine status. Environment International 121:667-674.

Mansour, H.H., and Tawfik, S.S. 2012. Efficacy of lycopene against fluoride toxicity in rats. Pharmaceutical Biology 50(6):707-11.

Marier, J.R. 1977. Some current aspects of environmental fluoride. The Science of the Total Environment 8:253-265.

Martin, O.V., Martin, S., and Kortenkamp, A. 2013. Dispelling urban myths about default uncertainty factors in chemical risk assessment: Sufficient protection against mixture effects? Environmental Health 12:53.

Marumo, F., and Iwanami, S. 2001. High fluoride concentrations in the serum and bone of patients with chronic renal failure [conference abstract]. Fluoride 34(3):213.



McCauley, H.B., and McClure, F.J. 1954. Effect of fluoride in drinking water on the osseous development of the hand and wrist in children. Public Health Reports 69(7):671-83. EJ. 1944.

McClure, F.J. 1944. Fluoride domestic waters and systemic effects. 1. Relation to bone-fracture experience, height, and weight of high school boys and young selectees of the armed forces of the United States. Public Health Reports 59:1543-1558.

McDonagh, M., Whiting, P., Bradley, M., Cooper, J., Sutton, A., Chestnutt, I., Misso, K., Wilson, P., Treasure, E., and Kleijnen, J. 2000. A Systematic Review of Public Water Fluoridation. NHS Centre for Reviews and Dissemination, University of York, York, UK.

McPherson, C.A., Zhang, G., Gilliam, R., Brar, S.S., Wilson, R., Brix, A., Picut, C., and Harry, G.J. 2018. An evaluation of neurotoxicity following fluoride exposure from gestational through adult ages in Long-Evans Hooded Rats. Neurotoxicity Research 34(4):781-798.

Mendley, S.R., Matheson, M.B., Shinnar, S., Lande, M.B., Gerson, A.C., Butler, R.W., Warady, B.A., Furth, S.L., and Hooper, S.R. 2015. Duration of chronic kidney disease reduces attention and executive function in pediatric patients. Kidney International 87:800-806.

Menkes, D.B., Thiessen, K., and Williams, J. 2014. Health effects of water fluoridation: How "effectively settled" is the science? NZMJ 127:1407:84-86.

Modesto, T., Tiemeier, H., Peeters, R.P., Jaddoe, V.W.V., Hofman, A., Verhulst, F.C., and Ghassabian, A. 2015. Maternal mild thyroid hormone insufficiency in early pregnancy and attention-deficit/hyperactivity disorder symptoms in children. JAMA Pediatrics 169(9):838-845.

Moleti, M., Trimarchi, F., Tortorella, G., Longo, A.C., Giorgianni, G., Sturniolo, G., Alibrandi, A., and Vermiglio, F. 2016. Effects of maternal iodine nutrition and thyroid status on cognitive development in offspring: A pilot study. Thyroid 26(2):296-305.

Morgan, L., Allred, E., Tavares, M., Bellinger, D., and Needleman, H. 1998. Investigation of the possible associations between fluorosis, fluoride exposure, and childhood behavior problems. Pediatric Dentistry 20(4):244-252.

Mooradian, A.D. 1994. Potential mechanisms of the age-related changes in the blood-brain barrier. Neurobiology of Aging 15(6):751-755.

Morreale de Escobar, G., Obregón, M.J., and Escobar del Rey, F. 2000. Is neuropsychological development related to maternal hypothyroidism or to maternal hypothyroxinemia? J. Clinical Endocrinology & Metabolism 85(11):3975-3987.

Morreale de Escobar, G., Obregón, M.J., and Escobar del Rey, F. 2004. Maternal thyroid hormones early in pregnancy and fetal brain development. Best Practice & Research Clinical Endocrinology & Metabolism 18(2):225-248.

Mukhopadhyay, D., Priya, P., and Chattopadhyay, A. 2015. Sodium fluoride affects zebrafish behaviour and alters mRNA expressions of biomarker genes in the brain: Role of Nrf2/Keap1. Environmental Toxicology and Pharmacology 40(2):352-9.

Mullenix, P.J., DenBesten, P.K., Schunior, A., and Kernan, W.J. 1995. Neurotoxicity of sodium fluoride in rats. Neurotoxicology and Teratology 17(2):169-177.

Nabavi, S.F., Eslami, Sh., Moghaddum, A.H., and Nabavi S.M. 2011. Protective effects of curcumin against fluoride-induced oxidative stress in the rat brain. Neurophysiology 43(4):287-91.

Nabavi, S.F., Nabavi, S.M., Latifi, A.M., Mirzaei, M., Habtemariam, S., and Moghaddam, A.H. 2012a. Mitigating role of quercetin against sodium fluoride-induced oxidative stress in the rat brain. Pharmaceutical Biology 50(11):1380-3.



Nabavi, S.F., Habtemariam, S., Jafari, M., Sureda, A., and Nabavi, S.M. 2012b. Protective role of gallic acid on sodium fluoride induced oxidative stress in rat brain. Bulletin of Environmental Contamination and Toxicology 89(1):73-7.

Nabavi SM, Sureda N, Nabavi SF, Latifi AM, Moghaddam AH, and Hellio C. 2012c. Neuroprotective effects of silymarin on sodium fluoride-induced oxidative stress. Journal of Fluorine Chemistry 142:79-82.

Nabavi, S.F., Nabavi, S.M., Habtemariam, S., Moghaddam, A.H., Sureda, A., and Mirzaei, M. 2013. Neuroprotective effects of methyl-3-*O*-methyl gallate against sodium fluoride-induced oxidative stress in the brain of rats. Cellular and Molecular Neurobiology 33(2):261-7.

Nagarajappa, R., Pujara, P., Sharda, A.J., Asawa, K., Tak, M., Aapaliya, P., and Bhanushali, N. 2013. Comparative assessment of intelligence quotient among children living in high and low fluoride areas of Kutch, India: a pilot study. Iranian Journal of Public Health 2(8): 813–818.

Nalagoni, C.S.R., and Karnati, P.R. 2016. Protective effect of resveratrol against neuronal damage through oxidative stress in cerebral hemisphere of aluminum and fluoride treated rats. Interdisciplinary Toxicology 9(2):78-82.

NAS (National Academies of Sciences, Engineering, and Medicine). 2011. Review of the Environmental Protection Agency's Draft IRIS Assessment of Formaldehyde. Washington, DC: The National Academies Press.

NAS (National Academies of Sciences, Engineering, and Medicine). 2014. Review of EPA's Integrated Risk Information System (IRIS) Process. Washington, DC: The National Academies Press.

NAS (National Academies of Sciences, Engineering, and Medicine). 2018. Progress Toward Transforming the Integrated Risk Information System (IRIS) Program: A 2018 Evaluation. Washington, DC: The National Academies Press.

Neurath, C. 2005. Tooth decay trends for 12 year olds in nonfluoridated and fluoridated countries. Fluoride 38:324-325.

Neville, M.J., Johnstone, E.C., and Walton, R.T. 2004. Identification and characterization of ANKK1: A novel kinase gene closely linked to DRD2 on chromosome band 11q23.1. Human Mutation 23:540-545.

Nicklas, T.A., Qu, H., Hughes, S.O., Wagner, S.E., Foushee, H.R., and Shewchuk, R.M. 2009. Prevalence of self-reported lactose intolerance in a multiethnic sample of adults. Nutrition Today 44(5):222-227.

Nicklas, T.A., Qu, H., Hughes, S.O., He, M., Wagner, S.E., Foushee, H.R., and Shewchuk, R.M. 2011. Self-perceived lactose intolerance results in lower intakes of calcium and dairy foods and is associated with hypertesnion and diabetes in adults. Am. J. Clin. Nutr. 94:191-198.

Niu, R., Sun, Z., Wang, J., Cheng, Z., and Wang, J. 2008. Effects of fluoride and lead on locomotor behavior and expression of Nissl body in brain of adult rats. Fluoride 4194):276-282.

Niu, R., Sun, Z., Cheng, Z., Li, Z., and Wang, J. 2009. Decreased learning ability and low hippocampus glutamate in offspring rats exposed to fluoride and lead. Environmental Toxicology and Pharmacology 28(2):254-258.

Niu, R., Liu, S., Wang, J., Zhang, J., Sun, Z., and Wang, J. 2014. Proteomic analysis of hippocampus in offspring male mice exposed to fluoride and lead. Biological Trace Element Research 162(1-3):227-33.

Niu, R., Xue, X., Zhao, Y., Sun, Z., Yan, X., Li, X., Feng, C., and Wang, J. 2015a. Effects of fluoride on microtubule ultrastructure and expression of Tubα1a and Tubβ2a in mouse hippocampus. Chemosphere 133(1):71-82.

Niu, R., Zhang, Y., Liu, S., Liu, F., Sun, Z., and Wang, J. 2015b. Proteome alterations in cortex of mice exposed to fluoride and lead. Biological Trace Element Research 164(1):99-105.



Niu, Q., Chen, J., Xia, T., Li, P., Zhou, G., Xu, C., Zhao, Q., Dong, L., Zhang, S., and Wang. A. 2018a. Excessive ER stress and the resulting autophagic flux dysfunction contribute to fluoride-induced neurotoxicity. Environmental Pollution 233:889-899.

Niu, R., Chen, H., Manthari, R.K., Sun, Z., Wang, J., Zhang, J., and Wang, J. 2018b. Effects of fluoride on synapse morphology and myelin damage in mouse hippocampus. Chemosphere 194:628-633.

NRC (National Research Council). 1983. Risk Assessment in the Federal Government: Managing the Process. Washington, National Academy Press.

NRC (National Research Council). 2006. Fluoride in Drinking Water: A Scientific Review of EPA's Standards. Washington, National Academy Press. [Available: http://www.nap.edu/catalog/11571.html]

NRC (National Research Council). 2009. Emergency and Continuous Exposure Guidance Levels for Selected Submarine Contaminants: Volume 3. Washington, National Academy Press. [Available: http://www.nap.edu/catalog.php?record_id=12741]

NTP (National Toxicology Program). 2015a. Systematic Review on the Neurobehavioral Toxicity of Fluoride in Animal Studies. National Institute of Environmental Health Sciences, National Toxicology Program Office of Health Assessment and Translation (June 2015).

NTP (National Toxicology Program). 2015b. Handbook for Conducting a LIterature-Based Health Assessment Using OHAT Approach for Systematic Review and Evidence Integration. National Institute of Environmental Health Sciences, National Toxicology Program, Office of Health Assessment and Translation (January 2015).

NTP (National Toxicology Program). 2016. Systematic Literature Review on the Effects of Fluoride on Learning and Memory in Animal Studies. NTP Research Report 1. Research Triangle Park, NC: National Toxicology Program (July 2016).

O'Connor, N.R. 2009. Infant formula. American Family Physician 79(7):565-570.

OMIM (Online Mendelian Inheritance in Man). 2018. 608774, Ankyrin Repeat- and Kinase Domain-Containing Protein 1; ANKK1 (https://www.omim.org/entry/608774; last updated May 24, 2018; accessed December 27, 2018).

Ou, X., Andres, A., Pivik, R.T., Cleves, M.A., Snow, J.H., Ding, Z., and Badger, T.M. 2016. Voxel-based morphometry and fMRI revealed differences in brain gray matter in breastfed and milk formula-fed children. Am. J. Neuroradiol. 37:713-719.

Pal, S., and Sarkar, C. 2014. Protective effect of resveratrol on fluoride induced alteration in protein and nucleic acid metabolism, DNA damage and biogenic amines in rat brain. Environmental Toxicology and Pharmacology 38(2):684-699.

Pan, Y. and Nicolazzo, J.A. 2018. Impact of aging, Alzheimer's disease and Parkinson's disease on the blood-brain barrier transport of therapeutics. Advanced Drug Delivery Reviews 135:62-74.

Pan, Y., Lü, P., Yin, L., Chen, K., and He, Y. 2015. Effect of fluoride on the proteomic profile of the hippocampus in rats. Zeitschrift für Naturforschung C. 70(5-6):151-7.

Pandit, C.G., Raghavachari, T.N.S., Rao, D.S., and Krishnamurti, V. 1940. A study of the factors involved in the production of mottled enamel in children and severe bone manifestations in adults. Ind. J. Med. Res. 28(2):533-558.

Pang, H., Yu, L., Lai, X., and Chen, Q. 2018. Relation between intelligence and COMT gene polymorphism in children aged 8-12 in the endemic fluorosis area and non-endemic fluorosis area. Chinese Journal of Control of Endemic Diseases 33(2):151-152.



Patel, J., Landers, K., Li, H., Mortimer, R.H., and Richard, K. 2011. Thyroid hormones and fetal neurological development. Journal of Endocrinology 209:1-8.

Pearce, E.N. 2015. Is iodine deficiency reemerging in the United States? AACE Clinical Case Reports 1(1):e81-e82.

Peckham, S., Lowery, D., and Spencer S. 2015. Are fluoride levels in drinking water associated with hypothyroidism prevalence in England? A large observational study of GP practice data and fluoride levels in drinking water. Journal of Epidemiology and Community Health 69(7):619-24.

Pei, J., Li, B., Liu, Y., Liu, X., Li, M., Chu, Y., Yang, Q., Jiang, W., Chen, F., Darko, G.M., Yang, Y., and Gao, Y. 2017. Matrix metallopeptidase-2 gene rs2287074 polymorphism is associated with brick tea skeletal fluorosis in Tibetans and Kazaks, China. Scientific Reports 7:40086.

Pereira, M., Dombrowski, P.A., Losso, E.M., Chioca, L.R., Da Cunha, C., and Andreatini, R. 2011. Memory impairment induced by sodium fluoride is associated with changes in brain monoamine levels. Neurotoxicity Research 19(1):55-62.

Pop, V.J., Kuijjpens, J.L., van Baar, A.L., Verkerk, G., van Son, M.M., de Vijlder, J.J., Vulsma, T., Wiersinga, W.M., Drexhage, H.A., and Vader, H.L. 1999. Low maternal free thyroxine concentrations during early pregnancyt are associated with impaired psychomotor developpment in infancy. Clinical Endocrinology 50:149-155.

Pop, V.J., Brouwers, E.P., Vader, H.L., Vulsma, T., van Baar, A.L., and de Vijlder, J.J. 2003. Maternal hypothyroxinaemia during early pregnancy and subsequent child development: A 3-year follow-up study. Clinical Endocrinology 59:282-288.

Popov, L.I., Filatovas, R.I., and Shershever, A.S. 1974. Characterization of nervous system intoxication in occupational fluorosis. *Gigiena Truda i Professional'nye Zabolevaniia* (5):25-27.

Pramanik, S., and Saha, D. 2017. The genetic influence in fluorosis. Environmental Toxicology and Pharmacology 56:157-162.

Psoter, W.J., Reid, B.C., and Katz, R.V. 2005. Malnutrition and dental caries: A review of the literature. Caries Res. 39:441-447.

Pulungan, Z.S.A., Sofro, Z.M., and Partadiredja, G. 2018. Sodium fluoride does not affect the working memory and number of pyramidal cells in rat medial prefrontal cortex. Anatomical Science International 93(1):128-138.

Qian, W., Miao, K., Li, T., and Zhang, Z. 2013. Effect of selenium on fluoride-induced changes in synaptic plasticity in rat hippocampus. Biological Trace Element Research 155(2):253–260.

Qin, L., Huo, S., Chen, R., Chang, Y., and Zhao, M. 1990. Using the Raven's Standard Progressive Matrices to determine the effects of the level of fluoride in drinking water of the intellectual abilities of school-age children. Chinese Journal of Control of Endemic Deseases 5(4):203-204. English translation in Fluoride 41(2):115-119 (2008).

Raghu, J., Raghuveer, V.C., Rao, M.C., Somayaji, N.S., and Babu, P.B. 2013. The ameliorative effect of ascorbic acid and Ginkgo biloba on learning and memory deficits associated with fluoride exposure. Interdisciplinary Toxicology 6(4):217-21.

Ranpariya, V.L., Parmar, S.K., Sheth, N.R., and Chandrashekhar, V.M. 2011. Neuroprotective activity of Matricaria recutita against fluoride-induced stress in rats. Pharmaceutical Biology 49(7):696-701.

Rauh, V.A., and Margolis, A. 2016. Research Review: Environmental exposures, neurodevelopment and child mental health - new paradigms for the study of brain and behavioral effects. J. Child Psychol. Psychiatry 57(7):775-793.



Reddy, K.P., Sailaja, G., and Krishnaiah, C. 2009. Protective effects of selenium on fluoride induced alterations in certain enzymes in brain of mice. Journal of Environmental Biology 30(5 Suppl):859-64.

Reddy, Y.P., Tiwari, S.K., Shaik, A.P., Alsaeed, A., Sultana, A., and Reddy, P.K. 2014. Effect of sodium fluoride on neuroimmunological parameters, oxidative stress and antioxidative defenses. Toxicology Mechanisms and Methods 24(1):31-6.

Ren, D., Li, K., and Liu, D. 1989. A study of the intellectual ability of 8-14 year-old children in high fluoride, low iodine areas. Chinese Journal of Control of Endemic Diseases 4(4):251 (republished in Fluoride 2008; 41:319-20).

Renwick, A.G. (1993) Data-derived safety factors for the evaluation of food additives and environmental contaminants. Food Additives and Contaminants 10(3):275-305.

Rice, W.B., and Lu, F.C. 1963. The effect of sodium fluoride on the actions of succinylcholine, parathion and demeton in Rats. Acta Pharmacologica et Toxicologica (Copenh). 20:39-42.

Rocha-Amador, D., Navarro, M.E., Carrizales, L., Morales R., and Calderón, J. 2007. Decreased intelligence in children and exposure to fluoride and arsenic in drinking water. Cadernos de Saúde Pública 23 Suppl 4:S579-87.

Rocha-Amador, D., Navarro, M., Trejo-Acevedo, A., Carrizales, L., Pérez-Maldonado, I., Díaz-Barriga, F., and Calderón, J. 2009. Use of the Rey-Osterrieth Complex Figure Test for neurotoxicity evaluation of mixtures in children. Neurotoxicology 30(6):1149-54.

Rodier, P.M. 1995. Developing brain as a target of toxicity. Environmental Health Perspectives 103(Supplement 6):73-76.

Rogalska, A., Kuter, K., Żelazko, A., Głogowska-Gruszka, A., Świętochowska, E., and Nowak, P. 2017. Fluoride alteration of [$^3$H]glucose uptake in Wistar rat brain and peripheral tissues. Neurotoxicity Research 31(3):436-443.

Roholm, K. 1937. *Fluorine Intoxication. A Clinical-Hygienic Study.* Publishers: NYT Nordisk Forlag, Arnold Busck, Copenhagen and H.K. Lewis & Co. Ltd, 136, Gower Street, London.

Román, G.C. 2007. Autism: Transient in utero hypothyroxinemia related to maternal flavonoid ingestion during pregnancy and to other environmental antithyroid agents. J. Nuerological Sciences 262:15-26.

Ron, M., Singer, L., Menczel, J., and Kidroni, G. 1986. Fluoride concentration in amniotic fluid and fetal cord and maternal plasma. Eur. J. Obstet. Gynecol. Reprod. Biol. 21:213-218.

Rose, D., and Marier, J.R. 1977. Environmental Fluoride. National Research Council of Canada.

Rosenberg, G.A. 2014. Blood-brain barrier permeability in aging and Alzheimer's disease. J. Prev. Alzheimers Dis. 1(3):138-139 (doi:10.14283/jpad.2014.25).

Russ, T.C., Killin, L.O.J., Hannah, J., Batty, G.D., Deary, I.J., and Starr, J.M. 2019. Aluminium and fluoride in drinking water in relation to later dementia risk. British Journal of Psychiatry (doi: 10.1192/bjp.2018.287) [Epub ahead of print].

Sadilova, M.S., Plotko, E.G., and Yel'nichyykh, L.N.1968. New data for the validation of the mean daily maximum permissible concentration of hydrogen fluoride in atmospheric air. From: Akademiya Meditsinakikh Nauk SSSR. "Biologicheskoe deystvie I gigienicheskoe znachenie atmosfemykh zagryaznertiy" .. Red. V. A. Ryazanova. Vypusk 11, Izdatel'stvo "Meditsina'~ Moskva, p. 5-15.

Salgarello, M., Lunardi, G., Inno, A., Pasetto, S., Severi, F., Gorgoni, G., and Gori, S. 2016. 18F-NaF PET/CT Imaging of Brain Metastases. Clinical Nuclear Medicine 41(7):564-5.



Samanta, A., Chanda, S., Bandyopadhyay, B., and Das, N. 2016. Establishment of drug delivery system nanocapsulated with an antioxidant (+)-catechin hydrate and sodium meta borate chelator against sodium fluoride induced oxidative stress in rats. Journal of Trace Elements in Medicine and Biology 33:54-67.

Sarkar, C., Pal, S., Das, N., and Dinda, B. 2014. Ameliorative effects of oleanolic acid on fluoride induced metabolic and oxidative dysfunctions in rat brain: experimental and biochemical studies. Food and Chemical Toxicology 66:224–236.

Sawan, R.M.M., Leite, G.A.S., Saraiva, M.C.P., Barbosa, F. Jr., Tanus-Santos, J.E., and Gerlach, R.F. 2010. Fluoride increases lead concentrations in whole blood and in calcified tissues from lead-exposed rats. Toxicology 271:21-26.

Schiffl, H. 2008. Fluoridation of drinking water and chronic kidney disease: Absence of evidence is not evidence of absence [letter]. Nephrol. Dial. Transplant. 23:411.

Schlesinger, E.R., Overton, D.E., Chase, H.C., and Cantwell, K.T. 1956a. Newburgh-Kingston caries-fluorine study XIII. Pediatric findings after ten years. Journal of the American Dental Association 52(3):296-306.

Schlesinger, E.R., Overton, D.E., Chase, H.C., and Cantwell, K.T. 1956b. Study of children drinking fluoridated and nonfluoridated water. Journal of the American Medical Association 160(1):21-4.

Seraj, B., Shahrabi, M., Shadfar, M., Ahmadi, R., Fallahzadeh, M., Frrokh Eslamlu, H., and Kharazifard, M.J. 2012. Effect of high water fluoride concentration on the intellectual development of children in Makoo/Iran. J. Dentistry (Tehran) 9(3):221-229.

Shalini, B., and Sharma, J.D. 2015. Beneficial effects of *Emblica officinalis* on fluoride-induced toxicity on brain biochemical indexes and learning-memory in rats. Toxicology International 22(1):35-9.

Shan, K.R., Qi, X.L., Long, Y.G., Nordberg, A., and Guan, Z.Z. 2004. Decreased nicotinic receptors in PC12 cells and rat brains influenced by fluoride toxicity--a mechanism relating to a damage at the level in post-transcription of the receptor genes. Toxicology 200(2-3):169-77.

Shannon, F.T., Fergusson, D.M., and Horwood, L.J. 1986. Exposure to fluoridated public water supplies and child health and behaviour. New Zealand Medical Journal 99:416-418.

Sharma, C., Suhalka, P., Sukhwal, P., Jaiswal, N., and Bhatnagar, M. 2014. Curcumin attenuates neurotoxicity induced by fluoride: An in vivo evidence. Pharmacognosy Magazine 10(37):61-65.

Sharma, C., Suhalka, P., and Bhatnagar, M. 2018. Curcumin and resveratrol rescue cortical–hippocampal system from chronic fluoride-induced neurodegeneration and enhance memory retrieval. International Journal of Neuroscience13:1-15.

Shen, Y.-W., and Taves, D.R. 1974. Fluoride concentrations in the human placenta and maternal and cord blood. Am. J. Obstet. Gynecol. 119(2):205-207.

Shen, Q.F., Xia, Y.P., and Xu, T.T. 2019. Matrix metalloproteinase-9 and p53 involved in chronic fluorosis induced blood-brain barrier damage and neurocyte changes. Archives of Medical Science 2:457-66.

Sheth, S., and Colletti, P.M. 2012. Atlas of sodium fluoride PET bone scans: atlas of NaF PET bone scans. Clinical Nuclear Medicine 37(5):e110-e116.

Shiboski, C.H., Gansky, S.A., Ramos-Gomez, F., Ngo, L., Isman, R., Pollick, H.F. 2003. The association of early childhood caries and race/ethnicity among California preschool children. J. Public Health Dentistry 63:38-46.

Shimonovitz, S., Patz, D., Ever-Hadani, P., Singer, L., Zacut, D., Kidroni, G., and Ron, M. 1995. Umbilical cord fluoride serum levels may not reflect fetal fluoride status. J. Perinat. Med. 23:279-282.



Shivaprakash, P.K., Ohri, K., and Noorani, HJ. 2011. Relation between dental fluorosis and intelligence quotient in school children of Bagalkot district. Journal of Indian Society of Pedodontics and Preventive Dentistry 29(2):117-120.

Short, E.M. 1944. Domestic water and dental caries: VI. The relation of fluoride domestic waters to permanent tooth eruption. J. Dent. Res. 23:247-255.

Spencer, K.F., and Limeback, H. 2018. Blood is thicker than water: Flaws in a National Toxicology Program study. Medical Hypotheses 121:160-163.

Spittle, B. 1994. Psychopharmacology of fluoride. a review. International Clinical Psychopharmacology. 9(2):79-82.

Stevenson, C.A., and Watson, A.R. 1957. Fluoride osteosclerosis. The American Journal of Roentgenology, Radium Therapy, and Nuclear Medicine 78(1):13-8.

Storhaug, C.L., Fosse, S.K., and Fadnes, L.T. 2017. Country, regional, and global estimates for lactose malabsorption in adults: A systematic review and meta-analysis. Lancet Gastroenterol. Hepatol. 2:738-746.

Suárez-Rodríguez, M., Azcona-San Julián, C., and Alzina de Aguilar, V. 2012. Hypothyroxinemia during pregnancy: The effect on neurodevelopment in the child. International Journal of Developmental Neuroscience 30:435-438.

Sudhir, K.M., Chandu, G.N., Prashant, G.M., Subba Reddy, V.V. 2009. Effect of fluoride exposure on Intelligence Quotient (IQ) among 13-15 year old school children of known endemic area of fluorosis, Nalgonda District, Andhra Pradesh. Journal of the Indian Association of Public Health Dentistry 1(13):88-94.

Sun, M., Li, S., Wang, Y., and Li, F. 1991. Using drawing tests to measure intelligence in children from areas impacted by combined Al-F endemic toxicosis (Shuicheng, Guizhou). Journal of Guiyang Medical College 16(3):204-06.

Sun, Y., Ke, L., Zheng, X., Li, T., Ouyang, W., and Zhang, Z. 2017. Effects of different levels of calcium intake on brain cell apoptosis in fluorosis rat offspring and its molecular mechanism. Biological Trace Element Research 176(2):355-366.

Sun, Z., Zhang, Y., Xue, X., Niu, R., and Wang, J. 2018. Maternal fluoride exposure during gestation and lactation decreased learning and memory ability, and glutamate receptor mRNA expressions of mouse pups. Human & Experimental Toxicology 37(1):87-93.

Susheela, A.K., Bhatnagar, M., Vig, K., and Mondal, N.K. 2005. Excess fluoride ingestion and thyroid hormone derangements in children living in Delhi, India. Fluoride 38:98-108.

Tang, Q., Du, J., Ma, H., Jiang, S., and Zhou, X. 2008. Fluoride and children's intelligence: A meta-analysis. Biol. Trace Elem. Res. 126:115-120.

Teng, Y., Zhang, J., Zhang, Z., and Feng, J. 2018. The effect of chronic fluorosis on calcium ions and CaMKIIα, and c-fos expression in the rat hippocampus. Biological Trace Element Research 182(2):295-302.

Thenkondar, A., Jafari, L., Sooriash, R., Hajsadeghi, F., Berenji, G.R., and Li, Y. 2017. 18F-NaF PET Demonstrating Unusual Focal Tracer Activity in the Brain. Clinical Nuclear Medicine 42(2):127-128.

Thiessen, K.M. 2011. Comments on EPA's Fluoride Risk Assessment and Relative Source Contribution Documents. Submitted to EPA's Office of Water and to EPA's Office of Pesticide Programs (April 19, 2011).

Till, C., Green, R., Grundy, J.G., Hornung, R., Neufeld, R., Martinex-Mier, E.A., Ayotte, P., Muckle, G., and Lanphear, B. 2018. Environmental Health Perspectives 126(10):107001.



Tipre, D.N., Zoghbi, S.S., Liow, J.S., Green, M.V., Seidel, J., Ichise, M., Innis, R.B., and Pike, V.W. 2006. PET imaging of brain 5-HT1A receptors in rat in vivo with 18F-FCWAY and improvement by successful inhibition of radioligand defluorination with miconazole. Journal of Nuclear Medicine 47(2):345-53.

Trivedi, M.H., Verma, R.J., and Chinoy, N.J. 2007. Amelioration by black tea of sodium fluoride-induced changes in protein content of cerebral hemisphere, cerebellum and medulla oblongata in brain region of mice. Acta Poloniae Pharmaceutica 64(3):221-5.

Tu, J., Liu, K., Song, Y., Zhang, Y., Cui, C., and Lu, C. 2011. Interactive effect of fluoride burden with calcitonin receptor gene polymorphisms on the risk of F bone injury. Int. Arch. Occup. Environ. Health 84:533-538.

Turner, S.D., Chan, J.T., and Li, E. 1998. Impact of imported everages on fluoridated and nonfluoridated communities. General Dentistry 146(2):90-193.

Underwood, E.J. 1977. Fluorine, Chapter 13 in: *Trace Elements in Human and Animal Nutrition*, 4th Edition. New York Academic Press, pp. 347-369.

USDHHS Panel (U.S. Department of Health and Human Services Federal Panel on community Water Fluoridation). 2015. U.S. Public Health Service Recommendation for Fluoride Concentration in Drinking Water for the Prevention of Dental Caries. Public Health Reports 130:318-331.

Valdez Jiménez, L., López Guzmán, O.D., Cervantes Flores, M., Costilla-Salazar, R., Calderón Hernández, J., Alcaraz Contreras, Y., and Rocha-Amador, D.O. 2017. In utero exposure to fluoride and cognitive development delay in infants. Neurotoxicology 59:65-70.

Varner, J.A., Horvath, W.J., Huie, C.W., Naslund, H.R., and Isaacson, R.L. 1994. Chronic aluminum fluoride administration. I. Behavioral observations. Behavioral and Neural Biology 61:233-241.

Varner, J.A., Jensen, K.F., Horvath, W., and Isaacson, R.L. 1998. Chronic administration of aluminum fluoride or sodium fluoride to rats in drinking water: Alterations in neuronal and cerebrovascular integrity. Brain Research 784(1-2):284-298.

Vermiglio, F., Lo Presti, V.P., Moleti, M., Sidoti, M., Tortorella, G., Scaffidi, G., Castagna, M.G., Mattina, F., Violi, M.A., Crisà, A., Artemisia, A., and Trimarchi, F. 2004. Attention deficit and hyperactivity disorders in the offspring of mothers exposed to mild-moderate iodine deficiency: A possible novel iodine deficiency disorder in developed countries. J. Clin. Endocrinol. Metab. 89:6054-6060.

Victora, C.G., Horta, B.L., Loret de Mola, C., Quevedo, L., Pinheiro, R.T., Gigante, D.P., Gonçalves, H., and Barros, F.C. 2015. Association between breastfeeding and intelligence, educational attainment, and income at 30 years of age: A prospective birth cohort study from Brazil. Lancet Global Health 3:e199-e205.

Victora, C.G., Bahl, R., Barros, A.J.D., França, G.V.A., Horton, S., Krasevec, J., Murch, S., Sankar, M.J., Walker, N., and Rollins, N.C., for The Lancet Breastfeeding Series Group. 2016. Breastfeeding in the 21st century: Epidemiology, mechanisms, and lifelong effect. Lancet 387:475-490.

Wadhwani, T.K., and Ramasway, A.S. 1953. Pathological changes in the tissues of rats (albino) and monkeys (*Macaca radiata*) in fluorine toxicosis. Journal of the Indian Institute of Science, Section A. 35:223-230.

Walton, J.L., and Messer, L.B. 1981. Dental caries and fluorosis in breast-fed and bottle-fed children. Caries Research 15:124-137.

Wang, G., Yang, D., Jia, F., and Wang, H. 1996. A study of the IQ levels of four- to seven-year-old children in high fluoride areas. *Endemic Diseases Bulletin* 11(1):60-6 (English translation published in *Fluoride* 2008; 41:340–43).



Wang, S.X., Wang, Z.H., Cheng, X.T., Li, J., Sang, Z.P., Zhang, X.D., Han, L.L., Qiao, X.Y., Wu, Z.M., and Wang, Z.Q. 2007. Arsenic and fluoride exposure in drinking water: children's IQ and growth in Shanyin county, Shanxi province, China. Environmental Health Perspectives 115(4):643-7.

Wang, J., Zhang, Y., Guo, Z., Li, R., Xue, X., Sun, Z., and Niu, R. 2018a. Effects of perinatal fluoride exposure on the expressions of miR-124 and miR-132 in hippocampus of mouse pups. Chemosphere 197:117-122.

Wang, C., Liang, C., Ma, J., Manthari, R.K., Niu, R., Wang, J., Wang, J., and Zhang, J. 2018b. Co-exposure to fluoride and sulfur dioxide on histological alteration and DNA damage in rat brain. Journal of Biochemical and Molecular Toxicology 32(2).

Warren, J.J., Levy, S.M., Broffitt, B., Cavanaugh, J.E., Kanellis, M.J., and Weber-Gasparoni, K. 2009. Considerations on optimal fluoride intake using dental fluorosis and dental caries outcomes—A longitudinal study. J. Public Health Dentistry 69:111-115.

Waugh, D.T., Godfrey, M., Limeback, H., and Potter, W. 2017. Black tea source, production, and consumption: Assessment of health risks of fluoride intake in New Zealand. Journal of Environmental and Public Health 2017:5120504.

Wei, N., Dong, Y.T., Deng, J., Wang, Y., Qi, X.L., Yu, W.F., Xiao, Y., Zhou, J.J., and Guan, Z.Z. 2018. Changed expressions of N-methyl-D-aspartate receptors in the brains of rats and primary neurons exposed to high level of fluoride. Journal of Trace Elements in Medicine and Biology 45:31-40.

Whitford, G.M., and Pashley, D.H. 1974. Soft tissue distribution of fluoride. Journal of Dental Research 53: Special Issue, Abstract 705.

Whitford, G.M., and Pashley, D.H. 1979. The effect of body fluid pH on fluoride distribution, toxicity, and renal clearance. In: Continuing Evaluation of the Use of Fluorides, Edited by Erling Johansen, Donald R. Taves, and Thor O. Olson. Chapter 8. AAAS (American Association for the Advancement of Science) Selected Symposium.

Whitford, G.M., Whitford, J.L., and Hobbs, S.H. 2009. Appetitive-based learning in rats: lack of effect of chronic exposure to fluoride. Neurotoxicology and Teratology 31(4):210-15.

Wilson, P.M., and Sheldon, T.A. 2006. Muddy waters: evidence-based policy making, uncertainty and the "York review" on water fluoridation. Evidence & Policy 2(3):321-331.

WHO (World Health Organization). 2004. Fluoride in drinking-water. Background document for development of *WHO Guidelines for Drinking-Water Quality*. World Health Organization, WHO/SDE/WSH/03.04/96.

Wolf, J.H. 2003. Low breastfeeding rates and public health in the United States. American Journal of Public Health 93(12):2000-2010.

Wu, J., Zhu, H., and Ji, H. 2013. Unexpected detection of brain metastases by 18F-NaF PET/CT in a patient with lung cancer. Clinical Nuclear Medicine 38(11):e429-32.

Wu, J., Wang, W., Liu, Y., Sun, J., Ye, Y., Li, B., Liu, X., Liu, H., Sun, Z., Li, M., Cui, J., Sun, D., Yang, Y., and Gao, Y. 2015. Modifying role of GSTP1 polymorphism on the association between tea fluoride exposure and the brick-tea type fluorosis. PLoS One 10(6):e0128280.

Xiang, Q., Liang, Y., Chen, L., Wang, C., Chen, B., Chen, X., and Zhou, M. 2003a. Effect of fluoride in drinking water on children's intelligence. Fluoride 36(2):84-94.

Xiang, Q., Liang, Y., Zhou, M., and Zang, H. 2003b. Blood lead of children in Wamiao-Xinhuai intelligence study [letter]. Fluoride 36(3):198-199.



Xiang, Q., Liang, Y., Chen, B., and Chen, L. 2011. Analysis of children's serum fluoride levels in relation to intelligence scores in a high and low fluoride water village in China. Fluoride 44(4):191-194.

Xu, Y., Lu, C., and Zhang, X. 1994. The effect of fluorine on the level of intelligence in children. *Endemic Diseases Bulletin* 9(2):83-84.

Yan, N., Liu, Y., Liu, S., Cao, S., Wang, F., Wang, Z., and Xi, S. 2016. Fluoride-induced neuron apoptosis and expressions of inflammatory factors by activating microglia in rat brain. Molecular Neurobiology 53(7):4449–60.

Yang, Y., Wang, X., Guo, X., and Hu, P. 1994. The effects of high levels of fluoride and iodine on child intellectual ability and the metabolism of fluoride and iodine. Chinese Journal of Epidemiology 15(4):296-8. English translation in Fluoride 41(4):336-339 (2008).

Yang, D., Liu, Y., Chu, Y., Yang, Q., Jiang, W., Chen, F., Li, D., Qin, M., Sun, D., Yang, Y., Gao, Y. 2016. Association between vitamin D receptor gene FokI polymorphism and skeletal fluorosis of the brick-tea type fluorosis: A cross sectional, case control study. BMJ Open 6(11):e011980.

Yang, L., Jin, P., Wang, X., Zhou, Q., Lin, X., and Xi, S. 2018a. Fluoride activates microglia, secretes inflammatory factors and influences synaptic neuron plasticity in the hippocampus of rats. Neurotoxicology 69:108-120.

Yang, Y., Zhao, Q., Liu, Y., Liu, X., Chu, Y., Yan, H., Fan, Y., Huo, S., Wang, L., Lou, Q., Guo, N., Sun, D., and Gao, Y. 2018b. FRZB1 rs2242070 polymorphisms is associated with brick tea type skeletal fluorosis in Kazakhs, but not in Tibetans, China. Archives of Toxicology 92:2217-2225.

Yang, H., Xing, H., Liu, S., Yu, H., and Li, P. 2019. Analysis of the protective effects of c-aminobutyric acid during fluoride-induced hypothyroidism in male Kunming mice. Pharmaceutical Biology, 57(1): 29-37.

Yao, Y., Zhou, J., Wang, X., Cui, Q., and Lin, F. 1996. Analysis on TSH and intelligence level of children with dental Fluorosis in a high fluoride area. Literature and Information on Preventive Medicine 2(1):26-27.

Yao, Y., Deng, Y., Yang, S., Zhou, J., Wang, X., and Cui, Z. 1997. Comparative assessment of the physical and mental development of children in endemic fluorosis area with water improvement and without water improvement. Literature and Information on Preventive Medicine 3(1):42-43.

Yazdi, S.M., Sharifian, A., Dehghani-Beshne, M., Momeni, V.R., and Aminian, O. 2011. Effects of fluoride on psychomotor performance and memory of aluminum potroom workers. Fluoride 44(3):158-162.

Yu, Y., Yang, W., Dong, Z., Wan, C., Zhang, J., Liu, J., Xiao, K., Huang, Y., and Lu, B. 1996. Neurotransmitter and receptor changes in the brains of fetuses from areas of endemic fluorosis. Chinese Journal of Endemiology 15(5):257-259. English translation (2008) in Fluoride 41(2):134-138.

Yu, X., Chen, J., Li, Y., Liu, H., Hou, C., Zeng, Q., Cui, Y., Zhao, L., Li, P., Zhou, Z., Pang, S., Tang, S., Tian, K., Zhao, Q., Dong, L., Xu, C., Zhang, X., Zhang, S., Liu, L., and Wang, A. 2018. Threshold effects of moderately excessive fluoride exposure on children's health: A potential association between dental fluorosis and loss of excellent intelligence. Environment International 118:116-124.

Yu, Q., Shao, D., Zhang, R., Ouyang, W., and Zhang, Z. 2019. Effects of drinking water fluorosis on L-type calcium channel of hippocampal neurons in mice. Chemosphere 220:169-175.

Yuan, J., Li, Q., Niu, R., and Wang, J. 2019. Fluoride exposure decreased learning ability and the expressions of the insulin receptor in male mouse hippocampus and olfactory bulb. Chemosphere 224:71-76.



Zeevi, N., Pachter, J., McCullough, L.D., Wolfson, L., and Kuchel, G.A. 2010. The blood-brain barrier: Geriatric relevance of a critical brain-body interface. J. Am. Geriatr. Soc. 58(9):1749-1757.

Zhang, R., Niu, Y., Du, H., Cao, X., Shi, D., Hao, Q., and Zhou, Y. 2009. A stable and sensitive testing system for potential carcinogens based on DNA damage-induced gene expression in human HepG2 cell. Toxicology in Vitro 23:158-165.

Zhang, J., Zhu, W.J., Xu, X.H., and Zhang, Z.G. 2011. Effect of fluoride on calcium ion concentration and expression of nuclear transcription factor kappa-B p65 in rat hippocampus. Experimental and Toxicologic Pathology 63(5):407-11.

Zhang, J., and Zhang, Z. 2013. Effects of chronic fluorosis on CaMKIIα, c-fos, Bax, and Bcl-2 channel signalling in the hippocampus of rats.  Fluoride 46(3):135-141.

Zhang, C., Ren, C., Chen, H., Geng, R., Fan, H., Zhao, H., Guo, K., and Geng, D. 2013a. The analog of *Ginkgo biloba* extract 761 is a protective factor of cognitive impairment induced by chronic fluorosis. Biological Trace Element Research 153:229-36.

Zhang, T., Shan, K.-R., Tu, X., He, Y., Pei, J.-J., and Guan, Z.-Z. 2013b. Myeloperoxidase activity and its corresponding mRNA expression as well as gene polymorphism in the population living in the coal-burning endemic fluorosis area in Guizhou of China. Biol. Trace Elem. Res. 152(3):379-386.

Zhang, L., Lu, X., Wang, Z., Qin, L., Yuan, L., and Yin, X. 2013c. Evaluation of the toxicity of fluorine in Antarctic krill on soft tisuues of Wistar rats. Advances in Polar Science 24(2):128-132.

Zhang, Y., Kim, J.-Y., Horst, O., Nakano, Y., Zhu, L., Radlanski, R., Ho, S., and Den Besten, P.K. 2014. fluorosed mouse ameloblasts have increased SATB1 retention and Gαq activity. PLOS One 9(8):e103994.

Zhang, K.L., Lou, D.D., and Guan, Z.Z. 2015a. Activation of the AGE/RAGE system in the brains of rats and in SH-SY5Y cells exposed to high level of fluoride might connect to oxidative stress. Neurotoxicology & Teratology 48:49-55.

Zhang, S., Zhang, X., Liu H., Qu, W., Guan, Z., Zeng, Q., Jiang, C., Gao, H., Zhang, C., Lei, R., Xia, T., Wang, Z., Yang, L., Chen, Y., Wu, X., Cui, Y., Yu, L., and Wang, A. 2015b. Modifying effect of COMT gene polymorphism and a predictive role for proteomics analysis in children's intelligence in endemic fluorosis area in Tianjin, China. Toxicological Sciences 144(2):238-245.

Zhang, Y., Huang, H., Gong, B., Duan, L., Sun, L., He, T., Cheng, X., Li, Z., Cui, L., and Ba, Y. 2017a. Do environmental fluoride exposure and *ESRα* genetic variation modulate methylation modification on bone changes in Chinese farmers? Chemical Research in Toxicology 30:1302-1308.

Zhang, Z., Wang, X., Nian, W., Liao, Q., Zhang, R., and Ouyang, W. 2017b. Effects of calcium on drinking fluorosis-induced hippocampal synaptic plasticity impairment in the offspring of rats. Translational Neuroscience 8:191-200.

Zhang, C., Huo, S., Fan, Y., Gao, Y., Yang, Y., and Sun, D. 2019. Autophagy may be involved in fluoride-induced learning impairment in rats. Biological Trace Element Research [Epub ahead of print].

Zhao, L.B., Liang, G.H., Zhang, D.N., and Wu, X.R. 1996. Effect of a high fluoride water supply on children's intelligence. Fluoride 29:190-192.

Zhao, M.X., Zhou, G.Y., Zhu, J.Y., Gong, B., Hou, J.X., Zhou, T., Duan, L.J., Ding, Z., Cui, L.X., and Ba, Y. 2015. Fluoride exposure, follicle stimulating hormone receptor gene polymorphism and hypothalamus-pituitary-ovarian axis hormones in Chinese women. Biomed. Environ. Sci. 28(9):696-700.

Zhao, Q., Niu, Q., Chen, J., Xia, T., Zhou, G., Li, P., Dong, L., Xu, C., Tian, Z., Luo, C., Liu, L., Zhang, S., and Wang, A. 2019. Roles of mitochondrial fission inhibition in developmental fluoride neurotoxicity:



Mechanisms of action in vitro and associations with cognition in rats and children. Archives of Toxicology 93(3):709-726.

Zheng, X., Sun, Y., Ke, L., Ouyang, W., and Zhang, Z. 2016. Molecular mechanism of brain impairment caused by drinking-acquired fluorosis and selenium intervention. Environmental Toxicology and Pharmacology 43:134-139.

Zhou, G.-Y., Ren, L.-J., Hou, J.-X., Cui, L.-X., Ding, Z., Cheng, X.-M., Zhu, J.-Y., Cui, R.-R., and Ba, Y. 2016. Endemic fluorosis in Henan province, China: ERα gene polymorphisms and reproductive hormones among women. Asia Pacific J. Clinical Nutrition 25(4):911-919.

Zhou, G., Tang, S., Yang, L., Niu, Q., Chen, J., Xia, T., Wang, S., Wang, M., Zhao, Q., Liu, L., Li, P., Dong, L., Yang, K., Zhang, S., and Wang, A. 2019. Effects of long-term fluoride exposure on cognitive ability and the underlying mechanisms: Role of autophagy and its association with apoptosis. Toxicology and Applied Pharmacology [Epub ahead of print].

Zhu, W., Zhang, J., and Zhang, Z. 2011. Effects of fluoride on synaptic membrane fluidity and PSD-95 expression level in rat hippocampus. Biological Trace Element Research 139(2):197-203.

Zhu, Y.P., Xi, S.H., Li, M.Y., Ding, T.T., Liu, N., Cao, F.Y., Zeng, Y., Liu, X.J., Tong, J.W., and Jiang, S.F. 2017. Fluoride and arsenic exposure affects spatial memory and activates the ERK/CREB signaling pathway in offspring rats. Neurotoxicology 59:56-64.

Zoeller, R.T. 2003. Transplacental thyroxine and fetal brain development. J. Clin. Invest. 111(7):954-957.

Zoeller, R.T., and Rovet, J. 2004. Timing of thyroid hormone action in the developing brain: Clinical observations and experimental findings. Journal of Neuroendocrinology 16:809-818.

Zohoori, F.V., Omid, N., Sanderson, R.A., Valentine, R.A., and Maguire, A. 2019. Fluoride retention in infants living in fluoridated and non-fluoridated areas: Effects of weaning. British Journal of Nutrition 121(1):74-81.

Zorrilla, E.P. 1997. Multiparous species present problems (and possibilities) to developmentalists. Dev. Psychobiol. 30:141-150.



# Exhibit 4

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3              AT SAN FRANCISCO

4   FOOD & WATER WATCH, et al.    *

5     Plaintiffs              *  Civ. No.

6   v.                        *  17-CV-02162-EMC

7   U.S. ENVIRONMENTAL PROTECTION *

8   AGENCY, et al.              *

9     Defendants              *

10            *    *    *    *    *

11          VIDEOTAPED DEPOSITION OF

12      JOYCE MORRISSEY DONOHUE, Ph.D., RD

13              MAY 13th, 2019

14              WASHINGTON, D.C.

15

16        Reported by:  Dawn M. Hyde

17

18

19

20

21

22

23

24

25

**CERTIFIED COPY**

1    Agency.

2            MR. DePASQUALE:  Daniel DePasquale

3    on behalf of the United States Environmental

4    Protection Agency.

5            MS. MESSIER:  Dawn Messier on behalf

6    of EPA.

7            THE VIDEOGRAPHER:  Will the court

8    reporter please swear in the witness and then

9    we can proceed.

10   Whereupon,

11       JOYCE MORRISSEY DONOHUE, Ph.D., RD,

12   a witness herein, called for oral examination in

13   the matter pending, being first duly sworn to tell

14   the truth, the whole truth, and nothing but the

15   truth, testified as follows:

16                   EXAMINATION

17       BY MR. CONNETT:

18       Q    **Good morning.**

19       A    Good morning.  My name is Donohue,

20   not Donahue.

21       Q    **Have you ever had a deposition taken**

22   **before?**

23       A    No.

24       Q    **So I am just going to start by**

25   **giving some basic background on the**

1    and wouldn't reject it.  So that's why it was

2    the National Defense Act that sponsored that

3    research.

4        Q    Gotcha.  Okay.  And since your

5    resume sort of fills in the gaps in terms of

6    what you do after your Ph.D., I would like to

7    kind of focus now on your work at EPA.  Okay?

8        A    Sure.

9        Q    And you started working at the EPA

10   in 1996.

11       A    Correct.

12       Q    And you have been -- your position

13   at the EPA since then has been senior health

14   scientist?

15       A    No.  I came in as a health scientist

16   and I didn't become a senior health scientist

17   until a couple of years after I got there.

18       Q    And what -- can you describe the

19   kind of work that you've done at EPA as a

20   health scientist?

21       A    I have worked on both the Clean

22   Water Act and the Safe Drinking Water Act.

23   Most of my work on the Clean Water Act was

24   when the 2000 methodology was written.  It was

25   partially written when I joined EPA but I was

1      Q     But with fluoride, you would

2    basically by the main go-to person on the

3    health aspects of fluoride exposure?

4      A     You're going to have to rephrase

5    that question and be very specific about which

6    part of fluoride because, remember, fluoride

7    is in a lot of molecules.

8      Q     Right.  Well, that is a good point.

9    When it comes to the health effects of

10   fluoride in drinking water, would it be fair

11   to say that you're the main person at EPA

12   working on that issue?

13     A     Inorganic fluoride.

14     Q     Yes?

15     A     If you limit it to inorganic

16   fluoride.

17     Q     So that would be correct, you would

18   be the main person at EPA dealing with the

19   health effects of inorganic fluoride exposure?

20     A     In the Office of Water.

21     Q     In the Office of Water.  And

22   inorganic -- the chemicals that are added to

23   drinking water for water fluoridation, they

24   are inorganic fluoride chemicals, right?

25     A     That is correct.

1    they retired.

2        Q    Would you -- you know who Karl

3    Jensen is, right?

4        A    Well, he is one of the ones I am

5    talking about.

6        Q    And Karl Jensen is a

7    neurotoxicologist, right?

8        A    Yes, he is.

9        Q    And he's the only scientist at EPA

10   to actually have conducted an animal study

11   looking at fluoride's neurotoxic effect,

12   right?

13       A    Yes.

14            MS. CARFORA:  Objection, foundation.

15   BY MR. CONNETT:

16       Q    Are you aware of that?

17       A    I can't remember a published study.

18   He wasn't at EPA when he -- he wasn't a lead

19   author.

20       Q    But he was an author of a study --

21       A    You're talking about Varner, et al.?

22       Q    Right.

23       A    Yes.  He was a graduate student, I

24   believe, at the time.

25       Q    And he was a coauthor of that animal

1    A    Correct.

2    Q    **And the most severe form of dental**

3    **fluorosis is called severe dental fluorosis?**

4    A    Correct.

5    Q    **And with severe dental fluorosis,**

6    **the enamel has extensive black staining,**

7    **right?**

8    A    The defining feature is that --

9    those pits in the enamel.  The coloration is

10   not considered in the definition.  It's those

11   pits in the enamel, and preceding that, the

12   porosity of the enamel that leads to the

13   staining.

14   Q    **So the -- in severe dental**

15   **fluorosis, the porosity of the enamel is so**

16   **severe that the enamel begins to pit and**

17   **crumble, right?**

18   A    That's the definition that's been

19   accepted as the, you know, that's when it

20   becomes severe.

21   Q    **And severe dental fluorosis is**

22   **generally characterized as having brown and**

23   **black staining of the enamel, right?**

24   A    If you're giving the broad term,

25   yes.  But the staining alone does not make it

1    that a child who has severe black staining on

2    the front two teeth, that that child might

3    consider that condition to be a severe effect,

4    be an adverse effect?

5        A    I doubt that a child would say that

6    other than to say why do I have these spots on

7    my teeth.  I would say a child wouldn't like

8    it.

9        Q    Well, you would agree that a child

10   or an adolescent, let's say an adolescent in

11   high school, if they had extensive black

12   staining of their front two teeth, that that

13   could cause pretty severe embarrassment with

14   their peers.  Would you agree with that?

15       A    What they would do would be avoid

16   letting people see their teeth.  I teach high

17   school students.

18       Q    So that might involve inhibiting

19   their smiles because they don't want to show

20   people their teeth, right?

21       A    That is correct.  At least the

22   students that I taught.

23       Q    And if you turn to the next

24   photograph, which is Exhibit Number 72, this

25   picture that we see here, this also is

1    consistent with the appearance of severe

2    dental fluorosis, right?

3        A    Again, it seems to be pretty evident

4    that there are pits.  I haven't seen the teeth

5    but by the pictures, I would judge that yes,

6    we have the pitting of the enamel.

7        Q    Now, when the EPA established the

8    MCLG in the 1980s, it did not consider this

9    condition that we see here -- this severe

10   dental fluorosis -- it did not consider this

11   to be an adverse health effect, did it?

12       A    Because they based it on severe

13   skeletal fluorosis, it's obvious that they did

14   not.

15       Q    And so the levels of fluoride

16   allowed in the water under the MCLG would

17   permit children to develop this condition that

18   we see here in Exhibit Numbers 71 and 72,

19   right?

20       A    According to the -- yes, according

21   to what the conclusion was at the time the

22   regulation was made, that this was not an

23   adverse effect and that it was crippling

24   skeletal fluorosis that was the basis of the

25   four, it would allow for this.

1          These people here might have also

2    been getting the four which is why, especially

3    with these people, it's as bad as it is,

4    right?

5          Q    Right.

6          A    So I don't know what the exposure

7    was here, but by definition, if this isn't

8    adverse, then yes.

9          **Q    Then by definition, if it's not**

10   **adverse, if EPA did not consider adverse, the**

11   **MCLG would allow that condition to occur?**

12         A    Maybe, because that's what I am

13   saying.  I don't know how much they were

14   getting in milligrams per liter.

15         **Q    Well, I know you don't know -- I'm**

16   **not asking you to tell me how much fluoride**

17   **these children that we see in these**

18   **photographs were receiving, but you agree that**

19   **under the four PPM MCLG that some children**

20   **will develop that condition that we see here?**

21         A    Some children will have pits in the

22   enamel of their teeth.  I can't agree or

23   disagree with whether they look like that, but

24   they will have pits in the enamel of their

25   teeth.

```
1              MS. CARFORA:  Michael, can we take a

2      break?

3              MR. CONNETT:  Yes.

4              THE VIDEOGRAPHER:  Going off the

5      record here at 11:53 a.m.

6              (Recess taken from 11:53 a.m.

7              until 12:14 p.m.)

8              THE VIDEOGRAPHER:  Okay.  We're

9      going back on the record at 12:14 p.m.  This

10     is tape number three of the videotaped

11     deposition of Joyce Donohue.

12         BY MR. CONNETT:

13         Q    Okay.  So I'd just like to recap

14     what we were just talking about about the

15     dental and skeletal fluorosis discussion.

16             When you first started working at

17     EPA in the 1990s, the EPA did not believe it

18     would be an adverse health effect for a child

19     to develop extensive pitting of the enamel as

20     a result of fluoride exposure, right?

21         A    Based on what they wrote at that

22     time.

23         Q    And the EPA did not believe it would

24     be an adverse health effect for a person to

25     suffer chronic joint pain from fluoride
```

1   exposure so long as they were not crippled,

2   right?

3       A    By the definition of crippling

4   skeletal fluorosis, one can -- again based on

5   what was written, it would appear they did

6   not.

7       Q    And the EPA, when you first started

8   working there, did not believe it would be an

9   adverse health effect for a person to suffer

10  osteoporosis from fluoride exposure so long as

11  it didn't cause outright crippling

12  deformities?

13      A    When EPA made the regulation in

14  1985, it didn't indicate that any of those

15  were adverse.  When I joined in 1996, the

16  written record was based on that 1985

17  decision.

18      Q    Right.

19      A    When I joined in 1996 and responded

20  to letters, I would say -- I was very careful

21  to say the MCL was four milligrams per liter

22  but not to say none of these other effects

23  were adverse.

24          So I could understand people who

25  wrote the letters and I tried to respond to

```
 1      BY MR. CONNETT:

 2      Q    And yet the MCLG for fluoride in the

 3  United States is still the same exact level

 4  that it was when the EPA set it in 1985,

 5  right?

 6      A    That is a statement of fact.

 7      Q    So the MCLG that we still have in

 8  place for fluoride in the year 2019 is a

 9  pretty crude standard?

10      A    It's an out-of-date assessment.

11      Q    So in the 1990s you come into the

12  EPA, and in the early 2000s you and the EPA

13  recognize that there's new toxicological data

14  on fluoride that needs to be considered,

15  right?

16      A    That's why they considered it.

17      Q    And the EPA asked, in the early

18  2000s, the National Research Council to review

19  this new toxicological data, right?

20      A    That is correct.

21      Q    And you yourself presented to the

22  National Research Council in 2003 to ask them

23  to do this review, right?

24      A    Correct.

25      Q    And I was there and we were talking.
```

1          A     Yes, we talked, yes.

2          **Q     I was at that meeting and you had,**

3     **in your discussion explaining to the NRC why**

4     **the EPA wanted the NRC to do this review, you**

5     **had mentioned that there was new data on**

6     **fluoride with respect to neurotoxicity; do you**

7     **remember that?**

8          A     Yes, I mean, it certainly is one of

9     the areas that --

10         **Q     And --**

11              MS. CARFORA:  Did you have more?

12     Did you finish your answer there?  You just

13     ended with the word "that."

14         A     That's just one of the areas where

15     there were new data, including the Varner

16     paper, several other papers.  So we -- in what

17     we charged the NRC to do, we didn't tell them

18     to just restrict themselves to dental

19     fluorosis and skeletal fluorosis.  The charge

20     to the National Research Council is broader

21     than that.  So Michael is correct.

22              BY MR. CONNETT:

23         **Q     And so there was -- in the 1990s and**

24     **early 2000s, there was new toxicological data**

25     **available on fluoride and neurotoxicity,**

1    right?

2        A    Correct.

3        Q    And you, the EPA, wanted the NRC to

4    review that data on neurotoxicity?

5        A    It was much broader than that.  We

6    asked them to do a host of effects.

7        Q    Right.  But you wanted NRC to, as

8    part of their review, to look at the new data

9    on neurotoxicity?

10       A    That was one of the topics, correct.

11       Q    And you also wanted them, the NRC,

12   to look at new data on endocrine disruption,

13   right?

14       A    Correct.

15       Q    And in 2006 the NRC released its

16   review of the MCLG?

17       A    Correct.

18       Q    And the NRC concluded that the

19   four ppm MCLG is too high and needs to be

20   lowered, right?

21       A    Unanimously.

22       Q    And the NRC concluded that severe

23   dental fluorosis is an adverse health effect,

24   right?

25       A    When it included the pitting of the

 1   **sentence.**

 2       A    "These changes have a bearing on the

 3   possibility that fluorides act to increase the

 4   risk of developing Alzheimer's disease."

 5       **Q    And that was a finding of the NRC,**

 6   **right?**

 7       A    On the possibility, yes, that was a

 8   finding.

 9       **Q    And can -- do you see the section**

10   **there titled "Anatomical changes in the**

11   **brain."**

12       A    In the same area.  Where is that?

13   Oh, okay, the section.  I'm sorry, I was

14   reading the paragraph.

15       **Q    And can you read the first sentence**

16   **there?**

17       A    That's Karl's paper.

18       **Q    And Karl is who?**

19       A    Karl Jensen.

20       **Q    An EPA scientist?**

21       A    He was.  He's retired now.

22       **Q    So this paragraph here is**

23   **summarizing Dr. Jensen's work?**

24       A    I know he found aluminum in both

25   cases in the brain.  We took a break at that

1    point.

2        Q    Right.  So can you read this summary

3    of Karl Jensen's research.

4        A    "Studies of rats exposed to sodium

5    fluoride and aluminum fluoride had reported

6    distortion in cells in the outer and inner

7    layers of the neocortex.  Neuronal

8    deformations were also found in the

9    hippocampus and to a smaller extent in the

10   amygdala" -- I always have trouble with

11   that -- "and cerebellum.  Aluminum was

12   detected in neurons and glia, as well as in

13   the lining and in the lumen of blood vessels

14   in the brain and kidney."

15       Q    Can you read the next sentence.

16       A    "The substantial enhancement of

17   reactive microglia, the presence of stained

18   intracellular neurofilaments and the presence

19   of IgM observed in rodents are related to

20   signs of dementia in humans."

21       Q    So this was one of the findings

22   again of the NRC review, right?

23       A    That one is a statement of fact.  I

24   mean, that's a statement of an outcome of a

25   study, not necessarily a finding.  That

1    finding was already published and available to

2    the public at that time.

3        Q    Okay.  So what the NRC is doing is

4    **just they are summarizing Dr. Jensen's**

5    **research?**

6        A    Correct.

7        **Q    And they are --**

8        A    He wasn't the lead but he is the one

9    who worked for EPA.

10       **Q    Right.  So before, I was asking you**

11   **whether Dr. Jensen had studied sodium fluoride**

12   **and he --**

13       A    Yes, I know, but what he found -- we

14   took a break then.  What he found was he found

15   aluminum in the brain in both cases.  So he

16   found that when he fed the aluminum fluoride

17   and the sodium fluoride and it was attributed,

18   maybe not in the paper, but since I worked

19   with Karl on this and we had a couple of

20   seminars where we brought in

21   neurotoxicologists, and good

22   neurotoxicologists, that aluminum fluoride

23   isn't terribly soluble.

24            So if you -- like calcium fluoride,

25   they like to pair up and have low solubility

1   with the functions of the brain and the body

2   by direct and indirect means."

3           Did I read that correctly?

4       A   Where are we?

5       Q   Right here.

6       A   Down here in Recommendations?

7       Q   Yes.

8       A   Okay.  That is "To determine the

9   potential adverse effects, additional data are

10  needed."  See, I guess personally I would

11  target more on the indirect but they said

12  this.  I can't deny that they said that.  But

13  as a biochemist, I'd focus on the indirect.

14      Q   But the NRC concluded, based on the

15  evidence available to it as of 2006, that

16  fluorides have the ability to interfere with

17  the functions of the brain.  That was NRC's

18  conclusion?

19      A   That was their conclusion, correct.

20      Q   So based on the -- according to the

21  NRC as of 2006, neurotoxicity is a hazard of

22  fluoride exposure at some level, right?

23      A   That was their conclusion, correct.

24      Q   So neurotoxicity, according to the

25  NRC, is a hazard of fluoride exposure?

```
1        A    Yes.

2        Q    And if you look towards the end of

3   page 267, last page, do you see there it says,

4   "The effects of fluoride on various aspects of

5   endocrine function should be examined further,

6   particularly with respect to a possible role

7   in the development of several diseases or

8   mental states in the United States.  Major

9   areas for investigation include the following:

10  thyroid disease especially in light of

11  decreasing iodine intake by the U.S.

12  population."

13           Did I read that correctly?

14       A    Correct.

15       Q    So the NRC is suggesting -- is

16  recommending -- strike that.  I will withdraw

17  the question.

18           Based on the concerns that the NRC

19  was expressing here, both in the neurotoxicity

20  review and the endocrine review, there were

21  some big potential problems from fluoride

22  exposure that needed to be investigated,

23  right?

24       A    I would agree with you there.

25       Q    And, I mean, based on what the NRC
```

1    Q    Right.  And you have read this

2    study?

3    A    I read it back when I sent it to

4    Barbara.  I don't remember it anymore.

5    Q    Right.

6    A    I mean, I remember that it exists,

7    yes.

8    Q    And do you -- this was -- this study

9    here is a prospective birth cohort study,

10   right?

11   A    Yes.

12   Q    And it found that prenatal fluoride

13   exposure in the ELEMENT cohort is associated

14   with significant loss of IQ in the children,

15   right?

16   A    It is one of the studies that finds

17   that, correct.  One of the post 2016 studies

18   that does that.

19   Q    And you would agree that this is a

20   very well-conducted study, right?

21   A    I would agree that it was well

22   conducted, yes.

23   Q    And you would agree that this study

24   justifies a reassessment of the current MCLG

25   for fluoride, correct?

```
 1    study I remember.
 2         Q    But if you look at the abstract,
 3    you'd agree --
 4         A    Yes, I now see the term ELEMENT.
 5         Q    And it found that urinary fluoride
 6    levels in the pregnant mother were
 7    significantly associated with an increased
 8    risk of ADHD symptoms in the offspring, right?
 9         A    Yes.
10         Q    And if you look at the results
11    section, the mean maternal urinary fluoride
12    content was just 0.85 milligrams per liter,
13    right?
14         A    I don't see that yet but --
15         Q    If you look at the results section,
16    it's the first sentence.
17         A    0.85, correct.
18         Q    So you would agree that this is an
19    important study here, prospective birth cohort
20    study which is finding a significant
21    relationship between low levels of fluoride in
22    the urine of pregnant women and ADHD symptoms
23    in children?
24         A    Yes.
25         Q    And you would agree that this study
```

1  further supports the need for reassessment of

2  current safety standards of fluoride in the

3  United States?

4      A   Yes, it is one of several.

5      Q   Okay.  And I am going to -- this --

6  in Dr. Ohanian's e-mail he also included a

7  study titled, "Till, EHP water and maternal

8  urine," do you see that?

9      A   Where's that?

10     Q   In the attachments.  If you look at

11 the description of the attachments in the

12 Ohanian e-mail.

13     A   Bashash, Till, EHP, Fluoride.  Till

14 in Canada.

15     Q   Right.

16     A   Okay.  So yes, if he sent it to me,

17 I have it.  And I know Till I think has two

18 publications out where she's an author.

19     Q   Okay.  So let's look at this Till

20 paper that Dr. Ohanian sent to you and the

21 others at EPA.  And do you see it?  It's in

22 that --

23     A   Okay.

24     Q   And you see it's titled, "Community

25 water fluoridation and urinary fluoride

1    Q    So would you agree that this study

2    here by Christine Till and colleagues provides

3    significant and important new information that

4    supports the reassessment of fluoride safety

5    standards in the United States?

6    A    It's one of the others that I've

7    already identified I had.  It's got Bruce

8    Lanphear in there too.

9    Q    And what's the importance of seeing

10   Bruce Lanphear's name as a coauthor of this

11   study?

12   A    He's an important lead person.

13   Q    And you would agree that Bruce

14   Lanphear has done very important and reliable

15   research?

16   A    Yes, I would.

17   Q    So when you see Bruce Lanphear's

18   name on a study, that gives it an added stamp

19   of authoritativeness; would it be fair to say

20   that?

21        MS. CARFORA:  Objection, form.

22   A    I am not going to judge.  Name

23   recognition.

24   BY MR. CONNETT:

25   Q    And so I'm not sure if you answered

1  my question, but you would agree that this

2  study right here adds further reason why we

3  need to do a reassessment of the fluoride

4  safety standards in the United States?

5      A    I think it's a reason for doing not

6  just the United States.  I think it's a reason

7  for doing an update to the fluoride

8  assessment.

9      Q    Everywhere?

10     A    Well, for anybody who's interested

11 in fluoride and the need for regulation of

12 fluoride exposure.

13     Q    Right.  Anyone interested in making

14 sure that fluoride is safe for consumption?

15     A    That people are not overexposed,

16 yes.

17     Q    And the other study that Dr. Ohanian

18 attached here in this e-mail is a study by

19 Malin, and Christine Till is a coauthor.

20     A    I have that one too.

21     Q    And it's titled, "Fluoride exposure

22 and thyroid function among adults living in

23 Canada: effect modification by iodine status,"

24 right?

25     A    Yes.

1  evaluation of the new data.  An individual

2  doesn't make those decisions.  Those decisions

3  are made by a community that has all kinds of

4  expertise.  So I have already agreed that I

5  think these are new, good studies, that they

6  need evaluation.  They need evaluation by

7  experts and I wouldn't classify myself as an

8  expert.

9      **Q    But you are the chief expert on**

10  **fluoride at EPA's Office of Water, right?**

11     A    That's correct, but the Office of

12  Water deals only with water.  There is no

13  regulation for iodine, and the Office of Water

14  doesn't always listen to me.

15     **Q    I understand.  Do you -- I might**

16  **have asked you this before but I forget your**

17  **answer.  Can you think of any other scientist**

18  **at the EPA who knows more about fluoride than**

19  **you do?**

20     A    I mean, Kris Thayer led the NIH

21  study.  She's now at EPA.  I can't answer to

22  her knowledge in the Office of Water and I am

23  only in that office.  Ed's pretty

24  knowledgeable because he knows the past.

25          Everybody else in the office --

```
 1        BY MR. CONNETT:
 2        Q    So I think -- oh, you know, one last
 3   document I meant to ask you about.  Oh, I
 4   forgot to mark it.  This will be Exhibit
 5   Number 92.  And you see this is an e-mail that
 6   you wrote to two individuals, and the subject
 7   is fluoride paper.
 8        A    Oh, yes.
 9             MS. CARFORA:  Hang on a second.  I
10   don't see that subject on here.  We're on
11   Exhibit Number 92?
12             MR. CONNETT:  Yes.
13             MS. CARFORA:  Thank you.  Sorry.
14        BY MR. CONNETT:
15        Q    It's dated -- the e-mail is dated
16   August 29th, 2018.
17        A    It would have been this year.
18        Q    Last year.
19        A    Last year.  Wow, it's already '19.
20        Q    And you attach in this e-mail a
21   study by Yu on fluoride and IQ.
22        A    That's another one of those studies
23   that deserves attention.
24        Q    And the title of this e-mail is
25   "Threshold effects of moderately excessive
```

1  fluoride exposure on children's health: a

2  potential association between dental fluorosis

3  and loss of excellent intelligence," correct?

4      A    Correct.

5      Q    And this study again found an

6  association between fluoride exposure and

7  reduced IQ, correct?

8      A    Correct.

9      Q    And you believe this study was a

10  well-done study, correct?

11      A    I thought they did a good job with

12  the confounding factors.

13      Q    And you think this is an important

14  study to be considered in reassessing the

15  fluoride safety standards?

16      A    Yes.

17      Q    It adds to the evidence base that

18  fluoride is a neurotoxicant, correct?

19      A    Correct.

20      Q    And so based on all these studies

21  that we're looking at, based on the latest

22  science, do you agree that neurotoxicity is a

23  potential risk of water fluoridation?

24      A    I can't agree.  You have to look at

25  the -- you have to evaluate these.

1      Q    And right now can you -- it's fair

2  to say that you could not identify a dose of

3  fluoride that is safe for the brain.  That's

4  not information that we currently understand,

5  right?

6      A    That is not information that my

7  office at EPA has evaluated to come up with an

8  assessment, correct.  I don't know whether

9  anybody else has.

10     Q    So you had talked earlier about

11 responding to letters from people from the

12 public.

13     A    Yes.

14     Q    If a pregnant mother sent you a

15 letter saying can you tell me the daily dose

16 of fluoride that is safe for my baby's

17 developing brain, could you give that -- could

18 you give them a dose or you would have to say

19 we don't currently know?

20          MS. CARFORA:  Objection, form,

21 foundation.

22     A    I don't approach the public in

23 words.  When I write to the public, I don't

24 write to them in jargon, reference dose or

25 things like that.  I try to tell them in plain

1  English what the controversies are and the

2  things that they should discuss.

3        If it's a pregnant woman, that she

4  should discuss with her doctor and there is

5  nothing wrong with going to a medical

6  practitioner and saying I have heard about

7  such and such and I wonder what you have to

8  tell me.

9        BY MR. CONNETT:

10       **Q    Okay.  And so if a pregnant woman**

11  **wrote you a letter and said I have just been**

12  **found -- the doctor just found that I have**

13  **over one part per million, or let's say one**

14  **part per million fluoride in my urine, and if**

15  **they asked you is that a safe level of**

16  **exposure for my baby, would you tell that**

17  **person it's a safe level?**

18       A    I would tell them I can't tell them

19  it's a safe level but I would again phrase it

20  in terms of what the controversy is, and I've

21  made that a practice for all the letters I've

22  written since Ken left.

23       **Q    And so if a pregnant woman sent you**

24  **a letter saying is it safe for me to be**

25  **drinking fluoridated water every day during my**

1    pregnancy, would you tell that woman that it's

2    safe for her to drink it in terms of her

3    baby's neurological health?

4         A    Since I have never done the

5    assessment, I can't tell her.  So I don't tell

6    people things unless there is actually

7    something to -- that I can cite to back up

8    whatever.

9              I usually acknowledge the

10   controversy and I usually write to them or try

11   to write to them as if I am not a scientist.

12   That I am speaking to them in language that

13   the general public can understand.  I may not

14   always succeed but I try to write the letters

15   that way.

16        Q    Right.

17             And so it sounds like, based on your

18   answer there, you would -- if someone asked

19   you, if a pregnant woman asked you is it safe

20   for me to be drinking fluoridated water during

21   my pregnancy, it sounds like you could not

22   provide them or cite them to any study

23   establishing the safety of fluoridated water

24   during pregnancy on a baby's neurological

25   health.

1      A    Oh, sometimes I will suggest that

2   people read something.  When a couple of these

3   came out, there were some good op-ed that came

4   with them, and that would be something that I

5   would suggest for a woman in that case.  It's

6   not making a judgment on graphs and lots of

7   data but, you know, I may not give them the

8   paper.  I may give them the citation.

9   Sometimes I actually send them the papers too.

10      Q    Well, say you have --

11      A    I mean, my management does.  I write

12   the letters, somebody else sends them out.

13      Q    **Say you have a more informed,**

14   **educated mother contacting you and she says,**

15   **Dr. Donohue, I have heard about this concern**

16   **about fluoride in the brain.  I am pregnant**

17   **right now and I'm trying to find safety data**

18   **to assure myself that this fluoridated water**

19   **is going to be safe for my baby.  Can you,**

20   **Dr. Donohue, cite me or send me a study that**

21   **establishes the neurological safety of**

22   **fluoridated water during pregnancy on the**

23   **child's brain?**

24      A    I couldn't send them a study per se.

25   I could send them a paper like this or I could

1  cite the paper and tell them how to get it

2  because some of them are available on the

3  internet.

4      **Q   And you're pointing there to the**

5  **studies that are showing harm from prenatal**

6  **fluoride exposure?**

7      A   Right now, I don't know of a study

8  on the other side of the -- a recent study on

9  the other side of the issue.

10      **Q   Right.**

11      A   So I haven't seen a rebuttal to any

12  of these papers.

13      **Q   So if they asked you can you point**

14  **me to a study that establishes the**

15  **neurological safety of prenatal fluoride**

16  **exposure, you couldn't -- you wouldn't send**

17  **them a study because you're not aware of any**

18  **reliable ones, correct?**

19      A   For neurological safety.  That is

20  not the reason I would send it to them if

21  there was -- if it was one -- I would send

22  both sides of the equation.  I wouldn't send

23  them one saying one thing when I knew there

24  was another one saying the other thing.

25      **Q   Right.  It's just that, as you sit**

1    **here today, you're not aware of a study that**

2    **would establish the safety of prenatal**

3    **fluoride exposure for the brain, right?**

4         A    Remember, dose makes the poison.   So

5    I am not aware of a study that right now says

6    this dose is safe.

7         **Q    Right.   Okay.**

8         A    And I am aware of several studies

9    that imply that some doses, and in at least

10   one of these papers it's above the

11   fluoridation level, may have some adverse

12   effects.

13              MR. CONNETT:   And I think that's all

14   the questions I have.

15              MS. CARFORA:   Can we go off the

16   record.

17              THE VIDEOGRAPHER:   We're going off

18   the record at 6:13 p.m. and this is the end of

19   today's testimony.

20              MS. CARFORA:   It is not the end of

21   the testimony.

22              THE VIDEOGRAPHER:   We're going off

23   the record.

24              (Recess taken from 6:13 p.m.

25              until 6:36 p.m.)

```
1    STATE OF MARYLAND

2    HOWARD COUNTY

3         I, Dawn Michele Hyde, a Notary Public of the

4    State of Maryland, Howard County, do hereby

5    certify that the above-captioned proceeding took

6    place before me at the time and place herein set

7    out.

8         I further certify that the proceeding was

9    recorded stenographically by me and this

10   transcript is a true record of the proceedings.

11        I further certify that I am not of counsel to

12   any of the parties, nor an employee of counsel,

13   nor related to any of the parties, nor in any way

14   interested in the outcome of the action.

15        As witness my hand and seal this 13th day of

16   May, 2019.

17              Dawn Hyde

18              Dawn M. Hyde, Notary Public

19              My Commission Expires 10/7/2019

20

21

22

23

24

25
```

# **Exhibit 5**

# REVIEW OF FLUORIDE

# BENEFITS
## and
# RISKS

REPORT OF THE AD HOC
SUBCOMMITTEE ON FLUORIDE

OF THE

COMMITTEE TO COORDINATE ENVIRONMENTAL
HEALTH AND RELATED PROGRAMS
PUBLIC HEALTH SERVICE





EXHIBIT
Ohanian
6
10-15-18

**FEBRUARY 1991**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE

**TABLE 23**

Preclinical and clinical stages of human skeletal fluorosis
and correlation of bone ash fluoride concentration

| OSTEOSCLEROTIC PHASE | ASH CONCENTRATION (mg F/kg) |
|---|---|
| Normal Bone | 500 - 1,000 |
| Preclinical Phase<br>asymptomatic;<br>slight radiographically-detectable<br>increases in bone mass | 3,500 - 5,500 |
| Clinical Phase I<br>sporadic pain; stiffness of joints;<br>osteosclerosis of pelvis &<br>vertebral column | 6,000 - 7,000 |
| Clinical Phase II<br>chronic joint pain; arthritic symptoms;<br>slight calcification of ligaments;<br>increased osteosclerosis/cancellous bones;<br>with/without osteoporosis of long bones | 7,500 - 9,000 |
| Phase III: Crippling Fluorosis<br>limitation of joint movement;<br>calcification of ligaments/neck,vert. column;<br>crippling deformities/spine & major joints;<br>muscle wasting;<br>neurological defects/compression of spinal cord | >8,400 |

(Adapted from:  Smith and Hodge, 1979; Franke et al., 1975; Schlegal, 1974)

National Academy of Science, 1980).  For endemic, tropical areas, the level of clinical effect for skeletal fluorosis is less certain (National Academy of Science, 1980);  Singh and Jolly (1970) stated that it may not be possible to determine the average minimal dose of fluoride needed to produce skeletal fluorosis, because of individual variations and the crude level of water analysis in many of the endemic areas.

For almost 40 years, investigators in the United States have searched for evidence of skeletal fluorosis. Radiographic changes in bone indicative of skeletal fluorosis, changes in bone mass, and effects on skeletal maturation were not observed at water fluoride concentrations of 1.2 mg/L for 10 years and from 3.3 to 6.2 mg/L for a lifetime (Hodge and Smith, 1981; Sowers et al., 1986; Schlesinger et al., 1956; McCauley and McClure, 1954).  In a survey of 170,000 radiographs of patients living in Texas and Oklahoma with water fluoride levels between 4 and 8 mg/L, Stevenson and Watson (1957) found 23 cases of radiographic osteosclerosis, but no evidence of skeletal fluorosis.

Skeletal fluorosis is highly variable in its clinical severity among individuals living in the same environment and exposed to the same risk of fluoride ingestion (Krishnamachari, 1986).  In the past 30 years, only five cases of crippling skeletal fluorosis have been reported in the literature in the

-46-

# Exhibit 6

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  AT SAN FRANCISCO

4    FOOD & WATER WATCH, et al.     *

5      Plaintiffs               *   Civ. No.

6    v.                         *   17-CV-02162-EMC

7    U.S. ENVIRONMENTAL PROTECTION *

8    AGENCY, et al.             *        **ORIGINAL**

9      Defendants               *

10              *    *    *    *    *

11            VIDEOTAPED DEPOSITION OF

12         JOHN WILLIAM HIRZY, Ph.D.

13              MAY 31st, 2019

14            WASHINGTON, D.C.

15

16         Reported by:  Dawn M. Hyde

17

18

19

20

21

22

23

24

25

1          MR. CONNETT:  Good morning.  Michael

2     Connett on behalf of the plaintiffs.

3          MS. CARFORA:  Debra Carfora from the

4     Department of Justice on behalf of EPA.

5          MR. WILBER:  Eric Wilber on behalf

6     of the EPA.

7          MR. DePASQUALE:  Daniel DePasquale,

8     EPA.

9          MR. DO:  John Thomas Do with the

10    Justice Department for EPA.

11          THE VIDEOGRAPHER:  Thank you.  Will

12    the court reporter now please administer the

13    oath and we can proceed.

14    Whereupon,

15          JOHN WILLIAM HIRZY, Ph.D.,

16    a witness herein, called for oral examination in

17    the matter pending, being first duly sworn to tell

18    the truth, the whole truth, and nothing but the

19    truth, testified as follows:

20                    EXAMINATION

21      BY MR. CONNETT:

22      Q    **Good morning, Dr. Hirzy.**

23      A    Morning, Michael.

24      Q    **We're here today to talk about some**

25    **of the work you did as a scientist at the**

1          MR. CONNETT:  Good morning.  Michael

2     Connett on behalf of the plaintiffs.

3          MS. CARFORA:  Debra Carfora from the

4     Department of Justice on behalf of EPA.

5          MR. WILBER:  Eric Wilber on behalf

6     of the EPA.

7          MR. DePASQUALE:  Daniel DePasquale,

8     EPA.

9          MR. DO:  John Thomas Do with the

10    Justice Department for EPA.

11          THE VIDEOGRAPHER:  Thank you.  Will

12    the court reporter now please administer the

13    oath and we can proceed.

14    Whereupon,

15          JOHN WILLIAM HIRZY, Ph.D.,

16    a witness herein, called for oral examination in

17    the matter pending, being first duly sworn to tell

18    the truth, the whole truth, and nothing but the

19    truth, testified as follows:

20                    EXAMINATION

21       BY MR. CONNETT:

22       Q    **Good morning, Dr. Hirzy.**

23       A    Morning, Michael.

24       Q    **We're here today to talk about some**

25    **of the work you did as a scientist at the**

1  Environmental Protection Agency on fluoride;

2  do you understand that?

3       A    Yes.

4       Q    Before we get to that, though, I

5  wanted to ask you some background questions

6  about your own professional background, okay.

7       A    Okay.

8       Q    Can you summarize your educational

9  background?

10      A    Yes.  I went to the University of

11 Missouri, not to become a Ph.D. in chemistry.

12 I went on a regular Navy ROTC scholarship with

13 the idea of becoming an officer in the Marine

14 Corps and that was my career goal.

15           White coat syndrome when they were

16 taking my blood pressure, however, caused me

17 to lose that appointment and so I stayed with

18 chemistry, earning a B.S. with honors at the

19 University of Missouri and continuing on there

20 for my Ph.D.

21           B.S. was in 1958.  Ph.D. in '62.

22 Phi Beta Kappa, Sigma Psi and Phi Eta Sigma

23 were the honor societies that I ended up

24 getting into during that time.

25      Q    So you have your Ph.D. in organic

 1              MS. CARFORA:  Objection, foundation.

 2       A    Yes.

 3       BY MR. CONNETT:

 4       **Q    Well, based on your experience at**

 5  **EPA, when a new professional comes on board,**

 6  **what level do they generally start at, if you**

 7  **know?**

 8              MS. CARFORA:  Objection, foundation.

 9       BY MR. CONNETT:

10       **Q    You can answer.**

11       A    Around GS11.  Normally, the

12  progression through the ranks, people top out

13  often at GS13.  That's about the journeyman

14  level in the professional ranks.  At least it

15  was at EPA.  GS13 was the journeyman level.

16  GS14 gets into senior scientists in the

17  divisional level or so forth.  And here I was

18  a GS15 in OTS.

19       **Q    Okay.  So let's talk about your work**

20  **at EPA.  You start in 1981.  You stayed at EPA**

21  **until 2008.**

22       A    Yes.

23       **Q    And you were in the Office of Toxic**

24  **Substances.**

25       A    Yes.  And the subsequent -- there

1   supervisors, haven't you?"  I'd never had a

2   woman supervisor before in my life.  "You

3   always had trouble with this, blah, blah,

4   blah.  Effective immediately, you're off this

5   project."

6           So that is how that all came about.

7   At least I didn't get fired right off the top.

8       Q    So you weren't able to do --

9       A    Yes, I wasn't able to do good

10  science in pursuit of the mission the way it

11  made sense to me and the way it ultimately

12  made sense to my division director and the

13  division director for the chemical control

14  division, who needed what I was trying to do.

15  It made perfect sense to all of us and I had

16  to really fight for that.

17      Q    Okay.  So let's briefly here just go

18  through some of the rest of your work at EPA.

19  So you were a senior scientist at Office of

20  Toxic Substances, right?

21      A    Yes.

22      Q    And you stayed on until 2008, right?

23      A    Yes.

24      Q    And it says here that you were the

25  ranking chemist.

1    A    Yes.  As it turned out, once we

2  organized the union and won our

3  representational election in 1984, Bill

4  Coniglio, who was the president, did a survey

5  of the bargaining unit, the professional

6  bargaining unit.

7        He said, "Bill, you know you're the

8  only GS15 chemist at headquarters?"  I said,

9  "You've got to be kidding me."  He said, "No.

10 You are the only GS15 chemist at

11 headquarters."

12       Well, that was kind of news to me

13 and that is why that business about the

14 ranking chemist -- there was no chemist at

15 equal rank to mine.  There were GM15s who

16 were -- like my branch chief was a GM15.

17    **Q    GM means manager?**

18    A    Yes, manager, yes.  GS is general

19 schedule.

20    **Q    So you were the ranking chemist for**

21 **all of the -- like not just for the Office of**

22 **Toxic Substances, but all offices at U.S. EPA**

23 **headquarters?**

24    A    There was no other chemist with a

25 GS15 rank at headquarters at that time.

1    Q    And during your time at Office of

2  Toxic Substances, as I see here in your

3  resume, you authored risk assessments --

4    A    Yes.

5    Q    -- on a number of different

6  chemicals.

7    A    Yes.  Well, let me talk about two of

8  them that were special --

9    Q    And just briefly because we really

10 need to move this forward.

11   A    Oh, okay.  The one that I'm most

12 proud of is -- other than the one that I had

13 to do some really innovative, kind of

14 out-of-the-box thinking on this CMA petition

15 thing was on 4,4'-methylenedianiline which was

16 the first chemical to trigger section 4(f) of

17 TSCA because of cancer concerns, and I was

18 given the job of doing risk assessment on

19 that.

20        I worked closely with -- I can't

21 remember his name in NIOSH -- it turned out

22 that all -- virtually all the exposures to

23 this chemical were in the industrial setting,

24 and we set up a research program where people

25 handling this stuff had exposure-measuring

1   patches put on.  And we got exposure

2   measurements and I developed, using interval

3   calculus calculating what the rate of

4   absorption was, based on the rate of

5   absorption through other kinds of tissue

6   that's normally -- anyway, it was a big deal

7   and it's a risk assessment that's this thick,

8   and I credited everybody who worked on that.

9   All the people who worked in health and

10  environment review division.  Everybody who

11  worked in EETD and everybody -- I've never

12  seen an EPA document like that where everybody

13  who worked on it got credit for it.

14          But I put my name on it, my branch

15  chief's name on it and then everybody else.

16  And it eventually turned out to be used by

17  OSHA to set -- negotiations between OSHA and

18  Labor to set industrial standards for

19  exposures to MDA.  It was a very big deal and

20  I was really happy with having done that.

21      **Q    And I see you won some awards.  A**

22  **silver medal award in 1983 and a bronze medal**

23  **award in 1987.**

24      A    Yes.  The silver medal was after I

25  got hammered by my branch chief for that CMA

```
1   thing, I got picked up by another branch

2   chief, Jeanette Wiltse, and she was in charge

3   of screening existing chemicals for toxicity.

4   And we worked out a process for doing that and

5   everybody who worked on that got a silver

6   medal.

7           The bronze medal was for my work on

8   establishing a daycare at EPA headquarters.  I

9   worked with some other people and other union

10  people and management types and we set up a

11  daycare center there and got recognition for

12  that.

13      Q    And after you left EPA, I see here

14  that you went on to do some teaching work at

15  American University.

16      A    Yes, I started there as an adjunct

17  in 1995 and then I went on an IPA from 2004 --

18  interagency personnel agreement -- as a

19  full-time faculty person at AU teaching

20  chemistry.

21          And then when I retired in '08, I

22  became a full-time employee of American

23  University on that chemistry faculty.  Taught

24  chemistry, environmental science.  And then an

25  honors course in ethics, law and rulemaking
```

```
 1    which I thought was -- it was a lot of fun.
 2            And then I retired from there
 3    in 2013.
 4        Q    So let's go and talk -- you had
 5    mentioned that you worked for the EPA
 6    headquarters union.
 7        A    Yes, I was an organizer and charter
 8    member and then served several terms as
 9    president.
10        Q    By charter member, does that mean
11    you helped found the union?
12        A    Yes, there eight of us on the
13    original charter for that Local 2050 I believe
14    NFFE and I'm one of them.  Bob Carton is
15    another one.
16        Q    What is NFFE?
17        A    National Federation of Federal
18    Employees.
19        Q    And so the EPA headquarters union of
20    scientists and professionals.  What --
21        A    Yes, we represented the professional
22    bargaining unit.  The professional unit is a
23    unit -- employees in which their job
24    description -- their work requires higher
25    education -- a degree in higher education,
```

1    basically.

2        **Q    And that would include the**

3    **toxicologists at EPA?**

4        A    Toxicologists, chemists, attorneys

5    and so forth.

6        **Q    And how many professionals came**

7    **within the EPA headquarters union?**

8        A    At the time I think it was around

9    1,200.

10        MS. CARFORA:  Can I just very

11    quickly ask, Michael, that you give the

12    witness instructions about you two not talking

13    over each other.

14        BY MR. CONNETT:

15        **Q    Yes.  So, Dr. Hirzy, it's totally**

16    **common and natural to, in everyday speech, we**

17    **know what the question's going to be and so we**

18    **begin answering it because we predict where**

19    **it's going.**

20        A    Okay.

21        **Q    Happens all the time.  In a**

22    **deposition, it's problematic because the**

23    **attorney has a right to object after I ask the**

24    **question.**

25        A    Okay.  Gotcha.

1   **what the union's position was on the fluoride**

2   **MCLG?**

3            MS. CARFORA:  Objection, foundation.

4       A    Well, over the years, as we looked

5   into this and read the literature, we became

6   aware that, for instance, there were many

7   publications in Journal of American Medical

8   Association, for instance, on increased hip

9   fractures.  Became aware that there had been

10  some cancer studies done and there had been

11  mutagenicity studies.  And then by -- as time

12  rolled on, other issues arose.

13           There were publications on

14  neurotoxicity became -- we became aware of

15  that.  We became aware of effects on the

16  thyroid gland, on the pineal gland and the

17  effect on premature maturation, especially in

18  young women, which was seen in one of the

19  famous Two Cities studies.  Became aware of

20  all of these kinds of effects that fluoride

21  had on tissues other than teeth.

22       BY MR. CONNETT:

23       **Q    So you have identified a number of**

24  **effects of fluoride on health.  Do you know**

25  **what the health effect was that EPA**

1  established the safe drinking water standard

2  around?

3      A    Yes.  It was crippling skeletal

4  fluorosis.  Basically spinal fusion basically,

5  that joints would be fused by the impact of

6  fluoride on connective tissue.  That was

7  alleged to be the most sensitive health

8  effect, and EPA used that as their basis for

9  setting their health-based standard.

10      Q    Do you have any opinion based on

11  what you learned about fluoride as to whether

12  crippling skeletal fluorosis is appropriately

13  considered the most sensitive effect of

14  fluoride exposure?

15      A    Yes, I do have an opinion and it's

16  not the most sensitive effect.

17      Q    And what do you base that on?

18      A    A plethora of research on effects on

19  other tissues beside connective tissue,

20  especially on the developing brain.  That is

21  one that has especially come to the fore.

22  Starting in the middle '90s, publications

23  started coming out of -- especially coming out

24  of China showing the impact of fluoride on

25  children's IQ.

1      **Q    What if we just limit the question**
2   **to the skeleton, the bones.  Do you think**
3   **crippling skeletal fluorosis is appropriately**
4   **considered the most sensitive skeletal effect**
5   **of fluoride?**
6          MS. CARFORA:  Objection, foundation.
7      A    Common sense says it can't be.  I
8   mean, you don't wake up one day and your spine
9   is fused.  I mean, there are aches and pains
10  that develop as your connective tissue becomes
11  more and more calcified, more and more
12  inflexible, and those kinds of arthritic-type
13  symptoms clearly are adverse health effects.
14          So, you know, it's crippling -- you
15  don't wake up one morning and suddenly your
16  spine is fused and say, oops, I've had too
17  much fluoride.
18      BY MR. CONNETT:
19      **Q    Have you ever heard of crippling**
20  **skeletal fluorosis being called stage three**
21  **skeletal fluorosis or phase three skeletal**
22  **fluorosis?**
23          MS. CARFORA:  Objection, compound.
24      A    Yes.  I mean, there are stage one,
25  stage two.  Basically the joint pain and then

1    stiffness and progressing to severe

2    arthritic-type symptoms and that kind of thing

3    that you see in the exploitative photographs

4    of people who -- especially in places where

5    endemic fluorosis, bone fluorosis in places

6    like India and China where the incredible

7    distortions of the bones are taking place.

8         BY MR. CONNETT:

9         **Q    Have you seen, in your review of the**

10   **literature on fluoride, have you seen any**

11   **studies or evidence to indicate that the**

12   **earlier stages of skeletal fluorosis, stage**

13   **one or stage two, that those stages can be**

14   **associated with symptoms?**

15        MS. CARFORA:  Objection, assumes

16   facts not in the record.

17        A    Yes.

18        BY MR. CONNETT:

19        **Q    What kind of symptoms have you seen**

20   **in the scientific literature being associated**

21   **with stage one and stage two skeletal**

22   **fluorosis?**

23        MS. CARFORA:  Objection, foundation,

24   leading.

25        A    Basically joint pain.

```
 1        BY MR. CONNETT:
 2        Q    And is joint pain something that you
 3   would consider as a scientist who's been
 4   involved in risk assessment, is joint pain
 5   something that you would consider to be an
 6   adverse health effect?
 7             MS. CARFORA:  Objection, foundation.
 8        A    As someone who has four prosthetic
 9   joints, I would say definitely it's an adverse
10   health effect.
11        BY MR. CONNETT:
12        Q    Now, were there -- did the union
13   have any -- strike that.
14             We have been talking about the
15   skeletal effects.  What about dental effects?
16   Was there any controversy surrounding the safe
17   drinking water standard for fluoride with
18   respect to dental effects?
19             MS. CARFORA:  Objection, foundation,
20   leading.
21        A    Yes.  Based even on the 1993 I think
22   it was National Academy report, they mentioned
23   that moderate and severe dental fluorosis
24   incidence were elevated in places where there
25   were higher fluoride levels in the drinking
```

1  softer tissue as the enamel is developing, and

2  if there are places where this enzymes misses

3  doing the work that it's supposed to do, that

4  results in the white spots.

5          I am not sure how that enzymatic

6  effect has to do with bones, but clearly

7  fluorine, the fluoride ion is attracted to the

8  calcium ion and the calcium ion is part of

9  this -- part of the enamel here that's clearly

10 part of the bone structures.

11     BY MR. CONNETT:

12     **Q    So, could you maybe summarize some**

13 **of what the EPA union did after it began**

14 **investigating the controversy surrounding the**

15 **fluoride drinking water standard in the 1980s?**

16          MS. CARFORA:  I'm going to object to

17 the narrative form of the question.

18     BY MR. CONNETT:

19     **Q    Okay.  Well, let me just ask it**

20 **differently.  Sometime in about 1985, I**

21 **believe you testified earlier, the EPA union**

22 **became aware of concerns with the fluoride**

23 **drinking water standard; is that correct?**

24     A    That's correct.  And what we did

25 after that, if I may continue that response,

1    is we tried to settle this issue in-house.

2    Bob Carton and I went to visit the director of

3    the Office of Drinking Water and ask for a

4    seminar by the people who wrote the technical

5    support document similar to the seminar that

6    we had heard from John Yiamouyiannis who

7    pointed out all the toxicity issues around

8    fluoride.

9         We wanted to hear from the people

10   who wrote the technical support document about

11   why they didn't address these.  And the Office

12   of Drinking Water director said no, no, we're

13   not going to do that.  We've followed the law.

14   We've posted this in the Federal Register.

15   There was notice and a comment period and

16   that's closed so there is not going to be any

17   kind of such seminar.

18        Well, we then tried to raise it

19   through the Science Advisory Board and other

20   communications with the administrator about

21   trying to get a handle on this and steer EPA

22   in the way of righteousness, if you will.

23   None of this worked.

24        So finally, by 1986 I think it was,

25   we sent a final request for review from SAB,

1   and if we don't get a response, we were going

2   to take other action.

3           And at that point the union resolved

4   to in fact submit an amicus curiae brief in

5   the NRDC lawsuit against EPA over the drinking

6   water standard.  That's how it progressed.  We

7   tried to settle it in-house and it was no

8   dice.

9       Q    So let me follow up on that.  You

10  said you filed an amicus curiae brief in a

11  court case?

12      A    Yes.

13      Q    And who was the plaintiff in that

14  case?

15           MS. CARFORA:  Objection, foundation.

16  BY MR. CONNETT:

17      Q    If you know.

18      A    Natural Resources Defense Council.

19      Q    And what was NRDC suing EPA over?

20           MS. CARFORA:  Objection, foundation.

21  BY MR. CONNETT:

22      Q    If you know.

23      A    Over the -- I presume it was the

24  health-based standard that was at issue.

25      Q    And in the amicus curiae brief, did

1   you -- did the EPA union side with the NRDC

2   over the -- against the EPA?

3        A    Yes.

4        Q    Are you aware, Dr. Hirzy, of any

5   other time where EPA scientists have filed an

6   amicus brief in a court case taking a position

7   at odds with the EPA administration?

8        A    No, I am not.

9        Q    Is it -- would it be fair to say

10  that that was a somewhat extraordinary step

11  that the union took?

12       A    Yes.

13            (Hirzy Deposition Exhibit Number 152

14            was marked for identification.)

15  BY MR. CONNETT:

16       Q    So I'm going to hand you two

17  documents here.  First I'll mark as Exhibit

18  Number 152, if you take a second to look

19  through this exhibit.

20            MS. CARFORA:  Counsel, is this

21  exhibit one document or is it a number of

22  different documents?

23            MR. CONNETT:  I'll ask the witness

24  what it is when he looks through it.

25

1    the Safe Drinking Water Act provisions that

2    say that EPA may not require the addition of

3    any substances for health protection to

4    drinking water.

5         BY MR. CONNETT:

6         Q    I see here in the letter he --

7    Robert Perciasepe states, "You are correct in

8    stating that the Safe Drinking Water Act

9    prohibits EPA from requiring or supporting the

10   addition of any substance including fluoride

11   to drinking water for preventative healthcare

12   purposes."

13             Did I read that correctly?

14        A    Yes, indeed you did.

15        Q    And is that consistent with your

16   understanding as well?

17        A    Yes.

18        Q    If you can set that aside.

19             (Hirzy Deposition Exhibit Number 156

20             was marked for identification.)

21        BY MR. CONNETT:

22        Q    Dr. Hirzy, I am going to hand you

23   a document that I have marked as Exhibit

24   Number 156.  What are we looking at here,

25   Dr. Hirzy?

```
1         A    This is the culmination of my

2    dealing with many inquiries from the public

3    about what the union's position is.  Why are

4    we against putting fluoride in drinking water.

5              In 1997, at a general meeting of the

6    membership, we voted to support the

7    Californians for safe drinking water action in

8    attempting to ban the statewide mandate for

9    fluoridation in California.  And we have had

10   many inquiries about why are you taking these

11   positions, and this was my summary of why we

12   have taken that position.

13        Q    So it's dated May 1st, 1999?

14        A    Yes.

15        Q    And the title is, "Why EPA's

16   Headquarters Union of Scientists Opposes

17   Fluoridation."

18        A    Yes.

19        Q    So this -- does this document here

20   respect the official position of the EPA

21   headquarters union on fluoridation?

22        A    Yes.

23        Q    And looking here at the first

24   paragraph, it states that, "Our union is

25   comprised of and represents the approximately
```

1   some critical biological function?  And there

2   isn't any except the response that I got

3   from -- I got no response about fluoride

4   having any useful biological purpose except

5   for mollusks, who some mollusks cannot form

6   their shells if the fluoride concentration is

7   too low.

8        So if you're a mollusk, you need the

9   fluoride.  If you're anything else, you don't.

10  That's basically what I took from that, from

11  that survey.

12       **Q    And that was a survey of EPA**

13  **scientists?**

14       A    Yes.  Well, I went out to the union

15  leadership and asked them if they could, you

16  know, similarly ask people that they knew, and

17  that is the response -- I got the one response

18  back from the folks up at Margaressett

19  [phonetic] Research Lab and they said they're

20  aware that mollusks need fluoride in order to

21  form their shell.

22       **Q    Now, in this position paper that you**

23  **wrote back in 1999, do you at all discuss**

24  **neurotoxicity issues?**

25       A    Yes.  By that time there had been

1    several developments in that area, not least

2    of which was the publication in

3    Neurotoxicology and Teratology by Isaacson,

4    et al., work group that included Karl Jensen,

5    an EPA scientist.

6            And they exposed rats to one part

7    per million fluoride as sodium fluoride or as

8    aluminum fluoride and found that there was

9    profound effects on the rat brain that was --

10   neuronal damage was the primary thing.  And

11   the fact that they saw this effect -- and the

12   aluminum fluoride was worse than the sodium

13   fluoride.

14           The thing that's really significant

15   about that is that one ppm in the drinking

16   water for rats is not the same as one ppm in

17   drinking water for humans.

18       Q    **What do you mean by that?**

19           MS. CARFORA:  I'm going to object to

20   the witness's answer as foundation and

21   counsel's question for lack of foundation.

22       A    From my training and experience in

23   toxicology, I understand that in order to

24   achieve the same serum levels of fluoride in

25   humans and rats, rats take about five times as

 1   much fluoride on the intake side than humans

 2   do.  In other words, for rats to get the

 3   equivalent of a human drinking one ppm water,

 4   they would have to be drinking five ppm water.

 5   And here, we're seeing these profound brain

 6   effects in these rats with essentially one

 7   fifth of the amount of water that people are

 8   exposed to.

 9            And the conclusion I drew from that

10   was whoa, we are way over anything like a

11   reasonable reference dose for humans just

12   drinking the so-called optimum level of

13   fluoride.

14            (Hirzy Deposition Exhibit Number 157

15            was marked for identification.)

16        BY MR. CONNETT:

17        Q    **And Dr. Hirzy, I'm going to hand you**

18   **a document that I have marked as 157.**

19        A    Yes, this is the one.

20        Q    **Is this the study that you were just**

21   **discussing?**

22        A    Yes.

23        Q    **And this was published in Brain**

24   **Research?**

25        A    Yes, this is Brain Research, yes.

1    Mullenix is published.

2         Q    Okay.  You can set that aside.

3              (Hirzy Deposition Exhibit Number 159

4              was marked for identification.)

5         BY MR. CONNETT:

6         Q    I am going to hand you a document

7    that I have marked as Exhibit Number 159

8    titled, "Defendants' response to plaintiffs'

9    first set of interrogatories," which was

10   provided to us in this case by EPA.  And,

11   Dr. Hirzy, if you could turn to page seven

12   and -- are you there?

13        A    Yes.

14        Q    You see at the top in bold it says,

15   "Identify all primary studies that EPA is

16   aware of which demonstrate or support the

17   neurological safety of prenatal fluoride

18   exposure."

19             Do you see that?

20        A    Yes.

21        Q    And then if I can direct your

22   attention to the bottom of the page.

23        A    Yes.

24        Q    It says, "Subject to and without

25   waiver of the objections above, EPA is aware

1  of the Mullenix study, 'Neurotoxicity of

2  sodium fluoride in rats' published in

3  Neurotoxicology and Teratology, 1995 that

4  demonstrates or supports the absence of

5  detectable adverse effects on the nervous

6  system following prenatal exposure."

7          Dr. Hirzy, is that a correct summary

8  of the -- well, let me ask you first.

9  Dr. Hirzy, do you agree with that statement?

10          MS. CARFORA:  Objection.  Calls for

11  an expert opinion.

12      A    Let me find the words.  Would that

13  the Principles of Scientific Integrity in fact

14  were followed by everybody who worked for EPA.

15  And this is clearly as overt a violation of

16  scientific integrity that I have ever seen in

17  print.

18          It is completely opposite of what

19  the Mullenix study found.  It's astounding to

20  see something like this as a publication of

21  the Environmental Protection Agency.

22      BY MR. CONNETT:

23      Q    You can set that aside.

24          Now, Dr. Hirzy, after the EPA

25  headquarters union released its position paper

1    Q    So if severe dental fluorosis was

2    considered a cosmetic effect, would the Safe

3    Drinking Water Act require that EPA protect

4    against it?

5    A    Yes.

6         MS. CARFORA:  Objection, foundation.

7    BY MR. CONNETT:

8    Q    If severe dental fluorosis is

9    considered a cosmetic effect, does the Safe

10   Drinking Water Act require EPA to protect

11   against it?

12   A    No.

13        MS. CARFORA:  Objection, foundation.

14   A    Not according to the plain language

15   of the statute as I read it.

16   BY MR. CONNETT:

17   Q    So I would like to return back to

18   your Senate testimony and I would like to

19   direct your attention to the top of page

20   three.

21   A    Say again, my Senate testimony.

22   Okay.

23   Q    Exhibit Number 160.

24   A    My mind wandered.  Okay.

25   Q    Page three, okay.  I am looking

1    here, Dr. Hirzy, the top paragraph, and you

2    state that the -- "Europe has about the same

3    rate of dental caries as the U.S., and most

4    European countries do not fluoridate."  That's

5    what you told --

6        A    Yes.  Yes.

7        Q    And have you had, through your work,

8    Dr. Hirzy, on fluoride, have you had the

9    opportunity to look into and research the

10   status of water fluoridation in Europe?

11       A    Yes, through a friend in --

12   Eugene -- last name escapes me -- a veteran of

13   the 29th Infantry Division at D-Day, as a

14   matter of fact.

15            He surveyed the water authorities

16   throughout Europe and also I think Japan and

17   China with respect to status of water

18   fluoridation and he shared those letters with

19   me, and that was the basis of my -- that was

20   the basis of my statement in this testimony.

21       Q    And you say here that, "I am

22   submitting letters from European and Asian

23   authorities on this point."  Are those the

24   letters that you just referenced?

25       A    Yes.

```
1              (Hirzy Deposition Exhibit Number 166

2              was marked for identification.)

3        BY MR. CONNETT:

4        Q    I am going hand you a document that

5   I've marked Exhibit Number 166.

6        A    Ah, yes, Wasser Gas.

7        Q    And if you take a second, Dr. Hirzy,

8   just to look through this exhibit.

9        A    Yes.  Yes.

10        Q    Are these the letters that you were

11   just referencing that you submitted to the

12   Senate?

13        A    Yes.  Yes.

14        Q    You can set that aside.  Do you

15   have -- Dr. Hirzy, based on everything you

16   have learned and researched, do you have an

17   understanding as to what percentage of the

18   population in Europe consumes fluoridated

19   drinking water?

20        A    It's very low.  It's probably around

21   two percent.  The Irish Republic fluoridates

22   and there's a small amount of it in England

23   and a little bit in Spain but that's basically

24   it.  Switzerland had fluoridated water and I

25   remember, while I was still at EPA, word came
```

1    out that they had dropped it because it wasn't

2    effective.  It didn't do anything and so

3    forth.  So it's a relatively small fraction of

4    Europe is fluoridated.

5        **Q    Now, have you, in the course of your**

6    **research on fluoride, looked at any data with**

7    **respect to the dental caries rates in Europe?**

8        A    Yes, I have looked at the graphic

9    representation of World Health Organization's

10   charting of dental caries rates comparing many

11   European countries and the United States and

12   other countries in the Third World, for

13   instance, and in all of those places the

14   dental caries rates are coming down from the

15   1950s through -- I think the graphs that I was

16   looking at was the late '90s perhaps.  I can't

17   remember now what the X axis looked like on

18   that graph but there are similar slopes.

19       **Q    So the dental decay rates in Europe**

20   **had been decreasing from the -- strike that.**

21           **So based on the data you looked**

22   **at -- and that data was from the World Health**

23   **Organization?**

24       A    Yes.

25       **Q    And that data shows the dental decay**

1    rates -- strike that.  I'll ask it again.

2              What does that data show

3    specifically with respect to Europe?

4        A    That there is a general decline in

5    dental caries rates throughout Europe.

6        Q    And how does the decline in caries

7    in Europe compare with the decline in caries

8    that we have seen here in the United States?

9        A    Pretty much on a parallel track.

10       Q    And what significance, if any, do

11   you draw from that fact?

12       A    That you don't need to put fluoride

13   in the drinking water in order to have a

14   decrease in dental caries rates.

15       Q    You can put those letters aside.

16             Dr. Hirzy, in your Senate testimony,

17   and I think you referenced it earlier, but you

18   cite to a letter from a Rebecca Hanmer.  Who

19   is Rebecca Hanmer?

20       A    She was at the time I think the

21   deputy assistant administrator for water, I

22   believe was her official title, as I recall

23   the signature line on that.

24             (Hirzy Deposition Exhibit Number 167

25             was marked for identification.)

```
 1    drinking water, what's it considered?
 2              MS. CARFORA:  Objection, foundation.
 3         A    According to this EPA official, it's
 4    a water pollutant.
 5         BY MR. CONNETT:
 6         Q    But it's permissible to add this to
 7    drinking water for fluoridation?
 8         A    Yes.
 9         Q    So, Dr. Hirzy, you talked about
10    reviewing some USGS documents.
11         A    Yes.
12         Q    And that's the U.S. Geological
13    Society?
14         A    U.S. Geological Survey.
15         Q    And in -- have you ever had occasion
16    to research the companies in the United States
17    that manufacture fluosilicic acid in
18    fluoridation chemicals?
19         A    Yes, in the USGS survey, Mosaic and
20    Simplot and Solvay I think are the ones that
21    were cited in the surveys that I've seen.
22         Q    Is it your understanding that those
23    are the primary manufacturers of fluoridation
24    in the United States?
25         A    I presume so because that's -- it's
```

1  the data from those that are reported by the

2  USGS.

3      Q    When you say the data from those,

4  what are you referring to?

5      A    They are solicited by -- this guy I

6  think is Michael Miller, as I recall, who is

7  the USGS employee who does this.  It's in the

8  report on fluorspar, which is a calcium

9  fluoride.  It's an important mineral in

10  manufacturing aluminum and other products.

11          And what happens is that fluosilicic

12  acid can be used as a substitute for some of

13  the uses that calcium fluoride is used for.

14  And for reasons that I am not aware of, but

15  the USGS obviously has its reasons, they lump

16  in the production values for

17  hydrofluorosilicic acid in with the fluorspar

18  stuff.

19          MS. CARFORA:  I object to the

20  witness's narrative, for lack of foundation.

21      BY MR. CONNETT:

22      Q    Okay.  You can set the Senate

23  testimony aside, Dr. Hirzy.

24          (Hirzy Deposition Exhibit Number 168

25          was marked for identification.)

1   STATE OF MARYLAND

2   HOWARD COUNTY

3       I, Dawn Michele Hyde, a Notary Public of the

4   State of Maryland, Howard County, do hereby certify

5   that the above-captioned proceeding took place

6   before me at the time and place herein set out.

7       I further certify that the proceeding was

8   recorded stenographically by me and this transcript

9   is a true record of the proceedings.

10      I further certify that I am not of counsel to

11  any of the parties, nor an employee of counsel, nor

12  related to any of the parties, nor in any way

13  interested in the outcome of the action.

14      As witness my hand and seal this 31st day of

15  May, 2019.

16

17      Dawn M. Hyde, Notary Public

18      My Commission Expires 10/7/2019

19

20

21

22

23

24

25

# Exhibit 7



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

JUL 26 1984

OFFICE OF
WATER

NOTE:

SUBJECT: The adverse health effects of fluorosis

TO: William D. Ruckelshaus
Administrator

FROM: Victor J. Kimm, Director
Office of Drinking Water (WH550)

After our meeting with Dr. Koop you asked for further in-
formation on three issues. These are discussed below, as is
a fourth, a recent move in South Carolina District Court to
force revision of the Fluoride regulation on an accelerted
schedule.

1. OGC memo on definition of adverse health effects.

Your first question was on the legal interpretation of
what constitutes an adverse health effect, and the extent of
your discretion in this matter. OGC has developed a memorandum
(Attachment 1) in response.

The basic findings of OGC are that there is no case law
which provides a standard by which to operate nor had Congress
made specific reference to a definition in any legislation or
legislative history. There is case law which suggests that you
have relatively broad discretion in these matters.

Specifically with regard to Fluorides, the last sentence
of the OGC memo states:

"On balance, I believe that a Primary regulation to control
the dental effects of fluoride would be upheld because of the
substantial deference accorded the Administrator in defining
adverse health effects."

2. Evaluating the psychological effects of fluorosis.

At your suggestion we have contacted former Surgeon General
Richmond, and have forwarded a letter asking him to comment on
the practicality of convening a panel of behavioral scientists
to review the fluorosis issue.

One drawback of such a panel, were it formed, is the
amount of time it will take to receive the report which would



EXHIBIT
Oharian
5
10-15-18

ensue.  As the next point will show, there may be sufficient
data now to demonstrate a clear functional effect from fluorsis,
obviating the need for review of psychological effects.

3.    A review of data on functional tooth deficits associated
      with fluorosis.

     The Surgeon General suggested verbally that high fluoride
exposures led to better (i.e., stronger) teeth, discoloration
and pitting notwithstanding.  He also suggested that he would
consider chips, fractures and related cavities to be functional
deficits which are adverse health effects.

     It is difficult to conclude a priori that teeth which
spontaneously pit are stronger teeth.  Further, data suggest
that the effects of fluorosis are not merely discoloration and
pitting, but fracturing, caries and tooth loss as well.  The
data which support this statement are presented in attachments
2, 3 and 4.

     These include peer reviewed case controlled studies which
document increases in caries associated with higher degrees of
fluorosis, as well as increased rates of caries in some popula-
tions exposed to higher levels of fluoride (for levels above the
optimal).  As the second attachment indicates, five of eight
studies found higher caries among those with the more extreme
levels of mottling.  But, as there are three studies which
suggest the obverse, there will be those who wish to continue
to argue the point.

     The Drinking Water Research Division (ORD) plotted the
caries dose-effect relationship, based on their studies and
those of other peer reviewed case controlled studies. (Attach-
ment 5)  The curve slopes downward (fewer cavities) until the
optimal level is reached, then begins to slope back upward (more
cavities) as the fluoride level increases.  (The current MCL is
set at twice optimal.)  The statistical validity range of these
points has not yet been determined.

     A third piece of data is from a study of the costs of
dental repair due to fluorosis.  A panel of six dental practi-
tioners were assembled to serve as a referee panel.  These
dentists were highly experienced.  They each had practices in
or adjacent to a community with fluoride levels in the critical
to high range ($\geq$ 2 times optimal), had experience in providing
care for mild to severe mottled enamel, had a minimum of five
years experience in general practice, and represented a geo-
graphic distribution in the nation.

This panel was asked to evaluate the dental needs of 55 teenagers selected from a population exposed to 4.8 ppm or less fluoride. They were to indicate what procedures would be used to repair cosmetic defects (mottling) and functional effects (pits, chips and fractures). The results of the evaluation indicate that both functional damage and cosmetic damage occurred, and that it would cost much more to fix the functional than the cosmetic damage.

We have some color photos of fluorotic teeth which shows the kind of chipping, pitting and fracturing individuals exposed to high fluoride levels must endure. It is difficult to examine such photos and conclude that such effects are not adverse.

4. Court ordered accelerated regulation.

The speed with which the fluoride issue is resolved may have to increase, as the State of South Carolina has taken steps to seek a court ordered regulatory schedule. It remains to be seen if and when this will occur.

Next Steps

You should know that this issue is being reviewed by the National Drinking Water Advisory Council next week. They will provide you their recommendations at that time.

We would like to discuss the options which are available to resolve this issue during your briefing, scheduled for July 27th.

cc: Jack E. Ravan

# Exhibit 8

Fluoride Vol. 32 No. 3 179-186 1999 Discussion Section   179



Chapter 280
P.O. Box 76082
Washington, DC 20013
202-260-2383(V)
202-401-3139(F)

The National Treasury Employees Union

May 1, 1999

# WHY EPA'S HEADQUARTERS UNION OF SCIENTISTS OPPOSES FLUORIDATION*

The following documents why our union, formerly National Federation of Federal Employees Local 2050 and since April 1998 Chapter 280 of the National Treasury Employees Union, took the stand it did opposing fluoridation of drinking water supplies. Our union is comprised of and represents the approximately 1500 scientists, lawyers, engineers and other professional employees at EPA Headquarters here in Washington, D.C.

The union first became interested in this issue rather by accident. Like most Americans, including many physicians and dentists, most of our members had thought that fluoride's only effects were beneficial - reductions in tooth decay, etc. We too believed assurances of safety and effectiveness of water fluoridation.[†]

Then, as EPA was engaged in revising its drinking water standard for fluoride in 1985, an employee came to the union with a complaint: he said he was being forced to write into the regulation a statement to the effect that EPA thought it was all right for children to have "funky" teeth. It was OK, EPA said, because it considered that condition to be only a *cosmetic* effect, not an adverse *health* effect. The reason for this EPA position was that it was under political pressure to set its health-based standard for fluoride at 4 mg/liter. At that level, EPA knew that a significant number of children develop moderate to severe dental fluorosis, but since it had deemed the effect as only cosmetic, EPA didn't have to set its health-based standard at a lower level to prevent it.

We tried to settle this ethics issue quietly, within the family, but EPA was unable or unwilling to resist external political pressure, and we took the fight public with a union *amicus curiae* brief[‡] in a lawsuit filed against EPA by a public interest group. The union has published on this initial involvement period in detail.[1]

Since then our opposition to drinking water fluoridation has grown, based on the scientific literature documenting the increasingly out-of-control exposures to fluoride, the lack of benefit to dental health from ingestion of fluoride and the hazards to human health from such ingestion. These hazards include

---

*For Correspondence: Bill Hirzy, NTEU Headquarters, Box 76082 Washington, DC 20013.
†For a history of how drinking water fluoridation began, see "Fluoride, Teeth and the Atomic Bomb", by investigative reporters Joel Griffiths and Chris Bryson [in *Fluoride* 1997;30(4):261-266], on-line at http://www.ia4u.net/~sherrell/bomb.htm.
‡http://www.rvi.net/~fluoride/amicus.htm [or: www.cadvision.com/fluoride/epa1985.htm].



PENGAD 800-631-6989

EXHIBIT
156
5|31||9

180   Hirzy

acute toxic hazard, such as to people with impaired kidney function, as well as chronic toxic hazards of gene mutations, cancer, reproductive effects, neurotoxicity, bone pathology and dental fluorosis. First, a review of recent neurotoxicity research results.

In 1995, Mullenix and co-workers[2] showed that rats given fluoride in drinking water at levels that give rise to plasma fluoride concentrations in the range seen in humans suffer neurotoxic effects that vary according to when the rats were given the fluoride – as adult animals, as young animals, or through the placenta before birth. Those exposed before birth were born hyperactive and remained so throughout their lives. Those exposed as young or adult animals displayed depressed activity. Then in 1998, Guan and co-workers[3] gave doses similar to those used by the Mullenix research group to try to understand the mechanism(s) underlying the effects seen by the Mullenix group. Guan's group found that several key chemicals in the brain – those that form the membrane of brain cells – were substantially depleted in rats given fluoride, as compared to those who did not get fluoride.

Another 1998 publication by Varner, Jensen and others[4] reported on the brain- and kidney-damaging effects in rats that were given fluoride in drinking water at the same level deemed "optimal" by pro-fluoridation groups, namely 1 part per million (1 ppm). Even more pronounced damage was seen in animals that got the fluoride in conjunction with aluminum. These results are especially disturbing because of the low dose level of fluoride that shows the toxic effect in rats - rats are more resistant to fluoride than humans. This latter statement is based on Mullenix's finding that it takes substantially more fluoride in the drinking water of rats than of humans to reach the same fluoride level in plasma. It is the level in plasma that determines how much fluoride is "seen" by particular tissues in the body. So when rats get 1 ppm in drinking water, their brains and kidneys are exposed to much less fluoride than humans getting 1 ppm, yet they are experiencing toxic effects. Thus we are compelled to consider the likelihood that humans are experiencing damage to their brains and kidneys at the "optimal" level of 1 ppm.

In support of this concern are results from two epidemiology studies from China[5,6] that show decreases in I.Q. in children who get more fluoride than the control groups of children in each study. These decreases are about 5 to 10 I.Q. points in children aged 8 to 13 years.

Another troubling brain effect has recently surfaced: fluoride's interference with the function of the brain's pineal gland. The pineal gland produces melatonin which, among other roles, mediates the body's internal clock, doing such things as governing the onset of puberty. Jennifer Luke[7] has shown that fluoride accumulates in the pineal gland and inhibits its production of melatonin. She showed in test animals that this inhibition causes an earlier onset of sexual maturity, an effect reported in humans as well in 1956, as part of the Kingston/Newburgh study, which is discussed below. In fluoridated Newburgh, young girls experienced earlier onset of menstruation (on average, by six months) than girls in non-fluoridated Kingston.[8]

From a risk assessment perspective, all these brain effect data are particularly compelling and disturbing because they are convergent.

We looked at the cancer data with alarm as well. There are epidemiology studies that are convergent with whole-animal and single-cell studies (dealing with the cancer hazard), just as the neurotoxicity research just mentioned all points in the same direction. EPA fired the Office of Drinking Water's chief toxicologist, Dr. William Marcus, who also was our local union's treasurer at the time, for refusing to remain silent on the cancer risk issue.[9] The judge who heard the lawsuit he brought against EPA over the firing made that finding - that EPA fired him over his fluoride work and not for the phony reason put forward by EPA management at his dismissal. Dr. Marcus won his lawsuit and is again at work at EPA. Documentation is available on request.

The type of cancer of particular concern with fluoride, although not the only type, is osteosarcoma, especially in males. The National Toxicology Program conducted a two-year study[10] in which rats and mice were given sodium fluoride in drinking water. The positive result of that study (in which malignancies in tissues other than bone were also observed), particularly in male rats, is convergent with a host of data from tests showing fluoride's ability to cause mutations (a principal "trigger" mechanism for inducing a cell to become cancerous) e.g.[11a,b,c,d] and data showing increases in osteosarcomas in young men in New Jersey,[12] Washington and Iowa[13] based on their drinking fluoridated water. It was his analysis, repeated statements about all these and other incriminating cancer data, and his requests for an independent, unbiased evaluation of them that got Dr. Marcus fired.

Bone pathology other than cancer is a concern as well. An excellent review of this issue was published by Diesendorf et al. in 1997.[14] Five epidemiology studies have shown a higher rate of hip fractures in fluoridated vs. non-fluoridated communities.[15a,b,c,d,e] Crippling skeletal fluorosis was the endpoint used by EPA to set its primary drinking water standard in 1986, and the ethical deficiencies in that standard setting process prompted our union to join the Natural Resources Defense Council in opposing the standard in court, as mentioned above.

Regarding the effectiveness of fluoride in reducing dental cavities, there has not been any double-blind study of fluoride's effectiveness as a caries preventative. There have been many, many small scale, selective publications on this issue that proponents cite to justify fluoridation, but the largest and most comprehensive study, one done by dentists trained by the National Institute of Dental Research, on over 39,000 school children aged 5-17 years, shows no significant differences (in terms of decayed, missing and filled teeth) among caries incidences in fluoridated, non-fluoridated and partially fluoridated communities.[16] The latest publication[17] on the fifty-year fluoridation experiment in two New York cities, Newburgh and Kingston, shows the same thing. The only significant difference in dental health between the two communities as a whole is that fluoridated Newburgh, N.Y. shows about twice

182   Hirzy

the incidence of dental fluorosis (the first, visible sign of fluoride chronic toxicity) as seen in non-fluoridated Kingston.

John Colquhoun's publication on this point of efficacy is especially important.[18] Dr. Colquhoun was Principal Dental Officer for Auckland, the largest city in New Zealand, and a staunch supporter of fluoridation - until he was given the task of looking at the world-wide data on fluoridation's effectiveness in preventing cavities. The paper is titled, "Why I changed My Mind About Water Fluoridation." In it Colquhoun provides details on how data were manipulated to support fluoridation in English-speaking countries, especially the U.S. and New Zealand. This paper explains why an ethical public health professional was compelled to do a 180-degree turn on fluoridation.

Further on the point of the tide turning against drinking water fluoridation, statements are now coming from other dentists in the pro-fluoride camp who are starting to warn that topical fluoride (e.g. fluoride in tooth paste) is the only significantly beneficial way in which that substance affects dental health.[19,20,21] However, if the concentrations of fluoride in the oral cavity are sufficient to inhibit bacterial enzymes and cause other bacteriostatic effects, then those concentrations are also capable of producing adverse effects in mammalian tissue, which likewise relies on enzyme systems. This statement is based not only on common sense, but also on results of mutation studies which show that fluoride can cause gene mutations in mammalian and lower order tissues at fluoride concentrations estimated to be present in the mouth from fluoridated tooth paste.[22] Further, there were tumors of the oral cavity seen in the NTP cancer study mentioned above, further strengthening concern over the toxicity of topically applied fluoride.

In any event, a person can choose whether to use fluoridated tooth paste or not (although finding non-fluoridated kinds is getting harder and harder), but one cannot avoid fluoride when it is put into the public water supplies.

So, in addition to our concern over the toxicity of fluoride, we note the uncontrolled - and apparently uncontrollable - exposures to fluoride that are occurring nationwide via drinking water, processed foods, fluoride pesticide residues and dental care products. A recent report in the lay media,[23] that, according to the Centers for Disease Control, at least 22 percent of America's children now have dental fluorosis, is just one indication of this uncontrolled, excess exposure. The finding of nearly 12 percent incidence of dental fluorosis among children in un-fluoridated Kingston New York[17] is another. For governmental and other organizations to continue to push for *more* exposure in the face of current levels of over-exposure coupled with an increasing crescendo of adverse toxicity findings is irrational and irresponsible at best.

Thus, we took the stand that a policy which makes the public water supply a vehicle for disseminating this toxic and prophylactically useless (via ingestion, at any rate) substance is wrong.

We have also taken a direct step to protect the employees we represent from the risks of drinking fluoridated water. We applied EPA's risk control methodology, the Reference Dose, to the recent neurotoxicity data. The Ref-

erence Dose is the daily dose, expressed in milligrams of chemical per kilogram of body weight, that a person can receive over the long term with reasonable assurance of safety from adverse effects. Application of this methodology to the Varner *et al*[4] data leads to a Reference Dose for fluoride of 0.000007 mg/kg-day. Persons who drink about one quart of fluoridated water from the public drinking water supply of the District of Columbia while at work receive about 0.01mg/kg-day from that source alone. This amount of fluoride is more than 100 times the Reference Dose. On the basis of these results the union filed a grievance, asking that EPA provide un-fluoridated drinking water to its employees.

The implication for the general public of these calculations is clear. Recent, peer-reviewed toxicity data, when applied to EPA's standard method for controlling risks from toxic chemicals, require an immediate halt to the use of the nation's drinking water reservoirs as disposal sites for the toxic waste of the phosphate fertilizer industry.[24]

This document was prepared on behalf of the National Treasury Employees Union Chapter 280 by Chapter Senior Vice-President J. William Hirzy, Ph.D. For more information please call Dr. Hirzy at 202-260-4683. His E-mail address is hirzy.john@epa.gov

### ENDNOTE LITERATURE CITATIONS

1   Applying the NAEP code of ethics to the Environmental Protection Agency and the fluoride in drinking water standard. Carton, R.J. and Hirzy, J.W. *Proceedings of the 23rd Ann. Conf. of the National Association of Environmental Professionals. 20-24 June, 1998.* GEN 51-61. On-line at URL http//:www.rvi.net/~fluoride/naep.htm.

2   Neurotoxicity of sodium fluoride in rats. Mullenix, P.J., Denbesten, P.K., Schunior, A. and Kernan, W.J. *Neurotoxicol. Teratol.* 17 169-177 (1995).

3   Influence of chronic fluorosis on membrane lipids in rat brain. Z.Z. Guan, Y.N. Wang, K.Q. Xiao, D.Y. Dai, Y.H. Chen, J.L. Liu, P. Sindelar and G. Dallner, *Neurotoxicology and Teratology* 20 537-542 (1998).

4   Chronic administration of aluminum- fluoride or sodium-fluoride to rats in drinking water: alterations in neuronal and cerebrovascular integrity. Varner, J.A., Jensen, K.F., Horvath, W. And Isaacson, R.L. *Brain Research* 784 284-298 (1998).

5   Effect of high fluoride water supply on children's intelligence. Zhao, L.B., Liang, G.H., Zhang, D.N., and Wu, X.R. *Fluoride* 29 190-192 (1996).

6   Effect of fluoride exposure on intelligence in children. Li, X.S., Zhi, J.L., and Gao, R.O. *Fluoride* 28 (1995).

7   Effect of fluoride on the physiology of the pineal gland. Luke, J.A. *Caries Research* 28 204 (1994).

8   Newburgh-Kingston caries-fluorine study XIII. Pediatric findings after ten years. Schlesinger, E.R., Overton, D.E., Chase, H.C., and Cantwell, K.T. *JADA* 52 296-306 (1956).

9   Memorandum dated May 1, 1990. *Subject*: Fluoride Conference to Review the NTP Draft Fluoride Report; *From*: Wm. L. Marcus, Senior Science Ad-

184    Hirzy

visor ODW; *To*: Alan B. Hais, Acting Director Criteria & Standards Division ODW.

10    Toxicology and carcinogenesis studies of sodium fluoride in F344/N rats and B6C3F₁ mice. *NTP Report No. 393* (1991).

11a    Chromosome aberrations, sister chromatid exchanges, unscheduled DNA synthesis and morphological neoplastic transformation in Syrian hamster embryo cells. Tsutsui et al. *Cancer Research* 44 938-941 (1984).

11b    Cytotoxicity, chromosome aberrations and unscheduled DNA synthesis in cultured human diploid fibroblasts. Tsutsui et al. *Mutation Research* 139 193-198 (1984).

11c    Positive mouse lymphoma assay with and without S-9 activation; positive sister chromatid exchange in Chinese hamster ovary cells with and without S-9 activation; positive chromosome aberration without S-9 activation. Toxicology and carcinogenesis studies of sodium fluoride in F344/N rats and B6C3F₁ mice. *NTP Report No. 393* (1991).

11d    An increase in the number of Down's syndrome babies born to younger mothers in cities following fluoridation. *Science and Public Policy* 12 36-46 (1985).

12    A brief report on the association of drinking water fluoridation and the incidence of osteosarcoma among young males. Cohn, P.D. *New Jersey Department of Health* (1992).

13    Surveillance, epidemiology and end results (SEER) program. National Cancer Institute in *Review of fluoride benefits and risks*. Department of Health and Human Services. F1-F7 (1991).

14    New evidence on fluoridation. Diesendorf, M., Colquhoun, J., Spittle, B.J., Everingham, D.N., and Clutterbuck, F.W. *Australian and New Zealand J. Public Health.* 21 187-190 (1997).

15a    Regional variation in the incidence of hip fracture: U.S. white women aged 65 years and older. Jacobsen, S.J., Goldberg, J., Miles, ,T.P. et al. *JAMA* 264 500-502 (1990).

15b    Hip fracture and fluoridation in Utah's elderly population. Danielson, C., Lyon, J.L., Egger, M., and Goodenough, G.K. *JAMA* 268 746-748 (1992).

15c    The association between water fluoridation and hip fracture among white women and men aged 65 years and older: a national ecological study. Jacobsen, S.J., Goldberg, J., Cooper, C. and Lockwood, S.A. *Ann. Epidemiol.* 2 617-626 (1992).

15d    Fluorine concentration is drinking water and fractures in the elderly [letter]. Jacqmin-Gadda, H., Commenges, D. and Dartigues, J.F. *JAMA* 273 775-776 (1995).

15e    Water fluoridation and hip fracture [letter]. Cooper, C., Wickham, C.A.C., Barker, D.J.R. and Jacobson, S.J. *JAMA* 266 513-514 (1991).

16    Water fluoridation and tooth decay: Results from the 1986-1987 national survey of U.S. school children. Yiamouyiannis, J. *Fluoride* 23 55-67 (1990).

17    Recommendations for fluoride use in children. Kumar, J.V. and Green, E.L. *New York State Dent. J.* (1998) 40-47.

18    Why I changed my mind about water fluoridation. Colquhoun, J. *Perspectives in Biol. and Medicine* 41 29-44 (1997). [reprinted in *Fluoride* 31(2) 103-118 (1998)]

19    A re-examination of the pre-eruptive and post-eruptive mechanism of the an-
       ti-caries effects of fluoride: is there any anti-caries benefit from swallowing
       fluoride? Limeback, H. *Community Dent. Oral Epidemiol.* 27 62-71 (1999).

20    Fluoride supplements for young children: an analysis of the literature focus-
       sing on benefits and risks. Riordan, P.J. *Community Dent. Oral Epidemiol.*
       27 72-83 (1999).

21    Prevention and reversal of dental caries: role of low level fluoride. Feather-
       stone, J.D. *Community Dent. Oral Epidemiol.* 27 31-40 (1999).

22    Appendix H. *Review of fluoride benefits and risks.* Department of Health and
       Human Services. H1-H6 (1991).

23    Some young children get too much fluoride. Parker-Pope, T. *Wall Street
       Journal* Dec. 21, 1998.

24    Letter from Rebecca Hanmer, Deputy Assistant Administrator for Water, to
       Leslie Russell re: EPA view on use of by-product fluosilicic acid as low cost
       source of fluoride to water authorities. March 30, 1983.

## OTHER CITATIONS

(This short list does not include the entire literature on fluoride effects)

a    Exposure to high fluoride concentrations in drinking water is associated with
      decreased birth rates. Freni, S.C. J. *Toxicol. Environ. Health* 42 109-121
      (1994).

b    Ameliorative effects of reduced food-borne fluoride on reproduction in silver
      foxes. Eckerlin, R.H., Maylin, G.A., Krook, L., and Carmichael, D.T. *Cor-
      nell Vet.* 78 75-91 (1988).

c    Milk production of cows fed fluoride contaminated commercial feed. Ecker-
      lin, R.H., Maylin, G.A., and Krook, L. *Cornell Vet.* 76 403-404 (1986).

d    Maternal-fetal transfer of fluoride in pregnant women. Calders, R., Chavine,
      J., Fermanian, J., Tortrat, D., and Laurent, A.M. *Biol. Neonate* 54 263-269
      (1988).

e    Effects of fluoride on screech owl reproduction: teratological evaluation,
      growth, and blood chemistry in hatchlings. Hoffman, D.J., Pattee, O.H., and
      Wiemeyer, S.N. *Toxicol. Lett.* 26 19-24 (1985).

f    Fluoride intoxication in dairy calves. Maylin, G.A., Eckerlin, R.H., and
      Krook, L. *Cornell Vet.* 77 84-98 (1987).

g    Fluoride inhibition of protein synthesis. Holland, R.I. *Cell Biol. Int. Rep.* 3
      701-705 (1979).

h    An unexpectedly strong hydrogen bond: ab initio calculations and spectro-
      scopic studies of amide-fluoride systems. Emsley, J., Jones, D.J., Miller,
      J.M., Overill, R.E. and Waddilove, R.A. *J. Am. Chem. Soc.* 103 24-28 (1981).

i     The effect of sodium fluoride on the growth and differentiation of human
      fetal osteoblasts. Song, X.D., Zhang, W.Z., Li, L.Y., Pang, Z.L., and Tan,
      Y.B. *Fluoride* 21 149-158 (1988).

j     Modulation of phosphoinositide hydrolysis by NaF and aluminum in rat cor-
      tical slices. Jope, R.S. J. *Neurochem.* 51 1731-1736 (1988).

k    The crystal structure of fluoride-inhibited cytochrome *c* peroxidase. Ed-
      wards, S.L., Poulos, T.L., Kraut, J. *J. Biol. Chem.* 259 12984-12988 (1984).

186   Hirzy

l   Intracellular fluoride alters the kinetic properties of calcium currents facilitating the investigation of synaptic events in hippocampal neurons. Kay, A.R., Miles, R., and Wong, R.K.S. *J. Neurosci.* 6 2915-2920 (1986).

m   Fluoride intoxication: a clinical-hygienic study with a review of the literature and some experimental investigations. Roholm, K. H.K. Lewis Ltd (London) (1937).

n   Toxin-induced blood vessel inclusions caused by the chronic administration of aluminum and sodium fluoride and their implications for dementia. Isaacson, R.L., Varner, J.A., and Jensen, K. F. *Ann. N.Y. Acad. Sci.* 825 152-166 (1997).

o   Allergy and hypersensitivity to fluoride. Spittle, B. *Fluoride* 26 267-273 (1993).

Published by the International Society for Fluoride Research
Editorial Office: 17 Pioneer Crescent, Dunedin 9001, New Zealand

# **Exhibit 9**

1          THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF CALIFORNIA

3              AT SAN FRANCISCO

4    FOOD & WATER WATCH, et al.    *

5      Plaintiffs              *  Civ. No.

6    v.                        *  17-CV-02162-EMC

7    U.S. ENVIRONMENTAL PROTECTION *

8    AGENCY, et al.            *

9      Defendants              *      **ORIGINAL**

10           *    *    *    *    *

11         VIDEOTAPED DEPOSITION OF

12       JOYCE S. TSUJI, Ph.D., DABT

13          SEPTEMBER 11th, 2019

14          WASHINGTON, D.C.

15

16       Reported by:  Dawn M. Hyde

17

18

19

20

21

```
 1            THE VIDEOGRAPHER:  This deposition

 2   is taking place at M Street, Washington, D.C.

 3   Would the court reporter please administer the

 4   oath and we can proceed.

 5   Whereupon,

 6            JOYCE TSUJI, Ph.D., DABT,

 7   a witness herein, called for oral examination in

 8   the matter pending, being first duly sworn to tell

 9   the truth, the whole truth, and nothing but the

10   truth, testified as follows:

11                    EXAMINATION

12      BY MR. CONNETT:

13      Q    Good morning, Dr. Tsuji.

14      A    Good morning.

15      Q    Have you ever conducted or published

16   any studies on fluoride?

17      A    I have not published any studies on

18   fluoride but I have conducted studies on

19   fluoride or co-authored reports on fluoride.

20      Q    What reports are you referring to?

21      A    The 2009 NRC.  I think it was called
```

1    projects.

2        Q    Okay.  Prior to your work in this

3    case, did you consider yourself an expert on

4    the neurotoxicity of fluoride?

5        A    No.

6        Q    What is your area of expertise?

7        A    My area of expertise is physiology;

8    toxicology; the environmental effects of

9    various stressors on physiology and

10   toxicology; risk assessment; biomonitoring,

11   particularly of certain metals, dioxin,

12   certain organic chemicals.

13       Q    So you are a toxicologist?

14       A    Yes.

15       Q    A certified toxicologist?

16       A    Yes.

17       Q    Are you an epidemiologist?

18       A    I am not an epidemiologist, but that

19   is a field I have a good working knowledge of

20   because most of the literature on metals is

21   based on epidemiology and I publish in that

1    area.

2        Q    So can a nonepidemiologist have a

3    competent understanding of epidemiology?

4             MR. ADKINS:  Objection, vague.

5        A    Yes, if you have the experience I

6    have on those issues concerning the chemicals

7    I have looked at.

8             BY MR. CONNETT:

9        Q    And do you consider yourself a

10   neurotoxicologist?

11       A    No, but neurotoxicology is within

12   the general area of my experience and I know a

13   lot about it because many of the metals have

14   neurotoxic effects.

15       Q    And do you consider yourself a risk

16   assessment scientist?

17       A    Yes.

18       Q    And as a risk assessment scientist,

19   is it fair to say that you become familiar

20   with and have knowledge and expertise in

21   epidemiology?

1        A      Well, you need to know a lot about

2    toxicology, epidemiology, exposure science and

3    various fields to do risk assessment.

4        **Q      Okay.  And in the course of your**

5    **work, have you become familiar with how EPA**

6    **conducts risk assessments?**

7                MR. ADKINS:  Objection, foundation.

8        A      Well, in the course of my

9    professional practice over the years, I have

10   worked on risk assessments that EPA has

11   approved.  I've sat on committees that have

12   looked at EPA's risk assessments and evaluated

13   them, like NRC committees, and so I have

14   somewhat of a good working knowledge about

15   what EPA does, but I don't understand all of

16   the different things that go into what the

17   agency does when they do these risk

18   assessments.

19       BY MR. CONNETT:

20       **Q      Okay.**

21       A      And risk assessment has evolved over

1       A    I guess I have looked at a few

2    instances.

3       Q    **So switching gears, are you familiar**

4    **with EPA's guidelines for neurotoxicity risk**

5    **assessment?**

6       A    Yes.

7       Q    **Have you read these guidelines in**

8    **their entirety?**

9       A    The 1998 report?

10      Q    **Yes.**

11      A    Yes.

12      Q    **And in this case, is it fair to say**

13   **that you did not perform a risk assessment**

14   **pursuant to these guidelines?**

15      A    I did not perform a risk assessment,

16   that's correct.

17      Q    **And why not?**

18      A    I was asked to look at the --

19   whether the evidence from the animal

20   neurotoxicity studies, in particular the

21   developmental neurotoxicity studies on

1   learning and memory, supported a causative

2   effect of neurotoxicity at the drinking water

3   level of 0.7 milligram per liter.

4       Q    Okay.  Now, you're familiar with the

5   term reference dose, correct?

6       A    Yes.

7       Q    Sometimes referred to as RfD?

8       A    Yes.

9       Q    A reference dose is the dose of a

10  chemical that EPA estimates can be consumed

11  over a lifetime without appreciable risk of

12  harm, correct?

13      A    It generally states that, and it

14  also says it's protective of sensitive

15  individuals.

16      Q    By definition, a reference dose is

17  set at a level that is lower than the level

18  that is known or suspected to cause harm,

19  correct?

20      A    That's the intent, yes.

21      Q    As a general rule, would you agree

1    well-conducted study.

2        Q    So maybe I misunderstood what you

3    just said but did you just say that you did

4    not use your scientific judgment in evaluating

5    the evidence in this case?

6        A    No, I was correcting -- I thought

7    you were recharacterizing what I had said

8    before and so I just was saying what I had

9    said before.

10       Q    So what am I missing when I ask you,

11   "Dr. Tsuji, did you use your scientific

12   judgment in evaluating the evidence in this

13   case?"  What am I missing with that statement?

14       A    Well, I don't want judgment to be

15   construed as purely opinions without a

16   rigorous scientific basis.

17       Q    Okay.  Now, in your report you rely

18   upon Dr. Chang's systematic review of the

19   epidemiological research on fluoride and IQ,

20   right?

21       A    Yes.

1      Q     Now, Dr. Chang, as with yourself,

2   did not conduct a risk assessment pursuant to

3   EPA's guidelines for neurotoxicity risk

4   assessment, correct?

5      A     Yes.

6      Q     And what predefined criteria did

7   Dr. Chang use for evaluating the weight of

8   evidence?

9      A     I know she looked at how studies --

10   the study design, whether they were of more

11   robust design or weaker study design.  She

12   looked at whether confounders were controlled

13   for.  She used -- I know she used the Hill

14   criteria in evaluating the evidence which is

15   pretty standard in epidemiological studies.

16      Q     So would you agree that she did use

17   the Hill guidelines for evaluating the weight

18   of evidence?

19      A     Yes.

20      Q     In your opinion, can two scientists

21   reach different conclusions about the causal

1          From what I can see and from what

2     plaintiffs note as well, it isn't as detailed

3     at the lower doses that we need to look at.

4          **Q    Okay.  In EPA's guidelines for**

5     **neurotoxicity risk assessment, EPA states, "Of**

6     **particular importance for the pharmacokinetics**

7     **of neurotoxicants is the blood-brain barrier."**

8     **Do you agree with the EPA on that statement?**

9          MR. ADKINS:  Objection to the extent

10    it misstates the document.

11         A    Certainly whether the chemical -- I

12    guess that speaks to how the chemical acts on

13    the nervous system and if it's centrally

14    active versus peripherally active.  But that

15    would involve -- centrally active, it would

16    involve the blood-brain barrier.

17         BY MR. CONNETT:

18         **Q    Would you agree that it is important**

19    **in assessing the biological plausibility of a**

20    **chemical causing neurotoxic effects, would you**

21    **agree that it's important to understand**

1   whether that chemical can get through the

2   blood-brain barrier?

3        A    Yes.

4        Q    Now, EPA has stated in some of its

5   publications the following statement.  "The

6   development of the blood-brain barrier is a

7   gradual process beginning in utero and

8   complete at approximately six months of age.

9   Because the blood-brain barrier limits the

10  passage of substances from blood to brain, in

11  its absence toxic agents can freely enter the

12  developing brain."

13           Do you agree with the EPA on that

14  statement?

15           MR. ADKINS:  Objection to the extent

16  it misstates statements that have been

17  ascribed to the EPA.

18       A    I think I have read that in various

19  documents, and it also speaks to exposure but

20  is not the complete picture on whether that

21  chemical could then cause toxicity.  That

1    would depend on the dose.

2        BY MR. CONNETT:

3        **Q    Okay.  I'll move to strike the**

4    **nonresponsive portion.**

5            **I'm just asking you do you agree**

6    **with that statement by EPA.**

7            MR. ADKINS:  Same objection, asked

8    and answered.

9        A    Yes, it speaks to exposure and you

10   first have to have exposure before you have

11   effects.

12       BY MR. CONNETT:

13       **Q    So is there anything about that**

14   **statement that you disagree with, leaving**

15   **aside your qualification that it's dealing**

16   **with exposure.  Is there anything about that**

17   **statement that you disagree with factually?**

18           MR. ADKINS:  Same objection,

19   compound.

20       A    I don't disagree with it unless it's

21   misinterpreted to mean exposure equals

1    effects.

2         BY MR. CONNETT:

3         Q    Okay.  Fair enough.  Do you agree

4    that the brain is more vulnerable to the

5    harmful effects of neurotoxicants when it does

6    not have the protection of the blood-brain

7    barrier?

8         A    Certainly it's more likely to have

9    exposure.

10        BY MR. CONNETT:

11        Q    Okay.  And if it's more likely to

12   have exposure, would you agree that the brain

13   is more vulnerable to the harmful effects of

14   neurotoxicants when it does not have the

15   protection of the blood-brain barrier?

16        A    Yes.

17        Q    Do you dispute that fluoride gets

18   past the placenta?

19             MR. ADKINS:  Objection, foundation.

20        A    I do not dispute that.

21

1    BY MR. CONNETT:

2       Q    Do you dispute that fluoride gets

3    into the fetal brain?

4            MR. ADKINS:  Objection, foundation.

5       A    I don't dispute that.

6            (Tsuji Deposition Exhibit Number 322

7            was marked for identification.)

8    BY MR. CONNETT:

9       Q    I'm going to hand you a document

10   which I will mark as Exhibit Number 322.  And

11   this document states, "Due to the absence of a

12   blood-brain barrier, the fetus may be at

13   greater risk than the general population of

14   experiencing neurotoxic effects from

15   fluoridated water."

16           Dr. Tsuji, do you agree with that

17   statement or disagree with it?

18           MR. ADKINS:  Objection, vague and

19   ambiguous, lacks foundation.

20      A    I guess as a hypothetical I would

21   agree with that supposition as a hazard and

1  which population is most susceptible.  As I

2  say in my report, I think the appropriate

3  focus is on early life stages.

4       BY MR. CONNETT:

5       Q    In your report you state that -- if

6  you turn to page 37 of your report.

7       A    Oh, 37.

8       Q    And I'm looking at the last

9  paragraph before section 4.6.5; do you see

10  that?

11       A    Yes, okay.

12       Q    You say, "Although developmental

13  toxicology studies in animals have limitations

14  for assessing exposure equivalent to

15  bottle-fed infants, as noted by Dr. Grandjean

16  based on the associations from epidemiological

17  studies, the in utero period appears to be a

18  critical period for fluoride exposure."

19            And so, Dr. Tsuji, you would agree

20  with Dr. Grandjean in that assessment?

21       A    Yes, and that's primarily because

1  this also is commenting on associations in the

2  epidemiological studies with maternal exposure

3  and fetal outcomes, which is different from

4  lead where you don't have associations so much

5  with in utero versus later IQ tests.

6      BY MR. CONNETT:

7      Q    Okay.  Now, are you aware of any

8  evidence from human studies that support the

9  neurological safety of prenatal exposure of

10  fluoride?

11          MR. ADKINS:  Objection, vague.

12      A    Safety.  So this is not something I

13  was really asked to look at.  I was mainly

14  looking at animal studies, and certainly the

15  most well-conducted animal study is not

16  finding functional effects from in utero

17  exposures.

18          So we do have a very well-conducted

19  animal study looking at that endpoint and

20  functional equivalence.

21

1  whether -- in fact at 0.7 the -- I don't think

2  that that level for a neonate drinking as much

3  water or exposed to as much fluoride as in

4  some of these studies or even EPA's own

5  calculations in 2010 would suggest that the

6  reference dose currently is not protective of

7  certainly the dental fluorosis and therefore

8  there is also a concern potentially for other

9  health effects.

10      BY MR. CONNETT:

11      **Q      Okay.  So you recognize that infants**

12  **drinking formula made with fluoridated water**

13  **can exceed EPA's proposed reference dose of**

14  **0.08 milligrams per kilogram per day?**

15      A    Yes.

16      **Q    And so -- and you recognize -- are**

17  **you familiar with the in press study by Till,**

18  **et al.?**

19      A    Yes.

20      **Q    And the study looked at the**

21  **association between neonatal exposure to**

1   aside whether or not bolus testing would be an

2   appropriate method to use, you would agree

3   that the available animal studies on fluoride

4   neurotoxicity have not attempted to assess the

5   neurological impacts of fluoride consumption

6   through formula?

7       A    Yes, the studies -- yes, the

8   available studies can't address that point to

9   much extent.

10      Q    And would you agree that that

11  limitation in the animal data creates an

12  uncertainty as to the applicability of the

13  developmental neurotoxicity data in animals to

14  humans?

15      A    It creates some uncertainty,

16  although much of the association has been

17  with in utero in the human studies.  Less is

18  focused on the neonatal period in the human

19  studies.

20      Q    Now, having reviewed the animal data

21  on fluoride neurotoxicity, you would agree

1    **that the animal studies have generally been**

2    **consistent in reporting impairments in**

3    **learning and memory at water fluoride**

4    **concentrations above 20 milligrams per liter?**

5           MR. ADKINS:  Objection, vague.

6        A    Well, I think I do have a statement

7    in my report that says that is where you see

8    the most consistency and effects.

9        BY MR. CONNETT:

10       Q    And would you agree that water

11   **fluoride concentrations of 45 milligrams per**

12   **liter, the available studies are almost**

13   **unanimous in reporting impairments in learning**

14   **and memory?**

15          MR. ADKINS:  Objection, vague.

16       A    Yes, at those levels you're also

17   seeing other effects of fluoride like the lack

18   of growth, the slower -- or less body weight

19   gain.

20       BY MR. CONNETT:

21       Q    **Leaving aside potential explanations**

1    overlooked.  At that time it was probably what

2    they call a pre-publication copy and for some

3    reason was not captured in our search of the

4    PubMed literature.

5        BY MR. CONNETT:

6        **Q    So we have been talking off and on**

7    **today about the McPherson study so I want to**

8    **kind of talk about that now in a more focused**

9    **way.  Is it fair to say, Dr. Tsuji, that your**

10   **conclusions in this case are largely driven by**

11   **the findings of the McPherson study?**

12           MR. ADKINS:  Objection, vague.

13       A    I base it on the other studies --

14   NTP 2016 findings as well as the studies that

15   were published subsequent to that on learning

16   and memory, and I looked for consistency of

17   those studies with the McPherson study.

18       BY MR. CONNETT:

19       **Q    And the McPherson study, just so**

20   **we're clear, is -- the authors are a group of**

21   **scientists from the NTP, right?**

1      A    As I understand, yes.

2      Q    So sometimes if I call it the NTP

3   animal study, will you know what I mean?

4      A    Yes.  I think that's the only one

5   they've published so far.

6      Q    And as you have already mentioned,

7   you find the McPherson study to be the most

8   reliable animal study of fluoride

9   neurotoxicity that you reviewed, right?

10     A    Yes.

11     Q    And would it be fair to say that you

12   place more weight on the McPherson study than

13   all the other animal studies on fluoride

14   neurotoxicity combined?

15     A    Well, I hesitate to say that because

16   it's not that I don't consider the other

17   studies.  In fact, I find that they are --

18   with their limitations they are consistent

19   with McPherson.  But I do place weight on

20   McPherson because it was well conducted and it

21   evaluated a number of different endpoints.

1    **Q    And so fair to say that you agree**

2    **that 20 milligrams per liter would be a**

3    **reasonable NOAEL for EPA to use in a risk**

4    **assessment on fluoride neurotoxicity?**

5                MR. ADKINS:  Objection, vague, lack

6    of foundation.

7        A    It would depend on what other

8    information they had.  If they had human

9    data -- my role here was mainly to look at

10   what is that -- what does the current animal

11   evidence suggest regarding plausibility in

12   humans.  And I'm seeing some disconnects here.

13       BY MR. CONNETT:

14       **Q    Okay.  But if EPA is doing a risk**

15   **assessment and they are just looking at the**

16   **animal data on fluoride neurotoxicity, you**

17   **would agree 20 milligrams per liter would be a**

18   **reasonable NOAEL to use?**

19                MR. ADKINS:  Objection, vague.

20       A    Well, with the exception that the

21   animals also had some dental fluorosis.

1  wanted to look at a lower dose.  So that is

2  the ten.  And then beyond that, they also

3  wanted to try to answer the question of how

4  much would be contributed by diet and what

5  effect that dietary exposure would be.

6  **Q    Would you agree that the McPherson**

7  **study would be more informative on the**

8  **relationship between fluoride and learning and**

9  **memory impairments if it had included a dose**

10 **group of, say, 40 ppm or 45 ppm?**

11      A    I think at that point it's fairly

12 clear in animal literature you're going to

13 have effects.  I think they thought they might

14 have effects at 20.  I don't know what they

15 would have thought but they think, from what I

16 can see in hindsight, it appears that based on

17 the limitations they had, they were trying to

18 pinpoint where a NOAEL would be, not reconfirm

19 where I think we already know that animals

20 lose weight and have problems.

21           So given their limitations, it's

1    A    No, I don't recall that.

2    **Q    Okay.**

3    A    It was a while ago that I read it.

4    **Q    Okay.  So the EPA, NTP and OECD**

5  **guidance documents all recommend that**

6  **developmental neurotoxicity studies include**

7  **both sexes, correct?**

8    A    Yes, they -- I think that is in

9  there.

10    **Q    But the NTP study only studied male**

11  **rats, right?**

12    A    Yes.

13    **Q    Do you know why the NTP study only**

14  **included male rats?**

15    A    I don't know the reasoning.  I can

16  only guess.

17    **Q    What would be your guess?**

18    A    My guess is that most of the -- at

19  that time most of the neurotoxic effects were

20  seen in males, particularly in the studies

21  reviewed in the 2016 review and because of --

```
 1        BY MR. CONNETT:

 2        Q     Okay.

 3        A     I don't go through the Morris -- I

 4   mean through the McPherson study in every

 5   single comparison they did.

 6        Q     But you emphasize how this study

 7   should be considered multiple different

 8   studies, right?

 9        A     Yes.

10        Q     So should we then pay attention to

11   the results for each of the studies that

12   McPherson did?

13        A     We should certainly look at those

14   results and compare them to other studies

15   using those types of equipment.

16        Q     Okay.  So let's look at what

17   McPherson found, and if you turn to page 786,

18   you see this is the results section of the

19   paper?

20        A     Yes.

21        Q     And you see they provide the results
```

1    of the hot plate test?

2        A    Okay.

3        Q    Do you see that?

4        A    Yes.

5        Q    And they report "In rats exposed to

6    20 ppm fluoride, significantly shorter

7    response latencies were observed with a

8    P-value less than 0.002," and they note that

9    "this shorter response latency is indicative

10   of hyperanalgesia."

11            Do you see that?

12       A    Okay.

13       Q    So they found -- the McPherson study

14   found a significant effect in the hot plate

15   test in the 20 ppm dosage group, correct?

16       A    Right.  It's more of a sensory

17   effect but I don't -- I was mainly looking at

18   learning and memory, and as I said, there

19   could have been -- when you do this many

20   comparisons by chance, you could find a

21   statistically significant difference and

1    you -- maybe there is a difference in sensory

2    ability.

3         **Q     Why did you not discuss or disclose**

4    **that the McPherson study found significant**

5    **effects using the hot plate test in your**

6    **report?**

7         A    Because I didn't think that was as

8    indicative a test of learning and memory as

9    having to learn something like some of the

10   other tests like the Morris water maze.

11        **Q    Now, do you know what hyperanalgesia**

12   **is?**

13        A    As -- I would surmise that it is

14   being sensitive to pain.

15        **Q    So it would represent increased**

16   **sensitivity to pain, right?**

17        A    Yes.

18        **Q    And earlier today you testified that**

19   **alterations in pain sensitivity would be an**

20   **adverse effect for purposes of hazard**

21   **assessment, correct?**

```
 1        A    Yes.

 2        Q    And this was not the first study on

 3   animals to find that fluoride increases pain

 4   sensitivity, correct?

 5        A    There are other studies out there,

 6   yes.

 7        Q    So when it comes to the hot plate

 8   test, would you agree that the McPherson study

 9   is not a -- that the 20 ppm group is not a

10   NOAEL?

11        A    Not -- yes, not for that particular

12   sensory test.

13        Q    So for the hot plate test, 20 ppm is

14   a LOAEL in the McPherson study, correct?

15        A    Yes.

16        Q    Now, that's not the only significant

17   effect that McPherson found in the 20 ppm

18   dosage group, correct?

19        A    I think there were other ones, and

20   again, I was focusing in on mainly the main

21   overall dose-response and the key test on
```

1    groups, suggesting that the difference in

2    latency was not related to a difference in

3    path selection to the platform?

4        A    Yes.

5        Q    So I want to break that down a

6    little bit, if you could.

7        A    Okay.

8        Q    So let me know when you're ready for

9    my question.

10       A    Let's see -- so some of this was --

11   let's see, the goal cognitive wasn't

12   statistically significant when you corrected

13   for the floating rats in the G2 group.  Was it

14   G1?  I think it was one of the control groups,

15   G2.

16       Q    Dr. Tsuji, I have a question I would

17   like to ask you now.  Are you ready?

18       A    Okay.  Okay.

19       Q    So on one hand they find -- the

20   McPherson study found that the 20 ppm rats

21   took less time to get to the hidden platform,

1    right?

2         A    Okay.

3         Q    **You agree with that interpretation,**

4    **right?**

5         A    Yes.

6         Q    **But yet they traveled the same**

7    **distance to get to the hidden platform, right?**

8         A    That's what they said, yes.

9         Q    **So with that -- that -- Dr. Tsuji,**

10   **would you agree that that would be consistent**

11   **with the 20 ppm rats swimming faster?**

12        A    It would appear so but it doesn't

13   suggest that they're different necessarily

14   than the control.

15        Q    **But if the -- would swimming faster**

16   **be at least -- would it be consistent with a**

17   **hyperactivity?**

18        A    Not necessarily.  Often

19   hyperactivity results in also not swimming in

20   a directed manner.

21        Q    **But would swimming -- could swimming**

1   faster be a -- could it be consistent with a

2   hyperactivity?

3       A    I don't know.  I would have to rely

4   on the interpretation of the authors for that.

5   There could be a lot of differences.  There

6   could be just --

7       Q    Well, based on your knowledge,

8   Dr. Tsuji, beyond fluoride, would you agree

9   that hyperactivity in rats can lead to faster

10  swimming?

11          MR. ADKINS:  Objection, vague,

12  incomplete hypothetical.

13      A    I think some of the tests I looked

14  at, hyperactivity results in faster but

15  probably more longer paths and it varies.

16      BY MR. CONNETT:

17      Q    Okay.

18      A    So I can't answer one way or the

19  other.

20      Q    Would you agree that there is some

21  uncertainty -- based on the findings with

1    discussing in my report.

2        **Q    Even though it's a significant**

3    **effect found at the 20 ppm high dose group?**

4        A    It looks like it could also be one

5    of these things that just happens by chance.

6    Groups can differ by chance.

7        **Q    Remember we talked earlier about how**

8    **directional changes, if they're associated**

9    **with the treatment, are generally regarded as**

10   **adverse effects?**

11       A    That is the -- that is often in

12   trying to do a hazard assessment.  I wasn't

13   trying to do a hazard assessment.  I was just

14   trying to assess what is the weight of

15   evidence for having dose-response and what is

16   the dose-response at higher versus lower

17   doses.

18       **Q    Fair.  But for purposes of hazard**

19   **assessment, would you agree that the**

20   **directional change reported here for the**

21   **Morris water maze hidden platform test is**

1    issues.

2        BY MR. CONNETT:

3        Q    Would you agree that there should be

4    at least some uncertainty factor applied to

5    account for interspecies variation, meaning

6    animal-to-human variation?

7        A    Yes, that can be done in different

8    ways.  But again, it depends on various

9    factors and how your -- what your population

10   you're intending to extrapolate to and things

11   like that.

12       Q    But you would agree that there

13   should at least be some uncertainty factor

14   applied for interspecies variation for

15   fluoride?

16           MR. ADKINS:  Objection, asked and

17   answered.

18       A    Yes.

19       BY MR. CONNETT:

20       Q    Now, with respect to intraspecies

21   variation, which is the human-to-human

1    ten.

2         Q    Are you aware of any -- do you think

3    that's -- let me ask you, do you think that's

4    a reasonable general rule?

5         A    I guess it depends on how you

6    interpret convincing evidence.

7         Q    Well, let me ask you, are you aware

8    of any convincing evidence that would justify

9    the use of an intraspecies uncertainty factor

10   of less than ten for fluoride?

11        A    I think for fluoride you have to

12   take into consideration that it's -- and I

13   think EPA has in some circumstances and on

14   expert committees I've been on, if a chemical

15   is not metabolized, that is one potential

16   source of difference among people and how they

17   might react.

18        Q    Okay.  Is there any other convincing

19   evidence or data that would suggest that we

20   can use a lower uncertainty factor than ten

21   for intraspecies variation?

```
1        A    I guess if you have actual human

2   data.  So you would have to look at the human

3   population and estimate susceptibilities and

4   see what the data tell you.  But this is all

5   kind of more hypothetical.  I haven't really

6   thought about fluoride.

7             I am just -- when I was responding

8   to Dr. Thiessen's checklist, I was just

9   stating that you would have to take these

10  considerations into account.  We don't just

11  use the default across the board.

12            You might for the chemicals that she

13  presented because there's not a lot of

14  information on them.

15       Q    Okay.  Let's talk about the human

16  data.  If the risk assessment is focusing on

17  neurotoxicity, would the human data need to be

18  addressing neurotoxicity for it to justify a

19  lower uncertainty factor?

20       A    I am not exactly sure what you're

21  asking me.
```

1    again, I have to speak to the low dose end of

2    the range.  Personally, when I look at the low

3    end of the range and see so much scatter and

4    variation that's not attributable to fluoride,

5    that tells me that it's not clear that there

6    is a relationship.

7           But that doesn't necessarily exclude

8    that there could be something.  But again,

9    it's -- I guess it would be more concerning if

10   the points were closer to fitting on a

11   relationship and we could actually see that

12   there was an association that was causal.

13       **Q    In this case do you intend to offer**

14   **any opinions as to what the specific**

15   **uncertainty factors should be for applying --**

16   **doing a risk assessment from animal data?**

17       A    Only in a general sense that one

18   should use available information you have and

19   not use defaults.  And there are factors that

20   one could consider but I haven't actually gone

21   through and done such a calculation nor do I

1    intend to do a calculation of a reference

2    dose.

3        **Q    And you don't intend to say the**

4    **uncertainty factor for interspecies variation**

5    **should be X and the uncertainty factor for**

6    **intraspecies variation should be X?**

7        A    No.

8        **Q    No, as in that is not an opinion you**

9    **intend to offer, correct?**

10        A    I don't intend to offer that

11    opinion.

12        **Q    Now, going back to factors that can**

13    **justify a lower uncertainty factor for**

14    **human-to-human variation, you have mentioned**

15    **whether the chemicals metabolized and whether**

16    **there's the existence of human data**

17    **demonstrating safety.**

18        A    I didn't say demonstrating safety.

19    Demonstrating what type of susceptibility or

20    variability, if you can get some kind of

21    measure of that.

1      A     That certainly could be examined.

2   In a hypothetical it could be.

3      **Q     Do you think that's an appropriate**

4   **consideration to use when assessing what**

5   **uncertainty factors should be used for**

6   **intraspecies variation?**

7          MR. ADKINS:  Objection, vague.

8      A     Well, again, I don't intend to

9   provide opinions regarding what the

10  uncertainty factors should be for

11  extrapolating from animal data for fluoride.

12  And I think I said before, if you first start

13  with your vulnerable population and I think

14  that's the population we have the most data on

15  their susceptibility.

16     BY MR. CONNETT:

17     **Q     Now I'm going to read you another**

18  **statement from EPA, okay.  EPA has stated**

19  **that, "It is known that thyroid hormones are**

20  **essential for normal brain development in**

21  **humans and that hypothyroidism during fetal**

1    subsequent to the NRC's 2006 report that would

2    contradict that estimate?

3        A    I didn't spend a lot of time looking

4    at that.  I mainly reviewed what NTP reviewed.

5        Q    So are you -- can you point me to

6    any studies subsequent to the NRC 2006 report

7    that contradicts NRC's estimate as to the

8    difference in bone fluoride concentrations

9    between rats and humans?

10       A    No, I'm not prepared to evaluate

11   that right now.

12       Q    Okay.  Now, because there are

13   differences in the toxicokinetics of fluoride

14   between animals and -- between rats and

15   humans, would you agree that that would

16   provide a justification for an uncertainty

17   factor for interspecies variation?

18       A    You need some kind of conversion

19   between rats and humans.

20       Q    And in your paper, you have used the

21   body weight scaling method to make that

1    after reviewing the animal studies, I'm not

2    sure about the applicability of what's going

3    on in the animals at these doses versus

4    whether they're applicable to humans.

5        BY MR. CONNETT:

6        Q    Okay.  Well, move to strike the

7    nonresponsive portion.  But would you agree --

8            Just note for the record the

9    videographer has returned.

10           Okay.  Would you agree that a

11   concentration of 20 milligrams per liter of

12   fluoride in the water of rats produces

13   fluoride exposures for the rats that are

14   relevant to the exposures that humans have at

15   approximately one milligram per liter of

16   fluoride in water?

17           MR. ADKINS:  Same objections.

18       A    I guess I would agree that 20

19   milligram per liter in the rats could be

20   considered as approximate for 1.2 milligram

21   per liter in the drinking water for the

```
 1    populations EPA examined.  The six-month-old

 2    to one-year-old and the 14-year-old.

 3         BY MR. CONNETT:

 4         Q     Now I want to return back to this

 5    body weight scaling method that EPA uses for

 6    determining the human equivalent dose of a

 7    concentration of a chemical given to animals.

 8    EPA has stated that the body weight scaling

 9    method, "predominantly addresses factors

10    involved in estimating toxicokinetics."  Do

11    you agree with EPA on that statement?

12         A     Yes, I think that's the intent of

13    it.

14         Q     And by predominantly addressing the

15    factors involved with toxicokinetics, do you

16    understand that the body weight method does

17    not capture all of the factors involved with

18    toxicodynamics?

19         A     Yes.

20         Q     And when EPA uses the body weight

21    scaling method, it applies in addition to --
```

1    enough time, will -- I'm sorry, a lower dose

2    of arsenic will not produce skin lesions after

3    six years but could after maybe 30 years.

4            And so the EPA's dose-response is

5    based on long-term lifetime exposures and

6    that's why it's lower.  We were looking at

7    what level in children with short-term

8    exposure, assuming they don't have any

9    exposure after that, but what type of exposure

10   in childhood would be a sensitive effect for

11   adverse outcomes.

12           And we found it was skin lesions but

13   we came up with a higher dose than for the

14   long-term exposures because that's what the

15   epidemiological data were showing.

16       Q    Okay.  And so in your 2015 review

17   you did a systematic review of the

18   epidemiological literature on arsenic and

19   neurodevelopment, correct?

20       A    Yes.

21       Q    And you found that most of the

1    **studies as of that time were cross-sectional,**

2    **correct?**

3        A    Yes, there were many cross-sectional

4    studies.

5        **Q    And you found those studies to be**

6    **inadequate to use for deriving a reference**

7    **dose, correct?**

8        A    Yes, although some of the

9    cross-sectional studies were actually pretty

10   well conducted and we talk about that as

11   supporting evidence.

12       **Q    Okay.  And in that review you**

13   **identified one epidemiological study that was**

14   **of sufficiently good quality to derive a**

15   **reference dose for arsenic neurotoxicity,**

16   **correct?**

17       A    From a precautionary perspective

18   because the most relevant epidemiological

19   study did not find clear dose-response in a

20   U.S. population.  So we went with a study that

21   actually had dose-response for a biomarker

1    correct?

2        A    Yes.

3        Q    And it was a study published in

4    2011?

5        A    Right.  And I think it had

6    co-authors with I want to say Columbia -- one

7    of the United States universities.

8        Q    Okay.  And that study had a

9    methodology and a study design that was --

10   basically permitted the derivation of an RfD,

11   correct?

12       A    Right, and it had dose-response in

13   girls but not boys.

14       Q    So in fact the Hamadani study found

15   a sex-specific effect for prenatal arsenic

16   exposure, correct?

17       A    Yes, although it was clear, you

18   know, again it could have been nutritional

19   confounding.

20       Q    But that sex-specific effect that

21   Hamadani found was not a basis in your

1   which was girls, right?

2       A    Yes, because we were doing a worst

3   case analysis.

4       Q    And EPA, when it does risk

5   assessments, generally does worst case

6   analysis in order to be protective of public

7   health, correct?

8           MR. ADKINS:  Objection, foundation.

9       A    Not necessarily.  I think they try

10  to do an accurate analysis.

11      BY MR. CONNETT:

12      Q    Okay.  And you certainly found that

13  the Hamadani study was of sufficient

14  methodological quality to permit the

15  derivation of an RfD, correct?

16          MR. ADKINS:  Objection, vague.

17      A    Yes, and we were also trying to

18  update an evaluation that was done by the

19  State of California that used an older study

20  of the Wasserman study that was done in blood,

21  but it was an older Wasserman study that did

1  find an association between arsenic and water

2  and IQ.

3          But the newer study did not find

4  any -- when looking at lower doses did not --

5  and correcting for all these confounders

6  better, did not find an association between

7  arsenic and water and IQ.

8      BY MR. CONNETT:

9      **Q    But the key justification or the key**

10 **reason for selecting the Hamadani study for**

11 **the RfD derivation was because it was a**

12 **prospective birth cohort study, correct?**

13     A    That was one of the considerations.

14     **Q    What other considerations justified**

15 **the use of that study for RfD derivation?**

16     A    Well, the fact that they attempted

17 to correct for a number of confounding

18 factors, although not perfectly.  It's

19 possible if they better corrected for maternal

20 IQ like Wasserman did, they would have

21 attenuated that association.  But again, we

1   were doing our worst case kind of screening

2   evaluation of well, how would that compare if

3   you do this worst case neurological evaluation

4   to the existing EPA RfD?

5        Q    Okay.  So you've pointed to the fact

6   that the Hamadani was a prospective birth

7   cohort study, one.  Two, that it controlled

8   for the other potential confounding factors,

9   although not perfectly.

10            What other factors supported the use

11   of that study for RfD derivation, or is that

12   it?

13       A    Well, because they used a biomarker

14   that was correct.  I believe they used

15   speciated urinary arsenic in a population that

16   doesn't have high seafood intake so that's

17   probably a fairly reliable indicator of

18   inorganic arsenic, even though it probably

19   does also have some dietary arsenic added

20   that's not inorganic arsenic.

21       Q    And you found the prenatal urinary

1    anyway -- the results.

2        Q    So they tested the levels of arsenic

3    in the urine of the mothers at gestational

4    week eight and gestational week 30, correct?

5        A    Yes.

6        Q    And there -- you agree that the

7    method that they used for testing the arsenic

8    in urine by controlling for specific gravity

9    was an appropriate method to use, correct?

10       A    Right.  It would have been better if

11   they had done first morning voids or were able

12   to do 24-hour urines or duplicate two-day

13   consecutive-day first morning voids.

14       Q    Now, in your risk assessment or the

15   RfD derivation that you did in your 2015

16   review, you picked one IQ point as the

17   benchmark response, correct?

18       A    Yes.

19       Q    And that means that the reference

20   dose that you ultimately calculated was

21   designed to protect against the loss of one IQ

1    **point, right?**

2         A    Yes.   We were trying to duplicate

3    what the State of California did.

4         **Q    And in using and selecting one IQ**

5    **point as the appropriate benchmark response,**

6    **you cited the EPA -- the federal EPA, correct?**

7         A    We may have done that as well.

8         **Q    And so would you agree then that it**

9    **is reasonable to use one IQ point as the**

10   **benchmark response for a reference dose**

11   **derivation?**

12             MR. ADKINS:   Objection, vague,

13   misstates testimony.

14        A    Well, for the example that we're

15   doing here with arsenic, which was more

16   screening to do a worst case evaluation and

17   compare it to the existing EPA reference dose.

18        BY MR. CONNETT:

19        **Q    Well, do you have any reason to --**

20   **do you disagree with using one IQ point as the**

21   **benchmark response for an RfD calculation?**

```
 1        A     I think that will have to be a

 2   decision that EPA will make.  We were just

 3   using what has been used before for arsenic.

 4   The State of California had used it.

 5        Q     And you specifically cited the EPA

 6   for that decision, correct?

 7        A     I thought we cited the State of

 8   California.

 9        Q     Okay.  So we were talking about the

10   Green study on fluoride and IQ earlier,

11   correct?

12        A     Yes.

13        Q     And as with Hamadani, that was also

14   a prospective birth cohort study, correct?

15        A     Yes.

16        Q     And as with Hamadani, it also

17   sampled the urine of the mothers several times

18   during pregnancy for fluoride, correct?

19        A     Yes.

20        Q     And as with the Hamadani study, it

21   also controlled for a number of potential
```

1    confounding factors, correct?

2        A    Yes, some.

3        Q    But in contrast to Hamadani, the

4    Green study was published on a -- involved a

5    population in North America, correct?

6        A    That's correct.

7        Q    And in contrast to Hamadani, the

8    Green study involved exposures to fluoride

9    that are closer to and in fact in the range of

10   exposures seen in the U.S. general population,

11   correct?

12           MR. ADKINS:  Objection, vague.

13       A    The exposures in the Green study,

14   yes, were lower relative to the U.S. compared

15   to arsenic in Hamadani to arsenic in the U.S.,

16   but there were some differences among the

17   study as well.

18       BY MR. CONNETT:

19       Q    Okay.  But that would be a strength

20   of the Green study versus Hamadani, correct,

21   that it was actually focusing in on exposures

1  that are found in the general population in

2  the United States, correct?

3       A    In terms of being applicable to the

4  U.S., yes.

5       Q    Okay.  So what -- and also in

6  contrast to Hamadani, Hamadani took two

7  urinary samples in the mother, correct?

8       A    Yes.

9       Q    And in Green they took three samples

10 of urinary fluoride in the mother, correct?

11      A    Yes, but I think in Hamadani for

12 this situation with arsenic, urinary arsenic

13 is going to be more consistent than fluoride

14 arsenic for Canadians who were having diverse

15 sources of exposure, whereas in Hamadani,

16 et al., their exposures are from the well

17 water, and high, so that's the dominant source

18 of their exposure.  It includes some food

19 exposure but the bulk of their exposure is

20 from drinking and using water in cooking.

21 Their staple diet, which is rice and stews,

1  **not Green to derive an RfD?**

2      A    You could do an example using Green,

3  a worst case analysis.  There is nothing

4  stopping anyone from doing that.  This is just

5  an example that we ran to see where things

6  would fall out relative to the existing

7  reference dose.  If this ended up saying that

8  the existing reference does was not

9  protective, then I think one needs to do some

10  more critical analysis.

11          Take a better look at that U.S.

12  study, maybe consider more studies in U.S.

13  populations in lower doses.  Try to maybe look

14  again at that Wasserman blood -- I don't know

15  if you can do anything with the blood study.

16          But this is a first step in trying

17  to figure out if the EPA's existing reference

18  dose for arsenic was protective of this

19  potential for neurotoxicity.

20      **Q    So are there any distinctions from**

21  **your vantage point that would make the Green**

1    **study less suitable for the RfD derivation**

2    **than the Hamadani study?**

3        A    Not if you wanted to do a worst case

4    analysis.

5        **Q    What if you just wanted to do an RfD**

6    **calculation without it just being a -- without**

7    **it being a worst case analysis situation?**

8        A    Well, I think then you would have to

9    take into other -- EPA would have to consider

10   a larger body then and make some decisions.

11       **Q    Okay.  But you don't have -- it's**

12   **not your testimony that the Green study is**

13   **somehow less methodological -- would you agree**

14   **that the Green study is at least as strong**

15   **methodologically as the Hamadani study?**

16           MR. ADKINS:  Objection, vague.

17       A    It's methodologically strong among

18   fluoride studies and studies --

19   epidemiological studies.  I think Dr. Chang

20   would agree.  However, it does have its

21   limitations and I think there's some

```
 1        A    I'd have to look at the document but

 2   I may have read that.  I don't remember.

 3        BY MR. CONNETT:

 4        Q    Do you believe that fluoride is an

 5   essential nutrient?

 6             MR. ADKINS:  Objection, vague.

 7        A    In terms of needing fluoride for

 8   health, I am not sure about that.

 9        BY MR. CONNETT:

10        Q    Okay.  Do you have any reason to

11   disagree with the National Academys of

12   Sciences when they say that fluoride has not

13   been shown to be an essential nutrient?

14             MR. ADKINS:  Objection to the extent

15   it misstates the National Academy of Science's

16   position.

17        A    I don't have any basis right now to

18   disagree with that.

19        BY MR. CONNETT:

20        Q    Would you agree that the collective

21   evidence as it currently is on fluoride and
```

1       A    If a -- I think the advice to

2  pregnant women would be if you have concerns,

3  you can reduce your fluoride intake since

4  it -- again assuming it has no benefit, CDC

5  has recommendations for bottle-fed infants to

6  not use fluoridated water.  So that's already

7  there.

8            So EPA and the federal agencies will

9  have to determine whether additional

10  recommendations need to be made at this point

11  along with their continued evaluation of the

12  evidence.

13      BY MR. CONNETT:

14      **Q    Do you think the CDC's**

15  **recommendation or do you think -- strike that.**

16            **Do you think the recommendation to**

17  **avoid the use of fluoridated water in infant**

18  **formula is a reasonable and sound**

19  **recommendation?**

20            MR. ADKINS:  Objection, vague, lacks

21  foundation.

1    A    Well, it certainly is a -- appears

2    to be reasonable given that the dose to

3    infants is potentially greater than reference

4    dose for enamel -- dental fluorosis.  And it

5    provides no benefit at that stage.

6        BY MR. CONNETT:

7        **Q    And in this case I deposed a**

8    **representative of the Centers for Disease**

9    **Control and I asked him if the CDC believes**

10   **prenatal fluoride exposure provides a benefit**

11   **to the offspring in terms of caries**

12   **prevention, and he testified that no, the CDC**

13   **is not aware of evidence to suggest a prenatal**

14   **benefit to the teeth.  Is that consistent with**

15   **your understanding?**

16        MR. ADKINS:  Objection, misstates

17   testimony.

18   A    Again, I haven't -- I was speaking

19   mainly to the infant formula situation and I

20   haven't prepared to look at the dental

21   fluorosis or the caries prevention, that part

1    offspring from prenatal fluoride exposure is a

2    relevant consideration?

3            MR. ADKINS:  Assumes facts, vague

4    and ambiguous, lacks foundation.

5       A    Assuming that we're -- I mean, they

6    would have to consider all aspects including

7    in a risk/benefit analysis, yes, they would

8    have to consider benefit and risk.

9       BY MR. CONNETT:

10      Q    And so in this case are you aware

11   that -- have you read Dr. Lanphear's report in

12   this case?

13      A    I have not.

14      Q    Dr. Lanphear's recommendation is

15   that there is enough information available

16   today to recommend pregnant women to reduce

17   their intake of fluoride, including minimizing

18   exposure to fluoridated water.  Do you think

19   that's a reasonable conclusion?

20           MR. ADKINS:  Objection, vague, lacks

21   foundation.

1      A     I guess if you -- it depends on if

2   you take a precautionary standpoint or not.

3   It depends on your risk management perspective

4   and I'm not prepared to give advice one way or

5   the other on that in this case.

6      BY MR. CONNETT:

7      **Q     But would you agree -- if the**

8   **interest is in taking a precautionary approach**

9   **to preventing adverse effects from fluoride**

10  **exposure, would you agree that Dr. Lanphear's**

11  **recommendation is a reasonable one?**

12          MR. ADKINS:  Objection, vague,

13  ambiguous, misstates testimony, lacks

14  foundation.

15     A     I think it really would depend on

16  what population you're talking about, how high

17  is their fluoride, what are their other

18  sources.  So I'm not prepared to give an

19  opinion on those matters.

20          MR. CONNETT:  Why don't we -- I am

21  going to need to look at my notes.  Let's go

1    manganese in their wells.

2        BY MR. CONNETT:

3        Q    The Mullenix study, we were talking

4    about that earlier, correct?

5        A    Yes.

6        Q    The Mullenix study found that

7    prenatal fluoride exposure causes some

8    neurotoxic effects, correct?

9        A    Yes, and if I remember correctly --

10   it's getting late in the day -- but I thought

11   that had exposure during gestation was by

12   injection.

13       Q    Right.

14       A    So it's bolus dosing.

15       Q    Right.  But from that bolus dosing,

16   it did find neurotoxic effects in that study,

17   correct?

18       A    I believe, yes, in the male rats.

19       Q    Now, we were talking about your 2015

20   review earlier so I want to go ahead and hand

21   that to you and I'll mark is as Exhibit

1    with exposures at the limit level."

2          Did I read that correctly?

3      A    Yes.

4      Q    Okay.  And so this was your -- those

5    two sources were your basis for using one IQ

6    point as your benchmark response, correct?

7      A    Right, in our worst case analysis.

8      Q    And your reference to the revised

9    U.S. National Ambient Air Quality standard has

10   a footnote attached to it, right?

11     A    Yes.

12     Q    And the footnote references the

13   Federal Register, correct?

14     A    Right.

15     Q    So you were referencing the U.S.

16   Environmental Protection Agency as a source

17   for your use of one IQ point for the benchmark

18   response, correct?

19     A    Right.  I remember the California

20   use of the one IQ point because that was done

21   for arsenic and so that's why my memory was of

1   California.

2       Q    And EPA had used the one IQ point as

3   a benchmark response for the lead regulation,

4   right?

5       A    Yes.

6       Q    Now, am I correct in understanding

7   that any fluoride neurotoxicity studies that

8   you read and considered for this case, the

9   animal studies --

10      A    Okay.

11      Q    -- are identified in Appendix C to

12  your report?

13      A    Well, there were earlier studies

14  that are not listed in Appendix C that I may

15  have reviewed, along with reviewing statements

16  in NTP 2016 and other references that were

17  cited back to the earlier literature.

18      Q    So --

19          MR. ADKINS:  Are you finished?

20          THE WITNESS:  Sorry, yes.

21

1   you mean on the BEST?

2        **Q      Yes.**

3        A      Board on Environmental -- sorry,

4   it's late in the day.  I think it's the Board

5   on Environmental Studies and Toxicology.

6        **Q      Okay.  And so you're familiar -- are**

7   **you familiar in a general way with how the**

8   **National Research Council selects scientists**

9   **to be part of its -- part of the panels that**

10  **write NRC reports?**

11       A      I don't understand completely their

12  selection process but I have observed who --

13  the people I serve with on panels depending on

14  topic.

15       **Q      Based on your experience, does the**

16  **NRC take care to ensure that only qualified**

17  **scientists are selected to serve as panelists**

18  **on NRC reports?**

19       A      They certainly try to make sure that

20  those who serve have the necessary expertise.

21       **Q      Okay.  And are you -- we've talked**

1    about today the NRC report on fluoride that

2    was published in 2006, right?

3        A    Yes.

4        Q    And we also talked about the NRC

5    report that was published in 2009 that you

6    were a part of that also had a chapter on

7    fluoride, correct?

8        A    Yes.

9        Q    Are you aware of any other NRC

10   reports published since 2006 or since 2000

11   that have addressed fluoride toxicity besides

12   those two reports?

13       A    I'd have to go back and look to see

14   if there is a AEGLs, or acute air quality

15   guideline level document or -- which is

16   usually EPA but reviewed by -- sometimes by

17   NRC or a spacecraft chapter on hydrogen

18   fluoride or fluoride.

19       Q    But as you sit here today, is it

20   fair to say that the only two NRC reports that

21   you are aware of that have been published

1    since 2000 which have addressed and examined

2    fluoride toxicity are the 2006 and 2009

3    reports that we've talked about today?

4        A    Yes, to the best of my knowledge

5    right now.

6        Q    And in both of those reports,

7    Dr. Kathleen Thiessen was selected to be a

8    panelist for the report, correct?

9        A    Yes.

10       Q    And in both of those reports

11   published by the National Research Council,

12   Dr. Thiessen co-authored the review of

13   fluoride toxicity, correct?

14       A    Yes.  As far as I know.

15            MR. CONNETT:  Those are all the

16   questions I have right now.

17            What do we have for the running

18   time?

19            THE VIDEOGRAPHER:  Six hours, 43

20   minutes.

21            MR. ADKINS:  Are you going to pass

1    STATE OF MARYLAND

2    HOWARD COUNTY

3        I, Dawn Michele Hyde, a Notary Public of the

4    State of Maryland, Howard County, do hereby certify

5    that the above-captioned proceeding took place

6    before me at the time and place herein set out.

7        I further certify that the proceeding was

8    recorded stenographically by me and this transcript

9    is a true record of the proceedings.

10       I further certify that I am not of counsel to

11   any of the parties, nor an employee of counsel, nor

12   related to any of the parties, nor in any way

13   interested in the outcome of the action.

14       As witness my hand and seal this 11th day of

15   September, 2019.

16                    *Dawn Hyde*

17            Dawn M. Hyde, Notary Public

18            My Commission Expires 10/7/2019

19                                    DAWN M. HYDE
                                      NOTARY PUBLIC
20                              HOWARD COUNTY, MD

21

# Exhibit 10

 **EPA**

820-R-10-019

# Fluoride:
# Dose-Response Analysis
# For Non-cancer Effects

**Health and Ecological Criteria Division**
**Office of Water**

**December, 2010**

**U.S. Environmental Protection Agency**
**Washington, D.C.**



# PREFACE

In March, 2006, the National Academy of Sciences National Research Council (NRC) released the Report: *Fluoride in Drinking Water: A Scientific Review of EPA's Standards.* The NRC (2006) noted that "in light of the collected evidence of various health endpoints and total exposure to fluoride, the committee concludes the EPA's MCLG of 4 mg/L should be lowered." They further suggested that, in order to develop an MCLG that is protective against severe enamel fluorosis, clinical stage II skeletal fluorosis and bone fractures, EPA should:

- Apply current approaches for quantifying dose-response where feasible,
- Consider susceptible populations,
- Characterize uncertainties and variability, and
- Provide better estimates of total exposure for individuals.

The Office of Water (OW) accepted the NRC (2006) findings as the summary of hazard for inorganic fluoride and focused on the dose-response analysis as they had recommended. The OW collected available dose-response data for severe dental fluorosis, clinical stage II skeletal fluorosis and skeletal fractures as they relate to fluoride exposure expanding on the data retrieved by NRC (2006) to include studies identified by literature searches that covered the time period from 2000 to 2010. Current methodologies (categorical regression and benchmark dose modeling) were applied in evaluating dose-response in order to identify an appropriate point of departure for severe dental fluorosis as the critical effect. The NRC analysis determined that severe dental fluorosis appears to occur at a lower dose than stage II skeletal fluorosis and/or bone fractures. This document presents the results of the dose-response analysis requested by NRC.

The objective of the OW effort was to identify a point of departure for the fluoride concentration in drinking water that would be protective for sensitive exposed populations (children) who are vulnerable to severe enamel fluorosis, and determine if that point of departure will also be protective against stage II skeletal fluorosis and bone fractures in adults. The OW analysis focused first on severe dental fluorosis based on the NRC analysis.

This document provides a detailed review of available dose-response data from published and peer-reviewed studies for the following endpoints as they relate to fluoride exposure from drinking water:

- Dental fluorosis
- Skeletal fluorosis
- Skeletal fractures

Detailed analyses of the suitability of studies that had been identified by NRC (2006) and those retrieved by the OW for the dose-response analysis are included as separate documents to accompany this report. There are two separate collections of study evaluations, one covers dental effects (*Dental Fluorosis: Evaluations of Key Studies*, EPA Report No. 820-R-10-018) and the other skeletal effects (*Fluoride-Related Skeletal Effects: Evaluations of Key Studies*, EPA Report No. 820-R-10-017).

EPA identified a point of departure (POD) of 1.87 mg F/L for severe dental fluorosis based on benchmark dose modeling of the prevalence for severe dental fluorosis associated with specific drinking water fluoride concentrations as reported by Dean (1942). In that era, drinking water and the diet were the major sources of fluoride exposure. The POD is a lower confidence bound on the concentration in drinking water associated with severe dental fluorosis in 0.5% of the population studied. This POD was the lowest concentration that was statistically justified by the population size. This value is consistent with other analyses of the Dean (1942) data set that identify 2 mg/L as the threshold drinking water fluoride concentration for severe dental fluorosis (EPA, 1986, NRC 1993, 2006).

In this document drinking water intake information for ingestion of tap water delivered by public drinking water systems, as reported in the USDA 1977–1978 Food Consumption Survey, is used to estimate the fluoride dose from drinking water associated with the POD in children studied by Dean (1942). Data from a publication on dietary fluoride by McClure (1943) were used to estimate the dose from the diet for the children studied by Dean (1942). The combination of the drinking water and dietary estimates thus become the basis for the OW inorganic fluoride Reference Dose (RfD) estimate of 0.08 mg F/kg/day. The RfD is an estimate of the fluoride dose that will protect against severe dental fluorosis, clinical stage II skeletal fluorosis and skeletal fractures while allowing for a fluoride exposure adequate to protect against tooth decay for children and adults. Confidence in the RfD is considered to be medium.

The OW has also prepared and peer reviewed a second document that provides fluoride exposure estimates for the age groups susceptible to severe dental fluorosis. This second document, *Fluoride: Exposure and Relative Source Contribution Analysis* (EPA Report No. 820-R-10-015), can be accessed through the following url:
.http://water.epa.gov/action/advisories/drinking/fluoride_index.cfm.

## 2.       Summary of Hazard as Reported by NRC

NRC (2006) analyzed a large body of literature on fluoride, primarily papers published since the early 1990s, regarding the effects of fluoride on teeth; the musculoskeletal, reproductive, endocrine, gastrointestinal, renal, hepatic, and immune systems; and on the endpoints of developmental toxicity, neurotoxicity (including behavioral effects), genotoxicity, and carcinogenicity.  Following this comprehensive analysis, NRC concluded that the biological tissues of most concern to fluoride exposures of 4 mg/L, the current MCLG, were the teeth and bones.

For the current RfD analysis, EPA obtained the critical references on dental fluorosis, dental cavities and bone fractures as related to fluoride exposure identified by NRC (2006).  EPA also identified, retrieved, and reviewed relevant information for these effects as well as for skeletal fluorosis published during the period between 2000 to August 2010 that were not included in NRC (2006).

This section on the assessment of noncancer health effects of fluoride provides a summary of the hazard information for the following:

- Dental fluorosis
- The relationship between caries prevalence and the degree of dental fluorosis
- Skeletal fluorosis
- Bone fractures relative to fluoride exposure

A detailed discussion of the critical studies is presented in Section 3. The focus on the endpoints listed above is consistent with the NRC (2006) analysis of hazard and their charge to the OW.

### 2.1.       Dental Enamel Fluorosis
### 2.1.1.   Background

Fluoride has an affinity for the developing enamel because apatite crystals have the capacity to bind and integrate fluoride ion into the crystal lattice (Robinson et al., 1996). Apatite is a salt of calcium phosphate that co-crystallizes with hydroxyl, fluoride or chloride ions. Hydroxyapatite $[Ca_{10}(PO_4)_6(OH)_2]$ is the primary calcium salt that is found in tooth enamel. The mineral formed in tooth enamel exposed to higher fluoride levels is fluoride containing carbonated apatite. Fluoride levels in subsurface fluorotic enamel are about 200 ppm rather than the 10-100 ppm fluoride in normal enamel. Precipitation of fluoride mineral salts at the surface of enamel results in high surface levels. This fluoride-substituted apatite has some increased resistance to bacterial acids that cause tooth decay. However, the primary function of fluoride in drinking water in reducing tooth decay is topical, primarily by the enhancement of remineralization (Fejerskov et al. 1994).

### 2.1.2.   Measures of dental fluorosis

Excessive intake of fluoride during enamel development can lead to enamel fluorosis, a condition of the dental hard tissues in which the enamel covering of the teeth fails to crystallize properly, leading to defects that range from barely discernable markings to brown stains and

# **Exhibit 11**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                       AT SAN FRANCISCO

 3   _____

 4   FOOD & WATER WATCH, et al.,    |
                                    |
 5                  Plaintiffs,     |   CIVIL ACTION
                                    |
 6            vs.                   |   FILE NO.
                                    |
 7   U.S. ENVIRONMENTAL PROTECTION  |   17-cv-2162-EMC
     AGENCY, et al.,                |
 8                                  |   ORIGINAL
                  Defendants.       |
 9   _____

10

11         VIDEOTAPE RULE 30(b)(6)DEPOSITION OF
         CENTERS FOR DISEASE CONTROL & PREVENTION
12                        THROUGH
                       CASEY HANNAN
13

14             Tuesday, November 6, 2018

15                     10:15 a.m.

16

17                  1600 Clifton Road
                Building 21, Suite 10000
18                  Atlanta, Georgia

19             Linda C. Ruggeri, CCR-A-261

20

21

22

23

24

25
```

```
 1              MR. CONNETT:  Good morning.  Michael
 2       Connett on behalf of the plaintiffs.
 3              MR. DO:  John Thomas Do with the
 4       Department of Justice for defendants.
 5              MS. STETTNER:  Joanna Stettner, attorney
 6       for Health & Human Services, CDC.
 7                        CASEY HANNAN,
 8    having been first duly sworn, was examined and
 9    testified as follows:
10                        EXAMINATION
11    BY MR. CONNETT:
12       Q.      Good morning.
13       A.      Good morning.
14       Q.      Can you please state your name for the
15    record.
16       A.      Casey Hannan.
17       Q.      And that's H-a-n-n-a-n?
18       A.      Correct.
19       Q.      Have you ever had a deposition taken
20    before?
21       A.      No.
22       Q.      Now, we're here today at the CDC's Office
23    of General Counsel's Office, but do you understand
24    that you have the same obligation to tell the truth
25    today just as if you were testifying in a courtroom
```

```
 1   interfacing with the American Dental Association, part

 2   of that would be about working together to promote

 3   community water fluoridation, correct?

 4        A.    Yes.

 5        Q.    Okay.  And CDC has taken an active role in

 6   promoting water fluoridation, correct?

 7        A.    Yes.

 8        Q.    Okay.  So you're still the acting

 9   director, correct?

10        A.    Correct.

11        Q.    What is there -- I mean, are you -- are

12   you going to be the director or what's the process of

13   going from acting director to director?

14        A.    What's the process from going to acting --

15   at this point I wouldn't be eligible to apply.

16        Q.    Okay.  We don't need to go into that.  So

17   now let's talk now about what you did to prepare for

18   today's deposition.  And, first, do you understand

19   that you are appearing today as a representative of

20   the CDC?

21        A.    I do.

22        Q.    And do you have an understanding as to

23   what this case is about?

24        A.    I do.

25        Q.    What is your understanding?
```

1          A.     It's an understanding that an action

2     brought against the Environmental Protection Agency

3     under the Toxic Substances Control Act related to the

4     purposeful addition of fluoride to water, and I

5     believe the group that you're representing is

6     petitioning EPA to regulate it or remove it.

7          **Q.     And are you aware of what the main health**

8     **issue is that is the subject of the case?**

9                MR. DO:  I'm going to object just to

10              scope.  I think he's speaking on behalf of

11              himself right now.

12         **Q.     (By Mr. Connett)  Are you aware, sir --**

13    **you know, just in preparing for this deposition, as**

14    **you sit here today, are you aware of what the main**

15    **health issues that is the focus of this case?**

16         A.     Inferring from the subpoena, yes, I

17    believe so.

18         **Q.     And what is that health issue?**

19         A.     Neurotoxicities.

20         **Q.     Okay.  So speaking of this subpoena, let**

21    **me go ahead and hand that to you.  I'll mark this as**

22    **Exhibit 31.**

23              (Exhibit 31 was marked for

24              identification.)

25         **Q.     (By Mr. Connett)  And I take it you have**

1       Q.      But as you look at it, it generally looks

2  like the document you recall?

3       A.      Yes, generally it looks that way.

4       Q.      Okay.  So I see the date on here is

5  October 11th, 2018, right?

6       A.      Correct.

7       Q.      And I'd like to direct your attention,

8  first of all, to the third paragraph on the page.  You

9  see the highlighted portion?

10      A.      Uh-huh.

11      Q.      It starts:  "This issue of community water

12  fluoridation as a neurotoxic risk was addressed by the

13  CDC in the May 1st, 2015, Federal Register notice

14  which relies on an extensive review of fluoride in

15  drinking water by the NRC.  Did I read that correctly?

16      A.      Yes, you did.

17      Q.      And the NRC is the National Research

18  Council, correct?

19      A.      Correct.

20      Q.      And you would agree that the NRC's review

21  of the toxicologic literature on fluoride was

22  extensive?

23      A.      I'm told it is such, yes, the most

24  extensive review undertaken.

25      Q.      Okay.  And that's a correct statement,

1    right?  The statement that we just read, that's a

2    correct statement?

3         A.    The first sentence of that paragraph, yes.

4         Q.    Okay.  And then the next sentence says:

5    "The federal interdepartmental interagency panel of

6    scientists, which included CDC, accepted the findings

7    of the 2006 National Research Council report Fluoride

8    in Drinking Water: A Scientific Review of EPA

9    Standards, as the summary of hazard."  Did I read that

10   correctly?

11        A.    Yes, you did.

12        Q.    So this is the same -- this reference to

13   the federal interagency panel, that's the same federal

14   panel we've been talking about today that issued the

15   Federal Register notice in May 2015, right?

16        A.    Correct.

17        Q.    Okay.  And so the CDC along with this

18   federal panel accepted the findings of the NRC's

19   summary of the hazard of fluoride exposure, right?

20        A.    That's correct.

21        Q.    Including the hazards, potential hazards,

22   of neurotoxic effects, correct?

23        A.    Those were included, yes.

24        Q.    Okay.  So fair to say that the CDC would

25   defer to the NRC when it comes to the potential

1    to their findings as to what the toxicologic

2    literature shows but not necessarily with respect to

3    their recommendations?

4         A.    I think that's a fair statement.

5         Q.    Okay.  So let's go and look at some of the

6    other findings that the NRC had on fluoride and

7    neurotoxicity.  You see towards the bottom of Page 221

8    there is a section titled "Neurochemical and

9    Biochemical Changes"?

10        A.    Yes.

11        Q.    Can you just read to yourself the first

12   sentence.

13        A.    Okay.

14        Q.    Okay.  So the NRC found that lipids and

15   phospholipids and protein content have been shown to

16   be reduced in the brains of laboratory animals

17   subsequent to fluoride exposure, correct?

18        A.    That's what they're saying here, yes.

19        Q.    And the CDC agrees with that finding?

20        A.    Yes, as a summary of the hazard.

21        Q.    Okay.  And if you look to the bottom of

22   Page 221, I'm going to read here.  It says:

23   "Fluorides also inhibit the activity of

24   cholinesterases including acetylcholinesterase.

25   Recently, the number of receptors for acetylcholine

1   has been found to be reduced in regions of the brain

2   thought to be most important for mental stability and

3   for adequate retrieval of memories."  Did I read that

4   correctly?

5       A.    Yes.

6       Q.    And, again, CDC agrees with that finding,

7   correct?

8       A.    As stated, yeah, we agree with the

9   summary, potential summary of the hazard.

10      Q.    Okay.

11      A.    Or potential hazard, excuse me.

12      Q.    And the next sentence reads:  "It appears

13  that many of fluoride's effects and those of the

14  aluminofluoride complexes are mediated by activation

15  of Gp, a protein of the G family.  G proteins mediate

16  the release of many of the best known transmitters of

17  the central nervous system."  Did I read that

18  correctly?

19      A.    Yes.

20      Q.    And CDC agrees with that finding from the

21  NRC, correct?

22      A.    As stated previously, yes.

23      Q.    Okay.  And if you look at the last

24  sentence of that same paragraph, it reads:  "Aluminum

25  fluoride not only provides false messages throughout

1    the nervous system, but at the same time diminishes

2    the energy essential to brain function."  Did I read

3    that correctly?

4         A.    Yes.

5         Q.    And CDC accepts that finding as a summary

6    of the hazard, correct?

7         A.    I do.  I'm confused about whether they're

8    talking about human subjects or lab animal subjects

9    here.  And if it's lab animal studies, that's a

10   different impact of the weight of these studies versus

11   done in human populations.

12        Q.    But, again, CDC accepts that this is an

13   accurate summary of the toxicological literature as of

14   that time, correct?

15        A.    CDC and the rest of the federal

16   interagency group did, yes.

17        Q.    Okay.  Now, you see there's the next

18   section down -- sorry.  Strike that.

19             The next paragraph begins:  "Fluorides

20   also increase the production of free radicals in the

21   brain through several different biological pathways.

22   These changes have a bearing on the possibility that

23   fluorides act to increase the risk of developing

24   Alzheimer's disease."  Did I read that correctly?

25        A.    Yes.

1      Q.      And CDC agrees with that finding of the

2   toxicologic literature?

3      A.      Yes.  And, again, I'm not clear if they're

4   talking about as demonstrated in laboratory animals or

5   in human studies.

6      Q.      Okay.  And you see the next section on

7   this page is titled "Anatomical Changes in the Brain"?

8      A.      Yes.

9      Q.      And it begins:  "Studies of rats exposed

10  to sodium fluoride or aluminum fluoride have reported

11  distortion in cells in the outer and inner layers of

12  the neocortex.  Neuronal deformations were also found

13  in the hippocampus and to a smaller extent in the

14  amygdala and the cerebellum."  Did I read that

15  correctly?

16     A.      Yes.

17     Q.      And CDC agrees with that finding as a

18  summary of the hazard?

19     A.      As it relates to rat studies, yes.

20     Q.      Okay.  And you see the next highlighted

21  portion in that paragraph?

22     A.      I do.

23     Q.      It reads:  "The substantial enhancement of

24  reactive microglia, the presence of stained

25  intracellular neurofilaments, and the presence of IgM

1    observed in rodents are related to signs of dementia

2    in humans.   The magnitude of the changes was large and

3    consistent among the studies."   Did I read that

4    correctly?

5         A.     Yes.

6         Q.     And CDC agrees with the NRC that this is a

7    correct summary of the hazard?

8         A.     Correct.

9         Q.     Now, you see under "Recommendations" on

10   that page?

11        A.     Yes.

12        Q.     The first sentence reads:   "On the basis

13   of information largely derived from histological,

14   chemical, and molecular studies, it is apparent that

15   fluorides have the ability to interfere with the

16   functions of the brain and the body by direct and

17   indirect means."   Did I read that correctly?

18        A.     Yes.

19        Q.     So CDC agrees with NRC that it is apparent

20   that fluorides have the ability to interfere with the

21   functions of the brain and the body by direct and

22   indirect means?

23        A.     Yes, CDC in connection with the

24   intergovernmental work group.   I should also -- I'd

25   like to add here in these summaries they don't

 1    quantify the level of fluoride exposure, at what level

 2    are these changes being seen, so just the point that

 3    scientifically it is important to acknowledge.

 4              MR. CONNETT:  Okay.  I move to strike the

 5         nonresponsive portion.

 6         Q.    (By Mr. Connett)  Now, if you turn to the

 7    next page, this is part of the recommendations that

 8    NRC provided in 2006 as to what research NRC believed

 9    should be done on the issue of fluoride neurotoxicity,

10    correct?

11         A.    I didn't quite understand what you said,

12    if you would be kind enough to repeat.

13         Q.    Absolutely.  And if you want to just

14    browse it over so you can assure yourself of this, but

15    you see how before we were looking at the section

16    titled "Recommendations" --

17         A.    Yes.

18         Q.    -- at the bottom of Page 222?  This

19    Page 223 provides NRC's recommendations as to the

20    research that should be done on fluoride

21    neurotoxicity.

22         A.    Okay.  I understand now.  Thank you.

23         Q.    And would you agree with that statement?

24         A.    Let me read it.  Would it be possible to?

25         Q.    Yes, please.  Take your time.

```
 1        A.      Yes.

 2        Q.      In the second paragraph, NRC states:

 3   "Studies of populations exposed to different

 4   concentrations of fluoride should be undertaken to

 5   evaluate neurochemical changes that may be associated

 6   with dementia.  Consideration should be given to

 7   assessing effects from chronic exposure, effects that

 8   might be delayed or occur late in life, and individual

 9   susceptibility."  Did I read that correctly?

10        A.      Yes.

11        Q.      So NRC was calling for more research to

12   look at fluoride's relationship to dementia, correct?

13        A.      Yes.  They were recommending that.

14        Q.      Okay.  So now, sir, I'd like to draw your

15   attention back to the objections that CDC issued to

16   our -- to the plaintiff's deposition notice, which we

17   marked previously as --

18        A.      43.

19        Q.      -- Exhibit 43.  And I'd specifically like

20   to draw your attention to Topic No. 7 on Page 4.  Are

21   you there?

22        A.      Yes.

23        Q.      Okay.  So Topic No. 7 in the plaintiff's

24   deposition notice was "CDC's position, if any, on

25   whether community water fluoridation presents a risk
```

1    of neurotoxicity and the basis for said position."

2    Did I read that correctly?

3         A.    Yes.

4         Q.    And I'm going to read the highlighted

5    portions here of CDC's response, okay?

6         A.    Uh-huh.

7         Q.    CDC says here that:  "CDC has not

8    conducted or sponsored independent research concerning

9    the risk of neurotoxicity associated with exposure to

10   fluoridated water and does not have in its possession

11   any internal scientific evidence concerning this

12   topic."  Did I read that correctly?

13        A.    Yes.

14        Q.    And that's a correct statement, sir,

15   right?

16        A.    Yes, it is.

17        Q.    Okay.  I'd like to now turn your attention

18   to Topic No. 11 that is addressed on Page 6 of CDC's

19   objections.  And Topic 11 as stated here is:  "CDC's

20   position, if any, on the tolerable upper fluoride

21   intake for neurotoxic effects and the basis for said

22   position."  I'm sorry.  I'm going to strike that whole

23   question there.  I'm going to just -- because I want

24   to start with Topic 10.  So I'm just going to start

25   over here.

1      A.      Okay.

2      Q.      So are you on Page 6 of the objections,

3   sir?

4      A.      I am.

5      Q.      Okay.  So you see it sets forth here

6   Topic 10 of plaintiff's deposition notice?

7      A.      Uh-huh.

8      Q.      And Topic 10 is "what CDC has done, if

9   anything, to determine the tolerable upper fluoride

10  intake for neurotoxic effects"?

11     A.      Uh-huh.

12     Q.      And CDC's response says:  "CDC has not

13  conducted or sponsored research concerning the

14  tolerable upper fluoride intake for neurotoxic

15  effects."  Did I read that correctly?

16     A.      Yes.

17     Q.      And that's a correct statement, sir,

18  right?

19     A.      Correct.

20     Q.      And now I'd like to draw your attention to

21  Topic No. 11 --

22     A.      Uh-huh.

23     Q.      -- which is addressed on the same page.

24  Topic 11 of plaintiff's deposition notice is:  "CDC's

25  position, if any, on the tolerable upper fluoride

 1    intake for neurotoxic effects and the basis for said

 2    position."  Did I read that correctly?

 3         A.    Yes, you did.

 4         Q.    Okay.  And I'd like to draw your attention

 5    to the sentence that's highlighted, okay.  And it

 6    says:  "CDC does not have in its possession any

 7    internal scientific evidence which relates to the

 8    tolerable upper fluoride intake for neurotoxic

 9    effects."  Did I read that correctly?

10         A.    Yeah.  "Effect" is singular, not plural,

11    but one small adjustment.

12         Q.    Okay.  And that's a correct statement,

13    sir, right?

14         A.    Yes.

15         Q.    Okay.  So if you could bring in front of

16    you the deposition notice again.  And you see here, by

17    the way, on this, looking back at CDC's objections,

18    you see how the words "tolerable upper fluoride intake

19    for neurotoxic effects" are capitalized?

20         A.    Yes.

21         Q.    And you see here in the deposition notice

22    we've provided a definition of what that phrase means

23    on Page 2?

24         A.    Yes.

25         Q.    And the definition of tolerable upper

1    fluoride intake for neurotoxic effects under this

2    deposition notice means "the maximum average daily

3    intake of fluoride expressed in terms of a dose,

4    milligrams per day, or dosage, milligrams per kilogram

5    per day, that will not cause any demonstrable

6    neurotoxicity on the fetus, infant, toddler, and/or

7    child."  Did I read that correctly?

8         A.    Yes.

9         Q.    Okay.  So the CDC is not aware and does

10   not have any evidence as to the tolerable upper

11   fluoride intake for neurotoxic effects on the fetus,

12   correct?

13        A.    On the fetus?

14        Q.    Yes.

15        A.    Let me consider that.  I don't know that

16   was specifically on the fetus.  That's another one of

17   the topics in here.  So we don't -- as it relates to

18   neurotoxic effects on the fetus, we don't have any

19   data of our own, sponsored any, and none in our

20   possession, yes.

21        Q.    Okay.  And is CDC aware of any data in its

22   possession or in the published literature to

23   demonstrate the tolerable upper fluoride intake for

24   neurotoxic effects on the fetus?

25        A.    I'm trying to recall something real quick.

```
 1    If I'm remembering correctly, that's correct.
 2         Q.    Okay.  And returning to the definition of
 3    tolerable upper fluoride intake for neurotoxic
 4    effects, you see how it also includes infants?
 5         A.    Uh-huh.
 6         Q.    So based on CDC's response to Topic 10 and
 7    11, it's correct to say that CDC does not have any
 8    data on the tolerable upper fluoride intake for
 9    neurotoxic effects for infants?
10         A.    Yes.
11         Q.    Okay.  And you see how the definition also
12    includes toddlers?
13         A.    Uh-huh.
14         Q.    So CDC does not have any data on the
15    tolerable upper fluoride intake for neurotoxic effects
16    on toddlers?
17         A.    That's true.
18         Q.    Okay.  And you see how the definition also
19    includes children?
20         A.    Yes.
21         Q.    So CDC does not have any data on the
22    tolerable upper fluoride intake for neurotoxic effects
23    on children?
24         A.    Right.  As stated in our response to the
25    issue on 10 and 11, we don't conduct research
```

1    ourselves related to tolerable upper fluoride intake.

2    Again, that's under the jurisdiction of EPA's drinking

3    water.

4           Q.    Okay.

5           A.    And they set maximum and minimum

6    containment levels about notifying people when levels

7    are exceeded.

8           Q.    Okay.  And CDC as you sit here today is

9    **not aware of any data in the published literature that**

10   **would define the tolerable upper fluoride intake for**

11   **neurotoxic effects on children -- for children?**

12          A.    As a rep of CDC, to my knowledge, we don't

13   have any knowledge about that.

14          Q.    **Okay.  Now I'd like to turn your attention**

15   **to Topic 5, which is addressed on Page 3 and 4 of**

16   **CDC's objections.  And Topic 5 of the deposition**

17   **notice as stated here is "what research the CDC has**

18   **conducted or sponsored, if any, to determine the risk**

19   **of neurotoxicity from fluoride exposure in susceptible**

20   **subsets of the population."  Did I read that**

21   **correctly?**

22          A.    Yes.

23          Q.    **Okay.  And I'm going to -- you see how**

24   **"susceptible subsets of the population" is capitalized**

25   **here?**

1        A.      Yes.

2        Q.      If I could just direct your attention

3   again to Page 2 of the deposition notice.

4        A.      Uh-huh.

5        Q.      I'm going to read for you the definition

6   of "susceptible subsets," okay.

7        A.      Okay.

8        Q.      It says:  "Susceptible subsets of the

9   population means, one, fetuses, infants, preadolescent

10  children, the elderly and, two, individuals with the

11  following conditions:  nutrient deficiencies, i.e.,

12  deficiencies of calcium, iodine, vitamin C, vitamin D,

13  and magnesium, kidney disease, and diabetes."  Did I

14  read that correctly?

15       A.      Yes.

16       Q.      Okay.  So returning to CDC's objections on

17  Page 3, CDC responds:  "CDC has not conducted or

18  sponsored research concerning the risk of

19  neurotoxicity associated with fluoride exposure in

20  susceptible populations."  Did I read that correctly?

21       A.      Yes.

22       Q.      And that's a correct statement, correct?

23       A.      Yes.

24       Q.      Okay.  And is CDC aware of any research

25  that establishes the neurological safety of fluoride

1    attention to Page 32, and do you see that highlighted

2    portion on the bottom left?

3         A.    Okay.  Now I do, yes.

4         Q.    Okay.  I'm just going to read that.

5    Featherstone writes here:  "Until recently the major

6    caries-inhibitory effect of fluoride was thought to be

7    due to its incorporation in tooth enamel or tooth

8    mineral during the development of the tooth prior to

9    eruption.  This supposed mechanism of action was

10   behind the public health efforts and individual

11   caries-preventive regimens such as the use of fluoride

12   supplements prescribed for children to strengthen the

13   teeth during their development."  Did I read that

14   correctly?

15        A.    Yes.

16        Q.    And as I think we've already discussed,

17   CDC agrees that that is a correct assessment of the

18   history of fluoride?

19        A.    Correct.

20        Q.    Okay.  And then Featherstone writes:

21   "There is now overwhelming evidence that the primary

22   caries-preventive mechanisms of action of fluoride are

23   post eruptive through topical effects for both

24   children and adults."  Did I read that correctly?

25        A.    Yes.

1        Q.      And the CDC agrees with that statement,

2    correct?

3        A.      Yes, we do.

4        Q.      Okay.  And if I could direct your

5    attention to Page 34.  Do you see the highlighted

6    portion at the top right of the page?

7        A.      Uh-huh.

8        Q.      Featherstone writes:  "Very importantly,

9    this means that fluoride incorporated during tooth

10   mineral development at normal levels of 20 to 100 ppm

11   even in fluoridated drinking water areas or with the

12   use of fluoride supplements does not alter the

13   solubility of the mineral.  Even at higher levels such

14   as 1000 ppm in the outer few micrometers of enamel,

15   there is no measurable benefit against acid-induced

16   dissolution."  Did I read that correctly?

17       A.      Yes.

18       Q.      And did CDC agree with that statement?

19              MR. DO:  I'm going to object there.  Until

20       you lay the foundation, I don't know if you're

21       asking in his personal capacity or --

22              MR. CONNETT:  This is in the CDC's

23       position --

24              MR. DO:  Okay.

25              MR. CONNETT:  -- with respect to Topic

 1  literature, correct?

 2      A.     I have to say that I am unfamiliar and not

 3  remembering the grade levels of what the evidence was.

 4      Q.     Okay.  Well, why don't we turn to Page 19.

 5  That might refresh your recollection.

 6      A.     Okay.

 7      Q.     Do you see the box at the bottom titled

 8  "Grading system used for determining the quality of

 9  evidence for a fluoride modality"?

10      A.     Gotcha.  Yes.

11      Q.     And Grade I -- and take your time to

12  review it.  But after you've reviewed it, would you

13  agree with me that Grade I is the highest quality of

14  evidence in this grading system?

15      A.     Okay.  I've reviewed it; and yes, I'll

16  agree --

17      Q.     Okay.

18      A.     -- to your statement.

19      Q.     So the CDC's conclusion in 2001 is that

20  they had good evidence, high-quality evidence, to show

21  that fluoride supplements do not provide a benefit for

22  children when given during pregnancy, correct?

23      A.     Yeah, when given to pregnant women.

24      Q.     Okay.  And is CDC aware of any information

25  published subsequent to 2001 that would in any way

1    document, we don't have a position on this

2    matter.

3        Q.    (By Mr. Connett)  Okay.  So if a pregnant

4    **mother wrote an e-mail to CDC asking if I drink**

5    **fluoridated water during my pregnancy, will that**

6    **provide a benefit to the teeth of my baby, CDC would**

7    **not answer yes to that question, correct?**

8            MR. DO:  I'm not sure how to object to

9        that question to be honest.  Objection, form.

10           MR. CONNETT:  Just say form.

11           MR. DO:  Form.  Form, foundation, calls

12       for speculation.

13           THE WITNESS:  If we were to get an e-mail

14       as such, we would summarize our understanding of

15       the evidence in saying we have not found evidence

16       that supports -- that shows benefit to the child

17       if ingested -- if community water fluoridation or

18       some other form of fluoride is ingested by the

19       mother.

20       Q.    (By Mr. Connett)  Okay.

21       A.    And we would also instruct them to consult

22   with their attending physician to make those choices.

23       Q.    Okay.  So I'd like to now move on to

24   **Topic 13 which has set forth in our notice as "CDC's**

25   **position, if any, on whether exposure to fluoridated**

1    studied it because that's not consistent with infant

2    feeding recommendations.  Exclusively breast-fed is

3    what we -- exclusive breast-feeding or bottle-feeding

4    for the first six months is the recommendations we

5    support, and they're made by a number of

6    organizations.

7         Q.      Okay.  So just to clarify because I think

8    I'm -- is the CDC aware of any evidence demonstrating

9    benefits from consumption of fluoridated drinking

10   water during the first six months of life?

11        A.      We are not aware of any evidence.

12        Q.      Okay.  If you could, turn back to the 2001

13   report.

14        A.      Okay.

15        Q.      And I'd just like to draw your attention

16   to Page 4.

17               MR. DO:  Are we on Exhibit 53?

18               MR. CONNETT:  Yes.

19               THE WITNESS:  I think so.  Page 4?

20        Q.      (By Mr. Connett)  Yes.  Are you there?

21        A.      Yes.

22        Q.      Okay.  And this is sort of redundant to

23   the previous one, but I'll just read the first

24   sentence at the bottom of the page.  It reads:  "The

25   laboratory and epidemiologic research that has led to

1          CERTIFICATE OF COURT REPORTER

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6              I hereby certify that the foregoing
     transcript was reported as stated in the caption and
7    the questions and answers thereto were reduced to
     writing by me; that the foregoing 279 pages represent
8    a true, correct, and complete transcript of the
     evidence given on Tuesday, November 6, 2018, by the
9    witness, Casey Hannan, who was first duly sworn by me.

10             I certify that I am not disqualified
     for a relationship of interest under
11   O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
     Reporter here as an independent contractor of
12   JPA Reporting, LLC who was contacted by
     Asbestos Reporters of California to provide court
13   reporting services for the proceedings; I will not be
     taking these proceedings under any contract that is
14   prohibited by O.C.G.A. 15-14-37(a) and (b) or
     Article 7.C. of the Rules and Regulations of the
15   Board; and by the attached disclosure form I confirm
     that neither I nor JPA Reporting, LLC are a party to a
16   contract prohibited by O.C.G.A. 15-14-37(a) and (b) or
     Article 7.C. of the Rules and Regulations of the
17   Board.

18             This 19th day of November, 2018.

19

20

21             _____
               LINDA C. RUGGERI
22             CERTIFIED COURT REPORTER
               GEORGIA CERTIFICATE NO. CCR-A-261
23

24

25

# Exhibit 12

The National Academies of | SCIENCES ENGINEERING MEDICINE

# THE NATIONAL ACADEMIES PRESS

This PDF is available at http://nap.edu/11571

SHARE   



## Fluoride in Drinking Water: A Scientific Review of EPA's Standards

### DETAILS

530 pages | 6 x 9 | PAPERBACK
ISBN 978-0-309-10128-8 | DOI 10.17226/11571



GET THIS BOOK

FIND RELATED TITLES

### CONTRIBUTORS

Committee on Fluoride in Drinking Water; Board on Environmental Studies and
Toxicology; Division on Earth and Life Studies; National Research Council

Visit the National Academies Press at NAP.edu and login or register to get:

– Access to free PDF downloads of thousands of scientific reports
– 10% off the price of print titles
– Email or social media notifications of new titles related to your interests
– Special offers and discounts



Distribution, posting, or copying of this PDF is strictly prohibited without written permission of the National Academies Press.
(Request Permission) Unless otherwise indicated, all materials in this PDF are copyrighted by the National Academy of Sciences.

Copyright © National Academy of Sciences. All rights reserved.

EXHIBIT

44   11/6/18
LCR

7

# Neurotoxicity and Neurobehavioral Effects

This chapter evaluates the effects of fluoride on the nervous system and behavior, with particular emphasis on studies conducted since the earlier NRC (1993) review. The human data include epidemiologic studies of populations exposed to different concentrations of fluoride and individual case studies. In addition, laboratory studies of behavioral, biochemical, and neuroanatomical changes induced by fluoride have been reviewed and summarized. At the end of the chapter, conclusions and recommendations for future research are presented.

## HUMAN STUDIES

### Cognitive Effects

Several studies from China have reported the effects of fluoride in drinking water on cognitive capacities (X. Li et al. 1995; Zhao et al. 1996; Lu et al. 2000; Xiang et al. 2003a,b). Among the studies, the one by Xiang et al. (2003a) had the strongest design. This study compared the intelligence of 512 children (ages 8-13) living in two villages with different fluoride concentrations in the water. The IQ test was administered in a double-blind manner. The high-fluoride area (Wamiao) had a mean water concentration of 2.47 ± 0.79 mg/L (range 0.57-4.50 milligrams per liter [mg/L]), and the low-fluoride area (Xinhuai) had a mean water concentration of 0.36 ± 0.15 mg/L (range 0.18-0.76 mg/L). The populations studied had comparable iodine and creatinine concentrations, family incomes, family educational levels, and other factors. The populations were not exposed to other sig-

*205*

Copyright National Academy of Sciences. All rights reserved.

220 FLUORIDE IN DRINKING WATER

the pineal melatonin system as well as the thyroid-stimulating hormone-growth hormone connection. It has been said in this regard "every molecule of $AlF_x$ is the messenger of false information" (Strunecka and Patocka 2002, p. 275). This may be an accurate synopsis of the $AlF_x$ effect at a single synapse, but the brain is a highly redundant and dispersed communication system containing millions of synapses. Because of this, observable alterations in mental or motor actions might require the formation of a multitude of false messages in a number of brain circuits acting over a prolonged period of time. Thus, the number of false messages required to disrupt an "action pattern" in the brain probably will vary according to the nature of the ongoing activities.

An especially important neurochemical transmitter that reaches almost all areas of the brain is ACh. As discussed above, some studies show that NaF and SiF inhibit cholinesterases, including acetylcholinesterase. The progressive accumulation of ACh at synaptic locations produced by the diminished esterase activity leads to a number of complex effects that can be summarized as an initial increase in stimulation of the target cells but ultimately leads to diminished stimulation—even a blockade of all activity. This earlier dialogue properly emphasized the behavioral importance of cholinergic activity in the brain and body more generally.

Long et al. (2002) reported changes in the number of acetylcholine receptors (nAChRs) in the rat brain due to fluoride. Rats were administered NaF in drinking water at 30 or 100-mg/L for 7 months. Decreased numbers of nAChRα7 subunits were found in the brains of rats from both treatment groups, but only the brains of the 100-mg/L group had diminished nAChRα4 subunits of this receptor. These results are of interest because changes in the nicotinic receptors have been related to the development of Alzheimer's disease (Lindstrom 1997; Newhouse et al. 1997) and, in frontal brain areas, to schizophrenia (Guan et al. 1999).



FINDINGS

### Human Cognitive Abilities

In assessing the potential health effects of fluoride at 2-4 mg/L, the committee found three studies of human populations exposed at those concentrations in drinking water that were useful for informing its assessment of potential neurologic effects. These studies were conducted in different areas of China, where fluoride concentrations ranged from 2.5 to 4 mg/L. Comparisons were made between the IQs of children from those populations with children exposed to lower concentration of fluoride ranging from 0.4 to 1 mg/L. The studies reported that while modal IQ scores were unchanged, the average IQ scores were lower in the more highly exposed

Copyright National Academy of Sciences. All rights reserved.

children. This was due to fewer children in the high IQ range. While the studies lacked sufficient detail for the committee to fully assess their quality and their relevance to U.S. populations, the consistency of the collective results warrant additional research on the effects of fluoride on intelligence. Investigation of other mental and physiological alterations reported in the case study literature, including mental confusion and lethargy, should also be investigated.

### Behavioral Effects on Animals

A few animal studies have reported alternations in the behavior of rodents after treatment with fluoride. However, the observed changes were not striking in magnitude and could have been due to alterations in hormonal or peptide activity. Animal studies to date have used conventional methodologies to measure learning and memory abilities or species-typical behaviors in novel locations. The tasks used to measure learning and memory did not require any significant mental effort. No studies were available on higher order mental functions, altered reactions to stress, responses to disease states, or supplemental reactions to known neurotoxins. Procedures are available that could test for cognitive functions, but they are labor intensive and have seldom been used in the past 60 years. One example is the reasoning test designed by Maier (1929), who found that even a small lesion of the neocortex impaired performance on the reasoning test (Maier 1932). A more recent example is the delayed matching to position test with different outcomes (Savage 2001), which have shown that damage to the hippocampus can affect learning.

### Fluorosilicates

As noted in Chapter 2, exposure to fluorosilicates could occur under some conditions. There are reports that such chemicals enhance the uptake of lead into the body and brain, whereas NaF does not. Further research is needed to elucidate how fluorosilicates might have different biological effects from fluoride salts.

### Neurochemical and Biochemical Changes

Lipids and phospholipids, phosphohydrolases and phospholipase D, and protein content have been shown to be reduced in the brains of laboratory animals subsequent to fluoride exposure. The greatest changes were found in phosphatidylethanolamine, phosphotidylcholine, and phosphotidylserine. Fluorides also inhibit the activity of cholinesterases, including acetylcholinesterase. Recently, the number of receptors for acetylcholine

Copyright National Academy of Sciences. All rights reserved.

222                                       *FLUORIDE IN DRINKING WATER*

has been found to be reduced in regions of the brain thought to be most important for mental stability and for adequate retrieval of memories.

It appears that many of fluoride's effects, and those of the aluminofluoride complexes are mediated by activation of Gp, a protein of the G family. G proteins mediate the release of many of the best known transmitters of the central nervous system. Not only do fluorides affect transmitter concentrations and functions but also are involved in the regulation of glucagons, prostaglandins, and a number of central nervous system peptides, including vasopressin, endogenous opioids, and other hypothalamic peptides. The $AlF_x$ binds to GDP and ADP altering their ability to form the triphosphate molecule essential for providing energies to cells in the brain. Thus, $AlF_x$ not only provides false messages throughout the nervous system but, at the same time, diminishes the energy essential to brain function.

Fluorides also increase the production of free radicals in the brain through several different biological pathways. These changes have a bearing on the possibility that fluorides act to increase the risk of developing Alzheimer's disease. Today, the disruption of aerobic metabolism in the brain, a reduction of effectiveness of acetylcholine as a transmitter, and an increase in free radicals are thought to be causative factors for this disease. More research is needed to clarify fluoride's biochemical effects on the brain.

### Anatomical Changes in the Brain

Studies of rats exposed to NaF or $AlF_3$ have reported distortion in cells in the outer and inner layers of the neocortex. Neuronal deformations were also found in the hippocampus and to a smaller extent in the amygdala and the cerebellum. Aluminum was detected in neurons and glia, as well as in the lining and in the lumen of blood vessels in the brain and kidney. The substantial enhancement of reactive microglia, the presence of stained intracellular neurofilaments, and the presence of IgM observed in rodents are related to signs of dementia in humans. The magnitude of the changes was large and consistent among the studies. Given this, the committee concludes further research is warranted in this area, similar to that discussed at a February 2-3,1999, EPA workshop on aluminum complexes and neurotoxicity and that recommended for study by NTP (2002).

### RECOMMENDATIONS

On the basis of information largely derived from histological, chemical, and molecular studies, it is apparent that fluorides have the ability to interfere with the functions of the brain and the body by direct and indirect means. To determine the possible adverse effects of fluoride, additional data from both the experimental and the clinical sciences are needed.

Copyright National Academy of Sciences. All rights reserved.

NEUROTOXICITY AND NEUROBEHAVIORAL EFFECTS                223

- The possibility has been raised by the studies conducted in China that fluoride can lower intellectual abilities. Thus, studies of populations exposed to different concentrations of fluoride in drinking water should include measurements of reasoning ability, problem solving, IQ, and short- and long-term memory. Care should be taken to ensure that proper testing methods are used, that all sources of exposure to fluoride are assessed, and that comparison populations have similar cultures and socioeconomic status.

- Studies of populations exposed to different concentrations of fluoride should be undertaken to evaluate neurochemical changes that may be associated with dementia. Consideration should be given to assessing effects from chronic exposure, effects that might be delayed or occur late-in-life, and individual susceptibility (see Chapters 2 and 3 for discussion of subpopulations that might be more susceptible to the effects of fluoride from exposure and physiologic standpoints, respectively).

- Additional animal studies designed to evaluate reasoning are needed. These studies must be carefully designed to measure cognitive skills beyond rote learning or the acquisition of simple associations, and test environmentally relevant doses of fluoride.

- At the present time, questions about the effects of the many histological, biochemical, and molecular changes caused by fluorides cannot be related to specific alterations in behavior or to known diseases. Additional studies of the relationship of the changes in the brain as they affect the hormonal and neuropeptide status of the body are needed. Such relationships should be studied in greater detail and under different environmental conditions.

- Most of the studies dealing with neural and behavioral responses have tested NaF. It is important to determine whether other forms of fluoride (e.g., silicofluorides) produce the same effects in animal models.

Copyright National Academy of Sciences. All rights reserved.

# **Exhibit 13**

Page 1

1              UNITED STATES DISTRICT COURT

               NORTHERN DISTRICT OF CALIFORNIA

2

3      FOOD & WATER WATCH, INC., et      )

       al.,                             )

4                                        )

                                         )

5                        Plaintiffs,    )

                                         )  Case No.

6      vs.                              )  3:17-cv-02162

                                         )  -EMC

7      UNITED STATES ENVIRONMENTAL      )

       PROTECTION AGENCY, et al.,       )

8                                        )

                                         )

9                        Defendants.    )

                                         )

10

11

12

13           VIDEO RECORD & ORAL DEPOSITION OF

14              Kathleen M. Thiessen, Ph.D.

15              Tuesday, August 27, 2019

16                    9:00 A.M.

17              U.S. Attorney's Office

18                 800 Market Street

19           Knoxville, Tennessee 37902

20

21

22

23

24

                  Georgette H. Mitchell

25         Registered Professional Reporter

                    LCR-55 (TN)

Kathleen M. Thiessen , Ph.D.                    August 27, 2019

Page 6

1          the US EPA.

2                    MR. CONNETT:  Michael Connett on behalf

3          of the plaintiffs.

4                    MS. CARFORA:  Good morning.

5                    Eric, are you going to make an

6          appearance?

7                    MR. WILBAR:  Sure.  Eric Wilbar on behalf

8          of US EPA.

9                    MS. CARFORA:  Good morning again.

10                    KATHLEEN M. THIESSEN, PH.D.,

11     having first been duly sworn, was examined and deposed

12     as follows:

13     EXAMINATION BY MS. CARFORA:

14          Q.     Try one more time.  Good morning.

15                 Can you state your name for the record,

16     please?

17          A.     Kathleen Thiessen.

18          Q.     Kathleen Thiessen.  And do you prefer to

19     be called Dr. Thiessen, Ms. Thiessen, Kathleen?  What

20     do you prefer?

21          A.     Dr. Thiessen is fine.

22          Q.     Dr. Thiessen.  Okay.  Great.  Have you

23     ever been deposed before?

24          A.     Yes.

25          Q.     How many times?

                                                    Page 297

1          A.      I know the name.  I'm not overly familiar

2     with any of that, no.

3          Q.      Do you know who his employer was?

4          A.      Not right off.

5          Q.      Okay.  Fine.  So let's -- you were asked

6     a lot of questions about changes going on in the brain

7     that the NRC identified.  So I'd like to go though and

8     talk with you in a little bit more detail what those

9     changes were, okay?  Make sense?

10              So if you could turn to page -- sorry, to

11    Exhibit 255, and I'd like to direct your attention to

12    the findings section of the chapter.  And he starts on

13    page 220.

14              Do you see that?

15         A.      Yes.

16         Q.      Now, counsel asked you some questions

17    about the first section which is dealing with the

18    then-existing epidemiological studies on IQ, right?

19         A.      Yes.

20         Q.      Okay.  Well, let's look at the findings

21    on the animal data, okay?

22         A.      Okay.

23         Q.      So if you turn to the next page, page

24    221.  You see the section at the bottom there, it's

25    entitled "Neurochemical and Biochemical Changes"?

Page 298

1          A.      Okay.  Yes.

2          Q.      Do you see that at the bottom?

3          A.      Yes.

4          Q.      Now, this is a section where NRC is

5    identifying its findings as to how fluoride causes

6    neurochemical and biochemical changes, correct?

7          A.      Yes.

8          Q.      Okay.  If you want to take a second and

9    just read that first paragraph.

10         A.      Okay.

11         Q.      Okay.  So these are some of the changes

12   that NRC had identified as occurring in animals

13   following fluoride exposure, correct?

14         A.      Yes.

15         Q.      Now, these changes include reduction in

16   lipid content in the brain?

17         A.      Yes.

18         Q.      And do these changes include reduction in

19   the protein content of the brain?

20         A.      Yes.

21         Q.      Do these changes incur -- include

22   reductions in the phospholipid content of the brain?

23         A.      Yes.

24         Q.      Do these changes incur inhibitions of

25   acetylcholinesterase?

Kathleen M. Thiessen , Ph.D.                    August 27, 2019

                                                Page  299

1            A.      Yes.

2            Q.      Do these changes include -- well, I'll

3    stop there.

4                    Dr. Thiessen, these -- are these changes

5    here that NRC is identifying known effects from

6    fluoride exposure in animals?

7            A.      Yes.

8            Q.      Okay.  So when we're talking about the

9    difference between a known effect and a potential

10   effect, these are potential effects when seeking to

11   extrapolate them to humans.

12                   Is that a fair -- fair summary?

13           A.      Yes.

14           Q.      Okay.  So they're -- these are known

15   effects in animals from fluoride exposure and they are

16   at this time, potential effects in humans.

17                   Is that a correct summary?

18           A.      Yes, there are actually a couple of

19   studies that show some of those effects in fetal brains

20   in mothers exposed to fluoride.

21           Q.      Okay.  So as of 2006, and based on the

22   NRC's conclusions, fluoride -- sorry, strike that.

23                   As of 2006, the NRC had enough

24   information available to it to conclude that

25   neurotoxicity is a known effect of fluoride exposure in

1             MS. CARFORA:   Thank you.

2    BY MR. CONNETT:

3        Q.     If you go to -- if you look at the third

4    sentence there in that paragraph it says that "fluoride

5    affects transmitter concentrations and functions."

6             Do you see that?

7        A.     Yes.

8        Q.     So the NRC had enough information

9    available to it from the animal studies to conclude

10   that fluoride affects neurotransmitter concentrations

11   and functions; is that correct?

12       A.     Yes.

13       Q.     Would you consider alterations to

14   neurotransmitter concentrations and functions to be an

15   adverse effect?

16       A.     Yes.

17       Q.     Now, if you -- the last sentence of that

18   paragraph NRC writes that "aluminum fluoride, not only

19   provides false messages throughout the nervous system

20   but, at the same time, diminishes the energy essential

21   to brain function."

22             Did I read that correctly?

23       A.     Yes.

24       Q.     So that was a finding from the NRC?

25       A.     Yes.

Kathleen M. Thiessen, Ph.D.                    August 27, 2019

Page 302

```
1          Q.      Dr. Thiessen, do you -- would you

2    consider the diminishment of the energy -- sorry,

3    strike that.

4                  Dr. Thiessen, would you consider a

5    diminishment to the energy available to the brain to be

6    an adverse effect?

7                  MS. CARFORA:  Objection, leading.

8                  THE WITNESS:  Yes.

9    BY MR. CONNETT:

10         Q.      Now if you turn to the next paragraph,

11   Dr. Thiessen, you see the first sentence there?  And

12   I'll read it for you.

13                 NRC writes, "Fluorides also increase the

14   production of free radicals in the brain through

15   several different biological pathways."

16                 Did I read that correctly?

17         A.      Yes.

18         Q.      So the NRC as of 2006, had enough

19   information available to it from the animal literature

20   to conclude that fluoride increased the oxidative

21   stress in the brain of animals; is that correct?

22         A.      Yes.

23         Q.      Dr. Thiessen, do you consider the

24   increase of oxidative stress in the brain to be an

25   adverse effect?
```

Page 304

1          MS. CARFORA:  Objection, leading.

2          THE WITNESS:  Yes.

3   BY MR. CONNETT:

4      Q.      And so the NRC had enough information

5   available to it as of 2006 to conclude that fluoride

6   can cause neuronal deformations in the brains of

7   animals?

8          MS. CARFORA:  Objection, leading.

9          THE WITNESS:  Yes.

10  BY MR. CONNETT:

11     Q.      Is that -- is that correct, Dr. Thiessen?

12     A.      Yes.

13     Q.      Okay.  And further on in the paragraph

14  the NRC writes, "The substantial enhancement of

15  reactive microglia, the presence of stained

16  intracellular neurofilaments and the presence of IGM

17  observed in rodents are related to signs of dementia in

18  humans."

19          Did I read that correctly?

20     A.      Yes.

21     Q.      So is it fair to say that the NRC looked

22  at some of these changes occurring in the brains of

23  fluoride-treated animals and saw those changes as

24  having a potential bearing on fluoride's ability to

25  cause dementia in humans?

Page 317

1        A.       That and the CDC report, the discussion

2   of that.

3        Q.       And you -- one of the questions that was

4   asked to you, I believe counsel stated that Dr.

5   Featherstone thought there was a systemic benefit of

6   fluoride.

7                 So I want to read to you a quote from Dr.

8   Featherstone's conclusions in his 1999 review, and then

9   ask you if you agree with Dr. Featherstone's

10  conclusion, okay?

11                Dr. Featherstone wrote, "The systemic

12  benefits of fluoride are minimal."

13                Would you agree with Dr. Featherstone?

14       A.       Yes.

15       Q.       Okay.  I know you weren't at Dr. Henry's

16  deposition and I know you haven't received a transcript

17  of her deposition, but in her deposition she testified

18  that you never discussed a document called The

19  Guidelines for Neurotoxicity Risk Assessment.

20                Is that correct?

21       A.       That is not correct.

22       Q.       Is -- is there any point in your report

23  where you reference or discuss the Guidelines for

24  Neurotoxicity Risk Assessment?

25       A.       Starting on page six.

Kathleen M. Thiessen, Ph.D.                     August 27, 2019

Page 318

1      Q.      And is it fair to say, Dr. Thiessen, that

2  you repeatedly reference and discuss the Guidelines for

3  Neurotoxicity Risk Assessment?

4      A.      Yes, I cited them many times.

5      Q.      So let me ask you, what role did the

6  EPA's guidelines for neurotoxicity risk assessment play

7  in your analysis?

8              Can you explain that a little bit?

9      A.      That was sort of the -- the basis or

10  framework for my analysis.  What does EPA say about the

11  neurotoxicity risk assessment and here's what we know

12  about fluoride.

13     Q.      So did you assess the literature under

14  the framework presented or recommended by the

15  guidelines?

16     A.      Yes.

17     Q.      Do you know if these guidelines are still

18  relied upon and used by EPA?

19     A.      It's my understanding that they are.  The

20  -- the list of chemicals that have been assessed

21  according to those guidelines, two of them are in --

22  are recent reports.

23     Q.      And I think you were just pointing to one

24  of the tables in your reports?

25     A.      Yes.

Page 337

1    There's a section there titled "margin of exposure" at

2    the bottom.

3              Do you see that?

4         A.    Yes.

5         Q.    And you write, "In assessing whether a

6    chemical poses an unreasonable risk under TSCA, as well

7    as under the guidelines, EPA uses the margin of

8    exposure method."

9              Did I read that correctly?

10        A.    Yes.

11        Q.    What guidelines are you referring to

12   there?

13        A.    That's the guidelines for neurotoxicity

14   risk assessment.

15        Q.    So is that one of the reasons why you

16   applied the margin of exposure analysis in this case?

17        A.    Yes.

18        Q.    Now, you were asked a lot of questions

19   about EPA's section five analyses.  And do you happen

20   to know whether EPA also does margin of exposure

21   analysis for section six analyses?

22              MS. CARFORA:  Objection, scope.  Lacks

23        foundation.

24              THE WITNESS:  It's in the -- it's listed

25        in the Federal Register as one of several

Kathleen M. Thiessen, Ph.D.                      August 27, 2019

Page 338

1        approaches that may be used in TSCA.

2    BY MR. CONNETT:

3        Q.      Are you aware of -- have -- have you had

4    an opportunity to look at the draft risk evaluation

5    that EPA just published for 1-BP?

6        A.      Yes.

7                MS. CARFORA:  Objection, scope.

8                MR. CONNETT:  And it's not scope since

9        you asked many, many questions about difference

10       between section five and section six.

11   BY MR. CONNETT:

12       Q.      Was that risk evaluation, Dr. Thiessen,

13   performed, was that a new chemical or is that an

14   existing chemical?

15               MS. CARFORA:  Objection.  Scope.

16               MR. CONNETT:  1-BP.

17               THE WITNESS:  It's an existing chemical.

18   BY MR. CONNETT:

19       Q.      All right.  Did EPA in conducting -- did

20   EPA find there to be an unreasonable risk in that

21   evaluation?

22               MS. CARFORA:  Objection, scope.

23               THE WITNESS:  Yes.

24   BY MR. CONNETT:

25       Q.      Did EPA use a margin of exposure analysis

Page 339

1    for its risk characterization?

2            A.      Yes.

3                    MS. CARFORA:  Objection, scope.

4    BY MR. CONNETT:

5            Q.      Did it?

6            A.      Yes.

7            Q.      Hmm.  Now, EPA -- did the EPA also

8    consider, if you recall, other risk-related

9    considerations when doing its risk characterization in

10   the 1-BP analysis?

11                   MS. CARFORA:  Objection, scope.

12                   THE WITNESS:  They considered the number

13           of people potentially exposed by several different

14           uses of the chemical.

15   BY MR. CONNETT:

16           Q.      Oh, they -- oh, EPA.  Hmm, they

17   considered the magnitude of exposure?

18                   MS. CARFORA:  Objection, scope.

19   BY MR. CONNETT:

20           Q.      In its -- in their assessment of the

21   risk?

22                   MS. CARFORA:  Same objection.

23                   THE WITNESS:  They considered -- for any

24           given use, they considered the number of people

25           that were potentially exposed and the -- the level

Kathleen M. Thiessen, Ph.D.                    August 27, 2019

Page 340

1          of exposure.

2     BY MR. CONNETT:

3          Q.      Huh.  And you also when you did your

4     analysis of unreasonable risk in this case, you also

5     considered the magnitude of exposure; is that correct?

6          A.      Yes.

7          Q.      All right.  Do you recall in the 1-BP

8     risk evaluation how many people EPA identified as being

9     exposed to 1-BP?

10               MS. CARFORA:  Objection, scope,

11          foundation.

12               THE WITNESS:  It depended on the specific

13          use.  Some were a few hundred and some were 20,

14          30,000.

15     BY MR. CONNETT:

16          Q.      Based on, would it be fair to say that it

17     was less than or approximately 100,000 people that were

18     identified as being exposed to 1-BP?

19               MS. CARFORA:  Objection, scope,

20          foundation, leading.

21               THE WITNESS:  I didn't count them all up,

22          but it would probably -- the total would probably

23          be under 100,000.

24     BY MR. CONNETT:

25          Q.      How does that magnitude of exposure in

Kathleen M. Thiessen, Ph.D.                    August 27, 2019

Page 341

1    the 1-BP risk evaluation, how does that compare to the

2    magnitude of exposure to fluoridation chemicals?

3                    MS. CARFORA:  Objection, scope,

4           foundation.

5                    THE WITNESS:  It's a considerably smaller

6           group of people and it's all or very nearly all

7           occupational exposure.

8    BY MR. CONNETT:

9           Q.      When you say it was primarily all

10   occupational exposure, what do you mean by that?

11                   MS. CARFORA:  Objection, scope,

12          foundation.

13                   THE WITNESS:  People exposed to the

14          chemical at -- at their place of work.

15   BY MR. CONNETT:

16          Q.      Okay.  So I want you -- I'm going to ask

17   you to -- I'm going to talk with you now about several

18   other considerations that one might look to in

19   assessing unreasonable risk, okay?

20          A.      Okay.

21          Q.      One is degree of uncertainty and in the

22   1-BP draft risk evaluation, EPA notes that one way of

23   assessing uncertainty is to look at the size of the --

24   the benchmark MOE.

25                   Do you understand that term?

```
 1        A.      Yes.

 2                MS. CARFORA:  Objection, scope,

 3        foundation.

 4   BY MR. CONNETT:

 5        Q.      Okay.  And EPA states that where the

 6   benchmark MOE has a uncertainty factor of 30, that

 7   would be generally relatively a less degree of

 8   uncertainty.

 9                Do you understand that?

10                MS. CARFORA:  Objection, scope,

11        foundation.

12                THE WITNESS:  Yes.

13   BY MR. CONNETT:

14        Q.      How does that uncertainty factor of 30,

15   how does that compare with the uncertainty factors that

16   you used in calculating benchmark MOEs in this case?

17                MS. CARFORA:  Objection, scope.

18                THE WITNESS:  I had benchmark MOEs of --

19        of 30 and 300.

20   BY MR. CONNETT:

21        Q.      Hmm.  Let's talk now about another

22   potential risk consideration that EPA can consider in

23   doing an unreasonable risk analysis and that's

24   reversibility of effect, okay?

25                Do you have any opinion as to the
```

Kathleen M. Thiessen, Ph.D.                August 27, 2019

Page 343

1    reversibility or lack thereof of fluorides effects on

2    the IQ?

3                    MS. CARFORA:  Objection, scope.

4                    THE WITNESS:  Generally you cannot expect

5            that to reverse and improve.  A lot of that is set

6            somehow very early on before birth or in the first

7            year or two or so after birth while the -- the

8            brain is developing, and if the -- if the

9            connections don't form correctly, then they're

10           pretty much not going to form later either.

11   BY MR. CONNETT:

12           Q.    Now, in your report you discuss a lot of

13   the cross-sectional studies from China on fluoride and

14   IQ, right?

15           A.    Yes.

16           Q.    Okay.  What are the age -- what's the --

17   what's the general ages?  Can you give me a range of

18   the ages that are studied in those paragraphs --

19   papers.

20                   MS. CARFORA:  Objection, scope.

21                   THE WITNESS:  Those are typically school

22           age and depending on the study, anywhere from six

23           to 12.  They might go up to 15.

24   BY MR. CONNETT:

25           Q.    Okay.  And in those cross-sectional

Kathleen M. Thiessen , Ph.D.                    August 27, 2019

Page 344

1   studies, are they -- have these cross-sectional studies

2   found differences in IQ in the children between the

3   high fluoride and low fluoride areas?

4                   MS. CARFORA:  Objection, scope.

5                   THE WITNESS:  Yes.

6   BY MR. CONNETT:

7       Q.      Do those findings have any bearing on the

8   question of whether fluoride effects on IQ are

9   reversible?

10                  MS. CARFORA:  Objection, scope.

11                  THE WITNESS:  There's no evidence to

12          suggest that if you move the kids from a high

13          fluoride area to the low fluoride area that --

14          that they would suddenly improve or slowly improve

15          in IQ.  There's no -- no evidence for that that

16          I'm aware of.

17  BY MR. CONNETT:

18      Q.      And if the difference in IQ between high

19  fluoride areas and low fluoride areas is still

20  demonstrable at age 12 or 13, assuming, okay, I want

21  you to assume for a second, I want you to assume that

22  the fluoride's effects on IQ are caused by prenatal and

23  early infant exposure.

24                  Are you with me on that assumption?

25      A.      Yes.

Kathleen M. Thiessen, Ph.D.                    August 27, 2019

Page 345

1        Q.      Okay.  So if the difference in IQ is

2   still demonstrable at age 13 in cross-sectional

3   studies, does that data have any bearing on the

4   reversibility of fluoride's IQ effects in your opinion?

5                MS. CARFORA:  Objection, scope.

6                THE WITNESS:  That would confirm my

7        expectation that it's not reversible.

8   BY MR. CONNETT:

9        Q.      Now, I want to talk about another

10  consideration that EPA may or may not consider in doing

11  an unreasonable risk evaluation and that is the

12  severity of the effect, okay?

13               If you can turn to your rebuttal report.

14  If you can turn to page 21 and there's a section at the

15  bottom titled "additional supporting information."

16               Do you see that?

17       A.      Yes.

18       Q.      And in the middle of that paragraph you

19  quote -- you quote an EPA document, right?

20       A.      Yes.

21       Q.      And the quote reads, "The value of one IQ

22  point was selected as consistent with CASAC

23  recommendations as to the magnitude of IQ loss they

24  considered to be significant from a public health

25  perspective."

Kathleen M. Thiessen , Ph.D.                    August 27, 2019

Page 346

1              Did I read that correctly?

2       A.      Yes.

3       Q.      Does this statement from an EPA document

4  have any bearing in your opinion on the question of the

5  severity of IQ loss from fluoride exposure -- or strike

6  that.  I'll ask it again.

7              Does this statement from an EPA document

8  have any bearing in your opinion as to whether IQ loss

9  from a chemical agent is a severe effect?

10             MS. CARFORA:  Objection, scope, leading.

11             THE WITNESS:  Yes.

12  BY MR. CONNETT:

13      Q.      And what -- and can you explain?

14             MS. CARFORA:  Objection, scope, leading.

15             THE WITNESS:  It's saying that even a one

16         point loss of IQ should be prevented.  That one IQ

17         point matters down the road.

18             MR. CONNETT:  I have no further questions

19         at this time.

20             MS. CARFORA:  Okay.  I have 48 minutes I

21         think is what we agreed.  I'd like to just start

22         that right now.

23             THE WITNESS:  I -- I need a break.

24             MS. CARFORA:  Okay.  Let's take a break.

25             THE VIDEOGRAPHER:  This is the end of

Kathleen M. Thiessen , Ph.D.                    August 27, 2019

                                        Page 380

1          Q.       If you can turn to page 25.   The first

2    line on the top of the page reads, "Alterations in the

3    structure of the nervous system", and it provides some

4    examples, "are regarded as evidence of a neurotoxic

5    effect."

6                    Do you see that?

7          A.       Yes.

8          Q.       Now, you've talked a lot today, Dr.

9    Thiessen, about neurochemical effects and

10   neuroanatomical effects.

11                  Are those sometimes called structural

12   effects?

13         A.       Yes.

14         Q.       So is it your understanding that EPA

15   considers structural effects on the nervous system to

16   be evidence of neurotoxicity?

17         A.       That's what it says.

18         Q.       Okay.  If you can turn to page 55.  If

19   you -- second paragraph, four lines down.

20         A.       Okay.

21         Q.       And I'll read it.  EPA states,

22   "Neurochemical and electrophysiological changes may be

23   regarded as adverse because of their known or presumed

24   relation to neuropathological and/or neurobehavioral

25   consequences."

Page 381

1                    Did I read that correctly?

2         A.      Yes.

3         Q.      So is it your understanding, Dr.

4    Thiessen, that EPA -- sorry.  Strike that.

5                    Is this consistent with your

6    understanding, Dr. Thiessen, about the effects of

7    neurochemical changes in the brain?

8         A.      Yes.

9         Q.      Does this then form your opinion that

10   you've offered today as to whether neurochemical

11   changes are likely to be adverse?

12        A.      Yes.

13        Q.      So if you could -- you were -- I've just

14   been showing you some quotes on structural effects and

15   whether structural effects are properly considered

16   adverse.

17                    I now want to ask you some questions

18   about functional effects on the nervous system, and

19   functional effects, am I correct in understanding,

20   include things like learning, learning impairments, and

21   memory impairments?

22        A.      Yes.

23        Q.      Okay.  So let's see how EPA has

24   considered whether learning effects and memory effects

25   are adverse.

Kathleen M. Thiessen , Ph.D.                    August 27, 2019

Page 392

```
1              C E R T I F I C A T E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4          I, Georgette H. Mitchell, Registered

5    Professional Reporter, Licensed Court Reporter #55 and

6    Notary Public, do hereby certify that I reported in

7    machine shorthand the deposition of KATHLEEN M.

8    THIESSEN, PH.D, called as a witness at the instance of

9    the Defendants, that the said witness was duly sworn by

10   me; that the reading and subscribing of the deposition

11   by the witness was waived; that the foregoing pages

12   were transcribed under my personal supervision and

13   constitute a true and accurate record of the deposition

14   of said witness to the best of my ability.

15         I further certify that I am not an attorney or

16   counsel of any of the parties, nor an employee or

17   relative of any attorney or counsel connected with the

18   action, nor financially interested in the action.

19         Witness my hand and seal this the 7th day of

20   September, 2019.

21

22                            _____

                              Georgette H. Mitchell

23                            Registered Professional

                              Reporter, Licensed Court

24                            Reporter 55, LCR expires

                              6-30-20 and Notary Public

25                            My Commission Expires:

                              February 2, 2020
```

# **Exhibit 14**

Phillipe Grandjean                                    September 13, 2019

                                                    Page 1

 1               UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3

 4   FOOD & WATER WATCH, INC., et al.,  ) Case No.

                                       ) 3:17-CV-02162-EMC

 5           Plaintiffs,               )

                                       )

 6        v.                           )

                                       )

 7   UNITED STATES ENVIRONMENTAL       )

     PROTECTION AGENCY, et al.,        )

 8                                     )

             Defendants.               )

 9   ----------------------------------)

10

11                    - - -

12             FRIDAY, SEPTEMBER 13, 2019

13                    - - -

14

15       Videotaped deposition of PHILLIPE GRANDJEAN,

16   M.D., PH.D., taken at the offices of U.S. Department

17   of Justice, 4 Constitution Square, 150 M Street N.E.,

18   Room 5.1405, Washington, D.C., beginning at 9:10 a.m.,

19   before Nancy J. Martin, a Registered Merit Reporter,

20   Certified Shorthand Reporter.

21

     Job No. CS3520657

22

Page 7

1   is not going to make an appearance.

2           MR. CONNETT:  Michael Connett on behalf of

3   the plaintiffs.

4           THE VIDEOGRAPHER:  Will the court reporter

5   please swear in the witness.

6

7               PHILLPPE GRANDJEAN, MD, PhD,

8           having been first duly sworn/affirmed,

9           was examined and testified as follows:

10

11                      EXAMINATION

12  BY MS. CARFORA:

13      Q.  Good morning, sir.

14      A.  Good morning.

15      Q.  We met a couple minutes ago.  My name is

16  Debbie Carfora.  We're with the Department of Justice,

17  and we are representing EPA in this matter.  It's

18  captioned Food & Water Watch, et al. vs. EPA, et al.,

19  also.

20      A.  Nice to meet you.

21      Q.  You too.  Thank you for coming today.  I know

22  you came a long way.  Did you fly here from Denmark

Page 64

1    decreased, and they are about at the same level

2    whether you are in a country with fluoridation or in a

3    country without fluoridation.  This has been done by

4    OECD, and there was a report several years ago in the

5    British Medical Journal that showed this.

6              So there seems to be -- you know, we are

7    achieving better dental health by means of fluoride

8    that by using topical treatment, which I think it is

9    in the countries that don't fluoridate, then the same

10   can be achieved as you might achieve by a combination

11   of fluoridated drinking water and topical treatment.

12   That is through toothpaste primarily.

13   BY MS. CARFORA:

14       Q.  So you agree even the fluoridated drinking

15   water contributes to the benefit?

16       A.  I don't know because in this country, I

17   believe that toothpastes are commonly supplemented

18   with a fluoride salt that makes -- you know, that

19   contributes topical exposure to fluoride and to which

20   degree that the water contributes anything, I don't

21   know.  I don't think that has been worked out.

22       Q.  Okay.  So, well, my question is do you have

Page 65

1    an opinion on if we eliminated the addition of

2    fluoride to drinking water, how would we compensate

3    for the loss of benefit to the teeth?

4              MR. CONNETT:  Assumes facts.

5              THE WITNESS:  I think your question is

6    incorrectly phrased because, as I just said, countries

7    that don't have fluoridation of the drinking water,

8    they have the same low caries rate as a country like

9    America or Canada.

10   BY MS. CARFORA:

11       Q.  And what's your understanding of how they

12   achieve that?

13             MR. CONNETT:  Asked and answered.

14             THE WITNESS:  My understanding that that has

15   been achieved over, you know, recent decades through

16   the introduction of fluoride-containing toothpastes,

17   primarily, and probably -- I'm not into this, but

18   dentists have some way of treating the enamel.  It's

19   something that the dentist will -- you don't do it

20   yourself in the bathroom.  This is what they do.

21   So -- to support the enamel.

22   BY MS. CARFORA:

Phillipe Grandjean                                    September 13, 2019

Page 70

1          And then we looked at the literature, and in

2     the Lancet paper from 2006, we concluded that fluoride

3     was a neurotoxicant.  We agreed with EPA, and that we

4     also said we didn't think the evidence was sufficient

5     to classify fluoride as a development neurotoxicant,

6     while we did classify lead and methylmercury and

7     arsenic and toluene and PCBs, I think those were the

8     five, as development toxicants.

9          And what happened in the years up to that was

10    that, you know, using the experience with lead, and

11    lead can cause brain toxicity in adults, and we know

12    that very well.  It has been profusely documented.

13    And as the literature on lead exposure and children's

14    brain development developed over several decades with

15    people like Herbert Needleman, who recently deceased,

16    we realized that children's brain development is

17    incredibly, substantially more vulnerable to

18    neurotoxicants than the adult mature brain because all

19    the brain cells are there.  They're in the right

20    spots.  They have all the right connections already in

21    the mature brain, and that makes the brain much less

22    sensitive.

Page 71

1          But the human brain during early development,

2     you know, the brain cells start like a tiny lit

3     sausage, and the cells have to find their way to their

4     final precision in the brain matter and line up.  Some

5     of them have to line up on top of each other.  They

6     have to send out projections, accents and dent rights,

7     to sort of wire the brain correctly.

8          Those processes are very, very sensitive.  So

9     with lead, it's like it requires perhaps a few percent

10    of the dose that's toxic to the adult compared to what

11    is toxic to the developing brain.

12         So we were worried, and that's why Richard

13    Horton said -- the editor of the Lancet said to me,

14    "Can you write this review for us?"  And I asked Phil

15    to, you know, co-author, and it's -- I don't know.  It

16    has been cited more than 1,000 times.  So it's very --

17    it's a standard reference, I would say --

18    BY MS. CARFORA:

19         Q.  Okay.  You said --

20         MR. CONNETT:  The witness is not finished

21    answering the question.

22    BY MS. CARFORA:

1            MR. CONNETT:  That --

2            MS. CARFORA:  I'm withdrawing the question.

3     I'm going to ask a different question.

4        Q.  My question for you -- my new question for

5     you, sir, is do you know --

6            MR. CONNETT:  Let the record reflect that

7     counsel has now interrupted the witness several times

8     when she's getting answers she doesn't like.  It's not

9     an appropriate thing to do in a deposition.  I'd ask

10    that you not do that again.

11           You can proceed.

12    BY MS. CARFORA:

13       Q.  Do you know, sitting here right now, at what

14    dose fluoride causes neurotoxic effect?

15           MR. CONNETT:  Overbroad.

16           THE WITNESS:  Sitting here right now, I have

17    a different answer than the answer I gave in 2006 and

18    the answer that was updated in 2014, and my answer

19    today is that yes, I know levels where developmental

20    neurotoxicity occurs in humans because now there is

21    substantially more information from high-quality

22    studies that have been conducted with objective,

Page 76

1    reliable methods and published in high-level

2    biomedical journals after peer review, and I think

3    that the unfortunate conclusion we have to accept

4    today is the conclusion that I have put in my report.

5            And that is that fluoride exposures, as they

6    occur in America today, primarily from fluoridated

7    drinking water, are toxic to brain development in

8    humans.

9    BY MS. CARFORA:

10       Q.  So what is the dose?

11           MR. CONNETT:  Asked and answered.

12           THE WITNESS:  You know, you're asking me a

13   very simple question.  Let me phrase my answer in

14   terms that relate to EPA and then the rule making at

15   EPA.

16           EPA, as a regulatory agency, requires, in

17   order to develop what they call a "reference dose,"

18   they recommend the use of a technique called

19   "benchmark dose calculation."  And so the point is

20   that thresholds of toxicity cannot be observed.  So

21   the answer to your question at which dose, I have to

22   say, well, doses that are above a threshold, but the

Phillipe Grandjean                                      September 13, 2019

Page 77

1   threshold cannot be observed -- I mean what we would

2   have to do is like dose pregnant women, you know, who

3   were devoid of fluoride exposure at different levels

4   of daily intakes to see what happened to the child's

5   brain development.

6           We don't do those sort of things.  But in

7   fact, what's happening in modern America, we are

8   dosing the whole population with fluoride, and we are

9   now convinced that the levels of exposure that are

10  achieved are above what I have calculated as a

11  benchmark dose that EPA would normally require to

12  develop a reference dose.  And that reference dose has

13  not been updated for decades.

14          So I think the time has come for us to

15  address the current scientific knowledge and see how

16  we can best adjust public policy in this area.

17  BY MS. CARFORA:

18      Q.  Sir, my question is very simple and

19  straightforward.  And you just said yourself that I

20  asked a very simple question.

21          My question is do you, sitting here today,

22  have an opinion as to at what dose fluoride causes

Page 78

1   neurotoxic effect?

2           MR. CONNETT:  Asked and answered.

3           THE WITNESS:  I think I gave you the answer,

4   but let me just say that if I follow EPA's

5   recommendations, I would say any exposure above the

6   benchmark dose level, that is above about 0.2

7   milligrams per liter of drinking water, that means

8   that above that dose, developmental neurotoxicity will

9   increase in magnitude and in frequency.

10  BY MS. CARFORA:

11      Q.  Okay.  So your testimony is that, if I

12  understand correctly, fluoride causes neuro

13  developmental toxicity at a dose of 0.2 or at a

14  concentration of 0.2 in the drinking water?

15      A.  Okay.  You use the word "dose," and I talk

16  about exposure.  So I am referring to the fluoride

17  concentration in the water because that's what has

18  been used in the scientific studies, and they've also

19  used the fluoride concentration in the urine, and

20  that's what EPA is addressing because they are

21  obviously regulating fluoride and water.  They can't

22  regulate fluoride in urine, but they can regulate the

Page 96

1           MR. CONNETT:  Overbroad.  Argumentative.

2    Vague and ambiguous.

3           THE WITNESS:  Okay.  So let me just be clear.

4    I have a reasonable understanding of what EPA does

5    because I mean I was working so closely with EPA on

6    methylmercury because EPA and the National Research

7    Council decided that my research should provide the

8    basis for a reference dose.  You know, that was in

9    2001, and I think the National Research Council report

10   was in 2000.

11          And we worked together on using the research

12   data that I had gathered so that EPA could do a proper

13   risk assessment and generate a reference dose for

14   methylmercury.  And this is now what's being updated

15   with the people.

16          So I do have a fair understanding of the

17   procedures and, you know, how risk assessments are

18   carried out in EPA.  I wouldn't say that I'm able to

19   give you a detailed explanation of all the details.

20   BY MS. CARFORA

21       Q.  Okay.  Does fluoride's toxicity depend on

22   root of exposure?

Page 158

1          The brain is crucial for, you know, our own

2     lives and also for society.  Brains are resources for

3     society.  This is a realization that has come, let's

4     say, over the last 20 years, starting with lead.  EPA

5     has certainly been part of this, and now fluoride is

6     emerging as something that appears to be causing IQ

7     deficits, and I think we need to respect that and not

8     just say, "Well, most of those kids will be within

9     normal range anyway."

10          That was the argument that was used by

11    industry against EPA regulating lead, and now I think

12    the time has come for EPA to realize that fluoride

13    seems to fit exactly in that very same pattern that

14    lead emerged as.

15     Q.  Based on what?  Based on trends?  Based on

16    statistical trends or based on some other, you know,

17    molecular design of the chemical itself?

18          MR. CONNETT:  Vague and ambiguous.

19          THE WITNESS:  I don't get the question.

20    BY MS. CARFORA:

21     Q.  You're saying -- I think you just compared

22    fluoride to lead, and I'm trying to figure out on what

Page 159

1  basis you're making the comparison.  Are you making

2  the comparison based on the molecular --

3      A.  All right.  So both lead and fluoride are

4  parts of this planet.  We're all exposed to them.

5  Humanity has been exposed to them, you know, through

6  eons.  So it's part of human life on this planet that

7  we're exposed to a range of elements, including

8  fluoride and lead.

9          Now, with lead the dictum was way back that

10 lead was a natural substance on this planet, and

11 therefore, not toxic.  And this was promoted by vested

12 interests.  You know, the trinity of the automobile

13 industry, the petroleum industry, and the gasoline

14 industry.  And it took EPA decades to get lead

15 appropriately -- you know, to phase out the use of

16 lead additives into gasoline.

17         And so with time we've learned that that is

18 not broken down in the body, can travel through the

19 placenta, through the blood brain barrier, and it can

20 cause loss of cognitive capacity.  And study after

21 study it showed that, and with substantial delays

22 because this was fought by vested interests.  Finally

Page 160

1    we have come about to, you know, regulating lead and

2    trying to decrease the exposure.  We're not quite

3    doing enough.  As we well know, there's water

4    contamination in many states.

5            But fluoride is now following that very same

6    pattern, and because of EPA's very impressive stand on

7    lead, I hope that EPA will read this literature on

8    fluoride, recent literature, and follow that same

9    track and regulate that because the IQs of the next

10   generation is -- it's a precious resource, and it's

11   part of human health to have optimal brain functioning

12   and not an -- intellectual deficits, increased risk of

13   ADHD or other -- the NRC even talks about dementia as

14   a degenerative disease of the central nervous system.

15           And so my pledge is that our perspective has

16   changed since the NRC wrote this report, but they

17   already planted the seed by saying, "Hey, it's a

18   hazard.  Let's learn more about it."

19       Q.  Okay.  I just want to make sure you weren't

20   saying we should assume fluoride is a developmental

21   neurotoxicant because we know lead was.  Ultimately --

22       A.  No, that's not what I'm saying.

Page 315

1      Q.   Now, you've previously -- you were asked some

2  questions about the analysis you did, I think back in

3  2013, on lead and creating a BMDL for lead?

4      A.   Right.

5      Q.   Did you use a human biomarker for the BMDL

6  for lead?

7      A.   Yeah.  For lead, it's appropriate to use the

8  blood -- the whole blood concentration of lead as the

9  exposure of parameters.

10      Q.   And that's called the benchmark dose?

11      A.   Benchmark dose, yeah.

12      Q.   Okay.  So and you were asked some questions

13  about, you know, whether certain findings in certain

14  studies, even if they were statistically significant,

15  can occur by chance.  Do you recall that line of

16  questioning?

17      A.   Yeah.

18      Q.   Dr. Grandjean, in your meta-analysis that you

19  did in 2012, you found what -- the vast majority of

20  the studies found effects of fluoride exposure on IQ?

21      A.   There were 27 studies, and 26 of them showed

22  that there was a tendency toward lower IQ points in

Page 316

1    communities with higher fluoride levels in the water.

2         Q.  Do you find -- would you find it unlikely

3    that 26 of 27 studies would all find an association

4    between fluoride as a matter of chance?

5         A.  Very unlikely, and we actually calculated a

6    joint P-value which was very, very low.

7         Q.  I'd like to now shift and talk about the NRC

8    report.  And if you could get the neurotoxicity

9    chapter in front of you, which I believe is Chapter 7.

10        A.  Okay.  No, I just have my own report.

11        Q.  Do you have it in front of you?

12        A.  I have it.

13        Q.  If you could turn to Page 220.

14        A.  Okay.

15        Q.  And you see there's a section here called

16   "Findings"?

17        A.  Uh-huh.

18        Q.  Okay.  I'd like to now direct your attention

19   to Page 221.

20        A.  Okay.

21        Q.  Do you see there's a section there titled

22   "Neurochemical and Biochemical Changes"?

Page 319

1    more recent papers that point to the same direction.

2         Q.   Okay.  So you've mentioned today several

3    times this notion of hazard assessment; right?

4         A.   Right.

5         Q.   And I think you testified earlier that what

6    the NRC is -- what this analysis is doing ultimately,

7    with respect to how fluoride affects the brain in

8    animals, is a hazard assessment; is that correct?

9         A.   Correct.

10        Q.   Okay.  So would it be fair to say that NRC is

11   stating, as of 2006, that neurotoxicity is a known

12   hazard in animals?

13        A.   Right.  And the hazard is -- means that there

14   is a potential risk.  We're not saying that there is a

15   risk but we're saying there is a potential because

16   it's a hazard.

17        Q.   And when you say, "potential risk," are you

18   talking about potential risk in humans?

19        A.   In humans as well and -- but, of course, that

20   is most likely dose dependent.

21        Q.   Right.  So if you can turn to the exhibit,

22   which is the Exhibit 256, which was Chapter 1, the

Page 341

1                    C E R T I F I C A T E

2         I do hereby certify that the aforesaid testimony

3    was taken before me, pursuant to notice, at the time

4    and place indicated; that said deponent was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth; that the testimony of said deponent was

7    correctly recorded in machine shorthand by me and

8    thereafter transcribed under my supervision with

9    computer-aided transcription; that the deposition is a

10   true and correct record of the testimony given by the

11   witness; and that I am neither of counsel nor kin to

12   any party in said action, nor interested in the

13   outcome thereof.

14

15

                Nancy J. Martin, RMR, CSR

16

17   Dated:  September 18, 2019

18   (The foregoing certification of this transcript does

19   not apply to any reproduction of the same by any

20   means, unless under the direct control and/or

21   supervision of the certifying shorthand reporter.)

22

# Exhibit 15



# NTP Research Report

## Systematic Literature Review on the Effects of Fluoride on Learning and Memory in Animal Studies

NTP RR 1

July 2016

Systematic Literature Review on the Effects of Fluoride on Learning and Memory in Animal Studies

## ABSTRACT

**BACKGROUND:** Previous systematic reviews of epidemiology studies have found support for a geographical association between high levels of naturally occurring fluoride in water (>1.5 ppm) and lower IQ in children. Most of the evidence from humans is from fluoride-endemic regions having higher background levels of fluoride compared to the fluoride concentrations historically used in community water fluoridation programs (0.7–1.2 ppm). Confidence in this body of evidence is limited, primarily due to poor reporting quality, lack of consideration of confounding (e.g., nutritional status, socioeconomic status, iodine deficiency), and concern for co-exposures to relatively high levels of other known neurotoxicants such as lead or arsenic. A systematic review of experimental animal studies could help in interpreting the human evidence.

**OBJECTIVE:** To investigate whether fluoride exposure has detrimental impacts on neurobehavior in laboratory animal studies, prioritizing assessment of learning and memory outcomes. Confidence in the body of evidence was assessed according to one of four statements: (1) High, (2) Moderate, (3) Low, or (4) Very Low/No Evidence Available.

**METHODS:** We included experimental animal studies that used mammalian species (whole organism) exposed during development or adulthood, which compared the effects of oral exposure to various fluoride concentrations to vehicle controls on neurobehavioral responses. The principal outcomes were learning and memory, but other neurobehavioral studies were included (e.g., anxiety, motor activity, aggression, sexual behavior). Studies assessing brain-related cellular, morphometric or histological endpoints were considered beyond the scope of this analysis. A literature search was performed up to January 14, 2016, using PubMed, BIOSIS, EMBASE, Scopus, Web of Science, PsycINFO, and several specialized databases. There were no date or language restrictions, and unpublished data and abstracts were excluded. Risk of bias was assessed regarding randomization, allocation concealment, blinding, exposure characterization, health outcome assessment, incomplete outcome data, selective outcome reporting, and other biases.

**RESULTS:** The database searches yielded 4,643 unique records and 13 records were identified from other sources. Of the 4,656 studies, we identified 68 studies using mice or rats and testing drinking water or dietary concentrations of 0.45 to 272 ppm fluoride (0.12 to 40 mg/kg-d). Most included studies were published after 2000. Forty-eight studies addressed learning and memory, 16 of which assessed exposure during development.

**Synthesis of results:** Meta-analysis was not conducted due to the small number of studies that measured endpoints similarly based on study design, that is, dose levels, duration of treatment, lifestage at exposure, species, or differences in measurement of behavioral responses. Relatively few studies provided information on other sources of fluoride (e.g., diet, water source). Most studies were statistically underpowered to detect a <20% change from control groups for behavioral tests. Approximately 30% of the learning and memory studies were considered to have a very serious risk of bias and were excluded from the narrative analysis. Conclusions were reached based on an analysis of 32 studies. Results show **low-to-moderate** confidence for a pattern of findings suggestive of an effect on learning and memory based on developmental and adult exposure studies. The evidence is strongest (moderate level-of-evidence) in animals exposed as adults and weaker (low level-of-evidence) in animals exposed during development. Level-of-evidence conclusions were rated down due to concern for indirectness and risk of bias. The evidence was strongest and most abundant for adult exposure studies using the Morris water maze. In many cases, across the entire dose range tested, whether the effects were specifically related to learning and memory—versus a possible impact on motor or sensory function that could have

Systematic Literature Review on the Effects of Fluoride on Learning and Memory in Animal Studies

impaired the ability of the animal to perform the learning and memory tests as measured—was not possible to discern. This was considered a form of indirectness. Additional studies are required to have higher confidence in the specificity of the responses as learning or memory impairments and in quantitative measures such as the effect sizes, point of departure, identification of no observed effect level or lowest observed effect level doses, or parameters for benchmark dose analysis. Based on control values (means and standard deviations/standard errors) and the number of animals per group, the studies appear statistically underpowered to detect a <10% or <20% change from controls for most behavioral endpoints.

**CONCLUSION:** Very few studies assessed learning and memory effects in experimental animals (rats and mice) at exposure levels near 0.7 parts per million, the recommended level for community water fluoridation in the United States. At concentrations higher than 0.7 parts per million, this systematic review found a low to moderate level-of -evidence that suggests adverse effects on learning and memory in animal exposed to fluoride. The evidence is strongest (moderate level-of-evidence) in animals exposed as adults and weaker (low level-of-evidence) in animals exposed during development. Confidence in these findings was reduced primarily based on potential confounding of the learning and memory assessments by deficits in motor function or fear and risk of bias limitations. Additional research is needed, in particular to address potential effects on learning and memory following exposure during development to fluoride at levels nearer to 0.7 parts per million. NTP is conducting laboratory studies in rodents to fill data gaps identified by this systematic review of the animal studies. The findings from those studies will be included in a future systematic review to evaluate potential neurobehavioral effects from exposure to fluoride during development with consideration of human, experimental animal and mechanistic data.

Systematic Literature Review on the Effects of Fluoride on Learning and Memory in Animal Studies

potential confounding; selection of appropriate control subject populations in epidemiology studies; demonstrated clinical significance of endocrine effects; and the biological relationship between histological, biochemical, and molecular alterations with behavioral effects. Regarding neurotoxicity and neurobehavioral effects, the main conclusions in the 2006 NRC report are:

> "Animal and human studies of fluoride have been published reporting adverse cognitive and behavioral effects. A few epidemiologic studies of Chinese populations have reported IQ deficits in children exposed to fluoride at 2.5 to 4 mg/L in drinking water. Although the studies lacked sufficient detail for the committee to fully assess their quality and relevance to U.S. populations, the consistency of the results appears significant enough to warrant additional research on the effects of fluoride on intelligence." [p. 8] (NRC 2006)

> "A few animal studies have reported alterations in the behavior of rodents after treatment with fluoride, but the committee did not find the changes to be substantial in magnitude. More compelling were studies on molecular, cellular, and anatomical changes in the nervous system found after fluoride exposure, suggesting that functional changes could occur. These changes might be subtle or seen only under certain physiological or environmental conditions. More research is needed to clarify the effect of fluoride on brain chemistry and function." [p. 8] (NRC 2006)

Since release of the 2006 NRC report, approximately 10 epidemiological studies of children's IQ have been published. A 2015 systematic analysis of the human literature conducted for the Republic of Ireland's Department of Health (Sutton et al. 2015) reviewed the new literature and concluded no evidence of an association with lowered IQ was apparent in studies of community water fluoridation. The authors based this conclusion primarily on an analysis of a prospective cohort study conducted in New Zealand (Broadbent et al. 2015). For fluoride-endemic areas, there was a strong suggestion that high levels of naturally occurring fluoride in water (>1.5 ppm) could be associated with negative health effects, including lowering of IQ. Overall, these studies were considered low quality, as they did not fully account for known confounding factors with regard to IQ (e.g., nutritional status, socioeconomic status), nor other potential influencing factors (e.g., iodine deficiency, chemical contaminants in the ground water such as arsenic and lead). The conclusions of Sutton et al. (2015) are consistent with findings of a 2012 meta-analysis of 27 epidemiology studies that supported the possibility of an adverse effect of "high" fluoride exposure[3] on children's neurodevelopment, specifically for lowered IQ (Choi et al. 2012). The Choi et al. meta-analysis, however, also identified study quality limitations, primarily related to reporting quality, that limited the strength of the conclusions (Choi et al. 2012). More than 35 experimental animal studies evaluating the neurobehavioral effects of fluoride have been published since release of the 2006 NRC report. A systematic review of experimental studies that focuses on the effects of fluoride on learning and memory would help interpret the human literature on IQ and identify key research/data gaps for additional study.

For cancer and endocrine disruption, the National Toxicology Program (NTP) is analyzing the amount of evidence available and the merit of pursuing systematic reviews given factors such as the extent of new research published since previous evaluations and whether these new reports address or correct the deficiencies noted in the literature (NRC 2006; OEHHA 2011; SCHER 2011).

---

[3] "High" was defined based on drinking water concentration, evidence of fluorosis, exposure related to coal-burning activities, and urine levels.

# **Exhibit 16**

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, et al., ) | Civ. No. 17-CV-02162-EMC |
| Plaintiffs, ) | |
| vs. ) | **DECLARATION OF PHILIPPE** |
| ) | **GRANDJEAN, MD, DMSc** |
| U.S. ENVIRONMENTAL PROTECTION ) | |
| AGENCY, et al. ) | |
| Defendants. ) | |

I, Philippe Grandjean, declare that:

1.      I have agreed to appear as an expert in this case and have prepared two expert reports which summarize the opinions that I intend to offer if called to testify at trial.

2.      Attached herein as **Exhibit A** is a true and correct copy of the initial expert report that I prepared for this case, dated June 27, 2019.

3.      Attached herein as **Exhibit B** is a true and correct copy of the rebuttal/supplemental expert report that I prepared for this case, dated August 14, 2019.

4.      I am a physician and environmental epidemiologist who specializes in the adverse health effects of exposures to environmental chemicals, including fluoride. I am currently responsible for several ongoing NIH-funded studies on adverse effects from exposure to environmental chemicals, and I co-direct a research center supported by the Superfund Research Program. I serve as both an Adjunct Professor at

1
DECLARATION OF PHILIPPE GRANDJEAN, MD, DMSc

the Harvard T.H. Chan School of Public Health, and Professor and Chair of Environmental Medicine at the University of Southern Denmark. I have been publishing peer-reviewed studies on fluoride toxicity since the 1980s. My most recent research on fluoride has focused on its consistent association with developmental neurotoxicity—a subject that I examined in a 2012 meta-analysis that was published in *Environmental Health Perspectives* (Choi, et al. 2012). A further summary of my qualifications is provided on pages 4-5 and 45-49 of my June 27, 2019 expert report, discussed below.

5.      As part of my work for this case, I analyzed data from the recent government-funded prospective cohort studies from Mexico (the ELEMENT cohort; Bashash, et al. 2017) and Canada (the MIREC cohort; Green, et al. 2019) to calculate the Benchmark Dose (BMD) and Benchmark Dose Level (BMDL) of fluoride using a 1-point drop in IQ as the adverse effect. My analyses and calculations are summarized on pages 38-40 of my initial report, and pages 15-17 of my supplemental report.

6.      As I discuss in my reports, the benchmark dose approach is a standard methodology that regulatory agencies, including the EPA, use to calculate health-based limits for chemical exposure. As I explain, EPA and other regulatory agencies use the BMDL as a "Point of Departure" for calculating exposure limits, such as reference doses (RfDs). To calculate the exposure limit from a BMDL derived from human data, EPA and other regulatory agencies generally apply an uncertainty factor of 10. The exposure limit will thus be lower than the BMDL. (Ex. A at 38, Ex. B at 16).

7.      My benchmark dose analyses of the ELEMENT and MIREC cohorts found comparable results between the two cohorts. In the ELEMENT cohort, the BMDL for maternal urinary fluoride (MUF) was 0.13 mg/L (both sexes); while in the MIREC cohort, it was 0.21 mg/L (for both sexes) and 0.13 mg/L (for boys). In the latter cohort, the BMDL for daily maternal fluoride intake during pregnancy was 0.15 mg of fluoride per day (for both boys and girls). (Ex. B at 16).

8.      I did not attempt to calculate a specific exposure limit or RfD in this case. However, as I explain in my reports, the BMDL values that I calculated are well below the exposure levels that have been

DECLARATION OF PHILIPPE GRANDJEAN, MD, DMSc

documented in fluoridated communities in North America. (Ex. A, at 40; Ex. B at 16). Exposure limits calculated from these BMDL values, therefore, will be substantially exceeded by the daily doses produced by artificial water fluoridation. For example, if EPA's default uncertainty factor of 10 is applied to these BMDLs, the resulting exposure limit would be on the order of 0.02 milligrams of fluoride per day, which is "very much below current exposure levels, especially in fluoridated communities." (Ex. B at 16).

10.     In addition to calculating benchmark doses, I conducted a comprehensive review of the published scientific literature on fluoride neurotoxicity, including: (1) pharmacokinetic studies investigating fluoride's ability to transfer through the placenta and into the brain; (2) occupational studies assessing neurological effects among fluoride-exposed adult workers; (3) animal studies investigating histological, neurochemical, and neurobehavioral alterations following fluoride treatment; (4) human cross-sectional studies investigating the relationship between long-term exposure to fluoride in drinking water and IQ; and (5) the recent prospective birth cohort studies, which are the most methodologically rigorous studies on fluoride neurotoxicity to date.

11.     EPA's epidemiology expert in this case, Dr. Ellen Chang from Exponent, critiqued my review for failing to cite "numerous studies." As I explain in my rebuttal report, however, most of the studies that Dr. Chang identified which I did not cite in my initial report found associations between fluoride exposure and neurotoxic outcomes, and thus further *support* my assessment of the literature. (Ex. B at 3). Further, in my rebuttal, I explain why the 4 "no effect" studies that I did not cite "have no impact on the conclusions that can be drawn" because they used ecological/cross-sectional study designs that "can fail to detect an effect even when one is present." (Ex B at 4). Thus, as I conclude in my rebuttal report, Dr. Chang's systematic review of the literature "confirms that I addressed and considered the most relevant epidemiological data on cognitive outcomes in regard to measures of fluoride exposure." (Ex. B at 4).

12.     Based on my benchmark dose calculations, and my broader review of the scientific literature, it is my scientific opinion that the levels of fluoride added to water in current fluoridation

DECLARATION OF PHILIPPE GRANDJEAN, MD, DMSc

programs greatly exceed the science-based limits that are needed to protect against developmental neurotoxicity. (Ex. A at 42-43). I, therefore, consider the elevated level of fluoride exposure in the U.S. population to be a serious public health concern. (Ex. A at 43).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 8, 2019, in Copenhagen, Denmark.

PHILIPPE GRANDJEAN, MD, DMSc

**Cited Publications:**

Bashash M, Thomas D, Hu H, Martinez-Mier EA, Sanchez BN, Basu N, Peterson KE, Ettinger AS, Wright R, Zhang Z et al: Prenatal Fluoride Exposure and Cognitive Outcomes in Children at 4 and 6-12 Years of Age in Mexico. *Environ Health Perspect* 2017, 125(9):097017.

Choi AL, Sun G, Zhang Y, Grandjean P: Developmental fluoride neurotoxicity: a systematic review and meta-analysis. *Environ Health Perspect* 2012, 120(10):1362-1368.

Green R, Lanphear B, Hornung R, Flora D, Martinez-Mier A, Neufeld R, Ayotte P, Muckle G, Till C: Fluoride exposure during fetal development and intellectual abilities in a Canadian birth cohort. *JAMA Pediatrcs* 2019 (Aug 19 : e191729).

# Exhibit A

**U.S. FEDERAL COURT**

**ACTION NO. 17-CV-02162**

**FOOD AND WATER WATCH,** *et al.* **v. U.S. EPA**

**EXPERT REPORT OF**
**PHILIPPE GRANDJEAN, MD, DMSc**

**PREPARED ON BEHALF OF**
**PLAINTIFFS**

**21 June 2019**

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 4
        A.    Qualifications ........................................................................................... 4
        B.    Materials relied upon ............................................................................... 5
        C.    Exhibits ................................................................................................... 6
        D.    Updates and reservation .......................................................................... 6
        E.    Compensation .......................................................................................... 6
        F.    Previous service as expert at deposition or trial during last 4 years ........... 6

II.     SUMMARY OF OPINIONS ................................................................................ 6

III.    BACKGROUND ON DEVELOPMENTAL NEUROTOXICITY .......................... 7
        A.    Emergence of brain development as vulnerable target ............................... 7

IV.     HUMAN EXPOSURE TO FLUORIDE ............................................................... 10
        A.    General sources of fluoride exposure ...................................................... 10
        B.    Fluoride uptake and retention ................................................................ 11
        C.    Fetal fluoride exposure .......................................................................... 12
        D.    Fluoride exposure biomarkers ............................................................... 12

V.      EVIDENCE OF NEUROTOXICITY .................................................................. 15
        A.    Neurotoxicity findings in human studies ................................................ 15
              1.     Fluoride neurotoxicity from occupational exposures ..................... 16
              2.     Neurotoxicity in endemic fluorosis areas ................................... 16
              3.     Childhood IQ Studies .............................................................. 17
              4.     Prospective studies of fluoride neurotoxicity ............................. 22
              5.     Retrospective studies of fluoride neurotoxicity ........................... 27
        B.    Plausibility of developmental fluoride neurotoxicity ............................... 28
              1.     Toxicological evidence .............................................................. 28
              2.     Assessment of plausibility of fluoride neurotoxicity ..................... 29

VI.     APPROACHES TO HAZARD EVALUATION ................................................... 30
        A.    Interpretation of epidemiology studies ................................................... 30
              1.     Bias toward the null ................................................................. 31
        B.    Assessment of uncertainties ................................................................... 32

VII.    RISK ASSESSMENT ........................................................................................ 33
        A.    Changing approaches to fluoride exposure ............................................. 33
        B.    Current standards for fluoride in drinking water ..................................... 35
        C.    Current documentation for risk assessment ............................................ 37
        D.    Setting drinking water health limits ....................................................... 38

    E.     Benchmark dose calculations for fluoride ................................................................ 38
    F.     Economic and societal value of preventing IQ losses ............................................. 40
    G.    Conclusions............................................................................................................... 42

VIII.  AFFIRMATION.................................................................................................................... 43

EXHIBIT A................................................................................................................................... 44

EXHIBIT B................................................................................................................................... 45

EXHIBIT C................................................................................................................................... 50

EXHIBIT D................................................................................................................................... 65

## I.  INTRODUCTION

My name is Philippe Grandjean. I have been asked to provide an evaluation of the neurological health risks associated with fluoride in drinking water.

The report is based on my education and experience as a physician and environmental epidemiologist, my own research on fluoride, and on my review of the scientific literature and regulatory standards for fluoride.

### A.  Qualifications

I earned my M.D. and D.M.Sc. degrees from the University of Copenhagen, Denmark, in 1974 and 1978, respectively.

I serve as Adjunct Professor of Environmental Health at the Harvard School of Public Health (since 2003) and as Professor and Chair of Environmental Medicine at the University of Southern Denmark (since 1982). Former positions in the U.S. include Research Fellow and Senior Fulbright Scholar, Mount Sinai School of Medicine in New York (1978-1979), and Adjunct Professor of Neurology and Environmental Health, Boston University Schools of Medicine and Public Health (1994-2002). As part of my work as a civil servant in Denmark, I have served for more than 30 years as the Consultant in Toxicology to the Danish Health Authority of the Danish Ministry of Health. In the latter capacity, I have reviewed and commented on case reports, research studies, surveillance programs for populations exposed to hazardous substances, and proposed regulations on environmental chemicals. In 1984, I drafted the Environmental Criteria Document on fluoride for the World Health Organization (WHO). Ten years later, I drafted the Criteria Document for an occupational exposure limit value for fluorine for the European Commission (EC). In regard to the U.S. Environmental Protection Agency (EPA), I served on the Science Advisory Panel (SAP) Endocrine Disruptor Screening Program Subcommittee (1998-1999). Also, I served in 2006 as reviewer of the report *Fluoride in Drinking Water: A Scientific Review of EPA's Standards* prepared by the National Research Council at the request of the EPA [1]. Since 2012, I have served on the Scientific Committee of the European Environment Agency (EEA).

My research in environmental epidemiology focuses on the health effects of exposures to environmental chemicals. Most of my efforts have concentrated on environmental pollutant exposures during early human development. Following my MD degree, my thesis research was housed at the institute where Kaj Roholm became Professor of Hygiene in 1946 (until his premature death two years later). Roholm is most famous for his doctoral (D.M.Sc.) thesis published as "Fluorine Intoxication" in 1937 [2]. After my postdoctoral studies in New York, I returned to Denmark and began an examination of occupational exposure to fluoride at the industrial facility where Roholm conducted his studies. During the 1980s, I published several articles on fluoride-associated mortality, cancer incidence, and fluoride metabolism [3-8]. My recent fluoride research has been on developmental neurotoxicity [9, 10].

My research has been entirely funded by public sources, mainly the U.S. National Institutes of Health. My current funding includes an $8.5 million center grant from the Superfund

Research Program (National Institute of Environmental Health Sciences), where I serve as Center co-lead and PI for one of the four center projects. The Center focuses entirely on perfluorinated alkylate substances (PFASs), how they disseminate, biomagnify and lead to adverse health effects.

I have published over 500 scientific papers, of which most are research articles in international scientific journals with peer review. My h-index in the Web of Science database is 66, and my work is cited well over a thousand times every year. Seven of my articles published in the last 10 years have earned the attribute "Highly Cited Paper," i.e., they received enough citations to place them in the top 1% of published papers in the field. I just received notice that an article in PLOS Medicine that I co-authored was selected as a "2018 Paper of the Year" by the funding NIH institute, among 2,900 publications considered.[1] I have also authored or edited 20 books, including textbooks on environmental health and risk assessment.

I am regularly invited as a speaker at international conferences and other scientific events. I am (Founding) Editor-in-Chief of the open-access scientific journal, Environmental Health (since 2002), which ranks among the top 10% of journals in the field. I also serve or have served on editorial boards of about a dozen journals in the fields of medicine, environmental science, and toxicology. As editor and as reviewer for other major journals, I frequently evaluate manuscripts on environmental epidemiology and toxicology.

In addition to the appointments mentioned above, I have served on, sometimes chaired, or acted as rapporteur for, expert committees under the auspices of the WHO, the International Agency for Research on Cancer (IARC), the EPA, the European Commission, the European Food Safety Authority (EFSA), and other organizations. During my six-year membership of the EFSA expert panel on food contaminants, I participated in multiple expert groups and contributed to the 'Guidance of the Scientific Committee on Use of the benchmark dose approach in risk assessment' [11]. I currently serve on the Scientific Committee of the EU's European Environment Agency.

A copy of my most recent CV is attached as Exhibit B. A list of publications which I authored or co-authored during the past 10 years is attached as Exhibit C.

## B.    Materials relied upon

For the purposes of this report, I have relied on my own experience, education, and training, on my own research, and on major publications concerning fluoride, in particular the literature on human neurotoxicity risks associated with fluoride exposure. The numbered references are listed in Exhibit D. Among major sources of information, I have relied upon the National Research Council (NRC) report [1] on fluoride and, among reviews on human neurotoxicity, our own meta-analysis [9] and the more recent meta-analysis by Duan [12]. I have assessed in detail the recent prospective studies, of which the one from Canada has not been formally published, and I therefore rely on the presentation of the results at an international conference in August last year as well as a master's thesis from the Canadian research group.

---

[1] https://factor.niehs.nih.gov/2019/1/feature/2-feature-papers-of-the-year/index.htm

In addition to epidemiological studies, I have considered the most relevant supporting toxicological information from laboratory animal studies and *in vitro* models to assess biological plausibility, where emphasis is placed on the expert conclusions in the reviews published by the NRC [1] and the National Toxicology Program (NTP) [13]. My review focuses on the evidence that carries the greatest weight, and I do not necessarily cite all reports that may be relevant. While summarizing available documentation, I also outline the emergence over time of the knowledge on human fluoride exposures and associated neurotoxicity risks.

C.      **Exhibits**

I may use as exhibits part or all of any of the documents or papers cited in this report including this report itself; graphs or tables drawn from data in any of those documents or papers, or any document helpful as foundation for or illustration of my testimony.

D.      **Updates and reservation**

The opinions expressed in this report are my own and are based on the data, documents, and facts available to me at the time of writing. Should additional relevant or pertinent information become available, I reserve the right to supplement the discussion and findings in my report. I also reserve the right to respond to any opinions on similar topics by other experts in this matter, and to respond to any criticism or comment on my opinions.

E.      **Compensation**

The Harvard T.H. Chan School of Public Health charges $300 per hour for my time in preparing this report. This compensation does not depend in any way on the content of my opinions.

F.      **Previous service as expert at deposition or trial during last 4 years**

State of Minnesota District Court for the County of Hennepin, Fourth Judicial District, Civil Action No. 27-CV-10-28862, deposition only.

United States district court for the Eastern District of Missouri (United States of America, et al. v. Ameren Missouri, Case No 4:11Cv77), deposition only.

United States district court for the District of Vermont, Case No. 5:16-cv-125, deposition only. United States district court for the District of New Hampshire, Civil Action No. 1:16-Cb-00242-Jl, deposition scheduled.


## II. SUMMARY OF OPINIONS

The opinions expressed in this report, which I hold to a reasonable degree of scientific certainty, can be summarized as follows:

- I conclude that elevated fluoride exposure is dangerous to human health. Excessive fluoride intake causes dental fluorosis, i.e., changes in tooth enamel that range from barely noticeable white spots to staining and pitting. Fluoride is accumulated in bone, where elevated concentrations can stimulate bone growth, thereby altering the tissue structure, and weakening the skeleton. EPA's current safe drinking water standard for fluoride was established to protect against the most serious clinical signs of fluoride toxicity, i.e., crippling (stage III) skeletal fluorosis. Neurotoxicity was not considered.

- Research on fluoride-exposed workers and laboratory animals suggest that elevated fluoride exposure may be toxic to the brain and nerve cells. Epidemiological studies have identified links to learning, memory, and intelligence deficits, though most of the past studies focused on populations with fluoride exposures higher than those typically provided by U.S. water supplies.

- Epidemiology studies from the most recent years document that adverse effects on brain development happen at elevated exposure levels that occur widely in North America, in particular in communities with fluoridated drinking water. These new prospective studies are of very high quality and leave little doubt that developmental neurotoxicity is a serious risk associated with elevated fluoride exposure. This evidence shows that community water fluoridation is associated with IQ losses that are substantial and of economic and societal concern.

- While existing limits for fluoride in drinking water are known not to protect against early stages of dental fluorosis, they are even less protective in regard to neurodevelopmental deficits. Applying methods for standards setting routinely used by the EPA, the recent studies on IQ deficits in children allow the calculation of a recommended limit that would protect against neurotoxicity. Such calculations show that current allowable limits for fluoride in drinking water and the levels of fluoride added in community water fluoridation programs both greatly exceed the science-based limit needed to protect against developmental neurotoxicity.

The evidence on fluoride neurotoxicity in the general population is fairly recent and may not yet represent the full toxicological perspective, such as adverse outcomes that may occur at a delay. As has been seen on numerous occasions, the evidence available today likely underestimates the true extent of fluoride toxicity. On this background, I consider the elevated levels of fluoride exposure from drinking water in the U.S. population as a serious public health concern.

## III. BACKGROUND ON DEVELOPMENTAL NEUROTOXICITY

### A.    Emergence of brain development as vulnerable target

Evidence has been accumulating over several decades that industrial chemicals can cause neurodevelopmental disorders that include learning disabilities, sensory deficits, developmental delays, and cerebral palsy [14], and the same is true of other neurodevelopmental deficits, such as attention deficit hyperactivity disorder (ADHD) [15]. Subclinical stages of these conditions also appear to be common, and the suspicion of a link between neurotoxic chemical

exposures and widespread neurobehavioral damage has increased since it was first raised by research demonstrating that lead is particularly toxic to the developing brain across a wide range of exposures [16-19].

The developing human brain is inherently much more susceptible to injury caused by toxic agents than the brain of an adult [20]. This susceptibility reflects the fact that in the nine months of prenatal life the human brain must evolve from a strip of cells along the dorsal ectoderm into a complex organ comprised of billions of precisely located, highly interconnected and specialized cells. Optimal brain development requires that neurons move along precise pathways from their points of origin to their assigned locations, that they establish connections with other cells near and distant, and that they learn to intercommunicate in meaningful ways [20-22].

All of these processes must take place within a tightly controlled time frame, in which each developmental stage must be reached on schedule and in the correct sequence. Because of the extraordinary complexity of human brain development, windows of unique susceptibility to toxic interference occur that have no counterpart in the mature brain, or in any other organ. Because of the unique structure of the human brain and its advanced function, no other species shows similar developmental vulnerability. If a developmental process in the brain is halted or inhibited, there is little potential for later repair, although plasticity will allow some compensation, and the consequences may therefore be permanent [20, 22].

To test chemicals for developmental neurotoxicity, standardized protocols have been developed using rodent models [23]. However, they may not necessarily be sufficiently sensitive, as rodent brains are far less complex than human brains, and intrauterine brain development is completed at a stage where the human fetal brain is still rapidly developing *in utero* for several more weeks with possible continued impact from maternal transfer of neurotoxicants [24].

During fetal development, the placenta can offer some protection against unwanted chemical exposures, but it is not an effective barrier against most environmental neurotoxicants [25]. For example, many metals easily cross the placenta, and the mercury concentration in cord blood can even exceed the one in maternal blood [26]. The blood-brain barrier, which protects the adult brain from many toxic agents, is not completely formed until about 6 months after birth [27].

Postnatally, the human brain continues to develop, and the period of heightened vulnerability therefore extends over many months through infancy and into early childhood. While most neurons have been formed by the time of birth, growth of glial cells and myelinisation of axons continue for several years and is not complete until late teenage years [21, 22].

The susceptibility of infants and children to industrial chemicals can be further amplified by their relatively increased exposures in regard to body weight, their augmented absorption rates, and diminished ability to detoxify many exogenous compounds as compared to adults [28, 29].

In 2005, when I evaluated the evidence of industrial chemicals regarding developmental neurotoxicity, only five substances (arsenic, lead, methylmercury, polychlorinated biphenyls, and toluene) fulfilled our criteria for causal relationship in humans [30]. Eight years later, when we reassessed the evidence, we added six more substances, including fluoride [31], because new evidence had emerged.

In 2006, the NRC evaluation of EPA's fluoride standards [1] concluded that fluoride can affect the brain through both direct and indirect means, that elevated fluoride concentrations in drinking-water may be of concern for neurological effects, and that additional research was warranted. I served as a reviewer of the report, which provides the general background for the present assessment. Today, EPA's regulations remain based on the assumption that crippling fluorosis is the most sensitive effect.

In 2007, knowing that much research on fluoride neurotoxicity in children had been done in China, I asked my Harvard colleague, Dr. Anna Choi, who speaks Chinese, if she could help evaluating the studies published in Chinese scientific journals. We contacted the (then) President of the International Society for Fluoride Research, Dr. Gulfan Sun, Professor at China Medical University and Dean of the School of Public Health, who also served as Chair of the Chinese national Committee on Endemic Diseases, to which fluorosis belongs.

During the following years, we located research reports on fluoride in drinking water and its association with cognitive deficits in children – a total of 27 studies, the majority of which had been carried out in China. Only a couple of these studies had been considered in previous reviews, such as the one by the NRC [1]. Professor Sun helped us ascertain the validity of the studies and their independence of other water contaminants, such as arsenic. All but one study suggested that a higher fluoride content of drinking water was associated with poorer IQ performance at school age [32]. Although some studies reflected neurotoxicity at highly elevated intake levels, the data was extensive also at fairly low exposures. I shall return later to this review and meta-analysis. I shall also describe the small study we ourselves carried out in China, with the help of Professor Sun and the Sichuan Center for Disease Control [10].

The focus in this report will therefore be on adverse outcomes on brain development as the critical effect, especially those associated with fluoride exposures occurring during fetal development and in the early years of childhood. In guiding preventive efforts, a recent consensus document found that protection against developmental stressors can elicit substantial benefits to the next and future generations and should not await a desired proof that may take decades to generate [33].

The continued reliance on an outdated risk assessment for fluoride – based on skeletal fluorosis only – is reminiscent of how lead toxicity was once perceived by health authorities [34]. For many years, it was thought that lead poisoning could result in a serious and distinctive clinical condition, and that there were no intermediate stages of concern. Under this paradigm, if a child did not develop frank lead poisoning, there was no reason to worry. Moreover, when evidence of "low-level toxicity" emerged, skepticism surged, as vividly described by the late Herbert Needleman [35]. Vested interests played an important role in maintaining this attitude. Recent research has clearly shown that toxicant exposures in early life

9

can have much more serious consequences than exposures occurring later in life [36], and that the developing brain is highly vulnerable [34].

## IV. HUMAN EXPOSURE TO FLUORIDE

### A.       General sources of fluoride exposure

Fluorine belongs to a group of elements called halogens. Because fluorine is very light and reactive (with the highest electronegativity of all the elements), fluorine gas is not found naturally in the environment. Instead, fluorine exists as an anion – fluoride – in the environment and is stabilized by forming mineral complexes with a number of cations, such as calcium and sodium [37].

In natural waters, fluoride is omnipresent, but the concentrations are generally low in surface waters such as rivers and lakes. The concentrations tend to be higher and more variable in ground water, such as wells. The average concentration in U.S. well water is 0.26 ppm (mg/L), according to USDA data [38]. For comparison, the currently recommended fluoride concentration in fluoridated drinking water is 0.7 mg/L.

Fluoride concentrations in groundwater are influenced by the occurrence of fluoride-bearing minerals. Globally, occurrences of fluoride-enriched geographical belts exist and are associated with a) sediments of marine origin in mountainous areas, b) volcanic rocks and c) granite and gneissic rocks. Examples include a stretch of area extending from Iraq and Iran through India and on to China, as well as southern parts of the U.S. [37]. Digging wells into such layers of mineral-rich soils will yield groundwater that may be high in fluoride.

Since the mid-1940's, compounds containing the mineral fluoride have been added to the majority of U.S. community water supplies to prevent tooth decay. Health concerns expressed by opponents have largely been dismissed until recently [39]. Addition of fluoride to drinking water has been hailed by the Centers for Disease Control and Prevention (CDC) as one of the 10 greatest health achievements of the 20th century [40], alongside vaccines and family planning. Today, approximately two-thirds of the U.S. population receives fluoridated community water.[2]

The early studies on the caries-protecting effects were conducted during a time when topical fluoride products, like toothpaste, were not commonly used. The availability of fluoride-containing toothpastes and other fluoridated dental products may explain why countries that do *not* fluoridate their water have seen substantial drops in cavity rates similar to those in fluoridated countries [41]. This observation is in agreement with the consensus that fluoride's predominant benefit to teeth comes from topical contact with the outside of the enamel, not from ingestion, as was once believed [1]. I understand that these issues are discussed in a separate expert report.

The EPA issued in 2010 calculations of relative source contributions for fluoride exposure [42]. For adults (above 14 years), drinking fluoridated water contributed 1.74 mg/d, or

---

[2] https://www.cdc.gov/fluoridation/statistics/FSGrowth.htm

60% of the daily total intake of 2.91 mg. In addition, other beverages contributed 0.59 mg and food, 0.38 mg. Overall, the EPA estimated that fluoridated water contributes an average of about 75% of daily intakes in fluoridated communities.

While fluoridated water is a major source of fluoride exposure, consumption of black tea is also a contributor [43, 44], especially when prepared with fluoridated water. Other sources of fluoride intake include certain foods (such as sardines), dental products, industrial emissions, supplements, pesticide residues, and certain pharmaceuticals that can release fluoride.

**B.      Fluoride uptake and retention**

By way of background, I shall briefly outline the fate of fluoride in mammals, as expressed in reviews [1, 37, 45]. According to the WHO monograph, approximately 75-90% of ingested fluoride is absorbed [37]. The absorbed fluoride converts to hydrogen fluoride once it reaches the acidic environment of the stomach [37, 45], where absorption occurs easily and is inversely related to the pH of the gastric contents [45]. Once absorbed in the blood, fluoride readily distributes throughout the body with approximately 99% of the body burden of fluoride retained in calcium-rich tissues such as bone and teeth (dentine and enamel) [37, 45]. In the pineal gland (the calcified parts), the fluoride-to-calcium ratio can exceed that in bone [46].

Fluoride crosses the placenta and reaches the fetus from the mother's blood stream [1, 37]. Breast-fed infants receive protection from fluoride exposure, as the level of fluoride in breast milk is lower than that in the mothers' blood and generally less than 0.01 mg/L [1, 47]. Children and infants retain higher proportions of fluoride compared to adults, i.e., about 80-90% of the absorbed fluoride, as compared to about 50-60% in adults [37, 45].

After absorption, fluoride is mainly retained in the skeleton, while some fluoride is also eliminated from bone in connection with continuous remodeling. The main excretion is via urine. Thus, the urinary excretion represents both the long-term accumulation (and its continuous release in connection with bone tissue remodeling) and the recent absorption [37].

The detailed distribution of fluoride in the body, and its retention in the brain, is known from laboratory animal studies. Thus, fluoride appears to accumulate in brain regions responsible for memory and learning [48, 49]. Autopsy studies in endemic areas in China have documented elevated fluoride concentrations in aborted fetal organs, and elevations in brain and bone (femur) were found to be significantly elevated, as compared to control fetal samples [50].

As discussed by the NRC [1], there was initially some uncertainty as to the extent to which fluoride passes the blood-brain barrier. A low estimate of brain-fluoride being approximately 20% of the concentration in serum is at odds with several experimental studies and may not apply to chronic exposures nor to prenatal exposures [1]. One study of human cerebrospinal fluid showed fluoride concentrations similar to those in serum [51]. Clinical studies using radioactive (sodium) fluoride, have confirmed that fluoride passes into the human brain, although it is possible that the integrity of the blood-brain barrier in the cancer patients studied may have been compromised [52-55].

C.      **Fetal fluoride exposure**

The first documentation of placental transfer in humans was the observation in 1974 [56] that fluoride concentrations in maternal and cord serum correlated well, with the cord blood showing slightly lower concentrations. These findings were replicated in 1986 [57], with results suggesting minor deviations depending on gestational age. A recent study from an area with water-fluoride levels of 0.4 - 0.8 mg/L showed that cord serum contained about 80% of the concentrations occurring in maternal serum [58].

A quarter of a century ago, advancements in fetal blood sampling techniques allowed for researchers to study fluoride's potential to pass the placenta and, in turn, a better understanding of maternal and fetal blood fluoride levels. Using these techniques, French researchers measured fetal blood concentrations of fluoride after the mothers were administered a small dose of sodium fluoride, and the elevations were statistically significantly higher (2.6 $\mu$mol/l)[3] than in a control group (less than 1 $\mu$mol/l) [59]. The placental passage was shown to occur already in the fifth and sixth months of pregnancy, i.e., the period when the deciduous teeth start to develop [59] (and when the blood-brain barrier is still immature).

In human fetuses, fluoride concentrations in both femur and brain were found to be markedly higher in an area with endemic fluorosis, as compared with controls at lower exposures [50]. Another recent study confirmed that fluoride concentrations in fetal brains from an endemic fluorosis area were higher than levels in a non-endemic area [60]. Accordingly, fluoride passes the placental barrier [61] and enters the fetal brain [50, 60].

D.      **Fluoride exposure biomarkers**

As drinking water is usually the main source of exposure, the water-fluoride concentration can be used as an exposure parameter, especially on a community basis. In addition, total fluoride intake can be calculated from daily water consumption and the intakes of other major sources, such as black tea. For individual exposure assessment, analysis of biological samples, including urine and blood (generally in the form of plasma or serum), is commonly used [62], as is assessment for dental fluorosis [37].

Urine: Urine-fluoride has been shown to be a good indicator of total daily fluoride intake [63]. Spot urine samples are often used in epidemiological studies and can be useful under stable exposure situations. Morning urine samples, or 24-hour samples are preferred, and timed excretion has also been successfully applied [5]. Due to temporal differences in urine production, fluoride concentrations in spot samples should appropriately be adjusted according to the creatinine concentration or density.

Most published studies are local in scope and do not necessarily reflect national levels of fluoride exposure. An early Israeli study of 16 pregnant women showed a tendency toward decreasing elimination of fluoride in urine during the course of pregnancy [52]. More recent studies show decreased urinary fluoride excretion in pregnant women and an increase over the course of pregnancy [58, 64, 65], perhaps linked to increased water intake. The authors of the

---

[3] For conversion of concentrations in $\mu$mol/L to mg/L, multiply by 0.019.

former study suggested that the lower urine-fluoride concentrations during pregnancy was due to transfer of fluoride to the fetus. The Canadian study of pregnant women from the Maternal-Infant Research on Environmental Chemicals (MIREC) cohort [65] found that water fluoridation was the major predictor of urine-fluoride levels, with creatinine-adjusted concentrations of 0.87 mg/L and 0.46 mg/L in fluoridated (0.6 ppm) and non-fluoridated (0.12 ppm) communities, a difference of 0.4 mg/L. The 95th percentiles in the two groups suggest that the difference can be more than twice as large at the higher ranges of exposure [65]. The 0.4 mg/L increase in urine-fluoride seen in relation to water fluoridation in Canada may underestimate levels in warmer regions in the U.S., although temperature is thought to play a lesser role today than it once did (see further below). In addition, it should be recognized that the population in non-fluoridated communities is affected by the so-called "halo" effect due to exposure to fluoridated water from consumption of beverages, prepared foods, etc. based on fluoridated water. Although probably an underestimation, I shall use the 0.4 mg/L difference as a conservative estimate in calculations in Section VII.F.

Large-scale contemporary population studies of urine-fluoride have been carried out in Canada and the UK [66-68], while little contemporary data is available from the U.S. population. The largest study in the U.S. appears to have been conducted in the 1940s, and it reported that pooled urine samples from healthy young males generally mirrored the fluoride concentration in the drinking water [69]. Later, as a continuation of the Manhattan Project, researchers from Rochester, NY, showed that the water-fluoride concentration of 0.06 mg/L was the same as the concentration in spot urine samples from adults, as reported in 1950 [70]. These studies are unlikely to be representative of conditions today, as I shall discuss further below.

Some data suggest that pregnant women may have lower urinary fluoride levels than non-pregnant controls, which may be related to fetal uptake and storage in hard tissues [64]. The only published study to date of urinary fluoride levels in U.S. pregnant women appears to be the Rochester study from 1974 [56], which found an average of 1.02 mg/L among a group of 16 women; the authors did not report the concentrations of fluoride in water. While not yet published, I understand that Dr. Pamela Den Besten recently measured urine-fluoride in 50 pregnant women from northern California and found levels similar to those reported from Canada [65]. I further understand that the CDC has analyzed fluoride in urine samples from the 2015-2016 National Health and Nutrition Examination Survey (NHANES) study, and that these results have also not yet been released.

Blood: The NRC concluded that the fasting plasma-fluoride concentration in adults, when expressed in micromoles per liter [$\mu$mol/L], would be approximately equal to the concentration in the drinking water expressed as parts per million [mg/L] [1]. This means that adults drinking fluoridated water at 0.7 mg/L would be expected to have an average plasma fluoride concentration of 0.7 $\mu$mol/L, or 14 $\mu$g/L. However, this calculation assumes low intake from sources other than the community drinking water.

In children and adolescents participating in the NHANES study in 2013-2014, fluoride in plasma averaged approximately 0.4 $\mu$mol/L, or 8 $\mu$g/L [71]. The lower blood concentrations in childhood are probably due to fluoride incorporation in the growing skeleton, as also indicated by plasma-fluoride concentrations increasing with age [1]. Data on plasma-

fluoride levels among infants and pre-school children remain sparse. One study showed that ingestion of 0.25 mg of fluoride (in tablet form) produced a mean plasma-fluoride of 63 µg/L (3.3 µmol/L) in infants within approximately 30 minutes [72]. There does not appear to be equivalent data available to assess peak plasma-fluoride levels after feeding with infant formula reconstituted with fluoridated water.

Fluorosis: WHO [37] considers dental fluorosis a useful biomarker of fluoride exposure during the tooth-forming years due to the well-established dose-response relationship between fluoride ingestion and the degree of dental fluorosis [73]. When water fluoridation was first introduced in the middle of the 20th century, health authorities estimated that less than 10% of children in fluoridated communities (1 mg/L) would develop dental fluorosis, and only in its mildest forms [74]. In the early days of water fluoridation in the U.S., health authorities had considered that "[f]or practical public health purposes, […] a safe level has been reached when not more than 10 to 15 per cent of children age 12-14 years, who have used water supplies since birth, and who have been examined under standard conditions, show the *mildest* type of mottled enamel" [74].

Decades later, epidemiological studies began to demonstrate that the prevalence and severity of fluorosis was higher than predicted [75]. A national survey in 1986-87 by the National Institute of Dental Research (NIDR) found that 29.9% of U.S. children living in fluoridated areas (0.7-1.2 mg/L) had fluorosis, versus 13.5% of children in non-fluoridated areas [76]. The overall prevalence of dental fluorosis among 12-to-15-year-olds has increased from 23% in NIDR's 1986-87 survey to 41% in the NHANES 1999-2004 survey [77]. The prevalence appears to have increased even further since that time. Thus, according to the National Center for Health Statistics at the CDC, 71.5% of children (ages 6-19) had some form of fluorosis in the three NHANES surveys from 2011 to 2016 [78, 79]. While the rates of moderate/severe fluorosis fluctuated for unknown reasons across the cycles,[4] the total fluorosis rate (very mild and above) was at least 57% in each of the three cycles, which is well above the prevalence rate when water fluoridation was first introduced [74].

Elevated occurrence of dental fluorosis has also been recorded in fluoridated areas overseas. A systematic review commissioned by the British government concluded that 48% of children develop dental fluorosis at a water-fluoride concentration of 1 mg/L, with 12% of children having fluorosis of aesthetic concern [80].

These data clearly show that dental fluorosis has increased in prevalence, probably in part due to extended "halo" effects (e.g., from fluoridated water being used for beverages and food products). Another potential exposure factor is the increased usage of fluoride-containing toothpastes among preschoolers [81], as well as changing infant feeding patterns, where increasing percentages of children are fed formula reconstituted with fluoridated water instead of breastmilk [82].

---

[4] In the 1999-2004 NHANES surveys, 3.6% had moderate or severe fluorosis, and this prevalence increased to 14.4% in the 2011-2016 surveys. However, there were large differences in the moderate/severe fluorosis rates between the 2011-2014 surveys (=20.9%) and 2015-2016 surveys (=1.4%). As assessment of the degree of dental fluorosis is somewhat subjective, the intra-observer agreement was found not to be perfect. CDC stated that the increase from 1999-2004 to 2011-2014 "is not biologically plausible" and "there may have been some change in the way the examiners evaluated the level of fluorosis over time."

The lack of large and representative studies on fluoride concentrations in urine and blood (serum or plasma) makes it hard to judge the overall fluoride exposure levels in U.S. populations exposed to fluoridated drinking water. However, I shall consider the Canadian data on urine-fluoride as reasonable guidance [65], although the high rate of dental fluorosis and greater reach of water fluoridation in the U.S. suggests that urine-fluoride concentrations may be higher than in Canada.

## V.  EVIDENCE OF NEUROTOXICITY

I shall now discuss the epidemiological evidence on neurotoxicity that I rely on, I shall summarize the supporting toxicological evidence, and lastly, I shall discuss possible mechanisms along with uncertainties and potential criticisms relating to the exposure assessment or endpoint in question. My assessment follows the general approach formalized by WHO's International Agency for Research on Cancer [83] and also used by regulatory agencies, such as the EPA.[5] Unfortunately, the most recent toxicity review of fluoride from EPA's Integrated Risk Information System (IRIS) that aims at covering hazard identification and dose-response assessment has not been updated for over 30 years.[6]

In the past, I have prepared evidence-based reviews on fluoride and fluorine for the European Commission and the WHO. Due to my long-term research interest in fluoride, I have followed the fluoride literature through weekly updates from the PubMed data base; for the purpose of the present report, I have carried out supplementary literature searches using the same data base. The present review therefore presents a reasonably comprehensive coverage of the relevant epidemiological evidence. In the absence of any recent guidance from IRIS, I rely on the most relevant studies, especially those that are prospective and therefore carry the greatest weight, and I have not aimed at covering studies of less validity or less strength, i.e., similar to the approach, e.g., in the NRC review [1], to which I contributed as a reviewer.

### A.      Neurotoxicity findings in human studies

It is my opinion, based on the weight of the epidemiological evidence, and the supporting toxicity evidence, that fluoride poses a substantial hazard to human health as a neurotoxicant. As noted by the NRC committee [1], past assessments of fluoride safety have relied on incomplete information on potential risks of adverse effects and have not focused on neurotoxicity.

Opportunities for epidemiological studies depend on the existence of comparable population groups exposed to fairly constant but differing amounts of fluoride from drinking water. Such circumstances are difficult to find in many industrialized countries, as fluoride concentrations in community water generally vary within a limited range, and because exposures are affected by residence changes. Multiple epidemiological studies of developmental fluoride

---

[5] Environmental Protection Agency. (2017). Procedures for Chemical Risk Evaluation Under the Amended Toxic Substances Control Act. Federal Register, Vol 82, July 20, 2017, pp. 33726-33753.
https://www.govinfo.gov/content/pkg/CFR-2010-title40-vol21/pdf/CFR-2010-title40-vol21-part132-appC.pdf
[6] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=53

neurotoxicity have been conducted in China where elevated water-fluoride concentrations may substantially exceed 1 mg/L in rural communities. In these settings, families typically remain at the same residence, thus being exposed to fairly constant water-fluoride concentrations. However, results of the published studies from China have not been widely disseminated and considered. Four studies published in English [84-87] were cited in the 2006 NRC report [1], while the WHO considered only two [84, 87] in its revised Environmental Health Criteria document on fluoride [88]. As I shall discuss below in section VII.A, language restrictions may only in part explain this exclusion of evidence.

I shall now briefly summarize the most relevant epidemiological studies, and I shall also highlight our own meta-analysis of the childhood studies.

### 1. Fluoride neurotoxicity from occupational exposures

The neurotoxicity of chemicals is often first discovered from workplace exposures [30], which were later followed by case reports that involved children or pregnant women [34]. The same is true of fluoride.

Although largely overlooked or ignored, Roholm first reported evidence of nervous system effects in his seminal study of cryolite workers in Copenhagen [2]: "The marked frequency of nervous disorders after employment has ceased might indicate that cryolite has a particularly harmful effect on the central nervous system." (p. 178) [2]. My own mortality study showed an excess of violent deaths among cryolite workers [4], but information on the causes of death did not allow any conclusions on deaths from nervous system disease.

Later on, the Manhattan Project in the 1940s recorded CNS effects in workers exposed to uranium hexafluoride gas ($UF_6$), and the "rather marked central nervous system effect with mental confusion, drowsiness and lassitude as the conspicuous features" was attributed to the fluoride rather than uranium [89, 90].

Other occupational health studies may be harder to interpret, as fluoride exposure usually occurs as part of a mixture. Nonetheless, industrial fluorosis was found to be associated with gradually progressive effects on the normal function and metabolism of the brain and other aspects of the nervous system [91], and a review highlighted difficulties with concentration and memory accompanied by general malaise and fatigue [92]. More recent studies have applied neuropsychological tests to assess cognitive problems associated with occupational fluoride exposures [93, 94]. While there can be little doubt about the occurrence of fluoride neurotoxicity from high-level occupational exposure, the evidence does not allow any detailed consideration of its dependence on dose and duration.

### 2. Neurotoxicity in endemic fluorosis areas

Neuropathology studies have been carried out in China in endemic areas where high fluoride concentrations in drinking water cause excessive exposures leading to skeletal fluorosis. These studies have not been easily accessible outside of China, but the journal Fluoride published in 2008 a series of previously published articles translated into English. I shall now briefly outline the neuropathology studies from endemic fluorosis areas. In brain tissue obtained

from aborted fetuses, electron microscopy showed retarded cell growth in the cerebral cortex, with substantial cytology changes [50]. A similar study used stereology to examine nerve cell numbers and volumes in fetal brain tissue and found lower densities [60]. A third study focused on neurotransmitters and receptors and found deviations that suggested neural dysplasia [95]. A more recent study of aborted fetal brain tissue was translated into English and replicated the neurotransmitter results; the study also found that excitatory aspartic acid was decreased and inhibitory taurine was elevated in comparison to controls [96]. These studies document that fluoride from the mother's circulation passes into the fetal brain and that elevated amounts can lead to anatomic and biochemical changes. However, one limiting factor of these studies is that the elevated fluoride exposure came primarily from coal burning, which may have contributed other contaminants besides fluoride that were not assessed.

Among the translated articles in the Fluoride journal in 2008, one study of 91 neonates showed that those born in an endemic fluorosis area (water-fluoride concentrations of 1.7 - 6.0 mg/L) scored more poorly on the standard Neonatal Behavioral Neurological Assessment, and that visual and auditory responses were also deficient, as compared to controls from areas with less than 1 mg/L [97]. The source of increased exposure in this study was drinking water, not coal. Nonetheless, the findings are consistent with the notion that fluoride can affect the brain during the prenatal period, although neonatal neurological assessments can be somewhat imprecise and may be only weakly predictive of subsequent brain development.

Cognitive tests generally have better validity, e.g., in terms of mental and psychomotor development indices, for which there is a standardized Chinese protocol. Infants from an endemic area examined at ages 3, 6, 9 and 12 months showed significantly lower results than those of the control group [98]. The exposed group also showed lower birth weight, and it is unclear whether this difference can lead to confounding or if a lower birth weight is a concomitant effect of the fluoride exposure. Again, as with the fetal neuropathology studies, the source of fluoride exposure in this study was coal, not water.

Studies in China have also found cognitive problems and neurological symptoms in adults with skeletal fluorosis living in endemic fluorosis areas. Using neuropsychological tests, including the Wechsler scale, 49 adult fluorosis patients (it is not clear whether the patients were from a coal- or waterborne fluorosis area) were compared with controls and showed deficits in language fluency, recognition, similarities, associative learning, and working memory [99]. Likewise, cognitive impairment in elderly subjects from a waterborne fluorosis area was much more common than in less-exposed controls [100]. Excess occurrence of neurological symptoms (i.e., headaches, insomnia, and lethargy) have also been recorded in both adults and children from waterborne fluorosis areas [101].

In the next section, I shall consider intelligence quotient (IQ) tests that can be carried out from about age 4 years or at school age with greater precision and better validity.

3.    **Childhood IQ Studies**

Most studies that have investigated fluoride's impact on childhood IQ are from locations in China with elevated exposure to fluoride, many in the so-called endemic areas [1, 102]. Exposures were generally assessed on a community basis, and cross-sectional

examinations of neuropsychological test performance were then related to water-fluoride concentrations and/or urinary fluoride concentrations. Prior to Tang's 2008 review [102] that was cited by the EU Scientific Committee on Health and Environmental Risks (SCHER) working group [103], another meta-analysis from 2007 documented adverse effects of elevated fluoride concentrations on children's intelligence [104]. Although the latter article referred only to five studies, four of them were not in Tang's analysis [102] that SCHER regarded as insufficient evidence of neurotoxicity.

Fluoride has received particular attention in China, where widespread dental fluorosis indicates pervasive high exposures [105]. Although microbiologically safe, water supplies from small springs or mountain sources have created pockets of increased exposures near or within areas of low exposures, thus representing epidemiology settings close to the ideal, as only the fluoride exposure would differ between nearby neighborhoods. In addition, rural families in China move much less frequently than U.S. families, thus allowing assessment of long-term exposures. Chinese researchers took advantage of this fact and published their findings, though mainly in Chinese journals, and according to the standards of science at the time. The early research dates to the 1980s but has not been widely cited, in part because of limited access to Chinese journals, in part because the notion of adverse effects from fluoride intake was considered unwelcome (see Section VI.B).

Findings from our meta-analysis of 27 studies published over 22 years suggest an inverse association between high fluoride exposure and children's intelligence. Children who lived in areas with high fluoride exposure had lower IQ scores than those who lived in low exposure or control areas. Our findings are consistent with Tang's earlier review [102], although ours more systematically addressed study selection and exclusion information, and was more comprehensive in 1) including nine additional studies, 2) performing meta-regression to estimate the contribution of study characteristics as sources of heterogeneity, and 3) estimating pooled risk ratios for the association between fluoride exposure and a low/marginal IQ test score.

Because these published studies were conducted independently, we used meta-analysis – a quantitative, formal, statistical technique – to systematically assess these published research studies to derive conclusions about the neurotoxicity of fluoride [9]. The outcome of the meta-analysis includes a more precise estimate of the association (in our study, the estimate is the standardized weighted mean difference estimate of the child's intelligence score associated with high exposure to fluoride) than any individual study that contributes to the pooled analysis. The variability or heterogeneity in study results was also examined. We did not attempt to generate any dose-response relationship, and the fluoride concentrations were used only for definitions for high and reference groups in each study.

Two of the 27 studies included in the analysis were conducted in Iran [106, 107], otherwise the study cohorts were populations from China. Two cohorts were exposed to fluoride from coal burning [108, 109], otherwise populations were exposed to fluoride through drinking water containing fluoride from soil minerals. The Combined Raven's Test – The Rural Edition in China (CRT-RC) was used to measure the children's intelligence in 16 studies. Other intelligence measures included the Wechsler Intelligence scale (3 studies), Binet IQ test (2 studies), Raven's test (2 studies), Japan IQ test (2 studies), Chinese comparative intelligence test

(1 study), and the mental work capacity index (1 study). As each of the intelligence tests used is designed to measure general intelligence, we used data from all eligible studies to estimate the possible effects of fluoride exposure on general intelligence. We conducted a sensitivity analysis restricted to studies that used similar tests to measure the outcome (specifically, the CRT-RC, Wechsler Intelligence test, Binet IQ test, or Raven's test), and an analysis restricted to studies that used the CRT-RC.  We also performed an analysis that excluded studies with possible concerns about co-exposures, such as iodine and arsenic, or with non-drinking water fluoride exposure from coal burning.

Among the 27 studies, all but one showed random-effect standardized mean difference (SMD) estimates that indicated an inverse association, ranging from -0.95 to -0.10 (one study showed a slight, non-significant effect in the opposite direction). The overall random-effects SMD estimate and 95% CI were -0.45 (-0.56, -0.34). Given that the standard deviation (SD) for the IQ scale is 15, an SMD of -0.45 corresponds to a loss of 6.75 IQ points. The $I^2$ residual of 68.7% indicates the proportion of residual between-study variation due to heterogeneity. Because of this heterogeneity between the study results, we primarily used the random-effects model for sensitivity analyses, which is generally considered to be the more conservative method [110]. Among the restricted sets of intelligence tests, the SMD for the model with only CRT-RC tests and drinking-water exposure was lower than that for all studies combined, but the difference was not significant, and heterogeneity remained at a similar magnitude in the restricted analyses.

We used meta-regression models to assess study characteristics as potential predictors of effect. Information on the child's gender and parental education were not reported in more than 80% of the studies, and only two of the studies reported household income. These variables were therefore not included in the models. Year of publication, but not mean age of the study children (-0.02, 95% CI -0.094, 0.04), was a significant predictor in the model with all 27 studies included. From the adjusted $R^2$, 39.8% of between-study variance was explained by these two covariates. The overall test of the covariates was significant (p=0.004).

Drinking water may contain other neurotoxicants, such as arsenic, but exclusion of studies including arsenic and iodine as co-exposures in a sensitivity analysis resulted in a lower estimate, although the difference was not significant. On restriction of the model to exclude the seven studies with arsenic and iodine as likely covariates and fluoride originating from coal-burning, thus including only the nine studies using the CRT-RC test with fluoride exposure from drinking water, neither age nor year of publication was a significant predictor, and the similarity of intelligence test outcomes and the source of exposure in the studies was confirmed. Despite the substantial heterogeneity among studies, we did not find conclusive evidence of publication bias.

While most reports were fairly brief and complete information on covariates was not available, the results tended to support the potential for fluoride-mediated developmental neurotoxicity at elevated levels of exposures. However, our meta-analysis has been criticized under a heading that referred to "Anti-Fluoridation Activities" [39], and one scientific article referred to our work as "selective readings" [111]. Another source [112] mentioned that the IQ deficits occurred at high fluoride concentrations "up to 11.5 mg/L", although this high level

occurred only in one of the many studies reviewed. Interestingly, similar wording was used also by the EPA [113] and by the Department of Health and Human Services (DHHS) [77], again misrepresenting the full range of exposure levels associated with IQ losses. Thus, many of the studies included in our review [9] referred to water-fluoride concentrations below the EPA's Maximum Contaminant Level Goal (MCLG) for fluoride (4 mg/L) [114]. Thus, for the studies that provided water-fluoride data that were below the MCLG, the average concentration in the high-exposure groups was 2.3 mg/L [9].

Similarly, Duan's more recent meta-analysis of waterborne fluoride exposures [12] reported that 18 of 27 studies referred to water-fluoride concentrations below 4 mg/L, and IQ reductions were observed at elevated concentrations of 1 to 2 mg/L (Duan's Table 2). Also consistent with our meta-analysis, a dose-response relationship between urinary fluoride concentrations (range = 0.24-2.84 mg/L) and reduced IQ was reported in a population without any severe dental fluorosis [115]. This study was not included in our meta-analysis because it did not present the IQ scores for dichotomized exposures (i.e., high fluoride vs. reference group). More recently, two additional cross-sectional studies reported linear relationships between urinary fluoride (one study also included plasma-fluoride) and IQ among children living in areas with mean water-fluoride contents of 1.4 mg/L and 1.5-2.5 mg/L [116, 117].

Our meta-analysis cannot be easily used to derive an exposure limit, as the actual exposures of the individual children during the most vulnerable time window (prenatal and early postnatal development) can only be deduced from the current exposure level. Misclassification of children in both high- and low-exposure groups may have occurred if the children were drinking water from other sources (e.g., at school or in the field), the so-called halo effect. That said, it should be noted that several of the studies did measure urinary fluoride in the children, which may represent, in part, accumulated fluoride. Further, unlike in the U.S., children in rural China have very little exposure to fluoridated dental products [118], thus making community water the dominant contributor of fluoride exposure during early childhood.

Several studies [86, 87, 119-122] report other risk factors, such as iodine intake, and exposure to arsenic or lead, both neurotoxicants, but our sensitivity analyses showed similar associations between high fluoride exposure and the outcomes even after exclusion of these studies. Although large tracts of China have superficial fluoride-rich minerals, there is little, if any, likelihood of contamination by other neurotoxicants that would be associated with fluoride concentrations in drinking water and thereby confound the results. For example, follow-up testing documented *lower* levels of blood lead and waterborne arsenic in the high-fluoride community than the control [86, 123, 124]. Thus, potential co-exposure to other neurotoxicants may cause reverse confounding, as we have documented for methylmercury from seafood [125].

Still, each of the articles included in our review had deficiencies, in some cases rather serious, which limit the conclusions that can be drawn. Most deficiencies related to the reporting, where key information was missing. However, through our collaboration with Chinese experts familiar with traditions of medical reporting and with the study settings, we were able to reach justified conclusions. A major weakness was that most studies were cross-sectional, but this study design is useful in a stable population where water supplies and fluoride concentrations have remained stable for many years. In such communities, the current exposure

level likely also reflects past developmental exposures. In fact, some studies highlighted that the children were born in the respective area, and/or had been using the same water supply since birth. Any deviation from stable exposure would result in exposure misclassification and most likely resulted in an underestimation of fluoride toxicity.

Although the studies that were included in our meta-analysis were generally of inadequate quality, mainly due to deficient reporting, the consistency of the findings supports the likelihood that developmental fluoride exposure causes cognitive deficits. For example, limited information was available on age adjustment of the cognitive test results reported as scaled scores, but age was not found to be a significant co-factor. When we published these findings, we recommended that future research should formally evaluate dose-response relations based on individual-level measures of exposure over time, including more precise prenatal exposure assessment and more extensive standardized measures of neurobehavioral performance, in addition to improving the assessment and control of potential confounders. Recent North American studies satisfy these requirements, as discussed in the next section.

Many more IQ studies in endemic fluorosis areas have been published after our review. As with the previous studies, these newer studies continue to find associations between fluoride and IQ, although many of them suffer from the same limitations. A PubMed search using the terms "fluoride AND intelligence" shows that 14 studies have been published on fluoride and IQ since our meta-analysis was published in 2012. While I consider it beyond the present report to evaluate these studies in detail, 13 of them report clear associations between elevated fluoride exposure and reduced intelligence. I am aware of at least seven Chinese-language studies published since 2012 that report similar associations between fluoride exposure and reduced IQ [98, 126-130]. I also note that some of the recent studies have identified possible genetic predisposition to fluoride neurotoxicity [117, 131]. This means that some subgroups of the general population will be more vulnerable to fluoride exposure and that exposure limits aimed at protecting the average population may not protect those with susceptible genotypes, as we have shown for methylmercury neurotoxicity [132]. A comprehensive evaluation of these studies is beyond the scope of this report.

To ascertain the validity of the Chinese reports on fluoride neurotoxicity, we carried out a pilot study in Sichuan using methods commonly applied in neurobehavioral epidemiology [10]. The children examined had lived in their respective communities since conception. Although we examined only 51 children, our results support the notion that cognitive deficits occur at elevated fluoride exposures. Interestingly, negative associations were found for cognitive function tests regarding all three measures of fluoride exposure. One was the known water-fluoride concentration at the residence where the child was born and had grown up, another was the child's morning urine-fluoride after having ingested fluoride-free water the night before (neither measure reached formal statistical significance as predictor of cognitive deficits). The strongest and statistically significant association was seen with the degree of dental fluorosis that served as a marker of early-life fluoride exposure. While the milder forms of dental fluorosis have been considered a cosmetic effect [37, 133, 134], our study suggested that fluorosis can serve as a useful marker of early fluoride exposure in studies of neurodevelopmental toxicity.

A prior study that was also co-authored by my Harvard colleague David Bellinger failed to observe a relationship between dental fluorosis and behavior, as determined from parental questionnaires [135]. Due to several weaknesses, the conclusions were cautious and, in the authors' wording, "cannot lay this issue to rest". Hopefully, future studies will clarify the relationship between dental fluorosis and neurobehavioral deficits, especially if the relationship is apparent only for certain teeth that share windows of fluorosis susceptibility with those that relate to developmental neurotoxicity.

### 4. Prospective studies of fluoride neurotoxicity

In recent years, several prospective studies have been carried out in Western populations with information on early-life exposures. These studies add substantial new information on developmental fluoride neurotoxicity and will be summarized below.

The New Zealand study: The first prospective study was based on a birth cohort established in Dunedin, New Zealand from births in 1972-1973 [111]. The 1,037 children were recruited at age 3 years, and IQ tests were administered at ages 7, 9, 11 and 13 years, and again at age 38, and the average result for 992 subjects was used for comparison between residents in areas with and without water fluoridation. No significant differences in IQ because of fluoride exposure were noted, and this finding was independent of potential confounding variables, including sex, socioeconomic status, breastfeeding, and birth weight. Despite the fact that lead exposure in this cohort was later reported to cause IQ deficits [136], the authors of the fluoride study chose not to control for exposure to lead or other chemicals that can affect neurodevelopment.[7] While prenatal fluoride exposure was not the focus of this study, and urine samples were not available for fluoride analysis, the average difference in exposure between children in fluoridated vs. non-fluoridated areas was estimated to be only 0.3 mg/day [137]. Maternal tea consumption was not assessed and may have introduced substantial imprecision of the exposure estimate. During the time that the children in this study were born (1972-1973), New Zealanders consumed as much as 2.6 kg of tea per capita per year, as compared to the consumption of 0.5 kg in Canada in the 1990s, i.e., the approximate time when the MIREC cohort (discussed below) was recruited [138]. An additional concern is that the 10% of cohort subjects who had not lived in fluoridated areas very likely received fluoride supplements, as was the case for 139 children in the study (probably mainly in non-fluoridated areas). In my judgment, although the New Zealand study has been hailed as evidence that fluoridated water is "not neurotoxic for either children or adults, and does not have a negative effect on IQ" [39], the exposure assessment is imprecise, and the statistical power is likely to be insufficient to identify an effect similar to the magnitude shown in more recent studies [139]. This study thus suffers from some of the same limitations as a previous cohort study from New Zealand [140], which reported no association between behavioral problems and residence in a fluoridated community during the first seven years of life. Neither study had access to individual measurements of fluoride exposure, and the exposure status relied solely on residence in a fluoridated community.

First Mexico study: In a prospective study from an area in Mexico with elevated levels of fluoride in drinking water, maternal pregnancy urine-fluoride (corrected for specific

---

[7] In response to criticism on this point, the authors published a letter [137] stating that they subsequently ran an analysis which controlled for lead and that it produced "no meaningful change." Few details were reported.

gravity) was examined for its association with scores on the Bayley Scales among 65 children evaluated at age 3-15 months [141]. The mothers in the study had average urine-fluoride concentrations at each of the three trimesters of pregnancy of 1.9, 2.0, and 2.7 mg/L (higher than the following study). These fluoride exposure indicators during first and second trimesters were associated with statistically significantly lower scores on the Bayley Mental Development Index (MDI) score after adjusting for covariates [141]. I understand that this study will be addressed in further detail in a separate report.

ELEMENT cohort: The existence of the ELEMENT (Early Life Exposure in Mexico to Environmental Toxicants) birth cohort in Mexico allowed longitudinal measurements of urine-fluoride in pregnant mothers and their offspring and their association with measures of cognitive performance of the children at ages 4 and 6–12 years [142]. The cohort had been followed to assess developmental lead neurotoxicity, and urine samples were available for fluoride analysis and adjustment for creatinine and density. Most of the mothers provided only one or two urine samples, thereby introducing some imprecision in the exposure estimate, but again such imprecision will tend to bias the results toward the null. Child cognitive function was determined by the General Cognitive Index (GCI) of the McCarthy Scale at age 4 years in 287 children with exposure data, and IQ by a Wechsler scale (WASI) at age 6–12 years in 211 children. Urinary fluoride in the mothers averaged 0.90 (s.d., 0.35) mg/L and 0.82 (s.d., 0.38) in the children.



*Figure 1. Association between maternal urinary fluoride concentration during pregnancy and the child's GCI at age 4 [142].[8]*

---

[8] Figure 2 legend in the published article: "Adjusted association of maternal creatinine-adjusted urinary fluoride (MUFcr) and General Cognitive Index (GCI) scores in children at age 4 y. Adjusted for gestational age, weight at birth, sex, parity (being the first child), age at outcome measurement, and maternal characteristics including smoking history (ever smoked vs. nonsmoker), marital status (married vs. others), age at delivery, IQ, education, and cohort (Cohort3-Ca,Cohort3-placebo and Cohort 2A). Shaded area is 95% confidence interval. Short vertical bars on the x-axis reflect the density of the urinary fluoride measures. Individual data points are individual observations, n=287."

Covariates included gestational age, birth weight, sex, parity, age at examination, and maternal characteristics, such as smoking history, marital status, age at delivery, IQ, and education. After covariate adjustment, an increase in maternal urine-fluoride by 0.5 mg/L was associated with a statistically significant loss of 3.15 (95% CI, -5.42; -0.87) and 2.50 (95% CI, -4:12; -0:59) the GCI and IQ scores, respectively (Figures 1 and 2).

These associations remained significant, and the effect sizes appeared to increase, in sensitivity analyses that controlled for lead, mercury, and socioeconomic status. The authors recognize possible limitations, including potentials for iodine deficiency or arsenic exposure, but the impact of such risk factors is likely to be small in this population and with little likelihood of causing bias. Given the fact that this cohort was followed from birth with meticulous documentation for lead exposure and other neurobehavioral risks adds to the strength of this study. A subsequent study of the same population also documented that elevated prenatal fluoride exposure was associated with tendencies toward development of ADHD (Figure 3) [143].



*Figure 2. Association between maternal urinary fluoride concentration during pregnancy and the IQ at ages 6-12 [142].[9]*

---

[9] Figure 3A legend in the published article: "Adjusted association of maternal creatinine-adjusted urinary fluoride (MUFcr) and children's IQ at age 6–12 y. Adjusted for gestational age, weight at birth, sex, parity (being the first child), age at outcome measurement, and maternal characteristics including smoking history (ever smoked vs. nonsmoker), marital status (married vs. others), age at delivery, IQ, education, and cohort (Cohort3-Ca,Cohort3-placeboandCohort2A). Short vertical bars on the x-axis reflect the density of the urinary fluoride measures. Individual data points are individual observation, n=211."



*Figure 3: Association between maternal urinary fluoride concentration during pregnancy and four dimensions of the child's behavioral scores* [143].[10]

MIREC cohort: Between 2008 and 2011, 2,011 pregnant women were recruited into the Maternal-Infant Research on Environmental Chemicals (MIREC) cohort. A subset of 601 were examined at age 3-4 years, with slightly less than half residing in fluoridated communities [144]. The study was presented at a scientific conference in August 2018, and I understand that a full report will soon be published. The following is a summary of the information from a published Master's thesis. Urine spot samples were obtained from each of the three semesters of pregnancy, and results were analyzed for those 526 mother-child pairs where urine was available from all three semesters, so that the overall average urine-fluoride could be used as an exposure biomarker, with adjustment for specific gravity and creatinine. Information was obtained on food and beverage intakes, including tea (assuming a fluoride content of 0.52 mg in each cup of black tea). Intellectual abilities were assessed using the age-appropriate Wechsler scale that provided a full-scale IQ. Covariate adjustment included exposures to other neurotoxicants and other relevant covariates, such as sex, age at examination, and maternal exposure to indirect smoking, race, and education (Figure 4) [144].

As had been shown in a previous study of a larger material [65], women residing in fluoridated communities had higher urine-fluoride concentrations (0.69 vs 0.40 mg/L) and also higher calculated daily fluoride intakes from water and other beverages (0.93 vs. 0.30 mg/day). Regression analyses showed that an increase in *urine*-fluoride of 1 mg/L was associated with a statistically significant loss in IQ of 4.49 points in boys, though not in girls (Figure 5). An increase of 1 mg/L of fluoride in *water* and an increase of 1 mg/day of fluoride *intake* was associated with an IQ loss of 5.3 points and 3.66 points, respectively, for both boys and girls [144]. Thus, this study is in close agreement with the data from the two studies carried out in Mexico.

---

[10] This figure is an excerpt of Figure 2 that has this legend: "Association of maternal creatinine-adjusted urinary fluoride (MUFcr) and Conners' Parent Rating Scales-Revised (CRS-R) measures in children at age 6 to 12 years. Outcome data are adjusted for gestational age, birth weight, sex, parity (being the first child), age at outcome measurement, and maternal characteristics including smoking history (ever smoked vs. non-smoker), marital status (married vs. others), education, socioeconomic status and cohort (Cohort 3 Ca, Cohort 3 placebo and Cohort 2A). Shaded area is the 95% confidence interval. The short vertical bars on the x-axis reflect the density of urinary fluoride measures. Individual data points are individual observations, n=210."



Fluoride Intake (mg/day)

*Figure 4: Association between maternal fluoride intake per day from beverages during pregnancy and childhood IQ at age 3 (blue represents fluoridated communities)* [144].[11]



*Figure 5: Association between maternal urinary fluoride (adjusted for creatinine) and childhood IQ at age 3* [144].[12]

---

[11] Figure 6 from the thesis has this legend: "Multiple Linear Regression predicting FSIQ from Fluoride Intake (FI)."
[12] Figure 4 in the thesis has this legend: "Results of Multiple Linear Regression Predicting FSIQ from MUF$_{SG}$."

These recent prospective studies from North America focused on prenatal exposure as a key window of neurological vulnerability. Given that fluoride is only excreted in minute amounts in human milk [1], the focus on prenatal exposure appears justified, while formula-mediated exposures remain a concern, as illustrated by dental fluorosis studies [145]. All the recent studies relied on individual exposure indicators, thus providing substantial support to the conclusion that elevated fluoride exposure during early development can cause neurotoxicity.

### 5.     Retrospective studies of fluoride neurotoxicity

A Swedish study utilized the register of military conscripts who underwent neurocognitive tests [146]. The authors then estimated the water-fluoride concentrations for each of about 80,000 subjects based on their residential history, where the geographic location of the home was linked to a water supply. The study found no meaningful or consistent relationship between the test results and the estimated home water-fluoride concentration (0 to 2 mg/L). The study did identify a relationship between water-fluoride and increased income, which the authors attributed to improved dental health. However, the study did not have access to specific individual fluoride exposure data. The method for estimating the likely water-fluoride concentration at the person's current home involved some assumptions which could have introduced a substantial amount of measurement error when using this number as a proxy of the fluoride exposure at the most vulnerable age. This study is therefore not a "negative" study, but rather a non-informative study due to the likely misclassification of the causative exposure.

In the U.S., parental reports on ADHD among 4-to-17-year-olds were collected from the National Survey of Children's Health and combined with information on water fluoridation at state level [147]. The prevalence of artificial water fluoridation in 1992 predicted significantly the state prevalence of ADHD from the surveys in 2003, 2007 and 2011. After adjustment for socioeconomic status, each 1% increase in artificial fluoridation prevalence in 1992 was associated with approximately 67,000 to 131,000 additional ADHD diagnoses from 2003 to 2011. Overall state water fluoridation prevalence (not distinguishing between fluoridation types) was also significantly positively correlated with state prevalence of ADHD for all but one year examined. Given the state-level exposure assessment and the use of parental reports of ADHD, this ecological study has important weaknesses, although the findings are in agreement with the prospective studies.

A Canadian study analyzed data from two cycles of the Canadian Health Measures Survey (CHMS) [148]. Randomly measured urine-fluoride results from children aged 3-to-12 years were linked to parental reports or self-reported learning disabilities. When the two cycles of the CHMS were combined (both including at least 1,100 subjects), unadjusted urine-fluoride was significantly correlated with an increased incidence of learning disabilities. However, this effect lost its statistical significance after controlling for creatinine and specific gravity. The authors concluded that there was no robust association between childhood fluoride exposure and reported learning disability among Canadian children at the ages studied. However,

I understand from Rivka Green's dissertation,[13] that a separate analysis of the same CHMS data has recently been carried out and has been submitted for publication; this analysis found a significant relationship between tap water-fluoride levels and attention problems.

Overall, these retrospective studies add some weight to the information otherwise available on fluoride neurotoxicity in children.

## B.    Plausibility of developmental fluoride neurotoxicity

### 1.    Toxicological evidence

*In vitro* studies have documented fluoride toxicity in brain cells, most of the studies using very high fluoride concentrations, but some showed effects at low, realistic levels [149, 150]. In the low-dose studies, 0.5 μmol/L (10 μg/L) was sufficient to induce lipid peroxidation and result in biochemical changes in brain cells [149], while 3 μmol/L (57 μg/L) was sufficient to induce inflammatory reactions in brain cells [150].

One of the first U.S. reports on experimental fluoride neurotoxicity emerged when a new method was developed for computerized surveillance of rat behavior. Fluoride was selected for a test of the new methodology and showed clear neurotoxicity [151]. The authors noted that the behavioral effects that they observed in the rats are "indicative of a potential for motor dysfunction, IQ deficits and/or learning disabilities in humans." Since the publication of this study in 1995, many additional animal studies have shown that fluoride produces neurochemical, biochemical, and anatomic changes in the brains of the treated animals, including reductions in phospholipid content, inhibition of acetylcholinesterase, alterations in neurotransmitter concentration and function, increases in oxidative stress, and substantial enhancement of reactive microglia [1]. As concluded by the NRC review requested by the EPA, "fluorides have the ability to interfere with the functions of the brain by direct and indirect means." [1].

More recently, a large number of reports on fluoride toxicity in animal models have been published. A PubMed search suggests that, following the NRC report in 2006, at least 100 publications have addressed fluoride neurotoxicity. Among relevant outcomes studied are increased oxidative stress, glial activation and inflammation, inhibition of acetylcholinesterase, decrease of nicotinic receptors, interference with calcium channels, altered glucose uptake, and impaired synaptic plasticity. A critical assessment of these studies is beyond the scope of my analysis, but the studies appear consistent with NRC's conclusion that elevated fluoride exposure is neurotoxic in animals. Most of the animal studies to date have investigated higher concentrations of fluoride than used in water fluoridation programs, but some of the studies used relatively low concentrations. Of note, rats exposed to water-fluoride at 1 mg/L for one year showed morphological alterations in the brain and increased concentrations of aluminum in brain tissue compared with controls [152].

---

[13]https://yorkspace.library.yorku.ca/xmlui/bitstream/handle/10315/35502/Green_Rivka_R_2018_Masters.pdf?sequence=2&isAllowed=y

The NTP published in 2016 a systematic review of the animal studies that have examined fluoride's impacts on learning and memory [13], thus leaving out neurochemical and other effects that have been described in recent studies. The NTP concluded: "At concentrations higher than 0.7 parts per million (mg/L), this systematic review found a low to moderate level-of-evidence that suggests adverse effects on learning and memory in animal[s] exposed to fluoride. The evidence is strongest (moderate level-of evidence) in animals exposed as adults and weaker (low level-of-evidence) in animals exposed during development" (p. vii). Under NTP's classification criteria for hazard identification, "moderate" evidence is the level below the highest level of evidence. The NTP considered that most studies had used concentrations exceeding the levels added to water in fluoridation programs, although the NTP recognized that rats require about five times more fluoride in their water to achieve the same serum-fluoride concentrations as humans. In total, 14 studies used a water-fluoride concentration < 4 mg/L, although four were excluded due to methodological issues. The NTP's level of confidence was less for developmental effects due in part to the fact that fewer such studies were available.

Subsequent to the NTP review, at least nine additional developmental studies have been published investigating fluoride's impact on learning memory in rodents [153-161]. Two studies found impairments of learning/memory in rats consuming water with 5 mg/L fluoride [153, 154]. One study that did not find an effect investigated exposures that began at day 6 of gestation in the Long Evans rat [155], a strain that has been previously observed to be more resistant to fluoride toxicity [162].

Further details are provided in the expert report by Kathleen Thiessen. The NTP has prepared a systematic review of the most recent experimental animal studies, mechanistic data, and human epidemiological evidence on fluoride neurotoxicity, and peer review will soon be completed, I understand.

## 2.    Assessment of plausibility of fluoride neurotoxicity

Fluoride neurotoxicity is clearly plausible, given the overall consistency of experimental studies of adverse neurological effects in fluoride-treated animals, as well as the biochemical effects of relevant fluoride concentrations *in vitro* [149, 150, 163]. By 2006, the NRC concluded that there was enough animal data to conclude that fluoride interferes with brain functions [1]; the evidence today is substantially more robust. The NTP had more confidence in fluoride impairing learning in adult animals [13], but this conclusion was affected by fewer studies being available on developmental exposure. As discussed in Section III, the complex development of the human brain renders it particularly vulnerable to neurotoxicants during the developmental period, where cell differentiation, multiplication, migration and other crucial processes must happen at certain times and in a particular sequence to create an optimally functioning brain [30, 164]. Of importance here is that fluoride can pass the placental barrier to reach the brain, and rodent studies published subsequent to the NTP's review bear out the importance of the prenatal period for fluoride neurotoxicity.

Among prominent adverse outcome pathways, the NRC concluded that fluoride is an endocrine disrupter that can affect thyroid function at intake levels as low as 0.01 to 0.03 mg/kg/day in individuals with iodine deficiency [1]. Large epidemiological studies published since the NRC report suggest that thyroid dysfunction is a relevant risk at elevated fluoride

exposures in fluoridated communities, especially in adults with iodine deficiency [68]. In England, the diagnosis of hypothyroidism was nearly twice as frequent in medical practices located in a fully fluoridated area, as compared to a non-fluoridated area [165]. These findings are of particular concern, as the thyroid hormone is crucial for optimal brain development [166]. I shall not discuss this evidence further, as I understand that fluoride toxicity to the thyroid gland is covered in a separate report.

The notion that fluoride is primarily a developmental neurotoxicant means that fluoride – like lead, methylmercury, and arsenic – can affect brain development at exposures much below those that cause toxicity in adults [167]. For lead and methylmercury, adverse effects are associated with blood concentrations as low as about 10 nmol/L. Blood-fluoride concentrations associated with elevated intakes from drinking-water may exceed 20 µg/L, or about 1 µmol/L, i.e., more than 100-fold greater than the serum concentrations of the neurotoxic metals that cause neurodevelopmental damage. Thus, although fluoride is neurotoxic, it appears to be much less potent than the neurotoxic metals, which are also present in the Earth's crust at much lower concentrations.

## VI. APPROACHES TO HAZARD EVALUATION

### A.    Interpretation of epidemiology studies

In evaluating the evidence on inorganic fluoride toxicity, a weight-of-the-evidence approach should be used, where human studies will contribute substantially. Because it would be unethical to conduct experimental studies in humans with substances that may cause cancer or other serious effects, the main human epidemiological evidence on fluoride comes from observational studies of occupational cohorts and from community studies of subjects exposed at different so-called background levels, such as through drinking water. Of particular relevance are prospective studies of population-based cohorts followed over time. Further, the validity of the exposure assessment is crucial and should rely on stable concentrations in drinking water or exposure biomarkers obtained at an appropriate time.

While most of the endemic fluorosis studies have rather simple cross-sectional designs and may have failed to control for the some confounding factors of possible importance, they also have important strengths, including: 1) Stable populations with stable water-fluoride concentrations. Many of the studies specifically limited the populations to those who had lived in the community their entire life (thus capturing prenatal exposures). 2) Unlike in the US, children in rural China (where most of these studies have been conducted) have very little exposure to fluoridated dental products [118], thus making water a more important and reliable metric of fluoride exposure. 3) The studies in endemic fluorosis areas that have controlled for or excluded key confounding factors (arsenic, iodine, parental education) were still capable of identifying associations with cognitive deficits [9].

Prospective information on exposed birth cohorts is desirable, as it is not just the dose that can matter but also the timing of the dosing in regard to the developmental stage of the subjects [33, 168]. In particular, birth cohorts are crucial, as they can reveal with greater certainty the impacts of exposures assessed during early life stages. The recent emergence of

such prospective information is fortunate, especially because the studies represent different settings and therefore, in concert, provide solid observational evidence.

This new information is in overall agreement with less certain cross-sectional studies, thereby supporting the strength of the evidence. In the past, the presence of limitations and perhaps absence of statistical significance in individual cross-sectional studies may have been misinterpreted as evidence that fluoride exposures are innocuous. However, in evaluating the weight of the evidence, the question must be asked what each study could potentially reveal, given the design and choice of study parameters, including such factors as imprecise exposure assessment. As the NRC once warned, the apparent absence of convincing evidence of (fluoride) toxicity should not be misinterpreted as proof that toxicity does not exist, and such erroneous conclusion has been dubbed the "untested chemicals assumption" [169].

### 1.    Bias toward the null

In the field of epidemiology, there is a well-known bias toward the null, of which epidemiologists (and readers of epidemiology reports) need to be careful, especially when human health is at stake. Studies that do not show a statistical significance are sometimes called "negative," although this term is misleading. Joint analyses of several such studies may well show a significant difference or trend. Table 1 highlights common causes of bias toward the null in epidemiological studies, i.e., reasons that a study might not show the existence of a risk that indeed is present, though hidden due to the bias. While biases in the opposite direction also exist, they are usually of much less significance [170].

*Table 1. Causes of bias toward the null in epidemiology studies [170].*

| |
|---|
| Inadequate statistical power in small studies |
| Lost cases and inadequate follow-up for long-term effects |
| Exposed or otherwise inappropriate comparison (control) group |
| Exposure misclassification |
| Insensitive or imprecise outcome measures |
| Failure to adjust for confounders with effects in the opposite direction |
| Disregarding vulnerable subgroups |
| 5% probability level to minimize risk of false positives (Type I error) |
| 20% probability level to minimize risk of false negatives (Type II error) |
| Pressure to avoid false alarm |

The bias toward the null is particularly problematic where human health is concerned; scientists and public health officers therefore often assess and rely on the direction or weight of the evidence and not solely on statistical significance, as it may take a very long time to obtain complete and irrefutable proof. Thus, observational studies will rarely if ever provide a 100 percent proof, and it is always possible for someone critical of the weight of the evidence to raise some type of doubt seeking to require additional or improved data before a conclusion can be drawn [171, 172]. Again, the presence of uncertainties often tends to cause underestimations of actual risks, not the opposite. This issue is of importance especially regarding substances that have not yet been studied in the detail desired or cannot be examined in randomized clinical

31

trials. Again, many unfortunate past errors in regard to industrial chemicals have shown that initial assessments were often erroneous and led to an underestimation of the true risks [173].

In the present report, while considering the extent of possible biases, my conclusions are based on the strength of the evidence and are stated in terms of assessing whether fluoride poses an unreasonable health risk to the general public or to susceptible subsets of the population, such as pregnant women and small children. My evaluation as an expert therefore considers the weight of the evidence, the uncertainties involved, the plausibility, and what could possibly be known, given the study opportunities and methodologies applied, as well as the likely overall impact on public health.

## B.  Assessment of uncertainties

In the absence of randomized clinical trials on fluoride, the hazard evaluation must be based on observational epidemiology studies, as supported by toxicological evidence from animal studies. As already noted, the NRC found the toxicological evidence sufficient to conclude that fluoride can cause neurotoxicity [1]. Although the more recent NTP review did not regard the studies on developmental neurotoxicity as conclusive [143], the report considered only attention and memory aspects rather than the additional and more extensive documentation on neurochemical and neuropathological effects.

True, the cross-sectional design of most of the human studies limits the ability to reach conclusions about causation (since the exposure is not ascertained before the development of the adverse outcome).  Still, this design is appropriate in stable populations where water supplies and fluoride concentrations have remained virtually unchanged so that current exposures is likely also to reflect developmental exposures. Also, some of these studies measured urinary fluoride concentrations, which partially reflect long-term exposures due to the accumulation of fluoride in the calcified tissues. Thus, jointly with more informative prospective studies, the results provide convincing evidence of developmental neurotoxicity.

As indicated above and also discussed in Section VII.A, research into fluoride neurotoxicity appears to have been controversial and unwelcome, and the desire for fluoride supplementation may have resulted in suppression of studies or publications, as suggested by case reports [90, 174, 175]. Further, severe critique was launched against studies that reported adverse effects that could challenge the wisdom of water fluoridation. For example, because our meta-analysis [9] indicated consistent associations between fluoride and reduced IQ, our findings were challenged. One commentary indicated that our review had been severely criticized [39] and referred to a report by a UK consulting firm hired to criticize our work [176]. An additional source was the previously released SCHER report [103]. This EU committee had questioned the plausibility of neurotoxicity and did not directly comment on our report. The disapproving commentary [39] also alleged that our article had been used by anti-fluoridationists and referred to the "many flaws" – without specifying what these flaws were. A later article referred to fluoride neurotoxicity as "misinformation" in the title of the article [177].

Similar superficial and misleading critiques were aired at a web site belonging to the American Academy of Pediatrics[14] and in additional journal articles [112, 178]. I particularly note that the adverse effects were said to be associated with elevated fluoride exposure from water up to 11.5 mg/L [178], i.e., the *highest* fluoride concentration present in *one* of the studies, while not mentioning that most of the studies included in our review referred to water-fluoride concentrations below the EPA's MCLG for fluoride (4 mg/L) [9]. As previously noted, almost the same wording was used by the EPA [113].

As our study [9] was misinterpreted in the media, we released a press statement [179], which concluded: "These results do not allow us to make any judgment regarding possible levels of risk at levels of exposure typical for water fluoridation in the U.S. On the other hand, neither can it be concluded that no risk is present. We therefore recommend further research to clarify what role fluoride exposure levels may play in possible adverse effects on brain development, so that future risk assessments can properly take into regard this possible hazard."

As alleged proof that water fluoridation poses no risk to cognitive development the study from New Zealand has been highlighted [39]. This study [111] erroneously stated that our press release "had to emphasize the fact that [our] research was irrelevant to CWF [Community Water Fluoridation]". Also, while the authors [111] emphasized potential biases in our meta-analysis [9], they downplayed the limitations to their own study (see Section V.A.4).

A federal interagency panel in 2015 accepted the NRC's findings [1] as a "summary of the hazard", and the panel recommended that the level of fluoride added to community water be reduced to 0.7 mg/L [77]. The aim of this recommendation remained to protect against dental fluorosis, as neurotoxicity was thought not to be relevant.

## VII.   RISK ASSESSMENT

### A.   Changing approaches to fluoride exposure

Fluoride ingestion has in the past been considered "essential" for optimal dental health. Already in 1989, a National Research Council report on nutrition noted that fluoride is not an essential nutrient, but a "beneficial element" for dental health purposes [180]. Further, fluoride's predominant mechanism of action in preventing caries comes from topical contact with the outside of the enamel, not from ingestion [1], as discussed in a separate report.

The concept of an "optimal fluoride dose" for caries prevention purposes is at odds with current knowledge as to fluoride's cariostatic mechanisms but is nevertheless still widely held [39]. EPA concluded that a reference dose (RfD) could not be below 0.05 mg/kg/day, in respect of the so-called optimal dose [181]. For this reason, assessments of fluoride exposure have mostly focused on securing sufficient intakes to obtain the assumed benefits, i.e., maintaining the so-called optimal intake without any excess of importance to health. Accordingly, reports from WHO and national agencies have generally focused on beneficial effects [37, 40, 182]. Given the strong association with dental health benefits observed in past studies, the tendency was to

---

[14] https://ilikemyteeth.org/harvard-study-fluoride-neurotoxicity/

minimize or disregard evidence of adverse effects [41, 183]. Certainly, dental fluorosis occurs more frequently and in more severe forms in fluoridated communities, especially in recent years. However, unless pitting developed, thereby paradoxically paving the way for caries development, these enamel changes were considered "cosmetic" [40, 133, 134]. This conclusion was reached without detailed evidence regarding other potential adverse effects that might occur in tandem with the enamel changes. I note here that our own study in rural China found that the degree of dental fluorosis was a significant predictor of cognitive deficits in the children examined [10].

One of the first U.S. reports on fluoride neurotoxicity in a rodent model [151] was met with disbelief, and serious critique was published as a letter in the highly respected journal that had published the toxicology article [184]. While the authors countered the critique, the first author was fired [185]. Thus, fluoride neurotoxicity was not a cherished research topic, although it is unclear if any censoring of research results or proposals has occurred. Still, anecdotal examples illustrate that a bias did occur in disregarding or ignoring risks when reviewing the health benefits of water fluoridation [90, 174, 175].

When I, at the request of WHO, drafted an environmental criteria document on fluoride for the International Programme of Chemical Safety (IPCS) in 1983, it was finalized by an expert committee that included members with a background in preventive dentistry, rather than toxicology and environmental health. The committee asked for substantial changes to minimize any mention of toxic effects or their relevance to human health [186]. As I was considered part of the secretariat, my views on achieving a better balance were not allowed in the final document, and I had to resign and ask to have my name removed. In a parallel experience, an EU expert report similarly underestimated adverse effects of elevated fluoride exposure [103]. Although I formally submitted comments to the committee, they were disregarded. In addition to neurotoxicity, carcinogenicity should be considered a potential risk, as observed in occupational epidemiology, such as my own studies of cryolite workers [4, 7]. While such evidence would normally be considered crucial for cancer risk assessment, IARC's evaluation of fluoride was uniquely limited to "Inorganic Fluorides Used in Drinking-water and Dental Preparations" [187], and with this limitation, little epidemiology was available for consideration of carcinogenicity.

My overall impression is that the safety of elevated fluoride exposure was exaggerated in ways similar to those employed by vested interests that misconstrued and misinterpreted the scientific evidence on other neurotoxicants, such as lead, mercury, and certain pesticides [34, 188]. In fact, Dr. R.A. Kehoe, the famous industry spokesman [189], forcefully dismissed the toxicity of both lead and fluoride [185].

The situation has now changed, for two reasons. First, the wisdom of adding fluoride to drinking water has been called in doubt, most strongly by a 2015 Cochrane systematic review that questioned the caries-prevention benefits of current-day water fluoridation [190]. Other evidence showed that the caries incidence had decreased in many countries, independently of drinking water fluoridation [41]. Second, evidence of adverse effects, especially developmental neurotoxicity, has burgeoned during recent years, as reviewed above in Section V. Because assessment of benefits is outside the scope of my report, I shall now focus on the risks, although in reality the two have been confounded in past assessments.

34

As recently noted by prominent EPA scientists, although without referring specifically to fluoride, risk assessment has failed when adverse human health effects are demonstrated at exposure levels predicted from animal studies to be safe [191]. In Section V, I described some of the major caveats when drawing conclusions on incomplete evidence and the common biases toward the null hypothesis. Similar concerns were also raised by another NRC committee that reviewed EPA's risk assessment procedures [169]. The committee highlighted the erroneous default assumption, i.e., the so-called "untested chemical assumption," that a chemical is innocuous, unless the evidence shows otherwise. The NRC fluoride review in 2006 [1] had emphasized that fluoride's potential adverse effects were incompletely documented, and that additional research was warranted. While some existing evidence was not included in the NRC review, much has been published during recent years that adds substantial weight to the assessment of fluoride neurotoxicity at low intake levels (see Section V). By far, fluoride is no longer "untested".

I shall now focus on the exposure levels that put the population(s) at increased risk and the likely target organs (or critical organs) that may suffer adverse effects at the lowest doses. This section will also include a brief review of exposure guidelines.

## B.   Current standards for fluoride in drinking water

### 1. MCLG
As part of the Safe Drinking Water Act (SDWA), fluoride is currently one of the contaminants that EPA regulates in drinking water. The EPA has determined a maximum amount of fluoride allowed in drinking water, which currently is enforced at 4.0 mg/L. This value is much higher than the DHHS recommendation of 0.7 mg/L for community water systems that add fluoride to their water to maintain caries prevention benefits (while ignoring neurotoxicity risks) [77].

The EPA established the 4.0 mg/L safe drinking water standard (MCLG) to protect against crippling skeletal fluorosis (i.e., stage III skeletal fluorosis), which EPA at the time considered to be the critical adverse health effect from fluoride exposure [192]. Stage III skeletal fluorosis represents the most severe form of fluoride-induced bone disease. The DHHS has summarized crippling fluorosis as having the following characteristics: "calcification of ligaments/neck, vert. column; crippling deformities/spine & major joints; muscle wasting; neurological defects/ compression of spinal cord." (p. 46) [193]. The MCLG was not designed to protect against earlier forms of bone disease, including stage II skeletal fluorosis, which is marked by "chronic joint pain; arthritic symptoms; slight calcification of ligaments; increased osteosclerosis/ cancellous bones; with/without osteoporosis," again according to the DHHS review. The EPA did not consider potential neurotoxicity. Given the recent documentation of the developing brain as a critical organ (Section V), the documentation for the MCLG appears outdated.

In its review of fluoride requested by the EPA, the NRC concluded in 2006 that the MCLG of 4 mg/L is too high and should be lowered [1]. The NRC based this conclusion on the fact that the MCLG does not appropriately protect against stage II skeletal fluorosis, bone

fracture, and severe dental fluorosis, and the NRC also noted the need to consider further the risk of neurotoxicity.

### 2. EPA's Six Year Reviews

As part of the SDWA, the EPA is required to review each national primary drinking water regulation, including fluoride, at least once every six years and revise them, if deemed appropriate. In EPA's first Six Year Review of Fluoride, the Agency asked the NRC to review the recent toxicological literature on fluoride. In the second Six Year Review, EPA had received NRC's conclusions [1] and conducted a risk assessment to determine an RfD that would protect against severe dental fluorosis, stage II skeletal fluorosis, and bone fracture. EPA set this RfD at 0.08 mg/kg/day based on dose-response data relative to severe dental fluorosis [42]. The EPA acknowledged that NRC identified "research needs for the endocrine, neurological and other effects of fluoride," but concluded that "the standard toxicity database for fluoride is complete negating the need for a database uncertainty factor." (p. 106). Accordingly, EPA did not apply an uncertainty factor to account, e.g., for potential neurotoxicity.

In 2016, the EPA completed its third Six-Year Review, including a summary of the health effects of fluoride [113]. As part of this latest iteration, the EPA referred to the NRC review [1] in regard to fluoride's impact on reproduction and development, the endocrine system, cancer, and neurotoxicity. Specific to the latter health endpoint, the EPA referenced our meta-analysis of the childhood IQ studies and highlighted only the highest exposure in the 27 studies (11.5 mg/L, see Section VI.B), rather than the exposures that were below the MCLG [9]. The EPA also reviewed four other studies on neurotoxicity [10, 13, 111, 147], but concluded that "overall, the new data were not sufficient to alter the NRC conclusion that severe dental fluorosis is the critical health effects endpoint for the MCLG" (p. 134). While considering the NTP's systematic review of the animal literature on learning and memory, the EPA did not take into account the wider animal literature summarized in Section V.B.1. Likewise, the Agency did not address several recent epidemiological studies also reviewed above. Although I find these omissions inappropriate, I should note that the prospective studies of prenatal fluoride exposure and IQ from Mexico and Canada were not yet completed at the time of EPA's most recent review, and thus not available for the Agency's consideration.

To date, EPA has yet to lower the MCLG in response to NRC's conclusions [1]. As it currently stands, therefore, the safe drinking water standard for fluoride in the US is still based on the crude premise that crippling skeletal fluorosis is the most sensitive adverse effect of chronic fluoride exposure. The dose-response assessment for fluoride available at EPA's IRIS data base is not useful, as it has not been updated for many years.

### 3. Other standards

The *WHO* has established a recommended limit of fluoride in drinking water at 1.5 mg/L [37]. The WHO set this "guideline value" at a level that would protect against more than "minimal" levels of dental fluorosis, but WHO did not consider potential neurotoxicity. In its monograph on fluoride [88] from 2002, WHO discussed several animal studies that investigated neurotoxicity, but did not review the available occupational or epidemiological studies. While the guideline level is "not a fixed value," WHO recommends that "at a minimum, the fluoride level in local water supplies should be monitored and the population examined for

signs of excessive fluoride exposure (e.g. moderate and/or severe dental fluorosis and crippling skeletal fluorosis)" [88].

The *Agency for Toxic Substances and Disease Registry* (ATSDR), in general agreement with the MCLG, issued a draft toxicological profile in September 2001 [194], updated in 2003 [61], and recommended a chronic-duration oral minimal risk level (MRL) of 0.05 mg/kg body weight per day. ATSDR based the MRL on a no-observed-adverse-effect level (NOAEL) of 0.15 mg/kg/day and a lowest-observed-adverse-effect level (LOAEL) of 0.25 mg/kg/day for skeletal effects (increased fracture rate) [195]. Again, neurotoxicity was not considered.

*DHHS* recently changed the recommended water-fluoride concentration from the 0.7-1.2 mg/L range to 0.7 mg/L [77]. As discussed earlier in this section, the DHHS made this recommendation based on the data demonstrating an increase in the prevalence of dental fluorosis, not with a view to limiting any risk of developmental neurotoxicity.

## C.    Current documentation for risk assessment

As I have argued in this report, developmental neurotoxicity should be regarded the critical effect of elevated fluoride exposure (see Section V), and IQ deficits represent the most appropriate effect indicator. In regard to dose-dependence of IQ deficits, an increase of the maternal urine-fluoride in the ELEMENT study [142] by 1 mg/L corresponds to a 4.5-to-6 point drop in IQ. The Canadian results are in good agreement with these findings, although the possibility of sex-dependent effects must be considered [144]. While the latter study showed a possible sex-linked difference in vulnerability, risk assessment should always be based on the most vulnerable population group, i.e., in this case on the findings in boys in the MIREC study. In regard to water-fluoride, an increase of 1 mg/L showed a joint effect in boys and girls corresponding to a 5.3 drop in IQ [144], i.e., similar to the ELEMENT study. I also note that our own meta-analysis shows an average difference of 6.75 IQ points between the high and low exposure groups in the 27 studies reviewed [9].

As discussed in section IV.D, the Canadian data [65] indicate that pregnant women drinking fluoridated water at 0.6 mg/L water have an average urine-fluoride excretion of 0.87 mg/L, whereas pregnant women drinking non-fluoridated water at 0.12 mg/L have a lower average urine-fluoride of 0.46 mg/L [65]. Although the "halo" effect probably results in elevated exposures among women residing in non-fluoridated communities, I shall assume that water fluoridation increases the urinary fluoride excretion level by approximately 0.4 mg/L. Again, this difference refers to the average water consumption levels in Canada, and greater differences may well occur in the U.S.

Given that water fluoridation increases the maternal urine-fluoride by (at least) 0.4 mg/L, one can now use the estimates of dose-dependent IQ losses to calculate the predicted IQ loss attributable to water fluoridation. Assuming that the exposures are above any known threshold, I shall rely on an approximate IQ loss at a slope of 5 IQ points per 1 mg/L, i.e. an IQ loss of 2 points for the 0.4 mg/L increase in urine-fluoride.

### D.      Setting drinking water health limits

Available data show that maternal urinary fluoride excretion levels during pregnancy and calculated daily fluoride intake are significantly associated with lower IQ levels in the child. Data from the ELEMENT study in Mexico [142, 143] and the MIREC study in Canada [144] provide suitable data for dose-response analysis. In addition, a third study also documents developmental neurotoxicity, although for the Bayley scale at a younger age, not IQ [141]. These studies document the associations at maternal urine-fluoride concentrations within ranges occurring in fluoridated communities. As these data refer to the critical effect in a highly vulnerable population, they are appropriate as documentation for identifying a safe drinking water limit.

Visual inspection of the ELEMENT data (Figure 2, page 23) [142] suggest a possible threshold of perhaps 0.8 mg/L in maternal urine when considering the IQ in 6-to-12-year-olds, while no threshold seemed to be present for deficits at age 4 years (Figure 1, page 22). Similarly, no threshold seemed to be present in the Canadian IQ study (Figures 4 and 5, pages 24-25) [144] or in the Mexico ADHD study [143]. I also note that cross-sectional studies in China have reported IQ deficits at elevated water-fluoride concentrations even below 1 mg/L [9].

Regulatory agencies are in overall agreement in using a benchmark dose approach to calculate non-cancer health-based limits for dietary intakes, such as drinking water [11, 196]. In this approach, a dose-response function is fitted to the data or adopted from a default assumption (usually a linear relationship). The benchmark dose (BMD) is defined as the dose that leads to a specific loss (or degree of abnormality) known as the benchmark response (BMR) in the outcome variable. The BMR must be specified before the analysis. In previous BMD analyses of human neurotoxicity, the BMR has been set at 1 IQ point [197, 198]. The statistical uncertainty in the BMD estimation is taken into account by calculating its lower one-sided 95% confidence limit, which is called the benchmark dose level (BMDL). The BMDL is then used as the point of departure for calculation of the exposure limit, by dividing the BMDL by an uncertainty factor (usually fixed at 10) to obtain a protective RfD [11, 196]. I shall now discuss the calculation of a BMDL using the available data on fluoride neurotoxicity.

### E.      Benchmark dose calculations for fluoride

My colleague, Esben Budtz-Jørgensen, and I are formalizing an agreement with the authors of the ELEMENT fluoride report [142] to jointly assess benchmark dose results, and access to the raw data will likely happen in the near future to allow preparation of a scientific publication. In the absence of the original data at this point, we have applied benchmark dose algorithms to estimate the approximate BMD and BMDL, first by using the descriptive data on the distributions of urinary fluoride concentrations and the IQs as already published as Table 4 [142].

The benchmark dose is the exposure dose leading to a specific decrease (denoted BMR) in the response (in this case, the IQ), when compared to unexposed individuals. The BMR must be defined before the analysis [196], and general guidelines have been developed for the selection of a BMR [11]. A 1-to-2 IQ point reduction at the population level was recognized by the U.S. EPA Clean Air Scientific Advisory Committee, which emphasized that "an IQ loss on

the order of one to two IQ points [should] be prevented in all but a small percentile of the population."[15] Similarly, in its Regulatory Impact Analysis of the monetized human health benefits of a revised National Ambient Air Quality Standard for lead, EPA used benefits derived from IQ improvements [199]. Further, EFSA has decided upon 1 IQ point as a proper benchmark response [200], and economists use calculated losses of lifetime incomes from the loss of 1 IQ point [201]. Our previous benchmark analysis on the effect of lead exposure [198] used a BMR of 1 IQ point, and we followed the same procedure for fluoride.

In the above framework, the BMD will satisfy

$$f(0) - f(BMD) = BMR \rightarrow BMD = f^{-1}(-BMR)$$

In a linear model ($Y = \alpha + \beta d + \varepsilon$), we get $BMD = -BMR/\beta$. The main result of the benchmark analysis is the BMDL, which is defined as a lower one-sided 95% confidence interval (CI) of the BMD. In a linear model

$$BMDL = -BMR/\beta_{lower}$$

where $\beta_{lower}$ is the one-sided lower 95% confidence limit for $\beta$ [198].

For the ELEMENT study [142], a linear dose-response model could be used for the effect of urine-fluoride concentrations on both measures of childhood IQ. In this model, the BMD and BMDL can be calculated based only on the regression coefficient and its precision. In Table 4 of the publication [142], this information is available both for a crude model and for a model A with confounder adjustment. The table below shows the benchmark results for these two models for both the age-4 GCI and school-age IQ.

*Table 2. Benchmark dose results (mg/L urine adjusted for creatinine) obtained from the ELEMENT study results [142].*

| Model | GCI | | IQ | |
|---|---|---|---|---|
| | BMD | BMDL | BMD | BMDL |
| Crude | 0.133 | 0.085 | 0.211 | 0.121 |
| Adjusted | 0.159 | 0.099 | 0.200 | 0.130 |
| Read from plot | 0.159 | 0.102 | - | - |

As these calculations are based on assumptions of Gaussian distributions, we checked the validity by scanning the numbers from the plot in the published article. We tentatively used the WebPlotDigitizer software to read the plot shown in the published paper (see Figure 1, page 22) [142], to obtain the individual adjusted GCI results for more accurate BMD

---

[15] CASAC Review of the EPA's Policy Assessment for the Review of the Lead National Ambient Air Quality Standards (External Review Draft – January 2013).
https://yosemite.epa.gov/sab/sabproduct.nsf/E2554E264EEF8CCB85257B80006B3014/$File/EPA-CASAC-13-005+unsigned.pdf

calculations. Of the original 287 observations, the software provided 286 observations, probably due to overlapping observations. Thus, missing a single point only, our calculations based on the scanned data should be fairly reliable.

Using the standard benchmark approach to epidemiological data and a linear dependency, we find that the BMD for GCI is approximately 0.16 mg/L, and that the BMDL is 0.10 mg/L (bottom line of Table 2). These results are in excellent agreement with the results calculated from the summary data (first lines of the table). To assess the robustness of the calculation, we included a logarithmic conversion of the exposure parameter. We also used a split linear dose-response curve as in one of our previous studies [202]. These sensitivity analyses showed BMD results that deviated only marginally from the calculation using the default linear association. In conclusion, Table 2 shows reliable BMD results that have been calculated in accordance with standard EPA procedures.

With a BMD (or rather a benchmark concentration [BMC], as it is expressed in terms of the urine-fluoride concentration) for an IQ loss at about 0.2 mg/L, these calculations show benchmark results well below the average urinary fluoride concentrations found among pregnant women in fluoridated communities [65] and that the BMDL is even lower. It is theoretically possible that the results to some degree exaggerate the risks at low levels. For example, when additional, larger studies become available, the uncertainty will decrease, and the BMDL will move closer to the BMD [203]. However, the data available so far suggest that the BMD will likely remain much below an apparent 0.8 mg/L threshold. Given the sensitivity analyses carried out, the confounder-adjusted results cannot be attributed to an error in the assumed dose-response curve. However, a higher BMD would be possible if choosing a BMR much higher than 1 IQ point. As already considered by the EPA (see above), allowing for larger IQ deficits would not be appropriate.

## F.    Economic and societal value of preventing IQ losses

The above calculations are based on a loss of one IQ point, while assuming that this loss is an adverse effect that should be prevented, as approved by the EPA. In support of this decision, research on other neurotoxicants [34] has shown that a shift to the left of IQ distributions in a population will have substantial impacts, especially among those in the high and low ranges of the distribution [204].

In order to compare the population-level effect with other neurotoxicants, some approximate estimates of fluoride-associated IQ losses can be made. The calculations rely on several assumptions that are necessary in the absence of actual data and are therefore meant only to identify relative orders of magnitude. On the conservative side, I shall also assume that all children are equally vulnerable and that the dose-dependent IQ losses observed in the recent prospective studies can be used to assess the impact on the population at large (i.e., that genetic predisposition can be ignored, see Section V.A.3).

A low threshold for neurotoxicity suggests that some fluoride neurotoxicity may occur also in non-fluoridated communities, though part of the exposures may be due to the "halo" effect from water fluoridation elsewhere. I shall focus on exposures directly attributable to water fluoridation, as these clearly contribute exposures above the BMD.

The Canadian study [65] showed that drinking water fluoridation leads to an average increase in urinary fluoride excretion of about 0.4 mg/L. Given the BMD results, this increase in exposure can be considered to be above the threshold for developmental neurotoxicity, and the elevated exposure will then correspond to an IQ loss of approximately 2 IQ points, using the dose dependent losses observed in the recent prospective studies [142, 144]. I shall now use this outcome as an appropriate approximation.

Because about two-thirds of the U.S. population receives fluoridated drinking water, one can assume that a similar proportion of the 4 million annual U.S. births[16] (i.e., more than 2.5 million births) are affected by fluoridation-associated exposure increases. With the 2-point average IQ loss associated with fluoridation, the 2.5 million births will lose a total estimated number of 5 million IQ points annually. This approximate number can be compared with calculations made by Professor David Bellinger on IQ losses due to major pediatric diagnoses affecting 0-to-5-year-old children [205]. According to CDC data and Bellinger's calculations, the top pediatric etiologies are preterm birth at 34 million IQ points lost and lead exposure representing 23 million IQ points lost. My estimate for fluoride is that children aged 0 to 5 years have lost approximately 25 million IQ points due to fluoridation. Fluoride exposure should therefore be considered a top risk factor for neurodevelopmental deficits. Even if this estimate is somewhat imprecise, and unevenly distributed, the order of magnitude is likely to be correct and is very considerable.

Economists have devised methods to calculate the societal gains from preventing IQ losses, as higher IQs will, on average, result in higher lifetime incomes. In terms of 2006-dollars, the value of 1 IQ point was calculated to be about $18,000 [201, 206]. In a 2008 report on monetized benefits of prevention of lead exposure, the EPA used lower cost estimates and stated that "[t]he earnings-based value-per-IQ-point lost that we apply in this analysis most likely represents a lower bound on the true value of a lost IQ point, because it is essentially a cost-of-illness measure, not a measure of an individual's willingness-to-pay (WTP) to avoid the loss of an IQ point" (p. 18) [199]. For 5 million IQ points lost per year, the annual cost from loss of income will probably approach $100 billion in current dollar values, a truly enormous cost, although it represents only the societal losses and not the costs to the individuals affected, or their families.

If we assume that a threshold does exist at approximately 0.8 mg/L in maternal urine, as suggested by the IQ findings in the ELEMENT study for the 6-to-12-year-old cohort members, then water fluoridation would still result in substantial IQ losses, as indicated by the 75th percentiles for maternal urine-fluoride concentrations in Canada [65]. The 75th percentiles are 1.04 mg/L and 0.52 mg/L for the fluoridated and non-fluoridated areas, thus only the former can be projected to exceed the assumed threshold. In fluoridated areas, pregnant women above the 75th percentile are already at least 0.29 mg/L above the hypothetical threshold, and thus 25% of the children would each experience an IQ loss of about 1.5 points or more. This would amount to over 4.5 million lost IQ points among 0-to-5-year-olds. Even this smaller amount of IQ losses exceeds the U.S. IQ losses attributed to methylmercury exposure [207]. Similar calculations can

---

[16] Centers for Disease Control. Births and Natality. Available at: https://www.cdc.gov/nchs/fastats/births.htm

be done using the data on the 95th percentiles, again assuming that the U.S. population in fluoridated areas have similar urine-fluoride concentrations as Canadians.

I have made these calculations only to illustrate the significance and impact of neurotoxicity outcomes, and I offer these crude estimates to emphasize my concern that developmental neurotoxicity due to early-life exposure to fluoride must be controlled.

## G.   Conclusions

In the past, health risks associated with elevated exposures to fluoride have been downplayed in the interest of promoting community water fluoridation to prevent caries development. Although this has resulted in a biased risk assessment and inappropriately high exposure limits for fluoride in water, the situation has changed due to two developments.

First, it now appears that water fluoridation no longer has the same beneficial impact on caries prevention that it once had, and topical fluoride exposure in the oral cavity has emerged as the preferred intervention in much of the industrialized world, thereby making systemic fluoride exposure unnecessary.

Second, substantial research now documents the risks and consequences of developmental neurotoxicity associated with fluoride exposure in early life. The critical effect from fluoride exposure is no longer dental fluorosis with pitting, or crippling skeletal fluorosis that occur at highly elevated exposures. The risk assessment relied upon by the EPA is therefore outdated.

Recent research has shown that the most vulnerable life stage for many toxicants, particularly those that adversely affect the brain, is during intrauterine development. Fluoride fits into this paradigm, and efforts to control human fluoride exposures must therefore focus on pregnant women and small children.

Research on fluoride-exposed workers and laboratory animals suggest that elevated fluoride exposure is toxic to the brain and nerve cells. Epidemiological studies have identified links to learning, memory, and intelligence deficits, though most of the past studies focused on populations with fluoride exposures higher than those typically provided by U.S. water supplies.

Epidemiology studies from the most recent years document that adverse effects on brain development happen at elevated exposure levels that occur widely in North America, in particular in communities with fluoridated drinking water. These new prospective studies are of very high quality and leave little doubt that developmental neurotoxicity is a serious risk associated with elevated fluoride exposure. This evidence shows that community water fluoridation is associated with IQ losses that are substantial and of economic and societal concern.

While existing limits for fluoride in drinking water are known not to protect against early stages of fluorosis, they are even less protective regarding neurodevelopmental deficits. Applying methods for standards setting routinely used by the EPA, the recent studies on

IQ deficits in children allow the calculation of a recommended limit that would protect against neurotoxicity. Such calculations show that current allowable limits for fluoride in drinking water and the levels of fluoride added in community water fluoridation programs both greatly exceed a science-based limit that would protect against developmental neurotoxicity.

The evidence on fluoride neurotoxicity in the general population is fairly recent and unlikely to represent the full toxicological perspective, including adverse effects that may occur at a delay. As has been seen on numerous occasions, the evidence available today may underestimate the true extent of fluoride toxicity. With a reasonable degree of scientific certainty, I therefore consider the elevated levels of fluoride exposure in the U.S. population as a serious public health concern.

## VIII.   AFFIRMATION

I affirm that the foregoing is a true and correct statement of my opinions in this matter and the grounds for those opinions.

Philippe Grandjean
21 June 2019

**EXHIBIT A**

**ABBREVIATIONS**

| | |
|---|---|
| ADHD | attention-deficit/hyperactivity disorder |
| ATSDR | Agency for Toxic Substances and Disease Registry |
| BMC | benchmark concentration |
| BMD | benchmark dose |
| BMDL | benchmark dose level |
| BMR | benchmark response |
| CHMS | Canadian Health Measures Survey |
| CI | 95% confidence interval |
| CDC | Centers for Disease Control and Prevention |
| CRT-RC | Combined Raven's Test – The Rural Edition in China |
| CWF | community water fluoridation |
| EC | European Commission |
| EEA | European Environment Agency |
| EFSA | European Food Safety Authority |
| ELEMENT | Early Life Exposure in Mexico to Environmental Toxicants |
| EPA | Environmental Protection Agency |
| DHHS | Department of Health and Human Services |
| GCI | General Cognitive Index (from the McCarthy scale) |
| IARC | International Agency for Research on Cancer |
| IPCS | International Programme on Chemical Safety |
| IQ | intelligence quotient |
| LOAEL | lowest-observed-adverse-effect level |
| MCLG | maximum contaminant level goal |
| NHANES | National Health and Nutrition Examination Survey |
| NIDR | National Institute of Dental Research |
| MIREC | Maternal-Infant Research on Environmental Chemicals |
| NOAEL | no-observed-adverse-effect level |
| NRC | National Research Council |
| NTP | National Toxicology Program |
| PubMed | Biomedical literature data base |
| RfD | reference dose |
| SAP | Science Advisory Panel |
| SCHER | Scientific Committee on Health and Environmental Risks |
| SD | standard deviation |
| SDWA | Safe Drinking Water Act |
| SMD | standardized mean difference |
| WASI | Wechsler Abbreviated Scale of Intelligence |
| WHO | World Health Organization |
| WTP | willingness-to-pay |

**EXHIBIT B**

**PHILIPPE GRANDJEAN, M.D. (CV)**

Office address
Institute of Public Health
University of Southern Denmark
Winsløwparken 17
DK-5000 Odense C, Denmark
Tel. (+45) 6550.3769
Fax (+45) 6591.1458
Email: pgrand@health.sdu.dk
http://www.sdu.dk/staff/PGrandjean.aspx

Home
Naboløs 4
DK-1206 Copenhagen
Denmark
Tel: (+45) 33 133 933

Harvard School of Public Health
Department of Environmental Health
Landmark Center, 3E-110
401 Park Drive
P.O. Box 15697
Boston, MA  02215
Tel: 617-384-8907
Fax: 617-384-8994
Email: Pgrand@hsph.harvard.edu
https://www.hsph.harvard.edu/philippe-grandjean/

10 Dana Street
apt 315
Cambridge, MA 02138
Mailing address:
P.O. Box 390589
Cambridge, MA 02139
Tel: 617-331-3317

Academic degrees
1974, M.D., University of Copenhagen
1975, Diploma in basic medical research, University of Copenhagen
1979, D.M.Sc. (dr.med.), University of Copenhagen

Chronology of employment

| | |
|---|---|
| 1974-1975 | Postgraduate training fellowship, University of Copenhagen |
| 1975-1978 | Research fellow, Institute of Hygiene, Univ. Copenhagen |
| 1978-1980 | Senior research fellow, University of Copenhagen |
| | Visiting fellow, Department of Community Medicine, |
| | Mount Sinai School of Medicine, New York |
| 1980-1982 | Director, Department of Occupational Medicine, |
| | Danish National Institute of Occupational Health |
| 1982- | Professor of Environmental Medicine, Odense University |
| 1983-2017 | Consultant in Toxicology, Danish Health Authority |
| 1994-2002 | Adjunct Professor of Public Health (Environmental Health) |
| | and Neurology, Boston University School of Medicine |
| 2003- | Adjunct Professor of Environmental Health, Harvard School of Public Health |

Awards and honors

Prize essay in medicine, University of Copenhagen (1972)
Fulbright senior research scholarship (1978)
Keynote speaker, Odense University anniversary (1983)
Gitlitz Memorial Lecture, Association of Clinical Scientists, USA (1985)
Knight of the Dannebrog, awarded by the Queen of Denmark (1990)
The Dannin prize for medical research (1991)
Fellow, American Association for the Advancement of Science (1994)
Irish Congress Lecturer, Royal College of Physicians of Ireland (1996)
Knight of the Dannebrog, First Degree, awarded by the Queen of Denmark (2003)
'Mercury madness award' for excellence in science in the public interest from eight US
environmental organizations (2004)
Emeritus Fellow, International Union of Pure and Applied Chemistry, IUPAC (2009)
Honorary Research Award, International Order of Odd Fellows (2010)
Science Communication Award, University of Southern Denmark (2012)
Bernardino Ramazzini Award (2015)
Basic & Clinical Pharmacology & Toxicology Nordic Award (2015)
Margrethegaarden honorary prize (2016)
John R. Goldsmith Award, International Society for Environmental Epidemiology (2016)

Editorial boards
American Journal of Industrial Medicine (1987-2017)
Applied Organometal Chemistry (1985-1991)
Arbejdsmiljø (Occupational Environment, in Danish, 1983-1990)
Archives of Environmental Health (European Editor, 1986-1992)
Archives of Toxicology (1987-)
Biomarkers (1996-2001)
Central European Journal of Occupational and Environmental Medicine (2015-)
Critical Reviews in Toxicology (1985-2012)
Danish Medical Bulletin (1994-2003)
Environmental Health (Editor-in-Chief, 2002-)
Environmental Health Perspectives (2003-)
Environmental Research (1981-1994 and 2014-, Associate Editor, 1995-2014)
Industrial Health (2000-2005)
International Journal of Hygiene and Environmental Health (2001-)
International Journal of Occupational and Environmental Health (1994-2011)
International Journal of Occupational Medicine & Environ Health (1991-
Journal of Environmental Medicine (1998-1999)
Naturens Verden (Natural Science, in Danish) (1987-1991)
Ugeskrift for Læger (Danish Medical Journal, in Danish) (1991-2007)

Scientific societies
American Association for the Advancement of Science (Fellow, 1994)
American Public Health Association
Collegium Ramazzini (Fellow, 1987; Member of the Council, 2005-2013)
Danish Medical Association
Danish Societies of Clinical Biochemistry, Epidemiology, Occupational and Environmental

46

Medicine, and Public Health
Faroese Society of Science and Letters
International Commission on Occupational Health
International Society for Environmental Epidemiology

Research support as Principal Investigator since 2000
2000-2006  NIEHS
Mercury associated neurobehavioral deficit in children
2001-2003  Nordic Arctic Research Programme (NARP)
Changing patterns of biomagnified pollutants in the northern marine environment
2001-2004 Danish Medical Research Council
Exposure assessment for endocrine disruptors
2002-2004 Danish Medical Research Council
Environmental epidemiology research
2003-2004 European Commission
Assessment of Neurobehavioral Endpoints and Markers of Neurotoxicant Exposures
(ANEMONE)
2003-2005 Danish Medical Research Council
Research in hormone related substances
2003-2006 NIEHS ES11687
Effects of perinatal disruptors in children
2003-2007 EPA STAR RD-83075801-0
Children's vulnerability to environmental immunotoxicant
2004-2011 NIEHS ES12199
Epidemiology of immunotoxicant exposure in children
2006-2011 NIEHS ES13692
Health effects of lifetime exposure to food contaminants
2006-2012 NIEHS ES14460
Three-generation human study of reproductive effects of marine food contaminants
2008-2012 Danish Council for Strategic Research
Environmental pollutant impact on antibody production against current and new childhood
vaccines
2007-2013 NIEHS ES009797
Mercury associated neurobehavioral deficit in children
2011-2017 NIEHS ES012199
Epidemiology of immunotoxicant exposure in children

Major Current Funding as Principal Investigator
2012-2019 NIEHS ES021993 and NSF OCE-1321612
Immunotoxicity in Humans with Lifetime Exposure to Ocean Pollutants
2013-2019 NIEHS ES021477
Glucose Metabolism in Adults Prenatally Exposed to Diabetogenic Pollutants
2013-2019 NIEHS ES021372
Pollutant-related diabetes in the Nurses' Health Study II
2014-2019 NIEHS ES023376
Gut Microbiome in Adults with Early Life Exposures to Environmental Chemicals

47

2017-2022 NIEHS P42ES027706
Sources, Transport, Exposure and Effects of PFASs (STEEP). Superfund Research Program
Center

<u>Major committees, boards and elective offices</u>
*Danish:*
Danish Medical Association: Member, Prevention Council (2011-2014)
Danish Medical Research Council: Consultant on environmental medicine (1985-1990);
    Member, Joint Research Council Committee on Environmental Research (1986-1991);
    Member of DMRC (1992-1998)
Danish Society of Community Medicine: Secretary (1977-1978)
Danish Society of Industrial Medicine: Board Member (1974-1983)
Ministry of Education: Member, Committee on Toxicology (1984-1986); Member, Committee
    on Environmental Education (1986-1987)
Ministry of the Environment: Member, Council on Environmental Chemicals (1983-1989);
    Member, Environmental Appeal Board (1986-2010); Member, Environmental Research
    Council (1990-1992); Member, Advisory Committee on Pesticide Research (1995-2004);
    Member, Advisory Committee on Arctic Research (1996-2004)
Ministry of Health: numerous committee appointments; Chair, Committee on Risk Perception
    (2000-2001)
Ministry of Labour: Consultant on Occupational Health, Council on Occupational Safety and
    Health (1983-1993); Member, Occupational Health Council Research Committee (on behalf
    of the Danish Medical Research Council) (1984-1990 and 1999-2003)
Ministry of Research: Chair, Committee on Research at the Faroe Islands (1995-1996); Member,
    Committee on Scientific Dishonesty (2004-2006); Chair, Committee on Non-Ionizing
    Radiation (2004-2009)
Odense University (from 2000 University of Southern Denmark), elected offices: Chairman,
    Institute of Community Health (1982-1985; 1996-1999); Member of Executive Committee,
    Institute of Community Health (from 2000 Institute of Public Health) (1986-1995; 2000-
    2005); Member, Faculty Research Committee (1983-1985); Member, Curriculum
    Committee (1984-1986); Member, Faculty Council (1985-1993); Vice-Dean (1991-1993);
    Member, Scientific Integrity Committee (2003-)

*United States and international:*
Academy of Finland: member of panel evaluating the National Institute of Public Health (1995),
    site visit of center of excellence (2001)
Agency for Toxic Substances and Disease Registry: Workshop Rapporteur, Neurobehavioral
    Test Batteries for Use in Environmental Health Field Studies (1992); Member, Expert Panel
    of Mercury (1998)
Association of Schools of Public Health in the European Region: Treasurer (1975-1977)
BioMedCentral: Member, Editors Advisory Group (2011-2013)
Boston Environmental Hazards Center: Consultant (1994-1999)
Collegium Ramazzini: President, International Conference, The precautionary principle:
    Implications for research and prevention in environmental and occupational health (2002);
    Member, Executive Council (2005-2013)
Commission of the European Communities: National Expert, Working Party on Environmental

and Lifestyle-Related Diseases (1988-1990); ad hoc Consultant for evaluation of research applications; ad hoc Scientific Advisor on Risk Assessment (2009-); Member, SCHER Working group on Dental Amalgam (Human Health) (2012-2013)

European Environment Agency: Member, Scientific Committee (2012-2020)

European Food Safety Authority: Member, Panel on Contaminants in the Food Chain responsible for 85 opinions (2003-2009); Member of Working Groups on mercury, polychlorinated biphenyls, cadmium, lead, and benchmark dose

Food Advisory Committee, U.S.FDA, Methylmercury: invited expert (2002)

INMA (Infancia y Medio Ambiente), Spain: Member, Project Steering Committee (2010-)

Institut de Recherche Santé, Environnement et Travail, France: Member, Board of Advisers (2015-)

International Agency for Research on Cancer: Member of Task Group, Monographs on the Evaluation of Carcinogenic Risks to Humans, Vol. 47 (1988), Vol. 49 (1989), as chairman, Vol. 58 (1993), and as Subgroup chair, Vol. 100C (2009)

International Commission on Occupational Health: Danish Delegation Secretary (1982-90); Member, Scientific Committee on the Toxicology of Metals (1987-); Member of the Board (1990-1996)

International Programme on Chemical Safety: Member of Task Group, Environmental Health Criteria, Vol. 36 (1984) and 72 (1986)

International Society for Environmental Epidemiology: Councillor (1991-1994)

International Union of Pure and Applied Chemistry: Member, Subcommittee on the Toxicology of Nickel (1979-1989); Titular Member (1985-1991) and Chairman (1987-1991), Commission on Toxicology; Chairman, Subcommittee on Risk Assessment (1985-1989)

Karolinska Institute (Stockholm, Sweden): Member of international evaluation panel on environmental medicine (1993)

Ministry for Scientific Policy (Belgium): Consultant on national research program on health hazards (1990 and 1994)

National Institutes of Health (USA): Member of Special emphasis panels (2009-)

NATO Priority Area Panel on Environmental Security: Member (1996-1997)

Norwegian Research Council: ad hoc reviewer (2001-2008); Chairman of Environment and Health Review Group (2009-2010); member of steering committee (2011-2015)

Prenatal programming and Toxicity (PPTOX) conferences: Organizer/Chair/ Co-chair, Torshavn (2007), Miami (2009), Paris (2012), Boston (2014), Kita-Kyushu (2016)

Society of Occupational and Environmental Health: Member, Governing Council (1990-1993)

Swedish Council for Work Life Research: Member, Priority Committee on Chemical Health Risks (1997-1998)

U.N. Environment Programme: Member, Global Mercury Assessment Working Group (2002)

U.S. Environmental Protection Agency: Member, SAB/SAP Endocrine Disruptor Screening Program Subcommittee (1998-1999); Member, Food Quality Protection Act (FQPA) Science Review Board (SRB)(1999-2003)

White House Office of Science and Technology Policy: Team leader and presenter, Workshop on Scientific Issues Relevant to Assessment of Health Effects from Exposure to Methylmercury (1998)

World Health Organization: Temporary Adviser or Consultant on several occasions, five times elected Rapporteur; Member, European Advisory Committee on Health Research (2011-)

# EXHIBIT C

## LIST OF GRANDJEAN PUBLICATIONS FROM RECENT 10 YEARS

<u>Publications in international peer-reviewed journals</u>

190. Coccini T, Manzo L, Debes F, Weihe P, Grandjean P. Application of lymphocyte muscarinic receptors and platelet monoamine oxidase-B as biomarkers of CNS function in a Faroese children cohort prenatally exposed to methylmercury and PCBs. Biomarkers 2009; 14: 67-76. PMCID: <u>PMC4415987</u>

191. Budtz-Jørgensen E, Debes F, Weihe P, Grandjean P. Structural equation models for meta-analysis in environmental risk assessment. Environmetrics 2010; 21: 510-27. PMCID: <u>PMC2947033</u>

192. Choi AL, Weihe P, Budtz-Jørgensen E, Jørgensen PJ, Salonen JT, Tuomainen T-P, Murata K, Nielsen HP, Petersen MS, Askham J, Grandjean P. Methylmercury exposure and adverse cardiovascular effects in Faroese whalingmen. Environ Health Perspect 2009; 117: 369-72. PMCID: <u>PMC2661905</u>

193. Bjørling-Poulsen M, Andersen HR, Grandjean P. Potential developmental neurotoxicity of pesticides used in Europe. Environ Health 2008; 7: 50. PMCID: <u>PMC2577708</u>

194. Chevrier C, Sullivan K, White RF, Comtois C, Cordier S, Grandjean P. Qualitative assessment of visuospatial errors in mercury-exposed Amazonian children. Neurotoxicology 2009; 30: 37–46. PMID: 18992767

195. Julvez J, Grandjean P. Neurodevelopmental toxicity risks due to occupational exposure to industrial chemicals during pregnancy. Industr Health 2009; 47: 459-68. PMID: 19834254

196. Grandjean P, Budtz-Jørgensen E. An ignored risk factor in toxicology: The total imprecision of exposure assessment. Pure Appl Chem 2010; 82: 383-91. PMCID: <u>PMC2856963</u>

197. Kirkegaard M, Sonne C, Dietz R, Letcher RJ, Jensen AL, Hansen SS, Jensen BM, Grandjean P. Alterations in thyroid hormone status in Greenland sledge dogs exposed to whale blubber contaminated with organohalogen compounds. Environ Qual Saf 2011; 74: 157-63. PMID: 20888641

198. Schlezinger JJ, Bernard PL, Haas A, Grandjean P, Weihe P, Sherr DH. Direct assessment of cumulative aryl hydrocarbon receptor agonist activity in sera from experimentally exposed mice and environmentally exposed humans. Environ Health Perspect 2010; 118: 693-8. PMCID: <u>PMC2866687</u>

199. White RF, Palumbo CL, Yugelun-Todd DA, Heaton KJ, Weihe P, Debes F, Grandjean P. Functional MRI approach to developmental methylmercury and polychlorinated biphenyl neurotoxicity. Neurotoxicology 2011; 32: 975-80. PMCID: <u>PMC4410805</u>

200. Lincoln RA, Vorhees DJ, Chesney EJ, Shine JP, Grandjean P, Senn DB. Fish consumption and mercury exposure among Louisiana recreational anglers. Environ Health Perspect 2011; 119: 245-51. PMCID: <u>PMC3040613</u>

201. Yorifuji T, Tsuda T, Grandjean P. Unusual cancer excess after neonatal arsenic exposure from contaminated milk powder. J Natl Cancer Inst 2010; 102: 360-1. PMCID: <u>PMC3611821</u>

202. Harari R, Julvez J, Murata K, Barr D, Bellinger DC, Debes F, Grandjean P. Neurobehavioral deficits and increased blood pressure in school-age children prenatally exposed to pesticides. Environ Health Perspect 2010; 118: 890-6. PMCID: <u>PMC2898869</u>

203. Grandjean P, Satoh H, Murata K, Eto K. Adverse effects of methylmercury: Environmental health research implications. Environ Health Perspect 2010; 118: 1137-45. PMCID:

PMC2920086

204. Mahaffey KR, Sunderland EM, Chan HM, Choi AL, Grandjean P, Mariën K, Oken E, Sakamoto M, Schoeny R, Weihe P, Yan C-H, Yasutake A. Balancing the benefits of n-3 polyunsaturated fatty acids and the risks of methylmercury exposure from fish consumption. Nutrit Rev 2011; 69: 493-508. PMCID: PMC3219437

205. Julvez J, Debes F, Weihe P, Choi A, Grandjean P. Sensitivity of continuous performance test (CPT) to mercury exposure at age 14 years. Neurotoxicol Teratol 2010; 32: 627–32. PMCID: PMC2980868

206. Dalgård C, Petersen MS, Schmedes AV, Brandslund I, Weihe P, Grandjean P. High latitude and marine diet: Vitamin D status in elderly Faroese. Br J Nutr 2010; 104: 914-8. PMCID: PMC4413010

207. Heilmann C, Budtz-Jørgensen E, Nielsen F, Heinzow B, Weihe P, Grandjean P. Serum concentrations of antibodies against vaccine toxoids in children exposed perinatally to immunotoxicants. Environ Health Perspect 2010; 118: 1434-8. PMCID: PMC2957925

208. Grandjean P, Poulsen LK, Heilmann C, Steuerwald U, Weihe P. Allergy and sensitization during childhood associated with prenatal and lactational exposure to marine pollutants. Environ Health Perspect 2010; 118: 1429-33. PMCID: PMC2957924

209. Grandjean P, Henriksen JE, Choi AL, Petersen MS, Dalgård C, Nielsen F, Weihe P. Marine food pollutants as a risk factor for hypoinsulinemia and type 2 diabetes. Epidemiology 2011; 22: 410-7. PMCID: PMC3107006

210. Yorifuji T, Debes F, Weihe P, Grandjean P. Prenatal exposure to lead and cognitive deficit in 7- and 14-year-old children in the presence of concomitant exposure to similar molar concentration of methylmercury. Neurotoxicol Teratol 2011; 33: 205-11. PMCID: PMC3026894

211. Grandjean P. Even low-dose lead exposure is hazardous. The Lancet 2010; 375: 855-6. PMID: 20833288

212. Spulber S, Rantamäki T, Nikkilä O, Castrén E, Weihe P, Grandjean P, Ceccatelli S. Effects of maternal smoking and exposure to methylmercury on Brain-Derived Neurotrophic Factor (BDNF) concentrations in cord serum. Toxicol Sci 2010; 117: 263–9. PMCID: PMC2940410

213. Mozaffarian D, Shi P, Morris JS, Spiegelman D, Grandjean P, Siscovick, Willett WC, Rimm EB. Mercury exposure and risk of cardiovascular disease in two U.S. cohorts. N Engl J Med 2011; 364: 1116-25. PMCID: PMC3082949

214. Ozonoff DM, Grandjean P. Milestones and impact factors (editorial). Environ Health 2010; 9: 35. PMCID: PMC2909227

215. Needham LL, Grandjean P, Heinzow B, Jørgensen PJ, Nielsen F, Patterson DG Jr, Sjödin A, Turner WE, Weihe P. Partition of environmental chemicals between maternal and fetal blood and tissues. Environ Sci Technol 2011; 45: 1121-6. PMCID: PMC3031182

216. Yorifuji T, Grandjean P, Tsuda T, Kashima S, Doi H. Cancer excess after arsenic exposure from contaminated milk powder. Environ Health Prev Med 2011; 16: 164-70. PMCID: PMC3078290

217. Grandjean P, Herz K. Methylmercury and brain development: Imprecision and underestimation of developmental neurotoxicity in humans. Mt Sinai J Med 2011; 78: 107-18. PMCID: PMC3096460

218. Pichery C, Bellanger M, Zmirou-Navier D, Glorennec P, Hartemann P, Grandjean P. Childhood lead exposure in France: benefit estimation and partial cost-benefit analysis of lead hazard control. Environ Health 2011; 10: 44. PMCID: PMC3123267

219. Wohlfahrt-Veje C, Main KM, Schmidt IM, Boas M, Jensen TK, Grandjean P, Skakkebæk

NE, Andersen HR. Lower birth weight and increased body fat at school age in children prenatally exposed to modern pesticides: A prospective study. Environ Health 2011; 10: 79. PMCID: PMC3196902

220. Wohlfahrt-Veje C, Andersen HR, Schmidt IM, Aksglaede L, Sørensen K, Juul A, Jensen TK, Grandjean P, Skakkebæk NE, Main KM. Early Breast Development in Girls after Prenatal Exposure to Non-Persistent Pesticides. Int J Androl 2012; 35: 273-82.

221. Dalgård C, Petersen MS, Weihe P, Grandjean P. Vitamin D status in relation to type 2 diabetes development. Diabetes Care 2011; 34: 1284-8. PMCID: PMC3114341

222. Julvez J, Debes F, Weihe P, Choi AL, Grandjean P. Thyroid dysfunction as a mediator of organochlorine neurotoxicity in preschool children. Environ Health Perspect 2011; 119:1429-35. PMCID: PMC3230434

223. Audouze K, Grandjean P. Application of computational systems biology to explore environmental toxicity hazards. Environ Health Perspect 2011; 119: 1754-9. PMCID: PMC3261980

224. Grandjean P, Andersen EW, Budtz-Jørgensen E, Nielsen F, Mølbak K, Weihe P, Heilmann C. Decreased serum vaccine antibody concentrations in children exposed to perfluorinated compounds. JAMA 2012; 307: 391-7. PMCID: PMC4402650

225. Grandjean P, Eriksen ML, Ellegaard O, Wallin JA. The Matthew effect in environmental science publication: A bibliometric analysis of chemical substances in journal articles. Environ Health 2011; 10: 96. PMCID: PMC3229577

226. Vestergaard S, Nielsen F, Andersson AM, Hjøllund NH, Grandjean P, Andersen HR, Jensen TK. Association between perfluorinated compounds and time to pregnancy in a prospective cohort of Danish couples attempting to conceive. Human Reproduct 2012; 27: 873-80. PMID: 22246448

227. Wohlfahrt-Veje C, Andersen HR, Jensen TK, Grandjean P, Skakkebaek NE, Main KM. Smaller genitals at school age in boys whose mothers were exposed to non-persistent pesticides in early pregnancy. Int J Androl 2012; 35: 265-72.

228. Grandjean P, Weihe P, Nielsen F, Heinzow B, Debes F, Budtz-Jørgensen E. Neurobehavioral deficits at age 7 years associated with prenatal exposure to toxicants from maternal seafood diet. Neurotoxicol Teratol 2012; 34: 466-72. PMCID: PMC3407364

229. Grandjean P, Grønlund C, Kjær IM, Jensen TK, Sørensen N, Andersson AM, Juul A, Skakkebæk NE, Budtz-Jørgensen E, Weihe P. Reproductive hormone profile and pubertal development in 14-year-old boys prenatally exposed to polychlorinated biphenyls. Reprod Toxicol 2012; 34: 498-503. PMCID: PMC3513575

230. Karagas MR, Choi AL, Oken E, Horvat M, Schoeny R, Kamai E, Grandjean P, Korrick S. Evidence on the human health effects of low level methylmercury exposure. Environ Health Perspect 2012; 120: 799-806. PMCID: PMC3385440

231. Grandjean P, Ozonoff D. Portrait of the journal as a young adult. Environ Health. 2012; 11: 30. PMCID: PMC3403879

232. Budtz-Jørgensen E, Bellinger D, Lanphear B, Grandjean P, International Pooled Lead Study Investigators. An international pooled analysis for obtaining a benchmark dose for environmental lead exposure in children. Risk Anal 2013; 33: 450-61. PMID: 22924487

233. Færch K, Højlund K, Vind BF, Vaag A, Dalgård C, Nielsen F, Grandjean P. Increased serum concentrations of persistent organic pollutants among prediabetic individuals: potential role of altered substrate oxidation patterns. J Clin Endocrinol Metab 2012; 97: E1705-13. PMCID: PMC3431564

234. Yorifuji T, Murata K, Bjerve K, Choi AL, Weihe P, Grandjean P. Visual evoked potentials in children prenatally exposed to methylmercury. Neurotoxicology 2013; 37: 15-8. PMCID: PMC3696435

235. Pichery C, Bellanger M, Zmirou-Navier D, Fréry N, Cordier S, Roue-LeGall A, Hartemann P, Grandjean P. Economic evaluation of health consequences of prenatal methylmercury exposure in France. Environ Health 2012; 11: 53. PMCID: PMC3533723

236. Andersen HR, Wohlfahrt-Veje C, Dalgård C, Christiansen L, Main KM, Christine Nellemann C, Murata K, Jensen TK, Skakkebæk NE, Grandjean P. Paraoxonase 1 polymorphism and prenatal pesticide exposure associated with adverse cardiovascular risk profiles at school age. PLoS ONE 2012; 7(5): e36830. PMCID: PMC3352943

237. Choi AL, Sun G, Zhang Y, Grandjean P. Developmental fluoride neurotoxicity: A systematic review and meta-analysis. Environ Health Perspect 2012; 120: 1362-8. PMCID: PMC3491930

238. Mozaffarian D, Shi P, Morris JS, Grandjean P, Siscovick D, Spiegelman D, Willett W, Rimm E, Curhan G, Forman J. Mercury exposure and risk of hypertension in US men and women in two prospective cohorts. Hypertension 2012; 60: 645-52. PMCID: PMC3466587

239. Wu H, Bertrand KA, Choi AL, Hu FB, Laden F, Grandjean P, Sun Q. Plasma levels of persistent organic pollutants and risk of type 2 diabetes: a prospective analysis in the Nurses' Health Study and meta-analysis. Environ Health Perspect 2013; 121: 153-61. PMCID: PMC3569682

240. Barouki B, Gluckman PD, Grandjean P, Hanson M, Heindel JJ. Developmental origins of non-communicable diseases and dysfunctions: Implications for research and public health. Environmental Health 2012: 11: 42. PMCID: PMC3384466

241. Julvez J, Davey-Smith G, Golding J, Ring S, St. Pourcain B, Gonzalez JR, Grandjean P. Prenatal methylmercury exposure and genetic predisposition to cognitive deficit at age 8 years. Epidemiology 2013; 24: 643-50. PMID: 23903878

242. Balbus JM, Barouki R, Birnbaum LS, Etzel RA, Gluckman PD, Grandjean P, Hancock C, Hanson MA, Heindel JJ, Hoffman K, Jensen GK, Keeling A, Neira M, Rabadán-Diehl C, Ralston J, Tang KC. Early-life prevention of non-communicable diseases (Comment). Lancet 2013; 381: 3-4. PMCID: PMC3849695

243. Dietz R, Sonne C, Basu N, Braune B, O'Hara T, Letcher RJ, Scheuhammer T, Andersen M, Andreasen C, Andriashek D, Asmund G, Aubail A, Baagøe H, Born EW, Chan HM, Derocher AE, Grandjean P, Knott K, Kirkegaard M, Krey A, Lunn N, Messier F, Obbard M, Olsen MT, Ostertag S, Peacock E, Renzoni A, Rigét FF, Skaare JU, Stern G, Stirling I, Taylor M, Wiig O, Wilson S, Aars J. What are the toxicological effects of mercury in Arctic biota? Sci Total Environ 2013; 443: 775-790. PMID: 23231888

244. Bellanger M, Pichery C, Aerts D, Berglund M, Castaño A, Čejchanová M, Crettaz P, Davidson F, Esteban M, Fischer ME, Gurzau AE, Halzlova K, Katsonouri A, Knudsen LE, Kolossa-Gehring M, Koppen G, Ligocka D, Miklavčič A, Reis MF, Rudnai P, Tratnik JS, Weihe P, Budtz-Jørgensen E, Grandjean P. Economic benefits of methylmercury exposure control in Europe: Monetary value of neurotoxicity prevention. Environ Health 2013; 12: 3. PMCID: PMC3599906

245. Halling J, Petersen MS, Jørgensen N, Jensen TK, Grandjean P, Weihe P. Semen quality and reproductive hormones in Faroese men – a cross-sectional population-based study of 481 men. BMJ Open 2013; 3: e001946. PMCID: PMC3612804

246. Grandjean P, Budtz-Jørgensen E. Immunotoxicity of perfluorinated alkylates: Calculation

of benchmark doses based on serum concentrations in children. Environ Health 2013; 12: 35. PMCID: PMC3643874

247. Choi AL, Mogensen UB, Bjerve K, Weihe P, Grandjean P, Budtz-Jørgensen E. Negative confounding by essential fatty acids in methylmercury neurotoxicity associations. Neurotoxicol Teratol 2014; 42: 85-92. PMCID: PMC4051703

248. Mozaffarian D, Shi P, Morris JS, Grandjean P, Siscovick DS, Spiegelman D, Hu FB. Methylmercury exposure and incident diabetes mellitus in US men and women in two prospective cohorts. Diabetes Care 2013; 36: 3578-84. PMCID: PMC3816920

249. Audouze K, Brunak S, Grandjean P. Computational approach to chemical etiologies of diabetes. Sci Comm 2013; 3: 2712. PMCID: PMC3965361

250. Fonseca MF, Hacon SS, Grandjean P, Choi AL, Bastos WR. Iron status as a covariate in methylmercury-associated neurotoxicity risk. Chemosphere 2014; 100: 89-96. PMID: 24411835

251. Grandjean P, Clapp R. Changing interpretation of human health risks from perfluorinated compounds. Publ Health Rep 2014:129; 482-5. PMCID: PMC4187289

252. Grandjean P, Landrigan PJ. Neurobehavioural effects of developmental toxicity. Lancet Neurol 2014; 13: 330-8. PMCID: PMC4418502

253. Kim BM, Choi A, Ha EH, Pedersen L, Nielsen F, Weihe P, Hong YC, Budtz-Jørgensen E, Grandjean P. Effect of hemoglobin and selenium on partition of mercury between maternal and cord blood. Environ Res 2014; 132: 407-12. PMCID: PMC4103659

254. Grandjean P, Ozonoff D. Transparency and translation of science in a modern world. Environ Health 2013; 12: 70. PMCID: PMC3765922

255. Tang-Peronard JL, Heitmann BL, Andersen HR, Steuerwald U, Grandjean P, Weihe P, Jensen TK. Association between prenatal polychlorinated biphenyl exposure and obesity development at ages 5 and 7 y: a prospective cohort study of 656 children from the Faroe Islands. Am J Clin Nutr 2014; 99: 5-13. PMCID: PMC3862459

256. Timmermann CAG, Rossing LI, Grøntved A, Ried-Larsen M, Dalgård C, Andersen LB, Grandjean P, Nielsen F, Svendsen KD, Scheike T, Jensen TK. Adiposity and glycemic control in children exposed to perfluorinated compounds. J Clin Endocrinol Metab 2014; 99: E608-14. PMID: 24606078

257. Julvez J, Grandjean P. Genetic susceptibility to methylmercury developmental neurotoxicity matters. Front Genet 2013; 4: 278. PMCID: 3861742.

258. Vesterholm Jensen D, Christensen JH, Virtanen HE, Skakkebæk NE, Main KM, Toppari J, Veje CV, Andersson AM, Nielsen F, Grandjean P, Jensen TK. No association between exposure to perfluorinated compounds and congenital cryptorchidism: a nested case-control study among 215 boys from Denmark and Finland. Reproduction 2014; 147: 411-7. PMID: 24218628

259. Li M, Sherman LS, Blum JD, Grandjean P, Mikkelsen B, Weihe P, Sunderland EM, Shine JP. Assessing sources of human methylmercury exposure using stable mercury isotopes. Environ Sci Technol 2014; 48: 8800-6. PMCID: PMC4123924

260. Grandjean P, Herz KT. Trace elements as paradigms of developmental neurotoxicants. J Trace Elem Med Biol 2015; 31: 130-4. PMCID: PMC4321972

261. Grandjean P, Weihe P, Debes F, Choi AL, Budtz-Jørgensen E. Neurotoxicity from prenatal and postnatal exposure to methylmercury. Neurotoxicol Teratol 2014; 43: 39-44. PMCID: PMC4066386

262. Grandjean P, Clapp R. Perfluorinated alkyl substances: emergence of insights into health risks. New Solutions 2015; 25: 147-63.

263. Osuna CE, Grandjean P, Weihe P, El-Fawal HAN. Autoantibodies associated with prenatal and childhood exposure to environmental chemicals in Faroese children. Toxicol Sci 2014; 142: 158-66. PMCID: PMC4334810

264. Mogensen UB, Grandjean P, Heilmann C, Nielsen F, Weihe P, Budtz-Jørgensen E. Structural equation modeling of immunotoxicity associated with exposure to perfluorinated compounds. Environ Health 2015; 14: 47. PMCID: PMC4488050

265. Andersen HR, Debes F, Wohlfahrt-Veje C, Murata K, Grandjean P. Occupational pesticide exposure in early pregnancy and neurobehavioral function in children at school age. Neurotoxicol Teratol 2015; 47: 1-9. PMID: 25450661

266. Kvist L, Giwercman A, Weihe P, Jensen TK, Grandjean P, Halling J, Petersen MS, Giwercman YL. Exposure to persistent organic pollutants and sperm sex chromosome ratio in men from the Faroe Islands. Environ Int 2014; 73: 359-64. PMCID: PMC4413009

267. Jensen TK, Timmermann AG, Rossing LI, Ried-Larsen M, Grøntved A, Andersen LB, Dalgaard C, Hansen OH, Scheike T, Nielsen F, Grandjean P. Polychlorinated biphenyl exposure and glucose metabolism in Danish children at age 9 years. J Clin Endocrinol Metab 2014; 99: E2643-51.

268. Choi AL, Zhang Y, Sun G, Bellinger D, Wang K, Yang XJ, Li JS, Zheng Q, Fu Y, Grandjean P. Association of cognitive deficits with prenatal exposure to fluoride in Chinese children: a pilot study. Neurotoxicol Teratol 2015; 47: 96-101. PMID: 25446012

269. Mørck TA, Nielsen F, Nielsen JKS, Siersma V, Grandjean P, Knudsen LE. PFAS concentrations in plasma samples from Danish school children and their mothers. Chemosphere 2015; 129: 203-9. PMID: 25147004

270. Kioumourtzoglou MA, Roberts AL, Nielsen F, Shelley Tworoger SS, Grandjean P, Weisskopf MG. Within-person reproducibility of red blood cell mercury over a 10- to 15-year period among women in the Nurses' Health Study II. J Exp Sci Environ Epidemiol 2016; 26: 219-23. PMCID: PMC4465060

271. Wu H, Grandjean P, Hu FB, Sun Q. Consumption of white rice and brown rice and urinary inorganic arsenic concentration. Epidemiology 2015: 26: e65-7. PMCID: PMC5081491

272. Jensen TK, Andersen LB, Kyhl HB, Nielsen F, Christensen HT, Grandjean P. Association between perfluorinated compounds and miscarriage in a case-control study of Danish pregnant women. PLoS One 2015; 10: e0123496. PMCID: PMC4388566

273. Trasande L, Zoeller RT, Hass U, Kortenkamp A, Grandjean P, Myers JP, DiGangi J, Bellanger M, Hauser R, Legler J, Skakkebaek N, Heindel JJ. Estimating burden and disease costs of exposure to endocrine disrupting chemicals in the European Union. J Clin Endocrinol Metab 2015; 100: 1245-55. PMCID: PMC4399291

274. Bellanger M, Demeneix B, Grandjean P, Zoeller RT, Trasande L. Neurobehavioral deficits, diseases and associated costs of exposure to endocrine disrupting chemicals in the European Union. J Clin Endocrinol Metab 2015; 100: 1256-66. PMCID: PMC4399309

275. Tang-Péronard JL, Heitmann BL, Jensen TK, Vinggaard AM, Madsbad S, Steuerwald U, Grandjean P, Weihe P, Nielsen F, Andersen HR. Prenatal exposure to persistent organic pollutants is associated with increased insulin levels in 5-year-old girls. Environ Res 2015; 142: 407-13. PMCID: PMC4609268

276. Timmermann CAG, Osuna CE, Steuerwald U, Weihe P, Poulsen LK, Grandjean P. Asthma and allergy in children with and without prior measles mumps, and rubella vaccination. Pediatr Allergy Immunol 2015; 26: 742-9. PMID: 25845848

277. Tøttenborg SS, Choi AL, Bjerve KS, Weihe P, Grandjean P. Effect of seafood mediated

PCB on desaturase activity and PUFA profile in Faroese septuagenarians. Environ Res 2015; 140: 699-703. PMCID: PMC4528611

278. Petersen MS, Halling J, Weihe P, Jensen TK, Grandjean P, Nielsen F, Jørgensen N. Spermatogenic capacity in fertile men with elevated exposure to polychlorinated biphenyls. Environ Res 2015; 138: 345-51. PMCID: PMC4394374

279. Grandjean P. Toxicology research for precautionary decision-making and the role of Human & Experimental Toxicology. Hum Exp Toxicol 2015; 34: 1231-7. PMID: 26614810

280. Pearce NE, Blair A, Vineis P, Ahrens W, Andersen A, Anto JM, Armstrong BK, Baccarelli AA, Beland FA, Berrington A, Bertazzi PA, Birnbaum LS, Brownson RC, Bucher JR, Cantor KP, Cardis E, Cherrie JW, Christiani DC, Cocco P, Coggon D, Comba P, Demers PA, Dement JM, Douwes J, Eisen EA, Engel LS, Fenske RA, Fleming LE, Fletcher T, Fontham E, Forastiere F, Frentzel-Beyme R, Fritschi L, Gerin M, Goldberg M, Grandjean P, Grimsrud TK, Gustavsson P, Haines A, Hartge P, Hansen J, Hauptmann M, Heederik D, Hemminki K, Hemon D, Hertz-Picciotto I, Hoppin JA, Huff J, Jarvholm B, Kang D, Karagas MR, Kjaerheim K, Kjuus H, Kogevinas M, Kriebel D, Kristensen P, Kromhout H, Laden F, Lebailly P, LeMasters G, Lubin JH, Lynch CF, Lynge E, 't Mannetje A, McMichael AJ, McLaughlin JR, Marrett L, Martuzzi M, Merchant JA, Merler E, Merletti F, Miller A, Mirer FE, Monson R, Nordby KC, Olshan AF, Parent ME, Perera FP, Perry MJ, Pesatori AC, Pirastu R, Porta M, Pukkala E, Rice C, Richardson DB, Ritter L, Ritz B, Ronckers CM, Rushton L, Rusiecki JA, Rusyn I, Samet JM, Sandler DP, de Sanjose S, Schernhammer E, Seniori Costantini A, Seixas N, Shy C, Siemiatycki J, Silvermann DT, Simonato L, Smith AH, Smith MT, Spinelli JJ, Spitz MR, Stallones L, Stayner LT, Steenland K, Stenzel M, Stewart BW, Stewart PA, Symanski E, Terracini B, Tolbert PE, Vainio H, Vena J, Vermeulen R, Victora CG, Ward EM, Weinberg CR, Weisenburger D, Wesseling C, Weiderpass E, Zahm SH. IARC monographs: 40 years of evaluating carcinogenic hazards to humans. Environ Health Perspect 2015; 123: 507-14. PMCID: PMC4455595

281. Zong G, Grandjean P, Wu H, Sun Q. Circulating persistent organic pollutants and body fat distribution, evidence from NHANES 1999-2004. Obesity 2015; 23: 1903-10. PMCID: PMC4551580

282. Debes F, Weihe P, Grandjean P. Cognitive deficits at age 22 years associated with prenatal exposure to methylmercury. Cortex 2016; 74: 358-69. PMCID: PMC4670285

283. Mogensen UB, Grandjean P, Nielsen F, Weihe P, Budtz-Jørgensen E. Breastfeeding as an exposure pathway for perfluorinated alkylates. Environ Sci Technol 2015; 49: 10466-73. PMID: 26291735

284. Kielsen K, Shamin Z, Ryder LP, Nielsen F, Grandjean P, Budtz-Jørgensen E, Heilmann C. Antibody response to booster vaccination with tetanus and diphtheria in adults exposed to perfluorinated alkylates. J Immunotoxicol 2016; 13: 270-3. PMCID: PMC4739630

285. Grandjean P, Barouki R, Bellinger D, Casteleyn L, Chadwick LH, Cordier S, Etzel RA, Gray KA, Ha EH, Junien C, Karagas M, Kawamoto T, Lawrence BP, Perera F, Prins G, Puga A, Rosenfeld CS, Sherr D, Sly P, Suk W, Sun Q, Toppari J, van den Hazel P, Walker CL, Heindel JJ. Life-long implications of developmental exposure to environmental stressors: New perspectives. Endocrinology 2015; 156: 3408-15. PMCID: PMC4588822

286. Heindel JJ, Balbus J, Birnbaum L, Brune-Drisse ML, Grandjean P, Gray K, Landrigan PJ, Sly PD, Suk W, Cory-Slechta D, Thompson C, Hanson M. Developmental origins of health and disease: integrating environmental influences. Endocrinology 2015; 156: 3416-21. PMCID: PMC4588819

287. Egsmose EL, Bräuner EV, Frederiksen M, Mørck TA, Siersma VD, Hansen PW, Nielsen F,

Grandjean P, Knudsen LE. Associations between plasma concentrations of PCB 28 and possible indoor exposure sources in Danish school children and mothers. Environ Intern 2016; 87: 13-9. PMID: 26638015

288. Perry MJ, Young HA, Grandjean P, Halling J, Petersen MS, Sheena EM, Parisa K, Weihe P. Sperm aneuploidy in men with elevated lifetime exposure to dichlorodiphenyldichloroethylene (DDE) and polychlorinated biphenyl (PCB) pollutants. Environ Health Perspect 2016; 124: 951-6. PMCID: PMC4937854

289. Julvez J, Paus T, Bellinger D, Eskenazi B, Tiemeier H, Pearce N, Ritz B, White T, Ramchandani P, Gispert JD, Desrivières S, Brouwer R, Boucher O, Alemany S, López-Vicente M, Suades-González E, Forns J, Grandjean P, Sunyer J. Environment and Brain Development: Challenges in the Global Context. Neuroepidemiology 2016; 46: 79-82. PMID: 26684467

290. Yorifuji T, Kato T, Ohta H, Bellinger DC, Matsuoka K, Grandjean P. Neurological and neuropsychological functions in adults with a history of developmental arsenic poisoning from contaminated milk powder. Neurotoxicol Teratol 2016; 53: 75-80. PMID: 26689609

291. Sunderland EM, Driscoll CT Jr, Hammitt JK, Grandjean P, Evans JS, Blum JD, Chen CY, Evers DC, Jaffe DA, Mason RP, Goho S, Jacobs W. Benefits of regulating hazardous air pollutants from coal and oil-fired utilities in the United States. Environ Sci Technol 2016; 50:2117-20. PMID: 26848613

292. Grandjean P. Learning from Bernardino Ramazzini, a tribute to the Magister from Carpi and to the Fellows of the Collegium Ramazzini. Eur J Oncol 2016: 21: 51-60.

293. Vandenberg LN, Ågerstrand M, Beronius A, Beausoleil C, Bergman Å, Bero LA, Bornehag CG, Boyer CS, Cooper GS, Cotgreave I, Gee D, Grandjean P, Guyton KZ, Hass U, Heindel JJ, Jobling S, Kidd KA, Kortenkamp A, Macleod MR, Martin OV, Norinder U, Scheringer M, Thayer KA, Toppari J, Whaley P, Woodruff TJ, Rudén C. A proposed framework for the systematic review and integrated assessment (SYRINA) of endocrine disrupting chemicals. Environ Health 2016; 15: 74. PMCID: PMC4944316

294. Trasande L, Zoeller RT, Hass U, Kortenkamp A, Grandjean P, Myers JP, DiGangi J, Hunt PM, Rudel R, Sathyanarayana S, Bellanger M, Hauser R, Legler J, Skakkebaek NE, Heindel JJ. Burden of disease and costs of exposure to endocrine disrupting chemicals in the European Union: an updated analysis. Andrology 2016; 4: 565-72. PMCID: PMC5244983

295. Dalgård C, Petersen MS, Steuerwald U, Weihe P, Grandjean P. Umbilical cord serum 25-hydroxyvitamin D concentrations and relation to birthweight, head circumference and infant length at age 14 days. Paediatr Perinat Epidemiol 2016; 30: 238-45. PMID: 27038010

296. Grandjean P. Paracelsus Revisited: The dose concept in a complex world. Basic Clin Pharmacol Toxicol 2016; 119: 126-32. PMCID: PMC4942381

297. Tinggaard J, Wohlfahrt-Veje C, Husby S, Christiansen L, Skakkebaek NE, Jensen TK, Grandjean P, Main KM, Andersen HR. Prenatal pesticide exposure and PON1 genotype associated with adolescent body fat distribution evaluated by dual X-ray absorptiometry (DXA). Andrology 2016; 4: 735-44. PMID: 27230552

298. Zong G, Grandjean P, Wang X, Sun Q. Lactation history, serum concentrations of persistent organic pollutants, and maternal risk of diabetes. Environ Res 2016; 150: 282-8. PMCID: PMC5003647

299. Birnbaum LS, Grandjean P. Alternatives to PFASs: Perspectives on the science (editorial). Environ Health Perspect 2015; 123: A104-5. PMCID: PMC4421778

300. Hu XC, Andrews D, Lindstrom AB, Bruton TA, Schaider LA, Grandjean P, Lohmann R, Carignan CC, Blum A, Balan SA, Higgins CP, Sunderland EM. Detection of poly- and

perfluoroalkyl substances (PFASs) in U.S. drinking water linked to industrial sites, military fire training areas and wastewater treatment plants. Environ Sci Technol Lett 2016 3: 344-350. PMCID: PMC5062567

301. Timmermann CAG, Budtz-Jørgensen E, Petersen MS, Weihe P, Steuerwald U, Nielsen F, Jensen TK, Grandjean P. Shorter duration of breastfeeding at elevated exposures to perfluoroalkyl substances. Reproduct Toxicol 2017; 68: 164–170. PMCID: PMC5233673

302. Lind DV, Priskorn L, Lassen TH, Nielsen F, Kyhl HB, Kristensen DM, Christesen HT, Jørgensen JS, Grandjean P, Jensen TK. Prenatal exposure to perfluoroalkyl substances and anogenital distance at 3 months of age as marker of endocrine disruption. Reproduct Toxicol 2017; 68: 200-206. PMID: 27421581

303. Oulhote Y, Shamim Z, Kielsen K, Weihe P, Grandjean P, Ryder LP, Heilmann C. Children's white blood cell counts in relation to developmental exposures to methylmercury and persistent organic pollutants. Reproduct Toxicol 2017; 68: 207-214. PMCID: PMC5292093

304. Karlsen M, Grandjean P, Weihe P, Steuerwald U, Oulhote Y, Valvi D. Early-life exposures to persistent organic pollutants in relation to overweight in preschool children. Reproduct Toxicol 2017; 68: 145-153. PMCID: PMC5290287

305. Dalsager L, Christensen N, Husby S, Kyhl H, Nielsen F, Høst A, Grandjean P, Jensen TK. Association between prenatal exposure to perfluorinated compounds and symptoms of infections at age 1-4years among 359 children in the Odense Child Cohort. Environ Int 2016; 96: 58-64. PMID: 27608427

306. Oulhote Y, Steuerwald U, Debes F, Weihe P, Grandjean P. Behavioral difficulties in 7-year old children in relation to developmental exposure to perfluorinated alkyl substances. Environ Int 2016; 97: 237-45. PMCID: PMC5154805

307. Weihe P, Debes F, Halling J, Petersen MS, Muckle G, Odland JØ, Dudarev A, Ayotte P, Dewailly É, Grandjean P, Bonefeld-Jørgensen E. Health effects associated with measured levels of contaminants in the Arctic. Int J Circumpolar Health 2016; 75: 33805. PMCID: PMC5156856

308. Grandjean P, Heilmann C, Weihe P, Nielsen F, Mogensen UB, Budtz-Jørgensen E. Serum Vaccine Antibody Concentrations in Adolescents Exposed to Perfluorinated Compounds. Environ Health Perspect 2017; 125: 077018. PMCID: PMC5744724

309. Oulhote Y, Debes F, Vestergaard S, Weihe P, Grandjean P. Aerobic fitness and neurocognitive function scores in young Faroese adults and potential modification by prenatal methylmercury exposure. Environ Health Perspect 2017; 125: 677-683. PMCID: PMC5381980

310. Kirk LE, Jørgensen JS, Nielsen F, Grandjean P. Role of hair-mercury analysis and dietary advice in lowering methylmercury exposure in pregnant women. Scand J Publ Health 2017; 45: 444-51. PMID: 28381203

311. Timmermann CAG, Budtz-Jørgensen E, Jensen TK, Osuna CE, Petersen MS, Steuerwald U, Nielsen F, Poulsen LK, Weihe P, Grandjean P. Association between perfluoroalkyl substance exposure and asthma and allergic disease in children as modified by MMR vaccination. J Immunotoxicol 2017; 14: 39-49. PMID: 28091126

312. Yorifuji T, Matsuoka K, Grandjean P. Height and blood chemistry in adults with a history of developmental arsenic poisoning from contaminated milk powder. Environ Res 2017; 155: 86-91. PMID: 28199894

313. Valvi D, Oulhote Y, Weihe P, Dalgård C, Bjerve KS, Steuerwald U, Grandjean P. Gestational diabetes and offspring birth size at elevated environmental pollutant exposures. Environ Int 2017; 107: 205-215. PMCID: PMC5584560.

314. Grandjean P, Heilmann C, Weihe P, Nielsen F, Mogensen UB, Timmermann A, Budtz-

Jørgensen E. Estimated exposures to perfluorinated compounds in infancy predict attenuated vaccine antibody concentrations at age 5 years. J Immunotoxicol 2017; 14: 188-195. PMCID: PMC6190594

315. Mie A, Andersen HR, Gunnarsson S, Kahl J, Kesse-Guyot E, Rembiałkowska E, Quaglio G, Grandjean P. Human health implications of organic food and organic agriculture: a comprehensive review. Environ Health 2017; 16: 111. PMCID: PMC5658984

316. Olesen TS, Bleses D, Andersen HR, Grandjean P, Frederiksen H, Trecca F, Bilenberg N, Kyhl HB, Dalsager L, Jensen IK, Andersson AM, Jensen TK. Prenatal phthalate exposure and language development in toddlers from the Odense Child Cohort. Neurotoxicol Teratol 2017; 65: 34-41. PMID: 29198963

317. Grandjean P, Bellanger M. Calculation of the disease burden associated with environmental chemical exposures: application of toxicological information in health economic estimation. Environ Health 2017; 16: 123. PMCID: PMC5715994

318. Timmermann CAG, Choi AL, Petersen MS, Nielsen F, Budtz-Jørgensen E, Weihe P, Grandjean P. Secondary Sex Ratio in Relation to Exposures to Polychlorinated Biphenyls, Dichlorodiphenyl Dichloroethylene, and Methylmercury. Int J Circumpolar Health 2017; 76: 1406234. PMCID: PMC5717715

319. Sun Q, Zong G, Valvi D, Nielsen F, Coull B, Grandjean P. Plasma Concentrations of Perfluoroalkyl Substances and Risk of Type 2 Diabetes: A Prospective Investigation among US Women. Environ Health Perspect 2018; 126(3): 037001. PMCID: PMC6071816

320. Liu G, Dhana K, Furtado JD, Rood J, Zong G, Liang L, Qi L, Bray GA, Smith SR, DeJonge L, Coull B, Grandjean P, Sun Q. Perfluoroalkyl Substances and Changes in Body Weight and Resting Metabolic Rate in Response to Weight-Loss Diets: A Prospective Study. PLoS Medicine 2018; 15(2): e1002502. PMCID: PMC5810983

321. Zong G, Valvi D, Coull B, Göen T, Hu FB, Grandjean P, Sun Q. Persistent organic pollutants and risk of type 2 diabetes: A prospective investigation among middle-aged women in Nurses' Health Study II. Environ Int 2018; 114: 334-42. PMCID: PMC5899920

322. Barouki R, Melén E, Herceg Z, Beckers J, Chen J, Karagas M, Puga A, Xia Y, Chadwick L, Yan W, Audouze K, Slama R, Heindel J, Grandjean P, Kawamoto T, Nohara K. Epigenetics as a mechanism linking developmental exposures to long-term toxicity. Environ Int 2018; 114: 77-86. PMCID: PMC5899930

323. Leung YK, Ouyang B, Niu L, Xie C, Ying J, Medvedovic M, Chen A, Weihe P, Grandjean P, Shuk-Mei Ho SM. Identification of sex-specific-methylation changes driven by specific chemicals in cord blood DNA in Faroe Islands birth cohort. Epigenetics 2018. PMCID: PMC5997167

324. Dassuncao C, Hu XC, Nielsen F, Weihe P, Grandjean P, Sunderland EM. Shifting Global Exposures to Poly- and Perfluoroalkyl Substances (PFASs) Evident in Longitudinal Birth Cohorts from a Seafood Consuming Population. Environ Sci Technol 2018; 52(6): 3738-47. PMID: 29516726

325. Audouze K, Taboureau O, Grandjean P. A systems biology approach to predictive developmental neurotoxicity of a larvicide used in the prevention of Zika virus transmission. Toxicol Appl Pharmacol 2018; 354: 56-63. PMCID: PMC6087490

326. Jensen RC, Glintborg D, Timmermann CAG, Nielsen F, Kyhl HB, Andersen HR, Grandjean P, Jensen TK, Andersen M. Perfluoroalkyl Substances and Glycemic Status in Pregnant Danish Women: The Odense Child Cohort. Environ Int 2018; 116: 101-7. PMID: 29660612

327. Hu XC, Dassuncao C, Zhang X, Grandjean P, Weihe P, Webster GM, Nielsen F, Sunderland EM. Can profiles of poly-and Perfluoroalkyl substances (PFASs) in human serum provide information on major exposure sources? Environ Health 2018; 17(1): 11. PMCID: PMC5796515

328. Veyhe AS, Andreassen J, Halling J, Grandjean P, Petersen MS, Weihe P. Prevalence of type 2 diabetes and prediabetes in the Faroe Islands. Diabetes Res Clin Pract 2018; 140: 162-73. PMID: 29596941

329. Andersen HR, Tinggaard J, Grandjean P, Jensen TK, Dalgård C, Main KM. Prenatal pesticide exposure associated with glycated haemoglobin and markers of metabolic dysfunction in adolescents. Environ Res 2018; 166: 71-7.

330. Petersen MS, Debes F, Grandjean P, Weihe P. Gender differences in cognitive performance and health status in the Faroese Septuagenarians cohort. Eur J Public Health 2018.

331. Yorifuji T, Takaoka S, Grandjean P. Accelerated functional losses in ageing congenital Minamata disease patients. Neurotoxicol Teratol 2018, 69: 49-53.

332. Petersen M, Halling J, Jørgensen N, Nielsen F, Grandjean P, Jensen T, Weihe P. Reproductive Function in a Population of Young Faroese Men with Elevated Exposure to Polychlorinated Biphenyls (PCBs) and Perfluorinated Alkylate Substances (PFAS). Int J Environ Res Public Health 2018; 15(9): 1880. PMCID: PMC6165232

333. Budtz-Jørgensen E, Grandjean P. Application of benchmark analysis for mixed contaminant exposures: Mutual adjustment of perfluoroalkylate substances associated with immunotoxicity. PloS One 2018; 13(10): e0205388. PMCID: PMC6195268

334. Grandjean P, Abdennebi-Najar L, Barouki R, Cranor CF, Etzel RA, Gee D, Heindel JJ, Hougaard KS, Hunt P, Nawrot TS, Prins GS. Time scales of developmental toxicity impacting on research and needs for intervention. Basic Clin Pharmacol Toxicol 2018. PMID: 30387920 DOI: 10.1111/bcpt.13162

335. Grandjean P. Delayed discovery, dissemination, and decisions on intervention in environmental health: a case study on immunotoxicity of perfluorinated alkylate substances. Environ Health 2018; 17: 62.

336. Mie A, Rudén C, Grandjean P. Safety of safety evaluation of pesticides: developmental neurotoxicity of chlorpyrifos and chlorpyrifos-methyl. Environ Health 2018; 17: 77.

337. Jensen TK, Mustieles V, Bleses D, Frederiksen H, Trecca F, Schoeters G, Andersen HR, Grandjean P, Kyhl HB, Juul A, Bilenberg N, Andersson AM. Prenatal bisphenol A exposure is associated with language development but not with ADHD-related behavior in toddlers from the Odense Child Cohort. Environ Res 2019; 170: 398-405.

338. Ammitzbøll C, Börnsen L, Petersen ER, Oturai AB, Søndergaard HB, Grandjean P, Sellebjerg F. Perfluorinated substances, risk factors for multiple sclerosis and cellular immune activation. J Neuroimmunol 2019; 330: 90-95.

339. Hu XC, Tokranov AK, Liddie J, Zhang X, Grandjean P, Hart JE, Laden F, Sun Q, Yeung LWY, Sunderland EM. Tap Water Contributions to Plasma Concentrations of Poly- and Perfluoroalkyl Substances (PFAS) in a Nationwide Prospective Cohort of U.S. Women. Environ Health Perspect 2019; 127: 67006.

340. Eryasa B, Grandjean P, Nielsen F, Valvi D, Zmirou-Navier D, Sunderland E, Weihe P, Oulhote Y. Physico-chemical properties and gestational diabetes predict transplacental transfer and partitioning of perfluoroalkyl substances. Environ Int 2019; 130: 104874.

Books

25. Gee D, Grandjean P, Hansen SF, van den Hove S, MacGarvin M, Martin J, Nielsen G, Quist D, Stanners D, eds. Late Lessons from Early Warnings, volume II (EEA Report No 1/2013). Copenhagen, European Environment Agency, 2013, 746 pp.
26. Grandjean P. Only one chance. How Environmental Pollution Impairs Brain Development – and How to Protect the Brains of the Next Generation. New York: Oxford University Press, 2013 (232 pp.).
27. Grandjean P, Hermann P. Kemi på hjernen – går ud over enhver forstand. København: Gyldendal, 2015 (334 sider).
28. Grandjean P. Cerveaux en danger (Brains in danger, in French). Translated by Odile Demange. Paris: Buchet Chastel, 2016 (336 pp.).

Book chapters and other publications

218. Budtz-Jørgensen E, Keiding N, Grandjean P. Approaches to handling uncertainty when setting environmental exposure standards. In: Baveye P, Mysiak J, Laba M, eds. Uncertainties in environmental modelling and consequences for policy making. Dordrecht, The Netherlands: Springer, 2009, pp. 267-80.
219. Grandjean P, Choi AL, Weihe P, Murata K. Methylmercury neurotoxicology: From rare poisonings to silent pandemic. In Wang C, Slikker W Jr, eds: Developmental Neurotoxicological Research: Principles, Models, Techniques, Strategies and Mechanisms. New York: Wiley, 2010, pp 335-56.
220. Straif K, Benbrahim-Tallaa L, Baan R, Grosse Y, Secretan B, El Ghissassi F, Bouvard V, Guha N, Freeman C, Galichet L, Cogliano V; WHO International Agency for Research on Cancer Monograph Working Group. A review of human carcinogens--part C: metals, arsenic, dusts, and fibres. Lancet Oncol 2009; 10: 453-4. PMID: 19418618
221. Grandjean P, Yorifuji T. Mercury (Chapter 8). In: Bingham E, Cohrssen B, eds. Patty's Toxicology, 6th ed. New York: Wiley 2012, Vol. 1, pp 213-27.
222. Takaro TK, Davis D, Van Rensburg S, Jroyo Aguilar RS, ... Grandjean P et al. (108 authors). Scientists appeal to Quebec Premier Charest to stop exporting asbestos to the developing world. Int J Occup Environ Health 2010 16: 242-9.
223. Darney S, Fowler B, Grandjean P, Heindel J, Mattison D, Slikker W Jr. Prenatal programming and toxicity II (PPTOX II): role of environmental stressors in the developmental origins of disease. Reprod Toxicol 2011; 31: 271. Also published in Journal of Developmental Origins of Health and Disease 2011; 2: 2.
224. Choi A, Grandjean P. Human health significance of dietary exposures to methylmercury. In: Liu G, Cai Y, O'Driscoll N, eds. Environmental Chemistry and Toxicology of Mercury. Chichester: Wiley, 2012, pp. 545-67.
225. Grandjean P. Exposure to environmental chemicals as a risk factor for diabetes development. In: Bourguignon J-P, Jégou B, Kerdelhué B, Toppari J, Christen Y, Eds. Multi-System Endocrine Disruption. Berlin: Springer 2011, pp. 91-9.
226. Julvez J, Yorifuji T, Choi AL, Grandjean P. Epidemiological evidence on methylmercury neurotoxicity. In: Aschner M, Ceccatelli S, eds. Methylmercury and Neurotoxicity. Berlin: Springer, 2012, pp. 13-35.
227. Grandjean P. Strengths and limitations of HBM – Imprecision matters. Int J Hyg Environ

Health 2012; 215: 94. PMID:22197511

228. Grandjean P. Larry Needham and the partition ratio. Chemosphere 2011; 85: 142. PMID: 22148142

229. Weihe P, Grandjean P. Cohort studies of Faroese children concerning potential adverse health effects after the mothers' exposure to marine contaminants during pregnancy. Acta Vet Scand 2012; 54(Suppl 1): S7.

230. Fox DA, Grandjean P, de Groot D, Paule M. Developmental origins of adult diseases and neurotoxicity: Epidemiological and experimental studies. Neurotoxicology 2012; 33: 810-6. PMID: 22245043

231. London L, Beseler C, Bouchard Mf, Bellinger DC, Colosio C, Grandjean P, Harari R, Kootbodien T, Kromhout H, Little F, Meijster T, Moretto A, Rohlman DS, Stallones L. Neurobehavioural and neurodevelopmental effects of pesticide exposures. Neurotoxicology 2012; 33: 887-96.

232. Bal-Price AK, Coecke S, Costa L, Crofton KM, Fritsche E, Goldberg A, Grandjean P, Lein PJ, Li A, Lucchini R, Mundy WR, Padilla S, Persico A, Seiler AEM, Kreysa J. Conference Report: Advancing the Science of Developmental Neurotoxicity (DNT) Testing for Better Safety Evaluation. Altex 2012: 29: 202-15.

233. Grandjean P, Heilmann C. Perfluorinated compounds and immunotoxicity in children – Reply (Letter). JAMA 2012; 307: 1910-1.

234. Schug TT, Barouki R, Gluckman P, Grandjean P, Hanson M, Heindel JJ. PPTOX III: Environmental Stressors in the Developmental Origins of Disease: Evidence and Mechanisms. Toxicol Sci 2013; 131: 343-50.

235. Andersen HR, Wohlfahrt-Veje C, Debes F, Nielsen F, Jensen TK, Grandjean P, Main KM. Langtidseffekter af prænatal pesticideksponering (Long-term effects of prenatal pesticide exposure, in Danish). Copenhagen: Miljøstyrelsen (Danish Environmental Protection Agency), 2012.

236. Grandjean P. Blyforgiftning i forebyggelse og forskning (Leder) [Lead poisoning in prevention and research (Editorial)]. Ugeskr Laeger 2012; 174: 2693.

237. Grandjean P, Pichery C, Bellanger M, Budtz-Jørgensen E. Calculation of mercury's effects on neurodevelopment (letter). Environ Health Perspect 2012; 120: a452.

238. Grandjean P, Keiding N. (2013) Precautionary Principle. In: El-Shaarawi AH, Piegorsch W(eds), Encyclopedia of Environmetrics. Chichester, UK: John Wiley, 2013. DOI: 10.1002/9780470057339.vnn011.

239. Grandjean P. Science for precautionary decision-making. In: Gee D, Grandjean P, Hansen SF, van den Hove S, MacGarvin M, Martin J, Nielsen G, Quist D, Stanners D. Late Lessons from Early Warnings, volume II (EEA Report No 1/2013). Copenhagen, European Environment Agency, 2013, pp. 517-35.

240. Grandjean P. Opinion: Toxicants and the Brain. The Scientist 2013 (June 17): 36043.

241. Choi AL, Grandjean P, Sun G, Zhang Y. Developmental fluoride neurotoxicity: Choi et al. respond (Letter). Environ Health Perspect 2013; 121: A70.

242. Grandjean P. Opinion: Problems with Hidden COI. The Scientist 2013 (October 28): 37934.

243. Grandjean P, Budtz-Jørgensen E. Epidemiological approaches to metal toxicology (Chapter 13). In: Nordberg GF, Fowler B, Nordberg M, Friberg LT, eds. Handbook on the toxicology of metals, Volume 1, 4th ed. Amsterdam: Elsevier, 2014, pp. 265-79.

244. Landrigan PJ, Lucchini R, Kotelchuck D, Grandjean P. Principles for prevention of toxic

effects from metals (Chapter 24). In: Nordberg GF, Fowler B, Nordberg M, eds. Handbook on the toxicology of metals, 4th ed. Amsterdam: Elsevier, 2014, pp. 507-28.

245. Grandjean P. Developmental origins of diseases: challenge for risk assessment of chemicals (EUROTOX abstract). Toxicol Lett 2013; 221 Suppl: S15.

246. Grandjean P. Mercury (Chapter 29). In: Landrigan PJ, Etzel RA, eds. Children's Environmental Health. New York: Oxford University Press, 2014, pp. 273-80.

247. Heilmann C, Jensen L, Weihe P, Nielsen F, Knudsen LE, Budtz-Jørgensen E, Mølbak K, Grandjean P. Persistente fluorforbindelser reducerer immunfunktionen (Persistent perfluorinated compounds cause immunotoxic effects, in Danish). Ugeskr Laeg 2015; 177: 660-3. PMID: 25350410

248. Grandjean P. Chemical brain drain: insidious and pervasive. In: Breyer, H, ed. Giftfreies Europa. Brussels, 2014, pp. 133-40.

249. Grandjean P. Mercury (article 02853). In: Caplan M, ed. Reference Module in Biomedical Sciences. Elsevier, 2015.

250. Grandjean P, Landrigan PJ. Neurodevelopmental toxicity: still more questions than answers - Authors' response. Lancet Neurol 2014; 13: 648-9. PMID: 24943339

251. Grandjean P. Prenatal prevention (letter). Science 2014; 345: 1462. PMID : 25237095

252. Grandjean P, Choi AL. Community water fluoridation and intelligence (letter). Am J Public Health 2015; 105: e3. PMCID: PMC4358213

253. Kim BM, Choi AL, Ha EH, Pedersen L, Nielsen F, Weihe P, Hong YC, Budtz- Jørgensen E, Grandjean P. Corrigendum to 'Effect of hemoglobin adjustment on the precision of mercury concentrations in maternal and cord blood' [Environ. Res. 132 (2014) 407-412]. Environ Res. 2016; 147: 630. PMID: 27040412

254. Choi AL, Zhang Y, Sun G, Bellinger DC, Wang K, Yang XJ, Li JS, Zheng Q, Fu Y, Grandjean P. Comment on "Severe dental fluorosis and cognitive deficits". Neurotoxicol Teratol 2015; 50: 32. PMID: 25986437

255. Oulhote Y, Grandjean P. Association between child poverty and academic achievement (letter). JAMA Pediatr 2016; 170: 179-80. PMID: 26720161

256. Kielsen K, Shamim Z, Ryder LP, Grandjean P, Heilmann C. Vaccination efficacy and environmental pollution. In: Esser C (ed.). Environmental Influences on the Immune System. Vienna: Springer, 2016, pp. 181-203.

257. Trasande L, Attina T, Skakkebaek NE, Juul A, Porta M, Soto AM, Vandenberg L, Sathyanarayana S, Fletcher T, Demeneix B, Bergman A, Cohn BA, Bellanger M, Gore AC, Legler J, Bourguignon JP, Slama R, Toppari J, Blumberg B, Myers JP, Zoeller RT, Kortenkamp A, DiGangi J, Philippe Grandjean P, Russ Hauser R, Rudel R. Endocrine disruptors: Refereed science to guide action on EDCs (Correspondence). Nature 2016; 536: 30.

258. Mie A, Guyot EK, Kahl J, Rembiałkowska E, Andersen HR, Grandjean, P, Gunnarsson S. Health implications of organic food and organic agriculture. Science and Technology Options Assessment Panel, Directorate-General for Parliamentary Research Services (DG EPRS) of the European Parliament, 2016.

259. Grandjean P, Kishi R, Kogevinas M; International Society for Environmental Epidemiology (ISEE). Prevention of developmental neurotoxicity. Epidemiology 2017; 28: 157-158. PMID: 27922529.

260. Oulhote Y, Bind MA, Coull B, Patel CJ, Grandjean P. combining ensemble learning techniques and G-computation to investigate chemical mixtures in environmental epidemiology studies. bioRxiv 2017 doi.org/10.1101/147413.

261. Budtz-Jørgensen E, Grandjean P. Application of benchmark analysis for mixed contaminant exposures: Mutual adjustment of two perfluoroalkylate substances associated with immunotoxicity. bioRxiv 2017 doi.org/10.1101/198564.

262. Fritsche E, Grandjean P, Crofton KM, Aschner M, Goldberg A, Heinonen T, Hessel EV, Hogberg H, Bennekou SH, Lein PJ, Leist M. Consensus statement on the need for innovation, transition and implementation of developmental neurotoxicity (DNT) testing for regulatory purposes. Toxicol Appl Pharmacol 2018; doi: 10.1016/j.taap.2018.02.004. Available at: https://www.sciencedirect.com/science/article/pii/S0041008X18300437?via%3Dihub

263. Grandjean P. Health status of workers exposed to perfluorinated alkylate substances (Letter). J Occup Environ Med 2018; 60(10): e562.

264. Grandjean P, Lederman SA, Silbergeld EK. Fish Consumption during Pregnancy. JAMA Pediatr 2019 (in press) doi: 10.1001/jamapediatrics.2018.4920

265. Grandjean P, Prins GS, Weihe P. Development Priority (Editorial). Basic Clin Pharmacol Toxicol 2019 (in press) doi: 10.1111/bcpt.13249

# EXHIBIT D

## CITED PUBLICATIONS

1.  National Research Council (NRC): Fluoride in Drinking Water: A Scientific Review of EPA's Standards. Washington, DC: The National Academies Press; 2006.
2.  Roholm K: Fluorine Intoxication. A Clinical-Hygienic Study, with a Review of the Literature and Some Experimental Investigations. Fluorine Intoxication. A Clinical-Hygienic Study, with a Review of the Literature and Some Experimental Investigations. London: H.K. Lewis; 1937.
3.  Grandjean P, Thomsen G: Reversibility of skeletal fluorosis. *Br J Ind Med* 1983, 40(4):456-461.
4.  Grandjean P, Juel K, Jensen OM: Mortality and cancer morbidity after heavy occupational fluoride exposure. *Am J Epidemiol* 1985, 121(1):57-64.
5.  Grandjean P, Horder M, Thomassen Y: Fluoride, aluminum, and phosphate kinetics in cryolite workers. *J Occup Med* 1990, 32(1):58-63.
6.  Grandjean P, Olsen JH, Jensen OM, Juel K: Cancer incidence and mortality in workers exposed to fluoride. *J Natl Cancer Inst* 1992, 84(24):1903-1909.
7.  Grandjean P, Olsen JH, Juel K: Excess cancer incidence among workers exposed to fluoride. *Scand J Work Environ Health* 1993, 19 Suppl 1:108-109.
8.  Grandjean P, Olsen JH: Extended follow-up of cancer incidence in fluoride-exposed workers. *J Natl Cancer Inst* 2004, 96(10):802-803.
9.  Choi AL, Sun G, Zhang Y, Grandjean P: Developmental fluoride neurotoxicity: a systematic review and meta-analysis. *Environ Health Perspect* 2012, 120(10):1362-1368.
10. Choi AL, Zhang Y, Sun G, Bellinger DC, Wang K, Yang XJ, Li JS, Zheng Q, Fu Y, Grandjean P: Association of lifetime exposure to fluoride and cognitive functions in Chinese children: a pilot study. *Neurotoxicol Teratol* 2015, 47:96-101.
11. EFSA Scientific Committee (EFSA): Guidance of the Scientific Committee on Use of the benchmark dose approach in risk assessment. *The EFSA Journal* 2009, 1150:1-72.
12. Duan Q, Jiao J, Chen X, Wang X: Association between water fluoride and the level of children's intelligence: a dose-response meta-analysis. *Public Health* 2018, 154:87-97.
13. National Toxicology Program (NTP): Systematic literature review on the effects of fluoride on learning and memory in animal studies. Research Report 1. Research Triangle Park, NC: National Institute of Environmental Health Sciences; 2016.
14. Boyle CA, Boulet S, Schieve LA, Cohen RA, Blumberg SJ, Yeargin-Allsopp M, Visser S, Kogan MD: Trends in the prevalence of developmental disabilities in US children, 1997-2008. *Pediatrics* 2011, 127(6):1034-1042.
15. Bennett D, Bellinger DC, Birnbaum LS, Bradman A, Chen A, Cory-Slechta DA, Engel SM, Fallin MD, Halladay A, Hauser R *et al*: Project TENDR: Targeting Environmental Neuro-Developmental Risks The TENDR Consensus Statement. *Environ Health Perspect* 2016, 124(7):A118-122.
16. Landrigan PJ, Whitworth RH, Baloh RW, Staehling NW, Barthel WF, Rosenblum BF: Neuropsychological dysfunction in children with chronic low-level lead absorption. *Lancet* 1975, 1(7909):708-712.
17. Needleman HL, Gunnoe C, Leviton A, Reed R, Peresie H, Maher C, Barrett P: Deficits in psychologic and classroom performance of children with elevated dentine lead levels. *N Engl J Med* 1979, 300(13):689-695.

18. Baghurst PA, Robertson EF, McMichael AJ, Vimpani GV, Wigg NR, Roberts RR: The Port Pirie Cohort Study: lead effects on pregnancy outcome and early childhood development. *Neurotoxicology* 1987, 8(3):395-401.

19. Dietrich KN, Krafft KM, Bornschein RL, Hammond PB, Berger O, Succop PA, Bier M: Low-level fetal lead exposure effect on neurobehavioral development in early infancy. *Pediatrics* 1987, 80(5):721-730.

20. Dobbing J: Vulnerable periods in developing brain. In: *Applied Neurochemistry.* Davidson A, Dobbing J, eds. Philadelphia: Davis; 1968: 287-316.

21. Rodier PM: Developing brain as a target of toxicity. *Environ Health Perspect* 1995, 103 Suppl 6:73-76.

22. Rice D, Barone S, Jr.: Critical periods of vulnerability for the developing nervous system: evidence from humans and animal models. *Environ Health Perspect* 2000, 108 Suppl 3:511-533.

23. Organisation for Economic Cooperation and Development (OECD): OECD Guideline for the Testing of Chemicals: Developmental Neurotoxicity Study. Paris: OECD; 2007.

24. Bal-Price A, Hogberg HT, Crofton KM, Daneshian M, FitzGerald RE, Fritsche E, Heinonen T, Hougaard Bennekou S, Klima S, Piersma AH *et al*: Recommendation on test readiness criteria for new approach methods in toxicology: Exemplified for developmental neurotoxicity. *ALTEX* 2018, 35(3):306-352.

25. Andersen HR, Nielsen JB, Grandjean P: Toxicologic evidence of developmental neurotoxicity of environmental chemicals. *Toxicology* 2000, 144(1-3):121-127.

26. Sakamoto M, Kubota M, Liu XJ, Murata K, Nakai K, Satoh H: Maternal and fetal mercury and n-3 polyunsaturated fatty acids as a risk and benefit of fish consumption to fetus. *Environ Sci Technol* 2004, 38(14):3860-3863.

27. Adinolfi M: The development of the human blood-CSF-brain barrier. *Dev Med Child Neurol* 1985, 27(4):532-537.

28. National Research Council (NRC): Pesticides in the diets of infants and children. Washington, D.C.: National Academy Press; 1993.

29. Ginsberg G, Hattis D, Sonawane B: Incorporating pharmacokinetic differences between children and adults in assessing children's risks to environmental toxicants. *Toxicol Appl Pharmacol* 2004, 198(2):164-183.

30. Grandjean P, Landrigan PJ: Developmental neurotoxicity of industrial chemicals. *Lancet* 2006, 368(9553):2167-2178.

31. Grandjean P, Landrigan PJ: Neurobehavioural effects of developmental toxicity. *Lancet Neurol* 2014, 13(3):330-338.

32. Choi AL, Grandjean P, Sun G, Zhang Y: Developmental fluoride neurotoxicity: Choi et al. Respond. *Environ Health Perspect* 2013, 121(3):A70.

33. Grandjean P, Abdennebi-Najar L, Barouki R, Cranor CF, Etzel RA, Gee D, Heindel JJ, Hougaard KS, Hunt P, Nawrot TS *et al*: Timescales of developmental toxicity impacting on research and needs for intervention. *Basic Clin Pharmacol Toxicol* 2018.

34. Grandjean P: Only one chance. How Environmental Pollution Impairs Brain Development – and How to Protect the Brains of the Next Generation. New York: Oxford University Press; 2013.

35. Needleman HL: What can the study of lead teach us about other toxicants? *Environ Health Perspect* 1990, 86:183-189.

36. Grandjean P, Barouki R, Bellinger DC, Casteleyn L, Chadwick LH, Cordier S, Etzel RA, Gray KA, Ha EH, Junien C *et al*: Life-Long Implications of Developmental Exposure to Environmental Stressors: New Perspectives. *Endocrinology* 2015, 156(10):3408-3415.

37. World Health Organization: Fluoride in drinking-water. In: Fawell J, Bailey K, Chilton E, Dahi E, Fewtrell L, Magara Y, eds. London, UK: IWA Publishing; 2006.

38. USDA Nutrient Data Laboratory: National Fluoride Database of Selected Beverages and Foods, Release 2. Washington, D.C.: U.S. Department of Agriculture; 2005.

39. Allukian M, Jr., Wong C: Fluoridation update 2014. *J Mass Dent Soc* 2014, 63(2):24-30.

40. Centers for Disease Control and Prevention (CDC): Ten Great Public Health Achievements -- United States, 1900-1999. *Morb Mortal Wkly Rep* 1999, 48:241-243.

41. Cheng KK, Chalmers I, Sheldon TA: Adding fluoride to water supplies. *BMJ* 2007, 335(7622):699-702.

42. United States Environmental Protection Agency (U.S. EPA): Fluoride: Exposure and Relative Source Contribution Analysis. Washington, DC: Health and Ecological Criteria Division, Office of Water, U.S. EPA; 2010.

43. Kakumanu N, Rao SD: Images in clinical medicine. Skeletal fluorosis due to excessive tea drinking. *N Engl J Med* 2013, 368(12):1140.

44. Waugh DT, Godfrey M, Limeback H, Potter W: Black Tea Source, Production, and Consumption: Assessment of Health Risks of Fluoride Intake in New Zealand. *J Environ Public Health* 2017, 2017:5120504.

45. O'Mullane DM, Baez RJ, Jones S, Lennon MA, Petersen PE, Rugg-Gunn AJ, Whelton H, Whitford GM: Fluoride and Oral Health. *Community Dent Health* 2016, 33(2):69-99.

46. Luke J: Fluoride deposition in the aged human pineal gland. *Caries Res* 2001, 35(2):125-128.

47. Ekstrand J, Boreus LO, de Chateau P: No evidence of transfer of fluoride from plasma to breast milk. *Br Med J (Clin Res Ed)* 1981, 283(6294):761-762.

48. Bhatnagar M, Rao P, Sushma J, Bhatnagar R: Neurotoxicity of fluoride: neurodegeneration in hippocampus of female mice. *Indian J Exp Biol* 2002, 40(5):546-554.

49. Pereira M, Dombrowski PA, Losso EM, Chioca LR, Da Cunha C, Andreatini R: Memory impairment induced by sodium fluoride is associated with changes in brain monoamine levels. *Neurotox Res* 2011, 19(1):55-62.

50. He H, Cheng Z, Liu W: Effects of fluorine on the human fetus. *Fluoride* 2008, 41(4):321-326.

51. Hu YH, Wu SS: Fluoride in cerebrospinal fluid of patients with fluorosis. *J Neurol Neurosurg Psychiatry* 1988, 51(12):1591-1593.

52. Gori S, Inno A, Lunardi G, Gorgoni G, Malfatti V, Severi F, Alongi F, Carbognin G, Romano L, Pasetto S *et al*: 18F-Sodium Fluoride PET-CT for the Assessment of Brain Metastasis from Lung Adenocarcinoma. *J Thorac Oncol* 2015, 10(8):e67-68.

53. Jones RP, Iagaru A: 18F NaF brain metastasis uptake in a patient with melanoma. *Clin Nucl Med* 2014, 39(10):e448-450.

54. Salgarello M, Lunardi G, Inno A, Pasetto S, Severi F, Gorgoni G, Gori S: 18F-NaF PET/CT Imaging of Brain Metastases. *Clin Nucl Med* 2016, 41(7):564-565.

55. Wu J, Zhu H, Ji H: Unexpected detection of brain metastases by 18F-NaF PET/CT in a patient with lung cancer. *Clin Nucl Med* 2013, 38(11):e429-432.

56. Shen YW, Taves DR: Fluoride concentrations in the human placenta and maternal and cord blood. *Am J Obstet Gynecol* 1974, 119(2):205-207.

57. Ron M, Singer L, Menczel J, Kidroni G: Fluoride concentration in amniotic fluid and fetal cord and maternal plasma. *Eur J Obstet Gynecol Reprod Biol* 1986, 21(4):213-218.

58. Opydo-Szymaczek J, Borysewicz-Lewicka M: Transplacental passage of fluoride in pregnant Polish women assessed on the basis of fluoride concentrations in maternal and cord blood plasma. *Fluoride* 2007, 40(1):46-50.

59. Forestier F, Daffos F, Said R, Brunet CM, Guillaume PN: [The passage of fluoride across the placenta. An intra-uterine study]. *J Gynecol Obstet Biol Reprod (Paris)* 1990, 19(2):171-175.

60. Du L, Wan C, Cao X, Liu J: The effect of fluorine on the developing human brain. *Fluoride* 2008, 41(4):327-330.

61. Agency for Toxic Substances and Disease Registry (ATSDR): Toxicological profile for fluorides, hydrogen fluoride, and fluorine (update). Atlanta, GA: Agency for Toxic Substances and Disease Registry; 2003.

62. Ekstrand J, Ehrnebo M: The relationship between plasma fluoride, urinary excretion rate and urine fluoride concentration in man. *J Occup Med* 1983, 25(10):745-748.

63. Villa A, Anabalon M, Cabezas L: The fractional urinary fluoride excretion in young children under stable fluoride intake conditions. *Community Dent Oral Epidemiol* 2000, 28(5):344-355.

64. Opydo-Symaczek J, Borysewicz-Lewicka M: Urinary fluoride levels for assessment of fluoride exposure of pregnant women in Poznan, Poland. *Fluoride* 2005, 38(4):312-317.

65. Till C, Green R, Grundy JG, Hornung R, Neufeld R, Martinez-Mier EA, Ayotte P, Muckle G, Lanphear B: Community Water Fluoridation and Urinary Fluoride Concentrations in a National Sample of Pregnant Women in Canada. *Environ Health Perspect* 2018, 126(10):107001.

66. Mansfield P: The distribution of urinary fluoride concentration in the UK. *Fluoride* 1999, 32(1):27-32.

67. McLaren L: Fluoridation Exposure Status Based on Location of Data Collection in the Canadian Health Measures Survey: Is It Valid? *J Can Dent Assoc* 2016, 82:g17.

68. Malin AJ, Riddell J, McCague H, Till C: Fluoride exposure and thyroid function among adults living in Canada: Effect modification by iodine status. *Environ Int* 2018, 121(Pt 1):667-674.

69. McClure FJ, Kinser, C.A.: Fluoride domestic waters and systemic effects. *Public Health Reports* 1944, 59(49):1575-1591.

70. Smith FA, Gardner DE, Hodge HC: Investigations on the metabolism of fluoride. II. Fluoride content of blood and urine as a function of the fluorine in drinking water. *J Dent Res* 1950, 29(5):596-600.

71. Jain RB: Concentrations of fluoride in water and plasma for US children and adolescents: Data from NHANES 2013-2014. *Environ Toxicol Pharmacol* 2017, 50:20-31.

72. Ekstrand J, Fomon SJ, Ziegler EE, Nelson SE: Fluoride pharmacokinetics in infancy. *Pediatr Res* 1994, 35(2):157-163.

73. Fejerskov O, Manji F, Baelum V: The nature and mechanisms of dental fluorosis in man. *J Dent Res* 1990, 69 Spec Issue:692-700.

74. National Research Council (NRC): Report of the Ad Hoc Committee on the Fluoridation of Water Supplies. Washington, DC: National Research Council; 1951.

75. Beltran-Aguilar ED, Griffin SO, Lockwood SA: Prevalence and trends in enamel fluorosis in the United States from the 1930s to the 1980s. *J Am Dent Assoc* 2002, 133(2):157-165.

76. Heller KE, Eklund SA, Burt BA: Dental caries and dental fluorosis at varying water fluoride concentrations. *J Public Health Dent* 1997, 57(3):136-143.

77. U.S. Department of Health and Human Services Federal Panel on Community Water Fluoridation: U.S. Public Health Service Recommendation for Fluoride Concentration in Drinking Water for the Prevention of Dental Caries. *Public Health Rep* 2015, 130(4): 318-331.

78. Wiener RC, Shen C, Findley P, Tan X, Sambamoorthi U: Dental Fluorosis over Time: A comparison of National Health and Nutrition Examination Survey data from 2001-2002 and 2011-2012. *J Dent Hyg* 2018, 92(1):23-29.

79. National Center for Health Statistics (U.S.): Data quality evaluation of the dental fluorosis clinical assessment data from the National Health and Nutrition Examination Survey, 1999-2004 and 2011-2016. Hyattsville, Maryland: National Center for Health Statistics; 2019.

80. McDonagh MS, Whiting PF, Wilson PM, Sutton AJ, Chestnutt I, Cooper J, Misso K, Bradley M, Treasure E, Kleijnen J: Systematic review of water fluoridation. *BMJ* 2000, 321(7265):855-859.

81. Levy SM: A review of fluoride intake from fluoride dentifrice. *ASDC J Dent Child* 1993, 60(2):115-124.

82. United States Department of Health and Human Services (DHSS): Trends in Breast Feeding among American Mothers. Hyattsville, MD: National Center for Health Statistics, Division of Vital Statistics; 1979.

83. IARC: Preamble: IARC monographs on the evaluation of carcinogenic risks to humans. http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf. Lyon, France; 2006.

84. Li X, Zhi J, Gao R: Effect of fluoride exposure on intelligence in children. *Fluoride* 1995, 28(4):189-192.

85. Lu Y, Sun ZR, Wu LN, Wang X, Lu W, Liu SS: Effect of high-fluoride water on intelligence of children. *Fluoride* 2000, 33(2):74-78.

86. Xiang Q, Liang Y, Chen L, Wang C, Chen B, Chen X, Zhou M: Effect of fluoride in drinking water on children's intelligence. *Fluoride* 2003, 36(2):84-94.

87. Zhao L, Liang G, Zhang D, Wu X: Effect of a High Fluoride Water Supply on Children's Intelligence. *Fluoride* 1996, 29(4):190-192.

88. World Health Organization (International Programme on Chemical Safety): Fluorides. In: *Environmental Health Criteria.* vol. 227. Geneva: WHO; 2002.

89. Ferry JL: Request for Animal Experimentation to Determine Central Nervous System Effects. In: Warren SL, ed. Memorandum edn. Rochester, NY; 1944.

90. Mullenix PJ: Fluoride poisoning: a puzzle with hidden pieces. *Int J Occup Environ Health* 2005, 11(4):404-414.

91. Duan J, Zhao M, Wang L, Fang D, Wang Y, Wang W: A comparative analysis of the results of multiple tests in patients with chronic industrial fluorosis. *Guizhou Medical Journal* 1995, 18(3):179-180.

92. Spittle B: Psychopharmacology of fluoride: a review. *Int Clin Psychopharmacol* 1994, 9(2):79-82.

93. Yazdi SM, Sharifian A, Dehghani-Beshne M, Momeni VR, Aminian O: Effects of fluoride on psychomotor performance and memory of aluminum potroom workers. *Fluoride* 2011, 44(3):158-162.

94. Guo Z, He Y, Zhu Q: Research on the neurobehavioral function of workers occupationally exposed to fluoride. *Fluoride* 2008, 41(2):152-155.

95. Yu Y, Yang W, Dong Z, Wan C, Zhang J, Liu J, Xiao K, Huang Y, Lu B: Neurotransmitter and receptor changes in the brains of fetuses from areas of endemic fluorosis. *Fluoride* 2008, 41(2):134-138.

96. Dong Z, Wan C, Zhang X, Liu J: Determination of the contents of amino-acid and monoamine neurotransmitters in fetal brains from a fluorosis-endemic area. *J Guiyang Med Coll* 1993, 18:241-245.

97. Li J, Yao L, Shao QL, Wu CY: Effects of high fluoride level on neonatal neurobehavioral development. *Fluoride* 2008, 41(2):165-170.

98. Chang A, Shi Y, Sun H, Zhang L: Analysis on the effect of coal-burning fluorosis on the physical development and intelligence development of newborns delivered by pregnant women with coal-burning fluorosis. *Chinese Journal of Control of Endemic Diseases* 2017, 32(8):872-873.

99. Shao QL, Wang Y, Li L, Li J: Initial study of cognitive function impairment as caused by chronic fluorosis. *Chinese Journal of Endemiology* 2003, 22(4):336-338.

100. Li M, Gao Y, Cui J, Li Y, Li B, Liu Y, Sun J, Liu X, Liu H, Zhao L *et al*: Cognitive Impairment and Risk Factors in Elderly People Living in Fluorosis Areas in China. *Biol Trace Elem Res* 2016, 172(1):53-60.

101. Sharma JD, Sohu D, Jain P: Prevalence of neurological manifestations in a human population exposed to fluoride in drinking water. *Fluoride* 2009, 42(2):127-132.

102. Tang Q, Du J, Ma H, Jiang S, Zhou X: Fluoride and children's intelligence: a meta-analysis. *Bio Trace Elem Res* 2008, 126:115-120.

103. Scientific Committee on Health and Environmental Risks (SCHER): Critical review of any new evidence on the hazard profile, health effects, and human exposure to fluoride and the fluoridating agents of drinking water. Brussels, Belgium; 2010.

104. Li FH, Chen X: Meta-analysis of the effect of endemic fluorosis on children's intelligence development. *Chinese General Practice* 2007, 10(8):618-619.

105. Wang C, Gao Y, Wang W, Zhao L, Zhang W, Han H, Shi Y, Yu G, Sun D: A national cross-sectional study on effects of fluoride-safe water supply on the prevalence of fluorosis in China. *BMJ Open* 2012, 2(5).

106. Poureslami H, Horri A, Atash R: High fluoride exposure in drinking water: effect on children's IQ, one new report. *Int J Pediatr Dent* 2011, 21(Suppl 1):47.

107. Seraj B, Shahrabi M, Falahzade M, Falahzade F, Akhondi N: Effect of High Fluoride Concentration in Drinking Water on Children's Intelligence. *Journal of Dental Medicine* 2006, 19(2):80-86.

108. Guo X, Wang R, Cheng C, Wei W, Tang L, Wang Q, Tang D, Liu G, He G, Li S: A preliminary exploration of IQ of 7-13 year old pupils in a fluorosis area with contamination from burning coal. *Chinese Journal of Endemiology* 1991, 10:98-100 (Also available: Fluoride 2008, 2041(2002):2125-2128).

109. Li X, Hou G, Yu B, Yuan C, Liu Y, Zhang L, Chi C: Investigation and analysis of children's intelligence and dental fluorosis in high fluoride area (in Chinese). *J Med Pest Control* 2010, 26(3):230-231.

110. Egger M, Davey Smith G, Altman D: Systematic reviews in health care meta-analysis in context. London: BMJ Publishing; 2001.

111. Broadbent JM, Thomson WM, Ramrakha S, Moffitt TE, Zeng J, Foster Page LA, Poulton R: Community Water Fluoridation and Intelligence: Prospective Study in New Zealand. *Am J Public Health* 2015, 105(1):72-76.

112. Allukian M, Jr., Carter-Pokras OD, Gooch BF, Horowitz AM, Iida H, Jacob M, Kleinman DV, Kumar J, Maas WR, Pollick H *et al*: Science, Politics, and Communication: The Case of Community Water Fluoridation in the US. *Ann Epidemiol* 2018, 28(6):401-410.

113. United States Environmental Protection Agency (U.S. EPA): Six-Year Review 3 - Health Effects Assessment for Existing Chemical and Radionuclide National Primary Drinking Water Regulations - Summary Report. Office of Science and Technology, Office of Water, U.S. EPA. Washington, DC; 2016.

114. United States Environmental Protection Agency (U.S. EPA): EPA and HHS Announce New Scientific Assessments and Actions on Fluoride / Agencies working together to maintain benefits of preventing tooth decay while preventing excessive exposure. 2011.

115. Ding Y, YanhuiGao, Sun H, Han H, Wang W, Ji X, Liu X, Sun D: The relationships between low levels of urine fluoride on children's intelligence, dental fluorosis in endemic fluorosis areas in Hulunbuir, Inner Mongolia, China. *J Hazard Mater* 2011, 186(2-3):1942-1946.

116. Zhang PH, Cheng L: Effect of coal-burning endemic fluorosis on children's physical development and intellectual level. *Chinese Journal of Control of Endemic Diseases* 2015, 30(6):458-460.

117. Cui Y, Zhang B, Ma J, Wang Y, Zhao L, Hou C, Yu J, Zhao Y, Zhang Z, Nie J *et al*: Dopamine receptor D2 gene polymorphism, urine fluoride, and intelligence impairment of children in China: A school-based cross-sectional study. *Ecotoxicol Environ Saf* 2018, 165:270-277.

118. Zhu L, Petersen PE, Wang HY, Bian JY, Zhang BX: Oral health knowledge, attitudes and behaviour of children and adolescents in China. *Int Dent J* 2003, 53(5):289-298.

119. Hong F, Cao Y, Yang D: A study of fluorine effects on children's intelligence development under different environments. *Chinese Primary Health Care* 2001, 15:56-57 (Also available: Fluoride 2008, 2041(2002):2156-2160).

120. Lin F, Ai H, Zhao H, Lin J, Jhiang J, Maimaiti., Aiken.: High fluoride and low iodine environment and subclinical cretinism in Xinjiang (in Chinese). *Endemic Dis Bull* 1991, 6(2):62-67.

121. Wang S, Wang L, Hu P, Guo S, Law S: Effects of high iodine and high fluorine on children's intelligence and thyroid function (in Chinese). *Chinese Journal of Endemiology* 2001, 20(4):288-290.

122. Wang SX, Wang ZH, Cheng XT, Li J, Sang ZP, Zhang XD, Han LL, Qiao XY, Wu ZM, Wang ZQ: Arsenic and fluoride exposure in drinking water: children's IQ and growth in Shanyin county, Shanxi province, China. *Environ Health Perspect* 2007, 115(4):643-647.

123. Xiang Q, Liang Y, Zhou M, Zang H: Blood lead of children in Wamiao-Xinhuai intelligence study (Letter to the Editor). *Fluoride* 2003, 36(3):198-199.

124. Xiang Q, wang Y, Yang M, Zhang M, Xu Y: Level of fluoride and arsenic in household shallow well water in Wamiao and Xinhuai villages in Jiangsu Province, China. *Fluoride* 2013, 46(4):192-197.

125. Choi AL, Cordier S, Weihe P, Grandjean P: Negative confounding in the evaluation of toxicity: the case of methylmercury in fish and seafood. *Crit Rev Toxicol* 2008, 38(10):877-893.

126. Dong L, Yao P, Chen W, Li P, Shi X: Investigation of Dental Fluorosis and Intelligence Levels of Children in Drinking Water-Related Endemic Fluorosis Area of Xi'an. *Chinese Journal of Epidemiology* 2018, 37(1):45-48.

127. Bai Z, Li Y, Fan Z, Li X, Li P: Investigation and analysis of the development of intelligence levels and growth of children in areas suffering fluorine and arsenic toxicity from pollution from burning coal. *Chinese Journal of Epidemiology* 2014, 33(2):160-163.

128. Jin T, Wang Z, Wei Y, Wu Y, Han T, Zhang H: Investigation of Intelligence Levels of Children of 8 to 12 Years of Age in Coal Burning-Related Endemic Fluorosis Areas. *Journal of Environment and health* 2017, 34(3):229-231.

129. Pang H, Yu L, Lai X, Chen Q: Relation Between Intelligence and COMT Gene Polymorphism in Children Aged 8-12 in the Endemic Fluorosis Area and Non-Endemic Fluorosis Area *Chinese Journal of Control of Endemic Diseases* 2018, 33(2):151-152.

130. Wei N, Li Y, Deng J, Xu S, Guan Z: The Effects of Comprehensive Control Measures on Intelligence of School-Age Children in Coal-Burning-Borne Endemic Fluorosis Areas *Chinese Journal of Endemiology* 2014, 33(3):320-324.

131. Zhang S, Zhang X, Liu H, Qu W, Guan Z, Zeng Q, Jiang C, Gao H, Zhang C, Lei R *et al*: Modifying effect of COMT gene polymorphism and a predictive role for proteomics analysis in children's intelligence in endemic fluorosis area in Tianjin, China. *Toxicol Sci* 2015, 144(2):238-245.

132. Julvez J, Grandjean P: Genetic susceptibility to methylmercury developmental neurotoxicity matters. *Front Genet* 2013, 4:278.

133. Newbrun E: What we know and do not know about fluoride. *J Public Health Dent* 2010, 70(3):227-233.

134. Aoba T, Fejerskov O: Dental fluorosis: chemistry and biology. *Crit Rev Oral Biol Med* 2002, 13(2):155-170.

135. Morgan L, Allred E, Tavares M, Bellinger D, Needleman H: Investigation of the possible associations between fluorosis, fluoride exposure, and childhood behavior problems. *Pediatr Dent* 1998, 20(4):244-252.

136. Reuben A, Caspi A, Belsky DW, Broadbent J, Harrington H, Sugden K, Houts RM, Ramrakha S, Poulton R, Moffitt TE: Association of Childhood Blood Lead Levels With Cognitive Function and Socioeconomic Status at Age 38 Years and With IQ Change and Socioeconomic Mobility Between Childhood and Adulthood. *JAMA* 2017, 317(12):1244-1251.

137. Broadbent JM, Thomson WM, Moffitt TE, Poulton R: Broadbent et al. Respond. *Am J Public Health* 2016, 106(2):213-214.

138. Grigg D: The worlds of tea and coffee: Patterns of consumption. *GeoJournal* 2002, 57(4):283-294.

139. Osmunson B, Limeback H, Neurath C: Study Incapable Of Detecting IQ Loss From Fluoride. *Am J Public Health* 2016, 106(2):212-213.

140. Shannon FT, Fergusson DM, Horwood LJ: Exposure to fluoridated public water supplies and child health and behaviour. *N Z Med J* 1986, 99(803):416-418.

141.   Valdez Jimenez L, Lopez Guzman OD, Cervantes Flores M, Costilla-Salazar R, Calderon Hernandez J, Alcaraz Contreras Y, Rocha-Amador DO: In utero exposure to fluoride and cognitive development delay in infants. *Neurotoxicology* 2017, 59:65-70.

142.   Bashash M, Thomas D, Hu H, Martinez-Mier EA, Sanchez BN, Basu N, Peterson KE, Ettinger AS, Wright R, Zhang Z *et al*: Prenatal Fluoride Exposure and Cognitive Outcomes in Children at 4 and 6-12 Years of Age in Mexico. *Environ Health Perspect* 2017, 125(9):097017.

143.   Bashash M, Marchand M, Hu H, Till C, Martinez-Mier EA, Sanchez BN, Basu N, Peterson KE, Green R, Schnaas L *et al*: Prenatal fluoride exposure and attention deficit hyperactivity disorder (ADHD) symptoms in children at 6-12 years of age in Mexico City. *Environ Int* 2018, 121(Pt 1):658-666.

144.   Green R, Lanphear B, Hornung R, Flora D, Martinez-Mier A, Muckle G, Ayotte P, Till C: Fluoride exposure during fetal development and childhood IQ: The MIREC Study. In: *ISES-ISEE Joint Annual Meeting: 2018; Ottawa, Canada*; 2018.

145.   Hong L, Levy SM, Broffitt B, Warren JJ, Kanellis MJ, Wefel JS, Dawson DV: Timing of fluoride intake in relation to development of fluorosis on maxillary central incisors. *Community Dent Oral Epidemiol* 2006, 34(4):299-309.

146.   Aggeborn L, Ohman M: The Effects of Fluoride in Drinking Water. Institute for Evaluation of Labour Market and Education Policy. Uppsala, Sweden; 2017: 1-83.

147.   Malin AJ, Till C: Exposure to fluoridated water and attention deficit hyperactivity disorder prevalence among children and adolescents in the United States: an ecological association. *Environ Health* 2015, 14:17.

148.   Barberio AM, Quinonez C, Hosein FS, McLaren L: Fluoride exposure and reported learning disability diagnosis among Canadian children: Implications for community water fluoridation. *Can J Public Health* 2017, 108(3):e229-e239.

149.   Gao Q, Liu YJ, Guan ZZ: Oxidative stress might be a mechanism connected with the decreased alpha 7 nicotinic receptor influenced by high-concentration of fluoride in SH-SY5Y neuroblastoma cells. *Toxicol In Vitro* 2008, 22(4):837-843.

150.   Goschorska M, Baranowska-Bosiacka I, Gutowska I, Tarnowski M, Piotrowska K, Metryka E, Safranow K, Chlubek D: Effect of acetylcholinesterase inhibitors donepezil and rivastigmine on the activity and expression of cyclooxygenases in a model of the inflammatory action of fluoride on macrophages obtained from THP-1 monocytes. *Toxicology* 2018, 406-407:9-20.

151.   Mullenix P, Denbesten P, Schunior A, Kernan W: Neurotoxicity of sodium fluoride in rats. *Neurotoxicol Teratol* 1995, 17:169-177.

152.   Varner J, Jensen K, Horvath W, Isaacson R: Chronic administration of aluminum-fluoride or sodium-fluoride to rats in drinking water: alterations in neuronal and cerebrovascular integrity. *Brain Res* 1998, 784:284-298.

153.   Chen J, Niu Q, Xia T, Zhou G, Li P, Zhao Q, Xu C, Dong L, Zhang S, Wang A: ERK1/2-mediated disruption of BDNF-TrkB signaling causes synaptic impairment contributing to fluoride-induced developmental neurotoxicity. *Toxicology* 2018.

154.   Bartos M, Gumilar F, Gallegos CE, Bras C, Dominguez S, Monaco N, Esandi MDC, Bouzat C, Cancela LM, Minetti A: Alterations in the memory of rat offspring exposed to low levels of fluoride during gestation and lactation: Involvement of the alpha7 nicotinic receptor and oxidative stress. *Reprod Toxicol* 2018, 81:108-114.

155.  McPherson CA, Zhang G, Gilliam R, Brar SS, Wilson R, Brix A, Picut C, Harry GJ: An Evaluation of Neurotoxicity Following Fluoride Exposure from Gestational Through Adult Ages in Long-Evans Hooded Rats. *Neurotox Res* 2018, 34: 781-798.

156.  Sun Z, Zhang Y, Xue X, Niu R, Wang J: Maternal fluoride exposure during gestation and lactation decreased learning and memory ability, and glutamate receptor mRNA expressions of mouse pups. *Human Exp Toxicol* 2018, 37(1):87-93.

157.  Zhu YP, Xi SH, Li MY, Ding TT, Liu N, Cao FY, Zeng Y, Liu XJ, Tong JW, Jiang SF: Fluoride and arsenic exposure affects spatial memory and activates the ERK/CREB signaling pathway in offspring rats. *Neurotoxicology* 2017, 59:56-64.

158.  Ge Y, Chen L, Yin Z, Song X, Ruan T, Hua L, Liu J, Wang J, Ning H: Fluoride-induced alterations of synapse-related proteins in the cerebral cortex of ICR offspring mouse brain. *Chemosphere* 2018, 201:874-883.

159.  Wang J, Zhang Y, Guo Z, Li R, Xue X, Sun Z, Niu R: Effects of perinatal fluoride exposure on the expressions of miR-124 and miR-132 in hippocampus of mouse pups. *Chemosphere* 2018, 197:117-122.

160.  Zhao Q, Niu Q, Chen J, Xia T, Zhou G, Li P, Dong L, Xu C, Tian Z, Luo C *et al*: Roles of mitochondrial fission inhibition in developmental fluoride neurotoxicity: mechanisms of action in vitro and associations with cognition in rats and children. *Arch Toxicol* 2019, 93(3):709-726.

161.  Zhou G, Tang S, Yang L, Niu Q, Chen J, Xia T, Wang S, Wang M, Zhao Q, Liu L *et al*: Effects of long-term fluoride exposure on cognitive ability and the underlying mechanisms: Role of autophagy and its association with apoptosis. *Toxicol Appl Pharmacol* 2019:114608.

162.  Elliott L: Lack of effect of administration of fluoride on the central nervous system of rats. *Acta Pharmacol Toxicol (Copenh)* 1967, 25(3):323-328.

163.  Dec K, Lukomska A, Maciejewska D, Jakubczyk K, Baranowska-Bosiacka I, Chlubek D, Wasik A, Gutowska I: The Influence of Fluorine on the Disturbances of Homeostasis in the Central Nervous System. *Biol Trace Elem Res* 2017, 177(2):224-234.

164.  Grandjean P: Only One Chance: How Environmental Pollution Impairs Brain Development — and How to Protect the Brains of the Next Generation. New York: Oxford University Press; 2013.

165.  Peckham S, Lowery D, Spencer S: Are fluoride levels in drinking water associated with hypothyroidism prevalence in England? A large observational study of GP practice data and fluoride levels in drinking water. *J Epidemiol Community Health* 2015, 69(7):619-624.

166.  Rovet JF: The role of thyroid hormones for brain development and cognitive function. *Endocr Dev* 2014, 26:26-43.

167.  Grandjean P: Occupational fluorosis through 50 years: clinical and epidemiological experiences. *Am J Ind Med* 1982, 3(2):227-236.

168.  Grandjean P, Bellinger D, Bergman A, Cordier S, Davey-Smith G, Eskenazi B, Gee D, Gray K, Hanson M, van den Hazel P *et al*: The Faroes statement: human health effects of developmental exposure to chemicals in our environment. *Basic Clin Pharmacol Toxicol* 2008, 102(2):73-75.

169.  National Research Council: Science and decisions: advancing risk assessment. Washington, D.C.: National Academy Press; 2009.

170. Grandjean P: Science for precautionary decision-making. In: *Late Lessons from Early Warnings*. Edited by Gee D, Grandjean, P., Hansen, S.F., van den Hove, S., MacGarvin, M., Martin, J., Nielsen, G., Quist, D., Stanners, D., vol. II. Copenhagen: European Environment Agency; 2013: 517-535.

171. Michaels D: Doubt is their product: how industry's assault on science threatens your health. New York: Oxford University Press; 2008.

172. Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE *et al*: The Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs). *Environ Health Perspect* 2015, 123(5):A107-111.

173. European Environment Agency: Late lessons from early warnings: the precautionary principle 1896-2000. In: *Environmental issue report No 22*. Copenhagen; 2001.

174. Diesendorf M, Diesendorf A: Suppression by medical journals of a warning about overdosing formula-fed infants with fluoride. *Account Res* 1997, 5(1-3):225-237.

175. Martin B, Groth E: Scientific knowledge in controversy: The social dynamics of the fluoridation debate. Albany, NY: SUNY Press; 1991.

176. Bazian: Independent critical appraisal of selected studies reporting an association between fluoride in drinking water and IQ. London: South Central Strategic Health Authority; 2009: 1-58.

177. Seymour B, Getman R, Saraf A, Zhang LH, Kalenderian E: When advocacy obscures accuracy online: digital pandemics of public health misinformation through an antifluoride case study. *Am J Public Health* 2015, 105(3):517-523.

178. Mertz A, Allukian M: Community water fluoridation on the Internet and social media. *J Mass Dent Soc* 2014, 63(2):32-36.

179. Grandjean P, Choi AL: Community water fluoridation and intelligence. *Am J Public Health* 2015, 105(4):e3.

180. National Research Council (NRC): Recommended Dietary Allowances, 10 edn. Washington, DC: National Academy Press; 1989.

181. United States Environmental Protection Agency (U.S. EPA): Fluoride: Dose-Response Analysis for Non-cancer Effects. InWashington, DC: Health and Ecological Criteria Division, Office of Water, U.S. EPA; 2010.

182. Petersen PE, Lennon MA: Effective use of fluorides for the prevention of dental caries in the 21st century: the WHO approach. *Community Dent Oral Epidemiol* 2004, 32(5):319-321.

183. Davis N: Is Fluoridated Drinking Water Safe? *Harvard Public Health*. Boston, MA: Harvard T.H. Chan School of Public Health; 2016.

184. Ross JF, Daston GP: To the editor. *Neurotox Teratol* 1995, 17:685-686.

185. Bryson C: The fluoride deception. New York: Seven Stories Press; 2004.

186. International Programme on Chemical Safety (IPCS): Environmental Health Criteria 36: Fluorine and Fluorides. Geneva, Switzerland: World Health Organization; 1984.

187. International Agency for Research on Cancer: Some Aromatic Amines, Anthraquinones and Nitroso Compounds, and Inorganic Fluorides Used in Drinking Water and Dental Preparations. *IARC Monographs On The Evaluation Of Carcinogenic Risks To Humans*. vol. 27. Lyon: International Agency for Research on Cancer; 1982.

188. Friedman L, Friedman M: Financial Conflicts of Interest and Study Results in Environmental and Occupational Health Research. *J Occup Environ Med* 2016, 58(3):238-247.

189. Needleman HL: Clair Patterson and Robert Kehoe: two views of lead toxicity. *Environ Res* 1998, 78(2):79-85.

190. Iheozor-Ejiofor Z, Worthington HV, Walsh T, O'Malley L, Clarkson JE, Macey R, Alam R, Tugwell P, Welch V, Glenny AM: Water fluoridation for the prevention of dental caries. *Cochrane Database Syst Rev* 2015(6):CD010856.

191. Gwinn MR, Axelrad DA, Bahadori T, Bussard D, Cascio WE, Deener K, Dix D, Thomas RS, Kavlock RJ, Burke TA: Chemical Risk Assessment: Traditional vs Public Health Perspectives. *Am J Public Health* 2017, 107(7):1032-1039.

192. United States Environmental Protection Agency (U.S. EPA): National Primary Drinking Water Regulations: Fluoride Final Rule and Proposed Rule. Pp. 47142-47155. Washington, DC; 1985.

193. United States Department of Health and Human Services (DHSS): Review of Fluoride: Benefits and Risks: Report of the Ad Hoc Committee on Fluoride, Committee to Coordinate Environmental Health and Related Programs. Washington, DC; 1991.

194. Agency for Toxic Substances and Disease Registry (ATSDR): Toxicological Profile for Hydrogen Fluoride, and Fluorine: Draft for Public Comment. Atlanta, GA: Agency for Toxic Substances and Disease Registry; 2001.

195. Li Y, Liang C, Slemenda CW, Ji R, Sun S, Cao J, Emsley CL, Ma F, Wu Y, Ying P *et al*: Effect of long-term exposure to fluoride in drinking water on risks of bone fractures. *J Bone Miner Res* 2001, 16(5):932-939.

196. U.S. Environmental Protection Agency (U.S. EPA): Benchmark dose technical guidance. Washington, DC: Risk Assessment Forum, U.S. Environmental Protection Agency; 2012.

197. Budtz-Jorgensen E, Grandjean P, Keiding N, White RF, Weihe P: Benchmark dose calculations of methylmercury-associated neurobehavioural deficits. *Toxicol Lett* 2000, 112-113:193-199.

198. Budtz-Jorgensen E, Bellinger D, Lanphear B, Grandjean P, International Pooled Lead Study I: An international pooled analysis for obtaining a benchmark dose for environmental lead exposure in children. *Risk Anal* 2013, 33(3):450-461.

199. United States Environmental Protection Agency (U.S. EPA): Proposed Lead NAAQS Regulatory Impact Analysis. Washington, DC: U.S. EPA; 2008.

200. European Food Safety Authority (EFSA): EFSA Panel on Contaminants in the Food Chain (CONTAM); Scientific Opinion on Lead in Food. *EFSA Journal* 2010, 8(4):1570.

201. Gould E: Childhood lead poisoning: conservative estimates of the social and economic benefits of lead hazard control. *Environ Health Perspect* 2009, 117(7):1162-1167.

202. Tang-Peronard JL, Heitmann BL, Andersen HR, Steuerwald U, Grandjean P, Weihe P, Jensen TK: Association between prenatal polychlorinated biphenyl exposure and obesity development at ages 5 and 7 y: a prospective cohort study of 656 children from the Faroe Islands. *Am J Clin Nutr* 2014, 99(1):5-13.

203. Murata K, Budtz-Jorgensen E, Grandjean P: Benchmark dose calculations for methylmercury-associated delays on evoked potential latencies in two cohorts of children. *Risk Anal* 2002, 22(3):465-474.

204. Bellinger DC: Interpretation of small effect sizes in occupational and environmental neurotoxicology: individual versus population risk. *Neurotoxicology* 2007, 28(2):245-251.

205. Bellinger DC: A strategy for comparing the contributions of environmental chemicals and other risk factors to neurodevelopment of children. *Environ Health Perspect* 2012, 120(4):501-507.

206. Spadaro JV, Rabl A: Global health impacts and costs due to mercury emissions. *Risk Anal* 2008, 28(3):603-613.

207. Grandjean P, Pichery C, Bellanger M, Budtz-Jorgensen E: Calculation of mercury's effects on neurodevelopment. *Environ Health Perspect* 2012, 120(12):A452.

# Exhibit B

U.S. FEDERAL COURT

ACTION NO. 17-CV-02162

FOOD AND WATER WATCH, *et al.* v. U.S. EPA

REBUTTAL AND SUPPLEMENTAL REPORT OF
PHILIPPE GRANDJEAN, MD, DMSc

PREPARED ON BEHALF OF
PLAINTIFFS

14 August 2019

1

TABLE OF CONTENTS

I.      INTRODUCTION................................................................................................3

II.     REBUTTAL REPORT.........................................................................................3
        A.    Systematic review of the evidence .....................................................3
        B.    Population studies of fluoride neurotoxicity.......................................5
        C.    Coherence between studies..................................................................6
        D.    Bias ......................................................................................................7
        E.    Causality assessment .........................................................................10

III.    SUPPLEMENTARY REPORT .........................................................................14
        A.    New data on infant fluoride exposure and IQ...................................14
        B.    New data on fluoride and ADHD in Canada ....................................14
        C.    New data on Western fluoride exposures ..........................................15
        D.    Benchmark dose calculations from the most recent human data.................15

IV.     CITED PUBLICATIONS ..................................................................................17

## I.  INTRODUCTION

Subsequent to finalizing my report in this case, I have reviewed the reports by defense experts Drs. Tala Henry, Joyce Tsuji, and Ellen Chang. I have also reviewed documents that I did not have access to prior to completing my report in June. Based on my review of the additional materials, I intend to offer the rebuttal opinions expressed below. I also intend to rely upon the materials that are identified in the supplemental report as further support for my initial opinions, which remain unchanged.

## II.  REBUTTAL REPORT

The reports by Drs Tala Henry and Joyce Tsuji express opinions that my methodology is flawed, superficial, not systematic, and with pre-conceived conclusions. Neither expert provides justification for their unusually strong opinions. Both experts rely without reservations on the likewise highly critical report by Dr. Ellen Chang on the epidemiological evidence regarding the association between exposure to fluoride and human developmental neurotoxicity. I shall therefore focus on Dr. Chang's report.

### A.      Systematic review of the evidence

Dr. Chang states that her systematic review identified "numerous" studies that I did not address, with the implication that these studies are somehow at odds with my opinion (p. 8). What Dr. Chang failed to explain is that the vast majority of these studies reported significant associations between fluoride exposure and neurotoxic outcomes, which is in agreement with my own assessment. Of the 32 studies that Dr. Chang has identified and which I did not specifically address, 28 found associations of elevated fluoride exposure with adverse effects.[1] These studies, which provide further *support* for my opinions, were not cited in my report because most are repetitions of the cross-sectional study design in endemic fluorosis areas that I have already discussed at length;[2] some are only available in abstract form;[3] some are secondary analyses of primary studies that I already addressed;[4] and one was not available to me at the time of my report [1]. As explained in my report, I do not consider it necessary to address and discuss each and every paper that reports on fluoride effects, especially when peer-reviewed systematic reviews are available, including our own [2]. I consider it more informative to examine the various *types* of studies, also including pharmacokinetics (e.g., distribution of fluoride throughout the body, including transfer through the placenta and blood brain barrier, and the minimal transfer into breast milk); studies of neurochemical and functional effects in other

---

[1] Aravind (2016); Asawa (2014), Calderon (2000), Das (2015), Khan (2015), Kundu (2015), Lu (2019), Manju (2017), Mustafa (2018), Das (2016), Qin (1990), Razdan (2017), Rocha-Amador (2007), Rocha-Amador (2008), Rocha-Amador (2009), Saxena (2012), Shivaprakash (2011), Singh (2013), Sudhir (2009), Thomas (2018), Till (2019), Trivedi (2007), Wang (2012), Wang (2006), Xiang (2015), Yu (2018), Zhang & Cheng (2015).
[2] Aravind (2016); Asawa (2014), Calderon (2000), Das (2015), Khan (2015), Kundu (2015), Manju (2017), Mustafa (2018), Das (2016), Qin (1990), Razdan (2017), Rocha-Amador (2007), Rocha-Amador (2008), Rocha-Amador (2009), Saxena (2012), Shivaprakash (2011), Singh (2013), Sudhir (2009), Trivedi (2007), Wang (2012), Wang (2006), Xiang (2015), Yu (2018), Zhang & Cheng (2015).
[3] Calderon (2000); Thomas (2018).
[4] Xiang (2015); Wang (2012).

species (e.g., rodents); different study designs for investigating effects in human populations (e.g., cross-sectional and prospective), and different endpoints relevant to neurotoxicity (e.g., cognitive tests, thyroid function, histological assessments of fetal brain). Notably, many of the studies that I addressed in my report were not considered by Dr. Chang[5] for unexplained or spurious reasons, e.g., that evidence of neurotoxicity in adults is irrelevant to developmental effects in humans (p. 31).

Dr. Chang's search identified a couple of studies that reported no significant effects that I did not rely on, but they have no impact on the conclusions that can be drawn. One study highlighted by Dr. Chang is a publication by Spittle and colleagues [3] that Dr. Chang refers to more than 20 times. Although noted in the reference list, Dr. Chang fails to acknowledge in her analysis that this report is in the form of an abstract and relates to a previous (full) publication [4] that was cited and addressed in my report (as reference number 140). I did not cite the Spittle abstract in my report, just as I did not cite abstracts of studies reporting harm.[6] It is standard practice for systematic reviews to omit abstracts, including in the systematic reviews conducted by the authoritative Cochrane group [5]. Dr. Chang provides no justification for including abstracts in her review, such as the one by Spittle [3], which omit critical methodological details. Further, in a rather stunning example of poor judgment, Dr. Chang includes the Spittle abstract in her causal analysis despite the fact that the abstract does not describe any confounder adjustment,[7] and uses an ecological metric for exposure (group water F level) – features which Dr. Chang has used to dismiss many papers that support the notion of fluoride neurotoxicity. To me, this represents a clear example of unacceptable bias.

The other three "no effect" studies that Dr. Chang cites and that I did not address are similarly unavailing. Two are cross-sectional studies from China which fail to show statistically significant associations between fluoride exposure and IQ,[8] and one is an ecological analysis [6] of the Malin & Till study [7], which I addressed but placed little weight on. As I explained in my report, there are many reasons why an ecological/cross-sectional study can fail to detect an effect even when one is present. The failure of these three studies to find statistically significant effects thus does nothing to contradict the large literature that I rely upon, including the prospective birth cohort studies that I placed the greatest weight on. Even Dr. Chang appears to recognize this, as she does not include any of these three studies in her causal analysis, and correctly notes that the analysis by Perrott [6] is a "relatively low quality" ecological study (p. 66).

In summary, despite asserting that my review failed to consider "numerous" papers, Dr. Chang's own review confirms that I addressed and considered the most relevant epidemiological data on cognitive outcomes in regard to measures of fluoride exposure. Dr.

---

[5] E.g., Dong (1993); Duan (1995); Ekstrand (1981); Li (2016); Spittle (1994); Guo (2001); Malin (2018); Opydo-Szymaczek (2005, 2007); Peckham (2015); Ron (1986); Salgarello (2016); Shao (2003); Shen & Taves (1974); Yazdi (2011); Yu (2008).
[6] Calderon (2000); Thomas (2018).
[7] On p. 132 of her Table, Dr. Chang "assume[s]" that the Spittle analysis controlled for the same confounders as the Shannon analysis. I understand that neither Dr. Chang, nor anyone else in her office has contacted Dr. Spittle to confirm this statement (Personal email communication with Bruce Spittle, August 13, 2019). According to Dr. Spittle, the abstract provided all important methodological details (Id.).
[8] Kang (2011); He (2010).

Chang's literature search also confirms that the majority of studies that I did not specifically address are consistent with and further support the association between fluoride and cognitive impairment, in accordance with my conclusions.

Dr. Chang's review is not as systematic as she claims. In contrast to the Institute of Medicine recommendations on systematic reviews that she allegedly relies upon, Dr. Chang did not use any pre-defined protocol for how she would weigh the evidence (p. 30-33). Further, her inclusion/exclusion of some studies is poorly explained, if at all. Thus, the Spittle abstract [3] arguably should have been excluded from Dr. Chang's review based on her own search criteria that would exclude duplicate reports and abstracts.

As her Appendix D, Dr. Chang provides a 95-page list of references that she chose not to consider. However, the criteria for excluding these more than 1,000 publications are unclear. Some of the references on this list seem to be outside the searches that Dr. Chang has described in great detail, and some would be very hard to retrieve (e.g., "Mandatory Public Health Measures. London: unless otherwise stated; 2005."). One of the references not considered is my own critical comments [8] (cited as number 170 in my report) on the New Zealand study [9] that Dr. Chang highlights as evidence that water fluoridation is not associated with IQ deficits. Exclusion of comments that point to weaknesses of a favored study is yet another clear sign of bias. There are other mistakes in Dr. Chang's decisions on exclusion of references, one of which is serious enough for me to comment on further, see below.

## B.   Population studies of fluoride neurotoxicity

Based on my research on fluoride that has by now spanned almost four decades, I have visited study areas in India and China, and have communicated with many highly productive fluoride scientists from many countries. As described in my report, I have collaborated with Chinese experts, through whom I obtained an understanding of the study settings and the publication practices that would not be apparent from a superficial review of the published or translated evidence that Dr. Chang has conducted.

Dr. Chang believes that the dozens of cross-sectional studies, most of which report statistically significant associations between long-term fluoride exposure and neurocognitive deficits are "insufficient to establish causal effects of fluoride exposure" (p. 9). She also refers to "high potential for selection bias" without providing any supporting evidence.[9] Dr. Chang does not consider how unlikely it is that these dozens of studies should all suffer from some special exposure misclassification that would cause bias away from the null, selection bias that would result in participation of intellectually disabled children only in the high-fluoride group, and residual confounding resulting in bias only away from the null in the many different

---

[9] For example, Dr. Chang speculates that Chinese-language studies that did not find adverse effects may not have been translated into English (p. 37). Instead of speculating about this, Dr. Chang could have conducted a search of online databases of Chinese-language research (e.g., CNKI). For unexplained reasons, Dr. Chang chose not to do so. A search of PubMed for "CNKI database" shows that many systematic reviews include CNKI as one of the databases to retrieve studies, and the Institute of Medicine recommendations for systematic review (which Chang relies on) calls for searching for foreign language studies when appropriate (IOM 2011, p. 8). CNKI is publicly available online at: http://oversea.cnki.net/kns55/default.aspx.

study settings. Although I recognize the issues raised and have taken them into regard in my report, I find it extremely unlikely, if not impossible, that the overwhelming evidence of fluoride neurotoxicity should be a mirage caused by bias, such as Dr. Chang apparently believes.

In Dr. Chang's view, "nearly all of the studies in this meta-analysis were of very poor quality and provided no reliable scientific basis for drawing conclusions about causality" (p. 20). Thus, Dr. Chang assumes that brief reports in Chinese scientific journals or poor translations must be equated with poor quality of the research. Such superficial judgment seems subjective and counter to the alleged aim of providing a systematic review. The fact that she used her own poorly justified judgment to discount evidence of fluoride again indicates serious bias.

C.    Coherence between studies

According to Dr. Chang, a major issue is the lack of coherence between studies. Indeed, in our review and meta-analysis [2], we did identify heterogenicity between the reports that we reviewed. However, this is not unusual and does not necessarily indicate publication bias, of which we found no sign.

Dr. Chang made the following claim about our meta-analysis [2]: "The authors did not explore the reasons for the more than 10-fold difference in the magnitude of the standardized mean difference between their meta-analysis estimate (–0.45 IQ points between high-fluoride and low-fluoride areas) and that of Tang et al. (2008) (–5.03 IQ points)" (p. 22). This statement is erroneous and misleading, as Dr. Chang falsely invents the existence of a 10-fold difference in risk. In contrast to Dr. Chang's opinion, the two reviews are in excellent agreement. As we clearly stated in our 2012 article: "Our findings are consistent with an earlier review (Tang et al. 2008), although ours more systematically addressed study selection and exclusion information…" [2].

Dr. Chang further claims that our analysis showed a difference of –0.45 IQ points (p.22) – and this is a critical misunderstanding. Our paper did not draw that conclusion. Because different intelligence scales had been used in the studies considered, we expressed the outcome as a random-effect standardized weighted mean difference estimate, as we clearly explain [2]. In order to translate this measure to a difference on an IQ scale, the result must be multiplied by the standard deviation of the IQ scale, i.e., 15. This should be clear from the published paper and from my report, where I wrote: "Given that the standard deviation (SD) for the IQ scale is 15, an SMD of -0.45 corresponds to a loss of 6.75 IQ points" (p. 19 of my report). Dr. Chang obviously missed this explanation along with the description in the published article.

Still, I can understand that our review article describes fairly complex, systematic analyses that may not be clear to all readers. Thus, the journal did receive a letter from a reader who, like Dr. Chang, did not understand the results. We therefore submitted a clarification that was published as a letter in the journal [10]. This letter was cited as reference number 32 in my report but was not cited by Dr. Chang. Interestingly, Dr. Chang did identify this reference in her systematic search, but it is listed among the publications that she decided not to consider (p. 14 of the list). Accordingly, by her systematic search, Dr. Chang identified our letter with the extended explanation, but for unknown reasons, she excluded the reference that could have

6

helped correct her misunderstanding. This oversight of course emphasizes that her handling of the literature search was not systematic.

Dr. Chang otherwise does recognize that most reports are in overall agreement, but she also claims that "the similarity of their findings makes these papers even more anomalous" (p. 37). Thus, Dr. Chang tries to argue both ways: First that the reports are not in agreement, then that it is abnormal that they are. Both opinions are unconvincing.

### D.     Bias

Dr. Chang claims: "Dr. Grandjean is incorrect in suggesting that imprecise measurement of exposures or outcomes leads predictably to bias toward the null" (p. 38). She then explains that *systematic* error can result in a bias away from the null, a well-known issue, although my concern was clearly related to *random or non-differential* misclassification. Dr. Chang then explains that random error can result in bias that "can be either toward or away from the null" (p. 38).

This critique is again biased, as Dr. Chang erroneously interprets my opinion and fails to acknowledge that random error is unlikely to cause a bias away from the null, as is well-known in epidemiology [11], as I have also discussed in past publications [12, 13]. Thus, when an exposure parameter is measured with imprecision, some truly highly exposed subjects are falsely considered to have a low exposure, and *vice versa*. In prospective epidemiological data where the exposure is often measured long before the outcome, a reasonable assumption is that the error is non-differential, i.e., independent of the outcome. An additional assumption is that the measurement error is correlated with the true exposure level, e.g., overestimated for truly highly exposed and underestimated for those with a true low exposure. Then the expected regression coefficient will generally be biased toward the null [14]. In addition, the probability of observing a bias *away* from the null decreases toward 0 as a function of the sample size. Thus, in large samples, a bias away from the null is unlikely (in contrast to what is indicated by Dr. Chang). Further, even when measurement error and true exposure level are correlated, the resulting bias will still be toward the null, except when this correlation is very strong. These results hold in linear regression models as well as in more general non-linear models [14].

Dr. Chang has included in her report a brief (6-page) Appendix C, which is meant to provide an introduction to epidemiology. However, the text is superficial, and it does not explain crucial issues, such as why measurement imprecision most likely will result in a bias toward the null (which is of course against her opinion), and why adjustment for covariates may result in additional bias toward the null when the exposure is measured with imprecision [15]. Appendix C is therefore not helpful.

Likewise, Dr. Chang describes cross-sectional studies as if they are all equal and as if the exposure parameter always represents a current and short-lasting exposure only. She fails to acknowledge in her causal analysis that exposure measures in many studies represent long-term conditions, in some studies also likely covering prenatal exposures, an essential detail.

Dr. Chang further claims that "Plaintiffs' experts do not critically examine the validity of potential biological markers, or biomarkers, of fluoride exposure and effects that have been used in epidemiological studies" (p. 47). On the contrary, my report contains a whole section on these issues (pp. 12-15). I also addressed the imprecision of the spot sample urinary fluoride method[10] used by Bashash [16] and explained how this imprecision would be expected to bias the results toward the null (p. 23), see above. Further, I discuss toxicokinetic data on the passage of fluoride across the placenta and blood-brain barrier (pp. 8, 11), which are issues of major importance to assessments of developmental neurotoxicity, but which Dr. Chang chooses to ignore.

Dr. Chang asserts that "None of the Plaintiffs' experts systematically evaluate the extent of confounder control in the available epidemiological literature" (p.59). While it is always possible to identify one or more parameters that would have been ideal to include, it is a matter of scientific judgment whether the absence of a particular covariate is problematic. Dr. Chang's systematic approach clearly aimed to identify alleged confounders in the studies that pointed toward adverse effects of fluoride exposure. In most cases, I deemed the absence of such information to be unfortunate, though not necessarily invalidating, e.g., if stratified analyses had been carried out, as we reported in our systematic review and meta-analysis [2]. I also note the statistical concern about adding adjustment for unjustified covariates, as this may exaggerate the bias toward the null when the exposure parameter is imprecise [15], an issue that Dr. Chang has not considered.

Of note, Dr. Chang made a systematic search for potential confounders only in the studies that pointed toward fluoride neurotoxicity. She did not provide similar scrutiny of studies that were unable to identify an adverse fluoride effect. Thus, in my report, I pointed out the potential of tea consumption to affect the individual fluoride exposure levels, particularly in the cohort studies from New Zealand, where frequent tea-drinking is a common habit (p. 22 in my report). Dr. Chang ignored this concern and only mentioned this in passing when reviewing the recent studies in Canada. Again, Dr. Chang's report is not systematic, or rather, it is systematic in its effort to disqualify any evidence that might link fluoride exposure to developmental neurotoxicity. For example, Dr. Chang relies on the Spittle abstract [3], although it does not provide any information on confounder control and other methodology concerns. Even the full study [4] is accepted by Dr. Chang at face value, and the critique offered in my report is ignored.

In regard to the most recent studies, Dr. Chang claims that "methodological uncertainties remain about the assessment of fluoride exposure and neurodevelopmental outcomes; and the reported findings are plausibly explained by confounding, bias, and chance" (p. 9). However, she does not provide any convincing evidence that such issues could have resulted in erroneous conclusions on fluoride neurotoxicity in the high-quality prospective studies.

Moreover, Dr. Chang refers to exaggerated associations that can result from lack of blinding (p. 59), but fails to acknowledge that at least 11 of the studies reporting adverse

---

[10] Dr. Chang makes contradictory statements about urinary fluoride measurements, noting on p. 47 that "no biomarker is currently considered to be a gold-standard," and then noting five pages later that 24-hour urine samples are the "gold standard measure" (p. 52).

neurocognitive effects have clearly been blinded, including the recent birth cohort studies, where the exposure was determined *after* the cognitive tests had been completed.[11] Despite producing a 56-page table to address "key characteristics" of the studies, Dr. Chang fails to mention this methodological strength in her summary of these studies (pp. 90-146).

Perhaps the most blatant example of bias in Dr. Chang's review is the double standard she applies to ecological studies. Dr. Chang correctly notes that "ecological studies are considered by epidemiologists to be especially weak" (p. 20), and she is dismissive of many studies on this ground. Despite this, Dr. Chang includes the three New Zealand papers that used ecologic measures of water fluoride exposure in her causal analysis [3, 4, 9] and unjustifiably treats these studies as being on equal footing with the recent prospective birth cohort studies which have individualized biomarker data [16, 17]. In an attempt to justify her conflation of these very distinct studies, Dr. Chang incorrectly claims that the New Zealand studies are not ecological because they had individual data on the "duration" of residence (p. 45). The fact that there was data on duration of residence does not transform a group-based level into an individualized one.

Further, Dr. Chang incorrectly claims the New Zealand studies provide information on the "timing" of exposure (p. 45). In fact, the Shannon [4] and Spittle [3] papers simply report total years of residence in fluoridated areas during the first seven years of life without specifying which years were spent in the fluoridated community. Accordingly, a child who lives her first year of life in a fluoridated area (a period of expected hypervulnerability) is treated the same as a child who lives her seventh year in a fluoridated area. The Broadbent study [9] provides little improvement over this crude assessment, as it simply distinguishes between children who had or had not lived in a fluoridated area during the first five years of life, without any apparent attempt to control for the duration or timing of exposures during these first five years. Dr. Chang fails to acknowledge any of these serious shortcomings, again a matter of serious bias.

Finally, Dr. Chang repeatedly highlights the risk of publication bias, e.g., in the *Fluoride* journal, which is not indexed by PubMed. However, she does not mention the bias against publication, i.e., in the opposite direction. The examples that I mentioned in my report (p. 34) illustrate that such bias exists, and the failure by Chang to mention both aspects again illustrates the bias and lack of balance of her report.

I am aware that Dr. Chang has written several reviews on other environmental chemicals, with conclusions that were favorable to the sponsor. One of them unreasonably criticized some of my publications in peer-reviewed journals [18], while another criticized the EPA's use of evidence on developmental neurotoxicity in children for standard setting purposes [19]. As Dr. Chang has apparently not conducted original research in these fields, my impression is that Dr. Chang allows her preconceived conclusions trump the actual findings of her "systematic review".

---

[11] Bashash (2017), Bashash (2018), Choi (2015), Das & Mondal (2016); Green (2019), Rocha-Amador (2007), Rocha-Amador (2009), Seraj (2012), Till (2019), Xiang (2003), Zhang (2015)

E.      **Causality assessment**

Another key point in Dr. Chang's report is that "most published scientific research findings are anticipated to be false (Ioannidis 2005)" (p. 38). Although the original report by John Ioannidis [20] did provide some stunning examples how clinical medicine could be misled by single reports, it would indeed be counterproductive if we were to ignore all published reports, as Dr. Chang seems to prefer. This nihilistic view was also not the intent of the author, but Dr. Chang seems to be unaware how Dr. Ioannidis in a more recent paper in the same journal highlighted the need for balanced review of scientific evidence in the interest of inspiring responsible policy decisions [21].

Nonetheless, Dr. Chang seems to favor studies carried out in North America, and she raises serious critique against studies carried out, e.g., by competent scientists in China and other countries. I of course agree that all research reports must be critically assessed, as I have done in my report. However, Dr. Chang's critique of publications from China is crushing and unbalanced. This prejudiced approach is in contrast to Dr. Chang's reliance on research from Bangladesh on highly elevated[12] arsenic exposures [22] in the above-mentioned review on arsenic [19] authored jointly with Dr. Tsuji, who also wrote an expert report for the defense in the present case. The arsenic report was supported by the Electric Power Research Institute and the Arsenic Science Task Force and criticized the EPA position on developmental neurotoxicity of this substance [19]. Dr. Chang used the Bangladeshi study of highly elevated exposures in an Asian country [22] to calculate a Reference Dose (RfD) for arsenic neurotoxicity at levels far higher than EPA's current standard. Notably, the methodology of the arsenic study is very similar to, and in some respects weaker than,[13] the methodology used in the ELEMENT and MIREC cohorts that provided evidence on fluoride neurotoxicity, yet Dr. Chang is largely dismissive of the latter Western studies that focused on exposures that overlap with current fluoride exposures in the U.S.[14] It therefore seems that Dr. Chang's criteria for judging causality depend on the conclusions desired.

Major misleading statements include the following: "he does not reach a conclusion of causality based on this body of literature" (p. 22) and "a conspicuous gap in the Plaintiffs' experts' reports in this matter is that none of them present a structured causal analysis of the relevant epidemiological studies of fluoride exposure and developmental neurotoxicity" (p. 62). It is not clear from her report how Dr. Chang could reach these stunning conclusions,

---

[12] The Bangladeshi study addressed a population with mean urinary arsenic levels ranging from 35 to 80 ug/L (Hamadani 2011), which is about 10 to 40 times the levels measured in the US population. This, however, did not stop Dr. Chang and her co-authors from calculating an RfD from these data (which resulted in an RfD above EPA's current value). By contrast, in her assessment of the fluoride literature, Dr. Chang gives little weight to the Valdez Jimenez prospective cohort data on the grounds that the mean urinary fluoride levels (1.9-2.7 mg/L) were higher than the levels seen in fluoridated areas (p. 66). However, based on the Canadian data from the Till study, the mean urinary F levels in the Valdez Jiminez study are only 2-to-4-fold higher than the mean level in fluoridated areas.

[13] Similar to the ELEMENT and MIREC studies, the Bangladeshi study is a prospective birth cohort study wherein maternal arsenic exposure was ascertained through two urinary samples during pregnancy. Unlike the ELEMENT and MIREC studies, the Bangladeshi study did not control for exposure to other neurotoxicants. Further, in contrast to the ELEMENT and MIREC studies, the study involved arsenic exposures that far exceed the exposures in the US (by a factor of 10 to 40).

[14] Uyghurturk DA et al. Fluoride Concentrations in Urine, Serum and Amniotic fluid in 2nd Trimester Pregnant Women in Northern California (manuscript, to be published).

although several errors and omissions mentioned above suggest that her review of my report was rather superficial.

As a conclusion, Dr. Chang claims: "I conducted a causal analysis of the overall weight of the relevant epidemiological and related scientific literature on fluoride exposure and developmental neurotoxicity, using the generally accepted Bradford Hill considerations and focusing on the higher-quality studies set in Western populations with lower levels of fluoride in drinking water" (p. 9). Again, this analysis is superficial and pays lip service only to Sir Austin's wise advice. The depth of Dr. Chang's analysis is problematic when considering the wealth of evidence and the risks of possible bias that are likely to occur toward the null. Dr. Chang cites Kenneth Rothman's textbook [23] in support for her causal analysis but fails to acknowledge Rothman's prudent criticism of the superficial type of checklist analysis that Dr. Chang relies on in her report. As Rothman has noted, "checklists lend a deceptive kind of mindless authority to an imperfect and creative process" (p.34). I also refer to an excellent review of the causality aspects published in a legal journal [24] that again argues against superficial assessments. As I shall now discuss, Dr. Chang's "causal analysis" is primitive and unbalanced, and her conclusions are biased.

*Strength*: Dr. Chang dismisses the strength of the association between fluoride and IQ on the grounds that a loss of 3 to 5 IQ points is "relatively small in comparison with normal, expected variation" (p. 69). Under this arbitrarily high standard, other well-known neurotoxicants (e.g., lead, methylmercury, arsenic) would fail Dr. Chang's strength criterion. In fact, a similar criticism that was once used to dismiss the epidemiological data on lead and IQ was appropriately rejected [25]. In the context of neurotoxicants, a population-wide loss of 3-to-5 IQ points is very large, and—as explained in my report (p. 38-39)—would produce enormous economic losses on a population level, as also recognized by the EPA. In accordance with the EPA view of preventable IQ deficits, I must disagree with Dr. Chang that the association is small and can be ignored.

*Consistency*: Dr. Chang highlights non-informative findings from studies that made no attempt to measure or investigate prenatal or early postnatal fluoride exposures [3, 4, 9, 26, 27] as contradicting the highly significant findings from the prospective ELEMENT [16] and MIREC [17] birth cohort studies (pp. 70-71). Dr. Chang fails to acknowledge the inappropriate apples-to-apples nature of this comparison and cites the "mixed" nature of the findings as a basis to conclude that the consistency factor has not been met. Further, Dr. Chang fails to mention that every single prospective birth cohort study to date has found a significant adverse effect of prenatal fluoride exposure on neurodevelopment [16, 17, 28-30]. Moreover, Dr. Chang gives short shrift to the consistent association between fluoride exposure and reduced IQ reported in the cross-sectional studies [2, 31, 32]. I already mentioned how Dr. Chang's misunderstanding of our meta-analysis [2] resulted in an erroneous claim that the reviews did not result in consistent conclusions. Dr. Chang also entirely ignored the findings from occupational studies, as well as the neuropathology data from examinations of fetal brain abnormalities. As I explained in my report, each of these types of studies is consistent with, and provide support for, fluoride being a neurotoxic agent at current levels of exposures.

*Specificity*: As Rothman and others have explained, and as Dr. Chang recognizes, lack of specificity "does not weight against or in favor of a causal conclusion" (p. 74).

11

*Temporality*: Dr. Chang's assessment of temporality mirrors her assessment of consistency in that she cites the New Zealand studies as contradicting the findings from the ELEMENT and MIREC cohorts. Once again, Dr. Chang fails to acknowledge the absence of prenatal or early postnatal fluoride exposure assessments in the New Zealand studies, nor any of the other shortcomings. Instead, Dr. Chang focuses on non-differential measurement uncertainties of the urinary fluoride data in the ELEMENT and MIREC cohorts to cast doubt on the findings of these studies. As already discussed, however, the imprecision of the urinary fluoride parameters would likely bias the results toward the null, not the reverse. The temporality requirement is thus met with fluoride, as each of the prospective birth cohort studies has found a significant association between early-life exposure to fluoride and the offspring's subsequent performance on neurobehavioral testing. In short, the exposure preceded the effect in these studies, which is what the temporality factor is supposed to assess.

*Biological Gradient*: Dr. Chang dismisses the biological gradient of fluoride's neurotoxicity effects by showing scatterplots from the ELEMENT and MIREC cohorts without the trend lines (pp. 77-81). However, this approach proves little, other than the undisputed fact that there is substantial natural variation in IQ across the population and that an appropriate statistical analysis is needed to extract a reliable estimate of the effect of the toxicant exposure. I am aware that similar scatterplots have been published showing the effects, e.g., of lead and IQ [33], and I believe that such scattering of results would not convince the EPA that lead is not neurotoxic. Dr. Chang also argues that outliers may have distorted the effects seen in the ELEMENT and MIREC cohorts (p. 77-78), without acknowledging that statistical analyses on the impact of exposure outliers have been conducted and that "the results did not change in any meaningful way" [16].

*Plausibility*: Dr. Chang limits her assessment of biologic plausibility to NTP's assessment of learning and memory [34] in animal models, and Dr. Tsuji's expert report (p. 83). In so doing, Dr. Chang completely ignores the large body of animal literature showing adverse neuroanatomical and neurochemical effects from fluoride exposure, as reviewed by the National Research Council (NRC) [35] and by Dr. Thiessen in her report. The NRC concluded that the neuroanatomical and neurochemical effects are sufficient to determine that fluoride interferes with brain function. Since the NRC reached this conclusion in 2006, much additional mechanistic research has been published. Dr. Chang ignores these data in favor of the NTP's narrower assessment, which found a "moderate" level of evidence for adult neurotoxicity, but a "low" level of evidence for developmental effects due largely to fewer studies being available.

I note that Dr. Chang (p. 83) relies on Dr. Tsuji's opinion when reaching her conclusion that there is no convincing evidence of fluoride neurotoxicity from experimental toxicology studies. I would rather rely on the conclusions drawn by the EPA's own experts on developmental neurotoxicity, including internationally recognized scientists such as William R. Mundy and Kevin M. Crofton [36]. These experts recently considered fluoride to be a chemical with substantial evidence of developmental neurotoxicity. I thus stand by the conclusion in my report that the animal data provide biologic plausibility for fluoride being a developmental neurotoxicant in humans.

*Coherence*: Dr. Chang dismisses the coherence of fluoridated water reducing IQ on the grounds that IQ scores in US children steadily improved throughout the 20th century (the

so-called "Flynn Effect") (p. 83-84). Dr. Chang even goes so far as to suggest that fluoridation may be responsible for the increased scores, although noting that the "pattern cannot be attributed with *certainty* to a beneficial effect of artificial drinking water fluoridation" (p. 84). That Dr. Chang would make this suggestion (in the absence of any reliable epidemiologic data to support it) highlights the relaxed evidentiary standards that Dr. Chang uses for data that supports her sponsor's position. Under Dr. Chang's simplistic framework, leaded gasoline could not have reduced IQ, as it was introduced in the early part of the 20th century and IQ scores continued to increase during the entire duration of its use. It is well accepted, however, that low-level lead exposure reduces IQ, and thus the Flynn Effect argument—while perhaps superficially appealing—does not demonstrate "incoherence." Rather, Dr. Chang's argument is not coherent with the science.

Dr. Chang fails to consider other considerations relevant to coherence, including the association between neonatal fluoride exposure mediated by infant formula feeding and reduced IQ [1], as further discussed below. While the studies prior to the recent Canadian analysis did not consider the potential role of neonatal fluoride exposure, formula feeding is well established to increase a baby's fluoride exposure, even in areas without fluoridated water [37, 38]. Although other factors are of likely importance, the relationship between formula-feeding and reduced IQ is coherent with maternal fluoride exposure during pregnancy being associated with a lowered IQ in the child. In this perspective, Dr. Chang's highlight of the Flynn effect is arbitrary and constitutes cherry picking for the purpose of rejecting coherence.

*Experiment*: Dr. Chang ignores the NRC's observation [35] that case reports of fluoride toxicity constitute "experimental studies" of neurologic symptomatology following fluoride exposure (NRC report, p. 208). The case reports involve "one or more individuals who underwent withdrawal from their source of fluoride exposure and subsequent re-exposures under 'blind' conditions" [35]. In most cases, the symptoms (which included lethargy, weakness, and impaired ability to concentrate) "disappeared with the elimination of exposure to fluoride and returned when exposure was reinstated". Although experimental support is not a crucial criterion [24], the existence of such support should not be missed in a systematic assessment.

*Analogy*: I agree with Dr. Chang that "analogies can be drawn to other naturally occurring elements, especially certain metals" like lead. As discussed above, many of the exaggerated criteria that she uses to reject a causal relationship between fluoridated water and IQ could be equally used to erroneously dismiss the causal relationship between low-level lead exposure and IQ.

Overall, Dr. Chang's opinions and her review of the evidence is not at an appropriate academic level for me to consider revising my own opinions, as written in my report from June. As discussed above, an appropriate and systematic assessment of the Bradford Hill guidelines supports, rather than refutes, the causal relationship between elevated fluoride exposure and adverse effects on brain development.

## III. SUPPLEMENTARY REPORT

I shall now discuss recent evidence that has now become available.

### A.    New data on infant fluoride exposure and IQ

In addition to the MIREC report that related childhood IQ to the maternal urine-fluoride excretion and the maternal fluoride intake during pregnancy [17], I have obtained access to an additional report that focuses on the infancy exposure to fluoride from formula prepared with community water [1]. This postnatal source is important, as very little fluoride passes into breast milk [39], thereby protecting breastfed infants from excess fluoride. Given that the brain remains highly vulnerable to neurotoxicants neonatally [40], as amply illustrated by lead [41], the MIREC study was utilized to extract data on infant exposures from formula. The families resided in both fluoridated or non-fluoridated cities in Canada, and data were obtained on 398 mother-child pairs. Again, IQ scores were obtained by the WISC at 3 to 4 years of age. Statistical models included fluoride exposure assessed in infancy with adjustment for major covariates, including child's sex and age, maternal education, maternal race, second-hand smoke in the home, and quality of the child's home (HOME scale); sensitivity analyses also included prenatal exposure. An increase in fluoride concentration in the community water by 0.5 mg/L was associated with significant decrements in full-scale IQ, as indicated by the regression coefficients (B) with 95% confidence intervals (CI) (B=-4.4, 95% CI: -8.34, -0.46) and in performance IQ (B=9.3, 95% CI: -13.77, -4.76) in formula-fed children. Among breastfed children, the fluoride exposure predicted a lower performance IQ only (B=-6.19, 95% CI:-10.45, -1.94). The associations with water fluoride concentration remained significant for the performance IQ after controlling for prenatal fluoride exposure among both formula-fed (B=-7.93, 95% CI:-12.84, -3.01) and breastfed children (B=-6.30, 95% CI: -10.92, -1.68). No tendencies were seen with verbal IQ.

This study extends the documentation on human developmental neurotoxicity at elevated fluoride exposure, as seen in communities with fluoridated drinking water, and it documents the risk within a narrow time window of the first six months postnatally. Thus, while there is ample support for developmental fluoride neurotoxicity in humans, the recent studies specifically point to exposures during early brain development being of the greatest concern, as would also be considered most plausible, as explained in my report (pp. 6-8) This new evidence therefore adds further support to my conclusions.

### B.    New data on fluoride and ADHD in Canada

Although I didn't specifically focus on Attention Deficit Hyperactivity Disorder (ADHD) in my report, Dr. Chang criticizes the evidence on ADHD as an indicator of neurodevelopmental abnormalities (e.g., p. 56). An ecological study found a higher prevalence in areas with water fluoridation among youth in the United States [7], although this association was not robust (to altitude adjustment). Further support derives from the ELEMENT prospective study that focused on symptoms of inattention and total ADHD scores at ages 6 to 12 years [30]. However, when using data from the Canadian Health Measures Survey (CHMS), no association was found between urinary fluoride and learning disability in children at ages 3 to 12 years [26].

A more sophisticated study has now been completed.[15] The researchers used cross-sectional data at ages 6 to 17 years from the CHMS. Community water and spot urine samples were analyzed for fluoride concentrations and the latter was adjusted for specific gravity. Regression analyses were carried out to test the association with ADHD diagnosis and the hyperactivity/inattention score on the Strengths and Difficulties Questionnaire (SDQ). After adjustment for covariates, including lead exposure, fluoridation of the home water supply increased the risk of an ADHD diagnosis, and an increase in water-fluoride by 1 mg/L was associated with a (statistically significant) 6-fold higher odds of an ADHD diagnosis in the 710 children known to rely on community water, although this association was not replicated using urine concentrations. Similar tendencies were seen for the SDQ data, especially among the older youth (not covered by the previous study [26]). Relying on improved individual exposure data and more specific outcomes in adolescents, this new study provides more weight to the evidence of fluoride neurotoxicity assessed by other means than IQ testing.

## C.    New data on Western fluoride exposures

Subsequent to finishing my initial report, ELEMENT researchers have published a new study that provides data on the fluoride exposures from water and food products in Mexico City [42]. The study found that the average concentration of fluoride in tap water in Mexico City was 0.17 ppm, while the average concentration in bottled water was 0.14 ppm. The study thus confirmed that drinking water provides a negligible contribution to fluoride exposure in the Mexico City population. In her report, Dr. Chang notes that "The Mexico City studies did not measure fluoride concentrations in drinking water, but the authors stated that natural levels may range from 0.15 to 1.38 mg/L" (p. 50). While the new study found some higher fluoride concentrations in food than in the U.S., this finding is consistent with Mexico's use of fluoridated salt. Thus, this information supports the validity of the ELEMENT studies [16, 30] and rebuffs a critique that Dr. Chang has raised.

I am also aware of recent fluoride exposure assessments carried out in California.[16] In pregnant women, fluoride concentrations in urine and serum were significantly higher in pregnant women living in optimally fluoridated communities, as compared with communities with lower fluoride concentrations in their drinking water, and the same was true for amniotic fluoride concentrations, thus confirming the transplacental passage of fluoride. Overall the maternal urinary fluoride concentrations were similar to those reported from Canada [43].

## D.    Benchmark dose calculations from the most recent human data

Now that the MIREC cohort study in Canada has been accepted for publication, I have obtained a copy of the final manuscript, which was already referred to by Dr. Chang. Within the cohort, a subset of 601 of the children were examined at age 3-4 years by an IQ scale,

---

[15] Riddell JK et al. Association of water fluoride and urinary fluoride concentrations with Attention Deficit Hyperactivity Disorder in Canadian Youth (manuscript, to be published).

[16] Uyghurturk, op.cit.

slightly less than half of the children residing in fluoridated communities [17]. Maternal urine spot samples were obtained from each of the three semesters of pregnancy, and results were analyzed for those 526 mother-child pairs. Information was obtained on food and beverage intakes, including tea. Proper covariate adjustment was included. The regression analyses showed that an increase in maternal urine-fluoride (U-F) of 1 mg/L was associated with a statistically significant loss in IQ of 4.49 points in boys, though not in girls. An increase of 1 mg/L of fluoride in water and an increase of 1 mg/day of fluoride intake were associated with an IQ loss of 5.3 points and 3.66 points, respectively, for both boys and girls.

Under the assumption of a Gaussian distribution, the reported regression coefficients and their standard deviations can be applied to estimate approximate BMD values. In my report (p. 39), I already provided the results obtained on the basis of the ELEMENT study results [16]. I am now able to provide benchmark results for the additional North American prospective study using IQ as the outcome in regard to the major exposure parameters. As in my previous report (p. 38), I have chosen a loss of 1 IQ point as the benchmark response, in agreement with previous EPA decisions.

*Table. Benchmark dose results (mg/L urine adjusted for creatinine, or mg estimated daily intake) obtained from recent study results on IQ [16, 17].*

| Study | Reference | Exposure | Sex | BMD | BMDL |
|-------|-----------|----------|-----|-----|------|
| ELEMENT | [16] | Maternal U-F | Both sexes | 0.20 | 0.13 |
| MIREC | [17] | Maternal U-F | Both sexes | 0.51 | 0.21 |
| | | Maternal U-F | Boys | 0.22 | 0.13 |
| | | Maternal U-F | Girls | (–) | 0.58 |
| | | Maternal F intake | Both sexes | 0.27 | 0.15 |

As shown in the above *table*, the prenatal BMD for girls is not defined, but the BMDL is still meaningful and is, as expected, higher than the other estimates obtained. Overall, the results derived from the two studies and based on relevant exposure parameters are comparable. Of note, the below BMDL values are well below average exposure levels in North America, especially in communities with drinking water fluoridation [43].

Typically, the EPA uses the BMDL to calculate a Reference Dose (RfD) by dividing by an assessment (or uncertainty) factor, where the default value is 10. Assuming an average BMDL of about 0.2 mg/L, or 0.2 mg/day, the RfD would likely be 0.02, i.e., very much below current exposure levels, especially in fluoridated communities. As benchmark dose calculations constitute a routine approach applied by the EPA [44], these calculations provide a basis for comparing the dose-dependent risk of cognitive deficits with current exposure levels, whether due to artificial fluoridation or elevated fluoride release to the groundwater from minerals in the underground.

In her published arsenic review [19], Dr. Chang dismissed all cross-sectional studies on developmental arsenic exposure and neurobehavioral deficits in children, but accepted the prospective study carried out in Bangladesh [22]. In accepting this study for her purpose, Dr.

Chang required that the study was a prospective birth cohort study, that 1 to 3 measurements of the chemical were available to evaluate prenatal exposure, while complete adjustment for confounding was considered unnecessary (the arsenic study did not control, e.g., for fluoride). Although the Bangladeshi study was large, the fluoride evidence available includes results from separate cohorts in Mexico and Canada that satisfy the same criteria. However, the arsenic exposure in Bangladesh was substantially greater than exposures in the U.S., while that is not the case in regard to the recent prospective fluoride studies. My calculations of benchmark values for fluoride are therefore in accordance with the criteria that Dr. Chang has previously used when generating benchmark calculations for arsenic.

## IV. CITED PUBLICATIONS

1.  Till C, Green R, Flora D, Hornung R, Martinez-Mier A, Blazer M, Farmus L, Ayotte P, Muckle G, Lanphear B: Fluoride Exposure from Infant Formula and Child IQ in a Canadian Birth Cohort (manuscript). 2019 (in review).
2.  Choi AL, Sun G, Zhang Y, Grandjean P: Developmental fluoride neurotoxicity: a systematic review and meta-analysis. *Environ Health Perspect* 2012, 120(10):1362-1368.
3.  Spittle B, Ferguson, D., Bouwer, C.: Intelligence and fluoride exposure in New Zealand children (abstract). *Fluoride* 1998, 31(3):S13.
4.  Shannon FT, Fergusson DM, Horwood LJ: Exposure to fluoridated public water supplies and child health and behaviour. *NZ Med J* 1986, 99(803):416-418.
5.  Iheozor-Ejiofor Z, Worthington HV, Walsh T, O'Malley L, Clarkson JE, Macey R, Alam R, Tugwell P, Welch V, Glenny AM: Water fluoridation for the prevention of dental caries. *Cochrane Database Syst Rev* 2015(6):CD010856.
6.  Perrott KW: Fluoridation and attention deficit hyperactivity disorder - a critique of Malin and Till (2015). *Br Dent J* 2018, 223(11):819-822.
7.  Malin AJ, Till C: Exposure to fluoridated water and attention deficit hyperactivity disorder prevalence among children and adolescents in the United States: an ecological association. *Environ Health* 2015, 14:17.
8.  Grandjean P, Choi AL: Community water fluoridation and intelligence. *Am J Public Health* 2015, 105(4):e3.
9.  Broadbent JM, Thomson WM, Ramrakha S, Moffitt TE, Zeng J, Foster Page LA, Poulton R: Community Water Fluoridation and Intelligence: Prospective Study in New Zealand. *Am J Public Health* 2015, 105(1):72-76.
10. Choi AL, Grandjean P, Sun G, Zhang Y: Developmental fluoride neurotoxicity: Choi et al. Respond. *Environ Health Perspect* 2013, 121(3):A70.
11. Carroll RJ: Measurement error in epidemiologic studies. In: *Encyclopedia of biostatistics.* Edited by Armitage P, Colton T. Chichester: Wiley; 1998: 2491-2519.
12. Grandjean P, Budtz-Jorgensen E: Total imprecision of exposure biomarkers: implications for calculating exposure limits. *Am J Ind Med* 2007, 50(10):712-719.
13. Grandjean P, Budtz-Jorgensen E: An ignored risk factor in toxicology: The total imprecision of exposure assessment. *Pure Appl Chem* 2010, 82(2):383-391.
14. Carroll RJ: Measurement error in nonlinear models : a modern perspective, 2nd edn. Boca Raton, FL: Chapman & Hall/CRC; 2006.

15. Budtz-Jorgensen E, Keiding N, Grandjean P, Weihe P, White RF: Consequences of exposure measurement error for confounder identification in environmental epidemiology. *Stat Med* 2003, 22(19):3089-3100.

16. Bashash M, Thomas D, Hu H, Martinez-Mier EA, Sanchez BN, Basu N, Peterson KE, Ettinger AS, Wright R, Zhang Z *et al*: Prenatal Fluoride Exposure and Cognitive Outcomes in Children at 4 and 6-12 Years of Age in Mexico. *Environ Health Perspect* 2017, 125(9):097017.

17. Green R, Lanphear B, Hornung R, Flora D, Martinez-Mier A, Neufeld R, Ayotte P, Muckle G, Till C: Fluoride exposure during fetal development and intellectual abilities in a Canadian birth cohort. *JAMA Pediatrcs* 2019 (in press).

18. Chang ET, Adami HO, Boffetta P, Wedner HJ, Mandel JS: A critical review of perfluorooctanoate and perfluorooctanesulfonate exposure and immunological health conditions in humans. *Crit Rev Toxicol* 2016, 46(4):279-331.

19. Tsuji JS, Garry MR, Perez V, Chang ET: Low-level arsenic exposure and developmental neurotoxicity in children: A systematic review and risk assessment. *Toxicology* 2015, 337:91-107.

20. Ioannidis JP: Why most published research findings are false. *PLoS Med* 2005, 2(8):e124.

21. Ioannidis JPA: All science should inform policy and regulation. *PLoS Med* 2018, 15(5):e1002576.

22. Hamadani JD, Tofail F, Nermell B, Gardner R, Shiraji S, Bottai M, Arifeen SE, Huda SN, Vahter M: Critical windows of exposure for arsenic-associated impairment of cognitive function in pre-school girls and boys: a population-based cohort study. *Int J Epidemiol* 2011, 40(6):1593-1604.

23. Rothman KJ, Greenland S, Lash TL: Modern epidemiology, 3rd edn. Philadelphia: Lippincott-Raven; 2012.

24. Neutra RR, Cranor, C. F., Gee, D.: The Use and Misuse of Bradford Hill in U.S. Tort Law. *Jurimetrics* 2018, 58(2):127-162.

25. Needleman HL, Bellinger D: Studies of lead exposure and the developing central nervous system: a reply to Kaufman. *Arch Clin Neuropsychol* 2001, 16(4):359-374.

26. Barberio AM, Quinonez C, Hosein FS, McLaren L: Fluoride exposure and reported learning disability diagnosis among Canadian children: Implications for community water fluoridation. *Can J Public Health* 2017, 108(3):e229-e239.

27. Morgan L, Allred E, Tavares M, Bellinger D, Needleman H: Investigation of the possible associations between fluorosis, fluoride exposure, and childhood behavior problems. *Pediatr Dent* 1998, 20(4):244-252.

28. Chang A, Shi Y, Sun H, Zhang L: Analysis on the effect of coal-burning fluorosis on the physical development and intelligence development of newborns delivered by pregnant women with coal-burning fluorosis. *Chinese Journal of Control of Endemic Diseases* 2017, 32(8):872-873.

29. Valdez Jimenez L, Lopez Guzman OD, Cervantes Flores M, Costilla-Salazar R, Calderon Hernandez J, Alcaraz Contreras Y, Rocha-Amador DO: In utero exposure to fluoride and cognitive development delay in infants. *Neurotoxicology* 2017, 59:65-70.

30. Bashash M, Marchand M, Hu H, Till C, Martinez-Mier EA, Sanchez BN, Basu N, Peterson KE, Green R, Schnaas L *et al*: Prenatal fluoride exposure and attention deficit

hyperactivity disorder (ADHD) symptoms in children at 6-12years of age in Mexico City. *Environ Int* 2018, 121(Pt 1):658-666.

31. Duan Q, Jiao J, Chen X, Wang X: Association between water fluoride and the level of children's intelligence: a dose-response meta-analysis. *Public Health* 2018, 154:87-97.

32. Tang Q, Du J, Ma H, Jiang S, Zhou X: Fluoride and children's intelligence: a meta-analysis. *Bio Trace Elem Res* 2008, 126:115-120.

33. Rothenberg SJ, Rothenberg JC: Testing the dose-response specification in epidemiology: public health and policy consequences for lead. *Environ Health Perspect* 2005, 113(9):1190-1195.

34. National Toxicology Program (NTP): Systematic literature review on the effects of fluoride on learning and memory in animal studies. Research Triangle Park, NC: National Institute of Environmental Health Sciences; 2016.

35. National Research Council: Fluoride in Drinking Water: A Scientific Review of EPA's Standards. Washington, D.C.: National Academy Press; 2006.

36. Mundy WR, Padilla S, Breier JM, Crofton KM, Gilbert ME, Herr DW, Jensen KF, Radio NM, Raffaele KC, Schumacher K *et al*: Expanding the test set: Chemicals with potential to disrupt mammalian brain development. *Neurotoxicol Teratol* 2015, 52(Pt A):25-35.

37. Harriehausen CX, Dosani FZ, Chiquet BT, Barratt MS, Quock RL: Fluoride Intake of Infants from Formula. *J Clin Pediatr Dent* 2019, 43(1):34-41.

38. Zohoori FV, Omid N, Sanderson RA, Valentine RA, Maguire A: Fluoride retention in infants living in fluoridated and non-fluoridated areas: effects of weaning. *Br J Nutr* 2019, 121(1):74-81.

39. Ekstrand J, Boreus LO, de Chateau P: No evidence of transfer of fluoride from plasma to breast milk. *Br Med J (Clin Res Ed)* 1981, 283(6294):761-762.

40. Grandjean P: Only one chance. How Environmental Pollution Impairs Brain Development – and How to Protect the Brains of the Next Generation. New York: Oxford University Press; 2013.

41. Needleman HL: What can the study of lead teach us about other toxicants? *Environ Health Perspect* 1990, 86:183-189.

42. Cantoral A, Luna-Villa LC, Mantilla-Rodriguez AA, Mercado A, Lippert F, Liu Y, Peterson KE, Hu H, Tellez-Rojo MM, Martinez-Mier EA: Fluoride Content in Foods and Beverages From Mexico City Markets and Supermarkets. *Food Nutr Bull* 2019:379572119858486.

43. Till C, Green R, Grundy JG, Hornung R, Neufeld R, Martinez-Mier EA, Ayotte P, Muckle G, Lanphear B: Community Water Fluoridation and Urinary Fluoride Concentrations in a National Sample of Pregnant Women in Canada. *Environ Health Perspect* 2018, 126(10):107001.

44. U.S. Environmental Protection Agency (U.S. EPA): Benchmark dose technical guidance. Washington, DC: Risk Assessment Forum, U.S. Environmental Protection Agency; 2012.

# Exhibit 17

Exhibit 335
P. Grandjean, MD
Sept. 13, 2019
N. Martin-Reporter
Veritext Legal
Solutions

**Review**





# Neurobehavioural effects of developmental toxicity

*Philippe Grandjean, Philip J Landrigan*

Neurodevelopmental disabilities, including autism, attention-deficit hyperactivity disorder, dyslexia, and other cognitive impairments, affect millions of children worldwide, and some diagnoses seem to be increasing in frequency. Industrial chemicals that injure the developing brain are among the known causes for this rise in prevalence. In 2006, we did a systematic review and identified five industrial chemicals as developmental neurotoxicants: lead, methylmercury, polychlorinated biphenyls, arsenic, and toluene. Since 2006, epidemiological studies have documented six additional developmental neurotoxicants—manganese, fluoride, chlorpyrifos, dichlorodiphenyltrichloroethane, tetrachloroethylene, and the polybrominated diphenyl ethers. We postulate that even more neurotoxicants remain undiscovered. To control the pandemic of developmental neurotoxicity, we propose a global prevention strategy. Untested chemicals should not be presumed to be safe to brain development, and chemicals in existing use and all new chemicals must therefore be tested for developmental neurotoxicity. To coordinate these efforts and to accelerate translation of science into prevention, we propose the urgent formation of a new international clearinghouse.

Lancet Neurol 2014; 13: 330–38

Published Online
February 15, 2014
http://dx.doi.org/10.1016/
S1474-4422(13)70278-3

Department of Environmental
Medicine, University of
Southern Denmark, Odense,
Denmark (P Grandjean MD);
Department of Environmental
Health, Harvard School of
Public Health, Boston, MA, USA
(P Grandjean); and Icahn School
of Medicine at Mount Sinai,
New York, NY, USA
(P J Landrigan MD)

Correspondence to:
Dr Philippe Grandjean,
Environmental and Occupational
Medicine and Epidemiology,
Harvard School of Public Health,
401 Park Drive E-110, Boston,
MA 02215, USA
pgrand@hsph.harvard.edu

## Introduction

Disorders of neurobehavioural development affect 10–15% of all births,[1] and prevalence rates of autism spectrum disorder and attention-deficit hyperactivity disorder seem to be increasing worldwide.[2] Subclinical decrements in brain function are even more common than these neurobehavioural developmental disorders. All these disabilities can have severe consequences[3]—they diminish quality of life, reduce academic achievement, and disturb behaviour, with profound consequences for the welfare and productivity of entire societies.[4]

The root causes of the present global pandemic of neurodevelopmental disorders are only partly understood. Although genetic factors have a role,[5] they cannot explain recent increases in reported prevalence, and none of the genes discovered so far seem to be responsible for more than a small proportion of cases.[5] Overall, genetic factors seem to account for no more than perhaps 30–40% of all cases of neurodevelopmental disorders. Thus, non-genetic, environmental exposures are involved in causation, in some cases probably by interacting with genetically inherited predispositions.

Strong evidence exists that industrial chemicals widely disseminated in the environment are important contributors to what we have called the global, silent pandemic of neurodevelopmental toxicity.[6,7] The developing human brain is uniquely vulnerable to toxic chemical exposures, and major windows of developmental vulnerability occur in utero and during infancy and early childhood.[8] During these sensitive life stages, chemicals can cause permanent brain injury at low levels of exposure that would have little or no adverse effect in an adult.

In 2006, we did a systematic review of the published clinical and epidemiological studies into the neurotoxicity of industrial chemicals, with a focus on developmental neurotoxicity.[6] We identified five industrial chemicals that could be reliably classified as developmental neurotoxicants: lead, methylmercury, arsenic, polychlorinated biphenyls, and toluene. We also noted 201 chemicals that had been reported to cause injury

to the nervous system in adults, mostly in connection with occupational exposures, poisoning incidents, or suicide attempts. Additionally, more than 1000 chemicals have been reported to be neurotoxic in animals in laboratory studies.

We noted that recognition of the risks of industrial chemicals to brain development has historically needed decades of research and scrutiny, as shown in the cases of lead and methylmercury.[9,10] In most cases, discovery began with clinical diagnosis of poisoning in workers and episodes of high-dose exposure. More sophisticated epidemiological studies typically began only much later. Results from such studies documented developmental neurotoxicity at much lower exposure levels than had previously been thought to be safe. Thus, recognition of widespread subclinical toxicity often did not occur until decades after the initial evidence of neurotoxicity. A recurring theme was that early warnings of subclinical neurotoxicity were often ignored or even dismissed.[11] David P Rall, former Director of the US National Institute of Environmental Health Sciences, once noted that "if thalidomide had caused a ten-point loss of intelligence quotient (IQ) instead of obvious birth defects of the limbs, it would probably still be on the market".[12] Many industrial chemicals marketed at present probably cause IQ deficits of far fewer than ten points and have therefore eluded detection so far, but their combined effects could have enormous consequences.

In our 2006 review,[6] we expressed concern that additional developmental neurotoxicants might lurk undiscovered among the 201 chemicals then known to be neurotoxic to adult human beings and among the many thousands of pesticides, solvents, and other industrial chemicals in widespread use that had never been tested for neurodevelopmental toxicity. Since our previous review, new data have emerged about the vulnerability of the developing brain and the neurotoxicity of industrial chemicals. Particularly important new evidence derives from prospective epidemiological birth cohort studies.

In this Review, we consider recent information about the developmental neurotoxicity of industrial chemicals

# **Exhibit 18**



United States
Environmental Protection
Agency

National Institute of
Environmental Health Sciences

# NIEHS/EPA CHILDREN'S ENVIRONMENTAL HEALTH AND DISEASE PREVENTION RESEARCH CENTERS

## IMPACT REPORT

## PROTECTING CHILDREN'S HEALTH WHERE THEY LIVE, LEARN, AND PLAY

EPA/600/R-17/407

# Children's Health Matters



**35%** The number of children diagnosed with leukemia has increased by **35%** over the past 40 years.[1]

**8.4%** **8.4%** of children in the U.S. have asthma.[2]

**1 in 42** 8-year-old boys have autism.[3]

## Children in the U.S. are at high risk for chronic disease

This may be a result of increasing exposures to environmental toxicants.



Approximately **16,000** premature births per year in the U.S. are attributable to air pollution.[4]

Children in **4 million** U.S. households may be exposed to high levels of lead.[5]

**60%** of acute respiratory infections in children worldwide are related to environmental conditions.[6]

Genetics were once thought to contribute **90%** to autism, but are now thought to only contribute **41-56%** in boys and **13-16%** in girls. **The role of environmental factors in autism is greater than previously thought.**[7]

Air pollution contributes to **600,000** deaths worldwide in children under 5 years old.[8]

2

# Children are uniquely vulnerable to environmental risks

**Biology.** Children's brains, lungs, immune, and other systems are rapidly developing. Their natural defenses are less developed than adults; skin and blood–brain barriers are more permeable, and metabolic and detoxification pathways are not yet fully developed.

**Behavior.** Children's behavior patterns make them more susceptible to exposure. They crawl and play close to the ground, putting them in contact with dirt and dust. They put their hands, toys, and other objects in their mouths. They eat, drink, and breathe more than adults relative to body mass.

# Children's environmental health has a significant impact on society



**$76.6 Billion**
Annual cost of environmentally related diseases in U.S. children.[10]
Diseases

**$833,000**
Total cost for one child with cancer (medical costs and lost parental wages).[11]
Cancer

**$2.2 Billion**
Annual cost of childhood asthma that could be attributed to environmental factors.[10]
Asthma

**$11,500 – $15,600**
Lifetime earnings lost as a result of the loss of one IQ point.[9]
IQ

**$1.4 –2.4 Million**
Lifetime cost of supporting one person with autism.[12]
Autism

Environmental exposures in the earliest stages of human development – including before birth – influence the occurrence of disease later in life. Improving the understanding of these **developmental origins of health and disease** is critical to reducing children's health risks and improving the quality of life for children and their families.

3

# ACKNOWLEDGMENTS

To the Children's Centers investigators, listed on the right – thank you! Research takes time and all the findings documented in this report are a result of your unrelenting perseverance. Thank you for investing your careers and ingenuity to change the landscape of children's environmental health. Thank you, also, for your significant contributions to this document. It has been awe-inspiring to watch you paint a picture that represents the extensive impact of your work.

I am indebted to Hayley Aja (EPA Student Contractor) and Emily Szwiec (Association of Schools and Programs of Public Health/EPA) who made tremendous contributions to the report with passion, dedication, and determination as both authors and reviewers. I am truly grateful to Patrick Lau for his support, expertise, and drive for excellence. The continued support and guidance from the EPA communications staff, including Kelly Widener, Pradnya Bhandari, Aaron Ferster, and Annie Kadeli were instrumental in preparing this report.

Kimberly Gray (NIEHS) has been a constant and determined partner in documenting the success of the Children's Centers program and this report would not be possible without her contributions. Additional support from NIEHS was provided by Christie Drew, Virginia Guidry, and Anne Thompson.

The development of this report also benefited from the invaluable comments of more than 20 EPA staff across the Agency (listed in Appendix A). Valuable input and constructive recommendations from Martha Berger and the EPA Office of Children's Health Protection, as well as the Children's Health Protection Advisory Committee, provided essential guidance on increasing the impact of the report.

Finally, sincere thanks to the individuals that make this research possible. The American people who have entrusted us to discover ways to better protect our children; the diligent staff in grants, financial, and legal offices at EPA, NIEHS, and the funded institutions; those who have organized and participated in peer reviews; the research support staff at the centers; and the children and parents who invest their time to participate in this research.

Over the last two decades, this program has been skillfully managed by various EPA and NIEHS staff — It has been my privilege to capture a snapshot of the impact of this program. With sincere gratitude,

Nica Louie
Project Officer, Children's Centers program
NCER, ORD, EPA

## CHILDREN'S CENTERS INVESTIGATORS WHO CONTRIBUTED TO THIS REPORT

**Cincinnati:** Bruce Lanphear, Kimberly Yolton

**Columbia University:** Frederica Perera, Kimberly Burke, Brittany Shea

**Dartmouth College:** Margaret Karagas, Carolyn Murray

**Denver:** Andrew Liu

**Duke University:** Susan Murphy, Ed Levin, Jamie Wylie

**Emory University:** Linda McCauley, P. Barry Ryan, Nathan Mutic

**The Johns Hopkins University:** Greg Diette, Nadia Hansel

**Northeastern University:** Akram Alshawabkeh

**UC Berkeley (CERCH):** Brenda Eskenazi, Asa Bradman, Kim Harley, Nina Holland, Karen Huen, James Nolan

**UC Berkeley (CIRCLE):** Catherine Metayer, Stephen Rappaport, Mark Miller, John Nides, Joseph Wiemels, Todd Whitehead

**UC Berkeley/Stanford University:** Katharine S. Hammond, Jennifer Mann, Kari Nadeau, Mary Prunicki, Deborah Hussey Freeland

**UC Davis:** Judy Van de Water, Isaac Pessah, Irva Hertz-Picciotto

**UC San Francisco:** Tracey Woodruff, Patrice Sutton, Erin DeMicco

**University of Illinois:** Susan Schantz, Jodi Flaws

**University of Michigan:** Karen Peterson, Vasantha Padmanabhan, Robin Lee, Dana Dolinoy, Jacyln Goodrich, Deborah Watkins, Brisa Sanchez, Wei Perng

**University of Southern California:** Rob McConnell, Andrea Hricko, John Froines

**University of Washington:** Elaine Faustman, Marissa Smith

5

# CONTENTS

## CHILDREN'S HEALTH MATTERS — 2

### EXECUTIVE SUMMARY — 8
In just a few pages, learn about the history of the Children's Centers, their unique research, and their groundbreaking work.

### COMMONLY USED ACRONYMS — 16

### CENTER NAMES AND AFFILIATIONS — 16
A list to help cross-reference center names and affiliations.

### READING GUIDE — 17
How to navigate through this report, whether you need a simple overview or a more in-depth look at the science.

## HEALTH OUTCOMES — 18

### ASTHMA — 20
Examples of how exposures in different locations such as near roadways or in rural settings could make asthma symptoms worse.

### BIRTH OUTCOMES — 22
Mothers exposed to some environmental chemicals while pregnant may be at higher risk for babies with preterm birth, low birth weight, and birth defects.

### CANCER — 24
The sharp increase in childhood leukemia over the past 40 years may be due to environmental exposures.

### IMMUNE FUNCTION — 26
Environmental exposures can interfere with the function and regulation of the immune system, causing other health problems such as altered neurodevelopment and cancer.

### NEURODEVELOPMENT: GENERAL — 28
Exposures to environmental chemicals before birth and during childhood can have detrimental effects on learning, attention, memory, and behavior.

#### NEURODEVELOPMENT: AUTISM SPECTRUM DISORDER — 30
The rates of autism have risen in recent years. Find out the role of prenatal and parental environmental exposures in urban or rural settings.

### OBESITY — 32
Environmental toxicants may play an important role in obesity. Findings to-date focus on refining methods for measuring obesity.

### REPRODUCTIVE DEVELOPMENT — 35
Exposure to environmental chemicals can affect the timing of puberty for boys and girls.

## ENVIRONMENTAL EXPOSURES — 36

### AIR POLLUTION — 38
Learn how kids' respiratory health is affected by air pollutants.

### ARSENIC — 42
Learn about prenatal exposures to arsenic and impact on fetal growth. Rice-based products and drinking water may also be a source of arsenic exposure.

### CONSUMER PRODUCTS
Every day we use a variety of products that expose us to chemicals that may affect child development.

#### CONSUMER PRODUCTS: BPA — 44
Found in toys, baby bottles, and water bottles, bisphenol A (BPA) can impact obesity and reproductive development.

#### CONSUMER PRODUCTS: PBDEs — 46
Used as flame retardants in furniture and other products, polybrominated diphenyl ethers (PBDEs) can impair neurodevelopment.

#### CONSUMER PRODUCTS: PHTHALATES — 48
Exposure to phthalates from shampoo, perfumes, and makeup can affect neurodevelopment and reproductive health.

### LEAD — 50
While lead levels have greatly decreased, many children are still at risk. Lead exposure impacts brain structure and function, contributes to ADHD, and can diminish school performance.

### PESTICIDES — 52
Kids are especially susceptible to pesticides, and exposure before birth or during childhood may result in ADHD, lowered IQ, and other neurodevelopmental disorders.

### SECONDHAND TOBACCO SMOKE — 56
Learn about how both maternal and paternal smoking before conception and during pregnancy can cause asthma, cancer, and neurodevelopmental effects.



# HALLMARK FEATURES 58

## COMMUNITY OUTREACH AND RESEARCH TRANSLATION 60
The Children's Centers have empowered communities by successfully translating scientific findings into actionable solutions.

## EXPOSURE ASSESSMENT 64
New methods that more precisely measure the environmental exposures for both mothers and children.

## INTERDISCIPLINARY APPROACHES 66
Examples of how leveraging the unique expertise of many fields to conduct research provides evidence to protect our children.

## NEW METHODS AND TECHNOLOGIES 68
Learn about the pioneering new approaches and technologies used to advance the field of children's environmental health.

## POPULATION-BASED STUDIES 70
Studies that start before birth and follow children up to young adulthood are invaluable for tracking the effects of exposures over time.

## RODENT MODELS 72
Examples of how animal models inform epidemiological studies to help explain the effects of exposure and reduce the burden of disease.

## SAMPLE REPOSITORY 74
The collection and storage of biological and environmental samples enable us to answer questions about exposures over long periods of time.

# APPENDICES

## INDEX 77

## REFERENCES 80

### CHILDREN'S HEALTH MATTERS 80

### HEALTH OUTCOMES 81

### ENVIRONMENTAL EXPOSURES 90

### HALLMARK FEATURES 101

## APPENDIX A — LIST OF EPA REVIEWERS 107
List of EPA staff who provided comments and recommendations for this report.

## APPENDIX B — SUMMARY OF THE CHILDREN'S CENTERS 108
List of the current and previously funded Children's Centers, including environmental exposures and health outcomes studied by each center.

# EXECUTIVE SUMMARY

Environmental exposures in the earliest stages of human development—including before birth—influence the occurrence of disease later in life. Since 1997, the U.S. Environmental Protection Agency (EPA) and the National Institute of Environmental Health Sciences (NIEHS) have partnered to investigate new frontiers in the field of children's environmental health research by supporting research devoted to children's environmental health and disease prevention. EPA funding has been provided under the Science to Achieve Results (STAR) grant program. STAR funds research on the environmental and public health effects of air quality, environmental changes, water quality and quantity, hazardous waste, toxic substances, and pesticides.



The Children's Environmental Health and Disease Prevention Research Centers (Children's Centers) program was established through this unique partnership, and continues to be successful in protecting children's health. **46 grants have been awarded to 24 centers through a highly competitive process.**

**EPA and NIEHS have together invested more than $300 million in the Children's Centers program to expand our knowledge on the exposures and health outcomes.** The partnership has led to tangible results in communities across the country.

This impact report highlights some of the progress the Children's Centers have made toward reducing the burden of environmentally induced or exacerbated diseases placed on children.

## EXECUTIVE ORDER 13045 — PROTECTION OF CHILDREN FROM ENVIRONMENTAL HEALTH RISKS

Signed in 1997, this Executive Order requires federal agencies to ensure their policies, standards, and programs account for any disproportionate risks children might experience.[14] With this incentive, EPA and NIEHS executed a memorandum of understanding to jointly fund and oversee a new and impactful research grant program focused on children's health.

# Exemplifying the value of partnerships between federal agencies

# Approaching the challenge of studying children's environmental health with a unique perspective







Many Children's Centers follow children from preconception through childhood, enabling a deeper understanding of the effects of environmental exposures on childhood diseases. This approach has also allowed for the collection of biological samples over time. These archives of biological samples serve as a resource for the future and provide critical information on the prenatal and childhood determinants of adult disease.

Determining what chemical exposures are toxic to children requires a variety of research approaches. Each center consists of three to four unique but integrated research projects related to the center's theme. Children's Centers are supported by cores that provide infrastructure, services, and resources to the research projects to help them meet their long–term goals. Each center is structured with at least two cores: one that coordinates and integrates center activities, and one that engages with the community and translates scientific findings. A coordinated interrelationship exists between the projects and cores that combine to form a cohesive center with a common theme.

The Children's Centers examine pressing questions with a wide-angle lens, not allowing the boundaries of any particular field to restrict, define, or determine the array of possible approaches. They bring together experts from many fields, including clinicians, researchers, engineers, social scientists, and others. Relying on a diverse set of disciplines has helped the centers successfully bridge the gap between environmental exposures and health outcomes.

A Children's Center is not a pediatric clinic or a physical building — it is the name used to describe a research program investigating the impact of environmental exposures on children's health. Investigators may be located in one building or at one university, however many centers are located across campuses in one or more partnering institutions.

## WANT TO LEARN MORE?

If you are interested in what makes the Children's Centers program unique, see the **Hallmark Features** section.

**9**

# Leveraging the expertise of researchers across the country



University of Washington

University of California, Davis

University of California, Berkeley (CERCH)

University of California, San Francisco

University of California, Berkeley (CIRCLE)

University of California, Berkeley/Stanford University

Denver

University of Southern California

## WANT TO LEARN MORE?

See **Appendix B** for more information about each Children's Center.

| | 1997 | 2000 | 2003 | 2005 |
|---|---|---|---|---|
| Year Request for Application (RFA) Issued | | | | |
| Grants Funded | 8 | 4 | 7 | 2 |
| Approximate Joint Funding (millions) | $60M | $28M | $52M | $15M |

# Fostering a new generation of leaders in children's environmental health



Dartmouth College

Northeastern University

University of Michigan (Peterson/Padmanabhan)

University of Michigan (Israel)

Columbia University

Harvard University

Brown University

Mount Sinai School of Medicine

University of Iowa

University of Medicine and Dentistry of New Jersey

University of Illinois

Cincinnati

The Johns Hopkins University

Duke University (NICHES)

Duke University (SCEDDBO)

Emory University

**KEY:**
- Open grants
- Closed grants
- Colors correspond to year RFA issued

**2009**
6
$44M

**2009**
Formative
6
$12M

**2012**
8
$62M

**2014**
5
$28M

**Totals**
**8 RFAs**

**46** grants

**$301M**

# Leading the field in research that improves the quality of life for children and adults

The Children's Centers have transformed the field of children's environmental health. They have heightened awareness of children's environmental health—both nationally and internationally—and have helped establish it as a distinct field of study. Research from the centers has led to new detection, treatment, and prevention strategies for diseases related to environmental exposures.

**Children's Centers research has identified the critical role environmental toxicants play in the development of asthma, obesity, ADHD, cancer, autism, and other childhood illnesses that may set the trajectory of health throughout adult life.**

The centers have led the way in clarifying the relationship between exposures in the earliest stages of human development—including before birth—and the occurrence of disease later in life. Improving understanding of the developmental origins of health and disease is critical for developing effective interventions to reduce health risks and improve quality of life for children and adults.

## WANT TO LEARN MORE?

If you are interested in a specific disease, see the **Health Outcomes** section.

If you are interested in a specific chemical, see the **Environmental Exposures** section.

## Children's Centers Publications by Year (as of June 2017)



**2,544** publications, including journal articles and book chapters.

**141** publications per year, on average (excluding 1998).

Through their groundbreaking work, the Children's Centers have pushed the boundaries of clinical, field, and laboratory–based research. The research has been disseminated through thousands of publications in diverse and peer–reviewed journals. The research findings lay a critical foundation for reducing health risks and improving quality of life for children and adults.

# Serving communities in ways that help protect children and pregnant women

Many times, scientific findings and research results are complex and difficult to understand. Empowered by Children's Centers program requirements[15] to translate and apply research findings to protect children, the Children's Centers successfully translate and communicate scientific findings into actionable solutions. The centers provide the public, community organizations, healthcare professionals, decision makers, and others with practical information about the science linking the environment to children's health.

Innovative partnerships between researchers and the community help drive research design, lead to practical interventions, and create culturally–appropriate communication materials. Through their efforts, the centers empower community members to participate in planning, implementing, and evaluating interventions and public health strategies for healthier children, families, and future generations.

Research from the Children's Centers has reached thousands of people across the world through various forms of media.*

### WANT TO LEARN MORE?

If you are interested in the community outreach and research translation efforts by the Children's Centers, see the **Hallmark Features** section.



**1,400** news media stories



**2,300** Facebook posts



**8,000** Tweets

*based on a June 2017 Altmetric analysis of 1,877 Children's Centers publications

**13**

# Continuing to transform the landscape



The Children's Centers are integral to both EPA and NIEHS' research programs. The centers are one of several commitments to foster a healthy environment for children. They have advanced our understanding of the critical role environmental toxicants play in the development of childhood illnesses that may set the trajectory of health throughout adult life.

While EPA and NIEHS have together invested more than $300 million in the Children's Centers program to better understand the impact of the environment on children's health, there is still much to learn. The relationships between many environmental exposure and health outcomes remain unexplored. More data is needed to reduce or eliminate any uncertainties in associations between environmental exposures and health outcomes.

**The work of the Children's Centers program has identified the need for more feasible, simple strategies to prevent environmental exposures and reduce the burden of disease in children.**

Future efforts to protect children's health will require collaboration with communities, health professionals, and local, state, and federal governments. The strong relationships that the centers have established will benefit researchers and members of the community in the future.

The future of children's environmental health relies on research that expands knowledge, reduces uncertainty, and furthers collaboration.

**14**

# of children's environmental health



**The Children's Centers research program addresses a broad range of key issues by:**

**Stimulating new and expanding existing research** on the environmental determinants of children's health and the biological mechanisms that impact health and development.

**Using an inter-disciplinary approach** to understand the persistent developmental effects of chemicals and other environmental exposures from preconception through childhood and adolescence.

**Enhancing communication** and accelerating translation of research findings into applied intervention and prevention methods.

**15**

# COMMONLY USED ACRONYMS

**ADHD** – Attention–Deficit Hyperactivity Disorder

**ASD** – Autism Spectrum Disorder

**BPA** – Bisphenol A

**EDCs** – Endocrine Disrupting Chemicals

**IPM** – Integrated Pest Management

**NO$_2$** – Nitrogen Dioxide

**OP** – Organophosphate

**PBDEs** – Polybrominated Diphenyl Ethers

**PAHs** – Polycyclic Aromatic Hydrocarbons

**PCBs** – Polychlorinated Biphenyls

**PM** – Particulate Matter

**STS** – Secondhand Tobacco Smoke

**UC** – University of California

**µg/dL** – Micrograms per deciliter

# CENTER NAMES AND AFFILIATIONS

**Brown University** – Formative Center for the Evaluation of Environmental Impacts on Fetal Development*

**Cincinnati** – Center for the Study of Prevalent Neurotoxicants in Children

**Columbia University** – Columbia Center for Children's Environmental Health

**Dartmouth College** – Children's Environmental Health and Disease Prevention Research Center at Dartmouth

**Denver** – Environmental Determinants of Airway Disease in Children

**Emory University** – Emory University's Center for Children's Environmental Health

**Duke University (NICHES)** – Center for Study of Neurodevelopment and Improving Children's Health Following Environmental Tobacco Smoke Exposure

**Duke University (SCEDDBO)** – Southern Center on Environmentally–Driven Disparities in Birth Outcomes*

**Harvard University** – Metal Mixtures and Children's Health*

**Mount Sinai School of Medicine** – Inner City Toxicants, Child Growth, and Development

**Northeastern University** – Center for Research on Early Childhood Exposure and Development in Puerto Rico

**The Johns Hopkins University** – Center for the Study of Childhood Asthma in the Urban Environment

**University of California, Berkeley (CERCH)** – Center for Environmental Research and Children's Health

**University of California, Berkeley (CIRCLE)** – Center for Integrative Research on Childhood Leukemia and the Environment

**University of California, Berkeley/Stanford University** – Berkeley/Stanford Children's Environmental Health Center

**University of California, Davis** – Center for Children's Environmental Factors in the Etiology of Autism

**University of California, San Francisco** – Pregnancy Exposures to Environmental Chemicals Children's Center

**University of Illinois** – Novel Methods to Assess Effects of Chemicals on Child Development

**University of Iowa** – Children's Environmental Airway Disease Center

**University of Medicine and Dentistry of New Jersey** – Center for Childhood Neurotoxicology and Assessment

**University of Michigan (Peterson/Padmanabhan)** – Lifecourse Exposures and Diet: Epigenetics, Maturation and Metabolic Syndrome

**University of Michigan (Israel)** – Michigan Center for the Environment and Children's Health*

**University of Southern California** – Southern California Children's Environmental Health Center

**University of Washington** – Center for Child Environmental Health Risks Research

\* Specific findings from these Centers are not discussed in this report

**16**

The Children's Centers have led the way in demonstrating many of the links between environmental exposures and health outcomes. This report outlines some of the important contributions the Children's Centers have made to the field of children's environmental health.



It is often challenging to neatly categorize research findings and you will notice an overlap between the topic areas. For example, findings about air pollution may also be found in the topic area about asthma. To assist readers, an index has been provided that lists the various places where a topic is mentioned.

Are you interested in learning more about a specific disease, like autism or cancer? Or intrigued about how children may be exposed to environmental toxins, like BPA or lead? You will see the report is split into **Health Outcomes** and **Environmental Exposures**. Within each of these sections, the report is organized into topic areas that the Children's Centers have focused on since the inception of the program.

Each topic area includes a brief background, a summary of scientific findings, and examples of impacts in the community or in decision making. Each of these sections can be identified by text box color and location on the topic page.





### Interested in scientific research?

Read the research findings boxes at the bottom of each page. These findings are linked to the publication abstracts to help you gain a greater depth of scientific understanding.

### Interested in impacts in communities?

Read the Impact on Community boxes at the bottom of some of the topic area pages. Also read the Community Outreach and Research Translation topic area in the Hallmark Features section.

### Need an overview of children's environmental health?

Focus on the top half of each topic area page, which provides general information.



### Want to know what makes the Children's Centers so successful?

Read the Hallmark Features section to learn about the unique characteristics that have facilitated the program's success.







Infants and children are more vulnerable than adults to the negative effects of environmental exposures. The rapid growth and development that occurs *in utero* and during infancy, childhood, and adolescence makes children especially susceptible to damage. In fact, exposures throughout childhood can have lifelong effects on health.

Many factors contribute to children's health, including genetics, nutrition, and exercise, among others. The adverse health consequences of environmental exposures may occur along with other risk factors, and it is often difficult to determine the extent that the environment contributes to children's health.

The following pages present research from the Children's Centers on increasing rates of common chronic illnesses and the role of environmental exposures.



# HEALTH OUTCOMES

ASTHMA **20**

BIRTH OUTCOMES **22**

CANCER **24**

IMMUNE FUNCTION **26**

NEURODEVELOPMENT **28**

NEURODEVELOPMENT: AUTISM SPECTRUM DISORDER **30**

OBESITY **32**

REPRODUCTIVE DEVELOPMENT **35**

**19**



# NEURODEVELOPMENT: GENERAL

## BACKGROUND

At birth, a baby has formed almost all of its brain cells.[76] Exposure to chemicals such as mercury, lead, arsenic, and pesticides can have negative effects on brain development, leading to cognitive delay, attention-deficit hyperactivity disorder (ADHD), lower IQ, higher rates of anxiety and depression, behavior and learning disorders, reduced self-regulatory capacities, and shortened attention span.[77-88] Currently, neurodevelopmental disorders affect 10 to 15 percent of children born annually, and rates of certain disorders have been increasing over the past 40 years.[89, 90] Not only can prenatal exposures to toxins increase the risk of neurodevelopmental disorders at birth, but they can also lead to disorders later in childhood.[89]

The brain reaches approximately **90%** of its adult size by age 6.[91]

**Columbia University**

Prenatal exposure to airborne polycyclic aromatic hydrocarbons (PAHs) can have negative effects on cognition and behavior in childhood. PAHs are widespread in urban areas largely as a result of fossil fuel combustion, specifically diesel fuel exhaust. The Columbia University Children's Center cohort of mothers and children in New York City was the first human study to examine the effects of prenatal exposure to PAHs on child development. Associations between prenatal PAH exposure and adverse cognitive and behavioral outcomes include:

- Increased likelihood to exhibit signs of cognitive developmental delay at 3 years old. These results suggest that more highly exposed children are potentially at risk for performance deficits in the early school years.[77]

- Lower full-scale and verbal IQ test scores at 5 years old.[78]

- Increased symptoms of anxiety, depression, and attention problems at 6 to 7 years old.[79]

- Slower information processing speed, increased aggression, and other behavioral self-control problems, and increased ADHD symptoms at age 7 to 9 years old.[80]

- Increased behavioral problems associated with ADHD at age 9. This is the first study to report associations between individual measures of early-life exposure to PAHs and ADHD behavior problems.[81]

- Long-lasting effects on self-regulatory capacities across early and middle childhood. These deficits point to emerging social problems with real-world consequences for high-risk adolescent behaviors.[82]



## IMPACT

The Children's Centers are exploring associations between brain development and environmental toxicants such as lead, pesticides, phthalates, PAHs, bisphenol A (BPA), and polybrominated diphenyl ethers (PBDEs). **Prenatal exposures to pollutants have shown a relationship to adverse cognitive and behavioral outcomes, demonstrating links to: ADHD, reduced IQ, lessened self-regulatory capacities, anxiety, depression, attention problems, lower memory function, and structural changes to the brain.** Researchers have engaged with parents, childcare providers, and decision makers to encourage changes that reduce exposures and improve children's neurodevelopment. Children's Centers findings have helped develop public health policy and interventions aimed at protecting pregnant women and their babies from toxic environmental exposures. Their findings support the need for additional action.

---

Phthalates are commonly used in plastics and may affect neurodevelopment in children because they can be released into indoor air and attach to dust particles, that people breathe.

· Phthalate concentrations in indoor dust were higher in houses of children with developmental delay compared to children without developmental delay.[92]

· Among boys with autism spectrum disorder and developmental delay, greater hyperactivity-impulsivity and inattention were associated with higher phthalate concentrations in indoor dust. [92]

· Among children without any developmental delays, impairments in several adaptive skills such as ability to follow directions, written abilities, and language skills were associated with higher phthalate concentrations in indoor dust.[92]

**UC Davis**

---

Prenatal exposure to chlorpyrifos can interfere with children's brain development. Chlorpyrifos is a pesticide still widely used in agriculture, however, in 2000 it was banned for almost all homeowner use.[83] In a 1998 sample of pregnant women in New York City, detectable levels of chlorpyrifos were found in all indoor air samples and 70 percent of umbilical cord blood samples.[84, 85] Since the ban, levels in indoor air and blood samples have decreased significantly in study participants. Children exposed to higher levels of chlorpyrifos before birth displayed adverse cognitive and behavioral outcomes compared to children exposed to lower levels, including:

· Significantly lower scores on mental development tests and increased attention problems and symptoms of ADHD at 3 years old.[85]

· Lower full scale IQ and working memory test scores at 7 years old.[86] The effect on working memory was more pronounced in boys than in girls with similar chlorpyrifos exposures.[87]

· Structural changes in the brain in regions that serve attention, receptive language, social cognition, emotion, and inhibitory control, and are consistent with deficits in IQ.[88]

**Columbia University**



# NEURODEVELOPMENT: AUTISM SPECTRUM DISORDER

## BACKGROUND

Autism spectrum disorder (ASD) includes a wide range of symptoms and levels of disability characterized by challenges with social skills, repetitive behaviors, speech, and non-verbal communication, along with unique strengths and differences.[93] ASD was previously thought to be mainly due to genetics, however it is now understood that environmental factors play an important role; the estimated genetic contribution to ASD has decreased from 90 percent to 38-60 percent.[94-96] Approximately 1 in 68 8-year-old children have ASD, and it is even more common in boys (1 in 42) than in girls (1 in 189). Rates of ASD have been steadily increasing since 2002.[97, 98] While several factors may contribute to the observed rise in ASD, including changes in the diagnostic criteria, an earlier age of diagnosis, and inclusion of milder cases, these could not account for the full extent of the increase.[99]

> Caring for a child with ASD costs about **$17,000 more per year** than caring for a child without ASD. [99]

| University of Southern California | Research on the relationship between traffic-related air pollution (TRAP) and ASD suggest that late pregnancy and early life are critical windows of exposure. Measuring residential distance to a major roadway is often used as a marker of TRAP. |
|---|---|
| UC Davis | • For mothers who lived near a freeway during pregnancy, the risk of having a child with ASD doubled.[100] <br><br> • Children who were exposed to higher levels of TRAP in utero and in the first year of life were more likely to develop ASD.[101] |

| UC Davis | Parental environmental and occupational exposures have been linked to ASD and developmental delay. <br><br> • Children were at higher risk for developing ASD if their parents were exposed to lacquer, varnish, and xylene at their jobs.[102] <br><br> • Children were at greater risk for ASD and developmental delay if their mothers were residing near pyrethroids insecticide applications just before conception or during the third trimester.[103] <br><br> • Children were 60 percent more likely to develop ASD if their mothers resided near agricultural fields where organophosphate (OP) pesticides were applied during their pregnancy. The association was strongest for third-trimester exposures and second-trimester chlorpyrifos applications.[103] |
|---|---|

30



"We hope to identify chemical exposures, maybe not for every autistic child, but for subsets of children that are particularly sensitive to chemicals. If one could identify those chemicals and remove or reduce their prevalence in the environments in which children live, one would be in a position to say that we've reduced the prevalence of autism."
– Dr. Isaac Pessah, Director, UC Davis Children's Center.

# IMPACT

The Children's Centers have launched the field of research on environmental contributions to ASD. The centers have made significant advances both in identifying modifiable risk factors and in generating evidence for several mechanistic pathways. **Researchers have identified potential links between air pollution, pesticides, occupational exposures, phthalates, and risk of ASD.** The Children's Centers discovered the first gene-by-environment interactions in the development of ASD. Research at the UC Davis Children's Center led to the development of a biomarker test for early risk of having a child with autism. This technology is now being developed into a commercial test. Thus, since the inception of the Children's Centers program, the landscape has changed; rigorous research is now being published at a steady and increasing rate, pointing to avenues for preventive strategies and treatment options.



The UC Davis Children's Center initiated the CHARGE (The CHildhood Autism Risks from Genes and Environment) Study, a case-control study of children with and without ASD. CHARGE is the first comprehensive study of environmental causes and risk factors for ASD. Since 2003, the study has enrolled California preschool students with and without autism and other developmental delays. Researchers collected information about chemicals in the environments of these children before and after birth, and assessed children for their stage of social, intellectual, and behavioral development. This study was the first to identify an interaction between genes and the environment that contributes to ASD.

Research has uncovered that interaction between genes and the environment may contribute to ASD. A functional promoter variant in the MET receptor tyrosine kinase gene, that regulates aspects of brain development, might interact with air pollution to increase the risk of ASD. Children with high air pollutant exposures and the variant MET genotype were at increased risk of ASD compared to children who had neither high air pollutant exposures nor the variant MET genotype. Subsequent animal toxicological research strengthened the causal inference and indicated a possible mechanism for air pollution effects.[104]

University of Southern California

UC Davis



## POPULATION—BASED STUDIES

## BACKGROUND

Cohort studies follow a designated study population over time to establish risk factors for disease. Prospective cohort studies that are designed to follow children from before birth into adolescence or adulthood can provide critical information on prenatal and early childhood determinants of adult disease. The plasticity of the brain during puberty is the same as the first three months of life, and it is important to observe children during both these phases of development. Many Children's Centers have initiated large observational, prospective cohort studies that start during pregnancy or immediately after birth, then follow the children up to young adulthood. Other Children's Centers have utilized cohorts funded through other mechanisms, leveraging major investments that have already been made, such as examples shown below for the Duke University and the University of Michigan Children's Centers.

**Columbia University**

Starting in 1998, the Columbia University Children's Center enrolled more than 700 Latina and African-American women from New York City for its Mothers and Newborns (MN) cohort. This initial study led to the enrollment of subsequent cohorts, including 130 younger siblings of the MN cohort participants and the Fair Start cohort, that is currently enrolling pregnant women from the same neighborhoods. These prospective cohort studies are examining the impact of prenatal and postnatal exposure to air pollution, bisphenol A (BPA), phthalates, flame retardants, and pesticides on childhood health and development. These studies have been instrumental in the field, finding associations between certain environmental exposures and multiple adverse outcomes including reduced birthweight, obesity, attention-deficit hyperactivity disorder (ADHD), reduced IQ, and anatomical brain changes. The research has also revealed interactions between toxicant exposure and stressors related to poverty.

**University of Washington**

The University of Washington Children's Center has enrolled and maintained a prospective cohort of farmworkers, nonfarmworkers, and their families living in Yakima Valley, Washington. Families were first enrolled in the study when the children were between ages 2 and 6 years. Over the next 10 years, researchers assessed pesticide exposure in multiple seasons by measuring levels of pesticides in dust, urine, and blood. The study has also assessed biological mechanisms linked with toxicity and disease. A hallmark of this cohort is the frequency of samples, taken multiple times per season, during multiple seasons per year, across multiple years. This structure has allowed researchers to evaluate between- and within-person variability across seasons and years. One unique element of this study is the extensive exposome-based assessments. Not only have researchers measured over 80 pesticides in dust, they have also assessed phthalates, metals, mold, and social stress exposures using biomarkers and questionnaires.



"The Children's Centers have overcome many hurdles to understand the links between environmental exposures and health outcomes or social and cultural factors. Long-term studies [are critically important] to assess the full range of developmental consequences...at different life stages."
– Excerpt from *Lessons learned for the National Children's Study.*[29]

**Duke University**

The Duke University Children's Center follows a subset of approximately 400 children from a pre-existing Newborn Epigenetics STudy (NEST) cohort. NEST includes 2,000 racially-diverse pregnant women in central North Carolina, and was specifically designed to allow for in-depth investigation of epigenetic mechanisms that link the prenatal environment to children's health outcomes. NEST has assembled a rich repository of biological specimens over time from these mothers and their children as well as medical and epidemiological data that altogether have provided a strong foundation for other studies, including the Duke University Children's Center. This center is specifically investigating how secondhand tobacco smoke exposure during early life increases the risk of developing ADHD during adolescence.

**University of Michigan**

The Early Life Exposures in Mexico to Environmental Toxicants (ELEMENT) cohort consists of children enrolled at birth in Mexico City beginning in 1994 and followed for more than 22 years. The previously funded cohort is now part of the University of Michigan Children's Center, which investigates the influence of lead exposure on fetal and infant development. Findings from ELEMENT have found relationships between prenatal lead and low birthweight,[30] lower weight and higher blood pressure in young girls,[31, 32] cognition,[33-36] and ADHD[37]; findings have also shown that calcium supplementation during pregnancy can blunt the mobilization of lead stored in bone, thereby reducing fetal exposure.[38-40] Over the long follow-up period, researchers have been able to study exposures to metals other than lead, including fluoride,[41] cadmium,[42] mercury,[43] BPA, and phthalates.[44-49] Studies on additional health outcomes, such as cognition,[50-53] behavior,[50, 54] dental health, sexual maturation,[45, 46, 48, 55] adiposity,[44, 56, 57] and cardiometabolic risk[58] have also been possible. Evidence from ELEMENT has informed U.S. and Mexican lead exposure guidelines, including the 2010 CDC "Guidelines for the Identification and Management of Lead Exposure in Pregnant and Lactating Women", among others.[59]

**UC Davis**

In addition to the CHARGE study, the UC Davis Children's Center launched a second epidemiologic study of autism spectrum disorder (ASD) in 2006. The Markers of Autism Risk in Babies – Learning Early Signs (MARBLES) study follows mothers with at least one child with ASD before, during, and after their pregnancy. This allows researchers to obtain information about babies' prenatal and postnatal exposures. Infants are enrolled at birth and assessed for neurodevelopmental status until 3 years old. MARBLES has enrolled over 440 mother-child pairs and has conducted longitudinal biological and environmental sampling.



# RODENT MODELS

## BACKGROUND

Determining what chemical exposures are toxic to children requires a variety of research approaches, including high throughput *in vitro* cell based assays, animal models, and clinical and epidemiological studies. Studying mice in particular allows researchers to mimic how environmental exposures might affect humans. Such animal models provide invaluable information that researchers can use to isolate what chemicals pose the greatest risks, work out the complex mechanisms of toxicity, determine who is at risk for disease, and develop effective treatments. The Children's Centers use animal models alongside epidemiological studies to inform actions designed to reduce the burden of disease in children.

**University of Illinois**

Animal studies from the University of Illinois Children's Center were the first to determine the long-term and transgenerational consequences of prenatal phthalate exposure on both male and female reproduction. Prenatal exposure to phthalates was found to disrupt several aspects of female reproduction, including a disrupted estrous cycle, ovarian cysts, increased uterine weight, reduced fertility, and direct damage to the ovaries.[60, 61] The chemical mixture used in these animal studies was based on the specific mixture of phthalates identified in the blood of pregnant women enrolled in the center's cohort study. The resulting data represent the first findings from animal studies using an environmentally relevant phthalate mixture.

**University of Illinois**

Researchers found that exposure to bisphenol A (BPA) during perinatal development and adolescence may alter neuron and glia numbers in the prefrontal cortex of adult rats.[62] Given that the prefrontal cortex is a part of the brain that is critical for learning and memory, changes to the structure and function of this region may have broad implications for health. Studies are also underway to explore the effects of an environmentally relevant mixture of phthalates on the prefrontal cortex. Early findings show that phthalates resulted in impaired cognitive flexibility in adult rats. Researchers have taken anatomical measurements of the prefrontal cortex of the rat brain to establish the neural basis for this deficit.[63]

**Columbia University**

Researchers used animal models to investigate the epigenetic mechanisms or ways that polycyclic aromatic hydrocarbons (PAHs) and BPA may affect neurodevelopment and obesity.[64-67] High prenatal PAH exposure was found to be associated with weight gain and greater fat mass in mice, as well as more sedentary behaviors.[66, 67] These results parallel the findings in epidemiological studies linking high prenatal PAH exposure with higher risk of childhood obesity.[68]



"We don't do advocacy. We conduct the science and provide it in a way that can empower both the communities and the policymakers to do something about it."
– Frank Gilliland, Director, University of Southern California Children's Center.

An animal model was used to examine the effects of preconception, prenatal, and early childhood exposure to tobacco smoke extract and nicotine on neurobehavioral function. Researchers successfully differentiated between the effects of exposure to the complex tobacco mixture and to nicotine alone. These investigators found predominant persistent neurobehavioral impairments with late gestational exposure. However, persisting neurobehavioral effects were also seen with early gestational and even preconceptional exposure.[69] Studying rats allows researchers to analyze effects of exposures that are difficult to study in humans, particularly in different parts of the brain. Because the effects of prenatal exposure in children is usually studied using blood, the genes identified in animals help to determine where researchers should look for similar epigenetic alterations in humans.

**Duke University**

Researchers are utilizing an agouti mouse model to mirror exposures seen in humans. They are investigating the role of perinatal and peripubertal lead, BPA, and phthalate exposures on offspring lifecourse metabolic status, reproductive development, and epigenetic gene regulation. Findings show that perinatal lead exposure in mice was associated with increased food intake, body weight, total body fat, energy expenditure, and insulin response in adult mice, with more pronounced effects in males.[70] In addition, lead exposure immediately before or after birth (perinatal) was associated with changes to gut microbiota that can cause obesity. Perinatal lead exposure also enhanced long-term epigenetic drift in mice.[71, 72]

**University of Michigan**

Using animal models, researchers have conducted neurobehavioral studies to identify how genetic differences and timing of exposure modifies the health effects of pesticide exposure. The use of *in vitro* models that mimic brain development shows the impact of pesticides on signaling pathways and brain disorders. *In vitro* and animal models have demonstrated that organophosphate (OP) pesticides significantly inhibited neural growth, even at low concentrations. These effects appeared to be mediated by oxidative stress, as they were prevented by antioxidants.[75,76] These results suggest potential mechanisms where OP pesticides may interfere with neurodevelopment in children. Understanding these mechanisms may help identify critical windows of susceptibility in children.

**University of Washington**

73

## LIST OF EPA REVIEWERS

**APPENDIX A**

**Dan Axelrad**, Office of Policy (OP)

**Martha Berger**, Office of Children's Health Protection (OCHP)

**Elaine Cohen-Hubal**, Office of Research and Development (ORD)

**Jeffery Dawson**, Office of Chemical Safety and Pollution Prevention (OCSPP), Office of Pesticide Programs (OPP)

**Andrew Geller**, ORD

**Angela Hackel**, OCHP

**Aaron Ferster**, ORD

**James Gentry**, ORD, National Center for Environmental Research (NCER)

**Intaek Hahn**, ORD, NCER

**Kaythi Han**, OCSPP, OPP

**James H. Johnson, Jr.**, ORD, NCER

**Annie Kadeli**, Office of Environmental Information (OEI)

**Rick Keigwin**, OCSPP, OPP

**Christopher Lau**, ORD, National Health and Environmental Effects Research Laboratory (NHEERL)

**Patrick Lau**, ORD, NCER

**Sylvana Li**, ORD, NCER

**Danelle Lobdell**, ORD, NHEERL

**Sarah Mazur**, ORD, Immediate Office of the Assistant Administrator

**Jacquelyn Menghrajani**, Region 9

**Jacqueline Moya**, ORD, National Center for Environmental Assessment (NCEA)

**Linda Phillips**, ORD, NCEA

**Patrick Shanahan**, ORD, NCER

**Maryann Suero**, Region 5

**Nicolle Tulve**, ORD, National Exposure Research Laboratory

**Kelly Widener**, ORD, NCER

# **Exhibit 19**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AT SAN FRANCISCO

FOOD & WATER WATCH, et al.     *

  Plaintiffs                   *   Civ. No.

v.                             *   17-CV-02162-EMC

U.S. ENVIRONMENTAL PROTECTION *

AGENCY, et al.                 *

  Defendants                   *

               *   *   *   *   *

VIDEOTAPED DEPOSITION OF

KRISTINA A. THAYER, Ph.D.

MAY 17th, 2019

WASHINGTON, D.C.


Reported by:  Dawn M. Hyde

Page 8

1    show you everything.  So at the end of the

2    day, you're going to see that the only changes

3    made were typographical mistakes and that can

4    be confirmed by simply looking at the

5    videotaped -- a copy of the videotape.  But

6    yes, I am happy -- I apologize for the

7    misunderstanding and I'm happy to work with

8    you to make sure that everyone's on the same

9    page with respect to what the transcript

10   originally showed with the typographical

11   errors and what corrections were made.

12           MS. CARFORA:  Thank you.

13           THE VIDEOGRAPHER:  Will the court

14   reporter please swear in the witness and then

15   we can proceed.

16   Whereupon,

17           KRISTINA A. THAYER, Ph.D.,

18   a witness herein, called for oral examination in

19   the matter pending, being first duly sworn to tell

20   the truth, the whole truth, and nothing but the

21   truth, testified as follows:

22                    EXAMINATION

23       BY MR. CONNETT:

24       Q    Good morning.

25       A    Hi.

1       A    Yes.

2       Q    And your field of study was

3    psychology?

4       A    Yes, and biology.  Kind of

5    biological psychology.

6       Q    Cool.  And you got a Ph.D. in 1999.

7       A    Uh-huh.

8       Q    From the University of Missouri.

9       A    Yes.

10      Q    And that was your field of study

11   there was biological sciences?

12      A    Uh-huh.

13      Q    And you worked with Theo Colborn?

14      A    Yes.

15      Q    And then I see that in 2003 you

16   became a staff scientist at the National

17   Toxicology Program.

18      A    Yes.

19      Q    And you stayed on as a scientist at

20   the National Toxicology Program until the

21   beginning of 2017?

22      A    Yes.

23      Q    And then you went to EPA?

24      A    Correct.

25      Q    And your current -- what's your

Page 12

1    current position at EPA?

2         A    I am the division director for the

3    Integrated Risk Information System, IRIS.

4         Q    So let's -- I would like to ask you

5    a little bit about some of the background

6    about what IRIS is, okay?

7         A    Uh-huh.

8              (Thayer Deposition Exhibit Number 101

9              was marked for identification.)

10   BY MR. CONNETT:

11        Q    And I will go ahead and mark this

12   document as Exhibit Number 101.  And I just

13   printed this out from the EPA website and it's

14   the "About IRIS" page and it says -- starts by

15   saying, "EPA's mission is to protect human

16   health and the environment."

17             That's a correct statement, right?

18        A    Correct.

19        Q    And it said that the "EPA's IRIS

20   program supports this mission by identifying

21   and characterizing the health hazards of

22   chemicals found in the environment."

23             And that's a correct statement?

24        A    Correct.

25        Q    And the way that IRIS goes about

1    its classification criteria, right?

2         A    Well, and this would have been

3    applied to, in this case, looking at

4    animal-only information, right.  So you don't

5    have the missing pieces, what is the human

6    evidence telling you.  And you would really,

7    to sort of come up with an overall conclusion,

8    you'd want both those pieces.

9         Q    Right.  But just looking at what

10   moderate -- when NTP is determining what level

11   of confidence it has in animal data, a

12   conclusion of moderate is the second highest

13   level of confidence it can have?

14        A    Yes.

15        Q    And you had noted that by concluding

16   that there's a moderate level of confidence in

17   the database, that basically what NTP is

18   saying is we think there's something happening

19   here but we need to do more research to kind

20   of disentangle some things and better clarify

21   the relationship between fluoride and

22   learning; would that be --

23        A    Yes, and I believe -- and you may

24   have to help me on the time frames -- I

25   believe part of our messaging also was that

1   there were some very specific data gaps to

2   help explore the scenario people were

3   interested in, low-level exposure during

4   development.  And then we were initiating some

5   experimental studies to help complement those

6   data gaps that were identified here.

7        Q    Right.  But when we are looking at

8   what does the finding of moderate evidence of

9   learning effects mean, it means we think there

10  is something happening here but we need to do

11  further research to clarify things, would that

12  be a fair --

13       A    Right.  And it would have been

14  constrained here to hazard.  Is there a

15  signal.  When you begin to pivot from hazard

16  to trying to think about dose-response,

17  toxicity by derivation -- which is not what

18  NTP does -- then it often is the case that

19  studies that are helpful for hazard are --

20  they're not always helpful for that second

21  stage.  You want features.  You want the study

22  to be well-conducted.

23            Ideally, you want it to have

24  multiple dose levels.  Ideally, you want those

25  dose levels to get down to the range that

1       A     Because the idea of the experimental

2    studies is to more directly go after the data

3    gaps that we saw in the animal evidence base.

4    And to do that, it just took us to having to

5    kind of segregate out more conclusions about

6    the higher dose from the lower dose studies.

7       Q     And -- well, why don't I just follow

8    up on that right now and ask you what is it --

9    why did the conclusion change?  Why was -- why

10    did the conclusion change from moderate

11    evidence of developmental neurotoxicity to low

12    evidence?  Because when the final report was

13    issued that was released to the public in July

14    of 2016, the conclusion was that there was a

15    low evidence for the neurotoxicity during the

16    developmental period, right?

17       A     Well, if you look on Table 3, okay,

18    so studies used for the evidence synthesis.

19    So what we talked about before were studies --

20    there were doses tested and then there's a

21    count of studies that are available.

22             Then we applied systematic review

23    purges, which I can describe more if you want.

24    And then what that includes is looking at each

25    study, using the same criteria for each study,

1    and evaluating its quality.

2              In some cases a study has

3    limitations that are serious enough that they

4    don't move on.  So you're not talking about a

5    minor limitation.  You're talking about

6    typically multiple limitations because

7    scientists are loath to exclude studies unless

8    there's a good reason.  That's not what we do.

9              So when you look down here, the

10   studies used for evidence synthesis.  So for

11   developmental, right, there was six studies

12   available.  How many of those were less than

13   ten, zero.  Eleven to 25, there were three.

14   Above 25, five.

15             So you can see, compared to the

16   adult, you had more studies available in the

17   adult.  You had fewer studies available in the

18   developmental time window that were considered

19   of the study quality that we wanted, and you

20   really didn't have them in sort of the target

21   dose range that we wanted.

22             So that is what I mean by looking at

23   those numbers.  We had more confidence always

24   in the adult conclusions.  There wasn't enough

25   studies in the developmental range for us to

1    have the same level of confidence in

2    describing the pattern.

3         Q    Okay.

4         A    That was always there.  That was

5    always there, and what became more apparent as

6    we developed the draft, was we have to express

7    that.  That was our judgments as the team, you

8    know, charged to develop this report.  And we

9    just didn't feel that collapsing across

10   everything was telling the story that you see

11   in this table.

12        Q    Okay.  But at least when you, you

13   know, at the time this report was given to the

14   Australian government and this first draft

15   that was circulated to the federal agencies,

16   the conclusion at this time is that these

17   studies that we see in Table 3 provided the

18   moderate evidence of adverse learning effects

19   during the development period, right?  At that

20   time, that was the conclusion?

21        A    Right.

22             (Thayer Deposition Exhibit Number 107

23             was marked for identification.)

24   BY MR. CONNETT:

25        Q    So I am going to go ahead and hand

1  Australian government, right?

2       A    I would have to go back to look.

3       Q    That's fine.  So here -- the

4  conclusion here, and you sort of already

5  identified it, but the conclusion here is that

6  we have a moderate -- there's moderate level

7  of evidence of fluoride impairing learning and

8  memory during adulthood, and there is low

9  confidence/evidence in fluoride impairing

10 learning, memory during the developmental

11 period, correct?

12      A    Right.

13      Q    So the conclusion for the

14 developmental period was downgraded, correct?

15      A    And in part again, when you look at

16 the number of studies that we had available,

17 we had just much more to work with in the

18 adult space.  But in tandem, we also initiated

19 the NTP experimental studies.

20      Q    Right.  And since the NTP -- since

21 this systematic review was done, are you aware

22 that there's been a number of new

23 developmental studies conducted on fluoride

24 and learning?

25      A    Generally aware.  I -- actually I

1    then again what happens is once you go from

2    hazard to actually pivoting and thinking about

3    quantitative dose-response on human studies,

4    then typically it's going to be a smaller set

5    of studies that are going to be informative.

6           Q    Right.  You've first got to

7    determine if there is a hazard.  Once you have

8    determined if there is a hazard, then you look

9    for human studies, if they're available, that

10   allow you to make a dose-response assessment?

11          A    Right.  In this case at this point

12   in terms of fluoride, we know there are human

13   studies.

14          Q    Right.

15          A    Do we know how -- what that hazard

16   would look like, no because I don't think

17   there's been an analysis, let alone the

18   dose-response.

19          Q    Right.  And I'm going to ask you

20   some questions on that later.  So let's get

21   back to the NTP report, and so can you --

22   sounds like one of the reasons why you had

23   less confidence in the developmental studies

24   as of this time, July 2016, is that there were

25   just less of them than there were of the adult

1   studies.

2       A    There were less of them but I

3   believe that there were those issues alluded

4   to in terms of our ability to separate out

5   learning from memory.

6            So if there is a motor impairment

7   and the animal can't move as well and the

8   learning test requires the animal to move

9   well, it's really hard to sort of figure out

10  if it's specifically a learning deficit or

11  whether it's possible some sort of motor

12  impairment might be underlying that.

13           And given that the eyes, the public

14  eyes, were on the learning impairments, we

15  felt like we couldn't fully separate those

16  out.

17      Q    Okay.  But if fluoride was causing a

18  motor impairment, that would be a neurotoxic

19  effect, right?

20      A    It would be, but it would also

21  change the focus of how do you think about

22  those human studies that are focused on IQ.

23  Do you know what I mean, in terms of the

24  evidence synthesis, you might not now be

25  talking about, relatively speaking, apples and

1    apples.

2        Q    Right.  But when you're looking at

3    the animal evidence to determine whether motor

4    effects could be contributing to the learning

5    or memory deficit --

6        A    Yes.

7        Q    -- isn't it relevant and important

8    to consider what the human epidemiological

9    data suggests, which is that fluoride lowers

10   IQ?  I mean, isn't that human data point

11   relevant for assessing whether the animal

12   studies are showing a learning effect or a

13   motor effect?

14       A    Yes, but that is why, you know, NTP

15   was proposing to do this multiple evidence

16   human analysis, because you do have to have

17   that context.  But I would say, though,

18   that -- true, but I would still say there's a

19   lot of value in trying to experiment through

20   the animal research, seeing if you could tease

21   it apart.  It makes the synthesis of the human

22   evidence easier.

23       Q    Right.

24       A    Because now you're trying to sort of

25   talk about the degree of support that you see

1    in these experimental animal studies for

2    learning impairment.  If you can tease apart

3    potential confounding from the motor, it

4    just -- it simplifies that process.

5         Q    Right.  And at the end of the day,

6    whether fluoride's causing a learning effect

7    or a motor effect, either of those effects

8    would be a neurotoxic effect?

9         A    Yes.

10        Q    So one thing I want to explore on

11   this issue of the developmental studies, first

12   is the adult studies, is you would agree -- or

13   tell me if you don't agree -- but you'd agree

14   that the developing brain is more vulnerable

15   to neurotoxicants than the adult brain?

16        A    That's a general assumption that we

17   make, yes.

18        Q    And one of the reasons for that is

19   because the developing brain, particularly

20   during fetal development and early neonatal

21   development, has a more permeable blood brain

22   barrier, right?

23             MS. CARFORA:  Objection, foundation.

24        A    Yes.  I am going to take that

25   because there are critical windows of

1   wildly off the mark, it would have been

2   caught.  That's what I'll say.

3       BY MS. CARFORA:

4       Q    And goes on to say, "Because the

5   blood brain barrier limits the passage of

6   substances from blood to brain, in its absence

7   toxic agents can freely enter the developing

8   brain."  And I believe you already stated

9   something to that effect.

10      A    Yes.

11      Q    You would agree with that statement?

12      A    I would agree with that statement.

13  The part that I'm fuzzy on are the actual

14  windows of maturity when the blood brain

15  barrier matures.

16      Q    So then it goes on to say -- and I

17  don't want to get into the details of the

18  evidence --

19      A    Thank you.  Thank you.

20      Q    -- on hexanone but it says, "Since

21  Purkinje cell degeneration has been observed

22  with adult rats exposed to this chemical,

23  infants may be at an increased risk for this

24  type of damage at lower levels of exposure due

25  to the incomplete maturation of the blood

1    question about this document for you.  If you

2    can turn to page 42.

3         A    Okay.

4         Q    And you see there is a section there

5    at the top called "Susceptible populations and

6    life stages."

7         A    Yes.

8         Q    And it starts by saying, "A

9    population subgroup is susceptible if exposure

10   occurs during a period of sensitivity."

11        A    Yes.

12        Q    And you would agree with that

13   statement?

14             MS. CARFORA:  Objection, foundation.

15        A    Yes.

16   BY MR. CONNETT:

17        Q    And it goes on to say that, "The

18   neonatal stage is a period of rapid

19   development of the nervous system and is

20   considered a critical window of development."

21             Did I read that correctly?

22        A    Yes.

23        Q    Do you agree with that statement?

24        A    Yes.

25             MS. CARFORA:  Objection, foundation.

1        A    Right.  I suspect, when we look at

2    fluoride, it won't be the same scenario.

3        Q    Because with fluoride we have far

4    more human data on fluoride neurotoxicity than

5    we have on RDX neurotoxicity.

6        A    Right.  And what I'm talking about

7    in terms of the same data is you mentioned

8    that there were case reports, a case study,

9    cross-sectional, right?

10       Q    Right.

11       A    What I'm talking about with fluoride

12   is I know we have more cohort kind of studies,

13   right.

14       Q    Right.

15       A    So it's not that I know those

16   studies but I know that the collection of

17   studies is much more rich for fluoride than

18   RDX.

19       Q    Right.  And so let's talk about

20   cohort studies, and you'd agree that

21   prospective cohort studies -- well, first of

22   all are you familiar with the phrase

23   prospective cohort studies?

24       A    Yes.

25       Q    Do you agree that that's basically

Page 163

1    the gold standard epidemiological study for

2    determining the relationship between an

3    environmental chemical and the human health

4    effect?

5            MS. CARFORA:  Objection, foundation.

6       A    It's an ideal study design in our

7    field.  It's not an experimental study but we

8    don't often see those in environmental health

9    for a variety of reasons.

10       BY MR. CONNETT:

11       Q    So for purposes of environmental

12   health epidemiology, a prospective cohort

13   study is the ideal study design?

14       A    It is, but beyond that -- beyond

15   that, you also have to think about the way

16   that the exposure was measured.  Was it

17   actually measured and reflective of the time

18   periods that you want.  And then you have to

19   think about the outcome.  So it's an ideal

20   study design, but that study design on its own

21   does not mean that every prospective cohort

22   study is going to automatically be high

23   quality.

24       Q    Right.

25            MS. CARFORA:  Can we take a break?

1          MR. CONNETT:  Yes, this is a good

2    time.

3          THE VIDEOGRAPHER:  Okay.  We're

4    going off the record here at 12:47 p.m.

5          (Lunch recess taken from 12:47 p.m.

6          until 1:24 p.m.)

7          THE VIDEOGRAPHER:  We are going back

8    on the record here at 1:24 p.m.  This is tape

9    number four of the videotaped deposition of

10   Kristina Thayer.

11     BY MR. CONNETT:

12     Q    Okay.  I would like to for the next

13   hour talk with you about animal studies, okay.

14   Just joking.

15     A    I was practicing my -- how did I do?

16     Q    Very good.  Very good.

17          So just sort of wrapping up our

18   discussion on animal studies, would you agree

19   that the animal evidence that exists today on

20   fluoride impairing learning and memory in

21   animals supports the biologic plausibility of

22   fluoride reducing IQ in humans?

23          MS. CARFORA:  Objection, foundation.

24     A    I would say supports a biological

25   plausibility of something neurological, but I

Page 165

1    think we still have this issue about being

2    able to sort of separate potential motor

3    impairment from learning and memory more

4    specifically.

5        BY MR. CONNETT:

6        Q    Okay.  So if I understand what

7    you're saying, you would agree that the animal

8    evidence on fluoride and learning and memory

9    supports the biologic plausibility of fluoride

10   causing neurological effects in humans?

11       A    I would say that the indications of

12   neurological effects in animals, which may be

13   motor, may be learning behavior, may be a

14   combination, support the biological

15   plausibility of further analysis of the human

16   literature.

17       Q    Okay.  So at the end you said

18   further analysis of the human literature.

19       A    Yes, and in part what you're talking

20   about is -- and this is from outside my area

21   of expertise -- can I extrapolate what the

22   Morris water maze means in terms of a human

23   counter -- a human measurement of IQ.  So a

24   lot of it's that extrapolation from the animal

25   models of measuring learning behavior to what

1   causes neurologic effects in animals, supports

2   the biologic plausibility of fluoride causing

3   neurologic effects in humans, right?

4           MS. CARFORA:  Objection, foundation.

5      A    Can support, but again, would need

6   to be further analyzed, right.

7       BY MR. CONNETT:

8      Q    Right.  And I'm not asking you to

9   tell me in this question that I know that

10  fluoride does this, this or this.  I'm just

11  saying you would agree that the evidence on

12  fluoride neurotoxicity in animals supports the

13  biologic plausibility of fluoride causing

14  neurologic effects --

15     A    Yes, when we do our structured

16  frameworks for evidence integration at the NTP

17  at the IRIS program, that would be an

18  indication of biological plausibility, yes.

19     Q    And you would agree -- remember we

20  looked at that RDX summary of the animal

21  literature and it said that there was

22  consistent evidence of neurotoxicity in the

23  animal studies for RDX?

24     A    Yes.

25     Q    And they referenced 11 of 16 studies

 1   First sentence.

 2        A    Yes.

 3        Q    And that's consistent with your

 4   understanding, right, that fluoride's

 5   predominant benefit we now know is topical,

 6   not systemic, right?

 7        A    Yes.

 8             MS. CARFORA:   Objection, foundation.

 9   BY MR. CONNETT:

10        Q    And in the introduction here you

11   talk about the findings of a Cochrane

12   systematic review on water fluoridation; do

13   you recall that?

14        A    Yes, but the details are...

15        Q    Absolutely.  So let's look at sort

16   of the middle of the second paragraph.  You

17   see there a discussion about the Cochrane

18   systematic review?

19        A    Yes.

20        Q    And by the way, do you know what

21   the -- are you familiar with the Cochrane

22   Center or the Cochrane Collaboration?

23        A    Yes.

24        Q    Because you have an expertise in

25   systematic reviews, right?

1            So you try to focus on unexplainable

2    inconsistency and you also think about

3    direction of the effect magnitude -- the

4    overall quality of the studies, and then you

5    reach judgment of how confident you are in the

6    association.

7            And so that's an expert judgment

8    process and it is what it is.  That is the

9    nature of the beast.  And so what systematic

10   review does is it doesn't disguise that as

11   being expert judgment.  It tries to make it

12   more transparent:  What factors did you think

13   about.

14           And so if you look in the report,

15   there's a section that tries to sort of be

16   clear about what factors drove -- gave a sort

17   of more confidence or less confidence in those

18   collection of studies and then all that gets

19   converted into this overall confidence

20   conclusion.

21   Q    Okay.  Now, you were the author of

22   this systematic review.  Is that the

23   appropriate way to explain that?

24   A    Lead author but, I mean, at the end

25   of the day, it's an NTP report which actually

1    means NTP is the author.  I wrote the words.

2    I did project management.  I did some of the

3    work, but you don't do systematic review on

4    your own.  It's inherently a team-based

5    activity.

6              So you have -- at a minimum you have

7    other people help you screen studies.  In a

8    case like this, you make sure that you have

9    experts who understand animal studies, animal

10   behavioral studies.

11             We also had to sort of reach out to

12   chemists to make sure -- to think about some

13   of the fluoride exposure information and how

14   we might convert.  So you have a team of

15   experts who work on this.

16        Q    So if there is a -- for example, you

17   said that you had two experts read or screen

18   reports for relevancy.  I think that is how

19   you put it, right?

20        A    Yes, relevancy to our PECO, right.

21        Q    Okay.  Now, if there is a dispute

22   between the two experts determining whether

23   the study meets the criteria set forth in

24   PECO, who resolves that dispute?

25        A    They discuss it.  Typically, it's

1    June 2008 and today, 2019?

2        A    Yes.

3        Q    So let me just confirm that.

4    Exhibit Number 109.

5        A    Uh-huh.

6        Q    That was an IRIS assessment that was

7    completed in June 2008; is that correct?

8        A    Correct.  And also again, the

9    systematic review processes that we're using

10   now would not have been implemented.  That's

11   actually on the assessments that are occurring

12   very recently.

13       Q    Okay.

14           MS. CARFORA:  Let me just state for

15   the record that the interruptions you hear on

16   the video are opposing counsel playing with

17   his binder and his papers.

18           MR. CONNETT:  Sorry about that.

19           MS. CARFORA:  I would also like to

20   say for the record while we're on the record

21   that Judge Chen's standing order does confirm

22   that one attorney start and finish the

23   deposition.

24           MR. NIDEL:  No, that's not what it

25   says.  It says one attorney conduct the

Page 307

1   STATE OF MARYLAND

2   HOWARD COUNTY

3        I, Dawn Michele Hyde, a Notary Public of the

4   State of Maryland, Howard County, do hereby certify

5   that the above-captioned proceeding took place

6   before me at the time and place herein set out.

7        I further certify that the proceeding was

8   recorded stenographically by me and this transcript

9   is a true record of the proceedings.

10       I further certify that I am not of counsel to

11  any of the parties, nor an employee of counsel, nor

12  related to any of the parties, nor in any way

13  interested in the outcome of the action.

14       As witness my hand and seal this 17th day of

15  May, 2019.

16

17                    Dawn M. Hyde, Notary Public

18                    My Commission Expires 10/7/2019

19

20

21

22

23

24

25

# **Exhibit 20**

Page 1

1                    UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    _____

4    FOOD & WATER WATCH, INC., et al.,      )

                                            )

5    Plaintiff,                             )

                                            )

6            vs.                            )No. 3:17-cv-02162-EMC

                                            )

7    US ENVIRONMENTAL PROTECTION AGENCY,    )

     et al.,                                )

8                                           )

     Defendant.                             )

9    _____

10                  Deposition Upon Oral Examination Of

11                            HOWARD HU

12   _____

13

14

15

16

17                          9:15 a.m.

18                      September 24, 2019

19                      700 Stewart Street

20                      Seattle, Washington

21

22

23

24   Job No. CS3560042

25   REPORTED BY:  Yvonne A. Gillette, CCR No. 2129.

Page 5

1   HOWARD HU,                       being duly sworn, testified

2                                    upon oath as follows:

3

4                        EXAMINATION

5   BY MR. ADKINS:

6   Q        Could you please state your full name for

7   the record?

8   A        Howard Hu.

9   Q        Good morning, Dr. Hu.  My name is Brandon

10  Adkins.  I'm an attorney with the US Department of

11  Justice.  I represent the Environmental Protection

12  Agency in this matter.  Are you represented by counsel

13  today?

14  A        I don't know.  I'm here as a fact witness.

15  That's all I know.

16  Q        And have you ever been deposed before?

17  A        Yes.

18  Q        Okay.  And how many times have you been

19  deposed?

20  A        Oh, well, I'm an expert witness in various

21  things related to my role as an occupational

22  environmental medicine physician and consultant and

23  also environmental epidemiology expert, so I would say

24  maybe 25 to 30 times.

25  Q        When is the last time you were a witness at

Howard Hu                                           September 24, 2019

Page 15

```
 1    Q        Is this a document you prepared as part of

 2    your preparation for this deposition?

 3    A        Yes.

 4    Q        Okay.  Could you read the studies cited in

 5    your notes, please, for the record?

 6    A        Yeah.  Sure.  These are in alphabetical

 7    order.  The first one is Bartos, et al.  Alterations

 8    in the memory of rat offspring exposed to low levels

 9    of fluoride during gestation and lactation, colon,

10    involvement of the alpha7 nicotinic receptor and

11    oxidative stress, published in Reproductive

12    Toxicology, 2018.  Chen -- that's C-H-E-N -- et al.,

13    ERK 1/2 mediated disruption of BDNF-TRKB signaling

14    causes synaptic impairment contributing to

15    fluoride-induced developmental neurotoxicity,

16    published in Toxicology 2018.

17             McPherson, et al., An evaluation of

18    neurotoxicity following fluoride exposure from

19    gestational through adult ages in Long-Evans hooded

20    rats, published in Neurotoxicology Research, 2018.

21    Wang et al., Effects of perinatal fluoride exposure on

22    the expression of -- I guess you should read it --

23    miR-124 and miR-132 in hippocampus of mouse pups,

24    published in Chemosphere, 2018.  Sun -- that's

25    S-U-N -- et al., Maternal fluoride exposure during
```

Page 31

```
 1   A         My opinion is that there's research that

 2   suggests that fluoride is a neurodevelopmental

 3   toxicant.

 4   Q         Now, do you have an opinion on whether

 5   fluoride is a neurodevelopmental toxicant at a

 6   particular level of exposure?

 7             MR. CONNETT:  Vague and ambiguous.

 8   A         I do.

 9   Q         And what's your opinion?

10   A         My opinion is that the most recent evidence

11   suggests that population level exposure to fluoride

12   includes a range of exposure that seems to be

13   associated with decrements in neurodevelopmental

14   function.

15   Q         What is the range of exposure you're

16   referring to?

17   A         I mean the range of exposures that were

18   associated with the ELEMENT study as well as the MIREC

19   study.

20   Q         Can you put any numbers to those ranges?

21   A         May I look at my papers?

22   Q         Sure.

23   A         Well, the ELEMENT study, just characterizing

24   it in a fairly simplistic way, I had prenatal maternal

25   urinary fluoride levels, creatinine corrected, that
```

1    ranged somewhere around 0.25 to 2 milligrams per liter

2    as can be seen from Figure 2 in our 2018 paper.  And

3    actually, I didn't bring a copy of the Till, et al.,

4    Journal of Pediatric paper, but their earlier paper in

5    2018 demonstrated that the maternal urinary fluoride

6    levels, creatinine corrected, were in a similar range.

7    Q        So when you -- when you say range of

8    exposure that seems to be associated with neurological

9    decrements, you're referring to prenatal fluoride

10   concentrations in pregnant mothers' urine?

11   A        That's correct.

12   Q        Okay.  I think you said Till, et al.'s most

13   recent study in Journal of Pediatrics.  Were you

14   referring to -- I think it's Rifka Green is the first

15   author; is that correct?

16   A        Correct.

17   Q        You prefaced your answer to my question as

18   saying, most -- the most recent evidence suggests.

19   And then you referred to, I believe it was -- was it

20   Bashash 2018 and Till 2018, those two studies?

21   A        I think Bashash 2017.

22   Q        And Till 2018.  Are there any other facts

23   that you relied upon in formulating this opinion?

24            MR. CONNETT:  Overbroad.  Vague and

25   ambiguous.

Page 33

```
 1   A          Not materially, no.

 2   Q          And what methodologies have you used to

 3   arrive at your opinion regarding fluoride's potential

 4   association with neurological decrements?

 5              MR. CONNETT:  Overbroad.

 6   A          Yeah.  It's a pretty broad question, but in

 7   general, it's the entire research enterprise that I

 8   understand is the subject of this inquiry, that is our

 9   ELEMENT research program looking at fluoride exposure

10   among the ELEMENT mothers and offspring and

11   measurements of neurobehavior development.

12   Q          So it's comparing prenatal urinary

13   concentrations in pregnant mothers with neurological

14   testing of the offspring of those mothers later in

15   life; is that correct?

16   A          Well, I guess that's a very simplistic

17   characterization, but it's looking at the longitudinal

18   association of prenatal and postnatal biomarkers of

19   fluoride exposure in the pregnant mothers and

20   offspring children and relating that to

21   neurobehavioral measures of development, while also

22   adjusting for a number of other covariants that could

23   be potentially confounding that relationship.

24   Q          Okay.  Do you have an opinion regarding the

25   effects of prenatal exposure to fluoride with respect
```

Howard Hu                                    September 24, 2019

Page 34

1   to intelligence?

2   A          Yes.

3   Q          And what's your opinion?

4   A          Well, our 2017 paper, just to quote it,

5   basically concluded that higher prenatal fluoride

6   exposure in the general range of exposures reported

7   for other general population samples of pregnant women

8   and non-pregnant adults was associated with lower

9   scores on tests of cognitive function, IE, cognition,

10  in the offspring at age 4 and 6 to 12 years.  That

11  remains my opinion based on our research.  And I will

12  simply note that the results of the Rifka Green, et

13  al. paper demonstrates some similarities.

14  Q          Okay.  What paper are you reading from?

15  A          From our team's 2017 paper, Bashash, et al.

16  Q          And do you have an opinion regarding the

17  effects of prenatal exposure to fluoride with respect

18  to ADHD symptoms?

19              MR. CONNETT:  By the way, just for the

20  record, did you refer to that as a 2018 study or 2017?

21              THE WITNESS:  2017, yes.

22  A          Okay.  Again, so I am consistent, I'm

23  reading from the Bashash, et al. 2018 paper, which

24  concluded that higher levels of fluoride exposure

25  during pregnancy were associated with global measures

Page 35

1    of attention deficit hyperactivity disorder, otherwise

2    known as ADHD, and more symptoms of inattention as

3    measured by the -- and this is the Conners Rating

4    Scaled, Revised in the offspring.  And that were the

5    results of our study in this area.  I stand by those

6    conclusions.

7    Q        You're pre-empting my next question.  When I

8    asked whether you had an opinion regarding the effects

9    of prenatal exposure to fluoride with respect to

10   intelligence, you referred to the conclusion written

11   in Bashash 2017.  So is your opinion with respect to

12   the effects of prenatal exposure to fluoride on

13   intelligence any different from the stated conclusion

14   in Bashash 2017 with respect to that topic?

15   A        No.

16            MR. CONNETT:  Vague and ambiguous.

17   Q        And similarly, is your opinion regarding the

18   effects of prenatal exposure with respect -- of

19   fluoride with respect to ADHD any different from the

20   conclusions stated in Bashash 2018?

21            MR. CONNETT:  Vague and ambiguous.

22   Overbroad.

23   A        Not materially, no.

24   Q        Do you have an opinion regarding the

25   applicability of the findings in your research of the

1    with a population that has one distribution of

2    internalized fluoride based on maternal urinary

3    fluoride and the other population's internalized

4    fluoride, I guess you could say, burden based on their

5    particular exposure source.  And I think because

6    you're looking at a biomarker, the interpretation

7    would be essentially about fluoride internalized

8    exposure.  I think that's all the inference you can

9    make.

10   Q        Okay.

11   A        Was I missing something?

12   Q        No.  It's a complicated question.  I

13   appreciate the answer.  Can we take a break?

14            MR. CONNETT:  Yeah.

15            (Lunch recess taken.)

16            (Exhibit No. 342 marked for identification.)

17   Q        Dr. Hu, the court reporter's now handed you

18   what's been marked as Exhibit 342.  Have you seen this

19   study before?

20   A        Yes.

21   Q        Okay.  This is a document entitled, Prenatal

22   Fluoride Exposure and Cognitive Outcomes in Children

23   at 4 and 6 through 12 years of age in Mexico.  I will

24   refer to this study as Bashash 2017.  Okay?

25   A        Okay.

1    Q          Were you a coauthor of Bashash 2017?

2    A          Yes.

3    Q          What were your responsibilities with respect

4    to the research being reported in Bashash 2017?

5    A          I was the principal investigator.  I was the

6    senior author responsible for design of the study,

7    conduct of the study, the drafting of the manuscript,

8    the interpretation of the results.  Basically every

9    aspect of the study.

10   Q          What was your responsibility with respect to

11   writing Bashash 2017?

12   A          Dr. Bashash drafted this manuscript.  I was

13   the first person to look at it and make suggestions,

14   do editing before it was then distributed to the other

15   coauthors for their input.  And then I looked at all

16   subsequent drafts and signed off on the final draft.

17   Q          Bashash 2017 was published in the Journal of

18   Environmental Health Perspectives, correct?

19   A          Correct.

20   Q          Is that a reliable authority?

21   A          It sure is.  It's the number one

22   environmental health journal in the world.

23   Q          Okay.  So please turn to page 2, the first

24   paragraph on that page.  I'll read from the paragraph.

25   Most epidemiologic studies demonstrating associations

Page 108

1   version, so I can't give you an informative response,

2   sorry.

3   Q        Did Bashash 2017 analyze the results of the

4   CANTAB test with respect to fluoride exposure?

5   A        It's in progress.

6   Q        No published results on that analysis yet?

7   A        No.

8   Q        When do you expect to submit that article

9   for review?

10  A        Somewhere in the next six months.

11  Q        Do you have an idea of when you will submit

12  it?  Well, strike the question.

13           Have you submitted the research for review

14  by any publications yet?

15  A        No, not yet.

16  Q        Were there other subtests of the WASI test,

17  W-A-S-I, that were administered but not reported in

18  Bashash 2017?

19  A        Not that I'm aware of.

20  Q        Okay.  Bashash 2017 reported that there were

21  299 mother child pairs with data on all covariants

22  tested and data on either the GCI or IQ tests,

23  correct?

24  A        Correct.

25  Q        There were 997 total mothers from the two

1  environmental contamination; is that correct?

2  A        Correct.

3  Q        Bashash 2017 did not conclude that fluoride

4  causes neurodevelopmental harm; is that correct?

5  A        No.  And we would never do so.  You cannot

6  make a conclusion like that based on a single

7  epidemiological study in my opinion.

8  Q        And to be fair, Bashash 2017 concluded that

9  the research shows a potential for neurodevelopmental

10 harm; is that correct?

11 A        Correct.

12          MR. ADKINS:  So why don't we take a break.

13          (Recess taken.)

14          (Exhibit No. 343 marked for identification.)

15 Q        The court reporter is handing you what's

16 been marked as Exhibit 343.  This is a study titled

17 Prenatal Fluoride Exposure and Attention Deficit

18 Hyperactivity Disorder, ADHD, Symptoms in Children at

19 6 to 12 Years of Age in Mexico City by Bashash, et al.

20 Published in the journal, Environment International in

21 2018.  I will refer to this study as Bashash 2018.

22 Okay?

23 A        Okay.

24 Q        You were a coauthor of Bashash 2018,

25 correct?

Page 126

1    A        Correct.

2    Q        What were your responsibilities with respect

3    to the research being reported in Bashash 2018?

4    A        Same as Bashash 2017.

5    Q        And what were your responsibilities with

6    respect to the writing of Bashash 2018?

7    A        Same as in Bashash 2017.

8    Q        Is the -- Bashash 2018 was published in the

9    journal Environment International, correct?

10   A        Yes.

11   Q        Is that a reliable authority?

12   A        It's probably the number two environmental

13   health journal based on impact factors.

14   Q        The procedure for analyzing maternal urine

15   samples was identical in Bashash 2018 compared to

16   Bashash 2017 and Thomas 2016, correct?

17   A        It's the same data.

18   Q        And were the procedures used to analyze that

19   data the same across those three studies?

20   A        More or less.

21   Q        In what ways were they different?

22   A        Well, the data was a little bit different in

23   terms of the sample sizes.  And we had our

24   neurobehavioral collaborator, Dr. Christine Till,

25   weighing heavily on the analysis and interpretation of

Page 165

1    rephrase the statement?

2    Q          Sure.  Do you agree with this statement, the

3    levels of fluoride exposure found in the ELEMENT

4    cohort are presumptively applicable to the levels

5    likely to be found in communities with artificial

6    water fluoridation?

7               MR. CONNETT:  Incomplete hypothetical.

8    A          Well, based on our previous discussion of

9    how I believe that the maternal urinary fluoride

10   levels in ELEMENT are roughly similar to those of the

11   Canadian women participating in the MIREC study who

12   live in water fluoridated communities, then yes.

13   There is a first order -- what's the right word --

14   first order implication that what you just said is

15   true.

16   Q          Is there a second order implication that

17   what I said is not true?

18   A          No, but I think that -- when I say first

19   order, I mean that is the -- that is the apparent

20   implication of our research and their research.

21   Q          Okay.  So you're of the opinion that the

22   rough comparison of urinary fluoride values in the

23   ELEMENT studies and the MIREC study in Till 2018 -- I

24   know Till has published other work -- those are

25   roughly comparable.  And that is a basis for -- a

Page 180

1    weren't -- you did not see such reports in the text.

2    You would need to confirm by looking at the

3    supplemental material to see whether any such

4    differences were reported.

5             So why don't you take a second to look at

6    the supplemental material for Bashash 2017.  And when

7    you're done, if you could answer whether Bashash 2017

8    reported whether there were any differences between

9    neurodevelopmental outcomes between the subjects with

10   and without complete data in that study?

11   A        As far as I can tell, it did not.

12            MR. ADKINS:  Okay.  I have no further

13   questions.  I pass the witness.

14            MR. CONNETT:  Okay.

15                      EXAMINATION

16   BY MR. ADKINS:

17   Q        Thank you for your patience, Dr. Hu.  Okay.

18   You were asked about some of your opinions based on

19   your own studies.  And I just want to follow up on

20   that briefly.  And to do so, I would like to ask you

21   if you agree or disagree with the following

22   statements, okay.  The first statement is, the ELEMENT

23   prospective cohort studies of fluoride's

24   neurodevelopmental effects are methodologically

25   rigorous studies that provide scientifically reliable

Page 181

1   and robust results.  Do you agree with that, Dr. Hu,

2   or not?

3   A          I agree with the elaboration that, by

4   reliable, I mean accurate and precise.

5   Q          Okay.  And do you agree with the following

6   statement:  The results of the ELEMENT prospective

7   cohort studies are consistent with and support the

8   conclusion that fluoride is a developmental

9   neurotoxicant at levels of exposure seen in the

10  general population in artificially fluoridated

11  communities?

12  A          I agree.

13  Q          Okay.  Now, I'm going to read you a

14  statement from a document written by both the EPA and

15  the National Institute of Environmental Health

16  Sciences.  And the statement reads, archives of

17  biological samples from birth cohort studies provide

18  critical information on the prenatal and childhood

19  determinants of adult disease.  Do you agree with the

20  EPA on that statement?

21           MR. ADKINS:  Objection to the extent it

22  misstates the document or EPA's position.

23  A          I agree.

24  Q          And in that same EPA document, it discusses

25  the ELEMENT study.  By the way, the EPA is one of the

Page 182

1   funders of the ELEMENT study; is that correct?

2          MR. ADKINS:  Objection.  Compound.

3   A       It was at its origins.  I do believe it does

4   not currently support the research.

5   Q       Okay.  In this document that the EPA

6   coauthored with the National Institute of

7   Environmental Health Sciences, it states that,

8   evidence from ELEMENT has informed US and Mexican lead

9   exposure guidelines, including the 2010 CDC guidelines

10  for the identification and management of lead exposure

11  in pregnant and lactating women.  Is that consistent

12  with your understanding, Dr. Hu?

13  A       Yes.

14          MR. ADKINS:  Objection to the extent it

15  misstates the document.

16  Q       Now, you were asked a lot of questions about

17  limitations in your studies.  And I would just like to

18  follow up on that.  First, I believe you've already

19  addressed this, but I'll just ask it again.  Dr. Hu,

20  are you aware of any epidemiology study that does not

21  have limitations?

22  A       No.

23  Q       Could the limitations associated with

24  epidemiology studies be minimized if we conducted

25  randomized controlled trials where we intentionally

Page 183

1    dose humans with environmental chemicals to see if

2    adverse effects result?

3              MR. ADKINS:  Objection.  Vague.  Incomplete

4    hypothetical.

5    A          Theoretically, yes, but obviously

6    practically impossible.

7    Q          And when you say practically impossible, why

8    is that something that's not done?  Why don't we

9    intentionally dose human beings to see if chemicals

10   cause adverse effects?

11   A          Completely unethical.

12   Q          Now, you were asked a lot of -- so you were

13   asked about a lot of limitations -- strike that.

14             You were asked about limitations in your

15   studies.  I would like to now ask you, if you could --

16   I know it's sort of late in the day, but could you

17   describe sort of in an outline form what the

18   methodological strengths of your studies on fluoride

19   and neurodevelopment are.

20   A          Sure.  This is a study that is among the

21   first to use biological markers to measure individual

22   exposures to fluoride, one of the first studies to use

23   a longitudinal design to address the temporality

24   between the sequence of exposure and the

25   neurobehavioral outcomes.  It was one of the largest

Page 185

1    potential confounders, which increased the rigor of

2    the study and the interpretation of the study's

3    results.

4    Q        Briefly, you were asked some questions about

5    your understanding of prenatal development.  And I

6    would like to read for you a statement from the EPA.

7    And I would like to ask if you agree with the

8    statement.  Okay?

9    A        Okay.

10   Q        The EPA wrote, quote, the development of the

11   blood-brain barrier is a gradual process, beginning in

12   utero and complete at approximately six months of age.

13   Because the blood-brain barrier limits the passage of

14   substances from blood to brain, in its absence, toxic

15   agents can freely enter the developing brain.  Dr. Hu,

16   do you agree with the EPA on that?

17   A        More or less.

18            MR. ADKINS:  Objection to the extent it

19   misstates the document.

20   A        More or less, yes.

21   Q        Is there anything you would clarify about

22   that statement?

23   A        Before toxicants have the opportunity to go

24   from mother to the fetal brain, they also have to

25   cross the placental barrier, which offers some -- has

Page 186

1   barrier qualities.  But once it's in fetal

2   circulation, the only thing that protects the fetal

3   brain is the fetal blood-brain barrier, which as you

4   noted, is not fully formed until six months of age.

5   Q        Do you have an understanding as to whether

6   fluoride passes the placenta?

7   A        It does according to the research that has

8   been focused on that topic.

9   Q        Now, you were asked some questions about

10  this 2014 WHO document.  Do you recall that?

11  A        Yes.

12  Q        I don't have the full document here because

13  this is an excerpt.  But I'm going to read from you

14  two statements from pages that were not included in

15  this excerpt.  Okay?

16  A        Okay.

17  Q        On page 9 of this document, the World Health

18  Organization states, quote, ingested fluoride from all

19  sources, whether deliberately or unintentionally

20  ingested, is excreted primarily in the urine.  Thus

21  studies of urinary fluoride levels are ideal for

22  assessing the intake of fluoride in populations.

23  Doctor Hu, is that consistent with your own

24  understanding?

25  A        Yes.

1    collected and published in this study provide

2    additional information about source apportionment of

3    fluoride exposure in the Mexico City cohort?

4    A          It does.  The limitation is that we didn't

5    specify the -- or rather, we didn't directly connect

6    the sources of food and beverage with our subject

7    population.  So that is a limitation that needs to be

8    acknowledged.  But to the extent that it does

9    represent the typical sources of food and water for a

10   population, it is possible to conclude that our

11   population likely is not exposed to fluoride

12   significantly through water.

13   Q          Okay.  And would the higher levels of

14   fluoride that you found in some of the food products,

15   would that be consistent with the use of fluoridated

16   salt in the Mexico City population?

17   A          In many cases, yes.

18   Q          So moving on, you talked about the -- some

19   of the analysis you did in your 2017 study.  And I

20   think you stated something to the effect of, we did

21   not assume linearity; is that correct?

22   A          That's correct.

23   Q          Now, did -- and I think you talked about

24   doing spline analyses.

25   A          Yes.

Page 204

1    Q         Did your spline analyses support the

2    existence of a linear dose response relationship

3    between prenatal fluoride exposure and General

4    Cognitive Index in 4 year olds?

5    A         Yes.

6    Q         And did your spline analyses support the

7    existence of a linear dose response relationship

8    between prenatal fluoride exposure and IQ in the 6 to

9    12 year olds?

10   A         For the most part, yes.  Although as we

11   commented in the paper, there was just the hint of a

12   possible flattening of the curve at the lower exposure

13   levels.  But we -- the data was too sparse for us to

14   draw any conclusions about that.

15   Q         Okay.  So does your research then, Dr. Hu,

16   support the existence of a linear dose response

17   relationship between prenatal fluoride exposure and

18   neurodevelopmental harm?

19   A         Yes.

20             MR. ADKINS:  Objection.  Leading.

21   A         For the most part, yes.

22   Q         Okay.  So I'm looking here at your 2017

23   study, and I'm looking at page 9.

24   A         Okay.

25   Q         Sorry.  You know what.  I'll strike the

Page 205

1    question.  And let's go and look at the abstract.

2              And I'm reading the last sentence of the

3    results section where you wrote, in multivariant

4    models, we found that an increase in maternal urine

5    fluoride of 0.5 milligrams per liter predicted 3.15

6    and 2.5 lower offspring GCI and IQ scores

7    respectively.  Is that what you found, Dr. Hu?

8    A         Yes.

9    Q         Okay.  So would you consider that -- let me

10   translate that and see if I'm correct here.  Does that

11   mean for every increase of 0.5 milligrams per liter in

12   the urine of the mother, 4 year children had on

13   average 3.15 less GCI points?

14             MR. ADKINS:  Objection.  Vague.  Leading.

15   A         Yes.

16   Q         And does it also mean that for every 0.5

17   milligrams per liter increase in the maternal urinary

18   fluoride, the 6 to 12 year olds had on average 2.5

19   less IQ points?

20             MR. ADKINS:  Same objections.

21   A         Yes.

22   Q         Are you familiar, Dr. Hu, with the effect

23   sizes of other neurotoxicants on IQ outcomes?

24   A         Yes.

25   Q         In the context of your knowledge as to the

Page 206

1   effects of other neurotoxicants like lead and mercury

2   on IQ, would you consider this effect size to be

3   small, large?  How would you characterize the effect

4   size that you found?

5                MR. ADKINS:  Objection.  Misstates

6   testimony.  Compound.

7   A          I would characterize this as being of a

8   similar magnitude as lead or mercury.

9   Q          Now, in this case, the defense

10  epidemiologist, named Dr. Ellen Chang, she's of the

11  opinion that if a chemical causes an average reduction

12  in IQ less than the standard deviation of 15 IQ

13  points, that it's a relatively weak effect on IQ.

14  Would you agree with Dr. Chang on that?

15  A          No.

16               MR. ADKINS:  Objection.  Misstates

17  testimony.

18  Q          What was your answer, Dr. Hu?

19  A          No.

20  Q          Dr. Hu, are you aware of any neurotoxicant

21  that causes an average reduction in IQ based on the

22  exposures seen in general population of more than 15

23  IQ points?

24  A          No.

25  Q          Does it surprise you, Dr. Hu, that an

214

```
1                    C E R T I F I C A T E

2    State of Washington    )

3                           )  ss.

4    County of King         )

5
            I, the undersigned Registered Professional
6    Reporter and Washington Certified Court Reporter, hereby
     certify that the foregoing deposition upon Oral examination
7    of HOWARD HU was taken before me on September 24, 2019 and
     transcribed under my direction;
8
            That the witness was duly sworn by me pursuant to
9    RCW 5.28.010 to testify truthfully; that the transcript of
     the deposition is a full, true, and correct transcript to
10   the best of my ability; that I am neither attorney for, nor
     a relative or employee of, any of the parties to the action
11   or any attorney or counsel employed by the parties hereto,
     nor financially interested in its outcome.
12
            I further certify that in accordance with CR
13   30(e), the witness was given the opportunity to examine,
     read, and sign the deposition, within 30 days, upon its
14   completion and submission, unless waiver of signature was
     indicated in the record.
15
            IN WITNESS WHEREOF, I have hereunto set my hand
16   and seal this date, September 30, 2019:

17

18

19                    /S/Yvonne A. Gillette

20                    Yvonne A. Gillette

21                    Washington Certified Court Reporter

22                    License No. 2129

23

24

25
```

# **Exhibit 21**

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3   _____

4

     FOOD & WATER WATCH, INC., et      )

5    al.,                              )

                                       )

6                                      )    Case No.

              Plaintiffs,              )

7                                      )    3:17-cv-02162-

        vs.                            )    EMC

8                                      )

     U.S. ENVIRONMENTAL PROTECTION     )

9    AGENCY, et al.,                   )

                                       )

10                                     )

              Defendants.              )

11                                     )

12  _____

13

14          DEPOSITION OF BRUCE LANPHEAR, M.D.

15                September 25, 2019

16              Bellingham, Washington

17

18

19

20

21   Reported by:

22   Connie Recob, CCR, RMR, CRR

23   CCR No. 2631

24   Job No. 3524414

25

Page 5

1                 BE IT REMEMBERED that on Wednesday,

2    September 25, 2019, at 1313 East Maple Street,

3    Bellingham, Washington, at 9:00 a.m., before Connie

4    Recob, CCR, RMR, CRR, appeared BRUCE LANPHEAR, M.D.,

5    the witness herein;

6                     WHEREUPON, the following proceedings

7    were had, to wit:

8

9                     <<<<<<  >>>>>>

10

11    BRUCE LANPHEAR, M.D.,    having been first duly sworn,

12                          deposed and testified as

13                          follows:

14

15                 MR. ADKINS:  Let's do introductions.

16    This is Brandon Adkins of the U.S. Department of

17    Justice for defendant EPA.

18                 MR. DePASQUALE:  Daniel DePasquale for

19    U.S. EPA.

20                 MR. CONNETT:  Michael Connett on behalf

21    of the plaintiffs.

22

23                 E X A M I N A T I O N

24    BY MR. ADKINS:

25        Q.  Would you please state your name for the

Bruce Lanphear                                        September 25, 2019

Page 31

1    developing brain from lead to flame retardants,

2    organophosphate pesticides, review study, review paper

3    I did in 2015.  I think that's all been provided to

4    you.  Oh, and then yeah, my expert report which also

5    obviously you have.

6         Q.  Great.  And this is your June 27, 2019, expert

7    report, correct?

8         A.  Yeah, June 27th, yeah.

9         Q.  Okay.  In what fields do you believe you're an

10   expert?

11        A.  Well, I'm kind of at an intersection of a

12   number of them.  I'd say children's environmental

13   health is the area that I have most expertise in which

14   is the intersection of pediatrics, epidemiology,

15   environmental health, toxicology, public health,

16   population health.

17             Those are the -- I think it's more the

18   intersection of those areas that I have expertise

19   rather than I'm not a pediatrician.  I'm not an

20   epidemiologist.  I'm not a toxicologist, right.  So

21   it's the intersection of all those.

22        Q.  What formal training have you received in

23   children's environmental health?

24                  MR. CONNETT:  Overbroad.

25                  THE WITNESS:  So the master's in public

1    health provides an overview of environmental health and

2    population health which are very related.  On top of

3    that, I did a three-year NIH fellowship in community

4    pediatric research around lead poisoning prevention at

5    the University of Rochester.  And then beyond that,

6    it's really been helping to develop the field rather

7    than being trained in the field because when I was just

8    in my training, my fellowship, it really wasn't a field

9    of children's environmental health.

10    BY MR. ADKINS:

11        Q.  Do you have a medical doctorate?

12        A.  Yes.

13        Q.  And then an MPH, correct?

14        A.  Yes.

15        Q.  Do you have a Ph.D.?

16        A.  No.

17        Q.  What was the -- what was the formal subject

18    matter in which you received your MPH, if any?

19        A.  Tropical medicine.

20        Q.  Topical medicine?

21        A.  Tropical medicine.

22        Q.  What is that?

23        A.  Well, now we call it global health, but at the

24    time it was mostly around parasitology, infectious

25    diseases, sanitation for low- to middle-income

Page 62

1            THE WITNESS:  Yeah, not that I can

2    recall.  Nothing specific.

3            MR. ADKINS:  Okay.  Can we take a break?

4            THE WITNESS:  Yeah.

5            (Recess 10:19-10:26.)

6            (Exhibit No. 348 marked

7             for identification.)

8

9         E X A M I N A T I O N (Continuing)

10    BY MR. ADKINS:

11        Q.  Dr. Lanphear, the court reporter has handed

12    you what's been marked as Exhibit 348.  This is a study

13    entitled Community Water Fluoridation in Urinary

14    Fluoride Concentrations in a National Sample of

15    Pregnant Women in Canada published in Environmental

16    Health Perspectives, October 2018.

17         I will refer to this study as Till 2018, okay?

18        A.  Okay.

19        Q.  You were a coauthor of Till 2018, correct?

20        A.  Correct.

21        Q.  What were your responsibilities with respect

22    to the research being reported in Till 2018?

23        A.  Well, this would be consistent for all the

24    studies we'll talk about so maybe we can summarize that

25    and get out by 12.

Bruce Lanphear                                      September 25, 2019

Page 63

1          So my job was really kind of as the senior

2    investigator, and Christine approached me to ask if I'd

3    be willing to do research on fluoride and children's

4    health.  I said yes, and then I identified the MIREC

5    study as a likely study we could tap into.  I had

6    already been involved in the MIREC study.  And then we

7    wrote a proposal together with Christine taking the

8    lead in writing it to NIH and to CIHR for funding, and

9    we submitted it and then we got funding.  And then we

10   got approval from the MIREC study to open up the

11   biobank and get some urine and then we identified the

12   lab.

13          Originally we were going to use a lab in

14   Canada, and I said I don't think that's a good idea; we

15   should use a laboratory that does fluoride assays all

16   the time.  And so we reached out to at that point

17   Angeles and we measured the fluoride and then we

18   started to look at the values we got.  We tested for

19   creatinine.  We had to get creatinine, and then we

20   looked at municipal fluoride levels, Christine and

21   Rivka and some others I think got those from the water

22   authorities, and then we did these analyses that led up

23   to the paper.

24      Q.  And so what were your responsibilities in

25   doing the analyses that led up to the paper?

1        A.  So mostly as I said, I was the senior

2    investigator.  Christine and Rivka would do the

3    original analyses along with Rick Hornung who was a

4    colleague that I brought into the team, and so I was

5    not doing the actual statistical analysis but rather

6    helping to interpret it, design the tables, how to

7    present it, what kind of creatinine corrections to use.

8    So almost all the decisions we did as a team, but I

9    wasn't directly doing the statistical analyses.

10       Q.  When you said Angeles, were you referring to

11   Dr. Angeles Martinez-Mier?

12       A.  Yes.

13       Q.  Did she weigh in on what creatinine

14   corrections to use in this study?

15       A.  I'm pretty sure she was involved in that, yes.

16       Q.  Was -- did you make a final decision on what

17   creatinine adjusted?

18       A.  We did most of them, most all that you could

19   do, so that they were very comparable with any other

20   study you wanted to use.

21       Q.  Sure.  What responsibilities, if any, did you

22   have with respect to writing Till 2018?

23       A.  So what we typically did for most of these

24   papers is that Christine and/or Rivka took the lead in

25   writing the first draft and then we'd go through an

Page 120

1  clarification.

2            MR. ADKINS:  I can strike and restate.

3            MR. CONNETT:  Yeah, because I wasn't

4  sure which cohort you were talking about.

5            MR. ADKINS:  Sure.  Of course.

6   BY MR. ADKINS:

7      Q.  So was the conclusion of Till 2018 that

8  research is urgently needed to determine whether

9  prenatal exposure to fluoride contributes to

10  neurodevelopmental outcomes in the offspring of the

11  women studied in the MIREC cohort?

12     A.  Yes.

13            MR. ADKINS:  Can we go off the record?

14            (Recess 12:00-1:00.)

15             (Exhibit No. 351 marked

16              for identification.)

17

18        E X A M I N A T I O N (Continuing)

19   BY MR. ADKINS:

20     Q.  Dr. Lanphear, the court reporter has handed

21  you what's been marked as Exhibit 351.

22     A.  Yes.

23     Q.  This is a paper entitled Association Between

24  Maternal Fluoride Exposure During Pregnancy and IQ

25  Scores in Offspring in Canada published in the American

Bruce Lanphear                                          September 25, 2019

                                                      Page 121

1   Medical Association JAMA Pediatrics journal in

2   August 2019.

3           Are you familiar with this study?

4       A.  Yes.

5       Q.  Okay.  I will refer to this study as Green

6   2019, okay?

7       A.  All right.

8       Q.  Now, with respect to Till 2018 you said

9   that -- I asked you about your responsibilities in the

10  research done in that paper and the writing done in

11  that paper, and you said that to shortcut some of this

12  your responsibilities you were about to describe were

13  the same for the other MIREC studies.

14          Would your answer with respect to the

15  questions that I asked about your responsibilities on

16  the research and the writing done in Till 2018 the same

17  with respect to Green 2019?

18      A.  Yes.

19      Q.  Is JAMA Pediatrics a reliable authority in

20  your opinion?

21      A.  Yes.

22      Q.  Green 2019 analyzed whether there was an

23  association between the fluoride exposure of certain

24  mothers who participated in the MIREC study and the IQ

25  of those mothers' offspring at ages three to four

Page 124

1   measure, the one we relied on most was the biomarker

2   exposure urinary fluoride.  The second one was fluoride

3   intake.  The third one was just water fluoride where we

4   didn't try to take into account black tea, it was just

5   the water fluoride.

6       Q.  And how did you measure water fluoride in

7   Green 2019?

8       A.  As we talked about in the Till 2018 paper, it

9   was based upon the reported measures from the water

10  plants that supplied water to the addresses of the

11  women in the study.

12      Q.  Right.  Did the methodology differ --

13      A.  No.

14      Q.  -- in any way from Till 2018?

15      A.  The methodology did not deliver -- did not

16  differ but not -- it wasn't always the same women based

17  upon the questions we were asking.

18      Q.  Right.  Understood.

19          So urine samples for the 512 women who

20  provided samples for all three trimesters in Green 2019

21  and who had a child with IQ data were analyzed; is that

22  correct?

23      A.  That's correct.

24      Q.  Okay.  Could you turn to table -- E Table 1 of

25  Green 2019?

Page 157

1        A.   Not fluoride exposure.  Well, not human

2   studies and not fluoride exposures, no.

3        Q.   Now, at the beginning of this deposition, you

4   did mention another study regarding animals?

5        A.   Right.

6        Q.   What study was that?  Could you refresh my

7   recollection?

8        A.   Yeah, that was a 19- -- I think it was a 1994

9   study in NeuroTox and I think we cited it here.  It's

10  Neurotoxicity of Sodium Fluoride in Rats,

11  Neurotoxicology Teratology 1995.

12       Q.   This is the Mullinex, M-U-L-L-E-N-I-X, study?

13       A.   Yes, right.

14       Q.   Great.  Green 2019 also reported a

15  statistically significant association among fluoride

16  intake based on a question -- based on questionnaire

17  responses in full-scale IQ scores among boys and girls;

18  is that correct?

19       A.   Correct.

20       Q.   Green 2019 did not report separate results for

21  the boys and girls studied as it did with respect to

22  the results relating to maternal urinary fluoride

23  concentrations; is that right?

24       A.   Yes.

25       Q.   Is there a reason why?

Page 207

1      Q.  Okay.

2                   MR. ADKINS:  Pass the witness.

3                   MR. CONNETT:  Okay.  Go off the record?

4                   MR. ADKINS:  Sure.

5                   (Recess 3:13-3:25.)

6                   (Exhibit No. 353 marked

7                    for identification.)

8

9                   E X A M I N A T I O N

10   BY MR. CONNETT:

11      Q.  Okay.  Dr. Lanphear, I just want to follow up

12   on some of the questions that have been asked by

13   counsel today.  I appreciate your patience.

14           First, you were asked about your opinions that

15   you intend to offer in this case, and Counsel didn't

16   specifically ask you about the expert report that you

17   wrote in this case, so I just want to go ahead and talk

18   about that briefly.

19      A.  Okay.

20      Q.  I've introduced your expert report as

21   Exhibit 353.  Do you have that in front of you?

22      A.  Yep.

23      Q.  And to be clear, this is just the report

24   itself.  It doesn't include the appendices, okay?

25      A.  Okay.

1      Q.  So on the first page of your report, you

2   identify six opinions that you intend to offer; is that

3   correct?

4      A.  Yes.

5      Q.  And do you stand by each and every one of

6   these opinions that are set forth here in your report?

7      A.  Yes.

8      Q.  Okay.  And you intend to offer these opinions

9   in this case?

10     A.  Yes.

11     Q.  And I'm just going to briefly just go through

12  for the record to make it clear to go through each one

13  of these, okay?

14     A.  Yes.

15     Q.  So you state here as your first opinion:

16  "Pregnant women living in fluoridated regions in Canada

17  have almost two times the amount of fluoride in their

18  urine as women living in nonfluoridated regions."

19          Is that correct?

20     A.  Correct.

21     Q.  And you are basing that on the Till 2018 study

22  that we've been talking about?

23     A.  Yes.

24              MR. ADKINS:  Objection.  Leading.

25   BY MR. CONNETT:

Page 209

1      Q.   What are you basing that opinion on there,

2  Dr. Lanphear?

3      A.   The study we did in 2018, Till 2018.

4      Q.   Okay.  And your second opinion that you've

5  listed here is that "the average urinary fluoride

6  concentration for the MIREC pregnant women living in

7  Canadian communities with fluoridated drinking water

8  was almost the same as those of the ELEMENT pregnant

9  women living in Mexico City where fluoride is added to

10  salt."

11          You stand by that opinion, Dr. Lanphear?

12      A.   Yes.

13      Q.   And what are you basing that opinion on?

14      A.   The two studies, Till 2018 and Bashash 2017.

15      Q.   Okay.  And the third opinion that you've

16  listed here is that "Our MIREC study, Green, et al. in

17  press:  Significantly enhances the quality of data

18  related to the neurotoxicity of fluoride because it

19  employs a prospective design that includes multiple

20  measures of fluoride exposure during pregnancy

21  including biomonitoring data and IQ outcomes that have

22  been evaluated in one of the world's most

23  comprehensively characterized and geographically

24  diverse birth cohorts."

25          Did I read that correctly?

Page 210

1          A.   Yes.

2          Q.   And do you stand by that opinion,

3   Dr. Lanphear?

4          A.   Yes.

5          Q.   Okay.  And the fourth opinion that you've

6   listed here is:  "As with the ELEMENT study, Bashash,

7   et al. 2017, we found that prenatal fluoride exposure

8   was significantly associated with lower intellectual

9   abilities in three- to four-year-old children.  These

10  associations remain large and significant in

11  controlling for relevant covariates."

12          Do you stand by that opinion, Dr. Lanphear?

13         A.   Yes, I do.

14         Q.   Now, you say here that the associations

15  remained large.  Can you explain that a little bit more

16  when you say -- is it your opinion that the effect size

17  that you found in the MIREC cohort was a large effect?

18         A.   Yes.

19                  MR. ADKINS:  Objection.  Compound.

20  Leading.

21                  THE WITNESS:  These are -- these effects

22  are large even though occasionally for individual

23  children people may say, Well, it's only 3 to 4 IQ

24  points, and I suppose if it was only your child -- or

25  it's not your child and somebody else's child, maybe

Page 211

1   it's not a big deal, but when you have hundreds of

2   thousands or millions of children who can lose up to 4

3   to 5 IQ points, it has a huge impact on the population

4   distribution of children who are no longer gifted or

5   who might be intellectually challenged, that is, have

6   an IQ less than 70 points.  And I would imagine that if

7   we asked parents, they would care quite a bit about

8   their child losing 4 to 5 IQ points.

9    BY MR. CONNETT:

10       Q.  Now, I'm going to ask you a few questions

11  later on some of your research on lead, but

12  Dr. Lanphear, am I correct in understanding that you

13  have published quite prolifically on lead's effects on

14  IQ?

15       A.  Yes.

16       Q.  Okay.  How would you compare the effect size

17  that you found for fluoride in IQ with the effect size

18  of general population exposures to lead?

19       A.  Well, if we look at -- I mean, the metrics we

20  use are very different.  One, we're using parts per

21  billion and the other we're using -- well, one's in

22  blood, one's in urine.  But if we look at the impact

23  across the range of exposures, let's say in the pooled

24  analysis, it was as much as 9, but that was because we

25  had -- 9 IQ points.

Page 212

1      Q.  For lead?

2      A.  For lead -- but that included children in

3  various cities that had extraordinarily high levels of

4  exposure.

5          In this population in this MIREC study, we

6  intentionally focused on exposures that were largely

7  below what's considered the optimal level of

8  fluoridation plus other measures, and so the range of

9  exposures is not quite as great, and yet for what we

10  think of as lead as being low to high, let's say less

11  than 1 microgram per deciliter to 10 microgram per

12  deciliter, we see a 6 to 7 IQ point decrement.

13          For the full range of exposure here, if we

14  just focus on maternal urinary fluoride for a moment

15  with boys, we see about a 4 to 5 IQ point decrement

16  across the range of exposure we see in Canadian boys in

17  the MIREC study.

18          So they're a little different metric, but

19  basically we see an effect across the range of

20  exposures that's comparable.

21      Q.  Okay.  And when you say "the full range of

22  exposure," are you referring to going from, say, zero

23  milligrams per liter fluoride in maternal urine to

24  1 milligram per liter of fluoride?

25              MR. ADKINS:  Objection.  Leading.

Page 213

1                    THE WITNESS:  Yeah, it's roughly that

2    range of exposure.  Of course, there are no children

3    with undetectable levels of fluoride.  We're all

4    exposed to some extent and up to I think 85th

5    percentile is one -- 1 milligram per liter, so we still

6    see 15 percent of the population with exposures above

7    that.  So in some cases, it might even be greater

8    than 5 IQ point decrement.

9     BY MR. CONNETT:

10        Q.  Okay.  Now, in this case did the fact that

11   EPA's epidemiologist that they have retained to provide

12   testimony on the epidemiological literature on fluoride

13   and IQ, Dr. Ellen Chang from Exponent, she has provided

14   the testimony in this case that in order for a

15   chemical's effect on IQ to be large enough to have

16   confidence that there's a causal association, she would

17   like to see an average IQ difference of 15 IQ points.

18            Do you have an opinion on that testimony,

19   Dr. Lanphear?

20                    MR. ADKINS:  Objection.

21   Mischaracterizes the testimony.

22                    THE WITNESS:  15 IQ points is huge.  If

23   we saw a 15-point decrease let's say in the population

24   of American children -- well, even let's just focus on

25   some stats that I'm very familiar with.  Even if we

Page 215

1    extremes but not the average.

2        Q.  Okay.  Does it surprise you to hear that EPA

3    would retain an epidemiologist that would have that

4    opinion?

5                    MR. ADKINS:  Objection.

6    Mischaracterizes testimony.  Argumentative.

7                    THE WITNESS:  I was really quite

8    troubled and shocked when I saw that EPA was using what

9    many chemical industries use, private rented white

10   coats as their expert.  I've interacted with them a

11   lot, and they're really -- they're scientists for hire.

12   They're scientists of uncertainty.

13            If you go back and look at the reports in the

14   past, time and again they've turned out to be wrong.

15   They've been on the wrong side of history.  They are

16   there to protect industry.  And for the EPA to retain

17   experts from Gradient or Exponent, it sickens me.  It

18   just sickens me.

19    BY MR. CONNETT:

20       Q.  So let's go back to your expert report, and

21   I'm looking here at your fifth opinion where you write,

22   "Based on the convergent results from the MIREC and

23   ELEMENT cohorts, the in utero period appears to be a

24   susceptible period of life vis-à-vis fluoride toxicity.

25   In light of these findings, I believe it is advisable

Page 216

```
 1   and prudent for pregnant women to begin taking steps to

 2   reduce their fluoride intake, including but not limited

 3   to reducing their consumption of fluoridated water."

 4          Dr. Lanphear, do you stand by that opinion?

 5       A.  I do.

 6       Q.  Now, you wrote this report on June 27th, 2019,

 7   or you finished it on that date, correct?

 8       A.  Yes.

 9       Q.  Okay.  Subsequent to writing this report, the

10   Green 2019 study was published in JAMA Pediatrics?

11       A.  Correct.

12       Q.  Okay.  When the JAMA Pediatrics study was

13   published, did you ever have an opportunity to listen

14   to a podcast by the JAMA Pediatrics editors?

15       A.  Yes.

16       Q.  Did any of the JAMA Pediatrics editors express

17   an opinion that relates to what you have written here

18   as Opinion No. 5?

19       A.  Yes, they did.

20       Q.  Can you explain?

21               MR. ADKINS:  Objection.  Narrative.

22               THE WITNESS:  Yeah, so the editor in

23   chief of JAMA Pediatrics, Dimitri Christakis, who's

24   very bright, one of the leading experts in pediatrics

25   in the United States, not the world, did a podcast and
```

Page 217

1    I think the podcast was important because in contrast

2    to his role, strict role as the editor where they go

3    through a copyediting, he was very free with his

4    recommendations.

5             And I think the key thing that stood out --

6    well, there are two or three key things.  First of all,

7    he was completely shocked that so many countries in

8    Europe didn't fluoridate.  How could that be?  Doesn't

9    everybody fluoridate?  And that there were cities in

10   Canada that didn't fluoridate.  How could that be?

11   Doesn't everybody fluoridate?

12            And he initially started out by talking about

13   how anybody that would talk about fluoride as harmful

14   he thought of as akin to the anti vaccines.  But this

15   study convinced him otherwise.

16            And while, of course, he, like any good

17   epidemiologist, raised some questions and some possible

18   limitations, in the end, his advice he would not advise

19   women who were pregnant to drink fluoridated water.

20   And I think most pediatricians would come to that same

21   conclusion despite the fact that these studies are not

22   definitive.  There's still questions.  There's still

23   some limitations.  It's a vast improvement over

24   previous studies and there's no benefit of fluoride

25   until the teeth erupt.

Page 218

1        And so in contrast with this whole idea that

2    well, maybe there's some -- maybe there's some toxicity

3    to some fluoride, but it protects our teeth, but that's

4    not true for the developing fetus or for the

5    six-month-old infant.  And so the equation changes

6    dramatically at that point.  And then as Dimitri talked

7    about, it raises a lot of complexities.  Maybe it was

8    Fred Rivara, his colleague, that raises a lot of

9    complexity.  What do you do, tell pregnant women to buy

10   bottled water?  Pregnant women shouldn't rely on the

11   public water source?  These are real complexities.

12   These are real problems.  And it's something that's

13   troubled me also is that also how can we be at this

14   point where for whatever reason, whether it's because

15   you live in Newark, New Jersey and lead contamination

16   or whether it's because we're now going to be

17   recommending, we have recommended that pregnant women

18   avoid fluoride during pregnancy and they can't rely on

19   the public water source, the most basic public health

20   good that we share or should share.  And what do we

21   tell women?

22        My guess is that most pediatricians will say

23   the same thing that Dimitri, once they stop and look at

24   the evidence.  That will take some time, by the way.

25   It won't happen overnight.

Page 226

1   And if that's just too -- if that requires too much of

2   an explanation and it's too late, then you can just

3   tell me and we'll move on.

4                    MR. ADKINS:  Objection.  Vague.  Calls

5   for a narrative.  Lacks foundation.  And leading.

6    BY MR. CONNETT:

7        Q.  Is there a way for you, Dr. Lanphear, to

8   summarize in a somewhat concise form your research on

9   lead and neurodevelopment and its impact on policy or

10  would that require just too much of an explanation?

11       A.  No, I think there's a couple quick points I

12  could make so we can all leave.  One is I think it has

13  a lot of relevance that when we first published our

14  study showing that there were affects below 10 and some

15  might have even inferred there was no safe level of

16  lead, there was largely disbelief for most of my

17  colleagues for most people in public health, most

18  people at EPA, and when the first paper was published,

19  that was understandable.  It was cross-sectional

20  analysis.  It was a national survey, but it was a

21  cross-sectional analysis.

22            When the second paper was published, people

23  were still, I think, getting used to the idea.  The

24  third paper was published and each of these showing

25  that steep decrement in IQ at the lowest measurable

Bruce Lanphear                                          September 25, 2019

Page 227

1    levels of lead, I certainly was convinced by that time,

2    not most of my colleagues or public health officials.

3    They came up with largely the same arguments we've

4    heard so far with fluoride.

5              Now, there's a lot more studies around lead

6    even at that point in 2005 when we published our third

7    study, but the reactions we're seeing aren't

8    surprising.  They're the same arguments, the same

9    dismissals that we heard with the idea that there may

10   not be any safe level of lead and some of them are so

11   ridiculous it's even troubling.  People who clearly

12   haven't read the research who dismiss it because they,

13   I guess, are just arrogant, but I saw that too.  Even

14   some of my colleagues who studied lead hadn't fully

15   looked at the literature and they were dismissive.

16   It's these cognitive biases.  We keep hearing

17   fluoride's safe, fluoride's safe.

18             One of the commentators in the Washington Post

19   said:  Hundreds of studies have been done showing that

20   fluoride is protective against tooth decay.  This is

21   just an observational study.  It's confounded by all

22   these things, presumably not even knowing that all the

23   evidence showing that fluoride protects against tooth

24   decay is observational.

25             So you can't have it both ways, and I'm not

Page 228

1    even arguing that fluoride isn't protective.  At least

2    I'm consistent.

3            The other part I think that Rivka pointed out

4    a few weeks ago, we were looking at all the reports on

5    the commentators including some federal officials who

6    basically dismissed this and critiqued it were passing

7    around pretty erroneous conclusions, and she was quite

8    troubled -- and this is the other reason they asked me

9    to get involved because they had been attacked

10   basically for doing good research.  And Rivka sort of

11   says, You know, I wish I didn't know that this is the

12   way the federal agencies operated.  I wish I didn't

13   know that they aren't there to protect us.

14           And yet this is how change happens.  This is

15   how it happened with lead.  This is how it happened

16   with smoking and tobacco.  Initially, there's a

17   dismissal, attack on the evidence, sometimes like with

18   Herb Edelman, an attack on the scientist.  It will

19   change.  The question is, how much harm will be done

20   before it changes?

21           Now, again, we don't have definitive evidence,

22   but the evidence at least for pregnant women and their

23   children is sufficient, at least based on my experience

24   as a public health professional, my experience as

25   somebody who looks at population impacts.  Despite the

Page  229

1   limitations, we know enough.

2       Q.   Now, you had mentioned earlier about why The

3   Journal of Pediatrics may have rejected your Till in

4   press study and you had mentioned your perception, and

5   you mentioned that I think you said that they may have

6   been fearful of publishing it because of the

7   controversy that may result.

8            And I just want to ask you, with respect to

9   the JAMA Pediatrics paper, did the JAMA Pediatrics

10  editor make any comments relevant to that issue of the

11  difficulty of publishing papers that might lead to

12  controversial results?

13      A.   Yes.

14            MR. ADKINS:  Objection.  Misstates

15  testimony.

16   BY MR. CONNETT:

17      Q.   What did the JAMA Pediatrics editor say in

18  terms of their hesitation, if any, about publishing

19  your study?

20            MR. ADKINS:  Objection.  Asked and

21  answered.

22            THE WITNESS:  Dimitri in the podcast

23  made it very clear that this was a really hard

24  decision, that they knew it was going to be

25  controversial, but that in the end, they looked at the

Bruce Lanphear                                    September 25, 2019

Page 258

1                        REPORTER'S CERTIFICATE

2

3          I, CONNIE A. RECOB, the undersigned Certified

4    Court Reporter, pursuant to RCW 5.28.010 authorized to

5    administer oaths and affirmations in and for the State

6    of Washington, do hereby certify that the sworn

7    testimony and/or proceedings, a transcript of which is

8    attached, was given before me at the time and place

9    stated therein; that any and/or all witness(es) were

10   duly sworn to testify to the truth; that the sworn

11   testimony and/or proceedings were by me

12   stenographically recorded and transcribed under my

13   supervision, to the best of my ability; that the

14   foregoing transcript contains a full, true, and

15   accurate record of all the sworn testimony and/or

16   proceedings given and occurring at the time and place

17   stated in the transcript; that a review of which was

18   not requested; that I am in no way related to any party

19   to the matter, nor to any counsel, nor do I have any

20   financial interest in the event of the cause.

21          WITNESS MY HAND and SIGNATURE this 1st day of

22   October, 2019.

23

24   CONNIE A. RECOB, RMR, CRR

     Washington Certified Court Reporter, CCR 2631

25   c.recob@gmail.com

# **Exhibit 22**

1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ENVIRONMENTAL PROTECTION AGENCY, *et al.*, <br><br> Defendants. | Case No. 17-cv-02162-EMC <br><br> DECLARATION OF FREDERICK HYMAN |

I, FREDERICK HYMAN, declare as follows:

    1.    I am a Dental Officer within the Division of Dermatology and Dental Products at the Center for Drug Evaluation and Research, U.S. Food and Drug Administration ("FDA").  Based on my duties and responsibilities as a Dental Officer at the FDA, I have personal knowledge of the facts set forth herein and could

- 1 -

1    and would testify competently thereto if called to do so.  I make this declaration

2    voluntarily on behalf of the FDA.

3         2.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), "drugs"

4    are defined, in relevant part, as "articles intended for use in the diagnosis, cure,

5    mitigation, treatment, or prevention of disease in man or other animals." 21 U.S.C.

6    § 321(g)(1)(B).  Almost any ingested, topical, or injectable product that, through its

7    label or labeling, is intended for such uses can be regulated by the FDA as a drug.

8         3.     A "new drug" is defined, in relevant part, as any drug that is "not

9    generally recognized, among experts qualified by scientific training and experience

10   to evaluate the safety and effectiveness of drugs, as safe and effective under the

11   conditions prescribed, recommended, or suggested in the labeling."  21 U.S.C.

12   § 321(p)(1).  To be generally recognized as safe and effective, there must be a

13   consensus of expert opinion that the drug product is safe and effective for its labeled

14   indications based upon adequate and well-controlled clinical investigations.

15        4.     Certain categories of over-the-counter drugs may be deemed generally

16   recognized as safe and effective if they conform strictly to regulations known as

17   "final monographs," which set out specific conditions (*e.g.*, active ingredients,

18   formulation, indications for use, warnings, route of administration, etc.).

19        5.     New drugs may not be introduced into interstate commerce unless a

20   new drug application ("NDA") for the drug has been approved by the FDA.  21

21   U.S.C. §§ 331(d) & 355(a).  The FDA does not require products that conform to the

22   conditions of a final monograph and the general conditions described in 21 C.F.R.

23   § 330.1 to have an NDA prior to marketing.

24        6.     For historical reasons, some drugs are available in the United States that

25   lack the required FDA approval for marketing and do not conform to an applicable

26   final monograph.  Because the FDA does not have complete data on these

27   unapproved new drugs and because the universe of such products is constantly

28   changing as products enter and leave the market, the FDA is unable to take action

- 2 -

1    immediately against all of these products.  To make the best use of scarce agency

2    resources, the FDA has prioritized its enforcement efforts with regard to such

3    products that remain on the market.

4                                    **Fluoride**

5           7.     The FDA has authority under the FDCA to regulate drugs intended for

6    use in the prevention of dental caries.  These drugs include but are not limited to:

7    (A) ingestible fluoride tablets, lozenges, and drops intended to prevent dental caries

8    by providing a daily dose generally between 0.25 to 1 mg F/day (hereinafter,

9    "ingestible fluoride products"),[1] and (B) topical over-the-counter fluoride products

10   intended to prevent dental caries, *e.g.*, toothpastes, varnishes, and rinses.  "Ingestible

11   fluoride products" are sometimes referred to in the medical community as "fluoride

12   supplements," but the FDA is not using the latter term to avoid any confusion with

13   products that are "dietary supplements" under the FDCA.

14          8.     The FDA does not regulate the addition of fluoride to public drinking

15   water to prevent dental caries.  The Environmental Protection Agency ("EPA"),

16   pursuant to the Safe Drinking Water Act of 1974, has established maximum

17   contaminant levels for fluoride in public drinking water.   State and local

18   governments are permitted, but not required, to fluoridate public drinking water

19   within the limits set by the EPA to help prevent dental caries.  The decision on

20   whether to add fluoride to public drinking water is made at the state or local level.

21

22

23

24
_____
25   [1] Because there are no approved NDAs for these products, the FDA can make no
     assurances as to the range of dosages that are identified in the labeling for ingestible
26   fluoride products currently marketed in the United States nor has the agency
     evaluated what might be an appropriate range of dosages (if any) for such products.
27

28

**Ingestible Fluoride Products**

9.      Ingestible fluoride products intended for use to prevent dental caries are "drugs" under 21 U.S.C. § 321(g)(1), "new drugs" under 21 U.S.C. § 321(p), and prescription drugs under 21 U.S.C. § 353(b)(1)(A).

10.      There are currently no approved NDAs for ingestible fluoride products.

11.      To date, the FDA has not taken enforcement actions to remove ingestible fluoride products from the market.[2]   The FDA has encouraged manufacturers of ingestible fluoride products to pursue regulatory approval of these products by submitting NDAs for the FDA's review.

**Topical Fluoride Products**

12.      On October 6, 1995, the FDA issued a final monograph (hereinafter, "Anticaries OTC Drug Monograph") establishing conditions under which certain topical over-the-counter anticaries drug products, including fluoride-containing toothpastes and treatment rinses, are generally recognized as safe and effective and not misbranded.  21 C.F.R. Part 355.

13.      Among other things, the Anticaries OTC Drug Monograph requires fluoride toothpastes to provide the following warning:   "Keep out of reach of children under 6 years of age.   If more than used for brushing is accidentally swallowed, get medical help or contact a Poison Control Center right away."   21 C.F.R. § 355.50(c)(1).  The first sentence of this statement must be bolded.  *Id.*

14.      Ingestible fluoride products do not meet the conditions in the Anticaries OTC Drug Monograph.

---

[2]  The FDA issued a warning letter to one manufacturer of ingestible fluoride products in January 2016.   The agency does not consider warning letters to be enforcement actions.

- 4 -

**Fluoride Neurotoxicity**

15.    The FDA has not conducted or sponsored independent research concerning the risk of neurotoxicity associated with exposure to fluoride and does not have in its possession any internal scientific evidence concerning this topic.  The FDA has no position on this topic.

16.    The FDA has not conducted or sponsored independent research concerning whether fluoride presents a risk to the functioning of the thyroid gland and does not have in its possession any internal scientific evidence concerning this topic.  The FDA has no position on this topic.

17.    The FDA has not conducted or sponsored research concerning the risk of neurotoxicity associated with fluoride exposure in susceptible populations and does not have in its possession any internal scientific evidence concerning this topic. The FDA has no position on this topic.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.    Executed this 5th day of NOVEMBER, 2018.

_____
FREDERICK HYMAN

# Exhibit 23

DEBRA J. CARFORA
JOHN THOMAS DO
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
601 D Street, NW, Suite 8000
Washington, DC 20004
Tel.    (202) 514-2640
debra.carfora@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC, et al., | Case No.: 17-cv-02162-EMC |
| Plaintiffs, | **Stipulation Regarding Manufacturers of Fluoridation Chemicals** |
| v. | |
| U.S. Environmental Protection Agency, et al., | |
| Defendants. | |

Plaintiffs and Defendant Environmental Protection Agency ("EPA") jointly submit this Statement of Stipulated Facts concerning three companies that manufacture water fluoridation chemicals in the Unites States.

1.     J.R. Simplot Company (hereafter Simplot) produces Hexafluorosilicic Acid, commonly known as Fluorosilicic Acid ("FSA").

2.      Simplot has not performed independent testing or analysis to determine the potential for FSA to cause neurotoxic effects.

3.     Simplot has not undertaken any specific tests or analysis to determine the potential for FSA in the form or level it may be introduced in public drinking water to impair the function of the thyroid gland.

4.     Simplot has not performed independent testing or analysis to determine the potential for FSA in the form or level it may be introduced in public drinking water to harm susceptible subsets of the population.

5.     Simplot has not performed independent testing or analysis to determine the daily dose of fluoride ion that will not cause neurotoxic effects.

6.     Mosaic Fertilizer and Mosaic Global Sales (collectively, the "Mosaic Subsidiaries") are subsidiaries of the Mosaic Company. These two subsidiaries respectively manufacture and sell FSA.

7.     The Mosaic Subsidiaries have not taken any actions to determine the potential for fluoridation chemicals to cause neurotoxic effects, to impair the functioning of the thyroid gland, or to harm susceptible subsets of the population.

8.     The Mosaic Subsidiaries have not taken a public position on the daily dose of fluoride ion that will not cause neurotoxic effects.

9.     Solvay Fluorides, LLC ("Solvay") manufactures and/or sells certain fluoridation chemicals.

10.     Solvay has not taken any actions to determine the potential for fluoridation chemicals to cause neurotoxic effects, to impair the functioning of the thyroid gland, or to harm susceptible subsets of the population.

11. Solvay, has not taken any actions to determine the daily dose of fluoride ion that will not cause neurotoxic effects.

12. Notwithstanding this stipulation, EPA is not waiving, and expressly reserves all rights and defenses to contest the relevance of these facts to Plaintiffs' claim throughout every stage of this litigation, including trial.

IT IS SO STIPULATED AND AGREED TO ON BEHALF OF:

DATED: May 22, 2019                    FOOD & WATER WATCH

                                       */s/ Michael Connett by permission*
                                       MICHAEL CONNETT
                                       Attorney for Plaintiffs

DATED: May 22, 2019

                                       */s/ Debra J. Carfora*
                                       DEBRA J CARFORA
                                       JOHN THOMAS H. DO
                                       United States Department of Justice
                                       *Attorneys for Defendant*

DATED: 5/22/2019



GRANTED

Judge Edward M. Chen

# Exhibit 24

**Amanda D. Phelka**
**11/14/2018**

1          UNITED STATES DISTRICT COURT
         for the Northern District of California

2

3   Food & Water Watch, et al.

4              Plaintiff,

5   vs.                              No. 17-cv-02162

6   Environmental Protection Agency, et al.

7              Defendant.

8   _____

9

10             VIDEOTAPED DEPOSITION OF

11             AMANDA D. PHELKA

12             789 North Dixboro Road
               Ann Arbor, Michigan

13
               November 14, 2018
14                10:18 a.m.

15

16

17

18

19

20

21

22

23

24

25

HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
                          313.567.8100

 1                      MS. LIDGARD:  Margaret Lidgard on

 2        behalf of NSF International.

 3                      VIDEO TECHNICIAN:  Will the court

 4        reporter please swear in the witness and then we can

 5        proceed.

 6                            - - -

 7                      AMANDA D. PHELKA,

 8        Witness herein, having been first duly sworn to

 9        testify the truth, the whole truth and nothing

10        but the truth, was examined and testified as

11        follows:

12                            - - -

13                      CROSS EXAMINATION

14   BY MR. CONNETT:

15   Q   Good morning.

**16   A   Good morning.**

17   Q   Can you please state your full name for the

18        record?

**19   A   Sure.  Amanda Phelka, spelled P-h-e-l-k-a.**

20   Q   Have you ever done a deposition before?

**21   A   I have.**

22   Q   And how many times would you estimate?

**23   A   Once.**

24   Q   And what was the subject matter of that

25        deposition?



Amanda D. Phelka
11/14/2018                                    Page 9

1   Q   What -- so you worked at Cardno ChemRisk for eight

2       years, that brings us, I think, to about 2012?

**3   A   Correct.**

4   Q   And what did you do -- what position did you get in

5       2012?

**6   A   I was hired by NSF as a Senior Toxicologist.**

7   Q   And is that the same position that you have today?

**8   A   Actually, no, I was promoted to Director of**

**9       Toxicology later that year.**

10  Q   You said Director of Toxicology?

**11  A   Correct.**

12  Q   And are you the Director of Toxicology today?

**13  A   I am.**

14  Q   So let's talk just first about your -- as a senior

15      toxicologist, what did that position entail?

**16  A   My principal responsibility was to prepare risk**

**17      assessments for unregulated contaminants identified**

**18      in drinking water as a result of testing products to**

**19      Standard 60 to 61.**

20  Q   How many risk assessments do you estimate you helped

21      prepare during your time as a Senior Toxicologist?

**22  A   I was only a Senior Toxicologist for four months.  I**

**23      believe I completed two.**

24  Q   And then you became the Director of Toxicology?

**25  A   Correct.**



Amanda D. Phelka
11/14/2018                          Page 10

1    Q    What does your position as Director of Toxicology at
2         NSF International entail?
3    A    **I report directly to the Chief Technical Officer.**
4         **My responsibilities are principally to manage the**
5         **staff that are conducting the work in accordance**
6         **with the programs that we support.**
7    Q    Do you yourself do any of the work with respect to
8         the risk assessments?
9    A    **I have peer reviewed risk assessments, I have been**
10        **available to the staff to assist with technical**
11        **issues related to the risk assessments but I have**
12        **not conducted a full risk assessment in my current**
13        **capacity.**
14   Q    But you will read and review risk assessments that
15        are in preparation?
16   A    **Correct.**
17   Q    So fair to say you're familiar with the risk
18        assessment process that NSF uses?
19   A    **Yes.**
20   Q    So do you understand that today you are appearing as
21        a representative of NSF International?
22   A    **Yes.**
23   Q    And you understand that NSF International has
24        designated you as the person to represent the
25        organization on certain issues related to



1      fluoridation chemicals?

**2**   **A**   **Yes.**

3    Q    And today I'm probably going to be referring to NSF

4         International as just NSF.  Will you understand what

5         I mean?

**6**   **A**   **Yes.**

7    Q    I'm going to hand you a document that I'll mark as

8         Exhibit 1, which is the deposition subpoena.

9                       (Exhibit 1 was marked for

10        identification.)

11                      MR. McCARTHY:  Do you have one for

12        me?

13                      MR. CONNETT:  I don't, sorry.

14                      MR. McCARTHY:  You don't have any

15        exhibits for me?

16                      MR. CONNETT:  You know, I just

17        realized I have three copies.

18                      MR. McCARTHY:  All right.  You can

19        share yours maybe if I need some --

20                      MR. CONNETT:  Yeah, absolutely.  If

21        you need to look at it, just let me know and I'll --

22                      MR. McCARTHY:  Okay.

23   Q    (by Mr. Connett) Have you seen this document

24        before?

**25**  **A**   **Yes.**



1                    MR. McCARTHY:   Yeah.

2   Q   (by Mr. Connett) So besides speaking with the

3       attorneys and Stan Hazan and Dave Purkiss and

4       reviewing some documents to see if you could find

5       any material responsive to the subpoena, did you do

6       anything else to prepare for today's deposition?

7   A   **I refreshed my memory on Standard 60.  I don't work**

8       **with Standard 60 on an everyday basis.  But beyond**

9       **that, no, it was just refreshing my memory.**

10  Q   And how did you do that, by actually reading the

11      standard?

12  A   **I skimmed through the relevant parts of the**

13      **standard.**

14  Q   And how long in total do you estimate that you spent

15      preparing for today's deposition?

16  A   **Ten hours.**

17  Q   Okay, just by way of background here, before asking

18      you specifically about the fluoridation chemicals,

19      can you tell us a little bit about what NSF is?

20  A   **NSF is a third party not-for-profit public health**

21      **and safety organization.  If I had to identify our**

22      **principal way that we handle our mission to protect**

23      **and improve public health, it would be through**

24      **standards development and then we test products to**

25      **those standards and certify products to those**

Amanda D. Phelka
11/14/2018                                    Page 17

1        standards and conduct audits of facilities.

2    Q   And NSF was founded in about 1944?

3    A   Correct.

4    Q   And its name at that time was National Sanitation

5        Foundation?

6    A   Correct.

7    Q   And then at some point in the 1990s, the National

8        Sanitation Foundation changed its name to NSF

9        International?

10   A   Correct.

11   Q   And when NSF started out, it was involved with

12       establishing standards for soda fountains and

13       luncheonette equipment?

14   A   Correct.

15   Q   And over the years, NSF expanded into other

16       markets?

17   A   Yes.

18   Q   And one of those markets today is water treatment

19       chemicals?

20   A   Correct.

21   Q   And could you just briefly describe what function or

22       role NSF has with respect to water treatment

23       chemicals?

24   A   Our principal role there is to test and certify

25       products to Standard 60.



**Amanda D. Phelka**
11/14/2018                                    Page 18

1   Q   Now, when people think about chemicals added to

2       drinking water, they may think it's, you know,

3       something that's governed by government agencies

4       like EPA, but NSF is not a government agency,

5       correct?

6   **A   Correct.**

7   Q   And back in the 1970s, early 1980s, EPA,

8       Environmental Protection Agency, used to -- was at

9       that time overseeing the water treatment chemical

10      industry, correct?

11  **A   Yes.**

12                  MS. CARFORA:  Objection.

13  Q   But then in the 1980s, EPA decided to delegate its

14      authority over water treatment chemicals to a

15      consortium led by the NSF, correct?

16                  MS. CARFORA:  Foundation.

17                  MR. McCARTHY:  Object to the form as

18      well.

19  **A   We -- NSF was part of that consortia.  We put or**

20      **that group put a proposal together to the EPA to be**

21      **hopefully selected to prepare standards on behalf of**

22      **the EPA.**

23  Q   (by Mr. Connett) And you've mentioned Standard 60

24      today.  That's one of the standards that the NSF-led

25      consortium developed?



Amanda D. Phelka
11/14/2018                                    Page 19

1    A    Correct.

2    Q    Can you briefly describe what Standard 60 is?

3    A    Standard 60 focuses on water treatment chemicals

4         exclusively.  There are several different sections

5         within the standard that represent different groups

6         or product types.  For example, there's a

7         disinfection section of the standard.  And then at

8         the end of the standard, there is the basically the

9         instructions on how those preparing risk assessments

10        or potentially needing to prepare risk assessments

11        to follow.

12   Q    And I'll just go ahead for the record and introduce

13        as Exhibit 2 an extended excerpt from Standard 60.

14                    (Exhibit 2 was marked for

15        identification.)

16   Q    And I take it you've seen this document before?

17   A    Yes.

18   Q    And the title on the front is NSF/ANSI 60-2016

19        Drinking Water Treatment Chemicals - Health Effects,

20        correct?

21   A    Correct.

22   Q    And this is what you've been referring to as

23        Standard 60, correct?

24   A    Correct.

25   Q    And what does ANSI stand for?



Amanda D. Phelka
11/14/2018                                          Page 20

1    A    The American National Standards Institute.

2    Q    And NSF works with ANSI to develop the standard?

3    A    ANSI, or the American National Standards Institute,

4         is an oversight body, so they oversee our

5         accreditation and that not only applies to Standard

6         60 but to all of the standards that we've developed

7         with their oversights.

8    Q    But NSF takes the lead in writing the standard and

9         putting it together, correct?

10   A    NSF is involved in writing the standards.  It's

11        really the -- in the case of Standard 60, as you

12        indicated, it was a consortia that prepared the

13        standard.  After the standard was prepared, it's now

14        maintained and revised and otherwise adjusted or

15        amended through the Joint Committee.  So NSF is part

16        of the Joint Committee but it's not our standard.

17   Q    One of the members of the Joint Committee is the

18        American Water Works Commission?

19   A    I do not know.

20   Q    And the standard was developed with input from

21        industry, correct?

22   A    Correct.

23   Q    By industry, I mean companies that sell water

24        treatment chemicals?

25   A    There are industry members on the Joint Committee,



Amanda D. Phelka
11/14/2018                                   Page 21

1       yes.

2    Q   Do you know were there environmental organizations

3        that had members on that Joint Committee?

4    A   **I do not know.**

5    Q   And Standard 60 was first adopted in 1987?

6    A   **That sounds correct.**

7    Q   And in the years since its adoption, many states

8        have passed laws requiring that water treatment

9        chemicals be certified under this standard, right?

10                  MR. McCARTHY:   Mr. Connett, what

11       topic are these questions aimed at, because I don't

12       see them applying to any of the 14.

13                  MR. CONNETT:   It's background for --

14       as you know, the deposition notice asks many

15       questions about Standard 60, so it's just background

16       to understand what Standard 60 is.

17                  MR. McCARTHY:   I'll let it go for a

18       little bit but I think this is getting beyond the

19       scope, so I think you ought to focus on the 14

20       topics.

21                  MR. CONNETT:   Do you remember the

22       question or you want me to ask it again?

23   A   **I'd like you to repeat it, please.**

24   Q   (by Mr. Connett) Since the standard was adopted in

25       1987, most states in the country have passed laws



Amanda D. Phelka
11/14/2018                           Page 22

```
 1      requiring that water treatment chemicals be

 2      certified under this standard, correct?

 3   A  Correct.

 4                      MS. CARFORA:  Objection, foundation.

 5                      MR. McCARTHY:  I'll join in the

 6      objection.

 7                      MR. CONNETT:  And just to create a

 8      clean record, I'll just hand you a document that I

 9      got from the NSF website on this.  I'll mark it

10      Exhibit 3.

11                      (Exhibit 3 was marked for

12      identification.)

13   Q  (by Mr. Connett) Are you familiar --

14                      MR. McCARTHY:  Give her a minute to

15      look at it.

16   A  Okay.

17   Q  (by Mr. Connett) Are you familiar with this

18      document?

19   A  I'm familiar with the NSF website.

20   Q  And you see there's a map here at the bottom half of

21      the first page?

22   A  Yes.

23   Q  And the sentence above the map says nearly all U.S.

24      states and Canadian provinces, territories require

25      water treatment chemicals to show compliance through
```



1      regulations with respect to fluoride in drugs --

2                      MS. CARFORA:  Objection.

3   Q  -- in determining the standard for fluoridation

4      chemicals?

5                      MS. CARFORA:  Assumes facts not in

6      the record.

7   A  **No.**

8   Q  (by Mr. Connett) And does NSF have any special

9      requirements for chemicals that are added to water

10     for medication purposes?

11  A  **No.**

12                     MS. CARFORA:  Objection, scope.

13  Q  (by Mr. Connett) For example, does NSF require

14     larger margins of safety for chemicals that are

15     added for medication purposes?

16                     MS. CARFORA:  Objection, scope.

17  A  **No.**

18  Q  (by Mr. Connett) Are there any chemicals besides

19     fluoride that are added to water for medication

20     purposes?

21                     MS. CARFORA:  Objection, scope,

22     assumes facts not in the record.

23  A  **The fluoridation chemicals are the only chemicals**

24     **that we certify that are not intended to treat the**

25     **water.**



1      we are interested to learn what, if anything, NSF
2      knows about the neurotoxicity of fluoride.  And
3      before asking you about that, I'd like to refer you
4      to page 5 of Standard 60.  And you see on page 5
5      there is a list of items that the manufacturer of a
6      water treatment chemical must submit to the NSF
7      during the certification process?

8   A  **Yes.**

9   Q  And the last item identified says "when required by
10     Annex A, a list of published and unpublished
11     toxicological studies relevant to the treatment
12     chemical and the chemicals and impurities present in
13     the treatment chemical."  Did I read that correctly?

14  A  **Yes.**

15  Q  Has -- and I'm now referring here to topics 5 and 6
16     of the deposition notice.  Has NSF ever received any
17     toxicological studies from manufacturers of
18     fluoridation chemicals with respect to the toxicity
19     of fluoride?

20  A  **In my preparation for this case, I did not find any**
21     **evidence that manufacturers have submitted data of**
22     **any kind for the fluoridation chemicals.**

23  Q  So it's fair to say then that NSF has never received
24     any toxicological studies from manufacturers on the
25     neurotoxicity of fluoride, correct?



Amanda D. Phelka
11/14/2018                                    Page 60

1    A    **Not that I could find.**

2    Q    And is it fair to say that NSF has never received

3         any toxicological studies from manufacturers on the

4         effects of fluoride on the thyroid gland?

5    A    **Not that I could find.**

6    Q    And can you -- we didn't discuss this earlier but

7         can you describe for me what you did to identify if

8         any toxicological studies had been provided to NSF

9         on fluoride?

10   A    **We maintain a file room.  File room contains our**

11        **documentation for all the formulary reviews ahead of**

12        **moving to an electronic system as well as folders on**

13        **the chemicals that we have evaluated and sometimes**

14        **folders on things that we haven't evaluated.  We**

15        **also maintain a section in the file room of**

16        **manufacturer submitted information.**

17   Q    So you looked at both the information available in

18        hard copy form that NSF has, correct?

19   A    **Correct.**

20   Q    And you also reviewed what's now available in

21        electronic form?

22   A    **Correct.**

23   Q    And you looked at both of those sources and you were

24        unable to find any toxicological studies that have

25        been submitted to NSF from any manufacturer of



Amanda D. Phelka
11/14/2018                                    Page 61

1       fluoridation chemicals with respect to fluoride?

2    A   Correct.

3    Q   Is there a requirement -- this is in your -- I'm not

4        asking you in your capacity as representative for

5        NSF in this but is there a requirement that if a

6        manufacturer has toxicological studies, unpublished

7        toxicological studies, that they need to provide

8        those to the NSF?

9                    MR. McCARTHY:  Objection, foundation;

10       objection, beyond the scope.

11   A   **If we are reviewing a chemical for which we do not**

12       **currently have a risk assessment, then we would be**

13       **seeking that information from the manufacturers**

14       **mostly to ensure that we have a full data set upon**

15       **which to base the risk assessment.**

16   Q   (by Mr. Connett) So then -- okay.  So in the case

17       like with fluoride where there is an MCL, NSF would

18       not require manufacturers of fluoridation chemicals

19       to submit unpublished toxicological studies on

20       fluoride?

21   A   Correct.

22                   MR. McCARTHY:  Objection, beyond the

23       scope.

24   Q   (by Mr. Connett) So I'm moving now to topic 7 of the

25       deposition notice, which reads "What NSF has done,



Amanda D. Phelka
11/14/2018                                    Page 62

1     if anything, to determine the potential for

2     fluoridation chemicals to cause neurotoxic effects."

3     So let me ask you has NSF taken any steps to

4     determine the potential for fluoridation chemicals

5     to cause neurotoxic effects?

6  A  **No.**

7  Q  Moving on to topic number 8, which reads "NSF

8     International's position, if any, on whether

9     fluoridation chemicals can cause neurotoxic effects

10    and the basis for said position."  Let me ask, does

11    NSF have any position on whether fluoridation

12    chemicals can cause neurotoxic effects?

13 A  **Since we have not conducted our own risk assessment**

14    **on the fluoridation chemicals, we do not have a**

15    **position on whether they are able to cause**

16    **neurotoxic effects.**

17 Q  And moving to topic 11 of the deposition notice,

18    which reads "What NSF International has done, if

19    anything, to determine the daily dose of fluoride

20    that will not cause neurotoxic effects."  Let me ask

21    you has NSF taken any steps to determine the upper

22    tolerable daily dose of fluoride that will not cause

23    neurotoxic effects in humans?

24 A  **We have not.**

25 Q  And moving to topic 12 of the deposition notice,



Amanda D. Phelka
11/14/2018                                          Page 63

1       which reads "NSF International's position, if any,

2       on the daily dose of fluoride that will not cause

3       neurotoxic effects and the basis for said position."

4       Does the NSF have a position on what the upper

5       tolerable daily dose of fluoride that will not cause

6       neurotoxic effects is?

7   A   **Since we have not conducted risk assessments on any**

8       **of the fluoridation chemicals, we do not have a**

9       **position on the daily dose that would be appropriate**

10      **to prevent or to reduce the risk for neurotoxic**

11      **effects from fluoride exposure.**

12  Q   And going back to topic 9, which reads "What NSF

13      International has done, if anything, to determine

14      the potential for fluoridation chemicals to harm the

15      thyroid gland", has NSF taken any steps to determine

16      the potential for fluoridation chemicals to harm the

17      thyroid gland?

18  A   **Since we have not conducted a risk assessment on any**

19      **of the fluoridation chemicals, we are unaware of**

20      **what studies may exist or with respect to the**

21      **fluoride effect on the thyroid gland.**

22  Q   And NSF has not taken any steps to determine the

23      potential for fluoridation chemicals to cause --

24  A   **Correct.**

25  Q   And I'll just finish out the question.  Let me --



Amanda D. Phelka
11/14/2018                                    Page 64

1      just for clarity of the record, I'll just ask that

2      question again, okay?

3   A  Sure.

4   Q  So NSF has not taken any steps to determine the

5      potential for fluoridation chemicals to harm the

6      thyroid gland, correct?

7   A  Correct.

8                  MR. McCARTHY:   Object to form, asked

9      and answered.

10  Q  And going to topic 10 of the deposition notice,

11     which reads "NSF International's position, if any,

12     on whether fluoridation chemicals can harm the

13     thyroid gland and the basis for said position."

14     Does NSF have any position on whether fluoridation

15     chemicals could harm the thyroid gland?

16  A  NSF does not have a position on that.

17  Q  Now, moving on to topic 13 of the deposition notice,

18     which reads "What NSF International has done, if

19     anything, to determine the daily dose of fluoride

20     that will not cause neurotoxic effects among

21     susceptible subsets of the population", has NSF

22     taken any steps to determine the daily dose of

23     fluoride that will not cause neurotoxic effects

24     among susceptible subsets of the population?

25  A  No.



**Amanda D. Phelka**
11/14/2018                                           Page 65

1   Q   And just for the clarity of the record, I'd like to

2       refer you to page 2 of the deposition notice which

3       defines susceptible subsets.  You see there the

4       definition of susceptible subsets includes fetuses,

5       you see that?

6   A   **Yes.**

7   Q   And infants?

8   A   **Yes.**

9   Q   And pre-adolescent children?

10  A   **Yes.**

11  Q   And the elderly?

12  A   **Yes.**

13  Q   And individuals with nutrient deficiencies?

14  A   **Yes.**

15  Q   Which includes deficiencies of iodine?

16  A   **Yes.**

17  Q   And deficiencies of calcium?

18  A   **Yes.**

19  Q   As well as individuals with kidney disease?

20  A   **Yes.**

21  Q   And individuals with diabetes?

22  A   **Yes.**

23  Q   You'd agree with me that there's many people in the

24      population that would satisfy one or more of those

25      conditions, correct?



```
 1                    MR. McCARTHY:  Objection, beyond the

 2           scope.

 3      A    Yes.

 4      Q    (by Mr. Connett) And does NSF have any position on

 5           what the upper tolerable intake of fluoride is that

 6           will not cause neurotoxic effects among any of these

 7           susceptible subsets of the population?

 8      A    We do not.

 9      Q    Now -- oh, sorry.  Earlier in the deposition when I

10           was asking you what NSF has done to certify the

11           safety of fluoridation chemicals, you mentioned that

12           NSF tests fluoridation chemicals for impurities,

13           correct?

14      A    Yes.

15      Q    And that's the only thing that NSF does under

16           Standard 60 to certify the safety of fluoridation

17           chemicals, correct?

18      A    Yes.

19      Q    So I'd like to now just follow up on that and ask

20           you some questions about what NSF does to test and

21           ensure that these chemicals are not contaminated,

22           okay?

23      A    Sure.

24      Q    So is it correct that NSF will test a manufacturer's

25           fluoridation chemical once per year?
```



Amanda Phelka
11/14/2018                                    Page 111

1    STATE OF MICHIGAN)
                     )  SS.
2    COUNTY OF OAKLAND)

3              CERTIFICATE OF NOTARY PUBLIC

4                        I, Robin V. Darnbrook,

5    Certified Shorthand Reporter, Notary Public,

6    Oakland County, Michigan, certify the witness

7    whose deposition was taken before me on

8    November 14, 2018 was by me cautioned and

9    sworn to testify the truth, that the testimony

10   contained in the deposition was recorded by means

11   of stenography, was reduced to a typewritten form

12   and is a true and correct transcript.

13                       I further certify I am not

14   connected by blood or marriage to any of the

15   parties, their agents or attorneys; that I am

16   not an employee of any of them, nor interested

17   directly or indirectly in the matter in

18   controversy.

19                       IN WITNESS WHEREOF, I have

20   hereunto set my hand and affixed my notarial

21   seal in the County of Oakland, State of

22   Michigan, this 11th day of November, 2018.

23   _____

24         Robin V. Darnbrook - CSR2508
           Notary Public, Oakland County, MI
25         My Commission Expires 11/19/2024



# **Exhibit 25**

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

DEBRA J. CARFORA
JOHN THOMAS H. DO
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC. 20044-7611
(202) 514-2640 (Carfora)
(202) 514-2593 (Do)
(202) 514-8865 (fax)
debra.carfora@usdoj.gov
john.do@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOOD & WATER WATCH, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Civil Action No. 4:17-cv-02162-EMC <br><br> **DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS** |

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendants United States Environmental Protection Agency and the Administrator of the U.S. Environmental Protection Agency (collectively "EPA") hereby submit its responses to Plaintiffs Food & Water Watch, Fluoride Action Network, Audrey Adams, Kristin Lavelle, Brenda Staudenmaier, American Academy of Environmental Medicine, International Academy of Oral Medicine & Toxicology, and Moms Against Fluoridation's First Set of Requests for Admission.

## PRELIMINARY STATEMENT

The responses to Plaintiffs' requests are based only on currently available information and upon such investigation as is reasonable for EPA to undertake under the circumstances of these requests.  EPA reserves the right to amend or supplement its responses if different or additional information is subsequently discovered during the course of this litigation, or if the relevance, significance, or applicability of information currently known is subsequently ascertained.  Nothing in this Response shall prejudice EPA's right to further discovery, research, analysis, or presentation of evidence.

EPA's response to each of the requests should not be deemed an admission that the information contained therein is material, relevant, or admissible in this case.  EPA reserves the right to seek an appropriate Protective Order with regard to any of the general objections or privileges or any of the specific objections or privileges asserted below.

## GENERAL OBJECTIONS

These general objections are incorporated into each of the specific responses:

1.    EPA objects to Plaintiffs' requests to the extent that their terms are vague, ambiguous, unclear, or overbroad.

2.    EPA objects to Plaintiffs' requests to the extent that they are unduly burdensome or oppressive.

1

DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS
4:17-cv-02162-EMC

3.   EPA objects to Plaintiffs' requests to the extent that they seek admissions not relevant to the claims or defenses at issue in this litigation.

4.   EPA objects to Plaintiffs' requests to the extent that they require unreasonable inquiry and review of information that is unknown or not readily obtainable in light of the facts and circumstances of this case.

5.   EPA objects to Plaintiffs' requests to the extent they seek expert opinions.

## RESPONSE TO REQUESTS FOR ADMISSION

**1. Admit that EPA's Maximum Contaminant Level Goal for fluoride (4 mg/L) was promulgated to protect against "crippling skeletal fluorosis."**

An MCLG is a non-enforceable health goal, which represents the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur.  EPA admits that the non-enforceable MCLG of 4 mg/L for fluoride was established to protect against crippling skeletal fluorosis.

**2. Admit that EPA's Maximum Contaminant Level Goal for fluoride (4 mg/L) was based on the premise that "crippling skeletal fluorosis" is the MOST SENSITIVE ADVERSE EFFECT.**

EPA objects to Plaintiffs' definition of "MOST SENSITIVE ADVERSE EFFECT" as vague and ambiguous.

Subject to and without waiver of the foregoing objection, EPA admits only that the Maximum Contaminant Level Goal for fluoride was based on a conclusion that crippling skeletal fluorosis is an adverse health effect which can occur from high levels of fluoride in drinking water. Otherwise, denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**3. Admit that EPA's 2010 RISK ASSESSMENT established a Reference Dose for fluoride (0.08 mg/kg/day) to protect against severe dental fluorosis.**

EPA admits that its 2010 "Fluoride: Dose-Response Analysis for Non-Cancer Effects," estimated oral reference dose ("RfD") for fluoride, based on the endpoint of enamel pitting as manifest in severe dental fluorosis, is 0.08 mg F/kg/day for children during the period from 6 months to 14 years of age. Otherwise, denied.

**4. Admit that EPA's 2010 RISK ASSESSMENT considered severe dental fluorosis the MOST SENSITIVE ADVERSE EFFECT.**

EPA objects to Plaintiffs' definition of "MOST SENSITIVE ADVERSE EFFECT" as vague and ambiguous.

Subject to and without waiver of the foregoing objections, EPA admits only that its 2010 "Fluoride: Dose-Response Analysis for Non-Cancer Effects," estimated oral reference dose ("RfD") for fluoride, based on the endpoint of enamel pitting as manifest in severe dental fluorosis, is 0.08 mg F/kg/day for children during the period from 6 months to 14 years of age. Otherwise, denied.

**5. Admit that some children ingesting the Reference Dose for fluoride (0.08 mg/kg/day) will develop severe dental fluorosis.**

EPA admits only that its 2010 "Fluoride: Dose-Response Analysis for Non-cancer Effects," estimated oral reference dose ("RfD") for fluoride, based on the endpoint of enamel pitting as manifest in severe dental fluorosis, is 0.08 mg F/kg/day for children during the period from 6 months to 14 years of age. Because the RfD was set at the lower confidence limit for fluoride concentration associated with 0.5% prevalence of dental fluorosis, some children ingesting the reference dose may develop severe dental fluorosis. Otherwise denied.

**6. Admit that EPA's SAFETY STANDARDS FOR FLUORIDE are based on the premise that people will not be harmed by chronic fluoride exposures unless and until they develop severe dental fluorosis and/or crippling skeletal fluorosis.**

EPA objects to Plaintiffs' definition of "SAFETY STANDARDS FOR FLUORIDE" as vague and ambiguous.  "EPA's Maximum Contaminant Level Goal" and "Reference Dose for fluoride that was established in the 2010 RISK ASSESSMENT" are not "safety standards" under the Safe Drinking Water Act and EPA does not refer to them as such.

Subject to and without waiver of the foregoing objections, EPA admits only that the current MCLG and the estimated oral reference dose for fluoride are based on the development of severe dental fluorosis and/or crippling skeletal fluorosis.

**7. Admit that EPA has never applied its GUIDELINES FOR NEUROTOXICITY RISK ASSESSMENT to fluoride.**

EPA admits that the Guidelines for Neurotoxicity Risk Assessment have not been applied in conducting risk assessment for the three chemical substances at issue in the Plaintiff's Complaint.

**8. Admit that EPA is not aware of any PRIMARY STUDY that supports the NEUROLOGICAL SAFETY of prenatal fluoride exposure.**

EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system, not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY" includes behavioral impairments that can be effects of the peripheral nervous system.  EPA further objects to Plaintiffs' request as unduly burdensome to the extent it is not relevant to any of the claims or defenses in this litigation.   It is Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than

1   EPA's burden to show "the absence of detectable adverse effects" on the nervous
2   system.  *See* 15 U.S.C. § 2620(b)(4)(B).

3        EPA objects to Plaintiffs' definition of "PRIMARY STUDY" as vague and
4   ambiguous.  EPA further objects to Plaintiffs' request as unduly burdensome to the
5   extent that it requires EPA to conduct an exhaustive literature search and review
6   each "primary study" within the particular contexts of Plaintiffs' construct to
7   determine if any such study exists.  To the extent this Request relates to relevant
8   expert opinion and reports, EPA intends to produce such information in connection
9   with its expert disclosures and pursuant to the scheduling order.

10        EPA further objects to Request No. 8 as overly broad and unduly
11  burdensome to the extent it is duplicative.  By way of further response, please see
12  EPA's response to Interrogatory No. 6.

13        Subject to and without waiver of the foregoing objections, EPA denies that
14  it is not aware of studies that demonstrate or support "the absence of detectable
15  adverse effects" on the nervous system following prenatal exposure.

16  9.  **Admit that EPA is not aware of any PRIMARY STUDY that supports**
17      **the NEUROLOGICAL SAFETY of prenatal fluoride exposure where**
18      **the pregnant mother has chronically elevated ($\geq$ 1 mg/L) levels of**
19      **fluoride in urine during pregnancy.**

20      EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as
21  vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system,
22  not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY"
23  includes behavioral impairments that can be effects of the peripheral nervous
24  system.  EPA further objects to Plaintiffs' request as unduly burdensome to the
25  extent it is not relevant to any of the claims or defenses in this litigation.  It is
26  Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than

27
28

DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS
4:17-cv-02162-EMC

1    EPA's burden to show "the absence of detectable adverse effects" on the nervous

2    system.  *See* 15 U.S.C. § 2620(b)(4)(B).

3           EPA objects to Plaintiffs' definition of "PRIMARY STUDY" as vague and

4    ambiguous.  EPA further objects to Plaintiffs' request as unduly burdensome to the

5    extent that it requires EPA to conduct an exhaustive literature search and review

6    each "primary study" within the particular contexts of Plaintiffs' construct to

7    determine if any such study exists.  To the extent this Request relates to expert

8    opinion and reports, EPA intends to produce such information in connection with

9    its expert disclosures and pursuant to the scheduling order.

10          Subject to and without waiver of the foregoing objections, EPA admits it is

11   not currently aware of studies that demonstrate or support "the absence of detectable

12   adverse effects" on the nervous system following prenatal fluoride exposure where

13   the pregnant mother has chronically elevated (> 1 mg/L) levels of fluoride in urine

14   during pregnancy.

15   **10. Admit that EPA is not aware of any PRIMARY STUDY that supports**

16   **the NEUROLOGICAL SAFETY of FLUORIDATED WATER for**

17   **persons with SUBOPTIMAL NUTRIENT INTAKE.**

18          EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as

19   vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system,

20   not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY"

21   includes behavioral impairments that can be effects of the peripheral nervous

22   system.  EPA further objects to Plaintiffs' request as unduly burdensome to the

23   extent it is not relevant to any of the claims or defenses in this litigation.  It is

24   Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than

25   EPA's burden to show "the absence of detectable adverse effects" on the nervous

26   system.  *See* 15 U.S.C. § 2620(b)(4)(B).

27

28

DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS
4:17-cv-02162-EMC

EPA objects to Plaintiffs' definition of "PRIMARY STUDY" as vague and ambiguous.  EPA further objects to Plaintiffs' request as unduly burdensome to the extent that it requires EPA to conduct an exhaustive literature search and review each "primary study" within the particular contexts of Plaintiffs' construct to determine if any such study exists.  To the extent this Request relates to expert opinion and reports, EPA intends to produce such information in connection with its expert disclosures and pursuant to the scheduling order.  EPA also objects to Plaintiffs' definition of "SUBOPTIMAL NUTRIENT INTAKE" as vague and ambiguous.

EPA further objects to Request No. 10 as overly broad and unduly burdensome to the extent it is duplicative.  By way of further response, please see EPA's response to Interrogatory Nos. 8 and 13.

Subject to and without waiver of the foregoing objections, EPA admits it is not currently aware of studies that demonstrate or support "the absence of detectable adverse effects" from fluoridated water on the nervous system for persons with SUBOPTIMAL NUTRIENT INTAKE.

**11. Admit that EPA is not aware of any PRIMARY STUDY that supports the NEUROLOGICAL SAFETY of FLUORIDATED WATER for persons with DEFICIENT NUTRIENT INTAKE.**

EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system, not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY" includes behavioral impairments that can be effects of the peripheral nervous system.  EPA further objects to Plaintiffs' request as unduly burdensome to the extent it is not relevant to any of the claims or defenses in this litigation.  It is Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than

7

1    EPA's burden to show "the absence of detectable adverse effects" on the nervous

2    system. *See* 15 U.S.C. § 2620(b)(4)(B).

3         EPA objects to Plaintiffs' definition of "PRIMARY STUDY" as vague and

4    ambiguous.  EPA further objects to Plaintiffs' request as unduly burdensome to the

5    extent that it requires EPA to conduct an exhaustive literature search and review

6    each "primary study" within the particular contexts of Plaintiffs' construct to

7    determine if any such study exists.  To the extent this Request relates to expert

8    opinion and reports, EPA intends to produce such information in connection with

9    its expert disclosures and pursuant to the scheduling order.  EPA also objects to

10    Plaintiffs' definition of "DEFICIENT NUTRIENT INTAKE" as vague and

11    ambiguous.

12         EPA further objects to Request No. 11 as overly broad and unduly

13    burdensome to the extent it is duplicative.  By way of further response, please see

14    EPA's response to Interrogatory Nos. 8 and 13.

15         Subject to and without waiver of the foregoing objections, EPA admits it is

16    not currently aware of studies that demonstrate or support "the absence of detectable

17    adverse effects" from fluoridated water on the nervous system for persons with

18    DEFICIENT NUTRIENT INTAKE.

19    **12. Admit that EPA is not aware of any PRIMARY STUDY that supports**

20        **the NEUROLOGICAL SAFETY of FLUORIDATED WATER for**

21        **persons with IMPAIRED KIDNEY FUNCTION.**

22         EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as

23    vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system,

24    not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY"

25    includes behavioral impairments that can be effects of the peripheral nervous

26    system.  EPA further objects to Plaintiffs' request as unduly burdensome to the

27    extent it is not relevant to any of the claims or defenses in this litigation.  It is

28

1    Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than

2    EPA's burden to show "the absence of detectable adverse effects" on the nervous

3    system.  *See* 15 U.S.C. § 2620(b)(4)(B).

4        EPA objects to Plaintiffs' definition of "PRIMARY STUDY" as vague and

5    ambiguous.  EPA further objects to Plaintiffs' request as unduly burdensome to the

6    extent that it requires EPA to conduct an exhaustive literature search and review

7    each "primary study" within the particular contexts of Plaintiffs' construct to

8    determine if any such study exists.  To the extent this Request relates to expert

9    opinion and reports, EPA intends to produce such information in connection with

10   its expert disclosures and pursuant to the scheduling order.

11       EPA further objects to Request No. 12 as overly broad and unduly

12   burdensome to the extent it is duplicative.  By way of further response, please see

13   EPA's response to Interrogatory No. 9.

14       Subject to and without waiver of the foregoing objections, EPA admits it is

15   not currently aware of studies that demonstrate or support "the absence of detectable

16   adverse effects" from fluoridated water on the nervous system for persons with

17   IMPAIRED KIDNEY FUNCTION.

18   13.  **Admit that EPA is not aware of any PRIMARY STUDY that supports**

19       **the NEUROLOGICAL SAFETY of FLUORIDATED WATER for**

20       **persons with COMT GENE POLYMORPHISM.**

21       EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as

22   vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system,

23   not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY"

24   includes behavioral impairments that can be effects of the peripheral nervous

25   system.  EPA further objects to Plaintiffs' request as unduly burdensome to the

26   extent it is not relevant to any of the claims or defenses in this litigation.  It is

27   Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than

28

9

1   EPA's burden to show "the absence of detectable adverse effects" on the nervous
2   system.  *See* 15 U.S.C. § 2620(b)(4)(B).

3       EPA objects to Plaintiffs' definition of "PRIMARY STUDY" as vague and
4   ambiguous.  EPA further objects to Plaintiffs' request as unduly burdensome to the
5   extent that it requires EPA to conduct an exhaustive literature search and review
6   each "primary study" within the particular contexts of Plaintiffs' construct to
7   determine if any such study exists.  To the extent this Request relates to expert
8   opinion and reports, EPA intends to produce such information in connection with
9   its expert disclosures and pursuant to the scheduling order.

10      Subject to and without waiver of the foregoing objections, EPA admits it is
11  not currently aware of studies that demonstrate or support "the absence of detectable
12  adverse effects" from fluoridated water on the nervous system for persons with
13  COMT GENE POLYMORPHISM.

14      14. **Admit that EPA is not aware of any PRIMARY STUDY that supports**
15          **the NEUROLOGICAL SAFETY of FLUORIDATED WATER for**
16          **persons with TOXIC CO-EXPOSURES.**

17      EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as
18  vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system,
19  not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY"
20  includes behavioral impairments that can be effects of the peripheral nervous
21  system.  EPA further objects to Plaintiffs' request as unduly burdensome to the
22  extent it is not relevant to any of the claims or defenses in this litigation.  It is
23  Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than
24  EPA's burden to show "the absence of detectable adverse effects" on the nervous
25  system.  See 15 U.S.C. § 2620(b)(4)(B).

26      EPA objects to Plaintiffs' definition of "PRIMARY STUDY" as vague and
27  ambiguous.  EPA further objects to Plaintiffs' request as unduly burdensome to the
28

10
DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS
4:17-cv-02162-EMC

1  extent that it requires EPA to conduct an exhaustive literature search and review
2  each "primary study" within the particular contexts of Plaintiffs' construct to
3  determine if any such study exists.  To the extent this Request relates to expert
4  opinion and reports, EPA intends to produce such information in connection with
5  its expert disclosures and pursuant to the scheduling order.

6  EPA also objects to Plaintiffs' definition of "TOXIC CO-EXPOSURES" as
7  vague and ambiguous.  Plaintiffs' define "toxic co-exposures" to be based on blood
8  levels, whereas the exposure to fluoridated water is based on water or, in some
9  instances, urine concentration.

10  EPA further objects to Request No. 14 as overly broad and unduly
11  burdensome to the extent it is duplicative.  By way of further response, please see
12  EPA's response to Interrogatory No. 10.

13  Subject to and without waiver of the foregoing objections, EPA admits it is
14  not currently aware of studies that demonstrate or support "the absence of detectable
15  adverse effects" from fluoridated water on the nervous system for persons with
16  TOXIC CO-EXPOSURES.

17  15. **Admit that EPA is not aware of any PRIMARY STUDY that supports**
18  **the NEUROLOGICAL SAFETY of FLUORIDATED WATER for**
19  **persons with $\geq 95^{th}$ percentile water intake.**

20  EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as
21  vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system,
22  not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY"
23  includes behavioral impairments that can be effects of the peripheral nervous
24  system.  EPA further objects to Plaintiffs' request as unduly burdensome to the
25  extent it is not relevant to any of the claims or defenses in this litigation.  It is
26  Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than

27
28

11
DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS
4:17-cv-02162-EMC

1  EPA's burden to show "the absence of detectable adverse effects" on the nervous
2  system.  See 15 U.S.C. § 2620(b)(4)(B ).

3        EPA objects to Plaintiffs' definition of "PRIMARY STUDY" as vague and
4  ambiguous.  EPA further objects to Plaintiffs' request as unduly burdensome to the
5  extent that it requires EPA to conduct an exhaustive literature search and review
6  each "primary study" within the particular contexts of Plaintiffs' construct to
7  determine if any such study exists.  To the extent this Request relates to expert
8  opinion and reports, EPA intends to produce such information in connection with
9  its expert disclosures and pursuant to the scheduling order.

10        Subject to and without waiver of the foregoing objections, EPA admits it is
11  not currently aware of studies that demonstrate or support "the absence of detectable
12  adverse effects" from fluoridated water on the nervous system for persons with >
13  95th percentile water intake.

14  **16. Admit that EPA is not aware of any PRIMARY STUDY that supports**
15  **    the NEUROLOGICAL SAFETY of fluoride for persons with**
16  **    chronically elevated (>1 mg/l) levels of fluoride in their urine.**

17        EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as
18  vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system,
19  not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY"
20  includes behavioral impairments that can be effects of the peripheral nervous
21  system.  EPA further objects to Plaintiffs' request as unduly burdensome to the
22  extent it is not relevant to any of the claims or defenses in this litigation.  It is
23  Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than
24  EPA's burden to show "the absence of detectable adverse effects" on the nervous
25  system.  See 15 U.S.C. § 2620(b)(4)(B ).  Further, elevated levels of fluoride (>1
26  mg/l) in urine is not relevant to the question of whether the artificial fluoridation of
27  drinking water presents an unreasonable risk of neurotoxic harm.

28

1        EPA objects to Plaintiffs' definition of "PRIMARY STUDY" as vague and

2   ambiguous.  EPA further objects to Plaintiffs' request as unduly burdensome to the

3   extent that it requires EPA to conduct an exhaustive literature search and review

4   each "primary study" within the particular contexts of Plaintiffs' construct to

5   determine if any such study exists.  To the extent this Request relates to expert

6   opinion and reports, EPA intends to produce such information in connection with

7   its expert disclosures and pursuant to the scheduling order.

8        Subject to and without waiver of the foregoing objections, EPA admits it is

9   not currently aware of studies that demonstrate or support "the absence of detectable

10  adverse effects" from fluoridated water on the nervous system for persons with

11  chronically elevated  levels of fluoride (>1 mg/l) in their urine.

12  **17. Admit that EPA is unable to identify a TOLERABLE UPPER**

13         **FLUORIDE      INTAKE      for     pregnant     women     that     is**

14         **NEUROLOGICALLY SAFE for the offspring.**

15       EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as

16  vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system,

17  not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY"

18  includes behavioral impairments that can be effects of the peripheral nervous

19  system.  EPA further objects to Plaintiffs' request as unduly burdensome to the

20  extent it is not relevant to any of the claims or defenses in this litigation.  It is

21  Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than

22  EPA's burden to show "the absence of detectable adverse effects" on the nervous

23  system.  See 15 U.S.C. § 2620(b)(4)(B ).

24       EPA further objects to Plaintiffs' request as unduly burdensome to the extent

25  that it requires EPA to conduct a systematic analysis to determine whether such a

26  tolerable upper fluoride intake is identifiable.  To the extent this Request relates to

27

28

DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS
4:17-cv-02162-EMC

expert opinion and reports, EPA intends to produce such information in connection with its expert disclosures and pursuant to the scheduling order.

Subject to and without waiver of the foregoing objections, Plaintiffs' Request is denied because EPA has not undertaken a systematic analysis to determine whether such a tolerable upper fluoride intake for pregnant women is identifiable.

**18. Admit that EPA is unable to identify a TOLERABLE UPPER FLUORIDE INTAKE that is NEUROLOGICALLY SAFE for infants.**

EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as vague and ambiguous. Neurotoxicity can occur on any part of the nervous system, not just the brain. Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY" includes behavioral impairments that can be effects of the peripheral nervous system. EPA further objects to Plaintiffs' request as unduly burdensome to the extent it is not relevant to any of the claims or defenses in this litigation. It is Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than EPA's burden to show "the absence of detectable adverse effects" on the nervous system. See 15 U.S.C. § 2620(b)(4)(B).

EPA further objects to Plaintiffs' request as unduly burdensome to the extent that it requires EPA to conduct a systematic analysis to determine whether such a tolerable upper fluoride intake is identifiable. To the extent this Request relates to expert opinion and reports, EPA intends to produce such information in connection with its expert disclosures and pursuant to the scheduling order.

Subject to and without waiver of the foregoing objections, Plaintiffs' Request is denied because EPA has not undertaken a systematic analysis to determine whether such a tolerable upper fluoride intake for infants is identifiable.

19. **Admit that EPA is unable to identify a TOLERABLE UPPER FLUORIDE INTAKE that is NEUROLOGICALLY SAFE for toddlers.**

EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system, not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY" includes behavioral impairments that can be effects of the peripheral nervous system.  EPA further objects to Plaintiffs' request as unduly burdensome to the extent it is not relevant to any of the claims or defenses in this litigation.  It is Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than EPA's burden to show "the absence of detectable adverse effects" on the nervous system.  See 15 U.S.C. § 2620(b)(4)(B).

EPA further objects to Plaintiffs' request as unduly burdensome to the extent that it requires EPA to conduct a systematic analysis to determine whether such a tolerable upper fluoride intake is identifiable.  To the extent this Request relates to expert opinion and reports, EPA intends to produce such information in connection with its expert disclosures and pursuant to the scheduling order.

Subject to and without waiver of the foregoing objections, Plaintiffs' Request is denied because EPA has not undertaken a systematic analysis to determine whether such a tolerable upper fluoride intake for toddlers is identifiable.

20. **Admit that EPA is unable to identify a TOLERABLE UPPER FLUORIDE INTAKE that is NEUROLOGICALLY SAFE for pre-adolescent children.**

EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system, not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY" includes behavioral impairments that can be effects of the peripheral nervous system.  EPA further objects to Plaintiffs' request as unduly burdensome to the

15

extent it is not relevant to any of the claims or defenses in this litigation.  EPA is not required to demonstrate "the absence of detectable adverse effects" on the nervous system.  Rather, it is Plaintiffs' burden to establish to the satisfaction of the Court by a preponderance of evidence that there is in fact evidence of an unreasonable risk of harm.  *See* 15 U.S.C. § 2620(b)(4)(B).

EPA further objects to Plaintiffs' request as unduly burdensome to the extent that it requires EPA to conduct a systematic analysis to determine whether such a tolerable upper fluoride intake is identifiable.  To the extent this Request relates to expert opinion and reports, EPA intends to produce such information in connection with its expert disclosures and pursuant to the scheduling order.

Subject to and without waiver of the foregoing objections, Plaintiffs' Request is denied because EPA has not undertaken a systematic analysis to determine whether such a tolerable upper fluoride intake for pre-adolescent children is identifiable.

21. **Admit that EPA is unable to identify a TOLERABLE UPPER FLUORIDE INTAKE that is NEUROLOGICALLY SAFE for the elderly.**

EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system, not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY" includes behavioral impairments that can be effects of the peripheral nervous system.  EPA further objects to Plaintiffs' request as unduly burdensome to the extent it is not relevant to any of the claims or defenses in this litigation.  It is Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than EPA's burden to show "the absence of detectable adverse effects" on the nervous system.  See 15 U.S.C. § 2620(b)(4)(B).

16

DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS
4:17-cv-02162-EMC

EPA further objects to Plaintiffs' request as unduly burdensome to the extent that it requires EPA to conduct a systematic analysis to determine whether such a tolerable upper fluoride intake is identifiable.  To the extent this Request relates to expert opinion and reports, EPA intends to produce such information in connection with its expert disclosures and pursuant to the scheduling order.

Subject to and without waiver of the foregoing objections, Plaintiffs' Request is denied because EPA has not undertaken a systematic analysis to determine whether such a tolerable upper fluoride intake for the elderly is identifiable.

**22. Admit that EPA is not aware of any randomized controlled trials that have investigated the benefits and/or safety of FLUORIDATED WATER.**

EPA admits only that in the Public Health Service's 2015 *Recommendation for Fluoride Concentration in Drinking Water*, the Public Health Service notes "there are no randomized, doubleblind, controlled trials of water fluoridation because its communitywide nature does not permit randomization of individuals to study and control groups or blinding of participants. However, community trials have been conducted, and these studies were included in systematic reviews of the effectiveness of community water fluoridation. As noted, these reviews of the scientific evidence related to fluoride have concluded that community water fluoridation is effective in decreasing dental caries prevalence and severity.'' Otherwise, denied.

**23. Admit that there are susceptible subsets of the population that are more vulnerable to the toxic effects of fluoride than the general public.**

EPA admits only that The Toxic Substances Control Act ("TSCA") requires that the Administrator consider "an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator." 15 U.S.C. § 2605(b)(4)(A). EPA recognizes that these terms, as

17

used in such public health statutes, describe groups of people with common attributes which may make them more sensitive or susceptible to the stressor(s) being assessed.

**24. Admit that there are susceptible subsets of the population that are more vulnerable to the neurotoxic effects of fluoride than the general public.**

EPA objects to the term "neurotoxic effects," which term is not defined and, therefore, is vague and ambiguous.

As such, subject to and without waiver of the foregoing objection, Plaintiffs' Request is denied because EPA is not aware of any scientifically defensible basis to conclude that fluoridation chemicals present neurotoxic effects to any subset of the United States population.

**25. Admit that individual susceptibility to the health effects of toxic substances will vary in a population of $\geq$200 million people.**

EPA admits only that individual susceptibility to toxic substances' effects may vary in a population of >200 million people and that the variability will depend on the toxicant and the population.

**26. Admit that individual susceptibility to a toxicant's neurotoxic effects will vary in a population of $\geq$200 million people.**

EPA objects to the term "neurotoxic effects," which term is not defined and, therefore, is vague and ambiguous.

EPA admits only that individual susceptibility to a toxicant's neurotoxic effects may vary in a population of >200 million people and that the variability will depend on the toxicant and the population.

DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS
4:17-cv-02162-EMC

**27. Admit that individual susceptibility to chronic fluoride toxicity will vary in a population of >200 million people.**

EPA admits only that individual susceptibility to chronic fluoride toxicity may vary in a population of >200 million people and that the variability will depend on the toxicant and the population.

**28. Admit that individual susceptibility to fluoride's neurotoxic effects will vary in a population of >200 million people.**

EPA objects to the term "neurotoxic effects," which term is not defined and, therefore, is vague and ambiguous.  Further, to the extent this Request relates to expert opinion and reports, EPA intends to produce such information in connection with its expert disclosures and pursuant to the scheduling order.

As such, subject to and without waiver of the foregoing objections, Plaintiffs' Request is denied because EPA is not aware of any scientifically defensible basis to conclude that fluoridation chemicals present neurotoxic effects to any subset of the population.

Dated:  July 12, 2018

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

*/s/ Debra J. Carfora*
DEBRA J. CARFORA
JOHN THOMAS H. DO

Attorneys for Defendants

19
DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS
4:17-cv-02162-EMC

# Exhibit 26

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

DEBRA J. CARFORA
JOHN THOMAS H. DO
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC. 20044-7611
(202) 514-2640 (Carfora)
(202) 514-2593 (Do)
(202) 514-8865 (fax)
debra.carfora@usdoj.gov
john.do@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOOD & WATER WATCH, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Civil Action No. 4:17-cv-02162-EMC <br><br> **DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants United States Environmental Protection Agency and the Administrator of the United States Environmental Protection Agency (collectively "EPA"), hereby submit its response to Plaintiffs Food & Water Watch, Fluoride Action Network, Audrey Adams, Kristin Lavelle, Brenda Staudenmaier, American Academy of Environmental Medicine, International Academy of Oral Medicine & Toxicology, and Moms Against Fluoridation's First Set of Interrogatories.

## PRELIMINARY STATEMENT

The responses to Plaintiffs' requests are based on the documents available at this time and upon such investigation as is reasonable for EPA to undertake under the circumstances of these requests.  If additions to, changes in, or modifications of the following responses, or if additional documentation becomes available, EPA reserves the right to use for any purpose any additional information and documents determined to be called for by these interrogatories without sanction or penalty and will promptly make such facts, information, or documents available for Plaintiffs' review.  EPA further reserves the right at any hearing on this matter or at trial to refer to information or documents not identified in these responses, the existence or relevance of which is later discovered by EPA and/or its counsel.

EPA's responses do not in any way constitute an adoption of Plaintiffs' definitions of words or phrases contained in the interrogatories.  Nor does EPA's responses constitute an adoption of Plaintiffs instructions.  EPA's response to each of the interrogatories should not be taken as an admission or a concession of the existence of any fact set forth or assumed by such a request, or that such answer constitutes evidence of any fact thus set forth or assumed. Nor should EPA's response to each of the interrogatories be deemed an admission that the information contained therein is material, relevant, or admissible at trial in this

1

1   case. Pursuant to Rule 33(a)(1) of the Federal Rules of Civil Procedure, Plaintiff

2   is permitted only 25 Interrogatories. EPA interprets Interrogatory No. 14 to

3   constitute 14 Interrogatories, bringing the total number of Interrogatories to 27.

4        EPA reserves the right to seek an appropriate Protective Order with regard

5   to any of the general objections or privileges or any of the specific objections or

6   privileges asserted below.

7   ## GENERAL OBJECTIONS

8        EPA makes the following General Objections, which are hereby

9   incorporated in, and made a part of, each of the specific responses to the

10  interrogatories set forth below:

11       1.    EPA objects to each of the interrogatories to the extent that they are

12  vague, ambiguous, duplicative, cumulative, overly broad, or unduly burdensome.

13       2.    EPA objects to each of the interrogatories to the extent that they seek

14  documents or information that are not relevant to the claims and defenses asserted

15  in this litigation or reasonably calculated to lead to the discovery of admissible

16  evidence.

17       3.    EPA objects to each of the interrogatories to the extent that they seek

18  documents or information protected by the deliberative process privilege, attorney-

19  client privilege, the work product doctrine, or any other applicable privilege or

20  prohibition.

21       4.    EPA objects to each of the interrogatories to the extent that they seek

22  to impose obligations that exceed the requirements of the Federal Rules of Civil

23  Procedure or the Local Rules of the United States District Court for the Northern

24  District of California.

25       5.    EPA objects to each of the interrogatories to the extent that they seek

26  documents or information that are not within the possession, custody, or control of

27  EPA.

28

2

DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
4:17-cv-02162-EMC

6.     EPA objects to each of the interrogatories to the extent that they seek documents or information that are already in the possession, custody, or control of Plaintiffs or that could be derived from other sources at substantially the same burden for Plaintiffs as for EPA.

7.     EPA objects to each of the interrogatories to the extent that they seek documents or information that are publicly available.  Such documents or information are accessible to any person seeking to review them. Similarly, EPA objects to each of the interrogatories as unduly burdensome to the extent that they seek documents or information that may be derived or ascertained from an examination, audit, or inspection of documents from publicly available sources. The burden of deriving or ascertaining information from an inspection of public documents is the same for Plaintiffs as it is for EPA.

8.     EPA objects to each of the interrogatories to the extent that they seek only legal contentions or conclusions.

9.     EPA objects to each of the interrogatories to the extent that they relate to expert opinions. EPA intends to produce such information in connection with its expert disclosures and pursuant to the Court's scheduling orders.

10.    EPA objects to the interrogatories to the extent that they are not reasonably limited in scope, time, location, place, or context.

12.    EPA objects to Plaintiffs' "Definitions" contained in the interrogatories to the extent that they seek to alter or expand upon the obligations imposed by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of California.

## RESPONSE TO INTERRAGTORIES

**1. Identify the author(s) of the GUIDELINES FOR NEUROTOXICITY RISK ASSESSMENT and for each author, identify their job title at**

the factual or scientific data concerning whether the artificial fluoridation of drinking water presents an unreasonable risk of neurotoxic harm.

6. **Identify all PRIMARY STUDIES that EPA is aware of which demonstrate or support the NEUROLOGICAL SAFETY of prenatal fluoride exposure.**

EPA objects to Plaintiffs' definition of "NEUROLOGICAL SAFETY" as vague and ambiguous.  Neurotoxicity can occur on any part of the nervous system, not just the brain.  Further, Plaintiffs' definition of "NEUROLOGICAL SAFETY" includes behavioral impairments that can be effects of the peripheral nervous system.  EPA further objects to Plaintiffs' request as unduly burdensome to the extent it is not relevant to any of the claims or defenses in this litigation.  It is Plaintiffs' burden to establish that there is an unreasonable risk of harm, rather than EPA's burden to establish a complete absence of detectable adverse effects. *See* 15 U.S.C. § 2620(b)(4)(B).

EPA objects to Plaintiffs' definition of "PRIMARY STUDY" as vague and ambiguous.  EPA further objects to Plaintiffs' request as unduly burdensome to the extent that it requires EPA to conduct an exhaustive literature search and review for each "primary study" within the particular contexts of Plaintiffs' construct to determine if any such study exists.  To the extent this Request relates to expert opinion and reports, EPA intends to produce such information in connection with its expert disclosures and pursuant to the scheduling order.

Subject to and without waiver of the objections above, EPA is aware of the MULLENIX STUDY, "Neurotoxicity of Sodium Fluoride in Rats," published in Neurotoxicology & Teratology (1995) that demonstrates or supports the absence of detectable adverse effects on the nervous system following prenatal exposure.

EPA objects to Plaintiffs' definition of "PRIMARY STUDY" as vague and ambiguous.  EPA further objects to Plaintiffs' request as unduly burdensome to the extent that it requires EPA to conduct an exhaustive literature search and review each "primary study" within the particular contexts of Plaintiffs' construct to determine if any such study exists.  To the extent this Request relates to expert opinion and reports, EPA intends to produce such information in connection with its expert disclosures and pursuant to the scheduling order.  EPA also objects to Plaintiffs' definition of "SUBOPTIMAL NUTRIENT INTAKE" as vague and ambiguous.

Subject to and without waiver of the objections above, EPA responds that, it is not currently aware of studies that demonstrate or support the "absence of detectable adverse effects" from fluoridated water on the endocrine system for persons with SUBOPTIMAL NUTRIENT INTAKE.

**14. If one or more of your responses to Plaintiffs' Requests for Admission Nos. 8 to 21 is anything other than an unqualified admission, identify all facts that support said response(s).**

EPA objects to Plaintiffs' use of a multi-part interrogatory.  EPA objects to Interrogatory No. 14 as unduly burdensome to the extent it exceeds the 25-interrogatory limit imposed by Federal Rule of Civil Procedure 33(a)(1).  EPA interprets Interrogatory No. 14 to constitute 14 separate interrogatories.  Bringing the total number of Interrogatories to 27.  EPA further objects to Interrogatory No. 14 as overly broad and unduly burdensome to the extent it is duplicative.  By way of further response, please see EPA's responses to Interrogatory Nos. 6-13.

Subject to and without waiver of any objections above and those set forth in EPA's response to Plaintiffs' Requests for Admission, EPA responds as follows:

EPA denied Plaintiffs' Requests for Admission No. 8 because there are some animal studies where pregnant dams were exposed to a dose in which no

effects were observed.  One such example is identified in the NRC Report (at pg 212-213) citing the MULLENIX STUDY, defined by Plaintiffs as "Neurotoxicity of Sodium Fluoride in Rats," published in Neurotoxicology & Teratology (1995). In Experiment #1 none of the rats treated on gestational days 14-18 showed any behavioral differences from controls.

In response to Plaintiffs' Requests for Admission Nos. 17-21, Plaintiffs' requests were denied because EPA has not undertaken a systematic analysis to determine whether such tolerable upper fluoride intakes are identifiable.

Dated:  July 12, 2018

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

*/s/ Debra J. Carfora*
DEBRA J. CARFORA
JOHN THOMAS H. DO
Attorneys for Defendants

DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
4:17-cv-02162-EMC

## VERIFICATION

1.      I, Tala R. Henry, am employed as an Acting Deputy Office Director with the United States Environmental Protection Agency at 1200 Pennsylvania Avenue, NW, Washington, DC.

2.      I have read the foregoing response to Plaintiffs' First Set of Interrogatories, in *Food & Water Watch, Inc., et al. v. U.S. Environmental Protection Agency et al.*, in the United States District Court for the Northern District of California. To the best of my knowledge, I believe that the factual information reflected in the responses to the interrogatories are true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on July 11, 2018 at Washington, DC.


__/s/ *Tala R. Henry*_____

TALA R. HENRY, PH.D.
ACTING DEPUTY DIRECTOR
OFFICE OF POLLUTION PREVENTION & TOXICS
U.S. ENVIRONMENTAL PROTECTION AGENCY

# **Exhibit 27**

1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   AT SAN FRANCISCO

4

5   FOOD & WATER WATCH, et al.,  )   **ORIGINAL**

                                 )

6                                )

              Plaintiffs,        )

7                                )  Case No.

      vs.                        )  17-CV-02162-EMC

8                                )

U.S. ENVIRONMENTAL               )

9   PROTECTION AGENCY, et al.,   )

                                 )

10            Defendants.         )

                  _____          )

11

12

13

14

15             VIDEOTAPED DEPOSITION OF

16               ELLEN CHANG, SC.D.

17

18            Thursday, August 29, 2019

19

20

21

22

23

24

25

1   please state their appearance for the record.

2          MR. CONNETT:  Michael Connett on behalf of

3   Plaintiffs.

4          MS. CARFORA:  Debra Carfora from the

5   Department of Justice on behalf of the EPA.

6          MR. DO:  John Thomas Do with the Department

7   of Justice.

8          Also, on the phone we have Brandon Adkins,

9   with the Department of Justice, and Eric Wilber, of

10  EPA.

11         MR. DePASQUALE:  Daniel DePasquale,

12  U.S. EPA.

13         THE VIDEOGRAPHER:  Thank you.

14         Will the court reporter now please

15  administer the oath to the witness, and we can

16  begin.

17         THE REPORTER:  Please raise your right

18  hand.

19         Do you solemnly swear that the testimony

20  you are about to give in this matter shall be the

21  truth, the whole truth, and nothing but the truth,

22  so help you God?

23         THE WITNESS:  Yes.

24         THE REPORTER:  Thank you.

25

```
 1                    Ellen Chang, ScD,

 2    called as a witness on behalf of Plaintiff, having

 3   been administered an oath in accordance with C.C.P.

 4   Section 2025, was examined and testified as follows:

 5

 6                      EXAMINATION

 7   BY MR. CONNETT:

 8      Q.   So you've just taken an oath, and you

 9   understand that you have the same obligation today

10   to tell the truth, just as if you were testifying in

11   front of a judge.

12           Do you understand that?

13      A.   Yes.

14      Q.   And today is our opportunity, as the

15   plaintiffs in this case, to ask you questions and to

16   get answers to those questions.

17           And do you understand that you are to

18   answer the question that I ask, not a question that

19   you think would be a better question for me to ask.

20           You understand that?

21      A.   Yes.

22      Q.   Okay.  So any time today you need a break,

23   just let me know.  It's not an endurance contest.

24   Just as long as there's not a question pending,

25   okay?
```

1    A.    Somewhere between 5 and 15, maybe.

2    **Q.    Okay.  And when was that project?**

3    A.    I think, 2013 or '14.

4    **Q.    Okay.  So other than that project in 2013**

5    **or 2014, had you ever reviewed the scientific**

6    **literature on fluoride?**

7    A.    Not -- I mean, I think I looked at it in a

8    cursory manner or when my kids were small.

9    **Q.    Okay.  So it's fair to say that prior to**

10   **your work in this case, you didn't consider yourself**

11   **a subject matter expert on fluoride and human**

12   **health.**

13   A.    I think that's fair.

14   **Q.    Okay.  And you didn't consider yourself a**

15   **subject matter expert on fluoride and neurotoxicity.**

16   A.    Correct.

17   **Q.    Have you ever --**

18        I think this is obvious, but I'll just ask

19   it just for the record:  Have you ever conducted or

20   published any studies on fluoride separate and apart

21   from what you did in this case?

22   A.    No, I haven't.

23   **Q.    Okay.  And have you ever conducted or**

24   **published any studies on fluoride neurotoxicity**

25   **separate and apart from what you did in this case?**

1       A.    No, I haven't.

2       **Q.    Okay.  Have you -- have you ever published**

3   **or conducted any studies related to fluoride in**

4   **human health, at any time in your career, separate**

5   **and apart from this case?**

6       A.    No, I haven't.

7       **Q.    Do you consider yourself an expert on**

8   **fluoride pharmacokinetics?**

9       A.    No.  I have some understanding of it, but I

10  wouldn't consider myself an expert on the

11  pharmacokinetics.

12      **Q.    Okay.  Do you consider yourself an expert**

13  **on fluoride's neurotoxicity?**

14          MS. CARFORA:  Asked and answered.

15          THE WITNESS:  So I do consider myself an

16  expert on the epidemiology of fluoride and

17  neurotoxic outcomes.  It depends on the, I guess,

18  subdiscipline of fluoride and neurotoxicity, whether

19  I consider myself an expert in that area.

20          I would say, no, for example, with regard

21  to animal toxicology and that subject.

22  BY MR. CONNETT:

23      **Q.    Uh-huh.**

24      A.    But yes, with regard to human epidemiology.

25      **Q.    Okay.  Do you consider yourself an expert**

1    Q.   Okay, yeah.

2    A.   So in each case I think another, I guess,

3    qualification I would make to the causal connection

4    column is that the conclusions that we had about

5    sort of lack of evidence or insufficient evidence

6    are -- are consistent with those of health and

7    regulatory agencies.  Because I'm not aware that any

8    have concluded that the causal effect has been

9    established.  So it's -- it's consistent.

10   **Q.   Okay.  So just to be clear.  I appreciate**

11   **your clarifications.**

12           **But just to be clear:  In --**

13           **For each of these 12 systematic reviews,**

14   **for the exposure levels of interest in the**

15   **population, am I correct in understanding that you**

16   **concluded in each instance that there was not**

17   **sufficient evidence to establish a causal**

18   **connection?**

19   A.   That is correct.  Although, the main point

20   of the arsenic in developmental neurotoxicity paper

21   was not about causality.  So that wasn't the

22   conclusion of the paper.

23   **Q.   Okay.  So I understand.**

24           **But as a practical matter, your conclusion**

25   **in the arsenic paper was that there was not**

1  **sufficient epidemiologic evidence to warrant re- --**

2  **reducing the current RFD below what it was then set**

3  **at, correct?**

4          MS. CARFORA:  Objection.  Misrepresents the

5  record.

6          THE WITNESS:  I would say it was different

7  from that.  That we looked at the epidemiologic

8  evidence, and it -- it -- we did think that there

9  was a good study for evaluating the existing --

10 well, for calculating a -- a reference dose and then

11 comparing it with the existing one.  And so that

12 it's not that there was insufficient epidemiologic

13 evidence to change it.

14 BY MR. CONNETT:

15     **Q.   Yeah.**

16     A.   It was that there was sufficient

17 epidemiologic evidence not to change the reference

18 dose.

19     **Q.   Okay.**

20     A.   Does that make sense?

21     **Q.   That makes sense.**

22          **And so that study that you did use in that**

23 **review for the reference dose, you -- your**

24 **conclusion was that study was a sufficient study for**

25 **calculating a reference dose, correct?**

1    A.   I think we had several qualifications or

2  sort of caveats on using that study in terms of its

3  relevance to the U.S. population.  As expressed in

4  our paper, it was a relatively high --

5    Q.   Uh-huh.

6    A.   -- exposure level at issue.  It was

7  conducted in Bangladesh in a relatively

8  nutritionally and socioeconomically deprived

9  population.  And that issues such as usual diet and,

10  perhaps, folate deficiency, and socioeconomic

11  differences might limit its ref- -- its relevance --

12    Q.   Uh-huh.

13    A.   -- to the U.S. population.

14    Q.   Uh-huh.

15    A.   But that those considerations would --

16  would most likely make it rela- -- I mean, reference

17  dose calculated based on the results of that study

18  relatively conservative compared with the U.S.  That

19  that population is probably more susceptible than

20  the U.S. general population.

21         And so with those caveats and some other

22  caveats, such as confounder control.

23         THE REPORTER:  I'm sorry, such as?

24         THE WITNESS:  Confounder control and

25  exposure assessment, we did think that that was the

 1  best of the available studies.

 2  BY MR. CONNETT:

 3      Q.   Okay.  So, I mean, you -- you found the

 4  study to be of sufficient methodological rigor to

 5  justify a quantitative risk assessment based on that

 6  data, correct?

 7      A.   So --

 8      Q.   Leaving aside the question of relevance to

 9  the U.S., which I understand your comments --

10      A.   Right.

11      Q.   -- on that.

12      A.   We still had concerns about the

13  methodological rigor, but it had sufficient

14  quantitative data.

15      Q.   Uh-huh.

16      A.   In terms of deciding on actually choosing

17  that study --

18      Q.   Uh-huh.

19      A.   -- for calculation of reference dose,

20  because I don't do risk assessment I didn't make

21  that determination.

22          When you say "You," it wasn't me as an

23  individual choosing this study.

24      Q.   But you put your name on that paper and

25  published it.

1   think the method can be completely clear and

2   reliable and valid, and yet be -- due to differences

3   in the individuals attempting to follow that method.

4   Again, in -- in terms of their judgment and their

5   qualifications and background and expertise, as well

6   as, how well they followed the method and -- and

7   that sort of thing.  I think you can lead -- you can

8   obtain different results despite following the same

9   valid method.

10          I would also say that reaching a conclusion

11  that evidence is insufficient to establish a causal

12  effect and a conclusion that evidence is sufficient

13  to establish a causal effect are not necessarily

14  opposite conclusions, but they are different.  But

15  not diametrically opposed, necessarily.

16      Q.   Okay.  Can you explain how --

17          So how is it that a conclusion that there

18  is insufficient evidence of caus- -- causation, how

19  is that not opposite the conclusion that there is

20  sufficient evidence of causation?  Can you explain

21  that a little bit more?

22      A.   Sure.  I think if you conclude that there

23  is insufficient evidence, you could conclude -- that

24  could be a conclusion that there is, for example, a

25  statistical association that is observed.  If we're

1   talking about epidemiology.  There could be a

2   conclusion that there is a statistically significant

3   association observed.  Even that it's consistent

4   across a number of studies, not necessarily all

5   studies, but in -- in multiple studies.  And yet --

6   and it could be suggestive of a causal association,

7   but not yet sufficient.

8           So, you know, it could fall short, for

9   example, in terms of uncertainties in exposure

10  assessment or in control for confounders.

11          And so I think that conclusion -- it's

12  similar to, for example, an NTP conclusion that

13  there's a presumed health hazard, or an IARC

14  conclusion that a given agent is a probable human

15  carcinogen, but not a definite human carcinogen.

16  There are degrees of classification of the level of

17  evidence.

18      Q.    Uh-huh.

19      A.    And so for me, the opposite conclusion

20  would be that there is evidence that it is not a

21  causal effect.

22          So that would be like the Group 4

23  classification for IARC, which my understanding is

24  they've only classified one agent ever as a Group 4

25  carcinogen where, you know, they said the

```
1    evidence -- there -- there's good evidence, and it
2    suggests it's not a carcinogen.  And then NTP, that
3    would be their classification that something is
4    not -- or not likely to be, I think is their lowest
5    classification.  Not likely to be a health hazard.
6    That, to me, would be closer to the opposite
7    conclusion than, you know, the -- the sort of
8    higher -- higher levels.
9         Q.   So insufficient evidence of causation, for
10   epidemiology sake, is not inconsistent with the
11   chemical being a presumed cause of the outcome.
12        A.   That is correct.  So presumed under NTP's
13   definition of presumed health hazard is -- is
14   actually specifically not known to be a health
15   hazard.  So it's specifically not a causal effect.
16   And so insufficient evidence is -- is consistent
17   with, you know, not known to be a cause.
18        Q.   Right.
19             So when you used the phrase insufficient
20   evidence of causation from the epidemiological
21   literature, you're not saying the chemical doesn't
22   cause the effect; is that correct?
23             MS. CARFORA:  Objection.  Mischaracterizes.
24             THE WITNESS:  It says -- when I say it's
25   insufficient, I'm saying that there's not enough
```

1    compelling evidence to reach a definitive

2    conclusion, one way or the other.

3    BY MR. CONNETT:

4        **Q.    Okay.  And your conclusion that there's**

5    **insufficient evidence of epidemiological -- sorry,**

6    **strike that.**

7            **Your conclusion, in any of your systematic**

8    **reviews that there is insufficient epidemiological**

9    **evidence of causation, is not inconsistent with the**

10   **chemical being a presumed cause of the effect.**

11       A.    Where presumed -- here we're using

12   presumed, I guess, do you mean it the way NTP means

13   it?  Where they have a specific technical

14   definition?

15       **Q.    No, let's use it more generally.**

16       A.    So presumed more generally, I would not use

17   that term because I think it's -- it's -- it can be

18   misinterpreted.

19       **Q.    Okay.**

20       A.    I think NTP can use it because they

21   specifically --

22       **Q.    Right.**

23       A.    -- define out what presumed means.

24       **Q.    Okay.**

25       A.    And then I'm comfortable -- I'm more

1    correlation between the two --

2        Q.    Uh-huh.

3        A.    -- suggesting that the -- the prenatal

4    measures were not independent of the postnatal

5    measurements.

6        Q.    Okay.

7        A.    So what I mean is that, I don't consider

8    any of these studies to have evaluated prenatal

9    exposure in isolation.

10       Q.    Right.

11             I understand that qualifier.  Understood.

12   That the -- that studies that have attempted to look

13   at prenatal fluoride exposure, that prenatal

14   fluoride exposure may correlate with postnatal

15   exposure.

16             I understand that caveat, okay?

17       A.    Uh-huh.

18       Q.    I'm gonna ask -- ask the question again,

19   which is:  Did you find in your systematic review

20   any study that attempted to examine prenatal

21   fluoride exposure that did not find some significant

22   association with neurodevelopmental effects.

23             MS. CARFORA:  Objection.  Asked and

24   answered.

25             THE WITNESS:  Among those -- among the

 1  three that I found that were published that

 2  attempted to look at some prenatal measurement of

 3  exposure, I think all three of them found some

 4  statistically significant association with adverse

 5  neurodevelopmental outcomes and some statistically

 6  nonsignificant associations.

 7  BY MR. CONNETT:

 8      **Q.   Are you referring to Bashash 2017, Bashash**

 9  **2018 and Green 2019?**

10      A.   No.  I mean, the Bashash studies, which

11  would be the ELEMENT ones.

12      **Q.   Right.**

13      A.   The -- the Till and Green ones, which are

14  the Canadian ones.

15      **Q.   Right.**

16      A.   And then the Valdez --

17      **Q.   Jimenez.**

18      A.   -- Jimenez one in other areas of Mexico

19  where they --

20      **Q.   Okay.**

21      A.   I'm sorry, not one.  There's a single study

22  by Valdez Jimenez looking at other areas in Mexico.

23      **Q.   Okay.  So I'm just gonna ask you some**

24  **questions here about -- that relate to assessing the**

25  **relative methodological strengths of studies, okay?**

1    had mentioned -- it seemed like you had mentioned

2    those controls earlier in your testimony as a

3    strength of the study, but I'll move on.

4           MS. CARFORA:  Objection.

5           THE WITNESS:  No.

6           MS. CARFORA:  Mischaracterizes the

7    testimony.

8           THE WITNESS:  I said that they assessed

9    those exposures, but not that they controlled for

10   them as confounders.

11   BY MR. CONNETT:

12     Q.    Fair enough.  Thank you for the

13   clarification.

14           Okay.  So in your report you state that

15   Dr. Grandjean and Dr. Thiessen omitted numerous

16   studies, correct?

17     A.    I think that's correct.

18     Q.    And do any of the studies that they omitted

19   or failed to discuss, do any of those studies in

20   your view undermine or contradict their opinions in

21   this case?

22     A.    I think that the individual studies, in and

23   of themselves and the results of those findings, are

24   not what is the important part of my opinion

25   regarding their omission.

1          My bigger concern relates to their not

2     systematically searching and reviewing literature.

3     So it's not the -- the individual studies and their

4     findings.

5          Q.   Uh-huh.

6          A.   I don't -- I don't think that the studies

7     that they omitted --

8          Q.   Uh-huh.

9          A.   -- would necessarily change their opinions

10    or mine.

11         Q.   Uh-huh.

12         A.   I think my -- my main issue is that they

13    have not conducted systematic comprehensive or

14    transparent searches, reviews, and assessments of

15    the epidemiologic literature.

16         Q.   Right.  Understood.

17              Now, you mentioned earlier that you read

18    Dr. Grandjean's rebuttal report, correct?

19         A.   Correct.  I -- I think it -- I can't

20    remember if it's called a rebuttal report, or

21    rebuttal and supplemental report, but yes.

22         Q.   Okay.  Now, Dr. Grandjean identified four,

23    I'll call 'em, no effect studies, that you

24    identified that he did not discuss.

25              Do you recall that?

1    B-A-Y-L-E-Y, Scales of Infant Development.

2         So, I guess if you characterize no-effect

3    studies as though as to find no significant

4    association, this one did find one, but they found

5    -- they found one with -- one outcome that they

6    evaluated, but apparently not with the other one.

7    BY MR. CONNETT:

8    **Q.    Okay.  So I wanna go and talk just a little**

9    **bit more about those four studies that I mentioned,**

10   **and --**

11        **The Perrott study, you're familiar with**

12   **that, right?**

13   A.    Yes.

14   **Q.    And you didn't include that in -- among the**

15   **ten in your studies in your causal analysis, right?**

16   A.    Correct.

17   **Q.    Okay.  The Kang study, you're familiar with**

18   **that, right?**

19   A.    Yes, generally.

20   **Q.    That's a cross-sectional study from China?**

21   A.    I think that's right.

22   **Q.    And you didn't include the Kang study in**

23   **your causal analysis, correct?**

24   A.    Let me just make sure that the description

25   is correct.

```
1            Kang 2011.

2       Q.   Yes.

3       A.   Is that correct?

4            Yes, that's right.

5       Q.   Okay.  The He study, 2010.

6            You're familiar with that, right?

7       A.   Yes.

8       Q.   And that's another cross-sectional study

9  from China, right?

10      A.   That's correct.

11      Q.   And you did not include that in your causal

12 analysis, correct?

13      A.   So I did include all these studies, I took

14 -- I took 'em into consideration, but in terms of

15 the ones that I weighted more heavily, I did not

16 include these.

17      Q.   Okay.  So you didn't give much weight to

18 the He 2010 study, right?

19      A.   That's right.

20      Q.   And you didn't give much weight to the Kang

21 2011 study, right?

22      A.   That's correct.

23      Q.   And you didn't give much weight to the

24 Perrott 2018 study, correct?

25      A.   That's correct.
```

1    A.    -- fluoride exposure from drinking water.

2    **Q.    Uh-huh.**

3    A.    I considered it to be relevant --

4    **Q.    Uh-huh.**

5    A.    -- which, as you pointed out, is different

6    from, I think you said, valid or rigorous, or

7    something.

8         But yes, I considered it relevant, but then

9    whether I would -- I think you asked me before

10   about, for example, the Morgan study in its relative

11   quality and the Broadbent study and the Shannon

12   study.  And the -- and I think also maybe Barberio,

13   the relative quality of those studies, compared with

14   others.

15   **Q.    Okay.**

16   A.    The Spittle study I would include with the

17   Shannon because it's the same study.

18   **Q.    Uh-huh.**

19   A.    So I would say that it is better in quality

20   than the ecological cross-sectional studies from

21   China, for instance.  But it's poorer in quality

22   than, for example, the Bashash and the Green studies

23   that came thereafter.

24   **Q.    What confounders did Spittle control for?**

25   A.    So it's -- it's not stated in the abstract,

```
 1      A.   -- I don't think would change their

 2  opinions.  It's not the lack of any one given study

 3  that I think --

 4      Q.   Uh-huh.

 5      A.   -- is a flaw.  It's the overall

 6  methodology.

 7      Q.   Right.

 8           Well, what --

 9           Is there any study that they didn't

10  identify and discuss that refutes or undermines

11  their opinions?

12           MS. CARFORA:  Objection.  Asked and

13  answered.

14           THE WITNESS:  Again, I think there's no one

15  individual study necessarily that would change or

16  undermine their opinions.  I think the fact that

17  they didn't do a systematic and thorough search and

18  review and assessment of the literature that

19  undermines the validity of their opinions.

20  BY MR. CONNETT:

21      Q.   Do you --

22           You know --

23           You had --

24           You identified and discussed many studies

25  that reported significant associations with fluoride
```

1   and IQ that Dr. Grandjean did not discuss in his

2   report.

3           Are you aware of that?

4   A.   Yes.

5   Q.   Now, do you think those studies that you

6   discussed, which found significant associations with

7   fluoride, do you think those studies support

8   Dr. Grandjean's conclusions, or are at odds with

9   Dr. Grandjean's conclusions, or none of the above?

10  A.   I think that they -- those studies that I

11  identified that identified -- that had signif- --

12  significant causative associations between fluoride

13  and adverse developmental -- neurodevelopmental

14  outcomes, I think that they do not provide

15  substantive support, one way or another, because

16  they are of poor methodological quality, in general.

17  And then they are not otherwise relevant to the U.S.

18  drinking water fluoridation situation.

19          So I don't think that they support his

20  opinions.  I think that they contribute, in and of

21  themselves, on a study-by-study basis, little weight

22  to any conclusion of association or causation.

23          Again, I think the bigger point related to

24  those studies is not that there's any sort of one

25  definitive study that would sway an opinion, one way

1    or another -- or another.  It's more of an issue of

2    not having conducted a systematic and thorough

3    review and analysis of literature.

4        Q.   Right.

5            I -- I understand that -- that -- that --

6    your criticism on that point.

7            But going back to the studies that you

8    identified and discussed, which reported

9    associations with adverse neurological effects that

10   Dr. Grandjean did not discuss, do I understand your

11   testimony that those studies don't add much weight

12   to the literature, one way or the other?  Is that a

13   fair summary?

14       A.   I would say that for this particular

15   assessment of the potential impact of community

16   drinking water fluoridation on neurodevelopmental

17   outcomes in the U.S., those studies, given their

18   limited quality and lack of relevance, that they --

19   that their results, I guess, carry little weight.

20       Q.   Okay.  And now hypothetical questions for

21   you, okay?  Going back to hypotheticals.

22           Let's say you looked at all the data, you

23   did your systematic review on fluoride and

24   neurotoxicity, and there was no Kang 2011 study.

25           You understand that?

1      A.    Yes.

2      Q.    **Would your opinions in this case be any**

3 **different?**

4      A.    So if that study simply had never existed.

5      Q.    **Correct.**

6      A.    No.  I don't think my -- my opinions would

7 change.

8      Q.    **Okay.  Similar hypothetical:  You do your**

9 **systematic review of the scientific literature and**

10 **the He 2010 study did not exist.**

11          **Would your opinions be any different?**

12     A.    No.  My overall opinions would not change.

13     Q.    **Okay.  Say you --**

14          **Same similar hypothetical:  You do your**

15 **systematic review of scientific literature, and the**

16 **Perrott study, or Perrott, does not exist.**

17          **Would your opinions be any different?**

18     A.    I think I had expressed an opinion that the

19 Malan, M-A-L-A-N, and Till, I think it's a different

20 Till, but T-I-L-L, ecological study was of very poor

21 quality, and they didn't control for a number of

22 confounders, and Perrott, in particular, identified

23 one confounder, which was something like elevation

24 -- you know, geographic elevation of residents.

25 That once they controlled for it, the association

1    was statistically nonsignificant.

2         I mean, I think that particular opinion

3    about the Malan and Till study would change.

4    Because I wouldn't be able to identify the one -- or

5    one particular confounder that was influential.

6    Q.   Right.

7    A.   But other than that, I don't think my

8    opinions about the association -- the bigger picture

9    opinions about association or causation, I don't

10   think that those opinions would change.

11   Q.   Okay.  And finally, on the same note, if

12   you did your scientific -- your systematic review of

13   scientific literature on fluoride, and the Spittle

14   abstract did not exist, would your opinions in this

15   case be any different?

16   A.   So under that hypothetical, no.  I don't

17   think my opinions would change.

18   Q.   Okay.

19        MR. CONNETT:  Now, we probably are at a

20   good stopping point.

21        Wanna take a five-minute break?

22        THE VIDEOGRAPHER:  We are off the record.

23        The time is 4:28 p.m.

24

25             (Break taken.)

```
1   STATE OF CALIFORNIA    )
                           )
2   COUNTY OF RIVERSIDE    )

3

4           I, KATIE HRON, C.S.R. No. 13483, in and for

5   the State of California, do hereby certify:

6           That prior to being examined, the witness

7   named in the foregoing deposition was by me duly

8   sworn to testify to the truth, the whole truth, and

9   nothing but the truth.

10          That said deposition was taken down by me

11  in shorthand at the time and place therein named and

12  thereafter reduced to typewriting under my

13  direction, and the same is a true, correct, and

14  complete transcript of my shorthand notes so taken.

15          That if the foregoing pertains to the

16  original transcript of a deposition in a Federal

17  Case, before completion of the proceedings, review

18  of the transcript { } was { } was not requested.

19          I further certify that I am not interested

20  in the event of this action.

21          In witness whereof, I have hereunto

22  subscribed my name on September 12, 2019.

23

24          _____

25                  Katie Hron, C.S.R. No. 13483
```

Asbestos Reporters of California
888-779-9974

# Exhibit 28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AT SAN FRANCISCO


FOOD & WATER WATCH, et al.,          )
                                     )
                  Plaintiffs,        )
                                     )
          vs.                        ) Civ. No.
                                     ) 17-CV-02162-EMC
U.S. ENVIRONMENTAL PROTECTION        )
AGENCY, et al.,                      )
                                     )
                  Defendants.        )
                                     )

**ORIGINAL**

VIDEOTAPED DEPOSITION OF CHARLOTTE W. LEWIS, M.D.

A.M. SESSION

August 8, 2019

Seattle, Washington

| | |
|---|---|
| 1 | THE VIDEOGRAPHER:  Thank you.  Here |
| 2 | begins Media Unit Number 1 of the deposition of |
| 3 | Dr. Charlotte Lewis.  The court reporter today is Katie |
| 4 | Eskew. |
| 5 | Will counsel please introduce yourself and state |
| 6 | whom you represent. |
| 7 | MR. CONNETT:  Good morning.  Michael |
| 8 | Connett on behalf of plaintiffs. |
| 9 | MR. DO:  John Thomas Do with the |
| 10 | Justice Department for defendants. |
| 11 | MR. WILBER:  Eric Wilber, U.S. EPA, |
| 12 | defendants. |
| 13 | MR. ADKINS:  Brandon Adkins of the |
| 14 | Department of Justice for defendants. |
| 15 | THE VIDEOGRAPHER:  And will the court |
| 16 | reporter now please swear in the witness? |
| 17 | |
| 18 | CHARLOTTE W. LEWIS, M.D.,   having been first duly sworn |
| 19 | by the Certified Court |
| 20 | Reporter, testified as |
| 21 | follows: |
| 22 | |
| 23 | EXAMINATION |
| 24 | BY MR. CONNETT: |
| 25 | Q   **Good morning.** |

```
1        testimony.

2    A    I believe there's other places, but they're not coming to

3         mind immediately.

4                        MR. CONNETT:  JT, just as an aside,

5         and I'm open to -- we can talk about this at a break, but

6         I think we should come up with some agreement as to

7         objections in this case.  I know I've objected along the

8         lines you've objected.  In terms of do we want to reach

9         an agreement that objections should just be "form," or do

10        we want to maintain descriptive objections, obviously

11        without being coaching the witness or instructing the

12        witness?

13                       MR. DO:  I have no plans on coaching

14        the witness.  However, I think to reach an agreement

15        right in the middle of a deposition, as we've currently

16        been proceeding, would perhaps be problematic.

17                       MR. CONNETT:  Okay.  But I'm just

18        saying, so -- because I can say, you can just say form

19        objection today if -- if you want; right?  But we can

20        talk about it during a break.  It's something I think we

21        should address before we go into all these expert

22        depositions, okay?

23                       MR. DO:  Sure.  Always happy to talk.

24                       MR. CONNETT:  Okay.

25   Q    (By Mr. Connett)  So are you familiar with the term
```

| | | |
|---|---|---|
| 1 | | "systematic review"? |
| 2 | A | Yes. |
| 3 | Q | **What is a systematic review, to your understanding?** |
| 4 | A | To my understanding, it is -- there's certainly |
| 5 | | methodology that underlies systematic reviews, and I |
| 6 | | myself have never done one, but it generally involves an |
| 7 | | extensive literature review to identify papers that are |
| 8 | | on certain topics, reviewing the quality of the |
| 9 | | literature, the quality of the research, and identifying |
| 10 | | those papers generally that meet certain criteria that |
| 11 | | are usually set in advance, and then summarizing the |
| 12 | | results of those studies in such a way that one is able |
| 13 | | to provide a conclusion or a statement about both the |
| 14 | | quality of the research and the overall conclusions of |
| 15 | | the research. |
| 16 | Q | **Okay.  Now, on Page 2 of your first report, you** |
| 17 | | **identify -- Page 2 and 3, sorry, you identify five issues** |
| 18 | | **that you were asked to examine; right?** |
| 19 | A | Exactly. |
| 20 | Q | **Okay.  Now, in addressing these five questions, did you** |
| 21 | | **conduct a systematic review?** |
| 22 | A | I -- I would not say that I conducted a systematic review |
| 23 | | in the way that I just described. |
| 24 | Q | **Okay.** |
| 25 | A | But I conducted an extensive literature review, reviewed |

```
 1        the quality of the literature and the research that I
 2        reviewed, and summarized that in my report.
 3   Q    In your -- as a pediatrician, someone who's published
 4        many papers in peer-reviewed journals, would the kind of
 5        review that you did here, an extensive literature review,
 6        be considered the kind of material that is acceptable for
 7        publication?
 8   A    Yes.
 9   Q    And it's the kind of review that experts like yourself
10        rely upon in forming opinions?
11                    MR. DO:   Objection with regards to
12        foundation.
13   A    I would -- in answering that question, I think that my
14        colleagues in pediatrics would rely upon such a review
15        for their -- for their learning.
16   Q    (By Mr. Connett)  Okay.  So to sort of summarize, a
17        literature review doesn't need to be, quote, a systematic
18        review, in order to provide reliable information about
19        the science; is that correct?
20   A    I agree with that statement.
21   Q    Okay.  Now, just to be clear, I know you said you didn't
22        do a systematic review in this case, but I just want to
23        break that down a little bit further.  Did you have --
24                    MR. DO:  Objection.  Sorry.  You
25        haven't finished answering [sic] your question.
```

1    Q    (By Mr. Connett)  In reviewing the literature in this

2         case, did you have any predefined criteria as to what

3         sources you would search?

4                        MR. DO:  Objection with regards to the

5         first statement counsel made to the extent it misstates

6         testimony.

7    Q    (By Mr. Connett)  Did you set any predefined criteria as

8         to what sources you would search for information?

9    A    In my work, I typically always start with searching

10        PubMed.

11   Q    Okay.  But in this case --

12   A    In this case I started with PubMed.

13   Q    But did you have any predefined criteria as to what

14        sources you would search or not?

15   A    Can you rephrase the question?

16   Q    Did you -- did you -- before you ever had a single study

17        in this case, did you come up with a criteria as to what

18        sources you would search for information?

19   A    Well, because I've been working in this area for a number

20        of years, I -- I have accumulated a bulk of literature,

21        and periodically I go to PubMed and enter in certain key

22        words in order to see if there are any updates to things

23        that have previously been published.

24            So I'd say I generally use PubMed, and key words

25        that I would use would come directly from these five

1    areas.

2  Q  **Okay.**

3  A  And then -- and then additional detail as well, as I read

4     studies that generates other questions and other search

5     terms.

6  Q  **And so in this case, you were relying on your prior**

7     **literature reviews; correct?**

8  A  Exactly.

9  Q  **And then you did some additional PubMed searches?**

10 A  Right.

11 Q  **Did you do -- did you search any other sources for other**

12    **papers?**

13 A  There are some older papers that are better accessed --

14    if they show up on PubMed but I'm not able to access them

15    through the University of Washington Health Sciences

16    Library, there are sometimes studies that I can access

17    through Google Scholar.

18 Q  **Okay.  So some of the papers that you received -- that**

19    **you reviewed in this case you accessed through Google**

20    **Scholar?**

21 A  Just to clarify, I identified the actual title and

22    authors, but because they were not available at the

23    library, there was a scanned-in version of the article

24    from perhaps 1940s, 1930s that I could access through

25    Google.

1   **Q**   **Okay.  Besides Google and PubMed, did you receive papers**

2       **in this case from any other sources?**

3   A   I did ask Dr. Moss if my literature review on certain

4       areas was complete or if he had suggestions about

5       specific topics so that I could double-check against my

6       own literature review to make sure that I had been

7       inclusive.

8   **Q**   **Okay.  So let me see if I can summarize this.  The**

9       **sources of -- the sources that you used to identify**

10      **relevant papers in this case --**

11   A   Mm-hmm.

12   **Q**   **-- one, your prior reviews of the literature?**

13   A   True.

14   **Q**   **New searches on PubMed?**

15   A   True.

16   **Q**   **Consultation with Dr. Moss?**

17   A   Correct.

18   **Q**   **And Google Scholar?**

19   A   Yes, but it wasn't a primary search of Google Scholar.

20   **Q**   **Okay.  Now, before doing your review in this case, did**

21      **you establish any predefined criteria as to what studies**

22      **you would include?**

23   A   No.

24   **Q**   **Before doing your review in this case, did you establish**

25      **any predefined criteria as to how to assess studies for**

1    bias?

2  A   In my training through my MPH and in my experience,

3      review of the literature and examination of its quality

4      and constant attention to sources of bias is part of my

5      routine practice.

6  Q   **I understand.  But in this case specifically, before you**

7      **reviewed any of the papers, did you write out a**

8      **predefined criteria as to how you would assess the**

9      **studies for bias?**

10 A   I did not write up how I would assess studies for bias.

11 Q   **Instead, you were relying on your own background and**

12     **training as a scientist; right?**

13 A   This is correct.

14 Q   **Okay.  Now, did you -- before reviewing any of the**

15     **studies in this case, did you write out any predefined**

16     **criteria as to how you would weigh the evidence?**

17 A   Again, I think that it's an -- it was not a formal

18     process, but one that I've developed over time.

19 Q   **Okay.  So you didn't write --**

20 A   Right.  I did not write it out.

21 Q   **Okay.  So you were relying on your own background and**

22     **training as a scientist to determine how you were going**

23     **to weigh the evidence that you reviewed?**

24 A   Correct.

25 Q   **Okay.  Now, before reviewing any of the studies in this**

```
 1   A    Okay.  Then -- then yes, I agree.
 2   Q    Okay.  So it's fair to say, then, that more people drink
 3        artificially fluoridated water in the United States alone
 4        than the rest of the world combined; right?
 5   A    Well, I -- I don't know exactly.  There are a number of
 6        countries who -- that there's close to a hundred percent
 7        of the population that receives a form of community water
 8        fluoridation.
 9   Q    Right.  And you see the figure from Marthaler that we
10        were looking at earlier?
11   A    Mm-hmm.
12   Q    He says that worldwide, 368 million people drink
13        artificially fluoridated water; right?
14   A    Water where the level has been adjusted, yes.
15   Q    Right.  United States, we have 200 million people --
16   A    Right.
17   Q    -- drinking artificially fluoridated water; right?
18   A    Right.
19   Q    200 million is more than half of 368 million; right?
20   A    That's true.
21   Q    So it's fair to say, then, that more people drink
22        artificially fluoridated water in the United States alone
23        than the rest of the world combined; right?
24   A    Based on those numbers, that's true.
25   Q    Do you have any reason to disagree with that?
```

```
 1  A   No.

 2  Q   Okay.  So in your report, your report that you wrote on

 3      June 27th, you talk about the -- how there was a lot of

 4      oral health problems and tooth decay in the United States

 5      in about the middle part of the 20th century; right?

 6  A   Yes.  Referring more to the earlier part of the 20th

 7      century, but yes.

 8  Q   Okay.  So I'm going to read you a summary of the oral

 9      health situation back in those days, okay?

10  A   From...?

11  Q   From the middle -- middle part of the 20th century, okay?

12  A   No.  I meant from what source?

13  Q   Well, I'm just going to -- I'll tell you that in a

14      second, okay?

15  A   Oh, okay.

16  Q   I was going to first --

17  A   All right.

18  Q   -- read you the summary.

19  A   Okay.

20  Q   It says, "The majority of elderly people over 60 years

21      were partly or totally edentulous, and children

22      frequently had first molars that" -- strike that.  Let

23      me -- let me walk that back.

24          I'll first start by saying, "The majority of elderly

25      above 60 years were partly or totally edentulous."
```

```
 1   STATE OF WASHINGTON )    I, Katie A. Eskew, CCR, RPR,
                          ) ss a certified court reporter
 2   County of King      )    in the State of Washington, do
                              hereby certify:

 3

 4
         That the foregoing deposition of CHARLOTTE W. LEWIS,
 5   M.D. was taken before me and completed on August 8, 2019,
     and thereafter was transcribed under my direction; that the
 6   deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
 7   objections, motions and exceptions;
 8       That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
         That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13       That I am herewith securely sealing the said deposition
     and promptly delivering the same to Michael P. Connett.
14
         IN WITNESS WHEREOF, I have hereunto set my signature on
15   the 20th day of August 2019.

16

17

18

19                           _____

20                           Katie A. Eskew, CCR, RPR
                             Certified Court Reporter No. 1953
                             (Certification expires 08/26/19.)
21

22

23

24

25
```

FOOD & WATER WATCH

VS

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

---

## CHARLOTTE LEWIS

August 08, 2019

---



888-779-9974

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   FOOD & WATER WATCH, et al.,      )

6                                    )

7            Plaintiffs,             )

8                                    )

9        VS.                         )   No. 17-CV-02162-EMC

10                                   )

11  U.S ENVIRONMENTAL PROTECTION     )

12  AGENCY, et al.,                  )

13                                   )

14           Defendants.             )

15  _____     )

16

17

18  TELEPHONIC VIDEOTAPED DEPOSITION OF CHARLOTTE LEWIS

19                    VOLUME II

20              (PAGES 174 TO 338)

21            THURSDAY, AUGUST 8, 2019

22                 2:30 P.M. PST

23

24

25       REPORTED BY:  ANTHONY JUDE CORDOVA, CSR 12943

**ORIGINAL**

```
1              BE IT REMEMBERED THAT, on August 8, 2019,

2    commencing at the hour of 2:30 p.m. of the said day,

3    before me, ANTHONY JUDE CORDOVA, RPR, CSR, a California

4    Certified Shorthand Reporter and Notary Public in the

5    state of Pennsylvania, telephonically appeared Charlotte

6    Lewis, produced as a witness in the above-titled court

7    and cause, who, being by me first duly sworn, was

8    examined in said cause.

9

10

11                        - - - -

12              APPEARANCES VIA TELEPHONE

13

14

15       FOR THE PLAINTIFFS:

16       Michael P. Connett, Esq.

17       WATERS KRAUS PAUL

18       222 North Pacific Coast Highway, Suite 1900

19       El Segundo, CA  90245

20       310.414.8146

21       Mconnett@waterskraus.com

22

23

24

25
```

```
 1   FOR THE PLAINTIFFS:

 2   Christopher T. Nidel, Esq.

 3   NIDEL & NACE

 4   2201 Wisconsin Avenue, NW, Suite 200

 5   Washington, DC  20007

 6   202.478.9677

 7   Chris@nidellaw.com

 8

 9   FOR THE DEFENDANTS:

10   John Thomas H. Do, Esq.

11   U.S. DEPARTMENT OF JUSTICE

12   ENVIRONMENT & NATURAL RESOURCES DIVISION

13   601 D Street, NW, Suite 8000

14   Washington, DC  20044

15   202.514.2640

16   John.do@usdoj.gov

17

18   FOR THE DEFENDANTS:

19   Eric P. Wilber, Esq.

20   OFFICE OF GENERAL COUNSEL

21   ENVIRONMENTAL PROTECTION AGENCY

22   1200 Pennsylvania Avenue, NW

23   Washington, DC  20460

24   202.564.3839

25   Wilber.eric@epa.gov
```

```
1   INDEX:

2   Examination by Mr. Connett          178

3   Examination by Mr. Do               307

4   Re-Examination by Mr. Connett       324

5

6   EXHIBITS REFERRED TO AND MARKED:

7

8   EX 97  Report                       194

9   EX 188 Journal article              210

10  EX 189 Warren study                 219

11  EX 190 Native American study        222

12  EX 191 ADA report                   226

13  EX 192 Chi report                   235

14  EX 193 FDA/Calvert letter           270

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    - - - -

 2                  PROCEEDINGS

 3                    - - - -

 4        MR. CONNETT:  Okay.  Just a bit of housekeeping.

 5   The court reporter who was present up to now had to

 6   leave which we knew about before the deposition began.

 7   We now have a court reporter appearing telephonically.

 8   The parties have agreed that the oath does not need to

 9   be read again and that we can proceed forward at this

10   time.

11                    - - - -

12                  CHARLOTTE LEWIS,

13                Being first duly sworn,

14           Was examined and testified as follows:

15                    - - - -

16                  EXAMINATION

17                    - - - -

18   BY MR. CONNETT:

19   Q.      Before break, we were talking about the caries

20   decline that occurred throughout the western world since

21   the mid part of the 20th century.  Do you have -- what

22   is your explanation as to why caries has declined in

23   countries like most of western Europe that do not add

24   fluoride to their water?

25           MR. DO:  Objection to the extent it misstates
```

1  Q.      Did you make any attempt in preparing your

2  report in this case to find out?

3  A.      No, because I primarily relied on Dean's

4  methodology to establish severity of fluorosis.

5  Q.      Okay.  On the Dean scale, what's your

6  understanding as to when -- at what stage of severity

7  the teeth become weaker?

8  A.      My understanding is that with severe dental

9  fluorosis, the teeth are more brittle.

10  Q.      Okay.  Are you aware of data showing that

11  moderate fluorosis -- teeth with moderate fluorosis are

12  weaker teeth than teeth with lesser degrees of --

13  A.      I'm not aware of the literature there.

14  Q.      Okay.  Did you in preparing your report in this

15  case do any kind of review to look for some new data on

16  the relationship between dental fluorosis and caries?

17          MR. DO:  Objection to form.

18  A.      I don't recall specifically looking at that

19  particular question.

20  BY MR. CONNETT:

21  Q.      Okay.  Did you read Dr. Slade's rebuttal report

22  in this case?

23  A.      I read Dr. Slade's initial report, but I don't

24  believe that I have -- have any copies or have received

25  a copy of his rebuttal report.

1  Q.      In his rebuttal report, he states that in the

2  Iowa fluoride study --

3  A.      Uh-huh.

4  Q.      -- children with mild fluorosis had higher rates

5  of caries than children without fluoride.  Does that

6  surprise you to hear that?

7          MR. DO:  Objection to the extent it misstates

8  the evidence.

9  A.      Well, I'm familiar with the finding from a paper

10 by -- or a concluding statement by Warren that said it's

11 hard to establish an exact level for which caries --

12 that's not exactly -- that in general, children with

13 exposure to less fluoride have more caries and children

14 exposed to more fluoride have more fluorosis, but it's

15 difficult to establish one particular level that applies

16 to everyone.

17 BY MR. CONNETT:

18 Q.      Okay.  Are you aware of the Warren finding that

19 fluoride intake has relatively little relationship to

20 the presence or absence of caries?

21         MR. DO:  Objection to the extent it misstates

22 the evidence.

23 A.      There are actually some results from the Iowa

24 fluoride studies that show that exposure to community

25 water fluoridation does have a beneficial effect

```
 1   primarily in low-income older children.
 2          MR. CONNETT:  Move to striking as nonresponsive.
 3   BY MR. CONNETT:
 4   Q.     My question is are you aware of Warren's
 5   finding, 2009, that total fluoride intake has relatively
 6   little relationship to caries?
 7          MR. DO:  Same objections.
 8   A.     I am aware that he concluded that based on one
 9   of his studies using the Iowa fluoride data.
10   BY MR. CONNETT:
11   Q.     Okay.  Now, you are a -- you have a nutrition
12   background; right?
13   A.     I was a registered dietitian before I went to
14   medical school.
15   Q.     Okay.  So, you -- I assume you are very
16   well-versed in what an essential nutrient is; right?
17   A.     That was a long time ago.
18   Q.     Okay.  Well, let me ask you.  Do you know what
19   an essential nutrient is?
20   A.     An essential nutrient is one that is necessary
21   for normal -- normal physiologic activity.  That's not
22   the best definition, but it's essential for normal
23   metabolism.
24   Q.     Okay.  And if you -- if you have a deficiency of
25   an essential nutrient, a disease will result; correct?
```

1        MR. DO:  Objection to form.

2   A.      Yes.  A deficiency of an essential nutrient --

3   sorry.  What was the last part?  You said if you have a

4   deficiency --

5   BY MR. CONNETT:

6   **Q.      A disease will result as a consequence?**

7        MR. DO:  Objection.  Form.  Incomplete

8   hypothetical.

9   A.      Yes.  You have -- there are examples of things

10  like pellagra where there's a deficiency of niacin or

11  beriberi when there's a deficiency of thiamin where a

12  disease state does result.

13  BY MR. CONNETT:

14  **Q.      Okay.  And you had mentioned that an essential**

15  **nutrient plays a necessary role in metabolism?**

16  A.      Nutrients, micronutrients typically are -- often

17  times play a role in metabolism.

18  **Q.      Are you familiar with the phrase metabolic**

19  **pathway?**

20  A.      I'm familiar with the phrase metabolic pathway.

21  **Q.      What does metabolic pathway mean?**

22  A.      Well, an example of metabolic pathway would be

23  when you have glycogens, let's say, stored in your liver

24  and a metabolic pathway would be something like the

25  breakdown of glycogen to provide glucose because glucose

1  is an essential nutrient for the -- for the brain.  So,

2  that would be an example of a metabolic pathway that's

3  fairly simple.  There's very complicated metabolic

4  pathways, as well.

5  Q.      So, an essential nutrient would be something

6  that some metabolic pathway in the body relies upon for

7  proper functioning; correct?

8  A.      In general, that's a true statement.

9  Q.      Okay.  Fluoride is not an essential nutrient;

10  correct?

11  A.      I think there's some controversy there.  I don't

12  personally agree with that statement.

13  Q.      Okay.  Are you aware of any metabolic pathway in

14  the body that requires fluoride?

15  A.      I'm not aware of a metabolic pathway that

16  requires only fluoride and nothing else.

17  Q.      Can you -- are you aware of any metabolic

18  pathway in the body that benefits from fluoride?

19  A.      Well, incorporation of fluoride into -- into

20  bony tissue such as teeth and bone, it's not necessary

21  that there be fluoride there, but one could think of

22  that as a metabolic pathway potentially.

23  Q.      Well, you're saying potentially, you could think

24  of it.  I'm asking you are you aware without speculating

25  of any metabolic pathway in the body that benefits from

1   **fluoride?**

2           MR. DO:   Objection.   Asked and answered.

3   A.      It's difficult because a metabolic pathway is

4   what we're talking about with regard to metabolic

5   pathways and breakdown of macronutrients or

6   incorporating macronutrients is different than what

7   we're talking about with fluoride aiding in the

8   remineralization of teeth.

9           MR. CONNETT:   Okay.   Move to strike as

10  nonresponsive.

11  BY MR. CONNETT:

12  **Q.      Again, the question is very specific.**

13  A.      Okay.

14  **Q.      The question is are you aware of any metabolic**

15  **pathway, without speculating, in the body that benefits**

16  **or requires fluoride --**

17          MR. DO:   Same objections.

18  BY MR. CONNETT:

19  **Q.      -- benefits from or requires fluoride?**

20          MR. DO:   Same objection.   Form.

21  A.      So, if we use a formal definition of metabolic

22  pathways, then the answer is no.

23  BY MR. CONNETT:

24  **Q.      Okay.   And are you aware of any cellular process**

25  **in the body that requires fluoride for proper**

```
1   functioning?

2            MR. DO:  Objection.  Form.  Vague.

3   A.      No.

4   BY MR. CONNETT:

5   Q.      Are you aware of any process in the body that

6   requires fluoride?

7            MR. DO:  Objection.  Vague.  Form.

8   A.      As for example like a catalyst or something, no.

9   BY MR. CONNETT:

10  Q.      Okay.  So, if you can turn to page 6 -- I'm

11  sorry -- page 7 of your rebuttal.

12  A.      Uh-huh.

13  Q.      You compare -- the top of page 7, you compare

14  water fluoridation to --

15  A.      Uh-huh.

16  Q.      -- flour --

17  A.      Uh-huh.

18  Q.      -- to iodine salt --

19  A.      Uh-huh.

20  Q.      -- to folic acid --

21  A.      Uh-huh.

22  Q.      -- and -- I'm sorry -- folic acid, to fortified

23  breakfast cereal and vitamin D fortified milk; correct?

24  A.      Yes.

25  Q.      Now, B vitamins are essential nutrients;
```

1    toxic effect.

2    BY MR. CONNETT:

3    **Q.    Are you aware of any other essential nutrient**

4    **that doesn't need to be swallowed to provide its**

5    **benefit?**

6           MR. DO:  Objection.  Form.

7    A.    Think about that.  Not off the -- not off the

8    top of my head.  An exposure to sunlight is what -- is a

9    topical effect that produces vitamin D from cholesterol.

10   So, that -- that would be potentially an example of

11   something that doesn't need to be swallowed.

12   BY MR. CONNETT:

13   **Q.    Okay.  But that scenario, the vitamin D, while**

14   **it's not being ingested, it is being dermally absorbed,**

15   **if you will, and goes into systemic circulation;**

16   **correct?**

17   A.    True.

18   **Q.    And, so, in that scenario that you've**

19   **identified, it is a systemic benefit as being -- that is**

20   **at play?**

21   A.    The conversion of cholesterol to vitamin D then

22   does have a systemic effect.

23   **Q.    Alright.  So, are you aware of any other**

24   **essential nutrient that doesn't -- that doesn't require**

25   **a systemic mechanism for its benefit?**

1    A.      Right now, I can't think of any.

2    Q.      **Okay.  So, in your report, you state that water**

3    **fluoridation is not medication; correct?**

4    A.      There is some controversy over this, but

5    community water fluoridation is considered to be a

6    public health strategy directed towards a population and

7    medication is typically directed towards individuals for

8    treatment of disease.

9    Q.      **And I'm reading from the bottom of page 6 of**

10   **your rebuttal --**

11   A.      Uh-huh.

12   Q.      **-- where you state that CWF does not fit the**

13   **definition of a medication because CWF is used to**

14   **prevent dental caries on a population level, not to**

15   **treat individuals.  That's your position here?**

16   A.      That's my position.

17   Q.      **What do you base that definition on?**

18   A.      Well, I think it's a well-established definition

19   of a public health intervention that's used to prevent

20   disease and not necessarily treat disease.

21   Q.      **Okay.  What -- can you -- can you tell me a**

22   **source that I could look at where I could find the**

23   **definition of what a medication is that you're relying**

24   **on?**

25   A.      Yes.  Off the top of my head, I can't

1    medication and public health strategy.

2    BY MR. CONNETT:

3    **Q.      Okay.  I'm just going to -- I'm going to**

4    **summarize what you testified and tell me if I have it**

5    **correct.**

6    A.      Okay.

7    **Q.      According to you, your testimony is fluoride is**

8    **a drug when it's added to toothpaste to prevent caries,**

9    **fluoride is a drug when added to supplements to prevent**

10   **caries, fluoride is not a drug when added to water to**

11   **prevent caries.  Is that a correct summary of your view?**

12          MR. DO:  Objection.  Form and to the extent it

13   misstates prior testimony.

14   A.      Insomuch as the definition of medication is

15   somewhat variable and depending on who you refer to,

16   that -- that is essentially a correct characterization

17   of my beliefs.

18   BY MR. CONNETT:

19   **Q.      Okay.  You understand that European countries,**

20   **one of the bases for some of the European countries to**

21   **reject fluoridation is their view that water**

22   **fluoridation is a form of mass medication?  Do you**

23   **understand that?**

24          MR. DO:  Objection to the form to the extent it

25   misstates evidence.

```
 1                     CERTIFICATE OF REPORTER

 2

 3         I, ANTHONY JUDE CORDOVA, a California Certified

 4    Shorthand Reporter and Notary Public, hereby certify

 5    that the witness in the foregoing deposition was by me

 6    duly sworn to tell the truth in the within-entitled

 7    cause;

 8         That said deposition was taken down in shorthand by

 9    me, a disinterested person, at the time and place

10    therein stated, that review was not waived, and that the

11    testimony of the said witness was thereafter reduced to

12    typewriting, by computer, under my direction and

13    supervision;

14         I further certify that I am not of counsel or

15    attorney for either or any of the parties to the said

16    deposition, nor in any way interested in the event of

17    this cause, and that I am not related to any of the

18    parties thereto.

19

20    DATE: 8-22, 2019

21

22    _____

23    Anthony Jude Cordova, R

24

25
```

Commonwealth of Pennsylvania - Notary Seal
Anthony Jude Cordova, Notary Public
Beaver County
My commission expires June 14, 2023
Commission number 1031043
Member, Pennsylvania Association of Notaries

Asbestos Reporters of California
888-779-9974

# Exhibit 29

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                    AT SAN FRANCISCO

4    FOOD & WATER WATCH, et al.     *

5      Plaintiffs              *  Civ. No.

6    v.                        *  17-CV-02162-EMC

7    U.S. ENVIRONMENTAL PROTECTION *

8    AGENCY, et al.            *

9      Defendants             *        **ORIGINAL**

10                  *    *    *    *    *

11              VIDEOTAPED DEPOSITION OF

12       GARY DOUGLAS SLADE, Ph.D., DDPH, B.D.Sc.

13                  AUGUST 13th, 2019

14                  WASHINGTON, D.C.

15

16          Reported by:  Dawn M. Hyde

17

18

19

20

21

1                VIDEOTAPED DEPOSITION OF

2          GARY DOUGLAS SLADE, Ph.D., DDPH, B.D.Sc.

3       The videotaped deposition of Gary Douglas

4  Slade, Ph.D., DDPH, B.D.Sc., taken by the

5  Plaintiffs in the above-captioned case on Tuesday,

6  August 13th, 2019, commencing at 9:11 a.m., at

7  Department of Justice, 150 M Street, Northeast,

8  Room 8211, Washington, D.C. 20002 and was reported

9  by Dawn M. Hyde, a notary public.

10

11

12

13

14

15

16

17

18

19

20

21

```
 1   APPEARANCES:

 2   MICHAEL P. CONNETT, ESQ.
             Waters, Kraus & Paul
 3           222 North Pacific Coast Hwy, Suite 1900
             El Segundo, California 90245
 4           310.414.8146
             mconnett@waterskraus.com
 5           On Behalf of Plaintiffs

 6   JOHN THOMAS H. DO, ESQ.
     BRANDON N. ADKINS, ESQ.
 7           U.S. Department of Justice
             Environment & Natural Resources Division
 8           601 D Street, NW, Suite 8000
             Washington, D.C. 20044
 9           202.514.2640
             john.do@usdoj.gov
10           brandon.adkins@usdoj.gov
             On Behalf of Defendants
11
     ERIC P. WILBER, ESQ.
12           Attorney - Adviser
             Office of General Counsel
13           Environmental Protection Agency
             1200 Pennsylvania Avenue, NW
14           Washington, D.C. 20460
             202.564.3839
15           wilber.eric@epa.gov
             On Behalf of Defendants
16

17   ALSO PRESENT:

18   Mr. Pat Ruffner, videographer

19

20

21
```

```
 1                    P R O C E E D I N G S

 2                       *    *    *    *

 3            THE VIDEOGRAPHER:  Good morning.  We

 4    are on the record.  My name is Patrick

 5    Ruffner.  I am the videographer for today.

 6            I represent Video Litigation

 7    Professionals.  I'm not financially interested

 8    in this action, nor am I a relative or

 9    employee of any of the attorneys or any of the

10    parties.

11            Today's date is August 13th, 2019

12    and the time is 9:11 a.m.

13            This deposition is taking place at

14    150 M Street, Northeast, Washington, D.C.

15    Case number is Civil Number 17-CV-02162-EMC,

16    in the matter of Food and Water Watch, et al.,

17    versus U.S. Environmental Protection Agency,

18    et al.

19            This is video unit number one, the

20    deposition of Gary Slade.  The court reporter

21    is Dawn Hyde.
```

1           Will attorneys present please state

2    their appearances for the record.

3           MR. CONNETT:  Good morning.  Michael

4    Connett on behalf of the plaintiffs.

5           MR. DO:  John Thomas Do with Justice

6    Department on behalf of federal defendant EPA.

7           MR. WILBER:  Eric Wilber on behalf

8    of U.S. EPA, defendant.

9           MR. ADKINS:  Brandon Adkins of the

10   U.S. Department of Justice for defendants.

11          THE VIDEOGRAPHER:  Will the court

12   reporter please swear in the witness.

13   Whereupon,

14      GARY DOUGLAS SLADE, Ph.D., DDPH, B.D.Sc.,

15   a witness herein, called for oral examination in

16   the matter pending, being first duly sworn to tell

17   the truth, the whole truth, and nothing but the

18   truth, testified as follows:

19                    EXAMINATION

20      BY MR. CONNETT:

21      Q    **Good morning, Dr. Slade.**

```
 1              (Deposition Exhibit Numbers 197 and 198

 2              were marked for identification.)

 3        BY MR. CONNETT:

 4        Q    So I am going to mark those reports

 5   for the record now.  The first report, your

 6   initial report I have marked as Exhibit

 7   Number 197 and your rebuttal report I have

 8   marked as Exhibit Number 198.

 9              Now, for your reports in this case

10   you did not conduct systematic reviews,

11   correct?

12        A    This is a narrative review which is

13   different from a systematic review.

14        Q    And can you describe what a

15   narrative review is.

16        A    It's the traditional way that

17   researchers used to -- and still do -- for

18   instance, prepare a paper and they'll review

19   the literature as preamble to their new

20   studies.  So I say used to because since

21   systematic review methodology was developed,
```

1   that has been singled out as a qualitatively

2   different level of review for multiple

3   methodological reasons.

4   **Q    But literature reviews are -- sorry,**

5   **strike that.**

6   **Narrative reviews still continue to**

7   **be published in the scientific literature,**

8   **correct?**

9   A    Oh, certainly they do, yes.

10  **Q    And they continue to be relied upon**

11  **by professionals like yourself in evaluating**

12  **the literature, correct?**

13  A    Good researchers will evaluate them.

14  Now, rely is your term.  When I evaluate any

15  evidence, I weight its merits.

16  **Q    Right.  You'll take -- any given**

17  **paper, you will look at it to assess the**

18  **merits of it based on the presentation of**

19  **material in that paper, right?**

20  A    That's what I always endeavor to do,

21  yes.

1    Q    Now, you are a subject matter expert

2  on the issue of fluoridation and caries,

3  correct?

4    A    Yes.

5    Q    And you're not -- you didn't come to

6  this case as a stranger to the issue of

7  fluoridation and caries, correct?

8    A    That's right.  I was recruited for

9  my expertise in that.

10    Q    And do you think that's a relevant

11  consideration in assessing the reliability of

12  your narrative review, the fact that you are a

13  subject matter expert on this issue?

14    MR. DO:  Objection to form.

15    A    I assume the Justice Department

16  wanted an expert so that's why they asked me.

17    BY MR. CONNETT:

18    Q    And so, for instance, when the judge

19  is reading your report, do you think it's a

20  relevant consideration for the judge to say,

21  "Dr. Slade is a subject matter expert on this

1    the preventive regimen that dentists use in

2    the United States, correct?

3        A    Yes.

4        Q    And -- but despite United States

5    having 200 million people drinking fluoridated

6    water, despite fluoride toothpaste

7    representing an overwhelming market share of

8    toothpaste sales, and despite dentists

9    routinely using fluoride in their dental

10   practice in the United States, do you -- the

11   United States has the world's highest per

12   capita direct cost of oral disease, correct?

13       A    The cost literature is something I

14   haven't looked at in detail, but I think the

15   Burden of Illness Study said that per capita

16   costs in the U.S. are higher.  I struggle to

17   remember how they ranked that with other

18   countries.

19       Q    Okay.  Well, let me see if I can

20   refresh your recollection by pointing you to

21   your own words in your expert report in this

1    case.

2         A    Thank you.

3         Q    If you can go to your initial

4    report, page five, and I'd like to direct your

5    attention to the last sentence on the page.

6         A    Right.

7         Q    And here you wrote, "The United

8    States has the world's highest per

9    capital[sic] direct costs, i.e., charges for

10   dental care and indirect costs, i.e., loss of

11   productivity of oral disease with dental

12   caries and tooth loss being the principal oral

13   diseases responsible."

14              That's what you wrote in your expert

15   report in this case, correct?

16        A    That is correct.

17        Q    And you stand by that statement?

18        A    I do.  I would actually -- I would

19   now want to correct the typo because it should

20   be per capita not per capital, but yes.

21        Q    Now, on page 25 of your report --

1      Q      The person I deposed was the acting

2  director of the oral health division.

3      A      Okay.

4      Q      And so I am going to --

5      A      I'm trying to answer your question.

6  I may have seen parts of this before but

7  because it says "The Witness," I'm not

8  associating it with a name.

9      Q      Okay.  It's Casey Hannan.

10     A      That sounds familiar.

11     Q      So I'm going to read you my question

12  to Mr. Hannan and his response, and then I'm

13  going to follow up with a question to you.  My

14  question was, "If a pregnant mother wrote an

15  e-mail to CDC asking if I drink fluoridated

16  water during my pregnancy, will that provide a

17  benefit to the teeth of my baby, CDC would not

18  answer yes to that question, correct?"

19          And his answer was, "If we were to

20  get an e-mail as such, we would summarize our

21  understanding of the evidence in saying we

1  have not found evidence that supports, that

2  shows benefit to the child if ingested, if

3  community water fluoridation or some other

4  form of fluoride is ingested by the mother."

5           Did I read that correctly?

6       A    Yes.

7       Q    Would you provide a similar answer

8  if you received an e-mail from a pregnant

9  mother with the same question?

10          MR. DO:  Objection, form,

11  foundation.

12      A    I would say something very similar

13  to what I've just said to you, which I'm

14  paraphrasing as being similar to what the

15  witness has said here.

16      BY MR. CONNETT:

17      Q    And which would be what?  First of

18  all, do you generally agree with the

19  statement -- the answer here by the CDC

20  representative?

21          MR. DO:  Objection, form.

1     A     "If we were to get an e-mail as

2   such, we would summarize our understanding of

3   the evidence in saying we have not found

4   evidence that supports if fluoridation or some

5   other form of fluoride is ingested by the

6   mother."

7          I would -- that is the general tenet

8   of what I'm saying as well.

9       BY MR. CONNETT:

10     **Q     So you cannot state, Dr. Slade, with**

11   **a reasonable degree of scientific certainty,**

12   **that prenatal exposure to fluoridated water**

13   **provides a benefit to the offspring, correct?**

14          MR. DO:   Objection, form, vague.

15     A     So I'm not aware of studies that

16   have specifically examined exposure for that

17   period and its association with caries in the

18   child at some later age.

19       BY MR. CONNETT:

20     **Q     So you had done -- in your causal**

21   **analysis of water fluoridation, you did a**

1    STATE OF MARYLAND

2    HOWARD COUNTY

3        I, Dawn Michele Hyde, a Notary Public of the

4    State of Maryland, Howard County, do hereby

5    certify that the above-captioned proceeding took

6    place before me at the time and place herein set

7    out.

8        I further certify that the proceeding was

9    recorded stenographically by me and this

10   transcript is a true record of the proceedings.

11       I further certify that I am not of counsel to

12   any of the parties, nor an employee of counsel,

13   nor related to any of the parties, nor in any way

14   interested in the outcome of the action.

15       As witness my hand and seal this 13th day of

16   August, 2019.

17                    _Dawn Hyde_

18                    Dawn M. Hyde, Notary Public

19                    My Commission Expires 10/7/2019

20

21

# **Exhibit 30**

1  C. ANDREW WATERS, ESQ., CA Bar No. 147259
   MICHAEL CONNETT, ESQ., CA Bar No. 300314
2  WATERS, KRAUS & PAUL
   222 N. Pacific Coast Hwy, Suite 1900
3  El Segundo, CA 90245
   310-414-8146 Telephone
4  310-414-8156 Facsimile

5  *Attorneys for Plaintiffs*

6                    UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
7                       AT SAN FRANCISCO

8  _____
   FOOD & WATER WATCH, et al.,              )
9                                           )   Civ. No. 17-CV-02162-EMC
                          Plaintiffs,       )
10           vs.                            )   **DECLARATION OF**
                                            )   **OLE FEJERSKOV, DMD, PhD**
11 U.S. ENVIRONMENTAL PROTECTION            )
   AGENCY, et al.                           )
12                                          )
                          Defendants.       )
13                                          )
                                            )
14 _____   )

15

16        I, Ole Fejerskov, declare that:

17        1.      I have agreed to appear as an expert in this case, and have prepared an expert report which

18 summarizes the opinions that I intend to offer if called to testify at trial. A true and correct copy of my

19 expert report is attached herein as **Exhibit A**.

20        2.      I am a cariologist who has spent over 40 years studying how fluoride affects dental tissue.

21 To date, I have published about 400 papers, mostly in peer reviewed scientific journals. I have written

22 and edited 10 international textbooks on dental caries and fluoride. I have been editor of several

23 international dental journals, and have served on the boards of dental research organizations such as

24 IADR (International Association of Dental Research), ORCA (European Organization for Caries

25 Research), and the European Research Group of Oral Biology. I have also served as a Member of the

26

27 World Health Organization Expert Panel on Oral Health and have received 8 honorary doctor degrees

28

---
                              1
            DECLARATION OF OLE FEJERSKOV, DDS, PhD, Dr. Odont.

from recognized international universities. A further summary of my qualifications is provided on pages 1-2 of my expert report.

3.      In my expert report, I explain that the beneficial effect of fluoride is due almost entirely to its local (topical) effect (pp. 9-17). It is not necessary, therefore, to ingest fluoride for caries control. By contrast, the detrimental effects of fluoride on dentition are due to its systemic absorption during tooth development, resulting in dental fluorosis which is a hypomineralisation of the enamel (pp. 3, 16-17). In order to obtain a caries reduction effect of fluoride, therefore, it is not important—and indeed inadvisable—to ingest fluoride during tooth formation (pp. 1 & 11). Towards this end, fluoride exposure during the *in utero* and early infancy period is contraindicated for oral health purposes (p. 23).

4.      In my expert report, I also explain that caries has declined in all developed countries since the middle part of the twentieth century, irrespective of water fluoridation (p. 20). For example, most countries in Europe do not fluoridate their water supplies, yet it is well established, and indeed beyond dispute, that the rate of caries has declined dramatically since the 1970s (p. 20). Consistent with this, caries has been documented to continue declining in communities after water fluoridation programs have been terminated (p. 22).

5.      As set forth in my report, it is my professional opinion that the addition of fluoride to public water supplies is no longer justified from an oral health perspective (p. 23).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 8, 2019, in Aarhus, Denmark.

_____
OLE FEJERSKOV, DDS, PhD, Dr. Odont.

# **<u>Exhibit A</u>**

# Rational Use of Fluorides in Modern Society

**Expert report of**
**Ole Fejerskov, DDS, PhD, Dr. Odont.**
**Aarhus, Denmark**
**June 27, 2019**

## I.        INTRODUCTION

The role of fluorides in the control of dental caries is widely considered an important public health success. However, as with many successful programs this success is not without cost and it is a story which at times has resulted in strong emotional debates within the dental profession which have not always been based on scientific evidence (Fejerskov 2004). Thus, despite the fact that *fluoride exerts its predominant cariostatic effect by being present in the oral cavity (the so-called topical effect)* and that *fluoride does not have to be ingested to reduce the caries rate in populations* (Fejerskov et al. 1981), the systemic use of fluoride continues to be widely recommended throughout the Anglo Saxon world. *The only proven effect of ingesting fluoride* during the long-lasting process of tooth development is to develop *dental fluorosis* which is the early signs of a toxic, biologic effect of fluoride (Fejerskov et al. 1977, Aoba & Fejerskov 2002). For the reasons set forth herein, it is my professional opinion that the addition of fluoride to public water supplies is no longer justified from an oral health perspective.

## II.        QUALIFICATIONS

I obtained my D.D.S. degree from The Royal Dental College, Aarhus in 1967, and after two years of post-doctoral training in General Pathology at the University Hospital, Aarhus University, I received my PhD in Odontology in 1970. Later in 1973, I received my Doctor Degree in Odontology from the Royal Dental College. My training during this period included postgraduate studies on advanced techniques for studying dental hard tissues at the London Hospital in England.

Since 1973, my research interests have predominantly been focused on how fluorides affect mineralizing dental hard tissues during development – and once the teeth are fully mineralized how fluoride interacts with the dental enamel in the oral cavity during caries development. The studies have been multidisciplinary and involved inorganic chemistry, cell and tissue cultures, structural studies at the light- and electron- microscopic level, immune-

1

studies on rats and domestic pigs, as well as extensive longitudinal clinical studies of dental caries, dental fluorosis and periodontal disease involving microbiology and epidemiology techniques in populations in Africa, South East Asia and the Peoples Republic of China. Such studies have only been possible by building international teams comprising experts in a wide variety of disciplines.

To date, I have published about 400 papers, mostly in peer reviewed scientific journals. I have written and edited 10 international textbooks on dental caries and fluoride. I have been editor of several international dental journals, including *Community Dentistry and Oral Epidemiology*, *Acta Odontologica Scandinavica*, *Scandinavian Journal of Dental Research*, and *Journal of Oral Rehabilitation*, and have served on the boards of dental research organizations such as IADR (International Association of Dental Research), ORCA (European Organization for Caries Research), and the European Research Group of Oral Biology. I have also served as a Member of the World Health Organization Expert Panel on Oral Health and have received 8 honorary doctor degrees from recognized international universities.

A copy of my current C.V. is attached as **Appendix A**, a list of my publications over the past 10 years is attached as **Appendix B**. A more complete discussion of my research career can be found in my recent book chapter *The Dental Profession in the 21st Century* (Fejerskov 2017). This is the first time I have agreed to serve as an expert in litigation.

## III.    QUESTION PRESENTED

I was asked to provide my opinion about the mechanism(s) by which fluoride controls tooth decay (caries), and the advisability of adding fluoride to drinking water in the current context of widespread availability of topical fluoride products such as toothpaste. I have not charged an hourly rate for my work in preparing this report, but I have received a $15,000 honorarium.

## IV.     BACKGROUND

### A.          Fluoride in Caries Prevention and Control - How Fluoride Came into Dentistry

It was the detrimental effects of fluoride on the appearance of tooth enamel (dental fluorosis) that prompted the initial detailed investigations and ultimately the discovery of its anticaries benefits (Fejerskov et al. 1988). The association between fluoride and "mottled enamel" as it was first designated became clear in the beginning of the 20th century thanks to two American dentists; Dr Fredrick McKay and a US Public Health Officer, H. Trendley Dean.  Subsequently the positive association between elevated exposure to fluoride and decreased prevalence of caries cavities became known (Dean & Elvove 1942).

'An endemic imperfection of the enamel of the teeth heretofore unknown in the literature of dentistry' (Black 1916) drew attention of the dental research community to the condition. One thing that puzzled both Black and McKay was that although mottled enamel was clearly hypocalcified and therefore theoretically more susceptible to decay, this did not appear to be the case (McKay 1928). Coincidentally, Ainsworth (1933) in England made a similar observation.

It became clear that the condition was localised to children born in specific geographical areas and McKay suspected that the water supplies of these districts might be an important aetiological factor. In Bauxite, Arkansas, changes to a water supply resulted in children having mottled enamel (Kempf & McKay 1930) and chemical analysis of the water supply revealed an unexpectedly high level of fluoride in the drinking water (14.7 ppm F). These high levels were later confirmed in other towns with mottled enamel (Churchill 1931). These observations did not establish a cause and effect relationship. However, when considered in light of findings by McCollum and co-workers that rats fed a diet with added fluoride developed hypomineralized teeth, the etiology of mottled enamel was clearly established.

In the 1930s systematic animal experiments and human epidemiological studies established both the association and cause-effect relationship between fluorides in drinking waters and mottled enamel (since referred to as dental fluorosis). The epidemiological studies were performed by a team led by Dean (Dean 1934, Dean & Elvove 1936, Dean & McKay 1939). Dean was also interested in the apparent anomaly that although the enamel appeared to be hypomineralised it did not appear to be any more susceptible to decay. He initially undertook a small study involving 114 children who had used water containing 0.6-1.5 ppm F and found only 4 percent were caries free compared to 22% of 122 children in an area with drinking water containing 1.7-2.5 ppm F (Dean 1938a). A further larger study suggested that caries experience in two cities with water supplies containing 1.7 and 1.8 ppm, was half that of two similar adjacent cities with only 0.2 ppm F in the drinking water (Dean et al. 1939).

The association between the fluoride level in the drinking water and caries levels was then characterised in the '21 city study' (actually a series of studies, Dean et al. 1941, 1942). Children from cities with natural fluoride concentrations in their drinking water ranging from around zero up to 2.6 ppm F were examined and the results of this classic piece of epidemiological investigation of both fluorosis and caries experience were reported (Dean 1942). This became the backbone for adding fluoride to water supplies subsequently.

Dean was equally interested in understanding the toxic effects of fluoride ingestion on tooth enamel and classified the severity of dental fluorosis in individuals (Dean 1934, 1938b, 1942) as questionable, very mild, mild, moderate and severe. The prevalence of subjects with lesions of any severity was about 50% at the level of 1 ppm F or less in the drinking water. The less severe forms of fluorosis (questionable and very mild) accounted for most cases. Dean showed a very clear dose response relationship between the fluoride level in the drinking water and the prevalence of fluorosis even at levels of fluoride in the drinking water below 1 ppm F. Therefore, even at low

4

levels of fluoride in the drinking water there was some risk attached to use of fluoride. As artificial water fluoridation became established in the USA tremendous efforts were taken by public health dentists to downplay these dimensions of early toxic effects. This included efforts to eliminate the category of "questionable" dental fluorosis by claiming that it reflected a variety of other types of enamel changes not caused by fluoride. Myers (1983), however, reviewed the available literature regarding the "questionable" category of fluorosis and demonstrated that it was a distinct entity associated with fluoride.

**Figure 1. Prevalence and severity of dental fluorosis in Dean's 21 cities**



*Source: Dental Caries – The Disease and Its Clinical Management, 3d Ed.*
*Wiley Blackwell, 2015, p. 246*

Dean gave much thought to the question what might constitute "the optimum level of fluoride" in drinking water supplies, i.e. the concentration of fluoride that would result in maximum "caries protection" while causing minimal dental fluorosis. Based on his studies on "the minimal threshold of chronic endemic dental fluorosis" Dean concluded that "amounts not exceeding 1 part per million expressed in terms of fluorine are of no public health significance" (Dean 1936). Dean's personal assessment "of no public health significance" was not synonymous with saying that no dental fluorosis occurs in the population. Indeed, Dean and public health authorities

5

recognized that water fluoridation would produce very mild and mild dental fluorosis in up to 10% of the population, which was considered a necessary trade-off for caries prevention[1] (NRC 1951). This resulted in the widespread adoption of 1-1.2 ppm F in USA as an 'optimal' level in the drinking water.

The strong association between the fluoride level in the drinking water and caries levels were based on cross sectional study designs. Therefore, in order to establish a cause and effect relationship, intervention studies were required and these commenced in the Lake Michigan area in 1944. Two towns were selected, Grand Rapids and Muskegon, and baseline caries levels in children aged 4-16 years were recorded. In addition, caries levels were recorded in Aurora, Illinois, an area with naturally occurring fluoride in the drinking water at the level of 1.4 ppm F (no attempts were made to assure that the populations in question were in fact comparable in terms of, for example, socio-economic composition, etc.).  At the start of the study, caries levels (Dean 1950) in the two Michigan cities were similar. Fluoride at the level of 1 ppm was then added to the drinking water of the city of Grand Rapids in January 1945 and caries levels were recorded again after 6½ years of fluoridation. In 'non-fluoride' Muskegon the average number of teeth with decay experience was 5.7 compared to 3.0 in 'fluoridated' Grand Rapids, so the study was deemed so successful that it was decided to fluoridate the drinking water of Muskegon (Arnold et al., 1953). After 15 years of fluoridation in Grand Rapids (Arnold et al.,1962) the number of teeth with cavities had fallen from 12.5 in 1944 to 6.2 in 1959, a reduction of approximately 50%.[2] Caries levels in

---

[1] The estimates of the expected prevalence of dental fluorosis that would result from water fluoridation invariably excluded 'questionable' fluorosis (e.g., Hodge 1950, NRC 1951). This left the impression that only about 10% of children would experience enamel disturbances from water containing 1 mg/L, whereas the actual figure, as discussed above, was approximately 50%.

[2] It must be acknowledged that a likely possible bias is introduced in most fluoridation studies by the fact that the fluoride level of the location investigated is known before the examinations are conducted. Further, by merely realising that a child has dental fluorosis, an examiner would know there was a history of fluoride exposure, and may thereby be inclined to expect less dental caries. These factors may serve to inflate the benefits.

Grand Rapids were now very similar to those experienced in Aurora, the naturally fluoridated city. Unfortunately no one was reporting how dental caries severity was changing in other comparable populations.

In an attempt to further build up the evidence of an "optimal fluoride dose" Hodge (1950) presented the results of logarithmic transformations of Dean and co-workers caries data and averaged index values of Dean's original scores of dental fluorosis. As can be seen in Hodge's figure below, the curves gave the impression that "below 1 ppm of fluoride, there is no indication that fluoride has any effect on the occurrence" of fluorosis (Hodge 1950). It is now appreciated that this way of statistically manipulating data was inappropriate, but the resulting illustrations were very convincing for lay-men and public health dentists. In a personal discussion with Hodge (who I greatly respected as a scientist) at a meeting in Utah in 1982 he fully appreciated that at the time he was carried away when making this transformation of the data.

**Figure 2.  Average indexes of fluorosis plotted against water fluoride content (logarithmic scale)**



*Figure from Hodge (1950)*

In Hodge's logarithmic analysis of Deans's data the mean caries experience recorded from the 21 city studies indicated that a maximum caries reduction was obtained around the concentration of about 1-1.2 ppm fluoride in water supplies, so the "optimum level" was determined

as the level of concentration of fluoride in water supplies which gave maximum caries reduction while causing minimal dental fluorosis of "no cosmetic concern" from a public health point of view. This estimate of the optimal water fluoride concentration was subsequently used to determine the amount of fluoride which should be given in other systemic fluoride regimens such as tablets, vitamin drops, salt, etc. which became introduced in populations where health authorities would not allow artificial fluoridation of water supplies.

By the middle of the 20th century there was much enthusiasm about the possibilities for caries prevention by adding fluorides to water supplies. During that period, in Europe in particular, the caries situation was overwhelming with numerous tooth extractions amongst children, so attempts to introduce "the American concept" of adding fluoride to the water supplies were made in a few countries as exemplified in Holland. The concept of an "optimum fluoride" consumption was further advanced, but in most European countries the population did not want to be "medicated" through the water supplies, and there were concerns expressed about the potential for adverse effects. Some European countries, including Germany, Holland, Ireland, Finland, Spain, Switzerland, and the United Kingdom, did begin water fluoridation to some extent. Most of these countries, however, subsequently terminated their water fluoridation programs. Today, the only European countries that still add fluoride to water are Ireland (100%), Spain (~10%), and the United Kingdom (~10%).

**B.        Systemic Fluoride and the Concept of Caries Resistant Teeth**

The concept of the necessity of ingesting fluoride was based on the belief that fluoride exerted its anti-cariogenic effect predominantly by becoming incorporated into the crystals in the dental hard tissues during enamel formation. This, it was believed, would make the enamel more "resistant" to the acid attack on tooth surfaces, because it was known that pure fluorapatite is less soluble than hydroxyapatite (Volker 1939; for a detailed discussion see Fejerskov & Larsen 2015).

With this paradigm it was therefore logical that public health dentists would have to argue that as much fluoride as possible should be ingested during tooth formation in early life in order to increase the "resistance of the tooth" (see Fejerskov 2004, Fejerskov 2017). Arguments that "optimal fluoride concentrations in water supplies result in more perfect mineralised teeth with pearl shine appearance," or "teeth formed in low fluoride areas are fluoride deficient" were common. Also, based on this old concept, fluoride was considered a micronutrient to control caries and it is still by some considered "essential in diet" (Hunt & Stoecker 1996, Bergman et al. 2009), although this is surprising taking into account how the concepts on cariostatic mechanisms of fluoride have changed, as discussed below.

## C.        Fluoride & the Caries Process

In order to understand fluoride's cariostatic mechanism, it is crucial to understand the caries process as a progressive loss of minerals from the tooth structure caused by biofilm metabolism, leading over time to the development of a cavity. The effect of fluoride on the caries process is not fully understood despite years of research. Nevertheless, while available in the oral cavity even at micromolar concentrations, fluoride has a measurable effect on the stability of tooth minerals, since it is a potent enhancer of mineral precipitation. The ultimate effect will be a reduction in the progression of caries lesions (Fejerskov & Larsen 2015).

The concept that fluoride delays caries progression by reducing demineralization and enhancing remineralization (rather than preventing caries formation) has to be understood in order to discuss the mode of action of each method of fluoride delivery. It is clear that tooth minerals are very stable because saliva under normal pH conditions has calcium and phosphate concentrations high enough to be supersaturated with respect to the mineral phases of teeth (mainly hydroxyapatite). It is only under certain conditions when this supersaturation is disturbed (i.e., when the biofilm metabolism produces acid from sugar fermentation) that dental demineralization can

occur. Therefore, it is not surprising that caries is ubiquitous in modern society, which lives on a sucrose-rich diet. Sucrose fermentation results in proton production which reduces the supersaturation of the biofilm fluid with respect to tooth minerals leading to mineral dissolution in order to maintain the saturation condition. If this demineralization episode is repeated many times a day, over a period of weeks or months a visible caries lesion develops (Fejerskov, 1997). Although fluoride does not affect biofilm formation and sugar metabolism in concentrations available in saliva and biofilm fluid, dental demineralization is reduced by the concomitant precipitation of fluorhydroxyapatite, a mineral phase that is more stable than hydroxyapatite at any given pH. Therefore, while hydroxyapatite from inside the tooth enamel is dissolving during a cariogenic challenge, a fluoridated apatite can precipitate in the outer surface layer of the enamel. The net result is a reduction of total mineral loss, accompanied by the gradual formation of a fluoride-enriched mineral (a consequence, and not cause, of the fluoride effect[3]).

The reduction of demineralization and enhancement of remineralization is the basis of fluoride use irrespective of the vehicles used. Methods of fluoride application can be considered as collective to the whole population (e.g., water), individual (e.g., toothpaste, mouthwash) or professionally applied (e.g., topical 2% NaF solution, F-gel, varnish). Water fluoridation does not depend on individual compliance and is a passive 'mass medication.' Other fluorides (supplements, toothpaste, gels, varnishes, etc) rely on active patient involvement.

Given the wide range of fluoride vehicles now available, and the change in the epidemiology of caries in recent decades (partly as a result of fluoride use), it is of utmost importance that the role and mode of action of each of these methods is understood so that they may

---

[3] After tooth eruption, the fluoride concentration in enamel can be increased as the result of pH fluctuations that cause dissolution and redeposition of the enamel (Fejerskov & Larsen 2015). Consistent with this, we have observed more fluoride in enamel covering a caries lesion than in surrounding sound enamel (Weatherell, Deutsch, Robinson & Hallsworth 1977).

be logically recommended. For example, fluoridated water controls caries because it is drunk regularly and present in cooking preparations, which causes the fluoride levels in the oral fluids to increase regularly during the day (Oliveby, et al. 1990). This moderate increase explains fluoridated water's effect on the caries process. Yet, fluoride levels in the dental biofilm can be maintained, even after interruption of water fluoridation, if a fluoride toothpaste is being used daily (Seppä et al., 1996, Richards et al. 2013).

## V.    OPINIONS

### A) There Is No Need to Ingest Fluoride for Caries Control Because Its Beneficial Effect Comes from Topical Contact with Teeth, Not from Ingestion

We have to appreciate the effects of fluorides on developing and erupted teeth to derive at a rational way of advocating the use of fluorides in contemporary populations. Fluoride can have both beneficial and detrimental effects on the dentition. The beneficial effect is due almost entirely to the local (topical) effect of fluoride on all sites in the dentition where tooth surfaces are covered by a biofilm after the teeth have erupted into the oral cavity. It is not necessary, therefore, to ingest fluoride for caries control. By contrast, the detrimental effects of fluoride are due to its systemic absorption during tooth development, resulting in dental fluorosis which is a hypomineralisation of the enamel the degree of which is a direct reflection of fluoride ingestion during tooth formation (Fejerskov et al. 1996). If we can enhance the intraoral exposure to fluoride throughout life and minimise systemic absorption during the period when the dentition is developing, fluoride can be used to maximise its benefits in caries control whilst at the same time minimising the risk of fluorosis and any other unwanted systemic effects.

Based on the following evidence, *we must conclude that in order to obtain a caries reduction effect of fluoride it is not important – and indeed inadvisable - to ingest fluoride during tooth formation*.

11

1)         **The level of fluoride found in human enamel is too low to have an effect on solubility**

During tooth formation fluoride is bound to the biological hydroxyapatite as the crystals grow in width and thickness. This process takes a long time in man where the permanent teeth takes 2-4 years to achieve their full content of mineral (the so-called enamel maturation process). The more fluoride ingested the more fluoride is incorporated, but in man the fluoride concentration in bulk enamel is rather low (50-100ppm) in areas where the drinking water contains from 0.5-1.5 ppm. Only in the outermost enamel layers (~100 microns) does fluoride accumulate and increase significantly to 1,000-2500ppm F. Yet, if all hydroxyl ions in the apatite should be substituted with fluoride ions the enamel would contain ~40.000ppm F!  Thus, even in the very outermost surface the fluoride substitutes only 5-10% of hydroxyl, as schematically visualized in the figure below. It should be acknowledged that it is necessary to have about 60% of the hydroxyl ions substituted to derive at a mineral that is more acid resistant.

**Figure 3. Fluoride replacement of hydroxyl ions in enamel**



*Source: Larsen & Bruun 1994, Textbook of Clinical Cariology, Munksgaard Publ. (fig. 11-5, p. 235)*

The lack of systemic benefit from pre-eruptive exposure to fluoridated water was evident in some of the early epidemiological research, although this was not appreciated until decades later (e.g., Koch, Fejerskov & Thystrup 1994, citing Russell 1949). Russell, for example, found that children moving out of fluoridated areas experienced an increase in caries increment similar to the level of their age-matched contemporaries in a low-fluoride area (Russell 1949).

Additionally, Arnold found that children whose teeth had completely formed prior to consuming fluoridated water experienced substantial reductions in decay after moving to a fluoridated area – thus highlighting the post-eruptive, topical nature of the effect (Fejerskov 2004, citing Arnold 1957).

**2)** **There is no relationship between enamel fluoride content & caries prevalence**

Despite slightly more fluoride in teeth formed in so-called "optimally fluoridated teeth" there is no consistent relationship between fluoride content in surface enamel and caries experience of the individuals (Poulsen & Larsen 1975; Richards & Fejerskov, et al. 1977). The US Centers for Disease Control (CDC) has recognized this, stating that: "The prevalence of dental caries in a population is not inversely related to the concentration of fluoride in enamel, and a higher concentration of enamel fluoride is not necessarily more efficacious in preventing dental caries" (CDC 2001).

Consistent with these findings, in vitro studies of experimental caries using gel techniques have shown exactly similar degrees of lesion development in teeth from low- and 'optimal'- fluoride areas (Kidd et al., 1980). Similarly, studies by Featherstone and others have shown that fluoride incorporated into hydroxyapatite has no measurable effect on the solubility of the mineral (Featherstone 2000). More recent in vitro research has confirmed the above conclusions (Marin et al.2016).

The only living animal known to have teeth with pure fluorapatite is sharks. Yet, if such teeth are placed in the human mouth and exposed to a caries challenge in situ they also develop caries lesions (Øgaard & Rølla 1988).

**3)** **No difference in enamel caries lesions between fluoridated and non-fluoridated areas**

Probably the most well designed clinical trial on water fluoridation was conducted in Europe - the Dutch Tiel-Culemburg studies by Otto Backer-Dirks (1967) and his collaborators.

13

These data were of particular importance because the original data were available decades later when the artificial fluoridation of the drinking water had to cease. Reanalyses of these data many years later (Groeneveld 1985 and Groeneveld & Backer Dirks 1988) confirmed the changed concepts on the mechanisms of fluoride action as proposed by Fejerskov, Thylstrup and Larsen in 1981. Hitherto, dental caries had only been reported at the level of distinct cavities (Decayed, Missing, Filled Teeth / Surfaces). There were fewer cavities observed in children in the fluoride population, but when including earlier stages of enamel caries (non-cavitated lesions) the data showed that there was no difference between fluoridated and non-fluoridated populations because fluoride just acted by slowing down the rate of mineral loss -  so if this was not realised it would seem as if fluoride prevented cavities.  Similar findings have been reported by Machiulskiene, et al. 2009. Groeneveld and Backer Dirks [1988] concluded that "on the initiation of a caries lesion no pre- nor posteruptive effect of fluoride can be observed. In fact apart from a small retardation of new lesions at younger ages there is almost no effect at all." Moreover, despite the fact that in fluoridated areas there is a higher concentration in the fluoride in the outer enamel layers, the difference in prevalence of lesions is so small between fluoride and non-fluoride areas that the conclusion that 'fluoride concentration in the enamel plays a role of minor importance in caries reduction [Fejerskov et al., 1981]' is justified."

4)          **Studies of fluoride supplements confirm the inadvisability of F ingestion**

The inadvisability of fluoride ingestion (systemic effect) was made apparent through attempts to reduce tooth decay by administering fluoride in tablets (Aasenden & Peebles 1974). In the study by Aasenden & Peebles a caries reduction was obtained but the children developed rather extensive dental fluorosis.  However, when similar studies were performed in Denmark and Holland and multivariate analytical methods applied to control for confounders – these fluoride supplement programs only resulted in development of dental fluorosis in the children without any caries

reduction (Tjimstra, et al. 1978; Thylstrup et al. 1979, Friis-Hasche, Thylstrup, et al. 1984, Kalsbeek, Verrips & Dirks 1992). To the extent that fluoride supplements exert any benefits, it is from the incidental increase of fluoride in the intraoral fluids and resulting contact with erupted enamel (Thylstrup, et al. 1979). Consistent with this, the recent Cochrane review on prenatal fluoride supplements (an exposure modality that is purely systemic) concluded "There is no evidence that fluoride supplements taken by women during pregnancy are effective in preventing dental caries in their offspring" (Takahashi, et al. 2017). The US Center for Disease Control previously derived the same conclusion about prenatal supplementation (CDC 2001).

5.         **Measures of total fluoride intake do not predict lower caries rates**

        The irrelevance of fluoride ingestion is further supported by the results of the "Iowa Fluoride Study" in the United States. The Iowa Fluoride Study used a prospective study design to examine the relationship between total daily fluoride intake from all sources (from birth through 17 years of age) with the development of caries and fluorosis (Warren, et al. 2009; Curtis et al. 2018). The study found that fluoride intake has little effect on caries development, but has a clear effect on fluorosis. According to the authors: "These findings suggest that achieving a caries-free status may have relatively little to do with fluoride *intake*, while fluorosis is clearly more dependent on fluoride intake" (Warren et al. 2009).

6.         **The primacy of fluoride's topical mechanisms are now widely acknowledged in the dental research field**

        My colleagues and I first proposed the primacy of fluoride's topical cariostatic effects in 1981. While it took some time for this view to be accepted (Fejerskov 2004), it can now safely be characterized as the consensus within the dental research field (CDC 1999, 2001, Featherstone 2000, European Commission 2005, NRC 2006). Despite this, surveys show that many practicing dentists in the United States remain unaware of this 'new' understanding (Yoder 2007).

7.	**Even low doses of fluoride ingestion are sufficient to disturb enamel formation and cause dental fluorosis**

There is a clear linear dose-response relationship between fluoride ingestion and dental fluorosis, and even seemingly low doses of fluoride are sufficient to cause dental fluorosis (Fejerskov, Baelum & Richhards 1996).  We demonstrated this through an analysis of 3 major American surveys (Dean's original data included), wherein we determined the prevalence of dental fluorosis, including "questionable" fluorosis, as a function of the estimated fluoride dose per kilogram of bodyweight (Fejerskov, Baelum & Richards 1996).  We found that, for every increase in dose of 0.02 mg/kg/day, there was a significant increase in severity of dental fluorosis (see Figure 7 below). Notably, we did not find a 'critical value' for fluoride intake below which the toxic effect on enamel was absent.

Because of the tendency to dismiss "questionable" fluorosis as being unrelated to fluoride, the low end of the dose-response curve between fluoride ingestion and enamel disturbances has been under appreciated in the dental field. To help address this, my colleague and I developed an index for diagnosing dental fluorosis (based on documented pathology of the enamel changes) that is more sensitive and reproducible than the original Dean index (Thylstrup & Fejerskov 1978). But, regardless of which index is used (Dean or TF), epidemiological studies have made clear that water fluoridation, even at 0.7 mg/L, causes dental fluorosis (Heller, et al. 1997). Moreover, studies have demonstrated that the prevalence and severity of fluorosis is higher today in fluoridated areas than was the case back in Dean's time (Beltran-Aguilar 2010, CDC 2019; Clark, et al. 1994; Heller, et al. 1997, Ismail, et al. 1990; McDonagh, et al. 2000). For example, the most recent national survey from the U.S. (2015-2016) found that 68.9% of U.S. children (aged 6-19 years) have at least very mild fluorosis (CDC 2019, Table 10). This survey was a nationally

16

representative sample,[4] and, as such, was not limited to children living in fluoridated areas. The rates of fluorosis are likely higher in fluoridated areas and, in any event, are clearly higher than what was considered acceptable when water fluoridation first began (Hodge 1950, NRC 1951).

**Figure 4. Community Fluorosis Index ($F_{ci}$) as a function of daily fluoride dose**



*Source: Textbook of Dental Caries 2015 (fig. 14.19d, p. 257)*

Finally, although still ingrained in current approaches to fluoride, we should no longer view dental fluorosis as a "necessary trade-off" for fluoride's anti-caries effects (Fejerskov 2004). Since fluoride does not need to be ingested to control caries, we can achieve its benefits without any appreciable amount of dental fluorosis (a toxic effect on dental hard tissue) in a population, and certainly not the prevalence rates now observed in the U.S. population. (For photos and further information about dental fluorosis, see **Appendix C**.)

## B) The Evidence on the Beneficial Effects of Individual Fluoride Products Like Toothpaste Is Far Stronger than the Evidence for Water Fluoridation

The research conducted on the effects of water fluoridation, milk fluoridation, fluoride supplements and salt fluoridation is still insufficient and/or of poor methodological quality. However, the evidence on the beneficial effects of fluoride toothpastes, mouth rinses, and gels is

---

[4] The community fluorosis index (CFI) in the 2015-2016 NHANES survey is substantially lower than the CFI in the 2011-2012 and 2013-2014 NHANES surveys (CDC 2019, Table 10). The reason(s) for this variability in results from these nationally representative surveys appears to be poorly understood.

consistent and strong, based on a sizeable body of evidence mainly from randomized controlled trials.

Since the mid-1900s, the various fluoride interventions – in the form of toothpastes, mouth rinses, and gels mainly – have been subjected to intensive clinical testing in randomized controlled trials (RCTs), the least biased evidence type from primary research into effectiveness. However, less conclusive study designs have been used to assess the effectiveness of fluoride in drinking water and fluoride added to salt.

Yet, it is only relatively recently that this evidence started to be summarized more objectively in rigorous systematic reviews, taking such differences in study question and design systematically into account. It is even more recently that decisions and recommendations for the appropriate use of fluoride for caries control are being based on the results of such reviews. Nevertheless, the general picture in the early 1990s was that the effectiveness of fluorides in caries prevention had been extensively summarized in traditional narrative reviews based on selected published literature, and effectiveness estimates had been reported in broad ranges, with no general agreement on the causes of differences in reported effectiveness. The systematic reviews published since 2000 have compiled evidence synthesized from hundreds of reports of randomized controlled trials (RCTs), as well as non-randomized evidence (from other types of studies), on the effects of fluorides in various forms. The large number of systematic reviews of trials published between 2002 and 2004 in particular are associated with the publication of the first Cochrane reviews (Marinho et al. 2002a,b; 2003a,b,c; 2004a,b).

Recommendations systematically developed for the appropriate use of fluoride in different settings/countries in practice guidelines are based largely on the results of the series of Cochrane fluoride reviews for preventing caries in children and adolescents (Marinho et al. 2002a,b, 2003a,b,c, 2004a,b; Walsh et al 2010; Wong et al 2011, Iheozor-Ejiofor 2015) and on the UK NHS

Centre for Reviews and Dissemination (CRD) systematic review on water fluoridation (McDonagh et al, 2000). They form the basis of the international evidence base used in numerous guidance documents worldwide (ADA-CSA 2006, EAPD 2009; NHMRC 2007).

In 2015, the Cochrane Center released its review of water fluoridation (Iheozor-Ejiofor 2015). In notable contrast to its conclusions on fluoridated toothpastes, the Cochrane review of water fluoridation found "very little contemporary evidence" to support the effectiveness of water fluoridation in the modern context where fluoride toothpastes and other individual-use fluoride products are now widely used. Further, while the studies that the Cochrane review identified "indicate that water fluoridation is effective at reducing caries levels in both deciduous and permanent dentition in children," the review concluded that "our confidence in the size of the effect estimates is limited by the observational nature of the study designs, the high risk of bias within the studies and, importantly, the applicability of the evidence to current lifestyles."  The Cochrane review's concern with the applicability of early studies to contemporary times, where topical fluoride products are now widely available, highlights an important admonition to consider when assessing the effectiveness of any treatment for caries:

> "[M]any clinical studies were conducted when the caries prevalence and incidence was much higher than it is today (for example, in many European countries caries prevalence and incidence has fallen amongst children by as much as 90%). This means it may be very unwise to apply results obtained in one period, in a certain population, to an entirely different population with a very different disease profile." (Kidd & Fejerskov 2016, p. 94).

Additionally, the Cochrane review "did not identify any evidence, meeting the review's inclusion criteria, to determine the effectiveness of water fluoridation for preventing caries in adults." Further, the review concluded that "There is insufficient evidence to determine whether water fluoridation results in a change in disparities in caries levels across SES."

The conclusions of the Cochrane review are consistent with the findings of the review by the UK NHS Centre for Reviews and Dissemination (McDonagh, et al. 2000), which found that

19

the research on water fluoridation's effectiveness is of a much lower quality than had previously been reported.  Many of the studies on water fluoridation failed to control for other factors that influence caries rates (e.g., income), and there has yet to be an RCT, which is considered the gold standard design for studying the effectiveness of medical treatments.

Based on the foregoing, it can be concluded from the Cochrane reviews that *the caries-preventive benefits of regular toothbrushing with fluoride toothpastes are firmly established, but scientific controversy on the effects of water fluoridation are likely to continue until higher quality studies are conducted and more definitive evidence is produced.*

### C) Caries Has Declined Significantly Throughout the Developed World in Communities With and Without Water Fluoridation

It is often stated, or assumed, that water fluoridation is the reason for the caries decline that has occurred in the United States since the middle part of the 20th century (e.g., CDC 1999). However, the caries decline has occurred in all developed countries, irrespective of water fluoridation. Most countries in Europe, for example, do not fluoridate their water supplies, yet it is well established, and indeed beyond dispute, that the rate of caries has declined dramatically since the 1970s (e.g., Fejerskov et al., 1982, Kalsbeek, et al. 1990, Kalsbeek, et al. 1992, Manji & Fejerskov 1994, Petersson 1996, Seppa, et al. 2000, Cheng 2007, SCHER 2011). In 1982, my colleagues and I documented that a dramatic decline in caries had occurred in Denmark, a country that does not fluoridate water supplies (Fejerskov, et al. 1982).  Many subsequent studies have confirmed similar declines in other countries without water fluoridation (Manji & Fejerskov 1994). As summarized by the EU Scientific Committee on Health and Environmental Risks, "independent of the fluoridation policies across the EU Member States, there has been a consistent decline over time in tooth decay in 12 year old children from the mid 1970s, regardless of whether drinking water, milk, or salt are fluoridated." (A figure from the SCHER report showing examples of the caries decline in countries with and without water fluoridation is reproduced in **Appendix D**.)

Notably, even in communities without water fluoridation in North America, a remarkable decline in caries occurred after the middle part of the 20th century (e.g., Glass 1981, Gray 1987). By 1986-1987, relatively little difference in caries could be discerned between children in the U.S. who had lived their whole lives in communities with fluoridated water and children who had lived their whole lives without fluoridated water in a national survey by the National Institute of Dental Research (Brunelle & Carlos 1990; Heller, et al. 1997). Brunelle & Carlos summarized this data as showing an approximate 18% difference in tooth decay in children living in fluoridated communities.[5] Heller, et al. analyzed this same data and found that—while dental fluorosis rates were obviously increased in fluoridated areas—the percentage of children without any caries was almost identical in communities with and without water fluoridation (55.2% vs. 53.2%). (For a visual comparison of Heller's results with Hodge's assessment from 1950, see **Appendix E**.) One of the strengths of the Heller study is that it had complete residential information for the children and was able to limit the analysis to children with lifelong exposure to water with known concentrations of fluoride. Overall, Heller found an average difference in tooth decay of approximately half a tooth surface, which is of questionable clinical significance (DeLiefde 1998, Locker 1999). Other modern studies of water fluoridation, including those conducted by advocates of the policy, have reported similarly small differences (e.g., DeLiefde 1998; Armfield, et al. 2005;

---

[5] Percentage reductions in dental caries should always be interpreted in the context of what the prevalence of dental caries is in a given population. When caries prevalence is high the distribution of disease in a population is following a Gaussian distribution whereas with low prevalence the disease distribution is very skewed. Thus, the majority of a child population may in fact be considered 'caries free' and caries is only recorded in a minor proportion of individuals. In the context of low caries rates, a relative difference in decay of 18% represents a small, and clinically questionable, difference in absolute decay (De Liefde 1998; Locker 1999). As noted by Gray (1987), "a 60 per cent reduction in DMFT when the average DMFT is 8-10 teeth is very significant. A 60 per cent reduction in the DMFT rate of children when the average DMFT is less than 4 teeth is of less significance. If the reduction that is occurring is not 60 per cent but closer to 25 per cent, then it is something else again." De Liefde (1998) described a 20 percent difference as "clinically meaningless" when the overall prevalence was 1.4 DMFT. The clinical significance of a 20% difference in the more sensitive DMF<u>S</u> metric is even more questionable.

Armfield, et al. 2010; Machiulskiene & Fejerskov, et al. 2009; Spencer, et al. 2018; Slade, et al. 2018). Some studies have been unable to detect a difference (e.g., Chankanka, et al. 2011 & 2015, Hildebolt, et al. 1989, Shiboski, et al. 2003).

Consistent with the finding that caries has declined throughout the developed world independent of water fluoridation, studies published since the 1990s have observed no demonstrable effect on caries rates from the termination of water fluoridation programs. In fact, in most of these studies, the rate of caries continued to decline despite the discontinuation of water fluoridation (Kunzel 1997; Burt, et al. 2000; Kunzel, et al. 2000a,b; Seppa, et al. 2000a,b; Maupome, et al. 2001). While two recent studies have reported contrary results (McLaren, et al. 2016; Meyer 2018), caries had already started to increase in one of the studies prior to the termination of fluoridation (Neurath, et al. 2017), and it is questionable whether either study properly accounted for other factors that could explain the caries trend.

Finally, a report by Burt et al. (2000) is of interest because it describes what happened to dental caries and dental fluorosis in a US population which by accident was deprived of fluoride ingestion from drinking water for almost a year. The authors performed a careful data analysis and interpretation. The population was also exposed to a broad range of topical fluorides, so the effect observed could only be ascribed to fluoride ingested from the water supplies. There was no effect on dental caries in the primary dentition but a distinct decline in prevalence (and severity) of dental fluorosis. This is in full agreement with studies from Hong Kong (Evans & Stamm, 1991) who observed that when fluoride was reduced from 1.0 to 0.7 ppm in the drinking water it resulted in a significant decline in prevalence of dental fluorosis. These data are also in accord with the dose-response relationship shown by Fejerskov et al. in 1996 (see figure 4 above) and the results of the NIDR's 1986-87 national survey (Heller, et al. 1997).

## VI.        CONCLUSION

Our understanding of the mechanism of action of fluoride on dental tissue ought to dictate how fluoride is used both in dental practice and in public health.  As explained above, fluoride's detrimental effect on dentition (i.e., dental fluorosis) comes exclusively from its systemic absorption prior to the eruption of the tooth, whereas fluoride's beneficial effects on dentition (i.e., caries control) comes almost entirely from its post-eruptive topical contact with the enamel. From a risk-benefit perspective, therefore, a rational use of fluoride would seek to minimize the ingestion of fluoride prior to the eruption of teeth and throughout the tooth-forming period.  Towards this end, fluoride exposure during the *in utero* and early infancy period is contraindicated for oral health purposes. Further, when considering fluoride's mechanism of action in light of the (i) increasing rates of dental fluorosis in North America and (ii) questionable effectiveness of water fluoridation under contemporary conditions of widespread topical fluorides, it is my professional opinion that the addition of fluoride to public water supplies is no longer justified from an oral health perspective.

_____

Ole Fejerskov, Aarhus University, Denmark, June 2019

23

# REFERENCES

Aasenden R, Peebles BC. Effects of fluoride supplementation from birth on human deciduous and permanent teeth. *Arch Oral Biol.* 1974 Apr; 19(4):321-6.

ADA Council on Scientific Affairs (ADA-CSA). Professionally Applied Topical Fluoride. Executive Summary of Evidence-Based Clinical Recommendations. *Journal of the American Dental Association*; Special Insert, May 2006.

Ainsworth NJ. Mottled Teeth. *British Dental Journal*; 1933; 55:233-50.

Aoba T, Fejerskov O. Dental fluorosis: chemistry and biology. *Critical reviews in Oral Biology and Medicine*. 2002; 13(2):155-70.

Armfield JM. Public water fluoridation and dental health in New South Wales. *Australian and New Zealand Journal of Public Health.* 2005 Oct;29(5):477-83.

Armfield JM. Community effectiveness of public water fluoridation in reducing children's dental disease. *Public Health Repor*ts; 2010 Sep-Oct;125(5):655-64.

Arnold FA, Dean HT, Knutson JW. Effect of fluoridated public water supplies on dental caries prevalence. *Public Health Reports;* 1953; Feb;68(2):141-8.

Arnold FA. The use of fluoride compounds for the prevention of dental caries. *International Dental Journal* 1957;7:54-72.

Arnold FA, Likins RC, Russell AI, Scott DB. Fifteenth year of the Grand Rapids fluoridation study. *Journal of the American Dental Association*; 1962; Dec; 65(6):780–785.

Beltrán-Aguilar ED, Barker L, Dye BA. Prevalence and severity of dental fluorosis in the United States, 1999-2004. *National Center for Health Statistics Data Brief*. 2010 Nov; (53):1-8.

Bergman C, Gray-Scott D, Chen JJ, Meacham S.  What is next for the Dietary Reference Intakes for bone metabolism related nutrients beyond calcium: phosphorus, magnesium, vitamin D, and fluoride? *Critical Reviews in Food Science and Nutrition*. 2009 Feb; 49(2):136-44.

Black GV, McKay FS. Mottled Teeth: An Endemic Developmental Imperfection of the Enamel of the Teeth Heretofore Unknown in the Literature of Dentistry. *Dental Cosmos.* 1916; 58(2):129-156.

Brunelle JA, Carlos JP. Recent trends in dental caries in U.S. children and the effect of water fluoridation. *Journal of Dental Research*. 1990 Feb;69 Spec No:723-7; discussion 820-3.

Burt BA, Keels MA, Heller KE. The effects of a break in water fluoridation on the development of dental caries and fluorosis. *Journal of Dental Research*. 2000 Feb;79(2):761-9.

Centers for Disease Control and Prevention [CDC]. Achievements in Public Health, 1900-1999: Fluoridation of Drinking Water to Prevent Dental Caries. *Morbidity and Mortality Weekly Report*. 1999; Oct 22; 48(41);933-940.

Centers for Disease Control and Prevention [CDC]. Recommendations for Using Fluoride to Prevent and Control Dental Caries in the United States. *Morbidity and Mortality Weekly Report*. 2001 Aug 17; 50(RR14);1-42.

Centers for Disease Control and Prevention [CDC]. Data Quality Evaluation of the Dental Fluorosis Clinical Assessment Data From the National Health and Nutrition Examination Survey, 1999–2004 and 2011–2016. National Center for Vital Health Statistics, 2(183). 2019.

Chankanka O, Cavanaugh JE, Levy SM, et al. Longitudinal associations between children's dental caries and risk factors. *Journal of Public Health Dentistry* 2011 Fall;71(4):289-300.

Chankanka O, Levy SM, Marshall TA, et al. The associations between dietary intakes from 36 to 60 months of age and primary dentition non-cavitated caries and cavitated caries. *Journal of Public Health Dentistry* 2015 Fall; 75(4):265-73.

Cheng KK, Chalmers I, Sheldon TA. Adding fluoride to water supplies. *British Medical Journal*. 2007 Oct 6; 335(7622):699-702.

Churchill HV. Occurrence of Fluorides in some Waters of the United States. *Industrial and Engineering Chemistry*. 1931; 23(9):996–998.

Clark DC. Trends in prevalence of dental fluorosis in North America. *Community Dentistry and Oral Epidemiology*. 1994; Jun; 22(3):148-52.

Curtis AM, VanBuren J, Cavanaugh JE, et al. Longitudinal associations between dental caries increment and risk factors in late childhood and adolescence. *Journal of Public Health Dentistry*. 2018; Sep;78(4):321-328.

Dean HT, Elvove E. Some epidemiologic aspects of chronic endemic dental fluorosis. *American Journal of Public Health*. 1936; 26:567-75.

Dean HT. Chronic endemic dental fluorosis (mottled enamel).  In: Gordon SM, ed. *Dental Science and Dental Art.* Philadelphia, PA: Lea and Febinger, 1938: 387-414.

Dean HT; Mckay FS. Production of mottled enamel halted by a change in common water supply. *American Journal of Public Health.* 1939; 29: 590-6.

Dean HT, Jay P, Arnold FA, Elvove E. Domestic water and dental caries, including certain epidemiological aspects of oral *L. acidophilus. Public Health Reports.* 1939; 54: 862-88.

Dean HT, Arnold FA, Elvove E. Domestic water and dental caries. II. A study of 2,832 white children, aged 12 to 14 years, of 8 suburban Chicago communities, including lactobacillus acidophilus studies of 1,761 children. *Public Health Reports.* 1941; 56:761–92

Dean HT, Arnold FA, Elvove E. Domestic water and dental caries. V. Additional studies of the relation of fluoride domestic waters to dental caries experience in 4425 white children, age 12-14 years, of 13 Cities in 4 States. *Public Health Reports*. 1942; 57:1155–79.

Dean HT. The investigation of physiological effects by the epidemiological method. In: Moulton FR, ed. *Fluorine and Dental Health.* AAAS Publication No. 19. American Association for the Advancement of Science, 1942: 23-31.

Dean HT, Arnold FA, Jay P, Knutson JW. Studies on the mass control of dental caries through fluoridation of the public water supply. *Public Health Reports.* 1950; 65: 1403-8.

de Liefde B. The decline of caries in New Zealand over the past 40 years. *The New Zealand Dental Journal*. 1998; Sep; 94(417):109-13.

Dirks OB. The relation between the fluoridation of water and dental caries experience. *International Dental Journal*; 1967; Sep;17(3):582-605.

European Academy of Paediatric Dentistry. Guidelines on the use of fluoride in children: an EAPD policy document. *European Archives of Paediatric Dentistry*. 2009; Sep;10(3):129-35.

European Commission. The Safety of Fluorine Compounds in Oral Hygiene Products for Children Under the Age of 6 Years. Health & Consumer Protection Directorate-General, Scientific Committee on Consumer Products, September 20, 2005.

Evans RW, Stamm JW. Dental fluorosis following downward adjustment of fluoride in drinking water. *Journal of Public Health Dentistry*. 1991; Spring;51(2):91-8.

Featherstone JD. The science and practice of caries prevention. *Journal of the American Dental Association*. 2000; Jul; 131(7):887-99.

Fejerskov O, Thylstrup A, Larsen MJ. Clinical and structural features and possible pathogenic mechanisms of dental fluorosis. *Scandinavian Journal of Dental Research*. 1977; Nov; 85(7):510-34.

Fejerskov O, Thylstrup A, Larsen MJ. Rational use of fluorides in caries prevention. A concept based on possible cariostatic mechanisms. *Acta Odontologica Scandinavica*. 1981; 39(4):241-9.

Fejerskov O, Antoft P, Gadegaard E. Decrease in caries experience in Danish children and young adults in the 1970s. *Journal of Dental Research* 1982; 51(Spec Iss):1305-1310.

Fejerskov O, Manji F, Baelum V., Møller IJ.  Dental Fluorosis – A Handbook for Health Workers. Munksgaard, Copenhagen, 1988.

Fejerskov O, Baelum V & Richards A.  Dose-response and dental fluorosis. In Fluoride in Dentistry, 2d Edition, Fejerskov O, Ekstrand J & Burt BA, eds., 1996, pp. 153-166.

26

Fejerskov O. Concepts of dental caries and their consequences for understanding the disease. *Community Dentistry & Oral Epidemiology* 1997;25:5-12.

Fejerskov O. Changing paradigms in concepts on dental caries: consequences for oral health care. *Caries Research* 2004; 38:182-191.

Fejerskov O, Kidd E & Nyvad B (eds). Dental Caries. The Disease and Its Clinical Management. Wiley Blackwell 3rd.ed, 2015.

Fejerskov O, Larsen MJ. Demineralization and Remineralization: The Key to Understanding Clinical Manifestations of Dental Caries. In Dental Caries. The Disease and Its Clinical Management. 3d.Edition, Fejerskov O, Kidd E & Nyvad B (eds), Wiley Blackwell, 2015, pp. 155-170.

Fejerskov, O. The Dental Profession in the 21st Century: Proud Past, Questionable Present, Challenging Future. In: L. Cohen, G. Dahlen, A. Escobar, O. Fejerskov, N. Johnson and F. Manji (eds.) The Future of Oral Health: Dentistry in Crisis-Time for Change, Daraja Press, 2017. Available online at: https://lacascada.pressbooks.com/chapter/chapter-1/

Friis-Hasché E, Bergmann J, Wenzel A, et al. Dental health status and attitudes to dental care in families participating in a Danish fluoride tablet program. *Community Dentistry and Oral Epidemiology*. 1984; Oct;12(5):303-7.

Glass RL. Secular changes in caries prevalence in two Massachusetts towns. *Caries Research*. 1981; 15(5):445-50.

Gray AS. Fluoridation. Time for a new base line? *Journal of the Canadian Dental Association*. 1987; Oct;53(10):763-5.

Groeneveld A. Longitudinal study of prevalence of enamel lesions in a fluoridated and non-fluoridated area. *Community Dentistry and Oral Epidemiology*. 1985; Jun; 13(3):159-63.

Groeneveld A, Backer Dirks O: Fluoridation of drinking water, past, present and future; in Ekstrand J, Fejerskov O, Silverstone LM: Fluoride in Dentistry. Copenhagen, Munksgaard, 1988, pp 229–251.

Heller KE, Eklund SA, Burt BA. Dental caries and dental fluorosis at varying water fluoride concentrations. *Journal of Public Health Dentistry*. 1997; Summer; 57(3):136-43.

Hildebolt CF, Elvin-Lewis M, Molnar S, et al. Caries prevalences among geochemical regions of Missouri. *American Journal of Physical Anthropology* 1989 Jan; 78(1):79-92.

Hodge HC. The Concentration of Fluorides in Drinking Water to Give the Point of Minimum Caries with Maximum Safety. *The Journal of the American Dental Association*. 1950; April; 40(4):436–439.

Hunt CD, Stoecker BJ. Deliberations and evaluations of the approaches, endpoints and paradigms for boron, chromium and fluoride dietary recommendations. *The Journal of Nutrition*. 1996; Sep; 126(9 Suppl):2441S-2451S

Iheozor-Ejiofor Z, Worthington HV, Walsh T, et al. Water fluoridation for the prevention of dental caries. *The Cochrane Database of Systematic Reviews*. 2015; Jun 18; (6):CD010856.

Ismail AI, Brodeur JM, Kavanagh M, et al. Prevalence of dental caries and dental fluorosis in students, 11-17 years of age, in fluoridated and non-fluoridated cities in Quebec. *Caries Research*. 1990; 24(4):290-7.

Kalsbeek H, Verrips GH. Dental caries prevalence and the use of fluorides in different European countries. *Journal of Dental Research*. 1990; Feb; 69 Spec No:728-32.

Kalsbeek H, Verrips E, Dirks OB. Use of fluoride tablets and effect on prevalence of dental caries and dental fluorosis. *Community Dentistry and Oral Epidemiology* 1992; Oct; 20(5):241-5.

Kalsbeek H, Kwant GW, Groeneveld A, et al. [Cessation of fluoridation of drinking water; results of caries research in Tiel and Culemborg in the period of 1968-1988]. Ned Tijdschr Tandheelkd. 1992; 99(1):24-8. Dutch.

Kempf GA, McKay FS. Mottled enamel in a segregated population. *Public Health Reports*. 1930; 45:2923-40.

Kidd EA, Thylstrup A, Fejerskov O, Bruun C. Influence of fluoride in surface enamel and degree of dental fluorosis on caries development in vitro. *Caries Research*. 1980; 14(4):196-202.

Kidd EA, Fejerskov O. Essentials of Dental Caries. Oxford University Press, 4th Edition, 2016.

Koch G, Fejerskov O, Thylstrup A. Fluoride in Caries Treatment – Clinical Treatment. In Textbook of Clinical Cariology, 2d Edition, Thylstrup A, Fejerskov O, eds., 1994, pp. 259-281.

Künzel W, Fischer T. Rise and fall of caries prevalence in German towns with different F concentrations in drinking water. *Caries Research*. 1997; 31(3):166-73.

Künzel W, Fischer T. Caries prevalence after cessation of water fluoridation in La Salud, Cuba. *Caries Research*. 2000; Jan-Feb; 34(1):20-5.

Künzel W, Fischer T, Lorenz R, Brühmann S. Decline of caries prevalence after the cessation of water fluoridation in the former East Germany. *Community Dentistry and Oral Epidemiology*. 2000; Oct;28(5):382-9.

Larsen MJ, Bruun C. Caries Chemistry and Fluoride—Mechanism of Action. In Textbook of Clinical Cariology, 2d Edition, Thylstrup A, Fejerskov O, eds., 1994, pp. 231-257.

Locker D. Benefits and Risks of Water Fluoridation. An Update of the 1996 Federal-Provincial Sub-committee Report. Prepared under contract for Public Health Branch, Ontario Ministry of Health, First Nations and Inuit Health Branch, Health Canada. November 15, 1999.

Machiulskiene V, Baelum V, Fejerskov O, Nyvad B. Prevalence and extent of dental caries, dental fluorosis, and developmental enamel defects in Lithuanian teenage populations with different fluoride exposures. *European Journal of Oral Sciences*. 2009; Apr; 117(2):154-60.

Manji F, Fejerskov O.  An Epidemiological Approach to Dental Caries. In Textbook of Clinical Cariology, 2d Edition, Thylstrup A, Fejerskov O, eds., 1994, pp. 159-191.

Marín LM, Cury JA, Tenuta LM, et al. Higher Fluorosis Severity Makes Enamel Less Resistant to Demineralization. *Caries Research*. 2016; 50(4):407-13.

Marinho VC, Higgins JP, Logan S, Sheiham A. Fluoride gels for preventing dental caries in children and adolescents. *The Cochrane Database of Systematic Reviews*. 2002a; (2): CD002280.

Marinho VC, Higgins JP, Logan S, Shciham A. Fluoride varnishes for preventing dental caries in children and adolescents. *The Cochrane Database of Systematic Reviews*. 2002b; (3): CD002279.

Marinho VC, Higgins JP, Sheiham A, Logan S. Fluoride toothpastes for preventing dental caries in children and adolescents. *The Cochrane Database of Systematic Reviews*. 2003a; (1): CD002278.

Marinho VC, Higgins JP, Logan S, Sheiham A. Fluoride mouthrinses fbr preventing dental caries in children and adolescents. *The Cochrane Database of Systematic Reviews*. 2003b; (3): CD002284.

Marinho VC, Higgins JP, Logan S, Sheiham A. Topical fluoride (toothpastes, mouthrinses, gels or varnishes) for preventing dental caries in children and adolescents. *The Cochrane Database of Systematic Reviews*. 2003c; (4): CD002782.

Marinho VC, Higgins JP, Sheiham A, Logan S. One topical fluoride (toothpastes, or mouthrinses, or gels, or varnishes) versus another for preventing dental caries in children and adolescents. *The Cochrane Database of Systematic Reviews*. *2004a;* (I): CD002780.

Marinho VC, Higgins JP, Sheiham A, Logan S. Combinations of topical fluoride (toothpastes, mouthrinses, gels, varnishes) versus single topical fluoride for preventing dental caries in children and adolescents. *The Cochrane Database of Systematic Reviews*. 2004b; (I): CD002781.

Maupomé G, Clark DC, Levy SM, Berkowitz J. Patterns of dental caries following the cessation of water fluoridation. *Community Denistry Oral Epidemiol.* 2001; Feb; 29(1):37-47.

McDonagh MS, Whiting PF, Wilson PM, et al. Systematic review of water fluoridation. *British Medical Journal*. 2000; Oct 7; 321(7265):855-9.

McKay FS. Relation of mottled enamel to caries. *Journal of the American Dental Association*. 1928; 15:1429-37.

McLaren L, Patterson S, Thawer S, et al. Measuring the short-term impact of fluoridation cessation on dental caries in Grade 2 children using tooth surface indices. *Community Dentistry and Oral Epidemiology* 2016; Jun; 44(3):274-82.

Meyer J, Margaritis V, Mendelsohn A. Consequences of community water fluoridation cessation for Medicaid-eligible children and adolescents in Juneau, Alaska. *BMC Oral Health*. 2018; Dec 13; 18(1):215.

Myers HM. Dose-response relationship between water fluoride levels and the category of questionable dental fluorosis. *Community Dent Oral Epidemiol. 1*983; Apr;  11(2):109-12.

Neurath C, Beck JS, Limeback H, et al. Limitations of fluoridation effectiveness studies: Lessons from Alberta, Canada. *Community Dentistry and Oral Epidemiology* 2017; Dec; 45(6):496-502

National Health and Medical Research Council (NHMRC, Australia). A Systematic Review of the Efficacy and Safety of Fluoridation. 2007.

National Research Council (NRC). Report of the Ad Hoc Committee on the Fluoridation of Water Supplies. Washington, DC: The National Academies Press. November 29, 1951.

National Research Council (NRC). Fluoride in Drinking Water. A Scientific Review of EPA's Standards. Washington, DC: The National Academies Press. 2006.

Ogaard B, Rölla G, Ruben J, et al. Microradiographic study of demineralization of shark enamel in a human caries model. *Scandinavian Journal of Dental Research*. 1988l Jun; 96(3):209-11.

Oliveby A, Twetman S, Ekstrand J. Diurnal fluoride concentration in whole saliva in children living in a high- and a low-fluoride area. *Caries Research*. 1990; 24(1):44-7.

Poulsen S, Larsen MJ. Dental caries in relation to fluoride content of enamel in the primary dentition. *Caries Research*. 1975; 9(1):59-65.

Richards A, Larsen MJ, Fejerskov O, Thylstrup A. Fluoride content of buccal surface enamel and its relation to dental caries in children. *Archives of Oral Biology*. 1977; 22(7):425-8.

Richards A, Machiulskiene V, Nyvad B, Baelum V. Saliva fluoride before and during 3 years of supervised use of fluoride toothpaste. *Clinical Oral Investigations* 2013; 17(9):2057-63.

Russell AL. Dental effects of exposure to fluoride-bearing Dakota sandstone waters at various ages and for various lengths of time. *Journal of Dental Research* 1949; 28:600-12.

Scientific Committee on Health and Environmental Risks (SCHER). Critical review of any new evidence on the hazard profile, health effects, and human exposure to fluoride and the fluoridating agents of drinking water. European Commission, May 16, 2011.

Seppä L, Hausen H, Kärkkäinen S. Plaque fluoride and mutans streptococci in plaque and saliva before and after discontinuation of water fluoridation. *European Journal of Oral Sciences*. 1996; Aug; 104(4 ( Pt 1)):353-8.

Seppä L, Kärkkäinen S, Hausen H. Caries in the primary dentition, after discontinuation of water fluoridation, among children receiving comprehensive dental care. *Community Dentistry and Oral Epidemiology.* 2000a; Aug; 28(4):281-8.

Seppä L, Kärkkäinen S, Hausen H. Caries trends 1992-1998 in two low-fluoride Finnish towns formerly with and without fluoridation. *Caries Research*. 2000b; Nov-Dec; 34(6):462-8.

Slade GD, Grider WB, Maas WR, Sanders AE. Water Fluoridation and Dental Caries in U.S. Children and Adolescents. *Journal of Dental Research*. 2018; Sep; 97(10):1122-1128.

Spencer AJ, Do LG, Ha DH. Contemporary evidence on the effectiveness of water fluoridation in the prevention of childhood caries. *Community Dentistry and Oral Epidemiology.* 2018; Aug; 46(4):407-415.

Takahashi R1, Ota E, Hoshi K, et al. Fluoride supplementation (with tablets, drops, lozenges or chewing gum) in pregnant women for preventing dental caries in the primary teeth of their children. *The Cochrane Database of Systematic Reviews*. 2017; Oct 23;10:CD011850.

Thylstrup A, Fejerskov O. Clinical appearance of dental fluorosis in permanent teeth in relation to histologic changes. *Community Dentistry and Oral Epidemiology*. 1978; Nov; 6(6):315-28.

Thylstrup A, Fejerskov O, Bruun C, Kann J. Enamel changes and dental caries in 7-year-old children given fluoride tablets from shortly after birth. *Caries Research*. 1979; 13(5):265-76.

Tijmstra T, Brinkman-Engels M, Groeneveld A. Effect of socioeconomic factors on the observed caries reduction after fluoride tablet and fluoride toothpaste consumption. *Community Dentistry and Oral Epidemiology*. 1978; Sep; 6(5):227-30.

Volker JF. Effect of fluorine on solubility of enamel and dentin. *Proceedings of the Society for Experimental Biology and Medicine*. 1939; 42: 725-7.

Walsh T, Worthington HV, Glenny AM, et al. Fluoride toothpastes of different concentrations for preventing dental caries in children and adolescents. *The Cochrane Database of Systematic Reviews*. 2010; Jan 20; (1):CD007868.

Warren JJ, Levy SM, Broffitt B, et al. Considerations on optimal fluoride intake using dental fluorosis and dental caries outcomes--a longitudinal study. *Journal of Public Health Dentistry*. 2009; Spring; 69(2):111-5.

Weatherell JA, Deutsch D, Robinson C, Hallsworth AS. Assimilation of fluoride by enamel throughout the life of the tooth. *Caries Research*. 1977; 11 Suppl 1:85-115.

Wiener RC, Shen C, Findley P, et al. Dental Fluorosis over Time: A comparison of National Health and Nutrition Examination Survey data from 2001-2002 and 2011-2012. *Journal of Dental Hygiene*. 2018; Feb; 92(1):23-29.

Wong MC, Clarkson J, Glenny AM, et al. Cochrane reviews on the benefits/risks of fluoride toothpastes. *Journal of Dental Research*. 2011; May; 90(5):573-9.

Yoder KM, Maupome G, Ofner S, Swigonski NL. Knowledge and use of fluoride among Indiana dental professionals. *Journal of Public Health Dentistry*. 2007; Summer; 67(3):140-7.

# Exhibit 31

Page 1

1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
2
     ------------------------------:
3    FOOD & WATER WATCH, INC.,      :
     et al.,                        :
4                                   :
               Plaintiffs,          :
5                                   :
          vs.                       : Case No.:
6                                   : 3:17-cv-02162-EMC
     UNITED STATES ENVIRONMENTAL    :
7    PROTECTION AGENCY, et al.,     :
                                    :
8              Defendants.          :
     ------------------------------:
9

10

11       DEPOSITION OF OLE FEJERSKOV, DDS, PH.D.

12

13   DATE:            Friday, August 23, 2019

14   TIME:            9:07 a.m.

15   LOCATION:        U.S. Department of Justice
                      Environment & Natural
16                      Resources Division
                      4 Constitution Square
17                    150 M Street, Northeast
                      Washington, D.C. 20002
18

     REPORTED BY:     Shari R. Broussard, RPR, CSR
19                    Reporter, Notary

20

21           Capital Reporting Company
          1250 Eye Street, NW, Suite 350
22             Washington, D.C. 20005

Page 4

1                P R O C E E D I N G S

2    WHEREUPON,

3                OLE FEJERSKOV, DDS, Ph.D.

4    called as a witness, and having been sworn by the

5    notary public, was examined and testified as

6    follows:

7                EXAMINATION BY COUNSEL FOR DEFENDANTS

8    BY MR. DO:

9         Q     Good morning, Dr. Fejerskov.

10        A     Good morning.

11        Q     My apologies again if I mispronounce

12   your name, but I'm not sure I developed those

13   phonemes when I was little to say it consistently.

14              Have you been deposed previously before?

15        A     No.

16        Q     But do you understand you just took an

17   oath to tell the truth?

18        A     Oh, yes.

19        Q     And the same oath you would if you were

20   to testify in court?

21        A     Yes.

22        Q     Is there anything that would prevent you

Ole Fejerskov , DDS PhD                                    August 23, 2019

Page 142

1   it seems as if nature is behaving according to the

2   basic science data we are having available.

3        Q    Is it fair to say you're of the opinion

4   that fluoride's anticaries benefit stems

5   predominantly from its topical effects?

6        A    Again, yes.

7        Q    The word "predominantly" to me could

8   mean majority; is that a fair way to interpret

9   that word?

10       A    When we used the word "predominantly"

11  back in time, it was meant that way.

12       Q    Okay.

13       A    Today, as you can understand, I've come

14  to the conclusion that's the mechanism of action.

15       Q    So you mean exclusively?

16       A    Yeah, I mean there's no reason to -- to

17  believe that it has any effect on the forming

18  enamel or the forming crystals in terms of

19  protecting for caries simply because the only

20  effect is that you develop dental fluorosis and

21  that's a totally different ballgame.

22       Q    So you used the word "predominantly" in

Page 218

1    caries control and that's a very different thing.

2    If a country choose to -- to have water

3    fluoridation, fine for me, that's -- that's of

4    course their choice.

5    BY MR. DO:

6        Q    But in terms of reaching this

7    conclusion, do you make a comparison between

8    Europe and the United States' dental disease

9    situations?

10              MR. CONNETT:  Overbroad.

11              THE WITNESS:  Of course.  What is -- is

12   striking to me is after the second World War when

13   water fluoridation was introduced in the United

14   States and -- and the caries situation here was --

15   was, yeah, it was high, but at that moment in time

16   the caries situation in Europe was double as high

17   as in the U.S.  And today we have a situation

18   where we are having significantly less dental

19   caries in all the Scandinavian countries --

20   Norway, Sweden, Iceland, Finland, Germany is also

21   on a rapid decline, et cetera -- without having

22   had to take the same system as you took, namely to

Page 219

1    fluoridate drinking water.

2    BY MR. DO:

3        Q    I apologize, I guess I'm still a little

4    confused.  I'm hearing from you both the

5    complexities of populations of dental caries

6    situation and how it's varied within countries

7    within continents, which would make comparisons

8    difficult or inappropriate, yet at the same time I

9    also believe I'm hearing you say that you did make

10   such a comparison.

11           MR. CONNETT:  Misstates testimony.

12           JT, you have the report.  If you want to

13   show the witness any particular statement you want

14   clarification on, you can do that.

15           MR. DO:  I appreciate the suggestion,

16   but I know that.  Thank you.

17           THE WITNESS:  You are -- I'm not saying

18   that you can't compare.  I'm just saying when you

19   are comparing, you have to ensure that you know

20   the variables which you are dealing with.  It --

21   you cannot just take any set of data which is

22   generated for other reasons and then start

Page 370

1                    CERTIFICATE OF NOTARY PUBLIC

2          I, SHARI R. BROUSSARD, the officer before

3     whom the foregoing deposition was taken, do hereby

4     certify that the witness whose testimony appears

5     in the foregoing deposition was duly sworn by me;

6     that the testimony of said witness was taken by me

7     in stenotype and thereafter reduced to typewriting

8     under my direction; that said deposition is a true

9     record of the testimony given by said witness;

10    that I am neither counsel for, related to, nor

11    employed by any of the parties to the action in

12    which this deposition was taken; and, further,

13    that I am not a relative or employee of any

14    counsel or attorney employed by the parties

15    hereto, nor financially or otherwise interested in

16    the outcome of this action.

17

18                              _Shari R. Broussard_

19                         SHARI R. BROUSSARD

                       Notary Public in and for the

20                         District of Columbia

21

      My commission expires:

22    August 14, 2020

# **Exhibit 32**

1              THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                    AT SAN FRANCISCO

4    FOOD & WATER WATCH, et al.     *

5      Plaintiffs                   *   Civ. No.

6    v.                            *   17-CV-02162-EMC

7    U.S. ENVIRONMENTAL PROTECTION *

8    AGENCY, et al.                 *

9      Defendants                   *        **ORIGINAL**

10                   *   *   *   *   *

11            VIDEOTAPED DEPOSITION OF

12              TALA RAE HENRY, Ph.D.

13               AUGUST 20th, 2019

14               WASHINGTON, D.C.

15

16          Reported by:  Dawn M. Hyde

17

18

19

20

21

```
1    Whereupon,

2              TALA RAE HENRY,

3    a witness herein, called for oral examination in

4    the matter pending, being first duly sworn to tell

5    the truth, the whole truth, and nothing but the

6    truth, testified as follows:

7                        EXAMINATION

8        BY MR. CONNETT:

9        Q    Good morning.

10       A    Morning.

11       Q    Now, you were just given the oath

12   and I know we're in a conference room and not

13   before a judge, but do you understand that you

14   have the same obligation to tell the truth

15   today just as if you were testifying before a

16   judge?

17       A    I do.

18       Q    Now, the court reporter -- have you

19   ever had a deposition taken before?

20       A    Yes.

21       Q    How many depositions?
```

1      A      Deputy office director of the Office

2  of Pollution Prevention and Toxics.

3      **Q      And is the office of Pollution**

4  **Prevention and Toxics, is that the office that**

5  **handles TSCA issues?**

6      A      It is the office that implements

7  TSCA.

8      **Q      And TSCA is the Toxic Substances**

9  **Control Act?**

10      A      Correct.

11      **Q      And you have been at the EPA for**

12  **about 25 years now?**

13      A      Correct.

14      **Q      And how would you describe your**

15  **expertise?  What subject matters are -- let me**

16  **back up.  Are you a toxicologist?**

17      A      Yes.

18      **Q      Are you a risk assessment scientist?**

19      A      Yes.

20      **Q      Any other areas that you consider**

21  **yourself an expert in?**

1      A     Those are very broad areas.  Let me

2    just clarify.  Currently in my position I'm a

3    senior executive, so I do have the expertise

4    and I have conducted risk assessments and been

5    a staff toxicologist in the past.  But in my

6    position now, again, I have the office's

7    resources in many areas available.

8      **Q     Okay.  And so during your 25 years**

9    **at EPA, have you personally been involved with**

10   **writing risk assessments?**

11     A     Yes.

12     **Q     And in addition to writing risk**

13   **assessments, have you personally been involved**

14   **in reviewing and providing comments on risk**

15   **assessments?**

16     A     Yes.

17     **Q     Fair to say that in the course of**

18   **your 25 years at EPA, you have been involved**

19   **in one way or another with many risk**

20   **assessments?**

21     A     Yes.

1    Q    Do you have an estimate as to how

2  many risk assessments you have been involved

3  with in some capacity?

4    A    No.

5    Q    More than 20?

6    A    Yes.

7    Q    More than 50?

8    A    Yes.

9    Q    More than a hundred?

10    A    Yes.

11    Q    More than 200?

12    A    I would have to count at that point.

13    Q    And can you give me -- I know there

14  is obviously many risk assessments that you

15  have been a part of, but can you summarize for

16  me how you have contributed to risk

17  assessments in your career at EPA?

18    A    I have actually written some parts

19  of risk assessments, I have extensively

20  reviewed them, I have edited, reviewed, okayed

21  or signed off on, if you will, in pretty much

1    any way, shape or form.

2        **Q     And how would you define risk**

3    **assessment?**

4        A     Risk assessment is to determine

5    whether or not risk is -- the probability of

6    risk from exposure to -- in my case it's been

7    always chemical substances.

8        **Q     Okay.  And let me just back up and**

9    **ask you what is it that led you to the EPA?**

10   **Why did you want to work for the EPA?**

11       A     Well, I was a junior in college in

12   my -- getting a biology degree.  I was in my

13   chemistry class and the professor came in and

14   announced that at the EPA laboratory in the

15   town where my college is, that they were

16   looking for student workers and, as many

17   college students, I was in need of funds.

18           So I got myself down there and

19   interviewed for the biological laboratory aide

20   job, which is on my CV, and secured the job.

21   That's how it started.

```
1        BY MR. CONNETT:

2        Q    Is it fair to say that EPA is

3   seeking to protect public health?

4            MS. CARFORA:  Objection, form.

5        A    I'm not speaking on behalf of EPA

6   today.

7        BY MR. CONNETT:

8        Q    Okay.  So prior to your -- now, I

9   know -- and we're going to talk about this a

10  little bit later -- I know that you were

11  involved with responding to the plaintiffs'

12  petition in this case.  We're going to talk

13  about that a little bit later.

14           But prior to your work on the

15  petition, had you ever been involved with any

16  fluoride-related projects at EPA?

17       A    Not to my recollection.

18       Q    And I will just go through some

19  examples of what I am referring to.  Had you

20  ever been involved with any regulatory actions

21  related to fluoride?
```

```
1        A     Not that I recall.

2        Q     Had you ever been involved with any

3   literature reviews related to fluoride?

4        A     No.

5        Q     Had you been involved with any

6   hazard assessments related to fluoride?

7        A     Not that I recall.

8        Q     Had you been involved with any

9   dose-response assessments related to fluoride?

10       A     Not that I recall.

11       Q     Had you been involved with any

12  exposure assessments related to fluoride?

13       A     Not that I recall.

14       Q     Had you been involved with any risk

15  characterizations related to fluoride?

16       A     Not that I recall.

17       Q     Do you consider yourself an expert

18  on fluoride toxicology?

19       A     No.

20       Q     Do you consider yourself an expert

21  on fluoride neurotoxicity?
```

1       A     No.

2       **Q     Do you consider yourself an expert**

3  **on fluoride and dental health?**

4       A     No.

5       **Q     Do you consider yourself an expert**

6  **on any aspect of fluoride?**

7       A     Not specifically.  Again, I am a

8  toxicologist and can evaluate papers that are

9  toxicology-type, papers but it's not an area

10  that I have studied extensively.

11      **Q     Prior to your involvement with the**

12  **petition in this case, had you ever reviewed**

13  **any of the scientific literature on fluoride?**

14      A     Not that I recall.

15      **Q     Have you, subsequent to the petition**

16  **being filed, actually read any of the primary**

17  **studies related to fluoride toxicity?**

18      A     Yes.

19      **Q     How many prior studies do you**

20  **estimate you have read?**

21      A     At the time that we were preparing

```
 1        A    No.

 2             (Deposition Exhibit Number 219 was

 3             marked for identification.)

 4        BY MR. CONNETT:

 5        Q    I'm going to hand you a copy of the

 6   EPA's initial expert disclosure in this case

 7   dated June 27th, 2019.  Have you reviewed this

 8   document before?

 9        A    Yes.

10        Q    Do you understand that in this

11   document the EPA is summarizing your -- the

12   opinions that they expected you would provide

13   in this case?

14        A    I believe that the Department of

15   Justice prepared the summary.

16        Q    And do you understand that that

17   summary is a summary of what the DOJ

18   anticipates you will testify about in this

19   case?

20        A    Yes.

21        Q    Now, can you -- because it's a bit
```

1    **unclear to me when I read this what opinions**

2    **are actually being offered.  Can you summarize**

3    **to your own understanding what opinions you**

4    **are providing here?  What the actual opinions**

5    **are.**

6         A    I am providing opinions about how

7    risk assessments are conducted at the EPA, in

8    particular under the Toxic Substances Control

9    Act, which has been significantly amended

10   since 2016.

11            And also there is some information

12   that I can provide on not only what it takes

13   to conduct a risk assessment that meets the

14   various requirements of TSCA, but also if

15   there were subsequently rulemaking under the

16   same statute, I have some knowledge and

17   expertise around that.

18        Q    And I know that you have

19   **published -- and I will introduce this in a**

20   **second -- but I know that you have been**

21   **offered as a rebuttal expert with additional**

1    **opinions set forth in a rebuttal report.  But**

2    **my questions here are limited to just these**

3    **initial disclosures, okay?**

4         A    Uh-huh.

5         **Q    So in these initial disclosures,**

6    **what is your understanding as to what your**

7    **opinions actually are?**

8         A    What it takes to do a risk

9    evaluation under the Toxic Substances Control

10   Act.

11              MS. CARFORA:  Michael, can we give

12   her an opportunity to just read this?  I don't

13   know when the last time she saw it was.

14              So why don't you go ahead and read

15   the document.

16              MR. CONNETT:  Can we just go off

17   record?

18              MS. CARFORA:  No.  Why are we going

19   off the record?  You're asking her questions

20   about a document you have presented to her, so

21   the witness should read the document you have

1    presented.  We need to give her an opportunity

2    to do that.

3             MR. CONNETT:  But it's a document

4    that sets forth her opinions in the case.

5             MS. CARFORA:  Okay.  That's fine.

6    Just give her an opportunity to read it.

7                  (Brief pause.)

8        BY MR. CONNETT:

9        **Q    So you have read the document?**

10       A    Yes.

11       **Q    And that is not the first time you**

12   **have read it, correct?**

13       A    Correct.

14       **Q    So what are the opinions that you**

15   **intend to offer here?**

16       A    My opinions about what it takes to

17   conduct a risk evaluation under TSCA, how

18   we're doing that now within that context.  And

19   should unreasonable risks be found, what the

20   processes and procedures -- really the

21   considerations that would also need to be

1    taken into account in doing so.

2         Q    So, I see in this report it sets

3    forth a factual description of the TSCA

4    statute; is that fair?

5         A    Yes.

6         Q    And it also sets forth a factual

7    description of what -- of the risk evaluations

8    that EPA is currently conducting.

9         A    Yes.

10         Q    And then it talks about what might

11    happen if the court was to find that

12    fluoridation chemicals presented an

13    unreasonable risk.

14         A    Correct.

15         Q    So what I am struggling with is I'm

16    struggling to see -- I see the factual

17    descriptions here, but what are the opinions?

18    I see the factual descriptions but what are

19    the opinions?

20         A    Depends what you ask.

21         Q    And I understand that but the

1    **purpose of disclosure -- and I know you're not**

2    **an attorney -- but the purpose of disclosure**

3    **is to identify the opinions an expert is going**

4    **to offer to the court.**

5            **So can you summarize for me what the**

6    **opinions are versus the facts that you intend**

7    **to discuss.**

8        A    I will discuss, when asked, opinions

9    about what kinds of information, data are

10   necessary to conduct a risk evaluation under

11   TSCA and should the -- you know, any part of

12   the construct of those risk evaluations, what

13   the requirements are to be included in a risk

14   evaluation under TSCA.

15           And then I can speak to the

16   processes and procedures primarily of the risk

17   evaluation but also if there were any

18   rulemaking that was subsequent to it under

19   TSCA.

20       Q    Okay.  So is that as specific as you

21   **can be with me now in terms of what opinions**

1  **you intend to offer under this report?**

2       A    Yes.  Very specifically opinions

3  about the conduct and the processes and

4  procedures of risk evaluation and rulemaking

5  under TSCA.

6              (Deposition Exhibit Number 220 was

7              marked for identification.)

8       BY MR. CONNETT:

9       Q    **I will go ahead and mark as the next**

10  **exhibit, which is 220, your rebuttal or**

11  **summary of your rebuttal opinions.  And I**

12  **should note that I have excluded from this**

13  **document the CV that was attached to it.**

14              **And you have read this report,**

15  **correct?**

16       A    Yes.

17       Q    **Did you write the report?**

18       A    I wrote a fair bit of the text

19  within the report.

20       Q    **A fair bit.  What percentage of the**

21  **report do you estimate you wrote?**

1    comparison, that is correct.

2        BY MR. CONNETT:

3        **Q    Do you -- of these 90 chemicals that**

4    **are listed in this TSCA work plan document, do**

5    **you know how many of those chemicals have**

6    **prospective birth cohort studies linking the**

7    **chemical to adverse developmental effects?**

8        A    No, I do not.

9        **Q    What would be your best estimate as**

10   **to the number of chemicals on this list that**

11   **have prospective birth cohort studies linking**

12   **the chemical to adverse developmental effects?**

13           MS. CARFORA:  Objection, asked and

14   answered.

15       A    I don't know.

16       BY MR. CONNETT:

17       **Q    Would you estimate that it would be**

18   **more or less than five chemicals on this list**

19   **that have prospective birth cohort studies --**

20           MS. CARFORA:  Objection, asked and

21   answered.

```
1        BY MR. CONNETT:

2        Q    -- linking the chemical to harm?

3        A    I really can't say.

4        Q    You would be completely guessing on

5   that?

6        A    Yes.

7        Q    How many of those 90 chemicals that

8   are on this list have over 50 epidemiological

9   studies associating the chemical with adverse

10   effects in humans?

11        MS. CARFORA:  Objection, asked and

12   answered.

13        A    I don't know the number.

14        BY MR. CONNETT:

15        Q    Can you give me your best estimate?

16        MS. CARFORA:  Objection, asked and

17   answered.

18        A    No.

19        BY MR. CONNETT:

20        Q    Would you estimate that there are

21   more than five chemicals on this list that
```

1    **fluoride exposure was associated with reduced**

2    **IQ in children, right?**

3         A    I think it was a similar association

4    between maternal urine concentrations and IQ

5    test results in some parts of the population.

6         **Q    So based on -- just leaving aside**

7    **all the other data on fluoride neurotoxicity,**

8    **would you agree from those two studies, that**

9    **there is a potential hazard of neurotoxicity**

10   **from prenatal fluoride exposure?**

11        A    Again, I'm not sure that I am

12   convinced that the biomarker is really, truly

13   representing whether or not there is prenatal

14   exposure.  This is one of the questions that

15   remains in my mind.

16        **Q    Well, would you agree that based on**

17   **all the studies that have been done on**

18   **fluoride neurotoxicity, that neurotoxicity is**

19   **a potential hazard of fluoride exposure?**

20        A    Yes.

21        **Q    And would you agree that there is a**

1    potential route of exposure to fluoridation

2    chemicals in the United States?

3        A    Yes.

4        Q    Would you agree that you don't need

5    to do a nine- to 12-month review to conclude

6    that there's a potential route of exposure to

7    fluoridation chemicals in the United States?

8        A    Restate the question.

9        Q    Would you agree that you don't need

10   to conduct a nine- to 12-month review to

11   conclude that there's a potential route of

12   exposure to fluoridation chemicals in the

13   United States?

14       A    I guess I'm not really understanding

15   the connection there.  There is a potential

16   exposure to those people who might drink

17   fluoridated water.

18       Q    And you don't need to conduct a

19   nine- to 12-month review to reach that

20   conclusion, right?

21       A    I personally?

1     Q     Yes.

2     A     No.

3     Q     Because it's pretty obvious, right?

4     A     Not necessarily.

5     Q     It's --

6     A     It's potential.

7     Q     You would agree there's a potential

8  route of exposure to fluoridation chemicals in

9  the United States?

10    A     Yes.

11    Q     Now, if you turn to page 33759,

12  looking at the last sentence of the paragraph

13  in the middle column, first paragraph; do you

14  see that?

15    A     Uh-huh.

16    Q     And it reads, "Because TSCA

17  specifically requires the prioritization

18  process to be risk-based and EPA's

19  determinations to exclude nonrisk factors,

20  relevant information at this stage is limited

21  to that which is risk-related," correct?

1    era, they met the intent or the letter, no, I

2    cannot say that today.

3        BY MR. CONNETT:

4        **Q    Okay.  I move to strike as**

5    **nonresponsive.  I just want to be really clear**

6    **about this.  It's a yes or no.**

7            **Can you identify for me a single**

8    **completed risk assessment that EPA has ever**

9    **done that used -- had a predefined criteria**

10   **for which papers it would select?**

11           MS. CARFORA:  Objection, asked and

12   answered.

13       A    Sitting here today, I cannot due to

14   lack of being able to explore the question.

15       BY MR. CONNETT:

16       **Q    Okay.  Can you identify for me any**

17   **completed risk assessment in EPA's entire**

18   **history that used a predefined criteria for**

19   **assessing the quality of studies?**

20           MS. CARFORA:  Objection, asked and

21   answered.

 1      BY MR. CONNETT:

 2      **Q    Yes or no?**

 3      A    Again, without looking back at some

 4  completed, I would need to basically read

 5  them, see what they said about what criteria

 6  were used and whether they were predefined.

 7      BY MR. CONNETT:

 8      **Q    I move to strike as nonresponsive**

 9  **because I don't think I got an answer.  It's**

10  **really a yes-or-no answer.**

11          **Can you point me to any completed**

12  **risk assessment in EPA's entire history where**

13  **EPA used a predefined criteria for assessing**

14  **the quality of the studies, yes or no?**

15          MS. CARFORA:  Objection, asked and

16  answered.

17      A    As we sit here today, no.

18      BY MR. CONNETT:

19      **Q    Can you point me to any completed**

20  **risk assessment in EPA's entire history where**

21  **EPA used a predefined method -- sorry, strike**

1      Q      And EPA has conducted narrative

2   reviews for some of its risk assessments in

3   the past, right?

4      A      In the past.

5      Q      In fact, most of EPA's risk

6   assessments in the past were narrative

7   reviews, right?

8      A      In the past.

9      Q      And when you say in the past, we're

10  talking prior to 2014, '15, right?

11     A      Yes.  Under TSCA, I can only speak

12  of but again, I'm not as familiar with some of

13  the more recent risk assessments in other

14  parts of the EPA so I can't really speak on

15  all of EPA.

16     Q      But for TSCA, EPA was using

17  narrative reviews for its risk assessments up

18  to about 2014, right?

19     A      Not exclusively.  Again, I believe

20  that some of the business tenets of systematic

21  review were still performed.

1    **Q     So you weren't involved in risk**

2    **assessments for your first 15 years at EPA?**

3         A     Define risk assessment.

4    **Q     Well, I will let you define it since**

5    **you're the expert.**

6         A     I reviewed -- largely reviewed risk

7    assessments when I first joined.  Then I was

8    in the Office of Research and Development

9    where we didn't perform or review.  And then

10   later I did ambient water quality criteria

11   which is a form of risk assessment.

12   **Q     So the risk assessments that you**

13   **reviewed or were in some way involved with**

14   **from when you first joined the agency up until**

15   **2009 were entirely narrative review?**

16        A     I can't affirm that without looking

17   at them.

18   **Q     Can you point me to or identify for**

19   **me a single risk assessment that you were**

20   **involved with between 1994 and 2009 that used**

21   **a systematic review procedure?**

1       A    No.

2            MS. CARFORA:  Tala, do you need a

3    break?

4            THE WITNESS:  Sure.

5            THE VIDEOGRAPHER:  This concludes

6    media unit number four.  The time on the video

7    is 2:25 p.m.  We are off the record.

8            (Recess taken from 2:25 p.m.

9            until 2:34 p.m.)

10           THE VIDEOGRAPHER:  This begins media

11   unit number five.  The time on the video is

12   2:34 p.m.  We are on the record.

13       BY MR. CONNETT:

14       **Q    Are you familiar with the Bradford**

15   **Hill analysis?**

16       A    The Bradford Hill criteria?

17       **Q    Yes.**

18       A    I'm familiar.

19       **Q    Are you familiar with -- are you**

20   **aware of any EPA risk assessment for noncancer**

21   **effects that has used or discussed the**

1    understand whether the data or the experiment

2    support causality.

3        Q    Was the -- did EPA consider the

4    temporal relationship issue in the 1-BP risk

5    evaluation?

6        A    Absolutely.

7        Q    And it considered -- EPA considered

8    biological gradient in the 1-BP --

9        A    Absolutely.

10       Q    Now, EPA over time issues guidelines

11   on various aspects of risk assessment, right?

12       A    As well as guidance.

13       Q    And in the final rule on risk

14   evaluation procedures under TSCA, EPA

15   references these prior guidelines, right?

16       A    Yes.

17       Q    And EPA states in the final rule

18   that it's -- that those guidelines can be used

19   and considered when doing risk evaluation,

20   right?

21       A    Yes.

1        Q     And one of the guidelines that EPA

2    has published in the past is guidelines on

3    neurotoxicity risk assessment, correct?

4        A     Yes.

5        Q     So when doing a risk evaluation

6    under TSCA, one can use and consider EPA's

7    guidelines on neurotoxicity risk assessment,

8    correct?

9        A     Yes.

10        Q     Now, are you familiar -- have you

11    ever read the guidelines on neurotoxicity risk

12    assessment?

13        A     Yes.

14        Q     When is the last time you read them?

15        A     Two weeks ago.

16        Q     Okay.  So why don't I pull those

17    out.

18             (Deposition Exhibit Number 234

19             was marked for identification.)

20    BY MR. CONNETT:

21        Q     I'm going to mark this as Exhibit

1    Number 234.  It's just an excerpt of EPA's

2    "Guidelines for neurotoxicity risk

3    assessment."  And I would like to draw your

4    attention to the introduction section here

5    which is on page one.  And the first sentence

6    of the introduction states, "These guidelines

7    describe the principles, concepts and

8    procedures that the U.S. Environmental

9    Protection Agency will follow in evaluating

10   data on potential neurotoxicity associated

11   with exposure to environmental toxicants."

12            Did I read that correctly?

13        A    Yes.

14        Q    Is that a correct statement?

15        A    Yes.

16        Q    So then if someone is evaluating

17   data on the potential neurotoxicity associated

18   with fluoride, someone should -- the risk

19   assessor should use these guidelines, correct?

20        A    To the extent they're applicable.

21        Q    Now, do these guidelines -- and I

1    very much the same things you do in what we

2    call a systematic review today.

3         BY MR. CONNETT:

4         Q    Okay.  So if one does a risk

5    assessment that is compliant with these

6    guidelines, one would effectively do a

7    systematic review?

8         A    Effectively.

9         Q    Okay.  Now, do these guidelines

10   require the use of predefined criteria for

11   which studies will be considered?

12        A    Guidelines by their very inherency,

13   if you will, don't require anything.

14        Q    Okay.  Do these guidelines recommend

15   or suggest the use of predefined criteria for

16   which studies will be considered?

17        A    Again, in the chapter that is fairly

18   lengthy on things to consider in reviewing

19   studies, there are quite a few predefined

20   criteria that one would consider in reviewing

21   those types of studies.  It's organized by

1      **Q      Okay.   A risk assessment that**

2    **follows and adheres to these guidelines for**

3    **neurotoxicity risk assessment, would that**

4    **provide credible information for making a**

5    **determination as to risk?**

6      A      Generally speaking, yes, but one

7    always has to consider, you know, the vintage

8    of the guidelines, what newer science has

9    become available since then, what potentially

10   supersedent guidance that EPA has, as well as

11   the context, in this case specifically TSCA,

12   context you're conducting a risk assessment.

13     **Q      Has EPA issued any superseding**

14   **guidelines for neurotoxicity risk assessment?**

15     A      Not specifically in whole.

16     **Q      So when you say not specifically in**

17   **whole, what do you mean?**

18     A      There are certain aspects of some

19   chapters in this guideline have had updated

20   guidance published subsequently but not called

21   the neurotoxicity risk assessment guidelines.

1      A     Yes.

2      Q     **Is that the name of the guidance?**

3      A     I believe so.

4      Q     **Do you recall what year that was**

5  **published?**

6      A     Recently.  In the last two or three.

7      Q     **Besides those two subsequent**

8  **guidance documents, can you think of any other**

9  **subsequent guidance documents?**

10      A     Not here right now, but again,

11  different refinements to dose-response

12  analysis.  Like this mentions benchmark dose

13  modeling but that's about it.  We have a whole

14  guidance on benchmark dose modeling out now.

15      Q     **So those are three subsequent**

16  **guidances.  Any others that you can think of?**

17      A     Not right offhand.

18      Q     **And I know that as part of your**

19  **rebuttal report you do not discuss**

20  **Dr. Thiessen's analysis of these guidelines,**

21  **right?**

1    A    I don't recall that she discussed

2  these guidelines specifically.

3    **Q    Okay.  As you sit here today --**

4    A    As we sit here today.

5    **Q    So obviously you don't have any**

6  **opinions as to Dr. Thiessen's analysis or**

7  **application of the 1998 guidelines, correct?**

8    MS. CARFORA:  Objection.  That

9  mischaracterizes her testimony.

10    A    I guess I would like to know better

11  what aspect of her analysis because I didn't

12  believe -- I mean, she conducted what I guess

13  she called risk assessments according to TSCA

14  Section 5 guidance, not the neurotox

15  guidelines, as I could tell.

16    BY MR. CONNETT:

17    **Q    Okay.  So as you sit here today, you**

18  **don't recall a discussion in her report about**

19  **these guidelines?**

20    A    I don't think the way that she

21  conducted her -- what she called a risk about,

1    you know, risk calculation was with regard to

2    these guidelines.

3        Q    Okay.  And I'm not just talking

4    about her risk characterization.  I'm talking

5    about her whole report, okay.

6        A    I'm sure she referenced them but I

7    don't recall here and now without seeing it

8    what aspects of it that she pointed to

9    specifically.

10       Q    Okay.  So since you don't recall

11   what aspects of the guidelines she may or may

12   not have cited, it's fair to say you do not

13   have any opinions about her interpretation or

14   application of the guidelines?

15           MS. CARFORA:  Objection.  That

16   mischaracterizes her testimony.

17       A    Again, I would rather have you show

18   me something specifically that she did.  I

19   don't recall anything specific about the

20   guidelines portion.

21

```
 1        BY MR. CONNETT:

 2        Q    Okay.  That's fair because today

 3   it's our opportunity to understand your

 4   opinions that obviously you already have

 5   developed, so I think you have answered my

 6   question.  You do not have opinions on

 7   Dr. Thiessen's application of her discussion

 8   of the guidelines.

 9             MS. CARFORA:  Objection,

10   mischaracterizes testimony.

11        BY MR. CONNETT:

12        Q    And if I have mischaracterized your

13   testimony, please educate me.

14        A    I don't recall any specific aspect

15   about her discussion of the neurotoxicity

16   guidelines for risk assessment.

17        Q    Okay.  And you understand,

18   Dr. Henry, that today is our opportunity to

19   understand your opinions in this case.

20        A    Yes.

21        Q    Right.  So if you have any opinions
```

 1    provided to counsel what is required of it

 2    under the rules for a nonretained expert to

 3    make counsel -- the plaintiffs aware of our

 4    experts' opinions and the underlying facts for

 5    those opinions in summary form.

 6              MR. CONNETT:  Okay.

 7          BY MR. CONNETT:

 8          Q    So one last question about the

 9    guidelines for neurotoxicity risk assessment.

10    The guidelines specifically reference this

11    concept of margin exposure as a method for

12    characterizing risk, correct?

13          A    Yes.

14          Q    Now --

15          A    Well, actually the margin of

16    exposure itself is not an expression of risk.

17    It's a calculation of the margin of exposure.

18    That is the difference between hazard and

19    exposure level.

20          Q    Okay.  And EPA uses this method --

21    this margin of exposure method to -- as a

1  basis for characterizing risk, right?

2       A    Yes, in some programs.

3       Q    Including in TSCA, right?

4       A    Yes.

5       Q    And in your rebuttal report in this

6  case, you identified margin of exposure as a

7  method EPA uses for characterizing risk under

8  TSCA, right?

9       A    Yes.

10      Q    And in a margin of exposure

11 analysis, if the calculated margin of exposure

12 is less than the benchmark margin of exposure,

13 EPA considers that to be a risk of concern,

14 correct?

15      A    It's a risk that we would consider

16 further.

17      Q    And in fact under TSCA, EPA

18 considers -- strike that.

19           Under TSCA, where the calculated

20 margin of exposure is less than the benchmark

21 margin of exposure, EPA considers that to be

1    **writings described as an unacceptable health**

2    **risk a situation where the calculated margin**

3    **of exposure is less than the benchmark margin**

4    **of exposure?**

5        A    Sitting here today, I don't recall

6    the exact construct of the words but as a

7    general principle, when you have an MOE below

8    a benchmark, that is where you think harder

9    about possibly refining the risk assessment or

10   making a risk call.

11       Q    **Okay.**

12       A    It's a generalized consideration.

13   It is not absolute.

14       Q    **As general rule, would you agree**

15   **that EPA considers it to be an unacceptable**

16   **risk when the calculated margin of exposure is**

17   **less than the benchmark margin of exposure?**

18       A    That's the starting generalization

19   but is not the end.

20       Q    **So the general rule is that where**

21   **the calculated margin of exposure is less than**

271

1    the benchmark margin of exposure, that is an

2    unacceptable health risk as a general rule?

3         A    I wouldn't call it a rule but it's

4    the general starting point for further

5    consideration.

6         Q    Okay.  And what -- remind me what is

7    the further consideration that needs to be

8    done after that?

9         A    Under TSCA?

10        Q    Yes.

11        A    You have to go beyond the risk

12   assessment and make an unreasonable risk

13   determination.

14        Q    And what do you have to do beyond

15   the margin of exposure analysis to reach the

16   unreasonable risk determination?

17        A    There are other risk-related factors

18   that may be considered.

19        Q    May be considered.  What are those

20   other risk-related factors that may be

21   considered?

1      A    The severity of the effect, the

2   reversibility of the effect, the population

3   exposed, the number of people exposed, for

4   example.

5      **Q    And would you agree that the more**

6   **people who are exposed to the chemical, that**

7   **that weighs in favor of an unreasonable risk**

8   **determination?**

9      A    I don't think that that is a general

10  rule.  I think it's context-specific so it

11  depends.

12     **Q    So why does EPA consider the number**

13  **of people exposed in doing its unreasonable**

14  **risk analysis?**

15     A    Swaying of various evidence.

16     **Q    What's the relevance for EPA to**

17  **understand the number of Americans exposed to**

18  **a chemical when it's doing its risk**

19  **evaluation?**

20          MS. CARFORA:  Objection, asked and

21  answered.

1       A     It's a consideration that we take

2   into account in moving from the margin of

3   exposure to making the unreasonable risk

4   determination.

5       BY MR. CONNETT:

6       Q     And why does EPA consider that?  Why

7   **is that factor relevant, the number of people**

8   **who are exposed to the chemical?**

9       A     It's a piece of information to

10  understand the -- how widespread the risk

11  could possibly be.

12      Q     And why is that important for EPA to

13  **understand how widespread the risk could be?**

14      A     It's a part of a risk

15  characterization to just know.  Again, under

16  TSCA there are many, many different uses and

17  so therefore there are very many different

18  exposure scenarios.  So we try to understand

19  for all of them and for the chemical as a

20  whole what kind of risk could possibly be over

21  what spatial and temporal and population

1       Q     And it says, "If the MOE

2    estimate" -- and MOE stands for margin of

3    exposure, right?

4       A     Yes.

5       Q     So it says here, "If the MOE

6    estimate was less than the benchmark MOE, the

7    exposure scenario for noncancer endpoints was

8    interpreted as a human health risk."

9       A     Yes.

10      Q     So under the analysis at that time,

11   if the calculated margin of exposure was less

12   than the benchmark margin of exposure, EPA

13   considered that a human health risk?

14      A     As a starting point, yes.

15      Q     Well, does it use the phrase "as a

16   starting point"?

17      A     No, it does not.

18      Q     Why doesn't it use the phrase "as a

19   starting point"?

20      A     Again, this was a draft that we took

21   to a peer-review panel and this is I believe

1   related to one of the questions, so yes.

2        Q    But no "as a starting point" phrase

3   in there, right?

4        A    Correct.

5        Q    Now, let's turn to page 61.  And

6   looking at the third paragraph on the page, it

7   starts by saying, "The MOE approach is one of

8   the standard approaches for noncancer risk

9   assessment."  And you agree with that, right?

10       A    Yes.

11       Q    And then if you scroll towards the

12   bottom of the paragraph, I think it's two

13   sentences from the end, it says, "If the MOE

14   is lower than the benchmark MOE, then the risk

15   is considered unacceptable," right?

16       A    Yes.

17       Q    That's a true statement, right?

18       A    That is what it says.

19       Q    And that's a true statement, right?

20       A    That is the basic construct of the

21   MOE.

1      Q     And that's exactly what you said in

2   your PowerPoint presentation that we just

3   looked at, right?

4      A     Correct.

5      Q     So this document that we're looking

6   at from 2016 says the same thing that you said

7   in your PowerPoint from 2016, right?

8      A     Correct.

9      Q     And neither of these documents use

10  the phrase "as a starting point," right?

11     A     Correct.

12     Q     Why didn't you use the phrase "as a

13  starting point"?

14     A     Because in 2016 these are

15  pre-amendment to TSCA, and as I have

16  explained, beyond the risk assessment piece

17  under the new TSCA, there's a risk

18  determination that's a separate piece.  After

19  you do the math -- which this is all talking

20  about the math -- then we move into risk

21  determination, unreasonable risk.  And so

1    there are -- it's a different piece of the

2    overall risk evaluation.

3        Q    So just so I'm clear, back in 2016

4    before the amendments were completed, was

5    it -- did you -- was it unacceptable risk

6    level as a starting point, or was it just

7    unacceptable risk level, the risk

8    characterization is done?

9        A    The risk characterization -- the

10   risk characterization, the final piece of the

11   risk assessment generally would present the

12   MOEs compared to the benchmark, as is.

13       Q    So prior to the amendment, that was

14   where EPA basically stopped the analysis on

15   risk characterization, is the MOE?

16       A    Yes.

17       Q    Okay.  Let's turn to page 67, last

18   page of this excerpt.  Do you see the first

19   sentence of the second paragraph.  It says,

20   "The MOEs presented in the document based on

21   both monitoring and modeling are mostly well

1   around the calculation, that would be higher.

2   I don't know what relatively high means

3   without seeing the body of the data.

4        Q    So the further below the benchmark

5   MOE that you are, as a general rule, the risk

6   will be greater?

7        A    That is the general context.  But

8   again, the benchmark MOE tells you a lot about

9   the uncertainty around that calculation.

10            MS. CARFORA:  Tala, do you need a

11   break?

12            THE WITNESS:  Sure.  Has it been an

13   hour already?

14            MR. CONNETT:  Just less.

15            THE VIDEOGRAPHER:  This concludes

16   media unit number five.  Time on the video is

17   3:26 p.m.  We're off the record.

18            (Recess taken from 3:26 p.m.

19            until 3:43 p.m.)

20            THE VIDEOGRAPHER:  This begins media

21   unit number six.  The time on the video is

1    3:43 p.m.  We are on the record.

2         BY MR. CONNETT:

3         Q    Okay.  So we were talking about the

4    minutes of that meeting from 2016 where the

5    then available draft risk evaluation for 1-BP

6    was discussed.  Now, on August 9th of this

7    year, EPA publicly released the draft risk

8    evaluation for 1-BP, correct?

9         A    Correct.

10        Q    And that draft risk evaluation is

11   compliant with the new requirements of TSCA?

12        A    Yes.

13        Q    Including the risk characterization

14   requirements, correct?

15        A    Yes.

16        Q    Now, in the draft risk evaluation

17   for 1-BP that was just released, EPA found --

18   concluded that there's an unreasonable risk,

19   right?

20        A    For certain conditions of use.

21        Q    And it based that conclusion on a

1    margin of exposure analysis, correct?

2       A    Partly.

3       Q    What else besides the margin of

4    exposure analysis did EPA base the

5    unreasonable risk finding on?

6       A    So if you read in the risk

7    determination piece, there are other

8    considerations that are spoken to in that

9    section.  So again, for each condition of use

10   it's somewhat slightly different.

11      Q    So what were the considerations that

12   EPA identified in the draft 1-BP risk

13   evaluation?

14      A    Say that again.

15      Q    What were the other risk

16   characterization considerations that EPA

17   identified in the draft risk evaluation for

18   1-BP?

19      A    I believe that the risk

20   determinations -- again, I don't have the

21   final document that's out there in front of me

1    but it characterizes the unreasonable risk in

2    the context of the MOE, the particular effect

3    because the effect on the toxicological

4    effects can vary by the exposure.  It talks

5    about the particular exposure circumstance

6    under the condition of use.  So those are the

7    main ones.

8         Q    Okay.  So you've identified -- well,

9    first off is the margin of exposure analysis,

10    right?

11        A    For each individual condition of use

12    and every exposure scenario under that and for

13    each relevant hazard.

14        Q    And so you have the margin of

15    exposure analysis and then you mentioned that

16    the EPA considered the toxicological effects,

17    the nature of the effects seen in animals.

18        A    Depending.  Some of the data, it may

19    have been -- it depends on the specific

20    condition of use and the exposure scenario.

21    So I can't speak to each one of those without

1    seeing it as to whether or not the database

2    was all animal or there was any human, whether

3    that be for hazard or exposure.

4        **Q    But are you aware that in the draft**

5    **evaluation document, EPA says that the point**

6    **of departure for the MOE analysis is animal**

7    **data?  Are you aware of that fact?**

8        A    Yes.

9        **Q    And are you aware that EPA in the**

10   **draft risk evaluation said that there's only**

11   **three epidemiological studies on 1-BP?**

12       A    Again, without seeing the final,

13   final document, I can't say.

14       **Q    What's your understanding as to how**

15   **many epidemiological studies have been**

16   **conducted on 1-BP in adverse human health**

17   **effects?**

18       A    Again, I don't have the specific

19   data set.  I am not that familiar with that.

20       **Q    Okay.  So just going back to the**

21   **risk characterization part of it, I am a**

 1   **little unclear on what other considerations**

 2   **EPA --**

 3       A    So that is the risk determination is

 4   what we were talking about previously and I

 5   did find it in the rule where we speak to

 6   that.  In making the risk determination, we

 7   may weigh a variety of factors.

 8       Q    **What page are you on?**

 9       A    I am on page 33735, left-handmost

10   column, last full paragraph.

11       Q    **Okay.**

12       A    So again, the risk characterization

13   is the end of the risk assessment.

14       Q    **Okay.**

15       A    Then you move on to risk

16   determination under TSCA.  It's an extra piece

17   that goes into a risk evaluation.  So these

18   are the unique aspects of TSCA.  So it says

19   that we will consider relevant factors

20   including but not limited to effects of the

21   chemical substance on health and human

1    exposure to such substance under the

2    conditions of use, including cancer or

3    noncancer.

4           And of course that is as relevant,

5    the effects of the chemical substance on the

6    environment and environmental exposure under

7    the conditions of use, the population exposed,

8    including any susceptible populations, the

9    severity of the hazard, which could be the

10   nature of the hazard or the -- I said

11   reversibility, here it says irreversibility --

12   and uncertainties.

13       Q    Okay.

14       A    So these -- and again, this is the

15   short list, if you will, but we're not

16   necessarily limited to that, recognizing that

17   given any particular chemical and database,

18   there may be other risk-related

19   considerations.

20       Q    What were the -- what was the hazard

21   or hazards that EPA based its unreasonable

1    risk determination on for the 1-BP chemical?

2         A    Again, I don't know all of the

3    various endpoints that are included in that

4    risk evaluation.

5         Q    Can you give me -- can you cite for

6    me any --

7         A    Neurotoxicity is one endpoint.

8         Q    Okay.  And what was the neurotoxic

9    effect specifically?

10        A    I don't know that without seeing the

11   assessment.

12        Q    Would you agree that neurotoxicity

13   is in terms of -- is a serious hazard?

14        A    Again, I don't know what the

15   definition means.

16        Q    In terms -- would you agree that

17   impairment of learning and memory is a severe

18   effect?

19        A    Again, you're putting, like, words

20   on that don't have a definition as far as sort

21   of a dose-response or a reversibility

1    component or any such thing so I can't really

2    answer.

3        Q    So -- because one of the

4    considerations here is the severity of the

5    hazard.  So would a chemical --

6        A    Yes, the severity could be the

7    nature and the reversibility.

8        Q    So impairment in learning and

9    memory, would that satisfy or would that be

10   considered a severe effect by EPA to your

11   knowledge?

12       A    I don't think that we have a scale

13   where various endpoints are put on.  Again, we

14   have to understand the chemical, its database,

15   on what certainty is there to really

16   understand and gauge these kinds of things.

17       Q    Okay.  So for the 1-BP risk

18   evaluation, which of these factors supported

19   EPA's determination of unreasonable risk?

20       A    Well, certainly the hazards, the

21   effects and the exposures.  I am not familiar

1    as we sit here today if any specific

2    subpopulations were identified in that

3    particular assessment and I don't know if they

4    spoke to anything around irreversibility, for

5    example.

6         Q    Okay.  So EPA based the benchmark

7    margin of exposure on a point of departure

8    derived from animal data, correct?

9         A    I believe so.

10        Q    So is it EPA's position --

11        A    Multiple, though.

12        Q    Multiple animal studies, correct?

13        A    And I think different endpoints

14   possibly as well.

15        Q    Okay.  Is it EPA's position in

16   reaching that unreasonable risk determination

17   that there is conclusive proof that 1-BP

18   exposure causes adverse effects in human

19   beings?

20             MS. CARFORA:  Objection to form.

21        A    I can't answer that.  I don't think

1    that is how we would say it.

2         BY MR. CONNETT:

3         **Q    So do you agree that -- strike that.**

4              **Does EPA need conclusive proof that**

5    **a chemical causes harm in human beings to make**

6    **an unreasonable risk determination?**

7         A    No.

8              MS. CARFORA:  Objection, form.

9         A    Again, I'm not here to speak for

10   EPA.

11        BY MR. CONNETT:

12        **Q    Based on your knowledge, was your**

13   **answer no?**

14        A    Yes.

15        **Q    So EPA does -- just to be clear,**

16   **EPA -- is it correct that EPA does not need**

17   **conclusive proof that a chemical causes harm**

18   **in human beings to make an unreasonable risk**

19   **determination?**

20             MS. CARFORA:  Objection, form.

21        A    Again, you have to -- it's got to be

1  asked in the context of specific chemicals and

2  databases.  I mean, there is an assumption

3  that animal studies -- effects in animal

4  studies are a proxy that can be used in risk

5  assessment to predict effects in humans.

6       BY MR. CONNETT:

7       **Q    Right, and that's what EPA did with**

8  **its 1-BP risk evaluation, right?**

9            MS. CARFORA:  Objection to form.

10      A    To the best of my knowledge today.

11      BY MR. CONNETT:

12      **Q    But I want to be clear on this and I**

13  **think you've answered it already, but just to**

14  **be clear, does EPA need conclusive proof that**

15  **a chemical causes harm in human beings before**

16  **it will make an unreasonable risk**

17  **determination?**

18            MS. CARFORA:  Objection, form.

19      A    Again, I can't speak for EPA and

20  I -- we haven't made unreasonable risk

21  findings very often thus far.

```
 1        BY MR. CONNETT:

 2        Q    Well, in the 1-BP draft --

 3        A    A draft.

 4        Q    -- did EPA conclude that there is

 5   conclusive proof that 1-BP causes adverse

 6   effects in human beings?

 7        A    I would have to see the document to

 8   see if those words were said.  I doubt that is

 9   what it said.

10        Q    Okay.  And would you agree that in

11   making the unreasonable risk determination,

12   EPA can rely solely on animal data?

13        A    Yes.

14        Q    And if you can turn back to the

15   minutes that we were looking at before.  If

16   you go to the last page, page 67 -- I'm sorry,

17   page 61.

18        A    Sixty-one?

19        Q    Yes.  And I am looking towards the

20   bottom of this middle paragraph.  And EPA

21   states that, "Animal evidence is relevant to
```

1    humans unless data counterindicate."

2            Do you see that?

3        A    The way I read this is this is the

4    committee's response to our charge question.

5        Q    Okay.  So the committee is stating

6    here that animal evidence is relevant to

7    humans unless data counterindicate; do you see

8    that?

9        A    Yes.

10       Q    Do you agree with that?

11       A    That is what our guidelines say.  It

12   is one of the assumptions in EPA's risk

13   assessment guidances that animal data -- we

14   assume that effects observed there are

15   relevant to humans unless other data indicate

16   otherwise.

17       Q    Okay.  You would agree that there's

18   far more epidemiological data associating

19   fluoride with adverse neurotoxic effects in

20   humans than is the case with 1-BP?

21           MS. CARFORA:  Objection, foundation.

1    for and reviewed.

2        **Q    Do you have any reason to believe**

3    **that that NRC assessment of fluoride exposure**

4    **in the United States was anything but**

5    **reliable?**

6        A    At the time it was performed, I

7    don't have any evidence to not think it's not.

8        **Q    Are you criticizing Dr. Thiessen for**

9    **relying on the NRC report for her assessment**

10   **of exposure in the United States?**

11       A    What I said is she did not provide

12   any evidence that she's searched and

13   summarized or reviewed -- she didn't present

14   any findings of the literature, she did not

15   present any evaluation or review of exposure

16   assessment but purports to conduct a risk

17   evaluation.

18       **Q    Are you aware of any published data**

19   **subsequent to the NRC review that contradicts**

20   **NRC's estimates as to exposure to fluoride?**

21       A    No, I am not.

1      Q      Would you say that the NRC review of

2  exposure to a chemical substance is the type

3  of material that qualifies as best available

4  science?

5      A      Yes.

6      Q      Now, you also criticize Dr. Thiessen

7  for doing an analysis with respect to the RfD

8  for fluoride, right?

9      A      Yes.

10     Q      What's your understanding as to why

11  Dr. Thiessen analyzed the RfD?

12     A      You mean why she derived one?

13     Q      No.   Why she analyzed and critiqued

14  the current -- or the proposed RfD from 2010.

15  What's your understanding as to why she did

16  that?

17     A      I really couldn't figure out why she

18  did that pertinent to this case.

19     Q      So you understand that that RfD that

20  EPA established in 2010 is the dose that the

21  EPA tells the American public every day is

1    is that Dr. Thiessen used criteria that are

2    generally applied for Section 5 analyses,

3    right?

4        A    The criteria as well as the entire

5    procedure, yes.

6        Q    Now, do you dispute that fluoride

7    would qualify as a high health hazard under

8    the Section 5 factors?

9        A    Again, I would need to see all the

10   data arrayed to make that call.

11       Q    So you don't have an opinion one way

12   or the other whether fluoride would satisfy

13   the Section 5 criteria?

14       A    Not here today.

15       Q    Okay.  Now, on page 22 of your

16   report you state that this entire section of

17   Dr. Thiessen's report is "flawed in that it

18   claims to support an unreasonable risk

19   determination using risk assessment approaches

20   and a regulatory framework that EPA uses for

21   new chemicals rather than for existing

1  chemicals," right?

2        A    Right.

3        Q    But Dr. Thiessen also used an MOE

4  analysis, correct?

5        A    Sitting here at this moment, I don't

6  recall.

7        Q    Okay.  Fair enough.  So let's move

8  on to some of your criticisms of

9  Dr. Grandjean's report, and let's turn to

10  page 23.  And the first full sentence of the

11  page you say, "It is Dr. Henry's opinion that

12  Dr. Grandjean selectively cited literature

13  including data from his own publications to

14  support bias and preconceived conclusions

15  about the neurotoxicity of fluoride."

16        A    Correct.

17        Q    Is that your opinion, Dr. Henry?

18        A    Yes.

19        Q    Did you read the reports that were

20  written by EPA's experts, Charlotte Lewis and

21  Gary Slade?

1    is to have a topical effect."  Doesn't address

2    ingestion at all.

3        Q    They're saying that the primary

4    benefit of fluoridated water in caries

5    prevention comes through topical content.

6        A    The primary function --

7            MS. CARFORA:  Objection, asked and

8    answered.

9        A    The primary function of fluoride in

10   drinking water in reducing tooth decay is

11   topical.

12       BY MR. CONNETT:

13       Q    Okay.  Do you have any reason to

14   disagree with that statement?

15       A    No.

16       Q    Now, further on down the page, you

17   say at -- actually it's the second paragraph

18   of that section.  You say that, "Dr. Grandjean

19   makes conclusions by applying methods for

20   standards setting routinely used by EPA but

21   then applies methods used to derive a maximum

 1    contaminant level in drinking water under the

 2    Safe Drinking Water Act."

 3              Did I read that correctly?

 4        A    Yes.

 5        Q    What methods are you referring to

 6    there?

 7        A    In which part?

 8        Q    You say that Dr. Grandjean applies

 9    methods used to derive a maximum contaminant

10    level.  What methods are you referring to?

11        A    The OW methods.

12        Q    And which methods that Dr. Grandjean

13    used are you referring to?

14        A    Well, again, both of these reports

15    were premised on making a case under TSCA.  So

16    he says he's going to apply methods for

17    standards setting routinely used by EPA.

18              So one would have thought in a

19    report about TSCA that he would go under there

20    but instead, he switches and goes back over to

21    the MCL under SDWA.

1    Q    Okay.  So just I am asking you what

2    methods did he apply that in your terms are

3    used to derive a maximum contaminant level?

4    A    He applied the MCL methods.

5    Q    What methods?

6    A    The Office of Water methods.

7    Q    Yes, but I am saying which methods

8    did Dr. Grandjean use in his analysis that in

9    your view are methods to be used for deriving

10   a maximum contaminant level, not methods to be

11   used to derive an unreasonable risk

12   determination.

13   A    He starts with deriving RfD, which

14   is not what we do under TSCA, and then goes on

15   from there.

16   Q    So it's your testimony that

17   Dr. Grandjean did an analysis to determine

18   the RfD?

19   A    Yes.

20   Q    Okay.  And so --

21   A    Although he may refer to -- I forget

1    if he refers to Thiessen but again, he is over

2    in the mindset of driving an MCL, not a TSCA.

3    That's my recollection of his presentation.

4        **Q    So it's your recollection, and I've**

5    **asked you to identify for me the methods that**

6    **in your view are used to derive -- strike**

7    **that.**

8            **Besides his RfD analysis, can you**

9    **point me to any other methods that**

10   **Dr. Grandjean used that in your view are used**

11   **to derive an MCL and not an unreasonable risk**

12   **determination?**

13       A    He is basically doing a maximum

14   contaminant level which is a water

15   concentration.

16       **Q    And how is he doing that?  What**

17   **about his analysis leads you to --**

18       A    I don't have the report right in

19   front of me.  If you want to refresh my memory

20   I can look quickly, but he's basically

21   seemingly rederiving the MCL, not deriving a

1    margin of exposure for TSCA.

2         Q    And you understand you've been

3    identified as an expert in this case, right?

4         A    Yes.

5         Q    And you understand that today is my

6    opportunity to understand the bases of your

7    opinion; do you understand that?

8         A    Yes.

9         Q    This is an opinion that's been

10   identified as coming from you, okay.  So now

11   it's my time and opportunity to understand

12   what that opinion's based on, okay.

13        A    Right.

14        Q    So I have asked you to tell me which

15   methods you're referring to here and you've

16   told me that it's an RfD analysis that

17   Dr. Grandjean did.

18        A    An MCL analysis.  So he is ambiguous

19   about applying methods for standards setting

20   routinely used.  And then he basically goes on

21   and goes down the drinking water path.

1      Q      Which particular methods that

2  Dr. Grandjean used are in your view limited to

3  deriving MCL, not --

4      A      I would have to look back at exactly

5  what he presented versus Thiessen, but both of

6  them as I recall spend a fair bit of time on

7  RfD which we explain -- I explain isn't

8  something that we -- that's not the construct

9  of the hazard assessment that we do under

10  TSCA.

11      Q      Okay.  Now, Dr. Grandjean in his

12  report, he did a BMD analysis; do you

13  understand that.

14      A      Okay.  That's right.  He didn't

15  provide the data, however, as I recall.

16      Q      He did a BMD analysis.

17      A      Thank you for the reminder, yes.

18      Q      So is it your testimony that a BMD

19  analysis is irrelevant to a TSCA risk

20  evaluation?

21      A      No.

1    **Q     Would you agree that EPA does BMD**

2    **analyses in making a risk determination under**

3    **TSCA?**

4         A     Yes.  My critique of his BMD

5    analysis was that he stated it was based on

6    data which he did not present or provide to us

7    so we could not possibly even look at that.

8         **Q     Where is that criticism that you**

9    **have just stated?  Where is that provided in**

10   **your written report?**

11        A     It's going down the path of MCL.

12        **Q     I want you -- you can take your**

13   **time.  I want you to read this and tell me**

14   **where that criticism is identified in this**

15   **report.  And I can tell you that your analysis**

16   **of Grandjean is on page 22 to 24.  So take**

17   **your time, look at this and tell me where you**

18   **make that statement.**

19             MS. CARFORA:  There's also a summary

20   of opinions on page one, Counsel, if you're

21   pointing her to --

1        BY MR. CONNETT:

2        Q    Fine.  Look at page one too.

3        A    Say what?

4        Q    If you look at page one and page 22

5    to 24, tell me where you provide that

6    criticism that you just stated in this report.

7        A    So on part A of 22 that he is not

8    providing -- he's not supported his

9    presentation of the scientific information

10    under anything about the peer review.  Again,

11    he didn't even provide the data, let alone

12    what reference it came from.

13        Q    Point me to the specific sentence

14    you're referring to.

15        A    It's midsentence, "Dr. Grandjean's

16    statement is not supported by his presentation

17    of the scientific information."

18        Q    Well, you're referring here to

19    Dr. Grandjean's statement about following the

20    general approaches used by the World Health

21    Organization and EPA, right?

1      Q      But you didn't read any of the

2  underlying studies except for about three or

3  four or five, right?

4      A      That's right.

5      Q      So you're just trusting Dr. Chang

6  and Dr. Tsuji in their assessment of the

7  literature, right?

8      A      They provided pretty extensive

9  reviews -- summaries of the reports and were

10  very transparent about the strengths and

11  limitations of those reports.

12      Q      Okay.  The next page, page 14, you

13  have a similar conclusory statement with

14  respect to risk characterization, right?

15      A      Right.

16      Q      You don't provide any explanation

17  for how you reached that conclusion that

18  there's not enough evidence to conclude that

19  fluoridation presents a developmental

20  neurotoxic risk, right?

21      A      The point here is that because we

1        A    Yes.

2        Q    And this is subsection -- this is

3    sometimes referred to as Section 6(c) of TSCA,

4    right?

5        A    Right.

6        Q    And Section 6(c)(2) identifies

7    the -- what does Section 6(c)(2) identify?

8        A    The requirements for the rule.

9        Q    And these -- the factors listed in

10   Section 6(c)(2)(A) are the costs and nonrisk

11   factors that EPA can consider in the risk

12   management phase, correct?

13       A    Yes.

14       Q    And these costs and nonrisk factors

15   include the benefits of the chemical substance

16   or mixture for various uses?

17       A    Can you point where you're talking

18   to?  Oh, this is for an actual 6(c) -- a risk

19   management rule.  You can -- this is what you

20   can consider in the rulemaking.

21       Q    Okay.  In the rulemaking, which is

1  factors identified in Section 6(c), right?

2      A    Yes.  [Inaudible] cost.

3      Q    And these costs and nonrisk factors

4  include the benefits of the chemical substance

5  or mixture?

6      A    Yes.

7      Q    And these costs and nonrisk factors

8  include the reasonably ascertainable economic

9  consequences of the rule, correct?

10     A    Yes.

11     Q    And the reasonably ascertainable

12 economic consequences of the rule include the

13 likely effect on public health, correct?

14     A    Are you under little (iv)?

15     Q    Yes.

16     A    "The likely effect on the national

17 economy, small business, technological

18 innovation, the environment and public

19 health," correct.

20     Q    Okay.  And these risk management

21 considerations, these factors are only to be

1    considered as part of the risk management rule

2    or the risk management process, right?

3        A    Correct.

4        Q    And in your initial report you talk

5    about how EPA, if the court was to find an

6    unreasonable risk, EPA may consider as part of

7    its rulemaking proceeding whether an exemption

8    applies under Section 6(g), correct?

9        A    Correct.

10       Q    And you specifically talk about the

11   exception under 6(g)(1)(C), right?

12       A    Yes.

13       Q    And that exception refers to a

14   situation or refers to the specific condition

15   of use of the chemical substance or mixture as

16   compared to reasonably available

17   alternatives -- sorry, strike that.  I'll ask

18   that again.

19            Under this exemption, EPA can issue

20   an exemption if "the specific condition of use

21   of the chemical substance or a mixture as

1    compared to reasonably available alternatives

2    provides a substantial benefit to health, the

3    environment or public safety," right?

4         A    Right.

5         Q    So in that -- in consider --

6         A    It's really more an exemption from

7    whatever regulatory remedy is being proposed

8    in the rule.  It's not issuing an exemption

9    per se, but get with the lawyers on that.

10        Q    Okay.  So basically what you mean

11   there is if the court finds there's an

12   unreasonable risk, EPA could assess whether

13   water fluoridation provides a substantial

14   benefit to health as compared to reasonably

15   available alternatives.  And if EPA makes that

16   conclusion, EPA could exempt fluoridation

17   chemicals from the regulation; is that

18   correct?

19        A    If that specific condition of use,

20   compared to reasonably available alternatives,

21   provides a substantial benefit to health, yes.

1      Q     And that's the first -- you wouldn't

2   consider this exemption.  You wouldn't do this

3   analysis until this evaluation phase is

4   complete, correct?

5      A     Yes.

6      Q     That's correct?

7      A     Yes.

8      Q     So EPA -- in doing a risk evaluation

9   of fluoridation chemicals, EPA cannot consider

10  the economic costs of banning fluoridation

11  until the rulemaking phase of the analysis,

12  correct?

13     A     Correct.

14     Q     And EPA cannot consider the benefits

15  of fluoridation chemicals until the rulemaking

16  phase of the analysis, correct?

17          MS. CARFORA:  Objection, form.

18     A     Again, I think there is -- I can't

19  speak on behalf of EPA.

20     BY MR. CONNETT:

21     Q     But based on your understanding --

1    A    But there are different -- I think

2  benefits can be different things.  There's

3  different kinds of benefits and it's not clear

4  to me that health -- like if something

5  prevents a disease.  I'm not sure.  I just

6  don't know if that can be considered.  It

7  hasn't come up.

8    **Q    As you sit here today, you do not**

9  **know one way or the other whether EPA can**

10  **consider fluoride's effects on caries**

11  **prevention as part of the risk evaluation?**

12    A    No, I think that if there was an

13  endpoint such as the severe dental fluorosis,

14  that is an adverse effect that can be

15  considered in the risk evaluation.

16    **Q    What about caries prevention?  Can**

17  **that be considered, that benefit of caries**

18  **prevention?**

19    A    That's not typically how it would be

20  done.  We would be looking for a dose-response

21  to find an adverse effect and protect against

1    that.

2         Q    So the question of benefits for

3    caries prevention would be -- would come up in

4    the rulemaking proceeding?

5         A    Yes.

6         Q    And -- but let's just to say --

7    let's just say, hypothetically speaking, that

8    the EPA can consider caries prevention as part

9    of the risk evaluation.  Are you with me so

10   far?

11        A    Okay.

12        Q    Would the require -- the same

13   scientific standards that applied to risks

14   apply to the assessment of the caries

15   prevention?

16        A    So again, I don't have any

17   experience in which -- in a risk assessment.

18   Basically the flip side of risk was considered

19   so I really don't have a basis on which --

20   anything to gauge that by.

21        Q    Okay.

1    A    Again, that doesn't have any context

2   whatsoever.  What do you mean by damaging of

3   the brain?

4    **Q    Okay.  Well, let me give you some**

5   **additional context.  That the damage to the**

6   **developing brain is reflected in a loss of IQ**

7   **of two points, okay.  Do you have any opinion**

8   **as to whether that effect on the brain that**

9   **results in a demonstrable loss of IQ is an**

10   **acceptable trade-off for preventing half a**

11   **tooth surface of -- from decay?**

12    A    I don't have an opinion.  Again,

13   the -- I don't think anyone should have to

14   lose any IQ points for any environmental

15   reason.  However, the decision around water

16   fluoridation is something that is done by

17   communities with whatever criteria they weigh

18   it.

19        So I don't really want to interject

20   an opinion upon those decisions made by the

21   U.S. public.

1  with that principle?

2       A    I think that we should look for --

3  if there are adverse effects, at what levels

4  that occurs and essentially conduct risk

5  assessment.

6       Q    And do you agree that the chemicals

7  added to drinking water should not cause harm

8  to the brain at the levels they are added?

9       A    That's how we would do it.  In my

10  experience, we would look for, again, all the

11  endpoints possible.  If that's one of the

12  endpoints and it's one of the most sensitive

13  endpoints, we would in a fact try to find the

14  no-effect level.

15       Q    So do you agree with that principle

16  that the chemicals we add to drinking water

17  should not damage the brain at the levels that

18  they are added?

19       A    We should -- as far as calculating

20  risk, we would look for a no-effect level.

21  Again, as we have discussed multiple times

1   now, under SDWA and under TSCA, when you get

2   to the risk management phase, other

3   considerations may prevail.

4       Q    Do you agree that chemicals that are

5   added to drinking water should not cause

6   reductions in IQ at the levels that they are

7   added?

8       A    Yes, I don't think that anyone

9   should lose IQ points.  But again, it's not my

10  decision.  That's my personal opinion but

11  that's not the full story.

12      Q    Okay.  Now, you had talked earlier

13  about -- when I was asking you about the

14  research that the NRC had recommended to be

15  done on fluoride; do you remember that?

16      A    Yes.

17      Q    And the NRC had recommended studies

18  to be done on IQ, on dementia and thyroid

19  disease; do you remember that?

20      A    Correct.

21      Q    And your response to -- when I asked

1      Q     Subsequent to July 20th, 2017, has

2   EPA given any consideration as to any

3   inorganic fluoride chemical including but not

4   limited to sodium fluoride qualifies as a

5   high-priority substance under the new rule?

6      A     Not to my knowledge.

7      Q     Okay.  And that would include

8   fluorosilicic acid, okay.

9      A     Yes.

10      Q     And your answer is the same?

11      A     Not to my knowledge.

12      Q     Okay.  Now, Dr. Tsuji -- I'm not

13   sure if I'm pronouncing the name right -- am

14   I?

15           MS. CARFORA:  That's right.

16      BY MR. CONNETT:

17      Q     You've read Dr. Tsuji's review?

18      A     Yes.

19      Q     Is it your opinion that Dr. Tsuji

20   performed a risk evaluation that's compliant

21   with EPA's risk evaluation rule?

1    assuming they have the same hazard profile.

2        Q    Right.  Same exact hazard profile

3    but one is in the drinking water of 200

4    million people, water, and one is in the

5    drinking water of 5,000 people; are you with

6    me?

7        A    Yes.

8        Q    Of those two chemicals, which would

9    you prioritize for further research?

10       A    Again, my personal opinion would

11   still -- I would still need more facts around

12   what if the one research or, you know, took 55

13   years to complete with methods that we don't

14   even have available versus one that we could

15   very quickly fill the data gaps for.

16       Q    Do you understand what the phrase

17   "all else being equal" means?  Do you

18   understand that phrase?

19       A    Yes.

20       Q    So all else being equal, if

21   chemical A is in the drinking water of 200

1    Q    So just to be clear, it's your

2    opinion that Congress gave you three and a

3    half years to finish the risk assessment or

4    the risk evaluation process under TSCA and

5    then an additional one year to complete risk

6    management?

7    A    To propose and then finalize within

8    another year.

9    Q    So it's just one year to propose the

10   risk management rule and then one additional

11   year to finalize that rule?

12   A    Yes.

13   Q    So from start to finish under the

14   timeline provided by Congress in the TSCA

15   statute, or I should say in the TSCA, it could

16   take you five and a half years to go from

17   prioritization all the way to --

18   A    That doesn't count prioritization.

19   Prioritization is a front step to that and the

20   law dictates that that must take no shorter

21   than nine months and no longer than 12.

1    the pieces together outside of a regulatory

2    context.

3        Q    So just based on your experience, is

4    it your opinion that risk assessment is

5    necessary in the regulatory context to -- for

6    the purpose of making policy decisions?

7        A    Certainly under TSCA and I think

8    it's become more or less the practice and the

9    expectation under a number of environmental

10   statutes that EPA implements.

11       Q    What's the basis for your opinion

12   that risk assessment is necessary in a policy

13   context under TSCA?

14       A    TSCA Section 6 directs us to conduct

15   a risk evaluation to support any rulemaking

16   under Section 6.

17       Q    So you -- would you agree that there

18   are regulatory and/or -- strike that.

19            Would you agree that there are

20   policy decisions that have to get made in the

21   context of risk assessments?

1    A    Yes.

2    Q    And could you give me an example of

3    what one of those -- what one of those

4    regulatory or policy decisions would be?

5    A    There is quite a few sort of what we

6    would call science policy decisions that go

7    into just the conduct of a risk assessment.  I

8    mean, not everything's predefined as to what

9    parameters to select, what approach to take to

10    characterize a certain effect.

11         So I mean, again, a policy decision

12    might be here is some data, we could do a

13    NOAEL/LOAEL approach or we could do BMD

14    modeling.  That's sort of a science policy

15    decision on which way to go.

16    Q    So, I mean, I think we talked

17    earlier that there are guidelines that exist

18    that EPA has published that technically

19    speaking its program should generally follow;

20    is that right?

21    A    Generally follow.  But again, I

1    do any of the chemicals under review have

2    health benefits?

3        A    Again, I haven't read each and every

4    one cover to cover but I would say, as a

5    toxicologist, I highly doubt it.

6        Q    So as of right now there would be no

7    template or example that you could use in

8    applying health benefits for a chemical that

9    might have them?

10            MR. CONNETT:  Vague and ambiguous.

11       A    No.  And again, I think that there

12   would need to be internal discussion with

13   counsel as to whether or not and how that

14   would even be possible.

15       BY MS. CARFORA:

16       Q    So based on your experience and your

17   opinion, is it true that noneconomic health

18   benefits could potentially be considered in a

19   risk evaluation?

20            MR. CONNETT:  Asked and answered

21   and -- asked and answered.

1    A    Again, I don't know for sure.

2    BY MS. CARFORA:

3    **Q    And based on your experience and**

4    **your opinion, could noneconomic health**

5    **benefits be considered as a risk factor?**

6         MR. CONNETT:  Asked and answered.

7    A    Noneconomic health benefits.  I

8    don't know.  Again, it's not a bridge we've

9    crossed so we have not deliberated over this

10   but I don't believe -- again, we would have

11   to -- the law is quite explicit about nonrisk

12   factors not being considered in risk

13   evaluation.

14   BY MS. CARFORA:

15   **Q    Is it your understanding that --**

16   **strike that.  I am going to withdraw that.**

17        **I just want to very quickly ask you**

18   **to clarify if you turn to your rebuttal**

19   **summary and tell me what the exhibit number**

20   **is.**

21   A    220.

1      Q      Okay.  But certainly for the

2    majority of them, they are not limited to a

3    single condition of use, correct?

4      A      That is correct.

5      Q      And are you offering any opinions in

6    this case on the extent of the risk to health

7    or the environment posed by these ten

8    chemicals undergoing risk evaluation?

9      A      No.

10      Q      Are you offering any opinions in

11    this case on the extent of the risk to health

12    or environment posed by those ten chemicals as

13    compared to the extent of the risk presented

14    by fluoridation chemicals?

15      A      No.

16      Q      Now, systematic review.  Are you

17    aware of any studies that have attempted to

18    assess the reproducibility of systematic

19    reviews that incorporate the key elements

20    identified by the NRC?

21      A      The reproducibility like of the

1    **Q    They were not identified on the list**

2    **of 1,245.  Okay.**

3         A    Not as stated.

4              (Videographer left the room.)

5         **Q    And --**

6              MS. CARFORA:  I just want the record

7    to reflect the videographer just left the

8    room.

9              COURT REPORTER:  His car's been

10   locked in the garage.

11             MS. CARFORA:  Okay.  I just want the

12   record to reflect -- I just want on the record

13   that he's left the room and it's still

14   running.

15             MR. CONNETT:  Right.

16        BY MR. CONNETT:

17        **Q    Now, these 90 chemicals that were**

18   **ultimately identified in the 2014 work plan**

19   **document, are you offering any opinions in**

20   **this case as to the extent of the risk to**

21   **health or environment posed by those 90**

1    **chemicals?**

2         A    No.   And EPA's very explicit in the

3    work plan that that list does not constitute a

4    risk evaluation or risk assessment.

5         **Q    How many draft risk evaluations of**

6    **these first ten chemicals has EPA produced so**

7    **far?**

8         A    I believe four, although the fourth

9    one I don't have 100 percent certainty as to

10   whether it's left the building, so to speak.

11        **Q    So the violet --**

12        A    Pigment violet 29.

13        **Q    1-BP?**

14        A    Yes.

15        **Q    And what are the other two drafts?**

16        A    HBCDs, hexabromocyclododecane was

17   peer reviewed, as well as was it 1-BP we just

18   did?

19        **Q    Yes, we mentioned 1-BP.   HBCD, has**

20   **that been -- has that draft been released to**

21   **the public?**

1   evaluation under the conditions of use.

2   That's the whole purpose.

3           So again, it's sort of like what we

4   call a screening process.  We consider some of

5   the same information.  So sort of a risk-based

6   prioritization, but the level of data

7   gathering and evaluation for that type of a

8   process that has to be done in that short of a

9   time is far, far less than what you need to do

10  in a risk evaluation.

11      BY MS. CARFORA:

12      **Q     Do you have an opinion on whether**

13  **the alleged risk of fluoride is less than the**

14  **risks known for the chemicals on the work**

15  **plan?**

16          MR. CONNETT:  Asked and answered,

17  lack of foundation and overbroad.

18      A     Having not conducted a risk

19  evaluation on any of them, no.

20      BY MS. CARFORA:

21      **Q     Because it would be impossible; is**

1    that right?

2           MR. CONNETT:  Leading.

3       A    Well, again, we haven't gone through

4    the process.  Any of them.  With fluoride, we

5    have not done prioritization, nor have we done

6    a risk evaluation.  We also haven't done --

7    completed a risk evaluation on any TSCA

8    chemicals on the work plan.

9       BY MS. CARFORA:

10      Q    Could you rank the alleged risk to

11   fluoride among the 90 chemicals on the work

12   plan?

13          MR. CONNETT:  Lack of foundation.

14      A    No.

15      BY MS. CARFORA:

16      Q    Why not?

17      A    Because it's not a risk assessment.

18   There's hazard is considered an exposure but

19   they're never integrated together.  They're

20   just scored separately.

21      Q    What do you mean by scored

1    separately?

2        A    Well, again, they were but in our

3    new process, we are to consider them but it

4    doesn't say do a risk assessment, it says

5    consider hazard, consider exposure, consider

6    persistence, consider bioaccumulation.

7        Q    **And you have considered all of those**

8    **things for the 90 chemicals on the work plan;**

9    **is that right?**

10       A    At a point in time back in 2011

11   or '12.

12       Q    **And in your understanding has EPA**

13   **ever considered those things for fluoride?**

14       A    No.  Not in this program.

15       Q    **And do you know why EPA has not done**

16   **that?**

17       A    Again, when we made the work plan,

18   the two fluoride chemicals that were

19   previously measured did not show up on any of

20   the lists that we used as the source of the

21   potential candidates.

1    we've been talking about, the source of

2    information that EPA looked to for

3    neurotoxicity was IRIS, right?

4        A    Yes.

5        Q    Do you know when EPA's IRIS division

6    did its assessment for fluoride?

7        A    I believe it was quite a while ago.

8    In the '80s perhaps.

9        Q    And it was focused on dental

10   fluorosis or used dental fluorosis as the

11   critical effect?

12       A    I have not read it so I cannot say.

13       Q    Okay.  I take it EPA never, during

14   this work plan process, never consulted with

15   the EPA scientists in the neurotoxicology

16   division, correct, on fluoride?

17       A    Not that I am aware.

18       Q    Okay.  Were you aware -- was anyone

19   at TSCA aware that the EPA scientists in the

20   neurotoxicology division identified fluoride

21   as having substantial evidence of

1     developmental neurotoxicity?

2          A     I was not aware.

3          Q     Okay.  If -- okay.  Now, of the ten

4     chemicals currently undergoing risk evaluation

5     at EPA under TSCA, can you identify for me any

6     chemical on that list which has greater

7     exposure potential in the United States than

8     fluoridation chemicals?

9          A     I cannot.  I don't have the facts

10    and figures in front of me for any of them.

11         Q     But you have some understanding

12    being involved with this process.  You have

13    some understanding as to the nature of the

14    chemicals being reviewed, right?

15         A     To some degree.

16         Q     So based on your understanding as to

17    the ten chemicals that are being evaluated

18    right now, can you identify for me any

19    chemical where there is greater potential

20    exposure than with fluoridation chemicals?

21         A     Without again looking at the

1    exposure assessment for all of them, I cannot.

2        Q    Can you -- of those ten chemicals,

3    do you have any reason to believe that any of

4    those chemicals has an exposure potential of

5    200 million Americans?

6        A    Again, I don't have the figures in

7    front of me.  Some of these chemicals have a

8    very large number of uses so depending on

9    who's using them, I just don't know.  It's

10   possible.

11       Q    Of these ten chemicals that are

12   currently being evaluated, do any of these

13   chemicals have prospective cohort studies

14   linking the chemical to adverse effects in

15   human beings?

16       A    Asked and answered, but not to my

17   knowledge.

18       Q    So not to your knowledge, correct?

19       A    Right.  I don't know.

20       Q    Okay.  Did you say that EPA has now

21   identified the second batch of high-priority

1  chemicals that will be going for risk

2  evaluation?

3      A    We have identified a list of 20 that

4  we are considering as candidates for

5  prioritization.

6      Q    Of those 20 chemicals, are you -- do

7  any of those chemicals have prospective cohort

8  studies linking them to adverse effects in

9  humans?

10      A    I don't have that knowledge.

11      Q    Of those 20 chemicals, is there any

12  chemical where there is an exposure potential

13  in the United States of 200 million or more

14  Americans?

15      A    I don't have that knowledge, and

16  again in the prioritization process I, would

17  not expect that we would have that level of

18  detail information.

19          MR. CONNETT:  Okay.  I have no

20  further questions.

21          MS. CARFORA:  The deposition is

1    STATE OF MARYLAND

2    HOWARD COUNTY

3        I, Dawn Michele Hyde, a Notary Public of the

4    State of Maryland, Howard County, do hereby

5    certify that the above-captioned proceeding took

6    place before me at the time and place herein set

7    out.

8        I further certify that the proceeding was

9    recorded stenographically by me and this

10   transcript is a true record of the proceedings.

11       I further certify that I am not of counsel to

12   any of the parties, nor an employee of counsel,

13   nor related to any of the parties, nor in any way

14   interested in the outcome of the action.

15       As witness my hand and seal this 20th day of

16   August, 2019.

17

18                 Dawn M. Hyde, Notary Public

19                 My Commission Expires 10/7/2019

20

21

# **Exhibit 33**

EPA/630/R-95/001F
April 1998

# Guidelines for
# Neurotoxicity Risk Assessment

(Published on May 14, 1998, Federal Register 63(93):26926-26954)

Risk Assessment Forum

U.S. Environmental Protection Agency
Washington, DC

**DISCLAIMER**

This document has been reviewed in accordance with U.S. Environmental Protection Agency policy and approved for publication.  Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

# GUIDELINES FOR NEUROTOXICITY RISK ASSESSMENT
## [FRL-6011-3]

**AGENCY**:  Environmental Protection Agency

**ACTION**:  Notice of availability of final Guidelines for Neurotoxicity Risk Assessment.

**SUMMARY**:  The U.S. Environmental Protection Agency (EPA) is today publishing in final form a document entitled *Guidelines for Neurotoxicity Risk Assessment* (hereafter "Guidelines").  These Guidelines were developed as part of an interoffice guidelines development program by a Technical Panel of the Risk Assessment Forum.  The Panel was composed of scientists from throughout the Agency, and selected drafts were peer-reviewed internally and by experts from universities, environmental groups, industry, and other governmental agencies.  The Guidelines are based, in part, on recommendations derived from various scientific meetings and workshops on neurotoxicology, from public comments, and from recommendations of the Science Advisory Board.  An earlier draft underwent external peer review in a workshop held on June 2-3, 1992, and received internal review by the Risk Assessment Forum.  The Risk Assessment Subcommittee of the Committee on the Environment and Natural Resources of  Office of Science and Technology Policy reviewed the proposed Guidelines during a meeting held on August 15, 1995.  The Guidelines were revised and proposed for public comment on October 4, 1995 (60 FR 52032-52056).  The proposed Guidelines were reviewed by the Science Advisory Board on July 18, 1996. EPA appreciates the efforts of all participants in the process, and has tried to address their recommendations in these Guidelines.

This notice describes the scientific basis for concern about exposure to agents that cause neurotoxicity, outlines the general process for assessing potential risk to humans because of environmental contaminants, and addresses Science Advisory Board and public comments on the 1995 *Proposed Guidelines for Neurotoxicity Risk Assessment* (FR 60:52032-52056).  These Guidelines are intended to guide Agency evaluation of agents that are suspected to cause neurotoxicity, in line with the policies and procedures established in the statutes administered by the Agency.

**DATES**:  The Guidelines will be effective April 30, 1998.

**ADDRESSES**:  The Guidelines will be made available in several ways:

(1) The electronic version will be accessible from EPA's National Center for Environmental Assessment home page on the Internet at http://www.epa.gov/ncea.

(2) 3½" high-density computer diskettes in WordPerfect format will be available from ORD Publications, Technology Transfer and Support Division, National Risk Management Research Laboratory, Cincinnati, OH; Tel: 513-569-7562; Fax: 513-569-7566.  Please provide the EPA No.: EPA/630/R-95/001Fa when ordering.

(3)  This notice contains the full document.  Copies of the Guidelines will be available for inspection at EPA headquarters and regional libraries, through the U.S. Government Depository Library program, and for purchase from the National Technical Information Service (NTIS), Springfield, VA; telephone: 1-800-553-6847, or 703-605-6000, fax: 703-321-8547.  Please provide the NTIS PB No. [PB98-117831] when ordering.

**FOR FURTHER INFORMATION CONTACT**:  Dr. Hugh A. Tilson, Neurotoxicology Division, National Health and Environmental Effects Research Laboratory, U.S. Environmental Protection Agency, Research Triangle Park, NC 27711, Tel: 919-541-2671;  Fax: 919-541-4849; E-mail: tilson.hugh@epamail.epa.gov.

**SUPPLEMENTARY INFORMATION**:  In its 1983 book *Risk Assessment in the Federal Government: Managing the Process*, the National Academy of Sciences recommended that Federal regulatory agencies establish "inference guidelines" to promote consistency and technical quality in risk assessment, and to ensure that the risk assessment process is maintained as a scientific effort separate from risk management.  A task force within EPA accepted that recommendation and requested that Agency scientists begin to develop such guidelines.  In 1984, EPA scientists began work on risk assessment guidelines for carcinogenicity, mutagenicity, suspect developmental toxicants, chemical mixtures, and exposure assessment.  Following extensive scientific and public review, these first five guidelines were issued on September 24, 1986 (51 FR 33992-34054).  Since 1986, additional risk assessment guidelines have been proposed, revised, reproposed, and finalized.  These guidelines continue the process initiated in 1984.  As with other EPA guidelines (e.g., developmental toxicity, 56 FR 63798-63826; exposure assessment, 57 FR 22888-22938; and carcinogenicity, 61 FR 17960-18011), EPA will revisit these guidelines as experience and scientific consensus evolve.

These Guidelines set forth principles and procedures to guide EPA scientists in the conduct of Agency risk assessments and to inform Agency decision makers and the public about these procedures. Policies in this document are intended as internal guidance for EPA.  Risk assessors and risk managers

at EPA are the primary audience, although these Guidelines may be useful to others outside the Agency. In particular, the Guidelines emphasize that risk assessments will be conducted on a case-by-case basis, giving full consideration to all relevant scientific information.  This approach means that Agency experts study scientific information on each chemical under review and use the most scientifically appropriate interpretation to assess risk.  The Guidelines also stress that this information will be fully presented in Agency risk assessment documents, and that Agency scientists will identify the strengths and weaknesses of each assessment by describing uncertainties, assumptions, and limitations, as well as the scientific basis and rationale for each assessment.  The Guidelines are formulated in part to bridge gaps in risk assessment methodology and data.  By identifying these gaps and the importance of the missing information to the risk assessment process, EPA wishes to encourage research and analysis that will lead to new risk assessment methods and data.


_____

Dated: April 30,1998

_____

signed by EPA Administrator
Carol M. Browner

# CONTENTS

**Part A:  Guidelines for Neurotoxicity Risk Assessment**

List of Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   1.1. Organization of These Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   1.2. The Role of Environmental Agents in Neurotoxicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   1.3. Neurotoxicity Risk Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   1.4. Assumptions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2. Definitions and Critical Concepts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

3. Hazard Characterization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
   3.1. Neurotoxicological Studies: Endpoints and Their Interpretation . . . . . . . . . . . . . . . . . . . 25
      3.1.1. Human Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
         3.1.1.1. Clinical Evaluations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
         3.1.1.2. Case Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
         3.1.1.3. Epidemiologic Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
         3.1.1.4. Human Laboratory Exposure Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
      3.1.2. Animal Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
         3.1.2.1. Structural Endpoints of Neurotoxicity . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
         3.1.2.2. Neurophysiological Endpoints of Neurotoxicity . . . . . . . . . . . . . . . . . . . 45
         3.1.2.3. Neurochemical Endpoints of Neurotoxicity . . . . . . . . . . . . . . . . . . . . . 53
         3.1.2.4. Behavioral Endpoints of Neurotoxicity . . . . . . . . . . . . . . . . . . . . . . . . . 59
      3.1.3. Other Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
         3.1.3.1. Pharmacokinetics  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
         3.1.3.2. Comparisons of Molecular Structure . . . . . . . . . . . . . . . . . . . . . . . . . . 80
         3.1.3.3. Statistical Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
         3.1.3.4. In Vitro Data in Neurotoxicology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
         3.1.3.5. Neuroendocrine Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
   3.2. Dose-Response Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
   3.3. Characterization of the Health-Related Database . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

4. Quantitative Dose-Response Analysis  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
   4.1. LOAEL/NOAEL and BMD Determination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
   4.2. Determination of the Reference Dose or Reference Concentration . . . . . . . . . . . . . . . . . 94

5. Exposure Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

6. Risk Characterization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
   6.1.  Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
   6.2.  Integration of Hazard Characterization, Dose-Response Analysis, & Exposure Assessment 99
   6.3.  Quality of the Database and Degree of Confidence in the Assessment . . . . . . . . . . . . . . 101
   6.4.  Descriptors of Neurotoxicity Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
        6.4.1.  Estimation of the Number of Individuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
        6.4.2.  Presentation of Specific Scenarios . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
        6.4.3.  Risk Characterization for Highly Exposed Individuals . . . . . . . . . . . . . . . . . . . . 103
        6.4.4.  Risk Characterization for Highly Sensitive or Susceptible Individuals . . . . . . . . . 104
        6.4.5.  Other Risk Descriptors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
   6.5.  Communicating Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
   6.6.  Summary and Research Needs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

**Part B:  Response to Science Advisory Board and Public Comments**

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
2. Response to Science Advisory Board Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
3. Response to Public Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

**List of Tables**

Table 1.  Examples of possible indicators of a neurotoxic effect . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Table 2.  Neurotoxicants and disorders with specific neurological targets . . . . . . . . . . . . . . . . . . . . 44
Table 3.  Examples of neurophysiological measures of neurotoxicity . . . . . . . . . . . . . . . . . . . . . . . . 47
Table 4.  Examples of neurotoxicants with known neurochemical mechanisms  . . . . . . . . . . . . . . . 55
Table 5.  Examples of measures in a representative functional observational battery  . . . . . . . . . . . . 61
Table 6.  Examples of specialized behavioral tests to measure neurotoxicity . . . . . . . . . . . . . . . . . . 62
Table 7.  Examples of compounds or treatments producing developmental neurotoxicity  . . . . . . . . 75
Table 8.  Characterization of the health-related database . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

**Part A:  Guidelines for Neurotoxicity Risk Assessment**

## 1.  Introduction

These Guidelines describe the principles, concepts, and procedures that the U.S. Environmental Protection Agency (EPA) will follow in evaluating data on potential neurotoxicity associated with exposure to environmental toxicants.  The Agency's authority to regulate substances that have the potential to interfere with human health is derived from a number of statutes that are implemented through multiple offices within EPA.  The procedures outlined here are intended to help develop a sound scientific basis for neurotoxicity risk assessment, promote consistency in the Agency's assessment of toxic effects on the nervous system, and inform others of the approaches used by the Agency in those assessments.  This document is not a regulation and is not intended for EPA regulations.  The Guidelines set forth current scientific thinking and approaches for conducting and evaluating neurotoxic risk assessments.  They are not intended, nor can they be relied upon, to create any rights enforceable by any party in litigation with the United States.

### 1.1.  *Organization of These Guidelines*

This introduction (section 1) summarizes the purpose of these Guidelines within the overall framework of risk assessment at EPA.  It also outlines the organization of the guidance and describes several default assumptions to be used in the risk assessment process, as discussed in the recent National Research Council report "Science and Judgment in Risk Assessment" (NRC, 1994).

Section 2 sets forth definitions of particular terms widely used in the field of neurotoxicology. These include "neurotoxicity" and "behavioral alterations." Also included in this section are discussions concerning reversible and irreversible effects and direct versus indirect effects.

Risk assessment is the process by which scientific judgments are made concerning the potential for toxicity in humans.  The National Research Council (NRC, 1983) has defined risk assessment as including some or all of the following components (paradigm): hazard identification, dose-response assessment, exposure assessment, and risk characterization.  In its 1994 report "Science and Judgment in Risk Assessment" the NRC extended its view of the paradigm to include characterization of each component (NRC, 1994).  In addition, it noted the importance of an approach that is less fragmented and more holistic, less linear and more interactive, and that deals with recurring conceptual issues that cut across all stages of risk

1

assessment.  These Guidelines describe a more interactive approach by organizing the process around the qualitative evaluation of the toxicity data (hazard characterization), the quantitative dose-response analysis, the exposure assessment, and the risk characterization.  In these Guidelines, hazard characterization includes deciding whether a chemical has an effect by means of qualitative consideration of dose-response relationships, route, and duration of exposure.  Determining a hazard often depends on whether a dose-response relationship is present (Kimmel et al., 1990).  This approach combines the information important in comparing the toxicity of a chemical with potential human exposure scenarios (section 3).  In addition, it avoids the potential for labeling chemicals as "neurotoxicants" on a purely qualitative basis.  This organization of the risk assessment process is similar to that discussed in the Guidelines for Developmental Toxicity Risk Assessment (56 FR 63798), the main difference being that the quantitative dose-response analysis is discussed under a separate section in these Guidelines.

Hazard characterization involves examining all available experimental animal and human data and the associated doses, routes, timing, and durations of exposure to determine qualitatively if an agent causes neurotoxicity in that species and under what conditions.  From the hazard characterization and criteria provided in these Guidelines, the health-related database can be characterized as sufficient or insufficient for use in risk assessment (section 3.3).  Combining hazard identification and some aspects of dose-response evaluation into hazard characterization does not preclude the evaluation and use of data for other purposes when quantitative information for setting reference doses (RfDs) and reference concentrations (RfCs) is not available.

The next step in the dose-response analysis (section 4) is the quantitative analysis, which includes determining the no-observed-adverse-effect-level (NOAEL) and/or the lowest-observed-adverse-effect-level (LOAEL) for each study and type of effect.  Because of the limitations associated with the use of the NOAEL, the Agency is beginning to use an additional approach, the benchmark dose approach (BMD) (Crump, 1984; U.S. EPA, 1995a), for more quantitative dose-response evaluation when sufficient data are available.  The benchmark dose approach takes into account the variability in the data and the slope of the dose-response curve, and provides a more consistent basis for calculation of the RfD or RfC.  If data are considered sufficient for risk assessment, and if neurotoxicity is the effect occurring at the lowest dose level (i.e., the critical effect), an oral or dermal RfD or an inhalation RfC, based on neurotoxic effects, is then derived.  This RfD or RfC is derived using the NOAEL or benchmark dose divided by uncertainty factors to account for interspecies differences in response, intraspecies variability, and other factors of study design or the

2

database.  A statement of the potential for human risk and the consequences of exposure can come only from integrating the hazard characterization and
dose-response analysis with the human exposure estimates in the final risk characterization.

The section on exposure assessment (section 5) identifies human populations exposed or potentially exposed to an agent, describes their composition and size, and presents the types, magnitudes, frequencies, and durations of exposure to the agent.  The exposure assessment provides an estimate of human exposure levels for particular populations from all potential sources.

In risk characterization (section 6), the hazard characterization, dose-response analysis, and exposure assessment for given populations are combined to estimate some measure of the risk for neurotoxicity.  As part of risk characterization, a summary of the strengths and weaknesses of each component of the risk assessment is given, along with major assumptions, scientific judgments and, to the extent possible, qualitative and quantitative estimates of the
uncertainties.  This characterization of the health-related database is always presented in conjunction with information on the dose, route, duration, and timing of exposure as well as the dose-response analysis including the RfD or RfC.  If human exposure estimates are available,
the exposure basis used for the risk assessment is clearly described, e.g., highly exposed individuals or highly sensitive or susceptible individuals.  The NOAEL may be compared to the various estimates of human exposure to calculate the margin(s) of exposure (MOE).  The
considerations for judging the acceptability of the MOE are similar to those for determining the appropriate size of the uncertainty factor for calculating the RfD or RfC.

The Agency recently issued a policy statement and associated guidance for risk characterization (U.S. EPA, 1995b, 1995c), which is currently being implemented throughout EPA.  This statement is designed to ensure that critical information from each stage of a risk assessment is used in forming conclusions about risk and that this information is communicated from risk assessors to risk managers (policy makers), from middle to upper management, and from the Agency to the public.  Additionally, the policy provides a basis for greater clarity, transparency, reasonableness, and consistency in risk assessments across Agency programs.

Final neurotoxicity risk assessment guidelines may reflect additional changes in risk characterization practices resulting from implementation activities.  Risk assessment is just one component of the regulatory process and defines the potential adverse health consequences of exposure to a toxic agent.  The other component, risk management, combines risk assessment with statutory directives regarding socioeconomic, technical, political, and other considerations in order to

decide whether to control future exposure to the suspected toxic agent and, if so, the nature and level of control.  One major objective of these Guidelines is to help the risk assessor determine whether the experimental animal or human data indicate the potential for a neurotoxic effect.  Such information can then be used to categorize evidence that will identify and characterize neurotoxic hazards, as described in section 3.3, Characterization of the Health-Related Database, and  Table 8 of these Guidelines.  Risk management is not dealt with directly in these Guidelines because the basis for decision making goes beyond scientific considerations alone, but the use of scientific information in this process is discussed.  For example, the acceptability of the MOE is a risk management decision, but the scientific bases for establishing this value are discussed here.

## 1.2.  *The Role of Environmental Agents in Neurotoxicity*

Chemicals are an integral part of life, with the capacity to improve as well as endanger health.  The general population is exposed to chemicals in air, water, foods, cosmetics, household products, and drugs used therapeutically or illicitly.  During daily life, a person experiences a multitude of exposures to potentially neuroactive substances, singly and in combination, both synthetic and natural.  Levels of exposure vary and may or may not pose a hazard, depending on dose, route, and duration of exposure.

A link between human exposure to some chemical substances and neurotoxicity has been firmly established (Anger, 1986; OTA, 1990).  Because many natural and synthetic chemicals are present in today's environment, there is growing scientific and regulatory interest in the potential for risks to humans from exposure to neurotoxic agents.  If sufficient exposure occurs, the effects resulting from such exposures can have a significant adverse impact on human health.  It is not known how many chemicals may be neurotoxic in humans (Reiter, 1987).  EPA's TSCA inventory of chemical substances manufactured, imported, or processed in the United States includes more than 65,000 substances and is increasing yearly.  An overwhelming majority of the materials in commercial use have not been tested for neurotoxic potential (NRC, 1984).

Estimates of the number of chemicals with neurotoxic properties have been made for subsets of substances.  For instance, a large percentage of the more than 500 registered active pesticide ingredients affect the nervous system of the target species to varying degrees.  Of 588 chemicals listed by the American Conference of Governmental Industrial Hygienists, 167 affected the nervous system or behavior at some exposure level (Anger, 1984).  Anger (1990) estimated that of the approximately 200 chemicals to which 1 million or more American workers are exposed, more than one-third may have

adverse effects on the nervous system if sufficient exposure occurs.  Anger (1984) also recognized neurotoxic effects as one of the 10 leading workplace disorders.  A number of therapeutic substances, including some anticancer and antiviral agents and abused drugs, can cause adverse or neurotoxicological side effects at therapeutic levels (OTA, 1990).  The number of chemicals with neurotoxic potential has been estimated to range from 3% to 28% of all chemicals (OTA, 1990).  Thus, estimating the risks of exposure to chemicals with neurotoxic potential is of concern with regard to their overall impact on human health.

### 1.3. *Neurotoxicity Risk Assessment*

In addition to its primary role in psychological functions, the nervous system controls most, if not all, other bodily processes.  It is sensitive to perturbation from various sources and has limited ability to regenerate.  There is evidence that even small anatomical, biochemical, or physiological insults to the nervous system may result in adverse effects on human health. Therefore, there is a need for consistent guidance on how to evaluate data on neurotoxic substances and assess their potential to cause transient or persistent and direct or indirect effects on human health.

These Guidelines develop principles and concepts in several areas.  They outline the scientific basis for evaluating effects due to exposure to neurotoxicants and discuss principles and methods for evaluating data from human and animal studies on behavior, neurochemistry, neurophysiology, and neuropathology.  They also discuss adverse effects on neurological development and function in infants and children following prenatal and perinatal exposure to chemical agents.  They outline the methods for calculating reference doses or reference concentrations when neurotoxicity is the critical effect, discuss the availability of alternative mathematical approaches to dose-response analyses, characterize the health-related database for neurotoxicity risk assessment, and discuss the integration of exposure information with results of the dose-response assessment to characterize risks.  These Guidelines do not advocate developing reference doses specific for neurotoxicity, but rather support the use of neurotoxicity as one possible endpoint to develop reference doses.  EPA offices have published guidelines for neurotoxicity testing in animals (U.S. EPA, 1986, 1987, 1988a, 1991a).  The testing guidelines address the development of new data for use in risk assessment.

These neurotoxicity risk assessment guidelines provide the Agency's first comprehensive guidance on the use and interpretation of neurotoxicity data, and are part of the Agency's risk assessment guidelines development process, which was initiated in 1984.  As part of its neurotoxicity guidelines development program, EPA has sponsored or participated in several conferences on relevant

5

issues (Tilson, 1990); these and other sources (see references) provide the scientific basis for these Guidelines.

This guidance is intended for use by Agency risk assessors and is separate and distinct from the recently published document on principles of neurotoxicity risk assessment (U.S. EPA, 1994). The document on principles was prepared under the auspices of the Subcommittee on Risk Assessment of the Federal Coordinating Council for Science, Engineering, and Technology and was not intended to provide specific directives for how neurotoxicity risk assessment should be performed. It is expected that, like other EPA risk assessment guidelines for noncancer endpoints (U.S. EPA, 1991b), this document will encourage research and analysis leading to new risk assessment methods and data, which in turn would be used to revise and improve the Guidelines and better guide Agency risk assessors.

### 1.4. *Assumptions*

There are a number of unknowns in the extrapolation of data from animal studies to humans. Therefore, a number of default assumptions are made that are generally applied in the absence of data on the relevance of effects to potential human risk. Default assumptions should not be applied indiscriminately. First, all available mechanistic and pharmacokinetic data should be considered. If these data indicate that an alternative assumption is appropriate or if they obviate the need for applying an assumption, such information should be used in risk assessment. For example, research in rats may determine that the neurotoxicity of a chemical is caused by a metabolite. If subsequent research finds that the chemical is metabolized to a lesser degree or not at all in humans, then this information should be used in formulating the default assumptions. The following default assumptions form the basis of the approaches taken in these Guidelines:

(1) It is assumed that an agent that produces detectable adverse neurotoxic effects in experimental animal studies will pose a potential hazard to humans. This assumption is based on the comparisons of data for known human neurotoxicants (Anger, 1990; Kimmel et al., 1990; Spencer and Schaumburg, 1980), which indicate that experimental animal data are frequently predictive of a neurotoxic effect in humans.

(2) It is assumed that behavioral, neurophysiological, neurochemical, and neuroanatomical manifestations are of concern. In the past, the tendency has been to consider only neuropathological changes as endpoints of concern. Based on data on agents that are known human neurotoxicants (Anger, 1990; Kimmel et al., 1990; Spencer and Schaumberg, 1980), there is usually at least one

experimental species that mimics the types of effects seen in humans, but in other species tested, the neurotoxic effect may be different or absent.  For example, certain organophosphate compounds produce a delayed-onset neuropathy in hens similar to that seen in humans, whereas rodents are characteristically insensitive to these compounds.  A  biologically significant increase in any of the manifestations is considered indicative of an agent's potential for disrupting the structure or function of the human nervous system.

(3)  It is assumed that the neurotoxic effects seen in animal studies may not always be the same as those produced in humans.  Therefore, it may be difficult to determine the most appropriate species in terms of predicting specific effects in humans.  The fact that every species may not react in the same way is probably due to species-specific differences in maturation of the nervous system, differences in timing of exposure, metabolism, or mechanisms of action.

(4)  It is also assumed that, in the absence of data to the contrary, the most sensitive species is used to estimate human risk.  This is based on the assumption that humans are as sensitive as the most sensitive animal species tested.  This provides a conservative estimate of sensitivity for added protection to the public.  As with other noncancer endpoints, it is assumed that there is a nonlinear dose-response relationship for neurotoxicants.  Although there may be a threshold for neurotoxic effects, these are often difficult to determine empirically. Therefore, a nonlinear relationship is assumed to exist for neurotoxicants.

These assumptions are "plausibly conservative" (NRC, 1994) in that they are protective of public health and are also well founded in scientific knowledge about the effects of concern.

## 2.  Definitions and Critical Concepts

This section defines the key terms and concepts that EPA will use in the identification and evaluation of neurotoxicity.  The various health effects that fall within the broad classification of neurotoxicity are described and examples are provided.  Adverse effects include alterations from baseline or normal conditions that diminish an organism's ability to survive, reproduce, or adapt to the environment.  Neurotoxicity is an adverse change in the structure or function of the central and/or peripheral nervous system following exposure to a chemical, physical, or biological agent (Tilson, 1990).  Functional neurotoxic effects include adverse changes in somatic/autonomic, sensory, motor, and/or cognitive function.  Structural neurotoxic effects are defined as neuroanatomical changes occurring at any level of nervous system organization; functional changes are defined as neurochemical, neurophysiological, or behavioral effects.  Chemicals can also be categorized into four classes:  those that act on the central nervous system, the peripheral nerve fibers, the peripheral nerve endings, or muscles or other tissues (Albert, 1973).  Changes in function can result from toxicity to other specific organ systems, and these indirect changes may be considered adverse.  For example, exposure to a high dose of a chemical may cause damage to the liver, resulting in general sickness and a decrease in a functional endpoint such as motor activity.  In this case, the change in motor activity could be considered as adverse, but not necessarily neurotoxic.  A discussion concerning problems associated with risk assessment of high doses of chemicals in the context of drinking water and health was published by the National Research Council (1986).

The risk assessor should also know that there are different levels of concern based on the magnitude of effect, duration of exposure, and reversibility of some neurotoxic effects. Neurotoxic effects may be irreversible (the organism cannot return to the state prior to exposure, resulting in a permanent change) or reversible (the organism can return to the pre-exposure condition).  Clear or demonstrable irreversible change in either the structure or function of the nervous system causes greater concern than do reversible changes.  If neurotoxic effects are observed at some time during the lifespan of the organism but are slowly reversible, the concern is also high.  There is lesser concern for effects that are rapidly reversible or "transient," i.e., measured in minutes, hours, or days, and that appear to be associated with the pharmacokinetics of the causal agent and its presence in the body.  Reversible changes that occur in the occupational setting or environment, however, may be of high concern if, for example, exposure to a short-acting solvent interferes with operation of heavy equipment in an industrial plant.  The context of the exposure should be considered in evaluating reversible effects.  Setting of exposure limits is not always associated with the determination of a reference dose, which is based on

chronic dosing.  Data from acute or subacute dosing can be used for health advisories or in studies involving developmental exposures.

It should also be noted that the nervous system is known for its reserve capacity (Tilson and Mitchell, 1983).  That is, repeated insult to the nervous system could lead to an adaptation.  There are, however, limits to this capacity, and when these limits are exceeded, further exposure could lead to frank manifestations of neurotoxicity at the structural or functional level.  The risk assessor should be aware that once damaged, neurons, particularly in the central nervous system, have a limited capacity for regeneration.  Reversibility of effects resulting from cell death or from the destruction of cell processes may represent an activation of repair capacity, decreasing future potential adaptability.  Therefore, even reversible neurotoxic changes should be of concern.  Evidence of progressive effects (those that continue to worsen even after the causal agent has been removed), delayed-onset effects (those that occur at a time distant from the last contact with the causal agent), residual effects (those that persist beyond a recovery period), or latent effects (those that become evident only after an environmental challenge or aging) have a high level of concern.

Environmental challenges can include stress, increased physical or cognitive workload, pharmacological manipulations, and nutritional deficiency or excess.  Evidence for reversibility may depend on the region of the nervous system affected, the chemical involved, and organismic factors such as the age of the exposed population.  Some regions of the nervous system, such as peripheral nerves, have a high capacity for regeneration, while regions in the brain such as the hippocampus are known for their ability to compensate or adapt to neurotoxic insult.  For example, compensation is likely to be seen with solvents (e.g., n-hexane) that produce peripheral neuropathy because of the repair capacity of the peripheral nerve.  In addition, tolerance to some cholinergic effects of cholinesterase-inhibiting compounds may be due to compensatory down-regulation of muscarinic receptors.  Younger individuals may have more capacity to adapt than older individuals, suggesting that the aged may be at greater risk to neurotoxic exposure.

Neurotoxic effects can be observed at various levels of organization of the nervous system, including neurochemical, anatomical, physiological, or behavioral.  At the neurochemical level, for example, an agent that causes neurotoxicity might inhibit macromolecule or transmitter synthesis, alter the flow of ions across cellular membranes, or prevent release of neurotransmitter from the nerve terminals.  Anatomical changes may include alterations of the cell body, the axon, or the myelin sheath.  At the physiological level, a chemical might change the thresholds for neural activation or reduce the speed of neurotransmission.  Behavioral alterations can include

9

significant changes in sensations of sight, hearing, or touch; alterations in simple or complex reflexes and motor functions; alterations in cognitive functions such as learning, memory, or attention; and changes in mood, such as fear or rage, disorientation as to person, time, or place, or distortions of thinking and feeling, such as delusions and hallucinations.  At present, relatively few neurotoxic syndromes have been thoroughly characterized in terms of the initial neurochemical change, structural alterations, physiological consequence, and behavioral effects. Knowledge of exact mechanisms of action is not, however, necessary to conclude that a chemically induced change is a neurotoxic effect.

Neurotoxic effects can be produced by chemicals that do not require metabolism prior to interacting with their sites in the nervous system (primary neurotoxic agents) or those that require metabolism prior to interacting with their sites (secondary neurotoxic agents).  Chemically induced neurotoxic effects can be direct (due to an agent or its metabolites acting directly on sites in the nervous system) or indirect (due to agents or metabolites that produce their effects primarily by interacting with sites outside the nervous system).  For example, excitatory amino acids such as domoic acid damage specific neurons directly by activating excitatory amino acid receptors in the nervous system, whereas carbon monoxide decreases oxygen availability, which can indirectly kill neurons.  Other examples of indirect effects include cadmium-induced spasms in blood vessels supplying the nervous system, dichloroacetate-induced perturbation of metabolic pathways, and chemically induced alterations in skeletomuscular function or structure and effects on the endocrine system. Professional judgment may be required in making determinations about direct versus indirect effects.

The interpretation of data as indicative of a potential neurotoxic effect involves the evaluation of the validity of the database.  This approach and these terms have been adapted from the literature on human psychological testing (Sette, 1987; Sette and MacPhail, 1992), where they have long been used to evaluate the level of confidence in different measures of intelligence or other abilities, aptitudes, or feelings.  There are four principal questions that should be addressed: whether the effects result from exposure (content validity); whether the effects are adverse or toxicologically significant (construct validity); whether there are correlative measures among behavioral, physiological, neurochemical, and morphological endpoints (concurrent validity); and whether the effects are predictive of what will happen under various conditions (predictive validity).  Addressing these issues can provide a useful framework for evaluating either human or animal studies or the weight of evidence for a chemical (Sette, 1987; Sette and MacPhail, 1992).  The next sections indicate the extent to which chemically induced changes can be interpreted as providing evidence of neurotoxicity.

10

**3. Hazard Characterization**

3.1. *Neurotoxicological Studies: Endpoints and Their Interpretation*

The qualitative characterization of neurotoxic hazard can be based on either human or animal data (Anger, 1984; Reiter, 1987; U.S. EPA, 1994). Such data can result from accidental, inappropriate, or controlled experimental exposures. This section describes many of the general and some of the specific characteristics of human studies and reports of neurotoxicity. It then describes some features of animal studies of neuroanatomical, neurochemical, neurophysiological, and behavioral effects relevant to risk assessment. The process of characterizing the sufficiency or insufficiency of neurotoxic effects for risk assessment is described in section 3.3. Additional sources of information relevant to hazard characterization, such as comparisons of molecular structure among compounds and in vitro screening methods, are also discussed.

The hazard characterization should:

    a. Identify strengths and limitations of the database:

    C Epidemiological studies (case reports, cross-sectional, case-control,  cohort, or human laboratory exposure studies);

    C Animal studies (including structural or neuropathological, neurochemical, neurophysiological, behavioral or neurological, or developmental endpoints).

    b. Evaluate the validity of the database:

    C Content validity (effects result from exposure);

    C Construct validity (effects are adverse or toxicologically significant);

    C Concurrent validity (correlative measures among behavioral,  physiological, neurochemical, or morphological endpoints);

    C Predictive validity (effects are predictive of what will happen under various conditions).

    c. Identify and describe key toxicological studies.

    d. Describe the type of effects:

    C Structural (neuroanatomical alternations);

    C Functional (neurochemical, neurophysiological, behavioral alterations).

    e. Describe the nature of the effects (irreversible, reversible, transient, progressive, delayed, residual, or latent).

    f. Describe how much is known about how (through what biological mechanism) the chemical produces adverse effects.

    g. Discuss other health endpoints of concern.

     h.  Comment on any nonpositive data in humans or animals.

     I.  Discuss the dose-response data (epidemiological or animal) available for further dose-response analysis.

     j.  Discuss the route, level, timing, and duration of exposure in studies demonstrating neurotoxicity as compared to expected human exposures.

     k.  Summarize the hazard characterization:

C  Confidence in conclusions;

C  Alternative conclusions also supported by the data;

C  Significant data gaps; and

C  Highlights of major assumptions.

### 3.1.1.  Human Studies

It is well established that information from the evaluation of human exposure can identify neurotoxic hazards (Anger and Johnson, 1985; Anger, 1990).  Prominent among historical episodes of neurotoxicity in human populations are the outbreaks of methylmercury poisoning in Japan and Iraq and the neurotoxicity seen in miners of metals, including mercury, manganese, and lead (Carson et al., 1987; Silbergeld and Percival, 1987; OTA, 1990).  In the past decade, lead poisoning in children has been a prominent issue of concern (Silbergeld and Percival, 1987). Neurotoxicity in humans has been studied and reviewed for many pesticides (Hayes, 1982; NRDC, 1989; Ecobichon and Joy, 1982; Ecobichon et al., 1990).  Organochlorines, organophosphates, carbamates, pyrethroids, certain fungicides, and some fumigants are all

known neurotoxicants.  They may pose occupational risks to manufacturing and formulation workers, pesticide applicators and farm workers, and consumers through home application or consumption of residues in foods.  Families of workers may also be exposed by transport into the home from workers' clothing.  Data on humans can come from a number of sources, including clinical evaluations, case reports, epidemiologic studies, and human laboratory exposure studies. A more extensive description of issues concerning human neurotoxicology and risk assessment has been published elsewhere (U.S. EPA, 1993).  A review of the types of tests used to assess cognitive and neurological function in children, in addition to a discussion of methodological issues in the design of prospective, longitudinal studies of developmental neurotoxicity in humans, has recently been published (Jacobson and Jacobson, 1996).  Stanton and Spear (1990) reviewed assessment measures used in developmental neurotoxicology for their comparability in humans and laboratory animals and their ability to detect

comparable adverse effects across species.  At the level of the various functional assessments for sensory, motivational, cognitive and motor function, and social behavior, there was good agreement across species among the neurotoxic agents reviewed.

3.1.1.1.  Clinical Evaluations

Clinical methods are used extensively in neurology and neuropsychology to evaluate patients suspected of having neurotoxicity.  An array of examiner-administered and paper-and-pencil tasks are used to assess sensory, motor, cognitive, and affective functions and personality states/traits. Neurobehavioral data are synthesized with information from neurophysiological studies and medical history to derive a working diagnosis.  Brain functional imaging techniques based on magnetic resonance imaging or emission tomography may also be useful in helping diagnose neurodegenerative disorders following chemical exposures in humans (Omerand et al., 1994; Callender et al., 1994). Clinical diagnostic approaches have provided a rich conceptual framework for understanding the functions (and malfunctions) of the central and peripheral nervous systems and have formed the basis for the development of methods for measuring the behavioral expression of nervous system disorders. Human neurobehavioral toxicology has borrowed heavily from neurology and neuropsychology for concepts of nervous system impairment and functional assessment methods. Neurobehavioral toxicology has adopted the neurologic/neuropsychologic model, using adverse changes in behavioral function to assist in identifying chemical- or drug-induced changes in nervous system processes.

Neurological and neuropsychological methods have long been employed to identify the adverse health effects of environmental workplace exposures (Sterman and Schaumburg, 1980). Peripheral neuropathies (with sensory and motor disturbances), encephalopathies, organic brain syndromes, extrapyramidal syndromes, demyelination, autonomic changes, and dementia are well-characterized consequences of acute and chronic exposure to chemical agents.  The range of exposure conditions that produce clinical signs of neurotoxicity also has been defined by these clinical methods.  It is very important to make external/internal dose measurements in humans to determine the actual dose(s) that can cause unwanted effects.

Aspects of the neurological examination approach limit its usefulness for neurotoxicological risk assessment.  Information obtained from the neurological exam is mostly qualitative and descriptive rather than quantitative.  Estimates of the severity of functional impairment can be reliably placed into only three or four categories (for example, mild, moderate, severe).  Much of the assessment depends on the subjective judgment of the examiner. For example, the magnitude and symmetry of muscle

13

strength are often judged by having the patient push against the resistance of the examiner's hands.  The endpoints are therefore the absolute and relative amount of muscle load sensed by the examiner in his or her arms.

Compared with other methods, the neurological exam may be less sensitive in detecting early neurotoxicity in peripheral sensory and motor nerves.  While clinicians' judgments are equal in sensitivity to quantitative methods in assessing the amplitude of tremor, tremor frequency is poorly quantified by clinicians.  Thus, important aspects of the clinical neurologic exam may be insufficiently quantified and lack sufficient sensitivity for detecting early neurobehavioral toxicity produced by environmental or workplace exposure conditions.  However, a neurological evaluation of persons with documented neurobehavioral impairment would be helpful for identifying nonchemical causes of neurotoxicity, such as diabetes and cardiovascular insufficiency.

Administration of a neuropsychological battery also requires a trained technician, and interpretation requires a trained and experienced neuropsychologist.  Depending on the capabilities of the patient, 2 to 4 hours may be needed to administer a full battery; 1 hour may be needed for the shorter screening versions.  These practical considerations may limit the usefulness of neuropsychological assessment in large field studies of suspected neurotoxicity.

In addition to logistical problems in administration and interpretation, neuropsychological batteries and neurological exams share two disadvantages with respect to neurotoxicity risk assessment.  First, neurological exams and neuropsychological test batteries are designed to confirm and classify functional problems in individuals selected on the basis of signs and symptoms identified by the patient, family, or other health professionals.  Their usefulness in detecting low base-rate impairment in workers or the general population is generally thought to be limited, decreasing the usefulness of clinical assessment approaches for epidemiologic risk assessment.

Second, neurological exams and neuropsychological test batteries were developed to assess the functional correlates of the most common forms of nervous system dysfunction: brain trauma, focal lesions, and degenerative conditions.  The clinical tests were validated against these neurological disease states.  With a few notable exceptions, chemicals are not believed to produce impairment similar to that from trauma or lesions; neurotoxic effects are more similar to the effects of degenerative disease.  There has been insufficient research to demonstrate which tests designed to assess functional expression of neurologic disease are useful in characterizing the modes of central nervous system impairment produced by chemical agents and drugs.

14

It should be noted that alternative approaches are available that avoid many of the limitations of clinical and neurological and traditional neuropsychological methods. Computerized behavioral assessment systems designed for field testing of populations exposed to chemicals in the community or workplace have been developed during the past decade.  The most widely used system is the Neurobehavioral Evaluation System (NES) developed by Baker et al. (1985).  Advantages of computerized tests include (1) standardized administration to eliminate intertester variability and minimize subject-experimenter interaction; (2) automated data collection and scoring, which is faster, easier, and less error-prone than traditional methods; and (3) test administration requires minimal training and experience.  NES tests have proven sensitive to a variety of solvents, metals, and pesticides (Otto, 1992).  Computerized systems available for human neurotoxicity testing are critically reviewed in Anger et al. (1996).

### 3.1.1.2.  Case Reports

The first type of human data available is often the case report or case series, which can identify cases of a disease and are reported by clinicians or discerned through active or passive surveillance, usually in the workplace.  However, case reports involving a single neurotoxic agent, although informative, are rare in the literature; for example, farmers are likely to be exposed to a wide variety of potentially neurotoxic pesticides.  Careful case histories assist in identifying common risk factors, especially when the association between the exposure and disease is strong, the mode of action of the agent is biologically plausible, and clusters occur in a limited period of time.

Case reports can be obtained more quickly than more complex studies.  Case reports of acute high-level exposure to a toxicant can be useful for identifying signs and symptoms that may also apply to lower exposure.  Case reports can also be useful when corroborating epidemiological data are available.

### 3.1.1.3.  Epidemiologic Studies

Epidemiology has been defined as "the study of the distributions and determinants of disease and injuries in human populations" (Mausner and Kramer, 1985).  Knowing the frequency of illness in groups and the factors that influence the distribution is the tool of epidemiology that allows the evaluation of causal inference with the goal of prevention and cure of disease (Friedlander and Hearn, 1980).  Epidemiologic studies are a useful means of evaluating the effects of neurotoxic substances on human populations, particularly if effects of exposure are cumulative or exposures are repeated.  Such

studies are less useful in cases of acute exposure, where the effects are short-term. Frequently, determining the precise dose or exposure concentration in epidemiological studies can be difficult. 3.1.1.3.1.  Cross-Sectional Studies.  In cross-sectional studies or surveys, both the disease and suspected risk factors are ascertained at the same time, and the findings are useful in generating hypotheses.  A group of people are interviewed, examined, and tested at a single point in time to ascertain a relationship between a disease and a neurotoxic exposure.  This study design does not allow the investigator to determine whether the disease or the exposure came first, rendering it less useful in estimating risk.  These studies are intermediate in cost and time required to complete compared with case reports and more complex analytical studies, but should be augmented with additional data.

3.1.1.3.2.  Case-Control (Retrospective) Studies.  Last (1986) defines a case-control study as one that "starts with the identification of persons with the disease (or other outcome variable) of interest, and a suitable control population (comparison, reference group) of persons without the disease." He states that the relationship of an "attribute" to the disease is measured by comparing the diseased with the nondiseased with regard to how frequently the attribute is present in each of the groups.  The cases are assembled from a population of persons with and without exposure, and the comparison group is selected from the same population; the relative distribution of the potential risk factor (exposure) in both groups is evaluated by computing an odds ratio that serves as an estimate of the strength of the association between the disease and the potential risk factor. The statistical significance of the ratio is determined by calculating a p-value and is used to approximate relative risk.

The case-control approach to the study of potential neurotoxicants in the environment provides a great deal of useful information for the risk assessor.  In his textbook, Valciukas (1991) notes that the case-control approach is the strategy of choice when no other environmental or biological indicator of neurotoxic exposure is available.  He further states: "Considering the fact that for the vast majority of neurotoxic chemical compounds, no objective biological indicators of exposure are available (or if they are, their half-life is too short to be of any practical value), the case-control paradigm is a widely accepted strategy for the assessment of toxic causation." The case-control study design, however, can be very susceptible to bias.  The potential sources of bias are numerous and can be specific to a particular study.  Many of these biases also can be present in cross-sectional studies.  For example, recall bias or faulty recall of information by study subjects in a questionnaire-based study can distort the results.  Analysis of the case-comparison study design assumes that the selected cases are

representative persons with the disease--either all cases with the disease or a representative sample of them have been ascertained.  It further assumes that the control or comparison group is representative of the nonexposed population (or that the prevalence of the characteristic under study is the same in the control group as in the general population).  Failure to satisfy these assumptions may result in selection bias that may invalidate study results.

An additional source of bias in case-control studies is the presence of confounding variables, i.e., factors known to be associated with the exposure and causally related to the disease under study. These should be controlled, either in the design of the study by matching cases to controls on the basis of the confounding factor, or in the analysis of the data by using statistical techniques such as stratification or regression.  Matching requires time to identify an adequate number of potential controls to distinguish those with the proper characteristics, while statistical control of confounding factors requires a larger study.

The definition of exposure is critical in epidemiologic studies.  In occupational settings, exposure assessment often is based on the job assignment of the study subjects, but can be more precise if detailed company records allow the development of exposure profiles.  Positive results from a properly controlled retrospective study should weigh heavily in the risk assessment process.

3.1.1.3.3.  Cohort (Prospective, Follow-Up) Studies.  In a prospective study design, a healthy group of people is assembled and followed forward in time and observed for the development of dysfunction. Such studies are invaluable for determining the time course for development of dysfunction (e.g., follow-up studies performed in various cities on the effects of lead on child development).  This approach allows the direct estimate of risks attributed to a particular exposure, since toxic incidence rates in the cohort can be determined.  Prospective study designs also allow the study of chronic effects of exposure.  One major strength of the cohort design is that it allows the calculation of rates to determine the excess risk associated with an exposure. Also, biases are reduced by obtaining information before the disease develops.  This approach, however, can be very time-consuming and costly.

In cohort studies information bias can be introduced when individuals provide distorted information about their health because they know their exposure status and may have been told of the expected health effects of the exposure under study.  More credence should be given to those studies in which both observer and subject bias are carefully controlled (e.g., double-blind studies).

17

A special type of cohort study is the retrospective cohort study, in which the investigator goes back in time to select the study groups and traces them over time, often to the present.  The studies usually involve specially exposed groups and have provided much assistance in  estimating risks due to occupational exposures.  Occupational retrospective cohort studies rely on company records of past and current employees that include information on the dates of employment, age at employment, date of departure, and whether diseased (or dead in
the case of mortality studies).  Workers can then be classified by duration and degree of exposure. Positive or negative results from a properly controlled prospective study should weigh heavily in the risk assessment process.

### 3.1.1.4.  Human Laboratory Exposure Studies

Neurotoxicity assessment has an advantage not afforded to the evaluation of other toxic endpoints, such as cancer or reproductive toxicity, in that the effects of some chemicals are short in duration and reversible.  This makes it ethically possible to perform human laboratory exposure studies and obtain data relevant to the risk assessment process.  Information from experimental human exposure studies has been used to set occupational exposure limits, mostly for organic solvents that can be inhaled.  Laboratory exposure studies have contributed to risk assessment and the setting of exposure limits for several solvents and other chemicals with acute reversible effects.

Human exposure studies sometimes offer advantages over epidemiologic field studies. Combined with appropriate sampling of biological fluids (urine or blood), it is possible to calculate body concentrations, examine toxicokinetics, and identify metabolites.  Bioavailability, elimination, dose-related changes in metabolic pathways, individual variability, time course of effects, interactions between chemicals, and interactions between chemical and environmental/biobehavioral processes (stressors, workload/respiratory rate) are factors that are generally easier to collect under controlled conditions.

Other goals of laboratory studies include the in-depth characterization of effects, the development of new assessment methods, and the examination of the sensitivity, specificity, and reliability of neurobehavioral assessment methods across chemical classes.  The laboratory is the most appropriate setting for the study of environmental and biobehavioral variables that affect the action of chemical agents.  The effects of ambient temperature, task difficulty, rate of ongoing behavior, conditioning variables, tolerance/sensitization, sleep deprivation, motivation, and so forth are sometimes studied.

18

From a methodological standpoint, human laboratory studies can be divided into two categories: between-subjects and within-subjects designs. In the former, the neurobehavioral performance of exposed volunteers is compared with that of nonexposed participants. In the latter, preexposure performance is compared with neurobehavioral function under the influence of the chemical or drug. Within-subjects designs have the advantage of requiring fewer participants, eliminating individual differences as a source of variability, and controlling for chronic mediating variables, such as caffeine use and educational achievement. A disadvantage of the within-subjects design is that neurobehavioral tests must be administered more than once. Practice on many neurobehavioral tests often leads to improved performance that may confound the effect of the chemical/drug. There should be a sufficient number of test sessions in the pre-exposure phase to allow performance on all tests to achieve a relatively stable baseline level.

Participants in laboratory exposure studies may have been recruited from populations of persons already exposed to the chemical/drug or from chemical-naive populations. Although the use of exposed volunteers has ethical advantages, can mitigate against novelty effects, and allows evaluation of tolerance/sensitization, finding an accessible exposed population in reasonable proximity to the laboratory can be difficult. Chemical-naive participants are more easily recruited but may differ significantly in important characteristics from a representative sample of exposed persons. Chemical-naive volunteers are often younger, healthier, and better educated than the populations exposed environmentally, in the workplace, or pharmacotherapeutically.

Compared with workplace and environmental exposures, laboratory exposure conditions can be controlled more precisely, but exposure periods are much shorter. Generally only one or two relatively pure chemicals are studied for several hours, whereas the population of interest may be exposed to multiple chemicals containing impurities for months or years. Laboratory studies are therefore better at identifying and characterizing effects with acute onset and the selective effects of pure agents. In all cases, the potential for participant bias should be as carefully controlled for as possible. Even the consent form can lead to participant bias, as toxic effects have been reported in some individuals who were warned of such effects in an informed consent form. In addition, double-blind studies have been shown to provide some control for observer bias that may occur in single-blind studies. More credence should be given to those studies in which both observer and subject bias are carefully controlled (Benignus, 1993).

A test battery that examines multiple neurobehavioral functions may be more useful for screening and the initial characterization of acute effects. Selected neurobehavioral tests that measure a

limited number of functions in multiple ways may be more useful for elucidating mechanisms or validating specific effects.

Both chemical and behavioral control procedures are valuable for examining the specificity of the effects.  A concordant effect among different measures of the same neurobehavioral function (e.g., reaction time) and a lack of effect on some other measures of psychomotor function (e.g., untimed manual dexterity) would increase the confidence in a selective effect on motor speed and not on attention or another nonspecific motor function. Likewise, finding concordant effects among similar chemical or drug classes along with different effects from dissimilar classes would support the specificity of chemical effect.  For example, finding that the effects of a solvent were similar to those of ethanol but not caffeine would support the specificity of solvent effects on a given measure of neurotoxicity.

## 3.1.2.  Animal Studies

This section provides an overview of the major types of endpoints that may be evaluated in animal neurotoxicity studies, describes the kinds of effects that may be observed and some of the tests used to detect and quantify these effects, and provides guidance for interpreting data. Compared with human studies, animal studies are more often available for specific chemicals, provide more precise exposure information, and control environmental factors better (Anger, 1984).  For these reasons, risk assessments tend to rely heavily on animal studies.

Many tests that can measure some aspect of neurotoxicity have been used in the field of neurobiology in the past 50 years.  The Office of Prevention, Pesticides and Toxic Substances (OPPTS) has published animal testing guidelines that were developed in cooperation with the Office of Research and Development (U.S. EPA, 1991a).  While the test endpoints included in the 1991 document serve as a convenient focus for this section, there are many other endpoints for which there are no current EPA guidelines.  The goal of the current document is to provide a framework for interpreting data collected in tests frequently used by neurotoxicologists.

Five categories of endpoints will be described: structural or neuropathological, neuro-physiological, neurochemical, behavioral, and developmental.  Table 1 lists a number of endpoints in each of these categories.  It is imperative for the risk assessor to understand that the interpretation of the indicators listed in Table 1 as neurotoxic effects is dependent on the dose at which such changes occur and the possibility that damage to other organ systems may contribute to or cause such changes indirectly.

20

**Table 1.  Examples of possible indicators of a neurotoxic effect**

| |
|---|
| <u>**Structural or neuropathological endpoints**</u> |
| Gross changes in morphology, including brain weight |
| Histologic changes in neurons or glia (neuronopathy, axonopathy,  myelinopathy) |
| <u>**Neurochemical endpoints**</u> |
| Alterations in synthesis, release, uptake, degradation of neurotransmitters |
| Alterations in second-messenger-associated signal transduction |
| Alterations in membrane-bound enzymes regulating neuronal activity |
| Inhibition and aging of neuropathy enzyme |
| Increases in glial fibrillary acidic protein in adults |
| <u>**Neurophysiological endpoints**</u> |
| Change in velocity, amplitude, or refractory period of nerve conduction |
| Change in latency or amplitude of sensory-evoked potential |
| Change in electroencephalographic pattern |
| <u>**Behavioral and neurological endpoints**</u> |
| Increases or decreases in motor activity |
| Changes in touch, sight, sound, taste, or smell sensations |
| Changes in motor coordination, weakness, paralysis, abnormal movement or posture, tremor, ongoing performance |
| Absence or decreased occurrence, magnitude, or latency of sensorimotor reflex |
| Altered magnitude of neurological measurement, including grip strength, hindlimb splay |
| Seizures |
| Changes in rate or temporal patterning of schedule-controlled behavior |
| Changes in learning, memory, and attention |
| <u>**Developmental endpoints**</u> |
| Chemically induced changes in the time of appearance of behaviors during development |
| Chemically induced changes in the growth or organization of structural or neurochemical elements |

3.1.2.1.  Structural Endpoints of Neurotoxicity

Structural endpoints are typically defined as neuropathological changes evident by gross observation or light microscopy, although most neurotoxic changes will be detectable only at the light microscopic level.  Gross changes in morphology can include discrete or widespread lesions in nerve tissue.  A change in brain weight is considered to be a biologically significant effect.  This is true regardless of changes in body weight, because brain weight is generally protected during undernutrition or weight loss, unlike many other organs or tissues.  It is inappropriate to express brain weight changes as a ratio of body weight and thereby dismiss changes in absolute brain weight.  Changes in brain weight are a more reliable indicator of alteration in brain structure than are measurements of length or width in fresh brain, because there is little historical data in the toxicology literature.

Neurons are composed of a neuronal body, axon, and dendritic processes.  Various types of neuropathological lesions may be classified according to the site where they occur (Spencer and Schaumburg, 1980; WHO, 1986; Krinke, 1989; Griffin, 1990).  Neurotoxicant-induced lesions in the central or peripheral nervous system may be classified as a neuronopathy (changes in the neuronal cell body), axonopathy (changes in the axons), myelinopathy (changes in the myelin sheaths), or nerve terminal degeneration.  Nerve terminal degeneration represents a very subtle change that may not be detected by routine histopathology, but requires detection by special procedures such as silver staining or neurotransmitter-specific immunohistochemistry. For axonopathies, a more precise location of the changes may also be described (i.e., proximal, central, or distal axonopathy).  In the case of some developmental exposures, a neurotoxic chemical might delay or accelerate the differentiation or proliferation of cells or cell types. Alteration in the axonal termination site might also occur with exposure.  In an aged population, exposure to some neurotoxicants might accelerate the normal loss of neurons associated with aging (Reuhl, 1991).  In rare cases, neurotoxic agents have been reported to produce neuropathic conditions resembling neurodegenerative disorders, such as Parkinson's disease, in humans (WHO, 1986).  Table 2 lists examples of such neurotoxic chemicals, their putative site of action, the type of neuropathology produced, and the disorder or condition that each typifies.  Inclusion of any chemical in any of the following tables is for illustrative purposes, i.e., it has been reported that the chemical will produce a neurotoxic effect at some dose; any individual chemical listed may also adversely affect other organs at lower doses.  It is important that the severity of each structural union be graded objectively and the grading criteria reported.

23

**Table 2.  Neurotoxicants and disorders with specific neurological targets**

| Site of action | Neurotoxic change | Neurotoxic chemical | Corresponding neurodegenerative disorder |
|---|---|---|---|
| Neuron cell body | Neuronopathy | Methylmercury Quinolinic acid 3-Acetylpyridine | Minamata disease Huntington's disease Cerebellar ataxia |
| Nerve terminal | Terminal destruction | 1-Methyl-4-phenyl 1,2,3,6-tetrahydropyridine (MPTP) (dopaminergic) | Parkinson's disease |
| Schwann cell myelin | Myelinopathy | Hexachlorophene | Congenital hypomyelinogenesis |
| Centra-peripheral distal axon | Distal axonopathy | Acrylamide, carbon disulfide, n-hexane | Peripheral neuropathy |
| Central axons | Central axonopathy | Clioquinol | Subacute myeloopticoneuro-pathy |
| Proximal axon | Proximal axonopathy | B,B'-Iminodipropionitrile | Motor neuron disease |

Alterations in the structure of the nervous system (i.e., neuronopathy, axonopathy, myelinopathy, terminal degeneration) are regarded as evidence of a neurotoxic effect. The risk assessor should note that pathological changes in many cases require time for the perturbation to become observable, especially with evaluation at the light microscopic level. Neuropathological studies should control for potential differences in the area(s) and section(s) of the nervous system sampled; in the age, sex, and body weight of the subject; and in fixation artifacts (WHO, 1986). Concern for the structural integrity of nervous system tissues derives from their functional specialization and lack of regenerative capacity.

Within each general class of nervous system structural alteration, there are various histological changes that can result after exposure to neurotoxicants. For example, specific changes in nerve cell bodies include chromatolysis, vacuolization, and cell death. Axons can undergo swelling, degeneration, and atrophy, while myelin sheath changes include folding, edematous splitting, and demyelination. Although terminal degeneration does occur, it is not readily detectable by light microscopy. Many of these changes are a result of complex effects at specific subcellular organelles, such as the axonal swelling that occurs as a result of neurofilament accumulation in acrylamide toxicity. Other changes may be associated with regenerative or adaptive processes that occur after neurotoxicant exposure.

3.1.2.2.  Neurophysiological Endpoints of Neurotoxicity

Neurophysiological studies measure the electrical activity of the nervous system. The term "neurophysiology" is often used synonymously with "electrophysiology" (Dyer, 1987). Neurophysiological techniques provide information on the integrity of defined portions of the nervous system. Several neurophysiological procedures are available for application to neurotoxicological studies. Examples are listed in Table 3. They range in scale from procedures that employ microelectrodes to study the function of single nerve cells or restricted portions of them, to procedures that employ macroelectrodes to perform simultaneous recordings of the summed activity of many cells. Microelectrode procedures typically are used to study mechanisms of action and are frequently performed in vitro. Macroelectrode procedures are generally used in studies to detect or characterize the potential neurotoxic effects of agents of interest because of potential environmental exposure. The present discussion concentrates on macroelectrode neurophysiological procedures because it is more likely that they will be the focus of decisions regarding critical effects in risk assessment. All of the procedures described below for use in animals also have been used in humans to determine chemically induced alterations in neurophysiological function.

**Table 3.  Examples of neurophysiological measures of neurotoxicity**

| System/function | Procedure | Representative agents |
|---|---|---|
| Retina | Electroretinography (ERG) | Developmental lead |
| Visual pathway | Flash-evoked potential (FEP) | Carbon disulfide |
| Visual function | Pattern-evoked potential (PEP) (pattern size and contrast) | Carbon disulfide |
| Auditory pathway | Brain stem auditory evoked potential (BAER) (clicks) | Aminoglycoside, antibiotics, toluene, styrene |
| Auditory function | BAER (tones) | Aminoglycoside, antibiotics, toluene, styrene |
| Somatosensory pathway | Somatosensory provoked | Acrylamide, n-hexane |
| Somatosensory function | Sensory-evoked potential (SEP) (tactile) | Acrylamide, n-hexane |
| Spinocerebellar pathway | SEP recorded from cerebellum | Acrylamide, n-hexane |
| Mixed nerve | Peripheral nerve compound action potential (PNAP) | Triethyltin |
| Motor axons | PNAP isolate motor components | Triethyltin |
| Sensory axons | PNAP isolate sensory components | Triethyltin |
| Neuromuscular | Electromyography (EMG) | Dithiobiuret |
| General central nervous system/level of arousal | Electroencephalography (EEG) | Toluene |

3.1.2.2.1.  Nerve Conduction Studies.  Nerve conduction studies, generally performed on peripheral nerves, can be useful in investigations of possible peripheral neuropathy.  Most peripheral nerves contain mixtures of individual sensory and motor nerve fibers, which may or may not be differentially sensitive to neurotoxicants.  It is possible to distinguish sensory from motor effects in peripheral nerve studies by measuring activity in sensory nerves or by measuring the muscle response evoked by nerve stimulation to measure motor effects.  While a number of endpoints can be recorded, the most critical variables are nerve conduction velocity, response amplitude, and refractory period.  It is important to recognize that damage to nerve fibers may not be reflected in changes in these endpoints if the damage is not sufficiently extensive.  Thus, the interpretation of data from such studies may be enhanced if evaluations such as nerve pathology and/or other structural measures are also included.

Nerve conduction measurements are influenced by a number of factors, the most important of which is temperature.  An adequate nerve conduction study will either measure the temperature of the limb under study and mathematically adjust the results according to well-established temperature factors or will control limb temperature within narrow limits.  Studies that measure peripheral nerve function without regard for temperature are not adequate for risk assessment.

In well-controlled studies, statistically significant decreases in nerve conduction velocity are indicative of a neurotoxic effect.  While a decrease in nerve conduction velocity is indicative of demyelination, it frequently occurs later in the course of axonal degradation because normal conduction velocity may be maintained for some time in the face of axonal degeneration.  For this reason, a measurement of normal nerve conduction velocity does not rule out peripheral axonal degeneration if other signs of peripheral nerve dysfunction are present.

Decreases in response amplitude reflect a loss of active nerve fibers and may occur prior to decreases in conduction velocity in the course of peripheral neuropathy.  Hence, changes in response amplitude may be more sensitive measurements of axonal degeneration than is conduction velocity.  Measurements of response amplitude, however, can be more variable and require careful application of experimental techniques, a larger sample size, and greater statistical power than measurements of velocity to detect changes.  The refractory period refers to the time required after stimulation before a nerve can fire again and reflects the functional status of nerve membrane ion channels.  Chemically induced changes in refractory periods in a well-controlled study indicate a neurotoxic effect.

In summary, alterations in peripheral nerve response amplitude and refractory period in studies that are well controlled for temperature are indicative of a neurotoxic effect.  Alterations in peripheral nerve function are frequently associated with clinical signs such as numbness, tingling, or burning

27

sensations or with motor impairments such as weakness.  Examples of compounds that alter peripheral nerve function in humans or experimental animals include acrylamide, carbon disulfide, n-hexane, lead, and some organophosphates.

3.1.2.2.2.  Sensory, Motor, and Other Evoked Potentials.  Evoked potential studies are electrophysiological procedures that measure the response elicited from a defined stimulus such as a tone, a light, or a brief electrical pulse.  Evoked potentials reflect the function of the system under study, including visual, auditory, or somatosensory; motor, involving motor nerves and innervated muscles; or other neural pathways in the central or peripheral nervous system (Rebert, 1983; Dyer, 1985; Mattsson and Albee, 1988; Mattsson et al., 1992; Boyes, 1992, 1993).  Evoked potential studies should be interpreted with respect to the known or presumed neural generators of the responses, and their likely relationships with behavioral outcomes, when such information is available.  Such correlative information strengthens the confidence in electrophysiological outcomes.  In the absence of such supportive information, the extent to which evoked potential studies provide convincing evidence of neurotoxicity is a matter of professional judgment on a case-by-case basis.  Judgments should consider the nature, magnitude, and duration of such effects, along with other factors discussed elsewhere in this document.

Data are in the form of a voltage record collected over time and can be quantified in several ways.  Commonly, the latency (time from stimulus onset) and amplitude (voltage) of the positive and negative voltage peaks are identified and measured.  Alternative measurement schemes may involve substitution of spectral phase or template shifts for peak latency and spectral power, spectral amplitude, root-mean-square, or integrated area under the curve for peak amplitude.  Latency measurements are dependent on both the velocity of nerve conduction and the time of synaptic transmission.  Both of these factors depend on temperature, as discussed in regard to nerve conduction, and similar caveats apply for sensory evoked potential studies.  In studies that are well controlled for temperature, increases in latencies or related measures can reflect deficits in nerve conduction, including demyelination or delayed synaptic transmission, and are indicators of a neurotoxic effect.

Decreases in peak latencies, like increases in nerve conduction velocity, are unusual, but the neural systems under study in sensory evoked potentials are complex, and situations that might cause a peak measurement to occur earlier are conceivable.  Two such situations are a reduced threshold for spatial or temporal summation of afferent neural transmission and a selective loss of cells responding late in the peak, thus making the measured peak occur earlier. Decreases in peak latency should not be

28

dismissed outright as experimental or statistical error, but should be examined carefully and perhaps replicated to assess possible neurotoxicity.  A decrease in latency is not conclusive evidence of a neurotoxic effect.

Changes in peak amplitudes or equivalent measures reflect changes in the magnitude of the neural population responsive to stimulation.  Both increases and decreases in amplitude are possible following exposure to chemicals.  Whether excitatory or inhibitory neural activity is translated into a positive or negative deflection in the sensory evoked potential is dependent on the physical orientation of the electrode with respect to the tissue generating the response, which is frequently unknown. Comparisons should be based on the absolute change in amplitude. Therefore, either increases or decreases in amplitude may be indicative of a neurotoxic effect.

Within any given sensory system, the neural circuits that generate various evoked potential peaks differ as a function of peak latency.  In general, early latency peaks reflect the transmission of afferent sensory information.  Changes in either the latency or amplitude of these peaks are considered convincing evidence of a neurotoxic effect that is likely to be reflected in deficits in sensory perception. The later-latency peaks, in general, reflect not only the sensory input but also the more nonspecific factors such as the behavioral state of the subject, including such factors as arousal level, habituation, or sensitization (Dyer, 1987).  Thus, changes in later-latency evoked potential peaks should be interpreted in light of the behavioral status of the subject and would generally be considered evidence of a neurotoxic effect.

3.1.2.2.3.  Seizures/Convulsions.  Some neurotoxicants (e.g., lindane, pyrethroids, trimethyltin, dichlorodiphenyltrichloroethane [DDT]) produce observable convulsions.  When convulsionlike behaviors are observed, as described in the behavioral section on convulsions, neurophysiological recordings can provide additional information to help interpret the results. Recordings of brain electrical activity that demonstrate seizurelike activity are indicative of a neurotoxic effect.

In addition to producing seizures directly, chemicals may also alter the frequency, severity, duration, or threshold for eliciting seizures through other means by a phenomenon known as "kindling." Such alterations can occur after acute exposure or after repeated exposure to dose levels below the acute threshold.  In experiments demonstrating changes in sensitivity following repeated exposures to the test compound, information regarding possible changes in the pharmacokinetic distribution of the compound is required before the seizure susceptibility changes can be interpreted as evidence of neurotoxicity.  Increases in susceptibility to seizures are considered adverse.

29

3.1.2.2.4.  Electroencephalography (EEG).  EEG analysis is used widely in clinical settings for the diagnosis of neurological disorders, and less often for the detection of subtle toxicant-induced dysfunction (WHO, 1986; Eccles, 1988).  The basis for using EEG in either setting is the relationship between specific patterns of EEG waveforms and specific behavioral states.  Because states of alertness and stages of sleep are associated with distinct patterns of electrical activity in the brain, it is generally thought that arousal level can be evaluated by monitoring the EEG.  Dissociation of EEG activity and behavior can, however, occur after exposure to certain chemicals.  Normal patterns of transition between sleep stages or between sleeping and waking states are known to remain disturbed for prolonged periods of time after exposure to some chemicals.  Changes in the pattern of the EEG can be elicited by anesthetic drugs and stimuli producing arousal (e.g., lights, sounds).  In studies with toxicants, changes in EEG pattern can sometimes precede alterations in other objective signs of neurotoxicity (Dyer, 1987).

EEG studies should be done under highly controlled conditions, and the data should be considered on a case-by-case basis.  Chemically induced seizure activity detected in the EEG pattern is evidence of a neurotoxic effect.

3.1.2.3.  Neurochemical Endpoints of Neurotoxicity

Many different neurochemical endpoints have been measured in neurotoxicological studies, and some have proven useful in advancing the understanding of mechanisms of action of neurotoxic chemicals (Bondy, 1986; Mailman, 1987; Morell and Mailman, 1987; Costa, 1988; Silbergeld, 1993). Normal functioning of the nervous system depends on the synthesis and release of specific neurotransmitters and activation of their receptors at specific presynaptic and postsynaptic sites. Chemicals can interfere with the ionic balance of a neuron, act as a cytotoxicant after transport into a nerve terminal, block reuptake of neurotransmitters and their precursors, act as a metabolic poison, overstimulate receptors, block transmitter release, and inhibit transmitter synthetic or catabolic enzymes. Table 4 lists several chemicals that produce neurotoxic effects at the neurochemical level (Bondy, 1986; Mailman, 1987; Morell and Mailman, 1987; Costa, 1988).

**Table 4.  Examples of neurotoxicants with known neurochemical mechanisms**

| Site of action | Examples |
|---|---|
| Neurotoxicants acting on ionic balance:<br>    Inhibit sodium entry<br>    Block closing of sodium channel<br>    Increase permeability to sodium<br>    Increase intracellular calcium | <br>Tetrodotoxin<br>p,p'-DDT, pyrethroids<br>Batrachotoxin<br>Chlorodecone |
| Synaptic neurotoxicants | MPTP |
| Uptake blockers | Hemicholinium |
| Metabolic poisons | Cyanide |
| Hyperactivation of receptors | Domoic acid |
| Blocks transmitter release | Botulinum toxin |
| Inhibition of transmitter degradation | Pesticides of the organophosphate and carbamate classes |
| Blocks axonal transport | Acrylamide |

31

As stated previously, any neurochemical change is potentially neurotoxic.  Persistent or irreversible chemically induced neurochemical changes are indicative of neurotoxicity.  Because the ultimate functional significance of some biochemical changes is not known at this time, neurochemical studies should be interpreted with reference to the presumed neurotoxic consequence(s) of the neurochemical changes.  For example, many neuroactive agents can increase or decrease neurotransmitter levels, but such changes are not  indicative of a neurotoxic effect.  If, however, these neurochemical changes may be expected to have neurophysiological, neuropathological, or neurobehavioral correlates, then the neurochemical changes could be classified as neurotoxic effects.

Some neurotoxicants, such as the organophosphate and carbamate pesticides, are known to inhibit the activity of a specific enzyme, acetylcholinesterase (for a review see Costa, 1988), which hydrolyzes the neurotransmitter acetylcholine.  Inhibition of the enzyme in either the  central or peripheral nervous system prolongs the action of the acetylcholine at the neuron's synaptic receptors and is thought to be responsible for the range of effects these chemicals produce, although it is possible that these compounds have other modes of action (Eldefrawi et al., 1992; Greenfield et al., 1984; Small, 1990).

There is agreement that objective clinical measures of cholinergic overstimulation (e.g., salivation, sweating, muscle weakness, tremor, blurred vision) can be used to evaluate dose-response and dose-effect relationships and define the presence and absence of effects.  A given depression in peripheral and central cholinesterase activity may or may not be accompanied by clinical manifestations.  A depression in RBC and/or plasma cholinesterase activity may or may not be accompanied by clinical manifestations.  It should be noted, however, that reduction in cholinesterase activity, even if the anticholinesterase exposure is not severe enough to precipitate clinical signs or symptoms, may impair the organism's ability to adapt to additional exposures to anticholinesterase compounds.  Inhibition of RBC and/or plasma cholinesterase activity is a biomarker of exposure, as well as a reflection of cholinesterase inhibition in other peripheral tissues (e.g., neuromuscular junction, peripheral nerve, or ganglia) (Maxwell et al., 1987; Nagymajtenyi et al., 1988; Padilla et al., 1994), thereby contributing to the overall hazard identification of cholinesterase-inhibiting compounds.

The risk assessor should also be aware that tolerance to the cholinergic overstimulation may be observed following repeated exposure to cholinesterase-inhibiting chemicals.  It has been reported, however, that although tolerance can develop to some effects of cholinesterase inhibition, the cellular mechanisms responsible for the development of tolerance may also lead to the development of other effects, i.e., cognitive dysfunction, not present at the time of initial exposure (Bushnell et al., 1991).

These adaptive biochemical changes in the tolerant animal may render it supersensitive to subsequent exposure to cholinergically active compounds (Pope et al., 1992).

In general, the risk assessor should understand that assessment of cholinesterase-inhibiting chemicals should be done on a case-by-case basis using a weight-of evidence approach in which all of the available data (e.g., brain, blood, and other tissue cholinesterase activity, as well as the presence or absence of clinical signs) is considered in the evaluation.  Generally, the toxic effects of anticholinesterase compounds are viewed as reversible, but there is human and experimental animal evidence indicating that there may be residual, if not permanent, effects of exposure to these compounds (Steenland et al., 1994; Tandon et al., 1994; Stephens et al., 1995).      A subset of organophosphate agents also produces organophosphate-induced delayed neuropathy (OPIDN) after acute or repeated exposure.  Inhibition and aging of neurotoxic esterase (or neuropathy enzymes) are associated with agents that produce OPIDN (Johnson, 1990; Richardson, 1995).  The conclusion that a chemical may produce OPIDN should be based on at least two of three factors: (1) evidence of a clinical syndrome, (2) pathological lesions, and (3) neurotoxic esterase (NTE)  inhibition.  NTE inhibition is necessary, but not sufficient, evidence of the potential to produce OPIDN when there is at least 55%-70% inhibition after acute exposure (Ehrich et al., 1995) and at least 45% inhibition following repeated exposure.

Chemically induced injury to the central nervous system may be accompanied by hypertrophy of astrocytes.  In some cases, these astrocytic changes can be seen light microscopically with immunohistochemical stains for glial fibrillary acidic protein (GFAP), the major intermediate filament protein in astrocytes.  In addition, GFAP can be quantified by an immunoassay, which has been proposed as a marker of astrocyte reactivity (O'Callaghan, 1988).  Immunohistochemical stains have the advantage of better localization of GFAP increases, whereas immunoassay evaluations are superior at detecting and quantifying changes in GFAP levels and establishing dose-response relationships.  The ability to detect and quantify changes in GFAP by immunoassay is improved by dissecting and analyzing multiple brain regions.  The interpretation of a chemical-induced change in GFAP is facilitated by corroborative data from the neuropathology or neuroanatomy evaluation.  A number of chemicals known to injure the central nervous system, including trimethyltin, methylmercury, cadmium, 3-acetylpyridine, and methylphenyltetrahydropyridine (MPTP), have been shown to increase levels of GFAP. Measures of GFAP are now included as an optional test in the Neurotoxicity Screening Battery (U.S. EPA, 1991a).

Increases in GFAP above control levels may be seen at dosages below those necessary to produce damage seen by standard microscopic or histopathological techniques.  Because increases in GFAP reflect an astrocyte response in adults, treatment-related increases in GFAP are considered to be evidence that a neurotoxic effect has occurred.  There is less agreement as to how to interpret decreases in GFAP relative to an appropriate control group.  The absence of a change in GFAP following exposure does not mean that the chemical is devoid of neurotoxic potential.  Known neurotoxicants such as cholinesterase-inhibiting pesticides, for example, would not be expected to increase brain levels of GFAP.  Interpretation of GFAP changes prior to weaning may be confounded by the possibility that chemically induced increases in GFAP could be masked by changes in the concentration of this protein associated with maturation of the central nervous system, and these data may be difficult to interpret.

3.1.2.4.  Behavioral Endpoints of Neurotoxicity

Behavior reflects the integration of the various functional components of the nervous system.  Changes in behavior can arise from a direct effect of a toxicant on the nervous system, or indirectly from its effects on other physiological systems.  Understanding the interrelationship between systemic toxicity and behavioral changes (e.g., the relationship between liver damage and motor activity) is extremely important.  The presence of systemic toxicity may complicate, but does not preclude, interpretation of behavioral changes as evidence of neurotoxicity.  In addition, a number of behaviors (e.g., schedule-controlled behavior) may require a motivational component for successful completion of the task.  In such cases, experimental paradigms designed to assess the motivation of an animal during behavior might be necessary to interpret the meaning of some chemical-induced changes in behavior.

EPA's testing guidelines developed for the Toxic Substances Control Act and the Federal Insecticide, Fungicide and Rodenticide Act describe the use of functional observational batteries (FOB), motor activity, and schedule-controlled behavior for assessing neurotoxic potential (U.S. EPA, 1991a).  Examples of measures obtained in a typical FOB are presented in Table 5.  There are many other measures of behavior, including specialized tests of motor and sensory function and of learning and memory (Tilson, 1987; Anger, 1984).

**Table 5.  Examples of measures in a representative functional observational battery**

| Home cage and open field | Manipulative | Physiological |
|---|---|---|
| Arousal | Approach response | Body temperature |
| Autonomic signs | Click response | Body weight |
| Convulsions, tremors | Foot splay | |
| Gait | Grip strength | |
| Mobility | Righting reflex | |
| Posture | Tail pinch response | |
| Rearing | | |
| Stereotypy | | |
| Touch response | | |

**Table 6.  Examples of specialized behavioral tests to measure neurotoxicity**

| Function | Procedure | Representative agents |
|---|---|---|
| **Motor function** | | |
| Weakness | Grip strength, swimming endurance, suspension rod, discriminative motor function | n-Hexane, methyl n-Butylketone, carbaryl |
| Incoordination | Rotorod, gait assessments, righting reflex | 3-Acetylpyridine, ethanol |
| Tremor | Rating scale, spectral analysis | Chlordecone, Type I pyrethroids, DDT |
| Myoclonic spasms | Rating scale | DDT, Type II pyrethroids |
| **Sensory function** | | |
| Auditory | Discrimination conditioning Reflex  modification | Toluene, trimethyltin |
| Visual | Discrimination conditioning | Methylmercury |
| Somatosensory | Discrimination conditioning | Acrylamide |
| Pain sensitivity | Discrimination conditioning | Parathion |
| Olfactory | Discrimination conditioning | 3-Methylindole, methylbromide |
| **Cognitive function** | | |
| Habituation | Startle reflex | Diisopropylfluorophosphate Pre/neonatal methylmercury |
| Classical conditioning | Nictitating membrane Conditioned flavor aversion Passive avoidance Olfactory conditioning | Aluminum Carbaryl Trimethyltin, IDPN Neonatal trimethyltin |

| Instrumental conditioning | One-way avoidance | Chlordecone |
| | Two-way avoidance | Pre/neonatal lead |
| | Y-maze avoidance | Hypervitaminosis A |
| | Biel water maze | Styrene |
| | Morris water maze | DFP |
| | Radial arm maze | Trimethyltin |
| | Delayed matching to sample | DFP |
| | Repeated acquisition | Carbaryl |

**Table 6.  Examples of specialized behavioral tests to measure neurotoxicity  (cont.)**

At the present time, there is no clear consensus concerning the use of specific behavioral tests to assess chemical-induced sensory, motor, or cognitive dysfunction in animal models.  The risk assessor should also know that the literature is clear that a number of other behaviors besides those listed in Tables 1, 5, and 6 could be affected by chemical exposure.  For example, alterations in food and water intake, reproduction, sleep, temperature regulation, and circadian rhythmicity are controlled by specific regions of the brain, and chemical-induced alterations in these behaviors could be indicative of neurotoxicity.  It is reasonable to assume that a NOAEL or LOAEL could be based on one or more of these endpoints.

The following sections describe, in general, behavioral tests and their uses and offer guidance on interpreting data.

3.1.2.4.1.  Functional Observational Battery (FOB).  An FOB is designed to detect and quantify major overt behavioral, physiological, and neurological signs (Gad, 1982; O'Donoghue, 1989; Moser, 1989). A number of batteries have been developed, each consisting of tests generally intended to evaluate various aspects of sensorimotor function (Tilson and Moser, 1992).  Many FOB tests are essentially clinical neurological examinations that rate the presence or absence, and in many cases the severity, of specific neurological signs.  Some FOBs in animals are similar to clinical neurological examinations used with human patients.  Most FOBs have several components or tests.  A typical FOB is summarized in Table 5 and evaluates several functional domains, including neuromuscular (i.e., weakness, incoordination, gait, and tremor), sensory (i.e., audition, vision, and somatosensory), and autonomic (i.e., pupil response and salivation) function.

The relevance of statistically significant test results from an FOB is judged according to the number of signs affected, the dose(s) at which effects are observed, and the nature, severity, and persistence of the effects and their incidence in relation to control animals.  In general, if only a few unrelated measures in the FOB are affected, or the effects are unrelated to dose, the results may not be considered evidence of a neurotoxic effect.  If several neurological signs are affected, but only at the high dose and in conjunction with other overt signs of toxicity, including systemic toxicity, large decreases in body weight, decreases in body temperature, or debilitation, there is less persuasive evidence of a direct neurotoxic effect.  In cases where several related measures in a battery of tests are affected and the effects appear to be dose dependent, the data are considered to be evidence of a neurotoxic effect, especially in the absence of systemic toxicity.  The risk assessor should be aware of

the potential for a number of false positive statistical findings in these studies because of the large number of endpoints customarily included in the FOB.

FOB data can be grouped into one or more of several neurobiological domains, including neuromuscular (i.e., weakness, incoordination, abnormal movements, gait), sensory (i.e, auditory, visual, somatosensory), and autonomic functions (Tilson and Moser, 1992). This statistical technique may be useful when separating changes that occur on the basis of chance or in conjunction with systemic toxicity from those treatment-related changes indicative of neurotoxic effects. In the case of the developing organism, chemicals may alter the maturation or appearance of sensorimotor reflexes. Significant alterations in or delay of such reflexes is evidence of a neurotoxic effect.

Examples of chemicals that affect neuromuscular function are 3-acetylpyridine, acrylamide, and triethyltin. Organophosphate and carbamate insecticides produce autonomic dysfunction, while organochlorine and pyrethroid insecticides increase sensorimotor sensitivity, produce tremors and, in some cases, cause seizures and convulsions (Spencer and Schaumburg, 1980).

3.1.2.4.2. Motor Activity. Motor activity represents a broad class of behaviors involving coordinated participation of sensory, motor, and integrative processes. Assessment of motor activity is noninvasive and has been used to evaluate the effects of acute and repeated exposure to neurotoxicants (MacPhail et al., 1989). An organism's level of activity can, however, be affected by many different types of environmental agents, including nonneurotoxic agents. Motor activity measurements also have been used in humans to evaluate disease states, including disorders of the nervous system (Goldstein and Stein, 1985).

Motor activity is usually quantified as the frequency of movements over a period of time. The total counts generated during a test period will depend on the recording mechanism and the size and configuration of the testing apparatus. Effects of agents on motor activity can be expressed as absolute activity counts or as a percentage of control values. In some cases, a transformation (e.g., square root) may be used to achieve a normal distribution of the data. In these cases, the transformed data and not raw data should be used for risk assessment purposes. The frequency of motor activity within a session usually decreases and is reported as the average number of counts occurring in each successive block of time. The EPA's Office of Prevention, Pesticides and Toxic Substances guidelines (U.S. EPA, 1991a), for example, call for test sessions of sufficient duration to allow motor activity to approach steady-state levels during the last 20 percent of the session for control animals. A sum of the counts in each epoch will add up to the total number of counts per session.

39

Motor activity can be altered by a number of experimental factors, including neurotoxic chemicals.  Decreases in activity could occur following high doses of non-neurotoxic agents (Kotsonis and Klaassen, 1977; Landauer et al., 1984).  Examples of neurotoxic agents that decrease motor activity include many pesticides (e.g., carbamates, chlorinated hydrocarbons, organophosphates, and pyrethroids), heavy metals (lead, tin, and mercury), and other agents (3-acetylpyridine, acrylamide, and 2,4-dithiobiuret).  Some neurotoxicants (e.g., toluene, xylene, triadimefon) produce transient increases in activity by presumably stimulating neurotransmitter release, while others (e.g., trimethyltin) produce persistent increases in motor activity by destroying specific regions of the brain (e.g., hippocampus).

Following developmental exposures, neurotoxic effects are often observed as a change in the ontogenetic profile or maturation of motor activity patterns.  Frequently, developmental exposure to neurotoxic agents will produce an increase in motor activity that persists into adulthood or that results in changes in other behaviors.  This is evidence of a neurotoxic effect. Like other organ systems, the nervous system may be differentially sensitive to toxicants in groups such as the young.  For example, toxicants introduced to the developing nervous system may kill stem cells and thus cause profound effects on adult structure and function.  Moreover, toxicants may have greater access to the developing nervous system before the blood-brain barrier is completely formed or before metabolic detoxifying systems are functional.

Motor activity measurements are typically used with other tests (e.g., FOB) to help detect neurotoxic effects.  Agent-induced changes in motor activity associated with other overt signs of toxicity (e.g., loss of body weight, systemic toxicity) or occurring in non-dose-related fashion are of less concern than changes that are dose dependent, are related to structural or other functional changes in the nervous system, or occur in the absence of life-threatening toxicity.

3.1.2.4.3. Schedule-Controlled Operant Behavior.  Schedule-controlled operant behavior (SCOB) involves the maintenance of behavior (e.g., performance of a lever-press or key-peck response) by reinforcement.  Different rates and patterns of responding are controlled by the relationship between response and subsequent reinforcement.  SCOB provides a measure of performance of a learned behavior (e.g., lever press or key peck) and involves training and motivational variables that should be considered in evaluating the data.  Agents may interact with sensory processing, motor output, motivational variables (i.e., related to reinforcement), training history, and baseline characteristics (Rice, 1988; Cory-Slechta, 1989).  Qualitatively, rates and patterns of SCOB display cross-species

40

generality, but the quantitative measures of rate and pattern of performance can vary within and between species.

In laboratory animals, SCOB has been used to study a wide range of neurotoxicants, including methylmercury, many pesticides, organic and inorganic lead, triethyltin, and trimethyltin (MacPhail, 1985; Tilson, 1987; Rice, 1988).  The primary SCOB endpoints for evaluation are response rate and the temporal pattern of responding.  These endpoints may vary as a function of the contingency between responding and reinforcement presentation (i.e., schedule of reinforcement).  Schedules of reinforcement that have been used in toxicology studies include fixed ratio and fixed interval schedules. Fixed ratio schedules engender high rates of responding and a characteristic pause after delivery of each reinforcement.  Fixed interval schedules engender a relatively low rate of responding during the initial portion of the interval and progressively higher rates near the end of the interval.  For some schedules of reinforcement, the temporal pattern of responding may play a more important role in defining the performance characteristics than the rate of responding.  For other schedules, the reverse may be true.  For example, the temporal pattern of responding may be more important than rate of responding for defining performance on a fixed interval schedule.  For a fixed ratio schedule, more importance might be placed on the rate of responding than on the post-reinforcement pause.

The overall qualitative patterns are important properties of the behavior.  Substantial qualitative changes in operant performance, such as elimination of characteristic response patterns, can be evidence of an adverse effect.  Most chemicals, however, can disrupt operant behavior at some dose, and such adverse effects may be due either to neurotoxic or non-neurotoxic mechanisms.  Unlike large qualitative changes in operant performance, small quantitative changes are not adverse.  Some changes may actually represent an improvement, e.g., an increase in the index of curvature with a decrease in fixed interval rate of responding. Assessing the toxicological importance of these effects requires considerable professional judgment and evaluation of converging evidence from other types of toxicological endpoints. While most chemicals decrease the efficiency of responding at some dose, some agents may increase response efficiency on schedules requiring high response rates because of a stimulant effect or an increase in central nervous system excitability.  Agent-induced changes in responding between reinforcements (i.e., the temporal pattern of responding) may occur independently of changes in the overall rate of responding.  Chemicals may also affect the reaction time to respond following presentation of a stimulus.  Agent-induced changes in response rate or temporal patterning associated with other overt signs of toxicity (e.g., body weight loss, systemic toxicity, or occurring in a non-dose-related fashion) are of less concern than changes that are dose dependent, related to

41

structural or other functional changes in the nervous system, or occur in the absence of life-threatening toxicity.

3.1.2.4.4.  Convulsions.  Observable convulsions in animals are indicative of an adverse effect. These events can reflect central nervous system activity comparable to that of epilepsy in humans and could be defined as neurotoxicity.  Occasionally, other toxic actions of compounds, such as direct effects on muscle, might mimic some convulsionlike behaviors.  In some cases, convulsions or convulsionlike behaviors may be observed in animals that are otherwise severely compromised, moribund, or near death.  In such cases, convulsions might reflect an indirect effect of systemic toxicity and are less clearly indicative of neurotoxicity.  As discussed in the section on neurophysiological measures, electrical recordings of brain activity could be used to determine specificity of effects on the nervous system.

3.1.2.4.5.  Specialized Tests for Neurotoxicity.  Several procedures have been developed to measure agent-induced changes in specific neurobehavioral functions such as motor, sensory, or cognitive function (Tilson, 1987; Cory-Slechta, 1989).  Table 6 lists several behavioral tests, the neurobehavioral functions they were designed to assess, and agents known to affect the response. Many of these tests in animals have been designed to assess neural functions in humans using similar testing procedures.

A statistically or biologically significant chemically induced change in any measure in  Table 6 may be evidence of an adverse effect.  However, judgments of neurotoxicity may involve not only the analysis of changes seen but the structure and class of the chemical and other available neurochemical, neurophysiological, and neuropathological evidence.  In general, behavioral changes seen across broader dose ranges indicate more specific actions on the systems underlying those changes, i.e., the nervous system.  Changes that are not dose dependent or that are confounded with body weight changes and/or other systemic toxicity may be more difficult to interpret as neurotoxic effects.

3.1.2.4.5.1.  Motor Function.  Neurotoxicants commonly affect motor function.  These effects can be categorized generally into (1) weakness or decreased strength, (2) tremor, (3) incoordination, and (4) spasms, myoclonia, or abnormal motor movements (Tilson, 1987; Cory-Slechta, 1989). Specialized tests used to assess strength include measures of grip strength, swimming endurance, suspension from a hanging rod, and discriminative motor function.  Rotorod and gait assessments are used to measure coordination, while rating scales and spectral analysis techniques can be used to quantify tremor and other abnormal movements.

42

3.1.2.4.5.2.  Sensory Function.  Gross perturbations of sensory function can be observed in simple neurological assessments such as the hot plate or tail flick test.  However, these tests may not be sufficiently sensitive to detect subtle sensory changes.  Psychophysical procedures that study the relationship between a physical dimension (e.g., intensity, frequency) of a stimulus and behavior may be necessary to quantify agent-induced alterations in sensory function.  Examples of psychophysical procedures include discriminated conditioning and startle reflex modification.

3.1.2.4.5.3.  Cognitive Function.  Alterations in learning and memory in experimental animals should be inferred from changes in behavior following exposure when compared with that seen prior to exposure or with a nonexposed control group.  Learning is defined as a relatively lasting change in behavior due to experience, and memory is defined as the persistence of a learned behavior over time.  Table 6 lists several examples of learning and memory tests and representative neurotoxicants known to affect these tests.  Measurement of changes in learning and memory should be separated from other changes in behavior that do not involve cognitive or associative processes (i.e., motor function, sensory capabilities, motivational factors).  In addition, any apparent toxicant-induced change in learning or memory should ideally be demonstrated over a range of stimulus and response conditions and testing conditions.  In developmental exposures, it should be shown that the animals have matured enough to perform the specified task.  Developmental neurotoxicants can accelerate or delay the ability to learn a response or may interfere with cognitive function at the time of testing.  Older animals frequently perform poorly on some types of tests, and it should be demonstrated that control animals in this population are capable of performing the procedure.  Neurotoxicants might accelerate age-related dysfunction or alter motivational variables that are important for learning to occur.  Further, it is not the case that a decrease in responding on a learning task is adverse while an increase in performance on a learning task is not.  It is well known that lesions in certain regions of the brain can facilitate the acquisition of certain types of behaviors by removing preexisting response tendencies (e.g., inhibitory responses due to stress) that moderate the rate of learning under normal circumstances.

Apparent improvement in performance is not either adverse or beneficial until demonstrated to be so by converging evidence with a variety of experimental methods.  Examples of procedures to assess cognitive function include simple habituation, classical conditioning, and operant (or instrumental) conditioning, including tests for spatial learning and memory.

3.1.2.4.5.4.  Developmental Neurotoxicity.  Although the previous discussion of various neurotoxicity endpoints and tests applies to studies in which developmental exposures are used, there are particular issues of importance in the evaluation of developmental neurotoxicity studies. This section underscores the importance of detecting neurotoxic effects following developmental exposure because an NRC (1993) report has indicated that infants and children may be differentially sensitive to environmental chemicals such as pesticides.  Exposure to chemicals during development can result in a spectrum of effects, including death, structural abnormalities, altered growth, and functional deficits (U.S. EPA, 1991b).  A number of agents have been shown to cause developmental neurotoxicity when exposure occurred during the period between conception and sexual maturity (e.g., Riley and Vorhees, 1986; Vorhees, 1987).

Table 7 lists several examples of  agents known to produce developmental neurotoxicity in experimental animals.  Animal models of developmental neurotoxicity have been shown to be sensitive to several environmental agents known to produce developmental neurotoxicity in humans, including lead, ethanol, x-irradiation, methylmercury, and polychlorinated biphenyls (PCBs) (Kimmel et al., 1990; Needleman, 1990; Jacobson et al., 1985; Needleman, 1986).  In many of these cases, functional deficits are observed at dose levels below those at which other indicators of developmental toxicity are evident or at minimally toxic doses in adults.  Such effects may be transient, but generally are considered adverse.  Developmental exposure to a chemical could result in transient or reversible effects observed during early development that could reemerge as the individual ages (Barone et al., 1995).

**Table 7.  Examples of compounds or treatments producing developmental neurotoxicity**

| Alcohols | Methanol, ethanol |
|---|---|
| Antimitotics | X-radiation, azacytidine |
| Insecticides | DDT, chlordecone |
| Metals | Lead, methylmercury, cadmium |
| Polyhalogenated hydrocarbons | PCBs, PBBs |

Testing for developmental neurotoxicity has not been required routinely by regulatory agencies in the United States, but is required by EPA when other information indicates the potential for developmental neurotoxicity (U.S. EPA, 1986, 1988a, 1988b, 1989, 1991a, 1991b). Useful data for decision making may be derived from well-conducted adult neurotoxicity studies, standard developmental toxicity studies, and multigeneration studies, although the dose levels used in the latter may be lower than those in studies with shorter term exposure.

Important design issues to be evaluated for developmental neurotoxicity studies are similar to those for standard developmental toxicity studies (e.g., a dose-response approach with the highest dose producing minimal overt maternal or perinatal toxicity, with number of litters large enough for adequate statistical power, with randomization of animals to dose groups and test groups, with litter generally considered as the statistical unit). In addition, the use of a replicate study design provides added confidence in the interpretation of data. A pharmacological/physiological challenge may also be valuable in evaluating neurological function and "unmasking" effects not otherwise detectable. For example, a challenge with a psychomotor stimulant such as d-amphetamine may unmask latent developmental neurotoxicity (Hughes and Sparber, 1978; Adams and Buelke-Sam, 1981; Buelke-Sam et al., 1985).

Direct extrapolation of developmental neurotoxicity to humans is limited in the same way as for other endpoints of toxicity, i.e., by the lack of knowledge about underlying toxicological mechanisms and their significance (U.S. EPA, 1991b). However, comparisons of human and animal data for several agents known to cause developmental neurotoxicity in humans showed many similarities in effects (Kimmel et al., 1990). As evidenced primarily by observations in laboratory animals, comparisons at the level of functional category (sensory, motivational, cognitive, motor function, and social behavior) showed close agreement across species for the agents evaluated, even though the specific endpoints used to assess these functions varied considerably across species (Stanton and Spear, 1990). Thus, it can be assumed that developmental neurotoxicity effects in animal studies indicate the potential for altered neurobehavioral development in humans, although the specific types of developmental effects seen in experimental animal studies will not be the same as those that may be produced in humans. Therefore, when data suggesting adverse effects in developmental neurotoxicity studies are encountered for particular agents, they should be considered in the risk assessment process.

Functional tests with a moderate degree of background variability (e.g., a coefficient of variability of 20% or less) may be more sensitive to the effects of an agent on behavioral endpoints than are tests with low variability that may be impossible to disrupt without

45

using life-threatening doses.  A battery of functional tests, in contrast to a single test, is usually needed to evaluate the full complement of nervous system functions in an animal.  Likewise, a series of tests conducted in animals in several age groups may provide more information about maturational changes and their persistence than tests conducted at a single age.

It is a well-established principle that there are critical developmental periods for the disruption of functional competence, which include both the prenatal and postnatal periods to the time of sexual maturation, and the effect of a toxicant is likely to vary depending on the time and degree of exposure (Rodier, 1978, 1990).  It is also important to consider the data from studies in which postnatal exposure is included, as there may be an interaction of the agent with maternal behavior, milk composition, or pup suckling behavior, as well as possible direct exposure of pups via dosed food or water (Kimmel et al., 1992).

Agents that produce developmental neurotoxicity at a dose that is not toxic to the maternal animal are of special concern.  However, adverse developmental effects are often produced at doses that cause mild maternal toxicity (e.g., 10%-20%  reduction in weight gain during gestation and lactation).  At doses causing moderate maternal toxicity (i.e., 20% or more reduction in weight gain during gestation and lactation), interpretation of developmental effects may be confounded.  Current information is inadequate to assume that developmental effects at doses causing minimal maternal toxicity result only from maternal toxicity; rather, it may be that the mother and developing organism are equally sensitive to that dose level.  Moreover, whether developmental effects are secondary to maternal toxicity or not, the maternal effects may be reversible while the effects on the offspring may be permanent.  These are important considerations for agents to which humans may be exposed at minimally toxic levels either voluntarily or involuntarily, because several agents (e.g., alcohol) are known to produce adverse developmental effects at minimally toxic doses in adult humans (Coles et al., 1991).

Although interpretation of developmental neurotoxicity data may be limited, it is clear that functional effects should be evaluated in light of other toxicity data, including other forms of developmental toxicity (e.g., structural abnormalities, perinatal death, and growth retardation). For example, alterations in motor performance may be due to a skeletal malformation rather than nervous system change.  Changes in learning tasks that require a visual cue might be influenced by structural abnormalities in the eye.  The level of confidence that an agent produces an adverse effect may be as important as the type of change seen, and confidence may be increased by such factors as reproducibility of the effect, either in another study of the same function or by convergence of data from tests that purport to measure similar functions.  A dose-response relationship is an extremely important

measure of a chemical's effect; in the case of developmental neurotoxicity both monotonic and biphasic dose-response curves are likely, depending on the function being tested.  The EPA Guidelines for Developmental Toxicity Risk Assessment (U.S. EPA, 1991b) may be consulted for more information on interpreting developmental toxicity studies.  The endpoints frequently used to assess developmental neurotoxicity in exposed children have been reviewed by Winneke (1995).

### 3.1.3.  Other Considerations

#### 3.1.3.1.  Pharmacokinetics

Extrapolation of test results between species can be aided considerably by data on the pharmacokinetics of a particular agent in the species tested and, if possible, in humans.  Information on a toxicant's half-life, metabolism, absorption, excretion, and distribution to the peripheral and central nervous system may be useful in predicting risk.  Of particular importance for the pharmacokinetics of neurotoxicants is the blood-brain barrier.  The vast majority of the central nervous system is served by blood vessels with blood-brain barrier properties, which exclude most ionic and nonlipid-soluble chemicals from the brain and spinal cord.  The brain contains several structures called circumventricular organs (CVOs) that are served by blood vessels lacking blood-brain barrier properties.  Brain regions adjacent to these CVOs are thus exposed to relatively high levels of many neurotoxicants. Pharmacokinetic data may be helpful in defining the dose-response curve, developing a more accurate basis for comparing species sensitivity (including that of humans), determining dosimetry at sites, and comparing pharmacokinetic profiles for various dosing regimens or routes of administration.  The correlation of pharmacokinetic parameters and neurotoxicity data may be useful in determining the contribution of specific pharmacokinetic processes to the effects observed.

#### 3.1.3.2.  Comparisons of Molecular Structure

Comparisons of the chemical or physical properties of an agent with those of known neurotoxicants may provide some indication of the potential for neurotoxicity.  Such information may be helpful for evaluating potential toxicity when only minimal data are available.  The structure-activity relationships (SAR) of some chemical classes have been studied, including hexacarbons, organophosphates, carbamates, and pyrethroids.  Therefore, class relationships or SAR may help predict neurotoxicity or interpret data from neurotoxicological studies.  Under certain circumstances (e.g., in the case of new chemicals), this procedure is one of the primary methods used to evaluate the potential for toxicity when little or no empirical toxicity data are available.  It should be recognized,

47

however, that effects of chemicals in the same class can vary widely. Moser (1995), for example, reported that the behavioral effects of prototypic cholinesterase-inhibiting pesticides differed qualitatively in a battery of behavioral tests.

### 3.1.3.3. Statistical Considerations

Properly designed studies on the neurotoxic effects of compounds will include appropriate statistical tests of significance. In general, the likelihood of obtaining a significant effect will depend jointly on the magnitude of the effect and the variability obtained in control and treated groups. The risk assessor should be aware that some neurotoxicants may induce a greater variability in biologic response, rather than a clear shift in mean or other parameters (Laties and Evans, 1980; Glowa and MacPhail, 1995). A number of texts are available on standard statistical tests (e.g., Siegel, 1956; Winer, 1971; Sokal and Rohlf, 1969; Salsburg, 1986; Gad and Weil, 1988).

Neurotoxicity data present some unique features that should be considered in selecting statistical tests for analysis. Data may involve several different measurement scales, including categorical (affected or not), rank (more or less affected), and interval and ratio scales of measurement (affected by some percentage). For example, convulsions are usually recorded as being present or absent (categorical), whereas neuropathological changes are frequently described in terms of the degree of damage (rank). Many tests of neurotoxicity involve interval or ratio measurements (e.g., frequency of photocell interruptions or amplitude of an evoked potential), which are the most powerful and sensitive scales of measurement. In addition, measurements are frequently made repeatedly in control and treated subjects, especially in the case of behavioral and neurophysiological endpoints. For example, OPPTS guidelines for FOB assessment call for evaluations before exposure and at several times during exposure in a subchronic study (U.S. EPA, 1991a).

Descriptive data (categorical) and rank order data can be analyzed using standard nonparametric techniques (Siegel, 1956). In some cases, if it is determined that the data fit the linear model, the categorical modeling procedure can be used for weighted least-squares estimation of parameters for a wide range of general linear models, including repeated-measures analyses. The weighted least-squares approach to categorical and rank data allows computation of statistics for testing the significance of sources of variation as reflected by the model. In the case of studies assessing effects in the same animals at several time points, univariate analyses can be carried out at each time point when the overall dose effect or the dose-by-time interaction is significant.

Continuous data (e.g., magnitude, rate, amplitude), if found to be normally distributed, can be analyzed with general linear models using a grouping factor of dose and, if necessary, repeated measures across time (Winer, 1971). Univariate analyses of dose, comparing dose groups to the control group at each time point, can be performed when there is a significant overall dose effect or a dose-by-time interaction. Post hoc comparisons between control and treatment groups can be made following tests for overall significance. In the case of multiple endpoints within a series of evaluations, some type of correction for multiple observations is warranted (Winer, 1971).

### 3.1.3.4. In Vitro Data in Neurotoxicology

Methods and procedures that fall under the general heading of short-term tests include an array of in vitro tests that have been proposed as alternatives to whole-animal tests (Goldberg and Frazier, 1989). In vitro approaches use animal or human cells, tissues, or organs and maintain them in a nutritive medium. Various types of in vitro techniques, including primary cell cultures, cell lines, and cloned cells, produce data for evaluating potential and known neurotoxic substances. While such procedures are important in studying the mechanism of action of toxic agents, their use in hazard identification in human health risk assessment has not been explored to any great extent.

Data from in vitro procedures are generally based on simplified approaches that require less time to yield information than do many in vivo techniques. However, in vitro methods generally do not take into account the distribution of the toxicant in the body, the route of administration, or the metabolism of the substance. It also is difficult to extrapolate in vitro data to animal or human neurotoxicity endpoints, which include behavioral changes, motor disorders, sensory and perceptual disorders, lack of coordination, and learning deficits. In addition, data from in vitro tests cannot duplicate the complex neuronal circuitry characteristic of the intact animal.

Many in vitro systems are now being evaluated for their ability to predict the neurotoxicity of various agents seen in intact animals. This validation process requires considerations in study design, including defined endpoints of toxicity and an understanding of how a test agent would be handled in vitro as compared to the intact organism. Demonstrated neurotoxicity in vitro in the absence of in vivo data is suggestive but inadequate evidence of a neurotoxic effect. In vivo data supported by in vitro data enhance the reliability of the in vivo results.

### 3.1.3.5. Neuroendocrine Effects

Neuroendocrine dysfunction may occur because of a disturbance in the regulation and modulation of neuroendocrine feedback systems.  One major indicator of neuroendocrine function is secretion of hormones from the pituitary.  Hypothalamic control of anterior pituitary secretions is also involved in a number of important bodily functions.  Many types of behaviors (e.g., reproductive behaviors, sexually dimorphic behaviors in animals) are dependent on the integrity of the hypothalamic-pituitary system, which could represent a potential site of neurotoxicity.  Pituitary secretions arise from a number of different cell types in this gland, and neurotoxicants could affect these cells directly or indirectly.  Morphological changes in cells mediating neuroendocrine secretions could be associated with adverse effects on the pituitary or hypothalamus and could ultimately affect behavior and the functioning of the nervous system. Biochemical changes in the hypothalamus may also be used as indicators of potential adverse effects on neuroendocrine function.  Finally, the development of the nervous system is intimately associated with the presence of circulating hormones such as thyroid hormone (Porterfield, 1994).  The nature of the nervous system deficit, which could include cognitive dysfunction, altered neurological development, or visual deficits, depends on the severity of the thyroid disturbance and the specific developmental period when exposure to the chemical occurred.

## 3.2.  *Dose-Response Evaluation*

Dose-response evaluation is a critical part of the qualitative characterization of a chemical's potential to produce neurotoxicity and involves the description of the dose-response relationship in the available data.  Human studies covering a range of exposures are rarely available, and therefore animal data are typically used for estimating exposure levels likely to produce adverse effects in humans.  Evidence for a dose-response relationship is an important criterion in establishing a neurotoxic effect, although this analysis may be limited when based on standard studies using three dose groups or fewer.  The evaluation of dose-response relationships includes identifying effective dose levels as well as doses associated with no increase in adverse effects when compared with controls.  The lack of a dose-response relationship in the data may suggest that the effect is not related to the putative neurotoxic effect or that the study was not appropriately controlled.  Much of the focus is on identifying the critical effect(s) observed at the LOAEL and the NOAEL associated with that effect.  The NOAEL is defined as the highest dose at which there is no statistically or biologically significant increase in the frequency of an adverse neurotoxic effect when compared with the appropriate control group in a database characterized as having sufficient evidence for use in a risk assessment (see section 3.3).  The risk

assessor should be aware of possible problems associated with estimating a NOAEL in studies involving a small number of test subjects and that have a poor dose-response relationship.

In addition to identifying the NOAEL/LOAEL or BMD, the dose-response evaluation defines the range of doses that are neurotoxic for a given agent, species, route of exposure, and duration of exposure.  In addition to these considerations, pharmacokinetic factors and other aspects that might influence comparisons with human exposure scenarios should be taken into account.  For example, dose-response curves may exhibit not only monotonic but also U-shaped or inverted U-shaped functions (Davis and Svendsgaard, 1990).  Such curves are hypothesized to reflect multiple mechanisms of action, the presence of homeostatic mechanisms, and/or activation of compensatory or protective mechanisms.  In addition to considering the shape of the dose-response curve, it should also be recognized that neurotoxic effects vary in terms of nature and severity across dose or exposure level.  At high levels of exposure, frank lesions accompanied by severe functional impairment may be observed.  Such effects are widely accepted as adverse.  At progressively lower levels of exposure, however, the lesions may become less severe and the impairments less obvious.  At levels of exposure near the NOAEL and LOAEL, the effects will often be mild, possibly reversible, and inconsistently found.  In addition, the endpoints showing responses may be at levels of organization below the whole organism (e.g., neurochemical or electrophysiological endpoints).  The adversity of such effects can be disputed (e.g., cholinesterase inhibition), yet it is such effects that are likely to be the focus of risk assessment decisions.  To the extent possible, this document provides guidance on determining the adversity of neurotoxic effects.  However, the identification of a critical adverse effect often requires considerable professional judgment and should consider factors such as the biological plausibility of the effect, the evidence of a dose-effect continuum, and the likelihood for progression of the effect with continued exposure.

## 3.3. *Characterization of the Health-Related Database*

This section describes a scheme for characterizing the sufficiency of evidence for neurotoxic effects.  This scheme defines two broad categories: sufficient and insufficient (Table 8).  Categorization is aimed at providing certain criteria for the Agency to use to define the minimum evidence necessary to define hazards and to conduct dose-response analyses.  It does not address the issues related to characterization of risk, which requires analysis of potential human exposures and their relation to potential hazards in order to estimate the risks of those hazards from anticipated or estimated

exposures.  Several examples using a weight-of-evidence approach similar to that described in these Guidelines have been described elsewhere (Tilson et al., 1995; Tilson et al., 1996).

**Table 8.  Characterization of the health-related database**

| | |
|---|---|
| **Sufficient evidence** | The sufficient evidence category includes data that collectively provide enough information to judge whether or not a human neurotoxic hazard could exist. This category may include both human and experimental animal evidence. |
| **Sufficient human evidence** | This category includes agents for which there is sufficient evidence from epidemiologic studies, e.g., case control and cohort studies, to judge that some neurotoxic effect is associated with exposure.  A case series in conjunction with other supporting evidence may also be judged "sufficient evidence." Epidemiologic and clinical case studies should discuss whether the observed effects can be considered biologically plausible in relation to chemical exposure.<br><br>(Historically, often much has been made of the notion of causality in epidemiologic studies.  Causality is a more stringent criterion than association and has become a topic of scientific and<br>philosophical debate.  See Susser [1986], for example, for a discussion of inference in epidemiology.) |
| **Sufficient experimental animal evidence/limited human data** | This category includes agents for which there is sufficient evidence from experimental animal studies and/or limited human data to judge whether a potential neurotoxic hazard may exist.  Generally, agents that have been tested according to current test guidelines would be included in this category.  The minimum evidence necessary to judge that a potential hazard exists would be data demonstrating an adverse neurotoxic effect in a single appropriate, well-executed study in a single experimental animal species.  The minimum evidence needed to judge that a potential hazard does not exist would include data from an appropriate number of  endpoints from more than one study and two species showing no adverse neurotoxic effects at doses that were minimally toxic in terms of producing an adverse effect.  Information on pharmacokinetics, mechanisms, or known properties of the chemical class may also strengthen the evidence. |

| | |
|---|---|
| **Insufficient evidence** | This category includes agents for which there is less than the minimum evidence sufficient for identifying whether or not a neurotoxic hazard exists, such as agents for which there are no data on neurotoxicity or agents with databases from studies in animals or humans that are limited by study design or conduct (e.g., inadequate conduct or report of clinical signs).  Many general toxicity studies, for example, are considered insufficient in terms of the conduct of clinical neurobehavioral observations or the number of samples taken for histopathology of the nervous system.  Thus, a battery of negative toxicity studies with these shortcomings would be regarded as providing insufficient evidence of the lack of a neurotoxic effect of the test material. Further, most screening studies based on simple observations involving autonomic and motor function provide insufficient evaluation of many sensory or cognitive functions. Data, which by itself would likely fall in this category, would also include information on SAR or data from in vitro tests.  Although such information would be insufficient by itself to proceed further in the assessment it could be used to support the need for additional testing. |

**Table 8.  Characterization of the health-related database (cont.)**

Data from all potentially relevant studies, whether indicative of potential hazard or not, should be included in this characterization.  The primary sources of data are human studies and case reports, experimental animal studies, other supporting data, and in vitro and/or SAR data. Because a complex interrelationship exists among study design, statistical analysis, and biological significance of the data, a great deal of scientific judgment, based on experience with neurotoxicity data and with the principles of study design and statistical analysis, is required to adequately evaluate the database on neurotoxicity.  In many cases, interaction with scientists in specific disciplines either within or outside the field of neurotoxicology (e.g., epidemiology, statistics) may be appropriate.

The adverse nature of different neurotoxicity endpoints may be a complex judgment.  In general, most neuropathological and many neurobehavioral changes are regarded as adverse. However, there are adverse behavioral effects that may not reflect a direct action on the nervous system. Neurochemical and electrophysiological changes may be regarded as adverse because of their known or presumed relation to neuropathological and/or neurobehavioral consequences.  In the absence of supportive information, a professional judgment should be made regarding the adversity of such outcomes, considering factors such as the nature, magnitude, and duration of the effects reported. Thus, correlated measures of neurotoxicity strengthen the evidence for a hazard.  Correlations between functional and morphological effects, such as the correlation between leg weakness and paralysis and peripheral nerve damage from exposure to tri-ortho-cresyl phosphate, are the most common and striking example of this form of validity. Correlations support a coherent and logical link between behavioral effects and biochemical mechanisms.  Replication of a finding also strengthens the evidence for a hazard.  Some neurotoxicants cause similar effects across most species.  Many chemicals shown to produce neurotoxicity in laboratory animals have similar effects in humans.  Some neurological effects may be considered adverse even if they are small in magnitude, reversible, or the result of indirect mechanisms.

Because of the inherent difficulty in "proving any negative,"  it is more difficult to document a finding of no apparent adverse effect than a finding of an adverse effect.  Neurotoxic effects (and most kinds of toxicity) can be observed at many different levels, so only a single endpoint needs to be found to demonstrate a hazard, but many endpoints need to be examined to demonstrate no effect.  For example, to judge that a hazard for neurotoxicity could exist for a given agent, the minimum evidence sufficient would be data on a single adverse endpoint from a well-conducted study.  In contrast, to judge that an agent is unlikely to pose a hazard for

neurotoxicity, the minimum evidence would include data from a host of endpoints that revealed no neurotoxic effects.  This may include human data from appropriate studies that could support a conclusion of no evidence of a neurotoxic effect.  With respect to clinical signs and symptoms, human exposures can reveal far more about the absence of effects than animal studies, which are confined to the signs examined.

In some cases, it may be that no individual study is judged sufficient to establish a hazard, but the total available data may support such a conclusion.  Pharmacokinetic data and structure-activity considerations, data from other toxicity studies, or other factors may affect the strength of the evidence in these situations.  For example, given that gamma diketones are known to cause motor system neurotoxicity, a marginal data set on a candidate gamma diketone, e.g., 1/10  animals affected, might be more likely to be judged sufficient than equivalent data from a member of a chemical class about which nothing is known.

A judgment that the toxicology database is sufficient to indicate a potential neurotoxic hazard is not the end of analysis.  The circumstances of expression of the hazard are essential to describing human hazard potential.  Thus, reporting should contain the details of the circumstances under which effects have been observed, e.g., "long-term oral exposures of adult rodents to compound X at levels of roughly 1 mg/kg have been associated with ataxia and peripheral nerve damage."

56

## 4. Quantitative Dose-Response Analysis

This section describes several approaches (including the LOAEL/NOAEL and BMD) for determining the reference dose (RfD) or reference concentration (RfC). The NOAEL or BMD/uncertainty factor approach results in an RfD or RfC, which is an estimate (with uncertainty spanning perhaps an order of magnitude) of a daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime.

The dose-response analysis characterization should:

C   Describe how the RfD/RfC was calculated;

C   Discuss the confidence in the estimates;

C   Describe the assumptions or uncertainty factors used; and

C   Discuss the route and level of exposure observed, as compared to expected human exposures.

### 4.1. *LOAEL/NOAEL and BMD Determination*

As indicated earlier, the LOAEL and NOAEL are determined for endpoints that are seen at the lowest dose level (so-called critical effect). Several limitations in the use of the NOAEL have been identified and described (e.g., Barnes and Dourson, 1988; Crump, 1984). For example, the NOAEL is derived from a single endpoint from a single study (the critical study) and ignores both the slope of the dose-response function and baseline variability in the endpoint of concern. Because the baseline variability is not taken into account, the NOAEL from a study using small group sizes may be higher than the NOAEL from a similar study in the same species that uses larger group sizes. The NOAEL is also directly dependent on the dose spacing used in the study. Finally, and perhaps most importantly, use of the NOAEL does not allow estimates of risk or extrapolation of risk to lower dose levels. Because of these and other limitations in the NOAEL approach, it has been proposed that mathematical curve-fitting techniques (Crump, 1984; Gaylor and Slikker, 1990; Glowa, 1991; Glowa and MacPhail, 1995; U.S. EPA, 1995a) be compared with the NOAEL procedure in calculating the RfD or RfC. These techniques typically apply a mathematical function that describes the dose-response relationship and then interpolate to a level of exposure associated with a small increase in effect over that occurring in the control group or under baseline conditions. The BMD has been defined as a lower confidence limit on the effective dose associated with some defined level of effect, e.g., a 5% or 10% increase in response. These guidelines suggest that the use of the BMD should be

explored in specific situations.  The Agency is currently developing guidelines for the use of the BMD in risk assessment.

Many neurotoxic endpoints provide continuous measures of response, such as response speed, nerve conduction velocity, IQ score, degree of enzyme inhibition, or the accuracy of task performance. Although it is possible to impose a dichotomy on a continuous effects distribution and to classify some level of response as "affected" and the remainder as "unaffected," it may be very difficult and inappropriate to establish such clear distinctions, because such a dichotomy would misrepresent the true nature of the neurotoxic response.  The risk assessor should be aware of the importance of trying to reconcile findings from several studies that seem to report widely divergent results.  Alternatively, quantitative models designed to analyze continuous effect variables may be preferable.  Other techniques that allow this approach, with transformation of the information into estimates of the incidence or frequency of affected individuals in a population, have been proposed (Crump, 1984; Gaylor and Slikker, 1990; Glowa and MacPhail, 1995).  Categorical regression analysis has been proposed because it can evaluate different types of data and derive estimates for short-term exposures (Rees and Hattis, 1994).  Decisions about the most appropriate approach require professional judgment, taking into account the biological nature of the continuous effect variable and its distribution in the population under study.

Although dose-response functions in neurotoxicology are generally linear or monotonic, curvilinear functions, especially U-shaped or inverted U-shaped curves, have been reported as noted earlier (section 3.2).  Dose-response analyses should consider the uncertainty that U-shaped dose-response functions might contribute to the estimate of the NOAEL/LOAEL or BMD. Typically, estimates of the NOAEL/LOAEL are taken from the lowest part of the dose-response curve associated with impaired function or adverse effect.

## 4.2.  *Determination of the Reference Dose or Reference Concentration*

Since the availability of dose-response data in humans is limited, extrapolation of data from animals to humans usually involves the application of uncertainty factors to the NOAEL/LOAEL or BMD.  The NOAEL or BMD/uncertainty factor approach results in an RfD or RfC, which is an estimate (with uncertainty spanning perhaps an order of magnitude) of a daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime.  The oral RfD and inhalation RfC are applicable to chronic exposure situations and are based on an evaluation of all the noncancer health effects, including neurotoxicity data.  RfDs

58

and RfCs in the Integrated Risk Information System (IRIS-2) database for several agents are based on neurotoxicity endpoints and include a few cases in which the RfD or RfC is calculated using the BMD approach (e.g., methylmercury, carbon disulfide).  The size of the final uncertainty factor used will vary from agent to agent and will require the exercise of scientific judgment, taking into account interspecies differences, the shape of the dose-response curve, and the neurotoxicity endpoints observed. Uncertainty factors are typically multiples of 10 and are used to compensate for human variability in sensitivity, the need to extrapolate from animals to humans, and the need to extrapolate from less than lifetime (e.g., subchronic) to lifetime exposures.  An additional factor of up to 10 may be included when only a LOAEL (and not a NOAEL) is available from a study, or depending on the completeness of the database, a modifying factor of up to 10 may be applied, depending on the confidence one has in the database.  Uncertainty factors of less than 10 can be used, depending upon the availability of relevant information.  Barnes and Dourson (1988) provide a more complete description of the calculation, use, and significance of RfDs in setting exposure limits to toxic agents by the oral route.  Jarabek et al. (1990) provide a more complete description of the calculation, use, and significance of RfCs in setting exposure limits to toxic agents in air.  Neurotoxicity can result from acute, shorter term exposures, and it may be appropriate in some cases, e.g., for air pollutants or water contaminants, to set shorter term exposure limits for neurotoxicity as well as for other noncancer health effects.

**5.  Exposure Assessment**

Exposure assessment describes the magnitude, duration, frequency, and routes of exposure to the agent of interest.  This information may come from hypothetical values, models, or actual experimental values, including ambient environmental sampling results.  Guidelines for exposure assessment have been published separately (U.S. EPA, 1992) and will, therefore, be discussed only briefly here.

The exposure assessment should include an exposure characterization that:

C    Provides a statement of the purpose, scope, level of detail, and approach used in the exposure assessment;

C    Presents the estimates of exposure and dose by pathway and route for individuals, population segments, and populations in a manner appropriate for the intended risk characterization;

C    Provides an evaluation of the overall level of confidence in the estimate of exposure and dose and the conclusions drawn; and

C    Communicates the results of the exposure assessment to the risk assessor, who can then use the exposure characterization, along with the hazard and dose/response characterizations, to develop a risk characterization.

A number of considerations are relevant to exposure assessment for neurotoxicants.  An appropriate evaluation of exposure should consider the potential for exposure via ingestion, inhalation, and dermal penetration from relevant sources of exposure, including multiple avenues of intake from the same source.

In addition, neurotoxic effects may result from short-term (acute), high-concentration exposures as well as from longer term (subchronic), lower level exposures.  Neurotoxic effects may occur after a period of time following initial exposure or be obfuscated by repair mechanisms or apparent tolerance. The type and severity of effect may depend significantly on the pattern of exposure rather than on the average dose over a long period of time.  For this reason, exposure assessments for neurotoxicants may be much more complicated than those for long-latency effects such as carcinogenicity.  It is rare for sufficient data to be available to construct such patterns of exposure or dose, and professional judgment may be necessary to evaluate exposure to neurotoxic agents.

## 6. Risk Characterization

### 6.1. *Overview*

Risk characterization is the summarization step of the risk assessment process and consists of an integrative analysis and a summary.  The integrative analysis (a) involves integration of the toxicity information from the hazard characterization and dose-response analysis with the human exposure estimates, (b) provides an evaluation of the overall quality of the assessment and the degree of confidence in the estimates of risk and conclusions drawn, and (c) describes risk in terms of the nature and extent of harm.  The risk characterization summary communicates the results of the risk assessment to the risk manager in a complete, informative, and useful format.

This summary should include, but is not limited to, a discussion of the following elements:

C   Quality of and confidence in the available data;

C   Uncertainty analysis;

C   Justification of defaults or assumptions;

C   Related research recommendations;

C   Contentious issues and extent of scientific consensus;

C   Effect of reasonable alternative assumptions on conclusions and estimates;

C   Highlights of reasonable plausible ranges;

C   Reasonable alternative models; and

C   Perspectives through analogy.

The risk manager can then use the derived risk to make public health decisions.

An effective risk characterization should fully, openly, and clearly characterize risks and disclose the scientific analyses, uncertainties, assumptions, and science policies that underlie decisions throughout the risk assessment and risk management processes.  The risk characterization should feature values such as transparency in the decision-making process; clarity in communicating with the scientific community and the public regarding environmental risk and the uncertainties associated with assessments of environmental risk; and consistency across program offices in core assumptions and science policies, which are well grounded in science and reasonable.  The following sections describe these four aspects of the risk characterization in more detail.

### 6.2. *Integration of Hazard Characterization, Dose-Response Analysis, and Exposure Assessment*

In developing the hazard characterization, dose-response analysis, and exposure portions of the risk assessment, the risk assessor should take into account many judgments concerning human

relevance of the toxicity data, including the appropriateness of the various animal models for which data are available and the route, timing, and duration of exposure relative to expected human exposure. These judgments should be summarized at each stage of the risk assessment process (e.g., the biological relevance of anatomical variations may be established in the hazard characterization process, or the influence of species differences in metabolic patterns in the dose-response analysis). In integrating the information from the assessment, the risk assessor should determine if some of these judgments have implications for other portions of the assessment and whether the various components of the assessment are compatible.

The risk characterization should not only examine the judgments but also explain the constraints of available data and the state of knowledge about the phenomena studied in making them, including (1) the qualitative conclusions about the likelihood that the chemical may pose a specific hazard to human health, the nature of the observed effects, under what conditions (route, dose levels, time, and duration) of exposure these effects occur, and whether the health-related data are sufficient to use in a risk assessment; (2) a discussion of the dose-response characteristics of the critical effects, data such as the shapes and slopes of the dose-response curves for the various endpoints, the rationale behind the determination of the NOAEL and LOAEL and calculation of the benchmark dose, and the assumptions underlying the estimation of the RfD or RfC; and (3) the estimates of the magnitude of human exposure; the route, duration, and pattern of the exposure; relevant pharmacokinetics; and the number and characteristics of the population(s) exposed.

If data to be used in a risk characterization are from a route of exposure other than the expected human exposure, then pharmacokinetic data should be used, if available, to make extrapolations across routes of exposure. If such data are not available, the Agency makes certain assumptions concerning the amount of absorption likely or the applicability of the data from one route to another (U.S. EPA, 1992).

The level of confidence in the hazard characterization should be stated to the extent possible, including the appropriate category regarding sufficiency of the health-related data. A comprehensive risk assessment ideally includes information on a variety of endpoints that provide insight into the full spectrum of potential neurotoxicological responses. A profile that integrates both human and test species data and incorporates a broad range of potential adverse neurotoxic effects provides more confidence in a risk assessment for a given agent.

The ability to describe the nature of the potential human exposure is important in order to predict when certain outcomes can be anticipated and the likelihood of permanence or reversibility of

the effect.  An important part of this effort is a description of the nature of the exposed population and the potential for sensitive, highly susceptible, or highly exposed populations.  For example, the consequences of exposure to the developing individual versus the adult can differ markedly and can influence whether the effects are transient or permanent.  Other considerations relative to human exposures might include the likelihood of exposures to other agents, concurrent disease, and nutritional status.

The presentation of the integrated results of the assessment should draw from and highlight key points of the individual characterizations of component analyses performed under these Guidelines.  The overall risk characterization represents the integration of these component characterizations.  If relevant risk assessments on the agent or an analogous agent have been done by EPA or other Federal agencies, these should be described and the similarities and differences discussed.

## 6.3.  *Quality of the Database and Degree of Confidence in the Assessment*

The risk characterization should summarize the kinds of data brought together in the analysis and the reasoning on which the assessment is based.  The description should convey the major strengths and weaknesses of the assessment that arise from availability of data and the current limits of our understanding of the mechanisms of toxicity.

A health risk assessment is only as good as its component parts, i.e., hazard characterization, dose-response analysis, and exposure assessment.  Confidence in the results of a risk assessment is thus a function of confidence in the results of the analysis of these elements. Each of these elements should have its own characterization as a part of the assessment.  Within each characterization, the important uncertainties of the analysis and interpretation of data should be explained, and the risk manager should be given a clear picture of consensus or lack of consensus that exists about significant aspects of the assessment.  Whenever more than one view is supported by the data and choosing between them is difficult, all views should be presented.  If one has been selected over the others, the rationale should be given; if not, then all should be presented as plausible alternative results.

## 6.4.  *Descriptors of Neurotoxicity Risk*

There are a number of ways to describe risks.  Several relevant ways for neurotoxicity are as follows:

## 6.4.1.  Estimation of the Number of Individuals

The RfD or RfC is taken to be a chronic exposure level at or below which no significant risk occurs.  Therefore, presentation of the population in terms of those at or below the RfD or RfC ("not at risk") and above the RfD or RfC ("may be at risk") may be useful information for risk managers.  This method is particularly useful to a risk manager considering possible actions to ameliorate risk for a population.  If the number of persons in the at-risk category can be estimated, then the number of persons removed from the at-risk category after a contemplated action is taken can be used as an indication of the efficacy of the action.

### 6.4.2.  Presentation of Specific Scenarios

Presenting specific scenarios in the form of "what if?" questions is particularly useful to give perspective to the risk manager, especially where criteria, tolerance limits, or media quality limits are being set.  The question being asked in these cases is, at this proposed exposure limit, what would be the resulting risk for neurotoxicity above the RfD or RfC?

### 6.4.3.  Risk Characterization for Highly Exposed Individuals

This measure is one example of the just-discussed descriptor.  This measure describes the magnitude of concern at the upper end of the exposure distribution.  This allows risk managers to evaluate whether certain individuals are at disproportionately high or unacceptably high risk.

The objective of looking at the upper end of the exposure distribution is to derive a realistic estimate of a relatively highly exposed individual or individuals.  This measure could be addressed by identifying a specified upper percentile of exposure in the population and/or by estimating the exposure of the highest exposed individual(s).  Whenever possible, it is important to express the number of individuals who comprise the selected highly exposed group and discuss the potential for exposure at still higher levels.

If population data are absent, it will often be possible to describe a scenario representing high-end exposures using upper percentile or judgment-based values for exposure variables.  In these instances caution should be used in order not to compound a substantial number of high-end values for variables if a "reasonable" exposure estimate is to be achieved.

### 6.4.4.  Risk Characterization for Highly Sensitive or Susceptible Individuals

This measure identifies populations sensitive or susceptible to the effect of concern. Sensitive or susceptible individuals are those within the exposed population at increased risk of expressing the toxic

64

effect.  All stages of nervous system maturation might be considered highly sensitive or susceptible, but certain subpopulations can sometimes be identified because of critical periods for exposure, for example, pregnant or lactating women, infants, or children.  The aged population is considered to be at particular risk because of the limited ability of the nervous system to regenerate or compensate to neurotoxic insult.

In general, not enough is understood about the mechanisms of toxicity to identify sensitive subgroups for all agents, although factors such as nutrition (e.g., vitamin B), personal habits (e.g., smoking, alcohol consumption, illicit drug abuse), or preexisting disease (e.g., diabetes, neurological diseases, sexually transmitted diseases, polymorphisms for certain metabolic enzymes) may predispose some individuals to be more sensitive to the neurotoxic effects of specific agents.  Gender-related differences in response to neurotoxicants have been noted, but these appear to be related to gender-dependent toxicodynamic or toxicokinetic factors.

In general, it is assumed that an uncertainty factor of 10 for intrapopulation variability will be be able to accommodate differences in sensitivity among various subpopulations, including children and the elderly.  However, in cases where it can be demonstrated that a factor of 10 does not afford adequate protection, another uncertainty factor may be considered in conducting the risk assessment.

## 6.4.5.  Other Risk Descriptors

In risk characterization, dose-response information and the human exposure estimates may be combined either by comparing the RfD or RfC and the human exposure estimate or by calculating the margin of exposure (MOE).  The MOE is the ratio of the NOAEL from the most appropriate or sensitive species to the estimated human exposure level.  If a NOAEL is not available, a LOAEL may be used in calculating the MOE.  Alternatively, a benchmark dose may be compared with the estimated human exposure level to obtain the MOE.  Considerations for the evaluation of the MOE are similar to those for the uncertainty factor applied to the LOAEL/NOAEL or the benchmark dose.  The MOE is presented along with a discussion of the adequacy of the database, including the nature and quality of the hazard and exposure data, the number of species affected, and the dose-response information.

The RfD or RfC comparison with the human exposure estimate and the calculation of the MOE are conceptually similar but are used in different regulatory situations.  The choice of approach depends on several factors, including the statute involved, the situation being addressed, the database used, and the needs of the decision maker.  The RfD or RfC and the MOE are considered along with other risk

assessment and risk management issues in making risk management decisions, but the scientific issues that should be taken into account in establishing them have been addressed here.

If the MOE is equal to or more than the uncertainty factor multiplied by any modifying factor used as a basis for an RfD or RfC, then the need for regulatory concern is likely to be small.  Although these methods of describing risk do not actually estimate risks per se, they give the risk manager some sense of how close the exposures are to levels of concern.

### 6.5.  *Communicating Results*

Once the risk characterization is completed, the focus turns to communicating results to the risk manager.  The risk manager uses the results of the risk characterization along with other technological, social, and economic considerations in reaching a regulatory decision.  Because of the way in which these risk management factors may affect different cases, consistent but not  necessarily identical risk management decisions should be made on a case-by-case basis.  These Guidelines are not intended to give guidance on the nonscientific aspects of risk management decisions.

### 6.6.  *Summary and Research Needs*

These Guidelines summarize the procedures that the U.S. Environmental Protection Agency would use in evaluating the potential for agents to cause neurotoxicity.  These Guidelines discuss the general default assumptions that should be made in risk assessment for neurotoxicity because of gaps in our knowledge about underlying biological processes and how these compare across species. Research to improve the risk assessment process is needed in a number of areas. For example, research is needed to delineate the mechanisms of neurotoxicity and pathogenesis, provide comparative pharmacokinetic data, examine the validity of short-term in vivo and in vitro tests, elucidate the functional modalities that may be altered, develop improved animal models to examine the neurotoxic effects of exposure during the premating and early postmating periods and in neonates, further evaluate the relationship between maternal and developmental toxicity, provide insight into the concept of threshold, develop approaches for improved  mathematical modeling of neurotoxic effects, improve animal models for examining the effects of agents given by various routes of exposure, determine the effects of recurrent exposures over prolonged periods of time, and address the synergistic or antagonistic effects of mixed exposures and neurotoxic response.  Such research will aid in the evaluation and interpretation of data on neurotoxicity and should provide methods to assess risk more

66

precisely.  Additional research is needed to determine the most appropriate dose-response approach to be used  in neurotoxicity risk assessments.

# REFERENCES

Adams, J; Buelke-Sam, J. (1981) Behavioral testing of the postnatal animal: testing and methods development. In: Kimmel, CA; Buelke-Sam, J, eds. Developmental toxicology. New York: Raven Press, pp. 233-238.

Albert, A. (1973) Selective toxicity: the physico-chemical basis of therapy. New York: Wiley, pp. 173-211.

Anger, WK. (1984) Neurobehavioral testing of chemicals: impact on recommended standards. Neurobehav Toxicol Teratol 6:147-153.

Anger, WK. (1986) Workplace exposures. In: Annau, ZA, ed., Neurobehavioral toxicology. Baltimore: Johns Hopkins University Press, pp. 331-347.

Anger, WK. (1990) Worksite behavioral research: results, sensitive methods, test batteries, and the transition from laboratory data to human health. Neurotoxicology 11:627-718.

Anger, K; Johnson, BL. (1985) Chemicals affecting behavior. In: O'Donoghue, J, ed. Neurotoxicity of industrial and commercial chemicals. Boca Raton, FL: CRC Press.

Anger, WK; Otto, DA; Letz, R. (Eds) (1996) Symposium on computerized behavioral testing of humans in neurotoxicology research. Neurotoxicol Teratol 18:347-518.

Baker, ER; Letz, R; Fidler, A; Shalat, S; Plantamura, D; Lyndon, M. (1985) Computer-based neurobehavioral testing for occupational and environmental epidemiology: Methodology and validation studies. Neurobehav Teratol 7:369-377.

Barone, S; Stanton, ME; Mundy, WR. (1995) Neurotoxic effects of neonatal triethyl tin (TET) exposure are exacerbated with aging. Neurobiol Aging 16:723-735.

Barnes, DG; Dourson, M. (1988) Reference dose (RfD): description and use in health risk assessments. Regulat Toxicol Pharmacol 8:471-486.

Benignus, VA. (1993) Importance of experimenter-blind procedure in neurotoxicology. Neurotoxicol Teratol 15:45-49.

Bondy, SC. (1986) The biochemical evaluation of neurotoxic damage. Fundam Appl Toxicol 6:208-216.

Boyes, WK. (1992) Testing visual system toxicity using visual evoked potential technology.  In: Isaacson, RL; Jensen, KF, eds., The vulnerable brain and environmental risks, Vol. 1: Malnutrition and hazard assessment. New York: Plenum, pp. 193-222.

Boyes, WK. (1993) Sensory-evoked potentials: measures of neurotoxicity. In: Erinoff, L, ed. Assessing the toxicity of drugs of abuse. NIDA Research Monograph 136. National Institute on Drug Abuse, Alcohol, Drug Abuse and Mental Health Administration, U.S. Department of Health and Human Services, pp. 63-100.

Buelke-Sam, J; Kimmel, CA; Adams, J. (1985) Design considerations in screening for behavioral teratogens: results of the collaborative teratology study. Neurobehav Toxicol Teratol 7:537-589.

Bushnell, P; Padilla, S; Ward, T; Pope, C; Olszyk, V. (1991) Behavioral and neurochemical changes in rats dosed repeatedly with diisopropylfluorophosphate (DFP). J Pharmacol Exp Therap 256:741-750.

Callender, TJ; Morrow, L; Subramanian, K. (1994) Evaluation of chronic neurological sequelae after acute pesticide exposure using SPECT brain scans. J Toxicol Environ Health 41:275-284.

Carson, BL; Stockton, RA; Wilkinson, RR. (1987) Organomercury, lead, tin compounds in the environment and the potential for human exposure. In: Tilson, HA; Sparber, SB, eds. Neurotoxicants and neurobiological function: Effects of organoheavy metals. New York: J. Wiley, pp. 1-80.

Coles, CD; Brown, RT; Smith, IE; Platzman, KA; Erickson, S; Falek, A. (1991) Effects of prenatal alcohol exposure at school age I. Physical and cognitive development. Neurotoxicol Teratol 13:357-367.

Cory-Slechta, DA. (1989) Behavioral measures of neurotoxicity. Neurotoxicology 10:271-296.

Costa, LG. (1988) Interactions of neurotoxicants with neurotransmitter systems. Toxicology 49:359-366.

Crump, KS. (1984) A new method for determining allowable daily intakes. Fundam Appl Toxicol 4:854-871.

Davis, JM; Svendsgaard, DJ. (1990) U-shaped dose-response curves: their occurrence and implication for risk assessment. J Toxicol Environ Health 30:71-83.

Dyer, RS. (1985) The use of sensory evoked potentials in toxicology. Fundam Appl Toxicol 5:24-40.

Dyer, RS. (1987) Macrophysiological assessment of organometal neurotoxicity. In: Tilson, HA; Sparber, SB, eds. Neurotoxicants and neurobiological function effects of organoheavy metals. New York: J. Wiley, pp. 137-184.

Eccles, CU. (1988) EEG correlates of neurotoxicity. Neurotoxicol Teratol 10:423-428.

Ecobichon, DJ; Joy, RM. (1982) Pesticides and neurological diseases. Boca Raton, FL: CRC Press, pp. 151-203.

Ecobichon, DJ; Davies, JE; Doull, J; Ehrich, M; Joy, R; McMillan, D; MacPhail, R; Reiter, LW; Slikker, W, Jr.; Tilson, H. (1990) Neurotoxic effects of pesticides. In: Baker, SR;
Wilkinson, CF, eds. The effect of pesticides on human health. Princeton, NJ: Princeton Scientific Publishing Co., Inc., pp. 131-199.

Ehrich, M; Jortner, BS; Padilla, S. (1995) Comparison of the relative inhibition of acetylcholinesterase and neuropathy esterase in rats and hens given cholinesterase inhibitors. Fundam Appl Toxicol 24:94-101.

Eldefrawi, AT; Jett, D; Eldefrawi, ME. (1992) Direct actions of organophosphorus anticholinesterases on muscarinic receptors. In: Chambers, JE; Levi, PE, eds. Organophosphates: chemistry, fate and effects. New York, Academic Press, pp. 257-270.

Friedlander, BR; Hearn, HT. (1980) Epidemiologic considerations in studying neurotoxic disease. In: Spencer, PS; Schaumberg, HH, eds. Experimental and clinical neurotoxicology. Baltimore: Williams and Wilkins, pp. 650-662.

Gad, SC. (1982) A neuromuscular screen for use in industrial toxicology. J Toxicol Environ Health 9:691-704.

Gad, S; Weil, CS. (1988) Statistics and experimental design for toxicologists, 2nd ed. Caldwell, NJ: Telford Press.

Gaylor, DW; Slikker, W. (1990) Risk assessment for neurotoxic effects. Neurotoxicology 11:211-218.

Glowa, JR. (1991) Dose-effect approaches to risk assessment. Neurosci Biobehav Rev 15:153-158.

Glowa, JR; MacPhail, RC. (1995) Qualitative approaches to risk assessment in neurotoxicology.  In: Chang, L; Slikker, W, eds. Neurotoxicology: approaches and methods. New York, Academic Press, pp 777-787.

Goldberg, AM; Frazier, JM. (1989) Alternatives to animals in toxicity testing. Sci Am 261:24-30.

Goldstein, MK; Stein, GH. (1985) Ambulatory activity in chronic disease. In: Tryon, WH, ed. Behavioral assessment in behavioral medicine. New York: Springer Publishing Co., pp. 160-162.

Greenfield, SA; Chubb, IW; Grunewald, RA; Henderson, Z; May, J; Protnoy, S; Weston, J; Wright, MC. (1984) A non-cholinergic function for acetylcholinesterase in substantia nigra: behavioral evidence. Exp Brain Res 54:513-520.

Griffin, JW. (1990) Basic pathologic processes in the nervous system. Toxicol Pathol 18:83-88.

Hayes, WJ. (1982) Pesticides studied in man. Baltimore: Williams and Wilkins.

Hughes, JA; Sparber, SB. (1978) d-Amphetamine unmasks postnatal consequences of exposure to methylmercury in utero: methods for studying behavioral teratogenesis. Pharmacol Biochem Behav 8:365-375.

Jacobson, JL; Jacobson, SW. (1996) Prospective, longitudinal assessment of developmental neurotoxicity. Environ Health Perspect 104: 275-283.

Jacobson, SW; Fein, GG; Jacobson, JL; Schwartz, PM; Dowler, JK. (1985) The effect of intrauterine PCB exposure on visual recognition memory. Child Dev 56:853-860.

Jarabek, AM; Menache, MG; Overton, JH; Dourson, ML; Miller, FJ. (1990) The U.S. Environmental Protection Agency's inhalation RfD methodology: risk assessment for air toxics. Toxicol Ind Health 6:279-301.

Johnson, MK. (1990) Organophosphates and delayed neuropathy: Is NTE alive and well? Toxicol Appl Pharmacol 102:385-399.

Kimmel, CA; Rees, DC; Francis, EZ, eds. (1990) Qualitative and quantitative comparability of human and animal developmental neurotoxicity. Neurotoxicol Teratol 12:175-292.

Kimmel, CA; Kavlock, RJ; Francis, EZ. (1992) Animal models for assessing developmental toxicity. In: Guzelian, PS; Henry, CJ; Olin, SS. eds. Similarities and differences between children and adults: implications for risk assessment. Washington, DC: ILSI Press, pp. 43-65.

Kotsonis, FN; Klaassen, CD. (1977) Toxicity and distributions of cadmium administered to rats at sublethal doses. Toxicol Appl Pharmacol 41:667-680.

Krinke, GJ. (1989) Neuropathologic screening in rodent and other species. J Am Coll Toxicol 8:141-155.

Landauer, MR; Tomlinson, NT; Balster, RL; MacPhail, RC. (1984) Some effects of the formamidine pesticide chlordimeform on the behavior of mice. Neurotoxicology 5:91-100.

Last, JM. (1986) Epidemiology and health information. In: Last, JM, ed. Public health and prevention medicine. New York: Appleton-Century-Crofts.

Laties, VG; Evans, HL. (1980) Methylmercury-induced changes in operant discrimination by the pigeon. J Pharmacol Exp Therap 214:620-628.

MacPhail, RC. (1985) Effects of pesticides on schedule-controlled behavior. In: Seiden, LS; Balster, RL, eds. Behavioral pharmacology: the current status. New York: A.R. Liss, pp. 519-535.

MacPhail, RC; Peele, DB; Crofton, KM. (1989) Motor activity and screening for neurotoxicity. J Am Coll Toxicol 8:117-125.

Mailman, RB. (1987) Mechanisms of CNS injury in behavioral dysfunction. Neurotoxicol Teratol 9:417-426.

Mattsson, JL; Albee, RR. (1992) Sensory evoked potentials in neurotoxicology. Neurotoxicol Teratol 10:435-443.

Mattsson, JL; Boyes, WK; Ross, JF. (1992) Incorporating evoked potentials into neurotoxicity test schemes. In: Tilson, HA; Mitchell, CL, eds. Target organ toxicology series: neurotoxicology. New York: Raven Press Ltd., pp. 125-145.

Mausner, JS; Kramer, S. (1985) Epidemiology: an introductory text, 2nd ed. Philadelphia: WB Saunders.

Maxwell, DM; Lenz, DE; Groff, WA; Kaminskis, A; Froehlich, HL. (1987) The effects of blood flow and detoxification on in vivo cholinesterase inhibition by Soman in rats. Toxicol Appl Pharmacol 88:66-76.

Morell, P; Mailman, RB. (1987) Selective and nonselective effects of organometals on brain neurochemistry. In: Tilson, HA; Sparber, SB, eds. Neurotoxicants and neurobiological function: effects of organoheavy metals. New York: Wiley, pp. 201-230.

Nagymajtenyi, L; Desi, I; Lorencz, R. (1988) Neurophysiological markers as early signs or organophosphate neurotoxicity. Neurotoxicol Teratol 10:429-434.

Moser, VC. (1989) Screening approaches to neurotoxicity: a functional observational battery. J Am Coll Toxicol 8:85-93.

Moser, VC. (1995) Comparisons of the acute effects of cholinesterase inhibitors using a neurobehavioral screening battery in rats. Neurotoxicol Teratol 17:617-625.

National Research Council (NRC). (1983) Risk assessment in the federal government. Managing the process. Washington, DC: National Academy of Sciences.

National Research Council (NRC). (1984) Toxicity testing: strategies to determine needs and priorities. Washington, DC: National Academy of Sciences.

National Research Council (NRC). (1986) Drinking water and health. Washington, DC: National Academy of Sciences, pp. 173-211.

National Research Council (NRC). (1994) Science and judgment in risk assessment. Washington, DC: National Academy of Sciences.

National Research Council (1993). Pesticides in the diets of infants and children. Washington, DC, National Academy of Sciences.

National Resources Defense Council (NRDC). (1989) Intolerable risk: pesticides in our children's food. New York: Natural Resources Defense Council.

71

Needleman, H. (1986) Epidemiological studies.  In: Annau, ZA, ed. Neurobehavioral toxicology. Baltimore: Johns Hopkins University Press, pp. 279-287.

Needleman, HL. (1990) Lessons from the history of childhood plumbism for pediatric neurotoxicology. In: Johnson, BL; Anger, WK; Durao, A; Xintaris, C, eds. Advances in neurobehavioral toxicology: application in environmental and occupational health. Chelsea, MI: Lewis Publishers, Inc., pp. 331-337.

O'Callaghan, JP. (1988) Neurotypic and gliotypic proteins as biochemical markers of neurotoxicity. Neurotoxicol Teratol 10:445-452.

O'Donoghue, JL. (1989) Screening for neurotoxicity using a neurologically based examination and neuropathology. J Am Coll Toxicol 8:97-115.

Office of Technology Assessment (OTA). (1990) Neurotoxicity: identifying and controlling poisons of the nervous system. U.S. Congress, Office of Technology Assessment (OTA-BA-436). Washington, DC: U.S. Government Printing Office.

Omerand, IE; Harding, AE; Miller, DH; Johnson, G; MacManus, D; duBoulay, EPGH; Kendall, BE; Moseley, IF; McDonald, WI. (1994) Magnetic resonance imaging in degenerative atoxic disorders. J Neurol Neurosurg Psychiatry 57:51-57.

Otto, DA. (1992) Assessment of neurobehavioral response in humans to a low level volatile organic compound (VOC) source. Ann. NY Acad Sci 641-248-260.

Padilla, S; Wilson, VZ; Bushnell, PJ. (1994) Studies on the correlation between blood cholinesterase inhibition and "tissue" inhibition in pesticide-treated rats. Toxicology 92:11-25.

Pope, CN; Chakraborti, TK; Chapman, ML; Farrar, JD. (1992) Long-term neurochemical and behavioral effects induced by acute chlorpyrifos treatment. Pharmacol Biochem Behav 42:251-256.

Porterfield, S. (1994) Vulnerability of the developing brain to thyroid abnormalities: environmental insults to the thyroid system. Environ Health Perspect 102:125-130.

Rebert, CS. (1983) Multisensory evoked potentials in experimental and applied neurotoxicology. Neurobehav Toxicol Teratol 5:659-671.

Reiter, LW. (1987) Neurotoxicology in regulation and risk assessment. Dev Pharmacol Ther 10:354-368.

Rees, DC; Hattis, D. (1994) Developing quantitative strategies for animal to human extrapolation. In: Hayes, AW, ed. Principles and methods of toxicology, 3rd ed. New York: Raven Press, pp. 275-315.

Reuhl, KR. (1991) Delayed expression of neurotoxicity: the problem of silent damage. Neurotoxicology 12:341-346.

Rice, DC. (1988) Quantification of operant behavior. Toxicol Lett 43:361-379.

Riley, EP; Vorhees, CV, eds. (1986) Handbook of behavioral teratology. New York: Plenum Press.

Richardson, RJ. (1995) Assessment of the neurotoxic potential of chlorpyrifos relative to other organophosphorus compounds: a critical review of the literature. J Toxicol Environ Health 44: 135-165.

Rodier, PM. (1978) Behavioral teratology. In: Wilson, JG; Fraser, FC, eds. Handbook of teratology, vol. 4. New York: Plenum Press, pp. 397-428.

Rodier, P. (1990) Developmental neurotoxicology. Toxicol Pathol 18:89-95.

Salsburg, DS. (1986) Statistics for toxicologists. New York: Marcel Dekker, Inc.

Sette, WF. (1987) Complexity of neurotoxicological assessment. Neurotoxicol Teratol 9:411-416.

Sette, WF; MacPhail, RC. (1992) Qualitative and quantitative issues in assessment of neurotoxic effects. In: Tilson, H; Mitchell, C, eds. Target organ toxicity series: Neurotoxicology, 2nd ed. New York: Raven Press, pp. 345-361.

Siegel, S. (1956) Nonparametric statistics for the behavioral sciences. New York: McGraw-Hill.

Silbergeld, EK. (1987) Neurochemical approaches to developing markers of neurotoxicity: Review of current status and evaluation of future prospects. Environ Res 63:274-286.

Silbergeld, EK; Percival, RV. (1987) The organometals: impact of accidental exposure and experimental data on regulatory policies. In: Tilson, HA; Sparber, SB, eds. Neurotoxicants and neurobiological function: effects of organoheavy metals. New York: J. Wiley, pp. 328-352.

Small, DH. (1990) Non-cholinergic actions of acetylcholinesterases: proteases regulating all growth and development? Trends Biol Sci 15:213-216.

Sokal, RR; Rohlf, FJ. (1969) Biometry. San Francisco: W.H. Freeman and Company.

Spencer, S; Schaumburg, HH. (1980) Experimental and clinical neurotoxicology. Baltimore: Williams and Wilkins.

Stanton, ME; Spear, LP. (1990) Workshop on the qualitative and quantitative comparability of human and animal developmental neurotoxicity. Workgroup I report: Comparability of measures of developmental neurotoxicity in humans and laboratory animals. Neurotoxicol Teratol 12:261-267.

Steenland, K; Jenkins, B; Ames, RG; O'Malley, M; Chrislip, D; Russo, J. (1994) Chronic neurological sequelae to organophosphate pesticide poisoning. Am J Public Health 84: 731-736.

Stephens, R; Sprugeon, A; Calvert, IA; Beach, J; Levy, LS; Berry, H; Harrington, JM. (1995) Neurophysiological effects of long-term exposure to organophosphates in sheep dip. The Lancet 345:1135-1139.

Sterman, AB; Schaumberg, HH. (1980) The neurological examination.  In: Spencer, PS; Schaumberg, HH, eds. Experimental and clinical neurotoxicology. Baltimore: Williams and Wilkins, pp. 675-680.

Susser, M. (1986) Rules of inference in epidemiology. Regulat Toxicol Pharmacol 6:116-128.

Tandon, P; Padilla, S; Barone, S; Pope, CN; Tilson, HA. (1994) Fenthion produces a persistent decrease in muscarinic receptor function in the adult rat retina. Toxicol Appl Pharmacol 125: 271-280.

Tilson, HA. (1987) Behavioral indices of neurotoxicity: what can be measured? Neurotoxicol Teratol 9:427-443.

Tilson, HA. (1990) Neurotoxicology in the 1990s. Neurotoxicol Teratol 12:293-300.

Tilson, HA; Moser, VC. (1992) Comparison of screening approaches. Neurotoxicology 13:1-14.

Tilson, HA; Mitchell, CL. (1983) Neurotoxicants and adaptive responses of the nervous system. Fed Proc 42:3189-3190.

Tilson, HA; MacPhail, RC; Crofton, KC. (1995) Defining neurotoxicity in a decision-making context. Neurotoxicology 16:363-375.

Tilson, HA; MacPhail, RC; Crofton, KC. (1996) Setting exposure standards: a decision process. Environ Health Perspect 104:401-405.

U.S. Environmental Protection Agency. (1986) Triethylene glycol monomethyl, monoethyl, and monobutyl ethers; proposed test rule. Federal Register 51:17883-17894.

U.S. Environmental Protection Agency. (1987, May 20) Toxic Substances Control Act testing guidelines. 50 FR 39397, September 27, 1985, as amended. 40 CFR 798.6050. Federal Register 52:19082.

U.S. Environmental Protection Agency. (1988a) Diethylene glycol butyl ether and diethylene glycol butyl ether acetate; final test rule. Federal Register 53:5932-5953.

U.S. Environmental Protection Agency. (1988b) Proposed guidelines for assessing male reproductive risk. Federal Register 53:24850-24869.

U.S. Environmental Protection Agency. (1989) FIFRA accelerated reregistration phase 3 technical guidance, Appendix D. Office of Prevention, Pesticides and Toxic Substances, Washington, DC. EPA No. 540/09-90-078. Available from: NTIS, Springfield, VA. PB-90-161530.

U.S. Environmental Protection Agency. (1991a) Pesticide assessment guidelines, subdivision F. Hazard evaluation: human and domestic animals. Addendum 10: Neurotoxicity, series 81, 82, and 83. Office of Prevention, Pesticides and Toxic Substances, Washington, DC. EPA 540/09-91-123. Available from: NTIS, Springfield, VA. PB91-154617.

U.S. Environmental Protection Agency. (1991b) Guidelines for developmental toxicity risk assessment. Federal Register 56:63798-63826.

U.S. Environmental Protection Agency. (1992) Guidelines for exposure assessment. Federal Register 57:22888-22938.

U.S. Environmental Protection Agency. (1994) Final report: principles of neurotoxicology risk assessment. Federal Register 59:42360-42404.

U.S. Environmental Protection Agency. (1995a) The use of the benchmark dose approach in health risk assessment. Office of Research and Development, Washington, DC. EPA/630/R-94/007.

U.S. Environmental Protection Agency. (1995b) Policy for Risk Characterization. Office of the Administrator, Washington, DC.

U.S. Environmental Protection Agency. (1995c) Guidance for Risk Characterization. Science Policy Council, Washington, DC.

U.S. Environmental Protection Agency. (1996) Guidelines for Reproductive Toxicity Risk Assessment. Federal Register 61:56274-56322.

Valciukas, JA. (1991) Foundations of environmental and occupational neurotoxicology. New York: Van Nostrand Reinhold.

Vorhees, CV. (1987) Reliability, sensitivity and validity of indices of neurotoxicity. Neurotoxicol Teratol 9:445-464.

Winer, BJ. (1971) Statistical principles in experimental design. New York: McGraw-Hill.

Winneke, G. (1995) Endpoints of developmental neurotoxicity in environmentally exposed children. Toxicol Lett 77:127-136.

World Health Organization. (1986) Principles and methods for the assessment of neurotoxicity associated with exposure to chemicals.  In: Environmental Health Criteria Document 60. Geneva: World Health Organization.

# **Exhibit 34**

EPA/635/R-07/005F
**www.epa.gov/iris**



# TOXICOLOGICAL REVIEW

# OF

# 2,2',4,4'-TETRABROMODIPHENYL ETHER (BDE-47)

### (CAS No. 5436-43-1)

## In Support of Summary Information on the Integrated Risk Information System (IRIS)

*June 2008*

U.S. Environmental Protection Agency
Washington, DC

**DISCLAIMER**

This document has been reviewed in accordance with U.S. Environmental Protection Agency policy and approved for publication.  Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

## 4.7.  SUSCEPTIBLE POPULATIONS AND LIFE STAGES

### 4.7.1.  Possible Childhood Susceptibility

A population subgroup is susceptible if exposure occurs during a period of sensitivity as observed in Eriksson et al. (2001) with adult mice exhibiting effects following neonatal exposure to BDE-47.  The neonatal stage is a period of rapid development of the nervous system and is considered a critical window of development.  The animal model indicates a potential for concern for early lifetime exposure (i.e., fetal or infant exposure) to the chemical.  The evidence of cerebellar and neocortical neuron BDE-47 accumulation in newborn rats (Kodavanti et al., 2005; Mundy et al., 2004) as well as the identification of BDE-47 in human maternal and cord serum, milk, and children's serum (Mazdai et al., 2003; Schecter et al., 2003; Thomsen et al., 2002) implies animals and humans are exposed to and accumulate BDE-47 during a period of rapid development of the brain.  This is a critical window of development and indicates a potential for susceptibility.  Whether such exposure constitutes a health risk for adverse neurodevelopmental effects in infants and children is not known at this time because of the limited toxicological database for BDE-47.  An association between prenatal or neonatal exposures to BDE-47 and neurobehavioral dysfunction in humans has not been established.

### 4.7.2.  Possible Gender Differences

Studies on BDE-47 are not available to determine whether susceptibility to BDE-47 differs in male and female humans or experimental animals.  A major urinary protein has been identified in male mice, which facilitates excretion of BDE-47 once the pathway for its synthesis becomes operational.  This decreases retention of BDE-47 in juvenile and mature males compared to females but is not functional during the early postnatal period of development.

# Exhibit 35

EPA/635/R-09/008F
www.epa.gov/iris



# TOXICOLOGICAL REVIEW

## OF

## 2-HEXANONE

(CAS No. 591-78-6)

**In Support of Summary Information on the
Integrated Risk Information System (IRIS)**

*September 2009*

U.S. Environmental Protection Agency
Washington, DC

**DISCLAIMER**

This document has been reviewed in accordance with U.S. Environmental Protection Agency policy and approved for publication.  Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

**Figure 4-1.  Proposed mechanism for 2,5-hexanedione-induced axonopathy.**

Note: γ-Diketones, such as 2,5-hexanedione, react with amino groups in all tissues to form pyrroles.  The pyrrole moiety can undergo further oxidation reactions with amino or sulfhydryl groups.  This results in the development of neurofilament aggregates (in the distal, subterminal axon), which, as they grow larger, form massive swellings of the axon.

Source:  Adapted from DeCaprio et al. (1988, 1982).

## 4.7.  WEIGHT-OF-EVIDENCE EVALUATION AND CANCER CHARACTERIZATION

### 4.7.1.  Summary of Overall Weight of Evidence

Under EPA's *Guidelines for Carcinogen Risk Assessment* (U.S. EPA, 2005a), there is "inadequate information to assess the carcinogenic potential" of 2-hexanone.  Specifically, there are no animal carcinogenicity studies available that examine exposure to 2-hexanone, and there are no studies available that assert a mutagenic potential of 2-hexanone.  The available occupational studies do not present evidence for carcinogenic action of 2-hexanone, although these are limited by frequent co-exposure to other chemicals (e.g., MEK).

## 4.8.  SUSCEPTIBLE POPULATIONS AND LIFE STAGES

### 4.8.1.  Possible Childhood Susceptibility

The susceptibility of the developing brain is based on the timing of neuronal development, the rapid growth that occurs in the third trimester and early infancy, and the lack of a protective barrier early in life (Costa et al., 2004).  In the cerebellum, Purkinje cells develop early, weeks 5–7 in humans, whereas granule cells are generated much later, gestational

weeks 24–40 in humans.  The developing brain is distinguished by the absence of a blood-brain barrier.  The development of this barrier is a gradual process, beginning in utero and complete at approximately 6 months of age.  Because the blood-brain barrier limits the passage of substances from blood to brain, in its absence, toxic agents can freely enter the developing brain.  Since Purkinje-cell degeneration has been observed with adult rats exposed to high levels of 2,5-hexanedione, infants may be at an increased risk for this type of damage at lower levels of exposures, due to the incomplete maturation of the blood-brain barrier (Hernandez-Viadel et al., 2002).  However, this would depend on the capacity of infants and small children to bioactivate 2-hexanone to 2,5-hexanedione.

Metabolism of 2-hexanone may vary between children and adults due to differences in the development and maturity of phase I and phase II enzymes (Johnsrud et al., 2003).  Studies indicate that the mode of action of 2-hexanone toxicity involves the metabolism to a more toxic metabolite, namely, 2,5-hexanedione.  Several enzymes, such as CYP2E1, CYP2B1/2, and CYP2C6/11, are inducible following administration of 2-hexanone in animal models (Imaoka and Funae, 1991; Nakajima et al., 1991); however, the individual isoforms involved in 2-hexanone metabolism have not been fully elucidated.  Toftgard et al. (1986) found that the formation of 2,5-hexanediol from 2-hexanol was catalyzed by a CYP450 isozyme different from CYP2B and present in liver but not in lung microsomes.  The authors concluded that 2-hexanol must be transported to the liver before the neurotoxic metabolite 2,5-hexanedione can be formed.  Because of this, changes in CYP450 protein levels and phase II enzymes during development may have an impact on susceptibility to 2-hexanone.  As mentioned above, the possible susceptibility of 2-hexanone may be influenced by life stage, but there are few studies to confirm the impact and severity of such exposure.  The available information suggests that young animals and children could more susceptible to 2-hexanone; however, the evidence of possible childhood susceptibility is inconclusive.

### 4.8.2.  Possible Gender Differences

Evaluations of human occupational exposures have not provided evidence that 2-hexanone acts in a gender-specific way.  Most animal studies also have not brought forth strong evidence for a sex-specific action of 2-hexanone.  However, it should be mentioned that in a few rat studies 2-hexanone appeared to affect the male reproductive system (Katz et al., 1980; Krasavage et al., 1980; O'Donoghue et al., 1978).

# **Exhibit 36**

EPA/635/R-11/001Fa

www.epa.gov/iris


United States
Environmental Protection
Agency

# TOXICOLOGICAL REVIEW

# OF

# METHANOL (NONCANCER)

(CAS No. 67-56-1)

## In Support of Summary Information on the

## Integrated Risk Information System (IRIS)

*September 2013*

U.S. Environmental Protection Agency
Washington, DC

**DISCLAIMER**

This document has been reviewed in accordance with U.S. Environmental Protection Agency policy and approved for publication. Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

dinoseb, supernumerary ribs were consistently associated with increases in the length of the 13th rib (Branch et al., 1996). This relationship was present in all fetal ages examined in the study. The authors concluded that these findings are consistent with supernumerary ribs being one manifestation of a basic alteration in the differentiation of the thoraco-lumbar border of the axial skeleton. The biological significance of this endpoint is further strengthened by the association of supernumerary ribs with adverse health effects in humans. The most common effect associated with the presence of extra cervical ribs is thoracic outlet disease (Nguyen et al., 1997; Fernandez Noda et al., 1996; Henderson, 1914). Thoracic outlet disease is characterized by numbness and/or pain in the shoulder, arm, or hands. Vascular effects associated with this syndrome include cerebral and distal embolism (Bearn et al., 1993; Connell et al., 1980; Short, 1975), while neurological symptoms include extreme pain, migraine, and symptoms similar to Parkinson's disease (Evans, 1999; Saxton et al., 1999; Fernandez Noda et al., 1996). Furthermore, Schumacher et al. (1992) observed 242 rib anomalies in 218 children with tumors (21.8%) and 11 (5.5%) in children without malignancy, a statistically significant ($p < 0.001$) difference that suggests an association between the presence of extra cervical ribs and childhood cancers. In conclusion, the mouse cervical rib endpoint is biologically significant and potentially relevant to humans, and thus appropriate for use in the derivation of a human health toxicity value (RfC or RfD).

### 5.1.1.2.2. Developmental Neurotoxicity

NEDO (1987) reported reduced brain, pituitary, and thymus weights in $F_1$ and $F_2$ generation Sprague-Dawley rats exposed to 1,000 ppm methanol. In a follow-up study of the $F_1$ generation brain weight effects, NEDO (1987) reported decreased brain, cerebellum, and cerebrum weights in $F_1$ males exposed to 1,000 ppm methanol from GD0 through the $F_1$ generation.[50] The methanol exposure levels used in these studies are difficult to interpret because dams were exposed prior to gestation, as well as during gestation and lactation, while pups were exposed during gestation (in utero) and lactation. However, the results from NEDO (1987) clearly show that postnatal methanol exposure increases the magnitude of brain weight reduction. In another experiment by NEDO (1987) referenced in the previous section, rats exposed to methanol only during organogenesis (GD7-GD17) exhibited decreases in brain weights in offspring at 8 weeks of age that were less severe than in rat pups in the studies in which methanol exposure was continued postnatally. This finding is not unexpected, given that the brain undergoes tremendous growth beginning early in gestation and continuing into the

---

[50] For the interpretation of the dose-response data, EPA did not rely on the statistics reported by NEDO (1987) which were based on inappropriate t-test methods but, instead, relied on the results of the benchmark dose analyses described in Appendix D.

postnatal period. Rats are considered altricial (i.e., born at a relatively underdeveloped stage), and thus many of their neurogenic events occur postnatally (Clancy et al., 2007). Brain effects from postnatal exposure are also relevant to humans given that, in humans, gross measures of brain growth increase for at least 2-3 years after birth, with the growth rate peaking approximately 4 months after birth (Rice and Barone, 2000).

Change in brain weight is considered to be a biologically significant effect (U.S. EPA, 1998a). This holds true regardless of whether changes in body weight occur simultaneously because brain weight is generally conserved even during malnutrition or weight loss, unlike many other organs or tissues (U.S. EPA, 1998a). Thus, change in absolute brain weight is an appropriate measure of effects on this critical organ. Decreases in brain weight have been associated with simultaneous deficits in neurobehavioral and cognitive parameters in animals exposed during gestation to various solvents, including toluene and ethanol (Gibson et al., 2000; Coleman et al., 1999; Hass et al., 1995). NEDO (1987) reported that brain, cerebellum, and cerebrum weights decreased in a dose-dependent manner in male rats exposed to methanol throughout gestation and the $F_1$ generation. While brain weight reduction has been observed in adult rats exposed to methanol (TRL, 1986), it has not been observed in other developmental bioassays of methanol. This lack of consistency across developmental studies may be due to the fact that brain weight is not an endpoint that has been extensively measured in other developmental studies of methanol [e.g., Rogers et al. (1993b)].

Developmental neurobehavioral effects associated with methanol inhalation exposure have also been investigated in monkeys. Burbacher et al. (2004a; 2004b; 1999a; 1999b) exposed *M. fascicularis* monkeys to 0, 200, 600, or 1,800 ppm (0, 262, 786, and 2,359 mg/m$^3$) methanol, 2.5 hours/day, 7 days/week during premating/mating and throughout gestation (approximately 168 days). There appeared to be neurotoxicological deficits in methanol-exposed offspring. VDR was significantly reduced in the 600 ppm (786 mg/m$^3$) methanol group for males and in the 1,800 ppm (2,359 mg/m$^3$) methanol group for both sexes. However, a dose-response trend for this endpoint was only exhibited for females. In fact, the VDR response in females is the only effect reported in the Burbacher et al. (2004a; 2004b; 1999a; 1999b) studies for which a significant dose-response trend is evident. As discussed in Section 4.4.2, confidence in these results may have been increased by statistical analyses that adjusted for multiple comparisons (NTP-CERHR, 2004). However, the dose-response trend for VDR in females remained significant both with ($p = 0.009$) and without ($p = 0.0265$) an adjustment for the shortened gestational periods. In addition, VDR is a measure of functional deficits in sensorimotor development that is consistent with other early developmental CNS effects (i.e., brain weight changes discussed above) that have been observed in rats exposed to methanol.

based on decreases in brain weight at 6 weeks of age in male rats exposed during gestation and throughout the $F_1$ generation employing AUC as the dose metric were 24.5 and 17.8 mg/m$^3$ using BMRs of 5% change relative to control mean and one SD from the control mean, respectively. Because a one SD decrease in brain weight in male rats at 6 weeks (postnatal) resulted in the lowest of the candidate RfC estimates and, therefore, the most likely to be protective against other effects of methanol exposure, it was chosen as the critical endpoint for use in the RfC derivation.

$$\text{RfC} = 858 \text{ mg-hr/L} \div 100 = 8.58 \text{ mg-hr/L} \Rightarrow \text{PBPK} \Rightarrow \mathbf{2 \times 10^1 \text{ mg/m}^3}$$
(rounded to 1 significant figure)

### 5.1.3.2. Application of UFs

UFs are applied to PODs to account for recognized uncertainties in extrapolation from experimental conditions to the assumed human scenario (i.e., chronic exposure over a lifetime). According to EPA guidance (U.S. EPA, 2002, 1994b), UFs used in deriving reference values are generally applied to HEC or HED estimates. However, as described in Appendix B (Section B.2.7, Table B-6), the human PBPK model developed for methanol is considered uncertain above inhalation concentrations of 500 ppm (655 mg/m$^3$) or oral ingestions of 50 mg/kg-day, since the blood levels predicted rise above those for which there are model calibration data. The HEC values (1,042 to 1,604 mg/m$^3$) and HED values (133 to 220 mg/kg-day) predicted by the human PBPK model for BMDLs from the candidate principal studies are well above these exposure levels. Consequently, the standard EPA practice of applying a human PBPK model to derive HEC or HED values prior to dividing by UFs (U.S. EPA, 2002, 1994b) would add considerable model uncertainty. In order to avoid the uncertainty associated with applying the model to exposure levels that are above the levels for which the model was calibrated and to account for possible non-linearities in the external versus internal dose relationships at high doses, EPA has applied the UFs to the internal BMDL (POD$_{internal}$) prior to HEC (and HED) derivation to obtain an RfC$_{internal}$ (and RfD$_{internal}$). This approach results in more scientifically reliable model predictions by lowering the BMDLs to within the more linear, calibrated range of the human PBPK model.

#### 5.1.3.2.1. Interindividual variation UF$_H$

A factor of 10 was applied to account for variation in sensitivity within the human population (UF$_H$). The UF$_H$ of 10 is commonly considered to be appropriate in the absence of convincing data to the contrary. The data from which to determine the potential extent of

variation in how humans respond to chronic exposure to methanol are limited, given the complex nature of the developmental endpoint employed and uncertainties surrounding the importance of metabolism to the observed teratogenic effects. Susceptibility to methanol is likely to involve intrinsic and extrinsic factors. Some factors may include alteration of the body burden of methanol or its metabolites, sensitization of an individual to methanol effects, or augmentation of underlying conditions or changes in processes that share common features with methanol effects. Additionally, inherent differences in an individual's genetic make-up, diet, gender, age, or disease state may affect the pharmacokinetics and pharmacodynamics of methanol, influencing susceptibility intrinsically (see Sections 3.3 and 4.9). Co-exposure to a pollutant that alters metabolism or other clearance processes, or that adds to background levels of metabolites may also affect the pharmacokinetics and pharmacodynamics of methanol, influencing susceptibility extrinsically. The determination of the UF for human variation is supported by several types of information, including information concerning background levels of methanol in humans, variation in pharmacokinetics revealed through human studies and from PBPK modeling, variation of methanol metabolism in human tissues, and information on physiologic factors (including gender and age), or acquired factors (including diet and environment) that may affect methanol exposure and toxicity.

Sensitivity analyses of the human PBPK models were performed (see Appendix B), and the results suggest that parameter variability is not likely to result in methanol blood level estimates that vary more than 3-fold, the toxicokinetic portion of the 10-fold $UF_H$. However, one needs to also consider the variation in background levels of methanol (Table 3-1), because that can be a factor governing the impact of an exogenous methanol exposure. From the data in Table 3-1, it can be seen that the reported background levels of methanol in blood have ranged considerably, from 0.25 to 5.2 mg/L. Overall, the extent of human interindividual variation in (endogenous and exogenous) methanol toxicokinetics and toxicodynamics would be very difficult to quantify given the significant uncertainties that exist regarding background levels and methanol's mode of action.

The candidate effects for RfC derivation have been observed in a potentially susceptible and sensitive fetal/neonatal subpopulation. However, there is also variability across fetuses and neonates that need to be taken into account. Children vary in their ability to metabolize and eliminate methanol and in their sensitivity to methanol's teratogenic effects. There is information on PK and pharmacodynamic factors suggesting that children can have differential susceptibility to methanol toxicity (see Section 4.9.1). Thus, there is uncertainty in children's responses to methanol that should be taken into consideration for derivation of the UF for human variation that is not available from either measured human data or PBPK modeling analyses. The enzyme primarily responsible for metabolism of methanol in humans, ADH, has been reported to be

# Exhibit 37

*The National Academies of* SCIENCES ENGINEERING MEDICINE

# THE NATIONAL ACADEMIES PRESS

This PDF is available at http://nap.edu/366

SHARE   



## Risk Assessment in the Federal Government: Managing the Process (1983)

### DETAILS

205 pages | 6 x 9 | PAPERBACK
ISBN 978-0-309-03349-7 | DOI 10.17226/366

### CONTRIBUTORS

Committee on the Institutional Means for Assessment of Risks to Public Health, National Research Council

GET THIS BOOK

FIND RELATED TITLES

### SUGGESTED CITATION

National Research Council 1983. *Risk Assessment in the Federal Government: Managing the Process*. Washington, DC: The National Academies Press. https://doi.org/10.17226/366.



Visit the National Academies Press at **NAP.edu** and login or register to get:

– Access to free PDF downloads of thousands of scientific reports

– 10% off the price of print titles

– Email or social media notifications of new titles related to your interests

– Special offers and discounts

Distribution, posting, or copying of this PDF is strictly prohibited without written permission of the National Academies Press. (Request Permission) Unless otherwise indicated, all materials in this PDF are copyrighted by the National Academy of Sciences.

Copyright © National Academy of Sciences. All rights reserved.

# Risk Assessment in the Federal Government: Managing the Process

Committee on the Institutional Means for Assessment of Risks to
Public Health
Commission on Life Sciences
National Research Council

NATIONAL ACADEMY PRESS

Washington, D.C. 1983

Copyright National Academy of Sciences. All rights reserved.

Risk Assessment in the Federal Government: Managing the Process
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 992 of 1126
PREFACE                                                                    ix

# Preface

In response to a directive from the Congress of the United States, the Food and Drug Administration contracted with the National Academy of Sciences to conduct a study of the institutional means for risk assessment. The Committee on the Institutional Means for Assessment of Risks to Public Health was formed in the National Research Council's Commission on Life Sciences in October 1981 and completed its work in January 1983. The members of the Committee were chosen to represent a broad array of backgrounds and special skills, both in the technology of risk assessment and in the formulation and application of policy in this field, and brought together extensive experience in industry, government, and academic life.

The Committee, with outstanding staff support, reviewed much of the published literature on risk assessment, studied the structures and operations of federal regulatory and research agencies, analyzed the history of regulation of selected chemicals, and sought and received the judgments of some exceptionally knowledgeable people. We are most grateful for the assistance so generously provided to us, but, of course, the responsibility for this report is entirely ours.

The Committee has sought to examine and codify past experience with risk assessment and relate that experience to patterns and practices. Our judgments are necessarily subjective, but we have endeavored to be impartial. In the process, we developed a disinclination for sweeping changes; we believe that more gradual, evolutionary alterations will result in greater improvements in the conduct and use of risk assessment.

REUEL A. STALLONES
Chairman

Copyright National Academy of Sciences. All rights reserved.

# Summary

## SETTING

This report explores the intricate relations between science and policy in a field that is the subject of much debate—the assessment of the risk of cancer and other adverse health effects associated with exposure of humans to toxic substances. It is a report of a search for the institutional mechanisms that best foster a constructive partnership between science and government, mechanisms to ensure that government regulation rests on the best available scientific knowledge and to preserve the integrity of scientific data and judgments in the unavoidable collision of the contending interests that accompany most important regulatory decisions.

Many decisions of federal agencies in regulating chronic health hazards have been bitterly controversial. The roots of the controversy lie in improvements in scientific and technologic capability to detect potentially hazardous chemicals, in changes in public expectations and concerns about health protection, and in the fact that the costs and benefits of regulatory policies fall unequally on different groups within American society.

The decade of the 1970s was a period of heightened public concern about the effects of technology on the environment. Individuals and groups urged strict government regulation as scientific evidence emerged that various chemical substances may induce cancers or other chronic health effects in humans, and new government programs were established to control potential hazards. The evidence of health effects of a few chemicals, such as asbestos, has been clear; in many more cases the evidence is meager and indirect. To aid decision-making,

Copyright National Academy of Sciences. All rights reserved.

Risk Assessment in the Federal Government: Managing the Process

agencies have developed procedures for identifying chronic health hazards and estimating the risks to human health posed by products and activities. However, rather than alleviating the controversy attending regulatory decisions, the procedures themselves have become a focus of criticism by scientists, industry representatives, and public-interest groups.

## STUDY OBJECTIVES AND SCOPE

The Committee on Institutional Means for Assessment of Risks to Public Health was formed, in response to a congressional directive, to fulfill three primary objectives:

- To assess the merits of separating the analytic functions of developing risk assessments from the regulatory functions of making policy decisions.
- To consider the feasibility of designating a single organization to do risk assessments for all regulatory agencies.
- To consider the feasibility of developing uniform risk assessment guidelines for use by all regulatory agencies.

The Committee considered the current practice of risk assessment and its relation to the process of regulation of hazards to human health, past efforts to develop and use risk assessment guidelines, the experience of government regulatory agencies with different administrative arrangements for risk assessment, and various proposals to modify risk assessment procedures. Our study was directed primarily, although not exclusively, to the issue of increased risk of cancer resulting from exposure to chemicals in the environment, an issue that has aroused great public concern in recent years, as illustrated by the controversies involving the control of saccharin, asbestos, and formaldehyde. Despite this emphasis, however, our conclusions and recommendations are applicable in some degree across the broad field of environmental health.

Criticisms of risk assessment have ranged broadly from details of the process to administrative management to statutory authority. The mandate to this Committee did not include examination of the scientific issues involved in risk assessment or the broad social policy questions

Copyright National Academy of Sciences. All rights reserved.

Risk Assessment in the Federal Government: Managing the Process

that have been raised. The Committee's more limited purpose was to examine whether altered <u>institutional arrangements or procedures</u> can improve regulatory performance.

## THE NATURE OF RISK ASSESSMENT

Regulatory actions are based on two distinct elements, <u>risk assessment</u>, the subject of this study, and <u>risk management</u>. Risk assessment is the use of the factual base to define the health effects of exposure of individuals or populations to hazardous materials and situations. Risk management is the process of weighing policy alternatives and selecting the most appropriate regulatory action, integrating the results of risk assessment with engineering data and with social, economic, and political concerns to reach a decision.

Risk assessments contain some or all of the following four steps:

- <u>Hazard identification</u>: The determination of whether a particular chemical is or is not causally linked to particular health effects.
- <u>Dose-response assessment</u>: The determination of the relation between the magnitude of exposure and the probability of occurrence of the health effects in question.
- <u>Exposure assessment</u>: The determination of the extent of human exposure before or after application of regulatory controls.
- <u>Risk characterization</u>: The description of the nature and often the magnitude of human risk, including attendant uncertainty.

In each step, a number of decision points (<u>components</u>) occur where risk to human health can only be inferred from the available evidence. Both scientific judgments and policy choices may be involved in selecting from among possible inferential bridges, and we have used the term <u>risk assessment policy</u> to differentiate those judgments and choices from the broader social and economic policy issues that are inherent in risk management decisions. At least some of the controversy surrounding regulatory actions has resulted from a blurring of the distinction between risk assessment policy and risk management policy.

Copyright National Academy of Sciences. All rights reserved.

Risk Assessment in the Federal Government: Managing the Process
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 996 of 1126
SUMMARY                                                                          4

## UNIFORM GUIDELINES FOR RISK ASSESSMENT

An inference guideline is an explicit statement of a predetermined choice among alternative methods (inference options) that might be used to infer human risk from data that are not fully adequate or are not drawn directly from human experience. For example, a guideline might specify the mathematical model to be used to estimate the effects of exposure at low doses on the basis of the effects of exposure at high doses.

Over the last 2 decades, most federal regulatory agencies and other institutions responsible for risk assessment of toxic chemicals have sought to develop such guidelines. Their efforts have met with varied success. Agencies have cited several reasons for writing guidelines: to provide a systematic way to meet statutory requirements, to inform the public and regulated industries of agency policies, to stimulate public comment on those policies, to avoid arguing generic questions anew in each specific case, and to foster consistency and continuity of approach. Interagency guidelines for carcinogens, although short-lived, were developed by the agencies of the Interagency Regulatory Liaison Group (IRLG) and adopted by the President's Regulatory Council in 1979. The stated objective of that effort was to reduce inconsistency, duplication of effort, and lack of coordination among the federal agencies.

The form of guidelines varies widely. Some guidelines are comprehensive and detailed, addressing most of the components of risk assessment and describing underlying scientific concepts; others address only a few broad principles. Guidelines differ greatly in their degree of flexibility, i.e., the degree to which they permit assessors to consider scientific evidence that may justify departures from the prescribed inference options. And they vary in the legal authority vested in them: some are adopted as formal regulations and others by less formal means.

The Committee concludes that guidelines are feasible and, if properly designed, desirable; that clear statements of the inferences to be made in each step would be of advantage to the regulatory agencies, to the industries concerned, and to the general public; and that guidelines should be used uniformly by the governmental agencies.

Copyright National Academy of Sciences. All rights reserved.

Risk Assessment in the Federal Government: Managing the Process
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 997 of 1126
SUMMARY                                                                5

## INSTITUTIONAL ARRANGEMENTS FOR RISK ASSESSMENT

Dissatisfaction with government regulatory actions has led to proposals to restructure the institutional arrangements for risk assessment by:

- Organizational separation of risk assessment from risk management.
- Centralization of risk assessment activities in a single organization to serve all the regulatory agencies.

Four federal agencies—the Environmental Protection Agency (EPA), Food and Drug Administration (FDA), Occupational Safety and Health Administration (OSHA), and Consumer Product Safety Commission (CPSC)—have been given primary authority to regulate activities and substances that pose chronic health risks, and these four agencies' past actions have inspired many of the proposals for institutional change. The Committee reviewed a number of agency structures and procedures in an attempt to determine the merits of institutional separation and centralization. Examples were selected to illustrate different degrees of separation and centralization in the four agencies. Independent scientific review panels have been used to obtain some of the advantages proposed for organizational separation, and some of their experiences were examined.

Cross-agency comparisons are difficult, because the regulatory agencies and their various programs differ markedly in structure, procedures, personnel characteristics, administrative history, and statutory direction. In addition, agencies and programs change, and practices adhered to for several years may be altered substantially. These practical limitations to the evaluation of agency structures and practices led the Committee to conclude that predicting the likely effects of organizational rearrangements on agency performance of risk assessment is unavoidably judgmental. However, the available evidence shows no clear advantage of one administrative structure over another.

## CONCLUSIONS AND MAJOR RECOMMENDATIONS

Dissatisfaction with the actions of federal regulatory agencies is often expressed as criticism of the conduct and administration of the risk assessment process. The

Copyright National Academy of Sciences. All rights reserved.

Risk Assessment in the Federal Government: Managing the Process
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 998 of 1126
SUMMARY                                                                    6

Committee believes that the basic problem in risk assessment is the sparseness and uncertainty of the scientific knowledge of the health hazards addressed, and this problem has no ready solution. The field has been developing rapidly, and the greatest improvements in risk assessment result from the acquisition of more and better data, which decreases the need to rely on inference and informed judgment to bridge gaps in knowledge.

Proposals to separate the administrative responsibility for risk assessment from risk management imply that the change would lead to improved risk assessment and hence better risk management decisions. Administrative relocation will not, however, improve the knowledge base, and, because risk assessment is only one element in the formulation of regulatory actions, even considerable improvements in risk assessment cannot be expected to eliminate controversy over those actions.

Organizational separation may have the advantage of establishing firmly the distinction between risk assessment and risk management, but it also has some disadvantages. The importance of distinguishing between risk assessment and risk management does not imply that they should be isolated from each other; in practice they interact, and communication in both directions is desirable and should not be disrupted. Institutional separation would surely reduce the responsiveness of the risk assessment process to the needs of the regulatory agencies for timely reports in accord with their priorities. In addition to the operational disadvantages, the disruption of current patterns of activity would be great, and the benefits uncertain. On balance, the Committee believes that transfer of risk assessment functions to an organization separate from the regulatory agencies is not appropriate.

We believe that risk assessment can be improved more surely and more effectively by adopting a program with three major parts: (A) implementation of procedural changes to ensure that individual assessments routinely take full advantage of the available scientific knowledge, while preserving the diversified approaches to the administration of risk assessment necessary to accommodate the varied needs of federal regulatory programs; (B) standardization of analytic procedures among federal programs through the development and use of uniform inference guidelines; and (C) creation of a mechanism that will ensure orderly and continuing review and modification of

Copyright National Academy of Sciences. All rights reserved.

Risk Assessment in the Federal Government: Managing the Process
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 999 of 1126

SUMMARY                                                                 7

risk assessment procedures as the scientific knowledge base expands.

> (A)  We recommend that regulatory agencies take steps to establish and maintain a clear conceptual distinction between assessment of risks and consideration of risk management alternatives; that is, the scientific findings and policy judgments embodied in risk assessments should be explicitly distinguished from the political, economic, and technical considerations that influence the design and choice of regulatory strategies.

We agree with proponents of such measures as the American Industrial Health Council's proposed science panel and H.R. 638 that efforts should be made by regulators and others to distinguish clearly between the assessment of risk and the choice of regulatory options.

We advocate the adoption of specific procedural measures that can be introduced under current arrangements. These measures include timely independent scientific review of major agency risk assessments and, to facilitate both scientific and public review of risk assessments, the routine preparation of written risk assessments that explicitly state the basis of choice among inference options.

> (B)  We recommend that uniform inference guidelines be developed for the use of federal regulatory agencies in the risk assessment process.

The Committee endorses the development and use of guidelines for risk assessment. These guidelines, which would structure the interpretation of scientific and technical information relevant to the assessment of health risks, should be followed by all federal agencies. They should address all elements of risk assessment, but allow flexibility to consider unique scientific evidence in particular instances.

The use of uniform guidelines would promote clarity, completeness, and consistency in risk assessment; would clarify the relative roles of scientific and other factors in risk assessment policy; would help to ensure that assessments reflect the latest scientific understanding; and would enable regulated parties to anticipate government decisions. In addition, adherence to inference

Copyright National Academy of Sciences. All rights reserved.

Risk Assessment in the Federal Government: Managing the Process
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1000 of 1126
INTRODUCTION                                                                11

which few animal tests were required and many other chemicals that were tested with methods that do not meet modern standards.

• Laws were written and programs designed before current quantitative methods for estimating human risks on the basis of data from animal studies were developed.

## DIFFICULTIES IN DECISION-MAKING

Agency decisions regarding potential carcinogens and similar hazards are commonly beset by two types of difficulties: inherent limitations on the power of analysis and practical constraints imposed by external pressures. Several such factors are particularly relevant to the consideration of scientific aspects of risk assessment.

### Inherent Limitations

**Uncertainty**

The dominant analytic difficulty is pervasive uncertainty. Risk assessment draws extensively on science, and a strong scientific basis has developed for linking exposure to chemicals to chronic health effects. However, data may be incomplete, and there is often great uncertainty in estimates of the types, probability, and magnitude of health effects associated with a chemical agent, of the economic effects of a proposed regulatory action, and of the extent of current and possible future human exposures. These problems have no immediate solutions, given the many gaps in our understanding of the causal mechanisms of carcinogenesis and other health effects and in our ability to ascertain the nature or extent of the effects associated with specific exposures. Because our knowledge is limited, conclusive direct evidence of a threat to human health is rare. Fewer than 30 agents are definitely linked with cancer in humans (Tomatis et al., 1978); in contrast, some 1,500 substances are reportedly carcinogenic in animal tests, although they include substances tested in studies of questionable experimental design. We know even less about most chemicals; only about 7,000 of the over 5,000,000 known substances have ever been tested for carcinogenicity (Maugh, 1978) --a small fraction of those theoretically under regulatory jurisdiction. We

Copyright National Academy of Sciences. All rights reserved.

Risk Assessment in the Federal Government: Managing the Process
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1001 of 1126
THE NATURE OF RISK ASSESSMENT                                    19

mandates, is an agency decision-making process that entails consideration of political, social, economic, and engineering information with risk-related information to develop, analyze, and compare regulatory options and to select the appropriate regulatory response to a potential chronic health hazard. The selection process necessarily requires the use of value judgments on such issues as the acceptability of risk and the reasonableness of the costs of control.

## Steps in Risk Assessment

Risk assessment can be divided into four major steps: hazard identification, dose-response assessment, exposure assessment, and risk characterization. A risk assessment might stop with the first step, hazard identification, if no adverse effect is found or if an agency elects to take regulatory action without further analysis, for reasons of policy or statutory mandate.

Of the four steps, hazard identification is the most easily recognized in the actions of regulatory agencies. It is defined here as the process of determining whether exposure to an agent can cause an increase in the incidence of a health condition (cancer, birth defect, etc.). It involves characterizing the nature and strength of the evidence of causation. Although the question of whether a substance causes cancer or other adverse health effects is theoretically a yes-no question, there are few chemicals on which the human data are definitive. Therefore, the question is often restated in terms of effects in laboratory animals or other test systems, e.g., "Does the agent induce cancer in test animals?" Positive answers to such questions are typically taken as evidence that an agent may pose a cancer risk for any exposed humans. Information from short-term in vitro tests and on structural similarity to known chemical hazards may also be considered.

Dose-response assessment is the process of characterizing the relation between the dose of an agent administered or received and the incidence of an adverse health effect in exposed populations and estimating the incidence of the effect as a function of human exposure to the agent. It takes account of intensity of exposure, age pattern of exposure, and possibly other variables that might affect response, such as sex, lifestyle, and other modifying factors. A dose-response assessment usually

Copyright National Academy of Sciences. All rights reserved.

# Exhibit 38

Case 3:17-cv-02162-EMC    Document 117-1    Filed 10/09/19    Page 1003 of 1126

An official website of the United States government.

Close

We've made some changes to EPA.gov. If the information you are looking for is not here, you may be able to find it on the EPA Web Archive or the January 19, 2017 Web Snapshot.

 United States Environmental Protection Agency

# About Risk Assessment

Learn about Risk Assessment

History of Risk at EPA

Getting Help

# Learn about Risk Assessment

Commonly asked questions and answers about risk assessment are listed below, if you have other questions please use the contact us form for assistance.

> *EPA considers risk to be the chance of harmful effects to human health or to ecological systems*

While there are many definitions of the word risk, EPA considers risk to be the chance of harmful effects to human health or to ecological systems resulting from exposure to an environmental stressor.

A stressor is any physical, chemical, or biological entity that can induce an adverse response. Stressors may adversely affect specific natural resources or entire ecosystems, including plants and animals, as well as the environment with which they interact.

# Risk Assessment Basics

EPA uses risk assessments to characterize the nature and magnitude of health risks to humans (e.g., residents, workers, recreational visitors) and ecological receptors (e.g., birds, fish, wildlife) from chemical contaminants and other stressors, that may be present in the environment.

**Risk assessment is**, to the highest extent possible, **a scientific process.**

In general terms, risk depends on the following 3 factors:

1. **How much of a chemical is present** in an environmental medium (e.g., soil, water, air),
2. **How much contact (exposure)** a person or ecological receptor has with the contaminated environmental medium, and
3. The inherent **toxicity of the chemical**.

At EPA, environmental risk assessments typically fall into one of two areas:

- Human Health
- Ecological

Following a planning and scoping stage where the purpose and scope of a risk assessment is decided, the risk assessment process usually begins by collecting measurements that characterize the nature and extent of chemical contamination in the environment, as well as information needed to predict how the contaminants behave in the future. Here are some useful links to get started:

- Conducting a human health risk assessment
- Conducting an ecological risk assessment

Based on this, the risk assessor evaluates the frequency and magnitude of human and ecological exposures that may occur as a consequence of contact with the contaminated medium, both now and in the future.

This evaluation of exposure is then combined with information on the inherent toxicity of the chemical (that is, the expected response to a given level of exposure) to predict the probability, nature, and magnitude of the adverse health effects that may occur. In the ideal world, all risk assessments would be based on a very strong knowledge base (i.e., reliable and complete data on the nature and extent of contamination, fate and transport processes, the magnitude and frequency of human and ecological exposure, and the inherent toxicity of all of the chemicals). However, in real life, information is usually limited on one or more of these key data needed for risk assessment calculations. This means that risk assessors often have to make estimates and use judgment when performing risk calculations, and consequently all risk estimates are uncertain to some degree. For this reason, a key part of all good risk assessments is a fair and open presentation of the uncertainties in the calculations and a characterization of how reliable (or how unreliable) the resulting risk estimates really are.

Risk managers then use this information to help them decide how to protect humans and the environment from stressors or contaminants. Note that "risk managers" can be federal or state officials whose job it is to protect the environment, business leaders who work at companies that can impact the environment, or private citizens who are making decisions regarding risk.

Developing a risk assessment is often an iterative process, which involves

researchers identifying and filling data gaps in order to develop a more refined assessment of the risk. This in turn may influence the need for risk assessors and risk managers to refine the scope of the risk assessment further triggering the need for more data or new assumptions.

## Getting Involved

- A Community Guide To Superfund Risk Assessment--What It's All About And How You Can Help
- Superfund Today: Focus on Revisions to Superfund's Risk Assessment Guidance (1999) (2 pp, 50 K, About PDF)
- Risk-Screening Environmental Indicators (RSEI) Model

## Risk Assessment Terminology

Most risk assessment terminology can be found in the Risk Assessment Glossary, but below we include the meaning behind "variability","uncertainty", and "probabilistic modeling." For these, consideration must be given to two important factors throughout the development of a risk assessment: variability and uncertainty.

Variability - Refers to the range of toxic response or exposure. For example, the dose that might cause a toxic response can vary from one person to the next depending on factors such as genetic differences, preexisting medical conditions, etc. Exposure may vary from one person to the next depending on factors such as where one works, time spent indoors or out, where one lives, how much people eat or drink, etc.

Uncertainty - Refers to our inability to know for sure - it is often due to incomplete data. For example, when assessing the potential for risks to people, toxicology studies generally involve dosing of sexually mature test animals such as rats as a surrogate for humans. Since we don't really know how differently humans and rats respond, EPA often employs the use of an uncertainty factor to account for possible differences. Additional consideration may also be made if there is some reason to believe that the very young are more susceptible than adults, or if key toxicology studies are not available.

Probabilistic Modeling, a related term, is a technique that utilizes the entire range of input data to develop a probability distribution of exposure or risk rather than a single point value. The input data can be measured values and/or estimated distributions. Values for these input parameters are sampled thousands of times through a modeling or simulation process to develop a distribution of likely exposure or risk. Probabilistic models can be used to evaluate the impact of variability and uncertainty in the various input parameters, such as environmental exposure levels, fate and transport processes, etc.

## Peer Review

Peer review is a documented critical review of a scientific/technical work product conducted by scientific experts who are independent of those who produced the product. Peer review can provide an independent evaluation of the assumptions,

Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1006 of 1126

calculations, extrapolations, alternate interpretations, methodology, acceptance criteria, and conclusions pertaining to the scientific/technical work product.

- Products and Publications Related to Scientific Coordination Produced by the Office of the Science Advisor (OSA)
- Frequent Questions about Peer Review
- Peer Review Handbook, 4th Edition, 2015
- Peer Review Agenda

When evaluating the scientific rigor of our risk assessments, EPA utilizes both standing federal advisory groups of experts such as the Science Advisory Board (SAB) and the FIFRA Scientific Advisory Panel, as well as ad hoc panels to provide peer review. EPA will occasionally seek peer review from outside expert groups such as the National Academy of Science (NAS)   EXIT   for highly complex and/or critical scientific topics.

LAST UPDATED ON JUNE 5, 2019

# Exhibit 39

An official website of the United States government.

Close

We've made some changes to EPA.gov. If the information you are looking for is not here, you may be able to find it on the EPA Web Archive or the January 19, 2017 Web Snapshot.

 **EPA** United States Environmental Protection Agency

## The NRC Risk Assessment Paradigm

> ## Dose-Response Assessment for Assessing Health Risks Associated With Exposure to Hazardous Air Pollutants
>
> - Summary and Tables
> - Sources of Chronic Dose-Response Information
> - Prioritization of Data Sources for Chronic Exposure
> - Additional Information, Adjustments and Special Cases for Dose-Response Values in Tables 1 and 2
> - Sources of Acute Dose-Response Information
> - **The NRC Risk Assessment Paradigm**
> - Risk Assessment for Carcinogenic Effects
> - Risk Assessment for Other Effects

To estimate potential health impacts associated with environmental exposures, EPA scientists and others have spent more than two decades developing an extensive set of risk assessment methods, tools, and data to estimate environmental health risks. Although significant uncertainties remain, this risk assessment methodology has been extensively peer-reviewed, is widely used and understood by the scientific community, and continues to expand and evolve as scientific knowledge advances.

EPA's framework for assessing and managing risks reflects the risk assessment and risk management paradigm set forth by the National Academy of Sciences (NRC) in 1983 [ , ], shown in Figure 1 below. The NRC concluded that risk assessment and risk management are "two distinct elements" between which agencies should maintain a clear conceptual distinction. The 1983 NRC report identified four steps integral to any risk assessment: 1) hazard identification, 2)

dose-response assessment, 3) exposure assessment, and 4) risk characterization.
The NRC paradigm for risk assessment serves as the basis for OAQPS risk
assessments under the air toxics program.

Figure 1. Diagram of NRC risk assessment/risk management paradigm.



Source: EPA Office of Research and Development.

Within the NRC paradigm, the evaluation of toxicity in a risk assessment is based
on two sequential analyses. The first is the hazard identification, which identifies
contaminants that may pose health hazards at environmentally relevant
concentrations, and qualitatively describes the effects that may occur in humans.
The second analysis is the human health dose-response assessment, which
characterizes the relationship between the exposure to a pollutant and the resultant
health effects.

Hazard Identification. The types of effects relevant to each chemical (e.g., cancer,
or effects other than cancer) are determined as part of the hazard identification.
Factors such as the experimental route of exposure, the type and severity of the
effects, the biological plausibility of findings, and the consistency of findings
across studies all contribute to the hazard identification statement.

Dose-Response Assessment. Generally, the dose-response assessment consists of
two parts: the evaluation of data in the observable range, and the extrapolation
from the observable range to low doses/risks. Recent terminology refers to the
result of analysis in the observable range as the "point of departure" from which
extrapolation begins. The approaches used for evaluation in the observable range
are similar for all types of effects, but EPA's current extrapolation methods differ
for effects concluded to have linear and nonlinear modes of action. Further details
of dose-response assessment are provided in the web pages on risk assessment for
carcinogenicity and other endpoints.

The nature of the dose-response assessment typically varies among pollutants.
Sufficient data may exist for some criteria air pollutants, such as ozone or carbon
monoxide, so that relatively complete dose-response relationships can be
characterized. In such cases, there is no need for extrapolation to lower doses
because adequate human health effects data are available at environmentally
relevant levels. However, this has not often been the case for air toxics.
Epidemiologic and toxicologic data for air toxics have typically resulted from
exposure levels that were high relative to environmental levels.

1. National Research Council. 1983. Risk assessment in the federal government. Managing the process. National Academy Press, Washington, DC.
2. National Research Council. 1994. Science and Judgment in Risk Assessment. National Academy Press, Washington, DC."

LAST UPDATED ON JANUARY 31, 2017

# Exhibit 40

An official website of the United States government.

Close

We've made some changes to EPA.gov. If the information you are looking for is not here, you may be able to find it on the EPA Web Archive or the January 19, 2017 Web Snapshot.

 United States Environmental Protection Agency

# Conducting a Human Health Risk Assessment

Planning

Hazard Identification

Dose-Response

Exposure Assessment

Risk Characterization

## Step 2

The objective of Step 2 is to document the relationship between dose and toxic effect.

### The 4 Step Risk Assessment Process



**Step 2:** Dose-response assessment is the second step of a human health risk assessment.

A **dose-response relationship** describes how the likelihood and severity of adverse health effects (the responses) are related to the amount and condition of exposure to an agent (the dose provided). Although this webpage refers to the "dose-response" relationship, the same principles generally apply for studies

Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1013 of 1126

where the exposure is to a concentration of the agent (e.g., airborne concentrations applied in inhalation exposure studies), and the resulting information is referred to as the "concentration-response" relationship.

The term "exposure-response" relationship may be used to describe either a dose-response or a concentration-response, or other specific exposure conditions.

Typically, as the dose increases, the measured response also increases. At low doses there may be no response. At some level of dose the responses begin to occur in a small fraction of the study population or at a low probability rate. Both the dose at which response begin to appear and the rate at which it increases given increasing dose can be variable between different pollutants, individuals, exposure routes, etc.

The shape of the dose-response relationship depends on the agent, the kind of response (tumor, incidence of disease, death, etc), and the experimental subject (human, animal) in question. For example, there may be one relationship for a response such as 'weight loss' and a different relationship for another response such as 'death'. Since it is impractical to study all possible relationships for all possible responses, toxicity research typically focuses on testing for a limited number of adverse effects.

> # Typically, as the dose increases, the measured response also increases.

Upon considering all available studies, the response (adverse effect), or a measure of response that leads to an adverse effect (known as a 'precursor' to the effect), that occurs at the lowest dose is selected as the critical effect for risk assessment. The underlying assumption is that if the critical effect is prevented from occurring, then no other effects of concern will occur.

As with hazard identification, there is frequently a lack of dose-response data available for human subjects. When data are available, they often cover only a portion of the possible range of the dose-response relationship, in which case some extrapolation must be done in order to extrapolate to dose levels that are lower than the range of data obtained from scientific studies. Also, as with hazard identification, animal studies are frequently done to augment the available data.

Studies using animal subjects permit the use of study design to control the number and composition (age, gender, species) of test subjects, the levels of dose tested, and the measurement of specific responses. Use of a designed study typically leads to more meaningful statistical conclusions than does an uncontrolled observational study were additional confounding factors must also be considered for their impact on the conclusions.

However, dose-response relationships observed from animal studies are often at much higher doses that would be anticipated for humans, so must be extrapolated to lower doses, and animal studies must also be extrapolated from that animal

species to humans in order to predict the relationship for humans. These extrapolations, among others, introduce uncertainty into the dose-response analysis.

# Basic Dose-Response Calculations & Concepts

As a component of the first step of the process discussed below, the scientific information is evaluated for a better biological understanding of how each type of toxicity or response (adverse effect) occurs; the understanding of how the toxicity is caused is called the "mode of action" (which is defined as a sequence of key events and processes, starting with interaction of an agent with a cell, proceeding through operational and anatomical changes, and resulting in the effect, for example, cancer formation).

Based on this mode of action, the Agency determines the nature of the extrapolation used in the second step of the process discussed above, either through non-linear or linear dose-response assessment.

## A two-step process...

**Step 1:** Take an assessment of all data that are available or can be gathered through experiments. This is in order to document the dose-response relationship(s) over the range of observed doses (i.e, the doses that are reported in the data collected).

However, frequently this range of observation may not include sufficient data to identify a dose where the adverse effect is not observed (i.e., the dose that is low enough to prevent the effect) in the human population.

**Step 2:** This consists of extrapolation to estimate the risk (probably of adverse effect) beyond the lower range of available observed data. This is in order to make inferences about the critical region where the dose level begins to cause the adverse effect in the human population.

## Non-linear dose-response assessment

Non-linear dose response assessment has its origins in the threshold hypothesis, which holds that a range of exposures from zero to some finite value can be tolerated by the organism with essentially no chance of expression of the toxic effect, and the threshold of toxicity is where the effects (or their precursors) begin to occur. It is often prudent to focus on the most sensitive members of the population; therefore, regulatory efforts are generally made to keep exposures below the population threshold, which is defined as the lowest of the thresholds of the individuals within a population.

If the "mode of action" information (discussed above) suggests that the toxicity has a threshold, which is defined as the dose below which no deleterious effect is expected to occur, then type of assessment is referred to by the Agency as a "non-linear" dose-response assessment. The term "nonlinear" is used here in a narrower sense than its usual meaning in the field of mathematics; a nonlinear assessment uses a dose-response relationship whose slope is zero (i.e., no response) at (and perhaps above) a dose of zero.

A No-Observed-Adverse-Effect Level (NOAEL) is the highest exposure level at which no statistically or biologically significant increases are seen in the frequency or severity of adverse effect between the exposed population and its appropriate control population. In an experiment with several NOAELs, the regulatory focus is normally on the highest one, leading to the common usage of the term NOAEL as the highest experimentally determined dose without a statistically or biologically significant adverse effect. In cases in which a NOAEL has not been demonstrated experimentally, the term "lowest-observed-adverse-effect level (LOAEL)" is used, which this is the lowest dose tested.

Mathematical modeling, which can incorporate more than one effect level (i.e., evaluates more data than a single NOAEL or LOAEL), is sometimes used to develop an alternative to a NOAEL known as a Benchmark Dose (BMD) or Benchmark Dose Lower-confidence Limit (BMDL). In developing the BMDL, a predetermined change in the response rate of an adverse effect (called the benchmark response or BMR; generally in the range of 1 to 10% depending on the power of a toxicity study) is selected, and the BMDL is a statistical lower confidence limit on the dose that produces the selected response. When the non-linear approach is applied, the LOAEL, NOAEL, or BMDL is used as the point of departure for extrapolation to lower doses.

The reference dose (RfD) is an oral or dermal dose derived from the NOAEL, LOAEL or BMDL by application of generally order-of-magnitude uncertainty factors (UFs). These uncertainty factors take into account the variability and uncertainty that are reflected in possible differences between test animals and humans (generally 10-fold or 10x) and variability within the human population (generally another 10x); the UFs are multiplied together: **10 x 10 = 100x.**

If a LOAEL is used, another uncertainty factor, generally 10x, is also used. In the absence of key toxicity data (duration or key effects), an extra uncertainty factor(s) may also be employed. Sometimes a partial UF is applied instead of the default value of 10x, and this value can be less than or greater than the default. Often the partial value is ½ log unit (the square root of 10) or 3.16 (rounded to 3-fold in risk assessment). Note, that when two UFs derived from ½ log units are multiplied together (3 x 3) the result is a 10 (equal to the full UF from which the two partial factors were derived).

Thus, the RfD is determined by use of the following equation: **RfD = NOAEL (or LOAEL or BMDL) / UFs**

In general, the RfD is defined as an estimate (with uncertainty spanning perhaps an order of magnitude) of a daily oral exposure to the human population (including sensitive groups, such as asthmatics, or life stages, such as children or the elderly) that is likely to be without an appreciable risk of deleterious effects during a lifetime.

The **RfD is generally expressed** in **units of milligrams per kilogram of bodyweight per day: mg/kg/day**.

A similar term, know as reference concentration (RfC), is used to assess inhalation risks, where concentration refers to levels in the air (generally expressed in the units of milligrams agent per cubic meter of air: $mg/m^3$).

- For more information, please see A Review of the Reference Dose and Reference Concentration Processes.

## Linear dose-response assessment

If the "mode of action" information (discussed above) suggests that the toxicity does not have a threshold, then this type of assessment is referred to by the Agency as a "linear" dose-response assessment. In the case of carcinogens, if "mode of action" information is insufficient, then linear extrapolation is typically used as the default approach for dose-response assessment.

- For more detailed information, please see EPA's Guidelines for Carcinogen Risk Assessment.

In this type of assessment, there is theoretically no level of exposure for such a chemical that does not pose a small, but finite, probability of generating a carcinogenic response. The extrapolation phase of this type of assessment does not use UFs; rather, a straight line is drawn from the point of departure for the observed data (typically the BMDL) to the origin (where there is zero dose and zero response).

The slope of this straight line, called the slope factor or cancer slope factor, is use to estimate risk at exposure levels that fall along the line. When linear dose-response is used to assess cancer risk, EPA calculates excess lifetime cancer risk (i.e., probability that an individual will contract cancer over a lifetime) resulting from exposure to a contaminant by considering the degree to which individuals were exposed, as compared to the slope factor.

Thus, the cancer risk is determined by use of the following equation: **Cancer Risk = Exposure x Slope Factor**

Total cancer risk is calculated by adding the individual cancer risks for each pollutant in each pathway of concern (i.e., inhalation, ingestion, and dermal absorption), then summing the risk for all pathways.

A similar term, know as inhalation unit risk (IUR), is used to assess inhalation risks, where the exposure-response relationship refers to concentrations in the air.

Note: When there are alternative procedures having significant biological support, the Agency encourages assessments to be performed using these alternative procedures, if feasible, in order to shed light on the uncertainties in the assessment, recognizing that the Agency may decide to give greater weight to one set of procedures than another in a specific assessment or management decision.

LAST UPDATED ON JUNE 20, 2017

# **Exhibit 41**

| 94TH CONGRESS 2d Session } | HOUSE OF REPRESENTATIVES | { REPORT No. 94-1341 |
|---|---|---|

# TOXIC SUBSTANCES CONTROL ACT

## REPORT

### BY THE

## COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE

together with

## SUPPLEMENTAL AND MINORITY VIEWS

(Including cost estimate of the Congressional Budget Office)

[To accompany H.R. 14032]



JULY 14, 1976.—Committed to the Committee of the Whole House
on the State of the Union and ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

· 74–031                    WASHINGTON : 1976

94TH CONGRESS } HOUSE OF REPRESENTATIVES {    REPORT
2d Session   }                              {  No. 94–1341

## TOXIC SUBSTANCES CONTROL ACT

JULY 14, 1976.—Ordered to be printed

Mr. STAGGERS, from the Committee on Interstate and Foreign Commerce, submitted the following

# REPORT

together with

## SUPPLEMENTAL AND MINORITY VIEWS

(Including cost estimate of the Congressional Budget Office)

[To accompany H.R. 14032]

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (H.R. 14032) to regulate commerce and protect health and the environment by requiring testing and necessary restrictions on certain chemical substances and mixtures, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment strikes out all after the enacting clause of the bill and inserts a new text which appears in italic type in the reported bill.

### PURPOSE OF THE LEGISLATION

The Committee bill takes a major step forward in providing urgently needed authority to protect health and the environment from dangerous chemicals. It accomplishes this in a number of ways. For example, through its testing and premarket notification provisions, the bill provides for the evaluation of the hazard-causing potential of new chemicals before commercial production begins. Thus, in addition to the authority to take action against a chemically-caused harm after its occurrence, there will be authority to prevent such harm from occurring. Further, manufacturers and processors of potentially hazardous chemicals already on the market may be required to test them to determine their effects on health and the environment, and action can be taken against chemicals discovered to be unreasonably hazardous. In addition, the bill provides for the collection of information regarding commercially produced chemicals so that the total exposure to a chemi-

(1)

cal and its total effect on health and the environment can be monitored and evaluated.

## BRIEF SUMMARY

Briefly, the bill will—

—Require manufacturers and processors of potentially harmful chemical substances and mixtures to test the substances or mixtures, as required by rules issued by the Administrator of the Environmental Protection Agency, so that their effect on health and the environment may be evaluated.

—Require manufacturers of new chemical substances and manufacturers and processors of existing chemical substances for significant new uses to notify the Administrator ninety days in advance of commercial production.

—Authorize delays or restrictions on the manufacture of a new chemical substance if there is inadequate information to evaluate the health or environmental effects of the substance and if in the absence of such information, the substance may cause or significantly contribute to an unreasonable risk to health or the environment.

—Authorize the Administrator to adopt rules to prohibit the manufacture, processing, or distribution of a chemical substance or mixture, to require labeling, or to regulate the manner of disposal of a chemical substance or mixture for which there is a reasonable basis to conclude that it causes or significantly contributes to an unreasonable risk to health or environment.

—Authorize the Administrator to obtain injunctive relief from a United States district court to protect the public and the environment from an imminently hazardous chemical substance or mixture.

—Authorize the Administrator to require manufacturers and processors to submit reports and maintain records respecting their commercially produced chemical substances and mixtures, to maintain records respecting adverse health or environmental effects of such substances and mixtures, and to provide available health and safety data on them.

—Require manufacturers and processors of chemical substances and mixtures to immediately notify the Administrator of information indicating that one of their substances or mixtures causes or contributes to a substantial risk to health or environment.

—Permit administrative inspections to enforce the bill and authorize court actions for seizures of chemical substances and mixtures which have been manufactured or distributed in violation of the requirements of the bill or of rules and orders promulgated under it.

—Permit citizens to bring suits to obtain compliance with the bill.

—Permit Federal district courts to order the Administrator to initiate rulemaking proceedings in response to citizen petitions.

—Set up procedural mechanisms to insure that all interested persons have an opportunity to participate in the agency rulemaking proceedings.

—Provide protection for employees who cooperate in the enforcement of the bill.

—Provide for evaluation on a continuing basis of the effects on employment of actions taken under the bill.

## BASIS FOR THE LEGISLATION

Chemicals have become a pervasive and enduring part of our environment. They are in our air, our water, and our soil. They are used in our manufacturing processes, and they are essential components for consumer and industrial goods. Production and use of chemicals have surged in the recent past. For example, in the past ten years, the production of synthetic organic chemicals has expanded by 233 percent,[1] and over 9,000 synthetic chemical compounds are each now in commercial use annually in amounts in excess of 1,000 pounds each.[2] In 1973, production of the top 50 chemicals alone totaled 410 billion pounds.[3] Society reaps enormous benefits from chemicals. However, it is generally accepted that as the number of chemicals in commercial use is greatly increased, the risk of producing chemicals that can cause grave and irreversible environmental damage or health problems is also increased.

This vast volume of chemicals have, for the most part, been released into the environment with little or no knowledge of their long-term health or environmental effects. As a result, chemicals currently in commercial and household use are now being found to cause or contribute to health or environmental hazards unknown at the time commercial use of the chemical began. For example, vinyl chloride was the 23rd most produced chemical when it was discovered to cause cancer, and the chemical has now been implicated as causing birth defects as well.[4] Asbestos, widely used in items ranging from talcum powder to brake linings to wallboard, is now known to cause cancer and other debilitating illnesses. However, such effects were not discovered until hundreds of workers had developed a rare form of lung cancer as a result of exposure to the substance.[5] Polychlorinated biphenyls (PCBs) had been used for forty years and approximately 390,000 tons had been released into the environment before they were recognized as an enduring environmental poison.[6] Unfortunately, such recognition came too late to prevent contamination of such major water systems as the Great Lakes and the Hudson River.

As the preceding examples indicate, it is often many years after exposure to a harmful chemical before the effects of its harm become visible. By that time it may be too late to reverse those effects. As indicated, hundreds of people may have been exposed to a carcinogen or an entire river system may have been polluted.

The experience with chemicals over the past few years has contributed to a growing realization that many of the major health prob-

---

[1] *Sixth Annual Report*, Council on Environmental Policy, p. 23 (1975).
[2] *Toxic Substances*, Council on Environmental Quality, p. 3 (1975).
[3] *Activities of Federal Agencies Concerning Selected High Volume Chemicals*, U.S. Environmental Protection Agency, EPA–560–4–75–001, p. ii (1975).
[4] Infante, Peter F., "Oncogenic and Mutagenic Risks in Communities with Polyvinyl Chloride Product Facilities," 271 New York Academy of Science Annals, pp. 49–57 (1976).
[5] Selicoff, I. J., "Asbestos Criteria Document Highlights," American Society of Safety Engineers Journal, p. 26 (March, 1974).
[6] "Effects of Chronic Exposure to Low-Level Pollutants in the Environment," Congressional Research Service, p. 2 (1975).

4

lems are caused by environmental factors. For example, approximately 60 to 90 per cent of all cancer is believed to be environmentally caused.[1] The National Foundation for the March of Dimes estimates that about 20% of all birth defects as caused by environmental influences, including chemicals, on the unborn child, and another 60% of birth defects are believed to be due to a combination of environmental and hereditary factors.[2]

Because diseases caused by environmental factors such as chemicals are often not susceptible to direct medical cure, there is an urgent need to prevent such chemically caused harm. The Department of Health, Education, and Welfare's Forward Health Plan stresses such prevention, stating:

> In recent years, it has become clear that only by preventing disease from occurring, rather than treating it late, can we hope to achieve any major improvement in the nation's health . . . [Heart disease, cancer, and stroke] are caused by factors (e.g., the environment and individual behavior) that are not susceptible to direct medical solution.
>
> . . . It is therefore, a basic premise of the prevention strategy that much greater attention and resources must be directed at preventing the underlying causes of disease rather than at the disease itself—at controlling cigarette smoking, alcohol abuse, and exposures to toxic chemicals in the environment than at the diseases which they cause.[3]

Similarly, the environmental harm caused by chemicals, like health effects, may be irreversible, and prevention of such harm is also urgently needed.

*Toxic Substances*, a 1971 report by the Council on Environmental Quality, reviewed the problems presented by toxic chemicals and concluded that present authorities for protecting against hazardous chemicals are fragmented and inadequate. According to the report, authority is needed to require testing of chemicals to determine their health and environmental effects, to impose use and distribution restrictions on chemicals where necessary to protect the public health and environment, and to collect information on chemicals and establish a system for classifying and using such information.

The recommendations of the report provided the original basis for the toxic substances control legislation. However, subsequent events have dramatically illustrated the urgent need for the legislation. For example, a major epidemiological study by the National Cancer Institute indicates that industrial chemical use and activity have produced

---

[1] "Sixth Annual Report," Council on Environmental Quality, p. 17 (1975). Chemicals are not, of course, the only environmental factors linked to cancer. Others include the large component of lung cancer attributable to cigarette smoking and natural agents such as solar radiation.

The costs to society from cancer are tremendous. The American Cancer Society estimates that 25 percent of the 213 million people now living in the United States will ultimately develop some form of cancer. "Cancer Facts and Figures." American Cancer Society, p. 3 (1975). Cancer killed an estimated 364,000 Americans in 1975. *Ibid.*

The economic costs of cancer are staggering. An estimated $3 billion is spent annually for hospital care, physician fees, nurses, drugs and other treatment. If the direct and indirect costs (e.g., loss of productivity, earning power) are added, the annual costs of cancer jump to $15 billion. *Id.* at 31.

[2] "Effects of Chronic Exposure to Low-Level Pollutants in the Environment, p. 135.

[3] "Forward Plan for Health," fiscal years 1977–81, U.S. Department of Health, Education, and Welfare, Public Health Service, pp. 12, 13, 15, 16, 17 (June 1975).

5

striking geographic concentrations of cancer deaths.[1] An unusually high rate of lung cancer among workers in a plant where bis chloro-methyl ether (BCME) was produced as a by-product of a manufacturing process has led to the conclusion that BCME is a highly potent carcinogen. BCME may form spontaneously in ordinary humid air whenever formaldehyde and hydrochloric acid are present together. These two chemicals are widely used in processes such as the treatment of permanent press fabrics, in the manufacture of water repellants, and in the manufacture of ion exchange resins and dispersing agents. Further, tris 2, 3-dibromopropyl phosphate, a fire retardant widely used in such items as children's pajamas, has been shown to have mutagenic effects in microbial systems. And there are, unfortunately, numerous other examples of harm resulting from the industrial uses of chemicals.

Because of the lack of testing by manufacturers and processors of chemicals to determine their health and environmental effects, the general population and the environment now serve as the laboratory for discovering adverse health and environmental effects. Aside from the glaring inequities in relying on human experience to indicate when a chemical is harmful, such a method is also a grossly inefficient way to identify problems. For example, vinyl chloride and asbestos were relatively easy hazards to identify because exposure to these agents could be correlated with incidences of otherwise rare cancers in a uniquely defined group of workers. Other kinds of hazards, and other substances, cannot be expected to present such easily traceable cause and effect relationships. As a result exposure to an extremely harmful chemical may continue unabated because the harm it causes will never be linked to the chemical.

Fortunately our ability to screen and test substances for adverse effects and our capabilities for monitoring and predicting the health and environmental effects of chemicals are sufficiently well-developed that it is not necessary to choose between the alternatives of using the population as guinea pigs or doing without the benefits provided by the increasing use and development of chemical products. The validity of applying animal test results to man is now firmly based upon empirical evidence and thus such results provide an invaluable tool for predicting human health effects. Further, major methodological advances are occurring with respect to improving testing and monitoring methods for assessing the long-term effects of a chemical. For example, methods for detecting low levels of carcinogens in the environment have increased significantly in both accuracy and reliability, and it is now possible to detect concentrations of polynuclear compounds at 1 part of an individual compound per billion as opposed to the 1959 sensitivity standard of 100 parts per billion. Analytical methods have improved as well. Illustrative is the salmonella test developed by Dr. Bruce Ames of the University of California, Berkeley, which is now available for screening for cancer-causing properties of chemicals and which has considerably reduced both the costs and time required for such screening. Although testing and monitoring may

---

[1] *Hearings on H.R. 7229. H.R. 7548. and H.R. 7664 before the Subcommittee on Consumer Protection and Finance of the House Committee on Interstate and Foreign Commerce, 94th Cong., 1st Sess., p. 132–138 (1975).*

not be able to provide certainty as to the long-term consequences resulting from exposure to a chemical, the predictions from such testing and monitoring can provide a reasonable basis for regulatory action to protect against potential long-term adverse effects.

Present authorities for protecting against and regulating hazardous chemicals are fragmented and inadequate. Although there are a number of Federal laws which now provide some authority for regulation (e.g., the Clean Air Act, the Federal Water Pollution Control Act, the Occupational Safety and Health Act of 1970, and the Consumer Product Safety Act) conspicuous gaps exist in the protections provided by such laws. Most significant among the deficiencies are the following:

(1) In general, such laws provide regulatory authority which is not set in motion until after human or environmental exposure to a harmful chemical has occurred.

(2) The authorities provided to reduce or eliminate the harmful exposure to a chemical may not be adequate or may be cumbersome or inefficient.

(3) No authority exists for collection of data to determine the totality of human and environmental exposure to chemicals.

An example of the deficiency described in paragraph (1) is the fact that there is presently no authority to require manufacturers of potentially dangerous new chemicals to test the chemical to determine its health and environmental effects before marketing. Thus, although there is some authority to remove harmful chemicals from the workplace, the home, etc., there is no authority which provides a means of assessing the safety of a chemical before exposure occurs. In addition, since present laws require regulatory agencies to bear the cost of testing to see if a chemical is safe, regulatory action often does not occur until adverse effects of a chemical become evident in the population or in the environment.

The inadequacies in current authorities to deal with the recognized harm presented by polychlorinated biphenyls (PCBs) illustrates the deficiencies in present law to deal with known harmful chemicals. Under the Federal Water Pollution Control Act, the Administrator of the Environmental Protection Agency has authority to control the discharge of PCBs into the waters. However, there is no means for regulating other avenues through which the environment is exposed to PCBs. For example, an estimated three-fourths of the amount of discarded PCB's have been disposed of in landfills. Under existing law there is no authority to deal with such disposal and even though water emissions may be restricted, environmental exposure through seepage from landfills will continue to occur.

Intelligent standards for regulating exposures to a chemical in the workplace, the home or elsewhere in the environment cannot be set unless the full extent of human or environmental exposure is considered. The importance of considering the cumulative impact of all sources of exposure and the synergistic effects resulting from exposure to a number of chemicals in regulating hazardous chemicals was pointed out by the National Academy of Sciences—National Academy of Engineers study which stated:

The concept of total body burden should be the significant indicator of exposure, rather than burden acquired in one or

7

another part of the environment or from one or another toxic material. People who work in a factory in which dangerous substances are handled in high concentration may live in an adjacent area in which the same or other substances are dispersed, thus increasing overall exposure. More than one organ may be attacked because the offending substance is transported by two or more media. Synergistic effects among two or more substances, by which the combined effect is more than the sum of the separate effects should be considered.[1]

Yet a comprehensive data system indicating the totality of human or environmental exposure does not exist. As a result, present regulations controlling workplace exposure, exposure in the home or elsewhere to a hazardous chemical may often be based on measurements indicating only one source of exposure, thereby resulting in less than full protection from the hazard.

In summary, the country faces serious risks of harm to the health of its people and to its environment from the substantial use which is made of chemicals, and Federal law is clearly inadequate to deal with such risks. A major element in our efforts to improve the nation's health and environment must be the enactment of protective legislation such as H.R. 14032. The overriding purpose of the bill is to provide protection of health and the environment through authorities which are designed to prevent harm.

### COMMITTEE CONSIDERATION

A 1971 report by the Council on Environmental Quality highlighted the growing need for a comprehensive program of toxic substances control. Based upon the Council's recommendations, the Environmental Protection Agency submitted legislative proposals on behalf of the Administration to the 92d Congress. The Committee's Subcommittee on Commerce and Finance held hearings on the Administration bill, and a Senate-passed bill which made substantial amendments to the Administration bill. After executive session, the Subcommittee reported a clean bill which represented an accommodation between the Administration and Senate-passed bills. This bill with certain further amendments was reported by the full Committee and passed the House by a record vote of 240 to 61. Time did not permit a conference with the Senate to work out differences before the adjournment of the 92d Congress.

In the 93d Congress, the Subcommittee on Commerce and Finance held hearings on a new bill submitted by the Administration (H.R. 5087) and a bill introduced by the Subcommittee chairman, Mr. Moss, and others (H.R. 5356) which substantially followed the bill passed by the House in the 92d Congress. The Subcommittee reported H.R. 5356, with amendments. The bill with certain further amendments was reported by the full Committee and passed the House by a record vote of 324 to 73. However, the conference with the Senate was unable to work out differences in the bills in the time remaining.

---

[1] Man, Materials and Environment: A Report to the National Commission on Materials Policy", National Academy of Sciences—National Academy of Engineers, p. 12 (March 1973).

## SECTION 6, REGULATION OF HAZARDOUS CHEMICAL SUBSTANCES AND MIXTURES

Section 6 empowers and directs the Administrator to take action to protect the public from hazardous chmeical substances and mixtures. Such action shall be taken against existing chemical substances, new chemical substances, and mixtures when there is a reasonable basis to conclude that the substance or mixture causes or significantly contributes to or will cause or significantly contribute to an unreasonable risk.

*Scope of regulation*

Section 6(a) provides that if the Administrator finds that there is a reasonable basis to conclude that the manufacture, processing, distribution in commerce, use or disposal of a chemical substance or mixture (or any combination of such activities) causes or significantly contributes to or will cause or significantly contribute to an unreasonable risk to health or environment, the Administrator shall by rule take regulatory action necessary to adequately protect against the risk. Absent such a finding, the Administrator may not take action under section 6(a).

This standard for taking action recognizes that factual certainty respecting the existence of an unreasonable risk of a particular harm may not be possible and the bill does not require it. Such uncertainty is particularly likely to occur true when dealing with the long term or chronic effects of a substance or mixture. For example, cancer does not appear immediately after exposure to a carcinogenic substance or mixture, but instead there may be a latency period of several years before the cancer appears. With mutagens, the effects may not become apparent until generations have passed. When, as here, regulatory action is intended to be taken to prevent the occurrence of harm in the future as well as protect against presently visible harm, such action often must be based not only consideration of facts but also on consideration of scientific theories, projections of trends from currently available data, modeling using reasonable assumptions, and extrapolations from limited data. Further, regulatory action may be taken even though there are uncertainties as to the threshold levels of causation. Thus, the bill requires a reasonable basis to conclude that a substance or mixture causes or significantly contributes to or will cause, or significantly contribute to an unreasonable risk to health or environment. Such a judgment may be based upon items such as toxicological, physiological, epidemiological, biochemical, or statistical research or studies or extrapolations therefrom. A finding by the Administrator that there is such a reasonable basis must include adequate reasons and explanations for the Administrator's conclusion. It does not, however, require the factual certainty of a "finding of fact" of the sort associated with adjudication.

(32)

425

The term "significantly contribute to an unreasonable risk" is used throughout the bill. The Committee has used such term because it recognizes that an individual substance or mixture may not be the sole identifiable factor which may cause an unreasonable risk. Because of the multiple avenues by which humans and the environment are exposed to a substance or mixture and because substances and mixtures do not occur in the environment in isolation, risks may result from complex interactions or because of cumulative effects. Thus the bill authorizes actions against a substance or mixture which is only a contributing factor to an unreasonable risk. The bill specifies that the contribution be significant, for the Committee does not intend to authorize action against a contributing factor which is only de minimus. However, the Committee recognizes that in many instances it will be impossible for the Administrator to show the quantity of contribution to a particular risk made by a particular substance or mixture, and the Committee does not intend that the Administrator be required to do so in such situations. Nor does the Administrator have to show that a substance or mixture is the predominant contributing factor. Because of potential cumulative or synergistic effects, even a small contribution may be significant. Moreover, because of the dispersion and transformation of chemical substances and mixtures in the environment, the substance or mixture may contribute to a risk indirectly or directly. The considerations discussed in this paragraph would, of course, apply whenever the phrase is used in the bill.

A section 6(a) rule may consist of any one or more of the following: (1) a requirement prohibiting the manufacturing, processing, or distribution in commerce of the substance or mixture or limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce; (2) a requirement prohibiting the manufacture, processing, or distribution in commerce of the substance or mixture for a particular use or prohibiting the manufacture, processing, or distribution in commerce of the substance or mixture for a particular use in excess of a specified level of concentration; (3) a requirement limiting the amount of the substance or mixture which may be manufactured, processed, or distributed in commerce for a particular use or a particular use in a concentration in excess of a specified level; (4) a requirement that the substance or mixture or any article containing it be marked with or accompanied by appropriate warnings and instructions; (5) a requirement that the manufacturers and processors of the substance or mixture make and retain records of the processes used to manufacture or process the substance or mixture; (6) a requirement regulating the manner or method of disposal of the substance, mixture or any article containing it by its manufacturer, processor, or by any commercial user; and (7) if a requirement described in clause (1), (2), or (3) is imposed, a requirement that the manufacturers and processors of the substance or mixture provide notice of the risk to persons in possession of the substance or mixture and to the public. The Committee recognizes the inherent interests of the States and political subdivisions respecting disposal of hazardous chemicals within their jurisdiction. As a result, the Committee has limited the Administrator to prescribing only those disposal requirements which do not violate any law of a State or a po-

34

litical subdivision of a State. In addition, any disposal requirement shall require persons subject to it to notify each State and political subdivision in which a required disposal may occur.

While the bill authorizes the Administrator to prohibit or limit the distribution in commerce of substances or mixtures and to prohibit or limit the distribution in commerce of substances and mixtures for a particular use, such authority does not authorize the Administrator to regulate the manner or method of transporting hazardous chemical substances or mixtures in commerce. For example, the loading, unloading, and storage in connection with transportation in commerce are regulated under the Hazardous Materials Act of 1974, and it is not the Committee's intent to grant the Administrator any regulatory authority under section 6(a) with respect to such loading, unloading, or storage.

The Committee recognizes that the requirements prescribed by the Administrator under this section may provide protection for employees in the workplace. For example, by prohibiting the manufacture of a substance, risks to employees involved in the manufacturing of the substance would be eliminated. However, the Committee wishes to emphasize that none of the authorities included in section 6(a) should be construed as authorizing the Administrator to issue workplace standards directly regulating such matters as the airborne concentrations of a substance to which employees may be exposed or the manner in which an employee is permitted to handle a substance. There is no authority in the bill for the Administrator to issue rules respecting personal protective equipment for employees, work practices in hazardous operations, or procedures for emergency situations. Such direct regulation of the workplace falls under the jurisdiction of the Occupational Safety and Health Act of 1970 not under this bill.

The Committee intends that any requirement prescribed under section 6(a) be the least burdensome possible for those subject to the requirement and for society while providing an adequate margin of protection against the unreasonable risk. The Committee expects that the determination of the least burdensome requirement will be based on information submitted to the Administration during the rulemaking proceeding and other information which is readily available to the Administrator. The Committee does not intend that needed regulation be unreasonably delayed while the Administrator develops quantative data comparing the costs of control methods. Because different environmental or health conditions in different areas of the country may require different forms of regulation to protect against an unreasonable risk, the bill permits a requirement to be limited in application to specified geographic areas.

*Protection against adulterated or contaminated substances and mixtures*

Subsection (b) of section 6 authorizes the Administrator to take action to prevent the adulteration or contamination of substances and mixtures. If the Administrator has good cause to believe that a particular manufacturer or processor is manufacturing or processing a substance or mixture in a manner which unintentionally results in the substance or mixture causing or significantly contributing to or to

# **Exhibit 42**

This PDF is available at http://nap.edu/2125   

SHARE



## Science and Judgment in Risk Assessment (1994)

### DETAILS

672 pages | 6 x 9 | HARDBACK
ISBN 978-0-309-04894-1 | DOI 10.17226/2125

### CONTRIBUTORS

Committee on Risk Assessment of Hazardous Air Pollutants, Commission on Life Sciences, National Research Council

GET THIS BOOK

FIND RELATED TITLES

### SUGGESTED CITATION

National Research Council 1994. *Science and Judgment in Risk Assessment*. Washington, DC: The National Academies Press. https://doi.org/10.17226/2125.



Visit the National Academies Press at NAP.edu and login or register to get:

– Access to free PDF downloads of thousands of scientific reports

– 10% off the price of print titles

– Email or social media notifications of new titles related to your interests

– Special offers and discounts

Distribution, posting, or copying of this PDF is strictly prohibited without written permission of the National Academies Press. (Request Permission) Unless otherwise indicated, all materials in this PDF are copyrighted by the National Academy of Sciences.

Copyright © National Academy of Sciences. All rights reserved.

# Science and Judgment in Risk Assessment

Committee on Risk Assessment of Hazardous Air Pollutants
Board on Environmental Studies and Toxicology
Commission on Life Sciences
National Research Council

NATIONAL ACADEMY PRESS

Washington, D.C. 1994

Copyright National Academy of Sciences. All rights reserved.

# 2

# Risk Assessment and Its Social and Regulatory Contexts

This chapter provides an overview of the origins and uses of quantitative risk assessment and the problems associated with it. Historical perspective is offered to aid understanding of how a method infused with so much uncertainty has still come to be seen by many as useful. Some attention is devoted to the important questions of how risk assessment has been used in decision-making and whether its use has improved decisions. The issues of public acceptance of the method and the degree to which decisions based on it are seen to provide adequate protection of the public health are also addressed. This chapter lists the major criticisms of risk assessment and the ways in which its results have been used, thus providing the justification for the selection of issues discussed in the succeeding chapters.

## General Concepts

This section briefly discusses some basic definitions and concepts concerning human-health risk assessment, its content, and its relationships to research and to decision-making. The definitions and concepts were first systematically formulated by a National Research Council committee in a report issued in 1983, *Risk Assessment in the Federal Government: Managing the Process*. The Red Book had a major influence on the practice of risk assessment and will be discussed extensively in this section of the report.

### What is Risk Assessment?

Human-health risk assessment entails the evaluation of scientific information on the hazardous properties of environmental agents and on the extent of

Copyright National Academy of Sciences. All rights reserved.

Science and Judgment in Risk Assessment

human exposure to those agents. The product of the evaluation is a statement regarding the probability that populations so exposed will be harmed, and to what degree. The probability may be expressed quantitatively or in relatively qualitative ways. There are other types of risk assessment that use similar processes but are outside the scope of this report, e.g., the risk assessment of the relative safety of a bridge.

Chemical hazards come in many forms. Some substances are radioactive, some explosive, some highly flammable. The particular hazard of concern here is chemical toxicity, including but not limited to carcinogenicity. Risk assessments can be carried out for any form of chemical toxicity. Risk assessment can be qualitative or quantitative. Many of the issues covered in this report concern quantitative expressions of risk.

## How Is Risk Assessment Conducted?

The 1983 NRC report described a four-step analytic process for human-health risk assessment. A substance leaves a source (e.g., an industrial facility), moves through an environmental medium (e.g., the air), and results in an exposure (people breathe the air containing the chemical). The exposure creates a dose in the exposed people (the amount of the chemical entering the body, which may be expressed in any of several ways), and the magnitude, duration, and timing of the dose determine the extent to which the toxic properties of the chemical are realized in exposed people (the risk). This model is captured in the following analytic steps:

**Step 1:** **Hazard Identification** entails identification of the contaminants that are suspected to pose health hazards, quantification of the concentrations at which they are present in the environment, a description of the specific forms of toxicity (neurotoxicity, carcinogenicity, etc.) that can be caused by the contaminants of concern, and an evaluation of the conditions under which these forms of toxicity might be expressed in exposed humans. Information for this step is typically derived from environmental monitoring data and from epidemiologic and animal studies and other types of experimental work. This step is common to qualitative and quantitative risk assessment.

**Step 2:** **Dose-Response Assessment** entails a further evaluation of the conditions under which the toxic properties of a chemical might be manifested in exposed people, with particular emphasis on the quantitative relation between the dose and the toxic response. The development of this relationship may involve the use of mathematical models. This step may include an assessment of variations in response, for example, differences in susceptibility between young and old people.

**Step 3:** **Exposure Assessment** involves specifying the population that might be exposed to the agent of concern, identifying the routes through which

Copyright National Academy of Sciences. All rights reserved.

exposure can occur, and estimating the magnitude, duration, and timing of the doses that people might receive as a result of their exposure.

**Step 4:**  **Risk Characterization** involves integration of information from the first three steps to develop a qualitative or quantitative estimate of the likelihood that any of the hazards associated with the agent of concern will be realized in exposed people. This is the step in which risk-assessment results are expressed. Risk characterization should also include a full discussion of the uncertainties associated with the estimates of risk.

Not every risk assessment encompasses all four steps. Risk assessment sometimes consists only of a hazard assessment designed to evaluate the potential of a substance to cause human health effects. Regulators sometimes take the additional step of ranking the potency of a number of chemicals—what is known as hazard ranking. Sometimes potency information is combined with exposure data to produce a risk ranking. These techniques all use some, but not all, of the four steps of the quantitative risk-assessment process.

Much of this report is devoted to the technical contents of the four steps of the process, because therein lie the issues that affect the reliability, utility, and credibility of risk-assessment outcomes. One important feature of those steps, however, needs to be emphasized here.

The 1983 NRC committee recognized that completion of the four steps rests on many judgments for which a scientific consensus has not been established. Risk assessors might be faced with several scientifically plausible approaches (e.g., choosing the most reliable dose-response model for extrapolation beyond the range of observable effects) with no definitive basis for distinguishing among them. The earlier committee pointed out that selection of a particular approach under such circumstances involves what it called a *science-policy* choice. Science-policy choices are distinct from the policy choices associated with ultimate decision-making, as will be seen below. The science-policy choices that regulatory agencies make in carrying out risk assessments have considerable influence on the results and are the focus of much that follows in this report.

### What is the Relationship Between Risk Assessment and Research?

Although the conduct of a risk assessment involves research of a kind, it is primarily a process of gathering and evaluating extant data and imposing science-policy choices. Risk assessment draws on research in epidemiology, toxicology, statistics, pathology, molecular biology, biochemistry, analytical chemistry, exposure modeling, dosimetry, and other disciplines; to the extent that it attempts to capture and take into account uncertainties, it also draws on the research efforts of decision analysts.

Risk assessment, at least in theory, can influence research directions. Because, at its best, risk assessment provides a highly organized profile of the

Copyright National Academy of Sciences. All rights reserved.

Science and Judgment in Risk Assessment
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1036 of 1126
RISK ASSESSMENT AND ITS SOCIAL AND REGULATORY CONTEXTS                 28

current state of knowledge of particular issues and systematically elucidates scientific uncertainties, it can provide valuable guidance to research scientists regarding the types of data that can most effectively improve understanding. Little effort seems to have been made to use risk assessments in this way, although the Office of Technology Assessment has recently completed a study that describes the role of risk assessment in guiding research (OTA, 1993).

## What is the Relationship Between Risk Assessment and Regulatory Decision-Making?

*Risk management* is the term used to describe the process by which risk-assessment results are integrated with other information to make decisions about the need for, method of, and extent of risk reduction. Policy considerations derived largely from statutory requirements dictate the extent to which risk information is used in decision-making and the extent to which other factors—such as technical feasibility, cost, and offsetting benefits—play a role.

Some statutes seem not to permit risk-assessment results to play a substantial role; they stress reductions of exposure to the "lowest technically feasible level" and usually require the best available technology. Proponents of such technology-based approaches often argue that they facilitate more rapid regulatory action and are especially suitable for making large and relatively inexpensive "first-cut" emission reductions. Proponents of quantitative risk assessment argue that such approaches are blind to the possibility that the risks remaining after application of such technology might still be unreasonably large or, in other situations, that they have been pushed to unnecessarily low values. As amended in 1990, Section 112 of the Clean Air Act gives quantitative risk-assessment results a secondary but still important role relative to technology-based controls.

## What Is a Default Option?

EPA's guidelines set forth "default options." These are generic approaches, based on general scientific knowledge and policy judgment, that are applied to various elements of the risk assessment process when specific scientific information is not available. For instance, ambient doses of contaminants in humans are generally far lower than the doses that produce tumors in animals in controlled studies. The guidelines advise that, in assessing the magnitude of cancer risk to humans from low doses of a chemical based on the results of a high-dose experiment, "in the absence of adequate information to the contrary, the linearized multistage procedure will be employed" (EPA, 1986a, 1987a); that is, cancer risk in humans exposed to low doses will be estimated mathematically by using high-dose data and a curve-fitting procedure to extrapolate to low doses. Departure from the guideline is allowed if there is "adequate evidence" that the mechanism through which the substance is carcinogenic is more consistent with a

Copyright National Academy of Sciences. All rights reserved.

Science and Judgment in Risk Assessment
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1037 of 1126
RISK ASSESSMENT AND ITS SOCIAL AND REGULATORY CONTEXTS          29

different model; for instance, that there is a threshold below which a substance will not cause a risk. Thus, the guideline amounts to a "default" that guides a decision-maker in the absence of evidence to the contrary; in effect, it assigns the burden of persuasion to those wishing to show that the linearized multistage procedure should not be used. Similar guidelines cover such important issues as the calculation of effective dose, the consideration of benign tumors, and the procedure for scaling animal-test results to estimates of potency in humans. In the absence of information on some critical point in a risk assessment, default procedures seem essential. The question, then, is not whether to use defaults, but which defaults are most appropriate for a specific task and when it is appropriate to use an alternative to a default.

### Historical Roots

It is helpful to provide a brief historical perspective on the origins and evolution of risk assessment, so that some of the reasons that led to the use of the technique can be seen. The review is divided into two main parts, with an intervening section devoted to the NRC study of 1983 that was so influential in the developments of the last decade.

**Early Efforts to Establish Safe Limits of Exposure to Toxic Substances**

About 50 years ago, toxicologists began to study the problem of establishing limits on exposures to hazardous substances that would protect human health. The early efforts began in the 1940s in connection with concerns about occupational exposures to chemicals and about residues of pesticides in foods. Toxicologists were guided by the principle that all substances could become harmful under some conditions of exposure—when the so-called threshold dose was exceeded—but that human health could be protected as long as those exposure conditions were avoided. Threshold doses were recognized to vary widely among chemicals, but as long as human exposures were limited to subthreshold doses, no injury to health would be expected. The threshold hypothesis thus involved rejection of the simplistic view that the world is divided into toxic and nontoxic substances and acceptance of the principle that, for all chemicals, there were ranges of exposure that were toxic and ranges that were not. The threshold hypothesis was based on both empirical observations and basic concepts of biology—that every organism, including the human, has the capacity to adapt to or otherwise tolerate some exposure to any substance and that the harmful effects of a substance would become manifest only when exposure exceeded that capacity. Even at that early stage, there were questions about whether carcinogens always had thresholds, but otherwise the threshold concept became widely accepted.

Although there was widespread acceptance of the threshold hypothesis (except

Copyright National Academy of Sciences. All rights reserved.

Science and Judgment in Risk Assessment
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1038 of 1126
RISK ASSESSMENT AND ITS SOCIAL AND REGULATORY CONTEXTS                30

among scientists working in genetics and in chemical carcinogenesis) (NRC, 1986), it was not apparent how the threshold dose was to be estimated for a large and diverse human population whose members have different thresholds of susceptibility. Experts in occupational health tended to rely heavily on observations of short-term toxicity in highly exposed workers and established acceptable exposure limits (the most prominent of which were the so-called threshold limit values, TLVs, first published by the American Conference of Governmental Industrial Hygienists in the 1950s) that were below the exposures that produced observable toxic effects. In the early 1950s, two Food and Drug Administration (FDA) scientists, O.G. Fitzhugh and A. Lehman, proposed a procedure for setting acceptable limits, which became known as acceptable daily intakes (ADIs), for dietary pesticide residues and food additives. Their procedure was based on the threshold hypothesis and first involved identification of a chemical's no-observed-effect level (NOEL) from the set of chronic animal-toxicity data in which the animals responded to the lowest dose tested—the "most sensitive" indication of the chemical's toxicity. Several response levels are characterized by acronyms. The first is the "no-observed-effect-level," NOEL. Earlier this was called the no-*observable*-effect level. *Observable* was changed to *observed* to be more in keeping with actual data ("observed"), rather than a rather vague potential "observable," which might be related to the size and sensitivity of the experiment. What is not observable in a small experiment might be easily observed in a large experiment. The word *adverse* was added to NOEL, making it NOAEL and making it clearer that *adverse* effects were of concern. The LOEL and LOAEL have a similar genesis and currently refer to the "lowest-observed-adverse-effect level"—the lowest dose at which an adverse effect was seen.

Fitzhugh and Lehman cited data suggesting that "average" human sensitivities might be up to 10 times those of laboratory animals and that some members of a large and diverse human population might be up to 10 times more sensitive than the "average" person. Thus came into use the safety factor of 100. The experimental NOEL was divided by 100 to arrive at a chemical-specific ADI. If human exposure was limited to daily amounts less than the ADI, then no toxicity was to be expected. In fact, Fitzhugh and Lehman, and later other authors and expert groups, including the World Health Organization, did not claim that an ADI arrived at in this fashion was risk-free, but only that it carried "reasonable certainty of no harm." No attempt was made to estimate the probability of harm. A variation of the safety-factor approach, often called margin of safety, is the estimate of the ratio of the NOEL to actual exposures. A judgment is made as to whether that ratio is acceptable. This margin-of-safety approach seems to be most common for substances already in general use, and in practice is often associated with lower ratios of NOEL to exposure than those based on safety factors.

The use of safety factors to establish ADIs was also recommended by various NRC committees (NRC, 1970, 1977, 1986) and adopted by the Joint Food

Copyright National Academy of Sciences. All rights reserved.

Science and Judgment in Risk Assessment
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1039 of 1126
RISK ASSESSMENT AND ITS SOCIAL AND REGULATORY CONTEXTS          31

and Agriculture Organization and World Health Organization expert committees on food additives (FAO/WHO, 1982) and pesticide residues (FAO/WHO, 1965).

Although it has since been modified in several minor ways, the basic procedure for setting limits on human exposures to chemicals in air, water, and food persists to this day. The threshold hypothesis has been criticized as inadequate to account for some toxic effects, and it has not been accepted by regulators as applicable to carcinogens, but it remains a cornerstone of other regulatory and public-health risk assessments. Section 112 of EPA's authority for regulating toxic air pollutants envisions a safety-factor approach for some kinds of risk assessment.

**The Problem of Carcinogens**

Not only is cancer a much-feared set of diseases, but public and scientific concerns about cancer-inducing chemicals in the environment have centered on the possibility that such substances might act through nonthreshold mechanisms; that is, that exposure to even one molecule of a carcinogen is associated with a small but non-zero increased risk of tumor induction. This possibility served as the basis for modern dose-response models, which were developed initially from observations of radiation-induced cancer. These models came into wide use and were promoted by the National Research Council's series of reports entitled *Biological Effects of Ionizing Radiation* and later incorporated into the regulatory decision-making of the Nuclear Regulatory Commission. Perhaps the earliest legislative acknowledgment of the possibility that chemical carcinogens might act in the same way came in the form of the "Delaney clause" of the Food Additive Amendments of 1958. Following the suggestions set forth by several FDA and National Cancer Institute (NCI) officials, Congress stipulated that no additive that concentrates in food during processing or is added to food during or after processing may be allowed in the food supply if it is found to be carcinogenic in animals. The basis for the Delaney clause was that it is not possible to specify a safe human exposure to a carcinogen in the same sense that a safe intake of a substance acting through threshold mechanisms could be identified.

Through the 1960s and into the early 1970s, toxicologists avoided the problem of identifying "acceptable" intakes of carcinogens. Where it was possible, regulators simply prohibited introduction of carcinogens into commerce. But where banning was difficult or even infeasible—for example, for environmental contaminants that were byproducts of manufacturing and energy production—choosing a maximal permissible human exposure, and acceptance of some risk. Limits were sometimes based on some concept of technical feasibility. The problem with such a criterion for setting limits was that it provided little confidence that human health was being adequately protected or, conversely, that risks were not being forced to unnecessarily low levels. In many cases, carcinogenic pollutants were simply ignored (NRC, 1983a).

Copyright National Academy of Sciences. All rights reserved.

# 6

# Default Options

EPA's risk-assessment practices rest heavily on "inference guidelines" or, as they are often called, "default options." These options are generic approaches, based on general scientific knowledge and policy judgment, that are applied to various elements of the risk-assessment process when the correct scientific model is unknown or uncertain. The 1983 NRC report *Risk Assessment in the Federal Government: Managing the Process* defined *default Option* as "the option chosen on the basis of risk assessment policy that appears to be the best choice in the absence of data to the contrary" (NRC, 1983a, p. 63). Default options are not rules that bind the agency; rather, as the alternative term *inference guidelines* implies, the agency may depart from them in evaluating the risks posed by a specific substance when it believes this to be appropriate. In this chapter, we discuss EPA's practice of adopting guidelines containing default options and departing from them in specific cases.

## Adoption Of Guidelines

As our discussion of risk assessment has made clear, current knowledge of carcinogenesis, although rapidly advancing, still contains many important gaps. For instance, for most carcinogens, we do not know the complete relationship between the dose of a carcinogen and the risk it poses. Thus, when there is evidence of a carcinogenic effect at a high concentration (for instance, in the workplace or in animal testing), we do not know for certain how strong the effect (if any) would be at the lower concentrations typically found in the environment. Similarly, we do not know how much importance to attach to experiments that

Copyright National Academy of Sciences. All rights reserved.

Science and Judgment in Risk Assessment
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1041 of 1126
DEFAULT OPTIONS                                                              86

show that exposure to a substance causes only benign tumors in animals or how to adjust for metabolic differences between animals and humans in calculating the carcinogenic potency of a chemical.

Other uncertainties are not peculiar to carcinogenesis, but are characteristic of many aspects of risk assessment. For example, calculating the doses received by individuals might require knowledge of the relationship between emission of a substance by a source and the ambient concentration of that substance at a particular place and time. It is impossible to install a monitor at every place where people might be exposed; moreover, monitoring results are subject to error. Thus, regulators attempt to use air-quality models to predict ambient concentrations. But because our knowledge of atmospheric processes is imperfect and the data needed to use the models cannot always be obtained, the predictions from atmospheric-transport models can differ substantially from measured ambient concentrations (NRC, 1991a).

In time, we hope, our knowledge and data will improve. Indeed, we believe that EPA and other government agencies must engage in scientific research and be receptive to the results of sound scientific research conducted by others. In the meantime, decisions about regulating hazardous air pollutants must be made under conditions of uncertainty. It is vital that the risk-assessment process handle uncertainties in a predictable way that is scientifically defensible, consistent with the agency's statutory mission, and responsive to the needs of decisionmakers.

These uncertainties, as we explain further in Chapter 9, are of two major types. One type, which we call *parameter uncertainty*, is caused by our inability to determine accurately the values of key inputs to scientific models, such as emissions, ambient concentrations, and rates of metabolic action. The second type, *model uncertainty*, is caused by gaps in our knowledge of mechanisms of exposure and toxicity—gaps that make it impossible to know for certain which of several competing models is correct. For instance, as mentioned above, we often do not know whether a threshold may exist below which a dose of a carcinogen will not result in an adverse effect. As we discuss in Chapter 9, model uncertainties, unlike parameter uncertainties, are often difficult to quantify.

The Red Book recommended that model uncertainties be handled through the development of uniform inference guidelines for the use of federal regulatory agencies in the risk-assessment process. Such guidelines would structure the interpretation of scientific and technical information relevant to the assessment of health risks. The guidelines, the report urged, should not be rigid, but instead should allow flexibility to consider unique scientific evidence in particular instances.

The Red Book described the advantages of such guidelines as follows (pp. 7-8):

Copyright National Academy of Sciences. All rights reserved.

Science and Judgment in Risk Assessment
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1042 of 1126
DEFAULT OPTIONS                                                                87

> The use of uniform guidelines would promote clarity, completeness, and consistency in risk assessment; would clarify the relative roles of scientific and other factors in risk assessment policy; would help to ensure that assessments reflect the latest scientific understanding; and would enable regulated parties to anticipate government decisions. In addition, adherence to inference guidelines will aid in maintaining the distinction between risk assessment and risk management.

This committee believes that those considerations continue to be valid. In particular, we stress the importance of inference guidelines as a way of keeping risk assessment and risk management from unduly influencing each other. Without uniform guidelines, risk assessments might be manipulated on an ad hoc basis according to whether regulating a substance is thought to be politically feasible. In addition, we believe that inference guidelines can provide a predictable and consistent structure for risk assessment and that a statement of guidelines forces an agency to articulate publicly its approach to model uncertainty.

Like the committee that produced the 1983 NRC report, we recognize that there is an inevitable interplay between risk assessment and risk management. As the 1983 report states (pp. 76, 81), "risk assessment must always include policy, as well as science," and "guidelines must include both scientific knowledge and policy judgments." Any choice of defaults, or the decision not to have defaults at all, therefore amounts to a policy decision. Indeed, without a policy decision, the report stated, risk-assessment guidelines could do no more than "state the scientifically plausible inference options for each risk assessment component without attempting to select or even suggest a preferred inference option" (NRC, 1983a, p. 77). Such guidelines would be virtually useless. The report urged that risk-assessment guidelines include risk-assessment policy and explicitly distinguish between scientific knowledge and risk-assessment policy to keep policy decisions from being disguised as scientific conclusions (NRC, 1983a, p. 7). That report urged that for consistency, policy judgments related to risk assessment ought to be based on a common principle or principles.

We believe that EPA acted reasonably in electing to issue *Guidelines for Carcinogen Risk Assessment* (EPA, 1986a). Those guidelines set out policy judgments about the accommodation of model uncertainties that are used to assess risk in the absence of a clear demonstration that a particular theory or model should be used.

For instance, the default options indicate that, in assessing the magnitude of risk to humans associated with low doses of a substance, "in the absence of adequate information to the contrary, the linearized multistage procedure will be employed" (EPA, 1986a, p. 33997). The linearized multistage procedure implies low-dose linearity. At low doses, if the dose is reduced by, say, a factor of 1,000, the risk is also reduced by a factor of 1,000; dose is linearly related to risk. Departure from this default option is allowed, under EPA's current guidelines,

Copyright National Academy of Sciences. All rights reserved.

if there is "adequate evidence" that the mechanism through which the substance is carcinogenic is more consistent with a different model—for instance, that there is a threshold below which exposure is not associated with a risk. Thus, the default option in guiding a decision-maker, in the absence of evidence to the contrary, assigns the burden of persuasion to those who wish to show that the linearized multistage procedure should not be used. Similar default options cover such important issues as the calculation of effective dose, the treatment of benign tumors, and the procedure for scaling animal-test results to estimates of potency in humans.

Some default options are concerned with issues of extrapolation—from laboratory animals to humans, from large to small exposures (or doses), from intermittent to chronic lifetime exposures, and from route to route (as from ingestion to inhalation). That is because few chemicals have been shown in epidemiologic studies to cause measurable numbers of human cancers directly, and epidemiologic data on only a few of these are sufficient to support quantitative estimates of human epidemiologic cancer risk. In the absence of adequate human data, it is necessary to use laboratory animals as surrogates for humans.

One advantage of guidelines, as already noted, is that they can articulate both the agency's choice of individual default options and its rationale for choosing all of the options. EPA's guidelines set out individual options but do not do so with ideal clarity. Nor has the agency explicitly articulated the scientific and policy bases for its options. Hence, there might be disagreement about precisely what the agency's default options are and the rationales for these options. We attempt here to identify the most important of the options (numbered points in the 1986 guidelines are cited):

- Laboratory animals are a surrogate for humans in assessing cancer risks; positive cancer-bioassay results in laboratory animals are taken as evidence of a chemical's cancer-causing potential in humans (IV).
- Humans are as sensitive as the most sensitive animal species, strain, or sex evaluated in a bioassay with appropriate study-design characteristics (III.A.1).
- Agents that are positive in long-term animal experiments and also show evidence of promoting or cocarcinogenic activity should be considered as complete carcinogens (II.B.6).
- Benign tumors are surrogates for malignant tumors, so benign and malignant tumors are added in evaluating whether a chemical is carcinogenic and in assessing its potency (III.A.1 and IV.B.1).
- Chemicals act like radiation at low exposures (doses) in inducing cancer; i.e., intake of even one molecule of a chemical has an associated probability for cancer induction that can be calculated, so the appropriate model for relating exposure-response relationships is the linearized multistage model (III.A.2).
- Important biological parameters, including the rate of metabolism of

Copyright National Academy of Sciences. All rights reserved.

Science and Judgment in Risk Assessment
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1044 of 1126
DEFAULT OPTIONS                                                                89

chemicals, in humans and laboratory animals are related to body surface area. When extrapolating metabolic data from laboratory animals to humans, one may use the relationship of surface area in the test species to that in humans in modifying the laboratory animal data (III.A.3).

- A given unit of intake of a chemical has the same effect, regardless of the time of its intake; chemical intake is integrated over time, irrespective of intake rate and duration (III.B).
- Individual chemicals act independently of other chemicals in inducing cancer when multiple chemicals are taken into the body; when assessing the risks associated with exposures to mixtures of chemicals, one treats the risks additively (III.C.2).

EPA has never articulated the policy basis for those options. As we discuss in the previous introductory section (Part II), the agency should choose and explain the principles underlying its choices to avoid the dangers of ad hoc decision-making. The agency's choices are for the most part intended to be conservative—that is, they represent an implicit choice by the agency, in dealing with competing plausible assumptions, to use (as default options) the assumptions that lead to risk estimates that, although plausible, are believed to be more likely to overestimate than to underestimate the risk to human health and the environment. EPA's risk estimates thus are intended to reflect the upper region of the range of risks suggested by current scientific knowledge.

EPA appears to use conservative assumptions to implement Congress's authorization in several statutes, including the Clean Air Act, for the agency to undertake preventive action in the face of scientific uncertainty (see, e.g., *Ethyl v. EPA*, 541 F.2d 1 (D.C. Cir.) (en banc), *certiorari denied* 426 U.S. 941 (1976), ratified by Section 401 of the Clean Air Act Amendments of 1977) and to set standards that include a precautionary margin of safety against unknown effects and errors in calculating risks (see *Environmental Defense Fund v. EPA*, 598 F.2d 62, 70 (D.C. Cir. 1978) and *Natural Resources Defense Council v. EPA*, 824 F.2d 1146, 1165 (en banc) (D.C. Cir. 1987)).

EPA's choice of defaults has been controversial. We note, though, that some of the arguments about EPA's practices are directed less at conservatism than at the means of implementation that the agency has adopted. We believe that the iterative approach recommended in the previous chapter combined with quantitative uncertainty analysis will improve the agency's practices regardless of the degree of conservatism chosen by the agency. We also note that with an iterative approach, the agency must use relatively conservative models in performing screening estimates designed to indicate whether a pollutant is worthy of further analysis and comprehensive risk assessment. Such estimates are intended to obviate the detailed assessment of risks that can with a high degree of confidence be deemed acceptable or de minimis (trivial). By definition, therefore, screening analyses must be sufficiently conservative to make sure that a pollutant that could pose dangers to health or welfare will receive full scrutiny.

Copyright National Academy of Sciences. All rights reserved.

Science and Judgment in Risk Assessment
Case 3:17-cv-02162-EMC   Document 117-1   Filed 10/09/19   Page 1045 of 1126
DEFAULT OPTIONS                                                                90

Over time, the choice of defaults should have decreasing impact on regulatory decision-making. As scientific knowledge increases, uncertainty diminishes. Better data and increased understanding of biological mechanisms should enable risk assessments that are less dependent on default assumptions and more accurate as predictions of human risk.

In evaluating EPA's risk-assessment methods, we are aware that the agency's guidelines, to use the terminology of the earlier NRC report, are in part statements of science policy, rather than purely statements of scientific fact. The guideline cited above dealing with extrapolation of high doses to low doses is illustrative. The guideline is not a claim that it is known that the relationship between dose and response is linear; that the true relationship between dose and response is uncertain and could be nonlinear is readily acknowledged. Rather, the guideline is based (1) on the scientific conclusion that the linear model has substantial support in current data and biologic theory and that no alternative model has sufficient support to warrant departure from the linear model for most chemicals identified as carcinogens; (2) on the further scientific conclusion that the linear model is more conservative than most alternative plausible models; and (3) on the policy judgment that a conservative model should be chosen when there is model uncertainty.

## Departures From Default Options

Agency policies should encourage further scientific research. Risk assessors and managers must be receptive to new scientific information about the character and magnitude of the toxic effects of a chemical substance. Putting this receptivity into practice, though, has proved difficult. The 1983 NRC report criticized how agencies had implemented their guidelines. The report noted that "the application of inference options to specific risk assessments has been marked by a general lack of explicitness" and that that made it "difficult to know whether assessors adhere to guidelines" (NRC, 1983a, p. 79). The NRC report recognized the need to prevent ad hoc and undocumented departures from guidelines in specific risk assessments. But the NRC report made it clear that well-designed guidelines "should permit acceptance of new evidence that differs from what was previously perceived as the general case, when scientifically justifiable." NRC urged a recognition of the need for a tradeoff between flexibility on the one hand and predictability and consistency on the other (NRC, 1983a, p. 81).

The NRC advocated that agencies seek a middle path between inflexibility and ad hoc judgments, but steering this course is difficult. Consistency and predictability are served if an agency sets out criteria for departing from its guidelines. If such criteria are themselves too rigidly applied, the guidelines could ossify into inflexible rules; but without such criteria, the guidelines could be subverted at will with the potential for political manipulation of risk assessment.

Copyright National Academy of Sciences. All rights reserved.

NRC's approach requires that agencies regard their inference options not as binding rules, but rather as guidelines that are to be followed unless a sufficient showing is made. In the decade since the NRC report, EPA has never articulated clearly its criteria for a departure. We believe that a structured approach would give better guidance to the scientific community and to the public and would ensure both that the default options are set aside only when there is a valid scientific reason for doing so and that decisions to set aside defaults are scientifically credible and receive public acceptance.

EPA's practice appears to be to allow departure in a specific case when it ascertains that there is a consensus among knowledgeable scientists that the available scientific evidence justifies departure from the default option. The agency apparently considers both the quality of the data submitted and the robustness of the theory that is used to justify the departure.

EPA needs to be more precise in describing the kind and strength of evidence that it will require to depart from a default option. Because the decision as to the evidentiary burden to be required is ultimately one of policy, and because we could not reach agreement on proposed language to implement such a standard (see Appendixes N-1 and N-2), we do not urge any particular standard; moreover, we are conscious of the difficulties of capturing the nuances of judgment in any verbal formula that will not be open to misinterpretation.

We believe that the agency must continue to rely on its Science Advisory Board (SAB) and other expert bodies to determine when departing from a default option is warranted according to default options EPA will develop. EPA has increasingly used peer review and workshops as a way to ensure that it carefully considers the propriety of departing from a default. These and other devices should continue to ensure broad peer and scientific participation to guarantee, as much as possible, that the agency's risk-assessment decisions are made with access to the best science available.

We note that here, too, EPA has a difficult path to tread. EPA has been criticized for delay in deciding whether to depart from default options. Increased procedural formality raises the possibility of further delays, especially in a period of budgetary stringency such as EPA can expect to face for some time. It is likely that EPA will be cutting back on hiring personnel at the salary ranks necessary to attract scientists with the needed experience and training to judge whether departure from a default option is justifiable. Congress ought to be aware of the need for greater agency resources to carry out the mandates of the Clean Air Act and similar legislation.

Even if a default option is not set aside, we believe that decision-makers ought to be informed in a narrative way of any specific information suggesting that, in specific cases, alternatives to the default options might have equal or greater scientific support, and believe that the characterization of risk should include a discussion of the effect of the alternative options on risk estimates.

Copyright National Academy of Sciences. All rights reserved.

# Exhibit 43

# THE NATIONAL ACADEMIES PRESS

This PDF is available at  http://nap.edu/12209

SHARE  



## Science and Decisions: Advancing Risk Assessment

**DETAILS**

424 pages | 7 x 10 | HARDBACK
ISBN 978-0-309-38814-6 | DOI 10.17226/12209

BUY THIS BOOK

FIND RELATED TITLES

**AUTHORS**

Committee on Improving Risk Analysis Approaches Used by the U.S. EPA, National Research Council



Visit the National Academies Press at **NAP.edu** and login or register to get:

– Access to free PDF downloads of thousands of scientific reports

– 10% off the price of print titles

– Email or social media notifications of new titles related to your interests

– Special offers and discounts

Distribution, posting, or copying of this PDF is strictly prohibited without written permission of the National Academies Press.
(Request Permission) Unless otherwise indicated, all materials in this PDF are copyrighted by the National Academy of Sciences.

Copyright © National Academy of Sciences. All rights reserved.

# SCIENCE AND DECISIONS

## Advancing Risk Assessment

Committee on Improving Risk Analysis Approaches Used by the U.S. EPA

Board on Environmental Studies and Toxicology

Division on Earth and Life Studies

### NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Copyright National Academy of Sciences. All rights reserved.

that has two components: a single "evidentiary standard" governing how EPA considers alternative assumptions in relation to the default and the specific scientific criteria that EPA will use to gauge whether an alternative model has met the evidentiary standard.

## Evidentiary Standard

Because of the effort that EPA has invested in selecting its current defaults and the consistency that defaults confer on the risk-assessment process, the use of an alternative to the default in specific cases faces a substantial hurdle and should be supported by specific theory and evidence. The committee recommends that EPA adopt an alternative assumption in place of a default when it determines that the alternative is "clearly superior,"[7] that is, that its plausibility clearly exceeds the plausibility of the default.

## Specific Criteria to Judge Alternatives

The scientific questions that should be addressed to assess whether an alternative to a default is clearly superior will depend on the particular inference gap that is to be bridged. The committee recommends that EPA establish issue-specific criteria for bridging inference gaps. Important issues that require development of criteria include the use of PBPK models vs allometry to scale doses across species, the relevance of animal tumors to humans, and PD differences between animals and humans. Many of those issues are relevant to the unification of cancer and noncancer dose-response modeling described in Chapter 5.

EPA in specific cases has developed criteria for departing from defaults. Three examples are presented below. The committee notes that these cases are presented as starting points for the development of criteria for departing from defaults; and their use does not imply that the committee agrees with their rationale in every detail.

*Low-dose extrapolation for thyroid follicular tumors in rodents.* In 1998, EPA developed guidance for when and how to depart from the default assumption that a substance that causes thyroid follicular tumors in rodents will have a linear dose-response relationship in humans (EPA 1998b). That guidance states clearly that EPA will consider a margin-of-exposure, rather than a linear approach, when it can be demonstrated that a particular rodent carcinogen is not mutagenic, that it acts to disrupt the thyroid-pituitary axis, and that no MOA other than antithyroid activity can account for the observed rodent tumor formation. EPA then presents eight criteria for determining whether the substance disrupts the thyroid-pituitary axis and states that the first five must be satisfied (the remaining three are "desirable").

*Relevance to humans of animal α2μ-globulin carcinogens.* In the case of criteria for setting aside the relevance of renal tumors that occurred after exposure to agents that act through the α2μ-globulin MOA, EPA developed clear criteria for departure from the default assumption that animal tumors are relevant to human risk. EPA (1991b) specified two conditions that must be satisfied to replace that default. First, for the agent in question, α2μ-globulin must be shown to be involved in tumor development. For this condition, EPA requires three findings (p. 86): "(1) Increased number and size of hyaline droplets in

---

[7]In legal parlance, a "beyond a reasonable doubt" standard would be "clearly superior." The term *clearly superior* should not be interpreted quantitatively, but the committee notes that statistical P values can also be used as an analogy. For example, rejecting the null in favor of the alternative only when P < 0.05 could be viewed as insisting that the alternative hypothesis is "clearly superior" to the "default null."

Copyright National Academy of Sciences. All rights reserved.

# Exhibit 44

EPA/630/P-02/002F
December 2002
Final Report

# A REVIEW OF THE REFERENCE DOSE AND REFERENCE CONCENTRATION PROCESSES

Prepared for the
Risk Assessment Forum
U.S. Environmental Protection Agency
Washington, DC

**Reference Dose/Reference Concentration (RfD/RfC) Technical Panel**

Bob Benson  (OPRA/Region 8)
Gary Foureman (NCEA/ORD)
Lee Hofmann (PARMS/OSWER)
Carole Kimmel (NCEA/ORD)*
Gary Kimmel  (NCEA/ORD)
Susan Makris  (OPP/OPPTS)
Deirdre Murphy (OAQPS/OAR)

Edward Ohanian (OST/OW)
Jennifer Orme-Zavaleta (NHEERL/ORD)
Deborah Rice (NCEA/ORD)
Jennifer Seed (OPPT/OPPTS)
Hugh Tilson (NHEERL/ORD)
Vanessa Vu (SAB Staff Office, formerly
OSCP/OPPTS and NCEA/ORD)

*Technical Panel Chair

**Technical Advisors**

Amy Mills, IRIS Director, NCEA/ORD
Bill Wood, RAF Director, NCEA/ORD

Risk Assessment Forum
U.S. Environmental Protection Agency
Washington, DC 20460

**DISCLAIMER**

This document has been reviewed in accordance with U.S. Environmental Protection Agency policy and approved for publication.  Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

Adjustment for the steepness of the dose-response curve has been noted as another critical aspect of the dose-response character that is not currently considered in the choice of a response level using either a BMD/BMC or a NOAEL approach.

The Technical Panel was unable to fully evaluate these issues or to reach agreement about any recommendation for change to the current methodology, and it recommends that they be considered further by the Agency.  The Technical Panel also recommends that factors such as the response rates at the BMD or the NOAEL, the power of the study, and the slope of the dose-response curve be included in the description of the database, where possible, as part of risk characterization.

---

**Box 4-4.  Variability and Uncertainty**

**Variability** refers to true heterogeneity or diversity.  For example, among a population that drinks water from the same source and with the same contaminant concentration, the risks from consuming the water may vary.  This may be due to differences in exposure (i.e., different people drinking different amounts of water and having different body weights, different exposure frequencies, and different exposure durations) as well as differences in response (e.g., genetic differences in resistance to a chemical dose).  Those inherent differences are referred to as variability.  Differences among individuals in a population are referred to as inter-individual variability, while differences for one individual over time is referred to as intra-individual variability.

**Uncertainty** occurs because of a lack of knowledge.  It is not the same as variability.  For example, a risk assessor may be very certain that different people drink different amounts of water but may be uncertain about how much variability there is in water intakes within the population.  Uncertainty can often be reduced by collecting more and better data, while variability is an inherent property of the population being evaluated.  Variability can be better characterized with more data, but it cannot be reduced or eliminated.  Efforts to clearly distinguish between variability and uncertainty are important for both risk assessment and risk characterization.

Source: U.S. EPA, 1997b.

---

### 4.4.5.  Application of Uncertainty/Variability Factors

Reference values are derived in a way that attempts to account for both the uncertainty and the variability in the data available (see Box 4-4). The existing definition of UF in the IRIS glossary mixes the above concepts.  The present definition for UF is as follows.

**Uncertainty Factor**:  One of several, generally 10-fold, factors used in operationally deriving the RfD and RfC from experimental data.  UFs are intended to account for (1) the variation in sensitivity among the members of the human population (i.e., interhuman or intraspecies variability); (2) the uncertainty in extrapolating animal data to humans (i.e., interspecies variability); (3) the uncertainty in extrapolating from data obtained in a study with less-than-lifetime exposure to lifetime exposure (i.e., extrapolating from subchronic to chronic exposure); (4) the uncertainty in extrapolating from a LOAEL rather than from a NOAEL; and (5) the uncertainty associated with extrapolation from animal data when the database is incomplete.

4-38

#### 4.4.5.2. *Interspecies UF*

The interspecies UF is applied to account for the extrapolation of laboratory animal data to humans, and it generally is presumed to include both toxicokinetic and toxicodynamic aspects. The toxicokinetic aspects of this factor were addressed in the section on deriving HEDs and HECs (Section 4.4.3). This UF is intended also to account for differences in species sensitivity (i.e., toxicodynamics) between the laboratory animal species used for testing and humans. Seldom are there data available to inform toxicodynamic differences. One-half the default 10-fold interspecies UF (i.e., $10^{0.5}$) is assumed to account for such differences, but more specific data should be used when available (see discussion of chemical-specific adjustment factors, Section 4.4.6.1 below), and the flexibility for applying a factor greater than 10 should be recognized. Unless data support the conclusion that the test species is more or equally as susceptible to the pollutant as are humans, and in the absence of any other specific toxicokinetic or toxicodynamic data, a default factor of 3 (in conjunction with HEC derivation) or 10 is applied.

#### 4.4.5.3. *Intraspecies UF*

The intraspecies UF is applied to account for variations in susceptibility within the human population (interhuman variability) and the possibility (given a lack of relevant data) that the database available is not representative of the dose/exposure-response relationship in the subgroups of the human population that are most sensitive to the health hazards of the chemical being assessed. As the reference concentration/dose is defined to be applicable to "susceptible subgroups," this UF was established to account for uncertainty in that regard. In general, the Technical Panel reaffirms the importance of this UF, recommending that reduction of the intraspecies UF from a default of 10 be considered only if data are sufficiently representative of the exposure/dose-response data for the most susceptible subpopulation(s).

Various authors who have evaluated the intraspecies UF using data from animal or human studies (as summarized by Dourson et al. [1996]) have concluded that the 10-fold default factor appears to be protective when starting from a median response—by inference a NOAEL assumed to be from an average group of humans. Renwick and Lazarus (1998) considered data on toxicokinetics and toxicodynamics to support the idea that the 10-fold intraspecies factor can be divided into two factors to account for kinetics and dynamics. When they evaluated the composite 10-fold factor to account for variability in both kinetics and dynamics, they concluded that a 10-fold factor would cover the vast majority (>99%) of the population. These evaluations, however, did not specifically consider children as part of the range of human variability when evaluating the adequacy of the intraspecies UF.

# **Exhibit 45**



United States
Environmental Protection
Agency

Prevention, Pesticides
and Toxic Substances
 (7510P)

EPA 739-R-07-010
December 2007

# Reregistration Eligibility Decision for Sodium Fluoride

US EPA ARCHIVE DOCUMENT

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C.  20460

OFFICE OF
PREVENTION, PESTICIDES
AND TOXIC SUBSTANCES

<u>**CERTIFIED MAIL**</u>

Dear Registrant:

This is to inform you that the Environmental Protection Agency (hereafter referred to as EPA or the Agency) has completed its review of the available data and public comments received related to the draft risk assessments for the antimicrobial sodium fluoride.  The enclosed Reregistration Eligibility Decision (RED) document was approved on December 20, 2007. Public comments and additional data received were considered in this decision.

Based on its review, EPA is now publishing its Reregistration Eligibility Decision (RED) and risk management decision for sodium fluoride and the associated human health and environmental risks.  A Notice of Availability will be published in the *Federal Register* announcing the publication of the RED.

The RED and supporting risk assessments for sodium fluoride are available to the public in EPA's Pesticide Docket EPA-HQ-2007-0833 at: <u>http://www.regulations.gov</u>.

The sodium fluoride RED was developed through EPA's public participation process, published in the Federal Register on October 10, 2007, which provides opportunities for public involvement in the Agency's pesticide tolerance reassessment and reregistration programs. Developed in partnership with USDA and with input from EPA's advisory committees and others, the public participation process encourages robust public involvement starting early and continuing throughout the pesticide risk assessment and risk mitigation decision-making process. The public participation process encompasses full, modified, and streamlined versions that enable the Agency to tailor the level of review to the level of refinement of the risk assessments, as well as to the amount of use, risk, public concern, and complexity associated with each pesticide.  Using the public participation process, EPA is attaining its strong commitment to both involve the public and meet statutory deadlines.

Please note that the sodium fluoride risk assessment and the attached RED document concern only this particular pesticide.  This RED presents the Agency's conclusions on the dietary, residential, occupational and ecological risks posed by exposure to sodium fluoride alone.  This document also contains both generic and product-specific data that the Agency intends to require in Data Call-Ins (DCIs).  Note that DCIs, with all pertinent instructions, will be sent to registrants at a later date.  Additionally, for product-specific DCIs, the first set of required responses will be due 90 days from the receipt of the DCI letter.  The second set of required responses will be due eight months from the receipt of the DCI letter.

As part of the RED, the Agency has determined that sodium fluoride will be eligible for reregistration provided that all the conditions identified in this document are satisfied, including implementation of the risk mitigation measures outlined in Section IV of the document. Sections IV and V of this RED document describe labeling amendments for end-use products and data requirements necessary to implement these mitigation measures. Instructions for registrants on submitting the revised labeling can be found in the set of instructions for product-specific data that accompanies this document.

Should a registrant fail to implement any of the risk mitigation measures outlined in this document, the Agency will continue to have concerns about the risks posed by sodium fluoride. Where the Agency has identified any unreasonable adverse effect to human health and the environment, the Agency may at any time initiate appropriate regulatory action to address this concern. At that time, any affected person(s) may challenge the Agency's action.

If you have questions on this document or the label changes necessary for reregistration, please contact the Chemical Review Manager, SanYvette Williams-Foy, (703) 305-7702. For questions about product reregistration and/or the Product DCI that will follow this document, please contact Adam Heyward at (703) 308-6422 or heyward.adam@epa.gov.

Sincerely,

Frank Sanders, Director
Antimicrobials Division (7510C)

**REREGISTRATION ELIGIBILITY**
**DECISION**
for
**Sodium fluoride**
List C
Case 3132

Approved by:

*Betty Shackleford for*
_____

Frank T. Sanders
Director, Antimicrobials Division

_____
12/20/07

Date

**ABSTRACT**

The Environmental Protection Agency (EPA or the Agency) has completed the human health and environmental risk assessments for sodium fluoride and is issuing its risk management decision.  The risk assessments, which are summarized below, are based on the review of the required target database supporting the use patterns of currently registered products and additional information received through the public docket.  After considering the risks identified in the revised risk assessments, comments received, and mitigation suggestions from interested parties, the Agency developed its risk management decision for uses of sodium fluoride that pose risks of concern.  As a result of this review, EPA has determined that sodium fluoride containing products are eligible for reregistration, provided that risk mitigation measures are adopted and labels are amended accordingly.  That decision is discussed fully in this document.

US EPA ARCHIVE DOCUMENT

## I.       Introduction

The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) was amended in 1988 to accelerate the reregistration of products with active ingredients registered prior to November 1, 1984 and amended again by the Pesticide Registration Improvement Act of 2003 to set time frames for the issuance of Reregistration Eligibility Decisions.  The amended Act calls for the development and submission of data to support the reregistration of an active ingredient, as well as a review of all submitted data by the U.S. Environmental Protection Agency (EPA or the Agency).  Reregistration involves a thorough review of the scientific database underlying a pesticide's registration.  The purpose of the Agency's review is to reassess the potential hazards arising from the currently registered uses of the pesticide; to determine the need for additional data on health and environmental effects; and to determine whether or not the pesticide meets the "no unreasonable adverse effects" criteria of FIFRA.

On August 3, 1996, the Food Quality Protection Act of 1996 (FQPA) was signed into law.  This Act amends FIFRA to require reregistration assessments of chemicals registered prior to 1984.  The Agency has decided that, for those chemicals that have tolerances and are undergoing reregistration, the tolerance reassessment will be initiated through this reregistration process.  The Act also requires that by 2006, EPA must review all tolerances in effect on the day before the date of the enactment of the FQPA.  FQPA also amends the Federal Food, Drug, and Cosmetic Act (FFDCA) to require a safety finding in tolerance reassessment based on factors including consideration of cumulative effects of chemicals with a common mechanism of toxicity.  This document presents the Agency's revised human health and ecological risk assessments; and the Reregistration Eligibility Decision (RED) for sodium fluoride.

Sodium fluoride is used for commercial use only as a wood preservative for utility poles and railroad ties.  Sodium fluoride products are used as supplemental wood treatments and are not intended for primary wood preservative or pressure treated wood preservation.

The Agency has concluded that no special hazard-based safety factor under the Food Quality Protection Act (FQPA) of 1996 is needed for sodium fluoride based on its current registered use patterns.

Risks summarized in this document are those that result only from the use of the active ingredients sodium fluoride.  The FFDCA requires that the Agency consider available information concerning the cumulative effects of a particular pesticide's residues and other substances that have a common mechanism of toxicity.  The reason for consideration of other substances is due to the possibility that low-level exposures to multiple chemical substances that cause a common toxic effect by a common toxic mechanism could lead to the same adverse health effect that would occur at a higher level of exposure to any of the substances individually. Unlike the pesticides for which EPA has followed a cumulative risk approach based on a common mechanism of toxicity, EPA has not yet initiated a review to determine if there were any other chemicals that have a mechanism of toxicity common with that of sodium fluoride.  Risks summarized in this document are those that result only from the use of sodium fluoride.  Therefore, the Agency did not perform a cumulative risk assessment as part of this RED for sodium

fluoride.  For purposes of this RED, the Agency has assumed that sodium fluoride does not have a common mechanism of toxicity with other substances.  If the Agency identifies other substances that share a common mechanism of toxicity with sodium fluoride, the Agency will perform aggregate exposure assessments on each chemical, and will begin to conduct a cumulative risk assessment.  Upon the Agency's request and according to a schedule determined by the Agency, the Registrant must submit such information as needed in order to evaluate issues related to whether sodium fluoride shares a common mechanism of toxicity with any other substance. For information regarding EPA's efforts to determine which chemicals have a common mechanism of toxicity and to evaluate the cumulative effects of such chemicals, see the policy statements released by EPA's Office of Pesticide Programs concerning common mechanism determinations and procedures for cumulating effects from substances found to have a common mechanism on EPA's website at http://www.epa.gov/pesticides/cumulative .

This document presents the Agency's decision regarding the reregistration eligibility of the registered uses of sodium fluoride.  In an effort to simplify the RED, the information presented herein is summarized from more detailed information, which can be found in the technical supporting documents for sodium fluoride referenced in this RED.  The revised risk assessments and related addenda are not included in this document, but are available in the Public Docket at www.regulations.gov (Docket # EPA-HQ-2007-0833).

This document consists of six sections.  Section I is the introduction.  Section II provides a chemical overview, a profile of the use and usage of sodium fluoride and its regulatory history.  Section III, Summary of sodium fluoride Risk Assessment, gives an overview of the human health and environmental assessments, based on the data available to the Agency.  Section IV, Risk Management, Reregistration, and Tolerance Reassessment Decision, presents the reregistration eligibility and risk management decisions.  Section V, What Registrants Need to Do, summarizes the necessary label changes based on the risk mitigation measures outlined in Section IV.  Finally, the Appendices list all use patterns eligible for reregistration, bibliographic information, related documents and how to access them, and Data Call-In (DCI) information.

## II.     Chemical Overview

### A.     Regulatory History

Sodium fluoride products were initially registered in 1964.  Sodium fluoride was originally sold to the U.S. telecommunications company in the 1930s as a wood preservative for utility poles lumber, timbers, posts, poles, ties, pilings, and all exterior wood exposed to moisture or weather.  There are six registered products. There are no inert uses or tolerances for this chemical.

### B.     Chemical Identification



**Figure 1.  Molecular Structure of Sodium Fluoride**

| | |
|---|---|
| **Common Name:** | Chemifluoro, Dentafluoro, Villiaumite |
| **Chemical Name:** | Sodium fluoride |
| **Other Name(s):** | Floridine, Florocid |
| **CAS Registry Number:** | 7681-49-4 |
| **OPP Chemical Code:** | 075202 |
| **Case Number:** | 3132 |
| **Empirical Formula:** | NaF |
| **Molecular Weight:** | 42.00 |
| **Basic Manufacturer:** | Osmose Inc. |

**Chemical Properties:**     Sodium fluoride (TGAI) is a yellow powder with a weak musty odor and melting point of $993\,^{\circ}$ C.  The boiling point for sodium fluoride is $1704\,^{\circ}$ C. Sodium fluoride (TGAI) has an estimated log $K_{ow}$ of -0.77 [1] and a vapor pressure of $5.43 \times 10^{-26}$ mm Hg $(25\,^{\circ}$ C$)$[1*]. Sodium fluoride (TGAI) is soluble in water at .4.10 g/100 ml; at 15°C and 4.3 g/100 ml at $25\,^{\circ}$ C. Sodium fluoride (TGAI) is readily soluble in many organic solvents and has a density of 2.55 g/cm$^3$.

The pH for sodium fluoride is slightly alkaline and stable under normal storage conditions. The Henry Law Constant (air/water partition constant) is 5.04 x $10^{-33}$ atm $m^3$/mole[1]

### C.    Use Profile

The following is information on the currently registered uses of sodium fluoride, including an overview of use sites and application methods.  A detailed table of the uses of sodium fluoride eligible for reregistration is available in Appendix A.

**Type of Pesticide:**    Fungicide

**Target Pests:**    Fungi

**Formulation Types:**  Powder (Technical Grade Active Ingredients (TGAI)); Soluble Concentrate (Manufacturing Use Products (MP)); Soluble Concentrate, Ready-to-use Solution, Pelleted/tablet (End Use Products (EP))

**Use Sites:**    Wood Preservative- (Exterior use only) Lumber, Timber, Posts, Poles, Ties, Pilings, and Other Wood Products.

**Methods and Rates of Application:**

**Wood Preservative**:  For control of internal decay, fill decay pockets and voids using a grease gun or other pressurized applicator.  Plug application holes with secure-fitting dowels

Using air or mechanical pressure pump, apply solution to interior cavity of wood structure through prepared opening.

Typical pole application is from 3 inches above to 18 inches below the ground line and lower where deeper decay is suspected. Application on poles to be restored should extend the length of wrap around type repair systems. Wrap the treatment area with water proof bandage.

US EPA ARCHIVE DOCUMENT

### a.        Occupational Toxicity

The doses and toxicological endpoints used in the occupational handler assessment of NaF scenarios are summarized in Table 2 below.

**Table 2. Sodium Fluoride for Use in Human Risk Assessment**

| Exposure Scenario | Dose (mg/kg/day) used in risk assessment UF | Special FQPA SF and Level of Concern for Risk Assessment | Study and Toxicological Effects |
|---|---|---|---|
| **Dietary Risk Assessments** | | | |
| Acute Dietary (general population and females 13-49) | No appropriate endpoints were identified that represent a single dose effect. Therefore, this risk assessment is not required. | | |
| Chronic Dietary | No appropriate endpoints were identified that represent a chronic dose effect. Therefore, this risk assessment is not required. | | |
| **Non-Dietary Risk Assessments** | | | |
| Short -Term Dermal (1 - 30 Days) | LOAEL = 20 mg/kg/day | Target MOE=300 (10x inter-species extrapolation, 10x intra-species variation, 3x for use of LOAEL) | Oral Subchronic Toxicity – Rat (Sodium Fluoride) LOAEL = 20 mg/kg/day, based on significant reductions in body weight gain and suppressed spontaneous motor activity. |
| Intermediate -Term Dermal (30 Days- 6 months) | NOAEL = 1.5 mg/kg/day | Target MOE=100 (10x inter-species extrapolation, 10x intra-species variation) | 6-month NTP oral toxicity study-mouse LOAEL = 7.5 mg/kg/day based on histopathology observed in bone with degeneration in tibias and femurs of animals |
| Long-Term Dermal (> 6 months) | LOAEL = 1.3 g/kg/day | TARGET MOE = 300 (10x inter-species extrapolation, 10x intra-species variation and 3x for use of LOAEL) | 2-year NTP chronic toxicity/carcinogenicity study in rats LOAEL = 1.3 mg/kg/day, based on dentine dysplasia in males and females, and ameloblast degeneration in males |
| Short-term Inhalation (1-30 days) | LOAEL = 20 mg/kg/day | Target MOE=300 (10x inter-species extrapolation, 10x intra-species variation, 3x for use of LOAEL) *Note:* 10x route extrapolation for confirmatory inhalation study. | Oral Subchronic Toxicity – Rat (Sodium Fluoride) LOAEL = 20 mg/kg/day, based on significant reductions in body weight gain and suppressed spontaneous motor activity. |

| Exposure Scenario | Dose (mg/kg/day) used in risk assessment UF | Special FQPA SF and Level of Concern for Risk Assessment | Study and Toxicological Effects |
|---|---|---|---|
| Intermediate-term Inhalation | NOAEL = 1.5 mg/kg/day | Target MOE=100 (10x inter-species extrapolation, 10x intra-species variation)<br><br>Note: 10x route extrapolation for confirmatory inhalation study. | 6-month NTP oral toxicity study-mouse LOAEL = 7.5 mg/kg/day based on histopathology observed in bone with degeneration in tibias and femurs of animals |
| Long-term Inhalation | LOAEL = 1.3 mg/kg/day | TARGET MOE =300 (10x inter-species extrapolation, 10x intra-species variation, 3x for use of LOAEL)<br><br>Note: 10x route extrapolation for confirmatory inhalation study. | 2-year NTP chronic toxicity/carcinogenicity study in rats LOAEL = 1.3 mg/kg/day, based on dentine dysplasia in males and females, and ameloblast degeneration in males |
| Cancer | Sodium fluoride has been classified as a "Group D" (not classifiable as to carcinogenicity). This conclusion is consistent with the recent report by the National Academy of Sciences which concluded that 'the evidence on the potential of fluoride to initiate or promote cancers, particularly of the bone, is tentative and mixed.' | | |

Notes: UF = uncertainty factor, FQPA SF = FQPA safety factor, NOAEL = no observed adverse effect level, LOAEL = lowest observed adverse effect level.

### b. Occupational Handler Exposure

Occupational risk for all potentially exposed populations is measured by a Margin of Exposure (MOE), which determines how close the occupational exposure comes to a No Observed Adverse Effect Level (NOAEL) from toxicological studies.  Occupational risk is assessed for exposure at the time of application (termed "handler" exposure).  Application parameters are generally defined by the physical nature of the formulation (e.g., formula and packaging), by the equipment required to deliver the chemical to the use site and by the application rate required to achieve an efficacious dose.

Potential occupational handler exposures can occur when sodium fluoride is used as a remedial wood treatment for the protection against decay producing fungi.  The Agency evaluated representative occupational handler scenarios to assess and determine dermal and inhalation exposures.  For sodium fluoride, handler scenarios were assessed by using unit exposure data to estimate occupational exposures.  Unit exposures are estimates of the amount of exposure to an active ingredient a handler receives while performing various handler tasks and are expressed in terms of micrograms or milligrams of active ingredient per pounds of active ingredient handled.  A series of unit exposures have been developed that are unique for each scenario typically considered in assessments (i.e., there are different unit exposures for different types of application equipment, job functions, and level of protection).

11

US EPA ARCHIVE DOCUMENT

**Table 5. Dermal and Inhalation Exposure and Risks for Remedial Applications of Sodium Fluoride to Poles.**

| Application | Dermal UE (mg/lb a.i) | Inhalation UE (mg/lb a.i) | Rate (gal/pole) | Rate (lb a.i/gal) | # poles | Dermal dose (mg/kg/day) | Inhalation dose (mg/kg/day) | Dermal MOEs | | | Inhalation MOEs | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ST (300) | IT (100) | LT (300) | ST (300) | IT (100) | LT (300) |
| Spray (Distribution Poles) | 0.36 | 0.0022 | 1 | 0.47 | 24 | 0.058 | 0.00035 | 350 | 26 | 22 | 56,000 | 4200 | 3700 |
| Spray (Transmission Poles) | 0.36 | 0.0022 | 1 | 0.47 | 30 | 0.073 | 0.00044 | 280 | 21 | 18 | 45,000 | 3400 | 2900 |
| Brush-on (Distribution Poles) | 24 | NA | 0.225 | 5.33 | 24 | 9.87 | NA | 2 | <1 | <1 | NA | | |
| Brush-on (Transmission Poles) | 24 | NA | 0.368 | 5.33 | 30 | 20.2 | NA | 1 | NA | NA | NA | | |

NA = Not applicable (e.g., short-term (ST) MOEs are only applicable for the high treatment frequency of poles).
  ST = short-term; IT = intermediate-term; LT = long-term.

UE are from PHED for termiticide MLAP, liquid pour, rod shank injection
Dermal UE is single layer of clothing and chemical resistant gloves.
Treatment solution for spray from EPA Reg. No. 75341-12 (i.e., 1 gal product x 8.34 lb/gal x 8.39% a.i / 1.5 gallons water = 0.47 lb a.i/gal treatment solution)
Brush-on rate EPA Reg No 75341-5 is 44.4% a.i; density of 12lb/gal = 5.33lb a.i./gallon
# poles =  registrant estimate during the reregistration phase 1 error comment period (Distribution is 24 poles per day and transmission is 30 poles per day
Dermal (mkd) = Dermal UE x rate x # poles x 1/70kg
Inhalation dose (mkd) = Inhalation UE x rate x #poles x 1/70kg
MOE ST Dermal & inhalation = LOAEL 20 mkd / dose;  UF = 300
MOE IT Dermal & Inhalation = NOAEL 1.5 mkd / dose; UF = 100
MOE LT Dermal & Inhalation = LOAEL 1.3 mkd / dose; UF = 300

17

# Exhibit 46

1   C. ANDREW WATERS, ESQ., CA Bar No. 147259
    MICHAEL CONNETT, ESQ., CA Bar No. 300314
2   WATERS, KRAUS & PAUL
    222 N. Pacific Coast Hwy, Suite 1900
3   El Segundo, CA 90245
    310-414-8146 Telephone
4   310-414-8156 Facsimile

5   *Attorneys for Plaintiffs*

6                   UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
7                          AT SAN FRANCISCO

8
    FOOD & WATER WATCH, et al.,          )
9                                        )   Civ. No. 17-CV-02162-EMC
                        Plaintiffs,      )
10                                       )   **DECLARATION OF**
            vs.                          )   **CHRISTINE WELLS, PhD**
11                                       )
    U.S. ENVIRONMENTAL PROTECTION        )
    AGENCY, et al.                       )
12                                       )
                        Defendants.      )
13                                       )
                                         )
14                                       )

15

16      I, Christine Wells, declare that:

17      1.      I have agreed to appear as an expert in this case, and have prepared two expert reports

18  which summarize the opinions that I intend to offer if called to testify at trial.

19      2.      A true and correct copy of my initial expert report, dated June 27, 2019, is attached herein

20  as **Exhibit A** (I have not included the appendices).

21      3.      A true and correct copy of my rebuttal expert report, dated August 1, 2019, is attached

22  herein as **Exhibit B** (I have not included the appendices).

23      4.      I am the senior member of the UCLA Institute for Digital Research and Education (IDRE)

24  Statistical Consulting Group. I have worked as a statistical consultant for this group for 18 years. I have

25  assisted more than 1,000 researchers on a wide variety of data analysis techniques, including the types of

26

27  analyses that I conducted in this case. I have taught numerous workshops, teaching the types of analyses

28

                                              1
    _____
                    DECLARATION OF CHRISTINE WELLS, PhD

that I used to address the research questions involved in this matter.

5.    For my June 27, 2019 report, I analyzed the relationship between fluoride intake and tooth decay (i.e., caries) in the NIH-funded Iowa Fluoride Study (IFS) cohort, which I understand to be the only prospective cohort study to address the relationship between total daily fluoride ingestion and caries from birth through adolescence. As described in my report, there is no statistically significant relationship between total fluoride ingestion during the first 6 years of life and caries at ages 9, 13, and 17 in the IFS cohort.

6.    For my August 1, 2019 report, I addressed Dr. Gary Slade's analysis on the relationship between caries rates and water fluoride concentration (measured at the *county* level) in the CDC's National Health and Nutrition Examination Surveys (NHANES). To do so, I conducted an analysis of NHANES data from 2013-2014 and found no statistically significant association between caries and water fluoride concentration (measured at the *home* level). By contrast, I found a large, and statistically significant, inverse association between sealant use and caries.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 8, 2019, in Newbury Park, California.


*Christine Wells, PhD*
CHRISTINE WELLS, PhD

# Exhibit A

**Pre-Eruptive Fluoride Ingestion and Caries:**
**An Analysis of Prospective Cohort Data from the Iowa Fluoride Study**

Expert Report of
Christine R. Wells, PhD
June 27, 2019

# I.    INTRODUCTION

## A.  Assignment

I was asked to analyze data from the Iowa Fluoride Study (IFS) to determine whether fluoride ingestion during the period before teeth erupt through the gums reduces the occurrence of caries. Specifically, I was asked to address the following three questions:

(1) Does the ingestion of fluoride during the first 6 months of life have any association with the presence/absence of caries in the primary teeth, as measured at age 5?
(2) Does the ingestion of fluoride during the first 6 months of life have any association with the number of caries in the permanent teeth at ages 9, 13, or 17?
(3) Does the ingestion of fluoride during the first 6 years of life have any association with the number of caries in the permanent teeth at ages 9, 13, or 17?

Data from the IFS was supplied directly to me by an attorney representing Dr. Levy, the Principal Investigator of the IFS.  All analyses were conducted using Stata 15.1.

## B.  Qualifications

I am the senior member of the UCLA Institute for Digital Research and Education (IDRE) Statistical Consulting Group.  I have worked as a statistical consultant for this group for 18 years.  I have assisted more than 1000 researchers who use a wide variety of data analysis techniques, including the types of analyses that I preformed to address the questions listed above.  I have taught numerous workshops, teaching the types of analyses that I used to address the research questions involved in this matter.  Additionally, I have co-authored 10 peer-reviewed papers, which are identified in my CV (attached as **Appendix A**).

## C.  Updates and reservation

The opinions expressed in this report are my own and are based on the data, documents, and facts available to me at the time of writing. Should additional relevant or pertinent information become available, I reserve the right to supplement the discussion and findings in my report.

## D.  Compensation & Prior Litigation Work

The hourly rate for my work in this case is $200. I have not previously served as an expert in litigation.

# II.   BACKGROUND

## A.  Fluoride's Mode of Action

By way of background to my analysis, I understand the following to be true:

Since the advent of water fluoridation more than 70 years ago, there has been considerable debate about the mechanism(s) by which fluoride in water may reduce the occurrence of caries.

The original theory, when water fluoridation programs were first introduced in the 1940s, was that ingested fluoride is incorporated into the enamel during the tooth-forming years (prior to eruption) and makes the enamel stronger for life (i.e., permanently more resistant to caries). This "systemic benefit" theory relies upon fluoride entering the developing enamel from the bloodstream after being absorbed from the stomach/intestines. Once the enamel has completed development there is no more systemic incorporation of fluoride into the enamel. Thus, the "systemic" mechanism is limited to the period of tooth formation.

The current theory of fluoride's mechanism of action is that the predominant benefit of fluoride comes from topical contact with the enamel after eruption into the mouth. [CDC 2001; Featherstone 2000; Fejerskov 2004]. Topical fluoride can only act on teeth that have erupted into the mouth, not when they are still under the gums.

According to the American Dental Association, primary teeth (also known as "deciduous" or "baby" teeth) first begin to erupt into the mouth at six months of age, while permanent teeth first begin to erupt at six years of age. [ADA 2005, 2006]. Prior to six months, therefore, the pre-eruptive effect is the exclusive mode of action for fluoride's influence on caries (for both primary and permanent teeth); for permanent teeth, the pre-eruptive effect is the exclusive mode of action up through age 6,

## B. Iowa Fluoride Study

The Iowa Fluoride Study (IFS) has been funded by over $25 million in grants from the National Institutes of Health (NIH) over the past 28 years. It is the only prospective cohort study of fluoride and caries to measure fluoride from all sources at frequent age intervals from birth through the teenage years. The IFS has also measured other factors that might be associated with caries, including socio-economic status, parental education, tooth brushing frequency, sugary drink and milk consumption. Many of these factors were measured at the same frequent age intervals as fluoride exposure. Caries were assessed in dental exams of primary and permanent teeth at ages 5, 9, 13, and 17 years. As noted by the IFS authors, "As studies involving recruitment and successful retention of a cohort from birth are extremely rare, the Iowa Fluoride Study offers a unique opportunity to study these relationships in unprecedented detail, enhancing our ability to develop effective adolescent caries prevention programs." [Levy 2004]

By providing age-specific fluoride intake data during the first six months and first six years of life, the IFS permits analyses of the effectiveness of pre-eruptive fluoride exposure in preventing caries. No published analyses of IFS data appear, however, to have ever directly addressed the question of fluoride's pre-eruptive versus post-eruptive benefits. The published IFS analyses that address the effectiveness of water fluoride exposure, or total fluoride exposure, have mostly found weak or no evidence of statistically significant benefits, and in those analyses where significant benefits were found, they can be attributed to post-eruptive exposures. [Broffit, et al. 2007; Chankanka, et al. 2011a,b; Chankanka, et al. 2015; Choo-Wosoba, et al. 2018; Curtis, et al. 2018; Kong, et al. 2015]

The IFS data that were provided to me was previously analyzed by Dr. Levy and his team in two published studies [Warren, et. al., 2009, Curtis, et. al., 2018]. The Curtis 2018 study examined a wide range of risk and protective factors measured in the IFS. The Curtis 2018 paper reported which factors showed a significant effect on adjusted decayed and filled surface increments (ADJCI) between age 9 to 17, while simultaneously controlling for other factors. It did not find (post-eruptive) fluoride exposure during these years to provide a statistically

significant benefit. It did not consider pre-eruptive exposures. The Warren 2009 study found that total fluoride intake was clearly associated with dental fluorosis, but had little relation to caries risk at age 5 or 9. However, Warren did not provide data on statistical significance, and no attempt was made to distinguish pre-eruptive from post-eruptive exposures.

## III.    METHODS

**The Pre-Eruptive Exposure Period.** The American Dental Association's data on the eruption timing of primary and permanent teeth were used to define the pre-eruptive exposure period in the IFS. [ADA 2005, 2006]. Based on these data, the pre-eruptive exposure period for primary teeth was identified as the first six months of age, while the pre-eruptive exposure period for the permanent teeth was identified as the first six years of life.

For permanent teeth, analyses were conducted not just for the 0-6 year full pre-eruptive period, but also for the early pre-eruptive period from 0-6 months, during infancy. This was done because this age period may have distinctly different exposure patterns than the first six years of life (due to infant formula use) and because, as I understand it, this is an age of particular interest to the question of developmental neurotoxicity.

Identifying a strict demarcation between pre-eruptive and post-eruptive exposures has some inherent limitations that should be recognized. While the first primary teeth begin erupting at six months of age and the first permanent teeth begin developing at age six, this is not universal; and many primary and permanent teeth begin developing a year or more after the first teeth erupts. Some pre-eruptive exposure will thus occur for some teeth after the demarcation points (six months and six years) used in this analysis. Using later points in time for the demarcation, however, will result in a mixture of pre-eruptive and post-eruptive exposures – since some teeth in the mouth will be exposed to topical fluoride. The demarcation of six months and six years was thus chosen because it best avoids confounding by post-eruptive exposures.

To assess whether pre-eruptive exposures occurring after age 6 would affect the results of the analysis, a sensitivity analysis was run where total fluoride ingestion up through age 13 was used as the predictor for caries at age 17. Age 13 was chosen as the demarcation for the sensitivity analysis as the ADA eruption charts indicate that all permanent teeth erupt by age 13, with the exception of the wisdom teeth. [ADA 2006].

**Measure of Fluoride Exposure.** Several different measures of fluoride exposure are available in the IFS data set (e.g., water fluoride concentration, quantity of fluoride ingested from fluoride in water, total ingested fluoride from all sources, and total ingested fluoride adjusted for bodyweight). Of these measures, total daily ingested fluoride adjusted for bodyweight (milligrams of fluoride per day divided by bodyweight or $mg/kg_{bodyweight}$/day or more compactly mg/kg/d) was selected because it is the most comprehensive measure of exposure. This measure accounts for the potential ingestion of fluoride from non-water sources, including fluoride toothpaste and supplements. It also adjusts for body weight, which is standard practice in pharmacological and toxicological analyses.

**Time-varying Covariates.** The IFS assessed several risk variables from questionnaires administered every six months or more frequently at young ages. For these time-varying covariates (toothbrushing frequency, sugary beverage consumption, and milk consumption), I focused on the post-eruptive exposure period (i.e., >6 months for primary teeth, >6 years for permanent teeth). This decision was made based on the assumption that these covariates affect caries post-eruptively rather than pre-eruptively. For example, teeth cannot be brushed before they have erupted. IFS studies have used a similar approach, choosing the time periods considered relevant to caries outcomes and omitting times considered unlikely to affect caries outcome [e.g., Curtis 2018, Choo-Wosoba 2018].

**Non-time-varying covariates.**  The IFS obtained information on non-time-varying risk factors (e.g. sex, family income, mother's and father's educational levels) at the first questionnaire at about age 1.5 months, and again in 2007 during the early adolescent years.  Consistent with the Curtis [2018] study, I used the values collected in 2007.

**Regression Analyses.**   To assess whether pre-eruptive exposure to fluoride reduced caries while controlling for the other caries risk factors, I used multivariate regression analyses, specifically logistic regression (for binary outcomes) and negative binomial regression (for count outcomes).  These statistical analyses are based on what is called a "model" with specified fluoride exposure variables, other risk factors or covariates, outcome variables, and specifies the types of relationships between the variables.  Multivariate regression analysis is a standard method that allows assessment of whether each variable in the model has a statistically significant effect on the outcome while controlling for all the other variables in the model which may also influence the outcome.

The regression models used to analyze the IFS data included a pre-eruptive fluoride exposure measure as the main exposure (predictor) variable of interest, along with other variables (covariates) that might affect caries or confound the relationship between fluoride and caries.  The outcomes considered were the presence of any caries (caries yes/no) or the count of caries at three different ages: 9, 13, and 17 years.  All models are single-level models; the time-varying covariates were averaged to create a single value for each participant.

The regression models included all the predictor variables that Curtis 2018 considered in their study. The Curtis 2018 study was intended to determine which of the variables measured in the IFS influenced caries so it selected variables previously shown to influence caries or reasonably expected to influence caries.

The IFS data that I received was presented as follows:

Gender (dichotomous: male or female)
Income (ordinal: $10,000 - $80,000 given in $20,000 increments)[1]
Mother's Education (dichotomous:  < 4y college or ≥4 y college)
Father's Education (dichotomous:  < 4y college or ≥4 y college)
Exact Age at dental exam (continuous: measured in years)

The models had three time-varying covariates (averaged across the ages shown in Table 4-1):

Tooth Brushing Frequency; brushing (times per day)
Sugary Beverage Consumption; sugar (ounces per day)
Milk Consumption; milk (ounces per day)

Along with the five non-time-varying predictor covariates and three time-varying covariates, every model has one fluoride exposure variable for a total of nine predictor variables.  Every model has one outcome variable (either a binary variable or a count) that is a measure of caries from a dental exam conducted at age 5, 9, 13, or 17 years on either primary or permanent teeth.

Finally, each of the 13 models was rerun with one interaction term included.  These interaction terms included fluoride squared, fluoride by gender, fluoride by brushing frequency, fluoride by milk consumption, fluoride by sugary beverage consumption, and fluoride by income.  Although this meant that an additional 78

---

[1] Due to the low number of subjects in the bottom two income brackets (<$40,000), these brackets were combined into a single category for my analyses to ensure a sufficient sample size in each income category.

models were run, no correction was made for multiple comparisons. At the p-value of 0.05, 4 statistically significant relationships would be expected by chance alone.

**Age at Exam**: The outcome measure ages are nominal and not exact.  The exact age at exam could differ by a year or more from the nominal age and that is why Exact Age is a separate covariate, because caries risk is known to increase with age so our model included the exact age to control for this caries risk factor.

The time-varying covariates in each model are the average over the age period that is considered post-eruptive.  It is unlikely that pre-eruptive exposure to these factors would affect caries outcomes, so only post-eruptive exposures were included in the models.  This is consistent with the Curtis [2018] study that only included post-eruptive time periods for time-varying covariates.

Table 1 provides a summary of the 13 regression models considered in our analyses.

**Table 1.   Table of analyses.**

| Model # | Model name: (Exposure age for F ; permanent or primary teeth ; age of caries assessment; caries Y/N or caries count) | Primary or Permanent Teeth | Pre-eruptive F exposure age period (age range, units) | F exposure measure (units) | Outcome measure: (caries Y/N or count) | Time-varying covariates; age range (years) |
|---|---|---|---|---|---|---|
| 1 | 0–6moF_prim5y_Y/N | Primary | 0-6 mo | Total F (mg/kg/d) | Caries Y/N 5y | 0.5 – 5 |
| 2 | 0–6moF_perm9y_Y/N | Permanent | 0-6 mo | Total F (mg/kg/d) | Caries Y/N 9y | 6 – 9 |
| 3 | 0–6moF_perm9y_count | Permanent | 0-6 mo | Total F (mg/kg/d) | DFS count 9y | 6 – 9 |
| 4 | 0–6moF_perm13y_ Y/N | Permanent | 0-6 mo | Total F (mg/kg/d) | Caries Y/N 9y | 6 – 13 |
| 5 | 0–6moF_perm13y_count | Permanent | 0-6 mo | Total F (mg/kg/d) | DFS count 13y | 6 – 13 |
| 6 | 0–6moF_perm17y_ Y/N | Permanent | 0-6 mo | Total F (mg/kg/d) | Caries Y/N 17y | 6 – 17 |
| 7 | 0–6moF_perm17y_count | Permanent | 0-6 mo | Total F (mg/kg/d) | DFS count 17y | 6 – 17 |
| 8 | 0–6yF_perm9y_ Y/N | Permanent | 0-6 y | Total F (mg/kg/d) | Caries Y/N 9y | 6 – 9 |
| 9 | 0–6yF_perm9y_count | Permanent | 0-6 y | Total F (mg/kg/d) | DFS count 9y | 6 – 9 |
| 10 | 0–6yF_perm13y_Y/N | Permanent | 0-6 y | Total F (mg/kg/d) | Caries Y/N 13y | 6 – 13 |
| 11 | 0–6yF_perm13y_count | Permanent | 0-6 y | Total F (mg/kg/d) | DFS count 13y | 6 – 13 |
| 12 | 0–6yF_perm17y_Y/N | Permanent | 0-6 y | Total F (mg/kg/d) | Caries Y/N 17y | 6 – 17 |
| 13 | 0–6yF_perm17y_count | Permanent | 0-6 y | Total F (mg/kg/d) | DFS count 17y | 6 – 17 |

**Statistical Significance:** I chose the conventional criteria of an alpha level of 0.05 (also described as a p-value of less than 0.05) to judge whether there was a statistically significant association between fluoride exposure and caries.  If the p-value was greater than 0.05, then the conclusion is that there was no statistical evidence that fluoride conferred a benefit against caries.

## IV.   RESULTS

### A.  Descriptive Statistics

Figure 1 shows the percentage of distribution of children who did or did not have caries at ages 5, 9, 13 and 17. Figure 2 shows the distribution of caries scores at ages 13 and 17. As would be expected, the percentage of children without caries in the permanent teeth progressively declined with age, with a concomitant rise in the number of decayed or filled surfaces. Larger, higher resolution versions of these figures can be found in **Appendix B.**

**Figure 1: Histograms showing the number of children with and without caries**



**Figure 2: Histograms showing the distribution of DFS in 13 and 17 year olds**



Table 2 shows the coefficients, p-values (a measure of statistical significance), and lower and upper 95% confidence intervals for the fluoride exposure variable in each model. In none of the models does the fluoride exposure have a statistically significant association with the caries outcome (i.e., no p-value is less than 0.05). Coefficients from logistic regression models are in the metric of expected log odds. Coefficients from negative binomial regression models are in the metric of expected log count. The 95% confidence intervals provide a measure of uncertainty around the coefficient. The 95% confidence intervals all show the lower and upper bound for the coefficient if a sample of 392 (the same number of participants in the IFS) was collected and analyzed a

large number of times (e.g., 10,000 times). The wider the 95% confidence interval is, the less precise the estimate of the coefficient is. Conversely, the narrower the 95% confidence interval is, the more precise the estimate of the coefficient is. A 95% confidence interval that includes 0 indicates that the coefficient is not statistically significantly different from 0 (i.e., the coefficient might be 0 in the population; a coefficient of 0 means no effect). Additional details of these analyses are provided in **Appendix C**.

Assessment for two-way interactions failed to identify any interaction effects. No interaction effects were seen in any of the models for fluoride and income, fluoride and toothbrushing frequency, or fluoride and sugary beverage consumption. In total, 78 analyses were run: 3 results were significant at a p-value of <0.05,[2] and two results were borderline significant (p-values of 0.051 and 0.054),[3] which is approximately what would be expected by chance alone: i.e., at a p-value of <0.05, random chance would be expected to produce 4 statistically significant results in a series of 78 analyses, which is essentially what I observed. Further, of the 5 statistically significant and borderline significant interactions, the kind of consistency across models that would be expected if the interactions were real was almost entirely lacking. For more details, see **Appendix D.**

**Table 2. Pre-eruptive Total Fluoride Intake relationship with caries.**

| Model # | Model name | Parameter coefficient* | p-value[Ω] | Lower 95% Confidence Interval of coefficient | Upper 95% Confidence Interval of coefficient |
|---|---|---|---|---|---|
| 1 | 0–6moF_prim5y_Y/N | -0.2622 | 0.394 | -0.8651 | 0.3407 |
| 2 | 0–6moF_perm9y_Y/N | 0.2894 | 0.341 | -0.3068 | 0.8856 |
| 3 | 0–6moF_perm9y_count | 0.1448 | 0.639 | -0.4595 | 0.7490 |
| 4 | 0–6moF_perm13y_Y/N | 0.3384 | 0.212 | -0.1931 | 0.8698 |
| 5 | 0–6moF_perm13y_count | 0.1930 | 0.376 | -0.2340 | 0.6200 |
| 6 | 0–6moF_perm17y_Y/N | 0.2538 | 0.360 | -0.2894 | 0.7970 |
| 7 | 0–6moF_perm17y_count | 0.2639 | 0.119 | -0.0681 | 0.5958 |
| 8 | 0–6yF_perm9y_Y/N | -0.4096 | 0.588 | -1.8911 | 1.0719 |
| 9 | 0–6yF_perm9y_count | -0.8036 | 0.319 | -2.3831 | 0.7758 |
| 10 | 0–6yF_perm13y_Y/N | 0.5271 | 0.418 | -0.7500 | 1.8039 |
| 11 | 0–6yF_perm13y_count | 0.0039 | 0.994 | -1.0326 | 1.0403 |
| 12 | 0–6yF_perm17y_Y/N | -0.7932 | 0.22 | -2.0601 | 0.4736 |
| 13 | 0–6yF_perm17y_count | 0.0784 | 0.835 | -0.6577 | 0.8145 |
| * The parameter coefficient shows the size of the change in the expected value when increasing fluoride exposure by 0.1 mg/kg/d. A positive value means an increase in caries; a negative value means a decrease in caries. [Ω] p-values greater than 0.05 indicate non-significant relationship | | | | | |

The following figures show the relationship between pre-eruptive fluoride ingestion and caries at ages 9, 13, and 17. The figures on the left show the (raw or unadjusted) relationship between fluoride and observed caries, without adjustment for other factors; the figures on the left show the relationship between fluoride and predicted caries after model adjustment for other factors. A horizontal line indicates that there is no relationship between the variables in the graph. A line with an upward slope indicates a positive relationship between the variables (meaning that as one variable increases, so does the other). A line that slopes downward from left to right shows a negative relationship between the variables (meaning that as one variable goes up, the other variable goes down). In the graphs below, the lines are nearly horizontal, meaning that there is no relationship between caries and pre-eruptive fluoride intake in these data. Appendix B provides larger, higher resolution versions of these figures.

---

[2] As documented in Appendix D, the three interaction effects that reached statistical significance were: 6 years of fluoride exposure squared for the age 17 binary caries count (p = 0.039); 6 months of fluoride exposure and milk for the age 17 binary caries outcome (p = 0.032); and 6 years of fluoride exposure and milk at the age 17 binary caries outcome (p = 0.007).
[3] As documented in Appendix D, the two interaction effects that reached borderline statistical significance were 6 months of fluoride exposure squared for the age 13 binary caries outcome (p = 0.051) and 6 months of fluoride exposure and female gender for the age 17 count outcome (p = 0.054).

**Figure 3.  Unadjusted (left) and adjusted (right) association between pre-eruptive F intake (0 to 6 mos) and caries at age 9.**

 

**Figure 4.  Unadjusted (left) and adjusted (right) association between pre-eruptive F intake (0 to 6 mos) and caries at age 13.**

 

**Figure 5.  Unadjusted (left) and adjusted (right) association between pre-eruptive F intake (0 to 6 mos) and caries at age 17.**

 

Food & Water Watch, et al. v. Environmental Protection Agency
Case No. 17-cv-02162

8

**Figure 6.  Unadjusted (left) and adjusted (right) association between pre-eruptive F intake (0 to 6 yrs) and caries at age 9.**



**Figure 7.  Unadjusted (left) and adjusted (right) association between pre-eruptive F intake (0 to 6 yrs) and caries at age 13.**



**Figure 8.  Unadjusted (left) and adjusted (right) association between pre-eruptive F intake (0 to 6 yrs) and caries at age 17.**



The correlation coefficients, which are given in each graph on the left (the graphs of the unadjusted data), range from -0.04 to 0.12.  Each of these values is very close to 0 (and statistically non-significant at $p = 0.05$),

Food & Water Watch, et al. v. Environmental Protection Agency
Case No. 17-cv-02162

meaning that there is no relationship between the observed number of caries and total fluoride intake for that age. The coefficient for the fluoride exposure variable and the associated p-value is given under each graph on the right (the graphs of the adjusted effects). As with the correlations shown on the left, none of the coefficients for fluoride exposure are statistically significant. Taken together, these graphs show that, in the IFS data, there is no relationship between caries and fluoride in either the raw or adjusted data at ages 9, 13 or 17.

Taking the results of all the models into consideration, the IFS data were remarkably consistent in showing no reduction in caries from pre-eruptive exposure to fluoride in primary or permanent teeth, even when controlling for income. By contrast, increased toothbrushing frequency was consistently associated with reduced caries. Mother's education, gender, and age were also significantly associated with caries, albeit less consistently.

To illustrate the strength of the effect of tooth brushing frequency on caries, graphs of the relationships between these two factors are shown in Figure 9. These are similar to the previous graphs, except instead of showing the relationship between fluoride and caries, they show the relationship between tooth brushing frequency and caries. In contrast to fluoride, tooth brushing frequency does show a strong statistically significant beneficial relationship with caries. These figures show visually that increasing brushing frequency is associated with a large reduction in caries count. The greater the brushing frequency, the lower the caries count. The resulting regression line has a steep downward slope to the right and is statistically significant ($p<0.0001$). This is in contrast to all the graphs of fluoride and caries, where the relationship was essentially a flat line indicating no association, or no benefit from fluoride.

**Figure 9: Unadjusted (left) and adjusted association between toothbrushing (6 to 17 yrs) and caries at age 17**

 

In simple terms, the Iowa Fluoride Study data show no evidence that pre-eruptive fluoride reduces caries. Even when a sensitivity analysis was run that extended the pre-eruptive exposure period to age 13 (thus encompassing the entire eruption period for all permanent teeth except the wisdom teeth, along with topical exposures from age 6 to 13), a benefit was still not observed. Further details about the sensitivity analysis are provided in **Appendix E**.

## V.    ASSUMPTIONS

The results of these analyses, as with any set of analyses, rest on certain assumptions.

- **Representativeness of the sample:** To the extent the results of these analyses are generalized beyond the actual sample studied, one must assume that the participants whose data are contained in the IFS dataset

are representative of the population of interest.  While there are no rules or guidelines that measure the degree of "representativeness" that is "sufficient," I understand there is a contention that the benefits of fluoridated drinking water may be greater in low-income populations with less access to dental care. To the extent this contention is true, the IFS data may not generalize well to low-income communities as the IFS cohort is skewed towards middle-income families.

- **Sufficient power:**  It is assumed that a large enough number of participants were included in the IFS to provide sufficient power to detect the effect of interest.  There is an inverse relationship between power and effect size:  The higher the power, the smaller the effect that can be detected.  However, in real-world applications, the assumption is that there was enough power to detect an effect that is important in the real world.  The determination of an effect size that is important in the real world, and hence the power analysis (determining the number of participants needed for the study), should have been done before the data were collected.

- **Independence:**  It is assumed that the observations (and, by extension, the errors [defined as the difference between the raw and predicted values] for each of the models) are independent.  This means that the data provided by one participant are not related to data provided by another participant.  This assumption may be violated if, for example, multiple participants lived in the same household and therefore had similar habits with respect to brushing frequency, milk or sugary beverage consumption, etc.

- **Handling of missing data:**  The data sets that I received contained no missing data; it is assumed that any missing data, including both unit and item non-response, were handled in an appropriate manner before I received the data sets.

- **Correctly specified model:**  It is assumed that all of the relevant variables were collected and included in the dataset.  One of the assumptions of all regression models (including logistic regression and negative binomial models) is that all relevant predictors are included in the model and no irrelevant predictors are included.  In other words, it is assumed that the model is properly specified.  Proper specification of the model is based on theory; only variables suggested by theory to have an impact on the outcome should be included in the model.  To my knowledge, each model that I ran met this criterion.

- **Predictors measured without error:**  It is assumed that all of the predictor variables were measured without error.  In the context of these data, it is assumed that all participants were accurate in each reporting of the number of times per day they brushed their teeth, the number of sugary beverages consumed and milk consumption at each data collection, as well as all of the other variables contained in the dataset. With respect to the fluoride exposure assessment, the validity of the data is supported by previous analyses that have confirmed statistically significant relationships between fluoride intake and dental fluorosis (a condition with a well-established dose-response relationship with fluoride intake). [Bhagavatula, et al. 2018; Hong, et al. 2006; Levy, et al. 2010; Marshall, et al. 2004].

- **Linear relationship between each predictor and the outcome:**  It is assumed that there is a linear relationship between each of the predictors and the outcome variable.  This assumption was checked for each model, and no gross violations were observed.

- **No outliers:**  It is assumed that there are no outliers, which are extreme data points that lie an abnormal distance from the rest of the data.  This assumption was checked for each model, and no gross violations were observed.

## VI.    CONCLUSION

The Iowa Fluoride Study (IFS) is a prospective cohort study of mostly middle-income families that investigated the relationship between total daily fluoride intake (from birth through adolescence) and caries. As a prospective study, the IFS is well suited to study the causal relationship (if any) between pre-eruptive fluoride ingestion and caries development. Based on my analysis, it is my opinion, to a reasonable degree of scientific certainty, that the IFS data shows no significant association between pre-eruptive fluoride exposure and caries. This result supports the view that pre-eruptive ingestion of fluoride is an ineffective means of preventing caries.

Christine Wells, Ph.D.
June 27, 2019

## VII.   BIBLIOGRAPHY

American Dental Association [ADA]. Tooth eruption: the primary teeth. *JADA* 2005; 136:1619.

American Dental Association [ADA]. Tooth eruption: the permanent teeth. *JADA* 2006; 137:127.

Bhagavatula P, et al. The relationships between fluoride intake levels and fluorosis of late-erupting permanent teeth. *J Public Health Dent.* 2018; 78(2):165-174.

Broffitt B, et al. An investigation of bottled water use and caries in the mixed dentition. *J Public Health Dent.* 2007; 67(3):151-8.

Broffitt B, et al. Factors associated with surface-level caries incidence in children aged 9 to 13: the Iowa Fluoride Study. *J Public Health Dent.* 2013; 73(4):304-10.

Centers for Disease Control and Prevention [CDC]. Recommendations for Using Fluoride to Prevent and Control Dental Caries in the United States. *MMWR* 2001; 50(RR14);1-42.

Chankanka O, et al. Mixed dentition cavitated caries incidence and dietary intake frequencies. *Pediatr Dent.* 2011; 33(3):233-40.

Chankanka O, et al. Longitudinal associations between children's dental caries and risk factors.  *J Public Health Dent.* 2011; 71(4):289-300.

Chankanka O, et al. The associations between dietary intakes from 36 to 60 months of age and primary dentition non-cavitated caries and cavitated caries. *J Public Health Dent.* 2015; 75(4):265-73.

Choo-Wosoba H, et al. A Bayesian approach for analyzing zero-inflated clustered count data with dispersion. *Stat Med.* 2018; 37(5):801-812.

Curtis AM, et al. Longitudinal associations between dental caries increment and risk factors in late childhood and adolescence. *J Public Health Dent.* 2018; 78(4):321-328.

Featherstone JD. The science and practice of caries prevention. *JADA* 2000; 131(7):887-99.

Fejerskov O. Changing paradigms in concepts on dental caries: consequences for oral health care. *Caries Res.* 2004; 38:182-191.

Hong L, et al. Fluoride intake levels in relation to fluorosis development in permanent maxillary central incisors and first molars. *Caries Res.* 2006; 40(6):494-500.

Kong M, et al. GEE type inference for clustered zero-inflated negative binomial regression with application to dental caries. *Comput Stat Data Anal.* 2015; 85:54-66.

Levy S. 2004. Project Summary. Grant Application to National Institutes of Health.

Levy SM, et al. Associations between fluorosis of permanent incisors and fluoride intake from infant formula, other dietary sources and dentifrice during early childhood. *JADA* 2010; 141(10):1190-1201.

Marshall TA, et al. Associations between Intakes of fluoride from beverages during infancy and dental fluorosis of primary teeth. *J Am Coll Nutr.* 2004; 23(2):108-16.

Warren JJ, et al. Considerations on optimal fluoride intake using dental fluorosis and dental caries outcomes--a longitudinal study. *J Public Health Dent* 2009; 69(2):111-5.

# Exhibit B

**NHANES, Fluoride, and Caries:**
**A Response to Gary Slade**

Expert Rebuttal Report of
Christine R. Wells, PhD
August 1, 2019

## I.     INTRODUCTION

### A.     Assignment

I was asked to review the expert report of Dr. Gary Slade, and his analysis of data from the National Health and Nutrition Examination Survey (NHANES) for the purpose of assessing his conclusion that NHANES data demonstrates a significant anti-caries benefit from water fluoridation. Specifically, I was asked to determine whether Dr. Slade's conclusion holds true when controlling for (1) measured home water fluoride concentration (versus the county-wide exposure metric that Slade used in his analyses) and (2) oral health interventions not considered in Dr. Slade's analysis (i.e., sealants and toothpaste use).

### B.     About NHANES

NHANES is a Centers for Disease Control (CDC) sponsored survey of a nationally representative sample of non-institutionalized residents of the United States that collects extensive information on many health measures through examinations, questionnaires, and laboratory measurements. NHANES and its precursors have been conducted since the 1960s. Since 1999 it has been conducted in 2-year cycles, with some components measured every cycle, and others included periodically, added or dropped. The cycles from 1999-2004 and from 2011-2016 have included an oral health examination that assessed caries in participants. The two most recent cycles (2013-2014 and 2015-2016) also included a measurement of the fluoride concentration in the study participant's tap water. These two cycles also had an oral health questionnaire that asked such questions as how many times per day the participant brushed their teeth. NHANES also collects detailed demographic information on each participant, such as age, gender, race/ethnicity, household income, etc.

I used data from these NHANES components for the 2013-2014 cycle in my analyses. All the data and data documentation was publicly available on the NHANES website. I was asked to conduct analyses similar to Slade's, using the same NHANES data, except that instead of using Slade's method of estimating water fluoridation exposure, I used the direct individual-level data available in NHANES 2013-2014 for home tap water fluoride concentration. By contrast, Slade's measure of fluoridation exposure was based on the county of residence of NHANES participants and the percent of that county's population with artificially fluoridated water. County of residence for NHANES participants is not publicly released, but was made available to Slade through an agreement with CDC to obtain this restricted-access data. Slade estimated the percentage of each county with water fluoridation through linkage to another data set managed by CDC, the Water Fluoridation Reporting System (WFRS), which is also not publicly released [Slade et al. 2018].

The fluoridation exposure measure used by Slade is known as an ecological or group-level measure. Instead of a measure at the individual level, it is a measure that applies to an entire group, in this case the entire county. Group-level exposure measures may not be as accurate as individual-level measures since they assign to everyone in a group the same exposure level, even though many individuals may have higher or lower exposures. They are also subject to the so-called "ecologic fallacy" which is when individuals in a study sample do not have exposures that reflect the group-level exposure.

## II.   METHODS

I was asked to assess the association between caries and home tap water fluoride concentration, while controlling for other factors that may affect caries risk to allow comparison to Slade's papers. I used multivariate regression models to adjust for the other factors. All data was from NHANES 2013-2014. For all models, the outcome of interest was a measure of tooth decay in permanent teeth known as DMFS for Decayed, Missing, and Filled tooth Surfaces. This was the same outcome Slade used in several of his models. I was requested to analyze the following three models:

**Model 1 – "Slade but individual F",** was similar to the models used by Slade, differing principally in using a different fluoride exposure variable. Instead of Slade's group-level measure "percent of county fluoridated" it used the individual-level home tap water fluoride concentration measured for each NHANES participant. The other factors that were controlled for, by inclusion in the model, were the same as those used by Slade. One covariate used by Slade (rural/urban) is not available in publicly released NHANES data so was not included in my analysis. Ordinary Least Squares (OLS) multivariate regression analysis was used, as in the Slade models.

**Model 2 – "Slade but individual F & neg. binom."**, was identical to Model 1 except instead of OLS regression, a different regression method known as negative binomial regression was used.  Negative binomial regression is more appropriate for count data outcomes where the distribution is very skewed, which was found to be true in the NHANES children's DMFS data.

**Model 3 – "+3 covariates"** was like Model 2 but added three covariates available in NHANES 2013-2014 which were considered to potentially affect tooth decay and DMFS count. The three added covariates were: "ratio of household income to poverty level", "amount of toothpaste used per day" and "percent of eligible permanent teeth with dental sealants".  The covariate "ratio of household income to poverty level" was included partly because it was added by Slade to the models in his co-authored 2019 paper that used NHANES data [Sanders et al. 2019].

Publicly released NHANES oral health data has tooth-level DMFS information, but does not include person-level DMFS counts. To calculate person-level DMFS from the tooth-level data, I used a CDC program written in the SAS programming language intended to calculate person-level DMFS from NHANES tooth-level data. [Selwitz, et al. 2005a] Similarly, information on sealants is only available at the tooth-level. To calculate person-level sealants data, I used a CDC program written in the SAS programming language intended to calculate person-level sealant percentage. [Selwitz, et al. 2005b]

**Measure of Fluoridation Exposure.**  For each NHANES participant, a sample of home tap water was taken and later analyzed for water fluoride concentration. NHANES data gives water fluoride concentration in units of milligrams per liter, or mg/L.  This was treated as a continuous variable in the models I analyzed.

**Outcome measure.** The outcome measure used in all analyses was DMFS, which is a measure of cumulative lifetime caries experience in permanent teeth.  DMFS was treated as a continuous variable.

**Covariates.**

Models 1 and 2 had the following five covariates:

Age, continuous, years, restricted to ages 6-19 years
Gender, 2 categories (female, male)

2

Race, 4 categories (non-Hispanic White; non-Hispanic Black; Hispanic, Other)
Parent's Education, 4 categories (less than High School; High School; some college; college grad.)
Period since last dental visit, 3 categories (<1 year; 1-2 years; >2 years)

Model 3 had all the covariates in Models 1 and 2 and added three more:

Ratio of income to poverty level, continuous
Toothpaste used per day, grams, continuous
Percent of eligible permanent teeth with sealants, continuous

The five covariates in Models 1 and 2 were the same as used by Slade, with the same definitions and categories. For Model 3, "toothpaste used per day" was derived from two NHANES questionnaire questions: "how many times per day does participant brush teeth" and "amount of toothpaste put on brush". The NHANES questionnaire included pictures of four toothbrushes, each with a different amount of toothpaste placed on it (see Figure 1). I was asked to treat the full brush amount as 1 g, the half brush as ½ g, the pea-size portion as ¼ gram and the smear as 1/8 gram. The amount put on the brush was multiplied by the number of times per day teeth were brushed to get the amount of toothpaste used per day.

**Figure 1. NHANES questionnaire pictures of toothpaste amounts used for brushing.**



The covariate "income to poverty ratio" was included in models used in Slade's 2019 study. [Sanders et al. 2019]. That paper also considered the interaction between fluoridation and poverty. A variant to Model 3 was thus run that included a 2-way interaction between water fluoride concentration and poverty ratio.

Slade's analyses excluded NHANES participants who were not born in the USA or who had not resided in the USA for at least 1 year. My analyses thus excluded these participants as well. Besides these exclusions, my analyses included only those aged 6 to 19 years.

**Regression Analyses.** To assess whether exposure to fluoride in home tap water reduced caries while controlling for the other caries risk factors, I used multivariate regression analyses, specifically OLS and negative binomial regression. These statistical analyses are based on what is called a "model" with specified fluoride exposure variables, outcome variables, and other risk factors variables. Multivariate regression

analysis is a standard method that allows assessment of whether each variable in the model has a statistically significant effect on the outcome while controlling for all the other variables in the model that may also influence the outcome.  The regression analysis also provides an estimate of the size and direction of the effect of each variable while controlling for the other variables. All analyses were conducted using Stata 15.1.

Table 1 provides a summary of the 3 regression models considered in our analyses.

**Table 1.  Table of analyses.**

| Model # | Model name | Exposure measure (units) | Outcome variable | Covariates | Regression method |
|---|---|---|---|---|---|
| 1 | Slade but home water F; OLS | Tap water F (mg/L) | DMFS | water F, age, sex, race, parent edu, last dental visit | OLS |
| 2 | Slade but home water F; neg. binom. | Tap water F (mg/L) | DMFS | water F, age, sex, race, parent edu, last dental visit | neg. binom. |
| 3a | Slade but home water F +3 covariates, neg. binom. | Tap water F (mg/L) | DMFS | water F, age, sex, race, parent edu, last dental visit, income to poverty ratio, toothpaste use, sealants | neg. binom. |
| 3b | Slade but home water F +3 covariates, neg. binom.; interaction poverty with water F | Tap water F (mg/L) | DMFS | water F, age, sex, race, parent edu, last dental visit, income to poverty ratio, toothpaste use, sealants, interaction income with water F | neg. binom. |

**Statistical Significance:** I chose the conventional criteria of an alpha level of 0.05 (also described as a p-value of less than 0.05) to judge whether there was a statistically significant association between fluoride exposure and caries. If the p-value was greater than 0.05, then the conclusion is that there was no statistical evidence that fluoridation conferred a benefit against caries.

## III.   RESULTS

### A.  Descriptive Statistics

Figure 2 shows the distribution of caries scores (DMFS). Figure 3 shows the distribution of tap water fluoride concentrations, demonstrating a bimodal distribution with peaks of percentage of participants having concentrations around 0.1 and 0.7 mg/L. The peak at 0.1 represents people without artificially fluoridated tap water. The peak at 0.7 mg/L represents those with artificially fluoridated water. The concentration of 0.7 mg/L was the recommended concentration for the entire USA at the time of the NHANES 2013-2014 survey. Very few participants had water F levels above about 1.5 mg/L which is a level above that allowed for artificial fluoridation and would indicate naturally occurring fluoride contamination.

**Figure 2. Distribution of DMFS (6 to 19 year olds)**



**Figure 3. Distribution of Water Fluoride Levels (6 to 19 year olds)**



Table 2 shows the coefficients, p-values (a measure of statistical significance), and lower and upper 95% confidence intervals for the fluoride exposure variable in each model. In none of the models does the fluoride exposure have a statistically significant association with the caries outcome (i.e., no p-value is less than 0.05). Coefficients from OLS regression models are in the metric of DMFS change for every 1 mg/L increase in water F concentration. Coefficients from negative binomial regression models are in the metric of expected log count of DMFS for every 1 unit increase in log(water F). The 95% confidence intervals provide a measure of uncertainty around the coefficient. The 95% confidence intervals all show the lower and upper bound for the coefficient if a sample of 2,037 (the unweighted number of NHANES participants in the subpopulation used in these analyses) as collected during the 2013-2014 NHANES cycle and analyzed a large number of times (e.g., 10,000 times). The wider the 95% confidence interval is, the less precise the estimate of the coefficient is. Conversely, the narrower the 95% confidence interval is, the more precise the estimate of the coefficient is.  A 95% confidence interval that includes 0 indicates that the coefficient is not statistically significantly different from 0 (i.e., the coefficient might be 0 in the population; a coefficient of 0 means no effect). Additional details of these analyses are provided in **Appendix A.**

**Table 2. Home tap water fluoride concentration (mg/L) relationship with caries (DMFS).**

| Model # | Model name | Parameter coefficient* | p-value[Ω] | Lower 95% Confidence Interval of coefficient | Upper 95% Confidence Interval of coefficient |
|---|---|---|---|---|---|
| 1 | Slade but water F; OLS | -0.4440 | 0.280 | -1.2887 | 0.4008 |
| 2 | Slade but water F; neg. binom. | -0.2886 | 0.082 | -0.6189 | 0.0417 |
| 3a | Slade but water F +3 covariates, net. binom. | -0.1361 | 0.351 | -0.4376 | 0.1655 |
| 3b | Slade but water F +3 covariates, net. binom.; interaction poverty with water F | -0.0341 | 0.608 | -0.1730 | 0.1048 |

* The parameter coefficient shows the size of the change in the predicted value of DMFS when increasing fluoride exposure by 1 mg/L. A positive value means an increase in caries; a negative value means a decrease in caries.
[Ω] p-values greater than 0.05 indicate non-significant relationship

Figure 4 shows the relationship between age and caries.

**Figure 4. Relationship of caries to age**



Complete model, marginal effect, DMFS v Age

**Figure 5. Marginal effects plots for home tap water F concentration in Models 1 and 2. For each plot, the non-plotted covariates are set at their mean or reference values.**



**Figure 6. Marginal effects plots for sealant use and home water fluoride level in Model 3. For each plot, the non-plotted covariates are set at their mean or reference values, except Age which is set at 17 years.**



Results of the multivariate regression analyses can be visualized for relevant levels of each of the covariates through the use of graphs known as marginal effects plots (Figures 5 and 6). The plots show the model-predicted relationship between one predictor variable in the model, and the outcome variable (DMFS), while controlling for all the other variables and setting each at a single relevant value. The set values for covariates were the means for continuous variables and the reference value for categorical values. Reference values were the same as used by Slade in his studies of NHANES data. In Figure 6, age was set at 17 years rather than the median, which was about 12 years. Since age had a very large effect on DMFS, with DMFS increasing rapidly with increasing age, age 17 was chosen to better show the effects of each of the other variables on DMFS. Using the older age group also allows for a longer duration of exposure to fluoridation, and thus would be expected to show the maximum benefit, if such a benefit existed.

The figures, when interpreted in combination with parameter coefficients (effect sizes and direction) reported in Table 2, demonstrate that home tap water fluoride concentration showed no statistically significant benefit. Regardless of statistical significance, the effect size for water fluoride, as visualized by the flat slope in the graphs, is small, especially for Model 3 which controls for the most factors and is thus most likely to reflect the true relationship. As illustrated in the marginal effects figure for model 3, water fluoridation (0.7

mg/L) was associated with a reduction of about 0.25 DMFS among 17-year-olds when compared against communities with 0.1 mg/L, which represents an approximate 8% reduction in predicted caries.

In contrast to measured home water fluoride concentration, sealants showed a very large effect, with predicted DMFS dropping from about 6 to a2 when sealants increase from 0% to 40% and age was set at 17 years.

To examine in more detail Slade's finding of a small non-significant benefit in reduced DMFS from fluoridation in those participants with low income to poverty ratios (poorer households), I analyzed a variant of Model 3 with the added term being the interaction between "income to poverty ratio" and tap water fluoride concentration. This was similar to the analysis in Slade's 2019 study [Sanders et al. 2019], except for the differences noted above between his models and Model 3. This analysis was consistent with Slade's in finding no statistically significant benefit from fluoridation, even in the poorer children. However, the effect size was even smaller than Slade's.

Figure 7 is a marginal effects plot showing the relationship between income to poverty ratio and predicted DMFS for two levels of water fluoride concentration: 0.1 and 0.7 mg/L.  These levels correspond to the fluoride levels typically found in non-fluoridated and fluoridated water in the USA. The lines are essentially parallel, indicating little interaction.  Thus, the effect of water fluoride on the outcome, DMFS, does not depend on the level of the poverty ratio.

**Figure 7. Marginal effects plot for Model 3, income to poverty ratio versus DMFS, with water F level set at typical non-fluoridated and fluoridated levels. Other covariates set at mean or reference levels except age set at 17 years.**



Taking the results of all the models into consideration, the NHANES data is consistent in showing no association between exposure to fluoridated water and caries. By contrast, increased sealant use was associated with a large, and statistically significant, reduction in caries rates. Increasing age had a very large and strong association with increasing caries (Figure 4), and income to poverty ratio was significantly associated with caries as well.  Toothpaste use, parent education, gender, and period since last dental visit were not significantly associated with caries.

## IV.   DISCUSSION

This analysis of nationally representative NHANES data, using individual home tap water concentration as the exposure measure, are at odds with Dr. Slade's conclusion that the NHANES data shows a benefit of water fluoridation on caries rates. These results suggest that Slade may have substantially overestimated the benefit of fluoridation in reducing caries risk.

One of the noteworthy findings of this analysis is that, in contrast to tap water fluoride concentration, sealant use was associated with a large statistically significant reduction in caries. Sealant data is available for all NHANES cycles but were not considered as a factor in Slade's analyses.  The finding of their effectiveness in NHANES 2013-2014 is consistent with a recent authoritative review of sealants that found large reductions in caries in teeth protected with sealants compared to unprotected teeth [Ahovuo-Saloranta et al. 2017].

This analysis of NHANES caries data has strengths and limitations. One of the strengths is the use of measured individual-level home water fluoride levels is a more accurate and therefore give more reliable results. Another strength is that, in contrast to Slade's analysis, the analyses controlled for toothpaste use and sealants. Additionally, whereas Slade used an OLS model, this analysis used the more appropriate negative binomial analysis. This is important because Slade's OLS model violated the assumptions underlying OLS regression in two ways.

First, with an outcome variable as skewed as DMFS, one needs to be concerned about the assumption of homogeneity of variance. This assumption states that the variance of the outcome variable should be approximately constant across the range of values of the predictor variables. The consequence of violating this assumption is that the standard errors associated with the regression coefficients are miscalculated. The extent of the miscalculation is proportional to the extent of the violation of the assumption. The calculation of the standard error of the regression coefficient is important because the test statistic is calculated as point estimated divided by its standard error.  The test statistic, along with the associated degrees of freedom, is used to determine the p-value, which determines if the coefficient will be declared to be statistically significant. [Ryan 1997; Fox 1997].

A second problem with Slade's OLS model is that the water fluoride variable is a county-level variable, while all other variables in the model are measured at the level of the individual. This violates the assumption of non-correlated residuals. Stated simply, in a single-level model, such as an OLS model which Slade used, each variable must be measured (or collected) at the same level. If variables are collected at different levels, such as at the individual level and the community level, then a two-level model must be used. Violation of this assumption can lead to standard errors that are underestimated or too small. [Bickel 2007] As noted by Hox:

   If this assumption is violated (and in multilevel data this is almost always the case) the estimates of the standard errors of conventional statistical test are much too small, and this results in many spuriously "significant" results. The effect is generally not negligible, as small dependencies in the combination with large group sizes still results in large biases in the standard errors.  The strong

biases that may be the effect of violation of the assumption of independent observations made in standard statistical tests have been known for a long time (Walsh, 1947) and are still a very important assumption to check in statistical analyses.

Running Slade's OLS regression model as a negative binomial regression model will address the issue of homogeneity, as that is not an assumption of negative binomial models. It will not, however, address the issue of one of the predictor variables being measured at a different level than the other variables in the model. All variables in the present analysis were individual-level variables, and thus the issues with multi-level analyses do not apply.

Some of the limitations in this analysis are as follows. First, as with Slade's analysis, it is observational, cross-sectional data, which means that associations can be examined but causality cannot be determined. Second, Slade's models all included one additional covariate, which was Rural-Urban Classification of the county of residence, or "rurality." Information on the county of residence of NHANES participants is not released publicly, so the models I analyzed did not include this variable. Slade's models showed no statistically significant effect of rurality on predicted DMFS (p-values above 0.75) and very small effect sizes (coefficients) that were in opposite directions (-0.08 DMFS for "small rural" compared to "urban" and +0.03 DMFS for "large rural" compared to "urban") [Slade 2018 supplement, Appendix Table 1]. Therefore, I do not expect the omission of rurality from the models I analyzed will have any substantive effect on the results.

Finally, this analysis had a smaller sample size than Slade's since home water fluoride concentrations were not measured until the 2013-2014 NHANES cycle. Nevertheless, the sample size in this analysis (n=2,037) is still large, and of sufficient power to detect relatively small influences on caries.

## V.   CONCLUSION

Based on my analysis, it is my opinion, to a reasonable degree of scientific certainty, that the NHANES data shows no significant association between home tap water fluoride concentration and caries, but does show a large, and significant, benefit from the use of sealants. This result supports the view that water fluoridation is an ineffective means of preventing caries in permanent teeth under contemporary conditions in the U.S.

*Christine Wells*

Christine Wells, Ph.D.
August 1, 2019

## VI. BIBLIOGRAPHY

Ahovuo-Saloranta A, Forss H, Walsh T, Nordblad A, Makela M, Wothington HV. Pit and fissure sealants for preventing tooth decay in permanent teeth. Cochrane Database of Systematic Reviews 2017, Issue 7. Art. No.: CD001830. DOI: 10.1002/14651858.CD001830.pub5.

Bickel, R. Multilevel Analysis for Applied Research: It's Just Regression. 2007. New York: Guilford Press.

Fox J. Applied Regression Analysis, Linear Models, and Related Methods. 1997. Thousand Oaks, CA: Sage Publications.

Hox JJ. Multilevel Analysis: Techniques and Applications, Second Edition. 2010. New York: Routledge Taylor and Francis Group.

Ryan TP. Modern Regression Methods. 1997. New York: John Wiley and Sons.

Slade GD, Grider WB, Maas WR, Sanders AE. Water Fluoridation and Dental Caries in U.S. Children and Adolescents. J Dent Res. 2018;97(10):1122-8. PMCID: PMC6169031.

Sanders AE, Grider WB, Maas WR, Curiel JA, Slade GD. Association Between Water Fluoridation and Income-Related Dental Caries of US Children and Adolescents. JAMA Pediatr. 2019.

Selwitz R, Wu T, Oldakowski R, Griffin S, Beltran E, Barker L, Dye B. Program name: ohddent.sas. May 24, 2005a.

Selwitz R, Wu T, Oldakowski R, Griffin S, Beltran E, Barker L, Dye B. Program name: ohdseal.sas. May 26, 2005b.

# Exhibit 47

**Summary of the facts and opinions to which Tala R. Henry, Ph.D is expected to testify:**

I.      **Summary of Opinions**

In response to the expert opinions offered by Dr. Kathleen Thiessen and Dr. Phillipe Grandjean on the methods for conducting risk assessments, and in particular, the methods for conducting a risk evaluation under the Toxic Substances Control Act (TSCA) based on the currently available scientific evidence, Dr. Henry will testify to the following:

- Dr. Thiessen's report is not a credible source of evidence for making conclusions regarding unreasonable risks under TSCA due to critical limitations, including:

    *1.      Mischaracterization of EPA hazard assessments and dose-response analyses as "risk assessments" and omission to any reference to or discussion of resources available in the public domain that describe the relevant and sound requirements and procedures for conducting a risk evaluation under section 6(b)(4) of TSCA.*

    *2.      There are inadequate or undocumented literature searches and Systematic Review. Literature searches for critical components of a risk evaluation (exposure assessment) appear not to have been conducted; and quality and relevancy reviews, using systematic review methods, for hazard data (animal and human) are not provided to ensure the risk determination is based on the weight of the scientific evidence (WoSE).*

    *3.      The reference dose (RfD) derived by EPA in the document, Fluoride: Dose-Responses Analysis for Non-cancer Effects, has as no relevance to the question of whether the artificial fluoridation of drinking water creates unreasonable risk because it is not fit-for-purpose for a TSCA risk evaluation.*

    *4.      The methodology for determining unreasonable risk is fundamentally flawed because it relies on the statutory framework and assessment methodologies used to review new chemicals substances under TSCA Section 5, which has different risk assessment requirements and findings than for risk evaluations on existing chemicals under TSCA Section 6.*

- Dr. Grandjean's report is not a credible source of evidence for making conclusions regarding unreasonable risks under TSCA due to critical limitations, including:

    *1.      The methodology for determining unreasonable risk is fundamentally flawed because it fails to demonstrate that the key tenets of systematic review were applied to his report and is presented in a manner that suggests biased and pre-conceived conclusions.*

    *2.      The report draws inappropriate and unsupported conclusions. Conclusions in the purported risk assessment conducted are inappropriate because the calculation exercise and the conclusions for making unreasonable*

1

> *risk determinations are fundamentally flawed because they rely on a different statutory framework and assessment methodologies that are not fit-for-purpose for a TSCA risk evaluation.*

## II.    Qualifications

Dr. Henry is a toxicologist with over 25 years of technical and managerial experience at the U.S. Environmental Protection Agency (EPA, or "the Agency"). Dr. Henry received a Ph.D. in Pharmacology from the University of Minnesota in 1994 and completed post-doctoral research in Toxicology at the University of Wisconsin in 1996.

During Dr. Henry's 25 years at EPA, Dr. Henry has provided toxicology and risk assessment expertise and guidance, oversight and daily programmatic management to multiple chemical management programs, and leadership of science policy development and implementation across EPA, with other federal agencies and in several international fora. Dr. Henry's most recent toxicology and risk assessment experience at EPA has been in the Office of Pollution Prevention and Toxics (OPPT), which is responsible for implementing the TSCA, including to interpret statutory provisions, develop policy and implementation strategies, and execute the 2016 amendments to TSCA. Since May 2019 Dr. Henry has been the Deputy Director of OPPT and was acting in this position from May 2018 to May 2019.

From October 2013 to May 2018 Dr. Henry was the Director of the Risk Assessment Division (RAD) within OPPT. As Division Director of RAD Dr. Henry provided technical and managerial leadership and oversight for conducting human health and environmental hazard, exposure and risk assessments of new and existing chemicals under TSCA. Dr. Henry was also a senior toxicologist in RAD from April 2006 to July 2009. From July 2009 through October 2013, Dr. Henry served as a senior manager and ultimately the Division Director, of the National Program Chemicals Division (NPCD) within OPPT. Dr. Henry's responsibilities in that position included to lead and oversee development of regulatory and non-regulatory approaches for managing risks of chemicals of high priority to the Agency, including those that pose persistent risks due to past uses (e.g., lead, PCBs, mercury, and asbestos).

During Dr. Henry's tenure in OPPT, she also represented EPA and the United States government in a number of international chemical assessment and management venues, including task forces and expert panels and fora such as the Organization for Economic Cooperation and Development (OECD), the Helsinki Chemicals Forum, and the United Nations Persistent Organic Pollutants Review Committee (POPRC) for the Stockholm Convention.

Dr. Henry has also worked within other EPA offices, including the Office of Water (OW), Office of Research & Development (ORD), and the Region 8 Office in Denver, Colorado. In OW, Dr. Henry was a Senior Toxicologist and the Program Manager/Coordinator of the Chemical Criteria Program. As such, Dr. Henry participated in the technical aspects of Ambient Water Quality Criteria Program. In particular, Dr. Henry provided technical expertise and oversight for implementing the then newly revised, *2000 Methodology for Deriving Ambient Water Quality Criteria for the Protection of Human Health* and led an effort to revise the *Guidelines for Deriving Numerical National Water Quality Criteria for the Protection of Aquatic Organisms*

MCLG, are significantly different than the exposure assessment and risk characterization steps in a TSCA risk evaluation and reflect fit-for-purpose procedures necessary to implement different statutory and/or regulatory frameworks.

Under the SDWA process, once the MCLG (non-enforceable health goal) is determined, EPA sets a Maximum Contaminant Level (MCL) (enforceable standard), which does consider costs and other non-risk factors. In most cases, the standard is a maximum contaminant level (MCL).

## VII.   Critique of Dr. Thiessen's Report

Dr. Henry will testify that Dr. Thiessen's report is not a credible source of evidence for making conclusions regarding unreasonable risks under the Toxic Substances Control Act (TSCA) due to critical limitations, as described below.

### A.   Mischaracterization of Hazard Assessments and Dose-Response Analysis as "Risk Assessments."

Dr. Thiessen continuously refers to as "risk assessments" Toxicological Profiles developed by EPA's IRIS Program. IRIS assessments provide only the first two steps in a risk assessment – the hazard identification and dose-response assessment. As such, IRIS assessments are hazard/effects assessments only. Thus, any mention in Dr. Thiessen's report of IRIS assessments as risk assessments is a mischaracterization. For example, Dr. Thiessen claims that EPA applied its Guidelines for Neurotoxicity Risk Assessment to 10 risk assessments, while instead citing to 10 IRIS assessments. Dr. Thiessen also incorrectly characterizes the 2011 and 2014 NRC/NAS recommendations to the IRIS program as recommendations on how to conduct risk assessments. This is fundamentally inaccurate. Moreover, Dr. Thiessen inaccurately refers to the fluoride dose-response analysis conducted by EPA in 2010 as a risk assessment, when it contains the hazard identification and dose-response analysis only. Therefore, any conclusions drawn regarding risks that are based on a reference to an IRIS hazard assessment or an EPA dose-response analysis are not accurate or credible.

### B.   Lack of Reference to Requirements for Conducting a Risk Evaluation under TSCA.

Dr. Thiessen's report omitted any reference to or discussion of resources available in the public domain that describe the requirements and procedures for conducting a risk evaluation under section 6(b)(4) of TSCA (See TSCA Statute; Procedures for Chemical Risk Evaluation under the Amended Toxic Substances Control Act (Risk Evaluation Rule) (82 Fed. Reg. 33726 (July 20, 2017)); Guidance to Assist Interested Persons in Developing and Submitting Draft Risk Evaluations Under the Toxic Substances Control Act and Application of Systematic Review in TSCA Risk Evaluations). The Risk Evaluation Rule identifies the requisite steps and data requirements of a risk evaluation process. The additional guidance documents provide transparency about the components that should be included and the processes by which EPA will consider risk evaluations under TSCA. In Dr. Henry's opinion, any expert opinion regarding risk assessment approaches or procedures necessary to support an action under TSCA section 6

should consider these available resources and, at the very least, attempt to provide data and information consistent with such guidance. Such an approach is absent from Dr. Thiessen's report. Because EPA's guidance presents the key factors and risk evaluation process necessary to foster predictability and transparency in making a risk determination under TSCA, any conclusion omitting such considerations, including best available science and weight of the scientific evidence, is not credible.

### C.      Inadequate or Undocumented Literature Searches and Systematic Review.

Literature searches for critical components of a risk evaluation (i.e., exposure assessment) do not appear to have been conducted, and quality and relevancy reviews using systematic review methods for hazard data—for both animals and humans—are not provided. Omission of exposure information is a critical limitation because to make an unreasonable risk finding under TSCA, regulations requires all components of a risk evaluation and all streams of evidence to have been systematically reviewed to ensure that risk determinations are based on the Weight of the Scientific Evidence. Not only is a properly conducted systematic review required under TSCA, but, in Dr. Henry's opinion, it is a necessary course of action to demonstrating reliance on the best available science and WoSE.

Additionally, Dr. Thiessen's report focuses primarily on only one component of a risk evaluation, the hazard assessment. Even within this limited domain, Dr. Thiessen's report fails to document that systematic review methods or approaches were applied in reviewing the literature she identifies to support her hazard assessment. Instead, Dr. Thiessen's report focuses on the quantity of studies and does little to address the quality of studies used to make conclusions based on the WoSE.  As such, Dr. Thiessen's ad hoc "weight of evidence" assertion is not credible because it fails to demonstrate foundational considerations, such as objectivity and transparency, in the process.

### D.      Inappropriate Use of RfD Derived by EPA's Office of Water.

In Dr. Thiessen's critique of the RfD derived by EPA (Fluoride: Dose-Response Analysis for Non-cancer Effects (U.S. EPA, 2010)) she refers to the "[c]urrent EPA Reference Dose," which is an RfD derived by EPA's OW for the specific purpose of supporting the development of water quality standards, which has no relevance in the TSCA context because it is not fit-for-purpose for a TSCA section 6 risk evaluation. More specifically, this RfD has no relevance to the question at hand because EPA does not generally use RfDs for TSCA risk evaluations for a variety of reasons.

In the time that has passed since the OW derived their RfD, numerous additional studies of potential fluoride toxicity have been published as documented by Dr. Chang and Dr. Tsuji. Consequently, scientific standards and the WoSE approaches laid out in TSCA section 26 and implementing regulations (Procedures for Chemical Risk Evaluation under the Amended Toxic Substances Control Act (82 Fed. Reg. 33726 (July 20, 2017)) would necessitate that EPA undertake its systematic review process to identify and evaluate not only the data/information

that underlies the OW RfD, but also data that has become available since the time the OW RfD was derived. Furthermore, the procedures and methods established in the TSCA statute, regulations, and guidance would need to be applied in order to develop a hazard assessment for a TSCA risk evaluation. Not only are these scientific standards required by statute and regulations under TSCA, but they are generally accepted scientific standards for making risk determinations based on the Best Available Science and WoSE.  For these reasons—lack of systematic review, WoSE and, most notably that EPA does not use RfDs in TSCA risk evaluations—the RfDs presented by Dr. Thiessen are irrelevant to a credible risk determination under TSCA.

### E.   Fundamental Flaws in Methodology for Determining Unreasonable Risk.

First, Dr. Thiessen erroneously asserts that EPA has defined unreasonable risk. In fact, EPA did not define unreasonable risk based on overwhelming public comment supporting EPA's position that a static definition of unreasonable risk would be inappropriate to capture the broad set of health and environmental risk measures and information that might be relevant to chemical substances and, as public commenters correctly pointed out, the science of risk characterization is still evolving. Second, Dr. Thiessen asserts several factors EPA considers in determining unreasonable risk.  These assertions, however, are based on risk determinations made under Section 5 of TSCA rather than Section 6.

Section 5 of TSCA provides the statutory authority and requirements for assessing and managing new chemicals (i.e., chemicals not currently in commerce). Fluoride chemicals appear on the TSCA inventory, meaning they are existing chemicals as defined by TSCA, and therefore the statutory requirements governing risk evaluation and risk management for fluoride chemicals are those defined in TSCA section 6. Indeed, the plaintiffs' petition for rulemaking specifically requested that EPA take action under TSCA section 6. The framework EPA applies in conducting risk assessments under TSCA section 5, while based on widely accepted fundamental risk assessment principles and the National Research Council's (NRC) risk assessment paradigm, identify methods and assumptions are necessarily different than considerations for actions under section 6 due to: (1) substantial differences in the quantity and types of data typically available for new chemicals; and (2) the short timeframe (i.e., 45 to 90 days) TSCA imposes for completing new chemical reviews including both the assessment and associated risk management.  Additionally, Dr. Thiessen's report utilizes the TSCA Section 5 screening analysis, which was designed to support a rapid hazard assessment for the purpose of efficiently binning chemical assessments into those which require additional and often more detailed or refined analysis (for high or moderate hazard chemicals) and those which conservative screening indicate are of low hazard and do not warrant detailed or refined analysis.

This classification scheme is based on dose/concentration values from standardized, guideline animal toxicity tests. As such, the approach was neither intended nor envisioned to be used with human studies.  This is because human toxicity data are rarely, if ever, available for new chemicals. In conducting risk evaluations of existing chemicals under TSCA section 6, EPA generally does not deploy rapid screening or 'binning' of a chemical to inform the level of

analysis that will be required, but rather EPA performs a much more intensive literature review and systematic review process as described in Application of Systematic Review under TSCA. This more robust process is appropriate in making risk determinations on existing chemicals, like water fluoridation chemicals. Hence, this entire section of Dr. Thiessen's report is flawed in that it claims to support an unreasonable risk determination using risk assessment approaches and a regulatory framework that EPA uses for new chemicals rather than for existing chemicals.

Due to these fundamental and significant flaws in approach, Dr. Thiessen's conclusion regarding unreasonable risk of neurotoxic effects of fluoride are not supported.

## VIII.   Critique of Dr. Grandjean's Report

Dr. Henry will testify that Dr. Grandjean's report is not a credible source of evidence for making conclusions regarding unreasonable risks under the Toxic Substances Control Act (TSCA) due to critical limitations, as described below.

### A.    Inadequate or Undocumented Literature Searches and Systematic Review.

To make risk determinations under TSCA, regulations require all components of a risk evaluation and all streams of evidence to have been systematically reviewed to ensure that risk determinations are based on the Weight of the Scientific Evidence. Not only is a properly conducted systematic review required under TSCA, but it is the necessary course of action when making a risk determination that is based on the Best Available Science and WoSE. Dr. Grandjean claims to have followed the general approaches used and applied by the World Health Organization's International Agency for Research on Cancer (IARC) (IARC, 2006) and EPA when evaluating scientific information, however, Dr. Grandjean's statement is not supported by his presentation of the scientific information, which lacks the key elements of systematic review. For example, Dr. Grandjean stated that his expert report focused on the evidence that "carries the greatest weight"; however, Dr. Grandjean did not describe the principles and methods used, the reliability of the principles and methods used, nor how he reliably applied the principles and methods with evaluating or "weighing" the quality, reliability, and relevance of the cited scientific information. Dr. Grandjean also stated that he does not "necessarily cite all reports that may be relevant," which suggests that his review is not be based on sufficient facts or data and that he did not utilize reliable principles and methods that would ensure a comprehensive gathering and evaluation of that information.

Dr. Grandjean summarizes studies on fluoride and childhood IQ testing, but did not state the principles and methods that he used and applied with identifying the cited literature, evaluating the quality of the individual studies, and stating why specific studies were included or excluded from his review.  Dr. Grandjean provides an opinion on fluoride neurotoxicity in humans that he asserts is based on the "weight of epidemiological evidence," however, nowhere in his report is described the methods and criteria he used to review studies or to conduct a weight of evidence analysis.  As such, and as discussed above, Dr. Grandjean's "weight of evidence" assertion is not

credible because it fails to demonstrate foundational considerations, such as objectivity and transparency, in the process.  Rather, it is Dr. Henry's opinion that Dr. Grandjean selectively cited literature, including data from his own publications, to support biased and pre-conceived conclusions about the neurotoxicity of fluoride.

## B.    Inappropriate and Unsupported Conclusions.

First, Dr. Grandjean twice references the 2006 NRC Report as supporting his assertion that fluoride's predominant benefit to teeth comes from topical contact with the outside enamel, and not from ingestion. The NRC report makes no such conclusion, and in fact explains that is not the consensus on this matter (National Research Council, 2006).

Second, Dr. Grandjean makes conclusions by "[a]pplying methods for standards setting routinely used by EPA," but then applies methods used to derive a Maximum Contaminant Level (MCL) in drinking water, under the Safe Drinking Water Act (SDWA). Not only are the regulatory purpose and statutory framework in which MCLs are applied different than the purpose and framework under TSCA, but the values derived, and the methods used to derive them are necessarily different than conducting a risk evaluation under TSCA. Most notably, the MCL is a concentration in water that must not be exceeded under the implementing framework of the SDWA. In contrast, a TSCA risk evaluation would compare the exposure of humans and the environment (i.e., the dose resulting from exposure to the fluoride), specifically applicable to the condition(s) of use, to the dose of fluoride identified in the hazard assessment to have no adverse effects. Using this comparison, the risk characterization, would indicate the 'margin of exposure, by which the exposures are greater than or less than the no adverse effect levels. The TSCA risk evaluation process results in a risk estimate, rather than an exposure concentration. The risk estimate is then used to make a determination about unreasonable risk under TSCA. Dr. Grandjean's associated calculation exercise and the conclusions for making unreasonable risk determinations are not fit-for-purpose for a risk evaluation under TSCA. Furthermore, Dr. Grandjean's derivation has not been subject to peer review nor public notice and comment – both of which are required components of making a final unreasonable risk determination under TSCA and are scientifically sound processes for making risk determinations based on the best available science and WoSE.

Third, Dr. Grandjean concedes that it is "hard to judge the overall fluoride exposure levels in U.S. populations exposed to fluoridated drinking water" due to paucity of data.  Consequently, Dr. Grandjean relies on Canadian data in his analysis. While it is not uncommon to use data derived from non-US populations in conducting risk evaluation under TSCA, it is imperative that such data be evaluated for its relevance to the US population. EPA's application of systematic review under TSCA includes an evaluation domain against which studies are evaluated to judge such relevance [Evaluation domain = Study Participation: Study design elements characterizing the selection of participants in or out of the study (or analysis sample), which influence whether the exposure-outcome distribution among participants is representative of the exposure-outcome

distribution in the overall population of eligible persons.]. Given that Dr Grandjean did not conduct a systematic review of the studies he used to support his analysis, there is not enough data or information from which to opine on whether Dr. Grandjean's use of Canadian fluoride levels as representative for the US population is reliable or relevant.

Due to these fundamental and significant flaws in approach, Dr. Grandjean's conclusions regarding the neurotoxic effects of fluoride are not supported.

## References

Bilotta GS, Milner AM, Boyd I (2014) *On the use of systematic reviews to inform environmental policies*. Environ Sci Pol. 42: 67-77. http://dx.doi.org/10.1016/j.envsci.2014.05.010

Chang, E (2019) Expert Report of Ellen Chang, Sc.D., *prepared on behalf of defendant 01 August 2019*, Food and Water Watch, et al. v. U.S. EPA, Action No. 17-CV-02162, U.S. Federal Court, 95 pp.

Grandjean, P (2019) *Expert report of Philippe Grandjean, MD, DMSc, prepared on behalf of plaintiffs 21 June 2019*, Food and Water Watch, et al. v. U.S. EPA, Action No. 17-CV-02162, U.S. Federal Court, 77 pp.

Higgins JPT and Green S (editors) (2011) *Cochrane Handbook for Systematic Reviews of Interventions* Version 5.1.0. The Cochrane Collaboration. Available from http://handbook.cochrane.org

IARC (2006) *Preamble, IARC monographs on the evaluation of carcinogenic risks to humans, International Agency for Research on Cancer (IARC),* World Health Organization, Lyon, France, 27 pp., available at: https://monographs.iarc.fr/wp-content/uploads/2018/06/CurrentPreamble.pdf (accessed on 28 July 2019)

National Research Council (1983) *Risk Assessment in the Federal Government: Managing the Process*. Washington, DC. National Academies Press.

National Research Council (1994) *Science and Judgment in Risk Assessment*. Washington, DC. The National Academies Press.

National Research Council (1996) *Understanding Risk: Informing Decisions in a Democratic Society*. Washington, DC: The National Academies Press.

National Research Council (2009) *Science and Decisions: Advancing Risk Assessment*. Washington, DC: The National Academies Press.

# Exhibit 48



E*ponent®

**Rebuttal Report of
Ellen T. Chang, Sc.D.**

*In the matter of*

**Food & Water Watch,** *et al.*
**v.**
**U.S. Environmental Protection
Agency,** *et al.*

**DJ # 90-5-1-4-21106**

Ellen T. Chang, Sc.D.
August 1, 2019

# Conclusions

As summarized earlier in this report, Plaintiffs' experts express opinions that fluoride exposure is adversely associated with neurodevelopment in children. However, they do not explicitly conclude that this association is causal in nature.

Specifically, Dr. Calderón Hernández states that fluoride exposure is "consistently associated with cognitive deficits in children" in her research studies, and that the dose-response data from prospective cohort studies performed by her research team (Valdez Jiménez et al. 2017) and by the Mexico City team (Bashash et al. 2017, Bashash et al. 2018) "suggests that fluoride poses a neurologic risk at the urinary fluoride levels found in pregnant women living in artificially fluoridated communities."

Dr. Grandjean states that epidemiological studies have "identified links" between fluoride exposure and cognitive deficits in children; and that studies in recent years "document that adverse effects on brain development happen at elevated exposure levels" commonly found in North America, leaving "little doubt that developmental neurotoxicity is a serious risk associated with elevated fluoride exposure."

Dr. Lanphear states that his research team's findings (Green et al. in press, Till et al. in review), along with those in Mexico City (Bashash et al. 2017), show that "prenatal fluoride exposure was significantly associated with lower intellectual abilities in 3-4 year old children," thereby indicating that "the *in utero* period appears to be a susceptible period of life vis-à-vis fluoride toxicity."

Dr. Hu is described in Plaintiffs' Amended Expert Disclosures as holding the opinion that the "methodologically rigorous" and "scientifically reliable and robust" findings from his research team "are consistent with and support the conclusion that fluoride is a developmental neurotoxicant at levels of exposure seen in the general population."

Dr. Thiessen states that "there is sufficient evidence to conclude that neurotoxicity is a hazard of fluoride exposure," but she notes that according to U.S. EPA (1998), "the purpose of the hazard identification analysis is to determine from the collective data whether a neurotoxicity hazard 'could exist' for the chemical [U.S. EPA 1998]. The Guidelines provide that 'the minimum evidence sufficient would be data on a single adverse endpoint from a well-conducted study.'" Thus, identification of a hazard according to these guidelines does not require sufficient evidence of a causal effect.

1807950.000 – 7057

In support of their opinions, Plaintiffs' experts cite their own (except for Dr. Thiessen) and selected other epidemiological studies of the association between fluoride exposure and developmental neurotoxicity. However, they have not conducted a systematic literature review of this topic to assess the totality of relevant epidemiological evidence currently available, nor do they indicate that they have conducted a formal causal analysis of this collective evidence. Therefore, I conducted a systematic literature review and causal analysis to address the gaps in the epidemiological evidence base presented by Plaintiffs' experts, and to provide an unbiased, comprehensive, transparent, and reproducible summary of the epidemiological evidence on this topic.

My systematic literature review shows that few rigorously conducted epidemiological studies are relevant to the question of whether artificial drinking water fluoridation in the U.S. causes developmental neurotoxicity. Dozens of poor-quality, cross-sectional, often ecological studies have been conducted in China, India, and other regions with high natural or anthropogenic levels of fluoride in water and/or air. These studies are of minimal relevance to the present matter due to their disparate sociodemographic, geographical, cultural, and environmental settings, their substantial potential for publication and editorial bias, and their high exposure levels. In light of their major methodological limitations, which could readily produce spurious statistical associations due to confounding or bias, these studies are not sufficient to establish a causal relationship between relatively high-concentration, naturally fluoridated drinking water and developmental neurotoxicity in humans.

In the relatively more informative, methodologically superior epidemiological studies conducted in Western regions, some statistically significant associations were observed between early-life low-level fluoride exposure and subsequent adverse neurodevelopmental outcomes, including some monotonic exposure-response trends. However, these associations were modest, inconsistent, of questionable biological plausibility, and not coherent with secular trends in IQ. In addition, concerns persist about potential selection bias, uncertainties and variation in exposure assessment, heterogeneity and limited reliability in outcome assessment, and high potential for confounding in these studies. Therefore, bias, confounding, and chance are reasonable explanations for the observed associations, which cannot reliably be attributed to causation.

In conclusion, in the absence of a systematic literature review and causal analysis, Plaintiffs' experts do not provide sufficient evidence to show a causal effect of fluoride exposure on developmental neurotoxicity in humans. To address the scientific gaps left by the Plaintiffs' expert reports, I conducted a systematic literature review and causal analysis of the available epidemiological studies on this issue. My assessment shows that the overall weight of scientific evidence does not demonstrate a causal effect of consumption of fluoridated drinking water on developmental neurotoxicity, including impaired IQ, behavioral or conduct problems,

ADD/ADHD, and other adverse neurodevelopmental outcomes, especially at a fluoride concentration of 0.7 mg/L in U.S. community drinking water.

1807950.000 – 7057

# **Exhibit 49**



**Expert Rebuttal Report of Joyce Tsuji**

*Food & Water Watch et al. v. U.S. Environmental Protection Agency, et al.*
*DJ #90-5-4-21106*

EPA's SMCL based on mild dental fluorosis and the MCLG based on preventing serious skeletal fluorosis are approximately within ranges of drinking water concentrations in animal studies that have reported effects in some tests of learning and memory. The review by NRC (2006), however, noted that at 4 mg/L, the risk of severe dental fluorosis was an adverse effect, and that this level may not be sufficiently protective of skeletal fluorosis.

Concentrations above 20 mg/L for animals (equivalent to total fluoride exposures in humans with drinking water of 1.2 mg/L) have also resulted in effects on body weight, possibly related to metabolic or systemic effects, or reduction in water and food intake. Reductions in body weight gain have been reported at fluoride exposure levels of 22.6 mg/L (Jiang et al. 2014a), 45.2 mg/L (Jiang et al. 2014a; Wang et al. 2018b); 67.9 mg/L (and reduced water intake; Jiang et al. 2014b), and 120 mg/L (Yang et al. 2018). Reduced milk production by dams was reported at 25 mg/L (Wu et al. 2008). Thus, in addition to the inability of the neurobehavioral tests to distinguish sensory and motor effects from those related to learning and memory, the observed neurobehavioral effects at these higher fluoride concentrations may be secondary to other influences that are not relevant for the U.S. population.

It also must be recognized that these equivalent fluoride water concentrations for a rat assume no exposure from the laboratory diets, and accordingly could overestimate equivalent fluoride water exposures in studies that use rodent diets with considerable fluoride (NTP 2016; McPherson et al. 2018). Therefore, dose comparison between animals and human is highly uncertain for the large majority of animal studies, which have not quantified exposure from the diet.

## 4.9   Toxicity Factor Adjustment and Margin of Exposure for Risk Assessment

In using the animal data to estimate toxicity reference values for risk assessment, a LOAEL, NOAEL, or benchmark dose from an animal study is used as a point of departure for extrapolation to a health protective reference dose for humans. Dr. Thiessen notes various adjustments that are incorporated to account for potential differences between animals and humans and for differences among humans. The Complaint implies that the EPA neurotoxicity guidance specifies an additional extrapolation factor of 10 for this endpoint (U.S. EPA 1998a). This is not the case, nor do Plaintiffs' experts recommend such an additional factor. Uncertainty factors from one to 10 may be assigned for sources of uncertainty including extrapolations from a LOAEL to a NOAEL, animal to humans, and variation within the human population. Dr. Thiessen applies various largely default factors (e.g., interspecies, intra-species, LOAEL to NOAEL, subchronic to chronic, database uncertainty). For a constituent such as fluoride in water, however, which is well absorbed, is not metabolized to intermediates, appears to have similar pharmacodynamics among species, with considerable evidence from animal and human studies (Rao et al. 1995; ATSDR 2003; NRC 2006), fewer uncertainty factors are needed and less than default values are appropriate. Similarity in pharmacodynamics among species indicates an uncertainty factor at the low end of the range for this extrapolation from animals. Considering less than a factor of 10 for within human variation for a substance that is not metabolized is also appropriate. Thus, a default factor of 10 in addition to the standard factors that are incorporated according to the EPA guidelines is not warranted for the neurotoxicity

endpoint. Dr. Thiessen also includes an uncertainty factor of 10 for subchronic to chronic exposure duration. However, such a factor is not warranted when the sensitive effect considered is a developmental endpoint, which occurs during early-life exposure. Review of EPA's IRIS database of reference doses for chemicals resulted in 26 chemicals in which the reference dose was based on a reproductive/developmental endpoint. Of these chemicals, only one, a polychlorinated biphenyl (Aroclor 2016) had an uncertainty factor adjustment (3) for study duration.

Dr. Thiessen also claims that margins of exposure between the point of departure dose from a toxicity study (e.g., NOAEL or LOAEL) and U.S. population exposures for other TSCA chemicals is much larger than for fluoride exposure. However, the TSCA chemicals she presents have much less human or animal data for characterizing their toxicity. In fact, for several of these chemicals, no appropriate studies were available and a toxicology study on analogous or a structurally similar chemical had to be used. Thus, it is entirely appropriate that much larger margins of exposure are used for these chemicals to protect the U.S. population compared to fluoride.

## 4.10  Evidence from Epidemiological Studies

As for the neurotoxicology studies, Plaintiffs' experts accept the findings and conclusions of the epidemiological studies as collectively demonstrating that fluoride is neurotoxic at environmentally relevant human exposure levels. Unlike toxicological studies that seek to define a no-effect level or effect level, or investigate the mechanism of toxic action of chemicals with dose, epidemiological studies are usually not specifically designed to define a threshold at which no risk is present. Rather, these studies typically calculate likelihood estimates or relative risks that compare disease rates between two different exposures or across incremental increases with continuous exposure data, assuming—but seldom verifying—an underlying linear relationship between exposure and response. Even when disease rates among multiple exposure categories or in the case of continuous data are examined, which might allow for a non-linear exposure-response relationship, measurement errors in exposure tend to linearize the relationship (Rhomberg et al. 2011a; Rhomberg et al. 2011b). The resulting dose-response relationship thereby may appear to be a continuous association down to low levels, even though the underlying association has a threshold below which no risk of disease occurs. Thus, a reported increased risk of health effects associated with increase in chemical exposure by some human observational studies, does not mean that such a risk can be applied to any dose of the chemical, or is even causal.

I rely upon and concur with the systematic review and critical assessment by Dr. Chang, regarding the epidemiological studies on early life fluoride exposure and cognitive outcomes in children. Such an assessment was not conducted by Plaintiffs' experts. Similar to the toxicology studies, the bulk of the human observational studies have been conducted in areas of China with naturally elevated levels of fluoride in groundwater, with a few studies in other developing countries such as India or Iran. Many of these studies have little to no individual-level correction for potential confounding factors, have little information on individual-level exposures (those that are ecological), often involve exposures much higher than in the United States, and generally lack sufficient information to evaluate the quality and reliability of the

which in turn results in low confidence in associations between fluoride exposure and reported outcomes.

As noted by Dr. Chang from her detailed review which was not conducted by Plaintiffs' experts, even in the recent, more well-conducted studies that find statistically significant associations, the correlation with fluoride exposure is poor. Specifically, fluoride exposure accounts for very little of the variation in cognitive outcomes among children (see also original and revised Figure 3 from Bashash et al. [2018] and original and revised and Figure 3 from Green et al. [in press] as presented in Dr. Chang's report). These studies do not find effects on birth weight or growth in children, unlike in many studies showing effects in the animal studies.

## 4.11 Conclusions

Plaintiffs' experts appear to acknowledge NTP's 2016 systematic review of the neurotoxicology literature, although they emphasize NTP's hazard evaluation of neurotoxicity in weanling and adult rodents as moderate, with less recognition of NTP's rating of the evidence from developmental neurotoxicity studies as low. Nevertheless, the developmental neurotoxicity studies in animals are more relevant for assessing the plausibility of associations reported in epidemiological studies for which the evidence has focused on *in utero* fluoride exposure and childhood cognitive outcomes.

Plaintiffs' experts appear to support their conclusions based on the quantity of studies reporting developmental neurotoxicity of fluoride without detailed examination of the quality and reliability of these studies. Many of the available developmental toxicology studies are poorly controlled and conducted, used low numbers of animals, often administered unrealistically high doses of fluoride, had signs of internal issues affecting the results, and lacked sufficient description of study details to judge the quality of the data, as previously noted by NTP (2016).

Most of the studies published since 2016 have similar deficiencies. However, a comprehensive study was published in 2018 by NTP researchers that was specifically designed to investigate the developmental effects of fluoride at lower doses on learning and memory and to address a number of deficiencies and uncertainties based on the existing literature (McPherson et al. 2018). This study found no adverse effects of fluoride at an exposure level that would overestimate total fluoride exposure in the U.S. population, including the currently recommended 0.7 mg/L drinking water level and other sources of fluoride exposure. The highest dose tested in this study is approximately equal to total fluoride exposures including fluoride in drinking water at the previous upper end of the range for artificial fluoridation recommended by USPHS (1.2 mg/L). Plaintiffs' experts, however, disregard the results of the 2018 NTP study (McPherson et al. 2018), and instead appear to base their opinions on the larger number of poorly conducted neurotoxicity studies as more compelling evidence for the effects of fluoride in humans.

The collective evidence from animal studies, which Plaintiffs' experts failed to critically evaluate, including early-life exposure or after weaning, shows some consistency in neurological effects on learning and memory at drinking water fluoride concentrations in excess of 20 mg/L. Even at these levels, however, the effects in the neurobehavioral tests are difficult

to distinguish from motor or sensory effects on performance rather than cognitive effects. In addition, Plaintiffs' experts do not recognize that these exposure levels have been associated with reduced body weight gain, decreased water intake, and decreased milk production in dams. Whether effects on performance reported in these studies are mediated through more general effects of fluoride on health or other influences such as water palatability is unclear. Effects on performance in these neurobehavioral tests thus do not appear to result from direct neurotoxic effects on learning and memory. Moreover, lack of control for potential study methodological factors and unknown fluoride exposure from laboratory rodent diets severely limit the reliability of most laboratory animal studies for identifying specific doses associated with adverse effects, much less cognitive effects on learning and memory.

In combination with Dr. Chang's conclusions based on her evaluation of the epidemiological literature, the current evidence from animal toxicology studies and human populations is insufficient to support a causal relationship between fluoride in drinking water at 0.7 mg/L and cognitive neurodevelopmental effects in U.S. populations.

# **Exhibit 50**

DEBRA J. CARFORA
JOHN THOMAS H. DO
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC. 20044-7611
Tel.     (202) 514-2640 (Carfora)
           (202) 514-2593 (Do)
Fax     (202) 514-8865
debra.carfora@usdoj.gov
john.do@usdoj.gov

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al., | No. 3:17-cv-02162-EMC |
| Plaintiffs, | **FEDERAL DEFENDANTS' EXPERT DISCLOSURES AND DESIGNATIONS (JUNE 27, 2019)** |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENY, et al., | |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 26(a)(2) and the Court's Scheduling Order, Federal Defendants hereby provide the following disclosures and designations of witnesses Federal Defendants may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705:

I. EXPERTS REQUIRED TO PROVIDE A WRITTEN REPORT

A. Gary D. Slade, PhD, DipDPH, BDSc, Professor of Dentistry and Director of Oral Epidemiology at the University of North Carolina at Chapel Hill, and Registered Dentist, 385 South Columbia Street, CB#7455, Chapel Hill, NC 27599-7455.

1. Area of expertise: Oral/dental epidemiology, dentistry, dental public health, and the relationship between dental health benefits and water fluoridation.

2. Report: Dental Health Benefits of Fluoride in Drinking Water (June 2019)

B. Charlotte W. Lewis, MD, MPH, board certified pediatrician and attending physician at the University of Washington Medical Center and Seattle Children's Hospital,  and Associate Professor of Pediatrics and Adjunct Associate Professor of Pediatric Dentistry at the University of Washington, Box 354920, Seattle, WA 98195-4920.

1. Area of expertise: Public health, dental public health, pediatrics, oral/dental health disparities, impact of dental carries, and relative merits of water fluoridation versus alternative public health measures.

2. Report: Public Health and Community Water Fluoridation (June 2019)

II. EXPERTS NOT REQUIRED TO PROVIDE A WRITTEN REPORT

A. Tala R. Henry, PhD, Deputy Director of the Office of Pollution Prevention and Toxics (OPPT) at the U.S. Environmental Protection Agency (EPA) and former Director of Risk Assessment Division of OPPT, 1200 Pennsylvania Avenue, NW, Washington, DC 20460.

1. Subject matter on which the witness is expected to present evidence: EPA's chemical safety program led by OPPT, EPA's implementation of the 2016 TSCA Amendments, EPA's risk evaluation and assessment guidance and principles, toxicology, and the relative risks posed by chemicals evaluated and prioritized under TSCA.

2. Summary of the facts and opinions to which the witness is expected to testify:

As part of EPA's chemical safety program led by the Office of Pollution Prevention and Toxics (OPPT), EPA has been diligently working to implement the Toxic Substances Control Act (TSCA), as amended. On June 22, 2016, the Frank R. Lautenberg Chemical Safety for the 21st Century Act (Pub. L. 114-182) was signed into law. It included substantial changes to EPA's authorities and responsibilities under TSCA. Amended TSCA – including new mandatory deadlines for EPA to evaluate chemicals and a new risk-based standard for finding unreasonable risks separate from managing those risks using costs or other non-risk factors – has necessitated substantial changes within EPA's program, requiring significant time, effort, and resources to implement the new statutory requirements.

Following these 2016 TSCA amendments, EPA was required to begin the risk evaluation process for 10 chemicals under TSCA section 6(b)(2)(A) to determine whether they present unreasonable risk of injury to health or the environment, based on the best available science and weight of scientific evidence, as required by TSCA sections 26(h) and 26(i), and the Agency's final rule, *Procedures for Chemical Risk Evaluation Under the Amended Toxic Substances Control Act* (82 Fed. Reg. 33,726 (July 20, 2017)). In December 2016, EPA published the initial list of 10 chemicals and began the process of evaluating their risks. These first 10 chemicals for risk evaluation were selected from the 2014 Update to EPA's TSCA Work Plan for Chemical Assessments (the "Work Plan") – a list of 90 chemicals which were identified by EPA for further evaluation prior to the 2016 TSCA amendments using a systematic screening system that considered combined hazard, exposure and persistence and bioaccumulation characteristics – which fluoride is not listed on. *TSCA Work Plan for Chemical Assessments: 2014 Update*, available at https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/tsca-work-plan-chemical-assessments-2014-update. In November 2018, EPA released a draft risk evaluation for Pigment Violet 29, and the remaining nine draft risk evaluations will be released this summer/fall to meet the statutory deadlines under TSCA section 6(b)(4)(G).

Aside from initiating risk evaluations for 10 chemicals, TSCA also requires EPA to implement a new prioritization process to designate a chemical as either a high-priority for risk evaluation or a low-priority for which risk evaluation is not warranted at the time. This process is codified in EPA's final rule, Procedures for Prioritization of Chemicals for Risk Evaluation Under the Toxic Substances Control Act (82 Fed. Reg. 33,753 (July 20, 2017)). Per the statute, the process must take between nine and twelve months, and incorporate certain risk-based criteria and opportunities for public input. Upon completion of one risk evaluation, EPA must have another chemical ready to designate as high-priority, such that there will always be at least 20 risk evaluations ongoing at any given time. At least 50% of those chemicals must come from the TSCA Work Plan, until the Work Plan chemicals are exhausted. In March 2019, EPA initiated the prioritization process for 40 additional chemical substance candidates (i.e., 20 high-priority candidates, and 20 low-priority candidates), including several more solvents and formaldehyde, 84 Fed. Reg. 10,491 (March 21, 2019). Concurrently with the 10 risk evaluations and additional prioritization requirement, EPA is also reviewing 2 requests, with 1 additional request expected, for risk evaluation from manufacturers under TSCA Section 6(b). Further, since 2016 EPA has been developing proposed rules for certain PBT chemicals as directed under TSCA section 6(h). This rule was proposed on June 21, 2019, which must be finalized within 18 months.

Where EPA identifies unreasonable risks under the conditions of use in its risk evaluation, those risks must be managed through rulemaking under TSCA section 6(a) so that the unreasonable risks under the conditions of use are no longer present. This process requires that risk management staff work closely with the risk assessment staff to ensure that any prohibitions or restrictions on the chemical are sufficient to eliminate the unreasonable risk. When proposing and promulgating a TSCA section 6(a) rule to prohibit or restrict a condition of use, EPA has to follow additional requirements under TSCA section 6(c) and must "consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment,

compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute when the proposed prohibition or other restriction takes effect." 15 U.S.C. § 2605(c)(2)(C). EPA would also determine which, if any, TSCA section 6(g) requirements may apply before promulgating a regulation. Further, under TSCA section 6(g)(1)(C), EPA may find a need for exemption of regulation of water fluoridation because of its substantial benefit to health compared to reasonably available alternatives, if any are identified at all. These determinations would require extensive work within EPA, collaboration with other federal government agencies, and discussion with outside stakeholders before a section 6(a) rule could be promulgated.

If the court were to find that fluoride presents an unreasonable risk to health or the environment, EPA should be able to regulate the risk found based on these considerations. However, unlike the other chemicals EPA is evaluating under TSCA section 6, it would be extremely challenging to develop an appropriate regulation under section 6(a) since OPPT would not have a completed risk evaluation to guide its risk management activities. Taking into account all of these considerations, it would likely take at least 4 years, the time allowed by TSCA section 6(c)(1) to propose and finalize such a rule.

The volume of ongoing and expected future work is unprecedented and all available staff resources are being used to meet the existing statutory deadlines. Adding the proposal and finalization of an additional section 6(a) rule for fluoride, which is not on the Work Plan or identified as a high priority chemical for risk evaluation, would cause significant strain to the TSCA regulatory program as it diligently works to meet the substantial requirements Congress imposed for chemicals which EPA has already identified may pose risks to human health or the environment.

Federal Defendants' Expert Disclosures and Designations
*Food & Water Watch, Inc., et al. v. U.S. Environmental Protection Agency, et al.*, No. 3:17-cv-02162-EMC (N.D. Cal.)

Dated:   June 27, 2019

Respectfully submitted,

/s/ *John Thomas H. Do*
DEBRA J. CARFORA
JOHN THOMAS H. DO
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
601 D Street, NW, Suite 8000
Washington, DC 20004
Tel: (202) 514-2640
Emails:        john.do@usdoj.gov
                   debra.carfora@usdoj.gov

*Attorneys for Federal Defendants*

6

1

**CERTIFICATE OF SERVICE**

2

      I hereby certify that a true and correct copy of the foregoing was served by electronic

3

mail and U.S. Postal Service on June 27, 2019 on Michael P. Connett, 222 N Pacific Coast

4

Highway, Suite 1900, El Segundo, CA 90245, 310-414-8146,

5

mconnett@waterskraus.com.

6

7

                          */s John Thomas H. Do*

8

                          JOHN THOMAS H. DO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7