Pages 1 – 59

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

FOOD & WATER WATCH, INC., et al.,    )
                                     )
            Plaintiffs,              )
                                     )
    VS.                              )  NO. C 17-02162 EMC
                                     )
ENVIRONMENTAL PROTECTION AGENCY,     )
et al.,                              )
                                     )  San Francisco, California
            Defendants.              )
_____)

Friday, November 15, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        WATERS KRAUS & PAUL
        222 North Pacific Coast Highway
        Suite 1900
        El Segundo, California  90245
  BY:  **MICHAEL P. CONNETT, ESQ.**
      **ANDREW WATERS, ESQ.**

For Defendants:

        U.S. DEPARTMENT OF JUSTICE
        Environment & Natural Resources
          Division
        Post Office Box 7611
        Washington, D.C.  20044
  BY:  **BRANDON N. ADKINS, ESQ.**
      **DEBRA J. CARFORA, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
        Official Reporter, U.S. District Court

<u>**Friday - November 15, 2019**</u>                    <u>**3:37 p.m.**</u>

<u>**P R O C E E D I N G S**</u>

       **THE CLERK:**  Calling Civil Action 17-2162, Food &
Water Watch Inc. et al. versus Environmental Protection Agency,
et al.

   Counsel, please approach the podium and state your
appearances for the record.

       **MR. CONNETT:**  Good afternoon, Your Honor.  Michael
Connett on behalf of the plaintiffs.

       **THE COURT:**  All right.  Thank you, Mr. Connett.

       **MR. WATERS:**  Also Andy Waters, Your Honor, on behalf
of plaintiffs.

       **THE COURT:**  All right, thank you.  Good afternoon.

       **MR. ADKINS:**  Good afternoon, Your Honor.  Brandon
Adkins of Department of Justice for defendant EPA.  I'm joined
by my colleague Debra Carfora, also of the Department of
Justice.

       **THE COURT:**  All right.  Good afternoon, everyone.

   Several things I want to cover this afternoon.  Obviously,
we are not going to be able to cover everything.  But the first
question has to do with standing.

   And maybe before I get there, I think it's important to
define the scope of this case.  My understanding is that the
EPA's position is that this complaint brought under Section 21
is defined and limited by the scope of the petition, and

1   therefore, it concerns neurotoxicity and not other kinds of

2   potential health hazards from fluoridation.

3       Correct?

4           **MR. CONNETT:**  Yes.  That is the -- the allegation in

5   this case is neurotoxicity is the risk of concern.

6           **THE COURT:**  All right.  So when I looked at the

7   description of the various plaintiffs, it's not obvious -- it

8   seems to me that in order to have standing in this case, given

9   the scope of the complaint, that the plaintiff has to have at

10  least a plausible case of suffering some injury or likelihood

11  of some future injury as a result of neurotoxicity.  And not

12  some other aspect of fluoridation.

13          **MR. CONNETT:**  Well, actually, Your Honor, I think our

14  response there is twofold.  First, on the matter of statutory

15  interpretation.  When we're dealing with prudential standing

16  and the zone-of-interest analysis, I think it is very

17  instructive to look at an *en banc* panel of the Fourth Circuit.

18  It's the case of *Gaston*, G-A-S-T-O-N.  The Ninth Circuit has

19  relied on it considerably.  The citation is 204 F.3d, 149.

20          And in that case, Your Honor, the Ninth Circuit was

21  looking at citizen suits under the Clean Water Act.  And the

22  Court held that -- under the statute there, Congress allows any

23  person who has an interest which may be adversely affected by a

24  violation of the Clean Water Act, to bring a citizen suit.  And

25  the Court held that in allowing any person with that

1  qualification to bring suit, Congress allowed persons to bring

2  cases that reached the outer limits of Article III.

3  　　　And here's a quote, Your Honor, from Page 155 of the

4  decision (As read):

5  　　　　　　　"If a Clean Water Act plaintiff meets the

6  　　　　　　　constitutional requirements for standing, then he

7  　　　　　　　*ipso facto* satisfies the statutory threshold as

8  　　　　　　　well."

9  　　　Now, here, Your Honor, under TSCA, Congress made no --

10  made no qualification or no -- did not limit which persons

11  could bring a claim under the Section 21.  It simply says:  Any

12  person may petition the administrator.

13  　　　The Clean Water Act, Congress said, any person who has an

14  interest which may by adversely affected.  So the Clean Water

15  Act is more narrow in who can file a case.  But even there, the

16  Fourth Circuit held that standing reaches the outer limits of

17  Article III.

18  　　　So I don't believe, Your Honor, that the zone of interest

19  analysis that counsel has made applies here to TSCA Section 21

20  citizen petition provision.  As long as plaintiffs have an

21  injury that comes within Article III, the plaintiffs have

22  standing.

23  　　　But even if, Your Honor, even if the Court was to hold

24  that plaintiffs must have some neurologically-related injury,

25  plaintiffs have that.

1            THE COURT:  So who, who would be best examples of

2     that?

3            MR. CONNETT:  I think the best example, Your Honor,

4     would be Julie Simms.  And Kyle Adams as well.  They have --

5     and I'll start with Julie Simms.

6        Julie Simms suffered daily headaches for over 20 years.

7     She tried a whole -- according to her declaration, which is in

8     evidence, experimented and tried a whole range of things to

9     cure this, including a large number of pharmaceuticals and

10     other potential --

11            THE COURT:  What suggests there's a plausible case

12     that this is related to neurotoxicity?

13            MR. CONNETT:  Well, headaches are a neu- -- as the

14     EPA has recognized and as the studies show (Indicating),

15     headaches are a classic form of neurological -- it's a classic

16     neurological symptom.

17        So a chemical that causes neurotoxicity can cause head- --

18     I mean, headaches --

19            THE COURT:  But there are millions of causes of

20     headaches.  So doesn't there have to be at least a plausible

21     case?  If we were to take the more than the narrow zone of

22     interest -- I understand your first argument, but I just want

23     to know factually, what -- I mean headache, is there some --

24     some differential diagnosis here that's been done to say:  No,

25     it's not from a brain tumor; no, it's not from migraines; no,

1  it's not from many other things that cause a headache, but it

2  has something to do with neurotoxicity to do with fluoride

3  here?

4          **MR. CONNETT:**  Well, the first thing I would note,

5  Your Honor, is that there is, as we note in our opposition

6  brief, there is scientific literature linking fluoride exposure

7  to --

8          **THE COURT:**  I'm going to assume that's true.  But

9  that doesn't necessarily indicate -- just because you have a

10  headache doesn't mean it's plausibly linked, unless there's

11  some other -- is there another factor here that indicates that

12  fluoride is a causal factor of these headaches?

13          **MR. CONNETT:**  Yes, there is.  And that's temporality.

14  The fact that you have someone who's suffering headaches, daily

15  headaches for 20 years, and then within three weeks of stopping

16  her exposure to fluoridated water she no longer has daily

17  headaches, she no longer -- and she has since gotten off of

18  medication.  She's no longer receiving any treatment for these

19  headaches.

20      So you have a temporal nexus here where daily headaches,

21  twenty years, stop drinking fluoridated water, within three

22  weeks the daily headaches are gone and have never returned in

23  the six-plus years.

24      And I would note, Your Honor, that we -- so the key here

25  is:  Is there a reasonable basis for Julie Simms to say: I do

1    not want to be exposed to fluoridated water because I'm

2    concerned it could cause me headaches?

3          I think that has to be yes there.  Here you have someone

4    who suffered these headaches for 20 years.  She stops drinking

5    fluoridated water, they go away.

6          **THE COURT:**  There has not been any medical tests.

7          **MR. CONNETT:**  There has not been any medical tests.

8    But I would note, Your Honor, that courts, including the Ninth

9    Circuit, have made clear that proving injury in fact for

10   standing purposes does not -- you don't need to prove causation

11   like you do in a -- you know, a traditional tort case.

12         The burden of proof here is not more likely than not.

13   It's not scientific certainty.

14         **THE COURT:**  Well, but for injunctive relief

15   generally, and in Article III, you still have to show

16   likelihood of redressability, that you're going to get some

17   redress from any injunctive relief.  And so there is an

18   implicit causation built into standing.

19         **MR. CONNETT:**  Right.  And the causation here with

20   Julie Simms is she has a credible basis to be very concerned

21   about fluoridated water's effect on her health.  And as a

22   result, Your Honor, she is taking a number of measures that are

23   causing her economic injury to avoid this harm.

24         If EPA was to ban or regulate fluoridation chemicals,

25   Julie Simms would no longer have to be suffering that economic

1    injury.

2          THE COURT:  Well, surely you can't just turn on the

3    subjective thoughts of -- you know, if somebody thought

4    satellites were causing headaches and were going to ask NASA to

5    take down those satellites, and yeah, you get relief from that,

6    that doesn't work.

7          MR. CONNETT:  Right.

8          THE COURT:  There's got to be some plausibility about

9    the causation.  That's why I asked if there's anything

10   temporal, coincidence or temporal indication.  That's one.

11       Do you have anybody else that has any kind of

12   medically-linked, at least, some plausible basis for linking

13   the symptoms, whatever those symptoms may be, with

14   neurotoxicity?

15         MR. CONNETT:  We have -- in addition, Your Honor, we

16   have Kyle Adams, who is the son -- and a plaintiff -- of the

17   plaintiff Audrey Adams.  And Kyle Adams is an adult autistic

18   individual whose doctors have diagnosed him with a sensitivity

19   to fluoride exposure.

20       And we have introduced, Your Honor, as part of Audrey

21   Adams' declaration, letters from her doctors -- from Kyle

22   Adams' doctors, stating that Kyle does have a sensitivity to

23   fluoride.  And that his sensitivity results in him suffering

24   headaches as a result of fluoride exposure.

25       And I would note, Your Honor, that counsel has objected to

these letters from Kyle Adams' doctors on the grounds of
hearsay.  And I do want to bring to the attention of the Court
that that objection on hearsay violates the stipulation that
the parties have reached, which is that the plaintiffs could
introduce declarations, including the exhibits, without
evidentiary objection.

So I just want to bring that to the -- to Your Honor's
attention.  The stipulation was signed by the Court as ECF
No. 102.  So those medical letters from Audrey -- from Kyle
Adams' doctors certainly provide -- here you have, Your Honor,
individuals -- granted, they're not experts, they're not
scientists.  But they have doctors telling them:  Your son has
a sensitivity to fluoride; he should avoid fluoride exposure.
It appears to cause him headaches.

So here, we have to look:  Is there a credible basis, is
there a reasonable basis for someone like Kyle Adams to avoid
fluoride exposure?

Well, you have his own doctor telling him --

**THE COURT:**  Do the doctors cite any studies
indicating some kind of association or causal relationship?

**MR. CONNETT:**  His doctor does not.  But our -- the
plaintiffs' experts have both cited studies -- Dr. Thiessen and
Dr. Grandjean have both cited studies from the scientific
literature which have linked fluoride exposure to headaches.
Including in adults.

1    **THE COURT:**  What about -- you say a special

2    sensitivity because of autism.  Are there studies that show

3    that?

4    **MR. CONNETT:**  There is not a study to specifically

5    examine whether autism makes one more or less susceptible to

6    fluoride exposure, Your Honor.  So we are not pointing to

7    studies on that point.

8    **THE COURT:**  Now, I did notice you also have one

9    plaintiff who had, I think, a thyroid problem.  Is that Talley?

10   **MR. CONNETT:**  Yes.  But Your Honor, we are not

11   proceeding with -- pursuant to the stipulation, plaintiffs have

12   agreed not to present Ms. Talley as a standing witness in this

13   case.

14   **THE COURT:**  Okay.

15   **MR. CONNETT:**  But I would mention another witness,

16   another standing witness in this case, which is Christy

17   LaVelle.  And she is a -- she works for the San Francisco

18   County Public Health Department.  She is an occupational health

19   therapist.  And she became very concerned about the health

20   effects of fluoridation chemicals in the early 2000s after

21   reading a statement from EPA's own scientists.

22   EPA's union of scientists at the headquarters office of

23   EPA issued a statement in 1999 opposing the addition of

24   fluoridation chemicals to water, in large part because of the

25   EPA scientists' concern about the neurological effects of

1    fluoride.  And after Ms. LaVelle read that statement, she

2    started to take measures to protect herself and her family from

3    this risk.

4        And her concern with fluoridation chemicals was magnified

5    in 2006 when the National Research Council published a

6    comprehensive and authoritative report where the NRC expressed

7    concerns about fluoride causing dementia.  According to the

8    NRC, the changes in the brains of rodents from fluoride

9    exposure paralleled the changes --

10       **THE COURT:**  Well, we'll get to that.  That gets to

11   the merits.

12       **MR. CONNETT:**  Yeah.

13       **THE COURT:**  Let me ask the government for its

14   response regarding the standing question.

15       **MR. ADKINS:**  Thank you, Your Honor.  Just a few

16   responses here.

17       First, *Lexmark* teaches that a zone-of-interest analysis is

18   actually a more searching review that the minimal

19   constitutional requirements under Article III.  So plaintiffs'

20   argument here that zone-of-interest analysis is satisfied

21   because Article III standing is satisfied is not consistent

22   with *Lexmark*.

23       **THE COURT:**  Well, isn't part of the argument here

24   that to the extent there is a zone-of-interest analysis here,

25   it is as broad as possible, given the wide language, the broad

1   language of the statute that says any person can bring a

2   Section 21?

3             **MR. ADKINS:**  No, Your Honor.  That's not quite EPA's

4   argument here.  What EPA has argued here is that --

5             **THE COURT:**  That's the plaintiffs' argument.  I

6   wanted you to respond to that.

7             **MR. ADKINS:**  Right.  So that's not correct,

8   Your Honor.  Excuse me.

9        The reason is the zone of interests that are relevant here

10  are the harms that were alleged in the underlying petition.

11  And because plaintiffs haven't alleged that headaches,

12  dementia, avoiding water fluoridation are harms that EPA ought

13  to regulate fluoride to prevent, they fall outside of the zone

14  of interest here.

15            **THE COURT:**  Well, but the petition is raising

16  concerns about neurotoxicity.  And some of these -- some of the

17  plaintiffs, at least it's alleged, and I don't know how

18  strongly alleged, but that their headaches and their symptoms

19  are due to neurotoxicity as a result of fluoride exposure.

20       So it does -- you may question the factual nexus there,

21  and whether a plausible claim has been made.  But I mean, that

22  seems to be within the zone of interest or the ballpark or

23  whatever you want to call it of what it is they're challenging

24  in the petition.

25            **MR. ADKINS:**  Well, the reason those allegations here

don't satisfy the zone-of-interest analysis is because they
weren't alleged at the petition level.  Plaintiffs have not
alleged that exposure to community water fluoridation in the
United States causes them headaches.

What this case is about is neurodevelopmental harms.  Loss
of IQ in children from exposure in utero and in infancy.  It's
not about headaches.

Second, there's no evidence supporting that exposure to
fluoride at the levels that are relevant here causes people
headaches or dementia.  It's just not the case that there are
actually scientific studies that give these standing declarants
any basis to have a credible fear of those harms.

There is -- now, as the Court has already identified,
there is no evidence that these standing declarants have put
forward, but for their self-serving declarations, that would
allow the Court to isolate that their headaches are as a result
of exposure to community water fluoridation.  And so plaintiffs
have not supported their burden there.

With respect to Kyle Adams, counsel's right that we have
made a number of hearsay objections to the purported medical
diagnoses that they have attached.

First, one of those medical diagnoses doesn't appear to be
from a medical doctor.

Second, there was no testing or diagnosis performed by
those individuals that would allow the Court to conclude,

from -- from an expert in the field or a medical doctor
treating those patients, that they're experiencing headaches
and these other symptoms that plaintiffs have asserted because
they are drinking fluoridated water.  And there's also no
scientific studies that would support that concern here.

So in addition to those being inadmissible hearsay, even
if the Court were to consider them, they don't support
plaintiffs' claim because --

**THE COURT:**  Who would satisfy standing under these
circumstances?  What's an example, a hypothetical, of somebody
who would satisfy?

**MR. ADKINS:**  I think one who could satisfy standing
is someone who is an expectant parent who -- who could be
consuming fluoridated water, and, and -- that could have
potential effects on the baby she's carrying in utero.  It
could be a potential -- a parent, someone with very young
children.

So the claims -- the harms that the plaintiffs have
alleged in the underlying petition are as a result of fluoride
exposure in utero and at a very young age.  None of the
standing declarants here is pregnant, none is a prospective
parent, and none has very young children.  So they can't have
suffered the harms that were alleged in the underlying
petition.

**THE COURT:**  Well, the petition does make reference to

IQ loss and other neurotoxic effects, particularly among

subpopulations which include infants, young children, elderly,

those with dietary deficiencies, renal impairment, and genetic

predispositions.

So, I mean, if they -- if someone were in one of those

several categories, that would line up with the petition.

MR. ADKINS:  Yes, that's correct, Your Honor.  But

none of the standing declarants here line up with those claims.

THE COURT:  Well, let me ask.  Other than your

disagreement over the zone of interest, and assuming for a

moment that standing would be -- would have to show some kind

of nexus or be tied to a petition, is there somebody in the

plaintiff group that satisfies any of the descriptors here in

the petition?

MR. CONNETT:  Absolutely, Your Honor.

First, on Page 4 of the petition, the petitioners, the

plaintiffs, identified for the EPA that there is research

linking fluoride to neurological symptoms.

And we attached -- to support that statement, Your Honor,

we attached only four papers.  One of the four papers was a

paper specifically investigating the relationship between

fluoride and neurological symptoms, including headaches.

THE COURT:  Where is that referred to?  I'm looking

at Page 4 of the petition.  So --

MR. CONNETT:  So, Page 4 cites, Your Honor, to a --

1    to an appendix.  I believe it's Appendix D.  And in our

2    opposition to EPA's motion, we attached that accompanying

3    appendix, which I believe is Exhibit 40 -- we attached it as

4    Exhibit 46, Your Honor, to our opposition to EPA's motion.

5         And you'll see there that we cite a study by Sharma.

6    2009.  And that study by Sharma, which we have also attached as

7    Exhibit 46, documents -- and I'll read a quote, Your Honor,

8    from the Sharma paper.

9         On Page 129 of the Sharma paper, it says (As read):

10             "The most prevalent neurological manifestation was

11             headache in both children and adults."

12        So we did make -- we did identify for the EPA that

13   fluoride can cause neurological symptoms, including headaches.

14        But --

15             **MR. ADKINS:**  Your Honor, the devil is in the details

16   here.  We can read all the findings we want from the studies.

17   But it's important to look at what was the exposure in the

18   study.

19             **THE COURT:**  No, I understand that there's a merits

20   question.  And we're not going to resolve a merits causation

21   question on a standing stage.  The question is whether somebody

22   is within -- whether it's a zone of interest or whatever

23   terminology you want to use.  And the argument here is that

24   there is a specific tie, although true, admitted through

25   incorporation by reference of an Appendix D which then includes

various things.

But the allegation is that the issue of neurotoxicity and its manifestation via headaches is one of the things that was discussed and raised.  And you've got somebody here, at least one or more plaintiffs, who allege that there's a causal relationship between their headaches and exposure.

MR. ADKINS:  I don't think it prevents a finding that plaintiffs don't have standing here.  I mean, there are -- there's no dispute here that fluoride can have potential neurodevelopmental effects at very high exposures.

And what plaintiffs need to do is to put forth scientific evidence that would support that their headaches are caused by or a result of exposure to --

THE COURT:  I guess that raises the question, how deep do we have to get into the merits just to prove standing? I mean --

MR. ADKINS:  I would think at least one study that could make that finding at least will get them over the hump and get them to trial here.  But they have not put that forward.

MR. CONNETT:  Your Honor, two quick points in response to that.

First, the Ninth Circuit in *Hall v. Norton*, 2001, makes clear that you don't need to establish causation for purposes of standing to the degree that you would need in a tort claim.

Many other circuits have held the same.  Including the *Gaston*
the case, the *en* banc Fourth-Circuit decision from 2000.

That court stated that the defense in that case was
creating evidentiary barriers to standing that the Constitution
does not require.  And you have similar language in a number of
other decisions.

I would point the Court to a Second Circuit case from 2003
titled *New York Public Interest Research Group v. Whitman*.  The
citation is 321 F.3d, and the pin cite is 325 to 326.

In that case, the Second Circuit held that for purposes of
standing, where you have a situation of the plaintiffs being
concerned about the risks posed by chemicals to them, the mere
fact that you have uncertainty in the scientific literature
about what those chemicals could do to their health, that mere
fact, alone, is sufficient --

**THE COURT:**  Yeah, but I've asked you the converse.  I
understand certainty is not required.

On the other hand, pure speculation, pure -- you've got to
have, it seems to me, if you apply *Iqbal* and *Twombly* to this
context -- I don't know if it does, but I could see where it
does -- you've got to have at least a quote plausible claim of
causation.

And here, is there -- to me, that's the question I asked
in the first place.  Is it plausible that the headaches
complained of have -- are related to the claimed hazard in the

1    petition?  I.e., use of fluoride.

2         And the best you can come up with so far is, one, there's

3    a temporal thing, which -- come back to that as well.  The

4    placebo effect, there's all sorts of the things.  It doesn't

5    show much.  I mean, all sorts of people think that there's a

6    causal relationship when in fact, no scientific relationship,

7    in many different arenas.

8         And two, you have doctor notes.  But the doctor notes

9    don't have much analysis, so you have to string it together

10   with Exhibit No. 46.  So whether that's enough, I don't know.

11   Seems to me that's the issue.  That's the issue, is:  How

12   plausible is this claim?

13        Mere uncertainty -- I agree.  Mere uncertainty doesn't

14   vitiate standing.  And we don't also -- I also agree you don't

15   have to resolve and have a trial on the merits just to

16   determine whether there's standing.  That's why an intermediate

17   step such as plausibility is a fair way to assess that.

18        So --

19             **MR. CONNETT:**  Your Honor, in addition to -- we have

20   the study that we've attached to our opposition as Exhibit 46.

21        We also cite on Page 22 of our opposition, in the

22   footnote, we cite to pages from our expert reports which

23   discuss other scientific research linking fluoride to

24   headaches.

25        And I would also note, Your Honor, that we have another

1   plaintiff -- like, to the extent that the Court -- we don't

2   believe that the zone-of-interest analysis that the EPA has

3   made with respect to limiting the injuries to those alleged in

4   the petition, we don't believe that's a sound analysis.

5        But even if it was, we have another plaintiff who comes

6   within the zone of interest identified in the petition.

7            **THE COURT:**  Who is that?

8            **MR. CONNETT:**  That's Christy LaVelle.  Because in the

9   petition, we have identified that the elderly are a susceptible

10  subset of the population.

11       And as Ms. LaVelle points out in her declaration, the --

12  in order to protect yourself from the harms of fluoride

13  exposure during your elderly years, you need to minimize your

14  exposure well before that.  Because fluoride --

15           **THE COURT:**  Where does it say she's elderly?

16           **MR. CONNETT:**  She's not currently elderly,

17  Your Honor, but here's the key point.

18       In order to protect yourself -- as our expert Dr. Thiessen

19  has explained in her expert report which is not rebutted by

20  EPA's experts, fluoride that you ingest during childhood and

21  adulthood accumulates in your bones.  And when, in the post --

22           **THE COURT:**  All right.  So that applies to anyone.

23  Anybody that's going to be elderly, therefore, anyone has

24  standing.

25           **MR. CONNETT:**  There's --

1           **THE COURT:**  There's nothing specific about

2    Ms. LaVelle.

3           **MR. CONNETT:**  Not specific in terms of whether she's

4    at any heightened risk, herself.  But the fact -- as the courts

5    have made clear, the fact that many people in the population

6    stand to suffer the same injury from or at risk of injury does

7    not negate standing.

8        So, yes.  The risk to the elderly comes from lifetime

9    exposure to fluoride.

10          **THE COURT:**  And everybody is expected to become

11   elderly at some point, barring something else.

12          **MR. CONNETT:**  Correct.

13          **THE COURT:**  What's your response to that argument?

14          **MR. ADKINS:**  Well, Your Honor, there's one -- there's

15   one point that I think we ought to make clear, especially

16   because this is a public hearing.

17       The NRC 2006 review did not conclude that consuming

18   fluoridated water leads to an increased risk of dementia.

19   There are no studies that show that.  Just as there are no

20   studies that show that drinking fluoridated water at levels

21   that are relevant here causes headaches.

22       So Ms. LaVelle's standing claim dies completely on that

23   issue.  There's just no scientific evidence supporting her fear

24   that one day she may be at a heightened risk of dementia

25   because she is drinking fluoridated water.  And the rest of the

1    harms that she's suffered are self-sustained.  She's avoided

2    community water fluoridation not because there is good science

3    or, frankly, any science showing that drinking fluoridated

4    water causes dementia.  She is doing it because she has an

5    unsupported fear of doing so.  And that can't support a claim

6    of standing.

7              **MR. CONNETT:**  And you Your Honor, in our opposition

8    to EPA's motion, we attach as Exhibit 34 the study published

9    just this year in the British Journal of Psychiatry, which

10   found a relationship between fluoride in drinking water at low

11   levels, and increased rates of dementia in the elderly.

12        And what you have here, you have in 2006, the National

13   Research Council in a review that the EPA has credited as

14   providing an accurate summary of the hazard of fluoride, the

15   NRC concluded that fluoride causes changes in the brains of

16   animals that parallel the changes seen in humans with dementia.

17        And based on those animal findings, the NRC recommended

18   that studies be done in humans to see if fluoride causes

19   dementia.

20             **THE COURT:**  It recommended studies.  But those

21   studies -- recommending a study is different from making a

22   finding.

23             **MR. CONNETT:**  Correct.  Absolutely.  And we're not

24   saying that the NRC concluded that fluoridation causes

25   dementia.  Nowhere will you see that allegation in any of our

papers or from our experts.  But what the NRC did is it points

to a massive concern.  Fluoride's potential relationship to

dementia.

    And I think it's -- it's more than reasonable for a

health-conscious person like Ms. LaVelle to say:  Jeez, the

National Research Council, this authoritative institution in

our country, has just said and concluded that fluoride may be

related to dementia.

    And Ms. LaVelle, as well as other plaintiffs, make the

reasonable decision:  I'm not going to wait another 20 or 30

years before the studies are done before I start taking

measures to protect myself and my family.

        **THE COURT:**  All right.  Let's move on.  I want to get

to the -- some of the substantive questions.

    The first question when we get to -- as we get into the

merits, is:  What is the proper motive analysis under

Section 21?  And do the sort of standards set forth in

Section 6(b) apply here?

    Now, in my earlier order, I disconnected 6(b) from 21 in

terms of the requirement that all uses or -- you know, need to

be -- for the reasons I stated.

    And whether 6(b) is mandatorily the criteria to be used

here, or just as a matter of sort of common sense to apply that

standard, I guess I would like to know, why shouldn't the

Court, at the very least, use Section 6(b) and the criteria

there?  Which, a lot of it is just sort of common sense,
frankly.

Why not use the criteria there to guide this analysis,
even though it's *de novo* analysis?

**MR. CONNETT:**  Well, there's nothing -- I don't think
there's anything prohibiting the Court from looking to EPA's
guidance on how EPA does risk evaluations.  You know, that can
be, you know, a source of information for the Court to consider
when looking at the weight the Court gives to any particular
expert's testimony.  But EPA's position is that it's required
and a prerequisite for plaintiffs' experts to follow all of the
rules that EPA has set forth for Section 6(b) risk evaluations.

And I think the Court's analysis in its decision on the
motion to dismiss applies equally here, which is that there's
nothing in Section 21 that incorporates the requirements of
Section 6(b).  And in fact, as the Court noted in its decision
on the motion to dismiss, Congress specifically stated that the
2016 amendments were not intended to bring about any
substantive change in Section 21.

But EPA's position here would bring about a profound
change to Section 21, because it would ultimately require
petitioners to EPA to do a systematic review, and require
courts to require systematic review in considering the *de novo*
challenge.  So EPA's position here is at odds with the
Congressional intent.  And so there's nothing requiring, as a

```
 1   prerequisite --

 2              THE COURT:  What comes out of a successful Section 21

 3   petition?  It would be an order to require the administrator to

 4   initiate a proceeding for the issuance of a rule under 6.

 5   Right?

 6              MR. CONNETT:  Correct.

 7              THE COURT:  So there's a logic, it seems to me, to

 8   say:  Well, if the Court's going to look at whether it should

 9   grant that petition to compel the administrator to then do a

10   Rule 6, including a Rule 6(b) analysis, why should the Court

11   impose something dramatically different in substance, and in

12   terms of sort of standards, only to have the administrator,

13   properly acting under Rule 6, end up, for instance, not

14   granting the relief?

15         I don't know what the purpose of that is.  It seems

16   like -- shouldn't they be aligned?

17              MR. CONNETT:  I -- Congress has -- you know, based on

18   the structure of the statute, has clearly delineated the

19   requirements for Section (b) from the requirements for

20   Section 21.  So whatever their reasons -- I mean, Congress

21   clearly wanted a robust mechanism for citizens to ensure that

22   the EPA is not letting bureaucratic lethargy get in the way of

23   active enforcement of the laws.

24         So to require citizens who don't have the resources of,

25   say, EPA's industrial consulting firm Exponent, which does
```

1    systematic reviews for the largest corporations in this country

2    all the time, plaintiff groups don't have the resources of the

3    corporations that fund Exponent.

4        Plaintiff groups -- to require citizen groups to do

5    systematic reviews would be to impose a substantial cost on

6    plaintiff citizen groups.  And you would find that citizen

7    petitions would probably -- would become likely too onerous for

8    citizens to do.

9        But Your Honor, even if -- even if -- and we don't

10   believe -- certainly don't believe the statute requires

11   systematic reviews under Section 21.  But even if it did,

12   Your Honor, it's a moot point here, for several reasons.

13       First, Dr. Thiessen, plaintiffs' risk assessment expert,

14   did a risk assessment in this case pursuant to EPA's guidelines

15   on neurotoxicity risk assessment.  And I'll refer to these in

16   this hearing as just "the guidelines."

17       But EPA's expert, Dr. Tala Henry, who is the Deputy

18   Director of the Office of Pollution Prevention and Toxics,

19   which oversees TSCA risk evaluations, Dr. Henry testified in

20   this case that a risk assessment under the guidelines is,

21   quote, "effectively a systematic review."

22       Now, the -- and the reason, Your Honor, for that is the

23   guidelines provide a number of predefined criteria.  And

24   factors to consider when analyzing the scientific literature.

25   That's exactly what Dr. Thiessen did.  She used --

1      **THE COURT:**  So your position is Dr. Thiessen did

2  comply, even if we were to apply Rule 6(b)(F), that she

3  complied, and that her -- her conclusion, her analysis,

4  satisfies.

5      **MR. CONNETT:**  Right.  And this is according to

6  Dr. Henry, who didn't realize that Dr. Thiessen did a risk

7  assessment under the guidelines.  Dr. Henry didn't realize

8  that.  And I don't believe she was provided that information.

9  But Dr. Henry stated that yes, an analysis -- a risk assessment

10  under the guidelines is effectively a systematic review.

11      So plaintiffs do not allege that Dr. Thiessen's review is

12  a formal systematic review.  But it's effectively a systematic

13  review, according to EPA's own expert.

14      **THE COURT:**  All right.

15      So let me find out from the EPA, what is deficient about

16  Dr. Thiessen's -- even assuming we apply the 6(b) kind of

17  criteria, weight of the scientific evidence, et cetera, what's

18  deficient about it?

19      **MR. ADKINS:**  Okay.  And I'd like to come back and

20  address a couple of points that counsel raised, but I'll answer

21  the Court's question first.

22      Dr. Thiessen did not conduct a systematic review as

23  required by TSCA.  Science-based decisions under TSCA must be

24  based on weight of the scientific evidence.  That's a term of

25  art under the statute that Congress defined to mean systematic

review.

Dr. Thiessen admittedly did not conduct a systematic review.  When she was asked why she didn't conduct a systematic review at her deposition, she testified that it would be too expensive.  That does not excuse plaintiffs for trying to convince the Court to set nationwide policy.

It's interesting to hear counsel now say that it's okay for the Court to consider EPA guidance, yet nowhere in their briefing or their expert reports have they tried to rely on the guidance that EPA's issued after TSCA's amendments.  And that guidance is specifically addressed to interested persons in submitting draft risk evaluations.

But they did not follow it.  The Court's prior order --

THE COURT:  Tell me about what -- systematic review, what is the guidance, what are the guidelines?  What is it supposed to have that's not in Dr. Thiessen's --

MR. ADKINS:  Right.  Systematic review requires a documented process for identifying relevant evidence, and analyzing each line of evidence, taking into consideration the strength of the evidence, the weaknesses, gaps in the evidence. Dr. Thiessen did not do any of that.

When counsel states that Dr. Tala Henry, EPA's risk-assessment expert, said that Dr. Thiessen did, in effect, a systematic review, that's completely misconstruing Dr. Tala Henry's testimony.  She did not review Dr. Thiessen's work, I

1    believe, at that point.  And Dr. Thiessen had already admitted

2    that she had not done a systematic review.  She has not

3    followed typical required elements of a risk assessment.

4        So even to say that Dr. Thiessen conducted a risk

5    assessment and therefore she did a systematic review is false.

6    Dr. Thiessen did not do an exposure assessment.

7        Plaintiffs admit that a risk assessment is required to

8    make a determination of risk here.  And a well-accepted step in

9    any risk determination under modern principles, or even under

10   the 1998 guidelines that plaintiffs rely on, requires an

11   exposure assessment.  Plaintiffs have not done that.

12       **THE COURT:**  And what would that look like?

13       **MR. ADKINS:**  An exposure assessment considers the

14   nature of the chemical, and the frequency and extent of the

15   exposures in the relevant population.

16       **THE COURT:**  And that's where the .7 would come into

17   play because that's the limit in the United States?

18       **MR. ADKINS:**  That's in part correct.  The .7 comes

19   into play -- the condition of use is typically set at the

20   scoping step of a risk assessment.  After the scoping step, one

21   conducts a hazard assessment, and then an exposure assessment.

22       That all comes together in a risk characterization where

23   the professional exercises professional judgment, and

24   integrates the exposures and the hazards for an ultimate risk

25   characterization.

1          That used to be where the process stopped.  But under the

2    TSCA amendments, Congress required that EPA take an additional

3    step of making a risk determination.  But because Dr. Thiessen

4    hasn't done an exposure assessment, she's missing a critical

5    element, and she can't even have done the risk characterization

6    which requires a exposure assessment.

7          Now, you'll hear from plaintiffs' counsel that

8    Dr. Thiessen relied on data for an exposure assessment instead

9    of doing her own.  And the data that she relied on was the NRC

10   2006 review.  That's over a decade old.  And she has done no

11   analysis to determine whether that data is still relevant for

12   the population today.  And that's critical here.

13         We're setting nationwide policy, and plaintiffs are

14   skipping critical steps of a risk determination and trying to

15   cut to the end step.  And that's not what TSCA requires, and

16   it's not what Congress meant.

17            **THE COURT:**  Is there anything deficient about the NRC

18   review data, other than the fact that it's a decade old?

19            **MR. ADKINS:**  There isn't evidence in the record to be

20   able to answer that question, because plaintiffs have not done

21   a systematic review or attempted to determine whether that data

22   is the best available science.  That's another requirement in

23   TSCA's scientific standards.  It's a term of art that Congress

24   used in the statute, and plaintiffs have wholly ignored here.

25            **MR. CONNETT:**  Your Honor, that's just factually


1    incorrect.  If you look at Dr. Thiessen's declaration in this

2    case -- and she cites to the pages in her expert report to

3    document this -- she did an exposure assessment.

4        And yes, she did rely in part on the NRC report.  But she

5    didn't just rely on the NRC.  She relied on intake information

6    from the Centers for Disease Control, as well as a number of

7    published studies that have come subsequent- --

8            **THE COURT:**  Where would I find the exposures -- I'm

9    looking at her report, her assessment of neurotoxicity of

10   fluoride.  Where would I see that?

11           **MR. CONNETT:**  Let me just get out the declaration

12   here.

13       I'm looking here at Exhibit 3 of plaintiffs' motion, which

14   is Dr. Thiessen's declaration.  We also attached it, I believe,

15   as an exhibit to our opposition.  But --

16           **THE COURT:**  Yeah, I have her report.

17           **MR. CONNETT:**  Okay.  So if you -- on Page 8 -- sorry.

18   On Paragraph 8, the bottom of Page 3 of her declaration, she

19   states that (As read):

20               "I also conducted an exposure assessment to assess

21               the extent of exposure to fluoridated water."

22       Then she cites pages from her report.

23       Now, her focus here primarily was on infants.  Because

24   infants -- and there's no dispute about this.  I mean, I think

25   EPA is trying to make this -- kind of create factual disputes

1   where they don't exist.

2       EPA's own 30(b)(C) (sic) representative admitted, under

3   oath, in this case that fluoridation chemicals, quote

4   "dramatically increase exposure to bottle-fed infants."

5       EPA has, itself, published data showing that bottle-fed

6   infants that receive fluoridated water have approximately 100

7   times more fluoride exposure than breast-fed babies.

8       So there's no new study that could be published that would

9   change that assessment.  It's -- you -- you're putting a

10  chemical --

11          THE COURT:  That's a comparison.  But shouldn't there

12  be some quantification?

13          MR. CONNETT:  Yes.  And she does --

14          THE COURT:  Comparison of breastfed versus

15  bottle-fed.

16          MR. CONNETT:  EPA has published that data.  And

17  Dr. Thiessen, on Pages 40 to 43 of her report, goes through the

18  published data, and specifically provides exposure estimates

19  for bottle-fed infants.

20      On Page 40 to 43 -- it's Exhibit A to her declaration.

21          THE COURT:  I'm looking at it.

22          MR. CONNETT:  It's a detailed assessment of infant

23  exposure.  And it's not in dispute by EPA's own 30(b)(6)

24  representative.

25          THE COURT:  What is the EPA's response?

1          **MR. ADKINS:**  It's not a complete exposure assessment,

2    Your Honor.  It's not -- the data, frankly, are not available

3    at this time in the United States to make the sorts of

4    comparisons that Dr. Thiessen is trying to do here.

5          And there's no analysis that the data that Dr. Thiessen is

6    relying on is -- is intended -- is being used for its intended

7    use, which is a requirement of best available science under

8    Section 26 of TSCA.

9          The scientific standards --

10         **THE COURT:**  Let me ask you, maybe we need to revisit

11   this question of 6(b).

12         I mean, if the outcome of a Rule 21 or Section 21 petition

13   is not an order ordering a substantive, you know, rule, but

14   it's an ordering -- it's a procedural order to the

15   administrator to initiate a rule proceeding, and then do the

16   6(b) analysis, and it's kind of a gateway, it seems to me.

17         And to say that, well, you have to, what, undertake your

18   own complete -- hire scientists and a research team to do an

19   exposure analysis and to do the whole nine yards to get an

20   order to require the administrator to do the work, that does

21   seem like it imposes -- it could impose an insuperable barrier

22   to get any kind of relief.

23         I mean, when could anybody ever, you know, get relief?

24         **MR. ADKINS:**  I don't disagree that it's an imposing

25   requirement, but we're talking about setting nationwide policy.

1      And Your Honor hit the nail on the head earlier --

2          **THE COURT:**  Well, but it's not setting policy; it's

3   asking the administrator to set the policy.

4          **MR. ADKINS:**  Right.

5          **THE COURT:**  The administrator could still come out

6   and say: I've done the 6(b) thing, and there's not enough here,

7   and there's not enough of a -- there's no unreasonable, you

8   know, threat.  And, end of it.

9          **MR. ADKINS:**  Your Honor's recognized that Section 21

10  is one of three pathways to a Section 6(a) regulation.  The

11  Court's consideration of risk here must be guided by the

12  process criteria and standards that Congress required in

13  determining whether regulation is warranted under Section 6(a).

14      Plaintiffs would have the Court make a determination here

15  that's completely divorced from TSCA's scientific standards.

16  That can't be the case, because it would have adverse effects.

17      For example, if the Court were to order, as you've stated,

18  if you were to order EPA to initiate a rulemaking proceeding

19  under Section 6(a) based on evidence that does not satisfy

20  TSCA's scientific standards, EPA would then be in the position

21  of having to make scientific judgments that aren't based on

22  best available science or weight of the scientific evidence.

23  And those judgments would be difficult to --

24          **THE COURT:**  Well, let me ask you, what you just said.

25  Why is that?

1          I mean, if all the Court can order at the end under

2     Section 21 is for the administrator to initiate a rule

3     proceeding, that doesn't dictate the substantive outcome of

4     that.

5          **MR. ADKINS:**  That's correct.  Under Section 6(a), EPA

6     must regulate the risk that the Court determined.  And because

7     -- because EPA must do that, EPA must be making decisions about

8     how to manage that risk which do have to satisfy Section 26,

9     which do have to satisfy the other scientific --

10         **THE COURT:**  So the risk will have been binding --

11    established in a binding manner upon the administrator, once

12    you go through a Rule 21, and the petitioner prevails?

13         **MR. ADKINS:**  Well, I want to make sure I'm clear.

14         If the Court were to make an unreasonable risk

15    determination here --

16         **THE COURT:**  Yeah.

17         **MR. ADKINS:**  -- the Court could ord- -- or would

18    order EPA to initiate a rulemaking proceeding.  As you've said,

19    the Court would not be dictating what the result of that

20    proceeding is.  But EPA would have a responsibility under

21    Section 6(a) to manage the risk that the Court identified

22    through a rulemaking process.

23         And in doing so, EPA will have to make scientific

24    judgments that must satisfy TSCA's scientific standards, and

25    will look back at the risk determination that the Court made.

1       If that risk determination is completely divorced from the

2  statutory requirements, as plaintiffs would have the Court do

3  here, EPA cannot make scientific judgments that are based on

4  best available science and weight of the scientific evidence.

5       THE COURT:  Why is that?  Why -- why would -- why

6  would the administrator and the EPA be barred or handcuffed

7  from making the kind of full scientific analysis that is

8  contemplated here?

9       MR. ADKINS:  The Court, in a sense, steps into the

10  shoes of the EPA in Section 6(b) when it's acting under

11  Section 21.  And EPA will have to consider the risks that the

12  Court identified in that -- in the risk determination.

13       THE COURT:  That risk is given.  The unreasonable

14  risk is given at that point.

15       MR. ADKINS:  That's right.  And the Court can order

16  EPA to regulate.  But the Court wouldn't be ordering EPA to,

17  for example, conduct a risk evaluation, and try to determine

18  what the best available science is.  That would be putting the

19  cart before the horse.

20       THE COURT:  The cart before the horse?  Or it's

21  already been done?

22       MR. ADKINS:  Well, presumably, the Court would have

23  had to consider the evidence that plaintiffs put forward in

24  light of TSCA's scientific requirements.  And then, based on

25  that evidence, make a finding or not of unreasonable risk.

1          **THE COURT:**  If the Court were to find unreasonable

2    risk, pursuant to Section 21, whatever the standard is, whether

3    it uses the full panoply of requirements under Rule 6(b) or

4    not, what is left for the administrator to do at that point?

5          **MR. ADKINS:**  The administrator under Section 6(a)

6    would have to manage the risk that the Court identified, using

7    TSCA scientific standards.

8          **THE COURT:**  And in managing that risk, could the

9    administrator reach a different conclusion, that there is not

10   an unreasonable risk?  Or that's a given at that point?

11         **MR. ADKINS:**  That would be a given at that point, but

12   the administrator would have discretion in how to manage the

13   risk.

14         **THE COURT:**  Okay.

15         **MR. ADKINS:**  Now, the Court had made mention of its

16   prior order.  I do want to be clear here that we're not asking

17   the Court to go against or in any way overturn that order.  I

18   think what the Court determined in that prior order was not to

19   import concepts from Section 6(b) into the Section 21 petition

20   process.

21       What EPA's offered here is a construction of Section 21

22   that brings harmony to the overall statutory scheme.

23         **THE COURT:**  I understand.  So it's not literally

24   incorporated by reference, but it can be looked to as guidance,

25   and as a policy, would make sense to apply those standards, is

1   what you mean.

2        **MR. ADKINS:**  And I think the Court has an obligation

3   to, because there are nearly verbatim terminology used in

4   Section 21 and the risk evaluation standard in Section 6(b).

5   And so the Court should interpret identical terminology in the

6   statute consistently.

7        **MR. CONNETT:**  Your Honor, if I could.

8      I agree with counsel that the Court steps into the shoes

9   of the EPA for purposes of a risk evaluation.  And -- or for

10  purposes of determining whether a risk exists.

11     And one very important point here is even if the Court

12  were to hold -- I don't believe the statute supports it -- if

13  the Court was to hold that there needs to be a systematic

14  review consistent with Rule Section -- Section 6(b), the Court

15  has that in this case, Your Honor.

16       **THE COURT:**  Has what?

17       **MR. CONNETT:**  The Court will have that systematic

18  review here at trial, in several ways.

19     First, as we've already discussed, Dr. Tala Henry admitted

20  that a risk assessment according to the guidelines is

21  effectively a systematic review.

22     But even if the Court was not to credit that, EPA's

23  experts on safety in this case, the two scientists from

24  Exponent, did systematic reviews.  One did a systematic review

25  of the human epidemiological literature.  The other did a

1  systematic review of the animal literature.  And Your Honor,

2  both experts conceded at their depositions that they did not

3  identify a single material study that would challenge the

4  opinions of plaintiffs' experts.

5      So the Court will have systematic reviews at its disposal.

6  And EPA's experts from Exponent, they are experts in finding

7  any possible uncertainty on any chemical causing any effect.

8  So the Court will be presented with a litany of uncertainties

9  in the data.  So the Court will have before it the very type of

10 systematic review that EPA claims is necessary.

11     And most importantly, EPA's experts, after doing these

12 systematic reviews, conceded that they didn't identify any

13 studies that contradict plaintiffs' experts' opinions.

14         THE COURT:  Where would I find the EPA expert?  What

15 tabs?

16         MR. CONNETT:  First would be Exhibit 27 of

17 plaintiffs' motion.  And that would be Dr. Ellen Chang, who is

18 EPA's epidemiologist.

19     And I believe it's on -- let me get the pages here --

20         THE COURT:  That's the deposition?

21         MR. CONNETT:  That's a deposition, Your Honor.  I

22 just need to --

23         THE COURT:  While he's looking for that, what's your

24 response to citing the EPA's experts to show that a systematic

25 review is done?

1          **MR. ADKINS:**  Thank you, Your Honor.  It does not save

2     plaintiffs' claim.

3          First, with respect to Dr. Thiessen's effective systematic

4     review, as I've said before, Dr. Tala Henry's testimony does

5     not support that somehow what Dr. Thiessen did is magically a

6     systematic review because she was following the risk assessment

7     principles of the statute.  Those are entirely different

8     concepts.

9          I think if the Court looks at our brief, looks at the

10    definition that Congress gave to weight of the scientific

11    evidence, it is clear that what Dr. Thiessen did is not a

12    systematic review.  And that there's no way doing a risk

13    assessment, if she even did one, can be a stand-in for

14    systematic review.

15         Second, EPA's experts' systematic reviews do not save

16    plaintiffs' claim here.  First, systematic review is not just

17    the tallying of studies, as plaintiffs would have the Court

18    believe.  It requires an integration of all lines of evidence,

19    consideration of the limitations and the methodologies.  And

20    the conclusions of that evidence.

21         And while EPA's experts did that, I doubt that plaintiffs

22    would like to rely on EPA's experts' conclusion, which is there

23    isn't -- EPA's risk assessment experts' conclusion, which is

24    the only opinion in evidence that has looked at EPA's

25    systematic reviews.

1          And that expert opinion is that based on the systematic

2     reviews, there isn't sufficient evidence to integrate exposures

3     and hazards for a risk characterization, which is required

4     under TSCA.

5          So even if plaintiffs were somehow able to flip the burden

6     here and rely on EPA's experts' systematic reviews, if they do,

7     judgment must be granted in favor of EPA.

8          MR. CONNETT:  Your Honor, I would start here by

9     noting that Dr. Grandjean, who is an NIH-funded epidemiologist

10    at Harvard School of Public Health and an expert in the field

11    of developmental neurotoxicity, he reviewed -- in his

12    supplemental and rebuttal report, he reviewed and considered

13    the systematic reviews that EPA's experts did.  And he goes --

14    and his conclusion is:  These support, further support my

15    findings.

16         In fact, as Dr. Grandjean notes -- and this is Exhibit 16,

17    Your Honor, to plaintiffs' motion -- Dr. Grandjean notes that

18    most of the studies that Dr. Chang -- the epidemiologist --

19    found that he did not specifically discuss, further confirm

20    that fluoride causes IQ loss in children.

21         So basically, you have a situation here where their

22    epidem- --

23         THE COURT:  At what levels, though?  At what levels

24    of exposure?

25         MR. CONNETT:  At levels that -- looking at 1.5 parts

1   per million to 2 1/2 half parts per million, in that realm --

2       **THE COURT:**  Isn't that one of the problems?  That --

3   that proof or evidence of the fact that higher levels of

4   exposure may not really be on point here, given the .7 --

5       **MR. CONNETT:**  Well, first, as EPA always -- I mean,

6   we have documents in the record here, Your Honor, where EPA

7   admits and states that they consistently, frequently, rely on

8   higher-dose studies to extrapolate and assess risk to the

9   general population.  It's standard fare for EPA risk

10  assessment.

11      And second, Your Honor, we have here --

12      **THE COURT:**  Well, what indication is there that one

13  can extrapolate almost on a linear basis?

14      **MR. CONNETT:**  Here's the best example, Your Honor.

15      In light of all these studies that we have coming out of

16  China, particularly, and other countries that have elevated

17  levels of fluoride in their water, generally over 1.5 parts per

18  million, the National Institutes of Health has now funded four

19  -- well, funded two different prospective cohort studies on

20  fluoride -- prenatal fluoride exposure and IQ in children.

21  These studies have been conducted in Mexico City and in Canada.

22      And there's been four papers now completed and published

23  on those two prospective cohort studies.  And each and every

24  one of these NIH-funded studies has found that low-level

25  fluoride exposure during pregnancy or early infancy is

1    associated with reduced IQ --

2              THE COURT:  What is the level?  What is the level in

3    Canada?

4              MR. CONNETT:  In Canada, .6 ppm was the average level

5    in the fluoridated community, .6 ppm, which is actually less

6    than the level that's added to water in the United States which

7    is .7 ppm.

8              THE COURT:  What about in Mexico?

9              MR. CONNETT:  In Mexico City, Your Honor, they use a

10   salt fluoridation program which is designed to replicate the

11   exposures produced by weather fluoridation.  And importantly,

12   Your Honor, the urinary fluoride levels in the pregnant women

13   in the Mexico City cohort are essentially the same as the

14   urinary fluoride levels in the pregnant women in the Canadian

15   cohort.

16        So the authors of these studies, Your Honor, who have

17   agreed to appear as experts in this case, have reached the

18   opinion that the evidence supports fluoride causing neurotoxic

19   effects at the levels added to water in the United States.

20        And counsel has noted in its papers that:  Well, we don't

21   entirely know what the urinary fluoride levels are in pregnant

22   women in fluoridated areas in the United States.  Well, first

23   off, it's a very reasonable and straightforward assumption that

24   if we're adding so-called optimal levels of fluoride to water

25   in the U.S., that we're going to get essentially the same

1    levels that you get in optimally-fluoridated areas in Canada.

2         But more than that, we now have a study here in

3    California, published by authors at the University of

4    California, San Francisco, which took a cohort of pregnant

5    women here in northern California and found that the urinary

6    fluoride levels in the pregnant women here in California are

7    slightly higher than but essentially the same as the levels in

8    the Canadian cohort.

9         Now, Your Honor --

10        **THE COURT:**  Where is that study?

11        **MR. CONNETT:**  That study is cited as Exhibit 29 --

12   it's attached as Exhibit 29 to plaintiffs' opposition brief.

13        And Your Honor, there's really a fundamental point that

14   EPA's arguments obfuscate, which is that there is no dispute in

15   this case, none, by any of their experts -- and certainly,

16   plaintiffs' experts agree -- that the best studies by far, no

17   question about it, the best studies ever conducted on fluoride

18   and neuro-developmental outcomes are the NIH-funded prospective

19   cohort studies.

20        EPA's scientist who runs the risk assessment division,

21   Kristina Thayer, said that the prospective cohort studies are

22   the ideal study design.  Dr. Chang, the epidemiologist for EPA

23   in this case, testified that the NIH-funded studies are the

24   best studies ever done on fluoride and neurotoxicity.  And

25   Your Honor, every single one of the NIH-funded studies has

 1   found adverse effects from low-level fluoride exposure.

 2           **THE COURT:**  Let me ask the EPA, then.

 3       So the main complaint or flaw with those studies has to do

 4   with the non-establishment of like urinary levels in the United

 5   States, if you can't extrapolate conditions in Canada or Mexico

 6   to the United States.

 7       Is that --

 8           **MR. ADKINS:**  That is -- that is one of the issues

 9   here.  But there's a lot to unpack here.

10       Counsel seems to admit that EPA's systematic reviews have

11   identified studies that their experts did not consider.  That

12   is why systematic review is required.  It's why Congress

13   required weight of the scientific evidence.

14       When setting -- when making a determination that has the

15   potential to set nationwide policy, TSCA requires consideration

16   of all the evidence.  Because plaintiffs have not done a

17   systematic review, they've now admitted that they've missed

18   some studies that EPA's experts identified.  And there could

19   even be other studies out there that no one's identified yet.

20   But because they haven't done the work, they can't -- they have

21   not met their burden.

22       Now, TSCA's requirements require consideration of a

23   chemical's risk under the conditions of use.  And that's a very

24   important term of art that's used in the statute.  And it's

25   reason why all of the examples that counsel points to of where

1  EPA has extrapolated hazards from very high exposures doesn't

2  work for TSCA, under the amended --

3          THE COURT:  The cohort studies, the NIH studies are

4  not -- they are similar by implication as a result of the UCSF

5  study and the levels that are used in Canada, and therefore,

6  not far-fetched.

7          MR. ADKINS:  There is a large body of evidence out

8  there that EPA does not dispute shows fluoride has potential

9  hazard at very high doses.  Recently, very recently, there have

10 been a few studies conducted in western populations that are

11 more akin to the exposures that we have seen here.

12         THE COURT:  Including the Canada cohorts.

13         MR. ADKINS:  Including the Canada study, and a study

14 of a Mexico City birth cohort.  Even within those studies,

15 there are variations in the conclusions.

16     For example, in the Canada study, the authors identified

17 effects in one sex, but not the other.  That hasn't been

18 explained yet.  It wasn't seen in the Mexico City birth cohort

19 study.  So we can't just assume that there's a risk, based on

20 two studies that don't even align in their results.  And that's

21 why TSCA requires consideration of the weight of the scientific

22 evidence.

23     Now, even if the Court were to -- well, I should say, the

24 Court doesn't need to look into the details here, because

25 plaintiffs have made a series of assumptions that those studies

are even generalizable to the United States.  Because they

haven't supported those assumptions, EPA is entitled to a

judgment as a matter of law.

So for example, plaintiffs have tried to compare the

Mexico City birth cohort study to Canada.  And from there,

they've tried to assume that because Canadians are genetically

similar to Americans, that somehow the Mexico City birth cohort

study is immediately comparable to the United States.  That is

not supported by any scientific evidence.  And just from

looking at the studies as a layperson, it can't be right.

The source of exposure in Mexico City, the primary source

of exposure for fluoride, is through fluoridated salt.  In the

United States, it's through community water fluoridation.  In

Canada, it's also mostly from community water fluoridation.

So just merely assuming that these studies can just

compare across various populations, without doing the work,

without doing the scientific analysis is a problem.

**THE COURT:**  Well, the urinary levels in the Mexico

City study were similar to that in Canada.  Even though the

exposure may be different, the source may be different, sort of

the end game is comparable.

And therefore, there's -- and then you have, I don't know,

this Exhibit 29 with the UCSF study.

**MR. ADKINS:**  I'll address that one, too.

It's not necessarily comparable.  You're correct that the

exposure levels in urine are considered a biomarker of total

exposure to fluoride.

     But as plaintiffs experts admitted at depositions -- and

this is in our briefing -- they haven't identified or

considered studies that show the source of exposure -- where

the source of exposure is different, you can have the same

biomarker exposure.

     And so it's actually an additional assumption that we

would be making that because someone's total exposure from

their biomarker is similar across populations, that they had

the same source of exposure.  But that -- that can't be right.

     Now, with respect to the California study, first, counsel

has represented this as a published study.  I'm not aware that

this study has been published anywhere.  In the exhibit that

counsel presented, the authors aren't even listed in this

study.

     Now, we know who the authors are, because counsel has

provided a copy of this before.  So I don't want to state that

we are without that information.  But I'm not aware of it being

published.

     Nor has Dr. Grandjean relied on this study, in any way.

If you look at his expert report, which, by the way, is

inadmissible hearsay, the report states that he is, quote,

(Indicating quotation marks) aware of a California study.  He

has not done any -- he has not shown any work that he's done an

1  analysis that the biomarker levels identified in that study are
2  similar or comparable to Canada.

3      And even if they were, he hasn't done any analysis of
4  whether the populations that were actually tested in California
5  are similar to the populations that were tested in Canada.

6      And plaintiffs' experts admit that there are things about
7  us as humans that can affect the amount of fluoride that is
8  represented in our urine.  Things like our metabolism is a key
9  one.  Someone's metabolism can critically affect the amount of
10 fluoride that is present in their urine.

11     And without doing the kind of analysis across those study
12 populations, plaintiffs' -- the basis for their conclusion
13 simply falls apart.

14     MR. CONNETT:  Your Honor, the underlying principle of
15 every argument that counsel has made with respect to the
16 uncertainties involved and extrapolating for the Mexico City
17 cohort, the Canadian cohort, to the United States, it is
18 exactly consistent with the approach that they have taken in
19 this case, their experts included, which is that you need
20 factual certainty.  You need to cross -- you need to eliminate
21 every potential --

22     THE COURT:  Well, that's one take.  The other take is
23 that's why you need the systematic review, even if you don't
24 have the -- the factual certainty, which nobody can ever obtain
25 in this field.

1          But if you have a proper systematic review, you would take

2     into account, for instance, the strength and the probative

3     value of the study, based on what some of the -- you know,

4     potential confounding factors and other things, and you take it

5     into account.  It's not that you give it no weight, but it may

6     affect the weight that you give it.  And if you do it in a

7     coherent, systematic way, then you can look at it rationally.

8          I mean, I think that's their argument.  Not that you --

9     you can't tolerate uncertainty, but you have to treat this in a

10    way that is systematic, and view each stream of evidence and

11    weigh it according to its weaknesses and its strengths.

12          **MR. CONNETT:**  Right.  And this goes back to the

13    purpose of systematic review, as Your Honor has noted, is to

14    make sure you're not missing something important.  We want to

15    make sure we have all of the evidence in front of you so you

16    can assess it.

17          **THE COURT:**  And you give proper weight or unweight to

18    each piece of evidence.

19          **MR. CONNETT:**  Right.  And one thing that's not in

20    dispute -- not in dispute, their experts admit it -- is that

21    those NIH-funded studies are the best available science today.

22          **THE COURT:**  Well, they may be the best available, but

23    are they good enough?

24          **MR. CONNETT:**  Well, here's where we have --

25          **MR. ADKINS:**  "Best available science" is a term of

1    art under this statute, so we shouldn't just throw that around.

2    It requires objective scientific studies.  It requires

3    consideration of whether the data that's being presented is

4    reasonably being used for its intended purpose.  And it

5    requires an analysis of the limitations of that data that was

6    used in that study.

7            MR. CONNETT:  And Doctor --

8            MR. ADKINS:  It's not just what the --

9            THE COURT:  Let him finish.  Actually, you

10   interrupted him.

11           MR. ADKINS:  Excuse me.

12           MR. CONNETT:  So Dr. Grandjean -- there's no dispute,

13   first off, that the NIH studies are the best studies available.

14   And their experts went and looked for all of the literature to

15   find all the studies on this.  So they did it; they looked for

16   the full universe of available studies.  And their experts have

17   confirmed that there is no study out there that's going to

18   change the results of what the plaintiffs' experts identified.

19           So we're not in a situation where there's some big unknown

20   out there, there's some missing -- potential missing study that

21   could change the results here.

22           It's undisputed that the best available studies ever done

23   on this issue have found harm from low-level fluoride exposure

24   and -- from prenatal and early infancy, and reduced IQ.

25           It's undisputed that the vast majority of cross-sectional

1    studies done in China and other countries have found

2    relationships between elevated fluoride exposure and reduced

3    IQ.

4        The national toxicology program, as the plaintiffs point

5    out in our briefs, concluded that the evidence shows a strong

6    suggestion of fluoride reducing IQ at --

7            **THE COURT:**  But the only studies that seem to exist

8    right now with comparable levels of exposure are the NIH

9    studies.   The China studies, it's higher.   It's at least double

10   the exposure.

11           **MR. CONNETT:**  They are higher, Your Honor.   But there

12   is first -- the margin, as plaintiffs' expert Dr. Thiessen who

13   was a co-author of the NRC reviews and has written reviews on

14   fluoride for EPA, as she has testified in this case, a margin

15   of 2 and .7 ppm is a very narrow margin.   When you're dealing

16   with an effect -- an adverse effect level, 2 ppm ad- -- or 1.5

17   ppm adverse effect level, and .7 as the level that you are

18   intentionally adding to water is a precariously slender margin.

19   Particularly when you're dealing with a concentration of

20   fluoride in the water.

21       There are people who drink much more water than other

22   people.   So some people drinking .7 ppm fluoride in the water

23   here in the U.S. will consume as much fluoride as a Chinese

24   child drinking fluoride at 1.5 ppm.   The key issue is dose.

25       And you have such a slender margin here, Your Honor, from

1   the Chinese studies in terms of the levels that have been

2   associated with harm and the levels that American children are

3   receiving here.

4         And again, this is a -- as EPA's experts -- Dr. Tala Henry

5   in her declaration has conceded to, this is -- when you're

6   doing a risk evaluation under TSCA, Your Honor, you need to do

7   risk assessment.  Risk assessment.  This is a case about risk.

8         And none of the EPA's experts have done risk assessments.

9   They've avoided that, completely.  You will not hear a single

10   expert from EPA get on that stand (Indicating) in this case,

11   and say:  There's no risk of neurotoxicity at .7 ppm.  Not a

12   single expert has provided that opinion.  They did not do a

13   risk assessment.

14        Instead, they did narrow causal analyses where they sought

15   to determine whether there's sufficient conclusive evidence

16   that .7 ppm causes neurotoxicity.  But that is not a risk

17   assessment.  That is not how EPA assesses risks for any other

18   chemicals.

19        And that's evident by the fact, Your Honor, as we point

20   out in our briefs, the way that EPA assesses risk in the real

21   world -- not in the courtroom, in the real world -- they assess

22   risk through a -- through a method called the margin of

23   exposure.  Margin of exposure.  That's how EPA assesses risks

24   in the real world.  Not in the courtroom.

25        And in the real world, Your Honor, they -- they will

1    determine that there's a unacceptable risk (Indicating

2    quotation marks) if you have adverse effects in animals, let's

3    just say at -- I'll give an example.  Sodium fluoride

4    pesticides.

5        If the animals had -- found -- had adverse effects at,

6    say, 300 milligrams per day of fluoride, and if humans had

7    exposure at 10 milligrams of fluoride, EPA considered that

8    unacceptable -- that's a risk.

9        EPA does a margin of exposure analysis where you look --

10           **THE COURT:**  But I assume that depends on a lot of

11   factors.  I mean, it's not automatically a formula,

12   mathematical formula, like that.  It depends on -- I would

13   assume it turns on the severity of the risk, and then a few

14   other factors.

15           **MR. CONNETT:**  Correct.  Correct.

16           **THE COURT:**  You know, sometimes the margin is -- is

17   acceptable; sometimes it's not.  I mean --

18           **MR. CONNETT:**  That's correct, Your Honor.  And EPA

19   does, after they do the margin of exposure analysis under TSCA,

20   they will consider other factors, like reversibility, severity

21   of the effect.

22        But none of their experts have made any attempt to show

23   that the risk assessment procedures that EPA uses in the real

24   world, what conclusion you can draw when you apply it to the

25   data on fluoride.  They completely ignored that.  They have not

1    done that.  They've -- they bypassed how EPA assesses risks in

2    the real world.

3        By contrast, plaintiffs' experts used EPA's risk

4    assessment procedures.  And every plaintiff expert,

5    Dr. Thiessen and Dr. Grandjean, who did so, found risks using

6    EPA's risk assessment procedures.

7        Again, you're not going to have any EPA expert get up on

8    that stand (Indicating) and say:  There's no risk from

9    fluoridated water.  Instead, they're going to say:  There's not

10   conclusive evidence that fluoridated water --

11            **THE COURT:**  It's got to be an unreasonable risk.

12            **MR. CONNETT:**  Unreasonable risk, correct.  And

13   plaintiffs' experts have done the necessary steps, provided the

14   necessary evidence, to reach that conclusion.  And their risk

15   assessment analyses, Your Honor, are not rebutted in this case.

16   No expert rebutted plaintiffs' experts.

17       The margin of exposure analysis, unrebutted.

18   Dr. Grandjean's benchmark dose analysis, unrebutted.  They

19   didn't even attempt to rebut it.  No attempt, whatsoever.  They

20   bypassed completely a risk assessment procedure.

21       And again, Your Honor, if you look at Tala Henry's

22   declaration that EPA attached to its motion, if you look at

23   that declaration, Your Honor, Paragraphs 13, 15, 17, and 19 all

24   make clear that you need to do a risk assessment if you are to

25   assess risk under TSCA.  To make a risk determination.  You

1  need to do a risk assessment.  But they didn't do it.  They

2  completely ignored it.

3          **THE COURT:**  Well, but the burden is on the

4  petitioner.

5          **MR. CONNETT:**  It is on the petitioner, but they never

6  rebutted our evidence on risk.  Our evidence on risk is

7  unrebutted.

8          **THE COURT:**  All right.  I'll let you respond, and

9  give you the last word, because we're going to --

10          **MR. ADKINS:**  Thank you, Your Honor.  So, let me try

11  to unpack some of this.

12      The first point here is counsel's now making several

13  statements about the nature of exposure in the United States.

14  Yet, he has not put forward and plaintiffs have not put forward

15  any evidence of an exposure assessment.  So those statements

16  are unsupported here.

17      Risk assessment is a requirement under the statute --

18          **THE COURT:**  I thought he just said that his experts

19  did an exposure assessment.

20          **MR. ADKINS:**  He's made statements about how people

21  drink fluoride.  Some people drink more, some people drink less

22  water.  None of that is supported by evidence in the record,

23  Your Honor.

24      Risk assessment is a requirement under TSCA.  It's not

25  EPA's burden to conduct a risk assessment.  It was plaintiffs'

burden to do that.  And they have not put forward an exposure

assessment or risk characterization that satisfies either TSCA

scientific standards or modern well-accepted scientific

methodologies for risk assessment, so they simply have not

satisfied their burden.

EPA has not necessarily contradicted plaintiffs' ultimate

statements about risk, because EPA has not tried to make a

pre-determined conclusion here, and simply rebut their experts

opinions for the sake of rebutting them.

You will hear testimony, if this case goes to trial, that

is similar to EPA's reasoning for denying the petition.  There

is not sufficient evidence to integrate hazards and exposures

for a risk characterization under TSCA.

It doesn't matter how people evaluate risk in the real

world.  EPA here is bound by the statutory terms of the Act.

And it has not identified sufficient evidence that meet the

obligations of the Act.

With respect to Dr. Grandjean's BMD, I'll be very quick

because this was mentioned briefly.  Dr. Grandjean's BMD does

not satisfy TSCA's scientific standards.  Instead, plaintiffs

and Dr. Grandjean, himself, have asked the Court to entirely

rely on his scientific background.

That's problematic for a number of reasons.  One, it

doesn't satisfy TSCA's scientific standards.

Two, Dr. Grandjean admitted at his deposition that he,

himself, didn't even conduct the BMD analysis.  He cut and
pasted it from another scientist's work, who is not a witness
in this case.

Third, he relied on the studies conducted outside of the
United States that are not generalizable.

Every systematic review that has been conducted on
fluoride's neuro-developmental harms has concluded that there
is not sufficient evidence at this time to conclude that
fluoride is a neurotoxin at the levels that are relevant here.

**THE COURT:**  Tell me, where in the record are the
strongest studies of non-conclusion that you would cite?

**MR. ADKINS:**  EPA has put forward declarations from
two -- from a neurotoxicologist and an epidemiologist who
conducted systematic reviews.

That's supported by a further declaration from EPA's risk
assessment expert, Dr. Tala Henry, who concluded that based on
those systematic reviews, there isn't sufficient evidence to
integrate hazards and exposures for a risk characterization.

There is also -- I see Your Honor's writing -- NRC 2016,
which concluded that there isn't sufficient evidence at that
range of exposure to conclude that fluoride is a neurotoxin.

And finally, there's the draft NTP monograph -- which,
admittedly, is not in evidence, but we brought to Your Honor's
attention I believe in September -- that has now also concluded
that while fluoride may be a hazard at very high levels of

1    exposure, there isn't sufficient evidence at this time to

2    conclude that it's a hazard --

3              THE COURT:  You say that's not -- that's not in

4    evidence.

5              MR. ADKINS:  It's not in evidence, but it is also

6    another systematic review.  So the others that I've stated are

7    ones that the Court can rely on here.

8              MR. CONNETT:  To be clear, every systematic review

9    that counsel just referred to is from its own litigation

10   experts, who, by their our admission, had never studied

11   fluoride before this case.

12       And the NTP report, just to be clear, just concluded, Your

13   Honor, in a draft, that fluoride is a presumed neurotoxin.  But

14   I won't go into that now.

15             MR. ADKINS:  NRC 2016 is not something that EPA's

16   experts have created, for litigation purposes here.  Sorry,

17   that's not correct.

18             THE COURT:  All right.  I will take the matter under

19   submission.  Thank you.

20             MR. ADKINS:  Thank you, Your Honor.

21       (Proceedings concluded)

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTER**

5          I, BELLE BALL, Official Reporter for the United States

6    Court, Northern District of California, hereby certify that the

7    foregoing is a correct transcript from the record of

8    proceedings in the above-entitled matter.

9

10                        *Belle Ball*

11    _____
                        /s/ Belle Ball

12          Belle Ball, CSR 8785, CRR, RDR

13          Friday, November 22, 2019

14

15

16

17

18

19

20

21

22

23

24

25