DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al., | Case No. 17-CV-02162 EMC |
| Plaintiffs, | **DEFENDANTS' THIRD MOTION IN LIMINE TO EXCLUDE THE DRAFT NATIONAL TOXICOLOGY PROGRAM MONOGRAPH** |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | Date:   January 7, 2020 |
| Defendants. | Time:  2:30 p.m. |
| | Place:  Courtroom 5, 17th floor |

**INTRODUCTION**

Plaintiffs previously opposed a short extension of pretrial deadlines to allow limited discovery regarding a draft systematic review that is currently undergoing peer review.  Docket No. 114.  The Court agreed with Plaintiffs and denied EPA's motion  to accommodate the release of this draft document.  Docket No. 115.  In an apparent reversal, Plaintiffs now seek to introduce that same draft document as a standalone exhibit at trial.  Because EPA was previously precluded from offering expert opinion on this draft document and because the draft document lacks a sponsoring witness to assist the trier of fact, the Court should exercise its discretion under Fed. R. Evid. 403 and exclude the draft document (and any related testimony or evidence).

**BACKGROUND**

Near end of discovery, EPA learned that the release of a draft systematic review of fluoride exposure and neurodevelopmental effects by the National Toxicology Program ("NTP[1]"), was imminent.   Docket No. 113, Decl. of Debra Carfora at 4-5.  EPA promptly moved this Court on September 19, 2019 to extend the discovery and dispositive motions deadlines to accommodate the release of this draft document ("Draft NTP Monograph").  Docket No. 113.   EPA explained that a brief extension would minimize the inefficiency and/or confusion that could otherwise result from proceeding with litigation prior to the release of the possibly germane Draft NTP Monograph. EPA proposed that the parties supplement their expert disclosures and allow for narrow depositions on the experts' opinions regarding the Draft NTP Monograph.  Docket No. 113 at 2.  Plaintiffs rejected this approach.   Docket No. 114 at 1-2.   Questioning the trustworthiness of a draft document that would not represent NTP's final position and arguing that any delay would prejudice their litigating position, Plaintiffs requested that the parties proceed with the truncated briefing schedule on the record at the time.  *Id*.; Docket No. 112 at 3 (summary judgment briefing schedule).   This Court agreed with Plaintiffs.   Docket No. 115.   In denying EPA's extension motion, the Court noted that both parties' experts are able to opine on the underlying literature that the NTP reviewed.  Docket No. 115 at 3.

---

[1] NTP is a program run by the United States Department of Health and Human Services out of the National Institute of Environmental Health Sciences.

1    The parties then proceeded with summary judgment briefing on October 9, 2019, without

2  the benefit of the Draft NTP Monograph or any expert opinion thereupon.  In EPA's motion for

3  summary judgment and at the November 15, 2019 hearing, EPA advanced its long-held position

4  that Plaintiffs failed to abide by the Toxic Substances Control Act's scientific requirements on use

5  of the "best available science" and "weight of the scientific evidence" which includes a systematic

6  review of the evidence.  Docket No. 117 at 7; Docket No. 119 at 1.  As such, Plaintiffs have failed

7  to present evidence in support of an unreasonable risk determination.  Indeed, the systematic

8  review carried out by EPA's expert revealed that Plaintiffs' evidence is not generalizable to the

9  United States' population and is insufficient to establish a causal relationship between community

10  water fluoridation and neurotoxicity.  Docket No. 117, Chang Decl. at Paragraph 23.

11    On or about October 22, 2019, a draft of the *NTP Monograph on the Systematic Review of*

12  *Fluoride Exposure and Neurodevelopmental and Cognitive Health Effects* was released on the

13  National Academies of Sciences' webpage for the purpose of peer review.[2]  The Draft NTP

14  Monograph, *inter alia,* (1) did *not* establish a causal or "known" relationship between fluoride and

15  neurotoxicity, (2) categorized fluoride as a "presumed" neurodevelopmental hazard with "low" to

16  "moderate confidence," and (3) concluded that its findings are *not* generalizable to the low levels

17  of fluoride (e.g., 0.7 milligrams/liter) found in community water fluoridation programs in the

18  United States. Draft NTP Monograph at 53.  As predicted by Plaintiffs in their opposition to EPA's

19  extension motion, ever page of the Draft NTP Monograph notes that it "does not represent and

20  should not be construed to represent any NTP determination or policy."  Draft NTP Monograph;

21  Docket No. 114 at 1-2.  The Draft NTP Monograph is now subject to peer review by relevant

22  experts in the field to assess the draft's protocols, clarity, and conclusions.  It is therefore subject

23  to change.  There is no date-certain for when the peer review process will end, how long NTP will

24  take to incorporate any comments, or when a final iteration will be released.  As noted by this

25  Court, the peer review process, alone, is currently set to last one year.  Docket No. 115 at 3;

---

[2]    Draft NTP Monograph on the Systematic Review of Fluoride Exposure and Neurodevelopmental and Cognitive Health Effects, available at https://www8.nationalacademies.org/pa/projectview.aspx?key=51752 (listed as a "support file" under the November 6, 2019 "event").

Peer Review of the Nation Toxicology Program Monograph, *available at*, https://www8.nationalacademies.org/pa/projectview.aspx?key=51752 (noting a peer review "project duration" of 12 months).

Following summary judgment briefing, the summary judgment hearing, and the release of the Draft NTP Monograph, Plaintiffs asked EPA whether the agency would consider (1) withdrawing the pending motion for summary judgment, (2) reopening discovery to allow for supplemental expert reports and narrow depositions on the experts' opinions on the Draft NTP Monograph, and (3) delaying trial. Do Decl., Exhibit A. Having already expended substantial resources briefing and arguing summary judgment on a truncated schedule and in consideration of the Court's previous order, EPA declined Plaintiffs' request. *Id.* at Paragraph 2, Exhibit A.

On November 22, 2019, as part of the parties' pre-trial meet and confer obligations, Plaintiffs listed the Draft NTP monograph as an exhibit. *Id.* at Paragraph 3. On November 25, 2019, Plaintiffs disclosed for the first time their intent to call Dr. Linda Birnbaum, the retired director of the National Toxicology Program, to testify to the Draft NTP Monograph. *Id.* at Paragraph 4; *see infra*, note 3. On November 26, 2019, Plaintiffs confirmed they had a good faith belief that Dr. Birnbaum would testify at trial and that she "and maybe others" could speak to the Draft NTP Monograph. Do Decl. at Paragraph 5. On December 4, 2019, Plaintiffs requested that EPA stipulate to the inclusion of short excerpts of the Draft NTP Monograph in lieu of Dr. Birnbaum's live testimony. *Id.* at Paragraph 6. When asked whether Dr. Birnbaum was still willing to testify, Plaintiffs instead represented that Dr. Birnbaum was "considering" testifying. *Id.* at Paragraph 6. That same day, Dr. Linda Birnbaum informed EPA that she had already notified Plaintiffs that she would not testify. *Id.* EPA informed Plaintiffs that including isolated excerpts from the Draft NTP Monograph would not fairly present the evidence. *Id.*, Exhibit B. In response, Plaintiffs notified EPA that they were considering subpoenaing Dr. Birnbaum, who resides outside of California. *Id.*, Exhibit B. Plaintiffs have otherwise not provided the identity of any other sponsoring witness for the Draft NTP Monograph.

**ARGUMENT**

EPA has consistently maintained, that if the Draft NTP Monograph is considered by the Court, it must be presented in a deliberative, fair manner.  Docket No. 113 at 2.  That would entail allowing the parties to provide vetted Fed. R. Evid. 702 testimony that has been timely disclosed and subject to examination by deposition.  But because discovery is over and the Court has effectively closed the record, the parties should be prepared to proceed to trial now.  Docket No. 115 at 3.  The Draft NTP Monograph is a highly technical review of the epidemiological studies that necessitates informed explanation, not out-of-context hearsay citations to isolated sentences by arguing counsel.  Therefore, Plaintiffs attempt to include the Draft NTP Monograph, without a sponsoring witness or other expert testimony to assist the Court, would unfairly prejudice EPA and could otherwise confuse the issues.  *Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1996) ("The district court has considerable latitude in performing a [Federal Rule of Evidence] 403 balancing test.").  The Court should therefore exclude the introduction of the Draft NTP Monograph and Plaintiffs' proposed testimony or argument regarding it.

Allowing the introduction of the Draft NTP Monograph at this late hour would unfairly prevent EPA's experts from opining on it.  Although EPA has maintained the Draft NTP Monograph may have probative value, it necessitates expert opinion to appropriately put it in context with the other evidence and otherwise elucidate the draft's strengths, weaknesses, applicability, and conclusions.  Presently, as explained in EPA's motion for summary judgment, EPA has proffered experts who have (1) critiqued Plaintiffs' literature review, Docket No. 117, Chang Decl. at 2 and Henry Decl. at 9-12, (2) provided their own systematic review of the literature which revealed that the neurotoxicity evidence is not generalizable to the United States' population and is insufficient to establish a causal relationship between community water fluoridation and neurotoxicity, Docket No. 117, Chang Decl. at Paragraph 23, and (3) concluded that Plaintiffs' proffered evidence cannot support a TSCA unreasonable risk determination, Docket No. 117, Henry Decl. at 9-13.  Introducing the Draft NTP Monograph now would preclude EPA's experts from opining on how the Draft NTP Monograph *corroborates* each of their opinions and *undermines* Plaintiffs' opinions.  And because there are no supplemental reports or depositions

regarding the Draft NTP Monograph, EPA and its experts would be hampered in rebutting any yet-to-be-disclosed opinions and arguments presented by Plaintiffs.  This type of trial by ambush is exactly what EPA sought to avoid in moving to extend discovery deadlines, and should not be condoned now.

Because it is too late to provide the Court with scientific context for the Draft NTP Monograph, its inclusion now risks confusing the issues.  The Draft NTP Monograph was not released by the NTP for the public's general consumption and certainly not for this litigation.  Instead, it was released to the National Academies of Sciences for the purpose of peer review by *experts*.  Indeed, these experts have specifically been tasked to confirm the methods and findings of the monograph and ensure that the findings are clearly presented.  *See* Project Scope, a*vailable at* https://www8.nationalacademies.org/pa/projectview.aspx?key=51752 (listing charge questions for peer reviewers).  So after the close of peer review, a year from now, the findings may change or the language otherwise clarified for the public, diminishing the current draft's probative value.  It is thus appropriate to exclude the Draft NTP Monograph for these reasons.  Indeed, Plaintiffs previously asserted that for these same reasons, draft studies must be excluded as inadmissible hearsay.  Docket No. 114 at 1 n.1 (citing *Toole v. McClintock*, 999 F.2d 1430, 1434–35 (11th Cir. 1993), where the court found that admitting a hearsay preliminary government study on cancer risks was an abuse of discretion).  Experts, of course, may rely on hearsay, Fed. R. Evid. 703, but there is no disclosed expert here to assist the Court in appreciating the draft nature of the monograph.[3]

---

[3] It appears unlikely that Dr. Birnbaum will testify.  *See supra* at 3.  Regardless, Dr. Birnbaum has never appeared on an expert disclosure.  Instead, she was previously opaquely disclosed as a fact witness on "[t]he studies on fluoride neurotoxicity that [National Institute of Environmental Health Sciences] has *funded* and/or *conducted*," perhaps referring to the 2016 NTP review of the animal literature or a 2018 follow up study.   The *forthcoming* NTP Monograph (a systematic review, not a study as noted by the Court, Docket No. 115 at 3) was never disclosed as a subject of proposed testimony until after the close of discovery, and no deposition has occurred.  Any of Plaintiffs' proposed witnesses, fact or expert, must be precluded from testifying on the Draft NTP Monograph.  Fed. R. Civ. P. 37(c)(1) ("exclusion of non-disclosed evidence is automatic and mandatory"); *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (listing a witness as a fact witness does not excuse the failure to disclose an expert).

This Court should also refuse to reward Plaintiffs' gamesmanship.  Plaintiffs opposed EPA's motion for extension which ensured a truncated briefing schedule and deprived EPA the opportunity to seek further opinions on the Draft NTP Monograph in an orderly fashion.  Now, after summary judgment briefing and the hearing, Plaintiffs seem to recognize their failure to abide by TSCA's scientific requirements and want to introduce new evidence on their own selective terms.  Having opposed additional time for the parties to provide additional evidence regarding the Draft NTP Monograph, Plaintiffs should not be allowed to introduce it or have witnesses testify regarding it.  EPA is ready for trial now[4] on the present record.  Plaintiffs should be as well.

## CONCLUSION

For the foregoing reasons, the Court should exclude the Draft NTP Monograph and Plaintiffs' proffered testimony regarding it.


Date: December 9, 2019
Washington, DC


                                        Respectfully Submitted,

                                        */s/ John Thomas H. Do*
                                        Debra J. Carfora
                                        John Thomas H. Do
                                        Brandon N. Adkins
                                        United States Department of Justice
                                        Environment & Natural Resources Division
                                        P.O. Box 7611
                                        Washington, D.C. 20044
                                        Tel: (202) 514-2640
                                        Fax: (202) 514-8865
                                        Email: debra.carfora@usdoj.gov

---

[4] To be clear, EPA opposes delaying trial at this late juncture as overly prejudicial to EPA, counsel, and witnesses.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to stipulation, I hereby certify that on this 9th day of December, 2019, a true and correct copy of the foregoing Defendants' Third Motion in Limine to Exclude the Draft National Toxicology Program Monograph was served on counsel for Plaintiffs by email.

/s/ *John Thomas H. Do*
John Thomas H. Do
United States Department of Justice

DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>Defendants. | Case No. 17-CV-02162 EMC<br><br>**DECLARATION OF JOHN THOMAS H. DO IN SUPPORT OF THIRD MOTION IN LIMINE TO EXCLUDE THE DRAFT NATIONAL TOXICOLOGY PROGRAM MONOGRAPH** |

1         I, John Thomas H. Do, submit the following declaration in support of Defendants' motion

2   in limine to exclude the Draft National Toxicology Program Monograph ("Draft NTP

3   Monograph"):

4         1.      I am a trial attorney within the Environment and Natural Resources Division of the

5   United States Department of Justice. I am counsel for Defendants ("EPA") in the above-captioned

6   case.

7         2.      On November 19, 2019, Michael Connett, Plaintiffs' counsel,  inquired whether

8   EPA would consider (1) withdrawing the pending motion for summary judgment, (2) reopening

9   discovery to allow for supplemental expert reports and narrow depositions on the experts' opinions

10  on the Draft NTP Monograph, and (3) delaying trial.  A copy of this email and EPA's response is

11  attached here as **Exhibit A**.

12        3.      On November 22, 2019, as part of the parties' pre-trial meet and confer obligations,

13  Mr. Connett provided me a list of proposed exhibits which included the Draft NTP Monograph.

14        4.      On  November 25, 2019, Mr. Connett disclosed for the first time his intent to call

15  Dr. Linda Birnbaum, the retired director of  the National Toxicology Program to opine on the Draft

16  NTP Monograph.

17        5.      On November 26, 2019, during a telephonic meet and confer, I asked Mr. Connett

18  whether Dr. Birnbaum would testify at trial in San Francisco.  Mr. Connett confirmed he had a

19  good faith belief that Dr. Birnbaum would testify at trial and that she "and maybe others" could

20  speak to the Draft NTP Monograph.

21        6.      On December 4, 2019, during a telephonic meet and confer, Mr. Connett asked that

22  EPA stipulate to the inclusion of short excerpts of the Draft NTP Monograph in lieu of Dr.

23  Birnbaum's live testimony. I again asked whether Dr. Birnbaum was willing to testify.  Mr.

24  Connett represented that Dr. Birnbaum was "considering" testifying.  That same day, I called Dr.

25  Linda Birnbaum.  This was my first communication with her, and she informed me that she had

26  already notified Plaintiffs that she would not testify.  Notwithstanding this information, I wrote to

27  Mr. Connett to confirm that EPA would not stipulate to the inclusion of Draft NTP Monograph

28  excerpts.  Mr. Connett replied that he would consider subpoenaing Dr. Birnbaum who I understand

to reside outside California.  A copy of my email to Mr. Connett and his response is attached here

as **Exhibit B.**


I declare under penalty of perjury that the foregoing is true and correct.  Executed in on this 9th

Day of December, 2019 in Washington DC.

*/s/ John Thomas H. Do*
John Thomas H. Do
United States Department of Justice

# EXHIBIT A

**Woolner, Matthew (ENRD)**

| | |
|---|---|
| **From:** | Carfora, Debra (ENRD) |
| **Sent:** | Monday, November 25, 2019 17:10 |
| **To:** | Michael Connett |
| **Cc:** | Adkins, Brandon (ENRD); Do, John Thomas (ENRD); Andrew Waters |
| **Subject:** | RE: Issue for consideration |

Michael,

Thank you for your email. Prior to the close of expert discovery and summary judgment briefing, EPA moved for an extension of time for limited additional expert discovery based in part on similar reasons provided in your November 19 email, (ECF No. 113). The Court denied EPA's motion on the basis of Plaintiffs' representations in opposition, (ECF Nos. 114, 115). Thus, we believe the Court has already considered and rejected Plaintiffs' new proposal to extend time.  Further, based on the Court's September 25 Order and Plaintiffs' insistence on a compressed summary judgment briefing schedule, EPA and the DOJ have spent considerable resources briefing, preparing, and arguing summary judgment and preparing to meet the pre-trial deadlines in this matter. We do not believe that NTP 2019 would cure the deficiencies in the record and, therefore, will not agree to withdraw EPA's motion for summary judgment. For these reasons, among others, EPA is not amenable to Plaintiffs' proposal.

DEBRA J. CARFORA, Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division
202.514.2640

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Tuesday, November 19, 2019 3:42 PM
**To:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Cc:** Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>; Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>;
Andrew Waters <waters@waterskraus.com>
**Subject:** Issue for consideration

Debbie:

Here's the idea that I mentioned on the phone just now. As I mentioned, I do not have client authority yet for this proposal, but I figured it would be better to start the conversation sooner, than later.

As explained in the Court's ruling on the MTD, Section 6(b)'s risk evaluation requirements are not imported into Section 21, and we expect the Court will re-confirm this in its decision on the MSJ. Nevertheless, we recognize that there is a legal dispute regarding the systematic review issue, and that there is at least some risk the Court could rule in EPA's favor. *If* the Court were to grant EPA's MSJ on this issue, Plaintiffs will likely be filing a new petition with the EPA shortly after the Court's ruling which will rely upon, inter alia, the NTP's systematic review. If EPA were to deny this second petition, we will find ourselves back in the ND Cal with essentially the same litigation.

In light of these considerations, I'm thinking it might make sense for all concerned to consider the following approach going forward:

We continue the case to allow the parties' experts time to consider the NTP's findings and supplement their reports accordingly, with the opportunity for further limited depositions of any expert who supplements. Consistent with EPA's proposal from September, I think 65 days would likely be adequate to complete this process. In the meantime, we would

work together on proposing a new schedule for trial, etc. As to the MSJs currently before the Court, we could either (A) withdraw them in their entirety and create a new MSJ deadline, or (B) just withdraw the systematic review issue.

I should repeat that I do not yet have client authority for this, but if this is something EPA is interested in, I could attempt to obtain it.

Please let me your thoughts after you've had a chance to consider.

## waterskrauspaul
**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

# EXHIBIT B

**Woolner, Matthew (ENRD)**

| | |
|---|---|
| **From:** | Michael Connett <mconnett@waterskraus.com> |
| **Sent:** | Wednesday, December 4, 2019 19:01 |
| **To:** | Do, John Thomas (ENRD) |
| **Cc:** | Carfora, Debra (ENRD); Adkins, Brandon (ENRD) |
| **Subject:** | RE: Proposed stipulation re: Dr. Birnbaum |

JT – To be clear, I spoke with Dr. Birnbaum two weeks ago and she indicated a potential willingness to appear as a witness in this case. It was not until TODAY that I received an email from her stating that, after further consideration, she does not want to voluntarily testify. This often happens when communicating with witnesses who are fearful of the repercussions of providing testimony on sensitive subjects and I suspect a phone call from DOJ attorneys has helped her further appreciate the controversial position she would be in by testifying about her work for the federal government. It was my intention to reach back out to Dr. Birnbaum to see if she would reconsider her position, but based on your representation, I will not pursue this further – we are giving consideration, however, to a possible subpoena.

That said, can you explain how a verbatim copy of the NTP report's Conclusion does not provide "a fair presentation" of the report's findings?

Lastly, intend to keep the NTP report on our Exhibit List.

**waterskraus**paul

**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

**From:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>
**Sent:** Wednesday, December 04, 2019 3:48 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>; Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Subject:** RE: Proposed stipulation re: Dr. Birnbaum

Michael,

Last week, you represented that you had a good faith understanding that Dr. Birnbaum would testify at trial. At our meet and confer today, you instead represented that Dr. Birnbaum was considering testifying. Following this meet and confer, we spoke with Dr. Birnbaum and learned that she had already informed you that she would not testify. Notwithstanding this information, we do not believe that the proposed stipulation would produce a fair presentation of the proposed evidence. With that, please confirm whether you still intend to list Dr. Birnbaum on the witness list or otherwise present the NTP monograph at trial. Thank you.

Regards,
JT

John Thomas H. Do | Attorney
U.S. Department of Justice | Environment & Natural Resources Division
P.O. Box 7611 Washington DC 20044 | 202-514-2593 | john.do@usdoj.gov

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Wednesday, December 4, 2019 1:54 PM
**To:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>; Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Subject:** Proposed stipulation re: Dr. Birnbaum

Pursuant to our meet and confer this morning, Plaintiffs will agree to withdraw calling Dr. Linda Birnbaum as a witness at trial if we include the following language in the Undisputed Facts. Please note that the quotation I have used is the entire Conclusion section of the Abstract, with no edits other than removing the in-text citation to the Jain 2017 paper on water F levels:

In October 2019, the National Toxicology Program (NTP) released a draft systematic review of the human and animal research on fluoride neurotoxicity, which is currently undergoing peer review by a committee of the National Academy of Sciences. The conclusion of NTP's draft systematic review is as follows: "NTP concludes that fluoride is presumed to be a cognitive neurodevelopmental hazard to humans. This conclusion is based on a consistent pattern of findings in human studies across several different populations showing that higher fluoride exposure is associated with decreased IQ or other cognitive impairments in children. However, the consistency is based primarily on higher levels of fluoride exposure (i.e., >1.5 ppm in drinking water). When focusing on findings from studies with exposures in ranges typically found in the United States (i.e., approximately 0.03 to 1.5 ppm in drinking water) that can be evaluated for dose response, effects on cognitive neurodevelopment are inconsistent, and therefore unclear. There is inadequate evidence to determine whether fluoride exposure lowers IQ or impairs cognitive function in adults. There are few human studies available that provide data to evaluate whether fluoride exposure is associated with other neurodevelopmental effects, beyond IQ or other cognitive measures. Although conclusions were reached by integrating evidence from human and animal studies with consideration of relevant mechanistic data, the conclusions are based primarily on the human evidence. The evidence from animal studies is inadequate to inform conclusions on cognitive effects, and the mechanisms underlying fluoride-associated cognitive neurodevelopmental effects are not well characterized."

Please let me know if EPA agrees with this stipulation.

**waterskrauspaul**
**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

1   C. ANDREW WATERS, ESQ., CA Bar No. 147259
    MICHAEL CONNETT, ESQ., CA Bar No. 300314
2   WATERS, KRAUS & PAUL
    222 N. Pacific Coast Hwy, Suite 1900
3   El Segundo, CA 90245
    310-414-8146 Telephone
4   310-414-8156 Facsimile

5   *Attorneys for Plaintiffs*

6                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
7                        AT SAN FRANCISCO

8   _____

9                                      )   Civ. No. 17-CV-02162-EMC
                                       )
10  FOOD & WATER WATCH, et al.,        )   **PLAINTIFFS' OPPOSITION TO**
                                       )   **DEFENDANTS' THIRD MOTION *IN***
10                          Plaintiffs, )   ***LIMINE* TO EXCLUDE THE DRAFT**
                                       )   **NATIONAL TOXICOLOGY PROGRAM**
11         vs.                         )   **MONOGRAPH**
                                       )
12  U.S. ENVIRONMENTAL PROTECTION      )
    AGENCY, et al.                     )   Judge: Hon. Edward M. Chen
13                                     )   Date: Jan 7, 2017 (Pretrial Conference)
                            Defendants. )   Time: 2:30 p.m.
14                                     )   Courtroom: 5 - 17th Floor

15

16  _____

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Relying on Federal Rule of Evidence 403, EPA asks this Court to exclude on prejudice grounds a recently-released draft monograph issued by the National Toxicology Program ("NTP") concluding that "fluoride is *presumed to be a cognitive neurodevelopmental hazard to humans,*" even though the NTP's reports are created for the very purpose of supporting its regulatory decisions. **Ex. 1** at 2. As this Court is aware, exclusion of evidence under Rule 403 is unusual in a bench trial because the court, as factfinder, is well-equipped to determine the appropriate weight to be given such evidence.  That alone justifies denial of EPA's Third Motion *in Limine*.  The motion should also be denied because: (1) EPA has failed to establish unfair prejudice; (2) the NTP Monograph is admissible as a public record; and (3) its draft status goes to its weight, not its admissibility.

**FACTUAL BACKGROUND**

**A.      NTP is charged with assessing health hazards and publishing those findings**

NTP was created in 1978 by the U.S. Department of Health, Education, and Welfare (now the U.S. Department of Health and Human Services) to "provide needed information to regulatory and research agencies and to strengthen the science base."[1] It acts through interagency agreements with various federal agencies, including the EPA's National Center for Environmental Assessments. **Ex. 2** at 29-32. Its Executive Committee "provides programmatic and policy oversight to the NTP director," and is comprised of the heads of nine federal agencies (or their designees), including the EPA. **Ex. 3.**

Among other functions, NTP is charged with coordinating toxicology testing programs within the federal government and providing information about potentially toxic chemicals to health agencies, regulatory agencies, research agencies, scientific communities, medical communities, and the public:  "The NTP plays a critical role in providing needed scientific data, interpretations, and guidance concerning the appropriate uses of these data to regulatory agencies...government agencies at State and Federal levels rely on the science base provided by the NTP in making credible decisions that will protect public health...." **Ex. 2** at 28. In performing these functions, NTP evaluates the scientific evidence to determine whether environmental chemicals and other substances cause adverse health effects.   Its Office of Health

---

[1] Public Health Service, Establishment of a National Toxicology Program, 43 Fed. Reg. 53060-61 (Nov. 14, 1978).

Assessment and Translation (OHAT) conducts health hazard assessments and other evidence evaluations, which can be published as NTP monographs. *Id.* at 95.

**B.     NTP's Monograph on Fluoride Neurotoxicity**

In October 2019, the NTP released its draft monograph on fluoride neurotoxicity. The NTP Monograph, which took three years to complete, is a systematic review of the human and animal literature on fluoride neurotoxicity. As set forth in the monograph, the NTP has concluded that "fluoride is *presumed to be a cognitive neurodevelopmental hazard to humans.*" **Ex. 1** at 2. The NTP reached this conclusion "based on a consistent pattern of findings in human studies across several different populations showing that higher fluoride exposure is associated with decreased IQ or other cognitive impairments in children." *Id.* According to the NTP, "the presumed hazard conclusion is supported by the *low expectation that new studies would decrease the hazard conclusion.*" *Id.* at 50.

**ARGUMENT**

**A.     EPA HAS FAILED TO DEMONSTRATE IT WOULD BE PREJUDICED BY ADMISSION OF THE NTP MONOGRAPH**

EPA asks this Court to exclude the NTP Monograph pursuant to Federal Rule of Evidence 403, claiming that it has suffered prejudice because it "was previously precluded from offering expert opinion on this draft document and because the draft document lacks a sponsoring witness to assist the trier of fact...." Mot. at 1:6-9.  But courts are reluctant to exclude evidence on prejudice grounds in a bench trial like this one: "[i]n such situations, the possibility of unfair prejudice, confusion of the issues, or delay and wasted time is remote."[2]  Indeed, given that the act of ruling on the Rule 403 motion requires that the court confront the very evidence sought to be excluded, "a threshold ruling is generally superfluous."[3]  In fact, some courts have held that Rule 403 is inapplicable to support the exclusion of evidence on prejudice grounds in a bench trial:

> Rule 403 assumes a trial judge is able to discern and weigh the improper inferences that a jury might draw from certain evidence, and then balance those improprieties against probative value and necessity. Certainly, in a bench trial, the same judge can also exclude

---

[2] *Bullard v. Wastequip Manufacturing Company LLC*, Cause No. CV 14-01309, 2015 WL 13757143, at *9, n. 81 (C.D.Cal. May 4, 2015) (citing cases).
[3] *Wright v. Watkins and Shepherd. Inc.*, No. 2:11-CV-01575, 2016 WL 10749220 at *3 (D. Nev. Jan. 19, 2016).

Continued on the next page

PLAINTIFFS' OPPOSITION TO EPA'S <u>THIRD</u> MOTION IN LIMINE
RE: NATIONAL TOXICOLOGY PROGRAM MONOGRAPH

those improper inferences from his mind in reaching a decision.[4]

Even if this Court considers EPA's specific claims of prejudice, it should find that they lack merit. For example, EPA claims that it would be prejudiced if the NTP Monograph is admitted without a sponsoring witness.  But as demonstrated below, the monograph is self-authenticating and falls within several applicable hearsay exceptions that do not require such a witness, meaning that any resulting prejudice EPA claims cannot be "unfair."

And while it is true that EPA was previously denied a continuance so it could develop expert testimony on the draft document, any prejudice resulting from the denial of that continuance cannot be "unfair" because it falls equally on the Plaintiffs.  Moreover, if, as EPA maintains, the NTP Monograph supports its position by revealing "that Plaintiffs' evidence is not generalizable to the United States' population and is insufficient to establish a causal relationship between community water fluoridation and neurotoxicity," Mot. at 2:8-10, the Agency can use the sections of the monograph that it believes support this position to cross-examine Plaintiffs' experts.[5]  Conversely, if Plaintiffs use the monograph to cross-examine the defense experts, EPA can prepare them to explain how the monograph actually supports its position. *Id.* at 2:13-18.  Finally, since the monograph is admissible, both parties have an equal right to argue to the Court from those portions of the monograph that they believe support their positions.  Again, if prejudice exists, it is equally distributed.

Even if EPA has demonstrated some quantum of prejudice, it has failed to establish that it substantially outweighs the NTP Monograph's probative value, nor can it do so.  NTP was created to prepare studies to "provid[e] needed scientific data... to regulatory agencies" like EPA, which "rely on the science base provided by the NTP in making credible decisions that will protect public health..."[6] **Ex. 2** at 28; **Ex. 4** at 4. EPA's contention that it has been prejudiced by that "science base" should therefore be met with some skepticism, suggesting, as it does, that the Agency's position in this case is at odds with this science base.

---

[4]  *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. Jan. 1981).
[5] *District of Columbia v. Cooper*, 483 A.2d 317, 324 (D.C. Ct. App.1984) (trial court abused its discretion by preventing counsel from impeaching an expert with a report made available to him and that undermined his diagnosis and credibility, even where the report was hearsay).
[6] *See* **Ex. 2** at 28; **Ex. 4** at 4.

3

**B**.     **THE NTP MONOGRAPH IS ADMISSIBLE WITHOUT A "SPONSORING WITNESS"**

EPA contends that the NTP Monograph can only be admitted through a "sponsoring witness" who can provide "informed explanation" and "scientific context" so that the report "can be presented in a deliberative, fair manner." Mot. at 4:3, 4:8; 5:5, 5:9-11.   To the extent this is a challenge to authenticity, it lacks merit. Since the NTP Monograph is a "publication purporting to be issued by a public authority," it is self-authenticating under Rule 902(5), and can be admitted as trustworthy without sponsoring witness testimony if relevant and not barred by the hearsay rule:

> Given the frequency with which official publications from government agencies are relevant to litigation and the increasing tendency for such agencies to have their own websites, Rule 902(5) provides a very useful method of authenticating these publications. When combined with the public records exception to the hearsay rule, Rule 803(8), these official publications posted on government agency websites should be admitted into evidence easily.[7]

Indeed, EPA's own draft reports have been found to be self-authenticating under Rule 902(5).[8]

This Court "may presume that public records are authentic and trustworthy. The burden of establishing otherwise falls on the opponent of the evidence, who must come 'forward with enough negative factors to persuade a court that a report should not be admitted.'"[9] EPA has made no such showing here. Since the NTP Monograph is self-authenticating, no sponsoring witness need be tendered.

Finally, even if a sponsoring witness is required, Plaintiffs have identified Dr. Linda Birnbaum, retired Director of the National Institute for Environmental Health Sciences ("NIEHS") and the NTP.[10]   As a fact witness who directed NTP for years, Dr. Birnbaum can testify about matters she observed, and is competent under Rule 901(b)(1) to testify about the NTP's study processes and methods, and to authenticate its draft report by testifying that it is what it claims to be.

///

///

///

///

---

[7] *Lorraine v. Markel American Ins. Co*., 241 F.R.D. 534, 551 (D.Md. 2007).
[8] *Castaic Lake Water Agency v. Whittaker Corp*., 272 F.Supp.2d 1053, 1060-1, n. 6 (C.D.Cal. 2003) (relying on Rule 902(5) to overrule authenticity objection to the admissibility of two EPA draft reports).
[9] *Paralyzed Veterans of America v. McPherson*, Cause No. C-06-4670, 2008 WL 4183981, at *7 (N.D.Cal. Sept. 9, 2008) (quoting *Gilbrook v. City of Westminster,* 177 F.3d 839, 858 (9th Cir.1999).
[10] Plaintiffs are still contemplating whether to subpoena Dr. Birnbaum.

4

**C.     THE NTP MONOGRAPH FALLS WITHIN THE PUBLIC RECORDS EXCEPTION TO THE HEARSAY RULE**

Because the NTP Monograph is a "record...of a public office" that "sets out...factual findings from a legally authorized investigation," it falls within the public records exception to the hearsay rule in this civil case.[11]

As detailed above, the NTP is a governmental body legally charged with evaluating scientific evidence to determine whether environmental chemicals or substances can cause adverse health effects, a mandate that includes the power to conduct health hazard assessments through its Office of Health Assessment and Translation (OHAT), the NTP office that published the NTP fluoride monograph. The draft NTP Monograph is just such a study, containing factual findings and conclusions about the medical and scientific literature's "consistent pattern of findings . . . showing that higher fluoride exposure is associated with decreased IQ or other cognitive impairments in children."[12]   And when the public records exception applies, a document may be admitted without a "sponsoring witness" in the absence of a showing by the opponent that the "source of information or other circumstances indicate a lack of trustworthiness," a showing EPA has not made here.[13]   Indeed, it does not appear that EPA is taking the position that the draft is untrustworthy.

**D.     THE NTP MONOGRAPH MADE FACTUAL FINDINGS; ITS DRAFT STATUS GOES TO ITS WEIGHT**

While EPA does not argue that the monograph is untrustworthy or that it failed to make "factual findings" within the meaning of Rule 803(8)(A)(iii), it does contend that because the NTP Monograph must still undergo a final round of peer review and is thus subject to change, its probative value is diminished.[14] Plaintiffs agree that the monograph's draft status diminishes its probative value, but does not extinguish it, as EPA expressly concedes. Mot. at 4:16-17 ("[T]he Draft NTP Monograph may have probative value...."). Instead, the monograph's status as a draft should go to weight, not admissibility, a matter for the Court in this bench trial:  "we are confident that the district court can hear relevant evidence, weigh its probative

---

[11] Fed. R. Evid. 803(8)(A)(iii).
[12] **Ex. 1**, NTP Monograph at 1-2.
[13] Fed. R. Evid. 803(8)(B).
[14] The NTP Monograph's study protocols have already undergone three separate rounds of peer review. *See* **Ex. 1** at 79.

Continued on the next page

5

1  value and reject any improper inferences."[15]

2  Though EPA implies otherwise, Plaintiffs' position here is not inconsistent with their opposition to
3  EPA's earlier request for an extension of the pretrial deadlines.  Plaintiffs readily acknowledge that on
4  September 23, they opposed that motion, arguing that "the release of a *draft* review provides no justification
5  for derailing the entire schedule, including the trial date."[16]  In making their case against an extension of
6  the pretrial deadlines, Plaintiffs advanced three arguments accepted by the Court:  1) Plaintiffs would face
7  the increased expense of re-deposing experts; 2) the anticipated NTP Monograph would not generate new
8  data, but would evaluate studies already available to the parties and their experts; and 3) the (then)
9  forthcoming monograph would be a draft, subject to 12 months of peer review and public comment.

10  As to the point that the monograph would be released in draft, Plaintiffs argued that "[f]ederal courts
11  have long recognized the *reduced trustworthiness* of draft government reports, holding them inadmissible
12  under Federal Rule of Evidence 803," citing cases in which the court did exclude draft reports on
13  trustworthiness grounds.[17]  Again, Plaintiffs concede that the draft status of the report reduces its
14  trustworthiness.  However, making the point that a trial schedule should not be disrupted while the court
15  and the parties awaited issuance of this draft monograph is not the same as arguing that the draft, once
16  issued, cannot be considered by the Court.  Plaintiffs did not argue in September, and do not argue now,
17  that the draft status of the report makes it *ipso facto* inadmissible, a position that EPA, too, stops short of
18  embracing. In fact, Plaintiffs' opposition in September specifically contemplated the Court considering the
19  Monograph's findings at trial, pointing out that it "can be used as a source for cross-examination at trial"
20  and given "whatever due weight [the Court] deems appropriate."[18]

21  Plaintiffs maintain that position here. The draft nature of the NTP report does reduce its probative
22  value, but this Court is in a position to give it appropriate weight.   Indeed, numerous courts have taken
23  judicial notice of draft reports—including those drafted by EPA itself—notice that Plaintiffs intend to ask
24  this Court to take in this case.[19]

25
26  [15] *Wright v. Watkins and Shepard Trucking, Inc.,* 2016 WL 10749220 at *7.
     [16] ECF No. 114 at 1:23-24, 1:1-3.
27  [17] ECF No. 114 at 1:22-2:3 and note 1.
     [18] ECF No. 114 at 16-21.
28  [19] *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F.Supp.2d 1053, 1060 (C.D.Cal. 2003) ("In addition,
     Continued on the next page

PLAINTIFFS' OPPOSITION TO EPA'S <u>THIRD</u> MOTION IN LIMINE
RE: NATIONAL TOXICOLOGY PROGRAM MONOGRAPH

Finally, EPA makes much of the fact that after receiving the NTP Monograph, Plaintiffs' counsel negotiated with the Agency in an attempt to reach an accommodation over the Monograph's use, a negotiation that included a proposed offer to acquiesce in EPA's previously-rejected request for a continuance for limited expert discovery on the monograph. Having read the NTP Monograph, Plaintiffs realized that even if this Court granted EPA's motion for summary judgment on the ground that Plaintiffs' experts failed to conduct a formal systematic review, they could file a new citizens' petition with the Agency, at which time they would be in position to rely upon NTP's systematic review of the literature, resulting in all parties finding themselves back in court "with essentially the same litigation," and with the NTP Monograph in evidence. Based on this new information, and to avoid a procedural path that was newly viable but less efficient, Plaintiffs' proposed a 65-day continuance "to minimize the inefficiency" of embarking on a second lawsuit.

## CONCLUSION

Though EPA moves to exclude as unfairly prejudicial the draft NTP Monograph concluding that fluoride is presumed to be a cognitive neurodevelopmental hazard to humans, it concedes that the draft report has probative value, never argues that it is untrustworthy, and makes no meaningful demonstration that admission of the monograph would cause it unfair prejudice. While both parties agree that the monograph's draft status may diminish its probative value, that fact goes to its weight, not admissibility. Because this is a bench trial, "excluding relevant evidence on the basis of 'unfair prejudice' is a useless procedure... a trial judge is able to discern and weigh the improper inferences... and then balance those improprieties against probative value and necessity."[20]  This Court should deny EPA's Third Motion in *Limine*.

December 19, 2019                              Respectfully submitted,

                                              */s/ Michael Connett*
                                              MICHAEL CONNETT

---

the Court takes judicial notice of two Environmental Protection Agency ("EPA") draft reports regarding perchlorate...," and citing cases); *see also Save Strawberry Canyon v. Department of Energy*, 613 F.Supp.2d 1177, 1191 (N.D.Cal. 2009) (court relies on draft environmental impact reports included in the Department of Energy's own request for judicial notice).

[20] *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994) (citing *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981).

7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by Notice of Electronic Filing this 19th day of December, 2019, upon all ECF registered counsel of record using the Court's CM/ECF system.

*/s/ Michael Connett*
MICHAEL CONNETT

# **<u>Exhibit 1</u>**



National Toxicology Program
U.S. Department of Health and Human Services

**DRAFT NTP MONOGRAPH ON THE**

# SYSTEMATIC REVIEW OF FLUORIDE EXPOSURE AND NEURODEVELOPMENTAL AND COGNITIVE HEALTH EFFECTS

September 6, 2019

Office of Health Assessment and Translation
Division of the National Toxicology Program
National Institute of Environmental Health Sciences
National Institutes of Health

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

NOTICE:

*This DRAFT Monograph is distributed solely for the purpose of pre-dissemination peer review under the applicable information quality guidelines. It has not been formally disseminated by NTP. It does not represent and should not be construed to represent any NTP determination or policy.*

*This DRAFT Monograph is distributed solely for the purpose of pre-dissemination peer review* and *does not represent and should not be construed to represent any NTP determination or policy.*

## ABSTRACT

**Background:** Previous reviews of epidemiological studies, including a 2006 evaluation by the National Research Council (NRC), found support for an association between consumption of high levels of naturally occurring fluoride in drinking water and neurological effects in humans and recommended further investigation (NRC 2006). Most of the evidence is from dental and skeletal fluorosis-endemic regions that have higher levels of naturally occurring fluoride than the fluoride concentrations historically added to water in community water fluoridation programs (0.7–1.2 ppm). NTP previously published a systematic review of the evidence from experimental animal studies of the effects of fluoride on learning and memory (NTP 2016). The systematic review found a low-to-moderate level of evidence that learning and memory deficits occur in non-human mammals exposed to fluoride. Studies in animals generally used fluoride drinking water concentrations that far exceeded the levels used in water fluoridation, and the lack of studies at lower fluoride concentrations was identified as a data gap. The evidence for effects on learning and memory was strongest (moderate) in animals exposed as adults, and evidence was weaker (low) in animals exposed during development. Since the publication of the NTP (2016) systematic review of the animal evidence, additional animal studies have been published. This systematic review extends the scope of the 2016 review by including human epidemiological studies, along with updated animal evidence and selected mechanistic information in order to reach hazard identification conclusions for fluoride and neurodevelopmental and cognitive effects.

**Objective:** To conduct a systematic review of the human, experimental animal, and mechanistic literature to evaluate the evidence and develop hazard conclusions about whether fluoride exposure is associated with neurodevelopmental and cognitive effects.

**Method:** A systematic review protocol was developed and utilized following the Office of Health Assessment and Translation (OHAT) approach for conducting literature-based health assessments.

**Results:** The literature search and screening process identified 149 published human studies, 339 published experimental animal studies, and 60 in vitro/mechanistic studies relevant to the objective. Eighty-two of the 149 human studies evaluated the association between fluoride exposure and neurodevelopmental or cognitive effects, and the remaining human studies evaluated thyroid effects or other potential mechanistic data. The majority of the experimental animal studies were mechanistic studies, which were not assessed in the NTP (2016) report. Thirty-five new experimental animal[1] studies evaluating effects on learning and memory and/or motor activity and sensory effects of fluoride were identified since the NTP (2016) systematic review.

The human body of evidence provides a consistent pattern of findings that high fluoride exposure is associated with decreased intelligence quotient (IQ) in children. There is a moderate level of evidence from cognitive neurodevelopmental studies in children based on four prospective cohort studies and nine cross-sectional studies that are considered functionally prospective in nature. Because the majority of available studies evaluate cognitive neurodevelopmental effects in children, the focus of the hazard conclusions is on cognitive neurodevelopmental effects. The evidence for cognitive effects in adults is limited, coming from two cross-sectional studies, and is inadequate to evaluate whether fluoride exposure in adults is associated with cognitive effects. The assessment of the new animal data focuses

---

[1] The term "animal" in this document refers to non-human mammals.

*This DRAFT Monograph is distributed solely for the purpose of pre-dissemination peer review* and *does not represent and should not be construed to represent any NTP determination or policy.*

on evaluating a deficiency identified during the prior NTP (2016) review concerning the difficulty in distinguishing potential effects of fluoride on motor and sensory functions from effects specifically on learning and memory functions. Further examination of the animal data, including studies carried out at the NTP, have further highlighted this deficiency in the animal studies. For this reason, the animal body of evidence is now considered inadequate to inform conclusions on whether fluoride exposure is associated with cognitive effects (including cognitive neurodevelopmental effects) in humans primarily due to the inability to separate these effects from the other effects on the nervous system, including motor activity or motor coordination. While the animal data provide evidence of effects of fluoride on neurodevelopment, the human evidence base is primarily focused on cognitive neurodevelopmental effects and is the focus of conclusions.

**Conclusions:** NTP concludes that fluoride is *presumed to be a cognitive neurodevelopmental hazard to humans*. This conclusion is based on a consistent pattern of findings in human studies across several different populations showing that higher fluoride exposure is associated with decreased IQ or other cognitive impairments in children. However, the consistency is based primarily on higher levels of fluoride exposure (i.e., >1.5 ppm in drinking water). When focusing on findings from studies with exposures in ranges typically found in the United States (i.e., approximately 0.03 to 1.5 ppm in drinking water, NHANES (Jain 2017)) that can be evaluated for dose response, effects on cognitive neurodevelopment are inconsistent, and therefore unclear. There is inadequate evidence to determine whether fluoride exposure lowers IQ or impairs cognitive function in adults. There are few human studies available that provide data to evaluate whether fluoride exposure is associated with other neurodevelopmental effects, beyond IQ or other cognitive measures. Although conclusions were reached by integrating evidence from human and animal studies with consideration of relevant mechanistic data, the conclusions are based primarily on the human evidence. The evidence from animal studies is inadequate to inform conclusions on cognitive effects, and the mechanisms underlying fluoride-associated cognitive neurodevelopmental effects are not well characterized.

*This DRAFT Monograph is distributed solely for the purpose of pre-dissemination peer review* and *does not represent and should not be construed to represent any NTP determination or policy.*

counts are tabulated by significance—statistically significant increase (↑), statistically significant decrease (↓), or not significant (NS). For example, the "↑" column displays numbers of unique studies with at least one endpoint in the mechanistic subcategory with significantly increasing results at fluoride exposure levels of ≤20 ppm. These columns are not mutually exclusive (i.e., a study may report on multiple endpoints with varying results within a single mechanistic subcategory and therefore may be reflected in the counts for the "↑", "↓", and NS columns, but would only be counted once in the Grand Total column). Endpoints, species, strain, sex, and exposure duration are available for each study in the interactive figure in Tableau®.

### In Vitro/Mechanistic Data on Neurodevelopmental or Cognitive Effects

Although in vitro data were collected as part of the systematic review process, NTP determined that the information on neurological effects obtained from these studies is too general, and results cannot necessarily be attributed to effects on learning and memory or other cognitive functions at this time. The in vitro data may help support specific mechanisms identified from in vivo mechanistic data, but, as described above, no specific mechanism has been determined for fluoride effects on learning and memory or other neurodevelopmental or cognitive outcomes.

### Evidence Synthesis for Neurodevelopmental or Cognitive Effects

There is consistent evidence that exposure to fluoride is associated with cognitive neurodevelopmental effects in children. There is <u>moderate confidence</u> in the human data in children from several well-conducted prospective studies with limited sample sizes, supported by a large number of functionally-prospective cross-sectional studies. The human body of evidence in adults is considered inadequate to evaluate whether fluoride exposure is associated with cognitive effects due to <u>low confidence</u> in the human data in adults, a limited number of studies, and a lack of evidence of an effect (i.e., there is not sufficient evidence of an effect, but the confidence in the data is not high enough to conclude that there is no effect). The animal data are inadequate to evaluate for learning and memory or cognitive effects primarily due to the inability to distinguish effects on learning and memory outcomes from other effects on the nervous system including motor activity. The animal studies are considered inadequate to support the IQ effects in children but provide evidence of other neurodevelopmental effects. There is also evidence from mechanistic studies of adverse neurological effects of fluoride of unknown relationship to learning and memory.

The moderate confidence in the body of evidence in children translates to a moderate level of evidence that fluoride is associated with decreased IQ and other cognitive neurodevelopmental effects in children. The limited and weaker evidence of cognitive effects in adults is considered to provide an inadequate level of evidence that fluoride is associated with cognitive effects in adults. The animal body of evidence is also considered to provide an inadequate level of evidence for cognitive effects in adults.

Integration of these level-of-evidence conclusions supports an initial hazard conclusion of *presumed to be a cognitive neurodevelopmental hazard to humans* because of the extent, consistency, and magnitude of effect in the available data in children. Because most of the available studies evaluated intelligence in children, the primary focus in human data was on IQ and other cognitive neurodevelopmental effects, which is the primary basis for the hazard conclusion. A separate conclusion on other neurodevelopmental effects was not reached based on limited information in humans. It is unlikely that evaluation of additional neurodevelopmental effects would change the hazard conclusion.

==The moderate level of evidence in the human data in children supports a hazard conclusion of *presumed* instead of *suspected* due to the relatively large and consistent body of evidence, especially in relation to measures of IQ (all 13 lower risk-of-bias studies that assessed IQ reported that higher fluoride is associated with at least one measure of decreased IQ) across multiple populations.== A conclusion of *presumed* is also supported by the relatively large magnitude of effect observed in two well-designed

*This DRAFT Monograph is distributed solely for the purpose of pre-dissemination peer review and does not represent and should not be construed to represent any NTP determination or policy.*

and well-conducted Canadian and Mexican prospective cohort studies of children where repeated urinary fluoride levels were assessed during pregnancy [i.e., for full-scale IQ, a 4.49-point decrease in boys per 1-mg/L increase in maternal urinary fluoride, a 3.66-point decrease in boys and girls combined per 1-mg increase in maternal total fluoride intake, and a 5.29-point decrease in boys and girls combined per 1-mg/L increase in water fluoride concentration (Green *et al.* 2019); and a 2.5-point decrease in full-scale IQ in boys and girls combined per 0.5-mg/L increase in maternal urinary fluoride (Bashash *et al.* 2017)]. Additional functionally-prospective cross-sectional studies present a consistent pattern of evidence that exposure to fluoride is associated with decreased IQ, which provides further support for the *presumed* hazard conclusion. Furthermore, the *presumed* hazard conclusion is supported by the low expectation that new studies would decrease the hazard conclusion.

**Effects in children**

- **Human body of evidence:** Moderate Confidence = Moderate Level of Evidence

- **Animal body of evidence:** No studies available to specifically assess effects on learning and memory after exposure during developmental periods separately from other neurological effects including motor activity = Inadequate Level of Evidence

- **Initial hazard conclusion (Moderate Human x Inadequate Animal)** = Presumed to be a Cognitive Neurodevelopmental Hazard to Humans

- **Final hazard conclusion (after consideration of biological plausibility)** = Presumed to be a Cognitive Neurodevelopmental Hazard to Humans

**Effects in adults**

- **Human body of evidence:** Low Confidence with no discernible effect = Inadequate Level of Evidence

- **Animal body of evidence:** No studies available to specifically assess effects on learning and memory after exposure in adulthood separately from other neurological effects including motor activity = Inadequate Level of Evidence

- **Initial hazard conclusion (Inadequate Human x Inadequate Animal)** = Not classifiable

- **Final hazard conclusion (after consideration of biological plausibility)** = Not classifiable

*This DRAFT Monograph is distributed solely for the purpose of pre-dissemination peer review and does not represent and should not be construed to represent any NTP determination or policy.*

## ABOUT THIS REVIEW

## Sources of Support

National Institute of Environmental Health Sciences/Division of the National Toxicology Program

## Contributors

### Evaluation Team
The evaluation team is composed of federal staff and contractor staff support.

| Name | Affiliation |
|------|-------------|
| Kyla Taylor, PhD | NIEHS/DNTP, Project Lead |
| John Bucher, PhD | NIEHS/DNTP |
| Andrew Rooney, PhD | NIEHS/DNTP |
| Vickie Walker | NIEHS/DNTP |
| Cynthia J. Willson, PhD, DVM, DACVP | ILS |
| Louise Assem, PhD | ICF [f] |
| Carlye A. Austin, PhD | ICF [d] |
| Robyn Blain, PhD | ICF [abcdef] |
| Natalie Blanton, MPH | ICF [a] |
| Kristin Bornstein, PhD | ICF [f] |
| Canden Byrd | ICF [a] |
| Michelle Cawley | ICF [c] |
| Anna Engstrom, PhD | ICF [abcdf] |
| Jeremy S. Frye, MLS | ICF [a] |
| Susan Goldhaber, MPH | ICF [e] |
| Ali Goldstone, MPH | ICF [f] |
| Pamela Hartman, MEM | ICF [abce] |
| Cara Henning, PhD | ICF [a] |
| Melinda Hoang, MPH | ICF [d] |
| Tao Hong | ICF [ef] |
| Jennifer Hsieh, MSPH | ICF [f] |
| Penelope Kellar | ICF [a] |
| Courtney Lemeris | ICF [a] |
| Alex Lindahl, MPH | ICF [f] |
| William Mendez, PhD | ICF [b] |
| Whitney Mitchell | ICF [a] |
| Revathi Muralidharan | ICF [de] |
| Johanna Rochester, PhD | ICF [def] |
| Pam Ross, MSPH | ICF [df] |
| Jennifer Seed, PhD | ICF [de] |
| Codi Sharp | ICF [de] |
| Robert Shin, MHS | ICF [e] |
| Kelly Shipkowski, PhD | ICF [df] |

*This DRAFT Monograph is distributed solely for the purpose of pre-dissemination peer review* and *does not represent and should not be construed to represent any NTP determination or policy.*

| Name | Affiliation |
|---|---|
| Christopher Sibrizzi, MPH | ICF [abcdef] |
| Anna Stamatogiannakis | ICF [a] |
| Nicole Vetter, MLS | ICF [a] |

Note: the roles of individual contractors differed: [a] indicates monograph development; [b] indicates review of data, results, and analyses; [c] indicates database and HAWC support; [d] indicates literature screening, [e] indicates data extraction, [f] indicates risk-of-bias assessment

## Peer Reviewers

The peer reviewers were outside experts selected for their experience with fluoride, developmental neurobehavioral toxicity, and systematic review procedures. Peer reviewers were screened for conflict of interest prior to their service and did not report any conflicts of interest. Service as a peer reviewer does not necessarily indicate that the reviewer endorses the final document.

### Protocol Reviewers

| Name | Affiliation |
|---|---|
| Joseph Braun, PhD | Brown University |
| Marie Sutton, PhD | Health Research Board |
| Thomas Zoeller, PhD | University of Massachusetts, Amherst |
| Thomas Webster, PhD | Boston University |
| Gail Wasserman, PhD | Columbia University |

no conflicts of interest declared

### Technical Review of Draft Monograph

| Name | Affiliation |
|---|---|
| Freya Kamal, PhD | NIEHS (retired) |

no conflicts of interest declared

## Protocol History and Revisions

| Date | Activity or revision |
|---|---|
| December 14, 2016 | **Draft evaluation protocol reviewed:** sent to technical advisors for peer review |
| April 10, 2017 | **Draft human risk-of-bias protocol reviewed;** sent to technical advisors for peer review |
| May 2, 2017 | **Draft animal risk-of-bias protocol reviewed;** sent to technical advisors for peer review |
| June 2017 | **Evaluation protocol finalized:** Review protocol finalized for use and posting |

# Exhibit 2



# Welcome to the 2018 Annual Report

"The NTP serves a critical role for our nation. It provides a unique, consolidated venue for toxicology research, testing, and analysis to occur." – Dr. Linda Birnbaum, NIEHS and NTP Director

Read the 2018 Letter from the NIEHS and NTP Director.



## FY 2018 at a Glance

▶ **Completed NTP Reports and Publications**

▶ **NTP Public Health Impact**

▶ **Brian Berridge Takes the Helm at the National Toxicology Program**

**More**



## Learn About Us

▶ **About NTP**

▶ **Organizational Structure and Oversight**

▶ **Interagency Agreements**

▶ **Funding**

**More**



## Scientific and Public Input Opportunities

▶ **NTP Board of Scientific Counselors**

▶ **SACATM**

▶ **Scientific Panels**

**More**







| Research and Testing | Literature Analysis | Partner Agency Research |
|---|---|---|

**Research and Testing**
- ▶ **Tox21**
- ▶ **Testing and Toxicology Studies**
- ▶ **NICEATM**
- ▶ **ICCVAM**

**Literature Analysis**
- ▶ **Noncancer Research**
- ▶ **Report on Carcinogens**

**Partner Agency Research**
- ▶ **NTP at NIEHS**
- ▶ **NTP at NCTR**
- ▶ **NTP at NIOSH**

The NTP Annual Report is produced by the NTP Office of Liaison, Policy, and Review. The text is not copyrighted and can be reprinted without permission. If you use parts of the Annual Report in a publication, please provide us a copy for our records. We welcome your comments and suggestions.

Official Citation: National Toxicology Program. Annual Report for Fiscal Year 2018. Research Triangle Park, NC: National Toxicology Program; 2019. Available from https://ntp.niehs.nih.gov/annualreport/2018

Director of Office of Liaison, Policy, and Review and Editor in Chief: Mary Wolfe | Managing Editor: Joshua Cleland (ICF)

# Letter from the NIEHS and NTP Director

In fiscal year (FY) 2018, NTP continued to advance toxicology and inform public health policy by providing information to decision makers and the public about substances in our environment. Numerous studies were published on substances of public health concern, such as flame retardants, cell phone radiofrequency radiation, and widely used industrial chemicals. Among these is the final report from the CLARITY-BPA core study and data sets from CLARITY-BPA grantee studies to evaluate the range of potential health effects from BPA in rats.

In addition, NTP engaged in several activities to advance alternatives to animal testing. Particularly noteworthy was publication of the *Strategic Roadmap for Establishing New Approaches to Evaluate the Safety of Chemicals and Medical Products in the United States*, a consensus perspective developed with input from many groups. The "Tox21" consortium met to discuss the new Toxicology in the 21st Century (Tox21) strategic plan that will continue to refine prediction of chemical toxicity to humans.



Dr. Birnbaum has served as the Director of the National Institute of Environmental Health Sciences (NIEHS) and the National Toxicology Program (NTP) since 2009. (Photo courtesy of Steve McCaw.)

NTP continued its systemic review literature activities to identify potential hazards for human health. In partnership with the NIH Countermeasures Against Chemical Threats (CounterACT) Program, NTP conducted a systematic review to assess long-term neurological effects following acute exposure to the organophosphorus nerve agent sarin. Antimony trioxide and *Helicobacter pylori* were evaluated for possible listing in the congressionally mandated Report on Carcinogens.

I invite you to read this report to learn about our work and what we accomplished in FY 2018 toward advancing toxicology and safeguarding public health by generating and communicating trusted scientific information.

Linda S. Birnbaum, Ph.D., D.A.B.T., A.T.S.

2018 Annual Report – Learn About Us – About NTP

## About NTP

The U.S. Department of Health, Education, and Welfare, now the U.S. Department of Health and Human Services, established NTP in 1978 in response to concerns about the potential human health effects of chemicals in our environment. NTP goals are to:

- Coordinate toxicology testing programs within the federal government.

- Strengthen the science base in toxicology.

- Develop and validate improved testing methods.

- Provide information about potentially toxic chemicals to health agencies, regulatory agencies, research agencies, scientific communities, medical communities, and the public.

NTP provides scientific data to regulatory agencies and other health-related research groups and interpretation and guidance in their appropriate use. The American people and government agencies, at state and federal levels, rely on NTP to provide a strong scientific basis for decisions aimed at protecting public health. In the past 40 years, NTP has studied and shared information on the health effects of more than 2,800 substances, including dietary supplements, industrial chemicals, consumer products, and complex mixtures.

In following government-wide efforts to increase access to the results of federally funded scientific research, NTP maintains open communication and dialogue with the public, federal and state agencies, industry, nongovernmental organizations, and academic institutions. The NTP website provides the public with a variety of information, including Federal Register notices, status of and data from NTP studies, access to NTP reports and journal publications, notifications through media releases, a calendar of upcoming events, and a newsletter, the *NTP Update*.

The public and other interested parties can stay abreast of NTP activities and events by subscribing to receive emails of news. In addition, requests for information can be made through the Central Data Management office (984-287-3211 or cdm@niehs.nih.gov) and an online contact form.

NTP welcomes input on its programs and priorities. This input can be submitted in response to formal requests for public comment in Federal Register notices or informal submissions to the Office of Liaison, Policy, and Review (984-287-3209 or the online contact form).

**NTP MISSION:**

To evaluate agents of public health concern by developing and applying the tools of modern toxicology and molecular biology

# Organizational Structure and Oversight

Three agencies form the core for NTP: National Institute for Occupational Safety and Health of the Centers for Disease Control and Prevention; U.S. Food and Drug Administration, primarily through the National Center for Toxicological Research; and National Institute of Environmental Health Sciences of the National Institutes of Health.



NTP is located administratively at NIEHS, and Linda Birnbaum, Ph.D., is director of both NIEHS and NTP. Beginning January 7, 2018, Brian Berridge, D.V.M., Ph.D., serves as NTP Associate Director and director of the NTP Division at NIEHS, herein referred to as NIEHS/NTP, which is a focal point for many NTP activities. NIEHS and NTP espouse best research practices and embrace developments in technology to discover how the environment affects people, maintaining leadership in the field of environmental health sciences by applying innovative research to address public health issues.

John Howard, M.D. is director of NIOSH. Staff from two NIOSH divisions participate in NTP activities. Elizabeth Whelan, Ph.D., chief of the Industry-wide Studies Branch, and Cheryl Estill, Ph.D., supervisor of Industrial Hygiene, manage NTP activities within the Division of Surveillance, Hazard Evaluations, and Field Studies. Donald Beezhold, Ph.D., is the principal investigator for the "Immunotoxicity of Workplace Xenobiotics" project through a NIOSH-NIEHS interagency agreement.

NIOSH's participation in NTP is consistent with its mandate to protect worker health and safety under the Occupational Safety and Health Act and the Federal Mine Safety and Health Act.

William Slikker Jr., Ph.D., director of FDA/NCTR, provides management oversight and coordination of NTP activities within NCTR. Their scientists partner with other researchers in FDA, other government agencies, academia, and industry to provide innovative technology, methods development, vital scientific training, and technical expertise. NCTR conducts an array of studies that reflect the NTP mission and are critical in supporting FDA product centers and their regulatory roles.

# Interagency Agreements

In FY 2018, NIEHS provided support for NTP activities through interagency agreements with other federal agencies.

## FDA/NCTR

Under an interagency agreement, NIEHS provided resources to FDA to conduct toxicology studies on FDA-regulated agents and on issues of mutual interest to NIEHS and FDA at the National Center for Toxicological Research. Gonçalo Gamboa da Costa, Ph.D., Division of Biochemical Toxicology, is FDA project officer of the NCTR-NIEHS interagency agreement and provides oversight and coordination of NCTR activities funded under the interagency agreement with NIEHS. These studies are designed to provide FDA and other regulatory agencies with hazard identification and dose-response data to support risk assessment and risk management decisions that could affect public health. The interagency agreement supports studies on endocrine-active agents, dietary supplements, food additives and contaminants, therapeutics and medicines, cosmetic ingredients, nanoscale materials and development of novel toxicological approaches. Studies in these areas have produced 18 published NTP technical reports and more than 250 peer-reviewed journal publications. The studies have led to an increased understanding of the pharmacokinetics, mode-of-action, and dose-response relationships of the substances and to refinements of risk assessment models. Further information about NTP at the National Center for Toxicological Research and current research can be found in the Partner Agency Research section of this annual report.

## CDC/NIOSH

NIEHS/NTP provides support to the National Institute for Occupational Safety and Health (NIOSH) of the Centers for Disease Control and Prevention (CDC) through two interagency agreements. Studies under the interagency agreement on "Immunotoxicity of Workplace Xenobiotics" have assessed the potential toxicity of exposures to substances such as fungi, mycotoxins, volatile organic compounds, lead, latex, nickel, isocyanates, nanomaterials, and beryllium in occupationally exposed populations such as miners, farmers, health care workers, autoworkers, and firefighters. The second interagency agreement supports the development of methods to assess complex mixtures, such as asphalt fumes, welding fumes, and tungsten fibers, and to conduct occupational exposure assessments to identify toxicologically relevant exposures. Research under these agreements in FY 2018 evaluated occupational exposure to bisphenol A, alternative flame retardants, and polycyclic aromatic hydrocarbons in coal tar sealants. For more information, see the Partner Agency Research section of the Annual Report.

## NIH/NCATS/DPI

This interagency agreement supports ongoing and anticipated studies conducted at the National Center for Advancing Translational Sciences/Division of Pre-Clinical Innovation to evaluate high-throughput and high-content screening assays in support of Tox21. Tox21 is a collaboration among federal agencies to characterize the potential toxicity of chemicals by using cells and isolated molecular targets instead of laboratory animals. This interagency agreement between NIEHS/NTP and the division produces data for information-poor substances to help prioritize them for further studies, including toxicological evaluation, mechanisms of action investigation, and development of predictive modeling for biological response.

## DOE/ORNL

Under this interagency agreement, NTP is working with DOE's Oak Ridge National Laboratory to develop tools important to evaluating the use and impact of its work. For example, publication mining tools help to evaluate NTP's impact across the agencies and with stakeholders to whom the work is disseminated and to extract and organize data (e.g., potential outcomes and impacts) from NTP's large inventory of documents (e.g., publications and progress reports).

## EPA/NCCT

With projects under this interagency agreement, EPA's National Center for Computational Toxicology works to accelerate the development and use of advanced methods and models for quantitative and qualitative risk assessments of environmental chemicals. Specifically, research in FY 2018 used non-targeted approaches to characterize chemicals present in feminine hygiene products.

## EPA/NCEA

This IAA between NTP and EPA' National Center for Environmental Assessment facilitates communication and coordination to foster common practices in human health assessments and to minimize the differences in hazard assessment methodologies. Through exchange of scientific expertise and peer review of work products, the agencies increase the quality and integrity of toxicological assessments while ensuring efficient use of federal resources and avoiding duplicative effort.

## NIST

Through an IAA to support the experimental study of cell phone radiofrequency radiation exposure, NIEHS/NTP and the National Institute of Standards and Technology collaborated under this interagency agreement to develop a new exposure system that addresses the limitation in existing systems. In a separate agreement, the NIST Text Analysis Conference, NIST assisted NTP with development of automated systematic review methods.

## Funding

NTP relies on voluntary allocations from the three core agencies—NIEHS, FDA/NCTR, and CDC/NIOSH—to support its activities. These allocations are specified after annual appropriations have been determined. The total NTP budget for FY 2018 was $136.7 million.



NTP conducts its research through in-house studies at the three core agencies or through contract laboratories or interagency agreements with other agencies. In FY 2018, NIEHS funded 30 contracts, listed below, held two workshops, three peer-review meetings, two Board of Scientific Counselors meetings, and one scientific advisory meeting. CDC and FDA could have additional contracts that support some of their voluntary NTP efforts.

### NIEHS Contracts That Supported NTP Activities in FY 2018

| Description | Contractor |
|---|---|
| Analytical Chemistry Services | Battelle Memorial |
| | Midwest Research Institute |
| | Research Triangle Institute |
| Archives and Specimen Repository | Experimental Pathology Laboratories |
| Bioinformatics Methylation Project | Laboratory Corp of America |

# Noncancer Research

In addition to conducting analysis activities to identify cancer hazards, NTP also evaluates the scientific evidence to determine whether environmental chemicals, physical substances, or mixtures—collectively referred to as substances—cause adverse, noncancer, health effects. NTP also provides opinions on whether these substances might be of concern given what is known about current human exposure levels. The NIEHS/NTP Office of Health Assessment and Translation (OHAT) conducts health hazard assessments and other evidence evaluations, including scoping reviews, evidence maps, and state-of-the-science evaluations, which are published as NTP monographs, NTP research reports, and journal publications, and hosts workshops to address important issues in environmental health sciences. Andrew Rooney, Ph.D., served as acting director of OHAT in FY 2018.

In FY 2018, OHAT added evidence mapping as a new interactive data presentation format as an output option of its evidence evaluations. Evidence maps categorize or "map" the key concepts for a particular question or topic. When performed with a systematic literature search and selection process, the resulting evidence map allows readers to explore evidence categorized by health effect, exposure, evidence stream (e.g., human, experimental animal, or mechanistic data) and study design. The State-of-the Science Evaluation of Transgenerational Inheritance of Health Effects demonstrates this new interactive data presentation.

## Ongoing Noncancer Health Effects Projects

| Project Study Scientist | Project Summary | Status |
|---|---|---|
| Evaluation of long-term neurological effects of acute exposure to the organophosphorus nerve agent sarin<br><br>Andrew Rooney | Sarin is a highly toxic organophosphorus nerve agent developed for chemical warfare during World War II that continues to be used as a weapon today.<br><br>In partnership with the NIH Countermeasures Against Chemical Threats (CounterACT) Program, NTP has conducted a systematic review to evaluate the evidence for long-term neurological effects in humans following acute exposure to sarin. | Draft monograph released December 2018 |
| Evaluation of inflammation-based atherosclerosis associated with environmental exposures<br><br>Brandy Beverly and Andrew Rooney | This evaluation examines whether environmental substances contribute to inflammation, which ultimately leads to atherosclerosis, and identify biomarkers of the inflammation involved.<br><br>Atherosclerosis was selected for investigation because of the significant public health impact of the disease, and the well-established role for inflammation in the disease process that leads to it. | Evaluation ongoing |
| NIEHS-EPA pilot study of exposure to chemicals in consumer products<br><br>Kyla Taylor | NIEHS is collaborating with EPA to perform a small-scale, longitudinal pilot study to evaluate the performance of existing survey, measurement, and modeling methods for assessing exposures to chemicals in several consumer product categories, including personal and child care, household cleaning, lawn and garden, home improvement, and food packaging products.<br><br>The pilot study addresses several research needs related to the measurement and modeling of human exposures. | Pilot study sample collection completed September 2018. Biological samples are being analyzed by CDC |

# Exhibit 3



**National Toxicology Program**
U.S. Department of Health and Human Services

Share This:
https://ntp.niehs.nih.gov/go/advisory

# Advisory Board & Committees

NTP calls on a variety of advisory groups to provide rigorous scientific peer review and advice on programs and activities. These groups are organized as follows:

| NTP Committee | What It Does | Related Links |
|---|---|---|
| **Executive Committee** A committee composed of the heads, or designated representatives, of nine federal agencies | • Provides programmatic and policy advice to the Director, NIEHS and NTP | • Members • Office of Liaison, Policy and Review |
| **Board of Scientific Counselors (BSC)** A federally chartered external advisory committee whose members are appointed by the Secretary of Health and Human Services | • Advises the NTP Executive Committee and Director, NIEHS and NTP on matters of scientific program content • Provides analysis and direction on NTP's scientific activities | • Charter • Members • Photo • Upcoming BSC Meetings • Past BSC Meetings |
| **Expert Panels** Ad hoc groups of experts | • Conduct peer reviews of draft reports and monographs • Provide NTP advice and scientifically rigorous evaluation on specific topics | • Upcoming Expert Panels • Past Expert Panels |
| **Scientific Advisory Committee on Alternative Toxicological Methods (SACATM)** A congressionally mandated, federally chartered advisory committee of up to 15 members appointed by the | • Advises the Interagency Coordinating Committee on the Validation of Alternative Methods (ICCVAM), the NTP Interagency Center for the Evaluation of Alternative Toxicological Methods (NICEATM), and the Director, NIEHS and NTP regarding the statutorily mandated duties of ICCVAM and | • About ICCVAM • Charter • Roster • Photo • Upcoming SACATM Meetings |

| NTP Committee | What It Does | Related Links |
|---|---|---|
| [Director, NIEHS and NTP](#) | NICEATM activities | • [Past SACATM Meetings](#) |

For contact information, visit the [Office of Liaison, Policy and Review](#).

---

Web page last updated on Oct. 4, 2019

NTP is located at the [National Institute of Environmental Health Sciences](#), part of the [National Institutes of Health](#)



National Toxicology Program
U.S. Department of Health and Human Services

# Members of the NTP Executive Committee

Members of NTP Executive Committee include the heads (or their designees) from the following federal agencies:

- Consumer Product Safety Commission
- Department of Defense
- Environmental Protection Agency
- Food and Drug Administration
- National Cancer Institute
- National Center for Environmental Health/Agency for Toxic Substances and Disease Registry
- National Institute of Environmental Health Sciences
- National Institute for Occupational Safety and Health
- Occupational Safety and Health Administration

Web page last updated on Oct. 4, 2019

NTP is located at the National Institute of Environmental Health Sciences, part of the National Institutes of Health

# **Exhibit 4**

nann
RA
1199
N27
2001



# The National Toxicology Program



A.R. MANN LIBRARY

APR - 9 2002

ITHACA, NY 14853

# ANNUAL PLAN

## Fiscal Year 2001

Digitized by Google

U.S. Department of Health and Human Services
Public Health Service

Original from
CORNELL UNIVERSITY

# NATIONAL TOXICOLOGY PROGRAM

# ANNUAL PLAN

# FOR FISCAL YEAR 2001

National Institute of Environmental Health Sciences/National Institutes of Health
National Center for Toxicological Research/Food and Drug Administration
National Institute for Occupational Safety and Health/Centers for Disease Control and Prevention

January 2002

National Toxicology Program
Public Health Service
Department of Health and Human Services

NIH Publication No. 02-5092


Digitized by Google

Original from
CORNELL UNIVERSITY

Generated for Channing Grace Baldwin Reeves (University of Washington) on 2019-12-12 20:39 GMT  /  http://hdl.handle.net/2027/coo.31924101589293
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

# PREFACE

The National Institute of Environmental Health Sciences of the National Institutes of Health (NIEHS/NIH), the National Institute for Occupational Safety and Health of the Centers for Disease Control and Prevention (NIOSH/CDC), and the National Center for Toxicological Research of the Food and Drug Administration (NCTR/FDA) form the core agencies comprising the National Toxicology Program (NTP).  The NTP is headquartered at the NIEHS/NIH and Dr. Kenneth Olden, Director NIEHS/NIH, also serves as the NTP Director.

The NTP is an interagency program whose mission is to evaluate agents of public health concern by developing and applying the tools of modern toxicology and molecular biology. This involves conducting toxicological evaluations of substances of public health concern, developing and validating improved (sensitive, specific, rapid) testing methods, developing approaches and generating data to strengthen the science base for risk assessment, and communicating with all stakeholders. The NTP has always drawn strength and direction from its commitment to open information exchange, adherence to impartiality, and rigorous scientific peer review.  Its vision, leadership, and commitment to the concept of good science for good decisions create an atmosphere that allows flexibility in the NTP's approach toward addressing public health concerns. The NTP plays a critical role in providing needed scientific data, interpretations, and guidance concerning the appropriate uses of data to regulatory agencies and other groups involved with health-related research.  Through its interactive relationship with regulatory agencies, the NTP plays an indirect, but important role in shaping public health policy.

The Program maintains an objective, science-based approach in dealing with critical issues in toxicology.  The NTP conducts research and sponsors workshops through its primary agencies (NIEHS/NIH, NCTR/FDA, and NIOSH/CDC) and leverages resources through cooperative and/or collaborative agreements with other Federal agencies, academia, and industry.  These interactions enhance opportunities to conduct toxicological evaluations of targeted agents, to strengthen the science base regarding mechanisms of disease etiology, and to promote the development of novel and alternative toxicology methods.  Current initiatives and plans for NTP research and testing for FY 2001 are summarized herein.

The NTP welcomes comment and constructive criticism of its programs and policies. Comments may be directed to NTP Liaison and Scientific Review Office (NIEHS, P.O. Box 12233, Research Triangle Park, NC 27709 or liaison@starbase.niehs.nih.gov).

Kenneth Olden, Ph.D.
Director

Digitized by  Google

National Toxicology Program
CORNELL UNIVERSITY

# OVERVIEW OF THE NATIONAL TOXICOLOGY PROGRAM

## MISSION AND GOALS

Today more than 80,000 chemicals are registered for use in commerce in the United States. An estimated 2,000 new ones are introduced annually to be used in products we encounter in our daily lives such as food, personal care products, prescription drugs, household cleaners, and lawn care products. The effects of many of these chemicals on human health are unknown, yet people and our environment may be exposed to them during their manufacture, distribution, use, and disposal or as pollutants in our air, water, or soil. While relatively few such chemicals are thought to pose a significant risk to human health, safeguarding the public depends upon identifying the effects of these synthetics as well as certain naturally occurring chemicals or substances and the levels of exposure at which they may become potentially hazardous to humans.

The Department of Health and Human Services (DHHS) established the National Toxicology Program (NTP) in 1978 and charged the NTP with coordinating toxicological testing programs within the Public Health Service of the Department; strengthening the science base in toxicology; developing and validating improved testing methods, and providing information about potentially toxic chemicals to health regulatory and research agencies, scientific and medical communities, and the public. The NTP is an interagency program whose mission is to evaluate agents of public health concern by developing and applying the tools of modern toxicology and molecular biology. In carrying out its mission, the NTP has several goals:

- to provide evaluations of substances of public health concern,
- to develop and validate improved (sensitive, specific, rapid) testing methods,
- to develop approaches and generate data to strengthen the science base for risk assessment, and
- to communicate with all stakeholders including government, industry, academia, the environmental community, and the public.

## ORGANIZATIONAL STRUCTURE AND OVERSIGHT

Three agencies, the National Institute of Environmental Health Sciences of the National Institutes of Health (NIEHS/NIH), the National Institute for Occupational Safety and Health of the Centers for Disease Control and Prevention (NIOSH/CDC), and the National Center for Toxicological Research of the Food and Drug Administration (NCTR/FDA) form the core for this program (Figure 1). The NTP is located administratively at the NIEHS/NIH and the Director of the NIEHS/NIH serves as the NTP Director. The National Cancer Institute of the National Institutes of Health (NCI/NIH) was a charter agency of the NTP and continues to participate on the NTP Executive Committee. Questions and inquiries about the NTP can be directed to the NTP Office of Liaison and Scientific Review (919-541-0530 or liaision@starbase.niehs.nih.gov, see Communication and Public Outreach).

### NTP Management

Dr. Kenneth Olden, Director NIEHS/NIH serves as NTP Director
Dr. Christopher Portier, Director, Environmental Toxicology Program, NIEHS/NIH

Digitized by 

National Toxicology Program

CORNELL UNIVERSITY

### Agency Program Management

NCTR/FDA:  Dr. William Allaben, Associate Director for Scientific Coordination
NIEHS/NIH:  Dr. Christopher Portier, Director, Environmental Toxicology Program
NIOSH/CDC:  Dr. Albert Munson, Director, Health Effects Laboratory Division

Agency staffs involved with the Program and their contact information are provided in Appendix 1.



Figure 1.   National Toxicology Program

ATSDR, Agency for Toxic Substances and Disease Registry; CPSC, U.S. Consumer Product Safety Commission; EPA, U.S. Environmental Protection Agency; FDA, Food and Drug Administration; NCEH/CDC, National Center for Environmental Health of the Centers for Disease Control and Prevention; NCI/NIH, National Cancer Institute of the National Institutes of Health; NCTR/FDA, National Center for Toxicological Research of the FDA; NIEHS/NIH, National Institute of Environmental Health Sciences of the National Institutes of Health, National Institutes of Health; NIOSH/CDC, National Institute for Occupational Safety and Health of the Centers for Disease Control and Prevention; OSHA, Occupational Safety and Health Administration.

### Advisory Committees

#### NTP Board of Scientific Counselors

The NTP Board of Scientific Counselors (the Board) (Figure 1), composed of up to 35 scientists primarily from the public and private sectors, provides scientific oversight to the Program as well as to the NTP Center for the Evaluation of Risks to Human Reproduction. A list of the current membership (as of January 2001) is provided in Appendix 2. The Board's members serve terms of up to four years. Members of the Board are distributed among the parent committee and two subcommittees in order to provide the necessary scientific expertise to the Program. The Board's Technical Reports Review Subcommittee meets annually/semiannually and provides peer review of NTP long-term toxicology and carcinogenesis technical reports. This subcommittee also provides peer review by mail of NTP toxicity studies. The Report on Carcinogens Subcommittee of the Board provides external scientific evaluation and peer review of substances nominated for listing in or delisting from the *Report on Carcinogens* (see page 77). Information about the Board is available from the executive secretary, Dr. Mary S. Wolfe (NIEHS/NIH), and minutes from its meetings are accessible on the NTP web page (http://ntp-serve.niehs.nih.gov) or from Central Data Management (see page 5).

Digitized by 

Original from
CORNELL UNIVERSITY

## Advisory Committee on Alternative Toxicological Methods

The Advisory Committee on Alternative Toxicological Methods (ACATM) (Figure 1) meets biannually and provides oversight to the NTP on the Interagency Center for the Evaluation of Alternative Toxicological Methods (NICEATM) and the Interagency Coordinating Committee on the Validation of Alternative Toxicological Methods (ICCVAM). It is composed of knowledgeable representatives from academia, industry, public interest and animal welfare organizations, other agencies, and the international community. The current roster (as of March 2001) is given in Appendix 3. The members serve rotating terms of up to four years. Summary minutes from these meetings are available through the NTP web page's link to NICEATM. In December 2000, under the ICCVAM Authorization Act of 2000 (PL106-545), a Scientific Advisory Committee was permanently established to provide guidance to NICEATM and ICCVAM (see page 74). The NTP will modify the composition and responsibilities of ACATM to comply with this law.

## NTP Executive Committee

The NTP Executive Committee (Figure 1) provides oversight to the NTP for policy issues. This committee is composed of the heads of Federal health and regulatory agencies. Table 1 lists the current membership.

**Table 1. NTP Executive Committee Membership Roster***

| Member | Affiliation |
| --- | --- |
| Henry Falk, M.D., M.P.H., Assistant Administrator | Agency for Toxic Substances and Disease Registry |
| Bernard Schwetz, Ph.D., Acting Principal Deputy Commissioner | Food and Drug Administration |
| Richard D. Klausner, M.D., Director | National Cancer Institute of the National Institutes of Health |
| Richard Jackson, M.D., M.P.H., Director | National Center for Environmental Health of the Centers for Disease Control and Prevention |
| Lawrence Fine, M.D., Dr.P.H., Acting Director (through May 2001)<br>Kathleen M. Rest, Ph.D., MPA, Acting Director (beginning June 2001) | National Institute for Occupational Safety and Health of the Centers for Disease Control and Prevention |
| Kenneth Olden, Ph.D., NTP Director | National Institute of Environmental Health Sciences of the National Institutes of Health |
| Christopher J. Portier, Ph.D., Director, Environmental Toxicology Program (Acting Director prior to June 2001) | National Institute of Environmental Health Sciences of the National Institutes of Health |
| Ruth Kirschstein, M.D., Acting Director | National Institutes of Health |
| Vacant, Assistant Secretary of Labor for Occupational Safety and Health | Occupational Health and Safety Administration of the U.S. Department of Labor |
| Ann Brown, Chairman | U.S. Consumer Product Safety Commission |
| Christine Todd Whitman, Administrator | U.S. Environmental Protection Agency |

*Membership as of June 1, 2001.

## ADDRESSING SCIENTIFIC AND REGULATORY OPPORTUNITIES

The NTP uses its goals to set priorities as it moves forward to improve the nation's ability to evaluate human health effects from chemical exposures. Its vision, leadership, and commitment to the concept of good science for good decisions create an atmosphere that allows the Program to be flexible and innovative in its approach toward addressing public health concerns related to chemical exposures at home and work and in our environment. The NTP has expanded its scope beyond cancer to include examining the impact of chemicals on non-cancer toxicities such as those affecting reproduction and development, and the immune, respiratory, and nervous systems. As part of this effort, the NTP Center for Evaluation of Risks to Human Reproduction was created.


CORNELL UNIVERSITY

The NTP recognizes that initiatives addressing critical knowledge gaps in toxicological evaluations offer the best opportunities for preventing environmentally mediated diseases. Therefore, the Program's testing of chemicals is evolving to include more mechanism-based toxicology studies that focus on understanding the mode of actions of chemical agents. In recent years, the NTP has placed a greater emphasis on providing human context to the interpretation and understanding of toxicological information generated using animal or *in vitro* cell models. This is imperative in order to be at the forefront in studying and developing risk assessment methodologies for quantifying the sequence of events that starts with chemical exposure and ends with toxicity. Examples of activities it covers include:

- an increased effort to collect information on exposures, either environmental or occupational, and on substances or mixtures of concern;
- the increased application of mechanistic information and scientific judgement in the deliberations for listings in the *Report on Carcinogens*; and
- an enhanced effort to examine the merits of alternative testing methods that may give better information than current models using fewer animals, causing less pain or distress, and hopefully providing improved data to reduce uncertainties in risk assessments.

Nationally, the NTP rodent bioassay is recognized as the standard for identification of carcinogenic agents; however, the NTP continues to work to reduce the use of experimental animals and to develop and validate alternative testing methods. This effort has led to creation of the NTP Interagency Center for the Evaluation of Alternative Toxicological Methods.

The strengthening of existing partnerships and the forging of new ones are important to achievement of the NTP's goals. Partnerships with sister Federal agencies are increasing and the NTP continues to collaborate with the private sector. Examples include co-sponsorship of numerous workshops, an interagency initiative in exposure assessment, establishment of an interagency committee (Interagency Coordinating Committee on the Validation of Alternative Methods) to oversee validation of alternative testing methods, and an interagency initiative to characterize occupational exposures. The NTP is supporting an effort to evaluate the phototoxicity of various compounds through establishment of the FDA-NIEHS Phototoxicology Research and Testing Laboratory and its designation as an NTP Center for Phototoxicology. In addition, the NTP is playing a role in providing toxicological assessments of water disinfection by-products and will provide this information to the U.S. Environmental Protection Agency (EPA) for its use in setting water standards.

Regulatory agencies make decisions for the protection of public health based on scientific information from multiple sources (e.g., toxicology, human studies, and basic research). The NTP plays a critical role in providing needed scientific data, interpretations, and guidance concerning the appropriate uses of these data to regulatory agencies as well as other groups involved in health-related research. The Program is committed to using the best science available in setting priorities for future studies and in designing, conducting, and interpreting the findings of those studies. The American people and government agencies at State and Federal levels rely on the science base provided by the NTP in making credible decisions that will protect public health without unnecessarily increasing the regulatory burden on industry. Over the past two decades, the NTP has developed an increasingly interactive relationship with regulatory agencies and through this relationship has played an important, although indirect, role in shaping public health policy. The Program maintains an objective, science-based approach in dealing with critical issues in toxicology. Recognition of this fact by all participants in the public debate over the regulation of chemicals has afforded the NTP the status of an "honest broker" in the continuing dialogue concerning the appropriate application of scientific advances to applied toxicology research and testing.


Digitized by Google

Original from
CORNELL UNIVERSITY

**DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES**

Public Health Service
National Toxicology Program
Central Data Management
P.O. Box 12233, MD E1-02
Research Triangle Park, NC 27709

**Official Business**
**Penalty For Private Use - $300**

SPECIAL FOURTH-CLASS
RATE
POSTAGE & FEES PAID
DHHS/NIH

NIH Publication No. 03-5309

Digitized by Google

Original from
CORNELL UNIVERSITY