DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Case No. 17-CV-02162 EMC <br><br> **DEFENDANTS' FOURTH MOTION IN LIMINE TO EXCLUDE IRRELEVANT EVIDENCE ON ALTERNATIVES TO FLUORIDATED WATER AND CUMULATIVE TESTIMONY ON LACK OF BENEFITS** <br><br> Date:  January 7, 2020 <br> Time:  2:30 p.m. <br> Place:  Courtroom 5, 17th floor |

Defendants' Fourth Motion in Limine to Exclude Evidence
on Alternatives and Cumulative Lack of Benefits Testimony
Case No. 17-cv-02162 EMC

## INTRODUCTION

This Court has the authority to "avoid[] unnecessary proof and cumulative evidence, and limit[] [expert] testimony." Fed. R. Civ. P. 16(c)(2)(D); Fed. R. Evid. 403. The United States Environmental Protection Agency ("EPA") respectfully moves the Court to preclude Plaintiffs from introducing (1) irrelevant expert testimony on alternatives to community water fluoridation and (2) needlessly cumulative testimony that the dental health benefits of community water fluoridation are overstated.

## BACKGROUND

Plaintiffs brought this action under section 21 of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §2620, seeking an injunction compelling EPA to initiate a rulemaking pursuant to TSCA section 6(a), *id.* §2605(a), to ban the introduction of fluoridation chemicals into drinking water due to an unreasonable risk of injury to human health. In support of their contention of unreasonable risk, Plaintiffs claim that community water fluoridation creates a neurotoxic harm with little health benefits. Petition at 1, attached as Exhibit A ("The risk to the brain posed by fluoridation additives is an unreasonable risk because . . . there is little benefit in swallowing fluoride"); Compl., Docket No. 1, at Paragraphs 91 to 95. It is undisputed that some communities add fluoride to drinking water for the purposes of preventing and reducing dental decay (i.e., dental caries). Plaintiffs' pending motion for summary judgment, however, seeks to exclude consideration of health benefits. Docket No. 117 at 11. But as EPA explained, health benefits are appropriately considered a risk factor in a *unreasonable risk* determination. Docket No. 119 at 20-23 (describing how the absence of a chemical may be characterized as a risk to human health). Rather than focus on whether community water fluoridation provides a health benefit, Plaintiffs seek to introduce evidence about *alternatives* to community water fluoridation. This includes evidence on the efficacy of fluoridated toothpaste and other anti-caries strategies that, in Plaintiffs' view, do not cause dental fluorosis (a cosmetic discoloration of the teeth enamel) and have driven the purported declines of dental caries *elsewhere*, particularly in Western Europe.

Defendants' Fourth Motion in Limine to Exclude Evidence
on Alternatives and Cumulative Lack of Benefits Testimony
Case No. 17-cv-02162 EMC

Further, Plaintiffs have also proffered *five* witnesses to testify to evidence of fluoride's anti-caries benefit, or lack thereof: retained experts Ole Fejerskov, Philippe Grandjean, Kathleen Thiessen, and Christine Wells, and the Center for Disease Control's ("CDC") designated Fed. R. Civ. P. 30(b)(6) witness, Casey Hannan.  These witnesses will purportedly testify to how fluoride exerts its anti-caries benefit (e.g., through topical contact and/or through ingestion), when it does so (e.g., while the teeth are developing *in utero* through early childhood and/or after teeth have erupted), and the effectiveness of alternative means to control caries (e.g., fluoridated toothpaste in Europe).  Not only do the witnesses reach the same conclusions (except for CDC), they largely rely on the same evidence.

## ARGUMENT

I.    **Evidence on Alternatives to Community Water Fluoridation Is Not Relevant to the Court's Analysis.**

At trial, Plaintiffs intend to proffer Dr. Fejerskov to provide the following five opinions:

(1) [F]luoride's beneficial effects come from topical contact with teeth, not ingestion;
(2) the evidence on the beneficial effects of individual-use topical fluoride products, like toothpaste, is much stronger than the evidence for water fluoridation[1];
(3) caries has declined significantly throughout the developed world in communities with and without water fluoridation, with little demonstrable difference in caries rates between communities that add fluoride to water and communities that do not[2];
(4) fluoride exposure during the *in utero* and early infancy period is contraindicated for oral health purposes; and
(5) in light of current data on the relationship between waterborne fluoride, caries, and dental fluorosis, adding fluoride to water is no longer justified from an oral health perspective.

---

[1] *See* Fejerskov Report at 2, attached as Exhibit B (charge question of whether community water fluoridation is "advisab[le] . . . in current content of widespread availability of . . . toothpaste"); Fejerskov Dep.173:2-5, Attached as Exhibit C (Q: Are you of the opinion that in lieu of community water fluoridation, fluoride toothpaste can provide the same dental caries control? A: Yeah.").
[2] *See* Fejerskov Dep. 218:11 to 219:1 (opining on dental caries in Norway, Sweden, Iceland, Finland and Germany); Fejerskov Dep. 284:20 to 286:17; 289:20 to 290:5 (Plaintiffs soliciting testimony on dental care alternatives in Australia and Denmark which provide personalized anti-caries care like home visits from dental therapists to teach proper teeth brushing).

Defendants' Fourth Motion in Limine to Exclude Evidence
on Alternatives and Cumulative Lack of Benefits Testimony
Case No. 17-cv-02162 EMC

Expert Disclosure at 2, attached as Exhibit D.  With the exception of Opinion (1), Dr. Fejerskov's opinions are irrelevant to the pertinent questions before the Court: whether community water fluoridation provides health benefits, to what degree it provides such benefits, and how to consider those benefits in light of any alleged neurotoxic risk.  Those opinions should thus be excluded pursuant to Fed. R. Evid. 402.

Neither toothpaste's anti-caries benefit, the subject of Opinion (2), nor testimony on how other countries control dental caries through alternative means, the subject of Opinion (3), is germane to community water fluoridation's health benefits in the United States.  *See* Fed. R. Evid. 401 (relevant evidence concerns "a fact that is of consequence to the determination of the action").  Indeed, only *after* there has been an unreasonable risk determination by this Court would EPA consider alternatives to community water fluoridation, as part of promulgating a risk management rule.  15 U.S.C. § 2605(c)(2)(C) ("The Administrator shall consider . . . whether technically and economically feasible alternatives that benefit health . . .  compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute . . . .).  Opinions (4) and (5) are also irrelevant because they are premised on ingested fluoride causing dental fluorosis, a cosmetic condition that alters the color of tooth enamel.  Fejerskov Report at 23; Fejerskov Dep. 138: 14-17 ("A: I'm not warning against water fluoridation.  I'm not an antagonist to water fluoridation.  I'm just saying with the knowledge of . . . dental fluorosis [and] the [dental] caries process . . . it's not necessary.").  Thus, Dr. Fejerskov's recommendations for alternative oral health strategies are not premised on any concerns regarding neurodevelopmental toxicity, the basis of Plaintiffs' unreasonable risk charge, and therefore his recommendations are irrelevant to the decision before this Court.  Fejerskov Dep. 74:8-11 ("Q: Do you have any intention on testifying to any connection between fluoride and neurotoxicity? A: No."); Fejerskov Dep. 138:1 to 139:13.  As such, whatever risk-benefit analysis Dr. Fejerskov may have conducted, he examined an immaterial risk, dental fluorosis, instead of neurotoxicity.[3]

---

[3] Fejerskov Report at 23 (offering an opinion "[f]rom a risk-benefit perspective").  The prospective risk of dental fluorosis is not the basis of the administrative petition, nor the basis of

Defendants' Fourth Motion in Limine to Exclude Evidence
on Alternatives and Cumulative Lack of Benefits Testimony
Case No. 17-cv-02162 EMC

As for the relevant question of whether community water fluoridation has an anti-caries benefit, Dr. Fejerskov affirms that it does. Fejerskov Report at 10-11 ("fluoridated water controls caries because it is drunk regularly . . . which causes the fluoride levels in the oral fluids to increase regularly during the day). Meanwhile, Opinions (2)-(5) threaten to waste time and confuse the issues, shifting the Court's attention to dental fluorosis and alternatives to community water fluoridation in other countries. Fed. R. Evid 402, 403. Such opinions should therefore be excluded.

## II.   Cumulative Testimony on Any Lack of Benefit Should be Excluded

Plaintiffs have offered five expert witnesses to discuss the same issue of what, if any, benefit fluoride provides to teeth. This duplicative testimony appears to be nothing more than an inappropriate attempt to provide the impression that the evidence is in Plaintiffs' overwhelming favor.[4] The Court has wide discretion to exclude "needlessly . . . cumulative evidence" that does "not present additional facts [for] the judge's decision." *Kay v. Cessna Aircraft Co.*, 548 F.2d 1370, 1373-74 (9th Cir. 1977). "[C]umulative evidence replicates other admitted evidence" and may be excluded even if relevant. *United States v. Ives*, 609 F.2d 930, 933 (9th Cir. 1979) (citing *United States v. Elksnis*, 528 F.2d 236, 238-39 (9th Cir. 1975)). The Court should exercise that authority to exclude unnecessarily cumulative testimony.

This authority applies with equal force to the exclusion of expert opinions that are "unnecessarily duplicative of prior testimony," *United States v. Lewis*, 837 F.2d 415, 418 (9th Cir. 1988), because "the probative value of an expert opinion [may] not outweigh[] the time consumed," *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1430 (9th Cir. 1991). Courts routinely compel parties to elect which single witness will testify on a given issue to avoid redundancy. *Se,e e.g.*, *Allen v. Hylands Inc.*, No. CV12-1150, 2015 WL 12720304, at *1 (C.D. Cal. Aug. 20, 2015), *aff'd*, 773 F. App'x 870 (9th Cir. 2019) (excluding testimony that covers the "same topics" or "rel[ies] on the same or very similar evidence"); *Carver v. Audio Prod. Int'l Corp.*, No. C00-

any standing witness. In any event, Dr. Fejerskov is not a risk assessor and offered no foundation for any purported risk-benefit analysis for this Court to consider.

[4] By contrast to the expert "head counting" proffered by Plaintiffs, EPA shall endeavor to streamline its own testimony on community water fluoridation's health benefits, including being open to proffering a single witness on this subject.

4

Defendants' Fourth Motion in Limine to Exclude Evidence
on Alternatives and Cumulative Lack of Benefits Testimony
Case No. 17-cv-02162 EMC

1477L, 2003 WL 25673996, at *1 (W.D. Wash. Mar. 4, 2003) (precluding "duplicate testimony" "[d]ue to the limited time available for this complex and technical trial").

In this case, Plaintiffs are attempting to flout Rule 403 by needlessly piling on redundant expert testimony, and indeed, Plaintiffs' own motion for summary judgment warns that "the total time of [the benefits experts'] collective testimony could be substantial." Docket No. 117 at 24.  All five witnesses are being offered to speak to how fluoride exerts its anti-caries benefit.  Dr. Fejerskov will discuss how "fluoride's beneficial effects come from topical contact with teeth, not ingestion." Expert Disclosure at 2.  Dr. Wells' entire report purportedly concerns how the "ingestion of fluoride is . . . ineffective." Expert Disclosure at 7.  Dr. Theissen included a specific appendix to her expert report on the "lack of effectiveness of community water fluoridation in improving dental health," which discusses how the "beneficial effect of fluoride on teeth is topical (e.g., from toothpaste), not from ingestion."  Theissen Report 137-143; *see also* Theissen Report at 61 and 129 (discussing "topical" application).   Dr. Grandjean, with little commentary, nonetheless also offers an opinion "that fluoride's predominant benefit to teeth comes from topical contact with the outside of the enamel, not from ingestion." Grandjean Report 10, attached as Exhibit F.  Finally, Plaintiffs will elicit a position from the CDC on "whether community water fluoridation provides a benefit." CDC 30(b)(6) Subpoena Topic 9, attached as Exhibit G.

At least four of the witnesses are to testify on the related question of when the anti-caries effects occur, opining on whether *in utero* and early childhood exposure to fluoride provides a benefit for developing teeth.  *See* Expert Disclosure at 2 (disclosing Dr. Fejerskov's opinion for this time period); Expert Disclosure at 7 (disclosing Dr. Wells' opinion on "pre-eruptive" exposure); Theissen Report at 61 and 138-39 (discussing benefits at different ages and periods of tooth development); CDC 30(b)(6) subpoena Topics 12 and 13 (soliciting information on prenatal and early childhood fluoride exposure).

Three of the witnesses speak of the irrelevant, alternative means of maintaining dental health, such as via fluoridated toothpaste, which has led to the purported reduction of caries outside the United States. Expert Disclosure at 2 (disclosing Dr. Fejerskov's opinion on the availability

5

Defendants' Fourth Motion in Limine to Exclude Evidence
on Alternatives and Cumulative Lack of Benefits Testimony
Case No. 17-cv-02162 EMC

and efficacy of toothpaste and the purported drop in caries elsewhere, particularly Europe); Thiessen Report at 138 (discussing how diet impacts dental caries and the decline in caries in "developed countries"); Grandjean Report 42 (concluding that toothpaste is the "preferred intervention" and led to a drop in caries in the "industrialized world").

Not only do the witnesses largely reach the same conclusions, they rely on the same lines of evidence. For example, three witnesses opine on the Iowa Fluoride Study. Dr. Wells' entire opening report concerns it. Disclosure at 7. Both Dr. Fejerskov and Dr. Thiessen reach the same conclusion that the Iowa Fluoride Study does not support an association between fluoride intake and caries prevention. Fejerskov Report at 15; Thiessen Report at 139. Similarly, three experts rely upon the 2015 Cochrane review of fluoridated drinking water. Fejerskov Report at 19-20; Thiessen Report at 137-138; Grandjean Report at 34. The overlap of authorities is particularly pronounced between Dr. Fejerskov and Dr. Thiessen, who both rely on evidence from JD Featherstone, KK Cheng, JJ Warren, M. McDonagh, the American Dental Association, and the CDC. This Court need not hear multiple experts opine on the same underlying evidence.

Finally, the Court should preclude the testimony of Mr. Hannan of the CDC. Although the CDC has long supported community water fluoridation (and continues to do so), the relevant question before the Court is whether the evidence, not a particular agency's position, demonstrates that community water fluoridation provides a health benefit. Plaintiffs have already proffered four other witnesses for that question, some who already cite to the CDC. Thiessen Report at 61; *Trevino v. Gates,* 99 F.3d 911, 922 (9th Cir. 1996) ("The fact that a party can present the relevant testimony through other witnesses is a factor that weighs in favor of exclusion.")

## CONCLUSION

Plaintiffs are threatening to flood the Court with needlessly cumulative testimony that unfairly prejudices EPA and wastes the Court's time. The Court should exercise its authority under Fed. R. Evid. 403 by limiting Plaintiffs to one expert witness to opine on the health benefits of fluoridated drinking water, and excluding testimony on irrelevant topics like dental fluorosis,

6

Defendants' Fourth Motion in Limine to Exclude Evidence
on Alternatives and Cumulative Lack of Benefits Testimony
Case No. 17-cv-02162 EMC

alternatives to fluoridated drinking water, or Europe's purported decline in dental caries.   This would allow each party to fairly present their case.

Date: December 9, 2019
Washington, DC

Respectfully Submitted,

*/s/ John Thomas H. Do*
Debra J. Carfora
John Thomas H. Do
Brandon N. Adkins
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

Defendants' Fourth Motion in Limine to Exclude Evidence
on Alternatives and Cumulative Lack of Benefits Testimony
Case No. 17-cv-02162 EMC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

Pursuant to stipulation, I hereby certify that on this 9th day of December, 2019, a true and correct copy of the foregoing Defendant's Fourth Motion in Limine to Exclude Irrelevant Evidence on Alternatives to Water Fluoridation and Cumulative Testimony on Lack of Benefits  was served on counsel for Plaintiffs by email.


*/s/ John Thomas H. Do*
John Thomas H. Do
United States Department of Justice

Defendants' Fourth Motion in Limine to Exclude Evidence
on Alternatives and Cumulative Benefit Testimony
Case No. 17-cv-02162 EMC

Exhibit A

  

  

November 22, 2016

Gina McCarthy, Administrator
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460

Dear Administrator McCarthy:

Pursuant to section 21 of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2620, the Fluoride Action Network, Food & Water Watch, Organic Consumers Association, American Academy of Environmental Medicine, International Academy of Oral Medicine and Toxicology, Moms Against Fluoridation, and undersigned individuals (collectively, "Petitioners") hereby petition the U.S. Environmental Protection Agency to protect the public and susceptible subpopulations from the neurotoxic risks of fluoride by banning the addition of fluoridation chemicals to water.

Under Section 6 of TSCA, EPA is invested with the authority to prohibit the "particular use" of a chemical substance if the use presents an unreasonable risk to the general public or susceptible subpopulations.   15 U.S.C. § 2605(a).   EPA has recognized that its authority to regulate chemical substances under TSCA includes the authority to prohibit *drinking water additives*.

EPA should exercise its authority under TSCA to prohibit fluoridation additives because application of the Agency's own *Guidelines for Neurotoxicity Risk Assessment* to the existing database on fluoride shows that (1) neurotoxicity is a hazard of fluoride exposure, and (2) the reference dose that would reasonably protect against this hazard is incompatible with the doses now ingested by millions of Americans in fluoridated areas.  In fact, the amount of fluoride now regularly consumed by many people in fluoridated areas *exceeds* the doses *repeatedly* linked to IQ loss and other neurotoxic effects; with certain subpopulations standing at elevated risk of harm, including infants, young children, elderly populations, and those with dietary deficiencies, renal impairment, and/or genetic predispositions.

The risk to the brain posed by fluoridation additives is an unreasonable risk because, *inter alia*, it is now understood that fluoride's predominant effect on tooth decay comes from *topical* contact with teeth, not *ingestion*.  Since there is little benefit in *swallowing* fluoride, there is little justification in exposing the public to *any* risk of fluoride neurotoxicity, particularly via a source as essential to human sustenance as the public drinking water and the many processed foods and beverages made therefrom.  The addition of fluoridation chemicals to water thus represents the very type of unreasonable risk that EPA is duly authorized to prohibit pursuant to its powers and responsibilities under Section 6 of TSCA, and Petitioners urge the Agency to exercise its authority to do so.

Exhibit B

# APPENDIX 2:

**Expert Report of Ole Fejerskov, DDS, PhD, Dr. Odont**

# Rational Use of Fluorides in Modern Society

**Expert report of**
**Ole Fejerskov, DDS, PhD, Dr. Odont.**
**Aarhus, Denmark**
**June 27, 2019**

## I.      INTRODUCTION

The role of fluorides in the control of dental caries is widely considered an important public health success. However, as with many successful programs this success is not without cost and it is a story which at times has resulted in strong emotional debates within the dental profession which have not always been based on scientific evidence (Fejerskov 2004). Thus, despite the fact that *fluoride exerts its predominant cariostatic effect by being present in the oral cavity (the so-called topical effect)* and that *fluoride does not have to be ingested to reduce the caries rate in populations* (Fejerskov et al. 1981), the systemic use of fluoride continues to be widely recommended throughout the Anglo Saxon world. *The only proven effect of ingesting fluoride* during the long-lasting process of tooth development is to develop *dental fluorosis* which is the early signs of a toxic, biologic effect of fluoride (Fejerskov et al. 1977, Aoba & Fejerskov 2002). For the reasons set forth herein, it is my professional opinion that the addition of fluoride to public water supplies is no longer justified from an oral health perspective.

## II.      QUALIFICATIONS

I obtained my D.D.S. degree from The Royal Dental College, Aarhus in 1967, and after two years of post-doctoral training in General Pathology at the University Hospital, Aarhus University, I received my PhD in Odontology in 1970. Later in 1973, I received my Doctor Degree in Odontology from the Royal Dental College. My training during this period included postgraduate studies on advanced techniques for studying dental hard tissues at the London Hospital in England.

Since 1973, my research interests have predominantly been focused on how fluorides affect mineralizing dental hard tissues during development – and once the teeth are fully mineralized how fluoride interacts with the dental enamel in the oral cavity during caries development. The studies have been multidisciplinary and involved inorganic chemistry, cell and tissue cultures, structural studies at the light- and electron- microscopic level, immune-

studies on rats and domestic pigs, as well as extensive longitudinal clinical studies of dental caries, dental fluorosis and periodontal disease involving microbiology and epidemiology techniques in populations in Africa, South East Asia and the Peoples Republic of China. Such studies have only been possible by building international teams comprising experts in a wide variety of disciplines.

To date, I have published about 400 papers, mostly in peer reviewed scientific journals. I have written and edited 10 international textbooks on dental caries and fluoride. I have been editor of several international dental journals, including *Community Dentistry and Oral Epidemiology*, *Acta Odontologica Scandinavica*, *Scandinavian Journal of Dental Research*, and *Journal of Oral Rehabilitation*, and have served on the boards of dental research organizations such as IADR (International Association of Dental Research), ORCA (European Organization for Caries Research), and the European Research Group of Oral Biology. I have also served as a Member of the World Health Organization Expert Panel on Oral Health and have received 8 honorary doctor degrees from recognized international universities.

A copy of my current C.V. is attached as **Appendix A**, a list of my publications over the past 10 years is attached as **Appendix B**. A more complete discussion of my research career can be found in my recent book chapter *The Dental Profession in the 21st Century* (Fejerskov 2017). This is the first time I have agreed to serve as an expert in litigation.

## III.     QUESTION PRESENTED

I was asked to provide my opinion about the mechanism(s) by which fluoride controls tooth decay (caries), and the advisability of adding fluoride to drinking water in the current context of widespread availability of topical fluoride products such as toothpaste. I have not charged an hourly rate for my work in preparing this report, but I have received a $15,000 honorarium.

## IV.      BACKGROUND

### A.          Fluoride in Caries Prevention and Control - How Fluoride Came into Dentistry

It was the detrimental effects of fluoride on the appearance of tooth enamel (dental fluorosis) that prompted the initial detailed investigations and ultimately the discovery of its anticaries benefits (Fejerskov et al. 1988). The association between fluoride and "mottled enamel" as it was first designated became clear in the beginning of the 20th century thanks to two American dentists; Dr Fredrick McKay and a US Public Health Officer, H. Trendley Dean.  Subsequently the positive association between elevated exposure to fluoride and decreased prevalence of caries cavities became known (Dean & Elvove 1942).

'An endemic imperfection of the enamel of the teeth heretofore unknown in the literature of dentistry' (Black 1916) drew attention of the dental research community to the condition. One thing that puzzled both Black and McKay was that although mottled enamel was clearly hypocalcified and therefore theoretically more susceptible to decay, this did not appear to be the case (McKay 1928). Coincidentally, Ainsworth (1933) in England made a similar observation.

It became clear that the condition was localised to children born in specific geographical areas and McKay suspected that the water supplies of these districts might be an important aetiological factor. In Bauxite, Arkansas, changes to a water supply resulted in children having mottled enamel (Kempf & McKay 1930) and chemical analysis of the water supply revealed an unexpectedly high level of fluoride in the drinking water (14.7 ppm F). These high levels were later confirmed in other towns with mottled enamel (Churchill 1931). These observations did not establish a cause and effect relationship. However, when considered in light of findings by McCollum and co-workers that rats fed a diet with added fluoride developed hypomineralized teeth, the etiology of mottled enamel was clearly established.

In the 1930s systematic animal experiments and human epidemiological studies established both the association and cause-effect relationship between fluorides in drinking waters and mottled enamel (since referred to as dental fluorosis). The epidemiological studies were performed by a team led by Dean (Dean 1934, Dean & Elvove 1936, Dean & McKay 1939). Dean was also interested in the apparent anomaly that although the enamel appeared to be hypomineralised it did not appear to be any more susceptible to decay. He initially undertook a small study involving 114 children who had used water containing 0.6-1.5 ppm F and found only 4 percent were caries free compared to 22% of 122 children in an area with drinking water containing 1.7-2.5 ppm F (Dean 1938a). A further larger study suggested that caries experience in two cities with water supplies containing 1.7 and 1.8 ppm, was half that of two similar adjacent cities with only 0.2 ppm F in the drinking water (Dean et al. 1939).

The association between the fluoride level in the drinking water and caries levels was then characterised in the '21 city study' (actually a series of studies, Dean et al. 1941, 1942). Children from cities with natural fluoride concentrations in their drinking water ranging from around zero up to 2.6 ppm F were examined and the results of this classic piece of epidemiological investigation of both fluorosis and caries experience were reported (Dean 1942). This became the backbone for adding fluoride to water supplies subsequently.

Dean was equally interested in understanding the toxic effects of fluoride ingestion on tooth enamel and classified the severity of dental fluorosis in individuals (Dean 1934, 1938b, 1942) as questionable, very mild, mild, moderate and severe. The prevalence of subjects with lesions of any severity was about 50% at the level of 1 ppm F or less in the drinking water. The less severe forms of fluorosis (questionable and very mild) accounted for most cases. Dean showed a very clear dose response relationship between the fluoride level in the drinking water and the prevalence of fluorosis even at levels of fluoride in the drinking water below 1 ppm F. Therefore, even at low

levels of fluoride in the drinking water there was some risk attached to use of fluoride. As artificial water fluoridation became established in the USA tremendous efforts were taken by public health dentists to downplay these dimensions of early toxic effects. This included efforts to eliminate the category of "questionable" dental fluorosis by claiming that it reflected a variety of other types of enamel changes not caused by fluoride. Myers (1983), however, reviewed the available literature regarding the "questionable" category of fluorosis and demonstrated that it was a distinct entity associated with fluoride.

**Figure 1. Prevalence and severity of dental fluorosis in Dean's 21 cities**



*Source: Dental Caries – The Disease and Its Clinical Management, 3d Ed.*
*Wiley Blackwell, 2015, p. 246*

Dean gave much thought to the question what might constitute "the optimum level of fluoride" in drinking water supplies, i.e. the concentration of fluoride that would result in maximum "caries protection" while causing minimal dental fluorosis. Based on his studies on "the minimal threshold of chronic endemic dental fluorosis" Dean concluded that "amounts not exceeding 1 part per million expressed in terms of fluorine are of no public health significance" (Dean 1936). Dean's personal assessment "of no public health significance" was not synonymous with saying that no dental fluorosis occurs in the population. Indeed, Dean and public health authorities

recognized that water fluoridation would produce very mild and mild dental fluorosis in up to 10% of the population, which was considered a necessary trade-off for caries prevention[1] (NRC 1951). This resulted in the widespread adoption of 1-1.2 ppm F in USA as an 'optimal' level in the drinking water.

The strong association between the fluoride level in the drinking water and caries levels were based on cross sectional study designs. Therefore, in order to establish a cause and effect relationship, intervention studies were required and these commenced in the Lake Michigan area in 1944. Two towns were selected, Grand Rapids and Muskegon, and baseline caries levels in children aged 4-16 years were recorded. In addition, caries levels were recorded in Aurora, Illinois, an area with naturally occurring fluoride in the drinking water at the level of 1.4 ppm F (no attempts were made to assure that the populations in question were in fact comparable in terms of, for example, socio-economic composition, etc.). At the start of the study, caries levels (Dean 1950) in the two Michigan cities were similar. Fluoride at the level of 1 ppm was then added to the drinking water of the city of Grand Rapids in January 1945 and caries levels were recorded again after 6½ years of fluoridation. In 'non-fluoride' Muskegon the average number of teeth with decay experience was 5.7 compared to 3.0 in 'fluoridated' Grand Rapids, so the study was deemed so successful that it was decided to fluoridate the drinking water of Muskegon (Arnold et al., 1953). After 15 years of fluoridation in Grand Rapids (Arnold et al.,1962) the number of teeth with cavities had fallen from 12.5 in 1944 to 6.2 in 1959, a reduction of approximately 50%.[2] Caries levels in

---

[1] The estimates of the expected prevalence of dental fluorosis that would result from water fluoridation invariably excluded 'questionable' fluorosis (e.g., Hodge 1950, NRC 1951). This left the impression that only about 10% of children would experience enamel disturbances from water containing 1 mg/L, whereas the actual figure, as discussed above, was approximately 50%.

[2] It must be acknowledged that a likely possible bias is introduced in most fluoridation studies by the fact that the fluoride level of the location investigated is known before the examinations are conducted. Further, by merely realising that a child has dental fluorosis, an examiner would know there was a history of fluoride exposure, and may thereby be inclined to expect less dental caries. These factors may serve to inflate the benefits.

Grand Rapids were now very similar to those experienced in Aurora, the naturally fluoridated city. Unfortunately no one was reporting how dental caries severity was changing in other comparable populations.

In an attempt to further build up the evidence of an "optimal fluoride dose" Hodge (1950) presented the results of logarithmic transformations of Dean and co-workers caries data and averaged index values of Dean's original scores of dental fluorosis. As can be seen in Hodge's figure below, the curves gave the impression that "below 1 ppm of fluoride, there is no indication that fluoride has any effect on the occurrence" of fluorosis (Hodge 1950). It is now appreciated that this way of statistically manipulating data was inappropriate, but the resulting illustrations were very convincing for lay-men and public health dentists. In a personal discussion with Hodge (who I greatly respected as a scientist) at a meeting in Utah in 1982 he fully appreciated that at the time he was carried away when making this transformation of the data.

**Figure 2.  Average indexes of fluorosis plotted against water fluoride content (logarithmic scale)**



*Figure from Hodge (1950)*

In Hodge's logarithmic analysis of Deans's data the mean caries experience recorded from the 21 city studies indicated that a maximum caries reduction was obtained around the concentration of about 1-1.2 ppm fluoride in water supplies, so the "optimum level" was determined

as the level of concentration of fluoride in water supplies which gave maximum caries reduction while causing minimal dental fluorosis of "no cosmetic concern" from a public health point of view. This estimate of the optimal water fluoride concentration was subsequently used to determine the amount of fluoride which should be given in other systemic fluoride regimens such as tablets, vitamin drops, salt, etc. which became introduced in populations where health authorities would not allow artificial fluoridation of water supplies.

By the middle of the 20th century there was much enthusiasm about the possibilities for caries prevention by adding fluorides to water supplies. During that period, in Europe in particular, the caries situation was overwhelming with numerous tooth extractions amongst children, so attempts to introduce "the American concept" of adding fluoride to the water supplies were made in a few countries as exemplified in Holland. The concept of an "optimum fluoride" consumption was further advanced, but in most European countries the population did not want to be "medicated" through the water supplies, and there were concerns expressed about the potential for adverse effects. Some European countries, including Germany, Holland, Ireland, Finland, Spain, Switzerland, and the United Kingdom, did begin water fluoridation to some extent. Most of these countries, however, subsequently terminated their water fluoridation programs. Today, the only European countries that still add fluoride to water are Ireland (100%), Spain (~10%), and the United Kingdom (~10%).

## B.        Systemic Fluoride and the Concept of Caries Resistant Teeth

The concept of the necessity of ingesting fluoride was based on the belief that fluoride exerted its anti-cariogenic effect predominantly by becoming incorporated into the crystals in the dental hard tissues during enamel formation. This, it was believed, would make the enamel more "resistant" to the acid attack on tooth surfaces, because it was known that pure fluorapatite is less soluble than hydroxyapatite (Volker 1939; for a detailed discussion see Fejerskov & Larsen 2015).

With this paradigm it was therefore logical that public health dentists would have to argue that as much fluoride as possible should be ingested during tooth formation in early life in order to increase the "resistance of the tooth" (see Fejerskov 2004, Fejerskov 2017). Arguments that "optimal fluoride concentrations in water supplies result in more perfect mineralised teeth with pearl shine appearance," or "teeth formed in low fluoride areas are fluoride deficient" were common. Also, based on this old concept, fluoride was considered a micronutrient to control caries and it is still by some considered "essential in diet" (Hunt & Stoecker 1996, Bergman et al. 2009), although this is surprising taking into account how the concepts on cariostatic mechanisms of fluoride have changed, as discussed below.

## C.        Fluoride & the Caries Process

In order to understand fluoride's cariostatic mechanism, it is crucial to understand the caries process as a progressive loss of minerals from the tooth structure caused by biofilm metabolism, leading over time to the development of a cavity. The effect of fluoride on the caries process is not fully understood despite years of research. Nevertheless, while available in the oral cavity even at micromolar concentrations, fluoride has a measurable effect on the stability of tooth minerals, since it is a potent enhancer of mineral precipitation. The ultimate effect will be a reduction in the progression of caries lesions (Fejerskov & Larsen 2015).

The concept that fluoride delays caries progression by reducing demineralization and enhancing remineralization (rather than preventing caries formation) has to be understood in order to discuss the mode of action of each method of fluoride delivery. It is clear that tooth minerals are very stable because saliva under normal pH conditions has calcium and phosphate concentrations high enough to be supersaturated with respect to the mineral phases of teeth (mainly hydroxyapatite). It is only under certain conditions when this supersaturation is disturbed (i.e., when the biofilm metabolism produces acid from sugar fermentation) that dental demineralization can

occur. Therefore, it is not surprising that caries is ubiquitous in modern society, which lives on a sucrose-rich diet. Sucrose fermentation results in proton production which reduces the supersaturation of the biofilm fluid with respect to tooth minerals leading to mineral dissolution in order to maintain the saturation condition. If this demineralization episode is repeated many times a day, over a period of weeks or months a visible caries lesion develops (Fejerskov, 1997). Although fluoride does not affect biofilm formation and sugar metabolism in concentrations available in saliva and biofilm fluid, dental demineralization is reduced by the concomitant precipitation of fluorhydroxyapatite, a mineral phase that is more stable than hydroxyapatite at any given pH. Therefore, while hydroxyapatite from inside the tooth enamel is dissolving during a cariogenic challenge, a fluoridated apatite can precipitate in the outer surface layer of the enamel. The net result is a reduction of total mineral loss, accompanied by the gradual formation of a fluoride-enriched mineral (a consequence, and not cause, of the fluoride effect[3]).

The reduction of demineralization and enhancement of remineralization is the basis of fluoride use irrespective of the vehicles used. Methods of fluoride application can be considered as collective to the whole population (e.g., water), individual (e.g., toothpaste, mouthwash) or professionally applied (e.g., topical 2% NaF solution, F-gel, varnish). Water fluoridation does not depend on individual compliance and is a passive 'mass medication.' Other fluorides (supplements, toothpaste, gels, varnishes, etc) rely on active patient involvement.

Given the wide range of fluoride vehicles now available, and the change in the epidemiology of caries in recent decades (partly as a result of fluoride use), it is of utmost importance that the role and mode of action of each of these methods is understood so that they may

---

[3] After tooth eruption, the fluoride concentration in enamel can be increased as the result of pH fluctuations that cause dissolution and redeposition of the enamel (Fejerskov & Larsen 2015). Consistent with this, we have observed more fluoride in enamel covering a caries lesion than in surrounding sound enamel (Weatherell, Deutsch, Robinson & Hallsworth 1977).

be logically recommended. For example, fluoridated water controls caries because it is drunk regularly and present in cooking preparations, which causes the fluoride levels in the oral fluids to increase regularly during the day (Oliveby, et al. 1990). This moderate increase explains fluoridated water's effect on the caries process. Yet, fluoride levels in the dental biofilm can be maintained, even after interruption of water fluoridation, if a fluoride toothpaste is being used daily (Seppä et al., 1996, Richards et al. 2013).

## V.    OPINIONS

### A) There Is No Need to Ingest Fluoride for Caries Control Because Its Beneficial Effect Comes from Topical Contact with Teeth, Not from Ingestion

We have to appreciate the effects of fluorides on developing and erupted teeth to derive at a rational way of advocating the use of fluorides in contemporary populations. Fluoride can have both beneficial and detrimental effects on the dentition. The beneficial effect is due almost entirely to the local (topical) effect of fluoride on all sites in the dentition where tooth surfaces are covered by a biofilm after the teeth have erupted into the oral cavity. It is not necessary, therefore, to ingest fluoride for caries control. By contrast, the detrimental effects of fluoride are due to its systemic absorption during tooth development, resulting in dental fluorosis which is a hypomineralisation of the enamel the degree of which is a direct reflection of fluoride ingestion during tooth formation (Fejerskov et al. 1996). If we can enhance the intraoral exposure to fluoride throughout life and minimise systemic absorption during the period when the dentition is developing, fluoride can be used to maximise its benefits in caries control whilst at the same time minimising the risk of fluorosis and any other unwanted systemic effects.

Based on the following evidence, *we must conclude that in order to obtain a caries reduction effect of fluoride it is not important – and indeed inadvisable - to ingest fluoride during tooth formation*.

11

1)        **The level of fluoride found in human enamel is too low to have an effect on solubility**

During tooth formation fluoride is bound to the biological hydroxyapatite as the crystals grow in width and thickness. This process takes a long time in man where the permanent teeth takes 2-4 years to achieve their full content of mineral (the so-called enamel maturation process). The more fluoride ingested the more fluoride is incorporated, but in man the fluoride concentration in bulk enamel is rather low (50-100ppm) in areas where the drinking water contains from 0.5-1.5 ppm. Only in the outermost enamel layers (~100 microns) does fluoride accumulate and increase significantly to 1,000-2500ppm F. Yet, if all hydroxyl ions in the apatite should be substituted with fluoride ions the enamel would contain ~40.000ppm F!  Thus, even in the very outermost surface the fluoride substitutes only 5-10% of hydroxyl, as schematically visualized in the figure below. It should be acknowledged that it is necessary to have about 60% of the hydroxyl ions substituted to derive at a mineral that is more acid resistant.

**Figure 3. Fluoride replacement of hydroxyl ions in enamel**



*Source: Larsen & Bruun 1994, Textbook of Clinical Cariology, Munksgaard Publ. (fig. 11-5, p. 235)*

The lack of systemic benefit from pre-eruptive exposure to fluoridated water was evident in some of the early epidemiological research, although this was not appreciated until decades later (e.g., Koch, Fejerskov & Thystrup 1994, citing Russell 1949). Russell, for example, found that children moving out of fluoridated areas experienced an increase in caries increment similar to the level of their age-matched contemporaries in a low-fluoride area (Russell 1949).

12

Additionally, Arnold found that children whose teeth had completely formed prior to consuming fluoridated water experienced substantial reductions in decay after moving to a fluoridated area – thus highlighting the post-eruptive, topical nature of the effect (Fejerskov 2004, citing Arnold 1957).

**2)        There is no relationship between enamel fluoride content & caries prevalence**

Despite slightly more fluoride in teeth formed in so-called "optimally fluoridated teeth" there is no consistent relationship between fluoride content in surface enamel and caries experience of the individuals (Poulsen & Larsen 1975; Richards & Fejerskov, et al. 1977).  The US Centers for Disease Control (CDC) has recognized this, stating that: "The prevalence of dental caries in a population is not inversely related to the concentration of fluoride in enamel, and a higher concentration of enamel fluoride is not necessarily more efficacious in preventing dental caries" (CDC 2001).

Consistent with these findings, in vitro studies of experimental caries using gel techniques have shown exactly similar degrees of lesion development in teeth from low- and 'optimal'- fluoride areas (Kidd et al., 1980). Similarly, studies by Featherstone and others have shown that fluoride incorporated into hydroxyapatite has no measurable effect on the solubility of the mineral (Featherstone 2000). More recent in vitro research has confirmed the above conclusions (Marin et al.2016).

The only living animal known to have teeth with pure fluorapatite is sharks. Yet, if such teeth are placed in the human mouth and exposed to a caries challenge in situ they also develop caries lesions (Øgaard & Rølla 1988).

**3)        No difference in enamel caries lesions between fluoridated and non-fluoridated areas**

Probably the most well designed clinical trial on water fluoridation was conducted in Europe - the Dutch Tiel-Culemburg studies by Otto Backer-Dirks (1967) and his collaborators.

These data were of particular importance because the original data were available decades later when the artificial fluoridation of the drinking water had to cease. Reanalyses of these data many years later (Groeneveld 1985 and Groeneveld & Backer Dirks 1988) confirmed the changed concepts on the mechanisms of fluoride action as proposed by Fejerskov, Thylstrup and Larsen in 1981. Hitherto, dental caries had only been reported at the level of distinct cavities (Decayed, Missing, Filled Teeth / Surfaces). There were fewer cavities observed in children in the fluoride population, but when including earlier stages of enamel caries (non-cavitated lesions) the data showed that there was no difference between fluoridated and non-fluoridated populations because fluoride just acted by slowing down the rate of mineral loss -  so if this was not realised it would seem as if fluoride prevented cavities.  Similar findings have been reported by Machiulskiene, et al. 2009. Groeneveld and Backer Dirks [1988] concluded that "on the initiation of a caries lesion no pre- nor posteruptive effect of fluoride can be observed. In fact apart from a small retardation of new lesions at younger ages there is almost no effect at all." Moreover, despite the fact that in fluoridated areas there is a higher concentration in the fluoride in the outer enamel layers, the difference in prevalence of lesions is so small between fluoride and non-fluoride areas that the conclusion that 'fluoride concentration in the enamel plays a role of minor importance in caries reduction [Fejerskov et al., 1981]' is justified."

4)        **Studies of fluoride supplements confirm the inadvisability of F ingestion**

The inadvisability of fluoride ingestion (systemic effect) was made apparent through attempts to reduce tooth decay by administering fluoride in tablets (Aasenden & Peebles 1974). In the study by Aasenden & Peebles a caries reduction was obtained but the children developed rather extensive dental fluorosis.  However, when similar studies were performed in Denmark and Holland and multivariate analytical methods applied to control for confounders – these fluoride supplement programs only resulted in development of dental fluorosis in the children without any caries

reduction (Tjimstra, et al. 1978; Thylstrup et al. 1979, Friis-Hasche, Thylstrup, et al. 1984, Kalsbeek, Verrips & Dirks 1992). To the extent that fluoride supplements exert any benefits, it is from the incidental increase of fluoride in the intraoral fluids and resulting contact with erupted enamel (Thylstrup, et al. 1979). Consistent with this, the recent Cochrane review on prenatal fluoride supplements (an exposure modality that is purely systemic) concluded "There is no evidence that fluoride supplements taken by women during pregnancy are effective in preventing dental caries in their offspring" (Takahashi, et al. 2017**)**. The US Center for Disease Control previously derived the same conclusion about prenatal supplementation (CDC 2001).

5.        **Measures of total fluoride intake do not predict lower caries rates**

The irrelevance of fluoride ingestion is further supported by the results of the "Iowa Fluoride Study" in the United States. The Iowa Fluoride Study used a prospective study design to examine the relationship between total daily fluoride intake from all sources (from birth through 17 years of age) with the development of caries and fluorosis (Warren, et al. 2009; Curtis et al. 2018). The study found that fluoride intake has little effect on caries development, but has a clear effect on fluorosis. According to the authors: "These findings suggest that achieving a caries-free status may have relatively little to do with fluoride *intake*, while fluorosis is clearly more dependent on fluoride intake" (Warren et al. 2009).

6.        **The primacy of fluoride's topical mechanisms are now widely acknowledged in the dental research field**

My colleagues and I first proposed the primacy of fluoride's topical cariostatic effects in 1981. While it took some time for this view to be accepted (Fejerskov 2004), it can now safely be characterized as the consensus within the dental research field (CDC 1999, 2001, Featherstone 2000, European Commission 2005, NRC 2006). Despite this, surveys show that many practicing dentists in the United States remain unaware of this 'new' understanding (Yoder 2007).

7.	**Even low doses of fluoride ingestion are sufficient to disturb enamel formation and cause dental fluorosis**

There is a clear linear dose-response relationship between fluoride ingestion and dental fluorosis, and even seemingly low doses of fluoride are sufficient to cause dental fluorosis (Fejerskov, Baelum & Richhards 1996).  We demonstrated this through an analysis of 3 major American surveys (Dean's original data included), wherein we determined the prevalence of dental fluorosis, including "questionable" fluorosis, as a function of the estimated fluoride dose per kilogram of bodyweight (Fejerskov, Baelum & Richards 1996).  We found that, for every increase in dose of 0.02 mg/kg/day, there was a significant increase in severity of dental fluorosis (see Figure 7 below). Notably, we did not find a 'critical value' for fluoride intake below which the toxic effect on enamel was absent.

Because of the tendency to dismiss "questionable" fluorosis as being unrelated to fluoride, the low end of the dose-response curve between fluoride ingestion and enamel disturbances has been under appreciated in the dental field. To help address this, my colleague and I developed an index for diagnosing dental fluorosis (based on documented pathology of the enamel changes) that is more sensitive and reproducible than the original Dean index (Thylstrup & Fejerskov 1978). But, regardless of which index is used (Dean or TF), epidemiological studies have made clear that water fluoridation, even at 0.7 mg/L, causes dental fluorosis (Heller, et al. 1997). Moreover, studies have demonstrated that the prevalence and severity of fluorosis is higher today in fluoridated areas than was the case back in Dean's time (Beltran-Aguilar 2010, CDC 2019; Clark, et al. 1994; Heller, et al. 1997, Ismail, et al. 1990; McDonagh, et al. 2000). For example, the most recent national survey from the U.S. (2015-2016) found that 68.9% of U.S. children (aged 6-19 years) have at least very mild fluorosis (CDC 2019, Table 10). This survey was a nationally

16

representative sample,[4] and, as such, was not limited to children living in fluoridated areas. The rates of fluorosis are likely higher in fluoridated areas and, in any event, are clearly higher than what was considered acceptable when water fluoridation first began (Hodge 1950, NRC 1951).

**Figure 4. Community Fluorosis Index ($F_{ci}$) as a function of daily fluoride dose**



*Source: Textbook of Dental Caries 2015 (fig. 14.19d, p. 257)*

Finally, although still ingrained in current approaches to fluoride, we should no longer view dental fluorosis as a "necessary trade-off" for fluoride's anti-caries effects (Fejerskov 2004). Since fluoride does not need to be ingested to control caries, we can achieve its benefits without any appreciable amount of dental fluorosis (a toxic effect on dental hard tissue) in a population, and certainly not the prevalence rates now observed in the U.S. population. (For photos and further information about dental fluorosis, see **Appendix C**.)

**B) The Evidence on the Beneficial Effects of Individual Fluoride Products Like Toothpaste Is Far Stronger than the Evidence for Water Fluoridation**

The research conducted on the effects of water fluoridation, milk fluoridation, fluoride supplements and salt fluoridation is still insufficient and/or of poor methodological quality. However, the evidence on the beneficial effects of fluoride toothpastes, mouth rinses, and gels is

---

[4] The community fluorosis index (CFI) in the 2015-2016 NHANES survey is substantially lower than the CFI in the 2011-2012 and 2013-2014 NHANES surveys (CDC 2019, Table 10). The reason(s) for this variability in results from these nationally representative surveys appears to be poorly understood.

consistent and strong, based on a sizeable body of evidence mainly from randomized controlled trials.

Since the mid-1900s, the various fluoride interventions – in the form of toothpastes, mouth rinses, and gels mainly – have been subjected to intensive clinical testing in randomized controlled trials (RCTs), the least biased evidence type from primary research into effectiveness. However, less conclusive study designs have been used to assess the effectiveness of fluoride in drinking water and fluoride added to salt.

Yet, it is only relatively recently that this evidence started to be summarized more objectively in rigorous systematic reviews, taking such differences in study question and design systematically into account.  It is even more recently that decisions and recommendations for the appropriate use of fluoride for caries control are being based on the results of such reviews. Nevertheless, the general picture in the early 1990s was that the effectiveness of fluorides in caries prevention had been extensively summarized in traditional narrative reviews based on selected published literature, and effectiveness estimates had been reported in broad ranges, with no general agreement on the causes of differences in reported effectiveness. The systematic reviews published since 2000 have compiled evidence synthesized from hundreds of reports of randomized controlled trials (RCTs), as well as non-randomized evidence (from other types of studies), on the effects of fluorides in various forms. The large number of systematic reviews of trials published between 2002 and 2004 in particular are associated with the publication of the first Cochrane reviews (Marinho et al. 2002a,b; 2003a,b,c; 2004a,b).

Recommendations systematically developed for the appropriate use of fluoride in different settings/countries in practice guidelines are based largely on the results of the series of Cochrane fluoride reviews for preventing caries in children and adolescents (Marinho et al. 2002a,b, 2003a,b,c, 2004a,b; Walsh et al 2010; Wong et al 2011, Iheozor-Ejiofor 2015) and on the UK NHS

Centre for Reviews and Dissemination (CRD) systematic review on water fluoridation (McDonagh et al, 2000). They form the basis of the international evidence base used in numerous guidance documents worldwide (ADA-CSA 2006, EAPD 2009; NHMRC 2007).

In 2015, the Cochrane Center released its review of water fluoridation (Iheozor-Ejiofor 2015). In notable contrast to its conclusions on fluoridated toothpastes, the Cochrane review of water fluoridation found "very little contemporary evidence" to support the effectiveness of water fluoridation in the modern context where fluoride toothpastes and other individual-use fluoride products are now widely used. Further, while the studies that the Cochrane review identified "indicate that water fluoridation is effective at reducing caries levels in both deciduous and permanent dentition in children," the review concluded that "our confidence in the size of the effect estimates is limited by the observational nature of the study designs, the high risk of bias within the studies and, importantly, the applicability of the evidence to current lifestyles."   The Cochrane review's concern with the applicability of early studies to contemporary times, where topical fluoride products are now widely available, highlights an important admonition to consider when assessing the effectiveness of any treatment for caries:

> "[M]any clinical studies were conducted when the caries prevalence and incidence was much higher than it is today (for example, in many European countries caries prevalence and incidence has fallen amongst children by as much as 90%). This means it may be very unwise to apply results obtained in one period, in a certain population, to an entirely different population with a very different disease profile." (Kidd & Fejerskov 2016, p. 94).

Additionally, the Cochrane review "did not identify any evidence, meeting the review's inclusion criteria, to determine the effectiveness of water fluoridation for preventing caries in adults." Further, the review concluded that "There is insufficient evidence to determine whether water fluoridation results in a change in disparities in caries levels across SES."

The conclusions of the Cochrane review are consistent with the findings of the review by the UK NHS Centre for Reviews and Dissemination (McDonagh, et al. 2000), which found that

19

the research on water fluoridation's effectiveness is of a much lower quality than had previously been reported. Many of the studies on water fluoridation failed to control for other factors that influence caries rates (e.g., income), and there has yet to be an RCT, which is considered the gold standard design for studying the effectiveness of medical treatments.

Based on the foregoing, it can be concluded from the Cochrane reviews that *the caries-preventive benefits of regular toothbrushing with fluoride toothpastes are firmly established, but scientific controversy on the effects of water fluoridation are likely to continue until higher quality studies are conducted and more definitive evidence is produced.*

### C) Caries Has Declined Significantly Throughout the Developed World in Communities With and Without Water Fluoridation

It is often stated, or assumed, that water fluoridation is the reason for the caries decline that has occurred in the United States since the middle part of the 20th century (e.g., CDC 1999). However, the caries decline has occurred in all developed countries, irrespective of water fluoridation. Most countries in Europe, for example, do not fluoridate their water supplies, yet it is well established, and indeed beyond dispute, that the rate of caries has declined dramatically since the 1970s (e.g., Fejerskov et al., 1982, Kalsbeek, et al. 1990, Kalsbeek, et al. 1992, Manji & Fejerskov 1994, Petersson 1996, Seppa, et al. 2000, Cheng 2007, SCHER 2011). In 1982, my colleagues and I documented that a dramatic decline in caries had occurred in Denmark, a country that does not fluoridate water supplies (Fejerskov, et al. 1982). Many subsequent studies have confirmed similar declines in other countries without water fluoridation (Manji & Fejerskov 1994). As summarized by the EU Scientific Committee on Health and Environmental Risks, "independent of the fluoridation policies across the EU Member States, there has been a consistent decline over time in tooth decay in 12 year old children from the mid 1970s, regardless of whether drinking water, milk, or salt are fluoridated." (A figure from the SCHER report showing examples of the caries decline in countries with and without water fluoridation is reproduced in **Appendix D**.)

Notably, even in communities without water fluoridation in North America, a remarkable decline in caries occurred after the middle part of the 20th century (e.g., Glass 1981, Gray 1987). By 1986-1987, relatively little difference in caries could be discerned between children in the U.S. who had lived their whole lives in communities with fluoridated water and children who had lived their whole lives without fluoridated water in a national survey by the National Institute of Dental Research (Brunelle & Carlos 1990; Heller, et al. 1997). Brunelle & Carlos summarized this data as showing an approximate 18% difference in tooth decay in children living in fluoridated communities.[5] Heller, et al. analyzed this same data and found that—while dental fluorosis rates were obviously increased in fluoridated areas—the percentage of children without any caries was almost identical in communities with and without water fluoridation (55.2% vs. 53.2%). (For a visual comparison of Heller's results with Hodge's assessment from 1950, see **Appendix E**.) One of the strengths of the Heller study is that it had complete residential information for the children and was able to limit the analysis to children with lifelong exposure to water with known concentrations of fluoride. Overall, Heller found an average difference in tooth decay of approximately half a tooth surface, which is of questionable clinical significance (DeLiefde 1998, Locker 1999). Other modern studies of water fluoridation, including those conducted by advocates of the policy, have reported similarly small differences (e.g., DeLiefde 1998; Armfield, et al. 2005;

---

[5] Percentage reductions in dental caries should always be interpreted in the context of what the prevalence of dental caries is in a given population. When caries prevalence is high the distribution of disease in a population is following a Gaussian distribution whereas with low prevalence the disease distribution is very skewed. Thus, the majority of a child population may in fact be considered 'caries free' and caries is only recorded in a minor proportion of individuals. In the context of low caries rates, a relative difference in decay of 18% represents a small, and clinically questionable, difference in absolute decay (De Liefde 1998; Locker 1999). As noted by Gray (1987), "a 60 per cent reduction in DMFT when the average DMFT is 8-10 teeth is very significant. A 60 per cent reduction in the DMFT rate of children when the average DMFT is less than 4 teeth is of less significance. If the reduction that is occurring is not 60 per cent but closer to 25 per cent, then it is something else again." De Liefde (1998) described a 20 percent difference as "clinically meaningless" when the overall prevalence was 1.4 DMFT. The clinical significance of a 20% difference in the more sensitive DMF<u>S</u> metric is even more questionable.

Armfield, et al. 2010; Machiulskiene & Fejerskov, et al. 2009; Spencer, et al. 2018; Slade, et al. 2018). Some studies have been unable to detect a difference (e.g., Chankanka, et al. 2011 & 2015, Hildebolt, et al. 1989, Shiboski, et al. 2003).

Consistent with the finding that caries has declined throughout the developed world independent of water fluoridation, studies published since the 1990s have observed no demonstrable effect on caries rates from the termination of water fluoridation programs. In fact, in most of these studies, the rate of caries continued to decline despite the discontinuation of water fluoridation (Kunzel 1997; Burt, et al. 2000; Kunzel, et al. 2000a,b; Seppa, et al. 2000a,b; Maupome, et al. 2001). While two recent studies have reported contrary results (McLaren, et al. 2016; Meyer 2018), caries had already started to increase in one of the studies prior to the termination of fluoridation (Neurath, et al. 2017), and it is questionable whether either study properly accounted for other factors that could explain the caries trend.

Finally, a report by Burt et al. (2000) is of interest because it describes what happened to dental caries and dental fluorosis in a US population which by accident was deprived of fluoride ingestion from drinking water for almost a year. The authors performed a careful data analysis and interpretation. The population was also exposed to a broad range of topical fluorides, so the effect observed could only be ascribed to fluoride ingested from the water supplies. There was no effect on dental caries in the primary dentition but a distinct decline in prevalence (and severity) of dental fluorosis. This is in full agreement with studies from Hong Kong (Evans & Stamm, 1991) who observed that when fluoride was reduced from 1.0 to 0.7 ppm in the drinking water it resulted in a significant decline in prevalence of dental fluorosis. These data are also in accord with the dose-response relationship shown by Fejerskov et al. in 1996 (see figure 4 above) and the results of the NIDR's 1986-87 national survey (Heller, et al. 1997).

## VI.      CONCLUSION

Our understanding of the mechanism of action of fluoride on dental tissue ought to dictate how fluoride is used both in dental practice and in public health.   As explained above, fluoride's detrimental effect on dentition (i.e., dental fluorosis) comes exclusively from its systemic absorption prior to the eruption of the tooth, whereas fluoride's beneficial effects on dentition (i.e., caries control) comes almost entirely from its post-eruptive topical contact with the enamel. From a risk-benefit perspective, therefore, a rational use of fluoride would seek to minimize the ingestion of fluoride prior to the eruption of teeth and throughout the tooth-forming period.   Towards this end, fluoride exposure during the *in utero* and early infancy period is contraindicated for oral health purposes. Further, when considering fluoride's mechanism of action in light of the (i) increasing rates of dental fluorosis in North America and (ii) questionable effectiveness of water fluoridation under contemporary conditions of widespread topical fluorides, it is my professional opinion that the addition of fluoride to public water supplies is no longer justified from an oral health perspective.

Ole Fejerskov, Aarhus University, Denmark, June 2019

23

Exhibit C

Page 1

```
 1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA

 2
     ------------------------------:
 3   FOOD & WATER WATCH, INC.,      :
     et al.,                        :
 4                                  :
              Plaintiffs,           :
 5                                  :
         vs.                        : Case No.:
 6                                  : 3:17-cv-02162-EMC
     UNITED STATES ENVIRONMENTAL    :
 7   PROTECTION AGENCY, et al.,     :
                                    :
 8           Defendants.            :
     ------------------------------:

 9

10

11      DEPOSITION OF OLE FEJERSKOV, DDS, PH.D.

12

13   DATE:           Friday, August 23, 2019
14   TIME:           9:07 a.m.
15   LOCATION:       U.S. Department of Justice
                     Environment & Natural
16                     Resources Division
                     4 Constitution Square
17                   150 M Street, Northeast
                     Washington, D.C. 20002
18
     REPORTED BY:    Shari R. Broussard, RPR, CSR
19                   Reporter, Notary
20
21          Capital Reporting Company
            1250 Eye Street, NW, Suite 350
22             Washington, D.C. 20005
```

Page 74

```
1    and citations for the opinions you have?

2         A    Yeah.  That's why it's written the way

3    it is.

4         Q    So have you disclosed all the support

5    and citations for the opinions expressed in this

6    report?

7         A    Yeah, I think so.

8         Q    Do you have any intention on testifying

9    to any connection between fluoride and

10   neurotoxicity?

11        A    No.   That's not my field of expertise.

12        Q    Can you summarize your opinions you

13   intend to testify to in this case?

14             MR. CONNETT:  Overbroad.

15             THE WITNESS:  A summary of what I am --

16   BY MR. DO:

17        Q    Of your opinions you intend to testify

18   to.

19        A    Of this report?

20        Q    Yes.

21             MR. CONNETT:  Overbroad.

22             You can answer.  I'm just making my
```

Ole Fejerskov, DDS PhD                                    August 23, 2019

Page 138

1          Q      So again going back to your opinion with

2     regards to whether or not community water

3     fluoridation is advisable from a risk/benefit

4     perspective, is that risk that is premised in your

5     opinion the hazard of dental fluorosis that you're

6     -- let me restate the question more clearly.

7                 You're of the opinion that community

8     water fluoridation is inadvisable from a

9     risk/benefit analysis, correct?

10         A      It's not necessary if you wish to obtain

11    caries control is my response.  I'm not -- I'm

12    not -- I'm not warning against water fluoridation.

13    I'm not --

14         Q      You're not what?  I'm sorry.

15         A      I'm not warning against water

16    fluoridation, I'm not an antagonist to water

17    fluoridation.  I'm just saying with the knowledge

18    of mechanisms of action we are having in terms of

19    developing dental fluorosis and in terms of

20    controlling the caries process, it's not necessary

21    to -- to have all the debate about safety.  So --

22    so that's my reason.  I'm saying we have developed

Ole Fejerskov, DDS PhD                        August 23, 2019

Page 139

1    since the 1940s, '50s with all the experience we

2    have from various parts of the world of what

3    happens.

4              There's good reason why most countries

5    in Europe, for example, obtains an enormous caries

6    reduction and it's not having the problem of

7    debates about water fluoridation.  To me it's a

8    waste of time.

9         Q    It's not necessary because we can

10   control dental caries through increased dental

11   cleaning, toothbrushing, correct?

12        A    Yeah, fluoride available in other ways,

13   topical ways.

14        Q    The specific topical ways you are

15   referring to is toothpaste, correct?

16        A    In this case it's logical.  The nice

17   thing is to -- to really care for any person, then

18   you have to clean your teeth.  So it's a -- it's a

19   lovely vehicle to put it in.

20        Q    If you were persuaded that ingestion of

21   fluoride did not cause any form of dental

22   fluorosis --

Ole Fejerskov, DDS PhD                                    August 23, 2019

Page  173

1   shown.

2        Q      Are you of the opinion that in lieu of

3   community water fluoridation, fluoride toothpaste

4   can provide the same dental caries control?

5        A      Yeah.

6        Q     Are you of the opinion that proper

7   dental cleaning and brushing of teeth is difficult

8   for young children?

9        A      If they are not being cared for by

10  adults, it's known that up to the age of 12 years

11  children cannot really perform toothbrushing

12  themselves.  It's quite surprising but they can't.

13       Q     Why is that?

14       A     Well, you are --

15       Q     I may have some ideas, but I'd like to

16  know what your thinking is.

17       A     Yeah.  Children's whole development and

18  behavior, et cetera, they could care less.  They

19  are first, when they grow up, really able to fully

20  appreciate what's going on.  And I'm not thinking

21  in terms of the caries process or anything, but in

22  terms of how to take care of themselves of their

Page 218

1  caries control and that's a very different thing.

2  If a country choose to -- to have water

3  fluoridation, fine for me, that's -- that's of

4  course their choice.

5  BY MR. DO:

6       Q    But in terms of reaching this

7  conclusion, do you make a comparison between

8  Europe and the United States' dental disease

9  situations?

10            MR. CONNETT:  Overbroad.

11            THE WITNESS:  Of course.  What is -- is

12  striking to me is after the second World War when

13  water fluoridation was introduced in the United

14  States and -- and the caries situation here was --

15  was, yeah, it was high, but at that moment in time

16  the caries situation in Europe was double as high

17  as in the U.S.  And today we have a situation

18  where we are having significantly less dental

19  caries in all the Scandinavian countries --

20  Norway, Sweden, Iceland, Finland, Germany is also

21  on a rapid decline, et cetera -- without having

22  had to take the same system as you took, namely to

Page 219

1   fluoridate drinking water.

2   BY MR. DO:

3       Q    I apologize, I guess I'm still a little

4   confused.  I'm hearing from you both the

5   complexities of populations of dental caries

6   situation and how it's varied within countries

7   within continents, which would make comparisons

8   difficult or inappropriate, yet at the same time I

9   also believe I'm hearing you say that you did make

10  such a comparison.

11           MR. CONNETT:  Misstates testimony.

12           JT, you have the report.  If you want to

13  show the witness any particular statement you want

14  clarification on, you can do that.

15           MR. DO:  I appreciate the suggestion,

16  but I know that.  Thank you.

17           THE WITNESS:  You are -- I'm not saying

18  that you can't compare.  I'm just saying when you

19  are comparing, you have to ensure that you know

20  the variables which you are dealing with.  It --

21  you cannot just take any set of data which is

22  generated for other reasons and then start

Page 284

1  dentists because in -- in -- in U.S. there is an

2  expensive tradition amongst those who can afford

3  it to have these children treated under general

4  anesthesia and that's a very traumatic thing to do

5  to a child of that age really.

6          So in -- in Holland the -- the pediatric

7  dentists have for long adopted another strategy,

8  namely to -- to do all they can to avoid general

9  anesthesia and intervene with other methods to

10 control dental caries.  Fortunately enough it's

11 not something which we are having as a problem in

12 neither Denmark, Norway, Sweden, or Finland and

13 that's probably because of the -- yeah, it's a

14 combination, it's the healthcare system and the

15 way we are taking care of children early on.

16    Q    Speaking of other methods of preventing

17 caries in children -- you can hold on to that --

18 other methods of --

19    A    I should --

20    Q    Yeah, yeah.  I'll start that again.

21         Speaking of other methods of preventing

22 caries in children, are you familiar with programs

Ole Fejerskov, DDS PhD                                    August 23, 2019

Page 285

1   involving home visits from dental therapists to

2   low-income families?

3        A    I -- I'm not aware of really good data

4   which has been published.  I'm aware of in --

5   in -- in Australia and Western Australia, oh, back

6   in the late 1990s -- Western Australia I have to

7   explain to you is a huge land mass and the

8   population is scattered throughout the area, so

9   it's -- it's difficult to access dental health

10  professionals.  And in -- in that great area they

11  started using auxiliaries to -- to actually --

12  with a short one or two year training to -- to

13  take care of contacting families systematically

14  throughout the north region to try to develop

15  other habits and tell about what could be done and

16  this actually worked surprisingly well.

17          If you ask me about, oh, what sort of

18  reference do come to my mind -- yeah, the reason

19  why I know about this was that I was actually a

20  visiting professor in Perth in -- in Western

21  Australia in 2000 and -- I can't remember.  No.

22  1993 I think.

Ole Fejerskov, DDS PhD                        August 23, 2019

                                              Page 286

1           The name is -- is probably Riordan.

2     Yeah, it's a strange name.  I think he's Irish.

3     R-I-O-R-D-A-N.  He was -- he was at the time one

4     of the people in the public dental health service

5     in -- in Perth and in Western Australia who

6     actually collected data because he was trained as

7     an epidemiologist and he was collecting data about

8     a variety of -- of, yeah, aspects on -- on dental

9     caries and fluorides.

10         Q     And what about the NEXO Program, are you

11    familiar with the NEXO Program --

12               MR. DO:   Objection.   Scope.

13    BY MR. CONNETT:

14         Q     -- talking about methods of reducing

15    caries in children?

16         A     Of course I'm aware of it because coming

17    from Denmark, it's -- it's a population in

18    Denmark.  It was initiated by my former colleague

19    who was as a professor at Copenhagen school, a

20    dental school, who unfortunately passed away,

21    who -- with whom I made the fluorosis index,

22    Thylstrup, and -- and he took the consequence

Ole Fejerskov, DDS PhD                                    August 23, 2019

Page 289

1    what's particularly challenging in the various age

2    groups afterwards.  And -- and when it comes to

3    dental caries, I know what they are doing there is

4    they are focusing in on -- on families when --

5    when the child is about six months of age because

6    that's when they want the families to get back to

7    this about teaching people to clean teeth.  And --

8    and that's what is then stimulated in all these

9    parents, namely don't -- you know, a small child

10   will -- doesn't like to have another person

11   sticking anything into the mouth.  They start

12   screaming, as you -- if you have children, you

13   will -- you will know it's a little of a noise

14   and -- and problem and you often give up.  But in

15   this case it's professionals who simply explain

16   to -- to the mothers how to handle and how to be

17   consistent and -- and they follow-up then in

18   subsequent years with -- with great success, great

19   success.

20        Q    Now, you had testified earlier in

21   response to some questions about I think you

22   stated you need to care for children, you need to

Ole Fejerskov, DDS PhD                          August 23, 2019

                                                    Page 290

1    teach children how to clean their teeth.

2              This program that you're talking about

3    from Denmark, is that consistent with that,

4    actually caring for children and teaching parents

5    how to care for their children's teeth?

6              MR. DO:  Objection.  Form.

7              THE WITNESS:  It's -- it's a common part

8    of the school dental healthcare system, but that

9    of course first starts at the age of six, seven.

10   But what I'm explaining here from -- from this

11   other community is that it is extended down to --

12   to as early in life as possible in most

13   communities in an attempt to -- to learn habits,

14   be used to -- to these sorts of -- of things.  Of

15   course this is only something you can do in -- in

16   a political welfare state type of society.  But

17   it's interesting that it's -- it's much less

18   costly than dental healthcare is otherwise and

19   that's interesting.

20   BY MR. CONNETT:

21       Q    Okay.  I want to show you one other

22   paper here and see if you recognize it, which I'll

Exhibit D

1
2
3
4
5

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

6

*Attorneys for Plaintiffs*

7
8
9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**AT SAN FRANCISCO**

10
11
12
13
14
15
16

| | | |
|---|---|---|
| FOOD & WATER WATCH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Civ. No. 17-CV-02162-EMC |
| | ) | |
| U.S. ENVIRONMENTAL PROTECTION | ) | **PLAINTIFFS' EXPERT** |
| AGENCY, et al. | ) | **DISCLOSURES** |
| | ) | |
| Defendants. | ) | |
| | ) | |

17
18

        Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs hereby provide the following expert disclosures.

19
20
21
22

        **Jacqueline Calderon Hernández, PhD**
        **Universidad Autonoma de San Luis Potosi**
        **Avenida Sierra Leona No. 550, CP 78210**
        **Colonia Lomas Segunda Seccion, San Luis Potosi, SLP, Mexico**
        **Tel: (52-444) 826 2300 ext 8459**

23
24
25
26
27
28

        Dr. Calderon Hernández is an environmental health scientist who has studied fluoride's impact on cognitive development in children for the better part of the past 20 years. Consistent with her report, Dr. Calderon Hernández will testify, *inter alia*, that (1) her studies of Mexican communities support, and are consistent with, fluoride being a neurotoxicant that causes cognitive deficits; (2) fluoride's effects on cognition can occur in the absence of demonstrable IQ loss; (3) the developing brain during the *in utero* period has a heightened sensitivity to environmental toxicants, including fluoride; and (4) the doses

1

commonly experienced by pregnant women in communities with fluoridated drinking water are associated with significant cognitive deficits in her prospective cohort data. Dr. Calderon Hernández's report, curriculum vitae, and list of publications from the previous 10 years are enclosed as Exhibit 1. This is the first time that Dr. Calderon Hernández has agreed to serve as an expert in litigation. The exhibits that Dr. Calderon Hernández intends to use at trial are included in her report, and the documents cited therein. Dr. Calderon Hernández's hourly rate for deposition and trial testimony is $250.

**Ole Fejerskov, DDS, PhD, Dr.Odont**
**Institute of Biomedicine**
**Aarhus University**
**Høegh-Guldbergs Gade 10**
**DK-8000 Aarhus C**
**Denmark**
**Tel: +45 40372027**

Dr. Fejerskov is a dental researcher who has written and edited 10 international textbooks on fluoride and dental caries, and has published hundreds of research papers on fluoride and oral health issues in peer-reviewed scientific journals. Since 1973, Dr. Fejerskov's research has focused on how fluoride affects the mineralization of teeth, including the development of caries and dental fluorosis. Consistent with his report, Dr. Fejerskov will testify, *inter alia*, that: (1) ingesting fluoride is an unnecessary and ineffective way of controlling caries because fluoride's beneficial effects come from topical contact with teeth, not ingestion; (2) the evidence on the beneficial effects of individual-use topical fluoride products, like toothpaste, is much stronger than the evidence for water fluoridation; (3) caries has declined significantly throughout the developed world in communities with and without water fluoridation, with little demonstrable difference in caries rates between communities that add fluoride to water and communities that do not; (4) fluoride exposure during the *in utero* and early infancy period is contraindicated for oral health purposes, and (5) in light of current data on the relationship between waterborne fluoride, caries, and dental fluorosis, adding fluoride to water is no longer justified from an oral health perspective.

Dr. Fejerskov's report, curriculum vitae, and list of publications from the previous 10 years are enclosed as Exhibit 2. This is the first time that Dr. Fejerskov has agreed to serve as an expert in litigation. The exhibits that Dr. Fejerskov intends to use at trial are included in his report, and the documents cited

therein. Dr. Fejerskov's hourly rate for deposition and trial testimony is $500.

**Philippe Grandjean, MD, DMSc**
**Harvard T.H. Chan School of of Public Health**
**Building 1 1312A**
**665 Huntington Ave**
**Boston, Massachusetts 02115**
**Tel: 617-331-3317**

Dr. Grandjean is a physician, environmental epidemiologist, and professor at the Harvard School of Public Health, who has published extensively on the impact of early life exposures to chemicals on the developing brain, including fluoride. Dr. Grandjean has been involved with fluoride research since the 1980s, has authored criteria documents on fluoride for the World Health Organization and European Commission, was an invited peer-reviewer of the National Research Council's (NRC) authoritative 2006 report on fluoride toxicology, and has published studies on the effect of fluoride on childhood IQ, including a meta-review of the epidemiological evidence.

Consistent with his report, Dr. Grandjean will testify, *inter alia*, that (1) the neurotoxicity of fluoride is supported by studies of occupationally exposed workers, laboratory animals, and communities exposed to elevated levels of fluoride in water and polluted air; (2) recent prospective cohort studies of prenatal fluoride exposure and IQ, funded by the National Institutes of Health, are high quality studies that leave little doubt that developmental neurotoxicity is a serious risk associated with elevated fluoride exposure; (3) fluoridated drinking water is associated with IQ losses that are substantial and of economic and societal concern; and (4) application of the benchmark dose (BMD) method to the new prospective data shows that the levels of fluoride added to water in fluoridation programs exceed the science-based limit needed to protect against developmental neurotoxicity.

Dr. Grandjean's report, curriculum vitae, list of publications from the previous 10 years, and list of cases in which he has provided testimony in the past four years, are enclosed as Exhibit 3. The exhibits that Dr. Grandjean intends to use at trial are included in his report, and the documents cited therein. Dr. Grandjean's hourly rate for deposition and trial testimony is $500.

PLAINTIFFS' EXPERT DISCLOSURES

1
2
3

**Howard Hu, MD, MPH, ScD**
**University of Washington School of Public Health**
**12544 42nd Avenue NE**
**Seattle, WA 98125**
**Tel. 206-685-2378**

4

Dr. Hu is a physician-scientist trained in internal medicine, occupational/environmental medicine,

5

epidemiology and general public health who has held leadership positions in science and academia for over

6

2 decades. Dr. Hu has published extensively on the impact of environmental chemicals, including fluoride,

7

on neurodevelopment. Currently, Dr. Hu is the Principal Investigator of an ongoing study that is examining

8

the impact of early-life exposures to fluoride on neurobehavioral development in a cohort in Mexico City

9

10

known as the Early Life Exposures in Mexico to Environmental Toxicants (ELEMENT) project.

11

ELEMENT is a pregnancy and birth cohort that Dr. Hu co-founded in 1993; it has been continuously funded

12

since 1993 by grants from the U.S. National Institute for Environmental Health Sciences (NIEHS). Since

13

its inception, ELEMENT has evolved into a highly successful, award-winning project involving

14

15

collaborators at various academic institutions throughout North America.  It has generated over 70 high-

16

impact publications and has provided evidence contributing towards health policies around the world.

17

Dr. Hu has agreed to provide testimony (as a non-retained expert) about his prospective study of

18

fluoride and neurodevelopment in the ELEMENT cohort. Although not required to prepare a report, Dr.

19

Hu has produced a report explaining the scope and basis of his testimony. Consistent with this report, Dr.

20

Hu will explain for the Court the rigorous design, conduct, and findings of the ELEMENT study. As

21

detailed in the papers attached to Dr. Hu's report, prenatal fluoride exposure is associated with large and

22

23

significant effects on IQ and ADHD symptoms in the ELEMENT cohort at levels of exposure that are

24

common in the general population.

25

Dr. Hu's report, curriculum vitae, list of publications from the previous 10 years, and list of cases

26

in which he has provided testimony in the past four years, are enclosed as Exhibit 4. The exhibits that Dr.

27

Hu intends to use at trial are included in his report, and the documents cited therein.

28

**Bruce Lanphear, MD, MPH**
**Simon Fraser University**
**Blusson Hall**
**8888 University Dr.**
**Burnaby, British Columbia V5A 1S6**
**Canada**
**Tel: 778-387-3939**

Dr. Lanphear is a clinician scientist and epidemiologist who has published extensively on the impact of environmental chemicals on the developing brain. Dr. Lanphear's research on the cognitive deficits caused by low levels of lead is widely considered seminal in the field, and has helped shape public health policies in the United States and abroad. Dr. Lanphear is currently the Co-Principal Investigator of an NIH-funded prospective study of the MIREC cohort in Canada that is investigating the neurodevelopmental effects of early-life exposures to fluoride. Dr. Lanphear has agreed to provide testimony (as a non-retained expert) about the methods and findings of his studies of fluoride and IQ in the MIREC cohort. Although not required to produce a report, Dr. Lanphear has produced a report explaining the opinions he will offer, along with the published and unpublished manuscripts that form the basis of his opinions. Dr. Lanphear has asked that the unpublished manuscripts be treated as confidential because premature public disclosure could jeopardize their publication. The unpublished manuscripts should not be publicly distributed and should only be used for purposes of this litigation.

Consistent with his report, and the data upon which it is based, Dr. Lanphear will testify, *inter alia*, that: (1) pregnant women living in fluoridated regions in Canada have almost two times the amount of fluoride in their urine as women living in non-fluoridated regions, (2) the average urinary fluoride concentration for pregnant women living in Canadian communities with fluoridated drinking is almost the same as those of the ELEMENT cohort being studied by Dr. Hu; (3) the study of fluoride and IQ in the MIREC cohort significantly enhances the quality of data related to fluoride's neurotoxicity because the study employs a prospective design that includes multiple measures of fluoride exposure during pregnancy (including biomonitoring data) and IQ outcomes that have been evaluated in one of the world's most comprehensively characterized and geographically diverse birth cohorts; (4) consistent with Dr. Hu's study of the ELEMENT cohort,  Dr. Lanphear has found that prenatal fluoride exposure is significantly associated with lower intellectual abilities in 3-4 year old children, and these associations remain large and significant when controlling for relevant covariates; (5) based on the convergent results from the MIREC and

5

ELEMENT cohorts, the *in utero* period is likely a susceptible period of life vis-à-vis fluoride toxicity; (6) it is advisable and prudent for pregnant women to begin taking steps to reduce their fluoride intake, including but not limited to reducing their consumption of fluoridated water; (7)  exposure to fluoridated water in infancy, particularly among formula fed infants, is associated with diminished intellectual abilities in the MIREC cohort; and (8) the association between infant exposure to fluoridated water and reduced IQ in the MIREC cohort remains significant after controlling for fetal fluoride exposure and other relevant covariates, suggesting that the susceptibility to fluoride's adverse neurological effects extends into infancy.

Dr. Lanphear's report, curriculum vitae, list of publications from the previous 10 years, and list of cases in which he has provided testimony in the past four years, are enclosed as Exhibit 5. The exhibits that Dr. Lanphear intends to use at trial are included in his report, and the documents cited therein. Dr. Lanphear will not be charging a fee for his deposition or trial testimony.

> **Kathleen M. Thiessen, PhD**
> **Oak Ridge Center for Risk Analysis**
> **102 Donner Dr.**
> **Oak Ridge, TN 37830**
> **Tel. 865-483-6111**

Dr. Thiessen is a risk assessment scientist at the Oak Ridge Center for Risk Analysis with thirty years of experience evaluating exposures, doses, and risks to human health from trace levels of contaminants in the environment, including fluoride. Dr. Thiessen has been an invited panelist for several of the National Research Council's (NRC) reviews of fluoride's hazards, including the NRC's report *Fluoride in Drinking Water: A Scientific Review of EPA's Standards*, which the Centers for Disease Control and EPA both consider an authoritative summary of fluoride's hazards. Dr. Thiessen has also authored health assessments for the EPA, including a Health Issue Assessment for fluorides.

Consistent with her report, Dr. Thiessen will testify, *inter alia*, that: (1) based on the hazard identification principles set forth in EPA's *Guidelines for Neurotoxicity Risk Assessment*, there is sufficient evidence to conclude that neurotoxicity is a hazard of fluoride exposure; (2) convergent data from experimental animal studies and epidemiological studies of human populations, alongside considerations of pharmacokinetics and biological plausibility, strongly indicate that neurotoxicity is a more sensitive effect of fluoride exposure than the effect EPA assumes to be the most sensitive (i.e., severe dental fluorosis); (3) identifiable subsets of the population have heightened susceptibility to the risk of harm from

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

fluoridation chemicals, including: the fetus; bottle-fed infants; the elderly; individuals with nutrient deficiencies, kidney disease, and/or high-water intake; and populations with specific genotypes; (4) EPA's current reference dose (RfD) for fluoride (0.08 mg/kg/day) is not protective against neurotoxicity, including loss of cognitive function; (5) EPA's current RfD is based on improper risk management (vs. risk assessment) considerations and an outdated understanding of fluoride's anti-caries mechanism; and (6) fluoridation chemicals present an "unreasonable risk" of neurotoxic effects, including IQ loss, if assessed under the same analytical framework that EPA uses in its risk evaluations of other chemicals under the Toxic Substance Control Act.

Dr. Thiessen's report, curriculum vitae, and list of publications from the previous 10 years, are enclosed as Exhibit 6. Dr. Thiessen has not served as an expert witness in the previous four years. The exhibits that Dr. Thiessen intends to use at trial are included in her report, and the documents cited therein. Dr. Thiessen's hourly rate for deposition and trial testimony is $300.

**Christine R. Wells,** PhD
**UCLA Statistical Consulting Group**
**79 Maynard Ave.**
**Newbury Park, CA  91320**
**Tel. 805-469-4726**

Dr. Wells is a statistical consultant and senior member of the Statistical Consulting Group for the University of California Los Angeles (UCLA). Dr. Wells has assisted more than 1,000 researchers on a wide array of data analysis projects, and has co-authored peer-reviewed publications involving statistical analyses of public health data, including data related to fluoride and teeth. Consistent with her report, Dr. Wells will explain the results of her bivariate and multivariate analyses of a 17-year prospective cohort study funded by the National Institute of Health (NIH). The study, known as the Iowa Fluoride Study (IFS), is the only study to prospectively investigate the effect of total daily fluoride ingestion (from birth to adolescence) on the development of caries. Dr Wells will testify that the IFS data shows no significant effect of pre-eruptive fluoride ingestion on caries, and that the IFS study supports the view that pre-eruptive ingestion of fluoride is an ineffective means of preventing caries. Dr. Wells's report, curriculum vitae, and list of publications from the previous 10 years, are enclosed as Exhibit 7. This is the first time that Dr. Wells has agreed to serve as an expert in litigation. The exhibits that Dr. Wells intends to use at trial are

included in her report, and the documents cited therein. Dr. Wells's hourly rate for deposition and trial testimony is $200.

Dated:   June 27, 2019                                      Respectfully submitted,

                                                            */s/ Michael Connett*
                                                            MICHAEL CONNETT
                                                            Attorney for Plaintiffs

### <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Civil Procedure 5 and the mutual consent of the parties that email to counsel will constitute proper service of discovery, I served a copy of the foregoing *Plaintiff's Expert Disclosures* upon Defendants on June 27, 2019 via email to the following counsel:

> Debra J. Carfora
> John T. Do
> U.S. Department of Justice
> Environment & Natural Resources Division
> Environmental Defense Section
> P.O. Box 7611
> Washington, DC. 20044-7611
> debra.carfora@usdoj.gov
> john.do@usdoj.gov

*Attorneys for Defendants*

Dated:   June 27, 2019

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

9

Exhibit E

# Assessment of the Neurotoxicity of Fluoride

Kathleen M. Thiessen, Ph.D.
June 27, 2019

Food & Water Watch et al. v. Environmental Protection Agency
No. 17-cv—02162

Oak Ridge Center for Risk Analysis, Inc.
102 Donner Drive
Oak Ridge, TN 37830



the economic or political effects of a particular control action for a particular chemical) are seen to affect either the scientific interpretations or the choice of inference options in a risk assessment, the credibility of the assessment inside and outside the agency can be compromised, and the risk management decision itself may lose legitimacy."[478]  EPA's 1998 Guidelines, citing NRC (1983), recommend that Federal regulatory agencies establish guidelines "to promote consistency and technical quality in risk assessment, and to ensure that the risk assessment process is maintained as a scientific effort separate from risk management."[479]  One of the reviewers of EPA's 2010 dose-response (RfD) report[480] specifically pointed out this shortcoming: "the assumption that 0.05 mg/kg/day is a required amount of fluoride and that dose estimates must be above this level could be considered a weakness because the purpose of U.S. EPA's analysis was to determine risk, not to conduct risk benefit analyses."[481]

*Fluoride's Mechanism of Action for Caries Prevention*

A second fundamental problem with EPA's analysis is that it accepts the outdated premise that fluoride needs to be ingested to prevent caries.  CDC's representative in this litigation, Casey Hannan, agreed that "there is now overwhelming evidence that the primary caries-preventive mechanisms of action of fluoride are post eruptive through topical effects for both children and adults."[482]  EPA actually acknowledges this in its risk assessment, noting that fluoride's "primary" benefit comes from topical contact with the teeth.[483]  Despite this, EPA made no attempt to address research showing that the *ingestion* of fluoride has no meaningful effect on caries prevention.  Although EPA relied extensively on the Iowa Fluoride Study (IFS) to understand the relationship between fluoride ingestion and dental fluorosis,[484] EPA failed to consider IFS data showing that fluoride ingestion has no significant relationship to tooth decay.[485]

Ultimately, the most obvious problem with EPA's assumption of a benefit is that it assumes that all age groups in the population, including *infants* and *adults*, need to ingest fluoride to get the benefit. This is at odds with current scientific understanding.  As CDC's Casey Hannan noted at his deposition, the CDC is unaware of any evidence to indicate that fluoride ingestion provides any benefit to teeth during the first 6 months of life.[486]  Hannon further testified that CDC is unaware of any benefit from prenatal fluoride exposure.[487]  Further, *any* benefit from ingesting fluoride would be limited to the period of time when the teeth are actually developing.[488]  Despite this, EPA's RfD operates on the premise that both adults and children need to ingest 0.05 mg/kg/day for caries prevention.  No biological justification is provided for this premise of a systemic benefit in adults.

---

[478] NRC (1983), p. 152.
[479] EPA (1998a), p. v; Federal Register (1998), p. 26926.
[480] EPA (2010b).
[481] EPA (2010c), p. 20.  This reviewer also pointed out that EPA's method assumed that severe dental fluorosis occurred in children with excess exposure to fluoride, rather than possibly in children who were more susceptible to adverse effects from fluoride intake.  Also see pp. 11, A-13, A-14, and B-13 of the April 2009 Peer Review Report that is included in the 2010 report (EPA 2010c).
[482] Hannan Deposition at p. 198:21-25.
[483] EPA (2010b), p. 3.
[484] EPA (2010b), pp. 21, 33, 102-103.
[485] For example, Warren et al. (2009).  See also Appendix E of this report.
[486] Hannan Deposition at pp. 224:8-11, 233:12-17.
[487] Hannan Deposition at pp. 213:19-214:3, 217:3-19.
[488] Hannan Deposition at pp. 207:10-24, 209:5-22.



very mild) of at least 10%, starting at a water fluoride concentration of about 0.9 mg/L (corresponding to 0.03 mg/kg/day, using EPA's mean body weights and water intakes).[590]   This does not include "questionable" dental fluorosis, which, given that it is clearly distinguishable from "normal," probably should be included in statistics for total dental fluorosis.

In summary, by basing its assessment on severe dental fluorosis, EPA has in effect taken a Point of Departure (the BMDL) that exceeds LOAELs and possibly FELs reported in or estimated from the literature for a variety of other adverse health effects.  EPA has mischaracterized the NRC report and ignored many of the NRC's findings.  Severe dental fluorosis cannot responsibly be considered as the critical effect for establishment of an RfD.

*Characterization of uncertainty*

EPA's selected Point of Departure of 0.07 mg/kg/day (for drinking water alone) corresponds to a difference of 0.02 mg/kg/day between the Point of Departure and the "beneficial dose" of 0.05 mg/kg/day.[591]   EPA stated a few pages earlier that adverse effects at doses of 0.06 mg/kg/day and lower were not even considered.[592]   EPA considered a difference of 0.02 mg/kg/day between the "recommended" intake and the Point of Departure to be "reasonable."[593]   The "margin of difference" between the final RfD (0.08 mg/kg/day from all sources of exposure) and the recommended intake is 0.03 mg/kg/day.[594]   At best, that small difference would allow no room for variability in individual intake or individual response; however, given that EPA ignored evidence for adverse health effects at low doses in order to protect the "recommended" intake of fluoride, there is no way that EPA's Point of Departure for fluoride can be considered "reasonable."

EPA then selected an Uncertainty Factor (UF) of 1.[595]   EPA's explanation was that "Conventional application of uncertainty factors is not always appropriate when carrying out a risk assessment for nutrients and other beneficial substances, especially when there is a relatively small difference between the levels that satisfy need and those that cause adverse effects."[596]   As described further below, this is properly a risk management decision and should not be part of the risk assessment. Fluoride is not a nutrient, and there is no "need" for fluoride to be satisfied.  Any benefit to humans from fluoride comes from topical use on the teeth, not from systemic ingestion.[597]   The reference to "a relatively small difference between the levels that satisfy need and those that cause adverse effects" is misleading, in that, by EPA's own reckoning, levels of fluoride intake that cause adverse effects can be less than the levels purported to be beneficial.[598]   When other adverse health effects (those ignored by EPA, as discussed above) are taken into account, it is quite clear that health risks to humans exist at levels of intake below those that EPA purports to be beneficial.  In addition,

---

[590] Dean (1942), p. 29, Table 1.

[591] EPA (2010b), p. 103.

[592] EPA (2010b), p. 101.  Doses of 0.04 and 0.05 mg/kg/day were considered "not appropriate as the point of departure for the RfD because they fall at or below the recommended fluoride intake level of 0.05 mg/kg/day."  "The same is true of the 0.04 and 0.06 mg/kg/day dose estimates."

[593] EPA (2010b), p. 101.

[594] EPA (2010b), p. 105.

[595] EPA (2010b), pp. 103, 105-106.

[596] EPA (2010b), p. 105.

[597] Featherstone (2000); CDC (2001).

[598] Federal Register (1985a), p. 20166:  "Fluoride is somewhat unique in this circumstance because there is some overlap of the doses at which beneficial and undesirable effects occur."



## Appendix E

## Lack of effectiveness of community water fluoridation in improving dental health[667]

The U.S. Department of Health and Human Services (HHS) considers community water fluoridation to be important in the prevention of dental caries,[668] as do governments and health agencies in a few other countries. However, the question of whether water fluoridation actually produces a benefit requires further attention.

There have been two thorough reviews of human studies on effects of fluoridation, one by the University of York and a more recent Cochrane review. The "York Report"[669] is often cited as showing the safety and efficacy of water fluoridation, but it actually does neither.[670] The report mentions a surprising lack of high-quality studies demonstrating benefits, and also finds little evidence that water fluoridation reduces socioeconomic disparities:

> Given the level of interest surrounding the issue of public water fluoridation, it is surprising to find that little high-quality research has been undertaken.[671]

> Water fluoridation aims to reduce social inequalities in dental health, but few relevant studies exist. The quality of research was even lower than that assessing overall effects of fluoridation.[672]

> Evidence relating to reducing inequalities in dental health was both scanty and unreliable.[673]

The Cochrane review[674] found "very little contemporary evidence" that met their inclusion criteria, with most data coming from studies carried out before 1975 that were considered to be at high risk of bias. As with the York Report, the Cochrane review found inadequate evidence for an effect of fluoridation on reducing disparities in caries across different socioeconomic levels. The Cochrane review also failed to find evidence on the effectiveness of fluoridation on prevention of caries in adults, even though some estimates of cost-effectiveness of fluoridation have been based on an assumption of caries prevention in adults.[675]

The apparent benefit is modest, about a 15% difference in the proportion of caries-free children.[676] The American Dental Association states that "water fluoridation continues to be effective in reducing dental decay by 20-40%,"[677] which would translate to less than 1 decayed, missing, or filled permanent tooth (DMFT) in older children and adolescents (based on U.S. data from CDC[678]).

---

[667] This material is drawn from previous comments prepared for various purposes.
[668] Federal Register (2011).
[669] McDonagh et al. (2000).
[670] Wilson and Sheldon (2006); Cheng et al. (2007).
[671] McDonagh et al. (2000).
[672] Cheng et al. (2007).
[673] Wilson and Sheldon (2006).
[674] Iheozor-Ejiofor et al. (2015).
[675] Discussed by Ko and Thiessen (2015).
[676] McDonagh et al. (2000); Iheozor-Ejiofor et al. (2015).
[677] ADA (2005).
[678] CDC (2005).



*Food and Water Watch v. EPA*                                                                     *Thiessen Report*

Neither McDonagh et al.,[679] nor the ADA,[680] nor the Cochrane review[681] has considered alternative explanations for the apparent effectiveness that has been reported. For example, fluoride exposure appears to delay the eruption of permanent teeth, something that has been known since the 1940s.[682] A delay in tooth eruption alters the curve of caries rates with respect to age and complicates the analysis of age-specific caries rates.[683] Specifically, "the longer the length of exposure to the oral environment the greater is the risk of the tooth becoming carious."[684] Komárek et al. have calculated that the delay in tooth eruption due to fluoride intake may explain the apparent reduction in caries rates observed when comparisons are made at a given age, as is usually done.[685]

Most studies of benefits of fluoride intake or fluoridation have failed to account for a number of important variables, including individual fluoride intakes (as opposed to fluoride concentrations in the local water supplies), sugar intake, socioeconomic variables, and the general decline in caries rates over the last several decades, independent of water fluoridation status. When World Health Organization data on oral health of children in various countries are compared, similar declines in caries over time are seen in all developed countries, regardless of fluoridation status.[686] The only peer-reviewed paper to be published from California's major oral health survey in the 1990s reported no association between fluoridation status and risk of early childhood caries.[687] Several studies show differences in caries rates with socioeconomic status or dietary factors but not with fluoridation status.[688]

In general, the role of diet and nutrition in good dental health seems to be underappreciated. For example, Cote et al. have documented a much lower rate of caries experience in refugee children from Africa than in U.S. children or refugee children from Eastern Europe, a situation that the authors attribute more to the amount of sugar in the diet than the presence of fluoride in the water.[689] Finn provides an extensive review of dental caries in "modern primitive peoples," concluding that they "show less dental caries than do most civilized peoples. . . . Evidence indicates, however, that primitive peoples have an increased caries attack rate when brought into contact with modern civilization and a civilized diet."[690]

A number of sources, including the Centers for Disease Control and Prevention,[691] indicate that any beneficial effect of fluoride on teeth is topical (e.g., from toothpaste), not from ingestion.[692] Featherstone describes mechanisms by which topical fluoride has an anti-caries effect and states

[679] McDonagh et al. (2000).
[680] ADA (2005).
[681] Iheozor-Ejiofor et al. (2015).
[682] Short (1944); NRC (2006).
[683] Psoter et al. (2005); Alvarez (1995); Alvarez and Navia (1989).
[684] Finn and Caldwell (1963); citing Finn (1952).
[685] Komárek et al. (2005).
[686] Cheng et al. (2007); Neurath (2005).
[687] Shiboski et al. (2003).
[688] For example, Adair et al. (1999); Hamasha et al. (2006).
[689] Cote et al. (2004).
[690] Finn (1952).
[691] CDC (2001).
[692] Reviewed by NRC (2006).



that "[f]luoride incorporated during tooth development [i.e., from ingested fluoride] is insufficient to play a significant role in caries protection."[693]  Also:

> The fluoride incorporated developmentally—that is, systemically into the normal tooth mineral—is insufficient to have a measurable effect on acid solubility.[694]

> The prevalence of dental caries in a population is not inversely related to the concentration of fluoride in enamel, and a higher concentration of enamel fluoride is not necessarily more efficacious in preventing dental caries.[695]

Fluoride concentrations in drinking water or saliva are too low to be contributing significantly to a topical anti-caries effect, especially since most drinking water is not "swished" around the teeth before being swallowed.  CDC states that "The concentration of fluoride in ductal saliva, as it is secreted from salivary glands, is low—approximately 0.016 parts per million (ppm) in areas where drinking water is fluoridated and 0.006 ppm in nonfluoridated areas. This concentration of fluoride is not likely to affect cariogenic activity."[696]

The single study that has examined caries experience in relation to individual fluoride intakes at various ages during childhood (the Iowa study) has found no association between fluoride intake and caries experience; caries rates (% of children with or without caries) at ages 5 and 9 were similar for all levels of fluoride intake.[697]  The authors state that "the benefits of fluoride are mostly topical" and that their "findings suggest that achieving a caries-free status may have relatively little to do with fluoride *intake*" (emphasis in the original).[698]  Most of the children with caries had "relatively few decayed or filled surfaces."[699]  The authors' main conclusion:

Given the overlap among caries/fluorosis groups in mean fluoride intake and extreme variability in individual fluoride intakes, firmly recommending an "optimal" fluoride intake is problematic.[700]

The national data set collected in the U.S. in 1986-1987 (more than 16,000 children, ages 7-17, with a history of a single continuous residence)[701] shows essentially no difference in caries rates in the permanent teeth of children with different water fluoride levels, although a strong dose response for dental fluorosis is quite obvious (Table 1; Fig. 1). Analysis in terms of mean DMFS (decayed, missing, or filled tooth surfaces) for the group (Fig. 2), as opposed to caries prevalence, shows an apparent 18% decrease between the low-fluoride (< 0.3 mg/L) and fluoridated (0.7-1.2 mg/L) groups.  In absolute terms, this is a decrease of about one-half (0.55) of one tooth surface per child.  One possible explanation is delayed tooth eruption, which was not considered in the study.  Note that the mean DMFS for the highest fluoride group is higher than for either of the two intermediate groups, also indicating that DMFS scores are not solely a function of water fluoride

---

[693] Featherstone (2000).
[694] Featherstone (2000).
[695] CDC (2001).
[696] CDC (2001).
[697] Warren et al. (2009).
[698] Warren et al. (2009).
[699] Warren et al. (2009).
[700] Warren et al. (2009).
[701] Heller et al. (1997); similar data can be obtained from Iida and Kumar (2009).  Note that the paper by Heller et al. was used by the Department of Health and Human Services in its justification for changing the recommended concentration of fluoride in drinking water (Federal Register 2015).



Exhibit F

U.S. FEDERAL COURT

ACTION NO. 17-CV-02162

FOOD AND WATER WATCH, *et al.* v. U.S. EPA

**EXPERT REPORT OF
PHILIPPE GRANDJEAN, MD, DMSc**

**PREPARED ON BEHALF OF
PLAINTIFFS**

21 June 2019

1

can have much more serious consequences than exposures occurring later in life [36], and that the developing brain is highly vulnerable [34].

## IV. HUMAN EXPOSURE TO FLUORIDE

### A.    General sources of fluoride exposure

Fluorine belongs to a group of elements called halogens. Because fluorine is very light and reactive (with the highest electronegativity of all the elements), fluorine gas is not found naturally in the environment. Instead, fluorine exists as an anion – fluoride – in the environment and is stabilized by forming mineral complexes with a number of cations, such as calcium and sodium [37].

In natural waters, fluoride is omnipresent, but the concentrations are generally low in surface waters such as rivers and lakes. The concentrations tend to be higher and more variable in ground water, such as wells. The average concentration in U.S. well water is 0.26 ppm (mg/L), according to USDA data [38]. For comparison, the currently recommended fluoride concentration in fluoridated drinking water is 0.7 mg/L.

Fluoride concentrations in groundwater are influenced by the occurrence of fluoride-bearing minerals. Globally, occurrences of fluoride-enriched geographical belts exist and are associated with a) sediments of marine origin in mountainous areas, b) volcanic rocks and c) granite and gneissic rocks. Examples include a stretch of area extending from Iraq and Iran through India and on to China, as well as southern parts of the U.S. [37]. Digging wells into such layers of mineral-rich soils will yield groundwater that may be high in fluoride.

Since the mid-1940's, compounds containing the mineral fluoride have been added to the majority of U.S. community water supplies to prevent tooth decay. Health concerns expressed by opponents have largely been dismissed until recently [39]. Addition of fluoride to drinking water has been hailed by the Centers for Disease Control and Prevention (CDC) as one of the 10 greatest health achievements of the 20th century [40], alongside vaccines and family planning. Today, approximately two-thirds of the U.S. population receives fluoridated community water.[2]

The early studies on the caries-protecting effects were conducted during a time when topical fluoride products, like toothpaste, were not commonly used. The availability of fluoride-containing toothpastes and other fluoridated dental products may explain why countries that do *not* fluoridate their water have seen substantial drops in cavity rates similar to those in fluoridated countries [41]. This observation is in agreement with the consensus that fluoride's predominant benefit to teeth comes from topical contact with the outside of the enamel, not from ingestion, as was once believed [1]. I understand that these issues are discussed in a separate expert report.

The EPA issued in 2010 calculations of relative source contributions for fluoride exposure [42]. For adults (above 14 years), drinking fluoridated water contributed 1.74 mg/d, or

---

[2] https://www.cdc.gov/fluoridation/statistics/FSGrowth.htm

10

minimize or disregard evidence of adverse effects [41, 183]. Certainly, dental fluorosis occurs more frequently and in more severe forms in fluoridated communities, especially in recent years. However, unless pitting developed, thereby paradoxically paving the way for caries development, these enamel changes were considered "cosmetic" [40, 133, 134]. This conclusion was reached without detailed evidence regarding other potential adverse effects that might occur in tandem with the enamel changes. I note here that our own study in rural China found that the degree of dental fluorosis was a significant predictor of cognitive deficits in the children examined [10].

One of the first U.S. reports on fluoride neurotoxicity in a rodent model [151] was met with disbelief, and serious critique was published as a letter in the highly respected journal that had published the toxicology article [184]. While the authors countered the critique, the first author was fired [185]. Thus, fluoride neurotoxicity was not a cherished research topic, although it is unclear if any censoring of research results or proposals has occurred. Still, anecdotal examples illustrate that a bias did occur in disregarding or ignoring risks when reviewing the health benefits of water fluoridation [90, 174, 175].

When I, at the request of WHO, drafted an environmental criteria document on fluoride for the International Programme of Chemical Safety (IPCS) in 1983, it was finalized by an expert committee that included members with a background in preventive dentistry, rather than toxicology and environmental health. The committee asked for substantial changes to minimize any mention of toxic effects or their relevance to human health [186]. As I was considered part of the secretariat, my views on achieving a better balance were not allowed in the final document, and I had to resign and ask to have my name removed. In a parallel experience, an EU expert report similarly underestimated adverse effects of elevated fluoride exposure [103]. Although I formally submitted comments to the committee, they were disregarded. In addition to neurotoxicity, carcinogenicity should be considered a potential risk, as observed in occupational epidemiology, such as my own studies of cryolite workers [4, 7]. While such evidence would normally be considered crucial for cancer risk assessment, IARC's evaluation of fluoride was uniquely limited to "Inorganic Fluorides Used in Drinking-water and Dental Preparations" [187], and with this limitation, little epidemiology was available for consideration of carcinogenicity.

My overall impression is that the safety of elevated fluoride exposure was exaggerated in ways similar to those employed by vested interests that misconstrued and misinterpreted the scientific evidence on other neurotoxicants, such as lead, mercury, and certain pesticides [34, 188]. In fact, Dr. R.A. Kehoe, the famous industry spokesman [189], forcefully dismissed the toxicity of both lead and fluoride [185].

The situation has now changed, for two reasons. First, the wisdom of adding fluoride to drinking water has been called in doubt, most strongly by a 2015 Cochrane systematic review that questioned the caries-prevention benefits of current-day water fluoridation [190]. Other evidence showed that the caries incidence had decreased in many countries, independently of drinking water fluoridation [41]. Second, evidence of adverse effects, especially developmental neurotoxicity, has burgeoned during recent years, as reviewed above in Section V. Because assessment of benefits is outside the scope of my report, I shall now focus on the risks, although in reality the two have been confounded in past assessments.

34

be done using the data on the 95th percentiles, again assuming that the U.S. population in fluoridated areas have similar urine-fluoride concentrations as Canadians.

I have made these calculations only to illustrate the significance and impact of neurotoxicity outcomes, and I offer these crude estimates to emphasize my concern that developmental neurotoxicity due to early-life exposure to fluoride must be controlled.

G.      Conclusions

In the past, health risks associated with elevated exposures to fluoride have been downplayed in the interest of promoting community water fluoridation to prevent caries development. Although this has resulted in a biased risk assessment and inappropriately high exposure limits for fluoride in water, the situation has changed due to two developments.

First, it now appears that water fluoridation no longer has the same beneficial impact on caries prevention that it once had, and topical fluoride exposure in the oral cavity has emerged as the preferred intervention in much of the industrialized world, thereby making systemic fluoride exposure unnecessary.

Second, substantial research now documents the risks and consequences of developmental neurotoxicity associated with fluoride exposure in early life. The critical effect from fluoride exposure is no longer dental fluorosis with pitting, or crippling skeletal fluorosis that occur at highly elevated exposures. The risk assessment relied upon by the EPA is therefore outdated.

Recent research has shown that the most vulnerable life stage for many toxicants, particularly those that adversely affect the brain, is during intrauterine development. Fluoride fits into this paradigm, and efforts to control human fluoride exposures must therefore focus on pregnant women and small children.

Research on fluoride-exposed workers and laboratory animals suggest that elevated fluoride exposure is toxic to the brain and nerve cells. Epidemiological studies have identified links to learning, memory, and intelligence deficits, though most of the past studies focused on populations with fluoride exposures higher than those typically provided by U.S. water supplies.

Epidemiology studies from the most recent years document that adverse effects on brain development happen at elevated exposure levels that occur widely in North America, in particular in communities with fluoridated drinking water. These new prospective studies are of very high quality and leave little doubt that developmental neurotoxicity is a serious risk associated with elevated fluoride exposure. This evidence shows that community water fluoridation is associated with IQ losses that are substantial and of economic and societal concern.

While existing limits for fluoride in drinking water are known not to protect against early stages of fluorosis, they are even less protective regarding neurodevelopmental deficits. Applying methods for standards setting routinely used by the EPA, the recent studies on

Exhibit G

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of California

| | | |
|---|---|---|
| Food & Water Watch, et al. | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.   17-cv-02162 |
| Environmental Protection Agency, et al. | ) | |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                    U.S. Centers for Disease Control and Prevention

_____
_(Name of person to whom this subpoena is directed)_

☑ _Testimony:_  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a
deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors,
or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or
those set forth in an attachment:

See attached Notice of 30(b)(6) Deposition of United States Centers for Disease Control and Prevention

| Place: Nidel & Nace P.L.L.C.<br>5335 Wisconsin Ave NW, Suite 440<br>Washington D.C. 20015 | Date and Time:<br>10/15/2018 9:00 am |
|---|---|

   The deposition will be recorded by this method:   Videotape

☑ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents,
electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the
material:

   All documents reviewed in preparation for the deposition.

   The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance;
Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to
respond to this subpoena and the potential consequences of not doing so.

Date:   09/05/2018

        _CLERK OF COURT_
                                                    OR
_____            _____
_Signature of Clerk or Deputy Clerk_                  _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_
Food & Water Watch, et al.
_____ , who issues or requests this subpoena, are:
Michael Connett, Waters, Kraus & Paul, 222 N. Pacific Coast Hwy, Suite 1900 El Segundo CA 90034  (310) 414-8146

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before
trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to
whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT**

31      11|6|18
        LCR

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    (i) disclosing a trade secret or other confidential research, development, or commercial information; or
    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## AT SAN FRANCISCO

|  |  |
|---|---|
| FOOD & WATER WATCH, et al., | ) |
| Plaintiffs, | ) |
| vs. | ) Civ. No. 17-CV-02162-EMC |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al. | ) **NOTICE OF 30(b)(6) DEPOSITION** ) **OF THE UNITED STATES** ) **CENTERS FOR DISEASE** |
| Defendants. | ) **CONTROL AND PREVENTION** |

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure,

Plaintiffs will take the deposition upon oral examination under oath of the designated representative(s)

of the United States Centers for Disease Control and Prevention (CDC). The deposition will be taken

before a notary public or other person authorized by law to administer oaths, will be stenographically

recorded and videotaped, and will take place on **October 15, 2018 at 9 am E.S.T.** at the following

location:

NIDEL & NACE P.L.L.C.
5335 Wisconsin Ave NW
Suite 440
Washington D.C. 20015
Tel: (202) 478-9677

Such deposition(s) will be taken for purposes of discovery, for use as evidence at trial, and for

any other permissible purpose under the Federal Rules of Civil Procedure and Federal Rules of Evidence. The deposition(s) shall continue from day-to-day, excluding weekends and holidays, until completed. Plaintiffs request that the CDC provide written notice at least five (5) business days before the deposition of the name(s) and employment position(s) of the individual(s) designated to testify on the CDC's behalf.

## DEFINITIONS:

FLUORIDE means the fluoride ion.

NEUROTOXICITY means detrimental effects on the central nervous system, including, but not limited to, detrimental effects on learning, memory, and/or behavior.

NEUROTOXIN means a substance that causes detrimental effects on the central nervous system, including, but not limited to, detrimental effects on learning, memory, and/or behavior.

SUSCEPTIBLE SUBSETS OF THE POPULATION means (1) fetuses, infants, pre-adolescent children, the elderly, and (2) individuals with the following conditions: nutrient deficiencies (i.e., deficiencies calcium, iodine, vitamin C, vitamin D, and magnesium), kidney disease, and diabetes.

TOLERABLE UPPER FLUORIDE INTAKE FOR NEUROTOXIC EFFECTS means the maximum average daily intake of FLUORIDE, expressed in terms of a dose (mg/day) or dosage (mg/kg/day), that will not cause any demonstrable NEUROTOXICITY on the fetus, infant, toddler, and/or child.

## TOPICS OF INQUIRY:

1. The prevalence and severity of dental fluorosis in United States children, aged 6 to 19, as documented by CDC's National Health and Nutrition Examination Surveys (NHANES) from 1999 to 2014.

2. Data that the CDC has in its possession (if any) on the urinary FLUORIDE levels in persons living in the United States.

2

3.  What research the CDC has conducted or sponsored (if any) to determine whether FLUORIDE is a NEUROTOXIN.

4.  What research the CDC has conducted or sponsored (if any) to determine the effects of FLUORIDE exposure on the functioning of the thyroid gland.

5.  What research the CDC has conducted or sponsored (if any) to determine the risk of NEUROTOXICITY from FLUORIDE exposure in SUSCEPTIBLE SUBSETS OF THE POPULATION.

6.  CDC's position (if any) on whether FLUORIDE is a NEUROTOXIN, and the basis for said position.

7.  CDC's position (if any) on whether community water fluoridation presents a risk of NEUROTOXICITY, and the basis for said position.

8.  CDC's position (if any) on whether community water fluoridation presents risks to the functioning of the thyroid gland, and the basis for said position.

9.  CDC's position (if any) on whether community water fluoridation provides a benefit to unerupted teeth, and the basis for said position.

10.  What CDC has done (if anything) to determine the TOLERABLE UPPER FLUORIDE INTAKE FOR NEUROTOXIC EFFECTS.

11.  CDC's position (if any) on the TOLERABLE UPPER FLUORIDE INTAKE FOR NEUROTOXIC EFFECTS, and the basis for said position.

12.  CDC's position (if any) on whether prenatal exposure to fluoridated water (i.e., water with 0.7 ppm FLUORIDE) provides a benefit to teeth, and the basis for said position.

13.  CDC's position (if any) on whether exposure to fluoridated water (i.e., water with 0.7 ppm FLUORIDE) during the first 6 months of life provides a benefit to teeth, and the basis for said position.

14.  CDC's position (if any) on whether infant formula should be reconstituted with fluoridated water (i.e., water with 0.7 ppm FLUORIDE), and the basis for said position.

NOTICE OF 30(b)(6) DEPOSITION OF U.S. CENTERS FOR DISEASE CONTROL & PREVENTION

15. CDC's position (if any) on whether individuals with iodine deficiency have a heightened susceptibility to the toxic effects of chronic FLUORIDE exposure, and the basis for said position.

16. CDC's position (if any) on whether individuals with calcium deficiency have a heightened susceptibility to the toxic effects of chronic FLUORIDE exposure, and the basis for said position.

17. CDC's position (if any) on whether individuals with kidney disease have a heightened susceptibility to the toxic effects of chronic FLUORIDE exposure, and the basis for said position.

Dated:   September 5, 2018

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

1

2     Pursuant to Federal Rule of Civil Procedure 5 and the consent of the attorneys for the Department of Justice that email to counsel will constitute proper service of this notice, I served a copy of the

3  foregoing *Subpoena* and *Notice of 30(b)(6) Deposition of the United States Centers for Disease Control and Prevention* upon attorneys for the Department of Justice on September 5, 2018 via email to the

4  following counsel:

5     Debra J. Carfora

6     John T. Do
       U.S. Department of Justice

7     Environment & Natural Resources Division
       Environmental Defense Section

8     P.O. Box 7611
       Washington, DC. 20044-7611

9     debra.carfora@usdoj.gov
       john.do@usdoj.gov

10

11    *Attorneys for Defendants*

12

13                  Dated:  September 5, 2018

14                  */s/ Michael Connett*

15                  MICHAEL CONNETT
                      Attorney for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

|  |  |
|---|---|
| FOOD & WATER WATCH, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al. <br><br> Defendants. | Civ. No. 17-CV-02162-EMC <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' FOURTH MOTION *IN LIMINE* TO EXCLUDE IRRELEVANT EVIDENCE ON ALTERNATIVES TO FLUORIDATED WATER AND CUMULATIVE TESTIMONY ON LACK OF BENEFITS** <br> Date: Jan 7, 2017 (Pretrial Conference) <br> Time: 2:30 p.m. <br> Courtroom: 5 - 17th Floor |

**INTRODUCTION**

At the outset of this opposition, Plaintiffs wish to make clear that the issues raised in EPA's Fourth Motion *in Limine* will be moot if the Court grants Plaintiffs' Motion *in Limine* Number 1. Should the Court grant Plaintiffs' motion, Plaintiffs will not be introducing *any* of the evidence that EPA seeks to exclude here. To the extent, however, that the Court allows evidence of benefits to be introduced, EPA's motion should be denied on the grounds that it (1) is premature, (2) misrepresents and greatly overstates the extent of overlap between Plaintiffs' experts, (3) improperly seeks to interfere with the narrative integrity of Plaintiffs' case, (4) seeks to exclude unquestionably relevant evidence, including the absence of benefits at the very stages of life (fetal/neonatal) when the risk of fluoride neurotoxicity is at its peak, and (5) requests a sweeping ruling that would encompass relevant evidence.

**ARGUMENT**

**A.   EPA'S MOTION IS PREMATURE BECAUSE, DUE TO THE TIME CONSTRAINTS OF TRIAL, PLAINTIFFS FULLY INTEND TO LIMIT ANY DUPLICATIVE TESTIMONY ON BENEFITS**

Given the limited time available for trial and extensive time needed for the testimony on risk, Plaintiffs have no incentive or interest in introducing duplicative testimony on benefits. Plaintiffs intend, therefore, to minimize overlapping testimony on benefits at trial. EPA's concerns are thus premature, particularly since this is a bench trial. As explained in *Wright v. Watkins and Shepherd. Inc.*, No. 2:11-CV-01575-LRH-GWF, 2016 WL 10749220 (D. Nev. Jan. 19, 2016), when a case is tried as a bench trial,

> the Court will be in a better position to rule upon challenges to witnesses and evidence during the course of trial when there will be more context and a fuller understanding of the issues and evidence in the case. . . . [¶] The rationale underlying pre-trial motions in limine does not apply in a bench trial, where it is presumed the judge will disregard inadmissible evidence and rely only upon competent evidence. When ruling on motions in limine, a court is forced to determine the admissibility of evidence without the benefit of the context of trial. Moreover, because "the judge rules on this evidentiary motion, in the case of a bench trial, a threshold ruling is generally superfluous." The more prudent course in a bench trial, therefore, is to resolve evidentiary doubts in favor of admissibility.

*Id.* at *3 (citations omitted); *see United States v. Heller*, 551 F.3d 1108, 1112 (9th Cir. 2009) ("For logistical and other reasons, pretrial evidentiary motions may be appropriate in some cases. But here, once the case became a bench trial, any need for an advance ruling evaporated."); *United States v. Pacific Gas and Elec.*

*Co.*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016) ("Rulings on admissibility of evidence normally should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context.").

## B.   EPA GREATLY OVERSTATES THE EXTENT OF OVERLAP BETWEEN PLAINTIFFS' EXPERTS

EPA's motion misrepresents and exaggerates the extent of overlap between the Plaintiffs' expert opinions. EPA does this, in part, by conflating the general topics being discussed (i.e., the lack of benefits from fluoride ingestion) with each expert's unique methodologies and findings. For example, EPA represents that Dr. Wells' "entire report" addresses how "ingestion of fluoride is . . . ineffective." Mot. at 5:8-9. This characterization obscures, rather than illuminates, Dr. Wells' opinions and the basis thereof. First, Dr. Wells did two reports, not one, and the second report does not specifically address fluoride ingestion—rather, it analyzes national data on the relationship between fluoridated water and caries to rebut EPA's expert analysis of same. **Ex. 1** ¶ 6. Second, in her initial report, Dr. Wells did an analysis that is entirely unique to this litigation: she analyzed raw data from an NIH-funded prospective cohort (that Plaintiffs obtained via a third-party subpoena) to determine the relationship between early life fluoride exposures and caries. *Id.* ¶ 5. While Dr. Wells' findings corroborate Dr. Fejerksov's expert opinion that fluoride ingestion is ineffective, Dr. Wells reached this conclusion through a fundamentally distinct analysis. *See* Ex. 2 to EPA's Motion (Dr. Fejerskov's expert report).

EPA also dubiously contends that it would be needlessly duplicative to introduce testimony from CDC's 30(b)(6)'s representative. Far from it. The fact that CDC concurs with Plaintiffs' experts on several key issues regarding benefits is materially important evidence in and of itself, that Plaintiffs should be allowed to present. *See* **Ex. 2** at 213:19-23, 217:3-19, 224:7-11. This is particularly so because the CDC's position conflicts with several of the opinions proffered by EPA's litigation experts. For example, EPA's litigation experts have opined that fluoride's systemic and topical benefits are of equal importance (i.e. "probably a draw"), and that fluoridated water provides benefits for the fetus and infants. **Ex. 3**; **Ex. 4.** The CDC, by contrast, agrees that "overwhelming evidence" shows that fluoride's benefits are predominantly topical, and that fluoridated water provides no known benefits to the fetus or infant less than 6 months of age. **Ex. 2** at 213:19-23, 217:3-19, 224:7-11.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## C.   EPA'S MOTION SEEKS TO IMPROPERLY INTERFERE WITH THE NARRATIVE INTEGRITY OF PLAINTIFFS' CASE

As already mentioned, Plaintiffs have an incentive to minimize any cumulative testimony on benefits due to the scarce time available for trial and the diminishment in time that duplicative testimony will cause for Plaintiffs' evidence on risk. But, even if that weren't the case, EPA's motion should be denied because it amounts to an improper request to interfere with the narrative integrity of Plaintiffs' case.

The Supreme Court has cautioned that, when determining whether to exclude evidence on the ground that it is "needlessly . . . cumulative," a court must have "an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case, and the mere fact that two pieces of evidence might go to the same point would not, of course, necessarily mean that only one of them might come in." *Old Chief v. United States*, 519 U.S. 172, 183 (1997). In other words, cumulative evidence is properly admissible when it will assist the proponent in establishing the strength of his or her case. *See Blue v. International Bhd. of Elec. Workers Local Union* 159, 676 F.3d 579, 585-86 (7th Cir. 2012) (documentary evidence admitted at trial was not "prejudicially cumulative" because it addressed point that defendant was willing to concede; plaintiff "was entitled to make her case with the evidence of her own choosing"); *see also United States v. Fields*, 483 F.3d 313, 356 (5th Cir. 2007) ("Rule 403 does not ban per se all duplicative evidence. It is not required that each piece of evidence admitted have an entirely unique theory of relevancy. Indeed, Rule 403 provides that courts should only exclude relevant evidence if the need to avoid cumulative presentation 'substantially' outweighs the probative value of the evidence.").

## D.   IF BENEFITS CAN BE CONSIDERED, THE ABSENCE OF BENEFIT DURING THE EARLY LIFE STAGES IS UNQUESTIONABLY RELEVANT

In its motion, EPA preposterously suggests that the lack of benefit from *in utero* and infant exposure is "irrelevant." Mot. at 3:14-15. To the extent the Court permits evidence of benefits, the absence of early-life benefits will be *highly* probative to the unreasonable risk determination as these are the life-stages where the risk of neurotoxicity is at its peak. For these susceptible populations, therefore, there is *no* benefit, only risk. The absence of benefits for these life stages is thus unquestionably relevant to the issue of whether fluoridation chemicals present an unreasonable risk to *susceptible* populations.

**E.     EPA'S SWEEPING REQUEST TO EXCLUDE ALL EVIDENCE OF ALTERNATIVES IS BASELESS AND WILL RESULT IN EVIDENCE OF INDISPUTABLE RELEVANCY BEING EXCLUDED**

Finally, EPA asks this Court to issue the sweeping ruling that any evidence on alternatives to fluoridation chemicals, including the use of fluoride in toothpaste, is *per se* irrelevant. There are many problems with this request. First, EPA fails to offer an intelligible explanation for why evidence of alternatives is irrelevant to the issue of benefits. EPA contends that alternatives cannot be considered because they are considered in the rulemaking proceeding. Mot. at 3:10-14. Yet, by that reasoning, evidence of benefits cannot be considered either because they too can be considered in the rulemaking. *See* 15 U.S.C. § 2605(c)(2). EPA cannot have it both ways.

Second, even *if* evidence of alternatives is irrelevant, the sweeping nature of EPA's request will result in evidence of indisputable relevance being excluded. For example, evidence that Europe has rejected water fluoridation and has experienced greater declines in caries than the United States is relevant to the issue of fluoridation's effectiveness, which is obviously relevant to the issue of benefits. Similarly, evidence on the effectiveness of fluoride in toothpaste is relevant[1] to demonstrating that fluoride prevents caries primarily through topical contact with the teeth, not ingestion—an issue that EPA's motion concedes to be relevant. Mot. 3:1-2.

### CONCLUSION

If the Court grants Plaintiffs Motion *in Limine* No. 1, EPA's Fourth Motion is moot and need not be considered. To the extent that the Court permits evidence of benefits at trial, EPA's Fourth Motion should be denied for the reasons stated above.

December 19, 2019                                   Respectfully submitted,


                                                    */s/ Michael Connett*
                                                    MICHAEL CONNETT
                                                    Attorney for Plaintiffs

---

[1] Dr. Fejerskov partially bases his opinions on fluoride's topical mechanism of action on the clinical evidence of fluoride toothpaste's efficacy versus the efficacy of fluoridated water.

4

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that a true and correct copy of the foregoing was served by Notice of Electronic

3

Filing this 19th day of December, 2019, upon all ECF registered counsel of record using the Court's

4

CM/ECF system.

5

6
                                        */s/ Michael Connett*
                                        MICHAEL CONNETT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' <u>FOURTH</u> MOTION *IN LIMINE*
RE: ALTERNATIVES TO FLUORIDATION & LACK OF BENEFITS

# **Exhibit 1**

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, et al., | Civ. No. 17-CV-02162-EMC |
| Plaintiffs, | |
| vs. | **DECLARATION OF CHRISTINE WELLS, PhD** |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al. | |
| Defendants. | |

I, Christine Wells, declare that:

1.      I have agreed to appear as an expert in this case, and have prepared two expert reports which summarize the opinions that I intend to offer if called to testify at trial.

2.      A true and correct copy of my initial expert report, dated June 27, 2019, is attached herein as **Exhibit A** (I have not included the appendices).

3.      A true and correct copy of my rebuttal expert report, dated August 1, 2019, is attached herein as **Exhibit B** (I have not included the appendices).

4.      I am the senior member of the UCLA Institute for Digital Research and Education (IDRE) Statistical Consulting Group. I have worked as a statistical consultant for this group for 18 years. I have assisted more than 1,000 researchers on a wide variety of data analysis techniques, including the types of analyses that I conducted in this case. I have taught numerous workshops, teaching the types of analyses

1
DECLARATION OF CHRISTINE WELLS, PhD

that I used to address the research questions involved in this matter.

5. For my June 27, 2019 report, I analyzed the relationship between fluoride intake and tooth decay (i.e., caries) in the NIH-funded Iowa Fluoride Study (IFS) cohort, which I understand to be the only prospective cohort study to address the relationship between total daily fluoride ingestion and caries from birth through adolescence. As described in my report, there is no statistically significant relationship between total fluoride ingestion during the first 6 years of life and caries at ages 9, 13, and 17 in the IFS cohort.

6. For my August 1, 2019 report, I addressed Dr. Gary Slade's analysis on the relationship between caries rates and water fluoride concentration (measured at the *county* level) in the CDC's National Health and Nutrition Examination Surveys (NHANES). To do so, I conducted an analysis of NHANES data from 2013-2014 and found no statistically significant association between caries and water fluoride concentration (measured at the *home* level). By contrast, I found a large, and statistically significant, inverse association between sealant use and caries.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 8, 2019, in Newbury Park, California.


*Christine Wells, PhD*
CHRISTINE WELLS, PhD

DECLARATION OF CHRISTINE WELLS, PhD

# **<u>Exhibit 2</u>**

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                      AT SAN FRANCISCO

 3   _____

 4   FOOD & WATER WATCH, et al.,      |
                                      |
 5                  Plaintiffs,       |  CIVIL ACTION
                                      |
 6            vs.                     |  FILE NO.
                                      |
 7   U.S. ENVIRONMENTAL PROTECTION    |  17-cv-2162-EMC
     AGENCY, et al.,                  |
 8                                    |  ORIGINAL
                  Defendants.         |
 9   _____

10

11        VIDEOTAPE RULE 30(b)(6)DEPOSITION OF
          CENTERS FOR DISEASE CONTROL & PREVENTION
12                        THROUGH
                       CASEY HANNAN
13

14              Tuesday, November 6, 2018

15                    10:15 a.m.

16

17                  1600 Clifton Road
                 Building 21, Suite 10000
18                   Atlanta, Georgia

19           Linda C. Ruggeri, CCR-A-261

20

21

22

23

24

25
```

```
 1    attention to Page 32, and do you see that highlighted

 2    portion on the bottom left?

 3         A.    Okay.  Now I do, yes.

 4         Q.    Okay.  I'm just going to read that.

 5    Featherstone writes here:  "Until recently the major

 6    caries-inhibitory effect of fluoride was thought to be

 7    due to its incorporation in tooth enamel or tooth

 8    mineral during the development of the tooth prior to

 9    eruption.  This supposed mechanism of action was

10    behind the public health efforts and individual

11    caries-preventive regimens such as the use of fluoride

12    supplements prescribed for children to strengthen the

13    teeth during their development."  Did I read that

14    correctly?

15         A.    Yes.

16         Q.    And as I think we've already discussed,

17    CDC agrees that that is a correct assessment of the

18    history of fluoride?

19         A.    Correct.

20         Q.    Okay.  And then Featherstone writes:

21    "There is now overwhelming evidence that the primary

22    caries-preventive mechanisms of action of fluoride are

23    post eruptive through topical effects for both

24    children and adults."  Did I read that correctly?

25         A.    Yes.
```

1      Q.      And the CDC agrees with that statement,

2   correct?

3      A.      Yes, we do.

4      Q.      Okay.  And if I could direct your

5   attention to Page 34.  Do you see the highlighted

6   portion at the top right of the page?

7      A.      Uh-huh.

8      Q.      Featherstone writes:  "Very importantly,

9   this means that fluoride incorporated during tooth

10  mineral development at normal levels of 20 to 100 ppm

11  even in fluoridated drinking water areas or with the

12  use of fluoride supplements does not alter the

13  solubility of the mineral.  Even at higher levels such

14  as 1000 ppm in the outer few micrometers of enamel,

15  there is no measurable benefit against acid-induced

16  dissolution."  Did I read that correctly?

17     A.      Yes.

18     Q.      And did CDC agree with that statement?

19          MR. DO:  I'm going to object there.  Until

20       you lay the foundation, I don't know if you're

21       asking in his personal capacity or --

22          MR. CONNETT:  This is in the CDC's

23       position --

24          MR. DO:  Okay.

25          MR. CONNETT:  -- with respect to Topic

```
 1   literature, correct?

 2        A.      I have to say that I am unfamiliar and not

 3   remembering the grade levels of what the evidence was.

 4        Q.      Okay.  Well, why don't we turn to Page 19.

 5   That might refresh your recollection.

 6        A.      Okay.

 7        Q.      Do you see the box at the bottom titled

 8   "Grading system used for determining the quality of

 9   evidence for a fluoride modality"?

10        A.      Gotcha.  Yes.

11        Q.      And Grade I -- and take your time to

12   review it.  But after you've reviewed it, would you

13   agree with me that Grade I is the highest quality of

14   evidence in this grading system?

15        A.      Okay.  I've reviewed it; and yes, I'll

16   agree --

17        Q.      Okay.

18        A.      -- to your statement.

19        Q.      So the CDC's conclusion in 2001 is that

20   they had good evidence, high-quality evidence, to show

21   that fluoride supplements do not provide a benefit for

22   children when given during pregnancy, correct?

23        A.      Yeah, when given to pregnant women.

24        Q.      Okay.  And is CDC aware of any information

25   published subsequent to 2001 that would in any way
```

```
 1        document, we don't have a position on this

 2        matter.

 3            Q.    (By Mr. Connett)  Okay.  So if a pregnant

 4    mother wrote an e-mail to CDC asking if I drink

 5    fluoridated water during my pregnancy, will that

 6    provide a benefit to the teeth of my baby, CDC would

 7    not answer yes to that question, correct?

 8             MR. DO:  I'm not sure how to object to

 9        that question to be honest.  Objection, form.

10             MR. CONNETT:  Just say form.

11             MR. DO:  Form.  Form, foundation, calls

12        for speculation.

13             THE WITNESS:  If we were to get an e-mail

14        as such, we would summarize our understanding of

15        the evidence in saying we have not found evidence

16        that supports -- that shows benefit to the child

17        if ingested -- if community water fluoridation or

18        some other form of fluoride is ingested by the

19        mother.

20        Q.    (By Mr. Connett)  Okay.

21        A.    And we would also instruct them to consult

22    with their attending physician to make those choices.

23        Q.    Okay.  So I'd like to now move on to

24    Topic 13 which has set forth in our notice as "CDC's

25    position, if any, on whether exposure to fluoridated
```

```
1    studied it because that's not consistent with infant

2    feeding recommendations.  Exclusively breast-fed is

3    what we -- exclusive breast-feeding or bottle-feeding

4    for the first six months is the recommendations we

5    support, and they're made by a number of

6    organizations.

7         Q.      Okay.  So just to clarify because I think

8    I'm -- is the CDC aware of any evidence demonstrating

9    benefits from consumption of fluoridated drinking

10   water during the first six months of life?

11        A.      We are not aware of any evidence.

12        Q.      Okay.  If you could, turn back to the 2001

13   report.

14        A.      Okay.

15        Q.      And I'd just like to draw your attention

16   to Page 4.

17                MR. DO:  Are we on Exhibit 53?

18                MR. CONNETT:  Yes.

19                THE WITNESS:  I think so.  Page 4?

20        Q.      (By Mr. Connett)  Yes.  Are you there?

21        A.      Yes.

22        Q.      Okay.  And this is sort of redundant to

23   the previous one, but I'll just read the first

24   sentence at the bottom of the page.  It reads:  "The

25   laboratory and epidemiologic research that has led to
```

# **Exhibit 3**

## Dental health benefits of fluoride in drinking water.

## 1. Synopsis

Dental caries (i.e., "tooth decay") causes pain and tooth loss, significantly diminishing individuals' quality of life. If not treated, the disease progresses and can create a dental abscess or even a fatal infection. One in four children in the United States has early childhood caries, a prevalence rate that has persisted since the 1990s, and the burden falls disproportionately on children living in poverty. In 2016, dental caries accounted for more than 800,000 visits to emergency rooms that were otherwise preventable. Between 2011 and 2015, Medicaid-enrollees underwent an increasing rate of dental treatment under general anesthesia – a measure of last resort for severe caries in children who cannot tolerate usual dental treatment. In 2013, the U.S. spent $26.9 billion on child dental care, surpassing the combined amount spent on asthma, anxiety disorders, upper respiratory tract infections, and other infectious diseases in children.

Observational epidemiologic studies of children covering more than half a century provide compelling and consistent evidence that fluoride in drinking water is associated with substantial benefits in preventing dental caries. The benefits are seen in the primary and permanent dentitions, with the magnitude of relative benefit being greater in the former. Statistical analytic methods used in recent decades account for other sources of fluoride—such as toothpaste—and other factors that influence dental caries in populations such as race, ethnicity, parental income and education. Those studies also demonstrate a caries-preventive benefit of water fluoridation even in populations where virtually all children use fluoridated toothpaste. The most recent U.S. evidence, reported in 2018, is from a study of a nationally-representative sample of children and adolescents that found a substantial preventive benefit, both in the permanent and primary teeth. Notably, benefits were more pronounced for children in low-income families than in high-income families. Similar studies of adults likewise show that water fluoridation is associated with reduced extent of dental caries.

Evidence from observational studies fulfills all criteria for a causal interpretation that water fluoridation prevents caries:

- Findings are *consistent*, over time and in different populations;
- The *strength of association* is of public health importance, typically in the range of 30-40% reductions in caries;
- The preventive association applies *specifically* to dental caries, not to other oral diseases;
- Studies establish the required *temporal sequence* between exposure to the fluoridation and caries prevention;
- There is a *biological gradient* in which the benefit increases with increasing extent of exposure to fluoridation;
- Results are *analogous* to caries-preventive effects of other (non-water) sources of fluoride;
- Several features of an *experimental study* are reproduced in studies of fluoridation; and

Overall, the studies of caries preventive mechanisms support a combination of pre-eruptive and post-eruptive effects of fluoride in drinking water. Over time, scientific opinion has altered as to whether the "predominant" contribution is via one or the other mechanism, with studies this century suggesting that it is probably a draw. It seems unlikely that any single biological experiment or observational epidemiological study will resolve the question definitively. Instead, and until such time that evidence is obtained from a randomized controlled trial of fluoridated water in humans, the most defensible conclusion is that both mechanisms are important in understanding caries preventive benefits of fluoridation. It follows that the greatest caries-preventive benefit is achieved when both mechanisms operate, which occurs for individuals who have lifetime exposure to fluoridation.[18]

## 5. Generalizability and public health significance

Previous sections have reviewed the large body of evidence supporting a caries-preventive benefit of community water fluoridation and found that the evidence satisfies criteria required to draw causal inferences based on observational studies. The evidence is abundant and consistent, showing that community water fluoridation is effective in preventing dental caries in both primary and permanent teeth, in children and adults, in the United States or elsewhere, and across all social strata. Indeed, there is good evidence that fluoridation provides greater preventive benefit in low-income households compared to high-income households, with the consequence that fluoridation probably reduces income-associated disparities in dental caries.

The results are readily generalizable to the U.S. population at large because most of U.S. epidemiologic studies selected study participants using inclusive criteria, oftentimes either fully enumerating all children in a school, or through rigorous methods of random sampling from the population.

The public health significance of the preventive benefit was profound when it was first described early in the 20th century.  At that time dental caries was rampant, there were no known strategies for its prevention, and when treatment was obtained, it often entailed extraction. Local governments were quick to adopt community water fluoridation because they perceived great benefits for their communities. In the case of Muskegon, MI, this was to the chagrin of researchers who studied dental caries in that community for the purpose of comparison with Grand Rapids. At the close of the century, water fluoridation was hailed as one of the nation's great public health achievements of the 20th century.[103]

Today, the public health significance of community water fluoridation needs to be considered in the contemporary environment where the overall rate of dental caries has declined, other forms of fluoride are widely used, and dentists have more effective and tolerable methods of treatment for caries. While many Americans enter adulthood having never experienced dental caries, dental caries remains a serious public health problem  - see Section 2.3.  Community-based prevention of the disease therefore is essential. The most recent results from the U.S. population of children show

# Exhibit 4

Lewis Rebuttal to Plaintiffs' Reports

August 1, 2019

I was asked to review and rebut certain aspects of papers by Drs Fejerskov, Thiessen, and Grandjean.  Much of this rebuttal is in response to the report entitled, *Rational Use of Fluorides in Modern Society*, by Dr Ole Fejerskov however throughout my response, I will also address comments from the other above authors since there is overlap in their opinions.

OVERVIEW

In particular, all of the authors stress the topical benefits of fluoride as a reason why community water fluoridation (CWF) should be discontinued in the United States. Yet, these authors ignore that CWF is a topical source of fluoride and the topical benefits of CWF extend to preventing dental caries in both primary and permanent teeth. Moreover, CWF is also a systemic source of fluoride, helping to prevent dental caries in the developing dentition of children--at a time in life when prevention is vital to the establishment of life-long oral health.  In an effort to counter an enormous literature about the benefits of CWF, the above authors rely on select, restricted systematic reviews to make inaccurate statements about the ongoing benefits of and need for CWF.  These authors also point to recent declines in dental caries around the world, even in places that have not implemented CWF, as evidence that CWF lacks effectiveness. In drawing such conclusions, the authors clearly ignore that various societies develop and rely on different preventive strategies depending on the characteristics and resources of that society.  CWF is one public health strategy, particularly well-suited to the US, but other countries have used other means besides CWF to improve their nation's oral health. The overarching single factor responsible for improved oral health in the developed word is fluoride--whether in toothpaste, mouthrinse, professional treatment or CWF. While fluoride prevents dental caries, sugar promotes dental caries since it is substrate for cariogenic bacteria (bacteria in the mouth that produce tooth-eroding acid when they metabolize sugar). It is true that primitive societies whose diets did not include a lot of refined carbohydrates had few dental caries, but there is little chance of replicating these primitive diets on a large scale in today's world. It is widely known that eating too much sugar is bad for teeth and bad for health, but merely giving advice about avoiding sugar isn't sufficient to prevent caries.

Turning to Dr Fejerskov's paper, I disagree with a number of Dr Fejerskov's opinions. In his introduction, Dr Fejerskov wrote: "The only proven effect of ingesting fluoride during the long-lasting process of tooth development is to develop dental fluorosis, which is the early signs of a toxic, biologic effect of fluoride."  This statement contains 2 ideas: 1) that the only proven

For example, the city of Evanston added fluoride to their public water supply in 1947. Blayney and Hill (1964) reported results of primary teeth examinations of children born before and after the initiation of CWF in Evanston. While the 2 groups of children differed in whether their mothers used low-fluoride or optimally fluoridated water during pregnancy, the children had access to optimally fluoridated water from birth onward. Cross-sectional dental examinations of 6-, 7- and 8-year old children were conducted every 2 years beginning in 1946 (before fluoridation started in Evanston) and continued through 1960.  Thus, cohorts of children varied in the age that they started drinking optimally fluoridated water and whether their mothers used optimally fluoridated water during pregnancy. Children using fluoridated water beginning at birth, whose mothers also used optimally fluoridated water during pregnancy demonstrated the lowest caries rate, even lower than the children who used optimally fluoridated water beginning in infancy but who were not exposed in utero (because CWF had not yet been initiated in Evanston when their mothers were pregnant). Similarly, studies in Corvallis, Oregon (Tank, 1964) (comparing it to the non-fluoridated city of Albany, Oregon) before and after initiation of CWF, indicated that children who were exposed to optimally fluoridated water both in utero and after birth had fewer caries compared to children who began consuming fluoridated water postnatally.  The authors in both the Evanston and Corvallis studies concluded that prenatal CWF adds a protective effect on caries prevention in children above and beyond that imparted by using optimally fluoridated water beginning at birth.

While some prenatal fluoride studies found fewer caries in the offspring such as this one in Evanston, others found no effect on caries in offspring of mothers who used optimally fluoridated water compared to those whose mothers used low fluoride water during pregnancy. Differences in results likely vary due to study design issues as well as the limited nature of in utero mineralization of primary teeth and because relatively less fluoride reaches the fetus than is present in maternal serum. Even though fluoride transfers passively from mother to fetus, rapid maternal skeletal uptake and renal excretion of fluoride limits the amount of fluoride that reaches fetal teeth  (Gedalia, 1989). These dynamics likely explain why fluorosis is uncommon in primary teeth except at extremely high levels of fluoride intake during primary dentition development. Dr. Fejerskov cites the Cochrane Review on prenatal fluoride supplements to support his opinion that prenatal fluoride has no effect on caries prevention. In fact, as is clear from the Cochrane Review, there has been only one RCT of prenatal fluoride supplements and it was ultimately found to be underpowered to detect a difference in caries between the treatment- and placebo- exposed offspring (Leverett, 1997). Thus, the impact of prenatal fluoride supplements was not clarified by this RCT. There has never been an RCT of prenatal

CWF, however there is epidemiologic evidence that supports the principle that prenatal exposure to CWF has additional caries preventive benefits, through a systemic mechanism, above and beyond those imparted by fluoride use beginning in infancy.

FLUORIDE TOOTHPASTE

I recognize that there is a strong body of evidence in support of the caries preventive effect of FTP. Unlike CWF, which is a population level intervention, FTP is a caries preventive modality on the individual level. Pediatricians, like myself, recommend twice daily FTP beginning at first tooth eruption, consistent with the American Dental Association guidelines. CWF, on the population level, and FTP, on the individual level, form the cornerstones of life-long oral health. However, from a practical perspective, CWF is substantially easier to use than FTP in infants and young children.  Regardless of the advice provided by pediatricians and other health professionals, and despite parental good intentions, brushing a baby or young child's teeth is technically challenging and often falls by the wayside in the midst of busy child rearing, as I discussed in my June 27, 2019 report. CWF is a passive public health strategy delivering both topical and systemic fluoride that is available to all, regardless of socioeconomic status, while FTP use depends on having the resources to purchase FTP and the knowledge, motivation and self-efficacy to brush a child's teeth twice daily.  Children require help brushing their teeth-- typically until they are about 7 or 8 years old. Dr Fejerskov considers FTP as a topical form of fluoride, but FTP is ingested in young children, and thus is a systemic fluoride source, because a portion of FTP used in brushing is inevitably swallowed until children learn to spit it out (Naccache, 1992). Fluoride rinses are even more problematic for young children who are unable to spit them out after rinsing; the fact that a young child would swallow most of the rinse is why we don't use these in young children.

CWF IS NOT MASS MEDICATION

Consistent with Dr Fejerskov's advocacy for individual use of FTP, he describes CWF as "mass medication." Emphasizing individual fluoride choice and mischaracterizing CWF as medicine are common fluoride misinformation tactics. Physicians differentiate prevention and treatment when we consider what comprises a medication. Medication is used to treat disease or reduce risk of disease in individuals at higher risk. Fluoride is available in highly concentrated forms (5000 to more than 40,000 fold higher concentration of fluoride compared to CWF) by prescription or for professional use; these modalities are appropriately classified as medication because they are used to treat dental caries and/or prevent it in high-risk individuals. CWF does not fit the definition of a medication because CWF is used to prevent dental caries on a population level, not to treat it in individuals.  In this way, CWF can be considered as similar to