DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al., | Case No. 17-CV-02162 EMC |
| Plaintiffs, | **DEFENDANTS' FIFTH MOTION IN LIMINE TO EXCLUDE TOXICOLOGICAL REVIEWSAND DRAFT RISK EVALUATIONS** |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | Date:   January 7, 2020 |
| Defendant. | Time:  2:30 p.m. |
| | Place:  Courtroom 5, 17th floor |

**INTRODUCTION**

Plaintiffs have identified nine Toxicological Reviews, completed by EPA's Office of Integrated Risk Information System ("IRIS"), and three Draft Risk Evaluations, completed by EPA's Office of Pollution Prevention and Toxics ("OPPT"), as exhibits for trial. Testimony and evidence concerning these IRIS Toxicological Reviews and OPPT Draft Risk Evaluations—which are all for chemicals unrelated to fluoridation—are irrelevant to the question of whether adding fluoridation chemicals to community water systems presents an unreasonable risk of neurotoxic harm. Therefore, testimony and evidence concerning these twelve documents must be excluded at trial. Even if relevant, the probative value of these documents (and any related testimony or evidence) is substantially outweighed by a danger of unfair prejudice, confusing the issues, and wasting time. Therefore, the Court should exercise its discretion to exclude the nine Toxicological Reviews, three Draft Risk Evaluations, and any related testimony or evidence proposed to be proffered at trial.

**BACKGROUND**

Plaintiffs have identified as exhibits for trial IRIS Toxicological Reviews for the following nine chemicals: 2,2',4,4'-Tetrabromodiphenyl Ether (BDE-47); 2,2',4,4'-5-Pentabromodiphenyl Ether (BDE-99); 2,2',4,4'-5,5'-Hexabromodiphenyl Ether (BDE-153); Decabromodiphenyl Ether (BDE-209); Chlorine Dioxide and Chlorite; 2-Hexanone; Methanol; Hexahydro-1,3,5-trinitro-1,3,5-triazine (RDX); Trimethylbenzenes. None of these chemicals is related to or used in the practice of community water fluoridation. The identified Toxicological Reviews were conducted by EPA's IRIS program,[1] located within EPA's National Center for Environmental Assessment in the Office of Research and Development. The IRIS program identifies and develops toxicity values for health effects (i.e., hazards) resulting from chronic exposures to chemicals found in the environment. An IRIS assessment includes only two components of the risk assessment process—Hazard Identification and Dose-Response Assessment. *See generally*, Exhibit A. Thus, IRIS assessments are not risk assessments. IRIS toxicity values may be used by EPA's program and

---

[1] For the convenience of the Court, attached as Exhibit A are excerpts of each Toxicological Review, available at: https://cfpub.epa.gov/ncea/iris_drafts/AtoZ.cfm.

regional offices to the extent that they meet the requirements of the statutes the program offices implement.

Plaintiffs have also identified as exhibits Draft Risk Evaluations for the following three chemicals: 1,4-Dioxane; 1-Bromopropane; and Methylene Chloride. None of these chemicals are related to or used in the practice of community water fluoridation, nor have Plaintiffs proffered any evidence that these chemical substances have properties similar to fluoridation chemicals. The Draft Risk Evaluations are the first draft risk evaluations completed by EPA's OPPT under the Frank R. Lautenberg Chemical Safety for the 21st Century Act ("Lautenberg Act"), amending TSCA. All Draft Risk Evaluations can only be finalized after careful consideration of peer review and public comments by EPA, which process is currently ongoing. *See* Henry Decl. ¶ 26, Exhibit B; *see also* 84 Fed. Reg. 31,315 (July 1, 2019) (announcing the availability of and seeking public comment on the draft Risk Evaluations for 1,4-Dioxane); 84 Fed. Reg. 39,830 (Aug. 12, 2019) (announcing the availability of and seeking public comment on the draft Risk Evaluations for 1-Bromopropane); 84 Fed. Reg. 57,866 (Oct. 29, 2019) (announcing the availability of and seeking public comment on the draft Risk Evaluations for Methylene Chloride).

Like the IRIS program, OPPT generally follows EPA's 1998 *Guidelines for Neurotoxicity Risk Assessment* ("Guidelines"),[2] which were designed to guide EPA's evaluation of substances that are suspected to cause neurotoxicity, in line with substantive standards established in the statutes administered by the Agency. 1998 Guidelines iv. "In particular, the Guidelines emphasize that risk assessments will be conducted on a case-by-case basis, giving full consideration to all relevant scientific information. This approach means that Agency experts study scientific information on each chemical under review and use the most scientifically appropriate interpretation to assess risk." *Id.* at vi.

---

[2] Excerpt attached as Exhibit C, which are cited herein as "1998 Guidelines."

Defendants' Fifth Motion in Limine to Exclude Toxicological Reviews and Draft Risk Evaluations
Case No. 17-cv-02162 EMC

## ARGUMENT

## I.   TESTIMONY AND EVIDENCE RELATED TO THE TOXICOLOGICAL REVIEWS AND DRAFT RISK EVLAUATIONS ARE IRRELEVANT TO THE COURT'S CONSIDERATION OF THE POTENTIAL RISKS OF FLUORIDE EXPOSURE.

Evidence is relevant only if it has "any tendency to make" the existence of any fact that is of consequence to the determination of the action more probable or "less probable than it would be without the evidence." Fed. R. Evid. 401(a). "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Testimony and evidence concerning IRIS Toxicological Reviews and OPPT Draft Risk Evaluations for chemicals unrelated to fluoridation are irrelevant because they have no probative value for answering the question of whether adding fluoridation chemicals to community water systems, the only condition of use at issue in this litigation, presents an unreasonable risk of neurotoxic harm. EPA expects Plaintiffs will argue that the Toxicological Reviews and Draft Risk Evaluations are relevant to demonstrate EPA's use of certain scientific principles that the Court should employ in assessing the risk of fluoridation chemicals solely on the basis that EPA has taken that approach in assessing entirely different chemicals. The Court must reject this argument.

As an initial matter, because the identified Toxicological Reviews were conducted by the IRIS program, the reviews may not be "in line with the policies and procedures established" by or "fit-for-purpose" under TSCA. *See* 1998 Guidelines iv. In fact, all but one of the identified Toxicological Reviews were completed and published prior to the June 22, 2016 TSCA amendments. *See generally*, Exhibit A. And in any event, none of them were developed specifically for use in the TSCA context. While the 1998 Guidelines continue to provide a framework for science policy decision making in risk assessment, "fit-for-purpose risk evaluations" under TSCA must use modern methodologies to systematically weigh the scientific evidence, taking into account exposures under the conditions of use. The concept of "fit-for-purpose risk evaluations" provides the flexibility to refine, as necessary, the process for evaluating risk using assumptions, uncertainty factors, and models or screening methodologies *given the nature of the evidence*, for the conditions of use. 82 Fed. Reg. 33,726, 33,739–40 (July 20, 2017) ("Risk Evaluation Rule").

The fit-for-purpose concept is consistent with the emphasis in both the Guidelines and EPA's TSCA Risk Evaluation Rule "that risk assessments will be conducted on a case-by-case basis, giving full consideration to all relevant scientific information." 1998 Guidelines vi; Henry Decl. ¶ 22. In other words, even though EPA may have employed certain scientific procedures or judgments in conducting assessments of entirely different and independent chemicals, that fact does not demonstrate a scientifically appropriate approach in assessing the risk of fluoridation chemicals. *See* 1998 Guidelines vi; Henry Decl. ¶ 22. Rather, Plaintiffs must demonstrate scientifically appropriate judgment in evaluating fluoridation chemicals based on the nature of the existing body of evidence for neurotoxic effects. S*ee* Risk Evaluation Rule 33,739–40 (explaining the importance of flexibility in the process for evaluating risk *given the nature of the evidence*). Thus, any proffered testimony and evidence concerning the IRIS Toxicological Reviews and Draft Risk Evaluations would not be relevant to any fact of consequence in the Court's determination of whether adding fluoridation chemicals to community water systems presents an unreasonable risk of neurotoxic harm. The Court must exclude all proffered testimony and evidence at trial regarding the IRIS Toxicological Reviews and Draft Risk Evaluations pursuant to Federal Rule of Evidence 402.

## II.   ALTERNATIVELY, ANY PROBATIVE VALUE IS SUBSTANTIALLY OUTWEIGHED BY OTHER CONSIDERATIONS.

Even if the documents could be considered relevant, "[t]he Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] wasting time." Fed. R. Evid. 403. "The district court has considerable latitude in performing a Rule 403 balancing test." *Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1996) (citing *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1430 (9th Cir. 1991)). Plaintiffs do not dispute that some risk-assessment process is required to make an unreasonable risk determination in this case. Because all risk assessments must be conducted on a case-by-case basis, permitting testimony and evidence concerning the IRIS Toxicological Reviews and Draft Risk Evaluations would result in unfair prejudice, would confuse the issues, and would waste time.

First, such evidence will have a distracting effect and confuse the already-complex scientific issues in this case because it would require unnecessary testimony and evidence comparing and distinguishing *the nature of the evidence* for chemicals unrelated to the practice of community water fluoridation. Second, allowing Plaintiffs to introduce the Toxicological Reviews and Draft Risk Evaluations would unfairly prejudice EPA by permitting Plaintiffs' to forgo demonstrating the most scientifically appropriate principles and procedures given the nature of the existing and available scientific literature for fluoridation chemicals, the only chemical substances at issue in this case; and would inappropriately shift the burden to EPA to distinguish and defend its scientific judgment in assessing chemicals unrelated to fluoridation. Additionally, consideration of the Draft Risk Evaluations could prejudice EPA's ability to defend the final risk evaluations, over which the circuit courts of appeal have exclusive jurisdiction. *See* 15 U.S.C. § 2618(a)(1)(A). Third, requiring EPA to explain and defend its scientific judgment for Toxicological Reviews and Draft Risk Evaluations for unrelated chemicals would waste the time and resources of the Court and the Government. Thus, the Court should exercise its broad discretion to exclude from testimony and evidence at trial the IRIS Toxicological Reviews and Draft Risk Evaluations pursuant to Federal Rule of Evidence 403.

## CONCLUSION

For the foregoing reasons, the Court should exclude all testimony and evidence concerning the IRIS Toxicological Reviews and Draft Risk Evaluations for chemicals unrelated to fluoridation chemicals and their use in community water fluoridation programs.

Defendants' Fifth Motion in Limine to Exclude Toxicological Reviews and Draft Risk Evaluations
Case No. 17-cv-02162 EMC

1 Date: December 6, 2019
Washington, D.C.

2                                        Respectfully Submitted,

3
                                         /s/ Debra J. Carfora
4                                        Debra J. Carfora
                                         John Thomas H. Do
5                                        Brandon N. Adkins
                                         United States Department of Justice
6                                        Environment & Natural Resources Division
                                         P.O. Box 7611
7                                        Washington, D.C. 20044
                                         Tel: (202) 514-2640
8                                        Fax: (202) 514-8865
                                         Email: debra.carfora@usdoj.gov
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Fifth Motion in Limine to Exclude Toxicological Reviews and Draft Risk
Evaluations
Case No. 17-cv-02162 EMC

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of December, 2019, a true and correct copy of the foregoing Defendants' Fifth Motion in Limine to Exclude Toxicological Reviews and Draft Risk Evaluations was served on counsel for Plaintiffs by email.

*/s/ Debra J. Carfora*
DEBRA J. CARFORA
United States Department of Justice

# EXHIBIT A

EPA/635/R-07/005F
**www.epa.gov/iris**



# TOXICOLOGICAL REVIEW

# OF

# 2,2',4,4'-TETRABROMODIPHENYL ETHER (BDE-47)

## (CAS No. 5436-43-1)

**In Support of Summary Information on the
Integrated Risk Information System (IRIS)**

*June 2008*

U.S. Environmental Protection Agency
Washington, DC

# FOREWORD

The purpose of this Toxicological Review is to provide scientific support and rationale for the hazard and dose-response assessment in IRIS pertaining to chronic exposure to 2,2',4,4'-tetrabromodiphenyl ether (BDE-47).  It is not intended to be a comprehensive treatise on the chemical or toxicological nature of BDE-47.

The majority of the available toxicological information on the tetrabromodiphenyl ether homolog group (CAS No. 40088-47-9) relates to the tetrabromodiphenyl congener 2,2',4,4'-tetrabromodiphenyl ether (CAS No. 5436-43-1).  Toxicological information related to other congeners in the tetrabromodiphenyl ether homolog group is also discussed.  However, this health assessment does not deal with commercial mixtures of brominated diphenyl ether homologs containing tetrabromodiphenyl ether as one of the constituents of commercial formulations.  In addition to BDE-47, IRIS health assessments have also been prepared for three other polybrominated diphenyl ether congeners: pentaBDE-99, hexaBDE-153, and decaBDE-209.  These four congeners, for which toxicological studies suitable for dose-response assessments were available, are the ones most commonly found in the environment and human biological media.

The intent of Section 6, *Major Conclusions in the Characterization of Hazard and Dose Response*, is to present the major conclusions reached in the derivation of the reference dose, reference concentration and cancer assessment, where applicable, and to characterize the overall confidence in the quantitative and qualitative aspects of hazard and dose response by addressing the quality of data and related uncertainties.  The discussion is intended to convey the limitations of the assessment and to aid and guide the risk assessor in the ensuing steps of the risk assessment process.

For other general information about this assessment or other questions relating to IRIS, the reader is referred to EPA's IRIS Hotline at (202) 566-1676 (phone), (202) 566-1749 (fax), or hotline.iris@epa.gov (email address).

EPA/635/R-07/006F
**www.epa.gov/iris**



# TOXICOLOGICAL REVIEW

# OF

# 2,2',4,4',5-PENTABROMODIPHENYL ETHER (BDE-99)

## (CAS No. 60348-60-9)

**In Support of Summary Information on the
Integrated Risk Information System (IRIS)**

*June 2008*

U.S. Environmental Protection Agency
Washington, DC

# FOREWORD

The purpose of this Toxicological Review is to provide scientific support and rationale for the hazard and dose-response assessment in IRIS pertaining to chronic exposure to 2,2',4,4',5-pentabromodiphenyl ether.  It is not intended to be a comprehensive treatise on the chemical or toxicological nature of 2,2',4,4',5-pentabromodiphenyl ether (BDE-99).

The majority of the available toxicological information on the pentabromodiphenyl ether homolog group (CAS No. 32534-81-9) relates to the pentabromodiphenyl congener BDE-99 (CASRN 60348-60-9).  Toxicological information related to other congeners in the pentabromodiphenyl ether homolog group is also discussed.  However, this health assessment does not deal with commercial mixtures of brominated diphenyl ether homologs containing pentabromodiphenyl ether as one of the constituents of commercial formulations.  In addition to BDE-99, IRIS health assessments have also been prepared for three other polybrominated diphenyl ether congeners: tetraBDE-47, hexaBDE-153, and decaBDE-209.  These four congeners are those for which toxicological studies suitable for dose-response assessments were available and are the ones most commonly found in the environment and human biological media.

The intent of Section 6, *Major Conclusions in the Characterization of Hazard and Dose Response*, is to present the major conclusions reached in the derivation of the reference dose, reference concentration and cancer assessment, where applicable, and to characterize the overall confidence in the quantitative and qualitative aspects of hazard and dose response by addressing the quality of data and related uncertainties.  The discussion is intended to convey the limitations of the assessment and to aid and guide the risk assessor in the ensuing steps of the risk assessment process.

For other general information about this assessment or other questions relating to IRIS, the reader is referred to EPA's IRIS Hotline at (202) 566-1676 (phone), (202) 566-1749 (fax), or hotline.iris@epa.gov (email address).

EPA/635/R-07/007F
**www.epa.gov/iris**



# TOXICOLOGICAL REVIEW

# OF

# 2,2',4,4',5,5'-HEXABROMODIPHENYL ETHER (BDE-153)

### (CAS No. 68631-49-2)

## In Support of Summary Information on the Integrated Risk Information System (IRIS)

*June 2008*

U.S. Environmental Protection Agency
Washington, DC

# FOREWORD

The purpose of this Toxicological Review is to provide scientific support and rationale for the hazard and dose-response assessment in IRIS pertaining to chronic exposure to 2,2',4,4',5,5'-hexabromodiphenyl ether (BDE-153).  It is not intended to be a comprehensive treatise on the chemical or toxicological nature of 2,2',4,4',5,5'-hexabromodiphenyl ether.

The majority of the available toxicological information on the hexabromodiphenyl ether homolog group (CASRN 36483-60-0) relates to the congener 2,2',4,4',5,5'-hexabromodiphenyl ether or BDE-153 (CASRN 68631-49-2).  Toxicological information related to other congeners in the hexabromodiphenyl ether homolog group is also discussed.  However, this health assessment does not deal with commercial mixtures containing hexabromodiphenyl ether congeners as one of the ingredients present in the formulation.  In addition to BDE-153, IRIS health assessments have also been prepared for three other polybrominated diphenyl ether congeners: tetraBDE-47, pentaBDE-99, and decaBDE-209.  These four congeners are those for which toxicological studies suitable for dose-response assessments were available and are the ones most commonly found in the environment and human biological media.

The intent of section 6, *Major Conclusions in the Characterization of Hazard and Dose Response*, is to present the major conclusions reached in the derivation of the reference dose, reference concentration and cancer assessment, where applicable, and to characterize the overall confidence in the quantitative and qualitative aspects of hazard and dose response by addressing the quality of data and related uncertainties.  The discussion is intended to convey the limitations of the assessment and to aid and guide the risk assessor in the ensuing steps of the risk assessment process.

For other general information about this assessment or other questions relating to IRIS, the reader is referred to EPA's IRIS Hotline at (202) 566-1676 (phone), (202) 566-1749 (fax), or hotline.iris@epa.gov (email address).

EPA/635/R-07/008F
**www.epa.gov/iris**



# TOXICOLOGICAL REVIEW

# OF

# DECABROMODIPHENYL ETHER (BDE-209)

## (CAS No. 1163-19-5)

## In Support of Summary Information on the Integrated Risk Information System (IRIS)

*June 2008*

U.S. Environmental Protection Agency
Washington, DC

# FOREWORD

The purpose of this Toxicological Review is to provide scientific support and rationale for the hazard and dose-response assessment in IRIS pertaining to chronic exposure to decabromodiphenyl ether.  It is not intended to be a comprehensive treatise on the chemical or toxicological nature of decabromodiphenyl ether (BDE-209).

This health assessment deals with BDE-209 of relatively high purity (≥94%) and does not deal with earlier commercial decabromodiphenyl ether mixtures containing lower proportions of decabromodiphenyl ether (e.g., 75% purity).  In addition to BDE-209, IRIS health assessments have also been prepared for three other polybrominated diphenyl ether congeners: tetraBDE-47, pentaBDE-99, and hexaBDE-153.  These four congeners are those for which toxicological studies suitable for dose-response assessments were available and are the ones most commonly found in the environment and human biological media.

The intent of Section 6, *Major Conclusions in the Characterization of Hazard and Dose Response*, is to present the major conclusions reached in the derivation of the reference dose, reference concentration and cancer assessment, where applicable, and to characterize the overall confidence in the quantitative and qualitative aspects of hazard and dose response by addressing the quality of data and related uncertainties.  The discussion is intended to convey the limitations of the assessment and to aid and guide the risk assessor in the ensuing steps of the risk assessment process.

For other general information about this assessment or other questions relating to IRIS, the reader is referred to EPA's IRIS Hotline at (202) 566-1676 (phone), (202) 566-1749 (fax), or hotline.iris@epa.gov (email address).



**EPA/635/R-00/007**

# TOXICOLOGICAL REVIEW

## OF

# CHLORINE DIOXIDE

### AND

# CHLORITE

(CAS Nos. 10049-04-4 and 7758-19-2)

**In Support of Summary Information on the
Integrated Risk Information System (IRIS)**

*September 2000*

U.S. Environmental Protection Agency
Washington, DC

**FOREWORD**

The purpose of this Toxicological Review is to provide scientific support and rationale for the hazard and dose-response assessment in IRIS pertaining to chronic exposure to chlorine dioxide and chlorite.  It is not intended to be a comprehensive treatise on the chemical or toxicological nature of chlorine dioxide and chlorite.

In Section 6, EPA has characterized its overall confidence in the quantitative and qualitative aspects of hazard and dose response.  Matters considered in this characterization include knowledge gaps, uncertainties, quality of data, and scientific controversies.  This characterization is presented in an effort to make apparent the limitations of the assessment and to aid and guide the risk assessor in the ensuing steps of the risk assessment process.

For other general information about this assessment or other questions relating to IRIS, the reader is referred to EPA's Risk Information Hotline at 513-569-7254.

EPA/635/R-09/008F
www.epa.gov/iris



# TOXICOLOGICAL REVIEW

# OF

# 2-HEXANONE

(CAS No. 591-78-6)

**In Support of Summary Information on the
Integrated Risk Information System (IRIS)**

*September 2009*

U.S. Environmental Protection Agency
Washington, DC

## FOREWORD

The purpose of this Toxicological Review is to provide scientific support and rationale for the hazard and dose-response assessment in IRIS pertaining to chronic exposure to 2-hexanone.  It is not intended to be a comprehensive treatise on the chemical or toxicological nature of 2-hexanone.

The intent of Section 6, *Major Conclusions in the Characterization of Hazard and Dose Response,* is to present the major conclusions reached in the derivation of the reference dose, reference concentration and cancer assessment, where applicable, and to characterize the overall confidence in the quantitative and qualitative aspects of hazard and dose response by addressing the quality of data and related uncertainties.  The discussion is intended to convey the limitations of the assessment and to aid and guide the risk assessor in the ensuing steps of the risk assessment process.

For other general information about this assessment or other questions relating to IRIS, the reader is referred to EPA's IRIS Hotline at (202) 566-1676 (phone), (202) 566-1749 (fax), or hotline.iris@epa.gov (email address).

EPA/635/R-11/001Fa
www.epa.gov/iris



United States
Environmental Protection
Agency

# TOXICOLOGICAL REVIEW

# OF

# METHANOL (NONCANCER)

(CAS No. 67-56-1)

## In Support of Summary Information on the

## Integrated Risk Information System (IRIS)

*September 2013*

U.S. Environmental Protection Agency
Washington, DC

# 1. INTRODUCTION

This document presents background information and justification for the Integrated Risk Information System (IRIS) Summary of the hazard and dose-response assessment of methanol. IRIS Summaries may include oral reference dose (RfD) and inhalation reference concentration (RfC) values for chronic and other exposure durations, and a carcinogenicity assessment.

The RfD and RfC, if derived, provide quantitative information for use in risk assessments for noncancer health effects known or assumed to be produced through a nonlinear (presumed threshold) mode of action (MOA). The RfD (expressed in units of milligrams per kilogram per day [mg/kg-day]) is defined as an estimate (with uncertainty spanning perhaps an order of magnitude) of a daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime. The inhalation RfC (expressed in units of milligrams per cubic meter [mg/m$^3$]) is analogous to the oral RfD but provides a continuous inhalation exposure estimate. The inhalation RfC considers toxic effects for both the respiratory system (portal-of-entry) and for effects peripheral to the respiratory system (extrarespiratory or systemic effects). Reference values are generally derived for chronic exposures (up to a lifetime), but may also be derived for acute ($\leq$ 24 hours), short-term (>24 hours up to 30 days), and subchronic (>30 days up to 10% of lifetime) exposure durations, all of which are derived based on an assumption of continuous exposure throughout the duration specified. Unless specified otherwise, the RfD and RfC are derived for chronic exposure duration.

Development of these hazard identification and dose-response assessments for the noncancer effects of methanol has followed the general guidelines for risk assessment as set forth by the National Research Council (NRC) (1983). EPA Guidelines and Risk Assessment Forum Technical Panel Reports that may have been used in the development of this assessment include the following: *Guidelines for the Health Risk Assessment of Chemical Mixtures* (U.S. EPA, 1986b), *Guidelines for Mutagenicity Risk Assessment* (U.S. EPA, 1986a), *Recommendations for and Documentation of Biological Values for Use in Risk Assessment* (U.S. EPA, 1988), *Guidelines for Developmental Toxicity Risk Assessment* (U.S. EPA, 1991), *Interim Policy for Particle Size and Limit Concentration Issues in Inhalation Toxicity Studies* (U.S. EPA, 1994a), *Methods for Derivation of Inhalation Reference Concentrations and Application of Inhalation Dosimetry* (U.S. EPA, 1994b), *Use of the Benchmark Dose Approach in Health Risk Assessment* (U.S. EPA, 1995), *Guidelines for Reproductive Toxicity Risk Assessment* (U.S. EPA, 1996), *Guidelines for Neurotoxicity Risk Assessment* (U.S. EPA, 1998a), *Science Policy Council Handbook: Risk Characterization* (U.S. EPA, 2000a), *Supplementary Guidance for Conducting*

*Health Risk Assessment of Chemical Mixtures* (U.S. EPA, 2000b), *A Review of the Reference Dose and Reference Concentration Processes* (U.S. EPA, 2002), *Guidelines for Carcinogen Risk Assessment* (U.S. EPA, 2005a), *Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens* (U.S. EPA, 2005b), *Science Policy Council Handbook: Peer Review* (U.S. EPA, 2006b), and *A Framework for Assessing Health Risks of Environmental Exposures to Children* (U.S. EPA, 2006a), *Recommended Use of Body Weight ¾ as the Default Method in Derivation of the Oral Reference Dose* (U.S. EPA, 2011b), and B*enchmark Dose Technical Guidance Document* (U.S. EPA, 2012a).

Primary, peer-reviewed literature identified through January 2013 was included where that literature was determined to be relevant to the assessment. The relevant literature included publications on methanol that were identified through Toxicology Literature Online (TOXLINE), PubMed, the Toxic Substance Control Act Test Submission Database (TSCATS), the Registry of Toxic Effects of Chemical Substances (RTECS), the Chemical Carcinogenesis Research Information System (CCRIS), the Developmental and Reproductive Toxicology/Environmental Teratology Information Center (DART/ETIC), the Hazardous Substances Data Bank (HSDB), the Genetic Toxicology Data Bank (GENE-TOX), Chemical abstracts, and Current Contents. Other peer-reviewed information, including health assessments developed by other organizations, review articles, and independent analyses of the health effects data were retrieved and included in the assessment where appropriate. Studies that had not been peer-reviewed and were potentially critical to the conclusions of the assessment were separately and independently peer-reviewed. Any pertinent scientific information submitted by the public to the IRIS Submission Desk or by reviewers during internal and external peer reviews was also considered in the development of this document. It should be noted that references added to the Toxicological Review after the external peer review in response to peer reviewer's comments have not changed the overall qualitative and quantitative conclusions.

An initial keyword search was based on the Chemical Abstracts Service Registry Number (CASRN) and several common names for methanol. The subsequent search strategy focused on the toxicology and toxicokinetics of methanol, particularly as they pertain to target tissues, effects at low doses, different developmental stages, sensitive subpopulations, and background levels from endogenous and exogenous sources. A more targeted search was completed for the construction and parameterization of a methanol physiologically-based pharmacokinetic (PBPK) model. The focus of this targeted search included existing PBPK models for primary alcohols and pharmacokinetic information for major metabolites and related enzymes. Both the general and targeted searches identified a multitude of studies that used methanol for laboratory procedures. Exclusion terms such as 'extract of methanol' were used in order to cull such irrelevant studies. The literature keyword searches are narrowed down further by manual review.



*EPA/635/R-18/211Fa*
**www.epa.gov/iris**

# Toxicological Review of Hexahydro-1,3,5-trinitro-1,3,5-triazine (RDX)

## (CASRN 121-82-4)

*August 2018*

Integrated Risk Information System
National Center for Environmental Assessment
Office of Research and Development
U.S. Environmental Protection Agency
Washington, DC

# PREFACE

This Toxicological Review critically reviews the publicly available studies on hexahydro-1,3,5-trinitro-1,3,5-triazine (RDX, Royal Demolition eXplosive, or cyclonite) to identify its adverse health effects and characterize exposure-response relationships.  This assessment was prepared under the auspices of the U.S. Environmental Protection Agency (EPA) Integrated Risk Information System (IRIS) Program.  It updates a previous IRIS assessment of RDX that included an oral reference dose (RfD) for effects other than cancer (posted in 1988), a determination on the carcinogenicity of RDX, and derivation of an oral slope factor (OSF) to quantify the cancer risk associated with RDX exposure (posted in 1990).  New information has become available, and this assessment reviews information on all health effects by all exposure routes.

A public meeting was held in December 2013 to obtain input on preliminary materials for RDX, including draft literature searches and associated search strategies, evidence tables, and exposure-response arrays prior to the development of the IRIS assessment.  All public comments provided on the preliminary materials were taken into consideration in developing the draft assessment.  A second public meeting was held in May 2016 to discuss key science topics on the public comment draft assessment.  These topics included (1) suppurative prostatitis as a marker for hazard to the urogenital system following RDX exposure, (2) evaluation and use of RDX physiologically based pharmacokinetic (PBPK) models, (3) neurotoxicity observed with RDX and consideration of dose and duration of exposure and the potential relationship to mortality, and (4) other science topics in the RDX assessment.  Independent experts identified by the National Academies' National Research Council joined members of the scientific community, stakeholders, and the general public in the discussion of these science topics.  The complete set of public comments submitted in connection with the December 2013 and May 2016 public meetings is available on the docket at https://www.regulations.gov (Docket ID No. EPA-HQ-ORD-2013-0430).

Organ/system-specific reference values are calculated based on effects in the nervous system, urinary system (kidney and bladder), and prostate.  These reference values may be useful for cumulative risk assessments that consider the combined effect of multiple agents acting on the same biological system.

This assessment was conducted in accordance with EPA guidance, which is summarized in the Preamble to IRIS Toxicological Reviews and cited at appropriate places in this assessment.  The findings of this assessment and related documents produced during its development are available on the IRIS website (https://www.epa.gov/iris).  Appendices containing information on assessments by other health agencies, details of the literature search strategy, toxicokinetic information, summaries of supplementary toxicity information, and dose-response modeling are provided as Supplemental Information to this assessment (see Appendices A to D).

*Toxicological Review of Hexahydro-1,3,5-trinitro-1,3,5-triazine*

The IRIS Program released preliminary assessment materials for RDX in December 2013 and the draft assessment for public comment in March 2016, during the period of development and implementation of systematic review methods by the IRIS Program. The approach to implementation is to use procedures and tools available at the time, without holding assessments until new methods become available. Accordingly, the IRIS Program conducted literature searches and evaluated studies using tools and documentation standards then available. Updated problem formulation materials and systematic review protocol development began with assessments started in 2015, after this assessment was well into assessment development. Implementation of systematic review is a process of continual improvement and this assessment represents a step in the evolution of the IRIS Program.

**Uses and Environmental Occurrence**

RDX is a military munitions explosive with limited civilian commercial uses (Gadagbui et al., 2012). In the United States, RDX is produced at Army ammunition plants and is not manufactured commercially. RDX production peaked in the 1960s, with 180 million pounds per year produced from 1969 to 1971. Yearly total production dropped to 16 million pounds in 1984 (ATSDR, 2012). According to the EPA ChemView Tool (https://chemview.epa.gov/chemview), the aggregate national production volume in 2015 was between 1 million and 10 million pounds.

RDX can be released into environmental media (air, water, soil) as a result of waste generated during manufacture, packing, or disposal of the pure product, or use and disposal of RDX-containing munitions (ATSDR, 2012; Gadagbui et al., 2012; ATSDR, 1999, 1993, 1992). RDX is mobile in soil, and leaching into groundwater has been reported in samples from military facilities (Best et al., 1999a; Godejohann et al., 1998; Bart et al., 1997; Steuckart et al., 1994; Spanggord et al., 1980). RDX transport in soil is generally through dissolution by precipitation and subsequent downward movement, including migration to groundwater aquifers, and not much via surface runoff (U.S. EPA, 2012b). Discussion of RDX properties and fate and transport is available in U.S. EPA (2012b) and on the EPA's Chemistry Dashboard at https://comptox.epa.gov/dashboard/. RDX has been detected in plants irrigated or grown with RDX-contaminated water (Best et al., 1999b; Simini and Checkai, 1996; Harvey et al., 1991) and has also been detected in indoor air samples from military facilities where RDX is produced (Bishop et al., 1988).

Exposures to RDX among the general population are likely to be confined to individuals in or around active or formerly used military facilities where RDX is or was produced, stored, or used. Oral, inhalation, and dermal routes of exposure may be relevant.

As of 2018, RDX was detected in surface water, groundwater, sediment, or soil at 32 active EPA National Priorities List (NPL) sites. The NPL serves as a list of sites with known or threatened releases of hazardous substances, pollutants, or contaminants throughout the United States and its territories. The NPL aids the Agency in identifying the most serious sites that may warrant cleanup. The majority of the NPL sites where RDX was listed are associated with military facilities. Based on Department of Defense records, Gadagbui et al. (2012) reported that RDX contamination is present



*EPA/635/R-16/161Fa*
**www.epa.gov/iris**

# Toxicological Review of Trimethylbenzenes

[CASRNs 25551-13-7, 95-63-6, 526-73-8, and 108-67-8]

*September 2016*

Integrated Risk Information System
National Center for Environmental Assessment
Office of Research and Development
U.S. Environmental Protection Agency
Washington, DC

# PREFACE

This Toxicological Review critically reviews the publicly available studies on the three isomers of trimethylbenzene (TMBs) (i.e., 1,2,3-TMB, 1,2,4-TMB, and 1,3,5-TMB) in order to identify their adverse health effects and to characterize exposure-response relationships. Because more types of studies are available for the 1,2,4-TMB isomer, it generally appears first when the individual isomers are listed. This assessment was prepared under the auspices of the U.S. Environmental Protection Agency (EPA) Integrated Risk Information System (IRIS) program.

This assessment was prepared because of the presence of TMBs at Superfund sites. Of sites on EPA's National Priorities List that report TMB isomer contamination (38 sites), 93% report 1,3,5-TMB contamination, 85% report 1,2,4-TMB contamination, 12% report 1,2,3-TMB contamination, and 17% report contamination by unspecified TMB isomers.

The *Toxicological Review of Trimethylbenzenes* is a new assessment; there is no previous entry on the IRIS Database for 1,2,3-TMB, 1,2,4-TMB, or 1,3,5-TMB. This assessment reviews information on all health effects by all exposure routes.

This assessment was conducted in accordance with EPA guidance, which is cited and summarized in the Preamble to IRIS Toxicological Reviews. The findings of this assessment and related documents produced during its development are available on the IRIS website (http://www.epa.gov/iris). Appendices for toxicokinetic information, summaries of toxicity studies, and other supporting materials are provided as supplemental information to this assessment (see Appendices C and D).

The IRIS Program released this assessment for public comment and peer review in June 2012, as it was beginning to implement systematic review. The approach to implementation is to use procedures and tools available at the time, without holding assessments until new methods become available. Accordingly, the IRIS Program edited this assessment to increase transparency and clarity and to use more tables and figures. It conducted literature searches and evaluated studies using tools and documentation standards then available. However, this assessment does differ in some its methods compared to those outlined in the Preamble, due to the phased implementation of systematic review. Notably, problem formulation materials and protocol development (Preamble, Section 3) began with assessments started in 2015, after this assessment was well into peer review. Additionally, this assessment does not fully implement the methods outlined in Section 4 of the Preamble (Evaluating Study Methods and Quality); this assessment did develop study evaluation tables. However, study quality was assessed when determining hazard and identifying which studies were suitable for dose-response analyses. This assessment addresses peer-review comments and retains the structure of the peer-review draft, to maintain fidelity with what the peer reviewers saw. Implementation of systematic review is a process of continuous

improvement subject to periodic review by the Chemical Assessment Advisory Committee (of EPA's Science Advisory Board). This assessment represents a step in the evolution of the IRIS Program.

For additional information about this assessment or for general questions regarding IRIS, please contact EPA's IRIS Hotline at 202-566-1676 (phone), 202-566-1749 (fax), or hotline.iris@epa.gov.

**Assessments by Other National and International Health Agencies**

Toxicity information on 1,2,4-TMB, 1,2,3-TMB, and 1,3,5-TMB has been evaluated by the National Institute for Occupational Safety and Health (NIOSH) and the National Advisory Committee for Acute Exposure Guideline Levels (AEGLs) for Hazardous Substances. The results of these assessments are summarized in Appendix B (Table B-1). It is important to recognize that these assessments may have been prepared for different purposes and may utilize different methods, and that newer studies may be included in the IRIS assessment.

**Chemical Properties and Uses**

TMBs are aromatic hydrocarbons with three methyl groups attached to a benzene ring and the chemical formula $C_9H_{12}$. The chemical and physical properties of the TMB isomers are similar to one another. TMBs are colorless, flammable liquids with a strong aromatic odor; an odor threshold of 0.4 parts per million (ppm) of air has been reported (U.S. EPA, 1994a). They are insoluble in water but miscible with organic solvents such as ethyl alcohol, benzene, and ethyl ether (OSHA, 1996). Production and use of TMBs may result in their release to the environment through various waste streams. If released to the atmosphere, 1,2,3-TMB, 1,2,4-TMB, and 1,3,5-TMB will exist solely in the vapor phase in the atmosphere under ambient conditions, based on measured vapor pressures of 1.69, 2.10, and 2.48 mm Hg at 25°C, respectively (HSDB, 2011a, b, c). All three isomers are expected to have limited mobility through soil based on their log $K_{oc}$ values, but are expected to volatilize from both moist and dry soil surfaces and surface waters based on their respective Henry's law constants and vapor pressures. Degradation of TMB isomers in the atmosphere occurs by reaction with hydroxyl radicals; the half-life is 11–12 hours (HSDB, 2011a, b, c). Non-volatilized TMBs may be subject to biodegradation under aerobic conditions (HSDB, 2011a, b, c). The estimated bioconcentration factors (133–439) and high volatility of TMBs suggest that bioaccumulation of these chemicals will not be significant (U.S. EPA, 1987). Additional information on the chemical identities and physicochemical properties of TMBs is listed in Table P-1.

The commercially available substance known as trimethylbenzene, Chemical Abstracts Service Registry Number (CASRN) 25551-13-7, is a mixture of three isomers in various proportions, namely CASRN 526-73-8 (1,2,3-TMB or hemimellitene), CASRN 95-63-6 (1,2,4-TMB or pseudocumene), and CASRN 108-67-8 (1,3,5-TMB or mesitylene). Production of TMB isomers occurs during petroleum refining, and 1,2,4-TMB individually makes up approximately 40% of the C9 aromatic fraction (i.e., aromatic hydrocarbons with nine carbons) (U.S. EPA, 1994a). The domestic production of the C9 fraction in 1991 was estimated to be approximately 80 billion

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al.,<br><br>Plaintiffs,<br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY, et al.,<br><br>Defendants. | Case No. 3:17-cv-02162 EMC<br><br>**DECLARATION OF**<br>**TALA R. HENRY** |

I, Tala R. Henry, Ph.D., submit the following declaration in support of Defendants' Motion for Summary Judgment:

**Dr. Henry's Experience at EPA and Risk-Assessment Expertise**

1.      I am currently the Deputy Director of the Office of Pollution Prevention and Toxics ("OPPT") at the U.S. Environmental Protection Agency ("EPA") and former Director of the Risk Assessment Division of OPPT.

2.      I am a toxicologist with over 25 years of technical and managerial experience at EPA. I received a Ph.D. in Pharmacology from the University of Minnesota in 1994 and completed post-doctoral research in Toxicology at the University of Wisconsin in 1996.

3.      During my 25 years at EPA, I have provided toxicology and risk-assessment expertise and guidance, oversight and daily programmatic management to multiple chemical management programs, and leadership of science policy development and implementation across EPA, with other

and uncertainties exist, and where policy choices will need to be made. TSCA requires that a risk evaluation "integrate and assess available information on hazards and exposures." 15 U.S.C. § 2605(b)(4)(F).

20.     As defined in TSCA, risk characterization identifies and assesses uncertainty and variability in each step of the risk evaluation; discusses considerations of data quality such as the reliability, relevance, and whether the methods utilized were reasonable and consistent; explains any assumptions used; and discusses information generated from independent peer review. 15 U.S.C. § 2625(h). Thus, each component of the risk evaluation (e.g., hazard assessment, dose-response assessment, exposure assessment) has an individual characterization written to carry forward the key findings, assumptions, limitations, and uncertainties. The set of these individual characterizations provide the informational basis to write an integrated risk characterization. The final, overall risk characterization thus consists of the individual component characterizations plus an integrative analysis. Each risk evaluation will quantitatively or qualitatively estimate and characterize risk for the identified receptors (human or ecological).

21.     The final step of a TSCA risk evaluation is determination of unreasonable risk. Under TSCA section 6(b), EPA must undertake a risk-evaluation process to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment. Prior to the 2016 amendments to TSCA, chemical substance risk assessments did not include a determination of unreasonable risk. Instead, the determination of "unreasonable risk" was made as part of the risk management rulemaking process. The amended statute now requires that a TSCA risk evaluation include a risk assessment as well as the EPA's determination of unreasonable risk, and, most significantly, requires that this determination be independent of consideration of cost or other non-risk factors.

22.     In its final Risk Evaluation Rule, EPA did not promulgate a definition of unreasonable risk. This approach was finalized after overwhelming public comment supporting EPA's decision that it would not be scientifically appropriate to define "unreasonable risk" given the uniqueness of each chemical-specific TSCA risk evaluation. EPA reasoned that defining specific risk measures for use in all TSCA risk evaluations would be inappropriate to capture the broad set of health and environmental

risk measures and information that might be relevant to chemical substances. In addition, a single definition would not account for the number of different risk characterization approaches or for changes in the scientific understandings of chemical hazards, exposures, and risk.

23.     EPA has explained that, in general, it may weigh a variety of factors in determining unreasonable risk. In making this determination, EPA considers relevant risk-related factors, including, but not limited to: the effects of the chemical substance on health and human exposure to such substance under the conditions of use; the effects of the chemical substance on the environment and environmental exposure under the conditions of use; the population exposed (including any potentially exposed or susceptible subpopulations); the severity of hazard (including the nature of the hazard, the irreversibility of the hazard); and uncertainties.

24.     EPA takes into consideration the Agency's confidence in the data used in the risk estimate. This includes an evaluation of the strengths, limitations, and uncertainties associated with the information used to inform the risk estimate and the risk characterization. The factors EPA may consider are the subject of considerable scientific complexity and policy debate.

25.     Agency deliberations and decisions regarding these types of issues can be informed by a variety of stakeholders through the public comment process and this is a compelling reason not to have promulgated a rigid and static definition.

26.     Finally, TSCA requires that EPA publish a draft risk evaluation for the purpose of soliciting public comment prior to finalizing the risk evaluation.

**Scientific Standards Required by TSCA**

27.     TSCA section 26 requires that EPA decisions based on science are based on the best available science and on the weight of the scientific evidence. 15 U.S.C. § 2625(h)-(i).

28.     Based on my experience with risk assessments, these factors are important to consider in assessing the risks of chemicals, not only because they are required by the statute, but because consideration of these factors adds transparency regarding the evidence and logic incorporated into TSCA risk evaluations, which in turn provides the opportunity for meaningful exchange of scientific views and input by experts and interested parties from outside the Agency during peer review and public

1   comment. This type of exchange is an integral part of the process to vet scientific assessments.

2       29.   Reasonably Available Information. TSCA section 26(k), 15 U.S.C. 2625(k), requires that

3   EPA consider information that is "reasonably available," without defining that term. EPA defines

4   "reasonably available information" to mean information that EPA possesses, or can reasonably obtain

5   and synthesize for use in TSCA risk evaluations, considering the deadlines for completing the evaluation.

6   EPA will seek to generally ensure that sufficient information to complete a TSCA risk evaluation exists

7   and is available to the Agency prior to initiating the evaluation.

8       30.   Best Available Science. Section 26(h) lists factors to consider, as applicable, in

9   employing best available science. These are: (1) the extent to which the scientific information, technical

10  procedures, measures, methods, protocols, methodologies, or models employed to generate the

11  information are reasonable for and consistent with the intended use of the information; (2) the extent to

12  which the information is relevant for the Administrator's use in making a decision about a chemical

13  substance or mixture; (3) the degree of clarity and completeness with which the data, assumptions,

14  methods, quality assurance, and analyses employed to generate the information are documented; (4) the

15  extent to which the variability and uncertainty in the information, or in the procedures, measures,

16  methods, protocols, methodologies, or models, are evaluated and characterized; and (5) the extent of

17  independent verification or peer review of the information or of the procedures, measures, methods,

18  protocols, methodologies, or models.

19      31.   The best available science requirement is an integral component of TSCA risk

20  evaluations. EPA incorporated a definition of the term in the Risk Evaluation Rule. 82 Fed Reg. 33,726

21  (July 20, 2017); 40 C.F.R. § 702.33. The first part of the definition originates from the Safe Drinking

22  Water Act ("SDWA"), 42 U.S.C. 300f et seq., and is also included in the EPA's Information Quality

23  Guidance. The SDWA definition was cited by a number of commenters, and EPA agreed this definition,

24  already in use at the Agency, is appropriate. The second part of the definition is taken directly from

25  TSCA section 26(h), which identifies mandatory approaches to fulfilling the science standards under

26  TSCA.

27      32.   By basing its definition of best available science on these two sources, EPA is remaining

28

7

# EXHIBIT C

EPA/630/R-95/001F
April 1998

# Guidelines for
# Neurotoxicity Risk Assessment

(Published on May 14, 1998, Federal Register 63(93):26926-26954)

Risk Assessment Forum

## GUIDELINES FOR NEUROTOXICITY RISK ASSESSMENT
### [FRL-6011-3]

**AGENCY**:  Environmental Protection Agency

**ACTION**:  Notice of availability of final Guidelines for Neurotoxicity Risk Assessment.

**SUMMARY**:  The U.S. Environmental Protection Agency (EPA) is today publishing in final form a document entitled *Guidelines for Neurotoxicity Risk Assessment* (hereafter "Guidelines").  These Guidelines were developed as part of an interoffice guidelines development program by a Technical Panel of the Risk Assessment Forum.  The Panel was composed of scientists from throughout the Agency, and selected drafts were peer-reviewed internally and by experts from universities, environmental groups, industry, and other governmental agencies.  The Guidelines are based, in part, on recommendations derived from various scientific meetings and workshops on neurotoxicology, from public comments, and from recommendations of the Science Advisory Board.  An earlier draft underwent external peer review in a workshop held on June 2-3, 1992, and received internal review by the Risk Assessment Forum.  The Risk Assessment Subcommittee of the Committee on the Environment and Natural Resources of  Office of Science and Technology Policy reviewed the proposed Guidelines during a meeting held on August 15, 1995.  The Guidelines were revised and proposed for public comment on October 4, 1995 (60 FR 52032-52056).  The proposed Guidelines were reviewed by the Science Advisory Board on July 18, 1996. EPA appreciates the efforts of all participants in the process, and has tried to address their recommendations in these Guidelines.

This notice describes the scientific basis for concern about exposure to agents that cause neurotoxicity, outlines the general process for assessing potential risk to humans because of environmental contaminants, and addresses Science Advisory Board and public comments on the 1995 *Proposed Guidelines for Neurotoxicity Risk Assessment* (FR 60:52032-52056).  These Guidelines are intended to guide Agency evaluation of agents that are suspected to cause neurotoxicity, in line with the policies and procedures established in the statutes administered by the Agency.

**DATES**:  The Guidelines will be effective April 30, 1998.

**ADDRESSES**:  The Guidelines will be made available in several ways:

(1) The electronic version will be accessible from EPA's National Center for Environmental Assessment home page on the Internet at http://www.epa.gov/ncea.

(2) 3½" high-density computer diskettes in WordPerfect format will be available from ORD Publications, Technology Transfer and Support Division, National Risk Management Research Laboratory, Cincinnati, OH; Tel: 513-569-7562; Fax: 513-569-7566.  Please provide the EPA No.: EPA/630/R-95/001Fa when ordering.

(3)  This notice contains the full document.  Copies of the Guidelines will be available for inspection at EPA headquarters and regional libraries, through the U.S. Government Depository Library program, and for purchase from the National Technical Information Service (NTIS), Springfield, VA; telephone: 1-800-553-6847, or 703-605-6000, fax: 703-321-8547.  Please provide the NTIS PB No. [PB98-117831] when ordering.


**FOR FURTHER INFORMATION CONTACT**:  Dr. Hugh A. Tilson, Neurotoxicology Division, National Health and Environmental Effects Research Laboratory, U.S. Environmental Protection Agency, Research Triangle Park, NC 27711, Tel: 919-541-2671;  Fax: 919-541-4849; E-mail: tilson.hugh@epamail.epa.gov.


**SUPPLEMENTARY INFORMATION**:  In its 1983 book *Risk Assessment in the Federal Government: Managing the Process*, the National Academy of Sciences recommended that Federal regulatory agencies establish "inference guidelines" to promote consistency and technical quality in risk assessment, and to ensure that the risk assessment process is maintained as a scientific effort separate from risk management.  A task force within EPA accepted that recommendation and requested that Agency scientists begin to develop such guidelines.  In 1984, EPA scientists began work on risk assessment guidelines for carcinogenicity, mutagenicity, suspect developmental toxicants, chemical mixtures, and exposure assessment.  Following extensive scientific and public review, these first five guidelines were issued on September 24, 1986 (51 FR 33992-34054).  Since 1986, additional risk assessment guidelines have been proposed, revised, reproposed, and finalized.  These guidelines continue the process initiated in 1984.  As with other EPA guidelines (e.g., developmental toxicity, 56 FR 63798-63826; exposure assessment, 57 FR 22888-22938; and carcinogenicity, 61 FR 17960-18011), EPA will revisit these guidelines as experience and scientific consensus evolve.

These Guidelines set forth principles and procedures to guide EPA scientists in the conduct of Agency risk assessments and to inform Agency decision makers and the public about these procedures. Policies in this document are intended as internal guidance for EPA.  Risk assessors and risk managers

at EPA are the primary audience, although these Guidelines may be useful to others outside the Agency. In particular, the Guidelines emphasize that risk assessments will be conducted on a case-by-case basis, giving full consideration to all relevant scientific information.  This approach means that Agency experts study scientific information on each chemical under review and use the most scientifically appropriate interpretation to assess risk.  The Guidelines also stress that this information will be fully presented in Agency risk assessment documents, and that Agency scientists will identify the strengths and weaknesses of each assessment by describing uncertainties, assumptions, and limitations, as well as the scientific basis and rationale for each assessment.  The Guidelines are formulated in part to bridge gaps in risk assessment methodology and data.  By identifying these gaps and the importance of the missing information to the risk assessment process, EPA wishes to encourage research and analysis that will lead to new risk assessment methods and data.

_____          _____

Dated: April 30,1998                     signed by EPA Administrator
                                         Carol M. Browner

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

|  |  |
|---|---|
| FOOD & WATER WATCH, et al., | Civ. No. 17-CV-02162-EMC |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' FIFTH MOTION *IN LIMINE* TO EXCLUDE TOXICOLOGICAL REVIEWS AND DRAFT RISK EVALUATIONS** |
| vs. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al. | Judge: Hon. Edward M. Chen |
| Defendants. | Date: Jan 7, 2017 (Pretrial Conference) |
|  | Time: 2:30 p.m. |
|  | Courtroom: 5 - 17th Floor |

## INTRODUCTION

Consistent with other motions it has filed, EPA seeks to distance itself from its own previously established methods and principles while hiding its own relevant admissions. By wiping the Court record free of EPA's own work on neurotoxicity, EPA attempts to assert a heightened standard for risk assessment in this litigation, one untethered to its own previous assessments. EPA contends that its IRIS Toxicological Reviews and Draft TSCA Risk Evaluations are irrelevant based on the simple fact that fluoride is not the chemical studied in any of these assessments. Documents do not have to mention the word fluoride, however, to be relevant to this case. As explained herein, the EPA documents at issue are relevant because they help to establish (1) the methods and principles for determining whether a chemical poses a neurotoxicity hazard, (2) what factors EPA considers in making unreasonable risk determinations under TSCA, and (3) the vulnerability of the developing brain to neurotoxicants. EPA's motion should be denied.

## FACTUAL BACKGROUND

### A.     IRIS Toxicological Reviews

The first set of documents that EPA seeks to distance itself from are the IRIS Toxicological Reviews. IRIS stands for the "Integrated *Risk* Information System." *See* "Integrated Risk Information System" available at https://www.epa.gov/iris (emphasis added). These risk assessments[1] were identified in this case by EPA in response to a request for "all risk assessments that EPA has conducted pursuant to the *Guidelines for Neurotoxicity Risk Assessment*." **Ex. 1**. Plaintiffs' risk assessment expert, Dr. Kathleen Thiessen, conducted a risk assessment of fluoride neurotoxicity pursuant to the *Guidelines for Neurotoxicity Risk Assessment* ("*Guidelines*"), and as part of her assessment, reviewed and relied upon the IRIS Toxicological Reviews that EPA identified. As detailed in Dr. Thiessen's report, the IRIS

---

[1] Although EPA contends that IRIS Toxicological Reviews "are not risk assessments" (because they are limited to Hazard Assessment and Dose Response), the National Research Council has stated that "Not every risk assessment encompasses all four steps. Risk assessment sometimes consists only of a hazard assessment designed to evaluate the potential of a substance to cause human health effects." National Research Council. SCIENCE AND JUDGMENT IN RISK ASSESSMENT. The National Academies Press, 1994, at p. 27.

Toxicological Reviews are relevant for demonstrating the quantum of evidence that EPA has found sufficient for making a hazard determination, as well as for showing what types of neurological effects EPA has considered adverse, and how EPA has applied findings in animals to humans. *See* **Ex. 2** (excerpts from Dr. Thiessen's expert report where she discusses the IRIS reviews).

Additionally, the IRIS Toxicological Reviews contain a number of admissions about the vulnerability of the developing brain to neurotoxicants. For example, in EPA's toxicological review of 2-Hexanone, EPA explained that:

> The developing brain is distinguished by the absence of a blood-brain barrier. The development of this barrier is a gradual process, beginning in utero and complete at approximately 6 months of age. Because the blood-brain barrier limits the passage of substances from blood to brain, in its absence, toxic agents can freely enter the developing brain.

**Ex. 3** at 58. In EPA's toxicological review of BDE-47, EPA stated:

> [G]iven the longer period of brain development in humans as compared to rodents and the higher importance of cognitive function, it is appropriate to consider that humans may be more sensitive than rodents in the absence of specific data.

**Ex. 4** at 46. EPA also noted in this review that "The neonatal stage is a period of rapid development of the nervous system and is considered a critical window of development." *Id.* at 42.

**B.      Draft TSCA Risk Evaluations**

The second set of documents that EPA seeks to exclude are its own draft TSCA Risk Evaluations that it has issued this year. These draft risk evaluations demonstrate, *inter alia*, that every unreasonable risk determination that EPA has so far made under the amended TSCA has been based on *animal* data, and has involved human exposures well below the documented adverse effect level. Further, the draft risk evaluations demonstrate that EPA uses the Margin of Exposure (MOE) approach to characterizing risk, which is a method that Dr. Thiessen used to characterize the risk of fluoridation chemicals.

///

///

///

**ARGUMENT**

**A.      EPA'S MOTION IS, AT BEST, PREMATURE**

Because this case will be heard and decided by the Court, not a jury, EPA's motion is premature. As explained in *Wright v. Watkins and Shepherd. Inc.*, No. 2:11-CV-01575-LRH-GWF, 2016 WL 10749220 (D. Nev. Jan. 19, 2016), when a case is tried as a bench trial,

> the Court will be in a better position to rule upon challenges to witnesses and evidence during the course of trial when there will be more context and a fuller understanding of the issues and evidence in the case. . . . [¶] The rationale underlying pre-trial motions in limine does not apply in a bench trial, where it is presumed the judge will disregard inadmissible evidence and rely only upon competent evidence. When ruling on motions in limine, a court is forced to determine the admissibility of evidence without the benefit of the context of trial. Moreover, because "the judge rules on this evidentiary motion, in the case of a bench trial, a threshold ruling is generally superfluous." The more prudent course in a bench trial, therefore, is to resolve evidentiary doubts in favor of admissibility.

*Id.* at *3 (citations omitted); *see United States v. Heller*, 551 F.3d 1108, 1112 (9th Cir. 2009) ("For logistical and other reasons, pretrial evidentiary motions may be appropriate in some cases. But here, once the case became a bench trial, any need for an advance ruling evaporated."); *United States v. Pacific Gas and Elec. Co.*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016) ("Rulings on admissibility of evidence normally should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context.").

**B.      BOTH SETS OF EPA DOCUMENTS ARE RELEVANT TO ASSESSING THE NEUROTOXIC RISK OF FLUORIDATION CHEMICALS**

"Relevancy is a fluid concept under the Evidence Rules" and "typically presents a rather low barrier to admissibility." *Iacobucci v. Boulter*, 193 F.3d 14, 20 (1st Cir. 1999); *see also Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009) ("The standard for relevancy is 'extremely liberal' under the Federal Rules of Evidence."); *Boyd v. City and County of San Francisco*, 576 F.3d 938, 943 (9th Cir. 2009) ("Evidence may be relevant even if it is redundant or cumulative, or if it relates to undisputed facts."); *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir. 2006) (evidence is relevant "if it has the slightest probative worth").

Here, both sets of EPA documents are clearly relevant to the issues in this case. <u>First</u>, EPA does not dispute that the *Guidelines* are relevant to this case despite the fact that they do not specifically discuss fluoride. This is because the *Guidelines* demonstrate the methods and principles that EPA uses when

conducting neurotoxicity risk assessments. This same reasoning holds true for the IRIS Toxicological Reviews, as they provide clarity and guidance on the meaning of the *Guidelines* by showing how EPA has actually interpreted and applied them in practice. The situation is analogous to how courts resolve disputes about statutory interpretation: courts do not just consider the statutory language, they consider the case law interpreting it as well. Here, the Toxicological Reviews are the functional equivalent of case law, and are relevant and probative to understanding the *Guidelines*.

Second, the IRIS Toxicological Reviews are relevant because they contain important admissions by EPA about the vulnerability of the developing brain that are relevant and probative to understanding fluoride's risks to the fetus and neonate. In this case, Plaintiffs have the burden of demonstrating an unreasonable risk to the general public or susceptible population(s). 15 U.S.C. § 2620(b)(4)(B). One of the questions in this case, therefore, is which populations are susceptible? In answering this question, EPA's admissions about the susceptibility of the fetal brain and neonatal brain to neurotoxicants will be relevant and probative, particularly since much of the research on fluoride and neurotoxicity has focused on these life stages.

Third, EPA's draft risk evaluations[2] under TSCA are relevant to understanding the quantum of evidence that is sufficient to make a risk determination, and the factors that EPA has considered in doing so. Of particular relevance is the fact that EPA's draft risk evaluations show that the Agency has made unreasonable risk determinations despite human exposures being well below the documented adverse effect level. This is relevant and probative to the issues in this case because the thrust of EPA's expert testimony in this case is that there's not yet conclusive proof that 0.7 mg/L in water causes neurotoxicity. Plaintiffs intend to offer the draft risk evaluations, therefore, to show that the standard EPA's attorneys have used in this case is at odds with, and indeed foreign to, the standard that EPA uses in practice. Plaintiffs also intend to offer the draft risk evaluations to demonstrate how rich and substantial the evidence on fluoride neurotoxicity is, as it includes far more evidence of human harm than the chemicals for which EPA has

---

[2] The draft status of these risk evaluations does not alter the fact that they are statements by EPA and thereby admissible under FRE 802(d)(2). As EPA notes in its motion, the drafts were completed by EPA and any remaining changes will be in response to third-party public comment and peer-review. Mot. at 2:6-10. *See Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089, 1095 (E.D. Cal. 2011) (finding draft report by defendant government agency to be a party admission under FRE 801(d)(2)).

1    made unreasonable risk determinations.

2    **C.    EPA'S CONCLUSORY ASSERTIONS FAIL TO ESTABLISH GROUNDS FOR
3          EXCLUSION UNDER FRE 403**

4           EPA asserts but fails to demonstrate that the two sets of EPA documents are prejudicial under FRE

5    403. EPA offers several conclusory statements for why the evidence will be prejudicial, including that they

6    "will have a distracting effect," will somehow shift the burden of proof onto EPA, and will waste time. Mot

7    at 4:1-15. In short, EPA appears to be questioning—albeit with little reasoning—the Court's ability to give

8    this evidence the due weight they deserve. This falls well short of EPA's burden, particularly where, as

9    here, the case will be tried in a bench trial setting.

10           As courts have noted, "Rule 403 is 'an extraordinary remedy which should be used sparingly.'"

11   *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2014) (quoting *United States v. King*,

12   713 F.2d 727, 731 (11th Cir. 1983)). "In applying Rule 403, courts must 'look at the evidence in a light

13   most favorable to admission, maximizing its probative value and minimizing its undue prejudicial impact,'"

14   *id.* (quoting *United States v. Alfaro-Moncada*, 607 F.3d 720, 734 (11th Cir. 2010)), with "the balance . . .

15   struck in favor of admissibility." *Id.*

16           The use of FRE 403 is particularly limited in bench trials. As the Ninth Circuit has noted, "in

17   a bench trial, the risk that a verdict will be affected unfairly and substantially by the admission of irrelevant

18   evidence is far less than in a jury trial." *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994). Some

19   courts have even gone so far as too question whether FRE 403 plays any role in a bench trial, particularly

20   with respect to concerns of undue prejudice. *See, e.g.*, *Mass Engineered Design, Inc. v. Planar Sys., Inc.*,

21   Case No. 3:16-cv-1510-SI, at *9-10 (D. Or. Jul. 6, 2018) ("Concerns of relevance and prejudice are

22   different in a bench trial and Rule 403 has a limited role, *if any*." (emphasis added)); *see also Schultz*

23   *v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) (holding that in civil bench trials "evidence should not be

24   excluded under [Rule] 403 on the ground that it is unfairly prejudicial"); *Gulf States Utils. Co. v. Ecodyne*

25   *Corp.*, 635 F.2d 517, 519 (5th Cir. 1981) (stating that "Rule 403's weighing of probative value

5

against prejudice . . . has no logical application to bench trials").

**CONCLUSION**

EPA's motion asserts an unduly cramped conception of relevance, and an unduly expansive conception of prejudice. The fact that EPA's Toxicological Reviews and Draft TSCA Risk Evaluations do not specifically discuss fluoride does not thereby make them irrelevant; and the fact that these assessments may introduce some additional scientific considerations at trial does not thereby make them prejudicial or a waste of time. For the reasons provided, therefore, EPA's motion should be denied, or at the very least, deferred until trial.

December 19, 2019                               Respectfully submitted,


                                                */s/ Michael Connett*
                                                MICHAEL CONNETT
                                                Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by Notice of Electronic Filing this 19th day of December, 2019, upon all ECF registered counsel of record using the Court's CM/ECF system.

*/s/ Michael Connett*
MICHAEL CONNETT

# Exhibit 1

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

DEBRA J. CARFORA
JOHN THOMAS H. DO
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC. 20044-7611
(202) 514-2640 (Carfora)
(202) 514-2593 (Do)
(202) 514-8865 (fax)
debra.carfora@usdoj.gov
john.do@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOOD & WATER WATCH, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Civil Action No. 4:17-cv-02162-EMC <br><br> **DEFENDANTS' SUPPLMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |

**SUPPLMENTAL RESPONSES TO INTERRAGTORIES**

**Interrogatory No. 2:** Identify all risk assessments that EPA has conducted pursuant to the GUIDELINES FOR NEUROTOXICITY RISK ASSESSMENT.

**Supplemental Response to Interrogatory No. 2:** EPA objects to Interrogatory No. 2 as overly broad and unduly burdensome because it seeks information not reasonably calculated to lead to the discovery of admissible evidence and seeks information related to the assessments of chemicals beyond the chemical substances at issue in the Plaintiffs' Complaint, which are hydrofluorosilic acid, sodium silicofluoride, and sodium fluoride.  Further, to the extent this request relates to relevant expert opinion and reports, EPA intends to produce such information in connection with its expert disclosures and pursuant to the scheduling order.

Subject to and without waiver of the objections above, EPA responds as follows: EPA has expressly applied the Guidelines on Neurotoxicity Risk Assessment to the assessment of any nervous system effects of the following chemicals:

- 1,2,3-Trimethylbenzene;
- 1,2,4-Trimethylbenzene;
- 1,3,5-Trimethylbenzene;
- Methanol;
- 2-Hexanone;
- 2,2',3,3',4,4',5,5',6,6'-Decabromodiphenyl ether (BDE-209);
- 2,2',4,4',5,5'-Hexabromodiphenyl ether (BDE-153);
- 2,2',4,4',5-Pentabromodiphenyl ether (BDE-99);
- 2,2',4,4'-Tetrabromodiphenyl ether (BDE-47);
- Hydrogen sulfide;

4

- Chlorine dioxide; and
- Chlorite (sodium salt).

Dated:  August 28, 2018

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

*/s/ Debra J. Carfora*
DEBRA J. CARFORA
JOHN THOMAS H. DO
Attorneys for Defendants

DEFENDANTS' SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES
4:17-cv-02162-EMC

# **Exhibit 2**

# Assessment of the Neurotoxicity of Fluoride

Kathleen M. Thiessen, Ph.D.
June 27, 2019

Food & Water Watch et al. v. Environmental Protection Agency
No. 17-cv—02162

Oak Ridge Center for Risk Analysis, Inc.
102 Donner Drive
Oak Ridge, TN 37830



*Food and Water Watch v. EPA*                                                      *Thiessen Report*

---

*Animal Studies – General Considerations*

Under the Guidelines, the hazard determination "can be based on either human or animal data."[22] EPA has a preference for using human data if suitable data exist;[23] in practice, however, animal data are almost always used.[24] EPA has expressly applied the Guidelines in 10 risk assessments.[25] Based on these assessments, EPA established reference doses (RfDs; summarized in Table 1) and/or reference concentrations (RfCs) to protect against neurotoxicity for 9 chemicals or groups of chemicals.[26] In each of these assessments, EPA relied on animal data to establish the RfD or RfC. One reason that EPA uses animal studies is that they "provide more precise exposure information, and control environmental factors better."[27] Another reason is that human data are rarely available: for 6 of the 9 chemicals for which EPA established RfDs or RfCs based on neurotoxicity endpoints, there were *no* human data on neurotoxicity (Table 1).

Neurotoxic endpoints in animal studies fall into several categories, including neuroanatomical (e.g., neuropathological), neurochemical, neurophysiological, behavioral and neurological, and developmental.[28] Neuroanatomical endpoints include gross changes to the brain, such as reduced brain weight, as well as changes to brain cells that are detectable under a microscope (i.e., "histological").[29] Neurochemical effects include alterations in synthesis, release, uptake, or degradation of neurotransmitters; alterations in second-messenger activities; and alterations or inhibition of enzymes or proteins.[30] Neurophysiological effects include alterations in nerve conduction or electroencephalographic patterns.[31] Behavioral and neurological changes include alterations to motor activity, changes in sensory abilities or motor coordination, seizures, and impairments in learning, memory, and attention.[32] Developmental endpoints include both changes in timing of the appearance of behaviors during development and changes in growth or organization of the nervous system.[33] In its risk assessments to date, EPA has established reference doses based on both neuroanatomical and behavioral effects, including axonal swelling in peripheral nerves (2-Hexanone),[34] reduced brain weight (Methanol),[35] reduced pain sensitivity (Trimethylbenzenes),[36] and impairment in

---

[22] EPA (1998a), p. 11; Federal Register (1998), p, 26931.

[23] EPA (2018a), p. 2-1.

[24] EPA (1998a), p. 20; Federal Register (1998), p. 26934.

[25] See EPA (2018b), pp. 4-5. These 10 risk assessments were performed for BDE-47 (EPA 2008a), BDE-99 (EPA 2008b), BDE-153 (EPA 2008c), BDE-209 (EPA 2008d), Chlorine Dioxide and Chlorite (EPA 2000b), 2-Hexanone (EPA 2009c), Methanol (EPA 2013a), RDX (EPA 2018a), Trimethylbenzenes (EPA 2016), and Hydrogen Sulfide (EPA 2003).

[26] Reference doses or reference concentrations were based on neurological endpoints for BDE-47 (EPA 2008a), BDE-99 (EPA 2008b), BDE-153 (EPA 2008c), BDE-209 (EPA 2008d), Chlorine Dioxide and Chlorite (EPA 2000b), 2-Hexanone (EPA 2009c), Methanol (EPA 2013a), RDX (EPA 2018a), and Trimethylbenzenes (EPA 2016). For Hydrogen Sulfide, the risk assessment was based on a non-neurologic endpoint but was specifically expected to be protective for the neurological endpoints (EPA 2003, pp. 45-46).

[27] EPA (1998a), p. 20; Federal Register (1998), p. 26934.

[28] EPA (1988a), pp. 20-21; Federal Register (1998), pp. 26934-26935.

[29] EPA (1998a), p. 21; Federal Register (1998), p. 26934.

[30] EPA (1998a), pp. 21, 30-32; Federal Register (1998), pp. 26934, 26938-26939.

[31] EPA (1998a), p. 21; Federal Register (1998), pp. 26934-26935.

[32] EPA (1998a), p. 21; Federal Register (1998), p. 26935.

[33] EPA (1998a), p. 21; Federal Register (1998), p. 26935.

[34] EPA (2009c), p. 60.

[35] EPA (2013a), pp. 5-6, 5-16, 5-17. The inhalation RfC for methanol was derived from a neurological endpoint. An oral RfD for methanol was derived from the same inhalation studies, but was based on a non-neurological endpoint (p. 5-28); therefore methanol is not included in Table 1.

[36] EPA (2016), pp. xxv, xxvi, 2-22, 2-23, 2-35.



spontaneous motor activity, learning, memory, and habituation (BDE-47, BDE-99, BDE-153, and BDE-209).[37]

In considering the relevance of these endpoints to humans, the Guidelines provide four default assumptions. First, EPA assumes that "an agent that produces detectable adverse neurotoxic effects in experimental animal studies will pose a potential hazard to humans."[38] Second, EPA assumes that neuroanatomical, neurochemical, neurophysiological, and behavioral changes "are of concern."[39] Third, EPA assumes that "the neurotoxic effects seen in animal studies may not always be the same as those produced in humans" due to "species-specific differences in maturation of the nervous system, differences in timing of exposure, metabolism, or mechanisms of action."[40] Fourth, EPA assumes that "humans are as sensitive as the most sensitive animal species tested."[41] Each of these four assumptions is "plausibly conservative," meaning that "they are protective of public health and are also well founded in scientific knowledge about the effects of concern."[42]

Finally, the principal studies which EPA has used to establish RfDs or RfCs have not been "perfect" studies. In fact, in most of the neurotoxicity risk assessments, EPA has identified a number of methodological limitations with the studies. Some of the principal studies did not conform to EPA's testing guidelines for animal studies, some used relatively small numbers of animals (e.g., 10 per group), and the principal studies that investigated effects from prenatal exposures did not control for litter effects. As a result, EPA had "low" confidence in the principal study it used to set the RfD for BDE-209,[43] "low-to-medium" confidence in the principal study for Trimethylbenzenes,[44] and "medium" confidence in the principal studies for Chlorine Dioxide/Chlorite[45] and 2-Hexanone[46] (Table 1). This did not stop EPA from establishing RfDs for these chemicals.

In 2011 and 2014, the National Academy of Sciences (NAS) recommended that EPA implement certain changes with respect to how its Integrated Risk Information System (IRIS) conducts risk assessments—not with respect to neurotoxicity specifically, but risk assessments in general. The thrust of the NAS recommendations was that EPA should implement more transparent and systematic procedures for determining which studies and endpoints to consider.[47] The NAS also encouraged EPA to move away from selection of a single principal study upon which to derive RfDs,[48] and to make greater use of physiologically based pharmacokinetic (PBPK) modelling data when extrapolating animal findings to humans.[49]

---

[37] EPA (2008a), p. 43; EPA (2008b), pp. 57-58; EPA (2008c), p. 32; EPA (2008d), pp. 51, 55.
[38] EPA (1998a), p. 6; Federal Register (1998), p. 26929.
[39] EPA (1998a), p. 6; Federal Register (1998), p. 26929.
[40] EPA (1998a), p. 7; Federal Register (1998), p. 26929.
[41] EPA (1998a), p. 7; Federal Register (1998), p. 26929.
[42] EPA (1998a), p. 7; Federal Register (1998), p. 26929.
[43] EPA (2008d), p. 66.
[44] EPA (2016), pp. 2-26, 2-36.
[45] EPA (2000b), p. 40.
[46] EPA (2009c), p. 79.
[47] NAS (2011), pp. 4, 164; NAS (2014), pp. 137-138.
[48] NAS (2014), p. 118.
[49] NAS (2014), p. 33.



**Table 1.  Chemicals with oral RfDs based on neurological endpoints, assessed according to EPA's Guidelines for Neurotoxicity Risk Assessment.[a]**

| Name of Chemical | Human Neurotoxicity Data?[b] | Principal Study | Confidence in Principal Study | Known Mode of Action? | Effect | Reference |
|---|---|---|---|---|---|---|
| BDE-47 | No | Animal | Not given[c] | Inadequate data | Changes in spontaneous motor activity and habituation | EPA (2008a) |
| BDE-99 | No | Animal | Not given[d] | Inadequate data | Neurobehavioral developmental effects; changes in motor activity | EPA (2008b) |
| BDE-153 | No | Animal | Not given[e] | Inadequate data | Spontaneous behavior, learning and memory | EPA (2008c) |
| BDE-209 | No | Animal | Low | Inadequate data | Changes in spontaneous behavior and habituation | EPA (2008d) |
| Chlorine Dioxide and Chlorite | No | Animal | Medium | No | Neurodevelopmental delay; lowered auditory startle amplitude | EPA (2000b) |
| 2-Hexanone | No | Animal | Medium | Yes | Axonal swelling in peripheral nerves | EPA (2009c) |
| RDX | One cross-sectional study, 16 case reports | Animal | High | Yes | Convulsions | EPA (2018a) |
| Trimethylbenzenes | Occupational studies of solvent mixtures, controlled experiments with healthy adults | Animal | Low to Medium | Tentative, based on structurally similar compounds | Decreased pain sensitivity | EPA (2016) |

[a] EPA (1998a); Federal Register (1998).

[b] Human studies of neurotoxicity endpoints, based on oral exposure.

[c] Confidence in the principal study was not stated, but the "overall confidence in the RfD assessment of BDE-47 is low" (EPA 2008a, p. 48).

[d] Confidence in the principal study was not stated, but the "overall confidence in the RfD [for BDE-99] is low" (EPA 2008b, p. 67).

[e] Confidence in the principal study was not stated, but the "overall confidence in the RfD assessment for BDE-153 is low" (EPA 2008c, p. 37).



Subsequent to the NAS's recommendations, EPA has issued two neurotoxicity risk assessments, for trimethylbenzenes (2016)[50] and RDX (2018).[51]  As with the prior risk assessments, both of these new risk assessments utilized animal data as the basis for the respective RfDs, as there were few human data available for either chemical.  For trimethylbenzenes, EPA identified a small number of occupational studies involving mixtures of solvents, as well as some controlled exposures of healthy adult volunteers (which generally showed little or no nervous system effects); these human data were considered inadequate for establishing an RfD.[52]  Similarly, with RDX, EPA identified three small-scale occupational studies and sixteen case reports of neurological effects associated with acute RDX exposures.  The human data on RDX were also considered inadequate to establish an RfD.[53]

For several of EPA's neurotoxicity risk assessments, including the 2018 risk assessment for RDX, EPA established an RfD despite a relatively small number of animal studies.  In the RDX risk assessment, EPA identified 16 (repeated dose) animal studies, only two of which had been published.  EPA characterized the animal studies as showing "consistent evidence" of neurotoxicity on the grounds that 11 of the 16 studies reported neurological effects,[54] and the effects were generally dose-related (although inconsistencies existed across the studies in terms of the doses that produced the effects).[55]  EPA's risk assessment of RDX highlights that "consistency" of the evidence is not synonymous with unanimity.

*Animal Studies on Fluoride Neurotoxicity*

The animal research on fluoride neurotoxicity was sufficient to permit the NRC to conclude, in 2006, that fluoride interferes with the functions of the brain.[56]  Many animal studies have been published since the NRC review, and the database is now stronger than it was when NRC issued its report.

A search of the National Library of Medicine's online database PubMed was conducted to identify studies published since the NRC's 2006 review.  The following search terms were used:  "fluoride and brain," "fluoride and learning," and "fluoride and memory."[57]  The titles of all studies published since 2006 were reviewed to identify potentially relevant studies, and, among potentially relevant primary studies, abstracts were reviewed to verify relevance.  Reviews, studies in Chinese for which translations were not available, and *in vitro* studies were excluded.  Full-text copies of all relevant studies were obtained.

In total, the search identified 110 papers.[58]  Papers that appeared to be reporting effects from the same underlying rodent experiment were treated as one study,[59] leaving 105 distinct studies.  This is not an exhaustive list of the studies published since 2006, as it does not reflect studies that were not indexed in PubMed (e.g., studies published in the journal *Fluoride* or in certain Chinese-language journals such as the *Chinese Journal of Endemiology*).  In addition, the search terms probably did not identify all relevant studies available on PubMed.  Nevertheless, this list should provide a reasonably representative sample of the

---

[50] EPA (2016).

[51] EPA (2018a).

[52] EPA (2016), pp. xxiii-xxiv, 1-5 to 1-7, 1-66.

[53] EPA (2018a), pp. xxxix-xl, 1-13, 1-80.

[54] EPA (2018a), p. 1-23.

[55] EPA (2018a), pp. 1-12, 1-18.

[56] NRC (2006), p. 222.

[57] These search terms are expected to identify many neurotoxicity studies, but not necessarily all studies that examined neurotoxic effects.  For example, studies of neuroanatomical or neurochemical effects might not be identified with these search terms.

[58] Summarized in Appendix A, with the exception of papers excluded for the reasons discussed below.

[59] Adedara et al. (2017a; 2017b); Akinrinade et al. (2015a; 2015b); Basha et al. (2011a; 2011b); Basha and Sujitha (2012a; 2012b); and Zhu et al. (2011) and Zhang et al. (2011).



fluoride in the rodent chow.  Many of the limitations identified by the NTP (e.g., lack of information on the purity of the fluoride compounds) would not be expected to skew the results in a consistent direction across laboratories.  Similarly, litter effects can produce false negatives as well as false positives,[83] and thus it is questionable whether they would skew the results of multiple studies in a consistent direction.  Moreover, some of the limitations that NTP identified (e.g., lack of statistical power due to a small number of animals), as well as limitations that NTP did not identify (e.g., in develomental studies, the absence of neonatal exposures that are comparable to those experienced by formula-fed infants[84]), would actually tend to bias the results toward the null.  Finally, the suggestion by NTP that rodent studies should use fluoride concentrations of 0.7 mg/L in order to be relevant to human exposures is at odds with longstanding tenets of risk assessment,[85] as explained later in this report; humans are considered much more sensitive to fluoride (and other chemicals) than are rats and mice.[86]

NTP also expressed concern that effects on learning and memory could not be definitively distinguished from effects on motor or sensory function that could have affected an animal's ability to perform adequately on the learning and memory tests.[87]  NTP did not mention that both kinds of effects are adverse effects, even if the precise nature of the effect is not clear.  In addition, as mentioned above, by limiting its review to studies investigating learning and memory, the NTP did not consider the much larger number of studies that have investigated neuroanatomical and neurochemical effects, endpoints that are more sensitive and also potentially less susceptible to bias associated with outcome assessment.

Subsequent to the NTP's review, 11 additional developmental studies have reported learning and memory outcomes.[88]  Ten of these studies found deficits in the fluoride-treated groups.  Notably, the Bartos et al. studies, which controlled for litter effects, found impairments in learning and memory at a fluoride concentration of just 5 mg/L.  While the other studies (with the exception of McPherson et al.) did not control for litter effects, this limitation does not preclude use of the research for setting an RfD.  As noted above, EPA has previously selected developmental studies that did not control for litter effects as principal studies for establishing neurotoxicity-based RfDs for other chemicals.

---

[83] Zorrilla (1997), p. 144; Lazic and Essioux (2013), p. 3.

[84] Fluoride concentrations in mammalian milk are very low in comparison to the mother's fluoride intake, even when the mother's fluoride intake is quite high (NRC 2006, pp. 33, 36; Drinkard et al. 1985).  In the animal studies described in this report that included maternal exposure to fluoride during lactation, the fluoride intake of the offspring during that period would have been low or negligible.  In contrast (as described later in this report), formula feeding of infants produces some of the highest fluoride exposures experienced by humans.  NTP (2016, p. 122) alludes to the difference in fluoride intakes between formula-fed and breastfed infants, but is not up to date on the minimal effect of maternal fluoride intake on the fluoride concentration in milk and does not discuss the reduced relevance of animal studies of maternal fluoride exposure during lactation with respect to formula-fed human infants.

[85] The principal author of the NTP study, Kristina Thayer, testified at her deposition that she is no longer comfortable with the assumption of a 1-to-1 equivalence between fluoride exposures in animals and humans; Thayer testified that she would approach the issue differently today, with greater attention to the principles of toxicokinetics and toxicodynamics. (Thayer Deposition at 151:9-152:3, 302:21-303:23).

[86] NTP (2016) discusses the differences in chronic fluoride exposure needed to reach similar fluoride concentrations in bone or plasma (pp. 122-123), and they provide an estimate of the water fluoride concentrations (7-9 mg/L, p. 56, footnote 14) needed to reach intakes in rats comparable to those in humans from 0.7 mg/L, allowing for allometric scaling between humans and rats.  Thus NTP should be aware that insisting on animal studies of exposures to 0.7 mg/L is inappropriate.

[87] NTP (2016), p. 55.

[88] Bartos et al. (2018; 2019); Chen et al. (2018a); Cui et al. (2017); Ge et al. (2018); McPherson et al. (2018); Sun et al. (2018); Wang et al. (2018a); Zhao et al. (2019); Zhu et al. (2017); Zhou et al.(2019).



*Food and Water Watch v. EPA*                                    *Thiessen Report*

The Guidelines recognize several types of human studies that can inform the hazard identification analysis, including case reports and epidemiological studies.[99]  In contrast to the 9 chemicals for which EPA has established RfDs or RfCs pursuant to the Guidelines (most of which did not have *any* human studies available), both categories of human studies are available for fluoride, including the most reliable kind of epidemiological study, prospective cohort studies.

I have become familiar with the human epidemiological data on fluoride neurotoxicity, both through my work for the National Research Council, and through my ongoing review of the literature.  A systematic review of the human literature was not considered necessary nor particularly helpful, since systematic reviews have already been conducted,[100] and those few studies reporting no effects are well known to people familiar with fluoride research.[101]  As those familiar with the literature know, there are many more studies reporting associations of fluoride exposure with neurotoxic outcomes than the reverse. The number of studies reporting no association between fluoride and neurotoxic outcomes is quite small, and, as such, a systematic review was not considered necessary to identify and address them.  Each of these "no effect" studies is addressed below.  To ensure that there are no additional no-effect studies, I reviewed the results of my PubMed searches for "fluoride and brain," "fluoride and learning," and "fluoride and memory," and conducted additional PubMed searches for "fluoride and intelligence" and "fluoride and IQ." These searches did not retrieve any additional no-effect studies, although they did retrieve additional studies reporting adverse effects.  Due to the sheer magnitude of studies reporting associations with neurotoxic outcomes, I have not sought to review each of them.  For purposes of completeness, however, I have attached a reference list of all epidemiological studies of which I am aware that have reported associations between fluoride exposure and cognitive deficits.[102]

*Case Reports:*  As noted in the Guidelines, "the first type of human data available is often the case report or case series," including clinician observations of occupationally exposed workers.[103]  This statement holds true for fluoride.  Decades before the first study of fluoride and IQ was published, case reports and clinician surveys of occupationally exposed workers identified neurological symptoms among fluoride-exposed individuals, including general malaise, fatigue, headaches, and difficulties with concentration and memory.[104]  As the NRC noted, "[t]here are numerous reports of mental and physiological changes after exposure to fluoride from various routes (air, food, and water) and for various time periods."[105]

While case reports are generally not sufficient, by themselves, to establish a hazard, the Guidelines consider them "useful when corroborating epidemiological data are available."[106]  Moreover, several of the case reports could be characterized as "experimental studies," since they involved "individuals who underwent withdrawal from their source of fluoride exposure and subsequent re-exposures under 'blind' conditions.  In most cases, the symptoms disappeared with the elimination of exposure to fluoride and

---

[99] EPA (1998a), p. 15; Federal Register (1998), p. 26932.

[100] See for example Tang et al. (2008); Choi et al. (2012); Duan et al. (2018).

[101] Aggeborn and Öhman (2017); Barberio et al. (2017); Broadbent et al. (2015); Morgan et al. (1998); Shannon et al. (1986).

[102] Appendix B contains a list of 67 studies associating fluoride exposures with cognitive deficits in humans.

[103] EPA (1998a), p. 15; Federal Register (1998), p. 26932.

[104] Roholm (1937), pp. 138-140, 178; Spittle (1994).

[105] NRC (2006), p. 208.

[106] EPA (1998a), p. 15; Federal Register (1998), p. 26932.



Unfortunately, because prospective cohort studies "can be very time-consuming and costly," they are rarely available for neurotoxicity risk assessments.[136]  At the times of their respective assessments, none of the 10 chemicals that EPA has assessed under the Guidelines had been studied using a prospective cohort.  In the case of fluoride, however, there are five prospective cohort studies, including four with individualized measurements of fluoride exposure.[137]  Notably, each of the prospective studies that collected individual measurements of fluoride exposure found that fluoride exposure predicted significant IQ loss.  By contrast, the one study that did not have individual measurements (Broadbent et al.), did not detect a measurable effect on IQ.[138]

Several differences in study design may help to explain why the study by Broadbent et al. did not detect an effect.[139]  First and foremost, in the Bashash and Green studies, fluoride exposure was measured by testing the pregnant mother's urine;[140] their analyses were thus focused on the impact of a likely vulnerable age-specific window, the prenatal period.  By contrast, Broadbent did not collect information on prenatal exposures, focusing instead on exposures after birth.  This is an important limitation, particularly in a country like New Zealand, where adults consume large quantities of fluoride-containing tea.[141]  Substantial overlap in the prenatal exposures in Broadbent's fluoridated and "non-fluoridated" cohorts is thus likely.

Second, most of the children in the non-fluoridated area in Broadbent's study used fluoride supplements and fluoride toothpaste, and, as such, were not a true "control" population.  In a follow-up letter, Broadbent et al. estimated that the difference in average exposure between the fluoridated and "non-fluoridated" population was just 0.3 mg/day.[142]  Given this likely substantial overlap in childhood exposures, the power of Broadbent's study to detect statistically significant differences in outcome is thus questionable, particularly given the relatively low number of children in the "non-fluoridated" group (n = 93).

Finally, as EPA's Guidelines recognize, bias may be introduced into prospective cohort studies if the examiner is aware of the subject's exposure status.[143]  Because of this, the Guidelines provide that "more credence should be given to those studies in which both observer and subject bias are carefully controlled (e.g., double-blind studies)."[144]  The Bashash and Green studies were both double-blinded studies,[145] but the only blinding mentioned in the Broadbent paper is that the examiner at the age 38 exam was blind to the subjects' previous IQ scores.  The lack of blinding in the Broadbent study is a potential source of bias, because the principal measure of fluoride exposure in the study (community water fluoride concentration) may have been available to the examiner.

---

[136] EPA (1998a), p. 17; Federal Register (1998), p. 26933.

[137] Bashash et al. (2017; 2018); Broadbent et al. (2015); Green (2018); Valdez Jiménez et al. (2017).

[138] Broadbent et al. (2015).

[139] See also Menkes et al. (2014).

[140] Bashash et al. (2017; 2018) and Green (2018) utilized spot urine samples, rather than first morning or 24 hour collection.  Spot samples are an imprecise metric of chronic exposure, and thus would have introduced some exposure error into the study.  This imprecision, however, would bias the results to the null.

[141] Waugh et al. (2017).

[142] Broadbent et al. (2016).

[143] EPA (1998a), pp. 17, 19; Federal Register (1998), pp. 26933-26934.

[144] EPA (1998a), pp. 17, 19; Federal Register (1998), pp. 26933-26934.

[145] In the Bashash et al. (2017; 2018) and Green (2018) studies, the cognitive tests were performed before the archived urine samples had been tested for fluoride, and thus neither the examiner nor the subject could have known the fluoride status.



for toxicokinetics and one for toxicodynamics.[423] Consistent with this, EPA has used a $UF_H$ of 10 in each of the nine risk assessments where it has established an RfD or RfC pursuant to the Guidelines (Table 4).

*Interspecies Variability (UF$_A$)*:  EPA recognizes that susceptibility to toxic substances can differ across species.  As with intraspecies variability, interspecies variability is rooted in principles of both toxicokinetics and toxicodynamics.  With respect to the kinetics component, EPA has developed a hierarchical framework of approaches that are geared towards ascertaining the "human equivalent dose" (HED).[424]  EPA's "optimal" approach for determining the HED is to use a physiologically based toxicokinetic model (PBTK).[425]  Where a PBTK model is not available, the "intermediate" approach is to use chemical-specific information that, while falling short of a full PBTK model, provides some reliable guidance.[426]  Where there is no reliable chemical-specific information on kinetics, EPA uses a default allometric scaling method.[427]

Allometric scaling is "scaling of physiological rates or quantities to relative growth and size (mass or volume) of one animal species relative to another species."[428]  Body weight scaling to the 3/4 power is EPA's default method for allometric scaling (hereafter referred to as the BW¾ Method).[429]  As shown in Table 5, the HED of a 10 mg/kg dose given to mice is 1.4 mg/kg, while the HED of the same dose given to rats is 2.4 mg/kg.[430]  Put another way, mice and rats need to be given 10 mg/kg of a chemical to achieve the human equivalent of 1.4 and 2.4 mg/kg, respectively.  The HED is thus 14% of the dose given to mice, and 24% of the dose given to rats.

The BW¾ Method "predominantly addresses factors involved in estimating toxicokinetics, as well as some toxicodynamic factors."[431]  EPA thus maintains a residual default UF of 3 (3.16 rounded down to 3) to allow for residual uncertainty from either toxicokinetics or toxicodynamics, unless there is chemical-specific information available.[432]  Under EPA's default approach to interspecies variability, therefore, a dose of 10 mg/kg/day in mice is treated as the equivalent of 0.47 mg/kg/day in humans, while a dose of 10 mg/kg/d in rats is treated as the equivalent of 0.8 mg/kg/day.

*Subchronic-to-Chronic (UF$_S$)*:  Where EPA bases an RfD on a study that does not investigate the effect of long-term (chronic) exposure, EPA will use an uncertainty factor of 3 to 10. EPA defines a chronic study in rodents as one which lasts "at least 12 months."[433]  If the study lasts less than 12 months, therefore, an uncertainty factor is applied.  In the derivation of the RfC for 2-Hexanone, for example, EPA applied an uncertainty factor of 10 because the principal study lasted only six months.[434]

---

[423] EPA (2016), p. 2-15.
[424] EPA (2011b), pp. 18-21; EPA (2018a), p. 2-10.
[425] EPA (2011b), p. 19.
[426] EPA (2011b), p. 19.
[427] EPA (2011b), p. 19.
[428] EPA (2011b), p. 1.
[429] EPA (2011b).
[430] EPA (2011b), p. 29, Table A-1; EPA (2018a), p. 2-12.
[431] EPA (2011b), p. 17.
[432] EPA (2011b), p. 21; EPA (2016), p. 2-15;  EPA (2018a), pp. 2-12, 2-13.
[433] EPA (1998b), p. 1.
[434] EPA (2009c), p. 74.



*Food and Water Watch v. EPA*                                                            *Thiessen Report*

Table 4.  Summary of RfDs or RfCs developed in compliance with EPA's Guidelines for Neurotoxicity Risk Assessment.

| Chemical | LOAEL | NOAEL | Uncertainty Factors | | | | | RfD or RfC[a] | Reference |
| | | | $UF_H$ | $UF_A$ | $UF_S$ | $UF_D$ | Composite | | |
|---|---|---|---|---|---|---|---|---|---|
| BDE-47 | 10.5 mg/kg | 0.7 mg/kg | 10 | 10 | 3 | 10 | 3000 | 0.1 µg/kg/day | EPA (2008a) |
| BDE-99 | 0.8 mg/kg | 0.4 mg/kg | 10 | 10 | 3 | 10 | 3000 | 0.1 µg/kg/day | EPA (2008b) |
| BDE-153 | 0.9 mg/kg | 0.45 mg/kg | 10 | 10 | 3 | 10 | 3000 | 0.2 µg/kg/day | EPA (2008c) |
| BDE-209 | 20.1 mg/kg | 2.22 mg/kg | 10 | 10 | 3 | 1 | 300 | 7 µg/kg/day | EPA (2008d) |
| Chlorine Dioxide and Chlorite | 6 mg/kg/day | 3 mg/kg/day | 10 | 10 | 1 | 1 | 100 | 0.03 mg/kg/day | EPA (2000b) |
| 2-Hexanone | 143 mg/kg/day | Not observed | 10 | 10 | 1 | 10 | 1000 | 0.005 mg/kg/day | EPA (2009c) |
| Methanol | 1000 ppm (1310 mg/m$^3$) | 500 ppm (655 mg/m$^3$) | 10 | 3 | 1 | 3 | 100 | 20 mg/m$^3$ | EPA (2013) |
| RDX | 8 mg/kg/day | 4 mg/kg/day | 10 | 3 | 1 | 10 | 300 | 0.004 mg/kg/day | EPA (2018a; 2018j) |
| Trimethylbenzenes | 492 mg/m$^3$ | 123 mg/m$^3$ | 10 | 3 | 3 | 3 | 300 | 0.01 mg/kg/day | EPA (2016) |

[a] Where EPA established both an RfD (mg/kg/day) and an RfC (mg/m$^3$) for a chemical, the RfD is presented.

Table 5.  Comparison of $BW^{1/1}$ and $BW^{3/4}$ in estimating oral exposure in humans from a 10 mg/kg exposure to rats, mice, and a dog.[a]

| Absolute animal intake or administered dose | Species | BW(h)/BW(a) | Scaling = $BW^{1/1}$ | | Scaling = $BW^{3/4}$ | |
| | | | BW scaling factor | BW scaled human intake or oral dose (mg/kg) | BW scaling factor | BW scaled human intake or oral dose (mg/kg) |
|---|---|---|---|---|---|---|
| 0.25 mg / 0.025 kg | mouse | 70 / 0.025 = 2800 | $2800^{1/1} = 2800$ | (2800 × 0.25 mg = 700 mg) 700 mg / 70 kg = 10 mg/kg | $2800^{3/4} = 385$ | (385 × 0.25 mg = 96 mg) 96 mg / 70 kg = 1.4 mg/kg |
| 2.5 mg / 0.25 kg | rat | 70 / 0.25 = 280 | $280^{1/1} = 280$ | (280 × 2.5 mg = 700 mg) 700 mg / 70 kg = 10 mg/kg | $280^{3/4} = 68$ | (68 × 2.5 mg = 170 mg) 170 mg / 70 kg = 2.4 mg/kg |
| 120 mg / 12 kg | dog | 70 / 12 = 5.8 | $5.8^{1/1} = 5.8$ | (5.8 × 120 mg = 700 mg) 700 mg / 70 kg = 10 mg/kg | $5.8^{3/4} = 3.7$ | (3.7 × 120 mg = 444 mg) 444 mg / 70 kg = 6.4 mg/kg |

[a] Taken from Table A-1 in EPA (2011b), p. 29.



*Database Deficiency (UF$_D$)*:  EPA regularly applies an uncertainty factor of 3 to 10 to account for important research gaps in the literature, or when there are indications of other toxic effects that have not been adequately studied.  According to EPA, "If there is concern that future studies may identify a more sensitive effect, target organ, population, or life stage, a database uncertainty factor reflects the nature of the database deficiency."[435]  In the 2-Hexanone risk assessment, for example, EPA applied a UF$_D$ of 10 because of both (a) the absence of multigenerational and developmental studies, and (b) the existence of studies which "suggest the possibility" of reproductive and immunological toxicity.[436]

*Composite uncertainty factors:*  As summarized in Table 4, the composite uncertainty factors that EPA has applied in its 9 neurotoxicity risk assessments under the Guidelines range from 100 to 3,000.  Three of these risk assessments (those for Methanol, RDX, and Trimethylbenzenes[437]), were published after EPA's adoption (in 2011) of its current hierarchical framework for determining HEDs from animal data.[438]  Prior to adoption of this method, UF$_A$ for interspecies variability had a value of 10 for each of the risk assessments; thereafter it has had a value of 3.  As a practical matter, however, the adjustment is similar across the two periods of time, because the point of departure now starts at a lower dose under EPA's current approach, due to derivation of the HED prior to application of uncertainty factors.


## B)  Identifying LOAEL/NOAELs for Fluoride Neurotoxicity from Animal Studies

EPA prefers to use human data for identifying a POD in the rare instances where such data are available.[439]  The recent prospective cohort studies[440] with individual-level biomonitoring data provide sufficient human data to establish a POD for fluoride neurotoxicity.  I understand that Dr. Philippe Grandjean has conducted an analysis of human data to establish a POD for fluoride neurotoxicity, and that he has calculated a BMDL of 0.1 mg/L (maternal urinary fluoride during pregnancy) based on a Benchmark Response (BMR) of 1 lost IQ point from prospective cohort data reported by Bashash et al.[441]  I understand that Dr. Grandjean has not attempted to establish an RfD, but a BMDL of 0.1 mg/L in maternal urine would result in an RfD well below the intake levels in fluoridated communities, particularly after the application of appropriate uncertainty factors.

To avoid duplication of Dr. Grandjean's analysis, and to determine whether his BMDL is consistent with potential RfDs derived from animal data, I sought to determine the range of RfDs that are supported by the current animal experimental data.  My purpose was not to derive a single value for the RfD, but to assess the approximate range of RfD values that would be obtained if EPA's ordinary risk assessment procedures are applied to examples selected from the fluoride database.  Of primary interest to this analysis is whether RfDs derived from neurotoxicity data would be greater than, equal to, or less than the current RfD of 0.08 mg/kg/day.

In light of the human data now available, animal data would no longer be the preferred source of the POD for fluoride neurotoxicity.[442]  However, several considerations could justify use of animal data to establish an RfD for fluoride.  First, EPA has used animal research as the principal study for each of the

[435] EPA (2018a), p. xxii.
[436] EPA (2009c), pp. 74-75.
[437] EPA (2013a; 2016; 2018a).
[438] EPA (2011b).
[439] EPA (2018a), p. 2-1.
[440] Bashash et al. (2017; 2018); Valdez-Jiménez et al. (2017); Green (2018).
[441] Bashash et al. (2017).
[442] EPA (2018a), p. 2-1.



neurotoxicity risk assessments that it has thus far conducted under the Guidelines.  Second, EPA has used impairment in learning and memory in rodents as the adverse effect upon which to base the RfD for other chemicals,[443] thus this is an accepted endpoint to use in deriving an RfD.  Third, a substantial number of animal studies of fluoride neurotoxicity have used 2 or 3 treatment groups, and EPA has found this to be sufficient for establishing the POD in most of its Guideline-compliant risk assessments (BDE-47, BDE-153, BDE-209, Chlorine Dioxide/Chlorite, and 2-Hexanone),[444] including animal studies with as few as 10 rats per group (2-Hexanone).[445]

For purposes of simplicity and clarity, I have selected the NOAEL/LOAEL method for example RfD calculations.  Although EPA now prefers using the BMD method, in this case either method will serve because, as shown below, whatever point one chooses in the range of observations in the identified studies, the resulting RfDs are each well below 0.08 mg/kg/d.

C)  Candidate PODs from the Animal Data on Fluoride Neurotoxicity

In the literature review discussed earlier, 37 rodent studies were identified that have investigated fluoride's impact on learning and memory since the NRC report (Table A-2).  All but 3 of these studies found adverse effects in the fluoride-treated rodents, including 16 of the 17 studies that investigated prenatal fluoride exposures.  Since the prenatal period represents a point of heightened vulnerability to neurotoxicants, the prenatal studies are a logical candidate for the point of departure.

To avoid studies at high risk of bias, the three studies that did not specifically mention using a randomization procedure were excluded from further consideration.[446]  Further, in order to focus the analysis on those studies best suited for a NOAEL/LOAEL analysis, four studies that only used one treatment dose were excluded.[447]

Table 6 summarizes the 10 prenatal studies that remained for LOAEL/NOAEL consideration.  Most of the studies used a similar dosing regimen with 2 or 3 treatment groups, and at least 10 rodents per group, which is consistent with several of the principal studies that EPA has previously used to establish an RfD.  Notably, 9 of the 10 studies found dose response trends for one or more effects, thus adding confidence to a causative role of the fluoride treatment.[448]  Additional confidence comes from the fact that the vast majority of other rodent studies have found demonstrable affects on learning as well.

---

[443] For example, BDE-153 (EPA 2008c, p. 36).

[444] EPA (2000b; 2008a; 2008c; 2008d; 2009c).

[445] EPA (2009c).

[446] Bera et al. (2007); Basha et al. (2011b); Ge et al. (2018).

[447] Niu et al. (2014); Banala and Karnati (2015); Dong et al. (2015); Zhu et al. (2017).

[448] See for example, Jiang et al. (2014b), Table 3; Cui et al. (2017), Table 3; Chen et al. (2018a), Figure 1d,e; Sun et al. (2018), Tables 2 and 3; Wang et al. (2018a), Figure 4b,c; Zhao et al. (2019), Figure 5e.



# **Exhibit 3**

EPA/635/R-09/008F
www.epa.gov/iris



# TOXICOLOGICAL REVIEW

# OF

# 2-HEXANONE

(CAS No. 591-78-6)

## In Support of Summary Information on the Integrated Risk Information System (IRIS)

*September 2009*

U.S. Environmental Protection Agency
Washington, DC

## DISCLAIMER

This document has been reviewed in accordance with U.S. Environmental Protection Agency policy and approved for publication.  Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

weeks 24–40 in humans.  The developing brain is distinguished by the absence of a blood-brain barrier.  The development of this barrier is a gradual process, beginning in utero and complete at approximately 6 months of age.  Because the blood-brain barrier limits the passage of substances from blood to brain, in its absence, toxic agents can freely enter the developing brain.  Since Purkinje-cell degeneration has been observed with adult rats exposed to high levels of 2,5-hexanedione, infants may be at an increased risk for this type of damage at lower levels of exposures, due to the incomplete maturation of the blood-brain barrier (Hernandez-Viadel et al., 2002).  However, this would depend on the capacity of infants and small children to bioactivate 2-hexanone to 2,5-hexanedione.

Metabolism of 2-hexanone may vary between children and adults due to differences in the development and maturity of phase I and phase II enzymes (Johnsrud et al., 2003).  Studies indicate that the mode of action of 2-hexanone toxicity involves the metabolism to a more toxic metabolite, namely, 2,5-hexanedione.  Several enzymes, such as CYP2E1, CYP2B1/2, and CYP2C6/11, are inducible following administration of 2-hexanone in animal models (Imaoka and Funae, 1991; Nakajima et al., 1991); however, the individual isoforms involved in 2-hexanone metabolism have not been fully elucidated.  Toftgard et al. (1986) found that the formation of 2,5-hexanediol from 2-hexanol was catalyzed by a CYP450 isozyme different from CYP2B and present in liver but not in lung microsomes.  The authors concluded that 2-hexanol must be transported to the liver before the neurotoxic metabolite 2,5-hexanedione can be formed.  Because of this, changes in CYP450 protein levels and phase II enzymes during development may have an impact on susceptibility to 2-hexanone.  As mentioned above, the possible susceptibility of 2-hexanone may be influenced by life stage, but there are few studies to confirm the impact and severity of such exposure.  The available information suggests that young animals and children could more susceptible to 2-hexanone; however, the evidence of possible childhood susceptibility is inconclusive.

### 4.8.2.  Possible Gender Differences

Evaluations of human occupational exposures have not provided evidence that 2-hexanone acts in a gender-specific way.  Most animal studies also have not brought forth strong evidence for a sex-specific action of 2-hexanone.  However, it should be mentioned that in a few rat studies 2-hexanone appeared to affect the male reproductive system (Katz et al., 1980; Krasavage et al., 1980; O'Donoghue et al., 1978).

# **Exhibit 4**

EPA/635/R-07/005F
**www.epa.gov/iris**



# TOXICOLOGICAL REVIEW

# OF

# 2,2',4,4'-TETRABROMODIPHENYL ETHER (BDE-47)

## (CAS No. 5436-43-1)

## In Support of Summary Information on the Integrated Risk Information System (IRIS)

*June 2008*

U.S. Environmental Protection Agency
Washington, DC

**DISCLAIMER**

This document has been reviewed in accordance with U.S. Environmental Protection Agency policy and approved for publication.  Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

## 4.7.  SUSCEPTIBLE POPULATIONS AND LIFE STAGES

### 4.7.1.  Possible Childhood Susceptibility

A population subgroup is susceptible if exposure occurs during a period of sensitivity as observed in Eriksson et al. (2001) with adult mice exhibiting effects following neonatal exposure to BDE-47.  The neonatal stage is a period of rapid development of the nervous system and is considered a critical window of development.  The animal model indicates a potential for concern for early lifetime exposure (i.e., fetal or infant exposure) to the chemical.  The evidence of cerebellar and neocortical neuron BDE-47 accumulation in newborn rats (Kodavanti et al., 2005; Mundy et al., 2004) as well as the identification of BDE-47 in human maternal and cord serum, milk, and children's serum (Mazdai et al., 2003; Schecter et al., 2003; Thomsen et al., 2002) implies animals and humans are exposed to and accumulate BDE-47 during a period of rapid development of the brain.  This is a critical window of development and indicates a potential for susceptibility.  Whether such exposure constitutes a health risk for adverse neurodevelopmental effects in infants and children is not known at this time because of the limited toxicological database for BDE-47.  An association between prenatal or neonatal exposures to BDE-47 and neurobehavioral dysfunction in humans has not been established.

### 4.7.2.  Possible Gender Differences

Studies on BDE-47 are not available to determine whether susceptibility to BDE-47 differs in male and female humans or experimental animals.  A major urinary protein has been identified in male mice, which facilitates excretion of BDE-47 once the pathway for its synthesis becomes operational.  This decreases retention of BDE-47 in juvenile and mature males compared to females but is not functional during the early postnatal period of development.

deriving the RfD, altered behavior due to exposure during development, is expected to be relevant to humans.  No quantitative data were identified to compare relative human and rodent sensitivity to these changes.  However, given the longer period of brain development in humans as compared to rodents and the higher importance of cognitive function, it is appropriate to consider that humans may be more sensitive than rodents in the absence of specific data.  Based on these considerations the default $UF_A$ value of 10 was applied.

A default intraspecies $UF_H$ of 10 was applied to account for variations in susceptibility within the human population (intrahuman variability).  This factor accounts for the segment of the human population that may be more sensitive than the general population to exposure to BDE-47.  A default value is warranted because insufficient information is currently available to assess human-to-human variability in BDE-47 toxicokinetics or toxicodynamics.

A $UF_S$ of 3 was used to account for uncertainties in extrapolating from effects seen in a single-exposure neurodevelopmental study to a lifetime exposure.  Exposure on PND 10 occurred during a period of rapid brain development in mice.  Brain development does not continue at an equivalent rate over a mouse's lifetime and is more quiescent during adult life stages.  Many brain structures have a very limited critical window during development in early life.  Following BDE-47 exposure, toxicokinetic data suggest that a mouse urinary protein becomes functional some time between PNDs 28 and 40, which leads to a dramatic increase in BDE-47 urinary excretion, especially in males.  This increased excretion reduces the total body burden of BDE, including the levels of radiolabel reaching the brain 24 hours after dosing in older mice compared with that in younger mice.  These data thus suggest that the risk of neurodevelopmental effects in neonatal mice may be greater than in older mice because of rapid postnatal brain growth and coincident increased retention of BDE-47 and/or its metabolites.  Therefore, chronic exposure is not expected to result in more serious effects.  However because the mice received only a single dose rather than repeated doses over multiple days within the hypothesized critical window, a threefold UF was applied.

A $UF_L$ for LOAEL-to-NOAEL extrapolation was not used because the Agency's current approach is to address this factor as one of the considerations in selecting a BMR for BMD modeling.  In this case, a change in the mean equal to 1 SD of the control mean was assumed to represent a minimal biologically significant change.

A $UF_D$ of 10 was used to account for database uncertainty.  The available oral database for BDE-47 lacks prenatal developmental neurotoxicity studies, reproductive toxicity studies, and standard chronic or subchronic studies of systemic toxicity.  Uncertainties regarding the effects of exposures during the prenatal period, extended postnatal exposures, and latent expression of early postnatal changes in the brain are addressed as a component of the database UF.