C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

|  |  |
|---|---|
| FOOD & WATER WATCH, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civ. No. 17-CV-02162-EMC

**PLAINTIFFS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE EVIDENCE OF FLUORIDATION CHEMICALS' ALLEGED BENEFITS (OR LACK THEREOF)**

Judge: Hon. Edward M. Chen
Date: Jan 7, 2017 (Pretrial Conference)
Time: 2:30 p.m.
Courtroom: 5 - 17th Floor

## INTRODUCTION

The Court should exclude evidence on the benefits (and lack thereof) of adding fluoridation chemicals to drinking water for two reasons.

<u>First</u>, and foremost, any evidence on benefits (and lack thereof) is irrelevant and thereby inadmissible under FRE 402. Plaintiffs brought this case under Section 21 of the Toxic Substances Control Act (TSCA), which requires Plaintiffs to prove that fluoridation chemicals present an "unreasonable risk" to human health "without consideration of costs or other nonrisk factors." 15 U.S.C. § 2620(b)(4)(B)(ii). According to the plain language, structure, purpose, and legislative history of TSCA, the benefit of a chemical substance is a "nonrisk" factor that can only be considered during EPA's rulemaking proceeding. Evidence on benefits is thus irrelevant and thereby inadmissible in this case.

<u>Second</u>, even if evidence on benefits (and lack thereof) had some minimal probative value, this is substantially outweighed by the waste of scarce trial time it will cause. FRE 403. There are currently only 8 days allotted for trial in this matter to address complex issues of epidemiology, toxicology, neurotoxicity and risk assessment. Allowing testimony on benefits will substantially limit the testimony on risk, as there are up to six witnesses who are prepared to testify on benefits (or lack thereof), including three of Plaintiffs' experts, two of EPA's experts, and a 30(b)(6) representative for the CDC whom Plaintiffs will be calling as a fact witness. Further, the evidence on benefits will be fully considered by EPA in the *rulemaking* proceeding, including the possibility of exempting fluoridation chemicals from a rule if EPA finds they provide substantial benefits that are not available from other reasonably available alternatives. Introducing evidence of benefits at trial, therefore, will be an unnecessary and wasteful redundancy.

## ARGUMENT

### A.   ANY EVIDENCE OF BENEFITS (OR LACK THEREOF) IS IRRELEVANT TO THE DETERMINATION OF UNREASONABLE RISK UNDER SECTION 21

"Irrelevant evidence is not admissible." FRE 402. In order to be relevant, evidence must be material; in other words, it must help resolve some fact that "is of consequence in determining the action." Fed. R.

---

1

Evid. 401(b). The instant action is brought under Section 21 of TSCA, which requires Plaintiffs to prove that fluoridation chemicals pose an "unreasonable risk . . . *without consideration of costs or other nonrisk factors.*" 15 U.S.C. § 2620(b)(4)(B)(ii) (emphasis added). To be relevant to this case, therefore, evidence must be of consequence to determining whether there is an unreasonable risk, and the statute prohibits nonrisk factors from informing this determination.  Evidence of benefits of fluoridation chemicals is thus of no consequence to the unreasonable risk determination, and thereby irrelevant.

### 1.  The Plain Meaning, Structure, and Purpose of TSCA Prohibit Consideration of Benefits from the Unreasonable Risk Determination

"Statutory interpretation begins with the text of the statute." *Food & Water Watch, Inc. v. United States Envt'l. Prot. Agency*, 291 F. Supp. 3d 1033, 1044 (N.D. Cal. 2017). "When an examination of the plain language of the statute, its structure, and purpose clearly reveals congressional intent, our judicial inquiry is complete." *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1073 (9th Cir. 2016). Here, the plain language, structure, purpose, and legislative history of TSCA support the interpretation that benefits are a "nonrisk" factor that cannot be considered as part of an unreasonable risk determination.

#### a.  Plain Meaning of "Nonrisk Factor"

Although the TSCA statute does not specifically define "nonrisk factor," an ordinary plain meaning interpretation is that "nonrisk" is anything that is not a risk. Benefits come within this umbrella. Indeed, as evident by the common practice of "risk-benefit" analyses, the words "risk" and "benefit" are generally understood to be diametrically opposite each other. Under a plain meaning interpretation, therefore, benefits are a nonrisk factor, and thereby impermissible to consider as part of an unreasonable risk determination.

#### b.  Structure of the Act

The structure of TSCA provides further support for benefits being a nonrisk factor. The only places in the statute where the word "benefit(s)" appears are sections that govern the *rulemaking* phase. *See* 15 U.S.C. § 2605(c)(2)(A) (EPA "shall consider . . . the *benefits* of the chemical substance . . ."); *id.* §

2605(c)(2)(C) (EPA shall consider the availability of alternatives "that *benefit* health or the environment, compared to the use so proposed to be prohibited or restricted"); *id.* § 2605(g)(1) (EPA "may . . . grant an exemption" from a rule if the condition of use "provides a substantial *benefit* to health" as compared to reasonably available alternatives) (emphases added). Importantly, EPA only enters into the rulemaking phase *if* and *after* an unreasonable risk determination has been made. The Act thus contemplates that benefits will be considered separate and apart from the determination of risk.

Additional support for this interpretation can be found in Section 6(b), which is the section that governs how EPA must conduct its own risk evaluations.[1] In subsection 6(b)(4)(F), Congress set forth the factors that EPA must consider in making an unreasonable risk finding. Here, the statute commands that EPA focus on "*hazards*" and "exposures," but makes no reference to benefits other than to confirm that EPA may "not consider costs or other nonrisk factors." 15 U.S.C. § 2605(b)(4)(F). The structure of TSCA is thus entirely consistent with the plain-language meaning of the word "nonrisk" as encompassing benefits.

### c. Purpose and Legislative History

As discussed above, TSCA forbids consideration of "nonrisk factors" in the risk determination phase, but permits consideration of "benefits" in the rulemaking phase. The requirement that the *determination* of risk precede the *management* of the risk serves several purposes, including (1) eliminating the redundancy of performing two separate risk-benefit analyses, and (2) making a clear delineation between the (strictly science-based) determination of *whether there is a risk* and the (policy-influenced) decision of *if and how to manage the risk*. These purposes would be frustrated by requiring risk-benefit analyses in both phases.

This interpretation is supported by the legislative history as discussed in a Senate report on the 2016 Amendments. 162 Cong. Rec. S3517 (daily ed. June 7, 2016). The Senate report addressed a question that

---

[1] Section 6(b) does not govern risk determinations under Section 21, *Food & Water Watch*, 291 F. Supp. 3d at 1044-47, but it provides some guidance as to what factors are considered "risk" factors under the Act. *See* 15 U.S.C. § 2605(b)(4)(F) (stating the factors that EPA must consider when doing a risk evaluation).

arose regarding how EPA is to carry out its responsibilities under Section 6(c)(2), which identifies the factors that must be considered in the rulemaking phase. *Id.* Since the first two factors (i.e., the chemical's effects on health and the environment) are risk-related, a question was raised as to whether EPA would need to conduct a "second risk evaluation" to address these factors during the rulemaking. *Id.* Senate negotiators clarified that there is no need to do this because EPA "can satisfy these requirements on the basis of the conclusions regarding the chemical's health and environmental effects and exposures in the risk evaluation itself." *Id.* By contrast, the Senate report makes no mention of EPA being able to rely upon the risk evaluation for assessing the last two factors in Section 6(c)(2), which include "benefits of the chemical substance" and effects on "public health." *Id.* The omission of these latter two factors from the Senate's analysis highlight an implicit understanding that the issue of benefits will not be raised during the risk evaluation, and thus no need for concern about redundancy.

### 2. EPA's Own Regulations Are Consistent with Benefits Being a "Nonrisk Factor" that Cannot Be Considered for the Unreasonable Risk Determination

EPA's own regulations share a similar implicit recognition that benefits are the sole domain of the rulemaking phase. In 2017, the EPA issued a Final Rule to explain how EPA will conduct risk evaluations under Section 6(b). 82 Fed. Reg. 33,726 (July 20, 2017). In this Final Rule, the EPA listed factors that the Agency will consider when making risk determinations. 82 Fed. Reg. at 33,735. Consistent with Section 6(b)(4)(F), the Final Rule states that EPA will consider the severity and nature of the *hazard*, but does not mention the word "benefit" once. *Id.* Further, although the Final Rule cites two risk-related factors from Section 6(c)(2), it excludes the two factors from this section that relate to benefits and public health. *Id.*

### 3. The Deputy Director of EPA's Office of Pollution Prevention and Toxics Agrees that Benefits Are a Nonrisk Factor

Consistent with EPA's Final Rule, the Deputy Director for EPA's Office of Pollution Prevention and Toxics, Dr. Tala Henry, agrees that benefits and the likely effect on public health are both "costs and nonrisk factors," and that the "question of benefits for caries prevention would come up in the rulemaking

proceeding." **Ex. 1** at 386:3-19, 391:2-5. Dr. Henry also testified that she doesn't know if it "would even be possible" to include benefits in the risk evaluation, and that "the law is quite explicit about nonrisk factors not being considered a risk factor." *Id.* at 476:6-14, 477:3-13.

### 4. The *Framework for Metals Risk Assessment* Does Not Salvage the Relevance of Benefits Because the *Framework* Only Applies to *Metals* that Are *Essential*, but Fluoride Is Neither

Plaintiffs anticipate that EPA will cite the *Framework for Metals Risk Assessment* (hereafter, "*Metals Framework*") as support for its position that the Court can consider the benefits of fluoridation chemicals in this litigation. The *Metals Framework*, however, provides no support for this position as fluoride is a halogen, not a metal.

Moreover, the *Metals Framework* is very clear that only "essentiality" can be considered in risk assessment, not mere benefit. **Ex. 2** at 1-10 ("*Essentiality* thus should be viewed as part of the overall dose-response relationship for those metals shown to be *essential* . . . . '[R]eference doses' designed to protect against toxicity of excess should not be set below doses identified as *essential*." (emphases added)). This is fatal to any reliance on the *Metals Framework* because EPA has admitted that fluoride is *not* an essential nutrient. **Ex. 3** at 330:1-4. Essential nutrients *need* to be *systemically absorbed* into the body at sufficient levels, otherwise a disease will result.[2] **Ex. 4 at** 267:3-268:1. With fluoride, the CDC's 30(b)(6) representative agreed that there is "overwhelming evidence" that fluoride's predominant benefit comes from *topical* contact with the surface of erupted teeth, not from systemic absorption. **Ex. 5** at 198:21-199:3. Consistent with this, the CDC's 30(b)(6) representative agreed that fluoride provides no known benefit prior to tooth eruption—*i.e.*, the fetal and neonatal period—a period of life where systemic absorption is the only possible mechanism for providing a benefit. **Ex. 5** at 213:19-23, 217:3-19, 224:7-11. The *risk* of fluoride *neurotoxicity*, by contrast, is at its *zenith* during these life stages, as evident by the recent NIH-funded birth cohort studies (Bashash 2017, Bashash 2018, Green 2019, Till 2019). Thus, for the life stages of greatest relevance to this case, there is no known benefit, only risk.

Finally, even *if* ingesting fluoride can provide some marginal benefit, ingestion is not *necessary* (i.e., not essential) for the prevention of caries, or any other disease. **Ex. 6** ¶ 3 ("It is not necessary . . . to

---

[2] Essential nutrients are necessary for the proper functioning of at least one metabolic pathway in the body, yet EPA's expert on benefits, Dr. Charlotte Lewis, admitted that there are no metabolic pathways which require fluoride. **Ex. 4** at 260:5-8, 261:14-22.

ingest fluoride for caries control."). Thus, in contrast to essential metals like iron, fluoride tablets are defined as *medication*, not nutritional supplements, and cannot be purchased over the counter—they require a *prescription*. **Ex. 4** at 272:3-9; 274:7-17 **Ex. 7** ¶¶ 7 & 9. The *Metals Framework* is thus completely inapposite to fluoride.

**B.     ALLOWING EVIDENCE OF BENEFITS SHOULD BE EXCLUDED UNDER FRE 403 BECAUSE IT WILL BE A WASTE OF SCARCE TRIAL TIME, PARTICULARLY SINCE EPA WILL BE CONSIDERING BENEFITS IN THE RULEMAKING PROCEEDING**

If there is any marginal probative value of the evidence on benefits, it is substantially outweighed by the waste of scarce trial time that will result from the substantial testimony it will require, and the fact that EPA will be fully considering benefits during the rulemaking proceeding.

If evidence of benefits is permitted in this case, it will consume a substantial portion of the 8 days that the Court has allotted for trial.[3] To help illustrate this, if evidence of benefits is permitted, Plaintiffs will call three experts (Dr. Ole Fejerskov, Dr, Kathleen Thiessen, and Dr. Christine Wells) to provide non-cumulative testimony on the lack of meaningful benefit from fluoridation chemicals in an age of widespread fluoride toothpaste use. Plaintiffs will also call the CDC's 30(b)(6) representative to confirm CDC's position that (1) fluoride's "predominant benefit" comes from topical contact with teeth, not ingestion, and that (2) fluoridated water provides no known benefit to the fetus and neonate. EPA, in turn, has two experts (Dr. Charlotte Lewis and Dr. Gary Slade) to present the position that fluoridation chemicals in water are effective at preventing caries. Taken together, this testimony will be time-consuming and thereby limit the time available for the critical testimony on risks, which includes four experts and two EPA scientists for Plaintiffs (Dr. Philippe Grandjean, Dr. Howard Hu, Dr. Bruce Lanphear, Dr. Kathleen Thiessen; Dr. Joyce Donohue, and Dr. Kristina Thayer) and three experts for EPA (Dr. Ellen Chang, Dr. Tala Henry, and Dr. Joyce Tsuji).

Finally, the calculus weighs yet further in favor of excluding benefits when considering that EPA

---

[3] Plaintiffs had asked for 10 to 15 days of trial, while EPA had asked for up to 5 days. ECF 55 at 4.

will address the benefits of fluoridation chemicals during the rulemaking proceeding, and may possibly elect to exempt fluoridation from regulation if it finds these benefits to be sufficiently substantial vis-à-vis other alternatives. **Ex. 1** at 388:10-21, 391:2-5. It would be a waste of judicial resources, therefore, to expend scarce trial time hearing evidence on benefits when this very same evidence will be considered anew by EPA during the rulemaking proceeding.

## CONCLUSION

The Court in this case is being asked to make a risk determination, *not* to promulgate a rule. Since Section 21 commands that a risk determination be done "without consideration of costs or other nonrisk factors," there can be no consideration of nonrisk factors at trial. Under ordinary principles of statutory construction, benefits (and lack thereof) are a nonrisk factor, and thus irrelevant and inadmissible. FRE 401 & 402. Further, even *if* there was some marginal probative value to this evidence, it should be excluded under FRE 403 due to the substantial and unnecessary waste of trial time that will result from its admission.

December 19, 2019                          Respectfully submitted,

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by Notice of Electronic Filing this 19th day of December, 2019, upon all ECF registered counsel of record using the Court's CM/ECF system.

*/s/ Michael Connett*
MICHAEL CONNETT

# **Exhibit 1**

FOOD & WATER WATCH

VS

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

**TALA HENRY**

August 20, 2019



888-779-9974

```
 1   after the risk evaluation is completed,

 2   correct?

 3       A    Yes.

 4       Q    And this Section 6(c)(2)(A) sets

 5   forth the costs and nonrisk factors that can

 6   be considered in the --

 7       A    It's not just nonrisk factors at

 8   this point.  Now you're in risk management.

 9       Q    Okay.

10       A    The nonrisk factors may not --

11   nonrisk factors may not be considered during

12   the risk evaluation.

13       Q    Right.

14       A    Now we're in the rulemaking.

15       Q    Right.  Now, we're in the rulemaking

16   which -- would it be fair to say the

17   rulemaking is essentially the risk management

18   phase?

19       A    Yes.

20       Q    And in the risk management phase,

21   the EPA can consider the cost and nonrisk
```

```
1    factors identified in Section 6(c), right?

2         A    Yes.  [Inaudible] cost.

3         Q    And these costs and nonrisk factors

4    include the benefits of the chemical substance

5    or mixture?

6         A    Yes.

7         Q    And these costs and nonrisk factors

8    include the reasonably ascertainable economic

9    consequences of the rule, correct?

10        A    Yes.

11        Q    And the reasonably ascertainable

12   economic consequences of the rule include the

13   likely effect on public health, correct?

14        A    Are you under little (iv)?

15        Q    Yes.

16        A    "The likely effect on the national

17   economy, small business, technological

18   innovation, the environment and public

19   health," correct.

20        Q    Okay.  And these risk management

21   considerations, these factors are only to be
```

1    considered as part of the risk management rule

2    or the risk management process, right?

3         A    Correct.

4         Q    And in your initial report you talk

5    about how EPA, if the court was to find an

6    unreasonable risk, EPA may consider as part of

7    its rulemaking proceeding whether an exemption

8    applies under Section 6(g), correct?

9         A    Correct.

10        Q    And you specifically talk about the

11   exception under 6(g)(1)(C), right?

12        A    Yes.

13        Q    And that exception refers to a

14   situation or refers to the specific condition

15   of use of the chemical substance or mixture as

16   compared to reasonably available

17   alternatives -- sorry, strike that.  I'll ask

18   that again.

19             Under this exemption, EPA can issue

20   an exemption if "the specific condition of use

21   of the chemical substance or a mixture as

```
 1   compared to reasonably available alternatives

 2   provides a substantial benefit to health, the

 3   environment or public safety," right?

 4       A    Right.

 5       Q    So in that -- in consider --

 6       A    It's really more an exemption from

 7   whatever regulatory remedy is being proposed

 8   in the rule.  It's not issuing an exemption

 9   per se, but get with the lawyers on that.

10       Q    Okay.  So basically what you mean

11   there is if the court finds there's an

12   unreasonable risk, EPA could assess whether

13   water fluoridation provides a substantial

14   benefit to health as compared to reasonably

15   available alternatives.  And if EPA makes that

16   conclusion, EPA could exempt fluoridation

17   chemicals from the regulation; is that

18   correct?

19       A    If that specific condition of use,

20   compared to reasonably available alternatives,

21   provides a substantial benefit to health, yes.
```

1      Q     And that's the first -- you wouldn't

2   consider this exemption.  You wouldn't do this

3   analysis until this evaluation phase is

4   complete, correct?

5      A     Yes.

6      Q     That's correct?

7      A     Yes.

8      Q     So EPA -- in doing a risk evaluation

9   of fluoridation chemicals, EPA cannot consider

10  the economic costs of banning fluoridation

11  until the rulemaking phase of the analysis,

12  correct?

13     A     Correct.

14     Q     And EPA cannot consider the benefits

15  of fluoridation chemicals until the rulemaking

16  phase of the analysis, correct?

17        MS. CARFORA:  Objection, form.

18     A     Again, I think there is -- I can't

19  speak on behalf of EPA.

20        BY MR. CONNETT:

21     Q     But based on your understanding --

1    A    But there are different -- I think

2    benefits can be different things.  There's

3    different kinds of benefits and it's not clear

4    to me that health -- like if something

5    prevents a disease.  I'm not sure.  I just

6    don't know if that can be considered.  It

7    hasn't come up.

8        **Q    As you sit here today, you do not**

9    **know one way or the other whether EPA can**

10   **consider fluoride's effects on caries**

11   **prevention as part of the risk evaluation?**

12       A    No, I think that if there was an

13   endpoint such as the severe dental fluorosis,

14   that is an adverse effect that can be

15   considered in the risk evaluation.

16       **Q    What about caries prevention?  Can**

17   **that be considered, that benefit of caries**

18   **prevention?**

19       A    That's not typically how it would be

20   done.  We would be looking for a dose-response

21   to find an adverse effect and protect against

1    that.

2        Q    So the question of benefits for

3    caries prevention would be -- would come up in

4    the rulemaking proceeding?

5        A    Yes.

6        Q    And -- but let's just to say --

7    let's just say, hypothetically speaking, that

8    the EPA can consider caries prevention as part

9    of the risk evaluation.  Are you with me so

10   far?

11       A    Okay.

12       Q    Would the require -- the same

13   scientific standards that applied to risks

14   apply to the assessment of the caries

15   prevention?

16       A    So again, I don't have any

17   experience in which -- in a risk assessment.

18   Basically the flip side of risk was considered

19   so I really don't have a basis on which --

20   anything to gauge that by.

21       Q    Okay.

1   do any of the chemicals under review have

2   health benefits?

3       A    Again, I haven't read each and every

4   one cover to cover but I would say, as a

5   toxicologist, I highly doubt it.

6       Q    So as of right now there would be no

7   template or example that you could use in

8   applying health benefits for a chemical that

9   might have them?

10          MR. CONNETT:  Vague and ambiguous.

11      A    No.  And again, I think that there

12  would need to be internal discussion with

13  counsel as to whether or not and how that

14  would even be possible.

15          BY MS. CARFORA:

16      Q    So based on your experience and your

17  opinion, is it true that noneconomic health

18  benefits could potentially be considered in a

19  risk evaluation?

20          MR. CONNETT:  Asked and answered

21  and -- asked and answered.

1       A    Again, I don't know for sure.

2       BY MS. CARFORA:

3       Q    And based on your experience and

4  your opinion, could noneconomic health

5  benefits be considered as a risk factor?

6            MR. CONNETT:  Asked and answered.

7       A    Noneconomic health benefits.  I

8  don't know.  Again, it's not a bridge we've

9  crossed so we have not deliberated over this

10  but I don't believe -- again, we would have

11  to -- the law is quite explicit about nonrisk

12  factors not being considered in risk

13  evaluation.

14      BY MS. CARFORA:

15      Q    Is it your understanding that --

16  strike that.  I am going to withdraw that.

17           I just want to very quickly ask you

18  to clarify if you turn to your rebuttal

19  summary and tell me what the exhibit number

20  is.

21      A    220.

# Exhibit 2



EPA 120/R-07/001 | March 2007
www.epa.gov/osa

United States
Environmental Protection
Agency

# Framework for Metals Risk Assessment





**Office of the Science Advisor**
Risk Assessment Forum

**1.4.2. All Environmental Media have Naturally Occurring Mixtures of Metals and Metals are Often Introduced into the Environment as Mixtures**

Implications for risk assessment include the following:

- Some metals act additively when they are present together, others act independently of each other, and still others are antagonistic or synergistic. Such interactions are important aspects of assessing exposure and effects.

- Interactions among metals within organisms may occur when they compete for binding locations on specific enzymes or receptors during the processes of absorption, excretion, or sequestration, or at the target site.

- The presence of and amount of other metals are important when conducting and interpreting laboratory tests.

**1.4.3. Some Metals are Essential for Maintaining Proper Health of Humans, Animals, Plants, and Microorganisms**

Implications for risk assessment include the following:

- Adverse nutritional effects can occur if essential metals are not available in sufficient amounts. Nutritional deficits can be inherently adverse and can increase the vulnerability of humans and other organisms to other stressors, including those associated with other metals.

- Excess amounts of essential metals can result in adverse effects if they overwhelm an organism's homeostatic mechanisms. Such homeostatic controls do not apply at the point of contact between the organism and the environmental exposure.

- Essentiality thus should be viewed as part of the overall dose-response relationship for those metals shown to be essential, and the shape of this relationship can vary among organisms. For a given population, "reference doses" designed to protect from toxicity of excess should not be set below doses identified as essential. Essential doses are typically life-stage and gender specific.

**1.4.4. The Environmental Chemistry of Metals Strongly Influences Their Fate and Effects on Human and Ecological Receptors**

Unlike organic chemicals, metals are neither created nor destroyed by biological or chemical processes. However, these processes can transform metals from one species to another (valence states) and can convert them between inorganic and organic forms. Metals also are present in various sizes, from small particles to large masses. Implications for risk assessment include the following:

- The form of the metal (chemical species, compound, matrix, and particle size) influences the metal's bioaccessibility, bioavailability, fate, and effects.

# **<u>Exhibit 3</u>**

**30(b)(6)**

FOOD & WATER WATCH

VS

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

**EDWARD OHANIAN**

October 15, 2018



888-779-9974

1      Q.  I understand you believe there's a benefit

2    to ingesting fluoride, but EPA recognizes that

3    fluoride is not an essential nutrient, correct?

4      A.  That's right.

5      Q.  Okay.  Now, EPA has also recognized that

6    fluoride's primary benefit to the teeth comes from

7    topical contact with the enamel, correct?

8      A.  It has been mentioned about intake,

9    itself, has played a key roll in preventing dental

10    cavities.

11      Q.  But EPA, itself, has recognized that

12    fluoride's primary benefit for caries prevention

13    purposes, comes from topical contact with the

14    outside of the tooth, correct?

15      A.  In this document?

16      Q.  Yes.

17      A.  Yes.

18      Q.  It has recognized that?

19      A.  Yes.

20      Q.  Okay.  So you, as a representative, of the

21    United States Environmental Protection Agency,

# **<u>Exhibit 4</u>**

FOOD & WATER WATCH

VS

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

---

**CHARLOTTE LEWIS**

August 08, 2019

---



888-779-9974

1  is an essential nutrient for the -- for the brain.  So,

2  that would be an example of a metabolic pathway that's

3  fairly simple.  There's very complicated metabolic

4  pathways, as well.

5  Q.      So, an essential nutrient would be something

6  that some metabolic pathway in the body relies upon for

7  proper functioning; correct?

8  A.      In general, that's a true statement.

9  Q.      Okay.  Fluoride is not an essential nutrient;

10  correct?

11  A.      I think there's some controversy there.  I don't

12  personally agree with that statement.

13  Q.      Okay.  Are you aware of any metabolic pathway in

14  the body that requires fluoride?

15  A.      I'm not aware of a metabolic pathway that

16  requires only fluoride and nothing else.

17  Q.      Can you -- are you aware of any metabolic

18  pathway in the body that benefits from fluoride?

19  A.      Well, incorporation of fluoride into -- into

20  bony tissue such as teeth and bone, it's not necessary

21  that there be fluoride there, but one could think of

22  that as a metabolic pathway potentially.

23  Q.      Well, you're saying potentially, you could think

24  of it.  I'm asking you are you aware without speculating

25  of any metabolic pathway in the body that benefits from

1    **fluoride?**

2          MR. DO:  Objection.  Asked and answered.

3    A.     It's difficult because a metabolic pathway is

4    what we're talking about with regard to metabolic

5    pathways and breakdown of macronutrients or

6    incorporating macronutrients is different than what

7    we're talking about with fluoride aiding in the

8    remineralization of teeth.

9          MR. CONNETT:  Okay.  Move to strike as

10   nonresponsive.

11   BY MR. CONNETT:

12   **Q.     Again, the question is very specific.**

13   A.     Okay.

14   **Q.     The question is are you aware of any metabolic**

15   **pathway, without speculating, in the body that benefits**

16   **or requires fluoride --**

17         MR. DO:  Same objections.

18   BY MR. CONNETT:

19   **Q.     -- benefits from or requires fluoride?**

20         MR. DO:  Same objection.  Form.

21   A.     **So, if we use a formal definition of metabolic**

22   **pathways, then the answer is no.**

23   BY MR. CONNETT:

24   **Q.     Okay.  And are you aware of any cellular process**

25   **in the body that requires fluoride for proper**

1    toxic effect.

2    BY MR. CONNETT:

3    **Q.       Are you aware of any other essential nutrient**

4    **that doesn't need to be swallowed to provide its**

5    **benefit?**

6          MR. DO:  Objection.  Form.

7    A.       Think about that.  Not off the -- not off the

8    top of my head.  An exposure to sunlight is what -- is a

9    topical effect that produces vitamin D from cholesterol.

10   So, that -- that would be potentially an example of

11   something that doesn't need to be swallowed.

12   BY MR. CONNETT:

13   **Q.       Okay.  But that scenario, the vitamin D, while**

14   **it's not being ingested, it is being dermally absorbed,**

15   **if you will, and goes into systemic circulation;**

16   **correct?**

17   A.       True.

18   **Q.       And, so, in that scenario that you've**

19   **identified, it is a systemic benefit as being -- that is**

20   **at play?**

21   A.       The conversion of cholesterol to vitamin D then

22   does have a systemic effect.

23   **Q.       Alright.  So, are you aware of any other**

24   **essential nutrient that doesn't -- that doesn't require**

25   **a systemic mechanism for its benefit?**

1    A.       Right now, I can't think of any.

2    Q.       Okay.  So, in your report, you state that water

3    fluoridation is not medication; correct?

4    A.       There is some controversy over this, but

5    community water fluoridation is considered to be a

6    public health strategy directed towards a population and

7    medication is typically directed towards individuals for

8    treatment of disease.

9    Q.       And I'm reading from the bottom of page 6 of

10   your rebuttal --

11   A.       Uh-huh.

12   Q.       -- where you state that CWF does not fit the

13   definition of a medication because CWF is used to

14   prevent dental caries on a population level, not to

15   treat individuals.  That's your position here?

16   A.       That's my position.

17   Q.       What do you base that definition on?

18   A.       Well, I think it's a well-established definition

19   of a public health intervention that's used to prevent

20   disease and not necessarily treat disease.

21   Q.       Okay.  What -- can you -- can you tell me a

22   source that I could look at where I could find the

23   definition of what a medication is that you're relying

24   on?

25   A.       Yes.  Off the top of my head, I can't

1    A.       Insomuch that fluoride supplements in this

2    country are prescribed, yes, they are medications.

3    Q.       And, in fact, yes, as you mentioned, to get

4    fluoride supplements in this country, you do need to get

5    a prescription; correct?

6    A.       This is true.

7    Q.       You cannot get fluoride supplements over the

8    counter; correct?

9    A.       Correct.

10   Q.       Okay.  And fluoride supplements are designed to

11   provide the same dose of fluoride that was originally

12   estimated to be delivered from water fluoridation;

13   correct?

14            MR. DO:  Objection to form.

15   A.       My understanding is that in the 1950s when the

16   benefits of community water fluoridation became

17   apparent, there were attempts to replicate that through

18   the development of fluoride supplements and then that

19   were then intended for the prevention of dental caries.

20   BY MR. CONNETT:

21   Q.       Okay.  The idea that fluoride supplement is we

22   want to provide children the same daily dose of fluoride

23   ingestion that they would receive if they were drinking

24   fluoridated water; correct?

25            MR. DO:  Objection to the extent it misstates

1  prior testimony or evidence.

2  A.      That was the basis in the 1950s for, as I

3  understand it, the development of fluoride supplements.

4  BY MR. CONNETT:

5  **Q.      And fluoride supplements are only available from**

6  **-- by -- by having a prescription?**

7  A.      In the United States.

8  **Q.      Okay.  And, so, you agree that when fluoride is**

9  **used to prevent dental caries, it is a medication?**

10      MR. DO:  Objection to form to the extent it

11  misstates prior testimony.

12  A.      I do not agree that community water fluoridation

13  is a form of mass medication.

14  BY MR. CONNETT:

15  **Q.      Okay.  And your basis for that belief is the --**

16  **summarize.  You accept that fluoride in toothpaste when**

17  **used to prevent caries is a drug, you accept that**

18  **fluoride supplements when used to prevent caries is a**

19  **drug, but you do not believe that fluoride added to**

20  **water to prevent caries is a drug.  Is that a fair**

21  **summary?**

22      MR. DO:  Objection.  Misstates prior testimony.

23  A.      I believe that community water fluoridation is

24  not -- is not a form of medication.  It's a preventive

25  public health strategy and there's a difference between

```
1   medication and public health strategy.

2   BY MR. CONNETT:

3   Q.      Okay.  I'm just going to -- I'm going to

4   summarize what you testified and tell me if I have it

5   correct.

6   A.      Okay.

7   Q.      According to you, your testimony is fluoride is

8   a drug when it's added to toothpaste to prevent caries,

9   fluoride is a drug when added to supplements to prevent

10  caries, fluoride is not a drug when added to water to

11  prevent caries.  Is that a correct summary of your view?

12          MR. DO:  Objection.  Form and to the extent it

13  misstates prior testimony.

14  A.      Insomuch as the definition of medication is

15  somewhat variable and depending on who you refer to,

16  that -- that is essentially a correct characterization

17  of my beliefs.

18  BY MR. CONNETT:

19  Q.      Okay.  You understand that European countries,

20  one of the bases for some of the European countries to

21  reject fluoridation is their view that water

22  fluoridation is a form of mass medication?  Do you

23  understand that?

24          MR. DO:  Objection to the form to the extent it

25  misstates evidence.
```

# **<u>Exhibit 5</u>**

```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                         AT SAN FRANCISCO

 3    _____

 4    FOOD & WATER WATCH, et al.,      |
                                       |
 5                  Plaintiffs,        |  CIVIL ACTION
                                       |
 6             vs.                     |  FILE NO.
                                       |
 7    U.S. ENVIRONMENTAL PROTECTION    |  17-cv-2162-EMC
      AGENCY, et al.,                  |
 8                                     |   ORIGINAL
                  Defendants.          |
 9    _____

10

11         VIDEOTAPE RULE 30(b)(6)DEPOSITION OF
           CENTERS FOR DISEASE CONTROL & PREVENTION
12                         THROUGH
                         CASEY HANNAN
13

14              Tuesday, November 6, 2018

15                   10:15 a.m.

16

17              1600 Clifton Road
            Building 21, Suite 10000
18              Atlanta, Georgia

19         Linda C. Ruggeri, CCR-A-261

20

21

22

23

24

25
```

1    attention to Page 32, and do you see that highlighted

2    portion on the bottom left?

3        A.    Okay.  Now I do, yes.

4        Q.    Okay.  I'm just going to read that.

5    Featherstone writes here:  "Until recently the major

6    caries-inhibitory effect of fluoride was thought to be

7    due to its incorporation in tooth enamel or tooth

8    mineral during the development of the tooth prior to

9    eruption.  This supposed mechanism of action was

10   behind the public health efforts and individual

11   caries-preventive regimens such as the use of fluoride

12   supplements prescribed for children to strengthen the

13   teeth during their development."  Did I read that

14   correctly?

15       A.    Yes.

16       Q.    And as I think we've already discussed,

17   CDC agrees that that is a correct assessment of the

18   history of fluoride?

19       A.    Correct.

20       Q.    Okay.  And then Featherstone writes:

21   "There is now overwhelming evidence that the primary

22   caries-preventive mechanisms of action of fluoride are

23   post eruptive through topical effects for both

24   children and adults."  Did I read that correctly?

25       A.    Yes.

```
1      Q.      And the CDC agrees with that statement,

2  correct?

3      A.      Yes, we do.

4      Q.      Okay.  And if I could direct your

5  attention to Page 34.  Do you see the highlighted

6  portion at the top right of the page?

7      A.      Uh-huh.

8      Q.      Featherstone writes:  "Very importantly,

9  this means that fluoride incorporated during tooth

10  mineral development at normal levels of 20 to 100 ppm

11  even in fluoridated drinking water areas or with the

12  use of fluoride supplements does not alter the

13  solubility of the mineral.  Even at higher levels such

14  as 1000 ppm in the outer few micrometers of enamel,

15  there is no measurable benefit against acid-induced

16  dissolution."  Did I read that correctly?

17      A.      Yes.

18      Q.      And did CDC agree with that statement?

19          MR. DO:  I'm going to object there.  Until

20      you lay the foundation, I don't know if you're

21      asking in his personal capacity or --

22          MR. CONNETT:  This is in the CDC's

23      position --

24          MR. DO:  Okay.

25          MR. CONNETT:  -- with respect to Topic
```

```
 1    literature, correct?
 2         A.     I have to say that I am unfamiliar and not
 3    remembering the grade levels of what the evidence was.
 4         Q.     Okay.  Well, why don't we turn to Page 19.
 5    That might refresh your recollection.
 6         A.     Okay.
 7         Q.     Do you see the box at the bottom titled
 8    "Grading system used for determining the quality of
 9    evidence for a fluoride modality"?
10         A.     Gotcha.  Yes.
11         Q.     And Grade I -- and take your time to
12    review it.  But after you've reviewed it, would you
13    agree with me that Grade I is the highest quality of
14    evidence in this grading system?
15         A.     Okay.  I've reviewed it; and yes, I'll
16    agree --
17         Q.     Okay.
18         A.     -- to your statement.
19         Q.     So the CDC's conclusion in 2001 is that
20    they had good evidence, high-quality evidence, to show
21    that fluoride supplements do not provide a benefit for
22    children when given during pregnancy, correct?
23         A.     Yeah, when given to pregnant women.
24         Q.     Okay.  And is CDC aware of any information
25    published subsequent to 2001 that would in any way
```

```
 1            document, we don't have a position on this

 2            matter.

 3                 Q.     (By Mr. Connett)  Okay.  So if a pregnant

 4      mother wrote an e-mail to CDC asking if I drink

 5      fluoridated water during my pregnancy, will that

 6      provide a benefit to the teeth of my baby, CDC would

 7      not answer yes to that question, correct?

 8                    MR. DO:  I'm not sure how to object to

 9            that question to be honest.  Objection, form.

10                    MR. CONNETT:  Just say form.

11                    MR. DO:  Form.  Form, foundation, calls

12            for speculation.

13                    THE WITNESS:  If we were to get an e-mail

14            as such, we would summarize our understanding of

15            the evidence in saying we have not found evidence

16            that supports -- that shows benefit to the child

17            if ingested -- if community water fluoridation or

18            some other form of fluoride is ingested by the

19            mother.

20            Q.    (By Mr. Connett)  Okay.

21            A.    And we would also instruct them to consult

22      with their attending physician to make those choices.

23            Q.    Okay.  So I'd like to now move on to

24      Topic 13 which has set forth in our notice as "CDC's

25      position, if any, on whether exposure to fluoridated
```

```
 1    studied it because that's not consistent with infant

 2    feeding recommendations.  Exclusively breast-fed is

 3    what we -- exclusive breast-feeding or bottle-feeding

 4    for the first six months is the recommendations we

 5    support, and they're made by a number of

 6    organizations.

 7         Q.     Okay.  So just to clarify because I think

 8    I'm -- is the CDC aware of any evidence demonstrating

 9    benefits from consumption of fluoridated drinking

10    water during the first six months of life?

11         A.     We are not aware of any evidence.

12         Q.     Okay.  If you could, turn back to the 2001

13    report.

14         A.     Okay.

15         Q.     And I'd just like to draw your attention

16    to Page 4.

17              MR. DO:  Are we on Exhibit 53?

18              MR. CONNETT:  Yes.

19              THE WITNESS:  I think so.  Page 4?

20         Q.     (By Mr. Connett)  Yes.  Are you there?

21         A.     Yes.

22         Q.     Okay.  And this is sort of redundant to

23    the previous one, but I'll just read the first

24    sentence at the bottom of the page.  It reads:  "The

25    laboratory and epidemiologic research that has led to
```

# **Exhibit 6**

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

_____

| | |
|---|---|
| FOOD & WATER WATCH, et al., | ) |
| | ) Civ. No. 17-CV-02162-EMC |
| Plaintiffs, | ) |
| | ) |
| vs. | ) **DECLARATION OF** |
| | ) **OLE FEJERSKOV, DMD, PhD** |
| U.S. ENVIRONMENTAL PROTECTION | ) |
| AGENCY, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

_____

I, Ole Fejerskov, declare that:

1.      I have agreed to appear as an expert in this case, and have prepared an expert report which summarizes the opinions that I intend to offer if called to testify at trial. A true and correct copy of my expert report is attached herein as **Exhibit A**.

2.      I am a cariologist who has spent over 40 years studying how fluoride affects dental tissue. To date, I have published about 400 papers, mostly in peer reviewed scientific journals. I have written and edited 10 international textbooks on dental caries and fluoride. I have been editor of several international dental journals, and have served on the boards of dental research organizations such as IADR (International Association of Dental Research), ORCA (European Organization for Caries Research), and the European Research Group of Oral Biology. I have also served as a Member of the World Health Organization Expert Panel on Oral Health and have received 8 honorary doctor degrees

from recognized international universities. A further summary of my qualifications is provided on pages 1-2 of my expert report.

3.     In my expert report, I explain that the beneficial effect of fluoride is due almost entirely to its local (topical) effect (pp. 9-17). It is not necessary, therefore, to ingest fluoride for caries control. By contrast, the detrimental effects of fluoride on dentition are due to its systemic absorption during tooth development, resulting in dental fluorosis which is a hypomineralisation of the enamel (pp. 3, 16-17). In order to obtain a caries reduction effect of fluoride, therefore, it is not important—and indeed inadvisable—to ingest fluoride during tooth formation (pp. 1 & 11). Towards this end, fluoride exposure during the *in utero* and early infancy period is contraindicated for oral health purposes (p. 23).

4.     In my expert report, I also explain that caries has declined in all developed countries since the middle part of the twentieth century, irrespective of water fluoridation (p. 20). For example, most countries in Europe do not fluoridate their water supplies, yet it is well established, and indeed beyond dispute, that the rate of caries has declined dramatically since the 1970s (p. 20). Consistent with this, caries has been documented to continue declining in communities after water fluoridation programs have been terminated (p. 22).

5.     As set forth in my report, it is my professional opinion that the addition of fluoride to public water supplies is no longer justified from an oral health perspective (p. 23).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 8, 2019, in Aarhus, Denmark.

_____
OLE FEJERSKOV, DDS, PhD, Dr. Odont.

# Exhibit 7

1

2

3

4

5

6

7

8

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

SAN FRANCISCO DIVISION

12

13

14  FOOD & WATER WATCH, INC., *et al.*,          Case No. 17-cv-02162-EMC

15                                )

                                  )

16              Plaintiffs,        )

                                  )    DECLARATION OF FREDERICK

17       v.                        )    HYMAN

                                  )

18  ENVIRONMENTAL PROTECTION       )

    AGENCY, *et al.*,              )

19                                )

                                  )

20              Defendants.        )

                                  )

21  ─────────────────────────────  )

22

23  I, FREDERICK HYMAN, declare as follows:

24       1.    I am a Dental Officer within the Division of Dermatology and Dental

25  Products at the Center for Drug Evaluation and Research, U.S. Food and Drug

26  Administration ("FDA").   Based on my duties and responsibilities as a Dental

27  Officer at the FDA, I have personal knowledge of the facts set forth herein and could

28

- 1 -

1    and would testify competently thereto if called to do so.  I make this declaration

2    voluntarily on behalf of the FDA.

3        2.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), "drugs"

4    are defined, in relevant part, as "articles intended for use in the diagnosis, cure,

5    mitigation, treatment, or prevention of disease in man or other animals." 21 U.S.C.

6    § 321(g)(1)(B).  Almost any ingested, topical, or injectable product that, through its

7    label or labeling, is intended for such uses can be regulated by the FDA as a drug.

8        3.    A "new drug" is defined, in relevant part, as any drug that is "not

9    generally recognized, among experts qualified by scientific training and experience

10   to evaluate the safety and effectiveness of drugs, as safe and effective under the

11   conditions prescribed, recommended, or suggested in the labeling."  21 U.S.C.

12   § 321(p)(1).  To be generally recognized as safe and effective, there must be a

13   consensus of expert opinion that the drug product is safe and effective for its labeled

14   indications based upon adequate and well-controlled clinical investigations.

15       4.    Certain categories of over-the-counter drugs may be deemed generally

16   recognized as safe and effective if they conform strictly to regulations known as

17   "final monographs," which set out specific conditions (*e.g.*, active ingredients,

18   formulation, indications for use, warnings, route of administration, etc.).

19       5.    New drugs may not be introduced into interstate commerce unless a

20   new drug application ("NDA") for the drug has been approved by the FDA.  21

21   U.S.C. §§ 331(d) & 355(a).  The FDA does not require products that conform to the

22   conditions of a final monograph and the general conditions described in 21 C.F.R.

23   § 330.1 to have an NDA prior to marketing.

24       6.    For historical reasons, some drugs are available in the United States that

25   lack the required FDA approval for marketing and do not conform to an applicable

26   final monograph.   Because the FDA does not have complete data on these

27   unapproved new drugs and because the universe of such products is constantly

28   changing as products enter and leave the market, the FDA is unable to take action

- 2 -

1   immediately against all of these products.  To make the best use of scarce agency

2   resources, the FDA has prioritized its enforcement efforts with regard to such

3   products that remain on the market.

4                                            **Fluoride**

5      7.   The FDA has authority under the FDCA to regulate drugs intended for

6   use in the prevention of dental caries.  These drugs include but are not limited to:

7   (A) ingestible fluoride tablets, lozenges, and drops intended to prevent dental caries

8   by providing a daily dose generally between 0.25 to 1 mg F/day (hereinafter,

9   "ingestible fluoride products"),[1] and (B) topical over-the-counter fluoride products

10  intended to prevent dental caries, *e.g.*, toothpastes, varnishes, and rinses.  "Ingestible

11  fluoride products" are sometimes referred to in the medical community as "fluoride

12  supplements," but the FDA is not using the latter term to avoid any confusion with

13  products that are "dietary supplements" under the FDCA.

14     8.   The FDA does not regulate the addition of fluoride to public drinking

15  water to prevent dental caries.  The Environmental Protection Agency ("EPA"),

16  pursuant to the Safe Drinking Water Act of 1974, has established maximum

17  contaminant levels for fluoride in public drinking water.   State and local

18  governments are permitted, but not required, to fluoridate public drinking water

19  within the limits set by the EPA to help prevent dental caries.  The decision on

20  whether to add fluoride to public drinking water is made at the state or local level.

21

22

23

24

_____

25  [1] Because there are no approved NDAs for these products, the FDA can make no
    assurances as to the range of dosages that are identified in the labeling for ingestible

26  fluoride products currently marketed in the United States nor has the agency

27  evaluated what might be an appropriate range of dosages (if any) for such products.

28

**Ingestible Fluoride Products**

9.     Ingestible fluoride products intended for use to prevent dental caries are "drugs" under 21 U.S.C. § 321(g)(1), "new drugs" under 21 U.S.C. § 321(p), and prescription drugs under 21 U.S.C. § 353(b)(1)(A).

10.     There are currently no approved NDAs for ingestible fluoride products.

11.     To date, the FDA has not taken enforcement actions to remove ingestible fluoride products from the market.[2]   The FDA has encouraged manufacturers of ingestible fluoride products to pursue regulatory approval of these products by submitting NDAs for the FDA's review.

**Topical Fluoride Products**

12.     On October 6, 1995, the FDA issued a final monograph (hereinafter, "Anticaries OTC Drug Monograph") establishing conditions under which certain topical over-the-counter anticaries drug products, including fluoride-containing toothpastes and treatment rinses, are generally recognized as safe and effective and not misbranded.  21 C.F.R. Part 355.

13.     Among other things, the Anticaries OTC Drug Monograph requires fluoride toothpastes to provide the following warning:  "Keep out of reach of children under 6 years of age.  If more than used for brushing is accidentally swallowed, get medical help or contact a Poison Control Center right away."  21 C.F.R. § 355.50(c)(1).  The first sentence of this statement must be bolded.  *Id.*

14.     Ingestible fluoride products do not meet the conditions in the Anticaries OTC Drug Monograph.

---

[2]  The FDA issued a warning letter to one manufacturer of ingestible fluoride products in January 2016.  The agency does not consider warning letters to be enforcement actions.

1

**Fluoride Neurotoxicity**

2      15.    The FDA has not conducted or sponsored independent research

3  concerning the risk of neurotoxicity associated with exposure to fluoride and does

4  not have in its possession any internal scientific evidence concerning this topic.  The

5  FDA has no position on this topic.

6      16.    The FDA has not conducted or sponsored independent research

7  concerning whether fluoride presents a risk to the functioning of the thyroid gland

8  and does not have in its possession any internal scientific evidence concerning this

9  topic.  The FDA has no position on this topic.

10      17.    The FDA has not conducted or sponsored research concerning the risk

11  of neurotoxicity associated with fluoride exposure in susceptible populations and

12  does not have in its possession any internal scientific evidence concerning this topic.

13  The FDA has no position on this topic.

14

15      I declare under penalty of perjury under the laws of the United States of

16  America that the foregoing is true and correct.   Executed this _5th_ day of

17  _NOVEMBER_, 2018.

18

19  _____

20                    FREDERICK HYMAN

21

22

23

24

25

26

27

28

DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| FOOD & WATER WATCH, INC., et al., | Case No. 17-CV-02162 EMC |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE OF FLUORIDATION CHEMICALS' ALLEGED BENEFITS (OR LACK THEREOF)** |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | Date:   January 7, 2020 <br> Time:  2:30 p.m. <br> Place:  Courtroom 5, 17th floor |

## INTRODUCTION

Plaintiffs have already argued that this Court should grant summary judgment on this same issue.  Dkt. No. 117 at 11.  The Court should reject Plaintiffs' repackaged argument here in their Motion in Limine No. 1 to exclude evidence on community water fluoridation's anti-caries benefits.  Such evidence on *health benefits* is critical to the question of whether community water fluoridation poses an *unreasonable risk* of injury *to health* under the Toxic Substances Control Act ("TSCA").  Further, given EPA's plan to rely primarily on the testimony of one expert regarding health benefits, presentation of such evidence will not be a waste of time under Fed. R. Evid. 403.

## BACKGROUND

It is undisputed that some communities add fluoride to drinking water for the purposes of preventing and reducing dental decay (i.e., dental caries).  Yet, Plaintiffs brought this action under section 21 of TSCA, 15 U.S.C. §2620, seeking an injunction to compel EPA to initiate a rulemaking pursuant to TSCA section 6(a), *id.* §2605(a), to ban the introduction of fluoridation chemicals to drinking water.  To succeed, Plaintiffs must establish there is "an unreasonable risk of injury" to human health "without consideration of costs or other nonrisk factors."  15 U.S.C. § 2620(b)(4)(B)(ii).  "Costs" and "nonrisk factors" are not defined under TSCA.  In support of their contention of unreasonable risk, Plaintiffs originally claimed that community water fluoridation leads to neurotoxic harm with little health benefits.  Petition at 1, attached as Exhibit A to EPA's Fourth Motion in Limine ("The risk to the brain posed by fluoridation additives is an unreasonable risk because . . . there is little benefit in swallowing fluoride"); Compl., Dkt. No. 1, at Paragraphs 91 to 95 (allegations regarding benefits, or lack thereof).  EPA's responded to the administrative petition, in part, that "EPA does not believe that the petition has presented a well-founded basis to doubt the health benefits of fluoridating drinking water.  The petition's argument about fluoridation benefits (*i.e.*, that the risks of neurotoxic health effects from fluoridation are unreasonable in part because they outweigh the expected health benefits arising from exposure to

1

fluoride) depends on first setting forth sufficient facts to establish the purported neurotoxic risks, to which the countervailing health benefits from fluoridation could be compared." *Fluoride Chemicals in Drinking Water; TSCA Section 21 Petition; Reasons for Agency Response*, 82 Fed. Reg. 11878, 11886 (Feb. 27, 2017).

In order to determine whether there is an unreasonable risk, the parties agree that a multi-part risk assessment is necessary.  Under TSCA, this includes hazard assessment, exposure assessment, risk characterization, and finally risk determination.  EPA's Motion for Summary Judgment, Dkt. No. 116 at 5 (discussing *Procedures for Chemical Risk Evaluation Under the Amended Toxic Substances Control Act* ("Risk Evaluation Rule"), 82 Fed. Reg. 33,726 (July 20, 2017)); Henry Decl., Dkt. No. 116-2, Paragraphs 12-23 (same); EPA's Reply in Support of Motion for Summary Judgment, Dkt. No. 119 at 2-3 (same).  But "[t]o account for the number of different [']risk characterization['] approaches and for changing science, EPA [did] not include any specific definition" of "unreasonable risk" in the Risk Evaluation Rule.  *See* 82 Fed. Reg. at 33,734-35. This is because defining specific measures for use in all risk evaluations would be inappropriate to capture the broad set of health and environmental impacts and information that might be relevant to each chemical substance.  82 Fed. Reg. at 33,734-35; Henry Decl., Dkt. No. 116-2, Paragraph 22.  Instead, "relevant factors include[e,] but [are] not limited to: the effects of the chemical substance on health," "the effects of the chemical substance on the environment," "the population exposed," "the severity of hazard . . ., and uncertainties."  82 Fed. Reg. at 33,735.  When there is a finding of unreasonable risk, EPA then considers alternatives to the activity to be regulated as part of promulgating a risk management rule.  15 U.S.C. § 2605(c)(2)(C) ("The Administrator shall consider . . . whether technically and economically feasible alternatives that benefit health . . . compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute . . . .).  EPA's Fourth Motion in Limine at 2-4 (arguing that consideration of benefits is relevant, but evidence regarding alternatives is not at this stage).

In support of their contention that the health benefits of fluoridated drinking water are overstated, Plaintiffs disclosed no less than four experts and the Center for Disease Control's

Defendants' Opposition to Plaintiffs Motion in Limine No. 1
To Exclude Evidence of Benefits
Case No. 17-cv-02162 EMC

("CDC") designated Fed. R. Civ. P. 30(b)(6) witness, Casey Hannan.  Expert Disclosure, attached to EPA's Fourth Motion in Limine as Exhibit D (listing Drs. Ole Fejerskov, Christine Wells, Philipe Grandjean, and Kathleen Thiessen); EPA's Fourth Motion in Limine at 5-6 (discussing each witness).  Dr. Thiessen conducted Plaintiffs' purported risk evaluation and determined that fluoride posed an unreasonable risk.  EPA originally disclosed Drs. Gary Slade (epidemiologist) and Charlotte Lewis (medical doctor) to testify to fluoridated water's health benefits and how Plaintiffs failed to fully account for such benefits.

## ARGUMENT

### I.      Evidence on Fluoride's Health Benefits is Relevant Because Plaintiffs' Own Experts Opine on Them.

It is now too late for Plaintiffs' reversal on the relevance of fluoride's benefits.  Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 117 at 11 (noting the change in position came in the middle of litigation); Petition at 1, attached as Exhibit A to EPA's Fourth Motion in Limine; Compl., Dkt. No. 1, at Paragraphs 91 to 95.  Because Plaintiffs' experts have already provided opinions on the health benefits of fluoride, EPA must be permitted to critique such opinions.  In particular, Dr. Thiessen is Plaintiffs' risk assessor who ultimately concluded that fluoride poses an unreasonable risk.  Her expert report is replete with discussion on the benefits of fluoride (or lack thereof), including an entire separate addendum, indicating that such benefits did not justify the continued practice of community water fluoridation.  Thiessen Report, attached as Exhibit E to EPA's Fourth Motion in Limine.  Thus, seemingly underlying her unreasonable risk determination is consideration of benefits.  And even if Plaintiffs were to argue, *post hoc*, that Dr. Thiessen's opinion on the benefits is divorced from her unreasonable risk determination, EPA should still remain free to critique her failure to account for fluoride's health benefits.

### II.     Health Benefits are Risk Factors, Not Nonrisk Factors, that Must be Considered to Determine Unreasonable Risk.

Neither "risk factors" nor "nonrisk factors" are defined under TSCA, but health benefits are appropriately considered in an *unreasonable risk* determination. Dkt. No. 119 at 20-23.  TSCA

risk evaluations must be conducted for a variety of chemical substances, some of which may have health benefits, but many of which do not. Although EPA has not yet had occasion to conduct a risk evaluation under the amended TSCA that considered a chemical substance with health benefits, health benefits can, as a matter of law, be part of the risk evaluation. Third Henry Decl., attached here as Exhibit A, at Paragraph 4; 82 Fed. Reg. at 33,734-35 (Risk Evaluation Rule not limiting methods of "risk characterization" or defining "risk determination"). For chemical substances that provide a health benefit, the absence of those chemical substances may be characterized as a risk to human health. Third Henry Decl., attached here as Exhibit A, at Paragraph 3[1]; Dkt. No. 119 at 20-23. And the presence of those chemicals can be characterized as a risk reduction. In other words, when a chemical has direct biological health benefits, that health benefit can be a risk factor—in effect, the reducing or cancelling out a health risk/hazard—instead of a nonrisk factor (e.g., economic benefits) that can only be considered in risk management. *See* 15 U.S.C. § 2605(c)(2)(C) (consideration of alternatives).

Here, it undisputed that fluoride reduces dental caries to some degree; those health benefits should therefore be accounted for in a TSCA risk evaluation to determine whether there is an unreasonable risk of injury to health. Fluoride's health benefits can specifically be considered as part of the risk characterization component. As part of this evaluation, the dose-response relationship for both the health benefit and any adverse impacts can be evaluated, including examination of the nature and severity of the adverse effect compared to the beneficial effect. Third Henry Decl., attached here as Exhibit A, at Paragraph 5. Also, following hazard assessment,

---

[1] Contrary to Plaintiffs' motion, Dr. Henry does not "agree[] that benefits are a nonrisk factor." Plaintiffs' Motion in Limine No. 1 at 4. Rather, Dr. Henry testified that the topics listed in TSCA Section 6(c)(2)(A) are "for . . . a risk management rule" and that they are "what you can consider in the rulemaking." Henry Dep., attached as Exhibit 2 to Dkt. No. 119-1, 384:17–20. In response to counsel's question about what may be considered in a rulemaking, "And these costs and nonrisk factors include the benefits of the chemical substance or mixture?," Dr. Henry testified, "Yes." Counsel's reference to "these costs and nonrisk factors" was to "costs and nonrisk factors that EPA can consider in the risk-management phase." *Id.* at 384:9–13. In any event, Dr. Henry's testimony is clear that her view is that those nonrisk factors include *economic* benefits. *Id.* at 147:4–6 (Q: "And the nonrisk factors would include benefits, right?"; A: "Economic benefits, yes."). Thus, Dr. Henry did not testify that *health* benefits of a chemical substance cannot be considered in a TSCA risk evaluation.

exposure assessment, and risk characterization, health benefits can be weighed at the final risk determination phase in deciding whether an identified risk is unreasonable.  82 Fed. Reg. at 33,735 (Risk Evaluation Rule providing a nonexhaustive list of risk determination considerations including "the *effects* of the chemical substance on health") (emphasis added); Third Henry Decl., attached here as Exhibit A, at Paragraph 6.

To illustrate, because some metals are important for human health, EPA must consider their health benefits in the overall dose-response relationship when conducting a risk assessment. *See* Office of the Science Advisor, Framework for Metals Risk Assessment 1-10 (March 2007), attached as Exhibit 11 to EPA's Motion for Summary Judgment, Dkt. No. 116 ("Essentiality thus should be viewed as part of the overall dose-response relationship for those metals shown to be essential . . . .").  Plaintiffs' attempt to cabin consideration of health benefits to essential metals fails for two reasons.  First, both essential metals and fluoride provide a health benefit.  Because Congress mandated that EPA use the Framework for Metals Risk Assessment when conducting risk evaluations for metals and metal compounds under TSCA section 6, there is congressional intent that health benefits can be considered during TSCA risk evaluations. *See* 15 U.S.C. § 2605(b)(2)(E). And second, even if it is only *essential* health benefits that should be considered, fluoride is arguably essential for dental health. Lewis Dep., attached here at Exhibit B, 265:4-9 ("Q: Is it your testimony that fluoride is an essential nutrient? A: I believe … in our current modern society, that fluoride is essential to the prevention of dental caries.").

Plaintiffs' final interpretive argument is premised on an illusory stringent distinction between a "(strictly science-based) determination of whether there is a risk" and a "(policy-influenced) decision of if and how to manage the risk."  Plaintiffs' Motion in Limine No. 1 at 3. But the Risk Evaluation Rule's nonexhaustive list of risk determination factors are not so different than the considerations found in section 6(c).  *Compare* 82 Fed. Reg. at 33,734-35 *with* 15 U.S.C. § 2605(c)(2).[2]  In any event, even if TSCA section 6 does not bind this Court, any plain reading of

---

[2] It is worth noting Plaintiffs simultaneously argue that TSCA section 6(c) risk management requirements apply, but paradoxically that section 6(b) risk determination requirements do not.

"*unreasonable* risk of injury to *health*" would entail some *weighing* of *health* benefits.  Otherwise, any risk would be unreasonable without a counterbalancing consideration.

### III.    It is an Appropriate Use of Time for Each Party to Present One Witness to Testify Regarding the Health Benefits of Fluoride.

The question before this Court is whether community water fluoridation poses an unreasonable risk of injury to *health*.  Plaintiffs' contention that evidence relating to the benefits of fluoride "will waste scarce trial time" is wholly misplaced, as evidence regarding fluoride's *health* benefits goes to the heart of the question before the Court.  Plaintiffs' Motion in Limine No. 1 at 6.  Moreover, Plaintiffs' perceived scarcity of trial time is a problem of Plaintiffs' own creation.  Plaintiffs' case is rife with the presentation of cumulative and irrelevant evidence on the same subjects.  *See* EPA's Second Motion in Limine at 2-4; EPA's Fourth Motion in Limine at 2-6; *Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1996) ("The fact that a party can present the relevant testimony through other witnesses is a factor that weighs in favor of exclusion of the prejudicial testimony.")  Plaintiffs intend to proffer no less than *four* witnesses to speak to the same studies on fluoride and neurotoxicity.  EPA's Second Motion in Limine at 3-4.  Plaintiffs have also proffered *five* witnesses to testify to fluoride's anti-caries benefit (or lack thereof).  EPA's Fourth Motion in Limine at 4-6.  Further, Plaintiffs seek to introduce evidence about *alternatives* to community water fluoridation which is only relevant in the event the Court finds there is an unreasonable risk; and even then, it would only be relevant in EPA's consideration of the resulting risk management rule.  EPA's Fourth Motion in Limine at 2-4 (citing 15 U.S.C. § 2605(c)).

EPA will present its case in chief in the two-week trial allotted with four witnesses compared to Plaintiffs' nine witnesses.  Plaintiffs' Motion in Limine No. 1 at 6.[3]  Of EPA's

---

*Compare* EPA's Motion for Summary Judgment, Dkt. No. 116 at 7 (arguing section 6(b) applies) *with* Plaintiffs' Motion in Limine No. 1 at 3-4 (arguing only section 6(c) applies).

[3] Listing Drs. Ellen Chang, Joyce Tsuji, Tala Henry, and Gary Slade for EPA and Drs. Philippe Grandjean, Howard Hu, Bruce Lanphear, Joyce Donohue, Kristina Thayer, Kathleen Thiessen, Ole Fejerskov, Christine Wells, and Mr. Casey Hannan for Plaintiffs.  To date, EPA has also designated Dr. Charlotte Lewis as a possible, limited rebuttal witness and Plaintiffs have designated Amanda Phelka of NSF International as a fact witness.

6

witnesses, Dr. Gary Slade will explain the anti-caries benefit of fluoridated drinking water.  Given that EPA plans to primarily rely on the testimony of that one expert for benefits, presentation of such evidence will not be a waste of time under Fed. R. Evid. 403.  This Court should not prejudice EPA by excluding health benefits evidence because Plaintiffs are unable to efficiently manage their case.  Instead, granting EPA's motions to exclude cumulative and irrelevant evidence (EPA's Second and Fourth Motions in Limine) will ensure a full and fair presentation of evidence, including evidence on fluoride's benefits.

## CONCLUSION

This Court cannot reach an unreasonable risk determination without first appreciating the health benefits of fluoridated drinking water in addition to any alleged adverse effects.  Not only probative, EPA's streamlined presentation of benefits evidence merits the Court's time.  Therefore, Plaintiffs' Motion in Limine No. 1 should be denied.

Date: December 17, 2019
Washington, DC

Respectfully Submitted,

*/s/ John Thomas H. Do*
Debra J. Carfora
John Thomas H. Do
Brandon N. Adkins
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

Defendants' Opposition to Plaintiffs Motion in Limine No. 1
To Exclude Evidence of Benefits
Case No. 17-cv-02162 EMC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to stipulation, I hereby certify that on this 17th day of December, 2019, a true and correct copy of the foregoing Defendant's Opposition To Plaintiffs Motion in Limine No. 1 was served on counsel for Plaintiffs by email.

/s/ John Thomas H. Do
John Thomas H. Do
United States Department of Justice

Defendants' Opposition to Plaintiffs Motion in Limine No. 1
To Exclude Evidence of Benefits
Case No. 17-cv-02162 EMC

# Exhibit A

Third Declaration of Dr. Tala Henry, PhD

1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**
9          **NORTHERN DISTRICT OF CALIFORNIA**
            **SAN FRANCISCO DIVISION**
10

11  FOOD & WATER WATCH, INC., et al.,

12                  Plaintiffs,                              Case No. 3:17-cv-02162 EMC

13          v.
                                                            **THIRD DECLARATION OF**
14  UNITED STATES ENVIRONMENTAL                             **TALA R. HENRY**
    PROTECTION AGENCY, et al.,
15
                    Defendants.
16

17          I, Tala R. Henry, Ph.D., submit the following third declaration in support of Defendants' response

18  to Plaintiff's Motion in Limine:

19          1.      My credentials are set out in the first and second declarations that I submitted, dated

20  October 8, 2019, and October 23, 2019, respectively, and are incorporated herein by reference.

21          2.      A TSCA risk evaluation includes the following components: (1) hazard assessment, (2)

22  exposure assessment, (3) risk characterization, (4) and risk determination.

23          3.      The absence of a chemical substance may be characterized as a risk to human health.

24          4.      Health benefits of a chemical substance can be incorporated into a TSCA risk evaluation,

25  and thus a risk determination under TSCA. To date, EPA has yet to conduct a TSCA risk evaluation on

26  a chemical substance that has direct biological health benefits. However, health benefits of a chemical

27  substance may be incorporated in the following ways.

28          5.      Health benefits can be included as part of the risk characterization for a chemical

substance that has both adverse health effects and beneficial health effects. Both types of effects can be considered in the risk characterization component of a TSCA risk evaluation. As part of this evaluation it is important to consider the dose-response relationship for both the biological function (i.e., health benefit) and adverse impacts of the chemical substance (e.g., fluoride) or compound (e.g., vitamin C) and to evaluate the characteristics of these relationships. Among the important characteristics that could be examined is the nature and severity of the adverse effect compared to the beneficial effect.

6.      Health benefits can also come into consideration after the hazard assessment, exposure assessment, and risk characterization pieces of the TSCA risk evaluation. For example, health benefits can be incorporated—as a risk factor related to the effects of the chemical substance on health under the condition of use—into the determination of whether the risk is "unreasonable."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 17, 2019, in Washington, DC.

Dr. Tala R. Henry
U.S. Environmental Protection Agency

2

# Exhibit B

Excerpt of Deposition of Dr. Charlotte Lewis, MD

FOOD & WATER WATCH

VS

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

---

**CHARLOTTE LEWIS**

August 08, 2019

---



888-779-9974

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    FOOD & WATER WATCH, et al.,      )

6                                     )

7            Plaintiffs,              )

8                                     )

9        VS.                          )   No. 17-CV-02162-EMC

10                                     )

11   U.S ENVIRONMENTAL PROTECTION      )    **CERTIFIED COPY**

12   AGENCY, et al.,                   )

13                                     )

14            Defendants.              )

15   _____  )

16

17

18   TELEPHONIC VIDEOTAPED DEPOSITION OF CHARLOTTE LEWIS

19                      VOLUME II

20               (PAGES 174 TO 338)

21             THURSDAY, AUGUST 8, 2019

22                 2:30 P.M. PST

23

24

25        REPORTED BY:  ANTHONY JUDE CORDOVA, CSR 12943

```
 1              MR. DO:  Objection.  Form.  Objection to form.
 2   Vague.
 3   BY MR. CONNETT:
 4   Q.      I'll withdraw the question and ask again.  Is it
 5   your testimony that fluoride is an essential nutrient?
 6              MR. DO:  Form.
 7   A.      I believe in our current -- in our current
 8   modern society, that fluoride is essential to the
 9   prevention of dental caries.
10              MR. CONNETT:  Move to strike as nonresponsive.
11   BY MR. CONNETT:
12   Q.      My question is do you believe and is it your
13   testimony that fluoride is an essential nutrient?
14              MR. DO:  Objection with regards to form, the
15   term essential nutrients.  Also, asked and answered.
16   A.      There's various different ways that you can
17   define essential nutrients and my definition of an
18   essential nutrient is, yes, fluoride is an essential
19   nutrient.
20   BY MR. CONNETT:
21   Q.      What's your definition of an essential nutrient?
22   A.      An essential nutrient is one which present at a
23   certain level prevents disease.
24   Q.      And what source are you relying upon for your
25   definition of essential nutrients?
```