DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
SIMI BHAT
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Case No. 17-CV-02162 EMC <br><br> **DEFENDANTS' TRIAL BRIEF** <br><br> Trial: February 3–14, 2020 |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

ISSUES FOR TRIAL ..................................................................................................................... 2

I.     Plaintiffs Lack Standing. ................................................................................................... 2

II.    The Only Relevant Condition of Use is the Addition of Fluoridation Chemicals to Drinking Water Up To 0.7 mg/L. ..................................................................................... 3

III.   Plaintiffs Cannot Show That Fluoridation Chemicals Present an Unreasonable Risk of Injury Under the Condition of Use. .................................................................................. 4

    A.     Plaintiffs Failed to Conduct a Systematic Review. ................................................ 4

    B.     Plaintiffs Did Not Complete a TSCA Risk Evaluation or Any Scientifically Sound Risk Assessment. ............................................................................................... 8

        1.     Dose-Response Assessment ........................................................................ 9

        2.     Exposure Assessment ............................................................................... 10

        3.     Risk Characterization ................................................................................ 10

        4.     Risk Determination ................................................................................... 12

    C.     There is Not Sufficient Information to Integrate Hazards and Exposures into a Risk Characterization. ................................................................................... 13

IV.   Plaintiffs' Failure to Account for the Health Benefits of Fluoridated Water Precludes Establishing that Fluoridation Chemicals Present an Unreasonable Risk. ...................... 14

    A.     The Health Benefits of Fluoride Include the Prevention and Reduction of Tooth Decay. .......................................................................................................... 14

    B.     Plaintiffs Failed to Meaningfully Consider These Health Benefits in Their Purported Risk Determination. ........................................................................... 15

CONCLUSION ............................................................................................................................ 15

# INTRODUCTION

Plaintiffs must prove by a "preponderance of the evidence" that (1) they have standing and (2) the addition of fluoridation chemicals to public drinking water in the United States up to a level of 0.7 milligrams per liter (mg/L) presents an unreasonable risk of injury to health under the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2620(b)(4)(B).

Plaintiffs will be unable to prove they have standing because they cannot show that the only "neurological symptom" that they claim to suffer—headaches—is caused by their exposure to community water fluoridation.

Nor will Plaintiffs be able to prove that the addition of fluoridation chemicals to public drinking water presents an unreasonable risk of injury to health under the condition of use. The most critical pieces of evidence for the Court's unreasonable risk determination at trial will be the testimony of the parties' expert epidemiologists, toxicologists, and risk assessors. Consistent with EPA's reasons for rejecting Plaintiffs' underlying administrative petition, there is not sufficient information reasonably available at this time to integrate regarding the hazards of and exposures to fluoridation chemicals, which is required for an assessment of risk under TSCA or other scientifically sound risk assessment principles. With respect to experimental animal toxicological studies, the most comprehensive and well-conducted developmental neurotoxicity study of learning and memory in animals did not find evidence of developmental neurotoxicity at doses comparable to community water fluoridation in the United States. With respect to human epidemiological studies, most of the studies were conducted in populations where average fluoride exposure levels were well above those attained through artificial fluoridation in the United States and were conducted in rural, impoverished areas where other potential environmental and behavioral influences on neurodevelopment prevent extrapolation to the United States. More recent studies in Western populations have found some statistically significant associations between observed early-life fluoride exposure and subsequent adverse neurodevelopmental outcomes, but even these associations were modest, inconsistent, of questionable biological plausibility, and not coherent with improving trends in IQ, among other issues such as bias and confounding.

Finally, Plaintiffs failed to meaningfully consider the health benefits of community water fluoridation to prevent and reduce tooth decay in their purported determination that this condition of use presents an unreasonable risk of injury to health.

## ISSUES FOR TRIAL

### I.   PLAINTIFFS LACK STANDING.

There is no science or data to prove at all, much less by a "preponderance of the evidence," that Plaintiffs will suffer neurotoxic injury caused by artificially fluoridated drinking water. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs' evidence regarding the effects of fluoride is focused on neurodevelopmental effects in animals and cognitive neurodevelopmental effects in humans. However, the only possible neurotoxic injury Plaintiffs allege is headaches. And the only support for Plaintiffs' allegations are conclusory, unsupported, and self-serving declarations.

Plaintiffs claim that they have standing because their declarants suffered the type of "neurotoxic injury" they alleged in their petition to EPA in the form of headaches. The entirety of the facts supporting their standing was produced in advance of trial. *See* Standing Stip. 2, ECF No. 100. As support for the proposition that artificially fluoridated drinking water causes headaches, Plaintiffs cite a single study, among over 300 others that were attached to the petition; that study discussed headaches as one symptom participants reported from drinking fluoridated water.[1] Pls.' Opp'n to Mot. for Summ. J. 22, ECF No. 127 (hereinafter, "Pls.' Opp'n"). Notably, the single study does not conclude that low levels of fluoride, such as in artificially fluoridated drinking water in the United States, cause headaches. Rather, the *lowest* exposure group consumed fluoridated water at levels at or below 1 mg/L. The study tenuously hypothesized that fluoride "may cause various neurological manifestations among subjects" in the *highest* or "endemic" areas. But the study did not conclude that exposure to fluoride in the lowest exposure group had any effect on self-reported headaches.

Plaintiffs further rely on the headaches reported by two standing declarants—Mr. Adams and Ms. Simms. *Id.* at 22. The "medical evidence" that Plaintiffs rely upon to support Mr. Adams'

---

[1] Sharma J.D., et al., Prevalence of neurological manifestations in a human population exposed to fluoride in drinking water, 42 Fluoride 127–32 (2009).

assertion that fluoridated drinking water causes his headaches consists of two out-of-court statements that are inadmissible hearsay. The only statement by a medical doctor simply summarizes Mr. Adams' self-reporting (via his mother) on his headaches and his speculation on their cause. Standing Stip. Ex. G ¶ 17. The second statement was not made by a licensed medical doctor. *Id.* Moreover, Mr. Adams' mother admits that Mr. Adams would not experience headaches if several other environmental factors were removed. For example, when Mr. Adams left his home to go camping or when Mr. Adams did not take long, hot showers, he would not experience headaches. *Id.* ¶¶ 14–15.

Plaintiffs did not present any medical diagnosis or testing regarding Ms. Simms' susceptibility to headaches after consuming fluoridated water. Ms. Simms admits that she experiences headaches when drinking un-fluoridated water, and that alcohol, lack of sleep, and aged cheese may also trigger her headaches. Standing Stip. Ex. F ¶ 15. Further, she made other health changes at the same time she stopped drinking fluoridated drinking water. *Id.* ¶¶ 17, 19.

Having admitted that many different conditions trigger their headaches, Plaintiffs have the burden to isolate fluoridated drinking water as the source of their headaches. *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1141–42 (9th Cir. 2013) (standing demonstration is weak when there are multiple potential causes of injury). Their standing declarations are not enough to prove that fluoride causes their headaches. And because Plaintiffs seek injunctive relief to remedy future harm, they must show "a very significant possibility of future harm; it is insufficient for them to demonstrate only a past injury." *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996). Because they cannot demonstrate any harm, much less make any showing of future harm by a preponderance of the evidence, this case must be dismissed for lack of standing.

## II. THE ONLY RELEVANT CONDITION OF USE IS THE ADDITION OF FLUORIDATION CHEMICALS TO DRINKING WATER UP TO 0.7 MG/L.

Plaintiffs must demonstrate by a preponderance of the evidence that "the chemical substance" that was the subject of their petition "presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation, under the conditions of

use." 15 U.S.C. § 2620(b)(4)(B)(ii). The underlying petition "sought to regulate only one condition of use, fluoridation of drinking water." *Food & Water Watch, Inc. v. EPA*, 291 F. Supp. 3d 1033, 1053–54 (N.D. Cal. 2017). Plaintiffs refer to three chemical substances containing the fluoride ion that are added to community water systems, which are silicofluoride, fluorosilicic acid, and sodium fluoride (collectively "fluoridation chemicals"). *Id.* at 1052–53. For community water systems that add fluoridation chemicals to their water, the U.S. Public Health Service ("PHS") recommends an optimal fluoride concentration of 0.7 mg/L for the prevention of dental caries. 80 Fed. Reg. 24,936 (May 1, 2015). Plaintiffs have not disputed this contention. *E.g.*, Pls.' Opp'n 5 (referring to studies of effects of water fluoridation that "generally exceed the levels added to water in the U.S. (0.7 mg/L)"). Because these fluoridation chemicals are only used to increase water fluoride concentrations up to 0.7 mg/L, Plaintiffs must demonstrate that exposure to fluoride up to 0.7 mg/L poses an unreasonable risk of neurotoxic injury.

### III. PLAINTIFFS CANNOT SHOW THAT FLUORIDATION CHEMICALS PRESENT AN UNREASONABLE RISK OF INJURY UNDER THE CONDITION OF USE.

If the Court declines to grant summary judgment, Plaintiffs must—but cannot—prevail on the following issues at trial.

#### A. Plaintiffs Failed to Conduct a Systematic Review.

EPA explained in its Motion for Summary Judgment that Plaintiffs must show that their evidence meets the statutory standards for TSCA section 6 decision making, including best available science and weight of the scientific evidence under subsections 26(h) and (i). "Weight of the scientific evidence" means "a systematic review method that uses a pre-established protocol to comprehensively, objectively, transparently, and consistently, identify and evaluate each stream of evidence, including strengths, limitations, and relevance of each study and to integrate evidence as necessary and appropriate based upon strengths, limitations, and relevance." *See* 40 C.F.R. § 702.33; 162 Cong. Rec. S3518 (daily ed. June 7, 2016). Systematic review is not only required under TSCA, it is also a well-accepted methodology in modern risk-assessment practice.

Neither Dr. Kathleen Thiessen nor Dr. Philippe Grandjean, Plaintiffs' experts, systematically reviewed the available literature assessing fluoride exposure and potential

4

neurotoxic effects. Because the opinions offered by Drs. Thiessen and Grandjean are unsupported by subsection 26(h) or (i)'s substantive requirements, Plaintiffs' claim fails as a matter of law. If, in deciding EPA's Motion for Summary Judgment, the Court agrees that its unreasonable risk determination should be based on a systematic review of the scientific evidence but finds that there is an issue of fact whether (1) Plaintiffs "effectively" conducted a systematic review, or (2) Plaintiffs can instead rely on the systematic reviews that EPA's experts conducted, Pls.' Opp'n 16, 18–19, then those issues will be presented at trial.

First, EPA will show that Dr. Thiessen, Plaintiffs' expert toxicologist and risk assessment scientist, did not conduct a systematic review or the effective equivalent of a systematic review. Dr. Thiessen has admitted that she did not take the time and effort required to conduct a systematic review. Nor is Dr. Thiessen's attempt to conduct a risk assessment "effectively" a systematic review. Pls.' Opp'n 16. EPA will show by cross-examination of Dr. Thiessen that she did not identify pre-established criteria to search, select, and critically assess the studies described in her expert report, which are essential tenets to systematic review. Therefore, the conclusions she reached do not rise to the level of objective, impartial assessment of the best available science.

Second, EPA will show that Dr. Grandjean, Plaintiffs' expert epidemiologist, did not conduct a systematic review and that his more limited "narrative review" does not satisfy TSCA's weight of the scientific evidence standard. EPA will show that Dr. Grandjean did not employ any pre-established criteria for selecting which studies to review or how to critically assess those studies in light of the condition of use. Dr. Grandjean is expected to testify that he relied upon a 2006 review by the National Research Council ("NRC 2006 review") of EPA's standards regarding fluoride in drinking water, as well as other meta-analyses. The NRC 2006 review does not meet TSCA's standard for best available science, among other limitations, and Dr. Grandjean failed to consider the settings, methodological qualities, and results of the underlying studies in the meta-analyses he identified.

In any event, the NRC 2006 review only found support for an association between consumption of *high levels of naturally occurring fluoride* in drinking water and neurological effects in humans and recommended further investigation. Most of the evidence was from dental

and skeletal fluorosis-endemic regions that have higher levels of naturally occurring fluoride than the fluoride concentrations added to water in community water fluoridation programs. Specifically, the NRC 2006 review considered adverse effects of water fluoride, focusing on a range of concentrations (2–4 mg/L) well above the current 0.7 mg/L that is recommended for community water fluoridation.

Third, even if Plaintiffs could rely on EPA's systematic reviews, it does not help their case. To address the scientific gaps left by the Plaintiffs' expert reports, EPA's toxicologist, Dr. Joyce Tsuji, and epidemiologist, Dr. Ellen Chang, conducted systematic literature reviews of experimental animal toxicology studies and human toxicological studies, respectively. These systematic reviews demonstrate that the overall weight of scientific evidence does not demonstrate a neurotoxic effect from consumption of fluoridated drinking water at a concentration of 0.7 mg/L.

Dr. Tsuji first evaluated the National Toxicology Program ("NTP")'s 2016 systematic review ("NTP 2016") because of the breadth and depth of its coverage and assessment of the published literature, including foreign language articles. NTP 2016 is a systematic review of the evidence from experimental animal studies of the effects of fluoride on learning and memory. The review found a low-to-moderate level of evidence for developmental neurotoxicity. Studies in animals generally used fluoride drinking water concentrations that far exceeded the levels used in community water fluoridation found in the United States, and the lack of studies at lower fluoride concentrations was identified as a data gap. Since the publication of NTP 2016, additional animal studies have been published.

Dr. Tsuji updated the NTP 2016 review by conducting a systematic search using predefined and well-documented criteria of the more recent literature from 2016 to June 15, 2019. Dr. Tsuji identified twelve developmental neurotoxicity studies published since the 2016 NTP review, including one animal study conducted by NTP researchers specifically to follow up on and fill the gaps regarding the uncertainties and deficiencies noted in the NTP 2016 review, McPherson et al. 2018. McPherson et al. 2018 is the most comprehensive and well-conducted and reported developmental neurotoxicity study of learning and memory in animals among the studies published after the NTP 2016 review. This study addressed many of the uncertainties and

deficiencies of previous studies noted by the NTP 2016 review by using more relevant exposures for U.S. populations, generally adhering to established protocols for conducting developmental neurotoxicity studies, controlling for important sources of variation and bias, examining a number of neurobehavioral test parameters, and evaluating signs of systemic toxicity as well as histopathology of the key areas of the brain and pathological assessment of other organs. McPherson et al. 2018 did not find evidence of developmental neurotoxicity at doses associated with the recommended community water fluoridation level of 0.7 mg/L.

Based on Dr. Tsuji's systematic review, other studies published after the NTP 2016 review had significant issues of study quality, risk of bias, indirectness for testing learning and memory, and hence reliability for basing conclusions, including serious limitations for quantifying the dose-response of fluoride exposure and developmental neurotoxicity and the consistency of this evidence with the epidemiological studies of cognitive effects in children. Drs. Thiessen and Grandjean focused on positive findings of effects or hazard of fluoride and thus they relied on overwhelmingly poor-quality studies on neurotoxicity. Further, Plaintiffs' experts failed to fully consider the results of McPherson et al. 2018.

EPA will offer testimony by its expert epidemiologist, Dr. Ellen Chang, who conducted a systematic review and causal analysis of epidemiology studies on fluoride exposure and neurotoxicity in humans. Dr. Chang will explain in detail the methods and results of her systematic review and causal analysis, and distinctions between her opinions and Plaintiffs' experts' opinions and the bases thereof. Consistent with Dr. Tsuji's systematic search, Dr. Chang conducted extensive searches using predefined and well-documented criteria. Dr. Chang conducted a qualitative assessment of the methodological quality and results of all of the studies identified in her systematic search according to standard epidemiological considerations, including study design, study population, exposure assessment, outcome assessment, and confounder adjustment, based on well-accepted scientific principles. Dr. Chang also considered the potential for publication bias.

In Dr. Chang's expert opinion, most of the available epidemiological studies were conducted in populations where average fluoride exposure levels were well above those attained


through artificial fluoridation in the United States, such that their findings cannot reliably be extrapolated to the potential health effects of consuming artificially fluoridated drinking water in the United States. Further, most were conducted in rural, impoverished areas, where other potential environmental and behavioral influences on neurodevelopment may limit the relevance of results to the United States. In the past two years, the available epidemiologic literature has been augmented by higher-quality studies in Western populations with lower levels of fluoride in drinking water, including some studies that found statistically significant adverse associations. However, the number of such studies is relatively small; methodological uncertainties remain about the assessment of fluoride exposure and neurodevelopmental outcomes; the observed associations were modest, inconsistent, of questionable biological plausibility, and not coherent with improving trends in IQ; and the reported findings are plausibly explained by confounding, bias, and chance.

Finally, EPA will offer testimony by its risk-assessment expert, Dr. Tala Henry, who has over twenty-five years of technical and managerial experience at EPA. Dr. Henry will testify that, based on Dr. Tsuji's systematic review of the toxicological studies and Dr. Chang's systematic review of epidemiological studies, and evaluation of the body of literature, sufficient information is not reasonably available at this time to integrate information on hazards and exposures into a risk characterization, a necessary step for reaching a determination of risk under *any* risk assessment process. Dr. Henry will also testify that due to fundamental and significant flaws in approach, Drs. Thiessen's and Grandjean's conclusions regarding unreasonable risk of neurotoxic effects of fluoride cannot be relied upon, particularly in light of TSCA's scientific standards.

**B.   Plaintiffs Did Not Complete a TSCA Risk Evaluation or Any Scientifically Sound Risk Assessment.**

Risk assessment is the process by which scientific judgments are made concerning the potential for toxicity in humans. Risk assessment involves a hazard assessment (which includes a hazard identification and dose-response assessment), exposure assessment, and risk characterization.

Risk evaluation is a term-of-art under TSCA and refers to the TSCA section 6(b)(4) process for determining whether a chemical substance presents an unreasonable risk of injury to health or the environment under the conditions of use. EPA has promulgated a regulation describing the process for conducting risk evaluations under TSCA as well as guidance to assist interested persons in developing and submitting draft risk evaluations. The regulation sets forth the risk evaluation process, which includes the scientifically accepted tenets of risk assessment, culminating in an ultimate determination of whether a chemical substance presents an unreasonable risk of injury to health or the environment (or a "risk determination") under the conditions of use. The risk determination step was added in the 2016 TSCA amendments and entails weighing a variety of factors (*e.g.*, uncertainties) to determine whether the chemical substance, under the conditions of use, presents an unreasonable risk of injury to health or the environment. Together, the components of EPA's risk-assessment process, coupled with the ultimate risk determination, constitute a "risk evaluation" under TSCA.

Plaintiffs do not dispute that risk must be assessed using some risk-assessment process. The TSCA section 6 risk-evaluation process controls here. However, even under the risk-assessment methodology that Plaintiffs attempted to perform, there are fatal gaps.

### 1. Dose-Response Assessment

The human evidence analyzing the possible association between exposure to fluoride in drinking water and neurological effects demonstrates a pattern of findings in Asian populations that higher fluoride exposure may be associated with decreased IQ or other cognitive impairments in children. However, the findings are based primarily on higher, endemic levels of fluoride exposure (*i.e.*, greater than 1.5 mg/L in drinking water). Even when focusing on findings from studies with exposures similar to those in the United States that can be evaluated for dose-response, effects on cognitive neurodevelopment are inconsistent (as explained below), and therefore cannot satisfy Plaintiffs' burden to show unreasonable risk of injury to health.

Moreover, while the studies relied upon by Plaintiffs may suggest an association between fluoride exposure and neurotoxic injury at fluoride exposures well above concentration levels used in community water fluoridation programs, any fluoride concentration-to-IQ-effect relationship

9

(i.e., dose-response relationship) can only be inferred from this evidence because the actual fluoride exposures are not measured. Such an inference is scientifically inappropriate because establishing a dose-response relationship (i.e. causation) between exposure to a toxicant and an effect is the most fundamental concept in toxicology.

### 2. Exposure Assessment

Plaintiffs' failed to conduct an exposure assessment. TSCA requires that EPA "take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use" when conducting a risk evaluation, which EPA implements through an exposure assessment. 15 U.S.C. § 2605(b)(4)(F)(iv). Dr. Grandjean has admitted that he "did not attempt to calculate a specific exposure limit." Grandjean Decl. ¶ 8, ECF No. 117-1. And Dr. Thiessen merely relied upon the fluoride intake estimate in the NRC 2006 review. Dr. Henry will testify that an exposure assessment includes some discussion of the size, nature, and types of individuals or populations exposed to the chemical, as well as discussion of the uncertainties in this information. Dr. Henry will further testify that whether the NRC 2006 data should be relied upon for an exposure assessment in this case requires a careful analysis of whether it can and should be used for measuring exposure today. Dr. Thiessen did not conduct this analysis.

### 3. Risk Characterization

When examining neurotoxicity, risk characterization requires that the hazard assessment, including hazard identification and dose-response analysis, and exposure assessment for given populations be combined to estimate the risk for a particular endpoint (*e.g.*, neurotoxicity). The goal of risk characterization is to compare toxicity levels with exposure doses to determine if risk may occur under a specific scenario or condition of use. Because Plaintiffs have not conducted an exposure assessment, they cannot perform a risk characterization.

Further, Dr. Thiessen's analysis is not credible, and Dr. Grandjean's analysis is not a risk characterization. Dr. Thiessen attempted to conduct a risk characterization using a margin-of-exposure analysis, which is a quantitative calculation for comparing toxicity to exposure. Dr. Thiessen's margin-of-exposure analysis is flawed because she relied on animal studies without having conducted a systematic review to consider uncertainties or weaknesses in the data or

whether the data are fit for her analysis, and she did not incorporate a proper exposure analysis. Moreover, Dr. Henry will testify that while a margin-of-exposure analysis can be used to characterize risk, it does not constitute, on its own, a finding of "unreasonable risk" under TSCA.

Unlike the available data for fluoride, there are chemical-specific situations for which it is scientifically appropriate to extrapolate a dose-response relationship from animal data to humans. This usually involves the application of uncertainty factors to a point of departure.[2] The size of the final uncertainty factor used will vary from agent to agent and will require the exercise of scientific judgment, taking into account interspecies variation, the shape of the dose-response curve, and the neurotoxicity endpoints observed. In the case of fluoride, however, the evidence will demonstrate that the body of animal evidence is inadequate for identifying specific doses that would result in adverse effects. Because the animal studies are inadequate for identifying neurotoxic effects from fluoride exposure, it is not scientifically appropriate to extrapolate a dose-response relationship from animal data to humans. Dr. Tsuji will testify as to the strengths and weaknesses of the methodology and results of the studies on which Dr. Thiessen relied. Dr. Tsuji will also testify regarding Dr. Thiessen's inappropriate application of uncertainty factors in her margin-of-exposure analysis.

Dr. Grandjean's benchmark-dose calculation is one way to calculate a point of departure for a dose-response assessment, but it is not the equivalent of a risk characterization, as Plaintiffs appear to believe. *See* Pls.' Reply 4, ECF No. 126 (arguing that an "unacceptable risk" exists by application of a margin-of-exposure analysis and citing to Dr. Grandjean's benchmark-dose calculation). EPA has explained in its summary judgment briefing and in its First Motion in Limine why testimony regarding the benchmark-dose calculation performed by a person not a witness in this case, which Dr. Grandjean pasted into his expert report, is inadmissible. Even if it were admissible, because Dr. Grandjean assumes the level of exposure to artificially fluoridated water

---

[2]   In toxicology, the point of departure is the point on a toxicological dose-response curve established from experimental data or observational data generally corresponding to an estimated low-effect level or no-effect level. For purposes of TSCA risk evaluations, EPA generally sets the point of departure at the no-effect level.

programs in the United States, rather than conducting an exposure assessment, the benchmark-dose calculation cannot support a risk characterization.

### 4. Risk Determination

Plaintiffs offer the testimony of Dr. Thiessen, a risk-assessment scientist, regarding a risk assessment she conducted pursuant to EPA's *Guidelines for Neurotoxicity Risk Assessment* ("1998 Guidelines"). As explained in EPA's Opposition to Plaintiffs' Motion for Summary Judgment, the 1998 Guidelines were designed to guide EPA's evaluation of substances that are suspected to cause neurotoxicity, in line with substantive standards established in the statutes administered by the Agency at that time. But risk-assessment principles have evolved. Since 1998, the National Academy of Sciences ("NAS") and the National Research Council ("NRC") expanded scientifically accepted risk-assessment principles, placing equal emphasis on fully characterizing the scope, uncertainties, limitations, and strengths of risk assessments. Finally, the 1998 Guidelines do not reflect the additional risk determination step added by the 2016 TSCA amendments. Thus, even if Dr. Thiessen's risk assessment under the 1998 Guidelines were acceptable, Plaintiffs' conclusion that Dr. Thiessen's risk characterization is evidence of unreasonable risk omits the risk-determination step added in the 2016 TSCA amendments.

In fact, none of Plaintiffs' experts conducted an analysis that resulted in and supported a risk determination under TSCA section 6. Only one of Plaintiffs' experts—Dr. Thiessen—even attempted to do so. But it is undisputed that Dr. Thiessen proceeded under the wrong section of TSCA. Dr. Thiessen used EPA's risk-assessment approach and regulatory framework for screening new chemicals under TSCA section 5, not the more robust risk-evaluation criteria for existing chemicals under TSCA section 6. Plaintiffs seek injunctive relief from this Court under TSCA section 6 via this section 21 proceeding. Dr. Henry will testify regarding the differences in EPA's approach under both sections and why Dr. Thiessen's analysis is not sufficient to support a risk determination under TSCA section 6.

**C.     There is Not Sufficient Information to Integrate Hazards and Exposures into a Risk Characterization.**

Plaintiffs must demonstrate an actual risk of neurotoxic injury at 0.7 mg/L before the Court can determine whether adding fluoridation chemicals to reach a concentration of 0.7 mg/L presents an unreasonable risk. At trial, EPA will show that the recent prospective birth cohort studies on which Plaintiffs primarily rely are not sufficient to conclude that fluoride presents an unreasonable risk to U.S. populations.

Plaintiffs contend that the recent prospective birth cohort studies in Mexico City and Canada, taken together with other studies of fluoride neurotoxicity in animals and humans, demonstrate that the practice of community water fluoridation in the United States poses an unreasonable risk of injury to health when assessed according to well-established risk-assessment methods. Although some associations were observed between early-life, low-level fluoride exposure and subsequent adverse neurodevelopmental outcomes, the evidence will demonstrate that these associations were modest, inconsistent, of questionable biological plausibility, and not coherent with improving trends in IQ. In addition, bias, confounding, and chance are reasonable explanations for the observed associations, which cannot reliably be attributed to community water fluoridation practices.

EPA will present testimony by Dr. Chang regarding the methodologies and conclusions of recent studies of fluoride's effects in Western populations, including the Mexico City and Canada studies. Dr. Chang will testify that the number of such studies is relatively small; methodological uncertainties remain about the assessment of fluoride exposure and neurodevelopmental outcomes; and the reported findings are plausibly explained by confounding factors, bias, and chance. For example, Dr. Chang will testify that the measure of exposure in those studies was fluoride concentration in "spot" urine, which reflects a short-term measure of exposure and is influenced by other factors. Further, one of the Canadian studies identified a statistical association for one sex but not the other. The heterogeneity in results is so far unexplained and inconsistent with, for example, the results of the Mexico City studies. And there is potential for confounding or bias in light of the overall weak statistical associations observed across the recent studies. Further, EPA

will show that Plaintiffs' experts have not conducted an analysis to support that the studies are generalizable to the United States population.

EPA will also present testimony by Dr. Henry that, based in part on Dr. Chang's systematic review and evaluation of the body of literature, information is not reasonably available at this time to conclude that the recommended drinking water fluoridation level of 0.7 mg/L would cause developmental neurotoxicity in the United States population, and therefore, the body of evidence is insufficient to integrate hazards and exposures into a risk characterization.

### IV. PLAINTIFFS' FAILURE TO ACCOUNT FOR THE HEALTH BENEFITS OF FLUORIDATED WATER PRECLUDES ESTABLISHING THAT FLUORIDATION CHEMICALS PRESENT AN UNREASONABLE RISK.

Fluoridated water has health benefits such that the absence of community water fluoridation creates a risk of injury to health. These health benefits should be factored into any evaluation of whether there is an *unreasonable* risk of injury to *health*. There is no dispute that fluoridated drinking water prevents and reduces dental decay (*i.e.*, dental caries) to some degree; instead, the parties' experts dispute the degree and nature of its prophylactic effect. But rather than review the science in any systematic manner, Plaintiffs understated and failed to meaningfully consider the health benefits in light of any neurotoxic effects.

#### A. The Health Benefits of Fluoride Include the Prevention and Reduction of Tooth Decay.

Dental caries are caused by "acid attacks" on the teeth and, left untreated, result in a loss of enamel (*i.e.*, a cavity). Dental caries are a prevalent, chronic disease, particularly among children. They can lead to significant pain, tooth loss, other harms, and otherwise diminish quality of life. Fluoridated drinking water affects the dental caries process during two periods: when enamel is developing prior to teeth eruption and after the teeth erupt.[3] The "pre-eruptive" mechanism occurs when fluoride in the bloodstream (from the consumption of fluoride) is incorporated into the developing enamel, altering its mineral structure, making it more resistant to acid-attacks when the tooth later erupts in the mouth. The "post-eruptive" mechanism occurs when

---

[3] The pre-eruptive versus post-eruptive mechanisms are sometimes inaccurately or imprecisely called the "systemic" and "topical" effect.

fluoride in the mouth comes into contact with erupted teeth. Fluoride comes into contact with erupted teeth upon the initial consumption of fluoridated drinking water and subsequently when consumed fluoride increases the amount of fluoride present in saliva. This "post-eruptive" mechanism (1) inhibits acid demineralization of enamel from an acid attack, (2) increases the efficacy of re-mineralization of the enamel following an acid attack, and (3) inhibits bacterial enzymes which produce acid attacks.

As Dr. Gary Slade will testify, a critical appraisal of the scientific literature, including systematic reviews, supports the conclusion that fluoride in drinking water leads to the meaningful prevention and sizable reduction of dental caries. These health benefits exist for both children and adults, for both primary (i.e., "baby") and permanent teeth, and are more pronounced among lower income populations which reduces health disparities. Access to community water fluoridation in childhood lays the foundation for caries prevention throughout life. It is therefore no wonder why water fluoridation is widely hailed as a public health breakthrough.

      **B.**     **Plaintiffs Failed to Meaningfully Consider These Health Benefits in Their Purported Risk Determination.**

Plaintiffs bear the burden of showing an *unreasonable risk* of injury to *health*. But they failed to conduct a systematic review of the literature regarding fluoride's health benefits or a dose-response analysis of those health benefits to meet that burden. This prevents any examination of the nature and severity of the purported adverse neurotoxic effects compared to the beneficial health effects. Indeed, it is unclear if Plaintiffs did any comparison at all. As such, Plaintiffs' presentation is incomplete, preventing a determination that fluoridated drinking water poses an unreasonable risk of injury to health.

## CONCLUSION

For the forgoing reasons, and based on the evidence that will be presented at trial, the Court should dismiss for lack of standing or, if the Court finds that Plaintiffs have standing, enter judgment in favor of EPA.[4]

---

[4] If this Court enters judgment for Plaintiffs, this case should proceed to briefing on the timing of rulemaking proceedings under 15 U.S.C. § 2620(b)(4)(B)(ii).

Date: December 19, 2019
Washington, D.C.

        Respectfully Submitted,

        */s/ Brandon N. Adkins*
        Brandon N. Adkins
        Debra J. Carfora
        John Thomas H. Do
        Simi Bhat
        United States Department of Justice
        Environment & Natural Resources Division
        P.O. Box 7611
        Washington, D.C. 20044
        Tel: (202) 616-9174
        Fax: (202) 514-8865
        Email: brandon.adkins@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of December, 2019, a true and correct copy of the foregoing Defendant's Trial Brief was filed electronically with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

<u>/s/ Brandon N. Adkins</u>
Brandon N. Adkins
United States Department of Justice

Defendants' Trial Brief
Case No. 17-cv-02162 EMC