DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al.,<br><br>Plaintiffs,<br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>Defendant. | Case No. 17-CV-02162 EMC<br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Date: January 7, 2020<br>Time: 2:30 p.m.<br>Place: Courtroom 5, 17th floor |

*Findings of Fact*

1. Fluoride is an ion of the element fluorine, which occurs naturally in the environment.

2. A common source of human exposure to fluoride is drinking water, in which the fluoride ion may be present naturally or added in controlled amounts for the prevention of dental caries.

3. While some communities in the United States have elevated levels of naturally occurring (or "background") fluoride in their drinking water, other communities add fluoridation chemicals to drinking water to reach a recommended optimal concentration for reducing tooth decay of 0.7 milligrams per liter (mg/L).

4.	Plaintiffs complain that three chemical substances containing the fluoride ion, silicofluoride, fluorosilicic acid, and sodium fluoride (collectively "fluoridation chemicals"), present an unreasonable risk of neurotoxic injury when added to community drinking water supplies.

5.	The U.S. Public Health Service ("PHS") recommends that communities add fluoridation chemicals to community water supplies to achieve a concentration optimal for dental caries prevention. This practice has been widely hailed as a successful public health breakthrough for dental caries prevention.

6.	PHS guidance is advisory, not regulatory, which means that while PHS recommends community water fluoridation as a public health intervention, the decision to fluoridate water systems is made by state and local governments.

7.	For community water systems that add fluoridation chemicals to their water, PHS currently recommends an optimal fluoride concentration of 0.7 mg/L (parts per million [ppm]) to maintain caries prevention benefits and reduce the risk of dental fluorosis.

8.	On November 23, 2016, a Toxic Substance Control Act ("TSCA") section 21, 15 U.S.C. § 2620, petition was submitted by the Fluoride Action Network, Food & Water Watch, Organic Consumers Association, the American Academy of Environmental Medicine, the International Academy of Oral Medicine and Toxicology, Moms Against Fluoridation, and the following individuals signing on behalf of themselves and their children: Audrey Adams of Renton, Washington, Jacqueline Denton of Asheville, North Carolina, Valerie Green of Silver Spring, Maryland, Kristin Lavelle of Berkeley, California, and Brenda Staudenmaier of Green Bay, Wisconsin.

9.	The general objective of the petition was to urge EPA to protect the public and susceptible subpopulations from an alleged risk of neurotoxic injury by banning the addition of fluoridation chemicals to community drinking water supplies. The specific action sought was a rule, under TSCA section 6(a)(2), 15 U.S.C. § 2605(a)(2), to prohibit the purposeful addition of fluoridation chemicals to U.S. water supplies. Thus, the petition sought to regulate fluoridation

chemicals under only one condition of use, the addition of fluoridation chemicals to community water systems for the prevention of dental caries.

10. The only standing declarants that Plaintiffs allege suffer any neurotoxic injury are Audrey Adams, on behalf of her son Kyle Adams, and Julie Simms, a member of Food and Water Watch and Fluoride Action Network. Plaintiffs allege that community water fluoridation causes the declarants to suffer headaches.

11. The petition did not describe "headaches" as an injury of concern. The only reference to headaches was in one study, among over three hundred others, attached to the petition.

12. The only scientific study on headaches and fluoridation chemicals that Plaintiffs cite does not conclude that levels of fluoride used in community water fluoridation programs cause headaches.

13. The evidence upon which Plaintiffs rely regarding the effects of fluoride is focused on neurodevelopment effects in animals and cognitive neurodevelopmental effects in humans.

14. Risk assessment is the process by which scientific judgments are made concerning the potential for toxicity in humans.

15. Risk assessment involves a hazard assessment (which includes a hazard identification and dose-response assessment), exposure assessment, and risk characterization.

16. Hazard identification involves examining all available experimental animal and human data and the associated doses, routes, timing, and durations of exposure to determine qualitatively if an agent causes neurotoxicity in that species and under what conditions.

17. Because a complex interrelationship exists among study design, statistical analysis, and the biological significance of the data, a great deal of scientific judgment, based on experience with the principles of study design and statistical analysis, is required to adequately evaluate the data on neurotoxicity.

18. EPA's Office of Pollution Prevention and Toxics ("OPPT") is responsible for health and environmental risk evaluations of existing chemicals under TSCA. As such, OPPT

conducts risk evaluations, pursuant to TSCA, to determine whether a chemical substance or category of chemical substances, under the conditions of use, presents an unreasonable risk of injury to health or the environment.

19. TSCA risk evaluations include the general components of risk assessment with one additional step. The final step of a risk evaluation is to determine whether the chemical substance, under the conditions of use, presents an unreasonable risk of injury to health or the environment. These determinations must specify whether a chemical substance does or does not present an unreasonable risk of injury to health or the environment under the conditions of use.

20. EPA developed guidance to assist interested persons in submitting draft risk evaluations. In accordance with TSCA, the guidance addresses the quality of the information and the process to be followed by interested persons in reaching risk determinations under TSCA.

21. "Best available science" means science that is reliable and unbiased. Use of best available science involves the use of supporting studies conducted in accordance with sound and objective science practices, including, when available, peer reviewed science and supporting studies and data collected by accepted methods or best available methods (if the reliability of the method and the nature of the decision justifies use of the data).

22. "Weight of the scientific evidence" means a systematic review method, applied in a manner suited to the nature of the evidence or decision, that uses a pre-established protocol to comprehensively, objectively, transparently, and consistently, identify and evaluate each stream of evidence, including the strengths, limitations, and relevance of each study, and to integrate evidence as necessary and appropriate based upon the strengths, limitations, and relevance.

23. Application of weight of the scientific evidence analysis is an integrative and interpretive process. It is more than simply tallying of the number of studies considered positive or negative. Certain principles of weight of the evidence evaluations are universal, including foundational considerations such as objectivity and transparency, and the general process. This process starts with assembling the relevant information, evaluating the information for quality and relevance, and finally synthesizing and integrating the different lines of evidence to support conclusions.

Defendants' Proposed Findings of Fact and Conclusions of Law
Case No. 17-cv-02162 EMC

24. Plaintiffs did not complete a risk assessment.

25. Plaintiffs did not integrate and assess the different lines of evidence on neurotoxic effects from exposure to fluoride.

26. Plaintiffs did not describe the weight of scientific evidence for neurotoxic effects from exposure to fluoride.

27. As explained in EPA's guidance, systematic review "is a scientific investigation that focuses on a specific question and uses explicit, pre-specified scientific methods to identify, select, assess, and summarize the findings of similar but separate studies. The goal of systematic review methods is to ensure that the review is complete, unbiased, reproducible, and transparent."

28. Consistent with EPA guidance, the key elements of systematic review include: (1) a clearly stated set of objectives (defining the question); (2) developing a protocol which describes the specific criteria and approaches that will be used throughout the process; (3) applying the search strategy criteria in a literature search; (4) selecting the relevant papers using predefined criteria; (5) assessing the quality of the studies, including analysis of the strengths and limitations, using predefined criteria; (6) analyzing and synthesizing the data using the predefined methodology; (7) interpreting the results and presenting a summary of findings.

29. An integrated systematic review of the available scientific evidence is necessary to meet the minimum scientific requirements for modern risk assessment practices.

30. Plaintiffs did not conduct a systematic review.

31. Among others, effects on neurological function and endocrine function (e.g., thyroid, parathyroid, pineal) were assessed in the 2006 National Research Council ("NRC") report Fluoride in Drinking Water: A Scientific Review of EPA's Standards (NRC 2006). The NRC review considered adverse effects of water fluoride, focusing on a range of concentrations (2–4 mg/L), which is more than double (and is as much as quadruple) the current 0.7-mg/L recommendation for community water fluoridation (NRC 2006). Other than severe fluorosis, the NRC did not find sufficient evidence of adverse health effects at fluoride levels below 4.0 mg/L.

32. The NRC report identified several challenges to evaluating the literature, citing deficiencies in reporting quality, lack of consideration of all sources of fluoride exposure, incomplete consideration of potential confounding, selection of inappropriate control subject populations in epidemiological studies, absence of demonstrated clinical significance of reported endocrine effects, and incomplete understanding of the biological relationship between histological, biochemical, and molecular alterations with behavioral effects (NRC 2006).

33. In 2016, the National Toxicology Program ("NTP") conducted a systematic review of the evidence from experimental animal studies on the potential effects of fluoride exposure on learning and memory ("NTP 2016"). The NTP 2016 systematic review found a low-to-moderate level of evidence that learning and memory deficits occur in experimental animals exposed to fluoride. Studies in animals generally used fluoride drinking water concentrations that far exceeded the levels used in community water fluoridation found in the United States, and the lack of studies at lower fluoride concentrations was identified as a data gap.

34. Based on the findings in the NTP 2016 review, NTP conducted additional animal studies before carrying out a full systematic review to incorporate human, animal, and potentially relevant mechanistic evidence in order to reach hazard identification conclusions for fluoride and learning and memory effects.

35. Based on a weight of the scientific approach, the existing animal data are inadequate to evaluate the effects of fluoride on learning and memory to support the cognitive effects observed in humans primarily due to the inability to separate the learning and memory effects from the effects on motor activity or motor coordination.

36. Although multiple categories of mechanistic data provide some evidence of adverse effects in the brain of animals, the mechanistic basis for fluoride-associated cognitive neurodevelopmental harm is not sufficiently understood for these findings to contribute to a finding of unreasonable risk of injury to health.

37. There are a number of basic data quality issues associated with the human studies Plaintiffs rely upon to demonstrate unreasonable risk of injury.

38. Many of the human studies cited by Plaintiffs are cross-sectional in design and are affected by antecedent-consequent bias.

39. Cross-sectional studies are most useful for developing hypotheses about possible causal relationships between an exposure and a health effect, but are rarely suitable for the development of a dose-response relationship for risk assessment.

40. The antecedent-consequent bias means it cannot be determined whether the exposure came before or after the health effects, since both are evaluated at the same time.

41. Plaintiffs give all studies equivalent weight, regardless of their quality and, therefore, have not properly accounted for the relatively poor quality of the exposure and effects data in the cited human studies.

42. Plaintiffs fail to set forth the strengths and limitations of each of the studies in the overall database of available studies or any criteria or rationale for identifying a neurotoxic hazard of fluoride. Thus, Plaintiffs have not provided a scientifically defensible basis to conclude that neurotoxicity is a hazard of fluoride exposure under the conditions of use—at concentrations up to 0.7 mg/L.

43. Plaintiffs fail to set forth the strengths and limitations of each of the studies in the overall database of available studies or any criteria or rationale for selecting the particular studies from which they attempt to derive a reference dose ("RfD"). Thus, Plaintiffs have not identified a scientifically defensible basis to support a quantitative dose-response analysis.

44. Without setting forth the strengths and limitations associated with each study and the weight of the scientific evidence provided by the available data, a necessary step in any assessment, it is not possible to characterize the hazard or identify suitable studies for extrapolating an RfD if appropriate.

45. The studies cited by Plaintiffs as evidence of neurotoxic effects of fluoride in humans have significant limitations for using them to draw conclusions on whether neurotoxicity is associated with fluoridation of drinking water.

46. When an association is suggested between an exposure and a disease outcome, the studies must be assessed to determine whether the effect is truly because of exposure or if

7
DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 17-cv-02162 EMC

alternate explanations are possible by adjusting for potential confounders, such as diet, behavior, and socioeconomic status, in order to appropriately assess the real relationship between the exposures to a specific substance and health effects. Because these confounding factors are present, but not recognized or controlled for, it is not possible to attribute effects to fluoride exposure as opposed to other factors or exposures.

47. While the studies relied upon by Plaintiffs may suggest an association between fluoride exposure and neurotoxic injury, any fluoride concentration-to-IQ effect relationship (i.e., dose-response relationship) is only inferred where actual fluoride exposures are not measured.

48. Where there has been shown an association between fluoride exposure and neurotoxic injury, that association occurs at fluoride exposures well above those found in artificially fluoridated U.S. drinking water. As such, any inference of hazard does not apply to the use of fluoride chemicals in public water systems at an optimal concentration for reducing tooth decay of 0.7 mg/L.

49. The studies relied on by Plaintiffs do not establish a dose-response relationship between fluoride exposure and neurotoxicity. Establishing a dose-response relationship between exposure to a toxicant and an effect is the most fundamental concept in toxicology. An understanding of this relationship is essential for the study of toxic materials. The lack of a dose dependent increase in effect with increasing exposure is a critical limitation of the data.

50. Without setting forth the strengths and limitations associated with each study and the weight of the scientific evidence provided by the available database, it is not possible to determine whether uncertainty factors are necessary for calculating an RfD because any selection of uncertainty factors and their magnitude should be based on the quality of the data, extent of the database and sound scientific judgment, and consider the impact of having adverse effects from an inadequate exposure as well as an excess exposure.

51. Based on a weight of the scientific evidence approach, when limiting studies to lower risk-of-bias studies that evaluated IQ at fluoride levels across a continuum that included the low dose range, results are inconsistent and, therefore, inadequate to evaluate whether fluoride exposure is associated with cognitive effects.

52. Based on a weight of the scientific evidence approach, the evidence for cognitive effects in adults is limited and, therefore, inadequate to evaluate whether fluoride exposure in adults is associated with cognitive effects.

53. Dental caries is one of the most common childhood diseases and continues to be problematic in all age groups. Historically, the addition of fluoridation chemicals to drinking water has been credited with significant reductions of dental caries in the U.S. population. In 2000, the then-Surgeon General noted that ''community water fluoridation remains one of the great achievements of public health in the twentieth century—an inexpensive means of improving oral health that benefits all residents of a community, young and old, rich and poor alike.''

54. Dental caries is caused by "acid attacks" on the teeth and, left untreated, results in a loss of enamel (i.e. a cavity), pain, tooth loss, and a degradation of quality of life.

55. Fluoride has been proven to protect teeth from decay by helping to rebuild and strengthen the tooth's surface or enamel.

56. Fluoridated drinking water acts on teeth during two time periods: when enamel is developing prior to teeth eruption and after the teeth erupt.

57. The "pre-eruptive" mechanism occurs when fluoride in the bloodstream (from the consumption of fluoride) is incorporated into the developing enamel, altering its mineral structure, making it more resistant to acid-attacks when the tooth later erupts.

58. The "post-eruptive" mechanism occurs when fluoride in the mouth comes into contact with erupted teeth. Fluoride comes in contact with erupted teeth upon the initial consumption of fluoridated drinking water and subsequently when consumed fluoride increases the amount of fluoride present in saliva.

59. The health benefits of fluoride include having fewer cavities, less severe cavities, less need for fillings and removing teeth, and less pain and suffering.

60. These health benefits exist for both children and adults, for both primary (i.e., "baby") and permanent teeth, and are more pronounced among lower income populations which reduces health disparities.

61. The scientific evidence related to fluoride shows that community water fluoridation is effective in decreasing dental caries prevalence and severity

62. Plaintiffs failed to meaningfully account for fluoride's health benefits in their risk assessment and have otherwise failed to provide sufficient information on health benefits to do so.

*Conclusions of Law*

1. Plaintiffs lack standing.

2. Under TSCA section 21(a), 15 U.S.C. § 2620(a), any person can petition EPA to initiate a rulemaking proceeding for the issuance, amendment, or repeal of a rule under TSCA section 6, 15 U.S.C. § 2605.

3. Under TSCA section 21(b)(1), the petition must set forth the facts which is claimed establish that it is necessary to issue a rule under section 6.

4. If EPA denies a petition filed under TSCA section 21(a), the petitioner may commence a civil action in a district court of the United States to compel the Administrator to initiate a rulemaking proceeding; any such order may not prescribe the content of a rule or the outcome of such a proceeding.

5. TSCA section 21(b)(4)(B)(ii) requires Plaintiffs to demonstrate by a preponderance of the evidence that "the chemical substance" that was the subject of their petition "presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation, under the conditions of use." 15 U.S.C. § 2620(b)(4)(B)(ii).

6. To initiate a rule under TSCA section 6(a), a determination must be made "in accordance with section 6(b)(4)(A) that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture . . . presents an unreasonable risk.'' 15 U.S.C. § 2605(a).

7. TSCA section 6(b)(4)(A) requires a risk evaluation process to "determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation . . . under the conditions of use." 15 U.S.C. § 2620(b)(4)(A).

8. TSCA establishes the minimum criteria that must be considered as part of a risk evaluation. 15 U.S.C. § 2605(b)(4)(F).

9. Decisions about risk of injury to health must be based on application of a "weight of the scientific evidence" approach, 15 U.S.C. § 2625(i), and must meet TSCA's scientific standards for identifying and characterizing the "best available science" for its intended purpose, 15 U.S.C. § 2625(h).

10. The petition sought to regulate fluoridation chemicals under only one condition of use, the use of fluoride chemicals to adjust the fluoride concentration in public water systems to an optimal concentration for reducing tooth decay of 0.7 mg/L. Thus, Plaintiffs must demonstrate that use of fluoridation chemicals to reach a concentration of 0.7 mg/L presents an unreasonable risk of neurotoxic effects.

11. Decisions about unreasonable risk of injury to health must consider effects from an inadequate exposure (or health benefits of the chemical substance) as well as from an excess exposure (or adverse health effects).

12. An integrated systematic review of the available scientific evidence is necessary to meet the statutory requirements of TSCA for determining whether fluoridation chemicals pose an unreasonable risk of injury to health or the environment when used to increase water fluoride concentrations to 0.7 mg/L.

13. A scientifically defensible risk assessment is necessary for determining whether fluoridation chemicals pose an unreasonable risk of injury to health or the environment when used to increase water fluoride concentrations to 0.7 mg/L.

14. Plaintiffs have not set forth a scientifically defensible basis to conclude that they have suffered or will suffer neurotoxic harm as specifically complained of in the petition as a result of their exposure to fluoride in the United States through the purposeful addition of fluoridation chemicals to drinking water.

15. Plaintiffs have not set forth a scientifically defensible basis to demonstrate by a preponderance of the evidence that fluoridation chemicals pose an unreasonable risk of injury to

health or the environment when used to increase water fluoride concentrations to 0.7 mg/L as part of community water fluoridation programs for dental caries prevention in the United States.

Date: December 19, 2019

Respectfully Submitted,

*/s/ Debra J. Carfora*
Debra J. Carfora
John Thomas H. Do
Brandon N. Adkins
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of December, 2019, a true and correct copy of the foregoing Defendants' Proposed Findings of Fact and Conclusions of Law was filed electronically with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Brandon N. Adkins*
Brandon N. Adkins
United States Department of Justice