C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

_____

| | |
|---|---|
| FOOD & WATER WATCH, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| U.S. ENVIRONMENTAL PROTECTION | ) |
| AGENCY, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

Civ. No. 17-CV-02162-EMC

**DECLARATION OF MICHAEL CONNETT IN SUPPORT OF PLAINTIFFS' ADMINISTRATIVE MOTION TO ADD FOUR EPA DOCUMENTS TO THE EXHIBIT LIST, PURSUANT TO LOCAL RULE 7-11**

_____

I, Michael Connett, submit the following declaration in support of Plaintiffs' Administrative Motion to Add Four EPA Documents to the Exhibit List, Pursuant to Local Rule 7-11.

1.     I am lead counsel for Plaintiffs in the above-captioned case.

2.     On December 19, 2019, I received an email from John Thomas Do, counsel for EPA, notifying me that EPA had found some errors in the filed exhibit list that would need to be corrected through an errata or amendment to the exhibit list. This email can be found on page 4 of **Exhibit A** which is attached hereto. Plaintiffs did not object to amending the exhibit list.

3.     On January 15, 2020, I emailed Mr. Do asking to set up a call to discuss amending the exhibit list, and notified him that Plaintiffs wished to add EPA's risk evaluation of NMP to their exhibit list. This email can be found on page 3 of Exhibit A.

4.     Plaintiffs first became aware of the NMP risk evaluation on January 10, 2020, which is the

date I found and downloaded it from the following EPA website: https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-evaluation-n-methylpyrrolidone-nmp-0. According to this website, EPA released the NMP risk evaluation "in November 2019."

5.      In my January 15, 2020 email to Mr. Do, I explained that Plaintiffs also wished to add a placeholder exhibit for any other risk evaluations that EPA might release prior to trial.

6.      On January 31, 2019, I discovered the EPA's *Exposure Factors Handbook* while doing research related to this case, including a 2019 update that EPA had published that presents data on tap water intake in the US population. Neither myself nor my clients were previously aware of these documents.

7.      As of January 31, 2020, I had not yet received a response to my January 15, 2020 email, so I followed up with an email on February 3, 2020 to again request a meeting to discuss amending the exhibit list. This email can be found on page 3 of Exhibit A.

8.      Following my February 3 email, I had several telephonic meet and confers with EPA counsel to discuss the various changes that the parties desired to make to the exhibit list, including the documents that Plaintiffs wished to add.

9.      On February 7, 2020, I provided EPA with an updated list of 6 EPA documents that Plaintiffs wished to add to their exhibit list, including the NMP risk evaluation, the placeholder for future risk evaluations, the Introduction chapter to the *Exposure Factors Handbook*, the 2019 Update to the *Handbook*, and two other documents that Plaintiffs since withdrew. This email can be found on page 1 of Exhibit A.

10.      On February 19, 2020, I received an email from Debra Carfora, counsel for EPA, informing me that EPA would not consent to Plaintiffs' request to add the EPA documents to the exhibit list and that Plaintiffs would need to file an Administrative Motion under Local Rule 7-11.

11.      On February 24, I emailed EPA counsel to notify them that (1) Plaintiffs were no longer seeking to add two of the six documents that I had previously identified, and (2) Plaintiffs would narrow

the placeholder exhibit to just EPA's risk evaluation for TCE. (According to the following EPA website, the TCE risk evaluation was "released in February 2020": https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-evaluation-trichloroethylene-tce-0.)  I received an email from Ms. Carfora later that day stating that EPA maintained its objection. This email correspondence from February 24 is attached as **Exhibit B.**

12.     **Exhibit C** is an excerpt of the Introduction to EPA's *Exposure Factors Handbook*, which I downloaded from EPA's website at: https://www.epa.gov/expobox/about-exposure-factors-handbook. Through the accompanying Administrative Motion, Plaintiffs seek to add the full chapter to their Exhibit List.

13.     **Exhibit D** is an excerpt of the Updated Chapter 3 to EPA's *Exposure Factors Handbook*, which I downloaded from EPA's website at: https://www.epa.gov/expobox/about-exposure-factors-handbook. Through accompanying Administrative Motion, Plaintiffs seek to add the full chapter to their Exhibit List.

14.     **Exhibit E** is an excerpt of a document that EPA produced in this case which summarizes the opinions EPA expects Dr. Tala Henry will provide at trial.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 26, 2020, in El Segundo, California.

*/s/ Michael Connett*
MICHAEL CONNETT
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
Tel: (310) 414-8146
Email: mconnett@waterskraus.com

DECLARATION OF MICHAEL CONNETT

# **<u>Exhibit A</u>**

| | |
|---|---|
| **From:** | Michael Connett |
| **To:** | "Carfora, Debra (ENRD)" |
| **Cc:** | Adkins, Brandon (ENRD); Lynch, Shelbie (ENRD); Bhat, Simi (ENRD); Do, John Thomas (ENRD) |
| **Subject:** | RE: Amending Exhibit List |
| **Date:** | Friday, February 07, 2020 10:33:00 AM |

Hi Debbie,

I will be available to meet and confer anytime after 11 am EST on either Thursday or Friday, so just let me know what works best on your end. And, yes, I will work to get you my edits early next week. The additional documents that I will be adding to the Exhibit List are as follows:

- EPA's Draft Risk Evaluation for NMP
- EPA's Draft Risk Evaluations that are completed between now and trial
- EPA Website: https://www.epa.gov/expobox/about-exposure-factors-handbook
- EPA's Exposure Factors Handbook – Introduction (2011)
- EPA's Exposure Factors Handbook – Chapter 3 (2011)
- EPA's Exposure Factors Handbook – Chapter 3, Updated (2019)

Per your email, let's discuss the date for exchanging all exhibits next week during our meeting.

Michael

**waterskrauspaul**

**Michael Connett  |  Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880  |  Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskraus.com.

---

**From:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Sent:** Thursday, February 06, 2020 4:32 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>; Lynch, Shelbie (ENRD) <Shelbie.Lynch@usdoj.gov>; Bhat, Simi (ENRD) <Simi.Bhat@usdoj.gov>; Do, John Thomas (ENRD) <John.Do@usdoj.gov>
**Subject:** RE: Amending Exhibit List

Michael,

I'm writing to memorialize our telephone call this afternoon and propose that we confer at the end of next week, after the parties have an opportunity to exchange proposed edits to the exhibit list. As noted by JT's email of December 19 (the pretrial filing deadline), we noticed some typographical errors on the exhibit list that we would like to correct in a supplemental filing.  We also understand from your email that some of Plaintiffs' objections, previously noted on December 19, may not have been included in the filed version of the exhibit list.  We proposed that the parties exchange their proposed edits early (to mid) next week and then confer on those edits on Thursday or Friday next

week.

Further, your email of January 15, put us on notice that Plaintiffs' intend to add exhibits to the list between now and trial. As an initial matter, we object to any additions to the exhibit list as untimely. Nevertheless, if you send a list of the late additions for our consideration, the parties can confer further on this issue next week.

Finally, we also need to confirm a final date for exchanging electronic exhibits.

Thanks,

DEBRA J. CARFORA, Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division
202.514.2640

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Thursday, February 6, 2020 4:09 PM
**To:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>
**Cc:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Subject:** RE: Amending Exhibit List

JT – Just following up on this. Does Monday at 4 pm EST work for you?

**waterskrauspaul**

**Michael Connett  | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880  |  Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskraus.com

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Tuesday, February 04, 2020 11:43 AM
**To:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>
**Cc:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>; Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Subject:** Re: Amending Exhibit List

Yes, that would be fine. How about Monday at 4 pm EST?

---

**From:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>
**Sent:** Tuesday, February 4, 2020 10:58:34 AM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>; Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>

**Subject:** Re: Amending Exhibit List

Michael,

I am out of the office this week .  Can we schedule something for early next week?  Thanks.

Sent from my iPhone

On Feb 3, 2020, at 3:09 PM, Michael Connett <mconnett@waterskraus.com> wrote:

Hey guys – Can we set up a call this week to discuss amending the exhibit list? We have a few changes to make on our end, and based on JT's email from December, I gather you have some things that need to be corrected as well. I am available to speak any day this week after 11 am EST.

<image002.png>
**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

---

**Michael Connett  | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880  | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskraus.com.
**From:** Michael Connett
**Sent:** Wednesday, January 15, 2020 10:50 AM
**To:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>
**Subject:** RE: Fluoride Expert Costs

Hi JT – Here's an email I sent in December that I suspect may have got lost in the shuffle, so I am re-sending.

Also, we should set up a call sometime soon to discuss amending the exhibit list, which you had mentioned wanting to do back in December. I need to double-check, but I think some of my objections that I sent on December 19 did not get onto the filed list. If that is the case, I will want to add those objections to the amended list. Also, there is one draft EPA risk evaluation that was not included in the list that I will want to add to the Amended List – i.e., the draft evaluation for NMP. I will also want to create a placeholder for any draft risk evaluations that are released between now and trial. I assume, of course, that EPA will object to these draft risk evaluations, as it has done for the other ones. In any event, if you want to discuss this, I will be available anytime next Wednesday, Thursday and Friday.

003

Michael

**Michael Connett  | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskraus.com.

**From:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>
**Sent:** Thursday, December 19, 2019 11:57 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>; Bhat, Simi (ENRD)
<Simi.Bhat@usdoj.gov>; Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Subject:** RE: Appendix B for final review

Michael,

Attached is the final exhibit list that I will be filing shortly.  Please know that in the
quality check tonight, we discovered some errors in some of the citations, mostly
typographical.  But rather than unilaterally make those edits now, I will highlight them
for you at a later time, hopefully tomorrow.  I suspect that once we exchange exhibits
next week, both sides may discovery more discrepancies.   I therefore recommend
holding off on filing any errata or amended exhibit list until after we receive each
other's exhibits next week and confer.   Thank you.

Regards,
JT

**From:** Do, John Thomas (ENRD)
**Sent:** Thursday, December 19, 2019 10:29 PM
**To:** 'Michael Connett' <mconnett@waterskraus.com>
**Cc:** Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>; Bhat, Simi (ENRD)
<SBhat@ENRD.USDOJ.GOV>; Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Subject:** RE: Appendix B for final review

Per our conversation, I am not in a position to substantively respond to these
objections, specifically the relevancy ones.  As such, you agreed that it has been the
practice to respond to relevancy objections at trial.  In any event, I will add your
objections to the final exhibit list and add "FRE 703" for our response.
Ok, rounding third…

JT

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Thursday, December 19, 2019 9:58 PM
**To:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>

004

**Cc:** Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>; Bhat, Simi (ENRD)
<SBhat@ENRD.USDOJ.GOV>; Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Subject:** Re: Appendix B for final review

JT - There are a few final objections I've been asked to make to 5 docs, which I've
highlighted in blue. I apologize for the late addition.


**Michael P. Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Thursday, December 19, 2019 6:52 PM
**To:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>
**Cc:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>; Bhat, Simi (ENRD)
<Simi.Bhat@usdoj.gov>; Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Subject:** Re: Appendix B for final review

Respective exhibit list should probably be plural, but otherwise fine.

Can u call me about the Exhibit List? There's one small issue I need to discuss
before you file.

Sent from my iPhone

---

**From:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>
**Sent:** Thursday, December 19, 2019 6:41:52 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>; Bhat, Simi (ENRD)
<Simi.Bhat@usdoj.gov>; Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Subject:** Appendix B for final review

See attached for final review of the cover to the exhibits.

---

**From:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Sent:** Thursday, December 19, 2019 9:17 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD)
<BAdkins@ENRD.USDOJ.GOV>; Bhat, Simi (ENRD) <SBhat@ENRD.USDOJ.GOV>
**Subject:** RE: Appendix C for final review

Michael,

Per our conversation, attached is the edited version. Please confirm for filing.

Thanks,

DEBRA J. CARFORA, Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division
202.514.2640

---

**From:** Carfora, Debra (ENRD)
**Sent:** Thursday, December 19, 2019 8:40 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>; Bhat, Simi (ENRD) <SBhat@ENRD.USDOJ.GOV>
**Subject:** Appendix C for final review

Michael,

Attached is Appendix C. Please review and confirm this is ok for filing.

Thanks,

_____
DEBRA J. CARFORA, Trial Attorney
Environmental Defense Section | Environment and Natural Resources Division |
U.S. Department of Justice
Phone | office 202.514.2640 | cell 202.598.3835 | fax 202.514.8865
4 Constitution Square, 150 M Street NE, Room 4.1114, Washington DC 20001

<ENV_DEFENSE-#884344-v10-fluoride__DRAFT_joint_exhibit_index.pdf>

# **Exhibit B**

| | |
|---|---|
| **From:** | Michael Connett |
| **To:** | Carfora, Debra (ENRD) |
| **Cc:** | Do, John Thomas (ENRD); Bhat, Simi (ENRD); Adkins, Brandon (ENRD) |
| **Subject:** | RE: Plaintiffs" Administrative Motion to Add EPA Docs to Exhibit List |
| **Date:** | Monday, February 24, 2020 10:09:08 AM |

Thanks. As I explained during our meet and confer, neither Plaintiffs nor its counsel had these documents during the fact or expert discovery period. (Two of the documents were not even published until after expert discovery was completed.)

Further, Plaintiffs disagree that EPA can or will be prejudiced by the Court knowing what EPA has stated in its own publications. This is particularly troubling since the EPA will be asking the Court to make findings of fact that are directly contradicted by EPA's own published work. For example, EPA is taking the position in this litigation that a risk determination cannot be made because, inter alia, there is not a credible exposure assessment. Yet, EPA completed its own exposure assessment last year and it fully supports the exposure estimates from Dr. Thiessen. It would be a miscarriage of justice for the EPA to maintain this argument while depriving the Court of EPA's own documents which disprove it.

At the end of the day, we should all want the truth to govern the result of this litigation – and Plaintiffs' motion will facilitate that.

**waterskrauspaul**

**Michael Connett  |  Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880  |  Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskraus.com.

**From:** Carfora, Debra (ENRD) <Debra.Carfora@usdoj.gov>
**Sent:** Monday, February 24, 2020 9:44 AM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Do, John Thomas (ENRD) <John.Do@usdoj.gov>; Bhat, Simi (ENRD) <Simi.Bhat@usdoj.gov>; Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Subject:** RE: Plaintiffs' Administrative Motion to Add EPA Docs to Exhibit List

Thanks for the update.

EPA maintains its position that it would be prejudiced by plaintiffs supplementing the exhibit list with any documents that were not identified at a deposition, as material relied on by an expert, nor produced or identified in response to written discovery requests. Supplementing the exhibit list would give plaintiffs an unfair advantage, contrary to the spirit of the disclosure obligations set out in the Federal Rules and the Court's deadlines.

Best,

DEBRA J. CARFORA, Senior Trial Counsel

Environmental Defense Section
Environment and Natural Resources Division
202.514.2640

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Monday, February 24, 2020 12:29 PM
**To:** Carfora, Debra (ENRD) <DCarfora@ENRD.USDOJ.GOV>
**Cc:** Do, John Thomas (ENRD) <JDo@ENRD.USDOJ.GOV>; Bhat, Simi (ENRD)
<SBhat@ENRD.USDOJ.GOV>; Adkins, Brandon (ENRD) <BAdkins@ENRD.USDOJ.GOV>
**Subject:** Plaintiffs' Administrative Motion to Add EPA Docs to Exhibit List

Debbie – In our motion, we will not be asking to add the following two docs to the Exhibit List:

- EPA Website: https://www.epa.gov/expobox/about-exposure-factors-handbook
- EPA's Exposure Factors Handbook – Chapter 3 (2011)

In addition, after learning that EPA released its draft risk evaluation for TCE last week, we will be modifying the following exhibit as follows:

- "EPA's Draft Risk Evaluations that are completed between now and trial" will now be: "**EPA's Draft Risk Evaluation for Trichloroethylene**"

I presume this will not change EPA's position on this matter, but to the extent it does, please let me know. I hope to file the motion by the end of the day.

**waterskrauspaul**

**Michael Connett | Attorney**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskraus.com

# **Exhibit C**

*Exposure Factors Handbook*

## Chapter 1—Introduction

**TABLE OF CONTENTS**

LIST OF TABLES ................................................................................................................................1-ii
LIST OF FIGURES .............................................................................................................................1-ii

1.   INTRODUCTION........................................................................................................................1-3
     1.1.   BACKGROUND AND PURPOSE...................................................................................1-3
     1.2.   INTENDED AUDIENCE .................................................................................................1-3
     1.3.   SCOPE .............................................................................................................................1-3
     1.4.   UPDATES TO PREVIOUS VERSIONS OF THE HANDBOOK....................................1-4
     1.5.   SELECTION OF STUDIES FOR THE HANDBOOK AND DATA PRESENTATION .............1-4
            1.5.1.   General Assessment Factors ................................................................................1-5
            1.5.2.   Selection Criteria .................................................................................................1-5
     1.6.   APPROACH USED TO DEVELOP RECOMMENDATIONS FOR EXPOSURE
            FACTORS .........................................................................................................................1-7
     1.7.   SUGGESTED REFERENCES FOR USE IN CONJUNCTION WITH THIS
            HANDBOOK.....................................................................................................................1-9
     1.8.   THE USE OF AGE GROUPINGS WHEN ASSESSING EXPOSURE ...........................1-10
     1.9.   CONSIDERING LIFE STAGE WHEN CALCULATING EXPOSURE AND RISK .............1-11
     1.10.  FUNDAMENTAL PRINCIPLES OF EXPOSURE ASSESSMENT................................1-13
            1.10.1.  Exposure and Dose Equations .............................................................................1-15
            1.10.2.  Use of Exposure Factors Data in Probabilistic Analyses ...................................1-17
     1.11.  AGGREGATE AND CUMULATIVE EXPOSURES........................................................1-18
     1.12.  ORGANIZATION OF THE HANDBOOK .......................................................................1-19
     1.13.  REFERENCES FOR CHAPTER 1 ...................................................................................1-20

APPENDIX 1A RISK CALCULATIONS USING EXPOSURE FACTORS HANDBOOK DATA AND
     DOSE-RESPONSE INFORMATION FROM THE INTEGRATED RISK INFORMATION
     SYSTEM (IRIS)..................................................................................................................1A-1

*Exposure Factors Handbook*

## *Chapter 1—Introduction*

# 1.   INTRODUCTION

## 1.1.   BACKGROUND AND PURPOSE

Some of the steps for performing an exposure assessment are (1) identifying the source of the environmental contamination and the media that transports the contaminant; (2) determining the contaminant concentration; (3) determining the exposure scenarios, and pathways and routes of exposure; (4) determining the exposure factors related to human behaviors that define time, frequency, and duration of exposure; and (5) identifying the exposed population. Exposure factors are factors related to human behavior and characteristics that help determine an individual's exposure to an agent. The National Academy of Sciences (NAS) report on *Risk Assessment in the Federal Government: Managing the Process* and subsequent publication of the U.S. Environmental Protection Agency's (EPA) exposure guidelines in 1986 identified the need for summarizing exposure factors data necessary for characterizing some of the steps outlined above (U.S. EPA, 1987a; NRC, 1983). Around the same time, the U.S. EPA published a report entitled *Development of Statistical Distributions or Ranges of Standard Factors Used in Exposure Assessment* to support the 1986 exposure guidelines and to promote consistency in U.S. EPA's exposure assessment activities (U.S. EPA, 1985). The exposure assessment field continued to evolve and so did the need for more comprehensive data on exposure factors. The *Exposure Factors Handbook* was first published in 1989 and updated in 1997 in response to this need (U.S. EPA, 1997a, 1989a). This current edition is the update of the 1997 handbook (U.S. EPA, 1997a), and it incorporates data from the *Child-Specific Exposure Factors Handbook* (U.S. EPA, 2008a) that was published in September 2008. The information presented in this handbook supersedes the *Child-Specific Exposure Factors Handbook* published in 2008 (U.S. EPA, 2008a).

The purpose of the *Exposure Factors Handbook* is to (1) summarize data on human behavioral and physiological characteristics that affect exposure to environmental contaminants, and (2) provide exposure/risk assessors with recommended values for these factors that can be used to assess exposure among both adults and children.

> Exposure factors are factors related to human behavior and characteristics that help determine an individual's exposure to an agent.

> Purpose:
> (1) summarize data on human behavioral and physiological characteristics
> (2) provide exposure/risk assessors with recommended values for these factors

## 1.2.   INTENDED AUDIENCE

The *Exposure Factors Handbook* is intended for use by exposure and risk assessors both within and outside the U.S. EPA as a reference tool and primary source of exposure factor information. It may be used by scientists, economists, and other interested parties as a source of data and/or U.S. EPA recommendations on numeric estimates for behavioral and physiological characteristics needed to estimate exposure to environmental agents.

## 1.3.   SCOPE

This handbook incorporates the changes in risk assessment practices that were first presented in the U.S. EPA's Cancer Guidelines, regarding the need to consider life stages rather than subpopulations (U.S. EPA, 2005c, e). A life stage "refers to a distinguishable time frame in an individual's life characterized by unique and relatively stable behavioral and/or physiological characteristics that are associated with development and growth" (U.S. EPA, 2005b). The handbook emphasizes a major recommendation in U.S. EPA's *Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens* (U.S. EPA, 2005e) to sum exposures and risks across life stages rather than relying on the use of a lifetime average adult exposure to calculate risk. This handbook also uses updated information to incorporate any new exposure factors data/research that have become available since it was last revised in 1997 and is consistent with the U.S. EPA's new set of standardized childhood age groups (U.S. EPA, 2005b), which are recommended for use in exposure assessments. Available data through July 2011 are included in the handbook.

The recommendations presented in this handbook are not legally binding on any U.S. EPA program and should be interpreted as suggestions that program offices or individual exposure assessors can consider and modify as needed. The recommendations provided in this handbook do not supersede standards or guidance established by U.S. EPA program offices, states, or other risk assessment organizations outside the Agency (e.g.,

World Health Organization, National Research Council). Many of these factors are best quantified on a site- or situation-specific basis. The decision as to whether to use site-specific or national values for an assessment may depend on the quality of the competing data sets as well as on the purpose of the specific assessment. The handbook has strived to include full discussions of the issues that assessors should consider in deciding how to use these data and recommendations.

This document does not include chemical-specific data or information on physiological parameters that may be needed for exposure assessments involving physiologically based pharmacokinetic (PBPK) modeling. Information on the application of PBPK models and supporting data are found in U.S. EPA (2006a) and Lipscomb (2006).

## 1.4.  UPDATES TO PREVIOUS VERSIONS OF THE HANDBOOK

All chapters have been revised to include published literature up to July 2011. Some of the main revisions are highlighted below:

- Added food and water intake data obtained from the National Health and Nutrition Examination Survey (NHANES) 2003–2006;
- Added fat intake data and total food intake data;
- Added new chapter on non-dietary factors;
- Updated soil ingestion rates for children and adults;
- Updated data on dermal exposure and added information on other factors such as film thickness of liquids to skin, transfer of residue, and skin thickness;
- Updated fish intake rates for the general population using data obtained from NHANES 2003–2006;
- Updated body-weight data with National Health and Nutrition Examination Survey 1999–2006;
- Added body-weight data for pregnant/lactating women and fetal weight;
- Updated children's factors with new recommended age groupings (U.S. EPA, 2005b);
- Updated life expectancy data with U.S. Census Bureau data 2006;
- Updated data on human milk ingestion and prevalence of breast-feeding; and

- Expanded residential characteristics chapter to include data from commercial buildings.

## 1.5.  SELECTION OF STUDIES FOR THE HANDBOOK AND DATA PRESENTATION

Many scientific studies were reviewed for possible inclusion in this handbook. Although systematic literature searches were initially conducted for every chapter, much of the literature was identified through supplementary targeted searches and from personal communications with researchers in the various fields. Information in this handbook has been summarized from studies documented in the scientific literature and other publicly available sources. As such, this handbook is a compilation of data from a variety of different sources. Most of the data presented in this handbook are derived from studies that target (1) the general population (e.g., Center for Disease Control and Prevention [CDC] NHANES) or (2) a sample population from a specific area or group (e.g., fish consumption among Native American children). With very few exceptions, the data presented are the analyses of the individual study authors. Since the studies included in this handbook varied in terms of their objectives, design, scope, presentation of results, etc., the level of detail, statistics, and terminology may vary from study to study and from factor to factor. For example, some authors used geometric means to present their results, while others used arithmetic means or distributions. Authors have sometimes used different terms to describe the same racial/ethnic populations. Within the constraint of presenting the original material as accurately as possible, the U.S. EPA has made an effort to present discussions and results in a consistent manner and using consistent terminology. The strengths and limitations of each study are discussed to provide the reader with a better understanding of the uncertainties associated with the values derived from the study.

If it is necessary to characterize a population that is not directly covered by the data in this handbook, the risk or exposure assessor may need to evaluate whether these data may be used as suitable substitutes for the population of interest or whether there is a need to seek additional population-specific data. If information is needed for identifying and enumerating populations who may be at risk for greater contaminant exposures or who exhibit a heightened sensitivity to particular chemicals, refer to *Socio-demographic Data Used for Identifying Potentially Highly Exposed Populations* (U.S. EPA, 1999).

*Exposure Factors Handbook*

*Chapter 1—Introduction*

Studies were chosen that were seen as useful and appropriate for estimating exposure factors for both adults and children. In conjunction with the *Guidance on Selecting Age Groups for Monitoring and Assessing Childhood Exposures to Environmental Contaminants* (U.S. EPA, 2005b), this handbook adopted the age group notation "X to <Y" (e.g., the age group 3 to <6 years is meant to span a 3-year time interval from a child's 3rd birthday up until the day before his or her 6th birthday). Every attempt was made to present the data for the recommended age groups. In cases where age group categories from the study authors did not match exactly with the U.S. EPA recommended age groups, the recommendations were matched as closely as possible. In some cases, data were limited, and age groups were lumped into bigger age categories to obtain adequate sample size. It is also recognized that dose-response data may not be available for many of the recommended age groupings. However, a standard set of age groups can assist in data collection efforts and provide focus for future research to better assess all significant variations in life stage (U.S. EPA, 2005b). To this date, no specific guidance is available with regard to age groupings for presenting adult data. Therefore, adult data (i.e., >21 years old) are presented using the age groups defined by the authors of the individual studies. No attempt was made to reanalyze the data using a consistent set of age groups. Therefore, in cases where data were analyzed by the U.S. EPA, age categories were defined as finely as possible based on adequacy of sample size. It is recognized that adults' activity patterns will vary with many factors including age, especially in the older adult population.

==Certain studies described in this handbook are designated as "key," that is, the most up-to-date and scientifically sound for deriving recommendations for exposure factors. The recommended values for all exposure factors are based on the results of the key studies== (see Section 1.6). Other studies are designated "relevant," meaning applicable or pertinent, but not necessarily the most important. As new data or analyses are published, "key" studies may be moved to the "relevant" category in future revisions because they are replaced by more up-to-date data or an analysis of improved quality. Studies may be classified as "relevant" for one or more of the following reasons: (1) they provide supporting data (e.g., older studies on food intake that may be useful for trend analysis); (2) they provide information related to the factor of interest (e.g., data on prevalence of breast-feeding); (3) the study design or approach makes the data less applicable to the

population of interest (e.g., studies with small sample size, studies not conducted in the United States).

It is important to note that studies were evaluated based on their ability to represent the population for which the study was designed. The users of the handbook will need to evaluate the studies' applicability to their population of interest.

### 1.5.1.  General Assessment Factors

The Agency recognizes the need to evaluate the quality and relevance of scientific and technical information used in support of Agency actions (U.S. EPA, 2006c, 2003d, 2002). When evaluating scientific and technical information, the U.S. EPA's Science Policy Council recommends using five General Assessment Factors (GAFs): (1) soundness, (2) applicability and utility, (3) clarity and completeness, (4) uncertainty and variability, and (5) evaluation and review (U.S. EPA, 2003d). These GAFs were adapted and expanded to include specific considerations deemed to be important during evaluation of exposure factors data and were used to judge the quality of the underlying data used to derive recommendations.

### 1.5.2.  Selection Criteria

The confidence ratings for the various exposure factor recommendations, and selection of the key studies that form the basis for these recommendations, were based on specific criteria within each of the five GAFs, as follows:

1) ***Soundness: Scientific and technical procedures, measures, methods, or models employed to generate the information are reasonable for, and consistent with, the intended application.*** The soundness of the experimental procedures or approaches in the study designs of the available studies was evaluated according to the following:

   a) **Adequacy of the Study Approach Used:** In general, more confidence was placed on experimental procedures or approaches that more likely or closely captured the desired measurement. Direct exposure data collection techniques, such as direct observation, personal monitoring devices, or other known methods were preferred where available. If studies utilizing direct measurement were not available, studies were selected that relied on validated indirect measurement methods such as surrogate measures (such as heart rate for

# Exhibit D



EPA/600/R-18/259F
February 2019

# Update for Chapter 3 of the Exposure Factors Handbook
*Ingestion of Water and Other Select Liquids*

National Center for Environmental Assessment
Office of Research and Development
U.S. Environmental Protection Agency
Washington, DC 20460

**DISCLAIMER**

This document has been reviewed in accordance with U.S. Environmental Protection Agency policy and approved for publication. Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

# 3. INGESTION OF WATER AND OTHER SELECT LIQUIDS

## 3.1. INTRODUCTION

This document is an update to Chapter 3 (Ingestion of Water and Selected Liquids) of the *Exposure Factors Handbook; 2011 Edition* (U.S. EPA, 2011). New information that has become available since 2011 has been added, and the recommended values have been revised as needed to reflect the additional information. The recommended values for the general population in this chapter have been updated using National Health and Nutrition Examination Survey (NHANES) data for 2005−2010; the 2011 version of this chapter used NHANES data for 2003−2006 for individuals ≥3 years of age and Continuing Survey of Food Intake by Individuals (CSFII) data for 1994-1996, and 1998 for children <3 years of age. Appendix A provides a comparison of the intake rates based on NHANES 2005-2010 data to those based on NHANES 2003-2006 and CSFII 1994-96 and 1998. Data for pregnant and lactating women have also been updated using NHANES 2005-2010 data. This update also provides, for the first time, water intake data for formula-fed infants. Recent relevant studies based on data other than NHANES and CSFII are also summarized to provide additional perspective on drinking water intake.

The chapter includes a comprehensive review of the scientific literature through 2017. The new literature was identified via formal literature searches conducted by EPA library services as well as targeted internet searches conducted by the authors of this chapter. Appendix B provides a list of the key terms that were used in the literature searches. Revisions to this chapter have been made in accordance with the approved quality assurance plan for the *Exposure Factors Handbook*.

Water ingestion is a pathway of exposure to environmental chemicals. Contamination of water may occur at the water supply source (groundwater or surface water); during treatment (for example, toxic by-products may be formed during chlorination); or post-treatment (such as leaching of lead or other materials from plumbing systems). People may be exposed to contaminants in water when consuming water directly as a beverage, indirectly from foods and drinks made with water, or incidentally while swimming or engaging in other water-related activities. Estimating the magnitude of the potential dose of toxics from water ingestion requires information on the quantity of water consumed. The purpose of this section is to describe key and relevant published studies that provide information on water ingestion for various populations and to provide recommended ingestion rate values for use in exposure assessments. As described in Chapter 1 of the *Exposure Factors Handbook: 2011 Edition* (U.S. EPA, 2011), key studies represent those studies that are the most up-to-date and scientifically sound for deriving recommendations for exposure factors, whereas other studies are designated "relevant," meaning applicable or pertinent, but not necessarily the most important. For example, studies that provide supporting data or information related to the factor of interest (e.g., number of drinking events per day), or have study designs or approaches that make the data less applicable to the population of interest (e.g., studies not conducted in the United States) have been designated as relevant rather than key. Key studies were selected based on the general assessment factors described in Chapter 1 of the handbook. The studies described in this section provide information on ingestion of water consumed as a beverage or in foods or beverages containing tap water, ingestion of other select liquids, and ingestion of water while swimming.

Historically, the Environmental Protection Agency (EPA) has assumed a drinking water ingestion rate of 2 L/day for adults and 1 L/day for infants and children under 10 years of age (U.S. EPA, 2000a). This rate includes water consumed in the form of juices and other beverages containing tap water. The National Research Council (NRC, 1977) estimated that daily consumption of water may vary with levels of physical activity and fluctuations in temperature and humidity. It is reasonable to assume that people engaging in physically demanding activities or living in warmer regions may have higher levels of water ingestion. However, there is limited information on the effects of activity level and climatic conditions on water ingestion.

U.S. EPA's analysis of 2005−2010 data from the NHANES was selected as the key study of drinking water ingestion for the general population and for pregnant and lactating women. NHANES 2005−2010 contains the most up-to-date information on water intake rate estimates. Kahn et al. (2013) was selected as a key study for formula-fed infants. Kahn et al. (2013) used data from U.S. Department of Agriculture's (USDA's) 1994−1996, 1998 CSFII.

The U.S. EPA analysis of NHANES data and the analyses of CSFII data by Kahn et al. (2013) generated ingestion rates for direct and indirect ingestion of water. Direct ingestion is defined as direct consumption of water as a beverage, while indirect ingestion includes water added during food or beverage preparation, but not water intrinsic to purchased foods (i.e., water that is naturally contained in foods) (Kahn and Stralka, 2008). Data for

*Update for Chapter 3 of the Exposure Factors Handbook*

*Chapter 3—Ingestion of Water and Other Select Liquids*

consumption of water from various sources (i.e., the community water supply, bottled water, and other sources) are also presented. It is noted that the type of water people drink has changed in the last decade, as evidenced by the increase in bottled water consumption (see Appendix A). However, the majority of the U.S. population consumes water from public (i.e., community) water distribution systems; about 15% of the U.S. population obtains their water from private (i.e., household) wells, cisterns, or springs (U.S. EPA, 2002; https://www.epa.gov/privatewells/about-private-water-wells). Regardless of the source of the water, the physiological need for water should be the same among populations using community or private water systems. For the purposes of exposure assessments involving site-specific contaminated drinking water, ingestion rates based on the community supply are most appropriate. Given the assumption that bottled water, and purchased foods and beverages that contain water are widely distributed and less likely to contain source-specific water, the use of total water ingestion rates may overestimate the potential exposure to toxic substances present only in local water supplies; therefore, tap water ingestion of community water, rather than total water ingestion, is emphasized in this section.

The key studies on water ingestion for the general population and pregnant and lactating women (NHANES), and the populations of formula-fed infants (CSFII) are based on short-term survey data (2 days). Although short-term data may be suitable for obtaining mean or median ingestion values that are representative of both short- and long-term ingestion distributions, upper- and lower-percentile values may be different for short-term and long-term data. Note too that most currently available water ingestion surveys are based on respondent recall, which may be a source of uncertainty in the estimated ingestion rates because of the subjective nature of this type of survey technique. Percentile distributions for water ingestion are presented in this handbook, where sufficient data are available. Information on ingestion of water based on climate and activity level, and on incidental ingestion of water while swimming, is also provided in this chapter.

Section 3.2 provides the recommendations and confidence ratings for use in risk assessment for community water ingestion among the general population, formula-fed infants, and pregnant and lactating women, and water ingestion among swimmers. Section 3.3.1 provides the key studies for general population water ingestion rates, Section 3.4.1 provides ingestion rates for pregnant and lactating women, Section 3.5.1 provides ingestion rates for

formula-fed infants, Section 3.7 provides ingestion rates for swimmers, and Section 3.8 provides data for other inadvertent water ingestion. For water ingestion at high activity levels or hot climates, no recommendations are provided, but Section 3.6 includes relevant studies on this topic. Relevant studies on all subcategories of water ingestion are also presented to provide the reader with added perspective on the current state of knowledge pertaining to ingestion of water and select liquids.

## 3.2. RECOMMENDATIONS

### 3.2.1. Water Ingestion from Consumption of Water as a Beverage and from Food and Drink

The recommended general population water ingestion rate values for the consumption of water as a beverage (direct) and from foods and drinks (indirect) are based on U.S. EPA's analysis of NHANES data from 2005−2010. Table 3-1 presents a summary of the recommended values for direct and indirect ingestion of community water. Per capita mean and 95th percentile values range from 145 mL/day to 956 mL/day and 565 mL/day to 2,976 mL/day, respectively, depending on the age group. Consumer-only mean and 95th percentile values range from 245 mL/day to 1,419 mL/day and 658 mL/day to 3,407 mL/day, respectively, depending on the age group. Per capita intake rates represent intake that has been averaged over the entire population (including those individuals that reported no intake). In general, per capita intake rates are appropriate for use in exposure assessments for which average daily dose estimates are of interest because they represent both individuals who drank water during the survey period and individuals who may drink water at some time but did not consume it during the survey period. Consumer-only intake rates represent the quantity of water consumed only by individuals who reported water intake during the survey period. Table 3-2 presents a characterization of the overall confidence in the accuracy and appropriateness of the recommendations for drinking water intake for use in risk assessments.

### 3.2.2. Pregnant and Lactating Women

Based upon the results of the U.S. EPA analysis of 2005−2010 NHANES data, per capita mean and 95th percentile values for ingestion of drinking water among pregnant women were 731 mL/day and 2,859 mL/day, respectively. The per capita mean and 95th percentile values for lactating women were 1,075 mL/day and 3,061 mL/day, respectively. Table 3-3 presents a summary of the recommended

values for water ingestion rates. Table 3-4 presents the confidence ratings for these recommendations.

### 3.2.3.    Formula-Fed Infants

The recommended values for drinking water ingestion rates for formula-fed infants are based on the results of Kahn et al. (2013). The mean total direct and indirect water intake values are 505, 627, 699, 691, and 591 mL/day for ages <1 month, 1 to <3 months, 3 to <6 months, 6 to <12 months, and 1 to <2 years, respectively. The 95th percentile total direct and indirect water intake values are 858, 1,096, 1,300, 1,350, and 1,254 for ages <1 month, 1 to <3 months, 3 to <6 months, 6 to <12 months, and 1 to <2 years, respectively. Table 3-5 presents a summary of the recommended values for formula-fed infants, and Table 3-6 presents the confidence ratings for the recommended values for formula-fed infants.

### 3.2.4.    Water Ingestion While Swimming or Diving

Based on the data from Dufour (2017), mean swimming pool water ingestion rates were 38, 44, 33, and 28 mL/hour for ages 6 to <11, 11 to <16, 16 to <21, and 21+ years, respectively. Upper percentile (95th percentile) swimming pool water ingestion rates were 96, 152, 105, and 92 mL/hour for ages 6 to <11, 11 to <16, 16 to <21, and 21+ years, respectively. Although these estimates were derived from swimming pool experiments, Dufour et al. (2006) noted that swimming behavior of recreational pool swimmers may be similar to freshwater swimmers. Estimates may be different for saltwater swimmers and competitive swimmers. Table 3-7 presents a summary of the recommended values for water ingestion rates while swimming. Table 3-8 presents the confidence ratings for these recommendations. Data on the amount of time spent swimming can be found in Chapter 16 (see Table 16-1) of this handbook.

*Update for Chapter 3 of the Exposure Factors Handbook*

*Chapter 3—Ingestion of Water and Other Select Liquids*

| Table 3-1. Recommended Values for Drinking Water Ingestion Rates (2-day average community water intake)[a] | | | | | |
|---|---|---|---|---|---|
| | Mean | | 95th Percentile | | |
| Age Group | mL/day | mL/kg-day | mL/day | mL/kg-day | Multiple Percentiles |
| Per Capita[b] | | | | | |
| Birth to <1 month | 184 | 42 | 851[c] | 200[c] | |
| 1 to <3 months | 145 | 25 | 905[c] | 164[c] | |
| 3 to <6 months | 187 | 27 | 981[c] | 141[c] | |
| 6 to <12 months | 269 | 30 | 988 | 112 | |
| Birth to <1 year | 220 | 29 | 974 | 137 | |
| 1 to <2 years | 146 | 13 | 565 | 51 | |
| 2 to <3 years | 205 | 15 | 778 | 58 | |
| 3 to <6 years | 208 | 11 | 741 | 42 | |
| 6 to <11 years | 294 | 10 | 1,071 | 34 | |
| 11 to <16 years | 315 | 6 | 1,395 | 26 | |
| 16 to <21 years | 436 | 6 | 1,900 | 28 | See Tables 3-9 and 3-13 |
| 21 to <30 years | 781 | 10 | 2,848 | 39 | |
| 30 to <40 years | 902 | 11 | 2,967 | 38 | |
| 40 to <50 years | 880 | 11 | 2,964 | 38 | |
| 50 to <60 years | 956 | 12 | 2,976 | 37 | |
| 60 to <70 years | 941 | 12 | 2,972 | 35 | |
| 70 to <80 years | 772 | 10 | 2,273 | 31 | |
| 80+ years | 784 | 11 | 2,122 | 30 | |
| 21 to <50 years | 858 | 11 | 2,938 | 38 | |
| 50+ years | 902 | 11 | 2,827 | 35 | |
| All ages | 711 | 11 | 2,641 | 37 | |
| Consumers-Only[d] | | | | | |
| Birth to <1 month | 581 | 133 | 938[c] | 224[c] | |
| 1 to <3 months | 785 | 136 | 1,224[c] | 267[c] | |
| 3 to <6 months | 649 | 93 | 1,125[c] | 158[c] | |
| 6 to <12 months | 554 | 62 | 1,104[c] | 133[c] | |
| Birth to <1 year | 595 | 79 | 1,106[c] | 174[c] | |
| 1 to <2 years | 245 | 22 | 658 | 57 | |
| 2 to <3 years | 332 | 24 | 901 | 67 | |
| 3 to <6 years | 338 | 19 | 836 | 45 | |
| 6 to <11 years | 455 | 15 | 1,258 | 41 | |
| 11 to <16 years | 562 | 10 | 1,761 | 31 | |
| 16 to <21 years | 722 | 10 | 2,214 | 31 | See Tables 3-17 and 3-21. |
| 21 to <30 years | 1,183 | 16 | 3,407 | 47 | |
| 30 to <40 years | 1,277 | 16 | 3,278 | 44 | |
| 40 to <50 years | 1,356 | 17 | 3,374 | 43 | |
| 50 to <60 years | 1,419 | 18 | 3,388 | 42 | |
| 60 to <70 years | 1,394 | 17 | 3,187 | 40 | |
| 70 to <80 years | 1,214 | 16 | 2,641 | 37 | |
| 80+ years | 1,087 | 16 | 2,250 | 33 | |
| 21 to <50 years | 1,277 | 16 | 3,353 | 44 | |
| 50+ years | 1,343 | 17 | 3,081 | 40 | |
| All ages | 1,096 | 17 | 2,972 | 44 | |

| | Table 3-1. Recommended Values for Drinking Water Ingestion Rates (2-Day Average Community Water Intake)[a] (Continued) | | | | |
|---|---|---|---|---|---|
| | Mean | | 95th Percentile | | |
| Age Group | mL/day | mL/kg-day | mL/day | mL/kg-day | Multiple Percentiles |
| | Per Capita[b] | | | | |

[a]    Ingestion rates for combined direct and indirect water from community water supply. Estimates are based on the average of 2 days of water consumption reported for each NHANES respondent. If the respondent reported zero consumption on one of the 2 days and nonzero consumption on the other day, his/her average consumption would be the average of zero and nonzero consumption.

[b]    Per capita intake rates are generated by averaging consumer-only intakes over the entire population (including those individuals that reported no intake).

[c]    Estimates are less statistically reliable based on guidance published in the *Joint Policy on Variance Estimation and Statistical Reporting Standards on NHANES III and CSFII Reports: NHIS/NCHS Analytical Working Group Recommendations* (NCHS, 1993).

[d]    Consumer-only intake represents the quantity of water consumed only by individuals that reported consuming water during the survey period.

FCID    = Food Commodity Intake Database.
NCHS    = National Center for Health Statistics.
NHIS    = National Health Interview Survey.

Source:    U.S. EPA analysis of NHANES 2005−2010 data using the FCID Consumption Calculator at http://fcid.foodrisk.org/.

*Update for Chapter 3 of the Exposure Factors Handbook*

*Chapter 3—Ingestion of Water and Other Select Liquids*

| Table 3-2. Confidence in Recommendations for Drinking Water Ingestion Rates[a] | | |
|---|---|---|
| General Assessment Factors | Rationale | Rating |
| **Soundness** | | Medium to High |
| *Adequacy of Approach* | The survey methodology and data analysis were adequate. The surveys sampled approximately 25,000 (NHANES) individuals; sample size varied with age. | |
| *Minimal (or defined) Bias* | No physical measurements were taken. The method relied on recent recall of standardized volumes of drinking water containers. | |
| **Applicability and Utility** | | High |
| *Exposure Factor of Interest* | The key studies were directly relevant to water ingestion. | |
| *Representativeness* | The data were demographically representative (based on stratified random sample). Sample sizes for some age groups were limited. | |
| *Currency* | NHANES data were collected between 2005 and 2010. | |
| *Data Collection Period* | Data were collected for 2 nonconsecutive days. However, long-term variability may be small. Use of a short-term average as a chronic ingestion measure can be assumed. | |
| **Clarity and Completeness** | | High |
| *Accessibility* | NHANES data are publicly available. | |
| *Reproducibility* | The methodology was clearly presented; enough information was included to reproduce the results. | |
| *Quality Assurance* | NHANES data collection follow strict QA/QC procedures. The FCID Calculator also underwent QA/QC. | |
| **Variability and Uncertainty** | | High |
| *Variability in Population* | Full distributions were developed. | |
| *Uncertainty* | Except for data collection based on recall, sources of uncertainty were minimal. | |
| **Evaluation and Review** | | Medium |
| *Peer Review* | NHANES surveys received a high level of peer review. The U.S. EPA analysis of NHANES has not been peer reviewed outside the Agency, but the FCID Consumption Calculator, which was used to conduct the analysis, was internally and externally peer reviewed. | |
| *Number and Agreement of Studies* | There was one key study for drinking water ingestion among the general population. Appendix B provides a comparison of the NHANES 2005−2010 and data sets used previously in the *Exposure Factors Handbook: 2011 Edition* (U.S. EPA, 2011) for estimating water ingestion among the general population (NHANES 2003−2006 and CSFII 1994−1996, 1998). | |
| **Overall Rating** | | **Medium to High, Low** for footnote "c" on Table 3-1 |
| [a] | See Section 1.5.2 in Chapter 1 of the *Exposure Factors Handbook: 2011 Edition* (U.S. EPA, 2011) for a detailed description of the evaluation criteria used in this table. | |
| FCID | = Food Commodity Intake Database. | |
| QA/QC | = Quality assurance/quality control. | |

**Table 3-3. Recommended Values for Water Ingestion Rates of Community Water for Pregnant and Lactating Women, and Women of Child-bearing Age (13 to <50 years)[a]**

| Per Capita[b] | | | | |
|---|---|---|---|---|
| | Mean | | 95th Percentile | |
| Group | mL/day | mL/kg-day | mL/day | mL/kg-day |
| Pregnant women | 731 | 9.8 | 2,859 | 37.3 |
| Lactating women | 1,075 | 16.5 | 3,061[c] | 47.0 |
| Child-bearing age | 683 | 9.8 | 2,634 | 38.2 |
| Consumers-Only[d] | | | | |
| | Mean | | 95th Percentile | |
| Group | mL/day | mL/kg-day | mL/day | mL/kg-day |
| Pregnant women | 1,158 | 15.5 | 2,935[c] | 37.7 |
| Lactating women | 1,495 | 22.9 | 3,061[c] | 47.0 |
| Child-bearing age | 1,082 | 15.6 | 2,956 | 44.6 |

[a]  Ingestion rates for combined direct and indirect water from community water supply. Estimates are based on the average of 2 days of water consumption reported for each NHANES respondent. If the respondent reported zero consumption on 1 of the 2 days and nonzero consumption on the other day, his/her average consumption would be the average of zero and nonzero consumption.
[b]  Per capita intake rates are generated by averaging consumer-only intakes over the entire population (including those individuals that reported no intake). See Table 3-62.
[c]  Estimates are less statistically reliable based on guidance published in the *Joint Policy on Variance Estimation and Statistical Reporting Standards on NHANES III and CSFII Reports: NHIS/NCHS Analytical Working Group Recommendations* (NCHS, 1993).
[d]  Consumer-only intake represents the quantity of water consumed only by individuals that reported consuming water during the survey period. See Table 3-63.
NCHS  = National Center for Health Statistics.
NHIS  = National Health Interview Survey.

Source:  U.S. EPA analysis of NHANES 2005−2010 data using the FCID Consumption Calculator at http://fcid.foodrisk.org/.

*Update for Chapter 3 of the Exposure Factors Handbook*

*Chapter 3—Ingestion of Water and Other Select Liquids*

| Table 3-4. Confidence in Recommendations for Water Ingestion for Pregnant/Lactating Women[a] | | |
|---|---|---|
| General Assessment Factors | Rationale | Rating |
| **Soundness** | | Low |
| *Adequacy of Approach* | The survey methodology and data analysis were adequate. The sample size was relatively small: 426 pregnant and 101 lactating women. | |
| *Minimal (or defined) Bias* | No physical measurements were taken. The method relied on recent recall of standardized volumes of drinking water containers. | |
| **Applicability and Utility** | | Low to Medium |
| *Exposure Factor of Interest* | The key study was directly relevant to water ingestion. | |
| *Representativeness* | The data were demographically representative (based on stratified random sample). | |
| *Currency* | Data were collected between 2005 and 2010. | |
| *Data Collection Period* | Data were collected for 2 nonconsecutive days. However, long-term variability may be small. Use of a short-term average as a chronic ingestion measure can be assumed. | |
| **Clarity and Completeness** | | Medium |
| *Accessibility* | The NHANES data are publicly available. | |
| *Reproducibility* | The methodology was clearly presented; enough information was included to reproduce the results. | |
| *Quality Assurance* | NHANES data collection follow strict QA/QC procedures. The FCID Consumption Calculator also underwent QA/QC. | |
| **Variability and Uncertainty** | | Low |
| *Variability in Population* | Full distributions were developed. | |
| *Uncertainty* | Except for data collection based on recall and the relatively small sample size, sources of uncertainty were minimal. | |
| **Evaluation and Review** | | Medium |
| *Peer Review* | NHANES surveys received a high level of peer review. The U.S. EPA analysis of NHANES has not been peer reviewed outside the Agency, but the FCID Consumption Calculator, which was used to conduct the analysis was internally and externally peer reviewed. | |
| *Number and Agreement of Studies* | There was one key study for pregnant/lactating women water ingestion. | |
| **Overall Rating** | | **Low** |

[a]      See Section 1.5.2 in Chapter 1 of the *Exposure Factors Handbook: 2011 Edition* (U.S. EPA, 2011) for a detailed description of the evaluation criteria used in this table.
FCID    = Food Commodity Intake Database.
QA/QC  = Quality assurance/quality control.

*Update for Chapter 3 of the Exposure Factors Handbook*

*Chapter 3—Ingestion of Water and Other Select Liquids*

**Table 3-5. Recommended Values for Water Ingestion Rates of Community Water for Formula-Fed Infants[a]**

| Indirect in Formula[b] | | | |
|---|---|---|---|
| | Mean | | 95th Percentile |
| Group | mL/day | mL/kg-day | mL/day | mL/kg-day |
| <1 month | 491[c] | 143[c] | 856[c] | 240[c] |
| 1 to <3 months | 572 | 124 | 963[c] | 285[c] |
| 3 to <6 months | 645 | 93 | 1,112[c] | 171[c] |
| 6 to <12 months | 573 | 65 | 1,192[c] | 136[c] |
| 1 to <2 years | 364 | 38[c] | 745[c] | 82[c] |

| Total Direct and Indirect[d] | | | |
|---|---|---|---|
| | Mean | | 95th Percentile |
| Group | mL/day | mL/kg-day | mL/day | mL/kg-day |
| <1 month | 505[c] | 146[c] | 858[c] | 240[c] |
| 1 to <3 months | 627 | 136 | 1,096[c] | 290[c] |
| 3 to <6 months | 699 | 101 | 1,300[c] | 186[c] |
| 6 to <12 months | 691 | 78 | 1,350[c] | 151[c] |
| 1 to <2 years | 591 | 60 | 1,254[c] | 119[c] |

[a]   Formula-consumers only; see Table 3-83.
[b]   Water used to reconstitute formula.
[c]   The sample size does not meet the minimum reporting requirements as described in the *Third Report on Nutrition Monitoring in the United States* (LSRO, 1995).
[d]   Ingestion rates for combined direct and indirect water from community water supply; includes water used to reconstitute formula plus all other community water ingested.

Source:   Kahn et al. (2013).

*Update for Chapter 3 of the Exposure Factors Handbook*

*Chapter 3—Ingestion of Water and Other Select Liquids*

| Table 3-6. Confidence in Recommendations for Water Ingestion for Formula-Fed Infants[a] | | |
|---|---|---|
| General Assessment Factors | Rationale | Rating |
| **Soundness** | | Medium |
| *Adequacy of Approach* | The survey methodology and data analysis were adequate. Data were available for approximately 700 formula-fed infants overall, but the sample sizes were small for some age ranges. | |
| *Minimal (or defined) Bias* | No physical measurements were taken. The method relied on recent recall of volumes of drinking water used to reconstitute infant formula. | |
| **Applicability and Utility** | | Medium |
| *Exposure Factor of Interest* | The key study was directly relevant to water ingestion. | |
| *Representativeness* | The data were demographically representative (based on stratified random sample). | |
| *Currency* | Data were collected between 1994 and 1998. | |
| *Data Collection Period* | Data were collected for 2 nonconsecutive days. However, long-term variability may be small. Use of a short-term average as a chronic ingestion measure can be assumed. | |
| **Clarity and Completeness** | | Medium |
| *Accessibility* | The CSFII data are publicly available. The Kahn et al. (2013) analysis of the CSFII 1994−1996, 1998 data was published in a peer-reviewed journal. | |
| *Reproducibility* | The methodology was clearly presented; enough information was included to reproduce the results. | |
| *Quality Assurance* | Quality assurance of the CSFII data was good; quality control of the secondary data analysis was not well described. | |
| **Variability and Uncertainty** | | Medium |
| *Variability in Population* | Mean and 95th percentile values were provided for five age groups of infants (Kahn et al., 2013). | |
| *Uncertainty* | Except for data collection based on recall, sources of uncertainty were minimal. | |
| **Evaluation and Review** | | Medium |
| *Peer Review* | The USDA CSFII survey received a high level of peer review. The Kahn et al. (2013) study was published in a peer-reviewed journal. | |
| *Number and Agreement of Studies* | There was one key study for formula-fed infants. | |
| **Overall Rating** | | **Medium** |
| [a]    See Section 1.5.2 in Chapter 1 of the *Exposure Factors Handbook: 2011 Edition* (U.S. EPA, 2011) for a detailed description of the evaluation criteria used in this table. | | |

# **<u>Exhibit E</u>**

**Summary of the facts and opinions to which Tala R. Henry, Ph.D is expected to testify:**

## I.    Summary of Opinions

In response to the expert opinions offered by Dr. Kathleen Thiessen and Dr. Phillipe Grandjean on the methods for conducting risk assessments, and in particular, the methods for conducting a risk evaluation under the Toxic Substances Control Act (TSCA) based on the currently available scientific evidence, Dr. Henry will testify to the following:

- Dr. Thiessen's report is not a credible source of evidence for making conclusions regarding unreasonable risks under TSCA due to critical limitations, including:

    *1.    Mischaracterization of EPA hazard assessments and dose-response analyses as "risk assessments" and omission to any reference to or discussion of resources available in the public domain that describe the relevant and sound requirements and procedures for conducting a risk evaluation under section 6(b)(4) of TSCA.*

    *2.    There are inadequate or undocumented literature searches and Systematic Review. Literature searches for critical components of a risk evaluation (exposure assessment) appear not to have been conducted; and quality and relevancy reviews, using systematic review methods, for hazard data (animal and human) are not provided to ensure the risk determination is based on the weight of the scientific evidence (WoSE).*

    *3.    The reference dose (RfD) derived by EPA in the document, Fluoride: Dose-Responses Analysis for Non-cancer Effects, has as no relevance to the question of whether the artificial fluoridation of drinking water creates unreasonable risk because it is not fit-for-purpose for a TSCA risk evaluation.*

    *4.    The methodology for determining unreasonable risk is fundamentally flawed because it relies on the statutory framework and assessment methodologies used to review new chemicals substances under TSCA Section 5, which has different risk assessment requirements and findings than for risk evaluations on existing chemicals under TSCA Section 6.*

- Dr. Grandjean's report is not a credible source of evidence for making conclusions regarding unreasonable risks under TSCA due to critical limitations, including:

    *1.    The methodology for determining unreasonable risk is fundamentally flawed because it fails to demonstrate that the key tenets of systematic review were applied to his report and is presented in a manner that suggests biased and pre-conceived conclusions.*

    *2.    The report draws inappropriate and unsupported conclusions. Conclusions in the purported risk assessment conducted are inappropriate because the calculation exercise and the conclusions for making unreasonable*

credible because it fails to demonstrate foundational considerations, such as objectivity and transparency, in the process. Rather, it is Dr. Henry's opinion that Dr. Grandjean selectively cited literature, including data from his own publications, to support biased and pre-conceived conclusions about the neurotoxicity of fluoride.

### B.     Inappropriate and Unsupported Conclusions.

First, Dr. Grandjean twice references the 2006 NRC Report as supporting his assertion that fluoride's predominant benefit to teeth comes from topical contact with the outside enamel, and not from ingestion. The NRC report makes no such conclusion, and in fact explains that is not the consensus on this matter (National Research Council, 2006).

Second, Dr. Grandjean makes conclusions by "[a]pplying methods for standards setting routinely used by EPA," but then applies methods used to derive a Maximum Contaminant Level (MCL) in drinking water, under the Safe Drinking Water Act (SDWA). Not only are the regulatory purpose and statutory framework in which MCLs are applied different than the purpose and framework under TSCA, but the values derived, and the methods used to derive them are necessarily different than conducting a risk evaluation under TSCA. Most notably, the MCL is a concentration in water that must not be exceeded under the implementing framework of the SDWA. In contrast, a TSCA risk evaluation would compare the exposure of humans and the environment (i.e., the dose resulting from exposure to the fluoride), specifically applicable to the condition(s) of use, to the dose of fluoride identified in the hazard assessment to have no adverse effects. Using this comparison, the risk characterization, would indicate the 'margin of exposure, by which the exposures are greater than or less than the no adverse effect levels. The TSCA risk evaluation process results in a risk estimate, rather than an exposure concentration. The risk estimate is then used to make a determination about unreasonable risk under TSCA. Dr. Grandjean's associated calculation exercise and the conclusions for making unreasonable risk determinations are not fit-for-purpose for a risk evaluation under TSCA. Furthermore, Dr. Grandjean's derivation has not been subject to peer review nor public notice and comment – both of which are required components of making a final unreasonable risk determination under TSCA and are scientifically sound processes for making risk determinations based on the best available science and WoSE.

Third, Dr. Grandjean concedes that it is "hard to judge the overall fluoride exposure levels in U.S. populations exposed to fluoridated drinking water" due to paucity of data. Consequently, Dr. Grandjean relies on Canadian data in his analysis. While it is not uncommon to use data derived from non-US populations in conducting risk evaluation under TSCA, it is imperative that such data be evaluated for its relevance to the US population. EPA's application of systematic review under TSCA includes an evaluation domain against which studies are evaluated to judge such relevance [Evaluation domain = Study Participation: Study design elements characterizing the selection of participants in or out of the study (or analysis sample), which influence whether the exposure-outcome distribution among participants is representative of the exposure-outcome