C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

_____
                                            )
FOOD & WATER WATCH, et al.,                 )    Civ. No. 17-CV-02162-EMC
                                            )
                        Plaintiffs,         )    **PLAINTIFFS' STATEMENT ON**
        vs.                                 )    **BELLWETHER EVIDENTIARY ISSUES**
                                            )
U.S. ENVIRONMENTAL PROTECTION               )
AGENCY, et al.                              )
                                            )
                        Defendants.         )
                                            )
_____     )

**INTRODUCTION**

Pursuant to the Court's request (ECF No. 177), Plaintiffs have met and conferred with EPA to resolve evidentiary objections and intend to continue doing so. As reflected in the Amended Exhibit List, the number of exhibits and objections have been substantially reduced. In addition, Plaintiffs have withdrawn their opposition to EPA's Third Motion *in Limine* (regarding the NTP Draft Monograph), although Plaintiffs have reserved the right to inquire about the NTP Monograph on cross-examination. Finally, pursuant to the Court's request, the Plaintiffs hereby identify the following bellwether evidentiary issues for which they seek a ruling at the Final Pre-Trial Conference on May 8. Plaintiffs also briefly respond to the bellwether issues raised by the EPA.

**PLAINTIFFS' BELLWETHER EVIDENTIARY ISSUES**

**Plaintiffs' Bellwether Issue No. 1:**

**EPA Admissions on the Public Health Consequences of Chemical-Induced IQ Loss**
[EPA Objection: Relevance]

Plaintiffs' Exhibit List contains five EPA documents[1] that help to establish the adverse nature of chemical-induced IQ loss. IQ loss is the principal health effect at issue in this case, and as explained herein, the adverse consequences of IQ reductions are relevant and highly probative to the "unreasonableness" inquiry. EPA's only objection to these EPA documents is that they are irrelevant because they do not specifically address fluoride. The documents need not address fluoride, however, to be relevant to this case. *See Iacobucci v. Boulter*, 193 F.3d 14, 20 (1st Cir. 1999) (noting that "[r]elevancy is a fluid concept under the Evidence Rules" and "typically presents a rather low barrier to admissibility"); *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009) ("The standard for relevancy is 'extremely liberal' under the Federal Rules of Evidence.").

Under TSCA, it is not enough to prove the existence of a risk; the risk must also be "unreasonable." 15 U.S.C. § 2620(b). In its Final Rule on TSCA risk evaluations, EPA identified several "risk-related factors" that the Agency agrees are relevant to the unreasonableness inquiry. These factors include "the

---

[1] The five documents are Plaintiffs' Ex. 33 (formerly 55), Ex. 34 (formerly 56), Ex. 35 (formerly 57), Ex. 42 (formerly 67), and Ex. 43 (formerly 69).

severity of the hazard" and the "nature of the hazard." 82 Fed. Reg. 33,734-33,735 (July 20, 2017). At trial, Plaintiffs' experts will present evidence showing that early-life fluoride exposure causes IQ loss, and that *in utero* exposure to fluoridation chemicals is associated with an *average* reduction of approximately 2 IQ points, with some children experiencing substantially larger reductions. One of the material issues in this case, therefore, will be whether an average loss of 2 IQ points is sufficiently severe to warrant an unreasonable risk determination.

The EPA documents are relevant and highly probative to this question. <u>First</u>, the documents show that EPA has repeatedly taken or proposed regulatory action to prevent chemical-induced IQ loss, including under TSCA. In its Final Rule for the national air standard for lead, EPA recognized that even small reductions in IQ on the individual level can have substantial public health consequences on the population level and agreed with its Clean Air Scientific Advisory Council (CASAC) that the lead standard "should prevent air-related IQ loss of a significant magnitude in all but a small percentile of the population." **Ex. A** (Pls' Ex. 42) at 67,000. According to the CASAC, "a population loss of 1-2 IQ points is highly significant from a public health perspective" and "the primary lead standard should be set so as to protect 99.5% of the population from exceeding that IQ loss." *Id*. Consistent with this, EPA set the standard at a level that would prevent a mean IQ loss of 2 points in all but a small subset of children. *Id.* at 67,005.

<u>Second</u>, the EPA documents recognize that "[c]ognitive effects are thought to strongly relate to a child's future productivity and earning potential," and that the loss of a single IQ point is associated with a significant reduction in lifetime earnings. **Ex. B** (Pls' Ex. 34) at ES-7; **Ex. C** (Pls' Ex. 43) at 30,552. In 2019, for example, the EPA estimated that the loss of 1 IQ point reduces lifelong earnings by an average of $18,686.[2] **Ex. C** (Pls' Ex. 43) at 30,522. EPA has described the economic valuation of avoided IQ deficits as based on "well established methods and data." **Ex. D** (Pls' Ex. 33) at 9-1. This admission supports the analysis of Plaintiffs' expert, Dr. Philippe Grandjean, who estimated that the loss of 1 IQ point can be expected to reduce lifetime earnings "by about 18,000." As Dr. Grandjean will explain at trial, the net societal effect of these losses in lifetime earnings from fluoride neurotoxicity is enormous.

---

[2] EPA used a 3% discount rate for this estimate. **Ex. C** (Pls' Ex. 43) at 30,522. This is the discount rate that EPA has repeatedly used in prior analyses of chemical-induced IQ loss, including in a TSCA analysis of lead. **Ex. E** (Pls' Ex. 35) at 4-12. In its TSCA analysis, EPA stated that "a 3 percent discount rate has been adopted as the most appropriate rate for use in this analysis." *Id.*

Third, the EPA documents recognize the problem with lowering IQ among children who are already at the borderline of intellectual disability. *E.g*., **Ex. A** (Pls' Ex. 42) at 66,976 (noting that a drop of several IQ points "might be sufficient to drop [an] individual into the range associated with increased risk of educational, vocational, and social failure"). In an analysis that EPA conducted under TSCA of the IQ impact from reducing lead paint exposure, the Agency considered both the average improvement in mean IQ as well as the number of children who would avoid having IQs lower than 70. **Ex. E** (Pls' Ex. 35) at ES11-ES12. The Agency concluded that further reduction in lead paint exposure would increase average IQ by 0.23 to 0.9 points and protect 8,000 to 30,000 children from having IQs lower than 70. *Id.* The EPA characterized these health impacts as "positive and substantial." *Id.*

As noted above, EPA's only grounds for disputing the relevance of these documents is that the documents do not specifically address fluoride. This is frivolous. The documents need not specifically address fluoride to be relevant – indeed, were that the rule, most of the documents on EPA's exhibit list would be irrelevant as well. The important facts are: (1) these documents address the impacts of IQ loss, which is the principal health effect at issue in this case, and (2) EPA's admissions about the serious public health consequences of population-wide IQ loss is relevant and highly probative to the unreasonableness inquiry.

### Plaintiffs' Bellwether Issue No. 2

**EPA Documents that Use Foreign-Based Epidemiological Data to Assess Risk in US Populations**
[EPA Objection: Relevance]

Plaintiffs seek rulings on EPA's relevance objection to three EPA documents[3] that show how EPA has handled foreign-based epidemiological data in the past. The documents are relevant because they support Plaintiffs' use of epidemiological studies on fluoride and IQ from Canada, Mexico, and other foreign countries to establish risk to the U.S. population.

As evident by EPA's First Motion *in Limine*, one of EPA's litigation strategies has been to argue that the NIH-funded studies on fluoride and IQ cannot be used to assess risk in the US population because the studies were conducted in Canada and Mexico City. Under this litigation strategy, EPA has put together a list of theoretical reasons why evidence of fluoride reducing IQ in Canadian and Mexican populations

---

[3] The three documents are Plaintiffs' Ex. 32 (formerly 53), Ex. 40 (formerly 62), and Ex. 59 (formerly 89).

might not be applicable to the US. While EPA is entitled to advance this argument, Plaintiffs are entitled to show the Court how unusual it is, and how it contradicts the way EPA actually handles epidemiological data in practice.

The three documents that Plaintiffs seek to introduce show how EPA used *prospective cohort data* on mercury and IQ to establish the reference dose for mercury in the US. As with the NIH-funded prospective cohort studies on fluoride, the mercury study was not conducted in the US (it was conducted in the Faroe Islands). Moreover, as with the fluoride data, the mercury data was analyzed by *Dr. Philippe Grandjean* (Plaintiffs' expert in this case) to calculate a Benchmark Dose (BMD) for the purpose of deriving a reference dose to protect against neurotoxic effects. Unlike with the fluoride data, however, EPA did not question the generalizability of the Faroe Islands data to the US population, and did not question Dr. Grandjean's BMD analysis thereof. Instead, the EPA used Dr. Grandjean's BMD estimates from the Faroe Islands study to derive the reference dose for mercury, which is the dose that EPA uses as its guide for protecting the US population from the neurodevelopmental risks of mercury.

In short, the mercury/IQ documents are relevant because they support Plaintiffs' reliance on Dr. Grandjean's BMD analysis of foreign-based prospective data on fluoride to assess risk in the United States. EPA's only grounds for its relevance objection is that the mercury documents do not specifically address fluoride. Once again, however, a document does not need to reference the word fluoride to be relevant to this case. Plaintiffs respectfully request, therefore, that the Court overrule EPA's relevance objections.

### Plaintiffs' Bellwether Issue No. 3

**Documents Showing the Absence of Neurological Safety Data for Fluoride**
[EPA Objection: Relevance]

Plaintiffs seek to introduce two documents[4] for the purpose of demonstrating the absence of neurological safety data for fluoride. EPA objects to these documents based on its apparent apprehension that Plaintiffs will use this evidence to shift the burden of proof onto EPA to prove fluoridation chemicals safe. This, however, is not how Plaintiffs intend to use this evidence. Instead, Plaintiffs intend to use this evidence to further demonstrate that (1) Plaintiffs' experts have not excluded or omitted any material data that contradict their assessment of risk, and, relatedly (2) the new NIH-funded research showing

---

[4] The two documents are Plaintiffs' Ex. 14 (formerly 22) and Ex. 16 (formerly 30).

neurological risk from fluoridation chemicals is not at odds with previous safety studies because no such studies exist.

The two exhibits at issue in this bellwether topic are a sworn declaration from the Food & Drug Administration (FDA) and a factual stipulation summarizing the information provided in sworn declarations from three manufacturers of fluoridation chemicals in the United States. **Ex. F** (Pls' Ex. 14) and **Ex. G** (Pls' Ex. 16). Each of these 4 entities has ample reason to know about the risks that fluoride poses to health: the FDA regulates a broad array of fluoride-containing dental products and the manufacturers sell fluoridation chemicals to municipalities across the country. Yet, the two exhibits demonstrate that none of these four entities have any data to demonstrate or support the neurological safety of fluoride, and the FDA has "no position" on whether fluoride presents a risk of neurotoxicity.[5]

Additionally, if the Court denies Plaintiffs' First Motion *in Limine*, the FDA's declaration is relevant to the issue of fluoride's "systemic" benefits because FDA confirms that it has never approved *any* fluoride product that is meant to be *ingested*. Ex. F (Pls' Ex. 14) ¶¶ 9-12. The only fluoride products that FDA has approved are those that are applied *topically*. *Id.* ¶ 12-14. This, in turn, supports Plaintiffs' position about the unreasonableness of ingesting fluoride before the teeth erupt (during the *in utero* and early infancy period), since there is no benefit during these life stages, only risk.

## EPA'S BELLWETHER ISSUES

### Documents that Purportedly Violate the Parties' Stipulation on the MCLG

EPA seeks to exclude three EPA documents on the grounds that introduction of this evidence violates the parties' stipulation on the MCLG. EPA's request should be denied because it (1) rests on an unduly expansive reading of the stipulation, (2) would exclude reports that contain relevant admissions on non-MCLG matters; and (3) calls for an unduly expansive remedy where far more tailored approaches are readily available.

First, EPA is expanding the scope of the stipulation far beyond its context and purpose. The parties entered into the stipulation because the Plaintiffs intended to call several witnesses, including EPA's 30(b)(6) representative, to discuss the crudeness of the MCLG and the political history behind it. EPA now

---

[5] The author of FDA declaration (Frederick Hyman) is a co-author of a fluoride review that the EPA seeks to enter into evidence in this case. EPA's Ex. 516. This gives further support for entering the declaration into evidence, in order to provide a more complete picture of current federal agency positions on fluoride.

seeks to expand the stipulation far beyond its original purpose to include any document that simply references the MCLG, no matter how banally or fleetingly.

**Second**, EPA seeks to exclude, *in toto*, documents that contain relevant admissions on material issues in the case that have nothing to do with the MCLG. To help demonstrate this, Plaintiffs will briefly discuss two of the documents that EPA seeks to exclude.

### Fluoride: Dose Response Analysis for Non-Cancer Effects (Ex. 29)

This report provides EPA's most extensive review of the scientific literature on fluoride, and makes many relevant admissions to issues in the case. These admissions include the following:

- Fluoride's primary benefit for caries prevention comes from *topical* contact with the teeth. Notably, this statement, which is based on research by Plaintiffs' dental expert Dr. Ole Fejerskov, contradicts the opinion of EPA's retained *litigation* expert. **Ex. H** (Pls' Ex. 29) at 3.
- There are subsets of the U.S. population who are more susceptible to the chronic effects of fluoride exposure, including over one million children who have pathological conditions that are expected to increase their vulnerability to fluoride's toxic effects. *Id*. at 31-32.
- Fluoridated water produces "high" levels of fluoride in baby formula, with published data indicating that fluoridated formula produces doses that are approximately 100 times higher than what a breast-fed baby receives. *Id.* at 32.

EPA seeks to exclude this 160-page document *in toto*, despite the fact that the word MCLG *appears on only 7 pages.*

### Fluoride: Exposure and Relative Source Contribution Analysis (Ex. 30)

This report documents EPA's assessment of fluoride exposure from drinking water and other sources, and contains admissions of direct relevance to both the exposure assessment and standing issues in this case. The relevant admissions include, *inter alia*, that (1) fluoride exposure has increased in the US, causing more children to develop dental fluorosis (a biomarker of excess fluoride exposure), and (2) the addition of fluoridation chemicals to drinking water ends up increasing the fluoride concentration of commercially-prepared processed beverages. **Ex. I** (Pls' Ex. 30) at 26, 70, 107-108. The latter admission confirms one of the primary concerns that Plaintiffs' standing witnesses have: i.e., that the addition of fluoridation chemicals to drinking water contaminates commercial beverages, and thus even if they filter the fluoride out of their tap water, they will still ingest the toxicant if they consume everyday products like soda and juice.

EPA seeks to exclude this 110-page exposure assessment *in toto*, despite the fact that only 10 pages make any reference to the MCLG.

<u>Third</u>, even if the limited and banal discussion of the MCLG in these reports was interpreted as coming within the scope of the stipulation, there are far more tailored approaches to remedy the situation. The obvious approach would be to simply omit or redact the discussions of the MCLG. There is no need to take the dragnet approach that EPA seeks; an approach that would prejudice Plaintiffs by excluding clearly relevant admissions that have nothing to do with the MCLG.

### Draft EPA Risk Evaluation Documents

EPA seeks a bellwether ruling to exclude all draft risk evaluations under TSCA.[6] This request should be denied because, irrespective of their draft status, there is no dispute that these are EPA's statements; they are thus *party admissions* under FRE 801. *See, e.g.*, *Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 334–35 (S.D.N.Y. 2009) (denying motion to exclude draft documents because they qualify as party admissions); *Nasutavicus v. Nat'l P'ship Investments Corp.*, No. CV 98-7035DDP, 2002 WL 34418403, at *2 (C.D. Cal. Oct. 7, 2002) (admitting preliminary drafts as party admissions).

Nor can there be any credible dispute about the relevance of EPA's risk evaluations under TSCA. As discussed at greater length in Plaintiffs' Opposition to EPA's Fifth Motion *in Limine*, these risk evaluations demonstrate EPA's current scientific judgment on what methods and considerations should be used to assess risk under the amended TSCA. Plaintiffs' risk assessment expert, Dr. Kathleen Thiessen, relied on these draft evaluations to form her opinions in this case, and will explain how the neurotoxic data that is available for fluoride is far more substantial and developed than the data that EPA has found to be sufficient for making risk determinations for other chemicals.

### Documents that Do Not Specifically Address Fluoridation Chemicals

EPA seeks a sweeping bellwether ruling on its relevance objection to exhibits that do not specifically address fluoridation chemicals. This sweeping rule would exclude a broad swath of relevant evidence and should be overruled.

---

[6] Plaintiffs have no ability to use final risk evaluations because, at the present time, there is not a single completed risk evaluation under the amended TSCA.

May 1, 2020                                    Respectfully submitted,

                                               */s/ Michael Connett*
                                               MICHAEL CONNETT
                                               Attorney for Plaintiffs

PLAINTIFFS' STATEMENT ON BELLWETHER EVIDENTIARY ISSUES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by Notice of Electronic Filing this 1st day of May, 2020, upon all ECF registered counsel of record using the Court's CM/ECF system.

_/s/ Michael Connett_
MICHAEL CONNETT

# Exhibit A

## (Excerpt of Plaintiffs' Ex. 42)

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 50, 51, 53 and 58**

**[EPA–HQ–OAR–2006–0735; FRL–8732–9]**

**RIN 2060–AN83**

**National Ambient Air Quality Standards for Lead**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** Based on its review of the air quality criteria and national ambient air quality standards (NAAQS) for lead (Pb), EPA is making revisions to the primary and secondary NAAQS for Pb to provide requisite protection of public health and welfare, respectively. With regard to the primary standard, EPA is revising the level to 0.15 μg/m³. EPA is retaining the current indicator of Pb in total suspended particles (Pb-TSP). EPA is revising the averaging time to a rolling 3-month period with a maximum (not-to-be-exceeded) form, evaluated over a 3-year period. EPA is revising the secondary standard to be identical in all respects to the revised primary standard.

EPA is also revising data handling procedures, including allowance for the use of Pb-PM₁₀ data in certain circumstances, and the treatment of exceptional events, and ambient air monitoring and reporting requirements for Pb, including those related to sampling and analysis methods, network design, sampling schedule, and data reporting. Finally, EPA is revising emissions inventory reporting requirements and providing guidance on its approach for implementing the revised primary and secondary standards for Pb.

**DATES:** This final rule is effective on January 12, 2009.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2006–0735. All documents in the docket are listed on the *www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, e.g., confidential business information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Air and Radiation Docket and Information Center, EPA/DC, EPA West, Room 3334, 1301 Constitution Ave.,

NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744 and the telephone number for the Air and Radiation Docket and Information Center is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** For further information in general or specifically with regard to sections I through III or VIII, contact Dr. Deirdre Murphy, Health and Environmental Impacts Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Mail code C504–06, Research Triangle Park, NC 27711; *telephone:* 919–541–0729; *fax:* 919–541–0237; *e-mail: Murphy.deirdre@epa.gov.* With regard to section IV, contact Mr. Mark Schmidt, Air Quality Analysis Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Mail code C304–04, Research Triangle Park, NC 27711; *telephone:* 919–541–2416; *fax:* 919–541–1903; *e-mail: Schmidt.mark@epa.gov.* With regard to section V, contact Mr. Kevin Cavender, Air Quality Analysis Division, Office of Air Quality Planning and Standards, Mail code C304–06, Research Triangle Park, NC 27711; *telephone:* 919–541–2364; *fax:* 919–541–1903; *e-mail: Cavender.kevin@epa.gov.* With regard to section VI, contact Mr. Larry Wallace, Ph.D., Air Quality Policy Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Mail code C539–01, Research Triangle Park, NC 27711; *telephone:* 919–541–0906; *fax:* 919–541–0824; *e-mail: Wallace.larry@epa.gov.* With regard to section VII, contact Mr. Tom Link, Air Quality Policy Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Mail code C539–04, Research Triangle Park, NC 27711; *telephone:* 919–541–5456; *e-mail: Link.tom@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

The following topics are discussed in this preamble:

I. Summary and Background
  A. Summary of Revisions to the Lead NAAQS
  B. Legislative Requirements
  C. Review of Air Quality Criteria and Standards for Lead
  D. Current Related Control Requirements
  E. Summary of Proposed Revisions to the Lead NAAQS
  F. Organization and Approach to Final Lead NAAQS Decisions
II. Rationale for Final Decisions on the Primary Lead Standard
  A. Introduction
  1. Overview of Multimedia, Multipathway Considerations and Background
  2. Overview of Health Effects Information
  a. Blood Lead
  b. Array of Health Effects and At-risk Subpopulations
  c. Neurological Effects in Children
  3. Overview of Human Exposure and Health Risk Assessments
  B. Need for Revision of the Current Primary Lead Standard
  1. Introduction
  2. Comments on the Need for Revision
  3. Conclusions Regarding the Need for Revision
  C. Conclusions on the Elements of the Primary Lead Standard
  1. Indicator
  a. Basis for Proposed Decision
  b. Comments on Indicator
  c. Conclusions on Indicator
  2. Averaging Time and Form
  a. Basis for Proposed Decision
  b. Comments on Averaging Time and Form
  c. Conclusions on Averaging Time and Form
  3. Level
  a. Basis for Proposed Range
  b. Comments on Level
  c. Conclusions on Level
  D. Final Decision on the Primary Lead Standard
III. Secondary Lead Standard
  A. Introduction
  1. Overview of Welfare Effects Evidence
  2. Overview of Screening Level Ecological Risk Assessment
  B. Conclusions on the Secondary Lead Standard
  1. Basis for Proposed Decision
  2. Comments on the Proposed Secondary Standard
  3. Administrator's Conclusions
  C. Final Decision on the Secondary Lead Standard
IV. Appendix R—Interpretation of the NAAQS for Lead
  A. Ambient Data Requirements
  1. Proposed Provisions
  2. Comments on Ambient Data Requirements
  3. Conclusions on Ambient Data Requirements
  B. Averaging Time and Procedure
  1. Proposed Provisions
  2. Comments on Averaging Time and Procedure
  3. Conclusions on Averaging Time and Procedure
  C. Data Completeness
  1. Proposed Provisions
  2. Comments on Data Completeness
  3. Conclusions on Data Completeness
  D. Scaling Factors to Relate Pb-TSP and Pb-PM₁₀
  1. Proposed Provisions
  2. Comments on Scaling Factors
  3. Conclusions on Scaling Factors
  E. Use of Pb-TSP and Pb-PM₁₀ Data
  1. Proposed Provisions
  2. Comments on Use of Pb-TSP and Pb-PM₁₀ Data
  3. Conclusions on Use of Pb-TSP and Pb-PM₁₀ Data

maximum exposure around 18–27 months, the current evidence has found even stronger associations between blood Pb at school age and IQ at school age. The evidence "supports the idea that Pb exposure continues to be toxic to children as they reach school age, and [does] not lend support to the interpretation that all the damage is done by the time the child reaches 2 to 3 years of age" (CD, section 6.2.12). The following physiological and demographic factors can further affect risk of Pb-related effects in some children.

• Children with particular genetic polymorphisms (*e.g.*, presence of the δ-aminolevulinic acid dehydratase-2 [ALAD-2] allele) have increased sensitivity to Pb toxicity, which may be due to increased susceptibility to the same internal dose and/or to increased internal dose associated with same exposure (CD, p. 8–71, sections 6.3.5, 6.4.7.3 and 6.3.6).

• Some children may have blood Pb levels higher than those otherwise associated with a given Pb exposure (CD, section 8.5.3) as a result of nutritional status (e.g., iron deficiency, calcium intake), as well as genetic and other factors (CD, chapter 4 and sections 3.4, 5.3.7 and 8.5.3).

• Situations of elevated exposure, such as residing near sources of ambient Pb, as well as socioeconomic factors, such as reduced access to health care or low socioeconomic status (SES) (USEPA, 2003, 2005c) can also contribute to increased blood Pb levels and increased risk of associated health effects from air-related Pb.

• As described in the proposal (sections II.B.1.b and II.B.3), children in poverty and black, non-Hispanic children have notably higher blood Pb levels than do economically well-off children and white children, in general.

c. Neurological Effects in Children

Among the wide variety of health endpoints associated with Pb exposures, there is general consensus that the developing nervous system in children is among the, if not the, most sensitive. While blood Pb levels in U.S. children have decreased notably since the late 1970s, newer studies have investigated and reported associations of effects on the neurodevelopment of children with these more recent blood Pb levels (CD, chapter 6). Functional manifestations of Pb neurotoxicity during childhood include sensory, motor, cognitive and behavioral impacts. Numerous epidemiological studies have reported neurocognitive, neurobehavioral, sensory, and motor function effects in children with blood Pb levels below 10

μg/dL (CD, sections 6.2 and 8.4).[32] As discussed in the Criteria Document, "extensive experimental laboratory animal evidence has been generated that (a) substantiates well the plausibility of the epidemiological findings observed in human children and adults and (b) expands our understanding of likely mechanisms underlying the neurotoxic effects" (CD, p. 8–25; section 5.3).

Cognitive effects associated with Pb exposures that have been observed in epidemiological studies have included decrements in intelligence test results, such as the widely used IQ score, and in academic achievement as assessed by various standardized tests as well by class ranking and graduation rates (CD, section 6.2.16 and pp 8–29 to 8–30). As noted in the Criteria Document with regard to the latter, "Associations between Pb exposure and academic achievement observed in the above-noted studies were significant even after adjusting for IQ, suggesting that Pb-sensitive neuropsychological processing and learning factors not reflected by global intelligence indices might contribute to reduced performance on academic tasks" (CD, pp 8–29 to 8–30).

With regard to potential implications of Pb effects on IQ, ==the Criteria Document recognizes the "critical" distinction between population and individual risk, identifying issues regarding declines in IQ for an individual and for the population. The Criteria Document further states that a "point estimate indicating a modest mean change on a health index at the individual level can have substantial implications at the population level" (CD, p. 8–77).[33] A downward shift in the mean IQ value is associated with both substantial decreases in percentages achieving very high scores and substantial increases in the percentage of individuals achieving very low scores== (CD, p. 8–81).[34] For an individual functioning in the low IQ range due to the influence of developmental risk

factors other than Pb, ==a Pb-associated IQ decline of several points might be sufficient to drop that individual into the range associated with increased risk of educational, vocational, and social failure== (CD, p. 8–77).

Other cognitive effects observed in studies of children have included effects on attention, executive functions, language, memory, learning and visuospatial processing (CD, sections 5.3.5, 6.2.5 and 8.4.2.1), with attention and executive function effects associated with Pb exposures indexed by blood Pb levels below 10 μg/dL (CD, section 6.2.5 and pp. 8–30 to 8–31). The evidence for the role of Pb in this suite of effects includes experimental animal findings (discussed in CD, section 8.4.2.1; p. 8–31), which provide strong biological plausibility of Pb effects on learning ability, memory and attention (CD, section 5.3.5), as well as associated mechanistic findings.

The persistence of such Pb-induced effects is described in the proposal and the Criteria Document (e.g., CD, sections 5.3.5, 6.2.11, and 8.5.2). The persistence or irreversibility of such effects can be the result of damage occurring without adequate repair offsets or of the persistence of Pb in the body (CD, section 8.5.2). It is additionally important to note that there may be long-term consequences of such deficits over a lifetime. Poor academic skills and achievement can have "enduring and important effects on objective parameters of success in real life", as well as increased risk of antisocial and delinquent behavior (CD, section 6.2.16).

Multiple epidemiologic studies of Pb and child development have demonstrated inverse associations between blood Pb concentrations and children's IQ and other cognitive-related outcomes at successively lower Pb exposure levels over the past 30 years (as discussed in the CD, section 6.2.13). For example, the overall weight of the available evidence, described in the Criteria Document, provides clear substantiation of neurocognitive decrements being associated in children with mean blood Pb levels in the range of 5 to 10 μg/dL, and some analyses indicate Pb effects on intellectual attainment of children for which population mean blood Pb levels in the analysis ranged from 2 to 8 μg/dL (CD, sections 6.2, 8.4.2 and 8.4.2.6). Thus, while blood Pb levels in U.S. children have decreased notably since the late 1970s, newer studies have investigated and reported associations of effects on the neurodevelopment of children with blood Pb levels similar to the more recent, lower blood Pb levels (CD,

---

[32] Further, neurological effects in general include behavioral effects, such as delinquent behavior (CD, sections 6.2.6 and 8.4.2.2), sensory effects, such as those related to hearing and vision (CD, sections 6.2.7 and 8.4.2.3), and deficits in neuromotor function (CD, p. 8–36).

[33] As an example, the Criteria Document states "although an increase of a few mmHg in blood pressure might not be of concern for an individual's well-being, the same increase in the population mean might be associated with substantial increases in the percentages of individuals with values that are sufficiently extreme that they exceed the criteria used to diagnose hypertension" (CD, p. 8–77).

[34] For example, for a population mean IQ of 100 (and standard deviation of 15), 2.3% of the population would score above 130, but a shift of the population to a mean of 95 results in only 0.99% of the population scoring above 130 (CD, pp. 8–81 to 8–82).

stating that in assuring this level of protection, EPA must take into account susceptible or vulnerable subgroups. In discussing these subgroups, some commenters noted factors such as nutritional deficiencies as contributing to susceptibility and identified minority and low-income children as a sensitive subpopulation for Pb exposures. Some of these commenters recommended much lower levels, such as 0.02 μg/m³, based on their views as to the level needed to protect public health with an adequate margin of safety in light of their interpretation of the advice of CASAC and EPA Staff and the evidence, including the lack of identifiable threshold. Some of these commenters recommending much lower levels expressed the view that the standard should be as protective as possible.

A second, much smaller, group of comments (including some industry comments and some state agency comments), recommended levels for the standard that are higher than 0.2 μg/m³. Among this group, some commenters provide little or no health-based rationale for their comment. Other commenters, in recommending various levels above 0.2 μg/m³, generally state that there is no benefit to be gained by setting a lower level for the standard. In support of this general conclusion, there is substantial uncertainty associated with the slope of the blood Pb-IQ loss concentration-response function at lower blood Pb levels, such that EPA should not rely on estimates that indicate a steeper slope at lower blood Pb levels; that the risk assessment results for total risk at alternative standard levels indicate no benefit to be achieved from a standard level below 0.5 μg/m³; that levels derived from the evidence-based framework need upward adjustment for use with an averaging time less than a year and that IQ loss estimates derived from the evidence-based framework presented in the proposal for levels from 0.10 to 0.50 μg/m³ do not differ much (*e.g.*, from 2 to 4.1 points IQ loss [steeper slopes] and from 1.1 to 2.2 points IQ loss [shallower slope] for the two sets of C–R functions).

For the range of reasons summarized in section II.C.3.a above, and the reasons described more fully in section II.C.3.c below, EPA does not believe that a level for the standard above 0.2 μg/m³ would protect public health with an adequate margin of safety. Rather, EPA concludes that such a level for the standard would not be protective of public health with an adequate margin of safety. Further, EPA disagrees with the industry comment that levels identified using the evidence-based framework should be

adjusted upward; this and other specific aspects of comments summarized above are discussed further in the Response to Comments document.

(ii) Use of Air-related IQ Loss Evidence-based Framework

As noted above, EPA received advice and recommendations from CASAC and comments from the public with regard to application of the air-related IQ loss evidence-based framework in the selection of a level for the primary standard. In the discussion that follows, we first describe CASAC advice and public comments on the appropriate degree of public health protection that should be afforded to at-risk populations in terms of IQ loss in children as estimated by this framework, We then describe CASAC advice and public comments on the specific parameters of C–R function and air-to-blood ratio.

In their July 2008 advice to the Agency on the proposal notice, CASAC characterized the target degree of protection proposed for use with the air-related IQ loss framework to be inadequate (Henderson, 2008a). As basis for this characterization, they repeat the advice they conveyed with their March 2007 letter, that they considered that *"a population loss of 1–2 IQ points is highly significant from a public health perspective"* and that *"the primary lead standard should be set so as to protect 99.5% of the population from exceeding that IQ loss"* (emphasis in original). They further emphasized their view that an IQ loss of 1–2 points should be "prevented in all but a small percentile of the population—and certainly not accepted as a reasonable change in *mean* IQ scores across the entire population" (emphasis in original).

Recommendations from several commenters, including the American Academy of Pediatrics, and state health agencies that commented on this issue, are in general agreement with the view emphasized by CASAC that air-related IQ loss of a specific magnitude, such as on the order of 1 or 2 points, should be prevented in a very high percentage (e.g., 99.5%) of the population.

EPA generally agrees with CASAC and the commenters that emphasize that the NAAQS should prevent air-related IQ loss of a significant magnitude in all but a small percentile of the population. However, it is important to note that in selecting a target degree of public health protection from air-related IQ loss in children for the purposes of this review, EPA is addressing this issue more specifically in the context of this evidence-based framework. In so doing, EPA is not determining a specific

quantitative public health policy goal in terms of an air-related IQ loss that is acceptable or unacceptable in the U.S. population *per se*, but instead is determining what magnitude of estimated air-related IQ loss should be used in conjunction with the specific air-related IQ loss evidence-based framework being applied in this review, recognizing the uncertainties and limitations in this framework. As discussed later, the estimated air-related IQ loss resulting from the application of this evidence-based framework should not be viewed as a bright line estimate of expected IQ loss in the population that would or would not occur. Nonetheless, these results provide a useful guide for the Administrator to use in making the basically qualitative public health policy judgment about the risk to public health that could reasonably be expected to result from exposure to the ambient air quality patterns that would be allowed by varying levels of the standard, in light of the averaging time, form, and indicator specified above.

In that context, it is important to recognize that the air-related IQ loss framework provides estimates for the mean of a subset of the population. It is an estimate for a subset of children that are assumed to be exposed to the level of the standard. The framework in effect focuses on the sensitive subpopulation that is the group of children living near sources and more likely to be exposed at the level of the standard. The evidence-based framework estimates a mean air-related IQ loss for this subpopulation of children; it does not estimate a mean for all U.S. children.

EPA is unable to quantify the percentile of the U.S. population of children that corresponds to the mean of this sensitive subpopulation. Nor is EPA confident in its ability to develop quantified estimates of air-related IQ loss for higher percentiles than the mean of this subpopulation. EPA expects that the mean of this subpopulation represents a high, but not quantifiable, percentile of the U.S. population of children. As a result, EPA expects that a standard based on consideration of this framework would provide the same or greater protection from estimated air-related IQ loss for a high, albeit unquantifiable, percentage of the entire population of U.S. children.

One industry association commenter noted agreement with EPA's focus on population mean (or median) for the framework, and the statement of greater confidence in estimates for air-related (as contrasted with total Pb-related) IQ loss at a central point in the distribution

In that context, the air-related IQ loss framework provides estimates for the mean air-related IQ loss of a subset of the population of U.S. children, and there are uncertainties associated with those estimates. It provides estimates for that subset of children likely to be exposed to the level of the standard, which is generally expected to be the subpopulation of children living near sources who are likely to be most highly exposed. In providing estimates of the mean air-related IQ loss for this subpopulation of children, the framework does not provide estimates of the mean air-related IQ loss for all U.S. children. The Administrator recognizes, as discussed above, that EPA is unable to quantify the percentile of the U.S. population of children that corresponds to the mean of this sensitive subpopulation, nor can EPA confidently develop quantified estimates for upper percentiles for this subpopulation. EPA expects that the mean of this subpopulation represents a high, but not quantifiable, percentile of the U.S. population of children. As a result, the Administrator expects that a standard based on consideration of this framework would provide the same or greater protection from estimated air-related IQ loss for a high, albeit unquantifiable, percentage of the entire population of U.S. children.[83]

In addition, EPA expects that the selection of a maximum, not to be exceeded, form in conjunction with a rolling 3-month averaging time over a three-year span, discussed in section II.C.2. above, will have the effect that the at-risk subpopulation of children will be exposed below the level of the standard most of the time. In light of this and the significant uncertainty in the relationship between time period of ambient level, exposure, and occurrence of a health effect, the choice of an air-related IQ loss to focus on in applying the framework should not be seen as a decision that a specific level of air-related IQ loss will occur in fact in areas where the revised standard is just met

or that such a loss has been determined as acceptable if it were to occur. Instead, the choice of such an air-related IQ loss is one of the judgments that need to be made in using the evidence-based framework to provide useful guidance in making the public health policy judgment on the degree of protection from risk to public health that is sufficient but not more than necessary, taking into consideration the patterns of air quality that would likely occur upon just meeting the standard as revised in this rulemaking.

In considering the appropriate air-related IQ loss to accompany application of the framework, the Administrator has considered the advice of CASAC and public comments on this issue, discussed above in section II.C.3.b. The Administrator recognizes that comments on the proposal have highlighted the ambiguity in using an air-related IQ loss for the framework that is phrased in terms of a range. For example, if a range of 1–2 points IQ loss is selected, it is unclear whether the intent is to limit points of air-related IQ loss to below 1, below 2, or below some level in between. For clarity, it is more useful to use a specific level as compared to a range. In addition, recognizing the uncertainties inherent in evaluating the health impact of an IQ loss across a population, as well as the uncertainties in the inputs to the framework, the Administrator believes it is appropriate to use a whole number for the air-related IQ loss level.

In consideration of comments from CASAC and the public and in recognition of the uncertainties in the health effects evidence and related information, as well as the role of a selected air-related IQ loss in the application of the framework, the Administrator concludes that an air-related IQ loss of 2 points should be used in conjunction with the evidence-based framework in selecting an appropriate level for the standard. Given the uncertainties in the inputs to the framework, the uncertainties in the

relationship between ambient levels, exposure period, and occurrence of health effects, and the focus of the framework on the sensitive subpopulation of more highly exposed children, a standard level selected using this air-related IQ loss, in combination with the selected averaging time and form, would significantly reduce and limit for a high percentage of U.S. children the risk of experiencing an air-related IQ loss of that magnitude.

With this specific air-related IQ loss in mind, the Administrator considered the application of this framework to a broad range of standard levels, using estimates for the two key parameters—air-to-blood ratio and C–R function—that are appropriate for use within the framework, as shown in Table 4 below. In so doing, the Administrator recognized that, relying on the median of the four C–R functions from analyses with blood Pb levels closest to those of today's children, a standard level in the lower half of the proposed range (0.10–0.20 $\mu$g/m³) would limit the estimated mean IQ loss from air-related Pb to below 2 points, depending on the choice of air-to-blood ratio within the range from 1:5 to 1:10.

As noted above, however, the Administrator does not believe it is appropriate to consider only a single air-to-blood ratio. Using the air-to-blood ratio of 1:7, a generally central estimate within the well supported range of estimates, the estimates of air-related IQ loss are below a 2-point IQ loss for standard levels of 0.15 $\mu$g/m³ and lower. At a level of 0.15 $\mu$g/m³, the Administrator recognizes that use of a 1:10 ratio produces an estimate greater than 2 IQ points and use of a 1:5 ratio produces a lower IQ estimate. Given the uncertainties and limitations in the air-related IQ loss framework, the Administrator views it as appropriate to place primary weight on the results from this central estimate rather than estimates derived using air-to-blood-ratios either higher or lower than this ratio.

TABLE 4—ESTIMATES OF AIR-RELATED MEAN IQ LOSS FOR THE SUBPOPULATION OF CHILDREN EXPOSED AT THE LEVEL OF THE STANDARD

| Potential level for standard ($\mu$g/m³) | Air-related mean IQ loss (points) for the subpopulation of children exposed at level of the standard | | |
| | IQ loss estimate is based on median slope of 4 C–R functions with blood Pb levels closer to those of today's U.S. children (range shown for estimates based on lowest and highest of 4 slopes) | | |
| | Air-to-blood ratio | | |
| | 1:10 | 1:7 | 1:5 |
| 0.50 | >5 * | >5 * | 4.4 (3.9–7.4) |

[83] Further, in determining what level of estimated IQ loss should be used for evaluating the results    obtained from this specific evidence-based framework, the Administrator is not determining    that such an IQ loss is appropriate for use in other contexts.

# Exhibit B

**(Excerpt of Plaintiffs' Ex. 34)**



United States
Environmental Protection
Agency

# Regulatory Impact Analysis of the Proposed Revisions to the National Ambient Air Quality Standards for Lead

Our analysis of the benefits associated with the selected NAAQS includes benefits related to reducing ambient lead concentrations and the ancillary benefits of reducing direct emissions of particulate matter.  To assess benefits specific to reduced lead concentrations, we created a spreadsheet model that provides a screening-level assessment of health benefits occurring as a result of implementing the selected NAAQS level.  The model uses various simplifying assumptions and is intended only to provide an approximate, preliminary estimate of the potential health benefits.  For the purposes of this analysis, the model estimates the adverse health impact of blood lead levels on cognitive function (which is most often measured as changes in IQ) in young children below seven years of age.  Cognitive effects are thought to strongly relate to a child's future productivity and earning potential.[8]

The model was constructed in Microsoft Excel and provides an integrated tool to complete five benefits estimation steps: 1) estimate lead in air concentrations for the "base case" and "control scenarios"; 2) estimate population exposures to air lead concentrations for each scenario; 3) estimate blood lead levels in the population for each scenario; 4) estimate avoided cases of health effects due to changes in blood lead levels; and 5) apply an economic unit value to each avoided case to calculate total monetized benefits.

Because most of the point source measures implemented to achieve the NAAQS standard are focused on controlling emissions of lead in particulate form, virtually all of these measures also have a significant impact on emissions of directly emitted particulate matter.  To estimate the value of these $PM_{2.5}$ emissions reductions, EPA utilized $PM_{2.5}$ benefit-per-ton estimates. These $PM_{2.5}$ benefit-per-ton estimates provide the total monetized human health benefits (the sum of premature mortality and premature morbidity) of reducing one ton of $PM_{2.5}$ from a specified source. EPA has used a similar technique in previous RIAs, including the recent ozone NAAQS RIA.[9]  The complete methodology for creating the benefit per-ton estimates used in this analysis is available in the Technical Support Document (TSD) accompanying the recent final ozone NAAQS RIA.[10]

*Analysis of Costs*

Consistent with our development of the illustrative control strategies described above, our analysis of the costs associated with the selected NAAQS focuses on point source PM controls. For the purposes of this analysis, these controls largely include measures from the AirControlNET control technology database, but also include additional measures associated with operating permits and/or New Source Performance Review standards applicable to sources similar to those included in our analysis.  For controls identified in AirControlNET, we estimated

---

[8] U.S. Environmental Protection Agency. (2006b). *Economic Analysis for the Renovation, Repair, and Painting Program Proposed Rule*. Office of Pollution Prevention and Toxics. Washington, DC.

[9] U.S. Environmental Protection Agency. (2008). *Final Ozone NAAQS Regulatory Impact Analysis*. Office of Air and Radiation. Research Triangle Park, NC, March.

[10] The Technical Support Document, entitled: *Calculating Benefit Per-Ton Estimates*, can be found in EPA Docket EPA-HQ-OAR-2007-0225-0284.

costs of control at a local level.  The data underlying this curve contains data points which we believe to be invalid (presented as part of the distributional analysis in Section 6.1.3.3).  The estimated curve estimates negative costs over a portion of emission reductions. In addition this approach relies heavily on the control strategy for the tightest standard alternative analyzed in this RIA, and does not account for variability in control strategies across alternative standards analyzed.  Lastly, we do not believe this curve well represents the knowledge of how control costs behave over time.

*Benefits*

- ***Exposure*.** The benefits of IQ point gains in children were very sensitive to the method employed for estimating exposures to the population.  When comparing the default method, which involved concentrations that were interpolated from multiple monitors, to the method assuming a uniform concentration within a 10 km radius around an individual monitor, the results increase by 40 percent. Increasing the radius to include the entire county in which the monitor resides results in roughly 3-fold increase in benefits. Decreasing the radius size also has a large impact on benefits, decreasing the value by as much as 94 percent when a radius of 1 km is used.

- ***Dose-response relationship*.** The dose-response function selected for quantifying the number of IQ points gained as a result of achieving the alternative NAAQS levels affected the results.  Utilizing alternate epidemiological studies decreased the primary estimate by as much as 72 percent or increased it by 140 percent.

- ***Earnings-based metric of IQ*.**  The earnings-based value-per-IQ-point lost that we apply in this analysis most likely represents a lower bound on the true value of a lost IQ point, because it is essentially a cost-of-illness measure, not a measure of an individual's willingness-to-pay (WTP) to avoid the loss of an IQ point.   Welfare economics emphasizes WTP measures as the more complete estimate of economic value.

- ***Co-control benefits related to PM*.**  Co-control benefits estimated here reflect the application of a national dollar benefit per ton estimate of the benefits of reducing directly emitted fine particulates from point sources.  Because they are based on national-level analysis, the benefit-per-ton estimates used here do not reflect local meteorology, exposure, baseline health incidence rates, or other local factors that might lead to an over-estimate or under-estimate of the actual benefits of controlling directly emitted fine particulates.

## ES.5  Conclusions and Insights

Our analysis has estimated the health benefits of reductions in ambient concentrations of lead resulting from a set of illustrative control strategies to reduce emissions of lead at point sources.  The results suggest there will be significant additional health benefits arising from reducing emissions from a variety of sources in and around projected nonattaining counties in

**Table 5-5.  Summary of Quantitative Relationships of IQ and Blood Pb for Analyses with Blood Pb Levels Closest to those of Children in the U.S. Today.**

| Blood Pb Levels (µg/dL) | | | Average Linear Slope[A] |
|---|---|---|---|
| Geometric Mean | Range (min-max) | Study/Analysis | (IQ points per µg/dL) |
| 2.9 | 0.8 – 4.9 | Tellez-Rojo et al 2006, <5 subgroup | -1.71 |
| 3.24 | 0.9 – 7.4 | Lanphear et al 2005[B], <7.5 peak subgroup | -2.94 |
| 3.32 | 0.5 – 8.4 | Canfield et al 2003[B], <10 peak subgroup | -1.79 |
| 3.8 | 1 - 9.3 | Bellinger and Needleman 2003[B] , <10 peak subgroup | -1.56 |
| | | Median value | -1.75 |

[A] Average linear slope estimates here are for relationship between IQ and concurrent blood Pb levels (BLL), except for Bellinger & Needleman for which study reports relationship fir 10 year old IQ with 24 month blood Pb levels.

[B] The Lanphear et al 2005 pooled International study includes blood Pb data from the Rochester and Boston cohorts, although for different ages (6 and 5 years, respectively) than the ages analyzed in Canfield et al 2003 and Bellinger and Needleman 2003.

**Benefit Valuation**

*Value of Avoided IQ decrements*

The valuation approach we apply for assessing monetary losses associated with IQ decrements is based on an approach applied in previous EPA analyses (USEPA, 1997, 2005 & 2006b).  The approach expresses the loss to an affected individual resulting from IQ decrements in terms of foregone future earnings for that individual.

To estimate the expected monetary value of these effects, we first estimated the median present value of future earnings at time of birth for a person born in the U.S., based on earnings and labor force participation rate data from the 2006 Current Population Survey (CPS).[23]  When calculating the lifetime earnings estimate, we assumed an individual born today would begin working at age 16 and retire at age 67.  We assumed a real growth rate for wages of one percent per year, as assumed in EPA's Section 812 retrospective analysis (US EPA, 1997); adjusted for survival probabilities based on current US vital statistics from the CDC's National Center for Health Statistics;[24] and adjusted for labor force participation by age.  We then discounted the

---

[23] See http://www.bls.gov/cps/home.htm - data.

[24] See http://www.cdc.gov/nchs/data/nvsr/nvsr54/nvsr54_14.pdf.

# Exhibit C

**(Excerpt of Plaintiffs' Ex. 43)**

# ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 141 and 142**

**[EPA–HQ–OW–2018–0780; FRL–9994–68–OW]**

**RIN 2040–AF28**

## National Primary Drinking Water Regulations: Perchlorate

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule, request for public comment.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing a drinking water regulation for perchlorate and a health-based Maximum Contaminant Level Goal (MCLG) in accordance with the Safe Drinking Water Act (SDWA). The EPA is proposing to set both the enforceable Maximum Contaminant Level (MCL) for the perchlorate regulation and the perchlorate MCLG at 0.056 mg/L (56 µg/L). The EPA is proposing requirements for water systems to conduct monitoring and reporting for perchlorate and to provide information about perchlorate to their consumers through public notification and consumer confidence reports. This proposal includes requirements for primacy agencies that implement the public water system supervision program under the SDWA. This proposal also includes a list of treatment technologies that would enable water systems to comply with the MCL, including affordable compliance technologies for small systems serving 10,000 persons or less.

**DATES:** Comments must be received on or before August 26, 2019. Under the Paperwork Reduction Act (PRA), comments on the information collection provisions are best assured of consideration if the Office of Management and Budget (OMB) receives a copy of your comments on or before July 26, 2019.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–HQ–OW–2018–0780, at *https://www.regulations.gov*. Follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov*. The EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment.

The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.*, on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *http://www2.epa.gov/dockets/commenting-epa-dockets*.

**FOR FURTHER INFORMATION CONTACT:** Samuel Hernandez, Office of Ground Water and Drinking Water, Standards and Risk Management Division (Mail Code 4607M), Environmental Protection Agency, 1200 Pennsylvania Avenue NW, Washington, DC 20460; telephone number: (202) 564–1735; email address: *hernandez.samuel@epa.gov*.

**SUPPLEMENTARY INFORMATION:** In addition to the proposed regulation, the EPA is requesting comment on three alternatives: (1) Whether the MCL and MCLG for perchlorate should be set at 0.018 mg/L (18 µg/L), (2) whether the MCL and MCLG for perchlorate should be set at 0.090 mg/L (90 µg/L), or (3) whether instead of issuing a national primary drinking water regulation, the EPA should withdraw the Agency's February 11, 2011, determination to regulate perchlorate in drinking water based on new information that indicates that perchlorate does not occur in public water systems with a frequency and at levels of public health concern and there may not be a meaningful opportunity for health risk reduction through a drinking water regulation. Under this last alternative, the final action would be a withdrawal of the determination to regulate and there would be no MCLG or national primary drinking water regulation for perchlorate. This proposed rule is organized as follows:

I. General Information
    A. What is the EPA proposing?
    B. Does this action apply to me?
II. Background
    A. What is perchlorate?
    B. Statutory Authority
    C. Statutory Framework and Regulatory History
III. Assessment and Modeling of the Health Effects of Perchlorate
    A. 2008 Preliminary Regulatory Determinations
    B. 2009 Supplemental Request for Comment and 2011 Final Regulatory Determination
    C. Science Advisory Board Recommendations
    D. Perchlorate Model Development and Peer Reviews
    E. Sensitive Population for Deriving MCLG
    F. BBDR Model Specification for the Sensitive Population
    G. Epidemiological Literature
    H. Identifying a Point of Departure for Developing the MCLG
    I. Translate PODs to RfDs
    J. Translate RfD Into an MCLG
IV. Maximum Contaminant Level Goal and Alternatives
V. Maximum Contaminant Level and Alternatives
VI. Occurrence
VII. Analytical Methods
VIII. Monitoring and Compliance Requirements
    A. What are the proposed monitoring requirements?
    B. Can States grant monitoring waivers?
    C. How are system MCL violations determined?
    D. When must systems complete initial monitoring?
    E. Can systems use grandfathered data to satisfy the initial monitoring requirements?
IX. Safe Drinking Water Act Right to Know Requirements
    A. What are the Consumer Confidence Report requirements?
    B. What are the public notification requirements?
X. Treatment Technologies
    A. What are the best available technologies?
    B. What are the small system compliance technologies?
XI. Rule Implementation and Enforcement
    A. What are the requirements for primacy?
    B. What are the State record keeping requirements?
    C. What are the State reporting requirements?
XII. Health Risk Reduction Cost Analysis
    A. Identifying Affected Entities
    B. Method for Estimating Costs
    C. Method for Estimating Benefits
    D. Comparison of Costs and Benefits
XIII. Uncertainty Analysis
    A. Uncertainty in the MCLG Derivation
    B. Uncertainty in the Economic Analysis
XIV. Request for Comment on Proposed Rule
XV. Request for Comment on Potential Regulatory Determination Withdrawal
XVI. Statutory and Executive Order Reviews
    A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563 Improving Regulation and Regulatory Review
    B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs
    C. Paperwork Reduction Act
    D. Regulatory Flexibility Act (RFA)
    E. Unfunded Mandates Reform Act
    F. Executive Order 13132: Federalism
    G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
    H. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
    I. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use
    J. National Technology Transfer and Advancement Act of 1995

al., 2016; Maraka et al., 2016) and effects on cardiovascular systems (Asvold et al., 2012; Sun et al., 2017) there are likely non-quantified benefits of risk reductions for other endpoints or reduced exposure to co-occurring contaminants, which are addressed below. Uncertainties regarding the quantifiable benefits are also addressed below.

The population impacted by the rule for which benefits can be quantified is specific to live births from mothers who were served by a CWS or NTNCWS with perchlorate concentrations above the potential MCLs. To determine the nationwide population of children that will experience a quantifiable benefit of avoided IQ decrements from reducing maternal perchlorate exposure during pregnancy, the EPA first estimated the total population being served by systems above the MCL based on data from UCMR 1. The EPA then multiplied the total population served for each affected CWS and NTNCWS by the proportion of women of childbearing age (aged 15–44) in the US, which is 19.7 percent (U.S. Census Bureau, 2017a). The number of women of childbearing age for each entry point was then multiplied by the annual number of live births in the US, or 62 births per 1,000 women (6.2 percent) (Martin, Hamilton, & Osterman, 2017).

The EPA used a two-step dose-response model to estimate health benefits of a reduction in perchlorate exposure as a result of regulating perchlorate in drinking water not to exceed the proposed MCL of 56 µg/L and alternative MCLs of 18 µg/L and 90 µg/L. The first step relates changes in perchlorate to changes in maternal free-thyroxine (fT4) during the first trimester of pregnancy using the EPA's BBDR model. Because the dose-response relationship between perchlorate exposure and maternal fT4 is dependent on maternal iodine intake status, this first-step analysis is repeated for several categories of iodine intake. For the BBDR simulations, the EPA used the 90th percentile ingestion rate to be consistent with the MCLG modeling approach, which may overstate the exposure in the simulation.

The second step of the dose-response model subsequently relates the predicted changes in maternal fT4 from the BBDR model to changes in child IQ using the function estimated in the EPA independent analysis of the Korevaar et al., (2016) study data. Ultimately, the changes in IQ are estimated for each impacted iodine intake group, and all of the impacted iodine intake groups' IQ decrements are averaged together based on the proportion of individuals in each iodine intake category. Table XII–4 shows the specific iodine intake groups and the proportion of non-pregnant women of childbearing age that fall into each group.

TABLE XII–4—PROPORTION OF POPULATION BASED ON MATERNAL IODINE INTAKE STATUS

| Iodine intake range (µg/day) used for benefits analysis | Proportion of the population (%) |
|---|---|
| 0 to <55 | 7.14 |
| 55 to <60 | 2.15 |
| 60 to <65 | 1.06 |
| 65 to <70 | 1.86 |
| 70 to <75 | 1.31 |
| 75 to <80 | 3.10 |
| 80 to <85 | 2.62 |
| 85 to <90 | 1.20 |
| 90 to <95 | 1.83 |
| 95 to <100 | 2.94 |
| 100 to <125 | 13.56 |
| 125 to <150 | 9.08 |
| 150 to <170 | 10.31 |
| 170 to <300 | 24.47 |
| ≥300 | 17.36 |

Source: U.S. EPA (2019a).

These changes in child IQ are then monetized using the EPA's estimate of the value of an IQ point. This estimate reflects the discounted present value of lifetime income reductions attributable to a 1-point reduction in IQ at birth. Therefore, the present value depends on the discount rate. At a 3 percent discount rate, the estimate is $18,686 per IQ point; at a 7 percent discount rate the estimate is $3,631.

Other potential benefits not quantified or monetized include additional avoided health effects which cannot currently be monetized, improved public perception of water quality, as well as a possible reduction of other co-occurring contaminants that target the thyroid, such as nitrate, as a result of water treatment for removal of perchlorate. For example, all of the treatment technologies evaluated for this rule (ion exchange, biological treatment, and reverse osmosis) can also remove co-occurring nitrate from drinking water. Section XIII provides additional discussion of uncertainties in this analysis.

*D. Comparison of Costs and Benefits*

This section provides the estimates of costs and benefits that the EPA derived using the methods described above. It includes estimates for the proposed and alternative MCLs.

For the proposed MCL of 56 µg/L, Table XII–5 summarizes the total estimated cost of the proposed rule to water systems and primacy agencies, and Table XII–6 summarizes the estimated per-household cost for the system incurring treatment costs.[16] Table XII–7 summarizes the estimated benefits. In both instances, the estimates based on the UCMR 1 sample are also national estimates because treatment costs occur only at large systems; there are no small system treatment costs or related benefits to extrapolate.

TABLE XII–5—SUMMARY OF TOTAL ANNUALIZED COSTS AT MCL OF 56 µg/L

[Millions; 2017$]

| Cost component | 3% Discount | 7% Discount |
|---|---|---|
| Drinking Water Systems Treatment Costs | $0.65 | $0.70 |
| Drinking Water Systems Monitoring and Administration Costs[1] | 5.93 | 6.38 |
| Drinking Water Systems Costs Subtotal | 6.58 | 7.07 |
| State Administration Costs | 3.09 | 3.20 |
| Total Costs | 9.67 | 10.28 |

Source: (USEPA, 2019a). Detail may not sum to total because of independent rounding.

---

[16] For all households served by all of the systems subject to the monitoring costs as well as MCL compliance, the average annual cost is less than $0.20.

# **Exhibit D**

**(Excerpt of Plaintiffs' Ex. 33)**



| United States | Office of Air Quality Planning and Standards | |
|---|---|---|
| Environmental | Air Quality Strategies and Standards Division | EPA-452/R-05-003 |
| Protection Agency | Research Triangle Park, NC 27711 | March 2005 |

# Regulatory Impact Analysis of the Clean Air Mercury Rule

# Final Report

**SECTION 9**

**ANALYSIS OF THE DOSE-RESPONSE RELATIONSHIP BETWEEN MATERNAL MERCURY BODY BURDEN AND CHILDHOOD IQ**

**9.1     Introduction**

In considering possible health endpoints for quantification and monetization in this analysis, EPA reviewed the scientific literature on the health effects of mercury, including the *Toxicological Effects of Methylmercury*, published by the National Research Council (NRC) in 2000 (NRC 2000).

Epidemiological studies of prenatal mercury exposure conducted in the Faroe Islands (Grandjean et al. 1997), New Zealand (Kjellstrom et al. 1989, Crump et al. 1998), and the Seychelles Islands (Davidson et al. 1998, Myers et al. 2003) have examined neurodevelopmental outcomes through the administration of tests of cognitive functioning.  Each of these studies included some but not all of the following tests: full-scale IQ, performance IQ, problem solving, social and adaptive behavior, language functions, motor skills, attention, memory and other functions.  The NRC reviewed the studies and determined that "Each of the studies was well designed and carefully conducted, and each examined prenatal MeHg [methylmercury] exposures within the range of the general U.S. population exposures" (NRC 2000).

EPA held a neurotoxicology  workshop with several of the NRC panel members in November 2002.  Participants were asked about which studies should be considered in generating dose-response functions for developmental neurotoxicity.  Participants were also asked about endpoints to consider for monetization and they suggested looking at neurological tests that might lead to changes in IQ or other neurodevelopmental impacts.

EPA has chosen to focus on quantification of intelligence quotient (IQ) decrements associated with prenatal mercury exposure as the initial endpoint for quantification and valuation of mercury health benefits.  Reasons for this initial focus on IQ include the availability of thoroughly-reviewed, high-quality epidemiological studies assessing IQ or related cognitive outcomes suitable for IQ estimation, and the availability of well-established methods and data for economic valuation of avoided IQ deficits, as applied in EPA's previous benefits analyses for childhood lead exposure.  Bellinger (2005) provides a more detailed discussion of the use of IQ as the focus of benefits analysis.

The focus of this analysis was to identify the appropriate dose-response coefficients from the Faroe Islands, New Zealand, and Seychelles studies, and to devise a statistical approach for combining those coefficients to provide an integrated estimate of the IQ dose-response coefficient.

EPA is using a linear model that goes through the origin to fit population-level dose-response relationships to the pooled data from the three studies.  The application of a linear model should not be interpreted to suggest that any of the three studies used have data showing health effects from methylmercury exposure at or below the RfD.  The RfD is an estimate (with

# **Exhibit E**

**(Excerpt of Plaintiffs' Ex. 35)**

# ECONOMIC ANALYSIS
## OF
## TOXIC SUBSTANCES CONTROL ACT
## SECTION 403: LEAD-BASED PAINT
## HAZARD STANDARDS

Economic and Policy Analysis Branch
Economics, Exposure and Technology Division
Office of Pollution Prevention and Toxics
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, DC 20460

December 21, 2000

Section 403 contains no reporting or recordkeeping requirements, and thus no ICR is necessary for this rule. However, an ICR was previously prepared and filed for the promulgation of regulations for TSCA §402(a) and 404, and these burden estimates were based on estimates of the number of lead-based paint identification and intervention activities anticipated. EPA re-examined the §402(a) and 404 ICR and determined that these estimates would not change due to the §403 standards.

### ES.4.4 Executive Order 12898--Federal Actions to Address Environmental Justice

EPA investigated environmental justice related issues with regard to the potential impacts of this action on the environmental and health conditions in low-income and minority communities. African-American households are more likely to live in housing with lead-based paint hazards and a larger proportion of their children will benefit from the standard. Among households performing interventions, non-Hispanic white households face a higher average cost per household to bring their housing units up to the standard. Lower-and upper-income households face roughly the same cost of compliance. This means that lower-income households will have to forego a larger share of their income to comply with §403. Depending on which blood-lead model is used, lower-income households will have either larger or smaller average benefits than higher-oncome households.

### ES.4.5  Executive Order 13045--Protection of Children from Environmental Health Risk and Safety Risks

The focus of the §403 regulation is on the protection of children's health. The household lead standards were chosen based on an analysis of the health risks to children. The benefits from §403 outlined in Chapter 5 are a reflection of benefits to children under 6 years old.

Of the estimated 173 million children born between 1997 and 2046, approximately 131 million children will be born into housing built prior to 1979. It is estimated that §403 will result in reductions in exposure to household lead in soil, dust, and paint for 46.0 million children born over that 50 year span. This reduction in exposure, in turn, will result in reductions in the incidence of elevated blood-lead levels and increases in average IQ. Exhibit ES-5 presents blood-lead and IQ statistics for both the baseline and post-compliance scenarios.

**Exhibit ES-5**
**Beneficial Health Impacts on Children Resulting from §403**

|  | Mean blood-lead level (µg/dl) | Number with elevated blood-lead due to pica (millions) | Number with blood-lead greater than 10 µg/dl (millions) | Number with blood-lead greater than 20 µg/dl (millions) | Average IQ point gain | Number avoiding IQ less than 70 |
|---|---|---|---|---|---|---|---|
| Baseline | 4.12 | 2.4 | 10.0 | 1.0 | NA | NA |
| Post-§403 IEUBK | 3.18 | 1.1 | 2.5 | 0.1 | 0.90 | 30,000 |
| Post-§403 Empirical | 3.88 | 1.1 | 8.0 | 0.7 | 0.23 | 8,000 |

As shown, the health impacts of §403 are positive and substantial. The reduction in the number of children suffering from elevated blood-lead levels due to pica (direct ingestion of paint chips) is on the order of 1.3 million. The reduction in the number of children with elevated blood-lead levels (greater than 10 µg/dl)

from all sources is estimated at 2.0 to 7.5 million. The increase in average IQ depends greatly on which benefits model is used but is between 0.23 and 0.90 points.  Similarly the number of children who will avoid an IQ less than 70 points is between 8,000 and 30,000, depending on the benefits model employed.

return to historic norms in the future (Freeman, 1993).  Thus the range of real rates of return on investment opportunities range from near zero to four percent.

The issues involving the appropriate discount rates and procedures are very complex, and are not likely to be resolved soon.  Much of the recent economic literature summarizing the discount rate debate concludes that discount rates reflecting either the social rate of time preference or the rate of return on investments are the appropriate discount rates to use, and there is not that great a difference between the rates.  For example Moore and Viscusi (1990) find no evidence that the rate of time preference for environmental-related health effects differs from financial rates of return, and cite evidence that two percent rate is appropriate.  Lind (1990) recommends a range of one to three percent, and Freeman (1993) recommends two to three percent.

**Applying these Findings to the Selection of a Discount Rate for the §403 Analysis.**  In this analysis, best practice suggests that both benefits and costs should be measured as consumption foregone and thus the social rate of time preference has been used for discounting, although what the rate is called is a moot point if Moore and Viscusi's findings are correct.  The reasoning for basing the discount rate on foregone consumption is that the benefits of the rule (e.g., avoidance of an IQ decrement) will provide the beneficiary with a higher income and therefore greater consumption potential.  In the case of costs, the reasoning for using foregone consumption as the discount rate is based on the manner in which the funds spent for rule compliance would otherwise be used.   This is particularly true for homeowners, who are likely to view expenditures on improving their home as a consumption expenditure and would not divert funds from investments for lead hazard reduction activities.  On the other hand, the argument could be made that landlords would reduce investments to finance lead hazard reduction activities.  There are two responses to this argument.  First, since the action is voluntary under §403, it can be assumed that the rate of return (say in terms of increased property value) is at least as great as the landlord would realize on the alternative investment and thus there is no decline in the future stream of production.  Second, even if the landlord were to divert his own investment funds to these activities, owner-occupied housing units constitute the majority of properties affected by this rule, and thus the discount rate relevant to homeowners would dominate.

Based on the information presented above, a 3 percent discount rate has been adopted as the most appropriate rate for use in this analysis.   It is used in Chapters 5, 6, and 7 for the estimation of the present value of costs, benefits and net benefits.  Since a 7 percent rate is often used for government regulations, results using 7 percent are presented as a sensitivity analysis in Chapter 8 to facilitate comparison among rules.

# Exhibit F

## (Plaintiffs' Ex. 14)

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

9

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

SAN FRANCISCO DIVISION

12

13

14  FOOD & WATER WATCH, INC., *et*      )   Case No. 17-cv-02162-EMC
    *al*.,                            )
15                                    )
                      Plaintiffs,     )
16                                    )   DECLARATION OF FREDERICK
                                      )   HYMAN
17         v.                         )
                                      )
18  ENVIRONMENTAL PROTECTION          )
    AGENCY, *et al*.,                 )
19                                    )
                                      )
20                    Defendants.     )
                                      )
21  ──────────────────────────────    )

22

23  I, FREDERICK HYMAN, declare as follows:

24         1.     I am a Dental Officer within the Division of Dermatology and Dental

25  Products at the Center for Drug Evaluation and Research, U.S. Food and Drug

26  Administration ("FDA").   Based on my duties and responsibilities as a Dental

27  Officer at the FDA, I have personal knowledge of the facts set forth herein and could

28

1   and would testify competently thereto if called to do so.  I make this declaration

2   voluntarily on behalf of the FDA.

3       2.   Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), "drugs"

4   are defined, in relevant part, as "articles intended for use in the diagnosis, cure,

5   mitigation, treatment, or prevention of disease in man or other animals." 21 U.S.C.

6   § 321(g)(1)(B).  Almost any ingested, topical, or injectable product that, through its

7   label or labeling, is intended for such uses can be regulated by the FDA as a drug.

8       3.   A "new drug" is defined, in relevant part, as any drug that is "not

9   generally recognized, among experts qualified by scientific training and experience

10  to evaluate the safety and effectiveness of drugs, as safe and effective under the

11  conditions prescribed, recommended, or suggested in the labeling."  21 U.S.C.

12  § 321(p)(1).  To be generally recognized as safe and effective, there must be a

13  consensus of expert opinion that the drug product is safe and effective for its labeled

14  indications based upon adequate and well-controlled clinical investigations.

15      4.   Certain categories of over-the-counter drugs may be deemed generally

16  recognized as safe and effective if they conform strictly to regulations known as

17  "final monographs," which set out specific conditions (*e.g.*, active ingredients,

18  formulation, indications for use, warnings, route of administration, etc.).

19      5.   New drugs may not be introduced into interstate commerce unless a

20  new drug application ("NDA") for the drug has been approved by the FDA.  21

21  U.S.C. §§ 331(d) & 355(a).  The FDA does not require products that conform to the

22  conditions of a final monograph and the general conditions described in 21 C.F.R.

23  § 330.1 to have an NDA prior to marketing.

24      6.   For historical reasons, some drugs are available in the United States that

25  lack the required FDA approval for marketing and do not conform to an applicable

26  final monograph.  Because the FDA does not have complete data on these

27  unapproved new drugs and because the universe of such products is constantly

28  changing as products enter and leave the market, the FDA is unable to take action

1  immediately against all of these products.  To make the best use of scarce agency

2  resources, the FDA has prioritized its enforcement efforts with regard to such

3  products that remain on the market.

4  **Fluoride**

5      7.    The FDA has authority under the FDCA to regulate drugs intended for

6  use in the prevention of dental caries.  These drugs include but are not limited to:

7  (A) ingestible fluoride tablets, lozenges, and drops intended to prevent dental caries

8  by providing a daily dose generally between 0.25 to 1 mg F/day (hereinafter,

9  "ingestible fluoride products"),[1] and (B) topical over-the-counter fluoride products

10  intended to prevent dental caries, *e.g.*, toothpastes, varnishes, and rinses.  "Ingestible

11  fluoride products" are sometimes referred to in the medical community as "fluoride

12  supplements," but the FDA is not using the latter term to avoid any confusion with

13  products that are "dietary supplements" under the FDCA.

14      8.    The FDA does not regulate the addition of fluoride to public drinking

15  water to prevent dental caries.  The Environmental Protection Agency ("EPA"),

16  pursuant to the Safe Drinking Water Act of 1974, has established maximum

17  contaminant levels for fluoride in public drinking water.   State and local

18  governments are permitted, but not required, to fluoridate public drinking water

19  within the limits set by the EPA to help prevent dental caries.  The decision on

20  whether to add fluoride to public drinking water is made at the state or local level.

---

[1] Because there are no approved NDAs for these products, the FDA can make no
assurances as to the range of dosages that are identified in the labeling for ingestible
fluoride products currently marketed in the United States nor has the agency
evaluated what might be an appropriate range of dosages (if any) for such products.

**Ingestible Fluoride Products**

9.    Ingestible fluoride products intended for use to prevent dental caries are "drugs" under 21 U.S.C. § 321(g)(1), "new drugs" under 21 U.S.C. § 321(p), and prescription drugs under 21 U.S.C. § 353(b)(1)(A).

10.    There are currently no approved NDAs for ingestible fluoride products.

11.    To date, the FDA has not taken enforcement actions to remove ingestible fluoride products from the market.[2]   The FDA has encouraged manufacturers of ingestible fluoride products to pursue regulatory approval of these products by submitting NDAs for the FDA's review.

**Topical Fluoride Products**

12.    On October 6, 1995, the FDA issued a final monograph (hereinafter, "Anticaries OTC Drug Monograph") establishing conditions under which certain topical over-the-counter anticaries drug products, including fluoride-containing toothpastes and treatment rinses, are generally recognized as safe and effective and not misbranded.  21 C.F.R. Part 355.

13.    Among other things, the Anticaries OTC Drug Monograph requires fluoride toothpastes to provide the following warning:  "Keep out of reach of children under 6 years of age.  If more than used for brushing is accidentally swallowed, get medical help or contact a Poison Control Center right away."  21 C.F.R. § 355.50(c)(1).  The first sentence of this statement must be bolded.  *Id.*

14.    Ingestible fluoride products do not meet the conditions in the Anticaries OTC Drug Monograph.

---

[2] The FDA issued a warning letter to one manufacturer of ingestible fluoride products in January 2016.  The agency does not consider warning letters to be enforcement actions.

**Fluoride Neurotoxicity**

15.   The FDA has not conducted or sponsored independent research concerning the risk of neurotoxicity associated with exposure to fluoride and does not have in its possession any internal scientific evidence concerning this topic.  The FDA has no position on this topic.

16.   The FDA has not conducted or sponsored independent research concerning whether fluoride presents a risk to the functioning of the thyroid gland and does not have in its possession any internal scientific evidence concerning this topic.  The FDA has no position on this topic.

17.   The FDA has not conducted or sponsored research concerning the risk of neurotoxicity associated with fluoride exposure in susceptible populations and does not have in its possession any internal scientific evidence concerning this topic. The FDA has no position on this topic.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.   Executed this _5th_ day of _NOVEMBER_, 2018.

_Frederick Hyman_
FREDERICK HYMAN

- 5 -

# <u>Exhibit G</u>

## (Plaintiffs' Ex. 16)

DEBRA J. CARFORA
JOHN THOMAS DO
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
601 D Street, NW, Suite 8000
Washington, DC 20004
Tel.   (202) 514-2640
debra.carfora@usdoj.gov

*Attorneys for Defendants*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC, et al., | Case No.: 17-cv-02162-EMC |
| Plaintiffs, | **Stipulation Regarding Manufacturers of Fluoridation Chemicals** |
| v. | |
| U.S. Environmental Protection Agency, et al., | |
| Defendants. | |

Plaintiffs and Defendant Environmental Protection Agency ("EPA") jointly submit this Statement of Stipulated Facts concerning three companies that manufacture water fluoridation chemicals in the Unites States.

1.     J.R. Simplot Company (hereafter Simplot) produces Hexafluorosilicic Acid, commonly known as Fluorosilicic Acid ("FSA").

2.     Simplot has not performed independent testing or analysis to determine the potential for FSA to cause neurotoxic effects.

3.     Simplot has not undertaken any specific tests or analysis to determine the potential for FSA in the form or level it may be introduced in public drinking water to impair the function of the thyroid gland.

4.     Simplot has not performed independent testing or analysis to determine the potential for FSA in the form or level it may be introduced in public drinking water to harm susceptible subsets of the population.

5.     Simplot has not performed independent testing or analysis to determine the daily dose of fluoride ion that will not cause neurotoxic effects.

6.     Mosaic Fertilizer and Mosaic Global Sales (collectively, the "Mosaic Subsidiaries") are subsidiaries of the Mosaic Company. These two subsidiaries respectively manufacture and sell FSA.

7.     The Mosaic Subsidiaries have not taken any actions to determine the potential for fluoridation chemicals to cause neurotoxic effects, to impair the functioning of the thyroid gland, or to harm susceptible subsets of the population.

8.     The Mosaic Subsidiaries have not taken a public position on the daily dose of fluoride ion that will not cause neurotoxic effects.

9.     Solvay Fluorides, LLC ("Solvay") manufactures and/or sells certain fluoridation chemicals.

10.     Solvay has not taken any actions to determine the potential for fluoridation chemicals to cause neurotoxic effects, to impair the functioning of the thyroid gland, or to harm susceptible subsets of the population.

11.     Solvay, has not taken any actions to determine the daily dose of fluoride ion that will not cause neurotoxic effects.

12.     Notwithstanding this stipulation, EPA is not waiving, and expressly reserves all rights and defenses to contest the relevance of these facts to Plaintiffs' claim throughout every stage of this litigation, including trial.

IT IS SO STIPULATED AND AGREED TO ON BEHALF OF:

DATED:  May 22, 2019                    FOOD & WATER WATCH

                                        */s/ Michael Connett by permission*
                                        MICHAEL CONNETT
                                        Attorney for Plaintiffs

DATED:  May 22, 2019

                                        */s/ Debra J. Carfora*
                                        DEBRA J CARFORA
                                        JOHN THOMAS H. DO
                                        United States Department of Justice
                                        *Attorneys for Defendant*

                    DATED: 5/22/2019

GRANTED

Judge Edward M. Chen

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# <u>Exhibit H</u>

**(Excerpt of Plaintiffs' Ex. 29)**



820-R-10-019

# Fluoride:
# Dose-Response Analysis
# For Non-cancer Effects

**Health and Ecological Criteria Division**
**Office of Water**

**December, 2010**

**U.S. Environmental Protection Agency**
**Washington, D.C.**



EXHIBIT
10-15-18 15
charian
PENGAD 800-531-6989

2.      **Summary of Hazard as Reported by NRC**

NRC (2006) analyzed a large body of literature on fluoride, primarily papers published since the early 1990s, regarding the effects of fluoride on teeth; the musculoskeletal, reproductive, endocrine, gastrointestinal, renal, hepatic, and immune systems; and on the endpoints of developmental toxicity, neurotoxicity (including behavioral effects), genotoxicity, and carcinogenicity.  Following this comprehensive analysis, NRC concluded that the biological tissues of most concern to fluoride exposures of 4 mg/L, the current MCLG, were the teeth and bones.

For the current RfD analysis, EPA obtained the critical references on dental fluorosis, dental cavities and bone fractures as related to fluoride exposure identified by NRC (2006).  EPA also identified, retrieved, and reviewed relevant information for these effects as well as for skeletal fluorosis published during the period between 2000 to August 2010 that were not included in NRC (2006).

This section on the assessment of noncancer health effects of fluoride provides a summary of the hazard information for the following:

- Dental fluorosis
- The relationship between caries prevalence and the degree of dental fluorosis
- Skeletal fluorosis
- Bone fractures relative to fluoride exposure

A detailed discussion of the critical studies is presented in Section 3. The focus on the endpoints listed above is consistent with the NRC (2006) analysis of hazard and their charge to the OW.

2.1.    **Dental Enamel Fluorosis**
2.1.1.  **Background**

Fluoride has an affinity for the developing enamel because apatite crystals have the capacity to bind and integrate fluoride ion into the crystal lattice (Robinson et al., 1996). Apatite is a salt of calcium phosphate that co-crystallizes with hydroxyl, fluoride or chloride ions. Hydroxyapatite $[Ca_{10}(PO_4)_6(OH)_2]$ is the primary calcium salt that is found in tooth enamel. The mineral formed in tooth enamel exposed to higher fluoride levels is fluoride containing carbonated apatite. Fluoride levels in subsurface fluorotic enamel are about 200 ppm rather than the 10-100 ppm fluoride in normal enamel. Precipitation of fluoride mineral salts at the surface of enamel results in high surface levels. This fluoride-substituted apatite has some increased resistance to bacterial acids that cause tooth decay. However, the primary function of fluoride in drinking water in reducing tooth decay is topical, primarily by the enhancement of remineralization (Fejerskov et al. 1994).

2.1.2.  **Measures of dental fluorosis**

Excessive intake of fluoride during enamel development can lead to enamel fluorosis, a condition of the dental hard tissues in which the enamel covering of the teeth fails to crystallize properly, leading to defects that range from barely discernable markings to brown stains and

the higher rates of severe fluorosis seen in the Rwenyonyi et al. (1999) study. This, however, does not exclude the possibility that some degree of the "fluorosis" seen in the high-altitude U.S. study populations may have been due to hypobaric hypoxia which, as NRC (2006) notes, may be mistaken for fluoride-induced fluorosis.

### 3.1.4.3.   Physiological/nutrition factors

The occurrence and severity of fluorosis may vary among individuals and populations exposed to the same levels of fluoride in environmental media. Such differences can be due to factors which enhance fluoride retention in the tissues, or produce alterations in enamel mineralization that may be indistinguishable from those produced by fluoride. Included among the physiological/nutritional variables that can affect fluorosis are: calcium deficiency; exposure to minerals such as strontium and aluminum; protein malnutrition; metabolic or respiratory acid-base abnormalities; certain pathological conditions and exposure to drugs early in childhood. These are discussed in this section.

**Minerals:**  Studies on laboratory animals have indicated that calcium in the diet inhibits GI tract absorption of fluoride (Whitford, 1994); however, fluoride uptake into enamel is independent of calcium uptake and the effects of fluoride on calcium homeostasis are not necessarily a factor in enamel fluorosis (Aoba and Fejerskov, 2002). Accordingly, low levels of calcium in the diet may increase the rate of absorption of ingested fluoride, and thereby favor the development of dental fluorosis with increased calcium intake leading to decreased fluoride absorption. On the other hand, oral intake of calcium will not directly alter the effects of absorbed fluoride on enamel development.

Certain forms of "mottled" enamel may be caused by exposure to excessive amounts of trace minerals, even in the absence of significant exposure to fluoride. Curzon and Spector (1977) surveyed 1313 children 12–14 years old in seven towns in Wisconsin where the drinking water contained low levels of fluoride (1.0–1.2 mg/L) but variable and sometime elevated levels of strontium (0.022–33.9 mg/L). Mottling of the dental enamel of the teeth was found to increase in prevalence and severity as the strontium concentration increased. No such relationship was observed with fluoride concentrations varying in the narrow range of 1.0 to 1.3 mg /L.

Other minerals may also produce similar effects. Rozier (1994) cites a study by Butler et al. (1985) which suggested that exposure to zinc in drinking water may contribute to dental mottling. In the Butler et al. (1985) study, 2592 school children in 16 towns in Texas were examined for dental mottling. Three of the towns had relatively high levels of zinc in the drinking water. Butler et al. (1985) reported that zinc was a predictor for mottling, but that the association was not strong. The odds ratio was 2.18 (95% CI 1.26 to 3.78). Butler et al. (1985) state that animal studies have shown that exposure to zinc, as well as to strontium and chromium, can cause dental mottling.

As a result of studies conducted in Tanzania, Yoder et al. (1998) suggested that elevated levels of aluminum and/or magnesium in magadi (a lake-shore salt deposit used in cooking as a food tenderizer and to shorten cooking time) may have contributed to the severe dental fluorosis seen in children (9–19 yrs old) exposed to only a very low level of fluoride in drinking water (0.18 mg/L) in the town that had a prevalence of 54.9% severe dental fluorosis. Magnesium reportedly affects enamel formation in laboratory animals (Angmar-Månsson et al., 1984);

however, similar effects have not yet been reported in humans. Aluminum is known to cause ostemalacia as a result of aluminum-induced phosphate depletion, and Yoder et al. (1998) were of the opinion that a similar mechanism might affect teeth. The effect of aluminum on dental enamel mineralization in humans is not known.

**Acid-base disturbances**: Angmar-Månsson and Whitford (1990) reviewed data documenting the effects of acid-base imbalances on dental fluorosis. The rate at which fluoride is excreted by the kidneys is affected by urinary pH. The renal clearance rate is depressed by acidosis, and enhanced by alkalosis. Consequently, soft and hard tissue levels of fluoride may be increased under conditions of acidosis and decreased under conditions of alkalosis. Significantly though, Angmar-Månsson and Whitford (1990) reported that animal studies have shown that both acidosis and alkalosis, in the absence of fluoride, may adversely affect the mineralization of the enamel in a manner resembling that of fluorosis. Fluoride supplementation appeared to attenuate the effects caused by acidosis and enhance the effects caused by alkalosis.

Angmar-Månsson and Whitford (1990) describe several variables which may affect acid-base balance; these included the acid load of the diet, certain drugs, certain metabolic or respiratory disorders, altitude (see Section 3.1.4.2), and physical activity. Of these, dietary factors were considered the most important and high protein diets in particular were associated with moderate to high levels of acidosis.

The extent to which changes in acid-base balance may affect the occurrence and severity of dental fluorosis in human populations has not been fully documented; however, infant formula based on cow's milk reportedly can cause some degree of systemic acidosis and an acidic urine, and there are reports that dental fluorosis is higher in formula-fed infants than in those fed breast-milk. This difference, however, may be due to high levels of fluoride in infant formula prepared with tap water compared with that in breast milk. Whitford (1990) noted that fluoride levels in human breast milk are only 0.4 times the concentration in maternal plasma. As an example, Whitford estimated that an infant's fluoride intake through consumption of 800 mL of breast milk containing 0.4 μmol F/L (0.0076 mg/L) would be 0.006 mg, vs. 0.80 mg from consuming the same volume of formula prepared with water containing 1 mg F/L.

In older children the increased retention of fluoride under acidotic conditions may be of greatest concern only when fluoride intake is excessive, although further research is needed to fully document such effects.

**Pathological conditions**: Primary diabetes insipidus; nephrogenic diabetes insipidus, diabetes mellitus; acute glomerulonephritis, pyelonephritis, renal tubular acidosis, and nephrotic syndrome are disorders affecting urinary flow rate which can result in abnormal increases in the consumption of water (Angmar-Månsson and Whitford, 1990). As noted by Angmar-Månsson and Whitford (1990), over one million children in the U.S. may be affected by one of these conditions, and it is possible that these disorders may contribute to higher levels of dental fluorosis in these children because of increased water consumption.

Because fluoride is excreted primarily through the kidney, individuals with kidney disease and reduced glomerular filtration are likely to have increased plasma fluoride levels (NRC, 2006), which, in turn, may result in increased tissue levels of fluoride. Such individuals may be more

# Exhibit I

## (Excerpt of Plaintiffs' Ex. 30)

 **EPA**

820-R-10-015

# Fluoride: Exposure and Relative Source Contribution Analysis

**Health and Ecological Criteria Division**
**Office of Water**

**December 2010**

**U.S. Environmental Protection Agency**
**Washington, D.C.**

### 2.3.2.  Alcoholic Beverages

Fluoride is present in a number of alcoholic beverages, especially wines, due to the use of cryolite as a pesticide on grapes. Burgstahler and Robinson (1997) reported fluoride levels of 0.23–2.80 ppm (mean 1.02 ppm) in California wines. Seven of 19 samples tested above 1 mg/L. Fluoride was determined using a fluoride ion-specific electrode. Martínez et al. (1998) reported mean fluoride concentrations ranging from 0.08 to 0.68 mg/L in 70 wines from the Canary Islands. The overall mean concentration was 0.16 mg/L. USDA (2005) found a mean concentration of 1.05 ppm from 14 red wine samples and 2.02 ppm for 17 white wine samples.

Warnakulasuriya et al. (2002) reported mean fluoride concentrations of 0.08–0.71 mg/L in eight kinds of beers available in Great Britain. The concentrations were the equivalent of 0.03–0.31 mg fluoride in one 440 mL can. USDA (2005) reported a mean of 0.45 ± 0.023 ppm for 142 light beer samples and 0.44±0.025 ppm for 102 regular beer samples. The average fluoride in distilled alcoholic beverages was 0.08 ppm in the USDA (2005) database.

### 2.3.3.  Summary for Fluoride in Beverages

The fluoride in commercial products tends to reflect the water source at the plant where juices and carbonated beverages are processed. In most instances concentrations in carbonated beverages ranged between 0.7 and 1 ppm, reflecting the concentrations in fluoridated water (Clovis and Hargreaves, 1988; Heilman et al., 1999; Schulz et al., 1976; Turner et al., 1998, USDA, 2005). Commercial fruit juices have the same or slightly lower means (Clovis and Hargreaves, 1988; Kiritsy et al., 1996; Stannard et al., 1991, USDA, 2005), although the means for grape-based products can be higher. USDA (2005) reported the mean concentration of grape juice as 0.77 mg/kg for 20 samples of regular grape juice and 2.13 mg/kg for 12 samples of white grape juice. Home-prepared products appear to reflect the concentration of the local water supply (Clovis and Hargreaves, 1988; Jackson et al., 2002).
Tea is a rich source of fluoride, especially when made from aged leaves (Cao et al., 2006). Herbal teas do not have the high fluoride content of real teas (Chan and Koh, 1996). All of the samples of brewed black tea analyzed by USDA (2005) had a mean fluoride concentration of > 3 ppm. Brewed herbal teas and green teas had lower concentrations. Three popular brands of bottled commercial ice teas had means between 0.72 and 1.23 mg/L (USDA, 2005).

Among alcoholic beverages, wines have the highest fluoride levels (usually 1–2 ppm) likely reflecting the cryolite use in the growing of grapes (Burgstahler and Robinson, 1997; Martinez et al., 1998; USDA, 2005). Levels of fluoride in distilled alcoholic beverages are low (<0.1 ppm; USDA, 2005) and those in beer are intermediate, about 0.4 to 0.5 ppm for U.S. products (USDA, 2005).

### 2.4.  Indirect Exposure from Pesticide Residues on Food

**Cryolite.** Cryolite (sodium aluminofluoride; $Na_3AlF_6$) was first registered for use as a pesticide in the U.S. in 1957 (U.S. EPA, 1996). It is used on fruits, vegetables and ornamental plants to protect against leaf eating insects. The major products treated with cryolite are grapes, citrus fruits, and potatoes. Applications rates are frequently high, and application can occur several times during a growing season (U.S. EPA, 1996).

| Table 3-7. Fluoride Intake From Average Drinking Water Consumption and 90th Percentile Fluoride Concentration (1.43 mg/L) Determined from Monitoring Records for 2002 through 2005 | | |
|---|---|---|
| **Group** | **Water Consumption** | **Fluoride Intake** |
| | Average Total mL | mg/day total |
| Infants <0.5 yr | 296 | 0.42 |
| 0.5–0.9 | 360 | 0.51 |
| 1–3yrs | 311 | 0.44 |
| 4–6yrs | 406 | 0.58 |
| 7–10 yrs | 453 | 0.65 |
| 11-14 yrs | 594 | 0.85 |
| 15-19 | 761 | 1.09 |
| 20+ | 1098 | 1.57 |
| **Total Pop.** | **926** | **1.32** |

SOURCE: Adapted from U.S. EPA, 2004, Table 5.1.A1.

As noted by NRC (2006), fluoride exposures from drinking water depend on individual water intakes, fluoride concentration in the water, and whether water purification or filtration systems are used to remove fluoride. Some individuals may have substantially higher intakes of fluoride from their drinking water as a result of specific types of activities that increase water intake (e.g., athletes or outdoor laborers in warm climates), life stage (e.g., pregnant or lactating women), or as a result of medical conditions such as diabetes mellitus, diabetes insipidus, or renal problems.



**Figure 8-3.  Total Daily Fluoride Intake Estimates Relative to the Proposed RfD using Mean Drinking Water Intakes for Consumers Only and the 90th percentile Fluoride Concentration for all Systems Reporting Detections of Fluoride.**



**Figure 8-4.  Total Daily Fluoride Intake Estimates Relative to the Proposed RfD using 90th Percentile Drinking Water Intakes for Consumers Only and Average Concentration (1.76 mg/L) for those Systems that Reached or Exceeded the SMCL of 2 mg/L at Least Once During the ICR Monitoring Period for the Second Six-year Review.**

In the case of fluoride, there are data on prevalence of dental fluorosis to support a conclusion that fluoride exposure levels among the population have increased in the last 40 to 50 years

**December 2010**

resulting in an increase in dental fluorosis (Iida and Kumar, 2009; CDC, 2005). The prevalence of dental fluorosis has increased from 10–12% in the areas with about 1 mg/L in drinking water at the time of Dean (NRC, 1993) to 23 % in 1986/87 (NRC, 1993; Iida and Kumar, 2009) and to 32% in the 1999-2002 NHANES survey (CDC, 2005). The 1986/1987 data come from the National Survey of Oral Health of U.S. School Children, which examined 40,693 subjects. The NHANES survey included a smaller set of subjects (17,092) at ages greater than 2 years (CDC, 2005). Comparable data are not available for severe dental fluorosis.

The CDC (2005) report found that the prevalence of fluorosis was higher in the 12–15 and 16–19 year age groups during the 1999–2002 survey than in the 20–39 year old age groups, which may be a reflection of recent increases in total fluoride exposure. The data also indicated that posterior teeth were impacted to a greater extent than the visible anterior teeth and that there was a higher prevalence among the Non-Hispanic African Americans than Non-Hispanic Caucasian Population. Most of the fluorosis reported in the CDC (2005) report was very-mild or mild, conditions that are associated with decreases in tooth decay. However, there were cases of moderate/severe dental fluorosis combined and the percentages reported were higher for the age groups younger than 20 years old than for older individuals indicating that increases in total fluoride intakes may be relatively recent.

### 8.4. Summary of findings

The OW conducted the Exposure and Relative Source Contribution assessment in order to determine the relationship of total fluoride intakes to the inorganic fluoride RfD from the companion dose-response assessment (U.S. EPA, 2010a). The relative contribution of ingested drinking water from public drinking water systems to total exposures was also examined.

The EPA MCLG/MCL for fluoride was established in 1986 and determined to be protective for Stage III (crippling) skeletal fluorosis. The determination of the MCLG/MCL included an assumption that drinking water contributed 100% of the exposure because the data used for quantification were derived from measures of the fluoride in the drinking water among the cases of Stage III skeletal fluorosis that provided the point of departure for the calculation.

The NRC (2006) examination of the MCL/MCLG for fluoride was an outgrowth of the first six-year review of the 1986 fluoride drinking water regulation as mandated by the 1996 SDWA and recognition by EPA of the number of scientific studies on the bone and dental effects of fluoride that were published after the regulation (U.S. EPA, 2003). The NRC published the report of their effort in 2006 as: *Fluoride in Drinking Water: A Scientific Review of EPA's Standards.* The NRC committee concluded that EPA's current MCLG of 4 mg/L for fluoride should be lowered to reduce the risk of severe enamel fluorosis and minimize the risk for bone fractures and skeletal fluorosis in adults. It charged the OW with conducting a dose-response assessment for the critical noncancer effects of fluoride on teeth and bone (U.S. EPA, 2010a) and the exposure and relative source assessment presented in this report. Through this effort, EPA has concluded that:

- Some young children are being exposed to fluoride up to about age 7 at levels that increase the risk for severe dental fluorosis.
- The contribution of residential tap water to total ingested fluoride is lower that it was in the past.