# Exhibit B

# Bellwether Exhibit Binder

# Pls.' Exhibit 029

# EPA - Fluoride: Dose-Response Analysis for Non-cancer Effects (EPA-820-R-10-019)



820-R-10-019

# Fluoride:
# Dose-Response Analysis
# For Non-cancer Effects

**Health and Ecological Criteria Division**
**Office of Water**

**December, 2010**

**U.S. Environmental Protection Agency**
**Washington, D.C.**

# PREFACE

In March, 2006, the National Academy of Sciences National Research Council (NRC) released the Report: *Fluoride in Drinking Water: A Scientific Review of EPA's Standards*. The NRC (2006) noted that "in light of the collected evidence of various health endpoints and total exposure to fluoride, the committee concludes the EPA's MCLG of 4 mg/L should be lowered." They further suggested that, in order to develop an MCLG that is protective against severe enamel fluorosis, clinical stage II skeletal fluorosis and bone fractures, EPA should:

- Apply current approaches for quantifying dose-response where feasible,
- Consider susceptible populations,
- Characterize uncertainties and variability, and
- Provide better estimates of total exposure for individuals.

The Office of Water (OW) accepted the NRC (2006) findings as the summary of hazard for inorganic fluoride and focused on the dose-response analysis as they had recommended. The OW collected available dose-response data for severe dental fluorosis, clinical stage II skeletal fluorosis and skeletal fractures as they relate to fluoride exposure expanding on the data retrieved by NRC (2006) to include studies identified by literature searches that covered the time period from 2000 to 2010. Current methodologies (categorical regression and benchmark dose modeling) were applied in evaluating dose-response in order to identify an appropriate point of departure for severe dental fluorosis as the critical effect. The NRC analysis determined that severe dental fluorosis appears to occur at a lower dose than stage II skeletal fluorosis and/or bone fractures. This document presents the results of the dose-response analysis requested by NRC.

The objective of the OW effort was to identify a point of departure for the fluoride concentration in drinking water that would be protective for sensitive exposed populations (children) who are vulnerable to severe enamel fluorosis, and determine if that point of departure will also be protective against stage II skeletal fluorosis and bone fractures in adults. The OW analysis focused first on severe dental fluorosis based on the NRC analysis.

This document provides a detailed review of available dose-response data from published and peer-reviewed studies for the following endpoints as they relate to fluoride exposure from drinking water:

- Dental fluorosis
- Skeletal fluorosis
- Skeletal fractures

Detailed analyses of the suitability of studies that had been identified by NRC (2006) and those retrieved by the OW for dose-response analysis are included as separate documents to accompany this report. There are two separate collections of study evaluations, one covers dental effects (*Dental Fluorosis: Evaluations of Key Studies*, EPA Report No. 820-R-10-018) and the other skeletal effects (*Fluoride-Related Skeletal Effects: Evaluations of Key Studies*, EPA Report No. 820-R-10-017).

EPA identified a point of departure (POD) of 1.87 mg F/L for severe dental fluorosis based on benchmark dose modeling of the prevalence for severe dental fluorosis associated with specific drinking water fluoride concentrations as reported by Dean (1942). In that era, drinking water and the diet were the major sources of fluoride exposure.  The POD is a lower confidence bound on the concentration in drinking water associated with severe dental fluorosis in 0.5% of the population studied.  This POD was the lowest concentration that was statistically justified by the population size. This value is consistent with other analyses of the Dean (1942) data set that identify 2 mg/L as the threshold drinking water fluoride concentration for severe dental fluorosis (EPA, 1986, NRC 1993, 2006).

In this document drinking water intake information for ingestion of tap water delivered by public drinking water systems, as reported in the USDA 1977–1978 Food Consumption Survey, is used to estimate the fluoride dose from drinking water associated with the POD in children studied by Dean (1942).  Data from a publication on dietary fluoride by McClure (1943) were used to estimate the dose from the diet for the children studied by Dean (1942).  The combination of the drinking water and dietary estimates thus become the basis for the OW inorganic fluoride Reference Dose (RfD) estimate of 0.08 mg F/kg/day.  The RfD is an estimate of the fluoride dose that will protect against severe dental fluorosis, clinical stage II skeletal fluorosis and skeletal fractures while allowing for a fluoride exposure adequate to protect against tooth decay for children and adults. Confidence in the RfD is considered to be medium.

The OW has also prepared and peer reviewed a second document that provides fluoride exposure estimates for the age groups susceptible to severe dental fluorosis.  This second document, *Fluoride: Exposure and Relative Source Contribution Analysis* (EPA Report No. 820-R-10-015), can be accessed through the following url:
http://water.epa.gov/action/advisories/drinking/fluoride_index.cfm

# TABLE OF CONTENTS

PREFACE ...................................................................................................................................... i

LIST OF TABLES ........................................................................................................................ v

LIST OF FIGURES ................................................................................................................... viii

ACKNOWLEDGMENTS ........................................................................................................... ix

LIST OF ACRONYMS ................................................................................................................ x

AUTHORS, CONTRIBUTORS AND REVIEWERS ............................................................. xii

EXECUTIVE SUMMARY ....................................................................................................... xiv

1. Introduction ........................................................................................................................... 1

2. Summary of Hazard as Reported by NRC .......................................................................... 3
   2.1. Dental Enamel Fluorosis ................................................................................................ 3
       2.1.1. Background .......................................................................................................... 3
       2.1.2. Measures of dental fluorosis ............................................................................... 3
       2.1.3. Adversity of dental fluorosis .............................................................................. 6
       2.1.4. Relationship between severe dental fluorosis and dental caries ......................... 6
   2.2. Impact of Fluoride Exposure on Bone Structure ........................................................... 7
       2.2.1. Skeletal fluorosis ................................................................................................. 7
       2.2.2. Fluoride and bone fractures ................................................................................. 7

3. Selection of Critical Studies for Dose-Response Analysis of Fluoride Drinking Water Data ....... 9
   3.1. Dental Fluorosis ............................................................................................................. 9
       3.1.1. Critical study for severe dental fluorosis .......................................................... 10
       3.1.2. Supplemental U.S. studies on dental fluorosis ................................................. 14
       3.1.3. Supplemental non-U.S. studies on dental fluorosis. ......................................... 22
       3.1.4. Environmental, physiological and genetic factors affecting dental fluorosis ........... 25
           3.1.4.1. The effect of climate ............................................................................. 26
           3.1.4.2. The effect of altitude ............................................................................. 28
           3.1.4.3. Physiological/nutrition factors ............................................................. 31
           3.1.4.4. Genetic factors ..................................................................................... 33
       3.1.5. Summary ............................................................................................................ 35
   3.2. Relationship between Dental Caries and Dental Fluorosis .......................................... 36
       3.2.1. Dental caries and severe fluorosis .................................................................... 38
       3.2.2. Dental caries and fluoride levels in drinking water .......................................... 48
       3.2.3. Dental caries as an adverse health effect .......................................................... 54
       3.2.4. Summary and conclusions. ................................................................................ 55
   3.3. Skeletal Fluorosis and Bone Fractures ........................................................................ 64
       3.3.1. Skeletal fluorosis ............................................................................................... 64
           3.3.1.1. Exposure to fluoride and changes in bone density ............................... 65
           3.3.1.2. Exposure to fluoride in stage II and stage III skeletal fluorosis ................. 70
       3.3.2. Bone fractures .................................................................................................... 74
           3.3.2.1. Epidemiological studies ........................................................................ 75
           3.3.2.2. Clinical trials ........................................................................................ 82

3.3.3. Summary and conclusions....................................................................83
    3.3.3.1. Skeletal fluorosis ..........................................................................83
    3.3.3.2. Bone fractures ............................................................................84

4. Approaches to Quantification of Dose-Response....................................87
    4.1. Critical Study for Severe Dental Fluorosis ....................................87
    4.2. Categorical Analysis of Dean (1942) Study ..................................88
    4.3. Benchmark Dose Analysis of Dean's Data on Severe Fluorosis .........89
    4.4. NOAEL/LOAEL Approach for Severe Fluorosis. ..........................92
    4.5. Summary and Conclusions...............................................................92

5. Reference Dose Derivation........................................................................94
    5.1. Nutritional Guidelines ....................................................................94
    5.2. Period of Developmental Sensitivity to Dental Fluorosis ..............96
    5.3. Dose Determination for Severe Dental Fluorosis ..........................98
        5.3.1. Body Weight and Drinking Water Intakes ...............................99
        5.3.2. Dose Estimates .......................................................................101
    5.4. RfD Determination........................................................................103
        5.4.1. Application of Estimated Oral RfD to Adult Populations........105
        5.4.2. Uncertainty factors ................................................................105
        5.4.3. Confidence in the Estimated Oral RfD ..................................106
        5.4.4. Impact of nutritional requirements on dentition and other uncertainties.............107
    5.5. Summary and Conclusions...............................................................107

APPENDIX A.  Categorical Data Analysis of Fluorosis Data Set of Dean (1942) ..............................120

APPENDIX B.  Benchmark Dose Analysis of Severe Fluorosis Data Set of Dean (1942)..................127

APPENDIX C. Epidemiology Study Evaluations ..............................................131

APPENDIX D. Fluoride Dose from Solid Foods at the Time of the Dean (1942) Study .................134

# LIST OF TABLES

Table 2-1.   Clinical Criteria for Dean's Enamel Fluorosis Index ..................................................4
Table 2-2.   Clinical Criteria and Scoring for the Thylstrup and Fejerskov Index (TFI) of Enamel Fluorosis.................................................................................................................5
Table 2-3.   Clinical Criteria and Scoring for the Tooth Surface Index of Fluorosis (TSIF) ...........5

Table 3-1.   Percent Distribution of Fluorosis in Populations Studied by Dean (1942) ...................12
Table 3-2.   Percent Distribution of Fluorosis in Arizona Populations Studied by Galagan and Lamson (1953) .......................................................................................................14
Table 3-3.   Percentage of Children by Fluorosis Diagnosis in the Study of Richards et al. (1967) .................15
Table 3-4.   Percent Distribution of Fluorosis in New Mexico Populations Studied by Eklund et al. (1987) ...................................................................................................................15
Table 3-5.   Percent Distribution of Fluorosis in Illinois Populations Studied by Driscoll et al. (1983) ...........16
Table 3-6.   Percent Distribution of Fluorosis in Midwest U.S. Populations Studied by Driscoll et al. (1986) ...................................................................................................................16
Table 3-7.   Percent Distribution of TSIF Scores for all Permanent Tooth Surfaces in Populations Studied by Heifetz et al. (1988) ..............................................................................17
Table 3-8.   Comparison of TSIF Scores and Mean Percent Fluorosed Surfaces for 8–10 yr old Children in Illinois Communities (Selwitz et al., 1995) ................................................18
Table 3-9.   Comparison of TSIF Scores and Mean Percent Fluorosed Surfaces for Children in Illinois Communities (Selwitz et al., 1995) .............................................................19
Table 3-10.  Comparison of TSIF Scores and Percent Fluorosed Surfaces for Children in Kewanee, IL  and two Communities  in Nebraska (Selwitz et al., 1998) ........................................20
Table 3-11.  Percent Distribution of Fluorosis in Children from Three Indiana Communities with Different Levels of Fluoride in Drinking Water ..........................................................21
Table 3-12.  Percent Distribution of Fluorosis in Taiwanese Populations Studied by Chen (1989) ....................24
Table 3-13.  Distribution of Fluorosis Scores in Brazilian School Children Studied by Cortes et al. (1996) ...................................................................................................................25
Table 3-14.  Percent Distribution of Fluorosis in S. African Populations Studied by Grobler et al. (2001) ...................................................................................................................25
Table 3-15.  Prevalence of Fluorosis in Children Living in Hot Climates ........................................26
Table 3-16.  Percentage of Children by Fluorosis Diagnosis for Each Fluoride-Temperature Zone .................28
Table 3-17.  Occurrence of Severe Fluorosis in High Altitude Areas in Uganda and the U.S. ..........................30
Table 3-18.  Studies Evaluating the Relationship between Dental Condition and Severity of Fluorosis .........38
Table 3-19.  Severe Fluorosis, Community Fluorosis Index and Mean DMFS Scores for Illinois School Children (8-16 yrs old) Studied by Driscoll et al. (1983) ..................................39
Table 3-20.  Percent Severe Fluorosis and Mean DMFS Scores for Midwestern School Children Studied by Driscoll et al. (1986) ..............................................................................39
Table 3-21.  Mean DMFS per Child and Fluorosis Scores for Illinois towns with fluoride water levels above optimal (Driscoll et al., 1986) ......................................................................40
Table 3-22.  Severe Fluorosis, Community Fluorosis Index, and Mean DMFT Scores for New Mexico Adult Populations Studied by Eklund et al. (1987) ...................................................41
Table 3-23.  Dental Condition and Level of Fluorosis by Tooth Type in New Mexico Adult Populations Studied by Eklund et al. (1987) .............................................................41
Table 3-24.  Weighted Child-level Estimates of Caries Prevalence and Mean DMFS of Permanent Teeth According to Degree of Fluorosis as Reported by Iida and Kumar (2009) ........................42
Table 3-25.  Fluorosis Severity and DMFT in Taiwanese School Children Studied by Chen (1989) ....43
Table 3-26.  Caries Status in Sri Lanka School Children Studied by Warnakulasuriya et al. (1992) ...............43
Table 3-27.  Mean DMFT by Fluorosis Score for Sri Lanka School Children Studied by Warnakulasuriya et al. (1992)..............................................................................................44
Table 3-28.  Mean DMFS by Fluorosis Score for Gaza Strip School Children Studied by Mann et al. (1987)...................................................................................................................44
Table 3-29.  Mean DMFS by Fluorosis Score for Gaza Strip School Children Studied by Mann et al. (1990)...................................................................................................................45

Table 3-30. Caries Prevalence and Fluorosis Severity in Ethiopian School Children Studied by Olsson (1979) .................................................................................................45

Table 3-31. Mean DMFT Scores and SD by Dental Fluorosis Grouping for Ethiopian School Children Studied by Wondwossen et al. (2004) .................................................46

Table 3-32. DMFS and DMFT Scores in Turkish School Children Studied by Ermis et al. (2003) .................46

Table 3-33. DMFS and DMFT Scores and Severity of Fluorosis in Turkish School Children Studied by Ermis et al. (2003) ......................................................................................47

Table 3-34. DMFT Scores in Brazilian School Children Studied by Cortes et al. (1996) ...................47

Table 3-35. Fluoride Levels and DMFT Scores for New Mexico Junior High School Children Studied by Striffler (1955) ...........................................................................48

Table 3-36. Dental Caries Experience of 13–15 yr olds in Seven U.S. Communities as Reported by Englander and DePaola (1979) ..............................................................50

Table 3-37. Mean DMFS Scores of Illinois School Children by Age Category and Water Fluoride Levels in 1980 and 1985 (Heifetz et al., 1988) ...............................................51

Table 3-38. Percent Caries-free and Mean DMFS Scores of Illinois Children in 1980, 1985 and 1990 (Selwitz et al., 1995) ..........................................................................52

Table 3-39. DMFS and DMFT Scores in Indiana School Children Studied by Jackson et al. (1995) ............52

Table 3-40. DMFS and DMFT Scores by Age Group in Indiana Populations Studied by Jackson et al. (1995) ...................................................................................53

Table 3-41. DMFT Scores in S. African School Children Studied by Grobler et al. (2001) ...................54

Table 3-42. Fluorosis and Dental Caries in Chinese School Children Studied by Ruan et al. (2005)...........54

Table 3-43. NRC Critical Studies Assessing the Effects of Severe Fluorosis on Caries Scores in Permanent Dentition ......................................................................56

Table 3-44. Summary of Results of Driscoll et al. (1986) Study of Illinois School Children ...........59

Table 3-45. Relationship of Fluoride in Drinking Water to CFI and DMFT and DMFS Scores....................60

Table 3-46. Relationship of Percent Severe Fluorosis to CFI and DMFT and DMFS Scores .....................61

Table 3-47. Relationship of CFI to DMFT and DMFS Scores ...................................................62

Table 3-48. Mean Mid-Radial Bone Mass in 20–35-year-old Iowa Women at Baseline (1983/1984) and at Follow-up (1988/1989) in Studies Conducted by Sowers et al. (1991)......................68

Table 3-49. Mean Mid-Radial Bone Mass in 55–80-year-old Iowa Women at Baseline (1983/1984) and at Follow-up (1988/1989) in Studies Conducted by Sowers et al. (1991).................69

Table 3-50. Selected Cases of Severe Skeletal Fluorosis in the U.S. ......................................72

Table 3-51. Key Observational Studies Identified by NRC (2006) for Evaluating the Effects of Fluoride in Drinking Water ($\geq$ 1.5 mg/L) on the Risk of Bone Fractures ...................75

Table 3-52. Risk of Fracture in a Five-Year Period (1983–84 to 1988–89) among Women of Three Rural Iowa Communities Studied by Sowers et al. (1991) ..........................................76

Table 3-53. Relationship between the Prevalence of Bone Fractures and Fluoride in Drinking Water in Chinese Populations Studied by Li et al. (2001) ..............................................78

Table 3-54. Effects of Fluoride in Drinking Water on the Risk of Hip Fractures in Finnish Women Aged 50–65 yr (Kurttio et al., 1999) ...................................................80

Table 3-55. Clinical Studies Assessing the Risk of Non-Vertebral Fractures in Postmenopausal Women Receiving Therapeutic Doses of Fluoride .................................................83

Table 3-56. Epidemiological Studies Evaluating the Effects of Fluoride in Drinking Water ...................85

Table 4-1. Percent Distribution of Fluorosis in Populations Studied by Dean (1942), Sorted by Concentration of Fluoride in Community–specific Drinking Water Supplies ...............88

Table 4-2. Comparison of Regression Models Used to Analyze Dean's (1942) Data .......................90

Table 4-3. Temperature and Altitude Data for Selected Dean Study Sites .............................91

Table 4-4. Comparison of BMD and BMDLs for 0.5% Severe Fluorosis Using Dean's Data Set Adjusted for Warm Climates and High Altitudes ....................................92

Table 5-1. Adequate Intake (AI) Reference Values and Tolerable Upper Intake Levels (UL) for Select Age Groups. ........................................................................95

Table 5-2. Body Weight and Tap Water Intake in the United States (Ershow and Cantor, 1989) ...............100

Table 5-3. Body Weight and Drinking Water Intake Data (Consumers Only) from Estimated Body Weight and Per Capita Water Ingestion in the United States – An Update (U.S. EPA 2004) .................................................................................100

**Table 5-4.** **Estimates of Fluoride Doses at Specific Tap Water Intakes for Age Groupings During the Sensitive Window for Development of Severe Enamel Fluorosis (at 1.87 mg F/L)** ..................... 101

**Table C-1.** **Evaluation of Epidemiology Studies** ........................................................................ 133

**Table D-1.** **Fluoride Contents of Selected Foods as Reported by McClure (1943, 1949)** ................................ 136
**Table D-2.** **Average Fluoride Content (mg/kg) of Vegetables Cooked in Water with Varying Fluoride Levels** ............................................................................................................ 137
**Table D-3.** **Fluoride Concentrations in Food Products** ........................................................... 138
**Table D-4.** **Comparison of Fluoride Data (ppm) from McClure (1943, 1949) to that from USDA (2005)** ........................................................................................................................ 139
**Table D-5.** **Estimated Fluoride Intakes from Drinking Water with 1 ppm Fluoride** ..................... 140
**Table D-6.** **Daily Fluoride Intakes Estimated by McClure, 1943** .......................................... 141
**Table D-7.** **Fluoride Content of Canned Vegetables** ............................................................... 142
**Table D-8.** **Estimated Fluoride Intake from Solid Foods with an Average 0.5 ppm F as Derived from McClure (1943)** ........................................................................................................ 143

## LIST OF FIGURES

**Figure 3-1.** **Relationship between severe fluorosis and fluoride in drinking water (U.S. studies) (NRC, 2006)** .................................................................................................................11

**Figure 3-2.** **Fluorosis in permanent teeth of school children born and reared in three study areas in Sweden (Forsman, 1974).** ...........................................................................................23

**Figure 3-3.** **Age-caries regression lines for groups with different degrees of enamel fluorosis.** ........................49

**Figure 3-4.** **Age-caries regression lines for groups with different degrees of enamel fluorosis exposed to water containing approximately 5 mg F/L** ...................................................................49

**Figure 3-5.** **Drinking water fluoride concentration vs. Community Fluorosis Index for selected studies.** ....................................................................................................................60

**Figure 3-6.** **Drinking water fluoride concentration vs. DMFT (□) and DMFS (●) scores for selected studies.** ....................................................................................................................61

**Figure 3-7.** **Percent severe fluorosis relative to DMFT (□) and DMFS (●) scores for selected studies.** ............62

**Figure 3-8.** **Community fluorosis index vs. DMFT (□) and DMFS (●) scores for selected studies.** ................63

**Figure 3-9.** **Prevalence of overall fractures and fluoride concentration in drinking water in six Chinese populations since the age of 20 yr (Li et al., 2001).** ...........................................................79

**Figure 3-10.** **Rate ratios and 95 percent confidence intervals for the association of the estimated fluoride concentration in well water (df = 1) and hip fractures in men and women (Cox regression) (Kurttio et al., 1999)** .....................................................................................80

**Figure 4-1.** **Maximum likelihood logistics regression analysis (CATMOD Procedure) of Dean (1942) data.** ..................................................................................................................89

**Figure 4-2.** **Benchmark dose analysis (BMDS vers. 2.0; with 95% CL) for the dichotomous Hill model for 0.5% severe fluorosis (data of Dean, 1942).** ...............................................................90

**Figure 5-1.** **Sampling sites used in Dean (1942) dental fluorosis study.** ..........................................................97

**ACKNOWLEDGMENTS**

This document was prepared by staff of Oak Ridge National Laboratory, Oak Ridge, Tennessee, under work assignment 2006-014, under the U.S. EPA IAG Number DW-89-9220971.  The Principal EPA Scientists are Joyce Morrissey Donohue, PhD, and Tina Duke, MPH, Health and Ecological Criteria Division, Office of Science and Technology, Office of Water, U.S. Environmental Protection Agency, Washington, DC.

The Oak Ridge National Laboratory is managed and operated by UT-Battelle, LLC, for the U.S. Department of Energy under Contract No. DE-AC05-00OR22725.

## LIST OF ACRONYMS

| | |
|---|---|
| ADA | American Dental Association |
| AI | Adequate Intake |
| BMD | Benchmark Dose |
| BMDL | Benchmark Dose lower 95% bound |
| BW | Body weight |
| CATMOD | Categorical modeling procedure of the SAS$^©$ Institute, Inc., of Cary, NC |
| CFI | Community Fluorosis Index |
| CSFII | Continuing Survey of Food Intake by Individuals |
| DDE | Developmental defects of enamel |
| dfs | Decayed or filled surfaces |
| dft | Decayed and filled primary teeth |
| DMF | Decayed, missing and filled |
| DMFS | Decayed, missing and filled permanent surfaces index |
| DMFT | Decayed, missing and filled permanent teeth index |
| DS | Decayed surface |
| DT | Decayed teeth |
| DWI | Drinking water intake |
| EDF | Environmental Defense Fund |
| $F_{ei}$ | Community Index of Dental Fluorosis |
| $F_{ti}$ | Severity index of dental fluorosis |
| FRI | Fluorosis Risk Index |
| FT | filled teeth |
| FS | filled surfaces |
| HR | Hazard ratio |
| IOM | Institute of Medicine |
| LOAEL | Lowest-Observed-Adverse-Effect Level |
| MCL | Maximum contaminant level |
| MCLG | Maximum contaminant level goal |
| MPFS | Mean percent of fluorosed surface |
| NF | Non-fluoridated |
| NIDR | National Institute of Dental Research |
| NIPDWR | National Interim Primary Drinking Water Regulations |
| NOAEL | No-Observed-Adverse-Effect Level |
| NRC | National Research Council |

| | |
|---|---|
| OR | Odds ratio |
| OHI-S | Simplified Oral Hygiene Index |
| OPF | Optimal fluoride level |
| OW | Office of Water |
| POD | Point of Departure |
| RfD | Reference dose |
| RMCL | Recommended Maximum Contaminant Level |
| RR | Relative Risk |
| SDWA | Safe Drinking Water Act |
| SMCL | Secondary Maximum Contaminant Level |
| TFI | Thylstrup and Fejerskov Index |
| TSIF | Tooth Surface Index of Fluorosis |
| $UF_H$ | Human-to-sensitive-human intraspecies uncertainty factor |
| $UF_A$ | Animal-to-human uncertainty factor |
| $UF_S$ | Subchronic-to-chronic uncertainty factor |
| $UF_L$ | LOAEL-to-NOAEL uncertainty factor |
| UL | Tolerable Upper Intake Level |

**AUTHORS, CONTRIBUTORS AND REVIEWERS**

Joyce Morrissey Donohue, Ph.D., R.D.
Health and Ecological Criteria Division
Office of Water
U.S. Environmental Protection Agency

Tina Duke, MPH.
Health and Ecological Criteria Division
Office of Water
U.S. Environmental Protection Agency

Dennis Opresko, Ph.D.
Toxicology and Hazard Assessment
Oak Ridge National Laboratory
Oak Ridge, TN

Annetta Watson, Ph.D.
Toxicology and Hazard Assessment
Oak Ridge National Laboratory
Oak Ridge, TN

Robert Ross, MS
Toxicology and Hazard Assessment
Oak Ridge National Laboratory
Oak Ridge, TN

**INTERNAL EPA REVIEWERS**

Allen Davis, Ph.D.
National Center for Environmental Assessment
Office of Research and Development
U.S. Environmental Protection Agency

Vicki Dellarco, Ph.D.
Office of Pesticide Programs
U.S. Environmental Protection Agency

Brenda Foos, MS
Office of Children's Health Protection
U.S. Environmental Protection Agency

Hend Galal-Gorchev, Ph.D.
Health and Ecological Criteria Division
Office of Water
U.S. Environmental Protection Agency

Jeff Gift, Ph.D.
National Center for Environmental Assessment
Office of Research and Development
U.S. Environmental Protection Agency

**EXTERNAL PEER REVIEWERS**

Jane A. Cauley, Dr.P.H.
Department of Epidemiology
University of Pittsburgh

Gary M. Whitford, D.M.D., Ph.D.
Department of Oral Biology and Maxillofacial pathology,
Medical College of Georgia

Richard D. Jackson, D.M.D.
School of Dentistry,
Oral Health Institute, Indiana University

Pamela Den Besten, D.D.S., M.S.
Department of Orofacial Sciences,
University of California at San Francisco

# EXECUTIVE SUMMARY

In response to the 2006 National Research Council (NRC) report: *Fluoride in Drinking Water: A Scientific Review of EPA's Standards*, the U.S. EPA Office of Water (OW) began a reassessment of the dose-response associated with the effects of ingested fluoride on severe dental fluorosis and bone structure.  This report is a culmination of that effort.

At low intake levels, fluoride has been shown to have therapeutic value in the prevention of dental caries; however, slightly higher levels, particularly in children during the period of enamel development can lead to dental fluorosis, a condition in which the enamel covering of the teeth fails to crystallize properly. Possible resulting problems include enamel defects ranging from barely discernable markings to brown stains and surface pitting.  Prolonged high intake of fluoride, at any age, can result in skeletal fluorosis, a condition which may increase bone brittleness, and in a potential increase in risk of bone fracture.  In high-dose cases, severe bone abnormalities can develop, crippling the affected individual.

After evaluation of the available literature, USEPA identified a study conducted by Dean (1942) using data from 1930 to early 1940 as that providing the most useful information on the association of fluoride intake from drinking water and the development of dental fluorosis in children.  Although there are some limitations in Dean's study, its value lies in the fact that it is relatively free of confounding factors associated with the widespread use of fluoride-containing consumer products introduced after that time.  Dean's study documented the prevalence and severity of dental fluorosis in 5824 children in 22 U.S. communities in 10 states where fluoride levels in drinking water ranged from 0.0 to 14.1 mg/L.  The Dean study provides baseline data from which a statistically sound estimate of the threshold for severe dental fluorosis was derived. Severe dental fluorosis, a condition defined by Dean as pitting of the enamel of the teeth, was identified by the NRC (2006) as a condition that could lead to an increased risk for dental caries by diminishing the protective function of the enamel.  The threshold for severe dental fluorosis in the children studied by Dean was derived statistically as the concentration in drinking water associated with the lower bound confidence limit for a prevalence rate of 0.5%; i.e., the concentration at which no more than 0.5% of exposed children in the susceptible age groups would develop any signs of severe dental fluorosis (pitting of one or more teeth).  This threshold fluoride concentration (for Dean's study populations) is 1.87 mg/L.

Because data on drinking water intakes were not collected during Dean's study, OW used an indirect approach to estimate the dose resulting from the drinking water concentration associated with the calculated threshold for severe dental fluorosis.  Data collected during the 1977/1978 Nationwide Food Consumption Survey on drinking water intakes and body weights of children were used to estimate fluoride doses in mg/kg/day for mean, 75th, 90th, and 95th percentile tap water consumer groupings for children in the age categories 0.5 to 0.9 yr, 1 to 3 yr, 4 to 6 yr, 7 to 10 yr and 11 to 14 yr.  This resulted in age- and drinking water consumption-specific dose estimates that ranged from 0.04 mg/kg/day to 0.19 mg/kg/day; for mean water consumption rates, the doses ranged from 0.04 to 0.09 mg/kg/day for the different age groups.  These values were compared to the dose level of 0.05 mg/kg/day which had been recommended as an Adequate Intake (AI) by the Institute of Medicine (IOM, 1997) for optimal anticaries protection.

Any doses that were less than or equal to the 0.05 mg/kg/day were eliminated from consideration as the threshold dose for severe dental fluorosis.  Doses greater than 0.05 mg/kg/day were considered as points of departure for the drinking water component of an oral Reference Dose (RfD) analysis.  The OW selected 0.07 mg/kg/day as the contribution of drinking water to the RfD because it provided a reasonable difference in exposure (0.02 mg/kg/day) between it and the IOM (1997) AI of 0.05 mg/kg/day, considering day to day dietary variability and the uncertainties in the analysis.

Although 0.06 mg/kg/day was also one of the age-specific dose estimates derived from the Dean data, OW felt that a 0.01 mg/kg/day difference between the IOM recommendation and the dose corresponding to severe dental fluorosis was too small given the calculated range of dose estimates and uncertainties surrounding both the AI and the drinking water component of the RfD. Support for the OST estimate was provided in the data from a study of fluorosis conducted at the University of Iowa (Hong et al., 2006a) where no cases of severe dental fluorosis of the central incisors and first molars using a severe fluorosis scale based on staining and/or pitting of the enamel were noted among 579 children exposed to $\leq 0.06$ mg/kg/day fluoride based on periodic exposure records provided by their parents during the period of tooth formation.

The drinking water oral RfD of 0.07 mg/kg/day was modified by OW to account for dietary fluoride intake at the time the children in the Dean (1942) study were exposed.  The OW determined a dietary exposure component of 0.01 mg/kg/day based on a diet where solid foods had an average concentration of 0.5 ppm fluoride using caloric intakes, body weights, and representative dietary staples from McClure (1943).  The dietary contribution of 0.01 mg/kg/day was added to the drinking water contribution of 0.07 mg/kg/day, resulting in a total oral RfD of 0.08 mg/kg/day. Confidence in the RfD is considered to be medium.

In evaluating the data available for skeletal effects of fluoride, OW did not identify any studies that were good candidates for dose- or concentration-response modeling. Unlike severe enamel fluorosis which showed a linear concentration-response, the skeletal effects display a biphasic relationship of fluoride exposure and its impact on bone strength which cannot be accommodated by currently available models. The available data led NRC and OW to conclude that exposure to concentrations of fluoride in drinking water of 4 mg/L and above are suggestive of, and appear to be positively associated with, an increased relative risk of bone fractures in susceptible populations when compared to populations exposed to 1 mg F/L.  However, there are insufficient data to conclude that this increase in relative risk would also apply if comparisons were made to groups exposed to negligible fluoride concentrations or if comparisons were made based on total fluoride intake rather than on the basis of drinking water concentrations.  A concentration of 4 mg/L in drinking water corresponds to a daily dose of 8 mg for person drinking 2 liters of water per day.

The NRC (2006) suggested that adults could be at risk for bone fractures at a fluoride drinking water concentration corresponding to a daily dose of 8 mg/day. The World Health Organization (2002) has chosen a higher value ($\geq 14$ mg/day) for an increased risk of bone fractures in some countries.  The oral RfD of 0.08 mg/kg/day estimated by OW is equivalent to a daily dose of 5.6 mg for a 70 kg person.  Compared to the NRC and WHO benchmarks, the OW proposed oral RfD of 0.08 mg/kg/day is consistent with the available data and is protective against a fluoride-related increased risk of bone fractures in adults.

1.      **Introduction**

In 2006, the National Research Council (NRC) released the report: *Fluoride in Drinking Water: A Scientific Review of EPA's Standards*, the product of a three-year effort to examine the health effects of ingested fluoride, specifically that originating from drinking water sources.  The development of the NRC (2006) report was funded by the U. S. EPA Office of Water (OW) in conjunction with the 2002/2003 review of the Maximum Contaminant Level Goal (MCLG) and the enforceable Maximum Contaminant Level (MCL) for fluoride established in 1986.  This report builds on the foundation laid by NRC and focuses on examining available dose-response data for the critical noncancer effects of fluoride on teeth and bone identified by NRC (2006) as adverse health effects.  This introduction provides the OW regulatory background on fluoride and summarizes the various events that preceded the NRC (2006) effort.

As summarized in 50 FR:20164, in December 1975 the U.S. EPA promulgated the National Interim Primary Drinking Water Regulations (NIPDWR) under Section 1412 of the Safe Drinking Water Act (SDWA).  A Maximum Contaminant Level (MCL) for fluoride which ranged from 1.4 mg/L to 2.4 mg/L was promulgated depending on annual average ambient temperatures of the target area and became effective in June 1977.  This range is twice that of the U.S. Public Health Service current recommendations for fluoridation of public water supplies, 0.7 mg/L to 1.2 mg/L (PHS 1962; see also CDC, 1995).  Once effective, the MCL was challenged by the Environmental Defense Fund as not being sufficiently protective of human health.  The Court of Appeals for the District of Columbia Circuit agreed with EPA [EDF v. Costle, 578 F.2d 337 (D.C. Cir. 1977) as cited in 50 FR: 20165].

Over the following eight years the MCL for fluoride continued to be discussed and debated frequently (50 FR: 20164).  One of the most notable participants was the State of South Carolina which in 1981 petitioned EPA to delete fluoride from the Primary Drinking Water Regulations.  South Carolina's contention was that dental fluorosis should be considered a cosmetic effect and not an adverse health effect.  This position was supported by other states and several organizations including the American Medical Association and the American Dental Association. In addition, the Surgeon General at the time, C. Everett Koop, concurred that dental fluorosis, while not a desirable condition, was not an adverse health effect (Koop, 1984).  Two years earlier in a letter to the EPA Deputy Administrator (Koop, 1982), Dr. Koop stated "I cannot condone the use of public water supplies that may cause undesirable cosmetic effects to teeth, just as I cannot condone the use of public water supplies below the optimum concentration because of a diminished protection against dental caries."  In his 1984 letter (Koop, 1984) Dr. Koop reiterated his support of this position.

In 1985 EPA promulgated a Recommended Maximum Contaminant Level (RMCL; presently known as the Maximum Contaminant Level Goal, MCLG) of 4 mg/L (50 FR: 47142) based on a human study showing crippling skeletal fluorosis at exposures of 20 mg per day (Roholm, 1937).  In 1986 EPA promulgated a MCL for fluoride of 4 mg/L and established a Secondary Maximum Contaminant Level (SMCL) of 2 mg/L (51 FR: 11396). National Secondary Drinking Water Regulations (NSDWRs or secondary standards) are non-enforceable guidelines regulating contaminants that may cause cosmetic effects (such as skin or tooth discoloration) or aesthetic effects (such as taste, odor, or color) in drinking water. EPA recommends secondary standards to

water systems but does not require systems to comply. However, states may choose to adopt them as enforceable standards.

In the early 1990s the National Research Council (NRC) was asked by the EPA to review the available data on the effects of ingested fluoride and the MCL of 4 mg/L.  In its published results, NRC (1993) stated that the MCL of 4 mg/L was an appropriate interim standard but noted that further research in the areas of fluoride intake, enamel fluorosis, bone strength and fractures, and carcinogenicity was needed (NRC, 1993).

A decade later, in conjunction with the 2002/2003 EPA review of all drinking water regulations (67 FR: 19030; FR 68: 42908), the NRC was asked by the EPA to reevaluate the adequacy of the MCLG and SMCL for fluoride, focusing on health effects data published since 1993 and with a consideration of all oral sources of potential fluoride exposure (NRC, 2006).  NRC (2006) concluded "In light of the collective evidence on various health end points and total exposure to fluoride, the committee concludes that EPA's MCLG of 4 mg/L should be lowered.  Lowering the MCLG will prevent children from developing severe enamel fluorosis and will reduce the lifetime accumulation of fluoride into bone that the majority of the committee concludes is likely to put individuals at increased risk of bone fracture and possibly skeletal fluorosis, which are particular concerns for subpopulations that are prone to accumulating fluoride in their bones." The Committee encouraged EPA to update the risk assessment for fluoride applying current approaches for quantifying risk with consideration given to susceptible populations and the uncertainties and variability in the data (NRC, 2006).

This report provides a technical examination of the human dose-response data on dental fluorosis, skeletal fluorosis, and skeletal fractures.  Critical studies were selected and, following a dose-response assessment, an oral Reference Dose is derived.

## 2.      Summary of Hazard as Reported by NRC

NRC (2006) analyzed a large body of literature on fluoride, primarily papers published since the early 1990s, regarding the effects of fluoride on teeth; the musculoskeletal, reproductive, endocrine, gastrointestinal, renal, hepatic, and immune systems; and on the endpoints of developmental toxicity, neurotoxicity (including behavioral effects), genotoxicity, and carcinogenicity.  Following this comprehensive analysis, NRC concluded that the biological tissues of most concern to fluoride exposures of 4 mg/L, the current MCLG, were the teeth and bones.

For the current RfD analysis, EPA obtained the critical references on dental fluorosis, dental cavities and bone fractures as related to fluoride exposure identified by NRC (2006).  EPA also identified, retrieved, and reviewed relevant information for these effects as well as for skeletal fluorosis published during the period between 2000 to August 2010 that were not included in NRC (2006).

This section on the assessment of noncancer health effects of fluoride provides a summary of the hazard information for the following:

- Dental fluorosis
- The relationship between caries prevalence and the degree of dental fluorosis
- Skeletal fluorosis
- Bone fractures relative to fluoride exposure

A detailed discussion of the critical studies is presented in Section 3. The focus on the endpoints listed above is consistent with the NRC (2006) analysis of hazard and their charge to the OW.

## 2.1.    Dental Enamel Fluorosis
## 2.1.1.  Background

Fluoride has an affinity for the developing enamel because apatite crystals have the capacity to bind and integrate fluoride ion into the crystal lattice (Robinson et al., 1996). Apatite is a salt of calcium phosphate that co-crystallizes with hydroxyl, fluoride or chloride ions.  Hydroxyapatite $[Ca_{10}(PO_4)_6(OH)_2]$ is the primary calcium salt that is found in tooth enamel. The mineral formed in tooth enamel exposed to higher fluoride levels is fluoride containing carbonated apatite. Fluoride levels in subsurface fluorotic enamel are about 200 ppm rather than the 10-100 ppm fluoride in normal enamel. Precipitation of fluoride mineral salts at the surface of enamel results in high surface levels. This fluoride-substituted apatite has some increased resistance to bacterial acids that cause tooth decay. However, the primary function of fluoride in drinking water in reducing tooth decay is topical, primarily by the enhancement of remineralization (Fejerskov et al. 1994).

## 2.1.2.  Measures of dental fluorosis

Excessive intake of fluoride during enamel development can lead to enamel fluorosis, a condition of the dental hard tissues in which the enamel covering of the teeth fails to crystallize properly, leading to defects that range from barely discernable markings to brown stains and

surface pitting. There are three main indices that have been used to label/grade the degree of enamel fluorosis:

- Dean's index (Dean, 1942)
- The Thylstrup-Fejerskov index (TFI; Thylstrup and Fejerskov, 1978); and
- The tooth surface index of fluorosis (TSIF; Horowitz et. al., 1984).

These indices are shown in the Tables 2-1, 2-2, and 2-3, respectively.  Dean's scores are assigned on the basis of the severest form of fluorosis recorded for two or more teeth in each individual (Dean, 1942). The TFI index classifies fluorosis based on the facial surface of each tooth while the TSIF index ascribes a fluorosis score to each unrestored surface of each tooth.   In the TFI and TSIF systems, fluorosis scores of 1 and 2 can be considered mild, 3 and 4 as moderate and 5-9 (TFI) or 5-7 (TSIF) as severe.  Dean's index, defining severe fluorosis as a score of 4, is by far the most widely used in the examined literature.

Since there is not a one-to-one correlation among the various classification indices, careful consideration must be given when studies are reviewed to ensure a consistency of interpretation. In this report the presence of enamel pitting (discrete or confluent) will be defined as severe enamel fluorosis; the same position as that taken by NRC (2006).

| Table 2-1. Clinical Criteria for Dean's Enamel Fluorosis Index | |
|---|---|
| **Diagnosis** | **Criteria** |
| Normal (0) | The enamel presents the usual translucent semi-vitriform type of structure. The surface is smooth, glossy, and usually a pale creamy white color. |
| Questionable (0.5) | The enamel discloses slight aberrations from the translucency of normal enamel, ranging from a few white flecks to occasional white spots. This classification is utilized when a definite diagnosis of the mildest form of fluorosis is not warranted and a classification of "normal" is not justified. |
| Very mild (1) | Small, opaque, paper white areas are scattered irregularly over the tooth but not involving as much as approximately 25% of the tooth surface. Frequently included in this classification are teeth showing no more than 1 to 2 mm of white opacity at the tip of the summit of the cusps of the bicuspids or second molars. |
| Mild (2) | The white opaque areas in the enamel of the teeth are more extensive but do not involve as much as 50% of the tooth. |
| Moderate (3) | All enamel surfaces of the teeth are affected, and surfaces subject to attrition show marked wear. Brown stain is frequently a disfiguring feature. |
| Severe (4) | All enamel surfaces are affected and hypoplasia is so marked that the general form of the tooth may be altered. The major diagnostic sign of this classification is the discrete or confluent pitting. Brown stains are widespread and teeth often present a corroded appearance. |

**SOURCE**: Dean (1942).

| Table 2-2. Clinical Criteria and Scoring for the Thylstrup and Fejerskov Index (TFI) of Enamel Fluorosis | |
|---|---|
| Score | Criteria |
| 0 | Normal translucency of enamel remains after prolonged air-drying. |
| 1 | Narrow white lines corresponding to the perikymata (transverse ridges on the exposed surface of the surface of the enamel of permanent teeth). |
| 2 | Smooth surfaces: More pronounced lines of opacity that follow the perikymata. Occasionally confluence of adjacent lines. Occlusal surfaces: Scattered areas of opacity < 2 mm in diameter and pronounced opacity of cuspal ridges. |
| 3 | Smooth surfaces: Merging and irregular cloudy areas of opacity. Accentuated drawing of perikymata often visible between opacities. Occlusal surfaces: Confluent areas of marked opacity. Worn areas appear almost normal but usually circumscribed by a rim of opaque enamel. |
| 4 | Smooth surfaces: The entire surface exhibits marked opacity or appears chalky white. Parts of surface exposed to attrition appear less affected. Occlusal surfaces: Entire surface exhibits marked opacity. Attrition is often pronounced shortly after eruption. |
| 5 | Smooth and occlusal surfaces: Entire surface displays marked opacity with focal loss of outermost enamel (pits) < 2 mm in diameter. |
| 6 | Smooth surfaces: Pits are regularly arranged in horizontal bands < 2 mm in vertical extension. Occlusal surfaces: Confluent areas < 3 mm in diameter exhibit loss of enamel. Marked attrition. |
| 7 | Smooth surfaces: Loss of outermost enamel in irregular areas involving less than half of entire surface. Occlusal surfaces: Changes in morphology caused by merging pits and marked attrition. |
| 8 | Smooth and occlusal surfaces: Loss of outermost enamel involving more than half of surface. |
| 9 | Smooth and occlusal surfaces: Loss of main part of enamel with change in anatomic appearance of surface. Cervical rim of almost unaffected enamel is often noted. |

SOURCE: Thylstrup and Fejerskov (1978).

| Table 2-3. Clinical Criteria and Scoring for the Tooth Surface Index of Fluorosis (TSIF) | |
|---|---|
| Score | Criteria |
| 0 | Enamel shows no evidence of fluorosis. |
| 1 | Enamel shows definite evidence of fluorosis—namely, areas with parchment-white color that total less than one-third of the visible enamel surface. This category includes fluorosis confined only to incisal edges of anterior teeth and cusp tips of posterior teeth ("snowcapping"). |
| 2 | Parchment-white fluorosis totals at least one-third, but less than two-thirds, of the visible surface. |
| 3 | Parchment-white fluorosis totals at least two-thirds of the visible surface. |
| 4 | Enamel shows staining in conjunction with any of the preceding levels of fluorosis. Staining is defined as an area of definite discoloration that may range from light to very dark brown. |
| 5 | Discrete pitting of the enamel exists, unaccompanied by evidence of staining of intact enamel. A pit is defined as a definite physical defect in the enamel surface with a rough floor that is surrounded by a wall of intact enamel. The pitted area is usually stained or differs in color from the surrounding enamel. |
| 6 | Both discrete pitting and staining of the intact enamel exist. |
| 7 | Confluent pitting of the enamel surface exists. Large areas of enamel may be missing and the anatomy of the tooth may be altered. Dark-brown stain is usually present. |

SOURCE: Horowitz et al. (1984).

### 2.1.3.  Adversity of dental fluorosis

There has been much debate over the past several decades whether enamel fluorosis is an adverse health effect (see Section 1 of this report for an overview).  As noted in Section 1, NRC (2006) reached somewhat different conclusions from prior panels relative to the health impact of dental fluorosis.  They concurred with previous panels that mild and moderate dental fluorosis are cosmetic; however, they felt that severe fluorosis had an adverse health impact because it damaged the enamel and reduced its efficacy in protecting the teeth from decay.  Dental decay is the destruction of the outer coating of the tooth (enamel) through the action of bacteria in the dental plaque.  If decay is untreated it spreads into the inner portion of the tooth causing a toothache and sometimes infection (an abscess).  Although not all members of the panel agreed with the classification of severe fluorosis as an adverse health effect, all agreed that it should be avoided.  Evidence cited by NRC in support of their conclusion included the following statements:

- "[T]he most severe forms of fluorosis manifest as heavily stained, pitted, and friable enamel that can result in loss of dental function" (Burt and Eklund, 1999).

- "The degree of porosity (hypermineralization) of such teeth results in a diminished physical strength of the enamel, and parts of the superficial enamel may break away . . . In the most severe forms of dental fluorosis, the extent and degree of porosity within the enamel are so severe that most of the outermost enamel will be chipped off immediately following eruption" (Fejerskov et al., 1990).

- "With increasing severity, the subsurface enamel all along the tooth becomes increasingly porous… the more severe forms are subject to extensive mechanical breakdown of the surface" (Aoba and Fejerskov, 2002).

- " . . the most severe forms of dental fluorosis might be more than a cosmetic defect if enough fluorotic enamel is fractured and lost to cause pain, adversely affect food choices, compromise chewing efficiency, and require complex dental treatment" (NRC, 1993).

NRC (2006) concluded that severe enamel fluorosis occurs in approximately 10% of children in communities with water fluoride concentrations at or near the current MCLG of 4 mg/L.  An examination of the dose response of severe dental fluorosis is provided in Section 3 of this report.  NRC (2006) recommended that "Additional studies, including longitudinal studies, of the prevalence and severity of enamel fluorosis should be done in U.S. communities with fluoride concentrations higher than 1 mg/L. These studies should focus on moderate and severe enamel fluorosis in relation to caries and in relation to psychological, behavioral, and social effects among affected children, their parents, and affected children after they become adults."

### 2.1.4.  Relationship between severe dental fluorosis and dental caries

NRC (2006) considered the relationship between severe dental fluorosis and increased dental caries to be a plausible one.  They found that there is some evidence that severe fluorosis can lead to a loss of the structural integrity of teeth, leading to an increase in dental caries.  However, the evidence is mixed as will be discussed in Section 3 of this report.

## 2.2.    Impact of Fluoride Exposure on Bone Structure

The two most studied effects of fluoride on the musculoskeletal system are skeletal fluorosis and bone fracture (NRC, 2006).  As described in NRC (2006), fluoride in the bones of mammals exists in two forms.  The less dominant form is a rapidly exchangeable form that associates with the surfaces of the hydroxyapatite crystals of the mineralized component of bone and does not require bone resorption for release to extracellular fluid. Hydroxyapatite is the mature form of a calcium phosphate insoluble salt that is deposited in and around the collagen fibrils in skeletal tissue. The predominant form of fluoride in bone resides within the hydroxyfluoroapatite crystals within the bone matrix rather than on its surfaces.

### 2.2.1.  Skeletal fluorosis

Skeletal fluorosis, a bone and joint condition, occurs following prolonged exposure to high concentrations of fluoride (see Section 3 of this report for a discussion of critical studies).  As summarized in NRC (2006), skeletal fluorosis is categorized into one of four stages: a preclinical stage and three clinical stages that increase in severity. The most severe stage (clinical stage III) historically has been referred to as the "crippling" stage. At stage II, mobility is not significantly affected, but it is characterized by sporadic pain, stiffness of joints, and osteosclerosis of the pelvis and spine.  As NRC has noted, very few epidemiological studies of skeletal fluorosis in the United States have been documented, especially when the source is restricted to water consumption alone.  In a retrospective study involving 170,000 radiological examinations of people in Texas and Oklahoma where many communities had water fluoride levels above 4 mg/L, Stevenson and Watson (1957) diagnosed only 23 cases of fluoride osteosclerosis in people consuming water with 4 to 8 mg F/L and no cases in people exposed to lower concentrations of fluoride in drinking water. The paper stated, without providing details, that these 23 individuals did not have unusual amounts of arthritis or back stiffness given their age (44 to 85), but 11 did have bone density of an extreme degree and nine had more than minimal calcification of pelvic ligaments (four had Grade 2 and five had Grade 4 calcification in either the sacrotuberous or sacrospinous ligaments). Based on the information presented, it is reasonable to assume that no cases of stage III skeletal fluorosis existed.  However, NRC concluded that, based on the publication contents, it was not possible to determine if there were any cases that could be characterized as stage II skeletal fluorosis.

NRC (2006) concluded that on the basis of existing epidemiologic literature, stage III skeletal fluorosis appears to be a rare condition in the U.S. and that the occurrence of stage II skeletal fluorosis at drinking water fluoride levels of 4 mg/L could not be determined.   To fill this data gap, they recommended that a systematic study of stage II and stage III skeletal fluorosis be conducted to clarify the relationship of fluoride ingestion, fluoride concentration in bone, and clinical symptoms.

### 2.2.2.  Fluoride and bone fractures

With respect to bone fractures, NRC (2006) notes that inducing a permanent alteration of skeletal mass in adults is difficult because bone has an innate mechanism for self correction.   This mechanism involves the formation of bone by osteoblasts and the resorption of bone by

osteoclasts.  Fluoride is known to stimulate osteoblast proliferation and may also affect oseoclastogenesis.

There have been numerous clinical trials of fluoride compounds used in the treatment of osteoporosis in conjunction with hormone and calcium supplements. As noted by NRC (2006) the evidence is convincing that the effect of fluoride, at therapeutic doses, is an increase in bone density with 30 mg/day the lowest dose of sodium fluoride to show a clear increase in bone density.  According to NRC, the measurement of bone strength in humans is not easy to determine, but animal studies provide some help with this determination.

Some animal studies report a biphasic effect of fluoride on bone strength (Beary, 1969; Rich and Feist, 1970; Turner et al., 1992).  When the concentrations of fluoride in rat bone were less than 1200 mg/kg, Turner et al. (1992) found that bone strength was increased but at concentrations of 6000 to 7000 mg/kg bone strength was decreased.  In studies conducted by Yan et al. (2007), fluoride exposure (50 or 100 ppm in drinking water for three weeks) led to dose-dependent increases in proximal tibia trabecular and vertebral bone mass density in C57BL/6J mice but not in C3H/HeJ mice.  Osteoclast potential, in situ trabecular osteoclast numbers, and serum markers for osteoclastogenesis were observed in the latter strain, but not in C57BL/6J mice, suggesting genetically controlled strain differences.

Rabbit studies which provide a better comparison to humans due to a similar bone resorption physiology, suggest that a high concentration of fluoride in drinking water (100 mg F/L) might diminish bone strength through direct changes on bone mineral and mineralization resulting in denser bone and increased hardness (Turner et al., 1997; Chachra et al., 1999). However, the two rabbit studies tested only one fluoride concentration, 100 mg/L, equivalent to about 8 mg/kg/day, and it is not known whether such effects occur in humans (NRC, 2006, p. 143).

NRC (2006) concluded that "the weight of evidence supports the conclusion that lifetime exposure to fluoride at drinking water concentrations of 4 mg/L and higher is likely to increase fracture rates in the population, compared with exposure to fluoride at 1 mg/L, particularly in some susceptible demographic groups that are prone to accumulating fluoride into their bones." The committee found "that the available epidemiologic data for assessing bone fracture risk in relation to fluoride exposure around 2 mg/L is suggestive but inadequate for drawing firm conclusions about the risk or safety of exposures at that concentration." Accordingly, the committee recommended a more complete analysis of communities consuming water with fluoride at 2 and 4 mg/L.  See Section 3 for a detailed discussion of some of the available studies.

3.      **Selection of Critical Studies for Dose-Response Analysis of Fluoride Drinking Water Data**

Recent U.S. epidemiological studies evaluating the relationship between the concentration of fluoride in drinking water and the prevalence and severity of dental fluorosis, dental caries, and stage II skeletal fluorosis are complicated by several confounding factors, including the widespread use of fluoride-containing dentifrices and mouth rinses, the use of fluoride supplements in early childhood, and the potential presence of fluoride in processed foods and beverages (a result of the use of fluoridated water in the preparation of these products). Consequently, total fluoride intake can be difficult to quantify in dose-response analyses based on water intake data from these studies. In contrast, epidemiological studies conducted in the U.S. prior to the introduction of such fluoride products can be expected to be relatively free of these confounding factors. Therefore, historical epidemiological studies, if conducted according to standardized and acceptable protocols, are preferred for evaluating the potential effects of ingested fluoride.

## 3.1.     Dental Fluorosis

Not all epidemiological studies of dental fluorosis are equally useful for dose-response modeling. The NRC (2006) notes that, in the evaluation of severe dental fluorosis, "it is more informative to know the proportion of a population who have any teeth with dark staining and pitting than the proportion of all teeth or all tooth surfaces that have these most severe manifestations of enamel fluorosis." Epidemiological studies that have focused on individual subject effects are therefore more relevant to evaluating severe dental fluorosis than those studies designed to focus on individual teeth or tooth surfaces. Furthermore, because "teeth most frequently affected by enamel fluorosis are posterior teeth" (NRC, 2006); studies examining only anterior teeth may not provide a complete picture as to the severity of fluorosis in the study population. The NRC (2006) cites Den Besten (1999) in noting that "Because the severity of fluorosis is related to the duration, timing, and dose of fluoride intake, cumulative exposure during the entire maturation stage, not merely during critical periods of certain types of tooth development, is probably the most important exposure measure to consider when assessing the risk of fluorosis." The cumulative effects of fluoride exposure would be expected to be seen most clearly in children 12-14 yrs old at a time when most of the permanent dentition is fully erupted (Dean, 1942); consequently, studies evaluating younger age groups may not provide sufficient data for a dose-response analysis.

Other studies that may not be ideal for use in fluorosis dose-response modeling include the following: 1) those in which fluorosis is indicated only as being present or absent; 2) those in which fluorosis is expressed as a mean index value for the entire population; 3) those in which the percent occurrence of both moderate and severe fluorosis are combined; and 4) those in which the exposure groups encompass fairly wide ranges of fluoride concentrations and/or are open-ended (e.g., highest exposure group $\geq 2$ mg F/L). Such data cannot be used to identify the threshold for severe fluorosis.

In evaluating studies on dental fluorosis, other factors, which must be taken into consideration include: 1) the effects of climate and varying drinking water intake rates; 2) the possible

presence of excessive amounts of dietary fluoride; 3) low levels of calcium intake in the study population (which may enhance fluoride uptake from drinking water and other sources); 4) the use of surface water or very shallow wells in which the fluoride levels may fluctuate randomly or seasonally; and 5) various sources of industrial pollution, such as coal burning, which may increase exposures to fluoride.

The NRC (2006) also cautions that not all enamel defects are caused by fluoride.  Citing Curzon and Spector (1977) and Cutress and Suckling (1990), NRC states that "Mottling unrelated to fluoride has been suggested to be due to malnutrition, metabolic disorders, exposure to certain dietary trace elements, …or physical trauma to the tooth."  Furthermore, there is some evidence that "hypobaric hypoxia that occurs at high altitudes is associated with bilaterally symmetrical and diffuse disturbances in enamel mineralization that may be mistaken for fluorosis."

### 3.1.1.  Critical study for severe dental fluorosis

All the factors mentioned above must be taken into consideration when identifying epidemiological studies that may be useful for evaluating dose-response relationships for dental fluorosis and, in particular, for severe dental fluorosis defined by discrete areas of pitting in the enamel.

The NRC (2006) examined available data on the prevalence of severe enamel fluorosis (Dean's Index) in the U.S. and found a clear correspondence with increasing water fluoride concentrations (Fig. 3-1).  NRC (2006) noted, however, that "Because of the wide variability in the methods and populations, and the lack of independence when a given study provided more than one result, the estimates were not subjected to formal statistical analysis."  The trend shown in Fig. 3-1 suggests a threshold for severe fluorosis at about 2 mg F/L.

The available epidemiological studies that included data on dental fluorosis and dental caries were carefully evaluated by the authors of the current report and screened to identify those studies that might provide the most useful quantitative data to further define the threshold for severe fluorosis.  The conclusion reached was that one of the most relevant studies was that conducted by Dean (1942).  Dean (1942) reported the results of surveys documenting the prevalence and severity of dental fluorosis in 22 U.S. communities in 10 states where fluoride levels in drinking water ranged from 0.0 to 14.1 mg/L (Table 3-1).  Dean (1942) is one of the earliest studies of this type using a standardized protocol for reporting dental fluorosis.  Dean's work was done in the late 1930's and the early 1940's and is relatively free of confounding factors associated with the widespread use of fluoride-containing consumer products introduced after that time.  A total of 5824 children were examined for dental fluorosis in the Dean (1942) study.  The children were primarily in the age range of 9 to 14 yrs old and/or in school grades 2-12 (about 6–17 yrs old).  The dental fluorosis status of each participant in the study was recorded according to Dean's Index of Fluorosis (see Section 2.1.2 for description), a categorical scoring system in which 0 represents no evidence of fluorosis; 0.5, questionable; 1, very mild; 2, mild; 3, moderate; and 4, severe fluorosis (pitting required).  A child was classified based on the severest form of dental fluorosis on two or more teeth. The frequency of occurrence for each score was computed within each study population (Table 3-1). The requirement for two or more teeth to exhibit externally apparent pitted enamel increases confidence in the classification for severe dental fluorosis.



**Figure 3-1.  Relationship between severe fluorosis and fluoride in drinking water (U.S. studies) (NRC, 2006).**

The strengths of this study lie in:

- Its large scale, and wide range of fluoride concentrations and consistency of results across several different communities
- The fact that the same individuals were involved in the measurements of fluorosis and fluoride in drinking water
- Inclusions of several geographic areas across the U.S.
- An acceptable standardized method was used to categorize fluorosis
- A clear dose-response was observed for severe dental fluorosis
- A requirement for continuous residence in the community
- For the most part, the children examined were mostly in the most appropriate age group, such that the majority of their permanent teeth had erupted. The towns where some children were younger than 12 years were the high fluoride towns where severe fluorosis was most likely to occur making the number of erupted of permanent teeth less important to the detection of severe fluorosis on at least 2 teeth.

- Fluoride concentrations in the drinking water were the average of 12 monthly samples for 18 of the 22 towns.  The 4 concentrations based on a single measurement were the 4 localities with the highest fluoride concentrations

- Home units for water treatment that might remove fluoride were not widely available

- Other potential sources of fluoride exposures, such as dentifrices and supplements, were not an issue

| Town | No. | Age (yr) | F (mg/L)[a] | Dean's Index | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 0 | 0.5 | 1 | 2 | 3 | 4 |
| Waukegan, IL | 423 | 12-14 | 0.0 | 97.9 | 1.9 | 0.2 | 0.0 | 0.0 | 0.0 |
| Michigan City, IN | 236 | 12-14 | 0.1 | 97.5 | 2.5 | 0.0 | 0.0 | 0.0 | 0.0 |
| Zanesville, OH | 459 | 12-14 | 0.2 | 85.4 | 13.1 | 1.5 | 0.0 | 0.0 | 0.0 |
| Lima, OH | 454 | 12-14 | 0.3 | 84.1 | 13.7 | 2.2 | 0.0 | 0.0 | 0.0 |
| Marion, OH | 263 | 12-14 | 0.4 | 57.4 | 36.5 | 5.3 | 0.8 | 0.0 | 0.0 |
| Elgin, IL | 403 | 12-14 | 0.5 | 60.5 | 35.3 | 3.5 | 0.7 | 0.0 | 0.0 |
| Pueblo, CO | 614 | 12-14 | 0.6 | 72.3 | 21.2 | 6.2 | 0.3 | 0.0 | 0.0 |
| Kewanee, IL | 123 | 12-14 | 0.9 | 52.8 | 35.0 | 10.6 | 1.6 | 0.0 | 0.0 |
| Aurora, IL | 633 | 12-14 | 1.2 | 53.2 | 31.8 | 13.9 | 1.1 | 0.0 | 0.0 |
| Joliet, IL | 447 | 12-14 | 1.3 | 40.5 | 34.2 | 22.2 | 3.1 | 0.0 | 0.0 |
| Elmhurst, IL | 170 | 12-14 | 1.8 | 28.2 | 31.8 | 30.0 | 8.8 | 1.2 | 0.0 |
| Galesburg, IL | 273 | 12-14 | 1.9 | 25.3 | 27.1 | 40.3 | 6.2 | 1.1 | 0.0 |
| Clovis, NM | 138 | 9-11 | 2.2 | 13.0 | 16.0 | 23.9 | 35.4 | 11.0 | 0.7 |
| Colorado Springs, CO | 404 | 12-14 | 2.6 | 6.4 | 19.8 | 42.1 | 21.3 | 8.9 | 1.5 |
| Plainview, TX | 97 | 9-12 | 2.9 | 4.1 | 8.3 | 34.0 | 26.8 | 23.7 | 3.1 |
| Amarillo, TX | 289 | 9-12 | 3.9[b] | 3.1 | 6.6 | 15.2 | 28.0 | 33.9 | 13.2 |
| Conway, SC | 59 | 9-11 | 4.0 | 5.1 | 6.7 | 20.4 | 32.2 | 23.7 | 11.9 |
| Lubbock, TX | 189 | 9-12 | 4.4 | 1.1 | 1.1 | 12.2 | 21.7 | 46.0 | 17.9 |
| Post, TX | 38 | grade 4-6[c] | 5.7[d] | 0.0 | 0.0 | 0.0 | 10.5 | 50.0 | 39.5 |
| Chetopa, KS | 65 | grade 3-12[c] | 7.6[d] | 0.0 | 0.0 | 9.2 | 21.5 | 10.8 | 58.5 |
| Ankeny, IA | 21 | grade 2-12[c] | 8.0[d] | 0.0 | 0.0 | 0.0 | 9.5 | 47.6 | 42.8 |
| Bauxite, AK | 26 | 14-19 | 14.1[d] | 0.0 | 0.0 | 3.9 | 3.9 | 38.5 | 53.8 |

**Table 3-1.  Percent Distribution of Fluorosis in Populations Studied by Dean (1942)**

**SOURCE**: Modified from Dean (1942).

[a] Analytical technique used to measure F in water samples was that of Elvove (1933), who utilized a colorimetric method employing a zirconium-alizarin reagent.  Dean (1942, p. 29) reported that the sensitivity of the method "may be considered as about 0.1 parts per million."

[b] "Subject to a possible correction to 4.2 mg F/L during susceptible period of age group examined" (no other explanation given by Dean, 1942).

[c] Grades 4–6 include ages of approximately 10–12 years; grades 3–12 include ages of approximately 8–17 years and grades 2–12, ages 7–17 years.

[d] Single determination, all others arithmetical mean of 12 consecutive monthly samples.

The Dean (1942) study also has a number of weaknesses; they include:

- No information was provided on the occurrence of dental caries in the study populations

- No information was provided on potential confounding factors, such as unique dietary intakes of fluoride

- Variability in examiner reliability was not addressed

- The size of the study populations at several of the higher water fluoride levels was relatively small

- Only white children were included (schools were segregated); therefore, ethnicity or racial differences in susceptibility were not addressed

- Differences in dental hygiene, dietary intakes, body weights and puberty/hormonal condition (e.g., age of menarche) could complicate extrapolation of results to present day populations

- Not all climate zones within the U.S. were included

- The data were not analyzed statistically

- Data on drinking water intakes were not collected

- The specific teeth responsible for the fluorosis scores were not identified

- The analytical method used to analyze for fluoride in drinking water was not as sensitive and free from interfering substances as more modern methods using spectrophotometry or a fluoride ion-specific electrode

The analytical technique used to measure fluoride in the Dean study was the zirconium-alizarin method with visual color comparison to standard solutions (Elvove, 1933). Although this method is no longer used, according to Megregian and Maier (1952) the regent was sensitive to small increments of fluoride over a range of 0.0 to 3.0 ppm, the critical range for assessing the threshold for severe fluorosis, and within this range the response was consistent with Beer's law. The sensitivity of the method was reported to be about 0.1 ppm in Dean (1942); and a concentration as low as 0.1 ppm is given in the tabulated summary of the data (Table 1 in Dean, 1942); however, in an earlier paper describing the method, Elvove (1933), reported a sensitivity of 0.2 ppm.

The analytical method has been reported to be sensitive to interfering substances such as aluminum, bicarbonate and sulfate (Megregian and Maier, 1952). However, examination of water quality data from the same time period for several of the key towns used in Dean's study indicated that potentially interfering substances were not at concentrations that would cause analytical problems (Dean and Elvove, 1936, 1937). The fluoride concentrations presented by Dean were, for all but four towns, averages of 12 consecutive monthly samples which, to some degree, adjusted for seasonal variation and potential errors in any one analysis. In a few cases, later studies of the water from the same towns found fluoride levels reasonably similar to those listed by Dean (1942). Therefore, in the absence of any evidence to suggest otherwise, it is assumed here that the sensitivity of the method is 0.1 ppm as reported by Dean (1942).

Because of its size and comprehensive nature, the Dean study provides baseline data from which a statistically-sound estimate of the threshold for severe fluorosis (Dean's Index score of 4) can be derived. The results shown in Table 3-1 indicate a dose-response relationship for both the moderate and severe levels of fluorosis, with the threshold for severe fluorosis occurring at approximately 2 mg F/L drinking water (see Section 4 for dose-response analysis).

### 3.1.2.  Supplemental U.S. studies on dental fluorosis

There are a number of other U.S. epidemiological studies that provide information on the occurrence and severity of dental fluorosis that can be used to supplement and compare with the Dean (1942) data.  The most relevant of these are summarized below.

**Galagan and Lamson (1953):**  Galagan and Lamson (1953) evaluated the occurrence and severity of dental fluorosis in 726 children (9-16 yr-olds) residing in six Arizona towns where the average annual temperature was 70°F.  Only children who had consumed water from the common municipal supply continuously from birth through their ninth year were included in the study. The fluoride levels in the water supplies of the towns ranged from 0.4 to 1.2 mg/L.  Dean's scoring system was used to categorize fluorosis.  Table 3-2 shows that prevalence and severity of fluorosis was higher in the study populations from towns with higher levels of fluoride in drinking water. Notably, severe fluorosis occurred in 1 of 95 children (1%) examined in Chandler where the fluoride level was 0.8 mg/L, and in 2 of 70 children (2.9%) examined in Florence where the fluoride level was 1.2 mg/L.  Galagan and Lamson (1953) reported that their study populations may have had an additional source of fluoride through consumption of beans, a dietary staple.  The beans are normally boiled for long periods of time in water, which may have resulted in the absorption of fluoride from the water.  Galagan and Lamson (1953), however, did not estimate the amount of fluoride that may have been ingested through this pathway.

Because the Galagan and Lamson (1953) study used a very similar protocol to that used by Dean (1942), it is a useful source for additional dental fluorosis data for communities in hot arid climate zones.  The results differ from those of Dean (1942) in that there were three cases of severe dental fluorosis in towns where the fluoride drinking water concentration was ≤ 1.2 mg/L even though continuous residence was a requirement for inclusion in the study.

| Table 3-2.  Percent Distribution of Fluorosis in Arizona Populations Studied by Galagan and Lamson (1953) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Town | No. | F (mg/L) | Dean's Index | | | | | |
| | | | 0 | 0.5 | 1 | 2 | 3 | 4 |
| Yuma | 82 | 0.4 | 64.6 | 31.7 | 2.4 | 1.2 | 0 | 0 |
| Tempe | 113 | 0.5 | 52.2 | 38 | 8.8 | 0.9 | 0 | 0 |
| Tucson | 316 | 0.7 | 38 | 45.3 | 12 | 3.2 | 1.6 | 0 |
| Chandler | 95 | 0.8 | 42.1 | 38.9 | 9.5 | 6.3 | 2.1 | 1.1 |
| Casa Grande | 50 | 1.0 | 14 | 38 | 30 | 18 | 0 | 0 |
| Florence | 70 | 1.2 | 24.3 | 20 | 25.7 | 14.3 | 12.9 | 2.9 |

**SOURCE**: Modified from Galagan and Lamson (1953).

**Richards et al. (1967):**  In the early 1960's, the California Department of Public Health began a 5-year program to evaluate the correlation between fluoride concentration in drinking water, dental caries, dental fluorosis, and temperature.  Dental caries and fluorosis were evaluated in 9000 children, 12–14 years old, from 83 towns, representing 6 different fluoride concentration ranges and three different temperature zones in the states of California, Texas, Colorado, Arizona, New Mexico and Illinois.  The full data set from the published paper showing the results by temperature zone are presented in Section 3.1.4.1.  The combined results for all temperature ranges, re-grouped into three fluoride concentration ranges, are shown in Table 3-3.

| Table 3-3.  Percentage of Children by Fluorosis Diagnosis in the Study of Richards et al. (1967) | | | |
|---|---|---|---|
| **Degree of Fluorosis** | **Fluoride Concentration** | | |
| | **≤0.7 ppm** (N = 3818)[a] | **0.8-1.3  ppm** (N = 2334)[a] | **>1.8 ppm** (N =1088)[a] |
| < Moderate | 99.95 | 97.77 | 80.88 |
| Moderate | 0.05 | 2.14 | 13.42 |
| Severe | 0 | 0.09 | 5.70 |

**SOURCE**: Modified from Richards et al. (1967).
[a]Number of children for whom the diagnosis was made.

**Eklund et al. (1987):**  Dental fluorosis and coronal caries were evaluated in adult lifelong residents (age ~30–60 years old) of two neighboring New Mexico towns (Eklund et al., 1987). One town (Lordsburg, N = 164), had naturally fluoridated drinking water containing 3.5 mg F/L. The second town (Deming, N = 151) had naturally fluoridated drinking water containing 0.7 mg F/L.  Subjects in both study populations were those who had been born in the community and had consumed city water during their first six years of life as well as through most or all of their adulthood.  Fluorosis severity was evaluated using Dean's 1942 classification scheme, but the qualitative description of severe fluorosis specified if the pitting was discrete or confluent (the latter was considered "very severe" and given a score of 5).  Residents of Lordsburg had much more severe and very severe fluorosis (76.2 %) than residents of Deming (0%), as shown in Table 3-4.  The study authors noted that the two populations, living only 60 miles apart, have very similar socioeconomic and cultural characteristics (74-89% Hispanic), suggesting that any non-drinking water fluoride exposures such as dietary fluoride were similar.  Furthermore, the age of the population would probably have precluded the use of fluoride supplements or dentifrices during the most sensitive period for dental fluorosis; therefore, it is likely that the results reported are due primarily to fluoride in drinking water.

| Table 3-4.  Percent Distribution of Fluorosis in New Mexico Populations Studied by Eklund et al. (1987) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Town** | **F (mg/L)** | **No.** | **Dean's Index** | | | | | | |
| | | | **0** | **0.5** | **1** | **2** | **3** | **4** | **5** |
| Deming | 0.7 | 151 | 68.9 | 15.2 | 11.3 | 1.3 | 3.3 | 0 | 0 |
| Lordsburg | 3.5 | 164 | 0 | 0 | 0.6 | 0.6 | 22.6 | 38.4 | 37.8 |

**Szpunar and Burt (1988):**  In studies conducted on schoolchildren aged 6–12 yrs in four Michigan communities, Szpunar and Burt (1988) reported that water fluoride levels up to 1.2 mg/L were not associated with any cases of severe fluorosis, and, in fact, the highest TSIF score recorded was 2.

**Driscoll et al. (1983); Horowitz et al. (1984); Driscoll et al. (1986); Heifetz et al. (1988); Selwitz et al. (1995); and Selwitz et al. (1998):**  This series of studies began as a cross-sectional survey of dental fluorosis and dental caries in 807 schoolchildren, ages 8–16 yr old, residing in seven Illinois communities where the water supplies contained natural fluoride at levels of 1.06, 2.08, 2.84, 2.89, 3.77, 3.84, or 4.07 mg/L (Driscoll et al., 1983).  The recommended optimal level of fluoride in drinking water for that geographic area was reported by the study authors to be 1 mg/L, and the communities were grouped together according to whether their fluoride level was optimal (1 mg/L), 2x optimal (2 mg/L), 3x optimal (3 mg/L) or 4x optimal

(4 mg/L).  Dean's Index was used to assess fluorosis.  The percent distributions of children with fluorosis in each fluoride group are shown in Table 3-5.

The prevalence of dental fluorosis was characteristically low in the optimal fluoride area. Substantial increases in fluorosis occurred in the above-optimal fluoride areas, with the condition being most pronounced in the 4x optimal area (3.77–4.07 mg F/L).  A clear dose-response can be seen in the occurrence of severe fluorosis.  The children in this study were examined in 1980; therefore, they were born in the years of 1964 to 1972.  The extent to which they might have been exposed to non-drinking water fluoride was not evaluated for the study populations in total.

Eight children living in an optimal fluoride area exhibited moderate to severe fluorosis, and the study authors questioned the parents of these children to determine if there had been any other sources of fluoride exposure. The questions covered such factors as erroneous residence history, prolonged absence from the community, use of water from sources other than the community supply, consumption of high-fluoride infant formula, use of dietary fluoride supplements, and ingestion of unusual amounts of fluoride dentifrices.  The information collected on other possible sources of fluoride exposure could not account for the moderate to severe fluorosis seen in this group of children.

**Table 3-5.  Percent Distribution of Fluorosis in Illinois Populations Studied by Driscoll et al. (1983)**

| Fluoride Level (mg/L) | N | Dean's Index | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0 | 0.5 | 1 | 2 | 3 | 4 |
| 1.06 | 336 | 56.0 | 29.5 | 7.4 | 4.8 | 1.8 | 0.6 |
| 2.08 | 143 | 18.2 | 28.7 | 23.1 | 16.8 | 8.4 | 4.9 |
| 2.84–2.89 | 192 | 22.9 | 26.0 | 15.1 | 19.8 | 7.8 | 8.3 |
| 3.77–4.07 | 136 | 12.5 | 15.4 | 16.9 | 25.0 | 7.4 | 22.8 |

In a continuation of this study, Driscoll et al. (1986) compared the occurrence of dental fluorosis in one of the seven Illinois towns (Kewanee; fluoride level in drinking water 1.06 mg/L), with that in four towns in Iowa where the fluoride levels were negligible (<0.3 mg/L).  The results are shown in Table 3-6.  Fluorosis was clearly more prevalent in Kewanee, Illinois.

**Table 3-6.  Percent Distribution of Fluorosis in Midwest U.S. Populations Studied by Driscoll et al. (1986)**

| Fluoride Level (mg/L) | N | Dean's Index | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0 | 0.5 | 1 | 2 | 3 | 4 |
| <0.3[a] | 316 | 93.0 | 4.1 | 1.9 | 1.0 | 0 | 0 |
| 1.06[b] | 336 | 56.0 | 29.5 | 7.4 | 4.8 | 1.8 | 0.6 |

[a]Belle Plaine, Durant, Marengo, and Missouri Valley, Iowa.
[b]Kewanee, Illinois.

In 1988, Heifetz et al. reported on a 5-yr follow-up study that was conducted on 8–10 yr old and 13–15 yr old children residing in the same seven Illinois towns studied by Driscoll et al. (1983, 1986, and others).  The study population was divided into three cohorts:
- Cohort 1 (13–15 year olds in 1980) whose developing teeth were at risk for dental fluorosis from 1965–72;

- Cohort 2 (8–10 year olds in 1980 and 13–15 year olds in 1985) who were at risk from 1970–77; and
- Cohort 3 (8–10 year olds in 1985) who were at risk from 1975–82.

Heifetz et al. (1988) used the Driscoll et al. (1983) data for the 13–15 yr old children in Cohort 1. The children in Cohorts 2 and 3 were examined in 1985.  The tooth surface index of fluorosis (TSIF) was used to evaluate the occurrence and severity of dental fluorosis; therefore, the data are not exactly comparable to the results of the Driscoll et al. (1983 and 1986) studies which used Dean's scoring system (i.e., the Heifetz et al. results are expressed in the terms of tooth surfaces rather than individuals).  In the TSIF scoring system, a score of 5 and above includes pitting of the enamel.  The results are shown in Table 3-7.

| Table 3-7.  Percent Distribution of TSIF Scores for all Permanent Tooth Surfaces in Populations Studied by Heifetz et al. (1988) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Group | No. | TSIF Score | | | | | | | |
| | | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| **8–10 yr-olds – 1980** | | | | | | | | | |
| Optimal[a] | 113 | 81.2 | 14.8 | 2.3 | 1.6 | 0.0 | 0.1 | 0.0 | 0.0 |
| 2x Optimal | 61 | 53.0 | 33.0 | 6.9 | 6.8 | 0.2 | 0.2 | 0.0 | 0.0 |
| 3x Optimal | 82 | 48.5 | 30.6 | 10.9 | 8.1 | 0.5 | 1.0 | 0.1 | 0.3 |
| 4x Optimal | 59 | 30.3 | 28.5 | 17.1 | 19.7 | 0.3 | 2.8 | 0.1 | 1.2 |
| **8–10 yr-olds – 1985** | | | | | | | | | |
| Optimal[a] | 156 | 72.0 | 20.6 | 5.6 | 1.8 | 0.0 | 0.1 | 0.0 | 0.0 |
| 2x Optimal | 102 | 48.0 | 30.4 | 11.6 | 8.7 | 0.0 | 1.3 | 0.0 | 0.0 |
| 3x Optimal | 112 | 48.0 | 29.4 | 12.3 | 8.2 | 0.2 | 1.5 | 0.0 | 0.4 |
| 4x Optimal | 62 | 24.2 | 32.2 | 18.7 | 19.7 | 0.6 | 3.1 | 0.1 | 1.4 |
| **13–15 yr-olds – 1980** | | | | | | | | | |
| Optimal[a] | 111 | 88.6 | 9.1 | 1.5 | 0.8 | 0.0 | 0.0 | 0.0 | 0.0 |
| 2x Optimal | 39 | 61.7 | 25.4 | 7.8 | 5.0 | 0.0 | 0.1 | 0.0 | 0.0 |
| 3x Optimal | 50 | 54.0 | 21.6 | 13.7 | 9.6 | 0.2 | 0.7 | 0.0 | 0.1 |
| 4x Optimal | 34 | 36.9 | 25.6 | 16.7 | 18.6 | 0.3 | 1.3 | 0.1 | 0.5 |
| **13–15 yr-olds – 1985** | | | | | | | | | |
| Optimal[a] | 94 | 70.6 | 21.6 | 4.9 | 2.8 | 0.1 | 0.0 | 0.0 | 0.0 |
| 2x Optimal | 23 | 33.5 | 32.5 | 18.6 | 13.8 | 0.3 | 1.3 | 0.0 | 0.0 |
| 3x Optimal | 47 | 30.8 | 34.9 | 18.2 | 13.6 | 0.3 | 1.2 | 0.1 | 0.9 |
| 4x Optimal | 29 | 22.5 | 30.8 | 18.8 | 22.1 | 0.5 | 3.9 | 0.0 | 1.5 |

[a] "Optimal" is defined by the study authors as 1 mg F/L for the study region (Midwest U.S.).

Heifetz et al. (1988) reported that the study populations in the 2x optimal fluoride group (1.95–2.08 mg F/L) appeared to be approaching a critical threshold for producing severe fluorosis in that 7.6% of labial surfaces of maxillary anterior teeth of 13–15 years olds examined in 1985

exhibited severe fluorosis.  The study authors noted that beginning in the early 1970's, there were other possible sources of exposure to fluoride, including commercial infant formula, processed foods, fluoride dentifrices, and fluoride supplements.

A ten-year follow-up study of 8–10 yr old and 14–16 yr old children from these same towns was conducted by Selwitz et al. (1995).  The evaluations took place in 1990, and the TSIF method was used to evaluate fluorosis (Note: information on the percentage distribution of individuals in each fluorosis category, rather than tooth surfaces, was not available from the study authors).  The TSIF scores for the 8–10 yr olds are shown in Table 3-8 and those for the 14–16 yr olds are shown in Table 3-9, with comparisons to the results from the 1980 and 1985 studies.

| | | | % Distribution of TSIF Scores | | | | | Percent | MPFS[c] | P value |
|---|---|---|---|---|---|---|---|---|---|---|
| **Group** | **No.** | **No. Surf.** | **0** | **1** | **2** | **3** | **4-7** | **Surfaces Fluorosed[b]** | | |
| **1980** | | | | | | | | | | |
| Optimal[a] | 113 | 3505 | 81.2 | 14.8 | 2.3 | 1.6 | 0.1 | 18.8 | 18.2 | – |
| 2x Optimal | 61 | 1807 | 53.0 | 33.0 | 6.9 | 6.7 | 0.4 | 47.0 | 47.3 | <0.001[d] |
| 3x Optimal | 82 | 2447 | 48.5 | 30.6 | 10.9 | 8.1 | 1.9 | 51.5 | 52.4 | <0.001[d] |
| 4x Optimal | 59 | 1765 | 30.3 | 28.5 | 17.1 | 19.7 | 4.4 | 69.7 | 69.2 | <0.001[d] |
| **1985** | | | | | | | | | | |
| Optimal[a] | 156 | 5220 | 72.0 | 20.5 | 5.6 | 1.8 | 0.1 | 28.0 | 28.9 | – |
| 2x Optimal | 102 | 3121 | 48.0 | 30.4 | 11.6 | 8.7 | 1.3 | 52.0 | 52.8 | <0.001[d] |
| 3x Optimal | 112 | 3426 | 48.0 | 29.4 | 12.3 | 8.2 | 2.1 | 52.0 | 50.9 | <0.001[d] |
| 4x Optimal | 62 | 1880 | 24.2 | 32.2 | 18.7 | 19.7 | 5.2 | 75.8 | 77.1 | <0.001[d] |
| **1990** | | | | | | | | | | |
| Optimal[a] | 167 | 4867 | 81.4 | 14.4 | 2.9 | 1.3 | 0.0 | 18.6 | 17.8 | – |
| 2x Optimal | 76 | 2071 | 45.0 | 24.7 | 14.2 | 14.7 | 1.4 | 55.0 | 55.6 | <0.001[d] |
| 3x Optimal | 69 | 1984 | 45.3 | 25.1 | 14.5 | 12.2 | 2.9 | 54.7 | 55.2 | <0.001[d] |
| 4x Optimal | 57 | 1570 | 38.4 | 24.9 | 15.3 | 18.3 | 3.1 | 61.6 | 59.8 | <0.001[d] |

Table 3-8.  Comparison of TSIF Scores and Mean Percent Fluorosed Surfaces for 8–10 yr old Children in Illinois Communities (Selwitz et al., 1995)

[a]"Optimal" is defined by the study authors as 1 mg F/L for the study region (Midwest USA).
[b]Percent of surfaces fluorosed across all subjects.
[c]Mean percent of fluorosed surfaces per subject.
[d]Difference from optimal; significant, $P<0.002$, adjusted $\alpha$ level for multiple comparisons using the Bonferroni procedure.

In children residing in areas with optimal water fluoride levels depicted in Table 3-8 and Table 3-9, the proportion of fluorosed tooth surfaces increased significantly from 1980 to 1985, but then declined by 1990 to the levels previously observed in 1980.  In children residing in areas with above optimal fluoride levels, fluorosis remained stable or showed no sustained increase from 1980 to 1990.

| Table 3-9. Comparison of TSIF Scores and Mean Percent Fluorosed Surfaces for Children in Illinois Communities (Selwitz et al., 1995) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Group** | **No.** | **No. Surf.** | **% Distribution of TSIF Scores** | | | | | **Percent Surfaces Fluorosed[b]** | **MPFS[c]** | **P value** |
| | | | **0** | **1** | **2** | **3** | **4-7** | | | |
| **1980** (Children 13-15 yr old) | | | | | | | | | | |
| Optimal[a] | 111 | 7340 | 88.6 | 9.1 | 1.5 | 0.8 | 0.0 | 11.4 | 11.1 | – |
| 2x Optimal | 39 | 2540 | 61.7 | 25.4 | 7.8 | 5.0 | 0.1 | 38.3 | 38.4 | <0.001[d] |
| 3x Optimal | 50 | 3341 | 54.0 | 21.6 | 13.7 | 9.6 | 1.0 | 46.0 | 45.5 | <0.001[d] |
| 4x Optimal | 34 | 2265 | 36.9 | 25.6 | 16.7 | 18.6 | 2.2 | 63.1 | 63.5 | <0.001[d] |
| **1985** (Children 13-15 yr old) | | | | | | | | | | |
| Optimal[a] | 94 | 5480 | 70.6 | 21.6 | 4.9 | 2.8 | 0.1 | 29.4 | 30.5 | – |
| 2x Optimal | 23 | 1492 | 33.5 | 32.5 | 18.6 | 13.8 | 1.6 | 66.5 | 67.2 | <0.001[d] |
| 3x Optimal | 47 | 3115 | 30.8 | 34.9 | 18.2 | 13.6 | 2.5 | 69.2 | 69.1 | <0.001[d] |
| 4x Optimal | 29 | 1843 | 22.5 | 30.8 | 18.8 | 22.1 | 5.9 | 77.5 | 77.8 | <0.001[d] |
| **1990[e]** (Children 14-16 yr old) | | | | | | | | | | |
| Optimal[a] | 91 | 6064 | 84.7 | 13.4 | 1.6 | 0.2 | 0.1 | 15.3 | 14.9 | – |
| 2x Optimal | 29 | 1883 | 52.5 | 22.9 | 13.1 | 11.0 | 0.5 | 47.5 | 48.9 | <0.001[d] |
| 3x Optimal | 48 | 3134 | 53.3 | 21.0 | 12.4 | 10.3 | 3.0 | 46.7 | 45.4 | <0.001[d] |
| 4x Optimal | 20 | 1275 | 33.3 | 20.8 | 18.0 | 24.8 | 3.1 | 66.7 | 67.6 | <0.001[d] |

[a]"Optimal" is defined by the study authors as 1 mg F/L for the study region (Midwest USA).
[b]Percent of surfaces fluorosed across all subjects.
[c]Mean percent of fluorosed surfaces per subject.
[d]Difference from optimal; significant, P<0.002, adjusted α level for multiple comparisons using the Bonferroni procedure.
[e]Children in 1990 were closer in age to 14-16 than to 13-15 yr.

In 1998, Selwitz et al. compared the fluorosis data from surveys conducted in Kewanee, IL (fluoride level 1.0 mg/L) with those from two communities in Nebraska (Holdrege and Broken Bow) where the fluoride levels were negligible (<0.3 mg/L).  The dental examination in all three communities took place in 1990. The results are shown in Table 3-10. The percent of tooth surfaces fluorosed across all subjects was similar in the three communities for the 8–10 yr olds (17.7–18.5%).  For the 13–16 yr olds, the total percent fluorosed was higher in Kewanee (15.1%) than in the two Nebraska communities (2.1 and 9.2%).  The mean percent of fluorosed tooth surfaces per person, adjusted for age and use of dietary fluoride supplements, for all study participants was similar in the three communities (17.6% in Kewanee, 12.3% in Holdrege, and 13.1% in Broken Bow (98% CI); more than 80% of tooth surfaces in all participants were fluorosis-free.  The study authors concluded that in comparison with studies undertaken in the previous decade, the difference in dental fluorosis prevalence between fluoridated and non-fluoridated communities had narrowed considerably.

| Table 3-10. Comparison of TSIF Scores and Percent Fluorosed Surfaces for Children in Kewanee, IL and two Communities in Nebraska (Selwitz et al., 1998) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Group | F (mg/L) | No. | No. Surf. | % Distribution of TSIF Scores | | | | | % Surface Fluorosed[b] |
| | | | | 0 | 1 | 2 | 3 | 4-7 | |
| **8-10 yr olds** | | | | | | | | | |
| Kewanee | 1[a] | 167 | 4867 | 81.4 | 14.4 | 2.8 | 1.3 | 0.0[c] | 18.5 |
| Holdrege | <0.3 | 104 | 2956 | 81.7 | 12.6 | 3.4 | 2.3 | 0.1 | 18.4 |
| Broken Bow | <0.3 | 47 | 1424 | 82.3 | 15.2 | 2.2 | 0.3 | 0.0 | 17.7 |
| **13-16 yr olds** | | | | | | | | | |
| Kewanee | 1[a] | 93 | 6203 | 85.0 | 13.1 | 1.6 | 0.3 | 0.1 | 15.1 |
| Holdrege | <0.3 | 24 | 1447 | 97.9 | 1.9 | 0.2 | 0.0 | 0.0 | 2.1 |
| Broken Bow | <0.3 | 60 | 3748 | 90.9 | 8.1 | 0.7 | 0.4 | 0.0 | 9.2 |

[a]Fluoride level in water supply in Kewanee is considered optimal for Midwest USA.
[b]Percent of surfaces fluorosed across all subjects.
[c]Two surfaces were affected.

**Jackson et al. (1995):** Dental fluorosis and caries prevalence in children aged 7–14 yr (born between 1978 and 1985) from three communities in Indiana having different levels of fluoride in drinking water (0.2 mg/L; 1.0 mg/L; and 4.0 mg/L) were compared using the TSIF index and Dean's scoring system for fluorosis (Jackson et al., 1995). The children included in the study had to meet the criterion of lifetime residency in the communities (e.g., born to parents who were residents of the communities and not being absent from the communities for more than 2 weeks in any one year). The examinations were conducted in February of 1992. As shown in Table 3-11, the prevalence of fluorosis increased with increasing fluoride concentration in drinking water, and the prevalence of severe fluorosis was 11.3% at 4 mg/L based on Dean's score of 4, and 19.8% based on the TSIF Index (score of ≥5). Considering the age of the children, it is likely that these populations were exposed to fluoride toothpaste during early childhood. The study authors also reported that fluoride supplements were consumed by 57.9% of the subjects in the 0.2 mg F/L group; 19.8% in the 1.0 mg F/L group, and 8.9% in the 4.0 mg F/L group.

| Table 3-11.  Percent Distribution of Fluorosis in Children from Three Indiana Communities with Different Levels of Fluoride in Drinking Water | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fluoride Level (mg/L) | No. | Dean's Fluorosis Scoring System | | | | | |
| | | 0 | 0.5 | 1 | 2 | 3 | 4[a] |
| 0.2 | 124 | 85.5 | 0 | 13.7 | 0.8 | 0 | 0 |
| 1.0 | 116 | 61.2 | 0 | 31.9 | 6.9 | 0 | 0 |
| 4.0 | 97 | 10.3 | 1.0 | 26.8 | 18.6 | 32.0 | 11.3 |
| Fluoride Level (mg/L) | No. | TSIF Score | | | | | |
| | | 0 | 1 | 2 | 3 | 4 | 5–7[b] |
| 0.2 | 126 | 81.8 | 15.1 | 3.2 | 0 | 0 | 0 |
| 1.0 | 117 | 54.7 | 34.2 | 9.4 | 0.9 | 0.9 | 0 |
| 4.0 | 101 | 7.9 | 22.8 | 16.8 | 25.7 | 6.9 | 19.8 |

SOURCE: Jackson et al. (1995).

[a]Score of 4 includes pitting.
[b]Scores of 5 and above include pitting.

**Jackson et al. (1999):** In December 1994, children representing the same age groups (7–14 yr) and from the same three communities were examined for dental fluorosis.  Fluorosis was scored using the TSIF index.  As in the previous study, the children had to meet the criterion of lifetime residency in the study communities.  The prevalence of fluorosis increased by about 14%, 20% and 6 % in the 0.2, 1.0 and 4.0 mg F/L communities, respectively.  However,  the prevalence of severe fluorosis decreased from 18% in 1992 to 9% in 1994 for children 7–10 yr old.  For children 11–14 yr old, the prevalence of severe fluorosis decreased from 25 to 8%.  Although increases occurred in prevalence of fluorosis in the 0.2 or 1.0 mg F/L communities, these were mainly confined to the TSIF categories 1 and 2, and no children in either community exhibited severe fluorosis at either time period.  The study authors did not suggest a reason for the difference in severe fluorosis for the children examined in 1992 compared to those examined in 1994.

**Hong et al. (2006a):** As part of the Iowa Fluoride Study, 628 children aged 8–10 yr (mean 9.3 yr; born in March 1992–February 1995) were evaluated for fluorosis of the permanent maxillary central incisors and first molars.  The fluoride intake of 405 of these same children had been followed from birth through 36 months by means of questionnaires their parents completed every 3–4 months.  Daily fluoride intake was estimated from water, beverages, and selected foods, fluoride supplements and dentifrice.  Fluorosis was evaluated using the Fluorosis Risk Index; this index considers fluorosis as severe when there is pronounced staining and/or pitting of the enamel.  A case of incisor fluorosis was defined as having an FRI of 2 or 3 on both maxillary central incisors; a case of first molar fluorosis was defined as having FRI of 2 or 3 on at least two first molars.   Hong et al. (2006a) reported that six individuals (1.5%) showed signs of severe fluorosis (FRI of 3).  Four individuals were listed as having severe fluorosis on the maxillary central incisors, and all of them had high levels of fluoride intake (>0.06 mg/kg/day) at either 0–12 months or 12–36 months.  Two subjects with severe fluorosis on the first molars recorded both moderate (0.04–0.06 mg/kg/day) and high (>0.06 mg/kg/day) fluoride intake over the first three years.

### 3.1.3.   Supplemental non-U.S. studies on dental fluorosis

A relatively large number of studies have evaluated the prevalence of dental fluorosis and dental caries in populations outside the United States.  In many cases these studies are not directly comparable to U.S. populations because of intrinsic differences in socioeconomic characteristics, dietary habits, dental hygiene practices, climatic conditions and other potential sources of confounding factors.  In some cases where these populations were not exposed to fluoride from commercial dental products and the primary source of fluoride exposure was through drinking water, the results of the studies can be useful for comparison with U.S. studies.  Additional studies are discussed below.

**Forsman (1974):**  The occurrence of dental fluorosis (Dean's index) and dental caries (DMFT or DMFS scores) was studied in residents (mostly school children) in three communities in southern Sweden (Gadderås, Påskallavik and Billesholm).  In Gadderås, 39 individuals (2–35 yrs old) were examined; 28 were born in the town and 15 were less than 15 yrs old.  A new water supply containing approximately 10 mg F/L went into use in 1946 and all homes were connected by 1950. In Påskallavik, 190 children born in 1955–1966 were examined, 61 of whom were born in the town.  The water source had a fluoride level of 7–10 mg/l from mid-1956 to beginning 1965; prior to 1956, private wells with low fluoride content were used, and after 1965 the water source was changed to one with a fluoride content of 2.0–2.5 mg/l.  For the purposes of this study, Forsman (1974) considered the fluoride level to be ~ 10 mg/L.  In Billesholm, of the 300 children examined 133 were born in the district and had always lived there.  Water was obtained from two deep wells; from 1957 to 1969 fluoride level varied between 4 and 7 mg/L, but mostly was around 5.5 mg/L. From 1969 to 1973 the fluoride content was 1–3 mg/L or less.  For purposes of this study, the fluoride level was considered by Forsman (1974) to be ~ 5 mg/L.  Other sources of fluoride exposure, such as dietary intake, were not evaluated.  The control population (160 children) came from areas of Kronoberg County with stable water sources containing 0.9 to 1.7 mg F/L.  This group is classified as ~1 mg F/L.

Fluorosis data for the permanent teeth of school children born and reared in the three study areas were presented in graphical form (see Fig. 3-2).  In general, the data indicate increasing severity of fluorosis with increasing fluoride exposure.  In Gadderås (~10 mg F/L), severe fluorosis was seen in approximately 64% of the study population.  Of the 26 children born in Påskallavik between 1957 and 1961, and exposed to ~10 mg F/L for 4 years or more, all but one had moderate to severe fluorosis.  Of the 12 children born in Påskallavik in 1962–64 (exposed to ~10 mg F/L up until 1965 when the water source was changed to one with 2–2.5 mg F/L) only about 18% exhibited severe fluorosis.  Forsman (1974) reported that the difference between the two groups was significant at the 1% level.  In Billesholm (~5 mg F/L), about 22% of the children exhibited severe fluorosis. Specific information on the distribution of fluorosis scores in the control areas (~1 mg F/L) were not reported by Forsman, however, it was noted that in earlier studies no cases of fluorosis more severe than Grade 2 were found in one of the control populations (Kronoberg County, N = 160).



**Figure 3-2.  Fluorosis in permanent teeth of school children born and reared in three study areas in Sweden (Forsman, 1974).**

In examining the occurrence of fluorosis in individuals in Gadderås whose exposure to 10 mg F/L drinking water began at different time periods after birth, Forsman (1974) found a clear concordance between the teeth affected by fluorosis relative to the F concentration during the period when permanent teeth were undergoing mineralization.  All children born in Gadderås after 1950 (when all homes were receiving drinking water with 10 mg F/L) had Grade 3 or Grade 4 fluorosis on all permanent teeth.  Children who began drinking water with 10 mg F/L at an age of about 5 years and above showed evidence of fluorosis only on the late mineralizing teeth.

Forsman (1974) also reported that fluorosis continued to develop in children after they moved away from the area with a 10 mg F/L to low fluoride areas.  In one case, a 3-yr-old who had moved to a district with <0.2 mg F/L still developed Grade 3 or 4 fluorosis on all teeth except the second molars which were graded as having a fluorosis score of 2.  In two other cases, 7-yr-old children, who had moved to a low fluoride district, developed Grade 3 or 4 fluorosis on all teeth except the third molars.  Forsman (1974) considered these to be cases of continuous exposure to fluoride as a result of fluoride from tissue depots after the external exposure had ceased.

**Mann et al. (1987):**  The prevalence and severity of dental caries and fluorosis was studied in a community in the Gaza Strip characterized by drinking water with 5 mg F/L (Mann et al., 1987).  The study population consisted of 182 adolescents (90 boys and 92 girls; 15–16 years old) residing since birth in the same village.  Dental fluorosis was determined according to Dean's index.  Thirty-eight boys and 8 girls exhibited severe fluorosis, resulting in a population prevalence rate of 25%.

**Chen (1989):**  Dental fluorosis and caries prevalence were evaluated in children 6 to 16 yrs old (2,669 boys and 2,438 girls) residing in 14 communities in Shenkang Hsiang province, Taiwan (Chen, 1989).  Chen (1989) reported that the recommended range of optimal water fluoride concentrations used in the study was 0.4–0.5 mg/L for the tropical zones of Taiwan and 0.6–0.7 mg/L for the subtropical zone, and is based on zone-specific water consumption rates.  The study author noted that the great majority of the population acquire their drinking water from shallow wells, and the rest from deep-wells.

The study communities were divided into six exposure categories based on water fluoride concentrations, and the range of concentrations in each of the exposure groups was as follows: 0.21–0.25 mg F/L (negligible); 0.43–0.48 mg F/L (optimal); 0.75–0.98 mg F/L (2x optimal); 2.40 mg F/L (4x optimal); 2.84–3.24 mg F/L (5x optimal); and 4.69 mg F/L (7x optimal).  Beginning in June 1981 a communal water supply (non-fluoridated, with a fluoride level of 0.09 mg/L) was available to the population and was supplied to all the schools in the province.  Dental fluorosis was scored using TSIF and the Dean Fluorosis Index.  The prevalence and severity of fluorosis was distinctly greater in all areas with higher than optimal fluoride levels (Table 3-12).  Severe fluorosis occurred in 0.2% of the children in the 2x optimal group, 0% in the 4x group, 0.3% in the 5x group, and in 1.3% in the 7x group.

| Table 3-12.  Percent Distribution of Fluorosis in Taiwanese Populations Studied by Chen (1989) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fluoride Level (mg/L)[a] | N | Dean's Index | | | | | |
| | | 0 | 0.5 | 1 | 2 | 3 | 4 |
| 0.21-0.25 | 851 | 89.7 | 4.9 | 4.1 | 1.3 | – | – |
| 0.43-0.48 | 1660 | 86.2 | 7.3 | 3.6 | 2.7 | 0.1 | – |
| 0.75-0.98 | 849 | 67.7 | 12.2 | 13.3 | 5.6 | 0.8 | 0.2 |
| 2.40 | 420 | 43.8 | 17.1 | 18.6 | 16.2 | 4.3 | – |
| 2.84-3.24 | 912 | 27.7 | 16.6 | 18.1 | 31.6 | 5.7 | 0.3 |
| 4.69 | 380 | 12.1 | 7.6 | 18.2 | 48.2 | 12.6 | 1.3 |

[a]According to Chen (1989), the recommended range of optimal water fluoride concentrations is 0.4–0.5 mg/L for the tropical zones of Taiwan and 0.6–0.7 mg/L for the subtropical zones.

Chen (1989) did not evaluate other fluoride exposure factors, such as dietary contributions to fluoride intake and the use of fluoride dentifrice and supplements; therefore, it is unclear to what extent the observed fluorosis was due to fluoride in drinking water alone.  Furthermore, because the study population was living in a tropical area, fluoride exposure was likely elevated due to higher drinking water consumption rates when compared to more temperate regions.  Other factors complicating the interpretation of Chen's data is the young age of some of the subjects (as young as 6 yrs old), and the introduction of a very low fluoride drinking water source in 1981.  Both of these factors may have contributed to overall lower fluorosis prevalence and severity scores and thereby confounded interpretation of the Chen (1989) results.

**Thaper et al. (1989):**  The prevalence and severity of dental fluorosis was studied in 16 rural communities in the State of Rajastan, India, by Thaper et al. (1989).  The study population consisted of 792 children 6–10 years old.  Dental fluorosis was scored according to Dean's Index.  At mean fluoride levels of 1.04 mg/L and 2.4 mg/L, there were no cases of severe fluorosis in the permanent teeth.  At 3.91 mg F/L, 3.65–16.10% of the examined permanent teeth exhibited severe fluorosis; at a mean fluoride level of 6.0 mg/L, 10.32–14.57% exhibited severe fluorosis.  The number of individuals with severe fluorosis was not reported.

**Cortes et al. (1996):**  The authors examined a total of 457 school children (6–12 years old) residing in three regions of Brazil for dental fluorosis (and dental caries): Olho D'Agua with 2–3 mg F/L drinking water, Vitoria with 0.7 mg/L, and Maceio with less than 0.01 mg/L.  Participating schools were selected for similarities in socioeconomic profiles, although Olho D'Agua was a more rural community while Maceio and Vitoria were more urban (no other information was

provided on the study populations).  Only exposure to fluoride in the drinking water was considered in the study. Photographs were taken and used for assessment of the degree of fluorosis of the upper central incisors.  The TFI was used to score fluorosis.  In reporting the results, Cortes et al. (1996) combined the data for TFI scores of 1 and 2, for scores of 3 and 4, and for all scores of 5 and above (Table 3-13).  Because only the upper central incisors were scored, it is uncertain as to how representative the results are for the entire dentition of the children examined.  Nevertheless, the data show a trend towards increasing severity of fluorosis with increasing concentration of fluoride in the water (data not analyzed statistically).

| TFI Score | Maceio (0.01 mg F/L) | | Vitoria (0.7 mg F/L) | | Olho D'Agua (2–3 mg F/L) | |
|---|---|---|---|---|---|---|
| | No. | Percent | No. | Percent | No. | Percent |
| 0 | 148 | 92.5 | 96 | 47.8 | 8 | 8.3 |
| 1-2 | 12 | 7.5 | 95 | 47.3 | 28 | 29.2 |
| 3-4 | - | | 9 | 4.5 | 42 | 43.8 |
| ≥5 | - | | 1 | 0.5 | 18 | 18.8 |

Table 3-13.  Distribution of Fluorosis Scores[a] in Brazilian School Children Studied by Cortes et al. (1996)

[a]Upper central incisors only were scored.

**Grobler et al. (2001):**  In studies conducted in South Africa, Grobler et al. (2001) found that 0.8% of a study population of children (10–15 yrs old) whose drinking water contained 0.48 mg F/L exhibited severe fluorosis (Dean's Index), and in a population whose drinking water contained 3.0 mg F/L 30% exhibited severe fluorosis (Table 3-14).  It was reported that fluoride exposure was not affected by dietary habits or the use of fluoride supplements or dentifrices, but it was noted that the area is hot and dry which may have resulted in increased drinking water intake (the average annual maximum temperatures for Sanddrif and Kuboes were reported to be ~25°C or 77°F; the temperature for Leeu Gamka was not given).

| Town | No. | F (mg/L) | Dean's Index | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 0 | 0.5 | 1 | 2 | 3 | 4 |
| Sanddrif | 47 | 0.19 | 38.3 | 14.9 | 25.5 | 17.0 | 4.2 | 0 |
| Kuboes | 115 | 0.48 | 40.0 | 9.5 | 33.9 | 10.4 | 5.2 | 0.8 |
| Leeu Gamka | 120 | 3.0 | 0.8 | 4.1 | 15.8 | 18.3 | 30.8 | 30.0 |

Table 3-14.  Percent Distribution of Fluorosis in S. African Populations Studied by Grobler et al. (2001)

### 3.1.4.  Environmental, physiological and genetic factors affecting dental fluorosis

In addition to fluoride levels in drinking water, various other environmental and physiological factors may affect the occurrence and severity of dental fluorosis, or produce changes in enamel mineralization which may resemble fluoride-induced dental fluorosis.  These include climate and altitude of place of residence; dietary habits; and nutritional status (vitamin and essential mineral deficiencies and exposure to certain minerals); physiological state (e.g., acid-base balance) and certain pathological conditions.

## 3.1.4.1.  The effect of climate

In 1962 the Public Health Service published revised Drinking Water Standards for fluoride which took into account differences in water consumption rates in different climates (PHS, 1962).  The recommended fluoride levels for drinking water ranged from 0.7 mg/L for warmer climates to 1.2 mg/L for colder climates (based on the annual average of the maximum daily air temperatures).  These standards, still in effect today (CDC, 1995), were the result of earlier studies which indicated that the prevalence and severity of fluorosis in populations residing in hot climates was higher than that for comparable populations in cooler climates having similar fluoride levels in drinking water (Galagan and Lamson, 1953, see Section 3.1.2 for discussion).  In the Galagan and Lamson (1953) study, children aged 9–16 yr residing in six Arizona towns were examined for dental fluorosis.  These Arizona communities were reported to have a mean annual temperature of 70°F.  Galagan and Lamson (1953) compared their results to those reported by Dean (1942) for towns with similar fluoride levels in drinking water but with lower mean annual temperatures.  The Dean communities used in the comparison had a mean average annual temperature of 50°F according to Galagan and Lamson (1953).  The Galagan and Lamson communities exhibited both a higher prevalence and increased severity of fluorosis compared to the communities studied by Dean (1942).  Selected data from these two studies are shown in Table 3-15.  The mean annual temperatures for the study localities are also included in the table.  The studies selected for Table 3-15 were conducted in the period between 1942 and 1953.  This minimizes the impact of the increased exposure to fluoride from dental products on the trends observed.

| F (mg/L) | % with Fluorosis | % Distribution of Fluorosis (Dean's Index) | | | | Location | Mean Annual Temp. (°F) | Reference |
|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | | | |
| 0.2 | 1.5 | 1.5 | 0 | 0 | 0 | Zanesville, OH | 55.7[b] | Dean (1942) |
| 0.3 | 2.2 | 2.2 | 0 | 0 | 0 | Lima, OH | 50.0[c] | Dean (1942) |
| 0.4 | 4 | 2.4 | 1.2 | 0 | 0 | Yuma, AZ[a] | 72.2[d] | Galagan and Lamson (1953) |
| 0.4 | 6.1 | 5.3 | 0.8 | 0 | 0 | Marion, OH | 52.1[d] | Dean, 1942 |
| 0.5 | 10 | 9 | 1 | 0 | 0 | Tempe, AZ[a] | 68.6[d] | Galagan and Lamson (1953) |
| 0.5 | 4.2 | 3.5 | 0.7 | 0 | 0 | Elgin, IL | 53[d] | Dean (1942) |
| 0.6 | 6.5 | 6.2 | 0.3 | 0 | 0 | Pueblo, CO | 52.6[d] | Dean (1942) |
| 0.7 | 17 | 12 | 3 | 2 | 0 | Tucson, AZ[a] | 67.4[d] | Galagan and Lamson (1953) |
| 0.8 | 19 | 9 | 6 | 2 | 1 | Chandler, AZ[a] | 67.6[d] | Galagan and Lamson (1953) |
| 0.9 | 12 | 10.6 | 1.6 | 0 | 0 | Kewanee, IL | 50.9[d] | Dean (1942) |
| 1.0 | 48 | 30 | 18 | 0 | 0 | Casa Grande, AZ[a] | 71.0[d] | Galagan and Lamson (1953) |
| 1.2 | 56 | 26 | 14 | 13 | 3 | Florence, AZ[a] | 69.3[d] | Galagan and Lamson (1953) |
| 1.2 | 15 | 14 | 1 | 0 | 0 | Aurora, IL | 49.4[d] | Dean (1942) |
| 1.2 | 32 | 30 | 2 | 0 | 0 | E. Moline, IL | 50.9[d] | Dean (1946) |
| 1.2 | 33 | 29 | 4 | 0 | 0 | Maywood, IL | 50.1[d] | Dean (1946) |

Table 3-15.  Prevalence of Fluorosis in Children Living in Hot Climates Compared with Children  Living in Temperate Climates

[a]Studies that were conducted on populations living in hot climates are highlighted.
[b]Yearly average based on monthly means of daily averages for Muskingum County, OH, 1961-1990, http://www.worldclimate.com/cgi-bin/data.pl?ref=N39W081+1302+339417C .
[c]Yearly average based on monthly means of daily averages for Allen County, OH, 1961-1990, http://www.worldclimate.com/cgi-bin/data.pl?ref=N40W084+1302+334551C .
[d]As reported in Galagan and Lamson (1953).

The results presented in Table 3-15 support the conclusion that fluorosis prevalence and severity is generally greater in populations living in hot climates compared to those in cooler climates for similar fluoride drinking water levels. However, there are limitations to this conclusion because the comparison is based on water concentration and lacks information on other sources of fluoride exposure.

Galagan and Lamson (1953) suggested that the higher temperatures in hot climates, as well as the increased amount of sunshine each day (radiant heat), contributed to the increased fluorosis by causing an increase in drinking water intake, resulting in an increase in fluoride intake. Temperature-related increases in total fluid and water consumption were documented by Galagan and Vermillion (1957) for children (under age 1 to age 10 yr) residing in two communities in California. The study showed that for every degree increase in daily maximum temperature between 50 and 100°F, water intake increased, on average, by 0.062 ounces per pound of body weight.  This relationship was described by the equation:

$$\text{Water intake (in ounces per pound)} = 0.0062 \times \text{temperature (in °F)} - 0.038$$

The correlation coefficient for this relationship was not reported.

Water accounted for 43% of the total daily intake and average water intake ranged from 18 mL/kg [0.27 fluid ounces (0.008 mL) per day per pound of body weight (0.454 kg) at a mean daily maximum temperature of 50ºF] to approximately 38 mL/kg [0.58 fluid ounces per day per pound of body weight) at a mean daily maximum temperature of 100ºF (estimates based on graphical presentation of the data)].  These data indicate that water intake can more than double under extremely hot conditions; consequently, fluoride intake from drinking water would increase proportionally.

In the early 1960's, the California Department of Public Health began a 5-year program to evaluate the correlation between fluoride concentration in drinking water, dental caries, dental fluorosis, and temperature (Richards et al., 1967).  Dental caries and fluorosis were evaluated in 9000 children, 12–14 years old, from 83 towns, representing 6 different fluoride concentrations and eight different temperature-range zones in the states of California, Texas, Colorado, Arizona, New Mexico and Illinois.  The findings for the relationship between fluorosis status, fluoride concentration and ambient air temperature for 7140 children are shown in Table 3-16. The results suggest that the likelihood for severe fluorosis increases as air temperature increases.  Use of ranges for the fluoride concentration reduces the confidence in this conclusion because the increases in moderate and severe fluorosis at the higher temperatures could also be the result of having more systems delivering water at the high end of the concentration range at the higher temperatures than at the lower temperatures.

Angmar-Månsson and Whitford (1990) have argued that temperature-related increases in drinking water consumption may no longer be relevant for assessing fluoride intake in the U.S. and other western countries because of changes in life style and dietary habits.  These authors note that water intake rates in hot climates may be affected by the increased use of air-conditioning in homes, schools and public places, and fluoride intake may be reduced because of the increased consumption of beverages other than drinking water that may contain little fluoride.  In recent years the consumption of bottled water and the use of home water filtration systems, may have

further reduced fluoride intake through tap water. In addition, time spent indoors by children may have increased due to the increase in television and computer use.  In a study of the 2592 school children in 16 towns in Texas, Butler et al. (1985) found that children from homes with air conditioning had a non-significant but lower prevalence of dental mottling (odds ratio 0.58, 95% CI 0.40–0.85) compared to children whose homes were not air conditioned.

| Fluorosis Score | Fluoride Concentration (ppm) | | | | | |
|---|---|---|---|---|---|---|
| | ≤0.15 | 0.2-0.4 | 0.5-0.7 | 0.8-1.0[b] | 1.1-1.3 | ≥1.8 |
| **≤65°F** | **Zone 1 (N = 330)[a]** | **Zone 4 (N = 169)** | **Zone 7 (N = 316)** | **Zone 10 (N = 316)** | **Zone 13 (N = 302)** | **Zone 16 (N = 306)** |
| Normal | 97.3 | 71.6 | 44.7 | 40.0 | 33.1 | 11.1 |
| Questionable | 2.4 | 26.0 | 40.9 | 39.2 | 41.1 | 23.5 |
| Very mild | 0.3 | 2.4 | 13.5 | 18.0 | 22.5 | 29.5 |
| Mild | – | – | 0.9 | 2.8 | 3.3 | 15.7 |
| Moderate | – | – | – | – | – | 15.0 |
| Severe | – | – | – | – | – | 5.2 |
| **66°–79°F** | **Zone 2 (N = 707)** | **Zone 5 (N = 709)** | **Zone 8 (N = 688)** | **Zone 11 (N = 548)** | **Zone 14 (N = 508)** | **Zone 17 (N = 553)** |
| Normal | 96.1 | 74.2 | 26.6 | 22.8 | 26.6 | 14.8 |
| Questionable | 3.5 | 19.5 | 42.9 | 44.3 | 32.7 | 18.4 |
| Very mild | 0.4 | 6.2 | 28.6 | 26.6 | 28.1 | 27.8 |
| Mild | – | 0.1 | 1.9 | 5.8 | 9.6 | 20.8 |
| Moderate | – | – | – | 0.5 | 2.8 | 12.8 |
| Severe | – | – | – | – | 0.2 | 5.4 |
| **≥80°F** | **Zone 3[c] (N = 209)** | **Zone 6 (N = 335)** | **Zone 9 (N = 331)** | **Zone 12 (N = 350)** | **Zone 15 (N = 310)** | **Zone 18 (N = 229)** |
| Normal | 52.6 | 32.2 | 18.1 | 18.3 | 8.4 | 8.3 |
| Questionable | 46.9 | 44.8 | 51.1 | 26.0 | 29.0 | 18.8 |
| Very mild | 0.5 | 20.0 | 26.0 | 37.7 | 37.5 | 25.3 |
| Mild | – | 3.0 | 4.2 | 15.1 | 17.4 | 27.9 |
| Moderate | – | – | 0.6 | 2.9 | 7.4 | 12.7 |
| Severe | – | – | – | – | 0.3 | 7.0 |

Table 3-16.  Percentage of Children by Fluorosis Diagnosis for Each Fluoride-Temperature Zone (Richards et al., 1967)

[a]N = number of children for whom diagnosis was made.
[b]Given as 0.8–0.7 ppm in paper and presumed to be a typographical error.
[c]Fluoride concentration 0.2 ppm.

### 3.1.4.2.  The effect of altitude

According to Angmar-Mansson and Whitford (1990) there is evidence that hypobaric hypoxia that occurs at high altitudes is associated with bilaterally symmetrical and diffuse disturbances in enamel mineralization that may be mistaken for fluorosis.  In addition to hypoxia per se, other physiological effects, including alterations in growth and development, acid-base status, hormonal balance, hematocrit, hemodynamics, and the function of the renal and cardiovascular systems may contribute to the disturbances in enamel mineralization observed in populations living at high altitudes (Angmar-Mansson and Whitford, 1990).

Several studies have examined the occurrence of dental fluorosis in populations living at different altitudes and exposed to different levels of fluoride in their drinking water.  Manji et al. (1986) recorded the occurrence of dental fluorosis in children 11–15 years old living at different altitudes (sea level, 1500 m and 2400 m) in towns in Kenya with different fluoride drinking water levels (<0.5 mg/L and 0.5–1.0 mg/L).  Fluorosis was measured using the TFI scoring system.  In the low fluoride areas (0.5 mg F/L) the percentage of children exhibiting dental fluorosis was 36.4, 78.0 and 100.0 at sea level, 1500, and 2400 m, respectively (statistical significance not reported).  In the high fluoride areas, the percentages were 71.2 at sea level and 93.8 at 1500 m (no study population at 2400 m).  The severity of fluorosis for each tooth type increased significantly with increases in altitude for both the low and high fluoride areas ($p < 0.001$; data shown graphically in study report).

The percent distribution of children for each grade of fluorosis for each study area was not included in the study report; however, Manji et al. (1986) reported that in the low fluoride areas less than 2% of the children had more than 50% of their teeth with TFI scores of $\geq 3$ at sea level, compared with 10% at 1500 m and 60% at 2400 m.  Similarly, in the high fluoride areas less than 2% of the children had more than 50% of their teeth with TFI scores of $\geq 3$ at sea level, compared to over 20% at 1500 m.  Manji et al. (1986) excluded temperature as a factor in the differences seen between the study populations, and noted that, based on the mean annual maximum air temperatures, there was an inverse relationship between temperature and prevalence and severity of dental fluorosis.  The authors did not feel that dietary differences between the study populations contributed to the altitude-related differences in fluorosis, although specific information on non-drinking water fluoride intake was not reported.  Manji et al. (1986) concluded that children living at high altitudes were more susceptible to dental fluorosis.

Yoder et al. (1998) examined the occurrence of dental fluorosis in school children (ages 9–19 yr) in three communities in Tanzania located at different altitudes (100 m, 840 m, and 1463 m) and with different levels of fluoride in their drinking water (mean concentrations of 0.046 ±0.047, 5.72 ±4.71, and 0.18 ±0.32 mg F/L, respectively; (significantly different at $p < 0.0001$, based on analysis of covariance).  The corresponding mean TFI scores were: 0.01 ±0.07, 4.44 ±1.68, and 4.39 ±1.52, and the percentages of teeth showing severe fluorosis were 0, 48.6 and 54.9%, respectively.  The percentage of severely fluorosed teeth in subjects from the highest altitude community was greater than in those from the middle altitude community even though the drinking water concentration at the high altitude locality was lower.

Statistical analysis implicated altitude as a risk factor for severe fluorosis.  The study authors, however, did not exclude the possibility that other factors, such as the use of a fluoride-containing food additive, the presence of other elements in the diet (aluminum and magnesium), nutritional factors (malnutrition, insufficient milk consumption, ingestion of tea), or genetic differences, contributed to the observed increased occurrence and severity of fluorosis in the high altitude community in spite of the relatively low water fluoride level.  Urinary fluoride levels in that community were normal, suggesting that fluoride intake was not excessive.

In studies conducted in the mountainous areas of Uganda, Rwenyonyi et al. (1999) compared the occurrence of dental fluorosis among 10–14-yr-old children in two fluoride districts (0.5 mg/L and 2.5 mg/L) while controlling for other factors related to fluorosis.  The altitudes of the two study

areas with a fluoride level of 0.5 mg/L were 900 and 2,200 m; in the two study areas with 2.5 mg F/L, the altitudes were 1,750 and 2,800 m.  Fluorosis was evaluated using the Thylstrup and Fejerskov index.  In the 0.5 mg F/L areas, the percentage of children with fluorosis (TFI score $\geq 1$ for at least one tooth) was 25% at 900 m and 45% at 2200 m (significantly different at p = 0.006).  In the 2.5 mg F/L areas, the percentage of children with TFI $\geq 1$ was 69% at 1750 m and 86% at 2800 m (significantly different at p = 0.0003).  The severity of fluorosis also increased with increases in altitude as shown by the increased percentage of children having TFI scores of 3 or higher.  The prevalence of severe fluorosis (TFI $\geq 5$) was estimated from the graphical presentation of the data to be 4% at 900 m and 7% at 2200 m where the fluoride level was 0.5 mg/L, and 26% at 1750 m and 38% at 2800 m where the fluoride level was 2.5 mg/L.  However, these differences in percent occurrence of TFI $\geq 5$ were not significant in either the low fluoride area ($\chi^2 = 1.02$, d.f. = 1, p = 0.313) or in the high fluoride area ($\chi^2 = 3.49$, d.f. = 1, p = 0.062).

Rwenyonyi et al. (1999) noted that besides altitude, fluoride exposure level, use of infant formula, vegetarian diets, and the storing of water in clay pots "had independent significant explanatory effects in the linear regression analysis."  Water storage was associated with reduced odds ratios in the low fluoride area, whereas the use of infant formula was a significant risk indicator in the high fluoride areas.  The study authors concluded that most of the variance in the prevalence and severity of dental fluorosis was explained by the fluoride intake from liquid, but altitude remained a significant risk indicator after controlling for the effect of other potential confounding factors by multiple and logistic regression analyses.

The areas studied by Rwenyonyi et al. (1999) are at altitudes of 900–2800 m.  Only a few studies conducted in the U.S. have been at altitudes falling within this range; these include Clovis, NM (1299 m), Pueblo, CO (1462 m) and Colorado Springs, CO (1900 m).  All three cities were included in Dean's 1942 survey.  At that time, the drinking water fluoride level in Clovis was 2.2 mg/L; that at Pueblo was 0.6 mg/L and that at Colorado Springs was 2.6 mg/L.  Table 3-17 compares the percent occurrence of severe fluorosis in the Ugandan and U.S. communities.  Comparable information was not available for the studies conducted in Kenya by Manji et al. (1986) and those conducted in Tanzania by Yoder et al. (1998).

| Table 3-17.  Occurrence of Severe Fluorosis in High Altitude Areas in Uganda and the U.S. | | | | |
|---|---|---|---|---|
| Town | Fluoride (mg/L) | No. | Altitude (m) | Percent Severe Fluorosis |
| Mpondwe, Uganda | 0.5 | 81 | 900 | 4[a] |
| Kyabayenze, Uganda | 0.5 | 82 | 2200 | 7[a] |
| Pueblo, CO | 0.6 | 614 | 1462 | 0[b] |
| Mutolere/Kagera, Uganda | 2.5 | 163 | 1750 | 26[a] |
| Kabindi, Uganda | 2.5 | 155 | 2800 | 38[a] |
| Colorado Springs, CO | 2.6 | 404 | 1900 | 1.5[b] |
| Clovis, NM | 2.2 | 138 | 1299 | 0.7[b] |

SOURCE: Dean (1942); Rwenyonyi et al. (1999).
[a]Percent of children with severe fluorosis (TFI $\geq 5$).
[b]Based on Dean's index of fluorosis; "severe" defined as Dean's score of  4.

Because of the relatively low percentages of severe fluorosis seen in the U.S. studies conducted at comparable altitudes, the evidence suggests that factors other than altitude are the primary cause of

the higher rates of severe fluorosis seen in the Rwenyonyi et al. (1999) study. This, however, does not exclude the possibility that some degree of the "fluorosis" seen in the high-altitude U.S. study populations may have been due to hypobaric hypoxia which, as NRC (2006) notes, may be mistaken for fluoride-induced fluorosis.

### 3.1.4.3.   Physiological/nutrition factors

The occurrence and severity of fluorosis may vary among individuals and populations exposed to the same levels of fluoride in environmental media. Such differences can be due to factors which enhance fluoride retention in the tissues, or produce alterations in enamel mineralization that may be indistinguishable from those produced by fluoride. Included among the physiological/nutritional variables that can affect fluorosis are: calcium deficiency; exposure to minerals such as strontium and aluminum; protein malnutrition; metabolic or respiratory acid-base abnormalities; certain pathological conditions and exposure to drugs early in childhood. These are discussed in this section.

**Minerals:** Studies on laboratory animals have indicated that calcium in the diet inhibits GI tract absorption of fluoride (Whitford, 1994); however, fluoride uptake into enamel is independent of calcium uptake and the effects of fluoride on calcium homeostasis are not necessarily a factor in enamel fluorosis (Aoba and Fejerskov, 2002). Accordingly, low levels of calcium in the diet may increase the rate of absorption of ingested fluoride, and thereby favor the development of dental fluorosis with increased calcium intake leading to decreased fluoride absorption. On the other hand, oral intake of calcium will not directly alter the effects of absorbed fluoride on enamel development.

Certain forms of "mottled" enamel may be caused by exposure to excessive amounts of trace minerals, even in the absence of significant exposure to fluoride. Curzon and Spector (1977) surveyed 1313 children 12–14 years old in seven towns in Wisconsin where the drinking water contained low levels of fluoride (1.0–1.2 mg/L) but variable and sometime elevated levels of strontium (0.022–33.9 mg/L). Mottling of the dental enamel of the teeth was found to increase in prevalence and severity as the strontium concentration increased. No such relationship was observed with fluoride concentrations varying in the narrow range of 1.0 to 1.3 mg /L.

Other minerals may also produce similar effects. Rozier (1994) cites a study by Butler et al. (1985) which suggested that exposure to zinc in drinking water may contribute to dental mottling. In the Butler et al. (1985) study, 2592 school children in 16 towns in Texas were examined for dental mottling. Three of the towns had relatively high levels of zinc in the drinking water. Butler et al. (1985) reported that zinc was a predictor for mottling, but that the association was not strong. The odds ratio was 2.18 (95% CI 1.26 to 3.78). Butler et al. (1985) state that animal studies have shown that exposure to zinc, as well as to strontium and chromium, can cause dental mottling.

As a result of studies conducted in Tanzania, Yoder et al. (1998) suggested that elevated levels of aluminum and/or magnesium in magadi (a lake-shore salt deposit used in cooking as a food tenderizer and to shorten cooking time) may have contributed to the severe dental fluorosis seen in children (9–19 yrs old) exposed to only a very low level of fluoride in drinking water (0.18 mg/L) in the town that had a prevalence of 54.9% severe dental fluorosis. Magnesium reportedly affects enamel formation in laboratory animals (Angmar-Månsson et al., 1984);

however, similar effects have not yet been reported in humans.  Aluminum is known to cause ostemalacia as a result of aluminum-induced phosphate depletion, and Yoder et al. (1998) were of the opinion that a similar mechanism might affect teeth.  The effect of aluminum on dental enamel mineralization in humans is not known.

**Acid-base disturbances**:  Angmar-Månsson and Whitford (1990) reviewed data documenting the effects of acid-base imbalances on dental fluorosis.  The rate at which fluoride is excreted by the kidneys is affected by urinary pH.  The renal clearance rate is depressed by acidosis, and enhanced by alkalosis.  Consequently, soft and hard tissue levels of fluoride may be increased under conditions of acidosis and decreased under conditions of alkalosis.  Significantly though, Angmar-Månsson and Whitford (1990) reported that animal studies have shown that both acidosis and alkalosis, in the absence of fluoride, may adversely affect the mineralization of the enamel in a manner resembling that of fluorosis.  Fluoride supplementation appeared to attenuate the effects caused by acidosis and enhance the effects caused by alkalosis.

Angmar-Månsson and Whitford (1990) describe several variables which may affect acid-base balance; these included the acid load of the diet, certain drugs, certain metabolic or respiratory disorders, altitude (see Section 3.1.4.2), and physical activity.  Of these, dietary factors were considered the most important and high protein diets in particular were associated with moderate to high levels of acidosis.

The extent to which changes in acid-base balance may affect the occurrence and severity of dental fluorosis in human populations has not been fully documented; however, infant formula based on cow's milk reportedly can cause some degree of systemic acidosis and an acidic urine, and there are reports that dental fluorosis is higher in formula-fed infants than in those fed breast-milk.  This difference, however, may be due to high levels of fluoride in infant formula prepared with tap water compared with that in breast milk.  Whitford (1990) noted that fluoride levels in human breast milk are only 0.4 times the concentration in maternal plasma.  As an example, Whitford estimated that an infant's fluoride intake through consumption of 800 mL of breast milk containing 0.4 $\mu$mol F/L (0.0076 mg/L) would be 0.006 mg, vs. 0.80 mg from consuming the same volume of formula prepared with water containing 1 mg F/L.

In older children the increased retention of fluoride under acidotic conditions may be of greatest concern only when fluoride intake is excessive, although further research is needed to fully document such effects.

**Pathological conditions:**  Primary diabetes insipidus; nephrogenic diabetes insipidus, diabetes mellitus; acute glomerulonephritis, pyelonephritis, renal tubular acidosis, and nephrotic syndrome are disorders affecting urinary flow rate which can result in abnormal increases in the consumption of water (Angmar-Månsson and Whitford, 1990).  As noted by Angmar-Månsson and Whitford (1990), over one million children in the U.S. may be affected by one of these conditions, and it is possible that these disorders may contribute to higher levels of dental fluorosis in these children because of increased water consumption.

Because fluoride is excreted primarily through the kidney, individuals with kidney disease and reduced glomerular filtration are likely to have increased plasma fluoride levels (NRC, 2006), which, in turn, may result in increased tissue levels of fluoride.  Such individuals may be more

susceptible to the adverse effects of fluoride including dental fluorosis in children and skeletal fluorosis in adults (see Section 3.3).

**Exposure to drugs**:  Tredwin et al. (2005) have reviewed the various minerals and drugs that induce disorders of the teeth.  Included among these are chemicals that cause extrinsic tooth discoloration, such as chlorhexidine (an antimicrobial), iron salts, essential oils and co-amoxiclav (a combination of amoxicillin and clavulanic acid).  In an efficacy study of chlorhexidine mouthrinses, Lorenz et al. (2006) reported that 40 of 68 test subjects using a chlorhexidine mouth rinse for 21 days exhibited signs of discoloration of teeth or tongue.

Hong et al. (2004) conducted a prospective study on 490 children from birth to 5 years of age, using a series of parent questionnaires to assess fluoride intake and amoxicillin intake. Amoxicillin use for 6 weeks to 3 months and 3 months to 6 months significantly increased the risk for fluorosis of primary second molars in bivariate analyses.  After controlling for fluoride intake, the adjusted risk of fluorosis was not significant for amoxicillin use.  The study authors concluded that amoxicillin could play a contributory role in the development of primary tooth fluorosis. In a continuation of these studies, Hong et al. (2005) used relative risk (RR), Mantel-Haenszel stratified analyses, and multivariate logistics regression to examine the relationship between amoxicillin use and dental fluorosis in the early erupting permanent teeth of 579 children who were participants in the Iowa Fluoride study.   The children were followed from birth to age 32 months, and were assessed for fluorosis at age 9 years.  Amoxicillin use from 3–6 months significantly increased the risk of fluorosis on the central maxillary incisors (RR = 2.04; 95% CI = 1.49–2.78).  After adjusting for fluoride intake and otitis media, the risk of fluorosis was still statistically significant (RR = 1.85, 95% CI = 1.20–2.78).

As reviewed by Tredwin et al. (2005), other drugs that have been reported to induce discoloration of the teeth include the antibiotics tetracyclines, minocycline (semi-synthetic tetracycline derivative), and ciprofloxacin.  The first causes yellowish to brown or gray discoloration; the second causes grey-green or blue-green discoloration, and the third causes a greenish discoloration.

### 3.1.4.4.   Genetic factors

Genetic factors may produce conditions that mimic dental fluorosis or cause an increased susceptibility to dental fluorosis.  The NRC (2006) notes that a genetic condition called amelogenesis imperfecta can be mistaken for fluorosis.  The condition results in defective development of dental enamel, marked by a brown color of the teeth due to improper differentiation of the ameloblasts.  This genetic condition reportedly occurs at a rate of 0.007% to 0.14%, depending on the population studied.

Racial differences in susceptibility to dental fluorosis have been reported in several studies. Russell (1962) evaluated dental fluorosis in 337 white and 82 African-American children who had been born in and spent at least their first seven years in Grand Rapids, MI.  The fluoride concentration in the water supply during this time was reported to be very strictly controlled at 1 mg/L.  For children 12–14 years old, Russell (1962) reported that the prevalence of very mild and mild fluorosis was 7.7% in white children and 14.1% in African-American children, suggesting a slightly higher susceptibility in the latter group (data not evaluated statistically). For

all age groups the percentages were 7.1% for white children and 15.9% for African-American children.

In an epidemiological study conducted in 1980–81 in 16 towns in Texas, Butler et al. (1985) found that the odds ratio for African-American children to develop dental fluorosis was 2.3 (95% CI = 1.4–3.7) when compared to the prevalence rates seen in Hispanic and non-Hispanic white children. All 2592 children studied were lifetime residents of the communities and were enrolled in grades 2–6 (ages 7–13) or grades 9–12 (ages 14–19) at the time of the study. Fluoride concentrations in the drinking water of the communities studied ranged from 0.2–3.3 ppm.

Williams and Zwemer (1990) evaluated the prevalence of dental fluorosis (TSIF scoring system) in 374, 12–14-year-old school children living in an urban or rural area of Georgia.  The participants included 217 county children (100 Afro-Americans and 127 whites) and 157 city children (102 Afro-American and 55 whites).  City residents had a life-long exposure to drinking water with fluoride levels of 0.9–1.2 mg/L, whereas the fluoride level in the drinking water of the county children ranged from 0.2 to 0.9 mg/L.  Chi-square analysis revealed a statistically significant association between higher TSIF scores and urban residence**.** However, the association with gender, race, dietary habits, toothpaste ingestion or fluoride supplement use (information obtained from parental questionnaires) was not significant.  The prevalence of moderate (TSIF score 4) and severe (TSIF score 5) dental fluorosis was 9.6% and 4.5% in the city (N = 157) and 0.5% and 0.9% in the county, respectively.

In order to evaluate the existence of susceptibility or tolerance genes in humans, Liu et al. (2006) analyzed leukocyte gene expression (using the gene chip HG-U133A) in 30 children, 10–12 years old, in populations from two residential areas of China with different levels of fluoride in their drinking water (1.1–2.0 mg F/L in one village and 0.76 mg F/L in another).  Comparisons were made between three groups of 10 children each, all selected at random.  Two groups were from the town with 1.1–2 mg F/L; in one group all the children showed signs of fluorosis, and in the other group none of the children exhibited fluorosis.  The third control group of ten came from the town with only 0.76 mg F/L.

The data were analyzed with Affymetrix Microarray Suite 5.0. The change in the p-value was calculated by the Wilcoxon's signed rank text.  The signal log ratio (SLR) algorithm was used to estimate the magnitude and direction of the change in the transcript, when two arrays were compared.  The robustly up-regulated or down-regulated genes were selected that conformed to all of the following criteria: present in the experimental sample, increase or decrease in expression and SLR $\leq 1.0$ or SLR $\geq 1.0$.  The results showed that, compared with the control group, 1057 genes were differentially expressed in the children from the high fluoride town (those with and without fluorosis).  Of these, 148 were robustly up-regulated and 61 were robustly down-regulated.  These included transcription factors, genes related to signal transduction, structure proteins, transport proteins, cancer genes, genes related to immunity and genes related to apoptosis.  A total of 964 genes were differentially expressed in the dental fluorosis group compared to the control group (71 robustly up-regulated and 60 robustly down-regulated).  When the dental fluorosis group was compared to the high fluoride-no fluorosis group, 633 genes were differentially expressed (15 robustly up-regulated and 67 robustly down-regulated); including genes related to immunity, transcription factors, signal transduction and structure proteins.

Several animal studies also indicate that there may be a genetic component to susceptibility to dental fluorosis.  Everett et al. (2002) evaluated the development of dental fluorosis in 12 different inbred strains of male weanling (three-week-old) mice (129P3/J, A/J, BALB/cJ, C3H/HeJ, C57BL/10J, CBA/J, DBA1/J, FVB/NJ, SJL/J, and SWR/J).  Three treatment groups consisted of 72 mice each, six from each of the 12 strains; one group received distilled water, the second received distilled water with 25 ppm fluoride, and the third distilled water with 50 ppm fluoride.  The fluoride ion-specific electrode was used to verify the fluoride concentrations.  Once a week each animal was given a complete oral examination and scored for dental fluorosis over the entire upper and lower incisor tooth surfaces using the TF scoring system.  Quantitative light-induced fluorescence (QLF) was also used to analyze fluorosis in extracted mandibular central incisors.  At day 60 of the treatment period all the test animals were killed, weighed, and examined and selected mineralized tissues were removed.  All strains developed various level of fluorosis at 50 ppm, and some strains were also responsive at 25 ppm.  A/J mice appeared to be the most susceptible to fluorosis which appeared early, within several weeks, and was seen at both 25 and 50 ppm.  In contrast, strain 129P3/J mice were the most resistant and showed only minimal fluorosis at 50 ppm.   QLF analysis of control and high-dose mice revealed no significance difference (p = 0.413) for the 129P3/J strain, but a statistically significant increase in fluorosis in the A/J mice (p = 0.006).

Vieira et al. (2005) examined genetic and environmental factors influencing the development of dental fluorosis in three strains of mice (A/J, 129P3/J and SWR/J) known to have different levels of susceptibility to dental fluorosis.  Groups of weanling mice were treated with four different levels of fluoride in their drinking water (0, 25, 50 and 100 ppm) for six weeks, after which their teeth were analyzed for fluoride content using neutron activation analysis. Dental fluorosis was assessed by QLF and tooth quality was determined by enamel and dentin micro-hardness and dentin mineralization.  Dental fluorosis increased with increase in fluoride level and was much higher for the A/J mice than the SWR/J mice indicating a greater susceptibility, even though enamel hardness was similar in the two strains.  A correlation was seen between fluorosis severity and tooth fluoride concentration, but only 34% of the variance was explained by the concentration of the fluoride in the tooth.  The study authors concluded that other factors, such as genetic susceptibility, are likely to be important in fluorosis severity.

### 3.1.5.   Summary

As noted by NRC (2006), the weight of evidence indicates that the threshold for severe dental fluorosis occurs at a water fluoride level of about 2 mg/L.  On the basis of a select set of criteria, the study identified as the most appropriate for dose-response modeling for dental fluorosis is that of Dean (1942).  This study provides a comprehensive data set on multiple communities using an appropriate fluorosis scoring system that is still in use today.

Other studies such as that of Galagan and Lamson (1953) and Eklund et al. (1987), and a number of non-U.S. studies provide information on the increased prevalence of fluorosis under hot climatic conditions.  Increases in dental fluorosis under these conditions have been attributed primarily to increased fluoride intake due to increased drinking water consumption.  Current fluoridation guidelines take into account such differences by recommending lower fluoride concentrations in drinking waters available in hot climates (CDC, 1995).  Some researchers, however, have suggested that climatic factors may be less important today considering changes

in living conditions (increased use of home and vehicle air conditioning), life style (more time spent indoors), and dietary habits (e.g., increased use of bottled water and filtered tap water which may contain reduced amounts of fluoride). Further research is needed in this area.

Based on studies of non-U.S. populations there is evidence that living at high altitudes may enhance the development of dental fluorosis or produce a condition that cannot be distinguished from dental fluorosis; however, the extent that this is occurring in U.S. populations living at high altitudes cannot be determined at this time.

Various physiological factors, such as calcium deficiency, co-exposure to certain minerals, malnutrition, respiratory or metabolic acidosis or alkalosis, and various pathological conditions affecting urinary output and kidney function, may contribute to increases in the prevalence and severity of dental fluorosis and/or produce dental abnormalities that are indistinguishable from dental fluorosis; conditions which may, in part, account for reports of high levels of fluorosis in some populations exposed to low levels of fluoride. These factors introduce an unquantifiable degree of uncertainty in interpreting dose-response data for fluoride-induced dental fluorosis.

## 3.2.    Relationship between Dental Caries and Dental Fluorosis

Early childhood exposure to fluoride in drinking water has been shown to significantly reduce the occurrence of caries. Although several studies cited by the NRC (2006) suggest that this beneficial effect of fluoride may extend to drinking water concentration as high as 4 mg/L (Englander and DePaola, 1979; Driscoll et al., 1983; Heifetz et al., 1988; Selwitz et al., 1995; Jackson et al., 1995), the NRC (2006) states that the evidence "is not persuasive that caries frequency is appreciably lower at approximately 4 mg/L than at approximately 2 mg/L or 3 mg/L." Of greater concern to the NRC (2006), however, is the possibility that those individuals exposed to fluoride levels above 2 mg/L and suffering from severe fluorosis might be at greater risk of developing caries due to the fluoride-induced pitting of the enamel which would allow food plaque to become entrapped in enamel defects and thereby induce decay. Evidence of an increase in decay rates in this segment of exposed populations would support the supposition that severe fluorosis is not merely an undesirable cosmetic effect, but can also have adverse consequences with the potential to impact health.

Very few studies have specifically investigated the relationship between caries frequency and degree of dental fluorosis. Generally, most studies have documented caries frequency in specific populations exhibiting a range of different levels of dental fluorosis but exposed to a single level of fluoride in drinking water. In cases where drinking water is the major route of fluoride exposure, and the levels of fluoride in the drinking water are high, then the fluoride concentration in the water may be indicative of the expected prevalence of severe fluorosis in the study population. To the extent that the fluoride concentration is directly related to severe fluorosis, data on the relationship between fluoride concentration and caries occurrence (i.e., studies that compare fluoride in drinking water to measures of cavities) can lend support to the severe fluorosis-cavity relationship. Likewise, relationships between the Community Fluorosis Index (CFI, originally referred to by Dean as the Index of Dental Fluorosis) for the study populations and cavities may be useful. The definition of the CFI, as paraphrased from Dean (1942), is as follows:

*The Community Fluorosis Index is a weighted average computed by assigning the following numeric weights to the various levels of fluorosis: normal = 0, questionable = 0.5; very mild = 1; mild = 2, moderate = 3, and severe = 4. The Index is equal to the sum of the scores for each fluorosis group (number of individuals times the numeric weight) divided by the total number of individuals in the study population. It is intended only as a relative measure of fluorosis to be used for intra and inter-population comparisons.*

In assessing dental caries, most studies have used scores for decayed, missing, and filled teeth (DMFT) or decayed, missing, and filled tooth surfaces (DMFS). These scores reflect the cumulative caries experience of a person or the average caries experience of a population (PHS, 1991). The mean DMFT or DMFS is calculated as the sum of the cases of each of the components across the entire study population divided by the total number of individuals examined; thus the higher the mean value, the worse the dental condition of the population. Mean DMFT and DMFS scores can also be derived for specific segments of a population, such as those that show a specific level of dental fluorosis. This approach allows comparisons between groups with different levels of fluorosis although it only indirectly addresses the issue of whether severely fluorosed teeth are at greater risk of caries. To assess the latter issue a comparison of the DMFS scores between severely fluorosed teeth with those of lesser severity would be needed.

The relationship between caries and fluoride exposure displays the U-shaped dose-response that characterizes many nutrients where there are adverse effects with intakes that are below those that confer a benefit and adverse effects with intakes that are greater than those with benefit. In such cases, comparisons need to be made between the intakes that define the base of the U and those that lie to either side of that base. The base of the U identifies the dose range that defines intakes providing nutritional benefit without risk of adversity for healthy populations. The symmetry of the U is often variable with the slope to the left frequently steeper than that to the right. In the case of fluoride a comparison between caries prevalence for moderate or mild/moderate fluorosis and severe fluorosis would be needed rather than between no or questionable fluorosis and severe fluorosis.

One confounding factor in DMFT or DMFS scoring of severely fluorosed teeth is the degree to which fluorotic pits might be misdiagnosed as pre-carious lesions and filled, thereby resulting in higher DMFT and DMFS scores. Examiner bias is another potential confounding factor which would be difficult to quantify. Few studies used multiple examiners to assess this possibility. During 1999–2002, among children aged 2–11 years, 41% had dental caries in their primary teeth. Forty-two percent of children and adolescents aged 6–19 years and approximately 90% of adults had dental caries in their permanent teeth. Among children aged 6–19 years, 32% had received dental sealants. Adults aged >20 years retained a mean of 24 of 28 natural teeth and 8% were edentulous (Beltrán-Aguilar et al., 2005). The increase of cavity prevalence with age illustrates the importance of comparing caries frequency across similar age groupings.

### 3.2.1.  Dental caries and severe fluorosis

The NRC (2006) identified 14 cases where comparisons were made between dental condition (i.e., DMFS, DMFT, or percent caries) and severity of dental fluorosis.  These 14 comparisons are summarized in Table 3-18.

| Table 3-18.  Studies Evaluating the Relationship between Dental Condition and Severity of Fluorosis | | | | | |
|---|---|---|---|---|---|
| Country (age) | Fluoride (mg/L) | No. | Fluorosis Score | Dental Condition (Endpoint) | Reference |
| **Studies Using Dean's Index of Fluorosis** | | | | | |
| U.S. (8–16 yr) | >2 to ≤4 | 218 | VM to Mod | 1.58       (mean DMFS) | Driscoll et al., 1986 |
| | | 54 | Severe | 2.96 | |
| | | 218 | VM to Mod | 4.5%      (D or F) | |
| | | 54 | Severe | 19.6% | |
| U.S. (adults) | 3.5 | 38 | M to Mod | 43%       (DMFT - molars) | Eklund et al., 1987 |
| | | 125 | Severe | 40% | |
| | | 38 | M to Mod. | 11%       (DMFT - premolars) | |
| | | 125 | Severe | 19% | |
| | | 38 | M to Mod. | 3%        (DMFT - anteriors) | |
| | | 125 | Severe | 6% | |
| Taiwan (6–16 yr) | 0.21–4.69 | 1290 | VM to Mod | 1.7       (mean DMFT) | Chen, 1989 |
| | | 10 | Severe | 2.5 | |
| Sri Lanka (14 yr) | 0.14–0.88[a] | 44 | M | 3.4       (mean DMFT) | Warnakulasuriya et al., 1992 |
| | | 48 | Mod to Severe | 3.3 | |
| Israel (15–16 yr) | 5 | 83 | Mod | 4.4       (mean DMFS) | Mann et al., 1987 |
| | | 46 | Severe | 10.4 | |
| Israel (6–8 yr) | 4.7–5.3 | 55 | Moderate | 1.25      (mean DMFS) | Mann et al., 1990 |
| | | 6 | Severe | 1.83 | |
| Ethiopia (6–7;13–14) | 3.5;12.4[b] | | Mod | 9% of teeth with cavities | Olsson 1979 |
| | | | Severe | 25% of teeth with cavities | |
| **Studies Using Other Indices of Fluorosis** | | | | | |
| Ethiopia (12–15 yr) | 0.2–2.2 | 58 | 3-4 (TFI) | 1.48 ±2.05  (mean DMFT) | Wondwossen et al., 2004 |
| | | 22 | 5-7 | 2.86 ±3.18 | |
| | 8.9–14.1 | 29 | 3-4 | 1.58 ±1.91  (mean DMFT) | |
| | | 67 | 5-7 | 2.31 ±2.23 | |
| Turkey (12–14 yr) | 1.42–1.66 | 24 | 1-3 (TSIF) | 1.7       (mean DMFS) | Ermis et al., 2003 |
| | | 105 | 4-7 | 1.9 | |
| | | 24 | 1-3 (TSIF) | 1.2       (mean DMFT) | |
| | | 105 | 4-7 | 1.3 | |
| Brazil (6–12 yr) | 2–3 | 42 | 3-4 (TFI) | 1.1 (1.4 SD)(mean DMFT) | Cortes et al., 1996 |
| | | 18 | ≥5 | 1.3 (1.1 SD) | |

Modified from NRC (2006): VM = very mild; M = mild, Mod = moderate; D = decayed; M = missing; F = filled; S = surfaces; T = teeth; TFI= Thylstrup and Fejerskov Index; TSIF = Tooth Surface Index of Fluorosis; SD = standard deviation.
[a]Mean values (total range 0.08 to 8.00 mg/L).
[b]Mean values (ranges were 1.2–7.4 mg/L and 6.0–17 mg/L, respectively).

NRC (2006) concluded that in 11 of the 14 available "contrasts," the measure of caries frequency was higher with severe fluorosis than with mild to moderate fluorosis.  The NRC (2006) qualifies this statement by noting that not all the studies evaluated the data statistically, and in some cases the differences were slight.  As shown in Table 3-18, ten of the comparisons used Dean's index for scoring the fluorosis, two used the TFI scoring system (Cortes et al., 1996; Wondwossen et al., 2004, and two used the TSIF system (Ermis et al., 2003). Four of the studies involved

different tooth types or different caries units (e.g. DMFT) within the same population (Driscoll et al, 1986; Eklund et al., 1987; Ermis et al., 2003; Wondwossen et al., 2004). Thus, only seven separate studies provide data based on Dean's index of fluorosis (Driscoll et al., 1986; Eklund et al., 1987; Chen, 1989; Warnakulasuriya et al., 1992; Mann et al., 1987; Mann et al., 1990; and Olsson 1979). The studies listed in Table 3-18 are discussed in more detail below.

Driscoll et al. (1983; 1986) evaluated the mean DMFS scores in school children in seven Illinois communities with different levels of fluoride in their drinking water and, correspondingly, different levels of prevalence of severe fluorosis based on Dean's classification of fluorosis (Tables 3-19, see also Table 3-18).  Mean DMFS scores decreased and then began to increase as the fluoride level, the Community Fluorosis Index, and the percent prevalence of severe fluorosis increased, although even in the highest exposure group the mean DMFS score did not exceed the value seen at the lowest fluoride level of 1.06 mg/L.

| Table 3-19.  Severe Fluorosis, Community Fluorosis Index and Mean DMFS Scores for Illinois School Children (8-16 yrs old) Studied by Driscoll et al. (1983) | | | | |
|---|---|---|---|---|
| Fluoride (mg/L) | Population Size | % Severe Fluorosis[a] | Community Fluorosis Index[a] | Mean DMFS |
| 1.06 | 336 | 0.6 | 0.39 | 3.14 |
| 2.08 | 143 | 4.9 | 1.16 | 1.97 |
| 2.84–2.89 | 192 | 8.3 | 1.25 | 1.41 |
| 3.77–4.07 | 136 | 22.8 | 1.88 | 2.02 |

[a]Based on Dean's fluorosis scoring system, and calculated from data given in Table 3-4.

In a continuation of these studies, Driscoll et al. (1986) included the prevalence of dental caries in four Iowa communities with very low fluoride in the water supply (<0.3 mg/L).  The communities with <0.3 mg F/L exhibited the highest mean DMFS score (Table 3-20).  The DMFS values in Tables 3-19 and 3-20 are illustrative of the U-shape for the caries concentration-response.

| Table 3-20.  Percent Severe Fluorosis and Mean DMFS Scores for Midwestern School Children Studied by Driscoll et al. (1986) | | | | |
|---|---|---|---|---|
| Fluoride Level (mg/L) | No. | % Severe Fluorosis | Mean No. DMFS per child | % Change from 0.3 mg/L Group |
| <0.3[a] | 316 | 0 | 5.07 | NA |
| 1.06[b] | 336 | 0.6 | 3.14[c] | 38.1 |
| 2.08[b] | 143 | 4.9[b] | 1.97[d] | 61.1 |
| 2.84–2.89[b] | 192 | 8.3[b] | 1.41[d] | 72.2 |
| 3.77–4.07[b] | 136 | 22.8[b] | 2.02[d] | 60.2 |

[a]Belle Plaine, Durant, Marengo, and Missouri Valley, Iowa.
[b]Illinois towns included in Driscoll et al. (1983) study (optimal fluoride 1 mg/L).
[c]Significantly lower than <0.3 mg/L group.
[d]Significantly lower than <0.3 mg/L group and also 1.06 mg/L group (p<0.01).

For the Illinois towns with fluoride concentrations above the ~1 mg/L regarded as optimal (e.g., $\geq 2$ mg/L), Driscoll et al. (1986) compared the mean DMFS score per child directly with the fluorosis score and found that the mean DMFS score for children with a fluorosis score of 4 was significantly higher than those with scores of 0.5 to 3 (Table 3-21). The lowest caries response was that for the questionable fluorosis score. However, had very mild and mild not been combined with moderate, the DMFS for one or both might have been lower than that for questionable based on data from other studies.

| Table 3-21.  Mean DMFS per Child and Fluorosis Scores for Illinois towns with fluoride water levels above optimal[a] (Driscoll et al., 1986) | | |
|---|---|---|
| **Dean's Fluorosis Index** | **No.** | **Mean No. DMFS** |
| 0 | 87 | 1.89 |
| 0.5 | 112 | 1.40 |
| 1–3 | 218 | 1.58 |
| 4 | 54 | 2.96[b] |

[a] $\geq 2$ mg F/L.
[b] Significantly higher than children with fluorosis scores of 0.5–3 (p<0.05); no other significant differences between groups.

These data suggest that, for this study population, the maximum anti-caries benefit of fluoride occurred in those individuals with questionable to moderate levels of fluorosis (score of 0.5 to 3). Because Driscoll et al. (1986) combined the DMFS data for the groups having fluorosis scores of 1 to 3 it is not possible to determine whether the trend in those intermediate levels increased progressively with increasing severity of fluorosis. [Note: according to Driscoll et al. (1986), data for children in the negligible and optimal fluoride areas were excluded from the analysis because so few of them exhibited fluorosis].

Eklund et al. (1987) evaluated dental caries and fluorosis in adult lifetime residents of Lordsburg (N = 164) and Deming (N = 151), New Mexico.  The fluoride concentration in drinking water of Lordsburg was 3.5 mg/L and that in Deming was 0.7 mg/L.  All teeth of each subject were examined for dental fluorosis (Dean's Index) and caries (DMFT scores).  The overall DMFT score (according to the criteria of Radike, 1972) was 7.0 for Lordsburg and 8.7 for Deming, suggesting that the Lordsburg residents had better protection against dental caries; these differences were statistically significant (p = 0.0041) (Table 3-22).  Residents of Lordsburg had much higher rates of severe fluorosis (38.4% severe and 37.8% very severe) than residents of Deming (95.4% normal to very mild and 0% severe or very severe) as well as a much higher Community Fluorosis Index (3.74 vs. 0.31 for Deming; p = 0.0006).  Information was not provided on the mean DMFT scores by category of fluorosis; however, for the Lordsburg subjects, 94.7% of the teeth exhibiting mild to moderate fluorosis were rated as "sound" (138 of 2609), whereas 76.3% of the teeth exhibiting severe fluorosis were rated as "sound."  These results are consistent with other observations that the anticaries effects of fluoride are present at concentrations above the 0.7 to 1.2 mg/L range identified as optimal.

| Table 3-22.  Severe Fluorosis, Community Fluorosis Index, and Mean DMFT Scores for New Mexico Adult Populations Studied by Eklund et al. (1987) | | | | | |
|---|---|---|---|---|---|
| Town | Subjects | Fluoride (mg/L) | % Severe Fluorosis | Community Fluorosis Index[a] | Mean DMFT |
| Deming | 151 | 0.7 | 0 | 0.31 | 8.7 |
| Lordsburg | 164 | 3.5 | 76.2 | 3.74[b] | 7.0 |

[a]Calculated from data given in Table 3-4.
[b]Cases of very severe fluorosis are given a score of 4 for calculation of the Index.

The Eklund et al. (1987) publication also evaluated the percent prevalence of decayed, missing or filled teeth by tooth type and level of severity of fluorosis in the Lordsburg study group (Table 3-23).  For the anteriors and premolars, the percentage of decayed, missing or filled teeth was higher for severe fluorosis than for mild to moderate fluorosis; however, this trend was not seen in molars which appeared to be more susceptible to caries than premolars or anterior teeth.  The data were not analyzed statistically by Eklund et al. (1987).  The Eklund et al. (1987) data for Deming and Lordsberg combined illustrate the protective function of fluoride in drinking water even when it leads to fluorosis.  However, it is also supportive of the hypothesis that individuals with severe dental fluorosis can experience an increased risk for cavities compared to those with milder cases of dental fluorosis.  The Eklund et al. (1987) publication did not report on the presence of fluorosis on the cavity-proned molars compared to that on the anterior teeth and premolars.

| Table 3-23.  Dental Condition and Level of Fluorosis by Tooth Type in New Mexico Adult Populations Studied by Eklund et al. (1987) | | | | |
|---|---|---|---|---|
| Tooth Type | Fluorosis Score[a] | No. of teeth examined | DMFT | Percent |
| Molars | Normal to very mild | 917 | 562 | 61.3 |
| | Mild to moderate | 529 | 230 | 43.5 |
| | Severe (+ very severe) | 483 | 193 | 40.0 |
| Premolars | Normal to very mild | 1049 | 262 | 25.0 |
| | Mild  to Moderate | 703 | 73 | 10.4 |
| | Severe (+ very severe) | 489 | 91 | 18.6 |
| Anteriors | Normal to very mild | 1744 | 87 | 5.0 |
| | Mild to Moderate | 1474 | 39 | 2.7 |
| | Severe (+ very severe) | 297 | 17 | 5.7 |

[a]Dean's index.

Iida and Kumar (2009) examined a subset of the 1986–1987 data from the National Survey of Oral Health of U.S. School Children (NIDR, 1992) to determine if there was an association between dental caries and enamel fluorosis.  The DMFS data for a total of 16,873 children 7–17 years of age with a continuous residence history were examined and categorized by the degree of fluorosis according to the Dean descriptors.  The fluorosis status was assigned according to the two teeth per child with the highest Dean-Index score.  The caries prevalence declined with increasing fluorosis level up to the severe fluorosis category where it increased (Table 3-24). The DMFS declined through the mild fluorosis descriptor, increased for the moderate fluorosis and

declined to the lowest level for the severe fluorosis grouping. Standard errors values were higher for the mild and moderate fluorosis categories indicating higher variability among those subjects.

The authors also categorized the data based on the decayed surfaces of the right maxillary first molars as related to the degree of fluorosis.  Right maxillary first molars with fluorosis consistently had lower levels of caries experience than did normal molars.  For some of the children included in Table 3-24, the right maxillary first molar was not moderately or severely fluorosed, thus reducing the number of children in the moderate group from 190 to 110 and those in the severe fluorosis group from 46 to 31.  When limited to the right maxillary molars, the caries prevalence and DMFS were inversely related to the degree of fluorosis.  According to the authors, the permanent first molar is one of the teeth most susceptible to both dental caries and fluorosis.  Variables associated with DMFS in this later group were age, sex, metropolitan status, school region and sealant use.

| Table 3-24. Weighted Child-level Estimates of Caries Prevalence and Mean DMFS of Permanent Teeth According to Degree of Fluorosis as Reported by Iida and Kumar (2009) | | | |
|---|---|---|---|
| Degree of fluorosis | Sample size | Caries prevalence % (SE) | Mean DMFS (SE) |
| Normal | 8261 | 54.3 (0.7) | 3.56 (0.1) |
| Questionable | 5089 | 56.3 (0.9) | 3.24 (0.1) |
| Very Mild | 2685 | 55.4 (1.2) | 2.97 (0.1) |
| Mild | 602 | 48.1 (2.5) | 2.40 (0.2) |
| Moderate | 190 | 45.9 (4.5) | 2.64 (0.5) |
| Severe | 46 | 52.6 (8.9) | 2.24 (0.5) |

Chen (1989) evaluated caries prevalence in 5107 children, 6 to 16 yrs old, residing in 14 communities in Shenkang Hsiang Province, Taiwan.  The communities were divided into six exposure categories based on water fluoride concentrations in the home.  The range of fluoride concentrations in each of the exposure groups was as follows: 0.21–0.25 mg/L (negligible); 0.43–0.48 mg/L (reported as optimal for the region ); 0.75–0.98 mg/L (2x optimal); 2.40 mg/L (4x optimal); 2.84–3.24 mg/L (5x optimal); and 4.69 mg/L (7x optimal).  Severe fluorosis occurred in 0.2% of the group whose water supply had 0.75–0.98 mg F/L; in 0.3% of the group with 2.84–3.24 mg F/L; and in 1.3% of the group with 4.69 mg F/L.  Dental caries were scored with the DMFT index.  Compared with the negligible exposure group, DMFT scores were 10.7% lower in the 0.43–0.48 mg F/L group; 14.3% lower in the 0.75–0.98 mg F/L group; and 50.0% lower in the 2.40 mg F/L group.  At higher concentrations the presence of fluoride appeared to be less protective against caries. The DMFT scores were only 42.9% lower in both the 2.84–3.24 mg F/L group and the 4.69 mg F/L groups.  The maximum reduction in DMFT occurred among the children receiving drinking water with 2.4 mg/L fluoride.

Chen (1989) compared the DMFT scores for different levels of fluorosis severity (Table 3-25).  The mean DMFT was 1.7 for very mild to moderate fluorosis and 2.5 for severe fluorosis.  Thus, on a total population basis (mean DMFT per child), the higher fluoride level was beneficial, but on a group basis, those with severe fluorosis did not benefit as much.  The DMFT score, however, for the severe fluorosis group was not significantly different from the no-fluorosis group, but it was significantly different (p<0.050) from those with the milder grades of fluorosis.

| Table 3-25.  Fluorosis Severity and DMFT in Taiwanese School Children Studied by Chen (1989) | | |
|---|---|---|
| Fluorosis Score[a] | No. | Mean DMFT/child |
| 0 | 3252 | 2.4 |
| 0.5 | 520 | 2.2 |
| 1–3 | 1290 | 1.7 |
| 4 | 10 | 2.5[b] |

[a]Dean's Index of Fluorosis.
[b]Significantly higher than fluorosis scores of 0.5 and 1–3 (p<0.05).  All other differences
not significant.

Warnakulasuriya et al. (1992) recorded the occurrence of dental caries and fluorosis in 380 school children (14 years old) residing in four different geographic areas of Sri Lanka with varying levels of fluoride in the water supplies. The mean fluoride values for each of the four regions were: 0.14 mg/L (range 0.08–0.33); 0.61 mg/L (range 0.09–5.60); 0.62 mg/L (range 0.36–2.80); and 0.88 mg/L (range 0.17–8.00).  The areas had similar altitudes with mean annual maximum temperatures of 29–32°C.  The study populations were similar in socioeconomic level.  Dental fluorosis was assessed using Dean's classification system and the criteria of Russell (1961) to distinguish between fluorosis and non-fluoride enamel opacities.  For Dean's Index, the authors used a score of 1 instead of 0.5 for questionable results, thus the most severe category was scored as 5.  Each child was examined for dental caries using the DMFT index. Each child supplied a sample of water from his or her domestic source of drinking water and these samples were analyzed for fluoride using a fluoride ion-specific electrode.  The children were then grouped into five fluoride categories as shown in Table 3-26.   The percent of children that were caries-free in the 0.6–0.79 mg F/L group was significantly larger than that for the lower and higher fluoride groups, and the mean DMFT scores were significantly lower than the other groups.  Significant differences were not seen among the other four exposure groups.  Local variations in the fluoride concentrations (e.g., 0.17 to 8.00 mg F/L) are likely to have compromised the usefulness of this study in detecting such differences.

| Table 3-26. Caries Status in Sri Lanka School Children Studied by Warnakulasuriya et al. (1992) | | | | | |
|---|---|---|---|---|---|
| Fluoride (mg/L) | Number examined | Percent Caries Free[a] | Mean DMFT[b] | SD | % DMFT Reduction |
| <0.4 | 211 | 16.6 | 3.35 | 2.69 | – |
| 0.4–0.59 | 49 | 20.4 | 2.88 | 2.34 | 14 |
| 0.6–0.79 | 32 | 37.5 | 1.91[b] | 2.35 | 43 |
| 0.8–0.99 | 27 | 29.6 | 2.56 | 2.27 | 24 |
| >1.0 | 61 | 24.5 | 2.74 | 2.30 | 18 |

[a]$\chi^2_4$ =57.25; p<0.001.
[b]One-way ANOVA – $F^4_{379}$ = 3.83; p<0.01 (as given in Warnakulasuriya et al., 1992).

The DMFT scores were compared with the level of severity of fluorosis (moderate and severe fluorosis were combined) and the results analyzed statistically (Table 3-27).  There were no significant differences between the DMFT scores. However, because the moderate and severe

fluorosis groups were combined, the effects of severe fluorosis on caries may have been masked to some extent.  The study authors note that the results may have been influenced by the mobility of children within a given geographic region, and by the consumption of water from schools, because wells within 15 miles of each other sometimes had a 10-fold difference in water fluoride concentrations. Thus, this study does not provide conclusive evidence for or against the supposition that severe fluorosis is associated with an increased occurrence of caries.

| Table 3-27.  Mean DMFT by Fluorosis Score for Sri Lanka School Children Studied by Warnakulasuriya et al. (1992) | | | | |
|---|---|---|---|---|
| Group | No. | Percent of Population | Mean DMFT[a] | SD |
| Normal (0) | 156 | 52 | 3.12 | ±2.61 |
| Questionable (1) | 44 | | 2.82 | ±2.39 |
| Very Mild (2) | 88 | 35 | 3.55 | ±2.54 |
| Mild (3) | 44 | | 3.43 | ±2.76 |
| Moderate (4) + Severe (5) | 48 | 13 | 3.31 | ±2.36 |

[a]One-way ANOVA – $F_{379}^{4}$ = 1.96; p>0.05 (as given in Warnakulasuriya et al., 1992).

Mann et al. (1987) reported on the prevalence of dental caries and dental fluorosis in the permanent teeth of 182 school children (15–16 years old) residing in one small village in the Gaza Strip.  The concentration of fluoride in the well water was 5 mg/L.  Dean's index was used for scoring fluorosis and DMFS for scoring the permanent dentition for caries.  The DMFS scores in relation to the severity of fluorosis are shown in Table 3-28.  The DMFS scores were significantly higher in the group with severe fluorosis (p <0.001, analysis of variance).  Boys exhibited a higher prevalence of severe fluorosis (42.2%) than girls (8.7%).  The study authors suggested that this might have been due to post-eruptive factors, such as masticatory forces on the defective enamel, higher consumption of tea containing high levels of fluoride, smoking which may have led to staining of the teeth and misdiagnosis of fluorosis severity, and difficulties in differentiating fissure cavities from fluorotic fissure pitting. The data, however, do support the supposition that severe fluorosis is associated with increased caries.

| Table 3-28.  Mean DMFS by Fluorosis Score for Gaza Strip School Children Studied by Mann et al. (1987) | | | | |
|---|---|---|---|---|
| Group (Fluorosis score) | No. | Percent of Population | Mean DMFS[a] | SD |
| Mild (2) | 53 | 29 | 2.81 | ±4.69 |
| Moderate (3) | 83 | 46 | 4.42 | ±5.39 |
| Severe (4) | 46 | 25 | 10.37 | ±9.87 |

[a]Statistically significant association between fluorosis and DMFS, ANOVA, p<0.001.

Mann et al. (1990) evaluated caries and fluorosis in the permanent and primary dentition in a population of children (72 boys and 80 girls, 6-8 yrs old) residing in the same village in the Gaza Strip which was the subject of the Mann et al. (1987) study.  Fluoride levels in the well water used as drinking water were 4.7–5.3 mg/L.  Dean's system was used for scoring fluorosis and DMFS for scoring the primary and permanent dentition for caries (results only for the permanent dentition discussed here).  DMFS scores gradually increased in the permanent dentition with increasing

fluorosis severity (Table 3-29), and the score for those individuals exhibiting severe fluorosis was reported to be significantly different from the individuals with no signs of fluorosis. These results generally support those of Mann et al. (1987) as the mean DMFS associated with severe fluorosis is approximately three-fold higher than that for mild fluorosis. Note: the gender differences observed in the Mann et al. (1987) study were not seen in the 1990 study.

| Table 3-29.  Mean DMFS by Fluorosis Score for Gaza Strip School Children Studied by Mann et al. (1990) | | | | |
|---|---|---|---|---|
| Group | No. | Percent of Population | Mean DMFS | SD |
| No signs | 7 | 4.6 | 0.29 | ±0.76 |
| Mild | 84 | 55.3 | 0.50 | ±1.06 |
| Moderate | 55 | 36.2 | 1.25 | ±1.54 |
| Severe | 6 | 3.9 | 1.83[a] | ±3.54 |

[a]Statistically different from group with no signs, ANOVA, p<0.05.

Olsson (1979) reported on the occurrence of dental fluorosis and dental caries in 478 Ethiopian school children (ages 6–7 years old and 13–14 years old ) residing in either Wonji, a sugar plantation area in the Shoa province; or Awassa, the capital of the Sidamo province. Fluoride levels in Wonji, taken from six wells, ranged from 6.0 mg/L to 17 mg/L (mean of 12.4 mg/L). In Awassa, fluoride levels taken from seven wells ranged from 1.2 mg/L to 7.4 mg/L (mean of 3.5 mg/L). Dental fluorosis was scored according to the criteria of Dean (1934), as modified by Moller (1965). The severe score was reserved for teeth with extensive loss of enamel while teeth with some confluent pits only were scored as moderate. Dental caries were assessed as the percent decayed teeth for primary and permanent teeth (results for the permanent teeth only discussed here). The prevalence of caries for each fluorosis severity level is shown in Table 3-30. The percentage of decayed teeth was significantly higher in the severe fluorosis group (p<0.05), and would likely be even higher if the teeth classified as moderate but with pitting were to be reclassified as severe. Olsson (1979) noted that high water consumption during the dry seasons, frequent tea drinking and possible malnutrition may have contributed to the degree of fluorosis seen in the study. Of the 239 children included in the assessment, 100 were not born in the study areas which may have affected the results. The data clearly indicate a higher percentage of teeth with caries in the severely fluorosed group.

| Table 3-30.  Caries Prevalence and Fluorosis Severity in Ethiopian School Children Studied by Olsson (1979) | | |
|---|---|---|
| Fluorosis Group | No. Teeth Examined | Percent Teeth Decayed |
| No signs | 1723 | 1 |
| Very Mild | 902 | 2 |
| Mild | 1076 | 4 |
| Moderate | 2714 | 9 |
| Severe | 99 | 25[a] |

[a]Significantly higher, ANOVA, p<0.05.

Wondwossen et al. (2004) also reported on the occurrence of dental fluorosis and dental caries in Ethiopian children.  In this study, 306 children, 12–15 yrs old, from three neighboring villages in the Rift Valley were examined.  The children were grouped into two exposure categories based on well-water fluoride concentrations measured in 1982–1997 (average values 0.4–1.4 mg F/L in 1982 to 0.3–2.2 mg F/L in 1997 for the moderate exposure group and 8.9–14.1 mg F/L in 1982 to 10.0–14.0 mg/L in 1997 for the high exposure group).  Dental fluorosis was scored using the Thylstrup-Fejerskov Index (TFI), and dental caries was recorded as DMFS and DMFT.  Based on a graphical presentation of the data, the proportion of the population showing severe fluorosis was estimated to have been about 63% in the high fluoride area, and about 13% in the moderate fluoride area.  As shown in Table 3-31, mean DMFT scores increased with increasing median TFI score, and the scores for the severe fluorosis group were significantly greater than those for the other groups.

| Table 3-31.  Mean DMFT Scores and SD by Dental Fluorosis Grouping for Ethiopian School Children Studied by Wondwossen et al. (2004) | | | | |
|---|---|---|---|---|
| Median TFI Score | Moderate Fluoride Area (0.3–2.2 mg F/L) | | High Fluoride Area (8.9–14.1 mg F/L) | |
| | No. | Mean DMFT (SD) | No. | Mean DMFT (SD) |
| 0 | 16 | 0.75 ±1.34 | - | 0 ±0 |
| 1-2 | 98 | 0.86 ±1.45 | 16 | 0.31 ±0.70 |
| 3-4 | 58 | 1.48 ±2.05 | 29 | 1.58 ±1.91 |
| 5-7 | 22 | 2.86 ±3.18[a] | 67 | 2.31 ±2.23[a] |

[a]Significantly different from other groups, p<0.05.

Ermis et al. (2003) compared the prevalence of dental caries and dental fluorosis in 278 school children (12–14 yrs old) in three communities in Turkey; one with a fluoride level of 0.30–0.40 mg/L in the water supply; the second with a fluoride of 1.42–1.54 mg/L; and the third with 1.55–1.66 mg/L F.  Fluorosis was assessed using the TSIF method, and caries was scored by both the DMFT and DMFS methods (Table 3-32).  Ermis et al. (2003) reported no significant differences in caries prevalence in the three groups of children (ANOVA, p>0.05).

| Table 3-32.  DMFS and DMFT Scores in Turkish School Children Studied by Ermis et al. (2003) | | | | | | |
|---|---|---|---|---|---|---|
| Fluoride (mg/L) | No. | Percent TSIF ≥5 | Mean DMFT | SD | Mean DMFS | SD |
| 0.30–0.40 | 149 | 0.00 | 0.84 | 0.98 | 1.58 | 2.24 |
| 1.42–1.54 | 63 | 0.89 | 1.30 | 1.46 | 1.78 | 2.52 |
| 1.55–1.66 | 66 | 5.49 | 1.26 | 1.42 | 1.97 | 2.60 |

However, as was observed in other studies, when mean DMFT and mean DMFS scores were compared by the severity of the fluorosis, they increased (Table 3-33). The differences were not significant (Spearman's correlation analysis, p>0.05); therefore, these data do not support the supposition that severe fluorosis is associated with an increase in caries. They are somewhat limited as a test for the hypothesis because they combine a TSIF score of 4, at which pitting of the enamel does not occur, with the higher grades of fluorosis (5–7) which do include enamel pitting.

| Table 3-33. DMFS and DMFT Scores and Severity of Fluorosis in Turkish School Children Studied by Ermis et al. (2003) | | | | | |
|---|---|---|---|---|---|
| TSIF Score | No. | Mean DMFT | SD | Mean DMFS | SD |
| 1–3 | 24 | 1.25 | 1.22 | 1.67 | 1.99 |
| 4–7 | 105 | 1.29 | 1.48 | 1.92 | 2.67 |

Cortes et al. (1996) conducted a screening study on the occurrence of dental caries and dental fluorosis in 457 school children (6–12 years old) residing in three regions of Brazil: Olho D'Agua with 2–3 mg F/L drinking water, Vitoria with 0.7 mg F/L, and Maceio with less than 0.01 mg F/L.  Participating schools were selected for similarities in socioeconomic profiles, although Olho D'Agua was a more rural community while Maceio and Vitoria were more urban (no other information was provided on the study populations).  Dental caries were scored with the DMFT/dmft notation for permanent/primary dentition, and the TFI was used to score fluorosis.  Table 3-34 shows the mean caries prevalence in six permanent teeth (upper central incisors and first molars) for subjects with different TFI scores (the criteria for selecting these particular tooth types were not given).  For the permanent dentition, the DMFT scores for the Vitoria children were significantly less ($p<0.01$) than those for the other two regions.  In Olho D'Agua, there was a statistically significant ($p<0.05$) increase in the mean DMFT in those children with TFI scores of 3 or greater when compared to those with TFI scores less than 3.

Cortes et al. (1996) concluded that the overall caries prevalence in these children was lower than expected but felt that it was because of the screening nature of this study. Only six permanent teeth per individual were examined to make comparisons easier, but this likely underestimated the prevalence of caries. The authors also stated that increasing the fluoride levels above 0.7 mg/L was beneficial in reducing caries prevalence for primary dentition but did not appear to be as beneficial for the permanent dentition.  Children in the high fluoride areas with a TFI score of 3 or greater had higher levels of dental caries suggesting that if fluoride intake is too high, enamel hypomineralization takes place and increases the risk of caries.  Note, however, that the mean DMFT scores (1.1 and 1.2 DMFT) in the Maceio study group with minimal fluorosis were similar to those in Ohlo D'Agua with moderate and severe fluorosis (1.1 and 1.3) illustrating the U-shaped response of DMFT to increasing fluoride concentration in the water.

| Table 3-34. DMFT Scores in Brazilian School Children Studied by Cortes et al. (1996) | | | | | |
|---|---|---|---|---|---|
| TFI Score | Maceio (0.01 mg F/L) | | Vitoria (0.7 mg F/L) | | Olho D'Agua (2-3 mg F/L) | |
| | Number examined | Mean DMFT[a] (SD) | Number examined | Mean DMFT[a] (SD) | Number examined | Mean DMFT[a] (SD) |
| 0 | 148 | 1.2 (1.6) | 96 | 0.6 (1.1)[b] | 8 | 0.9 (1.5) |
| 1–2 | 12 | 1.1 (1.6) | 95 | 0.3 (0.8)[b] | 28 | 0.6 (0.8) |
| 3–4 | – | – | 9 | 0.3 (0.7)[b] | 42 | 1.1 (1.4)[c] |
| ≥5 | – | – | 1 | 0.0 | 18 | 1.3 (1.1)[c] |

[a]Six permanent teeth (upper central incisors and first molars) were scored.
[b]Significantly less than values for the two other study areas.
[c]Significantly greater than mean DMFTs for TFI scores of 0–2 in Olho D'Agua.

### 3.2.2.  Dental caries and fluoride levels in drinking water

A number of studies have evaluated the prevalence of dental caries in various communities with water supplies containing different levels of fluoride, but without correlation to specific levels of dental fluorosis.  Nevertheless, the data may be useful in showing trends regarding effects of severe fluorosis on caries prevalence, especially in cases where fluoride in drinking water is the primary factor in fluorosis induction.  The most relevant of these studies are discussed below.  It should be noted, however, that in these studies – especially the more recent ones – several confounding factors increase the difficulty of determining whether the fluoride levels in drinking water correctly reflect the total fluoride intake of the populations studied.  Beginning in the early 1980's, fluoride containing dental products such as dentifrices and mouth rinses became more widely available, and consequently, total fluoride intake may have increased.  Use of fluoridated municipal water in the preparation of foods and beverages in the home, in restaurants and in commercial food manufacturing plants could have also increased fluoride intake, especially in communities that originally had non-fluoridated municipal water.  Conversely, the increased consumption of bottled water and the use of home water treatment devices beginning in the 1990's may have had the effect of reducing total fluoride intake from tap water.  Thus, although these studies may show trends, they cannot be used as conclusive evidence of the association of increased fluoride intake and an increase in dental caries. Because of these factors, the summaries of the studies are arranged chronologically in the paragraphs that follow.

Striffler (1955) examined the caries prevalence in junior high school students in several cities in New Mexico having different levels of fluoride in the drinking water supply and found that the average DMFT scores were inversely proportional to the fluoride level; the lowest average DMFT score was recorded for Lordsburg where the fluoride level was the highest (3.25 mg F/L, see Table 3-35).

| City | Number examined | F (mg/L) | No. of Continuous residents examined | Overall average DMFT score | Average DMFT score for continuous residents |
|---|---|---|---|---|---|
| Santa Fe | 888 | traces | 255 | 5.9 | 7.3 |
| Lovington | 485 | 0.8 | – | 2.6 | – |
| Belen | 573 | 0.9 | 126 | 2.5 | 1.9 |
| Lordsburg | 263 | 3.25 | 92 | 1.6 | 1.5 |

Table 3-35.  Fluoride Levels and DMFT Scores for New Mexico Junior High School Children Studied by Striffler (1955)

Forsman (1974) studied the prevalence of dental caries (DMFT or DMFS scores) and dental fluorosis (see Section 3.1) in residents (mostly school children) in three communities in southern Sweden (Gadderås, Påskallavik and Billesholm) who were exposed to fluoride in drinking water, and compared the results to that from a control population (school children from the city of Eskilstuna and Kronoberg county).  For the purposes of this study, Forsman (1974) considered the fluoride level in Gadderås and Påskallavik to be approximately 10 mg/L and that in Billesholm, to be ~5 mg/L.  In the control areas, fluoride levels of 0.9–1.7 mg/L had been recorded, and Forsman (1974) refers to these as the ~1 mg F/L areas.

Forsman (1974) reported that the caries frequency in the permanent teeth in areas with ~10 mg F/L was higher than that in the ~ 1 mg F/L areas. The study author provided age-caries regression plots for groups exposed to different fluoride levels and having different degrees of fluorosis (see Figs 3-3 and 3-4). Information on caries frequency can be visually extracted from these figures. For individuals from the 10 mg F/L areas who had a fluorosis score of $\geq 3$, the average DMFS was about 14 (N = 38 subjects), whereas in the control areas the average DMFS score for individuals with a fluorosis score of $\leq 2$, was 4 (N = 160 subjects ). In the ~5 mg F/L area (Fig. 3-4), average caries frequency (DMFS) in permanent teeth for individuals with a fluorosis score of $\geq 3$ was about 8.5 (N = 37 subjects) whereas it was about 4.5 (N = 91 subjects) for individuals with a fluorosis score of $\leq 2$. This difference was significant at the 1% level.



**Figure 3-3. Age-caries regression lines for groups with different degrees of enamel fluorosis. The regression lines cover the age ranges and the caries averages are marked by the points on the lines; "s" denotes standard deviations of the lines.**



**Figure 3-4. Age-caries regression lines for groups with different degrees of enamel fluorosis exposed to water containing approximately 5 mg F/L. The regression lines cover the age ranges and caries averages are marked by the points on the lines; "s" denotes standard deviations of the lines.**

The regression lines shown in Figs. 3-3 and 3-4 indicate that DMFS increases with age and that, beginning at about the age of 5, the higher the fluorosis score (Dean score of $\geq 3$ vs. $\leq 2$) the

greater the age related difference in DMFS.  The regression coefficients for the lines shown in Fig. 3-3 were not significantly different from one another.  In Figure 3-4 (ingestion of water with 5 ppm F), the higher level of fluorosis was associated with a higher DMFS value, and the difference in DMFS observed at two fluorosis levels was significant at the 1% level.

Englander and DePaola (1979) reported the results of a study in which 1,878 white adolescents (aged 12 to 15 years) residing in seven communities in five U.S. states were examined for caries in their permanent teeth.  The seven communities and their fluoride levels were: Boston, MA (<0.1 mg F/L); Danvers, MA (approximately 1 mg F/L); Mecklenburg County, NC (<0.1 mg F/L, from well water); Kalamazoo, MI (approximately 1 mg F/L); Stickley, IL (approximately 1 mg F/L); Charlotte, NC (approximately 1 mg F/L); and Midland, TX (5 to 7 mg F/L).  The subjects were all lifelong residents of the communities.  Although there were confounding factors which may have influenced the results, the data indicate that DMFS and DMFT scores decreased with increasing fluoride level and were lowest for Midland, TX (approximately 1.8 DMFT and 2.4 DMFS) where the fluoride level was 5–7 mg/L (Table 3-36).

| Table 3-36.  Dental Caries Experience of 13–15 yr olds in Seven U.S. Communities as Reported by Englander and DePaola (1979) | | | | |
|---|---|---|---|---|
| Town | Number of Subjects | F (mg/L) | Mean DMFT[a] | Mean DMFS (SE) |
| Boston, MA | 302 | <0.1 | 8 | 13.96 (±0.59) |
| Danvers, MA | 305 | 1 | 5 | 8.60 (±0.43) |
| Mecklenburg County, NC | 120 | <0.1 | 4.5 | 7.20 (±0.54) |
| Kalamazoo, MI | 315 | 1 | 3.7 | 5.12 (±0.27) |
| Stickley, IL | 312 | 1 | 3.2 | 4.51 (±0.29) |
| Charlotte, NC | 213 | 1 | 3.0 | 4.41 (±0.32) |
| Midland, TX | 311 | 5–7 | 1.8 | 2.40 (±0.21) |

Modified from Englander and DePaola (1979).
[a]Estimated from graphical presentation of the data.

Heifetz et al. (1988) conducted a five-year follow-up study of 8–10 yr olds and 13–15 yr olds in seven Illinois communities originally studied by Driscoll et al. (1983 and 1986).  For the 13–15 year olds, there was little difference between 1980 and 1985 in the relative differences in the mean DMFS scores between the optimal fluoride area ["optimal" was defined by the study authors as 1 mg F/L for the study region (Midwest USA)] and the above optimal fluoride areas (Table 3-37). For the 8–10 yr olds, the mean DMFS score was substantially higher at 4x optimal fluoride than at 3x optimal (but not reported as statistically significant) in 1980 but not in 1985. In 1985, there was very little difference between the 3x optimal and 4x optimal groups.  In all cases, the lowest DMFS scores occurred in the 3x optimal groups, with higher scores in the 4x optimal groups.  The study did not compare the DMFS scores based on the severity of fluorosis; however, a greater percentage of the tooth surfaces exhibited TSIF scores > 5 in the 4X optimal groups (Table 3-37).

| Table 3-37.  Mean DMFS Scores of Illinois School Children by Age Category and Water Fluoride Levels in 1980 and 1985 (Heifetz et al., 1988) | | | | | |
|---|---|---|---|---|---|
| Group | No. | TSIF Scores ≥5 (% of Surfaces) | Mean No. DMFS | % Difference from Optimal | % Difference from 1980 |
| **8–10 yr-olds – 1980** | | | | | |
| Optimal[a] | 113 | 0.1 | 1.79 | – | |
| 2x Optimal | 61 | 0.2 | 1.20 | 33.0 | |
| 3x Optimal | 82 | 1.4 | 0.76 | 57.5 | |
| 4x Optimal | 59 | 4.1 | 1.41 | 21.2 | |
| **8–10 yr-olds – 1985** | | | | | |
| Optimal[a] | 156 | 0.1 | 1.51 | – | -15.6 |
| 2x Optimal | 102 | 1.3 | 1.07 | 29.1 | -10.8 |
| 3x Optimal | 112 | 1.9 | 0.82 | 45.7 | +7.9 |
| 4x Optimal | 62 | 4.6 | 0.85 | 43.7 | -39.7 |
| **13–15 yr-olds – 1980** | | | | | |
| Optimal[a] | 111 | 0.0 | 4.56 | – | |
| 2x Optimal | 39 | 0.1 | 2.59 | 43.2 | |
| 3x Optimal | 50 | 0.8 | 1.92 | 57.9 | |
| 4x Optimal | 34 | 1.9 | 3.38 | 25.9 | |
| **13–15 yr-olds – 1985** | | | | | |
| Optimal[a] | 94 | 0.0 | 5.09 | – | +11.6 |
| 2x Optimal | 23 | 1.3 | 2.87 | 43.6 | +10.8 |
| 3x Optimal | 47 | 2.2 | 2.53 | 50.3 | +31.8 |
| 4x Optimal | 29 | 5.4 | 3.86 | 24.2 | +14.2 |

[a]"Optimal" is defined by the study authors as 1 mg F/L for the study region (Midwest USA).

In a 10-yr follow-up study conducted on children from these same Illinois communities, Selwitz et al. (1995) found the same trend seen in the earlier studies; the DMFS scores for children living in areas with 2x and 3x optimal fluoride in the water supply were lower than the scores for children living in the optimal and 4x optimal fluoride communities (Table 3-38) and the percent of cavity-free children decreased, meaning the percent of those with cavities increased. Comparisons of mean DMFS scores were not made on the basis of the severity of fluorosis.  In 1990, the mean DMFS score for communities with 4x optimal water fluoride was similar to that for the communities with optimal water fluoride, even though the mean percent fluorosed surfaces per subject was significantly greater in the 4x optimal fluoride communities.  The highest examined fluoride level of about 4 mg/L did not provide any additional anti-caries benefit over that occurring at 1 mg/L, nor did it contribute to a substantial increase in caries. However, in 1990 only a small proportion of the surfaces examined in the 4x optimal group (3%) had TSIF scores of 4 or more; therefore, the prevalence of severe fluorosis was quite low.

Jackson et al. (1995) examined caries prevalence (DMFT and DMFS) and dental fluorosis (Dean's fluorosis score) in 7–14 yr old children (born between 1978 and 1985) residing in three communities in Indiana having different fluoride drinking water levels [0.2 mg/L (non-fluoridated or NF); 1.0 mg/L (optimal fluoride level or OPF); and 4.0 mg/L (4x OPF)].  The mean DMFT score of the OPF group was not significantly different from that of the other two exposure groups, but the mean DMFT score of the 4X OPF group was significantly lower than that of the NF group (Table 3-39).  The mean DMFS scores for both the OPF and 4x OPF groups were significantly lower than that of the NF group.  In the 4x optimal group, the prevalence of severe fluorosis was

11.3% and the Community Fluorosis Index was 2.06, approximately 13 times greater than that for the NF group.

| | | MPFS[d] | | Caries Data | | | |
|---|---|---|---|---|---|---|---|
| Group | No. | 8–10 yr olds | 13–15 yr olds | % Caries-free | Mean DMFS (SE)[b] | % Difference from Optimal | p-value |
| **1980** | | | | | | | |
| Optimal | 224 | 18.2 | 11.1 | 35.3 | 2.86 (0.20) | – | |
| 2x Optimal | 100 | 47.3[e] | 38.4[e] | 52.0 | 1.71 (0.29) | 40.2 | 0.001[c] |
| 3x Optimal | 132 | 52.4[e] | 45.5[e] | 57.6 | 1.21 (0.25) | 57.7 | <0.001[c] |
| 4x Optimal | 93 | 69.2[e] | 63.5[e] | 44.1 | 2.13 (0.30) | 25.5 | 0.043 |
| **1985** | | | | | | | |
| Optimal | 250 | 28.9 | 30.5 | 44.0 | 2.81 (0.18) | – | – |
| 2x Optimal | 125 | 52.8[e] | 67.2[e] | 53.6 | 1.86 (0.26) | 33.8 | 0.003 |
| 3x Optimal | 159 | 50.9[e] | 69.1[e] | 54.1 | 1.50 (0.23) | 46.6 | <0.001[c] |
| 4x Optimal | 91 | 77.1[e] | 77.8[e] | 48.4 | 1.91 (0.31) | 32.0 | 0.012 |
| **1990** | | | | | | | |
| Optimal | 258 | 17.8 | 14.9 | 51.9 | 1.85 (0.18) | – | – |
| 2x Optimal | 105 | 55.6[e] | 48.9[e] | 58.1 | 1.45 (0.28) | 21.6 | 0.235 |
| 3x Optimal | 117 | 55.2[e] | 45.4[e] | 56.4 | 1.41 (0.27) | 23.8 | 0.176 |
| 4x Optimal | 77 | 59.8[e] | 67.6[e] | 50.7 | 1.85 (0.33) | 0.0 | 0.989 |

Table 3-38.  Percent Caries-free and Mean DMFS Scores of Illinois Children in 1980, 1985 and 1990 (Selwitz et al., 1995)

[a]"Optimal" fluoride in drinking water is defined by the study authors as 1 mg/L for the study region (Midwest USA).
[b]All mean DMFS scores have been age-adjusted.
[c]Significant, p<0.002, adjusted α level for multiple comparisons using the Bonferroni procedure.
[d]Mean percent fluorosed surfaces per subject.
[e]Significantly greater than score at optimal fluoride (p<0.001).

| Group[a] | Number examined[b] | Percent Severe Fluorosis | Community Fluorosis Index[c] | Mean DMFT (SD) | % Diff. from NF | Mean DMFS (SD) | % Diff. from NF |
|---|---|---|---|---|---|---|---|
| NF | 124; 126 | 0 | 0.153 | 3.68 (2.49)[d] | – | 5.54 (4.36) | – |
| OPF | 116; 117 | 0 | 0.457 | 3.34 (2.11)[d,e] | -9.2 | 4.35 (2.92)[d] | -21.2 |
| 4x OPF | 97; 101 | 11.3 | 2.12 | 2.95 (1.93)[e] | -19.8 | 4.26 (3.02)[d] | -23.1 |

Table 3-39.  DMFS and DMFT Scores in Indiana School Children Studied by Jackson et al. (1995)

[a]NF = 0.2 mg F/L; OPF = 1.0 mg F/L; 4x OPF = 4 mg F/L.
[b]Number examined for fluorosis; number examined for DMFT.
[c]Calculated from data presented in Table 3-11.
[d,e]Values with same superscripts not significantly different at p <0.05.

The mean DMFT and DMFS scores of the study populations were analyzed by Jackson et al. (1995) by age of the subjects (Table 3-40).  The data indicated that only the older children (11–14 yr old) showed significant decreases in these scores at the optimal and 4x optimal fluoride levels. The DMFT score for this age group at the 4x optimal fluoride was similar to the scores seen for all

the 7–10 yr olds regardless of fluoride level.  These data indicate that, in this study population, fluoride provides maximum anti-caries benefits at the 4x optimal level.

| Table 3-40.  DMFS and DMFT Scores by Age Group in Indiana Populations Studied by Jackson et al. (1995) | | | | | |
|---|---|---|---|---|---|
| Group | Number examined | Mean DMFT (SD) | % Diff. from NF | Mean DMFS (SD) | % Diff. from NF |
| **7–10 yrs** | | | | | |
| NF | 77 | 3.01 (1.48)[a] | - | 4.77 (3.08)[d] | - |
| OPF | 69 | 2.99 (1.58)[a] | -0.7 | 4.03 (2.45)[d] | -15.5 |
| 4x OPF | 69 | 2.96 (1.64)[a] | -1.7 | 4.30 (2.91)[d] | -9.9 |
| **11–14 yrs** | | | | | |
| NF | 49 | 4.73 (3.30)[b] | - | 6.76 (5.65) | - |
| OPF | 48 | 3.85 (2.63)[b,c] | -18.6 | 4.81 (3.44)[e] | -28.8 |
| 4x OPF | 32 | 2.94 (2.47)[c] | -37.8 | 4.16 (3.30)[e] | -38.5 |

**NOTE**: Values with same superscripts not significantly different at p <0.05.

Another study that evaluated caries experience and dental fluorosis relative to the drinking water concentration is that of Heller et al. (1997).  Data from the 1986–87 National Survey of Oral Health of U.S. School Children were used to assess the relationships between caries experience and dental fluorosis at different fluoride concentrations in drinking water.  Fluoride levels of school water were used as an indicator of the children's water fluoride exposure. The use of fluoride drops, tablets, professional fluoride treatments, and school fluoride rinses were also evaluated from caregiver questionnaires. Subjects 4–22 years old with a single continuous residence (n = 18,755) were included in this analysis. Dental caries was assessed using the system of Radike (1972).  Fluorosis was assessed on all erupted teeth using Dean's classification. The sharpest declines in dfs and DMFS were associated with increases in water fluoride levels between 0 and 0.7 ppm F, with little additional decline between 0.7 and 1.2 ppm F. Fluorosis prevalence was 13.5%, 21.7%, 29.9%, and 41.4% for children who consumed <0.3, 0.3 to <0.7, 0.7 to 1.2, and >1.2 ppm F water, respectively. In addition to fluoridated water, the use of fluoride supplements was associated with both lower caries and increased fluorosis.

The authors did not examine caries relative to severe fluorosis. However, they did provide the prevalence of severe fluorosis relative to the drinking water concentration.  The >1.21mg F/L grouping had a 2% severe fluorosis prevalence (~15 per 772 subjects); there were no cases of severe dental fluorosis in any other concentration grouping.

Grobler et al. (2001) studied the prevalence of fluorosis and dental caries in populations of children, 10–15 yrs old, residing in three South African towns: Leeu Gamka, 3.0 mg F/L; Kuboes, 0.48 mg F/L; and Sanddrif, 0.19 mg F/L.  The prevalence of severe fluorosis (Dean's score of 4) was 0% and 0.8% in Sanddrif and Kuboes, respectively, but 30% in Leeu Gamka, the high F area (see Table 3-14).  The mean DMFT was slightly higher in Leeu Gamka than in the other two towns (Table 3-41, data were not analyzed statistically).  The mean DMFT scores were not analyzed across study populations on the basis of fluorosis severity; however, Leeu Gamka was shown to have a higher Community Fluorosis Index than the other two towns, suggesting that the higher mean DMFT values were associated with greater fluorosis severity.

| | | | | **Table 3-41.  DMFT Scores in S. African School Children Studied by Grobler et al. (2001)** | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Town** | **F (mg/L)** | **No.** | **Mean Age** | **% Caries Free** | **% Fluorosis free** | **% Severe Fluorosis** | **Community Fluorosis Index[a]** | **Mean DMFT (SD)** |
| Sanddrif | 0.19 | 47 | 11.77 | 47 | 38 | 0 | 0.80 | 1.64 (0.30) |
| Kuboes | 0.48 | 115 | 12.01 | 50 | 40 | 0.8 | 0.82 | 1.54 (0.24) |
| Leeu Gamka | 3.00 | 120 | 11.48 | 29 | 1 | 30 | 2.67 | 1.98 (0.22) |

[a]Derived from fluorosis scores given in Table 3-11.

Ruan et al. (2005) reported on dental fluorosis (TFI scores) and dental caries (DMFS index) in 12–13 yr-old schoolchildren living in two rural areas in Shaanxi Province, China, a region where the prevalence of both dental and skeletal fluorosis is high.  The children were subdivided into five fluoride exposure groups (A, B, C, D, E) based on their well water fluoride concentration (Table 3-42).  The number of children (39) receiving well water with the highest fluoride concentration was about one third of those (95–116) for the lower fluoride concentrations.  As the mean TFI score increased across the five groups, the percent of the population with caries and the mean DMFT scores decreased.  Children exposed to the highest fluoride concentration (group E), who had the highest mean TFI score (4.78), had the lowest prevalence of caries (0.03 DMFT) among all the groups.  The highest fluorosis severity group was categorized as having a mean TFI of >4; thus, for this as well as the other groups, the percentage of children that had severe fluorosis (TFI ≥5) is not reported.

According to Ruan et al. (2005), the high prevalence of dental fluorosis and low prevalence of dental caries, even in areas with low fluoride concentrations in drinking water, differs from the situation normally found in industrialized Western nations.  Ruan et al. noted that calcium deficiency is common in China, and this may promote fluoride uptake and an increased prevalence of fluorosis.  Storage of water in clay pots appeared to increase the percent of children with fluorosis scores ≥3 when compared to other storage vessels (55.6% vs. 20.5%).  The authors concluded that this might reflect leaching of fluoride from the clays used to make the pots.

| | | | | **Table 3-42.  Fluorosis and Dental Caries in Chinese School Children Studied by Ruan et al. (2005)** |
|---|---|---|---|---|
| **Group** | **No.** | **F (mg/L)** | **% with Caries** | **Mean TFI[a] (95% CI)** | **Mean DMFT (95% CI)** |
| A | 95 | 0.4 | 22.1 | 0.30 (0.02–0.57) | 0.38 (0.21–0.55) |
| B | 116 | 1.0 | 19.8 | 1.40 (1.15–1.65) | 0.28 (0.16–0.41) |
| C | 115 | 1.8 | 7.0 | 3.16 (2.91–3.40) | 0.09 (0.0—0.15 |
| D | 112 | 3.5 | 5.4 | 3.62 (3.32–3.92) | 0.06 (0.01–0.11 |
| E | 39 | 5.6 | 2.6 | 4.78 (4.36–5.21) | 0.03 (0.00–0.08) |

[a]Group mean based on the individual median TFI score.

### 3.2.3.  Dental caries as an adverse health effect

Dental caries are caused by bacteria in dental plaque which erode calcium in the tooth enamel and expose the dentin.  If a cavity is untreated, bacteria invade the dentin and gain access to the pulp.  White cells move to the pulp to combat the bacteria, increasing pressure on nerves and causing a toothache.  If untreated, the infected tooth may abscess and die, leading to tooth loss.  The infection can also become systemic, leading to bacterial endocarditis (inflammation of the

heart muscle) and death in some cases (AMA, 1982).  A cavity that irritates the gum can lead to gingivitis or periodontitis; an infection in the gums leading to damage to the bone supporting the teeth.

About one-half of low income children aged 6–19 have untreated decay (CDC, 2007) which can lead to pain, dysfunction, loss of tooth surface, absence from school, reduced weight, and poor appearance; problems that can greatly reduce a child's capacity to succeed in life (CDC, 2007). Tooth decay occurs in more than 90% of adults over age 40 (CDC, 2007). One fourth of adults over age 60 have lost all of their teeth—primarily because of tooth decay (CDC, 2007). Especially among the elderly, tooth loss leads to eating difficulties and resultant nutrient intake problems.  These statistics illustrate the scope of the public health problems associated with tooth decay, even in the face of wide-spread fluoridation of drinking water and use of fluoridated dental products.  Therefore, any factor that increases decay is a matter of public health concern.

Cavities and their treatment are associated with several secondary risks.  To reduce the risk of bacterial endocarditis, the American Heart Association recommends prophylactic administration of antibiotics during repair of cavities for immune suppressed populations as well as for individuals with congenital heart disease, prior infection, or those who have had valve or heart replacements (Wilson et al., 2007).

It has been proposed that there may be a relationship between focal infections of the oral cavity, resultant inflammation, and other diseases, especially heart disease (Genco et al., 2002; Slots, 1998; Wu et al., 2000). Periodontal disease provides an opportunity for bacteria and bacterial products such as lipopolysaccharide toxins to gain access to systemic circulation, possibly disturbing lipid metabolism and increasing circulating cytokines (Wu et al., 2000). However, increased relative risks are observed in some epidemiology studies but not in others (Genco et al., 2002; DeStefano et al., 1993). An alternative hypothesis is that dental disease is a confounder for socioeconomic and behavioral factors (i.e., smoking and diet), and it is those factors that have the greatest impact on cardiovascular risk (DeStefano et al., 1993; Janket et al., 2004).

In a study by Janket et al. (2004), an asymptomatic dental score (ADS) was used to evaluate the relationship between five dental problems and biomarkers for heart disease in a group of 506 Finnish adults, 256 with heart disease and 250 without heart disease.  The best correlation was that between the ADS and C-reactive protein and fibrinogen (biomarkers for inflammation) and high density lipoprotein. Of the five dental problems considered contributors to risk, cavities ranked fourth after infection or inflammation around impacted or erupting wisdom teeth, tooth remnants and gingivitis.  Missing teeth ranked last.  The data from this study suggest that, although cavities may be a contributor to the association between cardiovascular risk and dental problems, they are a smaller contributor than oral cavity problems generating a strong inflammatory response.

### 3.2.4.  Summary and conclusions

A close examination of the studies cited by NRC (2006) as being relevant for an assessment of the relationship between severe fluorosis and caries (Table 3-43) indicates that, in some studies, caries prevalence in groups with severe fluorosis was significantly greater than that in groups with mild and moderate fluorosis but generally lower than those in groups with no fluorosis.

Groups with no or minimal fluorosis are generally those with minimal fluoride exposure and little fluoride-associated anticariogenic benefit.

| Table 3-43.  NRC Critical Studies Assessing the Effects of Severe Fluorosis on Caries Scores in Permanent Dentition | | | | | |
|---|---|---|---|---|---|
| Study/ Fluorosis Index | Fluorosis Score[a] | Caries Score (see footnotes) | p Values[b] of Significance | | Comment |
| **Chen, 1989** (Taiwan); 0.2–4.7 mg F/L | | | | | |
| Dean's Index | 0 | 2.4[c] | }<0.05 | }NS | Anti-caries maximal at fluorosis scores of 1–3.  Caries at fluorosis score of 4 not significantly different from that for group with fluorosis score of 0 but significantly different from those in the 0.5-3 grouping, indicative of a U-shaped dose-response curve. |
| | 0.5–3 | 1.7–2.2[c] | | | |
| | 4 | 2.5[c] | | | |
| **Cortes et al., 1996** (Brazil); 0.7 mg F/L | | | | | |
| TFI[h] | 0 | 0.6[c] | }NR | }NR | Only one individual with fluorosis score of ≥5.  No statistically significant differences.  Only 6 teeth per individual scored for caries. |
| | 1–4 | 0.3[c] | | | |
| | ≥5 | 0[c] | | | |
| **Cortes et al., 1996** (Brazil); 2–3 mg F/L | | | | | |
| TFI[h] | 0 | 0.9[c] | }NR | }NR | Statistical analysis of data limited to the following: for TFI scores ≥3, DMFT scores (1.1–1.3) significantly greater (p<0.05) than DMFT score of 0.6–0.9 for TFI scores less than 3. Lowest DMFT scores at TFI of 1–2. Only 6 teeth per individual scored for caries. |
| | 1–4 | 0.6–1.1[c] | | | |
| | ≥5 | 1.3[c] | | | |
| **Driscoll et al., 1986** (USA); 2–4 mg F/L | | | | | |
| Dean's Index | 0 | 1.89[d] | }<0.05 | }NS | A well conducted study. Anti-caries maximal at fluorosis scores of 0.5-3.  Caries at fluorosis score of 4 not significantly different from that for group with no fluorosis but significantly different from the 0.5 to 3 grouping. |
| | 0.5–3 | 1.40–1.58[d] | | | |
| | 4 | 2.96[d] | | | |
| **Eklund et al., 1987** (US); 3.5 mg F/L | | | | | |
| Dean's Index | 0–1 | 1.2–18.8–69.2[f] | }NR | }NR | Percent teeth "not-sound". Caries scores for anteriors—premolars—molars, respectively. Results inconsistent across teeth. |
| | 2–3 | 2.7–10.2–43.2[f] | | | |
| | 4–5 | 5.7–18.6–40[f] | | | |
| **Ermis et al., 2003** (Turkey); 0.3-0.4 mg F/L for TSIF = 0; 1.42-1.66 mg/L for other groups | | | | | |
| TSIF[h] Index | 0 | 0.84[c] | }NS | }NR | No statistical comparison between the fluorosis and non-fluorosis groups. |
| | 1–3 | 1.25[c] | | | |
| | 4–7 | 1.29[c] | | | |
| **Mann et al., 1987** (Gaza Strip); 5 mg F/L | | | | | |
| Dean's Index | 0–1 | — | }<0.001 | }ND | No individuals with fluorosis score of 0-1. Gender differences and confounding factors reported (excessive consumption of tea). |
| | 2–3 | 2.8–4.4[d] | | | |
| | 4 | 10.4[d] | | | |

**Table 3-43.  NRC Critical Studies Assessing the Effects of Severe Fluorosis on Caries Scores in Permanent Dentition**

| Study/ Fluorosis Index | Fluorosis Score[a] | Caries Score (see footnotes) | p Values[b] of Significance | | Comment |
|---|---|---|---|---|---|
| **Mann et al., 1990** (Gaza Strip); 5 mg F/L | | | | | |
| Dean's Index | 0 | 0.29[d] | } NR | } <0.05 | Study was conducted in the same town as the Mann et al. 1987 study, but on younger children (6–8 yr old); therefore, full caries experience was not reached. |
| | 2–3 | 0.5–1.25[d] | | | |
| | 4 | 1.83[d] | | | |
| **Olsson, 1979** (Ethiopia); 12.4 mg F/L (range 6–17 mg/L) and 3.5 mg F/L (range 1.2–7.4 mg F/L) | | | | | |
| Dean's Index | 0 | 1[e] | } NR | } NR | Percent decayed teeth. Statistical significance not indicated.  Mean caries values for individuals not reported. |
| | 1–3 | 15[e] | | | |
| | 4 | 25[e] | | | |
| **Warnakulasuriya et al., 1992** (Sri Lanka); 0.08-8.00 mg F/L F (56% <0.4 mg F/L) | | | | | |
| Dean's Index | 0 | 3.1[c] | } NS | } NS | Large variations in fluoride concentrations within study areas.  Fluorosis groups 1–3 include questionable to mild; groups 4 and 5 include moderate and severe.  Combining the latter two may have masked effects of severe fluorosis; however, no significant differences between score of 3–4 and that of 0, suggestive of a U-shaped dose-response pattern. |
| | 1-3 | 2.8–3.4[c] | | | |
| | 4-5 | 3.3[c] | | | |
| **Wondwossen et al., 2004** (Ethiopia); 0.4–2.2 mg F/L | | | | | |
| TFI[g] | 0 | 0.8[c] | } NR | } <0.05 | Median TFI scores.  Statistical significance of DMFT differences between TFI = 5–7 and TFI =1–4 not reported. |
| | 1–4 | 0.9–1.5[c] | | | |
| | 5-7 | 2.9[c] | | | |
| **Wondwossen et al., 2004** (Ethiopia); 8.9–14.1 mg F/L | | | | | |
| TFI[g] | 0 | — | } NS | } ND | Median TFI scores.  No individuals with fluorosis score of 0. |
| | 1–4 | 0.3–1.6[c] | | | |
| | 5–7 | 2.3[c] | | | |

[a]Intermediate fluorosis groups combined.

[b]NS = Not significant; ND = No data; NR = Not reported.

[c]DMFT, decayed, missing, filled teeth.

[d]DMFS, decayed, missing, filled surfaces.

[e]Percent decayed teeth based on all teeth examined; severe group includes teeth with pitting, scored by study authors as moderate.

[f]Percent teeth "not sound" for anteriors, premolars and molars, respectively.

[g]Thylstrup and Fejerskov Index.

[h]Tooth Surface Index of Fluorosis.

In the studies conducted in the U.S. and Taiwan, caries frequency in the severe fluorosis group was not significantly greater than that in the group with no or minimal fluorosis. In some cases it

was significantly greater than that for the groups with the lowest DMFT or DMFS scores, a possible reflection of the U-shape of the fluorosis-cavity relationship. In the U.S., severe fluorosis affects a relatively small number of children or adults which limits the statistical power of the few studies that have looked at cavities as a variable.

In many of the non-U.S. studies evaluated by the NRC (i.e., Ethiopia, Gaza Strip, Turkey), caries prevalence was lowest in groups showing no fluorosis, and there was a progressive increase in caries with increasing severity of dental fluorosis. Some of the factors which might account for differences in the fluorosis/caries relationship between the U.S. and other countries include differences in dental care, dental hygiene practices, dietary habits (i.e., consumption of sugars), and nutrient intakes (i.e., calcium balance). Additional studies with controls for variables that are known risk factors for caries would be very helpful in further defining the relationship between severe fluorosis and caries.

Analysis of the data on the relationship between the degree of fluorosis and cavities is complicated by the fact that different studies used different approaches for scoring both the degree of fluorosis and the prevalence of caries, limiting cross-study comparisons. Nevertheless, the weight of evidence does support the conclusion of the NRC (2006) that, under some circumstances, severe fluorosis may be associated with an increased prevalence of caries.

The study of Driscoll et al. (1986) is most applicable to the U.S. population in general. The results of this study showed that the anti-caries protective effect of fluoride in drinking water reached a maximum under conditions in which the resulting fluorosis ranged from questionable to moderate (Table 3-44). Severe fluorosis (fluorosis score of 4) was associated with a mean DMFS score (2.96) significantly higher ($p<0.05$) than that seen at fluorosis scores of 0.5–3. This high DMFS score of 2.96 was not significantly higher than that associated with a fluorosis score of 0 for no fluorosis (e.g., mean DMFS score of 1.89). When analyzed on the basis of the percent decayed or filled teeth, only approximately 5% was associated with very mild to moderate levels of fluorosis, but approximately 20% was associated with the severe level. These data suggest that severe fluorosis diminished the anti-caries protective action of fluoride to some degree. The Driscoll et al. (1986) study included populations of children residing in locations where the fluoride levels in drinking water ranged from 2 to about 4 mg/L, and excluded populations in areas where the fluoride levels were 1 mg/L and less. The mean caries score for the children in areas with <0.3 mg F/L was 5.07, substantially higher than that for the children exhibiting severe fluorosis (data not analyzed statistically).

| Table 3-44.  Summary of Results of Driscoll et al. (1986) Study of Illinois School Children[a] | | |
|---|---|---|
| Fluorosis Score[b] | No. | Value |
| | | Mean DMFS |
| 0 | 87 | 1.89 |
| 0.5 | 112 | 1.40 |
| 1–3 | 218 | 1.58 |
| 4 | 54 | 2.96[c] |
| | | Decayed or filled teeth |
| 1–3 | 218 | 4.5 % |
| 4 | 54 | 19.6 % |

[a]Data limited to children exposed to drinking water fluoride levels of ~2–4 mg/L.
[b]Dean's Index.
[c]Significantly higher than that for children with scores of 0.5–3 (p <0.05); no other significant differences between groups.

Most studies evaluating the effects of fluoride on dental caries have not directly compared specific levels of fluorosis severity with measures of caries occurrences (see Section 3.2.2).  However, data from these studies can be compared in several ways:

- Fluoride concentration in the drinking water relative to Community Fluorosis Index (CFI) (Table 3-45, Figure 3-5);

- Fluoride concentration in the drinking water relative to DMFT/DMFS (Table 3-45, Figure 3-6);

- Percent severe fluorosis relative to DMFT/DMFS  (Table 3-46, Figure 3-7);

- Community Fluorosis Index relative to DMFT/DMFS (Table 3-47, Figure 3-8).

The Community Fluorosis Index is a weighted average derived from Dean's fluorosis scores and the frequency of occurrence of those scores within the study population, and it is intended only as a relative measure of the fluorotic condition of the study populations (Dean, 1942).

The data in Table 3-45 indicate that as the fluoride concentration in the drinking water increases, the Community Fluorosis Index also increases (see Fig. 3-5).  The Table 3-45 data also show that the DMFT/DMFS decrease as the fluoride concentration in the drinking water increases to a concentration of about 3 mg/L at which point the DMFT/DMFS either remain level or increase (Figure 3-6).

Table 3-46 and Figure 3-7 compare the percent of the population with severe dental fluorosis with DMFT/DMFS.  Here, as in Figure 3-6, there is a suggestion of a U-shape to the relationship.  The outline of a U-shaped dose response can also be seen in Table 3-47 and Figure 3-8 which compare Community Fluorosis Index to the DMFT/DMFS scores.  The DMFT and DMFS values are lowest at a CFI of about 1 to 1.5 after which they begin to rise.

| Fluoride (mg/L) | No. | Fluorosis Scoring System | % Severe Fluorosis | Community Fluorosis Index[a] | Mean DMFT | Mean DMFS | Reference |
|---|---|---|---|---|---|---|---|
| **Table 3-45.  Relationship of Fluoride in Drinking Water to CFI and DMFT and DMFS Scores** | | | | | | | |
| 0.2 | 126 | Dean's | 0 | 0.15[d] | 3.68 | 5.54 | Jackson et al., 1995 |
| <0.3 | 316 | Dean's | 0 | 0.06[b] | | 5.07 | Driscoll et al., 1986 |
| ~1 | 336 | Dean's | 0 | 0.46[d] | 3.34 | 4.35 | Jackson et al., 1995 |
| 1.06 | 117 | Dean's | 0.6 | 0.39[c] | | 3.14 | Driscoll et al., 1983 |
| 2.08 | 143 | Dean's | 4.9 | 1.16[c] | | 1.97 | Driscoll et al., 1983 |
| 2.6 | 404 | Dean's | 1.5 | 1.3 | 2.46 | | Dean, 1946 |
| 2.84–2.89 | 192 | Dean's | 8.3 | 1.25[c] | | 1.41 | Driscoll et al., 1983 |
| 3.77–4.07 | 136 | Dean's | 22.8 | 1.88[c] | | 2.02 | Driscoll et al., 1983 |
| ~4 | 101 | Dean's | 11.3 | 2.06[d] | 2.95 | 4.26 | Jackson et al., 1995 |

[a]Weighted average of Dean's fluorosis scores and the frequency of occurrence of those scores within the study population.
[b]Calculated from data given in Table 3-6.
[c]Calculated from data given in Table 3-5.
[d]Calculated from data given in Table 3-11.



**Figure 3-5.  Drinking water fluoride concentration vs. Community Fluorosis Index for selected studies.**



[DMFS =solid circles; DMFT = open boxes]

**Figure 3-6.  Drinking water fluoride concentration vs. DMFT (☐) and DMFS (●) scores for selected studies.**

| Table 3-46.  Relationship of Percent Severe Fluorosis to CFI and DMFT and DMFS Scores | | | | | | | |
|---|---|---|---|---|---|---|---|
| % Severe Fluorosis | No. | Fluoride (mg/L) | Fluorosis Scoring System | Community Fluorosis Index[a] | Mean DMFT | Mean DMFS | Reference |
| 0 | 126 | 0.2 | Dean's | 0.15[d] | 3.68 | 5.54 | Jackson et al., 1995 |
| 0 | 316 | <0.3 | Dean's | 0.06[b] | | 5.07 | Driscoll et al., 1986 |
| 0 | 336 | ~1 | Dean's | 0.46[d] | 3.34 | 4.35 | Jackson et al., 1995 |
| 0.6 | 117 | 1.06 | Dean's | 0.39[c] | | 3.14 | Driscoll et al., 1983 |
| 1.5 | 404 | 2.6 | Dean's | 1.3 | 2.46 | | Dean, 1946 |
| 4.9 | 143 | 2.08 | Dean's | 1.16[c] | | 1.97 | Driscoll et al., 1983 |
| 8.3 | 192 | 2.84–2.89 | Dean's | 1.25[c] | | 1.41 | Driscoll et al., 1983 |
| 11.3 | 101 | ~4 | Dean's | 2.06[d] | 2.95 | 4.26 | Jackson et al., 1995 |
| 22.8 | 136 | 3.77–4.07 | Dean's | 1.88[c] | | 2.02 | Driscoll et al., 1983 |

[a]Weighted average of Dean's fluorosis scores and the frequency of occurrence of those scores within the study population.
[b]Calculated from data given in Table 3-6.
[c]Calculated from data given in Table 3-5.
[d]Calculated from data given in Table 3-11.



**Figure 3-7.  Percent severe fluorosis relative to DMFT (☐) and DMFS (●) scores for selected studies.**

| Table 3-47.  Relationship of CFI to DMFT and DMFS Scores | | | | | | | |
|---|---|---|---|---|---|---|---|
| Community Fluorosis Index[a] | No. | Fluoride (mg/L) | Fluorosis Scoring System | % Severe Fluorosis | Mean DMFT | Mean DMFS | Reference |
| 0.06[b] | 316 | <0.3 | Dean's | 0 | | 5.07 | Driscoll et al., 1986 |
| 0.15[d] | 126 | 0.2 | Dean's | 0 | 3.68 | 5.54 | Jackson et al., 1995 |
| 0.39[c] | 117 | 1.06 | Dean's | 0.6 | | 3.14 | Driscoll et al., 1983 |
| 0.46[d] | 336 | ~1 | Dean's | 0 | 3.34 | 4.35 | Jackson et al., 1995 |
| 1.16[c] | 143 | 2.08 | Dean's | 4.9 | | 1.97 | Driscoll et al., 1983 |
| 1.25[c] | 192 | 2.84–2.89 | Dean's | 8.3 | | 1.41 | Driscoll et al., 1983 |
| 1.3 | 404 | 2.6 | Dean's | 1.5 | 2.46 | | Dean, 1946 |
| 1.88[c] | 136 | 3.77–4.07 | Dean's | 22.8 | | 2.02 | Driscoll et al., 1983 |
| 2.06[d] | 101 | ~4 | Dean's | 11.3 | 2.95 | 4.26 | Jackson et al., 1995 |

[a]Weighted average of Dean's fluorosis scores and the frequency of occurrence of those scores within the study
population.
[b]Calculated from data given in Table 3-6.
[c]Calculated from data given in Table 3-5.
[d]Calculated from data given in Table 3-11.

The base of the U- shaped fluoride-caries relationship seems to occur at a drinking water concentration between 2 to 3 mg/L in Figure 3-6, a community severe fluorosis burden of about 5 to 10 percent in Figure 3-7, and at a CFI of about 1 to 1.5.  One limitation of the relationships as depicted in Tables 3-45, 3-46, 3-47 and Figures 3-6, 3-7, 3-8 is the fact that the data come from studies conducted at different times periods during which there were changes in exposure to fluoride from sources other than the drinking water.  The two data points that indicate an increase in the DMFT and DMFS scores both come from the same study (Jackson et al., 1995).  It is the most recent study and the one where intakes of fluoride from sources other than the drinking water were likely to have been the highest.

By limiting the data in Figures 3-6, 3-7, 3-8 to studies conducted in the United States, where 4 mg/L is the enforceable MCL, there is no information from systems with higher drinking water concentrations to more clearly define the upper limit of the beneficial range for fluoride exposures as correlated to the concentration in drinking water.



**Figure 3-8.  Community Fluorosis Index vs. DMFT (□) and DMFS (●) scores for selected studies.**

These data appear to support the results of the Driscoll et al. (1986) analysis of DMFS as related to the severity of dental fluorosis.  They indicate that there is an increasing anticaries benefit with increasing level of fluorosis up to a certain point, after which the incremental benefit from increased fluoride exposure, as reflected in the drinking water concentration, does not increase

(Fig. 3-6). The data, although limited, are also consistent with the NRC (2006) conclusion that the pitting of enamel that occurs with severe dental fluorosis may increase the cavity risk to levels above that associated with lesser degrees of fluorosis (Fig. 3-7).

Although the data are supportive of the NRC (2006) conclusions regarding enamel pitting they are moderately rather than strongly consistent with the hypothesis that the pitting of the enamel leads to an increased risk for caries. Socioeconomic status, availability of dental care, and personal dental hygiene habits are likely to confound the results from individual studies of the caries relationship. For this reason, the OW selected the pitting of the dental enamel as the critical effect for the dose-response analysis. It is the only endpoint with sufficient data to support dose-response modelling. The EPA finding on the caries association is consistent with NRC (2006) that the "available evidence is mixed but generally supportive".

Pitting of the enamel is a structural defect that weakens the barrier between the oral environment and the dentin of the teeth. It is progressive in that the enamel can flake off from the sides of the pits allowing them to become progressively larger (Fejerskov et al., 1994). Furthermore, the dentin of teeth with severe dental fluorosis is hypomineralized and structurally variant (Rojas-Sanchez et al., 2007; Waidyasekera et al., 2010) increasing the importance of the enamel's protective function. As stated by NRC (2006, page 4), the fact that dentists frequently fill the enamel pits in afflicted patients is an indirect acknowledgement of concern for the defect.

## 3.3.    Skeletal Fluorosis and Bone Fractures

Excessive intake of fluoride can result in skeletal fluorosis, a condition characterized by increasing bone density (preclinical and Stage I); sporadic pain, stiffness of the joints, and osteosclerosis of the pelvis and spine (Stage II); and chronic joint pain, arthritic symptoms, calcification of ligaments, and osteosclerosis of cancellous (porous) bones (Stage III). Alterations in micro-structure of bone tissue (e.g., abnormal crystal structure) resulting from skeletal fluorosis may be manifest as an increase in the likelihood of bone fractures.

Most of the fluoride in the body is found in bones where it exists in both rapidly and slowly exchanging pools. The rapidly exchanging pool involves the hydration shell on the surface of bone crystallites (collagen-mineral structural units). When plasma fluoride levels are high, more fluoride enters the hydration shell with most of it returning to extracellular fluid as plasma levels decline. However, a small portion remains with the crystallite in the newly formed bone as hydroxyfluoroapatite. Fluoride in the mature bone tissue exchanges slowly with the extracellular fluid but is released during bone remodeling and resorption (Stipanuk, 2000). The dose-response evidence for skeletal fluorosis and bone fractures in populations exposed to fluoride is addressed in this section.

### 3.3.1.   Skeletal fluorosis

As mentioned above, skeletal fluorosis is a disorder of the bones and joints which is directly related to the magnitude and duration of fluoride ingestion at levels above those of the general diet in the United States. This disorder is most often manifest in areas of the world with high levels of geological fluoride in the water and sometimes the food supply. It can also occur in occupationally exposed individuals.

Fluoride has an impact on the development and resorption of bone (Krishnamachari, 1986).  It is a stimulant for increased activity of ostoblasts, the bone forming cells that lie down the collagen matrix which later becomes mineralized.  Excess dietary fluoride, when it becomes incorporated in the hydroxyapatite crystal as hydroxyfluoroapatite, can alter the lattice structure (Mousny et al., 2008) and lead to increases in bone density which may render the bone more prone to fracture.  Factors that influence the occurrence of skeletal fluorosis include age, sex, dietary fluoride and calcium intakes, renal function, and parathyroid hormone activity.  Bone density measurements, analysis of bone biopsy tissues, and radiography are tools for early diagnosis of skeletal fluorosis.  There are no therapeutic treatments for the crippling form of the disease (Stage III) (Krishnamachari, 1986).

Ingestion of fluoride over a long period of time during which calcium intakes are apparently normal can lead to osteosclerosis with immobilization of joints of the axial skeleton and of the major joints of the extremities (Krishnamachari, 1986). Elevated urinary fluoride and increased bone fluoride content are indicators of fluoride toxicity. Hormones associated with bone mineral metabolism may also be affected.  Osteomalacia and osteoporosis of varying degrees as well as exostosis formation may also develop (Krishnamachari, 1986).  In some cases symptoms can be alleviated when fluoride intake is stopped (Hallanger et al., 2007) but reversal is unlikely for Stage III skeletal fluorosis.

NRC (2006) reviewed the available data on the concentration of fluoride in bone ash of individuals exhibiting various stages of skeletal fluorosis and concluded that the "likelihood and severity of clinical skeletal fluorosis increase with the bone fluoride content, but a given concentration of bone fluoride does not necessarily correspond to certain stage of skeletal fluorosis in all cases".  Wide ranges of bone fluoride have been reported for similar degrees of skeletal fluorosis.  On the basis of data for the iliac crest or pelvis, fluoride concentrations of 4,300 to 9,200 mg/kg in bone ash have been found in cases of stage II skeletal fluorosis, and concentrations of 4,200 to 12,700 mg/kg in bone ash have been reported in cases of stage III skeletal fluorosis. The overall ranges for other bones (not specifically identified) were 6,300 to 12,900 mg/kg (NRC, 2006).  Even so, some studies have reported no evidence of fluorosis with bone fluoride levels falling within these ranges (Zipkin et al., 1958; Erben et al., 1984).

Other factors, such as calcium intake, may alter the severity of fluorosis at a given concentration of bone fluoride.  In studies in which skeletal fluorosis was diagnosed at relatively low bone fluoride levels (2650-5850 mg/kg in bone ash), the individuals were reported to be suffering from hypocalcemia or secondary hyperparathyroidism (Teotia and Teotia, 1973, Pettifor et al., 1989).  Bone fluoride levels of 10,000-12,000 mg/kg bone ash fall within or exceed the ranges of concentrations that have been associated with stage II or stage III skeletal fluorosis (NRC, 2006), but because of inconsistencies in the entire data set, it is unlikely that bone fluoride concentration can be used in a dose-response analysis of skeletal fluorosis.

### 3.3.1.1.   Exposure to fluoride and changes in bone density

The earliest pre-clinical stages of skeletal fluorosis are associated with increases in bone density. This is generally considered to be the result of the anabolic action of fluoride on osteoblasts (bone forming cells) (NRC, 2006), and is the basis for the use of fluoride compounds in the

therapeutic treatment of osteoporosis.  Clinical studies have demonstrated increases in bone density in postmenopausal women suffering from osteoporosis when they were treated with fluoride (see discussion in Reid et al., 2007).

Bone mass is affected by many environmental and physiological factors.  Of critical importance in maintaining normal bone density is an adequate intake of calcium throughout life but especially in preteen and teenage years.  Adequate dietary intakes of the other bone forming minerals, notably magnesium and phosphorous are also important as is Vitamin D.  Conditions that can increase the risk of bone loss include postmenopausal decreases in estrogen production; use of corticosteroids, thyroid hormones, diuretics and blood thinning drugs; tobacco use; alcoholism; and poor nutrition.  Each of these conditions needs to be considered when evaluating results of studies assessing the effects of fluoride on bone density.

In a study conducted by Reid et al. (2007) and not available to NRC (2006), 80 postmenopausal women with osteoporosis who had been taking estrogen for one year or more were treated with 20 mg F (as glutamine monofluorophosphate, MFP) or a placebo over 4 years in a double blind trial.  Bone density of the total body, lumbar spine, femur, and distal and proximal regions of the forearm was measured with a dual-energy X-ray absorptiometer.  At the end of the 4-year trial, bone mass density in the lumbar spine (L2-4 in the anteroposterior projection, AP) of the fluoride-treated group was 22% above baseline and 16% higher than the placebo group which increased 6% above baseline (p <0.0001).  In "purely trabecular" bone of the vertebral body (L-3, lateral projection), the increase was 49% above baseline compared to 2.5% for the placebo group (p < 0.0001). There was a suggestion of a treatment-related effect in the trabecular-rich region of the ultradistal radius and ulna (p = 0.1). In contrast, for the cortical bone of the proximal radius there was no significant change in bone mass density (p = 0.9).

The greatest increases in bone density from fluoride treatment have been seen in trabecular bone of the spine, wrist, and hip.  [Trabecular bone, characterized as having a sponge-like network of interconnected bony spicules that form a meshwork of spaces filled with bone marrow, can also be found at the ends of the femur, tibia, humerus, and radius; in vertebral bodies, and in the iliac crest].  In contrast, cortical bone (bones, such as the central shafts of the long bones (e.g., mid-radius), which have a thick compact cortex and a relatively small amount of marrow) show little if any increase in density following treatment with fluoride.  In fact, some studies have reported cortical bone loss in the "radial shaft" ("cortical bone") or forearm at very high doses (75 mg/day) of sodium fluoride (Riggs et al., 1990; Kleerekoper et al., 1991).  Note, however, that in both of these latter studies, the placebo groups also showed loss of bone in the forearm, and the differences from the fluoride groups were not reported to be statistically significant.

In the Riggs et al. (1990) study, a 4% decrease in bone density of the radial shaft (reported to consist primarily of cortical bone and assumed to be the mid-radius), relative to controls, was seen in a group of women 50–75 yr of age with postmenopausal osteoporosis who had been taking 75 mg sodium fluoride and 1500 mg elemental calcium per day for 4 years.  Controls received placebo tablets and 1500 mg elemental calcium per day.  Riggs et al. (1990) also reported a 35% increase in bone density of the lumbar spine, a 12% increase for the femoral neck and a 10% increase for the femor in the area where it interacts with the hip joint.  The differences between the treatment and placebo groups were significantly different from zero at all sites reported.

As noted by Reid et al. (2007), increases in bone density following treatment with fluoride are related not only to the magnitude of the dose administered, but possibly also to the dose rate. Ringe et al., (1999) reported a bigger increase in bone mass density following treatment with 20 mg F/day than with 11 mg F/day, while Rubin et al. (2001) found no significant changes in bone density of individuals with osteoporosis receiving 23 mg F/day in a slow release form with 945 mg calcium.

Hansson and Roos (1987) studied four groups of 25 osteoporotic women over a three-year period in order to evaluate the effects of calcium and two different levels of fluoride on spinal bone mineral content. Group A was given 30 mg of sodium fluoride (13.56 mg/day as F) and 1 g/day calcium as a combination of the bicarbonate, lactate, and gluconate salts. Group B was given 10 mg of sodium fluoride (4.53 mg/day as F) and 1 g/day of calcium bicarbonate, lactate, and gluconate. Group C was given 1 g/day of calcium bicarbonate, lactate, and gluconate combined. Group D was given a starch placebo. The spinal bone (L3, trabecular) mineral content of the women in group A increased from the original 0.272 g/cm to 3.18 g/cm after three years of treatment (p< 0.01) while there was no significant change in the bone mineral content of the women receiving the lower fluoride dose, supplemental calcium or the starch placebo.

*Epidemiological Studies*.  Epidemiological studies have evaluated bone density in residents of areas with differing levels of fluoride (high and low) in their drinking water. Based on radiological exams conducted in 1943 and again in 1953 on residents of two towns in Texas, Leone et al. (1955) reported a higher number of cases of increased bone density and coarsened trabeculation (16–17/89 and 12–14/89, respectively) in residents of a town with 8 mg F/L drinking water compared to another town with 0.4 mg F/L (4/101 cases of increased bone density and 2–3/101 cases of coarsened trabeculation). Stevenson and Watson (1957) reported radiological evidence of increased bone density in 23 patients residing in communities where fluoride drinking water concentrations were 4 to 8 mg/L (based on a total of 170,000 radiographic examinations of the spine and pelvis). Extreme bone density (Grade 4 on a scale of 1–4) was found in 11 of these 23 patients.

Sowers et al. (1986) conducted a cross-sectional baseline survey of bone mass in 827 adult women residing in three rural communities in northwest Iowa. The women were divided into groups based on fluoride and calcium levels in drinking water; high fluoride (4.0 ± 0.1 mg F/L) with low calcium (15 ± 3 mg Ca/L); low fluoride (1 mg fluoride/L) with high calcium (375 ± 8 mg Ca/L); or low fluoride (1 mg fluoride/L) with moderate calcium (range 62–71 mg Ca/L for two wells). The community with low fluoride and moderate calcium concentrations in the water supply was considered the referent population. Twenty-four hour dietary recall information for food and beverages was obtained from interviews with each of the participants; however, because of earlier results of a total diet study by Singer and Ophaug (1982) that found drinking water to be the primary source of fluoride, Sowers et al. (1986) did not include dietary fluoride from sources other than drinking water in their assessment. Although more than 80% of the participants reported using fluoridated toothpaste; intake of fluoride through this use was not estimated. Thiazide use and hormone treatment with estrogen were treated as covariates. The study authors did not provide an explanation for including thiazide in their analysis; presumably though, the use of diuretics such as thiazide would increase urinary output and thereby affect fluoride levels in the body.

Sowers et al. (1986) found that mid-radius bone mass (measured distally at a site one-third the distance between the styloid process and the olecranon) did not differ among women 20–35 yrs old in the three communities.  Women 55–80 yrs old living in the high fluoride community had significantly less (about 5%) mean mid-radius bone mass than women of the same age range living in the low fluoride and moderate or high calcium communities.  When adjusted for estrogen and thiazide use, as well as total calcium intake (including water, food, and supplements), vitamin D intake and muscle area, levels of radial bone mass from women in the high fluoride community were lower than those for the other two groups, but the differences were not statistically significant.

In 1991, Sowers et al. (1991) conducted a follow-up study in these same towns.  The populations studied included 81.5–85% of the participants from the earlier study.  Women 20–35 yrs old in the higher fluoride community had significantly lower mean mid-radius bone mass values in 1988/89 than did women in the referent and higher-calcium communities (Table 3-48).

| Table 3-48.  Mean Mid-Radial Bone Mass in 20–35-year-old Iowa Women at Baseline (1983/1984) and at Follow-up (1988/1989) in Studies Conducted by Sowers et al. (1991) | | | | |
|---|---|---|---|---|
| Group | Adjusted[a]Value | p Value for Difference in Means | | |
| **Baseline (1983/1984) radial bone mass (g/cm$^2$)** | | | | |
| Referent[f] (N = 37) | 0.75 ± 0.008[b] | | | |
| Higher Ca[e] (N = 33) | 0.75 ± 0.008 | | | **NS[c]** |
| Higher F[d] (N = 67) | 0.74 ± 0.006 | | | |
| **Follow-up (1988/1989) radial bone mass (g/cm$^2$)** | | | | |
| Referent | 0.73 ± 0.008[b] | | | |
| Higher Ca | 0.74 ± 0.009 | } | **0.02** | } **0.04** |
| Higher F | 0.71 ± 0.006 | | | |
| **Absolute difference in radial bone mass in 5 yr (g/cm$^2$)** | | | | |
| Referent | -0.015 ± 0.005[b] | | | |
| Higher Ca | -0.011 ± 0.005 | } | **0.03** | } **0.08** |
| Higher F | -0.027 ± 0.004 | | | |
| **Percent loss of radial bone mass in 5 yr** | | | | |
| Referent | -2.1 ± 0.7 | | | |
| Higher Ca | -1.6 ± 0.7 | } | **0.03** | } **0.08** |
| Higher F | -3.6 ± 0.5 | | | |

[a]Adjusted for age and Quetelet index [weight in kg/(height in m)$^2$].
[b]Mean ± standard error.
[c]NS, not significant.
[d]4.0 ± 0.1 mg F/L and 15 ± 3 mg Ca/L.
[e]1 mg F/L and 375 ± 8 mg Ca/L.
[f]1 mg F/L and 67 ± 4 mg Ca/L.

The mean loss of mid-radius bone mass (absolute difference or percentage of loss) over the 5-year period was greater in women of the high-fluoride community than in women of the referent

and higher-calcium communities.  The study authors could not identify a factor other than higher fluoride exposure, to explain their observation.

The mean mid-radial bone mass values for women in the 55–80-year age group are shown in Table 3-49.  The values are adjusted for age and "Quetelet" index [weight in kg/(height in m)$^2$]. At both baseline and follow-up, mean mid-radial bone mass was significantly lower in the higher-fluoride community than in the referent and higher-calcium communities.  However, the rates of change in radial bone mass were not significantly different among the communities during this 5-year period.  The mean bone mass of the femur (measured at three sites, the neck, Ward's triangle, and the trochanter, which the study authors state included cortical and cancellous bone) was consistently lower in the higher fluoride community than in the higher calcium community; however, the mean femoral bone mass measures were not significantly lower than mean values in the referent community.

| Table 3-49.  Mean Mid-Radial Bone Mass in 55–80-year-old Iowa Women at Baseline (1983/1984) and at Follow-up (1988/1989) in Studies Conducted by Sowers et al. (1991) | | | | | |
|---|---|---|---|---|---|
| **Group** | **Adjusted[a]Value** | p Value for Difference in Means | | | |
| **Baseline (1983/1984) mid-radial bone mass (g/cm$^2$)** | | | | | |
| Control (N = 121) | 0.63 ± 0.008[b] | | | | |
| Higher Ca (N = 148) | 0.63 ± 0.007 | } | 0.006 | } | 0.02 |
| Higher F (N = 163) | 0.60 ± 0.007 | | | | |
| **Follow-up (1988/1989) mid-radial bone mass (g/cm$^2$)** | | | | | |
| Control | 0.59 ± 0.008 | | | | |
| Higher Ca | 0.59 ± 0.007 | } | 0.003 | } | 0.01 |
| Higher F | 0.56 ± 0.007 | | | | |
| **Absolute difference in mid-radial bone mass in 5 yr (g/cm$^2$)** | | | | | |
| Control | -0.039 ± 0.004 | | | | |
| Higher Ca | -0.043 ± 0.003 | | | | NS[c] |
| Higher F | -0.046 ± 0.003 | | | | |
| **Percent loss of mid-radial bone mass in 5 yr** | | | | | |
| Control | -6.4 ± 0.6 | | | | |
| Higher Ca | -6.9 ± 0.5 | | | | NS[c] |
| Higher F | -7.4 ± 0.5 | | | | |

[a]Adjusted for age and Quetelet index [weight in kg/(height in m)$^2$].
[b]Mean ± standard error.
[c]NS, not significant.

Sowers et al. (2005) measured serum fluoride concentrations and bone mass density (BMD) and evaluated the 4-year incident fracture frequency among adult (20–92 yrs old) women residents of the same three Iowa communities studied by Sowers et al. (1986 and 1991).  Bone mass density measurements were made on the femoral neck and lumbar vertebrae using dual X-ray densitometry and on the "distal" radius using single photon densitometry.  The study authors reported that the distal radius consisted primarily of cortical bone and the lumbar vertebrae primarily trabecular bone, but they did not characterize the femoral neck (trabecular bone).

BMD of the lumbar spine and femoral neck did not differ among the residents of the three communities; however, the BMD of the distal radius was significantly higher (p = 0.05) in the high fluoride community (0.667 ±0.004 g/cm$^2$) compared with the mean value in the control community (0.651±0.0053 g/cm$^2$).

Phipps and Burt (1990) compared cortical bone mass (distal radius with 75% cortical bone) in lifetime female residents of two towns in New Mexico; one town, Lordsburg, had a fluoride level of 3.5 mg/L in its drinking water, and the second town, Deeming, had a fluoride level of only 0.7 mg/L.  Bone density was measured by single photon absorptiometry.  The study participants consisted of 151 post-menopausal women ranging in age from 39 to 87 years old.  Bivariate analysis showed no difference in cortical bone mass between the women of the two communities; however, multiple regression analysis indicated that fluoride exposure was one of several significant predictors of bone mass (p < 0.05) (other predictors included weight, years since menopause, current estrogen supplementation, and diabetes).  Women living in the high fluoride area had a bone mass ranging from 0.004 to 0.039 g/cm$^2$ less than those living in the optimal fluoride community, suggesting that high fluoride exposure might result in a reduction in cortical bone mass.

Phipps et al. (2000) conducted a multicentre prospective study on risk factors for osteoporosis and bone fractures.  Information was collected for 7129 white women (≥65 yrs old) on exposure to fluoridated drinking water, bone mineral density, and the occurrence of fractures.  Exposure to fluoridated drinking water was determined from a questionnaire on residence history. Outcomes for women with 20 years of continuous exposure to fluoridated drinking water (N = 3218) were compared to those for women not exposed to fluoridated drinking water (N = 2563).   In women with continuous exposure mean bone mineral density was 2.6% higher at the femoral neck (p <0.001), 2.5% higher at the lumbar spine (p<0.001) and 1.9% lower at the distal radius (p=0.002).  The reduction in bone density in the cortical bone of the radius was similar to that reported in other studies.

In a study of 2076 women other than African-Americans living in a rural area of Pennsylvania, Cauley et al. (1995) found no evidence that exposure to residential fluoridated drinking water resulted in increased bone mass.  Estimates of fluoride exposure were based on number of years of community water use only (mean of 1.01 mg F/L for those communities that fluoridated their water and 0.15 mg F/L for those that did not fluoridate).

In summary, the available data indicate that changes in bone mass density following exposure to fluoride appear to be dependent on the magnitude of the dose and duration of the exposure and the type of bone evaluated.  Trabecular bone appears to be more likely to show a direct response to fluoride with cortical bone showing little-, no-, or in some cases possibly a decrease in density, especially at higher fluoride dose levels.  Confounding variables which must be considered in assessing bone mass changes associated with fluoride exposure include calcium and magnesium intake, Vitamin D status, and estrogen therapy.

### 3.3.1.2.   Exposure to fluoride in stage II and stage III skeletal fluorosis

**Stage II Skeletal Fluorosis.** This stage of skeletal fluorosis is characterized by sporadic pain, stiffness of the joints, and osteosclerosis of the pelvis and spine, calcification of the ligaments,

and, at times osteoporosis of the long bones. NRC (2006) considered Stage II skeletal fluorisis to be an adverse health effect because the described symptoms could affect mobility and are precursors to more serious mobility problems. There is, however, little information on the prevalence of stage II skeletal fluorosis in the U.S.

In a survey conducted in Texas and Oklahoma, Stevenson and Watson (1957) examined the results of 170,000 radiological examinations of the spine and pelvis and diagnosed only 23 cases of fluoride osteosclerosis in individuals living in areas where the drinking water contained 4 to 8 mg F/L. No cases of osteosclerosis were found in individuals living in areas with less than 4 mg F/L in drinking water. The 23 subjects were not classified as to stage of skeletal fluorosis, and NRC (2006) could not determine from the information provided what percentage, if any, of the 23 cases could be classified as stage II fluorosis. It was reported that eleven of the 23 subjects had more than a minimal increase in bone density and 15 had calcification of the pelvic ligaments.

A Public Health Service survey of adult residents living in two towns in Texas, one with 0.4 mg F/L in drinking water (N = 121) and the second with 8 mg F/L (N = 116) found only slight roentgenographic evidence of fluoride-related bone changes (either increased bone density with or without coarsened trabeculation, or coarsened trabeculation with lines of stress and without an increase in bone density) in 10–15% of the population exposed to 8 mg F/L (Leone et al., 1955). The study authors also reported that there was an "equivocal" increased thickening of cortical bone and periosteum with a slight relative narrowing of the bone marrow space. An "occasional" case of ligament calcification was also reported, but it was said to be a "common finding in any older age group." In one 59-yr old individual from the high-fluoride town, the investigators found "definite ossification of the right sacrotuberous ligament", but no other evidence of calcification was reported. Leone et al. (1955) did not refer to any of these cases as osteosclerosis, a histological characteristic of Stage II; therefore, it cannot be determined if any would fall into this category. NRC (2006) points out that the town with 8 mg F/L began a defluoridation program about 18 months before the study was undertaken.

With the exception of the Stevenson and Watson (1957) and Leone et al. (1955) reports, most documentation of fluoride associated skeletal fluorosis in the U.S. is based on case reports. A selected number of these case reports are listed in Table 3-50. The studies reported in Table 3-50 include cases of both Stage II and Stage III skeletal fluorosis.

Only two of the studies listed in Table 3-50 identify cases that would be categorized as Stage II fluorosis. Whyte et al. (2005) reported a case in which a 52 yr old woman developed skeletal fluorosis after consuming excessive amounts of fluoride in instant tea during her entire adult lifetime. The symptoms and radiographic evidence appeared to correspond to stage II skeletal fluorosis although the study authors did not specifically refer to her as having stage II skeletal fluorosis. The subject reported skeletal discomfort including neck and scapular pain and elbow and knee arthralgias. Radiographs documented the appearance of marked osteosclerosis and cortical thickening throughout the spine (especially the lumbar region) and pelvis. The ribs were similarly affected. The subject had reported that she had consumed one to two gallons of instant tea every day throughout her entire adult lifetime. Mean fluoride levels in samples of instant tea products were found to range from 1.0 to 6.5 ppm, and her daily fluoride dose was estimated to be 37–74 mg. Beginning at age 46 yr the subject had estrogen injections followed by oral

estrogen – methyltestosterone therapy for three years.  She also took 600 mg calcium twice daily for 4 years and a multivitamin daily for 6 months.  Approximately four years after she stopped drinking instant tea, her symptoms abated and her urinary fluoride levels had dropped from a previous high of about 14 mg/g creatinine to a normal level of 2.2 mg/g creatinine, but bone density of the lumbar spine and hip (femoral neck) remained elevated (251% and 131% of control means, respectively, compared to 214% and 124%, respectively, at the time she was first examined).  The study authors did not report on any changes in the patient's osteosclerotic condition after she had stopped drinking the instant tea.

| Table 3-50.  Selected Cases of Severe Skeletal Fluorosis in the U.S. | | | | |
|---|---|---|---|---|
| Estim. F in water (mg/L) | Estim. daily DW intake (L) | Estim. daily dose (mg F/day) | Effect/Comment | Reference |
| 2.8 | ~4–8 | 37–74 | Signs of stage II fluorosis. Exposure included high levels of fluoride in instant tea mix. | Whyte et al., 2005[a] |
| 7–8 | ? (high) | ? | Signs of stage II fluorosis. Hot climate and excessive intake of water. | Felsenfeld and Roberts, 1991[a] |
| 2.4–3.5 | 4-8 | 9.6–28 | Crippling skeletal fluorosis (Stage III). Excessive consumption of water. | Sauerbrunn et al., 1965 |
| 4–8 | ? | ? | Crippling skeletal fluorosis (Stage III). Excessive intake of water and tea | Goldman, et al., 1971 |
| 2–3 | 3 | 6–9 | Stage III; Renal deficiency | Johnson et al., 1979[a] |
| 8.5 | 2–4 | 17–34 | Stage III; Renal deficiency | Lantz et al., 1987[a] |

[a]As cited in NRC, 2006.

Felsenfeld and Roberts (1991) reported on a case of a 54 yr old woman who was diagnosed with osteosclerosis following a routine chest roentgenogram.  The subject had suffered from stiffness of the knees and hips for the two previous years.  The only other pertinent physical finding was kyphosis (abnormal curvature of the spine).  A metabolic bone survey showed sclerotic bones of the lumbar, thoracic and cervical spines, both clavicles and the pelvis.  In addition, a pronounced trabecular meshwork pattern was seen in the pelvis.  Certain diagnostic features of skeletal fluorosis, such as interosseous and ligamentous calcifications and bony exostoses were not found.  The fluoride concentration of the subject's drinking water, which was obtained from a well, was reported to be 429 μmol/L (8.15 mg/L).  The subject had been drinking this well water for the previous 7 years, but the average volume of water she drank was not reported.  Her urinary fluoride level was 151 μmol/L (normal range 11–58 μmol/L).  Within 6 weeks after she stopped drinking the well water, her urinary fluoride level dropped by 50%.

One case of what appears to be Stage II skeletal fluorosis was reported from the Gaspe Peninsula of Quebec, Canada (Boyle and Chagnon, 1995).  A 64-year-old Canadian farmer was admitted to a hospital after complaining of severe pain and stiffness in his joints and difficulty in breathing; his wife reported only mild pain in her hands and wrists.  X-rays of the farmer showed increased bone density and urinalysis indicated above normal levels of fluoride.  The water supply for the farm had changed six years earlier when a deep well replaced an earlier surface well.  Samples from the new well had a fluoride concentration of 25 mg/liter and low calcium and magnesium.  The farmer's fluoride intake was estimated to have been approximately 50 mg/day and his wife

about 30 to 40 mg/day for six years.  Within a year of discontinuing use of the well for drinking water, the joint pains had decreased and their flexibility increased.  The patient was monitored to determine if there was any appearance of excess bone growth.  The results suggested that the condition had not progressed to Stage III fluorosis at the time of diagnosis.

**Stage III Skeletal Fluorosis.** In stage III skeletal fluorosis (crippling skeletal fluorosis), deformities develop in the spine and major joints.  There is increased calcification of the joints including the ligaments and, at times neurological effects when the spinal cord becomes compressed by fluorotic bone. For the time period of 1960 to 1997, the Institute of Medicine (IOM, 1997) found only five confirmed cases of stage III skeletal fluorosis in the United States. Two of these case reports are included in Table 3-50; citations were not identified for the others.

Sauerbrunn et al. (1965) documented a case of crippling skeletal fluorosis in Texas.  This individual consumed excessive amounts of water (a condition known as polydipsia) and a significant amount of tea for a good portion of his life until his death at age 64.  His drinking water was thought to contain from 2.4 to 3.5 mg/L fluoride and his drinking water intake (reported by NRC, 2006) was estimated to range from 4 to 8 L per day, which would correspond to a daily fluoride dose about 10 to 28 mg.  A brother who was exposed to these concentrations for the same time period, had the same diet, and lived under similar environmental conditions, but who did not drink excessive amounts of water, only developed mottling of the teeth.

Another case report of an individual with crippling skeletal fluorosis is that of a 55-year old Papago Indian from Gila Bend, Arizona (Goldman, et al., 1971).  Similar to the case described by Sauerbrunn et al. (1965), this individual consumed large quantities of water throughout his life and also drank large amounts of hot tea.  The fluoride drinking water concentrations were estimated to range between 4 and about 8 mg/L; however, total fluoride intake was not reported.

Endemic stage II and stage III skeletal fluorosis are more frequently reported outside the U.S, most often in Africa, China and India.  Cao et al. (2003) evaluated the prevalence of skeletal fluorosis in adults living in the Naqu County area of Tibet.  One hundred eleven adults, $\geq 30$ years old, selected by a randomized sampling method, were included in the study.  The level of fluoride in the water, fuel, soil, food, brick tea, brick tea-water and urine were determined.  Total daily fluoride consumption was calculated to be 11.99 mg/day (with 99% coming from the consumption of brick tea which contained 739 mg F/kg).  (Note: Brick tea consists of mature leaves, twigs and berries of the tea plant *Camellia sinensis* which is compressed into a brick; the brick is pounded into pieces and then cooked in water to become thick brick tea water which is used in cooking). Physical examinations using standardized activities commonly associated with skeletal fluorosis (e.g., fingers could not touch the shoulder, middle finger could not touch the contralateral ear, etc.) were conducted on all the participants. Individual radiographs were taken for those that presented with more than three physical signs.  X-rays were taken of the A-P forearm including the wrist and elbow; the A-P shank including the knee joint; the A-P pelvis; and the A-P and the lateral spine.

Ninety-nine of the 111 subjects presented with more than three physical signs of skeletal fluorosis.  The prevalence of the skeletal fluorosis with more than 3 positive signs increased with age and was most prominent in those aged 60–78. Forty-two of these underwent radiographic examination; 3 (7%) were diagnosed with stage I skeletal fluorosis), 13 (31%) with stage II, and 19 (45%) with stage III.  The most common radiographic change was an increase in bone matrix

density progressing from a trabecular sand-like granular structure to coarse, dense and rough cloth-like appearance of the trabeculae, extensive fine or coarse dense fusion of trabeculae and marble-like bone sclerosis. In addition, fibrous tissue ossification, tendon attachment calcification and articular degeneration were not uncommon.  The study authors concluded that the risk of developing early signs of skeletal fluorosis appeared to be associated with an estimated fluoride intake by adults of 12 mg/day, 67% of which was reported to have come from the ingested tea.

Choubisa (2001) reported on the prevalence of skeletal and dental fluorosis in 21 villages of Banswara, Dungarpur, and Udaipur districts of southern Rajasthan, India, where fluoride (F) concentrations in drinking waters range from 1.5 to 4.0 ppm.  At a fluoride concentration of 1.5 ppm, 6.1, 6.8, and 9.5% of adults in villages of Banswara, Udaipur, and Dungarpur districts, respectively, showed evidence of skeletal fluorosis. Deformities such as crippling, kyphosis, and genu varum (Stage III) were observed most frequently in higher age groups (>40 years) at a fluoride concentration of 2.8 ppm or higher.  Males were more likely to be affected than females. X-rays of the cervical spine, rib cage, lumbar-dorsal spine with pelvis, forearm, and lower limb of 2–3 subjects from each village showed increased bone mass and density, as well as exostoses, calcification of ligaments and interosseous membranes, and osteosclerosis.  A weakness of this study is the fact that there was no assessment of sources of fluoride exposure from non-drinking water sources.

The results of the studies presented in Table 3-50, as well as the epidemiological studies discussed above suggest that a daily fluoride dose in excess of about 10 mg (in the absence of renal deficiency) may produce signs of stage II skeletal fluorosis.  The data, however, are too incomplete to be used in a dose-response analysis to estimate a threshold.  Although NRC (2006) considered stage II skeletal fluorosis to be an adverse effect, it "could not determine from the existing epidemiologic literature whether stage II skeletal fluorosis is occurring in U.S. residents who drink water with a fluoride concentration of 4 mg/L."  Based on data indicating that lifetime exposure to 4 mg F/L drinking water can result in bone fluoride levels (10,000–12,000 mg/kg bone ash) that fall within or exceed the ranges of concentration associated with stage II and stage III skeletal fluorosis, the NRC (2006) concluded that 4 mg F/L in drinking water "has the potential" to induce skeletal fluorosis, but that "more research is needed to clarify the relationship between fluoride ingestion, fluoride concentrations in bone, and stage of skeletal fluorosis before any firm conclusions can be drawn."  At a standard intake rate of 2 liters of drinking water per day, a concentration of 4 mg/L would result in a dose of 8 mg/day.  This dose is below most of those identified in the studies mentioned above, but does not include the potential for additional intake of fluoride through non-drinking water sources.

### 3.3.2.  Bone fractures

Numerous epidemiological and clinical studies have evaluated the occurrence of bone fractures in populations with differing levels of fluoride exposure.  NRC (2006) identified and summarized approximately 30 studies addressing this issue (NRC, 2006, Table 5-1).  NRC (2006) focused their review primarily on epidemiological studies of populations exposed to fluoride levels in drinking water of 2 mg/L and above, and also on clinical studies in which fluoride salts were used to treat osteoporosis.

NRC (2006) identified four observational (epidemiological) studies (Sowers et al., 1991; Kurttio et al., 1999; Li et al., 2001; and Sowers et al., 2005) and four randomized clinical trials (Riggs et al., 1990; Kleerekoper et al., 1991; Pak et al., 1995; and Reginster et al., 1998) as key studies in evaluating the potential increased risks of bone fracture following prolonged exposure to fluoride.  In evaluating such studies, various confounding factors must be considered that might affect bone loss, including dietary restrictions, nutritional status (i.e., calcium, magnesium, phosphorus, and Vitamin D levels); number of pregnancies; and hormone and drug therapies.

### 3.3.2.1.   Epidemiological studies

The four epidemiological studies identified by the NRC (2006) as being key to evaluating the risk of bone fractures from exposure to fluoride in drinking water ($\geq$1.5 mg/L) are summarized in Table 3-51.  All four studies indicate an increased risk of fractures in populations exposed to fluoride levels ranging from >1.5 mg/L to 7.97 mg/L.  Only one of the four studies (Sowers et al., 2005) also considered the effects of varying levels of calcium intake.  More detailed information on the four studies is provided below.

| Table 3-51.   Key Observational Studies Identified by NRC (2006) for Evaluating the Effects of Fluoride in Drinking Water ($\geq$ 1.5 mg/L) on the Risk of Bone Fractures | | | | | | |
|---|---|---|---|---|---|---|
| F in Water (mg/L) | Referent Group (mg F/L) | Population Gender/age | Risk Values | Fracture site | Risk | Reference |
| 4[a] | 1 | F, 55-80 yr | 2.1 (1.0, 4.4)[b] | any fracture | Relative risk | Sowers et al., 1991 |
| | | | 2.2 (1.1, 4.7)[b] | hip/wrist/spine | | |
| 4[a] | 1 | F, 20-92 yr | 2.55 (0.07)[c] | osteoporotic fractures | Risk ratio | Sowers et al., 2005 |
| 2.62–3.56 | 1 | M,F, >20 yr | 1.18 (0.35)[c] | all sites | Odds ratio | Li et al., 2001 |
| | | | 1.73 (0.34)[c] | hip | | |
| 4.32–7.97 | 1 | M,F, >20 yr | 1.47 (0.01)[c] | all sites | Odds ratio | Li et al., 2001 |
| | | | 3.26 (0.02)[c] | hip | | |
| >1.5 | $\leq$ 0.1 | F, 50-65 yr | 2.09 (1.16-3.76)[b] | hip | Adjusted Relative Risk | Kurttio et al. 1999 |
| | | M, 50-65 yr | 0.87 (0.35-2.16)[b] | | | |

Adapted from NRC (2006, Tables 5-2 and 5-3).
[a]With 15 $\pm$ 3 mg Ca/L; referent group exposed to 1 mg F/L and 67 $\pm$ 4 mg Ca/L.
[b]95% CI.
[c]p value.

Sowers et al. (1991, see also Sowers et al., 1986) examined skeletal fractures in adult women of three rural communities in northwest Iowa, as part of the same study in which they also evaluated the effects of fluoride in drinking water on bone density (see Section 3.3.1.1). Women aged 20-35 yr in the high fluoride community ($4.0 \pm 0.1$ mg F/L and $15 \pm 3$ mg Ca/L) had an increased probability of any fracture and of fractures of the spine, hip or wrist as compared with the referent community (1 mg F/L and $67 \pm 4$ mg Ca/L; Table 3-52). The 95% CI for these values, however, both encompassed 1.0. Women in the 55–80 yr old group in the high-fluoride community had an increased relative risk of 2.11 for any fracture (95% CI = 1.01–4.43), 2.20 for fracture at the spine, hip or wrist (95% CI = 1.07–4.69), and 2.2 for multiple fractures (95% CI = 1.0–4.6) compared with the referent community. The data indicate that almost all of the fractures in the high fluoride (4 mg/L) and high calcium groups (375 mg Ca/L and 1 mg F/L) were multiple site fractures. No significant differences in relative risk of any fracture; fractures of the wrist, spine, or hip; or multiple fractures were found between the high-calcium community and the referent community.

| Table 3-52.  Risk of Fracture in a Five-Year Period (1983–84 to 1988–89) among Women of Three Rural Iowa Communities Studied by Sowers et al. (1991) | | |
|---|---|---|
| **Group** | **Relative Risk[a] (95% CI)** | | |
| | **Any Fracture** | **Fracture of the Hip, Wrist or Spine** | **Fracture at Multiple Sites** |
| **Women aged 20–35 years old at baseline[b]** | | | |
| Referent  (1 mg F/L, 67 mg Ca/L) | — | — | |
| High Ca  (1 mg F/L, 375 mg Ca/L) | 0.36 (0.03-3.63) | 0.30 (0.04-3.39) | |
| High F  (4 mg F/L, 15 mg Ca/L) | 1.81 (0.45-8.22) | 2.70 (0.16-8.28) | |
| **Women aged 55–80 years old at baseline** | | | |
| Referent  (1 mg F/L, 67 mg Ca/L) | — | — | — |
| High Ca  (1 mg F/L, 375 mg Ca/L) | 1.54 (0.70-3.37 | 1.60 (0.71-3.40) | 1.60 (0.71-3.41 |
| High F  (4 mg F/L, 15 mg Ca/L) | 2.11 (1.01-4.43)[c] | 2.20 (1.07-4.69) | 2.2 (1.04-4.57) |

[a]Adjusted for age and Quetelet index [weight in kg/(height in m)$^2$].
[b]There were no multiple fractures in this age group.
[c]Relative risk adjusted for baseline radial bone mass = 1.99 (95% CI of 0.95–4.20).

Sowers et al. (1991) concluded that fluoride dose (years of residence multiplied by daily intake from beverages) was positively correlated with increased risk of fracture in the higher fluoride community. The relative risk of fracture in postmenopausal women with a fluoride exposure less than the median was 1.9 (95% CI, 0.88–4.0), while those postmenopausal women with an exposure greater than the median had a relative risk of 2.6 (95 % CI, 1.2–6.0) when compared with pre-menopausal women; however, as indicated, the 95% CI of the two groups overlap indicating that the differences were not significant. These relative risks were adjusted for age and Quetelet index [weight in kg/(height in m)$^2$].

Sowers et al. (2005) measured serum fluoride concentrations and bone mass density (BMD) and evaluated the 4-year fracture frequency among adult (20–92 yrs old) women residents of the

same three Iowa communities studied by Sowers et al. (1986 and 1991).  After adjusting for co-variates (including age, body size, thiazide use, hormone use, and menopausal status), no statistically significant association was found between serum fluoride levels and osteoporotic fractures [Risk ratio (RR) = 1.16, p = 0.66).  Thus, serum fluoride levels in subjects of the community with 4 mg F/L in the water supply were not statistically associated with bone fractures.  NRC (2006) notes that serum fluoride concentrations are not a good indicator of long-term fluoride intake.  They vary among individuals based on recent fluoride intakes, returning to baseline within hours of exposure, and therefore, may not be a good indicator of bone fluoride concentrations or long-term exposure.

In the Sowers et al. (2005) study, the RR for osteoporotic fractures in the group from the high fluoride area was elevated (2.55), but not significantly different (p = 0.07) from the referent group (1 mg F/L and 60 ± 4 mg Ca/L).  The group from the 1 mg/L F, high calcium area had an RR of 3.01 that was significantly different (p = 0.04) from the referent group.  NRC (2006) notes that the latter value suggests that the referent group might have had a low fracture rate because of risk factors not controlled for in the study.  The presence of high calcium would also be expected to reduce fluoride absorption which could have influenced the results for this group. Sowers et al. (2005) did not evaluate their results by age class as was done in the Sowers et al. (1991) study.

Li et al. (2001) conducted a retrospective cohort study in six areas of China with fluoride concentrations ranging from 0.25 to 7.97 mg/L (mean total fluoride intake ranged from 0.73 to 14.13 mg/day).  The subjects were men and women ≥50 yrs old.  Drinking water was considered the major source of fluoride in the study populations.  Dietary intakes of bone-forming nutrients for the six study populations were considered adequate based on 3-day dietary surveys which included estimates of calcium, protein and fluoride intake.  It was determined that drinking water and diet were the main fluoride exposure sources and there was virtually no exposure from sources such as supplements, dentifrice, mouthwash or infant formula. Data were also collected on degree of physical activity, tea drinking, cigarette smoking and alcohol consumption.  Average total daily exposures are reported for each of the exposure groups.  However, the publication does not provide any details on how the daily exposures were determined.  It is not clear whether they were based on drinking water concentrations and intakes alone or whether the dietary data were included in mean exposure estimates.

When compared to the group exposed to 1 mg F/L, the group exposed to 4.32 to 7.97 mg F/L (average 14.13 mg/day) showed a significant increase in overall fractures since age 20 [Odds ratio (OR) = 1.47, p = 0.01], and in hip fractures since age 20 (OR = 3.26, p = 0.02) (Table 3-53).  When the evaluation was based on all fractures occurring since age 50, the group exposed to 4.32 to 7.97 mg F/L had a significantly larger OR of 1.59 (p = 0.02) relative to the 1–1.06 mg/L group. Medical records and X-rays were collected when available.  In cases where the records were lacking, an X-ray of the self-reported fracture was taken to verify the event.

NRC (2006) applied the data presented in Li et al. (2001) to a generalized linear model to estimate that the absolute increase in fractures was 1.3% (95% CI = 0.3% to 2.2%, p = 0.01) for the increment from 1.00 to 4.00 mg/L for overall fractures since age 20.  When segregated by fracture type and age, the absolute increase was 0.4% (95% CI = 0.0% to 0.8%, p = 0.04) for hip fractures since age 20, and 0.9% (95% CI = 0.2% to 1.7%, p = 0.02) for overall fractures since age 50.  NRC, however, also points out that even though a trend for fractures appears to increase

from 1.00 to 4.00 mg/L, the rate for overall fractures at the lowest fluoride exposure level (0.25–0.34 mg/L) was higher than that at 1.0–1.06 mg/L, and in fact, the risk at the lowest level was similar to the risk at the highest exposure level, clearly showing a U-shaped response (Fig. 3-9). Further, the data for fractures of the hip since age 20 suggest that the value at the lowest concentration range may be an outlier, because it is not consistent with the U-shaped dose-response curve observed with the other groupings of the data.

| F in Water (mg/L) | No. | No. with fractures | Prevalence (%) | Odds Ratio (95% CI)[a] | p Value |
|---|---|---|---|---|---|
| **Table 3-53.  Relationship between the Prevalence of Bone Fractures and Fluoride in Drinking Water in Chinese Populations Studied by Li et al. (2001)** | | | | | |
| *Since age 20 yr – overall fractures* | | | | | |
| 0.25–0.34 | 1363 | 101 | 7.41 | 1.50 | 0.01 |
| 0.58–0.73 | 1407 | 90 | 6.40 | 1.25 | 0.17 |
| 1.00–1.06 | 1370 | 70 | 5.11 | 1.00 | — |
| 1.45–2.19 | 1574 | 95 | 6.04 | 1.17 | 0.33 |
| 2.62–3.56 | 1051 | 64 | 6.09 | 1.18  (0.83–1.67) | 0.35 |
| 4.32–7.97 | 1501 | 111 | 7.40 | 1.47  (1.10–1.97) | 0.01 |
| *Since age 20 – fractures of the hip* | | | | | |
| 0.25–0.34 | 1363 | 5 | 0.37 | 0.99 | 0.99 |
| 0.58–0.73 | 1407 | 6 | 0.43 | 1.12 | 0.85 |
| 1.00–1.06 | 1370 | 5 | 0.37 | 1.00 | — |
| 1.45–2.19 | 1574 | 14 | 0.89 | 2.13 | 0.15 |
| 2.62–3.56 | 1051 | 8 | 0.76 | 1.73  (0.56–5.33) | 0.34 |
| 4.32–7.97 | 1501 | 18 | 1.20 | 3.26  (1.21–9.81) | 0.02 |
| *Since age 50 – overall fractures* | | | | | |
| 0.25–0.34 | 1363 | 59 | 4.33 | 1.33 | 0.16 |
| 0.58–0.73 | 1407 | 45 | 3.20 | 0.97 | 0.87 |
| 1.00–1.06 | 1370 | 45 | 3.28 | 1.00 | — |
| 1.45–2.19 | 1574 | 52 | 3.30 | 0.96 | 0.85 |
| 2.62–3.56 | 1051 | 38 | 3.62 | 1.04  (0.65–1.66) | 0.87 |
| 4.32–7.97 | 1501 | 72 | 4.80 | 1.59  (1.08–2.35) | 0.02 |

[a]95% Confidence Limits were estimated by NRC (2006) using the approach of Greenland (1998).



**Figure 3-9.  Prevalence of overall fractures and fluoride concentration in drinking water in six Chinese populations since the age of 20 yr (Li et al., 2001).**

Kurttio et al. (1999) conducted a retrospective cohort study in Finland to determine the effects of water fluoride on the risk of hip fractures.  The study cohort consisted of 66,742 men and 77,885 women born in 1900–1930, who lived in the same rural area from at least 1967 to 1980.  The study population was divided into exposure groups based on the following fluoride concentrations: ≤0.10; 0.11–0.30; 0.31–0.50; 0.51–1.00; 1.10–1.50; and >1.50 mg F/L.  The modeled estimates of fluoride concentrations in well water ranged from below 0.05 mg/L (detection limit) to 2.4 mg/L. When all ages were combined for each gender, there was no correlation (age or area-adjusted) between the rate ratios (RR) of hip fractures and water fluoride concentrations, independent of whether fluoride concentration was treated as a stratified variable or a continuous variable. Age-adjusted and age-area-adjusted RRs for men were 0.97 and 0.90, respectively, and for women 1.07 and 1.10, respectively.

Analysis of the Finnish subjects stratified by age (six 5-year increments), however, found that the crude and adjusted (age, area) RRs for men aged 50–59 were below 1.0, whereas those for women aged 50–64 were above 1.0 (Fig. 3-10). No correlation was found between fluoride concentration and hip fracture in the older subjects (65–80 years old), which the study authors suggested might be due to other more prominent risk factors at higher ages (e.g. age-related changes in calcium absorption, fluoride metabolism, hormonal status, etc.). However, the factors noted are not confounders for the elderly alone and decreased calcium absorption and hormonal status are more often associated with increased fracture risk in the elderly than decreased fracture risk. Accordingly, the increased risk for the 50 to 65 year group compared to the older subjects is counter intuitive.



**Figure 3-10. Rate ratios and 95 percent confidence intervals for the association of the estimated fluoride concentration in well water (df = 1) and hip fractures in men and women (Cox regression). Age-adjusted (■ and ●) and age- and area-adjusted (□, ○) and the narrower cap of 95 percent confidence intervals) are shown (Kurttio et al., 1999)**

Analysis of the data for women aged 50–65 indicated that fluoride was associated with an increased risk of hip fracture this age group (Table 3-54). The adjusted RR was 2.09 (95% CI, 1.16–3.76) for women who were exposed to the greatest fluoride concentrations (>1.5 mg/L) as compared to women exposed to the lowest fluoride concentrations (≤ 0.1 mg/L).

| Table 3-54. Effects of Fluoride in Drinking Water on the Risk of Hip Fractures in Finnish Women Aged 50−65 yr (Kurttio et al., 1999) | | | | |
|---|---|---|---|---|
| **F in Water (mg/L)** | **Crude RR** | **95% CI** | **Age and Area Adjusted RR** | **95% CI** |
| ≤0.1 | 1.0 | | 1.0 | |
| 0.1–0.3 | 1.12 | 0.94−1.35 | 1.16 | 0.93−1.43 |
| 0.3−0.5 | 1.18 | 0.80−1.74 | 1.31 | 0.86−1.99 |
| 0.5–1.0 | 1.31 | 0.99−1.73 | 1.53 | 1.08−2.16 |
| 1.1–1.5 | 1.06 | 0.68−1.65 | 1.24 | 0.77−2.01 |
| ≥1.5 | 1.70 | 0.98−2.96 | 2.09 | 1.16−3.76 |

There are a number of weaknesses in this study, especially the lack of information on the fluoride concentration range represented for the ≥1.5 mg/L grouping and limited identification of possible confounding factors. Fluoride concentrations were modeled. When the modeled values were compared to measured values they were found to be lower by a factor of about 0.7. The grouping of subjects in narrow concentration ranges combined with the uncertainty in the fluoride concentration estimates increases the opportunity for exposure misclassification.

Many earlier studies compared the occurrence of fractures in populations continuously exposed to near optimal levels of fluoride in drinking water with those in populations with shorter exposures and/or to less than optimal levels. Results varied from study to study; some showed a small positive association, others showed a small negative association (see Hillier et al., 1996 for

review of pre-1995 studies, and Demos et al., 2001, for a review of 1991–1998 studies).  A select number of studies are briefly summarized here:

A small, statistically significant increase in relative risk of hip fracture in white men and women aged 65 and older was associated with water fluoridation in a national ecologic study conducted by Jacobsen et al. (1992). The relative risk was 1.08 (95% CI = 1.06–1.10) for women and 1.17 (95% CI = 1.13–1.22) for men. The relationship was observed at the county level and the study authors noted that the observation needed to be further assessed at the level of the individual.  In a later study Jacobsen et al. (1993) examined hip fracture incidence among men and women aged 50 years and older living in Rochester, MN, before and after fluoridation of the public water supply was instituted (1.1 mg F/L).  The study authors did not find a positive association between hip fracture incidence and water fluoridation.

In a study of 2076 women other than African-Americans living in a rural area of Pennsylvania, Cauley et al. (1995) found no evidence that continuous exposure to residential fluoridated drinking water (mean of 1.01mg F/L) was associated with increased risk of wrist or hip fractures when compared to populations with lower fluoride exposures (mean 0.15 mg F/L drinking water).

In a case-control study conducted in the UK, Hillier et al. (2000) evaluated the occurrence of hip fractures in men and women aged 50 years and older living in the English county of Cleveland. The study population consisted of 914 individuals with hip fractures and 1196 controls, of which 514 and 527, respectively, were interviewed.  Exposures to fluoride in water were estimated from residential histories and information provided by water suppliers.  Estimated lifetime exposure to fluoride ranged from 0.15 to 1.79 mg/L.  After adjustment for potential confounders (age, sex, place of residence), the odds ratio associated with lifetime exposure to $\geq 0.9$ mg F/L was 1.0 (95% CI = 0.7–1.5).

Phipps et al. (2000) conducted a multi-city prospective study on risk factors for osteoporosis and bone fractures in 7129 white women ($\geq 65$ yrs old) living in four locations in the United States. Women were classified as having been exposed or not exposed (or unknown exposure) to fluoride from 1950 to 1994.  Exposure to fluoride was determined from a questionnaire on residence history and information provided by water system maps, the 1992 fluoridation census, or as a result of direct contact with the water supplier. Outcomes were compared in women with 20 years continuous exposure to fluoride (N = 3218) to women with no exposures to fluoridated water (N = 2563) during the same time period.  No quantitative information was given on the levels of exposure to fluoride in drinking water.  In women with "continuous" exposure the multivariable adjusted risk for hip fractures was slightly reduced (risk ratio 0.69; 95% CI = 0.5– 0.96, p = 0.028) as was risk of vertebral fracture (risk ratio 0.73; 95% CI = 0.55–0.97, p = 0.033).

McDonagh et al. (2000) utilized data from 29 published studies to conduct a meta-analysis of bone fracture rates in populations exposed to 1 mg/L compared with those in populations living in non-fluoridated areas. The resulting data were evenly distributed around the "no effect point," but statistical testing showed significant heterogeneity among studies. Some of them showed a positive association whereas an almost equal number showed a negative association. Furthermore, the 95% confidence limits on the measures of effects varied considerably from study to study. McDonagh et al. (2000) stated that, although the results suggest no association between water fluoridation at 1 mg/L and bone fractures, such a conclusion should be interpreted with extreme caution.

### 3.3.2.2.   Clinical trials

The NRC identified four randomized clinical trials involving postmenopausal women which they considered relevant to the evaluation of the effects of fluoride on new non-vertebral bone fractures (Table 3-55). As noted by NRC (2006), the four studies were prospective, double-blinded and placebo controlled, and the subjects received supplemental calcium. In some cases (Riggs et al., 1990), a number of the subjects were being treated for osteoporosis and received vitamin D and/or estrogen supplements as well; in other cases (Kleerekoper et al., 1991) women on estrogen therapy were excluded from the trials. NRC reported that the summary risk estimate for new non-vertebral fractures was 1.85 (95% CI = 1.36–2.50) after four years.

In comparing the epidemiological data to that from the clinical trials, the NRC (2006) noted that, although fluoride dose levels used in the clinical trials were much higher than the doses estimated for the epidemiological studies, the estimated total fluoride exposures were similar, as were the estimated bone fluoride concentrations, which would account for the similarities in the increased risk estimates for bone fractures seen in both types of studies. The study using a slow-release form of fluoride (Pak et al., 1995) actually showed a lower relative risk for non-vertebral fractures (see Table 3-55). Pak et al. (1995) also reported that the group receiving slow-release fluoride had a significantly lower vertebral fracture rate ($0.064 \pm 0.182$ per patient-year compared with $0.205 \pm 0.297$ per patient-year; p = 0.002).

An increase in non-vertebral bone fracture risk was observed in a clinical trial conducted by Reid et al. (2007). In this double blind, 4-yr trial, postmenopausal women with osteoporosis, who had been taking estrogen for one year or more, were treated with 20 mg F (as glutamine monofluorophosphate, MFP) or a placebo. The data indicated that the individuals treated with fluoride had an increased risk of non-vertebral fractures (hazard ratio 3.3, 95% CI = 0.8–12.0), but a reduced risk of vertebral fractures (rate ratio of 0.12, 95% CI = 0.06–0.23, p < 0.01; and hazard ratio of 0.20, 95% CI = 0.05–1.30). The hazard ratio takes into account the time to first fracture using a proportional hazard model; the rate ratio compares fracture incidents per 1000 patient-years at risk between groups, assuming a Poisson distribution.

Reid et al. (2007) commented that Riggs et al. (1994), in a reanalysis of the data presented by Riggs et al. (1990), suggested that a rapid increase in bone mass density, brought about by high fluoride doses is associated with increased fracture risk, whereas "modest increments" in bone mass density were protective. Reid et al. (2007) cite a study by Ringe et al. (1999) which showed that fracture rates were lowest in individuals receiving 11 mg F/day compared to those receiving 22 mg F/day, with significantly fewer non-vertebral fractures. A reduction in vertebral

fracture rates (and similar numbers of non-vertebral fractures in both fluoride and placebo groups) had been observed in a study in which 23 mg F/day (together with 945 mg calcium) was administered in a slow release formula (Rubin et al., 2001). Reid et al. (2007) theorized that the bioavailability of the slow-release preparation was lower than that of many other preparations, and the co-administration of the calcium could have further reduced fluoride absorption. Reid et al. (2007) concluded that doses of fluoride less than 20 mg/day are more likely to demonstrate anti-fracture efficacy.

| Dose (mg F/day) | Avg. Period (yr) | Relative Risk | 95% CI | Rate Ratio[a] | 95% CI | Reference |
|---|---|---|---|---|---|---|
| 20[b] | 3.4 | 1.1 | 0.5–2.4 | 1.1 | 0.5–2.3 | Reginster et al., 1998 |
| 23[c] | 3.1 | 0.6[d] | 0.2–2.5 | — | — | Pak et al., 1995 |
| 34[e] | 2.4 | 1.5 | 0.7–3.5 | 3.0 (hot spots) | 2.0–4.6 | Kleerekoper et al., 1991 |
| 34[e] | 3.1 | 16.8 (incomplete) | 3.9–1.7 | | | Riggs et al., 1990 |
| | | 1.6 (complete) | 1.0–2.5 | 1.9 (complete) | 1.1–3.4 | |
| | | 2.5 (total)[f] | 1.7–3.7 | 3.1 (total)[d] | 1.8–5.6 | |
| | | 2.3 (complete, hip) | 0.6–8.8 | | | |

**Table 3-55. Clinical Studies Assessing the Risk of Non-Vertebral Fractures in Postmenopausal Women Receiving Therapeutic Doses of Fluoride**

**SOURCE:** Adapted from NRC (2006, Tables 5-3 and 5-4); based on a meta-analysis of Haguenauer et al. (2000).
[a]Rates were computed, presumably by NRC, "by dividing the number of incident fractures (possibly more than one person per subject) by participating person-time".
[b]Administered as sodium monofluorophosphate, 4 years.
[c]Administered as 50 mg sodium fluoride/day, slow-release; 12 months on, 2 months off; 4 cycles.
[d]Presumably calculated by Haguenauer et al. (2000); not specifically reported by Pak et al. (1995).
[e]Administered as 75 mg sodium fluoride/day, 4 years.
[f]Total fractures includes complete and "incomplete" stress fractures, the latter observed by roentgenography in participants reporting acute lower extremity pain syndrome.

### 3.3.3. Summary and conclusions
### 3.3.3.1. Skeletal fluorosis

Stage II skeletal fluorosis, characterized by sporadic pain, stiffness of the joints, and osteosclerosis of the pelvis and spine, was identified by NRC (2006) as an adverse effect associated with exposure to fluoride. In the United States very few reports of stage II and stage III skeletal fluorosis have been documented. The results of the limited epidemiological studies and cases histories suggest that a daily fluoride dose in excess of 10 mg may be required to produce signs of stage II skeletal fluorosis (except possibly in the case of individuals with renal disease). A daily dose of 10 mg is above the dose level that would result from a fluoride concentration of 4 mg/L and a daily drinking water intake rate of 2 L (excluding fluoride intake through non-drinking water sources). However, based on data indicating that lifetime exposure to 4 mg F/L drinking water can result in bone fluoride levels (10,000–12,000 mg/kg bone ash) that fall within or exceed the ranges of concentration associated with stage II and stage III skeletal fluorosis, the NRC (2006) concluded that 4 mg F/L in drinking water "has the potential" to induce these levels of fluorosis, but that "more research is needed to clarify the relationship

between fluoride ingestion, fluoride concentrations in bone, and stage of skeletal fluorosis before any firm conclusions can be drawn." Consequently, the currently available data are not sufficiently robust to support a dose-response analysis of the effects of fluoride in drinking water on the skeletal fluorosis.

### 3.3.3.2. Bone fractures

After evaluating the available data, NRC (2006) concluded that there was sufficient consistency among the small set of relevant epidemiological studies "to suggest the potential for increased risk" of bone fracture from exposure to drinking water containing 4 mg F/L or higher, compared to exposure to 1 mg/L. NRC (2006) further stated that data from animal studies and randomized clinical trials are consistent with the observational (epidemiological) evidence in humans, and that biochemical and physiological data indicate a biologically plausible mechanism by which fluoride could weaken bone (i.e., the incorporation of fluoride into the hydroxyapatite of the bone leading to an alteration of the crystalline structure and resulting in lower strength per unit volume). The majority of the NRC (2006) committee concluded that "lifetime exposure to fluoride at drinking water concentrations of 4 mg /L or higher are likely to increase fracture rates in the population, compared with exposure at 1 mg F/L, particularly in some susceptible demographic groups that are more prone to accumulate fluoride in their bone." Indeed, as summarized in Table 3-56, an increased relative risk of bone fracture at the higher fluoride drinking water levels is identified in all the key studies (although not at statistically significant levels in all cases). Since drinking water fluoride intake may be only a fraction of total fluoride intake, risks of bone fracture may be elevated at relatively low fluoride drinking water concentrations.

Additional information on bone fracture rates at fluoride concentrations lower than 2 mg/L, are included in Table 3-56. The results, in general, support the conclusions of the NRC that relative risk of fracture increases with increasing fluoride concentration; however, there are a few studies (Simonen and Laitinen, 1985; Jacobsen et al. 1993; Lehmann et al., 1998) in which the occurrence of fractures and/or relative risk at 1 mg F/L were actually lower than those seen at lower fluoride concentrations. Furthermore, as pointed out by NRC (2006), in the study of Li et al. (2001), the risk of overall fractures in the > 20 yr old group exposed to 0.25–0.34 mg F/L was significantly increased when compared to the 1 mg/L group (odds ratio 1.50; p = 0.01) (Fig. 3-9). Fractures of the hip in the >50 yr olds in the lowest exposure group (0.25–0.34 mg F/L) were also increased when compared to the 1 mg/L group, although not statistically significant (p = 0.16). According to NRC (2006), this is evidence of a U-shaped dose-response curve and is plausible based on some animal studies indicating a biphasic relationship between bone fluoride concentrations and bone strength. One possible explanation is that fluoride delivered to bone tissue at low sustained doses is more likely to produce a more stable skeletal microstructure than that which occurs following intermittent spikes of exposure which could lead to instabilities in the microstructure. If true, then under certain circumstances and in some populations, fluoride water concentrations in the range of 1 mg/L may, in fact, reduce the risk of fractures compared to lower exposure levels. In three of the key epidemiologic studies (Sowers et al., 1991, 2005, and Li et al., 2001), the referent group was exposed to 1 mg F/L drinking water. Likewise in the clinical trials assessing the occurrence of fractures following therapeutic use of fluoride (Section 3.3.2.2), relative risks were based on comparisons to placebo-dosed individuals who were from

areas with 1 mg F/L in drinking water.  Thus, in both types of studies the referent groups were usually exposed to 1 mg F/L in drinking water.

| Table 3-56.  Epidemiological Studies Evaluating the Effects of Fluoride in Drinking Water on the Risk of Bone Fractures | | | | | | |
|---|---|---|---|---|---|---|
| **F in Water (mg/L)** | **Referent Group (mg F/L)** | **Gender/age** | **Risk Values** | **Fracture site** | **Type of Risk** | **Reference** |
| <0.1 | 1 | M, >50 yr<br>F, >50 yr | 2.5 (1.6–3.9)[d] (p<0.001)<br>1.5 (1.2–1.8)[d] (p<0.05) | femoral-neck | Relative risk | Simonen and Laitinen, 1985 |
| Fluoridated | Not fluoridated ≤0.3 | F, ≥65 yr<br>M, ≥65 yr | 1.08 (1.06–1.10)[c]<br>1.17 (1.13–1.22) | hip | Relative risk | Jacobsen et al., 1992 |
| 1.1 (for 10 yr) | <1.1 (for 10 yr) | M,F; ≥50 yr | a. 0.63 (0.46, 0.86)[d]<br>b. 0.48% (pre-fluoridstion)<br>c. 0.45% (post-fluoridation) | hip | a. Relative risk<br>b. % incidence[f]<br>c. % incidence[f] | Jacobsen et al., 1993 |
| Fluoridated (~ 1) | Not fluoridated (~0.15) | F, ≥65 | 1.04 (0.84–1.29)[c]<br>0.99 (0.78–1.24)<br>1.09 (0.70–1.72)<br>0.83 (0.44–1.59)<br>0.94 (0.58–1.54) | non-spine<br>osteoporotic<br>wrist<br>hip<br>vertebral | Relative risk | Cauley et al., 1995 |
| 0.08–0.36<br>0.77–1.20 | | F, ≥60 yr | 0.18%<br>0.14% (p<0.0001) | hip | Age-adjusted mean annual incidence | Lehmann et al., 1998 |
| 1 | <0.3 | F, ≥65 | 1.27 (1.08-1.46)[d] | hip | Relative risk | Danielson et al., 1992 |
| 0.11–0.25<br>>0.25 | 0.05–0.11 | M,F, ≥65 yr | 3.25 (1.66–6.38)[d]<br>2.43 (1.11–5.33)[d] | hip | Odds ratio | Jacqmin-Gadda et al., 1998 |
| 0.11–1.83 | 0.05–0.11 | M,F, ≥65 yr | 1.86 (1.02–3.36)[e] | hip | Odds ratio | Jacqmin-Gadda et al., 1995 |
| 4[b] | 1 | F, 55–80 yr | 2.11 (1.01–4.43)[d]<br>2.20 (1.07–4.69)[d] | any fracture hip/wrist/spine | Adjusted relative risk | Sowers et al., 1991 |
| 4[b] | 1 | F, 20–92 yr | 2.55 (0.07)[c] | osteoporotic fractures | Risk ratio | Sowers et al., 2005 |
| Fluoridated | Not fluoridated | F, ≥65 yr | 0.69 (0.50–0.96)[d](0.028)[c]<br>0.73 (0.55–0.97)[d](0.033)[c]<br>1.32 (1.00–1.71)[d](0.051)[c]<br>0.85 (0.58–1.23)[d](0.378)[c] | hip<br>vertebrae<br>wrist<br>humerus | Risk ratio | Phipps et al., 2000 |
| 0.25–0.34<br>2.62–3.56<br>4.32–7.97 | 1 | M,F, >20 yr | 1.50  (0.01)[c]<br>1.18 (0.35)[c]<br>1.47 (0.01)[c] | all sites | Odds ratio | Li et al., 2001[a] |
| 0.25–0.34<br>2.62–3.56<br>4.32–7.97 | 1 | M,F, >20 yr | 0.99 (0.99)[c]<br>1.73 (0.34)[c]<br>3.26 (0.02)[c] | hip | Odds ratio | Li et al., 2001[a] |
| 0.25–0.34<br>2.62–3.56<br>4.32–7.97 | 1 | M,F, >50 yr | 1.33 (0.16)[c]<br>1.04 (0.87)[c]<br>1.59 (0.02)[c] | all sites | Odds ratio | Li et al., 2001[a] |
| >1.5 | ≤ 0.1 | F, 50–65 yr | 2.09 (1.16–3.76)[d] | hip | Adjusted rate ratio | Kurttio et al., 1999[a] |

[a]Identified by NRC (2006) as providing the most useful data for fluoride concentrations ≥2 mg/L.
[b]With 15 ± 3 mg Ca/L; referent group 1 mg F/L and 60  ± 4 mg Ca/L.
[c]p value; compared with referent group.
[d]95% CI.
[e]90% CI.
[f]Based on person years.

The one key drinking water study that did estimate relative risk by comparison to negligible fluoride exposures was that of Kurttio et al. (1999).  Women aged 50–65, exposed to >1.5 mg F/L drinking water were found to have an adjusted relative risk of 2.09 (95% CI = 1.16–3.76) for hip fractures, when compared to the group exposed to <0.01 mg/L.  The NRC (2006) considered this study "not sufficient alone to base judgment of fracture risk for people exposed at 2 mg/L" (their proposed point of departure for increases in dental fluorosis).   In the Kurttio et al. (1999) study, the reported fluoride concentrations were modeled estimates which showed a strong association with measured values (N = 1411).  The study authors reported a 0.71 correlation between analyzed and estimated values. At the highest concentrations, the estimated values tended to be 0.7 times less than the measured values which may have biased the risk estimates towards the null.  However, monitoring data at some sites indicated concentrations in excess of 6 mg/L which would have been estimated at less than 2 mg/l based on the model.  Thus, it is unclear what levels of exposure were responsible for the hip fractures in the 50–65 yr old women in the >1.5 mg/L group. Specific information on other non-drinking water sources of fluoride for the study population, as well as data on nutritional state, alcohol and tobacco use, estrogen therapy and physical activity was not included in the report.  Only 13 hip fractures were recorded in the 50–65 yr old women in the high exposure group (>1.5 mg F/L).  There may be a number of confounding factors associated with women in this age group which may not have been accounted for.  The women studied were of child-bearing age during the wartime years and nutritional deficiencies and number of pregnancies, may have affected their health status in later years.

Overall, the available data indicates that exposure to concentrations of fluoride in drinking water of 4 mg/L and above is suggestive of and appears to be positively associated with increased the relative risk of bone fractures in susceptible populations when compared to populations exposed to 1 mg F/L.  However, there are insufficient data to conclude that this increase in relative risk would also apply if comparisons were made to groups exposed to negligible fluoride concentrations or if comparisons were made based on total fluoride intake rather than on the basis of drinking water concentrations.

4.      **Approaches to Quantification of Dose-Response**

Based on information summarized in Section 3, the critical effect associated with exposure to fluoride (i.e., the adverse effect most likely to occur at the lowest exposure level) is severe dental fluorosis, a condition considered by the NRC (2006) to be an adverse health effect.  Severe dental fluorosis has been identified in a small percentage of populations exposed to fluoride levels in drinking water as low as 2 mg/L.  In contrast, there is no clear evidence that fluoride will cause other types of adverse health effects such as stage II skeletal fluorosis or bone fractures at levels as low as those associated with severe dental fluorosis.  Therefore, the endpoint considered here for a dose-response analysis is severe dental fluorosis.

4.1.    **Critical Study for Severe Dental Fluorosis**

As noted in Section 3, the study that appears to provide the most useful data regarding the effects of fluoride in drinking water on the occurrence of severe dental fluorosis is that conducted by Dean (1942).  Dean (1942) surveyed 22 U.S. communities in 10 states where fluoride levels in drinking water ranged from 0.0 to 14.1 mg/L (Table 4-1), and examined a total of 5824 children for dental fluorosis.  The strengths of this study are: 1) the dataset is sufficiently large and robust; 2) the range of fluoride concentrations is quite wide;  3) the protocol is sound; 4) there were few alternate sources of commercially available fluoride at the time the study was conducted (e.g., mouthwash, dentifrice, etc.) to confound the data or findings; 5) the concentration-response relationship shows a clear increasing risk of severe fluorosis with increasing fluoride concentration; and 6) the findings are consistent across several different communities. Weaknesses of the study include the following: 1) only white children were included in the survey; 2) potential socio-economic and cultural differences between the samples populations from the different towns were not documented; 3) cultural (e.g., dental hygiene practices and care, and dietary habits) and physiological differences (changes in average body weight, and hormonal changes resulting in decreasing age of menarche) between children in the Dean's study populations and today's children may complicate extrapolation of the Dean data to present day populations.

The children studied by Dean (1942) were primarily in the age range of 9 to 14 yrs old and/or in school grades 2–12.  The dental fluorosis status of each participant in the study was recorded according to Dean's Index of Fluorosis (see Section 2 for description), a categorical scoring system in which 0 represents no evidence of fluorosis; 0.5, questionable; 1, very mild; 2, mild; 3, moderate; and 4, severe fluorosis (including pitting).  The frequency of occurrence of each score was computed within each study population (Table 4-1).

The Dean (1942) data and results are summarized by increasing fluoride concentration (mg/L) in drinking water (Table 4-1), rather than fluoride intake from the drinking water. The water intakes (L/day) were not reported, and would have varied across the surveyed population.  It is recognized that the levels of dental fluorosis observed in the Dean (1942) study are the result of cumulative fluoride exposure and dose during the most sensitive period of tooth enamel formation and not the fluoride exposure at the time observations were made.  It is also understood that, in addition to fluoride exposures from drinking water ingestion, the Dean (1942) populations are likely to have also been exposed to fluoride present in dietary items grown or cooked with fluoride-containing water.

| Town | No | Age (yr) | F (mg/L) | Dean's Index | | | | | |
|------|-----|----------|----------|-----|-----|-----|-----|-----|-----|
| | | | | 0 | 0.5 | 1 | 2 | 3 | 4 |
| Waukegan, IL | 423 | 12–14 | 0.0 | 97.9 | 1.9 | 0.2 | 0.0 | 0.0 | 0.0 |
| Michigan City, IN | 236 | 12–14 | 0.1 | 97.5 | 2.5 | 0.0 | 0.0 | 0.0 | 0.0 |
| Zanesville, OH | 459 | 12–14 | 0.2 | 85.4 | 13.1 | 1.5 | 0.0 | 0.0 | 0.0 |
| Lima, OH | 454 | 12–14 | 0.3 | 84.1 | 13.7 | 2.2 | 0.0 | 0.0 | 0.0 |
| Marion, OH | 263 | 12–14 | 0.4 | 57.4 | 36.5 | 5.3 | 0.8 | 0.0 | 0.0 |
| Elgin, IL | 403 | 12–14 | 0.5 | 60.5 | 35.3 | 3.5 | 0.7 | 0.0 | 0.0 |
| Pueblo, CO | 614 | 12–14 | 0.6 | 72.3 | 21.2 | 6.2 | 0.3 | 0.0 | 0.0 |
| Kewanee, IL | 123 | 12–14 | 0.9 | 52.8 | 35.0 | 10.6 | 1.6 | 0.0 | 0.0 |
| Aurora, IL | 633 | 12–14 | 1.2 | 53.2 | 31.8 | 13.9 | 1.1 | 0.0 | 0.0 |
| Joliet, IL | 447 | 12–14 | 1.3 | 40.5 | 34.2 | 22.2 | 3.1 | 0.0 | 0.0 |
| Elmhurst, IL | 170 | 12–14 | 1.8 | 28.2 | 31.8 | 30.0 | 8.8 | 1.2 | 0.0 |
| Galesburg, IL | 273 | 12–14 | 1.9 | 25.3 | 27.1 | 40.3 | 6.2 | 1.1 | 0.0 |
| Clovis, NM | 138 | 9–11 | 2.2 | 13.0 | 16.0 | 23.9 | 35.4 | 11.0 | 0.7 |
| Colorado Springs, CO | 404 | 12–14 | 2.6 | 6.4 | 19.8 | 42.1 | 21.3 | 8.9 | 1.5 |
| Plainview, TX | 97 | 9–12 | 2.9 | 4.1 | 8.3 | 34.0 | 26.8 | 23.7 | 3.1 |
| Amarillo, TX | 289 | 9–12 | 3.9[a] | 3.1 | 6.6 | 15.2 | 28.0 | 33.9 | 13.2 |
| Conway, SC | 59 | 9–11 | 4.0 | 5.1 | 6.7 | 20.4 | 32.2 | 23.7 | 11.9 |
| Lubbock, TX | 189 | 9–12 | 4.4 | 1.1 | 1.1 | 12.2 | 21.7 | 46.0 | 17.9 |
| Post, TX | 38 | ~8–11[c] | 5.7[b] | 0.0 | 0.0 | 0.0 | 10.5 | 50.0 | 39.5 |
| Chetopa, KS | 65 | ~7–17[d] | 7.6[b] | 0.0 | 0.0 | 9.2 | 21.5 | 10.8 | 58.5 |
| Ankeny, IA | 21 | ~6–17[d] | 8.0[b] | 0.0 | 0.0 | 0.0 | 9.5 | 47.6 | 42.8 |
| Bauxite, AK | 26 | 14–19 | 14.1[b] | 0.0 | 0.0 | 3.9 | 3.9 | 38.5 | 53.8 |

**Table 4-1. Percent Distribution of Fluorosis in Populations Studied by Dean (1942), Sorted by Concentration of Fluoride in Community–specific Drinking Water Supplies**

**SOURCE:** Modified from Dean (1942).
[a] "Subject to a possible correction to 4.2 mg/L during susceptible period of age group examined" (no other explanation given by Dean, 1942).
[b] Single determination, all others are arithmetical means of 12 consecutive monthly samples.
[c] Grades 4–6.
[d] Grades 3–12.
[e] Grades 2–12.

## 4.2.   Categorical Analysis of Dean (1942) Study

Dean's (1942) entire data set was initially analyzed during the present assessment by use of a categorical data analysis procedure (categorical model, or CATMOD) developed by the SAS© Institute of Cary, NC.  Categorical analysis is particularly well suited for rank or score data such as are presented in Dean (1942), and for which it is useful to investigate and measure the strength of association between and among data categories. The CATMOD procedure incorporates a maximum likelihood logistics regression model to identify best-fit models (as log-linear modeling, logistic regression, and repeated measurement analysis) to the dataset of response frequency functions.

For the Dean (1942) dataset, the CATMOD procedure (detailed in Appendix A) aggregated the 6 classification responses (e.g., Dean's scores 0, 0.5, 1, 2, 3, 4) and determined not only that the Dean's score data were positively correlated with variable concentration but also that high fluoride concentrations in water could indicate the presence of the more severe dental fluorosis

categories.  For the severe fluorosis category (Dean's score of 4), one of the 22 data points examined is that for Bauxite, AR, where the presence of alumina dusts generated by a nearby aluminium smelter may have been a compromising factor.  As a consequence, the data from Bauxite were then removed and the resulting modified dataset re-analyzed.  Categorical analysis of variance indicates that fluoride concentration in this dataset is significantly and positively associated with severity of effect ($\chi^2 = 1101.86$, p <0.0001).



## Dean's Index of Fluorosis
(Subgroup size: Min N = 348, Max N = 4175)

**Figure 4-1.  Maximum likelihood logistics regression analysis (CATMOD Procedure) of Dean (1942) data. Asterisk (\*) indicates mean, horizontal line within box is median, and box boundaries indicate interquartile range surmounted by error bars.  Solid circles represent data points that are not bounded by interquartile range or error bars.**

### 4.3.    Benchmark Dose Analysis of Dean's Data on Severe Fluorosis

A Benchmark Dose (BMD, USEPA Benchmark Dose Software ver. 2.0) analysis was also conducted using the severe dental fluorosis data of Dean (1942).  Because the categorical analysis indicated that the Bauxite, AR, data point was an outlier (a confounding factor for the city of Bauxite was the presence of excessive amounts of alumina in the environment due to proximity of an operational aluminum mine and smelter), this data point was removed from the data set and not used in the BMD analysis. The data set used in the BMD analysis consisted of nine study sites where there was at least one occurrence of severe dental fluorosis, and also Galesbury, IL, the town that had the highest fluoride concentration without any cases of severe fluorosis.  A preliminary run was conducted using the BMD logistics, log logistics, probit, log probit, and dichotomous Hill models.  The results indicated that the best-fit model was the dichotomous Hill model (Table 4-2).

| Table 4-2.  Comparison of Regression Models Used to Analyze Dean's (1942) Data | | | | |
|---|---|---|---|---|
| **Model** | **AIC[a]** | **Goodness of Fit** | | |
| | | $\chi^2$ | **d.f.** | **p value** |
| log Probit | 721.805 | 5.96 | 8 | 0.6518 |
| Probit | 742.463 | 24.42 | 8 | 0.0019 |
| log Logistic | 728.566 | 11.64 | 8 | 0.1681 |
| Logistic | 754.388 | 34.00 | 8 | 0.0000 |
| Dichotomous Hill | 721.162 | 3.284 | 7 | 0.8576 |

[a]Akaike Information Criterion (AIC), a measure of comparison for statistical models (as intercept–only vs. fitted models).  The model exhibiting the smallest AIC value is preferred.

This model contains an asymptotic term useful for modeling responses that plateau at less than a 100% response level. The dichotomous Hill model was run to ascertain the BMD and BMDLs for 0.5%, 1% and 5% severe fluorosis. The BMD for 5% severe fluorosis is 3.28 mg/L (BMDL = 3.11 mg/L). The BMD for 1% severe fluorosis is 2.43 mg/L (BMDL = 2.18 mg/L).   For 0.5% severe dental fluorosis, the BMD was 2.14 mg/L and the BMDL 1.87 mg/L.  Statistical analysis of the data indicated that estimation of 0.1% severe fluorosis was outside the range of probability that the data set can support.  The complete BMD output of the dichotomous Hill model for 0.5% severe fluorosis is given in Appendix B, and the resulting plot is shown in Fig. 4-2.



Figure 4-2.  Benchmark dose analysis (BMDS vers. 2.0; with 95% CL) for the dichotomous Hill model for 0.5% severe fluorosis (data of Dean, 1942).

The OW also tried to model the Dean (1942) data on moderate fluorosis in order to determine the prevalence of moderate dental fluorosis at the BMD for 0.5% severe dental fluorosis. Unfortunately, none of the models was able to obtain an acceptable fit to the data even with the sequential removal of the locations with the three highest fluoride concentrations.

***Sensitivity Analysis of the Benchmark Dose Derivation.*** To determine to what degree the BMD might be affected by a plateau in the response at the highest fluoride concentrations, the dicotomous Hill model was run with sequential elimination of the data for the two highest concentrations. These two data points differ from the remaining Dean data set in that the fluoride concentrations were based on single measurements rather than 12 consecutive monthly samples, and the study population covered a wider age range (grades 2-12, roughly equivalent to ages 6–17 years), both factors which could introduce a unquantifiable degree of uncertainty in the results.

The p values for goodness of fit were 0.9551 and 0.9216 for running the model without the highest concentration and the two highest concentrations, respectively, and the corresponding BMD values for 0.5% severe fluorosis were 2.12 and 2.16 mg/L (BMDL values 1.84 and 1.85 mg/L, respectively) indicating that removing these values improved the fit, but had very little effect on the BMD (2.14 mg/L) and BMDL (1.87 mg/L) which were obtained when these two data points were included. These results support the use of the Dean data set for deriving a point of departure for the severe fluorosis endpoint using the BMD approach.

***Effect of Altitude and Elevated Temperatures on BMD Derivation.*** Several studies have suggested that high altitudes or elevated ambient temperatures may affect the development of dental fluorosis (see Section 3.1.4). Several of the study sites included in Dean's study fall within these two categories (see Table 4-3). In order to test the effects of temperature and altitude on the resulting BMDL derived from Dean's data, the BMD analysis (dichotomous Hill model) was conducted on data sets which excluded the two sites with the highest maximum temperatures and also the two highest altitude sites. Results are shown in Table 4-4. The best model fit was achieved using all the data points (but excluding that for Bauxite, AR). Therefore, it can be concluded that for this particular data set, the results were not affected by altitude or temperature.

| Table 4-3.  Temperature and Altitude Data for Selected Dean Study Sites | | | | |
|---|---|---|---|---|
| Site | Year | Annual Mean of Monthly Mean Maximums | Annual Mean of Monthly Means | Altitude |
| Clovis, NM | 1943 | 78.4°F | 61.7°F | 4289 ft |
| Colorado Springs, CO | 1942 | 64.3°F | 49.9°F | 6104 ft |
| Amarillo, TX | 1947 | 69.8°F | 56.4°F | 3608 ft |
| Plainview, TX | 1942 | 74.3°F | 59.5°F | 3369 ft |
| Lubbock, TX | 1947 | 73.0°F | 58.7°F | 3253 ft |
| Post, TX | 1964* | 76.5°F | 63.3°F | 2619 ft |
| Conway, SC | 1942 | 77.2°F | 65.4°F | 20 ft |

**SOURCE**: NOAA;  http://cdo.ncdc.noaa.gov/ancsum/ACS
* Incomplete data.

| Table 4-4.  Comparison of BMD and BMDLs for 0.5% Severe Fluorosis Using Dean's Data  Set Adjusted for Warm Climates and High Altitudes | | | |
|---|---|---|---|
| Data Set | BMD (mg/L) | BMDL (mg/L) | p value |
| A. Site with highest F level excluded (Bauxite, AK) | 2.14 | 1.87 | 0.8576 |
| B.  As in A, but with two high altitude sites excluded (Clovis, NM and Colorado Springs, CO) | 2.19 | 1.75 | 0.6543 |
| C.  As in A, but with two high temperature sites excluded (Post, TX and Conway, SC) | 2.15 | 1.86 | 0.6718 |
| D. As in A, but with two high altitude and two high temperature sites excluded | 2.20 | 1.73 | 0.3617 |

## 4.4.    NOAEL/LOAEL Approach for Severe Fluorosis

The Dean (1942) data for severe fluorosis (see Table 4-1) can be applied directly to the LOAEL/NOAEL (Lowest-Observed-Adverse-Effect Level/No-Observed-Adverse-Effect Level) approach.  In this case, a fluoride drinking water concentration of 2.2 mg/L in Clovis, NM, is the lowest concentration associated with severe fluorosis (0.7%), and is therefore the LOAEL.  The NOAEL corresponds to a fluoride concentration of 1.9 mg/L recorded in Galesburg, IL, where no occurrence of severe fluorosis was recorded.

## 4.5.    Summary and Conclusions

The critical study chosen for analysis of the association between dental fluorosis and fluoride concentrations in drinking water is that of Dean (1942) due to its large size and geographic scale (22 U.S. communities in 10 states; 5824 children), range of fluoride concentrations evaluated (from 0.0 to 14.1 mg/L; see Table 4-1), and selection of an appropriate age class (school children primarily between the ages of 9 and 14; an age class in which a very high percentage of permanent teeth have erupted). In addition, every tooth per subject was examined using the same scoring protocol (see Section 2 for description), and the community water supplies were tested for fluoride content by the same chemist (see Table 1, p. 29 of Dean, 1942).   This dataset is sufficiently large and robust to support statistical analysis, the protocol is sound, and there were few alternate sources of commercially available fluoride (e.g., mouthwash, dentifrice, etc.) or fluoridated community water supplies to confound the dental fluorosis data collected by Dean (1942) at the time this study was conducted (late 1930's and early 1940's). Study weaknesses include lack of information on dietary fluoride intake, and lack of data on drinking water intakes. Another limitation is the relatively smaller numbers of children examined in high-fluoride communities.  Although Dean (1942) notes that water chemistry data collected during the period of dental examination might not reflect the fluoride concentrations present during the years of tooth development, a requisite for inclusion of data in his study was a common water supply within each study location whose history showed no relevant changes in either physical set-up,

source, or composition during the time period that covered the life span of the subjects examined.

Categorical analysis of the Dean (1942) data set comparing Dean scores vs. fluoride water concentrations indicates that these rank data are acceptable for dose-response modeling. Further, results from the SAS[©] CATMOD (Categorical Model) Procedure indicated that the fluorosis score data of Dean (1942) were positively correlated with the fluoride concentration in water, and that high fluoride water concentrations were predictive of more severe fluorosis levels in teeth.

The benchmark dose model was applied to determine the statistical association between the prevalence of severe fluorosis and the concentration of fluoride in drinking water at the studied locations. The Benchmark Dose for a 0.5% severe fluorosis was determined to be 2.14 mg/L, with a lower 95% CL of 1.87 mg/L. The BMD is very close to the LOAEL of 2.2 mg/L for 0.7% severe fluorosis identified in the Dean (1942) study (see Table 4-1), and the BMDL is only slightly below the NOAEL of 1.9 mg/L identified for the community of Galesburg, IL.

In this report, data sets characterizing the relationship between severe dental fluorosis and dental caries, as well as the relationship between fluoride exposure and skeletal fractures in adults, were evaluated to determine if these associations were candidates for dose-response modeling. Background conditions for the cavity data were highly varied (different geographic locations, variation in accessibility to dental care, and subject age). Some evidence is available supporting the hypothesis that caries prevalence increases at fluoride levels greater than those having an anticariogenic effect. However, those data are not amenable to dose-response modeling and the dose-response varies across the different studies. The available database characterizing the relationship between skeletal fractures relative to fluoride exposure is limited at this time. Additional dose-response research is needed before modeling for association with cariogenic or skeletal endpoints can be undertaken.

## 5.    Reference Dose Derivation

Section 4 of this report establishes severe dental fluorosis as the critical effect for fluoride exposure during the period of pre-eruptive, permanent tooth-enamel formation.  Prior evaluations of the effects of excess fluoride (Koop, 1984; NRC, 1993) considered all stages of enamel fluorosis as a cosmetic effect, albeit one to avoid if possible.  However, NRC (2006) classified severe dental fluorosis as adverse due to the associated thinning and/or pitting of the enamel that weakens its role in protecting the dentin.

After examining the dose-response data for several aspects of dental fluorosis, EPA determined that data on the relationship between drinking water concentration and the occurrence of severe fluorosis was amenable to modeling.  Dean (1942) was selected as the critical study because of the size of the population studied and the number of data points provided.  In addition, this study was conducted prior to the introduction of fluoridation of water systems and the introduction of fluoride into dental products.  Accordingly, the confounding contribution of non-dietary sources to total fluoride exposure was minimal at that time. In many of the localities evaluated by Dean (1942), the source of fluoride in water was of geochemical origin. Therefore, the Dean (1942) dataset represents a population for which drinking water was the major source of fluoride exposure, with dietary intakes from local produce contributing only a small amount to total exposures.

The Benchmark Dose analysis (Section 4) of the relationship between drinking water concentration and the severe enamel fluorosis identified a BMD of 2.14 mg/L and BMDL (95% confidence bound) of 1.87 mg/L for the prevalence of severe dental fluorosis in 0.5% of the children evaluated.

Utilization of the BMD/BMDL data in derivation of an RfD requires conversion of the exposure associated with a drinking water concentration of 1.87 mg F/L to a dose in mg/kg/day for the sensitive population and knowledge of the vulnerable ages for development of enamel fluorosis. Severe fluorosis of the permanent teeth is a condition that lasts for the lifetime of the tooth, but can only occur during a defined period of tooth development. Determination of the dose associated with severe dental fluorosis is not an easy task because data on drinking water intakes and body weights for the populations studied and the individuals with severe fluorosis were not collected.  Accordingly, an indirect approach must be employed.  Consideration of the beneficial fluoride doses that increase the resistance of enamel to cavities is also an important consideration in selecting a point of departure for the RfD determination.

### 5.1.    Nutritional Guidelines

Risk assessment for elements such as fluoride with beneficial as well as adverse properties is a challenge, especially when there is a narrow boundary between the doses that are beneficial and those that have adverse effects.  The NAS established the first dietary recommendations for fluoride in 1989 (NRC, 1989).  At that time, fluoride was not classified as an essential element, but was considered beneficial for humans because of its valuable contributions to dental health (NRC, 1989).  The estimated range of safe and adequate dietary intakes (including drinking water) for adults was defined as a daily intake of between 1.5 and 4 mg F/day.  The estimated

safe and adequate intake range for the first year of life was identified as 0.1 to 1 mg/day and that for the 1–3 year old age group as 0.5 to 1.5 mg/day.

The dietary guidelines for fluoride were revised by the Institute of Medicine (IOM) in 1997.  The 1997 revisions (see Table 5-1) considered fluoride as a nutrient based on its presence and function in bones and tooth enamel. The dietary intake information (including fluoride from drinking water) was used to establish Adequate Intake (AI) guidelines for each age, life-stage (i.e. pregnancy or lactation), and/or gender grouping covered by the Dietary Reference Intakes (DRI).   An AI is defined as an estimate of the average nutrient intake by a group or groups of healthy people within a designated age, life-stage, and/or gender grouping and is the recommended dietary guideline when data to determine a more precise Estimated Average Requirement (EAR) are not available.  The AI is based on observed or experimentally determined estimates of average intakes by a group or groups of healthy people; in this case, those receiving drinking water optimally fluoridated to achieve optimal anticaries protection. The AI established for fluoride is 0.05 mg/kg/day for all age groups above 6 months, and is based on data from four studies of the dietary fluoride intake of children in the United States or Canada from optimally fluoridated communities (~ 1 mg/L) that were published after 1980.  The IOM (1997) converted the 0.05 mg/kg/day AI to mg/day intakes based on the average body weights for the age groups of concern in the OW assessment (Table 5-1).

| Table 5-1.  Adequate Intake (AI) Reference Values and Tolerable Upper Intake Levels (UL) for Select Age Groups. | | | | |
|---|---|---|---|---|
| Age Range (Body wt. in kg) | Criterion | AI (mg/day)[a] | | UL (mg/day) |
| | | Males | Females | |
| 0–6 mon (not reported) | Human milk content | 0.01 | 0.01 | 0.7 |
| 7–12 mon (9 kg) | Caries prevention | 0.5 | 0.5 | 0.9 |
| 1–3 yr (13 kg) | Caries prevention | 0.7 | 0.7 | 1.3 |
| 4–8 yr (22 kg) | Caries prevention | 1 | 1 | 2.2 |
| 9–13 yr (40 kg) | Caries prevention | 2 | 2 | 10 |
| 14–18 yr (boys, 64 kg; girls, 57 kg) | Caries prevention | 3 | 3 | 10 |

SOURCE: IOM (1997).
[a]AI is the observed estimate of nutrient intake that reduces the occurrence of dental caries in a group of healthy individuals.

The IOM (1997) also established a Tolerable Upper Intake Level (UL) for fluoride in different age, life-stage, and/or gender groupings. A UL is defined as the maximum level of a total chronic daily intake of a nutrient that is unlikely to pose risks of adverse health effects for almost all individuals in the general population. In the case of fluoride, the UL for infants and children up to age 8 was selected based on prevention of moderate dental fluorosis; for all other age groups, the UL was selected based on the prevention of skeletal fluorosis.

In the derivation of the UL for children, IOM (1997) used the Dean (1942) data and considered that there was a less than a 5% prevalence of moderate dental fluorosis at a 2 mg/L drinking water concentration.  At this concentration IOM estimated that fluoride intakes would range from 0.08 to 0.12 mg/kg/day.  The body weight and water intakes used for this estimate are not provided.  The middle of the range (0.1 mg/kg/day) was identified as a LOAEL for moderate dental fluorosis "the threshold beyond which moderate enamel fluorosis appears in some

children" (IOM, 1997).  The LOAEL was divided by an uncertainty factor of 1 to establish a dose of 0.1 mg/kg as the UL for infants and children through eight years of age.  Based on reference weights of 7 kg and 9 kg, respectively, the UL for infants in the first six months of life is 0.7 mg/day and that for the second six months is 0.9 mg/day.  Children were divided into two age groups, those one to three years old (bw = 13 kg) and those 4 through 8 years old (bw = 22 kg).  The UL for the first group of children is 1.3 mg/day and that for the second group is 2.2 mg/day.  The UL for all other age groups is 10 mg/day and was based on a NOAEL of 10 mg/day for the development of skeletal fluorosis.

## 5.2.    Period of Developmental Sensitivity to Dental Fluorosis

The U.S. EPA (1985) and the IOM (1997) have used birth to the age of 8 or 9 years as the period of concern for dental fluorosis. These early assessments focused on fluorosis of the anterior teeth because, from a cosmetic perspective, they are the most visible teeth.  Data suggesting that severe dental fluorosis may increase the risk for caries throughout the lifetime (NRC, 2006; Forsman, 1974) broadens the concern for severe fluorosis induction to cover the time period of enamel formation of both the anterior and posterior teeth.  A study by Groenveld et al. (1990) concluded that about 66% of the anticaries impact of fluoride on pit and fissure cavities of the posterior teeth with high caries susceptibility was due to pre-eruptive fluoride exposure, while the pre-eruptive contribution to protection of the anterior teeth with smooth surfaces was 25%.

A study of fluorosis in 70 children, ages 6.5 to 13, living in a village in Greenland and who had received sodium fluoride tablets (0.5 mg/day) showed that the age at which fluoride administration was initiated increased the risk of developing dental fluorosis and the teeth impacted (Larsen et al., 1985).  Exposures during ages 2.5 to 5.5 years were associated with fluorosis of the upper central incisors, from 2.5 to 4.5 years with the first molars, and from 5.5 to 8.5 years with the 2nd molars. The controls were children from the same age range who had not receive the fluoride tablets; all children were lifetime residents of the same village. The local water supply had a concentration of 0.1 mg F/L.  Outside of these age periods the risk was not significantly greater than that for the controls.  None of the children had TFI scores greater than 3.  It is important to note that the third molars would not have erupted and thus would not have been included in the analysis.

The dose-response curve developed from the Dean data is for the secondary teeth since, at the time of examination, approximately 94% of the permanent teeth were present (Dean, 1942). There are no dose-response data for primary teeth comparable to that from Dean (1942) for secondary teeth. The mineralization of the secondary teeth begins at about 6 ± 2 months with the incisors, whereas that for the primary teeth begins in utero (Massler and Schour, 1958).  The developing secondary teeth remain rather quiescent until age 2 years ± 6 months when formation of the other permanent teeth begins and the incisors begin to increase in size.  Tooth mineralization continues until age 10 years when all teeth except the wisdom teeth appear to be completely calcified.  Eruption of all teeth except for the wisdom teeth is complete by about age 13 (ADA, 2005).  The wisdom teeth erupt between ages 17 and 21 but are formed by age 15 years ± 6 months.  Since enamel formation appears to be complete by age 15 years, EPA has considered the period of greatest sensitivity to severe enamel fluorosis as the time from six months through 14 years of age in this assessment in order to cover the formation of the wisdom teeth.

The data indicate that fluoride exposure and developmental age are the major factors influencing the occurrence of severe dental fluorosis. However, as described in Section 3.1.4, there are other stressors that influence fluorosis development including diet, climate, altitude and possibly genetics. Low intakes of enamel-forming nutrients such as calcium and phosphorous could, when combined with exposure to excess fluoride, increase the tendency for fluorotic defects in the hydroxyapatite crystal lattice of the tooth enamel. However, no data were identified that directly support this hypothesis. Co-exposure to some other minerals (strontium, zinc; see Section 3.1.4.3) can influence the staining of teeth but not the enamel (pitting) defects of severe dental fluorosis.

Some studies (Section 3.1.4.1) show that there is an impact of climate on the prevalence of severe dental fluorosis. Areas with higher ambient air temperatures have a greater prevalence of fluorosis than those with a more temperate climate, hypothetically because of the direct relationship between temperature and drinking water intake (Galagan and Lamson, 1953; Galagan and Vermillion, 1957). Neither climate nor diet is likely to have had a major impact on the fluorosis data in the Dean (1942) study since all of the key cities represented in the concentration-response assessment have fairly comparable latitudes and average ambient air temperatures (See Figure 5-1 and Table 3-15).



**Figure 5-1.  Sampling sites used in Dean (1942) dental fluorosis study.**

There are some data (Section 3.1.4.2) from countries outside of the United States that suggest the prevalence of dental fluorosis may be increased at elevated altitudes (>2000 m).  Respiratory water loss may account for the altitude effects because at higher altitudes and low atmospheric pressure there is a greater than normal loss of water vapor from the lungs (IOM, 2005). In areas where ambient air temperatures are high, respiratory water losses may be accompanied by increased water intake. None of the sites in the Dean (1942) data set fell at altitudes over 2000 m although Colorado Springs, CO (one of 21 sites) has an altitude of 1900 m. Dose-response modeling in the presence and absence of the high temperature and high altitude sites, as well as both combined, showed there was little impact on the BMD and BMDL. Other factors discussed in Section 3.1.4 such as acid/base balance would not be influenced by the geographic position of the Dean (1942) observation sites.

### 5.3.    Dose Determination for Severe Dental Fluorosis

As mentioned above, an indirect approach was required in order to estimate the dose associated with severe dental fluorosis in the affected segment of the populations studied by Dean (1942) because data on drinking water intakes were not collected.  In the absence of drinking water intake data from the time of the Dean (1942) study, EPA used data collected during the 1977/1978 Nationwide Food Consumption Survey (Ershow and Cantor, 1989) on drinking water intakes and body weights of children during the susceptible age period to estimate their fluoride doses in mg/kg/day for the mean, 75th, 90th, and 95th percentile tap water consumer groupings. These data were selected because they provide the drinking water intake information that lie closest to the time of the Dean study and the body weight data are consistent with the growth curves for children from 1923 (Proudfit, 1923) and 1958 (Cooper et al., 1958); these dates bracket the time of the Dean (1942) studies. The water intake and body weight data were converted to estimated fluoride doses using the following equation:

$$\textbf{Estimated F dose} = \frac{\textbf{F concentration at the BMDL x L tap water consumed}}{\textbf{body weight}}$$

The assumption that drinking water was the primary source of exposure to fluoride in the communities studied is justified by the fact that, at the time of the Dean (1942) study, there was no fluoride in toothpaste or other dental products and no use of fluoride supplements.  In addition, there was no intentional fluoridation of community water supplies thus limiting the introduction of fluoride from drinking water into commercial foods and beverages processed in the many areas of the country with low natural levels of fluoride.

This calculation provides a range of doses for different age grouping at mean and each percentile of drinking water intake evaluated.  Any drinking water intakes (mean or percentile) that resulted in doses that were less than or equal to the 0.05 mg/kg/day IOM AI value associated with optimal, anticaries protection were eliminated from consideration as doses causing severe dental fluorosis.  At the time of the Dean (1942) study there were no data to suggest that severe dental fluorosis was present in situations where the drinking water fluoride concentration fell between 0.7 and 1.1 mg/L, the drinking water concentrations from the seven studies that were used as the basis for the IOM (1997) AI recommendation of 0.05 mg/kg/day.

The BMDL is a lower bound estimate of the tap water fluoride concentration associated with 0.5% severe dental fluorosis in a large population (5,824) of children as determined by the drinking water concentration-response observed in 20 locations studied.  The sensitivity analysis presented in Section 4.3 shows that the BMDL is not affected appreciably by differences in the modeling approach.  Because it is the deposition of fluoride in the crystal lattice of the tooth enamel that causes dental fluorosis, it is assumed that the small number of children who displayed severe dental fluorosis in the Dean (1942) publication were either sensitive to its effects or those that received excess exposure to fluoride during the period when the affected enamel was being formed.  Where exposure was the main contributor to the effects it was assumed that tap water was the source of almost all of the fluoride exposure. Nutritional and/or genetic factors may have played a role in the development of severe dental fluorosis for some affected individuals, however, these factors were assumed to have a minimal impact on the concentration-response noted in communities studied by Dean (1942) with drinking water concentrations near the BMDL.  Doses generated from drinking water intakes (mean or percentile) that were greater than 0.05 mg/kg/day AI were considered as points of departure for the drinking water component of the RfD analysis.

### 5.3.1.  Body Weight and Drinking Water Intakes

As mentioned in Section 5.3, EPA was not able to identify data that provide a detailed analysis of average body weights and water intakes for the sensitive population during the time the Dean (1942) data were collected.  Comprehensive body weight and drinking water intake data were identified in two important sources covering later time periods.  The first source (Ershow and Cantor, 1989), provided body weight and drinking water intake information (direct and indirect) from the 1977–1978 U.S. Department of Agriculture (USDA) Nationwide Food Consumption survey.  The other source is the U.S. EPA analysis of the data from the USDA 1994–1998 Continuing Survey of Food Intake by Individuals (CSFII) as presented in U.S. EPA, 2004.

There are some differences in the methodologies used to generate the 1989 and 2004 reports, but the general approach to data analysis and the framework for the analysis are the same.  The data are reported by Ershow and Cantor (1989) as gram intakes of tap water per day rather than the milliliters per day (mL/day) used in the EPA reports.  Thus, the gram intakes were converted to milliliters using a density for water of 1 g/ml.

Ershow and Cantor (1989) reported mean body weights and tap water intakes; tap water included direct and indirect uses.  Tap water intake was defined as the sum of drinking water intake and water added in final home or restaurant preparation of beverages and food.  U.S. EPA (2004) reported mean body weights and direct and indirect drinking (tap) water intakes   Direct drinking water refers to ingestion of plain drinking water and indirect water was defined as water used in the final preparation of foods and beverages at home or by food service establishments such as school cafeterias and restaurants (U.S. EPA, 2004). The combination of direct and indirect water reported in the U.S. EPA (2004) report is equivalent to the total tap water consumption in the Ershow and Cantor (1989) report. Both groups reported the mean body weights and water intakes using the same age groupings. The Ershow and Cantor data (1989) were derived from survey data contributed by about 26,000 participants (8621 children in the age range of interest) and collected during the 1970's. The data from the 1994–1998 CSFII (U.S. EPA, 2004) were contributed by about 21,000 participants (9687 children in the age range of interest).

Table 5.2 summarizes the body weight and tap water intake data (direct and indirect) from the Ershow and Cantor (1989) report for the age groups of interest; Table 5-3 summarizes comparable data (consumers only for the children) from the EPA (2004) report.  Ershow and Cantor (1989) did not provide consumer only data in their report but did use three-days of dietary recall information rather than the two-days used for the EPA (2004) analysis.  The consumer-only analysis from (EPA, 2004) was based only on recall data where water intake was provided for both days.  It was the judgment of Ershow and Cantor (1989) that their estimates of average intakes were fully representative of population intakes for all age groups other than the infants. They felt that intakes reported for formula-fed infants could be underestimations of actual exposures because the recall information did not distinguish between powdered, concentrate and ready-to-feed formula.

| Table 5-2.  Body Weight and Tap Water Intake in the United States (Ershow and Cantor, 1989) | | | | | |
|---|---|---|---|---|---|
| Age Range (years) | Mean Body Wt. (kg) | Tapwater Intake | | | |
| | | Mean (ml) | 75th Percentile (ml) | 90th Percentile (ml) | 95th Percentile (ml) |
| 0.5–0.9 | 9.2 | 328 | 480 | 688 | 764 |
| 1–3 | 14.1 | 646 | 820 | 1162 | 1419 |
| 4–6 | 20.3 | 742 | 972 | 1302 | 1520 |
| 7–10 | 30.6 | 787 | 1016 | 1338 | 1556 |
| 11–14 | 47.7 | 925 | 1196 | 1621 | 1924 |

As is apparent from a comparison of Table 5-2 and 5-3, tap water intake seems to have been greater in the 1970's than in the 1990's, with the exception of the 0.5 to 0.9 year-old infants. This is consistent with dietary data indicating that there has been an increase in the intake of bottled water and commercial beverages in place of tap water over the last decade (EPA, 2004; IOM, 1997). Measures of bottled water intakes and commercial bottled beverages are not included in the Ershow and Cantor (1989) report because at the time of the Nationwide Food Consumption survey in 1977/1978, bottled water was not as important a commercial product as it was at the time of the 1993–1998 survey.  Based on the EPA (2004) report, bottled water accounts for 13 % of mean total water intake.  Mean body weights have also increased slightly for the older age groups. The Ershow and Cantor (1989) data were used in the dose analysis that follows because they were collected during a time period closer to the Dean (1942) study.

| Table 5-3.  Body Weight and Drinking Water Intake Data (Consumers Only) from Estimated Body Weight and Per Capita Water Ingestion in the United States – An Update (U.S. EPA 2004) | | | | |
|---|---|---|---|---|
| Age Range (years) | Mean Body Wt. (kg) | Tapwater Intake | | |
| | | Mean (ml) | 90th Percentile (ml) | 95th Percentile (ml) |
| 0.5–0.9 | 9 | 467 | 971 | 1,147 |
| 1–3 | 14 | 349 | 723 | 946 |
| 4–6 | 21 | 442 | 943 | 1,176 |
| 7–10 | 32 | 487 | 993 | 1,241 |
| 11–14 | 51 | 641 | 1415 | 1,742 |

The children studied by Dean (1942) were largely 9 to 14 years old; however, their severe fluorosis developed during the pre-eruptive earlier period of enamel formation. The age ranges

used in this U.S. EPA assessment range from six-months (the beginning of enamel formation on the secondary teeth (Massler and Schour, 1958) through age 14 in order to cover late enamel development of the wisdom teeth. Since wisdom teeth were not likely to have erupted in the children evaluated by the Dean study, they would not be reflected in the severe fluorosis values observed by Dean (1942).

### 5.3.2.  Dose Estimates

The dose estimates generated using the drinking water intake values and mean body weights in Table 5-2 are summarized in Table 5-4. The values in Table 5-4 represent the doses associated with drinking water intakes and body weights for each of the age groups evaluated.

| Table 5-4.  Estimates of Fluoride Doses at Specific Tap Water Intakes for Age Groupings During the Sensitive Window for Development of Severe Enamel Fluorosis (at 1.87 mg F/L) | | | | |
|---|---|---|---|---|
| Age Range (Years) | Fluoride Exposure (mg/kg/day) | | | |
| | Mean | 75th Percentile | 90th Percentile | 95th Percentile |
| Ershow and Cantor, 1989 | | | | |
| 0.5 – 0.9[a] | 0.07 | 0.10 | 0.14 | 0.16 |
| 1−3 | 0.09 | 0.10 | 0.15 | 0.19 |
| 4−6 | 0.07 | 0.09 | 0.12 | 0.14 |
| 7−10 | 0.05 | 0.06 | 0.08 | 0.10 |
| 11−14 | 0.04 | 0.05 | 0.06 | 0.08 |

[a]Dose estimates for infants may underestimate the actual doses because of the lack of reliable information on the type of formula used for bottle-fed infants.

As children grow, their body weights, eating, and drinking water consumption patterns change. It is therefore important to evaluate each combination of water intake and body weight variables to determine the appropriate point of departure for the RfD determination.  Consideration of more than one age grouping with associated estimates of drinking water intake provides a fuller picture of the impact of age, water intake and body weight on fluoride dose from ingestion of drinking water containing 1.87 mg F/L, the derived BMDL for 0.5% severe fluorosis (see Section 4.3).

Examination of the dose estimates for individuals based on mean water intakes in Table 5-4 demonstrates that two of the doses, 0.04 and 0.05 mg/kg/day, are not appropriate as the point of departure for the RfD because they fall at or below the recommended fluoride intake level of 0.05 mg/kg/day (IOM, 1997). The same is true of the 0.04 and 0.06 mg/kg/day dose estimates at the 75th and 90th percentile drinking water intakes. The OW selected 0.07 mg/kg/day as the contribution of the drinking water to the RfD because it provided a reasonable difference (0.02 mg/kg/day) between it and the IOM (1997) intake (0.05 mg/kg/day) that was the basis for the AI considering day-to-day dietary variability.  Although the lower 0.06 mg/kg/day dose estimate also exceeded the IOM (1997) estimate of need, OW felt that a 0.01 mg/kg/day difference between the IOM estimate and a dose from drinking water that caused severe dental fluorosis was too small given the range of dose estimates in Table 5-4 and the uncertainties surrounding both the AI and the drinking water component of the RfD.  The range of estimates for the mean water intakes is 0.04 to 0.09 mg/kg/day and that for the full range of water intakes is 0.04 to 0.19 mg/kg/day.  The Dean (1942) report provided only drinking water concentration information; it included no data on diet or drinking water intakes for the children studied.  It is thus unclear whether high water intakes, individual sensitivity, or a combination of both factors predisposed

some children to severe rather than mild or moderate fluorosis in the populations studied by Dean (1942).

Support for the EPA fluoride dose estimates, as derived from drinking water intake estimates and the calculated BMLD for severe dental fluorosis, is provided by the data from the Iowa Fluoride Study (Hong et al., 2006a, b). As part of this study, 579 children were evaluated for dental fluorosis of the eight permanent incisors and four first molars at 8–10 years of age (mean 9.2 years). The fluoride intake of these same children had been followed from birth through 48 months by means of questionnaires their parents completed every 3–4 months (Hong et al., 2006b). Daily fluoride intake in mg/kg/day was estimated from water, beverages, and selected foods, fluoride supplements and dentifrice. Fluorosis was evaluated using the Fluorosis Risk Index (FRI). Severe Fluorosis cases were defined as having FRI definitive staining and/or pitting on both maxillary central incisors. [This characterization of severe fluorosis differs from that of the Dean Index in that it includes staining without pitting.] Individuals with FRI questionable fluorosis were excluded. The importance of fluoride intake during different time periods was assessed using t-tests and logistic regression.

One hundred and thirty-nine (24%) subjects had fluorosis (mostly mild) on both maxillary central incisors. Mean age-specific fluoride intake per unit body weight (bw) ranged from 0.040 to 0.057 mg/kg bw, with higher intake during earlier time periods and relative stability after 16 months (Hong et al., 2006a). In bivariate categorical analyses, fluoride intakes during each of the first 4 years were individually significantly related to fluorosis on maxillary central incisors, with the first year most important ($P < 0.01$), followed by the second ($P < 0.01$), third ($P < 0.01$), and fourth year ($P < 0.03$). Multivariable logistic regression analyses showed that, after controlling only for the first year, the later years individually were still statistically significant. When all four time periods were in the model, the first ($P < 0.01$) and second years ($P = 0.04$) were still significant, but the third ($P = 0.32$) and fourth ($P = 0.82$) were not. The lack of severe fluorosis in this population provides some support for considering intakes of 0.04 and 0.05 mg/kg day as below the threshold for severe fluorosis.

In a second publication, (Hong et al., 2006a) reported estimated fluoride intakes from birth to 36 months based on the questionnaire mentioned above. Relative risks for fluorosis were significantly elevated for intakes of 0.04 to 0.06 mg/kg/day and >0.06 mg/kg/day, compared with intakes <0.04 mg/kg/day. The highest relative risk 4.76 (2.39–9.41; 95% CI) was found for the average 24 to 36 month period. The few subjects (8) classified as having severe dental fluorosis all had fluoride intakes >0.06 mg/kg/day. Severe fluorosis was defined by the FRI as including staining and/or pitting of the central incisors or first molars. In that respect, this categorization differed from that of Dean where "discrete or confluent pitting" was necessary in order to categorize the fluorosis as severe.

EPA contacted Dr. Steven Levy, director of the Iowa Study and asked if he would be able to determine if any of the eight cases identified as severe by the FRI demonstrated pitting of the enamel. Dr. Levy (2010) reported back to EPA that only one of the eight cases (0.2% of the subjects with dietary records) had pitting according to photographs of the children's teeth. The pictures for a second child could not be located. Dr. Levy also provided EPA with the fluoride intake estimates (mg/kg bw) from water, selected foods, supplements and dentifrice for each of eight severe fluorosis cases.

The child that had the pitting of the enamel was apparently breast fed for at least the first 6 months. Starting at about 6 months the baby received substantial amounts of infant formula reconstituted with tap water.  At 8 months, the tap water source was changed from one with 0.05 mg/L F to one with 1 mg/L F.  The 9-month exposure record had the highest estimated daily fluoride intake (0.118 mg/kg bw) reported over the three-year period.  The average daily intake from 16 through 36 months was 0.079 mg/kg bw. Between 20 months and 36 months, the fluoride exposure estimate exceeded 0.08 mg/day in 4 of 5 reports.  The affected child's average fluoride intake for 3 to 9 months was the lowest of the 8 children in the data set shared by Dr Levy likely reflecting breast feeding for the first six to nine months.

For the 16 month to 36 month period, 2 of seven children had higher estimated average intakes than the child with pitted enamel. Their teeth developed staining, but no pitting.  Exposure records for the 8th child were deficient after the first year, with data for only one of seven reports. The child with the missing pictorial dental record had only two exposure reports of the five expected over the first year and both were > 0.1 mg/kg bw.  That child's average intake for the 16 month to 36 month period was 0.056 mg/kg bw.

There are limitations to the exposure records from this study as discussed in Hong et al. (2006a). There was no direct verification of the data reported by the parents in the questionnaires.  Also the questionnaire was administered at 3 to 4 months intervals and could not capture day to day variations in the children's exposures. The questionnaire did not ask for information on the use of fluoride mouth washes or gels. In some cases, records were incomplete because parents did not submit questionnaires for some of the time periods.  Given these limitations, the data suggest that both cumulative and episodic exposures during critical windows of enamel formation could have an impact on staining and pitting of the central incisors and first molars in children when they are exposed during the period 0.5 to 3 or 4 years of age.  This is the approximate time these teeth are forming (Massler and Schour, 1958). They are also supportive of the EPA fluoride dose estimates in Table 5-4 for children in this age range with severe dental fluorosis as defined by Dean when they are average consumers of drinking water at the BMDL (1.87 mg/L fluoride) for 0.5% severe fluorosis.

## 5.4.    RfD Determination

The point of departure for the drinking-water RfD is a dose of 0.07 mg/kg/day as identified in Section 5.3.2.  This dose is greater than the beneficial dose of 0.05 mg/kg/day and allows a 0.02 mg/kg/day difference between the AI and RfD.  It is less than the IOM UL estimate of 0.1 mg/kg/day, which was based on a <5 % increase in moderate dental fluorosis.  The OW drinking water RfD estimate is based on the lower bound confidence limit for the fluoride concentration associated with a 0.5% prevalence of severe dental fluorosis.  Thus, the two estimates are not necessarily in conflict.

$$RfD = \frac{0.07 \text{ mg/kg/day}}{1} = 0.07 \text{ mg/kg/day}$$

where:

| | | |
|---|---|---|
| 0.07 mg/kg/day | = | Lower Limit on Benchmark Dose estimates (in mg/kg bw/day) associated with severe fluorosis in the population studied by Dean (1942). |
| 1 | = | A composite Uncertainty Factor following EPA guidelines (see Section 5.4.2) |

It is unfortunate that the Dean (1942) publication does not provide any data on which teeth were the two most severely fluorotic teeth that became the basis of the fluorosis score.  Had those teeth been identified, it might have been possible to more precisely identify the age period of greatest sensitivity.  Without that data, it is necessary to consider the entire age period of enamel formation as the time of vulnerability to fluorosis.  Dean (1942) does mention that, in one community with a drinking water concentration of 1.2 mg/L, 11.1 % of the teeth positive for fluorosis were incisors or first molars and 88.9 percent were cuspids, bicuspids and second molars; however, none of the children in this population had moderate or severe fluorosis.

When conducting risk assessments involving exposures through drinking water, the BMDL concentration of 1.87 mg/L can be used in place of the RfD as the appropriate point of departure for determination of the MCLG because it does not include the uncertainty associated with assumptions used to calculate the drinking-water RfD.  A relative source contribution (RSC) factor would be applied to the BMDL concentration to account for exposure to fluoride through media such as dental products that were not available at the time the Dean (1942) data were collected.

The drinking water-based RfD was adjusted to account for the additional fluoride intake from foods at the time of the Dean (1942) study.  OW determined from the data presented by McClure (1943) that an intake of fluoride from a diet where solid foods had an average concentration of 0.50 ppm fluoride appeared to provide a reasonable basis for the contribution of solid foods to total fluoride exposure in the 1930 to 1940 time frame (see Appendix D).  The dietary fluoride intakes estimated by McClure (1943) for the 1–3, 4–6, 7–9 and 10–12 year old age groups consuming foods with an average of 0.5 ppm fluoride were divided by the midpoint of the ranges of body weights provided by McClure (1943) to derive the dose estimate for the contribution from solid foods.  The result of this calculation was an estimated dietary intake of 0.01 mg F/kg/day when the individual values for each age grouping were rounded to two decimal places (see Appendix D).

The final OW estimated oral RfD for fluoride was therefore:

| | | |
|---|---|---|
| Oral RfD | = | Intake from DW + Intake from food |
| **Oral RfD** | **=** | **0.07 mg/kg/day  + 0.01 mg/kg/day = 0.08 mg/kg/day** |

### 5.4.1.   Application of Estimated Oral RfD to Adult Populations

The estimated oral RfD (0.08 mg/kg/day) is protective against severe dental fluorosis in children during the critical period of enamel formation.  This value is likely also protective against fluoride-related adverse effects in adults, including skeletal fluorosis and an increased risk of bone fractures.  The oral RfD includes a drinking water component of 4.9 mg/day [equivalent to a drinking water concentration of 2.45 mg F/L (DWEL) for a 70 kg adult drinking 2 liters per day], and a food component of 0.7 mg/day (for a 70 kg man), and resulting in a total daily intake of 5.6 mg F/day.

In evaluating the data available for skeletal effects of fluoride (Section 3.3), EPA did not identify data that were good candidates for dose- or concentration-response modeling. Unlike severe enamel fluorosis which showed a linear concentration-response, the skeletal effects display a biphasic relationship of fluoride exposure and its impact on bone strength which cannot be accommodated by currently available models. Although the bone effects could not be reliably modeled for dose-response, the data examined in this current analysis indicated that the skeletal effects are unlikely to occur at the 1.87 mg/L BMDL for severe dental fluorosis.

The NRC (2006) qualitatively suggested that adults could be at risk for bone fractures at a fluoride drinking water concentration approaching 4 ppm (8 mg/day assuming a 2 L/day drinking water intake). The World Health Organization (2002) concluded that there was an increased risk of bone fractures at total fluoride intakes of $\geq 14$ mg/day in some countries and an increased risk of bone effects at total intakes above about 6 mg/day based in part on a study of bone fractures by Li et al. (2001) conducted in China.  The oral RfD of 5.6 mg/day, including a drinking water component of 4.9 mg/day (for a 70 kg person), is protective compared to each of these benchmarks.

### 5.4.2.   Uncertainty factors

In establishing an estimated oral RfD for fluoride, data on nutritional benefit were assessed in combination with the data on severe dental fluorosis to define a level that provides anticaries protection without causing severe dental fluorosis when consumed daily for a lifetime. Conventional application of uncertainty factors is not always appropriate when carrying out a risk assessment for nutrients and other beneficial substances, especially when there is a relatively small difference between the levels that satisfy need and those that cause adverse effects.  For this reason the total uncertainty factor applied was 1.  The widely recognized variability in epidemiological data on the prevalence of severe dental fluorosis combined with the data demonstrating the anticaries benefit of exposures to fluoride at concentrations at or below the BMDL do not support any other approach.  The margin of difference between the AI and RfD is 0.03 mg/kg/day.

The point of departure for the oral RfD analysis is the lower bound for 0.5 % severe dental fluorosis in children.  The sample size was large (138 to 404 individuals per data point in the critical area around the BMD (1.9–2.6 mg/L) and the participants were randomly selected. Geographic and climate differences related to the places of residence of the children examined were unlikely to contribute to sensitivity.  The population studied is the group vulnerable to

dental fluorosis of the secondary teeth (children ages 6 months to 14 years) eliminating the need for an intraspecies UF.  The duration of exposure covered the full period of sensitivity to severe dental fluorosis of the secondary teeth.  An oral RfD of 0.08 mg/kg/day appears to be protective for possible impacts on bone fractures and skeletal fluorosis in adults, and should be protective of severe dental fluorosis of the primary teeth as well. Accordingly, an uncertainty factor of other than 1 is not needed for intrahuman variability ($UF_H$) and for extrapolation from a subchronic to chronic exposure ($UF_S$). In addition, human data provide the basis of the estimated oral RfD. Therefore, an adjustment for the use of animal data ($UF_A$) is not necessary. The use of a BMDL for 0.5% severe fluorosis as the POD eliminated the need for a LOAEL to NOAEL extrapolation ($UF_L$)

The standard toxicity database for fluoride is complete negating the need for a database uncertainty factor ($UF_D$).  It includes chronic, reproductive, and developmental studies in animals as well as a variety of epidemiology studies in humans (NRC, 2006).  Although NRC (2006) did identify research needs for the endocrine, neurological and other effects of fluoride, they generally concluded that available studies on other effects were not sufficient to assess public health relevance to the U.S. population.  To date, the best documented and established public health consequences of fluoride exposure are severe dental fluorosis, skeletal fluorosis and increased risk of bone fractures.

As a consequence, 1 is the chosen value for each of the following uncertainty factors used in this estimate of the fluoride oral RfD:  $UF_H$, $UF_A$, $UF_S$, $UF_L$.  The composite UF is also equal to 1.

### 5.4.3.   Confidence in the Estimated Oral RfD

Confidence in the BMDL for fluoride exposure from drinking water is high because of the large number of children evaluated in the critical study and the fact that the data were collected before drinking water fluoridation, fluoridated supplements, and dental products were introduced. There remains some uncertainty that concentrations in water, especially in those communities with high naturally occurring fluoride levels, adequately capture total fluoride exposure. However, other exposures in those communities would increase, rather than decrease the BMDL.

Confidence in the estimated oral RfD may be impacted by uncertainties concerning the accuracy and sensitivity of the method used to measure fluoride in the water sources for the municipalities included in the Dean (1942) study (see Section 3.1.1). The method, modified zirconium-alizarin reagent with visual color comparison to standard solutions, is no longer used; however, the regent has been reported to be sensitive to small increments of fluoride over a range of 0.0 to 3.0 ppm, the critical range for assessing the threshold for severe fluorosis, and within this range it approximates Beer's law (Megregian and Maier, 1952). In addition, Dean's data appear to be:

- Internally consistent as evidenced by the BMD stability when end points at the high and low end of the curve were removed,

- Supported by later studies on some of the same water sources showing similar concentrations,

- Used average concentration values from 12 consecutive months for all but the three systems with the highest prevalence of severe dental fluorosis, thereby compensating for potential individual and seasonal variation,

- Based on water quality data from the same time period, and not likely to have been compromised by high levels of interfering substances.

Confidence in the estimated oral RfD is medium because of the difficulties encountered in converting the concentration-response data to dose estimates for the RfD derivation.

### 5.4.4.  Impact of nutritional requirements on dentition and other uncertainties

There are a few studies that have identified severe dental fluorosis in individuals from the United States exposed to fluoride in drinking water at a concentration lower than 1.87 mg F/L (Driscoll et al., 1983; Galagan and Lamson, 1953).  However, both studies were completed after the beginning of fluoridation and the introduction of fluoride from fluoridated water into the food supply. The Driscoll et al. (1983) study was conducted after fluoride was introduced into dental products.  Accordingly, they do not contribute to uncertainty regarding the Dean (1942) results.

The prevalence of fluorosis can be affected by factors which alter rates of intake and excretion. Of particular importance are water consumption rates (which may be affected by climate and altitude), the potential for increased fluoride intake through sources other than drinking water (foods or food additives containing high levels of fluoride and cooking of foods in fluoridated water), the use of fluoridated dental products; inadequate intake of essential vitamins and minerals (e.g., Vitamin D and calcium); and physiological and pathological conditions which may alter excretion rates (acid-base balance and kidney diseases).

As discussed in Section 3.1.4, there are a number of additional factors that may produce alterations in dental enamel that resemble those caused by fluoride.  These include dental changes caused by living at high altitudes, genetic abnormalities, malnutrition, or exposure to minerals such as strontium or aluminum or medications, which may complicate the diagnosis of dental fluorosis.

Because of fluoride-related and nonfluoride-related variables, the prevalence and severity of fluorosis in a given population may be impacted by factors other than the levels of fluoride in drinking water.  However, for the data set from which the BMDL is derived, the only confounding factor that was identified was the co-exposure in one of the study populations to high levels of aluminum. This data point was excluded from the calculation.

### 5.5.    Summary and Conclusions

The estimated oral RfD for fluoride, based on the endpoint of enamel pitting as manifest in severe dental fluorosis is 0.08 mg F/kg/day for children during the period from 6 months to 14 years of age.  Beyond the period when the enamel forms on pre-eruptive teeth, the ingestion of fluoride does not cause pitting of enamel. However, the RfD is applicable to the entire population since it is also protective for the endpoints of severe fluorosis of primary teeth, skeletal fluorosis and increased risk of bone fractures in adults.

6.	**References Cited**

ADA American Dental Association. 2005. Tooth Eruption Charts.
http://ada.org/public/topics/tooth_eruption.asp

American Medical Association. 1982. Family Medical Guide. Random House, New York, NY (pp 436–440).

Angmar-Månsson, B., G.M. Whitford, N.B. Allison, J.A. Devine, and J.T. Maher. 1984. Effects of simulated altitude on fluoride retention and enamel quality [abstract]. Caries Res. 18:165. As cited in Yoder et al., 1998.

Angmar-Månsson, B., and G.M. Whitford. 1990. Environmental and physiological factors affecting dental fluorosis. J. Dent. Res. 69 (Spec.):706–713.

Aoba, T. and O. Fejerskov. 2002. Dental fluorosis: Chemistry and biology. Crit. Rev. Oral. Biol. Med. 13(2):155–170. As cited in NRC, 2006.

Beary, D.F. 1969. The effects of fluoride and low calcium on the physical properties of the rat femur. Anat. Rec. 164(3):305–316. As cited in NRC, 2006.

Beltrán-Aguilar, E.D., L.K. Barker, M.T. Canto, et al. 2005. Surveillance for dental caries, dental sealants, tooth retention, edentulism, and enamel fluorosis — United States, 1988–1994 and 1999–2002. Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report, Surveillance Summaries, August 26, 2005, vol. 54, No SS-3, pp. 1–44.

Boyle D.R. and M. Chagnon. 1995. An incidence of skeletal fluorosis associated with groundwaters of the maritime carboniferous basin, Gaspe Region, Quebec, Canada. Environ. Geochem. Health 17:5–12.

Burt, B.A. and S.A. Eklund. 1999. *Dentistry, Dental Practice, and the Community*, 5th ed. W.B. Saunders Co., Philadelphia, PA. As cited in NRC, 2006.

Butler, W.J., V. Segreto, and E. Collins. 1985. Prevalence of dental mottling in school-aged lifetime residents of 16 Texas communities. Am. J. Public Health 75(12):1408–1412.

Cao, J., Y. Zhao, J. Liu, R. Xirao, S. Danzeng, D. Daji, and Y. Yan. 2003. Brick tea fluoride as a main source of adult fluorosis. Food and Chemical Toxicology 41:535–542.

Cauley, J.A., P.A. Murphy, T.J. Riley, and A.M. Buhari. 1995. Effects of fluoridated drinking water on bone mass and fractures: the study of osteoporotic fractures. J. Bone Miner. Res. 10:1076–1086.

CDC (Centers for Disease Control and Prevention). 1995. Engineering and Administrative Recommendations for Water Fluoridation, 1995. Morbidity and Mortality Weekly Report, Recommendations and Reports 44(RR-13).

CDC (Centers for Disease Control and Prevention).  2007.  Oral Health: Preventing Cavities, Gum Disease, and Tooth Loss.  Department of Health and Human Services.  Online file: http://www.cdc.gov/nccdphp/publications/aag/oh.htm

Chachra, D., C.H. Turner, A.J. Dunipace, and M.D. Grynpas. 1999. The effect of fluoride treatment on bone mineral in rabbits. Calcif. Tissue Int. 64(4):345–351.

Chen, B.C-S. 1989. Epidemiological study on dental fluorosis and dental caries prevalence in communities with negligible, optimal, and above-optimal fluoride concentrations in drinking water supplies. Chin. Dent. J. 8(3):117–127.

Choubisa, S.L. 2001. Endemic fluorosis in southern Rajasthan, India.  Fluoride 34:61-70.

Cooper, L.F., E.M. Barber, H.S., Mitchell, and H.J. Rynbergen. 1958. Nutrition in Health and Disease. J. B. Lippencott Company, Philadelphia PA. (pp. 653–656).

Cortes, D.F., R.P. Ellwood, D.M. O'Mullane, and J.R. Bastos. 1996. Drinking water fluoride levels, dental fluorosis, and caries experience in Brazil. J. Public Health Dent. 56(4):226–228.

Curzon, M.E. and P.C. Spector. 1977. Enamel mottling in a high strontium area of the U.S.A. Community Dent. Oral. Epidemiol. 5(5):243–247.

Cutress, T.W. and G.W. Suckling. 1990. Differential diagnosis of dental fluorosis. J. Dent. Res. 69 (Spec.):714–720.

Danielson, C., J.L. Lyon, M. Egger, and G.K. Goodenough. 1992. Hip fractures and fluoridation in Utah's elderly population. JAMA 268(6):746–748.

Dean, H.T. 1934. Classification of mottled enamel diagnosis. J. Am. Dent. Assoc. 21:1421–1426. As cited in NRC, 2006.

Dean, H.T.  1942.  The investigation of physiological effects by the epidemiology method.  In: *Fluoride and Dental Health*. Publ. Amer. Assoc Advanc. Sci., no. 19, pp. 23–31.

Dean, H.T.  1946.  The Epidemiological studies in the United States.  In: *Dental Caries and Fluorine*, F.J. Moulton, ed.  American Association for the Advancement of Science, Washington, DC.

Dean, H.T. and E. Elvove.  1936.  Some epidemiological aspects of chronic endemic dental fluorosis.  Amer. J. Public Health 26:567–575.

Dean, H.T. and E. Elvove.  1937.  Further studies on the minimal threshold of chronic endemic dental fluorosis.  Public Health Reports 52:1249–1295.

Demos, L.L., H. Kazda, F.M. Cicuttini, M. Sinclair, and C. Fairley.  2001. Water fluoridation, osteoporosis, fractures – recent developments. Austral. Dent. J. 46:80-87.

Den Besten, P.K. 1999. Biological mechanisms of dental fluorosis relevant to the use of fluoride supplements. Community Dent. Oral Epidemiol. 27(1):41–47.

DeStefano, F., R.F. Anda., H.S. Kahn et al. 1993. Dental disease and risk of coronary heart disease and mortality. BMJ. 306:688–691.

Driscoll, W.S., S.B. Heifetz, H.S., Horowitz, A. Kingman, R.J Meyers, and E.R. Zimmerman. 1983. Prevalence of dental caries and dental fluorosis in areas with optimal and above-optimal water fluoride concentrations. J. Amer. Dent. Assoc. 107(1):42–47.

Driscoll, W.S., S.B. Heifetz, H.S. Horowitz, A. Kingman, R.J Meyers, and E.R. Zimmerman. 1986.  Prevalence of dental caries and dental fluorosis in areas with negligible, optimal, and above-optimal fluoride concentrations in drinking water.  J. Amer. Dental Assoc. 113:29–33.

Eklund, S.A., B.A. Burt, A.I. Ismail, and J.J. Calderone. 1987. High-fluoride drinking water, fluorosis, and dental caries in adults. J. Am. Dent. Assoc. 114(3):324–328

Elvove, E. 1933.  Estimation of fluorides in waters.  Pub. Health Rep. 48 (40):1219–1222.

Englander, H.R. and P.F. DePaola. 1979. Enhanced anticaries action from drinking water containing 5 ppm fluoride. J. Am. Dent. Assoc. 98 (1):35–39.

Erben, J., B. Hajakova, M. Pantucek, and L. Kubes. 1984. Fluoride metabolism and renal osteodystrophy in regular dialysis treatment. Proc. Eur. Dial. Transplant Assoc. Eur. Ren. Assoc. 21:421–425.

Ermis, R.B., F. Koray, and B.G. Akdeniz. 2003. Dental caries and fluorosis in low- and high-fluoride areas in Turkey. Quintessence Int. 34(5):354–360.

Ershow, A.G. and K.P. Cantor. 1989. Total water and tapwater intake in the United States: population-based estimates of quantities and sources. National Cancer Institute Contract No. 263-MD-810264. Life Sciences Research Office, Federation of American Societies for Experimental Biology, Bethesda, MD.

Everett, E.T., M.A.K. McHenry, N. Reynolds, H. Eggertsson, J. Sullivan, C. Kantmann, E.A. Martinez-Mier, J.M. Warrick and G.K. Stookey.  2002. Dental fluorosis: variability among different inbred mouse strains. J. Dent. Res. 81:794–798.

Fejerskov, O., F. Manji, and V. Baelum. 1990. The nature and mechanisms of dental fluorosis in man. J. Dent. Res. 69 (Special Issue):692–700.  As cited in NRC, 2006.

Felsenfeld, A.J. and M.A. Roberts. 1991. A report of fluorosis in the United States secondary to drinking well water. JAMA 265(4):486–488.

Forsman, B. 1974. Dental fluorosis and caries in high-fluoride districts in Sweden. Community Dent. Oral Epidemiol. 2(3):132–148.

Galagan, D.J. and G.G. Lamson. 1953. Climate and endemic dental fluorosis. Public Health Reports. Vol. 68, No. 5:497–508.

Galagan, D.J. and J.R. Vermillion. 1957. Climate and Fluid Intake. Public Health Reports. Vol. 72, No. 6:484–490.

Genco, R., S. Offenbacher, and J. Beck. 2002.  Periodontal disease and cardiovascular mechanisms. JADA 133:14S–22S.

Gift, J. and A. Davis. 2007.  Review of Fluoride Dose-response Analysis for Non-cancer effects. Memo to J. Donohue, Office of Drinking Water, U.S. EPA, Nov. 9, 2007.

Goldman, S.M., M.L. Sievers, and D.W. Templin.  1971.  Radiculomyopathy in a southwestern Indian due to skeletal fluorosis. Arizona Med. 28:675–677.

Greenland, S. 1998. Meta-Analysis. In: *Modern Epidemiology*, 2nd ed., K.J. Rothman and S. Greenland, eds. Lippincott-Raven, Philadelphia, PA (pp. 643–674).  As cited in NRC (2006).

Grobler, S.R., A.J. Louw, and T.J. van Kotze. 2001. Dental fluorosis and caries experience in relation to three different drinking water fluoride levels in South Africa. Int. J. Paediatr. Dent. 11(5):372–379.

Groeneveld, A., A.A.M.J. van Eck, and O. Backer-Dirks. 1990. Fluoride in caries prevention: Is the effect pre- or post eruptive? J. Dent. Res. 69 (Special Issue):751–755.

Haguenauer, D., V. Welch, B. Shea, P. Tugwell, J.D. Adachi and G. Wells. 2000. Fluoride for the treatment of postmenopausal osteoporotic fractures: A meta-analysis. Osteoporosis Int. 11(9):727–738.  As cited by NRC, 2006.

Hallanger Johnson, J.E., A.E. Kearns, P.M. Doran, T.K. Khoo and R.A. Wermers.  2007. Fluoride-related bone disease associated with habitual tea consumption. Mayo Clinic Proceedings 82:719-724.

Hansson, T. and B. Roos. 1987. The effect of fluoride and calcium on spinal bone mineral content: A controlled, prospective (3 years) study. Calcif. Tissue Int. 40(6):315–317.

Heifetz, S.B., W.S. Driscoll, H.S. Horowitz, and A. Kingman. 1988. Prevalence of dental caries and dental fluorosis in areas with optimal and above-optimal water-fluoride concentrations: A 5-year follow-up survey. J. Am. Dent. Assoc. 116(4):490–495.

Heller, K.E., S.A. Eklund, and B.A. Burt. 1997. Dental caries and dental fluorosis at varying water fluoride concentrations. J. Public Health Dentistry 57:136–143.

Hillier, S., H. Inskip, D. Coggon, and C. Cooper.  1996.  Water fluoridation and osteoporotic fracture.  Community Dental Health 13 (Suppl. 2):63–68.

Hillier, S., C. Cooper, S. Kellingray, G. Russell, H. Hughes, and D. Coggon.  2000. Fluoride in drinking water and risk of hip fracture in the UK: a case-control study.  Lancet 355:265–269.

Hong, L., S. Levy, J. Warren, G. Bergus, D. Dawson, J. Wefel, and B. Broffitt.  2004.  Primary tooth fluorosis and amoxicillin use during infancy. Journal of Public Health Dentistry 64: 38–44.

Hong, L., S. Levy, J. Warren, D. Dawson, G. Bergus, and J. Wefel.  2005.  Association of amoxicillin use during early childhood with developmental tooth enamel defects. Arch. Pediatr. Adolesc. Med. 159:943–948.

Hong, L., S. Levy, J. Warren, B. Broffitt, and J. Cavanaugh.  2006a. Fluoride intake levels in relation to fluorosis development in permanent maxillary central incisors and first molars. Caries Res. 40:494–500.

Hong, L., S. Levy, B. Broffitt, J. Warren, M. Kanellis, J. Wefel and D. Dawson.  2006b. Timing of fluoride intake in relation to development of fluorosis on maxillary central incisors. Community Dent. Oral. Epidemiol. 34:299–309.

Horowitz, H.S., W.S. Driscoll, R.J. Meyers, S.B. Heifetz, and A. Kingman. 1984. A new method for assessing the prevalence of dental fluorosis: The Tooth Surface Index of Fluorosis. J. Am. Dent. Assoc. 109(1):37–41. As cited in NRC, 2006.

Iida, H. and J.V. Kumar.  2009.  The association between enamel fluorosis and dental caries in U.S. schoolchildren.  J. Amer. Dental Assoc. 140:855–862.

IOM (Institute of Medicine). 1997. *Dietary Reference Intakes for Calcium, Phosphorus, Magnesium, Vitamin D, and Fluoride*. National Academy Press, Washington, DC.

IOM (Institute of Medicine). 2005. *Dietary Reference Intakes for Water, Potassium, Sodium, Chloride and Sulfate*. National Academy Press, Washington, DC (p. 130).

Jackson, R.D., S.A. Kelly, B.P. Katz, J.R. Hull, and G.K. Stookey. 1995. Dental fluorosis and caries prevalence in children residing in communities with different levels of fluoride in the water. J. Public Health Dent. 55(2):79–84.

Jackson R, S. Kelly, B. Katz, E. Brizendine, and G. Stookey. 1999. Dental fluorosis in children residing in communities with different fluoride levels in the water: 33 month follow-up. Pediatric Dentistry 21:248–254.

Jacobsen, S.J., J. Goldberg, C. Cooper, and S.A. Lockwood. 1992. The association between water fluoridation and hip fracture among white women and men aged 65 years and older. A national ecologic study.  Ann. Epidemiol. 2:617-626.

Jacobsen, S.J., W.M. O'Fallon, and L.J. Melton III. 1993. Hip fracture incidence before and after the fluoridation of the public water supply, Rochester, Minnesota. Amer. J. Public Health 83(5): 743–745.

Jacqmin-Gadda, H., D. Commenges, and J.F. Dartigues. 1995. Fluorine concentrations in drinking water and fractures in the elderly [letter]. JAMA 273(10):775–776.

Jacqmin-Gadda, H., A. Fourrier, D. Commenges, and J.F. Dartigues. 1998. Risk factors for fractures in the elderly.  Epidemiology 9(4):417–423.

Janket, S.J., M. Qvarnstrom, J.H. Meurman et al. 2004. Predicting coronary heart disease utilizing dental health parameters. Circulation. 2004:109:1095–1100.

Johnson, W.J., D.R. Taves, and J. Jowsey. 1979. Fluoridation and bone disease. In: *Continuing Evaluation of the Use of Fluorides*. E. Johansen, D.R. Taves, and T.O. Olsen, eds. AAAS Selected Symposium. Westview Press, Boulder, CO. (pp. 275–293).

Kleerekoper, M., E.L. Peterson, D.A. Nelson, E. Phillips, M.A. Schork, B.C. Tilley, and A.M. Parfitt. 1991. A randomized trial of sodium fluoride as a treatment for postmenopausal osteoporosis. Osteoporosis Int. 1(3):155–161.

Koop, C.E. 1982.  Personal communication to Mr. John W. Hernandez, Jr., Deputy Administrator, U.S. Environmental Protection Agency.

Koop, C.E. 1984.  Personal communication to Mr. William Ruckelshaus, Administrator, Environmental Protection Agency.

Krishnamachari, K.A.V.R. 1986. Skeletal fluorosis in humans: a review of recent progress in the understanding of the disease.  Prog. Food Nutr. Science 10:279–314.

Kurttio, P., N. Gustavsson, T. Vartianinen, and J. Pekkanen. 1999. Exposure to natural fluoride in well water and hip fracture: A cohort analysis in Finland. Am. J. Epidemiol. 150(9):817–824.

Lantz, O., M.H. Jouvin, M.C. De Vernejoul, and P. Druet. 1987. Fluoride induced chronic renal failure. Am. J. Kidney Dis. 10(2):136–137.

Larsen, M.J., A. Richards, and O. Fejerskov.  1985.  Development of dental fluorosis according to age at start of fluoride administration.  Caries Res. 19:519-527.

Leone, N.C., C.A. Stevenson, T.F. Hilbish, and M.C. Sosman. 1955. A roentgenologic study of a human population exposed to high fluoride domestic water: A 10 year study. Am. J. Roentgenol. Radium Ther. Nucl. Med. 74(5):874–875.

Lehmann, R., M. Wapniarz, B. Hofman, B. Peiper, I. Haubitz, and B. Allolio. 1998. Drinking water fluoridation: Bone mineral density and hip fracture incidence. Bone 22(3):273–278.

Levy, S.M. 2010.  Department of Preventive and Community Dentistry, Department of Epidemiology, University of Iowa, Iowa City, IA.  Personal communication to J. Donohue, Health and Ecological Criteria Division, Office of Science and Technology, Office of Water, U.S. Environmental Protection Agency, Washington, DC.

Li, Y., C. Liang, C.W. Slemenda, R. Ji, S. Sun, J. Cao, C.L. Emsley, F. Ma, Y. Wu, P. Ying, Y. Zhang, S. Gao, W. Zhang, B.P. Katz, S. Niu, S. Cao, and C.C. Johnston, Jr. 2001. Effects of long-term exposure to fluoride in drinking water on risks of bone fractures. J. Bone Miner. Res. 16(5):932–939.

Liu, J., T. Xia, M. Zhang, W. He, P. He, X. Chen, K. Yang, and A. Wang. 2006. Screening of environmental response genes related to dental fluorosis. Fluoride 39:195-201.

Lorenz, K., G. Bruhn, C. Heumann, et al. 2006.  Effect of two new chlorhexidine mouthrinses on the development of dental plaque, gingivitis, and discoloration. A randomized, investigator-blind, placebo-controlled, 3-week experimental gingivitis study. J. Clin. Periodontol. 33:561–563

Manji, F., V. Bælum, and O. Fejerkov. 1986. Fluoride, altitude and dental fluorosis. Caries Res. 20: 473–480.

Mann, J., M. Tibi, and H.D. Sgan-Cohen. 1987. Fluorosis and caries prevalence in a community drinking above-optimal fluoridated water. Community Dent. Oral Epidemiol. 15(5):293–295.

Mann, J., W. Mahmoud, M. Ernest, H. Sgan-Cohen, N. Shoshan, and I. Gedalia. 1990. Fluorosis and dental caries in 6–8-year-old children in a 5 ppm fluoride area. Community Dent. Oral Epidemiol. 18(2):77–79.

Massler, M. and I. Schour. 1958. *Atlas of the Mouth in Health and Disease*. 2nd ed., 6th printing 1982. American Dental Association, Chicago, IL.

McDonagh, M., P. Whiting, M. Bradley, J. Cooper, A. Sutton, I. Chestnutt, K. Misso, P. Wilson, E. Treasure, and J. Kleijnen. 2000. *A Systematic Review of Public Water Fluoridation*. NHS Centre for Reviews and Dissemination, University of York, York, UK [online]. Available: http://www.york.ac.uk/inst/crd/fluorid.pdf [accessed Sept. 28, 2004].

Megregian, S. and F.J. Maier. 1952. Modified zirconium alizarin reagent for determination of fluoride in water. J. Am. Water Works Assn. 44:239-246.

Moller, I. 1965. *Dental fluorose og caries*. Thesis, Rhodos, Copenhagen.  As cited in Olsson, 1979.

Mousny, M., S. Omelon, L. Wise, et al. 2008.  Fluoride effects on bone formation and mineralization are influenced by genetics.  Bone 43(6):1067-1074.

NIDR (National Institute of Dental Research). 1992.  *Oral Health of United States Children: The National Survey of Oral Health in U.S. School Children, 1986–1987*. Public Use Data File, Documentation and Survey Methodology 1986–1987.  National Institutes of Health, National Institute of Dental Research, Bethesda, MD.  As cited in Iida and Kumar, 2009.

NRC (National Research Council). 1989. *Recommended Dietary Allowances*, 10th ed. National Academy Press, Washington, DC.

NRC (National Research Council). 1993. *Health Effects of Ingested Fluoride*. National Academy Press, Washington, DC.

NRC (National Research Council). 2006. *Fluoride in Drinking Water. A Scientific Review of EPA's Standards*. National Academy Press, Washington, DC.

Olsson, B. 1979. Dental findings in high-fluoride areas in Ethiopia. Community Dent. Oral Epidemiol. 7(1):51–56.

Pak, C.Y., K. Sakhaee, B. Adams-Huet, V. Piziak, R.D. Peterson, and J.R. Poindexter. 1995. Treatment of postmenopausal osteoporosis with slow-release sodium fluoride. Ann. Intern. Med. 123(6):401–408.  As cited in NRC (2006).

Pettifor, J.M., C.M. Schnitzler, F.P. Ross, and G.P. Moodley. 1989. Endemic skeletal fluorosis in children: Hypocalcemia and the presence of renal resistance to parathyroid hormone. Bone Miner. 7(3):275–288.

Phipps, K.R. and B.A. Burt. 1990.  Water-borne fluoride and cortical bone mass: a comparison of two communities.  J. Dent. Res. 69:1256–1260.

Phipps, K.R. E.S. Orwoll, J.D. Mason, and J. Cauley.  2000. Community water fluoridation, bone mineral density, and fractures: prospective study of effects in older women. 2000.  BMJ 321:860-864.

PHS (Public Health Service). 1962. *Public Health Service Drinking Water Standards*.  U.S. Department of Health, Education, and Welfare, Washington, DC. (p. 8).

PHS (Public Health Service). 1991. *Review of Fluoride Benefits and Risks*. Report of the Ad Hoc Subcommittee on Fluoride Committee of the Committee to Coordinate Environmental Health and Related Programs. Public Health Service, U.S. Department of Health and Human Services, Washington, DC.

Proudfit, F.T. 1923. *Dietetics for Nurses*. The MacMillan Company. New York, NY (pp. 499–501).

Radike, A.W. 1972. Criteria for diagnosis of dental caries. In: *Proceedings of the Conference on the Clinical Testing of Cariostatic Agents*, Oct. 14-16, 1968, American Dental Association, Chicago, IL. (pp. 87–88). As cited in Eklund et al., 1987.

Reginster, J.Y., L. Meurmans, B. Zegels, L.C. Rovati, H.W. Minne, G. Giacovelli, A.N. Taquet, I. Setnikar, J. Collett, and C. Gosset. 1998. The effect of sodium monofluorophosphate plus calcium on vertebral fracture rate in postmenopausal women with moderate osteoporosis. A randomized, controlled trial. Ann. Intern. Med. 129(1):1–8.

Reid, I.R., T. Cundy, A.B. Grey, A. Horne, J. Clearwater, R. Ames, B. J. Orr-Walker, F. Wu, M.C. Evans, G.D. Gamble, and A. King. 2007. Addition of monofluorophosphate to estrogen

therapy in postmenopausal osteoporosis – A randomized controlled trial. J. Clin. Endocrin. Metab. First published ahead of print April 17, 2007 as doi: 10.1210/jc.2006–2264.

Rich, C. and E. Feist. 1970. The action of fluoride on bone. In: *Fluoride in Medicine*, T.L. Vischer, ed. Hans Huber, Bern (pp. 70–87).

Richards, L.F., W.W. Westmoreland, M. Tashiro, C.H. McKay,  and J.T. Morrison.  1967. Determining optimum fluoride levels for community water supplies in raltion to temperature.  J. Amer. Dent. Assoc. 74:389–397.

Riggs, B.L., S.F. Hodgson, W.M. O'Fallon, E.Y. Chao, H.W. Wahner, J.M. Muhs, S.L. Cedel, and L.J. Melton III. 1990. Effect of fluoride treatment on the fracture rate in postmenopausal women with osteoporosis. N. Engl. J. Med. 322(12):802–809.

Riggs, B.L., W.M. O'Fallon, A. Lane, S.F. Hodgson, H.W. Wahner, J. Muhs, E. Chao, and L. J. Melton. 1994. Clinical trial of fluoride therapy in postmenopausal osteoporotic women- Extended observations and additional analysis. J. Bone Mineral Res. 9:265–275. As cited in Reid et al., 2007.

Ringe, J.D., C. Kipshoven, A. Coster, and R. Umbach. 1999. Therapy of established postmenopausal osteporosis with monofluorophosphate plus calcium: Dose-related effects on bone density and fracture rate. Osteoporos. Int. 9:171–178. As cited in Reid et al., 2007.

Robinson, C., J. Kirkham, and J.A. Weatherell. 1996. Fluoride in teeth and bone. In: *Fluoride in Dentistry*, 2nd ed., O. Fejerskov, J. Ekstrand, and B.A. Burt, eds.  Munksgaard, Copenhagen (pp. 69–87).  As cited in NRC, 2006.

Roholm, K.  1937.  *Fluorine Intoxication. A Clinical-Hygienic Study*.  H.K. Lewis & Co., Ltd., London.

Rozier, R.G. 1994. Epidemiologic indices for measuring the clinical manifestations of dental fluorosis: Overview and critique. Adv. Dent. Res. 8(1):39–55.

Ruan, J.P., Z.Q. Yang, Z.L. Wang et al. 2005.  Dental fluorosis and dental caries in permanent teeth: rural schoolchildren in high-fluoride areas in the Shaanxi province, China.  Acta Odont. Scand.  63:258–265.

Rubin, C.D., C.Y.C. Pak, B. Adams-Huet, H.K. Genant, J. Li, and S. Rao. 2001. Sustained-release sodium fluoride in the treatment of the elderly with established osteoporosis. Arch. Int. Med. 161:2325–2333. As cited in Reid et al. (2007).

Russell, A.L. 1961. The differential diagnosis of fluoride and nonfluoride opacities. J. Public Health Dent. 21:143–146.

Russell, A.L. 1962, Dental fluorosis in Grand Rapids during the seventeenth year of fluoridation. J. Amer. Dental Assoc. 65:608–612.

Rwenyonyi, C.M., K. Bjorvatn, J. Birkeland, and O. Haugejorden. 1999. Altitude as a risk indicator of dental fluorosis in children residing in areas with 0.5 and 2.5 mg fluoride per liter in drinking water. Caries Res. 33(4):267–274.

Sauerbrunn, B.J., D.M. Ryan, and J.F. Shaw. 1965. Chronic fluoride intoxication with fluorotic radiculomyelopathy. Ann. Intern. Med. 63(6):1074–1078.

Selwitz, R.H., R.E. Nowjack-Raymer, A. Kingman, and W.S. Driscoll. 1995. Prevalence of dental caries and dental fluorosis in areas with optimal and above-optimal water fluoride concentrations: A 10-year follow-up survey. J. Public Health Dent. 55(2):85–93.

Selwitz, R.H., R.E. Nowjack-Raymer, A. Kingman, and W.S. Driscoll. 1998. Dental caries and dental fluorosis among school children who were lifelong residents of communities having either low or optimal levels of fluoride in drinking water. J. Public Health Dent. 58(1):28–35.

Simonen, O. and O. Laitinen. 1985. Does fluoridation of drinking water prevent bone fragility and osteoporosis? The Lancet. (Aug 24):432–434.

Singer, L. and R.H. Ophaug. 1982. Fluoride intake of humans. In: *Proceedings of the International Fluoride Symposium*. Utah State University, Logan, UT. (pp. 57–66). As cited in Sowers et al. 1986.

Slots, J. 1998. Casual or causal relationship between periodontal infection and non-oral disease. Dent. Res. 77(10):1764–1765.

Sowers, M.F.R., R.B. Wallace, and J.H. Lemke. 1986. The relationship of bone mass and fracture history to fluoride and calcium intake: A study of three communities. Am. J. Clin. Nutr. 44(6):889–898.

Sowers, M.F.R., M.K. Clark, M.L. Jannausch, and R.B. Wallace. 1991. A prospective study of bone mineral content and fracture in communities with differential fluoride exposure. Am. J. Epidemiol. 133(7):649–660.

Sowers, M.F., G.M. Whitford, M.K. Clark, and M.L. Jannausch. 2005. Elevated serum fluoride concentrations in women are not related to fractures and bone mineral density. J. Nutr. 135(9):2247–2252.

Stevenson, C.A. and A.R. Watson. 1957. Fluoride osteosclerosis. Am. J. Roentgenol. Radium Ther. Nucl. Med. 78(1):13–18.  As cited in NRC, 2006.

Stipanuk, M.H. 2000. *Biochemical and Physiological Aspects of Human Nutrition*. W.B. Sauners Company, Philadelphia PA.

Striffler, D.F. 1955. Fluoridation in New Mexico: Its present status. N.M. State Dent. J. 5(2):3–11.

Szpunar, S.M. and B.A. Burt. 1988. Dental caries, fluorosis, and fluoride exposure in Michigan schoolchildren. J. Dent. Res. 67(5):802–806.

Teotia, S.P. and M. Teotia. 1973. Secondary hyperparathyroidism in patients with endemic skeletal flurosis. Br. Med. J. 1(5854):637–640.

Thaper, R., A. Tewari, H.S. Chawla, and V. Sachdev. 1989. Prevalence and severity of dental fluorosis in primary and permanent teeth at varying fluoride levels. J. Indian Soc. Prev. Dent. 7(1):38–45.

Thylstrup, A. and O. Fejerskov. 1978. Clinical appearance of dental fluorosis in permanent teeth in relation to histologic changes. Community Dent. Oral. Epidemiol. 6(6):315–328.  As cited in NRC, 2006.

Tredwin, C.J., C. Scully, and J.-V. Bagan-Sebastian.  2005. Drug-induced disorders of teeth. J. Dent. Res. 84:596–602.

Turner, C.H., M.P. Akhter, and R.P. Heaney. 1992. The effects of fluoridated water on bone strength. J. Orthop. Res. 10(4):581–587.

Turner, C.H., L.P. Garetto, A.J. Dunipace, W. Zhang, M.E. Wilson, M.D. Grynpas, D. Chachra, R. McClintock, M. Peacock, and G.K. Stookey. 1997. Fluoride treatment increased serum IGF-1, bone turnover, and bone mass, but not bone strength, in rabbits. Calcif. Tissue Int. 61(1):77–83.

U.S. EPA (U.S. Environmental Protection Agency). 1985. National Primary Drinking Water Regulations; Fluoride. Federal Register 50(93):20164–20175.

U.S. EPA (U.S. Environmental Protection Agency). 1986. National Primary and Secondary Drinking Water Regulations: Fluoride final Rule. Federal Register 51(63):11396-11412.

U.S. EPA (U.S. Environmental Protection Agency). 2000. Estimated Per Capita Water Ingestion and Body Weight in the United States. Office of Water, Washington, DC.

U.S. EPA (U.S. Environmental Protection Agency). 2004. Estimated Per Capita Water Ingestion and Body Weight in the United States-An Update. Office of Water, Washington, DC.

U.S. EPA (U.S. Environmental Protection Agency). 2010. Fluoride: Exposure and Relative Source Contribution Analysis. Office of Water, Washington, DC. EPA 820-R-10-015.

Vieira, A.P.G.F., R. Hannock, H. Eggertsson, E.T. Everett, and M.D. Grynpas.  2005.  Tooth quality in dental fluorosis: genetic and environmental factors. Calcif. Tissue Int. 76:17–25.

Warnakulasuriya, K.A., S. Balasuriya, P.A. Perera, and L.C. Peiris. 1992. Determining optimal levels of fluoride in drinking water for hot, dry climates - a case study in Sri Lanka. Community Dent. Oral Epidemiol. 20(6):364–367.

Whitford, G.M. 1990. The physiological and toxicological characteristics of fluoride. J. Dent. Res. 69(Spec Iss):539–549.

Whitford, G.M. 1994. Intake and metabolism of fluoride. Adv. Dent. Res. 8(1):5–14.

Wilson, W., K.A. Taubert, M. Gewitz, et al. 2007. Prevention of infective endocarditis: Guidelines from the American Heart Association. JADA 128:739–760.

Whyte, M.P., K. Essmyer, F.H. Gannon, and W.R. Reinus. 2005. Skeletal fluorosis and instant tea. Am. J. Medicine 118(1):78–82.

Williams, J.E. and J.D. Zwemer. 1990. Community water fluoride levels, preschool dietary patterns, and the occurrence of fluoride enamel opacities. J. Public Health Dent. 50:276–281.  As cited in Vieira et al., 2005.

Wondwossen , F., A.N. Åstrøm, K. Bjorvatn, and A. Bårdsen. 2004. The relationship between dental caries and dental fluorosis in areas with moderate- and high-fluoride drinking water in Ethiopia. Community Dent. Oral Epidemiol. 32(5):337–344.

World Health Organization (WHO). 2002. Fluorides. Environmental Health Criteria 227. United Nations Environment Programme. World Health Organization, Geneva, Switzerland.

Wu, T., M. Trevisan, R.J. Genco, K.L. Falkner, J.P. Dorn, and C.T. Sempos. 2000. Examination of the Relation between Periodontal Health Status and Cardiovascular Risk Factors: Serum Total and High Density Lipoprotein Cholesterol, C-reactive Protein, and Plasma Fibrinogen. Amer. J. Epidemiol. 151(3):273–282.

Yan, D., A. Gurumurthy, M. Wright, T, Wayne Pfeiler, E.G. Loboa, and E.T. Everett.  2007. Genetic background influences fluoride's effects on osteoclastogenesis. Bone 41:1036-1044.

Yoder, K.M., L. Mabelya, V.A. Robison, A.J. Dunipace, E.J. Brizendine, and G.K. Stookey. 1998. Severe dental fluorosis in a Tanzanian population consuming water with negligible fluoride concentration. Community Dent. Oral Epidemiol. 26(6):382–393.

Zipkin, I., F.J. McClure, N.C. Leone, and W.A. Lee. 1958. Fluoride deposition in human bones after prolonged ingestion of fluoride in drinking water. Public Health Rep. 73(8):732–740.

# APPENDIX A

## CATEGORICAL DATA ANALYSIS
## OF FLUOROSIS DATA SET OF DEAN (1942)

**(Categorical Model, or CATMOD, developed by
The SAS[©] Institute of Cary, NC).**

| Population Profiles | | |
|---|---|---|
| Sample | CONCENTRATION | Sample Size |
| 1 | 0 | 423 |
| 2 | 0.1 | 236 |
| 3 | 0.2 | 583 |
| 4 | 0.3 | 770 |
| 5 | 0.4 | 345 |
| 6 | 0.5 | 516 |
| 7 | 0.6 | 614 |
| 8 | 0.7 | 467 |
| 9 | 0.8 | 95 |
| 10 | 0.9 | 123 |
| 11 | 1 | 166 |
| 12 | 1.06 | 336 |
| 13 | 1.2 | 703 |
| 14 | 1.3 | 447 |
| 15 | 1.8 | 170 |
| 16 | 1.9 | 273 |
| 17 | 2.08 | 143 |
| 18 | 2.2 | 138 |
| 19 | 2.6 | 404 |
| 20 | 2.89 | 192 |
| 21 | 2.9 | 97 |
| 22 | 3.5 | 164 |
| 23 | 3.9 | 289 |
| 24 | 4 | 156 |
| 25 | 4.07 | 136 |
| 26 | 4.4 | 189 |

**December 2010**

| Population Profiles | | |
|---|---|---|
| **Sample** | **CONCENTRATION** | **Sample Size** |
| 27 | 5.7 | 38 |
| 28 | 7.6 | 65 |
| 29 | 8 | 21 |

| Response Profiles | |
|---|---|
| **Response** | **condition** |
| 1 | Mild |
| 2 | Moderate |
| 3 | Normal |
| 4 | Questionable |
| 5 | Severe |
| 6 | Very Mild |

| Response Frequencies | | | | | | |
|---|---|---|---|---|---|---|
| | Response Number | | | | | |
| Sample | 1 | 2 | 3 | 4 | 5 | 6 |
| 1 | 0 | 0 | 414 | 8 | 0 | 1 |
| 2 | 0 | 0 | 230 | 6 | 0 | 0 |
| 3 | 1 | 0 | 498 | 60 | 0 | 24 |
| 4 | 3 | 0 | 676 | 75 | 0 | 16 |
| 5 | 3 | 0 | 204 | 122 | 0 | 16 |
| 6 | 4 | 0 | 303 | 185 | 0 | 24 |
| 7 | 2 | 0 | 444 | 130 | 0 | 38 |
| 8 | 12 | 10 | 224 | 166 | 0 | 55 |
| 9 | 6 | 2 | 40 | 37 | 1 | 9 |
| 10 | 2 | 0 | 65 | 43 | 0 | 13 |
| 11 | 17 | 0 | 78 | 19 | 0 | 52 |
| 12 | 16 | 6 | 188 | 99 | 2 | 25 |
| 13 | 17 | 9 | 354 | 215 | 2 | 106 |
| 14 | 14 | 0 | 181 | 153 | 0 | 99 |
| 15 | 15 | 2 | 48 | 54 | 0 | 51 |
| 16 | 17 | 3 | 69 | 74 | 0 | 110 |
| 17 | 24 | 12 | 26 | 41 | 7 | 33 |
| 18 | 49 | 15 | 18 | 22 | 1 | 33 |
| 19 | 86 | 36 | 26 | 80 | 6 | 170 |
| 20 | 38 | 15 | 44 | 50 | 16 | 29 |
| 21 | 26 | 23 | 4 | 8 | 3 | 33 |
| 22 | 1 | 37 | 0 | 0 | 125 | 1 |
| 23 | 81 | 98 | 9 | 19 | 38 | 44 |
| 24 | 37 | 45 | 13 | 5 | 18 | 38 |
| 25 | 34 | 10 | 17 | 21 | 31 | 23 |

| Response Frequencies | | | | | | |
|---|---|---|---|---|---|---|
| | Response Number | | | | | |
| Sample | 1 | 2 | 3 | 4 | 5 | 6 |
| 26 | 41 | 87 | 2 | 2 | 34 | 23 |
| 27 | 4 | 19 | 0 | 0 | 15 | 0 |
| 28 | 14 | 7 | 0 | 0 | 38 | 6 |
| 29 | 2 | 10 | 0 | 0 | 9 | 0 |

**December 2010**

| Response Functions and Design Matrix | | | |
|---|---|---|---|
| | | Design Matrix | |
| Sample | Response Function | 1 | 2 |
| 1 | 1.02600 | 1 | 0 |
| 2 | 1.02542 | 1 | 0.1 |
| 3 | 1.22470 | 1 | 0.2 |
| 4 | 1.15584 | 1 | 0.3 |
| 5 | 1.48406 | 1 | 0.4 |
| 6 | 1.49031 | 1 | 0.5 |
| 7 | 1.39414 | 1 | 0.6 |
| 8 | 1.67238 | 1 | 0.7 |
| 9 | 1.62105 | 1 | 0.8 |
| 10 | 1.65041 | 1 | 0.9 |
| 11 | 1.95181 | 1 | 1 |
| 12 | 1.47321 | 1 | 1.06 |
| 13 | 1.73329 | 1 | 1.2 |
| 14 | 1.97539 | 1 | 1.3 |
| 15 | 2.12353 | 1 | 1.8 |
| 16 | 2.41209 | 1 | 1.9 |
| 17 | 1.86713 | 1 | 2.08 |
| 18 | 1.48188 | 1 | 2.2 |
| 19 | 2.23267 | 1 | 2.6 |
| 20 | 1.64323 | 1 | 2.89 |
| 21 | 1.77835 | 1 | 2.9 |
| 22 | 2.42378 | 1 | 3.5 |
| 23 | 1.33564 | 1 | 3.9 |

| Response Functions and Design Matrix | | | |
|---|---|---|---|
| | | Design Matrix | |
| Sample | Response Function | 1 | 2 |
| 24 | 1.61218 | 1 | 4 |
| 25 | 1.83088 | 1 | 4.07 |
| 26 | 1.28836 | 1 | 4.4 |
| 27 | 1.43421 | 1 | 5.7 |
| 28 | 2.17692 | 1 | 7.6 |
| 29 | 1.52381 | 1 | 8 |

| Analysis of Variance | | | |
|---|---|---|---|
| Source | DF | Chi-Square | Pr > ChiSq |
| Intercept | 1 | 29644.50 | <.0001 |
| CONCENTRATION | 1 | 1101.86 | <.0001 |
| Residual | 27 | 1030.63 | <.0001 |

| Analysis of Weighted Least Squares Estimates | | | | |
|---|---|---|---|---|
| Parameter | Estimate | Standard Error | Chi-Square | Pr > ChiSq |
| Intercept | 1.0803 | 0.00627 | 29644.50 | <.0001 |
| CONCENTRATION | 0.2712 | 0.00817 | 1101.86 | <.0001 |

| Covariance Matrix of the Parameter Estimates | | | |
|---|---|---|---|
| Row | Parameter | Col1 | Col2 |
| 1 | Intercept | 0.00003937 | -.00002081 |
| 2 | CONCENTRATION | -.00002081 | 0.00006674 |

| Correlation Matrix of the Parameter Estimates | | | |
|---|---|---|---|
| Row | Parameter | Col1 | Col2 |
| 1 | Intercept | 1.00000 | -0.40601 |
| 2 | CONCENTRATION | -0.40601 | 1.00000 |

**Dean's Index of Fluorosis=0 Condition=Normal**

| | Analysis Variable : CONCENTRATION Fluoride Concentration (ppm) | | | | | | |
|---|---|---|---|---|---|---|---|
| N | Lower 95% CL for Mean | Mean | Upper 95% CL for Mean | Median | Std Dev | Minimum | Maximum |
| 4175 | 0.6251690 | 0.6448407 | 0.6645124 | 0.5000000 | 0.6483295 | 0 | 4.4000000 |

**Dean's Index of Fluorosis=0.5 Condition=Questionable**

| | Analysis Variable : CONCENTRATION Fluoride Concentration (ppm) | | | | | | |
|---|---|---|---|---|---|---|---|
| N | Lower 95% CL for Mean | Mean | Upper 95% CL for Mean | Median | Std Dev | Minimum | Maximum |
| 1694 | 1.1139510 | 1.1542444 | 1.1945377 | 1.0000000 | 0.8455345 | 0 | 4.4000000 |

**Dean's Index of Fluorosis=1 Condition=Very Mild**

| | Analysis Variable : CONCENTRATION Fluoride Concentration (ppm) | | | | | | |
|---|---|---|---|---|---|---|---|
| N | Lower 95% CL for Mean | Mean | Upper 95% CL for Mean | Median | Std Dev | Minimum | Maximum |
| 1072 | 1.8645862 | 1.9343843 | 2.0041825 | 1.9000000 | 1.1646679 | 0 | 7.6000000 |

**Dean's Index of Fluorosis=2 Condition=Mild**

| | Analysis Variable : CONCENTRATION Fluoride Concentration (ppm) | | | | | | |
|---|---|---|---|---|---|---|---|
| N | Lower 95% CL for Mean | Mean | Upper 95% CL for Mean | Median | Std Dev | Minimum | Maximum |
| 566 | 2.7997891 | 2.9156890 | 3.0315890 | 2.6000000 | 1.4038218 | 0.2000000 | 8.0000000 |

**Dean's Index of Fluorosis=3 Condition=Moderate**

| | Analysis Variable : CONCENTRATION Fluoride Concentration (ppm) | | | | | | |
|---|---|---|---|---|---|---|---|
| N | Lower 95% CL for Mean | Mean | Upper 95% CL for Mean | Median | Std Dev | Minimum | Maximum |
| 446 | 3.5842192 | 3.7071076 | 3.8299961 | 3.9000000 | 1.3205280 | 0.7000000 | 8.0000000 |

**Dean's Index of Fluorosis=4 Condition=Severe**

| | Analysis Variable : CONCENTRATION Fluoride Concentration (ppm) | | | | | | |
|---|---|---|---|---|---|---|---|
| N | Lower 95% CL for Mean | Mean | Upper 95% CL for Mean | Median | Std Dev | Minimum | Maximum |
| 346 | 4.0942617 | 4.2554624 | 4.4166632 | 3.9000000 | 1.5245120 | 0.8000000 | 8.0000000 |

**APPENDIX B**

**BENCHMARK DOSE ANALYSIS**
**OF SEVERE FLUOROSIS DATA SET OF DEAN (1942)**

**(USEPA Benchmark Dose Software ver. 2.0)**

**DICHOTOMOUS HILL MODEL FOR 0.5% SEVERE FLUOROSIS**

```
================================================================
        Dichotomous Hill Model. (Version: 1.0; Date: 09/24/2006)
        Input Data File: C:\USEPA\BMDS2\Data\DicFluSet.(d)
        Gnuplot Plotting File:  C:\USEPA\BMDS2\Data\DicFluSet.plt
                                        Wed Aug 13 13:21:23 2008
================================================================

 BMDS Model Run
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

   The form of the probability function is:

   P[response] = v*g +(v-v*g)/[1+EXP(-intercept-slope*Log(dose))]

        where: 0 <= g < 1, 0 < v <= 1

                v is the maximum probability of response predicted by the model,

                and v*g is the background estimate of that probability.


   Dependent variable = Severe
   Independent variable = DOSE
   Slope parameter is not restricted

   Total number of observations = 10
   Total number of records with missing values = 0
   Maximum number of iterations = 250
   Relative Function Convergence has been set to: 1e-008
   Parameter Convergence has been set to: 1e-008


                    Default Initial Parameter Values
                            v =          -9999
                            g =          -9999
                    intercept =       -8.26097
                        slope =        4.28252


        Asymptotic Correlation Matrix of Parameter Estimates

        ( *** The model parameter(s)  -g
                have been estimated at a boundary point, or have been specified by
the user,
                and do not appear in the correlation matrix )

                        v      intercept        slope

        v               1           0.36        -0.53

intercept            0.36              1        -0.97

    slope           -0.53          -0.97            1



                        Parameter Estimates

                                              95.0% Wald Confidence
Interval
```

| Variable | Estimate | Std. Err. | Lower Conf. Limit | Upper Conf. Limit |
|----------|----------|-----------|-------------------|-------------------|
| v | 0.587691 | 0.073515 | 0.443604 | 0.731778 |
| g | 0 | NA | | |
| intercept | -9.0565 | 0.888417 | -10.7978 | -7.31524 |
| slope | 5.63552 | 0.70711 | 4.24961 | 7.02143 |

NA - Indicates that this parameter has hit a bound
     implied by some inequality constraint and thus
     has no standard error.


### Analysis of Deviance Table

| Model | Log(likelihood) | Deviance | Test d.f. | P-value |
|-------|-----------------|----------|-----------|---------|
| Full model | -355.599 | | | |
| Fitted model | -357.581 | 3.96504 | 7 | 0.7838 |
| Reduced model | -495.125 | 279.053 | 9 | <.0001 |

AIC:        721.162


### Goodness  of  Fit

| Dose | Est._Prob. | Expected | Observed | Size | Scaled Residual |
|------|-----------|----------|----------|------|-----------------|
| 1.9000 | 0.0025 | 0.694 | 0 | 273 | -0.8339 |
| 2.2000 | 0.0058 | 0.797 | 1 | 138 | 0.2285 |
| 2.6000 | 0.0146 | 5.889 | 6 | 404 | 0.04617 |
| 2.9000 | 0.0264 | 2.562 | 3 | 97 | 0.2772 |
| 3.9000 | 0.1175 | 33.958 | 37 | 289 | 0.5557 |
| 4.0000 | 0.1315 | 7.758 | 7 | 59 | -0.292 |
| 4.4000 | 0.1941 | 36.686 | 34 | 189 | -0.494 |
| 5.7000 | 0.3994 | 15.177 | 15 | 38 | -0.05862 |
| 7.6000 | 0.5376 | 34.944 | 38 | 65 | 0.7603 |
| 8.0000 | 0.5494 | 11.536 | 9 | 21 | -1.112 |

Chi^2 = 3.283691    d.f. = 7       P-value = 0.8576


### Benchmark Dose Computation

Specified effect =          0.005

Risk Type        =     Extra risk

Confidence level =          0.95

          BMD =      2.14408

          BMDL =     1.86945



**APPENDIX C**

**EPIDEMIOLOGY STUDY EVALUATIONS**

# EPIDEMIOLOGY STUDY EVALUATIONS

The key epidemiological studies used in the dose-response analysis are evaluated in Table C-1. Notes on the categories, and brief insight into scoring logic, are given below.

1. **Author** – Self explanatory.

2. **Study design** – The higher values were given to studies for factors such as: including the population of concern (children); pertinent selection criteria, appropriate monitoring endpoints; multiple fluoride concentrations in the drinking water; appropriate analytical and statistical methods.

3. **Population size** – Was there enough participants overall and were there enough at each exposure level?

4. **Endpoint definition & indices** – How was dental fluorosis defined? Was severe dental fluorosis well-defined? Were consistent/well-accepted indices used for scoring?

5. **Ability to estimate exposure from fluoride through drinking water** – Higher ratings were given to those who had resided in their communities continually during most susceptible periods. Also, higher ratings were given if samples or concentration information was taken during that time period.

6. **Concentration appropriate for U-shaped dose-response** – If we only have fluoride concentration information at the low and/or high end, valuable information is missing in the middle that tell the data story. Do we have a distribution of data between none/negligible and the MCL (4mg/L)?

7. **Statistical significance and confidence intervals** – Was statistical analysis done? Were p-values and/ or confidence intervals included? Were complex statistical text conducted when possible?

| Table C-1.  Evaluation of Epidemiology Studies[a] | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Study Author** | **Study Design[a]** | **Population Size** | **Endpoint definitions and indices** | **Inter/ Intra-examiner reliability** | **Ability to estimate exposure in drinking water** | **Concentrations appropriate for U- shaped Dose Response** | **Statistical significance, Confidence bounds** |
| Dean, 1942 | High | High | High | NS[b] | High | NA[c] | Low |
| Driscoll et al., 1983 | Medium | Medium | Medium | Medium | High | High | Medium |
| Driscoll et al., 1986 | Medium | Medium | High | NS[b] | High | High | High |
| Eklund, et al., 1987 | Low | Low | High | Medium | Medium | Low | High |
| Heifitz et al., 1988 | Medium | Low | Medium | High | High | High | NS[b] |
| Selwitz et al., 1995 | High | Medium | High | Medium | High | High | High |
| Jackson et al., 1995 | Medium | Low-Medium | High | Medium | Medium | Low | Medium |
| Iida & Kumar, 2009 | Medium-High | High | High | Medium | Medium-High | NS[b] | High |

[a]Confidence in each portion can be scored numerically or categorically (1-Low, 2-Medium, and 3-High).

[b]Not specified in the published report.

[c]Not applicable; the Dean (1942) study did not include an evaluation of cavities.

# APPENDIX D

# FLUORIDE DOSE FROM SOLID FOODS
# AT THE TIME OF THE DEAN (1942) STUDY

**Introduction**

The Dean (1942) paper that provides data for the dose-response analysis covers a duration of exposure vulnerability from about 1930 to 1940 for the children evaluated. That was an era when many sources of fluoride exposure that are present today did not exist. The availability and distribution of foods was also far different. Imported foods were rare and much of the food supply (i.e. dairy, produce) was of local origin. A much larger portion of the population, especially those outside of large cities, grew at least some of their fruits and vegetables and preserved them through canning, or drying techniques.

The historic information on fluoride in the food supply is important because, other than drinking water, diet was the major fluoride source for the children from whom the dose-response data were collected. The 1930–1940-era food data are needed to adjust any dose-response estimate derived from concentrations in drinking water so as to appropriately incorporate food as an additional exposure source when estimating the RfD for inorganic fluoride.

**Fluoride in Solid Foods (1930–1940)**

McClure (1949; see also McClure, 1939, 1943), summarized information published between 1933 and 1948 on the fluoride content of various foodstuffs. Many of these early studies used the Williard and Winter (1933) distillation method to recover fluoride from the food coupled with a colorimetric titration-based quantification approach (see McClure, 1939, 1949). [See U.S. EPA, 2010) for a discussions of analytical methods and their changes over time.] With the exception of items grown in an area characterized by high levels of fluoride in soils, or sprayed with a fluoride-containing pesticide, McClure (1949) reported typical concentrations below 10 ppm, and frequently below 1 ppm (see Table D-1). However, levels of detection appear to have been better with some food matrices than others.

When available, McClure (1949) reported fluoride content based on fresh weight and dry weight. Table D-1 presents only the fresh-weight or "as consumed" values. The data reviewed for his publication included non-U.S. studies; studies evaluating the effects of fluoride-containing pesticides on the fluoride content of produce; and studies evaluating the effects of high soil fluoride levels on fluoride content of plants, or high fluoride dietary intake on the fluoride content of animal products (i.e., milk, eggs and meat). Consequently, some of the values listed by McClure (1949) may not be representative of the fluoride content of a typical U.S. diet for that time period, not withstanding difficulties presented by the analytical methods used at the time. However, McClure (1949) did report that soil fluoride had little impact on the fluoride content of plants other than edible roots and tubers. Fluoride in irrigation water also appeared to have little impact on plant content (McClure, 1949).

| Table D-1. Fluoride Contents of Selected Foods as Reported by McClure (1943, 1949) | | | |
|---|---|---|---|
| <0.2 ppm | 0.2 to <0.5 ppm | 0.5 to <1 ppm | ≥1 ppm |
| Milk (0.07-0.017) | Milk (0.22-0.38) | Milk (0.55) | Butter (1.50)<br>Cheese (1.62) |
| Egg White (0-0.14)<br>Eggs (0.12-0.42) | Egg white (0.20-0.47)<br>Egg yolk (0.42) | Egg yolk (0.59-0.90) | Egg white (1.48)<br>Egg yolk (1.20) |
| Beef (<0.20-0.29)<br>Pork (<0.20)<br>Mutton (<0.20)<br>Calf liver 0.19 | Pork (0.34) | Chicken, boned and canned , (0.63)<br>Pork chop (0.98)<br>Veal (0.90)<br>Beef liver (0.99) | Beef (2.00)<br>Chicken (1.40)<br>Chicken liver (1.43-1.59)<br>Pork shoulder (1.20)<br>Frankfurter (1.67-1.70)<br>Roundsteak (1.28)<br>Lamb (1.20) |
| Mackerel, boned (<0.20)<br>Tuna (0.1) | | Shrimp (edible portion (0.93)<br>Oysters (0.65) | Fish (1.49-1.63)<br>Codfish (5.0-7.0)<br>Mackerel, canned (12.10)<br>Herring, smoked(3.5)<br>Sardines, canned (7.3-12.5)<br>Salmon, canned (4.16-9.0)<br>Salmon, fresh (5.77)<br>Crab meat (2.00)<br>Shrimp, canned (4.4)<br>Oysters (1.50-1.58) |
| Beans (0.11-0.15)<br>Cabbage (0.12-0.15)<br>Cauliflower (0.08-0.12)<br>Carrots (<0.20)<br>Celery (0.10-0.14)<br>Chick peas (0.14)<br>Potatoes (0.07-0.16)<br>Potatoes, sweet (<0.2)<br>Turnips (<0.20) | Beets (0.20-0.38)<br>Blackeye peas (0.23)<br>Carrots (0.4)<br>Cabbage (0.3-0.38)<br>Celery (0.20-0.24)<br>Lettuce (0.30)<br>Potatoes (0.2)<br>Spinach (0.21-0.44)<br>Tomatoes (0.24) | Cabbage (0.8)<br>Cauliflower (1.0)<br>Celery (0.7)<br>Peas (0.6)<br>Tomatoes (0.6-0.9) | Potatoes, whole (6.4)<br>Spinach (1.0-1.8) |
| Citrus Fruits (0.04-0.18<br>Noncitrus fruit (0.02-0.19)<br>Apples (0.035)<br>Strawberry (0.18) | Citrus Fruits (0.25-0.36)<br>Orange (0.22)<br>Noncitrus fruit (0.22-0.34)<br>Pears (0.21)<br>Peaches (0.21)<br>Banana (0.23) | Noncitrus fruit (0.52-0.92)<br>Apples (0.8) | Noncitrus fruit (1.05-1.32)<br>Apples (1.32) |
| Corn, canned (<0.20)<br>Wheat, bran (<0.20)<br>Rice (<0.1-0.19<br>Oats, crushed (<0.2)<br>Peanuts (0.20)<br>Coffee (0.20) | Corn meal (0.22)<br>Wheat, bran (0.29)<br>Flour (0.27-0.45)<br>Oats, fresh (0.25)<br>Hazelnuts (0.30) | Wheat germ (0.88)<br>Rice (0.67)<br>Almonds (0.90)<br>Spaghetti (0.8)<br>Coffee (0.7)<br>Cocoa (0.5)<br>Milk chocolate (0.5) | Wheat germ (1.7-4.0)<br>Soy beans (1.33)<br>Honey (1.00)<br>White bread (1.0)<br>Coffee (1.1-1.6)<br>Cocoa (2.00)<br>Milk chocolate (1.0-2.00)<br>Tea (4.1-398)<br>Tea infusion (1.19) |

SOURCE: Multiple sources as reported in McClure (1943, 1949).

[a]Concentration based on fresh weight or "as consumed." The same food may appear in more than one concentration grouping because of the range of results reported.

McClure (1949) also reported on an earlier study by Smith et al. (1945) that found that cooking vegetables in fluoridated water resulted in higher levels of fluoride in the cooked foods. When cooked in water containing 5 ppm fluoride, the fluoride content of beets, cabbage, and cauliflower increased from 0 to 1.0, 3.6, and 4.2 ppm, respectively; that of carrots increased from 2.3 to 3.2 ppm; spinach from 2.0 to 4.0 ppm; and Italian squash and Brussels sprouts from 0.2 to 3.8 and 2.9 ppm, respectively. Pinto beans, potatoes and oatmeal did not show an increase in fluoride content when cooked in water containing 5 ppm fluoride, but did increase in F when cooked in water containing 24 ppm F. Differences among individual foods may be related to the presence or absence of cations in the food matrix that form poorly soluble fluoride salts.

In a different study, the fluoride content of vegetables cooked in non-fluoridated water was compared with that of vegetables cooked in water with a fluoride concentration of 1, 2 or 5 mg F/L (Martin, 1951). As with McClure (1949), the Willard and Winter (1933) method was used to determine the fluoride concentration with the modification that magnesium acetate was used as the fixative. The fluoride content of the raw vegetables ranged from 0.14 to 0.84 mg/kg (Table D-2). Vegetables absorbed fluoride in proportion to the fluoride content of the water, and vegetables cooked in a saucepan absorbed more fluoride than those cooked in a pressure cooker. The study authors did not suggest an explanation for this, but it may have been due to the increased concentration of fluoride in the open saucepan following evaporation of the water. Higher concentrations of fluoride in the cooking water increased the absorption of fluoride into the vegetables, regardless of the mode of cooking. The fluoride level in vegetables cooked in a saucepan in water with 1 mg F/L ranged from 0.55 mg/kg (corn) to 2.02 mg/kg (spinach) while those cooked in fluoride-free water ranged from 0.17 mg/kg (carrots) to 1.00 mg/kg (spinach).

| Table D-2.  Average Fluoride Content (mg/kg) of Vegetables Cooked in Water with Varying Fluoride Levels | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Vegetable | Raw | Boiled in Saucepan | | | | Boiled in Pressure Cooker | | | |
| | | Fluoride Content of Water (ppm) | | | | Fluoride Content of Water (ppm) | | | |
| | | 0.0 | 1.0 | 2.0 | 5.0 | 0.0 | 1.0 | 2.0 | 5.0 |
| Carrots | 0.14 | 0.17 | 0.81 | 1.75 | 3.61 | 0.18 | 0.51 | 0.69 | 1.02 |
| Beans | 0.20 | 0.21 | 0.96 | 1.72 | 4.32 | 0.19 | 0.52 | 0.67 | 1.23 |
| Cauliflower | 0.27 | 0.27 | 1.24 | 2.10 | 5.03 | 0.27 | 0.69 | 1.09 | 2.24 |
| Peas | 0.22 | 0.28 | 1.22 | 2.02 | 3.88 | 0.25 | 0.84 | 1.08 | 1.52 |
| Spinach | 0.84 | 1.00 | 2.02 | 2.85 | 4.99 | 0.76 | 1.13 | 1.63 | 2.81 |
| Cabbage | 0.23 | 0.29 | 1.13 | 1.88 | 4.92 | 0.23 | 0.55 | 0.79 | 1.03 |
| Beets | 0.21 | 0.26 | 0.60 | 1.16 | 1.88 | 0.28 | 0.44 | 0.57 | 0.78 |
| Tomatoes | 0.17 | 0.23 | 0.61 | – | – | 0.13 | 0.26 | – | – |
| Corn (cob) | 0.24 | 0.29 | 0.55 | – | – | 0.17 | 0.42 | – | – |

**SOURCE**: Martin (1951).

Cholak (1960) reviewed pre-1951 data on concentrations of fluoride ion in various food products. Cholak (1960) did not give the method of analysis used in each case; however, he noted that the preferred method for fluoride determinations at that time was ashing followed by a distillation step and conversion to soluble hydrofluorosilicic acid and a colorimetric or

photometric analysis.  Concentrations were highest in meats and fish and lowest in fruits and vegetables (Table D-3).

| Table D-3.  Fluoride Concentrations in Food Products | | |
|---|---|---|
| Category | Fluoride Concentration (mg/kg food) | |
| | Mean | Range |
| Meat | 1.06 | 0.20–3.33 |
|    Beef | 0.94 | 0.20–2.0 |
|    Pork | 1.19 | 0.20–3.33 |
|    Chicken | – | 1.40 |
| Fish | 9.40 | 0.10–84.47 |
|    Mackerel | 25.51 | 0.02–84.47 |
|    Salmon | 8.55 | 4.16–19.34 |
| Oysters | 1.24 | 0.65–1.58 |
| Eggs | 0.44 | 0.00–1.48 |
| Citrus fruit | 0.17 | 0.028–0.360 |
| Noncitrus fruit | 0.34 | 0.00–1.32 |
| Cereals, and cereal products | 0.57 | 0.10–4.00 |
| Cotton seed meal | – | 20.0–31.0 |
| Vegetables and tubers | 0.58 | 0.10–6.40 |
| Beans | 0.13 | 0.11–0.15 |
| Cabbage | 0.31 | 0.12–0.80 |
| Potatoes | 1.19 | 0.07–6.40 |
| Cow's milk | 0.17 | 0.07–0.55 |

**SOURCE**: Cholak (1960).

Most of the studies discussed in the previous paragraphs were conducted using ashing, followed by extraction of the fluoride and a colorimetric technique for quantification.  These methods are subject to interferences from other ions found in the food matrix and co-eluting with the fluoride. The early methods have largely been replaced by nonashing techniques and quantification via a fluoride ion-specific electrode. Singer et al. (1980) evaluated fluoride concentrations in 117 food items placed in 12 composite food groups.  Fluoride in the food groups was determined by ashed and unashed techniques combined with either an ion-specific electrode or colorimetric analysis (eriochromecyanine R procedure, Singer and Armstrong, 1959).  The results from the ion-specific electrode were found to be more accurate than the colorimetric method, especially for unashed samples.  Ashed samples gave different results from unashed samples for some food groups but not for others. In a different study, Singer and Ophaug (1979) found that the use of a colorimetric method with eriochromecyanin R could result in erroneously high fluoride values for some foods.

In order to determine if the analytical method introduced a substantial bias towards erroneously high fluoride concentrations in the foods reported by McClure (1939, 1943, 1949), EPA compared values for a subset of foods from the McClure (1943, 1949) reports with those in the USDA (2005) fluoride database (Table D-4).  The USDA database summarizes published and unpublished information on the fluoride content of selected foods and beverages from a variety of sources after critical evaluation of the data.  It also includes the results of USDA sampling of food and beverage products at 144 locations across the U.S. The USDA samples were analyzed using a fluoride ion-specific electrode with direct readout for clear liquids, and a microdiffusion method for other foods. Representative foods from the dairy, meat/poultry/fish, grains, fruits, and

vegetable food groups that constitute a substantial portion of the daily solid food intake of children were selected for Table D-4.

| Food | McClure (1943) | McClure (1949) | USDA (2005) | Description from USDA (2005) |
|------|---------------|----------------|-------------|------------------------------|
| Milk | 0.07–0.22 | 0.07–0.55 | 0.03 | 1%, 2% and skim |
| Cheese | 1.6 | 1.62 | 0.35 | Cheddar |
| Egg | ND | 1.18 | 0.05 | cooked |
| Chicken | 1.4 | 0.63–1.40 | 0.15 | Includes fried and roasted |
| Beef | <0.2 | 2.00 | 0.22 | |
| Frankfurter | 1.7 | 1.67 | 0.48 | Beef hotdog |
| Tuna | ND | 0.1 | 0.19 | Tuna canned |
| Fish | 1.6–7.0 | <0.2–12.5 | 0.18 | Includes broiled and fried |
| Rice | 1 | 0.19–0.67 | 0.41 | Rice cooked |
| White bread | 1.0 | dry wt. only | 0.49 | Includes white and whole wheat bread |
| Spaghetti | ND | 0.8 | 0.18 | uncooked |
| Apples | 0.8 | 0.035–1.32 | 0.03 | Raw with peel |
| Pears | ND | 0.21 | 0.08 | Raw |
| Peaches | ND | 0.21 | 0.04 | Raw |
| Banana | ND | 0.23 | 0.01 | Raw |
| Orange | 0.22 | 0.07-0.17 | ND | Fruit |
| Strawberry | ND | 0.18 | 0.04 | Raw |
| Spinach | 1.0 | 0.21–1.8 | 0.38 | Cooked |
| potatoes | <0.2 | 0.20 | 0.45 | White, boiled |
| Beans | ND | 0.13 | 0.18 | Green cooked, canned frozen |
| Peas | ND | 0.6 | 0.29 | cooked, canned frozen |
| Tomatoes | 0.6–0.9 | 0.24 | 0.02 | Raw |
| Carrots | <0.2 | <0.22–0.4 | 0.03 | USDA raw |

Table D-4.  Comparison of Fluoride Data (ppm) from McClure (1943, 1949) to that from USDA (2005)

ND = no matching data

A comparison of the McClure (1943, 1949) data to that in the USDA, 2005 database indicates that the current measurements of the concentrations of fluoride in foods are almost uniformly the same or lower than those made with earlier analytical methods.  Differences are often as high as tenfold or greater.  These differences cast doubt on the fluoride quantification used in exposure assessments derived from the early food concentration information.  A portion of the difference probably results from interferences of other ions with the colorimetric analysis used by the early researchers.

The USDA (2005) database provides more descriptive information than McClure (1943; 1949) regarding the analyzed product. Where possible, the descriptions of food material were matched. However, the lack of detail in the McClure publications may contribute to the difference in results in cases where the form of the food analyzed for the McClure publication (i.e. raw or cooked) is not identified. Cooking and preparing foods with water that contains fluoride increases the fluoride content of the food as served (McClure, 1949; Martin, 1951; Marier and Rose, 1966).  This is true for home-prepared and commercial foods. However the uptake of fluoride from the process water varies with the food product. As mentioned earlier, this may

relate to the presence of cations in the water and/or the food. Cations in the water can form poorly soluble fluoride salts (such as calcium fluoride), which can reduce fluoride uptake into the finished product). Fluoride in cooking water can also react with these same cations when present in the food and, in cases where the salt formed is only weakly soluble, may increase the fluoride from water retained in the cooked product.

**Dietary Dose Estimation**

McClure (1943), used information obtained in the 1930's and early 1940's on the fluoride content of various foods to estimate fluoride intake for four different age groups (1–3; 4–6; 7–9; and 10–12 year olds) using different estimates of water consumption and fluoride concentrations in dry foods. Depending on scenario, plain drinking water consumption was estimated to provide 25-33 % of the total daily water intake requirement. In both scenarios, it was estimated that 10% or 25% of total water content of food was of drinking water origin. McClure (1943) used four estimates of possible fluoride levels in dry food: 0.1 ppm, 0.2 ppm, 0.5 ppm and 1 ppm. The resulting estimates of fluoride intakes from drinking water, food, and drinking water and food combined are shown in Table D-5.

| Table D-5. Estimated Fluoride Intakes from Drinking Water with 1 ppm Fluoride and Food with 0.1–1 ppm Fluoride (McClure, 1943) | | | | |
|---|---|---|---|---|
| **Parameters** | **Age Group** | | | |
| | **1–3 yr** | **4–6 yr** | **7–9 yr** | **10–12 yr** |
| Daily Energy allowance (calories) | 1,200 | 1,500 | 2,000 | 2,500 |
| Daily Water requirement (cc) | 1,200 | 1,500 | 2,000 | 2,500 |
| Drinking water consumption (cc): | | | | |
| a) Direct: 25% of total daily requirement Indirect: 10% from foods (cc) | 390 | 520 | 650 | 812 |
| b) Direct = 25% of total daily requirement Indirect: 20% from foods | 480 | 640 | 800 | 1,000 |
| c) Direct = 33% of total daily requirement Indirect = 10% from foods | 480 | 640 | 800 | 1,000 |
| d) Direct = 35% of total daily requirement Indirect = 20% from foods | 580 | 746 | 933 | 1,165 |
| Total daily fluoride intake (mg) with 1 mg F /L in DW: | | | | |
| Under conditions of (a) | 0.390 | 0.520 | 0.650 | 0.810 |
| Under conditions of (b) and (c) | 0.480 | 0.640 | 0.800 | 1.0 |
| Under conditions of (d) | 0.560 | 0.745 | 0.930 | 1.165 |
| Food Consumption (g): | | | | |
| Food consumption (g); total daily intake of dry foods when 1 g equals 4.5 calories | 265 | 355 | 445 | 555 |
| Fluoride ingested daily (mg) in food when dry food contains the following concentrations of F: | | | | |
| e) 0.10 ppm | 0.027 | 0.036 | 0.045 | 0.056 |
| f) 0.20 ppm | 0.053 | 0.071 | 0.089 | 0.111 |
| g) 0.50 ppm | 0.133 | 0.178 | 0.223 | 0.278 |
| h) 1.0 ppm | 0.265 | 0.360 | 0.450 | 0.560 |
| Estimated total fluoride intake (mg) from water and food: | | | | |
| Water (a) and Food (a) | 0.417 | 0.556 | 0.659 | 0.866 |
| Water (a) and Food (b) | 0.443 | 0.591 | 0.739 | 0.921 |
| Water (a) and Food (c) | 0.523 | 0.698 | 0.872 | 0.278 |
| Water (a) and Food (d) | 0.653 | 0.880 | 1.10 | 0.560 |

| Table D-5. Estimated Fluoride Intakes from Drinking Water with 1 ppm Fluoride and Food with 0.1–1 ppm Fluoride (McClure, 1943) | | | | |
|---|---|---|---|---|
| **Parameters** | **Age Group** | | | |
| | **1–3 yr** | **4–6 yr** | **7–9 yr** | **10–12 yr** |
| Water (b or c) and Food (a) | 0.507 | 0.676 | 0.845 | 1.056 |
| Water (b or c) and Food (b) | 0.533 | 0.711 | 0.889 | 1.111 |
| Water (b or c) and Food (c) | 0.613 | 0.818 | 1.023 | 1.278 |
| Water (b or c) and Food (d) | 0.745 | 1.00 | 1.250 | 1.560 |
| | | | | |
| Water (d) and Food (a) | 0.587 | 0.781 | 0.975 | 1.221 |
| Water (d) and Food (b) | 0.613 | 0.816 | 1.019 | 1.276 |
| Water (d) and Food (c) | 0.693 | 0.923 | 1.153 | 1.443 |
| Water (d) and Food (d) | 0.825 | 1.105 | 1.380 | 1.725 |

**SOURCE**: McClure, 1943.

The estimates of dried food intake were derived from caloric intake recommendations for each age group from NRC (1941) and a caloric density estimate of 4.5 cal/g dried food. Total fluoride intake ranged from 0.417 to 0.825 mg for children 1–3 years old; 0.556 to 1.105 mg for children 4–6 years old; 0.659 to 1.380 mg for children 7–9 years old; and 0.866 to 1.725 mg for children 10–12 years old (Tables D-5 and D-6).

McClure (1943) used estimates of average body weights for children of the four age groups to calculate fluoride intakes per unit body weight (Table D-6). According to McClure (1943), the body weight data for children, ages one through six years came from Woodbury (1921), while those for children six to twelve years old were published by the American Child Health Association.

| Table D-6. Daily Fluoride Intakes Estimated by McClure, 1943 | | | | | |
|---|---|---|---|---|---|
| **Age Interval** | **Body Wt.[a] (kg)** | **Daily Fluoride Intake** | | | |
| | | **From DW (mg)** | **From Food (mg)** | **Total (mg/day)** | **Total mg/kg/day** |
| Birth to 3 years | 8–16 | 0.390–0.560 | 0.027–0.265 | 0.417–0.825 | 0.026–0.103 |
| 4 to 6 years | 13–24 | 0.520–0.745 | 0.036–0.360 | 0.556–1.105 | 0.023–0.085 |
| 7 to 9 years | 16–35 | 0.650–0.930 | 0.045–0.450 | 0.659–1.380 | 0.020–0.086 |
| 10 to 12 years | 25–54 | 0.810–1.165 | 0.056–0.560 | 0.866–1.725 | 0.016–0.069 |

**SOURCE**: McClure (1943).
[a]Body weights of children 1-6 years old from Woodbury (1921); body weights of 6-12 year olds taken from Baldwin-Wood weight-height-age tables for boys and girls of school age, published by the American Child Health Association.

Earlier studies of fluoride in unprocessed foods found that the range was from 0.2–0.3 ppm F (McClure, 1949, Martin, 1951), with levels in the meat/fish and poultry food group about 1 ppm or higher.  In the McClure (1943) analysis above, the food contributed 0.03 to 0.6 mg/day to the diet of children while Armstrong and Knowlton (1942) estimated a daily intake of 0.27–0.32 mg/day. A study by Marier and Rose (1966) found that foods processed with 1 mg F/L water contained 0.6–1.0 ppm fluoride instead of 0.2–0.3 ppm. The authors used a micro-distillation method coupled with colorimetric/spectrophotometric detection which may have inflated

fluoride concentration determinations.  Nevertheless, the results indicate an increase in fluoride when foods are prepared in fluoridated water (Table D-7) as in the study by Martin (1951).

| Table D-7. Fluoride Content of Canned Vegetables | | | | |
|---|---|---|---|---|
| Food | Average Fluoride Content (mg/kg)[a] | | | |
| | Non-fluoridated Process Water | | Fluoridated Process Water  (1 mg F/L) | |
| | Liquid | Solid | Liquid | Solid |
| Mixed vegetables | 0.30 | 0.37 | 1.03 | 1.05 |
| Green beans | 0.14 | 0.20 | 0.71 | 0.89 |
| Whole potatoes | 0.13 | 0.38 | 0.87 | 0.76 |
| Diced carrots | 0.30 | 0.19 | 0.55 | 0.61 |
| Kernel corn | 0.10 | 0.20 | 0.48 | 0.56 |
| Green peas | 0.15 | 0.10 | – | – |
| Wax beans | – | – | 0.49 | 0.60 |

SOURCE: Marier and Rose (1966).
[a]Results are averages of single determinations for duplicate samples.

The OW used the integrated exposure estimates from McClure (1943) and the USDA (2005) concentrations of fluoride in foods to estimate the fluoride contribution from solid foods (including beverages such as milk and fruit juices) to the diet during the 1930-1940 time period. The OW analysis assumes that the estimated fluoride concentrations measured in food during the 1940 era were most likely higher than would have been determined using the improved analytical methods and instrumentation available today.   Taking into consideration the USDA (2005) data on concentrations in foods, the OW selected the 0.5 ppm average dietary fluoride concentration in dry food as the best one for estimating dietary exposure for children in the Dean (1942) study, excluding the contribution that came from the drinking water. The OW selection was based on the following considerations:

- Even a ten-fold concentration of the USDA value for fluoride in foods with high water content (mostly fruits and succulent vegetables) when they were dried would not increase the concentration to above 0.5 ppm for most food items.

- The fluoride in lower moisture-content foods such as bread, uncooked pasta, meats, and eggs is 0.5 ppm or below in the USDA (2005) fluoride database.

- Breakfast cereal products popular with children today but poorly represented in the McClure (1949) publication have fluoride concentrations of about 0.5 ppm in the USDA (2005) database (range of means 0.17 to 0.72 ppm).

- An average concentration of 0.2 ppm seems to underestimate exposure given the USDA (2005) food values for items common in the diets of children when considering the variability in their food consumption habits across the age range covered by the estimates (infancy to age 14 years). An average concentration of 1 ppm appears to be too high to be representative of a mixed diet.

Accordingly, the 0.5 ppm average fluoride concentration is a conservative, albeit uncertain, estimate of the fluoride in diet at the time of the Dean (1942) study.

The McClure (1943) fluoride intakes from dry foods estimated for the 1–3, 4–6, 7–9 and 10–12 year old age groups consuming foods with an average of 0.5 ppm fluoride are given in Table D-8. The intake estimates were divided by the midpoint of the range of body weights McClure (1943) provided (Table D-6) for each age range to derive an estimate for the contribution from dry solid foods at the time of tooth development for the participants in the Dean (1942) study:

**Dose from foods = Fluoride from dry food (mg/day) ÷ BW**

where:

Fluoride from dry foods   =   Value from Table D-5 for age group
(average F concentration of 0.5 ppm in diet)

BW   =   Median body weight for each age range (Table D-8)

| Table D-8. Estimated Fluoride Intake from Solid Foods with an Average 0.5 ppm F as Derived from McClure (1943) | | | |
|---|---|---|---|
| Age Range (years) | Body Weight Estimated Range (midpoint) (kg) | Fluoride Intake from Solid Foods (mg/day) | Fluoride Intake from Solid Foods (mg/kg/day)[a] |
| 1–3 | 8–16   (12) | 0.133 | 0.011 |
| 4–6 | 13–24   (18.5) | 0.178 | 0.010 |
| 7–9 | 16–35   (25.5) | 0.223 | 0.009 |
| 10–12 | 25–54   (39.5) | 0.278 | 0.007 |

[a]Calculated using the midpoint body weights.

The product of this calculation is an estimated intake of 0.01 mg/kg/day when the individual values (Table D-8) were rounded to two decimal places.  This dose is added to the 0.07 mg F/kg/day (Section 5.4) for the drinking water contribution from total daily fluoride exposure. Accordingly, the total daily dose is thus 0.08 mg F/kg/day for children receiving drinking water with a concentration of 1.87 mg F/L during the time period between about 1930 and 1940. This concentration is considered the point of departure from the dose-response assessment for a prevalence of 0.5% severe dental fluorosis among the children evaluated by Dean (1942).

**References**

Armstrong, W.D. and M. Knowlton.  1942. Fluorine derived from food. J. Dent. Res. 21:326.

Cholak, J.  1960.  Current information on the quantities of fluoride found in air, food and water. Arch. Indust. Health 21:312–315.

Dean, H.T.  1942.  The investigation of physiological effects by the epidemiology method.  In: *Fluoride and Dental Health*. Publ. Amer. Assoc. Advanc. Sci., no. 19, pp 23–31.

Marier, J.R. and D. Rose. 1966. The fluoride content of some foods and beverages – a brief survey using a modified Zr-SPADNS method. J. Food Sci. 31:941–946.

Martin, D.J.  1951.  Fluorine content of vegetables cooked in fluorine containing water. J. Dent. Res. 30:676.

McClure, F.J.  1939.  Fluorides in food and drinking water: A comparison of effects of water-ingested versus food-ingested sodium fluoride.  National Institute of Health, Bulletin 172, Federal Security Agency, U.S. Public Health Service, Washington, DC.

McClure, F.J.  1943.  Ingestion of fluoride and dental caries.  Quantitative relations based on food and water requirements of children 1-12 years old.  Amer. J. Dis. Child. 66:362-369. [Republished in Publication 825, pp. 283-286, U.S. Public Health Service, 1962]

McClure, F.J.  1949.  Fluoride in foods. Public Health Reports vol. 64, no. 34, pp 1061–1074.

NRC (National Research Council). 1941. *Recommended Dietary Allowances*, Committee on Food and Nutrition, NRC.  As cited in McClure, 1943.

Singer, L. and W.D. Armstrong. 1959.  Determination of fluorine in blood serum.  Anal. Chem. 31:105.

Singer, L. and R.H. Ophaug.  1979.  Total fluoride intake of infants.  Pediatrics 63:460–466.

Singer, L., R.H. Ophaug, and B.F. Harland.  1980.  Fluoride intake of young male adults in the United States. Amer. J. Clin. Nutrit. 33:328–332.

Smith, H.V., M.C. Smith, and M. Vavich. 1945.  Fluorine in milk, plant foods, and foods cooked in fluorine-containing water. Arizona Agri. Exp. Station., mimeographed report, 6 pages.  As cited in McClure, 1949.

U.S. EPA (U.S. Environmental Protection Agency). 2010. Fluoride: Exposure and Relative Source Contribution Analysis. Office of Water, Washington, DC. EPA 820-R-10-015.

USDA (U.S. Department of Agriculture). 2005.  USDA National Fluoride Database of Selected Foods and Beverages, Release 2.  Nutrient Data Laboratory, Agricultural Research Services, U.S. Department of Agriculture.  Beltsville, MD.

Willard H.H. and O.B. Winter.  1933. Volumetric method for determination of fluorine. Indust. Eng. Chem. (Anal. Ed.) 5:7–10.

Woodbury, R.M.  1921. Statures and Weights of Children Under Six Years of Age. U.S. Department of Labor, Childrens's Bureau.  As cited in McClure, 1943.

# Pls.' Exhibit 030

# EPA - Fluoride: Exposure and Relative Source Contribution Analysis (EPA-820-R-10-015)



820-R-10-015

# Fluoride: Exposure and Relative Source Contribution Analysis

**Health and Ecological Criteria Division**
**Office of Water**

**December 2010**

**U.S. Environmental Protection Agency**
**Washington, D.C.**

## PREFACE

In March, 2006, the National Academy of Sciences National Research Council (NRC) released the Report entitled "Fluoride in Drinking Water: A Scientific Review of EPA's Standards". The NRC stated that "in light of the collected evidence on various health endpoints and total exposure to fluoride, the committee concludes the EPA's MCLG of 4 mg/L should be lowered". They further suggested that, in order to develop an MCLG (Maximum Contaminant Level Goal) that is protective against severe enamel fluorosis, clinical stage II skeletal fluorosis and bone fractures, EPA should:

- Develop better estimates of total exposure for individuals,
- Use current approaches for quantifying risk,
- Consider susceptible populations, and
- Characterize uncertainties and variability.

In response to the NRC (2006) recommendations, the Office of Water (OW) collected available data on the various media that contribute to fluoride exposure in the United States for the purpose of estimating total exposures for children during the period of sensitivity to severe dental fluorosis (six months to 14 years). Data were also collected to develop an exposure estimate for the adult population. This document presents the exposure analysis.

The objective of the OW's exposure and relative source contribution analysis was to quantify the fluoride exposures for children and adults in the United States to accomplish the following:

- Determine sources of fluoride exposure for the U.S. population.
- Quantify exposures where possible for the age groups of concern.
- Compare oral intake estimates to the reference dose established in the companion dose-response assessment.
- Estimate the relative source contribution for each exposure source.
- Provide information for use in characterizing opportunities for reducing population risk from fluoride in public drinking water systems and facilitating any necessary adjustment in the regulatory non-enforceable Maximum Contaminant Level Goal (MCLG).

This document addresses the relative source contribution for drinking water from public systems and contains information from peer-reviewed publications on multiple topics; these topics include concentrations of fluoride in foods and beverages, estimated dietary exposure estimates for fluoride, concentrations of fluoride in tap water delivered by public drinking water systems, estimated fluoride intakes from toothpaste, and estimated fluoride exposures from sulfuryl fluoride (a pesticide).

In addition, this report presents background on the analytical methods used to measure fluoride in various media, as well as approaches applied in developing dietary exposure assessments. The background information is included to provide perspective on how methods of analysis used in individual studies have impacted the exposure estimates.

There are a number of factors that the reader should consider when reviewing this document characterizing the relative source contribution from tap water to total fluoride intake:

- Only peer-reviewed and published data from the United States and Canada were used in the assessment (excepting the Information Collection Request data collected by Office of Water for the second six-year review of its regulations).
- Water intakes are those for public water systems and consumers only (EPA, 2004).
- EPA conducted no independent study measuring dietary exposure; data employed are from the published papers.
- Exposure estimates for sulfuryl fluoride were prepared for the OW by the Office of Pesticide Programs.
- Office of Water policies applied in the relative source contribution analysis are those presented in EPA (2000b).
- The age groupings selected were those used by Ershow and Cantor (1987). The Ershow and Cantor (1987) publication provided the best available water intake data for the time period of the critical study (1930-1940).

The document is structured (see map below) to present the published information available on fluoride in foods (Chapter 2), fluoride in drinking water from public and nonpublic sources (Chapter 3), fluoride in toothpaste (Chapter 4), and fluoride from more minor exposure sources (Chapter 5). Each chapter also presents published exposure estimates applicable to each exposure medium when available. Chapters 2 and 3 include background data on the analytical methods used for the analyses in the cited studies and the experimental approaches used to assess dietary exposures.

Chapter 6 identifies the studies selected for the quantitative exposure analysis and the reasons supporting their selection. The RSC calculations and sensitivity analysis are found in Chapter 7 while Chapter 8 compares current exposure values to the reference dose from the dose-response document (EPA, 2010a) and nutritional guidelines from the Institute of Medicine (IOM, 1997). Appendices A and B located at the end of this document (beginning at page 127), were provided by the Office of Pesticide Programs and retain their original pagination.

The OW has also prepared and peer reviewed a second document that provides an estimate of the RfD for fluoride. This second document, *Fluoride: Dose-Response Analysis for Non-cancer Effects* (EPA Report No. 820-R-10-019), can be accessed through the following url: http://water.epa.gov/action/advisories/drinking/fluoride_index.cfm.



***Exposure and Relative Source Contribution Analysis* Document Map**

# TABLE OF CONTENTS

PREFACE ........................................................................................................................................ i

LIST OF TABLES ......................................................................................................................... vi

LIST OF FIGURES ..................................................................................................................... viii

ACKNOWLEDGMENTS .............................................................................................................. ix

LIST OF ACRONYMS ................................................................................................................... x

AUTHORS, CONTRIBUTORS AND REVIEWERS .................................................................... xi

EXECUTIVE SUMMARY ......................................................................................................... xiii

1.  INTRODUCTION ................................................................................................................1
    1.1.  Background ..............................................................................................................1
    1.2.  U.S. EPA RSC Policies ..........................................................................................1

2.  EXPOSURE FROM FOODS AND BEVERAGES ..............................................................4
    2.1.  Analytical Methods .................................................................................................4
          2.1.1.  Sample Preparation ....................................................................................4
          2.1.2.  Fluoride Recovery ......................................................................................5
          2.1.3.  Measurement and Quantitation of Fluoride Ion .........................................6
          2.1.4.  Confidence in Analytical Results ...............................................................8
    2.2.  Natural Fluoride Levels in Solid Foods ..................................................................9
          2.2.1.  Fluoride in Infant Foods ...........................................................................10
          2.2.2.  Fluoride in Foods of Children and Adults .................................................15
          2.2.3.  Summary of the Data on Fluoride in Solid Foods .....................................21
    2.3.  Fluoride in Beverages ...........................................................................................23
          2.3.1.  Non-Alcoholic Beverages ........................................................................23
          2.3.2.  Alcoholic Beverages ................................................................................26
          2.3.3.  Summary for Fluoride in Beverages ..........................................................26
    2.4.  Indirect Exposure from Pesticide Residues on Food .............................................26
    2.5.  Estimates of Dietary Fluoride Intake ....................................................................29
          2.5.1.  Exposure Assessment Methodologies .......................................................29
          2.5.2.  Infants ......................................................................................................33
          2.5.3.  Children to 14 Years of Age .....................................................................39
          2.5.4.  Older Children and Adults ........................................................................46
          2.5.5.  Combined Exposure Estimates for Age Groups of Concern .......................52

3.  EXPOSURE FROM DRINKING WATER ........................................................................57
    3.1.  Analytical Methods ...............................................................................................57
    3.2.  Natural Sources .....................................................................................................58
    3.4.  Fluoridation Contributions ....................................................................................66
    3.5.  Bottled Water ........................................................................................................67
    3.6.  Exposure from Drinking Water ..............................................................................68

4.  FLUORIDE IN DENTAL PRODUCTS ...........................................................................71
    4.1.  Toothpaste .............................................................................................................71
    4.2.  Topical Applications and Mouth Rinses .................................................................78
    4.3.  Summary of Fluoride Exposure from Dental Products ...........................................80

5.  OTHER SOURCES OF EXPOSURE ...............................................................................83
    5.1.  Exposure from Air .................................................................................................83

5.1.1.   Monitoring Data ............................................................83

5.1.2.   Exposure to Airborne Fluoride .................................84

5.2.   Oral Supplements ....................................................................84

5.3.   Soil Ingestion by Children .......................................................86

5.4.   Pharmaceuticals .......................................................................87

5.5.   Occupational Exposures ...........................................................87

5.6.   Smoking ....................................................................................87

6.    EXPOSURE ASSESSMENT SUMMARY ................................................88

6.1.   Dietary Intake ..........................................................................89

6.2.   Drinking Water ........................................................................93

6.3.   Toothpaste ................................................................................94

6.4.   Soils ..........................................................................................95

6.5.   Uncertainty ..............................................................................95

7.    RELATIVE SOURCE CONTRIBUTION (RSC) .......................................97

8.    RELATIONSHIP OF EXPOSURE ESTIMATES TO DIETARY GUIDELINES ......102

8.1.   Estimates of Daily Dietary Needs. ..........................................102

8.2.   Estimates of Tolerable Upper Limit Level ..............................103

8.3.   Exposure Profiles ...................................................................104

8.4.   Summary of findings ..............................................................108

9.    REFERENCES CITED .....................................................................111

APPENDICES...............................................................................................128

Appendix A.  Fluoride Chronic Dietary Exposure Analysis

Appendix B.  Sulfuryl Fluoride: Estimates of Fluoride Exposure from Pesticidal Sources – Customized Age Groups

## LIST OF TABLES

Table 2-1.   Fluoride Concentrations in Infant Formula (Dabeka and Mckenzie, 1987) ...................................10

Table 2-2.   Mean Fluoride Concentrations (mg/L) in Infant Formulas (McKnight-Hanes et al., 1988) ..............................................................................................................................................11

Table 2-3.   Fluoride Concentrations in Infant Formulas (Van Winkle et al., 1995) .....................................12

Table 2-4.   Fluoride Levels in Infant Formulas Reconstituted with Deionized Water (Siew et al., 2009) ..............................................................................................................................................12

Table 2-5.   Fluoride Concentrations in Infant Foods as Reported by Singer & Ophaug, 1979 .....................13

Table 2-6.   Fluoride Concentrations in Infant Foods as Reported by Heilman et al., 1997.........................14

Table 2-7.   Fluoride Concentrations in Infant Foods as Summarized by USDA (2005) .................................15

Table 2-8.   Fluoride Content of Food Commodity Groups .................................................................................15

Table 2-9.   Fluoride Content of Composite Food Groups for Four Geographic Regions of the U.S. .............16

Table 2-10.  Fluoride Content of Four Representative Diets for 2-Year-Olds ..................................................17

Table 2-11.  Fluoride Concentrations in Food Products ......................................................................................17

Table 2-12.  Fluoride Concentrations in Foods Obtained in Winnipeg, Canada ..............................................18

Table 2-13.  Fluoride Concentrations of Noncooked and Nonreconstituted Foods and Beverages Consumed  by Adolescents 12-14 Years Old[a] .............................................................................19

Table 2-14.  Fluoride Concentrations (mg/kg) of Drinking Water and Foods and Beverages Reconstituted in or Cooked in Tapwater ........................................................................................19

Table 2-15.  Fluoride Concentrations in Foods as Summarized by the USDA, 2005 .......................................20

Table 2-16.  Comparison of Food Group Measures over a 30-Year Period.......................................................22

Table 2-17.  Fluoride Content of Canned Vegetables ...........................................................................................23

Table 2-18.  Fluoride Concentrations in Beverages in Two Canadian Towns ..................................................24

Table 2-19.  Fluoride Levels in Beverages as Summarized by the USDA, 2005 ...............................................25

Table 2-20.  Fluoride Concentration in Tea as Served ........................................................................................25

Table 2-21.  Estimated Food Group Exposures of the General U.S. Population to Fluoride from Sulfuryl Fluoride Tolerances .............................................................................................................29

Table 2-22.  Fluoride Intake of Infants 6 Months Old (Singer and Ophaug, 1979) .........................................34

Table 2-23.  Fluoride Intake (mg F/day) by Infants 6 Months Old in Four Regions of the U.S. ....................35

Table 2-24.  Estimated Fluoride Intake of 6-Month Old Infants in Different Regions of the U.S. ...................36

Table 2-25.  Mean Dietary Fluoride Intake of 6-Month-Old Infants (Ophaug et al., 1985) .............................36

Table 2-26.  Estimated Fluoride Intake of 4–10 Month Old Infants with Varying Intakes of Milk or Formula ......................................................................................................................................37

Table 2-27.  Dietary Fluoride Intake of Infants from the 1960s to the 1990s ..................................................37

Table 2-28.  Updated Estimated Fluoride Intake of 4-10 Month Old Infants with Varying Intakes of Milk and Formula (Fomon et al., 2000) ...........................................................................................38

Table 2-29.  Volume of Formula Consumed and Body Weights from Birth to 12 Months (Siew et al., 2009) ......................................................................................................................................38

Table 2-30.  Fluoride Intake (mg F/day) by Children 2 Years Old in Four Regions of the U.S. ......................39

Table 2-31.  Dietary Fluoride Intake of an Average 2-Year-Old Child ..............................................................40

Table 2-32.  Mean Dietary Fluoride Intake of 2-Year-Olds .................................................................................41

Table 2-33.  Estimated Fluoride Intake of 3- to 5-Year-Old Children Living in a Nonfluoridated and Fluoridated Community ................................................................................................................42

Table 2-34.  Estimated Fluoride Intake of 6 to 11 and 12 to 19 Year Olds Living in a Nonfluoridated Community ..................................................................................................................................43

Table 2-35.  Estimated Fluoride Intake of  6 to 11 and 12 to 19 Year Old Children Living in a Fluoridated Community ................................................................................................................44

Table 2-36.  Dietary Fluoride Intake of 16-40 Month Old Children ....................................................................45

Table 2-37.  Fluoride Content of Four Two-week Representative Diets for Teens 16-19 Years Old ...............47

Table 2-38.  Average Daily Fluoride Intake of 16-19 Year Olds Residing in Four Cities...............................47

Table 2-39.  Daily Fluoride Intake Based on Composite Diets ............................................................................48

Table 2-40.  Average Daily Fluoride Intake (mg/day) of 16-19 Year Olds .......................................................49

Table 2-41.  Daily Fluoride Intake based on 6-day Hospital Diets .....................................................................49

Table 2-42.  Fluoride Intake of Individuals on a Metabolic Diet over a Six-Year Period ...............................50

Table 2-43.  Fluoride Intake from a General Hospital Diet Prepared with and without Fluoridated Water ............................................................................................................................................. 51
Table 2-44.  Daily Fluoride Intake in Sixteen U.S. Cities ........................................................................ 52
Table 2-45.  Summary of Daily Dietary Fluoride Intakes for Age Groups of Concern ........................... 53
Table 2-46.  Estimates of Daily Dietary Fluoride from Beverages for Age Groups of Concern ............. 54
Table 2-47.  Summary of Pesticidal Fluoride Contributions to Dietary Fluoride Exposure ................... 56

Table 3-1.  Public Water System Monitoring Data 1998–2005 .............................................................. 64
Table 3-2.  A Summary of Public Water System Fluoride Monitoring Data from Systems for Systems with at Least One Detection of 2 mg/L or Higher during the Year of Monitoring .......... 65
Table 3-3.  CDC Recommendations for Optimal Fluoride Concentrations in Public Water Supply Systems ............................................................................................................................................ 66
Table 3-4.  Estimated Daily Fluid and Plain Water Regional Intake in Children 1–10 Years Old ................ 67
Table 3-5.  Fluoride Intake from Consumption of Municipal Water (Direct and Indirect[a]) at the Average Concentration ( 0.87 mg/L) Determined from Monitoring Records for 2002 through 2005 ..................................................................................................................................... 68
Table 3-6.  Consumers Only Fluoride Intake from Consumption of Municipal Water (Direct and Indirect[a]) at the Average Concentration (0.87 mg/L) Determined from Monitoring Records for 2002 through 2005 .......................................................................................................... 69
Table 3-7.  Fluoride Intake From Average Drinking Water Consumption and  90th Percentile Fluoride Concentration (1.43 mg/L) Determined from Monitoring Records for 2002 through 2005 ..................................................................................................................................... 70

Table 4-1.  Toothpaste Use and Estimated Fluoride Ingestion by Children 2-5 Years Old ................. 73
Table 4-2.  Toothpaste Use by Children  6 to 12 Months Old ............................................................... 74
Table 4-3.  Age-Related Estimates of Fluoride Ingestion from Toothpaste Use .................................... 75
Table 4-4.  Toothpaste Use and Fluoride Ingestion  in Children Two to Seven Years Old ................. 76
Table 4-5.  Estimated Fluoride Intake from Toothpaste[a] in Children 1.5 to 36 Months Old ............. 77
Table 4-6.  Toothpaste Use and Ingestion by Children Ages 16 to 36 Months .................................... 77
Table 4-7.  Fluoride Ingestion from Toothpaste Use and Fluorosis ...................................................... 78
Table 4-8.  Percentage of Children Receiving Fluoride Treatments by Age Groups ............................. 79
Table 4-9.  Age-Related Exposure Estimates for Fluoride From Toothpaste ........................................ 80
Table 4-10.  Number of Toothbrushings Per Day Reported for Children (Six Months to Five Years Old) ................................................................................................................................................. 81

Table 5-1.  Daily Fluoride Supplementation Recommended by the ADA and the American Academy of Pediatric Dentistry ........................................................................................................................ 84
Table 5-2.  Fluoride Intake from Supplements in Children 1.5 to 36 Months Old ............................... 85

Table 6-1.  Estimated Daily Dietary Fluoride Intakes from Solid Foods for Age Groups of Concern ............ 90
Table 6-2.  Estimated Daily Fluoride Intake from Beverages Only for Age Groups of Concern .................. 92
Table 6-3.  Fluoride Intake from Consumption of Municipal Water (Direct and Indirect[a]) at the Average Concentration (0.87 mg/L) Determined from Monitoring Records for 2002 through 2005 ..................................................................................................................................... 94
Table 6-4.  Age-Related Exposure Estimates for Fluoride From Toothpaste ........................................ 94
Table 6-5.  Sulfuryl Fluoride Contributions to Dietary Fluoride Exposure. .......................................... 96

Table 7-1.  Representative Values for Fluoride Intakes Used in Calculation of the Relative Source Contribution for Drinking Water ..................................................................................................... 98
Table 7-2.  Representative Values for Fluoride Intakes (Including Sulfuryl Fluoride) Used in Calculation of the Relative Source Contribution from Drinking Water ........................................... 98

Table 8-1.  Comparison of Total Fluoride Intake Estimates to the Dietary Adequate Intake (AI). .............. 103
Table 8-2.  Comparison of Total Fluoride Intake Estimates to the IOM (1997) Tolerable Upper Intake Level and the OW Age-Specific Benchmarks ...................................................................... 104

# LIST OF FIGURES

**Figure 3-1.** Fluoride Levels in Groundwater in the U.S. (Fleischer et al., 1974). ...............................59

**Figure 3-2.** Arid Regions in the U.S. (McGinnies et al., 1968). ..................................................59

**Figure 7-1.** Percentage Media Contribution to Total Daily Fluoride Intake: 90th Percentile Drinking Water Intakes for Consumers Only and a Fluoride Concentration of 0.87 mg/L ........................99

**Figure 8-1.** Total Daily Fluoride Intake Estimates Relative to the Proposed RfD Using 90th Percentile Drinking Water Intake Data for Consumers Only and the Mean Drinking Water Fluoride Concentration (0.87 mg/L) .................................................................105

**Figure 8-2.** Total Daily Fluoride Intake Estimates Relative to the Proposed RfD Using the Mean Drinking Water Intake Data for Consumers Only and the Mean Drinking Water Fluoride Concentration (0.87 mg/L)................................................................106

**Figure 8-3.** Total Daily Fluoride Intake Estimates Relative to the Proposed RfD using Mean Drinking Water Intakes for Consumers Only and the 90th percentile Fluoride Concentration for all Systems Reporting Detections of Fluoride. ...............................107

**Figure 8-4.** Total Daily Fluoride Intake Estimates Relative to the Proposed RfD using 90th Percentile Drinking Water Intakes for Consumers Only and Average Concentration (1.76 mg/L) for those Systems that Reached or Exceeded the SMCL of 2 mg/L at Least Once During the ICR Monitoring Period for the Second Six-year Review. ......................................107

**December 2010**

# ACKNOWLEDGMENTS

This document was prepared by staff of Oak Ridge National Laboratory, Oak Ridge, Tennessee, under work assignment 2006-014, under the U.S. EPA IAG Number DW-89-9220971.  The Lead EPA Scientists are Joyce M. Donohue, Ph.D., and Tina Duke, M.P.H, Health and Ecological Criteria Division, Office of Science and Technology, Office of Water, U.S. Environmental Protection Agency, Washington, DC.

The Oak Ridge National Laboratory is managed and operated by UT-Battelle, LLC., for the U.S. Department of Energy under Contract No. DE-AC05-00OR22725.

# LIST OF ACRONYMS

| | |
|---|---|
| ADA | American Dental Association |
| ANOVA | Analysis of Variance |
| ATSDR | Agency for Toxic Substances and Disease Registry |
| AWQC | Ambient Water Quality Criteria |
| BW | Body weight |
| CAMP | Continuous Air Monitoring Project |
| CDC | Centers for Disease Control |
| CI | Confidence Interval |
| CSFII | Continuing Survey of Food Intake by Individuals |
| CTE | Central Tendency Exposure |
| DI | Drinking water intake |
| F | Fluoride |
| FDA | Food and Drug Administration |
| GI | Gastrointestinal |
| HMDS | Hexamethyldisiloxane |
| IOM | Institute of Medicine (of The National Academies) |
| ISE | Ion-selective electrode |
| MCL | Maximum contaminant level |
| MCLG | Maximum contaminant level goal |
| NDL | Nutrient Data Laboratory (U.S. Department of Agriculture) |
| NF | Non-fluoridated |
| NFCS | Nationwide Food Consumption Survey |
| NHANES | National Health and Nutrition Examination Survey |
| NIDR | National Institute of Dental Research |
| NIPDWR | National Interim Primary Drinking Water Regulations |
| nmole | Nanomole |
| NRC | National Research Council (of The National Academies) |
| OR | Odds ratio |
| OPF | Optimal fluoride level |
| OSHA | Occupational Safety and Health Administration |
| RDA | Recommended Daily Allowance |
| RfD | Reference dose (in mg/kg/day) |
| RMCL | Recommended Maximum Contaminant Level |
| RME | Reasonable Maximum Exposure |
| RSC | Relative Source Contribution |
| SD | Standard Deviation |
| SE | Standard Error |
| SEM | Standard Error of the Mean |
| SDWA | Safe Drinking Water Act |
| SMCL | Secondary Maximum Contaminant Level |
| USDA | U.S. Department of Agriculture |

**AUTHORS, CONTRIBUTORS AND REVIEWERS**

Joyce Morrissey Donohue, Ph.D., R.D.
Health and Ecological Criteria Division
Office of Water
U.S. Environmental Protection Agency

Tina Duke, M.P.H.
Health and Ecological Criteria Division
Office of Water
U.S. Environmental Protection Agency

Dennis Opresko, Ph.D.
Toxicology and Hazard Assessment
Oak Ridge National Laboratory
Oak Ridge, TN

Annetta Watson, Ph.D.
Toxicology and Hazard Assessment
Oak Ridge National Laboratory
Oak Ridge, TN

Bruce Tomkins, Ph.D.
Chemical Sciences Division
Oak Ridge National Laboratory
Oak Ridge, TN

**INTERNAL EPA REVIEWERS**

Brenda Foos, MS
Office of Children's Health Protection
U.S. Environmental Protection Agency

Denis Borum, MS
Office of Congressional and Intergovernmental Relations
U.S. Environmental Protection Agency

Lisa Melnyk, Ph.D.
National Exposure Research Laboratory
Office of Research and Development
U.S. Environmental Protection Agency

**EXTERNAL PEER REVIEWERS**

Linda C. Abbott, Ph.D.
Regulatory Risk Analyst
Office of Risk Assessment and Cost-Benefit Analysis
U.S. Department of Agriculture

Mary A. Fox, Ph.D.
Assistant Professor
Department of Health Policy and Management
Johns Hopkins Bloomberg School of Public Health

E. Angeles Martínez Mier, DDS, MSD, Ph.D.
Associate Professor
Department of Preventive and Community Dentistry
Indiana University School of Dentistry

David L. Ozsvath, Ph.D.
Professor of Geology and Water Science
Department of Geography/Geology
University of Wisconsin-Stevens Point

# EXECUTIVE SUMMARY

In response to the 2006 National Research Council (NRC) report: *Fluoride in Drinking Water: A Scientific Review of EPA's Standards*, the U.S. EPA Office of Water (OW) initiated an examination of dose-response data for critical noncancer effects of fluoride on teeth and bone in light of the NRC (2006) conclusion that "the EPA's MCLG of 4 mg/L should be lowered," so as to reduce the risk of severe enamel fluorosis and to minimize the risk for bone fractures and skeletal fluorosis in adults.  Dose-response assessment for fluoride was updated using current approaches for quantifying risk with consideration given to susceptible populations as well as uncertainties and variability in the data (U.S. EPA, 2010a).

One goal of the exposure and relative source contribution (RSC) analyses was to obtain and evaluate available U.S. domestic exposure data  that could be used by the Office of Water during its reconsideration of the current USEPA Maximum Contaminant Level Goal (MCLG; nonenforceable) for fluoride. This assessment examined data on the concentrations of fluoride in foods and beverages, available dietary exposure estimates for fluoride, concentrations of fluoride in the tap water delivered by public drinking water systems, incidental ingestion of fluoride from toothpaste use and potential exposures to fluoride from sulfuryl fluoride (pesticide) applications. The information utilized was largely drawn from peer-reviewed published literature that examined the exposure of US domestic or in some cases Canadian populations and communities.

Once information on the various media contributing to fluoride exposure were assembled and analyzed, total exposures for the period of sensitivity to severe dental fluorosis (six months to 14 years) were estimated.  An exposure estimate was also developed for the adult population.  The RSC determination followed the methodology established by the OW for chemicals found in drinking water which use average exposures for all media except residential drinking water from public drinking water systems.  The drinking water component of the relative source analysis is based on the average fluoride concentration (~0.9 mg/L) from public drinking water systems that reported detectable levels of fluoride during the second six-year review of U.S. EPA drinking water regulations and the intake data (direct and indirect) for the 90th percentile consumer from the U.S. Department of Agriculture (USDA) Continuing Survey of Food Intake by Individual (CSFII).  The analysis considers susceptible populations, and the impact of the uncertainties and variability in the data as part of the RSC analysis.

Among the age groups evaluated, the RSC values for drinking water range from 40 to 70 percent, with the higher values associated with infants fed with powdered formula or concentrate reconstituted with residential tap water (70%) and adults (60%). Comparison of the age-specific total estimated exposure for the 90th percentile drinking water consumer to the daily reference dose suggests that some children at ages less than seven years old may be at risk for severe dental fluorosis. The major contributors to total daily fluoride intakes for these age groups are their drinking water, commercial beverages, solid foods and swallowed toothpaste.

In addition to the exposure information, this report presents background information on the strengths and weaknesses of the analytical methods that were used to measure fluoride in various media for the key critical studies and the approaches applied in developing dietary exposure assessments.

# 1. Introduction

## 1.1. Background

In 2006, the National Research Council (NRC) released: *Fluoride in Drinking Water: A Scientific Review of EPA's Standards*, a three year effort to examine the health effects of ingested fluoride in drinking water.  The development of the NRC (2006) report was funded by the U. S. EPA Office of Water (OW).  The project was initiated as a result of the 2002/2003 review of the Maximum Contaminant Level Goal (MCLG) and the Maximum Contaminant Level (MCL) for fluoride.

NRC (2006) concluded that EPA's current MCLG of 4 mg/L for fluoride should be lowered to reduce the risk of severe enamel fluorosis and minimize the risk for bone fractures and skeletal fluorosis in adults.  In response, the U.S. EPA OW initiated an examination of the dose-response data for the critical noncancer effects of fluoride on teeth and bone.  The dose-response assessment for fluoride was updated using current approaches for quantifying risk with consideration given to susceptible populations and the uncertainties and variability in the data (U.S. EPA, 2010a).

The U.S. EPA (2010a) report identifies the fluoride concentration in drinking water that was not associated with an increased risk of severe dental fluorosis in 99.5% of children in selected towns distributed across the United States (Dean (1942) prior to the introduction of fluoridation and fluoridated dental products.  The U.S. EPA (2010a) report includes an estimated Reference Dose (RfD) for severe dental fluorosis derived from the Dean (1942) data.  It also determined that the RfD associated with severe dental fluorosis is similar to or lower than that associated with an increased risk of bone fracture or Stage III skeletal fluorosis.

At the time the dose-response data were collected the fluoride in drinking water was largely determined by local geological composition of the soils and bedrock; there was no intentional fluoridation of public drinking water supplies and no commercial fluoride-containing dental products.  Currently, exposures to fluoride come from drinking water, foods, beverages, dental products (toothpaste, mouth rinses), supplements, industrial emissions, pharmaceuticals, and pesticides.  In the case of young children, ingestion of fluoride-containing soil is another source of exposure. These exposure pathways are discussed in this report and quantified where possible. The data presented include some of the studies that were considered by the NRC (2006) report in their analysis of relative source exposures as well as additional published papers identified by the OW.

The ratio between exposure from drinking water and total exposure is called the relative source contribution (RSC).  The OW traditionally uses the RSC in the derivation of noncancer MCLGs for a drinking water regulation. Section 1.2 below describes OW RSC policies.

## 1.2. U.S. EPA RSC Policies

The OW RSC policies have evolved gradually over the more than twenty years since fluoride was regulated.  The derivation of the fluoride MCLG did not include an RSC, in part because the data supporting the critical effect of crippling skeletal fluorosis in adults were derived primarily

from the ingestion of fluoride from drinking water.  The diet was assumed to have a minimal contribution to total intake and was not reported in the critical studies.  The MCLG was derived from an estimated 20 mg/day chronic fluoride intake divided by a drinking water intake of 2 L/day and a 2.5 safety factor yielding an MCLG of 4 mg/L.  This same approach was used in determining the MCLG values for a few other contaminants (i.e. nitrate, copper, barium) because the exposure and toxicology data applied to drinking water and did not include background intakes from other sources.

Currently calculation of the MCLG for noncancer endpoints, in almost all cases, utilizes the Reference Dose (RfD) as the point of departure.  The reference dose is defined as:  "an estimate (with uncertainty spanning perhaps an order of magnitude) of a daily oral exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime" (U.S. EPA, http://www.epa.gov/ncea/iris/help_ques.htm#rfd ).

The MCLG is usually derived from the RfD using the following equation.

$$MCLG = \frac{RfD \times BW \times RSC}{DI}$$

where:

BW   = Average body weight (70 kg for an adult)
DI      = $90^{th}$ percentile drinking water intake (2 L/day for an adult)
RSC  = Relative Source Contribution

Prior to the 1998 Stage I Disinfectants and Disinfection Byproducts rule [Fed. Reg. 63(241):69389-69476], a 20% default RSC was applied for the majority of MCLGs for noncancer effects. The few exceptions to this practice were those cases where published data were used to support an alternate RSC.  A shift away from automatically defaulting to 20% was an outgrowth of the 2000 publication of the Ambient Water Quality Criteria (AWQC) for Human Health which included a peer reviewed decision tree approach for determining the RSC (EPA, 2000b).  The human health AWQC applies to the intake of a contaminant from both drinking water and fish/shellfish from ambient surface waters of interest.  It is easily adapted for use with drinking water alone scenarios.  It was used for determining the RSC values for chloroform, monochloroacetic acid, and trichloroacetic acid in the 2003 Stage II Disinfection By-product Rule [Fed. Reg. 71(2):387-493].  The MCLGs for all three compounds are based on the RfD rather than a cancer endpoint.  The MCLG for all carcinogens is currently zero and does not require an RSC.

Key features of the Human Health AWQC Decision Tree as applied to drinking water can be summarized as follows:

- The RSC value used is determined by the type and amount of data available.  The data should be representative of the population of concern (adults, child, pregnant woman, etc).

- The RSC is based on national exposure estimates that, at a minimum, provide average values and associated confidence bounds. Knowledge of the properties of the chemical and more limited exposure data can be used when nationally representative data are not fully available.
- All known exposure routes and media are considered.
- The lowest RSC is 20% based on the assumption that regulatory or guideline values for chemicals with exposures that are less than 20% of the total will not provide a meaningful opportunity to reduce risk for the population.  In these cases the greatest health benefit can be achieved by establishing guidance or regulations for the medium that contributes the major portion of the total exposure.
- The highest allowable RSC is 80% based on the assumption that there may be many minor sources of exposure that will not be captured by the available data.
- Subtraction and percentage options are available but are bounded by the 20% floor and 80% ceiling. There are policy limitations on the use of the subtraction approach. It can be applied only under circumstances where the MCLG is the sole health-based U.S. EPA criterion for the contaminant.  For example, the subtraction approach is not possible for fluoride because pesticides containing fluoride have established tolerances for food crops.
- Average exposure values are used to represent the contribution from the diet, ambient air, soil ingestion, and other exposure media.
- The drinking water intake contribution to total exposure is represented by the $90^{th}$ percentile value and the average analyte drinking water concentration because drinking water is the exposure route of concern for the OW.
- The body weight is an average for the population of interest (e.g. adults, infants, and children).
- Exposures to drinking water contaminants that occur during showering, bathing, laundry, etc. are not included as part of drinking water ingestion intake.  They are included in the other sources of exposure.
- In determining the RSC as a percentage, the estimated daily analyte intake from a $90^{th}$ percentile tap water consumption estimate at the average analyte concentration from public water systems is divided by the total uptake into the body from all quantified exposure routes.

The OW is in the process of considering refinements to the 2000 decision tree methodology for ambient water and drinking water.  However, those modifications were not available for the fluoride exposure assessment.  Accordingly, the RSC for fluoride has been developed using human health AWQC methodology framework.

**December 2010**

## 2.  Exposure from Foods and Beverages

In the 30-year period covered by the data in this report, there have been changes in analytical methods and instrumentation that have led to improvements in the accuracy and precision of measurements of fluoride in food and beverages.  The early studies usually relied on colorimetric techniques for the measurement of fluoride; such techniques were subject to interference from other elements in the food matrix.  Most later studies employed a fluoride ion-specific electrode in the measurement of fluoride.  Some changes in the measured levels of fluoride in foods and beverages over the years covered in this report and in EPA (2010a) appear to be a consequence of differences in the analytical methodologies used to measure fluoride as well as changes in food consumption patterns.  Section 2.1 below provides background historic information on analytical methods used to measure fluoride in food. The methodological impacts on measurements of fluoride concentrations in foods are discussed in Sections 2.1, 2.2.3 and 2.3.3.

### 2.1.  Analytical Methods

Procedures for the determination of fluoride in foods typically exhibit three distinct phases: digestion, isolation and quantification.  In the digestion phase, samples are ashed in the presence of a caustic agent such as concentrated calcium or sodium hydroxide.  The caustic agent not only serves to help digest the organic sample, but also acts as a trapping agent for fluoride ion.  Several methods can be used in the isolation phase.  In one method, the ashed residue is dissolved in concentrated acid.  Fluoride ion is converted to volatile hydrofluoric or hydrofluosilicic acid, distilled from the residues, and collected in a clean aqueous distillate.  Successful isolation of fluoride ion from the ashed residues has also been accomplished by merely allowing the analyte to diffuse through a membrane into a strongly basic trapping medium.  Hexamethyldisiloxane accelerates this process significantly.  Once the fluoride is isolated, several approaches can be employed in the quantification phase, including (a) titration with colorimetric reagents; (b) reaction with a colored reagent followed by spectrophotometric measurement; (c) measurement using a fluoride ion-selective electrode, and (d) gas chromatography.  Further details about each of these basic steps are provided below.

### 2.1.1.  Sample Preparation

Food samples are primarily composed of bulk organic matter which is largely insoluble in water, with small concentrations of inorganic species of interest.  The bulk organic matrix must be removed while inorganic analytes such as fluoride are retained.  In many cases, some form of "trapping" medium is required to ensure that fluoride is not lost during the digestion process.

Mineralization by ashing of the food sample is used to remove the organic matrix.  The process was initially described in AOAC (1945), and has been virtually unchanged in more than fifty years (AOACI, 2000).  Modest quantities of dry material, liquid samples, and undried food products or plant material are selected for analysis, depending upon the expected fluoride content and interferences.  The sample is mixed with a calcium hydroxide (lime) suspension or sodium hydroxide, dried and ashed in a muffle furnace at $600^{\circ}$ C.  Variations of the official methods can employ smaller samples, different trapping agents, or both (Malde et. al., 2001; Venkateswarlu, 1975; Singer and Ophaug, 1979).

Venkateswarlu (1975) compared "closed ashing", employing a standard oxygen bomb technique, with the "open ashing" employing a muffle furnace, described above.  Both procedures are applicable to solid samples, soft tissue, and liquid samples that are low in organic matter.  In all cases, the "closed ashing" approach required that samples be pressed into pellets containing up to 1 g of solid.  Blank values were typically < 0.05 µg fluoride.  The recoveries of fluoride from bovine albumin and serum at concentrations of 0.28 and 0.05 µg fluoride per gram sample exceeded 95%.  A comparison between results obtained from "closed" vs. "open" ashing for bovine and human sera samples suggested that the values obtained by the open ashing process are frequently lower than those obtained with closed ashing in an oxygen-enriched chamber.

Several authors have described procedures for quantifying fluoride in food matter that do not involve ashing; these changes are a reflection of improvements in analytical instrumentation. Pesselman et al. (1989) described an alternative preparation for soluble samples such as cocoa powder that did not involve ashing.  Small samples were mixed with doubly-deionized water and blended using a simple Waring blender.  The product was then centrifuged and vacuum filtered. Nedeljković et al. (1991) homogenized food samples and transferred the resulting slurry to a "microdiffusion" cell, described below, containing sodium hydroxide solution as the trapping medium.  Both methods employed a fluoride ion selective electrode, described below, for final measurement of fluoride concentration in solution.

### 2.1.2.  Fluoride Recovery

***Distillation.***  In the classical approach for isolating fluoride from interfering elements in the mineralized ash, fluoride is converted to hydrofluosilicic acid by adding perchloric or sulfuric acid to water (the former is preferable, since nearly all of the perchlorates are very soluble). This method was described by Willard and Winter (1933) almost seventy-five years ago.  Several pieces of glass are added to the sample in a distillation flask, and distilled.  When only a small quantity of fluorine (10 mg or less) is present in the sample and the temperature is not allowed to rise above approximately 125 ºC, the pieces of glass appear to supply the silica necessary to combine with the fluorine to form hydrofluosilicic acid, and there is no noticeable etching of the flask.  The authors presented data showing that 7-10 mg of fluoride (as sodium fluoride) could be recovered with >95% efficiency from a variety of matrices, such as plant ash, gelatinous silica, boric acid, and aluminum chloride.  A similar approach is presented in APHA/AWWA/WEF (2005) as "Method 4500 F⁻. B. Preliminary Distillation Step."

***Microdiffusion and Trapping of Fluoride.***  Many investigators have reported concerns with the standard method, including losses of a volatile fluoride species through the ground glass joints, the possibility of a perchlorate explosion, the obvious skill needed to make the distillation work properly, and the time and effort required for a proper isolation.  For these reasons, investigators have tried to develop simpler and faster isolation methods with analyte recovery comparable to that of the standard method.  Most of these involve the diffusion of hydrogen fluoride through modified polypropylene "Conway cells" (Öbrink, 1955; Conway, 1950), a specific microdiffusion cell design.

The "Conway cell" operates in the following manner:  According to Singer and Armstrong (1965), a strongly-basic "trapping solution" for HF, e.g., 2.5 N sodium hydroxide is placed into the center well ("inner chamber") of the diffusion cell.  The sample containing fluoride is

acidified strongly with perchloric acid and placed into the sample compartment ("outer chamber").  The cell is then sealed using a small Petri dish, heated to 55-60 °C, and left undisturbed for 22 hours.  Hydrogen fluoride diffuses from the sample compartment into the headspace of the sealed cell, and is collected in the trapping solution contained in the inner chamber.   The authors demonstrated that the recovery of 0.1-2 µg fluoride from samples of rat liver, beef liver, and beef muscle, by use of this diffusion procedure was virtually identical to that obtained using the Willard and Winter (1933) distillation procedure.  This new method was considered a reasonable substitute for the traditional distillation procedure because both approaches produced the same results at or below the microgram level for fluoride.  Additional experiments with 0.5 or 1 µg of $F^{18}$, a radioactive tracer, confirmed that the recoveries of fluoride typically exceeded 95% from human plasma, saliva, and urine when using the microdiffusion cell to isolate the analyte.

Taves (1968a) found that the diffusion of fluoride increased if silicone grease was used to seal the Conway cells.  In follow-up work, the author used 6 M hydrochloric acid saturated with 0.5 mL hexamethyldisiloxane (HMDS) in the "outer chamber" of the Conway cell, and examined the rate of fluoride diffusion into a variety of trapping agents with and without HMDS present (Taves, 1968b).  All recovery measurements were performed using the radioactive tracer $F^{18}$. Without the HMDS present, there was practically no diffusion of fluoride.  When the HMDS-saturated hydrochloric acid was present, but not in contact with sample, one-third of the fluoride diffused to the trapping solution in 10 minutes, owing to the volatilization of the HMDS.  Mixing the solutions increased the rate of diffusion appreciably and continuous rotary motion resulted in over 80% recovery of the radioactive tracer in only 10 minutes, a very rapid process.  In one hour at room temperature, >97% tracer recovery was attained by this method (Taves, 1968b).  HMDS is presumed to accelerate the diffusion of fluoride by formation of trimethylfluorosilane.

### 2.1.3.   Measurement and Quantitation of Fluoride Ion

***Ion-selective electrode (ISE).***  The fluoride ion-selective electrode (ISE) was introduced in the mid-1960s (Buck and Lindner, 2001), and quickly became the industry-wide standard for the accurate determination of fluoride concentrations. When this electrode is compared to later spectrophotometric methods, such as that employing the SPADNS [sodium 2-(parasulfophenylazo)-1, 8-dihydroxy-3, 6-naphthalene disulfonate] reagent, the former exhibits superior selectivity when challenged with chloride, chlorine, color and turbidity, iron, phosphate, sulfate, and aluminum (APHA/AWWA/WEF, 2005).

The key element in the fluoride electrode is the laser-type doped lanthanuim fluoride crystal across which a potential is established by fluoride solutions of different concentrations.  The crystal contacts the same solution at one face and an internal reference solution at the other. Strictly speaking, the fluoride electrode measures the ion activity of fluoride in solution rather than concentration.  Fluoride ion activity depends on the solution total ionic strength and pH, and on fluoride complexing species.  For that reason, adding an appropriate buffer provides a nearly uniform ionic strength background, adjusts pH, and breaks up complexes so that, in effect, the electrode measures concentration (APHA/AWWA/WEF, 2005; Omega, 1993). The literature documents successful use of the fluoride ISE in quantifying this analyte in many different foods and materials.

Singer and Ophaug (1979) presented a side-by-side comparison of fluoride concentration results obtained using both a colorimetric and fluoride ISE approach.  The results were entirely comparable for strained meats (chicken and beef with respective broths), milk-based infant formula, and vegetables (green beans, peas, and spinach) at concentrations ranging between 0.1-6 mg F/kg sample. When fruits (pears, applesauce, peaches, etc.) were analyzed, substantially (~20 times) higher levels were observed with the colorimetric method. It thus appears that reagents employing eriochromecyanin R (see "Spectrophotometric determination", below) to determine fluoride in the diffusates of unashed foods may result in erroneously high values.

***Spectrophotometric Determination.***  The introduction of the Beckman Model DU spectrophotometer, an instrument which could measure absorbance in both the ultra-violet and visible ranges, in 1941 (Simoni et. al., 2003) rendered the classic titration-methods for quantifying fluoride ion obsolete.  Spectrophotometric procedures frequently employed a zirconium-alizarin or eriochromecyanin R (*syn.* Eriochrome Cyanine R) lake dye, whose absorbance fades with increasing fluoride ion concentration (Singer and Armstrong, 1959; Megregarian and Maier, 1952) over the range of 0–4 ppm.  This method was highly dependent upon the presence of phosphate and iron, but relatively insensitive to bicarbonate, chloride, and sulfate.  Grutsch et al. (1953) demonstrated that the interferences from iron, manganese, and chlorine could be eliminated by adding thioglycolic acid to the aqueous samples.

The above approach is still one of those accepted for the determination of fluoride ion, albeit in a modified form (APHA/AWWA/WEF, 2005).  The SPADNS colorimetric method (Bellack and Schouboe, 1968) is based on the reaction between fluoride and a zirconium-dye lake.  Fluoride reacts with the dye lake, dissociating a portion of it into a colorless complex anion, $(ZrF_6)^{2-}$.  As the amount of fluoride increases and reacts with the dye, the color produced becomes progressively lighter; absorbance is measured at 570 nm.

Taves (1968c) described a related approach, in which the concentration of fluoride ion was related to the fluorescence quenching of a Morin (pentahydroxyflavone aluminum complex)-thorium complex, rather than the change in absorbance described above.  The standard quenching curve was linear between 0-10 nmoles of fluoride ion, after which significant deviations from linearity were observed.  The Morin-thorium reagent was also more sensitive to the fluoride than to the sulfate and phosphate ions by factors of twenty and forty, respectively. Nitrate has no immediate effect, but has a marked effect within 18 hours.  When the same amount of acid is used, the effect of chloride, perchlorate, and nitrate is only 1/80,000 that of fluoride.

The method described in Elvove (1933) uses "Nessler" color comparison tubes and the human eye as the detector.  Known quantities of fluoride, typically ranging between 0 and 55 µg/mL, were mixed with a fixed quantity of zierconium-alizarin reagent, permitted to stand undistubed, and then compared with the color of unknowns prepared in the same fashion.

***Titration.***  The classical titration of fluoride ion is based upon a two-step process.  Initially, fluoride ion (colorless) reacts with a zirconium-alizarin lake dye (red) to form a zirconium-fluoride complex (colorless) and free alizarin (yellow) (Grutsch et. al., 1953).  The resulting solution is then back-titrated with a standardized solution of thorium nitrate, which decomposes the zirconium-fluoride complex and permits the zirconium-lake complex (red) to reform.  The

endpoint of the titration is the faint permanent reappearance of the lake color.  (Willard and Winter, 1933).  Willard and Winter (1933) employed this procedure for quantifying fluoride accurately at the milligram level.  This procedure was modified to employ "Nessler tubes" for color comparison in the Official Methods of Analysis (AOAC, 1945; AOACI, 2000), and has not been changed in more than fifty years.

The procedures discussed above all employed distillation of volatile hydrogen fluoride prior to titration.  Singer and Armstrong (1965) described a titration of fluoride collected in the "trapping solution" of a "Conway cell", described above, using hydrochloric acid as the titrant to a simple phenolphthalein endpoint.  The authors do mention a Beckman model B spectrophotometer in the method, but it is not clear how this instrument was used.

***Gas Chromatography.***  In this procedure, as described by Fresen et al. (1968), an alkyl or arylchlorsilane (e.g., trimethylchlorsilane) is converted by water into the corresponding silanol which then reacts selectively with fluoride to form fluorsilane.  The fluorsilane is extracted from an acidified (1 M HCl) sample with an organic solvent such as benzene. The amount of fluoride still present in the aqueous layer after extraction is negligible.  The fluorsilane is injected into a gas chromatograph using an internal standard such as isopentane.  The relative peak height (corrected with a blank value) is linearly proportional to the fluoride content in the sample.  A solution of 0.6 mg trimethylchlorsilane per mL benzene is sufficient to determine amounts of fluoride from 0.01 to 10 µg.

### 2.1.4.   Confidence in Analytical Results

Analytical procedures for the determination of fluoride in foods and drinking water samples have been studied, evaluated, and improved since the 1930's.  During all of that time, questions and concerns raised by analytical chemists have remained the same, viz., (a) accuracy, (b) precision, (c) detection limit, (d) calibration range, (e) low blank, and (f) interferences. It is certainly true that current methods employing the fluoride ion-selective electrode, for example, are easier to use, exhibit a lower blank, and are more selective than predecessor methods.  However, from the onset, it is evident that investigators were keenly aware of technology limitations, and made strenuous attempts to correct or account for potential interferences.  Investigators tried to simplify or eliminate the traditional "open ashing" procedure, which reduces the mass and volume of the sample matrix and the ensuing distillation procedure for further isolating fluoride.

The method used to detect fluoride can often be predicted based upon the date of the research.  Prior to approximately 1950, the only method available was based upon titrations employing a zirconium-alizarin reagent first, followed by back-titration with thorium nitrate.  Between approximately 1950 and 1965, the preferred method was spectrophotometry using the zirconium-alizarin reagent alone.  Work reported after 1965 almost always employs the fluoride ion-selective electrode.

The results obtained using the earlier titration, spectrophotometric or colorimetric procedures exhibited sufficient precision and accuracy to support a reasonable estimate for the concentration of fluoride in environmental media.  For example, McClure (1939) employed a titration-based method to evaluate the fluoride content in a very wide variety of foods.  With the exception of items grown in a fluoride-containing area or sprayed with a fluoride-containing pesticide,

McClure (1939) reported typical concentrations below 10 ppm, and frequently below 1 ppm, however levels of detection appear to have been better with some food matrices than others. Forty years later, Singer and Ophaug (1979) employed an ion-selective electrode-based method and reported very similar results for a smaller variety of foodstuffs. Taken together, the newer methods may be easier to perform, are faster, more selective, and more sensitive than their earlier counterparts. In some cases the results from the older methods are comparable to those from the newer ones but that is not always the situation. A number of interferences and methodological variables can result in reported concentrations in foods being lower or higher than the actual concentration.

The most current methods of analysis for fluoride adopted by the Association of Official Analytical Chemists International (AOACI) include ion chromatography for inorganic fluoride in water; the ion selective electrode for fluoride in wine and other beverages, and the distillation method for fluorine in food (see: http://www.eoma.aoac.org/methods).

## 2.2.   Natural Fluoride Levels in Solid Foods

Several studies suggest that natural fluoride in foods may not be as bioavailable as that from inorganic fluoride compounds. IOM (1997) notes that when a soluble inorganic fluoride compound such as sodium fluoride is ingested with milk, baby formula, or foods with high concentrations of calcium, or certain other divalent or trivalent ions that form insoluble compounds, absorption may be reduced by 10 to 25%. Trautner and Siebert (1986) investigated the bioavailability in food products rich in natural fluoride (bone meal, fish bone meal, seaweed flour, canned sardines, chicken bone meal, tea, krill). Fluoride concentrations in plasma and saliva over 8 hr, as well as 24 hr urinary fluoride excretions, were determined in healthy adult volunteers receiving single oral doses containing between 2 and 10 mg F. Comparisons were made with sodium fluoride (administered as 2, 5, 7.5 and 10 mg doses in NaF solution, or 2, 5 and 8 mg doses as NaF tablets) which was assumed to be 100% bioavailable as reported by Ekstrand et al. (1978). Plasma, saliva, and urinary fluoride levels were determined with a fluoride ion-specific electrode. Fluoride in food items was determined by gas chromatography after extraction with HCl. Bioavailability (B) of fluoride from different substances (sub) was calculated from the plasma data as:

$$B\% = \frac{\Delta AUC_{sub} \times D_{NaF} \times 100}{\Delta AUC_{NaF} \times D_{sub}}$$

where: D = the quantity of the substance administered or present in the NaF reference sample, and $\Delta AUC$ is the net area under the fluoride plasma concentration curve minus the background fluoride levels in the control samples. The same procedure was used to calculate bioavailability from values of urinary fluoride:

$$B\% = \frac{\Delta U_{sub} \times D_{NaF} \times 100}{\Delta U_{NaF} \times D_{sub}}$$

where: $\Delta U$ is the net amount of fluoride excreted in the urine during 24 hr.

**December 2010**

The tested foods and beverages varied widely in their bioavailabilities.  Relative to sodium fluoride, bones of mammals, chicken, and fish, whole fish, were poor sources of fluoride (bioavailability less than one-fourth that of sodium fluoride).  In contrast, tea had a bioavailability close to that of sodium fluoride.

Spak et al. (1982) evaluated the bioavailability of fluoride added to baby formula and milk.  Three different 500 mL solutions (water, milk or formula) containing 10 ppm F (from sodium fluoride) were administered to volunteers aged 23-25 yr.  Fluoride levels in plasma and urine were determined with a modified microdiffusion technique (Taves, 1968b).  The results indicated that 72% of the fluoride in milk and 65% in the baby formula were absorbed.

### 2.2.1.   Fluoride in Infant Foods

**_Breast Milk_**.   Concentrations of fluoride in human breast milk are very low.  Dabeka et al. (1986) analyzed 210 samples of breast milk from Canadian women and found detectable concentrations in 92 (44%). Fluoride concentrations ranged from <0.002 to 0.097 mg/L. The mean concentration in milk from mothers in fluoridated communities (1 mg F/L water) was 0.0098 mg/L; in nonfluoridated communities the mean was 0.0044 mg/L.  Fluoride concentrations in breast milk were directly related to the fluoride concentration in the mother's drinking water (p = 0.007).  The IOM (1997) reported that concentrations in human milk ranged from 0.007 to 0.011 mg/L based on data from Ekstrand et al. (1984), Esala et al. (1982) and Spak et al. (1982).

**_Infant Formula_**.  Infant formula varies in fluoride content, depending on the type of formula and the water with which it is prepared.

Dabeka and McKenzie (1987) analyzed fluoride levels in about 115 samples of infant formulas.  Fluoride content was determined by micro-diffusion and a fluoride ion-specific electrode.  Results are shown in Table 2-1.

| Table 2-1.  Fluoride Concentrations in Infant Formula (Dabeka and Mckenzie, 1987) | | | |
|---|---|---|---|
| Category | Number of No. Samples | Fluoride Concentration (mg/kg food) | |
| | | Mean | Range |
| Ready to use formula, all: | 41 | 0.79 | 0.15–2.31 |
| Ready to use formula, Canadian | 34 | 0.90 | 0.35–2.31 |
| Ready to use formula, US | 7 | 0.23 | 0.15–0.28 |
| Ready to use formula, glass; all: | 23 | 0.75 | 0.28–1.13 |
| Canadian | 20 | 0.82 | 0.46–1.13 |
| US | 3 | 0.28 | 0.28–0.28 |
| Ready to use formula, canned; all: | 18 | 0.84 | 0.15–2.31 |
| Canadian | 14 | 1.02 | 0.35–2.31 |
| US | 4 | 0.19 | 0.15–0.26 |
| Conc. liquid formula | 33 | 0.60 | 0.15–1.47 |
| Powdered infant formula | 18 | 1.13 | 0.14–5.53 |
| Milk, evaporated | 9 | 0.23 | 0.06–0.55 |

Mean fluoride levels ranged from 0.23 mg/kg for evaporated milk to 1.13 mg/kg for powdered formula concentrate.  Dabeka and McKenzie (1987) note that a major source of fluoride in infant

formula appeared to be the processing water used by the manufacturer.  The concentrations of fluoride in the U.S. products appear to be lower than those in the Canadian products.

Johnson and Bawden (1987) analyzed fluoride levels in infant formulas obtained from local supermarkets in 7 cities across the U.S. (Minneapolis, Los Angeles, New York, Dallas, Seattle, Largo, Florida, and Chapel Hill, North Carolina).  Between 7 and 24 products were collected in each location. Concentrated and powdered formulas were reconstituted with de-ionized water according to manufacturers' directions.  Those from Chapel Hill were also reconstituted with fluoridated tapwater (1.1 mg F/L).  Fluoride was analyzed using the Taves microdiffusion method and a fluoride ion-specific electrode.  The mean fluoride concentration in ready-to-feed formulas ranged from 0.06 to 0.38 mg/L.  Mean fluoride levels in liquid concentrates reconstituted with de-ionized water ranged from 0.04 to 0.32 mg/L, whereas the Chapel Hill formulas reconstituted with tapwater containing 1.1 mg F/L ranged from 0.60 to 0.72 mg F/L.  For the powder concentrates reconstituted with de-ionized water, mean fluoride levels were 0.03 to 0.24 mg/L, whereas those from Chapel Hill reconstituted with tapwater containing 1.1 mg F/L ranged from 1.00 to 1.25 mg/L.  The overall mean fluoride concentration was 0.21 mg/L for ready-to-feed formulas, 0.10 mg/L for liquid concentrates and 0.12 mg/L for powder concentrates.

McKnight-Hanes et al. (1988) analyzed fluoride levels in infant formulas purchased in the Rochester, NY, area.  The formulas were prepared with de-ionized water or with water containing 0.15 mg F/L or 1.0 mg F/L.  Fluoride was separated from 3 mL of the prepared formula as hydrofluoric acid, appropriately buffered, and analyzed directly using a fluoride ion-specific electrode.  The Taves method was used to separate the acid-diffusible fluoride from the sample.  Results are shown in Table 2-2.  Results indicate that there is a significantly greater amount of fluoride in the ready-to-eat soy-based formula and the liquid concentrate soy-based formula than the corresponding milk-based formulas.

| Table 2-2.  Mean Fluoride Concentrations (mg/L) in Infant Formulas (McKnight-Hanes et al., 1988) | | | | |
|---|---|---|---|---|
| **Type** | **Diluent** | | | **Student's t-Test** |
| | **Deionized Water** | **0.15 mg F/L** | **1.0 mg F/L** | |
| **Milk-based formulas:** | | | | |
| Ready-to-use[a] | 0.127 | – | – | t = 3.3 |
| Liquid concentrates[a] | 0.121 | 0.196 | 0.621 | t = 2.9 |
| Powdered concentrates[a] | 0.055 | 0.170 | 0.825 | t = 1.4 |
| **Soy-based formulas:** | | | | |
| Ready-to-use[a] | 0.305 | – | – | p < 0.01[b] |
| Liquid concentrates[a] | 0.242 | 0.317 | 0.742 | p < 0.02[b] |
| Powdered concentrates[a] | 0.084 | 0.200 | 0.854 | N.S. |

**SOURCE:** McKnight-Hanes et al., 1988.
[a]Undiluted.
[b]Significantly greater than milk-based, ready-to-use formula.
[c]Significantly greater than milk-based liquid concentrate formula.

Van Winkle et al. (1995) analyzed fluoride levels in water and formula fed to 1,308 children younger than 2 years of age who were participants in the Iowa Fluoride Study.  Mothers of newborns completed questionnaires and 3-day food and beverage and dental care diaries which

were used to document fluoride intake from diet, supplements and dentifrice.  Information was obtained at 6 weeks, when the children were 3 months old, and every 3–4 months thereafter. Water sources other than unfiltered public water supplies were assayed for fluoride using a fluoride ion-specific electrode.  All formulas that appeared in the diaries were purchased and analyzed for fluoride using direct readout (DR) from a fluoride ion-specific electrode (milk-based formulas) or the modified Taves microdiffusion method (soy-based formulas) followed by fluoride ion-specific electrode analysis.  All powder and liquid concentrates were reconstituted with distilled water (0 mg F/L).  Fluoride levels in the various types of formula are given in Table 2-3. Fluoride levels in soy-based formulas were higher than those in milk-based formulas.

| Table 2-3.  Fluoride Concentrations in Infant Formulas (Van Winkle et al., 1995) | | | |
|---|---|---|---|
| Category | Number of No. Samples | Fluoride Concentration (mg/L) | |
| | | Mean (mg/L) | Range (mg/L) |
| **Milk-based formulas:** | | | |
| Ready-to-use | 16 | 0.17 | 0.04–0.55 |
| Liquid concentrates[a] | 14 | 0.12 | 0.04–0.19 |
| Powdered concentrates[a] | 17 | 0.14 | 0.05–0.28 |
| **Soy-based formulas:** | | | |
| Ready-to-use | 5 | 0.30 | 0.17–0.38 |
| Liquid concentrates[a] | 6 | 0.24 | 0.04–0.47 |
| Powdered concentrates[a] | 6 | 0.24 | 0.19–0.28 |

**SOURCE:** Van Winkle et al., 1995.

[a]Reconstituted with distilled water.

Siew et al. (2009) analyzed fluoride concentrations of 27 powdered and 13 liquid infant formula concentrates and nine ready-to-feed formulas purchased in the Chicago area.  The formulas included both milk-based and soy-based varieties.  The powdered and liquid concentrate formulas were reconstituted with deionized water according to the manufacturers' instructions. Powdered formulas were reconstituted by adding 2 ounces of deionized water to one scoop of formula, and liquid concentrates were reconstituted 1:1 with deionized water.  The total fluoride content of the formulas was analyzed using a modified Taves diffusion method and a fluoride ion-specific electrode. Results are shown in Table 2-4.

| Table 2-4.  Fluoride Levels in Infant Formulas Reconstituted with Deionized Water (Siew et al., 2009) | | | | | |
|---|---|---|---|---|---|
| Formula type | Base | Range of values (ppm) | N | Mean ±SD (ppm)[a] | P Value[b] |
| Powdered concentrate | Milk | 0.03–0.27 | 21 | 0.12 ±0.08 | 0.44 |
| | Soy | 0.06–0.29 | 6 | 0.16±0.09 | |
| Liquid concentrate | Milk | 0.07–0.48 | 8 | 0.27±0.18 | 0.01 |
| | Soy | 0.41–0.57 | 5 | 0.50±0.08 | |
| Ready-to-feed | Milk | 0.08–0.23 | 6 | 0.15±0.06 | 0.46 |
| | Soy | 0.13–0.32 | 3 | 0.21±0.10 | |
| **Overall mean** | | | **49** | **0.1976 ± 0.15** | |

**SOURCE**: Siew et al., 2009.

[a]Mean fluoride concentrations for milk-based formulas are compared with those for soy-based formulas.
[b]The P value is based on a *t* test (unpaired data) comparing the mean values for milk and soy-based formulas.

In general, soy-based formulas were higher in fluoride content than milk-based formulas. This difference was not statistically significant for powdered concentrate and ready-to-feed formulations; however, the fluoride concentration of the liquid concentrate soy formulas tested was significantly higher than that of milk-based liquid concentrate formulas ($P < 0.05$, $t$ test analysis for unpaired data). The fluoride content in different batches of the same product was fairly consistent.

***Infant Foods.*** Singer and Ophaug (1979) measured fluoride levels in a variety of infant foods including meats, vegetables, and fruits using a fluoride ion-specific electrode.  Results are shown in Table 2-5.  The highest fluoride concentration was found in strained chicken with broth (mean 5.29 mg/kg; range 1.94–10.64 mg/kg).  Mean F concentration in vegetables ranged from 0.15-0.43 mg/kg, and those in fruits 0.017-0.078 mg/kg. Fluoride levels in dry cereal varied depending on whether fluoridated water was used in the processing facility.  Mixed cereals, oatmeal, rice and barley cereals from facilities using non-fluoridated water contained 0.93, 0.98, 2.11, and 1.99 mg F/kg, respectively, whereas levels in the same types of cereals from plants using fluoridated water were 3.85, 4.87, 6.35, and 4.30 mg/kg, respectively.  Mean fluoride levels in fruit juices made with non-fluoridated water ranged from 0.014 to 0.14 mg/L; juices prepared with fluoridated water contained 0.15 to 1.48 mg F/L.  Similarly, mean fluoride levels in milk formulations were 0.08–0.31 mg/L when prepared with non-fluoridated water and 0.57–0.66 mg/L when prepared with fluoridated water.

| Table 2-5.  Fluoride Concentrations in Infant Foods as Reported by Singer & Ophaug, 1979 | | | |
|---|---|---|---|
| **Food Type** | **Number of Plants** | **Fluoride Concentration (mg/kg food)** | |
| | | **Mean** | **Range** |
| Strained meats | | | |
| Chicken and broth | 4 | 5.29 | 1.94–10.64 |
| Turkey and broth | 2 | 0.39 | 0.34–0.43 |
| Beef and broth | 3 | 0.19 | 0.17–0.21 |
| Lamb and broth | 2 | 0.29 | 0.16–0.42 |
| Liver and broth | 1 | 0.14 | 0.14 |
| Veal and broth | 1 | 0.40 | 0.40 |
| Pork and broth | 1 | 0.23 | 0.23 |
| **Overall mean** | | **0.99** | |
| Vegetables | | | |
| Carrots | 6 | 0.23 | 0.022–0.53 |
| Peas | 4 | 0.18 | 0.038–0.34 |
| Squash | 4 | 0.15 | 0.046–0.34 |
| Spinach | 2 | 0.43 | 0.18–0.67 |
| Green beans | 3 | 0.16 | 0.036–0.33 |
| Beets | 3 | 0.23 | 0.13–063 |
| **Overall mean** | | **0.24** | |
| Fruits | | | |
| Pears | 7 | 0.057 | 0.012–0.13 |
| Peaches | 5 | 0.017 | 0.003–0.034 |
| Applesauce | 7 | 0.078 | 0.016–0.23 |
| **Overall mean** | | **0.051** | |

**SOURCE:** Singer and Ophaug, 1979.

A group of 206 commercially available, ready-to-eat infant foods purchased in Iowa City, Iowa, were studied by Heilman et al. (1997) using a modified version of the Taves microdiffusion method coupled with a fluoride ion-specific electrode.  Fluoride levels ranged from 0.01 to 8.38 mg/kg. A summary of the results by food type is provided in Table 2-6.

| Table 2-6.  Fluoride Concentrations in Infant Foods as Reported by Heilman et al., 1997 | | | | |
|---|---|---|---|---|
| **Food Type** | **No. Samples** | **Fluoride Concentration (mg/kg food)** | | |
| | | **Range** | **Median** | **Mean** |
| Fruits and desserts | 88 | 0.01-0.49 | 0.03 | 0.10 |
| Vegetables | 48 | 0.01-0.42 | 0.08 | 0.12 |
| Mixed foods | 42 | 0.01-0.63 | 0.13 | 0.21 |
| Meats[a] | 19 | 0.01-8.38 | 0.05 | 1.46 |
| Chicken | 6 | 1.05-8.38 | 4.04 | 4.40 |
| Cereals | 9 | 0.01-0.31 | 0.02 | 0.08 |

SOURCE: Heilman et al., 1997.
[a]Includes poultry.

The highest fluoride concentrations were found in chicken (1.05-8.38 mg/kg); concentrations in other meats ranged from 0.01 mg/kg in veal to 0.66 mg/kg in turkey.  Heilman et al. (1997) reported that the substantial variation in fluoride levels within a given type of food was due primarily to different fluoride concentrations in the water used to process the foods.  High fluoride levels in chicken were attributed to the processing methods (mechanical deboning) that leave some skin and residual bone particles in the meat.  It was estimated that an infant consuming 2 oz (about 60 g) of chicken containing 8 mg F/kg would have a fluoride intake of about 0.48 mg (Heilman et al., 1997).

Heilman et al. (1997) also analyzed the fluoride content of 32 dry infant cereals and found that the fluoride content ranged from 0.10-0.40 mg/kg.  The study authors note that a considerable amount of fluoride may be added to the cereal during manufacturing when the cereal is processed as a slurry which is then dried, leaving any contained fluoride from the process-water behind.  Additional fluoride may be later added when the dry cereal is reconstituted with water containing fluoride.

In 2005, the U.S. Department of Agriculture published a National Fluoride Database (USDA, 2005).  This database summarizes and critically evaluates the quality of published and unpublished information on the fluoride content of selected foods and beverages from a variety of sources including data from some of the studies cited in this report.  The database also includes the results of USDA sampling of food and beverage products at 144 locations across the U.S. (Pehrsson et al., 2000) as well as upublished data from several research projects.  The USDA samples were analyzed using a fluoride ion-specific electrode with direct readout for clear liquids, and a microdiffusion method for other foods.  The ranges of mean values for various infant foods and beverages are shown in Table 2-7. The USDA data for foods consumed by adults are given in Table 2-15.

| Table 2-7.  Fluoride Concentrations in Infant Foods as Summarized by USDA (2005) | |
|---|---|
| **Category/food group** | **Range of Mean Fluoride Concentrations** |
| | **(mg/kg)** |
| Cereals | 0.01–0.16 |
| Desserts | 0.02–0.18 |
| Dinners | 0.02–0.29 |
| Fruit | 0.01–0.36 |
| Juice | 0.10–0.70 |
| Meat | 0.02–0.44 |
| Vegetables | 0.01–0.32 |

## 2.2.2.  Fluoride in Foods of Children and Adults

San Filippo and Battistone (1971) calculated the fluoride content of representative food items obtained in Baltimore, MD from an FDA "market basket program" on four separate occasions (four diets) in 1967 and 1968.  Each diet represented the 2-week food and beverage intake of 16-19 year old males. The food items were placed into 12 commodity groups and analyzed on a composite basis using microdiffusion and spectrophotometry (using erichrome cyanine R and zirconyl chloride).  Items were prepared in a manner representative of preparation in the home. Fluoride concentrations are shown in Table 2-8.  The highest fluoride levels were found in beverages (beverages included tea, coffee, soft drinks and drinking water).  Analysis of the drinking water in the study area indicated that the fluoride level ranged from 0.99 to 1.0 mg/L.

| Table 2-8.  Fluoride Content of Food Commodity Groups | | | | |
|---|---|---|---|---|
| **Commodity Group** | **Sample #1 (ppm)** | **Sample #2 (ppm)** | **Sample #3 (ppm)** | **Sample #4 (ppm)** |
| Dairy products | 0.19 | 0.22 | 0.15 | 0.11 |
| Meat, fish and poultry | 0.55 | 1.00 | 1.04 | 0.42 |
| Grain and cereal products | 0.49 | 0.44 | 0.26 | 0.59 |
| Potatoes | 0.13 | 0.17 | 0.17 | 0.45 |
| Leafy vegetables | 0.46 | 0.15 | 0.13 | 0.85 |
| Legume vegetables | 0.24 | 0.19 | 0.24 | 0.25 |
| Root vegetables | 0.08 | 0.06 | 0.07 | 0.22 |
| Garden fruits | 0.41 | 0.09 | 0.07 | 0.18 |
| Fruits | 0.11 | 0.10 | 0.11 | 0.10 |
| Oils, fats, shortenings | 0.45 | 0.24 | 0.25 | 0.12 |
| Sugar and adjunct | 0.44 | 0.30 | 0.33 | 0.56 |
| Beverages[a] | 1.22 | 1.07 | 1.10 | 1.10 |

**SOURCE:** San Filippo and Battistone, 1971.

[a]Tea, coffee, soft drinks and drinking water.

Singer et al. (1980) evaluated fluoride concentrations in 117 food items placed in 12 composite food groups for four geographic regions of the United States.  Fluoride in the food items was determined by four methods: ashed and unashed samples quantified using a fluoride ion-specific electrode and colorimetric analysis (eriochromecyanine R procedure).  The results from the ion-specific electrode were found to be more accurate than the colorimetric method, especially for unashed samples.  Mean fluoride levels in the composite food groups are shown in Table 2-9.  Beverages represented the single highest source of fluoride (0.82–1.35 ppm).

| Table 2-9.   Fluoride Content of Composite Food Groups for Four Geographic Regions of the U.S. | | | | |
|---|---|---|---|---|
| Commodity Group | San Francisco | Buffalo | Atlanta | Kansas City |
| | ppm F | ppm F | ppm F | ppm F |
| Dairy | 0.05 | 0.05 | 0.07 | 0.05 |
| Meats, fish, poultry | 0.22 | 0.22 | 0.92 | 0.32 |
| Grain and cereal products | 0.34 | 0.39 | 0.41 | 0.29 |
| Potatoes | 0.14 | 0.08 | 0.13 | 0.14 |
| Leafy vegetables | 0.13 | 0.13 | 0.15 | 0.10 |
| Legume vegetables | 0.15 | 0.24 | 0.39 | 0.31 |
| Root vegetables | 0.09 | 0.10 | 0.10 | 0.09 |
| Misc. vegetables | 0.15 | 0.14 | 0.06 | 0.17 |
| Fruits | 0.06 | 0.13 | 0.07 | 0.06 |
| Oils, fats | 0.24 | 0.13 | 0.15 | 0.15 |
| Sugars, adjuncts | 0.21 | 0.24 | 0.32 | 0.35 |
| Beverages[a] | 1.35 | 0.82 | 1.54 | 0.83 |

**SOURCE:** Singer et al., 1980.

[a]Includes tea, coffee, soft drinks, and water.

Food items in FDA toddler "Market Basket" collections made in 1977 and 1978 were analyzed for fluoride by Ophaug et al. (1980b).  The food items were placed in 11 composite groups for four cities of the United States.  Results are shown in Table 2-10.  In all four locations, beverages contained the highest concentrations of fluoride (0.54–1.19 ppm).

Taves (1983) measured fluoride levels in 93 foods and beverages included in a standard hospital diet. The study authors note that the hospital was in a fluoridated area and consequently any foods prepared with water reflect this factor.  The concentration of fluoride in the tapwater was not reported.  Inorganic and total fluoride levels were determined on ashed and unashed samples using the hexamethyldisiloxane (HMDS) microdiffusion (Taves) method coupled with a fluoride ion-specific electrode.  Range of mean levels in various food groups were reported as nanomole per gram food and were converted to measures of mg/kg or mg/L by the IOM (1997).  The transformed results are given in Table 2-11.  The highest fluoride concentration (144 nm/g; about 2.7 mg/L) was found in tea.

| Table 2-10.  Fluoride Content of Four Representative Diets for 2-Year-Olds | | | | |
|---|---|---|---|---|
| Commodity Group | Orlando | Grand Rapids | Philadelphia | Los Angeles |
| | ppm F | ppm F | ppm F | ppm F |
| Drinking water | 0.67 | 1.04 | 0.66 | 0.37 |
| Whole milk | 0.02 | 0.02 | 0.02 | 0.02 |
| Other dairy | 0.10 | 0.19 | 0.14 | 0.08 |
| Meats, fish, poultry | 0.48 | 0.44 | 0.37 | 0.22 |
| Grain and cereal products | 0.23 | 0.30 | 0.27 | 0.47 |
| Potatoes | 0.04 | 0.12 | 0.11 | 0.19 |
| Vegetables | 0.24 | 0.17 | 0.22 | 0.18 |
| Fruits and juices | 0.22 | 0.25 | 0.11 | 0.15 |
| Oils, fats | 0.29 | 0.45 | 0.24 | 0.15 |
| Sugars, adjuncts | 0.24 | 0.44 | 0.25 | 0.36 |
| Beverages[a] | 0.94 | 1.19 | 0.55 | 0.54 |

**SOURCE:** Ophaug et al., 1980b.

[a]Includes carbonated and noncarbonated soft drinks, Kool-Aid, and tea.

| Table 2-11.  Fluoride Concentrations in Food Products | | |
|---|---|---|
| Category | Fluoride Concentration (mg/kg or mg/L) | |
| | Mean | Range |
| Dairy products | 0.25 | 0.02–0.82 |
| Meat, fish and poultry | 0.22 | 0.04–0.51 |
| Grains and cereal products | 0.42 | 0.08–2.01 |
| Potatoes | 0.49 | 0.21–0.84 |
| Leafy vegetables | 0.27 | 0.08–0.70 |
| Legume vegetables | 0.53 | 0.49–0.57 |
| Root vegetables | 0.38 | 0.27–0.48 |
| Fruits | 0.06 | 0.02–0.08 |
| Sugars, etc. | 0.28 | 0.02–0.78 |
| Beverages[a] | 0.76 | 0.02–2.74 |
| Fats and oils | 0.25 | 0.02–0.44 |
| Miscellaneous | 0.59 | 0.29–0.87 |

**SOURCE:** Taves, 1983, as modified in IOM, 1997.

[a]Does not include drinking water, but does include beverages made with tapwater.

Fluoride was determined with an ion-specific electrode after microdiffusion separation in various foods obtained in 1987 in Winnipeg, Canada and reported in Dabeka and McKenzie (1995). Mean fluoride levels for various food groups ranged from 0.095 mg/kg for fruits and fruit juices to 2.1 mg/kg for fish (Table 2-12).  The highest single items were cooked veal (1.2 mg/kg),

canned fish (4.6 mg/kg), shellfish (3.4 mg/kg), cooked wheat cereal (1.0 mg/kg), and tea (5.0 mg/kg).  The mean for all samples was 0.325 mg/kg and the range was <0.011 to 4.97 mg/kg.

| Table 2-12.  Fluoride Concentrations in Foods Obtained in Winnipeg, Canada | | | |
|---|---|---|---|
| Category | Number of Samples | Fluoride Concentration (mg/kg food) | |
| | | Mean | Range |
| Milk and milk products | 12 | 0.189 | <0.012–0.797 |
| Meat and poultry | 17 | 0.251 | 0.037–1.230 |
| Fish | 4 | 2.118 | 0.213–4.567 |
| Soups | 4 | 0.606 | 0.412–0.836 |
| Vegetables | 38 | 0.146 | <0.011–0.678 |
| Fruits and fruit juices | 25 | 0.095 | <0.011–0.582 |
| Bakery goods and cereal | 24 | 0.402 | <0.011–0.678 |
| Fats and oils | 3 | 0.096 | 0.046–0.132 |
| Sugar and candies | 7 | 0.111 | <0.016–0.275 |
| Beverages | 7 | 1.148 | 0.213–4.970 |
| Miscellaneous[a] | 7 | 0.564 | 0.075–1.000 |

SOURCE: Dabeka and McKenzie, 1995.

[a]Includes tapwater (Dabeka and McKenzie, 1995, Table 2).

A recent study by Jackson et al. (2002) surveyed adolescents 12–14 years old to determine the foods and beverages most commonly consumed by this age group.  As a result, a total of 441 brand-name food items were purchased in both a non-fluoridated community (Connersville, IN; fluoride 0.16 ±0.01 mg/L drinking water) and in a fluoridated community (Richmond, IN; 0.90 ±0.05 mg/L).  The foods and beverage items were placed into dietary groups according to USDA guidelines, and the most up-to-date methods for analyzing for fluoride were used.  Fluoride in water and carbonated beverages was analyzed directly by using a combined fluoride ion-specific electrode and pH/ion meter. Measurements were compared to a series of standards.  Fluoride in foods, juices and milk was analyzed with the HMDS silicon-facilitated  microdiffusion method of Taves (1968b) as modified by Rojas-Sanchez (1999).  This method, which does not require pre-ashing of the sample, was recommended in 1981 by the Association of Official Analytical Chemists as the separation method of choice for analyzing fluoride in infant foods.  The method was validated in a series of spike and recovery tests.  The Intraclass Correlation Coefficient of the measurements was calculated to assess the reliability of the analyses (Bartko and Carpenter, 1976).  The fluoride content of food and beverage items that were not cooked or reconstituted with tap water did not vary significantly between the two towns; therefore, measurements of the fluoride content of these items were assessed together (Table 2-13).  However, fluoride content of some food items reconstituted with or prepared in tap water (beverages and grain products) was significantly different for several food categories (Table 2-14). The beverage items prepared with the local Richmond tap water (0.9 mg/L) had significantly higher fluoride concentrations then those prepared with the Connersville tap water (0.16 mg/L).

| Table 2-13.  Fluoride Concentrations of Noncooked and Nonreconstituted Foods and Beverages Consumed by Adolescents 12-14 Years Old[a] | | | | | |
|---|---|---|---|---|---|
| **Category[e]** | **N** | **Fluoride Concentration (mg/kg)** | | | |
| | | **Mean** | **Minimum** | **Maximum** | **95% CI** |
| Grains and cereal products[b] | 129 | 0.49±0.25 | 0.007 | 1.36 | 0.44, 0.53 |
| Vegetables[c] | 78 | 0.25±0.28 | 0.003 | 1.93 | 0.18, 0.31 |
| Fruits | 26 | 0.12±0.21 | 0.01 | 0.84 | 0.04, 0.20 |
| Dairy products | 30 | 0.31±0.29 | 0.23 | 1.36 | 0.20, 0.42 |
| Meat, poultry | 55 | 0.36±0.30 | 0.03 | 1.41 | 0.28, 0.44 |
| Nuts and seeds | 4 | 0.16±0.03 | 0.13 | 0.19 | 0.12, 0.20 |
| Fats and oils | 14 | 0.24±0.17 | 0.05 | 0.62 | 0.15, 0.34 |
| Sugars and sweets | 15 | 0.29±0.19 | 0.07 | 0.60 | 0.19, 0.40 |
| Beverages[d] | 32 | 0.55±0.26 | 0.04 | 0.93 | 0.46, 0.65 |

**SOURCE:** Jackson et al., 2002.

[a]Combined data for foods and beverages purchased in Connersville and Richmond, IN.
[b]Excludes foods prepared with water.
[c]Excludes foods cooked with water.
[d]Excludes reconstituted and fountain beverages.
[e]USDA food categories.

| Table 2-14.  Fluoride Concentrations (mg/kg) of Drinking Water and Foods and Beverages Reconstituted in or Cooked in Tapwater | | | | | | |
|---|---|---|---|---|---|---|
| **Food Group[d]** | **Connersville, IN** | | | **Richmond, IN** | | | **P value** |
| | **N** | **Mean** | **SD** | **N** | **Mean** | **SD** | |
| Water[e] | 3 | 0.16 | 0.01 | 3 | 0.90 | 0.05 | <0.01 |
| Beverages | | | | | | | |
| Bottled fruit drinks | 4 | 0.44 | 0.40 | 4 | 0.65 | 0.39 | 0.49 |
| Bottled carbonated beverages | 12 | 0.58 | 0.21 | 12 | 0.53 | 0.24 | 0.59 |
| Reconstituted/fountain carbonated beverages[a] | 10 | 0.16 | 0.04 | 12 | 0.78 | 0.29 | <0.01[e] |
| Grain products[b] | 13 | 0.26 | 0.11 | 11 | 0.86 | 0.47 | 0.01[e] |
| Vegetables[c] | | | | | | | |
| Raw | 3 | 0.10 | 0.06 | 3 | 0.10 | 0.10 | 0.99 |
| Cooked | 3 | 0.08 | 0.06 | 3 | 0.73 | 0.70 | 0.18 |

**SOURCE:** Jackson et al., 2002.

[a]Includes juices, powdered drinks and fast food fountain drinks.
[b]Includes cooked cereals, pastas, soups.
[c]Includes carrots, cauliflower, broccoli.
[d]USDA food categories.
[e]Significantly different between Connersville and Richmond.

The USDA (2005) database on foods provided information on foods consumed by the general population as well data on infant foods (see Table 2-7).  The ranges of mean values for various food categories are shown in Table 2-15.  The food categories in Table 2-15 are the headings used in the database.

This database is the most comprehensive source of information on the concentrations of fluoride in foods, but is incomplete because many foods found in an average U.S. diet are not included. The database was developed from the data reported in many of the publications cited in this report after critical review of the data and supplemented by data for foods collected and analyzed by USDA (mostly beverages) during development of the database. USDA used a "key foods" approach when selecting the materials they sampled for creation of the database; giving consideration to previously published fluoride data for foods, beverages, and drinking water as well as the respective patterns of consumption of these dietary items. Mean estimates of fluoride concentration and variability in drinking water, beverages and foods that are the chief contributors to dietary fluoride in the United States were developed from analyses of representative samples.

| Table 2-15.  Fluoride Concentrations in Foods as Summarized by the USDA, 2005 | |
|---|---|
| Category/food group | Range of Mean Fluoride Concentrations (mg/kg) |
| Baked goods | 0.13–0.69 |
| Beef products | 0.05–0.22 |
| Breakfast cereals | 0.17–0.72 |
| Cereal grains and pastas | 0.06–0.41 |
| Dairy and egg products | 0.01–0.35 |
| Cream substitute-powdered | 1.12 |
| Fast foods | 0.13–1.15 |
| Fats and oils | 0.01–0.27 |
| Finfish and shellfish | 0.18–2.10 |
| Fruits and fruit products | 0.01–2.34 |
| Lamb, veal and game | 0.05–0.32 |
| Legume and legume products | 0.02–0.54 |
| Meals, entree, side-dishes | 0.13–0.84 |
| Nuts | 0.10 |
| Pork products | 0.04–0.38 |
| Poultry | 0.15–0.21 |
| Sausages and luncheon meats | 0.16–0.48 |
| Snacks | 0.06–1.06 |
| Soups, sauces and gravies | 0.04–1.32 |
| Spices and herbs | 0.02–0.34 |
| Sweets | 0.01–0.89 |
| Vegetables and vegetable products | 0.01–0.55 |

**SOURCE:** USDA, 2005.

**December 2010**

### 2.2.3. Summary of the Data on Fluoride in Solid Foods

There is some consistency in the data on the concentrations of fluoride in foods despite the differences in analytical methods, preparation, and sampling practices. The solid foods highest in fluoride are fish and shellfish, reflective of the fluoride found in ocean water (~13 ppm). Most samples of fish and shellfish that have been analyzed contain greater than 1 ppm (Jackson et al., 2002; Singer et al., 1980; USDA, 2005). More recent analyses of fish samples are lower than those from the early studies (range 0.18–2.10; USDA, 2005). Choice of analytical methods can account for some of these differences as can the presence or absence of bone fragments in the sample analyzed.

When foods were grouped for analysis, the inclusion of fish in a grouping with meat and poultry tended to lead to a higher mean value than found for meat or poultry alone or combined (Dabeka and McKenzie, 1995; Jackson et al., 2002; USDA, 2005). Chicken had a relatively high fluoride content (>1 ppm) in baby foods (1.20–8.38 ppm; Heilman et al., 1997). However, in the USDA (2005) database chicken has a far lower average value (0.15 ppm) than reported in some of the earlier studies. The USDA value for chicken is attributed to Featherstone (1988), Jackson (2002) and Ophaug (1983–1987).

The majority of vegetables, be they leafy, root, legumes, green or yellow, have a relatively low fluoride concentration (<0.5 ppm; IOM 1997; Singer et al., 1980; USDA, 2005). The concentrations for fruits were generally lower than those in vegetables (< 0.2 ppm) in most assays (IOM, 1997; Singer et al., 1980; Singer and Ophaug, 1979; USDA, 2005). Table 2-15 derived from the USDA database indicated a concentration range of 0.01 to 2.34 ppm for fruits. However, in this case, the high end measure (raisins) was an outlier reflecting the use of cryolite as a pesticide on grapes and concentration through drying. Fresh grapes had 0.08 ppm fluoride; the concentration in all other fresh fruit was < 0.04 ppm.

Cereals, baked goods, breads, and other grain products tended to have fluoride concentrations between about 0.5 and 1 ppm (IOM, 1997; Jackson et al., 2002; Singer et al., 1980). Dairy product fluoride concentrations, as reported by IOM (1997), Singer et al. (1980), and USDA (2005) were low (<0.5 ppm).

Infant foods have a tendency to have a higher liquid content than foods for toddlers through adults in order to minimize chewing and increase the ease of swallowing. When fluoridated water is used in their preparation, this can add to the total fluoride concentration. Most infant foods studied had concentrations less than 0.5 ppm if they were cereal, fruit or vegetable based and less than 1 ppm if they contained meat. Products containing chicken had a higher fluoride concentration than those with meat or turkey in several studies (Heilman et al., 1997; Singer and Ophaug, 1979). However, this was not the case with the meat and poultry containing infant foods in the USDA (2005) database where concentrations were less than 0.5 ppm. The USDA data for the meat and poultry-containing baby foods was attributed to unpublished data from Steven Levy (University of Iowa).

In a study of maternal milk by Dabeka et al. (1986) fluoride levels were below detection in 56% of the 210 samples tested and the mean concentration in areas without fluoridated water was 0.0044 mg/L while those receiving fluoridated water (1 mg/L) was 0.0098 mg/L. These

differences were significant (p = 0.007). The IOM (1997) reported that the fluoride concentration in human breast milk ranged from 0.007 to 0.011 ppm.

The fluoride concentration in infant formula is difficult to assess and depends on the brand and form of the formula product (i.e., liquid, concentrate, powder; Dabeka and McKenzie, 1987) and the protein source (milk protein or soy protein; Van Winkle et al, 1995). In US products analyzed by Dabeka and McKenzie (1987) the mean fluoride levels ranged from 0.23 mg/kg for ready-to-serve products to 1.13 mg/kg for powdered formula concentrate. Fluoride from the dilution water further increases the total fluoride from formula (as served) in the case of concentrated and powdered products. For milk-based formulas Van Winkle et al. (1995) reported mean values of 0.17 mg/L for ready-to-use products, 0.12 mg/L for liquid concentrates, and 0.14 mg/L for powdered concentrates. In the case of soy formulas, the comparable values were 0.30 mg/L (ready-to-use) and 0.24 mg/L (liquid and powdered concentrate. Distilled water was used to prepare the samples for analysis.

In the most recent analysis of U.S. infant formula, Siew et al. (2009) reported mean values of 0.15, 0.27 and 0.12 ppm for milk-based, ready-to-use, liquid concentrates, and powdered concentrates, respectively, and 0.21, 0.50, and 0.16 ppm for soy-based, ready-to-use, liquid concentrates and powdered concentrates, respectively. The overall mean for all products combined was 0.198 ppm.

It is difficult to tell if changes in analytical methods over time have influenced the results from studies of fluoride in foods. Singer et al. (1980 found that the results with an ion-specific electrode were more accurate than a colorimetric method and that ashed samples gave different results from unashed samples for some food groups but not for others. Table 2-16 compares the results from several studies conducted over the past 30 plus years that grouped the foods in the same manner. No pattern is apparent in the results reported. The analytical results are likely influenced by the products represented in a food group, food growth and preparation practices, as well a variety of other variables that are difficult to quantify.

| Table 2-16.  Comparison of Food Group Measures over a 30-Year Period | | | | | |
|---|---|---|---|---|---|
| Food group | San Filippo and Battistone, 1971[a,b] (mg/kg) | Singer et al., 1980[b] (mg/kg) | Taves, 1983/ IOM, 1997 (mg/kg) | Jackson et al., 2002 (mg/kg) | USDA 2005 |
| Dairy products | 0.17 | 0.06 | 0.25 | 0.31 | 0.01-0.33 |
| Meat fish poultry | 0.75 | 0.24 | 0.22 | 0.36 | 0.04-2.10 |
| Grains and cereals | 0.45 | 0.36 | 0.42 | 0.49 | 0.06-0.72 |
| Leafy vegetables | 0.4 | 0.13 | 0.27 | | |
| Legume vegetables | 0.23 | 0.27 | 0.53 | 0.25 | 0.01-0.55 |
| Root vegetables | 0.10 | 0.1 | 0.38 | | |
| Fruits | 0.11 | 0.08 | 0.06 | 0.12 | 0.01-.0.13[c] |

[a]Average of 4 measurements.
[b]Colorimetric method used by San Fillipo and Battistone (1971) has a tendency to give higher results than the ion-specific electrode used by the other researchers (Singer et al., 1980).
[c]Raisins not included.

Cooking and preparing foods with water that contains fluoride increases the fluoride content of the food as served (Marier and Rose, 1966). This is true for home-prepared and commercial foods. However, the uptake of fluoride from the process water varies with the food product. This may relate to the presence of cations in the water that form poorly soluble fluoride salts such as calcium fluoride reducing fluoride uptake into the finished product to a greater extent than those like sodium that form soluble salts or from fluoride in the water reacting with these same ions in the food and increasing the fluoride from water retained in the cooked product.

Maier and Rose (1966) analyzed the fluoride content of canned vegetables processed at plants using low-fluoride water and plants using municipal water with 1 mg F/L using a micro-distillation method coupled with colorimetric/spectrophotometric detection. Use of fluoridated process water increased the fluoride content of the vegetables by 0.34 to 0.75 mg/kg (average 0.5 mg/kg) (Table 2-17). Although the values measured are likely to be high because of the colorimetric quantification, they do illustrate the impact of processing foods with fluoridated water. However, Ophaug (1985) reported that there was not a strong correlation between the local fluoride drinking water concentration and total fluoride intake from solid foods in market basket studies, most likely reflecting the combination of purchased and home prepared foods in a normal diet.

| Table 2-17.  Fluoride Content of Canned Vegetables | | | | |
|---|---|---|---|---|
| **Food** | **Average Fluoride Content (mg/kg)[a]** | | | |
| | **Non-fluoridated Process Water** | | **Fluoridated Process Water  (1 mg F/L)** | |
| | **Liquid** | **Solid** | **Liquid** | **Solid** |
| Mixed vegetables | 0.30 | 0.37 | 1.03 | 1.05 |
| Green beans | 0.14 | 0.20 | 0.71 | 0.89 |
| Whole potatoes | 0.13 | 0.38 | 0.87 | 0.76 |
| Diced carrots | 0.30 | 0.19 | 0.55 | 0.61 |
| Kernel corn | 0.10 | 0.20 | 0.48 | 0.56 |
| Green peas | 0.15 | 0.10 | – | – |
| Wax beans | – | – | 0.49 | 0.60 |

**SOURCE:** Marier and Rose, 1966.
[a]Results are averages of single determinations for duplicate samples.

## 2.3.   Fluoride in Beverages

Beverages are a major source of human dietary exposure to fluoride, especially after fluoridation of public drinking water became widespread and before the growth in bottled water intake. Exposure from plain (e.g., non-beverage) drinking water is summarized in Section 3 of this report.  Data on other beverages are presented below.

### 2.3.1.   Non-Alcoholic Beverages

Clovis and Hargreaves (1988) published data (Table 2-18) from a study by Hargreaves which measured fluoride levels in beverages in two towns in Canada.  One town had a fluoridated water supply (average adjusted fluoride concentration of 1.08 mg/L) and the other had a natural fluoride level of 0.23 mg/L.  Fluoride levels in commercially prepared beverages were similar in

the two towns; however, fluoride levels in home-prepared beverages were substantially higher in the community with the fluoridated water supply.

Stannard et al. (1991) measured fluoride levels in 43 ready-to-drink fruit juices purchased in the Boston area; however, the products were bottled in various locations around the U.S.  Fluoride was measured using a fluoride ion-specific electrode.  Fluoride concentrations ranged from 0.15 to 6.80 ppm. Forty-two percent of the samples had a fluoride content of greater than 1 ppm. Grape juice had the highest levels of fluoride (1.94–6.80 ppm), most likely reflecting the use of cryolite as a pesticide on grapes.

Fluoride concentrations were measured in 532 different juices and juice-flavored drinks (including five teas) purchased in Iowa City by Kiritsy et al. (1996).  Many of the products were distributed nationally or internationally.  Frozen-concentrated beverages were reconstituted with distilled water before analysis.   The fluoride concentration ranged from 0.02 to 2.8 mg/L (mean, 0.56 mg/L). Upper limits on most kinds of juices exceeded 1.50 mg/L.  The highest mean fluoride concentration (1.45 mg/L) was found in white grape juice.

| Table 2-18.  Fluoride Concentrations in Beverages in Two Canadian Towns | | |
|---|---|---|
| **Category** | **Fluoride Concentration (ppm)** | |
| | **Town #1 (1.08 mg/L)** | **Town #2 (0.23 mg/L)** |
| Milk | 0.03 | 0.03 |
| Carbonated beverages | 0.80 | 0.80 |
| Commercially prepared juice | 0.80 | 0.80 |
| Home prepared juice | 1.06 | 0.21 |
| Soups | 1.06 | 0.21 |
| Tea | 2.18 | 1.33 |
| Coffee | 1.08 | 0.23 |
| Other beverages prepared with tapwater | 1.08 | 0.23 |
| Misc., prepared with 0.1 ppm water | 0.10 | 0.10 |

**SOURCE:** Hargreaves, unpublished, as cited in Clovis and Hargreaves, 1988.

The fluoride content of 332 carbonated beverages was measured by Heilman et al. (1999).  The beverages were purchased in Iowa, but produced at 17 different locations.  Mean concentrations of fluoride ranged from 0.04 mg/L to 1.06 mg/L (overall mean 0.72±0.34 mg/L).

Turner et al. (1998) reported fluoride levels of 0.68–0.91 ppm (mean 0.78±0.07 ppm) in carbonated drinks bought in Houston, TX, and 0.0–0.73 ppm (mean 0.33±0.28 ppm) in carbonated drinks bought in San Antonio, TX.  Levels of fluoride in ready-to-drink juice drinks were 0.28–1.08 ppm (mean 0.77 ±0.21 ppm) in Houston and 0.16–1.02 ppm (mean 0.58 ±0.38 ppm) in San Antonio.  Fluoride determinations were made with a fluoride ion-specific electrode.

Various brands and kinds of coffee sold in the Houston area were analyzed for fluoride by Warren et al. (1996).  All samples were prepared with deionized distilled water. Fluoride levels ranged from 0.10 to 0.58 mg/L.  The mean concentration for decaffeinated coffee was 0.14 mg/L and that for caffeinated 0.17 mg/L.  Instant coffee had a mean fluoride content of 0.30 mg/L.

The USDA (2005) database contains mean values for a variety of beverage categories as shown in Table 2-19.  The results are consistent with those reported in other publications. In order to examine more closely the possible relationship between the concentrations of fluoride in carbonated beverages and possible use of tap water containing fluoride in the production of such beverages, the OW evaluated the mean and maximum concentration for the large sample sets (28–72 samples/set) in the USDA (2005) fluoride database.  The mean of the means for six different carbonated beverage sets (4 colas) was 0.53 mg/L while the mean of the maximum values was 0.97 mg/L.  Since the ingredients other than water in such beverages are not notably rich in fluoride, much of the fluoride present appears to come from the water component of the beverage.

| Table 2-19.  Fluoride Levels in Beverages as Summarized by the USDA, 2005 | |
|---|---|
| **Category/food group** | **Range of Mean Fluoride Concentrations (ppm)** |
| Carbonated, non-alcoholic drinks | 0.14–0.84 |
| Carbonated flavored water | 0.84–1.05 |
| Chocolate,  ready-to-drink | 0.87 |
| Coffee | 0.52–0.91 |
| Grain-based coffee substitute | 1.25 |
| Fruit juices and drinks | 0.08–1.09 |

Tea is a rich source of fluoride; concentrations vary depending on the type of tea, its source, and the age of the leaves.  The fluoride content of buds and young leaves ranges from 100 to 430 mg/kg, whereas that of older leaves ranges from 530 to 2350 mg/kg (Lu et al., 2004).  Data on the fluoride concentration of teas are summarized in Table 2-20.

| Table 2-20.  Fluoride Concentration in Tea as Served | | | |
|---|---|---|---|
| **Study** | **Type** | **Concentration (ppm)** | **Notes** |
| Cao et al., 2006 | Black tea sticks | 0.95–1.41 | |
| | Black tea granules | 0.7–2.44 | |
| | Black tea bags | 1.15–6.01 | Aged tea leaves |
| Chan and Koh, 1996 | Caffeinated | 0.34–3.71 | 44 brands; brewed 5 to 120 minutes |
| | Decaffeinated | 1.10–5.2 | |
| | Herbal | 0.02–0.14 | |
| USDA, 2005 | Caffeinated | 3.10–3.93 | |
| | Decaffeinated | 2.47–2.93 | |
| | Iced Tea | 0.72–1.23 | |
| | Green Tea | 1.15–2.72 | Caffeinated and decaffeinated |
| | Herbal | 0.13–0.90 | Chamomile, peppermint |
| Whyte et al., 2005 | Caffeinated and decaffeinated | 1–6.5 | Prepared with distilled water |

### 2.3.2.   Alcoholic Beverages

Fluoride is present in a number of alcoholic beverages, especially wines, due to the use of cryolite as a pesticide on grapes. Burgstahler and Robinson (1997) reported fluoride levels of 0.23–2.80 ppm (mean 1.02 ppm) in California wines. Seven of 19 samples tested above 1 mg/L. Fluoride was determined using a fluoride ion-specific electrode. Martínez et al. (1998) reported mean fluoride concentrations ranging from 0.08 to 0.68 mg/L in 70 wines from the Canary Islands.  The overall mean concentration was 0.16 mg/L.  USDA (2005) found a mean concentration of 1.05 ppm from 14 red wine samples and 2.02 ppm for 17 white wine samples.

Warnakulasuriya et al. (2002) reported mean fluoride concentrations of 0.08–0.71 mg/L in eight kinds of beers available in Great Britain.  The concentrations were the equivalent of 0.03–0.31 mg fluoride in one 440 mL can.  USDA (2005) reported a mean of $0.45 \pm 0.023$ ppm for 142 light beer samples and $0.44 \pm 0.025$ ppm for 102 regular beer samples.  The average fluoride in distilled alcoholic beverages was 0.08 ppm in the USDA (2005) database.

### 2.3.3.   Summary for Fluoride in Beverages

The fluoride in commercial products tends to reflect the water source at the plant where juices and carbonated beverages are processed.  In most instances concentrations in carbonated beverages ranged between 0.7 and 1 ppm, reflecting the concentrations in fluoridated water (Clovis and Hargreaves, 1988; Heilman et al., 1999; Schulz et al., 1976; Turner et al., 1998, USDA, 2005).  Commercial fruit juices have the same or slightly lower means (Clovis and Hargreaves, 1988; Kiritsy et al., 1996; Stannard et al., 1991, USDA, 2005), although the means for grape-based products can be higher. USDA (2005) reported the mean concentration of grape juice as 0.77 mg/kg for 20 samples of regular grape juice and 2.13 mg/kg for 12 samples of white grape juice.  Home-prepared products appear to reflect the concentration of the local water supply (Clovis and Hargreaves, 1988; Jackson et al., 2002).
Tea is a rich source of fluoride, especially when made from aged leaves (Cao et al., 2006).  Herbal teas do not have the high fluoride content of real teas (Chan and Koh, 1996).  All of the samples of brewed black tea analyzed by USDA (2005) had a mean fluoride concentration of > 3 ppm. Brewed herbal teas and green teas had lower concentrations. Three popular brands of bottled commercial ice teas had means between 0.72 and 1.23 mg/L (USDA, 2005).

Among alcoholic beverages, wines have the highest fluoride levels (usually 1–2 ppm) likely reflecting the cryolite use in the growing of grapes (Burgstahler and Robinson, 1997; Martinez et al., 1998; USDA, 2005).  Levels of fluoride in distilled alcoholic beverages are low (<0.1 ppm; USDA, 2005) and those in beer are intermediate, about 0.4 to 0.5 ppm for U.S. products (USDA, 2005).

### 2.4.   Indirect Exposure from Pesticide Residues on Food

**Cryolite.**  Cryolite (sodium aluminofluoride; $Na_3AlF_6$) was first registered for use as a pesticide in the U.S. in 1957 (U.S. EPA, 1996).  It is used on fruits, vegetables and ornamental plants to protect against leaf eating insects.  The major products treated with cryolite are grapes, citrus fruits, and potatoes.  Applications rates are frequently high, and application can occur several times during a growing season (U.S. EPA, 1996).

According to NRC (2006), the high fluoride content of grape juices (and grapes, raisins, and wines), even when little or no manufacturing water is involved, is thought to be due to a cryolite used in grape growing (Stannard et al., 1991; Kiritsy et al., 1996; Burgstahler and Robinson, 1997). The water-extractable fluoride in five brands of California raisins ranged from 0.83 mg/kg to 5.20 mg/kg (mean 2.71 mg/kg). Soaking the raisins in distilled water for 1–2 hr resulted in the release of 70–90% of the fluoride, suggesting that the fluoride was concentrated on the skin of the fruit (Burgstahler and Robinson, 1997).

One study reported by Waldbott (1963) showed that celery leaves sprayed with cryolite had fluoride residues of 77.0–135.0 ppm F whereas the normal levels of fluoride in celery were reported to be 0.7–5.7 ppm. Similarly, 2.0–4.5 ppm F was found on sprayed apples compared with 0.04–1.3 ppm F on unsprayed apples.

The market basket dietary data reported in this document include fluoride exposure from cryolite because of its long history of use on a variety crops. To avoid counting the exposure to fluoride from cryolite twice, the additional estimates of cryolite residue values provided by OPP (U.S. EPA, 2009, see Appendix A) were not directly incorporated into the EPA exposure assessment.

There is uncertainty surrounding the OPP estimation of fluoride exposure through cryolite, because the current analytical methods are unable to differentiate the various aluminum fluoride species in each product and instead report total fluoride. Thus, it is possible that the residue estimates could represent an overestimate. In the OPP assessment (U.S. EPA, 2009), the highest level of fluoride residues was contributed by the OPP "other" food group which includes grape and grape juice among other miscellaneous commodities such as coco beans, and coconut. About 60% of the total fluoride residue in the "other" group comes from cryolite rather than sulfuryl fluoride (See Appendix A).

**Sulfuryl Fluoride.** Sulfuryl fluoride, initially also known as Vikane, is a pesticide that was not registered for food use when the studies reported in Section 2.2.2 were conducted. Therefore, fluoride residues from its use are not included in the data presented. Sulfuryl fluoride was developed by Dow Chemical in the late 1950s as a structural fumigant. It was first registered by the OPP in December 1959 and first marketed in the United States in 1961. Sulfuryl fluoride is now produced and sold by several manufacturers, under various brand names.

Sulfuryl fluoride is highly reactive and breaks down to form sulfate and fluoride anions. Parent sulfuryl fluoride and the fluoride anion are the OPP's residues of concern for both tolerance expression and risk assessment. It is considered to be an effective replacement for ozone depleting methyl bromide, the conventional pesticide that had been used for structure fumigation.

On February 7, 2002 the Federal Register established temporary tolerances for residues of sulfuryl fluoride and inorganic fluoride in or on walnuts and raisins. The temporary tolerances were established to support an Experimental Use Permit (EUP) that involved testing a possible alternative to methyl bromide in the post-harvest fumigation of stored walnuts and raisins (Fed Reg. 67(59):14713–14714). The temporary tolerances supported a 3-year EUP effective between March 1, 2002 and March 1, 2005. There was no apparent exercise of the EUP. An 18-month

period was given to allow the treated commodities to clear commerce, meaning the temporary tolerances expired on September 1, 2006.

The OPP was later petitioned by Dow AgroSciences (DAS) to register sulfuryl fluoride to control pests in storage and processing facilities as well as to establish permanent tolerances for residues of sulfuryl fluoride and the fluoride anion on cereal grains, dried fruits, and tree nuts. In 2004 the Health Effects Division (HED) of OPP conducted a human health risk assessment for sulfuryl fluoride. Time-limited tolerances were granted for the requested commodities and facilities, with the understanding that when the National Academies of Sciences (NAS) review of fluoride for the OW was completed, the proposed tolerances were to be revisited.

In January of 2006, HED released a risk assessment that postdated a 2005 FR notice establishing tolerances for residues of sulfuryl fluoride and fluoride resulting from fumigation of additional foods (i.e. milk powder, eggs. cocoa, cheese, meat, coffee) and for food processing facilities. Health-effects related limitations for fluoride exposure were based on the OW's MCLG for fluoride in drinking water (4 mg/L and 2L drinking water per day). The MCLG was under evaluation by NAS at that time. The OPP risk assessment stated that the tolerances would be reevaluated once the NAS report was published.

HED performed a dietary exposure assessment for fluoride from treated food products for this effort at the request of the OW (U.S. EPA, 2009). The analysis incorporates the most recent residue data submitted to the agency by the registrant (Dow AgroSciences). The current analysis is intended to replace the exposure projections from the 2006 OPP risk assessment. The HED report to OW is found as Appendix A in this report.

The OPP report to the OW does not include any experimental data on residues in foods. The OPP exposure analysis is based on residue data from select foods commodities extrapolated to similar foods in deriving exposure estimates for humans. Intake data for food groups were derived from the USDA's Continuing Survey of Food Intakes by Individuals (CSFII). All the OPP exposure estimates utilize percent crop treated information.

The OPP analysis (U.S. EPA, 2009) used percent crops treated values for exposures during fumigation that ranged from 0.1% to 100% for food fumigation based on reports of methyl bromide usage by USDA. Use rate information was incorporated in the analysis to derive anticipated residue values. One hundred percent of the dried beans and legumes (except chick pea and cow pea) were assumed to be fumigated using sulfuryl fluoride as were cocoa beans and a high percentage of walnuts, dates, prunes, raisins, and figs. The percent of crop treated for coarse grains and wheat by-products such as flour was 0.1% and that for rice was 3%. For most nuts, 10% of the crop was estimated to be treated based on the data for methyl bromide.

The OPP (U.S. EPA, 2009) food group exposure estimates are summarized in Table 2-21. Food groups have been consolidated from the OPP tables to be consistent with groups reported in other publications. Twenty-one food groups were reduced to twelve in this process. The values reported are exposures of the general US population to fluoride from sulfuryl fluoride in each food group. The "Other" group includes but is not limited to, cocoa beans, coconut, cranberry, grape, and grape juice products. Based on the data from OPP, grains, legumes, and fruits including fruit juices appear to be the major contributors of fluoride in the U. S. diet through the

tolerances granted to sulfuryl fluoride.  The "other" food group is another large contributor but is varied in its composition.  The data from OPP were reported in units of mg/kg/day.  They were converted to mg/day values for this report using a 70 kg body weight consistent with OW policies for the general U.S. population.

| Table 2-21.  Estimated Food Group Exposures of the General U.S. Population to Fluoride from Sulfuryl Fluoride Tolerances | |
|---|---|
| Food Groups | mg/day[a] |
| Dairy products | 0.0002 |
| Meat & Poultry | 0.0007 |
| Cereal Grains | 0.0297 |
| Leafy vegetables | 0.0016 |
| Legume vegetables | 0.0370 |
| Root, tuber, bulb vegetables | 0.0015 |
| Cucurbit and Fruiting Vegetables | 0.0017 |
| Fruits & Fruit Juices | 0.0044 |
| Tree nuts | 0.0011 |
| Herbs and spices | 0.0002 |
| Oil seeds | <0.0001 |
| Other[b] | 0.0646 |

SOURCE: U.S. EPA, 2009.
[a]Based on a 70 kg body weight.
[b]The "other" category applies to foods not captured in one of the other groups including but not limited to cocoa beans, coconut, cranberry, grapes and grape juice.

## 2.5.   Estimates of Dietary Fluoride Intake

## 2.5.1.   Exposure Assessment Methodologies

Estimates of dietary fluoride exposure are based on studies using several analytical approaches. In reviewing the data it is important to understand the technical framework for each approach as well as its strengths and limitations.  The studies included in this Section have relied on combinations of several methods for collecting dietary data for use in an exposure analysis:

- Dietary records
- Dietary recalls
- Food frequency recall
- Market Basket or Total Diet Study (TDS) surveys
- Duplicate plate-type analyses.

The following paragraphs provide background information on each of the methods that were used in generating the fluoride exposure estimates. To facilitate evaluation of the resultant exposure estimate, the studies are grouped by method for three age groupings: infants, children ≤ 14 years, adolescents and adults.  Studies examining intakes for children less than 6 month of age

are not included because this age group was not identified as a sensitive population in the fluoride dose-response assessment (U.S. EPA, 2010a).

**Dietary Records.** Dietary record studies require participants to keep a diary of the amounts and kinds of foods they consume daily. This approach is useful for assessment of individual or group intakes. Generally a minimum of three days is recommended (Guthrie, 1989), often two week days and one week-end day. Compliance with recording intake tends to decline as the number of days and complexity of record keeping increase.

The accuracy of dietary records is dependant on the literacy and commitment of the participants. Failure to record condiments and other foods taken in small amounts is common. With busy individuals, record keeping can regress to end of the day recall as the study progresses. Some people may fail to record foods they think they should not be eating and favor recording intakes of foods they feel are nutritious.

The dietary record is applicable to other groups who share the characteristics (i.e. age, sex, and ethnicity) of the population that participated in the study, but not to groups with different demographics. They provide information on nutrient intake when they are coupled with food composition databases or analytical data on the amounts of a nutrient in specific foods. Three-day records are best for studies of macronutrient intakes and less-well suited for studies of micronutrients (Nutrition Quest, 2008).

**Dietary Recall.** Dietary recalls are the preferred method for population studies but can also be used for evaluation of individual intakes. The difference between the recall and record approach is the use of a trained interviewer for collection of the recall data. The interview is structured to stimulate the responder's memory. The interviewer has a set of props to assist the respondent in quantifying portion sizes. The use of the interview reduces the requirement for participant literacy and widens the pool of potential participants.

Single 24-hour recalls can be used to describe the average intake of a group or to determine if two groups have similar mean intakes. A single day 24-hour recall is not appropriate for epidemiology studies or for assessing the quality of an individual's diet (Nutrition Quest, 2008). Two- and three-day recalls are popular durations for the recall approach. As was the case for the dietary record, a three-day recall will often target two week days and one weekend day.

Recall intake data are coupled with food composition information from nutrient databases or food analysis information to generate exposure estimates. Studies show that large portion sizes are generally underestimated and small portion sizes overestimated in recall studies (Guthrie, 1989). The recall approach lessens the record-keeping fatigue problems encountered with the dietary record approach.

Two large-scale, recall-based studies in the United States are the National Health and Nutrition Examinations Survey (NHANES) and the Continuing Survey of Food Intake by Individuals (CSFII). NHANES is periodically updated by the National Center for Health Statistics of the Centers for Disease Control and Prevention (CDC). In the NHANES, dietary data are gathered through a 24-hour recall interviews conducted by a trained professional.

**December 2010**

The CSFII was conducted by the U.S. Department of Agriculture on a periodic basis. One purpose of this survey was to provide information on the kinds and amounts of food eaten by the U.S. population.  Each survey covered 3 years.  In each of the survey years, a nationally representative sample of the population was interviewed to provide information on 2 non-consecutive days of food intake using the 24-hour recall approach.  The direct tap water intake data reported in USEPA (2000a, 2004) were derived from the CSFII.

**Food Frequency Recall**.  In a food frequency recall the subject is asked how frequently foods from a defined list are consumed over a specific time period (i.e. per day, week or month).  The list of foods is selected based on the objective of the study, generally targeting foods that are a source of a particular nutrient or group of nutrients.  The food frequency questionnaire can be administered by an interviewer or self administered (Nutrition Quest, 2008).   Frequency recall data can be used in the development of analytical market baskets that reflect food preferences for age groups of interest, but need to be combined with national intake data for foods or food groups as collected by CSFII or NHANES in order to quantify food group intakes applicable to the population studied.

Food frequency recalls are well suited to examining food preferences focused on intakes of specific nutrients.  For example, if there is concern about vitamin A intake of elderly adults, a food frequency recall tool can be developed that focuses on foods know to be high in vitamin A. The population status can be estimated by the frequency at which such foods are consumed (i.e. daily vs. once per week). The food frequency tool is not as well suited to an evaluation of the nutritional status of an average daily diet.

**Market Basket Survey.**  A Market Basket Study relies on chemical analysis of a typical diet using foods purchased (market baskets) at different locations and during different seasons of the year.  The U.S. Food and Drug Administration uses a Market-Basket approach to track the intake of nutrients and contaminants in the U.S. diet in their Total Diet Study (TDS, Egan et al., 2007). Several of the studies in Section 2.2 used a Market Basket approach for collecting and grouping of foods. The results from those studies provided the data for some of the exposure estimates reported in this section.

The Market Basket approach combines food recall data with chemical analysis of foods that are representative of dietary intakes for different age/gender groups plus the geographic diversity and seasonal influences that influence the foods purchased. The composition of representative diets is derived from food intake studies such as the CSFII Survey.  The foods are purchased in different locations and prepared as they would be served.  Individual food samples are pooled, homogenized, and analyzed to obtain representative aliquots for the analytes of interest (Egan, 2002).  Intake from water that does not become incorporated in the foods as served is not captured by this analysis although analytes transferred to food from water during preparation are captured.  Foods can be analysed individually or in narrow food groups such as "white breads" or "cooked apple products" (Egan et al., 2007). The most recent FDA TDS included 280 foods from 12 broad food groups and covered 15 age/gender groupings (Egan et al., 2007).

The TDS represents the typical US diet.  It does not provide estimates for individual or population exposure distributions (Egan et al., 2007) unless coupled with the intake distributions

of a national survey such as NHANES or CSFII.  The TDS data can identify the food groups that are the major source of exposure to a nutrient or contaminant.

**Duplicate Plate or Duplicate Diet Analysis**.  In a duplicate plate or duplicate diet study the participants set aside an equivalent weighed portion of each of the foods they consume for analysis.  The plate terminology is appropriate in cases where two identical servings of each meal are prepared in a food service setting such as a hospital kitchen. One plate is served and consumed and the other is used for analysis.  In the case of a duplicate diet study sometimes duplicate portions of each food consumed are placed directly in one or more dedicated collection vessels and preserved for later analysis (Thomas et al., 1997). Often there are separate collection vessels for solid and liquid foods.  At the end of the collection period the foods are homogenized and several aliquots are harvested for chemical analysis of the analytes of interest.

The analyte concentration per mass of the aliquot when scaled to the mass of food collected/consumed produces the estimate of the analyte intake for the day.  The estimate of intake is rather accurate for each individual and can be averaged for the participating group providing a mean, median, standard deviation, and range for intake of the analyte.  Intake from direct tap water ingestion is not usually captured by this analysis.

The data from a duplicate diet study are limited if they do not identify and quantify the foods contributing the analyte to the diet, and do not easily extrapolate to groups with other dietary habits and/or demographic characteristics (age, gender, etc.).  Intake estimates are also impacted if the consumer eats more or less than was placed on the duplicate plate or in the collection vessel.

Carrying out a duplicate diet study is resource intensive (Thomas et al., 1997; Martinez-Mier et al., 2008).  It requires dedicated participants if the collection period lasts for more than a day or two. When participants are in a free-living setting they must prepare their foods, record and weigh what they consume, collect the duplicate portion in the dedicated collections vessels and keep the collected foods under conditions that will preserve the analytes and prevent spoilage. Special plans must be made for measuring, collecting and preserving any foods consumed away from the home setting.

Several exposure estimates reported in Section 2.2 involve plate analyses from hospital kitchens. This type of analysis represents foods served but not necessarily food consumed unless there is a correction for plate waste. The majority of duplicate plate or diet studies included in this report did not require that the participants prepare, record, measure, and preserve the foods they ate for later analysis in a free-living setting. Most of the studies cited were conducted in a hospital or school-like setting.

There are strengths and weakness to each of the dietary methodologies that impact the study outcomes.  Martinez-Mier et al. (2008) conducted a pilot study that compared the results of 3-day duplicate diets with 3-day diary records for 12 children (ages 18 to 25 months). Adults (parents and/or caregivers) kept the diaries and collected the food and beverage samples.  The 3-day averages for each child differed for the two approaches with the differences ranging from 0.01 to 0.4 mg F/day.  Both approaches suffered from protocol compliance problems, and large

variations in daily fluoride intake from both beverages and food were observed between and within children.

The majority of the published studies that provided estimated oral fluoride intakes from the diet for this report utilized a market basket approach coupled with recall records collected and analyzed by the U.S. Departure of Agriculture.  The date and title of the USDA study varies and is provided in the study descriptions that follow.  In one case the market basket was developed from a food frequency recall but it too used food group intake values from USDA.  Fewer studies were identified that used a diary approach or a duplicate diet approach.  In one instance the diary record was used to construct a market basket for analysis.

The study summaries that follow, with the exception of some of the duplicate plate analyses, are suitable for estimating dietary population intakes of fluoride within the limitations that apply to the methods described in preceding paragraphs.  Where possible, EPA chose to rely most heavily on studies that obtained the fluoride concentration information from a market basket analysis because such studies were considered to be more nationally representative than a study based duplicate diet analyses.

## 2.5.2.  Infants

Each of the studies assessing fluoride intake by infants used a market basket-type approach where analysis of the fluoride content of foods was combined with estimates of food intake from a recall, record, or intake recommendation, and measured or assumed drinking water concentration, in order to arrive at an estimate for fluoride exposure.

Singer and Ophaug (1979) estimated maximum and minimum total fluoride intake of 6-month old infants on diets prepared with fluoridated water or non-fluoridated water (Table 2-22). Commercial manufacturers of infant foods provided samples of foods and milk formulations produced at each of their domestic plants.  Each sample was "closely examined for the fluoride content of the water used in processing it" (actual fluoride concentrations in the processing water were not reported). The food samples were fixed with magnesium oxide and then ashed. Fluoride was isolated by diffusion and analyzed with a fluoride ion-specific electrode. Separate samples were unashed and analyzed for fluoride by a colorimetric technique and an ion-specific electrode.  While the results with the electrode were in good agreement with both ashed and unashed samples, the colorimetric method gave substantially higher fluoride readings-presumably due to interfering substances.

Food consumption estimates (milk, formula, and "beikost") were based on the total caloric intake for six month old infants according to the estimates of Fomon (1975).  Beikost is a term that refers to solid or semi-solid baby foods other than milk or formula. The quantity of each food consumed was calculated by dividing the caloric intake supplied by each food item (kcal/day) by average values of caloric density (kcal/gm) as given by Wiatrowski et al. (1975). The total fluoride intake was calculated using the mean fluoride values for various food groups.   In estimating fluoride intakes, maximum values were based on foods obtained from the plant using fluoridated water using the assumption that the infant's drinking water would contain 1.0 mg F/L; minimum intake values were based on data from the non-fluoridated plant using the assumption that the infant's drinking water would contain only 0.1 mg F/L.  For 6-month-old

infants (bw 8.1 kg) the minimum fluoride intake was 0.153 mg/day, and the maximum intake was 0.763 mg/day.

| **Table 2-22.  Fluoride Intake of Infants 6 Months Old (Singer and Ophaug, 1979)** | | | | |
|---|---|---|---|---|
| **Food Item** | **Caloric Intake[a] (kcal)/day** | **Food Consumption (g)[b]** | **Maximum Fluoride Intake[c]** | **Minimum Fluoride Intake[d]** |
| | | | **mg/day (mg/kg/day)** | **mg/day (mg/kg/day)** |
| Milk formula | 444 | 663 | 0.451 | 0.020 |
| Cereals | 57 | 15 | 0.073 | 0.023 |
| Fruits | 93 | 109 | 0.006 | 0.006 |
| Vegetables | 62 | 138 | 0.033 | 0.033 |
| Juices | 22 | 34 | 0.023 | 0.002 |
| Meats | 62 | 58 | 0.057 | 0.057 |
| Water | | 120 | 0.120 | 0.012 |
| **Total** | **740** | | **0.763 (0.094)** | **0.153 (0.019)** |

**SOURCE:** Singer and Ophaug, 1979.

[a]From Fomon, 1975.

[b]Consumption based on daily caloric intake and the following caloric densities (kcal/g): milk formula, 0.67; cereals 3.74; fruits, 0.85; vegetables, 0.45; meats, 1.06; and juices, 0.65.

[c]Mean fluoride content were: milk formulations – 0.68 mg/L; cereal – 4.84 mg/kg, and juices – 0.67 mg/L processed in plants using fluoridated water, and fruits – 0.051 mg/kg, vegetables – 0.24 mg/kg, meats – 0.99 mg/kg and water – 1.0 mg/L.

[d]Mean fluoride content of 1.5 mg/kg for cereal and 0.061 mg/L for juices processed in plants using nonfluoridated water, and 0.03 mg/L for human or bovine milk , 0.051 mg/L for fruit, 0.24 mg/L, for vegetables,  0.99 mg/kg for meats, and  0.1 mg/L for water.

Ophaug et al. (1980a) estimated the daily fluoride intake of 6-month-old infants for four geographic regions of the United States.  The study was based on the FDA market basket food collections for 1977 and 1978.  The foods were placed in 11 composite food groups.  The composites were prepared according to Shopping and Compositing Guides representing an average 14-day consumption of a 6-month-old infant in Orlando, Philadelphia, Grand Rapids, and Los Angeles.  The first three cities reportedly had fluoridated water supplies (1.07 mg/L was the maximum value reported, which was for Grand Rapids). The fluoride concentration in the Los Angeles water system at the time of the study was reported to be 0.37 mg/L.  The Shopping and Composite Guides are based on data obtained by the U.S. Department of Agriculture survey of food consumption made in 1965 to 1966 for each of the geographic regions (USDA, 1968). The fluoride levels in all composites except one were analyzed by ashing, followed by diffusion and detection by a fluoride ion-specific electrode.  The oils and fats composite was analyzed by an oxygen bomb reverse extraction procedure (Venkateswarlu, 1975).  The total daily fluoride intake ranged from a high of 0.541 mg/day in Orlando to a low of 0.207 mg/day in Grand Rapids (Table 2-23).  Using an estimated body weight of 8.1 kg for a 6-month-old infant, Ophaug et al. (1980a) calculated a fluoride intake of 0.026 to 0.067 mg/kg/day.

| Table 2-23.  Fluoride Intake (mg F/day) by Infants 6 Months Old in Four Regions of the U.S. | | | | |
|---|---|---|---|---|
| **Food Item** | **South (Orlando)** | **North central (Grand Rapids)** | **Northeast (Philadelphia)** | **West (Los Angeles)** |
| Water | 0.295 | 0.092 | 0.077 | 0.108 |
| Milk | 0.013 | 0.015 | 0.017 | 0.007 |
| Other dairy and formula | 0.060 | 0.024 | 0.016 | 0.073 |
| Meats, fish, poultry | 0.024 | 0.006 | 0.009 | 0.022 |
| Grains/cereals | 0.077 | 0.011 | 0.026 | 0.102 |
| Potatoes | 0.000 | 0.001 | 0.001 | - |
| Vegetables | 0.026 | 0.044 | 0.057 | 0.021 |
| Fruits/juices | 0.028 | 0.014 | 0.011 | 0.012 |
| Oils/fats | - | - | 0.005 | - |
| Sugars, etc. | 0.002 | 0.000 | 0.008 | 0.001 |
| Beverages | 0.016 | - | 0.045 | 0.008 |
| **Total** | **0.541** | **0.207** | **0.272** | **0.354** |

**SOURCE:** Ophaug, 1980a.

Ophaug et al. (1985) estimated dietary fluoride intake of 6-month-old infants in 20 cities across the U.S.  The cities were grouped in one of four geographic regions.  The survey used the same market basket and same composite food groupings as those used in the authors' 1980 publication.  Fluoride levels were determined with a fluoride ion-specific electrode in all but one case; fluoride level in oils and fats was determined using the oxygen bomb reverse extraction procedure.  Dietary fluoride intake from each composite was calculated by multiplying its fluoride content by an estimate of the amount consumed daily.  The fluoride content of the drinking water in the cities where the market baskets were collected ranged from 0.05 to 1.04 mg/L.  Specific information on food and drinking water intakes was not reported.

A summary of the estimated fluoride intakes for 6-month-old infants for each of the study sites in the Ophaug et al. (1985) study is shown in Table 2-24.  Fluoride intake for infants was estimated from an analysis of commercial infant foods processed in fluoridated and non-fluoridated plants. Within each region total fluoride intake was correlated with water fluoride concentration. The highest dietary intake of fluoride occurred in the southern region. The daily fluoride intake from foods (total intake minus that from water and beverages) averaged 0.171 ±0.012 (SE) mg/day and was not correlated with water fluoride level.

Ophaug et al. (1985) assessed their results by concentration of fluoride in drinking water. The mean total dietary intake of fluoride (including beverages) for 6-month old infants ranged from 0.226 mg/day where the fluoride level in drinking water was less than 0.3 mg/L to 0.418 mg/day in areas where the fluoride level was greater than 0.7 mg/L (Table 2-25).

**December 2010**

| Table 2-24.  Estimated Fluoride Intake of 6-Month Old Infants in Different Regions of the U.S. | | | | |
|---|---|---|---|---|
| Region/city (year of sample) | Water F Level | Total F intake | | F Intake in Foods |
| | mg/L | mg/day | mg/kg | mg/day |
| **Northeast:** | | | | |
| Boston, MA (1980) | 1.00 | 0.307 | 0.038 | 0.130 |
| Hartford, CT (1978) | 0.93 | 0.369 | 0.033 | 0.091 |
| Philadelphia, PA (1977) | 0.66 | 0.272 | 0.034 | 0.150 |
| Boston, MA (1977) | 0.10 | 0.305 | 0.038 | 0.227 |
| Manchester, NH (1980) | 0.10 | 0.220 | 0.027 | 0.140 |
| **North Central:** | | | | |
| Grand Rapids, WI (1978) | 1.04 | 0.207 | 0.026 | 0.115 |
| Akron, OH (1981) | 1.01 | 0.251 | 0.031 | 0.162 |
| Fargo, ND (1981) | 0.91 | 0.178 | 0.022 | 0.098 |
| Kansas City, KS (1982) | 0.54 | 0.097 | 0.012 | 0.049 |
| **South:** | | | | |
| Louisville, KY (1980) | 1.00 | 0.642 | 0.079 | 0.164 |
| Chattanooga, TN (1982) | 1.00 | 0.650 | 0.080 | 0.188 |
| Columbia, SC (1979) | 0.80 | 0.582 | 0.072 | 0.208 |
| Orlando, FL (1976) | 0.67 | 0.541 | 0.068 | 0.230 |
| Baton Rouge, LA (1980) | 0.30 | 0.265 | 0.033 | 0.123 |
| **West:** | | | | |
| Boise, ID (1979) | 1.00 | 0.549 | 0.068 | 0.257 |
| Boise ID (1980) | 1.00 | 0.504 | 0.062 | 0.210 |
| Denver, CO (1977) | 0.71 | 0.456 | 0.056 | 0.242 |
| Phoenix, AZ (1982) | 0.50 | 0.354 | 0.044 | 0.205 |
| Los Angeles, CA (1977) | 0.37 | 0.354 | 0.044 | 0.238 |
| Fresno, CA (1981) | 0.10 | 0.239 | 0.030 | 0.201 |
| Tacoma, WA (1981) | 0.05 | 0.204 | 0.025 | 0.179 |
| Sacramento, CA (1980) | 0.05 | 0.163 | 0.020 | 0.147 |
| **OVERALL MEAN** | | | | **0.171** |

SOURCE: Ophaug et al., 1985.

| Table 2-25.  Mean Dietary Fluoride Intake of 6-Month-Old Infants (Ophaug et al., 1985) | | | | | | |
|---|---|---|---|---|---|---|
| Fluoride Conc. | n | mg/day | SEM | n | mg/kg/day | SEM |
| <0.3 ppm | 5 | 0.226[a] | ±0.023 | 5 | 0.028[b] | ±0.003 |
| 0.3-0.7 ppm | 6 | 0.314 | ±0.059 | 6 | 0.039 | ±0.007 |
| >0.7 ppm | 11 | 0.418[a] | ±0.054 | 11 | 0.052[b] | ±0.007 |

SOURCE: Ophaug et al., 1985.
[a]Statistically different at p <0.025.
[b]Statistically different at p <0.025.

Fomon and Ekstrand (1999) estimated fluoride intakes of infants from birth to age 10 months. Fluoride concentrations in infant foods were derived from an earlier study (Fomon and Ekstrand, 1993b), as were estimates of mean energy intakes for specific age groups (Fomon and Ekstrand,

**December 2010**

1993a). Fomon and Ekstrand (1999) give an estimate of 120 mL/kg/day for milk or formula intake by "older infants" (although a specific age range is not given, the implication in the text is that these are infants 4–10 months old). The study authors note that the older infants would also be consuming a small amount of beikost (weaning food) which they estimated would increase in fluoride intake by an average 20 µg/kg/day in most cases. Estimates of fluoride intake from milk and formulas only are shown in Table 2-26.

| Table 2-26. Estimated Fluoride Intake of 4–10 Month Old Infants with Varying Intakes of Milk or Formula | | | | |
|---|---|---|---|---|
| Milk/ Formula | F Concentration (µg/L) | | | F Intake (µg/kg/day) for a Formula Intake of 120 mL/kg/day |
| | Formula | Water | As Fed | |
| Human milk | | | 6 | 1 |
| Cow's milk | | | 40 | 5 |
| **Formula**: | | | | |
| Ready to feed-milk-based | 200 | – | 200 | 24 |
| Conc. liquid-milk-based | 200 | 200 | 200 | 24 |
| | 200 | 1000 | 600 | 72 |
| Isolated soy protein-based | 240 | 200 | 270 | 22 |
| | 240 | 1000 | 620 | 74 |
| Powdered milk-based | 690[a] | 200 | 276[b] | 33 |
| | 690 | 600 | 700 | 84 |
| | 690 | 1000 | 980 | 118 |

SOURCE: Fomon and Ekstrand, 1993b; as modified by Fomon and Ekstrand, 1999.
[a]µg/kg of formula powder.
[b]Assumes that 145 g of formula diluted with 880 mL of water to make 1 liter.

Fomon and Ekstrand (1999) note that infant feeding patterns have changed from the 1960s and 70s to the 1980s and 90s with a trend toward more extended feeding of formula. As a result, prolonged intake of fluoride from formula became more common. A comparison of infant fluoride intakes during these two periods for infants from 4 to 10 months old is shown in Table 2-27. The study authors note that the estimates for the 1960s and early 1970's were based on measurements of fluoride levels in milk and formula made by Fomon and Ekstrand (1993b); and not on measurements from the 1960s and 1970s, and that values are therefore somewhat less than would be the case if calculations had been based on concentrations of fluoride in formulas actually marketed in the 1960s and 1970s.

| Table 2-27. Dietary Fluoride Intake of Infants 4-10 Months Old from the 1960s to the 1990s | | | | |
|---|---|---|---|---|
| Diet | 1960s-and Early 1970s[a] | | 1980s and Early 1990s | |
| | F Intake[b] (µg/kg/day) | Estim. % of Infants | F Intake[b] (µg/kg/day) | Estim. % of Infants |
| Human milk | – | – | 1–37 | 15 |
| Infant formula | 24–118[a] | <20 | 24–118 | 55 |
| Cow's milk | 5 | >80 | 5 | 30 |

SOURCE: Fomon and Ekstrand, 1999.
[a]Based on measurements of fluoride levels in milk and formula made by Fomon and Ekstrand (1993); and not on measurements from the 1960s and 1970s. The study authors note that the values listed are therefore somewhat less than would be the case if calculations had been based on concentrations of fluoride in formulas actually marketed in the 1960s and 1970s.
[b]Fluoride intakes by exclusively breast-fed infants do not exceed 1 µg/kg/day; however, many breast-fed infants also receive formula and the range of intakes in the table includes those of partially breast-fed infants.

Using the same assumptions concerning energy intakes of infants and energy equivalents of infant foods, Fomon et al. (2000) updated the estimates of fluoride intake by infants that were reported by Fomon and Ekstrand (1999). The study authors also included estimates of fluoride intake from formulas prepared at home with evaporated milk. These estimates are shown in Table 2-28.

| Table 2-28.  Updated Estimated Fluoride Intake of 4-10 Month Old Infants with Varying Intakes of Milk and Formula (Fomon et al., 2000) | | | | |
|---|---|---|---|---|
| **Milk/ Formula** | **F Concentration (µg/L)** | | | **F Intake (µg/kg/day)** |
| | **Formula** | **Water** | **As Fed** | **120 mL/kg/day** |
| Human milk | | | 6 | 1 |
| Cow's milk | | | 40 | 5 |
| **Formulas:** | | | | |
| Home prepared evaporated milk formula[a] | 90 | 200 | 155 | 19 |
| | 90 | 1000 | 632 | 76 |
| Ready to feed-milk-based | – | – | 200 | 24 |
| Conc. liquid-milk-based | 200 | 200 | 200 | 24 |
| | 200 | 1000 | 600 | 72 |
| Isolated soy protein-based | 250 | 200 | 225 | 27 |
| | 250 | 1000 | 625 | 75 |
| Powdered milk-based | 690[b] | 200 | 262[c] | 31 |
| | 690[b] | 1000 | 966[c] | 116 |

[a]Assumes 0.39L of evaporated milk to 0.57 L of water (also includes formulas made with fresh milk)
[b]µg/kg of formula powder.
[c]Assumes that 125 g of formula diluted with 880 mL of water makes 1 liter of formula as fed.

Siew et al. (2009) measured fluoride levels in different types of infant formula (see Table 2-4), and estimated the daily fluoride intake for age-groups from birth to 12 months. Based on body weight and formula intake data for male and female infants (Table 2-29), Siew et al. (2009) reported that female infants would have a slightly greater intake of fluoride than male infants.

| Table 2-29.  Volume of Formula Consumed and Body Weights from Birth to 12 Months (Siew et al., 2009) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Age (months)** | **Formula intake (ounces)[a]** | **Body weights (kg)** | | | | | |
| | | **Girls** | | | **Boys** | | |
| | | **10th Percent.** | **50th Percent.** | **90th Percent.** | **10th Percent.** | **50th Percent.** | **90th Percent.** |
| 0–4 | 21–29 | 2.7–5.2 | 3.4-6.2 | 4.0-7.1 | 2.8-5.7 | 3.6-6.7 | 4.2-7.8 |
| 4–6 | 29–32 | 5.2–6.2 | 6.2-7.2 | 7.1-8.4 | 5.7-6.8 | 6.7-7.9 | 7.8-9.2 |
| 6–9 | 30–32 | 6.2–7.4 | 7.2-8.5 | 8.4-9.8 | 6.8-8.0 | 7.9-9.3 | 9.2-10.8 |
| 9–12 | 24–30 | 7.4–8.3 | 8.5-9.5 | 9.8-11.0 | 8.0-9.0 | 9.3-10.3 | 10.8-11.9 |

SOURCE: Siew et al. 2009.
[a] Derived from Hendricks and Duggan's Manual of Pediatric Nutrition.

Total fluoride intake for female infants was then calculated from both the amount of fluoride ingested from the water used to reconstitute the formula (0.0, 0.4, 0.5, 0.7 or 1.0 ppm fluoride) and from the formula itself. Results showed that the formulas themselves did not contain fluoride at levels high enough to exceed an intake of 0.10 mg/kg/day with normal consumption.

It was estimated that a minimal risk of exceeding 0.1 mg/kg/day would exist with a fluoride drinking water level of 0.5 ppm.  If the drinking water contained 1 ppm fluoride, infants consuming powdered formula reconstituted with this water would exceed a fluoride intake of 0.1 mg/kg/day.  However, it should be recognized that fluoride is a nutrient and reconstitution of infant formulas with water containing lower levels of fluoride may result in infants not consuming the Adequate Intake for fluoride (0.5 mg/day) established by the Institute of Medicine (1997).  The American Dental Association (2007) recommends "Parents and caregivers should consult with their dentist, pediatrician or family physician regarding the most appropriate water to use in their area to reconstitute infant formula".  The ADA (2007) publication informs users of liquid concentrate or powdered infant formula as the primary source of nutrition that can "be mixed with water that is fluoride free or contains low levels of fluoride to reduce the risk of fluorosis".

### 2.5.3.  Children to 14 Years of Age

The fluoride exposure estimates for children up to 14 years of age come from three types of studies.  Most have used the Market Basket approach but there are also two that use dietary records of beverage intake to estimate the fluoride from beverages only and two that employed a duplicate plate methodology.  The Market Basket-type studies are presented first followed by the two using the dietary records and then the duplicate plate studies.

**Market Basket Studies**.  Ophaug et al. (1980b) estimated the daily fluoride intake of 2-year-old children residing in four regions of the United States (Table 2-30).

| Table 2-30.  Fluoride Intake (mg F/day) by Children 2 Years Old in Four Regions of the U.S. | | | | |
|---|---|---|---|---|
| **Food Item** | **South (Orlando)** | **North central (Grand Rapids)** | **Northeast (Philadelphia)** | **West (Los Angeles)** |
| Water | 0.274 | 0.302 | 0.206 | 0.136 |
| Milk | 0.009 | 0.011 | 0.011 | 0.010 |
| Other dairy and formula | 0.005 | 0.013 | 0.011 | 0.006 |
| Meats, fish, poultry | 0.060 | 0.051 | 0.057 | 0.023 |
| Grains/cereals | 0.023 | 0.042 | 0.029 | 0.055 |
| Potatoes | 0.001 | 0.005 | 0.004 | 0.006 |
| Vegetables | 0.016 | 0.011 | 0.016 | 0.016 |
| Fruits/juices | 0.021 | 0.042 | 0.020 | 0.020 |
| Oils/fats | 0.004 | 0.008 | 0.002 | 0.002 |
| Sugars, etc. | 0.008 | 0.014 | 0.008 | 0.010 |
| Beverages | 0.133 | 0.111 | 0.046 | 0.031 |
| **Totals     (mg/day)** | **0.554** | **0.610** | **0.410** | **0.315** |
| **(mg/kg/day)** | **0.044** | **0.049** | **0.033** | **0.025** |

SOURCE: Ophaug, 1980b.

This study was identical in methodology to that conducted by Ophaug et al. (1980a) for 6-month-old infants, but was based on the FDA toddler market basket food collections for 1977 and 1978.

The foods were placed in the same 11 composite food groups according to Shopping and Compositing Guides representing an average 14-day consumption of 2-year-old children. The Shopping and Composite Guides were based on data obtained by the U.S. Department of Agriculture survey of food consumption made in 1965 to 1966 for each of the geographic regions. The fluoride levels in all composites except one were analyzed by ashing, followed by diffusion and detection by a fluoride ion-specific electrode. The oils and fats composite was analyzed by an oxygen bomb reverse extraction procedure (Venkateswarlu, 1975). The total daily fluoride intake ranged from a low of 0.315 mg/day for Los Angeles to a high of 0.610 mg/day for Grand Rapids. The intake per unit body weight ranged from 0.025 mg/kg/day to 0.049 mg/kg/day.

Ophaug et al. (1985) continued the studies of Ophaug et al. (1980b) by evaluating dietary fluoride intake of 2-year-old children in 20 cities across the U.S. (Table 2-31).

| Table 2-31.  Dietary Fluoride Intake of an Average 2-Year-Old Child | | | | |
|---|---|---|---|---|
| City (year of sample) | Water F Level | Total F intake | | Foods |
| | (mg/L) | (mg/day) | (mg/kg) | (mg/day) |
| Northeast: | | | | |
| Boston, MA (1980) | 1.00 | 0.475 | 0.038 | 0.125 |
| Hartford, CT (1978) | 0.93 | 0.507 | 0.041 | 0.141 |
| Philadelphia, PA (1977) | 0.66 | 0.410 | 0.033 | 0.158 |
| Boston, MA (1977) | 0.10 | 0.348 | 0.028 | 0.314 |
| Manchester, NH (1979) | 0.10 | 0.182 | 0.014 | 0.132 |
| North Central: | | | | |
| Grand Rapids, WI (1978) | 1.04 | 0.607 | 0.049 | 0.194 |
| Akron, OH (1981) | 1.01 | 0.682 | 0.055 | 0.190 |
| Fargo, ND (1981) | 0.91 | 0.504 | 0.040 | 0.155 |
| Kansas City, KS (1982) | 0.54 | 0.376 | 0.040 | 0.150 |
| South: | | | | |
| Louisville, KY (1980) | 1.00 | 0.880 | 0.070 | 0.150 |
| Chattanooga, TN (1982) | 1.00 | 0.784 | 0.063 | 0.191 |
| Columbia, SC (1979) | 0.80 | 0.718 | 0.057 | 0.211 |
| Orlando, FL (1976) | 0.67 | 0.554 | 0.044 | 0.147 |
| Baton Rouge, LA (1980) | 0.30 | 0.310 | 0.025 | 0.107 |
| West: | | | | |
| Boise, ID (1979) | 1.00 | 0.537 | 0.043 | 0.127 |
| Boise ID (1980) | 1.00 | 0.568 | 0.045 | 0.173 |
| Denver, CO (1977) | 0.71 | 0.566 | 0.045 | 0.244 |
| Phoenix, AZ (1982) | 0.50 | 0.350 | 0.028 | 0.138 |
| Los Angeles, CA (1977) | 0.37 | 0.315 | 0.025 | 0.148 |
| Fresno, CA (1981) | 0.10 | 0.197 | 0.016 | 0.144 |
| Tacoma, WA (1981 | 0.05 | 0.162 | 0.013 | 0.116 |
| Sacramento, CA (1980) | 0.05 | 0.146 | 0.012 | 0.124 |
| **OVERALL MEAN** | | | | **0.163** |

SOURCE: Ophaug et al., 1985.

This study was based on FDA market food basket collections obtained during 1977–1982. The methodology was the same as that described above. The fluoride content of the drinking water in the cities where the market baskets were collected ranged from 0.05 to 1.04 mg/L. A summary of the fluoride intakes is given in Table 2-31. Fluoride dietary intake was highly correlated with water fluoride level with correlation coefficients $\geq 0.72$. The highest dietary intake occurred in the southern region, and was reported to be a reflection of greater consumption of water and beverages (551 g/day vs. 383-426 g/day in the other regions). The daily fluoride intake from foods (total intake minus that from water and beverages) averaged $0.161 \pm 0.010$ (SE) mg/day, and was not correlated with water fluoride level.

Mean total dietary intakes (including beverages) based on fluoride levels in drinking water are shown in Table 2-32. Mean fluoride intake increased with increase in fluoride concentration in drinking water.

| Table 2-32.  Mean Dietary Fluoride Intake of 2-Year-Olds | | | | | | |
|---|---|---|---|---|---|---|
| Fluoride Concentration in Drinking Water | n | mg/day | SEM | n | mg/kg/day | SEM |
| <0.3 ppm | 5 | 0.207[b,c] | ±0.036 | 5 | 0.017[e,f] | ±0.003 |
| 0.3-0.7 ppm | 6 | 0.386[a,c] | ±0.037 | 6 | 0.031[d,f] | ±0.003 |
| >0.7 ppm | 11 | 0.621[a,b] | ±0.039 | 11 | 0.050[d,e] | ±0.003 |

SOURCE: Ophaug et al., 1985.

[a]Statistically different at the p <0.0025.
[b]Statistically different at the p <0.0005.
[c]Statistically different at the p <0.005.
[d]Statistically different at the p <0.0025.
[e]Statistically different at the p <0.0005.
[f]Statistically different at the p <0.005.

Dabeka and McKenzie (1995) surveyed fluoride levels in various foods obtained in 1987 in Winnipeg, Canada. The foods were prepared for consumption and combined into 113 composites and 39 composite subsets using a Total Diet Study approach. The water used to prepare the foods contained 1 mg F/L. Fluoride was determined with a fluoride ion-specific electrode after microdiffusion. As reported in Dabeka et al. (1993), food intake data (g/person/day) for each of food composites was obtained from the Nutrition Canada Survey (Bureau of Nutritional Sciences, 1977) for the age groups of 1–4, 5–11, and 12–19 yr. Total dietary intake of fluoride (excluding plain drinking water) was estimated to be 0.353 mg/day for boys and girls 1–4 years old; 0.530 mg/day for boys and girls 5–11 years old; 1.025 mg/day for boys 12–19 years old; and 0.905 mg/day for girls 12–19 years old.

The fluoride content of 441 brand-name food items purchased in both a non-fluoridated community (Connersville, IN, fluoride 0.16 ±0.01 mg F/L) and in a fluoridated community (Richmond, IN, 0.90 ±0.05 mg F/L) (see Section 3.1.2) were evaluated by Jackson et al. (2002). A modified validated Food Frequency Questionnaire was administered to determine the 75 foods and beverages most commonly eaten by adolescents (ages 12–14) in these communities. Frequency of ingestion was weighted from 1 for less than monthly to 9 for two or more times per day. Parents of the children were interviewed to determine the outcome of the Frequency Recall and asked to identify the brand names of the foods and beverages most often purchased. Food samples were purchased in each community (grocery stores and restaurants) and prepared using

community water in cases where preparation was necessary.  Foods were grouped for analysis based on the USDA classification (1998).  [Note: According to USDA (1998), the beverages group excludes plain water and noncarbonated bottled water].  Homogenates of each food group were analyzed for their fluoride content and used to estimate exposure for 3–5 year old children.

Mean fluoride intakes were derived from the fluoride content of each food group homogenate using age and gender-specific mean food intakes from the Midwest regional data from the USDA (1998) CSFII survey (Table 2-33). Mean fluoride intake was 0.454 mg/day in Connersville, IN and 0.536 mg in Richmond, IN (Note: fluoride intake from consumption of drinking water was not included in the calculation).

| Table 2-33.  Estimated Fluoride Intake of  3- to 5-Year-Old Children Living in a Nonfluoridated and Fluoridated Community | | | | | |
|---|---|---|---|---|---|
| **Food Category** | **Food intake (g/day)[a]** | **Connersville, IN (F = 0.16 mg/L)** | | **Richmond, IN (F = 0.9 mg/L)** | |
| | | **F Content ($\mu$g/g)[b]** | **F Intake ($\mu$g/day)[b]** | **F Content ($\mu$g/g)[b]** | **F Intake ($\mu$g/day)[b]** |
| Grains and cereal products | 264 | 0.44 | 116.16 | 0.55 | 145.20 |
| Vegetables | 90 | 0.26 | 23.40 | 0.28 | 25.20 |
| Fruits | 213 | 0.13 | 27.69 | 0.11 | 23.43 |
| Dairy Products | 387 | 0.35 | 135.45 | 0.28 | 108.36 |
| Meat, poultry | 64[d] | 0.35 | 22.40 | 0.37 | 23.68 |
| Nuts and seeds | 5 | 0.14 | 0.70 | 0.18 | 0.90 |
| Fats and oils | 5 | 0.24 | 1.20 | 0.25 | 1.25 |
| Sugars and sweets | 45 | 0.24 | 10.80 | 0.35 | 15.75 |
| Beverages[c] | 291 | 0.40 | 116.40 | 0.66 | 192.06 |
| **Total** | **1010** | | **454.20** | | **535.83** |

**SOURCE:** Jackson et al., 2002.
[a]USDA, 1998.
[b]Mean values.
[c]Plain drinking water is not included in the category according to USDA (1998).
[d]USDA (1998) lists 99 grams/day for this age group for the mid-west region of the US; however, in Jackson et al. (2002) it is given as 64 grams/day.

Since the USDA (1998) percentile intake distributions for food groups were not available to the researchers, an upper bound estimate of fluoride intake was calculated using the mean intake and the 90th percentile data for fluoride concentration in each food group.  Jackson et al. (2002) calculated that the upper bound fluoride intake would be 0.925 mg/day (0.058 mg/kg/day) in Connersville and 0.999 mg/day (0.062 mg/kg/day) in Richmond.

Jackson et al. (2002) determined exposure data only for the 3–5 year old age group because of their vulnerability to dental fluorosis.  However, because the food frequency recall data that supported the market baskets were collected from adolescents, the analytical data on fluoride levels in the food groups can be combined with food group intake information from USDA (1998) to provide estimates for the 6–11 and 12–19 year age groups.  Tables 2-34 and 2-35

below provide the results of these calculations for Connersville and Richmond. The extrapolated estimates for both age groups are supported by the results from the Dabeka and McKenzie (1995) Canadian Study.

| Food Category[a] | Mean F Content ($\mu$g/g)[b] | 6-11 yr olds (average for males and females) | | 12-19 yr olds (average for males and females) | |
|---|---|---|---|---|---|
| | | Food intake[c] (g/day) | Fluoride Intake[d] ($\mu$g/day) | Food Intake[c] (g/day) | Fluoride Intake[d] ($\mu$g/day) |
| Grains/cereal products | 0.44 | 309 | 136 | 363 | 159.7 |
| Vegetables | 0.26 | 119 | 31.0 | 170.5 | 44.3 |
| Fruits | 0.13 | 163.5 | 21.3 | 144.5 | 18.8 |
| Dairy Products | 0.35 | 435 | 152.3 | 403.5 | 141.2 |
| Meat, poultry | 0.35 | 139.5 | 48.8 | 227 | 79.5 |
| Nuts and seeds | 0.14 | 5 | 0.7 | 3 | 0.4 |
| Fats and oils | 0.24 | 8.5 | 2.0 | 11.5 | 2.8 |
| Sugars and sweets | 0.24 | 53 | 12.7 | 42.5 | 10.2 |
| **BEVERAGES**[e] | 0.40 | 407.5 | **163** | 959.5 | **383.7** |
| **TOTAL F INTAKE** | | | **567.9** | | **840.7** |
| **F INTAKE FROM FOOD [(Total) – (beverages)]** | | | **404.8** | | **457** |

Table 2-34. Estimated Fluoride Intake of 6 to 11 and 12 to 19 Year Olds Living in a Nonfluoridated Community

[a]Food categories of eggs and legumes are listed in USDA (1998), but are not included in Jackson et al. (2002)
[b]Mean values (Jackson et al., 2002).
[c]USDA (1998; survey data from 1994-1996; mean food intake values).
[d]Fluoride intake calculated as fluoride concentration in food category ($\mu$g/g) multiplied by food intake (g/day).
[e]Plain drinking water is not included in the beverage category according to USDA (1998).

**Dietary Record Studies.** Three-day beverage records of Grade 6 children (average age 11.94 yr) in two towns in Canada were used to document daily means of the highest and lowest fluoride intake from beverages (Clovis and Hargreaves, 1988). The study was conducted in a town with a fluoridated water supply (average adjusted fluoride concentration of 1.08 mg/L) and in one without fluoride added to the water (0.23 mg F/L). The three highest and three lowest beverage intakes (including drinking water) were used to estimate the range of fluoride intakes in the two communities. In the nonfluoridated community, the probable fluoride intake ranged from 0.00–0.03 mg from milk, 0.02–0.43 mg from water, 0.08–0.69 mg from carbonated beverages; 0.01–0.14 mg from reconstituted juices; and 0.08–0.09 mg from other types of drinks. The total fluoride intake from beverages ranged from 0.02 to 0.82 mg. For the fluoridated community, the probable fluoride intake ranged from 0.00–0.05 mg from milk, 0.07–0.25 mg from water, 0.1–0.93 mg from carbonated beverages; 0.21–0.35 mg from reconstituted juices; and 0.07–1.76 mg from other types of drinks. The total fluoride intake from beverages ranged from 0.40 to 2.45 mg.

| Food Category[a] | Mean F Content (μg/g)[b] | 6-11 yr olds (average for males and females) | | 12-19 yr olds (average for males/females) | |
|---|---|---|---|---|---|
| | | Food intake[c] (g/day) | Fluoride Intake[d] (μg/day) | Food Intake[c] (g/day) | Fluoride Intake[d] (μg/day) |
| Grains/cereal products | 0.55 | 309 | 170.0 | 363 | 199.7 |
| Vegetables | 0.28 | 119 | 33.3 | 170.5 | 47.7 |
| Fruits | 0.11 | 163.5 | 18.0 | 144.5 | 15.9 |
| Dairy products | 0.28 | 435 | 121.8 | 403.5 | 113.0 |
| Meat, poultry | 0.37 | 139.5 | 51.6 | 227 | 84.0 |
| Nuts and seeds | 0.18 | 5 | 0.9 | 3 | 0.5 |
| Fats and oils | 0.25 | 8.5 | 2.1 | 11.5 | 2.9 |
| Sugars and sweets | 0.35 | 53 | 18.6 | 42.5 | 14.9 |
| **BEVERAGES**[e] | 0.66 | 407.5 | **269.0** | 959.5 | **633.3** |
| **TOTAL F INTAKE** | | | 685.3 | | 1111.9 |
| **F INTAKE FROM FOOD [(Total) – (beverages)]** | | | **416.3** | | **478.6** |

**Table 2-35.  Estimated Fluoride Intake of 6 to 11 and 12 to 19 Year Old Children Living in a Fluoridated Community**

[a]Food categories of eggs and legumes are listed in USDA (1998), but are not included in Jackson et al. (2002)
[b]Mean values (Jackson et al., 2002).
[c]USDA (1998; survey data from 1994-1996; mean food intake values).
[d]Fluoride intake calculated as fluoride concentration in food category (μg/g) multiplied by food intake (g/day).
[e]Plain drinking water is not included in the beverage category according to USDA (1998).

Pang et al. (1992) studied fluoride intake of 225 children, ages 2–10 years, living in North Carolina.  Data on beverage intake was collected by means of three-day diary records kept during April, May or June, 1990.  Concentrated fruit juices, fruit drinks, and teas were prepared with deionized water. Total fluid intake was 970–1,240 mL/day, and consumption of soft drinks, juices, tea, and other beverages 585–756 mL/day.  Of the total fluid consumption, milk and water constituted 36–40%.  Fluoride was determined by the microdiffusion method and a fluoride ion-specific electrode.  Fluoride concentrations in the beverages ranged from nondetectible to 6.7 mg/L; mean concentrations were 0.74 mg/L for soda, 0.36 mg/L for juices, 0.33 mg/L for punches, 2.56 mg/L for teas, and 0.85 mg/L for Gatorade.  The estimated average fluoride intake (±SD) from beverages (excluding milk, plain water and beverages listed less than five times in the diaries) for children ages 2–3, 4–6, and 7–10 years were 0.36±0.31, 0.54±0.52, and 0.60±0.48 mg/day, respectively.  The maximum fluoride intakes for individual children within these groups were 1.40, 2.39, and 2.00 mg/day, respectively.  The study authors note that fluoride levels were high in grape juice (maximum 1.6 ppm) and also in teas (mostly 2–3 ppm, and with a maximum of 6.5 ppm).

Levy et al. (2003a) estimated an average fluoride intake of 0.2 mg/day from beverages, not including plain drinking water, for 785 three to six year olds. Parents were asked to periodically

complete modified food frequency questionnaires which assessed numbers and sizes of daily servings of different categories of beverages and foods made with water. There was no direct verification of the data reported by the parents in the questionnaires. The 90th percentile estimate was about 0.5 mg/day.

**Duplicate Diet/Plate Analyses.**  Rojas-Sanchez et al. (1999) estimated fluoride intakes from foods and beverages (and dentifrice) consumed by children (16–40 months old; about 1.3 to 3.3 years old) living in three different communities using a duplicate plate methodology.  The three communities differed in the fluoride concentration of their water supply: 1) a low-fluoride community (San Juan, Puerto Rico; ≤0.3 mg F/L); 2) a fluoridated community (Indianapolis, IN, 0.8–1.2 mg F/L); and 3) a "halo" community (Connersville, IN, ≤0.3 mg F/L) in the distribution region for Indianapolis.  All participating children were required to be healthy, attend a certified, commercial-, community- or church-based day-care center on a full-time basis, and have parental consent and cooperation.  The day-care water source was required to have a fluoride concentration similar to the community water supply. Duplicate plate samples of all foods consumed (after visual adjustment for plate waste) on one or two day-care days and one weekend home day were collected and conglomerated for analysis.  Beverages were kept separate from solid foods.

Water samples were analyzed for fluoride using a combined fluoride ion-specific electrode and pH/ion meter calibrated with a series of standards.  Food samples were analyzed for fluoride using the HMDS-microdiffusion method of Taves (1968b) as modified by Dunipace et al. (1995).  All samples were analyzed in duplicate, and the reliability of measurements was determined using the Intraclass Correlation Coefficient, the values of which were estimated from the variance components of an ANOVA model.  Mean fluoride intake from food was 0.116-0.146 mg/day (Table 2-36) with no significant difference between communities.  Intake from beverages (including drinking water) was estimated to be 0.103, 0.257, and 0.396 mg/day for the low-fluoride, halo, and fluoridated communities; differences between the towns were statistically significant ($p < 0.05$) as determined by one-way ANOVA.  Based on mean values, total dietary fluoride intake (including drinking water) was 0.219 mg/day in San Juan, 0.389 mg/day in Connersville, and 0.544 mg/day in Indianapolis.

| Table 2-36.  Dietary Fluoride Intake of 16-40 Month Old Children | | | | | |
|---|---|---|---|---|---|
| **City** | **F in DW** | **N** | **F Intake[a] from Foods (µg/day)** | **F Intake[a] from Beverages (µg/day)** | **Total Dietary F Intake (µg/day)[d]** |
| San Juan, PR | ≤0.3 mg/L | 11 | 116±24[b] | 103±22[c] | 219 |
| Connersville, IN | ≤0.3 mg/L | 14 | 132±16[b] | 257±59[c] | 389 |
| Indianapolis, IN | 0.8-1.2 mg/L | 29 | 146±17[b] | 396±52[c] | 542 |

**SOURCE:** Rojas-Sanchez et al., 1999.
[a]Mean ± SEM.
[b]Not significantly different from each other ($p > 0.05$; one-way ANOVA).
[c]Significantly different, $p < 0.05$.
[d]Total of mean values.

Using a duplicate plate method, Brunetti and Newbrun (1983), evaluated the fluoride dietary intake and output of a group of 10 children (4 boys and 6 girls) ages 3 and 4 years, living in an

optimally fluoridated community (study location and fluoride concentration in drinking water not reported). The diet of the children was unrestricted except that they were not allowed to chew gum. Duplicates of all food and fluid served and any leftovers by each child were collected and pooled every 24 hr. Intake was measured by subtracting leftovers from food served. Samples were assayed for fluoride using a diffusion method. The reported average dietary intake of fluoride was 0.33 (±0.14) mg F/day (food and beverage). Fluoride output (assumed to be based on urinary excretion) was reported to be 0.28 (±0.08) mg F/day.

### 2.5.4. Older Children and Adults

Exposure estimates for older children and adults are based on market basket and duplicate-plate types of studies. As was the case in Sections 2.5.2 and 2.5.3, the data from Market Basket-type analyses are presented first. Summaries that utilized the duplicate plate-type of approach follow.

**Market Basket Studies.** San Filippo and Battistone (1971) calculated the fluoride content of representative diets of 16–19 year-old males. Food items were obtained in Baltimore, MD from a market basket program conducted by the FDA on four separate occasions in 1967 and 1968. The food items were purchased in local supermarkets and prepared "in a manner representative of preparation at home" using the local fluoridated water. The food items for a two-week period were weighed to the nearest gram (wet weight) and then separated into 12 commodity groups. The commodity groups were homogenized and analyzed on a composite basis using microdiffusion and a colorimetric analysis. For most groups, the final values were averages of triplicate analyses. Results are shown in Table 2-37. Analysis of the Baltimore water supply indicated that the fluoride level ranged from 0.99 to 1.1 mg/L.

The daily contribution of each commodity group was an average of the two-week content. The data indicated an average total daily intake of 2.09–2.34 mg fluoride. Beverages contributed 61% to the total (1.28–1.46 mg/day), and all other food stuffs including those prepared with milk or water contributed 39% (0.78–0.9 mg/day). San Filippo and Battistone (1971) note that in their study the fluoride intake from the food ranged from 0.8 to 0.9 mg/day, an increase of about 0.5 mg over the intake from areas containing low fluoride in the drinking water reported in other studies (McClure, 1949 and Cholak, 1959).

Singer et al. (1980) evaluated the total daily dietary fluoride intake of 16–19 year-old males living in four geographic regions of the United States. Fluoride content of FDA composite "market basket collections" made in 1975 and 1977 were used in the analysis (USFDA, 1977). Food collections consisted of 117 items placed in 12 composite groups. The diets were based on Department of Agriculture (USDA, 1968, 1972) regional food consumption surveys. Fluoride in the food items was determined for ashed and unashed samples using ion-specific electrode and colorimetric (eriochromecyanine R) procedures. Total daily dietary fluoride intake, excluding drinking water (see Singer et. al., 1985), ranged from 0.912 mg in Kansas City to 1.720 mg in Atlanta (Table 2-38). Average and total mean fluoride intake for all four cities combined is 1.211 mg/kg/day (Table 2-39). Beverages contributed 65% of the total.

| Table 2-37.  Fluoride Content of Four Two-week Representative Diets for Teens 16-19 Years Old | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Commodity Group** | **Diet #1** | | **Diet #2** | | **Diet #3** | | **Diet #4** | |
| | mg F /2 wk | mg F /day | mg F /2 wk | mg F /day | mg F /2 wk | mg F /day | mg F /2 wk | mg F /day |
| Dairy | 2.47 | 0.18 | 2.66 | 0.19 | 1.86 | 0.13 | 1.34 | 0.10 |
| Meats, fish, poultry | 2.03 | 0.15 | 4.20 | 0.30 | 4.38 | 0.31 | 1.52 | 0.11 |
| Grain and cereal products | 3.06 | 0.22 | 2.77 | 0.20 | 1.64 | 0.12 | 4.09 | 0.29 |
| Potatoes | 0.34 | 0.02 | 0.49 | 0.04 | 0.49 | 0.04 | 1.32 | 0.09 |
| Leafy vegetables | 0.52 | 0.04 | 0.37 | 0.03 | 0.34 | 0.02 | 0.94 | 0.07 |
| Legume vegetables | 0.28 | 0.02 | 0.14 | 0.01 | 0.18 | 0.01 | 0.28 | 0.02 |
| Root vegetables | 0.09 | 0.01 | 0.05 | 0.01 | 0.07 | 0.01 | 0.27 | 0.02 |
| Garden fruits | 1.11 | 0.08 | 0.19 | 0.01 | 0.14 | 0.01 | 0.45 | 0.03 |
| Fruits | 0.43 | 0.03 | 0.50 | 0.04 | 0.56 | 0.04 | 0.49 | 0.04 |
| Oils, fats and shortening | 1.27 | 0.09 | 0.34 | 0.02 | 0.36 | 0.03 | 0.18 | 0.01 |
| Sugar, salt, candy | 0.53 | 0.04 | 0.83 | 0.06 | 0.92 | 0.07 | 0.68 | 0.05 |
| Beverages: tea, coffee, soft drinks, water | 20.38 | 1.46 | 17.89 | 1.28 | 18.31 | 1.31 | 18.51 | 1.32 |
| **Totals** | **32.51** | **2.34** | **30.43** | **2.18** | **29.25** | **2.09** | **30.07** | **2.15** |

**SOURCE:** San Filippo and Battistone, 1971.

| Table 2-38.  Average Daily Fluoride Intake of 16-19 Year Olds Residing in Four Cities | | | | |
|---|---|---|---|---|
| **Commodity Group** | **San Francisco, CA** | **Buffalo, NY** | **Atlanta, GA** | **Kansas City, KS** |
| | mg F/day | mg F/day | mg F/day | mg F/day |
| Dairy | 0.035 | 0.039 | 0.052 | 0.040 |
| Meats, fish, poultry | 0.058 | 0.058 | 0.239 | 0.084 |
| Grain and cereal products | 0.138 | 0.167 | 0.168 | 0.126 |
| Potatoes | 0.022 | 0.013 | 0.021 | 0.022 |
| Leafy vegetables | 0.007 | 0.007 | 0.009 | 0.005 |
| Legume vegetables | 0.011 | 0.017 | 0.032 | 0.023 |
| Root vegetables | 0.003 | 0.004 | 0.003 | 0.003 |
| Misc. vegetables | 0.011 | 0.011 | 0.011 | 0.013 |
| Fruits | 0.013 | 0.031 | 0.015 | 0.013 |
| Oils, fats | 0.017 | 0.011 | 0.011 | 0.011 |
| Sugars, adjuncts | 0.018 | 0.020 | 0.026 | 0.028 |
| Beverages | 0.882 | 0.610 | 1.133 | 0.544 |
| **Totals[a]** | **1.215** | **0.988** | **1.720** | **0.912** |

**SOURCE:** Singer et al., 1980.

[a]Singer et al., 1985, state that the total daily fluoride intake reported in Singer et al., 1980, did not include fluoride ingested in drinking water.

| Table 2-39.  Daily Fluoride Intake Based on Composite Diets | | |
|---|---|---|
| **Category** | **Fluoride Intake (mg/day)** | |
| | **Mean** | **SD** |
| Dairy products | 0.042 | 0.007 |
| Meat, fish and poultry | 0.110 | 0.087 |
| Grains and cereal products | 0.150 | 0.021 |
| Potatoes | 0.020 | 0.004 |
| Leafy vegetables | 0.007 | 0.002 |
| Legume vegetables | 0.021 | 0.009 |
| Root vegetables | 0.003 | 0.001 |
| Garden Fruits | 0.012 | 0.001 |
| Fruits | 0.018 | 0.009 |
| Oils and fats | 0.013 | 0.003 |
| Sugars, etc. | 0.023 | 0.005 |
| Beverages | 0.792 | 0.270 |
| **Total Intake** | **1.211** | |

**SOURCE:** Singer et al., 1980.

In a continuation of the studies of Singer et al. (1980), Singer et al. (1985) utilized 24 FDA market basket collections made between 1975 and 1982 to again evaluate total daily fluoride intake of 15–19 year-olds living in the same four geographic regions of the United States.  Food collections (24 "market baskets") consisted of 117 items placed in the same 12 composite groups.  The diets used by Singer et al. (1985) were based on the USDA's Food Consumption Surveys of 1968 and 1972, and the USFDA (1977) Compliance Program Guidance Manual, extrapolated to reflect the Recommended Daily Allowance (RDA) for the average young adult male (2800 kcal).  Fluoride in the composites was determined on diffusates of ashed samples with a fluoride ion-specific electrode.

Total fluoride intake ranged from 0.46 to 2.04 mg/day in eight cities in the West; 0.93 to 2.45 mg/day for four cities in the South; 0.80 to 1.92 mg/day for four cities in the North Central part of the country; and 1.47 to 1.94 mg/day for 3 cities in the North East.  Singer et al. (1985) separated their data on the basis of the fluoride level in the municipal drinking water of each city to determine the impact of fluoride concentration in tap water on total fluoride intake (Table 2-40).  Foods, exclusive of beverages and drinking water, contributed a mean fluoride intake of 0.27–0.37 mg/day (overall mean 0.33 mg/day).  Singer et al. (1985) noted that a basal diet in a nonfluoridated region of the United States contained 0.43 mg of fluoride as reported by Maheshwari et al., 1981.

| Table 2-40.  Average Daily Fluoride Intake (mg/day) of 16-19 Year Olds | | | | |
|---|---|---|---|---|
| **Commodity Group** | **Fluoride Concentration of Municipal Water** | | | |
| | **< 0.3 mg/L** | **0.3-0.7 mg/L** | **>0.7 mg/L** | **<0.1 to 1.3 mg/L** |
| | **(0.14 ±0.03)[a]** **(n = 5)[b]** | **(0.56 ±0.05)[a]** **(n = 11)[b]** | **(1.04 ±0.05)[a]** **(n = 8)[b]** | **(n =24)[b]** |
| Total dietary | 0.86 ±0.14 | 1.39 ±0.13 | 1.85 ±0.11 | NR |
| Beverages and Water | 0.59 ±0.12 | 1.06 ±0.11 | 1.48 ±0.08 | NR |
| Food only | 0.27 ±0.03 | 0.33 ±0.03 | 0.37 ±0.05 | 0.33 ±0.02 |

**SOURCE:** Singer et al., 1985.

NR. Not reported.

[a]Mean F concentration ±SEM.

[b]Number of market baskets.

Based on a 6-day survey of a regular hospital diets (location not specifically mentioned, but presumed to be in the Rochester, NY area, as the affiliation of the researchers was the University of Rochester), and using information on fluoride levels in 93 foods and beverages (see Section 2.2.2), Taves (1983) calculated a mean total daily fluoride intake of 1.783 mg, of which 1.383 mg (78%) was provided by beverages (Table 2-41).  Tea was the major contributor to the intake from beverages. The author notes that drinking water was not taken into account in the study, but that the tap water used in the preparation of the hospital foods was fluoridated.  The fluoride level in the tap water was not reported.

| Table 2-41.  Daily Fluoride Intake based on 6-day Hospital Diets | | |
|---|---|---|
| **Category** | **Fluoride Intake (mg/day)** | |
| | **Mean** | **SD** |
| Dairy Products | 0.013 | 0.000 |
| Meat, fish and poultry | 0.044 | 0.035 |
| Grains and cereal products | 0.241 | 0.153 |
| Potatoes | 0.018 | NR |
| Leafy vegetables | 0.027 | 0.019 |
| Legume vegetables | 0.037 | NR |
| Root vegetables | 0.010 | NR |
| Garden Fruits | 0.000 | NR |
| Fruits | 0.006 | NR |
| Oils and fats | 0.003 | 0.001 |
| Sugars, etc. | 0.001 | 0.000 |
| Beverages | 1.383 | 0.041 |
| **Total Intake** | **1.783** | |

**SOURCE:** Taves, 1983.

NR, Not reported

Dabeka and McKenzie (1995) surveyed fluoride levels in various foods obtained in 1987 in Winnipeg, Canada.  The foods were prepared for consumption and combined into 113 composites and 39 composite subsets using a Total Diet Study approach.  The concentration of fluoride in tapwater was reported to be 1 mg/L.  Fluoride was determined with a fluoride ion-specific electrode after microdiffusion.  As reported in Dabeka et al. (1993), food intake data (g/person/day) for each of composites was obtained from the Nutrition Canada Survey (Bureau of Nutritional Sciences, 1977) for the age groups of 1–4, 5–11, and 12–19, and 20+ years.  Total dietary fluoride intake was 1.025 mg/day for 12–19 yr old males and 0.905 mg/day for 12–19 year old females.  For the age groups of 20+ years, the fluoride intake ranged from 2.17 to 3.03 mg/day.  Over all ages (including the 20+ yr groups) and both sexes, the estimated average dietary intake of fluoride was 1.76 mg/day; the food category contributing most to the estimated intake was beverages (80%).

**Duplicate Diet/Plate Methods.**  The fluoride content of the strictly controlled metabolic diets that were used over a six-year period at a VA hospital in the Chicago area during 1967–72 were analyzed by Osis et al. (1974b).  The house diets served to patients in the same hospital were also analyzed using the same approach.  Fluoride concentrations were determined by the diffusion method of Singer and Armstrong (1965) with spectrophotometric analysis.  Osis et al. (1974a) reported a coefficient of variation of 4.3% for this method.  The daily intake of fluoride of individuals on the metabolic diet, as shown in Table 2-42, averaged 1.56–1.91 mg/day.  During the course of the study, fluoridation of the tap water was temporarily discontinued.  As a result, it was possible for the study authors to compare the fluoride content of the general hospital diet when "non-fluoridated" water (0.27 mg F/L) was used in the preparation of meals with that prepared with fluoridated water (about 0.9 mg F/L).  The results, shown in Table 2-43, indicate that the average fluoride intake was reduced more than 50% when the "nonfluoridated" water was used in the preparation of the meals.

| Table 2-42.  Fluoride Intake of Individuals on a Metabolic Diet over a Six-Year Period | | |
|---|---|---|
| **Year** | **Average ±SD (mg/day)[a]** | **Range** |
| 1967 | 1.91 ±0.42 | 1.47–3.08 |
| 1968 | 1.60 ±0.15 | 1.26–1.83 |
| 1969 | 1.56 ±0.18 | 1.21–2.30 |
| 1970 | 1.76 ±0.15 | 1.46–2.06 |
| 1971 | 1.74 ±0.16 | 1.28–2.07 |
| 1972 | 1.60 ±0.15 | 1.33–1.88 |

SOURCE: Osis et al., 1974b.

[a]Water used in the preparation of the meals contained about 0.9 mg/L fluoride.

| Table 2-43.  Fluoride Intake from a General Hospital Diet Prepared with and without Fluoridated Water | | | |
|---|---|---|---|
| Meal | No. | Average ±SD (mg/day) | Range |
| Diet prepared with fluoridated water[a] | | | |
| Breakfast | 5 | 0.65 ±0.17 | 0.47–0.86 |
| Lunch | 5 | 0.75 ±0.28 | 0.42–1.16 |
| Dinner | 5 | 0.57 ±0.15 | 0.34–0.71 |
| **Total F (mg/day)[b]** | | **1.96 ±0.48** | **1.23–2.41** |
| Diet prepared with non-fluoridated water[c] | | | |
| Breakfast | 5 | 0.29 ±0.06 | 0.21–0.37 |
| Lunch | 5 | 0.32 ±0.06 | 0.25–0.37 |
| Dinner | 5 | 0.25 ±0.02 | 0.22–0.27 |
| **Total F (mg/day)[b]** | | **0.86 ±0.08** | **0.73–0.94** |

SOURCE: Osis et al., 1974b.

[a]Water used in the preparation of the meals contained 0.9 mg F/L.

[b]The total daily dietary fluoride represents the range from the lowest to the highest intakes per day, and does not represent the sum of the individual meals listed.

[c]Water used in the preparation of the meals contained about 0.27 mg F/L.

Kramer et al. (1974) analyzed the fluoride content of diets obtained from hospitals in 16 cities in the United States, 12 cities where the drinking water was fluoridated and 4 cities where the drinking water was not fluoridated (Table 2-44).  The diets were normal in composition and provided 2,400 to 2,600 kcal/day.  Most of the diets were collected as separate, individual meals, breakfast, lunch and dinner; although in some cases the food items making up the diet for the entire day were obtained.  The compositions of each individual meal and of the total diet were determined.  Beverages, including coffee and tea, were included, but not plain drinking water. Fluoride was analyzed by the method of Singer and Armstrong (1965).  Dietary fluoride was lowest in those communities having the lowest fluoride levels in drinking water.  The mean fluoride content of the diet was generally greater in fluoridated areas than in nonfluoridated areas, however, there was not a linear relationship between the fluoride concentration of the drinking water supply and that of the diet. The highest level of dietary fluoride was that for a community with a 0.6 mg/L fluoride concentration, not the system with the highest drinking water fluoride concentration (1.27 mg/L).

| Table 2-44.  Dietary Fluoride Intake in Sixteen U.S. Cities | | |
|---|---|---|
| **City** | **F in Drinking water (mg/L)** | **Daily Dietary F Intake (mg)** |
| Birmingham, AL | 0.08 | 0.78 |
| Iron Mountain, MI | 0.08 | 1.03 |
| Chicago, IL | 0.33 | 0.86[a] |
| Houston, TX | 0.44 | 0.95 |
| Durham, NC | 0.53 | 2.62 |
| Corvallis, OR | 0.60 | 3.44 |
| Tuscaloosa, AL | 0.76 | 2.94 |
| Martinez, CA | 0.81 | 1.73 |
| Milwaukee, WI | 0.85 | 3.41 |
| New York, NY | 0.88 | 2.55 |
| St. Louis, MO | 0.91 | 2.10 |
| Chicago, IL | 0.95 | 1.97 |
| Madison, WI | 1.11 | 2.88 |
| Louisville, KY | 1.14 | 1.98 |
| Lexington, KY | 1.15 | 2.84 |
| Cleveland, OH | 1.27 | 3.05 |

**SOURCE:** Kramer et al., 1974.

[a]Average of five diets analyzed at a time when the water was not fluoridated.

### 2.5.5.  Combined Exposure Estimates for Age Groups of Concern

The OW has used the dietary exposure data to estimate fluoride intakes for the age groups identified in the OW dose-response assessment (U.S. EPA, 2010a).  The data summarized in Table 2-45 come from the U.S. assessments discussed in Section 2.5.2 through 2.5.4 that were based on analytical data from foods and TDS or duplicate diet estimates.  Table 2-45 does not include intake from drinking water or the beverage grouping where possible.  The beverage data are summarized in Table 2-46.  Study conditions are described in the notes field of the table.

Evaluation of the food and exposure data support several conclusions related to fluoride intake via the diet.

- The use of fluoridated water in processing and preparing food increases the fluoride content of the diet for both home prepared and commercial foods but not in predictable linear fashion (Maier and Rose, 1966; Ophaug et al., 1985).

- The relationship between the fluoride in local tap water and intake from beverages displays a linear relationship ($\geq$ 0.72 correlation coefficient; Ophaug et al., 1985).

- Analytical methods influence the results.  The older colorimetric methods appear to be less reliable than more recent methods (Singer at al., 1980).

- Concentration of fluoride appears to be related to food group as follows: protein foods > grains and vegetables, > fruits, > beverages.

| Table 2-45.  Summary of Daily Dietary Fluoride Intakes for Age Groups of Concern | | |
|---|---|---|
| **Age years** | **Fluoride Exposure Estimate (mg/day)** | **Notes** |
| 0.5 - <1 | 0.171 ±0.012 | Ophaug et al., 1985 – Overall mean of 44 market baskets, and national food intake data; does not include F from water and beverages; 6 months old age group. |
| 1-<4 | 0.161 ±0.010 | Ophaug et al., 1985 – Overall mean of 22 market baskets, and national food intake data; does not include water and beverages; 2 years old age group. |
| | 0.116 ±0.024 0.132 ±0.016 0.146 ±0.017 | Rojas-Sanchez et al., 1999 – Duplicate plate analysis (n=54; mean ±SEM ) for three cities; excludes beverages and drinking water (≤0.3 mg F/L DW in 2 cities and 0.8-1.2 mg F/L DW in the third); 1.3-3.3 year old age group. |
| | 0.33 ±0.14 | Brunetti and Newbrunn, 1983 – Duplicate plate analysis (n=10, for 1-4 days); estimate for all foods and fluids consumed 3-4 year old age group |
| 4-<7 | 0.33 ±0.14 | Brunetti and Newbrunn, 1983 – Duplicate plate analysis (n=10, for 1-4 days); estimate for all foods and fluids consumed; 3-4 year old age group |
| | 0.338 | Jackson et al., 2002 – Analysis of 75 most commonly consumed foods and beverages of 12-14 yr olds placed in 9 composites and USDA food consumption data for 3-5 year olds. Does not include water and beverages; 0.16 mg F/L DW; fluoridated water concentration 0.16 mg/L. |
| | 0.344 | Jackson et al., 2002 – Analysis of 75 most commonly consumed foods and beverages of 12-14 yr olds placed in 9 composites and USDA food consumption data for 3-5 year olds. Does not include water and beverages; fluoridated water concentration 0.9 mg/L |
| 7-<11 | 0.35 | No U.S. data for age group. The estimate is based on the analytical food group fluoride data from Jackson et al., (2002) and USDA data on food group intakes for 6-11 year olds. Does not include water and beverages; fluoridated water concentration 0.9 mg/L. |
| 11-<14 | 0.405 | No U.S. data for age group. The estimate is based on the analytical food group fluoride data from Jackson et al., (2002) and USDA data on food group intakes for 12-19 year olds. Does not include water and beverages; fluoridated water concentration 0.9 mg/L |
| > 14 | 0.83 | San Filippo and Battistone, 1971 – Four market baskets, and FDA food intake data; does not include water and beverages; 16-19 years old. |
| | 0.424 | Singer et al., 1980.  Market baskets from 4 regions of the country; beverages and plain drinking water not included; 16-19 years old. |
| | 0.33 | Singer et al., 1985. 24 market baskets from different areas of the country; beverages and plain drinking water not included; 16-19 years old. |
| | 0.403 | Taves, 1983 – Six-day hospital diet; does not include beverages and plain drinking water; Adults. |

| Table 2-46.  Estimates of Daily Dietary Fluoride from Beverages for Age Groups of Concern | | |
|---|---|---|
| Age (yr) | Fluoride Exposure Estimate (mg/day) | Notes |
| 0.5- <1 | 0.14 (mg/L) | Van Winkle et al., 1995. Concentration for powdered formula prepared with distilled water. |
| 0.5–1 | 0.09–0.12 | Siew et al. 2009.  Estimates (from graphical presentation of data) of range of fluoride intake from powdered formula prepared with distilled water, based on estimates of fluoride intake for female infants 6 to 12 months old. |
| 1 - <4 | 0.36 ±0.31 | Pang et al., 1992 – Three-day drink diaries (n=57); beverages only, excluding milk, water and those listed fewer than five times; home-prepared beverages made with de-ionized water; 2–3 years old. |
| | 0.257 ±0.059 | Rojas-Sanchez et al., 1999 – Duplicate plate study (n=14; mean ±SEM); beverages and drinking water; ≤0.3 mg F/L DW; 1.3–3.3 years old. |
| | 0.396 ±0.052 | Rojas-Sanchez et al., 1999 – Duplicate plate study (n=29; mean ±SEM); beverages and drinking water; 0.8 mg F/L DW; 1.3–3.3 years old. |
| 4-<7 | 0.54 ±0.52 | Pang et al., 1992 – Three-day drink diaries (n=79); beverages only, excluding milk, water and those listed fewer than five times; home-prepared beverages made with de-ionized water; 4–6 years old. |
| | 0.116 | Jackson et al., 2002 – Analysis of 75 most commonly consumed foods and beverages of 12–14 yr olds placed in 9 composites and USDA food consumption data for 3–5 yr olds; beverages only, plain DW not included; low F location (0.16 mg/L); 3–5 years old. |
| | 0.192 | Jackson et al., 2002 – Analysis of 75 most commonly consumed foods and beverages of 12–14 yr olds placed in 9 composites and USDA food consumption data for 3–5 yr olds; beverages only, plain drinking water not included; fluoridated location (0.9 mg/L); 3–5 years old. |
| | 0.2 | Levy et al., 2003a. Estimate of average intake from beverages, not including plain drinking water for 3-6 year olds derived from questionnaires completed by the parents and historical data on fluoride concentrations in the beverages.  The 90th percentile estimate was 0.5 mg/day. |
| 7-<11 | 0.60±0.48 | Pang et al., 1992 – Three-day drink diaries (n=89); beverages only, excluding milk, water and those listed fewer than five times; home-prepared beverages made with de-ionized water; 7-10 years old. |
| | 0.216 | This estimate is based on the means from two market baskets in the study by Jackson et al. (2002) and USDA data on beverage intakes.  It does not include drinking water. Ages 6–11. |
| 11- <14 | 0.509 | This estimate is based on the means from two market baskets in the study by Jackson et al. (2002) and USDA data on beverage intakes.  It does not include drinking water. Ages 12–19. It is supported by the average (0.51 mg/L) from a Canadian dietary record survey by Clovis and Hargreaves (1988); (range 0.02-0.82 mg/day). |
| ≥14 | 1.34 | San Filippo and Battistone, 1971 – Four market baskets and FDA intake data; includes beverages and plain drinking water; 16–19 years old. |
| | 0.792 | Singer et al., 1980.  Market baskets from 4 regions of the country16–19 years old. |
| | 0.59 | Singer et al., 1985.  5 Market baskets from different areas of the country; plain drinking water not included.  Drinking water used to prepare beverages low in fluoride (0.14 mg/L ± 0.03); 15–19 years old. |
| | 1.383 ±0.041 | Taves, 1983 – beverages; does not including plain drinking water; derived from a duplicate plate hospital study; adults. |

The U. S. EPA assessment of dose-response for severe dental fluorosis (U.S. EPA, 2010a) divided the population into age groups that correlate with those used in the Ershow and Cantor (1989) analysis of drinking water intakes because they represented the water intake data that

were closest (1977-1978) to those likely to have occurred at the time of the Dean (1942) publication.  The age groupings reported in the published papers summarized above are not always congruent with those used by EPA (2010a).  For this reason Tables 2-45 and 2-46 array the published data according to the age groups used for the dose-response assessment.  As a result, each study was placed according to its best fit with the drinking water age groups.

Except for Brunetti and Newbrun (1983), Table 2-45 on intakes from solid foods does not include intakes from beverages. Milk and fruit juices are included in the solid foods grouping because of their placement in a market basket survey in the dairy and fruit groups, respectively. Table 2-46 is a summary of the data reported for other beverages as a separate market basket item.  In Table 2-46, no attempt was made to separate fluoride that may have originated from local tap water used in making tea, coffee or powdered juice drinks from the commercial beverages.  Two of the studies (Pang et al., 1992; Van Winkle et al., 1995) used deionized water in the home preparation of beverages.

There is variability in the results reported for the fluoride in beverages with Pang et al. (1992) generally reporting higher levels for the 4 to <7 year old group and the 7 to < 11 year old group than other studies. The Pang et al. (1992) study used a record keeping approach (3-days) to determining the kinds and amounts of beverages consumed by children in North Carolina in April, May and June.  The ages of the participants, diary approach, location (southern U.S.), and time of year (Spring and early Summer) could have influenced these results.

In order to refine the fluoride estimate from beverage ingestion, EPA examined the list of market basket foods and their categories in the 1990 and 2003 FDA market basket lists (Egan, 2009). Most fruit juices were included in the fruit rather than the beverage group. The beverage group included carbonated beverages, coffee, tea products reconstituted or prepared using tap water, and alcoholic beverages. Based on information obtained from FDA, beverages containing commercial water contributed 53 to 74 % of the total mass intake from the beverage category in the TDS based on the 1987–1988 CSFII and 65 to 77 % for the TDS based on the 1994–1998 CSFII (bottled water and alcoholic beverages excluded) for the age groups of interest.  The remainder would be contributed by the indirect use of tap water explaining the strong correlation between local levels in drinking water and the market basket results for beverages.  In general, the commercial water contribution to a market basket beverage intake increases with age (Egan, Personal Communication, 2009).  This is consistent with the higher intakes of carbonated and other commercial beverages by the older age groups.

The San Filippo and Battistone (1971) results for those >14 include plain drinking water but are similar to the Taves (1983) results which do not.  However, Taves (1983) explains that the hospital diets studied included orange juice, coffee, and two servings of tea on a daily basis as well as other juices.  The analytical data from the Taves (1983) study show that the tea was the major contributor to the fluoride from beverages.  For that reason the Singer et al. (1980, 1985) results are considered to be more representative of the general population when plain drinking water is excluded.

## 2.5.6.   Fluoride Exposures from Sulfuryl Fluoride Use

At the request of the Office of Water, OPP (U.S. EPA, 2009, 2010b) provided estimates of exposures to fluoride from the tolerances granted to sulfuryl fluoride (SuF in Table 2-47).  The OPP data were generated using the DEEM exposure program that integrates residue data from representative commodities with age-specific food group intakes from CSFII (1998).  Exposure estimates were provided by age group and whether the residues were the result of fumigation of food storage facilities or fumigation of food processing structures (U.S. EPA, 2010b).

| Table 2-47.  Summary of Pesticidal Fluoride Contributions to Dietary Fluoride Exposure | | | |
|---|---|---|---|
| **Population Group** | **Exposure Estimates, mg/day** | | |
| | **SuF Structural Fumigations** | **SuF Food Fumigations** | **Total** |
| 0.5-1 year | 0.0087 | 0.0213 | 0.0300 |
| Children 1-<4 yrs | 0.0121 | 0.0329 | 0.0450 |
| Children 4-<7 yrs | 0.0153 | 0.0466 | 0.0619 |
| Children 7-<11  yrs | 0.0170 | 0.0544 | 0.0714 |
| Youth 11-<14 yrs | 0.0182 | 0.0675 | 0.0857 |
| Adults >14 | 0.0187 | 0.0576 | 0.0763 |

**SOURCE:** U.S. EPA, 2010b

The age groups generated by the OPP exposure assessment (U.S. EPA, 2010b) are congruent with those used by OW for this report.  OPP (U.S. EPA, 2010b) also reported the exposure estimates in terms of mg/day.  The 11 to <14 year age group appears to have the highest estimated total exposure from sulfuryl fluoride residues.

### 3.  Exposure from Drinking Water

Fluoride occurs naturally in water.  Levels in drinking water can range from insignificant to unacceptably high depending on the water source and the extent of treatment.  In many locations where the fluoride levels are naturally low, fluoride is intentionally added to water supply systems to reduce the occurrence and severity of dental caries in children.  Community water fluoridation at a concentration of about 1 ppm was initiated in 1945 (Ripa, 1993).  Based on data collected in 1999 from 24 locations nation-wide, Miller-Ihli et al. (2003) concluded that 40% of the U.S. water supplies were fluoridated (mean concentration 1.01±0.15 mg/L). Currently CDC (2008) records indicate that about 69% of the population obtains its water from systems that fluoridate.

### 3.1.  Analytical Methods

Methods used to analyze for fluoride in drinking water have changed over time.  In the 1930s and early 1940s, colorimetric methods required visual comparison of the color of samples with a set of standard solutions to identify the fluoride concentration in the sample.  In the Elvove (1933) method, water samples were acidified with hydrochloric acid and mixed with a dye complex such as zirconium oxychloride and alizarin sodium monosulphonate mixed to produce a colored solution from binding of the fluoride with the reagent.  A series of solutions containing varying known amounts of sodium fluoride are mixed with the reagent to produce a series of colored standards.  The test samples were then visually compared to the standards (in "Nessler" tubes) to estimate the concentration by a match of the sample color with that of the color of the closest standard.  Elvove (1933) reported that as little as 0.01 mg of fluorine in 50 cc, or 0.2 mg/L could be differentiated from a corresponding control with this method.  This method was used by Dean (1942) in evaluating the fluoride content in water supplies of 22 U.S. cities.  The Dean (1942) report states that the sensitivity of the analytical method was about 0.1 mg/L.  The Dean (1942) study is the basis of the dose-response assessment for severe dental fluorosis in U.S. EPA (2010a).

The Elvove (1933) colorimetric method is subject to error caused by interfering substances such as sulfate, chloride, bicarbonate, iron, manganese, and aluminum when these substances exceed specific concentrations.  Nevertheless, colorimetric methods for fluoride determination are still considered Standard methods today, albeit using spectrophotometric instrumentation and standard curves for determining concentrations.

The most recent standard colorimetric methods employ two reagents related to those used by Elvove (1933).  One employs an acidic reagent containing zirconyl chloride and the complexing agent SPADNS [sodium 2-(parasulfophenylazo)-1, 8-dihydroxy-3, 6-naphthalene disulfonate] (APHA/AWWA/WEF, 2005).  The other employs both alizarin and lanthanum nitrate to form a blue complex in an automated system.

In the mid-1960s a fluoride ion-specific electrode was developed which allowed direct detection and measurement of fluoride concentrations in water by means of a potentiometer (see Section 2.1.3 for further discussion).  The concentration of the fluoride ion was in direct proportion to the current generated.  Compared to colorimetric methods, the fluoride ion-specific electrode exhibits superior selectivity when challenged with chloride, chlorine, color and turbidity, iron,

phosphate, sulfate, and aluminum (*Standard Methods,* APHA/AWWA/WEF, 2005). *Standard Methods* clearly indicates the electrode and colorimetric methods are most satisfactory

Ion-specific chromatography can also be used to analyze fluoride in aqueous solution, and although this method has a high level of sensitivity and specificity for fluoride, it has only rarely been used in the studies discussed in this report.

## 3.2.  Natural Sources

Drinking water can be obtained from non-fluoridated municipal systems, private wells, cisterns, springs, or from bottled water. The fluoride levels in these sources may vary considerably depending on the source, time of year, and the level of treatment. Certain geological formations are rich in fluoride-containing minerals from which fluoride can leach into surrounding groundwater or surface water. According to Fleischer et al. (1974), some groundwaters average as much as 8 ppm of fluoride or more. Groundwater from the Wilcox Basin in Southeastern Arizona can contain up to 282 ppm fluoride (Kister et al., 1966). Most water from this basin is used primarily for irrigation. However, it is also the water source for several public drinking water systems (Towne and Freark, 2001).

Fluoride levels in groundwater in the coterminous United States were mapped by the U.S. Geological Survey (see Figure 3-1). Some of the areas indicated in Figure 3-1 correspond to areas of aridity as shown in Figure 3-2 (McGinnies et al., 1968). In these areas drinking water consumption rates may be greater than average, and combined with the high levels of fluoride in groundwater, may contribute to higher than normal exposures to fluoride from private drinking water systems and more frequent exceedences of the SMCL. States that have reported MCL violations most frequently to the Safe Drinking Water Information System – Federal (SDWIS/FED) during the period from 1998 to 2006 are Arizona, Florida, Montana, New Mexico, Texas and Virginia. All states have some areas with high levels of geological fluoride.

In 1993, the CDC reported on naturally occurring fluoride levels in U.S. water sources. Although there is a range in fluoride concentrations within each state, in most cases the maximum reported concentrations correspond fairly well with the areas predicted to have high levels of fluoride in groundwater (Fig. 3-1). According to CDC (1993), maximum concentrations of 7 mg/L or greater were reported for Arizona, Colorado, Idaho, Iowa, Montana, New Mexico, North Dakota, Oklahoma, and Texas. Seventeen states had maximum concentrations exceeding 4.0 mg/L, and 32 states had maximum concentrations ≥2.0 mg/L in some localities. In most cases only a small proportion of the total sampled population was located in areas where the fluoride levels were high. The CDC (1993) estimated that of the approximately 10 million people in the U.S. with naturally fluoridated public drinking water, approximately 67% had fluoride concentrations of ≤1.2 mg/L; about 14% had concentrations of 1.3–1.9 mg/L; 14% had concentrations of 2.0–3.9 mg/L and 2% had levels of ≥4.0 mg/L.

Due to the differences in groundwater fluoride, private water sources (particularly well-water) are likely to have highly variable fluoride concentrations. Felsenfeld and Roberts (1991) reported one case of fluoride-associated osteosclerosis in an individual whose drinking water well had an average concentration of about 8 mg F/L.



**Figure 3-1.  Fluoride Levels in Groundwater in the U.S. (Fleischer et al., 1974).**



**Figure 3-2.  Arid Regions in the U.S. (McGinnies et al., 1968).**

**December 2010**

### 3.3. Public Drinking Water Systems

Public drinking water systems are required to monitor finished water for fluoride on defined schedules determined by whether or not the level detected exceeds the MCL, and to report the results to the state. If there is no exceedence of the MCL, surface water systems monitor once a year while groundwater systems monitor only once every three years unless granted a waiver by States to further reduce monitoring.  The monitoring identifies whether or not there has been an exceedence of the MCL and SMCL.  Exceedances are reported to consumers in their required yearly drinking water quality Consumer Confidence Report and trigger a return to quarterly monitoring.  When the yearly average fluoride concentration exceeds the MCL (4 mg/L) the Consumer Confidence Report is required to include the following language regarding health effects:

> *Some people who drink water containing fluoride in excess of the MCL over many years could get bone disease, including pain and tenderness of the bones. Fluoride in drinking water at half the MCL or more may cause mottling of teeth, usually in children less than nine years old.  Mottling, also known as dental fluorosis, may include brown staining and/or pitting of the teeth and occurs only in developing teeth before they erupt from the gums*. (40CFR141, subpart O, App. A).

In cases where the yearly average fluoride concentration exceeds the SMCL (2 mg/L), the following message must be sent to consumers within 12 months of the exceedence.  This can be accomplished by including the warning in the annual Consumer Confidence Report.  Exceedence of the SMCL is more frequent than exceedence of the MCL; ground water systems are affected to a greater extent than surface water systems.  Exceeding the SMCL does not require a return to quarterly monitoring.

> *This is a notification about your drinking water and a cosmetic dental problem that might affect children under nine years of age.  At low levels fluoride can help prevent cavities, but children drinking water containing more than 2 mg/L of fluoride may develop cosmetic discoloration of their permanent teeth (dental fluorosis).  The drinking water provided by your community water system [name] has a fluoride concentration of [insert number] mg/L.*

> *Dental fluorosis, in its moderate or severe forms, may result in brown staining or pitting of the permanent teeth.  This problem occurs only in developing teeth before they erupt from the gums.  Children under nine should be provided with alternative sources of drinking water or water that has been treated to remove the fluoride to avoid the possibility of staining and pitting of the permanent teeth.  You may also want to contact your dentist about proper use by young children of fluoride-containing products.  Older children and adults may safely drink the water.*

> *Drinking water containing more than 4 mg/L fluoride (the U.S. Environmental Protection Agency's drinking water standard) can increase your risk of developing bone disease.  Your drinking water does not contain more than 4 mg/L*

*fluoride, but we are required to notify you when we discover fluoride levels in your drinking water that exceed 2 mg/L because of this cosmetic dental problem.* (40CFR141.208).

In conjunction with the second six-year review of the National Primary Drinking Water Regulations, EPA conducted an Information Collection Request (ICR).  Through this process EPA asked that all States and primacy entities voluntarily submit their SDWA compliance monitoring data.  This request was for the submission of compliance monitoring data collected between January 1998 and December 2005 for 79 regulated contaminants.  A total of 52 States and entities provided compliance monitoring data that included all analytical detection and non-detection records.  These data represent the national occurrence of regulated contaminants in public drinking water systems.  Through extensive data management efforts, quality assurance evaluations, and communications with State data management staff, EPA established a high quality dependable contaminant occurrence database consisting of data from 46 States.  Details of the data management and data quality assurance evaluations are available in the supporting document (U.S. EPA, 2008b).

The contaminant occurrence data from the States and entities comprise more than 17 million analytical records from approximately 136,000 public water systems.  Approximately 265 million people are served by these public water systems nationally.  The number of States and public water systems represented in the data set varies across contaminants because of variability in voluntary State data submissions and contaminant monitoring schedules.  This is the largest, most comprehensive set of drinking water compliance monitoring data ever compiled and analyzed by EPA.

EPA used a two-stage analytical approach to analyze these data and characterize the national occurrence of contaminants.  The first stage of analysis provides a straightforward evaluation of contaminant occurrence.  This stage is a simple, non-parametric count of occurrence for regulated contaminants in public water systems. A typical stage 1 occurrence analysis generates a count of the number (or percentage) of systems with at least one analytical detection of a specific contaminant at a concentration above the concentration of interest (i.e., the SMCL). This approach generates a conservative (i.e., upwardly biased) estimate of the number of potential systems having contaminant occurrence at levels of interest.  It is the appropriate metric for a contaminant such as fluoride where intakes above the threshold of concern over even a limited period of time can have an impact on the development of enamel on the secondary teeth forming only during the time of the exposure.

ICR data for fluoride were examined on the basis of all samples and all systems as well as for only those systems that reported at least one sample with a concentration $\geq 2$ mg/L during the 8-year reporting period.  The results are summarized in Tables 3-1 and 3-2, and include conservative estimates of the total populations exposed during the monitoring period. According to information extracted from the U.S. Census Bureau's web site, there were 60.3 million children under the age 14 in the U.S. in 2010, approximately 21.4% of the total U.S. population. The period from 6 months to 14 years is the age period for enamel formation for secondary teeth, including the third molars (Massler and Schour, 1958).

The data set for fluoride included some entries with apparent unit discrepancies.  Fluoride concentrations were designated as mg/L values but appear to have actually been µg/L values based on the other reported measures from the same utility.  If the actual levels were truly mg/L measures, the high fluoride concentrations would have caused adverse effects among the exposed population (gastrointestinal irritation; see NRC, 2006 for review).

Values for detections reported as < 0.002 mg/L and greater than 40 mg/L were considered as outliers and eliminated from the analysis.  Values reported as greater than 20 mg/L are also suspect based on historic records for the United States, but have been included in the analysis presented in Tables 3-1 and 3-2.  A total of 426 entries were considered as anomalously high and eliminated from the analysis; six values between 40 and 100 mg/L and 420 values equal to or greater than 100 mg/L.

The ICR data set also included results from some transient noncommunity systems. The Agency excluded these samples from the analysis presented in Tables 3-1 and 3-2 because federal fluoride regulations do not apply.  The Agency also excluded all samples that could be identified as source water quality samples that do not represent water quality at the entry point to the distribution system (e.g., water quality prior to treatment or fluoridation).  The data in Tables 3-1 and 3-2 also do not include samples reporting fluoride as not detected in the determination of mean, median and 90th percentile values.  There are variations in the number of samples and systems across the monitoring period. These variations reflect differences in the monitoring schedule and the number of States providing data.  Systems that fluoridate are required to report fluoride levels monthly to the appropriate organization within their state (often the state dental officer) but have no obligation to report those monthly measurements to EPA.

The number of quarterly samples analyzed over the 8 years of monitoring ranged from about 7,000 to 12,000, with 2.3 to 5.6 % of these samples $\geq 2$ mg/L.  Monitoring data were analyzed for four quarters per year, but the data have been compressed in Table 3-1 and 3-2 to show only the range across the four quarters.  The systems reporting each quarter are not consistent because surface water systems with mean average annual concentrations below 4 mg/L have to report only once per year or once every three years for a groundwater system.

Table 3-1 suggests the possibility of a trend towards an increase in the percent of samples with detections of 2 mg/L or higher across the 8-year monitoring period.  In the first 4 years the percent of detections for the subset $\geq 2$ mg/L exceeded 4% for two of the 16 quarters.  In the second 4 years, the frequency increased to all 16 quarters. The percent of systems reporting a concentration of $\geq 2$ mg/L ranged from 4.1 % to 5.6 % in the first four years of monitoring and 4.6% to 8.3% in the second four years.  Close inspection of the ICR results indicates that the apparent trend was the result of an increase in the number of states included in the data set.  The later years include states with high geological levels of fluoride (Florida, Texas, and Virginia) that did not submit data for the early years of the monitoring period.

The mean, median, and 90th percentile concentrations were determined for each of the monitoring quarters.  Over the first four years of monitoring the high end of the range for the mean was 0.85 or 0.86 mg/L while in the second 4 years it increased to a maximum of 0.95 mg/L.  In the last four years, the range for the means is consistently higher than that for the medians reflecting positively skewed distribution (i.e., having a longer right tail with higher F

concentrations).  A similar trend is reflected in the 90th percentile values, which have also increased over the 8 years of monitoring.  The means and medians remain at a concentration within the recommended range for fluoridation and the 90th percentile value, although consistently above the upper end of the fluoridation range, never exceeded the 2 mg/L SMCL. The average quarterly mean for the 8 years reported is 0.85 mg/L and that for the 2002–2005 period is 0.87 mg/L.  The corresponding average quarterly 90th percentile values are 1.39 mg/L and 1.43 mg/L, respectively.

Table 3-2 represents only the systems that were at 2 mg/L or higher for at least one quarter during the eight year monitoring period. In parallel with the pattern observed in Table 3-1, Table 3-2 shows that the number of systems that measure a concentration of 2 mg/L or above in a given year is increasing from around 500 in the early years of the ICR time span to above 800 in the last two years.  This too reflects an increase in the number of states reporting. The samples from systems that have reported levels ≥ 2 mg/L come from 26 to 46% of the systems in each quarter. This difference between the percent of systems affected and percent of samples can reflect sampling at multiple entry points for the system or the taking of a second sample for confirmation of the original result.  It is important to remember when looking at the percent data, that the reporting of a value of ≥2 mg/L does not require a system to begin monitoring on a quarterly basis.  The system can maintain their yearly or triennial monitoring schedule, but are required to report the exceedence of the SMCL in their consumer confidence report.  Some systems may increase their monitoring for fluoride when the concentration reaches 2 mg/L.

In examining the mean and median of the concentrations reported by the systems that had at least 1 sample with a concentration of 2 mg/L or higher, all of the median values are still within the fluoridation range, while all of the means lie above the fluoridation range but are lower than the SMCL.  The ranges for the 90th percentile values are consistently above the SMCL but below the MCL. For the last four years of the ICR monitoring (2001–2005) the average quarterly fluoride concentration was 1.76 mg F/L and the 90th percentile value was 3.84 mg F/L. Over the ICR reporting period from 1.8 million to 6.4 million individuals could have been exposed in a given year to a concentration of 2 mg/L or higher for at least a short period of time.  It is not possible to estimate how many of these individuals may have been exposed during a period of vulnerability for severe dental fluorosis.

| Table 3-1.  Public Water System Monitoring Data 1998–2005 Ranges Across Quarterly Data in Each Year; Nondetect Values Not Included in Samples, Mean, Median and 90th Percentile | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Year** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** |
| **Samples** | 6,566 - 7,288 | 6,783 - 6,991 | 6,990 - 8,049 | 6,559 - 8,961 | 6,126 - 8,295 | 6,910 - 8,562 | 8,231 - 9,580 | 7,051 - 9,635 |
| **% samples ≥2 mg/L** | 3.2% - 3.6% | 2.8% - 3.0% | 2.7% - 3.3% | 3.1% - 4.5% | 4.0% - 5.1% | 5.2% - 6.2% | 4.9% - 6.4% | 5.4% - 6.8% |
| **Systems** | 3,263 - 3,973 | 3,134 - 3,322 | 3,489 - 3,873 | 3,972 - 4,480 | 3,541 - 4,563 | 4,054 - 4,981 | 5,007 - 5,700 | 3,869 - 5,472 |
| **% systems ≥2 mg/L** | 4.8% - 5.6% | 4.5% - 4.9% | 4.1% - 4.7% | 4.5% - 5.5% | 4.6% - 5.8% | 6.1% - 7.2% | 5.6% - 7.7% | 6.9% - 8.3% |
| **Mean (mg/L)[a]** | 0.81 - 0.85 | 0.83 - 0.85 | 0.82 - 0.86 | 0.81 - 0.86 | 0.78 - 0.89 | 0.86 - 0.93 | 0.80 - 0.90 | 0.84 - 0.95 |
| **Median (mg/L)[a]** | 0.83 - 0.86 | 0.88 - 0.92 | 0.87 - 0.90 | 0.77 - 0.87 | 0.70 - 0.85 | 0.80 - 0.85 | 0.69 - 0.80 | 0.75 - 0.86 |
| **90th percentile (mg/L)[a]** | 1.32 - 1.36 | 1.34 - 1.37 | 1.30 - 1.38 | 1.33 - 1.40 | 1.40 - 1.44 | 1.40 - 1.47 | 1.40 - 1.50 | 1.40 - 1.50 |
| **Population** | 40,455,048 - 52,890,715 | 41,810,370 - 70,262,253 | 43,543,007 - 70,200,938 | 45,062,700 - 82,331,386 | 50,333,719 - 82,609,244 | 44,398,104 - 87,126,153 | 47,726,060 - 86,715,548 | 58,824,170 - 102,533,400 |

**SOURCE:** The monitoring data used in this analysis were collected through information collection request for EPA's second Six-Year Review under the provisions of the Paperwork Reduction Act, 44 U.S.C. 3501 et seq.; Office of Management and Budget (OMB) control number 2040-0275.

[a]Mean, median and 90th percentile based on all detections (modal minimum reporting level (MRL) = 0.1 mg/L).

63

| Table 3-2.  A Summary of Public Water System Fluoride Monitoring Data from Systems for Systems with at Least One Detection of 2 mg/L or Higher during the Year of Monitoring<br><br>Ranges Across Quarterly Data in Each Year; Nondetect Values Not Included in the Sample, Mean, Median and 90th Percentile | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| Samples from systems that ever had a detection ≥ 2 mg/L | 1,380 - 1,513 | 1,372 - 1,494 | 1,432 - 1,527 | 1,225 - 1,762 | 1,138 - 1,473 | 1,409 - 1,603 | 1,557 - 1,951 | 1,521 - 1,713 |
| %  samples with at least one detection ≥2 mg/L | 15.3% - 17.4% | 13.3% - 14.7% | 14.5% - 16.5% | 16.4% - 24.0% | 24.9% - 27.5% | 29.6% - 31.8% | 27.7% - 33.9% | 30.5% - 31.8% |
| Systems that ever had a detection ≥ 2 mg/L | 499 - 563 | 528 - 549 | 541 - 586 | 563 - 656 | 579 - 668 | 687 - 763 | 756 - 843 | 754 - 822 |
| % systems with at least one detection≥2 mg/L | 32.3% - 36.9% | 26.5% - 29.5% | 27.3% - 32.0% | 31.4% - 36.3% | 32.3% - 35.6% | 40.5% - 44.3% | 42.3% - 48.3% | 42.6% - 45.9% |
| Mean  (mg/L) | 1.27 - 1.43 | 1.32 - 1.37 | 1.32 - 1.43 | 1.33 - 1.60 | 1.60 - 1.69 | 1.75 - 1.84 | 1.65 - 1.86 | 1.73 - 1.86 |
| Median (mg/L) | 1.05 - 1.10 | 1.10 - 1.10 | 1.10 - 1.11 | 1.10 - 1.20 | 1.20 - 1.29 | 1.20 - 1.30 | 1.15 - 1.30 | 1.20 - 1.23 |
| 90th percentile (mg/L) | 2.40 - 2.65 | 2.20 - 2.40 | 2.21 - 2.46 | 2.60 - 3.10 | 3.10 - 3.40 | 3.80 - 4.39 | 3.70 - 4.18 | 3.90 - 4.24 |
| Population-served by systems that ever had a detection ≥ 2 mg/L | 2,513,263 - 3,887,873 | 1,864,149 - 4,703,418 | 2,429,353 - 3,215,929 | 3,088,021 - 4,450,151 | 3,563,761 - 5,402,152 | 3,820,278 - 4,793,365 | 3,849,780 - 5,242,650 | 4,326,194 - 6,405,661 |

**SOURCE:** The monitoring data used in this analysis were collected through information collection request for EPA's second Six-Year Review under the provisions of the Paperwork Reduction Act, 44 U.S.C. 3501 et seq.; Office of Management and Budget (OMB) control number 2040-0275.

[a]Mean, median and 90th percentile based on only detections from systems that ever had a sample detection of 2 mg/L or higher (modal minimum reporting level (MRL) = 0.1 mg/L).

### 3.4.  Fluoridation Contributions

The U.S. Public Health Service (CDC, 1995) recommends that fluoride levels in municipal drinking water be maintained in the range of 0.7 to 1.2 mg/L. The exact level is determined by the annual average of maximum daily ambient air temperatures (Table 3-3).  The linkage between fluoridation levels and ambient air temperatures was based on the hypothesis that drinking water intake is increased in areas with warmer climates requiring less fluoride in the water to achieve the same average population dose.

| Table 3-3.  CDC Recommendations for Optimal Fluoride Concentrations in Public Water Supply Systems | |
|---|---|
| **Annual Average of Maximum Daily Air Temperatures[a]** | **Community Water Systems Fluoride Concentration (mg/L)** |
| 50.0–53.7°F | 1.2 |
| 53.8–58.3°F | 1.1 |
| 58.4–63.8°F | 1.0 |
| 63.9–70.6°F | 0.9 |
| 70.7–79.2°F | 0.8 |
| 79.3–90.5°F | 0.7 |

SOURCE: Adapted from CDC, 1995.

[a]Based on 5 years of temperature data.

In the past, school drinking water fluoridation programs targeted areas where the municipal water was not fluoridated (naturally or intentionally). CDC (2001) updated the school fluoridation recommendation because of the widespread use of fluoride toothpaste and, availability of other fluoride-treatment modalities that can be delivered in the school setting. CDC (2001) recommends that decisions to initiate or continue school fluoridation programs be based on an assessment of present caries risk in the target school(s) and alternative preventive modalities that might be available accompanied by periodic evaluation of program effectiveness.

Several studies have indicated that current drinking water consumption rates may not be as affected by climatic conditions as they once were thought to be, suggesting that the temperature-related guidelines for fluoride concentrations in drinking water may need to be reevaluated (NRC, 2006).  Heller et al. (1999) examined drinking water intake estimates documented in the 1994–1996 CSFII and compared these data to information from the 1977–78 Nationwide Food Consumption Survey and found no "obvious strong or consistent association between water intake and month or season."

Using 24-hr recall data from the third National Health and Nutrition Examination Survey (NHANES III, 1988–1994), Sohn et al. (2001), reported that for children aged 1–10 years there was no significant relationship (based on multiple regression analysis) between total fluid intake or plain water intake and mean daily maximum temperature, either before or after controlling for sex, age, socioeconomic status, and race or ethnicity.  Fluid intake was significantly associated with age, sex, socioeconomic status, and race and ethnicity.  Estimates of total fluoride intake and plain water intake by geographic region are shown in Table 3-4.  However, the NHANES survey was designed to avoid interviewing people in extremely hot or cold weather conditions.

This could be a limitation on the applicability of results from this analysis to the entire U. S. population.   The mean maximum temperatures used in the analysis (based on the average of daily maximum temperatures during 1960–1990 for the survey month) ranged from 53.4°F to 89.3°F.  The majority of temperatures were distributed within the range of 65.0° to 85°F.

| Table 3-4.  Estimated Daily Fluid and Plain Water Regional Intake in Children 1–10 Years Old | | | | | |
|---|---|---|---|---|---|
| Region | No. | Total Fluid Intake[b] | | Plain Water Intake | |
| | | mL/day±SE | mL/kg/day±SE | mL/day±SE | mL/kg/day±SE |
| Northeast | 679 | 1,734.8 ±30.7 | 86.9 ±2.3 | 568.2 ±52.1 | 26.4±2.1 |
| Midwest | 699 | 1,734.4 ±45.3 | 83.7 ±1.5 | 639.7 ± 53.8 | 28.9 ±1.8 |
| South | 869 | 1,739.4 ±31.2 | 83.2 ±2.2 | 612.9 ±24.1 | 27.6 ±1.3 |
| West | 1,622 | 1,737.4 ±24.5[a] | 81.1 ±1.7 | 624.4 ±44.2 | 27.0 ±1.9 |

SOURCE: Sohn et al., 2001; NHANES III, 1988–1994.

[a]A value of 734.4 is given in Sohn et al., 2001; however, based on the consumption per unit body weight, it appears that this data point should actually be 1,737.4 mL/day, as shown here.

It should be noted that the CDC recommendations for temperature-dependent optimal fluoride concentrations in municipal drinking water are still in effect (CDC, 1995) but are an issue of current interest as indicated by Heller et al. (1999) and Sohn et al. (2001). NRC (2006) and CDC (2001) have also recommended a reevaluation of the ambient air temperature-based guidelines.

## 3.5.  Bottled Water

Fluoride content of bottled water varies considerably with brand, source, and time of packaging. Nowak and Nowak (1989) analyzed the fluoride content of 19 types of bottled water obtained in the Iowa City area using a fluoride ion-specific electrode and found that the F concentration ranged from 0.004 to 0.33 mg/L. Chan et al. (1990) analyzed the fluoride content of twenty-two types of bottled water originating from nine different regions of the US and three regions of France.  Eighteen of the samples had fluoride levels below 0.3 mg/L; and the highest fluoride level was 0.79 mg/L.  Stannard et al. (1990) tested 24 brands of domestic and imported bottled waters for fluoride using an ion-specific electrode.  The fluoride levels ranged from a trace amount (two samples less than 0.1 mg/L) to 1.25 mg/L.  The average was calculated to be 0.33 mg/L, assuming the two samples to have 0 mg/L fluoride.

Among 78 commercially available bottled waters sampled in Iowa, Van Winkle et al. (1995) found that fluoride levels ranged from 0.2 mg/L to 1.36 mg/L with a mean of 0.18 mg/L; 83% ranged from 0.02 to 0.16 mg/L, 7% from 0.34 to 0.56 mg/L, 1% had a fluoride level of 0.88 mg/L and 9% had levels >1 mg/L.  Van Winkle et al. (1995) reported that 340 of 1308 homes (26%) used bottled water.

Allen et al. (1989) analyzed the chemical composition of 37 brands of imported and domestic bottled mineral water.  Fluoride was analyzed with an ion-selective electrode.  Fluoride concentrations ranged from <0.01 mg/L to 7.9 mg/L. In an earlier study MacFadyen et al. (1982) reported fluoride levels of <0.1 mg/L to 5.8 mg/L in 26 bottled spring waters.

The National Fluoride Database (USDA, 2005) includes data on the concentrations of fluoride in several brands of bottled water. Samples were collected in up to 144 locations across the country, depending on the level of contribution to fluoride intake as previously determined by the USDA. Differences in geographical location were incorporated into the sampling strategy. Fifteen brands and one to 20 samples per brand were assayed using a fluoride ion-specific electrode. The range of mean values for various types of bottled water was 0.02-0.78 mg/L. The one brand containing fluoride at a level within the fluoridation range was a product intended to supply fluoride. The mean concentration for most of the remaining samples tended to be below 0.2 mg/L F. According to U.S. EPA (2004), bottled water accounts for 3 mL/kg/day of total ingested water from all sources (equal to 210 mL/day for a 70 kg adult), or about 18 % of mean adult total water intake.

The fluoride concentrations in bottled water products vary substantially. Some products can contain fluoride at levels that exceeded the levels recommended for fluoridation; a few mineral or spring waters exceeded the MCL for fluoride.

## 3.6.   Exposure from Drinking Water

Estimated exposures from public drinking water sources have been calculated using the average and 90th percentile age-related water consumption estimates derived from U.S. EPA (2004), and the average national concentration of fluoride reported in the ICR monitoring data (Section 3.3). The average water concentration used for this calculation, 0.87 mg/L, is the average of the averages from the data submitted to EPA for the 16 monitoring quarters from 2002 through 2005. The data used to determine the average concentration are reported in Table 3-1.

Mean water consumption (direct and indirect) and mean fluoride intake for all individuals (consumers and nonconsumers) for specific age groups and the entire population, using the average fluoride concentration of 0.87 mg/L, are shown in Table 3-5.

| Table 3-5.  Fluoride Intake from Consumption of Municipal Water (Direct and Indirect[a]) at the Average Concentration ( 0.87 mg/L) Determined from Monitoring Records for 2002 through 2005 | | | | |
|---|---|---|---|---|
| Group | Water Consumption (mL/day)[b] | | Fluoride Intake (mg/day)[b] | |
| | Mean | 90 % C.I. Upper bound | Mean | 90% C.I. Upper bound |
| Infants <0.5 yr | 296 | 329 | 0.26 | 0.29 |
| 0.5–0.9 | 360 | 392 | 0.31 | 0.34 |
| 1–3 yrs | 311 | 324 | 0.27 | 0.28 |
| 4–6 yrs | 406 | 426 | 0.35 | 0.37 |
| 7–10 yrs | 453 | 485 | 0.39 | 0.42 |
| 11-14 yrs | 594 | 642 | 0.52 | 0.56 |
| 15-19 | 761 | 823 | 0.66 | 0.72 |
| 20+ | 1,098 | 1127 | 0.96 | 0.98 |
| **Total Pop.** | **926** | **949** | **0.81** | **0.83** |

**SOURCE:** Adapted from U.S. EPA, 2004. Table 5.1.A1.
[a]Indirect consumption refers to intake through beverages and foods that include fluoridated drinking water as an ingredient.
[b]Based on an average fluoride concentration of 0.87 mg/L.

U.S. EPA (2004) reported that during a 2-day survey period for the CSFII survey, it was determined that 5% of the individuals older than 1 year and 25% of infants younger than 1 yr did not drink community water. If these individuals are excluded from the average intake calculations, then the average amounts of municipal water consumed increase as do the fluoride exposures. U.S. EPA (2004) calculated water consumption levels for the group "consumers only" in order to adjust for those that did not report drinking water intake during the two days of dietary data reported. These data are most important for infants who consume formula reconstituted using tap water on a daily basis but whose formula intake is not recognized as a source of tap water in the survey records. Estimated fluoride exposure at the mean fluoride concentration (0.87 mg/day) and the consumer-only mean and 90th percentile intakes for the six month to < 1 year age group are 0.41 mg/day and 0.84 mg/day (water intake = 971 mL) , respectively (see Table 3-6). For the 1 to < 3 year old group they are 0.30 mg/day and 0.63 mg/day (water intake = 723 mL), respectively.

For comparison with the estimates in Table 3-5, Table 3-7 presents the estimated average fluoride exposures for all individuals (consumers and nonconsumers) with average drinking water consumptions of direct and indirect water who consume water that is at the 90th percentile fluoride concentration (1.43 mg/L) for a sustained period of time. The 90th percentile concentration used for this analysis is the average of the 90th percentile values for the 16 quarters reported to EPA between 2002 and 2005. Average consumers of drinking water from public systems representative of the 90th percentile fluoride concentration have higher daily intakes of fluoride from drinking water than those with 90th percentile intakes of drinking water at an average fluoride concentration. However, only ten percent of the population will have water at or greater than the 90th percentile concentration.

| Table 3-6. Consumers Only Fluoride Intake from Consumption of Municipal Water (Direct and Indirect[a]) at the Average Concentration (0.87 mg/L) Determined from Monitoring Records for 2002 through 2005 | | | | |
|---|---|---|---|---|
| **Group** | **Water Consumption[b] (mL/day)** | | **Fluoride Intake[b] (mg/day)** | |
| | **Mean** | **90% Percentile** | **Mean** | **90% Percentile** |
| Infants <0.5 yr | 548 | 985 | 0.48 | 0.86 |
| 0.5–0.9 | 467 | 971 | 0.41 | 0.84 |
| 1–3 yrs | 349 | 723 | 0.30 | 0.63 |
| 4–6 yrs | 442 | 943 | 0.38 | 0.82 |
| 7–10 yrs | 487 | 993 | 0.42 | 0.86 |
| 11-14 yrs | 641 | 1415 | 0.56 | 1.23 |
| 15-19 | 817 | 1671 | 0.71 | 1.45 |
| 20+ | 1176 | 2284 | 1.02 | 1.99 |
| **Total Pop.** | **1000** | **2069** | **0.87** | **1.80** |

**SOURCE:** Adapted from U.S. EPA, 2004. Table 5.2.A1.

[a]Indirect consumption refers to intake through beverages and foods that include fluoridated drinking water as an ingredient.
[b]Based on an average fluoride concentration of 0.87 mg/L .

| Table 3-7.  Fluoride Intake From Average Drinking Water Consumption and  90th Percentile Fluoride Concentration (1.43 mg/L) Determined from Monitoring Records for 2002 through 2005 | | |
|---|---|---|
| Group | Water Consumption | Fluoride Intake |
| | Average Total mL | mg/day total |
| Infants <0.5 yr | 296 | 0.42 |
| 0.5–0.9 | 360 | 0.51 |
| 1–3yrs | 311 | 0.44 |
| 4–6yrs | 406 | 0.58 |
| 7–10 yrs | 453 | 0.65 |
| 11-14 yrs | 594 | 0.85 |
| 15-19 | 761 | 1.09 |
| 20+ | 1098 | 1.57 |
| Total Pop. | 926 | 1.32 |

SOURCE: Adapted from U.S. EPA, 2004, Table 5.1.A1.

As noted by NRC (2006), fluoride exposures from drinking water depend on individual water intakes, fluoride concentration in the water, and whether water purification or filtration systems are used to remove fluoride.  Some individuals may have substantially higher intakes of fluoride from their drinking water as a result of specific types of activities that increase water intake (e.g., athletes or outdoor laborers in warm climates), life stage (e.g., pregnant or lactating women), or as a result of medical conditions such as diabetes mellitus, diabetes insipidus, or renal problems.

## 4. Fluoride in Dental Products

### 4.1. Toothpaste

According to Newbrun (1992), more than 95% of all toothpaste sold in the United States contains fluoride.  Results of the 1983 National Health Interview Survey showed that 67.8% of children younger than 5 years old used fluoridated tooth paste and 95.5% of those 5–9 years old (Ismail et al., 1987).  As many as 15% to 20% of children in some age groups studies by Wagener et al., (1992) used fluoride supplements or mouth rinses.

The total daily amount of fluoride ingested and systemically absorbed following tooth brushing with a fluoride toothpaste will vary with: 1) the concentration of fluoride in the toothpaste, 2) the amount of toothpaste used; 3) the frequency of brushing; 4) the amount of rinsing; 5) the swallowing control of the individual; and 6) the time of brushing relative to the time the last meal was eaten.  Most toothpaste sold in North America contains fluoride ion at a concentration of 1000–1100 ppm (Levy, 1993).  Toothpastes with lower concentrations of fluoride (250–500 ppm) are sold specifically for use by children (Newbrun, 1992) in other countries but are not generally available in the United States. Some products without added fluoride are available in the United States,

Fluoridated toothpastes (gel or paste products) in the United States are required to include guidance to users on their product label (USFDA, 2009).  Children under the age of 6 are to be instructed in "good brushing and rinsing habits to minimize swallowing" and supervised "as necessary until capable of using without supervision".  It is recommended that a dentist or pediatrician be consulted about toothpaste use for children under 2. The label should identify toothpaste as a product intended for adults and children 2-years of age and older. Brushing is recommended after every meal or twice per day. In a study discussed later, Levy et al. (1997) found that 31.7% of parents surveyed reported use of fluoridated toothpaste by their children by the time they were one year old, suggesting that many individuals do not follow the label guidance.

The amount of toothpaste used per brushing, the frequency of brushing and the amount of rinsing are expected to be highly variable factors which can substantially impact the amount of toothpaste ingested.  In studies conducted in Europe, Cochran et al. (2004) and O'Mullane et al. (2004) found that 60% of 1.5–2.5 year-olds swallowed between 70% and 100% of the toothpaste placed on the brush.  Borysewicz-Lewicka et al., (2007) reported that children swallowed on average 17% of the fluoride used in brushing with a gel containing 1.25% fluoride.  Baxter (1980) reported that children 5-6 years of age ingested an average of about 0.27 g per brushing; older children ingested less.

Levy (1993) noted that a full strip of toothpaste covering a child's size toothbrush is 0.75 to 1.0 g which could result in a fluoride intake as high as 1 mg per brushing.  Based on the literature available at the time, Levy (1993, 1994) estimated that children 2–3 years old would ingest about 0.3 g per brushing, equivalent to 59-65% of the amount used.  At one time a complete ribbon of toothpaste across the surface of the toothbrush was recommended.  However, more recent guidelines stress the application of a pea-sized portion.  Levy et al. (1992) found that children

using flavored toothpastes marketed specifically for children used higher amounts of toothpaste than those using regular toothpaste.

Levy (1993) also reported that 49% of 59 children aged 1–4 years did not rinse or expectorate when brushing and an additional 27% rinsed but ingested almost all of the rinse water.  Only 5% of the children under the age of 2.5 years spit after brushing.  In reviewing the available literature, Levy (1993, 1994) noted that children who did not rinse after tooth brushing ingested 75% more toothpaste than those who rinsed.  Swallowing control is especially weak in younger children, and Levy et al. (2001) note that several studies have shown that younger children may ingest more than half of the toothpaste used per brushing.  In studies on young adults, Sjögren and Melin (2001) found that oral retention of fluoride following brushing can be substantially reduced by more than 50% by increased rinsing.

Following ingestion, fluoride absorption in the GI tract has been found to be close to 100% (Ekstrand and Ehrnebo, 1980); however, the total amount absorbed can be affected by the presence of certain foods in the stomach.  Ekstrand and Ehrnebo (1979) reported that the absorption of fluoride from sodium fluoride tablets was reduced to 50–79% when co-administered with milk products.  Cury et al. (2005) conducted a double-blind crossover study on eleven volunteers (six women and five men aged 17–20 yrs) who ingested toothpastes with fluoride concentrations of 0, 550 or 1100 µg F/g.  The toothpastes were administered as a slurry (45 mg/kg body weight) while fasting or 15 min after a meal (breakfast or lunch).  Fluoride levels were measured in unstimulated whole saliva for up to 3 hours post-exposure and in urine 24 hour pre-exposure and 24 hr post-exposure using an ion-selective electrode.  Bioavailability was 61% and 71% after lunch and breakfast, respectively, compared to an assumed 100% after fasting for a toothpaste containing 1100 µg F/g, and 78% and 65%, respectively, for a toothpaste with 550 µg F/g.

Osuji et al. (1988) conducted a case-control study of children 8–10 years old (34 children with fluorosis and 34 controls) living in East York, Ontario, to determine the risk factors for dental fluorosis.  Factors evaluated included: prematurity, low birth weight, breastfeeding, use of fluoride mouth rinses or supplements, residence history, medical and dental history (including history of tooth brushing), and consumption of formula, tea, fish, soft drinks, milk, water, and reconstituted juices. The only factors showing a significant association with fluorosis were ingestion of infant formula and early use of fluoride tooth paste.  Children who brushed their teeth before age 25 months had 11 times the odds of developing fluorosis as those who began tooth brushing at a later age.  Prolonged use of infant formulas (≥13 months) was associated with 3.5 times the risk of fluorosis compared with no or shorter duration of formula use.  The odds ratio for developing fluorosis was 7.1 (95% C.L. = 1.14–44.45) for children with prolonged formula use, 13.8 (95% C.L. = 5.12–37.38) for children who had started brushing early, and 37.9 (95% C.L. = 10.60–134.52) for children who were in both groups.

Simard et al. (1989) evaluated tooth brushing habits, toothpaste use and its ingestion in a group of Canadian children 2 to 5 years old.  All but one of the children used a fluoridated toothpaste. The majority (71.4%) brushed twice daily, 23.8% brushed three times daily, and 4.8% brushed only once daily.  The study was conducted at a day care center where the children brushed with a toothpaste containing 0.24% NaF (1100 ppm F).  Brushing habits at home were determined by a questionnaire filled out by the parents.  The quantity of toothpaste used and ingested and the

estimated amount of fluoride ingested are shown in Table 4-1.  For all age groups combined the amount of fluoride ingested was 0.329 mg per brushing.

| Table 4-1.  Toothpaste Use and Estimated Fluoride Ingestion by Children 2-5 Years Old | | | | | | |
|---|---|---|---|---|---|---|
| Age (yr) | No of Subjects | Toothpaste Used  Per Brushing (g) | | Toothpaste Ingested Per Brushing (g) | | Estimated Fluoride Ingested Per brushing (mg) | |
| | | Mean | SD | Mean | SD | Mean | SD |
| 2–3 | 5 | 0.464 | ±0.19 | 0.278 | ±0.13 | 0.304 | ±0.15 |
| 4 | 9 | 0.783 | ±0.28 | 0.390 | ±0.25 | 0.429 | ±0.27 |
| 5 | 9 | 0.651 | ±0.34 | 0.221 | ±0.12 | 0.243 | ±0.13 |
| All | 23 | 0.662 | ±0.30 | 0.299 | ±0.19 | 0.329 | ±0.20 |

**SOURCE:** Simard et al., 1989.

Fluoride retention following tooth brushing in nineteen 3–10-year-old children was evaluated by Salama et al. (1989).  Each child brushed with 1.8 g of toothpaste (1043 ppm F as MFP). Fluoride recovered on the toothbrush and in expectorant was analyzed with a fluoride ion-specific electrode after HMDS diffusion.  The average quantity of fluoride not recovered was $0.36 \pm 0.05$ mg (range 0.08 to 0.82 mg).  The study authors concluded that fluoride intake from a single tooth brushing exceeds dietary intake in non-fluoridated areas and is equivalent to about 75% of dietary intake in fluoridated areas.

A pilot study was conducted to determine the tooth brushing habits of children 12–24 months old and used to estimate the quantity of fluoride that children in this age group would ingest during brushing (Simard et al., 1991).  The study was conducted in the Quebec City region and involved 15 children.  The authors used information from their earlier study (Simard et al., 1989) which indicated that children 2–3 years of age ingested about 60% of the toothpaste used to estimate fluoride exposures.  A survey of the parents indicated that 60% of the children had their teeth cleaned once a day, 32% twice a day and 8% three or four times per day.  The average amount of toothpaste used was 0.160 g.  The assumption was made that the mean NaF concentration in the toothpaste was 0.243%.  The amount of fluoride ingested was calculated by taking 60% of the quantity of toothpaste used per brushing per day multiplied by a conversion factor of 1.09 (to convert from NaF to mg F/g of toothpaste) multiplied by the number of times the child brushed each day.  The estimated amount of fluoride ingested per day ranged from 0.02 to 0.33 mg (N=8) for those whose teeth were cleaned once, and from 0.05 to 0.55 mg (N=6) for those whose teeth were cleaned twice per day.  The amount ingested by the one child who brushed three times per day was 0.07 mg.  Simard et al. (1991) reported that 20% of the children ingested more than 0.25 mg of fluoride per day.  The average amount of fluoride ingested by all 15 children was 0.15 mg/day.

Levy et al. (1995) summarized the results of studies conducted up to 1993 which evaluated the amounts of toothpaste ingested during tooth brushing for various age groups. Toothpaste ingestion per brushing for children 1–9 years old ranged from 0.11 to 0.39 g, with 90th percentile levels ranging from 0.08 to 0.73 g.  Assuming 1.1 mg F/g toothpaste, this amount of toothpaste ingestion would result in a consumption of 0.12–0.43 mg F (90th percentile range of 0.09 to 0.8

mg F).  Levy et al. (1995) estimated a mean fluoride intake from toothpaste of 0.01 mg (range 0–0.04 mg) for infants 6 months old, 0.07 mg (range 0.03–0.66 mg) for children 12 months old, and 0.25 mg (range 0.01–1.50 mg) for children 2 and 3 years old.

In a later study Levy et al. (1997) surveyed by questionnaire the parents of children born in eastern Iowa on the tooth brushing practices of their children up to 1 year of age (Table 4-2).  If it is assumed that about 62.45% of the toothpaste reported as used in the 1997 paper is ingested, then the estimated amount of fluoride ingested is 0.13 mg for 6-mo-olds, 0.12 mg for 9-mo-olds; and 0.12 mg for 12-mo-olds. The estimate for ingestion comes from a Levy et al. (2000) study of 3-4 year old subjects.  The percent of children who were reported as having their teeth brushed increased from 12.9% at six months to 64.5% at one year.  The percent of parents that reported using fluoride-containing toothpaste increased from 1.9% at six months to 31.7 % at one year.

| Table 4-2.  Toothpaste Use by Children  6 to 12 Months Old | | | |
|---|---|---|---|
| **Parameter** | **Age Groups** | | |
| | **6 Months** | **9 Months** | **`12 Months** |
| Number of children | 899 | 665 | 508 |
| Percentage with erupted teeth | 34.6% | 83.6% | 98.0% |
| Percentage whose teeth were brushed | 12.9% | 36.7% | 64.5% |
| Percentage using fluoridated toothpaste | 1.9% | 11.7% | 31.7% |
| Mean amount of fluoride used per brushing | 0.11 mg (0.02–0.05)[a] | 0.14 mg (0.02–0.88)[a] | 0.17 (0.02–0.88)[a] |
| Mean amount of fluoride used per day | 0.21 mg (0.02–1.50)[a] | 0.20 (0.01–1.75)[a] | 0.19 (0.01–1.75)[a] |
| **Frequency of cleaning/brushing** | | | |
| Less than once per day | 31.4% | 33.2% | 37.0% |
| Once per day | 41.2% | 45.5% | 44.8% |
| Twice per day | 16.9% | 17.0% | 14.7% |
| Three times per day | 6.3% | 3.1% | 3.5% |
| More than three times per day | 6.3% | 1.1% | – |

**SOURCE:** Levy et al., 1997.

[a]Range.

Levy et al. (2000) further evaluated the tooth brushing habits of 28 U.S. preschoolers (3–4 years old; mean age 44 months).  The average amount of toothpaste applied to the toothbrush was 0.256 g (range 0.035–0.620 g, SD = 0.177 g).  The estimated mean amount of ingested fluoride was determined by subtracting the estimated amount expectorated from the amount of toothpaste applied to the brush.  Fluoride was determined with a fluoride ion-specific electrode after diffusion using a modified Taves microdiffusion method.  The mean amount of fluoride ingested was 0.17 mg per brushing (SD 0.15 mg; range 0.00–0.52 mg), equivalent to 62.45% of the initial amount in the toothpaste.

Only a few studies have given 90th and 95th percentile estimates for toothpaste and/or fluoride ingestion. Barnhart et al. (1974) measured toothpaste use and ingestion in four age groups; 2–4

yr olds (N=68), 5–7 yr olds (N=4); 11–13 yr olds (N=98); and 20–35 yr olds (N=70) under simulated home-use conditions.  Chronic usage conditions were simulated with a statistical model to obtain realistic estimates of the 90th and 95th percentile ingestion.  The mean amount of toothpaste used per brushing was 0.86 g for the 2–4 yr olds, 0.94 g for the 5–7 yr olds and 1.10 g for the 11–13 yr olds.  Ingestion rates among the four groups are summarized in Table 4-3. Assuming 1000 ppm F in the toothpaste, these toothpaste ingestion rates would correspond to mean fluoride ingestion rates of 0.3 mg for the 2–4 yr olds, 0.13 mg for the 5–7 yr olds and 0.07 mg for the 11–13 yr olds.

| Table 4-3.  Age-Related Estimates of Fluoride Ingestion from Toothpaste Use | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Age (yr) | No. of Subjects | Toothpaste Used Per Brushing (grams)[a] | Toothpaste Ingestion (g) | | | Estimated Fluoride Ingestion (mg)[b] | | |
| | | | Mean | 90th Percentile | 95th Percentile | Mean | 90th Percentile | 95th Percentile |
| 2–4 | 62 | 0.86 | 0.30 | 0.73 | 0.82 | 0.3 | 0.73 | 0.82 |
| 5–7 | 56 | 0.94 | 0.13 | 0.27 | 0.44 | 0.13 | 0.27 | 0.44 |
| 11–13 | 73 | 1.10 | 0.07 | 012 | 0.21 | 0.07 | 0.12 | 0.21 |
| 20–35 | 60 | 1.39 | 0.04 | 0.12 | 0.13 | 0.04 | 0.12 | 0.13 |

SOURCE: Barnhart et al., 1974.

[a]Mean value.

[b]Assumes 1000 ppm F in toothpaste.

Environment Canada/Health Canada (1993) estimated the daily intake of fluoride from toothpaste (products for home use) for different age groups.  Based on a mean inorganic fluoride concentration of 1000 ppm in most toothpaste products (Beltran and Szpunar, 1988; Whitford, 1987), and an estimated toothpaste intake of 0.26-0.78 g/day for children 7 months to 4 years of age, 0.22–0.54 g/day for children 5 to 11 years of age, 0.14 g/day for adolescents 12-19 years of age, and 0.08 g/day for adults 20+ years of age (Levy, 1993), and assuming an average of two brushing per day, the fluoride intakes for these age groups was estimated to be 0.02–0.06 mg/kg bw/day, 0.008–0.02, 0.00246, and 0.00114 mg/kg bw/day, respectively. Using an average body weight of 57 kg for the 12-19 yr-olds and 70 kg for the adults, the daily fluoride intakes for these two age groups can be calculated as 0.14 mg/day and 0.0798 mg/day, respectively.

The most important factor determining the quantity of fluoride ingested by children during tooth-brushing was the amount of toothpaste used according to a study of 405 children, ages 2–7 yr, enrolled in Quebec City schools (Naccache et al., 1992).  The estimated amount of toothpaste used per brushing was determined by the difference between the amount used and the amount recovered from the toothbrush and rinse water.  Fluoride was analyzed with an ion-specific electrode.  The toothpaste contained 0.24% NaF.  The amount of toothpaste used, the age of the children and the amount of rinsing were analyzed by multiple regression analysis.  The amount of toothpaste used and the amount of fluoride ingested are shown in Table 4-4.  On average, the amount of toothpaste used was 0.5 g per brushing.  The mean amount of fluoride ingested was 0.229 mg per brushing.  The amount ingested decreased with increasing age.

| Table 4-4.  Toothpaste Use and Fluoride Ingestion  in Children Two to Seven Years Old | | | | | |
|---|---|---|---|---|---|
| Age (yr) | No of Subjects | Toothpaste Used (grams)[a] | | Estimated Fluoride Ingested (mg per brushing) | |
| | | Mean | SD | Mean | SD |
| 2 | 36 | 0.618 | 0.976 | 0.358 | 0.363 |
| 3 | 56 | 0.529 | 0.424 | 0.280 | 0.218 |
| 4 | 81 | 0.446 | 0.269 | 0.241 | 0.184 |
| 5 | 77 | 0.516 | 0.366 | 0.227 | 0.174 |
| 6 | 78 | 0.484 | 0.254 | 0.180 | 0.127 |
| 7 | 77 | 0.497 | 0.401 | 0.175 | 0.194 |
| Total | 405 | 0.503 | 0.401 | 0.229 | 0.195 |

**SOURCE:** Naccache et al., 1992.

Rojas-Sanchez et al. (1999) estimated fluoride intake from toothpaste in groups of children, aged 16–40 months, from three communities; San Juan, Puerto Rico (n=11), Connersville, IN (n=14) and Indianapolis, IN (n=29).  Intake was determined by subtracting the amount of toothpaste expelled and the amount left on the toothbrush from the amount initially placed on the toothbrush.  The concentration of fluoride in the toothpaste was 0.10–0.11% (theoretical).  Samples were analyzed for fluoride using the hexamethyldisiloxane microdiffusion method of Taves (1968b) as modified by Dunipace et al. (1995).  Frequency of brushing equal to or greater than two times per day was 91% (n=11) in San Juan; 67% (n = 14) in Connersville; and 46% (n = 29) in Indianapolis.  The mean amount (± SEM) of fluoride ingested in toothpaste each day was estimated to be 548 ±62 µg in San Juan, 576 ±86 µg in Connersville, and 424 ±73 µg in Indianapolis.

The patterns of fluoride ingestion from toothpaste use in children from shortly after birth (1.5 months) to an age of 36 months were reported by Levy et al. (2001).  Information was obtained from questionnaires as part of the longitudinal Iowa Fluoride Survey.  Estimates of the amount of toothpaste used were based on the parents selecting from pictures depicting children's toothbrushes with different quantities of toothpaste on them, and the amount ingested were based on estimates made by the parents.  Estimates of the fluoride ingested were based on the manufacturers indication of the fluoride content of the toothpaste used (in most cases 1000-1100 ppm).  Results are shown in Table 4-5.

Using the same methodology as that for children 0–36 months old (Levy et al., 2001, see above), Levy et al. (2003a) calculated fluoride ingestion from toothpaste use in children aged 36 to 72 months old.  Results of the survey by fluoride source were presented by Levy et al. (2003a) in graphical form.  As estimated from the graphical data, mean fluoride intake from toothpaste was about 0.28 mg/day at 36 months, 0.27 mg/day at 48 months, 0.20 mg/day at 60 months, and 0.17 mg/day at 72 months.  Estimates of 90th percentile intakes from toothpaste ingestion for these same age groups were 0.76, 0.76, 0.50, and 0.50 mg/day, respectively.

| Table 4-5.  Estimated Fluoride Intake from Toothpaste[a] in Children 1.5 to 36 Months Old | | |
|---|---|---|
| Age (months) | Intake (mg) | |
| | Mean (SD) | 90th Percentile |
| 1.5 | 0.000 | 0.000 |
| 3.0 | 0.000 | 0.000 |
| 6.0 | 0.002 (0.041) | 0.000 |
| 9.0 | 0.013 (0.081) | 0.000 |
| 12.0 | 0.038 (0.136) | 0.109 |
| 16.0 | 0.102 (0.207) | 0.250 |
| 20.0 | 0.191 (0.270) | 0.500 |
| 24.0 | 0.257 (0.312) | 0.656 |
| 28.0 | 0.267 (0.305) | 0.750 |
| 32.0 | 0.290 (0.315) | 0.750 |
| 36.0 | 0.278 (0.292) | 0.750 |

**SOURCE:** Levy et al., 2001.

[a]Portion of toothpaste ingested estimated from parent's report.

Participants in the Iowa Fluoride Study were evaluated to determine the effect of fluoride toothpaste ingestion on the occurrence of dental fluorosis (Franzman et al., 2006).  The study utilized information derived from questionnaires filled out by the participants' parents concerning fluoride exposures and toothbrushing at ages 16, 24, and 36 months.  The results of the survey on toothpaste use are shown in Table 4-6.  The estimated percent of individuals ingesting 75% or more of the toothpaste was 82% at age 16 months, 85% at age 24 months, and 66% at age 36 months.

| Table 4-6.  Toothpaste Use and Ingestion by Children Ages 16 to 36 Months | | | |
|---|---|---|---|
| Parameter | Percentage of Children (n = 343) | | |
| | 16 Months Old | 24 Months Old | 36 Months Old |
| Individuals who brush teeth | 90 | 100 | 100 |
| Use of fluoridated toothpaste | 65 | 90 | 96 |
| Brush teeth less than once/day | 35 | 25 | 18 |
| Brush teeth once/day | 48 | 51 | 57 |
| Brush teeth twice/day | 14 | 23 | 24 |
| Brush teeth more than twice /day | 4 | 2 | 1 |
| ≤25% toothpaste swallowed | 13 | 7 | 21 |
| 50% toothpaste swallowed | 5 | 9 | 13 |
| ≥75 toothpaste swallowed | 82 | 85 | 66 |

**SOURCE:** Franzman et al., 2006.

In an earlier study (Franzman et al., 2004) estimated that 51–59% of children 9–32 months old ingested 0.125–0.25 g of toothpaste per brushing, declining to 28% at 60 months. 12% ingested 0.5–0.75 g at 9 months, increasing to 64% at 60 months. The percentage using 0.875–1.0 g per brushing was <3% up to 28 months, 3–5% at 32–54 months and 7% at 60 months. Using the information from Franzman et al. (2004), Franzman et al. (2006) estimated the amount of fluoride ingested (per kg body weight) by children who were showing definitive signs of fluorosis on the incisors and those not showing signs of fluorosis. Results are presented in Table 4-7. Average body weights for each age group were not reported. For all but the 16-month children the fluoride ingestion per unit of body weight was higher for the children with dental fluorosis than those without.

| Table 4-7. Fluoride Ingestion from Toothpaste Use and Fluorosis | | | | | |
|---|---|---|---|---|---|
| **Age** | **Fluorosis Absent** | | **Fluorosis Present**[a] | | **P Value**[b] |
| | **Number** | **Median Daily Fluoride Ingestion (mg/kg bw)** | **Number** | **Median Daily Fluoride Ingestion (mg/kg bw)** | |
| 16 mo | 220 | 0.002 | 89 | 0.002 | 0.61 |
| 24 mo | 220 | 0.010 | 89 | 0.017 | 0.02 |
| 36 mo | 220 | 0.012 | 89 | 0.016 | 0.02 |
| 16–36 AUC[c] | 220 | 0.011 | 89 | 0.013 | 0.02 |

**SOURCE:** Franzman et al., 2006.
[a]Two or more incisors with definitive fluorosis (fluorosis risk index of 2).
[b]Based on Wilcoxon rank sum test.
[c]AUC = Area under the curve, a measure of cumulative exposure.

Bohaty et al. (1989) evaluated topical and systemic fluoride supplement use and the prevalence of dental fluorosis in 300 children, aged 6–13 from 6 elementary schools, living in areas with optimal water fluoridation (location of the study sites and the fluoride level in the drinking water were not reported). Fluorosis was scored using Dean's system (subjects with fluorosis were considered those with a Dean score of 0.5 or higher). The data were categorized according to fluoride use, residential history, age, sex and geographic location. Differences in frequency of the categorized data were evaluated statistically with Chi-square analysis where the differences were considered significant at $p < 0.05$. There were no differences between tooth brushing frequency and fluorosis scores in any group.

## 4.2. Topical Applications and Mouth Rinses

Several studies have evaluated use of topical fluoride products and mouth-rinses. According to Levy and Zarei-M (1991), the Dental Care Supplement of the 1983 National Health Information survey found that 5% of children under age 5 yr and 17% of children 5–17 years old reportedly were using fluoride mouth-rinses.

Data from the 1986–87 National Institute of Dental Research U.S. Children's Survey revealed that 54% of children 5–17 years old without access to fluoridated drinking water received topical

fluoride treatments at a dentist's office and 22% had received topical fluoride treatments through school-based programs. From data complied in the Iowa Fluoride Study, Levy et al. (2003b) found that only 6% of children surveyed had a fluoride treatment by age 3, 27% by age 4, 44% by age 5 and 66% by age 6 (Table 4-8). Children with dental caries were more likely to have had such a treatment.

| Age (yr) | Number and/or time of surveys | Number of respondents | Reported fluoride treatments (%) | Mean (±SD) number of survey periods with fluoride treatments |
|---|---|---|---|---|
| ≤1 yr | 6, 9, 12 mo | 719 | 0 | |
| 1–2 | 16, 20, 24 mo | 504 | <1% | 0.01 ±0.10 |
| 2–3 | 28, 32, 36 mo | 434 | 6% | 0.07±0.30 |
| 3–4 | 40, 44  48 or 42 and 48 mo | 404 | 28% | 0.41±0.74 |
| 4–5 | 52, 56, 60 mo or 54 and 60 mo | 432 | 46% | 0.74±0.90 |
| 5–6 | 66 and 72 mo | 490 | 58% | 0.93±0.87 |
| | | | | |
| 1–3 | 9 | 347 | 6% | 0.07 ±0.31 |
| 1–4 | 11–12 | 265 | 27% | 0.43 ±0.82 |
| 1–5 | 13–15 | 207 | 44% | 1.09 ±1.52 |
| 1–6 | 15–17 | 187 | 66% | 1.96 ±2.10 |

**Table 4-8.  Percentage of Children Receiving Fluoride Treatments by Age Groups**

**SOURCE:** Levy et al. 2003b.

Levy and Zarei-M (1991) reviewed several earlier studies (Ekstrand and Koch, 1980; Ekstrand et al., 1981; Le Compte and Doyle, 1982; Le Compte and Rubenstein, 1984; Larsen et al., 1985; and Wei and Hattab, 1989) which indicated that topical applications of fluoride gel in a professional setting can lead to ingestion of 1.3–31.2 mg fluoride. They also noted that substantial ingestion of fluoride could occur in the home from the use of fluoride mouth-rinses and self-applied topical fluoride gels based on data reported by Ericsson and Forsman, (1969), Wei and Kanellis (1983) and Bell et al. (1985).

Heath et al. (2001) evaluated fluoride salivary retention and ingestion in young adults after application of topical gels using commercial or custom trays, toothbrushes or spatulas. The gels contained 0.62 mg fluoride (toothpaste) to 62.5 mg fluoride (1.23% gel applied with a commercial tray) and the amount ingested ranged from 0.3 to 6.1 mg of fluoride (5-29% of total applied). An additional 0.1–3.5 mg fluoride was retained in the saliva and presumed to have been swallowed.

Eklund et al. (2000) evaluated insurance claims for 15,190 children for treatment provided by 1,556 dentists and determined that the mean number of annual topical fluoride treatments per child was 1.18 (range 0.0–3.22). The age of the patients ranged from 4 to 14 years. The NRC

(2006) concluded that intakes from topical fluorides during professional treatment were unlikely to be significant contributors to chronic fluoride exposures because they are used only a few times per year.

## 4.3.   Summary of Fluoride Exposure from Dental Products

Table 4-9 is a summary of studies that examined exposure to fluoride from toothpaste.  With few exceptions all of these studies were published in the early to mid-1990s and are likely to not reflect changes in guidance on the amounts of toothpaste recommended for brushing (a pea-sized portion rather than a ribbon). Accordingly, they may overestimate current fluoride intakes from toothpaste. The data provided in Table 4-9 come only from studies that measured ingested fluoride by comparing the amount placed on the toothbrush to that left on the toothbrush and expectorated. Many of other studies reported estimates of ingestion based on questionnaires from parent reporting on toothpaste use.  Data on ingestion estimates are not included in Table 4-9.

Use of fluoridated mouth washes on a daily basis in the home setting is likely to increase the daily dose of fluoride from dental products.  Unfortunately no primary data on exposures from mouthwashes were identified.  In 1983 less than 20% of children in the 6 months to 14 year age range of concern used mouthwashes.  However, these data may very well not reflect current use patterns.

Fluoride is released from a number of dental devices, including composite resins, resin-based cements, resin-bonding agents, orthodontic bracket adhesives, pit and fissure sealants, glass ionomer cements, and cavity varnishes.  However, the exposure dose is probably small (HHS, 2010).

| Table 4-9.  Age-Related Exposure Estimates for Fluoride From Toothpaste | | |
|---|---|---|
| Age (yr) | Fluoride Intake[a] (mg/day) | Notes |
| 0.5 <1 | 0.01 | Levy et al., 1995 – mean; 6 month olds |
| | 0.07 | Levy et al., 1995 – mean; 12 month olds |
| 1<4 | 0.358 ±0.363 | Nacchache et al., 1992 – 2 year olds |
| | 0.280 ±0.218 | Nacchache et al., 1992 – 3 year olds |
| | 0.25 | Levy et al., 1995; 2-3 year olds |
| | 0.424, 0.576 | Rojas-Sanchez et al., 1999; 1.3–3.3 year olds. Average of values for two different locations |
| | 0.17 | Levy et al., 2000; 3–4 year olds. |
| 4<7 | 0.241 ±0.184 | Nacchache et al., 1992; 4 year olds |
| | 0.227 ±0.174 | Nacchache et al., 1992; 5 year olds |
| | 0.180 ±0.127 | Nacchache et al., 1992; 6 year olds |
| 7<11 | 0.175 ±0.194 | Nacchache et al., 1992; 7 year olds |
| 11 – 14 | 0.2 | Levy et al., 1995 – as adjusted by NRC; 13-19 year olds |
| >14 | No data | No data |

[a]Fluoride values represent one brushing per day.

Surveys of fluoride ingestion from tooth brushing are indicative of wide individual variability with standard deviations that are frequently greater than the mean values (Naccache et al., 1992). The studies are generally consistent in showing that mean fluoride intake from toothpaste decreases with age. This is likely due in some part to maturation of the swallowing reflex as well as improved rinsing and expectoration practices.

The number of times a child or adult brushes their teeth per day is an important variable in determining the fluoride ingested because of toothpaste use. Table 4-10 summarizes the data available from studies in children that recorded this parameter. Three of the studies were conducted in the United States (Levy et al., 1997; Rojas-Sanchez et al., 1999; Franzman et al., 2006) and two in Canada (Simard et al., 1989, 1991). In all the studies but 2 (Rojas-Sanchez et al., 1999, at one location; Simard et al., 1989), the percentage brushing their teeth one time per day was greater than that for more frequent brushings. The Simard et al., 1989 study covered the largest age range (2 to 5 years), suggesting that those results may easily have been influenced by a high representation of older children who brushed two or three times per day. Based on these data, the OW chose to use the data for one brushing per day to represent fluoride exposure from ingestion of toothpaste. There are no ingestion data for elementary-school age children, adolescents or adults. Although some of the cited data are from Canada, the values reported suggest that the FDA (2009) guidance that children younger than 2 years in age should not use toothpaste when brushing their teeth is not practiced by many.

| Table 4-10.  Number of Tooth Brushings Per Day Reported for Children (Six Months to Five Years Old) | | | | | |
|---|---|---|---|---|---|
| **Study** | **N =** | **Age (years)** | **Percentages[a]** | | |
| | | | **1 time/day** | **2 times/day** | **3 times/day** |
| Simard et al, 1989 | 23 | 2 to 5 | 4.8 | 71.4 | 23.8 |
| Simard et al. 1991 | 15 | 1 to 2 | 60 | 32 | 8 |
| Levy et al., 1997 | 899 | 0.5 | 41.2 | 16.9 | 6.3 |
| | 665 | 0.75 | 33.2 | 17 | 3.1 |
| | 508 | 1 | 37 | 14.7 | 3.5 |
| Rojas-Sanchez et al., 1999 | 14 | 2.25 | 33[b] | 67[c] | |
| | 29 | 2.3 | 54[b] | 46[c] | |
| Franzman et al., 2006 | 90 | 1.3 | 48 | 14 | 4 |
| | 100 | 2 | 51 | 23 | 2 |
| | 100 | 3 | 51 | 24 | 1 |

[a]Some studies also reported those brushing their teeth less than once per day and more than three times per day. In these cases the percentages do not add up to 100%.
[b]Less than or equal to 1 time per day
[c]Equal to or greater than 2 times per day

The presence of food in the gastrointestinal tract decreases the bioavailability of fluoride from 30 to 40 % based on studies in which adults ingested a toothpaste slurry after eating a meal or after fasting (Cury et al., 2005).  In the fasted state, bioavailability was assumed to be close to 100%, deceasing to 61 to 71% after meals if the toothpaste has the current conventional 1100 ppm fluoride concentration.  These data are supported by a study of fluoride absorption after ingestion of tablets (2 mg) of sodium fluoride and sodium monofluorophosphate (Trautner and Einwag, 1989); both chemicals are used in toothpaste.  Ingestion of the tablet with milk reduced peak plasma fluoride levels to 70% of the level when the tablet was taken with water (Trautner and Einwag, 1989).

## 5.  Other Sources of Exposure

### 5.1.  Exposure from Air

As noted by NRC (2006), fluoride is released to the atmosphere by natural sources such as volcanoes and also by various anthropogenic sources.  Atmospheric releases of inorganic fluoride to the atmosphere can come from power plants burning coal, aluminum production plants, phosphate fertilizer plants, chemical production facilities, steel mills, magnesium plants, and manufacturers of brick and structural clay (ATSDR, 2003).

### 5.1.1.  Monitoring Data

Cholak (1960) reviewed pre-1951 data on atmospheric levels of fluoride ion in several non-industrial areas of the United States.  Average concentrations ranged from 0.02 ppb in Logan, Utah, to 2 ppb in New York.

Thompson et al. (1971) reported on water-soluble fluoride concentrations in ambient air collected by the National Air Surveillance Network in 1966, 1967, and 1968.  Fluoride levels were measured in water-extracted samples using a fluoride ion-specific electrode.  Of a total of 9175 urban air samples, only 18 (2%) exceeded 1.0 $\mu g/m^3$, and the maximum concentration recorded was 1.89 $\mu g/m^3$ (mean concentrations were not reported).  Of 2164 non-urban samples only 3 (1%) exceeded 0.1 $\mu g/m^3$, and the maximum concentration recorded was 0.16 $\mu g/m^3$.

Thompson et al (1971) also summarized the results of the Continuous Air Monitoring Project conducted in 1967 and 1968 in six major US cities (Chicago, Cincinnati, Denver, Philadelphia, St. Louis, and Washington, DC).  Over 110 samples were analyzed from each city.  The percentage of 1967 samples in which no fluoride could be detected (minimum detection limit 0.05 $\mu g/m^3$) ranged from 58% in Chicago to 98% in Washington, DC.  The percentage of 1968 samples in which no fluoride could be detected ranged from 42% in St Louis to 84% in Cincinnati.  The maximum recorded values were 1.90 $\mu g/m^3$ in St. Louis in 1967 and 0.55 $\mu g/m^3$ in Chicago in 1968.

Kelly et al. (1993) reported that ambient concentrations of hydrogen fluoride in the United States, as measured around 1983, ranged from 1.0 to 7.5 $\mu g/m^3$ (ATSDR, 2003).

Atmospheric concentrations of fluoride in most parts of Canada are generally low or undetectable (<0.05 $\mu g/m^3$) (Environment Canada/Health Canada, 1993).  Atmospheric levels in a residential area near Toronto averaged (monthly) 0.03 $\mu g/m^3$.

Fluoride levels in the atmosphere can be unusually high in certain locations due to industrial activity and/or the burning of fluoride-rich coal.  Ernst et al. (1986) reported that in 1981 the Surveillance Division of the Air Pollution Control Directorate-Canada measured an average atmospheric fluoride concentration (particulate and gaseous) of about 0.6 $mg/m^3$ downwind from an aluminum smelter located in a rural inhabited area on the U.S.-Canadian border.

## 5.1.2. Exposure to Airborne Fluoride

According to NRC (2006), exposure to airborne fluoride for most individuals in the United States is expected to be low compared with ingested fluoride as reported by U.S. EPA, (1988), with exceptions being populations living in heavily industrialized areas or having occupational exposure. Using inhalation rates of 10 $m^3$/day for children and 20 $m^3$/day for adults, NRC (2006) calculated that fluoride inhalation exposures in rural areas (<0.2 $\mu$g/$m^3$ fluoride) would be less than 2 $\mu$g/day for a child and 4 $\mu$g/day for an adult.  In urban areas (<2 $\mu$g/$m^3$), fluoride exposures would be less than 20 $\mu$g/day for a child and 40 $\mu$g/day for an adult.  Most of the data that support these estimates are 30 to 40 years old and were collected before restrictions were placed on many industrial releases of gases and particulate matter to ambient air.  The NRC estimates are consistent with the older monitoring data reported in Section 5.1.1 but the 1993 Canadian data cited above suggest that ambient air concentration in the U.S. may now be lower than the values used by NRC (2006) in their assessment.

Airborne fluoride can indirectly contribute to human exposure as a result of secondary contamination of edible fruits and vegetables.  In reviewing the data available at the time, Waldbott (1963) reported that peaches grown near an aluminum plant in Oregon contained 3.2–21.9 ppm fluoride, whereas those grown in an uncontaminated area contained only 0.21 ppm F. Similarly, carrots grown near an aluminum plant in Switzerland contained 5.0 ppm F, whereas uncontaminated carrots contained 0.22–2.0 ppm F.  High levels of fluoride were also reported for orange juice (0.05–3.12 ppm F), milk (3.2 ppm F) and spinach (16.0 ppm F) obtained in Tampa, FL, near a phosphate fertilizer plant.  The normal levels of fluoride in orange juice were reported to be 0.07–0.17 ppm, and that in milk 0.1–0.3 ppm.

## 5.2. Oral Supplements

Oral fluoride supplements are prescribed by physicians and dentists for children living in areas where the drinking water contains low levels of fluoride.  The daily doses of supplemental fluoride recommended by the American Dental Association (as revised in 1994) call for no supplement use for children less than 6 months old and none for any child whose water contains more than 0.6 mg F/L (Table 5-1).  Guidelines for other age groups and drinking water fluoride concentrations are summarized in Table 5-1.

| Table 5-1.  Daily Fluoride Supplementation Recommended by the ADA and the American Academy of Pediatric Dentistry | | | |
|---|---|---|---|
| Age | Fluoride Concentration in Local Water Supply | | |
| | <0.3 ppm | 0.3-0.6 ppm | >0.6 ppm |
| 0–6 months | None | None | None |
| 6–36 months | 0.25 mg | None | None |
| 3–6 years | 0.50 mg | 0.25 mg | None |
| 6–16 yr | 1.00 mg | 0.50 mg | None |

SOURCE: ADA ( http://www.ada.org/3088.aspx ).

The Dental Care Supplement of the 1989 National Health Interview Survey reported that approximately 10.5% of 31,446 children under 18 yr of age had used fluoride supplements (CDC, 1989).

Levy and Muchow (1992) evaluated patterns of fluoride supplement use among 446 children and their siblings living in either Iowa or North Carolina.  Fluoride intake through the use of supplements was compared to the fluoride levels of the municipal drinking water in the areas where the children lived.  Results suggested that approximately one-third of the primary children and 42% of the siblings did not receive an adequate amount of fluoride.

A survey conducted by Pendrys and Morse (1990) of seventh and eighth grade children living in Massachusetts and Rhode Island found that 35.1% of 74 children who had lived in a fluoridated community for at least 3 years during their first 6 years of life were given fluoride supplements.

As reported in Section 4, the patterns of fluoride ingestion from toothpaste use in children from shortly after birth (1.5 months) to an age of 36 months were reported by Levy et al. (2001). Using information from the questionnaires provided by the parents, Levy et al., (2003a) calculated fluoride ingestion from dietary supplements in children ages 36 to 72 months old. Results were presented in graphic form.  The estimates of mean fluoride intakes from supplements were less than 0.05 mg/day for all age groups (Table 5-2).

| Table 5-2.  Fluoride Intake from Supplements in Children 1.5 to 36 Months Old | | |
|---|---|---|
| Age (months) | Intake (mg/day) | |
| | Mean (SD) | Maximum |
| 1.5 | 0.014 (0.045)[a] | 0.375 |
| 3.0 | 0.018 (0.060) | 0.833 |
| 6.0 | 0.019 (0.063) | 1.000 |
| 9.0 | 0.014 (0.052) | 0.500 |
| 12.0 | 0.015 (0.054) | 0.500 |
| 16.0 | 0.011 (0.054) | 1.000 |
| 20.0 | 0.008 (0.038) | 0.250 |
| 24.0 | 0.008 (0.052) | 1.000 |
| 28.0 | 0.012 (0.068) | 1.000 |
| 32.0 | 0.013 (0.079) | 1.000 |
| 36.0 | 0.013 (0.079) | 1.000 |

SOURCE: Levy et al., 2001.

Trautner and Einwag (1986) measured the bioavailability of fluoride in three health food products recommended for children.  The net urinary excretion of fluoride in six children ages 15-16 years was measured after ingestion of bone meal tablets, calcium earth tablets or siliceous earth tablets with fluoride contents of 520, 100, and 115 mg F/kg.  Urinary fluoride was measured with an ion-specific electrode.  Mean relative bioavailability was found to be 53.9

±21.6% from bone meal tablets, 64.8 ±23.6% from calcium tablets, and 38.9 ±20.5% from siliceous earth tablets.

In a later study Trautner and Einwag (1989) measured the bioavailability of fluoride when administered as NaF or sodium monofluorophosphate tablets (2 mg F). The test subjects were 7-19 years old and were given the supplements while fasting, or with milk or with milk and food. Fluoride levels in blood samples were measured using an ion-specific electrode. In fasting subjects equal levels of bioavailability were seen for both fluoride compounds and assumed to be 100%. Ingestion of milk reduced peak plasma fluoride levels by 30% compared to that for fasting individuals, but this effect was not seen when the milk was consumed with food.

Bohaty et al. (1989) evaluated both topical and systemic fluoride supplement use and the prevalence of dental fluorosis in 300 children, aged 6-13 from 6 elementary schools, living in areas with optimal water fluoridation (location of the study sites and the fluoride level in the drinking water were not reported). Fluorosis was scored using Dean's system (subjects with fluorosis were considered those with a Dean score of 0.5 or higher). The data were categorized according to fluoride use, residential history, age, sex and geographic location. Differences in frequency of the categorized data were evaluated statistically with Chi-square analysis where the differences were considered significant at $p < 0.05$. Although there were no significant associations between the frequency of tooth brushing and dental fluorosis, for subjects from four schools (n = 206), the frequency of using fluoride supplements was significantly associated with fluorosis. Similarly, for subjects of three of these four schools, the use of fluoride gels and rinses was significantly associated with dental fluorosis.

## 5.3. Soil Ingestion by Children

Fluoride ranks 13th or 14th in terms of its elemental abundance in the earth's crust. Thus, fluoride in soil could be a source of inadvertent exposure, primarily for children. Typical fluoride concentrations in soil in the United States range from very low (<10 ppm) to as high as 7% (70,000 ppm) in some areas with high concentrations of fluorine-containing minerals (ATSDR, 2003). Mean or typical concentrations in the United States are on the order of 300–430 ppm. Soil fluoride content may be higher in some areas due to use of fluoride containing phosphate fertilizers or to deposition of airborne fluoride released from industry.

The EPA (2008) Child-Specific Exposure Factor's Handbook recommends use of a combined soil and outdoor dust ingestion rate of 60 mg/day for children < 1 year old and 100 mg/day for children 1 to < 21 years of age. Using an average fluoride concentration of 400 ppm, the oral intake from soils for an infant (<1 year) would be 0.02 mg/day and that for older children and adolescents would be 0.04 mg/day. The estimated intake for adults in the EPA (1997) Exposure Factors Handbook is 50 mg/day and equivalent to 0.02 mg F/day from soils with an average concentration of 400 ppm. Erdal and Buchanan (2005) estimated intakes of 0.0025 and 0.01 mg/kg/day for children (3–5 years), for mean and reasonable maximum exposures, respectively, based on a fluoride concentration in soil of 430 ppm. In their estimates, fluoride intake from soil was 5–9 times lower than that from fluoridated drinking water.

For children with pica (a condition characterized by consumption of nonfood items such as dirt or clay), an estimated value for soil ingestion is 10 g/day (U.S. EPA, 1997). For a 20-kg child

with pica, the fluoride intake from soil containing fluoride at 400 ppm would be 4 mg/day or 0.2 mg/kg/day. Although pica in general is not uncommon among children, the prevalence is not known (U.S. EPA, 1997). Pica behavior specifically with respect to soil or dirt appears to be relatively rare but is known to occur (U.S. EPA, 1997). Fluoride intake from soil for a child with pica could be a significant contributor to total fluoride intake. For most children and for adults, fluoride intake from soil probably would be important only in situations in which the soil fluoride content is high, whether naturally or due to industrial pollution.

## 5.4. Pharmaceuticals

As noted by Müller et al. (2007), since 1957, over 150 fluorine-containing drugs have come to the marketplace and now make up about 20% of all pharmaceuticals. The presence of fluorine in a drug can enhance binding efficacy and selectivity (Müller et al., 2007). Typical fluorine-containing drugs include fluoxetine (antidepressant Prozac), atorvastatin (cholesterol-lowering drug Lipitor), and ciprofloxacin (antibacterial drug Ciprobay). Waldbott (1963) reported that certain fluoride-containing tranquilizers and steroids, when taken three times per day, can result in a daily intake of 0.8–1.0 mg F. Fluoride in such drugs is organically bound to carbon atoms. The extent that the fluoride becomes bioavailable as a result of the metabolism of these drugs is likely to vary from drug to drug. To assess the contribution of fluorine-containing drugs to the total body pool of fluoride ion, information is needed on the changes in concentration of fluoride ion in blood serum following ingestion of such drugs. NRC (2006) reported that there are slight, but not significant increases of inorganic fluoride in serum after ingestion of several organofluorine pharmaceuticals but only a limited number of such products have been evaluated.

Oral electrolyte solutions were sampled for fluoride and found to contain 0.01–0.15 mg F/kg by Dabeka and McKenzie (1987). Electrolyte solutions are used to replenish the fluids lost during episodes of severe diarrhea in children.

## 5.5. Occupational Exposures

Inhalation exposures to fluoride in the workplace are limited by regulations established by the Occupational Safety and Health Administration (OSHA). The OSHA 8-hr TWA exposure limit of for fluoride is 2.5 mg/m$^3$ (ATSDR, 2003). A person breathing at an average rate of 20 m$^3$ per day would inhale 16.8 mg during one 8-hr working shift (equivalent to 0.24 mg/kg/day for a 70 kg man).

## 5.6. Smoking

As noted by NRC (2006), heavy cigarette smoking could contribute as much as 0.8 mg of fluoride per day to an individual (0.01 mg/kg/day for a 70-kg person) (U.S. EPA, 1988).

### 6. Exposure Assessment Summary

As mentioned in the preceding sections of this report, fluoride concentrations in different media and resultant fluoride exposures vary for a number of reasons including the following:

- The methodologies used in conducting the studies differ in the ways the data were gathered, grouped and analyzed
- The size and composition of the study populations differ between studies.
- The analytical methods used to determine the concentration of fluoride in media of interest have evolved over time with the evolution of new methods that improved fluoride recovery and detection levels as well as reduced interference from other ions
- The amounts of fluoride present in the drinking water supply and soils differ with local geology and fluoridation practices.
- Available commercial food and beverage products and population dietary preferences are not constant over time
- Use of fluoridated water as process water by commercial food and beverage facilities can increase fluoride content to levels above that in the unprocessed product.
- Home cooking of foods in fluoride-containing water increases the fluoride content of the finished product but the increase varies with the food material prepared.

Each of these factors contributes to the differences observed when comparing data from the studies included in this report and to the uncertainty inherent in establishing an RSC for fluoride.

In developing the RSC for the fluoride from drinking water, EPA chose to focus on the following media as the major contributors to total intake:

- Drinking water from public drinking water systems.
- Solid foods from the diet including milk and juices not made from concentrate.
- Residues of the recently registered pesticide, sulfuryl fluoride.
- Beverages, both commercial and home-prepared using tap water (i.e. coffee, tea, reconstituted juices and powdered beverage mixes).
- Infant formula made from powdered concentrate for the six-month to less than one-year age group.
- Toothpaste swallowed during tooth brushing.
- Incidental ingestion of soil and outdoor dust.

There are other sources of fluoride exposure such as ambient air, dietary supplements, professional dental treatment products, and some pharmaceuticals.  These sources make minimal contributions to daily intakes during the period of dental fluorosis vulnerability.  NRC (2006) estimated that average exposures from ambient air would be 2 micrograms per day for children and 4 micrograms per day for adults. Supplements are not recommended for use in cases where water is fluoridated, and thus, would not be appropriate at the 0.87 mg/L concentration that represents the national average fluoride concentration for public water systems (Section 3.3) because it falls within the recommended fluoridation range.  Professional dental fluoride treatments are episodic and do not contribute greatly to the average daily intake when normalized

across time.  The major chronic-use, fluoride-containing pharmaceuticals (i.e. Zocor and Prozac) do not include young children among their target population. Intakes of the antibiotic Ciptoflaxozin (Cipro) by children would be episodic rather than chronic. In addition, the covalently-bound fluoride in pharmaceuticals does not appear to be bioavailable (NRC, 2006).

After consideration of the strengths and weaknesses of the studies presented in the preceding sections of this report, EPA selected the data from one or two studies to represent the fluoride intake for each of the age groups used in assessing the dose-response for severe dental fluorosis (U.S. EPA, 2010a).  In making the selection of the representative study EPA applied the following guidelines:

- Where possible a study from the United States was selected over a study from Canada.
- The publication had to report that plain water was not included in the market basket or duplicate diet.
- Where there was no study that clearly eliminated plain water from the market basket in the study description, the study location with the lowest drinking water fluoride concentration was selected and the uncertainty introduced noted.
- Market basket approaches were preferred over duplicate diet or recall studies because they were considered to be more geographically representative.
- Studies considered for use as representative for toothpaste were those where the ingested toothpaste was measured.
- The study methodology and the ages of the children studied were both considered: methodology was given a higher weight in the selection process than age in situations where there were several study options for an age range.

The value selected and the rationale for its selection are provided in Tables 6-1, 6-2, 6-3, and 6-4 for solid foods, beverages, plain drinking water, and toothpaste, respectively.  Soil ingestion by young children was determined using an average soil concentration of about 400 ppm (see Section 5.3) and the EPA estimates of 60 or 100 mg/day for soil ingestion by young children (U.S. EPA, 2008).  Each value is reported to a hundredth of a mg/day due to the analytical limitations inherent in the representative values.

## 6.1.  Dietary Intake

**Foods.**  The food category includes milk and fruit and vegetable juices that are not made from concentrate.  Milk and such juices are not categorized as beverages by the FDA Total Diet Study (Egan et al., 2007).

Data from Ophaug et al., (1985) and Jackson et al. (2002) were selected as representative for all but adults in Table 6-1 below. These studies used a market basket approach in the analysis of food for their fluoride content.  Intakes for the non-beverage food groups come from the USDA (1998) Continuing Survey of Food Intakes by Individuals (Jackson et al., 2002) or its precursor USDA (1968) survey of food consumption.  The Ophaug et al. (1985) data are used for the 0.5- to <1-year and 1- to <4-year age groups.  The Jackson et al. (2002) data are used for the 4- to < 7-year age group. Duplicate plate data were available from Brunetti and Newbrunn (1983) and Rojas-Sanchez et al., (1999). OW determined that these were less representative of the age group

than the data selected because of the study design and the small number of participants. In addition, Brunetti and Newbrunn (1983) did not separate the fluoride from beverages from that for solid foods.

| Table 6-1. Estimated Daily Dietary Fluoride Intakes from Solid Foods for Age Groups of Concern | | |
|---|---|---|
| Age (years) | Exposure Estimate (mg/day) | Rationale |
| 0.5 – <1 | 0.25 | Ophaug et al., 1985 – Overall mean (0.17 mg/day) from 22 market baskets, and national food intake data (Table 2-24); does not include F from plain water and beverages. These data were adjusted by subtracting the average for the milk and the average for formula and other dairy products of 0.06 mg/day from (Ophaug, 1980a Table 2-23) and replacing it with 0.14 mg/day from the powdered formula (Van Winkle et al., 1995) [ 0.17 - 0.06 + 0.14 = 0.25]. The Ophaug et al. (1985) data apply to 6-month-old infants. |
| 1 – <4 | 0.16 | Ophaug et al., 1985 – Overall mean of 22 market baskets, and national food intake data; does not include plain water and beverages (see Table 2-31). Based on 2-year-old children. This value is slightly greater than the average of the means (0.13 mg/day) from the less representative Rojas-Sanchez et al. (1999) duplicate plate analysis using data for 54 children from three cities covering a larger segment of the age range 1.3–3.3 years. The Ophaug et al. (1985) estimate, although an older study, had a broader geographic representation. |
| 4 – <7 | 0.35 | Jackson et al. (2002). Average of 2 market basket values (0.350 and 0.357 mg/day) excluding plain drinking water and beverages. Based on 3- to 5-year-old children. |
| 7 – <11 | 0.41 | The estimate for this age group is based on the mean F concentration for food groups from two market baskets in the study by Jackson et al. (2002) and USDA (1998) data on food group intakes for the 6–11 year age group. It does not include plain drinking water or beverages. |
| 11 – 14 | 0.47 | The estimate for this group is based on the mean F concentration for food groups from two market baskets in the study by Jackson et al. (2002), and USDA (1998) data on food group intakes for the 12–19 year age group. It does not include plain drinking water or beverages. |
| >14 | 0.38 | Average of the exposure estimates of Singer et al., (1980, 1985) and Taves (1983). All estimates but Taves (1983) are based on 15- or 16- to 19-year-old males. The Taves study was a six-day duplicate diet type representing an adult regular hospital diet. |

In the case of the 0.5 to one year old group, the exposure value for foods applies to formula-fed children in cases where the formula is a powdered product reconstituted with tap water. Only the fluoride in the powdered formula, not that in the tap water used to reconstitute the formula, is included in the food value in Table 6-1. Powdered formula is the most prevalent product chosen (~90%) by parents who use formula according to the HHS Infant Feeding Practices Study (Table 3-15, CDC, 2009).

As described in the table, the food value for this age group was calculated by adding the average of the four city average intakes from milk to the average of the four city average intakes from other dairy products and formula (0.06 mg/day; Table 2-23) and subtracting the sum from the food total (0.17 mg/day; Table 2-24), and then adding the amount from the powdered formula (0.14 mg). The water added to reconstitute the formula is included in the drinking water exposure (Table 6-3). The relative contribution of fluoride in the powdered formula versus the added water depends on the concentration present in the water as well as the concentration in the powder. When the water is fluoridated it accounts for more of the exposure than the powdered formula.

The reported food value in Table 6-1 represents a child with no intake of fluoride from milk or other dairy products. In many cases children begin to consume milk rather than formula as they approach their first birthday. Total fluid feeding of infants begins to decline at about 5-months as the intake of solid foods increases; at 9 months only about 10% of infants are being given a fluid-only diet. (Grummer-Strawn et al., 2008) This is not reflected in Table 6-1 making the estimate a conservative one.

Using the data from Van Winkle et al. (1995 Table 2-3) to represent a soy-based powdered formula will increase the fluoride intake for soy-based, formula-fed children 0.5 to 1 years old by 0.1 mg/day to 0.36 mg/day. The mean value for powdered soy-formula preparations reported by Siew et al. (2009, Table 2-4) had lower fluoride concentration and would lower the total fluoride from the powdered concentrate by 0.03 mg/day.

There is a lack of appropriate data from published studies of the 7- to <11-year and 11- to 14-year age groups. Accordingly, local fluoride food-group concentrations from the Jackson et al. (2002) study were combined with national USDA (1998) food intake data for the closest age range and used to represent these age groups (Tables 2-34). Food product information in the USDA (2005) database is too limited to support OW development of a market basket to apply with age groups that lack primary data. The value for the 11 to <14 year old age group is a conservative estimate since the USDA (1998) food intake data apply to the 12 to 19 year age group. High food intakes associated with the teenage growth spurt will tend to cause averages for 12–19 year old children to be higher than those for 11 to <14 year old children.

The adult data available for fluoride intake from foods were limited to an analysis based on hospital diets of limited scope (Taves, 1983) and three market basket surveys (San Filippo and Battistone, 1971, Singer et al., 1980, 1985). Each of the market basket surveys was based on teen-aged male adolescents as the population of interest. This age group tends to have a higher caloric and food intake than adults > 20 years old. Singer at al. (1980) found that the colorimetric method used for fluoride analysis by San Filippo and Battistone (1971) produced higher fluoride concentrations than those obtained for the same homogenates using an ion-specific electrode. This is likely the reason that the San Filippo and Battistone results are about 0.3 to 0.4 mg/day higher than those from the other three studies. Because of the weaknesses in the San Filippo and Battistone (1971) data, EPA chose to average the results of the other three studies together as representative of average adult intakes from foods (0.40 + 0.42 + 0.33 mg/day ÷ 3 = 0.38 mg/day).

The uncertainties in the exposure estimates in Table 6-1 are acknowledged. However, despite the limitations found in the available data set, the pattern of fluoride intake is consistent with the expected pattern for food and calorie intakes that apply to the individual age groups. The mg/day intake for infants whose primary food source is formula made from a powdered concentrate was higher than that for the 1-3 years age group with a more mixed diet. The estimates for the other age groups were higher than that for infants, increasing with age as caloric requirements and food intake levels increase.

**Beverages.** As was the case for the food estimates, EPA selected a single value from the beverage data (Table 2-46) to represent the intakes for each age group of interest. The values selected and selection rationales are presented in Table 6-2. Estimates represent a combination

of fluoride from commercial beverages and beverages prepared at home using tap water.  As was the case for the food, the beverage estimates are given to the hundredth of a mg/day in recognition of the analytical limitations for the studies that provided the representative values.

| Table 6-2.  Estimated Daily Fluoride Intake from Beverages Only for Age Groups of Concern | | |
|---|---|---|
| Age (years) | Exposure Estimate (mg/day) | Rationale |
| 0.5 – <1 | – | No value.  All fluoride intake was considered to be from powdered formula (Table 6-1) prepared with tap water (The tap water fluoride concentration is in Table 6-3). |
| 1 – <4 | 0.36 | Mean value from Pang et al., (1992); 3-day drink diaries (n=57); beverages store-bought or made with de-ionized water. Milk and plain drinking water were excluded. Based on 2–3 year olds. |
| 4 – <7 | 0.54[c] | Mean value from Pang et al., (1992); 3-day drink diaries (n=79); beverages store-bought or made with de-ionized water. Milk and plain drinking water were excluded. Based on 4–6 year olds. |
| 7 – <11 | 0.60 | Mean value from Pang et al., (1992); 3-day drink diaries (n=89); beverages store-bought or made with de-ionized water. Milk and plain drinking water were excluded. Based on 7–10 year olds. |
| 11 – 14 | 0.38 | Derived from Jackson et al. (2002). Data for fluoride in the beverage food group were combined with USDA (1998) data on beverage intakes to estimate fluoride exposure.  Does not include plain drinking water. Applies to ages 12-19. The Jackson et al. (2002) estimate is supported by the Clovis and Hargreaves (1988) data from a dietary record Canadian study covering six-grade students, average age ~12 years (range of 0.02 to 0.82 mg/day). |
| >14 | 0.59 | Singer et al., (1985); based on 5 market baskets from different areas of the country and excluding plain drinking water. The average water fluoride level was 0.14 mg/l ± 0.03. Based on data for 15-19 year-olds. |

There is no beverage intake estimate for the 0.5 to <1-year age group because this analysis focuses on the group most likely to be at risk for severe dental fluorosis, those infants who exclusively consume powdered formula prepared with tap water.  The fluoride in the powdered formula is included in Table 6-1 and the fluoride in the tap water is in Table 6-3.

The Pang et al. (1992) data are used as representative for the 1-year through <11 year age groups. In this study the samples analyzed were selected from three-day diaries kept by or for 225 children.  Plain drinking water and milk were excluded but fruit juices were included. Home-prepared beverages were reconstituted with deionized water.  Accordingly, fluoride that would be introduced from preparing the beverages at home with tap water is included in Table 6-3 and not Table 6-2.  The inclusion of fruit juice could bias the results to the high side, but, with the exception of grapes, most fruits are low in fluoride.

Table 2-46 includes other measures of fluoride intakes from beverages among children in the 4 to <7 year age group and the 7 to < 11 year age groups.  Levy et al. (2003a) estimated an average fluoride intake of 0.2 mg/day from beverages, not including plain drinking water, for 3–6 year olds derived from questionnaires completed by the parents and historical data on fluoride concentrations in the beverages.  The 90th percentile estimate was about 0.5 mg/day.  The Levy study was a dietary record study.  The Jackson et al. (2002) food frequency recall-based market basket for a town with 0.16 mg/L in the drinking water provided a beverage contribution of

0.12 mg/day for the 4 to < 7 year age group and a value of 0.22 mg/day for the 7 to < 11 year age group.  The Pang et al. (1992) exposure estimate falls above the mean and 90th percentile levels in the Levy et al. (2003a) study and above the average values from Jackson et al. (1995). Accordingly it is a conservative value for fluoride intake from beverages.

The average male/female fluoride intake from beverages in the low fluoride town (0.16 mg/L; Connorsville, IN; Table 2-34) studied by Jackson et al. (2002) is used for the 11 to 14-year age group in the absence of other data.  The Jackson data do not include fluoride from plain drinking water but do include fluoride from bottled water.  This estimate may be slightly high since the beverage intakes apply to 12 to 19 year old adolescents and the local water was not totally free of fluoride. Inclusion of bottled water is expected to have a minimal impact on the fluoride intake. The USDA (2005) database indicates that commercial bottled waters are low in fluoride.

The beverage exposure estimate for adults is from Singer et al. (1985) for the 5 cities with the lowest drinking water fluoride levels (average 0.14 mg/L). It was selected as representative of intakes in communities with low fluoride in their drinking water and therefore in home prepared beverages. The Taves (1983) estimate of (1.38 mg/day) and that of San Fillipe and Battistone (1971; 1.34 mg/day) were higher. The San Fillipe and Battistone data were not selected because it included plain drinking water and used a colorimetric assay for fluoride analysis which is less accurate than the ion-specific electrode used by Singer et al. (1985).  The Taves (1983) estimate was based on house diets for adults in a hospital setting. Taves (1983) attributed the high fluoride levels to the fact that the hospital diets included daily servings of orange juice, coffee, and two servings of tea, as well as other juices.  The Taves data demonstrate that tea was the major contributor to the fluoride intake from beverages.  All of the adult data are from studies where tap water was used for home beverage preparation.

## 6.2. Drinking Water

Table 6-3 provides the estimates for fluoride intakes from plain drinking water and the indirect water that is used in the home preparation of beverages and foods when it is part of a standard recipe.  Following the RSC policy, the drinking water contribution is determined from the average fluoride concentration from public drinking water systems as reported to EPA through the ICR for the second six-year review of regulations combined with 90th percentile drinking water intakes.  The data apply to consumers only at the 90th percentile intake level.  The average water concentration (0.87 mg/L) was derived from 16 monitoring quarters covering the years 2002 through 2005 as described in Section 3.3. The drinking water intake data come from EPA (2004) rather than the EPA (2008) Child-Specific Exposure Factors Handbook because the age ranges in EPA (2004) match those used in the EPA (2010a) dose-response assessment for severe dental fluorosis while those in EPA (2008) do not.  Both EPA (2004) and EPA (2008) are based in CSFII 1994–1998 water intake data.

| Table 6-3.  Fluoride Intake from Consumption of Municipal Water (Direct and Indirect[a]) at the Average Concentration (0.87 mg/L) Determined from Monitoring Records for 2002 through 2005 | | |
|---|---|---|
| Group (yr) | Water Consumption[a] | Fluoride Intake[a] |
| | 90th Pecentile Intake Total mL | mg/day total |
| 0.5–0.9 | 971 | 0.84 |
| 1–3 | 723 | 0.63 |
| 4–6 | 943 | 0.82 |
| 7–10 | 993 | 0.86 |
| 11–14 | 1415 | 1.23 |
| 14+ | 2000[b] | 1.74[b] |

SOURCE: Adapted from U.S. EPA, 2004.
[a]Consumers only value.
[b]Value for the 14+ age group – EPA policy for adults.

## 6.3.  Toothpaste

There are a number of studies that report on toothpaste use and resultant potential total exposure from fluoridated dentifrice.  A more limited set of data are available from studies where the ingestion of toothpaste during tooth brushing was measured.  In the toothpaste ingestion studies, the toothpaste placed on the toothbrush was measured and corrected for that left on the toothbrush after brushing and that expectorated during post-brushing rinsing of the mouth.  The difference was assumed to be swallowed. The data from these studies are summarized in Table 6-4.  Each estimate is highly uncertain since the confidence bounds around the mean values are indicative of high inter-individual variability (See Table 4-9).  Estimates may be high because the studies were conducted before the recommendation became widely publicized for children to use only a pea-sized amount of toothpaste when brushing.

| Table 6-4.  Age-Related Exposure Estimates for Fluoride from Toothpaste | | |
|---|---|---|
| Age (yr) | Fluoride Intake (mg/day) | Notes |
| 0.5 – <1 | 0.07 | Mean for 12-month old children, from Levy et al., 1995.  The value for the six-month old child was 0.02 mg/day but few children brush at this age since children have few teeth at this age.  For that reason the estimate for the 12-month olds was considered to be a better choice (see Table 4-9). |
| 1 – <4 | 0.34 | Average of estimates from Levy et al., 1995; Levy et al., 2000; Nacchache et al., 1992 and Rojas-Sanchez et al., 1999 (see Table 4-9). |
| 4 – <7 | 0.22 | Average of estimates for 4, 5, and 6 year-olds by Nacchache et al., 1992 (see Table 4-9). |
| 7 – <11 | 0.18 | Average for seven year olds by Nacchache et al., 1992 (see Table 4-9). |
| 11 – 14 | 0.2 | NRC estimate based on Levy et al., 1995 (see Table 4-9). |
| Adult | No data | No measured value for ingestion.  Estimated as half that for 11 to 14 year olds. |

Data represent one brushing per day.  Studies suggest high inter-individual variability in the amount swallowed.

Fluoride intakes represent one brushing per day, a value that is applicable to about half the population for children < 3 years old according to the data collected by Franzman et al. (2006), Levy et al. (1997), and Simard et al. (1991).  The number of brushings appears to increase to twice a day for older children (Simard et al., 1989) but this estimate lacks confirmation from other studies. Increasing the number of brushings per day for children to 2 would double the intake estimates.

## 6.4.  Soils

Although concentration varies with local geological conditions, 400 ppm was been identified as a reasonable estimate for an average fluoride concentration in soils (ATSDR, 2003).  Based on this concentration and a combined soil and outdoor dust ingestion rate of 60 mg/day for children < 1 year old (U.S.EPA, 2008) the fluoride intake for an infant (<1 year) would be 0.02 mg/day.  The comparable fluoride intake for the 0–14 year age groups would be 0.04 mg/day using the 100 mg/day estimate for intakes of soil and indoor dusts (U.S. EPA, 2008).  The fluoride RSC assessment considers children older than 14 to be grouped with adults since they are no longer vulnerable to severe dental fluorosis.  The estimated intake for adults in the EPA (1997) Exposure Factors Handbook is 50 mg/day and equivalent to a 0.02 mg/day intake from soils with an average concentration of 400 ppm. Lower fluoride concentrations in soil are likely the norms for areas of the country with minimal geological fluoride.

## 6.5.  Uncertainty

There are many uncertainties in the estimates EPA selected for the RSC analysis related to analytical methods and study protocols.  In addition, the food preferences and food intakes of the U.S. population shift as new products are introduced into the market-place and the dietary intakes change.  The past thirty years have seen an increase in the use of pre-prepared commercial foods by the average consumer, increased imports of fresh produce from foreign countries, and more frequent eating of meals away from home at restaurants, schools and daycare facilities. Accordingly, the data from the selected studies (published between 1980 and 2002) are not necessarily representative of current food preferences and intakes.

Additional uncertainties in the exposure estimates are due to the lack of published studies that provide an exact match to the age ranges used in this analysis.  Some of the data come from very localized areas whereas other studies collected food and beverage samples representing different geographical areas across the country.  The concentrations of fluoride in the water used in food preparation were not always identified; in cases where the fluoride in the water was identified, the resultant concentrations in the finished foods did not always show a consistent relationship to the drinking water concentration. Each of these factors contributes to the uncertainty in the representative values chosen.

In recognition of the multiple uncertainties affecting the data, EPA has selected values that are representative of average to slightly above average fluoride intakes for the RSC analysis.  EPA believes that these are reasonable estimates.

In addition to the methodological variables influencing the intake assessment, there are also uncertainties about the bioavailability of fluoride in the diet.  The solubility product constants for

calcium and magnesium fluoride are low and can limit fluoride absorption from foods that contain these cations.  Spak et al. (1982) found that 72% of the fluoride in milk and 65% of the F in formula were bioavailable by measuring the fluoride levels in plasma after ingestion.  Cury et al. (2005) found the gastrointestinal absorption of fluoride in an ingested toothpaste slurry was lower when slurry ingestion occurred directly after a meal than when it was consumed after fasting. Hydroxyfluoroapatite, the form of fluoride found in bone, has a low solubility product constant.  Thus, when ashed for analysis, any meat, poultry, or fish products that may have contained bone fragments would contribute to an overestimate of the bioavailable fluoride in the product as consumed.

One major limitation with the food and beverage data reported in Tables 6-1 and 6-2 is the studies were all conducted before the approval of sulfuryl fluoride as a fumigant for food storage facilities and food processing plants. Accordingly, any fluoride currently in the food supply because of sulfuryl fluoride fumigation is not reflected in those data. The OPP (U.S. EPA, 2010b; see Appendix B) provided OW with estimated contributions of fluoride to the food supply from sulfuryl fluoride data (Table 6-5).  As was the case for Tables 6-1 through 6-4, fluoride residues are reported to the hundredth of a mg/day.

| Table 6-5.  Sulfuryl Fluoride Contributions to Dietary Fluoride Exposure. | | | |
|---|---|---|---|
| **Population Group** | **Exposure Estimates, mg/day** | | |
| | **Structural Fumigations** | **Food Fumigations** | **Total** |
| 0.5– <1 year | <0.01 | 0.02 | 0.03 |
| Children 1 – <4 yrs | 0.01 | 0.03 | 0.05 |
| Children 4 – <7 yrs | 0.02 | 0.05 | 0.06 |
| Children 7 – <11  yrs | 0.02 | 0.05 | 0.07 |
| Youth 11– <14 yrs | 0.02 | 0.07 | 0.09 |
| Adults >14 | 0.02 | 0.06 | 0.08 |

**SOURCE:** U.S. EPA, 2010b

## 7. Relative Source Contribution (RSC)

The OW has followed the general principles for RSC determination outlined in the Ambient Water Quality Criteria Human Health Methodology (U.S. EPA, 2000b) when determining the RSC from drinking water intake for fluoride. According to OW policies, the subtraction approach to RSC determination is not appropriate because of the OPP registration of pesticides (cryolite, sulfuryl fluoride) that limit fluoride residues on treated food products (See Section 1.2 of this report).  Accordingly, the percentage approach was applied.

The RSC for water from public systems is calculated using the following equation:

$$\text{RSC} = \frac{\text{DWI}}{\text{DWI} + \text{FI} + \text{BI} + \text{DI} + \text{SI}} \times 100$$

where:

DWI = Intake from consuming water (direct and indirect) with an average of 0.87 mg/L F (see Section 3.3) by the 90th percentile consumer
FI = Average intake of F from dietary foods except for beverages
BI = Average intake of F from beverages (commercial and prepared with tap water)
DI = Average intake of F from toothpaste use
SI = Average intake from soils and outdoor dust

Exposures from ambient air are not included in the RSC equation because they are a minor contributor (< 4 µg/day) to the total exposure estimate (Section 5.1.2). Based on the NRC estimated urban air concentration, the contribution of fluoride from air is ≤0.3% of the total exposure for a young child and < 0.1% of the total for an adult.  Fluoride intakes from supplements are also not included because the average drinking water concentration falls within the recommended range for fluoridation of drinking water, and supplements are not recommended for those who receive fluoridated drinking water (see Section 5.2).

Table 7-1 provides the representative values for intakes of fluoride through each quantified medium for each age group of interest as well as the total fluoride intake and the percentage contributed by direct and indirect drinking water residential tap water.  The 90th percentile drinking water intakes (consumers only) are used for all age groups as it is U.S. EPA policy to protect the majority of the population. The drinking water fluoride concentration is the average for all systems detecting fluoride.  Average values are used for the fluoride contributions from the other media as required by (EPA, 2000b).  Exposure estimates are presented at the one hundredth of a milligram intake level because of the analytical uncertainties surrounding the representative data selected.

| Table 7-1.  Representative Values for Fluoride Intakes Used in Calculation of the Relative Source Contribution for Drinking Water | | | | | | | |
|---|---|---|---|---|---|---|---|
| Age Group (years) | DWI[a] (mg/day) | FI (mg/day) | BI (mg/day) | TI (mg/day) | SI (mg/day) | Total (mg/day) | RSC (%) |
| 0.5 – <1 | 0.84 | 0.25[b] | – | 0.07 | 0.02 | 1.19 | 71 |
| 1 – <4 | 0.63 | 0.16 | 0.36 | 0.34 | 0.04 | 1.53 | 41 |
| 4 – <7 | 0.82 | 0.35 | 0.54 | 0.22 | 0.04 | 1.97 | 42 |
| 7 – <11 | 0.86 | 0.41 | 0.60 | 0.18 | 0.04 | 2.09 | 41 |
| 11 – 14 | 1.23 | 0.47 | 0.38 | 0.20 | 0.04 | 2.32 | 53 |
| > 14 | 1.74 | 0.38 | 0.59 | 0.10[c] | 0.02 | 2.83 | 61 |

[a]Consumers only; 90th percentile intake except for >14 years.  The > 14 year value is based on the OW policy of 2 L/day.
[b]Includes foods, F in powdered formula, and fruit juices; no allocation for other beverages.
[c]Assumed to be 50% of the value for the 11-14 year old age group.

DWI = Drinking Water Intake (see Table 6-3).
FI = Food Intake (Solid Foods) (see Table 6-1).
BI = Beverage intake (see Table 6-2).
TI = Toothpaste Intake (see Table 6-4).
SI = Soil Intake (see Section 6.4).

Table 7-1 does not include consideration of any residues from the use of sulfuryl fluoride, a fumigant that was approved for use on food products after all of the dietary data used for this report were collected (U.S. EPA, 2009b).  A separate calculation that includes estimation of fluoride residues from sulfuryl fluoride (SuF) is provided in Table 7-2.  Sulfuryl fluoride decomposes in the environment to produce sulfate and fluoride ions.  The OPP (U.S. EPA, 2009; 2010b) has provided the OW with estimates of fluoride residues from the currently approved uses of this product which include fumigation of food storage facilities and processing plants, as well as direct fumigation of some foods for pest control purposes.  Table 7-2 shows the results of the RSC calculation when sulfuryl fluoride residue is included in the RSC analysis.

| Table 7-2.  Representative Values for Fluoride Intakes (Including Sulfuryl Fluoride) Used in Calculation of the Relative Source Contribution from Drinking Water | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Age Group (years) | DWI[a] (mg/day) | FI (mg/day) | SuF (mg/day) | BI (mg/day) | TI (mg/day) | SI (mg/day) | Total (mg/day) | RSC (%) |
| 0.5 – <1 | 0.84 | 0.25[b] | 0.03 | -- | 0.07 | 0.02 | 1.21 | 70 |
| 1 – <4 | 0.63 | 0.16 | 0.05 | 0.36 | 0.34 | 0.04 | 1.58 | 40 |
| 4 – <7 | 0.82 | 0.35 | 0.06 | 0.54 | 0.22 | 0.04 | 2.03 | 40 |
| 7 – <11 | 0.86 | 0.41 | 0.07 | 0.60 | 0.18 | 0.04 | 2.16 | 40 |
| 11 – 14 | 1.23 | 0.47 | 0.09 | 0.38 | 0.20 | 0.04 | 2.41 | 51 |
| > 14 | 1.74[b] | 0.38 | 0.08 | 0.59 | 0.10[c] | 0.02 | 2.91 | 60 |

[a]Consumers only; 90th percentile intake except for >14 years. The > 14 year value is based on the OW policy of 2 L/day.
[b]Includes foods, F in powdered formula, and fruit juices; no allocation for other beverages.
[c]Assumed.  50% of the 11-14 year old age group.
DWI = Drinking Water Intake (see Table 6-3).
FI = Food Intake (Solid Foods) (see Table 6-1).
SuF = Sulfuryl Fluoride Intake (see Table 6-5)
BI = Beverage Intake (see Table 6-2).
TI = Toothpaste Intake (see Table 6-4).
SI = Soil Intake (see Section 6.4).

Figure 7-1 illustrates the percentage contributed by each of the media in Table 7-2 to daily total fluoride intake.  It is apparent that, for most individuals in the population, the contribution from drinking water is substantially less than the 100% assumed in the EPA 1986 derivation of the MCLG for crippling skeletal fluorosis.  However, the contribution from drinking water for adults who are not at risk for dental fluorosis (60%) is greater than the limiting value for children (40%) who are susceptible to severe dental fluorosis.



**Figure 7-1.  Percentage Media Contribution to Total Daily Fluoride Intake: 90th Percentile Drinking Water Intakes for Consumers Only and a Fluoride Concentration of 0.87 mg/L**

Drinking water contributes the highest percentage of the total fluoride intake (70%) for infants six months to one year old.  However, the high percentage contribution of drinking water for this age group is partially a consequence of the use of the intakes for infants fed exclusively with powdered formula reconstituted with tap water containing 0.87 mg/L fluoride for this analysis.  The food intake data for the 0.5 to 1 year old age group came from a study of six-month old infants (Ophaug et al., 1985) as described in Table 6-1.  This intake value also contributes to the high percent of the total coming from drinking water because, at this stage of development, the intake of formula is higher than that at one year when the typical infant's diet has expanded to include a variety of solid foods and juices.

The diet (solid foods, beverages, and sulfuryl fluoride) is another major contributor to total fluoride intake with sulfuryl fluoride making a minor contribution to the total.  It is the largest contributor for children ages 4 to <11.  However, dietary fluoride is indirectly impacted by the

fluoride in drinking water because cooking and preparing foods in fluoride-containing water increases the fluoride content of the prepared food (Maier and Rose, 1966; Ophaug et al., 1985). Many food and beverage production facilities use fluoride-containing water in food preparation. When there is fluoride in the water supply, some of it will end up in the food supply. This is particularly true for beverages. The work by Ophaug et al. (1985) found that correlation coefficients between beverage fluoride and the drinking water fluoride concentration ranged from 0.72 to 0.98 for the four quadrants of the country. There was not a strong correlation between the drinking water fluoride and the fluoride content of solid foods (Ophaug et al., 1985) although cooking studies have shown uptake from the preparation water (Martin, 1951).

As discussed in Section 6, there are alternative estimates for the contribution of fluoride from beverages, excluding plain drinking water, for children in the 4 through <11 year age groups. The alternative estimates are lower than the values from the Pang et al. (1999) diary-based study selected by EPA. They are 0.2 mg/day from Levy (2003a) and 0.12 from Jackson et al (1995) for the 4 through <7 year group and 0.22 from Jackson et al. (1995) for the 7 to <11 year age group. When the RSCs for drinking water were calculated with these values in place of the Pang et al. (1999) data, the RSC values changed from 40 and 39% to 49/51 and 48%.

The relative source for drinking water would also be affected by the use of a soy-based powdered formula rather than a milk-based powdered formula by children in the 0.5 to 1 year old age group. Under this circumstance the drinking water RSC will decline from 70% to 64% if the soy-formula data from VanWinkle et al. (1995) are used.

Geologically, one-third to one-half of the U.S. has access to ground water containing less than 0.5 ppm fluoride (See Figure 3-1), while surface waters exhibit lower geochemical fluoride levels. However, currently, about 69% of U.S. population receives fluoridated water (CDC, 2008), where the natural fluoride level has been augmented through the addition of certified fluoridation chemicals to attain final fluoride concentrations that range between 0.7 and 1.2 mg/L. Consequently, the average fluoride concentration in the nation's drinking water has increased from what it was before systems began the practice of fluoridating drinking water on an experimental basis in 1945 as a public health measure to lower cavities for children and adults (CDC, 1999).

Figure 7-1 indicates that existing data and estimates regarding sulfuryl fluoride in food items support a determination that sulfuryl fluoride is a minor contributor to the diet at current use levels. Recent identification of sulfuryl fluoride as a greenhouse gas (Papadimitriou et al., 2008; Anderson et al., 2009; Mühle et al., 2009) could limit future projected increases in SuF use.

After drinking water and diet, third in contribution to total fluoride intake for humans is toothpaste (Figure 7-1). Most recently introduced in 1955 as a measure to increase protection against dental cavities (Procter and Gamble, 2009), fluoridation of toothpaste with sodium fluoride, monofluorophosphate, or stannous fluoride has grown so that by 1989 almost 95% of the toothpaste sold to the U.S. market was fluoridated (Newbrun, 1989). The relative contribution of fluoride in toothpaste to total intake is highest (21%) for children in the 1- to 3-year age group. This is a consequence of poor swallowing control by children in this age range (Levy et al., 2001). Ingestion of fluoride from toothpaste decreases linearly with increased age as control of swallowing and expectoration reflexes mature (Figure 7-1).

The estimates of average ingestion of fluoride from toothpaste are more uncertain than those for food and drinking water.  There are several factors that contribute to the uncertainty including frequency of brushing, the amount of toothpaste used, and individual variability in use.  The data in Figure 7-1 represent average values per brushing and a single brushing per day.  In U.S. studies of the 1–3 year age group (Levy et al., 1997; Franzman et al., 2006) about 20 to 30 % of children brushed more frequently (Table 4-9).  Estimates for population groups greater than 3-years also assume one brushing per day.  Data on the frequency of brushing were not identified for school-aged children and adults but a substantial portion of those groups is likely to brush their teeth at least twice a day. Increased brushing frequency would increase intake contributed by toothpaste and its percent of the total. When the data were analyzed using estimates for two brushings per day for all age groups ≥7 years of age, the RSC values for drinking water decreased from 40, 40, 51 and 60% to 36, 37, 47 and 58%. None of these changes was substantial.

Another variable impacting the estimate is the amount of toothpaste placed on the toothbrush. The studies used to quantify the intake were conducted before the guidance (ADA, 1991) to reduce the toothpaste applied from a ribbon to a pea-sized portion was publicized and do not reflect the FDA (2009) recommendation that children younger than 2 years not use toothpaste when brushing their teeth.  Decreasing the amounts of toothpaste applied to the toothbrush decreases the fluoride ingested.  Finally, all of the dentifrice studies showed that there was high inter-individual variability among the subjects as indicated by the wide confidence bounds on the average values (see Table 4-8). Thus, there is considerable uncertainty in the toothpaste estimates.

Normalized daily intakes of fluoride from soils, indoor dust, ambient air, fluoride-containing pharmaceuticals, episodic dental treatments, and cigarette smoke are minor contributors to total exposures for the average children and adults. Use of fluoride-containing mouthwashes, particularly by children in the 1–7 year age group, is an unquantified exposure that could measurably increase the total estimates from Table 7-2.  Mouthwash contributions were not quantified because of a lack of data.  In 1983, the now dated National Health Interview Survey found that 5% of children under 5 used mouth rinses, as did 17% of children ages 5 to 17. However, this survey did not estimate fluoride intakes from such products and intakes from fluoridated mouthwashes are not included in the RSC analysis.

## 8.  Relationship of Exposure Estimates to Dietary Guidelines

Although, the contributions of various individual media to total fluoride intakes are important, the total intake is even more important from a public health perspective. Fluoride is a nutritionally-active substance with beneficial properties for both teeth and bone (IOM, 1997). Accordingly, total intakes should provide adequate fluoride to meet dietary guidelines without leading to severe dental fluorosis in children and skeletal problems in adults.

### 8.1.  Estimates of Daily Dietary Needs.

The National Academy of Sciences (NAS) provided dietary guidelines for fluoride beginning in 1989 (NRC, 1989). The most recent guidelines (Dietary Reference Intakes; IOM, 1997) established Adequate Intake (AI) recommendations for age groupings from infants through adults. The AI is the recommended average daily intake based on observed or experimentally determined approximations, or estimates of adequate nutrient intakes by a group (or groups) of apparently healthy people. The AI is used when a Recommended Dietary Allowance (RDA) cannot be determined because the data are not sufficient to establish average dietary needs based on a biological measure of a person's nutritional status. In the case of fluoride, an easily monitored biological measure of adequacy has not been established.

The AI for fluoride was based on the estimated dietary intakes that have been shown "to reduce the occurrence of dental cavities maximally in a population without causing unwanted side effects including moderate dental fluorosis." IOM (1997) determined that the role of fluoride in protecting tooth enamel, stimulating bone growth, and preventing calcification of soft tissues justified the development of dietary guidelines.

Table 8-1 provides the AI values for each age grouping targeted by IOM and compares the AI levels to the total dietary fluoride intake estimates from Table 7-2. The AI estimates for fluoride include drinking water and identify it as a major contributor to total fluoride (IOM, 1997). It is clear from these data that EPA estimates of current total F intakes meet the AI recommendations for infants, children through age 14, and females, but are below the AI recommendation for adult males.

IOM (1997) did not consider dental decay as a biomarker for low fluoride exposure because decay is associated with a variety of factors and cannot be attributed solely to low fluoride intakes. The AI for infants is based on the daily mean intake of a nutrient from human milk by exclusively breast-fed, healthy infants (IOM, 1997). Intakes from drinking water are included in the AI for fluoride for other age groups; in fact, the IOM (1997) considered ingested drinking water to be the major contributor to total dietary intake.

| Table 8-1.  Comparison of Total Fluoride Intake Estimates to the Dietary Adequate Intake (AI). | | |
|---|---|---|
| Age Range[a] (years) | AI [b] (mg/day) | F Intake  Estimate (mg/day)[c] |
| 0.5 – <1 | 0.5 | 1.21 |
| 1 – <4 | 0.7 | 1.58 |
| 4 – <7 | 1 | 2.03 |
| 7 – <11 | 2 | 2.16 |
| 11 to 14 | 2 | 2.41 |
| Adult females | 3 | 2.91 |
| Adult males | 4 | 2.91 |

[a]IOM age groups are not an exact match for those used by OW for intake assessments.  OW used the best fit of the AI guideline to the age ranges used in this assessment.
[b]IOM, 1997.
[c]From Table 7.2.

## 8.2.    Estimates of Tolerable Upper Limit Level

Avoiding intakes of fluoride at levels that could cause adverse effects is as important to public health as providing adequate fluoride for growth, development and maintenance. The IOM (1997) has established Tolerable Upper Intake Level (UL) recommendations for fluoride to protect against dental fluorosis in children and skeletal fluorosis in adults.  A UL is the highest average daily nutrient intake level (including drinking water for fluoride) that is unlikely to pose a risk of adverse health effects to almost all individuals in the general population.   The UL values established by IOM are based on protection of young children (up through age 8) from moderate dental fluorosis, and are based on a daily dose of 0.1 mg/kg derived from the Dean (1942) data and using a UF of 1.  The UL values for children from 6 mo to ≤8 yr range from 0.9 to 2.2 mg/day.  The age of concern for moderate dental fluorosis was capped at age 8 because the effects were classified as cosmetic and of greatest concern when the visible anterior teeth were impacted.  The risk of cavities occurring on both the anterior and posterior teeth when dental fluorosis is severe, as identified by NRC (2006), was not considered by IOM (1997).  The UL values for children older than age 8 and adults are based on skeletal fluorosis as a critical effect and a lack of related symptoms at daily intakes of 10 mg/day for 10 or more years (IOM, 1997).  The IOM UL did not consider the data linking fluoride to a possible increase in the risk for bone fractures that were considered by NRC (2006).

The OW dose-response document for fluoride (U.S. EPA, 2010a) developed an estimated RfD of 0.08 mg/kg/day for protection of 99.5% of the vulnerable population against severe dental fluorosis and concluded that this value is also protective against fractures and skeletal effects in adults.   The estimated RfD is lower than the equivalent value (UL of 0.1 mg/kg/day) used by IOM (1997).  The OW estimated RfD was derived for the 95th percentile lower bound on the concentration of fluoride in drinking water associated with a 0.5% prevalence of severe dental fluorosis in the population studied by Dean (1942), equivalent to a fluoride dose of 0.07

mg/kg/day. A 0.01 mg/kg/day contribution from the diet, as derived from McClure (1943), was added to the drinking water component to yield the 0.08 mg/kg/day RfD. The RfD derivation can be found in the EPA (2010a) companion document, *Fluoride: Dose-Response Analysis for Non-cancer Effects*.

The RfD (mg/kg/day) was converted to age-specific oral exposure benchmarks (mg/day) that should be protective for severe dental fluorosis in most children and skeletal effects in most adults using mean bodyweights for each age group from (EPA, 2004) as reported in Table 8-2. They are compared in the table to both the IOM (1997) UL guidelines and the OW total daily intake estimates from this document.

| Table 8-2. Comparison of Total Fluoride Intake Estimates to the IOM (1997) Tolerable Upper Intake Level and the OW Age-Specific Benchmarks | | | |
|---|---|---|---|
| Age Group (years) | OW Benchmark[a] (mg/day) | UL[b] (mg/day) | Intake Estimate (mg/day)[c] |
| 0.5 – <1 | 0.72 | 0.9 | 1.21 |
| 1– <4 | 1.12 | 1.3 | 1.58 |
| 4 – <7 | 1.68 | 2.2 | 2.03 |
| 7 – <11 | 2.56 | 2.2 for 8 year olds | 2.16 |
| | | 10 for >8 year olds (skeletal fluorosis)[d] | |
| 11 to 14 | 4.08 | 10 (skeletal fluorosis) | 2.41 |
| Adult females | 5.6 | 10 (skeletal fluorosis) | 2.91 |
| Adult males | 5.6 | 10 (skeletal fluorosis) | 2.91 |

[a]The OW benchmarks were established to protect against severe dental fluorosis in children up to age 14 and to protect against skeletal fractures and skeletal fluorosis in adults.

[b]IOM UL values were established to protect against dental fluorosis up to age 8.

[c]From Table 7-2.

[d]The IOM values for ages > 8 years were established to protect against skeletal fluorosis.

## 8.3. Exposure Profiles

The data in Table 8-2 indicate that some children drinking water at the 90th percentile intake level up to about age 7 are being exposed to fluoride on a daily basis at levels at or higher than estimated acceptable intake levels when the concentration of fluoride in their drinking water is at or above 0.87 mg/L. Figure 8-1 shows the relationship between current intake estimates (drinking water intake at the 90th percentile level) and the OW RfD-derived benchmarks in units of mg/day. The RfD-derived benchmarks for each age group are shown as the solid black line in Figures 8-1 through 8-4. When examining Figure 8-1 it is important to remember that the RfD represents an exposure that is estimated to provide the anticaries benefits from fluoride without causing severe dental fluorosis in 99.5% of the children who drink water with 0.87 mg/L F at a 90th percentile intake level and have average intakes from other media during the period of secondary tooth formation. Based on the dose-response for severe dental fluorosis in EPA (2010a) only 0.5% or fewer of children consistently ingesting fluoride at a levels equivalent to

the RfD for a several month period would be at risk of experiencing severe dental fluorosis in two or more teeth.



**Figure 8-1.  Total Daily Fluoride Intake Estimates Relative to the Proposed RfD Using 90th Percentile Drinking Water Intake Data for Consumers Only and the Mean Drinking Water Fluoride Concentration (0.87 mg/L)**

If the drinking water intake level is adjusted to an average intake to match the average values used for the other exposure media, the relationship between exposure intakes and the RfD-equivalent intake changes (Figure 8.2). Children with average intake of all media in the younger age groups would still be slightly over exposed if the drinking water concentration were 0.87 mg/L.  At higher concentrations in drinking water, the number of children at risk for severe dental fluorosis would likely increase.  Risk would also increase if the fluoride from any other exposure media were greater than the values utilized by EPA in this assessment.

The OW RfD identifies a level of exposure that is considered to be acceptable for the general population.  Levels above the RfD are not necessarily unacceptable but risk is considered to increase as the difference between the RfD-equivalent and the dose increases.



**Figure 8-2.  Total Daily Fluoride Intake Estimates Relative to the Proposed RfD Using the Mean Drinking Water Intake Data for Consumers Only and the Mean Drinking Water Fluoride Concentration (0.87 mg/L)**

In any population, dietary intakes and food choices change from day to day.  Each person's daily fluoride exposure will be influenced by what they eat each day and how they brush their teeth. No one is average on a continuous basis.  Many people will consistently be exposed to higher levels of each fluoride-containing medium others will consistently be exposed to lower levels than depicted.  Children in communities that routinely exceed the current SMCL for fluoride during the period when their teeth are forming will be particularly vulnerable to developing severe dental fluorosis.  Figure 8-3 depicts the impact of an average drinking water intake for consumers only and the 90th percentile fluoride concentration for all systems reporting detections of fluoride. Figure 8-4 depicts the age-specific intakes for populations where drinking water intakes are at the 90th percentile level and the fluoride concentration (1.76 mg/L) is the average for those systems that reached or exceeded the SMCL of 2 mg/L at least once during the last 4 years of the ICR monitoring period for the second six-year review of regulations (Table 3-2). Children in areas of the country with high geological levels of fluoride and resultant higher levels in their drinking water who are also at the high end of the drinking water intake distribution are those with the greatest risk for severe dental fluorosis.



**Figure 8-3.  Total Daily Fluoride Intake Estimates Relative to the Proposed RfD using Mean Drinking Water Intakes for Consumers Only and the 90th percentile Fluoride Concentration for all Systems Reporting Detections of Fluoride.**



**Figure 8-4.  Total Daily Fluoride Intake Estimates Relative to the Proposed RfD using 90th Percentile Drinking Water Intakes for Consumers Only and Average Concentration (1.76 mg/L) for those Systems that Reached or Exceeded the SMCL of 2 mg/L at Least Once During the ICR Monitoring Period for the Second Six-year Review.**

In the case of fluoride, there are data on prevalence of dental fluorosis to support a conclusion that fluoride exposure levels among the population have increased in the last 40 to 50 years

resulting in an increase in dental fluorosis (Iida and Kumar, 2009; CDC, 2005). The prevalence of dental fluorosis has increased from 10–12% in the areas with about 1 mg/L in drinking water at the time of Dean (NRC, 1993) to 23 % in 1986/87 (NRC, 1993; Iida and Kumar, 2009) and to 32% in the 1999-2002 NHANES survey (CDC, 2005). The 1986/1987 data come from the National Survey of Oral Health of U.S. School Children, which examined 40,693 subjects. The NHANES survey included a smaller set of subjects (17,092) at ages greater than 2 years (CDC, 2005). Comparable data are not available for severe dental fluorosis.

The CDC (2005) report found that the prevalence of fluorosis was higher in the 12–15 and 16–19 year age groups during the 1999–2002 survey than in the 20–39 year old age groups, which may be a reflection of recent increases in total fluoride exposure. The data also indicated that posterior teeth were impacted to a greater extent than the visible anterior teeth and that there was a higher prevalence among the Non-Hispanic African Americans than Non-Hispanic Caucasian Population. Most of the fluorosis reported in the CDC (2005) report was very-mild or mild, conditions that are associated with decreases in tooth decay. However, there were cases of moderate/severe dental fluorosis combined and the percentages reported were higher for the age groups younger than 20 years old than for older individuals indicating that increases in total fluoride intakes may be relatively recent.

## 8.4.  Summary of findings

The OW conducted the Exposure and Relative Source Contribution assessment in order to determine the relationship of total fluoride intakes to the inorganic fluoride RfD from the companion dose-response assessment (U.S. EPA, 2010a). The relative contribution of ingested drinking water from public drinking water systems to total exposures was also examined.

The EPA MCLG/MCL for fluoride was established in 1986 and determined to be protective for Stage III (crippling) skeletal fluorosis. The determination of the MCLG/MCL included an assumption that drinking water contributed 100% of the exposure because the data used for quantification were derived from measures of the fluoride in the drinking water among the cases of Stage III skeletal fluorosis that provided the point of departure for the calculation.

The NRC (2006) examination of the MCL/MCLG for fluoride was an outgrowth of the first six-year review of the 1986 fluoride drinking water regulation as mandated by the 1996 SDWA and recognition by EPA of the number of scientific studies on the bone and dental effects of fluoride that were published after the regulation (U.S. EPA, 2003). The NRC published the report of their effort in 2006 as:  *Fluoride in Drinking Water: A Scientific Review of EPA's Standards*.  The NRC committee concluded that EPA's current MCLG of 4 mg/L for fluoride should be lowered to reduce the risk of severe enamel fluorosis and minimize the risk for bone fractures and skeletal fluorosis in adults. It charged the OW with conducting a dose-response assessment for the critical noncancer effects of fluoride on teeth and bone (U.S. EPA, 2010a) and the exposure and relative source assessment presented in this report. Through this effort, EPA has concluded that:

- Some young children are being exposed to fluoride up to about age 7 at levels that increase the risk for severe dental fluorosis.
- The contribution of residential tap water to total ingested fluoride is lower that it was in the past.

- Use of fluoridated water for commercial beverage production has likely resulted in increased dietary fluoride in purchased beverages, adding to the risk for over-exposure.

- The increase of fluoride in solid foods because of fluoridated commercial process water is more variable than that for beverages.

- Incidental toothpaste ingestion is an important source of fluoride exposure in children up to about 4 years of age. However, use of fluoridated toothpaste is not recommended for children under age 2 according to FDA guidance and package labeling suggesting the need for greater parental awareness of the FDA (2009) recommendations.

- Ambient air, soils, and sulfuryl fluoride residues in foods are minor contributions to total fluoride exposure.

Based on the data collected and evaluated by the OW, it is likely that most children, even those that live in fluoridated communities, can be over-exposed to fluoride at least occasionally. Children who live in communities where the fluoride concentration routinely falls between 2 mg/L and 4 mg/L have an even greater opportunity for over-exposure unless parents follow the EPA public notification advice not to allow their children to routinely drink the tap water until they are nine years of age (the upper age limit for the current public notification), and consult with their dental professions regarding use of fluoridated dental products. The impact of the elevated intakes on the risk for severe dental fluorosis in one or more teeth depends on the timing, frequency and duration of the over-exposures.

The data from this report and its companion dose-response assessment (U.S. EPA, 2010a) will be used by the EPA in order to determine whether lowering the MCLG and/or MCL for fluoride will provide a meaningful opportunity to reduce the risk for severe dental fluorosis and skeletal effects among populations served by public drinking water systems. The EPA is required to consider whether the costs of reducing fluoride in public water supplies are justified by the health benefits accrued through such a change. Regulatory decisions related to the MCLG and MCL are separate from the assessment of hazard in the NRC (2006) report, the OW dose-response report (U.S. EPA, 2010a), and this exposure and RSC document.

The OW's exposure and relative source contribution analysis accomplished each of its desired objectives within the limitations of the data provided in the published literature and the monitoring information from the second six-year review ICR data. The output of the analysis is age-group specific for children at risk of developing severe dental fluorosis and is presented in a format that will aid the OGWDW in characterizing opportunities for reducing population risk from fluoride in public drinking water systems. The data are intended as a resource for facilitating any necessary adjustment in the regulatory nonenforceable MCLG and enforceable MCL.

It is important to remember, however, that the exposure quantification provided follows the policy guidelines from EPA (2000b) using average exposure estimates for all media other than drinking water, the average drinking water concentration for systems that detect fluoride, and 90th percentile drinking water intakes. Thus, the intake estimates are more representative of average consumers than they are for individuals residing in areas of the country where the average drinking water concentration falls between the 2 mg/L and 4 mg/L concentrations allowed by the NPDWR rather than the 0.87 mg/L that is representative of the country as a

whole and for those where the drinking water has very low fluoride concentrations (< 0.1 mg/L). For children residing in areas where the fluoride levels are close to the MCL (4 mg/L) the risk for severe dental fluorosis is considerably higher.  Some adolescents and adults receiving drinking water that is consistently close to the MCL can easily exceed the 6 mg/day where the risk for effects on bone are considered to be a concern (WHO, 2001).

# 9.  References Cited

Adair, S.M. and S. Wei.  1977. Infant fluoride intake from formulas and milk – implications for supplementation.  J. Dent Res. 56:B209.

Adair, S.M. and S. Wei.  1978. Supplemental fluoride recommendations for infants based on dietary fluoride intake.  Caries Res. 12:76–82.

Allen, H.E., M.A. Halley-Henderson, and C.H. Hass.  1989.  Chemical composition of bottled mineral water. Arch. Environ. Health 44:102–116.

ADA (American Dental Association).  1991. Resolution 75/91 of the Council on Dental Therapeutics.  American Dental Association, 211 E. Chicago Ave.  Chicago, IL 60611.

Anderson, M.P., D.R. Blake, F.S. Rowland, M.D. Hurley, and T.J Wallington.  2009. Atmospheric chemistry of sulfuryl fluoride: Reaction with OH radicals, Cl atoms, and $O_3$, atmospheric lifetime, IR spectrum, and global warming potential.  Environ. Sci. Technol. 43:1067–1070.

AOAC (Association of Official Agricultural Chemists). 1945.  Official and Tentative Methods of Analysis of the Association of Official Agricultural Chemists, Sixth Edition.  H. A. Lepper, Chairman.  Washington, D.C., Association of Official Agricultural Chemists.  Methods 29.22 through 29.28 "Fluorine – Tentative."

AOACI (Association of Official Analytical Chemists International, AOAC International). 2000. Official Methods of Analysis of AOAC International, 17th Edition, W. Horwitz, Editor. Gaithersburg, MD., AOAC International.  Section 9.2.11.  "AOAC Official Method 944.08, Fluorine in Food:  Distillation Method.  First Action 1944; Final Action." *Metals and Other Elements*, Chapter 9, pp. 24-28.

APHA/AWWA/WEF.  2005.  *Standard Methods for the Examination of Water & Wastewater,* 21st Edition, pages 4-82 through 4-89.  A.D. Eaton, L.S. Clesceri, E.W. Rice, and A.E. Greenberg, eds.  Published jointly by the American Public Health Association (APHA), American Water Works Association (AWWA), and Water Environment Federation (WEF), Washington, D.C.

Armstrong, W.D. and M. Knowlton.  1942. Fluorine derived from food. J. Dent. Res. 21:326.  As cited in Marier and Rose, 1966.

ATSDR (Agency for Toxic Substances and Disease Registry).  2003.  Toxicological Profile for Fluorides, Hydrogen Fluoride and Fluorine.  Agency for Toxic Substances and Disease Registry, Public Health Service U.S. Depart of Health and Human Services, Atlanta, GA.

Bartko, J.J. and W.T. Carpenter. 1976. On the methods and theory of reliability. J. Nervous Mental Dis. 163:307–317.  As cited in Jakson et al., 2002.

Barnhart, W.E., L.K. Hiller, G.J. Leonard, and S.E. Michaels.  1974.  Dentifrice usage and ingestion among four age groups.  J. Dent. Res. 53:1317–1322.

Baxter, P.M.  1980. Toothpaste ingestion during toothbrushing by school children.  Brit. Dent. J. 148:125–128.

Bell, R.A., G.M. Whitford, J.T. Barenie, et al. 1985. Fluoride retention in children using self-applied topical fluoride products.  Clin. Prev. Dent. 7:22–27.  As cited in Levy and Zarei-M., 1992.

Bellack, E. and P. J. Schouboe.  1968. Rapid photometric determination of fluoride with SPADNS-zirconium-lake."  Anal. Chem. 30:2032–2034.

Beltran, E.D. and S.M. Szpunar.  1988.  Fluoride in toothpaste for children: suggestion for change. Pediatric Dent. 10:185–188.  As cited in Environment Canada/Health Canada, 1993.

Bohaty, B.S., W.A. Parker, N.S. Seale, and E.R. Zimmerman.  1989.  The prevalence of fluorosis-like lesions associated with topical and systemic fluoride usage in an area of optimal water fluoridation.  Ped. Dent. 11:125–128.

Borysewicz-Lewicka, M., J. Opydo-Szymacek, and J. Opydo.  2007.  Fluoride ingestion after brushing with a gel containing a high concentration of fluoride.  Bio. Trace Elem. Res. 120:114–120.

Brunetti, A. and E. Newbrun.  1983.  Fluoride balance studies in children 3 and 4 years old. Caries Res. 17:171.  (Abstract)

Buck, R. P. and E. Lindner.   2001. Tracing the history of selective ion sensors."  Anal. Chem. 73:88A–97A.

Bureau of Nutritional Sciences.  1977.  Nutrition Canada Food Consumption Patterns Report. Bureau of Nutritional Sciences, Health Protection Branch, Health and Welfare Canada, Ottawa, ON., pp 1–26.  As cited in Dabeka and McKenzie, 1993.

Burgstahler, A.W. and M.A. Robinson.  1997.  Fluoride in California wines and raisins. Fluoride 30:142–146.

Burt, B.A.  1992.  The changing patterns of systemic fluoride intake. J. Dent. Res. 71:1228–1237.

Cao, J., Y. Zhao, Y. Li, et al. 2006. Fluoride levels in various tea commodities: measurement and safety evaluation.  Food Chem. Toxicol. 1131–1137.

CDC (Centers for Disease Control and Prevention).  1989.  Dental Care Supplement of the 1989 National Health Interview Survey (NHIS), http://wonder.cdc.gov/wonder/sci_data/surveys/nhis/type_txt/dental89.asp

CDC (Centers for Disease Control and Prevention).  1993.  Fluoridation Census 1992.  Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.

CDC (Centers for Disease Control and Prevention).  1995.  Engineering and Administrative Recommendations for Water Fluoridation, 1995. Morbidity and Mortality Weekly Report, Recommendations and Reports 44(RR-13).

CDC (Centers for Disease Control and Prevention).  1999.  Achievements in Public Health, 1900-1999: Fluoridation of Drinking Water to Prevent Dental Caries for Water Fluoridation. Morbidity and Mortality Weekly Report 48:933-940. http://www.cdc.gov/mmwr/preview/mmwrhtml/mm4841a1.htm

CDC (Centers for Disease Control and Prevention).  2001.  Recommendations for Using Fluoride to Prevent and Control Dental Caries in the United States. Morbidity and Mortality Weekly Report 50 (No. RR-14):1–42 (for school water fluoridation, see page 26).

CDC (Centers for Disease Control and Prevention).  2005.  United States National Health and Nutrition Examination Survey, 1999–2002. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service. http://www.cdc.gov/mmwr/preview/mmwrhtml/ss5403a1.htm#fig20.

CDC (Centers for Disease Control and Prevention).  2008.  Populations receiving optimally fluoridated public drinking water – United States, 1992–2006.  Morbidity and Mortality Weekly Report 57:737–741.

CDC (Centers for Disease Control and Prevention).  2009. Infant Feeding Practices II, Table 3-15.  http://www.cdc.gov/ifps.  Accessed September 2010.

Chan, J.T., C. Stark, and A.H. Jeske.  1990.  Fluoride content of bottled waters: Implications for dietary fluoride supplementation. Texas Dental J. April, 1990: 17–21.

Chan, J.T. and S.H. Koh.  1996.  Fluoride content in caffeinated, decaffeinated and herbal teas. Caries Res. 30:88–92.

Cholak, J.  1959.  Fluorides: A Critical Review.  J. Occupational Medicine, September, 1959, pp. 501–511.  As cited in San Fillipo and Battistone, 1971.

Cholak, J.  1960.  Current information on the quantities of fluoride found in air, food and water. Arch. Indust. Health 21:312–315.

Clovis, J. and J.A. Hargreaves. 1988. Fluoride intake from beverage consumption. Community Dent. Oral. Epidemiol. 16:11–15.

Cochran, J.A., C.E. Ketley, R.M. Duckworth, et al. 2004.  Development of a standardized method for comparing fluoride ingested from toothpaste from 1.5–3.5 year-old children in seven European countries. Part 2: Ingestion results.  Comm. Dent. Oral Epidemiol. 32:1.  As cited in Browne et al., 2005.

Conway, E. J.  1950.  *Microdiffusion Analysis and Volumetric Error*, 3rd edition. Crosby Lockwood and Son, London.

Cury, J.A., F.S. Del Fiol, L.M.A. Tebuta, and P.L. Rosalen.  2005.  Low-fluoride dentifrice and gastrointestinal fluoride absorption after meals.  J. Dent. Res. 84:1133–1137.

Dabeka, R.W., A.D. Mckenzie, H.B. Conacher, and D.C. Kirkpatrick.  1982.  Determination of fluoride in Canadian infant foods and calculation of fluoride intakes by infants. Can. J. Public Health 73:188–191.

Dabeka, R.W., K.F. Karpinski, A.D. McKenzie, and C.D. Bajdik.  1986.  Survey of lead, cadmium and fluoride in human milk and correlation of levels with environmental and food factors. Fd. Chem. Toxic. 24:913–921.

Dabeka, R.W. and A.D. Mckenzie.  1987.  Lead, cadmium and fluoride in market milk and infant formulas in Canada.  J. Assoc. Off. Anal. Chem. 70:754–757.

Dabeka, R.W., A.D. McKenzie, G.M.A. Lacroix, et al. 1993.  Survey of arsenic in total diet food composites and estimation of the dietary intake of arsenic by Canadian adults and children.  J. AOAC Internatl. 76:14–25.

Dabeka, R.W. and A.D. Mckenzie.  1995.  Survey of lead, fluoride, nickel, and cobalt in food composites and estimation of dietary intakes of these elements by Canadians in 1986-1988.  J. AOAC Internat. 78:897–905.

Dahle, D., R.V. Bonnar, and H.J. Wichmann. 1938.  Titration of small quantities of fluoride with thorium nitrate. J. Assoc. Off. Agric. Chem. 21:459. As cited in Machle et al., 1942.

Danielsen, M.E. and T. Gaarder.  1955. Fluorine content of drinking water and food in western Norway. Univ. Bergen Arbok Naturvitenskap. Rekke. No.15.  As cited in Marier and Rose, 1966.

Dean, H.T.  1942.  The investigation of physiological effects by the epidemiology method.  In: *Fluoride and Dental Health*. Publ. Amer. Assoc Advanc. Sci., no. 19. pp 23–31.

Dunipace, A.J., E.J. Brizendine, W. Zhang, et al. 1995.  Effect of aging on animal response to chronic fluoride exposure. J. Dent. Res. 74:358–368.  As cited in Rojas-Sanchez et al., 1999.

Egan. K. 2002. FDA's Total Diet Study: Monitoring U.S. Food Supply Safety. Food Safety Magazine. June/July.

Egan, K. 2009. Total Diet Study (TDS) consumption amounts for beverages based on the 1987-1988 NFCS (1990 TDS food list) and the 1994-1998 CSFII (2003 TDS Food List). E-mail to Joyce Donohue (EPA), January 8, 2009.

Egan, S.K., P.M. Bolger, and C.D. Carrington. 2007. Update of the U.S. FDA's Total Diet Study food list and diets. J. Exposure Sci. and Environ. Epidemiol. 17:1559-0631.

Eklund, S.A., J.L. Pittman, and K.E. Heller.  2000. Professionally applied topical fluoride and restorative care in insured children.  J. Public Health Dent. 60:33–38.

Ekstrand, J. and M. Ehrnebo.  1979. Influence of milk products on fluoride bioavailability in man. Europ. J. Clin. Pharmacol. 16:211–215.

Ekstrand, J. and M. Ehrnebo.  1980. Absorption of fluoride from fluoride dentifrices. Caries Res. 14:96–102.

Ekstrand, J., M. Ehrnebo, and L. Boreus.  1978. Fluoride bioavailability after intravenous and oral administration. Importance of renal clearance and urine flow. Clin. Pharmac. Ther. 23:329–337.  As cited in Trautner and Siebert, 1986.

Ekstrand, J. and G. Koch.  1980. Systemic fluoride absorption following fluoride gel application. J. Dent. Res. 59:1067.  As cited in Levy and Zarei-M., 1992.

Ekstrand, J., G. Koch, L.E. Lindgren, et al.  1981.  Pharmacokinetics of fluoride gels in children and adults. Caries Res. 15:213–220.  As cited in Levy and Zarei-M., 1992.

Ekstrand, J., C.J. Spak, J. Falch, J. Afseth, and H. Ulvestad. 1984. Distribution of fluoride to human breast milk following intake of high doses of fluoride. Caries Res. 18:93–95. As cited in IOM, 1997.

Elvove, E.  1933.  Estimation of fluorides in waters.  Public Health Reports 48:1219–1222.

Environment Canada/Health Canada. 1993.  Priority Substances List Assessment Report. Inorganic Fluorides. Canadian Environmental Protection Act. Ottawa, Canada.

Erdal, S. and S.N. Buchanan.  2005.  A quantitative look at fluorosis, fluoride exposure, and intake in children using a Health Risk Assessment approach.  Environ. Health Perspect. 113:111–117.

Ericsson, Y. and B. Forsman.  1969. Fluoride retained mouthrinses and dentifrices in preschool children. Caries Res. 3:290–299.   As cited in Levy and Zarei-M., 1992.

Ernst, P., D. Thomas, and M.R. Becklake.  1986.  Respiratory survey of North American Indian children living in proximity to an aluminum smelter. Am. Rev. Respir. Dis. 133:307–312.  As cited in NRC, 2006.

Ershow, A.G., and K.P. Cantor. 1989. Total water and tapwater intake in the United States: population-based estimates of quantities and sources. National Cancer Institute Contract No. 263-MD-810264. Life Sciences Research Office. Federation of American Societies for Experimental Biology. Bethesda, MD.

Esala, S., E. Vuori, and A. Helle. 1982. Effect of maternal fluoride intake on breast milk fluoride content. Brit. J. Nutrit. 48:201–204.  As cited in IOM, 1997.

Featherstone, J.D.B. and C.P. Shields. 1988. A study of fluoride intake in New York state residents. Final report. New York State Health Department, Albany.  As cited in Levy et al. 1995 and USDA, 2005.

Felsenfeld, A.J. and M.A. Roberts.  1991.  A report of fluorosis in the United States secondary to drinking well water. J. Amer. Med. Assoc, 265:486–488.

Fleischer, M. 1962.  Fluoride content of groundwater in the conterminous United States. U.S. Geological Survey Miscellaneous Geological Investigation I–387. U.S. Geological Survey, Washington, DC.

Fleischer, M., R.M. Forbes, R.C. Harris, L. Krook, and J. Kubots. 1974. Fluorine. In: *Geochemistry and the Environment*, vol. 1: *The Relation of Selected Trace Elements to Health and Disease*. National Academy of Sciences, Washington, DC, pp. 22–25.

Fomon, S.J. 1975.  What are infants in the United States fed? Pediatrics 56:350.  As cited in Singer and Ophaug, 1979.

Fomon, S.J. and E.F. Bell.  1993a.  Energy. In: *Nutrition of Normal Infants*, S.F. Fomon, ed. Mosby, St. Louis, MO, pp. 103–120.  As cited in Fomon and Ekstrand, 1999.

Fomon, S.J. and J. Ekstrand. 1993b. Fluoride. In: *Nutrition of Normal Infants*, S.J. Fomon, ed. Mosby, St. Louis, MO, pp. 299–310.  As cited in Fomon and Ekstrand, 1999.

Fomon, S.J. and J. Ekstrand. 1999. Fluoride intake by infants. J. Public Health Dent. 59:229–234.

Fomon, S.J. J. Ekstrand, and E.E. Ziegler. 2000. Fluoride intake and prevalence of dental fluorosis: Trends in fluoride intake with special attention to infants. J. Public Health Dent. 60:131–139.

Franzman, M.R., S.M. Levy, J.J. Warren, and B. Broffitt. 2004.  Tooth-brushing and dentifrice use among children ages 6-60 months. Pediat. Dent. 26:87–92.

Franzman, M.R., S.M. Levy, J.J. Warren, and B. Broffitt. 2006.  Fluoride dentifrice ingestion and fluorosis of the permanent incisors. J. Amer. Dent. Assoc. 137:645–652.

Fresen, J.A., F.H. Cox, and M.J. Witter.  1968. The determination of fluoride in biological materials by means of gas chromatography. Pharm. Weekblad 103:909–914.

Grummer-Strawn, L.M., K.S. Scanlon, and S.B. Fein.  2008.  Infant feeding and feeding transitions during the first year of life. Pediatrics 122:S36-S42.

Grutsch, J. F., W. H. Nebergall, J. C. Muhler, R. B. Fischer, and H. G. Day. 1953.   A procedure for the routine determination of fluorine in potable waters containing iron, manganese, aluminum, and chlorine.   J. Dent. Res. 32: 463–468.

Guthrie, H.A. 1989. *Introductory Nutrition*. Times Mirror/Mosby College Publishing. St. Louis MO, pp 621–634.

Ham, M.P. and M.D. Smith. 1950. Fluoride studies related to the human diet. Can. J. Res. F-28:227.

Heath, K., V. Singh, R. Logan, and J. McIntyre.  2001.  Analysis of fluoride levels retained intraorally or ingested following routine clinical applications of topical fluoride products.  Aust. Dent. J. 46:24–31.

Heilman, J.R., M.C. Kiritsy, S.M. Levy and J.S. Wefel. 1997.  Fluoride concentrations in infant foods.  J. Amer. Dent. Assoc. 128:857–863.

Heilman, J.R., M.C. Kiritsy, S.M. Levy and J.S. Wefel. 1999.  Assessing fluoride levels of carbonated soft drinks.  J. Amer. Dent. Assoc. 130:1593–1599.

Heller, K.E., W. Sohn, B.A. Burt and S.A. Eklund. 1999. Water consumption in the United States in 1994-96 and implications for water fluoridation policy. J. Public Health Dent. 59(1):3–11.

HHS (Health and Human Services). 2010. HHS comments on draft report *Fluoride: Exposure and Relative Source Contribution Analysis*.  Sent via e-mail from S. N. Howard, Office of Science and Data Policy, Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, 200 Independence Ave., SW, Room 433E, Washington, DC, to J. M. Donohue, Office of Water, U.S. Environmental Protection Agency, September 29, 2010.

Hodge, H.C. and F.A. Smith.  1965.  *Fluorine Chemistry*, vol 4, Academic Press, New York, pp. 155 and 171. As cited in Marier and Rose, 1966.

Iida, H., and J.V. Kumar. 2009. The association between enamel fluorosis and dental caries in U.S. schoolchildren.  J. Am. Dent. Assoc. 140:855–862.

IOM (Institute of Medicine). 1997.  *Dietary Reference Intakes for Calcium, Phosphorus, Magnesium, Vitamin D, and Fluoride* (1997).  The National Academies Press.  Online access: http://www.nap.edu/openbook.php?record_id=5776 .

Ismail, A.I., B.A. Burt, G.E. Hendersot, et al.  1987.  Findings from the Dental Care Supplement of the National Health Interview Survey, 1983.  J. Amer. Dent. Assoc. 114:617–621.

Jackson, R.D., E.J. Brizendine, S.A. Kelly, et al.  2002.  The fluoride content of foods and beverages from negligibly and optimally fluoridated communities.  Community Dent. Oral. Epidemiol. 30:382–391.

Johnson, J. and J.W. Bawden.  1987. The fluoride content of infant formulas available in 1985. Pediatr. Dent. 9:33–37.

Kelly, T.J., M. Ramamurthi, A.J. Pollack, et al. 1993. Ambient concentration summaries for Clean Air Act. Title III. Hazardous air pollutants. Final Report. Research Triangle Park, July 1993.  As cited in ATSDR, 2003.

Kirkpatrick, D.C., H.B.S. Conacher, J.C. Meranger, et al. 1980. The trace element content of Canadian baby foods and estimation of trace element intake by infants. Can. Inst. Food Sci. Technol. 13:154–161.  As cited in Dabkea et al., 1982.

Kiritsy, M.C., S.M. Levy, J.J. Warren, et al. 1996.  Assessing fluoride concentrations of juices and juice-flavored drinks.  J. Amer. Dent. Assoc. 127:895–902.

Kister, L.R., S.G. Brown, H.H. Schumann, and P.W. Johnson. 1966. Maps showing fluoride content and salinity of groundwater in the Wilcox basin, Grahman and Cochise Counties, Arizona. U.S. Geological Survey Hydrol. Invest. Atlas HA-214, pp. 1–6.  As cited in Fleischer et al. (1974).

Kramer, L., D. Osis, E. Wiatrowski, and H. Spencer.  1974. Dietary fluoride in different areas of the United States. Amer. J. Clin. Nutrit. 27:590–594.

Larsen, M.J., E. Kirkegard, O. Fejerskov, et al. 1985.  Prevalence of dental fluorosis after fluoride-gel treatments in a low-fluoride area.  J. Dent Res. 64:1076–1079.  As cited in Levy and Zarei-M., 1992.

Le Compte, E.J. and T.E. Doyle. 1982.  Oral fluoride retention following various topical application techniques in children.  J. Dent. Res. 61:1397–1400.  As cited in Levy and Zarei-M., 1992.

Le Compte, E.J. and L.K. Rubenstein.  1984.  Oral fluoride retention with thixotropic and APF gels and foam-lined and unlined trays.  J. Dent. Res. 63:69–70.  As cited in Levy and Zarei-M., 1992.

Levy, S.M. 1993. A review of fluoride intake from fluoride dentifrice. J. Dentist. Child. March-April, 1993, pp. 115–124.

Levy, S.M. 1994. Review of fluoride exposures and ingestion. Comm. Dentist. Oral Epidemiol. 22:173–180.

Levy, S.M. and G. Muchow.  1992. Provider compliance with recommended dietary fluoride supplement protocol.  Amer. J. Public Health 82:281–283.

Levy, S.M., T.J. Maurice, and J.R. Jacobsen.  1992.  A pilot study of preschoolers' use of regular-flavored dentifrices and those flavored for children. Pediat. Dent. 14:388–391.

Levy, S.M., M.C. Kiritsy, and J.J. Warren. 1995. Sources of fluoride intake in children. J. Public Health Dent. 55:39–52.

Levy, S.M., M.C. Kiritsy, S.L. Slager, et al. 1997. Patterns of fluoride dentifrice use among infants. Pediat. Dent. 19:50–55.

Levy, S.M., J.A. McGrady, P. Bhuridej, et al. 2000. Factors affecting dentifrice use and ingestion among a sample of U.S. preschoolers. Pediat. Dent. 22:389–394.

Levy, S.M., J.J. Warren, C.S. Davis, et al. 2001. Patterns of fluoride intake from birth to 36 months.  J. Public Health Dent. 61:70–77.

Levy, S.M., J.J. Warren, and B. Broffitt. 2003a. Patterns of fluoride intake from 36 to 72 months of age. J. Public Health Dent. 63:211–220.

Levy, S.M., B. Broffitt, R. Slayton, et al. 2003b.  Dental visits and professional fluoride applications for children ages 3 and 6 in Iowa.  Pediat. Dent. 25:565–571.

Levy, S.M. and Z. Zarei-M. 1991. Evaluation of fluoride exposures in children. J. Dentist. Child. November-December, 1991, pp. 467–473.

Lu, Y., G. W-F. Guo, and X-Q. Yang. 2004.  Fluoride content in tea and its relationship with tea quality.  J. Agric. Food Chem. 52:4472–4476.

MacFadyen, E.E., S.G. McNee, and D.A. Weetman.  1982.  Fluoride content of some bottled spring water. Brit. Dent. J., Dec. 21, 1982, pp. 423–424.

Machle, W, E.W. Schott, and E.J. Largen.  1942. The absorption and excretion of fluorides. J. Indust. Hyg. Toxicol. 24:199-204

Maheshwari, V.R., J. T. McDonald, V.S. Schneider, et al. 1981.  Fluoride balance studies in ambulatory healthy men with and without fluoride supplements. Amer. J. Clin. Nutrit. 34:2679–2684.

Malde, M. K., K. Bjorvatn, and K. Julshamn.  2001.  Determination of fluoride ion in food by the use of akali fusion and fluoride ion-selective electrode.  Food Chemistry 73:373-379.

Marier, J.R. and D. Rose. 1966. The fluoride content of some foods and beverages – a brief survey using a modified Zr-SPADNS method. J. Food Sci. 31:941–946.

Martin, D.J.  1951.  Fluorine content of vegetables cooked in fluorine containing water. J. Dent. Res. 30:676.  As cited in Marier and Rose, 1966.

Martinez, O.B., C. Diaz, T.M. Borges, et al. 1998.  Concentrations of fluoride in wines from the Canary Islands. Food Addit. Contam. 15:893–897.

Martinez-Mier, E.A., S.A. Kelly, G.J. Eckert, and R.D. Jackson. 2008. Comparison of a dietary survey and the duplicate plate method for determining dietary fluoride ingested by young children: a pilot study.  Int. J. Paediat. Dent. 19:99-107.

McClure, F.J.  1939.  Fluorides in food and drinking water.  National Institute of Health, Bulletin 172, United States Treasury Department, Public Health Service.

McClure, F.J.  1943.  Ingestion of fluoride and dental caries.  Quantitative relations based on food and water requirements of children 1-12 years old.  Amer. J. Dis. Child. 66:362. [Republished in Publication 825, U.S. Public Health Service, 1962]

McClure, F.J.  1949.  Fluoride in foods. Public Health Reports 64, No. 34, pp 1061–1074.

McGinnies, W.G., B.J. Goldman, and P. Paylore (editors). 1968.  *Deserts of the World: An Appraisal of Research into Their Physical and Biological Environments, Volume I.*  Tucson, Arizona. University of Arizona Press.   As cited by University of Arizona (College of Agriculture and Life Sciences.  Map of Arid Regions of North American.  Downloaded February 29, 2008 from http://ag.arizona.edu/~lmilich/meigsnam.jpg

McKnight-Hanes, M.C., D.H. Leverett, S.M. Adair, and C.P. Sheilds.  1988. Fluoride content of infant formulas; soy-based formulas as a potential factor in dental fluorosis. Pediatr. Dent. 10:189–194.

Megregian, S. and F.J. Maier.  1952.   Modified zirconium-alizarin reagent for determination of fluoride in water.  J. Amer. Water Works Assn. 44:239–248.

Miller-Ihli, N.J., P.R. Pehrsson, R.L. Cutrifelli, and J.M. Holden. 2003. Fluoride content of municipal water in the United States: What percentage is fluoridated? J. Food Compos. Anal. 16(5):621–628.

Mühle, J., J. Huang, R.F. Weiss, et al. 2009.  Sulfuryl fluoride in the global atmosphere. J. Geophys. Res. 114, D05306, 13 pp.

Müller, K., C. Faeh, and F. Diederich.  2007.  Fluorine in pharmaceuticals: looking beyond intuition.  Science 317:1881–1886.

Naccache, H., P.L. Simard, L. Trahan, et al. 1992.  Factors affecting the ingestion of fluoride dentifrice by children.  J. Public Health Dent. 52:222–6.

Nedeljković, M., B. Antonijević, and V. Matović.  1991.  Simplified sample preparation for fluoride determination in biological material.  Analyst 116: 477–478.

Newbrun, E.  1989.  Effectiveness of water fluoridation.  J. Public Health in Dent. 49:279–289.

Newbrun, E.  1992.  Current regulations and recommendations concerning water fluoridation, fluoride supplements and topical fluoride agents.  J. Dent. Res. 71:1255–1265.

Nowak, A.J. and M.V. Nowak.  1989.  Fluoride concentration of bottled and processed water. Iowa Dental J. 75:28.

NRC (National Research Council). 1941. *Recommended Dietary Allowances*. National Research Council Committee on Food and Nutrition. National Academy Press, Washington, DC.  As cited in McClure, 1943.

NRC (National Research Council). 1980. *Recommended Dietary Allowances*. 9th ed., National Research Council Committee on Dietary Allowances. National Academy Press, Washington, DC.  As cited in McKnight-Hanes et al., 1988.

NRC (National Research Council). 1989. *Recommended Dietary Allowances*, 10th ed. National Academy Press, Washington, DC.

NRC (National Research Council). 1993. *Health Effects of Ingested Fluoride*. National Academy Press, Washington, DC.

NRC (National Research Council). 2006. *Fluoride in Drinking Water. A Scientific Review of EPA's Standards*. National Academy Press, Washington, DC.

Nutrition Quest. 2008. About dietary analysis. http://www.nutritionquest.com/research/about_dietary_analysis.htm .

Öbrink, K. J. 1955. A modified Conway Unit for microdiffusion analysis.  Biochem. J. 59:134–136.

Omega 1993.  ISE-8790 & ISE-8795: Fluoride Ion Selective Electrodes.  Stamford, CT.  Omega Engineering, Inc.  http://www.omega.com/manuals/manualpdf/M0780.pdf .

O'Mullane, D.M., C.E. Ketley, J.A. Cochran, et al. 2004.  Fluoride ingestion from toothpaste: conclusions of a European Union-funded multicentre project. Comm. Dent. Oral. Epidemiol. 32 (Suppl. 1).

Ophaug, R.H., L. Singer, and B.F. Harland.  1980a.  Estimated fluoride intake of 6-month-old infants in four dietary regions of the United States.  Amer. J. Clin. Nutr. 33:324–327.

Ophaug, R.H., L. Singer, and B.F. Harland.  1980b.  Estimated fluoride intake of average two-year-old children in four dietary regions of the United States.  J. Dent. Res. 59:777–781.

Ophaug, R.H., L. Singer, and B.F. Harland.  1985.  Dietary fluoride intake of 6-month and 2-year old children in four dietary regions of the United States. Am. J. Clin. Nutrit. 42:701–707.

Osis, D, L. E. Wiatrowski, J. Samachson, and H. Spencer.  1974a.  Fluoride analysis of the human diet and of biological samples. Clinica Chimica Acta 51:211–216.

Osis, D, L. Kramer, E. Wiatrowski, and H. Spencer.  1974b. Dietary fluoride intake in man. J. Nutr. 104:1313–1318.

Osuji, O.O., J.L. Leake, M.L. Chipman, et al. 1988.  Risk factors for dental fluorosis in a fluoridated community. J. Dent. Res. 67:1488–92.

Pang, D.T.Y., C.L. Phillips, and J.W. Bawden. 1992.  Fluoride intake from beverage consumption in a sample of North Carolina children. J. Dent. Res. 71:1382–1388.

Papadimitriou, V.C., R.W. Portmann, D.W. Fahey, et al.  2008.  Experimental and theoretical study of the atmospheric chemistry and global warming potential of $SO_2F_2$.  J. Phys. Chem.112:12657–12665.

Pehrsson, P.R., D.B. Haytowitz, J.M. Holden, et al.  2000.  USDA's National Food and Nutrient Analysis Program: Food sampling. J. Food Comp. Anal. 12:379–389.

Pendrys, D.G. and D.E. Morse.  1990.  Use of fluoride supplementation by children living in fluoridated communities. J. Dent. Children, Sept.–Oct., 1990, pp. 343–347.

Pennington, J.A.T.  1980.  Total diet study – Results and plans for selected minerals in foods. FDA By-lines 4:179–188.  As cited in Singer et al., 1985.

Pesselman, R.L., R.G. Loken, M.J. Hoffman, and M.J. Feit.  1989.  Determination of fluoride in cocoa powder by ion-selective electrode.  J. Food Sci.  54:1650–1652.

Pisareva, M.F. 1955.  Fluoride content of some Kazakhstan food products.  Vestnik. Akad. Nauk. Kazakh. 11:86.  As cited in Marier and Rose, 1966.

Procter and Gamble, Inc. 2009. History of Crest. http://www.pg.com/company/who_we_are/crest_history.shtml

Record, S., D.F. Montgomery, and M. Milano. 2000. Fluoride supplementation and caries prevention. J. Ped. Health Care 14:247–249.

Ripa, L.W. 1993.  A half-century of community water fluoridation in the United States: review and commentary.  J. Public Health Dent. 53:17–44.

Rojas-Sanchez, F., S.A. Kelly, K.M. Drake, et al. 1999. Fluoride intake from foods, beverages and dentifrice by young children in communities with negligibly and optimally fluoridated water: a pilot study. Community Dentistry and Oral Epidemiology 27:288–297.

Salama, F, G.M. Whiford, and J.T. Barenie. 1989.  Fluoride retention by children from toothbrushing.  J. Dent. Res. 68 (Special issue):335 (Abstract 1227).

San Filippo, F.A. and G.C. Battistone. 1971. The fluoride content of a representative diet of the young adult male. Clin. Chim. Acta 31:453–457.

Schulz, E.M., J.S. Epstein, and D.J. Forrester. 1976.  Fluoride content of popular carbonated beverages. J. Prev. Dent. 3:27–29.  As cited in Heilman et al., 1999.

Simard, P.L., H.D. Lachapelle, L. Trahan, et al.  1989.  The ingestion of fluoride dentifrice by young children. ASCDJ Dent. Child 56:177–181.

Simard, P.L., H. Naccache, D. Lachapelle and J.M. Brodeur.  1991.  Ingestion of fluoride from dentifrices by children aged 12 to 24 months. Clinical Pediat. 30:614–617.

Simoni, R.D., R.L. Hill, M. Vaughan, and H. Tabor. 2003. A classic instrument:  The Beckman DU Spectrophotometer and its inventor, Arnold O. Beckman.   J. Biol. Chem. 278:e1. http://www.jbc.org/cgi/content/full/278/49/e1 .

Singer, L. and W.D. Armstrong.  1959.  Determination of fluoride in blood serum.  Anal. Chem. 31:105–109.

Singer, L. and W.D. Armstrong.  1965.  Determination of fluoride.  Anal. Biochem. 10:495–500. As cited in Osis et al., 1974.

Singer, L., R.H. Ophaug, and B.F. Harland.  1980.  Fluoride intake of young male adults in the United States. Amer. J. Clin. Nutrit. 33:328–332.

Singer, L., and R.H. Ophaug.  1979.  Total fluoride intake of infants.  Pediatrics 63:460–466.

Singer, L., R.H. Ophaug, and B.F. Harland.  1985.  Dietary fluoride intake of 15–19-year old male adults residing in the United States. J. Dent. Res. 64:1302–1305.

Sjögren, K. and N-H Melin.  2001.  The influence of rinsing routines on fluoride retention after toothbrushing.  Gerodontol. 18:15–20.

Smith, H.V., M.C. Smith, and M. Vavich.  1945.  Fluoride in milk, plant foods, and foods cooked in fluorine-containing water.  Arizona Agri. Exp. Sta., mimeographed report, 6 pp.  As cited in McClure, 1949.

Sohn, W., K.H. Heller, and B.A. Burt. 2001. Fluid consumption related to climate among children in the United States. J. Public Health Dent. 61(2):99–106.

Spak, C.J., J. Ekstrand, and D. Zylberstein.  1982.  Bioavailability of fluoride added to baby formula and milk.  Caries Res. 16:249–256.

Stamm, J.W. and H.C. Kuo.  1977. Fluoride concentration in prepared infant foods. (Abstract No. 1226). J. Dent. Res. 56:B209.

Stannard, J., J. Rovero, A. Tsamtsouris, and V. Gavris.  1990. Fluoride content of some bottled waters and recommendations for fluoride supplementation. J. Pedodontics 14:103–107.

Stannard, J., Y.S. Shim, M. Kritsineli, et al.  1991.  Fluoride levels and fluoride contamination of fruit juices. J. Clin. Pediat. Dent. 16:38–40.

Taves, D. R. 1968a.  Effect of silicone grease on the diffusion of fluoride.  Anal. Chem. 40:204–206.

Taves D.R.  1968b.  Separation of F by rapid diffusion using hexamethyldisiloxane. Talanta 15:31–39.

Taves, D. R. 1968c.  Determination of submicromolar concentration of fluoride in biological samples.  Talanta 12:1015–1023.

Taves D.R.  1983.  Dietary intake of fluoride ashed (total fluoride) vs. unashed (inorganic fluoride) analysis of individual foods. Brit. J. Nutrit. 49:295–301.

Thomas, K.W., L.S. Sheldon, E.D. Pellizzari, R.W. Handy, J.M. Roberds, and M.R. Berry. 1997. Testing duplicate diet sample collection methods for measuring personal dietary exposures to chemical contaminants. J. Exposure Analysis Environ. Epidemiol. 7(1):17-35.

Thompson, R.J., T.B. McMullen, and G.B. Morgan.  1971.  Fluoride concentrations in ambient air.  J. Air Pollut. Control Assoc. 21:484–487.

Towne, D. and M. Freark. 2001.  Ambient groundwater quality of the Wilcox basin: An ADEQ 1999 baseline study.  Arizona Department of Environmental Quality (ADEQ), Fact Sheet 01-13, ADEQ, Phoenix, AZ.  http://www.azdeq.gov/environ/water/assessment/download/wcx-02.pdf.

Trautner, K. and J. Einwag.  1986. Bioavailability of fluoride from some health food products in man. Caries Res. 20:518–524.

Trautner, K. and J. Einwag.  1989. Influence of milk and food on fluoride bioavailability from NaF and Na$_2$FPO$_3$ in man. J. Dent. Res. 68:72–77.

Trautner, K. and G. Siebert.  1986. An experimental study of bio-availability of fluoride from dietary sources in man.  Arch. Oral Biol. 31:223–228.

Turner, S.D., J.T. Chan, and E. Li.  1998. Impact of imported beverages on fluoridated and nonfluoridated communities. General Dentistry, March-April, 1998, pp. 190–193.

USDA (U.S. Department of Agriculture). 1968.  Household Food Consumption Survey 1965–66. Agricultural Research Services Report 2-5, Washington, DC.  As cited in Singer et al., 1980 and in Ophaug et al., 1985.

USDA (U.S. Department of Agriculture). 1972.  Household Food Consumption Survey 1965-66. Spring, 1965, Agricultural Research Services Report 11, Washington, DC.  As cited in Singer et al., 1980.

USDA (U.S. Department of Agriculture). 1998.  Data table: Food and Nutrient Intakes by Region, 1994–1996. USDA, Agricultural Research Services, Food Surveys Research Group. http://www.barc.usda.gov/bhnrc/foodsurvey/home.htm.

USDA (U.S. Department of Agriculture). 2005.  USDA National Fluoride Database of Selected Foods and Beverages, Release 2.  Nutrient Data Laboratory, Agricultural Research Services, U.S. Department of Agriculture.  Beltsville, MD.

U.S. EPA (U.S. Environmental Protection Agency). 1988. Summary Review of Health Effects Associated with Hydrogen Fluoride and Related Compunds.  Health Issue Assessment. Environmental Criteria and Assessment Office, Office of Health and Environmental Assessment, Office of Research and Development, Research Triangle Park, NC. EPA/600/8-89/002F.

U.S. EPA (U.S. Environmental Protection Agency). 1996. RED Facts:Cryolite. Pollution, Pesticides, and Toxic substances (7508W).  EPA-738-96-016.

U.S. EPA (U.S. Environmental Protection Agency). 1997. Exposure Factors Handbook, vol. I, II, and III.  National Center for Environmental Assessment, Office of Research and Development, Washington, DC. EPA/600/P-95/002Fa-c.   http://www.epa.gov/ncea/exposfac.htm.

U.S. EPA (U.S. Environmental Protection Agency). 2000a. Estimated per Capita Water Ingestion and Body Weight in the United States.  Based on data collected by the United States Department of Agriculture's 1994–1996 and 1998 Continuing Survey of Food Intakes by Individuals. Office of Water, U.S. Environmental Protection Agency, Washington, DC. EPA-822-R-00-008.

U.S. EPA (U.S. Environmental Protection Agency).  2000b.  Methodology for Deriving Ambient Water Quality Criteria for the Protection of Human Health.  EPA 882-B-00-004.  Available online at http://www.epa.gov/waterscience/criteria/humanhealth/method/complete.pdf

U.S. EPA (U.S. Environmental Protection Agency). 2002.  Child-Specific Exposure Factors Handbook. Risk Assessment Guidance for Superfund. vol.1, Human Health Evaluation Manual (Part A). Washington, DC. EPA/540/1-890002.

U.S. EPA (U.S. Environmental Protection Agency). 2004.  Estimated per Capita Water Ingestion and Body Weight in the United States—An Update.  Based on data collected by the United States Department of Agriculture's 1994–1996 and 1998 Continuing Survey of Food Intakes by Individuals.  Office of Water, U.S. Environmental Protection Agency, Washington, DC.

U.S. EPA (U.S. Environmental Protection Agency). 2008. Child-Specific Exposure Factors Handbook.  National Center for Environmental Assessment, Office of Research and Development, Washington, DC. EPA/600/R-06/096F.

U.S. EPA (U.S. Environmental Protection Agency). 2008b. Information Collection Request (ICR) for SDWA Compliance Monitoring Data.

U.S. EPA (U.S. Environmental Protection Agency). 2009. Fluoride Chronic Dietary Exposure Analysis.  DP Number 362184. Memorandum dated May 6, 2009, from Michael A. Doherty, Office of Prevention, Pesticide and Toxic Substances to Elizabeth Doyle, Office of Water, Office of Science and Technology, Washington, DC.

**December 2010**

U.S. EPA (U.S. Environmental Protection Agency). 2010a. Fluoride: Dose-response Analysis for Non-cancer Effects.  Health and Ecological Criteria Division, Office of Science and Technology, Office of Water, Washington, DC.  EPA 820-R-10-019.

U.S. EPA (U.S. Environmental Protection Agency). 2010b. Fluoride Chronic Dietary Exposure Analysis.  DP Number 379854. Memorandum dated July 1, 2010, from Michael A. Doherty, Office of Prevention, Pesticide and Toxic Substances to Elizabeth Doyle, Office of Water, Office of Science and Technology, Washington, DC.

USFDA (U.S. Food and Drug Administration). 1977.  Compliance Program Guidance Manual 7320.73. Total diet studies – Adults (FY77). U.S. Food and Drug Administration, Department of Health, Education and Welfare, Washington, DC.  As cited in Singer et al., 1980, and Singer et al., 1985.

USFDA (U.S. Food and Drug Administration). 1978.  Compliance Program Guidance Manual 7320.74 – total diet studies – infants and toddlers (FY79). U.S. Food and Drug Administration, Department of Health, Education and Welfare, Washington, DC.  As cited in Ophaug et al., 1985.

USFDA (U.S. Food and Drug Administration). 2009. Anticaries drug products for over-the-counter use. 21CFR, Ch. 1 (4-1-09 edition), Part 355, pp. 302–307.

Van Winkle, S., S.M. Levy, M.C. Kiritsy, et al. 1995.  Water and formula fluoride concentrations: significance for infants fed formula. Pediatr. Dent. 17:305–310.

Venkateswarlu, P. 1975.  Determination of total fluorine in serum and other biological materials by oxygen bomb and reverse extraction techniques. Anal. Biochem. 68:512.  As cited in Ophaug et al., 1980.

Wagenar, D.K., P. Nourjahk, and A.M. Horowitz.  1992.  Trends in childhood use of dental care products containing fluoride, 1983–1989.  Centers for Disease Control, U.S. Public Health Service, U.S. Department of Health and Human Services, Hyattsville, MD.  As cited in NRC, 2006.

Waldbott, G.L.  1963.  Fluoride in food. Amer. J. Clin. Nutrit. 12:455–462.

Warnakulasuriya, S., C. Harris, A. Gelbier, et al. 2002. Fluoride content of alcoholic beverages. Clinica Chim. Acta 320:1–4.

Warren, D.P., H.A. Henson, and J.T. Chang.  1996.  Comparison of fluoride contents in caffeinated, decaffeinated and instant coffees.  Fluoride 29:147–150.

Wei, S.H.Y. and F.N. Hattab.  1989.  Fluoride retention following topical application of a new APF foam. Pediatr. Dent. 11:121–124.  As cited in Levy and Zarei-M., 1992.

Wei, S.H.Y. and M.J. Kanellis.  1983.  Fluoride retention after sodium fluoride mouth rinsing by preschool children. J. Amer. Dent. Assoc. 106:626–629.  As cited in Levy and Zarei-M., 1992.

Whitford, G.M. 1987.  Fluoride in dental products: safety considerations. J. Dent. Res. 66:1056–1060.  As cited in Environment Canada/Health Canada, 1993.

WHO (World Health Organization).  1985.  Energy and protein requirements.  Report of the joint FAO/WHO/UNU expert consultation. Tech. Rept. 724. Geneva.  As cited in McKnight-Hanes et al., 1988.

Whyte, M.P., K. Essmyer, F.H. Gannon, and W.R. Reinus.  2005.  Skeletal fluorosis and instant tea. Amer. J. Med. 118:78–82.

Wiatrowski, E., L. Kramer, D. Osis, and H. Spencer. 1975. Dietary fluoride intake of infants. Pediatrics 55:517–522.

Willard H.H. and O.B. Winter.  1933. Volumetric method for determination of fluorine. Indust. Eng. Chem. (Anal. Ed.) 5:7–10.

Woodbury, R.M.  1921.  Statures and Weights of Children under six years of age. Publ. 87, Children's Bureau, U.S. Department of Labor.  As cited in McClure, 1943.

# APPENDICES

**Appendix A:**   **Fluoride Chronic Dietary Exposure Analysis**

**Appendic B:**   **Sulfuryl Fluoride: Estimates of Fluoride Exposure from Pesticidal Sources – Customized Age Groups**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, D.C. 20460**



OFFICE OF PREVENTION, PESTICIDE
AND TOXIC SUBSTANCES

## MEMORANDUM

Date:   6 May 2009

SUBJECT:   Fluoride Chronic Dietary Exposure Analysis

| | |
|---|---|
| PC Code:  None | DP Barcode: 362183 |
| MRID No.:  47594701 | Registration No.:  None |
| Petition No.:  None | Regulatory Action:  None |
| Assessment Type:  Single Chemical | Registration Case No.:  None |
| TXR No.:  None | CAS No.:  16984-48-8 |

FROM:   Michael A. Doherty, Ph.D., Senior Chemist
Risk Assessment Branch II
Health Effects Division (7509P)

THROUGH:   Thurston Morton, Chemist
Mohsen Sahafeyan, Chemist
Dietary Exposure Science Advisory Council
Health Effects Division (7509P)

Christina Swartz, Branch Chief
Risk Assessment Branch II
Health Effects Division (7509P)

TO:   Michael A. Doherty, Ph.D., Senior Chemist
Risk Assessment Branch II
Health Effects Division (7509P)

## Background

The Agency's Office of Water (OW) is currently examining its drinking water standard for
fluoride (F). As part of that examination, they are determining relative source contributions for
fluoride exposure (*i.e.*, how much fluoride comes from various sources such as toothpaste,
natural residues in foods, etc.). The Office of Pesticide Programs (OPP) has been asked to
supply OW with estimates of dietary exposure to fluoride that results from the use of pesticides.
OPP has identified two pesticides, cryolite and sulfuryl fluoride (SF), whose use results in
fluoride levels which may be elevated above background levels in treated foods. In 2006, OPP
completed an aggregate human health risk assessment for fluoride that addressed dietary
exposure to F from these two sources (M. Doherty, D312659, 18 January 2006). Since that time,
the registrant (Dow AgroSciences; DAS) for sulfuryl fluoride has provided the Agency with

information that will support a more refined estimate of F exposure attributable to the use of sulfuryl fluoride. This assessment incorporates refinements to fluoride residue levels, taking into account the information from DAS, and examines the contribution of various crops and crop groups to pesticidal F exposure. Note that because of the purpose of this assessment and the on-going work by OW, this document presents exposure estimates for fluoride and not risk estimates.

**Executive Summary**

Chronic dietary (food only) exposure assessments were conducted using the Dietary Exposure Evaluation Model DEEM-FCID™, Version 2.03 which use food consumption data from the U.S. Department of Agriculture's Continuing Surveys of Food Intakes by Individuals (CSFII) from 1994-1996 and 1998. Two analyses have been completed for sulfuryl fluoride, the first to address the structural fumigation uses, wherein foods may receive inadvertent treatment, and the second to obtain estimates for the food uses of the product, wherein foods are intentionally fumigated to treat pest problems. An additional, third analysis was conducted to determine the food-specific contributions to F exposure due to the use of cryolite.

All analyses include the use of percent crop treated (% CT) information and incorporate anticipated residues. The % CT and anticipated-residue values represent a range of refinements in which some conservatism remains. As more data become available and are validated by the Agency, further refinement to the exposure estimates may be possible. On the other hand, this assessment departs to some extent from regular HED practice by using very low percent crop treated estimates and anticipated residues predicted from data bearing on historical application rates. Regulatory measures, such as frequent mandatory reporting, may be appropriate to insure that usage and application rates do not change. Fluoride exposure estimates from pesticidal sources range from 0.0015 to 0.0063 mg/kg/day, depending on the population subgroup.

## I.    Residue Information

*Fluoride from Cryolite.* Residue and % CT estimates in the cryolite assessment are identical to those used in the previous assessment (M. Doherty, D309013, 12 October 2004). That assessment is based on average residue values from field trials and incorporates %CT estimates for the majority of the foods in the analysis. The resulting exposure estimates are considered to be moderately refined. OPP notes that the analytical method used to obtain the residue estimates in the cryolite field trials reports total fluoride and does not differentiate between the various aluminum-fluoride species that may be present in the treated commodities. Therefore, the residue estimates associated with the use of cryolite likely represent an overestimate of fluoride anion residues resulting from cryolite use.

*Fluoride from Sulfuryl Fluoride.* As in previous assessments (*e.g.*, M. Doherty, D317731, 18 January 2006), average residue values from fumigation trials conducted at the maximum total application rate of sulfuryl fluoride (1500 mg·h/L) were used to assess dietary exposure, except as noted below. OPP has received a significant amount of data depicting F residues in foods at various treatment rates, and for many foods there is a relationship between treatment rate and terminal F residues. Dow AgroSciences maintains a database which tracks sites where sulfuryl fluoride is used as well as various parameters associated with each fumigation, including the actual treatment rates. For foods with demonstrable rate/residue relationships, the average

residues from trials at the maximum rate have been adjusted to their average-fumigation-rate equivalent using linear regression (Table 1). The regression analysis, as described in the submission, is as follows and is in line with OPP guidance for deriving anticipated residues (USEPA/OPP, 15 June 2000):

> [Regressions] were based on relative concentrations and relative dose levels. Specifically, within each commodity, one or more samples treated at dose levels closest to the maximum label rate (1500 oz-hr) were designated as "reference samples". Reference dose levels and reference concentrations were derived as the average dose levels and concentrations associated with these reference samples. The dose levels and concentrations associated with all samples were then expressed as relative dose level and relative concentrations (percent of the reference dose level and of the reference concentration), and these relative values were used in the linear regression models of the form:

> > Relative Concentration = a + b × Relative dose,

> where a and b are the intercept and slope. The regression models described above were used to estimate the anticipated concentration at the average (historical) dose levels summarized above. In addition, predicted levels at the maximum dose rate of 1,500 oz-hr were also derived. Specifically, the concentration at dose level D was derived as:

> > Concentration at Dose D = Reference concentration × [a + ( b × Dose D/Reference dose)],

> where a and b are the intercept and slope from the corresponding regression model. Note that regression models were used only for commodities with more than two data points which spanned a range of at least 600 oz-hr and for which the regression p-value was 20% or lower. [The p-value of 20% was footnoted as follows: *The regression models for four commodities (corn flour, figs, raisins and white rice) had p-values lower than 20% but higher than the 5% level typically used to represent statistical significance. Nevertheless, the regression models were used to predict concentration levels for these four commodities because a visual examination of the data indicated a linear relationship between [dose] and residues. The regression models produced conservative estimates of anticipated residues at the average [dose], since the estimates were comparable to, if not higher than, the observed residues at the maximum [dose].*]

For all foods in the analysis, DAS has used a correction factor to account for the inability of the analytical method to measure total fluoride. The correction factor is commodity-specific and the values range from 0.37 to 1.0. Residue estimates are divided by the correction factor to obtain an estimated total fluoride concentration. The data used to obtain the correction factors are not available to OPP at this time and therefore the factors cannot be verified. The factors, being ≤ 1, result in residue estimates that are greater than or equal to prior OPP assessments; therefore, OPP is accepting them at this time without further review. The study should be submitted for review by the Agency. EPA will revise residue estimates, as needed, following review of these data.

HED has verified the regression parameters and analysis presented by DAS and, except for hazelnuts (filberts), concurs that the anticipated residues are not likely to underestimate actual residues resulting from the use of SF at the average dose levels reported to date. Hazelnuts are reported as having a regression with a negative intercept. Conceptually, the intercept represents the background residue in the untreated matrix; therefore, a negative intercept does not make sense from a residue perspective and is considered to be an artifact of the regression process. Therefore, for hazelnuts, OPP has recalculated the anticipated residues assuming an intercept of zero (the slope was not recalculated).

Sulfuryl fluoride currently has two use strategies (1) pest control in structures via structural fumigations and (2) control of pests in foods via direct fumigation of foods. During structural

fumigation, facilities are to be emptied of foods to the extent possible.  Nevertheless, there will be some foods that remain in the structure and that will be inadvertently treated with SF.  OPP is assessing these two uses separately.  Residue data are not available for a number of commodities that may be treated with SF.  For those commodities surrogate data have been used (*e.g.*, the residue estimate for figs is used for a number of other dried fruits).  Residue estimates are summarized in Table 5 for both the structural and food fumigation uses.  As previously noted, the residue estimates for fluoride coming from cryolite are identical to those used in the previous assessment.  A complete listing of the residue inputs is included in Attachments 1-3.

| Table 1.  Reference Values and Regression Parameters for Determination of Fluoride Anticipated Residues. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Food | Reference Dose, mg·hr/L | Residue at Reference Dose, ppm | Slope | Intercept | Average Rate, mg·hr/L | | Residue at Average Rate, ppm | |
| | | | | | Structural | Food | Structural | Food |
| Barley | 1628 | 2.95 | 1.149 | 0.611 | 590 | 610 | 3.03 | 3.07 |
| Cocoa Beans | 1483 | 5.12 | 1.082 | 0.034 | 790 | 790 | 3.12 | 3.12 |
| Corn | 1549 | 1.78 | 0.868 | 0.383 | 670 | 390 | 1.35 | 1.07 |
| Corn Flour | 1573 | 21.73 | 0.340 | 0.694 | 670 | 390 | 18.22 | 16.91 |
| Corn, Popcorn | 1505 | 0.95 | 0.801 | 0.513 | 1340 | 1340 | 1.16 | 1.16 |
| Dates | 1484 | 0.70 | 0.333 | 0.748 | 380 | 380 | 0.58 | 0.58 |
| Dried Plums | 1543 | 0.85 | 0.470 | 0.537 | 380 | 380 | 0.56 | 0.56 |
| Figs | 1524 | 1.14 | 0.239 | 0.657 | 380 | 380 | 0.81 | 0.81 |
| Oats | 1534 | 7.90 | 0.859 | 0.408 | 560 | 560 | 5.70 | 5.70 |
| Pistachios | 1517 | 4.10 | 1.248 | 0.094 | 350 | 540 | 1.56 | 2.21 |
| Raisin | 1545 | 0.05 | 1.033 | 14.612 | 380 | 380 | 0.74 | 0.74 |
| Rice, Brown | 1558 | 5.68 | 0.892 | 0.250 | 620 | 960 | 3.43 | 4.54 |
| Wheat Flour | 1533 | 25.93 | 0.770 | 0.550 | 590 | 610 | 21.96 | 22.22 |
| Wheat Germ | 1512 | 67.95 | 0.700 | 0.220 | 590 | 610 | 33.50 | 34.13 |
| Wheat Grain | 1539 | 2.92 | 0.382 | 0.669 | 590 | 610 | 2.38 | 2.39 |
| Rice, White | 1509 | 1.90 | 1.290 | 0.987 | 620 | 960 | 2.88 | 3.44 |
| Almonds | 1539 | 4.70 | 0.470 | 0.610 | 350 | 540 | 3.37 | 3.64 |
| Pecans | 1533 | 8.55 | 0.831 | 0.091 | 350 | 540 | 2.40 | 3.28 |
| Walnuts | 2460 | 2.25 | 1.939 | 0.336 | 350 | 540 | 1.38 | 1.71 |
| Hazelnuts[†] (Space)[*] | 1576 | 2.32 | 2.014 | -0.179 | 350 | -- | 1.03 | -- |
| Hazelnuts[†] (Food) | 1576 | 1.81 | 2.749 | -0.861 | -- | 540 | -- | 1.70 |

[†] The calculated residues assume the intercept is zero.
[*] Data are from hazelnuts without shell

## II.   Use Information

*Food Fumigations*.  Information regarding % $CT_F$ (% CT for food fumigations) was submitted to the Agency by DAS.  OPP's Biological and Economic Analysis Division (BEAD) has examined the information submitted by DAS and has derived recommended %$CT_F$ values for use in the dietary exposure analysis for food fumigations (C. Cook and E. Rim, D361041, 30 April 2009).  The recommendations from BEAD are summarized in Table 2.

| Table 2.  Summary of Revised Estimates of Percent Commodity Directly Treated with Sulfuryl Fluoride. | | | | |
|---|---|---|---|---|
| BEAD Commodity Grouping | Commodity | Percent Commodity Treated | | |
| | | DAS | BEAD | |
| | | | Estimate | Recommended |
| Meats and Cheese | Cheese[†] | 0.0 % | 0.0 % | 0.0 % |
| | Ham[†] | 0.0 % | 0.0 % | 0.0 % |

Table 2.  Summary of Revised Estimates of Percent Commodity Directly Treated with Sulfuryl Fluoride.

| BEAD Commodity Grouping | Commodity | Percent Commodity Treated | | |
|---|---|---|---|---|
| | | DAS | BEAD Estimate | Recommended |
| | Beef (Dried) | 0.0 % | 0.0 % | 0.0 % |
| Quarantined Uses[2] | Coconut | 0.1 % | 0.0 % | 0.1 % |
| | Coffee Bean | 0.1 % | 0.0 % | 0.1 % |
| | Macadamia Nut | 0.1 % | 0.0 % | 0.1 % |
| | Ginger | 0.1 % | 0.0 % | 0.1 % |
| Coarse Grains | Barley[3] | 0.1 % | 0.1 % | 0.1 % |
| | Corn[6] | 0.1 % | 0.1 % | 0.1 % |
| | Cottonseed[3] | 0.1 % | 0.1 % | 0.1 % |
| | Millet[3] | 0.0 % | 0.1 % | 0.1 % |
| | Oats[6] | 0.1 % | 0.1 % | 0.1 % |
| | Rice Hulls[3] | 0.0 % | 0.1 % | 0.1 % |
| | Sorghum[6] | 0.1 % | 0.1 % | 0.1 % |
| | Triticale[3] | 0.0 % | 0.1 % | 0.1 % |
| Processed Commodities | Corn – Flour, Grits, Meal | 0.1 % | 0.0 % | 0.1 % |
| | Herbs And Spices | 0.1 % | <0.1 % | 0.1 % |
| | Popcorn | 0.1 % | <0.1 % | 0.1 % |
| | Rice – Flour, Bran | 3.0 % | 0.0 % | 3.0 % |
| | Wheat – Flour, Germ, Bran, Shorts, Milled Byproducts | 0.1 % | 0.0 % | 0.1 % |
| Stored Commodities | Peanut[6] | 0.1 % | 0.6 % | 0.6 % |
| | Wheat[6] | 0.1 % | 0.4 % | 0.4 % |
| | Rice[6] | 3.0 % | 0.9 % | 3.0 % |
| | Wild Rice | 3.0 % | 0.9 % | 3.0 % |
| Nuts[4] | Almonds | 10.0 % | 2.2 % | 10.0 % |
| | Beechnut | 0.0 % | 2.2 % | 10.0 % |
| | Brazil Nut | 0.1 % | 2.2 % | 10.0 % |
| | Butternut | 0.0 % | 2.2 % | 10.0 % |
| | Cashew | 0.1 % | 2.2 % | 10.0 % |
| | Chestnut | 0.1 % | 2.2 % | 10.0 % |
| | Chinquapin | 0.0 % | 2.2 % | 10.0 % |
| | Filbert | 0.1 % | 2.2 % | 10.0 % |
| | Hickory Nut | 0.1 % | 2.2 % | 10.0 % |
| | Pecans | 0.1 % | 2.2 % | 10.0 % |
| | Pine Nut | 0.1 % | 2.2 % | 10.0 % |
| Methyl Bromide Critical Use Exemption Commodities | Pistachio[1] | 0.1 % | 27.0 % | 27.0 % |
| | Walnuts[1] | 20.0 % | 99.0 % | 99.0 % |
| | Dates[1] | 40.0 % | 42.0 % | 42.0 % |
| | Prunes, Raisins, Figs[1] | 40.0 % | 69.0 % | 69.0 % |
| | Other Dried Fruit[5, 7] | 0.1 % | 69.0 % | 69.0 % |
| | Dried Beans[1] | 100.0 % | 92.0 % | 100.0 % |
| | Legumes (Dried, except Chickpea & Cowpea)[5, 7] | 0.1 % | 92.0 % | 100.0 % |
| | Cocoa Beans[1] | 100.0 % | 100.0 % | 100.0 % |

1. Based on BEAD calculations from comparative methyl bromide usage.
2. Currently fumigated with methyl bromide to fulfill federal or state quarantine requirements.
3. Estimates based on PCT for sorghum and oats.  BEAD assumes similar categorization of small coarse grains.
4. This group did not request a methyl bromide CUE and BEAD is anticipating sulfuryl fluoride to replace methyl bromide. BEAD estimates PCT to be no more than the DAS estimate for almonds.  Based on the pest spectrum, nuts are primarily treated with phosphine, with some treated with Propylene Oxide.
5. Based on estimates from similar methyl bromide critical use exemption commodities
6. Based on reports of methyl bromide usage by USDA NASS
7. BEAD's estimate is based on a commodity with a similar use pattern; therefore BEAD defaults to the higher of the two estimates of the original commodity.

*Structural Fumigations*.  As in previous assessments, information regarding the percentage of facilities treated, the number of days the facilities are in operation, and the amount of material onsite during fumigation has been used to obtain % CT estimates associated with structural fumigations (% $CT_S$).  The estimate is calculated as follows:

% $CT_S$ = % facilities treated × number of days production held during fumigation × number of fumigations per year ÷ number of operating days per year,

where the percent of both the grain mills and processing facilities treated equals 40%, the number of days production held in the facility during a fumigation is 2 days for grain mills and 1 day for processing facilities, the number of fumigations per year is 3 for grain mills and 2.5 for processing facilities, and both grain mills and processing facilities are in operation for 300 days per year.  These values give a % $CT_S$ of 0.8 for grain mills and a % $CT_S$ of 0.4% for processing facilities.  Given knowledge of industry practices, EPA believes this to be a conservative manner of estimating residues resulting from structural fumigation; however, with the current label directions, further refinement is not appropriate.

There is the potential for "sequential" treatment of certain foods.  For example, wheat grain could be inadvertently treated during a structural fumigation, that grain milled into flour, and then a portion of that same flour could be inadvertently treated during a mill fumigation.  Past assessments have taken the extremely conservative assumption that the probability of sequential treatment occurring is 100%.  This assessment uses % $CT_S$ information to derive a more realistic picture of the likelihood of sequential treatments.  There are four scenarios that describe the sequential treatment possibilities associated with structural fumigations:

1. Flour is incidentally treated, source grain is incidentally treated
2. Flour is incidentally treated, source grain is not incidentally treated
3. Flour is not incidentally treated, source grain is incidentally treated
4. Flour is not incidentally treated, source grain is not incidentally treated.

The likelihood of each scenario can be estimated by multiplying the % $CT_S$ estimates for the various combinations (Table 3).

| Table 3.  Likelihood of Sequential Treatment with Sulfuryl Fluoride from Structural Fumigations. | | |
| --- | --- | --- |
| | Flour Treated (0.4%)[*] | Flour Not Treated (99.6%) |
| Grain Treated (0.8%) | 0.0032% (Scenario 1) | 0.797% (Scenario 3) |
| Grain Not Treated (99.2%) | 0.397% (Scenario 2) | 98.8% (Scenario 4) |

[*] Parenthetical values are % of facilities treated.  Values in the table are obtained by multiplying the % of facilities treated for each scenario (*e.g.*, % of flour bearing residues from both mill fumigation and grain fumigation = 0.004 × 0.008 = 0.000032 = 0.0032%).

Combining the scenario likelihood values, residue estimates for flours, and empirical factors for processing grains into flours (0.38 for wheat, 0.73 for other grains) gives the weighted average residue values presented in Table 4.  These values are used to estimate the exposure from grain flour as a result of structural fumigations.  Flour residue estimates for food fumigations are based on the regression analyses discussed above.  Exposure estimates from the inadvertent treatments

and food treatments are added together in a separate step in the assessment process to provide estimates of overall dietary exposure from the uses of SF.

| Table 4.  Weighted average residue estimates for grain flours resulting from structural treatment. | | | | | | | |
|---|---|---|---|---|---|---|---|
| Flour Source | Treated Grain Residue, ppm | Analytical Correction Factor | Corrected Treated Grain Residue, ppm | Flour Residue, ppm | | | Weighted Average, ppm[b] |
| | | | | Processed from Treated Grain[a] (0.797%)[*] | Treated Flour (0.397%) | Processed from Treated Grain + Treated Flour (0.0032%) | |
| Barley | 3.03 | 0.83 | 3.65 | 2.66 | 33.70 | 36.36 | 0.156 |
| Corn | 1.35 | 1.00 | 1.35 | 0.99 | 18.22 | 19.21 | 0.081 |
| Oats | 5.70 | 0.70 | 8.14 | 5.94 | 72.28 | 78.22 | 0.337 |
| Rice | 2.88 | 0.56 | 5.14 | 3.75 | 32.50 | 36.25 | 0.160 |
| Wheat | 2.38 | 0.83 | 2.90 | 1.10 | 31.40 | 32.50 | 0.134 |

[a] Grain residue × processing factor (0.38 for wheat, 0.73 for others)
[b] Weighted Average = Σ (Flour Residue × % Likelihood from Table 3 ÷ 100).  The contribution from Scenario 4 to the weighted average is zero since no treatments were involved (flour residue = 0 ppm).
[*] Parenthetical values are % likelihood estimates from Table 3.

Table 5 summarizes the inputs used for the dietary exposure assessment for fluoride coming from the uses of sulfuryl fluoride.  Where appropriate, the regression parameters (Table 1) were applied to the available residue data to obtain residue estimates based on actual use patterns.  The %CT information (Table 2) is also summarized in Table 5, and was used to derive weighted averages (Tables 3 and 4) for residues associated with structural fumigations and processed grain commodities.

| Table 5.  Summary of Analytical Correction Factors, Percent Crop Treated, and Residue Estimates for the Dietary Exposure Analysis of Fluoride from Use of Sulfuryl Fluoride. | | | | | | | |
|---|---|---|---|---|---|---|---|
| Food | Analytical Correction Factor | Structural | | | Food | | |
| | | Residue Value Data Source | % CT$_S$[*] | Residue, ppm[†] | Residue Value Data Source | % CT$_F$[*] | Residue, ppm[†] |
| Alfalfa, seed | 0.51 | See sorghum | 0.4 | 20.4 | | | |
| Almond | 0.37 | Regression[‡] | 0.4 | 9.2 | Regression | 10 | 9.7 |
| Almond, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Amaranth, grain | 0.51 | See sorghum | 0.4 | 20.4 | | | |
| Apple, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 69 | 1.0 |
| Apricot, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 69 | 1.0 |
| Arrowroot, flour | 0.70 | Non-mixed wheat flour | 0.4 | 31.4 | | | |
| Banana, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 69 | 1.0 |
| Barley, pearled barley | 0.83 | Regression[‡] | 0.8 | 3.65 | Regression[‡] | 0.1 | 3.7 |
| Barley, flour | 0.83 | Wtd avg (see text) | ** | 0.156 | Regression[‡] with 0.73X factor | 0.1 | 3.7 |
| Barley, bran | 0.83 | See Barley, pearled | 0.8 | 3.65 | Regression[‡] with 2.56X factor | 0.1 | 3.7 |
| Basil, fresh leaves | 0.69 | Avg @ 1569-1596 rate[§] | 0.4 | 67.1 | | | |
| Basil, dried leaves | 0.69 | Avg @ 1569-1596 rate | 0.4 | 67.1 | Avg @ 1569-1596 rate | 0.1 | 67.1 |
| Bean, black, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Bean, broad, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Bean, cowpea, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Bean, great northern, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Bean, kidney, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Bean, lima, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Bean, mung, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Bean, navy, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Bean, pink, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |

Table 5.  Summary of Analytical Correction Factors, Percent Crop Treated, and Residue Estimates for the Dietary Exposure Analysis of Fluoride from Use of Sulfuryl Fluoride.

| Food | Analytical Correction Factor | Structural Residue Value Data Source | % CT_S* | Residue, ppm† | Food Residue Value Data Source | % CT_F* | Residue, ppm† |
|---|---|---|---|---|---|---|---|
| Bean, pinto, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Beef, meat, dried | 0.69 | Avg @ 1573-1658 rate | 0.4 | 58.4 | | | |
| Beet, sugar, molasses | 0.69 | Avg @ 1454-1523 rate | 0.4 | 1.2 | | | |
| Brazil nut | 0.62 | See pecans | 0.4 | 3.9 | See pecans | 10 | 5.3 |
| Buckwheat | 0.83 | See wheat grain | 0.8 | 2.9 | | | |
| Buckwheat, flour | 0.70 | See wheat flour | ** | 0.112 | | | |
| Butternut | 0.62 | See pecans | 0.4 | 3.9 | See pecans | 10 | 5.3 |
| Cashew | 0.62 | See pecans | 0.4 | 3.9 | See pecans | 10 | 5.3 |
| Chestnut | 0.62 | See pecans | 0.4 | 3.9 | See pecans | 10 | 5.3 |
| Chickpea, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Chickpea, flour | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Chicory, roots | 0.69 | Avg @ 1616-1658 rate | 0.4 | 13.9 | | | |
| Chive | 0.69 | See dried parsley | 0.4 | 63.5 | See dried parsley | 0.1 | 63.5 |
| Chrysanthemum, garland | 0.69 | See dried parsley | 0.4 | 63.5 | | | |
| Cinnamon | 0.69 | Avg @ 1573-1580 rate | 0.4 | 73.5 | Avg @ 1573-1580 rate | 0.1 | 73.5 |
| Cocoa bean, chocolate | 0.69 | Cocoa beans @ 1500 rate | 0.4 | 8.4 | Cocoa beans @ 1500 rate | 100 | 8.4 |
| Cocoa bean, powder | 0.69 | Cocoa beans @ 1500 rate | 0.4 | 8.4 | Cocoa beans @ 1500 rate | 100 | 8.4 |
| Coconut, meat | 0.69 | Avg @ 1596-1607 rate | 0.4 | 49.1 | Avg @ 1596-1607 rate | 0.1 | 49.1 |
| Coconut, dried | 0.69 | Avg @ 1596-1607 rate | 0.4 | 49.1 | Avg @ 1596-1607 rate | 0.1 | 49.1 |
| Coconut, milk | 0.69 | Avg @ 1596-1607 rate | 0.4 | 49.1 | Avg @ 1596-1607 rate | 0.1 | 49.1 |
| Coconut, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Coffee, roasted bean | 0.69 | Avg @ 1573-1580 rate | 0.4 | 7.1 | Avg @ 1573-1580 rate | 0.1 | 7.1 |
| Coffee, instant | 0.69 | Avg @ 1610-1658 rate | 0.4 | 13.9 | Avg @ 1610-1658 rate | 0.1 | 13.9 |
| Coriander, leaves | 0.69 | See dried parsley | 0.4 | 63.5 | See dried parsley | 0.1 | 63.5 |
| Coriander, seed | 0.69 | See pepper, black/white | 0.4 | 7.1 | See pepper, black/white | 0.1 | 7.1 |
| Corn, field, flour | 1.00 | Wtd avg (see text) | ** | 0.081 | Regression | 0.1 | 16.9 |
| Corn, field, meal | 1.00 | Avg @ 1573-1590 rate | 0.8 | 14.0 | Corn grain × 0.78 | 0.1 | 2.8 |
| Corn, field, bran | 1.00 | Avg @ 1573-1590 rate | 0.8 | 14.0 | Corn grain × 0.78 | 0.1 | 2.8 |
| Corn, field, starch | 0.80 | Avg @ 1534-1573 rate | 0.8 | 6.6 | Corn grain × 0.17 | 0.1 | 0.6 |
| Corn, field, syrup | 0.78 | Corn grain × 0.17 | 0.8 | 0.6 | Corn grain × 0.17 | 0.1 | 0.6 |
| Corn, field, oil | 0.78 | Avg @ 1540-1580 rate | 0.8 | 0.4 | | | |
| Corn, pop | 0.69 | Regression | 0.8 | 1.7 | Regression | 0.1 | 1.7 |
| Cottonseed, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Cranberry, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 10 | 1.0 |
| Currant, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 10 | 1.0 |
| Date | 0.69 | Regression | 0.4 | 0.9 | Regression | 42 | 0.9 |
| Dill, seed | 0.69 | See pepper, black/white | 0.4 | 7.1 | See pepper, black/white | 0.1 | 7.1 |
| Dillweed | 0.69 | See dried parsley | 0.4 | 63.5 | See dried parsley | 0.1 | 63.5 |
| Egg (dried) | 0.69 | Avg @ 1414-1580 rate | 0.4 | 402.5 | | | |
| Fig, dried | 0.79 | Regression | 0.4 | 1.0 | Regression | 69 | 1.0 |
| Filbert | 0.69 | Regression | 0.4 | 1.5 | Regression | 10 | 2.5 |
| Filbert, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Flaxseed, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Garlic, dried | 0.69 | Avg @ 1414-1446 rate | 0.4 | 10.9 | Avg @ 1414-1446 rate | 0.1 | 10.9 |
| Ginger | 0.69 | | | | See garlic | 0.1 | 10.9 |
| Ginger, dried | 0.69 | See garlic | 0.4 | 10.9 | See garlic | 0.1 | 10.9 |
| Ginseng, dried | 0.69 | See garlic | 0.4 | 10.9 | | | |
| Grape, raisin | 0.72 | Regression | 0.4 | 1.0 | Regression | 69 | 1.0 |
| Guar, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Herbs, other | 0.69 | See dried parsley | 0.4 | 63.5 | See dried parsley | 0.1 | 63.5 |
| Hickory nut | 0.62 | See pecans | 0.4 | 3.9 | See pecans | 10 | 5.3 |
| Lemongrass | 0.69 | See dried parsley | 0.4 | 63.5 | See dried parsley | 0.1 | 63.5 |
| Lentil, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Lychee, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 69 | 1.0 |
| Macadamia nut | 0.62 | See pecans | 0.4 | 3.9 | See pecans | 0.1 | 5.3 |
| Mango, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 69 | 1.0 |

Table 5.  Summary of Analytical Correction Factors, Percent Crop Treated, and Residue Estimates for the Dietary Exposure Analysis of Fluoride from Use of Sulfuryl Fluoride.

| Food | Analytical Correction Factor | Structural | | | Food | | |
|---|---|---|---|---|---|---|---|
| | | Residue Value Data Source | % $CT_S$* | Residue, ppm† | Residue Value Data Source | % $CT_F$* | Residue, ppm† |
| Maple, sugar | 0.69 | Avg @ 1454-1523 rate | 0.4 | 1.2 | | | |
| Maple syrup | 0.69 | Avg @ 1454-1523 rate | 0.4 | 1.2 | | | |
| Marjoram | 0.69 | See basil | 0.4 | 67.1 | See basil | 0.1 | 67.1 |
| Milk (powdered) | 0.69 | Avg @ 1414-1580 rate | 0.4 | 5.4 | | | |
| Milk (cured; cheese) | 0.69 | Avg @ 1414-1446 rate | 0.4 | 3.9 | | | |
| Millet, grain | 0.83 | See wheat grain | 0.8 | 2.9 | See wheat grain | 0.1 | 2.9 |
| Oat, bran | 0.52 | See wheat bran | 0.8 | 74.2 | Barley with 2.56X factor | 0.1 | 18.5 |
| Oat, flour | 0.70 | Wtd avg (see text) | ** | 0.337 | Barley with 0.73X factor | 0.1 | 18.5 |
| Oat, groats/rolled oats | 0.83 | See pearled barley | 0.8 | 18.5 | Barley | 0.1 | 18.5 |
| Olive, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Onion, dry bulb, dried | 0.69 | Control value; treated samples <LOQ | 0.4 | 1.7 | | | |
| Palm, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Papaya, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 69 | 1.0 |
| Parsley, dried leaves | 0.69 | Avg @ 1454-1523 rate | 0.4 | 63.5 | Avg @ 1454-1523 rate | 0.1 | 63.5 |
| Pea, dry | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Pea, pigeon, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | Cocoa beans @ avg rate | 100 | 4.5 |
| Peach, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 69 | 1.0 |
| Peanut | 0.69 | Avg @ 1569-1596 rate | 0.4 | 16.4 | Avg @ 1569-1596 rate | 0.6 | 16.4 |
| Peanut, butter | 0.69 | Avg @ 1569-1596 rate | 0.4 | 16.4 | Avg @ 1569-1596 rate | 0.6 | 16.4 |
| Peanut, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Pear, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 69 | 1.0 |
| Pecan | 0.62 | Regression | 0.4 | 3.9 | Regression | 10 | 5.3 |
| Pepper, bell, dried | 0.69 | Avg @ 1569-1596 rate | 0.4 | 36.1 | | | |
| Pepper, nonbell, dried | 0.69 | Avg @ 1569-1596 rate | 0.4 | 36.1 | | | |
| Pepper, black/white | 0.69 | Avg @ 1454-1523 rate | 0.4 | 7.1 | Avg @ 1454-1523 rate | 0.1 | 7.1 |
| Peppermint, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Pine nut | 0.69 | Avg @ 1573-1580 rate | 0.4 | 8.8 | Avg @ 1573-1580 rate | 10 | 8.8 |
| Pineapple, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 69 | 1.0 |
| Pistachio | 0.69 | Regression | 0.4 | 2.3 | Regression | 27 | 3.2 |
| Plantain, dried | 0.79 | See figs | 0.4 | 1.0 | See figs | 69 | 1.0 |
| Plum, prune, dried | 0.82 | Regression | 0.4 | 0.7 | Regression | 69 | 0.7 |
| Potato, chips | 0.69 | Avg @ 1725-1734 rate | 0.4 | 7.1 | | | |
| Potato, dry | 0.69 | From egg noodles | 0.4 | 25.6 | | | |
| Potato, flour | 0.70 | Non-mixed wheat flour | 0.4 | 31.4 | | | |
| Psyllium, seed | 0.69 | See pepper, black/white | 0.4 | 7.1 | | | |
| Pumpkin, seed | 0.69 | See pine nut | 0.4 | 8.8 | | | |
| Quinoa, grain | 0.51 | See sorghum grain | 0.4 | 20.4 | | | |
| Rapeseed, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Rice, white | 0.75 | Regression | 0.8 | 3.9 | Regression | 3 | 4.5 |
| Rice, brown | 0.36 | Regression | 0.8 | 9.4 | Regression | 3 | 12.5 |
| Rice, flour | 0.56 | Wtd avg (see text) | ** | 0.160 | Avg @ 1573-1580 rate | 3 | 32.5 |
| Rice, bran | 0.69 | Avg @ 1573 rate | 0.8 | 37.5 | Avg @ 1573 rate | 3 | 37.5 |
| Rye, grain | 0.83 | See wheat grain | 0.8 | 2.9 | | | |
| Rye, flour | 0.70 | See wheat flour | 0.8 | 0.112 | | | |
| Safflower, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Savory | 0.69 | See dried parsley | 0.4 | 63.5 | See dried parsley | 0.1 | 63.5 |
| Sesame, seed | 0.69 | See pepper, black/white | 0.4 | 7.1 | | | |
| Sesame, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Sorghum, grain | 0.51 | Avg @ 1573-1580 rate | 0.8 | 20.4 | Avg @ 1573-1580 rate | 0.1 | 20.4 |
| Sorghum, syrup | 0.78 | Corn syrup | 0.8 | 0.6 | | | |
| Soybean, flour | 0.70 | Corn flour | ** | 0.081 | | | |
| Soybean, soy milk | 0.69 | Powdered milk | 0.4 | 2.4 | | | |
| Soybean, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Spearmint, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Spices, other | 0.69 | See pepper, black/white | 0.4 | 7.1 | See pepper, black/white | 0.1 | 7.1 |

Table 5.  Summary of Analytical Correction Factors, Percent Crop Treated, and Residue Estimates for the Dietary Exposure Analysis of Fluoride from Use of Sulfuryl Fluoride.

| Food | Analytical Correction Factor | Structural Residue Value Data Source | % $CT_S$[*] | Residue, ppm[†] | Food Residue Value Data Source | % $CT_F$[*] | Residue, ppm[†] |
|---|---|---|---|---|---|---|---|
| Sugarcane, sugar | 0.69 | Avg @ 1454-1523 rate | 0.4 | 1.2 | | | |
| Sugarcane, molasses | 0.69 | Avg @ 1454-1523 rate | 0.4 | 1.2 | | | |
| Sunflower, seed | 0.69 | Cocoa beans @ avg rate | 0.4 | 4.5 | | | |
| Sunflower, oil | 0.78 | ½ LOQ | 0.4 | 1.5 | | | |
| Tea, dried | 0.69 | See basil | 0.4 | 67.1 | | | |
| Tea, instant | 0.69 | See basil | 0.4 | 67.1 | | | |
| Tomato, dried | 0.79 | See figs | 0.4 | 1.0 | | | |
| Triticale, flour | 0.70 | See wheat flour | ** | 0.134 | Wheat with 0.38 factor | 0.1 | 2.9 |
| Turmeric | 0.69 | See pepper, black/white | 0.4 | 7.1 | See pepper, black/white | 0.1 | 7.1 |
| Walnut | 0.70 | Regression | 0.4 | 2.0 | Regression | 99 | 2.4 |
| Wheat, grain | 0.83 | Regression | 0.8 | 2.9 | Regression | 0.4 | 2.9 |
| Wheat, flour | 0.70 | Wtd avg (see text) | ** | 0.134 | Regression | 0.1 | 31.4 |
| Wheat, germ | 0.62 | Regression | 0.8 | 54.0 | Wheat grain × 4.8 | 0.1 | 13.9 |
| Wheat, bran | 0.52 | Avg @ 1573-1717 rate | 0.8 | 74.2 | Avg @ 1573-1717 rate | 0.1 | 74.2 |
| Wild rice | 0.36 | See rice, brown | 0.8 | 9.4 | See rice, brown | 3 | 12.5 |

[*] % $CT_S$ = percent crop treated for structural fumigations.  % $CT_F$ = percent crop treated for food fumigations.
[†] Residue values include the analytical correction factor.
[‡] Residue values are from Table 1, after application of the analytical correction factor.
[§] Avg @ rate = the average residue value from the listed application rate
[**] % $CT_S$ estimates associated with grain flours are incorporated into the residue estimate directly and are, therefore, not used as a modifying factor for these commodities.  For the DEEM input file, the value is set at 1.00.

For grains, the current label for sulfuryl fluoride allows for fumigation of corn, rice, and wheat processed commodities.  Fumigation of processed commodities of other grains (*e.g.*, barley, oats, and triticale) is not permitted.  The entries in Table 4 associated with the food fumigation of the processed commodities for these other grains include factors of 0.38 for flour and 2.56 for bran.  These factors are from a study (MRID 45396301) in which wheat was fumigated with sulfuryl fluoride and then processed into flour, bran, germ, etc. using simulated commercial practices.  A processing factor for chickpea flour is not available.  HED has assumed that there is no concentration of fluoride residue during the processing of chickpeas into flour, and believes that this is a conservative assumption given the processing factors for wheat flour (0.38) and corn flour (0.73).

## III.    DEEM-FCID™ Program and Consumption Information

These dietary exposure assessments were conducted using the Dietary Exposure Evaluation Model software with the Food Commodity Intake Database DEEM-FCID™, Version 2.03 which incorporates consumption data from USDA's Continuing Surveys of Food Intakes by Individuals (CSFII), 1994-1996 and 1998.  The 1994-96, 98 data are based on the reported consumption of more than 20,000 individuals over two non-consecutive survey days.  Foods "as consumed" (e.g., apple pie) are linked to EPA-defined food commodities (e.g. apples, peeled fruit - cooked; fresh or N/S; baked; or wheat flour - cooked; fresh or N/S, baked) using publicly available recipe translation files developed jointly by USDA/ARS and EPA.  For chronic exposure assessment, consumption data are averaged for the entire U.S. population and within population subgroups, but for acute exposure assessment are retained as individual consumption events.  Based on analysis of the 1994-96, 98 CSFII consumption data, which took into account dietary patterns and survey respondents, HED concluded that it is most appropriate to report risk for the following population subgroups: the general U.S. population, all infants (<1 year old), children

1-2, children 3-5, children 6-12, youth 13-19, adults 20-49, females 13-49, and adults 50+ years old.

For chronic dietary exposure assessment, an estimate of the residue level in each food or food-form (e.g., orange or orange juice) on the food commodity residue list is multiplied by the average daily consumption estimate for that food/food form to produce a residue intake estimate. The resulting residue intake estimate for each food/food form is summed with the residue intake estimates for all other food/food forms on the commodity residue list to arrive at the total average estimated exposure.  Exposure is expressed in mg/kg body weight/day.  This procedure is performed for each population subgroup.

## IV.   Results/Discussion

Chronic dietary exposure estimates are summarized in Table 6 for each source and each population subgroup noted above.  The estimated contributions from the various crop subgroups to total fluoride exposure from the currently registered uses of cryolite and sulfuryl fluoride are provided in Table 7.  The results of the commodity contribution analysis for each source are summarized in Attachments 7 through 9.  The complete commodity contribution reports have not been included in this document due to their excessive length.  These reports are available upon request.  Overall exposure is estimated to be greatest for the age group consisting of 1-2 year olds; however, 3-5 year olds have higher exposure for certain food groups (e.g., leafy vegetables, cucurbit vegetables, citrus fruits, pome fruits, and tree nuts; Table 7).

| Population Group | Exposure Estimates, mg/kg/day | | | |
|---|---|---|---|---|
| | Cryolite | SF Structural Fumigations | SF Food Fumigations | Total |
| U.S. Population (total) | 0.000682 | 0.000336 | 0.001023 | 0.002041 |
| All infants (< 1 year) | 0.000956 | 0.000505 | 0.001071 | 0.002532 |
| Children 1-2 yrs | 0.003275 | 0.000827 | 0.002169 | 0.006271 |
| Children 3-5 yrs | 0.002112 | 0.000800 | 0.002293 | 0.005205 |
| Children 6-12 yrs | 0.000885 | 0.000543 | 0.001743 | 0.003171 |
| Youth 13-19 yrs | 0.000346 | 0.000320 | 0.001032 | 0.001698 |
| Adults 20-49 yrs | 0.000445 | 0.000272 | 0.000814 | 0.001531 |
| Adults 50+ yrs | 0.000547 | 0.000215 | 0.000719 | 0.001481 |
| Females 13-49 yrs | 0.000473 | 0.000249 | 0.000799 | 0.001521 |

Table 6.  Summary of Pesticidal Fluoride Contributions to Dietary Fluoride Exposure.

## V.   Characterization of Inputs/Outputs

The residue estimates for most of the commodities in these analyses are moderately to highly refined.  Data reflecting residues of F at various fumigation rates could be used to further refine residue estimates for a number of commodities.  However, such data are not expected to result in significant changes to the exposure estimates presented in Section IV.  Percent CT estimates have been used for both the structural and food fumigation uses.  The % CT values used by OPP are considered to be highly refined, although certain conservatism remains in the values in that where there are discrepancies between the estimates from BEAD and Dow AgroSciences, the higher value was used.

| Table 7. Summary of Fluoride Exposure Estimates by Age Group and Crop/Food Group. | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Exposure, mg/kg/day | | | | | | | | |
| Group* | U.S. Pop. | Grouping by Age (Years) | | | | | | | |
| | | <1 | 1 – 2 | 3 – 5 | 6 – 12 | 13 – 19 | 20 – 50 | >50 | Females 13-49 |
| (O)  Other† | 0.0009222 | 0.0009517 | 0.0037942 | 0.0028948 | 0.0016121 | 0.0006471 | 0.0005932 | 0.0006092 | 0.0006484 |
| (M)  Meat | 0.0000004 | 0.0000000 | 0.0000009 | 0.0000002 | 0.0000006 | 0.0000011 | 0.0000004 | 0.0000002 | 0.0000004 |
| (P)  Poultry | 0.0000103 | 0.0000055 | 0.0000296 | 0.0000210 | 0.0000118 | 0.0000079 | 0.0000102 | 0.0000068 | 0.0000110 |
| (D)  Dairy Products | 0.0000032 | 0.0000684 | 0.0000135 | 0.0000096 | 0.0000031 | 0.0000017 | 0.0000011 | 0.0000014 | 0.0000011 |
| (1)  Root and Tuber Vegetables | 0.0000218 | 0.0000216 | 0.0000509 | 0.0000470 | 0.0000310 | 0.0000224 | 0.0000181 | 0.0000164 | 0.0000171 |
| (3)  Bulb Vegetables | 0.0000002 | 0.0000002 | 0.0000007 | 0.0000006 | 0.0000004 | 0.0000002 | 0.0000002 | 0.0000002 | 0.0000002 |
| (4)  Leafy Vegetables (except Brassica) | 0.0000077 | 0.0000000 | 0.0000040 | 0.0000061 | 0.0000063 | 0.0000075 | 0.0000088 | 0.0000077 | 0.0000094 |
| (5)  Brassica Leafy Vegetables | 0.0000148 | 0.0000082 | 0.0000313 | 0.0000230 | 0.0000167 | 0.0000094 | 0.0000131 | 0.0000161 | 0.0000134 |
| (6)  Legume Veg. (Succulent or Dried) | 0.0005292 | 0.0003465 | 0.0010570 | 0.0009845 | 0.0006567 | 0.0005222 | 0.0004703 | 0.0004453 | 0.0004313 |
| (8)  Fruiting Vegetables | 0.0000153 | 0.0000062 | 0.0000284 | 0.0000260 | 0.0000188 | 0.0000140 | 0.0000145 | 0.0000129 | 0.0000134 |
| (9)  Curcurbit Vegetables | 0.0000091 | 0.0000110 | 0.0000162 | 0.0000186 | 0.0000121 | 0.0000074 | 0.0000068 | 0.0000098 | 0.0000074 |
| (10) Citrus | 0.0000462 | 0.0000159 | 0.0001014 | 0.0001027 | 0.0000544 | 0.0000298 | 0.0000305 | 0.0000614 | 0.0000322 |
| (11) Pome Fruits | 0.0000013 | 0.0000017 | 0.0000027 | 0.0000030 | 0.0000023 | 0.0000012 | 0.0000009 | 0.0000011 | 0.0000010 |
| (12) Stone Fruits | 0.0000091 | 0.0000503 | 0.0000401 | 0.0000179 | 0.0000114 | 0.0000035 | 0.0000049 | 0.0000100 | 0.0000055 |
| (13) Berries | 0.0000061 | 0.0000117 | 0.0000147 | 0.0000147 | 0.0000093 | 0.0000049 | 0.0000042 | 0.0000056 | 0.0000046 |
| (14) Tree Nuts | 0.0000163 | 0.0000013 | 0.0000257 | 0.0000262 | 0.0000190 | 0.0000113 | 0.0000150 | 0.0000171 | 0.0000150 |
| (15) Cereal Grains | 0.0004246 | 0.0010255 | 0.0010501 | 0.0010019 | 0.0007000 | 0.0004035 | 0.0003361 | 0.0002590 | 0.0003077 |
| (19) Herbs and Spices | 0.0000026 | 0.0000016 | 0.0000092 | 0.0000072 | 0.0000044 | 0.0000026 | 0.0000020 | 0.0000014 | 0.0000020 |
| (20) Oilseeds | 0.0000003 | 0.0000039 | 0.0000004 | 0.0000004 | 0.0000004 | 0.0000003 | 0.0000002 | 0.0000002 | 0.0000002 |
| Fruit Juices‡ | 0.0002769 | 0.0007996 | 0.0022384 | 0.0012761 | 0.0004614 | 0.0001593 | 0.0001053 | 0.0000941 | 0.0001126 |
| Total | 0.0020407 | 0.0025312 | 0.0062710 | 0.0052054 | 0.0031708 | 0.0016980 | 0.0015305 | 0.0014818 | 0.0015213 |

* For crops, the groups correspond to OPP crop groupings.  Groups 7, 16, 17, and 18 do not consist of commodities for human consumption and are not included in this table.

† Foods not captured in one of the listed groups, including, but not limited to, cocoa beans, coconut, cranberry, grape, and grape juice. Use of cryolite is the predominant source of fluoride for this group.

‡ The exposure contributions from fruit juices are included in the overall total via the crop groups; therefore, the values listed as total do not include the specific exposure estimate from fruit juices.

**Attachments**

1. Inputs for the chronic dietary exposure analysis of fluoride from cryolite

2. Inputs for the chronic dietary exposure analysis of fluoride from structural fumigation with sulfuryl fluoride

3. Inputs for the chronic dietary exposure analysis of fluoride from food fumigation with sulfuryl fluoride

4. Results of the chronic dietary exposure analysis of fluoride from cryolite

5. Results of the chronic dietary exposure analysis of fluoride from structural fumigation with sulfuryl fluoride

6. Results of the chronic dietary exposure analysis of fluoride from food fumigation with sulfuryl fluoride

7. Commodity contribution summary for the chronic dietary exposure analysis of fluoride from cryolite

8. Commodity contribution summary for the chronic dietary exposure analysis of fluoride from structural fumigation with sulfuryl fluoride

9. Commodity contribution summary for the chronic dietary exposure analysis of fluoride from food fumigation with sulfuryl fluoride

Attachment 1.  Inputs for the chronic dietary exposure analysis of fluoride from cryolite

```
U.S. Environmental Protection Agency                            Ver. 2.00
DEEM-FCID Chronic analysis for CRYOLITE                        1994-98 data
Residue file: C:\Documents and Settings\mdoherty\My Documents\Chemistry Reviews\!DEEM
Runs\Sulfuryl Fluoride\Cryolite-AR-CT new raisin factor.R98
                                                           Adjust. #2 used
Analysis Date 02-19-2009        Residue file dated: 06-24-2004/10:05:08/8
-------------------------------------------------------------------------
Food Crop                            Residue     Adj.Factors       Comment
EPA Code  Grp  Food Name             (ppm)
                                                 #1        #2
--------  ----  -------------------  ----------  ------    ------   -------
12000120  12   Apricot              4.500000    1.000     0.010
12000121  12   Apricot-babyfood     4.500000    1.000     0.010
12000130  12   Apricot, dried       4.500000    6.000     0.010
12000140  12   Apricot, juice       4.500000    1.000     0.010
12000141  12   Apricot, juice-babyfood  4.500000  1.000   0.010
13010550  13A  Blackberry           0.250000    1.000     1.000
13010560  13A  Blackberry, juice    0.250000    1.000     1.000
13010561  13A  Blackberry, juice-babyfood  0.250000  1.000  1.000
13020570  13B  Blueberry            0.110000    1.000     1.000
13020571  13B  Blueberry-babyfood   0.110000    1.000     1.000
13010580  13A  Boysenberry          0.250000    1.000     1.000
05010610  5A   Broccoli             5.000000    1.000     0.020
05010611  5A   Broccoli-babyfood    5.000000    1.000     0.020
05010640  5A   Brussels sprouts     4.000000    1.000     0.020
05010690  5A   Cabbage              1.500000    1.000     0.010
05020700  5B   Cabbage, Chinese, bok choy  4.000000  1.000  0.010
09010750  9A   Cantaloupe           2.160000    1.000     0.010
09010800  9A   Casaba               2.160000    1.000     0.010
05010830  5A   Cauliflower          3.000000    1.000     0.020
10001060  10   Citrus citron        8.000000    1.000     0.040
05021170  5B   Collards             4.000000    1.000     0.020
95001300  O    Cranberry            0.500000    1.000     1.000
95001301  O    Cranberry-babyfood   0.500000    1.000     1.000
95001310  O    Cranberry, dried     0.500000    1.000     1.000
95001320  O    Cranberry, juice     0.500000    1.100     1.000
95001321  O    Cranberry, juice-babyfood  0.500000  1.100  1.000
09021350  9B   Cucumber             2.500000    1.000     0.010
13021360  13B  Currant              0.110000    1.000     1.000
13021370  13B  Currant, dried       0.110000    1.000     1.000
13011420  13A  Dewberry             0.250000    1.000     1.000
08001480  8    Eggplant             1.500000    1.000     0.010
13021490  13B  Elderberry           0.110000    1.000     1.000
13021740  13B  Gooseberry           0.110000    1.000     1.000
95001750  O    Grape                3.500000    1.000     0.330
95001760  O    Grape, juice         3.500000    0.830     0.330
95001761  O    Grape, juice-babyfood  3.500000  0.830     0.330
95001770  O    Grape, leaves        3.500000    1.000     0.330
95001780  O    Grape, raisin        3.500000    1.350     0.330
95001790  O    Grape, wine and sherry  3.500000  0.830    0.330
10001800  10   Grapefruit           9.000000    1.000     0.040
10001810  10   Grapefruit, juice    9.000000    0.026     0.040
09011870  9A   Honeydew melon       2.160000    1.000     0.010
13021910  13B  Huckleberry          0.110000    1.000     1.000
05021940  5B   Kale                 4.000000    1.000     0.020
95001950  O    Kiwifruit            4.500000    1.000     0.140
05011960  5A   Kohlrabi             5.000000    1.000     0.020
10001970  10   Kumquat              8.000000    1.000     0.040
10001990  10   Lemon                13.500000   1.000     0.020
10002000  10   Lemon, juice         13.500000   0.024     0.020
10002001  10   Lemon, juice-babyfood  13.500000  0.024    0.020
10002010  10   Lemon, peel          13.500000   0.280     0.020
04012040  4A   Lettuce, head        2.500000    1.000     0.010
04012050  4A   Lettuce, leaf        15.000000   1.000     0.010
10002060  10   Lime                 13.500000   1.000     0.040
10002070  10   Lime, juice          13.500000   0.024     0.040
10002071  10   Lime, juice-babyfood  13.500000  0.024     0.040
13012080  13A  Loganberry           0.250000    1.000     1.000
12002300  12   Nectarine            4.500000    1.000     0.010
10002400  10   Orange               8.000000    1.000     0.020
```

```
10002410 10   Orange, juice                       8.000000  0.022  0.020
10002411 10   Orange, juice-babyfood              8.000000  0.022  0.020
10002420 10   Orange, peel                        8.000000  0.280  0.020
12002600 12   Peach                               4.500000  1.000  0.010
12002601 12   Peach-babyfood                      4.500000  1.000  0.010
12002610 12   Peach, dried                        4.500000  7.000  0.010
12002611 12   Peach, dried-babyfood               4.500000  7.000  0.010
12002620 12   Peach, juice                        4.500000  1.000  0.010
12002621 12   Peach, juice-babyfood               4.500000  1.000  0.010
08002700 8    Pepper, bell                        3.500000  1.000  0.010
08002701 8    Pepper, bell-babyfood               3.500000  1.000  0.010
08002710 8    Pepper, bell, dried                 3.500000  1.000  0.010
08002711 8    Pepper, bell, dried-babyfood        3.500000  1.000  0.010
08002720 8    Pepper, nonbell                     3.500000  1.000  0.010
08002721 8    Pepper, nonbell-babyfood            3.500000  1.000  0.010
08002730 8    Pepper, nonbell, dried              3.500000  1.000  0.010
95002750 O    Peppermint                         19.500000  1.000  1.000
95002760 O    Peppermint, oil                    19.500000  0.026  1.000
12002850 12   Plum                                0.500000  1.000  0.010
12002851 12   Plum-babyfood                       0.500000  1.000  0.010
12002860 12   Plum, prune, fresh                  0.500000  1.000  0.010
12002861 12   Plum, prune, fresh-babyfood         2.000000  1.000  0.010
12002870 12   Plum, prune, dried                  2.000000  5.000  0.010
12002871 12   Plum, prune, dried-babyfood         2.000000  5.000  0.010
12002880 12   Plum, prune, juice                  2.000000  1.400  0.010
12002881 12   Plum, prune, juice-babyfood         2.000000  1.400  0.010
01032960 1C   Potato, chips                       0.650000  1.000  0.030
01032970 1C   Potato, dry (granules/ flakes)      0.650000  6.500  0.030
01032971 1C   Potato, dry (granules/ flakes)-b    0.650000  6.500  0.030
01032980 1C   Potato, flour                       0.650000  6.500  0.030
01032981 1C   Potato, flour-babyfood              0.650000  6.500  0.030
01032990 1C   Potato, tuber, w/peel               0.650000  1.000  0.030
01032991 1C   Potato, tuber, w/peel-babyfood      0.650000  1.000  0.030
01033000 1C   Potato, tuber, w/o peel             0.650000  1.000  0.030
01033001 1C   Potato, tuber, w/o peel-babyfood    0.650000  1.000  0.030
10003070 10   Pummelo                             9.000000  1.000  0.040
09023080 9B   Pumpkin                             2.500000  1.000  0.010
09023090 9B   Pumpkin, seed                       2.500000  1.000  0.010
13013200 13A  Raspberry                           0.250000  1.000  1.000
13013201 13A  Raspberry-babyfood                  0.250000  1.000  1.000
13013210 13A  Raspberry, juice                    0.250000  1.000  1.000
13013211 13A  Raspberry, juice-babyfood           0.250000  1.000  1.000
95003520 O    Spearmint                          19.500000  1.000  1.000
95003530 O    Spearmint, oil                     19.500000  0.026  1.000
09023560 9B   Squash, summer                      2.500000  1.000  0.010
09023561 9B   Squash, summer-babyfood             2.500000  1.000  0.010
09023570 9B   Squash, winter                      2.500000  1.000  0.010
09023571 9B   Squash, winter-babyfood             2.500000  1.000  0.010
95003590 O    Strawberry                          1.000000  1.000  0.020
95003591 O    Strawberry-babyfood                 1.000000  1.000  0.020
95003600 O    Strawberry, juice                   1.000000  1.000  0.020
95003601 O    Strawberry, juice-babyfood          1.000000  1.000  0.020
10003690 10   Tangerine                           8.000000  1.000  0.040
10003700 10   Tangerine, juice                    8.000000  0.028  0.040
08003750 8    Tomato                              1.500000  1.000  0.010
08003751 8    Tomato-babyfood                     1.500000  1.000  0.010
08003760 8    Tomato, paste                       1.500000  1.500  0.010
08003761 8    Tomato, paste-babyfood              1.500000  1.500  0.010
08003770 8    Tomato, puree                       1.500000  1.000  0.010
08003771 8    Tomato, puree-babyfood              1.500000  1.000  0.010
08003780 8    Tomato, dried                       1.500000 14.300  0.010
08003781 8    Tomato, dried-babyfood              1.500000 14.300  0.010
08003790 8    Tomato, juice                       1.500000  1.500  0.010
09013990 9A   Watermelon                          2.160000  1.000  0.010
09014000 9A   Watermelon, juice                   2.160000  1.000  0.010
```

Attachment 2.  Inputs for the chronic dietary exposure analysis of fluoride from structural fumigation with sulfuryl fluoride

```
U.S. Environmental Protection Agency                        Ver. 2.00
DEEM-FCID Chronic analysis for FLUORIDE                  1994-98 data
Residue file: C:\Documents and Settings\mdoherty\My Documents\Chemistry Reviews\!DEEM
Runs\Sulfuryl Fluoride\F Space Fumigation - 2009 - 5-1.R98
                                                   Adjust. #2 used
Analysis Date 05-06-2009          Residue file dated: 05-06-2009/13:52:45/8
Reference dose (RfD) = 0.114 mg/kg bw/day

-------------------------------------------------------------------------------
Food Crop                           Residue    Adj.Factors        Comment
EPA Code  Grp  Food Name            (ppm)
                                               #1        #2
--------  ----  -------------------------  ----------  ------    ------    -------
18000020  18    Alfalfa, seed              20.400000   1.000     0.004
14000030  14    Almond                      9.200000   1.000     0.004
14000031  14    Almond-babyfood             9.200000   1.000     0.004
14000040  14    Almond, oil                 1.500000   1.000     0.004
14000041  14    Almond, oil-babyfood        1.500000   1.000     0.004
95000060  O     Amaranth, grain            20.400000   1.000     0.004
11000090  11    Apple, dried                1.000000   1.000     0.004
11000091  11    Apple, dried-babyfood       1.000000   1.000     0.004
12000130  12    Apricot, dried              1.000000   1.000     0.004
01030150  1CD   Arrowroot, flour           31.400000   1.000     0.004
01030151  1CD   Arrowroot, flour-babyfood  31.400000   1.000     0.004
95000240  O     Banana, dried               1.000000   1.000     0.004
95000241  O     Banana, dried-babyfood      1.000000   1.000     0.004
15000250  15    Barley, pearled barley      3.650000   1.000     0.008
15000251  15    Barley, pearled barley-babyfood 3.650000 1.000   0.008
15000260  15    Barley, flour               0.156000   1.000     1.000
15000261  15    Barley, flour-babyfood      0.156000   1.000     1.000
15000270  15    Barley, bran                3.650000   1.000     0.008
19010280  19A   Basil, fresh leaves        67.100000   1.000     0.004
19010281  19A   Basil, fresh leaves-babyfood 67.100000 1.000     0.004
19010290  19A   Basil, dried leaves        67.100000   1.000     0.004
19010291  19A   Basil, dried leaves-babyfood 67.100000 1.000     0.004
06030300  6C    Bean, black, seed           4.500000   1.000     0.004
06030320  6C    Bean, broad, seed           4.500000   1.000     0.004
06030340  6C    Bean, cowpea, seed          4.500000   1.000     0.004
06030350  6C    Bean,  great northern, seed 4.500000   1.000     0.004
06030360  6C    Bean, kidney, seed          4.500000   1.000     0.004
06030380  6C    Bean, lima, seed            4.500000   1.000     0.004
06030390  6C    Bean, mung, seed            4.500000   1.000     0.004
06030400  6C    Bean, navy, seed            4.500000   1.000     0.004
06030410  6C    Bean, pink, seed            4.500000   1.000     0.004
06030420  6C    Bean, pinto, seed           4.500000   1.000     0.004
21000450  M     Beef, meat, dried          58.400000   1.000     0.004
01010530  1A    Beet, sugar, molasses       1.200000   1.000     0.004
01010531  1A    Beet, sugar, molasses-babyfood 1.200000 1.000    0.004
14000590  14    Brazil nut                  3.900000   1.000     0.004
15000650  15    Buckwheat                   2.900000   1.000     0.008
15000660  15    Buckwheat, flour            0.134000   1.000     1.000
14000680  14    Butternut                   3.900000   1.000     0.004
14000810  14    Cashew                      3.900000   1.000     0.004
14000920  14    Chestnut                    3.900000   1.000     0.004
06030980  6C    Chickpea, seed              4.500000   1.000     0.004
06030981  6C    Chickpea, seed-babyfood     4.500000   1.000     0.004
06030990  6C    Chickpea, flour             4.500000   1.000     0.004
01011000  1AB   Chicory, roots             13.900000   1.000     0.004
19011030  19A   Chive                      63.500000   1.000     0.004
04011040  4A    Chrysanthemum, garland     63.500000   1.000     0.004
19021050  19B   Cinnamon                   73.500000   1.000     0.004
19021051  19B   Cinnamon-babyfood          73.500000   1.000     0.004
95001090  O     Cocoa bean, chocolate       8.400000   1.000     0.004
95001100  O     Cocoa bean, powder          8.400000   1.000     0.004
95001110  O     Coconut, meat              49.100000   1.000     0.004
95001111  O     Coconut- meat-babyfood     49.100000   1.000     0.004
95001120  O     Coconut, dried             49.100000   1.000     0.004
95001130  O     Coconut, milk              49.100000   1.000     0.004
95001140  O     Coconut, oil                1.500000   1.000     0.004
```

```
95001141 O    Coconut, oil-babyfood             1.500000   1.000   0.004
95001150 O    Coffee, roasted bean             7.100000   1.000   0.004
95001160 O    Coffee, instant                 13.900000   1.000   0.004
19011180 19A  Coriander, leaves               63.500000   1.000   0.004
19011181 19A  Coriander, leaves-babyfood      63.500000   1.000   0.004
19021190 19B  Coriander, seed                  7.100000   1.000   0.004
19021191 19B  Coriander, seed-babyfood         7.100000   1.000   0.004
15001200 15   Corn, field, flour               0.081000   1.000   1.000
15001201 15   Corn, field, flour-babyfood      0.081000   1.000   1.000
15001210 15   Corn, field, meal               14.000000   1.000   0.008
15001211 15   Corn, field, meal-babyfood      14.000000   1.000   0.008
15001220 15   Corn, field, bran               14.000000   1.000   0.008
15001230 15   Corn, field, starch              6.600000   1.000   0.008
15001231 15   Corn, field, starch-babyfood     6.600000   1.000   0.008
15001240 15   Corn, field, syrup               0.600000   1.000   0.008
15001241 15   Corn, field, syrup-babyfood      0.600000   1.000   0.008
15001250 15   Corn, field, oil                 0.400000   1.000   0.008
15001251 15   Corn, field, oil-babyfood        0.400000   1.000   0.008
15001260 15   Corn, pop                        1.700000   1.000   0.008
95001280 O    Cottonseed, oil                  1.500000   1.000   0.004
95001281 O    Cottonseed, oil-babyfood         1.500000   1.000   0.004
95001310 O    Cranberry, dried                 1.000000   1.000   0.004
13021370 13B  Currant, dried                   1.000000   1.000   0.004
95001410 O    Date                             0.900000   1.000   0.004
19021430 19B  Dill, seed                       7.100000   1.000   0.004
19011440 19A  Dillweed                        63.500000   1.000   0.004
70001450 P    Egg, whole
              110-Uncooked; Fresh or N/S; Cook Meth N/S
                                               0.000000   1.000   0.004
              120-Uncooked; Frozen; Cook Meth N/S
                                               0.000000   1.000   0.004
              210-Cooked; Fresh or N/S; Cook Meth N/S
                                               0.000000   1.000   0.004
              211-Cooked; Fresh or N/S; Baked  0.000000   1.000   0.004
              212-Cooked; Fresh or N/S; Boiled
                                               0.000000   1.000   0.004
              213-Cooked; Fresh or N/S; Fried  0.000000   1.000   0.004
              214-Cooked; Fresh or N/S; Fried/baked
                                               0.000000   1.000   0.004
              215-Cooked; Fresh or N/S; Boiled/baked
                                               0.000000   1.000   0.004
              221-Cooked; Frozen; Baked        0.000000   1.000   0.004
              223-Cooked; Frozen; Fried        0.000000   1.000   0.004
              224-Cooked; Frozen; Fried/baked  0.000000   1.000   0.004
              230-Cooked; Dried; Cook Meth N/S
                                             402.500000   1.000   0.004
              232-Cooked; Dried; Boiled      402.500000   1.000   0.004
              233-Cooked; Dried; Fried       402.500000   1.000   0.004
              240-Cooked; Canned; Cook Meth N/S
                                               0.000000   1.000   0.004
              242-Cooked; Canned; Boiled       0.000000   1.000   0.004
              252-Cooked; Cured etc; Boiled    0.000000   1.000   0.004
              253-Cooked; Cured etc; Fried     0.000000   1.000   0.004
70001460 P    Egg, white
              110-Uncooked; Fresh or N/S; Cook Meth N/S
                                               0.000000   1.000   0.004
              120-Uncooked; Frozen; Cook Meth N/S
                                               0.000000   1.000   0.004
              130-Uncooked; Dried; Cook Meth N/S
                                             402.500000   1.000   0.004
              210-Cooked; Fresh or N/S; Cook Meth N/S
                                               0.000000   1.000   0.004
              211-Cooked; Fresh or N/S; Baked  0.000000   1.000   0.004
              212-Cooked; Fresh or N/S; Boiled
                                               0.000000   1.000   0.004
              213-Cooked; Fresh or N/S; Fried  0.000000   1.000   0.004
              214-Cooked; Fresh or N/S; Fried/baked
                                               0.000000   1.000   0.004
              221-Cooked; Frozen; Baked        0.000000   1.000   0.004
              223-Cooked; Frozen; Fried        0.000000   1.000   0.004
              230-Cooked; Dried; Cook Meth N/S
                                             402.500000   1.000   0.004
              232-Cooked; Dried; Boiled      402.500000   1.000   0.004
```

```
                        233-Cooked; Dried; Fried     402.500000   1.000      0.004
                        240-Cooked; Canned; Cook Meth N/S
                                                       0.000000   1.000      0.004
                        242-Cooked; Canned; Boiled     0.000000   1.000      0.004
                        250-Cooked; Cured etc; Cook Meth N/S
                                                       0.000000   1.000      0.004
70001461 P    Egg, white (solids)-babyfood           402.500000   1.000      0.004
95001540 O    Fig, dried                               1.000000   1.000      0.004
14001550 14   Filbert                                  1.500000   1.000      0.004
14001560 14   Filbert, oil                             1.500000   1.000      0.004
20001630 20   Flaxseed, oil                            1.500000   1.000      0.004
03001650 3    Garlic, dried                           10.900000   1.000      0.004
03001651 3    Garlic, dried-babyfood                  10.900000   1.000      0.004
01031670 1CD  Ginger, dried                           10.900000   1.000      0.004
01011680 1AB  Ginseng, dried                          10.900000   1.000      0.004
95001780 O    Grape, raisin                            1.000000   1.000      0.004
06031820 6C   Guar, seed                               4.500000   1.000      0.004
06031821 6C   Guar, seed-babyfood                      4.500000   1.000      0.004
19011840 19A  Herbs, other                            63.500000   1.000      0.004
19011841 19A  Herbs, other-babyfood                   63.500000   1.000      0.004
14001850 14   Hickory nut                              3.900000   1.000      0.004
19012020 19A  Lemongrass                              63.500000   1.000      0.004
06032030 6C   Lentil, seed                             4.500000   1.000      0.004
95002120 O    Lychee, dried                            1.000000   1.000      0.004
14002130 14   Macadamia nut                            3.900000   1.000      0.004
95002160 O    Mango, dried                             1.000000   1.000      0.004
95002180 O    Maple, sugar                             1.200000   1.000      0.004
95002190 O    Maple syrup                              1.200000   1.000      0.004
19012200 19A  Marjoram                                67.100000   1.000      0.004
19012201 19A  Marjoram-babyfood                       67.100000   1.000      0.004
27002220 D    Milk, fat
                        110-Uncooked; Fresh or N/S; Cook Meth N/S
                                                       0.000000   1.000      0.004
                        120-Uncooked; Frozen; Cook Meth N/S
                                                       0.000000   1.000      0.004
                        130-Uncooked; Dried; Cook Meth N/S
                                                       5.400000   1.000      0.004
                        150-Uncooked; Cured etc; Cook Meth N/S
                                                       3.900000   1.000      0.004
                        210-Cooked; Fresh or N/S; Cook Meth N/S
                                                       0.000000   1.000      0.004
                        211-Cooked; Fresh or N/S; Baked  0.000000  1.000      0.004
                        212-Cooked; Fresh or N/S; Boiled
                                                       0.000000   1.000      0.004
                        213-Cooked; Fresh or N/S; Fried  0.000000  1.000      0.004
                        214-Cooked; Fresh or N/S; Fried/baked
                                                       0.000000   1.000      0.004
                        215-Cooked; Fresh or N/S; Boiled/baked
                                                       0.000000   1.000      0.004
                        220-Cooked; Frozen; Cook Meth N/S
                                                       0.000000   1.000      0.004
                        221-Cooked; Frozen; Baked      0.000000   1.000      0.004
                        222-Cooked; Frozen; Boiled     0.000000   1.000      0.004
                        223-Cooked; Frozen; Fried      0.000000   1.000      0.004
                        224-Cooked; Frozen; Fried/baked  0.000000  1.000      0.004
                        230-Cooked; Dried; Cook Meth N/S
                                                       5.400000   1.000      0.004
                        231-Cooked; Dried; Baked       5.400000   1.000      0.004
                        232-Cooked; Dried; Boiled      5.400000   1.000      0.004
                        233-Cooked; Dried; Fried       5.400000   1.000      0.004
                        240-Cooked; Canned; Cook Meth N/S
                                                       0.000000   1.000      0.004
                        242-Cooked; Canned; Boiled     0.000000   1.000      0.004
                        250-Cooked; Cured etc; Cook Meth N/S
                                                       3.900000   1.000      0.004
                        253-Cooked; Cured etc; Fried   3.900000   1.000      0.004
                        255-Cooked; Cured etc; Boiled/baked
                                                       3.900000   1.000      0.004
27012230 D    Milk, nonfat solids
                        110-Uncooked; Fresh or N/S; Cook Meth N/S
                                                       0.000000   1.000      0.004
                        120-Uncooked; Frozen; Cook Meth N/S
                                                       0.000000   1.000      0.004
```

```
                    130-Uncooked; Dried; Cook Meth N/S
                                          5.400000   1.000      0.004
                    150-Uncooked; Cured etc; Cook Meth N/S
                                          3.900000   1.000      0.004
                    210-Cooked; Fresh or N/S; Cook Meth N/S
                                          0.000000   1.000      0.004
                    211-Cooked; Fresh or N/S; Baked  0.000000   1.000      0.004
                    212-Cooked; Fresh or N/S; Boiled
                                          0.000000   1.000      0.004
                    213-Cooked; Fresh or N/S; Fried  0.000000   1.000      0.004
                    214-Cooked; Fresh or N/S; Fried/baked
                                          0.000000   1.000      0.004
                    215-Cooked; Fresh or N/S; Boiled/baked
                                          0.000000   1.000      0.004
                    220-Cooked; Frozen; Cook Meth N/S
                                          0.000000   1.000      0.004
                    221-Cooked; Frozen; Baked     0.000000   1.000      0.004
                    222-Cooked; Frozen; Boiled    0.000000   1.000      0.004
                    223-Cooked; Frozen; Fried     0.000000   1.000      0.004
                    224-Cooked; Frozen; Fried/baked  0.000000   1.000      0.004
                    230-Cooked; Dried; Cook Meth N/S
                                          5.400000   1.000      0.004
                    231-Cooked; Dried; Baked      5.400000   1.000      0.004
                    232-Cooked; Dried; Boiled     5.400000   1.000      0.004
                    233-Cooked; Dried; Fried      5.400000   1.000      0.004
                    240-Cooked; Canned; Cook Meth N/S
                                          0.000000   1.000      0.004
                    242-Cooked; Canned; Boiled    0.000000   1.000      0.004
                    245-Cooked; Canned; Boiled/baked
                                          0.000000   1.000      0.004
                    250-Cooked; Cured etc; Cook Meth N/S
                                          3.900000   1.000      0.004
                    253-Cooked; Cured etc; Fried   3.900000   1.000      0.004
                    255-Cooked; Cured etc; Boiled/baked
                                          3.900000   1.000      0.004
27012231 D   Milk, nonfat solids-baby food/infant
                    110-Uncooked; Fresh or N/S; Cook Meth N/S
                                          0.000000   1.000      0.004
                    130-Uncooked; Dried; Cook Meth N/S
                                          5.400000   1.000      0.004
                    211-Cooked; Fresh or N/S; Baked  0.000000   1.000      0.004
                    240-Cooked; Canned; Cook Meth N/S
                                          0.000000   1.000      0.004
27022240 D   Milk, water
                    110-Uncooked; Fresh or N/S; Cook Meth N/S
                                          0.000000   1.000      0.004
                    120-Uncooked; Frozen; Cook Meth N/S
                                          0.000000   1.000      0.004
                    130-Uncooked; Dried; Cook Meth N/S
                                          5.400000   1.000      0.004
                    150-Uncooked; Cured etc; Cook Meth N/S
                                          3.900000   1.000      0.004
                    210-Cooked; Fresh or N/S; Cook Meth N/S
                                          0.000000   1.000      0.004
                    211-Cooked; Fresh or N/S; Baked  0.000000   1.000      0.004
                    212-Cooked; Fresh or N/S; Boiled
                                          0.000000   1.000      0.004
                    213-Cooked; Fresh or N/S; Fried  0.000000   1.000      0.004
                    214-Cooked; Fresh or N/S; Fried/baked
                                          0.000000   1.000      0.004
                    215-Cooked; Fresh or N/S; Boiled/baked
                                          0.000000   1.000      0.004
                    220-Cooked; Frozen; Cook Meth N/S
                                          0.000000   1.000      0.004
                    221-Cooked; Frozen; Baked     0.000000   1.000      0.004
                    222-Cooked; Frozen; Boiled    0.000000   1.000      0.004
                    223-Cooked; Frozen; Fried     0.000000   1.000      0.004
                    224-Cooked; Frozen; Fried/baked  0.000000   1.000      0.004
                    230-Cooked; Dried; Cook Meth N/S
                                          5.400000   1.000      0.004
                    231-Cooked; Dried; Baked      5.400000   1.000      0.004
                    232-Cooked; Dried; Boiled     5.400000   1.000      0.004
                    233-Cooked; Dried; Fried      5.400000   1.000      0.004
```

```
                    240-Cooked; Canned; Cook Meth N/S
                                      0.000000   1.000       0.004
                    242-Cooked; Canned; Boiled    0.000000   1.000       0.004
                    250-Cooked; Cured etc; Cook Meth N/S
                                      3.900000   1.000       0.004
                    253-Cooked; Cured etc; Fried  3.900000   1.000       0.004
                    255-Cooked; Cured etc; Boiled/baked
                                      3.900000   1.000       0.004
27032251 D    Milk, sugar (lactose)-baby food/infa
                    110-Uncooked; Fresh or N/S; Cook Meth N/S
                                      0.000000   1.000       0.004
                    130-Uncooked; Dried; Cook Meth N/S
                                      5.400000   1.000       0.004
                    210-Cooked; Fresh or N/S; Cook Meth N/S
                                      0.000000   1.000       0.004
                    212-Cooked; Fresh or N/S; Boiled
                                      0.000000   1.000       0.004
                    230-Cooked; Dried; Cook Meth N/S
                                      5.400000   1.000       0.004
                    240-Cooked; Canned; Cook Meth N/S
                                      0.000000   1.000       0.004
15002260 15   Millet, grain           2.900000   1.000       0.008
15002310 15   Oat, bran              74.200000   1.000       0.008
15002320 15   Oat, flour              0.337000   1.000       1.000
15002321 15   Oat, flour-babyfood     0.337000   1.000       1.000
15002330 15   Oat, groats/rolled oats 18.500000   1.000       0.008
15002331 15   Oat, groats/rolled oats-babyfood 18.500000   1.000       0.008
95002360 O    Olive, oil              1.500000   1.000       0.004
03002380 3    Onion, dry bulb, dried  1.700000   1.000       0.004
03002381 3    Onion, dry bulb, dried-babyfood 1.700000   1.000       0.004
95002440 O    Palm, oil               1.500000   1.000       0.004
95002441 O    Palm, oil-babyfood      1.500000   1.000       0.004
95002460 O    Papaya, dried           1.000000   1.000       0.004
19012490 19A  Parsley, dried leaves  63.500000   1.000       0.004
19012491 19A  Parsley, dried leaves-babyfood 63.500000   1.000       0.004
06032560 6C   Pea, dry                4.500000   1.000       0.004
06032561 6C   Pea, dry-babyfood       4.500000   1.000       0.004
06032580 6C   Pea, pigeon, seed       4.500000   1.000       0.004
12002610 12   Peach, dried            1.000000   1.000       0.004
12002611 12   Peach, dried-babyfood   1.000000   1.000       0.004
95002630 O    Peanut                 16.400000   1.000       0.004
95002640 O    Peanut, butter         16.400000   1.000       0.004
95002650 O    Peanut, oil             1.500000   1.000       0.004
11002670 11   Pear, dried             1.000000   1.000       0.004
14002690 14   Pecan                   3.900000   1.000       0.004
08002710 8    Pepper, bell, dried    36.100000   1.000       0.004
08002711 8    Pepper, bell, dried-babyfood 36.100000   1.000       0.004
08002730 8    Pepper, nonbell, dried 36.100000   1.000       0.004
19022740 19B  Pepper, black and white 7.100000   1.000       0.004
19022741 19B  Pepper, black and white-babyfood 7.100000   1.000       0.004
95002760 O    Peppermint, oil         1.500000   1.000       0.004
95002780 O    Pine nut                8.800000   1.000       0.004
95002800 O    Pineapple, dried        1.000000   1.000       0.004
14002820 14   Pistachio               2.300000   1.000       0.004
95002840 O    Plantain, dried         1.000000   1.000       0.004
12002870 12   Plum, prune, dried      0.700000   1.000       0.004
12002871 12   Plum, prune, dried-babyfood 0.700000   1.000       0.004
01032960 1C   Potato, chips           7.100000   1.000       0.004
01032970 1C   Potato, dry (granules/ flakes) 25.600000   1.000       0.004
01032971 1C   Potato, dry (granules/ flakes)-b 25.600000   1.000       0.004
01032980 1C   Potato, flour          31.400000   1.000       0.004
01032981 1C   Potato, flour-babyfood 31.400000   1.000       0.004
95003060 O    Psyllium, seed          7.100000   1.000       0.004
09023090 9B   Pumpkin, seed           8.800000   1.000       0.004
95003110 O    Quinoa, grain          20.400000   1.000       0.004
20003190 20   Rapeseed, oil           1.500000   1.000       0.004
20003191 20   Rapeseed, oil-babyfood  1.500000   1.000       0.004
15003230 15   Rice, white             3.900000   1.000       0.008
15003231 15   Rice, white-babyfood    3.900000   1.000       0.008
15003240 15   Rice, brown             9.400000   1.000       0.008
15003241 15   Rice, brown-babyfood    9.400000   1.000       0.008
15003250 15   Rice, flour             0.160000   1.000       1.000
15003251 15   Rice, flour-babyfood    0.160000   1.000       1.000
```

```
15003260 15    Rice, bran                          37.500000   1.000   0.008
15003261 15    Rice, bran-babyfood                 37.500000   1.000   0.008
15003280 15    Rye, grain                           2.900000   1.000   0.008
15003290 15    Rye, flour                           0.134000   1.000   1.000
20003300 20    Safflower, oil                       1.500000   1.000   0.004
20003301 20    Safflower, oil-babyfood              1.500000   1.000   0.004
19013340 19A   Savory                              63.500000   1.000   0.004
95003360 O     Sesame, seed                         7.100000   1.000   0.004
95003361 O     Sesame, seed-babyfood                7.100000   1.000   0.004
95003370 O     Sesame, oil                          1.500000   1.000   0.004
95003371 O     Sesame, oil-babyfood                 1.500000   1.000   0.004
15003440 15    Sorghum, grain                      20.400000   1.000   0.008
15003450 15    Sorghum, syrup                       0.600000   1.000   0.008
06003480 6     Soybean, flour                       0.081000   1.000   1.000
06003481 6     Soybean, flour-babyfood              0.081000   1.000   1.000
06003490 6     Soybean, soy milk                    2.400000   1.000   0.004
06003491 6     Soybean, soy milk-babyfood or in     2.400000   1.000   0.004
06003500 6     Soybean, oil                         1.500000   1.000   0.004
06003501 6     Soybean, oil-babyfood                1.500000   1.000   0.004
95003530 O     Spearmint, oil                       1.500000   1.000   0.004
19023540 19B   Spices, other                        7.100000   1.000   0.004
19023541 19B   Spices, other-babyfood               7.100000   1.000   0.004
95003620 O     Sugarcane, sugar                     1.200000   1.000   0.004
95003621 O     Sugarcane, sugar-babyfood            1.200000   1.000   0.004
95003630 O     Sugarcane, molasses                  1.200000   1.000   0.004
95003631 O     Sugarcane, molasses-babyfood         1.200000   1.000   0.004
20003640 20    Sunflower, seed                      4.500000   1.000   0.004
20003650 20    Sunflower, oil                       1.500000   1.000   0.004
20003651 20    Sunflower, oil-babyfood              1.500000   1.000   0.004
95003720 O     Tea, dried                          67.100000   1.000   0.004
95003730 O     Tea, instant                        67.100000   1.000   0.004
08003780 8     Tomato, dried                        1.000000   1.000   0.004
08003781 8     Tomato, dried-babyfood               1.000000   1.000   0.004
15003810 15    Triticale, flour                     0.134000   1.000   1.000
15003811 15    Triticale, flour-babyfood            0.134000   1.000   1.000
01033870 1CD   Turmeric                             7.100000   1.000   0.004
14003910 14    Walnut                               2.000000   1.000   0.004
15004010 15    Wheat, grain                         2.900000   1.000   0.008
15004011 15    Wheat, grain-babyfood                2.900000   1.000   0.008
15004020 15    Wheat, flour                         0.134000   1.000   1.000
15004021 15    Wheat, flour-babyfood                0.134000   1.000   1.000
15004030 15    Wheat, germ                         54.000000   1.000   0.008
15004040 15    Wheat, bran                         74.200000   1.000   0.008
15004050 15    Wild rice                            9.400000   1.000   0.008
```

Attachment 3.  Inputs for the chronic dietary exposure analysis of fluoride from food fumigation with sulfuryl fluoride

```
U.S. Environmental Protection Agency                        Ver. 2.00
DEEM-FCID Chronic analysis for FLUORIDE                     1994-98 data
Residue file: C:\Documents and Settings\mdoherty\My Documents\Chemistry Reviews\!DEEM
Runs\Sulfuryl Fluoride\F Food Fumigation - 2009  RevisedCT - 4-28 Strict Label.R98
                                                           Adjust. #2 used
Analysis Date 05-06-2009          Residue file dated: 05-06-2009/13:54:06/8
Reference dose (RfD) = 0.114 mg/kg bw/day

-------------------------------------------------------------------------------
Food Crop                               Residue     Adj.Factors      Comment
EPA Code   Grp   Food Name               (ppm)
                                                    #1        #2
-------- ---- -------------------------- ---------- ------    ------   -------
14000030 14    Almond                    9.700000   1.000     0.100
14000031 14    Almond-babyfood           9.700000   1.000     0.100
11000090 11    Apple, dried              1.000000   1.000     0.690
11000091 11    Apple, dried-babyfood     1.000000   1.000     0.690
12000130 12    Apricot, dried            1.000000   1.000     0.690
95000240 O     Banana, dried             1.000000   1.000     0.690
95000241 O     Banana, dried-babyfood    1.000000   1.000     0.690
15000250 15    Barley, pearled barley    3.700000   1.000     0.001
15000251 15    Barley, pearled barley-babyfood  3.700000  1.000  0.001
15000260 15    Barley, flour             3.700000   0.730     0.001
15000261 15    Barley, flour-babyfood    3.700000   0.730     0.001
15000270 15    Barley, bran              3.700000   2.560     0.001
19010290 19A   Basil, dried leaves       67.100000  1.000     0.001
19010291 19A   Basil, dried leaves-babyfood  67.100000  1.000   0.001
06030300 6C    Bean, black, seed         4.500000   1.000     1.000
06030320 6C    Bean, broad, seed         4.500000   1.000     1.000
06030340 6C    Bean, cowpea, seed        4.500000   1.000     1.000
06030350 6C    Bean,  great northern, seed  4.500000  1.000   1.000
06030360 6C    Bean, kidney, seed        4.500000   1.000     1.000
06030380 6C    Bean, lima, seed          4.500000   1.000     1.000
06030390 6C    Bean, mung, seed          4.500000   1.000     1.000
06030400 6C    Bean, navy, seed          4.500000   1.000     1.000
06030410 6C    Bean, pink, seed          4.500000   1.000     1.000
06030420 6C    Bean, pinto, seed         4.500000   1.000     1.000
14000590 14    Brazil nut                5.300000   1.000     0.100
14000680 14    Butternut                 5.300000   1.000     0.100
14000810 14    Cashew                    5.300000   1.000     0.100
14000920 14    Chestnut                  5.300000   1.000     0.100
06030980 6C    Chickpea, seed            4.500000   1.000     1.000
06030981 6C    Chickpea, seed-babyfood   4.500000   1.000     1.000
06030990 6C    Chickpea, flour           4.500000   1.000     1.000
19011080 19A   Chive                     63.500000  1.000     0.001
19021050 19B   Cinnamon                  73.500000  1.000     0.001
19021051 19B   Cinnamon-babyfood         73.500000  1.000     0.001
95001090 O     Cocoa bean, chocolate     8.400000   1.000     1.000
95001100 O     Cocoa bean, powder        8.400000   1.000     1.000
95001110 O     Coconut, meat             49.100000  1.000     0.001
95001111 O     Coconut- meat-babyfood    49.100000  1.000     0.001
95001120 O     Coconut, dried            49.100000  1.000     0.001
95001130 O     Coconut, milk             49.100000  1.000     0.001
95001150 O     Coffee, roasted bean      7.100000   1.000     0.001
95001160 O     Coffee, instant           13.900000  1.000     0.001
19011180 19A   Coriander, leaves         63.500000  1.000     0.001
19011181 19A   Coriander, leaves-babyfood 63.500000 1.000     0.001
19021190 19B   Coriander, seed           7.100000   1.000     0.001
19021191 19B   Coriander, seed-babyfood  7.100000   1.000     0.001
15001200 15    Corn, field, flour        16.900000  1.000     0.001
15001201 15    Corn, field, flour-babyfood 16.900000 1.000    0.001
15001210 15    Corn, field, meal         2.800000   1.000     0.001
15001211 15    Corn, field, meal-babyfood 2.800000  1.000     0.001
15001220 15    Corn, field, bran         2.800000   1.000     0.001
15001230 15    Corn, field, starch       0.600000   1.000     0.001
15001231 15    Corn, field, starch-babyfood 0.600000 1.000    0.001
15001240 15    Corn, field, syrup        0.600000   1.000     0.001
15001241 15    Corn, field, syrup-babyfood 0.600000 1.000     0.001
15001260 15    Corn, pop                 1.700000   1.000     0.001
```

```
95001310 O    Cranberry, dried              1.000000  1.000   0.100
13021370 13B  Currant, dried                1.000000  1.000   0.100
95001410 O    Date
              130-Uncooked; Dried; Cook Meth N/S
                                            0.900000  1.000   0.420
              210-Cooked; Fresh or N/S; Cook Meth N/S
                                            0.000000  1.000   0.000
              211-Cooked; Fresh or N/S; Baked  0.000000  1.000   0.000
              212-Cooked; Fresh or N/S; Boiled
                                            0.000000  1.000   0.000
              230-Cooked; Dried; Cook Meth N/S
                                            0.900000  1.000   0.420
19021430 19B  Dill, seed                    7.100000  1.000   0.001
19011440 19A  Dillweed                     63.500000  1.000   0.001
95001540 O    Fig, dried                    1.000000  1.000   0.690
14001550 14   Filbert                       2.500000  1.000   0.100
03001650 3    Garlic, dried                10.900000  1.000   0.001
01031660 1CD  Ginger                       10.900000  1.000   0.001
01031661 1CD  Ginger-babyfood              10.900000  1.000   0.001
01031670 1CD  Ginger, dried                10.900000  1.000   0.001
95001780 O    Grape, raisin                 1.000000  1.000   0.690
06031820 6C   Guar, seed                    4.500000  1.000   1.000
06031821 6C   Guar, seed-babyfood           4.500000  1.000   1.000
19011840 19A  Herbs, other                 63.500000  1.000   0.001
19011841 19A  Herbs, other-babyfood        63.500000  1.000   0.001
14001850 14   Hickory nut                   5.300000  1.000   0.100
19012020 19A  Lemongrass                   63.500000  1.000   0.001
06032030 6C   Lentil, seed                  4.500000  1.000   1.000
95002120 O    Lychee, dried                 1.000000  1.000   0.690
14002130 14   Macadamia nut                 5.300000  1.000   0.001
95002160 O    Mango, dried                  1.000000  1.000   0.690
19012200 19A  Marjoram                     67.100000  1.000   0.001
19012201 19A  Marjoram-babyfood            67.100000  1.000   0.001
15002260 15   Millet, grain                 2.900000  1.000   0.001
15002310 15   Oat, bran                    18.500000  2.560   0.001
15002320 15   Oat, flour                   18.500000  0.730   0.001
15002321 15   Oat, flour-babyfood          18.500000  0.730   0.001
15002330 15   Oat, groats/rolled oats      18.500000  1.000   0.001
15002331 15   Oat, groats/rolled oats-babyfood  18.500000  1.000   0.001
95002460 O    Papaya, dried                 1.000000  1.000   0.690
19012490 19A  Parsley, dried leaves        63.500000  1.000   0.001
19012491 19A  Parsley, dried leaves-babyfood  63.500000  1.000   0.001
06032560 6C   Pea, dry                      4.500000  1.000   1.000
06032561 6C   Pea, dry-babyfood             4.500000  1.000   1.000
06032580 6C   Pea, pigeon, seed             4.500000  1.000   1.000
12002610 12   Peach, dried                  1.000000  1.000   0.690
12002611 12   Peach, dried-babyfood         1.000000  1.000   0.690
95002630 O    Peanut                       16.400000  1.000   0.006
95002640 O    Peanut, butter               16.400000  1.000   0.006
11002670 11   Pear, dried                   1.000000  1.000   0.690
14002690 14   Pecan                         5.300000  1.000   0.100
19022740 19B  Pepper, black and white       7.100000  1.000   0.001
19022741 19B  Pepper, black and white-babyfood  7.100000  1.000   0.001
95002780 O    Pine nut                      8.800000  1.000   0.100
95002800 O    Pineapple, dried              1.000000  1.000   0.690
14002820 14   Pistachio                     3.200000  1.000   0.270
95002840 O    Plantain, dried               1.000000  1.000   0.690
12002870 12   Plum, prune, dried            0.700000  1.000   0.690
12002871 12   Plum, prune, dried-babyfood   0.700000  1.000   0.690
15003230 15   Rice, white                   4.500000  1.000   0.030
15003231 15   Rice, white-babyfood          4.500000  1.000   0.030
15003240 15   Rice, brown                  12.500000  1.000   0.030
15003241 15   Rice, brown-babyfood         12.500000  1.000   0.030
15003250 15   Rice, flour                  32.500000  1.000   0.030
15003251 15   Rice, flour-babyfood         32.500000  1.000   0.030
15003260 15   Rice, bran                   37.500000  1.000   0.030
15003261 15   Rice, bran-babyfood          37.500000  1.000   0.030
19013340 19A  Savory                       63.500000  1.000   0.001
15003440 15   Sorghum, grain               20.400000  1.000   0.001
19023540 19B  Spices, other                 7.100000  1.000   0.001
19023541 19B  Spices, other-babyfood        7.100000  1.000   0.001
15003810 15   Triticale, flour              2.900000  0.380   0.001
15003811 15   Triticale, flour-babyfood     2.900000  0.380   0.001
```

```
01033870 1CD   Turmeric                    7.100000   1.000   0.001
14003910 14    Walnut                      2.400000   1.000   0.990
15004010 15    Wheat, grain                2.900000   1.000   0.004
15004011 15    Wheat, grain-babyfood       2.900000   1.000   0.004
15004020 15    Wheat, flour               31.400000   1.000   0.001
15004021 15    Wheat, flour-babyfood      31.400000   1.000   0.001
15004030 15    Wheat, germ                13.900000   1.000   0.001
15004040 15    Wheat, bran                74.200000   1.000   0.001
15004050 15    Wild rice                  12.500000   1.000   0.030
```

Attachment 4.  Results of the chronic dietary exposure analysis of fluoride from cryolite

```
U.S. Environmental Protection Agency                          Ver. 2.00
DEEM-FCID Chronic analysis for CRYOLITE               (1994-98 data)
Residue file name: C:\Documents and Settings\mdoherty\My Documents\Chemistry Reviews\!DEEM
Runs\Sulfuryl Fluoride\Cryolite-AR-CT new raisin factor.R98
                                              Adjustment factor #2 used.
Analysis Date 02-19-2009/14:16:56    Residue file dated: 06-24-2004/10:05:08/8
===========================================================================
                   Total exposure by population subgroup
---------------------------------------------------------------------------

                                              Total Exposure
                                      -----------------------------------
          Population                         mg/kg
           Subgroup                       body wt/day
-------------------------------------    -------------
U.S. Population (total)                      0.000682

U.S. Population (spring season)              0.000655
U.S. Population (summer season)              0.000735
U.S. Population (autumn season)              0.000637
U.S. Population (winter season)              0.000702

Northeast region                             0.000807
Midwest region                               0.000670
Southern region                              0.000579
Western region                               0.000745

Hispanics                                    0.000605
Non-hispanic whites                          0.000716
Non-hispanic blacks                          0.000590
Non-hisp/non-white/non-black                 0.000563

All infants (< 1 year)                       0.000956
Nursing infants                              0.000401
Non-nursing infants                          0.001167
Children 1-6  yrs                            0.002334
Children 7-12 yrs                            0.000842

Females 13-19 (not preg or nursing)          0.000390
Females 20+ (not preg or nursing)            0.000530
Females 13-50 yrs                            0.000499
Females 13+ (preg/not nursing)               0.000342
Females 13+ (nursing)                        0.000471

Males 13-19 yrs                              0.000304
Males 20+ yrs                                0.000434
Seniors 55+                                  0.000563

Children 1-2 yrs                             0.003275
Children 3-5 yrs                             0.002112
Children 6-12 yrs                            0.000885
Youth 13-19 yrs                              0.000346
Adults 20-49 yrs                             0.000445
Adults 50+ yrs                               0.000547
Females 13-49 yrs                            0.000473


---------------------------------------------------------------------------
```

Attachment 5.  Results of the chronic dietary exposure analysis of fluoride from structural fumigation with sulfuryl fluoride

```
U.S. Environmental Protection Agency                      Ver. 2.00
DEEM-FCID Chronic analysis for FLUORIDE               (1994-98 data)
Residue file name: C:\Documents and Settings\mdoherty\My Documents\Chemistry Reviews\!DEEM
Runs\Sulfuryl Fluoride\F Space Fumigation - 2009 - 5-1.R98
                                            Adjustment factor #2 used.
Analysis Date 05-06-2009/13:56:30    Residue file dated: 05-06-2009/13:52:45/8
Reference dose (RfD, Chronic) = .114 mg/kg bw/day
===============================================================================
                  Total exposure by population subgroup
-------------------------------------------------------------------------------

                                           Total Exposure
                                       --------------------------------
             Population                      mg/kg
              Subgroup                    body wt/day
-------------------------------------   --------------
U.S. Population (total)                    0.000336

U.S. Population (spring season)            0.000343
U.S. Population (summer season)            0.000328
U.S. Population (autumn season)            0.000333
U.S. Population (winter season)            0.000341

Northeast region                          0.000354
Midwest region                            0.000348
Southern region                           0.000314
Western region                            0.000341

Hispanics                                 0.000336
Non-hispanic whites                       0.000337
Non-hispanic blacks                       0.000317
Non-hisp/non-white/non-black              0.000364

All infants (< 1 year)                    0.000505
Nursing infants                           0.000272
Non-nursing infants                       0.000593
Children 1-6  yrs                         0.000792
Children 7-12 yrs                         0.000515

Females 13-19 (not preg or nursing)       0.000282
Females 20+ (not preg or nursing)         0.000225
Females 13-50 yrs                         0.000264
Females 13+ (preg/not nursing)            0.000256
Females 13+ (nursing)                     0.000306

Males 13-19 yrs                           0.000355
Males 20+ yrs                             0.000278
Seniors 55+                               0.000213

Children 1-2 yrs                          0.000827
Children 3-5 yrs                          0.000800
Children 6-12 yrs                         0.000543
Youth 13-19 yrs                           0.000320
Adults 20-49 yrs                          0.000272
Adults 50+ yrs                            0.000215
Females 13-49 yrs                         0.000249


-------------------------------------------------------------------------------
```

Attachment 6.  Results of the chronic dietary exposure analysis of fluoride from food fumigation with sulfuryl fluoride

```
U.S. Environmental Protection Agency                          Ver. 2.00
DEEM-FCID Chronic analysis for FLUORIDE               (1994-98 data)
Residue file name: C:\Documents and Settings\mdoherty\My Documents\Chemistry Reviews\!DEEM
Runs\Sulfuryl Fluoride\F Food Fumigation - 2009  RevisedCT - 4-28 Strict Label.R98
                                            Adjustment factor #2 used.
Analysis Date 05-06-2009/13:57:26    Residue file dated: 05-06-2009/13:54:06/8
Reference dose (RfD, Chronic) = .114 mg/kg bw/day
=============================================================================
                    Total exposure by population subgroup
-----------------------------------------------------------------------------

                                           Total Exposure
                                   -----------------------------------
             Population                mg/kg
             Subgroup               body wt/day
-------------------------------    -------------
U.S. Population (total)               0.001023

U.S. Population (spring season)       0.000989
U.S. Population (summer season)       0.000931
U.S. Population (autumn season)       0.001055
U.S. Population (winter season)       0.001123

Northeast region                      0.000925
Midwest region                        0.000941
Southern region                       0.000972
Western region                        0.00128

Hispanics                             0.001799
Non-hispanic whites                   0.000925
Non-hispanic blacks                   0.000869
Non-hisp/non-white/non-black          0.00122

All infants (< 1 year)                0.001071
Nursing infants                       0.00061
Non-nursing infants                   0.001246
Children 1-6  yrs                     0.00224
Children 7-12 yrs                     0.001657

Females 13-19 (not preg or nursing)   0.000961
Females 20+ (not preg or nursing)     0.000702
Females 13-50 yrs                     0.000975
Females 13+ (preg/not nursing)        0.001258
Females 13+ (nursing)                 0.001155

Males 13-19 yrs                       0.001099
Males 20+ yrs                         0.000847
Seniors 55+                           0.000695

Children 1-2 yrs                      0.002169
Children 3-5 yrs                      0.002293
Children 6-12 yrs                     0.001743
Youth 13-19 yrs                       0.001032
Adults 20-49 yrs                      0.000814
Adults 50+ yrs                        0.000719
Females 13-49 yrs                     0.000799

-----------------------------------------------------------------------------
```

Attachment 7.  Commodity contribution summary for the chronic dietary exposure analysis of fluoride from cryolite

| | Exposure, mg/kg/day | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. | Infants | K1-2 | K3-5 | K6-12 | Y13-19 | A20-50 | A50+ | Fem13-49 |
| Crop Group = (O)  Other | 0.0005567 | 0.0008359 | 0.0030082 | 0.0018675 | 0.0007324 | 0.0002507 | 0.0003483 | 0.0004115 | 0.0003740 |
| Crop Group = (1)  Root and Tuber Vegetables | 0.0000189 | 0.0000169 | 0.0000430 | 0.0000388 | 0.0000260 | 0.0000195 | 0.0000157 | 0.0000150 | 0.0000147 |
| Crop Group = (1C) Tuberous and Corm Vegetables | 0.0000189 | 0.0000169 | 0.0000430 | 0.0000388 | 0.0000260 | 0.0000195 | 0.0000157 | 0.0000150 | 0.0000147 |
| Crop Group = (4)  Leafy Vegetables (except Brassica) | 0.0000077 | 0.0000000 | 0.0000040 | 0.0000061 | 0.0000063 | 0.0000075 | 0.0000088 | 0.0000077 | 0.0000094 |
| Crop Group = (4A) Leafy Greens | 0.0000077 | 0.0000000 | 0.0000040 | 0.0000061 | 0.0000063 | 0.0000075 | 0.0000088 | 0.0000077 | 0.0000094 |
| Crop Group = (5)  Brassica (Cole) Leafy Vegetables | 0.0000148 | 0.0000082 | 0.0000313 | 0.0000230 | 0.0000167 | 0.0000094 | 0.0000131 | 0.0000161 | 0.0000134 |
| Crop Group = (5A) Brassica: Head and Stem | 0.0000135 | 0.0000080 | 0.0000287 | 0.0000201 | 0.0000157 | 0.0000073 | 0.0000122 | 0.0000146 | 0.0000123 |
| Crop Group = (5B) Brassica: Leafy Greens | 0.0000013 | 0.0000002 | 0.0000026 | 0.0000029 | 0.0000011 | 0.0000021 | 0.0000009 | 0.0000015 | 0.0000010 |
| Crop Group = (8)  Fruiting Vegetables | 0.0000149 | 0.0000059 | 0.0000274 | 0.0000251 | 0.0000182 | 0.0000136 | 0.0000141 | 0.0000127 | 0.0000131 |
| Crop Group = (9)  Curcurbit Vegetables | 0.0000091 | 0.0000110 | 0.0000162 | 0.0000186 | 0.0000121 | 0.0000074 | 0.0000068 | 0.0000098 | 0.0000074 |
| Crop Group = (9A) Melons | 0.0000052 | 0.0000017 | 0.0000109 | 0.0000133 | 0.0000080 | 0.0000043 | 0.0000034 | 0.0000057 | 0.0000041 |
| Crop Group = (9B) Squash/Cucumbers | 0.0000039 | 0.0000094 | 0.0000052 | 0.0000054 | 0.0000041 | 0.0000031 | 0.0000034 | 0.0000041 | 0.0000033 |
| Crop Group = (10) Citrus Fruits | 0.0000462 | 0.0000159 | 0.0001014 | 0.0001027 | 0.0000544 | 0.0000298 | 0.0000305 | 0.0000614 | 0.0000322 |
| Crop Group = (12) Stone Fruits | 0.0000073 | 0.0000502 | 0.0000294 | 0.0000159 | 0.0000092 | 0.0000033 | 0.0000039 | 0.0000073 | 0.0000046 |
| Crop Group = (13) Berries | 0.0000061 | 0.0000117 | 0.0000147 | 0.0000147 | 0.0000093 | 0.0000049 | 0.0000042 | 0.0000056 | 0.0000046 |
| Crop Group = (13A)Berries: Caneberry Group | 0.0000041 | 0.0000050 | 0.0000088 | 0.0000096 | 0.0000062 | 0.0000035 | 0.0000027 | 0.0000043 | 0.0000028 |
| Crop Group = (13B)Berries: Bushberry Group | 0.0000020 | 0.0000067 | 0.0000059 | 0.0000051 | 0.0000030 | 0.0000014 | 0.0000015 | 0.0000013 | 0.0000017 |

Attachment 8.  Commodity contribution summary for the chronic dietary exposure analysis of fluoride from structural fumigation with sulfuryl fluoride

| | Exposure, mg/kg/day | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | U.S. | Infants | K1-2 | K3-5 | K6-12 | Y13-19 | A20-50 | A50+ | Fem13-49 |
| Crop Group = (O)  Other | 0.0000126 | 0.0000145 | 0.0000255 | 0.0000293 | 0.0000196 | 0.0000098 | 0.0000101 | 0.0000103 | 0.0000095 |
| Crop Group = (M)  Meat | 0.0000004 | 0.0000000 | 0.0000009 | 0.0000002 | 0.0000006 | 0.0000011 | 0.0000004 | 0.0000002 | 0.0000004 |
| Crop Group = (P)  Poultry | 0.0000103 | 0.0000055 | 0.0000296 | 0.0000210 | 0.0000118 | 0.0000079 | 0.0000102 | 0.0000068 | 0.0000110 |
| Crop Group = (D)  Dairy Products | 0.0000032 | 0.0000684 | 0.0000135 | 0.0000096 | 0.0000031 | 0.0000017 | 0.0000011 | 0.0000014 | 0.0000011 |
| Crop Group = (1)  Root and Tuber Vegetables | 0.0000029 | 0.0000047 | 0.0000079 | 0.0000082 | 0.0000050 | 0.0000029 | 0.0000024 | 0.0000014 | 0.0000024 |
| Crop Group = (1A) Root Vegetables | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (1B) Root Vegetables (exc sugar beet) subgroup | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (1C) Tuberous and Corm Vegetables | 0.0000029 | 0.0000047 | 0.0000079 | 0.0000082 | 0.0000050 | 0.0000029 | 0.0000024 | 0.0000014 | 0.0000023 |
| Crop Group = (1D) Tuberous/Corm Vegetables (exc sugar beet) | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (3)  Bulb Vegetables | 0.0000002 | 0.0000002 | 0.0000006 | 0.0000005 | 0.0000003 | 0.0000002 | 0.0000002 | 0.0000002 | 0.0000002 |
| Crop Group = (4)  Leafy Vegetables (except Brassica) | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (4A) Leafy Greens | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (6)  Legume Vegetables (Succulent or Dried) | 0.0000063 | 0.0000318 | 0.0000141 | 0.0000126 | 0.0000083 | 0.0000056 | 0.0000050 | 0.0000044 | 0.0000046 |
| Crop Group = (6C) Dried Shelled Pea/Bean (exc Soybean) | 0.0000021 | 0.0000013 | 0.0000042 | 0.0000039 | 0.0000026 | 0.0000021 | 0.0000019 | 0.0000018 | 0.0000017 |
| Crop Group = (8)  Fruiting Vegetables | 0.0000004 | 0.0000003 | 0.0000010 | 0.0000009 | 0.0000006 | 0.0000004 | 0.0000004 | 0.0000002 | 0.0000003 |
| Crop Group = (9)  Curcurbit Vegetables | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (9B) Squash/Cucumbers | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (11) Pome Fruits | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (12) Stone Fruits | 0.0000000 | 0.0000000 | 0.0000001 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (13) Berries | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (13B)Berries: Bushberry Group | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000003 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000003 |
| Crop Group = (14) Tree Nuts | 0.0000003 | 0.0000000 | 0.0000003 | 0.0000004 | 0.0000003 | 0.0000002 | 0.0000002 | 0.0000003 | 0.0000003 |
| Crop Group = (15) Cereal Grains | 0.0002967 | 0.0003739 | 0.0007256 | 0.0007112 | 0.0004892 | 0.0002876 | 0.0002397 | 0.0001887 | 0.0002171 |
| Crop Group = (19) Herbs and Spices | 0.0000021 | 0.0000013 | 0.0000074 | 0.0000058 | 0.0000035 | 0.0000021 | 0.0000016 | 0.0000011 | 0.0000016 |
| Crop Group = (19A)Herbs | 0.0000017 | 0.0000011 | 0.0000067 | 0.0000049 | 0.0000027 | 0.0000017 | 0.0000013 | 0.0000007 | 0.0000012 |
| Crop Group = (19B)Spices | 0.0000004 | 0.0000002 | 0.0000007 | 0.0000009 | 0.0000008 | 0.0000005 | 0.0000004 | 0.0000003 | 0.0000003 |
| Crop Group = (20) Oilseeds | 0.0000003 | 0.0000039 | 0.0000004 | 0.0000004 | 0.0000004 | 0.0000003 | 0.0000002 | 0.0000002 | 0.0000002 |

Attachment 9.  Commodity contribution summary for the chronic dietary exposure analysis of fluoride from food fumigation with sulfuryl fluoride

| | Exposure, mg/kg/day | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. | Infants | K1-2 | K3-5 | K6-12 | Y13-19 | A20-50 | A50+ | Fem13-49 |
| Crop Group = (O)  Other | 0.0003529 | 0.0001013 | 0.0007605 | 0.0009980 | 0.0008601 | 0.0003866 | 0.0002348 | 0.0001874 | 0.0002649 |
| Crop Group = (1)  Root and Tuber Vegetables | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (1C) Tuberous and Corm Vegetables | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (1D) Tuberous/Corm Vegetables (exc sugar beet) | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (3)  Bulb Vegetables | 0.0000000 | 0.0000000 | 0.0000001 | 0.0000001 | 0.0000001 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (6)  Legume Vegetables (Succulent or Dried) | 0.0005229 | 0.0003147 | 0.0010429 | 0.0009719 | 0.0006484 | 0.0005166 | 0.0004653 | 0.0004409 | 0.0004267 |
| Crop Group = (6C) Dried Shelled Pea/Bean (exc Soybean) | 0.0005229 | 0.0003147 | 0.0010429 | 0.0009719 | 0.0006484 | 0.0005166 | 0.0004653 | 0.0004409 | 0.0004267 |
| Crop Group = (11) Pome Fruits | 0.0000013 | 0.0000017 | 0.0000027 | 0.0000030 | 0.0000023 | 0.0000012 | 0.0000009 | 0.0000011 | 0.0000010 |
| Crop Group = (12) Stone Fruits | 0.0000018 | 0.0000001 | 0.0000106 | 0.0000020 | 0.0000022 | 0.0000002 | 0.0000010 | 0.0000027 | 0.0000009 |
| Crop Group = (13) Berries | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (13B)Berries: Bushberry Group | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 | 0.0000000 |
| Crop Group = (14) Tree Nuts | 0.0000160 | 0.0000013 | 0.0000254 | 0.0000258 | 0.0000187 | 0.0000111 | 0.0000147 | 0.0000168 | 0.0000147 |
| Crop Group = (15) Cereal Grains | 0.0001279 | 0.0006516 | 0.0003245 | 0.0002907 | 0.0002108 | 0.0001159 | 0.0000964 | 0.0000703 | 0.0000906 |
| Crop Group = (19) Herbs and Spices | 0.0000005 | 0.0000003 | 0.0000018 | 0.0000014 | 0.0000009 | 0.0000005 | 0.0000004 | 0.0000003 | 0.0000004 |
| Crop Group = (19A)Herbs | 0.0000004 | 0.0000003 | 0.0000017 | 0.0000012 | 0.0000007 | 0.0000004 | 0.0000003 | 0.0000002 | 0.0000003 |
| Crop Group = (19B)Spices | 0.0000001 | 0.0000001 | 0.0000002 | 0.0000002 | 0.0000002 | 0.0000001 | 0.0000001 | 0.0000001 | 0.0000001 |

# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## WASHINGTON, D.C. 20460



**OFFICE OF CHEMICAL SAFETY AND POLLUTION PREVENTION**

## MEMORANDUM

Date: 1 July 2010

SUBJECT: Sulfuryl Fluoride:  Estimates of Fluoride Exposure from Pesticidal Sources – Customized Age Groups

| | |
|---|---|
| PC Code:  078003 (Sulfuryl Fluoride) | DP Barcode: D379854 |
| MRID No.:  None | Registration No.:  None |
| Petition No.:  None | Regulatory Action:  None |
| Assessment Type:  Single Chemical | Registration Case No.:  None |
| TXR No.:  None | CAS No.:  16984-48-8 |

FROM: Michael A. Doherty, Ph.D., Senior Chemist      *michael a Doherty*
Risk Assessment Branch II
Health Effects Division (7509P)

THROUGH: Christina Swartz, Branch Chief      *[signature]*
Douglas A. Dotson, Ph.D., Senior Chemist   *D. Dotson*
Risk Assessment Branch II
Office of Pesticide Programs
Health Effects Division (7509P)

TO: Elizabeth Doyle, Branch Chief
Human Health Risk Assessment Branch
Office of Water
Office of Science and Technology (4304T)

In May 2009, the EPA's Office of Pesticide Programs (OPP) provided the Office of Water (OW) with estimates of exposure to fluoride from use of the pesticides cryolite and sulfuryl fluoride (Memorandum from M. Doherty to E. Doyle, DP Number D362184, 6 May 2009).  Those estimates were for the populations and sub-populations typically addressed by OPP dietary risk assessments; namely the general U.S. population, all infants (< 1 year), children 1-2 years, children 3-5 years, children 6-12 years, youth 13-19 years, adults 20-49 years, adults 50+ years, and females 13-49 years.  Exposure estimates were presented in units of mg/kg body weight/day.

The 2009 exposure estimates were developed for use by the OW in their relative source contribution (RSC) analysis for fluoride.  A draft RSC analysis document was provided by the OW to the OPP, at which time it became apparent that the OW is focusing on different population subgroups and that exposure estimates are being presented in units of mg/day.  The

OPP is providing new exposure estimates in order to match the population groups and exposure units of primary interest to the OW.

The OPP has used the same input files that were used to estimate the exposures reported in the May 2009 memorandum (included in Attachments 1-3 for reference). Rather than use the chronic dietary exposure module in the Dietary Exposure Evaluation Model (DEEM), the OPP has used the acute dietary exposure module, which provides a mechanism to (1) specify customized population groupings and (2) leave body weight out of the exposure estimates to give exposure in units of mg/day. Average exposure estimates from the acute module are identical to the exposure estimates given by the chronic module. Average exposure estimates for the customized population groups are summarized in Table 1. Complete outputs of the three analyses, including error estimates, are included as Attachments 4, 5, and 6.

| Table 1. Summary of Cryolite and Sulfuryl Fluoride (SF) Contributions to Dietary Fluoride Exposure. | | | | | |
|---|---|---|---|---|---|
| Age Range, years | Estimated Average Exposure, mg/day | | | | |
| | Cryolite | SF Structural Fumigations | SF Food Fumigations | Total SF | Total |
| 0.5 - <1 | 0.0308 | 0.0087 | 0.0213 | 0.0300 | 0.0608 |
| 1 - <4 | 0.0404 | 0.0121 | 0.0329 | 0.0450 | 0.0854 |
| 4 - <7 | 0.0313 | 0.0153 | 0.0466 | 0.0619 | 0.0932 |
| 7 - <11 | 0.0285 | 0.0170 | 0.0544 | 0.0714 | 0.0999 |
| 11 - <14 | 0.0248 | 0.0182 | 0.0675 | 0.0857 | 0.1105 |
| 14+ | 0.0327 | 0.0187 | 0.0576 | 0.0763 | 0.1090 |

These values do not have the uncertainty associated with translating the exposure values to different age group definitions or with converting the units from mg/kg body weight/day to mg/day, which had to rely on assumptions regarding body weights. The OPP notes that the residue inputs used in the analysis are point estimates; therefore, the error estimates reported in Attachments 4-6 reflect the variability due to consumption only and not variability in fluoride residues.

For most age groups, the exposure estimates in Table 1 are very similar to those used by the OW (Draft RSC Analysis Document, Table 6-5). The exception to this appears to be the 0.5-1 year old group for which the values in Table 1 are 2-3 times greater than those reported by the OW in Table 6-5. Examination of the "percent of person-days that are user-days" (Table 2) indicates that a higher proportion of the survey respondents in the 0.5-1 year group actually ate the foods associated with the various analyses compared to the previously reported group which includes children < 0.5 years old (Table 2).

| Table 2. Percent of Person-Days that are User-Days in the Fluoride Dietary Exposure Analyses. | | | |
|---|---|---|---|
| Age Range, years | Cryolite | SF Structural Fumigations | SF Food Fumigations |
| < 1 year | 51.0 | 89.1 | 71.7 |
| 0.5 - <1 | 93.1 | 99.4 | 98.1 |
| 1 - <4 | 98.6 | 99.9 | 99.8 |
| 4 - <7 | 99.3 | 100 | 100 |
| 7 - <11 | 99.2 | 100 | 100 |
| 11 - <14 | 98.9 | 100 | 100 |
| 14+ | 98.2 | 99.8 | 99.7 |

CC:
  Steve Bradbury (OPP/IO)
  Ephraim King (OW/IO)
  Tina Levine (OPP/HED)
  Edward Ohanian (OW/HECD)
  Steve Knizner (OPP/HED)
  Richard Keigwin (OPP/SRRD)
  Lois Rossi (OPP/RD)
  Jon Fluechaus (OGC)

Attachments:
1. Inputs for cryolite fluoride exposure estimates
2. Inputs for sulfuryl fluoride food fumigation exposure estimates
3. Inputs for sulfuryl fluoride structural fumigation exposure estimates
4. Results of cryolite fluoride exposure analysis
5. Results of sulfuryl fluoride food fumigation exposure analysis
6. Results of sulfuryl fluoride structural fumigation exposure analysis

Attachment 1. Inputs for cryolite fluoride exposure estimates

```
Filename: C:\Documents and Settings\MDOHERTY\My Documents\Chemistry Reviews\DEEM Runs\Sulfuryl
Fluoride\Cryolite-AR-CT new raisin factor.R98
Chemical: Cryolite
RfD(Chronic): .114 mg/kg bw/day  NOEL(Chronic): 0 mg/kg bw/day
RfD(Acute): 0 mg/kg bw/day  NOEL(Acute):  0 mg/kg bw/day
Date created/last modified: 06-24-2004/10:05:08/8           Program ver. 2.03
-------------------------------------------------------------------------------
  EPA    Crop                                   Def Res    Adj.Factors    Comment
  Code   Grp  Commodity Name                    (ppm)      #1      #2
-------- ---- ------------------------------    ---------  ------  ------  -------
12000120 12   Apricot                           4.500000   1.000   0.010
12000121 12   Apricot-babyfood                  4.500000   1.000   0.010
12000130 12   Apricot, dried                    4.500000   6.000   0.010
12000140 12   Apricot, juice                    4.500000   1.000   0.010
12000141 12   Apricot, juice-babyfood           4.500000   1.000   0.010
13010550 13A  Blackberry                        0.250000   1.000   1.000
13010560 13A  Blackberry, juice                 0.250000   1.000   1.000
13010561 13A  Blackberry, juice-babyfood        0.250000   1.000   1.000
13020570 13B  Blueberry                         0.110000   1.000   1.000
13020571 13B  Blueberry-babyfood                0.110000   1.000   1.000
13010580 13A  Boysenberry                       0.250000   1.000   1.000
05010610 5A   Broccoli                          5.000000   1.000   0.020
05010611 5A   Broccoli-babyfood                 5.000000   1.000   0.020
05010640 5A   Brussels sprouts                  4.000000   1.000   0.020
05010690 5A   Cabbage                           1.500000   1.000   0.010
05020700 5B   Cabbage, Chinese, bok choy        4.000000   1.000   0.010
09010750 9A   Cantaloupe                        2.160000   1.000   0.010
09010800 9A   Casaba                            2.160000   1.000   0.010
05010830 5A   Cauliflower                       3.000000   1.000   0.020
10001060 10   Citrus citron                     8.000000   1.000   0.040
05021170 5B   Collards                          4.000000   1.000   0.020
95001300 O    Cranberry                         0.500000   1.000   1.000
95001301 O    Cranberry-babyfood                0.500000   1.000   1.000
95001310 O    Cranberry, dried                  0.500000   1.000   1.000
95001320 O    Cranberry, juice                  0.500000   1.100   1.000
95001321 O    Cranberry, juice-babyfood         0.500000   1.100   1.000
09021350 9B   Cucumber                          2.500000   1.000   0.010
13021360 13B  Currant                           0.110000   1.000   1.000
13021370 13B  Currant, dried                    0.110000   1.000   1.000
13011420 13A  Dewberry                          0.250000   1.000   1.000
08001480 8    Eggplant                          1.500000   1.000   0.010
13021490 13B  Elderberry                        0.110000   1.000   1.000
13021740 13B  Gooseberry                        0.110000   1.000   1.000
95001750 O    Grape                             3.500000   1.000   0.330
95001760 O    Grape, juice                      3.500000   0.830   0.330
95001761 O    Grape, juice-babyfood             3.500000   0.830   0.330
95001770 O    Grape, leaves                     3.500000   1.000   0.330
95001780 O    Grape, raisin                     3.500000   1.350   0.330
95001790 O    Grape, wine and sherry            3.500000   0.830   0.330
10001800 10   Grapefruit                        9.000000   1.000   0.040
10001810 10   Grapefruit, juice                 9.000000   0.026   0.040
09011870 9A   Honeydew melon                    2.160000   1.000   0.010
13021910 13B  Huckleberry                       0.110000   1.000   1.000
05021940 5B   Kale                              4.000000   1.000   0.020
95001950 O    Kiwifruit                         4.500000   1.000   0.140
05011960 5A   Kohlrabi                          5.000000   1.000   0.020
10001970 10   Kumquat                           8.000000   1.000   0.040
10001990 10   Lemon                            13.500000   1.000   0.020
10002000 10   Lemon, juice                     13.500000   0.024   0.020
10002001 10   Lemon, juice-babyfood            13.500000   0.024   0.020
10002010 10   Lemon, peel                      13.500000   0.280   0.020
04012040 4A   Lettuce, head                     2.500000   1.000   0.010
04012050 4A   Lettuce, leaf                    15.000000   1.000   0.010
10002060 10   Lime                             13.500000   1.000   0.040
10002070 10   Lime, juice                      13.500000   0.024   0.040
10002071 10   Lime, juice-babyfood             13.500000   0.024   0.040
13012080 13A  Loganberry                        0.250000   1.000   1.000
12002300 12   Nectarine                         4.500000   1.000   0.010
10002400 10   Orange                            8.000000   1.000   0.020
10002410 10   Orange, juice                     8.000000   0.022   0.020
```

| | | | | |
|---|---|---|---|---|
| 10002411 | 10 | Orange, juice-babyfood | 8.000000 | 0.022 | 0.020 |
| 10002420 | 10 | Orange, peel | 8.000000 | 0.280 | 0.020 |
| 12002600 | 12 | Peach | 4.500000 | 1.000 | 0.010 |
| 12002601 | 12 | Peach-babyfood | 4.500000 | 1.000 | 0.010 |
| 12002610 | 12 | Peach, dried | 4.500000 | 7.000 | 0.010 |
| 12002611 | 12 | Peach, dried-babyfood | 4.500000 | 7.000 | 0.010 |
| 12002620 | 12 | Peach, juice | 4.500000 | 1.000 | 0.010 |
| 12002621 | 12 | Peach, juice-babyfood | 4.500000 | 1.000 | 0.010 |
| 08002700 | 8 | Pepper, bell | 3.500000 | 1.000 | 0.010 |
| 08002701 | 8 | Pepper, bell-babyfood | 3.500000 | 1.000 | 0.010 |
| 08002710 | 8 | Pepper, bell, dried | 3.500000 | 1.000 | 0.010 |
| 08002711 | 8 | Pepper, bell, dried-babyfood | 3.500000 | 1.000 | 0.010 |
| 08002720 | 8 | Pepper, nonbell | 3.500000 | 1.000 | 0.010 |
| 08002721 | 8 | Pepper, nonbell-babyfood | 3.500000 | 1.000 | 0.010 |
| 08002730 | 8 | Pepper, nonbell, dried | 3.500000 | 1.000 | 0.010 |
| 95002750 | O | Peppermint | 19.500000 | 1.000 | 1.000 |
| 95002760 | O | Peppermint, oil | 19.500000 | 0.026 | 1.000 |
| 12002850 | 12 | Plum | 0.500000 | 1.000 | 0.010 |
| 12002851 | 12 | Plum-babyfood | 0.500000 | 1.000 | 0.010 |
| 12002860 | 12 | Plum, prune, fresh | 0.500000 | 1.000 | 0.010 |
| 12002861 | 12 | Plum, prune, fresh-babyfood | 2.000000 | 1.000 | 0.010 |
| 12002870 | 12 | Plum, prune, dried | 2.000000 | 5.000 | 0.010 |
| 12002871 | 12 | Plum, prune, dried-babyfood | 2.000000 | 5.000 | 0.010 |
| 12002880 | 12 | Plum, prune, juice | 2.000000 | 1.400 | 0.010 |
| 12002881 | 12 | Plum, prune, juice-babyfood | 2.000000 | 1.400 | 0.010 |
| 01032960 | 1C | Potato, chips | 0.650000 | 1.000 | 0.030 |
| 01032970 | 1C | Potato, dry (granules/ flakes) | 0.650000 | 6.500 | 0.030 |
| 01032971 | 1C | Potato, dry (granules/ flakes)-b | 0.650000 | 6.500 | 0.030 |
| 01032980 | 1C | Potato, flour | 0.650000 | 6.500 | 0.030 |
| 01032981 | 1C | Potato, flour-babyfood | 0.650000 | 6.500 | 0.030 |
| 01032990 | 1C | Potato, tuber, w/peel | 0.650000 | 1.000 | 0.030 |
| 01032991 | 1C | Potato, tuber, w/peel-babyfood | 0.650000 | 1.000 | 0.030 |
| 01033000 | 1C | Potato, tuber, w/o peel | 0.650000 | 1.000 | 0.030 |
| 01033001 | 1C | Potato, tuber, w/o peel-babyfood | 0.650000 | 1.000 | 0.030 |
| 10003070 | 10 | Pummelo | 9.000000 | 1.000 | 0.040 |
| 09023080 | 9B | Pumpkin | 2.500000 | 1.000 | 0.010 |
| 09023090 | 9B | Pumpkin, seed | 2.500000 | 1.000 | 0.010 |
| 13013200 | 13A | Raspberry | 0.250000 | 1.000 | 1.000 |
| 13013201 | 13A | Raspberry-babyfood | 0.250000 | 1.000 | 1.000 |
| 13013210 | 13A | Raspberry, juice | 0.250000 | 1.000 | 1.000 |
| 13013211 | 13A | Raspberry, juice-babyfood | 0.250000 | 1.000 | 1.000 |
| 95003520 | O | Spearmint | 19.500000 | 1.000 | 1.000 |
| 95003530 | O | Spearmint, oil | 19.500000 | 0.026 | 1.000 |
| 09023560 | 9B | Squash, summer | 2.500000 | 1.000 | 0.010 |
| 09023561 | 9B | Squash, summer-babyfood | 2.500000 | 1.000 | 0.010 |
| 09023570 | 9B | Squash, winter | 2.500000 | 1.000 | 0.010 |
| 09023571 | 9B | Squash, winter-babyfood | 2.500000 | 1.000 | 0.010 |
| 95003590 | O | Strawberry | 1.000000 | 1.000 | 0.020 |
| 95003591 | O | Strawberry-babyfood | 1.000000 | 1.000 | 0.020 |
| 95003600 | O | Strawberry, juice | 1.000000 | 1.000 | 0.020 |
| 95003601 | O | Strawberry, juice-babyfood | 1.000000 | 1.000 | 0.020 |
| 10003690 | 10 | Tangerine | 8.000000 | 1.000 | 0.040 |
| 10003700 | 10 | Tangerine, juice | 8.000000 | 0.028 | 0.040 |
| 08003750 | 8 | Tomato | 1.500000 | 1.000 | 0.010 |
| 08003751 | 8 | Tomato-babyfood | 1.500000 | 1.000 | 0.010 |
| 08003760 | 8 | Tomato, paste | 1.500000 | 1.500 | 0.010 |
| 08003761 | 8 | Tomato, paste-babyfood | 1.500000 | 1.500 | 0.010 |
| 08003770 | 8 | Tomato, puree | 1.500000 | 1.000 | 0.010 |
| 08003771 | 8 | Tomato, puree-babyfood | 1.500000 | 1.000 | 0.010 |
| 08003780 | 8 | Tomato, dried | 1.500000 | 14.300 | 0.010 |
| 08003781 | 8 | Tomato, dried-babyfood | 1.500000 | 14.300 | 0.010 |
| 08003790 | 8 | Tomato, juice | 1.500000 | 1.500 | 0.010 |
| 09013990 | 9A | Watermelon | 2.160000 | 1.000 | 0.010 |
| 09014000 | 9A | Watermelon, juice | 2.160000 | 1.000 | 0.010 |

Attachment 2.  Inputs for sulfuryl fluoride food fumigation exposure estimates

```
U.S. Environmental Protection Agency                           Ver. 2.00
DEEM-FCID Chronic analysis for FLUORIDE                      1994-98 data
Residue file: C:\Documents and Settings\mdoherty\My Documents\Chemistry Reviews\!DEEM
Runs\Sulfuryl Fluoride\F Food Fumigation - 2009  RevisedCT - 4-28 Strict Label.R98
                                                          Adjust. #2 used
Analysis Date 05-06-2009          Residue file dated: 05-06-2009/13:54:06/8
Reference dose (RfD) = 0.114 mg/kg bw/day
```

--------------------------------------------------------------------------

| Food Crop EPA Code | Grp | Food Name | Residue (ppm) | Adj.Factors #1 | #2 | Comment |
|--------|-----|-----------|---------|------|------|-------|
| 14000030 | 14 | Almond | 9.700000 | 1.000 | 0.100 | |
| 14000031 | 14 | Almond-babyfood | 9.700000 | 1.000 | 0.100 | |
| 11000090 | 11 | Apple, dried | 1.000000 | 1.000 | 0.690 | |
| 11000091 | 11 | Apple, dried-babyfood | 1.000000 | 1.000 | 0.690 | |
| 12000130 | 12 | Apricot, dried | 1.000000 | 1.000 | 0.690 | |
| 95000240 | O | Banana, dried | 1.000000 | 1.000 | 0.690 | |
| 95000241 | O | Banana, dried-babyfood | 1.000000 | 1.000 | 0.690 | |
| 15000250 | 15 | Barley, pearled barley | 3.700000 | 1.000 | 0.001 | |
| 15000251 | 15 | Barley, pearled barley-babyfood | 3.700000 | 1.000 | 0.001 | |
| 15000260 | 15 | Barley, flour | 3.700000 | 0.730 | 0.001 | |
| 15000261 | 15 | Barley, flour-babyfood | 3.700000 | 0.730 | 0.001 | |
| 15000270 | 15 | Barley, bran | 3.700000 | 2.560 | 0.001 | |
| 19010290 | 19A | Basil, dried leaves | 67.100000 | 1.000 | 0.001 | |
| 19010291 | 19A | Basil, dried leaves-babyfood | 67.100000 | 1.000 | 0.001 | |
| 06030300 | 6C | Bean, black, seed | 4.500000 | 1.000 | 1.000 | |
| 06030320 | 6C | Bean, broad, seed | 4.500000 | 1.000 | 1.000 | |
| 06030340 | 6C | Bean, cowpea, seed | 4.500000 | 1.000 | 1.000 | |
| 06030350 | 6C | Bean,  great northern, seed | 4.500000 | 1.000 | 1.000 | |
| 06030360 | 6C | Bean, kidney, seed | 4.500000 | 1.000 | 1.000 | |
| 06030380 | 6C | Bean, lima, seed | 4.500000 | 1.000 | 1.000 | |
| 06030390 | 6C | Bean, mung, seed | 4.500000 | 1.000 | 1.000 | |
| 06030400 | 6C | Bean, navy, seed | 4.500000 | 1.000 | 1.000 | |
| 06030410 | 6C | Bean, pink, seed | 4.500000 | 1.000 | 1.000 | |
| 06030420 | 6C | Bean, pinto, seed | 4.500000 | 1.000 | 1.000 | |
| 14000590 | 14 | Brazil nut | 5.300000 | 1.000 | 0.100 | |
| 14000680 | 14 | Butternut | 5.300000 | 1.000 | 0.100 | |
| 14000810 | 14 | Cashew | 5.300000 | 1.000 | 0.100 | |
| 14000920 | 14 | Chestnut | 5.300000 | 1.000 | 0.100 | |
| 06030980 | 6C | Chickpea, seed | 4.500000 | 1.000 | 1.000 | |
| 06030981 | 6C | Chickpea, seed-babyfood | 4.500000 | 1.000 | 1.000 | |
| 06030990 | 6C | Chickpea, flour | 4.500000 | 1.000 | 1.000 | |
| 19011030 | 19A | Chive | 63.500000 | 1.000 | 0.001 | |
| 19021050 | 19B | Cinnamon | 73.500000 | 1.000 | 0.001 | |
| 19021051 | 19B | Cinnamon-babyfood | 73.500000 | 1.000 | 0.001 | |
| 95001090 | O | Cocoa bean, chocolate | 8.400000 | 1.000 | 1.000 | |
| 95001100 | O | Cocoa bean, powder | 8.400000 | 1.000 | 1.000 | |
| 95001110 | O | Coconut, meat | 49.100000 | 1.000 | 0.001 | |
| 95001111 | O | Coconut- meat-babyfood | 49.100000 | 1.000 | 0.001 | |
| 95001120 | O | Coconut, dried | 49.100000 | 1.000 | 0.001 | |
| 95001130 | O | Coconut, milk | 49.100000 | 1.000 | 0.001 | |
| 95001150 | O | Coffee, roasted bean | 7.100000 | 1.000 | 0.001 | |
| 95001160 | O | Coffee, instant | 13.900000 | 1.000 | 0.001 | |
| 19011180 | 19A | Coriander, leaves | 63.500000 | 1.000 | 0.001 | |
| 19011181 | 19A | Coriander, leaves-babyfood | 63.500000 | 1.000 | 0.001 | |
| 19021190 | 19B | Coriander, seed | 7.100000 | 1.000 | 0.001 | |
| 19021191 | 19B | Coriander, seed-babyfood | 7.100000 | 1.000 | 0.001 | |
| 15001200 | 15 | Corn, field, flour | 16.900000 | 1.000 | 0.001 | |
| 15001201 | 15 | Corn, field, flour-babyfood | 16.900000 | 1.000 | 0.001 | |
| 15001210 | 15 | Corn, field, meal | 2.800000 | 1.000 | 0.001 | |
| 15001211 | 15 | Corn, field, meal-babyfood | 2.800000 | 1.000 | 0.001 | |
| 15001220 | 15 | Corn, field, bran | 2.800000 | 1.000 | 0.001 | |
| 15001230 | 15 | Corn, field, starch | 0.600000 | 1.000 | 0.001 | |
| 15001231 | 15 | Corn, field, starch-babyfood | 0.600000 | 1.000 | 0.001 | |
| 15001240 | 15 | Corn, field, syrup | 0.600000 | 1.000 | 0.001 | |
| 15001241 | 15 | Corn, field, syrup-babyfood | 0.600000 | 1.000 | 0.001 | |
| 15001260 | 15 | Corn, pop | 1.700000 | 1.000 | 0.001 | |
| 95001310 | O | Cranberry, dried | 1.000000 | 1.000 | 0.100 | |

```
13021370 13B  Currant, dried                    1.000000   1.000    0.100
95001410 O    Date
              130-Uncooked; Dried; Cook Meth N/S
                                                 0.900000   1.000    0.420
              210-Cooked; Fresh or N/S; Cook Meth N/S
                                                 0.000000   1.000    0.000
              211-Cooked; Fresh or N/S; Baked    0.000000   1.000    0.000
              212-Cooked; Fresh or N/S; Boiled
                                                 0.000000   1.000    0.000
              230-Cooked; Dried; Cook Meth N/S
                                                 0.900000   1.000    0.420
19021430 19B  Dill, seed                         7.100000   1.000    0.001
19011440 19A  Dillweed                          63.500000   1.000    0.001
95001540 O    Fig, dried                         1.000000   1.000    0.690
14001550 14   Filbert                            2.500000   1.000    0.100
03001650 3    Garlic, dried                     10.900000   1.000    0.001
01031660 1CD  Ginger                            10.900000   1.000    0.001
01031661 1CD  Ginger-babyfood                   10.900000   1.000    0.001
01031670 1CD  Ginger, dried                     10.900000   1.000    0.001
95001780 O    Grape, raisin                      1.000000   1.000    0.690
06031820 6C   Guar, seed                         4.500000   1.000    1.000
06031821 6C   Guar, seed-babyfood                4.500000   1.000    1.000
19011040 19A  Herbs, other                      63.500000   1.000    0.001
19011841 19A  Herbs, other-babyfood             63.500000   1.000    0.001
14001850 14   Hickory nut                        5.300000   1.000    0.100
19012020 19A  Lemongrass                        63.500000   1.000    0.001
06032030 6C   Lentil, seed                       4.500000   1.000    1.000
95002120 O    Lychee, dried                      1.000000   1.000    0.690
14002130 14   Macadamia nut                      5.300000   1.000    0.001
95002160 O    Mango, dried                       1.000000   1.000    0.690
19012200 19A  Marjoram                          67.100000   1.000    0.001
19012201 19A  Marjoram-babyfood                 67.100000   1.000    0.001
15002260 15   Millet, grain                      2.900000   1.000    0.001
15002310 15   Oat, bran                         18.500000   2.560    0.001
15002320 15   Oat, flour                        18.500000   0.730    0.001
15002321 15   Oat, flour-babyfood               18.500000   0.730    0.001
15002330 15   Oat, groats/rolled oats           18.500000   1.000    0.001
15002331 15   Oat, groats/rolled oats-babyfood  18.500000   1.000    0.001
95002460 O    Papaya, dried                      1.000000   1.000    0.690
19012490 19A  Parsley, dried leaves             63.500000   1.000    0.001
19012491 19A  Parsley, dried leaves-babyfood    63.500000   1.000    0.001
06032560 6C   Pea, dry                           4.500000   1.000    1.000
06032561 6C   Pea, dry-babyfood                  4.500000   1.000    1.000
06032580 6C   Pea, pigeon, seed                  4.500000   1.000    1.000
12002610 12   Peach, dried                       1.000000   1.000    0.690
12002611 12   Peach, dried-babyfood              1.000000   1.000    0.690
95002630 O    Peanut                            16.400000   1.000    0.006
95002640 O    Peanut, butter                    16.400000   1.000    0.006
11002670 11   Pear, dried                        1.000000   1.000    0.690
14002690 14   Pecan                              5.300000   1.000    0.100
19022740 19B  Pepper, black and white            7.100000   1.000    0.001
19022741 19B  Pepper, black and white-babyfood   7.100000   1.000    0.001
95002780 O    Pine nut                           8.800000   1.000    0.100
95002800 O    Pineapple, dried                   1.000000   1.000    0.690
14002820 14   Pistachio                          3.200000   1.000    0.270
95002840 O    Plantain, dried                    1.000000   1.000    0.690
12002870 12   Plum, prune, dried                 0.700000   1.000    0.690
12002871 12   Plum, prune, dried-babyfood        0.700000   1.000    0.690
15003230 15   Rice, white                        4.500000   1.000    0.030
15003231 15   Rice, white-babyfood               4.500000   1.000    0.030
15003240 15   Rice, brown                       12.500000   1.000    0.030
15003241 15   Rice, brown-babyfood              12.500000   1.000    0.030
15003250 15   Rice, flour                       32.500000   1.000    0.030
15003251 15   Rice, flour-babyfood              32.500000   1.000    0.030
15003260 15   Rice, bran                        37.500000   1.000    0.030
15003261 15   Rice, bran-babyfood               37.500000   1.000    0.030
19013340 19A  Savory                            63.500000   1.000    0.001
15003440 15   Sorghum, grain                    20.400000   1.000    0.001
19023540 19B  Spices, other                      7.100000   1.000    0.001
19023541 19B  Spices, other-babyfood             7.100000   1.000    0.001
15003810 15   Triticale, flour                   2.900000   0.380    0.001
15003811 15   Triticale, flour-babyfood          2.900000   0.380    0.001
01033870 1CD  Turmeric                           7.100000   1.000    0.001
```

```
14003910 14   Walnut                       2.400000    1.000    0.990
15004010 15   Wheat, grain                 2.900000    1.000    0.004
15004011 15   Wheat, grain-babyfood        2.900000    1.000    0.004
15004020 15   Wheat, flour                31.400000    1.000    0.001
15004021 15   Wheat, flour-babyfood       31.400000    1.000    0.001
15004030 15   Wheat, germ                 13.900000    1.000    0.001
15004040 15   Wheat, bran                 74.200000    1.000    0.001
15004050 15   Wild rice                   12.500000    1.000    0.030
```

Attachment 3.  Inputs for sulfuryl fluoride structural fumigation exposure estimates

```
U.S. Environmental Protection Agency                        Ver. 2.00
DEEM-FCID Chronic analysis for FLUORIDE                     1994-98 data
Residue file: C:\Documents and Settings\mdoherty\My Documents\Chemistry Reviews\!DEEM
Runs\Sulfuryl Fluoride\F Space Fumigation - 2009 - 5-1.R98
                                                        Adjust. #2 used
Analysis Date 05-06-2009          Residue file dated: 05-06-2009/13:52:45/8
Reference dose (RfD) = 0.114 mg/kg bw/day
```

```
-----------------------------------------------------------------------------
Food Crop                                    Residue     Adj.Factors    Comment
EPA Code  Grp  Food Name                     (ppm)
                                                         #1        #2
--------  ----  ------------------------------  ----------  ------    ------   -------
18000020  18   Alfalfa, seed                    20.400000   1.000     0.004
14000030  14   Almond                            9.200000   1.000     0.004
14000031  14   Almond-babyfood                   9.200000   1.000     0.004
14000040  14   Almond, oil                       1.500000   1.000     0.004
14000041  14   Almond, oil-babyfood              1.500000   1.000     0.004
95000060  O    Amaranth, grain                  20.400000   1.000     0.004
11000090  11   Apple, dried                      1.000000   1.000     0.004
11000091  11   Apple, dried-babyfood             1.000000   1.000     0.004
12000130  12   Apricot, dried                    1.000000   1.000     0.004
01030150  1CD  Arrowroot, flour                 31.400000   1.000     0.004
01030151  1CD  Arrowroot, flour-babyfood        31.400000   1.000     0.004
95000240  O    Banana, dried                     1.000000   1.000     0.004
95000241  O    Banana, dried-babyfood            1.000000   1.000     0.004
15000250  15   Barley, pearled barley            3.650000   1.000     0.008
15000251  15   Barley, pearled barley-babyfood   3.650000   1.000     0.008
15000260  15   Barley, flour                     0.156000   1.000     1.000
15000261  15   Barley, flour-babyfood            0.156000   1.000     1.000
15000270  15   Barley, bran                      3.650000   1.000     0.008
19010280  19A  Basil, fresh leaves              67.100000   1.000     0.004
19010281  19A  Basil, fresh leaves-babyfood     67.100000   1.000     0.004
19010290  19A  Basil, dried leaves              67.100000   1.000     0.004
19010291  19A  Basil, dried leaves-babyfood     67.100000   1.000     0.004
06030300  6C   Bean, black, seed                 4.500000   1.000     0.004
06030320  6C   Bean, broad, seed                 4.500000   1.000     0.004
06030340  6C   Bean, cowpea, seed                4.500000   1.000     0.004
06030350  6C   Bean,  great northern, seed       4.500000   1.000     0.004
06030360  6C   Bean, kidney, seed                4.500000   1.000     0.004
06030380  6C   Bean, lima, seed                  4.500000   1.000     0.004
06030390  6C   Bean, mung, seed                  4.500000   1.000     0.004
06030400  6C   Bean, navy, seed                  4.500000   1.000     0.004
06030410  6C   Bean, pink, seed                  4.500000   1.000     0.004
06030420  6C   Bean, pinto, seed                 4.500000   1.000     0.004
21000450  M    Beef, meat, dried                58.400000   1.000     0.004
01010530  1A   Beet, sugar, molasses             1.200000   1.000     0.004
01010531  1A   Beet, sugar, molasses-babyfood    1.200000   1.000     0.004
14000590  14   Brazil nut                        3.900000   1.000     0.004
15000650  15   Buckwheat                         2.900000   1.000     0.008
15000660  15   Buckwheat, flour                  0.134000   1.000     1.000
14000680  14   Butternut                         3.900000   1.000     0.004
14000810  14   Cashew                            3.900000   1.000     0.004
14000920  14   Chestnut                          3.900000   1.000     0.004
06030980  6C   Chickpea, seed                    4.500000   1.000     0.004
06030981  6C   Chickpea, seed-babyfood           4.500000   1.000     0.004
06030990  6C   Chickpea, flour                   4.500000   1.000     0.004
01011000  1AB  Chicory, roots                   13.900000   1.000     0.004
19011030  19A  Chive                            63.500000   1.000     0.004
04011040  4A   Chrysanthemum, garland           63.500000   1.000     0.004
19021050  19B  Cinnamon                         73.500000   1.000     0.004
19021051  19B  Cinnamon-babyfood                73.500000   1.000     0.004
95001090  O    Cocoa bean, chocolate             8.400000   1.000     0.004
95001100  O    Cocoa bean, powder                8.400000   1.000     0.004
95001110  O    Coconut, meat                    49.100000   1.000     0.004
95001111  O    Coconut- meat-babyfood           49.100000   1.000     0.004
95001120  O    Coconut, dried                   49.100000   1.000     0.004
95001130  O    Coconut, milk                    49.100000   1.000     0.004
95001140  O    Coconut, oil                      1.500000   1.000     0.004
95001141  O    Coconut, oil-babyfood             1.500000   1.000     0.004
```

| | | | | | |
|---|---|---|---|---|---|
| 95001150 | O | Coffee, roasted bean | 7.100000 | 1.000 | 0.004 |
| 95001160 | O | Coffee, instant | 13.900000 | 1.000 | 0.004 |
| 19011180 | 19A | Coriander, leaves | 63.500000 | 1.000 | 0.004 |
| 19011181 | 19A | Coriander, leaves-babyfood | 63.500000 | 1.000 | 0.004 |
| 19021190 | 19B | Coriander, seed | 7.100000 | 1.000 | 0.004 |
| 19021191 | 19B | Coriander, seed-babyfood | 7.100000 | 1.000 | 0.004 |
| 15001200 | 15 | Corn, field, flour | 0.081000 | 1.000 | 1.000 |
| 15001201 | 15 | Corn, field, flour-babyfood | 0.081000 | 1.000 | 1.000 |
| 15001210 | 15 | Corn, field, meal | 14.000000 | 1.000 | 0.008 |
| 15001211 | 15 | Corn, field, meal-babyfood | 14.000000 | 1.000 | 0.008 |
| 15001220 | 15 | Corn, field, bran | 14.000000 | 1.000 | 0.008 |
| 15001230 | 15 | Corn, field, starch | 6.600000 | 1.000 | 0.008 |
| 15001231 | 15 | Corn, field, starch-babyfood | 6.600000 | 1.000 | 0.008 |
| 15001240 | 15 | Corn, field, syrup | 0.600000 | 1.000 | 0.008 |
| 15001241 | 15 | Corn, field, syrup-babyfood | 0.600000 | 1.000 | 0.008 |
| 15001250 | 15 | Corn, field, oil | 0.400000 | 1.000 | 0.008 |
| 15001251 | 15 | Corn, field, oil-babyfood | 0.400000 | 1.000 | 0.008 |
| 15001260 | 15 | Corn, pop | 1.700000 | 1.000 | 0.008 |
| 95001280 | O | Cottonseed, oil | 1.500000 | 1.000 | 0.004 |
| 95001281 | O | Cottonseed, oil-babyfood | 1.500000 | 1.000 | 0.004 |
| 95001310 | O | Cranberry, dried | 1.000000 | 1.000 | 0.004 |
| 13021370 | 13B | Currant, dried | 1.000000 | 1.000 | 0.004 |
| 95001410 | O | Date | 0.900000 | 1.000 | 0.004 |
| 19021430 | 19B | Dill, seed | 7.100000 | 1.000 | 0.004 |
| 19011440 | 19A | Dillweed | 63.500000 | 1.000 | 0.004 |
| 70001450 | P | Egg, whole | | | |
| | | 110-Uncooked; Fresh or N/S; Cook Meth N/S | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 120-Uncooked; Frozen; Cook Meth N/S | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 210-Cooked; Fresh or N/S; Cook Meth N/S | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 211-Cooked; Fresh or N/S; Baked | 0.000000 | 1.000 | 0.004 |
| | | 212-Cooked; Fresh or N/S; Boiled | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 213-Cooked; Fresh or N/S; Fried | 0.000000 | 1.000 | 0.004 |
| | | 214-Cooked; Fresh or N/S; Fried/baked | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 215-Cooked; Fresh or N/S; Boiled/baked | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 221-Cooked; Frozen; Baked | 0.000000 | 1.000 | 0.004 |
| | | 223-Cooked; Frozen; Fried | 0.000000 | 1.000 | 0.004 |
| | | 224-Cooked; Frozen; Fried/baked | 0.000000 | 1.000 | 0.004 |
| | | 230-Cooked; Dried; Cook Meth N/S | | | |
| | | | 402.500000 | 1.000 | 0.004 |
| | | 232-Cooked; Dried; Boiled | 402.500000 | 1.000 | 0.004 |
| | | 233-Cooked; Dried; Fried | 402.500000 | 1.000 | 0.004 |
| | | 240-Cooked; Canned; Cook Meth N/S | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 242-Cooked; Canned; Boiled | 0.000000 | 1.000 | 0.004 |
| | | 252-Cooked; Cured etc; Boiled | 0.000000 | 1.000 | 0.004 |
| | | 253-Cooked; Cured etc; Fried | 0.000000 | 1.000 | 0.004 |
| 70001460 | P | Egg, white | | | |
| | | 110-Uncooked; Fresh or N/S; Cook Meth N/S | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 120-Uncooked; Frozen; Cook Meth N/S | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 130-Uncooked; Dried; Cook Meth N/S | | | |
| | | | 402.500000 | 1.000 | 0.004 |
| | | 210-Cooked; Fresh or N/S; Cook Meth N/S | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 211-Cooked; Fresh or N/S; Baked | 0.000000 | 1.000 | 0.004 |
| | | 212-Cooked; Fresh or N/S; Boiled | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 213-Cooked; Fresh or N/S; Fried | 0.000000 | 1.000 | 0.004 |
| | | 214-Cooked; Fresh or N/S; Fried/baked | | | |
| | | | 0.000000 | 1.000 | 0.004 |
| | | 221-Cooked; Frozen; Baked | 0.000000 | 1.000 | 0.004 |
| | | 223-Cooked; Frozen; Fried | 0.000000 | 1.000 | 0.004 |
| | | 230-Cooked; Dried; Cook Meth N/S | | | |
| | | | 402.500000 | 1.000 | 0.004 |
| | | 232-Cooked; Dried; Boiled | 402.500000 | 1.000 | 0.004 |
| | | 233-Cooked; Dried; Fried | 402.500000 | 1.000 | 0.004 |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  | 240-Cooked; Canned; Cook Meth N/S |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  |  | 242-Cooked; Canned; Boiled | 0.000000 | 1.000 | 0.004 |
|  |  | 250-Cooked; Cured etc; Cook Meth N/S |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
| 70001461 | P | Egg, white (solids)-babyfood | 402.500000 | 1.000 | 0.004 |
| 95001540 | O | Fig, dried | 1.000000 | 1.000 | 0.004 |
| 14001550 | 14 | Filbert | 1.500000 | 1.000 | 0.004 |
| 14001560 | 14 | Filbert, oil | 1.500000 | 1.000 | 0.004 |
| 20001630 | 20 | Flaxseed, oil | 1.500000 | 1.000 | 0.004 |
| 03001650 | 3 | Garlic, dried | 10.900000 | 1.000 | 0.004 |
| 03001651 | 3 | Garlic, dried-babyfood | 10.900000 | 1.000 | 0.004 |
| 01031670 | 1CD | Ginger, dried | 10.900000 | 1.000 | 0.004 |
| 01011680 | 1AB | Ginseng, dried | 10.900000 | 1.000 | 0.004 |
| 95001780 | O | Grape, raisin | 1.000000 | 1.000 | 0.004 |
| 06031820 | 6C | Guar, seed | 4.500000 | 1.000 | 0.004 |
| 06031821 | 6C | Guar, seed-babyfood | 4.500000 | 1.000 | 0.004 |
| 19011840 | 19A | Herbs, other | 63.500000 | 1.000 | 0.004 |
| 19011841 | 19A | Herbs, other-babyfood | 63.500000 | 1.000 | 0.004 |
| 14001850 | 14 | Hickory nut | 3.900000 | 1.000 | 0.004 |
| 19012020 | 19A | Lemongrass | 63.500000 | 1.000 | 0.004 |
| 06032030 | 6C | Lentil, seed | 4.500000 | 1.000 | 0.004 |
| 95002120 | O | Lychee, dried | 1.000000 | 1.000 | 0.004 |
| 14002130 | 14 | Macadamia nut | 3.900000 | 1.000 | 0.004 |
| 95002160 | O | Mango, dried | 1.000000 | 1.000 | 0.004 |
| 95002180 | O | Maple, sugar | 1.200000 | 1.000 | 0.004 |
| 95002190 | O | Maple syrup | 1.200000 | 1.000 | 0.004 |
| 19012200 | 19A | Marjoram | 67.100000 | 1.000 | 0.004 |
| 19012201 | 19A | Marjoram-babyfood | 67.100000 | 1.000 | 0.004 |
| 27002220 | D | Milk, fat |  |  |  |
|  |  | 110-Uncooked; Fresh or N/S; Cook Meth N/S |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  |  | 120-Uncooked; Frozen; Cook Meth N/S |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  |  | 130-Uncooked; Dried; Cook Meth N/S |  |  |  |
|  |  |  | 5.400000 | 1.000 | 0.004 |
|  |  | 150-Uncooked; Cured etc; Cook Meth N/S |  |  |  |
|  |  |  | 3.900000 | 1.000 | 0.004 |
|  |  | 210-Cooked; Fresh or N/S; Cook Meth N/S |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  |  | 211-Cooked; Fresh or N/S; Baked | 0.000000 | 1.000 | 0.004 |
|  |  | 212-Cooked; Fresh or N/S; Boiled |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  |  | 213-Cooked; Fresh or N/S; Fried | 0.000000 | 1.000 | 0.004 |
|  |  | 214-Cooked; Fresh or N/S; Fried/baked |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  |  | 215-Cooked; Fresh or N/S; Boiled/baked |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  |  | 220-Cooked; Frozen; Cook Meth N/S |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  |  | 221-Cooked; Frozen; Baked | 0.000000 | 1.000 | 0.004 |
|  |  | 222-Cooked; Frozen; Boiled | 0.000000 | 1.000 | 0.004 |
|  |  | 223-Cooked; Frozen; Fried | 0.000000 | 1.000 | 0.004 |
|  |  | 224-Cooked; Frozen; Fried/baked | 0.000000 | 1.000 | 0.004 |
|  |  | 230-Cooked; Dried; Cook Meth N/S |  |  |  |
|  |  |  | 5.400000 | 1.000 | 0.004 |
|  |  | 231-Cooked; Dried; Baked | 5.400000 | 1.000 | 0.004 |
|  |  | 232-Cooked; Dried; Boiled | 5.400000 | 1.000 | 0.004 |
|  |  | 233-Cooked; Dried; Fried | 5.400000 | 1.000 | 0.004 |
|  |  | 240-Cooked; Canned; Cook Meth N/S |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  |  | 242-Cooked; Canned; Boiled | 0.000000 | 1.000 | 0.004 |
|  |  | 250-Cooked; Cured etc; Cook Meth N/S |  |  |  |
|  |  |  | 3.900000 | 1.000 | 0.004 |
|  |  | 253-Cooked; Cured etc; Fried | 3.900000 | 1.000 | 0.004 |
|  |  | 255-Cooked; Cured etc; Boiled/baked |  |  |  |
|  |  |  | 3.900000 | 1.000 | 0.004 |
| 27012230 | D | Milk, nonfat solids |  |  |  |
|  |  | 110-Uncooked; Fresh or N/S; Cook Meth N/S |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  |  | 120-Uncooked; Frozen; Cook Meth N/S |  |  |  |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  |  | 130-Uncooked; Dried; Cook Meth N/S |  |  |  |

```
                                       5.400000    1.000      0.004
                 150-Uncooked; Cured etc; Cook Meth N/S
                                       3.900000    1.000      0.004
                 210-Cooked; Fresh or N/S; Cook Meth N/S
                                       0.000000    1.000      0.004
                 211-Cooked; Fresh or N/S; Baked  0.000000    1.000      0.004
                 212-Cooked; Fresh or N/S; Boiled
                                       0.000000    1.000      0.004
                 213-Cooked; Fresh or N/S; Fried  0.000000    1.000      0.004
                 214-Cooked; Fresh or N/S; Fried/baked
                                       0.000000    1.000      0.004
                 215-Cooked; Fresh or N/S; Boiled/baked
                                       0.000000    1.000      0.004
                 220-Cooked; Frozen; Cook Meth N/S
                                       0.000000    1.000      0.004
                 221-Cooked; Frozen; Baked     0.000000    1.000      0.004
                 222-Cooked; Frozen; Boiled    0.000000    1.000      0.004
                 223-Cooked; Frozen; Fried     0.000000    1.000      0.004
                 224-Cooked; Frozen; Fried/baked  0.000000    1.000      0.004
                 230-Cooked; Dried; Cook Meth N/S
                                       5.400000    1.000      0.004
                 231-Cooked; Dried; Baked      5.400000    1.000      0.004
                 232-Cooked; Dried; Boiled     5.400000    1.000      0.004
                 233-Cooked; Dried; Fried      5.400000    1.000      0.004
                 240-Cooked; Canned; Cook Meth N/S
                                       0.000000    1.000      0.004
                 242-Cooked; Canned; Boiled    0.000000    1.000      0.004
                 245-Cooked; Canned; Boiled/baked
                                       0.000000    1.000      0.004
                 250-Cooked; Cured etc; Cook Meth N/S
                                       3.900000    1.000      0.004
                 253-Cooked; Cured etc; Fried  3.900000    1.000      0.004
                 255-Cooked; Cured etc; Boiled/baked
                                       3.900000    1.000      0.004
27012231 D    Milk, nonfat solids-baby food/infant
                 110-Uncooked; Fresh or N/S; Cook Meth N/S
                                       0.000000    1.000      0.004
                 130-Uncooked; Dried; Cook Meth N/S
                                       5.400000    1.000      0.004
                 211-Cooked; Fresh or N/S; Baked  0.000000    1.000      0.004
                 240-Cooked; Canned; Cook Meth N/S
                                       0.000000    1.000      0.004
27022240 D    Milk, water
                 110-Uncooked; Fresh or N/S; Cook Meth N/S
                                       0.000000    1.000      0.004
                 120-Uncooked; Frozen; Cook Meth N/S
                                       0.000000    1.000      0.004
                 130-Uncooked; Dried; Cook Meth N/S
                                       5.400000    1.000      0.004
                 150-Uncooked; Cured etc; Cook Meth N/S
                                       3.900000    1.000      0.004
                 210-Cooked; Fresh or N/S; Cook Meth N/S
                                       0.000000    1.000      0.004
                 211-Cooked; Fresh or N/S; Baked  0.000000    1.000      0.004
                 212-Cooked; Fresh or N/S; Boiled
                                       0.000000    1.000      0.004
                 213-Cooked; Fresh or N/S; Fried  0.000000    1.000      0.004
                 214-Cooked; Fresh or N/S; Fried/baked
                                       0.000000    1.000      0.004
                 215-Cooked; Fresh or N/S; Boiled/baked
                                       0.000000    1.000      0.004
                 220-Cooked; Frozen; Cook Meth N/S
                                       0.000000    1.000      0.004
                 221-Cooked; Frozen; Baked     0.000000    1.000      0.004
                 222-Cooked; Frozen; Boiled    0.000000    1.000      0.004
                 223-Cooked; Frozen; Fried     0.000000    1.000      0.004
                 224-Cooked; Frozen; Fried/baked  0.000000    1.000      0.004
                 230-Cooked; Dried; Cook Meth N/S
                                       5.400000    1.000      0.004
                 231-Cooked; Dried; Baked      5.400000    1.000      0.004
                 232-Cooked; Dried; Boiled     5.400000    1.000      0.004
                 233-Cooked; Dried; Fried      5.400000    1.000      0.004
                 240-Cooked; Canned; Cook Meth N/S
```

|  |  |  | 0.000000 | 1.000 | 0.004 |
|  | 242-Cooked; Canned; Boiled | | 0.000000 | 1.000 | 0.004 |
|  | 250-Cooked; Cured etc; Cook Meth N/S | | | | |
|  |  |  | 3.900000 | 1.000 | 0.004 |
|  | 253-Cooked; Cured etc; Fried | | 3.900000 | 1.000 | 0.004 |
|  | 255-Cooked; Cured etc; Boiled/baked | | | | |
|  |  |  | 3.900000 | 1.000 | 0.004 |
| 27032251 D | Milk, sugar (lactose)-baby food/infa | | | | |
|  | 110-Uncooked; Fresh or N/S; Cook Meth N/S | | | | |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  | 130-Uncooked; Dried; Cook Meth N/S | | | | |
|  |  |  | 5.400000 | 1.000 | 0.004 |
|  | 210-Cooked; Fresh or N/S; Cook Meth N/S | | | | |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  | 212-Cooked; Fresh or N/S; Boiled | | | | |
|  |  |  | 0.000000 | 1.000 | 0.004 |
|  | 230-Cooked; Dried; Cook Meth N/S | | | | |
|  |  |  | 5.400000 | 1.000 | 0.004 |
|  | 240-Cooked; Canned; Cook Meth N/S | | | | |
|  |  |  | 0.000000 | 1.000 | 0.004 |
| 15002260 15 | Millet, grain | 2.900000 | 1.000 | 0.008 |
| 15002310 15 | Oat, bran | 74.200000 | 1.000 | 0.008 |
| 15002320 15 | Oat, flour | 0.337000 | 1.000 | 1.000 |
| 15002321 15 | Oat, flour-babyfood | 0.337000 | 1.000 | 1.000 |
| 15002330 15 | Oat, groats/rolled oats | 18.500000 | 1.000 | 0.008 |
| 15002331 15 | Oat, groats/rolled oats-babyfood | 18.500000 | 1.000 | 0.008 |
| 95002360 O | Olive, oil | 1.500000 | 1.000 | 0.004 |
| 03002380 3 | Onion, dry bulb, dried | 1.700000 | 1.000 | 0.004 |
| 03002381 3 | Onion, dry bulb, dried-babyfood | 1.700000 | 1.000 | 0.004 |
| 95002440 O | Palm, oil | 1.500000 | 1.000 | 0.004 |
| 95002441 O | Palm, oil-babyfood | 1.500000 | 1.000 | 0.004 |
| 95002460 O | Papaya, dried | 1.000000 | 1.000 | 0.004 |
| 19012490 19A | Parsley, dried leaves | 63.500000 | 1.000 | 0.004 |
| 19012491 19A | Parsley, dried leaves-babyfood | 63.500000 | 1.000 | 0.004 |
| 06032560 6C | Pea, dry | 4.500000 | 1.000 | 0.004 |
| 06032561 6C | Pea, dry-babyfood | 4.500000 | 1.000 | 0.004 |
| 06032580 6C | Pea, pigeon, seed | 4.500000 | 1.000 | 0.004 |
| 12002610 12 | Peach, dried | 1.000000 | 1.000 | 0.004 |
| 12002611 12 | Peach, dried-babyfood | 1.000000 | 1.000 | 0.004 |
| 95002630 O | Peanut | 16.400000 | 1.000 | 0.004 |
| 95002640 O | Peanut, butter | 16.400000 | 1.000 | 0.004 |
| 95002650 O | Peanut, oil | 1.500000 | 1.000 | 0.004 |
| 11002670 11 | Pear, dried | 1.000000 | 1.000 | 0.004 |
| 14002690 14 | Pecan | 3.900000 | 1.000 | 0.004 |
| 08002710 8 | Pepper, bell, dried | 36.100000 | 1.000 | 0.004 |
| 08002711 8 | Pepper, bell, dried-babyfood | 36.100000 | 1.000 | 0.004 |
| 08002730 8 | Pepper, nonbell, dried | 36.100000 | 1.000 | 0.004 |
| 19022740 19B | Pepper, black and white | 7.100000 | 1.000 | 0.004 |
| 19022741 19B | Pepper, black and white-babyfood | 7.100000 | 1.000 | 0.004 |
| 95002760 O | Peppermint, oil | 1.500000 | 1.000 | 0.004 |
| 95002780 O | Pine nut | 8.800000 | 1.000 | 0.004 |
| 95002800 O | Pineapple, dried | 1.000000 | 1.000 | 0.004 |
| 14002820 14 | Pistachio | 2.300000 | 1.000 | 0.004 |
| 95002840 O | Plantain, dried | 1.000000 | 1.000 | 0.004 |
| 12002870 12 | Plum, prune, dried | 0.700000 | 1.000 | 0.004 |
| 12002871 12 | Plum, prune, dried-babyfood | 0.700000 | 1.000 | 0.004 |
| 01032960 1C | Potato, chips | 7.100000 | 1.000 | 0.004 |
| 01032970 1C | Potato, dry (granules/ flakes) | 25.600000 | 1.000 | 0.004 |
| 01032971 1C | Potato, dry (granules/ flakes)-b | 25.600000 | 1.000 | 0.004 |
| 01032980 1C | Potato, flour | 31.400000 | 1.000 | 0.004 |
| 01032981 1C | Potato, flour-babyfood | 31.400000 | 1.000 | 0.004 |
| 95003060 O | Psyllium, seed | 7.100000 | 1.000 | 0.004 |
| 09023090 9B | Pumpkin, seed | 8.800000 | 1.000 | 0.004 |
| 95003110 O | Quinoa, grain | 20.400000 | 1.000 | 0.004 |
| 20003190 20 | Rapeseed, oil | 1.500000 | 1.000 | 0.004 |
| 20003191 20 | Rapeseed, oil-babyfood | 1.500000 | 1.000 | 0.004 |
| 15003230 15 | Rice, white | 3.900000 | 1.000 | 0.008 |
| 15003231 15 | Rice, white-babyfood | 3.900000 | 1.000 | 0.008 |
| 15003240 15 | Rice, brown | 9.400000 | 1.000 | 0.008 |
| 15003241 15 | Rice, brown-babyfood | 9.400000 | 1.000 | 0.008 |
| 15003250 15 | Rice, flour | 0.160000 | 1.000 | 1.000 |
| 15003251 15 | Rice, flour-babyfood | 0.160000 | 1.000 | 1.000 |
| 15003260 15 | Rice, bran | 37.500000 | 1.000 | 0.008 |

| 15003261 | 15 | Rice, bran-babyfood | 37.500000 | 1.000 | 0.008 |
| 15003280 | 15 | Rye, grain | 2.900000 | 1.000 | 0.008 |
| 15003290 | 15 | Rye, flour | 0.134000 | 1.000 | 1.000 |
| 20003300 | 20 | Safflower, oil | 1.500000 | 1.000 | 0.004 |
| 20003301 | 20 | Safflower, oil-babyfood | 1.500000 | 1.000 | 0.004 |
| 19013340 | 19A | Savory | 63.500000 | 1.000 | 0.004 |
| 95003360 | O | Sesame, seed | 7.100000 | 1.000 | 0.004 |
| 95003361 | O | Sesame, seed-babyfood | 7.100000 | 1.000 | 0.004 |
| 95003370 | O | Sesame, oil | 1.500000 | 1.000 | 0.004 |
| 95003371 | O | Sesame, oil-babyfood | 1.500000 | 1.000 | 0.004 |
| 15003440 | 15 | Sorghum, grain | 20.400000 | 1.000 | 0.008 |
| 15003450 | 15 | Sorghum, syrup | 0.600000 | 1.000 | 0.008 |
| 06003480 | 6 | Soybean, flour | 0.081000 | 1.000 | 1.000 |
| 06003481 | 6 | Soybean, flour-babyfood | 0.081000 | 1.000 | 1.000 |
| 06003490 | 6 | Soybean, soy milk | 2.400000 | 1.000 | 0.004 |
| 06003491 | 6 | Soybean, soy milk-babyfood or in | 2.400000 | 1.000 | 0.004 |
| 06003500 | 6 | Soybean, oil | 1.500000 | 1.000 | 0.004 |
| 06003501 | 6 | Soybean, oil-babyfood | 1.500000 | 1.000 | 0.004 |
| 95003530 | O | Spearmint, oil | 1.500000 | 1.000 | 0.004 |
| 19023540 | 19B | Spices, other | 7.100000 | 1.000 | 0.004 |
| 19023541 | 19B | Spices, other-babyfood | 7.100000 | 1.000 | 0.004 |
| 95003620 | O | Sugarcane, sugar | 1.200000 | 1.000 | 0.004 |
| 95003621 | O | Sugarcane, sugar-babyfood | 1.200000 | 1.000 | 0.004 |
| 95003630 | O | Sugarcane, molasses | 1.200000 | 1.000 | 0.004 |
| 95003631 | O | Sugarcane, molasses-babyfood | 1.200000 | 1.000 | 0.004 |
| 20003640 | 20 | Sunflower, seed | 4.500000 | 1.000 | 0.004 |
| 20003650 | 20 | Sunflower, oil | 1.500000 | 1.000 | 0.004 |
| 20003651 | 20 | Sunflower, oil-babyfood | 1.500000 | 1.000 | 0.004 |
| 95003720 | O | Tea, dried | 67.100000 | 1.000 | 0.004 |
| 95003730 | O | Tea, instant | 67.100000 | 1.000 | 0.004 |
| 08003780 | 8 | Tomato, dried | 1.000000 | 1.000 | 0.004 |
| 08003781 | 8 | Tomato, dried-babyfood | 1.000000 | 1.000 | 0.004 |
| 15003810 | 15 | Triticale, flour | 0.134000 | 1.000 | 1.000 |
| 15003811 | 15 | Triticale, flour-babyfood | 0.134000 | 1.000 | 1.000 |
| 01033870 | 1CD | Turmeric | 7.100000 | 1.000 | 0.004 |
| 14003910 | 14 | Walnut | 2.000000 | 1.000 | 0.004 |
| 15004010 | 15 | Wheat, grain | 2.900000 | 1.000 | 0.008 |
| 15004011 | 15 | Wheat, grain-babyfood | 2.900000 | 1.000 | 0.008 |
| 15004020 | 15 | Wheat, flour | 0.134000 | 1.000 | 1.000 |
| 15004021 | 15 | Wheat, flour-babyfood | 0.134000 | 1.000 | 1.000 |
| 15004030 | 15 | Wheat, germ | 54.000000 | 1.000 | 0.008 |
| 15004040 | 15 | Wheat, bran | 74.200000 | 1.000 | 0.008 |
| 15004050 | 15 | Wild rice | 9.400000 | 1.000 | 0.008 |

Attachment 4.  Results of cryolite fluoride exposure analysis

```
U.S. Environmental Protection Agency                          Ver. 2.02
DEEM-FCID ACUTE Analysis for CRYOLITE                    (1994-98 data)
Residue file: Cryolite-AR-CT new raisin factor.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/13:01:11   Residue file dated: 06-24-2004/10:05:08/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: ""
================================================================================

Summary calculations (per capita):

                    95th Percentile      99th Percentile      99.9th Percentile
                      Exposure             Exposure             Exposure
                    ----------           ----------           ----------
All infants:
                      0.048374             0.180153             0.437825
Custom demographics 1: 0.5 - <1:
                      0.175850             0.367189             0.703934
Custom demographics 2: 1   <4:
                      0.202992             0.443950             0.921210
Custom demographics 3: 4 - <7:
                      0.159838             0.313532             0.737197
Custom demographics 4: 7 - <11:
                      0.126163             0.332575             0.741806
Custom demographics 5: 11 - <14:
                      0.113618             0.324475             0.733375
Custom demographics 6: 14+:
                      0.179623             0.425648             0.861668
```

```
U.S. Environmental Protection Agency                        Ver. 2.02
DEEM-FCID ACUTE Analysis for CRYOLITE                    (1994-98 data)
Residue file: Cryolite-AR-CT new raisin factor.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/13:01:11    Residue file dated: 06-24-2004/10:05:08/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: ""
==============================================================================

All infants                        Daily Exposure Analysis  /a
-----------                               (mg/day)
                                   per Capita    per User
                                   ------------  -----------
                Mean                0.008410      0.016502
                Standard Deviation  0.035543      0.048427
                Standard Error of mean  0.000652  0.001252

     Percent of Person-Days that are User-Days -  50.97%


  Estimated percentile of user-days falling below calculated exposure
                in mg/day

      Percentile    Exposure           Percentile    Exposure
      ----------    ----------         ----------    ----------
        10.00       0.000113             90.00       0.047259
        20.00       0.000331             95.00       0.102587
        30.00       0.000635             97.50       0.126726
        40.00       0.001133             99.00       0.243049
        50.00       0.001882             99.50       0.289194
        60.00       0.002814             99.75       0.366479
        70.00       0.004828             99.90       0.481071
        80.00       0.009149


  Estimated percentile of per-capita days falling below calculated exposure
                in mg/day

      Percentile    Exposure           Percentile    Exposure
      ----------    ----------         ----------    ----------
        10.00       0.000000             90.00       0.009432
        20.00       0.000000             95.00       0.048374
        30.00       0.000000             97.50       0.104997
        40.00       0.000000             99.00       0.180153
        50.00       0.000021             99.50       0.243227
        60.00       0.000370             99.75       0.289300
        70.00       0.001204             99.90       0.437825
        80.00       0.002981
-------------------------------------------------------------------------------
a/ Analysis based on all two-day participant records in CSFII 1994-98 survey.
                                   1
```

```
U.S. Environmental Protection Agency                          Ver. 2.02
DEEM-FCID ACUTE Analysis for CRYOLITE                    (1994-98 data)
Residue file: Cryolite-AR-CT new raisin factor.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/13:01:11    Residue file dated: 06-24-2004/10:05:08/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: ""
=============================================================================

Custom demographics 1: 0.5 - <1
All Seasons
All Regions
Sex: M/F-all/
All Races
Nursing and Non-Nursing (Ages <= 3)
Age-Low: 6 m  High: 1 yrs
---------------------------------
```

```
                              Daily Exposure Analysis
                                     (mg/day)
                                per Capita    per User
                                -----------   -----------
              Mean                0.030833      0.033133
              Standard Deviation  0.073530      0.075721
              Standard Error of mean  0.001241  0.001334

       Percent of Person-Days that are User-Days =  93.06%
```

```
Estimated percentile of user-days falling below calculated exposure
                          in mg/day

   Percentile   Exposure            Percentile   Exposure
   ----------   ----------          ----------   ----------
     10.00       0.000308             90.00       0.100236
     20.00       0.000788             95.00       0.183991
     30.00       0.001443             97.50       0.248128
     40.00       0.002305             99.00       0.369782
     50.00       0.004039             99.50       0.485080
     60.00       0.007185             99.75       0.577116
     70.00       0.015028             99.90       0.705472
     80.00       0.041860
```

```
Estimated percentile of per-capita days falling below calculated exposure
                          in mg/day

   Percentile   Exposure            Percentile   Exposure
   ----------   ----------          ----------   ----------
     10.00       0.000101             90.00       0.094318
     20.00       0.000481             95.00       0.175850
     30.00       0.001091             97.50       0.246802
     40.00       0.001901             99.00       0.367189
     50.00       0.003216             99.50       0.483932
     60.00       0.005960             99.75       0.525181
     70.00       0.012055             99.90       0.703934
     80.00       0.034430
```

                                    2

```
U.S. Environmental Protection Agency                          Ver. 2.02
DERM-FCID ACUTE Analysis for CRYOLITE                    (1994-98 data)
Residue file: Cryolite-AR-CT new raisin factor.R98
   Adjustment factor #2 used.
Analysis Date: 06-03-2010/13:01:11   Residue file dated: 06-24-2004/10:05:08/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: ""
===============================================================================

Custom demographics 2: 1 - <4
All Seasons
All Regions
Sex: M/F-all/
All Races
Nursing and Non-Nursing (Ages <= 3)
Age-Low: 1 yrs   High: 4 yrs
----------------------------
```

```
                        Daily Exposure Analysis
                              (mg/day)
                        per Capita    per User
                        -----------   -----------
           Mean          0.040443      0.041017
           Standard Deviation    0.090977      0.091492
           Standard Error of mean    0.000857      0.000867

     Percent of Person-Days that are User-Days =  98.60%
```

```
Estimated percentile of user-days falling below calculated exposure
                      in mg/day

   Percentile   Exposure              Percentile   Exposure
   ----------   ----------            ----------   ----------
     10.00       0.000553               90.00       0.121346
     20.00       0.001268               95.00       0.205310
     30.00       0.002092               97.50       0.287423
     40.00       0.003407               99.00       0.445745
     50.00       0.006150               99.50       0.527179
     60.00       0.012014               99.75       0.634370
     70.00       0.023498               99.90       0.924251
     80.00       0.050975
```

```
Estimated percentile of per-capita days falling below calculated exposure
                      in mg/day

   Percentile   Exposure              Percentile   Exposure
   ----------   ----------            ----------   ----------
     10.00       0.000463               90.00       0.120416
     20.00       0.001185               95.00       0.202992
     30.00       0.001996               97.50       0.284998
     40.00       0.003255               99.00       0.443950
     50.00       0.005910               99.50       0.523800
     60.00       0.011640               99.75       0.632941
     70.00       0.023114               99.90       0.921210
     80.00       0.050184
```

                                     3

```
U.S. Environmental Protection Agency                        Ver. 2.02
DEEM-FCID ACUTE Analysis for CRYOLITE               (1994-98 data)
Residue file: Cryolite-AR-CT new raisin factor.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/13:01:11   Residue file dated: 06-24-2004/10:05:08/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: ""
===============================================================================

Custom demographics 3: 4 - <7
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 4 yrs   High: 7 yrs
------------------------------
```

                            Daily Exposure Analysis
                                  (mg/day)
                          per Capita    per User
                          -----------   -----------
            Mean             0.031330      0.031550
            Standard Deviation   0.070270      0.070467
            Standard Error of mean   0.000841      0.000846

        Percent of Person-Days that are User-Days =  99.30%


    Estimated percentile of user-days falling below calculated exposure
                    in mg/day

        Percentile   Exposure            Percentile   Exposure
        ----------   ----------          ----------   ----------
          10.00      0.000698              90.00      0.090283
          20.00      0.001435              95.00      0.160747
          30.00      0.002307              97.50      0.231215
          40.00      0.003723              99.00      0.313832
          50.00      0.006322              99.50      0.440487
          60.00      0.011540              99.75      0.577595
          70.00      0.021241              99.90      0.737251
          80.00      0.037074


    Estimated percentile of per-capita days falling below calculated exposure
                    in mg/day

        Percentile   Exposure            Percentile   Exposure
        ----------   ----------          ----------   ----------
          10.00      0.000656              90.00      0.089739
          20.00      0.001389              95.00      0.159838
          30.00      0.002246              97.50      0.229675
          40.00      0.003648              99.00      0.313532
          50.00      0.006191              99.50      0.439401
          60.00      0.011397              99.75      0.576810
          70.00      0.021063              99.90      0.737197
          80.00      0.036609

                                    4

```
U.S. Environmental Protection Agency                        Ver. 2.02
DEEM-FCID ACUTE Analysis for CRYOLITE                   (1994-98 data)
Residue file: Cryolite-AR-CT new raisin factor.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/13:01:11    Residue file dated: 06-24-2004/10:05:08/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: ""
==================================================================================

Custom demographics 4: 7 - <11
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 7 yrs   High: 11 yrs
------------------------------
```

```
                            Daily Exposure Analysis
                                  (mg/day)
                            per Capita   per User
                           -----------  -----------
           Mean             0.028471     0.028704
           Standard Deviation  0.069277  0.069512
           Standard Error of mean  0.001337  0.001347

     Percent of Person-Days that are User-Days =  99.19%
```

```
Estimated percentile of user-days falling below calculated exposure
                        in mg/day

   Percentile   Exposure              Percentile   Exposure
   ----------  ----------             ----------  ----------
      10.00     0.000759                 90.00     0.074546
      20.00     0.001569                 95.00     0.126652
      30.00     0.002533                 97.50     0.225153
      40.00     0.003744                 99.00     0.333141
      50.00     0.005884                 99.50     0.485657
      60.00     0.010417                 99.75     0.671156
      70.00     0.017264                 99.90     0.741857
      80.00     0.028363
```

```
Estimated percentile of per-capita days falling below calculated exposure
                        in mg/day

   Percentile   Exposure              Percentile   Exposure
   ----------  ----------             ----------  ----------
      10.00     0.000703                 90.00     0.074291
      20.00     0.001513                 95.00     0.126163
      30.00     0.002456                 97.50     0.224248
      40.00     0.003685                 99.00     0.332575
      50.00     0.005711                 99.50     0.484766
      60.00     0.010173                 99.75     0.671024
      70.00     0.017039                 99.90     0.741806
      80.00     0.028166
```

5

```
U.S. Environmental Protection Agency                        Ver. 2.02
DEEM-FCID ACUTE Analysis for CRYOLITE            (1994-98 data)
Residue file: Cryolite-AR-CT new raisin factor.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/13:01:11    Residue file dated: 06-24-2004/10:05:08/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: ""
=========================================================================

Custom demographics 5: 11 - <14
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 11 yrs  High: 14 yrs
---------------------------------
```

```
                          Daily Exposure Analysis
                                 (mg/day)
                          per Capita    per User
                          -----------  -----------
              Mean          0.024786     0.025056
              Standard Deviation  0.061571  0.061850
              Standard Error of mean  0.001524  0.001540

       Percent of Person-Days that are User-Days =  98.92%


    Estimated percentile of user-days falling below calculated exposure
                      in mg/day

       Percentile   Exposure          Percentile   Exposure
       ----------  -----------        ----------  -----------
         10.00     0.000871            90.00      0.059909
         20.00     0.001695            95.00      0.115049
         30.00     0.002571            97.50      0.188393
         40.00     0.003597            99.00      0.324694
         50.00     0.005329            99.50      0.425857
         60.00     0.008325            99.75      0.489522
         70.00     0.014132            99.90      0.733597
         80.00     0.025251


    Estimated percentile of per-capita days falling below calculated exposure
                      in mg/day

       Percentile   Exposure          Percentile   Exposure
       ----------  -----------        ----------  -----------
         10.00     0.000773            90.00      0.059621
         20.00     0.001634            95.00      0.113618
         30.00     0.002497            97.50      0.188208
         40.00     0.003503            99.00      0.324475
         50.00     0.005215            99.50      0.425786
         60.00     0.008098            99.75      0.489044
         70.00     0.013948            99.90      0.733375
         80.00     0.025070
```

6

```
U.S. Environmental Protection Agency                        Ver. 2.02
DEEM-FCID ACUTE Analysis for CRYOLITE                   (1994-98 data)
Residue file: Cryolite-AR-CT new raisin factor.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/13:01:11    Residue file dated: 06-24-2004/10:05:08/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: ""
================================================================================

Custom demographics 6: 14+
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 14 yrs   High: 99 yrs
--------------------------

                         Daily Exposure Analysis
                                (mg/day)
                          per Capita    per User
                         ------------  ------------
            Mean            0.032704      0.033291
            Standard Deviation  0.084056  0.084692
            Standard Error of mean  0.000584  0.000594

      Percent of Person-Days that are User-Days =  98.24%


   Estimated percentile of user-days falling below calculated exposure
                    in mg/day

    Percentile   Exposure              Percentile   Exposure
    ----------   ----------            ----------   ----------
       10.00      0.000863                90.00      0.078174
       20.00      0.001938                95.00      0.182131
       30.00      0.003068                97.50      0.278982
       40.00      0.004460                99.00      0.427729
       50.00      0.006449                99.50      0.533164
       60.00      0.009821                99.75      0.681739
       70.00      0.016997                99.90      0.872898
       80.00      0.029959


   Estimated percentile of per-capita days falling below calculated exposure
                    in mg/day

    Percentile   Exposure              Percentile   Exposure
    ----------   ----------            ----------   ----------
       10.00      0.000684                90.00      0.076275
       20.00      0.001796                95.00      0.179623
       30.00      0.002912                97.50      0.276623
       40.00      0.004277                99.00      0.425648
       50.00      0.006224                99.50      0.530005
       60.00      0.009528                99.75      0.681273
       70.00      0.016530                99.90      0.861668
       80.00      0.029249
```

7

Attachment 5. Results of sulfuryl fluoride food fumigation exposure analysis

```
U.S. Environmental Protection Agency                           Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                      (1994-98 data)
Residue file: F Food Fumigation - 2009  RevisedCT - 4-28 Strict Label.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:59:31   Residue file dated: 05-06-2009/13:54:06/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and for adult pops only."
=============================================================================

Summary calculations (per capita):

                   95th Percentile      99th Percentile    99.9th Percentile
                      Exposure             Exposure            Exposure
                   ---------------      ---------------    ---------------
All infants:
                      0.039579             0.098237            0.230985
Custom demographics 1: 0.5 - <1:
                      0.096990             0.226422            0.429346
Custom demographics 2: 1 - <4:
                      0.140401             0.282132            0.528114
Custom demographics 3: 4 - <7:
                      0.176854             0.355497            0.663533
Custom demographics 4: 7 - <11:
                      0.204775             0.406162            0.744262
Custom demographics 5: 11 - <14:
                      0.291818             0.602765            0.981154
Custom demographics 6: 14+:
                      0.273986             0.563283            1.122529
```

```
U.S. Environmental Protection Agency                              Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                      (1994-98 data)
Residue file: F Food Fumigation - 2009  RevisedCT - 4-28 Strict Label.R98
     Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:59:31    Residue file dated: 05-06-2009/13:54:06/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and for adult pops only."
===============================================================================


All infants                      Daily Exposure Analysis  /a
-----------                              (mg/day)
                              per Capita    per User
                              ------------  -----------
              Mean               0.009074     0.012660
              Standard Deviation 0.020369     0.023098
              Standard Error of mean 0.000374  0.000500

     Percent of Person-Days that are User-Days =  71.67%


  Estimated percentile of user-days falling below calculated exposure
               in mg/day

     Percentile   Exposure            Percentile   Exposure
     ----------   ----------          ----------   ----------
        10.00     0.000096              90.00      0.033116
        20.00     0.000323              95.00      0.048078
        30.00     0.000933              97.50      0.073765
        40.00     0.002440              99.00      0.108894
        50.00     0.004827              99.50      0.135625
        60.00     0.007798              99.75      0.197544
        70.00     0.011819              99.90      0.274808
        80.00     0.019633


  Estimated percentile of per-capita days falling below calculated exposure
               in mg/day

     Percentile   Exposure            Percentile   Exposure
     ----------   ----------          ----------   ----------
        10.00     0.000000              90.00      0.027144
        20.00     0.000000              95.00      0.039579
        30.00     0.000022              97.50      0.057927
        40.00     0.000214              99.00      0.098237
        50.00     0.000957              99.50      0.124019
        60.00     0.003358              99.75      0.159292
        70.00     0.007314              99.90      0.230985
        80.00     0.013155
-------------------------------------------------------------------------------
a/ Analysis based on all two-day participant records in CSFII 1994-98 survey.
                              1
```

```
U.S. Environmental Protection Agency                          Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                     (1994-98 data)
Residue file: F Food Fumigation - 2009  RevisedCT - 4-28 Strict Label.R98
     Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:59:31    Residue file dated: 05-06-2009/13:54:06/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and for adult pops only."
================================================================================

Custom demographics 1: 0.5 - <1
All Seasons
All Regions
Sex: M/F-all/
All Races
Nursing and Non-Nursing (Ages <= 3)
Age-Low: 6 m  High: 1 yrs
--------------------------------
```

```
                            Daily Exposure Analysis
                                  (mg/day)
                             per Capita    per User
                             -----------   -----------
             Mean              0.021276      0.021691
             Standard Deviation 0.041194      0.041486
             Standard Error of mean 0.000696   0.000709

       Percent of Person-Days that are User-Days =  98.08%
```

```
Estimated percentile of user-days falling below calculated exposure
               in mg/day

    Percentile   Exposure          Percentile   Exposure
    ----------   ----------        ----------   ----------
       10.00     0.000713             90.00     0.053524
       20.00     0.001437             95.00     0.097690
       30.00     0.002363             97.50     0.132565
       40.00     0.003805             99.00     0.227504
       50.00     0.006416             99.50     0.273936
       60.00     0.010962             99.75     0.324460
       70.00     0.018673             99.90     0.429503
       80.00     0.029818
```

```
Estimated percentile of per-capita days falling below calculated exposure
                 in mg/day

    Percentile   Exposure          Percentile   Exposure
    ----------   ----------        ----------   ----------
       10.00     0.000592             90.00     0.052671
       20.00     0.001332             95.00     0.096990
       30.00     0.002232             97.50     0.131812
       40.00     0.003620             99.00     0.226422
       50.00     0.005965             99.50     0.273629
       60.00     0.010310             99.75     0.323589
       70.00     0.018080             99.90     0.429346
       80.00     0.029392
```

2

```
U.S. Environmental Protection Agency                          Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                   (1994-90 data)
Residue file: F Food Fumigation - 2009  RevisedCT - 4-28 Strict Label.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:59:31    Residue file dated: 05-06-2009/13:54:06/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and for adult pops only."
==========================================================================

Custom demographics 2: 1 - <4
All Seasons
All Regions
Sex: M/F-all/
All Races
Nursing and Non-Nursing (Ages <= 3)
Age-Low: 1 yrs   High: 4 yrs
-----------------------------
```

```
                              Daily Exposure Analysis
                                    (mg/day)
                              per Capita    per User
                             -----------   -----------
              Mean            0.032891      0.032958
              Standard Deviation  0.059247  0.059289
              Standard Error of mean  0.000558  0.000559

       Percent of Person-Days that are User-Days =  99.79%
```

```
   Estimated percentile of user-days falling below calculated exposure
                          in mg/day
```

| Percentile | Exposure | | Percentile | Exposure |
|---|---|---|---|---|
| 10.00 | 0.001493 | | 90.00 | 0.088963 |
| 20.00 | 0.002474 | | 95.00 | 0.140511 |
| 30.00 | 0.003756 | | 97.50 | 0.198017 |
| 40.00 | 0.005811 | | 99.00 | 0.282227 |
| 50.00 | 0.010068 | | 99.50 | 0.359262 |
| 60.00 | 0.017265 | | 99.75 | 0.443445 |
| 70.00 | 0.028945 | | 99.90 | 0.528153 |
| 80.00 | 0.045984 | | | |

```
   Estimated percentile of per-capita days falling below calculated exposure
                          in mg/day
```

| Percentile | Exposure | | Percentile | Exposure |
|---|---|---|---|---|
| 10.00 | 0.001475 | | 90.00 | 0.088844 |
| 20.00 | 0.002457 | | 95.00 | 0.140401 |
| 30.00 | 0.003733 | | 97.50 | 0.197707 |
| 40.00 | 0.005780 | | 99.00 | 0.282132 |
| 50.00 | 0.009990 | | 99.50 | 0.358994 |
| 60.00 | 0.017173 | | 99.75 | 0.443314 |
| 70.00 | 0.028867 | | 99.90 | 0.528114 |
| 80.00 | 0.045864 | | | |

3

```
U.S. Environmental Protection Agency                           Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                     (1994-98 data)
Residue file: F Food Fumigation - 2009  RevisedCT - 4-28 Strict Label.R98
     Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:59:31     Residue file dated: 05-06-2009/13:54:06/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and for adult pops only."
===============================================================================


Custom demographics 3: 4 - <7
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 4 yrs   High: 7 yrs
------------------------------
```

|  | Daily Exposure Analysis (mg/day) | |
|---|---|---|
|  | per Capita | per User |
| Mean | 0.046643 | 0.046649 |
| Standard Deviation | 0.073659 | 0.073662 |
| Standard Error of mean | 0.000881 | 0.000881 |

Percent of Person-Days that are User-Days = 99.99%

Estimated percentile of user-days falling below calculated exposure
in mg/day

| Percentile | Exposure | | Percentile | Exposure |
|---|---|---|---|---|
| 10.00 | 0.002394 | | 90.00 | 0.121850 |
| 20.00 | 0.004068 | | 95.00 | 0.176863 |
| 30.00 | 0.006915 | | 97.50 | 0.266527 |
| 40.00 | 0.012303 | | 99.00 | 0.355504 |
| 50.00 | 0.021403 | | 99.50 | 0.487238 |
| 60.00 | 0.032227 | | 99.75 | 0.534215 |
| 70.00 | 0.044555 | | 99.90 | 0.663534 |
| 80.00 | 0.067720 | | | |

Estimated percentile of per-capita days falling below calculated exposure
in mg/day

| Percentile | Exposure | | Percentile | Exposure |
|---|---|---|---|---|
| 10.00 | 0.002392 | | 90.00 | 0.121841 |
| 20.00 | 0.004066 | | 95.00 | 0.176854 |
| 30.00 | 0.006911 | | 97.50 | 0.266522 |
| 40.00 | 0.012297 | | 99.00 | 0.355497 |
| 50.00 | 0.021396 | | 99.50 | 0.487227 |
| 60.00 | 0.032222 | | 99.75 | 0.534211 |
| 70.00 | 0.044549 | | 99.90 | 0.663533 |
| 80.00 | 0.067714 | | | |

4

```
U.S. Environmental Protection Agency                        Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                  (1991-98 data)
Residue file: F Food Fumigation - 2009  RevisedCT - 4-28 Strict Label.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:59:31    Residue file dated: 05-06-2009/13:54:06/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and for adult pops only."
==================================================================================


Custom demographics 4: 7 - <11
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 7 yrs   High: 11 yrs
-------------------------------

                          Daily Exposure Analysis
                                (mg/day)
                          per Capita    per User
                         -----------   -----------
           Mean            0.054355      0.054355
           Standard Deviation  0.089280      0.089280
           Standard Error of mean  0.001723      0.001723

     Percent of Person-Days that are User-Days = 100.00%


   Estimated percentile of user-days falling below calculated exposure
              in mg/day

      Percentile   Exposure            Percentile   Exposure
      ----------   ----------          ----------   ----------
        10.00      0.002781              90.00      0.130309
        20.00      0.005067              95.00      0.204775
        30.00      0.009619              97.50      0.297045
        40.00      0.017785              99.00      0.406162
        50.00      0.028257              99.50      0.539413
        60.00      0.037462              99.75      0.639542
        70.00      0.050645              99.90      0.744262
        80.00      0.076801


   Estimated percentile of per-capita days falling below calculated exposure
              in mg/day

      Percentile   Exposure            Percentile   Exposure
      ----------   ----------          ----------   ----------
        10.00      0.002781              90.00      0.130309
        20.00      0.005067              95.00      0.204775
        30.00      0.009619              97.50      0.297045
        40.00      0.017785              99.00      0.406162
        50.00      0.028257              99.50      0.539413
        60.00      0.037462              99.75      0.639542
        70.00      0.050645              99.90      0.744262
        80.00      0.076801
                              5
```

```
U.S. Environmental Protection Agency                          Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                    (1994-98 data)
Residue file: F Food Fumigation - 2009  RevisedCT - 4-28 Strict Label.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:59:31     Residue file dated: 05-06-2009/13:54:06/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and for adult pops only."
==============================================================================

Custom demographics 5: 11 - <14
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 11 yrs   High: 14 yrs
-------------------------------
```

|  | Daily Exposure Analysis (mg/day) | |
|---|---|---|
|  | per Capita | per User |
| Mean | 0.067522 | 0.067522 |
| Standard Deviation | 0.127399 | 0.127399 |
| Standard Error of mean | 0.003154 | 0.003154 |

Percent of Person-Days that are User-Days = 100.00%

Estimated percentile of user-days falling below calculated exposure
in mg/day

| Percentile | Exposure | | Percentile | Exposure |
|---|---|---|---|---|
| 10.00 | 0.002472 | | 90.00 | 0.179495 |
| 20.00 | 0.004212 | | 95.00 | 0.291818 |
| 30.00 | 0.006674 | | 97.50 | 0.400124 |
| 40.00 | 0.014134 | | 99.00 | 0.602765 |
| 50.00 | 0.027275 | | 99.50 | 0.792960 |
| 60.00 | 0.040233 | | 99.75 | 0.827384 |
| 70.00 | 0.057641 | | 99.90 | 0.981154 |
| 80.00 | 0.092775 | | | |

Estimated percentile of per-capita days falling below calculated exposure
in mg/day

| Percentile | Exposure | | Percentile | Exposure |
|---|---|---|---|---|
| 10.00 | 0.002472 | | 90.00 | 0.179495 |
| 20.00 | 0.004212 | | 95.00 | 0.291818 |
| 30.00 | 0.006674 | | 97.50 | 0.400124 |
| 40.00 | 0.014134 | | 99.00 | 0.602765 |
| 50.00 | 0.027275 | | 99.50 | 0.792960 |
| 60.00 | 0.040233 | | 99.75 | 0.827384 |
| 70.00 | 0.057641 | | 99.90 | 0.981154 |
| 80.00 | 0.092775 | | | |

6

```
U.S. Environmental Protection Agency                          Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                    (1994-98 data)
Residue file: F Food Fumigation - 2009  RevisedCT - 4-28 Strict Label.R98
    Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:59:31    Residue file dated: 05-06-2009/13:54:06/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and for adult pops only."
===============================================================================

Custom demographics 6: 14+
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 14 yrs   High: 99 yrs
--------------------------

                         Daily Exposure Analysis
                                (mg/day)
                          per Capita    per User
                          ----------   ----------
               Mean         0.057620     0.057768
               Standard Deviation  0.117804   0.117919
               Standard Error of mean  0.000819  0.000821

    Percent of Person-Days that are User-Days =  99.74%


  Estimated percentile of user-days falling below calculated exposure
                    in mg/day

     Percentile   Exposure              Percentile   Exposure
     ----------   ----------            ----------   ----------
        10.00     0.001770                 90.00     0.168094
        20.00     0.002968                 95.00     0.274313
        30.00     0.004572                 97.50     0.395651
        40.00     0.007237                 99.00     0.563477
        50.00     0.012067                 99.50     0.747002
        60.00     0.021400                 99.75     0.883366
        70.00     0.039452                 99.90     1.122607
        80.00     0.074577


  Estimated percentile of per-capita days falling below calculated exposure
                      in mg/day

     Percentile   Exposure              Percentile   Exposure
     ----------   ----------            ----------   ----------
        10.00     0.001744                 90.00     0.167643
        20.00     0.002939                 95.00     0.273986
        30.00     0.004537                 97.50     0.395310
        40.00     0.007181                 99.00     0.563283
        50.00     0.011979                 99.50     0.746855
        60.00     0.021271                 99.75     0.883065
        70.00     0.039263                 99.90     1.122529
        80.00     0.074327
```

7

## Attachment 6.  Results of sulfuryl fluoride structural fumigation exposure analysis

```
U.S. Environmental Protection Agency                        Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                   (1994-98 data)
Residue file: F Space Fumigation - 2009 - 5-1.R98    Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:57:19   Residue file dated: 05-06-2009/13:52:45/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and is valid for adult pops. only"
================================================================================

Summary calculations (per capita):

                    95th Percentile       99th Percentile      99.9th Percentile
                      Exposure              Exposure              Exposure
                    ---------             ---------             ---------
All infants:
                     0.012880              0.021374              0.046940
Custom demographics 1: 0.5 - <1:
                     0.020257              0.032080              0.050413
Custom demographics 2: 1 - <4:
                     0.025853              0.039290              0.062731
Custom demographics 3: 4 - <7:
                     0.030100              0.045022              0.076355
Custom demographics 4: 7 - <11:
                     0.034938              0.050785              0.074763
Custom demographics 5: 11 - <14:
                     0.037161              0.051720              0.089794
Custom demographics 6: 14+:
                     0.045247              0.074354              0.135312
```

```
U.S. Environmental Protection Agency                         Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                    (1994-98 data)
Residue file: F Space Fumigation - 2009 - 5-1.R98    Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:57:19    Residue file dated: 05-06-2009/13:52:45/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and is valid for adult pops. only"
================================================================================
```

```
All infants                         Daily Exposure Analysis  /a
-----------                                (mg/day)
                                 per Capita    per User
                                 -----------   -----------
             Mean                  0.004162     0.004671
             Standard Deviation    0.005018     0.005087
             Standard Error of mean 0.000092    0.000099

       Percent of Person-Days that are User-Days =  89.10%
```

```
   Estimated percentile of user-days falling below calculated exposure
                            in mg/day

     Percentile   Exposure                 Percentile   Exposure
     ----------   ----------               ----------   ----------
        10.00     0.000287                    90.00     0.010182
        20.00     0.001141                    95.00     0.013552
        30.00     0.001796                    97.50     0.017857
        40.00     0.002352                    99.00     0.022398
        50.00     0.003240                    99.50     0.032183
        60.00     0.004202                    99.75     0.041136
        70.00     0.005457                    99.90     0.047989
        80.00     0.007331
```

```
   Estimated percentile of per-capita days falling below calculated exposure
                            in mg/day

     Percentile   Exposure                 Percentile   Exposure
     ----------   ----------               ----------   ----------
        10.00     0.000000                    90.00     0.009705
        20.00     0.000296                    95.00     0.012880
        30.00     0.001279                    97.50     0.017653
        40.00     0.001912                    99.00     0.021374
        50.00     0.002668                    99.50     0.032032
        60.00     0.003716                    99.75     0.040955
        70.00     0.004955                    99.90     0.046940
        80.00     0.006913
```
--------------------------------------------------------------------------------
a/ Analysis based on all two-day participant records in CSFII 1994-98 survey.
1

```
U.S. Environmental Protection Agency                           Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                      (1994-98 data)
Residue file: F Space Fumigation - 2009 - 5-1.R98     Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:57:19    Residue file dated: 05-06-2009/13:52:45/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and is valid for adult pops. only"
================================================================================

Custom demographics 1: 0.5 - <1
All Seasons
All Regions
Sex: M/F-all/
All Races
Nursing and Non-Nursing (Ages <= 3)
Age-Low: 6 m  High: 1 yrs
--------------------------------
                         Daily Exposure Analysis
                                (mg/day)
                          per Capita    per User
                          -----------   -----------
            Mean            0.008687      0.008742
            Standard Deviation   0.006490      0.006473
            Standard Error of mean   0.000110      0.000110

     Percent of Person-Days that are User-Days =  99.37%


   Estimated percentile of user-days falling below calculated exposure
                  in mg/day

      Percentile   Exposure             Percentile   Exposure
      ----------   ----------           ----------   ----------
       10.00       0.002317              90.00       0.016759
       20.00       0.003754              95.00       0.020288
       30.00       0.004835              97.50       0.024883
       40.00       0.006085              99.00       0.032100
       50.00       0.007295              99.50       0.038552
       60.00       0.008688              99.75       0.041749
       70.00       0.010478              99.90       0.050424
       80.00       0.012723


   Estimated percentile of per-capita days falling below calculated exposure
                  in mg/day

      Percentile   Exposure             Percentile   Exposure
      ----------   ----------           ----------   ----------
       10.00       0.002228              90.00       0.016715
       20.00       0.003685              95.00       0.020257
       30.00       0.004790              97.50       0.024758
       40.00       0.006034              99.00       0.032080
       50.00       0.007254              99.50       0.038501
       60.00       0.008650              99.75       0.041724
       70.00       0.010442              99.90       0.050413
       80.00       0.012683
                                2
```

```
U.S. Environmental Protection Agency                        Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                    (1994-98 data)
Residue file: F Space Fumigation - 2009 - 5-1.R98    Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:57:19    Residue file dated: 05-06-2009/13:52:45/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and is valid for adult pops. only"
========================================================================
```

```
Custom demographics 2: 1 - <4
All Seasons
All Regions
Sex: M/F-all/
All Races
Nursing and Non-Nursing (Ages <= 3)
Age-Low: 1 yrs   High: 4 yrs
-----------------------------
```

Daily Exposure Analysis
(mg/day)

|                        | per Capita | per User |
|------------------------|------------|----------|
| Mean                   | 0.012080   | 0.012093 |
| Standard Deviation     | 0.007781   | 0.007776 |
| Standard Error of mean | 0.000073   | 0.000073 |

Percent of Person-Days that are User-Days =  99.89%

Estimated percentile of user-days falling below calculated exposure
in mg/day

| Percentile | Exposure | Percentile | Exposure |
|------------|----------|------------|----------|
| 10.00      | 0.004254 | 90.00      | 0.021199 |
| 20.00      | 0.006188 | 95.00      | 0.025862 |
| 30.00      | 0.007792 | 97.50      | 0.030621 |
| 40.00      | 0.009186 | 99.00      | 0.039299 |
| 50.00      | 0.010638 | 99.50      | 0.047837 |
| 60.00      | 0.012244 | 99.75      | 0.054314 |
| 70.00      | 0.014101 | 99.90      | 0.062737 |
| 80.00      | 0.016786 |            |          |

Estimated percentile of per-capita days falling below calculated exposure
in mg/day

| Percentile | Exposure | Percentile | Exposure |
|------------|----------|------------|----------|
| 10.00      | 0.004233 | 90.00      | 0.021193 |
| 20.00      | 0.006169 | 95.00      | 0.025853 |
| 30.00      | 0.007783 | 97.50      | 0.030615 |
| 40.00      | 0.009178 | 99.00      | 0.039290 |
| 50.00      | 0.010629 | 99.50      | 0.047830 |
| 60.00      | 0.012237 | 99.75      | 0.054306 |
| 70.00      | 0.014095 | 99.90      | 0.062731 |
| 80.00      | 0.016780 |            |          |

3

```
U.S. Environmental Protection Agency                        Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                  (1994-98 data)
Residue file: F Space Fumigation - 2009 - 5-1.R98    Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:57:19    Residue file dated: 05-06-2009/13:52:45/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and is valid for adult pops. only"
===============================================================================

Custom demographics 3: 4 - <7
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 4 yrs   High: 7 yrs
------------------------------
```

|                         | Daily Exposure Analysis (mg/day) | |
|-------------------------|------------|----------|
|                         | per Capita | per User |
| Mean                    | 0.015334   | 0.015335 |
| Standard Deviation      | 0.008582   | 0.008582 |
| Standard Error of mean  | 0.000103   | 0.000103 |

Percent of Person-Days that are User-Days = 100.00%

Estimated percentile of user-days falling below calculated exposure
in mg/day

| Percentile | Exposure | Percentile | Exposure |
|------------|----------|------------|----------|
| 10.00      | 0.006783 | 90.00      | 0.025067 |
| 20.00      | 0.008838 | 95.00      | 0.030101 |
| 30.00      | 0.010475 | 97.50      | 0.036002 |
| 40.00      | 0.012192 | 99.00      | 0.045022 |
| 50.00      | 0.013877 | 99.50      | 0.054278 |
| 60.00      | 0.015620 | 99.75      | 0.062688 |
| 70.00      | 0.017752 | 99.90      | 0.076356 |
| 80.00      | 0.020477 |            |          |

Estimated percentile of per-capita days falling below calculated exposure
in mg/day

| Percentile | Exposure | Percentile | Exposure |
|------------|----------|------------|----------|
| 10.00      | 0.006782 | 90.00      | 0.025067 |
| 20.00      | 0.008837 | 95.00      | 0.030100 |
| 30.00      | 0.010475 | 97.50      | 0.036002 |
| 40.00      | 0.012192 | 99.00      | 0.045022 |
| 50.00      | 0.013876 | 99.50      | 0.054278 |
| 60.00      | 0.015620 | 99.75      | 0.062687 |
| 70.00      | 0.017752 | 99.90      | 0.076355 |
| 80.00      | 0.020476 |            |          |

4

```
U.S. Environmental Protection Agency                         Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                    (1994-98 data)
Residue file: F Space Fumigation - 2009 - 5-1.R98    Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:57:19   Residue file dated: 05-06-2009/13:52:45/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and is valid for adult pops. only"
=============================================================================

Custom demographics 4: 7 - <11
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 7 yrs   High: 11 yrs
-------------------------------

                         Daily Exposure Analysis
                                (mg/day)
                          per Capita    per User
                          ----------   ----------
            Mean            0.016963     0.016963
            Standard Deviation          0.009573     0.009573
            Standard Error of mean      0.000185     0.000185

     Percent of Person-Days that are User-Days = 100.00%


   Estimated percentile of user-days falling below calculated exposure
                   in mg/day

     Percentile   Exposure              Percentile   Exposure
     ----------   ----------            ----------   ----------
        10.00      0.007496                90.00      0.027494
        20.00      0.009838                95.00      0.034938
        30.00      0.011950                97.50      0.041059
        40.00      0.013499                99.00      0.050785
        50.00      0.015090                99.50      0.064499
        60.00      0.016983                99.75      0.071295
        70.00      0.019627                99.90      0.074763
        80.00      0.022463


   Estimated percentile of per-capita days falling below calculated exposure
                   in mg/day

     Percentile   Exposure              Percentile   Exposure
     ----------   ----------            ----------   ----------
        10.00      0.007496                90.00      0.027494
        20.00      0.009838                95.00      0.034938
        30.00      0.011950                97.50      0.041059
        40.00      0.013499                99.00      0.050785
        50.00      0.015090                99.50      0.064499
        60.00      0.016983                99.75      0.071295
        70.00      0.019627                99.90      0.074763
        80.00      0.022463
                                  5
```

```
U.S. Environmental Protection Agency                          Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                    (1994-98 data)
Residue file: F Space Fumigation - 2009 - 5-1.R98   Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:57:19    Residue file dated: 05-06-2009/13:52:45/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and is valid for adult pops. only"
===============================================================================

Custom demographics 5: 11 - <14
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 11 yrs  High: 14 yrs
--------------------------------

                         Daily Exposure Analysis
                                (mg/day)
                         per Capita    per User
                         ----------    ----------
            Mean           0.018195      0.018195
            Standard Deviation    0.010600    0.010600
            Standard Error of mean  0.000262  0.000262

     Percent of Person-Days that are User-Days = 100.00%


  Estimated percentile of user-days falling below calculated exposure
                      in mg/day

      Percentile   Exposure          Percentile   Exposure
      ----------   ----------        ----------   ----------
        10.00      0.007430            90.00      0.031142
        20.00      0.009973            95.00      0.037161
        30.00      0.011986            97.50      0.044191
        40.00      0.014242            99.00      0.051720
        50.00      0.016293            99.50      0.065023
        60.00      0.018556            99.75      0.074234
        70.00      0.021368            99.90      0.089794
        80.00      0.024821


  Estimated percentile of per-capita days falling below calculated exposure
                      in mg/day

      Percentile   Exposure          Percentile   Exposure
      ----------   ----------        ----------   ----------
        10.00      0.007430            90.00      0.031142
        20.00      0.009973            95.00      0.037161
        30.00      0.011986            97.50      0.044191
        40.00      0.014242            99.00      0.051720
        50.00      0.016293            99.50      0.065023
        60.00      0.018556            99.75      0.074234
        70.00      0.021368            99.90      0.089794
        80.00      0.024821
                            6
```

```
U.S. Environmental Protection Agency                          Ver. 2.02
DEEM-FCID ACUTE Analysis for FLUORIDE                      (1994-98 data)
Residue file: F Space Fumigation - 2009 - 5-1.R98    Adjustment factor #2 used.
Analysis Date: 06-03-2010/12:57:19    Residue file dated: 05-06-2009/13:52:45/8
No body weight adjustment; Toxicology endpoints not used
Daily totals for food and foodform consumption used.
Run Comment: "RfD is converted Fluoride MCL and is valid for adult pops. only"
==============================================================================
```

Custom demographics 6: 14+
All Seasons
All Regions
Sex: M/F-all/
All Races
Age-Low: 14 yrs   High: 99 yrs
--------------------------

Daily Exposure Analysis
(mg/day)

|  | per Capita | per User |
|---|---|---|
| Mean | 0.018672 | 0.018711 |
| Standard Deviation | 0.014970 | 0.014961 |
| Standard Error of mean | 0.000104 | 0.000104 |

Percent of Person-Days that are User-Days =  99.79%

Estimated percentile of user-days falling below calculated exposure
in mg/day

| Percentile | Exposure |  | Percentile | Exposure |
|---|---|---|---|---|
| 10.00 | 0.005648 |  | 90.00 | 0.035058 |
| 20.00 | 0.008329 |  | 95.00 | 0.045280 |
| 30.00 | 0.010533 |  | 97.50 | 0.057802 |
| 40.00 | 0.012727 |  | 99.00 | 0.074405 |
| 50.00 | 0.015106 |  | 99.50 | 0.087706 |
| 60.00 | 0.017760 |  | 99.75 | 0.110445 |
| 70.00 | 0.021331 |  | 99.90 | 0.135358 |
| 80.00 | 0.026257 |  |  |  |

Estimated percentile of per-capita days falling below calculated exposure
in mg/day

| Percentile | Exposure |  | Percentile | Exposure |
|---|---|---|---|---|
| 10.00 | 0.005592 |  | 90.00 | 0.035028 |
| 20.00 | 0.008289 |  | 95.00 | 0.045247 |
| 30.00 | 0.010499 |  | 97.50 | 0.057763 |
| 40.00 | 0.012698 |  | 99.00 | 0.074354 |
| 50.00 | 0.015084 |  | 99.50 | 0.087587 |
| 60.00 | 0.017733 |  | 99.75 | 0.110395 |
| 70.00 | 0.021308 |  | 99.90 | 0.135312 |
| 80.00 | 0.026235 |  |  |  |

7

# Pls.' Exhibit 033

# EPA – Regulatory Impact Analysis of the Final Clean Air Mercury Rule, EPA-452/R-05-003



# Regulatory Impact Analysis of the Final Clean Air Mercury Rule

EPA-452/R-05-003
March 2005

Regualtory Impact Analysis of the
Final Clean Air Mercury Rule

U.S. Environmental Protection Agency
Office of Air Quality Planning and Standards
Air Quality Strategies and Standards Division
Innovative Strategies and Economics Group (MD 339-01)
Research Triangle Park, N.C. 27711

# CONTENTS

ACRONYMS AND ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxii

SECTION 1    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
    1.0    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1

SECTION 2    IMPACT OF MERCURY ON HUMAN HEALTH, ECOSYSTEMS, AND
              WILDLIFE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
    2.1    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
    2.2    Mercury Poisoning Episodes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
    2.3    Reference and Benchmark Doses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2
    2.4    Neurologic Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-6
    2.5    Cardiovascular Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-7
    2.6    Genotoxic Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-7
    2.7    Immunotoxic Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-7
    2.8    Other Human Toxicity Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-8
    2.9    Ecological Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-9
    2.10   Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-9
    2.11   References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-10

SECTION 3    ECOSYSTEM SCALE MODELING FOR MERCURY BENEFITS
              ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1
    Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1
    3.1    Introduction -- Rule Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4
          3.1.1    Use of Mercury Maps (MMaps) to Project Changes in Fish Tissue
                Concentrations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5
          3.1.2    Goal/Purpose of Ecosystem Case Studies . . . . . . . . . . . . . . . . . . 3-9
    3.2    Recent Advances in Mercury Science . . . . . . . . . . . . . . . . . . . . . . . . . 3-10
          3.2.1    Mercury Cycle Chemistry . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-10
          3.2.2    Mercury Processes in the Atmosphere . . . . . . . . . . . . . . . . . . . . 3-10
          3.2.3    Mercury Processes in Soils . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-11
          3.2.4    Mercury Processes in Water . . . . . . . . . . . . . . . . . . . . . . . . . . 3-12
          3.2.5    Bioavailability of Inorganic Mercury to Methylating Microbes . . . . . 3-12
          3.2.6    Mercury Accumulation in the Food Web . . . . . . . . . . . . . . . . . . 3-14
          3.2.7    Summary of Findings in the METAALICUS Study . . . . . . . . . . . . 3-14
          3.2.8     Summary of Florida Everglades Study . . . . . . . . . . . . . . . . . . . 3-15
    3.3    Overview of Models Used in This Study . . . . . . . . . . . . . . . . . . . . . . . 3-16
          3.3.1    Atmospheric Models . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-16
          3.3.2    Ecosystem Models . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-17
    3.4    Overview of Case Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-21
          3.4.1    Ecosystem Characteristics . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-22
          3.4.2    Baseline Atmospheric Deposition at Each Site . . . . . . . . . . . . . . . 3-24
          3.4.3    Atmospheric Loading Scenarios Investigated . . . . . . . . . . . . . . . . 3-24
          3.4.4    Summary of Model Evaluation . . . . . . . . . . . . . . . . . . . . . . . . 3-25
          3.4.5    Baseline Fish Mercury Concentrations . . . . . . . . . . . . . . . . . . . . 3-27

      3.4.6   Magnitude of Changes in Fish Tissue Residues . . . . . . . . . . . . . . . 3-30
      3.4.7   Summary of Observed Temporal Responses to Declines in Loading . 3-32
      3.4.8   Effect of Land Uses Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-34
      3.4.9   Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-36
3.5     National Scale Ecosystem Variability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-37
      3.5.1   United States Lakes Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . 3-37
      3.5.2   Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-39
3.6     References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-46

SECTION 4  PROFILE OF FISHING ACTIVITY IN THE U.S. . . . . . . . . . . . . . . . . . . . . . 4-1
4.1     Industry Characterization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1
      4.1.1   Introduction and Overview of the Fishing Industry . . . . . . . . . . . . . 4-1
      4.1.2   Commercial Fishing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-2
      4.1.3   Recreational Fishing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6
4.2     U.S. Production Statistics for Commercial and Recreational Fishing . . . . . . . 4-8
      4.2.1   Commercial Fishing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-8
      4.2.2   Recreational Fishing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-15
4.3     U.S. Demand for Commercial and Recreational Fishing . . . . . . . . . . . . . . . . 4-19
      4.3.1   Commercial Imports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-19
      4.3.2   U.S. Demand for Commercial Fishery Products . . . . . . . . . . . . . . . 4-24
      4.3.3   Recreational Fishing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-26
      4.3.4   Total U.S. Demand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-35
4.4     Economic Value of Key Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-36
      4.4.1   Finfish . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-36
      4.4.2   Shellfish . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-37
      4.4.3   Fish Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-39
4.5     Characterization of Fish Consuming Populations . . . . . . . . . . . . . . . . . . . . . 4-39
      4.5.1   Fish  Consumption Pathways and Associated Fish-Consuming
      Populations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-40
      4.5.2   Fish Consuming Populations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-41
      4.5.3   General Fish Consumption Rates for Key Fish Consuming
      Populations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-42
      4.5.4   Discussion of Population and Fish Consumption Data in the Context of the
              Mercury Benefits Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-45
4.6     Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-47
      4.6.1   Commercial Fish Production, Demand, and Consumption . . . . . . . . . 4-47
      4.6.2   Recreational Fishing Activity, and Consumption . . . . . . . . . . . . . . . 4-48
      4.6.3   Overall Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-49
4.7     References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-49

SECTION 5  MERCURY CONCENTRATIONS IN FISH . . . . . . . . . . . . . . . . . . . . . . . . . 5-1
5.1     Methylmercury Concentrations in Saltwater Fish Species . . . . . . . . . . . . . . . 5-1
5.2     Methylmercury in Freshwater Fish Species . . . . . . . . . . . . . . . . . . . . . . . . . 5-2
      5.2.1   Sources of Variability in Hg within the NLFA . . . . . . . . . . . . . . . . 5-4
      5.2.2   National Lake Fish Tissue Study . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6
5.3     Comparison of the Differences in the NLFA and the NLFTS . . . . . . . . . . . . 5-7
5.4     Combining the NLFA and NLFTS Data . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-9

| | 5.5 | Normalization of Hg Fish Tissue Concentration Data | 5-10 |
|---|---|---|---|
| | 5.6 | Resulting Fish Tissue Concentrations | 5-13 |
| | 5.7 | Summary | 5-17 |
| | 5.8 | References | 5-17 |

SECTION 6    PROFILE OF THE UTILITY SECTOR ............................... 6-1

| | 6.1 | Power-Sector Overview | 6-1 |
|---|---|---|---|
| | | 6.1.1 Generation | 6-1 |
| | | 6.1.2 Transmission | 6-3 |
| | | 6.1.3 Distribution | 6-3 |
| | 6.2 | Deregulation and Restructuring | 6-3 |
| | 6.3 | Pollution and EPA Regulation of Emissions | 6-4 |
| | 6.4 | Pollution Control Technologies | 6-5 |
| | 6.5 | Regulation of the Power Sector | 6-6 |
| | 6.6 | Cap and Trade | 6-7 |
| | 6.7 | Clean Air Interstate Rule | 6-8 |

SECTION 7  COST AND ENERGY IMPACTS ................................. 7-1

| | 7.1 | Modeling Background | 7-1 |
|---|---|---|---|
| | 7.2 | Projected Hg Emissions | 7-3 |
| | 7.3 | Projected $SO_2$ and $NO_x$ Emissions | 7-5 |
| | 7.4 | Projected Costs | 7-5 |
| | 7.5 | Projected Control Technology Retrofits | 7-7 |
| | 7.6 | Projected Generation Mix | 7-8 |
| | 7.7 | Projected Capacity Additions | 7-9 |
| | 7.8 | Projected Coal Production for the Electric Power Sector | 7-9 |
| | 7.9 | Projected Retail Electricity Prices | 7-10 |
| | 7.10 | Projected Fuel Price Impacts | 7-12 |
| | 7.11 | Social Cost Calculations | 7-12 |
| | 7.12 | Limitations of Analysis | 7-13 |
| | 7.13 | Significant Energy Impact | 7-17 |
| | 7.14 | Sensitivity Analysis on Assumptions for Hg Control Costs | 7-17 |
| | 7.15 | Sensitivity Analysis on Assumptions for Natural Gas Prices and Electricity Growth | 7-22 |
| | 7.16 | Small Entity Impacts | 7-27 |
| | | 7.16.1 Identification of Small Entities | 7-29 |
| | | 7.16.2 Overview of Analysis and Results | 7-30 |
| | | 7.16.3 Summary of Small Entity Impacts | 7-35 |
| | 7.17 | Unfunded Mandates Reform Act (UMRA) Analysis | 7-36 |
| | | 7.17.1 Identification of Government-Owned Entities | 7-37 |
| | | 7.17.2 Overview of Analysis and Results | 7-37 |
| | | 7.17.3 Summary of Government Entity Impacts | 7-42 |
| | 7.18 | List of IPM Runs in Support of CAMR | 7-43 |

SECTION 8  AIR QUALITY MODELING:  CHANGES IN HG DEPOSITION TO U.S.
            WATERBODIES .................................................. 8-1
    8.1    Emissions Inventories and Estimated Emissions Reductions ............. 8-2
    8.2    Model, Domain, Configuration, Inputs, Application ..................... 8-5
           8.2.1  Air Quality Model ........................................ 8-5
           8.2.2  Modeling Domain ......................................... 8-6
           8.2.3  Time Periods Modeled for Mercury Deposition ................... 8-6
           8.2.4  Model Inputs ............................................ 8-7
    8.3    CMAQ Model Performance Evaluation ............................. 8-8
    8.4    Mercury Deposition Results ...................................... 8-9
    8.5    Summary of Findings: HUC Level Deposition Analysis ................. 8-14
    8.6 References ...................................................... 8-17

SECTION 9   ANALYSIS OF THE DOSE-RESPONSE RELATIONSHIP BETWEEN
            MATERNAL MERCURY BODY BURDEN AND CHILDHOOD IQ ...... 9-1
    9.1    Introduction ................................................... 9-1
    9.2    Epidemiological Studies of Mercury and Neurodevelopmental Effects ...... 9-2
    9.3    Statistical Analysis ............................................. 9-4
    9.4    Strengths and Limitations of the IQ Dose-Response Analysis ............. 9-8
    9.5    References ..................................................... 9-11

SECTION 10  EXPOSURE MODELLING AND  BENEFIT METHODOLOGY WITH AN
            APPLICATION TO A NO-THRESHOLD MODEL ................... 10-1
    10.1   Introduction .................................................. 10-1
           10.1.1 Summary .............................................. 10-2
           10.1.2 Modeling Overview ...................................... 10-6
           10.1.3 Monetized Benefits: Results in Brief ........................ 10-8
           10.1.4 Key Steps ............................................ 10-11
    10.2   Estimation of Mercury Levels in Freshwater Fish .................... 10-12
    10.3   Estimation of Exposed Populations and Fishing Behaviors ............. 10-18
           10.3.1 Primary Data Sources on Fishing Activity in the United States .... 10-18
           10.3.2 Population Centroid Approach. ........................... 10-24
           10.3.3 Angler Destination Approach ............................ 10-36
    10.4   Estimation of Mercury Exposures, IQ Decrements, and Lost Future Earnings
            ......................................................... 10-42
           10.4.1 Modeling Approach for Estimating Individual Exposures ........ 10-43
           10.4.2 Modeling Approach for Estimating IQ Effects and Lost Earnings .. 10-45
    10.5   Model Results:  Estimated Benefits of Utility Mercury Emission Controls . 10-47
           10.5.1 Results for the Population Centroid Approach ................ 10-53
           10.5.2 Results for the Angler Destination Approach ................. 10-67
           10.5.3 Comparison of Results from Two Approaches ................. 10-89
           10.5.4 Sensitivity Analysis of Alternative Dose-Response Functions ..... 10-96
           10.5.5 Distribution of Per-Capita IQ Changes for the Exposed Population (in
                  support of distributional equity analysis) ................... 10-97
    10.6   Analysis of Potentially High-Risk Subpopulations ................... 10-103
           10.6.1 Mercury Ingestion Estimates for Individuals in the Upper Range of the
                  Fish Consumption Distribution ........................... 10-104

10.6.2 Mercury Ingestion Estimates for Individuals in Low Income, High Fish Consumption Households . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-110

10.6.3 Mercury Ingestion Estimates for Two Selected Ethnic Populations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-112

10.6.4 Adaptation of the Population Centroid Approach to Estimate Exposed Hmong and Chippewa Population . . . . . . . . . . . . . . . . . . . . . . 10-119

10.6.5 Sensitivity Analysis Examining the Economic Benefit Equity Issue in the Context of High Fish Consuming (subsistence) Populations Including Native Americans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-129

10.7 Discussion and Qualification of Results:  Assumptions, Limitations, and Uncertainties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-134

10.7.1 Mercury Concentration Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . 10-135

10.7.2 Exposed Population Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-137

10.7.3 Matching of Exposed Populations to Mercury Concentrations . . . . 10-138

10.7.4 Fish Consumption Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-140

10.7.5 Modelling and Valuation of IQ Related Effects  . . . . . . . . . . . . . . . 10-141

10.7.6 Unquantified Benefits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-142

10.8 References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-144

SECTION 11  BENEFITS OF MERCURY REDUCTION CONSIDERING ESTABLISHED HEALTH-BASED BENCHMARKS AND OVERALL BENEFITS CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-1

11.1 Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-1

11.2 The Mercury - IQ-loss Paradigm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-1

11.3 Quantifying IQ Benefits Associated with Mercury Emission Reductions . . . 11-3

11.4 Data Element (3) – The Level of the Threshold  . . . . . . . . . . . . . . . . . . . . . 11-4

11.5 Date Element (4) –  The Baseline Levels of Exposure for Consumers of Recreational-Caught Fish  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-4

11.6 Overview of Benefits Methodology  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-5

11.7 Freshwater Fish Mercury Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-5

11.8 Deriving Baseline Mercury Exposures from All Sources of Mercury  . . . . . 11-8

11.9 Deriving Scaling Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

11.10 Monetization and Scaling of IQ Benefits  . . . . . . . . . . . . . . . . . . . . . . . . . 11-13

11.11 Uncertainties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-15

11.12 Conclusions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-15

11.13 References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-16

SECTION 12  CO-BENEFITS RESULTING FROM REDUCTIONS IN EMISSIONS OF PM2.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-1

12.1 Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-1

12.2 Emissions Modeling  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-3

12.3 Air Quality Modeling and Population-Level Exposure Estimation . . . . . . . . 12-4

12.4 Modeling Changes in Health Endpoint (Mortality) Incidence  . . . . . . . . . . . 12-5

12.5 Valuation of Benefits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-7

12.6 Presentation of Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-8

12.7 Discussion of Uncertainties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-8

12.8 References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-11

APPENDIX A-1  MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR
        EAGLE BUTTE (SOUTH DAKOTA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A1-1
    A1.1   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A1-1
    A1.2   Site Characteristics and Model Parameterization . . . . . . . . . . . . . . . . . . . . . .   A1-4
    A1.3   SERAFM Simulations of Eagle Butte, Lee Dam . . . . . . . . . . . . . . . . . . . . . . .   A1-5
    A1.4   WASP7 Simulations of Eagle Butte, Lee Dam . . . . . . . . . . . . . . . . . . . . . . . .   A1-6
    A1.5   BASS Model Simulations of Methylmercury and Fish Dynamics in Lee Dam,
           Eagle Butte, SD—Response to Changes in Mercury Loading . . . . . . . . . .   A1-13

APPENDIX A-2   MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR
        PAWTUCKAWAY LAKE (NEW HAMPSHIRE) . . . . . . . . . . . . . . . . . . . . . . . . .   A2-1
    A2.1   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A2-1
    A2.2   SERAFM Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A2-2
    A2.3   WASP Model Calibration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A2-3
    A2.4   References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A2-10

APPENDIX A-3   MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR
        LAKE WACCAMAW (NORTH CAROLINA) . . . . . . . . . . . . . . . . . . . . . . . . . . .   A3-1
    A3.1   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A3-1
    A3.2   Empirical Data from Lake Waccamaw . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A3-2
    A3.3   SERAFM Application: Lake Waccamaw . . . . . . . . . . . . . . . . . . . . . . . . . . .   A3-4
    A3.4   Lake Waccamaw WASP Model Calibration . . . . . . . . . . . . . . . . . . . . . . . . .   A3-6
    A3.5   References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A3-13

APPENDIX A-4   MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR THE
        BRIER CREEK WATERSHED (LOCATED IN THE SAVANNAH RIVER BASIN,
        GEORGIA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-1
    A4.1   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-1
    A4.2   Mercury Deposition Network . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-3
    A4.3   Watershed Hydrologic and Sediment Loading Model . . . . . . . . . . . . . . . . .   A4-4
    A4.4   Water Quality Fate and Transport Model . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-5
    A4.5   Model Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-6
           A4.5.1 Water Quality Model . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-6
    A4.6   Brier Creek Watershed Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-8
           A4.6.1 Brier Creek Soil Mercury Calibration . . . . . . . . . . . . . . . . . . . . . . . .   A4-9
           A4.6.2 Mercury Loading Fluxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-10
           A4.6.3 Future Projections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-11
           A4.6.4 Sensitivity of Temporal Response . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-13
    A4.7   Brier Creek Water Body Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-16
           A4.7.1 Phase 1: Long Term Buildup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-16
           A4.7.2 Phase 2: Response to 2002 Flows . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-17
           A4.7.3 Phase 3: Future Attenuation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-20
           A4.7.4 Sensitivity of Time Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-22

APPENDIX A-5   MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR
        LAKE BARCO (FLORIDA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A5-1

A5.1    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A5-1
A5.2    Empirical Data from Lake Barco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A5-1
A5.3    SERAFM Application: Lake Barco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A5-1
A5.4    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A5-3

APPENDIX B   QUALITATIVE ECOLOGICAL REVIEW OF MERCURY LITERATURE B-1
B.1     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-1
B.2     Potential Exposure Media . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-2
        B.2.1   Mercury in Air . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-2
        B.2.2   Mercury in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-2
        B.2.3   Mercury in Soil . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-2
B.3     Bioaccumulation of Mercury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-3
B.4     Exposure and Toxic Effects in Wildlife . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-4
        B.4.1   Aquatic Plant Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-4
        B.4.2   Aquatic Invertebrate Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-4
        B.4.3   Fish and Amphibian Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-6
        B.4.4   Terrestrial Plant Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-8
        B.4.5   Terrestrial Invertebrate Species . . . . . . . . . . . . . . . . . . . . . . . . . . . B-8
        B.4.6   Avian Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-9
        B.4.7   Mammalian Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-11
B.5     Ecosystems Potentially Affected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-13
B.6     Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-13
B.7     References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-14

APPENDIX C   CARDIOVASCULAR EFFECTS AND METHYLMERCURY . . . . . . . . . . C-1
C.1     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1
C.2     Acute Myocardial Infarctions and Major Cardiovascular Effects . . . . . . . . . . . C-1
        C.2.1   The Kuopio Ischemic Heart Disease Risk Factor Study (KIHD) Cohort
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-2
        C.2.2   The European Multicenter Case Control Study on Antioxidants,
                Myocardial Infarction and Cancer of the Breast (EURAMIC) Cohort
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-4
        C.2.3   Mechanisms for Cardiovascular Impacts . . . . . . . . . . . . . . . . . . . . C-4
        C.2.4   Other Studies Evaluating CVD and Mercury Levels . . . . . . . . . . . . . . . C-5
C.3     Other Cardiovascular Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-7
C.4     Cardiovascular Health Benefits of Fish Consumption . . . . . . . . . . . . . . . . . . . C-8
C.5     Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-9
C.6     References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-10

APPENDIX D   NORMALIZATION OF MERCURY IN FISH TISSUE SAMPLES . . . . . D-1
D.1     Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-1
        D.1.1   National Descriptive Model of Mercury in Fish (NDMMF) . . . . . . . . D-1
D.2     General Examination of Model Performance . . . . . . . . . . . . . . . . . . . . . . . . . . D-2
        D.2.1   NDMMF Estimated Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-2
        D.2.2   Accuracy of NDMMF Estimated Values . . . . . . . . . . . . . . . . . . . . . D-3
        D.2.3   Spatial Examination of Model Performance . . . . . . . . . . . . . . . . . . . D-5
        D.2.4   Predictive Examination of Model Performance (Withheld Data Set) . D-6

D.3     References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-9

APPENDIX E-1     ANALYSIS OF TRIP TRAVEL DISTANCE FOR FRESHWATER
                 ANGLERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E1-1
E1.1     Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E1-1
E1.2     Analysis of Travel Distance Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E1-2
E1.3     Summary Results Applied in the Population Centroid Approach . . . . . . . . . E1-4

APPENDIX E-2     METHODOLOGY FOR ESTIMATING FRESHWATER FISHING
                 DAYS BY WATERSHED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E2-1
E-2.1     Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E2-1

**Tables**

Table 3- 1. Comparison of SERAFM and IEM-2M Forecasted Mercury Concentrations Using
          Parameter Values for Model Ecosystem Described in the Mercury Study Report to
          Congress (RtC) and a 50% Reduction in Atmospheric Deposition . . . . . . . . . . . . . . 3-19
Table 3- 2.  Summary of Ecosystem Characteristics Used To Parameterize Mercury Models  3-23
Table 3- 3.  Baseline Atmospheric Deposition For Each Model Ecosystem . . . . . . . . . . . . . . 3-24
Table 3- 4.  Forecasted Atmospheric Deposition Rates in Case Study Areas Using the CMAQ
          and REMSAD Models . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-25
Table 3- 5.  List of Model Frameworks Applied to Ecosystems . . . . . . . . . . . . . . . . . . . . . . 3-26
Table 3- 6.  Summary of Mercury Parameters Used in the SERAFM Model . . . . . . . . . . . . . 3-27
Table 3- 7.  Empirically Derived BAFs for Each of the Ecosystem Case Studies  . . . . . . . . . 3-27
Table 3- 8.  MMaps and SERAFM Forecasted Fish Mercury Concentration at Steady State after
          Removal of Coal Fired Utilities as a Component of Deposition Using the REMSAD and
          CMAQ Models (Zero-out Scenario) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-31
Table 3- 9.  Sediment Response Times in Years to Reach 90% of Steady-state Concentrations
          Following 50% Mercury Deposition Reductions . . . . . . . . . . . . . . . . . . . . . . . . . . 3-32
Table 3- 10.  Fish Tissue Response Times in Years to Reach 90% of Steady-state Concentrations
          Following 50% Mercury Deposition Reductions . . . . . . . . . . . . . . . . . . . . . . . . . 3-33
Table 3- 11.  Frequency of Different Lake Sizes Across the United States  . . . . . . . . . . . . . . 3-38
Table 4-1.  Finfish Fishing Industry (NAICS code 114111) . . . . . . . . . . . . . . . . . . . . . . . . 4-4
Table 4-2.  Shellfish Fishing Industry (NAICS code 114112)  . . . . . . . . . . . . . . . . . . . . . . 4-4
Table 4-3.  Value of Aquacultural Products Sold, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5
Table 4-4.  Number of Anglers and Fishing Licenses in the United States . . . . . . . . . . . . . . 4-7
Table 4-5.  Annual Domestic Landings for Commercial Fishing  (Finfish and Shellfish) . . . . 4-8
Table 4-6.  Commercial Fish Landings by Region  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-10
Table 4-7.  2002 U.S. Commercial Fish Landings by End Use . . . . . . . . . . . . . . . . . . . . . . 4-10
Table 4-8.  2002 U.S. Commercial Landings by Month . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-11
Table 4-9.  Finfish Species with the Highest 2002 U.S. Commercial Landings . . . . . . . . . . 4-11
Table 4-10.  Shellfish Types with the Highest 2002 Commercial Landings . . . . . . . . . . . . . 4-12
Table 4-11.  Total 2002 U.S. Aquacultural Production . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-13
Table 4-12.  2002 Exports of Edible Finfish Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-14
Table 4-13.  2002 Exports of Edible Shellfish Products . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-15
Table 4-14.  2002 Recreational Marine Landings for Selected Finfish Types  . . . . . . . . . . . . 4-16
Table 4-15.  2002 Recreational Marine Catch and Harvest by Region and Top Species
          Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-18

x

Table 4-16.  2002 Imports of Edible Fresh or Frozen Finfish Products . . . . . . . . . . . . . . . . 4-22
Table 4-17.  2002 Imports of Edible Canned and Cured Finfish Products . . . . . . . . . . . . . . 4-23
Table 4-18.  2002 Imports of Edible Fresh and Frozen Shellfish Products . . . . . . . . . . . . . . 4-24
Table 4-19.  2002 Imports of Edible Canned Shellfish Products . . . . . . . . . . . . . . . . . . . . . 4-24
Table 4-20.  2002 U.S. Demand for Commercial Finfish (metric tons) . . . . . . . . . . . . . . . . . 4-25
Table 4-21.  2002 U.S. Demand for Commercial Shellfish (metric tons) . . . . . . . . . . . . . . . . 4-25
Table 4-22.  2002 U.S. Consumption of Commercial Fishery Products . . . . . . . . . . . . . . . . . 4-26
Table 4-23.  Number of Anglers and Days of Fishing for 2001 . . . . . . . . . . . . . . . . . . . . . . 4-27
Table 4-24.  2001 U.S. Recreational Freshwater Fishing:  Targeted Species by Region . . . . 4-28
Table 4-25.  Freshwater Fishing Bag and Size Limits for Selected States and Species . . . . . 4-31
Table 4-26.  Saltwater Fishing Bag and Size Limits for Selected States and Species . . . . . . 4-32
Table 4-27.  Percent of Freshwater Anglers by Age Group . . . . . . . . . . . . . . . . . . . . . . . . . . 4-33
Table 4-28.  Percent of Anglers by Sex and Age Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-33
Table 4-29.  2001 Demographic Summary, Angler Race (% Non-White) . . . . . . . . . . . . . . . 4-34
Table 4-30.  Incidence of Fishing Among White, African American, and Hispanic Recreational
Boaters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-34
Table 4-31.  Percent of U.S. Population Who Fished (By Household Income) . . . . . . . . . . . 4-35
Table 4-32.  2002 Economic Value of Commercial Landings for Important Finfish Types . . 4-36
Table 4-33.  Average 2001 Wholesale Prices for Several Fresh Finfish Types . . . . . . . . . . . 4-37
Table 4-34.  2002 Economic Value of Commercial Landings of Several Shellfish Types . . . 4-38
Table 4-35.  Average 2001 Wholesale Prices for Several Fresh Shellfish Types . . . . . . . . . . 4-39
Table 4-36.  2002 Economic Value of Commercial Fishery Products . . . . . . . . . . . . . . . . . . 4-39
Table 4-37.  Demographic (count) Data for Key Fish Consuming Populations in the U.S. . . 4-43
Table 4-38  Fish Consumption Rates for Key Fish Consuming Populations in the U.S. . . . . 4-44
Table 4-39.  Total Fish Consumption for Recreational Saltwater Anglers, Recreational
Freshwater Anglers and General U.S. Fish Consuming Population . . . . . . . . . . . . . 4-46
Table 5-1.  Concentrations of Mercury in Marine Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-2
Table 5-2.  Number of Fish Tissue Samples / Watershed From the National Listing of Fish
Advisories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-3
Table 5-3.  Hg Fish Tissue Concentrations From Various Environments (ppm) . . . . . . . . . . 5-5
Table 5-4.  Statistical Distribution of Normalized Hg Fish Tissue Concentrations . . . . . . . 5-12
Table 5-5.  Statistical Distribution of Non-Normalized Hg Fish Tissue Concentrations Shown in
Figure 5-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-13
Table 6-1.  Existing Electricity Generating Capacity by Energy Source, 2002 . . . . . . . . . . 6-1
Table 6-2.  Total U.S. Electric Power Industry Retail Sales in 2003 (Billion kWh) . . . . . . . 6-2
Table 6-3.  Electricity Net Generation in 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-2
Table 6-4.  Emissions of $SO_2$ and $NO_x$ in 2003 and Percentage of Emissions in the CAIR
Affected Region (tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8
Table 6-5.  Current Electricity Net Generation and EPA Projections for 2010 and 2015 . . . 6-9
Table 7-1.  CAMR Options Annual Emissions Caps (Tons) . . . . . . . . . . . . . . . . . . . . . . . . . 7-1
Table 7-2.  CAIR Annual Emissions Caps (Million Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . 7-1
Table 7-3.  Projected Emissions of Hg with the Base Case[a] (No Further Controls), with CAIR,
and with CAMR (Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-4
Table 7-4.  Projected Speciated Emissions of Hg in 2020 with CAIR and CAMR (Tons) . . . 7-4
Table 7-5.  Projected Emissions of $SO_2$ with the Base Case[a] (No Further Controls), with CAIR,
and with CAMR (Million Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-5

Table 7-6.  Projected Emissions of NO$_x$ with the Base Case[a] (No Further Controls), with CAIR, and with CAMR (Million Tons)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-5

Table 7-7.  Annualized National Cost and Present Value Cost Incremental to CAIR ($1999) . 7-6

Table 7-8.  Marginal Cost of Hg, SO$_2$, and NO$_x$ Reductions with CAMR ($1999)  . . . . . . . . 7-6

Table 7-9.  Pollution Controls by Technology with the Base Case (No Further Controls), with CAIR, and with CAMR (GW)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-7

Table 7-10.  Generation Mix with the Base Case (No Further Controls), with CAIR, and with CAMR (Thousand GWhs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8

Table 7-11.  Total Coal and Natural Oil/Gas-Fired Capacity by 2020 (GW) . . . . . . . . . . . . . 7-9

Table 7-12.  Coal Production for the Electric Power Sector with the Base Case (No Further Controls), with CAIR , and with CAMR (Million Tons)  . . . . . . . . . . . . . . . . . . . . . . . . . 7-9

Table 7-13.  Projected National Retail Electricity Prices with the Base Case (No Further Controls) and with CAIR (Mills/kWh) ($1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-10

Table 7-14.  Retail Electricity Prices by NERC Region with the Base Case (No Further Controls), with CAIR, and with CAMR (Mills/kWh) ($1999)  . . . . . . . . . . . . . . . . . . 7-11

Table 7-15.  Henry Hub Natural Gas Prices and Average Minemouth Coal Prices with the Base Case (No Further Controls), with CAIR, and with CAMR (1999$/mmBtu) . . . . . . . . 7-12

Table 7-16.  Projected Emissions of Hg with CAIR and CAMR (Tons)  . . . . . . . . . . . . . . . . 7-18

Table 7-17.  Projected Emissions of SO$_2$ with CAIR and CAMR (Million Tons)  . . . . . . . . . 7-18

Table 7-18.  Projected Emissions of NO$_x$  with CAIR and CAMR (Million Tons)  . . . . . . . . . 7-18

Table 7-19.  Annualized Cost and Present Value Cost Incremental to CAIR ($1999)  . . . . . 7-19

Table 7-20.  Marginal Cost of Hg, SO$_2$, and NO$_x$ Reductions with CAMR ($1999)  . . . . . . . 7-19

Table 7-21.  Pollution Controls by Technology with CAIR and with CAMR (GW)  . . . . . . . 7-19

Table 7-22.  Generation Mix with the Base Case (No Further Controls), with CAIR, and with CAMR (Thousand GWhs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-20

Table 7-23.  Total Coal and Natural Oil/Gas-Fired Capacity by 2020 (GW)  . . . . . . . . . . . . 7-20

Table 7-24.  Coal Production for the Electric Power Sector with the Base Case (No Further Controls), with CAIR , and with CAMR (Million Tons)  . . . . . . . . . . . . . . . . . . . . . . . 7-21

Table 7-25.  Retail Electricity Prices by NERC Region with the Base Case (No Further Controls), with CAIR, and with CAMR (Mills/kWh) ($1999)  . . . . . . . . . . . . . . . . . . 7-22

Table 7-26.  Projected Emissions of Hg for CAIR and CAMR with EPA and EIA Assumptions for Natural Gas Prices and Electric Growth (Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-23

Table 7-27.  Projected Nationwide Emissions of SO$_2$ and NO$_x$ under CAIR and CAMR with EPA and EIA Assumptions for Natural Gas and Electric Growth (Million Tons)  . . . . . . 7-23

Table 7-28.  Annualized Cost and Present Value Cost Incremental to CAIR with EPA and EIA Assumptions for Natural Gas Prices and Electric Growth (Billion $1999) . . . . . . . . . 7-24

Table 7-29.  Marginal Cost of SO$_2$ and NO$_x$ Reductions under CAIR and CAMR with EPA and EIA Assumptions for Natural Gas Prices and Electric Growth ($/ton, in 1999) . . . . 7-24

Table 7-30.  Pollution Controls under CAIR with EPA and EIA Assumptions for Natural Gas and Electricity Growth (GWs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-24

Table 7-31.  Generation Mix under CAIR and CAMR with EPA and EIA Assumptions for Natural Gas and Electric Growth (Thousand GWhs)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-25

Table 7-32.  Coal Production for the Electric Power Sector under CAIR and CAMR with EPA and EIA Assumptions for Natural Gas and Electricity Growth (Million Tons)  . . . . . 7-26

Table 7-33.  Retail Electricity Prices by NERC Region for the Base Case (No Further Controls), CAIR, and CAMR with EPA and EIA Assumptions for Natural Gas and Electricity Growth (Mills/kWh) ($1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-27

Table 7-34.  Potentially Regulated Categories and Entities[a] . . . . . . . . . . . . . . . . . . . . . . . . 7-28
Table 7-35.  Projected Impact of CAMR on Small Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-30
Table 7-36.  Summary of Distribution of Economic Impacts of CAIR on Small Entities . . . 7-34
Table 7-37.  Incremental Annualized Costs under CAMR relative to CAIR, Summarized by
            Ownership Group and Cost Category ($1,000,000) . . . . . . . . . . . . . . . . . . . . . . . . 7-35
Table 7-38.  Summary of Potential Impacts on Government Entities under CAIR . . . . . . . . 7-37
Table 7-39.  Distribution of Economic Impacts on Government Entities under CAMR . . . . 7-41
Table 7-40.  Incremental Annualized Costs under CAMR Relative to CAIR Summarized by
            Ownership Group and Cost Category ($1,000,000) . . . . . . . . . . . . . . . . . . . . . . . . 7-42
Table 7-41.  Listing of Runs from the Integrated Planning Model Used in Analyses Done in
            Support of the CAMR Final Rule Analyses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-44
Table 8-1.  Summary of Emissions Sources for 2001 and 2020 Mercury Emissions
            Inventories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-3
Table 8-2.  Summary of Mercury Emissions by Species: 2001 and 2020 (with CAIR)
            Baselines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-3
Table 8-3.  Summary of Changes in Mercury Emissions Associated with CAMR Control
            Option 1:  2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-4
Table 8-4.  Summary of Changes in Mercury Emissions Associated with CAMR Control
            Option 2: 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-4
Table 8-5.  CMAQ Performance Statistics for Mercury Wet Deposition: 2001 . . . . . . . . . . . 8-9
Table 8-6.  Summary Statistics of Total Mercury Depositions (ug/m$^2$) by Modeling
            Scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-14
Table 8-7.  Summary Statistics of Utility Attributable Deposition (ug/m$^2$) by Modeling
            Scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-16
Table 9-1.  Neurobehavioral Tests Administered at the 6-Year Evaluations in the
            New Zealand Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-3
Table 9-2.  Neurobehavioral Tests Administered at the 7-Year Evaluations in the Faroe Islands
            Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-3
Table 9-3.  Neurobehavioral Tests Administered at the 9-Year Evaluations in the Seychelles
            Islands Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-4
Table 9-4.  Relationship Between Maternal Mercury Body Burden and IQ in Three Studies:  IQ
            Decrement per ppm of Maternal Hair Mercury . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-6
Table 10-1(a).  Summary of Per Capita Changes in IQ Due to Mercury Exposure . . . . . . . . 10-4
Table 10-1(b).  Impacts of Mercury on High Fish Consuming Groups . . . . . . . . . . . . . . . . . 10-6
Table 10-1(c).  Summary of Total Benefits Associated with Modelled Avoided IQ Decrements in
            Prenatally Exposed Children Due to Reduced Mercury Exposure from Freshwater
            Recreational Angling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-10
Table 10-2.  Summary Statistics for Estimated Fish Tissue Mercury Concentrations (ppm) by
            State: 2001 Base Case[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-16
Table 10-3.  HUC-Level Distribution of Mercury Sampling Sites and Estimated Fish Tissue
            Concentrations:  2001 Base Case [a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-17
Table 10-4.  Summary of Fishing Activity Levels by State in 2001 from NSFHWR . . . . . . 10-20
Table 10-5.  Overview of Key Attributes of the Population Centroid and Angler Destination
            Models . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-23
Table 10-6.  Block Group Demographic Characteristics by State (in 2000):  Data Used in
            Population Centroid Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-30

Table 10-7.  Estimated Annual Number of Prenatally Exposed Children for Selected Lag Periods from 2001:  Population Centroid Approach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-31

Table 10-8.  Estimated Annual Number of Prenatally Exposed Children for Selected Lag Periods from 2020:  Population Centroid Approach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-33

Table 10-9.  Average Estimated Mercury Concentrations (ppm) in Freshwater Fish by Distance Interval from Block Group Centroids:  Base Case 2001 . . . . . . . . . . . . . . . . . . . . . . 10-35

Table 10-10.  State-Level Summary of Exposed Population Estimates:  Angler Destination Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-42

Table 10-11.  Effects of Emission Control Scenarios—Percent Reduction in Estimated Fish Tissue Mercury Concentrations from 2001 Base Case[a] . . . . . . . . . . . . . . . . . . . . . . . 10-49

Table 10-12.  Effects of Emission Control Scenarios—Percent Reduction in Estimated Fish Tissue Mercury Concentrations from 2020 Base Case with CAIR[a] . . . . . . . . . . . . . 10-51

Table 10-13.  Estimated Distribution of Mercury Ingestion by Distance Traveled to Fish: Population Centroid Approach—2001 Base Case . . . . . . . . . . . . . . . . . . . . . . . . . . 10-54

Table 10-14.  Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2001 Base Case[a]  . . . . . . . . . 10-55

Table 10-15.  Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2020 Base Case with CAIR[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-57

Table 10-16.  2020 Base Case with CAIR:  Modelled Avoided Losses Relative to 2001 Base Case (Applied to 2020 Demographics)—Population Centroid Approach[a, b] . . . . . . . 10-61

Table 10-17.  2001 Utility Mercury Emissions Zero Out:  Modelled Avoided Losses Relative to 2001 Base Case—Population Centroid Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . 10-63

Table 10-18.  2020 with CAIR Emissions Zero Out:  Modelled Avoided Losses Relative to 2020 with CAIR Base Case—Population Centroid Approach[a, b] . . . . . . . . . . . . . . . . . . . . 10-65

Table 10-19.  Estimated Benefits of 2020 CAMR Control Option 1:  Relative to 2020 with CAIR—Population Centroid Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-68

Table 10-20.  Estimated Benefits of 2020 CAMR Control Option 2:  Relative to 2020 with CAIR—Population Centroid Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-70

Table 10-21.  Summary of Annual Benefit Estimates:  Population Centroid Approach[a] . . . 10-72

Table 10-22.  Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings:  Angler Destination Approach—2001 Base Case[a] . . . . . . . . . 10-77

Table 10-23.  Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings:  Angler Destination Approach—2020 with CAIR[a] . . . . . . . . . 10-81

Table 10-24.  2020 Base Case with CAIR:  Modelled Avoided Losses Relative to 2001 Base Case Applied to 2020 Demographics—Angler Destination Approach[a, b] . . . . . . . . . 10-83

Table 10-25.  2001 Utility Mercury Emissions Zero Out:  Modelled Avoided Losses Relative to 2001 Base Case—Angler Destination Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . . 10-85

Table 10-26.  2020 with CAIR Emissions Zero Out:  Modelled Avoided Losses Relative to 2020 with CAIR Base Case—Angler Destination Approach[a, b] . . . . . . . . . . . . . . . . . . . . . 10-87

Table 10-27.  Estimated Benefits of 2020 With CAIR Control Option 1:  Relative to 2020 with CAIR—Angler Destination Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-90

Table 10-28.  Estimated Benefits of 2020 With CAIR Control Option 2:  Relative to 2020 with CAIR—Angler Destination Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-92

Table 10-29.  Summary of Annual Benefit Estimates:  Angler Destination Approach . . . . . 10-94

Table 10-30.  Summary and Comparison of Annual Benefit Estimates:  Population Centroid Approach vs. Angler Destination Approach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-95

Table 10-31.  Summary and Comparison of Annual Benefit Estimates Under Alternative IQ
Dose-Response Assumptions: Population and Angler Destination Approach . . . . . 10-96

Table 10-32.  Summary of Estimated Mercury Exposures for Consumption-Based Subsistence
Population, with Associated IQ Decrements and Foregone Earnings:  Population
Centroid Approach—2001 Base Case[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-105

Table 10-33.  Summary of Estimated Mercury Exposures for Consumption-Based Subsistence
Population, with Associated IQ Decrements and Foregone Earnings:  Population
Centroid Approach—2020 with CAIR[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-107

Table 10-34.  Summary of Annual Benefit Estimates for Consumption-Based Subsistence
Population:  Population Centroid Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-109

Table 10-35.  Summary of Estimated Mercury Exposures for Income-Based Subsistence
Population, with Associated IQ Decrements and Foregone Earnings:  Population
Centroid Approach—2001 Base Case[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-114

Table 10-36.  Summary of Estimated Mercury Exposures for Income-Based Subsistence
Population, with Associated IQ Decrements and Foregone Earnings:  Population
Centroid Approach—2020 with CAIR[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-116

Table 10-37.  Summary of Annual Benefit Estimates for Income-Based Subsistence Population:
Population Centroid Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-118

Table 10-38.  Block Group Demographics for Hmong and Chippewa Females, Aged 15 to 44 (in
2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-120

Table 10-39.  Estimated Annual Number of Prenatally Exposed Children from Special
Populations for Selected Lag Periods:  Population Centroid Approach . . . . . . . . . 10-124

Table 10-40.  Summary of Estimated Mercury Exposures for Special Populations in 2001, with
Associated IQ Decrements and Foregone Earnings:  Population Centroid
Approach—Base Case 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-125

Table 10-41.  Summary of Estimated Mercury Exposures for Special Populations in 2020, with
Associated IQ Decrements and Foregone Earnings:  Population Centroid
Approach—Base Case 2020 with CAIR[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-126

Table 10-42.  Summary of Annual Benefit Estimates for Hmong Special Population: Population
Centroid Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-127

Table 10-43.  Summary of Annual Benefit Estimates for Chippewa Special Population:
Population Centroid Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-128

Table 10-44.  Results of the Sensitivity Analysis Examining Distributional Equity for Native
American (subsistence) Populations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-133

Table 10-45.  Unquantified Health and Ecosystem Effects Associated with Exposure to Mercury
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-142

Table 11-1.  Freshwater Fish IQ Loss and Hair Mercury from the 2020 Baseline . . . . . . . . . 11-6

Table 11-2.  Change in IQ Loss and Hair Mercury from the 2020 Zero Out (No Threshold)
Compared to the Baseline, and the Relative Probability of each Change Category . . 11-7

Table 11-3.  Change in IQ Loss and Hair Mercury from the CAMR Option 1 (No Threshold)
Compared to the Baseline, and the Relative Probability of each Change Category . . 11-8

Table 11-4.  Change in IQ Loss and Hair Mercury from the CAMR Option 2 (No Threshold)
Compared to the Baseline, and the Relative Probability of each Change Category . . 11-8

Table 11-5.  Joint Distribution of Mercury Exposure from Freshwater Fish and Total Mercury
Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-10

Table 11-6.  Scaling Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-13

Table 11-7.  IQ Benefits for CAMR Option 1 under Established Health-Based Benchmarks
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-14

Table 11-8.  IQ Benefits for CAMR Option 2 under Established Health-Based Benchmarks
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-14

Table 12-1.  PM2.5 Co-Benefits Associated with CAMR Regulatory Options 1 and 2
in 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-8

Table A1-1.  Observed Mercury Concentrations in Northern Pike from Lee Dam (DMA-80
results) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1-4

Table A1-2.  Statistical summary of northern pike length normalized BAF (4 years) for Eagle
Butte (used in SERAFM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1-5

Table A1-3.  SERAFM Parameter Values for Eagle Butte . . . . . . . . . . . . . . . . . . . . . . . . A1-5

Table A1-4.  Calibrated SERAFM Rate Constants for Eagle Butte . . . . . . . . . . . . . . . . . . A1-6

Table A1-5.  SERAFM 50% Load Reduction Scenario for Eagle Butte . . . . . . . . . . . . . . . A1-6

Table A1-6.  SERAFM Zero-Out Scenario for Eagle Butte (Removal of Deposition attributed to
coal-fired utilities) in the CMAQ and REMSAD Models . . . . . . . . . . . . . . . . . . . . A1-6

Table A1-7.  WASP Forecasted Mercury Concentrations in Eagle Butte Sediments in Response
to 50% Loading Reduction Scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1-12

Table A2-1.  Summary of Yellow Perch Mercury Data from Pawtuckaway Lake . . . . . . . . A2-1

Table A2-2.  Pawtuckaway Lake Parameter Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A2-2

Table A2-3.  A Comparison of Measured and Baseline Steady State Values for Pawtuckaway
Lake . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A2-2

Table A2-4.  Lake Pawtuckaway SERAFM Calibrated Rate Constants . . . . . . . . . . . . . . . A2-3

Table A2-5.  Time to Reach 90% Steady State After 50% Reduction in Atmospheric
Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A2-3

Table A2-6.  SERAFM Model Forecasts with Zero-Out Scenario for Coal-Fired Power Plants
(Medium Response Time Scenario) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A2-3

Table A2-7.  Mercury Response Times for Lake Pawtuckaway, in years . . . . . . . . . . . . . . A2-8

Table A3-1.  Observational Data from Lake Waccamaw . . . . . . . . . . . . . . . . . . . . . . . . . . A3-2

Table A3-2.  Raw Fish Tissue Data Collected from Lake Waccamaw . . . . . . . . . . . . . . . . A3-3

Table A3-3.  Annual Wet Deposition of Mercury at Waccamaw 1998-2000 . . . . . . . . . . . A3-4

Table A3-4. Model Parameter Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3-5

Table A3-5.  Measured and Baseline Steady State Values for Lake Waccamaw . . . . . . . . A3-5

Table A3-6.  SERAFM Calibrated Rate Constants for Lake Waccamaw . . . . . . . . . . . . . . A3-6

Table A3-7. SERAFM 50% Load Reduction Scenario for Lake Waccamaw . . . . . . . . . . . A3-6

Table A3-8.  SERAFM Zero-Out Scenario for Lake Waccamaw (Removal of Deposition
Attributed to Coal-fired Utilities) in the CMAQ and REMSAD Models . . . . . . . . A3-6

Table A3-9.  WASP Response Time Estimates for Lake Waccamaw . . . . . . . . . . . . . . . . . A3-11

Table A4-1.  Average Mercury Deposition Hg Concentrations and Depositions Rates . . . . A4-4

Table A4-2.  Specified and Calculated Reaction Rates and Coefficients . . . . . . . . . . . . . . A4-6

Table A4-3.  Flows, Depths, Length and Volumes used in WASP Model . . . . . . . . . . . . . A4-7

Table A4-4.  Measured vs. Predicted for Sediment Components . . . . . . . . . . . . . . . . . . . . A4-7

Table A4-5.  Predicted and Observed Mercury Concentrations under Annual Average Load and
Flow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4-8

Table A4-6.  Soil Mercury Data in Local Region . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A4-8

Table A4-7.  June 2003 Survey vs WASP Predictions for Mercury . . . . . . . . . . . . . . . . . A4-18

Table A5-1.  Lake Barco Parameter Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A5-1

Table A5-2.  Measured and Baseline Steady State Values for Lake Barco . . . . . . . . . . . . . A5-2

Table A5-3.  Lake Barco SERAFM Calibrated Rate Constants . . . . . . . . . . . . . . . . . . . . . .  A5-2
Table A5-4.  Time to Reach 90% Steady State After 50% Reduction in Atmospheric
             Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A5-2
Table A5-5.  SERAFM Model Forecasts with Zero-Out Scenario for Coal-Fired Power
             Plants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A5-3

Table D-1.  Statistical Distribution of Residuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  D-3
Table D-2.  Differences between the Performance of Lake and River Samples Used as Inputs
            into the NDMMF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  D-5
Table D-3.  Statistical Distribution of Residuals from Withheld Data Set . . . . . . . . . . . . . .  D-7
Table E1-1.  Reported Trip Travel Distance for Freshwater Anglers (miles) . . . . . . . . . . . . .  E1-2
Table E1-2.  Demographic Characteristics of Freshwater Anglers[a] . . . . . . . . . . . . . . . . . . .  E1-3
Table E1-3.  Demographic Characteristics of Freshwater Anglers . . . . . . . . . . . . . . . . . . . . .  E1-3
Table E1-4.  OLS Regression Results for Determinants of Reported Trip Travel
             Distance (miles) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  E1-5
Table E1-5.  Travel Distance Frequencies by Demographic Group (Percentage in each Distance
             Category) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  E1-6
Table E2-1.  Frequency Distributions for HUC Level-of-Use Indicators . . . . . . . . . . . . . . . .  E2-4
Table E2-2.  Variable Definitions and Descriptive Statistics . . . . . . . . . . . . . . . . . . . . . . . . .  E2-5
Table E2-3.  Estimated Determinants of HUC Level-of-Use Indicators for Lake Trips:  Negative
             Binomial Regressions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  E2-6
Table E2-4.  Estimated Determinants of HUC Level-of-Use Indicators for River Trips:  Negative
             Binomial Regressions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  E2-7
Table E2-5.  Predicted Level-of-Use Indicators for HUCs in Study Area:  Negative Binomial
             Regression Model Predictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  E2-8

**Figures**

Figure 2-1.  Probability Distribution Function of Blood Mercury Levels in US Women of Childbearing Age (NHANES Data 1999-2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-5

Figure 3- 1.  BASS Predicted BAFs for Pike/Perch in Lee Dam, Eagle Butte  . . . . . . . . . . . . 3-28

Figure 3- 2.  Observed vs. Predicted Fish Mercury Concentrations in Model Ecosystems at Steady State with No Change in Atmospheric Loading  . . . . . . . . . . . . . . . . . . . . 3-29

Figure 3- 3.  Temporal Response of Mercury Concentrations in Fish from Pawtuckaway Lake, NH to a Decline in Mercury Loading  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-30

Figure 3- 4.  Temporal Response of Mercury Concentrations in Fish from Lake Barco, FL to a Decline in Mercury Loading  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-31

Figure 3- 5.  Projected Ecosystem Response Times to Zero-out Deposition Scenario Using the SERAFM Model  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-33

Figure 3- 6.  Upper Brier Creek Loading Flux Attenuation  . . . . . . . . . . . . . . . . . . . . . . . . . . 3-35

Figure 3- 7.  Watershed Loading Flux Attenuation Considering Land-use Change  . . . . . . . . 3-35

Figure 3- 8.  Model Ecosystem Locations with CMAQ Grid Cells and Locations of Electricity Generating Units (EGUs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-40

Figure 3- 9.  Model Ecosystem Locations with Gradient in Sulfate Deposition Across the Eastern US  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-41

Figure 3- 10.  Model Ecosystem Locations with Percent Wetland Area Aggregated for Each HUC  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-42

Figure 3- 11.  Model Ecosystem Locations with CMAQ 2001 Total Mercury Deposition  . . 3-43

Figure 3- 12.  Model Ecosystem Locations with Measured Fish Tissue Concentrations  . . . . 3-44

Figure 3- 13.  Measured 1995-2001 Fish Hg Concentrations > 0.3 ppm  . . . . . . . . . . . . . . . . 3-45

Figure 4-1.  Sources of U.S. Fish Consumption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-2

Figure 4-2.  Location of U.S. Aquacultural Operations, 1998  . . . . . . . . . . . . . . . . . . . . . . . . 4-6

Figure 4-3.  Recreational Fishing Participation Rates by State  . . . . . . . . . . . . . . . . . . . . . . . 4-7

Figure 4-4.  2002 Commercial Landings by Distance from Shore  . . . . . . . . . . . . . . . . . . . . . 4-9

Figure 4-5.  2002 Recreational Marine Finfish Landings by Distance from Shore  . . . . . . . . . 4-17

Figure 4-6.  U.S. Commercial Fish Imports by Area, 2002  . . . . . . . . . . . . . . . . . . . . . . . . . . 4-20

Figure 4-7.  U.S. Commercial Fish Imports by Country, 2002  . . . . . . . . . . . . . . . . . . . . . . . 4-21

Figure 4-8.  2001 Total Recreational Fishing Days  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-29

Figure 4-9.  2001 Recreational Fishing Days, State Residents  . . . . . . . . . . . . . . . . . . . . . . 4-29

Figure 4-10.  2001 Recreational Fishing Days, Non-State Residents  . . . . . . . . . . . . . . . . . . 4-30

Figure 4-11.  2002 Market Share of Commercial Finfish (% of Total Economic Value)  . . . . 4-37

Figure 4-12.  2002 Market Share of Commercial Shellfish (% of Total Economic Value)  . . 4-38

Figure 4-13.  Fish Consumption Pathways  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-40

Figure 5-1.  NLFA Sample Locations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-3

Figure 5-2.  Frequency Distribution of Average Watershed Fish Tissue Concentrations (ppm) 5-4

Figure 5-3.  Frequency and Average Concentrations of Various NLFA Sample Methods (Cuts of Fish)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-4

Figure 5-4.  Sample Locations from the NLFTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6

Figure 5-5.  Cumulative Distribution Functions (CDFs) for Normalized NLFTS and NLFA Lake Data.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-8

Figure 5-6.  Total Area/Sample in the Combined NLFA and NLFTS Data Set  . . . . . . . . . . . 5-9

Figure 5-7.  Locations Where Normalized Fish Tissue Concentrations are Utilized, and Where Non-Normalized Data are Utilized  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-12

Figure 5-8.  Baseline Average Hg Fish Tissue Concentrations  . . . . . . . . . . . . . . . . . . . . . . . 5-13

Figure 5-9.  Statistical Distribution of Averages of Hg. Fish Tissue Concentrations in ppm . 5-14
Figure 5-10.  Number of Unique Sampling Events Within Each HUC . . . . . . . . . . . . . . . . . . 5-15
Figure 5-11.  Average Fish Tissue Concentrations By HUC  . . . . . . . . . . . . . . . . . . . . . . . . . . 5-16
Figure 5-12.  Frequency Distribution of HUC Averaged Concentrations (ppm)  . . . . . . . . . . 5-16
Figure 6-1.  Status of State Electricity Industry Restructuring Activities (as of February 2003)6-4
Figure 6-2.  Emissions of Hg, $SO_2$, and $NO_x$ from the Power Sector (2003)  . . . . . . . . . . . . . . 6-5
Figure 7-1.  Projected Mercury Emissions in 2020 by State  . . . . . . . . . . . . . . . . . . . . . . . . . . 7-3
Figure 7-2.  NERC Power Regions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-10
Figure 8-1.  CMAQ Modeling Domain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-6
Figure 8-2.  Base Case Total Mercury Deposition: 2001  . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10
Figure 8-3.  Decrease in Total Mercury Deposition with Power Plant Zero-Out
          Simulation: 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-11
Figure 8-4.  Change in Total Mercury Deposition for All Sources: 2020 (with CAIR)
          Relative to 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-12
Figure 8-5.  Total Mercury Deposition: 2020 (with CAIR)  . . . . . . . . . . . . . . . . . . . . . . . . . 8-12
Figure 8-6.  Change in Mercury Depositions from Power Plants Due to CAMR
          Option 1: 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-13
Figure 8-7.  Change in Mercury Deposition from Power Plants Due to CAMR
          Option 2: 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-13
Figure 8-8.  Cumulative Distribution of Total Mercury Deposition (ug/m$^2$) Fat HUC-8 Level by
          Modeling Scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-15
Figure 8-9.  Cumulative Distribution of Utility Attributable Mercury Deposition at HUC-8 Level
          by Model Scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-16
Figure 8-10.  Cumulative Distribution of Percent Deposition (ug/m$^2$) Attributable to Utilities at
          HUC-8 Level by Modeling Scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-17
Figure 9-1.  95% Confidence Intervals for Full Scale IQ from the New Zealand, Seychelles and
          Faroes Studies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-7
Figure 10-1.  Locations of Lake Fish Tissue Mercury Sampling Sites Used in the Analysis  10-14
Figure 10-2.  Locations of River Fish Tissue Mercury Sampling Sites Used in the Analysis
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-15
Figure 10-3.  Flow Diagram for Population Centroid Approach . . . . . . . . . . . . . . . . . . . . . . 10-25
Figure 10-4.  Population Centroid Approach:  Linking Census Block Groups to Demographic
          Data and Mercury Fish Tissue Samples  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-27
Figure 10-5.  Flow Diagram for Angler Destination Approach  . . . . . . . . . . . . . . . . . . . . . . 10-37
Figure 10-6.  Estimated Distribution of Lake-Fishing Days Across HUCs in 2001  . . . . . . 10-40
Figure 10-7.  Estimated Distribution of River-Fishing Days Across HUCs in 2001  . . . . . . 10-41
Figure 10-8.  Spatial Distribution of Estimated Average Daily Maternal Mercury Ingestion
          Rates:  Angler Destination Approach—2001 Base Case . . . . . . . . . . . . . . . . . . . . 10-74
Figure 10-9.  Spatial Distribution of Estimated IQ Decrements per HUC:  Angler Destination
          Approach—2001 Base Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-75
Figure 10-10.  Spatial Distribution of Estimated Percent Reduction in IQ Losses:  Improvement
          with 2001 Utility Emissions Zero-Out Scenario (Zero Lag) . . . . . . . . . . . . . . . . . 10-76
Figure 10-11.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury
          Emissions Reductions:  2001 Utility Emissions Zero-Out Relative to 2001 Base Case;
          Population Centroid Approach; Variable Consumption Rate . . . . . . . . . . . . . . . . . 10-99

Figure 10-12.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions: 2001 Utility Emissions Zero-Out Relative to 2001 Base Case; Population Centroid Approach; Variable Consumption Rate . . . . . . . . . . . . . 10-99

Figure 10-13.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions:  CAMR Control Option 1 Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate . . . . . . . . . . . . . . . . . 10-100

Figure 10-14.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions: CAMR Control Option 1 Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate  . . . . . . . 10-100

Figure 10-15.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions:  CAMR Control Option 2 Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate . . . . . . . . . . . . . . . . . 10-101

Figure 10-16.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions:  CAMR Control Option 2 Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate  . . . . . . . 10-101

Figure 10-17.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions:  2020 Utility Emissions Zero-Out Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate  . . . . . . . 10-102

Figure 10-18.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions: 2020 Utility Emissions Zero-Out Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate . . . 10-102

Figure 10-19.  U.S. Census Tracts with Native American Populations . . . . . . . . . . . . . . . . . 10-113

Figure A1-1.  Location of Lee Dam (lower left quadrant) on La Plant SW quadrangle . . . .  A1-3

Figure A1-2.  WASP Water Column Solids Calibration.  . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-7

Figure A1-3.  WASP Upper Sediment Solids Calibration . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-8

Figure A1-4.  WASP Burial Rate Calibration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-8

Figure A1-5.  WASP Total Mercury Buildup in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-9

Figure A1-6.  WASP Methyl Mercury Buildup in Water . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-9

Figure A1-7.  WASP Total Mercury Buildup in Sediment . . . . . . . . . . . . . . . . . . . . . . . . .  A1-10

Figure A1-8.  WASP Methyl Mercury Buildup in Sediment  . . . . . . . . . . . . . . . . . . . . . . .  A1-10

Figure A1-9.  WASP Total Mercury Attenuation in Water . . . . . . . . . . . . . . . . . . . . . . . . .  A1-11

Figure A1-10. WASP Total Mercury Attenuation in Surface Sediment . . . . . . . . . . . . . . .  A1-11

Figure A1-11.  WASP Attenuation Sensitivity in Water . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-12

Figure A1-12.  WASP Attenuation Sensitivity in Water . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-13

Figure A1-13.  Base Case Response of Northern Pike to Methylmercury Exposure  . . . . .  A1-14

Figure A1-14.  Base case response of yellow perch to methylmercury exposure (0.5ng/L)  A1-14

Figure A1-15.  Attenuation of Methylmercury in Northern Pike after Load Reduction . . .  A1-15

Figure A1-16.  Attenuation of Methylmercury in Yellow Perch after Load Reduction . . .  A1-15

Figure A2-1.  WASP Water Column Solids Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . .  A2-4

Figure A2-2.  WASP Solids Simulation for Surface Sediment . . . . . . . . . . . . . . . . . . . . . .  A2-5

Figure A2-3.  WASP Simulation of Burial Velocity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A2-5

Figure A2-4.  WASP Total Mercury Buildup in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A2-6

Figure A2-5.  WASP Methyl Mercury Buildup in Water . . . . . . . . . . . . . . . . . . . . . . . . . .  A2-7

Figure A2-6.  WASP Total Mercury Buildup in Sediment . . . . . . . . . . . . . . . . . . . . . . . . .  A2-7

Figure A2-7.  WASP Methyl Mercury Buildup in Sediment  . . . . . . . . . . . . . . . . . . . . . . .  A2-8

Figure A2-8.  WASP Total Mercury Attenuation in Epilimnion  . . . . . . . . . . . . . . . . . . . .  A2-9

Figure A2-9.  WASP Total Mercury Attenuation in Hypolimnion . . . . . . . . . . . . . . . . . . .  A2-9

Figure A2-10.  WASP Total Mercury Attenuation in Surface Sediment . . . . . . . . . . . . .  A2-10
Figure A3-1.  Southeastern North Carolina and Lake Waccamaw . . . . . . . . . . . . . . . . .  A3-1
Figure A3-2.  WASP Water Column Solids Calculation . . . . . . . . . . . . . . . . . . . . . . . . .  A3-7
Figure A3-3.  WASP Solids Simulation for Surface Sediment . . . . . . . . . . . . . . . . . . . . .  A3-8
Figure A3-4.  WASP Simulation of Burial Velocity  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A3-8
Figure A3-5.  WASP Total Mercury Buildup in Water . . . . . . . . . . . . . . . . . . . . . . . . . . .  A3-9
Figure A3-6.  WASP Methyl Mercury Buildup in Water  . . . . . . . . . . . . . . . . . . . . . . . . .  A3-10
Figure A3-7.  WASP Total Mercury Buildup in Sediment  . . . . . . . . . . . . . . . . . . . . . . . .  A3-10
Figure A3-8.  WASP Methyl Mercury Buildup in Sediment  . . . . . . . . . . . . . . . . . . . . . .  A3-11
Figure A3-9.  WASP Total Mercury Attenuation in Epilimnion  . . . . . . . . . . . . . . . . . . .  A3-12
Figure A3-10.  WASP Total Mercury Attenuation in Surface Sediment  . . . . . . . . . . . . .  A3-12
Figure A4-1.  Brier Creek Watershed  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A4-1
Figure A4-2.  Brier Creek Subwatersheds for Hg Loadings  . . . . . . . . . . . . . . . . . . . . . .  A4-2
Figure A4-3.  Brier Creek Watershed Landuses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A4-3
Figure A4-4.  Mercury Deposition Network Sampling Locations  . . . . . . . . . . . . . . . . . .  A4-4
Figure A4-5.  Brier Creek Soil Mercury Buildup  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A4-9
Figure A4-6.  Brier Creek Loading Flux Buildup  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A4-10
Figure A4-7.  Upper Brier Creek Soil Mercury Attenuation . . . . . . . . . . . . . . . . . . . . . .  A4-11
Figure A4-8.  Brier Creek Loading Flux Attenuation  . . . . . . . . . . . . . . . . . . . . . . . . . . .  A4-12
Figure A4-9.  Upper Brier Creek Soil Mercury Attenuation . . . . . . . . . . . . . . . . . . . . . .  A4-13
Figure A4-10.  Upper Brier Creek Loading Flux Attenuation  . . . . . . . . . . . . . . . . . . . . .  A4-14
Figure A4-11.  Watershed Loading Flux Attenuation considering Landuse Change  . . . . .  A4-15
Figure A4-12 Base Case Water Column Mercury Concentration for Brier Creek  . . . . . . .  A4-16
Figure A4-13.  Base Case Sediment Mercury Concentration for Brier Creek  . . . . . . . . . .  A4-17
Figure A4-14.  Brier Creek Total Mercury Water Column Concentration . . . . . . . . . . . . .  A4-18
Figure A4-15.  Brier Creek Methyl Mercury Water Column Concentration  . . . . . . . . . . .  A4-19
Figure A4-16.  Mercury Attenuation over Time in Water Column . . . . . . . . . . . . . . . . . .  A4-20
Figure A4-17.  Mercury Attenuation over Time in Sediments  . . . . . . . . . . . . . . . . . . . . .  A4-21
Figure A4-18.  Sensitivity Range for Upstream Waters  . . . . . . . . . . . . . . . . . . . . . . . . .  A4-23
Figure A4-19.  Sensitivity Range for Downstream Waters  . . . . . . . . . . . . . . . . . . . . . . .  A4-24
Figure D-1.  Box and Whisker Plots of the NLFWA Observed, NDMMF Estimated, and
          Residuals Measurements in ppm  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  D-3
Figure D-2.  Scatterplot of Predicted vs. Observed Measurements . . . . . . . . . . . . . . . . .  D-4
Figure D-3.  Scatterplot of Residual vs. Observed Measurements  . . . . . . . . . . . . . . . . .  D-4
Figure D-4.  Locations of Withheld Observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  D-7
Figure D-5.  Box and Whisker Plots of Observed, Predicted, and Residual (Error) Distributions
          for the Withheld Data Set  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  D-8
Figure D-6.  Scatterplot of Predicted vs. Observed Measurements . . . . . . . . . . . . . . . . .  D-8
Figure D-7.  Scatterplot of Residual vs. Observed Measurements  . . . . . . . . . . . . . . . . .  D-9
Figure E2-1.  U.S. Hydrologic Regions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  E2-2

# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| ACI | activated carbon injection |
| ACS | American Cancer Society |
| ADHD | attention deficit hyperactivity disorder |
| ADI | acceptable daily intake |
| ADP | adenosine diphosphate |
| AERMOD | American Meteorological Society/EPA Regulatory Model |
| AHRQ | Agency for Healthcare Research and Quality |
| AMI | acute myocardial infarction |
| ANL | Argonne National Laboratory |
| ASA | American Sportfishing Association |
| atm | atmosphere |
| ATSDR | Agency for Toxic Substance and Disease Registry |
| BAF | bioaccumulation factor |
| BASS | Bioaccumulation and Aquatic System Simulator |
| BC | boundary conditions |
| BEA | Bureau of Economic Analysis |
| BenMAP | Benefits Mapping and Analysis Program |
| BLS | Bureau of Labor Statistics |
| BMD | benchmark dose |
| BMDL | BMD lower statistical confidence limit |
| BMI | body mass index |
| BMR | benchmark response |
| BOC | Bureau of Census |
| C-R | concentration-response |
| CAAA | Clean Air Act Amendments |
| CAIR | Clean Air Interstate Rule |
| CAMR | Clean Air Mercury Rule |
| CDF | Cumulative Distribution Function |
| CEEPR | Center for Energy and Environmental Policy Research |
| cfs | cubic feet per second |
| CH3Hg | monomethyl mercury |
| CHD | coronary heart disease |
| CI | confidence interval |
| cm | centimeter |
| CMAQ | Community Multi-Scale Air Quality |
| CPS | Current Population Survey |
| CRDM | Climatological Regional Dispersion Model |
| CRF | capital recovery factor |
| CRST | Cheyenne River Sioux Tribal |
| CSFII | Continuing Survey of Food Intake by Individuals |
| CVD | cardiovascular disease |
| D-MCM | Dynamic Mercury Cycling Model |
| DEP | Department of Environmental Protection |
| DHHS | Department of Health and Human Services |

| | |
|---|---|
| DDT | dichloro-diphenyl-trichloroethane |
| DHA | docosahexaenoic acid |
| DOC | dissolved organic carbon |
| DOE | Department of Energy |
| DOI | Department of the Interior |
| DOM | dissolved organic matter |
| DPA | docosapentaenoic acid |
| E-MCM | Everglades Mercury Cycling Model |
| ECG | electrocardiogram |
| EFH | Exposure Factors Handbook |
| EGRID | Emissions & Generated Resource Integrated Database |
| EGU | electric generating unit |
| EIA | Economic Impact Analysis |
| EIA | Energy Information Administration |
| EKG | electrocardiogram |
| ELA | Experimental Lakes Area |
| EMF | emission modification factor |
| EMMA | Environmental Monitoring and Measurement Advisor |
| E.O. | Executive Order |
| EPA | Environmental Protection Agency |
| EPRI | Electric Power Research Institute |
| ESP | electrostatic precipitator |
| EU | European Union |
| EURAMIC | The European Multicenter Case Control Study on Antioxidants, Myocardial Infarction and Cancer of the Breast |
| EXAMS2 | Exposure Analysis Modeling System, Version 2 |
| F | Fahrenheit |
| FAO | Food and Agriculture Organization |
| FDA | Food and Drug Administration |
| FERC | Federal Energy Regulatory Commission |
| FF | fabric filters |
| FGD | flue gas desulfurization |
| FGETS | Food and Grill Exchange of Toxic Substances |
| FL | fork length |
| ft | feet |
| g | gram |
| GDP | gross domestic product |
| GIS | Geographic Information System |
| GRU | Gainesville Regional Utilities |
| GW | gigawatt |
| GWh | gigawatt hours |
| H-PAC | Hazard Prediction and Assessment Capability |
| HDL | high-density lipoprotein |
| Hg | mercury |
| $Hg^0$ | elemental mercury |
| Hg(II) | inorganic divalent mercury |
| HgCl2 | mercuric chloride |

| | |
|---|---|
| HgP | particulate mercury |
| HgT | total mercury |
| hrs | hours |
| HUC | hydrologic unit code |
| HYSPLIT | Hybrid Single Particle Lagrangian Integrated Trajectory |
| ICR | Information Collection Request |
| IEM-2M | Indirect Exposure Model, Version 2 |
| IGCC | Integrated Gasification Combined Cycle |
| IMT | intima-media thickness |
| in | inch |
| IOM | Institute of Medicine |
| IOU | investor-owned utility |
| IQ | intelligence quotient |
| IPM | Integrated Planning Model |
| IRIS | Integrated Risk Information System |
| ISC3 | Industrial Source Complex |
| K | Kelvin |
| kg | kilogram |
| KIHD | Kuopio Ischemic Heart Disease |
| km | kilometer |
| kWh | kilowatt hour |
| lb | pound |
| lbs | pounds |
| L | liter |
| LC50 | lethal concentration for 50% percent of the population |
| LC omega-3 PUFA | long chain omega-3 polyunsaturated fatty acids |
| LDL | low-density lipoprotein |
| m | meter |
| M | molar mass |
| mm | millimeter |
| MACT | Maximum Achievable Control Technology |
| MAS/MILS | Mineral Availability System/Mineral Industry Location System |
| MCM | Mercury Cycling Model |
| MDN | Mercury Deposition Network |
| ME | Midwest/Northeast |
| MeHg | methylmercury |
| METAALICUS | Mercury Experiment to Assess Atmospheric Loading in Canada and the United States |
| mg | milligram |
| MI | myocardial infarction |
| MIT | Massachusetts Institute of Technology |
| MM5 | Mesoscale Model |
| MMAPS | Mercury Maps |
| mmBtu | million British thermal units |
| mol | mole |
| MRFSS | Marine Recreational Fishing Statistical Survey |
| MRL | minimal risk level |

| | |
|---|---|
| MW | megawatt |
| MWC | municipal waste combustor |
| MWh | megawatt hour |
| MWI | medical waste incinerator |
| NAAQS | National Ambient Air Quality Standards |
| NAICS | North American Industry Classification System |
| NAS | National Academy of Sciences |
| NASS | National Agriculture Statistics Service |
| NDMMF | National Descriptive Model of Mercury in Fish |
| NEI | National Emissions Inventory |
| NERC | North American Electric Reliability Council |
| NES | Neurobehavioral Evaluation System |
| NFTS | National Fish Tissue Survey |
| ng | nanogram |
| NHD | National Hydrography Database |
| NHANES | National Health and Nutrition Examination Survey |
| NH3 | ammonia |
| NLCD | National Land Cover Data |
| NLFA | National Listing of Fish and Wildlife Advisories |
| NLSY | National Longitudinal Study of Youth |
| NLFTS | National Lake Fish Tissue Survey |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| NOAEC | No Observable Adverse Effects Concentration |
| NOAEL | No Observed Adverse Effect Level |
| NODA | Notice of Data Availability |
| NOx | nitrogen oxides |
| NPR | Notice of Proposed Rulemaking |
| NPV | net present value |
| NRC | National Research Council |
| NRS | National Recreation Survey |
| NSFHWR | National Survey of Fishing, Hunting and Wildlife-Associated Recreation |
| NSPS | New Source Performance Standards |
| NSR | New Source Review |
| NSRE | National Survey on Recreation and the Environment |
| NW | Northwest |
| O&M | operation and maintenance |
| OM | organic matter |
| OMB | Office of Management and Budget |
| OR | odds ratio |
| ORD | Office of Research and Development |
| P-PUFA | plasma polyunsaturated fatty acids |
| PAC | powder activated carbon |
| PCB | polychlorinated biphenyl |

| | |
|---|---|
| PCS | Permit Compliance System |
| pH | potential of hydrogen |
| PM | particulate matter |
| POTW | Publicly Owned Treatment Works |
| ppb | parts per billion |
| ppm | parts per million |
| RARE | Regional Applied Research Effort |
| RELMAP | Regional Lagrangian Model of Air Pollution |
| REMI | Regional Economic Models, Inc. |
| REMSAD | Regulatory Modeling System for Aerosols and Deposition |
| RFA | Regulatory Flexibility Act |
| RfD | Reference Dose |
| RFF | Resources for the Future |
| RGM | Reactive Gaseous Mercury |
| RIA | Regulatory Impact Analysis |
| RNA | ribonucleic acid |
| RQ | risk quotient |
| RR | relative risk |
| RtC | Report to Congress |
| RUSLE | Revised Universal Soil Loss Equation |
| SAB-HES | Science Advisory Board Health Effects Subgroup |
| SCR | selective catalytic reduction |
| SD | standard deviation |
| SE | Southeast |
| sec | second |
| SIC | standard industrial classification |
| SIP | state implementation plan |
| SMR | standard mortality rate |
| SNCR | selective non-catalytic reduction |
| SO2 | sulfur dioxide |
| sq km | square kilometer |
| SR-MATRIX | Source Receptor Matrix |
| SRB | sulfate reducing bacteria |
| st dev | standard deviation |
| SW | Southwest |
| SWAT | Soil and Water Assessment Tool |
| TDI | tolerable daily intake |
| TL | total length |
| TMDL | Total Maximum Daily Load |
| TOLD-SL | Test of Language Development - Spoken Language |
| TRUM | Technology, Retrofit and Upgrading Model |
| TSD | Technical Support Document |
| UF | uncertainty factor |
| ug | microgram |

| uM | micromole |
|---|---|
| um | micrometer |
| UMRA | Unfunded Mandates Reform Act |
| U.S. | United States |
| USACE | United States Army Corps of Engineers |
| U.S.C. | United States Code |
| USDA | United States Department of Agriculture |
| USEPA | United States Environmental Protection Agency |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| UV-B | ultraviolet light, type B |
| VMI | Visual-Motor Integration |
| VSL | Value of Statistical Life |
| WASP | Water Quality Analysis Simulation Program |
| WCS | Watershed Characterization System |
| WHO | World Health Organization |
| WISC | Wechsler Intelligence Scales for Children |
| WISC-III | Wechsler Intelligence Scales for Children administered in the Seychelles Islands |
| WISC-R | Wechsler Intelligence Scales for Children administered in New Zealand and the Faroe Islands |
| WRAML | Wide-Range Assessment of Memory Learning |
| WTP | willingness to pay |
| yr | year |

EPA-452/R-05-003
March 2005

Regulatory Impact Analysis of the Clean Air Mercury Rule
Final Report

U.S. Environmental Protection Agency
Office of Air Quality Planning and Standards
Air Quality Strategies and Standards Division
Innovative Strategies and Economics Group (MD 339-01)
Research Triangle Park, N.C. 27711

**SECTION 1**

**INTRODUCTION**

**1.0     Introduction**

This report provides an analysis of the benefits and costs of the final Clean Air Mercury Rule (CAMR).  In Section 2, we discuss the potential health effects of mercury.  Section 3 provides a detailed discussion of mercury in the environment, including how mercury deposited to water bodies transforms into methylmercury in fish tissue.  This section also provides an assessment of the response time for systems after a change in mercury deposition.  Because fish consumption is the primary pathway for exposure to methylmercury, Section 4 provides a profile of fishing activity in the United States.  Section 5 presents information on concentrations of mercury **in** fish.  Because this regulation requires control on coal-fired power plants, Section 6 provides a profile of the power sector in the United States, while Section 7 describes the emissions, control requirements, control options considered for CAMR, and the regulatory costs of the final CAMR.  In addition, Section 7 also provides an assessment of impacts on small businesses and government entities.  Section 8 describes the resulting change in mercury deposition from air quality modeling of the CAMR regulatory options.  Section 9 presents a derivation of a dose-response function that relates mercury consumption in women of childbearing with changes in IQ seen in children that were exposed prenatally. IQ is used as a surrogate for the neurobehavioral endpoints that EPA relied upon for setting the methylmercury reference dose (RfD).  Chapter 10 presents exposure modeling and benefit methodologies applied to a no-threshold model (i.e., a model that assumes no threshold in effects at low doses of mercury exposure).  Chapter 11 presents the final benefit analysis numbers of CAMR giving consideration to established health benchmarks (i.e., consideration of potential thresholds on effects at low doses of mercury exposure).  Finally, Chapter 12 presents a benefit analysis of reductions in PM as a result of controls applied for mercury.  Table 1-1 below summarizes the benefits, costs, and net benefits of the CAMR.

SECTION 2    IMPACT OF MERCURY ON HUMAN HEALTH, ECOSYSTEMS, AND
             WILDLIFE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
2.1    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
2.2    Mercury Poisoning Episodes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
2.3    Reference and Benchmark Doses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2
2.4    Neurologic Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-6
2.5    Cardiovascular Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-7
2.6    Genotoxic Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-7
2.7    Immunotoxic Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-7
2.8    Other Human Toxicity Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-8
2.9    Ecological Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-9
2.10   Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-9
2.11   References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-10

**Figures**

Figure 2-1.  Probability Distribution Function of Blood Mercury Levels in US Women of
             Childbearing Age (NHANES Data 1999-2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-5

**SECTION 2**

**IMPACT OF MERCURY ON HUMAN HEALTH, ECOSYSTEMS, AND WILDLIFE**

**2.1      Introduction**

This section discusses the potential human health and ecological effects due to exposure to methylmercury.  The material in this section is based upon the National Research Council (NRC) of the National Academies of Science report titled "Toxicological Effects of Methylmercury," which provides a thorough review of the effects on mercury on human health (NRC 2000), augmented by other related and more recent publications regarding the effects of methylmercury exposure.  Many of the peer-reviewed articles cited in this section are publications originally cited in the NRC report (all secondary citations are clearly noted in the reference section).

The section starts with a short account of mercury poisoning episodes in Japan and Iraq (Section 2.2), which provide much of the basis for research on human health at very high exposure levels.  Next, the reference dose and benchmark dose for methylmercury exposure are discussed in Section 2.3 to provide context for the ensuing descriptions of specific health effects (Sections 2.4 – 2.8).  The section concludes with a discussion of ecological effects (Section 2.9) and conclusions (Section 2.10).

**2.2      Mercury Poisoning Episodes**

Instances of methylmercury poisoning have made it clear that adults, children, and developing fetuses are at risk from ingestion exposure to methylmercury.  These episodes resulted in exposures well above those observed in any US subpopulations, however, they provided early motivation for risk management of mercury.  Two of these high-dose mercury poisoning occurred in Japan and Iraq.  In Japan, industrial by-products containing organic mercury were discharged into Minamata Bay between 1953 and 1960, contaminating fish and resulting in methylmercury poisoning of the local population via consumption of fish.  The central nervous system was the primary target; symptoms of exposure included paresthesia (a burning or prickling sensation in the skin), ataxia (failure of muscle control), sensory disturbances (e.g., impaired vision, hearing, and smell), tremors, difficulty in walking, irritability, and others, including death (NRC 2000).  Children of exposed women displayed a higher incidence of symptoms than did exposed adults.  Some victims were born with a condition resembling cerebral palsy, with severe disturbances of nervous function, and affected offspring were very late in reaching developmental milestones (EPA 1997, UNEP 2002).

Maternal hair mercury concentrations in this population ranged from 3.8 to 133 ppm (mean of 41 ppm).  There is significant uncertainty associated with these exposure estimates, primarily because measurements of methylmercury exposure were not taken until several years after the poisoning episode had begun and identification of cases was incomplete; however, it is clear that the exposures were quite high.

Another series of acute mercury poisonings occurred in Iraq in the late 1950s and 1972 following consumption of bread made with seed grain treated with fungicides containing alkylmercury compounds, affecting thousands of people in total.  Symptoms in the exposed population were similar to those observed in Minamata, with severely affected individuals exhibiting paresthesia, ataxia, blurred vision, slurred speech, hearing difficulties, blindness, deafness, and death.  Toxicity was observed in many adults and children who had consumed this bread over a three-month period, but the population that showed greatest sensitivity were offspring of women who had eaten contaminated bread during pregnancy.  Maximum maternal hair mercury levels during pregnancy for mothers of affected children ranged to over 600 ppm, with some effects in children (e.g., delayed ability to walk) possibly associated with maternal hair mercury levels less than 100 ppm.

In both Iraq and Japan, the effects in offspring prenatally exposed to methylmercury were more serious, and in some cases seen at lower doses, than in adults (EPA 1997, NRC 2000).

These instances of methylmercury poisoning have made it clear that adults, children, and developing fetuses are at risk from ingestion exposure to methylmercury.  In both episodes, mothers with few or no symptoms of nervous system damage gave birth to infants with severe disabilities, and it became clear that the developing nervous system of the fetus is more vulnerable to methylmercury than the adult nervous system.  Even though these episodes resulted in exposures well above those observed in any US subpopulations, they provided early motivation for risk management of mercury, and the U.S. FDA first proposed an administrative guideline for mercury levels in fish and shellfish in 1969 in response to the poisonings in Japan (EPA 1997).  In the years since these episodes, much research has been undertaken to more fully understand the effects associated with high-dose methylmercury poisoning as well as more common lower-dose exposures, and these data have been used by EPA and others in mitigating potential human health effects.

## 2.3    Reference and Benchmark Doses

EPA has set a health-based ingestion rate for chronic oral exposure to methylmercury, termed an oral Reference Dose (RfD).  The RfD is an estimate (with uncertainty spanning perhaps an order of magnitude) of a daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime (EPA 2002).  EPA believes that exposures at or below the RfD are unlikely to be associated with appreciable risk of deleterious effects.  It is important to note, however, that the RfD does not define an exposure level corresponding to zero risk; mercury exposure near or below the RfD could pose a very low level of risk which EPA deems to be non-appreciable.  It is also important to note that the RfD does not define a bright line, above which individuals are at risk of adverse effect.

In 1995, EPA set an oral RfD for methylmercury at 0.0001 mg/kg-day based on a study of the Iraqi poisoning episode (Marsh et al. 1987).  Subsequent research from large epidemiological studies in the Seychelles, Faroe Islands, and New Zealand added substantially to the body of knowledge on neurological effects from methylmercury exposure.  Per Congressional direction via the House Appropriations Report for Fiscal Year 1999, the NRC was contracted by EPA to examine these data and, if appropriate, make recommendations for

deriving a revised RfD.  NRC's analysis concluded that the Iraqi study should no longer be considered the critical study for the derivation of the RfD and also provided specific recommendations to EPA regarding methylmercury based on analyses of the three large epidemiological studies (NRC 2000).  EPA's current assessment of the methylmercury RfD, revised in 2001, relied on the quantitative analyses performed by the NRC (EPA 2002).

In their analysis, NRC examined in detail the epidemiological data from the Seychelles, the Faroe Islands, and New Zealand, as well as other toxicological data on methylmercury.  In determining a recommended point of departure (i.e., the specific dose on which health criteria should be based), NRC recommended a benchmark dose approach which applies mathematical models to the available data to identify the point of departure.  The BMD is the exposure level at which a particular level of response (i.e., the benchmark response, or BMR) for some outcome of concern is predicted to occur.  In their assessment of the epidemiological data, NRC proposed that the Faroe Islands cohort was the most appropriate study for defining an RfD, and specifically selected children's performance on the Boston Naming Test (a neurobehavioral test) as the key endpoint. They recommended a BMR of 0.05 (i.e., the level at which would result in a doubling in the number of children with a response at the 5th percentile of the population).[1]  On the basis of this study cohort and that test, NRC identified a BMD of 85 ppb in cord blood.  The NRC also estimated the 95% lower confidence limit for the BMD (i.e., the BMDL) for this endpoint to be 58 ppb.  The BMDL is a conservative estimate which is used as a point of departure in risk assessment.  Although this BMDL was specifically recommended by NRC as appropriate for deriving the RfD, NRC also conducted BMD analyses on other endpoints in the Faroe cohort and several endpoints in the other two populations, as well as an integrative analysis of data from all three studies (NRC 2000).

In updating the RfD, EPA considered BMD analyses completed by NRC involving endpoints of neuropsychological development from the Faroe Islands cohort (including results for the Boston Naming Test), the New Zealand cohort, and the NRC's integrative analysis of all three studies.  The BMDLs for these endpoints, measured as concentrations of mercury in umbilical cord blood, were considered.  For the purposes of calculating the RfD, EPA converted these BMDLs to maternal daily dietary intake in mg/kg-day using a one-compartment model.[2]  The BMDLs for these analyses (measured in terms of mercury in cord blood) were all observed to be within a relatively close range, and the calculated RfDs converge at about 0.0001 mg/kg-day.  Specifically, BMDLs for a number of neurological endpoints based on tests that gauge a child's ability to learn and process information (i.e., Boston Naming Test, Continuous Performance Test, California Verbal Learning Test, McCarthy Perceived Performance, and McCarthy Motor Test) were calculated by NRC to range from about 25 to 100 ppb mercury in cord blood.  These exposures were converted to dietary exposures of about 0.0005 mg/kg-

---

[1] As noted by NRC in reference to data from the Seychelles, Faroe Islands, and New Zealand, "because those data are epidemiological, and exposure is measured on a continuous scale, there is no generally accepted procedure for determining a dose at which no adverse effects occur."  The NRC chose a 5% response level in the BMD analysis for test results in the lower 5% of the distribution.

[2] The one-compartment toxicokinetic model employed by EPA is described by NRC (2000); it represents all maternal body compartments as a single pool with a relatively small set of parameters, and assumes steady-state conditions in the maternal system.  Methylmercury dose levels were measured as concentrations in umbilical cord blood (analysts have assumed that methylmercury concentration in cord blood is roughly equal to that in maternal blood).

bw/day to 0.0019 mg/kg-day, with most dietary exposures estimated to be about 0.001 mg/kg-bw/day. The integrative BMDL (taking into account data from all three studies) was calculated by NRC to be 32 ppb mercury in cord blood, or an exposure of about 0.6 ug/kg-day. All of these results were considered in defining the RfD; as stated in the IRIS summary for methylmercury:

"Rather than choose a single measure for the RfD critical endpoint, EPA based this RfD for this assessment on several scores from the Faroes measures, with supporting analyses from the New Zealand study, and the integrative analysis of all three studies." (EPA 2002)

EPA used the various BMDLs and then applied an uncertainty factor of 10 to account for interindividual toxicokinetic variability and pharmacodynamic variability and uncertainty. On this basis, EPA defined the updated RfD of 0.0001 mg/kg-day in 2001. Although derived from a more complete data set and with a somewhat different methodology, the current RfD is the same as the previous (1995) RfD.

The levels at which these key neurological effects were observed – in the study populations on which the updated RfD is based – provide a useful frame of reference for considering other, non-neurological effects described below (see above for observed exposure levels). It is important to note that although these populations were exposed to elevated levels of methylmercury via fish or marine mammal consumption, the exposure levels of interest in these studies are far below those associated with the Minamata and Iraqi poisoning episodes mentioned previously. In addition, to put these exposure levels in perspective, it is useful to consider typical mercury exposure levels in the U.S. measured in the National Health and Nutrition Examination Survey (NHANES). This survey is conducted by the National Center for Health Statistics via standardized interviews to provide continuous health data for the general U.S. population, and it has included measurements of mercury in blood and hair as biomarkers of mercury exposure. Based on NHANES data for blood collected for 1999-2002, the overall distribution of blood mercury concentrations for women of child-bearing age (i.e., between 16 and 49 years of age) has been estimated for the U.S. population (see Figure 2-1). The RfD and BMDL derived from the Faroe cohort effect level are included on this chart for reference. Although all observed exposures are below the BMDL, and most of the exposures fall below the RfD, about 6% of the population exposures were at or above the RfD (MMWR Vol. 53 / No. 43). The geometric mean blood mercury concentration in the NHANES data for 1999-2002 is 0.92 ppb, and the range of observed concentrations was from 0.07 to 38.90 ppb.[3]

---

[3] The NHANES data summarized above suggests that exposures of women of child-bearing age in the U.S. exceed the RfD.



Note:  Cumulative frequency (y-axis) refers to the fraction of the population exposed at or below a given blood mercury level. EPA's RfD for methylmercury is 0.1 ug/kg-day, which is approximately equivalent to a concentration of 5.8 ppb in blood.

**Figure 2-1.  Probability Distribution Function of Blood Mercury Levels in US Women of Childbearing Age (NHANES Data 1999-2002)**

NRC notes in their analysis that a biomarker conversion factor of about 5 ppb in blood per 1 ppm in hair can be used to estimate the corresponding hair mercury values.  Using this approach, the RfD of 5.8 ppb in blood corresponds to a hair mercury concentration of about 1 ppm, and the BMDL and BMD are equivalent to about 12 ppm and 17 ppm, respectively. Analyses of hair mercury for U.S. women of child-bearing age have been conducted using NHANES data from 1999-2000.  A geometric mean hair mercury concentration of 0.20 ppm was reported for this population, and the geometric mean of the concentration of organic mercury was 0.80 ppb in blood (Mahaffey et al. 2004).  Among frequent fish consumers (i.e., study participants who reported consuming fish three or more times in the previous 30 days),[4] geometric mean hair mercury levels were three-fold higher compared with nonconsumers (viz., 0.38 ppm vs. 0.11 ppm).  Higher percentiles of exposure were also reported, with the 95th percentile hair mercury levels corresponding to 1.73 ppm and 2.75 ppm for all women and women frequently consuming fish, respectively (McDowell et al. 2004).

In general, the primary route by which the U.S. population is exposed to mercury is through the consumption of fish containing methylmercury.  Exposure to methylmercury may result in a variety of health effects.  The various categories of health effects, and the evidence on their significance, are described in the following pages.

## 2.4    Neurologic Effects

---

[4]  Fish consumption rates were collected by questionnaire at the time of the survey; no information was collected regarding portion size or preparation methods.

In their review of the literature, NRC found neurodevelopmental effects to be the most sensitive endpoints and appropriate for establishing an RfD (NRC, 2000). Three large-scale epidemiological studies have examined the effects of low dose prenatal mercury exposure and neurodevelopmental outcomes through the administration of numerous tests of cognitive functioning. These studies were conducted in the Faroe Islands (Grandjean et al. 1997), New Zealand (Kjellstrom et al. 1989, Crump et al. 1998), and the Seychelles Islands (Davidson et al. 1998, Myers et al. 2003). The NRC noted that deficiencies of the magnitude observed in those studies were likely to be associated with difficulty with vocabulary, verbal learning, attention, and motor functions (NRC 2000). The NRC also concluded that children exposed at the levels reported in those studies are likely to struggle to keep up in class and may need special education, or other remedial help with school. Studies involving animals found sensory effects and support the conclusions reached by studies involving human subjects, with a similar range of neurodevelopmental effects reported (NRC 2000). As noted by the NRC, the clinical significance of some of the more subtle endpoints included in the human low-dose studies is difficult to gauge due to the quantal nature of the effects observed (i.e., subjects either display the abnormality or do not) and the rather low occurrence rate of these effects.

Little is known about the effects of low level chronic methylmercury exposure in children that can be linked to exposures *after* birth. The difficulty in identifying a cohort exposed after birth but not prenatally, or separating prenatal from postnatal effects, makes research on the topic complicated. These challenges were present in the three large epidemiologic studies used to derive the RfD, as in all three studies there was postnatal exposure as well.

Several studies have also examined the effects of chronic low-dose methylmercury exposures on adult neurological and sensory functions (e.g., Lebel et al. 1996, Lebel et al. 1998, Beuter and Edwards 1998). Research results suggest that elevated hair methylmercury concentrations (i.e., up to 50 ppm, and possibly as low as 20 ppm, though the NOAEL was not always be clearly estimated) in individuals are associated with visual deficits, including loss of peripheral vision and chromatic and contrast sensitivity. These individuals also exhibited a loss of manual dexterity, hand-eye coordination, and grip strength; difficulty performing complex sequences of movement; and (at the higher doses) tremors, although expression of some effects was sex-specific. Although additional data would be needed to quantify a dose-response relationship for these effects, it is noteworthy that the effects occurred at doses lower than the Japanese and Iranian poisoning episodes, via consumption of mercury-laden fish in riverine Brazilian communities (where extensive mercury contamination has resulted from small-scale gold mining activities begun in the 1980s); however these doses are above the EPA's RfD equivalent level for hair mercury. In regard to the Lebel et al. (1998) study, NRC states that "the mercury exposure of the cohort is presumed to have resulted from fish-consumption patterns that are stable and thus relevant to estimating the risk associated with chronic, low-dose methylmercury exposure" (NRC 2000). NRC noted, however, "that the possibility cannot be excluded that the neurobehavioral deficits of the adult subjects were due to increased prenatal, rather than ongoing, MeHg exposure." More recent studies in the Brazilian communities provide some evidence that the adverse neurobehavioral effects may in fact result from postnatal exposures (e.g., Yokoo et al. 2003); however, additional longitudinal study of these and other populations is required to resolve questions regarding exposure timing and fully characterize the potential neurological impacts of methylmercury exposure in adults.

## 2.5    Cardiovascular Impacts

While important, the weight of evidence for cardiovascular effects is not as strong as it is for childhood neurological effects and the state of the science is still being evaluated.  However, in some recent epidemiological studies in men, methylmercury exposure is associated with a higher risk of acute myocardial infarction, coronary heart disease and cardiovascular disease in some populations (e.g. Salonen et al. 1995; Guallar et al.2002).  Other recent studies have not observed this association (e.g. Yoshizawa et al. 2002; Hallgren et al. 2001).  The studies that have observed an association suggest that the exposure to methylmercury may attenuate the beneficial effects of fish consumption.  Studies investigating the relationship between methylmercury exposure and cardiovascular impacts have reached different conclusions.  The findings to date and the plausible biologic mechanisms warrant additional research in this arena (Stern 2005; Chan and Egeland 2004).

The potential for adverse cardiovascular effects due to consumption of fish containing methylmercury is of particular interest given the evidence for the *protective* cardiovascular effect believed to occur from an increased dietary fish intake. Strong evidence indicates that consumption of fish, particularly fatty fish, has a cardio-protective effect (Wang et al. 2004; 2005 Dietary Guidelines Advisory Committee 2004; NRC 2000, Kris-Etherton et al. 2002). Thus, consumption of fish containing methylmercury is not necessarily detrimental even though some evidence suggests that  the cardiovascular system may be a target system for methylmercury exposure .

A more robust discussion of multiple studies evaluating the association between methylmercury exposure via fish consumption and acute myocardial infarction and other cardiovascular effects as well as a description of the association between fish consumption and cardioprotective effects is presented in Appendix B.

## 2.6    Genotoxic Effects

The NRC concluded that evidence that human exposure caused genetic damage is inconclusive.  However, in one recent study of adults living in the Tapajós River region in Brazil Amorim et al. (2000) reported a direct relationship between methylmercury concentration in hair and cytogenetic damage in lymphocytes, with polyploidal aberrations and chromatid breaks observed at mercury hair levels around 7.25 ppm and 10 ppm, respectively.  Long-term methylmercury exposures in this population were believed to occur through consumption of fish, suggesting that cytotoxic effects may result from dietary,  chronic methylmercury exposures similar to and above those seen in the Faroes and Seychelles populations.

## 2.7    Immunotoxic Effects

Although exposure to some forms of mercury can result in a decrease in immune activity or an autoimmune response (ATSDR 1999), evidence for immunotoxic effects of methylmercury is scarce (NRC 2000).  However, a recent study of fish-consuming communities in Amazonian Brazil has identified a possible association between methylmercury exposure and immunotoxic effects, although the authors noted that this may reflect interactions with infectious disease and other factors (Silva et al. 2004).  Exposures to these communities occurred via fish consumption

(some community members were also exposed to inorganic mercury through gold mining activities).  The researchers assessed levels of specific antibodies that are markers of mercury-induced autoimmunity.  They found that both prevalence and levels of these antibodies were higher in a population exposed to methylmercury via fish consumption compared to a reference (unexposed) population.  Median hair mercury concentration was 8 ppm in the more exposed population (range 0.29-58.47 ppm) and 5.57 ppm in the less exposed reference population (range 1.19-16.96 ppm).  The ranges of mercury hair concentrations reported in this study are within an order of magnitude of the concentration corresponding to the methylmercury RfD.  Overall, there is a relatively small body of evidence from human studies that suggests exposure to methylmercury can result in immunotoxic effects.

## 2.8   Other Human Toxicity Data

Based on limited human and animal data, methylmercury is classified as a "possible" human carcinogen by the International Agency for Research on Cancer (IARC 1994) and in the Integrated Risk Information System (IRIS) (EPA 2002).  The existing evidence supporting the possibility of carcinogenic effects in humans from low-dose chronic exposures is tenuous.  Multiple human epidemiological studies have found no significant association between mercury exposure and overall cancer incidence, although a few studies have shown an association between mercury exposure and specific types of cancer incidence (e.g., acute leukemia and liver cancer; NRC 2000).  The MSRC observed that "Methylmercury is not likely to be a human carcinogen under conditions of exposure generally encountered in the environment" (p 6-16, Vol V).  This was based on observation that tumors were noted in one species only at doses causing sever toxicity to the target organ.  While some of the human and animal research suggests that a link between methylmercury and cancer may plausibly exist, more research is needed.

There is also some evidence of reproductive and renal toxicity in humans from methylmercury exposure.  For example, a smaller than expected number of pregnancies were observed among women exposed via contaminated wheat in the Iraqi poisoning episode of 1956 (Bakir et al. 1973); other victims of that same poisoning event exhibited signs of renal damage (Jalili and Abbasi 1961); and an increased incidence of deaths due to kidney disease was observed in women exposed in Minamata Bay via contaminated fish (Tamashiro et al. 1986).  Other data from animal studies suggest a link between methylmercury exposure and similar reproductive and renal effects, as well as hematological toxicity (NRC 2000).  Overall, human data regarding reproductive, renal, and hematological toxicity from methylmercury are very limited and are based on either studies of the two high-dose poisoning episodes in Iraq and Japan or animal data, rather than epidemiological studies of chronic exposures at the levels of interest in this analysis.  Note that the U.S. EPA Mercury Study Report to Congress provides an assessment of methylmercury cancer risk using the 1993 version of the Revised Cancer Guidelines.  For hazard identification, these are similar to the current EPA revisions.

## 2.9   Ecological Effects

Deposition of mercury to water bodies can also have an impact on ecosystems and wildlife.  While the benefit of further reducing mercury emissions cannot be quantified for ecosystems at this time, we find it useful to qualitatively describe this benefit for context.

Mercury contamination is present in all environmental media with aquatic systems experiencing the greatest exposures due to bioaccumulation.  Bioaccumulation refers to the net uptake of a contaminant from all possible pathways and includes the accumulation that may occur by direct exposure to contaminated media as well as uptake from food.  Elimination of methylmercury from fish is so slow that long-term reductions of mercury concentrations in fish are often due to growth of the fish ("growth dilution"), whereas other mercury compounds are eliminated relatively quickly.  Piscivorous avian and mammalian wildlife are exposed to mercury mainly through the consumption of contaminated fish and, as a result, accumulate mercury to levels greater than those in their prey items (EPA 1997).

Numerous studies have generated field data on the levels of mercury in a variety of wild species.  Many of the data from these environmental studies are anecdotal in nature rather than representative or statistically designed studies.  The body of work examining the effects of these exposures is growing but still incomplete given the complexities of the natural world.  A large portion of the adverse effect research conducted to date has been carried out in the laboratory setting rather than in the wild; thus, conclusions about overarching ecosystem health and population effects are difficult to make at this time.  Nevertheless, numerous adverse effects have been identified.  Further reducing the presence of mercury in the environment may help to alleviate the potential for adverse ecological health outcomes.

A full discussion of potential ecosystem effects updated since the 1997 Mercury Report to Congress is provided in Appendix C.

## 2.10    Conclusions

In summary:

- Children who are exposed to low concentrations of methylmercury prenatally may be at risk of poor performance on neurobehavioral tests, such as those measuring attention, fine motor function, language skills, visual-spatial abilities and verbal memory.

- Some recent epidemiological studies in men suggest that methylmercury  is associated with a higher risk of acute myocardial infarction, coronary heart disease and cardiovascular disease in some populations.  Other recent studies have not observed this association.  The studies that have observed an association suggest that the exposure to methylmercury may attenuate the beneficial effects of fish consumption.  The findings to date and the plausible biologic mechanisms warrant additional research in this arena (Stern 2005; Chan and Egeland 2004).

- The exposure levels at which neurological effects have been observed may occur via consumption of fish (rather than high-dose poisoning episodes).  Exposure levels of concern for these effects are generally within two orders of magnitude of typical exposures for women of child-bearing age based on NHANES data, and within approximately an order of magnitude of the high end of the US exposure distribution.

- There is some recent evidence that exposures of methylmercury may result in genotoxic or immunotoxic effects. Other research with less corroboration suggest that reproductive, renal, and hematological impacts may be of concern. There are insufficient human data to evaluate whether these effects are consistent with levels in the U.S. population.

- Plant and aquatic life, as well as fish, birds, and mammalian wildlife can be affected by mercury exposure, however overarching conclusions about ecosystem health and population effects are difficult to make at this time.. Ecological effects are discussed in greater detail in Appendix C.

## 2.11   References

2005 Dietary Guidelines Advisory Committee, August, 2004. Report of the 2005 Dietary Guidelines Advisory Committee. http://www.health.gov/dietaryguidelines/dga2005/default.htm http://www.health.gov/dietaryguidelines/dga2005/report/

Agency for Toxic Substances and Disease Registry (ATSDR). 1999. Toxicological Profile for Mercury. U.S. Department of Health and Human Services, Public Health Service, Atlanta, GA.

Amorim, M.I.M., D. Mergler, M.O. Bahia, H. Dubeau, D. Miranda, J. Lebel, R.R. Burbano, and M. Lucotte. 2000. Cytogenetic damage related to low levels of methyl mercury contamination in the Brazilian Amazon. An. Acad. Bras. Ciênc. 72(4): 497-507.

Bakir, F., S.F. Damluji, L. Amin-Zaki, M. Murtadha, A. Khalidi, N.Y. al-Rawi, S. Tikriti, H.I. Dhahir, T.W. Clarkson, J.C. Smith, and R.A. Doherty. 1973. Methylmercury poisoning in Iraq. Science. 181(96):230-241 (as cited in NRC 2000).

Beuter, A., and R. Edwards. 1998. Tremor in Cree subjects exposed to methylmercury: a preliminary study. Neurotoxicol. Teratol. 20(6):581-9.

Centers for Disease Control, *Blood Mercury Levels in Young Children and Childbearing-Aged Women -United States, 1999-2002*, MMWR Morb Mortal Wkly Rep. 2004 Nov 5;53(43):1018-1020. http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5343a5.htm

Chan, H.M. and G.M. Egeland. 2004. Fish Consumption, Mercury Exposure, and Heart Disease. Nutrition Reviews. 62(2): 68-72.

Crump, K.S., T. Kjellstrom, A.M. Shipp, A. Silvers, and A. Stewart. 1998. Influence of prenatal mercury exposure upon scholastic and psychological test performance: benchmark analysis of a New Zealand cohort. Risk Anal. 18(6):701-713.

Davidson, P.W., G.J. Myers, C. Cox, C. Axtell, C. Shamlaye, J. Sloane-Reeves, E. Cernichiari, L. Needham, A. Choi, Y. Wang, M. Berlin, and T.W. Clarkson. 1998. Effects of prenatal and postnatal methylmercury exposure from fish consumption on neurodevelopment:

outcomes at 66 months of age in the Seychelles Child Development Study. JAMA. 280(8):701-707.

Grandjean, P., K. Murata, E. Budtz-Jorgensen, and P. Weihe. 2004. Autonomic Activity in Methylmercury Neurotoxicity:14-Year Follow-Up of a Faroese Birth Cohort. J. Pediatr. 144:169-76.

Guallar, E., M.I. Sanz-Gallardo, P. van't Veer, P. Bode, A. Aro, J. Gomez-Aracena, J.D. Kark, R.A. Riemersma, J.M. Martin-Moreno, and F.J. Kok; Heavy Metals and Myocardial Infarction Study Group. 2002. Mercury, fish oils, and the risk of myocardial infarction. N Engl J Med. 347(22):1747-54.

Hallgren CG, Hallmans G, Jansson J-H, Marklund SL, Huhtasaari F, Schütz A, Strömberg U, Vessby B, and Skerfving S. 2001. Markers of high fish intake are associated with decreased risk of a first myocardial infarction. British Journal of Nutrition 86:397-404.

International Agency for Research on Cancer (IARC). 1994. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans and their Supplements: Beryllium, Cadmium, Mercury, and Exposures in the Glass Manufacturing Industry. Vol. 58.

Jalili, H.A., and A.H. Abbasi. 1961. Poisoning by ethyl mercury toluene sulphonanilide. Br. J. Indust. Med. 18(Oct.):303-308 (as cited in NRC 2000).

Kjellstrom, T., P. Kennedy, S. Wallis, A. Stewart, L. Friberg, B. Lind, P. Witherspoon, and C. Mantell. 1989. Physical and mental development of children with prenatal exposure to mercury from fish. Stage 2: Interviews and psychological tests at age 6. National Swedish Environmental Protection Board Report No. 3642.

Kris-Etherton, P.M., W.S. Harris, and L.J. Appel. 2002. Fish consumption, fish oil, omega-3 fatty acids, and cardiovascular disease. Circulation. 106(21): 2747-2757.

Lebel, J., D. Mergler, M. Lucotte, M. Amorim, J. Dolbec, D. Miranda, G. Arantes, I. Rheault, and P. Pichet. 1996. Evidence of early nervous system dysfunction in Amazonian populations exposed to low-levels of methylmercury. Neurotoxicology. 17(1):157-167.

Lebel, J., D. Mergler, F. Branches, M. Lucotte, M. Amorim, F. Larribe, and J. Dolbec. 1998. Neurotoxic effects of low-level methylmercury contamination in the Amazonian Basin. Environ. Res. 79(1):20-32.

Mahaffey, K.R., R.P. Clickner, and C.C. Bodurow. 2004. Blood Organic Mercury and Dietary Mercury Intake: National Health and Nutrition Examination Survey, 1999 and 2000. Environ Health Perspect 112:562–570.

Marsh, D.O., T.W. Clarkson, C. Cox, et al. 1987. Fetal methylmercury poisoning: relationship between concentration in single strands of maternal-hair and child effects. Arch. Neurol. 44:1017-1022. (as cited in EPA 2002 IRIS documentation.)

McDowell, M.A., C.F. Dillon, J. Osterloh, P.M. Bolger, E. Pellizzari, R. Fernando, R. Montes de Oca, S.E. Schober, T. Sinks, R.L. Jones, and K.R. Mahaffey. 2004. Hair mercury levels in U.S. children and women of childbearing age: Reference range data from NHANES 1999–2000. Environmental Health Perspectives. 112(11):1165-1171.

Myers, G.J., P.W. Davidson, C. Cox, C.F. Shamlaye, D. Palumbo, E. Cernichiari, J. Sloane-Reeves, G.E. Wilding, J. Kost, L.S. Huang, and T.W. Clarkson. 2003. Prenatal methylmercury exposure from ocean fish consumption in the Seychelles child development study. Lancet. 361(9370):1686-92.

National Research Council (NRC).  2000.  Toxicological Effects of Methylmercury.  Committee on the Toxicological Effects of Methylmercury, Board on Environmental Studies and Toxicology, Commission on Life Sciences, National Research Council.  National Academy Press, Washington, DC.

Salonen J.T., K. Seppanen, K. Nyyssonen, H. Korpela, J. Kauhanen, M. Kantola, J. Tuomilehto, H. Esterbauer, F. Tatzber, and R. Salonen. 1995. Intake of mercury from fish, lipid peroxidation, and the risk of myocardial infarction and coronary, cardiovascular, and any death in eastern Finnish men. Circulation. 91:645-655.

Silva IA, J.F. Nyland, A. Gorman, A. Perisse, A.M. Ventura, E.C. Santos, J.M. de Souza, C.L. Burek , N.R. Rose, and E.K. Silbergeld. 2004. Mercury exposure, malaria, and serum antinuclear/antinucleolar antibodies in amazon populations in Brazil: a cross-sectional study. Environ Health. 3(1):11.

Stern AH.  2005.  A review of the studies of the cardiovascular health effects of methylmercury with consideration of the suitability for risk assessment.  Environmental Research 98(1):133-142.

Tamashiro, H., M. Arakaki, M. Futatsuka, and E.S. Lee. 1986. Methylmercury exposure and mortality in southern Japan: A close look at causes of death. J. Epidemiol. Community Health. 40(2):181-185 (as cited in NRC 2000).

United Nations Environmental Programme (UNEP).  2002. Global Mercury Assessment. December. UNEP Chemicals, part of UNEP's Technology, Industry and Economics Division.

U.S. Environmental Protection Agency (EPA). 1997.  Mercury Study Report to Congress. Volume V: Health Effects of Mercury and Mercury Compounds. EPA-452/R-97-007. U.S. EPA Office of Air Quality Planning and Standards, and Office of Research and Development.

U.S. Environmental Protection Agency (EPA).  2002 (date of most recent revision of on-line materials; website accessed January 2005).  Integrated Risk Information System (IRIS). Methylmercury.  U.S. EPA Office of Research and Development, National Center for Environmental Assessment.  Oral RfD and inhalation RfC assessments last revised

7/27/2001.  .  Carcinogenicity assessment last revised 5/1/1995.  Available online at http://www.epa.gov/iris/subst/0073.htm

Wang C, Chung M, Lichtenstein A, Balk E, Kupelnick B, DeVine D, Lawrence A, Lau J. 2004. Effects of Omega-3 Fatty Acids on Cardiovascular Disease. Summary, Evidence Report/Technology Assessment No. 94. (Prepared by the Tufts-New England Medical Center Evidence-based Practice Center, Boston, MA.) AHRQ Publication No. 04-E009-1. Rockville,MD: Agency for Healthcare Research and Quality. March 2004.Agency for Healthcare Research and Quality (AHRQ), DHHS March, 2004. Omega-3 Fatty Acids Effects on Cardiovascular Disease, http://www.ahrq.gov/clinic/epcindex.htm#dietsup

Yokoo, E.M., J.G. Valente, L. Grattan, S.L. Schmidt, I. Platt, E.K. Silbergeld.  2003.  Low level methylmercury exposure affects neuropsychological function in adults.  Environ. Health. 2003 Jun 04;2(1):8.

Yoshizawa, K., E.B. Rimm, S. Morris, V.L. Spate, C-C. Hsieh, D. Spiegelman, M.J. Stampfer, and W.C. Willett. 2002. Mercury and the risk of coronary heart disease in men.  N Engl J Med. 347:1755-1760.

SECTION 3    ECOSYSTEM SCALE MODELING FOR MERCURY BENEFITS ANALYSIS ........ 3-1
Executive Summary ................................................................... 3-1
3.1    Introduction -- Rule Background ................................................ 3-4
    3.1.1    Use of Mercury Maps (MMaps) to Project Changes in Fish Tissue
          Concentrations ................................................... 3-5
    3.1.2    Goal/Purpose of Ecosystem Case Studies ........................... 3-9
3.2    Recent Advances in Mercury Science ........................................... 3-10
    3.2.1    Mercury Cycle Chemistry ........................................ 3-10
    3.2.2    Mercury Processes in the Atmosphere .............................. 3-10
    3.2.3    Mercury Processes in Soils ...................................... 3-11
    3.2.4    Mercury Processes in Water ..................................... 3-12
    3.2.5    Bioavailability of Inorganic Mercury to Methylating Microbes ..... 3-12
    3.2.6    Mercury Accumulation in the Food Web ............................ 3-14
    3.2.7    Summary of Findings in the METAALICUS Study .............. 3-14
    3.2.8    Summary of Florida Everglades Study ............................. 3-15
3.3    Overview of Models Used in This Study ........................................ 3-16
    3.3.1    Atmospheric Models ............................................ 3-16
    3.3.2    Ecosystem Models .............................................. 3-17
3.4    Overview of Case Studies .................................................... 3-21
    3.4.1    Ecosystem Characteristics ....................................... 3-22
    3.4.2    Baseline Atmospheric Deposition at Each Site ................... 3-24
    3.4.3    Atmospheric Loading Scenarios Investigated ...................... 3-24
    3.4.4    Summary of Model Evaluation .................................... 3-25
    3.4.5    Baseline Fish Mercury Concentrations ........................... 3-27
    3.4.6    Magnitude of Changes in Fish Tissue Residues ................. 3-30
    3.4.7    Summary of Observed Temporal Responses to Declines in Loading . 3-32
    3.4.8    Effect of Land Uses Changes .................................... 3-34
    3.4.9    Summary ....................................................... 3-36
3.5    National Scale Ecosystem Variability ......................................... 3-37
    3.5.1    United States Lakes Distribution ............................... 3-37
    3.5.2    Summary ....................................................... 3-39
3.6    References ................................................................. 3-46

**Tables**

Table 3- 1. Comparison of SERAFM and IEM-2M Forecasted Mercury Concentrations Using Parameter Values for Model Ecosystem Described in the Mercury Study Report to Congress (RtC) and a 50% Reduction in Atmospheric Deposition . . . . . . . . . . . . . . . 3-19

Table 3- 2.  Summary of Ecosystem Characteristics Used To Parameterize Mercury Models  3-23

Table 3- 3.  Baseline Atmospheric Deposition For Each Model Ecosystem . . . . . . . . . . . . . . 3-24

Table 3- 4.  Forecasted Atmospheric Deposition Rates in Case Study Areas Using the CMAQ and REMSAD Models . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-25

Table 3- 5.  List of Model Frameworks Applied to Ecosystems . . . . . . . . . . . . . . . . . . . . . . . 3-26

Table 3- 6.  Summary of Mercury Parameters Used in the SERAFM Model . . . . . . . . . . . . . 3-27

Table 3- 7.  Empirically Derived BAFs for Each of the Ecosystem Case Studies  . . . . . . . . . 3-27

Table 3- 8.  MMaps and SERAFM Forecasted Fish Mercury Concentration at Steady State after Removal of Coal Fired Utilities as a Component of Deposition Using the REMSAD and CMAQ Models (Zero-out Scenario)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-31

Table 3- 9.  Sediment Response Times in Years to Reach 90% of Steady-state Concentrations Following 50% Mercury Deposition Reductions  . . . . . . . . . . . . . . . . . . . . . . . . . . 3-32

Table 3- 10.  Fish Tissue Response Times in Years to Reach 90% of Steady-state Concentrations Following 50% Mercury Deposition Reductions  . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-33

Table 3- 11.  Frequency of Different Lake Sizes Across the United States  . . . . . . . . . . . . . . . 3-38

**Figures**

Figure 3- 1.  BASS Predicted BAFs for Pike/Perch in Lee Dam, Eagle Butte  . . . . . . . . . . . 3-28

Figure 3- 2.  Observed vs. Predicted Fish Mercury Concentrations in Model Ecosystems at Steady State with No Change in Atmospheric Loading  . . . . . . . . . . . . . . . . . . . . . . 3-29

Figure 3- 3.  Temporal Response of Mercury Concentrations in Fish from Pawtuckaway Lake, NH to a Decline in Mercury Loading  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-30

Figure 3- 4.  Temporal Response of Mercury Concentrations in Fish from Lake Barco, FL to a Decline in Mercury Loading  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-31

Figure 3- 5.  Projected Ecosystem Response Times to Zero-out Deposition Scenario Using the SERAFM Model  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-33

Figure 3- 6.  Upper Brier Creek Loading Flux Attenuation  . . . . . . . . . . . . . . . . . . . . . . . . . . 3-35

Figure 3- 7.  Watershed Loading Flux Attenuation Considering Land-use Change  . . . . . . . . 3-35

Figure 3- 8.  Model Ecosystem Locations with CMAQ Grid Cells and Locations of Electricity Generating Units (EGUs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-40

Figure 3- 9.  Model Ecosystem Locations with Gradient in Sulfate Deposition Across the Eastern US  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-41

Figure 3- 10.  Model Ecosystem Locations with Percent Wetland Area Aggregated for Each HUC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-42

Figure 3- 11.  Model Ecosystem Locations with CMAQ 2001 Total Mercury Deposition  . . 3-43

Figure 3- 12.  Model Ecosystem Locations with Measured Fish Tissue Concentrations . . . . 3-44

Figure 3- 13.  Measured 1995-2001 Fish Hg Concentrations > 0.3 ppm  . . . . . . . . . . . . . . . 3-45

**SECTION 3**

**ECOSYSTEM SCALE MODELING FOR MERCURY BENEFITS ANALYSIS**

**Executive Summary**

In the United States, humans are exposed to methylmercury (MeHg) mainly by consuming fish that contain MeHg.  Aquatic ecosystems respond to changes in mercury deposition in a highly variable manner as a function of differences in their chemical, biological and physical properties.  Depending on the characteristics of a given ecosystem, methylating microbes convert a small but variable fraction of the inorganic mercury in the sediments and water derived from human activities and natural sources into MeHg.  Methylmercury is the only form of mercury that biomagnifies in the food web.  Concentrations of MeHg in fish are generally on the order of a million times the MeHg concentration in water.  In addition to mercury deposition, key factors affecting MeHg production and accumulation in fish include the amount and forms of sulfur and carbon species present in a given waterbody.  Thus, two adjoining water bodies receiving the same deposition can have significantly different fish mercury concentrations.

For the Utility Mercury Reduction Benefits Assessment, EPA applied the Mercury Maps (MMaps) model to estimate changes in freshwater fish mercury concentrations resulting from changes in mercury deposition after regulation of mercury emissions from U.S. coal-fired power plants.  MMaps, a simplified form of the IEM-2M model applied in EPA's 1997 *Mercury Study Report to Congress*, is a static model that assumes a proportional relationship between declines in atmospheric mercury deposition and concentrations in fish at steady state.  This means, for example, that a 50% decrease in mercury deposition rates is projected to lead to a 50% decrease in mercury concentrations in fish.  MMaps does not consider the dynamics of relevant ecosystem specific factors that can affect the methylation and bioaccumulation in fish in different water bodies over time, nor does it consider the inputs of non-air sources to the watershed.  In all cases, the MMaps model does not address the lag time of different ecosystems to reach steady state (i.e., when fish mercury concentrations reflect changes in atmospheric deposition).  In addition, applying the MMaps model assumes that atmospheric deposition is the principle source of mercury to the waterbodies being investigated and environmental factors that affect MeHg production and accumulation in organisms will remain constant, allowing each ecosystem to reach steady state. While MMaps has several limitations, EPA knows of no alternative tool for performing a national-scale assessment of such changes.

The objectives of this chapter are to: (a) provide information on the response times of different ecosystems to declines in mercury deposition, and (b) characterize some of the key sources of uncertainty around the proportional relationship used by the MMaps model.  To do this, EPA applied dynamic, ecosystem scale waterbody, watershed, and bioaccumulation models to five freshwater systems spanning a range of types across the United States.  We used model results to investigate the magnitude and timing of changes in fish mercury concentrations associated with changes in atmospheric mercury deposition after regulation of coal-fired power plants.  While important advances have been made in recent years to enhance scientific understanding of the behavior of mercury in the environment, our ability to effectively model the range in response times for different systems is constrained by our limited knowledge of how

methylation and bioaccumulation occur in various ecosystems. Because of these uncertainties, no modeling framework can be considered *a priori* predictive of ecosystem responses at this time.  In recognition of the above, we calibrated models applied in the ecosystem case studies to monitoring data from each of the specific ecosystems studied. In addition, when choosing the locations of these case studies it was essential to rely on well-studied ecosystems where there were sufficient empirical data available to parameterize ecosystem scale models.

Sites investigated can be characterized as follows:

(1)     Small, southern seepage lake with negligible watershed (Lake Barco, FL);
(2)     Watershed dominated, coastal plain river (Brier Creek, GA);
(3)     Large, shallow, well-mixed southern lake (Lake Waccamaw, NC);
(4)     Medium sized, stratified seepage lake with a moderate sized drainage basin in the Northeast (Pawtuckaway Lake, NH); and
(5)     Shallow, well-mixed farm pond in the Midwest (Eagle Butte, SD).

When considering other ecosystem variables that may affect MeHg production (e.g., sulfate deposition, percent wetland coverage, and organic carbon), these case studies represent ecosystem types of moderate methylation potential across the United States.  Fish tissue concentrations and atmospheric deposition rates measured in these regions also do not represent the extremes observed on a national scale.  Therefore, while these ecosystem case studies cover the bulk of the distributions of the key environmental characteristics that will affect MeHg production, they may miss the tails of the distributions for some characteristics.

For each of the above system types, we characterized a range of response times by varying key parameters in the modeling scenarios known to drive the temporal response.  Case studies of individual ecosystems show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.  Forecasted response times to changes in mercury inputs were longest for Brier Creek, a system strongly influenced by the watershed mercury loading, and Pawtuckaway Lake, a stratified cold water lake that had significant watershed mercury inputs.  Shallow, well-mixed systems like Lake Waccamaw and Lee Dam, which receive most of their mercury inputs from the atmosphere are projected to respond to changes in atmospheric deposition in less than a decade, although watershed loading dynamics could introduce significant lag times in reaching the full response.  These findings are consistent with those observed in the Florida Everglades, which can be characterized as a shallow, well-mixed, dynamic system and accordingly shows a measurable response within a decade.  Results from Brier Creek, the watershed dominated system, qualitatively concur with findings from the METALLICUS study showing a much longer response time for mercury deposited in the watershed than direct atmospheric deposition to the surface of a waterbody.

Overall, we conclude that the most likely appropriate response times for freshwater ecosystems to be considered in the national scale assessment range between five and 30 years, while recognizing that some systems will likely take more than 50-100 years to reach steady state.  This assessment is based on the "medium" or moderate estimates across the several system types considered in this study.  Because our modeling scenarios include two extremes of

rapidly and slowly responding system types (e.g., a watershed dominated system and warm, shallow, well-mixed systems), we expect that the range in responsiveness of freshwater bodies in the United States will be captured within the "fast, medium and slow" scenarios presented in the report.  One additional uncertainty in our calculations related to preliminary results from the METAALICUS study showing newly deposited mercury is converted to methylmercury more rapidly than legacy mercury.  These results, if extrapolated to other freshwater sites, imply that the response time of some freshwater ecosystems may be more rapid than predicted by our best available models at this time.

To appreciate the importance of the adjustment time for the benefits analysis, consider the following scenario: Suppose that (a) current benefits are proportional to the reduction in fish tissue concentrations from baseline levels, (b) fish tissue concentrations decrease exponentially to eventually reach 90% of the total reduction, and (c) the "adjustment time" is measured as the time required to reach 90% of the eventual total reduction.  Under these conditions, using discount rates between 3% and 7% the net present values (NPV) of benefits if the adjustment times were 5 years would be between 1.6 and 2.1 times the NPV if the adjustment time were 50 years, even if the same eventual reduction were reached.

To investigate some of the key sources of uncertainty around the proportional relationship used by the MMaps model, we modeled the magnitudes of expected changes in fish mercury concentrations locations after removal of utilities as an emissions source.  At each of the case study locations considered, removal of coal fired utilities as a source of mercury reduced atmospheric deposition rates between four and fifteen percent.  These values are relatively small in magnitude compared to maximum values observed across the country where the maximum model forecasted difference in deposition in this "zero-out" scenario exceeds 70%.  To place this in context, this rule is expected to reduced total mercury emissions in the U.S. by up to 70% for the "cap and trade" alternative.  At the locations considered in this study, EPA estimates that the reductions in emissions associated with the cap and trade alternative will eventually reduce loading rates by approximately 10% from current conditions (see Table 3-8 below).  This decline in deposition can be contrasted with areas most highly affected by the proposed regulation, where declines in deposition are more likely to be on the order of 50% according to modeling projections.  Accordingly, we modeled a 50% decline in atmospheric loading in all of the case studies to investigate responses of similar ecosystem types to large declines in mercury deposition.

Our analysis suggests that differences between results from the ecosystem scale waterbody models and MMaps model across all sites are mainly a function of the initial fish mercury concentrations at steady state.  Because error bars around each species of piscivorous fish investigated in the case studies from a single water body are large, we expect that on a national scale, techniques used to normalize fish mercury data will be a major source of uncertainty in the MMaps model.  Accordingly, both the completeness of national fish tissue monitoring data coverage and the statistical techniques used to normalize these data among different trophic levels and ages will have a major impact on how well the MMaps approach captures the true variability in fish mercury concentrations across the country.  Ecosystem models may be used to supplement limited fish tissue data with forecasted fish mercury concentrations given other information on mercury concentrations and dynamics in a given waterbody.  Overall, it is clear that the magnitude of the uncertainty in the atmospheric and

ecosystem models at this time is much greater than the signal derived from a change in loading following removal of the coal fired utilities at the sites investigated in this report.

Another source of uncertainty in the MMaps forecasts are the atmospheric deposition rates used to forecast changes in fish mercury concentrations. For each case study site, deposition rates in the corresponding CMAQ and REMSAD grid cells were compared to empirically derived loading rates. At the locations chosen for these case studies, site specific data suggest somewhat higher deposition rates than the CMAQ and REMSAD models. This would result in an overestimate of the relative change in atmospheric deposition and changes in fish mercury concentration by the MMaps model. These findings reinforce the need for additional data sets that can be used to test model-forecasted atmospheric mercury deposition rates.

The effect of epistemic uncertainty (i.e., lack of knowledge) about key mercury process variables, such as the functional form of equations used to quantify methylation rate constants, is a major contributor to overall uncertainty in the MMaps and ecosystem models that cannot be quantified at this time. In addition, a preliminary assessment of the expected effect of land-use changes on fish mercury concentrations for a watershed dominated system illustrates changes like urbanization within a watershed can alter the magnitude and timing of fish mercury concentrations. Accordingly, EPA's Office of Research and Development views this study as part of an iterative modeling exercise.

## 3.1   Introduction -- Rule Background

As described in the NODA (FR 69864-69877, December 1, 2004), EPA's revised benefits analysis estimates the extent to which adverse human health effects will be reduced as a result of reducing mercury (Hg) emissions from coal-fired power plants. In the United States, humans are exposed to methylmercury (MeHg) mainly by consuming fish that contain MeHg. Accordingly, to estimate changes in human exposure EPA must analyze how changes in Hg deposition from U.S. coal-fired power plants translate into changes in MeHg concentrations in fish. This proposed rule is expected to reduce total mercury emissions in the U.S. by up to 70% using the "cap and trade" program. In the case studies described later in this section, EPA estimates that the reductions in emissions associated with the cap and trade program will eventually reduce loading rates to the locations considered in this study by approximately 10% from current conditions (see Table 3-4 below). This decline in deposition can be contrasted with areas most highly affected by the proposed regulation, where declines in deposition are more likely to be on the order of 50% according to modeling projections. Quantifying the linkage between different levels of Hg deposition and fish tissue MeHg concentration is an important step in the benefits methodology and the focus of the material described in this chapter.

To effectively estimate fish MeHg concentrations in a given ecosystem, it is important to understand that the behavior of Hg in aquatic ecosystems is a complex function of the chemistry, biology, and physical dynamics of different ecosystems. The majority (95 to 97 percent) of the Hg that enters lakes, rivers, and estuaries from direct atmospheric deposition is in the inorganic form (Lin and Pehkonen, 1999). Microbes convert a small fraction of the pool of inorganic Hg in the water and sediments of these ecosystems into the organic form of Hg (MeHg). MeHg is the only form of Hg that biomagnifies in organisms (Bloom, 1992). Ecosystem-specific factors

that affect both the bioavailability of inorganic Hg to methylating microbes (*e.g.*, sulfide, dissolved organic carbon) and the activity of the microbes themselves (*e.g.*, temperature, organic carbon, redox status) determine the rate of MeHg production and subsequent accumulation in fish (Benoit et al., 2003). The extent of MeHg bioaccumulation is also affected by the number of trophic levels in the food web (*e.g.*, piscivorous fish populations) because MeHg biomagnifies as large piscivorous fish eat smaller organisms (Watras and Bloom, 1992; Wren and MacCrimmon, 1986). These and other factors can result in considerable variability in fish MeHg levels among ecosystems at the regional and local scale.

### 3.1.1   Use of Mercury Maps (MMaps) to Project Changes in Fish Tissue Concentrations

To analyze the relationship between Hg deposition and MeHg concentrations in fish in freshwater aquatic ecosystems across the U.S. for the national scale benefits assessment, EPA applied EPA's Office of Water's Mercury Maps (MMaps) approach. MMaps implements a simplified form of the IEM-2M model applied in EPA's Mercury Study Report to Congress (USEPA, 1997).  By simplifying the assumptions inherent in the freshwater ecosystem models that were described in the Report to Congress, the MMaps model showed that these models converge at a steady-state solution for MeHg concentrations in fish that are proportional to changes in Hg inputs from atmospheric deposition (e.g., over the long term fish concentrations are expected to decline proportionally to declines in atmospheric loading to a waterbody).  This solution only applies to situations where air deposition is the only significant source of Hg to a water body, and the physical, chemical, and biological characteristics of the ecosystem remain constant over time.  EPA recognizes that concentrations of MeHg in fish across all ecosystems may not reach steady state and that ecosystem conditions affecting mercury dynamics are unlikely to remain constant over time.  EPA further recognizes that many water bodies, particularly in areas of historic gold and Hg mining in western states, contain significant non-air sources of Hg. Finally, EPA recognizes that MMaps does not provide for a calculation of the time lag between a reduction in Hg deposition and a reduction in the MeHg concentrations in fish. Despite these limitations, EPA is unaware of any other tool for performing a national-scale assessment of the change in fish MeHg concentrations resulting from reductions in atmospheric deposition of Hg.

MMaps has several limitations:

1.    The MMaps approach is based on the assumption of a linear, steady-state relationship between concentrations of methylmercury in fish and present day air deposition mercury inputs. We expect that this condition will likely not be met in many waterbodies because of recent changes in mercury inputs and other environmental variables that affect mercury bioaccumulation. For example, the US has recently reduced human-caused emissions while international emissions have increased.

2.    The requirement that environmental conditions remain constant over the time required to reach steady state inherent in the MMaps methodology may not be met, particularly in systems that respond slowly to changes in mercury inputs.

3.      Many water bodies, particularly in areas of historic gold and mercury mining in western States, contain significant nonair sources of mercury. MMaps methodology cannot be applied to these waterbodies.

4.      Finally, MMaps does not provide for a calculation of the time lag between a reduction in mercury deposition and a reduction in the methylmercury concentrations in fish.

The following paragraphs provide additional details on the above limitations, as well as a brief assessment of the degree to which conditions match those assumptions. The MMaps model (US EPA, 2001) assumes that for long-term steady state conditions, reductions in fish tissue concentrations are expected to track linearly with reductions in air deposition watershed loads. The MMaps model represents a *reduced form* of the IEM-2M and MCM models used in the Mercury Study Report to Congress (USEPA, 1997), as well as the subsequent Dynamic MCM (D-MCM) model (Harris et al., 1996). That is, the equations of these mercury fate and transport models are reduced to steady state and consolidated into a single equilibrium equation equating the ratio of future/current air deposition rates to future/current fish tissue concentrations. At certain sites, the MMaps model has been shown to produce results equivalent to those of these complex models over the long term, under a specific set of conditions.

Though plainly stated, the steady state assumption is a compilation of a number of individual conditions. For example, fish tissue data may not represent average, steady state concentrations for two major reasons:

•      Fish tissue and deposition rate data for the base period are not at steady state. Where deposition rates have recently changed, the watershed or waterbody may not have had sufficient time to fully respond. The pool of mercury in different media could be sufficiently large relative to release rates, and thus needs more time to achieve a new equilibrium. This is more likely to occur in deeper lakes and lakes with large catchments where turnover rates are longer and where the watershed provides significant inputs of mercury.

•      Fish tissue data do not represent average conditions (or conditions of interest for forecast fish levels). Methylation and bioaccumulation are variable and dynamic processes. If fish are sampled during a period of high or low methylation or bioaccumulation, they would not be representative of the average, steady state or dynamic equilibrium conditions of the waterbody. This effect is significantly more pronounced in small and juvenile fish. Examples include tissue data collected during a drought or during conditions of fish starvation. Other examples include areas in which seasonal fluctuations in fish mercury levels are significant, due for example from seasonal runoff of contaminated soils from abandoned gold and mercury mines or areas geologically rich in mercury. In such a case, MMaps predictions would be valid for similar, conditions (e.g. wet year/dry year, or season) in the future, rather than typical or average conditions. Alternatively, sufficient fish tissue would need to be collected to get an average concentration that represents a baseline dynamic equilibrium.

Other ecosystem conditions might cause projections from the MMaps approach to be inaccurate for a particular ecosystem. Watershed and waterbody conditions can undergo significant changes in capacity to transport, methylate, and bioaccumulate mercury. Examples of this include regions where sulfate and/or acid deposition rates are changing (in turn affecting methymercury production independently of total mercury loading), and where the trophic status of a waterbody is changing. A number of other water quality parameters have been correlated with increased fish tissue concentrations (e.g. low pH, high DOC, lower algal concentrations), but these relationships are highly variable among different waterbodies. MMaps will be biased when waterbody characteristics change between when fish were initially sampled, and the new conditions of the waterbody.

As is stated above, the relationship between the change in mercury deposition from air to the change in fish tissue concentration holds only when air deposition is the predominant source of the mercury load to a waterbody.  Due to this requirement in the model, the national application of the MMaps approach screened out watersheds in which sources of mercury other than air deposition were significant.[1]  Therefore, fish tissue concentrations are assumed to remain unchanged if located in watersheds that contain potentially significant nonpoint sources such as: historic mercury mining locations (as a surrogate for mercury bedrock deposits) (MAS/MILS database for mercury mines (US EPA, 2001b); significant producer gold mines (USGS Database for Significant Deposits; Long, et al, 1998); or mercury cell chlor-alkali facilities (USEPA – PCS database). Watersheds are also screened from the analysis where the sum estimated mercury loads from other sources, e.g. Publicly Owned Treatment Works (POTW) exceeds an arbitrary level of significance (e.g. 5% of total load).

To the degree to which the applicability of the above conditions is unknown, MMaps is a screening level estimate of the changes in fish tissue as a result of changes in air deposition rates. Where these specific conditions do apply, the results from MMaps will be equivalent. The above criteria, for assessing the validity of the steady state assumption, were used to evaluate this benefits analysis application (in the same order as above):

- Changes in sulfate deposition and waterbody sulfate concentration and pH. This has been shown to be the cause for 50% of the reduction in fish tissue mercury levels in a lake in Minnesota. Significant changes in the presence of riparian wetlands in the Adirondack park in New York, thought due to the resurgence in beaver population since the turn of the century, has led to a dramatic increase of mercury export from watersheds to waterbodies. Increased development and urbanization is associated with depressed bioaccumulation rates. Thus in some areas, the predictions using this approach will be somewhat inaccurate due to other confounding factors.

- While the base year for deposition modeling was 2001, the bulk of the fish tissue data was collected in the early 1990's. We know that emissions in 2001 were 50% of that in 1990. Given a short time lag (5 years) the available fish tissue would reflect these higher emissions from 1990. Thus, projected changes in fish tissue concentrations will be applied to higher fish tissue concentrations, and thus be somewhat higher than is actually

---

[1] An alternative approach, presented in US EPA, 2001, allows for taking into account other significant sources where loads from these sources can be quantified and are not expected to change with time.

expected. In this benefits context, this mismatch between air deposition and fish tissue data results in an underestimate of benefits.

- It is unknown to which degree the NLFA and NFTS data reflect those that are commonly fished. While state monitoring programs now generally focus on areas of high fishing pressure, early monitoring programs (prior to 1995) used to develop fish advisories focused their sampling efforts on areas near industrial outfalls and agricultural runoff, looking primarily for organochlorine (e.g. PCBs, DDT, chlordane) contaminants. For this reason, only data collected after 1999 were used in the RIA.  Use of the Wente covariance model removes bias that might be introduced by fish samples by correcting for variability in mercury concentrations attributable to differences in trophic level, length and age from those species most typically consumed by humans.

It should be noted that MMaps was designed to address an important, but very specific issue – that of eventual response of fish tissue to air deposition reductions. As such it responds to a need to understand how mercury reductions, independent of other changes in the environment, will impact fish contamination and human health. More complex models are required in cases where more complete descriptions are needed. A dynamic model is essential for modeling waterbody recovery during the period in which waterbody response lags reductions in mercury loads. A dynamic model is also essential for understanding seasonal fluctuations, as well as year-to-year fluctuations due to meteorological variability. Finally, a more complex model would be essential for assessing the impact of other watershed and water quality changes (e.g. erosion, wetlands coverage, and acid deposition) that might affect mercury bioaccumulation in fish. These complex models are used to derive the MMaps approach, and are themselves based on a number of assumptions. The science of mercury fate and transport in the environment is an actively evolving area of research (e.g. see US EPA, 2003c). While these assumptions are considered reasonable given the state of the science of environmental modeling and mercury in the environment, the validity of assumptions inherent in both the MMaps approach and dynamic ecosystem scale models will need to be reevaluated as the science of mercury fate and transport evolves.

The MMaps methodology was peer reviewed by a set of national experts in the fate and transport of mercury in watersheds. While two reviewers felt it could be used to predict future fish tissue concentrations, a third cautioned it should not be considered a robust predictor until scientific data can be generated to validate the approach. Reviewers systematically identified a set of implicit assumptions that compose the steady state assumption in the MMaps approach. They pointed out that due to evolving and complex nature of the science of mercury, some features of the complex models are assumptions themselves, and thus cannot be wholly relied upon as ultimate predictors of mercury fate and transport.  The reviewers pointed out that there is limited scientific information to directly verify this approach, and that some scientific data appears to refute individual components of the overall steady state assumption. One reviewer did perform a D-MCM and MMaps comparison, and found that, under these assumptions, MMaps model did produce comparable steady-state results as the D-MCM model. There was considerable discussion about how best to aggregate the data, to scale up to a deposition reduction requirement, from fish-specific and waterbody specific information.  The peer review report has not been released because the document that it relates to has not yet been approved for

release by EPA.  However, the description of the approach, and the methodologies as applied in this RIA, are largely consistent with the peer review recommendations.

The MMaps report (US EPA, 2001) presented a national-scale application of Mercury Maps to determine the percent reductions in air deposition that would be needed in watersheds across the country for average fish tissue concentrations to achieve the national methylmercury criterion. In this national scale assessment, fish tissue concentrations were aggregated at the scale of large watersheds, thus presenting average results for each watershed.  The use of other scales of aggregation, e.g., waterbody specific, is consistent with the Mercury Maps approach to the degree to which different mercury loads can be discerned.

### 3.1.2   Goal/Purpose of Ecosystem Case Studies

To supplement the MMaps methodology, this report explores the range in temporal responses of different ecosystems following reductions in atmospheric Hg emissions and some of the sources of uncertainty around the proportional relationship used by the MMaps model.  To do this, we provide quantitative examples from five case studies of a range of freshwater ecosystem types across the Eastern and Midwestern United States.  For all of these systems, we applied an updated dynamic version of the IEM-2M model originally used in the *Mercury Study Report to Congress* (USEPA, 1997) to forecast the time lag of fish mercury concentrations in each ecosystem to different atmospheric mercury input scenarios.  We present our results in the context of recent scientific findings related to the temporal response of different ecosystems and the factors affecting accumulation of mercury in fish.

Because different ecosystems exhibit dramatically different responses to changes in mercury loading depending on their chemical and physical attributes, results from individual case studies must be qualified by their representativeness of ecosystem variability across the United States.  Using georeferenced empirical databases that describe some of the watershed and waterbody characteristics across United States, we describe a preliminary assessment of the variability in some factors known to be important for MeHg formation and bioaccumulation in fish.  Although this analysis has not been completed, the concept is demonstrated by a *preliminary qualitative* assessment of how much of the ecosystem variability in MeHg formation and bioaccumulation has been captured by the modeling case studies.  Developing broad categories of ecosystem types based on their propensity for MeHg formation and bioaccumation in fish and their frequency of occurrence is an iterative effort.  By combining the frequency of each category of ecosystem type with the magnitude and time lag in fish tissue reductions modeled using dynamic, ecosystem scale models, such an analysis could ultimately provide an alternate methodology for a national scale assessment of expected changes in fish MeHg concentrations resulting from reductions in atmospheric mercury deposition.

EPA acknowledges that present modeling capabilities do not allow *a priori* predictions of ecosystem responses due to considerable uncertainties in the science.  These epistemic uncertainties limit the predictive power of both the MMaps approach and the models applied in this exercise (see Peer Review Comments, Appendix 8).  Because of these limitations, modeling scenarios employed in this study are first calibrated to real ecosystem and rely heavily on empirical data to develop credible rate constants and flux terms for each of the case studies investigated.  EPA's Office of Research and Development views this modeling exercise as part a

series of iterative modeling development phases that will eventually allow us to achieve our goal of *a priori* modeled responses.  Accordingly, this report highlights advances in our modeling capabilities since the publication of the *Mercury Study Report to Congress* in 1997.  EPA will continue to develop the models described in this report by incorporating the latest scientific knowledge on the factors that control the distribution and accumulation of mercury in freshwater and coastal marine food web.  This goal is consistent with EPA's Mercury Research Strategy (U.S. EPA, 2000).

## 3.2    Recent Advances in Mercury Science

This modeling exercise is based on our understanding of how mercury cycles through ecosystems and accumulates in fish.  The set of physical, chemical, and biological processes controlling mercury fate in watersheds and water bodies can be synthesized into a general conceptual model that guides our model selection, refinement, and application.  These processes can be grouped into specific categories: mercury cycle chemistry; mercury processes in the atmosphere, soils and water; bioavailability of mercury in water; and mercury accumulation in the food web. The following is a narrative of our conceptual model, discussing the recent scientific developments that have added to our understanding of mercury processes.  This review builds upon the work previously summarized in EPA's Mercury Report to Congress (USEPA, 1997). The end of this section concludes with the conceptual model summary.

### 3.2.1   *Mercury Cycle Chemistry*

Mercury occurs naturally in the environment as several different chemical species.  The majority of mercury in the atmosphere (95-97%) is present in a neutral, elemental state ($Hg^0$) (Lin and Pehkonen, 1999), while in water, sediments and soils the majority of mercury is found in the oxidized, divalent state (Hg(II)) (Morel et al., 1998).  A small fraction (percent) of this pool of divalent mercury is transformed by microbes into methylmercury ($CH_3Hg(II)$/ MeHg) (Jackson, 1998).  Methylmercury is retained in fish tissue and is the only form of mercury that biomagnifies in aquatic food webs (Kidd et al., 1995).  As a result, methylmercury concentrations in higher trophic level organisms such as piscivorous fish, birds and wildlife are often $10^4$-$10^6$ times higher than aqueous methylmercury concentrations (Jackson, 1998).  Transformations among mercury species within and between environmental media result in a complicated chemical cycle.  Mercury emissions from both natural and anthropogenic sources are predominantly as Hg(II) species and $Hg^0$ (Landis and Keeler, 2002; Seigneur et al., 2004).  Anthropogenic point sources of mercury consist of combustion (e.g., utility boilers, municipal waste combustors, commercial/industrial boilers, medical waste incinerators) and manufacturing sources (e.g., chlor-alkali, cement, pulp and paper manufacturing) (USEPA, 1997).  Natural sources of mercury arise from geothermic emissions such as crustal degassing in the deep ocean and volcanoes as well as dissolution of mercury from geologic sources (Rasmussen, 1994).

### 3.2.2   *Mercury Processes in the Atmosphere*

The relative contributions of local, regional and long range sources of mercury to fish mercury levels in a given water body are strongly affected by the speciation of natural and anthropogenic emissions sources. Elemental mercury is oxidized in the atmosphere to form the more soluble mercuric ion (Hg(II)) (Schroeder et al., 1989).  Particulate and reactive gaseous

phases of Hg(II) are the principle forms of mercury deposited onto terrestrial and aquatic systems because they are more efficiently scavenged from the atmosphere through wet and dry deposition than $Hg^0$ (Lindberg and Stratton, 1998). Because Hg(II) species or reactive gaseous mercury (RGM) and particulate mercury (Hg(p)) in the atmosphere tend to be deposited more locally than $Hg^0$, differences in the species of mercury emitted affect whether it is deposited locally or travels longer distances in the atmosphere (Landis et al., 2004).  Recent research indicates that certain meteorological conditions and atmospheric constituents can result in the rapid oxidation of $Hg^0$ to RGM, potentially increasing the fraction of $Hg^0$ from anthropogenic sources that is deposited more locally (Landis, Pers. Comm., 2004).

Atmospheric models use various mathematical frameworks to describe how meteorology and atmospheric chemistry interact with different mercury species from a variety of sources to determine mercury deposition (e.g., (Bullock and Brehme, 2002; Cohen et al., 2004).  Modeling the atmospheric fate and transport of mercury is outside of the scope of this project, although outputs of several atmospheric models will be used in combination with available empirical data to estimate atmospheric deposition of mercury to different water bodies under different regulatory scenarios.

### 3.2.3   Mercury Processes in Soils

A portion of the mercury deposited in terrestrial systems is re-emitted to the atmosphere. On soil surfaces, sunlight may reduce deposited Hg(II) to $Hg^0$, which may then evade back to the atmosphere (Carpi and Lindberg, 1997; Frescholtz and Gustin, 2004; Scholtz et al., 2003). Significant amounts of mercury can be co-deposited to soil surfaces in throughfall and litterfall of forested ecosystems (St. Louis et al., 2001), and exchange of gaseous $Hg^0$ by vegetation has been observed (e.g., (Gustin et al., 2004).

Hg(II) has a strong affinity for organic compounds such that inorganic Hg in soils and wetlands is predominantly bound to dissolved organic matter (Mierle and Ingram, 1991).  MeHg likewise forms stable complexes with solid and dissolved organic matter (Hintelmann and Evans, 1997).  These complexes can dominate MeHg speciation under aerobic conditions (Karlsson and Skyllberg, 2003).  Truly dissolved and dissolved organic carbon (DOC)-complexed Hg(II) and MeHg are transported by percolation to shallow groundwater, and by runoff to adjacent surface waters (Ravichandran, 2004).  Sorbed Hg(II) and MeHg are transported by erosion fluxes to depositional areas on the watershed and to adjacent surface waters (e.g., (Hurley et al., 1998).

Concentrations of MeHg in soils are generally very low.  In contrast, wetlands are areas of enhanced MeHg production and account for a significant fraction of the external MeHg inputs to surface waters that have watersheds with a large portion of wetland coverage (e.g., (St. Louis et al., 2001).  Accordingly, there is a positive relationship between MeHg yield and percent wetland coverage (Hurley et al., 1995).  Hydrology exerts an important control on the magnitude and flux of MeHg in wetland ecosystems (Branfireun and Roulet, 2002), as well as the transport of inorganic mercury deposited in a given watershed to surface waters (Babiarz et al., 2001).

It should also be noted that there are exceptions to the predominace of wetlands as an external source of MeHg to surface waters.  For example, preliminary simulations with a multi-

cell version of EPRI's Dynamic Mercury Cycling Model (D-MCM®) for Lake Superior generated a model result where direct atmospheric deposition of methylmercury was predicted to be the largest single source of methylmercury to the waterbody (Harris et al., 2002). This was not because methylmercury deposition rates were unusually high. It was instead because in-situ production and terrestrial loading of MeHg were predicted to be low.

### 3.2.4   Mercury Processes in Water

In a water body, deposited Hg(II) is reduced to $Hg^0$ by ultraviolet and visible wavelengths of sunlight as well as microbially mediated reduction pathways (Amyot et al., 2000; Mason et al., 1995). In turn, $Hg^0$ is oxidized back to Hg(II), driven by sunlight as well as by "dark" chemical or biochemical processes (Lalonde et al., 2001; Zhang and Lindberg, 2001). Driven by wind and water currents, dissolved $Hg^0$ in the water column is volatilized, which can be a significant removal mechanism for mercury in surface waters and a net source of mercury to the atmosphere (Siciliano et al., 2002).

In the water column and sediments, Hg(II) partitions strongly to silts and biotic solids, sorbs weakly to sands, and complexes strongly with dissolved and particulate organic material. The abundance of various inorganic ligands (e.g., $OH^-$, $Cl^-$, $S^{2-}$, DOC) in freshwater and saltwater ecosystems plays an important role in both oxidation and reduction of inorganic mercury as well as its bioavailability to methylating microbes. For example, reduction of Hg(II) is hypothesized to be a function of the predominance of $Hg(OH)_2$, which is inversely correlated with pH (Mason et al., 1995). Reduction of Hg(II) to $Hg^0$ and subsequent volatilization from the water column is important because it effectively reduces the pool of inorganic mercury that could potentially undergo conversion to MeHg.

Hg(II) and MeHg sorbed to solids settle out of the water column and accumulate on the surface of the benthic sediment layer. Surficial sediments interact with the water column via resuspension and bioturbation. The burial of sediments below the surficial zone can be a significant removal mechanism for contaminants in surface sediments (e.g., (Gobas et al., 1998; Gobas et al., 1995). The depth of the active sediment layer is a highly sensitive parameter for predicting the temporal response of different ecosystems to changes in mercury loading in environmental fate models. This is because the reservoir of Hg(II) potentially available for conversion to MeHg in the sediments is a function of the depth and volume of the active sediment layer. The.compartment conducive for methylation is similarly affected (Harris and Hutchison, 2003; Sunderland et al., 2004). Physical characteristics of different ecosystem types affect estuarine mixing and sediment resuspension, which also affect the production of MeHg in the water and sediments (Rolfhus et al., 2003; Sunderland et al., 2004; Tseng et al., 2001).

### 3.2.5   Bioavailability of Inorganic Mercury to Methylating Microbes

The amount of bioavailable MeHg in water and sediments of aquatic systems is a function of the relative rates of mercury methylation and demethylation. In the water, MeHg is degraded by two microbial processes and sunlight (Barkay et al., 2003; Sellers et al., 1996). Recent research has shown that demethylating Hg-resistant bacteria may adapt to systems that are highly contaminated with total mercury, helping to explain the paradox of low MeHg and fish Hg levels in these systems (Schaefer et al., 2004).

Mass balances for a variety of lakes and coastal ecosystems show that *in situ* production of MeHg is often one of the main sources of MeHg in the water and sediments (Benoit et al., 1998; Bigham and Vandal, 1994; Gbundgo-Tugbawa and Driscoll, 1998; Gilmour et al., 1998; Mason et al., 1999). Sulfate reducing bacteria (SRB) are thought to be the principle agents responsible for the majority of MeHg production in aquatic systems (Beyers et al., 1999; Compeau and Bartha, 1987; Gilmour and Henry, 1991). SRB thrive in the redoxocline, where the maximum gradient between oxic and anoxic conditions exists (Hintelmann et al., 2000). Thus, in addition to the presence of bioavailable Hg(II), MeHg production and accumulation in aquatic systems is a function of the geochemical parameters that enhance or inhibit the activity of methylating microbes, especially sulfur concentrations, redox potential (Eh) and the composition and availability of organic carbon.

A number of factors affect the bioavailabilty of Hg(II). A strong inverse relationship between complexation of Hg(II) by sulfides and MeHg production has been demonstrated in a number of studies (Benoit et al., 1999; Benoit et al., 1999; Craig and Bartlett, 1978; Craig and Moreton, 1986). Passive diffusion of dissolved, neutral inorganic mercury species is hypothesized as one of the main modes of entry across the cell membranes of methylating microbes (Benoit et al., 1999; Benoit et al., 2003; Benoit et al., 1999). Thus, the formation of neutral, dissolved mercury species such as $HgCl_2$, $Hg(OH)_2$, HgClOH, and $HgS^0$(aq.), which depend on the availability of constituent ligands in the surface and interstitial waters, may strongly influence the availability of inorganic mercury to SRB, although our understanding of the forms of mercury that are bioavailable to methylating microbes is currently incomplete (Benoit et al., 2001; Benoit et al., 1999; King et al., 2001). The availability of the pool of inorganic mercury in the water and sediments for methylation is also dominated by the binding of Hg(II) with dissolved organic matter (DOM) complexes (Ravichandran, 2004).

Changes in the bioavailability of inorganic mercury and the activity of methylating microbes as a function of sulfur, carbon and ecosystem specific characteristics mean that ecosystem changes and anthropogenic "stresses" that do not result in a direct increase in mercury loading to the ecosystem but alter the rate of MeHg formation may also affect mercury levels in organisms (e.g., (Grieb et al., 1990). Because mercury concentrations in fish can increase even when there has been no change in the total amount of mercury deposited in the ecosystem, environmental changes such as eutrophication, which may alter microbial activity and the chemical dynamics of mercury within an ecosystem, must be considered together with emission control strategies to effectively manage mercury accumulation in the food web.

Recent research indicates that the bioavailability or reactivity of newly deposited Hg(II) may be greater than older "legacy" mercury in the system (Hintelmann et al., 2002). These results suggest that lakes receiving the bulk of their mercury directly from deposition to the lake surface (e.g., some seepage lakes) would see fish mercury concentrations respond more rapidly to changes in atmospheric deposition than lakes receiving most of their mercury from watershed runoff. The implications of these data are also that systems with a greater surface area to watershed area ratio that receive most of their inputs directly from the atmosphere (e.g., seepage lakes) may respond more rapidly to changes in emissions and deposition of mercury than those receiving significant inputs of mercury from the catchment area.

### 3.2.6    Mercury Accumulation in the Food Web

Dissolved Hg(II) and MeHg accumulate in aquatic vegetation, phytoplankton, and benthic invertebrates. Unlike Hg(II), MeHg biomagnifies though each successive trophic level in both benthic and pelagic food chains such that mercury in predatory, freshwater fish is found almost exclusively as MeHg (Bloom, 1992; Watras et al., 1998).  Thus, trophic position and food-chain complexity plays an important role in MeHg bioaccumulation (Kidd et al., 1995).

The chemical and physical characteristics of different ecosystems affect MeHg uptake at the base of the food chain, driving bioaccumulation at higher trophic levels.  At the base of pelagic freshwater food-webs, MeHg uptake by plankton is thought to be a combination of passive diffusion and facilitated transport (Laporte et al., 2002; Watras et al., 1998).  Uptake of MeHg by plankton can be enhanced or inhibited by the presence of different ligands bound to MeHg (Lawson and Mason, 1998).  Similarly, the assimilation efficiency of MeHg at the base of the food chain is also affected by the type of dissolved MeHg-complexes in the water and sediments.  This may be a function of differences in the ability of organisms to solubilize MeHg through digestive processes with different MeHg complexes (Lawrence and Mason, 2001; Leaner and Mason, 2002).  The presence of organic ligands and high concentrations of DOC in aquatic ecosystems are generally thought to limit MeHg uptake by biota (Driscoll et al., 1995; Sunda and Huntsman, 1998; Watras et al., 1998).

In fish, MeHg bioaccumulation is a function of several uptake (diet, gills) and elimination pathways (excretion, growth dilution) (Gilmour et al., 1998; Greenfield et al., 2001).  As a result, the highest mercury concentrations for a given fish species correspond to smaller, long-lived fish that accumulate MeHg over their life span with minimal growth dilution (e.g., (Doyon et al., 1998).  In general, higher mercury concentrations are expected in top predators, which are often large fish relative to other species in a waterbody.

### 3.2.7    Summary of Findings in the METAALICUS Study

METAALICUS is a whole-ecosystem experiment examining the relationship between atmospheric mercury deposition and fish mercury concentrations (Harris et al., 2004).  Stable, non-radioactive isotopes of inorganic Hg(II) are being added to an 8.3-ha lake and its 44-ha watershed in the Experimental Lakes Area (ELA), Ontario, Canada.  Using isotopes provides the ability to follow newly deposited mercury separately from background mercury.  Different Hg(II) isotopes are being applied to uplands, wetlands and the lake surface to distinguish the contributions of each of these sources to fish mercury levels.  Beginning in 2001, and continuing each year since (3 years to-date), annual wet deposition of atmospheric Hg(II) has been increased experimentally 3-4 fold relative to long term average wet deposition rates to the area.  Annual mercury additions to the lake surface were 22 $\mu$g m$^{-2}$ each year.  Upland and wetland areas received isotopes at average annual application rates of 21-25 and 25-28 $\mu$g m$^{-2}$ yr$^{-1}$ respectively for the 2001-2003 period.

During the first season of additions (2001), concentrations of inorganic mercury in the surface waters of Lake 658 nearly doubled as a result of the mercury isotope ($^{202}$Hg) added directly to the lake surface.  This represented a nearly proportional response for inorganic mercury, relative to the increase in mercury loading to the lake as a result of the spikes to the

lake surface.   Inorganic $^{202}$Hg added to the lake surface was also detected as MeHg in the first season in the water column, sediments and biota, including fish.  Concentrations of $^{202}$Hg-labelled MeHg in water, sediments and biota continued to increase in 2002 and 2003. Different response dynamics were observed for the buildup of added mercury as MeHg in different compartments.   Results to-date suggest that the system has not yet stabilized in response to the annual isotope additions directly to the lake surface.  Inorganic mercury isotopes added to the terrestrial system were measured in the uplands and wetlands and observed at near-detection levels in lake waters by late 2002 (upland isotope only), but were not yet detectable in fish as of 2003.  Initial efforts to simulate the L658 experiment with a mass balance model of aquatic Hg cycling were unable to match the rate at which the isotope applied to the lake as inorganic mercury was observed as MeHg in the system.  The apparent higher bioavailability for methylation of newly added mercury compared to "older" mercury may be a factor.

### 3.2.8    Summary of Florida Everglades Study

The Florida Everglades TMDL Pilot Study is one of the best-known investigations of the temporal response of an aquatic system to reduced mercury loading.  In the Everglades, elevated mercury concentrations in fish are caused by a combination of atmospheric loading, net methylation in water column periphyton, and food web dynamics(Atkeson, 2003).  Periphyton and macrophytes influence fish levels through their control of available divalent and methyl mercury in the water column.

Incinerator mercury emissions in southern Florida have declined approximately 99% since the mid-1980's as a result of pollution prevention and control policies. In general accord, mercury in fish and wildlife of the Everglades has declined by approximately 60% since the mercury peaked in biota in the mid-1990's.

In 1999 Florida DEP and USEPA began a modeling analysis of the environmental cycle of mercury to explore the tools and data needed to perform a Total Maximum Daily Load analysis (TMDL) for an atmospherically derived pollutant. Extensive Everglades specific data are available to support a linked, multi-media modeling analysis through the auspices of the South Florida Mercury Science Program, a 10-year multi-agency program of research, modeling and monitoring studies.

The dynamic mercury cycling model (E-MCM) was applied to investigate changes in fish tissue Hg (at site at WCA 3A-15) with declines in atmospheric mercury deposition as part of the Pilot TMDL study for that site (Tetra Tech Inc., 2000).  Model simulations showed that regardless of the magnitude of the load reduction, fish mercury concentrations were predicted to change by 50% of the ultimate response within 8-9 years.  Within 25-30 years, 90% of the ultimate predicted response has occurred.  In all cases, the actual magnitude of the change in fish Hg was dependent on the magnitude of the load reduction.  In the above simulations, a 3 cm thick active sediment layer was assumed and the model did not distinguish between new and old or "legacy" Hg.

At steady state, E-MCM forecasts a linear relationship between atmospheric mercury deposition and mercury concentrations in largemouth bass, with a small residual mercury concentration in fish at zero atmospheric mercury deposition: for any reduction in mercury

inputs to the Everglades a slightly lesser reduction in fish mercury concentrations may be anticipated. Furthermore, the E-MCM predicts near equivalence between the change in atmospheric mercury deposition rate and the change in largemouth bass mercury concentration over the likely range for current estimates of atmospheric deposition of mercury. The slight offset from a 1:1 relationship results from slow mobilization of historically deposited mercury from deeper sediment layers to the water column. Until buried below the active zone, this mercury can continue to cycle through the system.  In addition, because mercury is a naturally occurring element, fish tissue mercury concentrations can never be reduced to zero.  Further, the model showed that absent changes to the system other than mercury loading (e.g. sulfur or nutrient cycling, or hydrology), an ~80% reduction from the ca. 1996 peak total annual mercury atmospheric deposition would be needed for mercury concentrations in a 3-year old largemouth bass in the central Everglades to be reduced to less than Florida's present fish consumption advisory action level of 0.5 mg/kg.

Despite the quality of the modeling done as part of the Everglades study, this analysis has limited applicability to other aquatic systems because of unusual attributes of the Everglades. These attributes are listed below.

- Physiography of the waterbody — As a flat, shallow, vegetated marshland the Everglades is atypically vulnerable to atmospheric deposition because of its great surface-to-volume ratio.
- Climate — Year-round high temperature and insolation stimulates chemical and physical processes, promoting rapid aquatic cycling and unusually high production of MeHg.
- Meteorology — Easterly trade winds typify the synoptic transport regime during the summer when ~ 85% of rainfall and ~ 90% of mercury deposition occurs. This pattern efficiently brings emissions from the southeast coastal counties of Florida out over the Everglades where frequent thunderstorms focus deposition there.
- Sources — Incineration was the largest emissions category in south Florida through the mid-1990's. A predominance of emissions was 'reactive gas-phase mercury' (RGM or Hg(II)) which tends to deposit on a local scale.
- Synergy — Coupled with meteorology described above, the dominance of emissions as RGM has resulted in an unusually tight local-scale coupling between emissions in southern Florida and local-scale deposition.

## 3.3    Overview of Models Used in This Study

The general approach taken in this project was to couple outputs from atmospheric fate and transport models with a set of watershed and water body models that are parameterized using empirical data from well-characterized ecosystems.

### 3.3.1    Atmospheric Models

Over the past decade, EPA has used a variety of analytical and numerical simulation tools to project the atmospheric transport, chemistry, and deposition of both criteria (*e.g.*, ozone, fine particles, etc.) and toxic (*e.g.*, Hg) air pollutants. These models range in complexity from simple, one-layer Gaussian dispersion models (e.g., Industrial Source Complex (ISC3) model) to more complex, multi-layer Lagrangian puff-type trajectory models (e.g., Hybrid Single Particle

Lagrangian Integrated Trajectory (HYSPLIT) model), and finally to complex three dimensional (3–D) Eulerian grid models (e.g., Community Multiscale Air Quality (CMAQ) model). EPA and others have been using a suite of complex numerical models to assess the transport and fate of Hg emissions in the local, regional, and global atmosphere. In the *Utility Report to Congress*, EPA relied heavily on the ISC3 dispersion model to assess nearfield Hg deposition effects. The HYSPLIT model has also been used extensively in the Great Lakes and Chesapeake Bay watersheds to analyze source-receptor relationships for Hg deposition in these areas (Cohen et al., 2004).

A review of the strengths and weaknesses of atmospheric mercury fate and transport modeling is beyond the scope of this project. However, projected deposition scenarios for different water bodies obtained from the models described above serve as inputs to the aquatic fate and transport modeling described in this chapter. Modeled deposition rates (2001) using the CMAQ and REMSAD models for each of the five ecosystems were compared to site-specific data. Local monitoring data and sedimentary records of total mercury deposition obtained from dated sediment cores (where available) were used obtain the best possible estimates of overall loading to individual ecosystems. Outputs from atmospheric mercury cycling models (REMSAD/CMAQ) were then used to forecast the relative change in mercury inputs to each ecosystem modeled when contributions from coal-fired utilities were removed (e.g., the percent difference in atmospheric deposition for each ecosystem between 2001 and scenario removing coal-fired utilities as a source) to isolate their contribution the fraction of mercury accumulation in fish. Details of the atmospheric deposition scenarios are described below in Section 3.4.

### 3.3.2   Ecosystem Models

EPA has developed a set of watershed, water body, and food web models that describe the speciation, transport, and bioaccumulation of mercury as a function of the physical and chemical properties of a specific ecosystem. The selected watershed and water body models have been recently applied to various case studies. In this project, they were refined for consistency and used to construct ecosystem specific mass balances for the three principle mercury components – inorganic divalent mercury, Hg(II), elemental mercury, $Hg^0$, and monomethyl mercury, $CH_3Hg(II)$ (or MeHg). We compare the results from the SERAFM and WASP waterbody fate and transport models (Section 3.4) as an internal check on consistency of the modeling results. For more information on the specific models described below, please see http://www.epa.gov/athens and www.epa.gov/crem.

### 3.3.2.1  Overview of the SERAFM Model

The SERAFM model incorporates more recent advances in scientific understanding described above and implements an updated set of the IEM-2M solids and mercury fate algorithms described in detail in the *Mercury Study Report to Congress* (USEPA, 1997). These updates provide more realistic representations of the processes governing mercury fate and transport in aquatic systems. Major differences between the SERAFM model and the IEM-2M model are as follows:

- *Dynamic calculations*:  SERAFM can describe the temporal response of fish mercury concentrations to changes in mercury loading, while the IEM-2M model calculated expected fish tissue mercury concentrations at steady state.
- *Watershed Loading*: Both IEM-2M and SERAFM model soil erosion into the water body using the Revised Universal Soil Loss Equation (RUSLE).  However, in SERAFM mercury loading from the watershed to the water body is modeled using run-off coefficients.  SERAFM defines four land-use types: impervious, upland, riparian, and wetland/forest.  The user defines the percentage of each type in the watershed.  The model uses run-off coefficients to describe mercury from atmospheric deposition to each land type as loadings to the water body.  IEM-2M calculates mercury concentrations in soils, and calculates erosion and transport to the water body.
- *Two-Layer*: SERAFM has the capability to model a layered lake system with an epilimnion and hypolimnion, while IEM-2M used a single, well mixed layer to represent the water column.
- *Photo-reactions*: Recent research has demonstrated the photo-reactions of mercury. These have been incorporated into SERAFM but were not part of the original IEM-2M model.  The oxidation and reduction of mercury as functions of visible and UV-B light are included.
- *Speciation*: Speciation of mercury with hydroxides, chlorides, and sulfides has been included in the SERAFM model but was not incorporated in the IEM-2M model.The abiotic oxidation rate constant for HgII is multiplied by the fraction of dissolved divalent mercury and the fraction of HgII present as $Hg(OH)_2$.
- *Equilibrium Partitioning*: SERAFM models equilibrium partitioning between multiple compartments or phases: aqueous phase, abiotic particles (silts/fines), biotic particles (phytoplankton, zooplankton, seston), and DOC-complexation. In SERAFM, the biotic demethylation rate constant is multiplied by the sum of the fraction dissolved and the fraction DOC-complexed, as suggested by previous research (Matilainen and Verta, 1995).
- *Trophic status*:  Trophic status of the lake has been incorporated into the SERAFM model and was not a component of the IEM-2M model.  Trophic status is used to calculate visible light attenuation in the lake, the turnover of biomass, and the phytoplankton and zooplankton concentration in the SERAFM model framework.
- *Suspended particle types in the water column*: The SERAFM model accounts for both zooplankton and phytoplankton as biotic materials in the system, while IEM-2M only accounted for one biotic particle type.
- *Reaction rates*: The SERAFM model incorporates more recent reaction rate coefficients, and the understanding of the variability of these rates with different conditions.
- *Partition coefficients*: The SERAFM model incorporates more recent values for mercury partition coefficients for each mercury species.  Future versions of the SERAFM model will calculate site-specific partitioning as a function of sediment organic matter and the organic carbon content of suspended materials.

State variables in both the IEM-2M and SERAFM models include three mercury species, $Hg^0$, Hg(II), and MeHg.  As mentioned above, SERAFM includes four solids types (abiotic solids, phytoplankton solids, zooplankton solids, and detrital solids) and dissolved organic carbon, DOC.  Both IEM-2M and SERAFM simulations are driven by external mercury loadings delivered from the atmosphere, from watershed tributaries, and from point sources, or by internal

loadings from contaminated sediments.  SERAFM calculates the time-dependent solids and mercury species concentrations in the water column and sediments of the specified water body reach. Hg(II) and MeHg are partitioned to suspended and benthic solids and to dissolved DOC with user-specified partition coefficients for each sorbent type.

In the SERAFM model, mercury species are subject to several transformation reactions, including photo-oxidation and dark oxidation of $Hg^0$ in the water column, photo-reduction and methylation of Hg(II) in the water column and sediment layers, and photo-degradation and demethylation of MeHg in the water column and sediment layers. Water column oxidation, reduction and demethylation reactions are driven by sunlight, and so their input rate constants are attenuated through the water column using specified light extinction coefficients. $Hg^0$ is subject to volatile exchange between the water column and the atmosphere governed by a transfer rate calculated from velocity and depth, and by its Henry's Law constant.

A preliminary comparison of the SERAFM model to the IEM-2M model using the parameter values for the model ecosystem described in the RtC suggests that updates to the IEM-2M model incorporated into the SERAFM model result in lower values for fish mercury concentrations (Table 3-1).  However, the model ecosystem described in the RtC uses a lower dry deposition rate than estimated based on more recent understanding and assumes that there is no watershed MeHg loading.  When these parameters are updated to reflect current knowledge, forecasted fish mercury concentrations are higher than the original IEM-2M results (see Table 3-1).

**Table 3- 1. Comparison of SERAFM and IEM-2M Forecasted Mercury Concentrations Using Parameter Values for Model Ecosystem Described in the Mercury Study Report to Congress (RtC) and a 50% Reduction in Atmospheric Deposition**

| Parameters | RtC Model Ecosystem | RtC Model Ecosystem | Updated Parameters |
|---|---|---|---|
| Model | IEM-2M | SERAFM | SERAFM |
| Water Column MeHg Unfiltered | 0.08 | 0.031 ng L$^{-1}$ | 0.12 ng L$^{-1}$ |
| Water Column HgT Unfiltered | 1.16 ng L$^{-1}$ | 2.50 ng L$^{-1}$ | 1.17 ng L$^{-1}$ |
| Trophic Level 4 Fish | 0.44 ug g$^{-1}$ | 0.21 ug g$^{-1}$ | 0.80 ug g$^{-1}$ |
| Trophic Level 4 Fish BAF: FishHg/MeHg | | 6.8x10$^6$ | |

The "Updated Parameters" column refers to modification of the original model ecosystem described in the RtC to incorporate more recent knowledge on the magnitude of dry deposition and inputs of MeHg from the catchment.

*3.3.2.2 Overview of the WASP Model*

WASP (Water Quality Analysis Simulation Program) is a dynamic, mass balance framework for modeling contaminant fate and transport in surface water systems. This model helps users interpret and predict water quality responses to natural phenomena and man-made

pollution for various pollution management decisions.  WASP is an enhancement of the original WASP (Ambrose, 1987; Ambrose, 1988; Connolly and Thomann, 1985; Di Toro et al., 1983) and allows the user to investigate 1, 2, and 3 dimensional systems, and a variety of pollutant types. The time-varying processes of advection, dispersion, point and diffuse mass loading and boundary exchange are represented in the model. WASP also can be linked with hydrodynamic and sediment transport models that can provide flows, depths, velocities, and temperature, salinity and sediment fluxes.

The WASP7 mercury module simulates three mercury species, $Hg^0$, $Hg(II)$, and MeHg, as well as three solids types (silt, sand, and biotic solids) (e.g., (Ambrose and Wool, 2001). Simulations are driven by the speciated mercury loadings delivered from the atmosphere, from watershed tributaries, and from point sources.  Throughout the simulation period, WASP calculates solids and mercury species concentrations in the water column and sediments of each reach. Transport processes simulated include advection, dispersion, and sediment-water column exchange. $Hg(II)$ and MeHg are partitioned to silt, sand, and biotic solids, and to dissolved organic carbon (DOC).

### 3.3.2.3 Overview of the WCS Model

Although significant progress has been made in recent years on estimations of mercury transport fluxes in watershed areas within a region in which atmospheric deposition is presumably constant (Balogh et al., 1998; Hurley et al., 1995; Lawson et al., 2001; Lee et al., 1995; Tsiros, 1999), only a few watershed studies have focused on the importance of indirect anthropogenic sources of Hg such as terrestrial runoff, compared to direct atmospheric deposition.  The EPA Region 4 Watershed Characterization System (WCS) is a GIS-based modeling system for calculating soil particle transport and pollutant fate in watersheds (Greenfield et al., 2002).  Its mercury transport module was developed from the IEM-2M model, which calculated mercury species concentrations in an idealized watershed and water body based on steady atmospheric mercury deposition and long-term average hydrology. Similarly, the WCS calculates long-term average hydrology and sediment yield, but simulates total $Hg(II)$ in a more realistic, distributed sub-watershed network. A second-generation WCS that operates on a finer computational grid is under development. Initial background soil mercury concentrations along with wet and dry atmospheric mercury deposition fluxes are input to the model.  For pervious subwatershed grid elements, WCS calculates surficial soil mercury concentrations over time using a mass balance.  Calculated total mercury in the surficial soil layers is partitioned between the dissolved and particulate phases (in the soil water and on the soil solids) assuming local equilibrium, governed by a partition coefficient.  Dissolved mercury is lost from the surficial soil layers through percolation and runoff.  Particulate mercury is lost through water runoff erosion. No wind resuspension is included in the model calculations. A fraction of the soil mercury is reduced and volatilized back to the atmosphere. Subwatershed mercury loadings in runoff water and runoff erosion particles are delivered to the watershed tributary system. For impervious areas and water surface areas within the subwatersheds, atmospheric mercury deposition is delivered to the tributary system without loss.

Surficial soil concentrations for each of the three mercury components are calculated in WCS on a daily basis using a mass balance equation driven by an input term for atmospheric deposition.  Mercury output terms include gaseous flux from soil to air by volatilization, vertical

hydrologic transport through soil by percolation, and horizontal hydrologic transport from surficial soil by runoff water and runoff erosion particles.  A source/sink term for mercury cycling with first-order kinetics is used to represent oxidation of $Hg^0$, methylation of Hg(II), demethylation of MeHg, and abiotic reduction of Hg(II) to $Hg^0$, with a functional dependence of the reduction rate on soil moisture and vegetation cover shading (Tsiros, 2002).

### 3.3.2.4 Overview of the BASS Model

BASS (Bioaccumulation and Aquatic System Simulator) describes the dynamics of mercury bioaccumulation in the food chain using algorithms that account for mercury accumulation among different species and different age classes using species-specific uptake and elimination terms such as diet composition and growth dilution (Barber, 2001; Barber et al., 1987; Barber et al., 1988; Barber et al., 1991).

BASS simulates the population and bioaccumulation dynamics of age-structured fish communities. Although BASS was specifically developed to investigate the bioaccumulation of chemical pollutants within a community or ecosystem context, it can also be used to explore population and community dynamics of fish assemblages that are exposed to a variety of non-chemical stressors such as altered thermal regimes associated with hydrological alterations or industrial activities, commercial or sports fisheries, and introductions of non native or exotic fish species.  Contaminants entering each fish through gill exchange and ingestion are partitioned internally to water, lipid, and non-lipid organic material.  Internal equilibrium among these phases is assumed to be rapid in comparison with external exchanges.  Stability coefficients are specified for the binding of MeHg to available sulfhydryl groups in the fish's non-lipid organic material.

BASS's model structure is very generalized and flexible. Users can simulate both small, short-lived species (e.g., daces, minnows, etc.) and large, long-lived species (e.g., bass, perch, sunfishes, trout, etc.) by specifying either monthly or yearly age classes for any given species. The community's food web is defined by identifying one or more foraging classes for each fish species based on body weight, body length, or age. The dietary composition of each of these foraging classes is then specified as a combination of benthos, incidental terrestrial insects, periphyton/attached algae, phytoplankton, zooplankton, and/or other fish species, including its own. One of the strengths of the BASS model relative to other bioaccumulation model frameworks is that there are no restrictions on the number of chemicals or the number of fish species that can be simulated, the number of cohorts/age classes that fish species may have, or the number of foraging classes that fish species may have (Barber, 2003).

## 3.4    Overview of Case Studies

Case studies presented in this section are used to explore the range in temporal responses of different ecosystems following reductions in atmospheric Hg emissions and some of the sources of uncertainty around the proportional relationship used by the MMaps model.  To do this, we provide quantitative examples from five case studies that span a range of freshwater ecosystem types across the Eastern and Midwestern United States.

The five case studies selected for this project were constrained to reasonably well-studied ecosystems where there were sufficient empirical data to parameterize time-dependent aquatic cycling models. Our goal was to select well-characterized sites that would display a range in the magnitude and timing of responses to changes in mercury loading because of differences in ecosystem specific factors that affect the transport and transformation of mercury in different water bodies. The sites selected (see Section 3.5) cover a range of ecosystem types, sizes and latitudes.

### 3.4.1   Ecosystem Characteristics

A brief description of each site is given below and a summary of ecosystem characteristics used to parameterize the models are detailed in Table 3-2.

- *Eagle Butte, South Dakota:* Livestock lakes and ponds on the Cheyenne River Sioux Tribal Lands. The site modeled (Lee Dam), is a shallow, well-mixed system with a water surface area of $0.2$ km$^2$ and a catchment to lake area ratio of 22.6. There are power plants in the vicinity of this site, although the prevailing meteorology likely transports most emissions east of the site. Currently, consumption advisories are in place on reservation lands due to high levels of mercury in piscivorous fish. Mercury dynamics at this site are currently being studied as part of an EPA Regional Office RARE Grant awarded in 2003 (http://www.epa.gov/osp/regions/RARE_Region8.pdf). Atmospheric deposition data, total mercury and MeHg concentrations in sediments, water and biota have all been collected as part of this study. To model this system, we used the empirical data collected at this site to parameterize both the SERAFM and WASP models. The BASS model was applied to investigate mercury residue attenuation in length classes of co-dominant fishes.
- *Pawtuckaway Lake, New Hampshire:* Medium sized, seepage lake in Nottingham, New Hamsphire. This lake has a water surface area of $3.6$ km$^2$ and a catchment to lake area ratio of 13.7. Pawtuckaway Lake is characteristic of undisturbed lakes within the Northeastern Highlands Ecoregion (Omernik, 1987; US EPA, 2000). This lake was part of a recent study of mercury dynamics across a number of Vermont and New Hampshire Lakes funded by EPA's Office of Research and Development under the Regional Environmental Monitoring and Assessment Program (Kamman et al., 2004). Local mercury sources in the region include a number of utility units (See Figure 3-8) and several incinerators.
- *Lake Waccamaw, North Carolina:* Large, bay lake in southeastern North Carolina. Lake Waccamaw has a water surface area of almost $35$ km$^2$ and a catchment to lake area ratio of slightly more than six (Table 3-2). In 1992, a survey of fish mercury concentrations North Carolina's Department of Environment, Health and Natural Resources in this region revealed that fish mercury concentrations exceeded 1 ppm in over 60% of the samples. Waccamaw is a popular destination for recreational fishing and a fish consumption advisory is currently in place. The area surrounding Lake Waccamaw is typical of the region: flat terrain with ubiquitous wetlands and waterways. Very little commercial or industrial activity takes place in the area immediately surrounding the park, population density is relatively low and roadways are lightly traveled. The nearest town is Whiteville, NC, located approximately 15 kilometers to the west-northwest of Lake Waccamaw. A variety of mercury sources are located in this region including at

least two coal-fired electric utility boilers, a large municipal waste incinerator, several large coal or oil-fired industrial boilers, and a pulp and paper mill. By far the largest historic source of mercury emissions was the HoltraChem mercury cell chlor-alkali operation located in Riegelwood, NC, approximately 25 kilometers east-northeast of Lake Waccamaw, which ceased operation in the last decade.

- *Brier Creek, Georgia:* Brier Creek is a coastal plain river, dominated by a watershed that contains several different types of land uses and is modeled using 11 different sub-watersheds located in central/eastern portion of Georgia. Unlike the lakes modeled in this report, the watershed response drives mercury dynamics in Brier Creek. Brier Creek is a popular destination for recreational fishing. Fish consumption advisories are in place in this region due to high mercury levels.

- *Lake Barco, Florida:* Small, seepage lake in northeast Florida. Lake Barco is located approximately 35 km east of Gainesville, Florida on the Ordway Preserve that is operated by the University of Florida. The Ordway is protected from direct human impacts, although some recreational fishing does take place. Lake Barco has a water surface area of 0.12 km$^2$ and a negligible catchment area. Hydrology and geochemistry of Lake Barco have been well characterized by past studies (EPRI, 2003; Pollman et al., 1991) and there are several nearby mercury sources. For example, Gainesville Regional Utilities (GRU) operates a medium-size coal-fired power plant approximately 40 km northwest of Lake Barco. Emissions of Hg from the Deerhaven Unit No. 2 facility averaged approximately 30 kg yr$^{-1}$ between 1998 and 2002 (range 13 to 47 kg yr$^{-1}$).

**Table 3- 2.  Summary of Ecosystem Characteristics Used To Parameterize Mercury Models**

| Parameter | Lake Pawtuckaway | Lake Waccamaw | Lake Barco | Eagle Butte | Brier Creek |
|---|---|---|---|---|---|
| Watershed Area (m$^2$) | 5.00 x10$^7$ | 2.17x10$^8$ | 0 | 4.21 x10$^6$ | 2.19 x10$^9$ |
| Percent Impervious | 1% | 1% | n/a | 40% | 2% |
| Percent Forest | 88% | 72% | n/a | 0% | 47% |
| Percent Riparian | 10% | 0% | n/a | 20% | 12% |
| Percent Upland | 1% | 27% | n/a | 40% | 39% |
| Lake Area (m$^2$) | 3.64x10$^7$ | 3.47 x10$^7$ | 1.18 x10$^5$ | 1.86 x10$^5$ | n/a |
| Catchment/Lake Ratio | 13.7 | 6.3 | 0 | 22.6 | n/a |
| Epilimnion Depth (m) | 2.0 | 2.3 | 3.7 | 2.0 | 0.3 – 2.0 |
| Hypolimnion Depth (m) | 3.0 | n/a | n/a | n/a | n/a |
| Hypolimnion Anoxia | Yes | n/a | n/a | n/a | n/a |
| Hydraulic Residence Time (days) | 165 | 241 | n/a | n/a | 12 |
| Inflow/Outflow (m$^3$ yr$^{-1}$) | 4.05x10$^7$ | 1.20x10$^8$ | 0 | 0 | 3.3 – 7.4 x10$^8$ |
| Water pH | 6.45 | 4.3 | 4.5 | 9.0 | n/a |
| Epilimnion DOC (mg L$^{-1}$) | 5.5 | 25.9 | 0.8 | 27.0 | 5.0-8.0 |
| Hypolimnion DOC (mg L$^{-1}$) | 5.6 | n/a | n/a | n/a | n/a |
| Trophic Status | Dystrophic | Mesotrophic | Oligotrophic | Eutrophic | n/a |

### 3.4.2   Baseline Atmospheric Deposition at Each Site

For each site, measured empirical data were used to characterize the current level of atmospheric deposition (Table 3-3).  Lake Pawtuckaway data were obtained from Kamman and Engstrom (2002).  We estimated total deposition at Lake Waccamaw and Lake Barco by assuming dry deposition was approximately 50% of total deposition.  Wet deposition at Lake Waccamaw represented averaged cumulative wet deposition at MDN site NC-O8 between 1998 and 2000.  Wet deposition of mercury at Lake Barco deposition were from a technical report (EPRI, 2003).  Atmospheric deposition at Eagle Butte was calculated as from ongoing empirical measurements and data for Brier Creek were from a number of MDN sampling sites.  In Pawtuckaway Lake, Lake Waccamaw, Lake Barco and Eagle Butte, MeHg was assumed to represent approximately 3% of total deposition (Fitzgerald et al., 1994; Iverfeldt, 1991), which falls within the range of measured values.

**Table 3- 3.  Baseline Atmospheric Deposition For Each Model Ecosystem**

|  | Lake Pawtuckaway | Lake Waccamaw | Lake Barco | Eagle Butte | Brier Creek |
|---|---|---|---|---|---|
| Annual Precipitation (cm yr$^{-1}$) | 102.0 | 120.4 | 134.8 | 43.0 | 120 .0 |
| HgT Precipitation (ng L$^{-1}$) | 10.0 | 12.0 | 11.5 | 21.9 | 12.2 |
| Wet Deposition (ng L$^{-1}$) | 10.2 | 14.4 | 15.5 | 9.4 | 14.7 |
| Dry Deposition (μg m$^2$ yr$^{-1}$) | 10.2 | 14.4 | 15.5 | 10 | 12.1 |
| Wet Deposition (MeHg) μg m$^2$ yr$^{-1}$ | 0.15 | 0.22 | 0.23 | 0.20 | n/a |
| Dry Deposition (MeHg) μg m$^2$ yr$^{-1}$ | 0.15 | 0.22 | 0.23 | 0.15 | n/a |
| Total Deposition (HgT) μg m$^2$ yr$^{-1}$ | 20.7 | 29.2 | 31.5 | 19.8 | 26.8 |

### 3.4.3   Atmospheric Loading Scenarios Investigated

For each site, we compared deposition rates in the 36x36 km grid cell corresponding to the ecosystem locations forecasted using the CMAQ and REMSAD atmospheric fate and transport models (Table 3-4) to the empirically derived loading rates presented in Table 3-4.  Overall, the site specific data suggest somewhat higher deposition rates than the CMAQ and REMSAD models at the locations chosen for these case studies.  This reinforces the need for additional data sets that can be used to test model-forecasted atmospheric mercury deposition rates.  In Table 3-4, 2001 base case deposition rates are compared to two atmospheric deposition scenarios.  The 2020 projection describes anticipated loading rates at the end of the proposed rule and the zero out scenario was calculated by removing coal fired utilities from the atmospheric models as sources of mercury emissions.

Projected differences in atmospheric deposition (Table 3-4) with the zero-out scenario are similar to 2020 projected deposition rate under the Clean Air Interstate Rule (CAIR) presumably because the 2020 scenario includes reductions in emissions from mercury sources other than coal-fired utilities.   We therefore modeled only the change in fish tissue

concentrations associated with the zero out deposition scenarios.  To do this, we calculated a maximum percent difference between 2001 base case deposition the zero out scenarios for the REMSAD and CMAQ numbers, and investigated the anticipated response of fish mercury concentrations to these changes.  Changes in atmospheric loading under these scenarios across all ecosystems range from four to fifteen percent.  These values are relatively small in magnitude compared to maximum values observed across the country.

Accordingly, we also considered the range in deposition changes projected to occur across the country.  The highest forecasted relative change in deposition across all the grid cells covering the United States in the CMAQ and REMSAD atmospheric models after removal of power plants as a source of mercury was approximately 70% (50 $\mu$g m$^{-2}$ yr$^{-1}$ to 15 $\mu$g m$^{-2}$ yr$^{-1}$). In addition to the zero-out scenarios run using the SERAFM model, we modeled a standard 50% decline in atmospheric loading for each case study to compare the expected response across sites.

**Table 3- 4.  Forecasted Atmospheric Deposition Rates in Case Study Areas Using the CMAQ and REMSAD Models**

| Ecosystem | CMAQ Deposition Projections ($\mu$g m$^{-2}$ yr$^{-1}$) | | | REMSAD Deposition Projections  ($\mu$g m$^{-2}$ yr$^{-1}$) | | |
|---|---|---|---|---|---|---|
| | Baseline (2001) | 2020 Projection | Zero Out Utilities | Baseline (2001) | 2020 Projection | Zero Out Utilities |
| Brier Creek, GA | 14.2 | 12.6 | 12.7 | 13.2 | 11.8 | 12.0 |
| Eagle Butte, SD | 8.6 | 8.2 | 8.4 | 6.7 | 6.5 | 6.5 |
| Lake Barco, FL | 15.6 | 14.3 | 14.8 | 16.7 | 14.9 | 15.5 |
| Pawtuckaway Lake, NH | 16.1 | 15.0 | 15.2 | 10.3 | 8.9 | 9.4 |
| Lake Waccamaw, NC | 16.3 | 14.2 | 14.1 | 19.0 | 16.2 | 16.2 |

*Note: The gradients of mercury deposition around model ecosystem watersheds are fairly low, even with a known EGU source nearby with the exception of Brier Creek.  Two CMAQ grid cells that overlap the Brier Creek watershed are twice the magnitude of the average grid value of 16 $\mu$g m$^{-2}$ yr$^{-1}$.*

### 3.4.4   Summary of Model Evaluation

Models applied to each case study system are listed in Table 3-5.  Irrespective of the quality of their process algorithms, none of the models can be considered *a priori* predictive tools.  It is understood that all environmental models are under-determined, so that different combinations of model parameters can cause simulated concentrations to match the limited set of observations.  It is also understood that observed datasets are always incomplete and uncertain and represent only a snapshot of the real system.  Thus, model calibration involves professional judgment.

**Table 3- 5.  List of Model Frameworks Applied to Ecosystems**

| Ecosystem | Model Frameworks Applied |
|---|---|
| Brier Creek, GA | WASP, WCS |
| Eagle Butte, SD | SERAFM, WASP, BASS |
| Lake Barco, FL | SERAFM |
| Pawtuckaway Lake, NH | SERAFM, WASP |
| Lake Waccamaw, NC | SERAFM, WASP |

To address model identification uncertainty, we conducted multiple calibrations of different model frameworks. Results of these model calibrations are described below.  We applied the SERAFM model to all systems but Brier Creek.  Because mercury dynamics in Brier Creek are dominated by a watershed that consists of 11 tributaries, a surface water body model like SERAFM is not suitable for application.  At three sites (Eagle Butte, Lake Waccamaw and Pawtuckaway Lake) both the WASP and SERAFM models were applied as an internal quality assurance check.

All models were calibrated using the available empirical data and run to steady state before investigating any atmospheric loading scenarios.  In some cases it was necessary to supplement the observed site-specific data with parameter values and ranges from the general scientific literature.  The most reasonable set of parameters that best fit the observed data at each site were used as the base case.  Details of these calibrations are contained in the Attachments 1-5 that describe each of the site-specific applications.

Although there was insufficient time to do a formal sensitivity analysis of these models, we investigated the effects of parameter values (summarized in Table 3-6) on ecosystem response times using several different model calibrations.  For each ecosystem, we modeled the fast, medium and slow response scenarios by varying the depth of the active sediment layer and the macro-dispersion coefficient for the sediments (i.e., exchange rate between surface sediment and water column.  We chose the same upper sediment depth modeled in the U.S. EPA *Mercury Study Report to Congress* (US EPA 1997), where a default value of 2 cm and a uniform distribution of one to three centimeters were justified (see the technical discussion in Volume III, Appendix B.2.27, p. B-50).  The sediment-water dispersion coefficient is known to be greater than molecular diffusion coefficient, with a commonly accepted value of around $10^{-6}$ to $10^{-5}$ cm$^2$ sec$^{-1}$ (Bowie et al., 1985).  Dispersion coefficients for sediments subject to bioturbation (disturbance by benthic organisms) are commonly accepted to fall between $10^{-5}$ to $10^{-4}$ cm$^2$sec$^{-1}$ (Schnoor, 1987).  We used these alternate calibrations in the scenario projection phase of this project to provide a semi-quantitative uncertainty envelope for the temporal responses of the various ecosystems.  In addition, we investigated the uncertainty in watershed loading response times by conducting sensitivity analyses with the WCS model of the Brier Creek watershed. Given more time, a formal error propagation analysis would be a valuable addition to this study.

**Table 3- 6.  Summary of Mercury Parameters Used in the SERAFM Model**

| | H [atm-m3/mol] | $K_{d,abio}$ [L/kg] | $K_{d,bio}$ [L/kg] | $K_{d,DOC}$ [L/kg] |
|---|---|---|---|---|
| Hg0 | $7.1 \times 10^{-3}$ | 0 | 0 | 0 |
| HgII | $7.10 \times 10^{-10}$ | 250,000 | 399,052 | 251,188.6 |
| MeHg | $4.7 \times 10^{-7}$ | 100,000 | 516,313 | 100,000 |

| Parameter | Range | | |
|---|---|---|---|
| Active Sediment Layer Thickness | 1 – 3 cm | | |
| Macro-Dispersion in Sediments | $5 \times 10^{-5} - 10^{-4}$ cm$^2$ s$^{-1}$ | | |
| **Runoff Coefficients: Ratio of Watershed Export to Deposition Loading** | | | |
| | **Hg0** | **HgII** | **MeHg** |
| Impervious | 1 | 1 | 1 |
| Wetland/Forest | 0.2 | 0.2 | 4.9 |
| Riparian | 0.2 | 0.2 | 2.0 |
| Upland | 0.2 | 0.2 | 0.2 |

H=Henry's Law Constant (used to describe portioning of mercury between air and water), $K_d$=partition coefficient between solids and water for abiotic solids (abio), biotic solids (bio) and dissolved organic carbon (DOC)

### 3.4.5 Baseline Fish Mercury Concentrations

To maintain consistency with the original IEM-2M model, the SERAFM model forecasts fish mercury concentrations as a function of an empirically derived bioaccumulation factor (BAF).  This BAF was based on site specific fish mercury concentration data and MeHg concentrations in the water column.  Site specific fish mercury concentration data were also used as the baseline value used in MMaps model to forecast fish mercury levels with changing atmospheric deposition scenarios that are described in the next section.

Empirically derived BAFs for these systems fall within the range of those measured at other sites (Table 3-7).  Bioaccumulation factors were calculated for all SERAFM applications by normalizing residues to the length of the dominant species of Level 4 (top) piscivoire for which age data were available (e.g., 2 yr old largemouth bass).

**Table 3- 7.  Empirically Derived BAFs for Each of the Ecosystem Case Studies**

| BAFs (L/kg) | MeHg (ng/L) HgT (ng/L) | | BAF-MeHg | BAF - HgT |
|---|---|---|---|---|
| Eagle Butte | 0.82 | 10.2 | 8.90E+05 | 8.73E+04 |
| Lake Barco | 0.018 | 1.03 | 3.06E+07 | 5.34E+05 |
| Lake Pawtuckaway | 0.19 | 2.26 | 1.11E+06 | 9.29E+04 |
| Lake Waccamaw | 0.48 | 4.79 | 1.24E+06 | 3.86E+04 |
| Hypothetical Ecosystem (USEPA 1997) | -- | -- | 6.80E+06 | 5.30E+05 |

We chose to base fish mercury responses in the SERAFM model on empirically derived BAFs to be consistent with the original IEM model, which was the basis for the MMaps derivation.  However, there are some limitations to the BAF approach that deserve mention. Because MeHg concentrations in the water column are highly variable, the derived BAF is inherently underdetermined.  One less variable approach might be to normalize between model sites using the fraction of organic carbon in sediments as the fraction of MeHg available for

uptake by organisms appears to be directly related to the organic carbon content of the sediments (Lawrence and Mason, 2001; Lawrence et al., 1999; Mason and Lawrence, 1999).  More important though, response times (i.e., rates to and from equilibrium) in aquatic communities to changes in loading rates are driven by food web dynamics and species metabolic rates responding to changes in concentrations of MeHg in the water column and sediments.

To cross check empirically calibrated BAFs and to improve the estimated response times of mercury residues in different species and age/size classes of fish, the BASS bioenergetics based trophic dynamics model was also applied to the Eagle Butte site (Figure 3-1).



**Figure 3- 1.  BASS Predicted BAFs for Pike/Perch in Lee Dam, Eagle Butte**

Annual size classes for fishes between ages 1 and 25 and ages 1 and 12 were simulated for northern pike and yellow perch in the BASS model, respectively.  Results show that BAFs predicted by the BASS model are in general agreement with the empirically derived BAFs for Lee Dam, Eagle Butte (note that the SERAFM BAF was developed for four year-old northern pike).  The $\log_{10}$ length normalized BAF used in SERAFM (i.e., $\log_{10}(8.90 \times 10^5) = 5.96$) differs slightly from the BASS prediction of 6.22 (based on dissolved water column MeHg).  These BAFs would be equivalent when half of the water column MeHg is dissolved, as specified in the BASS model.

For the SERAFM model applications to each ecosystem, initial concentrations of mercury in water, sediment and fish are run to steady state before any atmospheric deposition scenario projections are investigated.  Concentrations at steady state in each compartment vary depending on the parameterization of the SERAFM model (e.g., fast, medium, and slow parameter values described above).

Model forecasted fish mercury concentrations are compared to observed fish concentrations in Figure 3-2.



Straight line represents 1:1 relationship between observed and modeled results.

**Figure 3- 2.  Observed vs. Predicted Fish Mercury Concentrations in Model Ecosystems at Steady State with No Change in Atmospheric Loading**

At steady state, SERAFM overpredicts fish mercury concentrations in Lake Barco and underpredicts concentrations in Lake Waccamaw.  Underprediction of observed fish mercury levels in Lake Waccamaw is likely a function of the recent closure of the chlor-alkali facility in proximity to the lake.  When the SERAFM model is run to steady state under the current loading scenario, expected fish mercury concentrations are somewhat lower than observed values.  It is therefore likely that fish mercury concentrations in Lake Waccamaw are not presently at steady state and will continue to decline if the current level of atmospheric deposition remains constant. We do not have enough information the recent history of Lake Barco to speculate as to why we observe the difference between model-predicted and observed fish concentrations.  Given additional time, a more comprehensive sensitivity analysis of factors affecting these results would be a useful starting point.  On a purely speculative level, it is possible that fish mercury concentrations in Lake Barco are also not at steady state with respect to current deposition levels.  If mercury loading to this ecosystem has increased recently but has not yet been reflected in observed fish tissue residues, than fish Hg levels would be overpredicted by the SERAFM model.

Analysis of the degree of corroboration between observed and model predicted fish mercury concentrations is a useful starting point for discussion of the MMaps model.  Like SERAFM, the MMaps model uses a proportional relationship between declines in deposition forecasted by atmospheric fate and transport models and concentrations in fish.  Unlike SERAFM, MMaps assumes the empirical data reflect steady state concentrations in the fish, thereby over and underestimating mercury concentrations in fish in ecosystems that have experienced recent changes in mercury inputs.

Initial mercury concentrations in fish used in the MMaps model are therefore critical for model outputs. As illustrated in Figure 3-2, the error bars around one species of piscivorous fish from a single water body are large. National fish tissue data coverages for even a five year period used by the MMaps approach are limited and span different trophic levels and ages of species. In addition to uncertainty in atmospheric models used to forecast changes in mercury deposition described above, uncertainty in MMaps forecasts as the result of variability in fish mercury residues will be significant and is not likely to capture the true variability in mercury concentrations among ecosystems in the United States.

### 3.4.6   *Magnitude of Changes in Fish Tissue Residues*

For all ecosystems but Brier Creek, we ran scenario projections for fish mercury concentrations after a 50% reduction in atmospheric deposition. Examples of SERAFM forecasted atte                                                                    ake Barco are shown in Figu                                                              sediments mainly to inve                                                              y deposition, and the effects



**Figure 3- 3.   1                                                                    wtuckaway Lake, NH to a**



**Figure 3- 4.  T⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯ ke Barco, FL to a Decline in ⋯⋯⋯⋯⋯**

*3.4.6.1 Zero-Ou⋯⋯*

    For Paw⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯ve simulated fish mercury concentrations using the forecasted decline in deposition in each ecosystem associated with the removal of U.S. utilities as a component of atmospheric deposition (Table 3-8).

**Table 3- 8.  MMaps and SERAFM Forecasted Fish Mercury Concentration at Steady State after Removal of Coal Fired Utilities as a Component of Deposition Using the REMSAD and CMAQ Models (Zero-out Scenario)**

| Ecosystem | % Difference in Atm. Hg Deposition Zero-Out Scenario | MMaps Forecasted Fish Hg Zero-Out Scenario ($\mu$g g$^{-1}$) | SERAFM Forecasted Fish Hg Zero-Out Scenario ($\mu$g g$^{-1}$) |
|---|---|---|---|
| Eagle Butte | 4.3% | 0.85 | 0.86 |
| Lake Barco | 6.8% | 0.51 | 1.12 (0.65-1.58) |
| Pawtuckaway Lake | 8.5% | 0.19 | 0.21 (0.19-0.24) |
| Lake Waccamaw | 14.8% | 0.51 | 0.18 |

    Fish mercury concentrations under the "zero-out" scenario for both MMaps and SERAFM are shown in the columns following the percent differences in deposition at each site calculated from the REMSAD and CMAQ models (Table 3-4).  Although both models use the proportional relationship described above, comparing the magnitude of forecasted fish mercury levels illustrates some of the uncertainty in model-predicted values.  Overall, it is clear that the magnitude of the uncertainty in the atmospheric and ecosystem models at this time is much greater than the signal derived from a change in loading following removal of the coal fired utilities at these sites.  This may not be the case for highly impacted systems described above,

where atmospheric deposition declines forecasted by the REMSAD and CMAQ models exceed 70% at some sites. Attenuation curves for fish mercury using the 50% decline in loading scenario may therefore better represent the response of mercury in fishes in similar types of ecosystems that are highly affected by mercury deposition from coal fired utilities (Figures 3-3, 3-4).

The major differences between the SERAFM model and the MMaps model across all sites are a function of the initial fish mercury concentrations at steady state that drive the response in both systems. Although both models assume fish mercury concentrations are at steady state with respect to baseline atmospheric deposition levels used to calculate the percent change in deposition (e.g., the same percent change is used in both models but overall loading rates and initital fish concentrations are different), only SERAFM calculates an expected concentration of mercury in fish at steady state for each ecosystem. Relative confidence in the two models is equivocal at this time, although the uncertainties in both approaches are highlighted by the observed differences in results.

### 3.4.7   Summary of Observed Temporal Responses to Declines in Loading

Table 3-9 compares the 50% decline scenario projections using the SERAFM and WASP models. The Brier Creek scenario incorporates response times in the watershed soils as well as in the water body sediments. The four lake scenarios account for the dynamic internal sediment response to instantaneous declines in total mercury loading. Accounting for watershed response times would add to the overall lake response time estimates.

**Table 3- 9.  Sediment Response Times in Years to Reach 90% of Steady-state Concentrations Following 50% Mercury Deposition Reductions**

| Site | Fast SERAFM | Medium SERAFM | Slow SERAFM | Fast WASP | Medium WASP | Slow WASP |
|---|---|---|---|---|---|---|
| Brier Creek – Upstream | n/a | n/a | n/a | 40 | 74 | 113 |
| Brier Creek – Downstream | n/a | n/a | n/a | 58 | 89 | 132 |
| Eagle Butte | 3 | 4 | 6 | 6 | 11 | 16 |
| Lake Barco | 14 | 28 | 45 | n/a | n/a | n/a |
| Pawtuckaway Lake | 80 | 125 | >180 | 24 | 44 | 69 |
| Lake Waccamaw | 3 | 6 | 12 | 10 | 15 | 17 |

*Note: Fast = 1 cm active sediment layer, D (macro-dispersion coefficient) = $10^{-4}$ $cm^2s^{-1}$; Medium = 2 cm active sediment layer, D = $10^{-4}$ $cm^2s^{-1}$, Slow = 3 cm sediment, D = $5x10^{-5}$ $cm^2s^{-1}$.*

Overall, forecasted time lags were comparable between models, increasing confidence in the range of lag time obtained from the modeling results. The greatest difference between the two models was observed in Pawtuckaway Lake. Forecasted recovery of Pawtuckaway Lake was 2-3 times faster than SERAFM using the WASP model. This can likely be attributed to differences in the treatment of the sediment solids balance between the two models. We used the same parameters in SERAFM as the MCM model applied to Lake Barco by EPRI (EPRI, 2003). The EPRI study forecasts a slight longer temporal response (54-160 years) to achieve 90% of steady state concentrations in fish, compared to SERAFM estimates of 14-43 years for fish and 14-48 years for sediments.

The Brier Creek-WASP/WCS model was only used to forecast a response times in water and sediments with a 50% reduction in atmospheric deposition. Epilimnion mercury response times for Brier Creek under the fast, medium and slow scenarios were 8, 11, and 11 years respectively. These response times should be comparable to the response of fish in this system, depending on the predominance of benthic or pelagic food webs in this system.

The response times forecasted by the SERAFM model for fish mercury concentrations to reach 90% of steady state with a 50% decline in atmospheric deposition and the zero-out scenario are presented in Table 3-10 and Figure 3-5.

**Table 3- 10.  Fish Tissue Response Times in Years to Reach 90% of Steady-state Concentrations Following 50% Mercury Deposition Reductions**

| Site | Fast | Medium | Slow |
|------|------|--------|------|
| Eagle Butte | 2 | 3 | 4 |
| Lake Barco | 14 | 28 | 43 |
| Pawtuckaway Lake | 34 | 56 | 64 |
| Lake Waccamaw | 1 | 1 | 2 |



EB = Eagle Butte, LB = Lake Barco, PL = Pawtuckaway Lake, LW = Lake Waccamaw.

**Figure 3- 5.  Projected Ecosystem Response Times to Zero-out Deposition Scenario Using the SERAFM Model**

Results presented in Figure 3-5 show SERAFM forecasted response times in the water, sediments and fish. One artifact of the formulation of the SERAFM model is that fish tissue residues decline faster than total mercury concentrations in the water and sediments in Figure 4-5. Fish mercury residues are a function of a BAF that is linked to the MeHg concentrations in the water column in the SERAFM model. Because MeHg concentrations in water respond more quickly than the total Hg pools in the water and sediments and the BAF multiplier is applied

directly to the water column MeHg concentration, the model shows an instantaneous response in fish mercury.

A more realistic lag time will be obtained from a bioaccumulation model that takes into account trophic interactions and bioenergetics drive mercury dynamics.  For example, the BASS model forecasts the comparable response for the same age/length class used to develop a BAF calibration in SERAFM (average concentration trophic level four species) to be roughly twice the water column response time (See Figure 3-1).  Growth dilution and mortality affect the response of all fish cohorts to decreased atmospheric loading.  The oldest, most heavily contaminated fish (also captured in the BASS model) take a longer period to show the same decline in these cohorts (i.e., length/size class). For example, the largest size class for Northern Pike at Eagle Butte indicated that it would take about 10 years for the most heavily contaminated fish to respond to a decline in loadings.  Overall, the response time of mercury in fish for all sites is expected to be roughly twice that of the water column response. Simple averaging of residues for all fish of a species using the BAF approach obscures the fact that cohorts with lower body burdens respond quicker and the most long-lived cohort responds over a much longer period of time.

### 3.4.8   Effect of Land Uses Changes

As mentioned above, we investigated the uncertainty in watershed loading response times by conducting sensitivity analyses with the WCS model of the Brier Creek watershed.  The depth of soil incorporation significantly influences soil response time.  The default of 1 cm was varied plus and minus 50% to get a range of response times.  The loading responses for Upper Brier Creek are given in Figure 3-6.  An initial rapid drop-off in loading (due to instantaneous drop in deposition to water surfaces and impervious runoff) is followed by a slower drop-off in runoff and erosion fluxes, controlled by soil mercury concentrations.  The 50% loading response varied between 8, 10, and 15 years for incorporation depths of 0.5, 1.0, and 1.5 cm.  The 90% loading response times were much longer, varying between 35, 70, and 100 years, respectively.

Land use changes can also significantly affect future loading response from a watershed. Urbanization can increase the total impervious areas in a watershed, decrease the amount of wetlands, and alter the stream's hydrological response.  The net effect of these changes on fish mercury concentrations is uncertain.  Reducing wetlands and hydraulic residence time should reduce net methylation.  On the other hand, covering pervious land with impervious surfaces should increase the delivery of atmospheric deposition fluxes to the water body.  In particular, changing pervious land use areas to impervious areas will directly affect the delivery of atmospheric deposition fluxes to the water body.



**Figure 3- 6.  Upper Brier Creek Loading Flux Attenuation**

In the WCS model, impervious areas were assumed to deliver 100% of the deposition load, while pervious areas delivered a much smaller fraction through runoff and erosion.  By comparison, the SWAT model (Neitsch et al., 2002) assigns a curve number that delivers virtually all rainfall and associated loads from *hydraulically-connected* impervious areas, which average between 73% and 97% of the total impervious area, depending on land use.  Although the fraction of the Brier Creek watershed covered by impervious surfaces is small (about 3% of the upper watershed), even modest growth over many years could increase the total watershed delivery of deposited mercury, working against the overall reductions in atmospheric emissions.



**Figure 3- 7.  Watershed Loading Flux Attenuation Considering Land-use Change**

The loading response of Upper Brier Creek to 3 land use scenarios is shown in the next Figure 3-7.  All scenarios assume an immediate 50% cut in atmospheric deposition.  The base case assumes present land use patterns.  The other two scenarios assume modest impervious surface growth rates of 0.5 % per year and 1 % per year, reaching a total of 4.7% and 7.9% impervious coverage in 100 years.  For the 0.5% scenario, total watershed loads reach a minimum in 80 years, with watershed loadings stalling at 40% of present levels.  For the 1% scenario, total watershed loads reach a reduction level of 33% in 50 years, and then increase significantly.  After 100 years, the 50% cut in atmospheric deposition would translate into a 25% drop in ambient watershed loading (Figure 3-7).  These simulations are meant to suggest possible responses to land use changes.  If impervious areas deliver only 50% of deposited mercury, then the 1% growth scenario should follow the 0.5% trend line in Figure 3-7.

### 3.4.9   Summary

Among the five ecosystems investigated in this study, the range in temporal response to declines in mercury loading ranged from less than five years to an order of decades.  Response is gauged by the time required for mercury to reach equilibrium at 90% of the initial concentrations.  Fast and slow response scenarios for the five ecosystems ranged from 1 to over 180 years in sediments.  The medium response scenarios also varied widely but were generally on the order of one to three decades for fish mercury concentrations.  Forecasted response times to changes in mercury inputs were longest for Brier Creek, a system strongly influenced by the watershed mercury loading, and Pawtuckaway Lake, a stratified cold water lake.  Shallow, well-mixed systems like Lake Waccamaw and Lee Dam are projected to respond to changes in atmospheric deposition in less than a decade.

Consistent with other investigations (e.g., (EPRI, 2003), this analysis showed that individual ecosystems are highly sensitive to uncertainty in model parameters.  Long term mercury response is strongly influenced by the sediment balance, which varies greatly among water bodies.  Key parameters include watershed erosion and sediment delivery, water body production, deposition, resuspension and burial rates, and surface sediment mixing depth (active sediment layer).  The effect of epistemic uncertainty (i.e., lack of knowledge) about key mercury process variables, such as the functional form of equations used to quantify methylation rate constants, is a major contributor to overall uncertainty that cannot be quantified at this time.  Although scientific understanding of these process variables is rapidly progressing, no modeling framework can be considered *a priori* predictive at this time.  Accordingly, all models must be parameterized to specific ecosystems being investigated to develop a credible set of rate constants and process terms.

Our best available, practicable science suggests that over the long-term (i.e., at steady state), the change in mercury concentrations in freshwater fish will be proportional to changes in mercury inputs.  Thus, in systems where atmospheric deposition of inorganic mercury is the major source of mercury to surface waters, long-term changes in fish mercury concentrations will be proportional to declines in atmospheric deposition as suggested by the MMaps approach.  There is some discrepancy between results from our modeled scenarios based on the MMaps model that can be attributed to uncertainty in both the **models and data**.  Where there are sources of mercury in the watershed other than atmospheric loading, the response of fish tissue concentrations will be affected in a manner that is not proportional to changes in atmospheric

deposition.  Preliminary findings of the METALLICUS study show negligible concentrations of deposited mercury in fish three years after the addition of labeled mercury isotopes to the watershed, supporting the supposition that mercury deposited on the watershed takes significantly longer to accumulate in fish than mercury deposited directly on the surface of a waterbody (Pers. Comm., R. Harris).

A preliminary assessment of the expected effect of land-use changes on fish mercury concentrations for a watershed dominated system illustrates changes like urbanization within a watershed can alter the magnitude and timing of fish mercury concentrations.  A number of peer-reviewed studies have shown that other environmental changes such as enhanced nutrient loading in Long Island Sound (Hammerschmidt et al., 2004; Hammerschmidt and Fitzgerald, 2004), sulfate deposition in the Everglades (Krabbenhoft et al., presentation to EPA 2/7/05) and reservoir flooding can also dramatically change fish mercury concentrations independently of changes in total mercury additions to the ecosystem.  With further advances in knowledge and new data on mercury fate and transport, EPA's long term goal is to provide tools that have the capability to provide *a priori* forecasts of ecosystem responses to changes in mercury deposition.

## 3.5     National Scale Ecosystem Variability

As mentioned in the introductory sections of this report, different ecosystems exhibit dramatically different responses to changes in mercury loading depending on their chemical and physical attributes.  Results from individual case studies must therefore be qualified by their representativeness of ecosystem condition and variability across the United States.  Using georeferenced empirical databases that describe some of the watershed and waterbody characteristics across the United States, we present the ecosystem case studies along the gradient of data known to be important for MeHg formation and bioaccumulation in fish.  Although this analysis has not been completed, the concept is demonstrated by a *preliminary qualitative* assessment of how much of the ecosystem variability in MeHg formation and bioaccumulation has been captured by the modeling case studies.  Developing broad categories of ecosystem types based on their propensity for MeHg formation and bioaccumulation in fish and their frequency of occurrence is an iterative effort.  By combining the frequency of each category of ecosystem type with the magnitude and time lag in fish tissue reductions modeled using dynamic, ecosystem scale models, such an analysis could ultimately provide a different methodology for a national scale assessment of expected changes in fish MeHg concentrations resulting from reductions in atmospheric mercury deposition.

### 3.5.1     *United States Lakes Distribution*

- We used the USGS  National Hydrography Database (NHD)(1:100,000 scale) to obtain information on the frequency of different lake sizes across the country
- For each Electricity Generating Unit (EGU) we constructed a circular buffer area having a 50 km radius using GIS software (ArcMap, ArcView).  This buffer zone was chosen to reflect the geographic extent of the majority of elevated deposition from a local source (Expert Panel on Mercury Atmospheric Processes, 1994).  This distance is not meant to conclusively define the extent of local deposition, but is used to approximate near-field characteristics of the areas surrounding EGUs.
- The NHD lake coverage was then clipped using the 50km radii.

- The lake area was divided into three different classes and the total number in each class was calculated across all of the buffered areas (see Table 3-11).

**Table 3- 11.  Frequency of Different Lake Sizes Across the United States**

| Lake Type Frequency | All U.S. | 50 km Radius Around EGUs |
|---|---|---|
| Small l (0.01-0.1 km$^2$) | 328,564 | 119,492 |
| Medium (0.1 – 10 km$^2$) | 64,260 | 23,563 |
| Large Large (>10 km$^2$) | 1,200 | 442 |

From this analysis, it is apparent that there are a large number of lakes (<0.1 km$^2$) surrounding the EGUs across the country.  Small, well-mixed shallow systems (like Eagle Butte and Lake Barco), tend to respond more rapidly to changes in mercury deposition than larger, deeper lakes.  The temporal response of these systems is also driven by the catchment to lake area ratio of these systems, which was beyond the scope of our initial analysis.  Generally, systems where mercury dynamics are dominated by the response of the watershed to changes in loading (like Brier Creek), will respond more slowly to changes in atmospheric deposition.

Ecosystems differ dramatically in their propensity to convert incoming inorganic mercury to methylmercury.  Other environmental factors that are generally accepted as reasonable ancillary variables for MeHg formation in waterbodies include: dissolved organic carbon content of surface waters, pH, sulfate, % wetland area of the catchment, sulfide concentrations and sediment organic matter.  National scale coverages of these data are currently under development by a number of groups.  In this assessment, we assembled the available data on sulfate deposition, % wetland coverage, and total mercury deposition projected by the CMAQ model for 2001.  Over the long term, by combining these data layers, a statistical model of MeHg production will be developed to characterize ecosystems affected by atmospheric inputs of mercury.

Data layers used to generate Figures 3-8 through 3-13 are described below:

- Model ecosystems relative to EGUs across the country.  We used EGRID 2002 Version 2.01 Plant File (Year 2000 data) to generate the data points representing the EGUs. We used lat/long to create point coverage for the U.S.
- WETLANDS: We used the NLCD 1993 land cover data.
- Mean wet sulfate deposition 1987-1999 (kg/ha/yr).  Sulfur deposition aggregated by HUC based on data from "Enhanced wet deposition estimates using modeled precipitation inputs", Grimm, Jeffrey, W. , James A. Lynch.  2004. Environmental Monitoring and Assessment Vol. 90 P. 243-268.
- CMAQ deposition 2001 scenario.  Source: Russ Bullock, NOAA-ARL and EPA/ORD/NERL
- FISH tissue data for all US.  Figure 3-12 is based on raw data from the USGS EMMA database  (http://emmma.usgs.gov/fishHgAbout.aspx and http://emmma.usgs.gov/datasets.aspx ).  Figure 3-13 shows the normalized fish tissue data from NLFA and NLFTS databases used in the Regulatory Impact Assessment.

### 3.5.2   Summary

Extrapolating the results of the case studies to other systems is an ongoing challenge. Qualitatively, the ecosystem case studies fall in the mid-range of sulfate deposition and do not capture much of the variability across the country.  Sites capture a wide range of % wetland coverage and appear to be in regions of predominantly moderate mercury deposition rates, but they do not capture the tails of this distribution.  Based on this preliminary assessment it is likely that the case studies represent ecosystem types of moderate methylation potential across the United States.  This is supported by fish tissue concentrations measured in these regions, which generally fall within the impacted category that is above EPA's 0.3 ppm tissue residue guideline (US EPA, 2001) but do not represent the extremes in fish mercury concentrations observed on a national scale.   Therefore, while these ecosystem case studies cover the bulk of the distributions of the key environmental characteristics that will affect MeHg production, they may miss the tails of the distributions for some characteristics.

**Figure 3- 8.  Model Ecosystem Locations with CMAQ Grid Cells and Locations of Electricity Generating Units (EGUs)**



**Figure 3- 9. Model Ecosystem Locations with Gradient in Sulfate Deposition Across the Eastern US**



**Figure 3- 10.  Model Ecosystem Locations with Percent Wetland Area Aggregated for Each HUC**



**Figure 3- 11.  Model Ecosystem Locations with CMAQ 2001 Total Mercury Deposition**

# Methylmercury Residues in Fish Tissue



**Figure 3- 12.  Model Ecosystem Locations with Measured Fish Tissue Concentrations**



Source: EPA  NLFA and NLFTS

**Figure 3- 13.  Measured 1995-2001 Fish Hg Concentrations > 0.3 ppm**

## 3.6    References

Ambrose, R.B., 1987. Modeling Volatile Organics in the Delaware Estuary. Journal of Environmental Engineering, 113(4): 703-721.

Ambrose, R.B. and Wool, T.A., 2001. Modeling Tools Used for Mercury TMDLs in Georgia Rivers. In: K. Hatcher (Editor), Proceedings of the 2001 Georgia Water Resources Conference, March 26-27, 2001. University of Georgia: Athens, Georgia, Athens, GA, pp. 532-535.

Ambrose, R.B.e.a., 1988. WASP4, A Hydrodynamic and Water Quality Model--Model Theory, User's Manual, and Programmer's Guide., U.S. Environmental Protection Agency, Athens, GA.  EPA/600/3-87-039.

Amyot, M., Lean, D.R.S., Poissant, L. and Doyon, M.-R., 2000. Distribution and transformation of elemental mercury in the St. Lawrence River and Lake Ontario. Canadian Journal of Fisheries and Aquatic Sciences, 57 (Suppl. 1): 155-163.

Atkeson, T., 2003. The Everglades Mercury TMDL Pilot Study: Final Report by the Florida Department of Environmental Protection (http://www.dep.state.fl.us/secretary/news/2003/nov/pdf/mercury_report_summary.pdf).

Babiarz, C.L. et al., 2001. Partitioning of total mercury and methylmercury to the colloidal phase in freshwaters. Environmental Science and Technology, 35(24): 4773-4782.

Balogh, S.J., M.L., M. and D.K., J., 1998. Transport of Mercury in Three Contrasting River Basins. Environmental Science and Technology, 32: 456-462.

Barber, M., 2003. A review and comparison of models for predicting dynamic chemical bioconcentration in fish. Environmental Toxicology and Chemistry, 22(9): 1963-1992.

Barber, M.C., 2001. Bioaccumulation and Aquatic System Simulator (BASS) User's Manual Beta Test Version 2.1, U.S. Environmental Protection Agency, Office of Research and Development, EPA/600/R-01/035, Athens, GA, USA.

Barber, M.C., Suárez, L.A. and Lassiter, R.R., 1987. FGETS (Food and Gill Exchange of Toxic Substances): A simulation model for predicting the bioaccumulation of nonpolar organic pollutants by fish, U.S. Environmental Protection Agency, Office of Research and Development,  EPA/600/3-87/038, Athens, GA.

Barber, M.C., Suárez, L.A. and Lassiter, R.R., 1988. Modeling bioconcentration of nonpolar organic pollutants by fish. Environmental Toxicology and Chemistry, 7: 545-558.

Barber, M.C., Suárez, L.A. and Lassiter, R.R., 1991. Modelling bioaccumulation of organic pollutants in fish with an application to PCBs in Lake Ontario salmonids. Canadian Journal of Fisheries and Aquatic Sciences, 48: 318-337.

Barkay, T., Miller, S.M. and Summers, A.O., 2003. Bacterial mercury resistance from atoms to ecosystems. FEMS Microbiology Reviews, 27: 355-384.

Benoit, J., Gilmour, C.C., Mason, R.P. and Heyes, A., 1999. Sulfide controls on mercury speciation and bioavailability to methylating bacteria in sediment pore waters. Environmental Science and Technology, 33(6): 951-957.

Benoit, J.M., Gilmour, C.C., Heyes, A., Mason, R.P. and Miller, C., 2003. Geochemical and Biological Controls over Methylmercury Production and Degradation in Aquatic Systems, Biogeochemistry of Environmentally Important Trace Metals. ACS Symposium Series 835.

Benoit, J.M., Gilmour, C.C. and Mason, R.P., 2001. The influence of sulfide on solid-phase mercury bioavailability for methylation by pure cultures of *Desulfobulbus propionicus* (1pr3). Environmental Science and Technology, 35(1): 127-132.

Benoit, J.M., Gilmour, C.C., Mason, R.P., Riedel, G.S. and Reidel, G.F., 1998. Behavior of mercury in the Patuxent River estuary. Biogeochemistry, 40: 249-265.

Benoit, J.M., Mason, R.P. and Gilmour, C.C., 1999. Estimation of mercury-sulfide speciation in sediment pore waters using octanol-water partitioning and implications for availability to methylating bacteria. Environmental Toxicology and Chemistry, 18(10): 2138-2141.

Beyers, D.W., Rice, J.A. and Clements, W.H., 1999. Evaluating biological significance of chemical exposure to fish using a bioenergetics-based stressor-response model. Canadian Journal of Fisheries and Aquatic Sciences, 56: 823-829.

Bigham, G.N. and Vandal, G.M., 1994. A drainage basin perspective of mercury transport and bioaccumulation: Onondaga Lake, New York, Twelfth International Neurotoxicology Conference, Hot Springs, Arkansas USA.

Bloom, N.S., 1992. On the chemical form of mercury in edible fish and marine invertebrate tissue. Canadian Journal of Fisheries and Aquatic Sciences, 49: 1010-1017.

Bowie, G. et al., 1985. Rates, Constants, and Kinetics Formulations in Surface Water Quality Modeling (Second Edition), U.S. EPA, Athens, GA, EPA/600/3-85/040, June, 1985.

Branfireun, B. and Roulet, N., 2002. Controls on the fate and transport of methylmercury in a boreal headwater catchment, northwestern Ontario, Canada. Hydrology and Earth System Sciences, 6(4): 785-794.

Bullock, R.O. and Brehme, K., 2002. Atmospheric mercury simulation using the CMAQ model: Formulation description and analysis of wet deposition results. Atmospheric Environment, 36: 2135–2146.

Carpi, A. and Lindberg, S.E., 1997. Sunlight-mediated emission of elemental mercury from soil amended with municipal sewage sludge. Environmental Science and Technology, 31(7): 2085-2091.

Cohen, M. et al., 2004. Modeling the Atmospheric Transport and Deposition of Mercury to the Great Lakes. Environmental Researrch, 95: 247-265.

Compeau, G.C. and Bartha, R., 1987. Effect of salinity on mercury-methylating activity of sufate reducing bacteria in estuarine sediments. Applied and Environmental Microbiology, 53: 261-265.

Connolly, J. and Thomann, R.V., 1985. WASTOX, A Framework for Modeling the Fate of Toxic Chemicals in Aquatic Environments.  Part 2:  Food Chain., U.S. Environmental Protection Agency, Gulf Breeze, FL and Duluth, MN.

Craig, P.J. and Bartlett, P.D., 1978. The role of hydrogen sulphide in environmental transport of mercury. Nature, 275: 635-637.

Craig, P.J. and Moreton, P.A., 1986. Total mercury, methyl mercury and sulphide levels in British estuarine sediments-III. Water Research, 20(9): 1111-1118.

Di Toro, D.M., Fitzpatrick, J.J. and Thomann, R.V., 1983. Water Quality Analysis Simulation Program (WASP) and Model Verification Program (MVP) - Documentation., Hydroscience, Inc., Westwood, NY, for U.S. EPA, Duluth, MN, Contract No. 68-01-3872.

Doyon, J.-F., Schetagne, R. and Verdon, R., 1998. Different mercury bioaccumulation rates between sympatric populations of dwarf and normal lake whitefish (*Coregonus clupeaformis*) in the La Grande complex watershed, James Bay, Quebec. Biogeochemistry, 40: 203-216.

Driscoll, C.T. et al., 1995. The role of dissolved organic carbon in the chemistry and bioavailability of mercury in remote Adirondack lakes. Water, Air, Soil Pollution, 80: 499-508.

EPRI, 2003. Factors Affecting Predicted Responses of Fish Mercury Concentrations to Changes in Mercury Loading., Electric Power Research Institute Report 1005521, Palo Alto, CA.

Expert Panel on Mercury Atmospheric Processes, 1994. Mercury Atmospheric Processes: A Synthesis Report. In: R.H. Osa (Editor), Mercury Atmospheric Processes. Environment Canada, Tampa, Florida, pp. 23.

Fitzgerald, W.F., Mason, R.P., Vandal, G.M. and Dulac, F., 1994. Air-water cycling of mercury in lakes. In: C.J. Watras and J.W. Huckabee (Editors), Mercury Pollution: Integration and Synthesis. Lewis Publishers, Chelsea, MI, pp. 203-220.

Frescholtz, T. and Gustin, M.S., 2004. Soil and foliar mercury emission as a function of soil concentration. Water, Air, and Soil Pollution, 155: 223-237.

Gbundgo-Tugbawa and Driscoll, 1998. Application of the regional mercury cycling model (RMCM) to predict the fate and remediation of mercury in Onondaga Lake, New York. Water, Air, and Soil Pollution, 105: 417-426.

Gilmour, C.C. and Henry, E.A., 1991. Mercury methylation in aquatic systems affected by acid deposition. Environmental Pollution, 71: 131-169.

Gilmour, C.C. et al., 1998. Methylmercury concentrations and production rates across a trophic gradient in the northern Everglades. Biogeochemistry, 40: 327-345.

Gobas, F.A.P.C., Pasternak, J.P., Lien, K. and Duncan, R.K., 1998. Development and field validation of a multimedia exposure model for waste load allocation in aquatic ecosystems: application to 2,3,7,8-tetrachloro-p-dioxin and 2,3,7,8-tetrachlorodibenzofuran in the Fraser River watershed. Environmental Science and Technology, 32: 2442-2449.

Gobas, F.A.P.C., Z'Graggen, M.N. and Zhang, X., 1995. Time response of the Lake Ontario ecosystem to virtual elimination of PCBs. Environmental Science and Technology, 29(8): 2038-2046.

Greenfield, B.K., Hrabik, T.R., Harvey, C.J. and Carpenter, S.R., 2001. Predicting mercury levels in yellow perch: use of water chemistry, trophic ecology, and spatial traits. Canadian Journal Fisheries and Aquatic Sciences, 58: 1419–1429.

Greenfield, J., Dai, T. and Manguerra, H., 2002. Watershed Modeling Extensions of the Watershed Characterization System., Ft. Lauderdale, Florida, USA, February 2002.

Grieb, T.M. et al., 1990. Factors affecting mercury accumulation in fish in the upper Michigan peninsula. Environmental Toxicology and Chemistry, 9: 919-930.

Gustin, M. et al., 2004. Application of controlled mesocosms for understanding mercury air-soil-plant exchange. Environmental Science and Technology, 38: 6044-6050.

Hammerschmidt, C., Fitzgerald, W., Lamborg, C., Balcom, P. and Visscher, P., 2004. Biogeochemistry of methylmercury in sediments of Long Island Sound. Marine Chemistry, 90: 31-52.

Hammerschmidt, C.R. and Fitzgerald, W.F., 2004. Geochemical controls on the production and distribution of methylmercury in near-shore marine sediments. Environmental Science and Technology, 38(5): 1487-1495.

Harris, R., Gherini, S. and Hudson, R., 1996. Regional Mercury Cycling Model: A Model for Mercury Cycling in Lakes, R-MCM Version 1.0 Draft User Guide and Technical

Reference, Electric Power Research Institute, Wisconsin Department of Natural Resources, Lafayette, California.

Harris, R. and Hutchison, D., 2003. Factors Affecting the Predicted Response of Fish Mercury Concentrations to Changes in Mercury Loading. 1005521, Electric Power Research Institute, Palo Alto, CA.

Harris, R.C. et al., 2004. The METAALICUS Project:  Overview of Study and Results To-Date, 7th Internation Conference on Mercury as a Global Pollutant, Slovenia.

Harris, R.C., Hutchinson, D. and Beals, D., 2002. Lake Superior Mercury Cycling Model. Presented at the annual meeting of the International Association of Great Lakes Research (IAGLR), June 2002.

Hintelmann, H. and Evans, R.D., 1997. Application of stable isotopes in environmental tracer studies - measurement of monomethylmercury by isotope dilution ICP-MS and detection of species transformation. Fresenius Journal of Analytical Chemistry, 358: 378-385.

Hintelmann, H. et al., 2002. Reactivity and mobility of new and old mercury deposition in a boreal forest ecosystem during the first year of the METAALICUS study. Environmental Science and Technology, 36: 5034-5040.

Hintelmann, H., Keppel-Jones, K. and Evans, R.D., 2000. Constants of mercury methylation and demethylation rates in sediments and comparison of tracer and ambient mercury availability. Environmental Toxicology and Chemistry, 19(9): 2204-2211.

Hurley, J. et al., 1995. Influences of watershed characteristics on mercury levels in Wisconsin rivers. Environmental Science and Technology, 29(7): 1867-1875.

Hurley, J.P., Cowell, S.E., Shafer, M.M. and Hughes, P.E., 1998. Tributary loading of mercury to Lake Michigan: Importance of seasonal events and phase partitioning. Science of the Total Environment, 213: 129-137.

Iverfeldt, A., 1991. Water, Air, and Soil Pollution, 56: 553-564.

Jackson, T.A., 1998. Mercury in aquatic ecosystems. In: W.J. Langston and M.J. Bebianno (Editors), Metal Metabolism in Aquatic Environments. Chapman & Hall, London, pp. 77-158.

Kamman, N., Driscoll, C.T., Estabrook, B., Evers, D.C. and Miller, E.K., 2004. Biogeochemistry of Mercury in Vermont and New Hampshire Lakes An Assessment of Mercury in Water, Sediment and Biota of Vermont and New Hampshire Lakes Comprehensive Final Project Report May, 2004, Project Funding Provided by United States Environmental Protection Agency Office of Research and Development under the Regional Environmental Monitoring and Assessment Program.

Karlsson, T. and Skyllberg, U., 2003. Bonding of ppb levels of methyl mercury to reduced sulfur groups in soil organic matter. Environmental Science and Technology, 37: 4912-4918.

Kidd, K., Hesslein, R., Fudge, R. and Hallard, K., 1995. The influence of trophic level as measured by delta-N-15 on mercury concentrations in fresh-water organisms. Water, Air, and Soil Pollution, 80(1-4): 1011-1015.

King, J.K., Kostka, J.E., Frischer, M.E., Saunders, F.M. and Jahnke, R.A., 2001. A quantitative relationship that demostrates mercury methylation rates in marine sediments are based on community composition and activity of sulfate-reducing bacteria. Environmental Science and Technology, 35(12): 2491-2496.

Lalonde, J., Amyot, M., Kraepiel, A. and Morel, F., 2001. Photooxidation of Hg(0) in artificial and natural waters. Environmental Science and Technology, 35: 1367-1372.

Landis, M. and Keeler, G., 2002. Atmospheric mercury deposition to Lake Michigan during the Lake Michigan mass balance study. Environmental Science and Technology, 36(21): 4518-4524.

Landis, M.S., Lynam, M. and Stevens, R.K., 2004. The Monitoring and Modeling of Mercury Species in Support of Local Regional and Global Modeling. In: N. Pirrone and K.R. Mahaffey (Editors), Dynamics of Mercury Pollution on Regional and Global Scales. Kluwer Academic Publishers, New York, NY.

Laporte, J.-M., Andres, S. and Mason, R.P., 2002. Effect of ligands and other metals on the uptake of mercury and methylmercury across the gills and the intestine of the blue crab (Callinectes sapidus). Comparative Biochemistry and Physiology Part C, 131: 185-196.

Lawrence, A.L. and Mason, R.P., 2001. Factors controlling the bioaccumulation of mercury and methylmercury by the estuarine amphipod *Leptocheirus plumulosus*. Environmental Pollution, 111: 217-231.

Lawrence, A.L., Mcaloon, K.M., Mason, R.P. and Mayer, L.M., 1999. Intestinal solubilization of particle associated organic and inorganic mercury as a measure of bioavailability to benthic invertebrates. Environmental Science and Technology, 33(11): 1871-1876.

Lawson, N.M. and Mason, R.P., 1998. Accumulation of mercury in estuarine food chains. Biogeochemistry, 40: 235-247.

Lawson, N.M., Mason, R.P. and Laporte, J.M., 2001. The fate and transport of mercury, methylmercury, and other trace metals in Chesapeake Bay tributaries. Water Research, 35: 501-515.

Leaner, J.J. and Mason, R.P., 2002. Factors controlling the bioavailability of ingested methylmercury to channel catfish and atlantic sturgeon. Environmental Science and Technology, 36: 5124-5129.

Lee, Y.H., Bishop, K., Pettersson, C., Iverfeldt, I. and Allard, B., 1995. Subcatchment Output of Mercury and Methylmercury at Svartberget in Northern Sweden. Water, Air, and Soil Pollution, 80: 455-465.

Lin, C.-J. and Pehkonen, S.O., 1999. The chemistry of atmospheric mercury: a review. Atmospheric Environment, 33: 2067-2079.

Lindberg, S.E. and Stratton, J.E., 1998. Atmospheric mercury speciation: concentrations and behavior of reactive gaseous mercury in ambient air. Environmental Science and Technology, 32(1): 49-57.

Mason, R.P. and Lawrence, A.L., 1999. Concentration, distribution, and bioavailability of mercury and methylmercury in sediments of Baltimore Harbor and Chesapeake Bay, Maryland, USA. Environmental Toxicology and Chemistry, 18(11): 2438-2447.

Mason, R.P. et al., 1999. Mercury in the Chesapeake Bay. Marine Chemistry, 65: 77–96.

Mason, R.P., Morel, F.M.M. and Hemond, H.F., 1995. The role of microorganisms in elemental mercury formation in natural waters. Water, Air, and Soil Pollution, 80: 775-787.

Matilainen, T. and Verta, M., 1995. Mercury methylation and demethylation in aerobic surface waters. Canadian Journal of Fisheries and Aquatic Sciences, 52: 1597-1608.

Mierle, G. and Ingram, R., 1991. The role of humic substance in the mobilization of mercury from watersheds. Water, Air, and Soil Polution, 56: 349-357.

Morel, F., Kraepiel, A.M.L. and Amyot, M., 1998. The chemical cycle and bioaccumulation of mercury. Annual Reviews of Ecological Systems, 29: 543-566.

Neitsch, S.L., Arnold, J.G., Kiniry, J.R., Williams, J.R. and King, K.W., 2002. Soil and Water Assessment Tool theoretical documentation - version 2000. TWRI Report TR-191., Texas Water Resources Institute, College Station, Texas.

Omernik, J.M., 1987. Ecoregions of the conterminous United States. Map (scale 1:7,500,000). Annals of the Association ofAmerican Geographers, 77: 119-125.

Pollman, C. et al., 1991. Preliminary analysis of the hydrologic and geochemical controls on acid-neutralizing capcity in two acidic seepage lakes in Florida. Water Resources Research, 27(9): 2321-2355.

Rasmussen, P.E., 1994. Current methods of estimating atmospheric mercury fluxes in remote areas. Environmental Science and Technology, 28(13): 2233-2241.

Ravichandran, M., 2004. Interactions between mercury and dissolved organic matter - a review. Chemosphere, 55: 319-331.

Rolfhus, K. et al., 2003. Distribution and fluxes of total and methylmercury in Lake Superior. Environmental Science and Technology, 37(5): 865-872.

Schaefer, J. et al., 2004. Role of the bacterial organomercury lyase (MerB) in controlling methylmercury accumulation in mercury-contaminated natural waters. Environmental Science and Technology, 38: 4304-4311.

Schnoor, J.L., et al., 1987. Processes, Coefficients, and Models for Simulating Toxic Organics and Heavy Metals in Surface Waters,⌐ U.S. EPA, Athens, GA, EPA/600/3-87/015, June 1987.

Scholtz, M.T., Heyst, B.J.V. and Schroeder, W.H., 2003. Modelling of mercury emissions from background soils. Science of the Total Environment, 304: 185-207.

Schroeder, W.H., Munthe, J. and Lindqvist, O., 1989. Cycling of mercury between water air and soil compartments of the environment. Water, Air, and Soil Pollution, 48: 337-347.

Seigneur, C., Jayaraghavan, K., Lohman, K., Karamchandani, P. and Scott, C., 2004. Global Source Attribution for Mercury Deposition in the United States. Environmental Science and Technology, 38: 555-569.

Sellers, P., Kelly, C.A., Rudd, J.W.M. and MacHutchon, A.R., 1996. Photodegradation of methylmercury in lakes. Nature, 380: 694.

Siciliano, S., O'Driscoll, N. and Lean, D., 2002. Microbial reduction and oxidation of mercury in freshwater lakes. Environmental Science and Technology, 36(14): 3064-3068.

St. Louis, V. et al., 2001. Importance of the forest canopy to fluxes of methyl mercury and total mercury to boreal ecosystems. Environmental Science and Technology, 35: 3089-3098.

Sunda, W.G. and Huntsman, S.A., 1998. Processes regulating cellular metal accumulation and physiological effects: Phytoplankton as model systems. Science of the Total Environment, 219: 165-181.

Sunderland, E.M. et al., 2004. Speciation and bioavailability of mercury in well-mixed estuarine sediments. Marine Chemistry, 90: 91-105.

Tetra Tech Inc., 2000. Florida Pilot Mercury Total Maximum Daily Load (TMDL) Study: Application of the Everglades Mercury Cycling Model (E-MCM) to Site WCA 3A-15. Prepared for the United States Environmental Protection Agency and Florida Department of Environmental Protection. October 2000.

Tseng, C.M., Amouroux, D., Abril, G. and Donard, O.F.X., 2001. Speciation of mercury in a fluid mud profile of a highly turbid macrotidal estuary (Gironde, France). Environmental Science and Technology, 35(13): 2627-2633.

Tsiros, I., 2002. Modeling assessment of air emission flux of mercury from soils in terrestrial landscape components: Model tests and sensitivities. Journal of Air and Waste Management Association, 52(3): 339-348.

Tsiros, I.X., 1999. A Modeling Analysis of Factors Influencing Mass Balance Components of Airborne Deposited Mercury in Terrestrial Landscapes. J. Environ. Sci. Health A, 34(10): 1079-2005.

U.S. EPA, 2000. Mercury Research Strategy. Unites States Environmental Protection Agency, Washington, DC.

US EPA, 2000. Level III ecoregions ofthe continental United States (revision of Omernik, 1987). US Environmental Protection Agency National Health and Environmental Effects Research Laboratory, Western Ecology Division, Corvallis, OR.

US EPA, 2001. Mercury Maps.  A Quantitative Spatial Link Between Air Deposition and Fish Tissue. Final Report. EPA/823/R-01/009, USEPA, Washington, D.C.

US EPA, 2001. Methylmercury fish tissue residue criterion, United States Environmental Protection Agency, Office of Water, 4304 EPA-823-F-01-001, January 2001, www.epa.gov/waterscience/criteria/methylmercury/factsheet.html.

USEPA, 1997. Mercury Study Report to Congress. EPA-452/R-97-005, Office of Air Quality Planning and Standards

United States Environmental Protection Agency, Washington.

Watras, C.J. et al., 1998. Bioaccumulation of mercury in pelagic freshwater food webs. Science of the Total Environment, 219(2-3): 183-208.

Watras, C.J. and Bloom, N.S., 1992. Mercury and methylmercury in individual zooplankton: implications for bioaccumulation. Limnol. Oceanogr., 37: 1313-1318.

Wren, C.D. and MacCrimmon, H.R., 1986. Comparative bioaccumulation of mercury in two adjacent freshwater ecosystems. Water Research, 6: 763-769.

Zhang, H. and Lindberg, S.E., 2001. Sunlight and Iron(III)-Induced Photochemical Production of Dissolved Gaseous Mercury in Freshwater. Environmental Science and Technology, 35: 928-935.

SECTION 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1

PROFILE OF FISHING ACTIVITY IN THE U.S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1

4.1    Industry Characterization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1
         4.1.1    Introduction and Overview of the Fishing Industry . . . . . . . . . . . . . . . 4-1
         4.1.2    Commercial Fishing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-2
         4.1.3    Recreational Fishing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

4.2    U.S. Production Statistics for Commercial and Recreational Fishing . . . . . . . . . . . . . 4-8
         4.2.1    Commercial Fishing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-8
         4.2.2    Recreational Fishing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-15

4.3    U.S. Demand for Commercial and Recreational Fishing . . . . . . . . . . . . . . . . . . . . 4-19
         4.3.1    Commercial Imports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-19
         4.3.2    U.S. Demand for Commercial Fishery Products . . . . . . . . . . . . . . . . . 4-24
         4.3.3    Recreational Fishing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-26
         4.3.4    Total U.S. Demand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-35

4.4    Economic Value of Key Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-36
         4.4.1    Finfish . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-36
         4.4.2    Shellfish . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-37
         4.4.3    Fish Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-39

4.5    Characterization of Fish Consuming Populations . . . . . . . . . . . . . . . . . . . . . . . . . 4-39
         4.5.1    Fish  Consumption Pathways and Associated Fish-Consuming
                     Populations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-40
         4.5.2    Fish Consuming Populations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-41
         4.5.3    General Fish Consumption Rates for Key Fish Consuming
                     Populations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-42
         4.5.4    Discussion of Population and Fish Consumption Data in the Context of the
                     Mercury Benefits Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-45

4.6    Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-47
         4.6.1    Commercial Fish Production, Demand, and Consumption . . . . . . . . . 4-47
         4.6.2    Recreational Fishing Activity, and Consumption . . . . . . . . . . . . . . . . 4-48
         4.6.3    Overall Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-49

4.7    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-49

**Tables**

Table 4-1.  Finfish Fishing Industry (NAICS code 114111) . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-4

Table 4-2.  Shellfish Fishing Industry (NAICS code 114112) . . . . . . . . . . . . . . . . . . . . . . . .  4-4

Table 4-3.  Value of Aquacultural Products Sold, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-5

Table 4-4.  Number of Anglers and Fishing Licenses in the United States . . . . . . . . . . . . . . .  4-7

Table 4-5.  Annual Domestic Landings for Commercial Fishing  (Finfish and Shellfish) . . . .  4-8

Table 4-6.  Commercial Fish Landings by Region . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-10

Table 4-7.  2002 U.S. Commercial Fish Landings by End Use . . . . . . . . . . . . . . . . . . . . . . . .  4-10

Table 4-8.  2002 U.S. Commercial Landings by Month . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-11

Table 4-9.  Finfish Species with the Highest 2002 U.S. Commercial Landings . . . . . . . . . . .  4-11

Table 4-10.  Shellfish Types with the Highest 2002 Commercial Landings . . . . . . . . . . . . . .  4-12

Table 4-11.  Total 2002 U.S. Aquacultural Production . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-13

Table 4-12.  2002 Exports of Edible Finfish Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-14

Table 4-13.  2002 Exports of Edible Shellfish Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-15

Table 4-14.  2002 Recreational Marine Landings for Selected Finfish Types . . . . . . . . . . . .  4-16

Table 4-15.  2002 Recreational Marine Catch and Harvest by Region and Top Species
          Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-18

Table 4-16.  2002 Imports of Edible Fresh or Frozen Finfish Products . . . . . . . . . . . . . . . . .  4-22

Table 4-17.  2002 Imports of Edible Canned and Cured Finfish Products . . . . . . . . . . . . . . .  4-23

Table 4-18.  2002 Imports of Edible Fresh and Frozen Shellfish Products . . . . . . . . . . . . . . .  4-24

Table 4-19.  2002 Imports of Edible Canned Shellfish Products . . . . . . . . . . . . . . . . . . . . . . .  4-24

Table 4-20.  2002 U.S. Demand for Commercial Finfish (metric tons) . . . . . . . . . . . . . . . . .  4-25

Table 4-21.  2002 U.S. Demand for Commercial Shellfish (metric tons) . . . . . . . . . . . . . . . .  4-25

Table 4-22.  2002 U.S. Consumption of Commercial Fishery Products . . . . . . . . . . . . . . . . .  4-26

Table 4-23.  Number of Anglers and Days of Fishing for 2001 . . . . . . . . . . . . . . . . . . . . . . .  4-27

Table 4-24.  2001 U.S. Recreational Freshwater Fishing:  Targeted Species by Region . . . .  4-28

Table 4-25.  Freshwater Fishing Bag and Size Limits for Selected States and Species . . . . .  4-31

Table 4-26.  Saltwater Fishing Bag and Size Limits for Selected States and Species . . . . . .  4-32

Table 4-27.  Percent of Freshwater Anglers by Age Group . . . . . . . . . . . . . . . . . . . . . . . . . .  4-33

Table 4-28.  Percent of Anglers by Sex and Age Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-33

Table 4-29.  2001 Demographic Summary, Angler Race (% Non-White) . . . . . . . . . . . . . . .  4-34

Table 4-30.  Incidence of Fishing Among White, African American, and Hispanic Recreational
          Boaters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-34

Table 4-31.  Percent of U.S. Population Who Fished (By Household Income) . . . . . . . . . . .  4-35

Table 4-32.  2002 Economic Value of Commercial Landings for Important Finfish Types . .  4-36

Table 4-33.  Average 2001 Wholesale Prices for Several Fresh Finfish Types . . . . . . . . . . .  4-37

Table 4-34.  2002 Economic Value of Commercial Landings of Several Shellfish Types . . .  4-38

Table 4-35.  Average 2001 Wholesale Prices for Several Fresh Shellfish Types . . . . . . . . . .  4-39

Table 4-36.  2002 Economic Value of Commercial Fishery Products . . . . . . . . . . . . . . . . . .  4-39

Table 4-37.  Demographic (count) Data for Key Fish Consuming Populations in the U.S. . .  4-43

Table 4-38  Fish Consumption Rates for Key Fish Consuming Populations in the U.S.  . . . .  4-44

Table 4-39.  Total Fish Consumption for Recreational Saltwater Anglers, Recreational
          Freshwater Anglers and General U.S. Fish Consuming Population . . . . . . . . . . . .  4-46

**Figures**

Figure 4-1.  Sources of U.S. Fish Consumption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-2
Figure 4-2.  Location of U.S. Aquacultural Operations, 1998 . . . . . . . . . . . . . . . . . . . . . . . . .  4-6
Figure 4-3.  Recreational Fishing Participation Rates by State . . . . . . . . . . . . . . . . . . . . . . . .  4-7
Figure 4-4.  2002 Commercial Landings by Distance from Shore  . . . . . . . . . . . . . . . . . . . . .  4-9
Figure 4-5.  2002 Recreational Marine Finfish Landings by Distance from Shore . . . . . . . .  4-17
Figure 4-6.  U.S. Commercial Fish Imports by Area, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . .  4-20
Figure 4-7.  U.S. Commercial Fish Imports by Country, 2002 . . . . . . . . . . . . . . . . . . . . . . .  4-21
Figure 4-8.  2001 Total Recreational Fishing Days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-29
Figure 4-9.  2001 Recreational Fishing Days, State Residents  . . . . . . . . . . . . . . . . . . . . . . .  4-29
Figure 4-10.  2001 Recreational Fishing Days, Non-State Residents . . . . . . . . . . . . . . . . . .  4-30
Figure 4-11.  2002 Market Share of Commercial Finfish (% of Total Economic Value) . . . .  4-37
Figure 4-12.  2002 Market Share of Commercial Shellfish (% of Total Economic Value)  . .  4-38
Figure 4-13.  Fish Consumption Pathways . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-40

# SECTION 4

# PROFILE OF FISHING ACTIVITY IN THE U.S.

## 4.1     Industry Characterization

Because fish consumption is the primary pathway for exposure to methylmercury, this section provides background information through a profile of the fishing industry in the United States.  We provide a characterization of the commercial and recreational fishing industries, followed by information on U.S. commercial and recreational fish production, U.S. commercial and recreational fishing demand, data on the pricing of affected fish products, and an industry outlook.  We also provide a characterization of populations that consume fish, and the potential magnitude of quantities consumed in each category of fish consumption pathways.  Based on data availability, most of the information in this profile is based on calendar year 2002.  However, in some sections, historic and projected industry data are provided.

This section demonstrates that the recreational freshwater fisher population (28 million) is significantly larger than the recreational saltwater population (9 million), while both of these populations are significantly smaller than the general population of fish consumers in the U.S. (184 million) which includes many individuals receiving a significant fraction of their fish from commercially-produced stocks.

Based on information provided in this section, we see that commercial fish consumption constitutes a large portion of exposure to methylmercury.  However, a large majority of the commercial fish consumed are imported from foreign sources, or 3-200 miles offshore by domestic commericial fishermen (with a majority of domestic landings occuring off the Pacific coast).  These sources of exposure are not likely to be impacted by the control of utilities from the CAMR rule.  However, methylmercury concentrations from freshwater sources are likely to be affected by control domestic electric utilities.  Therefore, the quantified benefit analysis in Section 11 evaluates the benefits of improved health from reduced exposure to methylmercury from recreational freshwater fishing activities.

### 4.1.1    Introduction and Overview of the Fishing Industry

The most common mechanism of exposure to mercury for humans and wildlife is through the consumption of mercury containted in predatory fish.  These include saltwater fish such as tuna, shark, and swordfish, which are most often caught commercially.  They also include freshwater fish such as bass, perch, and walleye, which are often caught recreationally.

The fish that Americans eat come from a variety of sources.  Figure 4-1 shows that total fish consumption is composed of commercial fish and shellfish, aquaculture (or farm raised fish for commercial sale), fish caught from recreational activities, fish caught for cultural or traditional practices, and imports from international waters.  The types of fish consumed vary greatly and may come from saltwater or freshwater sources.  The figure also shows that the benefits analysis focuses on the consumption of recreationally-caught freshwater fish.



**Figure 4-1.  Sources of U.S. Fish Consumption**

The focus of this profile is a characterization of the commercial fishing industry and recreational fishing activity.  However, some information on industries associated with commercial and recreational fishing is also included.  The industrial categories with information in this profile are provided below with their North American Industrial Classification System (NAICS) code:

| Description | NAICS | Description | NAICS |
|---|---|---|---|
| Finfish Fishing | 114111 | Seafood Canning | 311711 |
| Shellfish Fishing | 114112 | Fresh and Frozen Seafood Processing | 311712 |
| Finfish Farming and Fish Hatcheries | 112511 | Fish and Seafood Wholesalers | 422460 |
| Shellfish Farming | 112512 | Fish and Seafood Retail Markets | 445220 |
| Shipbuilding and Repair | 336611 | Seafood Restaurants | 7221, 7222 |
| Boat Building | 336612 | Fishing Supply Stores | 451110 |
| Boat Dealers | 441222 | Charter Fishing Boat Services | 4872102 |

The rest of this section provides an industry characterization for the commercial and recreational fishing industries.  Section 4.1.2 covers the commercial fishing industry.  Section 4.1.3 provides information on the recreational fishing industry.

### 4.1.2   Commercial Fishing

The commercial fishing industry grossed over $3 billion in revenues in 2003 and is dominated by saltwater species of fish (i.e., tuna, shrimp, clams, shark).  Over 60% of domestic commercial saltwater fish are caught between 3 and 200 miles from shore (most of the remaining

commercial saltwater catch is made within 3 miles from shore.  Approximately, two-thirds of the U.S. commercial landings occur along the Pacific coast.  Imports of commercial seafood account for 35% of U.S. demand for commercial fishery products.

### 4.1.2.1 Industry Characterization

The commercial fishing industry is classified under the standard industrial classification system (SIC) as 0912 for finfish firms and 0913 for shellfish firms, and the NAICS under codes 114111 and 114112, respectively.  Although detailed industry gross domestic product (GDP) data were not available at the five digit NAICS code level, the gross industrial output for NAICS code 114100 was $3.19 billion in 2002 (BEA, 2004).  Gross industrial output for the years 1998 through 2003 were:

| Year | Gross Output (Billion $) |
|------|--------------------------|
| 1998 | 3.28 |
| 1999 | 3.56 |
| 2000 | 3.65 |
| 2001 | 3.39 |
| 2002 | 3.19 |
| 2003 | 3.45 |

The estimated value of year 2002 U.S. edible and nonedible fish products was $7.67 billion, which was 0.07% of U.S. GDP in 2002.  Production and marketing for the commercial fishing industry generated an estimated $28.4 billion in value added to the U.S. Gross National Product.  In addition to primary, secondary, and imports processing, value added activities include retail trade from food service and retail trade from stores.  Total consumer expenditures for commercial fishing products were estimated to be $55.1 billion in 2002 (NMFS, 2003a).

The commercial fishing industry includes products from finfish fishing, shellfish fishing, and aquaculture.  Each sub-industry is discussed further below.  As expected, the majority of U.S. commercial fish landings occur off the coast of the United States.  Some commercial fishing products are caught within three miles of the U.S. coast, while the majority of commercial products are caught further from shore (i.e., between 3-200 miles off the U.S. coast).  In fact, most commercial fishing occurs in saltwater from the Pacific and Atlantic Oceans, and in the Gulf of Mexico, with the largest portion of landings from the Pacific Ocean.  Section 4.2 provides more detail on U.S. commercial and recreational fish landings.

### 4.1.2.1.1  Finfish Fishing

In 2002, there were 1,113 establishments with 4,301 employees for NAICS 114111, finfish fishing.  Table 4-1 shows the number of firms, number of establishments, employment and payroll for 1998-2002 from the Bureau of Census (BOC) publication *County Business Patterns* and *Statistics of U.S. Businesses* (BOC, 2004a; 2004b).  *Statistics of U.S. Businesses*

from the Bureau of Census 2002 have not been released yet, so the number of firms for 2002 is not available (BOC, 2004b).  The data demonstrate that the finfish industry is dominated by one-facility firms rather than firms that have multiple facilities nationwide and the average firm employs approximately 3.5 people.

**Table 4-1.  Finfish Fishing Industry (NAICS code 114111)**

| Year | Number of Firms | Number of Establishments | Number of Employees | Annual Payroll ($1,000) |
|---|---|---|---|---|
| 1998 | 1,269 | 1,275 | 4,630 | 181,872 |
| 1999 | 1,307 | 1,312 | 5,088 | 191,521 |
| 2000 | 1,350 | 1,357 | 4,833 | 190,500 |
| 2001 | 1,293 | 1,302 | 4,586 | 183,490 |
| 2002 | NA | 1,113 | 4,301 | 190,657 |

Source: BOC, 2004a; BOC, 2004b.

*4.1.2.1.2  Shellfish Fishing*

The Census Bureau reports that there were 793 establishments with 2,195 employees in 2002 for NAICS 114112, shellfish fishing.  Table 4-2 shows the number of firms, number of establishments, employment and payroll for 1998-2002 from the *County Business Patterns* and *Statistics of U.S. Businesses* from the Bureau of Census (BOC, 2004a, 2004b).  Statistics of U.S. Businesses from the Bureau of Census 2002 have not been released yet, so the number of firms for 2002 is not available.  Like the finfish industry, the shellfish industry is also dominated by firms with only one establishment with average employment of 3 people per firm.

**Table 4-2.  Shellfish Fishing Industry (NAICS code 114112)**

| Year | Number of Firms | Number of Establishments | Number of Employees | Annual Payroll ($1,000) |
|---|---|---|---|---|
| 1998 | 831 | 832 | 2,535 | 68,723 |
| 1999 | 858 | 859 | (G) | (D) |
| 2000 | 940 | 941 | 2,628 | 75,414 |
| 2001 | 935 | 936 | (H) | (D) |
| 2002 | NA | 793 | 2,195 | 60,944 |

(D) -- Withheld to avoid disclosing data for individual companies; data are included in broader industry totals

(A)-(C), (E)-(M) -- Employment-size classes are indicated as follows:

    A--0 to 19  B--20 to 99  C--100 to 249  E--250 to 499

    F--500 to 999  G--1,000 to 2,499  H--2,500 to 4,999

    I--5,000 to 9,999  J--10,000 to 24,999

    K--25,000 to 49,999  L--50,000 to 99,999

    M--100,000 or more

Source: BOC, 2004a; BOC, 2004b.

*4.1.2.1.3  Aquaculture*

Although firm-level statistics on aquaculture were not available from the BOC for NAICS codes 112511 (finfish) or 112512 (shellfish), the U.S. Department of Agriculture (USDA), National Agricultural Statistics Service (NASS) reports that in 2002 aquacultural sales totaled $1.13 billion with 6,653 farms (NASS, 2002).  Detailed aquacultural data are available from the 1998 Census of Aquaculture (NASS, 1998).  According to USDA, there were 4,028 aquacultural farms in 1998 with 3,252 used for freshwater fish and 815 used for saltwater fish farming.  Total sales in 1998 were $978 million with food fish accounting for over 70% of sales. These data indicate a large increase in the number of farms from 1998 to 2002, but a relatively small increase in sales.

An estimated 68% of these farms were in the southern states of the U.S.  Mississippi was the top State in aquacultural sales, capturing nearly 30 percent of the $978 million dollar total in 1998.  Arkansas, Florida, Maine, and Alabama came in second through fifth, respectively, in sales.  Food fish (e.g., catfish, trout, salmon, tilapia, hybrid striped bass, etc.) accounted for about two-thirds of the aquacultural sales.  Other aquaculture activities include raising fish to stock waterbodies with particular species.  Figure 4-2 provides a map of aquacultural farming operations in the U.S. based on total freshwater and saltwater acreage from the U.S. Department of Agriculture's 1998 Census of Aquaculture.

**Table 4-3.  Value of Aquacultural Products Sold, 1998**

| Product | Farms | Sales ($1,000) |
|---|---|---|
| Catfish | 1,370 | 450,710 |
| Trout | 561 | 72,473 |
| Food fish, other than catfish and trout | 435 | 168,532 |
| Baitfish | 275 | 168,532 |
| Ornamental fish | 345 | 68,982 |
| Sport or game fish | 204 | 7,390 |
| Other fish | 11 | 267 |
| Crustaceans | 837 | 36,318 |
| Mollusks | 535 | 89,128 |
| Other animal aquaculture, algae, and sea vegetables | 216 | 46,734 |
| **Total** | **4,028** | **978,012** |

Source: NASS, 1998.



**Figure 4-2.  Location of U.S. Aquacultural Operations, 1998**

### *4.1.3   Recreational Fishing*

Recreational fishing is characterized by individuals fishing for sport/recreational purposes, and/or for subsistence.

#### *4.1.3.1 Industry Characterization*

##### *4.1.3.1.1  Information on Recreational Anglers in the United States*

In 2001, 29.5 million fishing licenses were sold in the United States, while the number of anglers (aged 16 and over) is estimated to be 34.1 million (USFWS, 2002).  Of these 34.1 million anglers, 28.4 million participated in freshwater fishing and 9.1 million participated in saltwater fishing.  Table 4-4 shows the number of fishing licenses sold, the number of anglers, and the participation rate (percent of population) for each region of the United States.  Figure 4-3 shows the number of anglers per capita (aged 16 and over) by state.  Data on recreational fishing demographics are provided in Section 4.3.3.2 below.

Approximately 16% of the U.S. population participates in recreational fishing activities. The states with the greatest numbers of anglers are California and Texas.  However, when taking population into account, these states have relatively low participation rates (9% and 15%, respectively).  As shown in Figure 4-3, the states with the highest levels of fishing participation

are in the Northern Plains region:  Minnesota (36%), Montana (32%), and Wyoming (32%) and
Alaska (41%).

**Table 4-4.  Number of Anglers and Fishing Licenses in the United States**

| Region | Fishing Licenses (thousands) | Number of Anglers* (thousands) | Population* (thousands) | Participation Rate |
|---|---|---|---|---|
| United States Total | 29,452 | 34,071 | 212,298 | 16% |
| Great Lakes | 5,395 | 6,182 | 36,294 | 17% |
| Northeast | 4,578 | 6,433 | 51,975 | 12% |
| Northern Plains | 4,355 | 3,722 | 13,858 | 27% |
| South Central | 4,556 | 5,572 | 28,880 | 19% |
| Southeast | 5,463 | 7,192 | 40,241 | 18% |
| West | 5,106 | 4,947 | 40,624 | 12% |

*Ages 16 and over only



**Figure 4-3.  Recreational Fishing Participation Rates by State**

**4.2      U.S. Production Statistics for Commercial and Recreational Fishing**

Data are provided in this section on production estimates for the commercial and recreational fishing sectors.  Primarily, these data are estimates of the amount of fish landed by either commercial or recreational anglers.  Available data are often aggregated as either finfish or shellfish or by groups of individual fish species.  Production data for recreational freshwater fishing are lacking.  More detailed production data are provided in the report titled "Profile of the Fishing Industry in the United States" available in the docket for this rulemaking (Pechan, 2005).

**4.2.1   Commercial Fishing**

This section summarizes available U.S. commercial production information (fish landings), including landings of finfish or shellfish, fish types, locations of fish landings, edible and non-edible uses of fish products, and seasonal production information.  These data were taken from the National Marine Fisheries Service (NMFS) of the National Oceanic and Atmospheric Administration (NOAA).

The NMFS provides both monthly and annual summaries of commercial fishery landings that are updated weekly.  Domestic fishery landings are those fish and shellfish that are landed and sold in the 50 states by U.S. fishermen and do not include landings made in U.S. territories or by foreign fishermen.  Landings are provided in round (whole) weight even though many fish may be processed while at sea.  Landings do not include aquaculture products except for clams, mussels and oysters.

**4.2.1.1  Domestic Commercial Fishery Landings**

Table 4-5 provides a summary of total domestic commercial landings of finfish and shellfish for the years 1993 – 2003 (landed by U.S. fishermen and sold in the U.S.).  Although production data for 2003 are available, the year 2002 was selected for use in this profile, since the NMFS indicates that data for 2003 may be incomplete (NMFS, 2004).  Pechan (2005) provides detailed 2002 landings data by fish species for finfish and shellfish, respectively.

**Table 4-5.  Annual Domestic Landings for Commercial Fishing  (Finfish and Shellfish)**

| Year | Metric Tons |
|------|-------------|
| 1993 | 4,630,853 |
| 1994 | 4,762,637 |
| 1995 | 4,496,420 |
| 1996 | 4,374,409 |
| 1997 | 4,514,152 |
| 1998 | 4,233,291 |
| 1999 | 4,267,982 |
| 2000 | 4,147,069 |
| 2001 | 4,314,492 |
| 2002 | 4,270,030 |
| 2003 | 4,311,663 |

Source:  NMFS, 2004.

NMFS categorizes commercial landings by distance to shore and identifies these distances as inland, state territorial sea, and federal exclusive economic zone with Florida and Puerto Rico having unique location identifiers.  Inland landings refer to commercial landings in bays, estuaries, and sounds within the United States.  State territorial sea represents the area that extends out three nautical miles from shore for all states with the exception of Florida and Puerto Rico whose territorial sea extends to ten nautical miles.  Federal exclusive economic zone refers to the ocean area that extends to 200 nautical miles beyond the state territorial sea boundary (NMFS, 2003b).

Figure 4-4 is a chart showing the amount of commercial fish landed in inland waters and state and territorial seas (0 - 3 miles from shore) to be 36% of the total, while 61% of commercial fish were landed in the Federal exclusive economic zone (3 - 200 miles offshore).  Only 3% of domestic commercial fish landings occurred in high seas locations or off foreign shores.  Pechan (2005) provides additional details on the commercial fish species caught by distance from shore.



Source: NMFS, 2004.

**Figure 4-4.  2002 Commercial Landings by Distance from Shore**

A review of the commercial fish landings by region demonstrated that the Pacific coast accounted for 65% of total landings (see Table 4-6) with Alaska and California accounting for the largest portion.  Alaska alone accounted for over 26% of total U.S. landings.  The next highest landing region in percent, the Gulf Coast (18%), had significantly less landings than the Pacific Coast.  Among the Gulf Coast landings, Louisiana was the state with the highest landing totals.  New England and the Chesapeake Bay contributed 6% and 5% to U.S. landings, respectively, with total commercial landings in Virginia and Massachusetts (686 million pounds) having the highest landing numbers among their groups.  The Mid-Atlantic, South Atlantic, and the Great Lakes regions combined for the remaining 4.5% of total commercial landings.  Within the United States, the ports registering the highest number of fish landings in 2002 were Dutch Harbor-Unalaska, AK, Empire-Venice, LA, and Reedville, VA.

**Table 4-6.  Commercial Fish Landings by Region**

| Region | Metric Tons | Percent |
|---|---|---|
| New England | 264,859 | 6.2 |
| Middle Atlantic | 93,756 | 2.2 |
| Chesapeake Bay | 224,834 | 5.3 |
| South Atlantic | 97,431 | 2.3 |
| Gulf Coast | 778,428 | 18.3 |
| Pacific Coast | 2,784,260 | 65.5 |
| Great Lakes | 8,096 | 0.2 |
| **TOTAL** | **4,251,664** | **100** |

Source: NMFS, 2004.

Fish landings can be disaggregated into edible fish (fish used for human consumption) and non-edible products (often used for animal consumption, fish meal, fish oil, or bait).  Fish landings ready to be used for human food consumption are generally either fresh or frozen, while fish that are canned, cured, or processed for both human and non-human consumption are categorized as landings for industrial purposes.

Of the 4.3 million tons landed by U.S. fishermen in 2002, an estimated 3.4 million metric tons were to be used for human food while the remaining 0.9 million metric tons of fish landings were designated to be used for other purposes (fish meal, oil, or other including bait and animal food).  These data are shown in Table 4-7 below.  Among the canned and cured products, about 320,000 metric tons were to be used for human food.  About 4% of total landings were used for bait and other animal consumption.  About 19% of landings were used for reduction to fish meal, oil, or other fish products.  The amount of this last end use destined for human consumption (i.e. fish oil) was not available.

**Table 4-7.  2002 U.S. Commercial Fish Landings by End Use**

| End Use | Metric Tons | Percent |
|---|---|---|
| Fresh and Frozen: | | |
| For human food | 2,940,000 | 69.3 |
| For bait and animal food | 150,000 | 3.5 |
| **Subtotal** | **3,090,000** | **72.8** |
| **Canned:** | | |
| For human food | 260,053 | 6.1 |
| For bait and animal food | 24,926 | 0.6 |
| **Subtotal** | **284,979** | **6.7** |
| **Cured:** | | |
| Cured for human food | 53,024 | 1.2 |
| Reduction to meal, oil, other | 816,666 | 19.2 |
| **Subtotal** | **869,690** | **20.4** |
| **Total** | **4,244,669** | **100** |

Source:  NMFS, 2003b.
Totals do not add exactly or match between tables due to rounding.

In 2002, almost one-third of all commercial landings for human consumption occurred during the months of July and August (see Table 4-8).  An additional 25% of total commercial

landings occurred during the months of February and March while roughly 11% of fish were landed during September.

**Table 4-8.  2002 U.S. Commercial Landings by Month**

| Month | Landings for Human Food | | Landings for Industrial Purposes | | Total | |
|---|---|---|---|---|---|---|
| | Metric Tons | Percent | Metric Tons | Percent | Metric Tons | Percent |
| January | 149,234 | 4.6 | 24,494 | 2.5 | 173,729 | 4.1 |
| February | 432,734 | 13.2 | 20,412 | 2.1 | 453,146 | 10.6 |
| March | 400,982 | 12.3 | 16,783 | 1.7 | 417,766 | 9.8 |
| April | 107,050 | 3.3 | 54,432 | 5.5 | 161,482 | 3.8 |
| May | 154,224 | 4.7 | 90,266 | 9.1 | 244,490 | 5.7 |
| June | 216,367 | 6.6 | 136,534 | 13.7 | 352,901 | 8.3 |
| July | 484,445 | 14.8 | 203,213 | 20.4 | 687,658 | 16.1 |
| August | 597,845 | 18.3 | 168,739 | 17.0 | 766,584 | 18.0 |
| September | 358,344 | 11.0 | 117,936 | 11.9 | 476,280 | 11.2 |
| October | 218,635 | 6.7 | 107,503 | 10.8 | 326,138 | 7.7 |
| November | 90,720 | 2.8 | 28,123 | 2.8 | 118,843 | 2.8 |
| December | 57,607 | 1.8 | 25,855 | 2.6 | 83,462 | 2.0 |
| **Total** | **3,268,188** | **100** | **994,291** | **100** | **4,262,479** | **100** |

Totals do not match between tables due to rounding.
Source: NMFS, 2003b.

Table 4-9 provides a summary of the species of finfish with the highest landings by U.S. commercial fishermen during 2002 (tuna were added for comparison; most tuna consumed in the U.S. are imported).  Pechan (2005) provides additional detail in 2002 finfish landings by species. Pollock and Menhaden were by far the finfish types with the highest commercial landings by U.S. craft in 2002.  These two finfish types are almost exclusively caught by commercial fishermen.  Pollock are often used in making frozen fish products (e.g., fish sticks), surimi (see Section 4.2.1.3), and other minced fish products.  Menhaden are often used to produce cut or live bait, fishmeal and fish oil.

**Table 4-9.  Finfish Species with the Highest 2002 U.S. Commercial Landings**

| Finfish Type | Metric Tons | % of Total Finfish Landed |
|---|---|---|
| Pollock | 1,519,101 | 41.4 |
| Menhaden | 793,486 | 21.6 |
| Salmon | 254,613 | 6.94 |
| Cod | 245,705 | 6.70 |
| Hake | 141,642 | 3.86 |
| Sole | 116,779 | 3.18 |
| Herring | 99,173 | 2.70 |
| Sardine | 97,527 | 2.66 |
| Tuna* | 22,513 | 0.61 |
| Other Finfish | 377,904 | 10.3 |
| **Total 2002 Finfish** | **3,668,443** | **100** |

Source: NMFS, 2004.
Note: These estimates are for domestic landings and do not include quantities of imports.
* There are a number of species that rank higher than tuna, but are not displaed in this table.
Tuna is added for comparison purposes only to other species.

Table 4-10 provides a summary of the shellfish types with the highest commercial harvests in 2002 by the domestic fleet.  Nearly half of the 2002 landings were for shrimp and crab.  Of the total finfish and shellfish landings in 2002, shellfish represent about 14% of the total.  Details on the commercial landings of shellfish in 2002 are provided in a separate report (Pechan, 2005).

**Table 4-10.  Shellfish Types with the Highest 2002 Commercial Landings**

| Shellfish Type | Metric Tons | % of Total Shellfish Landed |
|---|---|---|
| Shrimp | 156,059 | 25.9 |
| Crab | 139,840 | 23.2 |
| Squid | 93,217 | 15.5 |
| Clam | 59,059 | 9.82 |
| Lobster | 39,454 | 6.56 |
| Scallop | 24,047 | 4.00 |
| Oyster | 16,701 | 2.78 |
| Other Shellfish[a] | 73,238 | 12.2 |
| **Total 2002 Shellfish** | **601,615** | **100** |

Source: NMFS, 2004.
[a] NMFS includes some non-shellfish species in the "Other shellfish" group including seaweed (7.8%), sponges (0.05%) and turtles (0.006%).

### 4.2.1.2 Aquaculture

Total aquacultural production in 2002 was 393 thousand metric tons with catfish accounting for 73% or 286 thousand metric tons (NMFS, 2004).  Aquaculture provides most of the commercial catfish production in the U.S.  Data for both finfish and shellfish are provided in Table 4-11.  Trout production levels were 6% of the total, while salmon accounted for 3%.  An additional 7% of aquacultural production in 2002 was attributed to raising crawfish.

### *4.2.1.3 Exports of Finfish and Shellfish*

Total exports include both "exports" (exports of fishery products of domestic origin) and "re-exports" (exports of fishery products of foreign origin).  Total edible finfish and shellfish exports for 2002 were about 970,000 metric tons (product weight), with finfish accounting for about 85% of this amount (NMFS, 2003b).  Table 4-12 provides 2002 summary export data for finfish.  These export data include products of both domestic and foreign origin.  The largest export of a particular finfish product was surimi, which made up 23% of the exported finfish products.  Surimi is a Japanese word meaning "minced fish".  It is typically produced from skinless Alaskan pollack and used in the subsequent manufacture of imitation fish products (e.g., imitation crabmeat).  Over 91% of the finfish products exported were either fresh or frozen. (Pechan, 2005) provides additional details of fresh and frozen fish exports in 2002.

Table 4-13 provides 2002 export data for shellfish.  Among U.S. 2002 shellfish exports, the largest export products were as follows: squid (39%), lobster (20%), crabs (10%), and shrimp (10%).  Nearly 89% of shellfish products were exported either fresh or frozen.  Pechan (2005) provides more detailed information on shellfish exports.

**Table 4-11.  Total 2002 U.S. Aquacultural Production**

| Fish Species | Metric Tons | Percent |
|---|---:|---:|
| **Finfish:** | | |
| Baitfish[a] | 6,329 | 1.6 |
| Catfish | 286,039 | 72.7 |
| Salmon[a] | 12,734 | 3.2 |
| Striped bass[a] | 4,758 | 1.2 |
| Tilapia | 9,000 | 2.3 |
| Trout | 24,699 | 6.2 |
| **Finfish Subtotal** | **343,559** | **87.3** |
| **Shellfish:** | | |
| Clams[a] | 4,473 | 1.1 |
| Crawfish | 27,825 | 7.1 |
| Mussels[a] | 627 | 0.2 |
| Oysters[a] | 8,413 | 2.1 |
| Shrimp[a] | 4,080 | 1.0 |
| Miscellaneous[a] | 4,425 | 1.1 |
| **Shellfish Subtotal** | **49,843** | **12.7** |
| **Total** | **393,402** | **100** |

Source: NMFS, 2003b.

[a] Saltwater species.  The baitfish and and all shellfish species (except crawfish) are believed to be primarily saltwater species, although definitive data were not available from the source material.

4-13

**Table 4-12.  2002 Exports of Edible Finfish Products**

| Product | Metric Tons | % of Total |
|---|---|---|
| *Fresh or Frozen Finfish:* | | |
| *Freshwater (whether or not whole):* | | |
| Eels | 3,063 | 0.36 |
| Tilapia | 2,331 | 0.28 |
| Trout | 600 | 0.07 |
| **Total Freshwater (whether or not whole)** | **5,994** | **0.73** |
| *Saltwater (whether or not whole):* | | |
| Flatfish[a] | 67,519 | 8.01 |
| Groundfish[b] | 103,900 | 12.3 |
| Salmon | 78,539 | 9.32 |
| Tuna | 15,302 | 1.82 |
| Other[c] | 159,613 | 18.9 |
| **Total Saltwater Finfish (whether or not whole)** | **424,873** | **51.5** |
| ***Freshwater (fillets and steaks):*** | | |
| Catfish | 73 | 0.01 |
| Tilapia | 2,065 | 0.25 |
| Total Freshwater (fillets and steaks) | 2,138 | 0.06 |
| *Saltwater (fillets and steaks):* | | |
| Flatfish[a] | 760 | 0.10 |
| Groundfish[b] | 80,514 | 9.56 |
| Other | 16,397 | 1.95 |
| Total Saltwater (fillets and steaks) | 97,671 | 11.4 |
| Blocks, Regular And Minced | 26,372 | 2.93 |
| Surimi | 190,911 | 23.1 |
| Fish Sticks And Similar Products | 21,332 | 2.55 |
| **Total Finfish: Fresh And Frozen** | **769,291** | **91.3** |
| ***Canned Finfish*** | | |
| Anchovy | 333 | 0.04 |
| Herring | 3,313 | 0.39 |
| Sardine | 16,190 | 1.92 |
| Mackerel | 1,049 | 0.12 |
| Salmon | 44,708 | 5.31 |
| Tuna | 1,628 | 0.19 |
| **Total Finfish: Canned** | **67,221** | **7.98** |
| ***Cured Finfish*** | | |
| Dried | 843 | 0.10 |
| Pickled or Salted | 4,554 | 0.54 |
| Smoked or Kippered | 503 | 0.06 |
| **Total Finfish: Cured** | **5,900** | **0.70** |
| **Total Finfish Exports[d]** | **842,412** | **100** |

Source:  NMFS, 2003b.  Includes exports of edible products of both domestic and foreign origin.
[a]  Flatfish includes halibut.
[b]  Groundfish include cod and  pollock.
[c]  Other include atka mackerel, butterfish, herring, lingcod, mackerel, monkfish, mullet, sablefish, sardine, scorpionfish, sea bass, shark and dogfish, toothfish, and unclassified.
[d]  Excludes other fish products such as fish balls, cakes, and puddings, fish/shellfish juice, soups and broths, caviar and roe, prepared fish meals, and other.

**Table 4-13.  2002 Exports of Edible Shellfish Products**

| Product | Metric Tons | % of Total |
|---|---:|---:|
| *Fresh and Frozen Shellfish Products* | | |
| Crabs and Crabmeat | 16,089 | 10.3 |
| Crawfish (freshwater) | 199 | 0.13 |
| Lobsters and Lobster Meat | 30,748 | 19.7 |
| Shrimp | 15,060 | 9.67 |
| Conch | 444 | 0.29 |
| Clams | 834 | 0.54 |
| Cuttlefish | 145 | 0.09 |
| Mussels | 645 | 0.41 |
| Oysters | 1,788 | 1.15 |
| Scallops | 4,589 | 2.95 |
| Octopus | 528 | 0.34 |
| Squid | 60,151 | 38.6 |
| Snails | 36 | 0.02 |
| Sea Urchins | 1,505 | 0.97 |
| Unclassified | 5,472 | 3.51 |
| Frog Legs and Meat[a] | 79 | 0.05 |
| **Total Fresh and Frozen Shellfish Products** | **138,312** | **88.8** |
| *Canned Shellfish Products* | | |
| Crabmeat | 538 | 0.35 |
| Lobsters and Lobster Meat | 31 | 0.02 |
| Shrimp | 1,507 | 0.97 |
| Clams | 1,762 | 1.13 |
| Squid | 13,575 | 8.72 |
| **Total Canned Shellfish Products** | **17,413** | **11.2** |
| **Total Shellfish** | **155,725** | **100** |

Source:  NMFS, 2003b.
[a] NMFS includes frog legs and meat in the shellfish category.

## 4.2.2   Recreational Fishing

Data on recreational freshwater fish harvest are not available for this profile.  Information on the freshwater species most often targeted by recreational anglers are provided later in Section 4.3.3.1 (see Table 4-24).

NMFS provided data on estimated recreational marine (saltwater) finfish landings based on the Marine Recreational Fishing Statistical Survey (MRFSS; NMFS, 2003b).  Similar data for recreational shellfish landings are not available.  The purpose of the MRFSS is to establish a reliable data base for estimating the impact of marine recreational fishing on marine resources.

This annual survey has been conducted since 1979.  The MRFSS covers all coastal states except Texas and Alaska.  The survey provides coverage of saltwater sport fishing (including estuarine and brackish water) from private/rental boats, charter and head boats, and the shore on the Atlantic Coast (Maine-East Florida), Gulf Coast (Louisiana-West Florida), and Pacific coast (Washington through California).

A summary of recreational marine finfish landed for 2002 is provided in Table 4-14 below.  This summary excludes the fish that were caught and subsequently released alive.  More detailed data are provided in a separate report (Pechan, 2005).  It should be noted that recreational marine finfish landings in 2002 were less than 20% of the average annual landings estimated by NMFS from 1999 - 2003 (Pechan, 2005).  NMFS indicates that recreational boat fishing trips were not included for 2002 for Washington and Oregon, but other reasons for the large discrepancy were not identified.

**Table 4-14.  2002 Recreational Marine Landings for Selected Finfish Types**

| Finfish Type | 2002 Landings (Metric Tons) | % of Total | 1999-2003 Average Landings (Metric Tons) |
|---|---|---|---|
| Dolphinfish | 6,712 | 6.5 | 35,826 |
| Drums | 20,366 | 20 | 116,503 |
| Flounders | 5,997 | 5.8 | 37,533 |
| Pacific Barracuda | 9,292 | 9.0 | 3,393 |
| Sea Basses | 6,896 | 6.7 | 29,866 |
| Temperate Basses | 8,903 | 8.6 | 44,561 |
| Tunas and Mackerels | 14,103 | 14 | 90,921 |
| Other Finfish | 31,262 | 30 | 200,714 |
| **Total** | **103,531** | **100** | **559,317** |

Figure 4-5 shows that roughly 32% of the 103,529 metric tons of marine finfish landed in U.S. waters in 2002 occurred in the Federal Exclusive Economic Zone (distances of 3-200 miles from shore) while 29% of total finfish landings were within 3 miles from shore (State Territorial Sea).  The remaining 39% of finfish were landed in Inland Waters.  For shellfish, 65% of the 534,608 metric tons landed were made within Inland Waters and State and Territorial Sea (< 3 miles from shore).  A separate report provides more details on the types of marine recreational fish caught by distance from shore (Pechan, 2005).



Source: NMFS, 2004.

**Figure 4-5.  2002 Recreational Marine Finfish Landings by Distance from Shore**

Table 4-15 provides 2002 recreational marine catch data by region and top harvested species group.  This summary data was compiled based on the MRFSS and summarized by U.S. region.  The regions were constructed by the American Sportfishing Association (ASA).  The data are summarized this way to be consistent with recreational fishing data provided later in this report.

The northeast region includes the coastal New England States, Delaware, District of Columbia, Maryland, New Jersey, New York, and Virginia.  The south central region includes data only for Louisiana, since data for Texas were not included in the MRFSS.  The southeast region includes Alabama, Florida, Georgia, Mississippi, North Carolina, and South Carolina.  The west region includes California, Oregon, Washington, and Hawaii (Alaska was not included in the MRFSS).  Harvested weight was not available for all state-species groups.  Therefore, average weights per fish for each region were estimated using the available data.  These average weights per fish were used to estimate harvested weight where unavailable.

The greatest amount of recreational marine catch was harvested in the Southeast region followed by the Northeast.  Harvest values for the West region would likely be much higher if the harvest for Alaska were included, and values in the south central region would be higher if data for Texas were included in the MRFSS.

**Table 4-15.  2002 Recreational Marine Catch and Harvest by Region and Top Species Group**

| Species Group | # of Fish Caught | # of Fish Harvested[a] | Harvested Weight[b] (metric tons) |
|---|---|---|---|
| Northeast | | | |
| **Total for Region** | **128,019** | **41,934** | **37,013** |
| Drums | 28,675 | 14,361 | 5,568 |
| Tunas and Mackerels | 4,356 | 3,821 | 3,711 |
| Bluefish | 10,411 | 3,684 | 4,326 |
| Porgies | 7,641 | 3,661 | 1,682 |
| Flounders | 17,326 | 3,550 | 3,802 |
| **South Central[c]** | | | |
| Total for Region | **24,565** | **10,457** | **9,974** |
| Drums | 18,724 | 8,953 | 8,143 |
| Porgies | 2 | 652 | 679 |
| Flounders | 320 | 272 | 144 |
| Catfishes | 3,123 | 194 | 127 |
| Snappers | 190 | 130 | 307 |
| **Southeast** | | | |
| **Total for Region** | **225,303** | **111,486** | **40,882** |
| Herrings | 53,400 | 46,693 | 211 |
| Drums | 42,101 | 15,566 | 6,671 |
| Porgies | 22,793 | 10,448 | 2,593 |
| Mullets | 10,240 | 8,442 | 1,103 |
| Jacks | 13,796 | 6,839 | 2,813 |
| **West[c]** | | | |
| **Total for Region** | **42,015** | **24,067** | **15,944** |
| Rockfishes | 5,435 | 4,270 | 2,797 |
| Smelts | 4,186 | 4,174 | 142 |
| Flounders | 5,464 | 3,875 | 1,378 |
| Sea Basses | 6,931 | 2,403 | 1,538 |
| Herrings | 2,399 | 2,216 | 151 |

[a]Harvest equals catch minus fish released alive.
[b]Weight estimated for some state/species groups.
[c]Does not include Alaska (west) and Texas (south central).

### 4.3    U.S. Demand for Commercial and Recreational Fishing

This section presents information on the U.S. demand for commercial and recreational fishing and related industries.

### 4.3.1    Commercial Imports

This section provides information on commercial imports of finfish and shellfish products.  Included are data on the type of products and supplying countries.  These products include those produced through commercial catches, as well as foreign aquaculture.  Total edible imports for 2002 were 4.0 million metric tons with finfish contributing 65% of the total.  A detailed breakdown, by product weight, of edible fish imports is provided in a separate report (Pechan, 2005).  The following sections provide a summary of edible finfish and shellfish imports.  In comparison to domestic production (net of exports), commercial imports represent a large component of total U.S. demand for fish products.  It should be noted that the CAMR is not likely to substantially affect the level of methylmercury in fish that is imported to the U.S., because of the small contribution of U.S. emissions to the global pool that impacts MeHg in imported fish.

Figures 4-6 and 4-7 provide a breakdown of commercial fishery products by region and country, respectively (NMFS, 2003b).  An estimated 46% of US imports were from Asia while 26% were from other regions in North America.  South America could be credited with landing 17% of U.S. imports while  Europe, Africa, and Oceania combined to total 11% (Figure 4-6).  Although the largest portions of U.S. fish imports were from Asian landings, Canada represents the largest share at 18% when compared on a per country basis (Figure 4-7).



**Figure 4-6.  U.S. Commercial Fish Imports by Area, 2002**



Source: NMFS, 2003b.

**Figure 4-7.  U.S. Commercial Fish Imports by Country, 2002**

### 4.3.1.1 Finfish

Table 4-16 provides a breakdown of edible fresh and frozen finfish products imported to the United States in 2002 (see detailed breakdown in Pechan (2005)).  Fresh and frozen finfish are categorized into the following products: whether or not whole; regular blocks; minced blocks; fillets and steaks; surimi; and fish sticks and similar products.  The total imported fresh or frozen finfish products in 2002 was almost 1 million metric tons.  Of the freshwater species imported, tilapia was the most common and accounted for over 6% of the total finfish product imports.  Tuna was the largest group of saltwater fish species imported at nearly 17% of the fresh or frozen imports.

Table 4-17 provides information on imported canned and cured finfish products imported in 2002 (see details in Pechan, 2005).  In 2002, about 288,000 metric tons of canned and cured finfish products were imported into the United States for consumption.  Nearly 60% of this amount was canned tuna.

**Table 4-16.  2002 Imports of Edible Fresh or Frozen Finfish Products**

| Finfish Product | Metric Tons | % of Total Finfish by Weight |
|---|---|---|
| *Whether or Not Whole* | | |
| *Freshwater:* | | |
| Tilapia | 40,748 | 4.19 |
| Unclassified | 17,642 | 1.81 |
| **Total Freshwater Fish** | **58,390** | **6.00** |
| *Saltwater:* | | |
| Flatfish[a] | 21,111 | 2.17 |
| Groundfish[b] | 24,615 | 2.53 |
| Salmon | 82,665 | 8.50 |
| Tuna | 162,252 | 16.68 |
| Other | 116,840 | 12.01 |
| **Total Saltwater Fish** | **407,483** | **41.9** |
| **Total Whether Or Not Whole** | **465,873** | **47.9** |
| *Blocks, Regular* | | |
| **Total Freshwater Fish** | 127 | 0.01 |
| *Saltwater:* | | |
| Flatfish[a] | 1,460 | 0.15 |
| Groundfish[b] | 50,572 | 5.20 |
| Other | 2,494 | 0.26 |
| **Total Saltwater Fish** | **54,256** | **5.61** |
| **Total Regular Blocks** | **54,653** | **5.62** |
| *Blocks, Minced* | | |
| **Total Freshwater Fish** | 1 | 0.00 |
| *Saltwater:* | | |
| Flatfish[a] | 13 | 0.00 |
| Groundfish[b] | 1,934 | 0.20 |
| Other | 10,091 | 1.04 |
| **Total Saltwater Fish** | **12,038** | **1.24** |
| **Total Minced Blocks** | **12,039** | **1.24** |
| *Fillets And Steaks* | | |
| *Freshwater:* | | |
| Tilapia | 26,440 | 2.72 |
| Other | 24,134 | 2.48 |
| **Total Freshwater Fillets** | 50,574 | 5.20 |
| *Saltwater:* | | |
| Flatfish[a] | 23,369 | 2.40 |
| Groundfish[b] | 104,985 | 10.8 |
| Other | 239,535 | 24.6 |
| **Total Saltwater Fillets** | **367,889** | **37.8** |
| **Total Fillets And Steaks** | **418,463** | **43.0** |
| **Surimi** | **3,559** | **0.37** |
| **Fish Sticks And Similar Products** | **18,271** | **1.88** |
| **Total Fresh And Frozen Finfish** | **972,858** | **100** |

Source:  NMFS, 2003b.
[a]  Flatfish include halibut, Greenland turbot, plaice, sole, and other.
[b]  Groundfish include cod, haddock, hake, Pollock and ocean perch.

**Table 4-17.  2002 Imports of Edible Canned and Cured Finfish Products**

| Finfish Product | Metric Tons |
|---|---|
| *Canned* | |
| Anchovy | 3,298 |
| Herring | 3,814 |
| Mackerel | 9,928 |
| Salmon | 4,542 |
| Sardines | 22,220 |
| Tuna | 171,523 |
| Balls, Cakes, and Puddings | 9,014 |
| Other (includes Finfish and Shellfish) | 28,880 |
| **Total, Canned** | **253,219** |
| *Cured* | |
| Dried | 7,468 |
| Pickled or Salted | 20,952 |
| Smoked or Kippered | 6,498 |
| **Total, Cured** | **34,918** |
| **Total Canned and Cured Imports** | **288,137** |

Source:  NMFS, 2003b.

### 4.3.1.2 Shellfish

Table 4-18 provides data on 2002 edible fresh and frozen shellfish imported into the United States.  Total shellfish imports were about 692,000 metric tons in 2002.  By far, shrimp was the largest fresh and frozen shellfish product imported (over 60% of total shellfish).  Crab and crabmeat was the next highest product imported at over 11% of total shellfish.  Pechan (2005) contains details of the fresh and frozen shellfish products imported in 2002.

Table 4-19 provides data on 2002 edible canned shellfish product imports (for this table, it was assumed that all cured edible fish products are finfish products and they were placed in Table 4-17 above).  Over 33,000 metric tons of canned shellfish products were imported for consumption in 2002.  About 60% of this amount was canned crabmeat.

**Table 4-18.  2002 Imports of Edible Fresh and Frozen Shellfish Products**

| Shellfish Product | Metric Tons | % of Total Shellfish |
|---|---|---|
| Total Crab and Crabmeat | 79,805 | 11.5 |
| Total Lobster and Lobster Meat | 50,586 | 7.30 |
| Shrimp | 427,454 | 61.8 |
| Clam | 8,800 | 1.27 |
| Mussels | 20,727 | 3.00 |
| Scallops | 21,868 | 3.16 |
| Octopus | 14,164 | 2.05 |
| Squid | 46,759 | 6.76 |
| Unclassified or Other[a] | 21,774 | 3.15 |
| **Total Shellfish** | **691,937** | **100** |

Source:  NMFS, 2003b.
[a]  Other includes Abalone, krill, crawfish, conch, cuttlefish, oysters, snails, sea urchins, and frog legs and meat.

**Table 4-19.  2002 Imports of Edible Canned Shellfish Products**

| Shellfish Product | Metric Tons | % of Total Shellfish |
|---|---|---|
| Clams | 5,330 | 15.9 |
| Crabmeat | 20,545 | 61.2 |
| Lobsters | 47 | 0.14 |
| Oysters | 5,825 | 17.3 |
| Shrimp | 1,849 | 5.50 |
| **Total** | **33,596** | **100** |

Source:  NMFS, 2003b.

### 4.3.2   U.S. Demand for Commercial Fishery Products

Table 4-20 provides a summary of commercial finfish demand per capita for several important finfish types.  These estimates were derived from the production data provided in Section 4.2, the import data summarized above, and a 2002 U.S. population estimate of 288 million (BOC, 2005).  These estimates should not be considered per capita consumption estimates for several reasons.  First, not all fish species landed commercially are intended for human consumption (about 23% are for industrial purposes).  Most of the non-edible landings are for menhaden (about 80%).  This is noted at the bottom of Table 4-20.  In addition, existing U.S. inventory of fishery products are not included in these estimates.  Conversions have not been made to estimate the edible portion of each type of edible finfish or shellfish.  Finally, landings are provided in units of live weight, whereas product import and export data are provided as product weights.  Table 4-21 provides similar estimates of per capita demand for shellfish products.

**Table 4-20.  2002 U.S. Demand for Commercial Finfish (metric tons)**

| Finfish Type | 2002 Production[a] | 2002 Exports | 2002 Imports | 2002 U.S. Demand | Demand per capita (lb) |
|---|---|---|---|---|---|
| Pollock | 1,519,101 | 331,976[b] | 80,889 | 1,268,014 | 9.71 |
| Menhaden | 793,486 | 0 | 0 | 793,486 | 6.08 |
| Salmon | 275,382 | 133,380 | 210,735 | 352,737 | 2.70 |
| Cod | 245,705 | 103,934 | 78,777 | 220,548 | 1.69 |
| Hake | 141,642 | 8,886 | 10,622 | 143,378 | 1.10 |
| Sole | 116,779 | 48,117 | 12,353 | 81,015 | 0.62 |
| Herring | 99,173 | 18,565 | 7,846 | 88,454 | 0.68 |
| Sardine | 97,527 | 61,288 | 24,794 | 61,033 | 0.47 |
| Tuna | 22,513 | 16,930 | 333,775 | 339,358 | 2.60 |
| Other Finfish | 693,821 | 168,460 | 435,722 | 961,083 | 7.36 |
| **Total Finfish** | **4,005,129** | **891,536** | **1,195,513** | **4,309,106** | **32.99** |

Source:  NMFS, 2004.

[a] Production = Commercial Landings + Aquacultural Production.

[b] Assumes that surimi and regular/minced fish blocks are all made up of pollock.

**Table 4-21.  2002 U.S. Demand for Commercial Shellfish (metric tons)**

| Shellfish Type | 2002 Production[a] | 2002 Exports | 2002 Imports | 2002 U.S. Demand | Demand per capita (lb) |
|---|---|---|---|---|---|
| Shrimp | 159,666 | 16,567 | 429,303 | 572,402 | 4.38 |
| Crab | 139,840 | 16,627 | 85,135 | 208,348 | 1.60 |
| Squid | 93,217 | 73,726 | 46,759 | 66,250 | 0.51 |
| Clam | 63,584 | 2,596 | 14,130 | 75,118 | 0.58 |
| Lobster | 39,454 | 30,779 | 50,633 | 59,308 | 0.45 |
| Scallop | 24,047 | 4,589 | 21,868 | 41,326 | 0.32 |
| Oyster | 24,330 | 1,788 | 5,825 | 28,367 | 0.22 |
| Other Shellfish | 92,260 | 15,289 | 56,665 | 133,636 | 1.02 |
| **Total Shellfish** | **636,398** | **161,961** | **710,318** | **1,184,755** | **9.07** |

Source:  NMFS, 2004.

[a] Production = Commercial Landings + Aquacultural Production.

The data in Table 4-20 show that most of the U.S. tuna demand is met through imports.  In 2002, less than 7% of the tuna demand is met through commercial landings by the domestic fleet.

Total 2002 per capita demand for commercial fishery products is estimated at 42.1 lb/person.  This estimate can be compared to an NMFS estimate of "per capita use" of 66.0 lb/person in 2002, which includes both edible and industrial uses but does not include exports, beginning/ending year inventory, or defense purchases (NMFS, 2003b).

NMFS developed estimates of 2002 U.S. per capita consumption for edible commercial fishery products (NMFS, 2003b).  To do this, a "disappearance model" was developed to account for the edible portion of commercial landings and imports, exports of edible products, and inventories of edible products.  NMFS caveats their estimates by noting that the data sources for the model are not always reported completely, and that incorrect model assumptions can lead to significant changes in estimated consumption.  NMFS estimated a total 2002 U.S. per capita

consumption of 15.6 lb edible meat/person.  Additional consumption data are provided in Table 4-22 below.

**Table 4-22.  2002 U.S. Consumption of Commercial Fishery Products**

| Commercial Product | 2002 Consumption (lb/person) |
|---|---|
| Fresh and Frozen Finfish and Shellfish | 11.0 |
| Canned Finfish and Shellfish | 4.3 |
| Cured Finfish and Shellfish | 0.3 |
| **Total** | **15.6** |
| *Consumption of Specific Products* | |
| Canned: | |
| Salmon | 0.5 |
| Sardines | 0.1 |
| Tuna | 3.1 |
| Shellfish | 0.3 |
| Other | 0.3 |
| Fresh and Frozen: | |
| Fillets and Steaks | 4.1 |
| Sticks and Portions | 0.8 |
| Shrimp (all preparations) | 3.7 |

Source: NMFS, 2003b.

### 4.3.3   Recreational Fishing

### 4.3.3.1 U.S. Consumption of Recreationally-Caught Fish

Data on recreational saltwater fishing catch is available from the Marine Recreational Fishing Statistics Survey (MRFSS) from the NOAA Fisheries Statistics Division.  These data were provided in Section 4.2.2.  This survey provides data on catch (all fish caught) and harvest (all fish not released alive).

Data for freshwater recreational harvest are not available; however, the number of anglers and number of days of fishing is available from the 2001 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation (USFWS, 2002).  This survey is a partnership effort between the USFWS, States and national conservation organizations.  The purpose of the survey is to quantify the economic impact of wildlife-based recreation.  The 2001 survey was the tenth in a series that began in 1955.  Information from a total of 25,070 sportspersons (anglers and hunters) were gathered for the 2001 survey.  Data from the survey were summarized by the American Sportfishing Association (ASA, 2003).  Table 4-23 shows the number of anglers for the top freshwater, Great Lakes, and saltwater species.

**Table 4-23.  Number of Anglers and Days of Fishing for 2001**

| Type of Fish Targeted | Anglers (millions) | Days of Fishing (millions) | Average # Days/Angler |
|---|---|---|---|
| Freshwater except Great Lakes | | | |
| Black bass | 10.7 | 160 | 15.0 |
| Panfish | 7.9 | 103 | 13.0 |
| Trout | 7.8 | 83 | 10.6 |
| Catfish/bullhead | 7.5 | 104 | 13.9 |
| Crappie | 6.7 | 95 | 14.2 |
| White bass, striped bass, and striped bass hybrids | 4.9 | 62 | 12.7 |
| **Total Freshwater except Great Lakes** | **45.5** | **607** | **13.3** |
| **Great Lakes** | | | |
| Perch | 0.7 | 7 | 10.0 |
| Walleye, sauger | 0.6 | 6 | 10.0 |
| Black bass | 0.6 | 6 | 10.0 |
| Salmon | 0.5 | 4 | 8.0 |
| Lake trout | 0.3 | 4 | 13.3 |
| Steelhead | 0.3 | 4 | 13.3 |
| **Total Great Lakes** | **3.0** | **31** | **10.3** |
| **Saltwater** | | | |
| Flatfish (flounder, halibut) | 2.3 | 21 | 9.1 |
| Striped bass | 1.7 | 17 | 10.0 |
| Sea trout | 1.5 | 17 | 11.3 |
| Bluefish | 1.1 | 12 | 10.9 |
| Salmon | 0.7 | 5 | 7.1 |
| Mackerel | 0.6 | 6 | 10.0 |
| **Total Saltwater** | **7.9** | **78** | **58.4** |
| **Total  - All Fish** | **56.4** | **716** | **12.7** |

Source: USFWS, 2002.

Table 4-24 shows the most targeted freshwater species, measured by angler participation, for each region of the country.  Bass (large and small mouth), pan fish, trout, catfish, and crappie were the most popular target species for freshwater anglers nationwide.  The region with the largest number of anglers for all targeted species was the southeast followed by the south central United States.  In the western part of the United States, trout were by far the most targeted freshwater species.

**Table 4-24.  2001 U.S. Recreational Freshwater Fishing:  Targeted Species by Region**

| Targeted Species | Number of Anglers (thousands) | | | | | | |
|---|---|---|---|---|---|---|---|
| | West | South East | South Central | North East | Great Lakes | Northern Plains | All Regions |
| Crappie | 186 | 2,027 | 1,822 | 477 | 1,478 | 880 | 6,648 |
| Panfish | 230 | 1,907 | 1,177 | 876 | 2,893 | 1,062 | 7,894 |
| Bass (white, striped) | 526 | 1,387 | 1,217 | 718 | 904 | 327 | 4,925 |
| Bass (large & smallmouth) | 873 | 2,897 | 2,320 | 2,139 | 2,144 | 796 | 10,694 |
| Catfish | 612 | 2,275 | 2,330 | 651 | 1,295 | 517 | 7,494 |
| Walleye | 36[a] | 108[a] | 99[a] | 333[a] | 1,142 | 1,601 | 3,214 |
| Sauger | [a] | [a] | [a] | [a] | 63 | 63 | 174 |
| Pike | [a] | [a] | [a] | 336 | 763 | 914 | 2,060 |
| Trout | 2,645 | 583 | 749 | 1,926 | 458 | 1,768 | 7,797 |
| Salmon | 932 | [a] | 31 | 189 | 99 | 111 | 1,368 |
| Steelhead | 370 | [a] | [a] | 59 | 96 | [a] | 536 |
| Other | 644 | 1,176 | 409 | 440 | 296 | 211 | 3,176 |
| Anything | 392 | 1,413 | 856 | 963 | 812 | 445 | 4,689 |
| **Total[b]** | **4,127** | **6,107** | **5,208** | **4,587** | **5,388** | **4,344** | **27,913** |

[a] Sample size is too small to report results with any reliability, (N = 30-39);  or the species is not present in this region.

[b] Angler numbers reported here are the number of anglers who fished in the given region.  Summing across the regions to derive a U.S. total will result in an overestimate as some anglers fished in more than one region.  The All Regions totals reported in this table eliminates all double-counting and reports the actual number of anglers in the United States.

A separate report provides information on the number of days spent fishing by anglers in each State (Pechan, 2005).  Figures 4-8 through 4-10 are maps showing the total number of days spent fishing in 2001 by all anglers, resident anglers, and non-resident anglers, respectively.  High levels of recreational fishing are shown to occur in the Great Lakes States, Florida, New York, Texas, and California.  Pechan (2005) provides additional information on the expenditures on fishing equipment and related recreational angling activities across the U.S.



**Figure 4-8.  2001 Total Recreational Fishing Days**



**Figure 4-9.  2001 Recreational Fishing Days, State Residents**



**Figure 4-10.  2001 Recreational Fishing Days, Non-State Residents**

A number of surveys have been conducted to determine the amount of sport fish consumed by anglers.  A discussion of consumption rates for freshwater recreational anglers are provided in Section 4.5 and in Section 11 of this report.  Tables 4-25 and 4-26 provide information on bag limits and size limits for recreational fishing.

**Table 4-25.  Freshwater Fishing Bag and Size Limits for Selected States and Species**

| Species | California | | Texas | | Minnesota | | Florida | |
|---|---|---|---|---|---|---|---|---|
| | Bag Limit | Min. Size (inches) | Bag Limit | Min. Size (inches) | Bag Limit | Min. Size (inches) | Bag Limit | Min. Size (inches) |
| Black Bass | 5-10[a] | 12-no limit[a] | 5[b] | 14[b] | 6[b] | none[b] | only 1 fish may be over 22" [b] | 12-24[a] |
| White bass | none | none | 25[b] | 10[b] | 30 | none | only 6 fish may be over 24" | none |
| Striped and Hybrid Bass | 2[b] | 18[b] | 5[b] | 18[b] | none | none | only 6 fish may be over 24" [b] | none |
| Panfish | none | none | none | none | none | none | none[b] | none |
| Trout | 0-5[a] | 8-no limit[a] | 5[b] | none[b] | Lake: 2[b] Stream: 0-5[a] | none[b] | none | none |
| Catfish | none | none | channel/blue: 25[b] flathead: 5[b] | channel/blue: 12[b] flathead: 18[b] | 5, 1 fish over 24' | none | none | none |
| Bullhead | none | none | none | none | 100 | none | none | none |
| Crappie | 25[b] | none[b] | 25[b] | 10[b] | 10[b] | none[b] | none[b] | none[b] |

[a]Limit depends on location.
[b]Special limits apply in certain areas.

**Table 4-26.  Saltwater Fishing Bag and Size Limits for Selected States and Species**

| Species | Florida | | California | | Texas | | North Carolina | |
|---|---|---|---|---|---|---|---|---|
| | **Bag Limit** | **Min. Size (inches)** | **Bag Limit** | **Min. Size (inches)** | **Bag Limit** | **Min. Size (inches)** | **Bag Limit** | **Min. Size (inches)** |
| Flounder | 10 | 12 | none | none | 10 | 14 | none | 13-14 (TL)[a] |
| Halibut | none | none | California: 3-5[a] Pacific: 1 | California: 22 Pacific: 32 | none | none | none | none |
| Striped Bass | none | none | 2 | 18-no limit[a] | 5 | 18 | 0-3[a] | 18-28 (TL)[a] |
| Spotted Seatrout | 4-5[a], 1 fish over 20" | 15 | 3 (all trout) | none | 10, 1 over 25" | 15 | 10 | 12 (TL) |
| Bluefish | 10 | 12 (FL) | none | none | none | none | 15; only 6 over 24" (coastal waters) | none |
| Salmon | none | none | 2 | 20-24[a] | none | none | none | none |
| Mackerel | none | none | none | none | King: 2 Spanish: 15 | King: 27 Spanish: 14 | King: 3 Spanish: 15 (FL) | King: 24 Spanish: 12 (FL) |

[a]Limit depends on location.
[b]Special limits apply in certain areas.
Total length (TL) is measured from tip of snout with mouth closed to tip of compressed tail.
Fork length (FL) is measured from tip of snout to middle of fork in tail.

### 4.3.3.2 Recreational Fishing Demographics

The USFWS currently maintain statistics on U.S. freshwater angler participation rates in addition to demographic characteristics of U.S. anglers.  Angler participation rates are usually measured in number of anglers and the number of angler fishing days for each state (Pechan, 2005).  Additional survey data are available that provide demographic information for U.S. anglers.  Below are some of the highlights of the demographic statistics followed by a break down of angler participation by region.

Based on USFWS survey data, 67% of recreational fishermen were between the ages of 25 to 54.  Male anglers outnumbered women by a ratio of 3 to 1.  Freshwater recreational anglers fished in ponds, lakes, and reservoirs over rivers and streams at a ratio of 2 to 1.  Table 4-27 shows the percentage of freshwater anglers by age group.  Table 4-28 shows the percentage of anglers by sex and age.  These data show that women of childbearing age (16-44) make up 60% of female anglers.  Female anglers make up 26% of all anglers.  Thus, women of childbearing age make up 15.6% of all anglers (i.e. 60% of the 26%).

**Table 4-27.  Percent of Freshwater Anglers by Age Group**

| Age Group | Percent of Total Anglers |
|---|---|
| 16-17 | 4 |
| 18-24 | 9 |
| 24-34 | 19 |
| 35-44 | 27 |
| 45-54 | 20 |
| 55-64 | 12 |
| 65-Older | 9 |

Source:  USFWS, 2002.

**Table 4-28.  Percent of Anglers by Sex and Age Group**

| Age Group | Male | Female |
|---|---|---|
| 16 to 17 years | 4 | 3 |
| 18 to 24 years | 7 | 8 |
| 25 to 34 years | 19 | 21 |
| 35 to 44 years | 26 | 28 |
| 45 to 54 years | 20 | 21 |
| 55 to 64 years | 13 | 11 |
| 65 years and older | 10 | 8 |
| All Ages | 74 | 26 |

Source: USFWS, 2002.

USFWS statistics showed that non-white fishermen encompassed a greater portion of saltwater recreational fishermen with an average of 12% compared to comprising only 7% of total freshwater recreational fishermen.  From Table 4-29, one can see that the western part of the

United States had the highest participation rate per capita of non-white anglers followed by the Southeast.  The lowest participation rates among non-white anglers were in the Great Lakes region and the Northern Plains.

**Table 4-29.  2001 Demographic Summary, Angler Race (% Non-White)**

| Region | Freshwater | Saltwater | Great Lakes |
|---|---|---|---|
| West | 12 | 22 | N/A |
| Southeast | 11 | 9 | N/A |
| South Central | 7 | 7 | N/A |
| Northeast | 5 | 10 | 3 |
| Great Lakes | 4 | N/A | 11 |
| Northern Plains | 3 | N/A | 0 |
| Average | 7 | 12 | 5 |

Source: USFWS, 2002.

According to a *Recreational Boating and Fishing Foundation 2003 Boating and Fishing Attitude, Segmentation Study* (RBFF, 2003) on minorities, Hispanics demonstrated to be more active participants than African Americans, among a group of respondents that were categorized to be active or prospective fishing participants, with 74% showing some incidence of fishing and 13% considered avid fishermen compared to 55% and 7%, respectively, for African Americans. Only 17% of Hispanics had never participated in fishing while 25% of African Americans had not.  However, compared to whites, both ethnic groups showed a lower active participation rate (see Table 4-30).  It should be noted that Asian fishing participation statistics were not available.

**Table 4-30.  Incidence of Fishing Among White, African American, and Hispanic Recreational Boaters**

| Participant Description | White (%) | African American (%) | Hispanic (%) |
|---|---|---|---|
| Active Participant | 80 | 55 | 74 |
| Avid | 18 | 7 | 13 |
| Semi-Avid | 19 | 17 | 14 |
| Occasional | 43 | 31 | 47 |
| Lapsed (prospective) | 11 | 20 | 10 |
| Never Participated (prospective) | 10 | 25 | 17 |

Source:  RBFF, 2003.

USFWS survey data showed fishing participation rate to be positively correlated with household income (see Table 4-31).  Household income groups of $40 thousand per year or more had the highest participation rate with over 22% of each income group participating in fishing. Only 8% of households with annual income less than $10 thousand participated in some kind of fishing activity.

**Table 4-31.  Percent of U.S. Population Who Fished (By Household Income)**

| Income Group | Percent of Income Group that Fished |
|---|---|
| Less Than $10,000 | 8 |
| $10,000 -  19,999 | 11 |
| $20,000 - 24,999 | 14 |
| $25,000 - 29,999 | 16 |
| $30,000 - 34,999 | 18 |
| $35,000 - 39,999 | 20 |
| $40,000 - 49,999 | 22 |
| $50,000 - 74,999 | 23 |
| $75,000 - 99,999 | 23 |
| $100,000 or Greater | 22 |

Source:  USFWS, 2002.

### 4.3.4    Total U.S. Demand

NMFS estimated that the total 2002 U.S. commercial finfish and shellfish demand was 66.0 lb/capita (NMFS, 2003b).  Of this total, 15.6 lb/capita represented edible fish and shellfish meat.  For comparison, Jacobs et al (1998) obtained an estimate of total fish and shellfish consumption of 15.65 grams/person/day (12.6 lb/capita) from the Continuing Survey of Food Intake by Individuals (CSFII) Study.  This survey was conducted during the years of 1989-1991.  During those years, NMFS estimated an average U.S. consumption rate of 15.2 lb/capita.  Therefore, these two sources show reasonably good agreement, although the NMFS estimate does not include recreational demand.

### 4.3.4.1 Finfish

From Table 4-14, the total 2002 U.S. recreational marine demand was 103,531 metric tons (all finfish).  From this value, the total demand for recreationally-harvested finfish is 0.79 lb/capita.  From Table 4-20, the total 2002 U.S. commercial finfish demand was estimated to be 33.0 lb/capita.  As mentioned earlier in this section, there are no similar data for recreational freshwater finfish demand.

### 4.3.4.2 Shellfish

From Table 4-21, the total 2002 U.S. commercial shellfish demand was estimated to be 9.07 lb/capita.  No data were identified to estimate recreational shellfish demand.

## 4.4     Economic Value of Key Species

This section presents available information on the economic value of the commercial and recreational fishing industries.  Available information on the wholesale and retail pricing of products from the commercial fishing industry are also provided.  In other sections, we have discussed the level of production of commercial fish.  In this section, we combine production levels with economic value and see that in the commercial fishing industry, shellfish sales total $1.8 million while finfish sales total $1.3 million.  Shrimp, crab, and lobster are the top shellfish species sold, while pollock (used in fish sticks) is the top finfish species sold. Domestic tuna sales are lower in sales than several other species (however, the U.S. imports large quantities of tuna).

### 4.4.1   Finfish

Table 4-32 provides a summary of the economic value of commercial landings for several finfish types.  Note that these data exclude aquacultural products, and that for catfish, most of the production of these fish comes from aquaculture.  The economic value data are also shown graphically in Figure 4-11 as a percentage of the total 2002 commercial finfish landings ($1,368,877,000).  Additional details on the economic value of 2002 commercial landings are provided in a separate report (Pechan, 2005).  Table 4-33 provides information on 2001 wholesale pricing of several fresh finfish (NMFS, 2005).  Data for 2002 were not available.  The NMFS gathers wholesale pricing data from the Fulton Fish Market in New York City.  Additional data are provided in Pechan (2005).

**Table 4-32.  2002 Economic Value of Commercial Landings for Important Finfish Types**

| Finfish Type | Economic Value (thousand dollars) | % of Total Finfish Landed by weight |
|---|---|---|
| Pollock | 209,890 | 41.4 |
| Menhaden | 105,172 | 21.6 |
| Salmon | 156,082 | 6.94 |
| Cod | 126,844 | 6.70 |
| Hake | 26,215 | 3.86 |
| Sole | 22,437 | 3.18 |
| Herring | 21,310 | 2.70 |
| Sardine | 10,824 | 2.66 |
| Tuna | 85,478 | 0.61 |
| Other Finfish | 604,625 | 10.3 |
| **Total 2002 Finfish** | **1,368,877** | **100** |

Source: NMFS, 2003b.



**Figure 4-11.  2002 Market Share of Commercial Finfish (% of Total Economic Value)**

**Table 4-33.  Average 2001 Wholesale Prices for Several Fresh Finfish Types**

| Finfish Type | Price ($/lb) |
|---|---|
| Pollock | 1.45 |
| Flounder | 1.95 |
| Swordfish | 3.91 |
| Cod | 1.77 |
| Whiting | 0.59 |
| Croaker | 0.28 |

Source:  NMFS, 2005 (Fulton Fish Market).

### 4.4.2  Shellfish

Table 4-34 provides a summary of the economic value of commercial landings for several shellfish types.  The economic value data are also shown in Figure 4-12 as a percentage of the total 2002 commercial shellfish landings ($1,808,167,000).  Additional details on the economic value of 2002 commercial landings are provided in Pechan (2005).  Table 4-35 provides 2001 wholesale pricing data for several shellfish types as reported by NMFS (NMFS, 2005).  Data for 2002 were not available.

**Table 4-34.  2002 Economic Value of Commercial Landings of Several Shellfish Types**

| Shellfish Type | Economic Value (thousand dollars) | % of Total Shellfish Landed by Weight |
|---|---|---|
| Shrimp | 522,399 | 25.9 |
| Crab | 397,349 | 23.2 |
| Squid | 43,540 | 15.5 |
| Clam | 171,134 | 9.82 |
| Lobster | 316,085 | 6.56 |
| Scallop | 203,494 | 4.00 |
| Oyster | 93,449 | 2.78 |
| Other Shellfish[a] | 60,717 | 12.2 |
| **Total 2002 Shellfish** | **1,808,167** | **100** |

Source: NMFS, 2003b.

[a] NMFS includes some non-shellfish species in the "Other shellfish" group including seaweed, sponges and turtles (Pechan, 2005).



**Figure 4-12.  2002 Market Share of Commercial Shellfish (% of Total Economic Value)**

**Table 4-35.  Average 2001 Wholesale Prices for Several Fresh Shellfish Types**

| Shellfish Type | Price ($/lb) |
|---|---|
| Crab[a] | 48.07 |
| Clam[a] | 106.82 |
| Lobster | 6.85 |
| Oyster[a] | 60.87 |
| Squid | 0.92 |

Source:  NMFS, 2005 (Fulton Fish Market).
[a] Pricing is in $/bushel.

### 4.4.3   Fish Products

Fishery products are processed fish products from commercially caught fish.  These products are categorized as:  fresh and frozen (fish fillets and steaks, fish sticks and portion, and breaded shrimp); canned products (e.g. tuna, etc.); and industrial fishery products (fish meal and oil).  A summary of the 2002 economic value of these products is provided in Table 4-36 below (NMFS, 2003b).  In November of 2004, the wholesale price of fish meal was $589/metric ton (NMFS, 2005).  The wholesale price of fish oil was $617/metric ton.  Wholesale pricing information for other fishery products was not identified.

**Table 4-36.  2002 Economic Value of Commercial Fishery Products**

| Fishery Product | Economic Value (thousand dollars) | Weight (metric tons) |
|---|---|---|
| Fresh and Frozen | | |
| Fillets and Steaks | 983,900 | 235,464 |
| Fish Sticks and Portions | 288,600 | 106,777 |
| Breaded Shrimp | 475,500 | 67,360 |
| Canned | | |
| Salmon | 295,600 | 101,470 |
| Sardines | n/a | n/a |
| Tuna | 675,300 | 248,119 |
| Clams | 117,400 | 63,005 |
| Other | 139,600 | 165,337 |
| Industrial Fishery Products | | |
| Fish Meal | 139,700 | 289,351 |
| Fish Oils | 41,400 | 95,664 |
| Other | 78,900 | n/a |
| **Total** | **3,235,900** | |

Source: NMFS, 2003b.

## 4.5   Characterization of Fish Consuming Populations

This section provides background information on fish consumption in the U.S. including (a) identification of specific fish consumption pathways (e.g., commercial saltwater fish consumption, self-caught freshwater fish consumption), (b) the numbers of individuals potentially exposed through those pathways (i.e., specific fish consuming populations such as recreational freshwater anglers) and (c) a characterization of the general levels of fish consumption associated with those fish consuming populations.  In Section 4.5.1, we begin by identifying a variety of fish

consumption pathways through which the U.S. population can be exposed to mercury that has bioaccumulated in fish.  This section also clarifies the linkage between fish consumption pathways and specific consuming populations (e.g., consumption of self-caught freshwater fish by the freshwater recreational angler population).  Section 4.5.2 presents some basic demographic information for the fish consuming populations.  Section 4.5.3 presents general fish consumption rate data for the three key populations covered in Section 4.5.2.  Note, that Section 4.5.4 is not intended to provide an exhaustive review of published fish consumption data, but rather to provide the reader with a perspective for how consumption rates may differ across pathways and populations.  Section 4.5.4 combines the demographic (count) and consumption information to provide a characterization of the populations potential affected by mercury exposures and to help identify those populations that are to be included in the benefits analysis in Section 11 of this report.

### 4.5.1   Fish  Consumption Pathways and Associated Fish-Consuming Populations

Mercury exposure through fish consumption can be considered in terms of specific fish consumption pathways such as self-caught freshwater fish consumption and commercial saltwater fish consumption.  A list of fish consumption pathways is presented in Figure 4-13.  The commercial fish consumption pathways in Figure 4-13 can be further differentiated as domestic-versus foreign-sourced fish. Note, it is also possible to further differentiate both commercial and self-caught pathways by fish species (e.g., foreign-sourced commercial yellow-fin tuna).

**Figure 4-13.  Fish Consumption Pathways**



Each of the pathways listed in Figure 4-13 can be associated with a specific fish consuming population.  For example, commercial saltwater fish is purchased and consumed by a subset of the U.S. population including those individuals that buy this type of fish in foodstores and restaurants.  However, this delineation of fish consuming populations according to fish consumption pathway is somewhat artificial since, in reality, most individuals consume a mixture of fish over time reflecting several of these pathways.  For example, recreational anglers may fish in both freshwater and saltwater waterbodies and consume commercially-produced freshwater and saltwater fish (e.g., store-bought or restaurant-bought).  Therefore, these recreational anglers are exposed to multiple fish consumption pathways simultaneously.

### 4.5.2   *Fish Consuming Populations*

In the previous sections, we present total fish produced and U.S. demand for various fish species. This information gives the reader a general characterization of the magnitude of fish consumed in the U.S. (and in relation to the various consumption pathways discussed in this section).  In addition, Table 4-37 provides a characterization of the number of people in the population who eat fish from the different consumption pathways.  Table 4-37 provides population counts for three of the key fish consuming populations of concern from a benefits standpoint including: (a) the general population who consumes both commercial and (to a lesser extent) self-caught fish, in both cases including a mix of freshwater, saltwater and estuarine species (b) recreational freshwater anglers who consume fish obtained from inland lakes, creeks and rivers and (c) recreational saltwater anglers who fish in the estuarine, near-coastal and open ocean areas.

The *freshwater angler* and *saltwater angler* numbers presented in Table 4-37 include both "total anglers" (number of consuming and non-consuming anglers) and "total consumers"(the number of total "consuming" individuals linked to the recreational self-caught fishing activity, i.e., the total number of individuals including family and friends with which a fisher shares their catch).  These two sets of counts (total anglers and total consumers) were calculated separately for freshwater and saltwater recreational categories.  The "total anglers" estimates are obtained directly from the National Survey of Fishing, Hunting and Wildlife-Associated Recreation (USFWS, 2002).  However, the "total consumers" numbers are calculated by multiplying the total recreational fisher number by (a) the fraction of recreational fishers who consume their catch (0.84 or 84%) and (b) a factor reflecting the number of family/friends with which the average recreational fisher shares their catch (2.5).[1]  For purposes of comparing the number of recreational fishers (freshwater and saltwater) to the number of fish consumers in the general population, it is most appropriate to use the "total consumers" numbers for the recreational groups.

Note that there is overlap in the three populations presented in Table 4-37.  For example, the general population includes both the recreational freshwater and saltwater anglers.  In addition, there is some degree of overlap between freshwater and saltwater anglers. Each of the

---

[1]  The "fraction of recreational fishers who consume" factor (0.84) was derived by taking the average of "consuming fraction" values presented in three key freshwater studies presented in EPA, 1997 including West et al., 1989, Chemrisk 1991, and West et al., 1993.  No comparable "consuming fraction" values were readily available for saltwater anglers, so this freshwater value was applied to the saltwater angler category.  The "sharing" factor of 2.5 was obtained from EPA, 1997 and is based on values presented in a number of different fishing activity surveys as documented in EPA, 1997.

three  populations in Table 4-37 is further differentiated into: (a) adult consumers and (b) prenatal infants likely exposed to mercury through maternal consumption of mercury-contaminated fish (the target group considered in the benefits analysis).

The purpose, in presenting the data in Table 4-37, is to provide the reader with perspective on the sizes of key fish consuming populations in the U.S.. These data demonstrate that the recreational freshwater fisher population (28 million) is significantly larger than the recreational saltwater population (9 million), while both of these populations are significantly smaller than the general population of fish consumers in the U.S. (184 million) which includes many individuals receiving a significant fraction of their fish from commercially-produced stocks.  This suggests that, while the benefits analysis has captured a key fish consuming population in modeling recreational freshwater anglers, a potentially large group of individuals (general consumers and recreational saltwater anglers) are not included in the primary benefits analysis (this issue is discussed in greater detail in Section 4.5.4.1).

### 4.5.3   General Fish Consumption Rates for Key Fish Consuming Populations

In presenting perspective on the degree of potential exposure to mercury for different fish consuming populations in the U.S., in additional to considering the total number of individuals within each population (information presented in Section 4.5.4), it is also important to consider fish consumption rates for those populations.  Table 4-38 presents general fish consumption rates (including mean and high-end estimates where available) for key fish consuming populations including: (a) the general population exposed through commercial and self-caught fish, (b) recreational freshwater anglers and (c) recreational saltwater anglers.  Due to limitations in available data, it was not possible to identify consumption rates for the full set of fish consumption pathways identified in Figure 4-13.  However, the values presented in Table 4-38 do provide coverage for key populations.  All of the values presented Table 4-38 represent long-term dietary consumption (i.e., annual-averaged daily intake rates), thereby allowing comparison across pathways/sub-populations (additional characteristics relevant to this discussion are also included in Table 4-38 as part of the Comments section).

4-42

**Table 4-37.  Demographic (count) Data for Key Fish Consuming Populations in the U.S.**

| Population | Population Count | Comments | References |
|---|---|---|---|
| *General population* (including consumption of commercial and self-caught fish including saltwater, freshwater and estuarine species) | | | |
| Adult fish consumers (>18yrs) | 184,000,000 | 88% of adults surveyed reported consuming fish or shellfish at least once within the last month.  Fish consumption likely includes commercial saltwater and freshwater as well as self-caught freshwater and saltwater for some fraction of respondents. | Percent fish consumption obtained from NHANES III as summarized in EPA, 1997. Demographic count for adults obtained from US Census 2000. |
| Female adult (15-44 yrs) fish consumers | 53,000,000 | 86% of females 15-44 yrs (general fertility range) surveyed reported consuming fish or shellfish within the last month. Fish consumption likely includes commercial saltwater and freshwater as well as self-caught freshwater and saltwater for some fraction of respondents. | Percent fish consumption obtained from NHANES III as summarized in EPA, 1997. Demographic count for females 15-44 yrs obtained from US Census 2000. |
| Infants born to mothers who consume fish in the general population | 3,430,000 | Developed by applying the general U.S. fertility rate for 2000 (64.8 births per 1000 females 15-44 yrs old) to the number of adult females aged 15-44yrs. | Fertility rate data from US Census 2000. |
| *Freshwater anglers* (self-caught freshwater fish consumption only) | | | |
| Total anglers (>15 yrs) | 27,900,000 | Includes total number of anglers fishing in freshwater water bodies including streams, rivers and lakes (excludes Great Lakes). Includes consumers and non-consumers (i.e., catch and release) | National Survey of Fishing, Hunting and Wildlife-Associated Recreation (USFWS, 2002) |
| Total consumers of recreationally-caught freshwater fish (all ages) | 58,590,000 | Based on application of "consuming" factor and "sharing" factor to the total anglers estimate above (see text for details) | |
| Infants born to mothers who consume recreationally-caught freshwater fish | 420,000 to 580,000 | Modeled as part of the mercury benefits analysis conducted for recreational freshwater anglers | Estimate generated using USFWS, 2002 data, combined with US Census 2000 data (see Section 11 for additional details). |
| *Saltwater anglers* (self-caught saltwater and estuarine fish consumption only) | | | |
| Saltwater angler (self-caught saltwater and estuarine fish consumption) | 9,100,000 | Includes consumers and non-consumers (i.e., catch and release) | National Survey of Fishing, Hunting and Wildlife-Associated Recreation (USFWS, 2002) |
| Total consumers of recreationally-caught saltwater fish (all ages) | 19,110,000 | Based on application of "consuming" factor and "sharing" factor to the total anglers estimate above (see text for details) | |
| Infants born to mothers who consume recreationally-caught saltwater fish | 135,000 to 186,000 | Estimated using the applicable ratio (between prenatally-exposed infants and anglers) developed for freshwater recreational anglers (see above) | |

**Table 4-38  Fish Consumption Rates for Key Fish Consuming Populations in the U.S.**

| Population | Fish Consumption (long-term annual-average equivalent in g/day) | Comments | References |
|---|---|---|---|
| *General population* (including consumption of commercial and self-caught fish including saltwater, freshwater and estuarine species) | | | |
| General population fish consumers (all ages combined) | - freshwater/ estuarine: 6.0 (mean) <br> - saltwater: 14.1 (mean) <br> - total fish: 20.1 (mean);  60.3 (95th%) | - uncooked (but does seem to represent edible portion to some extent) <br> - total population (consumers and non-consumers in survey) | EPA, 1996a (CSF II, 1989-1991) (as reported in EPA, 1997) |
| General population adults (>18 yrs) | - freshwater/ estuarine: 5.6 (mean) <br> - saltwater: 12.4 (mean) <br> - total fish: 18.0 (mean) | - as consumed <br> - total population (consumers and non-consumers in survey) | EPA, 1996a (CSF II, 1989-1991) (as reported in EPA, 1997) |
| General population females (15-44 yrs) | - freshwater/estuarine: 4.3 (mean) <br> - saltwater: 10.0 (mean) <br> - total fish: 14.3 (mean) | - as consumed <br> - total population (consumers and non-consumers in survey) | EPA, 1996a (CSF II, 1989-1991) (as reported in EPA, 1997) |
| *Freshwater anglers* (self-caught freshwater fish consumption only) | | | |
| Anglers (all ages combined) | - Maine 5 (mean); 13 (95th%) <br> - New York 5 (mean); 18 (95th%) <br> - Michigan 12 (mean); 39 (96th%) <br> - Michigan 17 (mean) <br><br> - EPA "recommended" freshwater fish consumption rate: 8 (mean); 25 (95th%) | - consumers plus non-consumers (catch and release) <br> - uncooked (but does seem to represent edible portions) | - Ebert et al., 1992 <br> - Connelly et al., 1987 <br> - West et al., 1989 <br> - West et al., 1993 <br> (all as reported in EPA, 1997) |
| *Saltwater anglers* (self-caught saltwater and estuarine fish consumption only) | | | |
| Anglers and consumers of fish caught by anglers (e.g., family members) (all ages combined) | - Atlantic:  5.6 (mean); 18.0 (95th%) <br> - Pacific: 2.0 (mean); 6.8 (95th%) <br> - Gulf: 7.2 (mean); 26.0 (95th%) | - edible fraction (uncooked) <br> - consumers and non-consumers | NMFS, 1993 (as reported in EPA, 1997) |

Review of the values presented in Table 4-38 reveals some interesting comparisons and contrasts between consumption rates for different populations:

- The general population has greater average consumption rates for saltwater fish 14.1 g/day) than do the saltwater anglers (2.0 to 7.2 g/day depending on region).  It is important to point out that the saltwater angler values refer to self-caught fish only.  It is likely that they would also consume some amount of commercially-produced saltwater fish, which would mean that in terms of total saltwater fish, the saltwater anglers might have higher consumption than the general population.  However, in comparing self-caught saltwater fish consumption to general population saltwater fish consumption, the latter is a larger value on average.

- Self-caught freshwater fish consumption (5 to17 g/day depending on region) is larger, on average, than self-caught saltwater fish consumption (2 to 7 g/day depending on region).  These data suggest that freshwater anglers may, on average, have twice the intake of self-caught fish than saltwater anglers.

- Regional data on consumption rates suggests that populations can differ significantly in their fish consumption depending on where they are located. This can have important implications for modeling distributional benefits for fish consumption as part of an equity analysis.  If fish consumption rates differ

significantly across regions, then this may suggest that exposure through fish consumption may also differ regionally (of course this will also depend on the regional variability of mercury concentrations in fish consumed).  In considering distributional equity, it may be necessary to conduct more refined exposure modeling that tracks these different patterns of fish consumption regionally (and links them to spatial distribution of fishers and mercury fish tissue concentrations).  However, in reality, the patchiness of data characterizing regional variability in fish consumption rates tends to prevent a comprehensive treatment of this issue in the context of a national-scale benefits analysis.  Instead, individual case studies focusing on specific regions and assessing the potential importance of regional variability in factors such as fish consumption rates and the spatial distribution of fishing populations can be conducted.

### 4.5.4   Discussion of Population and Fish Consumption Data in the Context of the Mercury Benefits Analysis

Information presented in Section 4.5.4 can be used to gain a perspective on the degree to which the benefits analysis presented in this RIA has covered key fish consuming populations in the U.S. from the standpoint of potential benefits linked to mercury emissions reductions.  Specifically, the recreational freshwater angler population modeled for the benefit analysis can be compared, in terms of total fish consumption, to the other key populations (i.e., recreational saltwater anglers and the general U.S. fish consuming population).

Table 4-39 presents total fish consumption estimates for the three key populations covered in Sections 4.5.2 and 4.5.3 (total consumers associated with recreational saltwater angler activity, total consumers associated with recreational freshwater angler activity and the general fish consuming population in the U.S.).  Note, for the recreational angling scenarios, the total consumer categories were used in conducting this comparison rather than the total angler categories, since the former focus on the total number of individuals consuming fish caught by the anglers.  These estimates were generated by multiplying average (mean) fish consumption values presented in Table 4-38 by the total demographic counts for these populations presented in Table 4-37. While this approach is relatively simplistic and is subject to uncertainty, it is considered sufficient to provide a general perspective on the magnitude of differences in total fish consumption by the three populations.

**Table 4-39.  Total Fish Consumption for Recreational Saltwater Anglers, Recreational Freshwater Anglers and General U.S. Fish Consuming Population**

| Population (adults) | Population count | Consumption Rate (g/day) | Total fish consumption (kg/year) |
|---|---|---|---|
| General fish consuming population | 184,000,000 | 20.1 | 1,349,916,000 |
| Recreational freshwater anglers | 58,590,000 | 8 | 171,082,800 (13% of general population consumption value) |
| Recreational saltwater anglers | 19,110,000 | 4.9* | 34,178,235 (3% of general population consumption value) |

*The consumption rate presented for recreational saltwater anglers was derived by taking the average of the regional values.

4-45

Total fish consumption values presented in Table 4-39 highlight the fact that the primary benefits analysis for this RIA is capturing a relatively small fraction of overall fish consumption. Specifically, the recreational freshwater angler population modeled for the primary benefits estimates represents only 13% of total fish consumption in the U.S. (comparing self-caught freshwater fish consumption by recreational anglers to consumption of all fish types by the general population). It is important to note, that the actual magnitude of IQ benefits for a given population is a function of (a) that population's fish consumption rate, (b) the baseline fish tissue concentrations for fish that the population consumes and (c) the magnitude of changes in mercury deposition to the waterbodies containing fish that a given population catches and the relationship between those deposition changes and mercury fish tissue concentrations. In short, the likely difference in IQ benefits between the three populations presented in Table 4-39 is dependent on several key factors related to mercury concentration in fish in addition to total fish consumption rates for these populations. While it is still informative to consider that approximately 86% of fish consumption by the U.S. population is not being covered in the benefit analysis, Section 8 of this RIA shows that deposition to U.S. waterbodies from coal-fired power plants will predominently occur in freshwater waterbodies in the Eastern-half of the U.S. Thus, the benfeit analysis of freshwater recreational anglers captures the primary segment of the affected population. To the extent that CAMR reductions will impact fish in coastal regions and the ocean, there remains a potential for a small amount of additional IQ benefits related to the general population of fish consumers (including foreign and domestically-caught commercial fish and coastal recreationally-caught fish).

### 4.5.4.1 Potentially High-Exposure Subpopulations

The primary benefits analysis includes consideration for several potentially high-exposure subpopulations including:

- A high fish consumption rate study population that is defined as "subsistence" fishers for the purposes of this study;

- A low-income high fish consumption study population (an alternative approach to model subsistence fishers);

- A Southeast Asian ethnic group with high freshwater fish consumption due to cultural practices; and

- A Native American population with high freshwater fish consumption due to cultural practices.

While these special subpopulations provide important insights into the issue of distributional (equity) benefits (i.e., the potential for IQ benefits to be disproportionately distributed across the U.S. population), they do not represent a significant (net) fraction of overall benefits due to the size of the subpopulations relative to overall U.S. fish consumption. In the case of the high fish consumption (subsistence) population (first bullet above), this group is a subset of the larger recreational freshwater fisher population and therefore, is incorporated as part of the recreational (self-caught) freshwater angler analysis in Section 10.

Because these subpopulations are included primarily to provide insights into potential distributional (equity) issues, and do not contribute a significant fraction to net benefits, they are not discussed in detail in this section, which is primary concerned with provide the reader with perspective on the magnitude of total U.S. population consumption through various fish consumption pathways.

## 4.6   Summary

Because fish consumption is the primary pathway for exposure to methylmercury, this section provides background information on fishing activity through a profile of the fishing industry in the United States. Methylmercury exposure through fish consumption is considered in terms of specific fish consumption pathways such as commercial and self-caught (recreational) fish consumption, which is composed of fish species from freshwater and saltwater sources.

### 4.6.1   Commercial Fish Production, Demand, and Consumption

Fish products from commercial fishing activities include: fresh and frozen (fish fillets and steaks, fish sticks and portion, and breaded shrimp); canned products (e.g. tuna, etc.); and industrial fishery products (fish meal and oil).

The amount of commercial fish landed in inland waters and state and territorial seas (0 - 3 miles from shore) is estimated to be 36% of the total commercial landings, while 61% of commercial fish were landed in the Federal exclusive economic zone (3 - 200 miles offshore). The Pacific coast region accounted for 65% of total commercial landings with Alaska and California accounting for the largest portion.  Alaska alone accounted for over 26% of total U.S. landings.  The Gulf Coast accounts had significantly less landings than the Pacific Coast at 18%, followed by New England and the Chesapeake Bay contributing 6% and 5% to U.S. landings, respectively.

Total commercial finfish landings equal 3.6 million metric tons.  Commercial shellfish landings total approximately 600,000 metric tons.  Pollock and Menhaden were by far the finfish types with the highest commercial landings by U.S. craft in 2002.  These two finfish types are almost exclusively caught by commercial fishermen.  Pollock are often used in making frozen fish products (e.g., fish sticks), surimi (see Section 4.2.1.3), and other minced fish products. Menhaden are often used to produce cut or live bait, fishmeal and fish oil.  Shrimp and crab are the top species of shellfish caught commercially.

Total aquacultural production from fish farms in 2002 was 393 thousand metric tons with catfish accounting for 73% or 286 thousand metric tons, followed by trout at 6% of total aquaculture production.

The U.S. exports total 1.09 million metric tons of commercial fish, with 56% of exports going to Asia, followed by 20% to Europe and 18% to North America.  Total edible imports for 2002 were 4.0 million metric tons with finfish contributing 65% of the total. An estimated 46% of U.S. imports were from Asia while 26% were from other regions in North America.

NMFS estimated that the total 2002 U.S. commercial finfish and shellfish per capita demand was 66.0 lb/capita (NMFS, 2003b).  Of this total, 15.6 lb/capita represented edible fish and shellfish meat.  Most of the U.S. tuna demand is met through imports (less than 7% of the tuna demand is met through commercial landings by the domestic fleet).

### 4.6.2   Recreational Fishing Activity, and Consumption

Recreational fishing activity occurs in saltwater (estuaries, coastal regions, and open ocean) and freshwater locations (lakes, rivers, and streams).  Roughly 32% of the 103,529 metric tons of marine finfish landed from recreational angling in U.S. waters in 2002 occurred at distances of 3-200 miles from shore, while 29% of total finfish landings were within 3 miles from shore.  The remaining 39% of finfish were landed in Inland Waters.  For shellfish, 65% of the 534,608 metric tons landed were made within Inland Waters and State and Territorial Sea (< 3 miles from shore).

Data for freshwater recreational harvest are not available; however, the number of anglers and number of days of fishing is available from the 2001 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation (USFWS, 2002).  There are approximately 28 million freshwater recreational anglers and 9 million saltwater recreational anglers.  The region with the largest number of anglers was the southeast followed by the south central United States.  Bass (large and small mouth), pan fish, trout, catfish, and crappie were the most popular target species for freshwater anglers nationwide.  Considering the number of days spent fishing, high levels of recreational fishing activity are shown to occur in the Great Lakes States, Florida, New York, Texas, and California.

The total demand for recreationally-harvested finfish is 0.79 lb/capita.  From Table 4-31, the total 2002 U.S. commercial finfish demand was estimated to be 33.0 lb/capita.  The total 2002 U.S. commercial shellfish demand was estimated to be 9.07 lb/capita.  No data were identified to estimate recreational shellfish demand.

### 4.6.3   Overall Conclusions

This section demonstrates that the recreational freshwater fisher population (28 million) is significantly larger than the recreational saltwater population (9 million), while both of these populations are significantly smaller than the general population of fish consumers in the U.S. (184 million) which includes many individuals receiving a significant fraction of their fish from commercially-produced stocks.

Based on information provided in this section, we see that commercial fish consumption constitutes a large portion of exposure to methylmercury.  However, a large majority of the commercial fish consumed are imported from foreign sources, or 3-200 miles offshore by domestic commericial fishermen (with a majority of domestic landings occuring off the Pacific coast).  These sources of exposure are not likely to be impacted by the control of utilities from the CAMR rule.  However, methylmercury concentrations from freshwater sources are likely to be affected by control domestic electric utilities.  Therefore, the quantified benefit analysis in Section 10 evaluates the benefits of improved health from reduced exposure to methylmercury from recreational freshwater fishing activities.

## 4.7    References

ASA, 2003.  American Sportfishing Association.  *Today's Angler*, 2003.

BEA, 2004.  Bureau of Economic Accounts.  Gross-Domestic-Product-(GDP)-by-Industry Data, GDPbyInd_GO_NAICS.xls, downloaded from http://www.bea.doc.gov/bea/dn2/gdpbyind_data.htm, December 2004.

BOC, 2005.  U.S. Bureau of Census.  Data downloaded from the American Factfinder database at http://factfinder.census.gov/home, accessed January 2005.

BOC, 2004a.  U.S. Bureau of Census.  *CBP United States Economic Profiles*, downloaded from http://www.census.gov/epcd/cbp/view/cbpus.html, 2004.

BOC, 2004b.  Bureau of Census.  Statistics of United States Businesses, downloaded from http://www.census.gov/csd/susb/susb.htm, 2004.

EPA, 1997.  U.S. Environmental Protection Agency, *Volume I - General Factors Exposure Factors Handbook Update to Exposure Factors Handbook, EPA/600/8-89/043 - May 1989*, EPA/600/P-95/002Fa, August 1997.

Jacobs, H.L., H.D. Kahn, K.A. Stralka, and D.B. Phan (1998).  Estimates of per Capita Fish Consumption in the U.S. Based on the Continuing Survey of Food Intake by Individuals (CSFII).  *Risk Analysis*, 18 (3):283-291, 1998.

NASS, 2002.  National Agricultural Statistics Service, U.S. Department of Agriculture.  *2002 Census of Agriculture*, 2002.

NASS, 1998.  National Agricultural Statistics Service, U.S. Department of Agriculture.  *1998 Census of Aquaculture*, April, 1998.

NMFS, 2005.  National Marine Fisheries Service, National Oceanic and Atmospheric Administration.  Commercial Fishery Landings data, downloaded from http://www.st.nmfs.gov/st1/market_news/, accessed January 2005.

NMFS, 2004.  National Marine Fisheries Service, National Oceanic and Atmospheric Administration.  *Fisheries of the U.S., 2003,* October 2004.

NMFS, 2003a.  National Marine Fisheries Service, Fisheries Statistics Division, National Oceanic and Atmospheric Administration.  *Statistical Highlights: Fisheries of the United States, 2003*, 2003.

NMFS, 2003b.  National Marine Fisheries Service, National Oceanic and Atmospheric Administration.  *Fisheries of the U.S., 2002,* September 2003.

Pechan, 2005.  E.H. Pechan & Associates, Inc.  *Profile of the Fishing Industry in the United States, Final*.  Prepared for Lisa Conner, U.S. Environmental Protection Agency, Air

Quality Strategies and Standards Division, Innovative Strategies and Economics Group, Research Triangle Park, NC, March, 2005.

RBFF, 2003.  Recreational Boating and Fishing Foundation. *2003 Boating and Fishing Attitude, Segmentation Study*, 2003.

USFWS, 2002.  U.S. Fish and Wildlife Service, *2001 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation*, 2001.

SECTION 5  MERCURY CONCENTRATIONS IN FISH . . . . . . . . . . . . . . . . . . . . . . . . . 5-1
    5.1     Methylmercury Concentrations in Saltwater Fish Species . . . . . . . . . . . . . . . 5-1
    5.2     Methylmercury in Freshwater Fish Species . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-2
           5.2.1   Sources of Variability in Hg within the NLFA . . . . . . . . . . . . . . . . 5-4
           5.2.2   National Lake Fish Tissue Study . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6
    5.3     Comparison of the Differences in the NLFA and the NLFTS . . . . . . . . . . . . . 5-7
    5.4     Combining the NLFA and NLFTS Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-9
    5.5     Normalization of Hg Fish Tissue Concentration Data . . . . . . . . . . . . . . . . . . . 5-10
    5.6     Resulting Fish Tissue Concentrations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-13
    5.7     Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-17
    5.8     References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-17

**Tables**
Table 5-1.  Concentrations of Mercury in Marine Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-2
Table 5-2.  Number of Fish Tissue Samples / Watershed From the National Listing of Fish
        Advisories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-3
Table 5-3.  Hg Fish Tissue Concentrations From Various Environments (ppm) . . . . . . . . . . 5-5
Table 5-4.  Statistical Distribution of Normalized Hg Fish Tissue Concentrations . . . . . . . 5-12
Table 5-5.  Statistical Distribution of Non-Normalized Hg Fish Tissue Concentrations Shown in
        Figure 5-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-13

**Figures**
Figure 5-1.  NLFA Sample Locations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-3
Figure 5-2.  Frequency Distribution of Average Watershed Fish Tissue Concentrations (ppm) 5-4
Figure 5-3.  Frequency and Average Concentrations of Various NLFA Sample Methods (Cuts of
        Fish) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-4
Figure 5-4.  Sample Locations from the NLFTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6
Figure 5-5.  Cumulative Distribution Functions (CDFs) for Normalized NLFTS and NLFA Lake
        Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-8
Figure 5-6.  Total Area/Sample in the Combined NLFA and NLFTS Data Set . . . . . . . . . . . 5-9
Figure 5-7.  Locations Where Normalized Fish Tissue Concentrations are Utilized, and Where
        Non-Normalized Data are Utilized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-12
Figure 5-8.  Baseline Average Hg Fish Tissue Concentrations . . . . . . . . . . . . . . . . . . . . . . . 5-13
Figure 5-9.  Statistical Distribution of Averages of Hg. Fish Tissue Concentrations in ppm . 5-14
Figure 5-10.  Number of Unique Sampling Events Within Each HUC . . . . . . . . . . . . . . . . . . 5-15
Figure 5-11.  Average Fish Tissue Concentrations By HUC . . . . . . . . . . . . . . . . . . . . . . . . . 5-16
Figure 5-12.  Frequency Distribution of HUC Averaged Concentrations (ppm) . . . . . . . . . . 5-16

**SECTION 5**

**MERCURY CONCENTRATIONS IN FISH**

Because fish consumption is a major pathway for human exposure to methylmercury, it is important to determine the methylmercury concentrations of consumable fish. A baseline concentration of consumable fish will enable EPA to determine the reduction in exposure related to a reduction in Hg in fish tissue resulting from reduction in air deposition of Hg.

As is discussed in Section 4, the fish that Americans consume come from a variety of sources including saltwater species from the ocean and estuaries, and freshwater species from lakes, rivers, and streams. Fish may be purchased from commercial sources, or caught recreationally and consumed. In this section, we describe the level of methylmercury contamination in shellfish (saltwater species) and finfish (both saltwater and freshwater species).

## 5.1     Methylmercury Concentrations in Saltwater Fish Species

The EPA's Office of Water has developed the Mercury in Marine Life database, which provides information on the level of methylmercury contamination in estuarine and marine species (i.e., commercial and non-commercial seafood)[1]. The Mercury in Marine Life database contains over 15,000 records on methylmercury tissue concentrations in approximately 250 different fish and shellfish species. The geographic coverage includes data from all 24 coastal states, the District of Columbia and Puerto Rico. Data was not evenly distributed by coast. More tissue samples were taken from the Gulf of Mexico than either the Atlantic or Pacific Ocean.

The average methylmercury concentration (i.e., mean in ppm) for several species in the database are presented in Table 5-1. Not surprisingly, many of the species groups with high methylmercury concentrations are top-level predators. This was expected considering methyl mercury's tendency to bioaccumulate up the food chain. Twenty-six percent of the samples contained total mercury concentrations above 0.3 ppm. Five percent of the samples contained total methylmercury tissue concentrations above 1.0 ppm, the FDA action level for issuance of a fish advisory. King mackerel and a number of shark species contain the highest means. Other species with relatively high concentrations include barracuda, jack crevalle, Spanish mackerel, ladyfish, and seatrout.

---

[1] As discussed in ch. 3, samples are Hg, which are used as a proxy for MeHg.

**Table 5-1.  Concentrations of Mercury in Marine Life**

| Species Group | Count | Mean (ppm) | Range (ppm) | St Dev |
|---|---|---|---|---|
| Marlins | 11 | 2.424 | 0.270 - 6.80 | 1.838 |
| Mackerels | 849 | 0.791 | 0.013 - 4.47 | 0.703 |
| Sharks | 620 | 0.776 | 0.020 - 6.90 | 0.729 |
| Barracudas | 54 | 0.757 | 0.076 - 3.10 | 0.642 |
| Tunas | 34 | 0.647 | 0.071 - 1.57 | 0.421 |
| Jacks | 486 | 0.509 | 0.017 - 3.90 | 0.453 |
| Ladyfish | 194 | 0.479 | 0.020 - 2.60 | 0.408 |
| Groupers | 229 | 0.473 | 0.045 - 3.30 | 0.418 |
| Bluefish | 289 | 0.445 | 0.020 - 2.00 | 0.331 |
| Snook | 496 | 0.398 | 0.030 - 2.08 | 0.315 |
| Drums | 2544 | 0.382 | 0.001 - 6.62 | 0.499 |
| Sea basses | 57 | 0.352 | 0.020 - 1.32 | 0.343 |
| Rockfish | 315 | 0.294 | 0.004 - 1.44 | 0.221 |
| Catfishes | 385 | 0.245 | 0.000 - 1.80 | 0.305 |
| Wrasses | 54 | 0.234 | 0.070 - 0.75 | 0.149 |
| Temperate basses | 625 | 0.226 | 0.000 - 1.25 | 0.211 |
| Crabs | 385 | 0.224 | 0.001 - 3.68 | 0.427 |
| Eels | 133 | 0.223 | 0.000 - 0.80 | 0.154 |
| Snappers | 380 | 0.218 | 0.004 - 2.80 | 0.182 |
| Sturgeons | 10 | 0.216 | 0.120 - 0.35 | 0.07 |
| Rays | 104 | 0.197 | 0.013 - 0.91 | 0.151 |
| Tripletails | 110 | 0.192 | 0.014 - 1.28 | 0.187 |
| Porgies | 292 | 0.178 | 0.001 - 1.73 | 0.191 |
| Grunts | 67 | 0.177 | 0.020 - 0.66 | 0.116 |
| Kingfish | 86 | 0.167 | 0.017 - 0.78 | 0.147 |
| Lobsters | 18 | 0.127 | 0.050 - 0.25 | 0.067 |
| Flounders | 1006 | 0.117 | 0.001 - 1.70 | 0.152 |
| Dolphin Fish | 44 | 0.107 | 0.031 - 0.49 | 0.106 |
| Croakers | 425 | 0.098 | 0.000 - 1.10 | 0.124 |
| Oysters | 2212 | 0.073 | 0.002 - 3.91 | 0.121 |
| Mullets | 203 | 0.065 | 0.001 - 1.14 | 0.121 |
| Salmon | 300 | 0.065 | 0.015 - 0.61 | 0.051 |
| Mussels | 1157 | 0.059 | 0.002 - 0.93 | 0.077 |
| Shrimp | 171 | 0.051 | 0.000 - 1.02 | 0.094 |
| Clams | 51 | 0.049 | 0.008 - 0.12 | 0.022 |
| Cods | 150 | 0.045 | 0.007 - 0.26 | 0.045 |
| Herring | 186 | 0.043 | 0.010 - 0.24 | 0.038 |
| Surfperches | 391 | 0.041 | 0.002 - 0.26 | 0.039 |

Source: U.S. EPA, Office of Water; Mercury in Marine Life Database.

## 5.2   Methylmercury in Freshwater Fish Species

The most extensive source of national-level monitored mercury data for freshwater fish is the National Listing of Fish and Wildlife Advisories (NLFA) maintained by EPA's Office of Water.  The NLFA includes more than 91,500 samples of fish tissue contaminant data collected by states, Native American tribal governments, territories, and Canada (and submitted to EPA) from over 10,700 locations nationwide from 1967 through 2003. Figure 5-1 shows the continental locations of Hg fish tissue samples recorded in the NLFA to date. In some

watersheds[2], freshwater fish were sampled hundreds or even thousands of times, but most areas have a handful of samples.  Watersheds without samples are typically found in the West. Table 5-2 shows the frequency at which watersheds were sampled.



**Figure 5-1.  NLFA Sample Locations**

**Table 5-2.  Number of Fish Tissue Samples / Watershed From the National Listing of Fish Advisories**

| Number of Samples | Number of Watersheds |
|---|---|
| No samples | 1069 |
| 1 - 4 samples | 237 |
| 5 - 49 samples | 547 |
| 50 - 99 samples | 126 |
| 100 - 499 samples | 157 |
| 500 - 999 samples | 13 |
| 1,000 or more samples | 3 |

The average watershed Hg fish tissue concentration is .29 ppm., and samples within a watershed are typically within .81 ppm. of each other.  Between watersheds, average watershed concentrations range from .001 ppm. to over 4 ppm.  The frequency distribution shown in Figure 5-2 illustrates the average concentration found in watersheds.

---

[2] A watershed is defined as a USGS 8-digit HUC.  HUCs are discussed later in this chapter.



**Figure 5-2.  Frequency Distribution of Average Watershed Fish Tissue Concentrations (ppm)**

In the NLFA dataset, each sample is described according to the sample location, sample date, measured methylmercury concentration, species and size of fish, and the part of the fish sampled.  Each of these elements in the data result in large variation across the NLFA samples.

### 5.2.1   Sources of Variability in Hg within the NLFA

*Variation Across Sample Methods*

Different states have used various sampling methods (cuts of fish) over the years to determine fish tissue concentrations.  Figure 5-3 shows the frequency various sampling methods were employed in the NLFA, and the average fish tissue concentration of Hg associated with each sampling method.

**Figure 5-3.  Frequency and Average Concentrations of Various NLFA Sample Methods (Cuts of Fish)**

*Variation Across Species*

There are close to 400 different species of fish sampled in the NLFA.  Average concentrations for freshwater species, where samples were geocoded, range from .007 to 1.85 ppm  The mean average concentration for a given species (freshwater or saltwater) is .25, with a standard deviation of .43.

*Variation Across Lake/River/Other Types of Ecosystem*s

About 70% of the samples have geographic coordinates associated with them. Where samples were geocoded (i.e. a latitude and longitude were recorded based on a written site description), it was possible to map the sample location.  Mapping sample locations allowed the EPA to classify locations as either lake or river.  Locations closer to known non-flowing waterbodies were assigned as type "lake", and locations closer to known flowing waterbodies were assigned as type "river".  Locations that did not have geographic coordinates associated with them were mostly saltwater fish species, but are considered unclassified.  On average, river environments were .017 ppm higher in fish tissue concentrations than lake environments, however river environments typically contained more variability in concentrations.  Table 5-3 provides details related to fish tissue samples from unclassified, river and lake environments.

**Table 5-3.  Hg Fish Tissue Concentrations From Various Environments (ppm)**

| Type | Number of Samples | Minimum | Maximum | Average | Standard Deviation | Variance |
|------|-------------------|---------|---------|---------|--------------------|----------|
| unclassified | 40,965 | 0.00 | 29.00 | 0.3455 | 0.4827 | 0.2330 |
| lakes | 17,623 | 0.00 | 7.59 | 0.3438 | 0.3519 | 0.1238 |
| rivers | 33,048 | 0.00 | 8.94 | 0.3614 | 0.4386 | 0.1924 |

*Other Potential Sources of Variability in NLFA Hg samples*

Sometimes, the same location was sampled multiple times over the span of a few months or even years.  On average, most locations were sampled about 8 times, and same-location repeat samples typically range within .4 ppm of each other.

Sampling efforts over time are not evenly spatially distributed.  There is fairly evenly distributed sampling efforts in the first half of the 1990's, but the late 1990's and early 2000's show much heavier sampling in the north and southeast.  There are some states that submitted samples to the NLFA for some years, and not for others.

The NLFA Hg fish tissue concentrations represent total Hg concentration from all sources.  The state of South Carolina is of particular interest because concentrations are relatively high.  This could be due to the historic use of mercury in gold mining that took place in the middle part of the state.

It is possible that Hg fish tissue concentrations are changing over time, but due to these other sources of variability, and inconsistent spatial patterns of sampling, it is not possible to determine if indeed these temporal trends are present, or the strength of their influence.

### 5.2.2   National Lake Fish Tissue Study

In addition to the NLFA, EPA's National Lake Fish Tissue Survey (NLFTS) also provides useful data on concentrations of Hg in fish tissue.  Conducted in 1999-2003, this study sampled fish tissue from 500 randomly selected lakes and reservoirs across the U.S. (from the estimated 270,000 lakes and reservoirs in the lower 48 States).  Figure 5-4 shows locations of NLFTS sample sites.



· Sample Locations

**Figure 5-4.  Sample Locations from the NLFTS**

In comparison to the NLFA, the design of the NLFTS provides more evenly spatially distributed sampling sites across the United States, but are much fewer in number than the NLFA.  The NLFTS was statistically designed to be representative and sampled 54 different species of fish using same-species composite sample methods[3]. For each lake sampled, one composite sample of a predatory species, and one of a bottom-dwelling species were taken.

Some of the more commonly sampled species in the NLFTS are Largemouth Bass, Carp, Catfish, Trout, and Walleye.  The average length of all the species used in each same-species composite sample is also recorded.  Samples were collected from mid-1999 through 2003.  Hg concentrations in the NLFTS range from .004 to 1.46 ppm  The average measured NLFTS Hg fish tissue concentration is .22 ppm

---

[3] A same-species composite sample is where several fish of the same species are used together to determine the methyl mercury concentration.

## 5.3     Comparison of the Differences in the NLFA and the NLFTS

Of the two major sources of Hg fish tissue concentration data available (the NLFA and NLFTS), each has it's strengths and weaknesses.  The NLFA contains a large number of samples, but could be biased given the purpose for which it was developed (fishing advisories). The potential for bias arises because NLFA samples typically collected either at sites that are known to be popular fishing locations, or because sites are suspected of having elevated levels of Hg.  The NLFTS is known to be unbiased (because sample locations were selected based on a stratified random sample), but has comparatively fewer samples from fewer locations. Therefore, it is important to compare the two datasets to determine the presence or absence and significance of the suspected upward NLFA bias

Our initial data investigations of the NLFA and NLFTS indicated that fish tissue concentrations varied according to the species sampled, length of the fish sampled, and the sample method.  A straight comparison of the NLFA and NLFTS would be inappropriate given these other sources of variability in fish tissue concentration.  To control for these sources of variability for a comparison of the data sets, both of the data sets were normalized using the National Descriptive Model of Mercury and Fish (NDMMF), which is discussed in detail in section 5.5.  The NDMMF is a statistical model that normalizes Hg fish tissue concentration data to control for species/size/sample method variability[4].  Once the data has been normalized to account for these factors, the outputs of the model are then compared by source of data input (NLFA vs. NLFTS)

The EPA's Office of Water conducted an analysis to determine if the NLFA and NLFTS provide substantially different estimates of fish tissue concentrations.  The purpose of the comparison study was to determine if there is a visible and/or statistically significant bias in the NLFA data relative to that in the NLFTS.

Since concentrations of methyl mercury in fish may be different in rivers than in lakes, and the NLFTS study is just of lakes, the lake subset of NLFA normalized data was selected for use in the comparison. Where multiple regression estimates were available for the same lake, the normalized concentrations were averaged.  Cumulative Distribution Function (CDF) estimates were generated using the statistical software R v. 1.9.1 (Venables and Smith, 2004) with Probability Survey Data Analysis Functions (psurvey.analysis v. 2.2) (Kincaid, 2004) module. CDF estimates were generated for both the NLFA and NLFTS. Stratified random sample weight adjustments were incorporated in the CDF estimates for the NLFTS data.

---

[4] The NDMMF is a statistical normalization technique that is specifically designed for Hg fish tissue concentrations. In this sense, the NDMMF is a non-traditional statistical normalization technique.

Figure 5-5 shows the CDF comparison plot for the NLFA and NLFTS normalized lake data sets as continuous functions by fish tissue methyl mercury concentrations, with 95th percentile limits for the NLFTS[5]. A surprising result that is apparent in the figure, is that there is little difference between the two distributions for lake fish. However, the upper end of the distribution (e.g. 95th percentile) shows an upward bias (of 0.14 ppm) in NLFA with respect to NLFTS. Differences at other points in the distribution (5th, 25th, 50th, and 75th percentiles) are quite small (range from -0.017 ppm to 0.025 ppm). Four statistical CDF comparison tests were performed on the two data sets. All four tests indicate the two CDFs can not be considered statistically different at the 95% level (p values > 0.17). A z-test for difference in the means of the two data sets indicated they are not different, at the 95% level.



**Figure 5-5.  Cumulative Distribution Functions (CDFs) for Normalized NLFTS and NLFA Lake Data.**

The overall conclusion is that the two data sets, for NLFA and NLFTS lakes, are not statistically different though there is a clear upward bias at the very upper end of the NLFA concentration distribution.

---

[5] Since calculations of the 95th percentile confidence limits on the CDF estimates are dependent on an assumption of simple random sampling, which does not hold for the NLFA data, the accuracy of the confidence limits are affected and thus are not presented for the NLFA data.

## 5.4    Combining the NLFA and NLFTS Data

The lack of statistical difference in the distributions of fish tissue concentrations (except in the highest 95th percentile) in the NLFA supports its use along with the NLFTS data for a benefits analysis for this rule.

When the two data sets (NLFA and NLFTS) are combined, on average, there is one sample location / 1,000 sq. km.  The sampling network is more-dense in the East and on the West Coast, and less dense in the Midwest.  Figure 5-6. illustrates the variable spatial density of the combined NLFA and NLFTS sample locations.



**Figure 5-6.  Total Area/Sample in the Combined NLFA and NLFTS Data Set**

An examination of the combined NLFA and NLFTS fish tissue concentrations reveals further data problems that need to be addressed.  In the combined data set, there are over 92,224 records of concentrations sampled in the late 1960's through 2003, and 35 different sampling methods were used to obtain Hg concentrations from over 450 different species of fish that range in length from .01 to 379 in. (over 30 ft., and an obvious data entry error).  Samples were obtained from  over 11,000 different locations across the U.S., and concentrations range from below detection limits to over 10 ppm

To eliminate errors within the data due to data entry and focus benefit analysis efforts, the following criteria were applied to the data that were selected for further analysis:

- Sampling date must be later than 1990.
- The sample must be geo-referenced.

- The sample length must have a recorded length[67] that is reasonable when compared to world record lengths.[8]
- All Hg concentration units that were recorded in .ppb were converted to .ppm to maintain consistency with the majority of the samples.
- Only freshwater species samples are used.

## 5.5    Normalization of Hg Fish Tissue Concentration Data

Hg fish tissue concentration variability due to species/size/sample method can be seen at a global database scale in averages reported previously in this report, and on an individual sample level.  For example, at Abbots Creek in North Carolina, at least 20 largemouth bass were sampled using the same sample method on the same day in 1992.  The lengths of these fish ranged from 9 to 19 inches, and fish tissue concentrations ranged from .24 ppm (9 inch fish), to 1.4 ppm (19 inch fish).  In addition, a 12.41 in black crappie and a 12.41 in. largemouth bass were sampled at Abbots Creek.  The concentration of the black crappie was .34 ppm, while the concentration of the largemouth bass was .19 ppm  An example of variability potentially introduced by sample method can also be found from the Abbots Creek samples where two 8 in. goldfish were sampled four months apart.  One was sampled using the whole fish, and one was sampled using a fillet.  The whole fish sample was .32 ppm and the fillet sample was .96 ppm

Due to these sources of variability, a computation of the simple average of existing fish tissue concentrations at a location would not provide a representative estimate of Hg in fish for use in a benefits analysis.  Averaging would include many species that are not typically targeted by anglers, and very small fish which would misrepresent Hg fish tissue concentrations consumed by the public.  Because of this, we considered focusing on key fish species that are frequently targeted by anglers and consumable sizes representative of sizes typically found in lakes and rivers.

We considered using a subset of the combined NLFA and NLFTS consisting of these species larger that a minimum length, but we found that this would reduce the already sparse data set.  Based on size alone, the removal of sampled fish less than 6 inches long would reduce the data set by about 20%.  Controlling for species of fish that are typically targeted by anglers would reduce the data set even further.

---

[6] Where a fish weight was recorded, the length was predicted using a regression for each sampled fish species of the log of the length as a dependent variable, and the weight of a fish as the independent variable.  Typical residual error is approximately 10% across all species.

[7] It is of interest to note that almost all of the samples from the states of  IA, NE,  OH, TN, VA, and PA,  were removed because the length of the fish was not recorded.

[8] Must not be more than 10% longer than a recorded world record length for that fish species. An additional 10% over current world records was allowed so that only obvious data entry problems are filtered out of the data set.  A 10% threshold over the world record represents, for this study, fish lengths considered outside the realm of possibility.  The recorded length must also be less than 108 inches (108 in. is 10% greater than the length of the largest world record of any freshwater species). Background research on world record lengths for each species was extremely time consuming.  To focus QA/QC efforts, only species that were sampled at least 30 times in the U.S. were investigated.

To take full advantage of the Hg fish tissue concentration samples within the NLFA and NLFTS, it is important to control for variability due to species/fish size/sample method. Using information on species, size, sample method, location, and date of sampling event enables the use of statistical procedures to estimate what Hg fish tissue concentration would have been, had a different species/size/sample method been used to collect samples and detect the Hg concentrations.

The USGS developed a procedure called the National Descriptive Model of Mercury and Fish (NDMMF) (Wente 2004). The NDMMF is a statistical model related to covariance. It is calibrated using the NLFA and NLFTS data. The model is designed to allow the prediction of different species, cuts, and lengths of fish for sampling events, even when those species/lengths/cuts of fish were not sampled during those sampling events.

The idea is to model methyl mercury concentration as a power function of fish length, i.e., $y = ax^b$, where y = methyl mercury concentration, x = length, and a,b are parameters. Potentially, that could be done for each species at each site, but the data are far too sparse for that, and, further, we wanted to devise some way to predict mercury concentrations for a species that was not even collected at some given site. So, the assumptions are made that: (i) a universal, national value of "b" for each tissue type from each fish species, and (ii) the value of "a" at a given site at a given time is the same for all species. Thus a prediction of mercury concentration for a given tissue from a fish of an arbitrary species of length x could then be predicted by "looking up" the right value of "b" for that species and tissue and the value of "a" for that site and time.

To implement the NDMMF, the NLFA and NLFTS fish tissue concentrations are further prepared for analysis. If the method of sample collection was "fillet skin on scales off" or "composite fillet skin on", these were assigned to the "fillet skin on" sample method type. Various methods of "Fillet skin off" sample types were treated in a similar manner. "Composite" types were treated as "whole" sample types. Sample types that were "tissue carcass, crab, meat, dorsal muscle plug with skin, dorsal muscle plug without skin ,edible portion, eggs, gills, lipid, liver, organism without head or viscera, shellfish, tissue, turtle muscle/somatic , unknown, or viscera" were deleted.

Those species sampled 29 or fewer times were excluded from the analysis due to the lack of quality assurance background information collected for these samples (see section 5.4 description of data criteria). In total, the steps discussed in section 5.4 to remove data entry errors and to select relevant data for benefits analysis leave a total of 42,756 remaining samples from the original population of 92,224 samples.

The remaining samples are log-transformed to model the relationship as log y = b * log x + log a, 1 is added to x and to y to escape the problem of taking the log of zero. The SAS program LIFEREG is then used to estimate the parameters. More detail about the NDMMF can be found at http://pubs.water.usgs.gov/sir20045199/.

The NDMMF was used to generate estimates of fish tissue concentrations for six species that are both commonly targeted by freshwater fish anglers and were frequently sampled in the NLFA and NLFTS data bases (largemouth bass, catfish, brown trout, white crappie, white perch,

and walleye).  The target sizes selected for each species is representative of the typical adult size of that fish species found in the wild (Schultz 2004).

For sampling events where samples were removed during data preparation, and the target species were sampled, the sampled target species Hg concentrations were averaged for every unique sampling event.

This means that for some sample locations, we cannot control for variability resulting from the size of the sample fish through the normalization process.  In these cases, we retain the raw data from the NLFA and NLFTS.  Figure 5-7 shows locations where it was possible to compute NDMMF estimates, and where raw data was used.  Table 5-4 gives the average, max, min, and standard deviation of Hg fish tissue concentrations of the normalized data using the NDMMF.  Table 5-5 below gives the average, max., min., and standard deviation of the non-normalized fish tissue concentrations used for this analysis.



**Figure 5-7.  Locations Where Normalized Fish Tissue Concentrations are Utilized, and Where Non-Normalized Data are Utilized**

**Table 5-4.  Statistical Distribution of Normalized Hg Fish Tissue Concentrations**

| SPECIES | Average | Maximum | Minimum | Standard Deviation |
|---|---|---|---|---|
| Largemouth Bass | .31 | 4.08 | 0 | .36 |
| Catfish | .23 | 2.98 | 0 | .26 |
| White Crappie | .14 | 1.89 | 0 | .17 |
| White Perch | .27 | 3.45 | 0 | .31 |
| Brown Trout | .11 | 1.47 | 0 | .13 |
| Walleye | .42 | 5.47 | 0 | .48 |

**Table 5-5.  Statistical Distribution of Non-Normalized Hg Fish Tissue Concentrations Shown in Figure 5-5**

| SPECIES | Average | Maximum | Minimum | Standard Deviation | Number of Samples |
|---------|---------|---------|---------|--------------------|--------------------|
| Largemouth Bass | .57 | 4.22 | 0 | .68 | 558 |
| Catfish | .14 | 1.30 | 0 | .13 | 556 |
| White Crappie | .13 | 1.11 | 0 | .18 | 60 |
| White Perch | .10 | .84 | 0 | .15 | 50 |
| Brown Trout | .09 | .56 | 0 | .09 | 56 |
| Walleye | .66 | 7.59 | 0 | 1.21 | 55 |

## 5.6    Resulting Fish Tissue Concentrations

To develop a baseline of Hg fish tissue concentrations for the benefits analysis of this rule, both the normalized and non-normalized data values shown in Tables 5-4 and 5-5 were merged to form a single data set, and the average of all the fish tissue concentrations (either normalized or non-normalized), by sampling event was computed.  To do this we specify a sampling location and date as an "event", and then calculate an average for each event.  For example, at event X, estimates were computed for largemouth bass, catfish, white crappie, white perch, brown trout, and walleye.  All six species estimates were then averaged at event X to compute a single representative Hg fish tissue concentration for that event.  For the raw data, where multiple target species were sampled in a particular event, these were averaged.  Figure 5-8 shows the statistical distribution of averages.  Figure 5-9 is a map of sample locations and representative Hg fish tissue concentrations in ppm

**Figure 5-8.  Baseline Average Hg Fish Tissue Concentrations**





**Figure 5-9.  Statistical Distribution of Averages of Hg. Fish Tissue Concentrations in ppm**

The species - averaged concentrations at each event were then averaged for each unique location.  These averages were then averaged by US Geological Survey (USGS) 8-digit watershed units called Hydrologic Unit Code (HUC) Classification Areas.  Just like states can be subdivided into counties, large watersheds can be subdivided into smaller and smaller watersheds.  For example, the Chesapeake Bay Watershed is composed of 104 small 8–digit HUCs.  The 8-digit HUC is the smallest USGS Hydrologic Unit Code (HUC) Classification.  Figure 5-10 geographically shows the USGS 8-digit HUCs and the frequency they were sampled  Approximately 35% of HUCs in the states east and south of North Dakota (excluding North Dakota) were not sampled.



**Figure 5-10.  Number of Unique Sampling Events Within Each HUC**

For the most part, higher concentrations averaged by HUC can be found in the southeastern coastal plains of North Carolina, south and west in the coastal plains around to Mississippi.  Maine, New Hampshire, and some areas of New York, Pennsylvania and Ohio show some higher concentrations. Mercury Maps has recorded the presence of gold mines in South Carolina, chlor-alkali plants in Ohio, and mercury mines in Arkansas that may, in part, explain their higher Hg fish tissue concentrations.  Figure 5-11 shows a map of mercury fish tissue concentrations averaged by HUC.

Average HUC concentration is .25 ppm  The overwhelming majority of HUCs have concentrations below 1 ppm  Figure 5-12 shows a frequency distribution of average HUC concentrations.



**Figure 5-11.  Average Fish Tissue Concentrations By HUC[9] [10]**



**Figure 5-12.  Frequency Distribution of HUC Averaged Concentrations (ppm)**

---

[9] 226 8-digit HUC watersheds have average concentrations higher than the Office of Water Methylmercury water quality criterion of .3 ppm

[10] Where no samples fall within a HUC, the HUC is shown in white.  This does not indicate that Hg is not in the fish, but simply that data do not exist to estimate Hg concentration at this location.

## 5.7    Summary

The data of mercury concentrations in finfish and shellfish from freshwater and saltwater sources indicate a wide variety of contamination levels in fish species.  The data demonstrate the finding in Section 3 of this report that larger predatory fish in the higher tropic levels tend to have higher levels of methyl mercury contamination in fish tissue.

We obtained data for a variety of fish species from the Mercury in Marine Life Database, the National Listing of Fish Advisories (NLFA), and the National Lake Fish Tissue Study (NLFTS).  There are considerably more fish tissue samples from freshwater sources than for saltwater sources.  The mean concentrations for the saltwater fish species obtained from the Mercury in Marine Life Database ranges from 0.04 ppm to 2.4 ppm, but some samples from predatory fish such as marlin, mackerel, shark, and barracuda indicate levels as high as 6.9 ppm Data for the freshwater fish species from the NLFA and NLFTS are used in the quantified benefit analysis provided in Section 11 of this report.  Because the concentration of mercury in fish tissue can vary by species, the length of the fish, the sampling method (i.e., fillet, whole fish, skin on/off), and by location, EPA normalized the data from the NLFA and the NLFTS to control for variability from factors other than location of the fish tissue sample.  The resulting normalized fish tissue samples were then average to the 8-digit HUC to provide a characterization of fish tissue concentrations in a watershed.  The mean mercury concentrations in the HUCs ranges from 0 ppm to 7.59 ppm, with an overall mean of 0.25 ppm

## 5.8    References

EPA.  1997.  Mercury Study Report to Congress.
   http://www.epa.gov/airprogm/oar/mercury.html

Kincaid, Thomas, 2004. User Guide for psurvey.analysis, version 2.4. Probability Survey Data Analysis Functions. Available from:
   http://www.epa.gov/nheerl/arm/analysispages/techinfoanalysis.htm

Schultz, Ken, 2004.  Field Guide to Freshwater Fish.  John Wiley and Sons, Hoboken N.J.

Venables, W.N. and Smith, D.M., 2004. An Introduction to R: Notes on R: A Programming Environment for Data Analysis and Graphics Version 1.9.1 (2004-06-21) Available from:
   http://cran.us.r-project.org/

Wente, S.P., 2004, A Statistical Model and National Data Set for Partitioning Fish-Tissue Mercury Concentration Variation between Spatiotemporal and Sample Characteristic Effects: U.S. Geological Survey Scientific Investigations Report 2004-5199.  Avalaible from:  http://pubs.water.usgs.gov/sir20045199/

SECTION 6    PROFILE OF THE UTILITY SECTOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-1
    6.1    Power-Sector Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-1
        6.1.1   Generation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-1
        6.1.2   Transmission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-3
        6.1.3   Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-3
    6.2    Deregulation and Restructuring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-3
    6.3    Pollution and EPA Regulation of Emissions . . . . . . . . . . . . . . . . . . . . . . . . . . 6-4
    6.4    Pollution Control Technologies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-5
    6.5    Regulation of the Power Sector . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-6
    6.6    Cap and Trade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7
    6.7    Clean Air Interstate Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8


Table 6-1.  Existing Electricity Generating Capacity by Energy Source, 2002 . . . . . . . . . . . 6-1
Table 6-2.  Total U.S. Electric Power Industry Retail Sales in 2003 (Billion kWh) . . . . . . . . 6-2
Table 6-3.  Electricity Net Generation in 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-2
Table 6-4.  Emissions of $SO_2$ and $NO_x$ in 2003 and Percentage of Emissions in the CAIR
        Affected Region (tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8
Table 6-5.  Current Electricity Net Generation and EPA Projections for 2010 and 2015 . . . . 6-9


Figure 6-1.  Status of State Electricity Industry Restructuring Activities (as of February 2003) 6-4
Figure 6-2.  Emissions of Hg, $SO_2$, and $NO_x$ from the Power Sector (2003) . . . . . . . . . . . . . 6-5

**SECTION 6**

**PROFILE OF THE UTILITY SECTOR**

This section discusses important aspects of the power sector as they relate to CAMR, including the types of power-sector sources affected by CAMR, and provides background on the power sector and EGUs.  In addition, this section provides some historical background on EPA regulation of and future projections for the power sector.

## 6.1    Power-Sector Overview

The functions of the power sector can be separated into three distinct operating activities: generation, transmission, and distribution.

### 6.1.1   Generation

Electricity generation is the first process in the delivery of electricity to consumers.  The process of generating electricity, in most cases, involves creating heat to rotate turbines which, in turn, create electricity.  The power sector is comprised of over 16,000 generating units, consisting of fossil-fuel fired units, nuclear units, and hydroelectric and renewable sources dispersed throughout the country (see Table 6-1).

**Table 6-1.  Existing Electricity Generating Capacity by Energy Source, 2002**

| Energy Source | Number of Generators | Generator Nameplate Capacity (MW) |
|---|---|---|
| Coal | 1,566 | 338,199 |
| Petroleum | 3,076 | 43,206 |
| Natural Gas | 2,890 | 194,968 |
| Dual Fired | 2,974 | 180,174 |
| Other Gases | 104 | 2,210 |
| Nuclear | 104 | 104,933 |
| Hydroelectric | 4,157 | 96,343 |
| Other Renewables | 1,501 | 18,797 |
| Other | 41 | 756 |
| **Total** | **16,413** | **979,585** |

Source:  EIA

These electric-generating sources provide electricity for commercial, industrial, and residential uses, each of which consumes roughly one-third of the total electricity produced (see Table 6-2).

**Table 6-2.  Total U.S. Electric Power Industry Retail Sales in 2003 (Billion kWh)**

|  | N | % |
|---|---|---|
| Residential | 1,280 | 37% |
| Commercial | 1,119 | 32% |
| Industrial | 991 | 28% |
| Other | 109 | 3% |
| **All Sectors** | **3,500** | **100%** |

Source:  EIA

In 2003, electric-generating sources produced 3,848 billion kWh to meet electricity demand.  Roughly 70 percent of this electricity was produced through the combustion of fossil fuels, primarily coal and natural gas, with coal accounting for more than half of the total (see Table 6-3).

**Table 6-3.  Electricity Net Generation in 2003 (billion kWh)**

|  | N | % |
|---|---|---|
| Coal | 1,970 | 51% |
| Petroleum | 118 | 3% |
| Natural Gas | 629 | 16% |
| Other Gases | 11 | 0.3% |
| Nuclear | 764 | 20% |
| Hydroelectric | 275 | 7% |
| Other | 81 | 2% |
| **Total** | **3,848** | **100%** |

Source:   EIA

Note:    Retail sales and net generation may not correspond exactly because net generation data may include net exported electricity and loss of electricity.

Coal-fired generating units typically supply "base-load" electricity, which means these units operate continuously throughout the day.  Coal-fired generation, along with nuclear generation, meet the part of  electricity demand that is relatively constant.  Gas-fired generation, however, typically supplies "peak" power, when there is increased demand for electricity (e.g., when businesses operate throughout the day or when people return home from work and run appliances and heating/air-conditioning, versus late at night or very early morning when demand for electricity is reduced).

### 6.1.2   Transmission

Transmission is the term used to describe the movement of electricity, through use of high voltage lines, from electric generators to substations where power is stepped down for local distribution.  Transmission systems have been traditionally characterized as a collection of independently operated networks or grids interconnected by bulk transmission interfaces.

Within a well-defined service territory, the regulated utility has historically had responsibility for all aspects of developing, maintaining, and operating transmission of electricity.  These responsibilities typically included system planning and expanding, maintaining power quality and stability, and responding to failures.

### 6.1.3   Distribution

Distribution of electricity involves networks of smaller wires and substations that take the higher voltage from the transmission system and step it down to lower levels to match the needs of customers.  The transmission and distribution system is the classic example of a natural monopoly because it is not practical to have more than one set of lines running from the electricity-generating sources to neighborhoods or from the curb to the house.

Transmission and distribution have been considered differently than generation in current efforts to restructure the industry.  Transmission has generally been developed by the larger vertically integrated utilities that typically operate generation and distribution networks.  Distribution is handled by a large number of utilities that often only sell electricity.  Electricity restructuring has focused primarily on converting the industry to fully compete the sale of electricity production or generation and not the transmission or distribution of electricity.  The restructuring of the industry is, in large part, the separating of generation assets from the transmission and distribution assets into separate economic entities in many state efforts.  Transmissions and distribution remain price regulated throughout the country based on the cost of service.

## 6.2   Deregulation and Restructuring

The ongoing process of deregulation of wholesale and retail electric markets is changing the structure of the electric power industry.  In addition to reorganizing asset management between companies, deregulation is aimed at the functional unbundling of generation, transmission, distribution, and ancillary services the power sector has historically provided to competitors in the generation segment of the industry.

Beginning in the 1970s, government policy shifted against traditional regulatory approaches and in favor of deregulation for many important industries, including transportation, communications, and energy, which were all thought to be natural monopolies (prior to 1970) that warranted governmental control of pricing.  Some of the primary drivers for deregulation of electric power included the desire for more efficient investment choices, the possibility of lower electric rates, reduced costs of combustion turbine technology that opened the door for more companies to sell power, and complexity of monitoring utilities' cost of service and establishing cost-based rates for various customer classes (see Figure 6-1).  The pace of restructuring in the

electric power industry slowed significantly in response to market volatility and financial turmoil associated with bankruptcy filings of key energy companies in California.  By the end of 2001, restructuring had either been delayed or suspended in eight states that previously enacted legislation or issued regulatory orders for its implementation.  Another 18 other states that had seriously explored the possibility of deregulation in 2000 reported no legislative or regulatory activity in 2001 (DOE, EIA, 2003a).  Currently, there are 17 states where price deregulation of generation (restructuring) has occurred.  The effort is more or less at a standstill; however, at the federal level, there are efforts in the form of proposed legislation and proposed Federal Energy Regulatory Commission (FERC) actions aimed at reviving restructuring.  For states that have not begun restructuring efforts, it is unclear when and at what pace these efforts will proceed.

**Figure 6-1.  Status of State Electricity Industry Restructuring Activities (as of February**



**2003)**

## 6.3    Pollution and EPA Regulation of Emissions

The burning of fossil fuels, which generates about 70 percent of our electricity nationwide, results in air emissions of Hg, $SO_2$ and $NO_x$, important precursors in the formation of fine particles and ozone ($NO_x$ only).  The power sector is a major contributor of these three pollutants, and reductions of $SO_2$ and $NO_x$ emissions are critical to EPA's efforts to bring about attainment with the fine particle and ozone NAAQS through programs like CAIR, and critical to

EPA's effort under CAMR because control of SO$_2$ and NO$_x$ also can result in Hg reduction. In 2003, the power sector accounted for 40% of total nationwide Hg emissions, 67 percent of total nationwide SO$_2$ emissions and 22 percent of total nationwide NO$_x$ emissions (see Figure 6-2).

**Figure 6-2.  Emissions of Hg, SO$_2$, and NO$_x$ from the Power Sector (2003)**



Mercury emissions from the power sector come mainly from coal-fired units, and CAMR represents the first time Hg emissions from these units will be regulated. Mercury emissions can vary by coal type, especially for units with existing PM, NO$_x$, and SO$_2$ controls. In general, given the different properties of coal, these existing controls are best able to capture Hg from bituminous coals, with less capture from subbituminous and lignite coals.

## 6.4    Pollution Control Technologies

There are two primary options for reducing SO$_2$ emissions from coal-burning power plants. Units may switch from higher to lower sulfur coal, or they may use flue gas desulfurization (FGD, commonly referred to as scrubbers). According to data submitted to EPA for compliance with the Title IV Acid Rain Program, the SO$_2$ emission rates for coal-fired units varied from under 0.4 lbs/mmBtu to over 5 lbs/mmBtu depending on the type of coal combusted.

It is generally easier to switch to a coal within the same rank (e.g., bituminous or sub-bituminous) because these coals will have similar heat contents and other characteristics. Switching completely to sub-bituminous coal (which typically has a lower sulfur content) from bituminous coal is likely to require some modifications to the unit. Limited blending of sub-bituminous coal with bituminous coal can often be done with much more limited modifications.

The two most commonly used scrubber types include wet scrubbers and spray dryers. Wet scrubbers can use a variety of sorbents to capture SO$_2$ including limestone and magnesium enhanced lime. The choice of sorbent can affect the performance, size, and capital and operating costs of the scrubber. New wet scrubbers typically achieve at least 95 percent SO$_2$ removal. Spray dryers can achieve over 90 percent SO$_2$ removal.

One method of reducing $NO_x$ emissions is through the use of combustion controls (such as low $NO_x$ burners and over-fired air).  Combustion controls reduce $NO_x$ by ensuring that the combustion of coal occurs under conditions that form less $NO_x$.  Post-combustion controls reduce $NO_x$ by removing the $NO_x$ after it has been formed.  The most common post-combustion control is SCR.  SCR systems inject ammonia ($NH_3$), which combines with the $NO_x$ in the flue gas, to form nitrogen and water, and uses a catalyst to enhance the reaction.  These systems can reduce $NO_x$ by 90 percent and achieve emission rates of around 0.06 lbs $NO_x$/mmBtu.  Selective noncatalytic reduction also removes $NO_x$ by injecting ammonia, but no catalyst is used.  These systems can reduce $NO_x$ by up to 40 percent.

Hg capture can occur through existing controls and through Hg-specific control technologies.  Many power plants have existing mercury capture as a co-benefit of air pollution control technologies for $NO_x$, $SO_2$ and particulate matter (PM). This includes capture of particulate-bound mercury in PM control equipment and capture of soluble ionic Hg in wet flue gas desulfurization (FGD) systems.  Additional data have also shown that the use of SCR for $NO_x$ control enhances oxidation of Hg to the soluble ionic form, resulting in increased removal in the wet FGD system for units burning bituminous coal.  The range of Hg removal depends on the control configuration and the coal type burned, and can vary between 0 and 98 percent.  (For further discussion see *Control of Emissions from Coal-Fired Electric Utility Boilers: An Update*, EPA/Office of Research and Development, March 2005, in docket.)

Mercury-specific controls, most notably activated carbon injection (ACI), are used on municipal waste combustor (MWC) and medical waste incinerator (MWI) facilities in the U.S. and Europe. At present, ACI is the most widely studied of the mercury-specific control technologies for coal-fired power plants and shows the potential to achieve moderate-to-high levels of mercury control.  EPA's modeling provides ACI as a compliance choice and assumes a 90% removal with the addition of a fabric filter PM control device.

For more detail on the cost and performance assumptions of pollution controls, see the documentation for the Integrated Planning Model (IPM), a dynamic linear programming model that EPA uses to examine air pollution control policies for Hg, $SO_2$ and $NO_x$ throughout the contiguous United States for the entire power system.  Documentation for IPM can be found at www.epa.gov/airmarkets/epa-ipm.

## 6.5     Regulation of the Power Sector

At the federal level, efforts to reduce emissions of $SO_2$ and $NO_x$ have been occurring since 1970.  Policy makers have recognized the need to address these harmful emissions, and incremental steps have been taken to ensure that the country meets air quality standards.

Federal regulation of $SO_2$ and $NO_x$ emissions at power plants began with the 1970 Clean Air Act.  The Act required the Agency to develop performance standards for a number of source categories including coal-fired power plants.  The first New Source Performance Standards (NSPS) for power plants (subpart D) required new units to limit $SO_2$ emissions either by using scrubbers or by using low sulfur coal.  $NO_x$ was required to be limited through the use of low $NO_x$ burners.  A new NSPS (subpart Da), promulgated in 1978, tightened the standards for $SO_2$ requiring scrubbers on all new units.

The 1990 Clean Air Act Amendments (CAAA) placed a number of new requirements on power plants. The Acid Rain Program, established under Title IV of the 1990 CAAA, requires major reductions of $SO_2$ and $NO_x$ emissions. The $SO_2$ program sets a permanent cap on the total amount of $SO_2$ that can be emitted by electric power plants in the contiguous United States at about one-half of the amount of $SO_2$ these sources emitted in 1980. Using a market-based cap-and-trade mechanism allows flexibility for individual combustion units to select their own methods of compliance. The program uses a more traditional approach to $NO_x$ emission limitations for certain coal-fired electric utility boilers, with the objective of achieving a 2 million ton reduction from projected $NO_x$ emission levels that would have been emitted in 2000 without implementation of Title IV.

The Acid Rain Program comprises two phases for $SO_2$ and $NO_x$. Phase I applied primarily to the largest coal-fired electric generation sources from 1995 through 1999 for $SO_2$ and from 1996 through 1999 for $NO_x$. Phase II for both pollutants began in 2000. For $SO_2$, the Acid Rain Program applies to thousands of combustion units generating electricity nationwide; for $NO_x$ it generally applies to affected units that burned coal during 1990 through 1995. The Acid Rain Program has led to the installation of a number of scrubbers on existing coal-fired units as well as significant fuel switching to lower sulfur coals. Under the $NO_x$ provisions of Title IV, most existing coal-fired units were required to install low $NO_x$ burners.

The CAAA also placed much greater emphasis on control of $NO_x$ to reduce ozone nonattainment. This has led to the formation of several regional $NO_x$ trading programs as well as an intrastate $NO_x$ trading program in Texas. The Ozone Transport Commission (a group of northeast states) created an interstate $NO_x$ trading program that began in 1999. In 1998, EPA promulgated regulations (the $NO_x$ SIP Call) that required 21 states in the eastern United States and the District of Columbia to reduce $NO_x$ emissions that contributed to nonattainment in downwind states using the cap-and-trade approach. This program began in the summer of 2004 and has resulted in the installation of significant amounts of selective catalytic reduction.

In addition to federal programs to reduce emissions of $SO_2$ and $NO_x$, several states have also taken action. Several states, like North Carolina, New York, Connecticut, and Massachusetts, have moved to control these emissions to address nonattainment. To date, there have not been any regulations on the utility sector to control mercury emissions.

## 6.6    Cap and Trade

The cap-and-trade system under CAMR, which is largely based on the Acid Rain Trading Program and the $NO_x$ SIP Call, provides the power sector with considerable flexibility in meeting the emission reduction requirements. Cap-and-trade regulation is an extremely efficient tool that allows for environmental goals to be met in the most cost-effective manner, because firms have economic incentives to achieve emissions reductions where they are cheapest. The system allows for various compliance options, with each firm determining what option works best given certain costs, such as fuel costs or costs of pollution controls.

In addition to the pollution control options discussed above, companies can comply with cap-and-trade programs through more efficient use of the generating fleet to take advantage of generating sources that emit less and run more efficiently, commonly referred to as dispatch

changes.  By shifting generation to these more efficient units, the power sector is reducing the cost of compliance because there is a cost to pollute under a cap.  Another option is purchasing additional allowances to cover emissions.

## 6.7     Clean Air Interstate Rule

The CAIR is a new regulatory action that addresses air quality problems and improves public health and the environment by substantially reducing emissions of $SO_2$, $NO_x$, and Hg. The final CAIR requires annual $SO_2$ and $NO_x$ reductions in 23 States and the District of Columbia, and also requires ozone season $NO_x$ reductions in 25 States and the District of Columbia.  Many of the CAIR States are affected by both the annual $SO_2$ and $NO_x$ reduction requirements and the ozone season $NO_x$ requirements.  CAIR allows affected states to adopt a two-phased cap-and-trade program to meet emissions reduction requirements of roughly 73 percent for $SO_2$ and 61 percent for $NO_x$ from 2003 levels.

The rule would affect roughly 3,000 fossil fuel-fired units with a nameplate capacity greater than 25 MW.  These sources accounted for roughly 90 percent of nationwide $SO_2$ emissions and 78 percent of nationwide $NO_x$ emissions in 2003 (see Table 6-4).

**Table 6-4.  Emissions of $SO_2$ and $NO_x$ in 2003 and Percentage of Emissions in the CAIR Affected Region (tons)**

|  | $SO_2$ | $NO_x$ |
|---|---|---|
| CAIR Region | 9,501,201 | 3,251,980 |
| Nationwide | 10,595,069 | 4,165,026 |
| CAIR Emissions as % of Nationwide Emissions | 90% | 78% |

Source:  EPA.
Note: Region includes the States of Alabama, Connecticut, District of Columbia, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wisconsin

EPA modeling[1] shows that coal-fired and oil/gas-fired generation will continue to play an important part of the electricity generating portfolio in the United States.  Electricity demand is anticipated to grow by 1.6 percent a year, and total electricity demand is projected to be 4,198 billion kWh by 2010.  Table 6-5 shows current electricity generation and projected levels in 2010 and 2015 using EPA modeling.

**Table 6-5.  Current Electricity Net Generation and EPA Projections for 2010 and 2015 (billion kWh)**

|  | **2003** | **2010** | **2015** |
|---|---|---|---|
| Coal | 1,970 | 2,198 | 2,242 |
| Oil/Gas | 758 | 777 | 1,026 |
| Other | 1,119 | 1,223 | 1,235 |
| **Total** | **3,848** | **4,198** | **4,503** |

Source:   2003 data is from EIA.  Projections are from the Integrated Planning Model run by EPA.

---

[1]EPA uses the IPM to make power-sector forecasts about emissions, costs, and other key factors of the power sector. Industry projections presented here are from EPA's base case scenario.  For more information about IPM, see http://www.epa.gov/airmarkets/epa-ipm/index.html.

CHAPTER 7   COST AND ENERGY IMPACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-1
7.1   Modeling Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-1
7.2   Projected Hg Emissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-3
7.3   Projected SO₂ and NOₓ Emissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-5
7.4   Projected Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-6
7.5   Projected Control Technology Retrofits . . . . . . . . . . . . . . . . . . . . . . . . . 7-8
7.6   Projected Generation Mix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-9
7.7   Projected Capacity Additions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-9
7.8   Projected Coal Production for the Electric Power Sector . . . . . . . . . . . . . 7-10
7.9   Projected Retail Electricity Prices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-11
7.10  Projected Fuel Price Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-13
7.11  Social Cost Calculations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-13
7.12  Limitations of Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-14
7.13  Significant Energy Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-18
7.14  Sensitivity Analysis on Assumptions for Hg Control Costs . . . . . . . . . . . 7-18
7.15  Sensitivity Analysis on Assumptions for Natural Gas Prices and Electricity
      Growth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-23
7.16  Small Entity Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-28
      7.16.1  Identification of Small Entities . . . . . . . . . . . . . . . . . . . . . . . . . . 7-30
      7.16.2  Overview of Analysis and Results . . . . . . . . . . . . . . . . . . . . . . . . 7-31
      7.16.3  Summary of Small Entity Impacts . . . . . . . . . . . . . . . . . . . . . . . . 7-36
7.17  Unfunded Mandates Reform Act (UMRA) Analysis . . . . . . . . . . . . . . . . 7-37
      7.17.1  Identification of Government-Owned Entities . . . . . . . . . . . . . . . 7-38
      7.17.2  Overview of Analysis and Results . . . . . . . . . . . . . . . . . . . . . . . . 7-39
      7.17.3  Summary of Government Entity Impacts . . . . . . . . . . . . . . . . . . . 7-44
7.18  List of IPM Runs in Support of CAMR . . . . . . . . . . . . . . . . . . . . . . . . . 7-45

**Tables**

Table 7-1.  CAMR Options Annual Emissions Caps (Tons) . . . . . . . . . . . . . . . . . . . . . . . . 7-1
Table 7-2.  CAIR Emissions Caps (Million Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-1
Table 7-3.  Projected Emissions of Hg with the Old Base Caseᵃ, New Base Case, and with
            CAMR Options (Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-5
Table 7-4.  Projected Speciated Emissions of Hg in 2020 with New Base Case (CAIR) and
            CAMR Options (Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-5
Table 7-5.  Projected Emissions of SO₂ with the Old Base Caseᵃ, New Base Case (CAIR), and
            with CAMR Options (Million Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-6
Table 7-6.  Projected Emissions of NOx with the Old Base Caseᵃ, New Base Case (CAIR), and
            with CAMR Options (Million Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-6
Table 7-7.  Annualized National Private Compliance Cost and Present Value Cost ($1999) . . 7-7
Table 7-8.  Marginal Cost of Hg, SO₂, and NOx Reductions with CAMR Options ($1999) . . 7-7
Table 7-9.  Pollution Controls by Technology with the Old Base Case, New Base Case (CAIR),
            and with CAMR Options (GW) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8
Table 7-10.  Generation Mix with the Old Base Case, with New Base Case (CAIR), and with
             CAMR Options (Thousand GWhs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-9
Table 7-11.  Total Coal and Natural Oil/Gas-Fired Capacity by 2020 (GW) . . . . . . . . . . . . 7-10
Table 7-12.  Coal Production for the Electric Power Sector with the Old Base Case, New Base
             Case (CAIR) , and with CAMR Options (Million Tons) . . . . . . . . . . . . . . . . . . 7-10

Table 7-13.  Projected National Retail Electricity Prices with the Old Base Case, New Base Case (CAIR), and CAMR Options (Mills/kWh) ($1999) . . . . . . . . . . . . . . . . . . . . . . . . . 7-11

Table 7-14.  Retail Electricity Prices by NERC Region with the Old Base Case, New Base Case (CAIR), and with CAMR Options (Mills/kWh) ($1999) . . . . . . . . . . . . . . . . . . . . . 7-12

Table 7-15.  Henry Hub Natural Gas Prices and Average Delivered Coal Prices with the Old Base Case, New Base Case (CAIR), and with CAMR Options (1999$/mmBtu) . . . . 7-13

Table 7-16.  Projected Emissions of Hg with New Base Case (CAIR) and CAMR, without and with Selected Technological Advances (Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-19

Table 7-17.  Projected Emissions of $SO_2$ with New Base Case (CAIR) and CAMR, without and with Selected Technological Advances (Million Tons) . . . . . . . . . . . . . . . . . . . . . . . 7-19

Table 7-18.  Projected Emissions of NOx  with the New Base Case (CAIR) and CAMR without and with Selected Technological Advances (Million Tons) . . . . . . . . . . . . . . . . . . . . 7-20

Table 7-19.  Annualized Private Compliance Cost and Present Value Cost Incremental to the New Base Case (CAIR) ($1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-20

Table 7-20.  Marginal Cost of Hg, $SO_2$, and $NO_x$ Reductions with CAMR without and with Selected Technological Advances ($1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-20

Table 7-21.  Pollution Controls by Technology with the New Base Case (CAIR), and CAMR without and with Selected Technological Advances (GW) . . . . . . . . . . . . . . . . . . . . . 7-21

Table 7-22.  Generation Mix with the Old Base Case, the New Base Case (CAIR), and with CAMR without and with Selected Technological Advances (Thousand GWhs) . . . . 7-21

Table 7-23.  Total Coal and Natural Oil/Gas-Fired Capacity by 2020 (GW) . . . . . . . . . . . . . 7-22

Table 7-24.  Coal Production for the Electric Power Sector with the Old Base Case, New Base Case (CAIR) , and with CAMR without and with Selected Technological Advances (Million Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-22

Table 7-25.  Retail Electricity Prices by NERC Region with the Old Base Case, New Base Case (CAIR), and with CAMR without and with Selected Technological Advances (Mills/kWh) ($1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-23

Table 7-26.  Projected Emissions of Hg for the New Base Case (CAIR) and CAMR with EPA and EIA Assumptions for Natural Gas Prices and Electric Growth (Tons) . . . . . . . . 7-24

Table 7-27.  Projected Nationwide Emissions of $SO_2$ and $NO_x$ under the New Base Case  (CAIR) and CAMR with EPA and EIA Assumptions for Natural Gas and Electric Growth (Million Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-25

Table 7-28.  Annualized Cost and Present Value Cost Incremental to the New Base Case (CAIR) with EPA and EIA Assumptions for Natural Gas Prices and Electric Growth (Billion $1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-25

Table 7-29.  Marginal Cost of $SO_2$ and $NO_x$ Reductions under the New Base Case (CAIR) and CAMR with EPA and EIA Assumptions for Natural Gas and Electric Growth ($/ton, in $1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-26

Table 7-30.  Pollution Controls under the New Base Case (CAIR) with EPA and EIA Assumptions for Natural Gas and Electricity Growth (GWs) . . . . . . . . . . . . . . . . . 7-26

Table 7-31.  Generation Mix under the New Base Case (CAIR) and CAMR with EPA and EIA Assumptions for Natural Gas and Electric Growth (Thousand GWhs) . . . . . . . . . . . 7-27

Table 7-32.  Coal Production for the Electric Power Sector under the New Base Case (CAIR) and CAMR with EPA and EIA Assumptions for Natural Gas and Electricity Growth (Million Tons) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-27

Table 7-33.  Retail Electricity Prices by NERC Region for the Base Case (No Further Controls), CAIR, and CAMR with EPA and EIA Assumptions for Natural Gas and Electricity Growth (Mills/kWh) ($1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-28

Table 7-34.  Potentially Regulated Categories and Entities[a] . . . . . . . . . . . . . . . . . . . . . . . . .   7-29
Table 7-35.  Projected Impact of CAMR on Small Entities  . . . . . . . . . . . . . . . . . . . . . . . . .   7-31
Table 7-36.  Summary of Distribution of Economic Impacts of CAIR on Small Entities  . . .   7-35
Table 7-37.  Incremental Annualized Costs under CAMR relative to CAIR, Summarized by
            Ownership Group and Cost Category ($1,000,000)  . . . . . . . . . . . . . . . . . . . . . .   7-36
Table 7-38.  Summary of Potential Impacts on Government Entities under CAIR  . . . . . . . .   7-38
Table 7-39.  Distribution of Economic Impacts on Government Entities under CAMR  . . . .   7-43
Table 7-40.  Incremental Annualized Costs under CAMR Relative to CAIR Summarized by
            Ownership Group and Cost Category ($1,000,000)  . . . . . . . . . . . . . . . . . . . . . .   7-43
Table 7-41.  Listing of Runs from the Integrated Planning Model Used in Analyses Done in
            Support of the CAMR Final Rule Analyses  . . . . . . . . . . . . . . . . . . . . . . . . . . .   7-45

**Figures**

Figure 7-1.  Projected Mercury Emissions in 2020 by State . . . . . . . . . . . . . . . . . . . . . . . . .   7-4
Figure 7-2.  NERC Power Regions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7-11

# SECTION 7

# COST AND ENERGY IMPACTS

This chapter reports the cost, economic, and energy impact analysis performed for CAMR.  EPA used the IPM, developed by ICF Consulting, to conduct its analysis.  IPM is a dynamic linear programming model that can be used to examine air pollution control policies for Hg, $SO_2$, and $NO_x$ throughout the contiguous United States for the entire power system. Documentation for IPM can be found at www.epa.gov/airmarkets/epa-ipm.

## 7.1    Modeling Background

The analysis presented here covers the electric power sector, a major source of Hg, $SO_2$, and $NO_x$ emissions nationwide.  CAMR requires that states control electric generation units fueled by coal through state Hg emissions reduction requirements.  EPA has assumed that states implement those reductions through a cap-and-trade program.  This analysis also assumes that electric generating units will also comply with CAIR requirements through a cap-and-trade program.  For mercury, the analysis examines three control options, all implemented in multiple phases.  See Table 7-1 for total annual Hg emissions caps for CAMR options examined.  For $SO_2$ and $NO_x$, EPA modeled the requirements of the final CAIR.  This modeling includes regionwide annual SO2 and $NO_x$ caps on the 23 States and the District and Columbia that are required to make annual reductions, and includes a regionwide ozone season $NO_x$ cap on the 25 States and the District of Columbia required to make ozone season reductions.  See Table 7-2 for total annual emissions caps under CAIR used in EPA modeling.

**Table 7-1.  CAMR Options Annual Emissions Caps (Tons)**

|  | 2010–2014 | 2015-2017 | 2018–Thereafter |
|---|---|---|---|
| Option 1 (38/15) | 38 | 38 | 15 |
| Option 2 (15/15) | 38 | 15 | 15 |
| Option 3 (24/15) | 38 | 24 | 15 |

**Table 7-2.  CAIR Emissions Caps (Million Tons)**

|  | 2010–2014 | 2015–Thereafter |
|---|---|---|
| $SO_2$ | 3.6 | 2.5 |
| $NO_x$ (Annual) | 1.5 | 1.3 |
| $NO_x$ (Summer) | 0.6 | 0.5 |

The final CAMR requires annual Hg reductions in 50 States and the District of Columbia. The final CAMR will require a 38 ton cap in 2010 and a 15 ton cap in 2018.  Using IPM, EPA modeled the cost and emissions impacts of three Hg control options to aid in its decision for the final CAMR.  This chapter will provide the analysis conducted for all three options.  IPM output files for the model runs used in CAMR analyses are available in the CAMR docket.

The modeling conducted for this analysis assumes that sources are complying with the final CAIR control strategy along with a CAMR control strategy.  To provide incremental comparison, the CAIR modeling results are also presented.  The CAIR IPM modeling includes regionwide annual $SO_2$ and $NO_x$ caps on the 23 States and the District of Columbia for States required to make annual reductions, and includes a regionwide ozone season $NO_x$ cap on the 25 States and the District of Columbia required to make ozone season reductions.  EPA modeled the final CAIR $NO_x$ strategy as an annual $NO_x$ cap with a nested, separate ozone season $NO_x$ cap.

CAMR was designed to achieve significant Hg emissions reductions from the power sector in a highly cost-effective manner.  EPA analysis has found that the most efficient method to achieve the emissions reduction targets is through a cap-and-trade system that States have the option of adopting.  States, in fact, can choose not to participate in the optional cap-and-trade program.  However, EPA believes that a cap-and-trade system for the power sector is the best approach for reducing Hg emissions.  As a result, EPA modeling has focused on the cap-and-trade approach for meeting the CAMR requirements.  The modeling done with IPM assumes a nation-wide Hg cap and trade system on the power sector for the 48 contiguous states.  However, EPA recognizes that states may use a different approach for reducing emissions, given that CAMR allows States to choose how they will meet their Hg emissions budget through reductions from utility units.  States can elect not to participate in the federal trading program, and pursue reductions through other means including facility limits and trading limited to inside the state borders.  This would likely impact the cost estimate of the program.

IPM has been used for evaluating the economic and emission impacts of environmental policies for over a decade.  The model's base case incorporates title IV of the Clean Air Act (the Acid Rain Program), the $NO_x$ SIP Call, various New Source Review (NSR) settlements, and several state rules affecting emissions of $SO_2$ and $NO_x$ that were finalized prior to April of 2004. The NSR settlements include agreements between EPA and Southern Indiana Gas and Electric Company (Vectren), Public Service Electric & Gas, Tampa Electric Company, We Energies (WEPCO), Virginia Electric Power Company (Dominion), and Santee Cooper.  IPM also includes various current and future state programs in Connecticut, Illinois, Maine, Massachusetts, Minnesota, New Hampshire, North Carolina, New York, Oregon, Texas, and Wisconsin.  IPM includes state rules that have been finalized and/or approved by a state's legislature or environmental agency.  The base case is used to provide a reference point to compare environmental policies and assess their impacts and does not reflect a future scenario that EPA predicts will occur.

The economic modeling presented in this chapter has been developed for specific analyses of the power sector.  Thus, the model has been designed to reflect the industry as accurately as possible.  As a result, EPA has used discount rates in IPM that are appropriate for the various types of investments and other costs that the power sector incurs.  The discount rates used in IPM may differ from discount rates used in other EPA analyses done for CAMR,

particularly the discount rates used in the benefits analysis that are assumed to be social discount rates. EPA uses the best available information from utilities, financial institutions, debt rating agencies, and government statistics as the basis for the discount rates used for power sector modeling. These discount rates have undergone review by the power sector and the Energy Information Administration. EPA's discount rate approach has not been challenged in court.

EPA's modeling is based on its best judgment for various input assumptions that are uncertain, particularly assumptions for Hg control technology, future fuel prices and electricity demand growth. To some degree, EPA addresses the uncertainty surrounding these assumptions through its sensitivity analysis provided in the chapter. Other uncertainties, like states choosing not to participate in the trading program, would also impact the cost estimate.

More detail on IPM can be found in the model documentation, which provides additional information on the assumptions discussed here as well as all other assumptions and inputs to the model (www.epa.gov/airmarkets/epa-ipm).

## 7.2    Projected Hg Emissions

Because excess emission reductions are projected to be banked under the first phase of the Hg program, emissions in the second (or third phase) will be initially higher than the cap that are required for CAMR. As shown in Figure 7-1, the results of EPA modeling of CAMR show state-by-state emissions in 2020 for some states do change significantly among CAMR options. However, for some states, the emissions projections among options follow the same profile as the national emission projections in 2020.



**Figure 7-1.  Projected Mercury Emissions in 2020 by State**

Table 7-3 provides projected total Hg emissions levels and Table 7-4 provides projected speciated Hg emissions levels in 2020.  EPA projections of Hg emissions are based on 1999 Hg ICR emission test data and other more recent testing conducted by EPA, DOE, and industry participants (for further discussion see *Control of Emissions from Coal-Fired Electric Utility Boilers: An Update*, EPA/Office of Research and Development, March 2005, in docket).  That emissions testing has provided a better understanding of Hg emissions and their capture in pollution control devices.  Mercury speciates into three basic forms, ionic, elemental, and particulate.  In general, ionic Hg compounds are more readily adsorbed than elemental Hg.  The presence of chlorine compounds (which tend to be higher for bituminous coals) results in increased ionic mercury.

Overall the 1999 Hg ICR data revealed higher levels of Hg capture for bituminous coal-fired plants as compared to low-rank coal-fired plants, large ranges of Hg capture in existing plants, higher levels of Hg capture in fabric filters (FF) compared to electrostatic precipitators (ESPs), and a significant capture of ionic Hg in wet $SO_2$ scrubbers.  Additional Hg testing indicates that for bituminous coals SCR has the ability to convert elemental Hg to ionic Hg and thus allow easier capture in a wet scrubber.  This understanding of Hg capture was incorporated into EPA modeling assumptions (see IPM documentation, Hg EMFs) and is the basis for projections of Hg co-benefits from installation of scrubbers and SCR under CAIR.

**Table 7-3.  Projected Emissions of Hg with the Old Base Case[a], New Base Case, and with CAMR Options (Tons)**

|  | 2010 | 2015 | 2020 |
|---|---|---|---|
| Old Base Case | 46.6 | 45.0 | 46.2 |
| New Base Case: CAIR | 38.0 | 34.4 | 34.0 |
| Option 1 (38/15) | 31.3 | 27.9 | 24.3 |
| Option 2 (15/15) | 30.9 | 25.7 | 20.1 |
| Option 3 (24/15) | 31.1 | 27.4 | 21.1 |

Note:  The emissions projections are for coal-fired electric power units greater than 25 MW.
[a] Base case includes Title IV Acid Rain Program, $NO_x$ SIP Call, and State rules finalized before March 2004.
Source:  Integrated Planning Model run by EPA.

**Table 7-4.  Projected Speciated Emissions of Hg in 2020 with New Base Case (CAIR) and CAMR Options (Tons)**

|  | Elemental Hg | Ionic Hg | Particulate Hg | Total |
|---|---|---|---|---|
| 1999 | 26.2 | 20.6 | 1.7 | 48.6 |
| New Base Case: CAIR | 25.8 | 7.9 | 0.8 | 34.4 |
| Option 1 (38/15) | 17.6 | 6.6 | 0.8 | 25.0 |
| Option 2 (15/15) | 14.3 | 5.7 | 0.8 | 20.9 |
| Option 3 (24/15) | 15.1 | 5.9 | 0.8 | 21.8 |

Note:  Numbers may not add due to rounding and include un affected units.  The emissions data presented here are EPA modeling results and include some unaffected units.  1999 emissions from 1999 Hg ICR estimate.

## 7.3    Projected $SO_2$ and $NO_x$ Emissions

The addition of Hg cap does not significantly affect $SO_2$ and NOx emissions when compared to CAIR alone.  National $SO_2$ emissions are somewhat lower in 2020 under the CAMR scenarios because sources are projected to install more scrubbers to achieve compliance for both CAIR and CAMR.  Because of excess emission reductions are projected to be banked under the title IV Acid Rain Program that sources will be allowed to use under the requirements of CAIR, emissions in 2010 and 2015 will be higher than the caps that are required for CAIR. Tables 7-5 and 7-6  provide projected emissions levels for $SO_2$ and NOx.

**Table 7-5.  Projected Emissions of $SO_2$ with the Old Base Case[a], New Base Case (CAIR), and with CAMR Options (Million Tons)**

|  | 2010 | | 2015 | | 2020 | |
|---|---|---|---|---|---|---|
|  | Nationwide | CAIR Region | Nationwide | CAIR Region | Nationwide | CAIR Region |
| Old Base Case | 9.7 | 8.8 | 8.9 | 8.0 | 8.6 | 7.7 |
| New Base Case: CAIR | 6.1 | 5.1 | 5.0 | 4.0 | 4.3 | 3.3 |
| Option 1 (38/15) | 6.1 | 5.1 | 4.9 | 4.0 | 4.2 | 3.3 |
| Option 2 (15/15) | 6.1 | 5.1 | 4.9 | 3.9 | 4.2 | 3.3 |
| Option 3 (24/15) | 6.1 | 5.1 | 4.9 | 4.0 | 4.2 | 3.3 |

Note: Emissions projections are for fossil-fired electric power sector.
[a]  Base case includes Title IV Acid Rain Program, $NO_x$ SIP Call, and State rules finalized before March 2004.
Source:  Integrated Planning Model run by EPA.

**Table 7-6.  Projected Emissions of NOx with the Old Base Case[a], New Base Case (CAIR), and with CAMR Options (Million Tons)**

|  | 2010 | | 2015 | | 2020 | |
|---|---|---|---|---|---|---|
|  | Nationwide | CAIR Region | Nationwide | CAIR Region | Nationwide | CAIR Region |
| Old Base Case | 3.6 | 2.8 | 3.7 | 2.8 | 3.7 | 2.8 |
| New Base Case: CAIR | 2.5 | 1.5 | 2.2 | 1.3 | 2.2 | 1.3 |
| Option 1 (38/15) | 2.4 | 1.5 | 2.2 | 1.3 | 2.2 | 1.3 |
| Option 2 (15/15) | 2.4 | 1.5 | 2.2 | 1.3 | 2.2 | 1.3 |
| Option 3 (24/15) | 2.4 | 1.5 | 2.2 | 1.3 | 2.2 | 1.3 |

Note:  Emissions projections are for fossil-fired electric power sector.
[a]  Base case includes Title IV Acid Rain Program, $NO_x$ SIP Call, and State rules finalized before March 2004.
Source:  Integrated Planning Model run by EPA.

## 7.4     Projected Costs

Table 7-7 provides EPA's projections of annual and present value costs incremental to CAIR.  The cost of electricity generation represents roughly one-third to one-half of total electricity costs, with transmission and distribution costs representing the remaining portion.  A better impact measure of the cost to the consumer is the impact on electricity pricing, which is shown in a later table.

The presence of an earlier cap under CAMR Option 2 (an the reduction of years of banking excess emissions) results in higher projected costs than Option 1.  CAMR Option 2 costs are projected to be the highest of the options and is reflected by the lowest projected Hg

emissions in 2020.  The intermediate cap of 24 tons under Option 3 also reduces the amount of banking of excess emissions and results in higher projected costs than Option 1.  However, because the final cap goes into place in 2018, the projected costs are lower than Option 2 and is reflected by the projected Hg emission in 2020 being higher than Option 2.

The marginal costs for Hg, $SO_2$ and $NO_x$ can be found in Table 7-8.  EPA projects a reduction in the $SO_2$ allowance price and changes in the NOx allowance price under CAMR when compared to CAIR alone.  The changes in $SO_2$ and NOx allowance prices are due to the different set of costs faced by sources under CAMR.  In th case of $SO_2$, the ability to control for both Hg and $SO_2$ effectively through scrubbers results in marginal cost of $SO_2$ being reflected in th Hg allowance price such that $SO_2$ allowance price falls.  In th case of NOx, because SCR is an effective Hg control when combined with a scrubber, facilities choose to control different units than they would in th absence of a cap on Hg emissions.  Sources will choose to control unit where they can install a combination of scrubbers and SCR to achieve both mercury and NOx reductions.

**Table 7-7.  Annualized National Private Compliance Cost and Present Value Cost ($1999)**

| Cost (billions) | 2010 | 2015 | 2020 | Present value (2007-2025) |
|---|---|---|---|---|
| Option 1 (38/15) | $0.16 | $0.10 | $0.75 | $3.9 |
| Option 2 (15/15) | $0.16 | $0.36 | $1.04 | $6.0 |
| Option 3 (24/15) | $0.16 | $0.18 | $1.04 | $5.2 |

Note: Annual incremental costs of CAIR are $2.4 billion in 2010, $3.6 billion in 2015, and $4.4 billion in 2020, present value (2007-2025) is $41.1 billion.
Note:  Numbers rounded to the nearest ten million for annualized cost.
Source:  Integrated Planning Model run by EPA.

**Table 7-8.  Marginal Cost of Hg, $SO_2$, and NOx Reductions with CAMR Options ($1999)**

| | | 2010 | 2015 | 2020 |
|---|---|---|---|---|
| New Base Case: CAIR | SO₂ ($/ton) | $800 | $1,000 | $1,300 |
| | NOx ($/ton) | $1,300 | $1,600 | $1,600 |
| Option 1 (38/15) | SO₂ ($/ton) | $700 | $900 | $1,200 |
| | NOx ($/ton) | $1,200 | $1,500 | $1,300 |
| | Hg ($/lb) | $23,200 | $30,100 | $39,000 |
| Option 2 (15/15) | SO₂ ($/ton) | $700 | $900 | $1,100 |
| | NOx ($/ton) | $1,200 | $1,500 | $1,200 |
| | Hg ($/lb) | $29,000 | $37,600 | $48,700 |
| Option 3 (24/15) | SO₂ ($/ton) | $700 | $900 | $1,100 |
| | NOx ($/ton) | $1,200 | $1,500 | $1,300 |
| | Hg ($/lb) | $26,400 | $34,200 | $44,400 |

Note:  Numbers rounded to the nearest hundred for marginal cost.
Source:  Integrated Planning Model run by EPA.

Actual costs may be lower than those presented since modeling assumes no improvements in the cost of mercury control technology.  Given that this is the first time

mercury emission will be regulated at the federal level[1] for the coal-fired power sector and given the current level of research and demonstration of mercury control technologies, control cost are expected to improve over time.  For purposes of options comparisons, EPA has conservatively assumed no cost improvements in Hg control technologies.  Later, in this Chapter, EPA will present a sensitivity analysis in which we examine impact of mercury technology improvements by providing a lower cost mercury control option in future years.

## 7.5      Projected Control Technology Retrofits

Under the modeled Hg options, Hg reduction is projected to result from the installation of additional flue gas desulfurization (FGD or scrubbers) on existing coal-fired generation capacity for $SO_2$ control, additional selective catalytic reduction technology (SCR) on existing coal-fired generation capacity for $NO_x$ control, and activated carbon injection (ACI) on existing coal-fired capacity for Hg-specific control  (see Table 7-9).  In addition, during the first phase of the Hg program, some Hg banking of emissions is projected to be attributed to coal switching and dispatch changes.  Most of the $NO_x$ reductions achieved in the first phase of the rule can be attributed to the large pool of existing SCR that are used during the ozone season in the $NO_x$ SIP call region that, for relatively little additional cost, run the SCRs year-round.  Due to earlier second phase cap (Option 2) and the addition of a third phase (Option 3), less banking is projected in 2010 to 2015 timeframe and results in more ACI in 2020 as emissions approach the 15 ton cap.

**Table 7-9.  Pollution Controls by Technology with the Old Base Case, New Base Case (CAIR), and with CAMR Options (GW)**

|  | 2010 | | | 2015 | | | 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
|  | **FGD** | **SCR** | **ACI** | **FGD** | **SCR** | **ACI** | **FGD** | **SCR** | **ACI** |
| Old Base Case | 110 | 111 | -- | 116 | 119 | -- | 117 | 121 | 0.3 |
| New Base Case: CAIR | 146 | 125 | -- | 177 | 151 | -- | 198 | 153 | 0.5 |
| Option 1 (38/15) | 146 | 126 | 2 | 179 | 153 | 3 | 199 | 156 | 13 |
| Option 2 (15/15) | 146 | 127 | 3 | 179 | 153 | 12 | 198 | 156 | 38 |
| Option 3 (24/15) | 147 | 127 | 3 | 179 | 153 | 5 | 199 | 156 | 30 |

Note:     Numbers may not add due to rounding.  Base case retrofits include existing scrubbers and SCR as well as additional retrofits for the Title IV Acid Rain Program, the $NO_x$ SIP call, NSR settlements, and various state rules.

Source:    Integrated Planning Model run by EPA.

---

[1] Some states have enacted Hg reduction requirements for the coal-fired power sector.  See IPM documentation for modeled State Hg regulations.

## 7.6    Projected Generation Mix

Table 7-10 show the generation mix with CAMR.  Coal-fired generation and natural gas-fired generation are projected to remain relatively unchanged because of the phased-in nature of CAMR, which allows industry the appropriate amount of time to install the necessary pollution controls.

**Table 7-10.  Generation Mix with the Old Base Case, with New Base Case (CAIR), and with CAMR Options (Thousand GWhs)**

|  |  | 2010 | 2015 | 2020 | Change From New Base Case in 2020 |
|---|---|---|---|---|---|
| Old Base Case | Coal | 2,198 | 2,195 | 2,410 |  |
|  | Oil/Natural Gas | 777 | 1,072 | 1,221 |  |
|  | Other | 1,223 | 1,233 | 1,218 |  |
| New Base Case: CAIR | Coal | 2,165 | 2,197 | 2,384 |  |
|  | Oil/Natural Gas | 807 | 1,069 | 1,247 |  |
|  | Other | 1,217 | 1,232 | 1,217 |  |
| Option 1 (38/15) | Coal | 2,160 | 2,194 | 2,365 | -0.8% |
|  | Oil/Natural Gas | 812 | 1,072 | 1,265 | 1.5% |
|  | Other | 1,216 | 1,233 | 1,217 | 0.0% |
| Option 2 (15/15) | Coal | 2,158 | 2,191 | 2,365 | -0.8% |
|  | Oil/Natural Gas | 813 | 1,075 | 1,266 | 1.5% |
|  | Other | 1,216 | 1,233 | 1,217 | 0.0% |
| Option 3 (24/15) | Coal | 2,159 | 2,193 | 2,367 | -0.7% |
|  | Oil/Natural Gas | 812 | 1,074 | 1,263 | 1.3% |
|  | Other | 1,216 | 1,232 | 1,217 | 0.0% |

Note:    Numbers may not add due to rounding.
Source:  2003 data are from EIA: Coal - 1,970; Oil/Natural Gas - 758; Other - 1,120.  Projections are from the Integrated Planning Model run by EPA.

Under all three Hg control options modeled and relative to the new base case, no coal-fired generation is projected to be uneconomic to maintain under CAMR.

## 7.7    Projected Capacity Additions

In addition, EPA projects that future growth in electric demand will be met with a combination of new natural gas- and coal-fired capacity (see Table 7-11).

**Table 7-11.  Total Coal and Natural Oil/Gas-Fired Capacity by 2020 (GW)**

|  | Current | Old Base Case | New Base Case: CAIR | Option 1 (38/15) | Option 2 (15/15) | Option 3 (24/15) |
|---|---|---|---|---|---|---|
| Pulverized Coal | 305 | 318 | 315 | 314 | 314 | 314 |
| IGCC | 0.6 | 8 | 9 | 8 | 8 | 8 |
| Oil/Gas | 395 | 467 | 469 | 471 | 471 | 471 |

Source:   Current data are from EPA's NEEDS 2004; projections are from the Integrated Planning Model run by EPA.

## 7.8      Projected Coal Production for the Electric Power Sector

Coal production for electricity generation is expected to increase relative to current levels, with or without CAIR (see Table 7-12).  The reductions in emissions from the power sector will be met through the installation of pollution controls for Hg, $SO_2$ and $NO_x$ removal. The pollution controls can achieve up to a 95 percent $SO_2$ removal rate, which allows industry to rely more heavily on local bituminous coal in the eastern and central parts of the country that has a higher sulfur content and is less expensive to transport than western subbituminous coal.

**Table 7-12.  Coal Production for the Electric Power Sector with the Old Base Case, New Base Case (CAIR) , and with CAMR Options (Million Tons)**

| Supply Area | 2000 | 2003 | Old Base Case | | | New Base Case: CAIR | | |
|---|---|---|---|---|---|---|---|---|
|  |  |  | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 |
| Appalachia | 299 | 275 | 325 | 315 | 301 | 306 | 306 | 331 |
| Interior | 131 | 135 | 161 | 162 | 173 | 165 | 191 | 218 |
| West | 475 | 526 | 603 | 631 | 714 | 607 | 586 | 609 |
| National | 905 | 936 | 1,089 | 1,109 | 1,188 | 1,078 | 1,083 | 1,158 |

| Supply Area | Option 1 (38/15) | | | Option 2 (15/15) | | | Option 3 (38/15) | | |
|---|---|---|---|---|---|---|---|---|---|
|  | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 |
| Appalachia | 303 | 310 | 330 | 303 | 309 | 322 | 304 | 309 | 325 |
| Interior | 169 | 194 | 224 | 170 | 195 | 231 | 171 | 194 | 232 |
| West | 589 | 568 | 572 | 587 | 565 | 574 | 587 | 567 | 570 |
| National | 1,061 | 1,071 | 1,127 | 1,060 | 1,069 | 1,127 | 1,061 | 1,070 | 1,127 |

Source:   2000 and 2003 data are derived from EIA data.  All projections are from the Integrated Planning Model run by EPA.

## 7.9    Projected Retail Electricity Prices

Retail electricity prices for the U.S. are projected to increase a small amount with CAMR (see Table 7-13).  The cap-and-trade approach allows industry to meet the requirements of CAMR in the most cost-effective manner, thereby minimizing the costs passed on to consumers. Retail electricity prices by NERC region (see Figure  7-2) are provided in Table 7-14 and show small increases in retail prices for the NERC regions in the eastern part of the country.  By 2020, national retail electricity prices are projected to be roughly 0.3 percent higher with CAMR when compared to CAIR.



**Figure 7-2.  NERC Power Regions**

**Table 7-13.  Projected National Retail Electricity Prices with the Old Base Case, New Base Case (CAIR), and CAMR Options (Mills/kWh) ($1999)**

| Year | Old Base Case | New Base Case: CAIR | Option 1 (38/15) | Option 2 (15/15) | Option 3 (24/15) |
|------|---------------|---------------------|------------------|------------------|------------------|
| 2010 | 58 | 61 | 61 | 61 | 61 |
| 2015 | 61 | 64 | 65 | 65 | 65 |
| 2020 | 61 | 64 | 65 | 65 | 65 |

Source: Retail Electricity Price Model run by EPA.  2000 national electric price is 66 mills/kWh from EIA's AEO 2003.

**Table 7-14.  Retail Electricity Prices by NERC Region with the Old Base Case, New Base Case (CAIR), and with CAMR Options (Mills/kWh) ($1999)**

### Option 1

| Power Region | Primary States Included | 2000 | Base Case | | | CAIR | | | Option 1 | | | Change from CAIR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2020 |
| ECAR (1) | OH, MI, IN, KY, WV, PA | 57.4 | 51.7 | 55.2 | 56.1 | 53.7 | 58.6 | 58.0 | 53.9 | 58.7 | 58.1 | 0.2% |
| ERCOT (2) | TX | 65.1 | 57.9 | 64.4 | 62.6 | 59.4 | 64.5 | 63.3 | 59.1 | 64.9 | 63.4 | 0.1% |
| MAAC (3) | PA, NJ, MD, DC, DE | 80.4 | 59.3 | 69.4 | 72.2 | 61.0 | 72.0 | 72.7 | 61.3 | 72.1 | 72.9 | 0.2% |
| MAIN (4) | IL, MO, WI | 61.2 | 52.6 | 57.8 | 61.0 | 53.9 | 60.4 | 62.0 | 54.1 | 60.5 | 62.3 | 0.5% |
| MAPP (5) | MN, IA, SD, ND, NE | 57.4 | 52.8 | 49.3 | 47.6 | 52.9 | 49.6 | 48.0 | 53.0 | 49.6 | 48.2 | 0.5% |
| NY (6) | NY | 104.3 | 82.8 | 87.9 | 88.1 | 83.3 | 88.9 | 88.5 | 83.3 | 89.1 | 88.7 | 0.4% |
| NE (7) | VT, NH, ME, MA, CT, RI | 89.9 | 77.4 | 83.9 | 82.8 | 77.4 | 84.7 | 83.1 | 77.5 | 84.8 | 83.1 | 0.0% |
| FRCC (8) | FL | 67.9 | 71.2 | 71.3 | 69.5 | 71.7 | 72.3 | 70.5 | 71.8 | 72.3 | 70.7 | 0.3% |
| STV (9) | VA, NC, SC, GA, AL, MS, TN, AR, LA | 59.3 | 56.2 | 55.1 | 55.3 | 57.0 | 56.2 | 56.6 | 57.1 | 56.2 | 56.8 | 0.3% |
| SPP (10) | KS, OK, MO | 59.3 | 54.2 | 57.0 | 56.7 | 54.6 | 57.5 | 57.0 | 54.6 | 57.5 | 57.2 | 0.3% |
| PNW (11) | WA, OR, ID | 45.9 | 49.6 | 47.4 | 46.9 | 49.8 | 47.5 | 46.9 | 49.8 | 47.5 | 47.1 | 0.5% |
| RM (12) | MT, WY, CO, UT, NM, AZ, NV, ID | 64.1 | 63.9 | 65.2 | 64.7 | 64.1 | 65.6 | 65.4 | 64.2 | 65.6 | 65.1 | -0.4% |
| CALI (13) | CA | 94.7 | 97.1 | 98.9 | 99.3 | 97.3 | 99.1 | 99.5 | 97.3 | 99.1 | 99.7 | 0.3% |
| National | Contiguous Lower 48 States | 66.0 | 60.3 | 63.1 | 63.4 | 61.3 | 64.5 | 64.3 | 61.3 | 64.5 | 64.5 | 0.2% |

### Option 2

| Power Region | Primary States Included | 2000 | Base Case | | | CAIR | | | Option 2 | | | Change from CAIR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2020 |
| ECAR (1) | OH, MI, IN, KY, WV, PA | 57.4 | 51.7 | 55.2 | 56.1 | 53.7 | 58.6 | 58.0 | 53.9 | 58.8 | 58.1 | 0.2% |
| ERCOT (2) | TX | 65.1 | 57.9 | 64.4 | 62.6 | 59.4 | 64.5 | 63.3 | 59.1 | 64.9 | 63.4 | 0.1% |
| MAAC (3) | PA, NJ, MD, DC, DE | 80.4 | 59.3 | 69.4 | 72.2 | 61.0 | 72.0 | 72.7 | 61.3 | 72.1 | 72.9 | 0.2% |
| MAIN (4) | IL, MO, WI | 61.2 | 52.6 | 57.8 | 61.0 | 53.9 | 60.4 | 62.0 | 54.1 | 60.6 | 62.4 | 0.7% |
| MAPP (5) | MN, IA, SD, ND, NE | 57.4 | 52.8 | 49.3 | 47.6 | 52.9 | 49.6 | 48.0 | 53.0 | 49.7 | 48.3 | 0.8% |
| NY (6) | NY | 104.3 | 82.8 | 87.9 | 88.1 | 83.3 | 88.9 | 88.5 | 83.3 | 89.2 | 88.7 | 0.3% |
| NE (7) | VT, NH, ME, MA, CT, RI | 89.9 | 77.4 | 83.9 | 82.8 | 77.4 | 84.7 | 83.1 | 77.5 | 84.7 | 83.2 | 0.2% |
| FRCC (8) | FL | 67.9 | 71.2 | 71.3 | 69.5 | 71.7 | 72.3 | 70.5 | 71.7 | 72.3 | 70.7 | 0.3% |
| STV (9) | VA, NC, SC, GA, AL, MS, TN, AR, LA | 59.3 | 56.2 | 55.1 | 55.3 | 57.0 | 56.2 | 56.6 | 57.1 | 56.4 | 56.8 | 0.4% |
| SPP (10) | KS, OK, MO | 59.3 | 54.2 | 57.0 | 56.7 | 54.6 | 57.5 | 57.0 | 54.6 | 57.6 | 57.6 | 1.0% |
| PNW (11) | WA, OR, ID | 45.9 | 49.6 | 47.4 | 46.9 | 49.8 | 47.5 | 46.9 | 49.8 | 47.4 | 47.2 | 0.6% |
| RM (12) | MT, WY, CO, UT, NM, AZ, NV, ID | 64.1 | 63.9 | 65.2 | 64.7 | 64.1 | 65.6 | 65.4 | 64.2 | 65.6 | 65.0 | -0.6% |
| CALI (13) | CA | 94.7 | 97.1 | 98.9 | 99.3 | 97.3 | 99.1 | 99.5 | 97.3 | 99.1 | 99.7 | 0.3% |
| National | Contiguous Lower 48 States | 66.0 | 60.3 | 63.1 | 63.4 | 61.3 | 64.5 | 64.3 | 61.3 | 64.6 | 64.5 | 0.3% |

### Option 3

| Power Region | Primary States Included | 2000 | Base Case | | | CAIR | | | Option 3 | | | Change from CAIR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2020 |
| ECAR (1) | OH, MI, IN, KY, WV, PA | 57.4 | 51.7 | 55.2 | 56.1 | 53.7 | 58.6 | 58.0 | 53.9 | 58.8 | 58.1 | 0.2% |
| ERCOT (2) | TX | 65.1 | 57.9 | 64.4 | 62.6 | 59.4 | 64.5 | 63.3 | 59.1 | 64.9 | 63.4 | 0.1% |
| MAAC (3) | PA, NJ, MD, DC, DE | 80.4 | 59.3 | 69.4 | 72.2 | 61.0 | 72.0 | 72.7 | 61.3 | 72.1 | 72.9 | 0.2% |
| MAIN (4) | IL, MO, WI | 61.2 | 52.6 | 57.8 | 61.0 | 53.9 | 60.4 | 62.0 | 54.0 | 60.6 | 62.5 | 0.7% |
| MAPP (5) | MN, IA, SD, ND, NE | 57.4 | 52.8 | 49.3 | 47.6 | 52.9 | 49.6 | 48.0 | 53.0 | 49.7 | 48.3 | 0.7% |
| NY (6) | NY | 104.3 | 82.8 | 87.9 | 88.1 | 83.3 | 88.9 | 88.5 | 83.3 | 89.2 | 88.7 | 0.3% |
| NE (7) | VT, NH, ME, MA, CT, RI | 89.9 | 77.4 | 83.9 | 82.8 | 77.4 | 84.7 | 83.1 | 77.5 | 84.8 | 83.1 | 0.0% |
| FRCC (8) | FL | 67.9 | 71.2 | 71.3 | 69.5 | 71.7 | 72.3 | 70.5 | 71.8 | 72.3 | 70.7 | 0.3% |
| STV (9) | VA, NC, SC, GA, AL, MS, TN, AR, LA | 59.3 | 56.2 | 55.1 | 55.3 | 57.0 | 56.2 | 56.6 | 57.1 | 56.3 | 56.8 | 0.4% |
| SPP (10) | KS, OK, MO | 59.3 | 54.2 | 57.0 | 56.7 | 54.6 | 57.5 | 57.0 | 54.6 | 57.5 | 57.5 | 0.7% |
| PNW (11) | WA, OR, ID | 45.9 | 49.6 | 47.4 | 46.9 | 49.8 | 47.5 | 46.9 | 49.8 | 47.4 | 47.2 | 0.6% |
| RM (12) | MT, WY, CO, UT, NM, AZ, NV, ID | 64.1 | 63.9 | 65.2 | 64.7 | 64.1 | 65.6 | 65.4 | 64.2 | 65.6 | 65.1 | -0.5% |
| CALI (13) | CA | 94.7 | 97.1 | 98.9 | 99.3 | 97.3 | 99.1 | 99.5 | 97.3 | 99.1 | 99.8 | 0.3% |
| National | Contiguous Lower 48 States | 66.0 | 60.3 | 63.1 | 63.4 | 61.3 | 64.5 | 64.3 | 61.3 | 64.6 | 64.5 | 0.3% |

Source: Retail Electricity Price Model run by EPA.  2000 prices from EIA's AEO 2003.

## 7.10    Projected Fuel Price Impacts

The impacts of CAMR on coal prices and natural gas prices before shipment are shown in Table 7-15 .

**Table 7-15.  Henry Hub Natural Gas Prices and Average Delivered Coal Prices with the Old Base Case, New Base Case (CAIR), and with CAMR Options (1999$/mmBtu)**

|  | 2010 | | 2015 | | 2020 | |
|---|---|---|---|---|---|---|
|  | Delivered Coal | Henry Hub Gas | Delivered Coal | Henry Hub Gas | Delivered Coal | Henry Hub Gas |
| Old Base Case | 1.05 | 3.20 | 1.01 | 3.25 | 0.96 | 3.16 |
| New Base Case: CAIR | 1.05 | 3.25 | 0.98 | 3.30 | 0.93 | 3.20 |
| Option 1 (38/15) | 1.05 | 3.25 | 0.98 | 3.30 | 0.93 | 3.25 |
| Option 2 (15/15) | 1.05 | 3.25 | 0.98 | 3.30 | 0.93 | 3.25 |
| Option 3 (24/15) | 1.05 | 3.25 | 0.98 | 3.30 | 0.94 | 3.25 |

Source:  Integrated Planning Model run by EPA.  2000 natural gas data are from Platts GASdata is $4.15/mmBtu.   2000 coal price from EIA is $1.25/mmBtu.
Note:  Coal price changes largely result from changes in the mix of coal types used.  Delivered coal prices vary widely, but large changes in the cost of each type of coal are not projected.

## 7.11    Social Cost Calculations

The annualization factor used for pure social cost calculations (for annualized costs) normally includes the life of capital and the social discount rate.  For purposes of benefit-cost analysis of this rule, EPA has calculated the annualized social costs using the discount rates from the benefits analysis for CAMR (3% and 7% and a 30 year life of capital.  The costs of added insurance was included in the calculations, but local taxes were not included because they are considered to be transfer payments, and not a social cost).  Using these discount rates, the social costs of CAMR incremental to CAIR are $151 million in 2010 and $848 million in 2020 using a discount rate of 3%, and are $157 million in 2010 and $896 million in 2020 using a discount rate of 7%.

Recent research suggests that the total social costs of a new regulation may be affected by interactions between the new regulation and pre-existing distortions in the economy, such as taxes.  In particular, if cost increases due to a regulation are reflected in a general increase in the price level, the real wage received by workers may be reduced, leading to a small fall in the total amount of labor supplied.  This "tax interaction effect" may result in an increase in deadweight loss in the labor market and an increase in total social costs.  The limited empirical data available to support quantification of any such effect leads to this qualitative identification of the costs.

## 7.12    Limitations of Analysis

EPA's modeling is based on its best judgment for various input assumptions that are uncertain, particularly assumptions for Hg control technologies and future fuel prices and electricity demand growth.  To some degree, EPA addresses the uncertainty surrounding these three assumptions through its sensitivity analysis.  Sensitivity analysis on future fuel prices and electricity demand growth are provided in  section 7.15.  A discussion on Hg technology cost uncertainty and sensitivity analysis are provided below in section 7.14.  As a general matter, the Agency selects the best available information from available engineering studies of air pollution controls and has set up what it believes is the most reasonable modeling framework for analyzing the cost, emission changes, and other impacts of regulatory controls.

The annualized cost estimates of the private compliance costs that are provided in this analysis are meant to show the increase in production (engineering) costs of CAMR to the power sector.  In simple terms, the private compliance costs that are presented are the annual increase in revenues required for the industry to be as well off after CAMR is implemented as before.  To estimate these annualized costs, EPA uses a conventional and widely-accepted approach that is commonplace in economic analysis of power sector costs for estimating engineering costs in annual terms.  For estimating annualized costs, EPA has applied a capital recovery factor (CRF) multiplier to capital investments and added that to the annual incremental operating expenses.  The CRF is derived from estimates of the cost of capital (private discount rate), the amount of insurance coverage required, local property taxes, and the life of capital.  The private compliance costs presented earlier are EPA's best estimate of the direct private compliance costs of CAMR.

The annualized cost of CAMR, as quantified here, is EPA's best assessment of the cost of implementing CAMR, assuming that States adopt the model cap and trade program.  Under CAMR, States are required to meet Hg emission budget based on reductions from coal-fired utility units.  States have the discretion to participate in the federal cap-and-trade program or to meet their budget through other options (including facility limits and trading restricted inside state boarder).  These costs are generated from rigorous economic modeling of changes in the power sector due to CAMR.  This type of analysis using IPM has undergone peer review and federal courts have upheld regulations covering the power sector that have relied on  IPM's cost analysis.

The direct private compliance cost includes, but is not limited to, capital investments in pollution controls, operating expenses of the pollution controls, investments in new generating sources, and additional fuel expenditures.  EPA believes that the cost assumptions used for CAMR  reflect, as closely as possible, the best information available to the Agency today.  The cost associated with monitoring emissions, reporting, and record keeping for affected sources is not included in these annualized cost estimates, but EPA has done a separate analysis and estimated the cost to be about $76 million (see final CAMR preamble Section  VI.B. Paperwork Reduction Act).

Furthermore, there are some unquantified costs that EPA wants to identify as limits to its analysis.  These costs include the costs of federal and State administration of the program, which we believe are modest given our experience with the Acid Rain Program and the NOx Budget Trading Program and likely to be less than the alternative of States developing approvable State

Plans, securing EPA approval of those State Plans, and federal/state enforcement.  There also may be unquantified costs of transitioning to CAMR, such as the costs associated with the retirement of smaller or less efficient electricity generating units, and employment shifts as workers are retrained at the same company or re-employed elsewhere in the economy.     There are certain relatively small permitting costs associated with Title IV that new program entrants face (we believe there are far less than 1,000 new entrants who may require one day of additional work for trading permits).  In a separate analysis for the CAIR RIA, EPA estimated the indirect cost and impacts of higher electricity prices on the entire economy for the CAIR scenario (see Regulatory Impact Analysis for the Final Clean Air Interstate Rule, Appendix E (March 2005)).  Given the small difference in electricity prices between CAMR and CAIR, analysis for CAMR would project similar results.

Cost estimates for CAMR are based on results from ICF's Integrated Planning Model.  The model minimizes the costs of producing electricity (including abatement costs) while meeting load demand and other constraints (full documentation for IPM can be found at www.epa.gov/airmarkets/epa-ipm).  The structure of the model assumes that the electric utility industry will be able to meet the environmental emission caps at least cost.  Montgomery (1972) has shown that this least cost solution corresponds to the equilibrium of an emission permit system.[2]   See also Atkinson and Tietenburg (1982), Krupnick et al. (1980), and McGartland and Oates (1985).[3][4][5]  However, to the extent that transaction and/or search costs, combined with institutional barriers, restrict the ability of utilities to exhaust all the gains from emissions trading, costs are underestimated by the model.  Utilities in the IPM model also have "perfect foresight."  To the extent that utilities misjudge future conditions affecting the economics of pollution control, costs may be understated as well.

This modeling analysis does not take into account the potential for advancements in the capabilities of pollution control technologies for $SO_2$ and $NO_x$ removal as well as reductions in their costs over time.  Market-based cap-and-trade regulation  serves to promote innovation and the development of new and cheaper technologies.  As an example, recent cost estimates of the Acid Rain $SO_2$ trading program by Resources for the Future (RFF) and MIT's Center for Energy and Environmental Policy Research (CEEPR) have been as much as 83% lower than originally projected by the EPA.[6]  It is important to note that the original analysis for the Acid Rain

---

[2] Montgomery, W. David 1972.  "Markets in Licenses and Efficient Pollution Control Programs." *Journal of Economic Theory* 5(3): 395-418.

[3] S. Atkinson and T. Tietenberg 1982. "The empirical properties of two classes of design for transferable discharge permit markets," *Journal of Environmental Economics and Management* 9:101-121

[4] Krupnick, A., W. Oates and E. Van De Verg. 1980. "On Marketable Air Pollution Permits: The Case for a System of Pollution Offsets." *Journal of Environmental Economics and  Management* 10: 233-47.

[5] McGartland, A and W. Oates. 1985. "Marketable Permits for the Prevention of Environmental Deterioration," *Journal of Environmental Economics and Management* 12: 207-228.

[6] See (1) Carlson, Curtis.; Burtraw, Dallas R.; Cropper, Maureen and Palmer, Karen L. 2000. Sulfur Dioxide Control by Electric Utilities: What Are the Gain from Trade?  *Journal of Political Economy* 108 (#6): 1292-1326, and (2) Ellerman, Denny. January, 2003. Ex Post Evaluation of Tradable Permits: The U.S. SO2 Cap-and-Trade Program.

Program done by EPA also relied on an optimization model like IPM.  Ex ante, EPA costs estimates of roughly $2.7 to $6.2 billion[7] in 1989 were an overestimate of the costs of the program in part because of the limitation of economic modeling to predict technological improvement of pollution controls and other compliance options such as fuel switching.  Ex post estimates of the annual cost of the Acid Rain $SO_2$ trading program range from $1.0 to $1.4 billion.  Harrington et al. have compared estimates of actual costs of many large EPA regulatory programs to predictions of those costs made while programs were under development and found a tendency for predicted costs to overstate actual implementation costs for market-based programs.[8]  EPA's mobile source programs use adjusted engineering cost estimates to account for this fact, which EPA has not done in this case.[9]

As configured in this application, the IPM model does not take into account demand response (i.e., consumer reaction to electricity prices).  The increased retail electricity prices shown in Table  7-14 would prompt end users to curtail (to some extent) their use of electricity and encourage them to use substitutes.[10]  The response would lessen the demand for electricity, lowering electricity prices and reducing generation and emissions.  Because of demand response, certain unquantified negative costs (i.e., savings) result from the reduced resource costs of producing less electricity because of lower demand.  To some degree, these saved resource costs will offset the additional costs of pollution controls and fuel switching that we would anticipate with CAMR. Although the reduction in electricity use is likely to be small, the cost savings from such a large industry ($250 billion in revenues in 2003) is likely to be substantial.  EIA analysis examining multi-pollutant legislation under consideration in 2003 indicates that the annualized costs of CAMR may be overstated substantially by not considering demand response.

It is also important to note that the capital cost assumptions for scrubbers used in EPA modeling applications are highly conservative.  These are a substantial part of the compliance costs.  Data available from recent published sources show the reported FGD costs from recent installations to be below the levels projected by the IPM.  In addition, EPA  conducted a survey of recent FGD installations and compared the costs of these installations to the costs used in IPM.  This  survey included small, mid-size, and large units.  Examples of the comparison of these referenced published data with the FGD capital cost estimates obtained from IPM are provided in the Final CAMR docket.  There is also evidence that scrubber costs will decrease in the future because of the learning-by-doing phenomenon, as more scrubbers are installed[11].

---

Massachusetts Institute of Technology Center for Energy and Environmental Policy Research.

[7]  2010 Phase II cost estimate in $1995.

[8] Harrington, W. R.D. Morgenstern, and P. Nelson, 2000. "On the Accuracy of Regulatory Cost Estimates," Journal of Policy Analysis and Management 19(2): 297-322.

[9] See recent regulatory impact analysis for the Tier 2 Regulations for passenger vehicles (1999) and Heavy-Duty Diesel Vehicle Rules (2000).

[10] The degree of substitution/curtailment depends on the price elasticity of electricity.

[11] Manson, Nelson, and Neumann, 2002. "Assessing the Impact of Progress and Learning Curves on Clean Air Act Compliance Costs," Industrial Economics Incorporated.

Another area of uncertainty is the performance of mercury control removal systems, like the one assumed in the modeling, activated carbon injection with added pulse-jet fabric filters. ACI systems have shown great promise in demonstrated tests. However, there is uncertainty about the availability and effectiveness of ACI across all coal types in the 2010 timeframe, since these systems have not been fully deployed on coal-fired generating plants. EPA's assumption of 90% removal for ACI is based on EPA's Office of Research and Development (ORD) assessment ( for further discussion see *Control of Emissions from Coal-Fired Electric Utility Boilers: An Update*, EPA/Office of Research and Development, March 2005, in CAMR docket). Although modeled in IPM to be available immediately for all coal-fired generation as a simplification of modeling, ORD assessment concluded that ACI could not be fully deployed on all plants by 2010 timeframe. EPA's modeling projects only a small amount of ACI use in the 2010 timeframe which is consistent with ORD's conclusion about the availability of ACI.

An additional limitation of Hg control assumptions is that we are assuming no development in control technologies even though we recognize that this is a fast moving area with new developments nearly monthly. Actual costs may be lower than those presented since modeling assumes no improvements in the cost of mercury control technology. Given that this is the first time mercury is regulated for the coal-fired power sector and the current level of research and demonstration of mercury control technologies, control costs are expected to improve over time. For purposes of modeling, EPA has conservatively based its cost assumptions for mercury control on today's knowledge and not included cost improvement assumptions in the modeling. Later, in this Chapter (section 7.14), EPA presents a sensitivity analysis in which we examine impact of mercury technology improvements by providing a lower cost mercury control option in future years. It is important to note that CAMR's cap-and-trade approach will encourage technological innovation in Hg emissions control and allow sources to exploit currently unforeseen emissions control technologies.

Further, while there are many choices of technology for mercury control in existence or under development, several are not offered to model plants in IPM. Plants in IPM cannot retrofit with a fabric filter or make improvements to existing controls to capture mercury, such as improving the cloth to air ratio of the fabric filter, up-grading their ESP or injecting carbon. In addition, research and development continues on other Hg control technologies, including the use of pre-combustion controls (e.g. K-fuels), or multi-pollutant controls (i.e., one control removing $SO_2$, NOx, and Hg). Given a cap-and-trade approach, we would expect further development and innovation of technology.

EPA's latest update of IPM incorporates State rules or regulations adopted before March 2004 and various NSR settlements. Documentation for IPM can be found at www.epa.gov/airmarkets/epa-ipm. Any State or settlement action since that time has not been accounted for in our analysis in this chapter.

On balance, after consideration of various unquantified costs (and savings that are possible), EPA believes that the annual private compliance costs that we have estimated are more likely to overstate the future annual compliance costs that industry will incur, rather than understate those costs.

## 7.13    Significant Energy Impact

According to *E.O. 13211: Actions that Significantly Affect Energy Supply, Distribution, or Use*, this rule is not significant, measured incrementally to CAIR, because it does not have a greater than a 1 percent impact on the cost of electricity production and it does not result in the retirement of greater than 500 MW of coal-fired generation.

Several aspects of CAMR are designed to minimize the impact on energy production. First, EPA recommends a trading program rather than the use of command-and-control regulations.  Second, compliance deadlines are set cognizant of the impact that those deadlines have on electricity production.  Both of these aspects of CAMR reduce the impact of the proposal on the electricity sector.

## 7.14    Sensitivity Analysis on Assumptions for Hg Control Costs

This section presents results of cost sensitivity analysis using the IPM.  As discussed earlier in this Chapter, actual costs may be lower than those presented since modeling assumes no improvements in the cost of mercury control technology.  Given that this is the first time mercury is federally regulated for the coal-fired power sector and given the current level of research and demonstration of mercury control technologies, control cost are expected to improve over time.  The sensitivity analysis presented examines the impacts of possible improvements in Hg control costs over time.  EPA selected Option 1 as the policy option for the final CAMR.  For that reason, EPA proceeded with sensitivity analyses for that option.

The sensitivity analysis presented includes examination of the impact of mercury technology improvements by providing a lower cost mercury control option in future years. Specifically, the sensitivity analysis examines the impact of providing a second ACI option in 2013 with brominated sorbents and lower capital costs.  The assumptions of costs and performance for the sensitivity analysis is based on recent testing sponsored by EPA, DOE, and industry and more information on these advanced sorbents can be found in white paper by EPA's Office of Research and Development, available in the docket.  For purposes of modeling, EPA has assumed the availability of two ACI options: (1) ACI using conventional sorbents and achieving 90% removal with the addition of a fabric filter; and (2) ACI using advanced sorbents and achieving 80 to 90% removal without the addition of a fabric filter (see memorandum to the docket entitled "Assumptions used in sensitivity analysis for the Clean Air Mercury Rule").  The first ACI option is available at the start of the model and the second ACI is available in 2013. For comparison of impacts, the sorbent sensitivity was modeled based on the reduction levels for CAMR Option 1 (Hg trading scenario plus CAIR of 38 tons in 2010, 15 tons in 2018).

Tables 7-16 and 7-17 provide Hg, $SO_2$, and NOx emission projections for the sorbent sensitivity option.  Because the banking of excess emission under the first phase of the Hg program, emissions are projected to be higher than the cap that is required for CAMR in 2020. However, with lower future Hg technology costs, less banking and higher emissions are projected in 2010 and 2015 under the sorbent sensitivity option.

Table 7-19 provides annual and present value costs incremental to CAIR and Table 7-20 provides marginal costs.  Under the sorbent sensitivity, the second ACI option has higher O&M

costs, but lower capital costs resulting in overall lower cost projections.  Compared with CAMR option 1, annual costs and present value cost are projected to be lower for the sorbent sensitivity option and Hg marginal cost are projected to be about 50 percent lower.

The lower costs for ACI technology also results in higher projections of ACI retrofits in 2020 for the sorbent sensitivity option (see Table 7-21).  When compared to Option 1, Coal generation and production are projected to increase under the sorbent sensitivity option (see Tables 7-22, 7-23, and 7-24).  Retail electricity prices are not projected to changes significantly when comparing the sorbent sensitivity option to Option 1 (see Table 7-25).

**Table 7-16.  Projected Emissions of Hg with New Base Case (CAIR) and CAMR, without and with Selected Technological Advances (Tons)**

|  | 2010 | 2015 | 2020 |
|---|---|---|---|
| New Base Case: CAIR | 38.0 | 34.4 | 34.0 |
| Option 1 – Current Technology | 31.3 | 27.9 | 24.3 |
| Option 1 – Sorbent Sensitivity | 32.6 | 29.3 | 23.1 |

Note:  The emissions data presented here are EPA modeling results.

**Table 7-17.  Projected Emissions of $SO_2$ with New Base Case (CAIR) and CAMR, without and with Selected Technological Advances (Million Tons)**

|  | 2010 | | 2015 | | 2020 | |
|---|---|---|---|---|---|---|
|  | Nationwide | CAIR Region | Nationwide | CAIR Region | Nationwide | CAIR Region |
| New Base Case: CAIR | 6.1 | 5.1 | 5.0 | 4.0 | 4.3 | 3.3 |
| Option 1 – Current Technology | 6.1 | 5.1 | 4.9 | 4.0 | 4.2 | 3.3 |
| Option 1 – Sorbent Sensitivity | 6.1 | 5.1 | 4.9 | 4.0 | 4.3 | 3.3 |

Source:  Integrated Planning Model run by EPA.

**Table 7-18.  Projected Emissions of NOx  with the New Base Case (CAIR) and CAMR without and with Selected Technological Advances (Million Tons)**

|  | 2010 | | 2015 | | 2020 | |
|---|---|---|---|---|---|---|
|  | Nationwide | CAIR Region | Nationwide | CAIR Region | Nationwide | CAIR Region |
| New Base Case: CAIR | 2.5 | 1.5 | 2.2 | 1.3 | 2.2 | 1.3 |
| Option 1 – Current Technology | 2.4 | 1.5 | 2.2 | 1.3 | 2.2 | 1.3 |
| Option 1 – Sorbent Sensitivity | 2.4 | 1.5 | 2.2 | 1.3 | 2.2 | 1.3 |

Source:  Integrated Planning Model run by EPA.

**Table 7-19.  Annualized Private Compliance Cost and Present Value Cost Incremental to the New Base Case (CAIR) ($1999)**

| Cost (billions) | 2010 | 2015 | 2020 | Present value (2007-2025) |
|---|---|---|---|---|
| Option 1 – Current Technology | $0.16 | $0.10 | $0.75 | $3.9 |
| Option 1 – Sorbent Sensitivity | $0.10 | $0.04 | $0.56 | $2.2 |

Note: Annual incremental costs of CAIR are $2.4 billion in 2010, $3.6 billion in 2015, and $4.4 billion in 2020, present value (2007-2025) is $41.1 billion.
Note:  Numbers rounded to the nearest hundred million for annualized cost.
Source:  Integrated Planning Model run by EPA.

**Table 7-20.  Marginal Cost of Hg, $SO_2$, and $NO_x$ Reductions with CAMR without and with Selected Technological Advances ($1999)**

|  |  | 2010 | 2015 | 2020 |
|---|---|---|---|---|
| New Base Case: CAIR | $SO_2$ ($/ton) | $800 | $1,000 | $1,300 |
|  | NOx ($/ton) | $1,300 | $1,600 | $1,600 |
| Option 1 – Current Technology | $SO_2$ ($/ton) | $700 | $900 | $1,200 |
|  | NOx ($/ton) | $1,200 | $1,500 | $1,300 |
|  | Hg ($/lb) | $23,200 | $30,100 | $39,000 |
| Option 1 – Sorbent Sensitivity | $SO_2$ ($/ton) | $800 | $1,000 | $1,300 |
|  | NOx ($/ton) | $1,200 | $1,500 | $1,400 |
|  | Hg ($/lb) | $11,800 | $15,300 | $19,900 |

Note:  Numbers rounded to the nearest hundred for marginal cost.
Source:  Integrated Planning Model run by EPA.

**Table 7-21.  Pollution Controls by Technology with the New Base Case (CAIR), and CAMR without and with Selected Technological Advances (GW)**

| | 2010 | | | 2015 | | | 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | FGD | SCR | ACI | FGD | SCR | ACI | FGD | SCR | ACI |
| New Base Case: CAIR | 146 | 125 | -- | 177 | 151 | -- | 198 | 153 | 0.5 |
| Option 1 – Current Technology | 146 | 126 | 2 | 179 | 153 | 3 | 199 | 156 | 13 |
| Option 1 – Sorbent Sensitivity | 146 | 126 | 1 | 179 | 153 | 3 | 197 | 155 | 25 |

Note:     Retrofits include existing scrubbers and SCR as well as additional retrofits for the Title IV Acid Rain Program, the
          $NO_x$ SIP call, NSR settlements, and various state rules.
Source:   Integrated Planning Model run by EPA.

**Table 7-22.  Generation Mix with the Old Base Case, the New Base Case (CAIR), and with CAMR without and with Selected Technological Advances (Thousand GWhs)**

| | | 2010 | 2015 | 2020 | Change From New Base Case in 2020 |
|---|---|---|---|---|---|
| Old Base Case | Coal | 2,198 | 2,195 | 2,410 | |
| | Oil/Natural Gas | 777 | 1,072 | 1,221 | |
| | Other | 1,223 | 1,233 | 1,218 | |
| New Base Case: CAIR | Coal | 2,165 | 2,197 | 2,384 | |
| | Oil/Natural Gas | 807 | 1,069 | 1,247 | |
| | Other | 1,217 | 1,232 | 1,217 | |
| Option 1 – Current Technology | Coal | 2,160 | 2,194 | 2,365 | -0.8% |
| | Oil/Natural Gas | 812 | 1,072 | 1,265 | 1.5% |
| | Other | 1,216 | 1,233 | 1,217 | 0.0% |
| Option 1– Sorbent Sensitivity | Coal | 2,161 | 2,196 | 2,372 | -0.5% |
| | Oil/Natural Gas | 811 | 1,070 | 1,258 | 0.9% |
| | Other | 1,217 | 1,233 | 1,217 | 0.0% |

Note:     Numbers may not add due to rounding.
Source:   2003 data are from EIA: Coal - 1,970; Oil/Natural Gas - 758; Other - 1,120.  Projections are from the Integrated
          Planning Model run by EPA.

**Table 7-23.  Total Coal and Natural Oil/Gas-Fired Capacity by 2020 (GW)**

|  | Current | Old Base Case | New Base Case: CAIR | Option 1 – Current Technology | Option 1 – Sorbent Sensitivity |
|---|---|---|---|---|---|
| Pulverized Coal | 305 | 318 | 315 | 314 | 314 |
| IGCC | 0.6 | 8 | 9 | 8 | 9 |
| Oil/Gas | 395 | 467 | 469 | 471 | 470 |

Source:   Current data are from EPA's NEEDS 2004; projections are from the Integrated Planning Model run by EPA.

**Table 7-24.  Coal Production for the Electric Power Sector with the Old Base Case, New Base Case (CAIR) , and with CAMR without and with Selected Technological Advances (Million Tons)**

| Supply Area | 2000 | 2003 | Old Base Case | | | New Base Case: CAIR | | |
|---|---|---|---|---|---|---|---|---|
|  |  |  | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 |
| Appalachia | 299 | 275 | 325 | 315 | 301 | 306 | 306 | 331 |
| Interior | 131 | 135 | 161 | 162 | 173 | 165 | 191 | 218 |
| West | 475 | 526 | 603 | 631 | 714 | 607 | 586 | 609 |
| National | 905 | 936 | 1,089 | 1,109 | 1,188 | 1,078 | 1,083 | 1,158 |

| Supply Area | Option 1 – Current Technology | | | Option 1 – Sorbent Sensitivity | | |
|---|---|---|---|---|---|---|
|  | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 |
| Appalachia | 303 | 310 | 330 | 305 | 312 | 333 |
| Interior | 169 | 194 | 224 | 168 | 191 | 220 |
| West | 589 | 568 | 572 | 592 | 578 | 579 |
| National | 1,061 | 1,071 | 1,127 | 1,065 | 1,081 | 1,132 |

Source:   2000 and 2003 data are derived from EIA data.  All projections are from the Integrated Planning Model run by EPA.

**Table 7-25.  Retail Electricity Prices by NERC Region with the Old Base Case, New Base Case (CAIR), and with CAMR without and with Selected Technological Advances (Mills/kWh) ($1999)**

| | | | | Option 1 | | | | | | | | | |
| | | | | Base Case | | | CAIR | | | Option 1 | | | Change from CAIR |
| Power Region | Primary States Included | 2000 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ECAR | OH, MI, IN, KY, WV, PA | 57.4 | 51.7 | 55.2 | 56.1 | 53.7 | 58.6 | 58.0 | 53.9 | 58.7 | 58.1 | 0.2% |
| ERCOT | TX | 65.1 | 57.9 | 64.4 | 62.6 | 59.4 | 64.5 | 63.3 | 59.1 | 64.9 | 63.4 | 0.1% |
| MAAC | PA, NJ, MD, DC, DE | 80.4 | 59.3 | 69.4 | 72.2 | 61.0 | 72.0 | 72.7 | 61.3 | 72.1 | 72.9 | 0.2% |
| MAIN | IL, MO, WI | 61.2 | 52.6 | 57.8 | 61.0 | 53.9 | 60.4 | 62.0 | 54.1 | 60.5 | 62.3 | 0.5% |
| MAPP | MN, IA, SD, ND, NE | 57.4 | 52.8 | 49.3 | 47.6 | 52.9 | 49.6 | 48.0 | 53.0 | 49.6 | 48.2 | 0.5% |
| NY | NY | 104.3 | 82.8 | 87.9 | 88.1 | 83.3 | 88.9 | 88.5 | 83.3 | 89.1 | 88.7 | 0.4% |
| NE | VT, NH, ME, MA, CT, RI | 89.9 | 77.4 | 83.9 | 82.8 | 77.4 | 84.7 | 83.1 | 77.5 | 84.8 | 83.1 | 0.0% |
| FRCC | FL | 67.9 | 71.2 | 71.3 | 69.5 | 71.7 | 72.3 | 70.5 | 71.8 | 72.3 | 70.7 | 0.3% |
| STV | VA, NC, SC, GA, AL, MS, TN, AR, LA | 59.3 | 56.2 | 55.1 | 55.3 | 57.0 | 56.2 | 56.6 | 57.1 | 56.2 | 56.8 | 0.3% |
| SPP | KS, OK, MO | 59.3 | 54.2 | 57.0 | 56.7 | 54.6 | 57.5 | 57.0 | 54.6 | 57.5 | 57.2 | 0.3% |
| PNW | WA, OR, ID | 45.9 | 49.6 | 47.4 | 46.9 | 49.8 | 47.5 | 46.9 | 49.8 | 47.5 | 47.1 | 0.5% |
| RM | MT, WY, CO, UT, NM, AZ, NV, ID | 64.1 | 63.9 | 65.2 | 64.7 | 64.1 | 65.6 | 65.4 | 64.2 | 65.6 | 65.1 | -0.4% |
| CALI | CA | 94.7 | 97.1 | 98.9 | 99.3 | 97.3 | 99.1 | 99.5 | 97.3 | 99.1 | 99.7 | 0.3% |
| National | Contiguous Lower 48 States | 66.0 | 60.3 | 63.1 | 63.4 | 61.3 | 64.5 | 64.3 | 61.3 | 64.5 | 64.5 | 0.2% |

| | | | | Sorbent Sensitivity | | | | | | | | | |
| | | | | Base Case | | | CAIR | | | Sensitivity | | | Change from CAIR |
| Power Region | Primary States Included | 2000 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ECAR (1) | OH, MI, IN, KY, WV, PA | 57.4 | 51.7 | 55.2 | 56.1 | 53.7 | 58.6 | 58.0 | 53.8 | 58.6 | 58.0 | 0.1% |
| ERCOT (2) | TX | 65.1 | 57.9 | 64.4 | 62.6 | 59.4 | 64.5 | 63.3 | 59.2 | 64.9 | 63.4 | 0.2% |
| MAAC (3) | PA, NJ, MD, DC, DE | 80.4 | 59.3 | 69.4 | 72.2 | 61.0 | 72.0 | 72.7 | 61.1 | 72.0 | 72.9 | 0.2% |
| MAIN (4) | IL, MO, WI | 61.2 | 52.6 | 57.8 | 61.0 | 53.9 | 60.4 | 62.0 | 54.0 | 60.5 | 62.3 | 0.4% |
| MAPP (5) | MN, IA, SD, ND, NE | 57.4 | 52.8 | 49.3 | 47.6 | 52.9 | 49.6 | 48.0 | 52.9 | 49.6 | 48.0 | 0.1% |
| NY (6) | NY | 104.3 | 82.8 | 87.9 | 88.1 | 83.3 | 88.9 | 88.5 | 83.3 | 89.1 | 88.8 | 0.3% |
| NE (7) | VT, NH, ME, MA, CT, RI | 89.9 | 77.4 | 83.9 | 82.8 | 77.4 | 84.7 | 83.1 | 77.5 | 85.0 | 83.0 | -0.1% |
| FRCC (8) | FL | 67.9 | 71.2 | 71.3 | 69.5 | 71.7 | 72.3 | 70.5 | 71.8 | 72.3 | 70.7 | 0.3% |
| STV (9) | VA, NC, SC, GA, AL, MS, TN, AR, LA | 59.3 | 56.2 | 55.1 | 55.3 | 57.0 | 56.2 | 56.6 | 57.1 | 56.2 | 56.7 | 0.3% |
| SPP (10) | KS, OK, MO | 59.3 | 54.2 | 57.0 | 56.7 | 54.6 | 57.5 | 57.0 | 54.6 | 57.5 | 57.2 | 0.3% |
| PNW (11) | WA, OR, ID | 45.9 | 49.6 | 47.4 | 46.9 | 49.8 | 47.5 | 46.9 | 49.8 | 47.5 | 47.2 | 0.5% |
| RM (12) | MT, WY, CO, UT, NM, AZ, NV, ID | 64.1 | 63.9 | 65.2 | 64.7 | 64.1 | 65.6 | 65.4 | 64.1 | 65.6 | 65.3 | -0.2% |
| CALI (13) | CA | 94.7 | 97.1 | 98.9 | 99.3 | 97.3 | 99.1 | 99.5 | 97.2 | 99.1 | 99.7 | 0.22% |
| National | Contiguous Lower 48 States | 66.0 | 60.3 | 63.1 | 63.4 | 61.3 | 64.5 | 64.3 | 61.3 | 64.5 | 64.4 | 0.2% |

Source: Retail Electricity Price Model run by EPA.  2000 prices from EIA's AEO 2003.

## 7.15   Sensitivity Analysis on Assumptions for Natural Gas Prices and Electricity Growth

Sensitivity analyses were performed using projections from the 2004 Annual Energy Outlook produced by the Energy Information Administration (EIA).  EPA used EIA estimates for the difference between natural gas prices and coal prices, which we have short-handed as "EIA natural gas prices," as well as EIA's projection of electricity growth.  These particular assumptions involve considering the higher differential between minemouth coal and wellhead natural gas prices.  For the years 2010, 2015, and 2020, there was a higher differential of $0.25 mmBtu, $0.42 mmBtu, and $0.38 mmBtu, respectively.  The electricity growth was changed to match EIA's growth of 1.8 percent a year rather than EPA's growth of 1.6 percent.

Nationwide emissions of Hg, $SO_2$, and NOx using EIA assumptions are presented in Tables 7-26 and 7-27.  Mercury emissions profiles with EIA assumptions are similar and lower than emissions with EPA assumptions.  Lower Hg emissions for EIA assumptions can be attributed to the building of new and cleaner coal-fired capacity.

Total annual costs and present value costs of CAMR incremental to CAIR with EIA assumptions are in Table 7-28.  The costs of CAMR with EIA assumptions for natural gas prices and electricity growth in 2010 and 2015 are only slightly different from costs of CAIR without those assumptions and can be attributed to the building of new and cleaner coal-fired capacity that leads to lower overall costs (see Tables 7-28 and 7-29).  As demand continues to grow, coal-fired generation continues to increase and requires the use of additional scrubbers.  Although more pollution controls are installed using EIA assumptions, dispatch changes lead to the use of more efficient generation.  The power sector is less inclined to use gas as a compliance option in the region because of the higher operating cost.  Once the power sector passes the point where there is no longer excess gas capacity in the marketplace (as currently exists), new coal-fired capacity is the logical choice to meet demand.

Coal-fired generation under CAMR increases using EIA assumptions for natural gas prices and electricity growth.  Table 7-31 shows the generation mix with EIA assumptions.  Coal production patterns change slightly and production for all three major coal-producing regions is higher, because coal-fired generation is a cheaper source of electricity than natural gas in most parts of the country with the higher EIA prices, even as more pollution controls are added to coal-fired generation and used to meet the additional electricity demand (see Table 7-32).

Electricity prices are not greatly altered with EIA assumptions for natural gas and electricity growth (see Table 7-33).  Average electricity prices are projected to be lower than current levels (2000) using both EPA and EIA assumptions for natural gas and electricity growth.

**Table 7-26.  Projected Emissions of Hg for the New Base Case (CAIR) and CAMR with EPA and EIA Assumptions for Natural Gas Prices and Electric Growth (Tons)**

|  |  | 2010 | 2015 | 2020 |
|---|---|---|---|---|
| Old Base Case | EPA Assumptions | 46.6 | 45.0 | 46.2 |
|  | EIA Assumptions | 47.5 | 47.0 | 47.8 |
| New Base Case: CAIR | EPA Assumptions | 38.0 | 34.4 | 34.0 |
|  | EIA Assumptions | 38.3 | 35.2 | 35.4 |
| Option 1 | EPA Assumptions | 31.3 | 27.9 | 24.3 |
|  | EIA Assumptions | 31.5 | 28.5 | 23.5 |

Note:  The emissions data presented here are EPA modeling results.

**Table 7-27.  Projected Nationwide Emissions of $SO_2$ and $NO_x$ under the New Base Case (CAIR) and CAMR with EPA and EIA Assumptions for Natural Gas and Electric Growth (Million Tons)**

|  | SO$_2$ | | | NOx | | |
|---|---|---|---|---|---|---|
|  | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 |
| Old Base Case with EPA Assumptions | 9.7 | 8.9 | 8.6 | 3.6 | 3.7 | 3.7 |
| New Base Case (CAIR) with EPA Assumptions | 6.1 | 5.0 | 4.3 | 2.5 | 2.2 | 2.2 |
| Option 1 with EPA Assumptions | 6.1 | 4.9 | 4.2 | 2.4 | 2.2 | 2.2 |
| Old Base Case with EIA Assumptions | 9.7 | 8.8 | 8.6 | 3.7 | 3.8 | 3.8 |
| New Base Case (CAIR) with EIA Assumptions | 6.1 | 5.0 | 4.0 | 2.4 | 2.1 | 2.2 |
| Option 1 with EIA Assumptions | 6.1 | 4.9 | 4.3 | 2.4 | 2.2 | 2.2 |

Source:  Integrated Planning Model run by EPA.

**Table 7-28.  Annualized Cost and Present Value Cost Incremental to the New Base Case (CAIR) with EPA and EIA Assumptions for Natural Gas Prices and Electric Growth (Billion $1999)**

|  | 2010 | 2015 | 2020 | Present value (2007-2025) |
|---|---|---|---|---|
| Option 1- EPA Assumptions | $0.16 | $0.10 | $0.75 | $3.9 |
| Option 1 - EIA Assumptions | $0.16 | $0.21 | $0.53 | $3.1 |

Note: Annual incremental costs of CAIR with EPA assumptions are $2.4 billion in 2010, $3.6 billion in 2015, and $4.4 billion in 2020, present value (2007-2025) is $41.1 billion.  Annual incremental costs of CAIR with EIA assumptions are $2.6 billion in 2010, $3.4 billion in 2015, and $4.1 billion in 2020, present value (2007-2025) is $42.9 billion.
Note:  Numbers rounded to the nearest tenth million for annualized cost.
Source:  Integrated Planning Model run by EPA.

**Table 7-29.  Marginal Cost of SO$_2$ and NO$_x$ Reductions under the New Base Case (CAIR) and CAMR with EPA and EIA Assumptions for Natural Gas Prices and Electric Growth ($/ton, in $1999)**

|  |  |  | 2010 | 2015 | 2020 |
|---|---|---|---|---|---|
| New Base Case: CAIR | SO$_2$ | EPA Assumptions | $800 | $1,000 | $1,300 |
|  |  | EIA Assumptions | $800 | $1,200 | $1,500 |
|  | NOx | EPA Assumptions | $1,300 | $1,600 | $1,600 |
|  |  | EIA Assumptions | $1,400 | $1,700 | $1,700 |
| Option 1 | SO$_2$ | EPA Assumptions | $700 | $900 | $1,200 |
|  |  | EIA Assumptions | $800 | $1,000 | $1,300 |
|  | NOx | EPA Assumptions | $1,200 | $1,500 | $1,200 |
|  |  | EIA Assumptions | $1,200 | $1,600 | $1,300 |
|  | Hg | EPA Assumptions | $23,200 | $30,100 | $39,000 |
|  |  | EIA Assumptions | $26,400 | $34,200 | $44,400 |

Source:  Integrated Planning Model run by EPA.

**Table 7-30.  Pollution Controls under the New Base Case (CAIR) with EPA and EIA Assumptions for Natural Gas and Electricity Growth (GWs)**

| | Technology | EPA Assumptions | | | EIA Assumptions | | |
|---|---|---|---|---|---|---|---|
| | | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 |
| New Base Case: CAIR | FGD | 146 | 177 | 198 | 157 | 185 | 209 |
| | SCR | 125 | 151 | 153 | 134 | 161 | 162 |
| Option 1 | FGD | 146 | 179 | 199 | 155 | 187 | 203 |
| | SCR | 126 | 153 | 156 | 137 | 160 | 162 |
| | ACI | 2 | 3 | 13 | 3 | 4 | 26 |

Note:    Retrofits include existing scrubbers and SCR as well as additional retrofits for the Title IV Acid Rain Program, the $NO_x$ SIP call, NSR settlements, and various state rules.
Source:  Integrated Planning Model run by EPA.

**Table 7-31.  Generation Mix under the New Base Case (CAIR) and CAMR with EPA and EIA Assumptions for Natural Gas and Electric Growth (Thousand GWhs)**

| | Fuel | EPA Assumptions | | | EIA Assumptions | | |
|---|---|---|---|---|---|---|---|
| | | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 |
| Old Base Case | Coal | 2,198 | 2,242 | 2,410 | 2,243 | 2,638 | 3,048 |
| | Oil/Natural Gas | 777 | 1,026 | 1,221 | 902 | 867 | 873 |
| | Other | 1,223 | 1,235 | 1,218 | 1,224 | 1,235 | 1,224 |
| | Total | 4,198 | 4,503 | 4,850 | 4,369 | 4,739 | 5,145 |
| New Base Case: CAIR | Coal | 2,165 | 2,197 | 2,384 | 2,228 | 2,632 | 3,045 |
| | Oil/Natural Gas | 807 | 1,069 | 1,247 | 916 | 871 | 874 |
| | Other | 1,217 | 1,232 | 1,217 | 1,223 | 1,234 | 1,221 |
| | Total | 4,190 | 4,498 | 4,848 | 4,367 | 4,738 | 5,141 |
| Option 1 | Coal | 2,160 | 2,194 | 2,365 | 2,221 | 2,616 | 3,014 |
| | Oil/Natural Gas | 812 | 1,072 | 1,265 | 922 | 887 | 904 |
| | Other | 1,216 | 1,233 | 1,217 | 1,222 | 1,235 | 1,219 |
| | Total | 4,188 | 4,499 | 4,847 | 4,366 | 4,738 | 5,138 |

Note:  Numbers may not add due to rounding.
Source:  Integrated Planning Model run by EPA.

**Table 7-32.  Coal Production for the Electric Power Sector under the New Base Case (CAIR) and CAMR with EPA and EIA Assumptions for Natural Gas and Electricity Growth (Million Tons)**

| Supply Area | 2000 | 2003 | EPA Assumptions | | | EIA Assumptions | | |
|---|---|---|---|---|---|---|---|---|
| | | | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Old Base Case | Appalachia | 299 | 275 | 325 | 315 | 301 | 328 | 341 | 340 |
| | Interior | 131 | 135 | 161 | 162 | 173 | 161 | 182 | 247 |
| | West | 475 | 526 | 603 | 631 | 714 | 626 | 748 | 840 |
| | National | 905 | 936 | 1,089 | 1,109 | 1,188 | 1,115 | 1,271 | 1,428 |
| New Base Case: CAIR | Appalachia | 299 | 275 | 306 | 310 | 331 | 320 | 367 | 390 |
| | Interior | 131 | 135 | 164 | 193 | 219 | 174 | 207 | 260 |
| | West | 475 | 526 | 607 | 579 | 607 | 614 | 676 | 765 |
| | National | 905 | 936 | 1,077 | 1,082 | 1,156 | 1,109 | 1,250 | 1,415 |
| Option 1 | Appalachia | 299 | 275 | 303 | 310 | 330 | 317 | 377 | 396 |
| | Interior | 131 | 135 | 169 | 194 | 224 | 179 | 209 | 269 |
| | West | 475 | 526 | 589 | 568 | 572 | 595 | 639 | 706 |
| | National | 905 | 936 | 1,061 | 1,071 | 1,127 | 1,091 | 1,225 | 1,371 |

Source:  2000 and 2003 data are from EIA.  All projections are from the Integrated Planning Model run by EPA.

**Table 7-33.  Retail Electricity Prices by NERC Region for the Base Case (No Further Controls), CAIR, and CAMR with EPA and EIA Assumptions for Natural Gas and Electricity Growth (Mills/kWh) ($1999)**

| EPA Assumptions for Natural Gas and Electricity Growth | | | | | | | | | | | | | Change from CAIR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Base Case | | | CAIR | | | Option 1 | | | |
| Power Region | Primary States Included | 2000 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | | 2020 |
| ECAR (1) | OH, MI, IN, KY, WV, PA | 57.4 | 51.7 | 55.2 | 56.1 | 53.8 | 58.5 | 58.0 | 53.9 | 58.7 | 58.1 | | 0.2% |
| ERCOT (2) | TX | 65.1 | 57.9 | 64.4 | 62.6 | 59.3 | 64.6 | 63.3 | 59.1 | 64.9 | 63.4 | | 0.1% |
| MAAC (3) | PA, NJ, MD, DC, DE | 80.4 | 59.3 | 69.4 | 72.2 | 61.2 | 71.7 | 72.8 | 61.3 | 72.1 | 72.9 | | 0.2% |
| MAIN (4) | IL, MO, WI | 61.2 | 52.6 | 57.8 | 61.0 | 54.0 | 60.3 | 62.0 | 54.1 | 60.5 | 62.3 | | 0.5% |
| MAPP (5) | MN, IA, SD, ND, NE | 57.4 | 52.8 | 49.3 | 47.6 | 52.9 | 49.6 | 48.0 | 53.0 | 49.6 | 48.2 | | 0.5% |
| NY (6) | NY | 104.3 | 82.8 | 87.9 | 88.1 | 83.3 | 88.8 | 88.4 | 83.3 | 89.1 | 88.7 | | 0.4% |
| NE (7) | VT, NH, ME, MA, CT, RI | 89.9 | 77.4 | 83.9 | 82.8 | 77.5 | 84.7 | 83.0 | 77.5 | 84.8 | 83.1 | | 0.2% |
| FRCC (8) | FL | 67.9 | 71.2 | 71.3 | 69.5 | 71.7 | 72.3 | 70.5 | 71.8 | 72.3 | 70.7 | | 0.3% |
| STV (9) | VA, NC, SC, GA, AL, MS, TN, AR, LA | 59.3 | 56.2 | 55.1 | 55.3 | 57.0 | 56.2 | 56.6 | 57.1 | 56.2 | 56.8 | | 0.3% |
| SPP (10) | KS, OK, MO | 59.3 | 54.2 | 57.0 | 56.7 | 54.6 | 57.5 | 57.0 | 54.6 | 57.5 | 57.2 | | 0.3% |
| PNW (11) | WA, OR, ID | 45.9 | 49.6 | 47.4 | 46.9 | 49.8 | 47.5 | 46.9 | 49.8 | 47.5 | 47.1 | | 0.5% |
| RM (12) | MT, WY, CO, UT, NM, AZ, NV, ID | 64.1 | 63.9 | 65.2 | 64.7 | 64.1 | 65.6 | 65.4 | 64.2 | 65.6 | 65.1 | | -0.4% |
| CALI (13) | CA | 94.7 | 97.1 | 98.9 | 99.3 | 97.3 | 99.1 | 99.5 | 97.3 | 99.1 | 99.7 | | 0.3% |
| National | Contiguous Lower 48 States | 66.0 | 60.3 | 63.1 | 63.4 | 61.3 | 64.4 | 64.3 | 61.3 | 64.5 | 64.5 | | 0.2% |

| EIA Assumptions for Natural Gas and Electricity Growth | | | | | | | | | | | | | Change from CAIR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Base Case | | | CAIR | | | Option 1 | | | |
| Power Region | Primary States Included | 2000 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | 2010 | 2015 | 2020 | | 2020 |
| ECAR (1) | OH, MI, IN, KY, WV, PA | 57.4 | 53.5 | 59.8 | 57.1 | 55.3 | 61.5 | 58.8 | 55.5 | 61.7 | 59.2 | | 0.6% |
| ERCOT (2) | TX | 65.1 | 63.3 | 66.0 | 64.4 | 63.6 | 66.6 | 65.0 | 63.5 | 66.9 | 65.2 | | 0.3% |
| MAAC (3) | PA, NJ, MD, DC, DE | 80.4 | 63.1 | 74.7 | 72.8 | 64.0 | 75.4 | 73.7 | 64.0 | 75.6 | 73.7 | | 0.0% |
| MAIN (4) | IL, MO, WI | 61.2 | 54.9 | 63.8 | 62.4 | 55.9 | 65.2 | 63.3 | 56.0 | 65.2 | 63.5 | | 0.3% |
| MAPP (5) | MN, IA, SD, ND, NE | 57.4 | 52.9 | 49.6 | 48.1 | 53.1 | 49.9 | 48.6 | 53.1 | 50.0 | 48.9 | | 0.6% |
| NY (6) | NY | 104.3 | 89.0 | 91.3 | 87.8 | 89.1 | 91.9 | 88.8 | 89.1 | 91.7 | 89.0 | | 0.2% |
| NE (7) | VT, NH, ME, MA, CT, RI | 89.9 | 85.1 | 85.5 | 81.2 | 84.7 | 85.9 | 81.8 | 84.6 | 86.0 | 82.5 | | 0.8% |
| FRCC (8) | FL | 67.9 | 72.5 | 74.6 | 73.7 | 73.3 | 75.3 | 74.3 | 73.4 | 75.5 | 74.4 | | 0.0% |
| STV (9) | VA, NC, SC, GA, AL, MS, TN, AR, LA | 59.3 | 57.1 | 57.1 | 57.1 | 57.8 | 58.3 | 58.6 | 57.8 | 58.2 | 58.8 | | 0.4% |
| SPP (10) | KS, OK, MO | 59.3 | 56.2 | 59.5 | 57.9 | 56.7 | 59.7 | 58.1 | 56.7 | 59.9 | 58.7 | | 1.0% |
| PNW (11) | WA, OR, ID | 45.9 | 50.4 | 50.0 | 49.9 | 50.7 | 50.2 | 49.9 | 50.3 | 49.9 | 49.5 | | -0.7% |
| RM (12) | MT, WY, CO, UT, NM, AZ, NV, ID | 64.1 | 66.0 | 67.9 | 66.6 | 66.3 | 68.0 | 66.4 | 66.3 | 68.2 | 66.9 | | 0.8% |
| CALI (13) | CA | 94.7 | 99.5 | 101.4 | 101.8 | 99.6 | 101.5 | 101.8 | 99.9 | 101.8 | 102.0 | | 0.2% |

| National | Contiguous Lower 48 States | 66.0 | 62.8 | 66.1 | 64.9 | 63.5 | 67.0 | 65.8 | 63.6 | 67.1 | 66.1 | 0.5% |

Source: Retail Electricity Price Model run by EPA.  2000 prices from EIA's AEO 2003.

## 7.16   Small Entity Impacts

The Regulatory Flexibility Act (5 U.S.C. § 601 et seq.), as amended by the Small Business Regulatory Enforcement Fairness Act (Public Law No. 104-121), provides that whenever an agency is required to publish a general notice of proposed rulemaking, it must prepare and make available an initial regulatory flexibility analysis, unless it certifies that the proposed rule, if promulgated, will not have "a significant economic impact on a substantial number of small entities" (5 U.S.C. § 605[b]).  Small entities include small businesses, small organizations, and small governmental jurisdictions.

For the purposes of assessing the impacts of CAMR on small entities, a small entity is defined as:

(1)   A small business according to the Small Business Administration size standards by the North American Industry Classification System (NAICS) category of the owning entity.  The range of small business size standards for electric utilities is 4 billion kilowatt-hours of production or less;

(2)   a small government jurisdiction that is a government of a city, county, town, district, or special district with a population of less than 50,000; and

(3)   a small organization that is any not-for-profit enterprise that is independently owned and operated and is not dominant in its field.

Table 7-34 lists entities potentially affected by this proposed rule with applicable NAICS code.

## Table 7-34.  Potentially Regulated Categories and Entities[a]

| Category | NAICS Code[b] | Examples of Potentially Regulated Entities |
|---|---|---|
| Industry | 221112 | Coal-fired electric utility steam generating units. |
| Federal Government | 221112[c] | Coal-fired electric utility steam generating units owned by the federal government. |
| State/Local/ Tribal Government | 221112[c] | Coal-fired electric utility steam generating units owned by municipalities. |
|  | 921150 | Coal-fired electric utility steam generating units in Indian Country. |

[a]   Include NAICS categories for source categories that own and operate electric generating units only.
[b]   North American Industry Classification System.
[c]   Federal, state, or local government-owned and operated establishments are classified according to the activity in which they are engaged.

Courts have interpreted the RFA to require a regulatory flexibility analysis only when small entities will be subject to the requirements of the rule.[12]  In the January 30, 2004 Notice of Proposed Rulemaking (NPR) EPA determined that the proposed rule would not have a significant impact on a substantial number of small entities.  However, to provide additional information to States and affected sources, EPA conduct a general analysis of the potential economic impact of CAMR on small entities.

EPA examined the potential economic impacts to small entities associated with this rulemaking based on assumptions of how the affected states will implement control measures to meet their $NO_x$ and $SO_2$ budgets under the Clean Air Interstate Rule (CAIR) and their Hg budgets for EGUs under CAMR.  Under CAMR, States have the option of either participating in an EPA-run trading program, or implementing their Hg budget as a strict cap on Hg emissions from EGUs.  This analysis assumes that all affected States in the CAIR region choose to meet their CAIR budgets by controlling EGUs only, and that all States participate in the nationwide Hg cap-and-trade program.  This analysis does not examine potential indirect economic impacts associated with CAIR or CAMR, such as employment effects in industries providing fuel and pollution control equipment, or the potential effects of electricity price increases on industries and households.   Because CAMR is implemented in conjunction with CAIR, the costs of CAMR are measured incrementally to the costs of CAIR alone.

This analysis presents the annualize cost of CAMR for the year 2020, which is two years into the second phase of the Hg cap-and-trade program, and for which the Hg emission cap is 15 tons.  An important caveat to note in considering the results presented in this section is (as discussed earlier in this chapter) that EPA assumes no development in control technologies over the course of the Hg cap-and-trade program.   In reality, Hg emissions control is a fast moving area with new developments nearly monthly.  Actual costs may be lower than those presented since modeling assumes no improvements in the cost of mercury control technology, while in reality, control costs are expected to improve over time.  As a result, this the projected costs of the Hg cap-and-trade program for 2020 presented in this analysis most certainly overstate the impact of the rule on small entities during the second phase of the program.  At the same time, however, the marginal cost projected for mercury control in 2020 may also overstate the cost-savings that entities selling allowances may experience under the rule.  Finally, it should be noted that during the first phase of the program, the fact that the cap is equal to co-benefits under CAIR should limit the impact of CAMR on small entities.

### 7.16.1  Identification of Small Entities

EPA used EGRID data as a basis for compiling the list of potentially affected small entities.  EGRID is EPA's Emissions & Generation Resource Integrated Database, which contains emissions and resource mix data for virtually every power plant and company that generates electricity in the United States.[13]  The data set contains detailed ownership and

---

[12]  See Michigan v. EPA, 213 F.3d 663, 668-69 (D.C. Cir. 2000), cert. den. 121 S.Ct. 225, 149 L.Ed.2d 135 (2001).  An agency's certification need consider the rule's impact only on entities subject to the rule.

[13]  eGRID is available at http://www.epa.gov/cleanenergy/egrid/download.htm.

corporate affiliation information.  For plants burning coal as the primary fuel, plant-level boiler and generator capacity, heat input, generation, and emissions data were aggregated by owner and then parent company.  Entities with more than 4 billion kWh of annual electricity generation were removed from the list, as were municipal-owned entities serving a population greater than 50,000.  Finally, for cooperatives, investor-owned utilities, and subdivisions that generate less than 4 billion kWh of electricity annually but may be part of a large entity, additional research on power sales, operating revenues, and other business activities was performed to make a final determination regarding size.  Because the rule does not affect units with a generating capacity of 25 MW or less, small entities that do not own at least one coal-fired generating unit with a capacity greater than 25 MW were dropped from the data set.  According to EPA's analysis, approximately 35 small entities were exempted by this provision.  EPA identified a total of 81 potentially affected small entities, out of a possible 116.  The number of potentially affected small entities by ownership type, and summary of projected impacts, is listed in Table 7-35.

**Table 7-35.  Projected Impact of CAMR on Small Entities**

| EGU Ownership Type | Number of Potentially Affected Entities | Total Net Compliance Cost in 2020 Incremental to CAIR ($1999 millions) | Number of Small Entities with Compliance Costs >1% of Generation Revenues in 2020 | Number of Small Entities with Compliance Costs >3% of Generation Revenues in 2020 |
|---|---|---|---|---|
| Cooperative | 21 | 8.5 | 7 | 1 |
| Investor-Owned Utility | 2 | 6.4 | 2 | 0 |
| Municipal | 48 | 15.2 | 28 | 11 |
| Subdivision | 8 | 6.3 | 5 | 2 |
| Other | 1 | -0.003 | 0 | 0 |
| Total | 80 | 36.5 | 42 | 14 |

Note:   The total number of potentially affected entities in this table excludes the 35 entities that have been dropped because they will not be affected by CAMR. Also, the total number of entities with costs greater than 1 percent or 3 percent of revenues includes only entities experiencing positive costs.

Source:  IPM and TRUM analysis

### 7.16.2  Overview of Analysis and Results

This section presents the methodology and results for estimating the impact of CAMR to small entities in 2020 based on the following endpoints:

- annual economic impacts of CAMR on small entities and

- ratio of small entity impacts to revenues from electricity generation.

### 7.16.2.1          Methodology for Estimating Impacts of CAMR on Small Entities

An entity can comply with CAMR through some combination of the following: installing retrofit technologies, purchasing allowances, switching to a lower Hg fuel, or reducing emissions through a reduction in generation. Additionally, units with more allowances than needed can sell these allowances on the market. The chosen compliance strategy will be primarily a function of the unit's marginal control costs and its position relative to the marginal control costs of other units. Because CAMR will be implemented in conjunction with CAIR, units affected by both rules will attempt to minimize their cost of compliance over both rules, by considering Hg, $SO_2$, and $NO_x$ control strategies simultaneously.

To attempt to account for each potential control strategy over the combined rules, EPA estimates compliance costs as follows:

$$C_{Compliance} = \Delta C_{Operating+Retrofit} + \Delta C_{Fuel} + \Delta C_{Allowances} + \Delta C_{Transaction} - \Delta R \qquad (8.1)$$

where C represents a component of cost as labeled, and $\Delta R$ represents the retail value of foregone electricity generation.

In reality, compliance choices and market conditions can combine such that an entity may actually experience a savings in any of the individual components of cost. Under CAIR and CAMR, for example, EPA projects that the price of low-sulfur coal will fall as many units install scrubbers and switch away from low-sulfur coal to cheaper bituminous coal, such that many entities actually experience a reduction in fuel costs relative to the base caes as a result of lower prices due to the demand shift. Similarly, although some units will forgo some level of electricity generation (and thus revenues) to comply, this impact will be lessened on these entities by the projected increase in electricity prices under CAIR and CAMR as well as reductions in fuel costs, and those not reducing generation levels will see an increase in electricity revenues. Elsewhere, unscrubbed units burning low-sulfur coal might find it most economical to install mercury-specific controls such as ACI, and sell their surplus of Hg allowances on the market. Because this analysis evaluates the total costs along each of the four compliance strategies laid out above for each entity, it inevitably captures savings or gains such as those described. As a result, what we describe as cost is really more of a measure of the net economic impact of the rule on small entities.

For this analysis, EPA used IPM-parsed output to estimate net compliance costs at the unit level. These impacts were then summed for each small entity, adjusting for ownership share. Net impact estimates were based on the following: operating and retrofit costs, sale or purchase of allowances, and the change in fuel costs or electricity generation revenues under CAMR relative to CAIR. These individual components of compliance cost were estimated as follows:

(1)   **Operating and retrofit costs:** Using the IPM-parsed output for the base case, CAIR, and CAMR (available in the docket), EPA identified units that install control technology under CAIR and CAMR and the technology installed. The equations for calculating retrofit costs were adopted from EPA's Technology Retrofit and Updating Model (TRUM). The model calculates the capital cost (in $/MW); the fixed operation and maintenance (O&M) cost (in $/MW-year); the

variable O&M cost (in $/MWh); and the total annualized retrofit cost for units projected to install FGD, SCR, SNCR, or ACI.

(2) **Sale or purchase of allowances:** EPA estimated the value of initial $SO_2$, $NO_x$, and Hg allowance holdings. For $SO_2$, units were assumed to retain their Phase II allowance allocations as determined under EPA's 1998 reallocation of Acid Rain allowances, adjusted to reflect the 50 percent reduction in 2010 and 65 percent reduction in 2015 under CAIR. Because of the resources involved in compiling allowance-holding data, the value of banked $SO_2$ allowances was not considered in this analysis. The implication of this is that the annual net purchase of allowances may be overstated for some units. For $NO_x$, the state emission budgets were assumed to be apportioned to units on a heat-input basis. Each unit was assumed to receive a share of the state $NO_x$ emission budget equal to its share of the total state heat input for that year in the base case. This is a simplification of what is included in the model rule, which proposes allocating $NO_x$ allowances based on heat input from 1999-2002.[14] However, states can ultimately decide how to allocate $NO_x$ allowances. For Hg, unit allocations were the same as those listed in the March 16, 2004 Supplemental Notice of Proposed Rulemaking.

To estimate the value of allowances holdings, allocated NOx and $SO_2$ allowances were subtracted from projected emissions, and the difference was then multiplied by the allowance prices projected by IPM for 2020. Units were assumed to purchase or sell allowances to exactly cover their projected $NO_x$ and $SO_2$ emissions under CAIR + CAMR. For Hg, units that did not have allowances sufficient to cover projected 2020 emissions were projected to withdraw allowances from their respective Hg allowance banks if available, or else purchase the required amount of allowances. Units holding 2020 allowances in excess of projected 2020 emissions were projected to sell these excess allowances. The estimation of the size of a unit's mercury allowance bank is discussed further below.

(3) **Fuel costs:** Fuel costs were estimated by multiplying fuel input (MMBtu) by region and fuel-type-adjusted fuel prices ($/MMBtu) from TRUM. The change in fuel expenditures under CAMR was then estimated by taking the difference in fuel costs between CAMR and CAIR.

(4) **Value of electricity generated:** EPA estimated electricity generation by first estimating unit capacity factor and maximum fuel capacity. Unit capacity factor is estimated by dividing fuel input (MMBtu) by maximum fuel capacity (MMBtu). The maximum fuel capacity was estimated by multiplying capacity (MW) * 8,760 operating hours * heat rate (MMBtu/MWh). The value of electricity generated is then estimated by multiplying capacity (MW)*capacity factor*8,760*regional-adjusted retail electricity price ($/MWh).

---

[14] A similar approach was used in regulatory impact analyses for the 126 FIP and $NO_x$ SIP Call.

As discussed later in this analysis, many small entities projected to be affected by CAMR do not have to operate in a competitive market environment and thus should be able to pass compliance costs on to consumers. To somewhat account for this, we incorporated the projected regional-adjusted retail electricity price calculated under CAMR in our estimation of generation revenue under CAMR.

(5)     **Administrative costs:** Because most affected units are already monitored as a result of other regulatory requirements, EPA considered the primary administrative cost to be transaction costs related to purchasing or selling allowances. EPA assumed that transaction costs were equal to 1.5 percent of the total absolute value of a unit's allowances. This assumption is based on market research by ICF Consulting.

(6)     **Value of the Mercury Bank:** EPA's economic analysis of CAMR suggests that a significant bank of approximately 70 tons of Hg allowances will be built up during the first phase of the cap-and-trade program. Sources will be relying heavily on this bank for compliance during the second phase of the program. While not all sources will have banked allowances during the first phase of the program, many sources will be able to draw from this bank during the second phase and avoid or limit Hg allowance purchases. EPA estimated the size of the bank by comparing projected emissions for the years 2010-2019 with allocations for those years. This estimate assumed that small entity sources with surplus allowances in those years would bank those allowances rather than sell them on the market, and would draw from this bank in any year that they were short allowances. EPA estimated the cost of using banked allowances by taking the average cost of Hg control in the first phase of the program discounted to 2020, multiplied by the number of banked allowances used. Finally, any surplus allowances remaining in the small entity banks in 2020 were valued at the 2020 Hg allowance price.

### 7.16.2.2     Results

The potential impacts of CAMR on small entities are summarized in Table 7-35. All costs are presented in $1999. EPA estimated the incremental annualized net compliance cost to small entities to relative to CAIR to be approximately $37 million in 2020. This cost is driven largely by mercury allowance purchases and additional retrofits relative to CAIR. The costs to small entities in 2020 are limited, however, by the ability of approximately 30 of the 81 small entities to sell surplus 2020 and/or banked allowances in 2020.

EPA does not project that any coal-fired generation would be uneconomic to maintain relative to CAIR. This finding suggests that the extent of CAMR's adverse economic impacts beyond CAIR on small entities is limited.

EPA further assessed the economic and financial impacts of the rule using the ratio of compliance costs to the value of revenues from electricity generation, focusing in particular on entities for which this measure is greater than 1 percent. Although this metric is commonly used in EPA impact analyses, it makes the most sense when as a general matter an analysis is looking

at small businesses that operate in competitive environments.  However, small businesses in the electric power industry often operate in a price-regulated environment where they are able to recover expenses through rate increases.  Given this, EPA considers the 1 percent measure in this case a crude measure of the price increases these small entities will be asking of rate commissions or making at publicly owned companies.

Of the 80 small entities considered in this analysis, and 116 total small entities in the affected region 42 were projected to have compliance costs greater than 1% of revenues, while 14 were projected to have compliance costs greater than 3% of revenues.   As was emphasized earlier, this result is largely due to the magnitude of the projected marginal Hg control cost in 2020.   A marginal cost similar to what was projected in the sensitivity analysis discussed earlier in this chapter would eliminate significant impacts.  Furthermore, the majority of small entities in this analysis operate in a competitive market and thus should be able to recover their costs of complying with CAMR.  It should also be emphasized that under CAMR, states, through their choice of Hg allowance allocation methodologies, can potentially mitigate adverse affects of CAIR on small entities.

The distribution across entities of economic impacts as a share of base case revenue is summarized in Table 7-36.  Although the distributions of economic impacts on each ownership type are in general fairly tight.  Entities with the lowest negative net impacts are those that have complied with the Hg rule without additional retrofits, and have a number of surplus Hg allowances for sale.  On average, the impact of the rule on small entities is less than 1% of electricity generation revenues.

**Table 7-36.  Summary of Distribution of Economic Impacts of CAIR on Small Entities**

| EGU Ownership Type | Capacity-Weighted Average Economic Impacts as a % of Generation Revenues | Min | Max |
|---|---|---|---|
| **Cooperative** | 0.52 % | -6.30 % | 4.7 % |
| **Investor-owned utility** | 1.94 % | 1.48 % | 2.22 % |
| **Municipal** | 1.21 % | -5.30 % | 6.39 % |
| **Subdivision** | 1.54 % | -0.52 % | 3.31 % |
| **Other** | -0.09 % | -0.09 % | -0.09 % |
| **All** | **0.96 %** | **-6.30 %** | **6.4%** |

Source:  IPM and TRUM analysis

In the cases where entities are projected to experience positive net impacts that are a high percentage of revenues, these entities generally have a shortage of Hg allowances and must

7-34

purchase them on the market at the projected 2020 price.  Many of these entities also reduce generation slightly, and thus generation revenues, relative to CAIR alone.

The separate components of annualized costs to small entities under CAIR and CAIR + CAMR are summarized in Table 7-37.  Under CAMR, allowance purchases, driven largely by the marginal cost projected for Hg in 2020, as well as additional retrofits, are the most significant components of compliance cost for small entities in 2020.  Also, fuel costs under for all groups with the exception of IOUs increase relative to CAIR, largely because of an increased demand for bituminous coal and the resulting higher bituminous coal price relative to CAIR.   Retrofit and operating costs for subdivisions, municipals, and cooperatives increase significantly, largely because of the installation of FGD, SCR and ACI.  Finally, all groups with the exception of IOUs experience an increase in electricity revenues relative to CAIR alone.  This increase is largely driven by increases in the retail price of electricity relative to CAIR alone, although a few units are projected to increase generation under CAIR + CAMR.  The two IOUs in this analysis experience an increased revenue loss that results largely from generation reductions relative to CAIR in 2020.

**Table 7-37.  Incremental Annualized Costs under CAMR relative to CAIR, Summarized by Ownership Group and Cost Category ($1,000,000)**

| EGU Ownership Type | Retrofit + Operating Cost | Net Purchase of Allowances | Fuel Cost | Lost Electricity Revenue | Administrative Cost |
|---|---|---|---|---|---|
| Cooperative | 4.9 | 2.9 | 2 | -1.3 | 0.1 |
| IOU | -0.1 | 4.1 | -0.6 | 3 | 0.1 |
| Municipal | 6.2 | 10.3 | 6.3 | -7.6 | 0.1 |
| Subdivision | 5.3 | 0.8 | 0.4 | -0.2 | 0.1 |
| Other | 0 | 0 | 0 | -0.1 | 0.001 |

Note:  Numbers may not add to totals in Table 7-35 due to rounding.

Source:  IPM and TRUM analysis.

### 7.16.3  Summary of Small Entity Impacts

While EPA has certified, based on earlier analysis that was summarized in the January 30, 2004 NPR, that CAMR will not have a significant impact on a substantial number of small entities, this analysis has been conducted to provide additional understanding of the nature of potential impacts, and additional information to the states as they propose plants to meet the emissions budgets set by this rulemaking.

EPA projects an incremental impact on small entities relative to CAIR of approximately $37 million relative to CAIR.  EPA also projects that no additional small entity coal capacity will be uneconomic to maintain under CAMR relative to what was projected to be uneconomic

to maintain under CAIR, which is the new base case.  This finding suggests that the incremental impact of CAMR on small entities is limited.

Furthermore, of the 81small entities potentially affected, and the 116 small entities with in the country with coal units included in EPA's modeling, 42 may experience compliance costs in excess of 1 percent of revenues, while 14 are projected to experience compliance costs in excess of 3 percent of revenues, based on our assumptions of how the affected states implement control measures to meet their emissions budgets as set forth in this rulemaking.   As is discussed earlier in this analysis, the finding of a significant impact to some entities during the second phase of the program is largely a product of the marginal cost projected for Hg control in 2020. In reality, control costs of Hg are expected to be lower by 2020, such that allowance prices would be reduced, and significant impacts unlikely.  Further, the majority of these small entities operate in cost-of-service markets where they should be able to pass on their costs of compliance to rate-payers.

Two other points should be considered when evaluating the impact of CAMR, specifically, and cap-and-trade programs more generally, on small entities.  First, under CAIR, the cap-and-trade program is designed such that states determine how Hg allowances are to be allocated across units.  States electing to participate in the Hg cap-and-trade program could allocate allowances in a manner that would mitigate any potential disadvantage faced by small entities.  Further, States that chose to implement their State budget as a strict cap could provide some level of exemption to sources owned by small entities, and require greater reductions from other sources.   Finally, it should be noted that, the use of a cap-and-trade program in general will limit impacts on small entities relative to a less flexible command-and-control program.

## 7.17    Unfunded Mandates Reform Act (UMRA) Analysis

Title II of the UMRA of 1995 (Public Law 104-4)(UMRA) establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and Tribal governments and the private sector.  Under Section 202 of the UMRA, 2 U.S.C. 1532, EPA generally must prepare a written statement, including a cost-benefit analysis, for any proposed or final rule that "includes any Federal mandate that may result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more ... in any one year."  A "Federal mandate" is defined under Section 421(6), 2 U.S.C. 658(6), to include a "Federal intergovernmental mandate" and a "Federal private sector mandate."  A "Federal intergovernmental mandate," in turn, is defined to include a regulation that "would impose an enforceable duty upon State, Local, or Tribal governments," Section 421(5)(A)(i), 2 U.S.C. 658(5)(A)(i), except for, among other things, a duty that is "a condition of Federal assistance," Section 421(5)(A)(i)(I).  A "Federal private sector mandate" includes a regulation that "would impose an enforceable duty upon the private sector," with certain exceptions, Section 421(7)(A), 2 U.S.C. 658(7)(A).

Before promulgating an EPA rule for which a written statement is needed under Section 202 of the UMRA, Section 205, 2 U.S.C. 1535, of the UMRA generally requires EPA to identify and consider a reasonable number of regulatory alternatives and adopt the least costly, most cost-effective, or least burdensome alternative that achieves the objectives of the rule.

In the NPR, EPA concluded that the proposed Hg MACT contained a Federal Mandate that may result in expenditures of $100 million or more for State, local, and Tribal governments in aggregate, or the private sector in any one year.  For that reason, EPA prepared a written statement for the NPR consistent with the requirements of Section 202 of the UMRA. In today's final rule,  EPA is not directly establishing any regulatory requirements that may significantly or uniquely affect small governments, including Tribal governments.  Thus, under CAMR, EPA is not obligated to develop under Section 203 of the UMRA a small government agency plan. Furthermore, in a manner consistent with the intergovernmental consultation provisions of Section 204 of the UMRA, EPA carried out consultations with the governmental entities affected by this rule.

EPA analyzed the economic impacts of the final CAMR.  This analysis does not examine potential indirect economic impacts associated with CAIR, such as employment effects in industries providing fuel and pollution control equipment, or the potential effects of electricity price increases on industries and households.

This analysis presents the annualize cost of CAMR for the year 2020, which is two years into the second phase of the Hg cap-and-trade program, and for which the Hg emission cap is 15 tons.  An important caveat to note in considering the results presented in this section is (as discussed earlier in this chapter) that EPA assumes no development in control technologies over the course of the Hg cap-and-trade program.   In reality, Hg emissions control is a fast moving area with new developments nearly monthly.  Actual costs may be lower than those presented since modeling assumes no improvements in the cost of mercury control technology, while in reality, control costs are expected to improve over time.  As a result, this the projected costs of the Hg cap-and-trade program for 2020 presented in this analysis most certainly overstate the impact of the rule on government-owned entities during the second phase of the program.  At the same time, however, the marginal cost projected for mercury control in 2020 may also overstate the cost-savings that entities selling allowances may experience under the rule.  Finally, it should be noted that during the first phase of the program, the fact that the cap is equal to co-benefits under CAIR should limit the impact of CAMR on government entities.

*7.17.1 Identification of Government-Owned Entities*

Using eGRID data, EPA identified state- and municipality-owned utilities and subdivisions.  EPA then used IPM-parsed output to associate these plants with individual generating units.  Entities that did not own at least one unit with a generating capacity of greater than 25 MW were omitted from the analysis because of their exemption from the rule.  This exempts 37 entities owned by state or local governments.   Thus, EPA identified 88 state and municipality-owned utilities that are potentially affected by CAIR, out of a possible 125, which are summarized in Table 7-38.

**Table 7-38.  Summary of Potential Impacts on Government Entities under CAIR**

| EGU Ownership Type | Potentially Affected Entities | Net Compliance Cost in 2020 Incremental to CAIR ($1999 millions | Number of Government Entities with Compliance Costs >1% of Generation Revenues | Number of Government Entities with Compliance Costs >3% of Generation Revenues |
|---|---|---|---|---|
| Subdivision | 8 | 6.5 | 5 | 2 |
| State | 10 | 9.2 | 4 | 0 |
| Municipal | 70 | 32.2 | 35 | 12 |
| Total | 88 | 47.9 | 44 | 14 |

Note:   The total number of potentially affected entities in this table excludes the 37 entities that have been dropped because they will not be affected by CAMR.  Also, the total number of entities with costs greater than 1 percent or 3 percent of revenues includes only entities experiencing positive costs.
Source: IPM and TRUM analysis

## 7.17.2 Overview of Analysis and Results

After identifying potentially affected government entities, EPA estimated the impact of CAMR + CAIR, relative to CAIR alone, in 2020 based on the following:

- total impacts of compliance on government entities and

- ratio of small entity impacts to revenues from electricity generation.

The financial burden to owners of EGUs under CAMR is composed of compliance and administrative costs.  This section outlines the compliance and administrative costs for the 88 potentially affected government-owned units identified in EPA modeling.

### 7.17.2.1   Methodology for Estimating Impacts of CAMR on Government Entities

The primary burden on state and municipal governments that operate utilities under CAMR is the cost of installing control technology on units to meet their Hg emission budget or the cost of purchasing allowances.  An entity can comply with CAMR through some combination of the following: installing retrofit technologies, purchasing allowances, switching to a lower Hg fuel, or reducing emissions through a reduction in generation.  Additionally, units with more allowances than needed can sell these allowances on the market.  The chosen compliance strategy will be primarily a function of the unit's marginal control costs and its position relative to the marginal control costs of other units.  Because CAMR will be implemented in conjunction with CAIR, units affected by both rules will attempt to minimize their cost of compliance over both rules, by considering Hg, $SO_2$, and $NO_x$ control strategies simultaneously.

To attempt to account for each potential control strategy over the combined rules, EPA estimates compliance costs as follows:

$$C_{Compliance} = \Delta C_{Operating+Retrofit} + \Delta C_{Fuel} + \Delta C_{Allowances} + \Delta C_{Transaction} - \Delta R \qquad (8.2)$$

where C represents a component of cost as labeled, and $\varDelta R$ represents the retail value of foregone electricity generation.

In reality, compliance choices and market conditions can combine such that an entity may actually experience a savings in any of the individual components of cost. Under CAIR and CAMR, for example, EPA projects that the price of low-sulfur coal will fall as many units install scrubbers and switch away from low-sulfur coal to cheaper bituminous coal, such that many entities actually experience a reduction in fuel costs relative to the base caes as a result of lower prices due to the demand shift. Similarly, although some units will forgo some level of electricity generation (and thus revenues) to comply, this impact will be lessened on these entities by the projected increase in electricity prices under CAIR and CAMR as well as reductions in fuel costs, and those not reducing generation levels will see an increase in electricity revenues. Elsewhere, unscrubbed units burning low-sulfur coal might find it most economical to install mercury-specific controls such as ACI, and sell their surplus of Hg allowances on the market. Because this analysis evaluates the total costs along each of the four compliance strategies laid out above for each entity, it inevitably captures savings or gains such as those described. As a result, what we describe as cost is really more of a measure of the net economic impact of the rule on small entities.

In this analysis, EPA used IPM-parsed output for the base case, CAIR, and CAMR to estimate net compliance cost at the unit level. These costs were then summed for each government entity, adjusting for ownership share. Compliance cost estimates were based on the following: operating and retrofit costs, sale or purchase of allowances, and the change in fuel costs or electricity generation revenues under CAMR relative to CAIR. These components of compliance cost were estimated as follows:

(1) **Operating and retrofit costs:** Using the IPM-parsed output for the base case, CAIR, and CAMR (available in the docket), EPA identified units that install control technology under CAIR and CAMR and the technology installed. The equations for calculating retrofit costs were adopted from EPA's Technology Retrofit and Updating Model (TRUM). The model calculates the capital cost (in $/MW); the fixed operation and maintenance (O&M) cost (in $/MW-year); the variable O&M cost (in $/MWh); and the total annualized retrofit cost for units projected to install FGD, SCR, SNCR, or ACI.

(2) **Sale or purchase of allowances:** EPA estimated the value of initial $SO_2$, $NO_x$, and Hg allowance holdings. For $SO_2$, units were assumed to retain their Phase II allowance allocations as determined under EPA's 1998 reallocation of Acid Rain allowances, adjusted to reflect the 50 percent reduction in 2010 and 65 percent reduction in 2015 under CAIR. Because of the resources involved in compiling allowance-holding data, the value of banked $SO_2$ allowances was not considered in this analysis. The implication of this is that the annual net purchase of allowances may be overstated for some units. For $NO_x$, the state emission budgets were assumed to be apportioned to units on a heat-input basis. Each unit was assumed to receive a share of the state $NO_x$ emission budget equal to its share of the total state heat input for that year in the base case. This is a simplification of what is included in the model rule, which proposes allocating $NO_x$ allowances

based on heat input from 1999-2002.[15]  However, states can ultimately decide how to allocate $NO_x$ allowances.  For Hg, unit allocations were the same as those listed in the March 16, 2004 Supplemental Notice of Proposed Rulemaking.

To estimate the value of allowances holdings, allocated NOx and $SO_2$ allowances were subtracted from projected emissions, and the difference was then multiplied by the allowance prices projected by IPM for 2020.  Units were assumed to purchase or sell allowances to exactly cover their projected $NO_x$ and $SO_2$ emissions under CAIR + CAMR.   For Hg, units that did not have allowances sufficient to cover projected 2020 emissions were projected to withdraw allowances from their respective Hg allowance banks if available, or else purchase the required amount of allowances.  Units holding 2020 allowances in excess of projected 2020 emissions were projected to sell these excess allowances.  The estimation of the size of a unit's mercury allowance bank is discussed further below.

(3)     **Fuel costs:**  Fuel costs were estimated by multiplying fuel input (MMBtu) by region and fuel-type-adjusted fuel prices ($/MMBtu) from TRUM.  The change in fuel expenditures under CAMR was then estimated by taking the difference in fuel costs between CAMR and CAIR.

(4)     **Value of electricity generated:**  EPA estimated electricity generation by first estimating unit capacity factor and maximum fuel capacity.  Unit capacity factor is estimated by dividing fuel input (MMBtu) by maximum fuel capacity (MMBtu).  The maximum fuel capacity was estimated by multiplying capacity (MW) * 8,760 operating hours * heat rate (MMBtu/MWh).  The value of electricity generated is then estimated by multiplying capacity (MW)*capacity factor*8,760*regional-adjusted retail electricity price ($/MWh).

As discussed later in this analysis, most government entities projected to be affected by CAMR do not have to operate in a competitive market environment and thus should be able to pass compliance costs on to consumers.  To somewhat account for this, we incorporated the projected regional-adjusted retail electricity price calculated under CAMR in our estimation of generation revenue under CAMR.

(5)     **Administrative costs:**  Because most affected units are already monitored as a result of other regulatory requirements, EPA considered the primary administrative cost to be transaction costs related to purchasing or selling allowances.  EPA assumed that transaction costs were equal to 1.5 percent of the total absolute value of a unit's allowances.  This assumption is based on market research by ICF Consulting.

---

[15] A similar approach was used in regulatory impact analyses for the 126 FIP and $NO_x$ SIP Call.

(6)     **Value of the Mercury Bank:** EPA's economic analysis of CAMR suggests that a significant bank of approximately 70 tons of Hg allowances will be built up during the first phase of the cap-and-trade program.  Sources will be relying heavily on this bank for compliance during the second phase of the program.  While not all sources will have banked allowances during the first phase of the program, many sources will be able to draw from this bank during the second phase and avoid or limit Hg allowance purchases.  EPA estimated the size of the bank by comparing projected emissions for the years 2010-2019 with allocations for those years.  This estimate assumed that state and local government-owned sources with surplus allowances in those years would bank those allowances rather than sell them on the market, and would draw from this bank in any year that they were short allowances.   EPA estimated the cost of using banked allowances by taking the average cost of Hg control in the first phase of the program discounted to 2020, multiplied by the number of banked allowances used.  Finally, any surplus allowances remaining in the government entity banks in 2020 were valued at the 2020 Hg allowance price.

### 7.17.2.2      Results

A summary of economic impacts on government-owned entities is presented in Table 7-38.  According to EPA's analysis, the total net economic impact on government-owned entities (state- and municipality-owned utilities and subdivisions) is expected to be approximately $48 million in 2020.   This cost is driven largely by mercury allowance purchases and additional retrofits relative to CAIR.   The costs to government entities in 2020 are limited, however, by the projection that 33 of the 88 entities sell surplus and/or banked allowances in 2020.  In the absence of banked allowances, costs to these entities in 2020 would be greater.

EPA does not project that any coal-fired generation would be uneconomic to maintain relative to CAIR.   This finding suggests that the extent of CAMR's adverse economic impacts beyond CAIR on small entities is limited.

As was done for the small entities analysis, EPA further assessed the economic and financial impacts of the rule using the ratio of compliance costs to the value of revenues from electricity generation in the base case, also focusing specifically on entities for which this measure is greater than 1 percent.  EPA projects that 44 government entities will have compliance costs greater than 1 percent of revenues from electricity generation in 2020, and 12 entities are projected to have compliance costs greater than 3 percent of revenues.   Entities that are projected to experience negative compliance costs under CAMR are not included in those totals.  This approach is more indicative of a significant impact when an analysis is looking at entities operating in a competitive market environment.  Government-owned entities do not operate in a competitive market environment and therefore will be able to recover expenses under CAIR and CAMR through rate increases.  Given this, EPA considers the 1 percent measure in this case a crude measure of the extent to which rate increases will be made at publicly owned companies.

The distribution across entities of economic impacts as a share of base case revenue is summarized in Table 7-39.  For state-owned entities and subdivisions, the maximum economic impact as a share of base case revenues is approximately 3 percent.  A few municipality-owned entities experience economic impacts that are significantly higher than the capacity-weighted average for this group.  In the cases where entities are projected to experience positive net costs that are a high percentage of revenues, these entities do not find it economic to retrofit and are unable to switch to a lower-sulfur coal.  Thus, these entities comply primarily through the purchase of allowances and reductions in generation.  Overall, the capacity-weighted average impact of the rule as a share of revenues is well under 1%.

**Table 7-39.  Distribution of Economic Impacts on Government Entities under CAMR**

| EGU Ownership Type | Capacity-Weighted Average Economic Impacts as a % of Generation Revenues | Min | Max |
|---|---|---|---|
| Sub-division | 1.50 % | -0.52 % | 3.31 % |
| State | 0.30 % | -0.96 % | 2.88 % |
| Municipal | 0.38 % | -16.55 % | 6.39 % |
| All | 0.40 % | -16.55 % | 6.39 % |

Source: IPM and TRUM analysis

Additionally, a few municipal entities are projected to experience negative net costs that are a high percentage of base case generation revenues.  These entities have units that are able to switch to a cheaper, lower-sulfur coal to comply with CAIR and are able to maintain or increase generation levels, thus increasing revenues.  Further, entities in regions for which we project large electricity price increases relative to other regions tend to be among those at the lower end of the distribution.

The various components of annualized incremental cost under CAIR to each group of government entities are summarized in Table 7-40.  Under CAMR, the most significant components of control costs for these entities are allowance purchases, driven largely by the marginal cost projected for Hg in 2020, as well as additional retrofits.   Also, the increased demand for bituminous coal and the resulting higher bituminous coal price relative to CAIR leads to an increase in fuel costs for all groups.  Retrofit and operating costs for all groups increase relative to CAIR alone, because of the installation of ACI, as well as some additional FGD and SCR.  Finally, both states and municipals are projected to experience an increase in electricity generation revenues relative to CAIR alone, while subdivisions are projected to experience a slight additional drop in revenues relative to CAIR alone.  Increased generation revenues are largely a result of slight increases in the retail price of electricity in most regions under CAMR, although some facilities are projected to increase generation.  Subdivisions experience a loss in generation revenues because of a net decrease in electricity generation relative to CAIR that is not offset by the increase in electricity prices.

**Table 7-40.  Incremental Annualized Costs under CAMR Relative to CAIR Summarized by Ownership Group and Cost Category ($1,000,000)**

| EGU Ownership Type | Retrofit + Operating Cost | Net Purchase of Allowances | Fuel Cost | Lost Electricity Revenue | Administrative Cost |
|---|---|---|---|---|---|
| Subdivision | 5.3 | 1.0 | 0.4 | 0.2 | 0.1 |
| State | 8.5 | 7.2 | 2.0 | -8.6 | 0.2 |
| Municipal | 7.6 | 17.5 | 9.0 | -2.1 | 0.3 |

Note:  Numbers may not add to totals in Table 7-38 due to rounding.

Source:  IPM and TRUM analysis.

### 7.17.3  Summary of Government Entity Impacts

EPA examined the potential economic impacts on state and municipality-owned entities associated with this rulemaking based on assumptions of how the affected states will implement control measures to meet their emissions.  These impacts have been calculated to provide additional understanding of the nature of potential impacts and additional information to the states as they create State plans to meet the Hg emission budgets set by this rulemaking.

According to EPA's analysis, the total net economic impact on government-owned entities is expected to be approximately $48 million in 2020.  These costs are driven largely by the purchase of Hg allowances and the cost of additional retrofits under the combination of CAIR and CAMR.  EPA projects that no additional government entity capacity will be uneconomic to maintain under CAMR relative to what was projected to be uneconomic to maintain under CAIR.  This suggests that the incremental impact of CAMR on small entities relative to CAIR alone is limited.

Of the 88 government entities considered in this analysis and the 125 government entities that are included in EPA's modeling, 44 are projected to experience compliance costs in excess of 1 percent of electricity generation revenues in 2020, and 14 of these are projected to experience compliance costs in excess of 3% of generation revenues.  may in 2015, based on our assumptions of how the affected states implement control measures to meet their emissions budgets as set forth in this rulemaking.   As is discussed earlier in this analysis, the finding of a significant impact to some entities during the second phase of the program is largely a product of the marginal cost projected for Hg control in 2020.   In reality, control costs of Hg are expected to be lower by 2020, such that allowance prices would be reduced, and significant impacts unlikely.  Further, government entities operate in cost-of-service markets where they should be able to pass on their costs of compliance to rate-payers.  The above points aside, potential adverse impacts of CAMR on state- and municipality-owned entities could be limited by the fact that the cap-and-trade program is designed such that states determine how Hg allowances are to be allocated across units.  A state that wishes to mitigate the impact of the rule on state- or municipality-owned entities  might choose to allocate Hg allowances in a manner that is favorable to these entities.  Finally, in general, the use of cap-and-trade programs in general will limit impacts on entities owned by small governments relative to a less flexible command-and-control program.

EPA has determined that this rule may result in expenditures of more than $100 million to the private sector in any single year.  EPA believes that the final represents the least costly, most cost-effective approach to achieve the air quality goals of this rule.  The costs and benefits associated with the final rule are discussed throughout this RIA.

## 7.18   List of IPM Runs in Support of CAMR

A list of the IPM runs that were used in the various analyses done in support of the final CAMR is provided.  Model output from each of the IPM runs listed in this memo is available in the CAMR docket and also on EPA's Web site at www.epa.gov/airmarkets/epa-ipm.

**Table 7-41.  Listing of Runs from the Integrated Planning Model Used in Analyses Done in Support of the CAMR Final Rule Analyses**

| Run Name | Run Description |
|---|---|
| Base Case 2004 | Base case model run, which includes the national Title IV $SO_2$ cap-and-trade program; $NO_x$ SIP Call regional ozone season cap-and-trade program; and state-specific programs in Connecticut, Illinois, Maine,  Massachusetts, Minnesota, Missouri, New Hampshire, New York, North Carolina, Oregon, Texas, and Wisconsin.  This run represents conditions without the proposed CAIR. |
| CAIR 2004_Analysis | CAIR control strategy used for much of the analytical work for the final CAIR (includes AR/DE/NJ for annual controls and no ozone season cap and is the IPM run used for air quality modeling) |
| CAIR 2004_Final | Final CAIR policy (includes annual and ozone season caps for the States who contribute to PM2.5 and/or ozone nonattainment), used in Hg cost modeling |
| CAMR_Option 1 | Final CAMR control strategy |
| CAMR_Option 2 | CAMR option with Hg caps of 38 tons in 2010 and 15 tons in 2015 |
| CAMR_Option 3 | CAMR option with Hg caps of 38 tons in 2010, 24 tons in 2015, and 15 tons in 2018 |
| CAMR_Sorbent Sensitivity_Option 1 | CAMR run with second ACI control option in 2013 using advanced sorbents |
| Base Case 2004_EIA | Base Case run with EIA assumptions for the difference between natural gas prices and coal prices, as well as EIA's projection of electricity growth |
| CAIR 2004_EIA | CAIR run with EIA assumptions for the difference between natural gas prices and coal prices, as well as EIA's projection of electricity growth |
| CAMR 2004_EIA | CAMR run with EIA assumptions for the difference between natural gas prices and coal prices, as well as EIA's projection of electricity growth |
| **Parsed Files** | |
| EPA base case parsed for year 2010 | |
| EPA base case parsed for year 2015 | |
| EPA base case parsed for year 2020 | |
| EPA CAIR parsed for year 2020 | |
| EPA CAMR_Option 1 parsed for year 2020 | |
| EPA CAMR_Option 2 parsed for year 2020 | |
| EPA CAMR_Option 3 parsed for year 2020 | |

SECTION 8    AIR QUALITY MODELING:  CHANGES IN HG DEPOSITION TO U.S.
                WATERBODIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-1
        8.1    Emissions Inventories and Estimated Emissions Reductions . . . . . . . . . . . . . . 8-2
        8.2    Model, Domain, Configuration, Inputs, Application . . . . . . . . . . . . . . . . . . . . . 8-5
                8.2.1   Air Quality Model . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-5
                8.2.2   Modeling Domain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-6
                8.2.3   Time Periods Modeled for Mercury Deposition . . . . . . . . . . . . . . . . 8-6
                8.2.4   Model Inputs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-7
        8.3    CMAQ Model Performance Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-8
        8.4    Mercury Deposition Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9
        8.5    Summary of Findings: HUC Level Deposition Analysis . . . . . . . . . . . . . . . . 8-14
        8.6   References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-17

**Tables**

Table 8-1.  Summary of Emissions Sources for 2001 and 2020 Mercury Emissions
Inventories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-3
Table 8-2.  Summary of Mercury Emissions by Species: 2001 and 2020 (with CAIR)
Baselines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-3
Table 8-3.  Summary of Changes in Mercury Emissions Associated with CAMR Control
Option 1:  2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-4
Table 8-4.  Summary of Changes in Mercury Emissions Associated with CAMR Control
Option 2: 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-4
Table 8-5.  CMAQ Performance Statistics for Mercury Wet Deposition: 2001 . . . . . . . . . . . 8-9
Table 8-6.  Summary Statistics of Total Mercury Depositions (ug/m$^2$) by Modeling
Scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-14
Table 8-7.  Summary Statistics of Utility Attributable Deposition (ug/m$^2$) by Modeling
Scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-16

**Figures**

Figure 8-1.  CMAQ Modeling Domain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-6
Figure 8-2.  Base Case Total Mercury Deposition: 2001 . . . . . . . . . . . . . . . . . . . . . . . . . 8-10
Figure 8-3.  Decrease in Total Mercury Deposition with Power Plant Zero-Out
Simulation: 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-11
Figure 8-4.  Change in Total Mercury Deposition for All Sources: 2020 (with CAIR)
Relative to 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-12
Figure 8-5.  Total Mercury Deposition: 2020 (with CAIR) . . . . . . . . . . . . . . . . . . . . . . . . 8-12
Figure 8-6.  Change in Mercury Depositions from Power Plants Due to CAMR
Option 1: 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-13
Figure 8-7.  Change in Mercury Deposition from Power Plants Due to CAMR
Option 2: 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-13
Figure 8-8.  Cumulative Distribution of Total Mercury Deposition (ug/m$^2$) Fat HUC-8 Level by
        Modeling Scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-15
Figure 8-9.  Cumulative Distribution of Utility Attributable Mercury Deposition at HUC-8 Level
        by Model Scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-16
Figure 8-10.  Cumulative Distribution of Percent Deposition (ug/m$^2$) Attributable to Utilities at
        HUC-8 Level by Modeling Scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-17

**SECTION 8**

**AIR QUALITY MODELING:  CHANGES IN HG DEPOSITION TO U.S. WATERBODIES**

This section summarizes the emissions inventories and air quality modeling that serve as the inputs to the benefits analysis for the Clean Air Mercury Rule (CAMR).  EPA used a sophisticated photochemical air quality model to predict the levels of mercury deposition for a 2001 base year and a 2020 baseline reflecting co-control of mercury from implementation of the Clean Air Interstate Rule (CAIR) as well as two control options for CAMR.  The estimated changes in mercury deposition associated with the control options were then combined with fish tissue data for use in estimating health and welfare effects.   In addition, utility attributable deposition of mercury was estimated based on zero-out modeling for both the 2001 and 2020 baselines.

The 1997 Mercury Study Report to Congress noted that "a single air quality model which was capable of model both the local as well as regional fate of mercury was not identified."  In fact, at that time such a model did not exist.  Thus, the modeling approach for this report employed two models: 1) the Regional Lagrangian Model of Air Pollution (RELMAP) to address regional-scale atmospheric transport, and 2) the Industrial Source Code  model (ISC3) to address local-scale analyses (i.e., within 50 km of source).  This approach also required assumptions to be made about the background concentrations of mercury that were uniformly added to the regional component and the use of "model plants" to represent typical sources for the local-scale transport.  At this time, the Agency would have significant concerns about using the ISC3 model for assessments of Hg deposition associated with CAMR.  The Agency will later this year promulgate the American Meteorological Society/Environmental Protection Agency Regulatory MODel (AERMOD) that will replace ISC3 as the recommended and preferred model for use in regulatory permit modeling assessments.  This model contains the Argonne National Laboratory (ANL) versions of the wet and dry deposition algorithm which contain refinements beyond the ISC3 model and are considered more robust through extensive testing and evaluation.  The ISC3 outputs for wet and dry deposition were never fully tested and verified for use in regulatory applications.

The Agency views the application of a more robust and sophisticated modeling approach as critical and required for assessing the Hg deposition associated with CAMR because of the density and properties of Hg and its complex transport and reactions in the atmosphere.  The Community Multiscale Air Quality (CMAQ) modeling system best meets our requirements and the recommendations of the Report to Congress for a  'single air quality model" to address Hg deposition.  CMAQ is a three-dimensional grid-based Eulerian air quality model designed to estimate pollutant concentrations and depositions over large spatial scales (e.g., over the contiguous United States).  Because it accounts for spatial and temporal variations as well as differences in the reactivity of Hg emissions, CMAQ is the best available model for evaluating the impacts of the CAMR on U.S. mercury depositions.  This model appropriately accounts for the atmospheric reactions of specific Hg emissions and their significance in the levels of deposition as shown through our results here for CAMR.  In addition, the boundary and initial species concentrations are provided by a three-dimensional global atmospheric chemistry and

transport model, i.e., Harvard's GEOS-CHEM model.  The model simulations are performed based on plant-specific emissions of Hg by species as provided by the Integrated Planning Model (IPM).

Section 8.1 provides a summary of the emissions inventories that were modeled for this rule.  Section 8.2 summarizes the model, domain, configuration, inputs, and application.  Section 8.3 summarizes the model performance.  Section 8.4 summarizes the results of estimating mercury depositions for the 2001 and 2020 scenarios modeled.  Section 8.5 summarizes the findings at water bodies for the scenarios modeled and Section 8.6 provides the key references for this analysis.

## 8.1    Emissions Inventories and Estimated Emissions Reductions

The CAMR Emissions Inventory Technical Support Document (TSD) discusses the development of the 2001 and 2020 emissions inventories for input to the air quality modeling of this final rule in greater detail.  Table 8-1 provides the emission sources and the basis for current and future-year inventories, while Table 8-2 summarizes the mercury emissions by species from utilities, also known as Electric Generating Units (EGUs), and other sources that were used in modeling of mercury deposition.

As Table 8-2 demonstrates, a total of almost 115 tons of mercury were emitted across all sources in 2001.  EGUs emitted a total of 48.6 tons, or 42.3 percent of mercury emissions across all sources during this base year.  Almost 21 tons of the most readily deposited form of mercury, i.e., reactive gaseous mercury (RGM), were emitted by these utilities and therefore comprised 42.4 percent of their mercury emissions.

The 2020 baseline emissions shown in Table 8-2 accounts for increases in economic activity and population growth between 2001 and 2020 that lead to increased production in the utility and manufacturing sectors and hence increases in emissions over time, as well as the implementation of regulatory policies from MACT standards (primarily on non-EGU sources) and the CAIR controls (as applied to EGUs in the eastern U.S.) which decreases emissions over this time period.  Total mercury emissions in 2020 are roughly 87 tons, reflecting a net reduction of almost 28 tons (or 24 percent) from 2001 levels.  As shown, the 2020 baseline with CAIR shows net reductions in mercury emissions for EGUs of 14.2 tons or a 29.1 percent reduction from 2001 levels.  Utility emissions are expected to account for 39.5 percent of total mercury emissions in 2020, which is only slightly lower than their share in 2001.  However, the reductions associated with CAIR co-control show a large reduction of 61.8 percent in their emissions of reactive gaseous mercury relative to their 2001 level of emissions, i.e., 20.58 tons in 2001 to only 7.87 tons in 2020.

**Table 8-1.  Summary of Emissions Sources for 2001 and 2020 Mercury Emissions Inventories**

| Sector | Emissions Source | 2001 Base Year | 2020 Base Case Projections |
|---|---|---|---|
| Utilities - Electric Generating Units (EGU) | Power industry electric generating units (EGUs) | 1999 National Emission Inventory (NEI) data | Integrated Planning Model (IPM) reflecting growth in Btu demand as well as regulatory policies implemented through 2020, such as the Clean Air Interstate Rule |
| Non-EGU point sources | Non-Utility Point | 1999 NEI, with medical waste incinerator sources replaced with draft 2002 NEI | (1) Department of Energy (DOE) fuel use projections, (2) Regional Economic Models, Inc. (REMI) Policy Insight® model, (3) decreases to REMI results based on trade associations, Bureau of Labor Statistics (BLS) projections and Bureau of Economic Analysis (BEA) historical growth from 1987 to 2002, (4) Maximum Achievable Control Technology category growth and control assumptions |
| Non-point sources | All other stationary sources inventoried at the county level | 1999 NEI, with medical waste incinerator sources replaced with draft 2002 NEI | same as above |

ᵃThis table documents only the sources of data for the U.S. inventory.  The sources of data used for Canada and Mexico are explained in the technical support memorandum and were held constant from the base year to the future years.

**Table 8-2.  Summary of Mercury Emissions by Species: 2001 and 2020 (with CAIR) Baselines**

| Emissions Source | Mercury Emissions Species (tons) | | | Total Mercury Emissions (tons) |
|---|---|---|---|---|
| | Elemental | Reactive Gaseous | Particulate | |
| *2001 Base Year* | | | | |
| EGUs | 26.26 | 20.58 | 1.73 | 48.57 |
| Non-EGU Point | 37.85 | 13.33 | 7.60 | 58.78 |
| Non-point | 5.05 | 1.53 | 0.96 | 7.54 |
| Total, All Sources | 69.16 | 35.44 | 10.29 | 114.89 |
| *2020 (with CAIR) Baseline* | | | | |
| EGUs | 25.72 | 7.87 | 0.83 | 34.42 |
| Non-EGU Point | 28.03 | 10.37 | 6.61 | 45.01 |
| Non-point | 5.69 | 1.30 | 0.77 | 7.76 |
| Total, All Sources | 59.44 | 19.54 | 8.21 | 87.19 |

Table 8-3 shows the reductions in mercury emissions associated with the CAMR Control Option 1 in 2020.  The 2020 EGU emissions are reduced by approximately 10 tons to a total of 25 tons, representing a 11 percent reduction from total baseline emissions in 2020 (with CAIR), or a 27 percent reduction from the EGU sector alone.  Under CAMR Control Option 2

(Table 8-4), EGU emissions are further reduced by an additional 4 tons to a total of roughly 21 tons.  This represents a 16 percent reduction from total emissions from the 2020 baseline (with CAIR), or a 39 percent reduction from the EGU sector alone.

**Table 8-3.  Summary of Changes in Mercury Emissions Associated with CAMR Control Option 1:  2020**

| Emissions Source | Change in Mercury Emissions Species (tons) | | | Total Change in Mercury Emissions (tons) |
|---|---|---|---|---|
| | Elemental | Reactive Gaseous | Particulate | |
| EGUs | 8.07 (31.4%) | 1.30 (16.5%) | 0.00 (0.0%) | 9.37 (27.2%) |
| Non-EGU Point | n/a | n/a | n/a | n/a |
| Non-point | n/a | n/a | n/a | n/a |
| Total, All Sources | 8.07 (13.6%) | 1.30 (6.7%) | 0.00 (0.0%) | 9.37 (10.7%) |

Note: n/a is not applicable.

**Table 8-4.  Summary of Changes in Mercury Emissions Associated with CAMR Control Option 2: 2020**

| Emissions Source | Change in Mercury Emissions Species (tons) | | | Total Change in Mercury Emissions (tons) |
|---|---|---|---|---|
| | Elemental | Reactive Gaseous | Particulate | |
| EGUs | 11.39 (44.3%) | 2.16 (27.4%) | 0.04 (4.8%) | 13.59 (39.5%) |
| Non-EGU Point | n/a | n/a | n/a | n/a |
| Non-point | n/a | n/a | n/a | n/a |
| Total, All Sources | 11.39 (19.2%) | 2.16 (11.1%) | 0.04 (0.5%) | 13.59 (15.6%) |

Note: n/a is not applicable.

In comparison to current mercury emissions (i.e., the 2001 base year scenario), the CAIR and CAMR Option 1 achieve a total reduction in EGU emissions of approximately 24 tons (48 percent), while CAIR and CAMR Option 2 achieve a total reduction in EGU emissions of approximately 28 tons (57 percent).

## 8.2    Model, Domain, Configuration, Inputs, Application

This section summarizes the methods for and results of estimating mercury depositions for 2001 and 2020 base cases and control scenarios for the purposes of the benefits analysis.  The mercury deposition changes were estimated using national-scale applications of the Community Multi-Scale Air Quality (CMAQ) model. In Section 8.2.1, we describe the estimation of mercury depositions using CMAQ.

### 8.2.1    Air Quality Model

We use the emissions inputs summarized above with a national-scale application of the Community Multi-scale Air Quality (CMAQ) modeling system to estimate mercury depositions in the contiguous United States.  CMAQ is a three-dimensional grid-based Eulerian air quality model designed to estimate pollutant concentrations and depositions over large spatial scales (e.g., over the contiguous United States).  Because it accounts for spatial and temporal variations as well as differences in the reactivity of emissions, CMAQ is useful for evaluating the impacts of the CAMR on U.S. mercury depositions.  Our analysis applies the modeling system to the entire United States for six emissions scenarios:  a 2001 base year, a 2001 base year with utility mercury emissions zeroed-out, a 2020 projection with CAIR incorporated, a 2020 projection with CAIR incorporated and utility mercury emissions zeroed-out, a 2020 projection with CAIR and control option 1 incorporated, a 2020 projection with CAIR and control option 2 incorporated.

The CMAQ version 4.3 was employed for this CAMR modeling analysis (Byun and Schere, 2004, Bullock and Brehme 2002).  This version reflects updates in a number of areas to improve performance and address comments from its peer review.  The updates in mercury chemistry used for CAMR from that described in (Bullock and Brehme 2002) are as follows: (1) the elemental mercury (Hg0) reaction with $H_2O_2$ assumes the formation of 100 percent reactive gaseous mercury (RGM) rather than 100 percent particulate mercury (HgP), (2) the Hg0 reaction with ozone assumes the formation of 50 percent RGM and 50 percent HgP rather than 100 percent HgP, (3) the Hg0 reaction with OH assumes the formation of 50 percent RGM and 50 percent HgP rather than 100 percent HgP, and (4) the rate constant for the Hg0 + OH reaction was lowered from 8.7 to 7.7 x$10^{-14}$cm$^3$molecules$^{-1}$s$^{-1}$.  CMAQ simulates every hour of every day of the year and, thus, requires a variety of input files that contain information pertaining to the modeling domain and simulation period.  These include hourly emissions estimates and meteorological data in every grid cell, as well as a set of pollutant concentrations to initialize the model and to specify concentrations along the modeling domain boundaries.  These initial and boundary concentrations were obtained from output of a global chemistry model.  We use the model predictions in a relative sense by first determining the ratio of mercury deposition predictions.  The calculated relative change is then combined with the corresponding fish tissue concentration data to project fish tissue concentrations for the future case scenarios.  The following sections provide a more detailed discussion of the modeling and a summary of the results.

### 8.2.2   Modeling Domain

As shown in Figure 8-1, the modeling domain encompasses the lower 48 states and extends from 126 degrees west longitude to 66 degrees west longitude and from 24 degrees north latitude to 52 degrees north latitude.  The modeling domain is segmented into rectangular blocks referred to as grid cells.  The model actually predicts pollutant concentrations for each of these grid cells.  For this application the horizontal domain consisted of 16,576 grid cells that are roughly 36 km by 36 km.  In addition, the modeling domain contains 14 vertical layers with the top of the modeling domain at about 16,200 meters, or 100 millibar. The height of the surface layer is 38 meters.



**Figure 8-1.  CMAQ Modeling Domain**

### 8.2.3   Time Periods Modeled for Mercury Deposition

CMAQ was run for a full year for each of the six CAMR emissions scenarios modeled.  The overall model run time for completing an annual simulation was reduced by dividing the year into two six-month periods which were run in parallel on different computer processors.  That is, the annual simulation was performed as two separate six month model runs.  One run was for January through June and the other run was for July through December.  Each six-month run included a 10-day ramp-up (i.e., "spin-up") period designed to minimize the influence of the initial concentration fields (i.e., initial conditions) used at the start of the model run.  The development of initial condition concentrations is described in Section 8.2.4 below.  The ramp-up periods used for the CAMR CMAQ applications are as follows:

- First six-month ramp-up period is December 22 - 31, 2000
- Second six-month ramp-up period is June 21 - 30, 2001

Model predictions from these ramp-up periods were discarded and not used in analyses of the modeling results. The meteorological conditions, initial conditions and boundary conditions were held constant for each of the emissions scenarios modeled and are described below in section 8.2.4.

### 8.2.4   Model Inputs

CMAQ requires a variety of input files that contain information pertaining to the modeling domain and simulation period.  These include gridded, hourly emissions estimates and meteorological data as well as initial and boundary conditions.  Separate emissions inventories were prepared for the 2001 base year and each of the future-year base cases and control scenarios.  All other inputs were specified for the 2001 base year model application and remained unchanged for each future-year modeling scenario.

CMAQ requires detailed emissions inventories containing temporally allocated emissions for each grid cell in the modeling domain for each species being simulated.  The previously described annual emission inventories were processed into model-ready inputs through the emissions processing system.  Details of the processing of emissions are provided in the Clean Air Mercury Rule Emissions Inventory Technical Support Document (EPA, 2005).

Meteorological data, such as temperature, wind, stability parameters, and atmospheric moisture contents influence the formation, transport, and removal of air pollution.  The CMAQ model requires a specific suite of meteorological input files in order to simulate these physical and chemical processes.  For the CAMR CMAQ modeling, meteorological input files were derived from a simulation of the Pennsylvania State University / National Center for Atmospheric Research Mesoscale Model (Grell *et al.*, 1994) for the entire year of 2001.  This model, commonly referred to as MM5, is a limited-area, nonhydrostatic, terrain-following system that solves for the full set of physical and thermodynamic equations which govern atmospheric motions.  For this analysis, version 3.6.1 of MM5 was used.

National modeling, such as the CAMR annual mercury modeling, requires the prescription of boundary conditions (BC's) to account for the influx of pollutants and precursors from the upwind source areas outside the modeling domain. A scientifically sound approach to estimate incoming pollutant concentration associated with intercontinental transport is to use a global chemistry model to provide the dynamic BC's for the national model simulation.  For the CAMR mercury modeling, we used the predictions from a three-dimensional global atmospheric chemistry and transport model, the GEOS-CHEM model (Yamatosca B., 2004) developed at Harvard University to provide the lateral boundary and initial species concentrations.  The lateral boundary species concentrations varied with height and time (every 3 hours).  Terrain elevations and land use information were obtained from the U.S. Geological Survey database at 10 km resolution and aggregated to the roughly 36 km horizontal resolution used for this CMAQ application.

### 8.3     CMAQ Model Performance Evaluation

At this point in time, it is difficult to assess model performance for total mercury deposition.  Scientist currently believe through analysis of very limited measurements that wet and dry deposition are approximately equal in magnitude.  There currently is no measurement network to evaluate the performance of models in estimating dry deposition of mercury. Thus, we are not  able to evaluate the performance of air quality models in predicting dry deposition, which is thought to be roughly half of total mercury deposition.  There is a network of mercury wet deposition monitors, which are scattered throughout remote locations in the United States and Canada, mostly in the east.  Thus, model predictions of wet deposition can be evaluated by a monitoring network.

An operational model performance evaluation for mercury wet deposition for 2001 was performed to estimate the ability of the CMAQ modeling system to replicate base-year wet depositions of mercury.  The wet deposition evaluation principally comprises statistical assessments of model versus observed pairs that were matched in time and space on a seasonal and annual basis.  The statistics are presented separately for the entire domain, the East, and the West (using the 100th meridian to divide the eastern and western United States).  These statistics on model performance along with an annual observed versus predicted performance scatter plot can be found in the Clean Air Mercury Rule Emissions Inventory and Air Quality Modeling Technical Support Document.

For mercury wet deposition, this evaluation includes comparisons of model predictions to the corresponding measurements from the Mercury Deposition Network (MDN).  The principal evaluation statistics used to evaluate CMAQ performance are the fractional bias and fractional error.  Fractional bias is defined as:

$$FBIAS = \frac{2}{N} \sum_{i=1}^{N} \frac{(Pred_{x,t}^{i} - Obs_{x,t}^{i})}{(Pred_{x,t}^{i} + Obs_{x,t}^{i})} * 100$$

where: N = the number of measurement sites
Pred = model predicted deposition at site x over time t (i.e. Annual)
Obs = observed deposition at site x over time t

Fractional bias is a useful model performance indicator because it has the advantage of equally weighting positive and negative bias estimates.  Fractional error is similar to fractional bias except the absolute value of the difference is used so that the error is always positive.  Fractional error is defined as:

$$FERROR = \frac{2}{N} \sum_{i=1}^{N} \frac{|Pred_{x,t}^{i} - Obs_{x,t}^{i}|}{Pred_{x,t}^{i} + Obs_{x,t}^{i}} * 100$$

The fractional bias and fractional error statistics were calculated using the predicted-observed pairs for the full year of 2001 and for each season, separately.  These metrics were calculated annually and seasonally for all available MDN sites in 2001.  Only sites where data was

available more than half the weeks in a season were utilized for the seasonal performance evaluation and only sites that had four seasons meeting this data completeness requirement were utilized for the annual performance evaluation.  There were 52 MDN sites in 2001 that meet the annual data completeness requirements, of those sites 48 were located in the east and 4 were located in the west.  Fractional bias for cases where the model underpredicts by a factor of 2 would be -67 and for cases where the model overpredicts by a factor of 2 would be + 67 percent. The results in Table 8-5 shows that averaged annually over all MDN monitoring sites, CMAQ underestimates mercury wet deposition with a fractional bias of approximately -23 percent. This underprediction bias is well within a factor of 2.  The 4 MDN sites in the west do not provide an adequate or representative basis for inferring model performance.

**Table 8-5.  CMAQ Performance Statistics for Mercury Wet Deposition: 2001**

| Area | #MDN Sites | Fractional Bias (%) | Fractional Error (%) |
|---|---|---|---|
| Entire Domain | 52 | -23.2 | 30.2 |
| East | 48 | -27.0 | 30.2 |
| West | 4 | 21.7 | 30.5 |

## 8.4    Mercury Deposition Results

Maps showing the mercury deposition results are provided below.  The annual total modeled mercury deposition for the 2001 base case is shown in Figure 8-2.  The reduction in total mercury deposition that would result if all US power plant mercury emissions were zeroed-out in 2001 is shown in Figure 8-3.  The change in 2001 total mercury deposition in 2020 with CAIR is shown in figure 8-4.  The total mercury deposition for 2020 with CAIR is shown in Figure 8-5.  The decrease in 2020 with CAIR when all US power plant emissions are zeroed-out is shown in Figure 8-6.  The change in 2020 CAIR total mercury depositions with CAMR Option 1 is shown in Figure 8-7.  The change in 2020 CAIR total mercury depositions with CAMR Option 2 is shown in Figure 8-8.  It can be seen in Figures 8.3 and 8.4 that the implementation of CAIR and other minor non-utility mercury emissions decreases in 2020 result in a similar reduction in total mercury deposition as completely eliminating power plant mercury emissions. The main cause of this result is that CAIR results in a very large decrease in reactive gaseous mercury (RGM) emissions from Power Plants through the implementation of scrubber control technology (see Table 8-2 ).  RGM is the most readily deposited form of mercury.  It can be seen in Figures 8-7 and 8-8 that the implementation of CAMR Option 1 and CAMR Option 2 results in some scattered total mercury deposition reductions beyond CAIR in 2020, but for the most part these reductions are not very significant compared to those obtained by CAIR.  Most of the mercury emissions reductions from CAMR are in the form of elemental mercury (Hg0).  This form of mercury is not readily deposited, but enters the global pool of mercury.  Thus, CAMR will result in a reduction of the transport of mercury to other places in the world.



**Figure 8-2.  Base Case Total Mercury Deposition: 2001**



**Figure 8-3.  Decrease in Total Mercury Deposition with Power Plant Zero-Out Simulation: 2001**



**Figure 8-4.  Change in Total Mercury Deposition for All Sources: 2020 (with CAIR) Relative to 2001**



**Figure 8-5.  Total Mercury Deposition: 2020 (with CAIR)**



**Figure 8-6.  Change in Mercury Depositions from Power Plants Due to CAMR Option 1: 2020**



**Figure 8-7.  Change in Mercury Deposition from Power Plants Due to CAMR Option 2: 2020**

**8.5       Summary of Findings: HUC Level Deposition Analysis**

The cumulative distribution of Hydrologic Unit Code (HUC) level depositions across watersheds are provided in Table 8-6 and Figure 8-8.  The cumulative percentage of HUCs that have deposition less than the value on the x-axis for each of the six modeled scenarios are shown in Figure 8-8.  For example, 90 percent of the HUCs have depositions below 22.16 ug/m$^2$ in the 2001 base case.  For the 2020 CAIR plus CAMR Option 1 scenario, 90 percent of the HUCs have depositions below 19.48 ug/m$^2$.

**Table 8-6.  Summary Statistics of Total Mercury Depositions (ug/m$^2$) by Modeling Scenario**

| Statistics | 2001 Base Case | 2001 Utility Hg Zero-Out | 2020 CAIR | 2020 Utility Hg Zero-Out | 2020 CAIR & CAMR Option 1 | 2020 CAIR & CAMR Option 2 |
|---|---|---|---|---|---|---|
| Minimum | 6.994 | 6.942 | 6.078 | 5.898 | 6.075 | 6.075 |
| Maximum | 54.54 | 54.38 | 62.76 | 62.72 | 62.76 | 62.75 |
| 50$^{th}$ percentile | 15.92 | 14.60 | 14.59 | 13.92 | 14.44 | 14.39 |
| 90$^{th}$ percentile | 22.16 | 19.48 | 19.46 | 19.04 | 19.37 | 19.33 |
| 99$^{th}$ percentile | 32.35 | 27.20 | 29.15 | 28.93 | 28.96 | 28.95 |



**Figure 8-8.  Cumulative Distribution of Total Mercury Deposition (ug/m$^2$) Fat HUC-8 Level by Modeling Scenario**

The cumulative distribution of Hydrologic Unit Code (HUC) level depositions attributable to utilities are provided in Table 8-7 and Figure 8-9.  The cumulative percentage of HUCs that have deposition less than the value on the x-axis for 4 of the modeled scenarios are shown in Figure 8-9.  For example, 90 percent of the HUCs have depositions attributable to utilities below 4.08 ug/m$^2$ in the 2001 base case.  For the 2020 CAIR plus CAMR Option 1 scenario, 90 percent of the HUCs have depositions attributable to utilities below 1.16 ug/m$^2$. CAIR shifts the distribution of utility attributable deposition significantly, resulting in a 75 percent reduction in the 99th percentile of utility attributable deposition, and a 20 percent reduction in the 50th percentile.  CAMR Option 1 and Option 2 results in an additional reduction in 2020 utility attributable deposition in the 99th percentile of 15 and 20 percent , respectively. At the 50th percentile, CAMR Option 1 and Option 2  result in an additional reduction of 2020 utility attributable deposition of 16 and 29 percent, respectively.  As can be seen in Figure 8-10, CAIR also shifts the distribution of percentage of HUCs with deposition  attributable to utilities. In the 2001 base case, 10 percent of HUCs had greater than 20 percent of deposition attributable to utilities.  In the 2020 with CAIR scenario, 10 percent of HUCs had greater than 10 percent of deposition attributable to utilities. In the 2020 CAIR plus CAMR Option 1 scenario, 10 percent of HUCs had greater than 7 percent of deposition attributable to utilities.

**Table 8-7.  Summary Statistics of Utility Attributable Deposition (ug/m$^2$) by Modeling Scenario**

| Statistics | 2001 Base Case | 2020 CAIR | 2020 CAIR & CAMR Option 1 | 2020 CAIR & CAMR Option 2 |
|---|---|---|---|---|
| Minimum | 0.00 | 0.00 | 0.00 | 0.00 |
| Maximum | 19.71 | 4.03 | 3.85 | 3.80 |
| 50th percentile | 0.39 | 0.31 | 0.26 | 0.22 |
| 90th percentile | 4.08 | 1.38 | 1.16 | 0.99 |
| 99th percentile | 10.15 | 2.56 | 2.17 | 2.04 |





**Figure 8-9.  Cumulative Distribution of Utility Attributable Mercury Deposition at HUC-8 Level by Model Scenario**



**Figure 8-10. Cumulative Distribution of Percent Deposition (ug/m$^2$) Attributable to Utilities at HUC-8 Level by Modeling Scenario**

## 8.6  References

Bullock, R. and Brehme, K., "Atmospheric Mercury Simulation using the CMAQ Model: Formulation, Description, and Analysis of Wet Deposition Results", Atmospheric Environment 36, 2135-2146, 2002.

Byun, D., and K.L. Schere.  March 2004.  "Review of the Governing Equations, Computational Algorithms, and Other Components of the Models-3 Community Multiscale Air Quality (CMAQ) Modeling System."  Submitted to the *Journal of Applied Mechanics Reviews*.

Grell, G., J. Dudhia, and D. Stauffer, 1994: A Description of the Fifth-Generation Penn State/NCAIR Mesoscale Model (MM5), NCAIR/TN-398+STR., 138 pp, National Center for Atmospheric Research, Boulder CO.

U.S. Environmental Protection Agency (EPA).  2005.  Clean Air Mercury Rule Emission Inventory Technical Support Document. Office of Air Quality Planning and Standards. Research Triangle Park, NC.

Yantosca, B., 2004. GEOS-CHEMv7-01-02 User's Guide, Atmospheric Chemistry Modeling Group, Harvard University, Cambridge, MA, October 15, 2004.

SECTION 9  ANALYSIS OF THE DOSE-RESPONSE RELATIONSHIP BETWEEN
        MATERNAL MERCURY BODY BURDEN AND CHILDHOOD IQ . . . . . . . . . . . 9-1
9.1     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-1
9.2     Epidemiological Studies of Mercury and Neurodevelopmental Effects . . . . . . 9-2
9.3     Statistical Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-4
9.4     Strengths and Limitations of the IQ Dose-Response Analysis . . . . . . . . . . . . 9-8
9.5     References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11

**Tables**

Table 9-1.  Neurobehavioral Tests Administered at the 6-Year Evaluations in the New Zealand
        Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-3
Table 9-2.  Neurobehavioral Tests Administered at the 7-Year Evaluations in the Faroe Islands
        Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-3
Table 9-3.  Neurobehavioral Tests Administered at the 9-Year Evaluations in the Seychelles
        Islands Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-4
Table 9-4.  Relationship Between Maternal Mercury Body Burden and IQ in Three Studies:  IQ
        Decrement per ppm of Maternal Hair Mercury . . . . . . . . . . . . . . . . . . . . . . . 9-6

**Figures**

Figure 9-1.  95% Confidence Intervals for Full Scale IQ from the New Zealand, Seychelles and
        Faroes Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-7

**SECTION 9**

**ANALYSIS OF THE DOSE-RESPONSE RELATIONSHIP BETWEEN MATERNAL MERCURY BODY BURDEN AND CHILDHOOD IQ**

## 9.1     Introduction

In considering possible health endpoints for quantification and monetization in this analysis, EPA reviewed the scientific literature on the health effects of mercury, including the *Toxicological Effects of Methylmercury*, published by the National Research Council (NRC) in 2000 (NRC 2000).

Epidemiological studies of prenatal mercury exposure conducted in the Faroe Islands (Grandjean et al. 1997), New Zealand (Kjellstrom et al. 1989, Crump et al. 1998), and the Seychelles Islands (Davidson et al. 1998, Myers et al. 2003) have examined neurodevelopmental outcomes through the administration of tests of cognitive functioning. Each of these studies included some but not all of the following tests: full-scale IQ, performance IQ, problem solving, social and adaptive behavior, language functions, motor skills, attention, memory and other functions. The NRC reviewed the studies and determined that "Each of the studies was well designed and carefully conducted, and each examined prenatal MeHg [methylmercury] exposures within the range of the general U.S. population exposures" (NRC 2000).

EPA held a neurotoxicology  workshop with several of the NRC panel members in November 2002. Participants were asked about which studies should be considered in generating dose-response functions for developmental neurotoxicity. Participants were also asked about endpoints to consider for monetization and they suggested looking at neurological tests that might lead to changes in IQ or other neurodevelopmental impacts.

EPA has chosen to focus on quantification of intelligence quotient (IQ) decrements associated with prenatal mercury exposure as the initial endpoint for quantification and valuation of mercury health benefits. Reasons for this initial focus on IQ include the availability of thoroughly-reviewed, high-quality epidemiological studies assessing IQ or related cognitive outcomes suitable for IQ estimation, and the availability of well-established methods and data for economic valuation of avoided IQ deficits, as applied in EPA's previous benefits analyses for childhood lead exposure. Bellinger (2005) provides a more detailed discussion of the use of IQ as the focus of benefits analysis.

The focus of this analysis was to identify the appropriate dose-response coefficients from the Faroe Islands, New Zealand, and Seychelles studies, and to devise a statistical approach for combining those coefficients to provide an integrated estimate of the IQ dose-response coefficient.

EPA is using a linear model that goes through the origin to fit population-level dose-response relationships to the pooled data from the three studies. The application of a linear model should not be interpreted to suggest that any of the three studies used have data showing health effects from methylmercury exposure at or below the RfD. The RfD is an estimate (with

uncertainty spanning perhaps an order of magnitude) of a daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime (EPA 2002). EPA believes that exposures at or below the RfD are unlikely to be associated with appreciable risk of deleterious effects. It is important to note, however, that the RfD does not define an exposure level corresponding to zero risk; mercury exposure near or below the RfD could pose a very low level of risk which EPA deems to be non-appreciable. It is also important to note that the RfD does not define a bright line, above which individuals are at risk of adverse effect. The regulation is focused on the reduction of exposures and the associated health benefits that would accrue to people currently exposed at levels above the RfD due solely to power plants.

Use of a linear model that goes through the origin, rather than one that reflects a threshold effect is technically more simple and practical. It associates an increment of IQ benefit with a given reduction in exposure. A linear model allows us to estimate the benefits of reductions in exposure due to power plants without a complete assessment of other sources of exposure. Other models would require information on the joint distribution of exposure from power plants and other sources to estimate the benefits of reducing the exposure due to power plants, which would require much more precise information about consumption patterns.

## 9.2    Epidemiological Studies of Mercury and Neurodevelopmental Effects

The IQ dose-response analysis uses data from three major prospective studies investigating potential neurotoxicity of low-level, chronic mercury exposure: the New Zealand study, the Seychelles Child Development Study, and the Faroe Islands study.

In assembling the New Zealand sample, Kjellstrom et al. (1989) ascertained the fish consumption of 10,930 of 16,293 pregnant women in the study area. They identified 935 women who reportedly consumed fish at least 3 times per week. Hair samples were obtained from these women, and 73 were found to have a hair mercury level of 6 parts per million (ppm) or greater. In this group, the mean was 8.3 ppm, with a range of 6 to 86 ppm, although only one woman had a level greater than 20 ppm. Each woman with 6 ppm hair mercury or greater was matched to 3 controls - one with hair mercury between 3-6 ppm, one with hair mercury less than 3 ppm and high fish consumption, and one with hair mercury less than 3 ppm and low fish consumption. Ethnic group, age, smoking, residence time in New Zealand, and child sex were also used to select controls. The final study group included 237 children, including 57 fully-matched sets of 4 children. Although children were assessed at 4 and 6 years of age, only the data collected at the older age is considered in this analysis, as the reliability and validity of neurodevelopmental testing generally increases with child age. Table 9-1 lists the tests administered at the 6 year evaluation, and indicates the general functional domain each is considered to assess.

**Table 9-1.  Neurobehavioral Tests Administered at the 6-Year Evaluations in the New Zealand Study**

| Test | Primary Domain Assessed |
| --- | --- |
| Wechsler Intelligence Scale for Children-Revised | General intelligence |
| McCarthy Scales of Children's Abilities | General development |
| Test of Language Development | General verbal skills |
| Peabody Picture Vocabulary Test | Receptive language |
| Clay Reading Diagnostic Survey | Reading |
| Burt Word Recognition Test | Single word reading |
| Key Math Diagnostic Arithmetic Test | General math skills |
| Everts Behavioral Rating Scale | Behavior disorders |

The Faroe Islands investigators assembled a birth cohort of 1,353 newborns recruited from 3 hospitals over a 21 month period in 1986-1987.  In 1,022 women, two biomarkers of prenatal mercury exposure were collected: cord-blood mercury, and maternal hair mercury at delivery.  Neurodevelopmental assessments of 917 children were conducted at age 7 (Grandjean et al. 1997).  For these 917 children, the geometric mean concentration of mercury in cord-blood was 22.6 parts per billion (ppb) (interquartile range 13.1 – 40.5 ppb, full range 0.9 – 351 ppb).  The geometric mean concentration of mercury in maternal hair was 4.2 ppm (interquartile range: 2.5-7.7 ppm, full range 0.2 – 39.1 ppm) (Budtz-Jorgensen et al. 2004a).  Neurodevelopmental assessments of the children were conducted at age 7 years (Grandjean et al. 1997).  Table 9-2 lists each test administered and the corresponding general functional domain.

**Table 9-2.  Neurobehavioral Tests Administered at the 7-Year Evaluations in the Faroe Islands Study**

| Test | Primary Domain Assessed |
| --- | --- |
| Wechsler Intelligence Scale for Children-Revised (selected subtests) | |
| Digit span | Short-term memory |
| Similarities | Abstract verbal reasoning |
| Block Design | Constructional praxis |
| Bender-Gestalt Test | Visual-motor integration |
| California Verbal Learning Test-Children | Verbal learning and memory |
| Boston Naming Test | Confrontational naming |
| Tactual Performance Test | Nonverbal memory |
| Neurobehavioral Evaluation System (NES) (selected tests) | |
| Finger tapping | Motor speed |
| Hand-eye coordination | Hand-eye coordination |
| Continuous performance test | Vigilance |
| Profile of Mood States | Mood |
| Child Behavior Checklist (selected items) | Behavior disorders |

In assembling the Seychelles Child Development Study sample, investigators obtained hair samples from 779 pregnant women and ultimately enrolled a study sample consisting of 740 newborns.  The mean maternal hair mercury level was 6.8 ppm (range 0.9-25.8 ppm) (Davidson et al. 1998).  Neurodevelopmental assessments were conducted when the children were 6.5, 19, 29, and 66 months, and at 9 years.  The mean maternal hair mercury level for the 643 children who participated in the assessment at age 9 years was 6.9 ppm (standard deviation 4.5 ppm) (Myers et al. 2003).  Table 9-3 lists the tests administered at this age and the corresponding general functional domain.

**Table 9-3.  Neurobehavioral Tests Administered at the 9-Year Evaluations in the Seychelles Islands Study**

| Test | Primary Domain Assessed |
|---|---|
| Wechsler Intelligence Scale for Children-Third Edition | General intelligence |
| California Verbal Learning Test-Children | Verbal learning and memory |
| Boston Naming Test | Confrontational naming |
| Finger tapping | Motor speed |
| Continuous performance test | Vigilance |
| Developmental Test of Visual-Motor Integration | Visual-motor integration |
| Bruininks-Oseretsky Test of Motor Proficiency (selected subtests) | Gross and fine motor skills |
| Grooved Pegboard | Manual dexterity |
| Trail-Making Test | Visual tracking and executive function |
| Woodcock-Johnson Tests of Achievement (selected subtests) Letter-Word Identification Applied Math | Single word reading Quantitative problem-solving |
| Wide Range Assessment of Memory and Learning Design Memory subtest | Visual memory |
| Haptic Discrimination Test | Cross-modal integration |
| Child Behavior Checklist | Behavioral disorders |
| Connors' Hyperactivity Index | ADHD screener |

## 9.3    Statistical Analysis

A statistical analysis was conducted to integrate data from the three studies to produce a single estimate of the IQ dose-response relationship.  Details of the analysis, including statistical model formulation, selection of input values, results and sensitivity analysis are reported in Ryan (2005) and are summarized below.

Data available for this analysis consisted of dose-response coefficients estimated by the investigators for each of the three studies.  These coefficients express a central estimate of the average reduction in children's scores in tests of IQ (or other tests of cognitive performance) for a one unit change in the mercury body burden of the mother during pregnancy.

A Bayesian hierarchical statistical model was used to estimate the integrated dose-response coefficient.  This is similar to the approach used by the NRC panel to calculate a

benchmark dose value integrating data from all three studies (NRC 2000).  A more technical description of these same methods has been provided by Coull et al. (2004).  The model makes use of dose-response coefficients for IQ, and also incorporates coefficients for other cognitive tests conducted in the studies, in an effort to obtain more robust estimates of the IQ relationship that account for within-study (endpoint-to-endpoint) variability as well as variability across studies.  As compared with a model that uses only the IQ dose-response coefficients and their variances, this approach makes use of more data from the studies to better characterize the variability in estimation of the integrated IQ coefficient.

The key parameter inputs to the statistical model are the estimated IQ dose-response coefficients for each study.  The Wechsler Intelligence Scales for Children (WISC) is a standard test of childhood IQ that was used in each of the three studies.  The version of the test administered in the Seychelles Islands (WISC-III) was different from that used in New Zealand and the Faroe Islands (both WISC-R). As part of the standardization of the WISC-III, however, both versions were administered to approximately 200 children.  The correlation between the Full-Scale IQ scores for the two versions of the WISC was 0.89; thus the WISC-R and WISC-III appear to measure the same constructs and generate scores with similar dispersion (Wechsler 1991).

For the New Zealand study, full-scale IQ dose-response coefficients were reported in Crump et al. (1998).  In Table III of this paper, two coefficients for full scale IQ are reported: one with the complete cohort, and the other for which one very influential observation (with unusually high maternal hair mercury) was excluded.  The NRC Committee on the Toxicological Effects of Methylmercury reviewed the influence of the one outlier on the model outcome in comparison to a model without this outlier, and determined that exclusion of the outlier was reasonable and appropriate (NRC, 2000).  In keeping with the conclusions by the NRC committee, this analysis uses the coefficient from the regression in which the outlier child was excluded:  an IQ change of -0.53 IQ points (95% confidence interval -1.1, 0.069) for each ppm of mercury in maternal hair.

For the Seychelles study, a 2003 paper reports results for IQ tests administered at age 9 (Myers et al. 2003).  This analysis uses the coefficient from Table 9-2 of this study:  an IQ change of -0.13 IQ points (95% confidence interval -0.33, 0.07) for each ppm of mercury in maternal hair.

The WISC-R includes 10 core subtests and 3 supplementary subtests.  For the Faroes study, the investigators did not administer the complete version of the WISC-R because of their conclusion that a methylmercury-associated deficit in a broad measure such as Full-Scale IQ provides relatively little insight into the specific nature of methylmercury's neuropsychological effects on children.  The Faroes investigators did administer three of the WISC-R subtests to the children in their study (Similarities, Block Design, and Digit Span).  Thus, to include data from the Faroe Islands in this integrated assessment of prenatal mercury exposure on childhood IQ, it was necessary to estimate a Faroe Islands dose-response coefficient for full-scale IQ from the three available subtests.

Information on correlations between WISC-R subtest scores and WISC-R full-scale IQ scores is available to assess the validity of a full-scale IQ estimated from the subtests.

Similarities and Block Design are core subtests of the WISC-R, and Digit Span is a supplementary subtest. The WISC-R was standardized on a nationally-representative sample of U.S. children ages 6 to 16 years. Based on subtest scores, Sattler (1988) identified the pair, triad, quartet, etc. of subtests that provides the most valid estimate of full-scale IQ. Only the 10 core subtests were considered in this exercise. Of the 45 possible combinations of 2 core subtests (i.e., 10 subtests taken 2 at a time), the combination of Similarities and Block Design, the two core subtests administered in the Faroe Islands study, ranked 3rd in the magnitude of the validity coefficient (0.885). The top-ranked combination was Vocabulary and Block Design (0.906). The combination ranked 2nd was Information and Block Design (0.888). It is reasonable to expect that taking into account Digit Span scores, the supplementary subtest administered, will increase the validity coefficient. The results of this exercise indicate that combining the scores of the Faroese children on Similarities, Block Design and Digit Span will provide valid estimates of their full-scale IQ scores.

In support of this integrated IQ dose-response analysis, the Faroes research team conducted further analysis to estimate a full-scale IQ dose-response coefficient based on the data for the three subtests. This new Faroes analysis makes use of a structural equation model similar to that described in Budtz-Jorgensen et al. (2002), and is reported in Budtz-Jorgensen et al. (2005). As with other reports on results of the Faroe Islands study, the full-scale IQ coefficient for the Faroes data is reported using cord blood mercury as the marker for exposure; results from New Zealand and the Seychelles are presented in terms of maternal hair mercury. The Faroes coefficient was converted to terms of hair mercury, using the reported median maternal hair:cord blood mercury ratio for the Faroes cohort of approximately 200 (Budtz-Jorgensen et al. 2004a). After conversion of the Faroes estimate from terms of cord blood mercury to hair mercury, the estimated Faroes coefficient is an IQ change of -0.12 IQ points (95% confidence interval -0.24, -0.01) for each ppm of mercury in maternal hair (Ryan 2005).

The IQ dose-response estimates for each of the three studies, along with 95% confidence intervals, are shown in Table 9-4 and Figure 9-1.

**Table 9-4. Relationship Between Maternal Mercury Body Burden and IQ in Three Studies: IQ Decrement per ppm of Maternal Hair Mercury**

| Study | Regression Coefficient (95% Confidence Interval) | Notes |
|---|---|---|
| New Zealand | -0.53 (-1.1, 0.069) | Reported in Table III of Crump (1998); outlier child omitted. |
| Seychelles | -0.13 (-0.33, 0.07) | Reported in Table 2 of Myers (2003). |
| Faroe Islands | -0.12 (-0.24, -0.01) | Reported in Ryan (2005), based on structural equation modeling of three IQ subtests by Budtz-Jorgensen et al. (2005). |
| Ryan (2005) Integrative Analysis - Main Case | -0.13 (-0.28, -0.03) | see text and Ryan (2005) |



**Figure 9-1.  95% Confidence Intervals for Full Scale IQ from the New Zealand, Seychelles and Faroes Studies**

Coefficients for other cognitive outcomes used in the model were obtained from the same sources as the IQ dose-response coefficients (Crump et al. 1998, Myers et al. 2003, and Budtz-Jorgensen et al. 2005).  Tests included in the model included:  California Verbal Learning Test (Faroes and Seychelles); Boston Naming Test (Faroes and Seychelles); the Wide-Range Assessment of Memory and Learning (WRAML) and Visual-Motor Integration (VMI) (Seychelles only); Bender Visual Motor Gestalt Test (Faroes only); and the Test of Language Development - Spoken Language (TOLD-SL), WISC performance IQ, and McCarthy Scales of Children's Abilities perceptual performance scale (New Zealand only).  Criteria for selection of these outcomes and details on how they were used in the model are described in the report on the statistical analysis (Ryan 2005).

The statistical analysis produced a dose-response relationship, integrating data from all three studies, with a central estimate of an IQ change of -0.13 IQ points (95% confidence interval -0.28, -0.03) for every ppm of mercury in maternal hair.  This central estimate is close to the values for the Faroes and Seychelles studies, suggesting relatively little influence on the

integrated value from the larger coefficient estimated in the New Zealand study.  The smaller influence of the New Zealand coefficient is due to the smaller size of the cohort in this study, as well as the greater uncertainty in the central estimate of the dose-response coefficient in this study, as depicted in Figure 9-1.

Several sensitivity analyses were conducted, reflecting the following variations in the inputs to the model:

- Use of only the IQ dose-response coefficients, without the coefficients for the additional cognitive endpoints;

- Use of an alternate hair:blood mercury ratio for calculation of the Faroes coefficients in hair mercury terms;

- Use of the New Zealand coefficients that include one highly influential observation; and

- Use of an alternate interpretation of the Faroes structural equation model outputs for the IQ dose-response coefficient.

These sensitivity analyses found very consistent results, with central estimates all in the approximate range of -0.10 to -0.25 IQ points for each ppm of mercury in maternal hair. The results consistently suggested a significant association between mercury and IQ, with lower confidence limits ranging from about -0.2 to -0.5, and upper confidence limits between -0.02 and -0.04.  Details of the sensitivity analyses are presented in the statistical analysis report (Ryan 2005).

## 9.4    Strengths and Limitations of the IQ Dose-Response Analysis

This analysis has produced, for the first time, an estimate of the relationship between maternal mercury body burdens during pregnancy and childhood IQs that incorporates data from all three epidemiologic studies judged by the NRC to be of high quality and suitable for risk assessment.  The statistical approach makes use of all the available data (including information on results for related tests of cognitive function), and can be used to produce population-based estimates of a health outcome that can be readily monetized for use in benefit-cost analysis[1].

---

[1] There is limited evidence directly linking IQ and methylmercury exposure in the three large epidemiological studies that were  evaluated by the NAS and EPA.  Based on its evaluation of the three studies, EPA believes that children who are prenatally exposed to low concentrations of methylmercury may be at increased risk of poor performance on neurobehavioral tests, such as those measuring attention, fine motor function, language skills, visual-spatial abilities (like drawing), and verbal memory.  For this analysis, EPA is adopting IQ as a surrogate for the neurobehavioral endpoints that NAS and EPA relied upon for the RfD.

In the Faroes Island Study, a full scale IQ evaluation was not conducted.  However, two core subtests were evaluated (Similarities and Block design) and one supplementary test was conducted (Digit Span).  The Similarities and Block Design tests are reported to be well correlated with the full WISC-R battery (0.885, see Bellinger (2005)), but how the Digit Span test relates is not reported.  In the EPA analysis, we assume that it relates similarly.  In the Faroes study, performance scores on the Similarities and Block Design tests were not shown to be statistically related to

There are several aspects of IQ as a metric for neurodevelopmental effects in this benefit-cost analysis that are important to recognize.

Full-Scale IQ is a composite index that averages a child's performance across many functional domains, providing a good overall picture of cognitive health. An extensive body of data documents the predictive validity of full-scale IQ, as measured at school-age, and late outcomes such as academic and occupational success (Neisser et al. 1996). In addition, methods are readily available for valuing shifts in IQ and thus conducting a benefits analysis of interventions that shift the IQ distribution in a population. Methods for monetization of the other tests administered in the three studies have not been developed.

It is important to recognize, however, that full-scale IQ might not be the cognitive endpoint that is most sensitive to prenatal mercury exposure. Significant inverse associations were found, in both the New Zealand and Faroe Islands studies, between prenatal mercury levels and neurobehavioral endpoints other than IQ. If the effects of mercury are highly focal, affecting only specific cognitive functions, taking full-scale IQ as the primary endpoint for a benefits analysis might underestimate the impacts. In averaging performance over diverse functions in order to compute full-scale IQ, the specific effects of mercury on only certain of these functions would be "diluted," and the estimated magnitude of the change in performance per unit change in the mercury biomarker would be underestimated.

Moreover, it is well-known that there may be substantial deficits in cognitive well-being even in individuals with normal or above average IQ. The criterion most frequently used to identify children with learning disabilities for the purposes of assignment to special education services is a discrepancy between IQ and achievement. Specifically, the child's achievement in reading, math, or other academic areas is significantly lower than what would be expected, given his or her full-scale IQ. Thus, there are deficits in cognitive functioning that are not captured by IQ scores. For example, two of the most sensitive endpoints in the Faroe Islands study were the Boston Naming Test, which assesses word retrieval, and the California Verbal Learning Test-Children, which assesses the acquisition and retention of information presented verbally. Depending on the severity of the deficits, a child who has deficits in either of these skills could be at a considerable disadvantage in the classroom setting and at substantial educational risk. Neither of these abilities is directly assessed by the WISC-R or WISC-III, however, and so do not explicitly contribute to a child's IQ score.. Therefore, benefits calculations relying solely on IQ decrements are likely to underestimate the benefits to cognitive functioning of reduced mercury exposures. In additions, impacts on other neurological domains (such as motor skills

---

cord blood or maternal mercury levels; the Digit Span test did show a statistical relationship with cord blood mercury.

Both the New Zealand and Seychelles study administered the WISC IQ test (WISC III in Seychelles, WISC R in New Zealand). A reanalysis of the New Zealand data found a positive association, but it was not statistically significant. No significant associations were seen in the Seychelles study. As displayed in Figure 5 of Ryan (2005), the confidence intervals for full scale IQ in both these studies include zero. However, Ryan conducted an integrative analysis, combining results from all three studies. When combined, the statistical power of the analysis increases. While the size of the dose-response relationship declined relative to past studies with a statistically significant finding, Ryan found a statistically significant relationship between IQ and mercury. The confidence interval did not include zero.

and attention/behavior) are not represented by IQ scores and thus are also excluded from the benefits analysis.

As discussed above, the Faroe Islands study did not include testing for full-scale IQ.  For this analysis, an estimate of a dose-response coefficient for full-scale IQ was estimated using the three subtests.  While this extrapolation introduces some uncertainty, information has been presented that demonstrates a high correlation between the subtests and full-scale IQ scores.

While the Seychelles and New Zealand studies use maternal hair mercury as the exposure biomarker, the Faroe Islands study uses cord blood mercury.  For purposes of the integrated analysis, it was necessary to express results from all three studies in the same terms.  Several studies have examined the relationship between hair mercury and blood mercury, and have reported hair:blood ratios typically in the range of 200 to 300 (see ATSDR 1999, pages 249-252 for a review).  However, these studies generally do not use cord blood mercury, which is the exposure metric in the Faroes study.  A recent analysis found that mercury concentrations in cord blood are, on average, 70 percent higher than those in maternal blood (Stern and Smith 2003).  For conversion of Faroes data from cord blood mercury to maternal hair mercury, it was most appropriate to use data specific to this population, indicating a median maternal hair:cord blood mercury ratio of 200 (Budtz-Jorgensen et al. 2004a).  An alternate ratio of 250 was examined in sensitivity analysis, and resulted in an integrated dose-response coefficient that is reduced by about 12 percent (central estimate of -0.131 vs. -0.115).

This analysis relies on use of summary statistics, i.e. dose-response coefficients and associated variability statistics, for each of the three studies.  Original data were not available for this analysis.  While a lack of original data is often cited as a problem for cross-study analyses, its impact is lessened in this application for several reasons.  All three studies had careful epidemiological designs that measured a variety of important potential confounders such as maternal age and education.  All estimated dose-response coefficients were derived from well documented regression models that adjusted for age, maternal education and other important factors.  Also, the National Research Council had asked the individual study investigators for very specific details about the way in which their analyses had been done and had also asked for additional analyses where necessary.  Further, work by Dominici et al. (2000) took a similar approach for hierarchical modeling of estimated dose-response coefficients extracted from separate studies.

The major uncertainty concerning the New Zealand study is the strong influence of one child in the study population with a particularly high maternal hair mercury level.  Published analyses of the New Zealand study presented results with data for this child both included and excluded (Crump et al. 1998).  In keeping with the conclusions of the NRC (2000), the integrated dose-response analysis presented in this section made use of the dose-response coefficients calculated with this child omitted.  A sensitivity analysis using the New Zealand coefficient with this child included results in an integrated dose-response coefficient that is reduced by about 17 percent (central estimate of -0.131 vs. -0.108).

Some uncertainty is also associated with the Seychelles study due to the exclusion of some members of the cohort from the data reported by Myers et al. (2003) and used as input to this integrated dose-response analysis.  The Seychelles researchers did not include a small

number of outliers (defined as observations with model residuals exceeding 3 standard deviation units), and no results are available for the full cohort.  However, the authors report that "In all cases, the association between prenatal MeHg exposure and the endpoint was the same, irrespective of whether outliers were included" (Myers et al. 2003).

Finally, the integrated dose-response analysis assumes the exposures assigned to each study subject are accurate representations of true exposure.  In reality, there is likely to be some discrepancy between measured and actual exposures, for example, due to variation in hair length. Alternatively, the true exposure of interest may have been during the first trimester of pregnancy, whereas exposures in maternal hair and cord blood measured at birth reflect exposures later in pregnancy.  Presence of exposure measurement error could introduce a bias in the results, most likely towards the null (Budtz-Jorgensen et al. 2004b).

## 9.5   References

ATSDR (1999).  *Toxicological Profile for Mercury*.  Agency for Toxic Substances and Disease Registry.

Bellinger DC (2005).  Neurobehavioral Assessments Conducted in the New Zealand, Faroe Islands, and Seychelles Islands Studies of Methylmercury Neurotoxicity in Children. Report to the U.S. Environmental Protection Agency.

Budtz-Jorgensen E, Keiding N, Grandjean P, Weihe P (2002). Estimation of health effects of prenatal methylmercury exposure using structural equation models. *Environmental Health,*1(1):2.

Budtz-Jorgensen E, Grandjean P, Jorgensen P, Weihe P, Keiding N (2004a). Association between mercury concentrations in blood and hair in methylmercury-exposed subjects at different ages. *Environmental Research,* 95(3):385-93.

Budtz-Jorgensen E, Keiding N, Grandjean P (2004b). Effects of exposure imprecision on estimation of the benchmark dose.  *Risk Analysis, 2*4(6):1689-96.

Budtz-Jorgensen E, Debes F, Weihe P, Grandjean P (2005).  Adverse mercury effects in 7 year-old children expressed as loss in "IQ."  Report to the U.S. Environmental Protection Agency.

Coull BA, Mezzetti M, Ryan LM (2003). A Bayesian hierarchical model for risk assessment of methylmercury. *Journal of  Agricultural, Biological & Environmental Statistics*, 8(3):253-270.

Crump KS, Kjellstrom T, Shipp AM, Silvers A, Stewart A (1998).  Influence of prenatal mercury exposure upon scholastic and psychological test performance: Benchmark analysis of a New Zealand cohort. *Risk Analysis*, 18:701-713.

Davidson PW, Myers GJ, Cox C, Axtell C, Shamlaye C, Sloane-Reeves J, Cernichiari E, Needham L, Choi A, Wang Y, Berlin M, Clarkson TW (1998).  Effects of prenatal and

postnatal methylmercury exposure from fish consumption on neurodevelopment: outcomes at 66 months of age in the Seychelles Child Development Study. *Journal of the American Medical Association,* 280(8):701-7.

Dominici F, Samet JM, Zeger SL (2000). Combining evidence on air pollution and daily mortality from the 20 largest US cities: a hierarchical modeling strategy. *Journal of the Royal Statistical Society A,* 163:263-284.

Environmental Protection Agency (EPA 2002).  Mercury Neurotoxicity Workshop Notes; available at: <www.epa.gov/ttn/ecas/benefits.html>

Grandjean P, Weihe P, White RF, Debes F, Araki S, Yokoyama K, Murata K, Sorensen N, Dahl R, Jorgensen PJ (1997).  Cognitive deficit in 7-year-old children with prenatal exposure to methylmercury. *Neurotoxicology and Teratology,* 19:417-428.

Kjellstrom T, Kennedy P, Wallis S, Stewart A, Friberg L, Lind B, et al. (1989). Physical and mental development of children with prenatal exposure to mercury from fish. National Swedish Environmental Protection Board Report No. 3642.

Myers GJ, Davidson PW, Cox, C, Shamlaye CF, Palumbo D, Cernichiari E, Sloane-Reeves J, Wilding GE, Kost J, Huang LS, Clarkson TW (2003). Prenatal methylmercury exposure from ocean fish consumption in the Seychelles child development study. *Lancet*, 361:1686-1692.

NRC (2000). *Toxicological Effects of Methylmercury*.  National Research Council.  Washington, DC:  National Academies Press.

Neisser U, Boodoo G, Bouchard TJ, et al. (1996).  Intelligence: Knowns and unknowns. *American Psychologist,* 51:77-101.

Ryan, LM (2005).  Effects of Prenatal Methylmercury on Childhood IQ:  A Synthesis of Three Studies.  Report to the U.S. Environmental Protection Agency.

Sattler JM (1988). *Assessment of Children*, 3rd Edition. San Diego: Jerome M. Sattler Publisher.

Stern, AH, Smith AE (2003). An assessment of the cord blood:maternal blood methylmercury ratio: Implications for risk assessment.  *Environmental Health Perspectives,* 111:1465-1470.

Wechsler D (1991). *WISC-III Manual*. San Antonio: The Psychological Corporation.

SECTION 10  EXPOSURE MODELLING AND  BENEFIT METHODOLOGY WITH AN
APPLICATION TO A NO-THRESHOLD MODEL  . . . . . . . . . . . . . . . . . . . . 10-1
10.1  Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-1
    10.1.1  Summary  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-2
    10.1.2  Modeling Overview  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-6
    10.1.3  Monetized Benefits: Results in Brief . . . . . . . . . . . . . . . . . . . . . . . 10-8
    10.1.4  Key Steps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11
10.2  Estimation of Mercury Levels in Freshwater Fish . . . . . . . . . . . . . . . . . . 10-12
10.3  Estimation of Exposed Populations and Fishing Behaviors  . . . . . . . . . . . 10-18
    10.3.1  Primary Data Sources on Fishing Activity in the United States . . . . 10-18
    10.3.2  Population Centroid Approach. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-24
    10.3.3  Angler Destination Approach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-36
10.4  Estimation of Mercury Exposures, IQ Decrements, and Lost Future Earnings
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-42
    10.4.1  Modeling Approach for Estimating Individual Exposures  . . . . . . . . 10-43
    10.4.2  Modeling Approach for Estimating IQ Effects and Lost Earnings  . . 10-45
10.5  Model Results:  Estimated Benefits of Utility Mercury Emission Controls . 10-47
    10.5.1  Results for the Population Centroid Approach  . . . . . . . . . . . . . . . . 10-53
    10.5.2  Results for the Angler Destination Approach  . . . . . . . . . . . . . . . . . 10-67
    10.5.3  Comparison of Results from Two Approaches  . . . . . . . . . . . . . . . . 10-89
    10.5.4  Sensitivity Analysis of Alternative Dose-Response Functions  . . . . . 10-96
    10.5.5  Distribution of Per-Capita IQ Changes for the Exposed Population (in
        support of distributional equity analysis)  . . . . . . . . . . . . . . . . . . . 10-97
10.6  Analysis of Potentially High-Risk Subpopulations  . . . . . . . . . . . . . . . . 10-103
    10.6.1  Mercury Ingestion Estimates for Individuals in the Upper Range of the
        Fish Consumption Distribution  . . . . . . . . . . . . . . . . . . . . . . . . . . 10-104
    10.6.2  Mercury Ingestion Estimates for Individuals in Low Income, High Fish
        Consumption Households  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-110
    10.6.3  Mercury Ingestion Estimates for Two Selected Ethnic Populations
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-112
    10.6.4  Adaptation of the Population Centroid Approach to Estimate Exposed
        Hmong and Chippewa Population  . . . . . . . . . . . . . . . . . . . . . . . . 10-119
    10.6.5  Sensitivity Analysis Examining the Economic Benefit Equity Issue in the
        Context of High Fish Consuming (subsistence) Populations Including
        Native Americans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-129
10.7  Discussion and Qualification of Results:  Assumptions, Limitations, and
    Uncertainties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-134
    10.7.1  Mercury Concentration Estimates  . . . . . . . . . . . . . . . . . . . . . . . . 10-135
    10.7.2  Exposed Population Estimates  . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-137
    10.7.3  Matching of Exposed Populations to Mercury Concentrations . . . . 10-138
    10.7.4  Fish Consumption Estimates  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-140
    10.7.5  Modelling and Valuation of IQ Related Effects  . . . . . . . . . . . . . . 10-141
    10.7.6  Unquantified Benefits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-142
10.8  References  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-144

**Tables**
Table 10-1(a).  Summary of Per Capita Changes in IQ Due to Mercury Exposure  . . . . . . . . 10-4

Table 10-1(b).  Impacts of Mercury on High Fish Consuming Groups . . . . . . . . . . . . . . . . . 10-6
Table 10-1(c).  Summary of Total Benefits Associated with Modelled Avoided IQ Decrements in Prenatally Exposed Children Due to Reduced Mercury Exposure from Freshwater Recreational Angling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-10
Table 10-2.  Summary Statistics for Estimated Fish Tissue Mercury Concentrations (ppm) by State: 2001 Base Case[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-16
Table 10-3.  HUC-Level Distribution of Mercury Sampling Sites and Estimated Fish Tissue Concentrations:  2001 Base Case [a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-17
Table 10-4.  Summary of Fishing Activity Levels by State in 2001 from NSFHWR . . . . . . 10-20
Table 10-5.  Overview of Key Attributes of the Population Centroid and Angler Destination Models . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-23
Table 10-6.  Block Group Demographic Characteristics by State (in 2000):  Data Used in Population Centroid Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-30
Table 10-7.  Estimated Annual Number of Prenatally Exposed Children for Selected Lag Periods from 2001:  Population Centroid Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-31
Table 10-8.  Estimated Annual Number of Prenatally Exposed Children for Selected Lag Periods from 2020:  Population Centroid Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-33
Table 10-9.  Average Estimated Mercury Concentrations (ppm) in Freshwater Fish by Distance Interval from Block Group Centroids:  Base Case 2001 . . . . . . . . . . . . . . . . . . . . . . 10-35
Table 10-10.  State-Level Summary of Exposed Population Estimates:  Angler Destination Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-42
Table 10-11.  Effects of Emission Control Scenarios—Percent Reduction in Estimated Fish Tissue Mercury Concentrations from 2001 Base Case[a] . . . . . . . . . . . . . . . . . . . . . . 10-49
Table 10-12.  Effects of Emission Control Scenarios—Percent Reduction in Estimated Fish Tissue Mercury Concentrations from 2020 Base Case with CAIR[a] . . . . . . . . . . . . 10-51
Table 10-13.  Estimated Distribution of Mercury Ingestion by Distance Traveled to Fish: Population Centroid Approach—2001 Base Case . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-54
Table 10-14.  Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2001 Base Case[a] . . . . . . . . . 10-55
Table 10-15.  Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2020 Base Case with CAIR[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-57
Table 10-16.  2020 Base Case with CAIR:  Modelled Avoided Losses Relative to 2001 Base Case (Applied to 2020 Demographics)—Population Centroid Approach[a, b] . . . . . . 10-61
Table 10-17.  2001 Utility Mercury Emissions Zero Out:  Modelled Avoided Losses Relative to 2001 Base Case—Population Centroid Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . 10-63
Table 10-18.  2020 with CAIR Emissions Zero Out:  Modelled Avoided Losses Relative to 2020 with CAIR Base Case—Population Centroid Approach[a, b] . . . . . . . . . . . . . . . . . . . 10-65
Table 10-19.  Estimated Benefits of 2020 CAMR Control Option 1:  Relative to 2020 with CAIR—Population Centroid Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-68
Table 10-20.  Estimated Benefits of 2020 CAMR Control Option 2:  Relative to 2020 with CAIR—Population Centroid Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-70
Table 10-21.  Summary of Annual Benefit Estimates:  Population Centroid Approach[a] . . . 10-72
Table 10-22.  Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings:  Angler Destination Approach—2001 Base Case[a] . . . . . . . . . 10-77
Table 10-23.  Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings:  Angler Destination Approach—2020 with CAIR[a] . . . . . . . . . 10-81

Table 10-24.  2020 Base Case with CAIR:  Modelled Avoided Losses Relative to 2001 Base Case Applied to 2020 Demographics—Angler Destination Approach[a, b] . . . . . . . . . 10-83

Table 10-25.  2001 Utility Mercury Emissions Zero Out:  Modelled Avoided Losses Relative to 2001 Base Case—Angler Destination Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . . 10-85

Table 10-26.  2020 with CAIR Emissions Zero Out:  Modelled Avoided Losses Relative to 2020 with CAIR Base Case—Angler Destination Approach[a, b] . . . . . . . . . . . . . . . . . . . . 10-87

Table 10-27.  Estimated Benefits of 2020 With CAIR Control Option 1:  Relative to 2020 with CAIR—Angler Destination Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-90

Table 10-28.  Estimated Benefits of 2020 With CAIR Control Option 2:  Relative to 2020 with CAIR—Angler Destination Approach[a, b] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-92

Table 10-29.  Summary of Annual Benefit Estimates:  Angler Destination Approach . . . . . 10-94

Table 10-30.  Summary and Comparison of Annual Benefit Estimates:  Population Centroid Approach vs. Angler Destination Approach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-95

Table 10-31.  Summary and Comparison of Annual Benefit Estimates Under Alternative IQ Dose-Response Assumptions: Population and Angler Destination Approach  . . . . . 10-96

Table 10-32.  Summary of Estimated Mercury Exposures for Consumption-Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2001 Base Case[a]  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-105

Table 10-33.  Summary of Estimated Mercury Exposures for Consumption-Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2020 with CAIR[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-107

Table 10-34.  Summary of Annual Benefit Estimates for Consumption-Based Subsistence Population:  Population Centroid Approach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-109

Table 10-35.  Summary of Estimated Mercury Exposures for Income-Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2001 Base Case[a]  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-114

Table 10-36.  Summary of Estimated Mercury Exposures for Income-Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2020 with CAIR[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-116

Table 10-37.  Summary of Annual Benefit Estimates for Income-Based Subsistence Population:  Population Centroid Approach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-118

Table 10-38.  Block Group Demographics for Hmong and Chippewa Females, Aged 15 to 44 (in 2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-120

Table 10-39.  Estimated Annual Number of Prenatally Exposed Children from Special Populations for Selected Lag Periods:  Population Centroid Approach  . . . . . . . . 10-124

Table 10-40.  Summary of Estimated Mercury Exposures for Special Populations in 2001, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—Base Case 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-125

Table 10-41.  Summary of Estimated Mercury Exposures for Special Populations in 2020, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—Base Case 2020 with CAIR[a]  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-126

Table 10-42.  Summary of Annual Benefit Estimates for Hmong Special Population: Population Centroid Approach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-127

Table 10-43.  Summary of Annual Benefit Estimates for Chippewa Special Population:  Population Centroid Approach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-128

Table 10-44.  Results of the Sensitivity Analysis Examining Distributional Equity for Native American (subsistence) Populations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-133

Table 10-45.  Unquantified Health and Ecosystem Effects Associated with Exposure to Mercury
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-142

**Figures**

Figure 10-1.  Locations of Lake Fish Tissue Mercury Sampling Sites Used in the Analysis
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-14
Figure 10-2.  Locations of River Fish Tissue Mercury Sampling Sites Used in the Analysis
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-15
Figure 10-3.  Flow Diagram for Population Centroid Approach . . . . . . . . . . . . . . . . . . . . . 10-25
Figure 10-4.  Population Centroid Approach:  Linking Census Block Groups to Demographic
Data and Mercury Fish Tissue Samples  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-27
Figure 10-5.  Flow Diagram for Angler Destination Approach  . . . . . . . . . . . . . . . . . . . . . . 10-37
Figure 10-6.  Estimated Distribution of Lake-Fishing Days Across HUCs in 2001  . . . . . . 10-40
Figure 10-7.  Estimated Distribution of River-Fishing Days Across HUCs in 2001  . . . . . . 10-41
Figure 10-8.  Spatial Distribution of Estimated Average Daily Maternal Mercury Ingestion
Rates:  Angler Destination Approach—2001 Base Case . . . . . . . . . . . . . . . . . . . . 10-74
Figure 10-9.  Spatial Distribution of Estimated IQ Decrements per HUC:  Angler Destination
Approach—2001 Base Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-75
Figure 10-10.  Spatial Distribution of Estimated Percent Reduction in IQ Losses:  Improvement
with 2001 Utility Emissions Zero Out Scenario (Zero Lag)  . . . . . . 10-76
Figure 10-11.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury
Emissions Reductions:  2001 Utility Emissions Zero-Out Relative to 2001 Base Case;
Population Centroid Approach; Variable Consumption Rate  . . . . . . . . . . . . . . . . . 10-99
Figure 10-12.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to
Mercury Emissions Reductions: 2001 Utility Emissions Zero-Out Relative to 2001 Base
Case; Population Centroid Approach; Variable Consumption Rate  . . . . . . . . . . . . 10-99
Figure 10-13.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury
Emissions Reductions:  CAMR Control Option 1 Relative to 2020 Base Case with CAIR;
Population Centroid Approach; Variable Consumption Rate  . . . . . . . . . . . . . . . . . 10-100
Figure 10-14.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to
Mercury Emissions Reductions: CAMR Control Option 1 Relative to 2020 Base Case
with CAIR; Population Centroid Approach; Variable Consumption Rate  . . . . . . . 10-100
Figure 10-15.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury
Emissions Reductions:  CAMR Control Option 2 Relative to 2020 Base Case with CAIR;
Population Centroid Approach; Variable Consumption Rate  . . . . . . . . . . . . . . . . . 10-101
Figure 10-16.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to
Mercury Emissions Reductions:  CAMR Control Option 2 Relative to 2020 Base Case
with CAIR; Population Centroid Approach; Variable Consumption Rate  . . . . . . . 10-101
Figure 10-17.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury
Emissions Reductions:  2020 Utility Emissions Zero-Out Relative to 2020 Base Case
with CAIR; Population Centroid Approach; Variable Consumption Rate  . . . . . . . 10-102
Figure 10-18.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to
Mercury Emissions Reductions: 2020 Utility Emissions Zero-Out Relative to 2020 Base
Case with CAIR; Population Centroid Approach; Variable Consumption Rate  . . . 10-102
Figure 10-19.  U.S. Census Tracts with Native American Populations . . . . . . . . . . . . . . . . . 10-113

**SECTION 10**

**EXPOSURE MODELLING AND  BENEFIT METHODOLOGY
WITH AN APPLICATION TO A NO-THRESHOLD MODEL**

**10.1    Introduction**

In this section, we describe two exposure modeling approaches designed to provide an estimate the underlying benefits analysis of reducing mercury emissions that may result from the Clean Air Mercury Rule.  Sections 10 and 11 together form the basis for our benefits methodology and calculations.  In this Section, we construct a scenario that reflects an upper-bound on the number of people affected by mercury.  In particular, the scenario incorporates an assumption of no theshold.  We estimate benefits with this assumption by deploying a very disaggregated, spatially-rich model.  This exercise provides very detailed results.  In Section 11, the model is simplified a bit by aggregating recreational fishers into descrete bins or categories, making the analysis much more manageable.  The analysis in Section 11 simulates exposure scenarios under the assumption of thresholds.  Two different thresholds are explored.  The threshold analysis gives "scaling factors" or benefits as a percent of the no threshold case developed in this Section.  Benefit estimates are then estimated by multiplying the scaling factors by the benefits calculated in this Section.  Hence, this Section forms the core analytic underpinnings for the final benefit numbers that are derived and presented in Section 11.

In this Section, we quantify and monetize, to the extent feasible, benefits associated with modelled avoided IQ deficits due to reduced exposure from the consumption of recreationally-caught freshwater fish assuming there is no threshold in effects at low doses of mercury.  The analysis focuses on estimating changes in exposures to women of childbearing age because adverse health effects in children have been linked to prenatal mercury exposures.  In addition, because mercury emissions in the U.S. predominantly affect the eastern-half of the country, the analysis is also focused on affected populations in that part of the country.  While the geographic coverage and the exposed population largely reflect the areas impacted by the CAMR, it should be noted that, as Section 4 discusses, this analysis focuses on freshwater exposures in the eastern-half of the U.S., which will reduce the size of the exposed population considered for analysis.  This focus for the analysis is necessary because of limitations in modeling how changes in mercury deposition will effect fish tissue concentrations for the other fish consumption pathways discussed in Section 4 of this report and there is relatively little fish tissue information for the Western-half of the U.S.  As discussed in Section 8 the largest change in power plant deposition associated with the recently finalized CAIR and CAMR program will occur in the eastern-half of the U.S., so the unquantified benefits for the western-hald of the U.S. is expected to be quite small.  As is discussed in previous sections, we are unable to quantify several categories of potential benefits, such as benefits from other health and ecological effects, as well as commercial and recreationally-caught saltwater species.  As metioned throughout the report, power plant emission reductions under CAIR and CAMR will have a minimal effect on exposure levels associated with these other consumption pathways.  Our benefit assessment has several known uncertainties and biases, which are discussed further in Section 10.7.  While some of these are downward biases and some are upward biases, taken together, the Agency believes

that the benefits presented in this section likely underestimate the total benefits of reducing mercury emissions from power plants due to the potential health effects and potentially exposed populations that are not quantified in this analysis.

### 10.1.1  Summary

The basic methodology used in this Section is to project the change in IQ of a population of children due to mercury exposure *in utero*.  The exposure is based on consumption of fish by pregnant women.  The mercury in the fish is due in part to atmospheric deposition of mercury from power plants.  A monetary value is placed on incremental loss of IQ by these children[1].  The incremental reduction in exposure due to mercury emission reductions from power plants is then applied to this methodology to calculate the improvement in IQ and the monetary value of that improvement, attributable to the emissions reduction.  The study examines only consumption of freshwater fish, because our analysis indicates that these are the only fish significantly impacted by U.S. power plants.

The analysis first examines impacts on the general population of children of freshwater fishers.  It then considers much smaller populations that consume greater amounts of fish than the general population, including subsistence fishers, certain Native Americans, and Asian Americans.

With respect to impacts on the general population, two methods of approaching the problem were used, a "Population Centroid" and an "Angler Destination" approach.  These approaches reflect different ways of estimating where freshwater fishers fish.  Table 1 shows the relative impacts on IQ deriving from different mercury emission rates and the two different analytical approaches, for the average child in the general population.  More detailed results are presented in the body of this Section.

---

[1] There is limited evidence directly linking IQ and methylmercury exposure in the three large epidemiological studies that were  evaluated by the NAS and EPA.  Based on its evaluation of the three studies, EPA believes that children who are prenatally exposed to low concentrations of methylmercury may be at increased risk of poor performance on neurobehovioral tests, such as those measuring attention, fine motor function, language skills, visual-spatial abilities (like drawing), and verbal memory.  For this analysis, EPA is adopting IQ as a surrogate for the neurobehavioral endpoints that NAS and EPA relied upon for the RfD.

In the Faroes Island Study, a full scale IQ evaluation was not conducted.  However, two core subtests were evaluated (similarities and block design) and one supplementary test was conducted (Digit Span).  The similarities and block design tests are reported to be well correlated with the full WISC-R battery (0.885 see Bellinger paper), but how the Digit Span test relates is not reported.  In the EPA analysis, we assume that it relates similarly.  In the Faroes study, performance scores on the similarities and block design tests were not shown to be statistically related to cord blood or maternal mercury levels; the digit span test did show a statistical relationship with cord blood mercury.

Both the New Zealand and Seychelles study administered the WISC IQ test (WISC III in Seychelles, WISC R in New Zealand).  A reanalysis of the New Zealand data found a positive association, but it was not statistically significant.  No significant associations were seen in the Seychelles study.  In the EPA analysis, the the confidence intervals for full scale IQ in both these studies include zero.  However, Ryan (2005) conducted an integrative analysis, combining results from all three studies.  When combined, the statistical power of the analysis increases.  While the size of the dose-reponse relationship declined relative to past studies with a statistically significant finding, Ryan found a statistically significant relationship between IQ and mercury. The confidence interval did not include zero.

10-2

The data in Table 10-1a show that both analytical approaches yield similar results.  A typical child of freshwater fishers lost approximately 0.06 - 0.07 IQ points due to mercury exposure in 2001, depending on the analytical approach.  Average IQ is, by definition, 100 points.  Implementing CAIR would reduce this IQ loss by a little less than 0.007 to 0.009 IQ points in 2020.  Under Options 1 and 2 of the CAMR, this reduction would be increased by 0.0006 to 0.0009 IQ points.  Total elimination of power plant emissions would have about the same effect as CAIR Option 2.  Focusing on the Population Centroid approach, it is seen that CAIR reduces the 2001 mercury impact on IQ by 11.8%;  CAIR plus CAMR Option 1 reduces the impact by 12.7% (an additional 0.9%);  and totally eliminating power plant mercury emissions reduces the 2001 impact by 13.2% (another 0.5% beyond CAIR plus CAMR Option 1.

**Table 10-1(a).  Summary of Per Capita Changes in IQ Due to Mercury Exposure**

| Measurement of IQ impact per capita (average impact over study population) | Approach | |
|---|---|---|
| | Population Centroid | Angler Destination |
| IQ loss due to mercury exposure in 2001 | 0.0621 | 0.069 |
| IQ loss in 2020 under CAIR emission reductions | 0.0548 | 0.060 |
| Avoided IQ loss due to CAIR in 2020, relative to 2001 | 0.0073 | 0.0089 |
| Avoided IQ loss with no power plant emissions in 2020, relative to 2001 | 0.0082 | 0.0090 |
| Avoided IQ loss w/ no power plant emissions in 2020, vs CAIR in 2020 | 0.0009 | 0.0001 |
| | | |
| IQ loss in 2020 w/ CAIR & Option 1 of CAMR | 0.0542 | 0.0594 |
| Avoided IQ loss due to CAIR & Option 1, vs CAIR alone | 0.0006 | 0.0006 |
| | | |
| IQ loss in 2020 w/ CAIR & Option 2 of CAMR | 0.0539 | 0.0591 |
| Avoided IQ loss due to CAIR & Option 2, vs CAIR alone | 0.0009 | 0.0009 |
| | | |

In short, the overall impact of mercury on the IQ of children in the general population is relatively small, less than one-thousanth of a normal IQ (Normal = 100). Implementing CAIR dramatically reduces the contribution of power plants to this small projected mercury impact on children, and CAMR Option 1 eliminates the majority of the remaining impact associated with power plants.

We apply a value of about $8,800 (net present value) per IQ point improvement per capita. Thus, the value of CAMR Option 1 is equal to the number of exposed children x the mean improvement in IQ (0.0006 points) x $8,800[2], or $2.6 million. In the body of this Section, this number is adjusted to reflect various "lag" periods, to reflect the amount of time required for emission reductions to result in changes in fish mercury concentrations.

In addition to the analysis of the general US population, this Section also assesses the benefit of CAMR on subsistence anglers, Native Americans, and Asian Americans, who consume more fish than the general population. Table 2 presents results similar to Table 1, for subsistence fishers and two Native American tribes.

As expected, a larger impact on IQ due to mercury was found for these smaller groups, with an average IQ impact in 2001 from all mercury sources of 0.331 IQ points on children of subsistence fishers, for example. Implementation of CAIR reduced this impact to 0.290 IQ points in 2020. Application of CAMR Option 1 reduced impacts by an additional 0.0033 points and complete elimination of emissions from US power plants reduced impacts by another 0.012 points, or down to 0.275 points. Hence, for this more sensitive group, CAIR again provides the bulk of the reduction possible by controlling power plants, but in this case totally eliminating power plant emissions can provide about a one-hundredth of a point of improvement in average IQ, compared to CAMR Option 1.

For the Native American tribes (the Hmong and the Chippewa), current impacts on IQ are estimated to be about 0.1 IQ point. CAIR provided no benefit to the Hmong, where power plants contribute only about 6% of the impact associated with mercury consumption. For the Chippewa, CAIR reduced impacts about 11%. The CAMR options reduced impacts another 0.8% or 1.5%, and total elimination of power plant emissions would contribute another 8.5% reduction. In absolute terms, the effect of total elimination of power plant mercury emissions, beyond CAMR Option 1, was projected to be about one-hundredth of an IQ point.

---

[2] This value is based on foregone earnings over a lifetime discounted at 3 percent. The value per IQ point when calculated at a 7 percent discount rate is $1580 per IQ point (1999$).

**Table 10-1(b).  Impacts of Mercury on High Fish Consuming Groups**

| Measurement of IQ impact per capita | Subsistence Fishers | Hmong (MN, WI) | Chippewa (MI, MN, WI) |
|---|---|---|---|
| | | | |
| | | | |
| IQ loss due to Hg Exposure in 2001, mean per capita | 0.3310 | 0.1140 | 0.1340 |
| IQ loss in 2020 under CAIR | 0.2900 | 0.1140 | 0.1220 |
| Avoided IQ loss due to CAIR 2020, v 2001 | 0.0410 | (0.0007) | 0.0150 |
| Avoided IQ loss w/ no PP Hg 2020, v 2001 | | | |
| Avoided IQ loss w/ no PP Hg 2020, v CAIR 2020 | 0.0154 | 0.0069 | 0.0130 |
| | | | |
| IQ loss in 2020 w/ CAIR & CAMR Opt1 | 0.2867 | 0.1136 | 0.1210 |
| Avoided IQ loss due to CAIR & CAMR Opt 1, v CAIR | 0.0033 | 0.0004 | 0.0010 |
| | | | |
| IQ loss in 2020 w/CAIR & CAMR Opt2 | 0.2852 | 0.1126 | 0.1200 |
| Avoided IQ loss due to CAIR & CAMR Opt2, v CAIR | 0.0048 | 0.0014 | 0.0020 |
| | | | |
| Number of children in group | 22,302 | 553 | 1,094 |
| | | | |

### 10.1.2  Modeling Overview

The mercury benefits model developed to support this analysis estimates the IQ decrement for children of recreational freshwater fishers exposed prenatally to methylmercury through maternal fish consumption.  The model is designed to provide two types of benefits results:

1. Total reductions in IQ decrement (and associated dollar values) for the entire modeled population of prenatally exposed children; and

2. Distributional results in the form of per-capita reductions in IQ decrements for each of the modeled children in the analysis population.

The first category of results (total IQ benefits) can be used to support a traditional cost-benefit analysis comparing the total monetized benefits against total monetized costs.  The second category of results (distribution of per-capita IQ losses) can be used to examine the distributional equity of IQ impacts across the study population of prenatally-exposed children (e.g., what is the range of individual IQ changes across the study population and how many children are projected to have IQ changes above specific levels of interest?).

In addition to generating benefits estimates for the children of recreational freshwater fishers, the mercury benefits model also provides benefits estimates for several high-exposure sub-populations including:

1. A high fish consumption rate study population that is defined as "subsistence" fishers for the purposes of this study;

2.      A low-income high fish consumption study population (an alternative approach to model subsistence fishers);

3.      A Southeast Asian ethnic group with high freshwater fish consumption due to cultural practices; and

4.      A Native American population with high freshwater fish consumption due to cultural practices.

These high-exposure scenarios are intended to provide coverage for special populations potentially experiencing health impacts from the consumption of self-caught freshwater fish due to increased consumption rates.

Because key factors in modeling freshwater fisher exposure (e.g., methylmercury fish tissue concentrations, mercury deposition rates from power plants, the distribution of fishers and fishing activity) can display significant spatial variability, the mercury benefits model has been developed to provide adequate spatial resolution for a regulatory analysis of modeling fishing activity and subsequent mercury exposure associated with CAMR.  The mercury benefits model has been developed to provide coverage for local- to regional-scale trends in fisher exposure linked to more generalized spatial patterns of fishing activity, mercury fish tissue concentrations and mercury deposition.  The model also considers variability in the consumption rate of self-caught freshwater fish by fishers, which is not necessary for a total (best estimate) prediction of IQ impacts, but which is critical in modeling the distribution of per-capita IQ impacts across the study population.  By considering local- to regional-scale trends in patterns of recreational fisher exposure as well as variability in fish consumption rates, this model provides a quantitative assessment of the distribution and magnitude of exposures and IQ decrements across the fisher study population (prenatally-exposed children).

In addition, because of the complexity in modeling fishing activity, two models of freshwater fishing behavior have been developed for this analysis.  One model (the "population centroid" approach) represents a "push" model in that it focuses first on identifying where recreational fishers live and then models their fishing behavior in the form of fishing trips out to different distance rings (10, 20, 50 and 100 miles) from their home residences.  This model is applied at the US Census block group level, which results in exposure estimates being generated for a relatively large number of polygons (165,000 block groups in the study area).  The second model (the "angler destination" approach), represents a "pull" model in that it focuses on identifying where anglers fish and does not consider their residential location.  This model is applied at the watershed-level as identified by USGS 8-digit hydrologic unit code (HUC) and assesses the distribution of recreational fishing activity across HUCs in the study area.  Because fishing activity (behavioral) data used in the HUC model does not include coverage for special subpopulations evaluated in this analysis (e.g., Native Americans, Southeast Asian subpopulations and economically disadvantaged subsistence subpopulations), these specialized analyses were implemented using the population centroid approach.  In addition, due to the greater spatial precision of the population centroid model, relative to the HUC model, the population centroid model was also used as the basis for generating distributional (per-capita IQ impact) results for the fishers.

The mercury benefits model generates health impact and valuation results by first estimating the change in total mercury deposition over waterbodies within the 37 state study area (mercury deposition is modeled using CMAQ).[3]  These changes in mercury deposition are generated by comparing two air modeling scenarios (e.g., a control scenario versus a baseline scenario for a particular simulation year).  These changes in mercury deposition are then translated into changes in methylmercury fish tissue concentrations based on the proportionality assumption advanced in Mercury Maps (i.e., a incremental percent change in deposition produces a matching percentage change in mercury fish tissue concentrations)[4].  Modeled changes in methylmercury fish tissue concentrations can, in turn, be used together with the fishing behavioral models described above, to predict changes in population-level mercury exposure.  These exposure changes can be translated through modeling into IQ reductions, which can then be monetized using valuation functions based primarily on foregone (lost) earnings resulting from reductions in IQ.  Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.  Thus, benefits results generated for this analysis are reported using a range of lag periods following regulatory implementation (e.g., 5, 10, 20, and 50 years).  Based on the response times from the case studies discussed above, we present a range of benefits based on the 10 and 20 year lag as central estimates.[5]  We also provide results for the 5 and 50 years to demonstrate how benefits would differ under potential shorter and longer lag periods.  Modeling of benefits for these different lags reflects the effects of economic discounting as well as demographic growth in the exposed population.

### 10.1.3  Monetized Benefits: Results in Brief

The mercury benefits analysis generated two categories of results including total IQ decrements and associated monetary (dollar) values for modeled populations and distributional results in the form of per-capita IQ reduction estimates for the group of modeled individuals.  Total IQ decrement and valuation results were generated for the recreational fisher population as well as for the four potentially high-risk sub-populations described above.  Distributional results (per-capita IQ decrements) were generated only for the recreational fisher population.

---

[3] The 37 states included in the analysis are the following (plus the District of Columbia): Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, Delaware, Maryland, New Jersey, New York, Pennsylvania, Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Virginia, West Virginia, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Nebraska, North Dakota, Ohio, South Dakota, Wisconsin, Oklahoma, and Texas

[4] There are several limitations with the Mercury Maps approach that are discussed fully in Section 3 of this report. In particular, it applies only to waterbodies where air deposition is the primary source of mercury load on a system. In Section 10.7.1.1, we estimate the number of areas (HUCs) that have non-air deposition to the waterbodies and remove them from the analysis to determine the affect on total benefits.

[5] A 30 year lag is also indicated by the case studies in Section 3, but are not provided in the benefit analysis in this Section.  EPA expects that results of the 30 year lag would not significantly differ from the 20 year lag presented in this Section.

The following conditions and emissions control scenarios were modeled for this RIA:

- 2001 Base Case
- 2001 Utility Emissions Zero-Out
- 2020 Base Case with CAIR
- 2020 Utility Emissions Zero-Out
- 2020 CAMR Control Option 1
- 2020 CAMR Control Option 2

Table 10-1c provides a summary of the total benefits estimated for each of these emissions control scenarios.

**Table 10-1(c).  Summary of Total Benefits Associated with Modelled Avoided IQ Decrements in Prenatally Exposed Children Due to Reduced Mercury Exposure from Freshwater Recreational Angling**

| Emission Control Scenario | Range of Estimated Benefits Associated with Modelled Avoided IQ Decrements Due to Mercury Exposure (millions of 1999 dollars)[a] | | | |
| --- | --- | --- | --- | --- |
| | Recreational Freshwater Angler[b] | Subsistence Anglers[c] | Native American Case Study Population[d] | Asian American Case Study Population[e] |
| **2001 Zero Out of EGU Emissions** (Relative to 2001 Baseline Emissions) -Using a 3% discount rate -Using a 7% discount rate | $19.0 - $37.0 $ 8.9 - $20.2 | $ 4.9 - $ 6.7 $ 2.3 - $4.6 | $0.10 - $0.12 $0.05 - $0.08 | $0.047-$0.050 $0.021-$0.034 |
| **2020 Base Case (with CAIR)** (Relative to 2001 Baseline Emissions) -Using a 3% discount rate -Using a 7% discount rate | $20.5 - $43.8 $ 9.6 - $30.0 | $ 4.9 - $7.0 $ 2.3 - $4.8 | $0.12 - 0.13 $0.6 - $0.9 | $0.005-$0.007 approx. $0.003 |
| **2020 Zero Out of EGU Emissions** (Relative to 2020 Base Case with CAIR) -Using a 3% discount rate -Using a 7% discount rate | $ 8.1 - $16.1 $ 3.8 - $11.0 | $ 2.2 - $2.7 $ 1.0 - $ 1.8 | approx. $0.10 $0.05 - $0.08 | $0.060-$0.064 $0.028-$0.043 |
| **CAMR Option 1** (Relative to 2020 Base Case with CAIR) -Using a 3% discount rate -Using a 7% discount rate | $ 1.7 - $ 3.0 $ 0.8 - $ 2.0 | $ 0.5 - $ 0.6 $ 0.2 - $ 0.4 | approx. $0.007 $0.005-$0.003 | approx. $0.003 $0.001-$0.002 |
| **CAMR Option 2** (Relative to 2020 Base Case with CAIR) -Using a 3% discount rate -Using a 7% discount rate | $ 2.5 - $ 4.6 $ 1.2 - $ 3.1 | $ 0.7 - $ 0.9 $ 0.3 - $ 0.6 | approx. $0.015 $0.007-$0.010 | approx. $0.012 $0.006-$0.009 |
| **Combined Benefits of CAIR and CAMR** (CAMR Option 1 + 2020 Base with CAIR Relative to 2001 Base Case) -Using a 3% discount rate -Using a 7% discount rate | $22.2 - $46.8 $10.4 - $32.0 | $ 5.5 - $7.6 $ 2.5 - $5.2 | $0.011-$0.012 $0.050-$0.080 | $0.008-$0.010 $0.023-$0.036 |

a  The value per IQ point used to calculcate total benefits presented in this table is $8800/IQ point and is based on a 3 percent discount rate of net earnings over a lifetime.  The value per IQ point at a 7 percent discount rate is $1580/ IQ point (1999$) according to EPA(1997c).

b  The range of results presented for the Recreational Freshwater Angler of recreational anglers are based on potential outcomes from the Angler Destination exposure modeling and the Population Centroid exposure modeling discussed in this chapter, as well as results ranging in value from a 10 to 20 year lag.  See Table 10-21 and Table 10-29 for the full matrix of potential results from the benefit modeling of this population.

c  The range of results presented for Subsistence Anglers are based on potential outcomes from the Income-based modeling and the Consumption-based modeling discussed in this chapter, as well as results ranging in value from a 10 to 20 year lag.  See Table 10-33 for the full matrix of potential results from the benefit modeling of this population.

d  The range of results presented for the Native American case study of the Chippewa in Minnesota, Wisconsin, and Michigan are based on potential outcomes from the Population Centroid exposure modeling discussed in this chapter, as well as results ranging in value from a 10 to 20 year lag.  See Table 10-42 for the full matris of potential results frm the benefit modeling of this population.

e  The range of results presented for the Asian American case study of the Hmong in Minnesota and Wisconsin are based on potential outcomes from the Population Centroid exposure modeling discussed in this chapter, as well as results ranging in value from a 10 to 20 year lag.  See Table 10-41.

### 10.1.4  Key Steps

The process used for estimating mercury exposures is divided into three general steps:

1.    Estimate mercury levels in freshwater fish across the eastern half of the United States.

2.    Estimate the size of the exposed populations of interest (i.e., prenatally exposed children of freshwater anglers) and their spatial relation to mercury levels in freshwater fish (i.e., location and methylmercury concentration in fish consumed by mothers).

3.    Estimate fish consumption and mercury ingestion rates for the mothers of prenatally exposed children of freshwater anglers.

Based on these exposure estimates, it is then possible to estimate associated health decrement and monetary losses.  The process for quantifying these losses can be summarized as:

1.    Estimate reductions in expected IQ levels for the exposed population

2.    Estimate the expected value of foregone future earnings associated with the IQ decrements.

To estimate the benefits of mercury emissions reductions, the preceding exposure assessment and IQ valuation steps were conducted under two baseline (i.e., "base case") scenarios—one for 2001 and the other for 2020 (with CAIR)—and four emissions reduction scenarios.  The benefits associated with each of the emissions reduction scenarios, in particular the CAMR control options, were then estimated as the difference (reduction) in the total value of IQ losses, going from the relevant baseline scenario to conditions with the emissions reductions in place.  These steps and the results are described in detail in the following sections of this report.

Section 10.2 describes the data sources and methods used to estimate the spatial distribution of mercury levels in freshwater fish across the eastern United States.  It also summarizes the estimates of mercury concentrations based on these methods.

Section 10.3 describes data sources and two discrete methods for estimating the number of modelled prenatally exposed children and average levels of mercury in freshwater fish consumed by their mothers.  Results from applying the two methods are also reported and compared.

Section 10.4 describes the data, modeling approach, and results for estimating levels of mercury ingestion through consumption of noncommercial freshwater fish in the study area.  The modeling approach was applied with both of the methods described in Section 10.3 to estimate distributions of mercury ingestion rates across the exposed population.  This section also describes methods for estimating IQ decrements and foregone future earnings resulting from the estimated exposures.

Section 10.5 summarizes results and provides quantitative estimates of the benefits associated with the zero out scenario.  Estimates of exposures, IQ decrements, and foregone future earnings are reported and compared for both baseline conditions and for the zero out scenario.

Section 10.6 examines the distributional implications of the regulation by describing how the estimated changes in IQ effects are distributed across the exposed population.

Section 10.6 also adapts the methods described in Sections 10.3 and 10.4 to assess mercury exposures, IQ effects, and benefits for potentially highly exposed subpopulations.  Three methods are explored for evaluating high mercury exposures, each of which focuses on subpopulations with high expected rates of freshwater fish consumption.  The first method focuses on exposures among individuals in the top fifth percentile of freshwater fish consumption rates.  The second method implements an approach for examining exposures among low-income individuals for whom self-caught freshwater fish may be an integral part of their diet.  The third method focuses on two specifically studied ethnic groups in the Great Lakes area who have been found to consume relatively high rates of noncommercial freshwater fish—the Hmong and the Chippewa Indians.

Section 10.7 discusses the main assumptions, limitations, and uncertainties associated with the methods described in the report.  It also describes the unquantified benefits associated with reductions in mercury emissions.

## 10.2    Estimation of Mercury Levels in Freshwater Fish

To estimate mercury levels in consumed freshwater fish across the eastern half of the United States, this analysis relied primarily on monitoring data (i.e., fish tissue samples drawn from freshwater sites across the study area).  A potential alternative to monitored data would be to estimate mercury levels based on dynamic and localized fate and transport modeling; however, models of this type present significant technical challenges when applied at regional/national spatial scale.[6]

Data from the NLFA and NLFTS were used as inputs into the NDMMF[7] model to generate MeHg fish tissue concentrations normalized to the typical sizes of frequently targeted fish species (largemouth bass, walleye, crappie, catfish, trout, and perch).  All six species concentrations were generated for each waterbody, then averaged to develop a representative MeHg concentration for that waterbody at a given sample date.[8]  Where a single location was

---

[6] An independent peer review of the benefits methodology indicated that ecosystem based fate and transport modeling of bioaccumulation of MeHg in fish tissue for a national scale analysis would not be practical or even feasible at this time.

[7] A comprehensive evaluation of the performance of the NDMMF, and detailed description of the model are available in Appendix E.

[8] Details related to the selection of MeHg sample data, variability within the data, how the NDMMF was applied, and overall concentrations is provided in ch. 5.

sampled on multiple dates, the representative MeHg concentrations were averaged at that location.  The resulting estimates are summarized by state in Table 10-2.

After MeHg concentrations are computed for every sample location, the concentrations are then linked to exposed populations using two exposure modeling methods. The angler destination approach, described in section 10.1.2, evaluates exposure based on fishing pressure at the HUC, thus, we estimate the average fish tissue concentration for lakes and rivers located in each HUC in the study area.  In the second approach, the population centroid approach discussed in Section 10.1.2, concentrations are linked to populations based on trip travel distance rings. More detail about these two approaches is provided later in this section.

The values reported in Table 10-2 are based on these estimated averages per sampling location.  Across all sampling locations the average (median) estimated mercury concentration in fish tissue was 0.23 ppm (0.18 ppm) for lake sites and 0.25 ppm (0.19 ppm) for river sites.

Table 10-3 describes how the lake and river mercury concentration data (summarized in Table 10-2) are distributed across the 1,362 HUCs in the study area.  Over 60 percent of HUCs are without lake estimates of mercury concentrations in fish, and almost 50 percent are without river estimates.  For the 512 HUCs with fish tissue concentration estimates for lakes, the average HUC level concentrations range from 0.004 ppm to 1.5 ppm.  Roughly 15 percent have average mercury concentrations below 0.1 ppm.

The minimum and maximum mercury concentration in the lake fish are 0.004 ppm in Illinois and 2.64 ppm in Pennsylvania.  In the case of 707 HUCs with river estimates, the mean mercury concentration in HUCs range from 0.004 ppm to 2.2 ppm.  Roughly 25 percent HUCs have average mercury concentrations below 0.1 ppm.  The minimum and maximum mercury concentration in the river fish are 0.0003 ppm in Louisiana and 3.3 ppm in Pennsylvania.



**Figure 10-1.  Locations of Lake Fish Tissue Mercury Sampling Sites Used in the Analysis**



**Figure 10-2.  Locations of River Fish Tissue Mercury Sampling Sites Used in the Analysis**

**Table 10-2.  Summary Statistics for Estimated Fish Tissue Mercury Concentrations (ppm) by State: 2001 Base Case[a]**

| State | Lake Sampling Sites | | | | | River Sampling Sites | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Min | Mean | Max | Median | Number | Min | Mean | Max | Median |
| AL | 56 | 0.011 | 0.113 | 0.575 | 0.076 | 104 | 0.012 | 0.157 | 1.003 | 0.094 |
| AR | 50 | 0.016 | 0.261 | 0.943 | 0.221 | 174 | 0.009 | 0.340 | 1.311 | 0.295 |
| CT | 20 | 0.072 | 0.311 | 1.511 | 0.246 | 38 | 0.030 | 0.215 | 0.581 | 0.194 |
| DC | | | | | 0.000 | 5 | 0.070 | 0.109 | 0.165 | 0.090 |
| DE | 3 | 0.036 | 0.070 | 0.102 | 0.102 | 80 | 0.002 | 0.102 | 1.563 | 0.072 |
| FL | 91 | 0.022 | 0.299 | 1.105 | 0.282 | 98 | 0.027 | 0.374 | 0.983 | 0.353 |
| GA | 65 | 0.013 | 0.195 | 0.674 | 0.174 | 258 | 0.002 | 0.282 | 3.223 | 0.156 |
| IA | 18 | 0.030 | 0.069 | 0.168 | 0.060 | 45 | 0.030 | 0.131 | 0.480 | 0.110 |
| IL | 31 | 0.004 | 0.081 | 0.358 | 0.071 | 41 | 0.005 | 0.097 | 0.552 | 0.076 |
| IN | 15 | 0.030 | 0.124 | 0.311 | 0.088 | 109 | 0.030 | 0.186 | 0.502 | 0.173 |
| KS | 3 | 0.103 | 0.361 | 0.649 | 0.649 | 9 | 0.023 | 0.150 | 0.380 | 0.140 |
| KY | 9 | 0.099 | 0.153 | 0.268 | 0.154 | 51 | 0.039 | 0.170 | 0.548 | 0.159 |
| LA | 52 | 0.013 | 0.175 | 1.489 | 0.126 | 44 | 0.000 | 0.238 | 3.190 | 0.152 |
| MA | 6 | 0.124 | 0.266 | 0.394 | 0.278 | 1 | 0.578 | 0.578 | 0.578 | 0.578 |
| MD | 7 | 0.015 | 0.061 | 0.177 | 0.064 | 35 | 0.007 | 0.046 | 0.173 | 0.030 |
| ME | 92 | 0.026 | 0.480 | 1.020 | 0.479 | 52 | 0.134 | 0.496 | 1.787 | 0.453 |
| MI | 179 | 0.048 | 0.190 | 0.624 | 0.165 | 67 | 0.066 | 0.181 | 0.477 | 0.172 |
| MN | 309 | 0.018 | 0.173 | 1.022 | 0.145 | 216 | 0.014 | 0.164 | 0.734 | 0.143 |
| MO | 8 | 0.050 | 0.152 | 0.350 | 0.120 | 7 | 0.044 | 0.162 | 0.287 | 0.171 |
| MS | 7 | 0.080 | 0.215 | 0.299 | 0.244 | 18 | 0.082 | 0.387 | 0.727 | 0.343 |
| NC | 84 | 0.065 | 0.304 | 1.210 | 0.228 | 341 | 0.028 | 0.249 | 0.985 | 0.203 |
| ND | 16 | 0.096 | 0.204 | 0.377 | 0.185 | 4 | 0.168 | 0.325 | 0.517 | 0.307 |
| NE | 17 | 0.029 | 0.136 | 0.391 | 0.129 | 127 | 0.001 | 0.135 | 0.647 | 0.111 |
| NH | 56 | 0.037 | 0.390 | 1.425 | 0.350 | 76 | 0.059 | 0.348 | 0.804 | 0.298 |
| NJ | 10 | 0.081 | 0.254 | 0.753 | 0.162 | 64 | 0.068 | 0.337 | 2.129 | 0.207 |
| NY | 66 | 0.033 | 0.310 | 0.947 | 0.266 | 118 | 0.037 | 0.320 | 1.350 | 0.251 |
| OH | 100 | 0.013 | 0.205 | 1.037 | 0.149 | 504 | 0.010 | 0.252 | 0.980 | 0.240 |
| OK | 68 | 0.017 | 0.214 | 1.164 | 0.179 | 66 | 0.016 | 0.223 | 0.648 | 0.179 |
| PA | 19 | 0.061 | 0.546 | 2.640 | 0.255 | 60 | 0.020 | 0.403 | 3.300 | 0.170 |
| SC | 39 | 0.109 | 0.221 | 0.497 | 0.208 | 162 | 0.123 | 0.493 | 2.479 | 0.375 |
| TN | 44 | 0.090 | 0.184 | 0.505 | 0.158 | 21 | 0.100 | 0.194 | 0.414 | 0.170 |
| TX | 41 | 0.006 | 0.141 | 0.363 | 0.137 | 57 | 0.004 | 0.182 | 1.228 | 0.147 |

(continued)

**Table 10-2.  Summary Statistics for Estimated Fish Tissue Mercury Concentrations (ppm) by State:  2001 Base Case (continued)**

| State | Lake Sampling Sites | | | | | River Sampling Sites | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Min | Mean | Max | Median | Number | Min | Mean | Max | Median |
| VA | 18 | 0.018 | 0.146 | 0.470 | 0.092 | 38 | 0.011 | 0.118 | 1.900 | 0.050 |
| VT | 31 | 0.054 | 0.291 | 0.641 | 0.270 | 22 | 0.069 | 0.345 | 0.945 | 0.279 |
| WI | 187 | 0.029 | 0.201 | 0.900 | 0.182 | 204 | 0.029 | 0.240 | 0.897 | 0.212 |
| WV | 6 | 0.170 | 0.296 | 0.400 | 0.306 | 45 | 0.034 | 0.195 | 0.848 | 0.117 |
| **All** | **1,823** | **0.004** | **0.227** | **2.640** | **0.175** | **3,361** | **0.000** | **0.254** | **3.300** | **0.185** |

[a] For summary purposes, in this table the data are summarized at a state level; however, the data used in the analysis were analyzed at a Census block group level or at a HUC level.

**Table 10-3.  HUC-Level Distribution of Mercury Sampling Sites and Estimated Fish Tissue Concentrations:  2001 Base Case [a]**

| | Lake | | River | |
|---|---|---|---|---|
| | Number[b] | Percent | Number[b] | Percent |
| Number of Samples in HUC | | | | |
| 0 | 850 | 62.41 | 655 | 48.09 |
| 1–3 | 366 | 26.87 | 429 | 31.50 |
| 4–10 | 125 | 9.18 | 205 | 15.05 |
| 11–25 | 16 | 1.17 | 60 | 4.41 |
| 26+ | 5 | 0.37 | 13 | 0.95 |
| | | | | |
| Average Concentration (in ppm) in HUC | | | | |
| No data | 850 | 62.41 | 655 | 48.09 |
| 0.00–0.05 | 47 | 3.45 | 59 | 4.33 |
| 0.06–0.10 | 81 | 5.95 | 107 | 7.86 |
| 0.11–0.19 | 168 | 12.33 | 218 | 16.01 |
| 0.20–0.29 | 115 | 8.44 | 159 | 11.67 |
| 0.30 and over | 101 | 7.42 | 164 | 12.04 |

[a] Based on average concentration across samples and species-specific estimates at each sampling station.

[b] Number of sampling stations.

### 10.3    Estimation of Exposed Populations and Fishing Behaviors

Based on the spatial distribution of estimated mercury levels in fish, the next step in the analysis is to estimate the average daily ingestion of mercury (g/day) through noncommercial freshwater fish consumption (HgI) for selected populations of interest.  Because the primary measurable health effect of concern—developmental neurological effects in children—occurs as a result of in-utero exposures to mercury, the specific population of interest in this case is prenatally exposed children.  To identify and estimate the size of this exposed population, the analysis focuses on women of childbearing age in freshwater angler households in the 37-state study area.  More specifically, it estimates the number of pregnant women in these households in 2001 and in other selected years.

Generally speaking, mercury ingestion for a population i in a given year can be calculated as the product of three estimates, as shown in Eq. (10.1):

$$HgI_i = N_i * CHg_i * C_i \qquad \text{(Eq. 10.1)}$$

where

| | | |
|---|---|---|
| $N_i$ | = | size of the exposed population of interest i (annual number of pregnant women in freshwater angler households during the year), |
| $CHg_i$ | = | average concentration (μg/g) of methyl mercury in noncommercial freshwater fish filets consumed by population i, and |
| $C_i$ | = | average daily consumption rate (g/day) of noncommercial freshwater fish by population i. |

As described in more detail below, EPA applied two alternative approaches for defining and estimating $N_i$ and $CHg_i$ for the 37-state study area.  Both approaches rely primarily on two national-level data sources for characterizing freshwater angler populations and their fishing behaviors.  The discussion below begins by describing these two data sources, and then describes how they are used in the two alternative approaches ( in combination with data from the Census and other information sources) to estimate $N_i$ and $CHg_i$.  Consumption rate estimates for recreationally caught freshwater ($C_i$) are based primarily on recommendations in EPA's *Exposure Factors Handbook* (EPA, 1997a) although several other sources were also considered (see Section 10.1.3).  These estimates are described in more detail in Section 10.1.4.

#### 10.3.1  Primary Data Sources on Fishing Activity in the United States

Two main sources of national-level activity data are available and suitable for estimating the size and spatial distribution of freshwater angler populations and activities:

- The National Survey of Fishing, Hunting, and Wildlife-Associated Recreation (NSFHWR), maintained by the Department of the Interior (DOI) (DOI and DOC, 1992, 1997, 2002); and
- The National Survey of Recreation and the Environment (NSRE 1994).

**NSFHWR Angler Data**.  The NSFHWR, conducted by the U.S. Census Bureau about every 5 years since 1955, includes data on the number and characteristics of participants as well as time and money spent on hunting, fishing, and wildlife watching.  The most recent version,

the 2001[9] NSFHWR (DOI and DOC, 2002), collected data on 25,070 respondents in the sportspersons (hunters and anglers) sample and 15,303 in the wildlife watchers sample, all over the age of 15.

The freshwater fishing subset of the sportspersons survey is the most relevant to the mercury analysis.  Of the 25,070 respondents included in the 2001 sportspersons sample, 11,280 respondents participated in freshwater fishing.  Using the weights provided in the NSFHWR data, it is estimated that 28.4 million Americans participated in freshwater fishing in 2001, spending approximately 467 million total days freshwater fishing.

The survey distinguishes between several types of freshwater fishing.  Respondents were asked the number of days spent fishing in the Great Lakes; in other ponds, lakes, or reservoirs; and in rivers or streams.  Table 10-4 summarizes the NSFHWR data on freshwater fishing by state.  It reports number of anglers and fishing days separately for lakes (including the Great Lakes, ponds, reservoirs, etc.) and rivers (including rivers and streams), and it distinguishes between states as the residence of the anglers and states as the destination for anglers (residents and nonresidents).

Over 80 percent of freshwater anglers in the United States reside in our study area, and they accounted for roughly 88 percent of lake-fishing days and 77 percent of river-fishing days in the country in 2001.  The states with the largest numbers of resident freshwater anglers in 2001 were Texas with 1.9 million anglers and Illinois and Minnesota, both with 1.3 million anglers.  Minnesota had the highest number of lake-fishing days (including both state residents and nonresidents) in 2001 (25.1 million) followed by Texas and Wisconsin, with 22.6 million and 18.2 million days, respectively.  Pennsylvania, New York, and Florida had the largest number of river-fishing days, each with over 6 million days in 2001.

The NSFHWR data also contain information on demographic characteristics of the anglers, including gender, age, and marital status.  For example, in the states in our study area, roughly 17 percent of freshwater anglers were women of childbearing age.  About 32 percent were married male adults less than 45 years old.  These two subpopulations are of interest for our analysis because it is among these groups that we most expect to find either pregnant women who consume their freshwater catch or men who share their catch with pregnant women.

---

[9] The screening survey for the 2001 NSFHWR covered activities in 2000, but the follow-up and more in-depth surveys focused on 2001.

**Table 10-4.  Summary of Fishing Activity Levels by State in 2001 from NSFHWR**

| State | Fishing by State Residents | | | Fishing in Each State (by Residents and Nonresidents) | | |
|---|---|---|---|---|---|---|
| | Number of Freshwater Anglers[a] | Number of Lake-Fishing Days[a,b] | Number of River-Fishing Days[b] | Number of Freshwater Anglers | Number of Lake-Fishing Days[a] | Number of River-Fishing Days |
| AL | 572,604 | 6,237,724 | 4,168,160 | 732,204 | 6,838,700 | 4,078,525 |
| AR | 546,099 | 9,805,445 | 2,279,229 | 781,772 | 10,576,329 | 2,716,241 |
| CT | 236,880 | 2,413,792 | 1,699,745 | 254,482 | 2,320,467 | 1,404,884 |
| DE | 47,496 | 318,592 | 284,984 | 73,147 | 315,203 | 329,185 |
| DC | 13,921 | 0 | 41,764 | 6,961 | 0 | 6,961 |
| FL | 1,153,514 | 12,036,042 | 5,831,107 | 1,315,528 | 12,332,411 | 6,386,844 |
| GA | 953,119 | 10,286,143 | 4,332,960 | 1,016,703 | 9,761,303 | 3,525,712 |
| IL | 1,302,368 | 16,091,265 | 4,976,135 | 1,125,760 | 11,866,587 | 4,105,517 |
| IN | 729,603 | 12,043,601 | 3,433,917 | 754,408 | 10,985,097 | 2,942,734 |
| IA | 511,674 | 4,891,453 | 3,978,169 | 541,613 | 4,183,232 | 3,539,145 |
| KS | 420,418 | 5,405,143 | 978,403 | 403,691 | 4,910,572 | 795,508 |
| KY | 609,959 | 9,774,419 | 2,439,232 | 779,677 | 10,288,090 | 2,553,575 |
| LA | 552,769 | 5,961,407 | 2,414,115 | 659,237 | 6,117,510 | 2,523,430 |
| ME | 180,475 | 2,318,947 | 828,351 | 271,840 | 2,774,182 | 1,005,643 |
| MD | 327,679 | 1,640,229 | 2,390,203 | 366,585 | 1,461,502 | 2,912,591 |
| MA | 335,587 | 4,496,619 | 1,458,347 | 324,740 | 4,028,656 | 1,098,457 |
| MI | 970,174 | 15,373,711 | 2,594,901 | 1,275,200 | 16,562,948 | 2,933,216 |
| MN | 1,294,333 | 23,908,920 | 2,966,955 | 1,565,228 | 25,139,287 | 2,859,056 |
| MS | 409,808 | 6,832,990 | 1,820,004 | 494,165 | 7,441,168 | 1,538,864 |
| MO | 976,151 | 9,840,152 | 2,427,720 | 1,214,950 | 10,848,890 | 2,697,573 |
| NE | 264,223 | 2,726,954 | 654,359 | 296,090 | 2,586,388 | 656,657 |
| NH | 133,489 | 1,824,024 | 861,481 | 220,552 | 2,004,541 | 1,036,094 |
| NJ | 345,726 | 4,729,331 | 2,133,589 | 330,957 | 4,290,623 | 1,476,570 |
| NY | 864,957 | 11,839,200 | 5,768,677 | 1,051,982 | 12,560,010 | 6,417,990 |
| NC | 710,251 | 9,470,233 | 4,315,601 | 847,994 | 9,163,218 | 4,346,851 |
| ND | 137,839 | 2,291,206 | 335,634 | 178,621 | 1,936,036 | 316,964 |
| OH | 1,246,262 | 16,197,914 | 4,348,070 | 1,260,043 | 15,098,754 | 3,979,234 |
| OK | 679,571 | 11,384,571 | 2,312,773 | 774,255 | 11,193,434 | 2,225,586 |
| PA | 1,008,107 | 8,856,695 | 11,274,947 | 1,182,356 | 9,124,678 | 10,664,975 |
| RI | 46,446 | 509,566 | 184,055 | 50,733 | 429,931 | 222,018 |
| SC | 511,862 | 6,951,092 | 2,247,640 | 591,069 | 6,997,418 | 2,249,877 |
| SD | 144,382 | 1,807,212 | 785,679 | 214,429 | 2,200,846 | 1,044,079 |
| TN | 763,484 | 11,159,872 | 5,100,470 | 903,385 | 11,118,719 | 5,375,402 |
| TX | 1,882,755 | 24,014,324 | 6,275,434 | 1,841,749 | 22,573,278 | 5,419,444 |

(continued)

**Table 10-4.  Summary of Fishing Activity Levels by State in 2001 from NSFHWR (continued)**

| State | Fishing by State Residents | | | Fishing in Each State (by Residents and Nonresidents) | | |
|---|---|---|---|---|---|---|
| | Number of Freshwater Anglers[a] | Number of Lake-Fishing Days[a,b] | Number of River-Fishing Days[b] | Number of Freshwater Anglers | Number of Lake-Fishing Days[a] | Number of River-Fishing Days |
| VT | 99,564 | 1,360,820 | 552,364 | 171,420 | 1,409,024 | 900,343 |
| VA | 652,561 | 8,348,688 | 3,514,615 | 721,301 | 8,237,651 | 3,545,041 |
| WV | 260,343 | 2,177,141 | 2,172,734 | 317,632 | 1,917,931 | 2,316,617 |
| WI | 948,912 | 15,763,077 | 4,077,048 | 1,349,553 | 18,295,238 | 4,506,934 |
| All 50 States plus DC | 28,438,814 | 340,972,513 | 141,048,761 | 28,438,814 | 340,972,513 | 141,048,761 |

[a] Includes days fished in other states.
[b] Includes Great Lakes, lakes, ponds, and reservoirs.
Source:  U.S. Department of the Interior (DOI), Fish and Wildlife Service and U.S. Department of Commerce, Bureau of the Census.  2002.  *2001 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation*.  Washington, DC:  U.S. Government Printing Office.

**NSRE Angler Data**.  The NSRE, formerly known as the National Recreation Survey (NRS), is a nationally administered survey designed to assess outdoor recreation participation in the United States and elicit information regarding people's opinions about their natural environment.  The NSRE sample of freshwater anglers is smaller than the NSFHWR sample, but it is nonetheless a useful resource because it provides a wide variety of information about fishing activities.  Importantly, it includes relatively detailed information about the nature and location of recent freshwater trips.  Because the sampling procedure is designed to be representative, inferences may be drawn as to the relative popularity of particular types of freshwater bodies (e.g., lakes, rivers) among the general public and the average distance traveled to reach these sites.  Although most recently conducted in 2000, data from 1994 survey (NSRE 1994) are currently best suited to support this analysis.

NSRE was conducted by the Survey Research Center at the University of Georgia.  Surveyors asked 16,000 individuals by telephone about their water-based recreation activities—specifically boating, fishing, swimming, or viewing—during the previous year.  The survey elicited information from respondents about *the most recent* trip taken in each of the four categories.  Of particular interest for the mercury analysis is the information regarding fishing trip destination for all respondents who fish.

In addition to information about the location of the last fishing trip destinations, the NSRE contains information on the type of waterbody visited on the last trip.  Waterbodies are broken down into four categories:  lakes, rivers and streams, wetlands, and coastal areas.  Of the 3,257 respondents who had fished in the previous year, 1,698 indicated that their last trip was to a lake, 694 to a river or stream, 5 to a wetland, and 720 to a coastal area.  (Type of waterbody visited was not available for 141 responses.)

One of the main advantages of NSRE is that it includes geocoded data for reported fishing destinations.  To specify the location of the last fishing trip, respondents were asked to provide the name of the waterbody, the nearest town to the waterbody, and an estimate of the distance and direction from their home to the waterbody.  Of the 2,520 freshwater destinations reported in NSRE, HUC codes have been identified for 1,768 respondents/trips.

*10.1.2.2*      *Estimation Approaches and Results for Exposed Populations and Fishing Behaviors*

To define and estimate exposed populations and their corresponding mercury exposures through freshwater fishing in our study area, EPA has developed two distinct but related approaches:

- The population centroid approach; and
- The angler destination approach.

Using two separate approaches, with respect to specific modeling assumptions, provides useful insights into model uncertainty.  These issues are discussed in more detail in Section 10.7.

The two approaches are similar in several respects.  Most importantly, both approaches define the main population of interest as prenatally exposed children in freshwater angler households in the 37-state study area.  They also both use estimates of mercury fish tissue concentration estimates based on NLFA and NLFTS sampling data (as described in Section 10.2).  In addition, the two approaches use state-level data from the NSFHWR as an essential input for estimating the size, characteristics, and behaviors of angler populations in the study area.

However, there are also key differences in the way the two approaches use the mercury sampling data, the NSFHWR, and other supporting data to estimate populations and exposures.  The population centroid approach focuses on the residential location of freshwater anglers, the typical distances they travel to fish, and the distribution of mercury concentrations within these travel distances.  It uses Census information to define the location and demographic characteristics of potentially exposed populations and uses data from the NSFHWR to estimate the fraction of freshwater anglers with respect to each population and location.  The second approach—the angler destination approach—focuses on the fishing destination of anglers and the distribution of mercury concentrations across these destinations.  It defines destinations according to standard watershed codes (eight-digit HUC) and uses information from both the NSFHWR and NSRE to estimate levels of angler activity and fish consumption on a watershed-by-watershed basis.

Below we describe each of the two approaches in more detail.  We also summarize and compare results from the two approaches.  Key elements associated with each modeling approach are presented in Table 10-5.

**Table 10-5.  Overview of Key Attributes of the Population Centroid and Angler Destination Models**

| Population Centroid Model | Angler Destination Model |
|---|---|
| • Push" model based on first estimating the number of recreational fisher within each US Census block group and then predicting fishing activity in the form of trip travel distances out to different fishing trip travel rings (10, 20, 50 and 100 mile rings). | • "Pull" model based on first determining the relative attractiveness of individual watersheds for recreational fishing activity (this model does not consider the residential location of fishers but instead, focuses on modeling their fishing locations).  Fishing activity modeled at the 8-digit hydrologic unit code (HUC) watershed level (these HUCs are 1,600 square miles on average, which is significantly larger than the block groups used in the population centroid model). |
| • Fish tissue samples are averaged within each ring to provide exposure levels for fishers assigned to a particular ring (averaged tissue samples are also differentiated for rivers versus lakes, and fishing activity within each ring is separated into river- versus lake-activity). | |
| • Fishing activity (i.e., trip travel distances) are also differentiated according to income level and urban/rural status of modeled recreational fishers. | • Predictive model for fishing activity in individual HUCs consider range of factors related to fishing activity (e.g., population density in vicinity of HUC, HUC surface area, total number of lake boundary and river miles within the HUC). |
| • Model generates estimates of recreational fisher exposure generated for 165,000 block groups (significantly more spatial differentiation compared with the angler destination approach) | • Model generates separate recreational fisher exposure estimates 1,360 HUCs (less than 1/10th of the number of block groups modeled). |
| • Total modeled population:  434,000 prenatally-exposed infants in 2001. | • Total modeled population:  587,000 prenatally-exposed infants in 2001.  Note, this estimate is larger than the population centroid's modeled population because the angler destination model estimates exposures for pregnant women as the combined effect of (1) their own fishing activity and (2) adult males bringing home and sharing fish they catch. |
| • Model used to support the per-capita distributional IQ impact analysis, due to its greater spatial differentiation and use of more detailed demographic data relative to the angler destination model. | |

### 10.3.2  Population Centroid Approach.

This approach uses Census block groups to spatially separate and characterize potentially affected populations in the study area.  In the Census, block groups are generally defined to contain between 600 and 3,000 people.  A total of 503 block groups were identified in the study area, and five distance intervals were mapped from the centroid of each block group.  Then, freshwater fishing trips and fish consumption are allocated to anglers in each group according to data on typical travel distances for freshwater fishing in the United States.  The flow diagram in Figure 10-3 illustrates the main components of the approach, spatial scale of the data used to estimate these components, and how these components are interrelated.  For each selected block group, the following steps were applied.

First, Census data were used to define the size, age, gender distribution, and income of the population within each of the roughly 165,000 block groups in the study area.

Second, the size of the exposed population of interest (annual number of prenatally exposed children in freshwater angler households) in each block group was estimated by combining Census, Vital Statistics, and NSFHWR data.  For each block group, this estimation required:

1. Estimating the number of pregnant women (NP) living in the block group as
$$NP = NF * f_s \qquad \text{(Eq. 10.2)}$$

where

| | | |
|---|---|---|
| $NF$ | = | number of females aged 15 to 44 in (Census 2000) and |
| $f_s$ | = | state-level general fertility rate (average number of live births in an year per 1,000 women aged 15 to 44) (Hamilton, Sutton, and Ventura, 2003). |

2. Estimating the annual number of prenatally exposed children in angler households (NPA) as
$$NPA = NP*(NA_s/N_s) \qquad \text{(Eq. 10.3)}$$

where

| | | |
|---|---|---|
| $NA_s$ | = | state-level number of 15 years and older angler residents (NSFHWR) and |
| $N_s$ | = | 15 years and older adult population of states (Census). |

Eq. (10.3) reflects an estimate of the number of pregnant women in each state who reside in freshwater angler households (not necessarily the number who are freshwater anglers themselves).  To estimate this value (NPA), Eq. (10.3) implies that (1) the fraction of pregnant women in a state who are in freshwater angler households is equal to the fraction of households in the state that include freshwater anglers (i.e., pregnant women are no more or less likely than the rest of the state population to live in households with freshwater anglers) and (2) the fraction of *households* in the state that include freshwater anglers is equal to the fraction of adult *residents* in the state who are freshwater anglers.  The implications of these assumptions for the results of the analysis are discussed in more detail in Section 10.7.



**Figure 10-3.  Flow Diagram for Population Centroid Approach**

To estimate NPA for years after 2001, it was assumed that state-level fertility rates ($f_s$) and angler participation rates ($NA_s/N_s$) would remain constant; however, the number of women of childbearing age in each block (NF) was increased based on county-level population growth projections (Woods and Poole, 2001).  In other words, for the period 2001-2025, the estimated NPA for each block group was assumed to increase at the same rate as the projected annual population growth rates for females 15-44 in their corresponding counties.  Woods and Poole (2001) provide population projections only for years up to 2025.  For years beyond 2025, it was assumed that NPA for each block group increase linearly at the same rate as the annual population growth rate for NF in corresponding counties from 2024 to 2025.  As discussed in more detail in Section 10.1.4, estimates of exposed populations were developed for future years to account for lagged effects between reductions in mercury emissions and reductions in mercury concentrations in fish.  Uncertainties resulting from these assumptions are discussed in more detail in Section 10.7.

Third, average mercury concentrations in freshwater fish for angler households were separately estimated for each block group.  To estimate these averages, the available mercury concentration data were separated according to (1) distance from each block group centroid (separating them into five distance categories) and (2) waterbody type (lake or river).  As shown in Figure 10-4, a separate average mercury concentration was estimated for each waterbody type and distance interval.  These estimates were then applied to calculate a weighted average of these mercury concentration estimates for each block group.  To weight these estimates it was assumed that the percentage of fish consumed from each distance and waterbody category is equivalent to the percentage of fishing trips to each distance and waterbody category.  The procedure used to estimate the distribution of trips across waterbody types and distance categories for each block group is described below.

To approximate the percentage freshwater fishing trips from each block group to each waterbody type ($c_l$ or $c_r$), state-level averages were used.  These averages were calculated for each state, based on the portion of residents' freshwater angler days that are to each waterbody type.  In other words, these portions were calculated as

$$c_l = D_{ls}/(D_{ls} + D_{rs}) \qquad\qquad \text{(Eq. 10.4)}$$
$$c_r = (1 - c_l) \qquad\qquad\qquad \text{(Eq. 10.5)}$$

where

$D_{ls} =$ number of lake-fishing days by state resident anglers (DOI, 2002) and
$D_{rs} =$ number of river-fishing days by state resident anglers (DOI, 2002).

These lake- and river-fishing day estimates from the NSFHWR are also summarized in Table 10-4.



**Figure 10-4.  Population Centroid Approach:  Linking Census Block Groups to Demographic Data and Mercury Fish Tissue Samples**

Data from NSRE 1994 were used to approximate the percentage of freshwater fishing trips to different distances from anglers' residential location.  Five distance intervals were defined as 0–10 miles, >10–20 miles, >20–50 miles, >50–100 miles, and 100+ miles.  Based on self-reported trip distance information from nearly 2,000 respondents (see Appendix E-1 for details), each of these distance categories was associated with roughly 20 percent of the reported trips in the NSRE sample.  Four distinct demographic groups were also found to have significantly different average travel distances for freshwater fishing in the NSRE sample:  urban with above $50,000 income, rural with above $50,000 income, urban with below $50,000 income, and rural with below $50,000 income.[10]  The portion of trips for each demographic group ($i = 1 - 4$) to each distance interval ($j = 1 - 5$) are defined as $e_{ij}$.  The estimated values for $e_{ij}$ are reported in Appendix E-3.  Uncertainties associated with this trip travel distance analysis are discussed in Section 10.7.

To estimate the portion of households in each demographic group ($p_i$ for $i = 1 - 4$), each block group was categorized as either urban (including suburban) or rural.  Census data on the percentage of the population in each block group with household income less than $50,000 were used to define the portion in the below $50,000 income groups.

---

[10] An annual household income of $50,000 (in 2000 dollars) is close to the median value for both the NSRE sample and the U.S. population.

To estimate a weighted average mercury concentration for each block group (CHg), the average mercury concentration in freshwater fish for each combination of waterbody (i.e, lake or river) and distance interval (i.e., 10 = 2 x 5 combinations) was first estimated.  This average concentration is defined as $CHg_{kj}$ for k = lake or river and j = 1 – 5 distance interval.[11]  For each block group, this approach assumes that the sample averages of CHg (from available NLFA and NLFTS sampling data) for each distance–waterbody combination provide an reasonable estimate of the true average mercury concentrations in the distance–waterbody combination.

The weighted average mercury concentration in freshwater fish for each block group was then calculated as

$$\overline{CH}g = \sum_i p_i * \left[ \sum_{jk} (e_{ij}) * (c_k) * (CHg_{jk}) \right]$$  (Eq. 10.6)

for

| | | |
|---|---|---|
| i | = | 1 – 4 demographic group, |
| j | = | 1 – 5 distance interval, |
| k | = | lake or river, and |
| $p_i$ | = | percentage of block group households in demographic group i (Census). |

To match exposed populations with corresponding average mercury concentrations in fish, one method is to match the total NPA (annual number of prenatally exposed children in angler households) from each block group with the corresponding weighted average mercury concentration (CHg) for that block group.  This method is equivalent to assuming that all exposed individuals in the same block group and demographic group (i) are exposed to the same average levels of mercury.  This would occur, for example, if they all allocate trips to (or fish consumption from) the different distance intervals and waterbody types according to the same proportions, $e_{ij}$ and $c_k$.

An alternative method for matching populations with mercury concentrations using the population centroid approach is to assume that:

- Each exposed individual in a block group is associated with freshwater fishing in a single distance interval and a single waterbody type (i.e., all the fish they consume comes from the same distance and type of waterbody);

- The exposed populations in each block group (rather than just the fishing trips) are distributed across the distance intervals and waterbody types according to the estimated proportions $e_{ij}$ and $c_k$.

In this case, as many as 20 separate exposed subpopulations can be defined for each block group:

$$NPA_{ijk} = NPA * p_i * e_{ij} * c_k \quad \text{(for all i, j, and k.)}$$  (Eq. 10.7)

---

[11] For the 100+ miles category (j = 5) the mean mercury concentration for lake and river samples in the entire 37-state study area (see Table 10-4) was used to define $CHg_{5l}$ and $CHg_{5r}$ respectively.

Each subpopulation $NPA_{ijk}$ can then be separately matched with the block group's average mercury concentration for the corresponding distance and waterbody category ($CHg_{jk}$).

Using the model described in Section 10.1.4 (below) to estimate mercury ingestion rates, these two methods will produce the same estimates of total mercury ingestion for a block group NPA. However, they will differ according to how individual ingestion rates are distributed within the exposed population. The first method assumes constant ingestion rates across a block group NPA, whereas the second method estimates separate ingestion rates for each subpopulation ($NPA_{ijk}$) in the block group.

Modeling separate exposure levels for each subpopulation ($NPA_{ijk}$) within each block group is critical to characterizing the per-capita distribution of IQ changes within the study population and does provide the basis for that assessment (along with consideration for variability in fish consumption rates). However, providing this level of differentiation in modeling individual exposure is not necessary for generating a mean (best estimate) IQ loss and associated monetary value for the entire study population.

***Summary of Results***.  This section summarizes some of the key results of applying the steps outlined above. Table 10-6 reports state-level summaries of the Census block group data used in the analysis. Nearly 165,000 block groups were identified in the 37-state study area. The average number of women of childbearing age (16 to 44) per block group in 2000 was 281. On average, there were approximately 60 percent of households with incomes above $50,000 and approximately 75 percent of block groups that were predominantly urban (or suburban).

Table 10-7 reports estimates of the annual number of prenatally exposed children in selected years from 2001 to 2051 aggregated to the state level.[12] For reasons discussed in more detail below, the selected years correspond to lag periods of 5, 10, 20, and 50 years. We also provide the estimate of prenatally exposed children in a base year of analysis (2001) for comparison purposes. These estimates are derived from the Census demographic data reported in Table 10-6 combined with state-level fertility rates, freshwater fishing participation rates, and county-level population growth projections. The size of the exposed population of interest in 2001 was estimated to average over 11,000 individuals per state in the study area, with a total of over 434,000 in the entire area.

Table 10-8 estimates the annual number of prenatally exposed children in selected years and lag periods starting in 2020. We also provide the estimate of prenatally exposed children in the base year (2020) for comparison purposes. In 2020, the size of the exposed population of interest was estimated to be 482,000.

---

[12] Although the results are reported at study area and the state levels, the analysis is conducted at the individual block group level.

**Table 10-6.  Block Group Demographic Characteristics by State (in 2000):  Data Used in Population Centroid Approach**

| State | Number of Block Groups | Percentage Urban Block Groups[a] | Female Population, Aged 16–44, in Block Group | | | Percentage of Block Group Households in Above $50,000 Income Category | | |
|---|---|---|---|---|---|---|---|---|
| | | | Min | Mean | Max | Min | Mean | Max |
| AL | 3,329 | 55 | 0 | 283 | 2,591 | 0 | 71 | 100 |
| AR | 2,135 | 54 | 0 | 255 | 1,752 | 0 | 73 | 100 |
| CT | 2,620 | 88 | 0 | 269 | 3,718 | 0 | 46 | 100 |
| DC | 433 | 99 | 0 | 327 | 2,243 | 0 | 57 | 98 |
| DE | 502 | 83 | 0 | 337 | 2,899 | 0 | 53 | 94 |
| FL | 9,112 | 87 | 0 | 344 | 6,355 | 0 | 64 | 100 |
| GA | 4,788 | 69 | 0 | 386 | 4,239 | 0 | 63 | 100 |
| IA | 2,634 | 58 | 0 | 224 | 2,618 | 0 | 64 | 100 |
| IL | 9,843 | 85 | 0 | 271 | 3,960 | 0 | 55 | 100 |
| IN | 4,798 | 69 | 0 | 268 | 3,559 | 0 | 62 | 100 |
| KS | 2,299 | 69 | 0 | 242 | 2,773 | 0 | 63 | 100 |
| KY | 3,157 | 53 | 0 | 273 | 3,207 | 0 | 70 | 100 |
| LA | 3,509 | 73 | 0 | 278 | 2,962 | 0 | 70 | 100 |
| MA | 5,053 | 92 | 0 | 274 | 2,678 | 0 | 50 | 100 |
| MD | 3,678 | 84 | 0 | 315 | 4,212 | 0 | 48 | 100 |
| ME | 1,143 | 38 | 0 | 226 | 960 | 0 | 65 | 100 |
| MI | 8,450 | 74 | 0 | 247 | 3,452 | 0 | 56 | 100 |
| MN | 4,082 | 68 | 0 | 257 | 1,882 | 0 | 54 | 100 |
| MO | 4,540 | 67 | 0 | 257 | 2,004 | 0 | 67 | 100 |
| MS | 2,148 | 51 | 0 | 286 | 2866 | 0 | 73 | 100 |
| NC | 5,271 | 58 | 0 | 329 | 5,413 | 0 | 65 | 100 |
| ND | 630 | 45 | 0 | 207 | 2,114 | 0 | 70 | 100 |
| NE | 1,591 | 69 | 0 | 222 | 2,111 | 0 | 62 | 100 |
| NH | 874 | 59 | 0 | 297 | 2,000 | 0 | 52 | 100 |
| NJ | 6,510 | 94 | 0 | 271 | 3,473 | 0 | 45 | 100 |
| NY | 15,079 | 85 | 0 | 272 | 4,840 | 0 | 55 | 100 |
| OH | 9,354 | 78 | 0 | 253 | 3,941 | 0 | 62 | 100 |
| OK | 2,901 | 66 | 0 | 245 | 2,154 | 0 | 71 | 100 |
| PA | 10,387 | 78 | 0 | 239 | 2,659 | 0 | 63 | 100 |
| RI | 821 | 92 | 0 | 276 | 2,348 | 0 | 58 | 100 |
| SC | 2,859 | 61 | 0 | 301 | 3,764 | 0 | 67 | 100 |
| SD | 688 | 45 | 0 | 221 | 1,622 | 0 | 70 | 100 |
| TN | 4,014 | 64 | 0 | 303 | 3,181 | 0 | 68 | 100 |
| TX | 14,463 | 81 | 0 | 318 | 4,936 | 0 | 63 | 100 |
| VA | 4,749 | 70 | 0 | 326 | 3,535 | 0 | 55 | 100 |
| VT | 530 | 36 | 28 | 238 | 1,534 | 15.05 | 62 | 98.13 |
| WI | 4,388 | 69 | 0 | 255 | 2,758 | 0 | 58 | 100 |
| WV | 1,588 | 46 | 0 | 228 | 1,954 | 0 | 75 | 100 |
| **Study Area** | 164,950 | 75 | 0 | 281 | 6,355 | 0 | 60 | 100 |

[a]  Urban designation was assigned to a block group if 50 percent or greater of its population was categorized as urban.

Source:  2000 Census.

**Table 10-7.  Estimated Annual Number of Prenatally Exposed Children for Selected Lag Periods from 2001:  Population Centroid Approach**

| | Base Year of Comparison (2001) | | | Central Estimate of Fish Tissue Response Times | | | | | | Alternative Estimate of Fish Tissue Response Times | | | | | |
| | | | | 10 Year Lag (2011) | | | 20 Year Lag (2021) | | | 5 Year Lag (2006) | | | 50 Year Lag (2051) | | |
| | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population |
| Study Area | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Study Area** | 2.63 | 2.51 | 434,059 | 2.75 | 2.80 | 452,575 | 2.95 | 3.22 | 486,487 | 2.69 | 2.64 | 442,938 | 3.84 | 4.83 | 632,017 |
| **State** | | | | | | | | | | | | | | | |
| AL | 3.0 | 2.3 | 9,948 | 3.0 | 2.4 | 9,869 | 3.0 | 2.5 | 9,906 | 3.0 | 2.3 | 9,907 | 3.4 | 3.5 | 11,230 |
| AR | 4.6 | 2.9 | 9,832 | 4.8 | 3.2 | 10,242 | 5.1 | 3.7 | 10,968 | 4.7 | 3.0 | 10,033 | 6.8 | 5.9 | 14,557 |
| CT | 1.6 | 1.0 | 4,134 | 1.6 | 1.0 | 4,176 | 1.7 | 1.1 | 4,491 | 1.6 | 1.0 | 4,152 | 2.4 | 1.5 | 6,229 |
| DC | 0.5 | 0.5 | 236 | 0.5 | 0.4 | 224 | 0.5 | 0.4 | 211 | 0.5 | 0.4 | 228 | 0.7 | 0.5 | 286 |
| DE | 1.7 | 1.3 | 836 | 1.7 | 1.3 | 854 | 1.8 | 1.3 | 901 | 1.7 | 1.3 | 850 | 2.2 | 1.6 | 1,109 |
| FL | 2.3 | 2.5 | 21,218 | 2.6 | 2.9 | 23,903 | 3.0 | 3.4 | 27,786 | 2.5 | 2.7 | 22,532 | 4.6 | 5.4 | 41,941 |
| GA | 4.2 | 3.9 | 20,255 | 4.6 | 4.7 | 22,252 | 5.3 | 5.8 | 25,175 | 4.4 | 4.3 | 21,306 | 7.8 | 10.6 | 37,558 |
| IA | 3.2 | 2.5 | 8,448 | 3.1 | 2.6 | 8,249 | 3.2 | 2.8 | 8,339 | 3.2 | 2.6 | 8,326 | 3.4 | 3.6 | 9,054 |
| IL | 2.8 | 2.5 | 27,670 | 2.9 | 2.7 | 28,470 | 3.1 | 2.9 | 30,205 | 2.8 | 2.6 | 27,963 | 3.8 | 4.1 | 37,881 |
| IN | 2.8 | 2.4 | 13,640 | 2.9 | 2.6 | 14,027 | 3.1 | 2.8 | 14,783 | 2.9 | 2.5 | 13,799 | 3.8 | 3.9 | 18,037 |
| KS | 3.6 | 2.5 | 8,246 | 3.8 | 2.8 | 8,606 | 4.1 | 3.2 | 9,294 | 3.7 | 2.7 | 8,410 | 5.4 | 5.1 | 12,289 |
| KY | 3.3 | 2.3 | 10,322 | 3.2 | 2.3 | 10,139 | 3.3 | 2.5 | 10,347 | 3.2 | 2.3 | 10,211 | 3.8 | 3.4 | 12,041 |
| LA | 3.1 | 2.1 | 10,709 | 3.0 | 2.1 | 10,582 | 3.1 | 2.3 | 10,892 | 3.0 | 2.1 | 10,580 | 3.3 | 2.9 | 11,677 |
| MA | 1.1 | 0.7 | 5,663 | 1.1 | 0.7 | 5,671 | 1.2 | 0.8 | 5,928 | 1.1 | 0.7 | 5,686 | 1.6 | 1.0 | 7,846 |
| MD | 1.6 | 1.2 | 5,881 | 1.7 | 1.3 | 6,084 | 1.8 | 1.5 | 6,610 | 1.6 | 1.3 | 6,017 | 2.4 | 2.2 | 8,742 |
| ME | 2.1 | 1.2 | 2,378 | 1.9 | 1.1 | 2,223 | 1.9 | 1.1 | 2,139 | 2.0 | 1.2 | 2,324 | 1.9 | 1.1 | 2,124 |
| MI | 2.0 | 1.4 | 17,028 | 2.0 | 1.5 | 17,185 | 2.1 | 1.6 | 17,672 | 2.0 | 1.4 | 17,186 | 2.5 | 2.1 | 20,816 |
| MN | 5.6 | 3.8 | 22,806 | 5.8 | 4.3 | 23,777 | 6.4 | 5.2 | 25,952 | 5.7 | 4.1 | 23,286 | 8.1 | 7.6 | 32,953 |
| MO | 3.7 | 2.7 | 16,804 | 3.7 | 2.8 | 17,015 | 3.9 | 3.2 | 17,924 | 3.7 | 2.8 | 16,906 | 4.9 | 4.5 | 22,289 |

(continued)

10-31

**Table 10-7.  Estimated Annual Number of Prenatally Exposed Children for Selected Lag Periods from 2001:  Population Centroid Approach (continued)**

| State | Base Year of Comparison (2001) | | | Central Estimate of Fish Tissue Response Times | | | | | | Alternative Estimate of Fish Tissue Response Times | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 10 Year Lag (2011) | | | 20 Year Lag (2021) | | | 5 Year Lag (2006) | | | 50 Year Lag (2051) | | |
| | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population |
| | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | |
| MO | 3.7 | 2.7 | 16,804 | 3.7 | 2.8 | 17,015 | 3.9 | 3.2 | 17,924 | 3.7 | 2.8 | 16,906 | 4.9 | 4.5 | 22,289 |
| MS | 3.7 | 2.3 | 7,909 | 3.7 | 2.5 | 7,920 | 3.7 | 2.7 | 8,008 | 3.7 | 2.4 | 7,886 | 4.3 | 3.8 | 9,208 |
| NC | 2.6 | 2.1 | 13,483 | 2.8 | 2.5 | 14,702 | 3.1 | 3.0 | 16,534 | 2.7 | 2.3 | 14,066 | 4.8 | 4.9 | 25,075 |
| ND | 3.4 | 3.1 | 2,101 | 3.2 | 3.0 | 2,016 | 3.2 | 3.1 | 2,004 | 3.3 | 3.0 | 2,050 | 3.4 | 3.2 | 2,138 |
| NE | 3.2 | 1.9 | 5,138 | 3.4 | 2.1 | 5,393 | 3.7 | 2.4 | 5,849 | 3.3 | 2.0 | 5,256 | 4.8 | 3.2 | 7,635 |
| NH | 2.2 | 1.6 | 1,966 | 2.3 | 1.6 | 1,991 | 2.3 | 1.7 | 2,045 | 2.3 | 1.6 | 2,004 | 3.0 | 2.3 | 2,625 |
| NJ | 1.1 | 0.7 | 6,838 | 1.1 | 0.8 | 7,024 | 1.2 | 0.9 | 7,636 | 1.1 | 0.8 | 6,927 | 1.6 | 1.2 | 10,130 |
| NY | 1.1 | 0.9 | 16,877 | 1.1 | 1.0 | 16,994 | 1.2 | 1.0 | 17,663 | 1.1 | 1.0 | 16,937 | 1.4 | 1.3 | 21,400 |
| OH | 2.3 | 1.7 | 21,457 | 2.3 | 1.7 | 21,317 | 2.3 | 1.8 | 21,659 | 2.3 | 1.7 | 21,356 | 2.7 | 2.4 | 25,190 |
| OK | 4.5 | 3.0 | 13,117 | 4.6 | 3.1 | 13,298 | 4.9 | 3.4 | 14,281 | 4.5 | 3.1 | 13,126 | 6.1 | 4.5 | 17,713 |
| PA | 1.5 | 0.9 | 15,146 | 1.4 | 1.0 | 14,756 | 1.4 | 1.0 | 14,702 | 1.4 | 1.0 | 14,965 | 1.6 | 1.4 | 16,862 |
| RI | 0.9 | 0.6 | 755 | 1.0 | 0.6 | 785 | 1.0 | 0.6 | 815 | 0.9 | 0.6 | 773 | 1.3 | 0.9 | 1,066 |
| SC | 3.2 | 2.6 | 9,010 | 3.3 | 2.7 | 9,327 | 3.4 | 3.0 | 9,716 | 3.2 | 2.7 | 9,222 | 4.2 | 3.9 | 12,031 |
| SD | 3.7 | 3.1 | 2,508 | 3.7 | 3.2 | 2,502 | 3.9 | 3.5 | 2,590 | 3.7 | 3.1 | 2,500 | 4.4 | 4.3 | 2,941 |
| TN | 3.3 | 2.6 | 13,317 | 3.4 | 2.8 | 13,663 | 3.6 | 3.2 | 14,511 | 3.4 | 2.7 | 13,510 | 4.8 | 4.8 | 19,133 |
| TX | 3.9 | 3.4 | 55,802 | 4.5 | 4.1 | 64,381 | 5.2 | 4.9 | 74,645 | 4.2 | 3.8 | 59,828 | 7.6 | 7.6 | 108,932 |
| VA | 2.5 | 2.0 | 11,793 | 2.6 | 2.3 | 12,440 | 2.8 | 2.6 | 13,471 | 2.6 | 2.1 | 12,158 | 3.8 | 4.1 | 17,946 |
| VT | 2.4 | 1.5 | 1,288 | 2.3 | 1.5 | 1,223 | 2.2 | 1.5 | 1,161 | 2.4 | 1.5 | 1,270 | 2.3 | 1.7 | 1,242 |
| WI | 3.6 | 2.4 | 15,848 | 3.6 | 2.5 | 15,839 | 3.7 | 2.6 | 16,427 | 3.6 | 2.5 | 15,884 | 4.3 | 3.3 | 18,932 |
| WV | 2.3 | 1.3 | 3,651 | 2.2 | 1.3 | 3,460 | 2.0 | 1.3 | 3,248 | 2.2 | 1.3 | 3,518 | 2.0 | 1.6 | 3,160 |

**Table 10-8. Estimated Annual Number of Prenatally Exposed Children for Selected Lag Periods from 2020:  Population Centroid Approach**

| Study Area | Base Year of Comparison (2020) | | | Central Estimate of Fish Tissue Response Times | | | | | | Alternative Estimate of Fish Tissue Response Times | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 10 Year Lag (2030) | | | 20 Year Lag (2040) | | | 5 Year Lag (2025) | | | 50 Year Lag (2070) | | |
| | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population |
| | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | |
| **Study Area** | 2.92 | 3.17 | 481,987 | 3.21 | 3.67 | 528,721 | 3.51 | 4.22 | 577,910 | 3.06 | 3.41 | 504,127 | 4.40 | 5.93 | 725,474 |
| **State** | | | | | | | | | | | | | | | |
| AL | 3.0 | 2.5 | 9,871 | 3.1 | 2.8 | 10,275 | 3.2 | 3.1 | 10,730 | 3.0 | 2.6 | 10,048 | 3.6 | 4.2 | 12,093 |
| AR | 5.1 | 3.6 | 10,877 | 5.6 | 4.3 | 11,978 | 6.2 | 5.1 | 13,206 | 5.3 | 4.0 | 11,364 | 7.9 | 7.5 | 16,891 |
| CT | 1.7 | 1.1 | 4,437 | 1.9 | 1.2 | 5,005 | 2.1 | 1.4 | 5,588 | 1.8 | 1.2 | 4,714 | 2.8 | 1.8 | 7,335 |
| DC | 0.5 | 0.4 | 211 | 0.5 | 0.4 | 227 | 0.6 | 0.5 | 255 | 0.5 | 0.4 | 213 | 0.8 | 0.7 | 339 |
| DE | 1.8 | 1.3 | 894 | 1.9 | 1.4 | 966 | 2.1 | 1.5 | 1,034 | 1.9 | 1.4 | 932 | 2.5 | 1.8 | 1,239 |
| FL | 3.0 | 3.3 | 27,339 | 3.5 | 4.0 | 31,950 | 4.0 | 4.6 | 36,708 | 3.2 | 3.7 | 29,572 | 5.6 | 6.7 | 50,980 |
| GA | 5.2 | 5.7 | 24,796 | 6.0 | 7.2 | 28,805 | 6.9 | 8.8 | 32,973 | 5.6 | 6.4 | 26,721 | 9.5 | 13.7 | 45,477 |
| IA | 3.2 | 2.8 | 8,325 | 3.2 | 3.0 | 8,551 | 3.3 | 3.3 | 8,791 | 3.2 | 2.9 | 8,431 | 3.6 | 4.1 | 9,510 |
| IL | 3.0 | 2.9 | 29,953 | 3.3 | 3.3 | 32,470 | 3.6 | 3.7 | 35,047 | 3.2 | 3.1 | 31,181 | 4.3 | 4.8 | 42,778 |
| IN | 3.1 | 2.8 | 14,665 | 3.3 | 3.2 | 15,769 | 3.5 | 3.5 | 16,849 | 3.2 | 3.0 | 15,229 | 4.2 | 4.7 | 20,089 |
| KS | 4.1 | 3.2 | 9,222 | 4.4 | 3.7 | 10,073 | 4.9 | 4.4 | 11,128 | 4.2 | 3.4 | 9,545 | 6.3 | 6.5 | 14,294 |
| KY | 3.3 | 2.5 | 10,303 | 3.4 | 2.7 | 10,808 | 3.6 | 3.0 | 11,395 | 3.3 | 2.6 | 10,515 | 4.2 | 4.0 | 13,156 |
| LA | 3.1 | 2.3 | 10,857 | 3.2 | 2.5 | 11,120 | 3.2 | 2.7 | 11,385 | 3.1 | 2.4 | 10,987 | 3.5 | 3.3 | 12,182 |
| MA | 1.2 | 0.7 | 5,867 | 1.3 | 0.8 | 6,499 | 1.4 | 0.9 | 7,140 | 1.2 | 0.8 | 6,178 | 1.8 | 1.2 | 9,064 |
| MD | 1.8 | 1.5 | 6,533 | 2.0 | 1.7 | 7,253 | 2.2 | 2.0 | 7,962 | 1.9 | 1.6 | 6,898 | 2.7 | 2.7 | 10,089 |
| ME | 1.9 | 1.1 | 2,137 | 1.9 | 1.1 | 2,133 | 1.9 | 1.1 | 2,129 | 1.9 | 1.1 | 2,136 | 1.9 | 1.1 | 2,115 |
| MI | 2.1 | 1.6 | 17,539 | 2.2 | 1.7 | 18,610 | 2.3 | 1.9 | 19,660 | 2.1 | 1.6 | 18,085 | 2.7 | 2.4 | 22,811 |
| MN | 6.3 | 5.1 | 25,696 | 6.9 | 5.9 | 28,010 | 7.4 | 6.7 | 30,364 | 6.6 | 5.5 | 26,833 | 9.2 | 9.2 | 37,425 |
| MO | 3.9 | 3.1 | 17,805 | 4.2 | 3.5 | 19,123 | 4.5 | 4.0 | 20,630 | 4.0 | 3.3 | 18,369 | 5.5 | 5.4 | 25,154 |

(continued)

Table 10-8. Estimated Annual Number of Prenatally Exposed Children for Selected Lag Periods from 2020: Population Centroid Approach (continued)

| | Central Estimate of Fish Tissue Response Times | | | | | | | | | Alternative Estimate of Fish Tissue Response Times | | | | | |
| | Base Year of Comparison (2020) | | | 10 Year Lag (2030) | | | 20 Year Lag (2040) | | | 5 Year Lag (2025) | | | 50 Year Lag (2070) | | |
| | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population | Per Block Group | | Total Exposed Population |
| State | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | | Mean | S.D. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MS | 3.7 | 2.7 | 7,974 | 3.9 | 3.0 | 8,341 | 4.1 | 3.4 | 8,754 | 3.8 | 2.9 | 8,135 | 4.7 | 4.6 | 9,992 |
| NC | 3.1 | 2.9 | 16,264 | 3.6 | 3.5 | 19,020 | 4.2 | 4.2 | 21,903 | 3.3 | 3.2 | 17,578 | 5.8 | 6.2 | 30,553 |
| ND | 3.2 | 3.1 | 2,005 | 3.2 | 3.1 | 2,022 | 3.3 | 3.1 | 2,077 | 3.2 | 3.1 | 1,994 | 3.6 | 3.5 | 2,244 |
| NE | 3.7 | 2.4 | 5,829 | 4.0 | 2.6 | 6,347 | 4.4 | 2.9 | 6,960 | 3.8 | 2.5 | 6,041 | 5.5 | 3.9 | 8,800 |
| NH | 2.3 | 1.7 | 2,023 | 2.5 | 1.8 | 2,211 | 2.8 | 2.0 | 2,408 | 2.4 | 1.7 | 2,112 | 3.4 | 2.6 | 3,000 |
| NJ | 1.2 | 0.9 | 7,554 | 1.3 | 1.0 | 8,378 | 1.4 | 1.1 | 9,212 | 1.2 | 0.9 | 7,961 | 1.8 | 1.5 | 11,714 |
| NY | 1.2 | 1.0 | 17,537 | 1.2 | 1.1 | 18,769 | 1.3 | 1.2 | 20,022 | 1.2 | 1.1 | 18,143 | 1.6 | 1.5 | 23,779 |
| OH | 2.3 | 1.8 | 21,660 | 2.4 | 2.0 | 22,715 | 2.6 | 2.2 | 23,893 | 2.4 | 1.9 | 22,126 | 2.9 | 2.7 | 27,429 |
| OK | 4.9 | 3.4 | 14,132 | 5.2 | 3.7 | 15,182 | 5.6 | 4.1 | 16,387 | 5.0 | 3.5 | 14,579 | 6.9 | 5.2 | 20,003 |
| PA | 1.4 | 1.0 | 14,621 | 1.5 | 1.1 | 15,340 | 1.5 | 1.3 | 16,065 | 1.4 | 1.1 | 14,978 | 1.8 | 1.7 | 18,239 |
| RI | 1.0 | 0.6 | 807 | 1.1 | 0.7 | 889 | 1.2 | 0.8 | 974 | 1.0 | 0.7 | 847 | 1.5 | 1.0 | 1,227 |
| SC | 3.4 | 2.9 | 9,634 | 3.6 | 3.2 | 10,399 | 3.9 | 3.5 | 11,176 | 3.5 | 3.1 | 10,010 | 4.7 | 4.5 | 13,508 |
| SD | 3.9 | 3.5 | 2,587 | 4.0 | 3.7 | 2,669 | 4.2 | 4.0 | 2,799 | 3.9 | 3.6 | 2,605 | 4.8 | 4.9 | 3,187 |
| TN | 3.6 | 3.2 | 14,372 | 3.9 | 3.7 | 15,848 | 4.3 | 4.2 | 17,412 | 3.8 | 3.4 | 15,065 | 5.5 | 5.9 | 22,105 |
| TX | 5.1 | 4.8 | 73,600 | 5.9 | 5.7 | 84,608 | 6.7 | 6.6 | 96,191 | 5.5 | 5.2 | 78,817 | 9.1 | 9.3 | 130,939 |
| VA | 2.8 | 2.6 | 13,318 | 3.1 | 3.1 | 14,795 | 3.4 | 3.6 | 16,295 | 3.0 | 2.8 | 14,044 | 4.4 | 5.1 | 20,798 |
| VT | 2.2 | 1.5 | 1,156 | 2.2 | 1.5 | 1,185 | 2.3 | 1.6 | 1,212 | 2.2 | 1.5 | 1,172 | 2.4 | 1.9 | 1,293 |
| WI | 3.7 | 2.6 | 16,324 | 3.9 | 2.8 | 17,182 | 4.1 | 3.0 | 18,015 | 3.8 | 2.7 | 16,766 | 4.7 | 3.7 | 20,515 |
| WV | 2.1 | 1.3 | 3,261 | 2.0 | 1.4 | 3,194 | 2.0 | 1.5 | 3,178 | 2.0 | 1.3 | 3,202 | 2.0 | 1.8 | 3,129 |

Table 10-9 summarizes the mercury concentration data for freshwater fish in each of the distance and waterbody type categories.[13]  Some of the key results from this table are the following:

- A relatively small percentage of block groups have lake samples within 0–10 miles (26 percent) and >10–20 miles (49 percent);
- A larger percentage of block groups have river samples within 0–10 miles (52 percent) and >10–20 miles (69 percent);
- Almost 94 percent of block groups have at least one lake sample within 100 miles;
- Over 99 percent of block groups have at least one river sample within 100 miles; and
- For all samples within 100 miles, the mean (median) concentration in lake samples is 0.21 ppm (0.18 ppm) and in river samples is 0.23 ppm (0.2 ppm).

**Table 10-9.  Average Estimated Mercury Concentrations (ppm) in Freshwater Fish by Distance Interval from Block Group Centroids:  Base Case 2001**

| Distance from Centroid | N[a] | Min | Mean | Max | Median |
|---|---|---|---|---|---|
| Lake Sampling Sites | | | | | |
| 0–10 miles | 44,327 | 0.0036 | 0.209 | 2.640 | 0.150 |
| >10–20 miles | 80,524 | 0.0036 | 0.204 | 2.640 | 0.164 |
| >20–50 miles | 147,696 | 0.0063 | 0.201 | 2.225 | 0.177 |
| >50–100 miles | 161,837 | 0.0063 | 0.229 | 1.054 | 0.193 |
| 0–100 miles | 163,402 | 0.0036 | 0.213 | 2.640 | 0.180 |
| | | | | | |
| River Sampling Sites | | | | | |
| 0–10 miles | 86,269 | 0.0004 | 0.217 | 3.300 | 0.165 |
| >10–20 miles | 114,505 | 0.0004 | 0.221 | 3.300 | 0.184 |
| >20–50 miles | 157,663 | 0.0004 | 0.224 | 3.190 | 0.203 |
| >50–100 miles | 163,311 | 0.0335 | 0.232 | 1.022 | 0.225 |
| 0–100 miles | 164,084 | 0.0004 | 0.225 | 3.300 | 0.202 |

[a]Number of block groups (out of 164,950) with at least one sample in the distance interval.

[13] Note that each of the sampling site mercury concentration estimates reported in Table 10-4 is included multiple times in the estimates reported in Table 10-9, because they are all located within 100 miles of multiple block groups.

### 10.3.3 Angler Destination Approach

Rather than focusing on the point of origin (i.e., residential location) of freshwater anglers, as is done in the population centroid approach, the angler destination approach focuses on recreational fishing behavior and determines the areas that are more likely to be fished, using information on inland watersheds (defined by HUCs).[14] The advantage of the NSFHWR, as described above, is that it is based on a relatively large number of observations and, therefore, can provide reliable estimates of angler activities and demographics on a state level. However, it does not provide information at a finer level of spatial resolution than the state. In contrast, the NSRE provides a much smaller sample on angler activities and demographics, but it also provides more detailed information on the destination (i.e., HUC) of fishing trips.

The flow diagram in Figure 10-5 illustrates the main components of this approach and how they are interrelated including the spatial scale of the data used for various model components. To implement the angler destination approach, the following steps were applied.

First, for each state, data from the NSFHWR were used to provide the total annual number of lake- and river-fishing days in the state ($D_{ls}$ and $D_{rs}$) by both residents and nonresidents in 2001 (see Table 10-4).

Second, data from the NSRE were used to estimate the portion of these state-level fishing days that occur in each HUC within the state. The details of this analysis of the NSRE data are provided in Appendix E-2. To summarize, the following process was applied:

1.  Counted the number of lake and river trips in NSRE 1994 to each HUC in the United States ($T_{lh}$, $T_{rh}$), and used these counts as indicators of the "level of use" for each HUC.

2.  Used a negative binomial regression model to estimate the HUC-level determinants of the level-of-use counts (determinants include the number of lake or river miles in the HUC, population within 50 miles of the HUC, size of the HUC, etc). In a simplified form, the regression model assumes that the probability of observing the value $t_h$ for $T_{lh}$ (or $T_{rh}$) can be expressed as:

$$\Pr(T_{ih} = t_h) = \frac{\exp(-\exp(\beta_i X_h))(\exp(\beta_i X_h))^{t_h}}{t_h!} \quad \text{for i = l,r} \qquad \text{(Eq. 10.8)}$$

---

[14] A site-choice random utility model (RUM) approach was also considered for modeling fishing behavior, but the data and analytical requirements of this alternative approach were determined to be beyond the scope of this analysis.



**Figure 10-5.  Flow Diagram for Angler Destination Approach**

where

$X_h$ represents a vector of HUC-level characteristics and $\beta_i$ represents a corresponding vector of coefficients. These coefficient vectors were estimated using maximum likelihood methods and are represented as $\hat{\beta}_l$ and $\hat{\beta}_r$.

3.   Used the results of the estimated econometric model to predict a level-of-use indicator for each HUC ($\hat{T}_{rh}, \hat{T}_{rh}$), based on observed HUC-level characteristics.

4.   For each state, approximate the percentage of state-level lake- and river-fishing days that occur in each HUC as:

$$p_{lh} = \frac{\hat{T}_{lh}}{\sum_h \hat{T}_{lh}} \qquad \text{(Eq. 10.9)}$$

$$p_{rh} = \frac{\hat{T}_{rh}}{\sum_h \hat{T}_{rh}} \qquad \text{(Eq. 10.10)}$$

Third, fishing days in each HUC (h) were estimated for each waterbody type ($A_{lh}$ and $A_{rh}$) by combining the state-level fishing day totals from the NSFHWR (Step 1) with the HUC-level portions estimates (Step 2):

$$A_{lh} = p_{lhs}*D_{ls} \qquad \text{(Eq. 10.11)}$$

$$A_{rh} = p_{rhs}*D_{rs} \qquad \text{(Eq. 10.12)}$$

Fourth, "angler-year equivalents" were estimated for each HUC ($N_h$), using the nationwide estimate from the NSFWHR of the average number of fishing days per year per angler ($\bar{d}=16.42$ days/yr). In other words, each 16.42 estimated angler days in HUC h in 2001 were treated as the equivalent of one angler-year to the HUC in 2001.

$$NA_h = (A_{lh} + A_{rh}) / \bar{d} \qquad \text{(Eq. 10.13)}$$

Fifth, the number of these angler-year equivalents that are specifically for pregnant women were approximated as

$$NPA_h = NA_h * (nf_s + nm_s) * f_s \qquad \text{(Eq. 10.14)}$$

where

$nf_s$   =   percentage of anglers fishing in state s that are female and of childbearing age (NSFHWR) and

$nm_s$   =   percentage of anglers fishing in state s that are male and married and between the ages of 18 and 44 (NSFHWR).

$f_s$   =   state-level fertility rate (see Eq.[10.2])

The base year for the $NPA_h$ estimates is 2001, which is the most recent year for NSFHWR data. To estimate $NPA_h$ for subsequent years, it was assumed that this exposed

10-38

population associated with each HUC would grow at the same rate as the projected annual population growth for females 15-44 in the entire 37-state study area.[15]  Population growth rates based on Woods and Poole (2001) population projections for females 15-44 in the study area were used to estimate NPAh up to 2025.  For years beyond 2025, it was assumed that $NPA_h$ in the study area increase linearly at the same rate as the annual population growth rate for females 15-44 from 2024 to 2025.

Sixth, the georeferenced mercury concentration estimates (summarized in Tables 10-2 and 10-3) were used to estimate average mercury concentrations in each HUC for each waterbody type ($CHg_{lh}$, $CHg_{rh}$).  This approach assumes that the sample averages of CHg (from available NLFA and NLFTS sampling data) for each waterbody type in each HUC provide an unbiased estimate of the true average mercury concentrations in the corresponding waterbody type and HUC.  The weighted (by number of fishing days in each waterbody type) average mercury concentration in freshwater fish in each HUC was estimated as follows:

$$CHg_h = \frac{(A_{lh} * CHg_{lh}) + (A_{rh} * CHg_{rh})}{A_{lh} + A_{rh}}. \qquad \text{(Eq. 10.15)}$$

As in the case of the population centroid approach, an alternative method is to apportion $NP_h$ to different water bodies (j = river or lake).  Each subpopulation ($NP_{jh}$) can then be matched with the average mercury concentration for the corresponding waterbody j ($CHg_{jh}$).

**Summary of Results**.  This section summarizes some of the key results from applying the angler destination approach outlined above.  Figures 10-6 and 10-7 display the estimated distributions of lake- and river-fishing days across HUCs ($A_{lh}$ and $A_{rh}$) in 2001.  The HUCs with the highest estimated density of lake fishing (i.e., 200 or more annual lake-fishing days per square mile) are widely distributed across the study area.  As expected, many are located in areas with extensive lake shoreline miles such as the Great Lakes region and in Minnesota, and several are also located in Tennessee, Kentucky, and Florida.  The HUCs with the highest density of river fishing (i.e., 200 or more annual river fishing days per square mile) are most heavily concentrated in Pennsylvania, New York, Connecticut, and Massachusetts, as well as in North Carolina, Tennessee and Florida.

Table 10-10 reports the estimated annual number of prenatally exposed children across states and HUCs in 2001.  It is important to note that, in contrast to the estimates reported in Tables 10-7 and 10-8 for the population centroid approach, the states in this table refer to where fishing took place and where the mercury exposure originated from rather than state of residence.  Using the angler destination approach, the size of the exposed population of interest

---

[15] Woods and Poole county level population projections were not used to predict future exposed populations in the angler destination approach because the exposed population are based on fishing destination rather than residential location.



**Figure 10-6.  Estimated Distribution of Lake-Fishing Days Across HUCs in 2001**



**Figure 10-7.  Estimated Distribution of River-Fishing Days Across HUCs in 2001**

**Table 10-10.  State-Level Summary of Exposed Population Estimates:  Angler Destination Approach**

| | Estimated Annual Number of Prenatally Exposed Children in 2001 | | | | |
|---|---|---|---|---|---|
| State | Average per HUC | Total | State | Average per HUC | Total |
| AL | 251 | 13,077 | NC | 335 | 19,451 |
| AR | 253 | 14,669 | ND | 54 | 2,684 |
| CT | 397 | 4,762 | NE | 77 | 5,477 |
| DC | 4 | 8 | NH | 165 | 2,805 |
| DE | 59 | 592 | NJ | 809 | 10,520 |
| FL | 421 | 22,748 | NY | 412 | 21,401 |
| GA | 406 | 21,530 | OH | 679 | 30,556 |
| IA | 208 | 12,069 | OK | 350 | 23,791 |
| IL | 636 | 33,696 | PA | 433 | 24,704 |
| IN | 603 | 23,517 | RI | 167 | 835 |
| KS | 133 | 11,929 | SC | 329 | 11,837 |
| KY | 330 | 15,840 | SD | 65 | 3,798 |
| LA | 212 | 12,491 | TN | 340 | 20,723 |
| MA | 340 | 6,808 | TX | 309 | 64,537 |
| MD | 333 | 7,318 | VA | 357 | 18,224 |
| ME | 135 | 2,977 | VT | 102 | 1,726 |
| MI | 344 | 20,998 | WI | 470 | 24,429 |
| MN | 448 | 36,700 | WV | 139 | 5,149 |
| MO | 299 | 19,720 | **Study Area** | **313** | **586,516** |
| MS | 230 | 12,417 | | | |

(i.e., prenatally exposed children) was estimated to average more than 15,000 per state in the study area, with a total of almost 590,000 in the entire area.  The state with the highest estimated number of prenatally exposed children is Texas, with almost 65,000, followed by Minnesota and Ohio, both with over 30,000.  This total exposed population estimate is roughly 35 percent greater than the estimate based on the population centroid approach.  For reasons discussed in more detail in Section 10.7, the assumptions underlying the angler destination approach are likely to overestimate the exposed population of interest, whereas those underlying the population centroid approach are likely to underestimate the exposed population.

## 10.4    Estimation of Mercury Exposures, IQ Decrements, and Lost Future Earnings

This section describes the methods and results for estimating mercury exposures through consumption of noncommercial freshwater fish.  It describes how the estimates derived and summarized in the previous section—in particular, distributions of (1) the annual number of prenatally exposed children and (2) the average mercury concentrations in freshwater fish consumed by their mothers—were combined to calculate mercury ingestion levels from recreationally caught freshwater fish in this population.  In addition it describes methods for translating these exposure estimates into corresponding estimates of (1) expected reductions in IQ levels achieved by the prenatally exposed children and (2) expected reductions in the value of future earnings resulting from the IQ decrements.

### 10.4.1  Modeling Approach for Estimating Individual Exposures

Both the population centroid approach and the angler destination approach described above define distinct subpopulations of women of childbearing age in angler households. Women in each subpopulation i are estimated to be exposed to the same average levels of mercury in recreationally caught freshwater fish.  In the population centroid approach these subpopulations are grouped by Census block group (and still further by income and urban-rural area categories), whereas in the angler destination approach they are grouped by HUC.

To estimate average daily mercury ingestion rates for each subpopulation i, a similar method was applied using results from both the population centroid and the angler destination approach.  In both cases, the ingestion rates were calculated based on the following equation:

$$HgI_i \ = \ CHgFC_i * C \ = \ (CHgFU_i * CCF) * C \qquad (10.16)$$

where

| | | |
|---|---|---|
| HgI | = | average daily mercury ingestion rate (µg/day); |
| CHgFU | = | average mercury concentration in uncooked freshwater fish (µg/g = ppm); |
| CCF | = | cooking conversion factor:  ratio of mercury concentration in cooked fish to mercury concentration in uncooked fish (= 1.5); |
| CHgFC | = | average mercury concentration in cooked freshwater fish (ppm); and |
| C | = | average daily self-caught freshwater cooked fish consumption rate (g/day) = 8 g/day. |

To determine an appropriate daily fish consumption rate (C) for the analysis, EPA conducted an extensive review of existing literature characterizing self-caught freshwater fish consumption including:  (a) EPA's 1997 Exposure Factors Handbook (EPA, 1997b), (b) EPA Office of Water's documentation presenting methodologies for deriving Ambient Water Quality Criteria (USEPA, 2000c), (c) studies recommended by peer reviewers of the mercury benefits model, and (d) studies identified in the open literature, in order to insure that the best available data were used in modeling ingestion for the recreational fisher population.  In conducting this literature review, the modeling team applied several key criteria in assessing the applicability of consumption data presented in studies:

1.    *Self-caught freshwater consumption data for regions relevant to the study area*: The ingestion rate data had to apply to the consumption of freshwater fish caught by fishers at locations representative of the 37 state study area.  Many of the studies that were reviewed included saltwater fish species, or some component of commercially caught (i.e., store-purchased) fish, either of which resulted in exclusion of the study from consideration.  In addition, some of the studies, provided estimates for populations located in areas of the United States outside of the 37 state study area, where fishing behavior could differ systematically (in terms of types of fish harvested and seasonality) from the eastern half of the country.

2. *Consumption rates (including meal event frequency data) that supported generation of an annual-averaged daily consumption rate for fish*: The concentration-response function for IQ decrements is based on maternal hair mercury concentrations, which, in turn, is based on the estimated annual-averaged daily exposure level for methylmercury in ug/kg bodyweight/day. This exposure level is itself based on an annual-averaged daily consumption rate for fish (for the study population, or modeled individuals within that population) combined with the methylmercury concentration in ingested fish. Because the analysis required annual-averaged daily fish consumption estimates, the underlying consumption data had to include information on meal event frequency over longer periods. This is especially true for the high-end percentile consumption estimates required to generate the lognormal distribution of recreational fisher consumption rates. Many of the fish consumption studies that were reviewed, provided data for fish consumption over a relatively short survey period (days) and did not include information on the long-term frequency of self-caught fish meals. Only those studies providing long-term frequency data were ultimately selected for this analysis.

3. *Coverage for the entire recreational fisher population including consumers and non-consumers (catch and release)*: Modeling of recreational fisher exposure can be conducted either focusing on consumers only (i.e., excluding catch-and-release fishers), or by modeling "all fishers" including those who consume their catch and those who engage in catch-and-release activity. Because we are not able to identify in the data the portion of recreational anglers that are consumers only, we have selected a consumption rate that applies to "all fishers" `(i.e., one that incorporates a 0 g/d consumption rate for non-consumers). [16]

Based on application of the above criteria to available studies characterizing recreational freshwater fish consumption, it was decided that the ingestion rates for recreational freshwater fishers specified as "recommended" in the EPA's Exposure Factors Handbook (mean of 8 g/day and 95th percent of 25 g/day), represented the most appropriate values to use in this analysis. These recommended values were derived based on ingestion rates from four studies conducted in Maine, Michigan and Lake Ontario (Ebert et al., 1992; Connelly et al., 1996; West et al., 1989; West et al., 1993) that matched the suitability criteria presented above (i.e., annual-averaged daily intake rates for self-caught freshwater fish by all recreational fishers including consumers and non-consumers). The mean values presented in these four studies ranged from 5 to 17 g/day, while the 95th percent values ranged from 13 to 39 g/day (Note: the 39 g/day value actually represents a 96th percent value). The EPA "recommended values" were developed by

---

[16] Note: exposure modeling for recreational fishers could have focused on consumers and excluded those engaging in catch-and-release (i.e., non-consumers). However this would require representative information on "percent consumers" within the recreational fisher population to allow the overall recreational fisher population to be parsed appropriately. While this information is available from a number of fish consumption surveys, the values can differ significantly across those surveys, suggesting that there is uncertainty associated with our ability to differentiate (especially at the national level) recreational fishers based on consumption versus non-consumption status. Consequently, EPA decided to model recreational fisher exposure focusing on all fishers and did not attempt to differentiate consumers from non-consumers.

considering the range and spread of means and 95th percent values presented in the four studies. The average daily fish consumption rate of 8 g/day correspond to approximately (8 x 365 / 117 =) 25 fish meals per year using the average fish meal size of 117 g/meal from Pao et al. (1982). EPA recognizes that use of mean and 95th percent consumption rates based on these four studies may not be representative of fishing behavior across the entire 37 state study area and that there may be regional trends in consumption that differ from the values used in this analysis. However, EPA believes that these four studies do represent the best available data for developing recreational fisher ingestion rates for the 37 state study area that meet all of the study suitability criteria presented above. It should be noted that there are a large number of local-scale studies, including Creel surveys, that characterize fishing practices for specific waterbodies or groups of waterbodies in particular geographic areas. However, these studies often do not meet one or more of the suitability criteria presented above and are not readily generalizable to larger regional areas. Consequently, these local-scale studies were not used in deriving ingestion rates for this analysis.

Because the consumption rate estimate C is for cooked fish and the mercury concentrations are estimated for uncooked filet, a conversion factor (CCF) was applied to estimate mercury concentrations in cooked fish. Cooking fish tends to reduce the overall weight of fish by approximately one-third (Great Lakes Sport Fish Advisory Task Force, 1993). Because volatilization of mercury is unlikely to occur during cooking, the overall amount of mercury will stay unchanged during cooking, and the concentration of mercury will increase by a factor of roughly 1.5 (Morgan, Berry, and Graves, 1997).

### 10.4.2  Modeling Approach for Estimating IQ Effects and Lost Earnings

Estimating the IQ decrements in children that result from mothers' ingestion of mercury required two steps. First, based on the estimated average daily maternal ingestion rate, the expected mercury concentration in the hair of exposed pregnant women was estimated as follows:

$$CHgH_i \ = \ (0.08)^{-1} * (HgI_i/W) \qquad\qquad \text{(Eq. 10.17)}$$

where

      CHgH   = average mercury concentration in maternal hair (ppm)
      W        = average body weight for female adults ages 15-44 (= 64 kg)

This conversion rate between average daily ingestion rate and maternal hair concentration is based on the one compartment toxicokinetic model used for deriving EPA's reference dose for MeHg by Swartout and Rice (2000). Uncertainty and variability in various input parameters was analyzed using Monte Carlo simulation to establish a relationship between the mercury ingestion dose and hair mercury concentration. The simulation results indicated that the median conversion factor was 0.08 μg/Kg-day of mercury ingestion for 1 ppm of mercury concentration in hair. The 2002 EPA Workshop on Methylmercury Neurotoxicity recommended that this one compartment model might be better suited than PBPK model in modeling dose-response (EPA, 2002c). The average body weight estimate (W) was based on EPA's Exposure Factor Handbook (EPA, 1997a).

Second, to estimate the expected IQ decrement in offspring resulting from in utero exposure to mercury through mothers' fish consumption, the following dose-response relationship was applied:

$$dIQ_i = 0.131 * CHgH_i \qquad \text{(Eq. 10.18)}$$

where

      $dIQ$ = IQ decrement in exposed mother/child (IQ pts)

This dose response relationship is based on the statistical analysis in Section 9 that integrates the results of the available epidemiological studies of mercury and neurobehavior effects (see Section 9 for additional details).

The monetary value of losses resulting from IQ decrements were then assessed in terms of foregone future earnings for the affected individuals. These losses were estimated using to the following equation:

$$V_i = VIQ_i * dIQ_i \qquad \text{(Eq. 10.19)}$$

where

      $V$ = present value of net earnings losses per IQ point loss per prenatally exposed child (1999 dollars)
      $VIQ$ = value per change in IQ point (= $8,807)

This valuation approach for assessing losses associated with IQ decrements is based on an approach used by EPA to assess benefits for reductions in lead exposures (EPA, 2000a). For that analysis, EPA used results from a study by Salkever (1995) to estimate the effects of IQ loss on expected future earnings and years of education.

Salkever (1995) analyzes data from the National Longitudinal Study of Youth (NLSY) and uses a three equation regression model to estimate the relationships between IQ levels, educational attainment, and expected future earnings. The results of this study indicate that the average effect (for men and women combined) of a one point decrease in IQ is:

1. A 2.379 percent decrease in future earnings; and
2. A 0.1007 decrease in years of schooling.

To estimate the expected monetary value these effects, EPA first estimated the average present value of future earnings at the time of birth for a person born in the U.S. Using earnings data from the 1992 Current Population Survey (CPS) and discounting at a 3 percent annual rate, this present value was estimated to be $366,021 in 1992 dollars.

EPA then estimated the average direct and indirect costs associated with one additional year of schooling. Based on Department of Education data, the average annual expenditure per student was estimated to be $5,500, and the average annual opportunity cost (lost income from being in school) was estimated to be $10,925. Assuming that these costs were incurred at age 19 (based on an average of 12.9 years of education among those over age 25 in the U.S.) the

combined present value of these two costs at time of birth (discounted at 3 percent) were estimated to be $9,367 per additional year of schooling in 1992 dollars.

Combining these estimates with the results from the Salkever (1995) study summarized above implies that the average present value of net earnings losses associated with a one point decrease in IQ is $7,765 in 1992 dollars.  This value is calculated as the average present value of lost earnings per IQ point loss ($8,708 = $366,021 * 0.2379) minus the partially offsetting change in average education costs per IQ point loss ($943 = $9,367 * 0.1007).  Corrected for inflation using the GDP deflator, the average present value of net earnings losses per IQ point loss is $8,807 in 1999 dollars[17].

It is important to note that this value per IQ point lost is considered a "cost of illness" measure rather than a measure of willingness-to-pay (WTP) to prevent a loss of an IQ point.  The cost-of-illness approach simply measures ex post costs and does not attempt to measure the loss in utility due to pain and suffering or the costs of any averting behaviors that individuals have taken to avoid the illness altogether (EPA, 2000b).  However, the cost-of-illness estimate may be considered a lower bound estimate of WTP (Harrington and Portney, 1987; Berger et al., 1987).  The main reason that the cost of illness understates total WTP is the failure to account for many effects of disease beyond those associated solely with net earnings.

## 10.5    Model Results:  Estimated Benefits of Utility Mercury Emission Controls

Based on the modeling approach described above, mercury ingestion levels, IQ decrements, and lost future earnings were estimated for each modeled subpopulation and then aggregated across the study area.  These estimates were calculated for the following conditions and emissions control scenarios:

- 2001 Base Case

- 2001 Utility Emissions Zero-Out

- 2020 Base Case with CAIR

- 2020 Utility Emissions Zero-Out

- 2020 CAMR Control Option 1

- 2020 CAMR Control Option 2

For the 2001 Base Case, it was assumed the mercury emissions, and therefore mercury concentration levels in fish, would remain constant at their currently observed levels (summarized in Table 10-2).

For each of the other five emissions control scenarios, mercury concentration levels were re-estimated for the entire study area.  To estimate the effect of emissions controls, EPA first

---

[17]   The value per IQ estimate using a 7 percent discount rate is $1,580 per IQ point.

conducted air quality modeling runs and estimated mercury deposition levels across the study area for baseline (i.e., 2001 Base Case) emissions conditions. Based on the format of the air quality modeling results, the study area was segmented into roughly 10,000 36x36 km grids, and separate mercury deposition estimates were generated for each grid. EPA then repeated this process for each of the five emissions control scenarios. Comparing each set of model results to baseline results, EPA estimated percent reductions in mercury deposition relative to baseline for each grid and for each emissions control scenario. Based on results from EPA's Mercury MAPs (MMaps) approach discussed in Section 3, reductions in mercury fish tissue concentrations in each grid were assumed to be directly proportional to the estimated mercury deposition reductions for the grid. As Section 3 discusses, this proportionality assumption is limited to areas where air deposition is the primary source of mercury loading to a waterbody, and is applicable at steady-state (i.e., when the waterbody comes to equilibrium after a given change in mercury loading).

Therefore, to re-estimate fish tissue mercury concentrations at each mercury sampling point for each emissions control scenario, the following steps were applied:

1. Each lake and river sampling point in the study area was mapped to its corresponding air quality grid using GIS.

2. The baseline (Base Case 2001) mercury fish tissue concentration estimates for each sampling point (as summarized in Table 10-2) were reduced by the same percentage as the estimated percent reduction in mercury deposition for its corresponding grid.

The resulting estimates of changes in mercury fish tissue concentrations are summarized in Tables 10-11 and 10-12. Table 10-11 reports results relative to the 2001 baseline levels for two emissions control scenarios: 2001 Utility Emissions Zero-Out and 2020 Base Case with CAIR.

Under the 2001 Utility Emissions Zero-Out scenario, the fish tissue mercury concentrations in lakes and rivers were estimated to decline by an average of 11 and 15 percent respectively across the study area, with the largest percentage reductions occurring in Pennsylvania, Ohio, and West Virginia. The percent reductions across sampling points varied from less than one percent to over 67 percent relative to 2001 baseline levels.

Under the 2020 Base Case with CAIR, mercury concentrations were estimated to decline on average by similar amount—11 percent for lakes and 14 percent for rivers. Again the largest percentage reductions were estimated to occur in Pennsylvania, Ohio, and West Virginia; however, the range of estimated reductions across sampling points was much larger for this scenario, going from over 10 percent *increases* in mercury levels at some points to over 60 percent reductions at others.

**Table 10-11. Effects of Emission Control Scenarios—Percent Reduction in Estimated Fish Tissue Mercury Concentrations from 2001 Base Case[a]**

| | Mean (Min–Max) Percent Reduction Across Sampling Sites | | | |
| --- | --- | --- | --- | --- |
| | Utility Mercury Emissions Zero-Out in 2001 | | Base Case with CAIR in 2020 | |
| | Lake Sites | River Sites | Lake Sites | River Sites |
| Study Area | 10.6 (0.6 – 67.7) | 15.3 (0.5 – 67.7) | 10.7 (−24.5 – 61.8) | 14.4 (−27.1 – 61.8) |
| **State** | | | | |
| AL | 19 (8 – 41.3) | 16.8 (7.6 – 53.4) | 19.1 (−1.7 – 41.2) | 15.5 (−3.3 – 43.4) |
| AR | 7.3 (4.7 – 18.3) | 7.2 (4.4 – 18.3) | 6 (−0.5 – 10.2) | 6.3 (−3.6 – 13.2) |
| CT | 7.7 (4.7 – 10.1) | 8.3 (4.7 – 10.1) | 15.1 (5.4 – 46.1) | 13.1 (5.1 – 46.1) |
| DC | — | 28.5 (28.5 – 28.5) | — | 39.2 (39.2 – 39.2) |
| DE | 19 (16.7 – 22.5) | 19.6 (12.3 – 29.5) | 15.6 (11.7 – 19.7) | 17.6 (2.5 – 25.7) |
| FL | 4.1 (0.6 – 15.9) | 4.3 (0.5 – 45.5) | 8.2 (−3.1 – 19.3) | 7 (−3.1 – 40.5) |
| GA | 15.3 (5.4 – 33.6) | 15.2 (4.8 – 42.3) | 15.5 (7 – 32.7) | 16 (6.8 – 41.5) |
| IA | 7.8 (4.1 – 25.3) | 7.2 (4.1 – 25.3) | 4.5 (−2.7 – 6.1) | 2.9 (−12.5 – 6.1) |
| IL | 23.4 (9.9 – 40.3) | 16.4 (6.2 – 30) | 15.5 (−0.9 – 31.4) | 8.1 (−15.2 – 27.1) |
| IN | 22.7 (15.9 – 32.4) | 19.7 (7.5 – 51.9) | 12.1 (−0.9 – 33.6) | 16 (−9.3 – 44.4) |
| KS | 5.3 (3.6 – 8.6) | 7.6 (2.9 – 13.2) | 4.2 (2.8 – 4.9) | 3.8 (−0.9 – 9.8) |
| KY | 17.1 (2.7 – 21.5) | 23.9 (2.7 – 38.1) | 22.1 (15.6 – 41.4) | 23.1 (2.9 – 41.4) |
| LA | 5.6 (3.1 – 11.3) | 4.4 (3 – 7) | 6.3 (2.7 – 12.4) | 5.4 (3.2 – 15.8) |
| MA | 9.3 (5.9 – 21.4) | 3.6 (3.6 – 3.6) | 11 (4.6 – 18.1) | 55.9 (55.9 – 55.9) |
| MD | 33.6 (22.8 – 50.5) | 32.4 (13.9 – 58.5) | 32 (21 – 48.4) | 30.6 (5.1 – 56.9) |
| ME | 3.1 (2.1 – 5) | 3.4 (2.1 – 6) | 5.6 (−2.9 – 37.2) | 4.6 (−13.3 – 37.2) |
| MI | 14 (2.6 – 42.8) | 14.5 (2.8 – 27.8) | 9.8 (0.5 – 30.7) | 16.8 (3.7 – 40.1) |
| MN | 2.3 (0.9 – 9.5) | 2.9 (0.9 – 8.2) | 4.5 (−24.5 – 41.9) | 2.4 (−24.5 – 41.9) |
| MO | 8.9 (5.9 – 15.5) | 8.9 (6.2 – 11.2) | 5.9 (−5.9 – 21.7) | 2.9 (−0.9 – 5.3) |
| MS | 6.9 (4.8 – 9.4) | 10.1 (5.2 – 15) | 8.5 (6.4 – 9.6) | 17 (4.2 – 50.3) |
| NC | 18.5 (10.1 – 30.8) | 16.4 (8.5 – 51.1) | 18.3 (12 – 30.9) | 17.4 (4.9 – 49.8) |
| ND | 2.9 (1.3 – 5) | 6.1 (1.2 – 16.1) | 4.3 (3 – 5.1) | 6.3 (2.6 – 10.4) |
| NE | 5 (1.7 – 25.3) | 5.4 (1.4 – 25.3) | 2.4 (−15.1 – 6.1) | 3.7 (−15.1 – 8.7) |
| NH | 5.9 (4.3 – 6.8) | 6 (4.9 – 9) | 8.4 (3.8 – 15.6) | 9.4 (2.2 – 30.1) |
| NJ | 16.9 (10 – 28) | 13.1 (10 – 28) | 9.4 (0.4 – 16) | 2.6 (−7.6 – 16) |
| NY | 13.9 (6.1 – 30.5) | 12.5 (5.5 – 30.4) | 14.3 (−7.6 – 26.7) | 11.2 (−7.6 – 35.9) |
| OH | 27.2 (15.4 – 45.6) | 29.8 (15.4 – 55.8) | 25.6 (16.1 – 45.3) | 27.1 (9.7 – 53.7) |
| OK | 7.3 (1.8 – 18.9) | 8.3 (1.8 – 18.9) | 5.4 (−3.7 – 13.8) | 6.6 (−3.7 – 35.8) |

(continued)

**Table 10-11.  Effects of Emission Control Scenarios—Percent Reduction in Estimated Fish Tissue Mercury Concentrations from 2001 Base Case (continued)**

| | Mean (Min–Max) Percent Reduction Across Sampling Sites | | | |
| | Utility Mercury Emissions Zero-Out in 2001 | | Base Case with CAIR in 2020 | |
| | Lake Sites | River Sites | Lake Sites | River Sites |
| State | | | | |
| PA | 31.7 (10.3 – 67.7) | 34.8 (10.3 – 67.7) | 27.5 (4.6 – 61.8) | 33 (–11.9 – 61.8) |
| SC | 15.3 (13.4 – 20.2) | 14.8 (4.3 – 28.9) | 14.8 (12.5 – 20.7) | 13.5 (–21.5 – 44.3) |
| TN | 20.3 (9.9 – 37.4) | 21.7 (11.5 – 37.4) | 21.3 (–7.4 – 38.9) | 22.4 (12.7 – 38.9) |
| TX | 9 (1.1 – 64.4) | 6.8 (0.5 – 30.7) | 10.3 (3.3 – 55.6) | 6.8 (–14.5 – 26.2) |
| VA | 25.6 (16.6 – 41.1) | 23.8 (9.2 – 35.7) | 23 (–4.8 – 31.3) | 26 (17.2 – 39.2) |
| VT | 6.8 (5.7 – 8.3) | 6.9 (2 – 8.3) | 10.8 (7.5 – 22.6) | 11.9 (4.7 – 30.1) |
| WI | 5.6 (2.3 – 40.3) | 8 (2.8 – 40.3) | 5.9 (–4.8 – 24.1) | 5.8 (–27.1 – 35.6) |
| WV | 33.2 (32.8 – 34.3) | 37.4 (20.3 – 60.6) | 33.5 (32.6 – 34.5) | 36.8 (21.4 – 60.2) |

[a] For summary purposes data are reported at a state level in this table.   The analysis accounted for within state variations in estimated percent reductions in mercury concentrations.

Using the resulting mercury concentration estimates from the 2020 Base Case with CAIR scenario as a new reference point, Table 10-12 reports estimated reductions in mercury levels for the other three emissions control scenarios.  Under the 2020 Utility Emissions Zero-Out scenario, the fish tissue mercury concentrations in lakes and rivers were estimated to decline by an average of 5 and 6 percent respectively across the study area, with over 10 percent reductions in both lake and river levels estimated to occur in Illinois, Michigan, and Missouri.

The 2020 CAMR Control Option 1 was estimated to reduce fish concentrations estimates relative to the 2020 baseline by an average of less than 1 percent, whereas the 2020 CAMR Control Option 2 was estimated to reduce these concentrations by an average of between 1 and 2 percent.  In both cases, states with relatively high estimated reductions (3 percent or more reductions in both lakes and rivers) included Pennsylvania and New Jersey.

Although Mercury Maps assumes that reductions in mercury deposition levels result in roughly proportionate reductions in steady state fish tissue concentrations (everything else being equal), there is uncertainty regarding how long it takes for these effects to occur (i.e., for fish tissue concentrations to reach a new steady state), which is discussed in detail in Section 3 of this report.  Based on the response times from the case studies discussed in Section 3[18], to reflect the possibility that reductions in mercury emissions in 2001 and in 2020 would have lagged effects on fish tissue concentrations, we present a range of benefits based on the 10 and 20 year lags as

---

[18] Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.

**Table 10-12. Effects of Emission Control Scenarios—Percent Reduction in Estimated Fish Tissue Mercury Concentrations from 2020 Base Case with CAIR[a]**

| | Mean (Min–Max) Percent Reduction Across Sampling Sites | | | | | |
| | Utility Mercury Emissions Zero-Out in 2020 | | CAMR Control Option 1 | | CAMR Control Option 2 | |
| Study Area | Lake Sites | River Sites | Lake Sites | River Sites | Lake Sites | River Sites |
|---|---|---|---|---|---|---|
| | 5.41 (0.32 – 45.8) | 6.38 (0.27 – 33.19) | 0.7 (–4.68 – 36.5) | 0.99 (–8.96 – 19.49) | 1.27 (–3.55 – 36.92) | 1.65 (–8.83 – 28.13) |
| **State** | | | | | | |
| AL | 4.82 (2.58 – 13.16) | 5.31 (2.39 – 24.74) | 0.37 (–4.34 – 1.91) | 0.8 (–4.34 – 5.93) | 1.19 (0.24 – 2.38) | 1.37 (–0.33 – 6.11) |
| AR | 5.55 (2.85 – 22.33) | 5.43 (2.6 – 23.08) | 2.46 (0.68 – 17.95) | 2.24 (0.6 – 18.38) | 2.97 (0.92 – 18.28) | 2.85 (0.82 – 18.72) |
| CT | 3.03 (2.4 – 3.86) | 2.95 (2.4 – 3.86) | 0.67 (0.56 – 1.08) | 0.76 (0.54 – 1.08) | 0.77 (0.65 – 1.19) | 0.87 (0.65 – 1.19) |
| DC | — | 16.32 (16.32 – 16.32) | — | 1.57 (1.57 – 1.57) | — | 2.37 (2.37 – 2.37) |
| DE | 8.83 (7.18 – 9.88) | 10.51 (7.05 – 18.64) | 2.38 (0.55 – 3.85) | 3.56 (–7.46 – 10.12) | 2.84 (0.96 – 4.47) | 4.01 (–6.75 – 10.12) |
| FL | 1.5 (0.32 – 4.16) | 1.24 (0.27 – 5.67) | 0.1 (–1.39 – 2.34) | -0.01 (–8.96 – 2.34) | 0.23 (–1.26 – 2.57) | 0.12 (–8.83 – 2.57) |
| GA | 5.43 (1.95 – 16.36) | 4.77 (1.79 – 33.19) | 0.39 (–0.44 – 1.25) | 0.41 (–0.44 – 1.68) | 2.58 (–0.09 – 12.63) | 1.95 (–0.09 – 28.13) |
| IA | 9.02 (4.25 – 25.26) | 8.84 (3.89 – 25.26) | 1.71 (0.45 – 7.56) | 1.31 (0.43 – 7.56) | 3.09 (1.31 – 11.87) | 2.41 (1.01 – 11.87) |
| IL | 13.2 (7.99 – 18.79) | 11.56 (4.51 – 24.5) | 1.38 (0.52 – 2.43) | 1.19 (–0.42 – 4.35) | 2.05 (1.07 – 3.96) | 1.78 (–0.11 – 4.76) |
| IN | 14.08 (7.03 – 25.12) | 9.28 (2.85 – 26.27) | 1.95 (–0.13 – 6.72) | 0.63 (–3.78 – 6.66) | 2.37 (0.14 – 7.31) | 0.97 (–3.62 – 7.23) |
| KS | 6.51 (4.24 – 11.06) | 9.78 (3.07 – 16.52) | 1.22 (0.63 – 2.41) | 0.89 (0.34 – 3.02) | 2.89 (2.13 – 4.42) | 3.95 (1.73 – 6.14) |
| KY | 5.72 (1.84 – 12.06) | 7.21 (1.84 – 14.98) | 0.2 (0.06 – 0.35) | 0.36 (–0.41 – 1.14) | 0.53 (0.29 – 0.65) | 0.66 (–0.21 – 1.4) |
| LA | 3.24 (1.57 – 6.35) | 2.51 (1.57 – 6.17) | 0.69 (0.24 – 4.02) | 0.37 (0.16 – 0.7) | 0.92 (0.35 – 4.19) | 0.52 (0.24 – 0.89) |
| MA | 2.92 (2.1 – 5.59) | 2.16 (2.16 – 2.16) | 0.69 (0.49 – 1.38) | –1.33 (–1.33 – –1.33) | 0.8 (0.58 – 1.5) | –1.24 (–1.24 – –1.24) |
| MD | 8.53 (6.03 – 11) | 8.02 (3.04 – 12.7) | 2.63 (1.52 – 4.36) | 2.31 (–0.74 – 4.54) | 2.88 (1.76 – 4.59) | 2.79 (–0.39 – 5.77) |
| ME | 2.3 (0.95 – 10.41) | 2.46 (0.95 – 10.41) | 0.98 (0.26 – 6.05) | 1.04 (0.26 – 6.05) | 1.18 (0.33 – 8.59) | 1.29 (0.33 – 8.59) |
| MI | 10.21 (2.41 – 29.78) | 10.88 (2.94 – 22.25) | 0.61 (–3.63 – 6.72) | 0.6 (–0.97 – 1.98) | 1.15 (–3.35 – 7.31) | 1.04 (–0.57 – 2.61) |
| MN | 2.49 (0.96 – 9.29) | 3.01 (1.06 – 12.15) | 0.2 (0.05 – 0.83) | 0.22 (0.05 – 0.66) | 0.43 (0.18 – 2.14) | 0.57 (0.18 – 6.13) |
| MO | 10.34 (4.96 – 23.21) | 11.51 (6.59 – 16.52) | 1.73 (0.86 – 4.59) | 1.22 (0.59 – 2.15) | 2.95 (1.8 – 6.09) | 3.39 (1.49 – 5.9) |

(continued)

10-51

**Table 10-12. Effects of Emission Control Scenarios—Percent Reduction in Estimated Fish Tissue Mercury Concentrations from 2020 Base Case with CAIR (continued)**

| | Mean (Min–Max) Percent Reduction Across Sampling Sites | | | | | |
| | Utility Mercury Emissions Zero-Out in 2020 | | CAMR Control Option 1 | | CAMR Control Option 2 | |
| State | Lake Sites | River Sites | Lake Sites | River Sites | Lake Sites | River Sites |
|---|---|---|---|---|---|---|
| MS | 3.14 (2.33 – 3.64) | 3.61 (2.35 – 10.17) | 0.68 (0.48 – 1.11) | 0.74 (0.34 – 3.3) | 0.98 (0.71 – 1.43) | 0.97 (0.53 – 3.51) |
| NC | 6.34 (2.79 – 11.45) | 5.23 (2.29 – 24.07) | 0.48 (–1.92 – 1.85) | 1.13 (–0.11 – 19.49) | 0.83 (–1.47 – 2.16) | 1.43 (0.23 – 19.73) |
| ND | 2.67 (1.07 – 4.51) | 5.85 (1.79 – 12.78) | 0.71 (0.26 – 2.29) | 1.43 (0.19 – 3.57) | 0.78 (0.32 – 2.32) | 1.54 (0.28 – 3.61) |
| NE | 6.79 (1.59 – 27.99) | 7.2 (1.52 – 27.99) | 1.5 (0.21 – 8.14) | 1.37 (0.2 – 8.14) | 2.27 (0.32 – 9.81) | 3.32 (0.32 – 16.8) |
| NH | 3.72 (2.12 – 7.25) | 3.12 (2.12 – 7.42) | 1.07 (0.46 – 3.07) | 0.92 (0.46 – 5.85) | 1.19 (0.56 – 3.46) | 1.04 (0.56 – 6.08) |
| NJ | 8.62 (3.17 – 21.19) | 6.79 (3.17 – 21.19) | 4.74 (1.26 – 15.88) | 2.97 (1.13 – 15.88) | 4.94 (1.36 – 16.09) | 3.09 (1.2 – 16.09) |
| NY | 4.4 (1.97 – 11.34) | 4.23 (1.62 – 13.11) | 1.1 (0.48 – 2.37) | 1.2 (–0.73 – 2.71) | 1.34 (0.59 – 2.83) | 1.44 (0.51 – 3.17) |
| OH | 10.21 (6.05 – 16.69) | 9.42 (4.53 – 16.69) | 0.13 (–4.68 – 1.55) | 0.56 (–4.68 – 2.54) | 0.78 (–3.55 – 4.61) | 1 (–3.55 – 4.61) |
| OK | 6.29 (1.84 – 25.38) | 6.58 (1.82 – 25.38) | 0.6 (0.19 – 2.15) | 0.72 (0.19 – 2.15) | 3.21 (0.7 – 20.16) | 3.16 (0.7 – 20.16) |
| PA | 9.65 (4.53 – 18.4) | 10.38 (3.96 – 25.64) | 3.66 (0.63 – 10.58) | 4.47 (0.36 – 16.73) | 3.97 (0.89 – 10.94) | 4.75 (0.84 – 16.95) |
| SC | 5.8 (3.6 – 9.08) | 5.98 (1.33 – 19.71) | 0.49 (0.16 – 0.92) | 0.29 (–0.23 – 1.57) | 1.45 (0.71 – 2.57) | 1.04 (0.27 – 2.3) |
| TN | 5.12 (2.18 – 14.35) | 5.58 (2.87 – 14.35) | 1.03 (–0.28 – 11.02) | 1.17 (0.22 – 11.02) | 1.49 (0.41 – 11.33) | 1.65 (0.72 – 11.33) |
| TX | 3.5 (0.87 – 23.63) | 3.35 (0.4 – 24.33) | 0.54 (–0.05 – 7.28) | 0.37 (0.06 – 2.11) | 1 (0.2 – 11.4) | 0.7 (0.12 – 3.9) |
| VA | 8.88 (3.96 – 45.8) | 7.72 (2.95 – 18.66) | 3.86 (0.91 – 36.5) | 2.09 (0.29 – 11.25) | 4.22 (1.17 – 36.92) | 2.46 (0.74 – 12.33) |
| VT | 2.35 (1.82 – 2.76) | 2.39 (0.88 – 2.74) | 0.59 (0.08 – 1.04) | 0.57 (0.15 – 1.04) | 0.71 (0.2 – 1.14) | 0.69 (0.22 – 1.14) |
| WI | 5.1 (2.8 – 18.79) | 7.4 (2.96 – 18.79) | 0.34 (–0.05 – 2.43) | 0.54 (–0.05 – 2.54) | 1.08 (0.4 – 3.96) | 2.02 (0.53 – 11.58) |
| WV | 6.71 (6.07 – 7.52) | 7.9 (4.38 – 14.88) | 2.14 (1.56 – 2.99) | 2.58 (0.69 – 9.4) | 2.39 (1.81 – 3.24) | 2.86 (0.89 – 9.67) |

[a] For summary purposes data are reported at a state level in this table.   The analysis accounted for within state variations in estimated percent reductions in mercury concentrations.

central estimates.  We also provide results for the 5 and 50 year lags to demonstrate how benefits would differ under shorter and longer lag periods.

Results based on the modeling framework described above were estimated using exposure estimates from both the population centroid approach and the angler destination approaches.  These results are summarized and discussed separately below.

The monetized benefits of the two CAMR control options—2020 CAMR Control Option 1 and 2020 CAMR Control Option 2—were estimated as the reduction in total IQ related losses in the affected population relative to 2020 baseline conditions (2020 Base Case with CAIR).  In other words, benefits were calculated as the difference between (1) the estimated aggregate present value of earnings losses in the 2020 baseline scenario and (2) the estimated aggregate present value of earnings losses in the 2020 control scenario.

### 10.5.1  Results for the Population Centroid Approach

Applying the population centroid approach and equations 10.16 and 10.17 to estimate mercury ingestion levels requires matching block group subpopulations (N) with corresponding average mercury levels.  As discussed in Section 10.1.2 one method for matching is to first subdivide the exposed population in each block group (NPA) according to demographic group i, distance interval j, and waterbody type k (lake or river) and then estimate the size of each subpopulation, $NPA_{ijk}$, using equation 10.7.  This method assumes that each individual in the subpopulation receives all of his/her noncommercial freshwater fish from the same distance interval j and waterbody type k; therefore, each individual can be matched with the corresponding average mercury concentration from that distance interval and waterbody type ($CHg_{jk}$).  The results reported in this section were generated using this method to match subpopulations and mercury concentrations.

One of the limitations of the available mercury concentration estimates, is that they do not provide lake and river estimates for each possible location in the study area.  As reported in Table 10-9, for many block groups in the study area, mercury sampling locations did not exist for each of the specified distance categories.  To address these data limitations, a simple spatial extrapolation method was used to provide estimates of exposures for all the distance intervals within and beyond 100 miles of each block group centroid.  For the four distance intervals within 100 miles of each centroid, if they did not contain a lake or river sampling location for mercury, they were assigned the average lake or river concentration estimate (respectively) from the other distance categories within 100 miles of the centroid.  For exposures beyond 100 miles from each centroid, the mean lake and river concentrations from the entire study area (0.23 ppm for lakes and 0.25 ppm for rivers, as reported in Table 10-2) were used.

Table 10-13 reports model results for mercury ingestion rates under baseline conditions in 2001.  It disaggregates results by separating the estimated exposed subpopulations according to their assumed distance to the freshwater fish they consume.  It reports the distribution of estimated HgI levels for subpopulations in the four distance intervals below 100 miles.  The distributions are roughly similar for subpopulations in each distance interval, with an average (and 75th percentile) HgI of between 2.5 and 3 µg/day.

**Table 10-13.  Estimated Distribution of Mercury Ingestion by Distance Traveled to Fish: Population Centroid Approach—2001 Base Case**

| | Average Daily Maternal Ingestion of Mercury (µg/day) by Distance Interval | | | | | |
|---|---|---|---|---|---|---|
| | 0–10 miles | >10–20 miles | >20–50 miles | >50–100 miles | >100 miles | Average |
| 1st percentile | 0.48 | 0.42 | 0.53 | 0.80 | 2.72 | 1.25 |
| 5th percentile | 0.92 | 0.80 | 0.91 | 1.12 | 2.72 | 1.47 |
| 25th percentile | 1.48 | 1.45 | 1.49 | 1.70 | 2.76 | 1.81 |
| 50th percentile | 2.03 | 2.01 | 2.13 | 2.23 | 2.76 | 2.26 |
| 75th percentile | 2.74 | 2.74 | 2.75 | 2.93 | 2.79 | 2.82 |
| 95th percentile | 4.56 | 4.61 | 4.66 | 4.67 | 2.86 | 4.16 |
| 99th percentile | 6.51 | 6.73 | 6.86 | 6.46 | 2.90 | 5.06 |
| Mean | 2.50 | 2.47 | 2.46 | 2.71 | 2.77 | 2.58 |
| Std Dev | 1.65 | 1.79 | 1.37 | 1.23 | 0.23 | 1.01 |

Table 10-14 summarizes model results for the 2001 Base Case based on exposure estimates from the population centroid approach in 2001.[19]  The estimated annual number of prenatally exposed children in freshwater angler households is just over 434,000.  The states with the largest estimated exposed populations are Texas and Illinois.  The average daily mercury ingestion rate for pregnant women in freshwater angler households (HgI) was estimated to be 2.44 µg/day for the entire study area.  The states with the highest average rates were primarily in New England, which is also where the highest estimates of average mercury concentrations in freshwater fish were located.  For example, the average rates for Maine and New Hampshire were both estimated to be above 4 µg/day under baseline conditions.  Average IQ decrements in prenatally exposed children were estimated to be over 0.06 points for the study area, with the highest average (per capita) reductions estimated again in New England states.  Under baseline conditions in 2001, the total IQ losses associated with self-caught freshwater fish consumption were estimated to be 27,100 and the present value in 2001 of foregone net earnings associated with these IQ decrements was estimated to sum to almost $240 million (in 1999 dollars).

Table 10-15 summarizes model results for the 2020 Base Case with CAIR[16], based on the exposure estimates from the population centroid approach for 2020, as reported in Table 10-8.  To provide a direct comparison with the 2001 Base Case results, the results reported in Table 10-15 assume that all mercury emissions reductions associated with CAIR have been implemented by 2020 and that there is no lag between emissions reductions and fish tissue mercury concentrations.  Due to population growth between 2001 and 2020, the estimated annual number of prenatally exposed children in freshwater angler households is almost 482,000.  The average daily mercury ingestion rate for pregnant women in freshwater angler households (HgI) was estimated to be roughly 12 percent below the 2001 Base Case level, at 2.14 µg/day for the

---

[19] For comparison purposes between the 2001 Base Case and the 2020 Base Case with CAIR, the benefits presented in Tables 10-14 and 10-15 do not reflect potential lags in fish tissue response times for a change in mercury deposition.

Table 10-14. Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2001 Base Case[a]

| Study Area | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2001; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| **Study Area** | 434,059 | 2.44 | 1.01 | 0.062 | 0.026 | 27,094 | $550 | $227 | $238,626,988 |
| **State** | | | | | | | | | |
| AL | 9,948 | 1.99 | 0.72 | 0.051 | 0.018 | 507 | $449 | $161 | $4,464,277 |
| AR | 9,832 | 2.56 | 0.57 | 0.066 | 0.015 | 645 | $578 | $128 | $5,680,355 |
| CT | 4,134 | 3.37 | 0.90 | 0.086 | 0.023 | 357 | $760 | $202 | $3,141,787 |
| DC | 236 | 1.80 | 0.20 | 0.046 | 0.005 | 11 | $406 | $45 | $95,779 |
| DE | 836 | 2.26 | 0.28 | 0.058 | 0.007 | 48 | $509 | $63 | $425,082 |
| FL | 21,218 | 3.74 | 0.88 | 0.096 | 0.022 | 2,029 | $842 | $198 | $17,872,632 |
| GA | 20,255 | 2.59 | 0.68 | 0.066 | 0.017 | 1,340 | $583 | $153 | $11,800,171 |
| IA | 8,448 | 1.54 | 0.19 | 0.039 | 0.005 | 334 | $348 | $43 | $2,937,846 |
| IL | 27,670 | 1.69 | 0.28 | 0.043 | 0.007 | 1,193 | $380 | $63 | $10,507,395 |
| IN | 13,640 | 2.04 | 0.33 | 0.052 | 0.008 | 713 | $460 | $75 | $6,280,533 |
| KS | 8,246 | 3.29 | 1.00 | 0.084 | 0.026 | 694 | $741 | $225 | $6,112,146 |
| KY | 10,322 | 2.18 | 0.47 | 0.056 | 0.012 | 574 | $490 | $106 | $5,059,688 |
| LA | 10,709 | 2.51 | 0.69 | 0.064 | 0.018 | 689 | $567 | $155 | $6,066,865 |
| MA | 5,663 | 3.85 | 0.35 | 0.098 | 0.009 | 557 | $867 | $80 | $4,909,319 |
| MD | 5,881 | 1.60 | 0.28 | 0.041 | 0.007 | 240 | $360 | $62 | $2,117,268 |
| ME | 2,378 | 4.86 | 0.73 | 0.124 | 0.019 | 296 | $1,095 | $165 | $2,604,794 |
| MI | 17,028 | 2.40 | 0.34 | 0.061 | 0.009 | 1,044 | $540 | $76 | $9,198,072 |
| MN | 22,806 | 1.74 | 0.30 | 0.045 | 0.008 | 1,017 | $393 | $68 | $8,955,172 |
| MO | 16,804 | 2.28 | 0.97 | 0.058 | 0.025 | 982 | $515 | $218 | $8,648,998 |
| MS | 7,909 | 2.63 | 0.52 | 0.067 | 0.013 | 532 | $592 | $118 | $4,681,160 |
| NC | 13,483 | 2.73 | 0.66 | 0.070 | 0.017 | 943 | $616 | $150 | $8,305,285 |

(continued)

Table 10-14. Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings: Population Centroid Approach—2001 Base Case (continued)

| State | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2001; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| ND | 2,101 | 2.22 | 0.55 | 0.057 | 0.014 | 119 | $500 | $124 | $1,050,953 |
| NE | 5,138 | 1.73 | 0.33 | 0.044 | 0.008 | 228 | $391 | $73 | $2,008,393 |
| NH | 1,966 | 4.25 | 0.41 | 0.109 | 0.011 | 214 | $957 | $93 | $1,881,273 |
| NJ | 6,838 | 3.08 | 0.48 | 0.079 | 0.012 | 538 | $693 | $107 | $4,739,979 |
| NY | 16,877 | 3.06 | 0.76 | 0.078 | 0.020 | 1,320 | $689 | $172 | $11,628,981 |
| OH | 21,457 | 2.54 | 0.55 | 0.065 | 0.014 | 1,395 | $573 | $125 | $12,288,120 |
| OK | 13,117 | 2.49 | 0.43 | 0.064 | 0.011 | 837 | $562 | $97 | $7,369,896 |
| PA | 15,146 | 3.34 | 1.98 | 0.086 | 0.051 | 1,295 | $753 | $447 | $11,405,684 |
| RI | 755 | 3.66 | 0.30 | 0.094 | 0.008 | 71 | $825 | $68 | $623,444 |
| SC | 9,010 | 3.10 | 0.71 | 0.079 | 0.018 | 715 | $699 | $161 | $6,301,059 |
| SD | 2,508 | 2.01 | 0.91 | 0.051 | 0.023 | 129 | $453 | $205 | $1,135,391 |
| TN | 13,317 | 2.28 | 0.40 | 0.058 | 0.010 | 776 | $513 | $90 | $6,834,282 |
| TX | 55,802 | 2.01 | 0.56 | 0.052 | 0.014 | 2,875 | $454 | $127 | $25,324,716 |
| VA | 11,793 | 1.95 | 0.54 | 0.050 | 0.014 | 588 | $439 | $121 | $5,174,750 |
| VT | 1,288 | 3.58 | 0.65 | 0.092 | 0.017 | 118 | $806 | $146 | $1,038,103 |
| WI | 15,848 | 2.18 | 0.38 | 0.056 | 0.010 | 882 | $490 | $85 | $7,770,204 |
| WV | 3,651 | 2.66 | 0.40 | 0.068 | 0.010 | 248 | $599 | $90 | $2,187,136 |

a Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table. For comparison purposes with the 2020 Base Case with CAIR, benefits presented in this table do not reflect potential lags in fish tissue response to a change in mercury deposition.

**Table 10-15. Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings: Population Centroid Approach—2020 Base Case with CAIR[a]**

| Study Area | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (μg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2001; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| **Study Area** | 481,987 | 2.14 | 0.80 | 0.0548 | 0.0204 | 26,413 | $1,412 | $1,598 | $232,623,719 |
| **State** | | | | | | | | | |
| AL | 9,871 | 1.69 | 0.72 | 0.0432 | 0.0185 | 427 | $1,129 | $1,205 | $3,759,332 |
| AR | 10,877 | 2.34 | 0.52 | 0.0599 | 0.0133 | 651 | $2,687 | $1,771 | $5,736,031 |
| CT | 4,437 | 2.93 | 0.75 | 0.0750 | 0.0192 | 333 | $1,119 | $809 | $2,931,055 |
| DC | 211 | 1.47 | 0.06 | 0.0375 | 0.0016 | 8 | $161 | $133 | $69,675 |
| DE | 894 | 1.98 | 0.23 | 0.0507 | 0.0060 | 45 | $796 | $617 | $399,568 |
| FL | 27,339 | 3.46 | 0.88 | 0.0885 | 0.0226 | 2,420 | $2,339 | $2,854 | $21,317,014 |
| GA | 24,796 | 2.17 | 0.55 | 0.0556 | 0.0140 | 1,378 | $2,534 | $2,760 | $12,132,565 |
| IA | 8,325 | 1.44 | 0.15 | 0.0368 | 0.0038 | 306 | $1,024 | $956 | $2,696,242 |
| IL | 29,953 | 1.50 | 0.18 | 0.0384 | 0.0045 | 1,149 | $1,028 | $1,014 | $10,121,039 |
| IN | 14,665 | 1.74 | 0.26 | 0.0445 | 0.0067 | 652 | $1,198 | $1,138 | $5,746,041 |
| KS | 9,222 | 3.16 | 0.97 | 0.0809 | 0.0249 | 746 | $2,896 | $2,729 | $6,573,870 |
| KY | 10,303 | 1.72 | 0.32 | 0.0441 | 0.0082 | 454 | $1,267 | $915 | $4,001,455 |
| LA | 10,857 | 2.30 | 0.62 | 0.0589 | 0.0158 | 640 | $1,606 | $1,218 | $5,634,355 |
| MA | 5,867 | 3.44 | 0.25 | 0.0879 | 0.0064 | 516 | $899 | $581 | $4,544,090 |
| MD | 6,533 | 1.32 | 0.21 | 0.0337 | 0.0053 | 220 | $527 | $424 | $1,937,548 |
| ME | 2,137 | 4.47 | 0.54 | 0.1144 | 0.0137 | 245 | $1,885 | $1,049 | $2,154,061 |
| MI | 17,539 | 2.04 | 0.26 | 0.0522 | 0.0067 | 915 | $954 | $749 | $8,061,103 |
| MN | 25,696 | 1.67 | 0.24 | 0.0427 | 0.0060 | 1,096 | $2,366 | $2,064 | $9,656,733 |
| MO | 17,805 | 2.15 | 0.96 | 0.0551 | 0.0245 | 980 | $1,902 | $1,838 | $8,634,048 |
| MS | 7,974 | 2.38 | 0.47 | 0.0609 | 0.0120 | 486 | $1,992 | $1,501 | $4,278,349 |
| NC | 16,264 | 2.22 | 0.59 | 0.0569 | 0.0150 | 925 | $1,546 | $1,474 | $8,149,444 |

(continued)

10-57

**Table 10-15. Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2020 with CAIR (continued)**

| State | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (μg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2001; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| ND | 2,005 | 2.02 | 0.50 | 0.0516 | 0.0128 | 103 | $1,452 | $1,261 | $910,706 |
| NE | 5,829 | 1.61 | 0.28 | 0.0413 | 0.0072 | 241 | $1,332 | $875 | $2,118,974 |
| NH | 2,023 | 3.83 | 0.26 | 0.0980 | 0.0067 | 198 | $1,998 | $1,444 | $1,745,904 |
| NJ | 7,554 | 2.82 | 0.28 | 0.0721 | 0.0072 | 545 | $737 | $556 | $4,797,708 |
| NY | 17,537 | 2.71 | 0.46 | 0.0694 | 0.0117 | 1,216 | $710 | $653 | $10,713,538 |
| OH | 21,660 | 1.94 | 0.32 | 0.0496 | 0.0083 | 1,074 | $1,011 | $786 | $9,458,550 |
| OK | 14,132 | 2.32 | 0.37 | 0.0595 | 0.0095 | 841 | $2,552 | $1,842 | $7,402,873 |
| PA | 14,621 | 2.64 | 1.43 | 0.0675 | 0.0366 | 986 | $836 | $754 | $8,687,193 |
| RI | 807 | 3.25 | 0.09 | 0.0830 | 0.0022 | 67 | $719 | $455 | $590,322 |
| SC | 9,634 | 2.66 | 0.60 | 0.0681 | 0.0155 | 657 | $2,023 | $1,812 | $5,782,498 |
| SD | 2,587 | 1.85 | 0.99 | 0.0475 | 0.0252 | 123 | $1,616 | $1,918 | $1,081,144 |
| TN | 14,372 | 1.89 | 0.26 | 0.0483 | 0.0066 | 694 | $1,523 | $1,302 | $6,113,673 |
| TX | 73,600 | 1.83 | 0.43 | 0.0469 | 0.0111 | 3,450 | $2,117 | $2,118 | $30,388,891 |
| VA | 13,318 | 1.60 | 0.47 | 0.0410 | 0.0120 | 546 | $1,012 | $917 | $4,805,964 |
| VT | 1,156 | 3.15 | 0.52 | 0.0806 | 0.0133 | 93 | $1,549 | $936 | $820,772 |
| WI | 16,324 | 1.99 | 0.33 | 0.0509 | 0.0085 | 831 | $1,667 | $1,186 | $7,316,669 |
| WV | 3,261 | 1.84 | 0.26 | 0.0472 | 0.0068 | 154 | $853 | $515 | $1,354,724 |

[a]  Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table. For comparison purposes with the Base Cases in 2001, benefits presented in this table do not incorporate potential lags in fish tissue response to a change in mercury deposition.

entire study area.[20]  The states with the highest estimated average rates continued to be primarily in New England.  Average IQ decrements in prenatally exposed children were estimated to be less than 0.06 points for the study area.  Under the 2020 conditions  with CAIR, the total IQ losses associated with prenatal exposures to self-caught freshwater fish consumption in 2020 were estimated to be 26,400 IQ points and the present value in 2020 of foregone net earnings associated with these IQ decrements was estimated to sum to almost $233 million (in 1999 dollars).

Tables 10-16, 10-17, and 10-18 report estimated *reductions* in exposures, IQ decrements, and net earnings losses associated with CAIR and the two utility emissions zero-out scenarios. Based on the response times from the case studies discussed in Section 3[21], to reflect the possibility that reductions in mercury emissions in 2020 would have lagged effects on fish tissue concentrations, we present a range of benefits based on the 10 and 20 year lags as central estimates.  We also provide results for the 5 and 50 year lags to demonstrate how benefits would differ under shorter and longer lag periods.  Differences in annual benefit estimates across the selected lag periods are attributable to two factors.  The first factor is differences in the size of the exposed population, due to the inclusion of projected population growth factors across time.  For example, from 2001 to 2021, the exposed population was estimated to grow by 12 percent to over 486,000.  The second factor is differences in the present value of IQ-related losses.  To make the estimates of lost future earnings comparable across the four lag periods, they were all expressed as present values in 2001 or 2020; therefore, losses to children born in future years (2006, 2011, 2021, and 2051) were discounted assuming a 3 percent discount rate[22].

Table 10-16 reports results for the 2020 with CAIR scenario, by comparing them to conditions with (1) 2001 Base Case mercury levels in fish and (2) exposed population levels estimated to occur in the year of the selected lag periods.  The per capita IQ decrements avoided were estimated to decrease by 0.007 points (12 percent).  Total IQ decrements avoided are estimated to decrease by approximately 3,900 to 4,200 points in 2020 under a 10 to 20 year lag period.  The mercury emission reductions associated with CAIR are estimated to reduce the present value of total net earnings losses due to prenatal exposures in 2020 by approximately $20.5 to $25.3 million under the 10 to 20 year lag periods.  Under the alternative lag periods considered in the analysis, the total IQ decrements avoided and monetary value of benefits are 3,500 IQ points at a value of $28.1 million under a 5 year lag and 5,200 IQ points at a value of $10.5 million under a 50 year lag.

---

[20] The average daily mercury ingestion rate given here of 2.14 ug/day from freshwater fish is below the EPA's Reference Dose (RfD) for mercury of 5.8 ug/day.  This estimate does not account for total exposure from consumption from other rifhs sources.  See Section 11 of this report for a detailed discussion of the implication of the RfD on this analysis.

[21] Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.

[22] Due to the large number of tables and calculations provided in this section, the implications on results of using a 7 percent discount rate are presented in the summary tables for each approach analyzed.

Table 10-17 reports results for the 2001 Zero-Out relative to the 2001 Base Case.  Under this scenario, the average daily mercury ingestion rate for pregnant women in freshwater angler households was estimated to decrease by roughly 13 percent for the entire study area.  The average per capita IQ decrements in prenatally exposed children were also estimated to decline by roughly 13 percent under the zero out scenario, decreasing by an average of 0.008 points over the entire study area.  As shown in Table 10-17, the states that were estimated to benefit from the largest per capita reductions in IQ losses are Pennsylvania and West Virginia (0.02 points in each state).  Total IQ decrements avoided are estimated to decrease by approximately 3,700 to 3,900 points in 2020 under a 10 to 20 year lag period.  The mercury emission reductions associated with the 2001 zero out of utility emissions are estimated to reduce the present value of total net earnings losses due to prenatal exposures in 2020 by approximately $19.0 to $24.0 million under the 10 to 20 year lag periods.  Under the alternative lag periods considered in the analysis, the total IQ decrements avoided and monetary value of benefits are 3,600 IQ points at a value of $27.5 million under a 5 year lag and 5,000 IQ points at a value of $10.0 million under a 50 year lag.

Table 10-18 reports comparable results for the 2020 Utility Emissions Zero-Out relative to the 2020 Base Case with CAIR.  The average daily mercury ingestion rate for pregnant women in freshwater angler households and average per capita IQ decrements in prenatally exposed children were estimated to decrease by roughly 5 percent for the entire study area.  Total IQ decrements avoided are estimated to decrease by approximately 1,500 to 1,600 points in 2020 under a 10 to 20 year lag period.  The mercury emission reductions associated with the zero out of emission remaining after 2020 with CAIR are estimated to reduce the present value of total net earnings losses due to prenatal exposures in 2020 by approximately $8.0 to $10.0 million under the 10 to 20 year lag periods.  Under the alternative lag periods considered in the analysis, the total IQ decrements avoided and monetary value of benefits are 1,500 IQ points at a value of $11.0 million under a 5 year lag and 2,000 IQ points at a value of $4.1 million under a 50 year lag.

**Table 10-16. 2020 Base Case with CAIR:  Modelled Avoided Losses Relative to 2001 Base Case (Applied to 2020 Demographics)—Population Centroid Approach[a, b]**

| Study Area | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
|---|---|---|---|---|---|---|---|---|---|
| Study Area | 0.0073 | 3,866 | 4,209 | 3,695 | 5,238 | $25,335,445 | $20,524,068 | $28,068,173 | $10,522,314 |
| State | | | | | | | | | |
| AL | 0.0078 | 80 | 83 | 78 | 94 | $522,582 | $406,589 | $591,997 | $189,434 |
| AR | 0.0047 | 57 | 62 | 54 | 79 | $372,468 | $304,097 | $410,802 | $158,587 |
| CT | 0.0114 | 57 | 64 | 54 | 84 | $373,838 | $310,480 | $408,213 | $167,847 |
| DC | 0.0085 | 2 | 2 | 2 | 3 | $12,639 | $10,569 | $13,744 | $5,794 |
| DE | 0.0069 | 7 | 7 | 6 | 9 | $43,569 | $34,696 | $48,735 | $17,108 |
| FL | 0.0071 | 226 | 260 | 209 | 361 | $1,481,167 | $1,266,474 | $1,589,056 | $724,896 |
| GA | 0.0104 | 299 | 344 | 276 | 481 | $1,959,059 | $1,679,796 | $2,098,096 | $966,526 |
| IA | 0.0028 | 24 | 25 | 24 | 27 | $157,468 | $120,449 | $179,995 | $53,675 |
| IL | 0.0049 | 158 | 170 | 151 | 207 | $1,032,355 | $828,493 | $1,149,790 | $415,887 |
| IN | 0.0080 | 127 | 136 | 122 | 164 | $830,840 | $663,683 | $927,759 | $329,616 |
| KS | 0.0041 | 41 | 45 | 39 | 58 | $269,820 | $221,159 | $296,914 | $116,312 |
| KY | 0.0112 | 121 | 127 | 118 | 145 | $793,923 | $619,390 | $898,068 | $290,574 |
| LA | 0.0049 | 54 | 55 | 54 | 59 | $355,039 | $269,529 | $407,422 | $117,651 |
| MA | 0.0105 | 68 | 75 | 65 | 95 | $447,789 | $365,837 | $493,684 | $191,062 |
| MD | 0.0068 | 49 | 54 | 47 | 68 | $322,312 | $262,666 | $355,859 | $136,439 |
| ME | 0.0095 | 20 | 20 | 20 | 20 | $132,502 | $98,398 | $153,759 | $40,296 |
| MI | 0.0093 | 173 | 182 | 168 | 209 | $1,130,786 | $886,044 | $1,276,121 | $420,204 |
| MN | 0.0020 | 55 | 60 | 53 | 74 | $363,410 | $292,938 | $403,744 | $148,529 |
| MO | 0.0038 | 73 | 79 | 70 | 96 | $480,351 | $385,610 | $534,904 | $193,700 |
| MS | 0.0063 | 53 | 56 | 51 | 64 | $346,536 | $271,555 | $391,058 | $128,809 |
| NC | 0.0125 | 238 | 274 | 220 | 380 | $1,558,876 | $1,333,737 | $1,671,787 | $764,276 |

(continued)

**Table 10-16. 2020 Base Case with CAIR:  Modelled Avoided Losses Relative to 2001 Base Case Applied to 2020 Demographics—Population Centroid Approach (continued)**

| State | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| ND | 0.0049 | 10 | 10 | 10 | 11 | $64,360 | $49,733 | $73,175 | $22,767 |
| NE | 0.0028 | 18 | 20 | 17 | 25 | $118,046 | $96,254 | $130,292 | $50,057 |
| NH | 0.0105 | 23 | 25 | 22 | 32 | $152,746 | $123,654 | $169,288 | $63,299 |
| NJ | 0.0067 | 56 | 62 | 53 | 80 | $369,285 | $303,096 | $406,047 | $159,866 |
| NY | 0.0086 | 162 | 171 | 157 | 199 | $1,062,160 | $835,940 | $1,195,819 | $400,747 |
| OH | 0.0152 | 344 | 361 | 336 | 413 | $2,256,841 | $1,762,498 | $2,551,488 | $828,953 |
| OK | 0.0042 | 64 | 69 | 61 | 84 | $419,008 | $336,105 | $466,796 | $168,535 |
| PA | 0.0168 | 258 | 267 | 253 | 296 | $1,689,870 | $1,304,303 | $1,922,502 | $595,299 |
| RI | 0.0107 | 10 | 10 | 9 | 13 | $62,288 | $50,737 | $68,790 | $26,328 |
| SC | 0.0110 | 115 | 123 | 111 | 148 | $752,632 | $600,633 | $840,877 | $297,638 |
| SD | 0.0037 | 10 | 10 | 10 | 12 | $65,022 | $50,419 | $73,792 | $23,289 |
| TN | 0.0097 | 154 | 169 | 146 | 214 | $1,007,148 | $823,356 | $1,109,960 | $430,603 |
| TX | 0.0045 | 385 | 439 | 358 | 599 | $2,522,650 | $2,138,657 | $2,720,686 | $1,204,386 |
| VA | 0.0080 | 118 | 129 | 112 | 163 | $774,228 | $631,324 | $854,523 | $328,354 |
| VT | 0.0102 | 12 | 12 | 12 | 13 | $79,133 | $59,908 | $90,938 | $25,949 |
| WI | 0.0047 | 81 | 85 | 79 | 97 | $533,092 | $415,898 | $603,022 | $195,109 |
| WV | 0.0200 | 64 | 63 | 64 | 62 | $419,609 | $309,364 | $488,673 | $123,914 |

[a]  Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table.

[b]  Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.

[c]  Per capita IQ decrements and mercury ingestion rate vary only very slightly across different lag periods.  Therefore, for brevity sake, we report the results for the 10 year lag period case.

**Table 10-17. 2001 Utility Mercury Emissions Zero Out: Modelled Avoided Losses Relative to 2001 Base Case—Population Centroid Approach[a,b]**

| Study Area State | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2001; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
| | 0.0081 | 3,674 | 3,891 | 3,623 | 4,960 | $24,080,244 | $18,973,876 | $27,522,949 | $9,963,920 |
| AL | 0.0077 | 76 | 77 | 76 | 87 | $498,871 | $373,165 | $580,312 | $174,977 |
| AR | 0.0056 | 57 | 61 | 56 | 80 | $374,531 | $296,529 | $426,616 | $159,757 |
| CT | 0.0076 | 32 | 34 | 31 | 47 | $207,370 | $166,027 | $238,981 | $94,933 |
| DC | 0.0088 | 2 | 2 | 2 | 3 | $12,861 | $9,006 | $15,185 | $5,024 |
| DE | 0.0091 | 8 | 8 | 8 | 10 | $51,035 | $40,007 | $58,919 | $20,280 |
| FL | 0.0044 | 105 | 122 | 100 | 184 | $690,798 | $595,815 | $756,618 | $370,192 |
| GA | 0.0097 | 216 | 247 | 206 | 376 | $1,417,902 | $1,205,174 | $1,566,735 | $754,952 |
| IA | 0.0038 | 31 | 32 | 32 | 34 | $205,618 | $154,912 | $240,401 | $68,796 |
| IL | 0.0081 | 232 | 247 | 228 | 312 | $1,520,561 | $1,204,058 | $1,728,824 | $626,223 |
| IN | 0.0092 | 129 | 137 | 127 | 167 | $848,492 | $666,643 | $966,985 | $335,634 |
| KS | 0.0066 | 57 | 62 | 55 | 84 | $372,660 | $302,207 | $420,109 | $169,416 |
| KY | 0.0109 | 111 | 113 | 112 | 129 | $724,909 | $548,625 | $847,860 | $259,550 |
| LA | 0.0043 | 45 | 46 | 45 | 49 | $296,048 | $225,716 | $344,048 | $98,620 |
| MA | 0.0078 | 44 | 46 | 44 | 61 | $290,190 | $225,540 | $337,552 | $122,917 |
| MD | 0.0077 | 47 | 51 | 47 | 67 | $308,041 | $248,152 | $353,594 | $134,345 |
| ME | 0.0057 | 13 | 12 | 13 | 12 | $82,477 | $59,203 | $99,791 | $24,305 |
| MI | 0.0114 | 196 | 202 | 196 | 236 | $1,287,068 | $983,452 | $1,492,774 | $474,548 |
| MN | 0.0029 | 70 | 77 | 68 | 98 | $457,894 | $373,857 | $518,260 | $196,272 |
| MO | 0.0063 | 106 | 112 | 106 | 141 | $697,528 | $546,921 | $803,148 | $282,823 |
| MS | 0.0058 | 46 | 47 | 46 | 54 | $302,039 | $227,761 | $348,550 | $108,785 |
| NC | 0.0125 | 183 | 206 | 176 | 310 | $1,201,286 | $1,002,879 | $1,333,984 | $623,774 |

(continued)

Table 10-17. 2001 Utility Mercury Emissions Zero Out: Modelled Avoided Losses Relative to 2001 Base Case—Population Centroid Approach (continued)

| | | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2001; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | Per Capita[c] | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
|---|---|---|---|---|---|---|---|---|---|
| **State** | | | | | | | | | |
| ND | 0.0031 | 6 | 6 | 6 | 6 | $40,482 | $29,829 | $47,850 | $12,925 |
| NE | 0.0042 | 23 | 25 | 22 | 32 | $149,297 | $121,372 | $168,120 | $64,976 |
| NH | 0.0073 | 15 | 15 | 15 | 19 | $95,231 | $72,725 | $111,107 | $38,443 |
| NJ | 0.0111 | 78 | 85 | 77 | 114 | $512,870 | $415,666 | $586,162 | $228,680 |
| NY | 0.0108 | 184 | 190 | 184 | 226 | $1,207,790 | $926,866 | $1,399,430 | $454,284 |
| OH | 0.0159 | 338 | 342 | 339 | 395 | $2,214,893 | $1,666,293 | $2,577,917 | $793,664 |
| OK | 0.0046 | 61 | 66 | 60 | 82 | $398,767 | $319,584 | $455,579 | $164,099 |
| PA | 0.0203 | 300 | 294 | 306 | 328 | $1,965,224 | $1,435,975 | $2,326,920 | $658,018 |
| RI | 0.0086 | 7 | 7 | 7 | 9 | $44,208 | $34,111 | $50,576 | $18,333 |
| SC | 0.0117 | 109 | 113 | 108 | 139 | $712,105 | $550,761 | $817,218 | $279,934 |
| SD | 0.0037 | 9 | 9 | 9 | 11 | $59,949 | $46,251 | $69,514 | $21,198 |
| TN | 0.0095 | 130 | 138 | 129 | 182 | $852,552 | $672,804 | $978,646 | $366,004 |
| TX | 0.0043 | 279 | 324 | 259 | 473 | $1,828,979 | $1,577,641 | $1,968,963 | $950,221 |
| VA | 0.0113 | 140 | 151 | 137 | 200 | $918,053 | $736,190 | $1,043,174 | $401,475 |
| VT | 0.0069 | 8 | 8 | 9 | 8 | $55,273 | $38,890 | $66,685 | $16,971 |
| WI | 0.0069 | 109 | 113 | 109 | 130 | $712,244 | $550,450 | $827,480 | $260,986 |
| WV | 0.0205 | 71 | 66 | 72 | 64 | $464,152 | $322,820 | $548,360 | $128,187 |

a   Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table.
b   Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more. The medium response scenarios also varied widely but were generally on the order of one to three decades.
c   Per capita IQ decrements and mercury ingestion rate vary only very slightly across different lag periods. Therefore, for brevity sake, we report the results for the 10 year lag period case.

**Table 10-18. 2020 with CAIR Emissions Zero Out: Modelled Avoided Losses Relative to 2020 with CAIR Base Case—Population Centroid Approach[a, b]**

| Study Area | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| | 0.0029 | 1,520 | 1,651 | 1,455 | 2,043 | $9,962,464 | $8,050,132 | $11,052,917 | $4,104,007 |
| **State** | | | | | | | | | |
| AL | 0.0018 | 18 | 19 | 18 | 22 | $120,628 | $93,754 | $136,729 | $43,564 |
| AR | 0.0032 | 38 | 41 | 36 | 52 | $247,726 | $202,009 | $273,412 | $105,073 |
| CT | 0.0023 | 11 | 13 | 11 | 17 | $74,045 | $61,506 | $80,846 | $33,261 |
| DC | 0.0025 | 1 | 1 | 1 | 1 | $3,735 | $3,123 | $4,062 | $1,712 |
| DE | 0.0039 | 4 | 4 | 4 | 5 | $24,599 | $19,586 | $27,519 | $9,653 |
| FL | 0.0012 | 39 | 45 | 36 | 62 | $254,611 | $217,598 | $273,240 | $124,432 |
| GA | 0.0024 | 68 | 78 | 63 | 108 | $445,245 | $379,786 | $478,394 | $216,388 |
| IA | 0.0026 | 22 | 23 | 22 | 24 | $144,142 | $109,892 | $165,047 | $48,533 |
| IL | 0.0039 | 125 | 135 | 120 | 166 | $820,256 | $660,566 | $911,783 | $334,213 |
| IN | 0.0035 | 55 | 58 | 53 | 68 | $357,823 | $282,024 | $402,531 | $135,681 |
| KS | 0.0064 | 65 | 72 | 61 | 96 | $422,799 | $353,482 | $459,854 | $193,683 |
| KY | 0.0023 | 25 | 26 | 24 | 30 | $163,530 | $127,946 | $184,696 | $60,455 |
| LA | 0.0016 | 17 | 18 | 17 | 19 | $113,423 | $86,041 | $130,207 | $37,480 |
| MA | 0.0027 | 17 | 19 | 16 | 24 | $113,281 | $92,592 | $124,858 | $48,405 |
| MD | 0.0023 | 17 | 19 | 16 | 23 | $110,453 | $90,289 | $121,735 | $47,211 |
| ME | 0.0033 | 7 | 7 | 7 | 7 | $46,197 | $34,351 | $53,574 | $14,122 |
| MI | 0.0054 | 101 | 107 | 98 | 124 | $664,343 | $522,489 | $748,223 | $250,057 |
| MN | 0.0015 | 43 | 47 | 41 | 58 | $282,405 | $228,469 | $313,104 | $116,785 |
| MO | 0.0050 | 95 | 104 | 91 | 130 | $621,907 | $505,203 | $687,897 | $260,597 |
| MS | 0.0019 | 16 | 17 | 15 | 19 | $103,267 | $80,568 | $116,811 | $37,801 |
| NC | 0.0030 | 58 | 66 | 53 | 92 | $378,000 | $322,827 | $405,830 | $184,367 |

(continued)

**Table 10-18. 2020 with CAIR Emissions Zero Out: Modelled Avoided Losses Relative to 2020 with CAIR Base Case—Population Centroid Approach (continued)**

| State | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| ND | 0.0015 | 3 | 3 | 3 | 3 | $20,371 | $15,544 | $23,314 | $6,882 |
| NE | 0.0032 | 20 | 22 | 19 | 28 | $133,935 | $108,936 | $148,042 | $56,345 |
| NH | 0.0031 | 7 | 7 | 7 | 9 | $44,812 | $36,300 | $49,647 | $18,608 |
| NJ | 0.0041 | 34 | 37 | 32 | 48 | $222,831 | $182,732 | $245,137 | $96,203 |
| NY | 0.0032 | 60 | 64 | 58 | 75 | $391,969 | $309,697 | $440,351 | $149,881 |
| OH | 0.0037 | 84 | 88 | 82 | 101 | $549,932 | $430,087 | $621,252 | $203,004 |
| OK | 0.0027 | 41 | 44 | 39 | 55 | $266,732 | $215,406 | $296,026 | $109,671 |
| PA | 0.0053 | 81 | 85 | 80 | 96 | $533,357 | $414,507 | $604,567 | $192,572 |
| RI | 0.0026 | 2 | 3 | 2 | 3 | $15,007 | $12,219 | $16,577 | $6,335 |
| SC | 0.0036 | 37 | 40 | 36 | 48 | $243,906 | $194,560 | $272,572 | $96,312 |
| SD | 0.0020 | 5 | 6 | 5 | 6 | $34,762 | $26,989 | $39,424 | $12,507 |
| TN | 0.0021 | 34 | 37 | 32 | 47 | $222,943 | $181,794 | $246,064 | $94,553 |
| TX | 0.0014 | 119 | 135 | 111 | 184 | $782,514 | $660,448 | $846,244 | $368,728 |
| VA | 0.0051 | 75 | 83 | 71 | 106 | $491,642 | $403,406 | $540,675 | $212,643 |
| VT | 0.0021 | 2 | 2 | 2 | 3 | $16,030 | $12,151 | $18,410 | $5,282 |
| WI | 0.0037 | 64 | 67 | 62 | 76 | $417,403 | $325,491 | $472,274 | $152,519 |
| WV | 0.0030 | 9 | 9 | 9 | 9 | $61,899 | $45,764 | $71,987 | $18,490 |

a   Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table.

b   Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.

c   Per capita IQ decrements and mercury ingestion rate vary only very slightly across different lag periods.  Therefore, for brevity sake, we report the results for the 10 year lag period case.

Table 10-19 report similar calculations for the 2020 CAMR Option 1. Relative to the 2020 Base Case with CAIR, this option is estimated to reduce per capita IQ decrements across the study area by 0.0006 points. Total IQ decrements avoided under Option 1 are estimated to decrease by approximately 318 to 346 points in 2020 under a 10 to 20 year lag period. The mercury emission reductions associated with CAMR Option 1 are estimated to reduce the present value of total net earnings losses due to prenatal exposures in 2020 by approximately $1.7 to $2.0 million under the 10 to 20 year lag periods. Under the alternative lag periods considered in the analysis, the total IQ decrements avoided and monetary value of benefits are 300 IQ points at a value of $2.3 million under a 5 year lag and 350 IQ points at a value of $0.8 million under a 50 year lag.

Table 10-20 report results of the 2020 CAMR Option 2. Relative to the 2020 Base Case with CAIR, this option is estimated to reduce per capita IQ decrements across the study area by 0.0009 points. Total IQ decrements avoided under Option 2 are estimated to decrease by approximately 475 to 520 points in 2020 under a 10 to 20 year lag period. The mercury emission reductions associated with CAMR Option 2 are estimated to reduce the present value of total net earnings losses due to prenatal exposures in 2020 by approximately $2.5 to $3.1 million under the 10 to 20 year lag periods. Under the alternative lag periods considered in the analysis, the total IQ decrements avoided and monetary value of benefits are 450 IQ points at a value of $3.4 million under a 5 year lag and 650 IQ points at a value of $1.3 million under a 50 year lag.

Table 10-21 summarizes the annual benefit estimates for CAMR Control Options 1 and 2, and it compares them to aggregate estimates associated with CAIR emissions reductions and the two Utility Emissions Zero-Out scenarios (in 2001 and 2020). To assess the sensitivity of these results to the assumed rate at which future gains/losses are discounted, the benefit estimates are also reported assuming 3 and 7 percent discount rates. In addition, we present a 1 percent discount rate for the 50 year lag period to reflect the discount rate for inter-generational effects as is recommended in the EPA Guidelines for Economic Analysis.

In comparison to the other mercury emissions reductions, the estimated benefits of Option 1 are roughly 21 percent of the estimated benefits that would be achieved by eliminating utility mercury emissions (i.e., 2020 Utility Emissions Zero-Out). The estimated benefits of Option 2 are approximately 31 percent as large as those for the 2020 Utility Emissions Zero-Out scenario.

### 10.5.2  Results for the Angler Destination Approach

This section summarizes results from applying the angler destination approach. As reported in Table 10-3, many of the HUCs in the study area do not contain lake and/or river mercury sampling locations. As was done in the population centroid approach, a simple spatial extrapolation method was used to address these data limitations. For HUCs that do not contain a lake (river) sample, they were assigned the lake (river) mean from the entire study area (e.g., 0.23 ppm for lakes and 0.25 ppm for rivers in the 2001 Base Case).

**Table 10-19.  Estimated Benefits of 2020 CAMR Control Option 1:  Relative to 2020 with CAIR—Population Centroid Approach[a,b]**

| Study Area | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
|---|---|---|---|---|---|---|---|---|---|
| **Study Area** | 0.0006 | 318 | 346 | 304 | 430 | $2,086,359 | $1,687,988 | $2,313,079 | $862,951 |
| **State** | | | | | | | | | |
| AL | 0.0002 | 3 | 3 | 3 | 3 | $16,779 | $13,010 | $19,042 | $6,009 |
| AR | 0.0013 | 15 | 16 | 14 | 20 | $98,522 | $79,453 | $109,429 | $40,326 |
| CT | 0.0006 | 3 | 3 | 3 | 4 | $19,128 | $15,904 | $20,872 | $8,617 |
| DC | 0.0005 | 0 | 0 | 0 | 0 | $692 | $579 | $752 | $317 |
| DE | 0.0014 | 1 | 1 | 1 | 2 | $8,852 | $7,046 | $9,904 | $3,470 |
| FL | 0.0002 | 6 | 7 | 6 | 9 | $39,199 | $33,373 | $42,166 | $18,946 |
| GA | 0.0003 | 8 | 9 | 8 | 13 | $53,256 | $45,606 | $57,081 | $26,179 |
| IA | 0.0004 | 3 | 3 | 3 | 4 | $21,968 | $16,694 | $25,196 | $7,307 |
| IL | 0.0005 | 18 | 19 | 17 | 24 | $115,700 | $93,378 | $128,451 | $47,477 |
| IN | 0.0004 | 7 | 7 | 6 | 8 | $43,038 | $33,644 | $48,632 | $15,862 |
| KS | 0.0012 | 12 | 14 | 12 | 19 | $81,222 | $68,174 | $88,131 | $37,650 |
| KY | 0.0003 | 3 | 3 | 3 | 3 | $18,766 | $14,509 | $21,330 | $6,652 |
| LA | 0.0003 | 4 | 4 | 4 | 4 | $23,896 | $18,081 | $27,468 | $7,820 |
| MA | 0.0006 | 4 | 5 | 4 | 6 | $27,173 | $22,211 | $29,949 | $11,612 |
| MD | 0.0008 | 6 | 6 | 5 | 8 | $37,122 | $30,494 | $40,798 | $16,113 |
| ME | 0.0013 | 3 | 3 | 3 | 3 | $18,016 | $13,390 | $20,898 | $5,497 |
| MI | 0.0004 | 8 | 8 | 8 | 10 | $52,581 | $41,328 | $59,240 | $19,750 |
| MN | 0.0002 | 4 | 5 | 4 | 6 | $29,069 | $23,439 | $32,289 | $11,893 |
| MO | 0.0009 | 18 | 19 | 17 | 25 | $116,271 | $94,896 | $128,264 | $49,451 |
| MS | 0.0004 | 4 | 4 | 3 | 4 | $23,119 | $17,953 | $26,217 | $8,323 |
| NC | 0.0005 | 9 | 11 | 9 | 15 | $60,245 | $51,447 | $64,684 | $29,376 |

(continued)

# Table 10-19. Estimated Benefits of 2020 CAMR Control Option 1: Relative to 2020 with CAIR—Population Centroid Approach (continued)

| State | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| ND | 0.0004 | 1 | 1 | 1 | 1 | $5,528 | $4,219 | $6,326 | $1,869 |
| NE | 0.0007 | 5 | 5 | 4 | 6 | $29,969 | $24,408 | $33,099 | $12,662 |
| NH | 0.0008 | 2 | 2 | 2 | 2 | $11,734 | $9,488 | $13,013 | $4,844 |
| NJ | 0.0016 | 14 | 15 | 13 | 19 | $89,843 | $73,692 | $98,824 | $38,814 |
| NY | 0.0010 | 19 | 21 | 19 | 25 | $127,759 | $101,285 | $143,262 | $49,417 |
| OH | 0.0003 | 6 | 6 | 6 | 7 | $38,067 | $29,742 | $43,026 | $14,004 |
| OK | 0.0004 | 5 | 6 | 5 | 7 | $35,259 | $28,314 | $39,256 | $14,233 |
| PA | 0.0021 | 33 | 34 | 32 | 39 | $213,167 | $166,443 | $241,023 | $78,245 |
| RI | 0.0006 | 1 | 1 | 0 | 1 | $3,351 | $2,728 | $3,701 | $1,414 |
| SC | 0.0003 | 3 | 3 | 3 | 4 | $20,552 | $16,486 | $22,896 | $8,267 |
| SD | 0.0004 | 1 | 1 | 1 | 1 | $7,649 | $5,945 | $8,669 | $2,763 |
| TN | 0.0004 | 7 | 7 | 6 | 9 | $43,676 | $35,203 | $48,527 | $17,845 |
| TX | 0.0003 | 29 | 33 | 27 | 43 | $190,955 | $159,347 | $207,925 | $86,980 |
| VA | 0.0031 | 46 | 51 | 44 | 66 | $304,403 | $250,091 | $334,512 | $132,187 |
| VT | 0.0005 | 1 | 1 | 1 | 1 | $4,145 | $3,146 | $4,757 | $1,373 |
| WI | 0.0003 | 6 | 6 | 6 | 7 | $38,029 | $29,668 | $43,019 | $13,917 |
| WV | 0.0008 | 3 | 3 | 3 | 3 | $17,661 | $13,174 | $20,448 | $5,468 |

a   Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table.

b   Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.

c   Per capita IQ decrements and mercury ingestion rate vary only very slightly across different lag periods.  Therefore, for brevity sake, we report the results for the 10 year lag period case.

**Table 10-20.  Estimated Benefits of 2020 CAMR Control Option 2:  Relative to 2020 with CAIR—Population Centroid Approach[a,b]**

| Study Area | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
| **Study Area** | 0.0009 | 475 | 518 | 453 | 648 | $3,112,816 | $2,527,403 | $3,444,104 | $1,302,261 |
| **State** | | | | | | | | | |
| AL | 0.0005 | 5 | 5 | 5 | 6 | $33,043 | $25,636 | $37,489 | $11,857 |
| AR | 0.0017 | 20 | 22 | 19 | 28 | $133,134 | $108,432 | $147,041 | $56,252 |
| CT | 0.0007 | 4 | 4 | 3 | 5 | $23,456 | $19,500 | $25,598 | $10,564 |
| DC | 0.0006 | 0 | 0 | 0 | 0 | $927 | $775 | $1,008 | $425 |
| DE | 0.0016 | 2 | 2 | 1 | 2 | $9,979 | $7,943 | $11,165 | $3,913 |
| FL | 0.0003 | 11 | 12 | 10 | 17 | $68,824 | $58,661 | $73,983 | $33,374 |
| GA | 0.0009 | 27 | 31 | 25 | 42 | $176,240 | $150,021 | $189,602 | $85,143 |
| IA | 0.0007 | 6 | 6 | 6 | 7 | $40,034 | $30,470 | $45,881 | $13,394 |
| IL | 0.0008 | 27 | 30 | 26 | 37 | $179,218 | $144,755 | $198,881 | $73,728 |
| IN | 0.0006 | 10 | 10 | 9 | 12 | $62,282 | $48,840 | $70,258 | $23,206 |
| KS | 0.0027 | 27 | 30 | 26 | 40 | $178,850 | $148,340 | $195,450 | $79,973 |
| KY | 0.0004 | 5 | 5 | 5 | 5 | $30,227 | $23,483 | $34,270 | $10,899 |
| LA | 0.0005 | 5 | 5 | 5 | 6 | $34,511 | $26,132 | $39,654 | $11,327 |
| MA | 0.0008 | 5 | 6 | 5 | 7 | $33,380 | $27,285 | $36,790 | $14,266 |
| MD | 0.0009 | 7 | 7 | 6 | 9 | $43,528 | $35,723 | $47,864 | $18,838 |
| ME | 0.0016 | 3 | 3 | 3 | 3 | $22,357 | $16,613 | $25,936 | $6,816 |
| MI | 0.0007 | 13 | 13 | 12 | 15 | $82,012 | $64,560 | $92,320 | $30,968 |
| MN | 0.0003 | 9 | 10 | 9 | 13 | $62,124 | $50,114 | $68,989 | $25,453 |
| MO | 0.0016 | 30 | 33 | 29 | 42 | $196,787 | $161,225 | $216,604 | $84,711 |
| MS | 0.0006 | 5 | 5 | 5 | 6 | $34,120 | $26,506 | $38,683 | $12,301 |
| NC | 0.0007 | 13 | 15 | 12 | 20 | $83,460 | $71,474 | $89,452 | $41,030 |

(continued)

Table 10-20. Estimated Benefits of 2020 With CAIR Control Option 2:  Relative to 2020 with CAIR—Population Centroid Approach (continued)

| State | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
| ND | 0.0005 | 1 | 1 | 1 | 1 | $6,901 | $5,270 | $7,896 | $2,337 |
| NE | 0.0015 | 10 | 10 | 9 | 13 | $62,393 | $50,688 | $69,011 | $26,150 |
| NH | 0.0010 | 2 | 2 | 2 | 3 | $14,166 | $11,457 | $15,710 | $5,852 |
| NJ | 0.0018 | 15 | 17 | 14 | 21 | $99,911 | $81,948 | $109,901 | $43,160 |
| NY | 0.0012 | 23 | 24 | 22 | 29 | $149,088 | $118,099 | $167,255 | $57,508 |
| OH | 0.0001 | 1 | 1 | 1 | 2 | $8,284 | $6,667 | $9,212 | $3,368 |
| OK | 0.0014 | 21 | 23 | 20 | 28 | $136,825 | $110,719 | $151,679 | $56,625 |
| PA | 0.0023 | 35 | 37 | 34 | 42 | $228,368 | $178,561 | $258,016 | $84,236 |
| RI | 0.0007 | 1 | 1 | 1 | 1 | $4,147 | $3,377 | $4,581 | $1,751 |
| SC | 0.0008 | 8 | 9 | 8 | 10 | $52,469 | $41,957 | $58,555 | $20,888 |
| SD | 0.0006 | 2 | 2 | 2 | 2 | $10,937 | $8,498 | $12,399 | $3,946 |
| TN | 0.0006 | 10 | 11 | 10 | 14 | $67,360 | $54,560 | $74,632 | $27,962 |
| TX | 0.0005 | 44 | 49 | 41 | 66 | $285,177 | $239,171 | $309,587 | $131,872 |
| VA | 0.0033 | 49 | 54 | 46 | 69 | $321,251 | $263,882 | $353,067 | $139,419 |
| VT | 0.0007 | 1 | 1 | 1 | 1 | $5,233 | $3,973 | $6,005 | $1,734 |
| WI | 0.0010 | 17 | 18 | 17 | 20 | $110,883 | $86,510 | $125,426 | $40,588 |
| WV | 0.0010 | 3 | 3 | 3 | 3 | $20,928 | $15,579 | $24,255 | $6,427 |

[a]  Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table.

[b]  Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.

[c]  Per capita IQ decrements and mercury ingestion rate vary only very slightly across different lag periods.  Therefore, for brevity sake, we report the results for the 10 year lag period case.

**Table 10-21. Summary of Annual Benefit Estimates: Population Centroid Approach[a]**

| | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
|---|---|---|---|---|
| | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| **Annual Number of Prenatally Exposed Children** | | | | |
| 2001 Base Case | 452,575 | 486,487 | 442,938 | 632,017 |
| 2020 Base Case (with CAIR) | 528,721 | 577,910 | 504,127 | 725,474 |
| **Total Value of Benefits (1999$s)** | | | | |
| 2001 Utility Emissions Zero-Out (Relative to 2001 Base Case) | | | | |
| 1% Discount Rate; Present Value in 2001 | N/A | N/A | N/A | $26,559,677 |
| 3% Discount Rate; Present Value in 2001 | $24,080,244 | $18,973,876 | $27,522,949 | $9,963,920 |
| 7% Discount Rate; Present Value in 2001 | $16,451,115 | $8,855,743 | $22,748,995 | $1,482,868 |
| 2020 Base Case with CAIR (Relative to 2001 Base Case applied to 2020 demographics) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $28,048,124 |
| 3% Discount Rate; Present Value in 2020 | $25,335,445 | $20,524,068 | $28,068,173 | $10,522,314 |
| 7% Discount Rate; Present Value in 2020 | $17,308,643 | $9,579,269 | $23,199,647 | $1,565,971 |
| 2020 Utility Emissions Zero-Out (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $10,939,580 |
| 3% Discount Rate; Present Value in 2020 | $9,962,464 | $8,050,132 | $11,052,917 | $4,104,007 |
| 7% Discount Rate; Present Value in 2020 | $6,806,145 | $3,757,266 | $9,135,749 | $610,774 |
| **BENEFITS OF CONTROL OPTIONS** | | | | |
| 2020 CAMR Control Option 1 (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $2,300,269 |
| 3% Discount Rate; Present Value in 2020 | $2,086,359 | $1,687,988 | $2,313,079 | $862,951 |
| 7% Discount Rate; Present Value in 2020 | $1,425,357 | $787,840 | $1,911,867 | $128,428 |
| 2020 CAMR Control Option 2 (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $3,471,289 |
| 3% Discount Rate; Present Value in 2020 | $3,112,816 | $2,527,403 | $3,444,104 | $1,302,261 |
| 7% Discount Rate; Present Value in 2020 | $2,126,610 | $1,179,624 | $2,846,712 | $193,807 |

[a]  Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.

Figure 10-8 displays the estimated spatial distribution of 2001 baseline average mercury ingestion rates across HUCs in the study area. Maine, Pennsylvania, Massachusetts, and New Hampshire are the main states with high levels for average mercury ingestion rates. Given that the fish consumption rate is constant across the study area, the higher mercury ingestion rate in these states is primarily due to the relatively high average fish tissue mercury concentrations in these states (as evident from Table 10-2). Figure 10-9 displays the 2001 baseline distribution of total IQ point decrements across HUCs in the study area. States like New York, Texas, Florida, Pennsylvania, and Ohio have higher total IQ decrements because of higher mercury concentration and higher number of anglers together. The distribution of estimated percentage reductions in per capita IQ decrements associated with the 2001 Utility Emissions Zero-Out scenario are displayed in Figure 10-10. Higher percentage reductions from the baseline risk levels are mostly in Pennsylvania, Ohio, Virginia and West Virginia.

Table 10-22 summarizes model results for the 2001 Base Case, based on exposure estimates from the angler destination approach in 2001. The estimated annual number of prenatally exposed children in freshwater angler households is close to 587,000. The states with the largest estimated exposed populations are Texas, Minnesota and Illinois. The average daily mercury ingestion rate for pregnant women in freshwater angler households (HgI) was estimated to be 2.7 μg/day for the entire study area. The states with the highest average rates were primarily in the Northeast (except for Florida). For example, the average rates for Maine, Pennsylvania and New Hampshire were all estimated to be above 4 μg/day under baseline conditions.[23] Average IQ decrements in prenatally exposed children were estimated to be 0.07 points for the study area.

Under baseline conditions in 2001, the total IQ losses associated with self-caught freshwater fish consumption were estimated to be 40,200 IQ points and the present value in 2001 of foregone earnings associated with these IQ decrements was estimated to sum to $354 million (in 1999 dollars).

---

[23] The average daily mercury ingestion rate given here of 2.7 ug/day from freshwater fish is below the EPA's Reference Dose (RfD) for mercury of 5.8 ug/day. This estimate does not account for total exposure from consumption from other rifhs sources. See Section 11 of this report for a detailed discussion of the implication of the RfD on this analysis.



**Figure 10-8.  Spatial Distribution of Estimated Average Daily Maternal Mercury Ingestion Rates:  Angler Destination Approach—2001 Base Case**



**Figure 10-9.  Spatial Distribution of Estimated IQ Decrements per HUC:  Angler Destination Approach—2001 Base Case**



**Figure 10-10.  Spatial Distribution of Estimated Percent Reduction in IQ Losses: Improvement with 2001 Utility Emissions Zero Out Scenario (Zero Lag)**

**Table 10-22. Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings: Angler Destination Approach—2001 Base Case[a]**

| | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2001; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| **Study Area** | 586,516 | 2.68 | 1.55 | 0.069 | 0.040 | 40,207 | $604 | $350 | $354,113,271 |
| **State** | | | | | | | | | |
| AL | 13,077 | 1.70 | 1.31 | 0.043 | 0.034 | 569 | $383 | $296 | $5,009,131 |
| AR | 14,669 | 2.32 | 1.01 | 0.059 | 0.026 | 872 | $524 | $229 | $7,680,796 |
| CT | 4,762 | 2.95 | 1.34 | 0.075 | 0.034 | 359 | $665 | $302 | $3,165,411 |
| DC | 8 | 1.08 | 0.06 | 0.028 | 0.002 | 0 | $242 | $13 | $1,978 |
| DE | 592 | 2.06 | 0.60 | 0.053 | 0.015 | 31 | $463 | $136 | $274,454 |
| FL | 22,748 | 3.56 | 1.41 | 0.091 | 0.036 | 2,074 | $803 | $318 | $18,269,235 |
| GA | 21,530 | 2.91 | 1.58 | 0.074 | 0.040 | 1,603 | $656 | $355 | $14,115,893 |
| IA | 12,069 | 1.95 | 0.72 | 0.050 | 0.018 | 601 | $438 | $162 | $5,291,262 |
| IL | 33,696 | 1.84 | 0.96 | 0.047 | 0.025 | 1,586 | $415 | $217 | $13,971,988 |
| IN | 23,517 | 2.38 | 0.78 | 0.061 | 0.020 | 1,430 | $536 | $177 | $12,597,628 |
| KS | 11,929 | 2.90 | 1.03 | 0.074 | 0.026 | 885 | $653 | $233 | $7,793,163 |
| KY | 15,840 | 2.39 | 0.60 | 0.061 | 0.015 | 969 | $539 | $134 | $8,536,621 |
| LA | 12,491 | 2.47 | 0.93 | 0.063 | 0.024 | 790 | $557 | $210 | $6,961,559 |
| MA | 6,808 | 3.45 | 1.08 | 0.088 | 0.028 | 602 | $778 | $243 | $5,299,186 |
| MD | 7,318 | 1.32 | 1.00 | 0.034 | 0.026 | 247 | $297 | $225 | $2,175,909 |
| ME | 2,977 | 5.54 | 1.39 | 0.142 | 0.035 | 422 | $1,249 | $312 | $3,717,653 |
| MI | 20,998 | 2.72 | 1.16 | 0.070 | 0.030 | 1,462 | $613 | $262 | $12,875,688 |
| MN | 36,700 | 2.03 | 0.71 | 0.052 | 0.018 | 1,903 | $457 | $161 | $16,756,418 |
| MO | 19,720 | 2.64 | 0.53 | 0.068 | 0.013 | 1,332 | $595 | $119 | $11,729,835 |
| MS | 12,417 | 2.84 | 0.57 | 0.073 | 0.014 | 901 | $639 | $128 | $7,937,478 |
| NC | 19,451 | 2.79 | 1.02 | 0.071 | 0.026 | 1,389 | $629 | $229 | $12,237,634 |

(continued)

**Table 10–22. Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings: Angler Destination Approach—2001 Base Case (continued)**

| State | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (μg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Forgone Net Earnings due to IQ Decrements (in 2001; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| ND | 2,684 | 2.78 | 0.37 | 0.071 | 0.009 | 191 | $626 | $83 | $1,680,883 |
| NE | 5,477 | 2.26 | 0.79 | 0.058 | 0.020 | 317 | $510 | $178 | $2,795,383 |
| NH | 2,805 | 4.45 | 1.33 | 0.114 | 0.034 | 319 | $1,002 | $301 | $2,809,423 |
| NJ | 10,520 | 3.35 | 1.47 | 0.086 | 0.037 | 903 | $756 | $330 | $7,952,715 |
| NY | 21,401 | 3.67 | 1.46 | 0.094 | 0.037 | 2,011 | $828 | $328 | $17,712,372 |
| OH | 30,556 | 2.88 | 1.05 | 0.074 | 0.027 | 2,255 | $650 | $236 | $19,859,741 |
| OK | 23,791 | 2.42 | 1.18 | 0.062 | 0.030 | 1,470 | $544 | $265 | $12,950,097 |
| PA | 24,704 | 4.75 | 5.05 | 0.121 | 0.129 | 3,000 | $1,069 | $1,138 | $26,420,063 |
| RI | 835 | 3.28 | 0.60 | 0.084 | 0.015 | 70 | $740 | $135 | $618,220 |
| SC | 11,837 | 3.06 | 1.01 | 0.078 | 0.026 | 925 | $689 | $228 | $8,150,271 |
| SD | 3,798 | 2.49 | 0.66 | 0.064 | 0.017 | 242 | $561 | $149 | $2,131,921 |
| TN | 20,723 | 2.44 | 0.74 | 0.063 | 0.019 | 1,295 | $550 | $167 | $11,407,980 |
| TX | 64,537 | 2.47 | 0.65 | 0.063 | 0.017 | 4,084 | $557 | $147 | $35,973,218 |
| VA | 18,224 | 2.11 | 1.06 | 0.054 | 0.027 | 982 | $474 | $239 | $8,647,351 |
| VT | 1,726 | 3.68 | 1.69 | 0.094 | 0.043 | 163 | $830 | $381 | $1,431,637 |
| WI | 24,429 | 2.48 | 0.62 | 0.063 | 0.016 | 1,551 | $559 | $139 | $13,660,658 |
| WV | 5,149 | 3.03 | 1.00 | 0.077 | 0.026 | 399 | $682 | $225 | $3,512,420 |

[a] Benefits analyses using the angler destination approach were conducted at a HUC level, but the results are aggregated and reported at a state level in this table.

Table 10-23 summarizes model results for the 2020 Base Case with CAIR based on the exposure estimates from the angler destination approach. Due to population growth between 2001 and 2020, the estimated annual number of prenatally exposed children in freshwater angler households is approximately 675,000. The average daily mercury ingestion rate for pregnant women in freshwater angler households (HgI) was estimated to be roughly 13 percent below levels from the 2001 Base Case, at 2.33 μg/day for the entire study area. The states with the highest estimated average rates continued to be primarily in Northeast. Average IQ decrements in prenatally exposed children were estimated to be less than 0.06 points for the study area. Under the 2020 conditions with CAIR, the total IQ losses associated with self-caught freshwater fish consumption were estimated to be 40,200 and the present value in 2020 of foregone net earnings associated with these IQ decrements was estimated at $354 million (in 1999 dollars). These aggregate estimates are very similar to the 2001 Base Case results – the increase in exposed population from 2001 to 2020 and the reduction in mercury levels due to CAIR have roughly offsetting effects on the estimates of total IQ decrements.

Tables 10-24, 10-25, and 10-26 report estimated *reductions* in exposures, IQ decrements, and net earnings losses associated with CAIR and the two utility emissions zero-out scenarios. Based on the response times from the case studies discussed in Section 3[24], to reflect the possibility that reductions in mercury emissions in 2020 would have lagged effects on fish tissue concentrations, we present a range of benefits based on the 10 and 20 year lags as central estimates. We also provide results for the 5 and 50 year lags to demonstrate how benefits would differ under shorter and longer lag periods.

Table 10-24 reports results for the 2020 with CAIR scenario, by comparing them to conditions with (1) 2001 Base Case mercury levels in fish and (2) exposed population levels in 2020 to 2070. The per capita IQ decrements were estimated to decrease by 0.0089 points (13 percent). Total IQ decrements were estimated to decrease by 6,700 to 7,400 points in 2020 under a 10 to 20 year lag period. The mercury emission reductions associated with CAIR are estimated to reduce the present value of total net earnings losses due to prenatal exposures in 2020 by approximately $44.7 to $36 million under the 10 to 20 year lag periods. Under the alternative lag periods considered in the analysis, the total IQ decrements avoided and monetary value of benefits are 6,300 IQ points at a value of $48.1 million under a 5 year lag and 9,400 IQ points at a value of $19 million under a 50 year lag.

Table 10-25 reports results for the 2001 Zero-Out relative to the 2001 Base Case. The average per capita IQ decrements in prenatally exposed children were estimated to decline by roughly 13 percent under the zero out scenario, decreasing by an average of 0.009 points over the entire study area. As shown in Table 10-25 (and Figure 10-10), the states that were estimated to benefit from the largest per capita reductions in IQ losses are Pennsylvania, West Virginia, and Ohio (0.18 or more points in each state). Total IQ decrements avoided are estimated to decrease by approximately 5,600 to 6,200 points in 2020 under a 10 to 20 year lag

---

[24] Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more. The medium response scenarios also varied widely but were generally on the order of one to three decades.

period.  The mercury emission reductions associated with the 2001 zero out of utility emissions are estimated to reduce the present value of total net earnings losses due to prenatal exposures in 2020 by approximately $30.0 to $37.0 million under the 10 to 20 year lag periods.  Under the alternative lag periods considered in the analysis, the total IQ decrements avoided and monetary value of benefits are 5,500 IQ points at a value of $41.5 million under a 5 year lag and 8,200 IQ points at a value of $16.5 million under a 50 year lag.

Table 10-26 reports results for the 2020 Utility Emissions Zero-Out relative to the 2020 Base Case with CAIR.  The average daily mercury ingestion rate for pregnant women in freshwater angler households and average per capita IQ decrements in prenatally exposed children were estimated to decrease by roughly 6 percent for the entire study area.  Total IQ decrements avoided are estimated to decrease by approximately 2,400 to 2,700 points in 2020 under a 10 to 20 year lag period.  The mercury emission reductions associated with CAIR are estimated to reduce the present value of total net earnings losses due to prenatal exposures in 2020 by approximately $13.1 to $16.0 million under the 10 to 20 year lag periods.  Under the alternative lag periods considered in the analysis, the total IQ decrements avoided and monetary value of benefits are 2,300 IQ points at a value of $17.7 million under a 5 year lag and 3,500 IQ points at a value of $6.9 million under a 50 year lag.

**Table 10-23. Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings: Angler Destination Approach—2020 with CAIR[a]**

| Study Area | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2020; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| **Study Area** | 674,357 | 2.33 | 1.28 | 0.060 | 0.033 | 40,211 | $525 | $289 | $354,146,357 |
| **State** | | | | | | | | | |
| AL | 15,035 | 1.44 | 1.19 | 0.037 | 0.030 | 554 | $325 | $268 | $4,880,859 |
| AR | 16,866 | 2.17 | 0.92 | 0.055 | 0.024 | 935 | $488 | $208 | $8,238,433 |
| CT | 5,475 | 2.52 | 1.28 | 0.064 | 0.033 | 353 | $567 | $288 | $3,105,516 |
| DC | 9 | 0.68 | 0.07 | 0.017 | 0.002 | 0 | $153 | $15 | $1,440 |
| DE | 681 | 1.80 | 0.54 | 0.046 | 0.014 | 31 | $405 | $121 | $276,132 |
| FL | 26,155 | 3.25 | 1.40 | 0.083 | 0.036 | 2,178 | $733 | $316 | $19,180,880 |
| GA | 24,755 | 2.52 | 1.46 | 0.064 | 0.037 | 1,595 | $567 | $329 | $14,048,148 |
| IA | 13,876 | 1.77 | 0.62 | 0.045 | 0.016 | 629 | $399 | $139 | $5,537,508 |
| IL | 38,743 | 1.59 | 0.81 | 0.041 | 0.021 | 1,573 | $357 | $182 | $13,849,691 |
| IN | 27,039 | 2.03 | 0.70 | 0.052 | 0.018 | 1,407 | $458 | $157 | $12,391,617 |
| KS | 13,716 | 2.62 | 1.02 | 0.067 | 0.026 | 920 | $591 | $229 | $8,102,384 |
| KY | 18,213 | 2.03 | 0.55 | 0.052 | 0.014 | 947 | $458 | $125 | $8,339,087 |
| LA | 14,362 | 2.28 | 0.84 | 0.058 | 0.021 | 838 | $514 | $189 | $7,376,996 |
| MA | 7,828 | 3.00 | 0.94 | 0.077 | 0.024 | 602 | $677 | $211 | $5,299,712 |
| MD | 8,414 | 1.06 | 0.79 | 0.027 | 0.020 | 227 | $238 | $177 | $2,002,919 |
| ME | 3,423 | 5.23 | 1.36 | 0.134 | 0.035 | 458 | $1,178 | $306 | $4,033,529 |
| MI | 24,143 | 2.46 | 1.11 | 0.063 | 0.028 | 1,520 | $555 | $250 | $13,388,662 |
| MN | 42,196 | 1.92 | 0.70 | 0.049 | 0.018 | 2,069 | $432 | $158 | $18,222,891 |
| MO | 22,673 | 2.39 | 0.47 | 0.061 | 0.012 | 1,384 | $538 | $107 | $12,187,216 |
| MS | 14,277 | 2.52 | 0.52 | 0.065 | 0.013 | 921 | $568 | $116 | $8,113,273 |
| NC | 22,364 | 2.30 | 0.92 | 0.059 | 0.023 | 1,316 | $518 | $207 | $11,587,446 |

(continued)

**Table 10-23. Summary of Estimated Mercury Exposures, with Associated IQ Decrements and Foregone Earnings: Angler Destination Approach—2020 with CAIR (continued)**

| State | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2020; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| ND | 3,086 | 2.56 | 0.33 | 0.066 | 0.008 | 202 | $578 | $75 | $1,782,188 |
| NE | 6,297 | 2.07 | 0.70 | 0.053 | 0.018 | 334 | $467 | $159 | $2,940,513 |
| NH | 3,225 | 4.07 | 1.24 | 0.104 | 0.032 | 336 | $918 | $278 | $2,959,412 |
| NJ | 12,096 | 3.06 | 1.39 | 0.078 | 0.036 | 947 | $689 | $314 | $8,337,532 |
| NY | 24,606 | 3.17 | 1.26 | 0.081 | 0.032 | 1,998 | $715 | $283 | $17,595,195 |
| OH | 35,133 | 2.20 | 0.70 | 0.056 | 0.018 | 1,975 | $495 | $158 | $17,390,082 |
| OK | 27,354 | 2.23 | 1.07 | 0.057 | 0.027 | 1,562 | $503 | $240 | $13,758,988 |
| PA | 28,404 | 3.60 | 3.85 | 0.092 | 0.098 | 2,619 | $812 | $867 | $23,070,030 |
| RI | 961 | 2.93 | 0.56 | 0.075 | 0.014 | 72 | $660 | $127 | $634,231 |
| SC | 13,610 | 2.66 | 0.93 | 0.068 | 0.024 | 926 | $599 | $209 | $8,154,050 |
| SD | 4,367 | 2.23 | 0.56 | 0.057 | 0.014 | 249 | $502 | $125 | $2,191,439 |
| TN | 23,827 | 2.00 | 0.64 | 0.051 | 0.016 | 1,217 | $450 | $143 | $10,719,756 |
| TX | 74,202 | 2.21 | 0.57 | 0.057 | 0.015 | 4,199 | $498 | $129 | $36,978,242 |
| VA | 20,954 | 1.75 | 0.93 | 0.045 | 0.024 | 938 | $394 | $209 | $8,261,322 |
| VT | 1,984 | 3.25 | 1.42 | 0.083 | 0.036 | 165 | $731 | $321 | $1,451,289 |
| WI | 28,088 | 2.32 | 0.59 | 0.059 | 0.015 | 1,667 | $523 | $134 | $14,680,994 |
| WV | 5,921 | 2.31 | 0.64 | 0.059 | 0.016 | 349 | $520 | $144 | $3,076,753 |

[a] Benefits analyses using the angler destination approach were conducted at a HUC level, but the results are aggregated and reported at a state level in this table. For comparison purposes with the Base Cases in 2001, benefits presented in this table do not incorporate potential lags in fish tissue response to a change in mercury deposition.

**Table 10-24. 2020 Base Case with CAIR:  Modelled Avoided Losses Relative to 2001 Base Case Applied to 2020 Demographics—Angler Destination Approach[a, b]**

| Study Area | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
| Study Area | 0.0089 | 6,679 | 7,363 | 6,337 | 9,415 | $43,769,459 | $35,903,739 | $48,142,771 | $18,913,979 |
| **State** | | | | | | | | | |
| AL | 0.0066 | 111 | 122 | 105 | 156 | $725,459 | $595,088 | $797,945 | $313,491 |
| AR | 0.0040 | 75 | 82 | 71 | 105 | $489,454 | $401,495 | $538,359 | $211,506 |
| CT | 0.0111 | 67 | 74 | 64 | 95 | $440,961 | $361,717 | $485,021 | $190,551 |
| DC | 0.0101 | 0.11 | 0.12 | 0.10 | 0.15 | $689 | $565 | $758 | $298 |
| DE | 0.0066 | 5 | 5 | 5 | 7 | $32,559 | $26,708 | $35,812 | $14,070 |
| FL | 0.0079 | 230 | 253 | 218 | 324 | $1,506,686 | $1,235,923 | $1,657,230 | $651,080 |
| GA | 0.0100 | 275 | 303 | 261 | 388 | $1,801,801 | $1,478,003 | $1,981,831 | $778,607 |
| IA | 0.0045 | 69 | 76 | 65 | 97 | $451,069 | $370,009 | $496,139 | $194,919 |
| IL | 0.0065 | 279 | 308 | 265 | 393 | $1,829,053 | $1,500,357 | $2,011,806 | $790,384 |
| IN | 0.0088 | 264 | 291 | 250 | 372 | $1,728,205 | $1,417,632 | $1,900,882 | $746,804 |
| KS | 0.0071 | 108 | 119 | 103 | 152 | $708,499 | $581,176 | $779,290 | $306,162 |
| KY | 0.0092 | 186 | 205 | 176 | 262 | $1,218,938 | $999,885 | $1,340,731 | $526,736 |
| LA | 0.0050 | 79 | 87 | 75 | 111 | $517,930 | $424,854 | $569,681 | $223,812 |
| MA | 0.0115 | 100 | 110 | 95 | 141 | $654,970 | $537,266 | $720,412 | $283,030 |
| MD | 0.0067 | 63 | 69 | 60 | 89 | $411,975 | $337,940 | $453,138 | $178,026 |
| ME | 0.0080 | 30 | 33 | 29 | 43 | $198,943 | $163,191 | $218,821 | $85,969 |
| MI | 0.0067 | 178 | 197 | 169 | 251 | $1,168,843 | $958,792 | $1,285,630 | $505,089 |
| MN | 0.0028 | 131 | 145 | 125 | 185 | $861,393 | $706,594 | $947,461 | $372,232 |
| MO | 0.0065 | 164 | 181 | 155 | 231 | $1,073,033 | $880,201 | $1,180,247 | $463,687 |
| MS | 0.0081 | 128 | 141 | 121 | 180 | $836,533 | $686,202 | $920,117 | $361,489 |
| NC | 0.0126 | 313 | 345 | 297 | 441 | $2,050,491 | $1,682,001 | $2,255,369 | $886,073 |

(continued)

**Table 10-24. 2020 Base Case with CAIR: Modelled Avoided Losses Relative to 2001 Base Case Applied to 2020 Demographics—Angler Destination Approach (continued)**

| State | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
|---|---|---|---|---|---|---|---|---|---|
| ND | 0.0055 | 19 | 21 | 18 | 27 | $124,232 | $101,907 | $136,645 | $53,684 |
| NE | 0.0049 | 34 | 38 | 33 | 49 | $225,882 | $185,289 | $248,451 | $97,610 |
| NH | 0.0095 | 34 | 38 | 32 | 48 | $223,606 | $183,422 | $245,948 | $96,626 |
| NJ | 0.0076 | 102 | 112 | 96 | 143 | $665,803 | $546,153 | $732,328 | $287,712 |
| NY | 0.0128 | 349 | 385 | 331 | 492 | $2,287,436 | $1,876,365 | $2,515,989 | $988,464 |
| OH | 0.0176 | 686 | 756 | 651 | 967 | $4,495,750 | $3,687,828 | $4,944,952 | $1,942,736 |
| OK | 0.0047 | 142 | 157 | 135 | 201 | $933,671 | $765,883 | $1,026,961 | $403,465 |
| PA | 0.0292 | 921 | 1,015 | 874 | 1,298 | $6,034,162 | $4,949,775 | $6,637,078 | $2,607,526 |
| RI | 0.0091 | 10 | 11 | 9 | 14 | $63,239 | $51,874 | $69,557 | $27,327 |
| SC | 0.0102 | 153 | 169 | 145 | 216 | $1,004,906 | $824,316 | $1,105,313 | $434,247 |
| SD | 0.0068 | 33 | 36 | 31 | 46 | $214,525 | $175,974 | $235,960 | $92,702 |
| TN | 0.0114 | 302 | 333 | 287 | 426 | $1,979,290 | $1,623,596 | $2,177,054 | $855,305 |
| TX | 0.0067 | 552 | 609 | 524 | 778 | $3,619,204 | $2,968,804 | $3,980,824 | $1,563,957 |
| VA | 0.0091 | 212 | 234 | 201 | 299 | $1,388,296 | $1,138,808 | $1,527,011 | $599,921 |
| VT | 0.0111 | 25 | 27 | 23 | 35 | $160,835 | $131,932 | $176,906 | $69,501 |
| WI | 0.0041 | 129 | 142 | 123 | 182 | $846,939 | $694,737 | $931,562 | $365,985 |
| WV | 0.0184 | 121 | 134 | 115 | 171 | $794,199 | $651,475 | $873,553 | $343,195 |

[a] Benefits analyses using the angler destination approach were conducted at a HUC level, but for summary purposes the results are aggregated and reported at a state level in this table.

[b] Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more. The medium response scenarios also varied widely but were generally on the order of one to three decades.

[c] Estimated per capita IQ decrements and mercury ingestion rate do not vary across different lag periods with the angler destination approach.

**Table 10-25. 2001 Utility Mercury Emissions Zero Out: Modelled Avoided Losses Relative to 2001 Base Case—Angler Destination Approach[a,b]**

| Study Area | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2001; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
|---|---|---|---|---|---|---|---|---|---|
| **Study Area** | 0.0090 | 5,636 | 6,148 | 5,460 | 8,202 | $36,934,050 | $29,978,191 | $41,479,456 | $16,477,629 |
| **State** | | | | | | | | | |
| AL | 0.0066 | 91 | 100 | 89 | 133 | $599,322 | $486,451 | $673,079 | $267,379 |
| AR | 0.0051 | 79 | 86 | 77 | 115 | $517,992 | $420,437 | $581,740 | $231,095 |
| CT | 0.0060 | 30 | 33 | 29 | 44 | $198,764 | $161,331 | $223,226 | $88,676 |
| DC | 0.0081 | 0 | 0 | 0 | 0 | $460 | $373 | $516 | $205 |
| DE | 0.0066 | 4 | 5 | 4 | 6 | $27,293 | $22,153 | $30,652 | $12,176 |
| FL | 0.0055 | 134 | 146 | 130 | 195 | $876,952 | $711,794 | $984,877 | $391,240 |
| GA | 0.0093 | 213 | 233 | 207 | 310 | $1,397,305 | $1,134,148 | $1,569,269 | $623,389 |
| IA | 0.0051 | 65 | 71 | 63 | 95 | $426,459 | $346,143 | $478,942 | $190,259 |
| IL | 0.0076 | 273 | 298 | 264 | 397 | $1,788,859 | $1,451,960 | $2,009,010 | $798,075 |
| IN | 0.0095 | 237 | 258 | 229 | 345 | $1,552,030 | $1,259,734 | $1,743,036 | $692,417 |
| KS | 0.0074 | 94 | 102 | 91 | 136 | $614,414 | $498,700 | $690,029 | $274,113 |
| KY | 0.0087 | 147 | 160 | 142 | 214 | $961,667 | $780,554 | $1,080,017 | $429,035 |
| LA | 0.0050 | 66 | 73 | 64 | 97 | $435,766 | $353,698 | $489,395 | $194,411 |
| MA | 0.0087 | 63 | 69 | 61 | 92 | $414,894 | $336,756 | $465,954 | $185,099 |
| MD | 0.0069 | 53 | 58 | 52 | 78 | $350,194 | $284,241 | $393,292 | $156,234 |
| ME | 0.0051 | 16 | 18 | 16 | 24 | $106,020 | $86,053 | $119,068 | $47,299 |
| MI | 0.0081 | 181 | 197 | 175 | 263 | $1,184,445 | $961,376 | $1,330,212 | $528,424 |
| MN | 0.0018 | 69 | 75 | 67 | 100 | $450,121 | $365,349 | $505,517 | $200,815 |
| MO | 0.0067 | 141 | 153 | 136 | 205 | $921,773 | $748,173 | $1,035,213 | $411,236 |
| MS | 0.0075 | 99 | 108 | 96 | 143 | $646,120 | $524,435 | $725,636 | $288,258 |
| NC | 0.0122 | 252 | 275 | 244 | 367 | $1,652,481 | $1,341,266 | $1,855,848 | $737,232 |

(continued)

**Table 10-25. 2001 Utility Mercury Emissions Zero Out: Modelled Avoided Losses Relative to 2001 Base Case—Angler Destination Approach (continued)**

| | | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2001: 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| State | Per Capita[c] | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
|---|---|---|---|---|---|---|---|---|---|
| ND | 0.0051 | 15 | 16 | 14 | 21 | $95,044 | $77,145 | $106,741 | $42,403 |
| NE | 0.0047 | 28 | 30 | 27 | 40 | $181,100 | $146,993 | $203,388 | $80,795 |
| NH | 0.0068 | 20 | 22 | 20 | 30 | $133,480 | $108,341 | $149,907 | $59,550 |
| NJ | 0.0125 | 140 | 153 | 135 | 203 | $916,294 | $743,727 | $1,029,061 | $408,792 |
| NY | 0.0125 | 284 | 310 | 275 | 414 | $1,863,495 | $1,512,540 | $2,092,832 | $831,373 |
| OH | 0.0180 | 586 | 639 | 568 | 853 | $3,841,667 | $3,118,159 | $4,314,454 | $1,713,908 |
| OK | 0.0052 | 133 | 145 | 128 | 193 | $868,975 | $705,320 | $975,919 | $387,682 |
| PA | 0.0323 | 851 | 928 | 824 | 1,238 | $5,575,486 | $4,525,445 | $6,261,651 | $2,487,428 |
| RI | 0.0091 | 8 | 9 | 8 | 12 | $52,962 | $42,987 | $59,480 | $23,628 |
| SC | 0.0106 | 134 | 146 | 129 | 194 | $875,061 | $710,259 | $982,753 | $390,397 |
| SD | 0.0065 | 26 | 29 | 25 | 38 | $172,035 | $139,635 | $193,206 | $76,751 |
| TN | 0.0109 | 241 | 263 | 234 | 351 | $1,580,236 | $1,282,627 | $1,774,712 | $705,001 |
| TX | 0.0064 | 438 | 478 | 425 | 638 | $2,873,128 | $2,332,026 | $3,226,719 | $1,281,807 |
| VA | 0.0103 | 200 | 218 | 193 | 291 | $1,308,459 | $1,062,035 | $1,469,489 | $583,751 |
| VT | 0.0070 | 13 | 14 | 13 | 19 | $84,701 | $68,749 | $95,125 | $37,788 |
| WI | 0.0042 | 109 | 119 | 106 | 159 | $716,280 | $581,382 | $804,432 | $319,559 |
| WV | 0.0187 | 103 | 112 | 99 | 149 | $672,317 | $545,698 | $755,058 | $299,945 |

[a] Benefits analyses using the angler destination approach were conducted at a HUC level, but for summary purposes the results are aggregated and reported at a state level in this table.

[b] Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.

[c] Estimated per capita IQ decrements and mercury ingestion rate do not vary across different lag periods with the angler destination approach.

**Table 10-26. 2020 with CAIR Emissions Zero Out: Modelled Avoided Losses Relative to 2020 with CAIR Base Case—Angler Destination Approach[a, b]**

| Study Area / State | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
|---|---|---|---|---|---|---|---|---|---|
| **Study Area** | 0.0033 | 2,452 | 2,703 | 2,327 | 3,457 | $16,071,187 | $13,183,067 | $17,676,972 | $6,944,799 |
| **State** | | | | | | | | | |
| AL | 0.0018 | 30 | 33 | 28 | 42 | $196,083 | $160,845 | $215,675 | $84,733 |
| AR | 0.0035 | 65 | 72 | 62 | 92 | $426,322 | $349,709 | $468,919 | $184,226 |
| CT | 0.0019 | 12 | 13 | 11 | 17 | $77,362 | $63,459 | $85,091 | $33,430 |
| DC | 0.0024 | 0 | 0 | 0 | 0 | $166 | $136 | $182 | $72 |
| DE | 0.0025 | 2 | 2 | 2 | 3 | $12,610 | $10,344 | $13,870 | $5,449 |
| FL | 0.0019 | 54 | 60 | 52 | 77 | $356,504 | $292,437 | $392,125 | $154,055 |
| GA | 0.0028 | 77 | 85 | 73 | 109 | $506,464 | $415,448 | $557,068 | $218,857 |
| IA | 0.0029 | 45 | 50 | 43 | 63 | $294,703 | $241,743 | $324,149 | $127,349 |
| IL | 0.0031 | 135 | 149 | 128 | 190 | $884,090 | $725,212 | $972,426 | $382,040 |
| IN | 0.0037 | 111 | 123 | 106 | 157 | $730,635 | $599,334 | $803,637 | $315,727 |
| KS | 0.0038 | 59 | 65 | 56 | 83 | $383,870 | $314,886 | $422,225 | $165,881 |
| KY | 0.0027 | 55 | 61 | 52 | 77 | $359,669 | $295,034 | $395,607 | $155,423 |
| LA | 0.0024 | 38 | 42 | 36 | 54 | $249,120 | $204,351 | $274,011 | $107,651 |
| MA | 0.0029 | 25 | 28 | 24 | 35 | $163,677 | $134,263 | $180,032 | $70,729 |
| MD | 0.0017 | 16 | 17 | 15 | 22 | $103,428 | $84,841 | $113,762 | $44,694 |
| ME | 0.0031 | 12 | 13 | 11 | 16 | $76,013 | $62,353 | $83,608 | $32,847 |
| MI | 0.0047 | 126 | 139 | 120 | 178 | $827,885 | $679,107 | $910,605 | $357,752 |
| MN | 0.0014 | 65 | 71 | 61 | 91 | $423,007 | $346,989 | $465,273 | $182,793 |
| MO | 0.0035 | 87 | 96 | 83 | 123 | $570,043 | $467,602 | $627,000 | $246,331 |
| MS | 0.0030 | 47 | 52 | 45 | 67 | $309,813 | $254,137 | $340,769 | $133,879 |
| NC | 0.0032 | 79 | 87 | 75 | 111 | $515,616 | $422,956 | $567,135 | $222,812 |

(continued)

**Table 10-26. 2020 with CAIR Emissions Zero Out: Modelled Avoided Losses Relative to 2020 with CAIR Base Case—Angler Destination Approach (continued)**

| | | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| State | Per Capita[c] | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
|---|---|---|---|---|---|---|---|---|---|
| ND | 0.0025 | 9 | 10 | 8 | 12 | $57,208 | $46,927 | $62,924 | $24,721 |
| NE | 0.0026 | 18 | 20 | 17 | 25 | $117,725 | $96,569 | $129,488 | $50,872 |
| NH | 0.0039 | 14 | 15 | 13 | 20 | $91,363 | $74,944 | $100,492 | $39,481 |
| NJ | 0.0057 | 77 | 85 | 73 | 109 | $504,947 | $414,204 | $555,399 | $218,201 |
| NY | 0.0038 | 105 | 115 | 99 | 147 | $685,370 | $562,204 | $753,850 | $296,167 |
| OH | 0.0043 | 166 | 183 | 158 | 234 | $1,089,536 | $893,738 | $1,198,399 | $470,818 |
| OK | 0.0031 | 94 | 104 | 90 | 133 | $618,670 | $507,490 | $680,485 | $267,344 |
| PA | 0.0081 | 254 | 280 | 241 | 358 | $1,664,222 | $1,365,148 | $1,830,505 | $719,156 |
| RI | 0.0034 | 4 | 4 | 3 | 5 | $23,529 | $19,301 | $25,880 | $10,168 |
| SC | 0.0036 | 55 | 61 | 52 | 78 | $360,945 | $296,080 | $397,009 | $155,974 |
| SD | 0.0027 | 13 | 14 | 12 | 18 | $85,529 | $70,159 | $94,075 | $36,959 |
| TN | 0.0026 | 70 | 77 | 66 | 99 | $458,050 | $375,735 | $503,817 | $197,936 |
| TX | 0.0026 | 211 | 232 | 200 | 297 | $1,381,894 | $1,133,556 | $1,519,968 | $597,154 |
| VA | 0.0037 | 86 | 95 | 82 | 121 | $563,901 | $462,563 | $620,244 | $243,677 |
| VT | 0.0023 | 5 | 5 | 5 | 7 | $32,641 | $26,775 | $35,902 | $14,105 |
| WI | 0.0035 | 108 | 119 | 102 | 152 | $706,115 | $579,220 | $776,667 | $305,131 |
| WV | 0.0038 | 25 | 27 | 24 | 35 | $162,463 | $133,267 | $178,696 | $70,205 |

a   Benefits analyses using the angler destination approach were conducted at a HUC level, but the results are aggregated and reported at a state level in this table.

b   Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.

c   Estimated per capita IQ decrements and mercury ingestion rate do not vary across different lag periods with the angler destination approach.

10-88

Table 10-27 report similar calculations for the 2020 CAMR Option 1.  Relative to the 2020 Base Case with CAIR, this option is estimated to reduce per capita IQ decrements across the study area by 0.0006 points.  Total IQ decrements avoided under Option 1 are estimated to decrease by approximately 460 to 500 points in 2020 under a 10 to 20 year lag period.  The mercury emission reductions associated with CAMR Option 1 are estimated to reduce the present value of total net earnings losses due to prenatal exposures in 2020 by approximately $2.5 to $3.0 million under the 10 to 20 year lag periods.  Under the alternative lag periods considered in the analysis, the total IQ decrements avoided and monetary value of benefits are 430 IQ points at a value of $3.3 million under a 5 year lag and 650 IQ points at a value of $1.3 million under a 50 year lag.

Table 10-28 report results of the 2020 CAMR Option 2.  Relative to the 2020 Base Case with CAIR, this option is estimated to reduce per capita IQ decrements across the study area by 0.0009 points.  Total IQ decrements avoided under Option 2 are estimated to decrease by approximately 700 to 775 points in 2020 under a 10 to 20 year lag period.  The mercury emission reductions associated with CAMR Option 2 are estimated to reduce the present value of total net earnings losses due to prenatal exposures in 2020 by approximately $3.8 to $4.6 million under the 10 to 20 year lag periods.  Under the alternative lag periods considered in the analysis, the total IQ decrements avoided and monetary value of benefits are 660 IQ points at a value of $5.0 million under a 5 year lag and 990 IQ points at a value of $2.0 million under a 50 year lag.

Table 10-29 summarizes the annual benefit estimates for CAMR Control Options 1 and 2, and it compares them to aggregate estimates associated with CAIR emissions reductions and the two Utility Emissions Zero-Out scenarios.  To assess the sensitivity of these results to the assumed rate at which future gains/losses are discounted, the benefit estimates are also reported assuming 3 and 7 percent discount rates.  In addition, we present a 1 percent discount rate for the 50 year lag period to reflect the discount rate for inter-generational effects as is recommended in the EPA Guidelines for Economic Analysis.  Using a 3 percent discount rate, the aggregate present value in 2020 of avoided net earnings losses due to reductions in mercury exposures for selected years were estimated to range between $2.5 to $3.0 million for Option 1 and between $3.8 to $4.6 million for Option 2.

In comparison to the other mercury emissions reductions, the estimated benefits of Option 1 are roughly 19 percent of the estimated benefits that would be achieved by eliminating utility mercury emissions (i.e., 2020 Utility Emissions Zero-Out).  The estimated benefits of Option 2 are almost 29 percent as large as those for the 2020 Utility Emissions Zero-Out scenario.

### 10.5.3  Comparison of Results from Two Approaches

Table 10-30 summarizes and compares results from the population centroid approach and the angler destination approach, for each of the selected years (i.e., lagged effects).  Assuming a 3 percent annual discount rate, the estimated annual benefits associated with the CAMR Option 1 range from $1.7 to $2.0 million with the population centroid approach and $2.5 to $3.0 million with the angler destination approach, for an average range across both approaches under the 10 to 20 year lag period of $1.7 to 3.0 million.  For CAMR Option 2, the annual benefits range from

$2.5 to $2.1 million with the population centroid approach and $3.8 to 4.6 million with the angler

**Table 10-27. Estimated Benefits of 2020 With CAIR Control Option 1:  Relative to 2020 with CAIR—Angler Destination Approach[a, b]**

| Study Area | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
| State | 0.0006 | 457 | 504 | 434 | 644 | $2,995,451 | $2,457,145 | $3,294,747 | $1,294,416 |
| AL | 0.0002 | 4 | 4 | 4 | 6 | $25,793 | $21,158 | $28,370 | $11,146 |
| AR | 0.0014 | 27 | 30 | 26 | 38 | $176,298 | $144,616 | $193,913 | $76,183 |
| CT | 0.0004 | 3 | 3 | 2 | 4 | $17,025 | $13,966 | $18,726 | $7,357 |
| DC | 0.0003 | 0 | 0 | 0 | 0 | $20 | $17 | $22 | $9 |
| DE | 0.0004 | 0 | 0 | 0 | 0 | $1,997 | $1,638 | $2,197 | $863 |
| FL | 0.0002 | 5 | 6 | 5 | 8 | $35,495 | $29,116 | $39,041 | $15,338 |
| GA | 0.0003 | 8 | 9 | 7 | 11 | $51,482 | $42,230 | $56,626 | $22,247 |
| IA | 0.0004 | 7 | 7 | 6 | 9 | $43,839 | $35,961 | $48,219 | $18,944 |
| IL | 0.0004 | 16 | 17 | 15 | 22 | $102,905 | $84,412 | $113,187 | $44,468 |
| IN | 0.0004 | 12 | 13 | 12 | 17 | $79,906 | $65,546 | $87,890 | $34,530 |
| KS | 0.0006 | 9 | 10 | 9 | 13 | $60,012 | $49,227 | $66,008 | $25,933 |
| KY | 0.0003 | 6 | 7 | 6 | 9 | $40,766 | $33,440 | $44,840 | $17,616 |
| LA | 0.0005 | 9 | 9 | 8 | 12 | $56,228 | $46,123 | $61,846 | $24,298 |
| MA | 0.0005 | 5 | 5 | 4 | 7 | $30,738 | $25,214 | $33,810 | $13,283 |
| MD | 0.0004 | 4 | 4 | 4 | 5 | $24,727 | $20,283 | $27,197 | $10,685 |
| ME | 0.0012 | 4 | 5 | 4 | 6 | $29,092 | $23,864 | $31,998 | $12,571 |
| MI | 0.0004 | 11 | 12 | 10 | 15 | $68,912 | $56,528 | $75,797 | $29,779 |
| MN | 0.0001 | 6 | 7 | 6 | 9 | $40,853 | $33,511 | $44,935 | $17,654 |
| MO | 0.0006 | 15 | 16 | 14 | 21 | $96,596 | $79,237 | $106,248 | $41,742 |
| MS | 0.0005 | 7 | 8 | 7 | 10 | $48,514 | $39,796 | $53,361 | $20,964 |
| NC | 0.0005 | 12 | 13 | 12 | 17 | $79,502 | $65,215 | $87,446 | $34,355 |

(continued)

**Table 10-27. Estimated Benefits of 2020 With CAIR Control Option 1: Relative to 2020 with CAIR—Angler Destination Approach (continued)**

| State | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| ND | 0.0006 | 2 | 2 | 2 | 3 | $12,868 | $10,556 | $14,154 | $5,561 |
| NE | 0.0004 | 3 | 3 | 3 | 4 | $20,484 | $16,803 | $22,530 | $8,852 |
| NH | 0.0012 | 4 | 5 | 4 | 6 | $28,501 | $23,379 | $31,349 | $12,316 |
| NJ | 0.0023 | 31 | 34 | 29 | 43 | $200,521 | $164,486 | $220,556 | $86,650 |
| NY | 0.0008 | 22 | 24 | 21 | 31 | $143,881 | $118,024 | $158,257 | $62,175 |
| OH | 0.0003 | 14 | 15 | 13 | 19 | $88,663 | $72,730 | $97,522 | $38,314 |
| OK | 0.0004 | 11 | 13 | 11 | 16 | $75,345 | $61,805 | $82,874 | $32,559 |
| PA | 0.0030 | 93 | 103 | 89 | 132 | $612,298 | $502,263 | $673,477 | $264,591 |
| RI | 0.0006 | 1 | 1 | 1 | 1 | $3,987 | $3,271 | $4,386 | $1,723 |
| SC | 0.0003 | 5 | 6 | 5 | 7 | $32,924 | $27,008 | $36,214 | $14,228 |
| SD | 0.0004 | 2 | 2 | 2 | 3 | $13,706 | $11,243 | $15,075 | $5,923 |
| TN | 0.0005 | 14 | 15 | 13 | 20 | $91,916 | $75,398 | $101,100 | $39,720 |
| TX | 0.0004 | 32 | 35 | 30 | 45 | $209,545 | $171,888 | $230,482 | $90,550 |
| VA | 0.0016 | 37 | 41 | 35 | 52 | $240,792 | $197,519 | $264,851 | $104,053 |
| VT | 0.0006 | 1 | 1 | 1 | 2 | $7,971 | $6,538 | $8,767 | $3,444 |
| WI | 0.0003 | 9 | 9 | 8 | 12 | $55,817 | $45,787 | $61,395 | $24,120 |
| WV | 0.0011 | 7 | 8 | 7 | 10 | $45,531 | $37,349 | $50,080 | $19,675 |

[a] Benefits analyses using the angler destination approach were conducted at a HUC level, but the results are aggregated and reported at a state level in this table.

[b] Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more. The medium response scenarios also varied widely but were generally on the order of one to three decades.

[c] Estimated per capita IQ decrements and mercury ingestion rate do not vary across different lag periods with the angler destination approach.

**Table 10-28. Estimated Benefits of 2020 With CAIR Control Option 2: Relative to 2020 with CAIR—Angler Destination Approach[a,b]**

| Study Area | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
|---|---|---|---|---|---|---|---|---|---|
| Study Area | 0.0009 | 700 | 772 | 664 | 987 | $4,586,570 | $3,762,327 | $5,044,846 | $1,981,982 |
| **State** | | | | | | | | | |
| AL | 0.0004 | 7 | 8 | 7 | 10 | $48,579 | $39,849 | $53,433 | $20,992 |
| AR | 0.0018 | 35 | 38 | 33 | 49 | $226,689 | $185,951 | $249,339 | $97,959 |
| CT | 0.0005 | 3 | 3 | 3 | 4 | $20,176 | $16,551 | $22,192 | $8,719 |
| DC | 0.0004 | 0 | 0 | 0 | 0 | $28 | $23 | $31 | $12 |
| DE | 0.0006 | 0 | 1 | 0 | 1 | $3,145 | $2,580 | $3,460 | $1,359 |
| FL | 0.0004 | 11 | 12 | 11 | 16 | $73,160 | $60,013 | $80,470 | $31,614 |
| GA | 0.0010 | 28 | 31 | 27 | 40 | $186,772 | $153,207 | $205,434 | $80,709 |
| IA | 0.0008 | 12 | 13 | 11 | 17 | $77,054 | $63,207 | $84,753 | $33,297 |
| IL | 0.0006 | 25 | 28 | 24 | 35 | $163,649 | $134,240 | $180,000 | $70,717 |
| IN | 0.0006 | 19 | 21 | 18 | 27 | $123,657 | $101,435 | $136,012 | $53,435 |
| KS | 0.0012 | 18 | 20 | 17 | 26 | $120,199 | $98,598 | $132,209 | $51,941 |
| KY | 0.0005 | 11 | 12 | 10 | 15 | $71,142 | $58,357 | $78,250 | $30,742 |
| LA | 0.0007 | 12 | 13 | 11 | 16 | $76,098 | $62,423 | $83,702 | $32,884 |
| MA | 0.0007 | 6 | 7 | 6 | 9 | $42,065 | $34,506 | $46,268 | $18,177 |
| MD | 0.0005 | 5 | 5 | 5 | 7 | $32,228 | $26,436 | $35,448 | $13,926 |
| ME | 0.0014 | 5 | 6 | 5 | 8 | $35,489 | $29,112 | $39,035 | $15,336 |
| MI | 0.0007 | 19 | 21 | 18 | 27 | $124,334 | $101,990 | $136,757 | $53,728 |
| MN | 0.0003 | 12 | 14 | 12 | 18 | $81,863 | $67,151 | $90,042 | $35,375 |
| MO | 0.0010 | 25 | 27 | 23 | 35 | $161,994 | $132,882 | $178,179 | $70,002 |
| MS | 0.0008 | 12 | 14 | 12 | 17 | $80,345 | $65,907 | $88,373 | $34,719 |
| NC | 0.0007 | 18 | 19 | 17 | 25 | $115,883 | $95,058 | $127,462 | $50,076 |

(continued)

Table 10-28. Estimated Benefits of 2020 With CAIR Control Option 2:  Relative to 2020 with CAIR—Angler Destination Approach (continued)

| State | Per Capita[c] | Total Avoided IQ Decrements | | | | Total Avoided Net Earnings Losses (Present Value in 2020; 3% discount rate; 1999$) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
| | | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr. Lag |
| ND | 0.0008 | 3 | 3 | 2 | 4 | $17,003 | $13,947 | $18,702 | $7,347 |
| NE | 0.0008 | 6 | 6 | 5 | 8 | $36,187 | $29,684 | $39,802 | $15,637 |
| NH | 0.0014 | 5 | 5 | 5 | 7 | $32,423 | $26,597 | $35,663 | $14,011 |
| NJ | 0.0025 | 33 | 37 | 31 | 47 | $217,220 | $178,184 | $238,924 | $93,867 |
| NY | 0.0011 | 30 | 33 | 28 | 42 | $194,435 | $159,493 | $213,862 | $84,021 |
| OH | 0.0007 | 27 | 30 | 26 | 38 | $178,335 | $146,287 | $196,154 | $77,064 |
| OK | 0.0013 | 39 | 43 | 37 | 55 | $256,552 | $210,448 | $282,186 | $110,863 |
| PA | 0.0033 | 105 | 116 | 100 | 148 | $687,982 | $564,346 | $756,723 | $297,296 |
| RI | 0.0009 | 1 | 1 | 1 | 1 | $5,986 | $4,911 | $6,585 | $2,587 |
| SC | 0.0008 | 12 | 13 | 12 | 17 | $79,822 | $65,478 | $87,798 | $34,493 |
| SD | 0.0007 | 3 | 4 | 3 | 5 | $21,853 | $17,926 | $24,036 | $9,443 |
| TN | 0.0008 | 21 | 23 | 20 | 30 | $137,697 | $112,952 | $151,456 | $59,503 |
| TX | 0.0006 | 53 | 59 | 51 | 75 | $349,061 | $286,332 | $383,938 | $150,839 |
| VA | 0.0018 | 41 | 46 | 39 | 58 | $271,563 | $222,761 | $298,697 | $117,350 |
| VT | 0.0007 | 2 | 2 | 1 | 2 | $9,959 | $8,169 | $10,954 | $4,304 |
| WI | 0.0008 | 26 | 29 | 25 | 37 | $170,194 | $139,609 | $187,199 | $73,546 |
| WV | 0.0013 | 9 | 9 | 8 | 12 | $55,746 | $45,728 | $61,316 | $24,089 |

[a]  Benefits analyses using the angler destination approach were conducted at a HUC level, but the results are aggregated and reported at a state level in this table.

[b]  Case studies of individual ecosystems (as presented in Section 3) show that the time necessary for aquatic systems to reach a new steady state after a reduction in mercury deposition rates can be as short as 5 years or as long as 50 years or more.  The medium response scenarios also varied widely but were generally on the order of one to three decades.

[c]  Estimated per capita IQ decrements and mercury ingestion rate do not vary across different lag periods with the angler destination approach.

**Table 10-29.  Summary of Annual Benefit Estimates:  Angler Destination Approach**

| | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
|---|---|---|---|---|
| | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| **Annual Number of Prenatally Exposed Children** | | | | |
| 2001 Base Case | 624,862 | 681,608 | 605,347 | 909,371 |
| 2020 Base Case (with CAIR) | 748,424 | 825,065 | 710,103 | 1,054,990 |
| **Total Value of Benefits (1999$s)** | | | | |
| 2001 Utility Emissions Zero-Out (Relative to 2001 Base Case) | | | | |
| 1% Discount Rate; Present Value in 2001 | N/A | N/A | N/A | $43,922,522 |
| 3% Discount Rate; Present Value in 2001 | $36,934,050 | $29,978,191 | $41,479,456 | $16,477,629 |
| 7% Discount Rate; Present Value in 2001 | $25,232,565 | $13,991,825 | $34,284,695 | $2,452,263 |
| 2020 Base Case with CAIR (Relative to 2001 Base Case applied to 2020 demographics) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $50,416,821 |
| 3% Discount Rate; Present Value in 2020 | $43,769,459 | $35,903,739 | $48,142,771 | $18,913,979 |
| 7% Discount Rate; Present Value in 2020 | $29,902,373 | $16,757,477 | $39,792,234 | $2,814,850 |
| 2020 Utility Emissions Zero-Out (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $18,511,953 |
| 3% Discount Rate; Present Value in 2020 | $16,071,187 | $13,183,067 | $17,676,972 | $6,944,799 |
| 7% Discount Rate; Present Value in 2020 | $10,979,497 | $6,152,979 | $14,610,837 | $1,033,551 |
| **BENEFITS OF CONTROL OPTIONS** | | | | |
| 2020 CAMR Control Option 1 (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $3,450,377 |
| 3% Discount Rate; Present Value in 2020 | $2,995,451 | $2,457,145 | $3,294,747 | $1,294,416 |
| 7% Discount Rate; Present Value in 2020 | $2,046,429 | $1,146,832 | $2,723,262 | $192,640 |
| 2020 CAMR Control Option 2 (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $5,283,142 |
| 3% Discount Rate; Present Value in 2020 | $4,586,570 | $3,762,327 | $5,044,846 | $1,981,982 |
| 7% Discount Rate; Present Value in 2020 | $3,133,448 | $1,756,004 | $4,169,799 | $294,966 |

**Table 10-30.  Summary and Comparison of Annual Benefit Estimates:  Population Centroid Approach vs. Angler Destination Approach**

| | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
|---|---|---|---|---|
| | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| **Population Centroid Approach** | | | | |
| **Annual Number of Prenatally Exposed Children** | | | | |
| 2001 Base Case | 452,575 | 486,487 | 442,938 | 632,017 |
| 2020 Base Case (with CAIR) | 528,721 | 577,910 | 504,127 | 725,474 |
| **BENEFITS OF CONTROL OPTIONS** | | | | |
| 2020 CAMR Control Option 1 (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $2,300,269 |
| 3% Discount Rate; Present Value in 2020 | $2,086,359 | $1,687,988 | $2,313,079 | $862,951 |
| 7% Discount Rate; Present Value in 2020 | $1,425,357 | $787,840 | $1,911,867 | $128,428 |
| 2020 CAMR Control Option 2 (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $3,471,289 |
| 3% Discount Rate; Present Value in 2020 | $3,112,816 | $2,527,403 | $3,444,104 | $1,302,261 |
| 7% Discount Rate; Present Value in 2020 | $2,126,610 | $1,179,624 | $2,846,712 | $193,807 |
| **Angler Destination Approach** | | | | |
| **Annual Number of Prenatally Exposed Children** | | | | |
| 2001 Base Case | 624,862 | 681,608 | 605,347 | 909,371 |
| 2020 Base Case (with CAIR) | 748,424 | 825,065 | 710,103 | 1,054,990 |
| **BENEFITS OF CONTROL OPTIONS** | | | | |
| **2020 CAMR Control Option 1** (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $3,450,377 |
| 3% Discount Rate; Present Value in 2020 | $2,995,451 | $2,457,145 | $3,294,747 | $1,294,416 |
| 7% Discount Rate; Present Value in 2020 | $2,046,429 | $1,146,832 | $2,723,262 | $192,640 |
| **2020 CAMR Control Option 2** (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $5,283,142 |
| 3% Discount Rate; Present Value in 2020 | $4,586,570 | $3,762,327 | $5,044,846 | $1,981,982 |
| 7% Discount Rate; Present Value in 2020 | $3,133,448 | $1,756,004 | $4,169,799 | $294,966 |

destination approach, for an average range across both approaches under the 10 to 20 year lag period of $1.7 to 3.8 million.  The main source of difference between the two approaches are the estimated sizes of the exposed populations.  The estimates from the angler destination approach are generally between 35 percent and 40 percent higher than from the other approach.  As described in Section 10.1.2 the two approaches use different modeling assumptions to identify numbers of pregnant women in angler households.  As discussed in more detail in Section 10.7, the assumptions used in the population centroid approach are likely to underestimate these numbers, whereas the assumptions of the angler destination approach are likely to overestimate them.  Therefore, the results of the two modeling approaches can be interpreted as providing lower and upper bound average estimates of exposed populations and benefits.

### 10.5.4  Sensitivity Analysis of Alternative Dose-Response Functions

EPA conducted a sensitivity analysis of alternative dose-response functions provided in Section 9 of this report.  Specifically, we estimated the benefits with a lower dose-response function with a beta coeffiicent of -0.108, and a higher dose-response function with a beta coefficient of -0.233.  The findings of the sensitivity analysis are present in Table 10-31 and show that with the lower dose-response function, the benefits would decrease by about 18 percent, while the higher dose-resopnse function would increase benefits by about 56 percent.

**Table 10-31.  Summary and Comparison of Annual Benefit Estimates Under Alternative IQ Dose-Response Assumptions: Population and Angler Destination Approach**

|  | 5-Yr Lag | 20-Yr. Lag |
|---|---|---|
| Population Centroid Approach |  |  |
| 2020 Base Case (with CAIR) | 504,127 | 577,910 |
| **BENEFITS OF CONTROL OPTION 1** |  |  |
| 2020 CAMR Control Option 1 (Relative to 2020 Base Case with CAIR; 3% Discount Rate; Present Value in 2020) |  |  |
| IQ Dose-Response Coefficient = -0.108 | $  1,906,966 | $  1,391,623 |
| IQ Dose-Response Coefficient = -0.131 | $  2,313,079 | $  1,687,988 |
| IQ Dose-Response Coefficient = -0.233 | $  4,114,102 | $  3,002,299 |
| **Angler Destination Approach** |  |  |
| **Annual Number of Prenatally Exposed Children** |  |  |
| 2020 Base Case (with CAIR) | 710,103 | 825,065 |
| **BENEFITS OF CONTROL OPTION 1** |  |  |
| 2020 CAMR Control Option 1 (Relative to 2020 Base Case with CAIR; 3% Discount Rate; Present Value in 2020) |  |  |
| IQ Dose-Response Coefficient = -0.108 | $  2,716,280 | $  2,025,738 |
| IQ Dose-Response Coefficient = -0.131 | $  3,294,747 | $  2,457,145 |
| IQ Dose-Response Coefficient = -0.233 | $  5,860,123 | $  4,370,341 |

**10.5.5  Distribution of Per-Capita IQ Changes for the Exposed Population (in support of distributional equity analysis)**

In addition to considering the net benefits associated with reductions in mercury fish tissue concentrations, an additional factor to consider as part of a cost-benefit (as stipulated in Executive Order 12866) is the distributional equity of benefits in relation to the distribution of societal costs.  To support an assessment of distributional equity in the context of this analysis, EPA has modeled per-capita IQ changes for the population of modeled recreational fishers.  Consideration of the distribution of IQ changes across the modeled population using these results supports a determination regarding the degree of equity in benefits associated with this regulation.

Thus far, the analysis of mercury ingestion levels has assumed a constant rate of freshwater fish consumption (C) across the exposed population.  However, the population centroid approach can also be adapted to allow for variation in C.  As described above in Section 10.1.4, the constant consumption rate (C) is based on the recommended average rate for freshwater recreational anglers in EPA's *Exposure Factor Handbook (EFH)* (EPA, 1997b).  However, the *EFH* also provides guidelines regarding the variability in average daily fish consumption rates across the recreational freshwater fishing population.  It recommends mean *and 95th percentile* daily self-caught fish freshwater fish consumption rate for freshwater recreational anglers of 8 g/day and 25 g/day respectively.  The distribution of consumption rate is skewed to the right because the 95th percentile is more than 3 times the mean.  Therefore, the variability in the consumption rate can be represented by a distribution such as lognormal distribution.  The *EFH* contains examples of lognormal distributions fitted to fish consumption data.  Based on *EFH* recommendations, it is also possible to incorporate the variation in consumption rates by allowing it to vary randomly (within the defined distribution) across the exposed population.

To create a full distribution of consumption rates that is consistent with the EFH recommendations, the consumption rates was assumed to be log-normally distributed across the population with a mean of 8 g/day and a 95th percentile of 25 g/day; that is, the specified distribution for the consumption rate was log-normal (8, 10.45).  Lognormal distribution was deemed to be appropriate because of its skewed shape and because it would not allow for fish consumption rates in the negative range.  Drawing randomly from this distribution, a consumption rate was assigned to each of the roughly 165,000 block groups in the study area.  The fish consumption in each block group was assumed to be constant for the modeling purposes.  This approach was used to avoid the computational burden of assigning a random consumption rate to a fractional person in a block group (the *estimated* number of exposed persons in each block group is not an integer) and because the estimated number of exposed persons per block group is relatively small.  Although some degree of randomness is lost by assuming a constant consumption rate in a block group, the inter-individual variability in consumption rate is adequately represented because the average number of exposed individuals in a block group is only 2.6 with standard deviation of 2.5.  In effect, a sample of 165,000 people is used to represent the consumption rate variability in approximately 435,000 people, which is adequate for the modeling purposes.  After randomly assigning consumption rates to the block groups, the population centroid approach was reapplied using Eq. (10.16) with a variable

consumption rate to calculate average daily mercury ingestion rates for the estimated exposed population (NPA) in each block group.

Based on this adapted version of the population centroid approach, Figures 10-11 to 10-18 show how the avoided IQ decrements (i.e., benefits) are distributed in the exposed population under alternative emissions reductions scenarios.  In all of these figures,  the consumption rate is allowed to vary across the exposed population as described above.

Figures 10-11 and 10-12 report results for the 2001 Utility Emissions Zero-Out scenario, relative to the 2001 Base Case.  Most of the prenatally exposed children avoid less than 0.025 IQ point decrements; however, a significant number have avoided IQ decrements between 0.025 and 0.1 IQ points.  About 1,300 prenatally exposed children have avoided IQ loss greater than 0.1 IQ points.  Figure 10-12 shows the cumulative distribution of avoided IQ decrements across the exposed population.  Reduction in IQ decrements (i.e., benefits) due to the Zero-Out scenario are less than 0.02 IQ points from the baseline levels for more than 90 percent of the prenatally exposed children.

Figures 10-13 and 10-14 report results for the 2020 Utility Emissions Zero-Out scenario, relative to the 2020 Base Case with CAIR.  Again, a large majority of the prenatally exposed children avoid less than 0.025 IQ point decrements.  In this case, less than 100 prenatally exposed children have avoided IQ loss greater than 0.1 IQ points.  Figure 10-14 shows the cumulative distribution of avoided IQ decrements across the exposed population.  Reductions in IQ decrements (i.e., benefits) due to the 2020 Zero-Out scenario are less than 0.01 IQ points from the 2020 baseline levels for more than 90 percent of the prenatally exposed children.

Figures 10-15 through 10-18 report results for the CAMR Control Options relative to the 2020 Base Case with CAIR.  In both cases 11 or less prenatally exposed children are estimated to  avoid IQ losses of more than 0.1 IQ points.  Figures 10-16 and 10-18 show the cumulative distributions of avoided IQ decrements for the two CAMR control options.  In both cases, reductions in IQ decrements (i.e., benefits) are less than 0.003 IQ points from the 2020 baseline levels for more than 90 percent of the prenatally exposed children.



**Figure 10-11.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions:  2001 Utility Emissions Zero-Out Relative to 2001 Base Case; Population Centroid Approach; Variable Consumption Rate**



**Figure 10-12.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions: 2001 Utility Emissions Zero-Out Relative to 2001 Base Case; Population Centroid Approach; Variable Consumption Rate**



**Figure 10-13.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions:  CAMR Control Option 1 Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate**



**Figure 10-14.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions: CAMR Control Option 1 Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate**



**Figure 10-15.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions:  CAMR Control Option 2 Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate**



**Figure 10-16.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions:  CAMR Control Option 2 Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate**



**Figure 10-17.  Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions:  2020 Utility Emissions Zero-Out Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate**



**Figure 10-18.  Cumulative Distribution of Modelled Avoided IQ Decrements (Benefits) due to Mercury Emissions Reductions: 2020 Utility Emissions Zero-Out Relative to 2020 Base Case with CAIR; Population Centroid Approach; Variable Consumption Rate**

It is important to note that these results based on a variable consumption rate only represent one realization of the random distribution of fish consumption rates across the exposed populations. The results would be somewhat different if the randomization process were repeated; however, the summary results would most likely be very similar. In addition, the results presented at the tail of this distribution are based on a mathematical calculation of the results of the benefit modeling and are not based on any empirical evidence the Agency has that people consume large amounts of recreationally caught freshwater fish (i.e., 2-3 meals per day) such that they would incur this level of IQ loss.

## 10.6    Analysis of Potentially High-Risk Subpopulations

In addition to considering the full distribution of IQ benefits across the modeled study population of prenatally exposed children it is also possible to consider distributional equity by examining segments of the exposed population expected to experience disproportionately high impacts (and hence benefits) due to (a) proximity to high methylmercury fish concentrations and/or (b) relatively high fish consumption rates. In this analysis, to further examine this issue of distributional equity, EPA examined several special sub-populations believed to be at elevated risk of methylmercury fish exposure. The analyses conducted for these potential high-risk subpopulations are described in this section. Consideration of IQ change and benefits estimates generated for these special sub-populations can support a determination regarding the potential for distributional equity playing a key factor in benefits for this regulation.

In this section of the report the high-risk populations of interest are groups of individuals who are exposed to relatively high levels of mercury through consumption of self-caught freshwater fish. In particular, they are groups with high rates of fish consumption. The term "subsistence fishing"[25] may apply to the subpopulations analyzed in this section, depending on how this term is interpreted. These subpopulations are not necessarily from households for whom fishing is a primary activity for survival; however, their high rates of noncommercial freshwater fish consumption suggest that it is an integral part of their diet.

Below high-risk subpopulations are addressed in three ways, each of which is an adaptation of the population centroid approach. In the first case, fish consumption rates were allowed to vary systematically across the exposed population. The analysis focused on mercury ingestion by the those in the top fifth percentile of consumption rate distribution. In the second case, the analysis focused on the portion of the exposed population with incomes below the poverty threshold. Because we are lacking data on consumption rates by income categories, it was assumed that a portion of these populations have noncommercial freshwater fish consumption rates comparable to the population examined in the first case (top fifth percentile of the total consumption rate distribution). In the third case, the analysis focused on two ethnic subpopulations in the U.S. with high expected rates of freshwater fish consumption—the Hmong and the Chippewa in Minnesota, Wisconsin, and Michigan. Using existing studies of these populations' fishing and fish consumption behaviors, the population centroid approach was adapted and applied to estimate mercury exposures for prenatally exposed children in these ethnic groups.

---

[25] "Subsistence fishing" is defined as the taking of fish for the sustenance of families, communities, and cultures.

### 10.6.1  Mercury Ingestion Estimates for Individuals in the Upper Range of the Fish Consumption Distribution

In this section of the report, mercury ingestion levels for potentially high risk subpopulations are analyzed by incorporating information about the variability in average daily fish consumption rates across the recreational freshwater fishing population.  According to EPA's *Exposure Factors Handbook (EFH)* (EPA, 1997b), the recommended mean and 95th percentile daily self-caught fish freshwater fish consumption rate (C) for freshwater recreational anglers are 8 g/day and 25 g/day respectively.  In this analysis of potentially high risk individuals, the consumption rate is allowed to vary systematically across the population, using the same method described in Section 10.4.

To create a full distribution of consumption rates that is consistent with the EFH recommendations, the consumption rate was assumed to be log-normally distributed across the population with a mean of 8 g/day and a 95th percentile of 25 g/day.  Drawing randomly from this distribution, a different consumption rate was assigned to each of the roughly 165,000 block groups in the study area.  The population centroid approach was then reapplied and combined with Eq. (10.16) using a variable consumption rate to calculate average daily mercury ingestion rates for the estimated exposed population (NPA) in each block group.

To specifically address potentially high risk groups, Tables 10-32 and 10-33 report results only for exposed populations that were randomly assigned consumption rates higher than 95th percentile consumption rate of the recreational freshwater angler (i.e., above 25 g/day).  Table 10-32 reports detailed result for the 2001 Base Case.  The annual number of prenatally exposed children in this high risk group was estimated to be 22,300 and the mean HgI across block groups was 12.95 µg/day.  Average IQ decrements in this group were estimated to be 0.33 points and the total present value of foregone earnings was estimated to be $65 million.  As with the estimates reported for the recreational freshwater angler in Section 10.1.4, these estimates are based on observed mercury levels in freshwater fish (as summarized in Table 10-2) and therefore include all sources of mercury freshwater fish.

Table 10-33 summarizes similar model results for the 2020 Base Case with CAIR.  The annual number of prenatally exposed children in this high risk group in 2020 was estimated to be 24,700 and the mean HgI across block groups was 11.33 µg/day, which is 12 percent lower than in the 2001 Base Case.  Average IQ decrements in this group were estimated to be 0.29 points and the total present value of foregone earnings was estimated to be $63 million.

Table 10-34 reports estimates of beneficial changes to this subsistence population under the five emissions control scenarios, including estimates for five lag periods and three assumed discount rates.  The 2001 Utility Emissions Zero-Out and the 2020 Base Case with CAIR are both estimated to result in per capita IQ decrements that are on average between 0.042 and 0.047 less than under the 2001 Base Case.  Compared to the 2020 Base Case with CAIR, the 2020 Utility Emissions Zero-Out is estimated to reduce per capita IQ decrements by an average of

**Table 10-32. Summary of Estimated Mercury Exposures for Consumption-Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings: Population Centroid Approach—2001 Base Case[a]**

| Study Area / State | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2001; 1999$) | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| **Study Area** | 22,302 | 12.95 | 10.19 | 0.331 | 0.261 | 7,390 | $2,918 | $2,297 | $65,086,047 |
| **State** | | | | | | | | | |
| AL | 507 | 10.56 | 7.03 | 0.270 | 0.180 | 137 | $2,379 | $1,584 | $1,206,122 |
| AR | 466 | 15.86 | 19.71 | 0.406 | 0.504 | 189 | $3,573 | $4,441 | $1,666,437 |
| CT | 218 | 17.94 | 11.59 | 0.459 | 0.297 | 100 | $4,042 | $2,611 | $882,544 |
| DC | 13 | 8.39 | 3.68 | 0.215 | 0.094 | 3 | $1,890 | $829 | $24,954 |
| DE | 37 | 10.71 | 4.86 | 0.274 | 0.124 | 10 | $2,413 | $1,095 | $90,402 |
| FL | 1,114 | 19.49 | 10.00 | 0.499 | 0.256 | 555 | $4,391 | $2,253 | $4,891,366 |
| GA | 1,097 | 14.03 | 10.06 | 0.359 | 0.257 | 394 | $3,161 | $2,268 | $3,469,580 |
| IA | 391 | 8.02 | 3.89 | 0.205 | 0.100 | 80 | $1,808 | $877 | $707,055 |
| IL | 1,407 | 8.70 | 4.95 | 0.223 | 0.127 | 313 | $1,961 | $1,116 | $2,759,572 |
| IN | 813 | 11.55 | 6.91 | 0.295 | 0.177 | 240 | $2,602 | $1,556 | $2,116,091 |
| KS | 369 | 17.87 | 11.98 | 0.457 | 0.307 | 169 | $4,027 | $2,700 | $1,487,071 |
| KY | 589 | 10.87 | 6.25 | 0.278 | 0.160 | 164 | $2,449 | $1,408 | $1,441,147 |
| LA | 679 | 13.81 | 10.09 | 0.353 | 0.258 | 240 | $3,111 | $2,274 | $2,111,880 |
| MA | 303 | 19.83 | 11.33 | 0.507 | 0.290 | 154 | $4,468 | $2,553 | $1,352,521 |
| MD | 262 | 7.71 | 4.00 | 0.197 | 0.102 | 52 | $1,736 | $900 | $455,573 |
| ME | 122 | 25.80 | 10.63 | 0.660 | 0.272 | 80 | $5,813 | $2,395 | $707,079 |
| MI | 884 | 12.39 | 7.23 | 0.317 | 0.185 | 280 | $2,791 | $1,629 | $2,467,205 |
| MN | 1,093 | 8.87 | 4.80 | 0.227 | 0.123 | 248 | $1,998 | $1,083 | $2,184,445 |
| MO | 820 | 12.51 | 8.75 | 0.320 | 0.224 | 262 | $2,819 | $1,971 | $2,311,088 |
| MS | 392 | 12.37 | 6.13 | 0.316 | 0.157 | 124 | $2,787 | $1,382 | $1,090,960 |
| NC | 756 | 14.76 | 13.52 | 0.378 | 0.346 | 285 | $3,327 | $3,047 | $2,514,047 |

(continued)

**Table 10-32.  Summary of Estimated Mercury Exposures for Consumption–Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2001 Base Case (continued)**

| State | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2001; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| ND | 127 | 11.00 | 6.17 | 0.281 | 0.158 | 36 | $2,478 | $1,390 | $314,521 |
| NE | 246 | 8.68 | 3.87 | 0.222 | 0.099 | 55 | $1,956 | $872 | $480,417 |
| NH | 63 | 19.21 | 6.75 | 0.492 | 0.173 | 31 | $4,330 | $1,520 | $272,212 |
| NJ | 365 | 15.70 | 13.68 | 0.402 | 0.350 | 146 | $3,538 | $3,082 | $1,289,682 |
| NY | 874 | 15.92 | 9.85 | 0.407 | 0.252 | 356 | $3,586 | $2,219 | $3,135,000 |
| OH | 1,150 | 14.63 | 13.53 | 0.374 | 0.346 | 430 | $3,297 | $3,049 | $3,790,446 |
| OK | 759 | 12.98 | 7.69 | 0.332 | 0.197 | 252 | $2,924 | $1,732 | $2,218,085 |
| PA | 775 | 18.10 | 13.21 | 0.463 | 0.338 | 359 | $4,078 | $2,976 | $3,158,572 |
| RI | 30 | 18.00 | 11.51 | 0.460 | 0.295 | 14 | $4,055 | $2,594 | $121,504 |
| SC | 465 | 16.90 | 11.82 | 0.432 | 0.303 | 201 | $3,808 | $2,664 | $1,771,388 |
| SD | 124 | 9.60 | 5.29 | 0.246 | 0.135 | 31 | $2,163 | $1,192 | $269,236 |
| TN | 686 | 12.95 | 8.44 | 0.331 | 0.216 | 227 | $2,917 | $1,901 | $2,002,465 |
| TX | 2,586 | 10.53 | 5.69 | 0.269 | 0.146 | 696 | $2,373 | $1,282 | $6,134,208 |
| VA | 668 | 10.02 | 6.66 | 0.256 | 0.170 | 171 | $2,257 | $1,501 | $1,507,902 |
| VT | 50 | 17.22 | 8.05 | 0.441 | 0.206 | 22 | $3,880 | $1,814 | $192,461 |
| WI | 812 | 10.50 | 5.20 | 0.269 | 0.133 | 218 | $2,365 | $1,171 | $1,920,550 |
| WV | 192 | 13.21 | 8.78 | 0.338 | 0.225 | 65 | $2,976 | $1,977 | $570,259 |

[a]  Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table.

**Table 10-33.  Summary of Estimated Mercury Exposures for Consumption-Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings: Population Centroid Approach—2020 with CAIR[a]**

| | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2020; 1999$) | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| **Study Area** | 24,724 | 11.33 | 8.34 | 0.290 | 0.213 | 7,165 | $7,485 | $10,476 | $63,100,915 |
| **State** | | | | | | | | | |
| AL | 509 | 9.05 | 6.51 | 0.232 | 0.166 | 118 | $6,141 | $6,676 | $1,037,813 |
| AR | 514 | 14.22 | 17.84 | 0.364 | 0.456 | 187 | $14,079 | $18,853 | $1,647,238 |
| CT | 234 | 15.59 | 10.13 | 0.399 | 0.259 | 93 | $6,079 | $6,149 | $820,718 |
| DC | 12 | 6.83 | 2.48 | 0.175 | 0.063 | 2 | $824 | $636 | $18,136 |
| DE | 40 | 9.44 | 3.83 | 0.242 | 0.098 | 10 | $4,025 | $2,572 | $84,529 |
| FL | 1,447 | 18.03 | 9.63 | 0.461 | 0.246 | 668 | $13,271 | $18,187 | $5,878,893 |
| GA | 1,331 | 11.72 | 7.91 | 0.300 | 0.202 | 399 | $14,174 | $17,435 | $3,515,077 |
| IA | 382 | 7.44 | 3.78 | 0.190 | 0.097 | 73 | $4,741 | $5,054 | $639,995 |
| IL | 1,516 | 7.74 | 4.16 | 0.198 | 0.107 | 300 | $5,374 | $5,914 | $2,644,042 |
| IN | 875 | 9.66 | 5.52 | 0.247 | 0.141 | 216 | $6,852 | $7,988 | $1,904,965 |
| KS | 404 | 17.44 | 12.14 | 0.446 | 0.311 | 180 | $15,136 | $15,844 | $1,589,252 |
| KY | 583 | 8.51 | 4.42 | 0.218 | 0.113 | 127 | $6,283 | $5,304 | $1,118,388 |
| LA | 690 | 12.61 | 7.73 | 0.323 | 0.198 | 223 | $9,201 | $8,479 | $1,959,919 |
| MA | 313 | 17.74 | 10.02 | 0.454 | 0.256 | 142 | $4,807 | $3,952 | $1,249,821 |
| MD | 294 | 6.33 | 2.91 | 0.162 | 0.075 | 48 | $2,268 | $1,840 | $419,500 |
| ME | 113 | 23.73 | 10.51 | 0.607 | 0.269 | 69 | $11,602 | $10,809 | $603,321 |
| MI | 900 | 10.52 | 5.69 | 0.269 | 0.146 | 242 | $4,774 | $4,888 | $2,134,093 |
| MN | 1,224 | 8.39 | 4.14 | 0.215 | 0.106 | 263 | $11,582 | $10,530 | $2,316,415 |
| MO | 852 | 11.89 | 8.86 | 0.304 | 0.227 | 259 | $10,289 | $12,852 | $2,284,126 |
| MS | 392 | 11.15 | 5.13 | 0.285 | 0.131 | 112 | $9,472 | $7,507 | $985,087 |
| NC | 930 | 12.02 | 10.12 | 0.308 | 0.259 | 286 | $9,228 | $10,983 | $2,519,356 |

(continued)

**Table 10-33.  Summary of Estimated Mercury Exposures for Consumption-Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings:  Population Centroid Approach—2020 with CAIR (continued)**

| State | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2020; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| ND | 123 | 9.85 | 5.41 | 0.252 | 0.138 | 31 | $8,054 | $5,855 | $273,830 |
| NE | 282 | 8.07 | 3.61 | 0.206 | 0.092 | 58 | $5,896 | $4,237 | $512,923 |
| NH | 64 | 17.30 | 5.13 | 0.443 | 0.131 | 28 | $7,138 | $3,622 | $249,817 |
| NJ | 402 | 14.30 | 11.13 | 0.366 | 0.285 | 147 | $3,713 | $3,428 | $1,295,668 |
| NY | 908 | 14.09 | 8.81 | 0.360 | 0.225 | 327 | $3,723 | $4,724 | $2,881,885 |
| OH | 1,176 | 11.19 | 11.31 | 0.286 | 0.289 | 337 | $6,163 | $10,259 | $2,964,188 |
| OK | 820 | 12.11 | 6.61 | 0.310 | 0.169 | 254 | $13,318 | $10,817 | $2,237,462 |
| PA | 746 | 14.42 | 9.76 | 0.369 | 0.250 | 275 | $4,615 | $4,977 | $2,422,759 |
| RI | 33 | 15.93 | 8.03 | 0.407 | 0.206 | 13 | $3,679 | $3,200 | $117,744 |
| SC | 496 | 14.36 | 9.95 | 0.367 | 0.254 | 182 | $10,696 | $12,041 | $1,604,395 |
| SD | 120 | 8.75 | 4.38 | 0.224 | 0.112 | 27 | $6,765 | $3,700 | $236,769 |
| TN | 763 | 10.48 | 7.36 | 0.268 | 0.188 | 205 | $9,441 | $11,605 | $1,803,311 |
| TX | 3,418 | 9.62 | 5.48 | 0.246 | 0.140 | 841 | $10,962 | $15,938 | $7,410,196 |
| VA | 765 | 8.20 | 5.08 | 0.210 | 0.130 | 161 | $5,238 | $4,930 | $1,414,187 |
| VT | 45 | 15.17 | 5.87 | 0.388 | 0.150 | 17 | $5,454 | $2,936 | $152,718 |
| WI | 835 | 9.53 | 4.26 | 0.244 | 0.109 | 204 | $8,155 | $7,315 | $1,794,118 |
| WV | 174 | 9.13 | 5.05 | 0.233 | 0.129 | 41 | $4,714 | $2,898 | $358,264 |

a  Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table.  For comparison purposes with the Base Cases in 2001, benefits presented in this table do not incorporate potential lags in fish tissue response to a change in mercury deposition.

**Table 10-34.  Summary of Annual Benefit Estimates for Consumption-Based Subsistence Population:  Population Centroid Approach**

| | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
|---|---|---|---|---|
| | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| **Annual Number of Prenatally Exposed Children** | | | | |
| 2001 Base Case | 23,232 | 24,955 | 22,747 | 32,450 |
| 2020 Base Case (with CAIR) | 27,126 | 29,661 | 25,859 | 37,266 |
| **Per Capita Avoided IQ Decrements** | | | | |
| 2001 Utility Emissions Zero-Out (Relative to 2001 Base Case) | 0.0439 | 0.0432 | 0.0442 | 0.0423 |
| 2020 Base Case with CAIR (Relative to 2001 Base Case applied to 2020 demographics) | 0.0462 | 0.0469 | 0.0451 | 0.0449 |
| 2020 Utility Emissions Zero-Out (Relative to 2020 Base Case with CAIR) | 0.0152 | 0.0151 | 0.0153 | 0.0149 |
| 2020 CAMR Control Option 1 (Relative to 2020 Base Case with CAIR) | 0.0032 | 0.0032 | 0.0032 | 0.0032 |
| 2020 CAMR Control Option 2 (Relative to 2020 Base Case with CAIR) | 0.0048 | 0.0048 | 0.0048 | 0.0047 |
| **Total Value of Benefits (1999$s)** | | | | |
| 2001 Utility Emissions Zero-Out (Relative to 2001 Base Case) | | | | |
| 1% Discount Rate; Present Value in 2001 | N/A | N/A | N/A | $7,358,513 |
| 3% Discount Rate; Present Value in 2001 | $6,678,524 | $5,255,162 | $7,636,211 | $2,760,562 |
| 7% Discount Rate; Present Value in 2001 | $4,562,627 | $2,452,760 | $6,311,683 | $410,837 |
| 2020 Base Case with CAIR (Relative to 2001 Base Case applied to 2020 demographics) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $7,794,954 |
| 3% Discount Rate; Present Value in 2020 | $7,036,390 | $5,701,309 | $7,749,431 | $2,924,924 |
| 7% Discount Rate; Present Value in 2020 | $4,807,114 | $2,660,991 | $4,807,114 | $435,204 |
| 2020 Utility Emissions Zero-Out (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $2,967,472 |
| 3% Discount Rate; Present Value in 2020 | $2,705,281 | $2,185,277 | $3,001,948 | $1,113,254 |
| 7% Discount Rate; Present Value in 2020 | $1,848,191 | $1,019,942 | $2,481,249 | $165,679 |
| **BENEFITS OF CONTROL OPTIONS** | | | | |
| 2020 CAMR Control Option 1 (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $630,695 |
| 3% Discount Rate; Present Value in 2020 | $573,373 | $463,559 | $635,939 | $236,607 |
| 7% Discount Rate; Present Value in 2020 | $391,716 | $216,358 | $525,633 | $35,213 |
| 2020 CAMR Control Option 2 (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $945,748 |
| 3% Discount Rate; Present Value in 2020 | $850,046 | $689,683 | $940,902 | $354,799 |
| 7% Discount Rate; Present Value in 2020 | $580,733 | $321,898 | $777,699 | $52,803 |

0.015 points.  CAMR Options 1 and 2, by comparison, are estimated to reduce them by an average of 0.003 and 0.005 points respectively.

Under CAMR Option 1, the aggregate benefits for this subsistence population assuming 10 and 20 year lag periods are estimated to be $0.6 million and $0.5 million, respectively, for those prenatally exposed in 2020.  These estimates are 21 percent as large as those for the 2020 Utility Emissions Zero-Out.  For CAMR Option 2, these values are estimated to both be $0.9 million and 31 percent as large as corresponding estimates for the 2020 Utility Emissions Zero-Out.

### 10.6.2  *Mercury Ingestion Estimates for Individuals in Low Income, High Fish Consumption Households*

Another potentially high-risk subpopulation in the U.S. is comprised of individuals in low income households who rely on self-caught freshwater fish as part of their diet (EPA, 2002b).  Although studies have documented these types of behaviors among low income groups in specific locations in the U.S. (West, 1992; Belton, Roundy, and Weinstein, 1986), a broad definition of this behavior at the national level is not available.

To assess potentially high exposures among low income subpopulations, the population centroid approach was adapted to focus specifically on low-income populations.  Mercury ingestion levels were estimated for this subpopulation under a defined set of assumptions.  First, Census data were used to restrict the analysis to women of childbearing age in households with incomes below $10,000.[26]  That is, NF in Eq. (10.2) (i.e., number of females ages 15-44) was redefined to include only low income women of childbearing age from each block group.  State-level fertility rate data were again used to estimate the number of low-income pregnant women in each block group.

Second, to estimate the portion of these women that reside in angler households, results from the NSFHWR (Pullis, 2000) were used, which found that angler participation rates among low income individuals are on average 35 percent lower than for the general population in the U.S.  The state-level participation rate estimates were scaled down ($NA_s/N_s$ in Eq. [10.3]) for the general population by 35 percent to estimate the annual number of prenatally exposed children in low-income angler households in each block group.

Third, it was assumed that 50 percent of these prenatally exposed children are in households that rely on self-caught freshwater fish.  This assumption was based in part on data from NSRE 1994, which found that roughly half of the single-day freshwater fishing trips by low income anglers were to waterbodies within 20 miles of their residence.  Therefore, it was assumed that low income individuals making single day trips to waterbodies within 20 miles represent subsistence-type (rather than strictly recreational) fishing behaviors.

Fourth, to match these individuals in low-income, high fish consumption households with mercury concentrations, average mercury concentrations within 20 miles of each block group

---

[26] Poverty level for a 2-3 person household in 2000 was $11,239-$13,738 (www.census.gov/hhes/poverty/threshld/thresh00.html)

were calculated.  To weight lake and river concentrations in this calculation, the same proportion of lake and river fishing ($c_l$, $c_k$ in Eqs. [10.4] and [10.5] ) was assumed for low income households as for the general population in each block group.

Fifth, to estimate mercury ingestion rates for these subpopulations, the same model described in Eq. (10.1) was applied; however, the daily fish consumption rate (C) was allowed to vary randomly.  To create a full distribution of consumption rates that is consistent with the assumption that subsistence fishers consume more than the 95th percentile amount of fish, consumption rates were randomly drawn from the tail beyond the 95th percentile of the log-normal distribution defined in Section 10.5.  Then, a different sampled consumption rate was randomly assigned to each of the roughly 165,000 block groups in the study area.  The population centroid approach was then reapplied.

Table 10-35 reports detailed result for the 2001 Base Case.  The annual number of prenatally exposed children in this high risk group was estimated to be 22,400 and the mean HgI across block groups was 12.44 µg/day[27].  Average IQ decrements in this group were estimated to be 0.32 points and the total present value of foregone earnings was estimated to be $63 million.

Table 10-36 summarizes similar model results for the 2020 Base Case with CAIR.  The annual number of prenatally exposed children in this high risk group in 2020 was estimated to be 24,100 and the mean HgI across block groups was 10.96 µg/day, which is 12 percent lower than in the 2001 Base Case.  Average IQ decrements in this group were estimated to be 0.28 points and the total present value of foregone earnings was estimated to be $60 million.

Table 10-37 reports estimates of beneficial changes to this income-based subsistence population under the five emissions control scenarios, including estimates for five lag periods and three assumed discount rates.  The 2001 Utility Emissions Zero-Out and the 2020 Base Case with CAIR are both estimated to result in per capita IQ decrements that are on average between 0.035 and 0.042 less than under the 2001 Base Case.  Compared to the 2020 Base Case with CAIR, the 2020 Utility Emissions Zero-Out is estimated to reduce per capita IQ decrements by an average of 0.015 points.  CAMR Options 1 and 2, by comparison, are estimated to reduce them by an average of 0.003 and 0.005 points respectively.

Under CAMR Option 1, the aggregate benefits for this subsistence population assuming 10 and 20 year lag periods are estimated to be $0.6 million and $0.5 million, respectively, for those prenatally exposed in 2020.  These estimates are 21 percent as large as the corresponding estimates for the 2020 Utility Emissions Zero-Out.  For CAMR Option 2, these values are estimated to be $0.8 million and $0.7 million, respectively, which are 31 percent as large as the estimates for the 2020 Utility Emissions Zero-Out.

---

[27] The average daily mercury ingestion rate given here of 12.44 ug/day from freshwater fish is two times the EPA's Reference Dose (RfD) for mercury of 5.8 ug/day.  This estimate does not account for total exposure from consumption from other fish sources.  See Section 11 of this report for a detailed discussion of the implication of the RfD on this analysis.

### 10.6.3  Mercury Ingestion Estimates for Two Selected Ethnic Populations

To further analyze mercury ingestion levels among potential high risk subpopulations, a separate analysis was conducted focusing on two selected special populations that are primarily located within a subregion of the study area:

1.  Hmong in Minnesota and Wisconsin; and
2.  Chippewa (Ojibwa) in Minnesota, Wisconsin, and Michigan.

These groups were selected for the following reasons.  First, among ethnic groups in the United States, Southeast Asians and Native Americans have traditionally had relative high rates of fish consumption (EPA, 1997c).  The Hmong are Southeast Asians of primarily Laotian origin, and the Chippewa are a Native American tribe from the Great Lakes area. As discussed in more detail below, studies investigating the fishing behaviors of these two groups have found relatively high rates of participation in freshwater fishing activities and of freshwater fish consumption.

Second, large portions of both the Hmong and Chippewa populations are located in three states within our 37-state study area.  Other than California, the Hmong population in the United States has primarily settled in Minnesota and Wisconsin, where they now number over 75,000. The Chippewa are among the five most populous tribes in the United States, numbering over 100,000 in 2000 and are primarily located in Minnesota, Wisconsin, and Michigan.  The Chippewa account for a large majority of the Native American population in the study areas of this benefit analysis, as is evident by Figure 10-19, which displays U.S. Bureau defined Native American tracts.

Third, due to the availability of Census data and fishing behavior studies for the Hmong and Chippewa, the exposure assessment methods developed for the recreational freshwater angler can be adapted for these two subpopulations.  In particular, the population centroid approach described in the previous sections can be adapted to include some of the specific conditions of these special populations



Source: US Census Bureau 2004.

**Figure 10-19.  U.S. Census Tracts with Native American Populations**

**Table 10-35. Summary of Estimated Mercury Exposures for Income-Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings: Population Centroid Approach—2001 Base Case[a]**

| Study Area | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (μg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2001; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| **Study Area** | 22,393 | 12.44 | 12.67 | 0.318 | 0.324 | 7,126 | $2,803 | $2,803 | $62,756,741 |
| **State** | | | | | | | | | |
| AL | 732 | 10.00 | 9.15 | 0.256 | 0.234 | 187 | $2,254 | $2,061 | $1,649,964 |
| AR | 663 | 12.96 | 9.75 | 0.332 | 0.249 | 220 | $2,921 | $2,197 | $1,935,007 |
| CT | 158 | 22.21 | 18.23 | 0.568 | 0.466 | 90 | $5,004 | $4,108 | $792,822 |
| DC | 20 | 5.04 | 2.77 | 0.129 | 0.071 | 3 | $1,135 | $625 | $22,162 |
| DE | 31 | 8.84 | 5.53 | 0.226 | 0.142 | 7 | $1,993 | $1,247 | $62,171 |
| FL | 1,059 | 19.64 | 13.16 | 0.502 | 0.337 | 532 | $4,425 | $2,965 | $4,686,540 |
| GA | 1,027 | 13.86 | 10.76 | 0.355 | 0.275 | 364 | $3,122 | $2,424 | $3,207,259 |
| IA | 348 | 6.21 | 3.52 | 0.159 | 0.090 | 55 | $1,398 | $794 | $486,319 |
| IL | 1,222 | 6.33 | 4.78 | 0.162 | 0.122 | 198 | $1,426 | $1,076 | $1,743,592 |
| IN | 565 | 9.04 | 6.42 | 0.231 | 0.164 | 131 | $2,037 | $1,448 | $1,150,670 |
| KS | 360 | 16.98 | 14.12 | 0.434 | 0.361 | 156 | $3,825 | $3,183 | $1,378,019 |
| KY | 716 | 11.46 | 7.86 | 0.293 | 0.201 | 210 | $2,583 | $1,771 | $1,849,315 |
| LA | 855 | 13.07 | 13.05 | 0.334 | 0.334 | 286 | $2,946 | $2,941 | $2,517,166 |
| MA | 259 | 21.59 | 14.11 | 0.552 | 0.361 | 143 | $4,865 | $3,179 | $1,261,763 |
| MD | 199 | 6.53 | 4.72 | 0.167 | 0.121 | 33 | $1,472 | $1,063 | $292,363 |
| ME | 119 | 28.78 | 15.65 | 0.736 | 0.401 | 88 | $6,485 | $3,528 | $771,948 |
| MI | 750 | 12.09 | 8.07 | 0.309 | 0.207 | 232 | $2,725 | $1,819 | $2,043,439 |
| MN | 742 | 7.60 | 5.36 | 0.194 | 0.137 | 144 | $1,712 | $1,207 | $1,270,006 |
| MO | 849 | 10.68 | 9.73 | 0.273 | 0.249 | 232 | $2,407 | $2,194 | $2,042,312 |
| MS | 651 | 13.29 | 8.60 | 0.340 | 0.220 | 221 | $2,996 | $1,938 | $1,950,276 |
| NC | 733 | 14.32 | 9.29 | 0.366 | 0.238 | 269 | $3,227 | $2,093 | $2,365,451 |

(continued)

**Table 10-35. Summary of Estimated Mercury Exposures for Income-Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings: Population Centroid Approach—2001 Base Case (continued)**

| State | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2001; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| ND | 119 | 12.52 | 12.12 | 0.320 | 0.310 | 38 | $2,821 | $2,731 | $336,550 |
| NE | 222 | 7.33 | 5.16 | 0.188 | 0.132 | 42 | $1,653 | $1,162 | $366,374 |
| NH | 58 | 24.69 | 17.20 | 0.632 | 0.440 | 37 | $5,563 | $3,876 | $325,028 |
| NJ | 254 | 15.54 | 11.42 | 0.398 | 0.292 | 101 | $3,501 | $2,573 | $888,373 |
| NY | 1,066 | 15.77 | 12.04 | 0.404 | 0.308 | 430 | $3,554 | $2,712 | $3,790,552 |
| OH | 1,029 | 13.28 | 10.01 | 0.340 | 0.256 | 350 | $2,993 | $2,256 | $3,079,702 |
| OK | 812 | 12.06 | 8.15 | 0.309 | 0.209 | 250 | $2,717 | $1,837 | $2,205,353 |
| PA | 771 | 19.57 | 27.90 | 0.501 | 0.714 | 386 | $4,409 | $6,288 | $3,398,897 |
| RI | 43 | 21.14 | 11.23 | 0.541 | 0.287 | 23 | $4,764 | $2,530 | $206,753 |
| SC | 539 | 16.90 | 14.54 | 0.432 | 0.372 | 233 | $3,807 | $3,277 | $2,052,104 |
| SD | 132 | 10.05 | 7.39 | 0.257 | 0.189 | 34 | $2,264 | $1,665 | $298,184 |
| TN | 792 | 11.47 | 8.36 | 0.294 | 0.214 | 232 | $2,585 | $1,883 | $2,047,437 |
| TX | 3,101 | 9.69 | 7.08 | 0.248 | 0.181 | 769 | $2,184 | $1,596 | $6,771,389 |
| VA | 455 | 9.28 | 7.86 | 0.238 | 0.201 | 108 | $2,092 | $1,772 | $951,503 |
| VT | 52 | 18.47 | 11.99 | 0.473 | 0.307 | 25 | $4,162 | $2,703 | $218,402 |
| WI | 599 | 10.26 | 7.53 | 0.263 | 0.193 | 157 | $2,313 | $1,698 | $1,384,873 |
| WV | 292 | 14.53 | 9.51 | 0.372 | 0.243 | 109 | $3,275 | $2,144 | $956,703 |

[a] Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table. For comparison purposes with the Base Cases in 2020, benefits presented in this table do not incorporate potential lags in fish tissue response to a change in mercury deposition.

**Table 10-36. Summary of Estimated Mercury Exposures for Income-Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings: Population Centroid Approach—2020 with CAIR[a]**

| Study Area | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2020; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| **Study Area** | 24,132 | 10.96 | 9.58 | 0.280 | 0.245 | 6,769 | $2,470 | $2,159 | $59,613,908 |
| **State** | | | | | | | | | |
| AL | 707 | 8.51 | 9.04 | 0.218 | 0.231 | 154 | $1,918 | $2,037 | $1,356,146 |
| AR | 711 | 11.95 | 8.37 | 0.306 | 0.214 | 217 | $2,693 | $1,886 | $1,914,546 |
| CT | 171 | 19.42 | 19.97 | 0.497 | 0.511 | 85 | $4,376 | $4,500 | $747,241 |
| DC | 17 | 3.17 | 1.47 | 0.081 | 0.038 | 1 | $715 | $331 | $12,454 |
| DE | 34 | 7.58 | 4.70 | 0.194 | 0.120 | 7 | $1,708 | $1,059 | $57,258 |
| FL | 1,342 | 18.37 | 11.62 | 0.470 | 0.297 | 631 | $4,139 | $2,618 | $5,553,735 |
| GA | 1,147 | 11.72 | 9.45 | 0.300 | 0.242 | 344 | $2,642 | $2,130 | $3,029,686 |
| IA | 340 | 6.00 | 3.19 | 0.154 | 0.082 | 52 | $1,352 | $720 | $460,380 |
| IL | 1,284 | 5.74 | 3.64 | 0.147 | 0.093 | 188 | $1,292 | $821 | $1,659,781 |
| IN | 598 | 7.60 | 5.09 | 0.195 | 0.130 | 116 | $1,714 | $1,147 | $1,024,603 |
| KS | 389 | 16.56 | 12.77 | 0.424 | 0.327 | 165 | $3,733 | $2,878 | $1,451,555 |
| KY | 704 | 8.72 | 6.09 | 0.223 | 0.156 | 157 | $1,964 | $1,372 | $1,382,855 |
| LA | 842 | 12.18 | 11.74 | 0.312 | 0.300 | 262 | $2,745 | $2,645 | $2,311,469 |
| MA | 268 | 19.24 | 12.96 | 0.492 | 0.332 | 132 | $4,335 | $2,921 | $1,163,445 |
| MD | 199 | 5.21 | 4.14 | 0.133 | 0.106 | 27 | $1,174 | $934 | $233,479 |
| ME | 106 | 26.54 | 14.04 | 0.679 | 0.359 | 72 | $5,980 | $3,163 | $631,624 |
| MI | 753 | 10.18 | 6.79 | 0.260 | 0.174 | 196 | $2,294 | $1,531 | $1,727,063 |
| MN | 790 | 7.90 | 5.64 | 0.202 | 0.144 | 160 | $1,780 | $1,270 | $1,405,268 |
| MO | 871 | 10.27 | 9.50 | 0.263 | 0.243 | 229 | $2,313 | $2,140 | $2,015,424 |
| MS | 634 | 12.17 | 7.57 | 0.311 | 0.194 | 197 | $2,743 | $1,706 | $1,739,298 |
| NC | 862 | 11.38 | 7.66 | 0.291 | 0.196 | 251 | $2,563 | $1,727 | $2,209,022 |

(continued)

**Table 10-36. Summary of Estimated Mercury Exposures for Income-Based Subsistence Population, with Associated IQ Decrements and Foregone Earnings: Population Centroid Approach—2020 with CAIR (continued)**

| State | Annual Number of Prenatally Exposed Children | Average Daily Maternal Ingestion of Mercury (µg/day/person) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (in 2020; 1999$) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| ND | 115 | 11.60 | 10.78 | 0.297 | 0.276 | 34 | $2,613 | $2,429 | $300,095 |
| NE | 249 | 6.95 | 4.58 | 0.178 | 0.117 | 44 | $1,566 | $1,032 | $389,257 |
| NH | 59 | 22.42 | 15.67 | 0.574 | 0.401 | 34 | $5,052 | $3,530 | $300,514 |
| NJ | 278 | 15.33 | 10.79 | 0.392 | 0.276 | 109 | $3,455 | $2,432 | $961,970 |
| NY | 1,116 | 15.09 | 10.47 | 0.386 | 0.268 | 431 | $3,402 | $2,359 | $3,796,552 |
| OH | 1,026 | 9.57 | 6.77 | 0.245 | 0.173 | 251 | $2,157 | $1,525 | $2,211,994 |
| OK | 869 | 11.44 | 7.66 | 0.293 | 0.196 | 254 | $2,578 | $1,726 | $2,240,049 |
| PA | 727 | 14.99 | 19.86 | 0.383 | 0.508 | 279 | $3,377 | $4,474 | $2,453,711 |
| RI | 47 | 18.67 | 9.39 | 0.478 | 0.240 | 23 | $4,208 | $2,115 | $198,873 |
| SC | 563 | 14.35 | 11.49 | 0.367 | 0.294 | 207 | $3,233 | $2,589 | $1,819,762 |
| SD | 135 | 9.53 | 8.28 | 0.244 | 0.212 | 33 | $2,147 | $1,865 | $288,880 |
| TN | 836 | 9.25 | 6.58 | 0.237 | 0.168 | 198 | $2,085 | $1,484 | $1,742,925 |
| TX | 3,968 | 8.98 | 6.45 | 0.230 | 0.165 | 912 | $2,024 | $1,453 | $8,033,117 |
| VA | 462 | 7.59 | 6.91 | 0.194 | 0.177 | 90 | $1,711 | $1,557 | $791,208 |
| VT | 47 | 16.09 | 9.65 | 0.412 | 0.247 | 19 | $3,625 | $2,174 | $169,340 |
| WI | 609 | 9.38 | 6.03 | 0.240 | 0.154 | 146 | $2,113 | $1,359 | $1,287,089 |
| WV | 258 | 9.32 | 9.88 | 0.239 | 0.253 | 62 | $2,101 | $2,227 | $542,241 |

[a] Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table. For comparison purposes with the Base Cases in 2001, benefits presented in this table do not incorporate potential lags in fish tissue response to a change in mercury deposition.

**Table 10-37. Summary of Annual Benefit Estimates for Income-Based Subsistence Population: Population Centroid Approach**

| | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
|---|---|---|---|---|
| | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| **Annual Number of Prenatally Exposed Children** | | | | |
| 2001 Base Case | 23,037 | 24,310 | 22,699 | 30,548 |
| 2020 Base Case (with CAIR) | 27,126 | 29,661 | 25,859 | 37,266 |
| **Per Capita Avoided IQ Decrements** | | | | |
| 2001 Utility Emissions Zero-Out (Relative to 2001 Base Case) | 0.042 | 0.041 | 0.043 | 0.040 |
| 2020 Base Case with CAIR (Relative to 2001 Base Case applied to 2020 demographics) | 0.035 | 0.034 | 0.035 | 0.033 |
| 2020 Utility Emissions Zero-Out (Relative to 2020 Base Case with CAIR) | 0.015 | 0.015 | 0.015 | 0.014 |
| 2020 CAMR Control Option 1 (Relative to 2020 Base Case with CAIR) | 0.003 | 0.003 | 0.003 | 0.003 |
| 2020 CAMR Control Option 2 (Relative to 2020 Base Case with CAIR) | 0.005 | 0.005 | 0.005 | 0.004 |
| **Total Value of Benefits (1999$s)** | | | | |
| 2001 Utility Emissions Zero-Out (Relative to 2001 Base Case) | | | | |
|   1% Discount Rate; Present Value in 2001 | N/A | N/A | N/A | $6,556,561 |
|   3% Discount Rate; Present Value in 2001 | $6,379,897 | $4,905,014 | $7,362,516 | $2,459,708 |
|   7% Discount Rate; Present Value in 2001 | $4,358,611 | $2,289,334 | $6,085,461 | $366,063 |
| 2020 Base Case with CAIR (Relative to 2001 Base Case applied to 2020 demographics) | | | | |
|   1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $6,499,636 |
|   3% Discount Rate; Present Value in 2020 | $6,139,097 | $4,905,679 | $6,853,900 | $2,438,352 |
|   7% Discount Rate; Present Value in 2020 | $4,194,102 | $2,289,645 | $5,665,066 | $362,885 |
| 2020 Utility Emissions Zero-Out (Relative to 2020 Base Case with CAIR) | | | | |
|   1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $2,851,684 |
|   3% Discount Rate; Present Value in 2020 | $2,717,338 | $2,165,647 | $3,038,206 | $1,069,816 |
|   7% Discount Rate; Present Value in 2020 | $1,856,428 | $1,010,780 | $2,511,218 | $159,214 |
| **BENEFITS OF CONTROL OPTIONS** | | | | |
| 2020 CAMR Control Option 1 (Relative to 2020 Base Case with CAIR) | | | | |
|   1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $593,633 |
|   3% Discount Rate; Present Value in 2020 | $572,354 | $454,554 | $641,184 | $222,703 |
|   7% Discount Rate; Present Value in 2020 | $391,020 | $212,155 | $529,968 | $33,143 |
| 2020 CAMR Control Option 2 (Relative to 2020 Base Case with CAIR) | | | | |
|   1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $885,766 |
|   3% Discount Rate; Present Value in 2020 | $840,630 | $670,774 | $939,259 | $332,297 |
|   7% Discount Rate; Present Value in 2020 | $574,301 | $313,073 | $776,341 | $49,454 |

***10.6.4  Adaptation of the Population Centroid Approach to Estimate Exposed Hmong and Chippewa Population***

The first step in applying the population centroid approach is to estimate the size and location of the relevant populations.  The approach was adapted to address limitations in the Census data for analyzing specific ethnic subpopulations.

One of the limitations of Census data is that demographic data for specific racial groups, such as Hmong and Chippewa, are not available at a block group level.  However, they are available at a Census tract level and at higher levels of spatial aggregation (e.g., county).  To apply the population centroid model, tract-level data were first used to approximate the number of Hmong and Chippewa females aged 15 to 44 in each block group.  First, for each tract, the percentage of its *total population* residing in each block group was calculated.  These same percentages were then applied to divide the Hmong and Chippewa populations into each block group.  In effect, it was assumed that distribution of the Hmong and Chippewa populations across block groups in a tract is the same as the distribution of the total population in the tract.

Another limitation of Census data is that, if a specific racial group numbers less than 100 in a tract, the population size for this group is not reported in Census tract-level data.  Because this analysis does not include these unreported populations, it underestimate the total size of the relevant Hmong and Chippewa populations.

Table 10-38 summarizes the resulting block group population estimates in 2001 for females aged 15 to 44.  State-level population growth rate projections to update Census 2000 data to 2001.  Using tract-level data, Hmong populations could be estimated for roughly 7 percent of the Census block groups in Minnesota and about 9 percent in Wisconsin.  Chippewas populations could be estimated in Michigan and Wisconsin for about 1 percent of block groups and in Minnesota for 4 percent.  The estimated number of females of childbearing age in each block group ranged from 0 to 184 for the Hmong and from 0 to 662 for the Chippewa.

As shown in Table 10-38, the total number of Hmong women of childbearing age in the two states is estimated to be roughly 13,300, which is about 16 percent of the total Hmong population.  Since women of childbearing age typically represent about 20 percent of the overall population, it is expected that the analysis based on tract level Census data underestimated the exposed Hmong population by about 20 percent.  For Chippewa, a similar calculation suggests

**Table 10-38. Block Group Demographics for Hmong and Chippewa Females, Aged 15 to 44 (in 2001)**

| State | Total Hmong Population | Total Chippewa Population | Total Number of Block Groups | Number of Block Groups | | Hmong Female Population, Aged 15–44, per Block Group[a,b] | | | Chippewa Female Population, Aged 15–44, per Block Group[a,b] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | With Hmong Populations[b] | With Chippewa Populations[b] | Mean | S.D. | Total | Mean | S.D. | Total |
| MI | — | 32,267 | 8,450 | — | 103 | — | — | — | 23.33 | 29.84 | 2,403 |
| MN | 45,530 | 39,910 | 4,082 | 279 | 166 | 28.56 | 29.66 | 7,969 | 29.44 | 69.72 | 4,888 |
| WI | 36,809 | 16,560 | 4,388 | 398 | 48 | 13.29 | 13.45 | 5,290 | 37.73 | 56.48 | 1,811 |
| Total | 82,339 | 88,737 | 16,920 | 677 | 317 | 19.58 | 22.91 | 13,259 | 28.71 | 57.64 | 9,101 |

[a] For Census tracts with Hmong or Chippewa populations of less than 100, population is extrapolated from county-level data.
[b] Estimate extrapolated from Census tract-level data.

that the exposed Chippewa population was underestimated by about 50 percent.  The uncounted populations are presumably in tracts with less than 100 Hmong or Chippewa.

The second step is to estimate the number of *pregnant* women by Census block group for each of the two special populations (denoted by subscript T).  For the recreational freshwater angler analysis, state-level fertility rate data were used to estimate numbers of pregnant women. Fertility rates for broad ethnic groups are not available at a state level, but they are available at a national level (Hamilton, Sutton, and Ventura, 2003).  Therefore, state-level fertility rates for the general population were adjusted by the ratio of (1) national-level fertility rates for each ethnic group to (2) national-level fertility rate for the general population.  For the two special populations, the number of pregnant women in each Census block was estimated as follows.

$$\text{Number of pregnant women } (NP_T) = NF_T * f_s * (f_{NT} / f_N) \qquad \text{(Eq. 10.19)}$$

where

$NF_T$   =   number of females aged 15 to 44 (Census) for the given special population,

$f_s$   =   state-level fertility rate for the general population (live births per 1,000 women aged 15 to 44),

$f_N$   =   national fertility rate for the general population (live births per 1,000 women aged 15 to 44), and

$f_{NT}$   =   national fertility rate for Asians/Pacific Islander (including Hmong) or American Indians (including Chippewa) (live births per 1,000 women aged 15 to 44).

For Minnesota, Wisconsin, and Michigan, the state-level fertility rates for the general population in 2001 ($f_s$) were 61.8, 59.6, and 62 live births respectively per 1,000 women aged 15 to 44.  The national fertility rate for the general population ($f_N$) was 65.3 births per 1,000.  For Asians/Pacific Islanders and for American Indians, the national fertility rates were 64.2 and 58.1 respectively.

In the third step, the number of pregnant women in each block group who live in households with freshwater anglers was estimated.  For both groups, the size of this exposed population of interest was estimated as:

$$NPA_T = NP_T * AH_T \qquad \text{(Eq. 10.20)}$$

where $AH_T$ = percentage of households with freshwater anglers.

For the Hmong, results from a study by Hutchison and Kraft (1994) were used to estimate $AH_T$.  This study examined a random sample of 125 Hmong households from Green Bay, Wisconsin, and collected data on fishing frequency, fish consumption frequency, fishing travel distances, types of fish caught and consumed, and other related behaviors.  In their sample, 57.6 percent of the households were freshwater anglers.  For this analysis, it was assumed that this same percentage applies to all Hmong households in Minnesota and Wisconsin.

For the Chippewa, this third step (estimation of $AH_T$ and $NPA_T$) was not applied because, as discussed below, the freshwater fish consumption rate estimate available for the

Chippewa is not restricted to only angler households.  Therefore, to maintain consistency with this consumption rate estimate, the exposed Chippewa population was not restricted to only include those in angler households.

After estimating the exposed populations of interest, the population centroid approach was applied to estimate the average mercury concentration in consumed freshwater fish and the rate of mercury ingestion for the exposed population so interest.

To estimate the percentage of trips to different distance categories for the Hmong, results from Hutchison and Kraft (1994) were again used.  In their study, the maximum freshwater fishing trip distance for the Hmong was 48 miles; thus, it was assumed that all trips by Hmong anglers are within 50 miles of their residence.  Within the 50-mile radius, trips were allocated to the three distance categories in the same proportion (23:17:23) as for the recreational freshwater angler.  Therefore, the percentage of Hmong freshwater fishing trips in the three distance categories of 0–10 miles, >10–20 miles, and >20–50 miles were assumed to be 36.5 percent, 27 percent, and 36.5 percent, respectively.

No specific data on average distance traveled to fish are available for the Chippewa.  However, information in Peterson et al. (1994) suggests that most fish is locally caught.  Therefore, the same trip distance assumptions that were applied to the Hmong were also applied to the Chippewa.  In other words, it was assumed that all fishing trips are within 50 miles and that, within this radius, they are distributed in the same proportion as for the recreational freshwater angler.

To further adapt the model for the two special populations, daily consumption rate (C) estimates based on specific data for these populations were included in the analysis.  For the Hmong, a consumption rate of 21.2 g/day was included, which was calculated using the consumption frequency data reported by Hutchison and Kraft (1994).  Using their summary data, the average number of fish meals per year (34.1) for anglers in the sample was estimated.  This estimate was then multiplied by the assumed average fish meal size of 8 oz/meal (227 g/meal) reported in Hutchison and Kraft and divided by 365 to estimate the average daily fish consumption rate.

For the Chippewa, a daily consumption rate of 20 g/day was used, based on recommendations from EPA's *Exposure Factor Handbook* (EPA, 1997b).  EPA's analysis used data from Peterson et al. (1994) to estimate a mean freshwater fish consumption rate (1.2 meals per week) and Pao et al. (1982) to estimate the average weight of a fish meal (117 g/meal).  The Peterson et al. (1994) study specifically examined the fish consumption habits and blood mercury levels of Chippewa Indians from northern Wisconsin, using a random sample of 175 and a nonrandom sample of 152 tribal members.  This daily consumption rate is based on a general sample of Chippewa adults, not only on a sample of those who fish or who consume freshwater fish.  Therefore, this rate can reasonably be applied to the total estimated exposed population of Chippewa, rather than to a subset from angler households.

**Summary and Discussion of Results**.  Table 10-39 summarizes estimates of the size of exposed population of interest.  In 2001 the mean population of prenatally exposed children per block group was estimated to be 0.12 and 0.08, and the total exposed population estimate was

553 and 10,947 across the study area for the Hmong and Chippewa respectively.  By 2021 (after a 20 year lag), the Hmong population of prenatally exposed children is expected almost double, and the exposed Chippewa population was projected to grow by over 60 percent.

The estimated average daily maternal ingestion rates (HgI) across the states in 2001 are reported in Table 10-40.  For the Hmong, HgI was estimated to be 4.46 µg/day and per capita IQ decrements were estimated to be 0.11 points.  For the Chippewa, the HgI estimate is 5.2 µg/day and the per capita IQ decrements were estimated to be 0.13 points.  Under baseline conditions in 2001, the present value of total IQ related losses for the Hmong was estimated to be $0.6 million.  For the Chippewa, it was estimated to be $1.3 million.

Table 10-41 reports comparable results for the 2020 Based with CAIR.  For the Hmong, HgI was estimated to be 4.46 µg/day and per capita IQ decrements were estimated to be 0.11 points for the two states (MN and WI) combined.  These estimates are the same as for the 2001 Base Case, but they reflect higher estimated average mercury concentrations for block groups in MN (relative to the 2001 baseline) and lower concentrations in WI.  For the Chippewa, the HgI estimate is 4.7 µg/day and the per capita IQ decrements were estimated to be 0.12 points.  Under baseline conditions in 2001, the present value of total IQ related losses for the Hmong was estimated to be $1 million.  For the Chippewa, it was estimated to be $1.9 million.  Both of these estimates are higher than for the 2001 Base Case due to the relatively large increase in exposed populations from 2001 to 2020 (as reported in Table 10-39)

Tables 10-42 and 10-43 report estimates of beneficial changes to the two subpopulations under the five emissions control scenarios, including estimates for five lag periods and three assumed discount rates.  For the Hmong, the 2001 Utility Emissions Zero-Out is estimated to result in changes in per capita IQ decrements that range from 0.0007 less to 0.0012 more than under the 2001 Base Case, and the 2020 Base Case with CAIR is estimated to result in per capita IQ decrements that are between 0.0069 and 0.0078 less.  Compared to the 2020 Base Case with CAIR, the 2020 Utility Emissions Zero-Out is estimated to reduce per capita IQ decrements by an average of 0.0075 points.  CAMR Options 1 and 2, by comparison, are estimated to reduce them by an average of 0.0004 and 0.0014 points respectively.

For the Chippewa, the 2001 Utility Emissions Zero-Out is estimated to result in per capita IQ decrements that are approximately 0.023 less than under the 2001 Base Case, and the 2020 Base Case with CAIR is estimated to result in per capita IQ decrements that are 0.015 less.  Compared to the 2020 Base Case with CAIR, the 2020 Utility Emissions Zero-Out is estimated to reduce per capita IQ decrements by an average of 0.013 points.  CAMR Options 1 and 2, by comparison, are estimated to reduce them by an average of 0.001 and 0.002 points respectively.

**Table 10-39. Estimated Annual Number of Prenatally Exposed Children from Special Populations for Selected Lag Periods: Population Centroid Approach**

**LAG Periods from 2001**

| Population State | Base Year of Comparison (2001) Per Block Group Mean | S.D. | Total Exposed Population | 5 Year Lag (2006) Per Block Group Mean | S.D. | Total Exposed Population | 10 Year Lag (2011) Per Block Group Mean | S.D. | Total Exposed Population | 20 Year Lag (2021) Per Block Group Mean | S.D. | Total Exposed Population | 50 Year Lag (2051) Per Block Group Mean | S.D. | Total Exposed Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Hmong** | | | | | | | | | | | | | | | |
| MN | 0.136 | 0.449 | 321 | 0.165 | 0.544 | 390 | 0.192 | 0.636 | 452 | 0.238 | 0.796 | 561 | 0.422 | 1.357 | 995 |
| WI | 0.102 | 0.206 | 232 | 0.124 | 0.255 | 282 | 0.147 | 0.305 | 333 | 0.195 | 0.416 | 445 | 0.421 | 0.996 | 958 |
| 2-State Total | 0.119 | 0.352 | 553 | 0.145 | 0.428 | 672 | 0.170 | 0.502 | 786 | 0.217 | 0.639 | 1,006 | 0.421 | 1.193 | 1,953 |
| **Chippewa** | | | | | | | | | | | | | | | |
| MI | 0.051 | 0.203 | 400 | 0.058 | 0.221 | 451 | 0.063 | 0.241 | 495 | 0.074 | 0.265 | 575 | 0.136 | 0.490 | 1,064 |
| MN | 0.172 | 0.912 | 506 | 0.208 | 1.099 | 613 | 0.235 | 1.226 | 693 | 0.293 | 1.474 | 862 | 0.607 | 3.060 | 1,788 |
| WI | 0.061 | 0.395 | 189 | 0.075 | 0.484 | 229 | 0.085 | 0.547 | 260 | 0.107 | 0.701 | 330 | 0.230 | 1.693 | 706 |
| 3-State Total | 0.079 | 0.487 | 1,094 | 0.094 | 0.584 | 1,293 | 0.105 | 0.651 | 1,448 | 0.128 | 0.787 | 1,767 | 0.257 | 1.674 | 3,559 |

**LAG Periods from 2020**

| Population State | Base Year of Comparison (2020) Per Block Group Mean | S.D. | Total Exposed Population | 5 Year Lag (2025) Per Block Group Mean | S.D. | Total Exposed Population | 10 Year Lag (2030) Per Block Group Mean | S.D. | Total Exposed Population | 20 Year Lag (2040) Per Block Group Mean | S.D. | Total Exposed Population | 50 Year Lag (2070) Per Block Group Mean | S.D. | Total Exposed Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Hmong** | | | | | | | | | | | | | | | |
| MN | 0.269 | 0.899 | 634 | 0.264 | 0.882 | 621 | 0.297 | 0.993 | 701 | 0.364 | 1.215 | 859 | 0.565 | 1.816 | 1,333 |
| WI | 0.180 | 0.396 | 410 | 0.222 | 0.482 | 506 | 0.261 | 0.576 | 595 | 0.339 | 0.767 | 772 | 0.582 | 1.362 | 1,325 |
| 2-State Total | 0.226 | 0.700 | 1,045 | 0.243 | 0.715 | 1,127 | 0.280 | 0.815 | 1,295 | 0.352 | 1.020 | 1,632 | 0.574 | 1.609 | 2,657 |
| **Chippewa** | | | | | | | | | | | | | | | |
| MI | 0.073 | 0.247 | 569 | 0.078 | 0.281 | 611 | 0.090 | 0.316 | 699 | 0.112 | 0.395 | 875 | 0.177 | 0.669 | 1,386 |
| MN | 0.310 | 1.794 | 914 | 0.322 | 1.589 | 949 | 0.375 | 1.836 | 1,104 | 0.480 | 2.344 | 1,413 | 0.826 | 4.157 | 2,432 |
| WI | 0.091 | 0.587 | 280 | 0.120 | 0.797 | 370 | 0.142 | 0.951 | 435 | 0.184 | 1.267 | 566 | 0.306 | 2.178 | 938 |
| 3-State Total | 0.128 | 0.897 | 1,763 | 0.140 | 0.856 | 1,930 | 0.162 | 0.994 | 2,238 | 0.206 | 1.279 | 2,854 | 0.344 | 2.248 | 4,756 |

**Table 10-40. Summary of Estimated Mercury Exposures for Special Populations in 2001, with Associated IQ Decrements and Foregone Earnings: Population Centroid Approach—Base Case 2001**

| Population | State | Average Daily Maternal Ingestion of Mercury (ug/day) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (1999$s in 2001) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| Hmong | | | | | | | | | |
| | MN | 3.783 | 0.364 | 0.097 | 0.009 | 31.106 | $852 | $82 | $273,959 |
| | WI | 5.392 | 1.513 | 0.138 | 0.039 | 31.961 | $1,215 | $341 | $281,492 |
| | 2-State Total | 4.457 | 1.276 | 0.114 | 0.033 | 63.067 | $1,004 | $288 | $555,451 |
| Chippewa | | | | | | | | | |
| | MI | 6.406 | 1.075 | 0.164 | 0.028 | 65.523 | $1,444 | $242 | $577,082 |
| | MN | 4.057 | 0.976 | 0.104 | 0.025 | 52.526 | $914 | $220 | $462,613 |
| | WI | 5.815 | 1.318 | 0.149 | 0.034 | 28.060 | $1,310 | $297 | $247,128 |
| | 3-State Total | 5.218 | 1.505 | 0.134 | 0.039 | 146.109 | $1,176 | $339 | $1,286,823 |

[a] Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table.

10-126

**Table 10-41. Summary of Estimated Mercury Exposures for Special Populations in 2020, with Associated IQ Decrements and Foregone Earnings: Population Centroid Approach—Base Case 2020 with CAIR[a]**

| Population | State | Average Daily Maternal Ingestion of Mercury (ug/day) | | IQ Decrements in Prenatally Exposed Children | | | Present Value of Foregone Net Earnings due to IQ Decrements (1999$s in 2020) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Total | Mean | S.D. | Total |
| Hmong | | | | | | | | | |
| | MN | 4.040 | 0.311 | 0.103 | 0.008 | 65.563 | $910 | $70 | $577,428 |
| | WI | 5.101 | 1.570 | 0.131 | 0.040 | 53.566 | $1,149 | $354 | $471,769 |
| | 2-State Total | 4.456 | 1.112 | 0.114 | 0.028 | 119.128 | $1,004 | $251 | $1,049,197 |
| Chippewa | | | | | | | | | |
| | MI | 5.733 | 1.311 | 0.147 | 0.034 | 83.480 | $1,292 | $295 | $735,236 |
| | MN | 3.904 | 0.901 | 0.100 | 0.023 | 91.320 | $880 | $203 | $804,278 |
| | WI | 5.506 | 1.445 | 0.141 | 0.037 | 39.476 | $1,241 | $326 | $347,674 |
| | 3-State Total | 4.749 | 1.325 | 0.122 | 0.034 | 214.276 | $1,070 | $299 | $1,887,187 |

[a] Benefits analyses using the population centroid approach were conducted at a block group level, but for summary purposes the results are aggregated and reported at a state level in this table. For comparison purposes with the Base Cases in 2001, benefits presented in this table do not incorporate potential lags in fish tissue response to a change in mercury deposition.

**Table 10-42.  Summary of Annual Benefit Estimates for Hmong Special Population: Population Centroid Approach**

| | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
|---|---|---|---|---|
| | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| **Hmong (MN and WI)** | | | | |
| **Annual Number of Prenatally Exposed Children** | | | | |
| 2001 Base Case | 786 | 1,006 | 672 | 1,953 |
| 2020 Base Case (with CAIR) | 1,295 | 1,632 | 1,127 | 2,657 |
| **Per Capita Avoided IQ Decrements** | | | | |
| 2001 Utility Emissions Zero-Out (Relative to 2001 Base Case) | 0.0096 | 0.0095 | 0.0097 | 0.0094 |
| 2020 Base Case with CAIR (Relative to 2001 Base Case applied to 2020 demographics) | 0.0006 | 0.0008 | 0.0004 | 0.0012 |
| 2020 Utility Emissions Zero-Out (Relative to 2020 Base Case with CAIR) | 0.0075 | 0.0076 | 0.0074 | 0.0078 |
| 2020 CAMR **Control Option 1** (Relative to 2020 Base Case with CAIR) | 0.0004 | 0.0004 | 0.0004 | 0.0004 |
| 2020 CAMR **Control Option 2** (Relative to 2020 Base Case with CAIR) | 0.0015 | 0.0016 | 0.0015 | 0.0016 |
| **Total Value of Benefits (1999$)** | | | | |
| 2001 Utility Emissions Zero-Out (Relative to 2001 Base Case) | | | | |
| 1% Discount Rate; Present Value in 2001 | N/A | N/A | N/A | $98,779 |
| 3% Discount Rate; Present Value in 2001 | $49,613 | $46,758 | $49,506 | $37,057 |
| 7% Discount Rate; Present Value in 2001 | $33,894 | $21,824 | $40,919 | $5,515 |
| 2020 Base Case with CAIR (Relative to 2001 Base Case applied to 2020 demographics) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $16,402 |
| 3% Discount Rate; Present Value in 2020 | $5,071 | $6,539 | $3,725 | $6,153 |
| 7% Discount Rate; Present Value in 2020 | $3,465 | $3,052 | $3,079 | $916 |
| 2020 Utility Emissions Zero-Out (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $110,358 |
| 3% Discount Rate; Present Value in 2020 | $63,540 | $60,308 | $63,511 | $41,401 |
| 7% Discount Rate; Present Value in 2020 | $43,409 | $28,148 | $52,495 | $6,161 |
| **BENEFITS OF CONTROL OPTIONS** | | | | |
| 2020 CAMR **Control Option 1** (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $6,076 |
| 3% Discount Rate; Present Value in 2020 | $3,477 | $3,311 | $3,466 | $2,280 |
| 7% Discount Rate; Present Value in 2020 | $2,375 | $1,546 | $2,865 | $339 |
| 2020 CAMR **Control Option 2** (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $23,043 |
| 3% Discount Rate; Present Value in 2020 | $12,968 | $12,417 | $12,877 | $8,644 |
| 7% Discount Rate; Present Value in 2020 | $8,859 | $5,796 | $10,643 | $1,287 |

**Table 10-43.  Summary of Annual Benefit Estimates for Chippewa Special Population: Population Centroid Approach**

| | Central Estimate of Fish Tissue Response Times | | Alternative Estimate of Fish Tissue Response Times | |
|---|---|---|---|---|
| | 10-Yr Lag | 20-Yr Lag | 5-Yr Lag | 50-Yr Lag |
| **Chippewa (MI, MN, and WI)** | | | | |
| **Annual Number of Prenatally Exposed Children** | | | | |
| 2001 Base Case | 1,448 | 1,767 | 1,293 | 3,559 |
| 2020 Base Case (with CAIR) | 2,238 | 2,854 | 1,930 | 4,756 |
| **Per Capita Avoided IQ Decrements** | | | | |
| 2001 Utility Emissions Zero-Out (Relative to 2001 Base Case) | 0.022 | 0.021 | 0.024 | 0.021 |
| 2020 Base Case with CAIR (Relative to 2001 Base Case applied to 2020 demographics) | 0.015 | 0.016 | 0.015 | 0.015 |
| 2020 Utility Emissions Zero-Out (Relative to 2020 Base Case with CAIR) | 0.013 | 0.013 | 0.013 | 0.013 |
| 2020 CAMR Control Option 1 (Relative to 2020 Base Case with CAIR) | 0.001 | 0.001 | 0.001 | 0.001 |
| 2020 CAMR Control Option 2 (Relative to 2020 Base Case with CAIR) | 0.002 | 0.002 | 0.002 | 0.002 |
| **Total Value of Benefits (1999$)** | | | | |
| 2001 Utility Emissions Zero-Out (Relative to 2001 Base Case) | | | | |
| 1% Discount Rate; Present Value in 2001 | N/A | N/A | N/A | $214,504 |
| 3% Discount Rate; Present Value in 2001 | $115,066 | $102,720 | $120,309 | $80,472 |
| 7% Discount Rate; Present Value in 2001 | $78,611 | $47,943 | $99,441 | $11,976 |
| 2020 Base Case with CAIR (Relative to 2001 Base Case applied to 2020 demographics) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $220,164 |
| 3% Discount Rate; Present Value in 2020 | $130,050 | $123,387 | $130,029 | $82,595 |
| 7% Discount Rate; Present Value in 2020 | $88,847 | $57,589 | $107,475 | $12,292 |
| 2020 Utility Emissions Zero-Out (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $190,562 |
| 3% Discount Rate; Present Value in 2020 | $113,612 | $106,942 | $114,256 | $71,490 |
| 7% Discount Rate; Present Value in 2020 | $77,618 | $49,913 | $94,438 | $10,639 |
| **BENEFITS OF CONTROL OPTIONS** | | | | |
| 2020 CAMR Control Option 1 (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $11,266 |
| 3% Discount Rate; Present Value in 2020 | $6,698 | $6,331 | $6,716 | $4,227 |
| 7% Discount Rate; Present Value in 2020 | $4,576 | $2,955 | $5,551 | $629 |
| 2020 CAMR Control Option 2 (Relative to 2020 Base Case with CAIR) | | | | |
| 1% Discount Rate; Present Value in 2020 | N/A | N/A | N/A | $26,212 |
| 3% Discount Rate; Present Value in 2020 | $15,331 | $14,543 | $15,331 | $9,834 |
| 7% Discount Rate; Present Value in 2020 | $10,474 | $6,788 | $12,671 | $1,463 |

For the Hmong subpopulation, the aggregate benefits of CAMR Option 1 assuming 10 and 20 year lag periods are estimated to be $3,500 and $3,300 respectively.  These estimates are 5 percent as large as the corresponding estimates for the 2020 Utility Emissions Zero-Out.  For CAMR Option 2, these estimates are $14,000 and $12,400 respectively, which are 20 percent as large as the corresponding estimates for the 2020 Utility Emissions Zero-Out.

For the Chippewa subpopulation, the aggregate benefits of CAMR Option 1 assuming 10 and 20 year lag periods are estimated to be $6,700 and $6,300 respectively.  These estimates are 6 percent as large as the corresponding estimates for the 2020 Utility Emissions Zero-Out.  For CAMR Option 2, these estimates are $15,300 and $14,500 respectively, which are 14 percent as large as the corresponding estimates for the 2020 Utility Emissions Zero-Out.

The analyses presented in this section examining distributional equity in the context of the Hmong and Chippewa were constrained significantly by not having considered variability in fish consumption rates for these two high fish consuming populations.  Challenges in identifying peer-reviewed data characterizing high-end percentile self-caught freshwater fish consumption rates for these two populations prevented IQ benefits modeling from considering inter-individual variability in fish consumption rates.  While this is not problematic in the context of modeling overall (mean) benefits for the population as a whole, it does significantly limit the utility of considering per-capita IQ benefits in the context of distributional equity, since a key factor determining high-end benefits levels is not considered (i.e., high-end fish consumption rates which can result in disproportionately large IQ benefits, if matched to large mercury fish tissue concentration changes).

In order to provide additional insights into the distributional equity issue (and address to a certain extent this limitation in characterizing high-end fish consumption in modeling both the Hmong and Chippewa), EPA has included a Sensitivity Analysis specifically examining the issue of distributional equity for high fish consuming populations.  As discussed below, this sensitivity analysis uses high-end (potentially bounding) fish consumption rates identified through NODA comments to support an analysis of distributional equity for Native American populations in the 37 state study area."

### 10.6.5  Sensitivity Analysis Examining the Economic Benefit Equity Issue in the Context of High Fish Consuming (subsistence) Populations Including Native Americans

There is the potential that, due to elevated fish consumption rates, individuals exhibiting subsistence-like fishing behavior could experience disproportionately higher benefits from this rule (i.e., the degree of per-capita IQ benefit for prenatally-exposed children of these fishers could be significantly higher than the degree of IQ benefit predicted for the general recreational angler population).  Another way of viewing this issue is that EGU-attributable mercury impacts could disproportionately impact these high fish-consuming populations and consequently, this rule could have relatively larger benefits for these special populations by reducing their disproportionate health impacts.  If this is the case (i.e., special high-consumption populations are found to have disproportionately larger benefits then the general recreational angler), then it be justified to support this rule on economic equity grounds, regardless of the net economic benefit-cost ratio.

Ideally, this distributional equity issue would be examined by systematically modeling population-level benefits for potentially high exposure populations including Native American populations exhibiting subsistence-like behavior.  Specifically, using the population centroid model combined with (a) a probabilistic consideration of fish consumption rate variability in the study population, (b) demographic data on the distribution of these special populations across the study area and (c) modeled delta fish tissue concentrations for the CAMR rule, we would model the distribution of benefits (i.e., IQ loss reductions) across specific high consumption populations as a result of CAMR.  In this context, modeling exposure using *fish consumption variability distributions* is critical since ultimately, we are interested in higher-end exposures for these populations which likely reflect a combination of high fish consumption rates paired with relatively higher mercury fish tissue concentrations changes (for the rule being modeled).

In developing the benefits model for this RIA, EPA attempted to conduct this type of focused benefits modeling for two key potentially high-consuming populations including the Hmong and Chippewa (the former located in Minnesota, Wisconsin and Michigan and the latter in Minnesota and Wisconsin - see Section 10.6.1).  These two populations were chosen because they are known to have higher fish consumption rates and because mercury fish tissue concentrations in these areas are fairly large relative to other portions of the study area.  However, several factors surfaced in modeling these two population which prevented a comprehensive analysis of these populations in the context of distributional equity including (a) it was not possible to establish fish consumption distributions for either populations since we could not identify a defensible upper-end percentile consumption rate for use in fitting a distribution and (b) ultimately, air quality modeling showed that the regions where these two populations are located are not generally associated with the highest EGU-related mercury deposition changes (these high deposition change areas are located primarily near the Ohio River valley).  These two factors diminished the ability of the benefits analysis, as conducted for the Hmong and Chippewa to effectively address the potential for distributional equity concerns regarding these two populations.

However, given the potential importance that EPA places on distributional equity as a consideration in cost-benefit analysis, we have completed a sensitivity analysis designed to evaluate the potential for disproportionate health benefits for high fish consumption (subsistence) populations.  The methodology used in this sensitivity analysis and the results of the analysis are presented in this section.  Specifically, we have selected a high-end (near bounding) fish consumption rate (discussed below) for Native American populations and combined this value with upper-bound mercury fish tissue concentration changes (deltas) for Option 1 identified through several scenarios (described below) to estimate upper bound IQ benefits for these populations across the 37 state study area.  This sensitivity analysis, while not allowing any enumeration of these populations, does allow us to determine whether there is the potential for disproportionate health impacts for Native American populations and other high fish consuming populations based on a combination of these conservative exposure assumptions.

A determination that disproportionate health benefits are experienced by a special population is ultimately based on consideration of two factors: (a) are the levels of health benefits (in this case IQ loss reductions for prenatally-exposed children) for the special population relatively larger than the general recreational angler population and (b) in absolute terms, are the magnitude of the health benefits experienced by the special population considered

significant.  This second point is important to emphasize.  Even if a special population has relatively larger health benefits (e.g., an order of magnitude larger than the general recreational angler), if those health benefits are considered non-significant in absolute terms (e.g., less than 1 IQ point is saved based on conservative high-end exposure modeling), then it may be reasonable to conclude that there is little support for an distributional equity argument since the absolute level of health benefit involved is not considered significant.

<u>Fish Consumption Values Used in the Sensitivity Analysis</u>

Because this sensitivity analysis is considering high-end conditions for exposure in the context of this distributional equity analysis for Native American populations, the fish consumption rate selected needed to represent high-end (near bounding) behavior, if possible. The EPA recommends a 95th% consumption rate of 170 g/day for Native American subsistence fishing populations in its Exposure Factors Handbook (EPA, 1997).  This consumption rate would be a reasonable upper-bound for Native American populations and could arguably be used in this sensitivity analysis.  However, in comments received for the NODA to this rule, fish consumption rates specifically for the Ojibwa in Minnesota, Wisconsin and Michigan were identified.  These values covered consumption rates for the spring (189.6-393.8 grams/day) and fall (155.8 to 240.7 grams/day) spear fishing seasons.  Because this sensitivity analysis is attempting to determine whether an equity issue exists (i.e., are there individuals with disproportionate health benefits), EPA decided that rather than using the EPA-recommended value of 170 g/day, it would develop an even more conservative (near bounding) value based on the NODA comment data.  Specifically, EPA used the highest seasonal value provided by the commentor and apply that to the full year (i.e., assume that annual-averaged daily fish consumption is 393.8 grams/day).  This value is very conservative and is not appropriate for other portions of this analysis since it is not possible to determine the percentile of the Ojibwe population that it represents (i.e., it could be a near max/bounding value, or it could be closer to a 95th%).  However, because this distributional equity analysis is intended to screen for potential disparities in health benefits, use of a very conservative bounding analysis is considered reasonable in this case.

<u>Selection of Fish Tissue Concentration Changes (deltas) Under Option 1 for the Sensitivity Analysis</u>

The sensitivity analysis was implemented using the change in fish tissue concentration (for selected locations) due to Option 1.  This is the relevant metric to use in examining the distributional equity issue since we are interested in seeing whether special high consumption populations experience disproportionately higher health benefits <u>because of the CAMR rule</u>. However, this being said, there were several different ways in which specific fish tissue concentration values could be selected (e.g., use the Option 1 concentrations modeled in the RIA for the Chippewa, be more conservative and select the maximum fish tissue concentrations under Option 1 across the states where the Chippewa are located).  Ultimately, EPA evaluated three different fish tissue concentration scenarios for this sensitivity analysis, each representing a different perspective on fish tissue concentration locations:

*Scenario 1 - use fish tissue concentration values modeled in the RIA for the Chippewa*: This scenario essentially represents applying the high-end fish consumption rate described above to

the Chippewa population modeled above.  With this scenario, we selected the maximum Option 1 fish tissue concentration modeled for the Chippewa in the RIA (i.e., the maximum ring-averaged fish tissue concentration estimated for the Chippewa using the Population Centroid Model.

*Scenario 2 - select the maximum Option 1-attributable fish tissue concentration change predicted anywhere within Minnesota, Wisconsin and Michigan (i.e., identify a single maximum fish tissue concentration value for each state)*:  This is a more conservative scenario than Scenario 1 since it assumes that Native Americans could be fishing anywhere in these three states.  In addition, while Scenario 1 is based on averaging of standardized fish tissue concentrations across the 6 predicted (edible) fish species and across simulation years (which is reasonable for the economic analysis as conducted for the primary estimate), this scenario takes the more conservative approach of selecting the maximum fish tissue concentration change that will reflect a specific fish species in a specific year (i.e., Scenario 2 does not average across species or time and therefore will represent a higher-end concentration change value compared with Scenario 1).

*Scenario 3 - identify the maximum Option 1 fish tissue concentration change for locations within the 37 state study area where Native Americans are located:* This scenario expands the sensitivity analysis to include any HUCs co-located with tribal census tracts as defined by the US Census.  Specifically, the maximum fish tissue concentration (not averaged across species or year) for each HUC was identified and used in the sensitivity analysis (Note: only the max value found across the entire study area is presented in the results table).

EPA believes that these three scenarios provide reasonable coverage for Native American Populations within the 37 state study area, although it is important to note that smaller populations of Native Americans may be located in other locations not covered by the sensitivity analysis.  It is also important to note that, this sensitivity analysis (specifically Scenario 2) also provides coverage for the Hmong, since that scenario uses the maximum fish concentration change that is found in three of the states where Hmong are primarily located.

<u>Results of the Sensitivity Analysis</u>

The results of the sensitivity analysis examining the distributional equity issue are presented in Table 10-44.  This table identifies both the mercury fish tissue concentration change (delta) values under Option 1 and the fish species (where applicable) and provides the IQ changes modeled for this analysis.[28]  As described above, all results generated for this sensitivity analysis were based on a conservative (near bounding) consumption rate of 393.8 g/day which EPA identified through NODA comments. This value, while appropriate for a sensitivity analysis, was not used in other components of this analysis (e.g., primary benefits estimate) because it is not possible to clearly identify which percentile of the subsistence population this value represents.

---

[28] In generating these IQ changes, EPA used the same methodology applied in the general RIA for IQ change estimation with the exception that the consumption rate described above (393.8 g/day) was used (see Section 10.1.3.1 and 10.1.3.2 for additional details on IQ change calculation).  Modeling of IQ change for the sensitivity analysis did include application of the cooking loss factor of 1.5 in predicting exposure levels.

**Table 10-44.  Results of the Sensitivity Analysis Examining Distributional Equity for Native American (subsistence) Populations**

| Sensitivity Analysis Scenario | Option 1-attributable mercury fish tissue concentration change (ppm) | Species modeled | Predicted IQ change for prenatally-exposed children |
|---|---|---|---|
| Scenario 1: maximum fish concentration change for Chippewa in the RIA | | | |
| Chippewa value | 0.00083 | average across 6 species | 0.012 |
| Scenario 2: maximum fish concentration change in MI, WI, and MN not limited to where Native Americans are located (and not averaged across species or year) | | | |
| Michigan | 0.0212 | Walleye | 0.32 |
| Wisconsin | 0.0207 | Walleye | 0.31 |
| Minnesota | 0.0069 | Walleye | 0.10 |
| Scenario 3: maximum fish concentration change in HUCs within the 37 state study area where Native Americans are located (based on Native American Census block designation) | | | |
| Max value (MS) | 0.0406 | Walleye | 0.61 |

The results presented in Table 10-44 suggest that there may not be a strong argument for distributional equity for Native American (subsistence) populations within the 37 state study area (given the precision of the fisher exposure model used here - see discussion below).  Even the most conservative scenario evaluated for the sensitivity analysis (involving the Option 3-attributable fish tissue concentration change of 0.0406 ppm paired with the high consumption rate used in this analysis), only produced a IQ change of 0.61 points.  Although it is likely that high consuming Native American (subsistence) populations, as well as other high consuming populations do experience relatively higher benefits compared with the general recreational angler, because the absolute degree of health benefit (in terms of IQ points saved) is still relatively low (i.e., significantly less than 1), we conclude that a compelling argument can not be made on distributional equity grounds for this rule.[29]

The issue of distributional equity can also be raised in the context of high fish consuming (near subsistence) recreational anglers (i.e., is there a relatively smaller number of recreational anglers who consume at the high-end of the consumption distribution and experience health benefits significantly larger than the recreational freshwater angler of recreational anglers)?  Because we conducted modeling for recreational anglers for the RIA with consideration for fish consumption variability by this population, it is possible to examine the tail of the *Option 1 - attributable IQ change distribution* to determine whether high-end consumers in this population might experience disproportionate health benefits.  The maximum modeled IQ benefit for the recreational angler as a result of Option 1-related mercury fish tissue concentration reductions is

---

[29] The recreational angler population modeled for the RIA has a mean IQ change due to Option 1 attributable mercury fish tissue concentrations changes of 0.010, which is over an order of magnitude lower than the maximum IQ change predicted in the Sensitivity Analysis.

0.28 IQ points, which results in the same conclusion as drawn for the Native American populations (i.e., this degree of health benefit may be significantly higher than the general recreational angler population with its mean IQ change of 0.0010, but it is still considered not significant from an absolute perspective since it is significantly less than 1 IQ point).

Note, that the conclusions presented above are based on the fish consumption exposure model used in this RIA (with modifications as noted above) and consequently reflect the level of precision and accuracy inherent in this model.  Because this economic benefits model was not developed to support site-specific analysis of individual waterbodies and the populations that fish at those waterbodies, there is the potential for this analysis to have overlooked individuals who may be subjected to higher absolute benefits because they fish at waterbodies where the Option 1 mercury fish concentration change is significantly larger than what is captured in the three Scenarios described above.

## 10.7   Discussion and Qualification of Results:  Assumptions, Limitations, and Uncertainties

The previously described methods and results provide useful insights regarding:

1.  The extent of potentially harmful mercury exposures due to consumption of noncommercial freshwater fish;

2.  The size and distribution of resulting IQ losses among prenatally exposed children,;

3.  The value of future earnings losses associated with these IQ decrements; and

4.  The extent to which these losses could be avoided through emissions controls on coal-fired power plants.

However, these estimates are based on modeling approaches that require simplifying assumptions and are subject to limitations and uncertainties.

Uncertainty regarding the estimates developed in this section can arise from several sources.  Some of the uncertainty can be attributed to model uncertainty.  For example, to estimate exposures a number of different modeling approaches have been selected and combined, each of which simplifies potentially complex processes.  The results therefore depend importantly on how these models are selected and specified.

One strategy used to evaluate the potential effects of model uncertainty has been to define alternative estimation approaches within the exposures assessment.  For instance, two separate approaches—population centroid and angler destination—were developed to estimate the size of the exposed populations and their relation to mercury concentrations in fish.  Also, to investigate exposures among high-risk groups three different approaches were summarized in Section 10.6.  The ranges of exposure estimates reported for these different approaches help to demonstrate the sensitivity of results with respect to model selection.

Another important source of uncertainty can be characterized as input or parameter uncertainties. Each of the modeling components discussed in this report requires summary data and estimates of key model parameters. All of these inputs are measured with some degree of uncertainty and can affect, to differing degrees, the confidence range of our summary results. The discussion below identifies and highlights some of the key model parameters, characterizes the source and extent of uncertainties associated with them, and characterizes the potential effects of these uncertainties on the model results.

To organize this discussion, different components of the modeling framework are discussed separately. It first discusses issues related to estimating the mercury concentrations and then those related to estimating the exposed population. After that, it discusses issues related to matching these two components and then concludes by discussing the estimation of mercury ingestion through fish consumption.

### 10.7.1 Mercury Concentration Estimates

As described in Section 10.1.2, the core mercury concentration estimates for the analysis come from the fish tissue sample data in the NLFA. These estimates were then used to approximate mercury concentrations across the study area for a specific time period (2001) and for normalized conditions (size, species, and cut of fish). Some of the key assumptions, limitations, and uncertainties associated with these estimates are the following:

- The NLFA data themselves are subject to measurement and reporting error and variability. The NLFA is the largest and most detailed source of data on mercury in fish; however, the system was not centrally designed (e.g., by EPA) using a common set of sampling and analytical methods. Rather, states collected the data primarily to support the development of advisories, and the data are submitted voluntarily to EPA. Each state uses different methods and criteria for sampling and allocates different levels of resources to their monitoring programs. In addition, there are uncertainties regarding the precise locations (lat/long coordinates) of some of the samples. The heterogeneity and potential errors across state sampling programs can bias the results in any direction and contribute to uncertainty.

- The NLFA sampling data were assigned as either lake or river samples, based on the location coordinates for sampling sites in the NLFA and by mapping them with GIS to the nearest type of waterbody. This process also involves measurement error and may have resulted in misclassifications for some of the samples. These errors are not expected to bias results, but they contribute to uncertainty.

- The NDMMFT statistical model described in Section 10.1.1 was applied to the NLFA to estimate concentrations at specific locations and dates under normalized conditions (size, species, and cut of fish). These normalized estimates were then averaged across species and dates to create a single mercury concentration estimate for each of the roughly 5,200 sampling locations in the study area. This process of normalizing and averaging results involves both model uncertainty and estimation error. For example, if anglers systematically keep fish of different species or sizes than those

included in the normalization and averaging process, then the modeling approach may lead to over- or underestimates of exposures.

- The normalized/averaged mercury concentration estimates (summarized in Table 10-2) were then spatially extrapolated, as discussed in Section 10.1.2. These spatial extrapolation processes are potentially significant sources of uncertainty and may also overstate actual mercury levels. In the population centroid approach, average concentrations within specified distance intervals from block group centroids were first extrapolated to all waterbodies within the interval, and then further averaged and extrapolated to other distance intervals as well. In the angler destination approaches, average concentrations in a HUC were used to characterize fish from all waterbodies in the HUC. All of these approaches assume that NLFA mercury samples are representative of "local" conditions in similar waterbodies. However, even though states use a variety of approaches to monitor and sample fish tissue contaminants, in some cases, the sampling sites are selected to target areas with high levels of angler activity and/or a high level of pollution potential. To the extent that sample selection procedures favor areas with relatively high mercury, the spatial extrapolation methods used in this report will tend to overstate exposures. These approaches also implicitly assume that mercury concentration estimates are strongly spatially correlated, such that closer sampling sites (i.e., from same HUC or distance interval) provide more information about mercury concentrations than more distant sites. To the extent that spatial correlation is weaker than assumed, this will increase the degree of uncertainty in the modeling results.

- To estimate mercury fish tissue concentrations under each of the emissions reductions scenarios, it was assumed that concentrations in any given area would decline in exactly the same proportion as modeled reductions in mercury deposition for the area. This assumption was based on Mercury Maps, which also assumes a linear, steady-state relationship between concentrations of methylmercury in fish and air deposition of mercury. However, Mercury Maps also recognizes that this condition may not be met in waterbodies that contain significant non-air sources of mercury. To assess the potential effect that nonair sources of mercury would have on the results reported in this section, EPA identified 56 HUCs in the 37-state study area with gold or mercury mines or chloralkali plants. EPA recalculated aggregate benefits in the study area for the 2001 Utility Emissions Zero-Out scenario assuming that concentrations in these 56 HUCs would not be reduced at all by the emissions controls. The resulting benefit estimates declined by less than 3 percent. These results suggest that overestimation of benefits due to exclusion of sources is relatively small. This analysis did not attempt to identify or otherwise account for naturally-occurring sources of mercury. To the extent that these are present and substantially affect concentrations in the water bodies of interest, the benefits will be overestimated.

### 10.7.2  Exposed Population Estimates

Section 10.1.2 describes two main approaches for estimating the annual number of children prenatally exposed to mercury because of their mothers' consumption of noncommercial freshwater fish.  The population centroid approach addresses this objective by focusing on where these women of childbearing age are most likely to live in relation to mercury levels in freshwater fish.  In contrast, the angler destination approach focuses on where angler households are most likely to go fishing, in relation to where mercury concentrations in freshwater fish are located.

Each approach has advantages and disadvantages.  The main advantage of the population centroid approach is that it uses detailed Census data and allows us to characterize and subdivide populations with a high degree of confidence at a high level of spatial resolution (almost 165,000 block groups in the study area).  A main disadvantage of this approach is that it requires strong assumptions for identifying the portion of these populations that live in freshwater angler households and for matching these populations to mercury levels in fish.  The main advantage of the angler destination approach is that it starts by identifying angler populations and where they fish; however, it requires relatively strong assumptions for linking these populations to populations of women of childbearing age who consume their catch.

In certain respects, the two approaches rely on similar data sources and use them in similar ways; therefore, they are subject to similar uncertainties.

- Both approaches rely primarily on data from the NSFHWR to estimate state-level freshwater angler activity levels.  The NSFHWR is based on a sample of over 10,000 freshwater anglers nationwide.  The population centroid approach primarily uses the NSFHWR to estimate state-level freshwater fishing participation rates and lake-to-river day ratios.  The angler destination approach uses data on the level of lake- and river-fishing days by state.  Each of these data elements is measured with some error in the NSFHWR, but they are based on a relatively large sample.  As discussed below, more uncertainty is generated in both approaches when these state-level estimates are applied or extrapolated to smaller spatial scales (block groups and HUCs).

- Both approaches also use state-level fertility rate data to approximate the rate of pregnancy among women of childbearing age in angler households for a smaller geographic area.  The state-level fertility rates from the National Vital Statistics are estimated with relatively little error; however, applying these rates to specific block groups or HUCs (and specifically to women in angler households) does involve considerably more uncertainty.

In other respects, the two approaches use very different assumptions and are subject to different sources of uncertainty in measuring exposed populations.  Moreover, as discussed below, some of these assumptions are likely to lead to underestimates of exposed populations in the population centroid approach and to overestimates in the other approach.

- The population centroid approach assumes that, in each block group, the percentage of women who live in freshwater angler *households* (i.e., households with at least one freshwater angler) is equal to the percentage of the state adult *population* that fishes. Applying the state-level participation rate to approximate the conditions at a block level creates uncertainty.  More importantly, however, using individual-based fishing participation rates to approximate household rates is likely to underestimate the percentage of women living in freshwater angler households.[30]  Unfortunately data on household participation levels in freshwater fishing are not readily available.

- In the angler destination approach, it is assumed that the percentage of self-caught fish from a HUC that goes to households with women of childbearing age is equal to the sum of (1) the state-level percentage of anglers who are women of childbearing age plus (2) the state-level percentage of anglers who are male, married, and in the same age range as women of childbearing age.  In other words, it assumes that women who are exposed during pregnancy must either be anglers themselves or be married to an adult male angler below the age of 45.  On the one hand, this approach may not capture women who receive noncommercial fish from other individuals (besides husbands younger than 45), in which case it would underestimate the size of the exposed population.  On the other hand, and probably more importantly, this approach is likely to double count women of childbearing age who meet both criteria (anglers and married to angler men younger than 45).  The extent of this double counting is not known, but it would lead to an overestimation of the exposed population.

- The angler destination approach also estimates exposures by estimating "angler-year equivalents" for each HUC.  Angler-year equivalents can be thought of as groups of freshwater fishing days in a HUC, such that 16.42 fishing days in a year (U.S. annual average for freshwater anglers) are equivalent to one angler year.  This approach assumes that the same expected *total* mercury ingestion by pregnant women will result from these fishing days, regardless of whether the days are all spent by one or by many anglers.[31]

### 10.7.3  Matching of Exposed Populations to Mercury Concentrations

Section 10.1.3 also describes how the two approaches were used to match the estimated exposed populations in each geographic area with corresponding mercury levels in freshwater fish.  In the population centroid approach, this entails matching (1) different portions of the estimated number of pregnant women in angler households in each block group with (2) average mercury concentration estimates in different waterbody types and distance intervals.  In the angler destination approach, this entails matching (1) different portions of freshwater fishing days in each state with (2) average mercury concentration estimates in each HUC in the state.

---

[30] For example, hypothetically if one out of every three members in each household fished, the population rate would be 33 percent, but the household rate would be 100 percent.

[31] If the dose-response relationship for health effects with respect to mercury ingestion is linear (as is assumed), the aggregate health effects resulting from ingestion should only depend on the total mercury ingestion and not on how the ingestion is distributed among the exposed population.

In the population centroid approach, subpopulations are assigned to waterbody types based on state-level ratios of lake-to-river fishing days (from the NSFHWR). They are further assigned to distance intervals based on observed travel distance patterns in national fishing data (NSRE 1994). An important limitation of both methods is that neither one takes into account the physical characteristics of the area in which the population is located. In particular, the allocation of exposures to lakes or rivers at different distances from each block group does not take into account the presence or number of these waterbodies in each distance interval.

Using the NSRE 1994 data to assign subpopulations to distance intervals involves additional uncertainty because it is based on more aggregate data and on a much smaller sample of anglers than the NSFHWR. Additional uncertainty is also introduced by using *self-reported* travel distance estimates to calculate travel distance patterns[32]. Moreover, the analysis does not control for the potential effect of trip frequency on trip distance and resulting exposures. For example, if anglers who fish more often are also more likely to fish closer to home, then mercury concentrations within the smaller distance intervals should be weighted more heavily in their average mercury exposure estimates. Because a constant average freshwater fish consumption rates is assumed in the main analysis (8 g/day), variations in fishing (and therefore fish consumption) intensity are not accounted for. If there is a negative correlation between trip frequency and average travel distance, and if more frequent fishers are located in areas closer to higher (lower) average mercury concentration, then the population centroid approach is likely to underestimate (overestimate) mercury ingestion levels for frequent fishers and for the exposed population as a whole.

The angler destination approach also combines state-level (NSFHWR) and national data (NSRE 1994) to match anglers with mercury concentrations. However, in contrast to the population centroid approach, it allocates state-level lake- and river-fishing days based on both physical and demographic data. Rather than allocating fishing days in proportion to just one of these characteristics (e.g., HUC area), data from the NSRE were used to estimate and apply a multivariate model described in Appendix E-2. Although based on a relatively small sample of fishing trip data and a somewhat crude estimate of angler activity in each HUC, the model results indicate that several factors, including population size and number of lake/river miles per HUC, have statistically significant effects in explaining variations in fishing levels across HUCs. The intended purpose of this model for predicting the allocation of fishing days across HUCs (rather than a simpler allocation rule) is to reduce uncertainty by including as much information as possible about the HUCs. However, it does not eliminate uncertainty in these estimates. The modeled coefficients inherently include statistical error, and other unmeasured factors are also likely to contribute to variations in fishing levels across HUCs.

One potentially important factor that is not included in either model for matching populations and mercury concentrations is the effect of fish consumption advisories on fishing behavior. Evidence summarized in Jakus, McGuinness, and Krupnick (2002) suggests that awareness of advisories by anglers is relatively low (less than 50 percent), and even those who

---

[32] In addition to errors in respondents' own assessments of travel distance, their estimates may be a more accurate reflection of road distance than the straight line distance used in the exposure calculations. If so, the analysis most likely overestimates the percentage of trips to more distant waterbodies. The effect of this potential overestimation on the average and total mercury exposure estimates is not known.

are aware do not always alter their fishing behavior.  Nonetheless, anglers are less likely to fish in areas with advisories.  Unfortunately, we were not able to reliably quantify the reduction and redistribution of fishing trips in either model to account for fish advisories.  By excluding these effects, the model estimates are likely to overstate mercury exposures.

### 10.7.4  Fish Consumption Estimates

Perhaps the most influential variable in both modeling approaches is the rate of noncommercial freshwater fish consumption.  Based on recommendations in EPA's EFH, we have assumed 8 g/day for the general population in freshwater angler households.  Unfortunately, data are not available to reliably vary this rate with respect to characteristics of the population across the entire study area.  In Section 10.6, we applied alternative consumption rate assumptions for selected Asian and Native American populations because existing studies have estimated consumption rates specifically for these populations, but they represent a small portion of our study population.

Uncertainty regarding the true average fish consumption rate has a direct effect on uncertainty for the model results.  Because a single consumption rate is applied uniformly across the entire exposed population and because it is a multiplicative factor in the model (see Eq. [10.1]), the two uncertainties are directly proportional to one another.  As discussed in Section 10.1.3, the recommended 8 g/day rate is based on four studies with mean estimates ranging from 5 (37 percent less than 8) to 17 (113 percent more than 8) g/day.  If it is assumed that this range of estimates represents the uncertainty in the mean freshwater fish consumption rate for the study population, then the resulting uncertainty range for the estimated mean mercury ingestion level will also be between –37 percent and +113 percent of the mean mercury ingestion level.

For a number of reasons, average consumption rates of freshwater fish may well differ from the recommended 8 g/day value.  For example, the rate may be less for females than for male anglers and even less for females in angler households who do not fish themselves.  To the extent that their consumption rates differ, the model estimates are likely to overstate mercury exposure.

Because of fish consumption advisories of various types, women of childbearing age and pregnant women in particular may well reduce their levels of consumption.  Some evidence of these types of behavioral changes were found, for example, in a recent study by Oken et al. (2003).  To the extent that these types of changes occur, they suggest that the current model results overstate mercury exposures in the population of interest.

A final potentially influential variable in both modeling approaches is the assumed conversion factor for mercury concentrations between uncooked and cooked fish.  Studies have found that cooking fish tends to reduce the overall weight of fish by approximately one-third (Great Lakes Sport Fish Advisory Task Force, 1993) without affecting the overall amount of mercury.  But these conversion rates depend on cooking practices and types of fish.  Uncertainty regarding this conversion factor also has a proportionate effect on the modeling results.

***10.7.5  Modelling and Valuation of IQ Related Effects***

The models for estimating and valuing IQ effects based on (1) estimated mercury ingestion levels and (2) the size of the exposed population involve three main steps.  The first step is translating maternal mercury ingestion rates to mercury levels in hair.  The second step is translating differences in hair mercury concentrations during pregnancy to IQ changes in offspring.  The third step is translating IQ losses into expected reductions in lifetime earnings.  As discussed below, each of these steps also involves uncertainty.

•   The conversion of mercury ingestion rate to mercury concentration in hair is based on uncertainty analysis of a toxicokinetic model for estimating reference dose (Swartout and Rice, 2000).  The conversion factor was estimated by considering the variability and uncertainty in various inputs used in deriving the dose including body weight, hair-to-blood mercury ratio, half-life of MeHg in blood, and others.  Therefore, there is uncertainty regarding the conversion factor between hair mercury concentration and mercury ingestion rate.  Although, the median conversion factor (0.08 µg/kg-day/hair-ppm) is used, the ninety-percent confidence interval is from 0.037 to 0.16 µg/kg-day/hair-ppm.  Any change in the conversion factor will proportionately affect the benefits results because of the linearity of the model.

•   The dose-response model used to estimate neurological effects on children because of maternal mercury body burden is susceptible to various uncertainties, as discussed in Section 9.4.  In particular there are three main concerns.  First, there are other cognitive end-points that have stronger association with MeHg than IQ point losses.  Therefore, using IQ points as a primary endpoint in the benefits assessment may underestimate the impacts.  Second, blood-to-hair ratio for mercury is uncertain which can cause the results from analyses based on mercury concentration in blood to be uncertain.  Third, uncertainty is associated with the design of the epidemiological studies used in deriving the dose-response models and the differences between these studies[33].  More discussion on the uncertainty in dose-response function is provided in Section 9.4.

•   The valuation of IQ losses is based on a unit-value approach developed by EPA, which estimates that the average effect of a 1 point reduction in IQ is to reduce the present value of net future earnings by $8,807 (in 1999$).  Three key assumptions of this unit-value approach are that (1) there is a linear relationship between IQ changes and net earnings losses and (2) the unit value applies to even very small changes in IQ, and (3) the unit value will remain constant (in real present value terms) for several years into the future.  Each of these assumptions contributes to uncertainty in the results.  The unit value estimate is itself subject to two main sources of uncertainty.  The first source is directly related to uncertainties inherent in the  statistical analysis by Salkever (1995), which provides estimates of average reductions in future earnings and years in school as a result of IQ changes.  The average percent change estimates are subject to statistical error, modeling uncertainties, and variability across the population.  The second main source of

---

[33] One uncertainty from the epidemiological studies is that the cognitive test were performed on young children who continued to be exposed to mercury after birth.

uncertainty are the estimates of average lifetime earnings and costs of schooling.  Both of these estimates are derived from national statistics from the early 1990s, but they are also subject to statistical error, modeling uncertainties, and variability across the population.

### 10.7.6  Unquantified Benefits

In addition to the uncertainties discussed above associated with the benefit analysis of reducing exposures to methylmercury from recreational freshwater angling, there are several additional benefits that we are unable to quantify, which adds to the uncertainties in the final estimate of benefits of the CAMR.

Table 10-45 displays the health and ecosystem effects associated with methylmercury exposure that are discussed in Section 2 for which we are currently unable to quantify.

**Table 10-45.  Unquantified Health and Ecosystem Effects Associated with Exposure to Mercury**

| Category of Health or Ecosystem Effect | Potential Health or Ecosystem Outcomes |
|---|---|
| Neurologic Effects | Impaired cognitive development<br>Problems with language<br>Abnormal social development |
| Cardiovascular Effects* | Potential for fatal and non-fatal myocardial infarctions (heart attacks) - See Appendix B for a detailed discussion |
| Genotoxic Effects* | Associations with genetic effects |
| Immunotoxic Effects* | Possible autoimmunity effects in antibodies |
| Ecological Effects* | Neurological effects in wildlife (birds, fish, and mammals) that is similar to humans |

* These are potential effects and are not quantified because the literature is either contradictory or incomplete.

For one of these health effects, cardiovascular disease, the Agency conducted a critical review of the available literature and determined that while some studies show that the effect may exist, it is premature to include analysis of cardiovascular effects in our benefit analysis. Studies investigating the relationship between methylmercury exposure and cardiovascular impacts have reached different conclusions.  The findings to date and the plausible biologic mechanisms warrant additional research in this area.  Appendix B provides an in-depth discussion of these epidemiology studies.   If future scientific studies demonstrate this effect occurs, the benefits of reduced cardiovascular effects (from fatal and non-fatal heart attacks) if quantified could possibly be many times larger than those we are able to quantify in this section of the report due to the potential for mortality effects (monetized with the value of a statistical life which is much higher in value than IQ loss).

In addition to the health and ecosystem effects that we are not able to quantify, there are exposures to other segments of the U.S. population that we are currently unable to quantify.  In Section 4 of this report, we discuss the other fish consumption pathways that lead to exposure to

methylmercury, including: consumption of commercial seafood and freshwater fish (produced domestically as well as imported from foreign sources), and consumption of recreationally caught seafood from estuaries, coastal waters, and the deep ocean. These consumption pathways impact additional recreational anglers who are not modeled in our benefit analysis as well as the general U.S. population. Reductions in domestic fish-tissue concentrations can also impact the health of foreign consumers (consuming U.S. exports). Due to technical/theoretical limitations in the science, EPA is unable to quantify the benefits associated with several of these fish consumption pathways. For example, reductions in U.S. power plant emissions will result in a lowering of the global burden of elemental mercury, which will likely produce some degree of reduction in mercury concentrations for fish sourced from the open ocean and freshwater and estuarine waterbodies in foreign countries. In the case of mercury reductions for fish in the open ocean, complexities associated with modeling the linkage between changes in air deposition of mercury and reductions in biomagnification and bioaccumulation up the food chain (including open ocean dilution and the extensive migration patterns of certain high-consumption fish such as tuna) prevent the modeling of fish obtained from the open ocean. In the case of commercial fish obtained from foreign freshwater and estuarine waterbodies, while there are technical challenges associated with modeling long-range transport of elemental mercury and the subsequent impacts to fish in these distant locations, additional complexities such as accurately modeling patterns of harvesting and their linkages to commercial consumption in the U.S. prevent inclusion of foreign-sourced freshwater and estuarine fish in the primary benefits analysis.

Finally, with regard to commercially-produced freshwater fish sourced in the U.S. (i.e., fish from catfish, bass, and trout farms), we are unable to accurately quantify effects from this consumption pathway because many of the fish farms operating in the U.S. utilize feed that is not part of the aquatic foodweb of the waterbody containing the fish farm (e.g., use of agricultural-based supplemental feed). In addition, many of the farms involve artificial "constructed" waterbody environments that are a-typical of aquatic environments found in the regions where those farms are located, thereby limiting the applicability of Mercury Maps assumption in linking changes to mercury deposition to changes in mercury fish tissue concentrations (e.g., waterbodies may have restricted or absent watersheds and modified aquatic chemistry, which can effect methylation rates and impact time-scales for reaching steady-state mercury fish tissue concentrations following reductions in mercury deposition). Some research indicates that the recycling of water at fish farms can magnify the mercury concentration because the system does not remove mercury as it is recycled, while newly deposited mercury is added to the system. Thus, additional research on aquaculture farms is necessary before a benefit analysis can be conducted.

Exclusion of these commercial pathways means that this benefits analysis, while covering an important source of exposure to domestic mercury emissions (recreational freshwater anglers), excludes a large and potentially important group of individuals. As discussed in Section 4 of this report, recreational freshwater consumption accounts for approximately 10 - 17 percent of total U.S. fish consumption, and 90 percent is derived from commercial sources (domestic seafood, aquaculture, and imports). However, as is mentioned throughout this report, several of the other consumption pathways will not be affected by CAMR, or will be affected to at minimal levels.

Another area of unquantified benefits is associated with the study area selected for the benefit analysis conducted in this section, specifically the eastern 37 states of the continental U.S.. The focus on the eastern-half of the U.S. excludes evaluation of benefits from freshwater sources in the West as well as commercially produced fish in the Pacific (which produces 68% of the commercial fish supply in the U.S.). However, air quality modeling has shown that the largest change in deposition from U.S. power plants emissions of mercury will occur in the eastern-half of the U.S. so the unquantified benefits for this portion of the U.S. is expected to be quite small.

In conclusion, there are several unquantified benefits associated with this analysis that add to the overall uncertainty in the estimate of total benefits of CAMR. To the extent that CAMR will reduce mercury deposition from power plants over estuarine areas, coastal, open ocean waters, and in waterbodies in the western-half of the U.S., there would be a subsequent reduction in mercury fish tissue concentrations in these different waterbodies and an associated benefit from avoided decrements in IQ and other known health and ecosystem effects.

## 10.8   References

Belton, T., R. Roundy, and N. Weinstein. 1986. "Urban Fisherman: Managing the Risks of Toxic Exposure." *Environment* 28(9):19-37.

Berger, Mark C., Glenn C. Blomquist, Don Kenkel, and George S. Tolley. 1987. "Valuing Changes in Health Risks: A Comparison of Alternative Measures." *Southern Economic Journal* 53(4):967-984.

Connelly, N.A., B.A. Knuth, and T.L. Brown. 1996. "Sportfish Consumption Patterns of Lake Ontario Anglers and the Relationship to Health Advisories." *North American Journal of Fisheries Management* 16:90-101.

Ebert, E., N. Harrington, K. Boyle, J. Knight, J. and R. Keenan. 1993. "Estimating Consumption of Freshwater Fish among Maine Anglers." *North American Journal of Fisheries Management* 13:737-745.

Great Lakes Sport Fish Advisory Task Force. September 1993. *Protocol for a Uniform Great Lakes Sport Fish Consumption Advisory*.

Hamilton, B.E., P.D. Sutton, and S.J. Ventura. August 4, 2003. "Revised Birth and Fertility Rates for the 1990s and New Rates for Hispanic Populations, 2000 and 2001: United States." *National Vital Statistics Reports* 51(12).

Harrington, Winston, and Paul R. Portney. 1987. "Valuing the Benefits of Health and Safety Regulation." *Journal of Urban Economics* 22:101-112.

Hutchison, R., and C.E. Kraft. 1994. "Hmong Fishing Activity and Fish Consumption." *Journal of Great Lakes Research* 20(2):471-487.

Jakus, P., M. McGuinness, and A. Krupnick.  2002.  "The Benefits and Costs of Fish
        Consumption Advisories for Mercury."  Discussion Paper 02-55.  Washington, DC:
        Resources for the Future.

Morgan, J.N., M.R. Berry, and R.L. Graves.  1997.  "Effects of Commonly Used Cooking
        Practices on Total Mercury Concentration in Fish and Their Impact on Exposure
        Assessments."  *Journal of Exposure Analysis and Environmental Epidemiology*
        7(1):119-133.

Oken E., K.P. Kleinman, W.E. Berland, S.R. Simon, J.W. Rich-Edwards, and M.W. Gillman.
        2003.  "Decline in Fish Consumption Among Pregnant Women After a National Mercury
        Advisory."  *Obstetrics and Gynecology* 102(2):346-351.

Pao, E.M., K.H. Fleming, P.M. Guenther, and S.J. Mickle.  1982.  *Foods Commonly Eaten by
        Individuals:  Amount per Day and per Eating Occasion*.  USDA Home Economics
        Research Report.  No. 44.  Washington, DC, Human Nutrition Information Service.
        *Citations as referenced in EPA 1997b.*

Peterson, D.E., M.S. Kanarek, M.A. Kuykendall, J.M. Diedrich, H.A. Anderson, P.L.
        Remington, and T.B. Sheffy.  1994.  "Fish Consumption Patterns and Blood Mercury
        Levels in Wisconsin Chippewa Indians."  *Archives of Environmental Health* 49(1):53-58.

Pullis, Genevieve.  2000.  *Participation and Expenditure Patterns of African-American,
        Hispanic, and Women Hunters and Anglers:  Addendum to the 1996 National Survey of
        Fishing, Hunting and Wildlife-Associated Recreation*.  Report 96-6.  Washington, DC:
        U.S. Fish and Wildlife Services.

Salkever, David.  1995.  "Updated Estimates of Earnings Benefits from Reduced Lead Exposure
        of Children to Environmental Lead."  *Environmental Research* 70:1-6.

Swartout, J., and G. Rice.  2000.  "Uncertainty Analysis of the Estimated Ingestion Rates Used
        to Derive the Methylmercury Reference Dose."  *Drug and Chemical Toxicology*
        23(1):293-306. 11-41

U.S. Department of the Interior (DOI), Fish and Wildlife Service and U.S. Department of
        Commerce, Bureau of the Census.  1992.  *1991 National Survey of Fishing, Hunting, and
        Wildlife-Associated Recreation*.  Washington, DC:  U.S. Government Printing Office.

U.S. Department of the Interior (DOI), Fish and Wildlife Service and U.S. Department of
        Commerce, Bureau of the Census.  1997.  *1996 National Survey of Fishing, Hunting, and
        Wildlife-Associated Recreation*.  Washington, DC:  U.S. Government Printing Office.

U.S. Department of the Interior (DOI), Fish and Wildlife Service and U.S. Department of
        Commerce, Bureau of the Census.  2002.  *2001 National Survey of Fishing, Hunting, and
        Wildlife-Associated Recreation*.  Washington, DC:  U.S. Government Printing Office.

U.S. Environmental Protection Agency (EPA).  1997a.  *Exposure Factors Handbook.  Volume 1: General Factors*.  EPA/600/P-95/002Fa.  Washington, DC:  Office of Research and Development, National Center for Environmental Assessment.

U.S. Environmental Protection Agency (EPA).  1997b.  *Exposure Factors Handbook.  Volume 2: Food Ingestion Factors*.  EPA/600/P-95/002Fa.  Washington, DC:  Office of Research and Development, National Center for Environmental Assessment.

U.S. Environmental Protection Agency (EPA).  1997c.  *Mercury Study Report to Congress*.  EPA-452/R-97-003.  Washington, DC:  U.S. Environmental Protection Agency.

U.S. Environmental Protection Agency (EPA).  2000a.  *Economic Analysis of Toxic Substances Control Act Section 403:  Lead-Based Paint Hazard Standards*.  Washington, DC:  U.S. Environmental Protection Agency.

U.S. Environmental Protection Agency (EPA).  2000b.  *Fish Consumption and Environmental Justice*.  Washington, DC:  U.S. Environmental Protection Agency.

U.S. Environmental Protection Agency (EPA).  2000c.  *Methodology for Deriving Ambient Water Quality Criteria for the Protection of Human Health (2000)*.  Washington, DC:  U.S. Environmental Protection Agency.

U.S. Environmental Protection Agency (EPA).  2002a.  *Estimated Per Capita Fish Consumption in the United States*.  EPA-821-C-02-003.  Washington, DC:  U.S. Environmental Protection Agency.

U.S. Environmental Protection Agency (EPA).  2002b.  *Guidelines for Preparing Economic Analyses*.  Washington, DC:  U.S. Environmental Protection Agency.

U.S. Environmental Protection Agency (EPA).  2002c.  *Mercury Neurotoxicity Workshop Notes*.  Washington, DC.  November 4, 2002.  http://www.epa.gov/ttn/ecas/regdata/ Benefits/mercuryworkshop.pdf.

Wente, S.P.  2004.  *A Statistical Model and National Data Set for Partitioning Fish-Tissue Mercury Concentration Variation between Spatiotemporal and Sample Characteristic Effects:  U.S. Geological Survey Scientific Investigations Report* 2004-5199.

West, P.C., M.J. Fly, R. Marans, and F. Larkin.  1989.  *Michigan Sport Anglers Fish Consumption Survey. A report to the Michigan Toxic Substance Control Commission*.  Michigan Department of Management and Budget Contract No. 87-20141.

West, P.C., J.M. Fly, R. Marans, F. Larkin, and D. Rosenblatt.  May 1993.  *1991-92 Michigan Sport Anglers Fish Consumption study*.  Prepared by the University of Michigan, School of Natural Resources for the Michigan Department of Natural Resources, Ann Arbor, MI.  Technical Report No. 6.

West, Patrick C.  1992.  "Invitation to Poison?  Detroit Minorities and Toxic Fish Consumption
from the Detroit River."  In *Race and the Incidence of Environmental Hazards:  A Time
for Discourse*.  Bryant Bunyan and Paul Mohai (eds.).  Boulder:  Westview Press.

Woods & Poole Economics, Inc.  2001.  Population by Single Year of Age CD.  CD-ROM.
Woods & Poole Economics, Inc.

SECTION 11  BENEFITS OF MERCURY REDUCTION CONSIDERING ESTABLISHED HEALTH-BASED BENCHMARKS AND OVERALL BENEFITS CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-1
11.1  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-1
11.2  The Mercury - IQ-loss Paradigm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-1
11.3  Quantifying IQ Benefits Associated with Mercury Emission Reductions . . . 11-3
11.4  Data Element (3) – The Level of the Threshold . . . . . . . . . . . . . . . . . . . . 11-4
11.5  Date Element (4) –  The Baseline Levels of Exposure for Consumers of Recreational-Caught Fish . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-4
11.6  Overview of Benefits Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-5
11.7  Freshwater Fish Mercury Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-5
11.8  Deriving Baseline Mercury Exposures from All Sources of Mercury . . . . . . 11-8
11.9  Deriving Scaling Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12
11.10  Monetization and Scaling of IQ Benefits . . . . . . . . . . . . . . . . . . . . . . . . . 11-13
11.11  Uncertainties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-15
11.12  Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-15
11.13  References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-16


**Tables**

Table 11-1.  Freshwater Fish IQ Loss and Hair Mercury from the 2020 Baseline . . . . . . . . 11-6
Table 11-2.  Change in IQ Loss and Hair Mercury from the 2020 Zero Out (No Threshold) Compared to the Baseline, and the Relative Probability of each Change Category . . 11-7
Table 11-3.  Change in IQ Loss and Hair Mercury from the CAMR Option 1 (No Threshold) Compared to the Baseline, and the Relative Probability of each Change Category . . 11-8
Table 11-4.  Change in IQ Loss and Hair Mercury from the CAMR Option 2 (No Threshold) Compared to the Baseline, and the Relative Probability of each Change Category . . 11-8
Table 11-5.  Joint Distribution of Mercury Exposure from Freshwater Fish and Total Mercury Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-10
Table 11-6.  Scaling Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-13
Table 11-7.  IQ Benefits for CAMR Option 1 under Established Health-Based Benchmarks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-14
Table 11-8.  IQ Benefits for CAMR Option 2 under Established Health-Based Benchmarks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-14

**SECTION 11**

**BENEFITS OF MERCURY REDUCTION CONSIDERING ESTABLISHED
HEALTH-BASED BENCHMARKS AND OVERALL BENEFITS CONCLUSIONS**

## 11.1   Introduction

Chapter 10 presents our estimates of the reductions in methylmercury exposure from recreationally-caught fish for our regulatory options.  That chapter also presents our calculations of IQ loss for the case of a nonthreshold, linear dose-response curve (i.e.,  the analysis assumes a linear dose-response curve and no threshold).[1]  Under this combination of assumptions, the risk assessor need not worry about background concentrations – all mercury exposure reductions have the same effect on IQ, regardless of the initial level of exposure from all sources of mercury.  This set of assumptions is convenient but not consistent with EPA's mercury Reference Dose (RfD).[2]   In fact, as discussed below, the effect of methylmercury on IQ is less likely below the benchmark dose (BMD) and increasingly more uncertain as exposures approach zero.

This chapter first presents some important summary material about EPA's mercury RfD and discusses the implications of the RfD for risk assessment and benefit analysis.  Next, the exposure reduction and IQ loss estimates for the no-threshold case presented in Chapter 10 are scaled to quantify the IQ loss due to fetal mercury exposure under a variety of scenarios depicting our understanding of possible thresholds and background concentrations.        The scenarios in this chapter represent the Agency's interpretation of benefits under the current RfD.  The IRIS assessment (Methylmercury (MeHg), EPA's Integrated Risk Information System, CASRN 22967-92-6) USEPA, www.epa.gov/iris/subst/0073.htm,  EPA 2001) reflects the Agency's formal position on the nature of risk of Mercury at low doses.

The chapter concludes with a presentation of EPA's final estimates of IQ-related benefits.  To generate IQ-related benefits from reduced mercury exposure, we use three different models – two reflect health-based thresholds for mercury and the other assumes no threshold exist.   The benefit estimates are arrayed in a heirarchy from most certain to less certain benefits.

## 11.2   The Mercury - IQ-loss Paradigm

In general, a risk threshold for any particular substance suggests that there is an exposure level that is without appreciable risk of adverse health effects.  In the absence of data or compelling biological rationale indicating the contrary, EPA's default paradigm assumes such a

---

[1]  IQ was chosen as the endpoint for this analysis because the monetary implications associated with this endpoint are the most straightforward to model and provide a reasonable method for developing a concentration-response relationship. (EPA 2002)

[2]  This linear, no threshold case serves a very useful purpose.  In this chapter, we explain that as we empirically apply thresholds to the exposed population, we can scale the "no threshold" IQ loss by the change in exposed populations (weighted by change in exposure) to arrive at benefits for threshold scenarios

threshold for all noncancer health effects.  This threshold is reflected in the derivation of the Reference Dose (RfD).  "In general, the RfD is an estimate (with uncertainty spanning perhaps an order of magnitude) of a daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime" (EPA 2001,  p. 2)   "This oral reference dose is based on the assumption that thresholds exist for certain toxic effects ..." [3]  (EPA 2001,  p. 2)  The RfD is typically expressed in units of mg/kg bw/day.

The RfD paradigm is appropriate for methylmercury.  We lack a biological rationale for how methylmercury causes neurobehavioral loss and other neurological effects[4].  Hence we cannot use our understanding of how methylmercury causes these effects to provide suggestive theories of the lack of a threshold.  Further, for the most part, the data from the major studies examining developmental and neurological effects from mercury exposure involve exposure levels that are well above the exposure levels in the U.S.  Hence, the underlying data do not provide an ability to empirically test whether a threshold does or does not exist at levels of exposure experienced by US citizens.

As described in Section 2.3 of this document, in updating the RfD, EPA considered a BMD analyses completed by NRC involving endpoints of neuropsychological development from the Faroe Islands cohort (including results for the Boston Naming Test), the New Zealand cohort, and the NRC's integrative analysis of all three studies.  The BMDLs for these endpoints, measured as concentrations of mercury in umbilical cord blood, were considered.  For the purposes of calculating the RfD, EPA converted these BMDLs to maternal daily dietary intake in mg/kg bw/day using a one-compartment model.  The BMDLs for these analyses (measured in

---

[3] Note that it is conceptually possible to have a de minimus risk at the RfD, rather than an absolute threshold.

[4] There is limited evidence directly linking IQ and methylmercury exposure in the three large epidemiological studies that were  evaluated by the NAS and EPA.  Based on its evaluation of the three studies, EPA believes that children who are prenatally exposed to low concentrations of methylmercury may be at increased risk of poor performance on neurobehavioral tests, such as those measuring attention, fine motor function, language skills, visual-spatial abilities (like drawing), and verbal memory.  For this analysis, EPA is adopting IQ as a surrogate for the neurobehavioral endpoints that NAS and EPA relied upon for the RfD.

In the Faroes Island Study, a full scale IQ evaluation was not conducted.  However, two core subtests were evaluated (similarities and block design) and one supplementary test was conducted (Digit Span).  The similarities and block design tests are reported to be well correlated with the full WISC-R battery (0.885, see Bellinger (2005) paper), but how the Digit Span test relates is not reported.  In the EPA analysis, we assume that it relates similarly.  In the Faroes study, performance scores on the similarities and block design tests were not shown to be statistically related to cord blood or maternal mercury levels; the digit span test did show a statistical relationship with cord blood mercury.

Both the New Zealand and Seychelles study administered the WISC IQ test (WISC III in Seychelles, WISC R in New Zealand).  A reanalysis of the New Zealand data found a positive association, but it was not statistically significant.  No significant associations were seen in the Seychelles study.   As displayed in Figure 5 of Ryan (2005), the confidence intervals for full scale IQ in both these studies include zero.  However, Ryan conducted an integrative analysis, combining results from all three studies.  When combined, the statistical power of the analysis increases.  While the size of the dose-response relationship declined relative to past studies with a statistically significant finding, Ryan found a statistically significant relationship between IQ and mercury. The confidence interval did not include zero.

terms of mercury in cord blood) were all observed to be within a relatively close range, and the calculated RfDs converge at about 0.0001 mg/kg bw/day. These exposures were converted to dietary exposures of about 0.0005 mg/kg bw/day to 0.0019 mg/kg bw/day, with most dietary exposures estimated to be about 0.001 mg/kg bw/day. The integrative BMDL (taking into account data from all three studies) was calculated by NRC to be 32 ppb mercury in cord blood, or an exposure of about 0.6 ug/kg-day. EPA used the various BMDLs and then applied an uncertainty factor of 10 to account for interindividual toxicokinetic variability and pharmacodynamic variability and uncertainty. On this basis, EPA defined the updated RfD of 0.0001 mg/kg bw/day in 2001. Although derived from a more complete data set and with a somewhat different methodology, the current RfD is the same as the previous (1995) RfD. The threshold is likely to be at or above the RfD. We discuss our assumptions of where the threshold falls for benefit analysis later in this section.

Its worth noting that other risk assessors and regulatory agencies from around the world use similar paradigms for benchmarking risks of noncancer health effects. Agencies use reference dose (RfD), acceptable daily intake (ADI), tolerable daily intake (TDI) and minimal risk level (MRL) as descriptors of their exposure benchmarks indicating acceptable exposure levels without appreciable risks. These concepts, in general, assume a threshold for effect, a level with no effect or acceptable effect.

How does EPA's RfD compare to other regulatory agencies benchmark for mercury risk? Health Canada established its Tolerable Daily Intake (TDI) level at twice the EPA's RfD. Their benchmark is .2 ug/kg bw/day. The Agency for Toxic Substances and Disease Registry (ATSDR) has set a Minimal Risk Level (MRI) of .3 ug/kg bw/day – three times EPA's RfD level. The World Health Organization's (WHO) benchmark is set at .23 ug/kg bw/day. Of these major agencies, EPA's RfD has established the lowest risk benchmark to define levels of exposure that are without appreciable risks.

## 11.3    Quantifying IQ Benefits Associated with Mercury Emission Reductions

To assess the IQ benefits from reduced mercury exposure, we must have four pieces of information or data elements:

(1)    The reduction in exposure from the regulatory option under investigation

(2)    Assuming a linear dose-response curve, we need the slope of that curve.

(3)    The level (if any) of the threshold where the dose-response curve intersects the x axis.

(4)    If a threshold does exist, we also need to know the baseline exposure levels from all sources.[5]

---

[5] This baseline exposure level is necessary to know who is above the threshold. Exposure reductions for those individuals already below the threshold would not generate benefits. Hence, we need to know each fish consumer's methymercury exposure from all sources to ascertain whether they are above or below the threshold.

Exposure reductions [data element (1)] are derived in Chapter 10.  The dose-response curve [data element (2)] is also discussed in a previous chapter.  Our core analysis will use a primary does-response curve that implies an individual will avoid  an IQ point decrement for every 1 ppm hair mercury reduction.

Data elements (3) and (4) require more discussion.

## 11.4    Data Element (3) – The Level of the Threshold

The preceding discussion of EPA's RfD does suggest we should model a threshold for calculating IQ benefits.  However, as noted above, the RfD is a level of exposure without appreciable risks.  It is plausible that the actual threshold could be higher than the RfD, it is unlikely to be lower.  In the absence of data or a compelling biological rationale to suggest a threshold level, we will estimate IQ benefits using a variety of threshold assumptions.  We will use some of the benchmark levels of exposure established by regulatory agencies (discussed above) as possible thresholds.  Specifically, we will simulate benefits assuming: (1) a threshold equal to EPA's RfD  and  (2) a threshold in the neighborhood of the WHO and Health Canada benchmarks of .23 and .2 ug/kg bw/day respectively.

## 11.5    Date Element (4) –  The Baseline Levels of Exposure for Consumers of Recreational-Caught Fish

To quantify the IQ benefits from the methyl mercury exposure reductions, we need to know the initial methylmercury exposure levels.  If the mercury exposure of a woman eating recreationally-caught fish is below the proposed threshold, then further reductions would not yield IQ improvements.  If the fish consumers were above the RfD, then IQ improvements would be expected from reductions in methylmercury exposure.  Threshold models require information on the joint distribution of exposure from all sources and much more precise information about fish  consumption patterns.

We also must account for the people currently above the RfD (due to all sources of methylmercury exposure) that would be taken below the RfD due to the rule.  This would be very difficult to do because we would need the background exposure from all sources to determine who is currently exposed at a level above the RfD.  For example, assume that there is an individual who is currently exposed at a level just over the RfD, but only a small part of this is due to the power plants. Looking at the change due to the rule would show a very small change in mercury exposure for this individual, but it could actually push him below the RfD threshold.

Unfortunately, EPA does not have the empirical information necessary to statistically link recreational fishing populations to baseline methylmercury levels.  EPA's Notice of Data Availability (EPA 2004) discussed our interest in obtaining additional information on this issue and asked for any available information.  We did not receive information that would help us estimate the joint probability distribution of recreational fish consumption and commercial fish consumption sufficient to quantify baseline mercury exposures.  Although we have some information on the population at large, we do not have similar information for recreational anglers.

Hence, we are left without sufficient data to address this issue in an ideal manner. The technical approach for dealing with this data gap is addressed in this chapter below.

The remainder of this chapter derives and presents our estimates of IQ benefits.

## 11.6    Overview of Benefits Methodology

We make full use of the exposure estimates and IQ loss benefits calculated for the linear, no threshold case for each of our regulatory options presented in Chapter 10 to derive benefit estimates for our core threshold scenarios. The analytic steps we take are:

(1)    Using the results from Chapter 10 for the Zero Out scenario, place each block group (described in Chapter 10) into categories or bins depending on the size of their exposure reduction (IQ reduction). By establishing bins or discrete categories, the computations, particularly for the uncertainty analysis are simplified greatly. The zero out scenario provides us with an estimate of the total mercury exposure due solely to electric utilities.

(2)    Assign an average exposure reduction to and IQ losses for each bin (discrete category).

(3)    Perform similar classifications and calculations for regulatory options.

(4)    Assign each bin a "background" exposure based on blood mercury distribution from the 1999-2002 National Health and Nutrition Examination Survey (NHANES), assuming of course that the mercury from eating recreationally-caught food is a lower bound on total mercury exposure for any individual. This provides a distribution of total mercury exposure for the recreational fishing population.

(5)    Impose thresholds (discussed above)

(6)    Assess exposure reductions for each of the regulatory options for all bins above threshold.

(7)    Scale benefits from the no-threshold case (presented in Chapter 10) to reflect only those exposure reductions that occur to people above the threshold.

## 11.7    Freshwater Fish Mercury Exposure

The model in Chapter 10 used 165,000 block groups to produce estimates of mercury exposure and the associated monetized benefits of avoided IQ decrements due to the rule. While, in principle, these block groups could be used to estimate the benefits for individuals above a threshold, a simpler approach can be used relying on a small number discrete interval categories or "bins" of data. In other words, we use the number of individuals experiencing an IQ decrement within a small range, as was illustrated in [Figure 11-11 from the draft Chapter 11 on 2-17-05]. The advantage to using a small number of bins is that an uncertainty analysis can be conducted to produce a range of estimates which would be much more difficult to conduct using the full sample.

The 2020 baseline results from the Population Centroid Model described in Chapter 10 provides an estimate of the average mercury concentration in maternal hair (ppm) from freshwater fish consumption for 481,987 individuals in the baseline.  For purposes of producing bins, mercury concentrations are obtained using the mid point of IQ decrements in 0.1 intervals and the inverse of equation [EQ 11-18 from the draft Chapter 11 on 2-17-05].  That is

$$CHgH_j = dIQ_j / 0.131 \qquad \text{(11 Eq. 1)}$$

where

$CHgH$ =  average mercury concentration in maternal hair (ppm) for bin j;
$dIQ_j$ =  mid point of the IQ decrement interval for bin j.

These data are describe in Table 11-1.

**Table 11-1.  Freshwater Fish IQ Loss and Hair Mercury from the 2020 Baseline**

| Number of Individuals | IQ Loss Range | IQ Loss Mid Point | Hair Mercury (ppm) |
|---|---|---|---|
| 416,844.83 | 0 - 0.1 | 0.05 | 0.385 |
| 45,666.60 | 0.1 - 0.2 | 0.15 | 1.154 |
| 11,157.90 | 0.2 - 0.3 | 0.25 | 1.923 |
| 4,095.02 | 0.3 - 0.4 | 0.35 | 2.692 |
| 1,870.15 | 0.4 - 0.5 | 0.45 | 3.462 |
| 899.31 | 0.5 - 0.6 | 0.55 | 4.231 |
| 432.62 | 0.6 - 0.7 | 0.65 | 5.000 |
| 339.36 | 0.7 - 0.8 | 0.75 | 5.769 |
| 206.28 | 0.8 - 0.9 | 0.85 | 6.538 |
| 176.41 | 0.9 - 1 | 0.95 | 7.308 |
| 74.69 | 1 - 1.1 | 1.05 | 8.077 |
| 68.73 | 1.1 - 1.2 | 1.15 | 8.846 |
| 15.76 | 1.2 - 1.3 | 1.25 | 9.615 |
| 23.49 | 1.3 - 1.4 | 1.35 | 10.385 |
| 31.21 | 1.4 - 1.5 | 1.45 | 11.154 |
| 22.41 | 1.5 - 1.6 | 1.55 | 11.923 |
| 9.77 | 1.6 - 1.7 | 1.65 | 12.692 |
| 11.20 | 1.7 - 1.8 | 1.75 | 13.462 |
| 17.96 | 1.8 - 1.9 | 1.85 | 14.231 |
| 1.56 | 1.9 - 2 | 1.95 | 15.000 |
| 0.92 | 2 - 2.1 | 2.05 | 15.769 |
| 3.84 | 2.1 - 2.2 | 2.15 | 16.538 |
| 5.07 | 2.2 - 2.3 | 2.25 | 17.308 |
| 1.35 | 2.3 - 2.4 | 2.35 | 18.077 |
| 2.17 | 2.5 - 2.6 | 2.55 | 19.615 |
| 1.39 | 3 - 3.1 | 3.05 | 23.462 |
| 1.00 | 4.9 - 5 | 4.95 | 38.077 |
| 3.97 | 5.1 - 5.2 | 5.15 | 39.615 |
| 2.44 | 5.7 - 5.8 | 5.75 | 44.231 |

The 2020 baseline results can be compared to three scenarios

1.  A hypothetical "zero out" scenario, in which mercury emissions from coal-fired utilities are completely eliminated in 2020.  This provide an estimate of the full range of potential IQ-related benefits from eliminating EGU-attributable mercury contamination of freshwater fish.

2.  Option 1, in which mercury emissions from coal-fired utilities are capped at 38 tons per year in 2010 and capped at 15 tons per year in 2018.

3.  Option 2, in which  mercury emissions from coal-fired utilities are capped at 38 tons per year in 2010 and capped at 15 tons per year in 2015.

Due to the fact that the analysis is being done using data in bins, these three scenarios are reported as change in mercury levels.  These changes are generated by comparing the IQ decrements from the baseline and the particular scenario under consideration.  The difference in the IQ decrements are then place in a small number discrete interval categories, or bins, with the number of individuals in each change category.  These changes can then be applied to the number of individuals in each exposure category to obtain the estimated monetized benefit of avoided IQ decrements.  These data are reported in Table 11-2, 11-3, and 11-4 for the three scenarios.

**Table 11-2.  Change in IQ Loss and Hair Mercury from the 2020 Zero Out (No Threshold) Compared to the Baseline, and the Relative Probability of each Change Category**

| Number of Individuals | IQ Loss Range | Hair Mercury Range | Probability |
|---|---|---|---|
| 477,526 | 0 - 0.025 | 0 - 0.192 | 99.0744% |
| 3,640 | 0.025 - 0.05 | 0.192 - 0.385 | 0.7552% |
| 537 | 0.05 - 0.075 | 0.385 - 0.577 | 0.1115% |
| 186 | 0.075 - 0.1 | 0.577 - 0.769 | 0.0386% |
| 53 | 0.1 - 0.125 | 0.769 - 0.962 | 0.0111% |
| 16 | 0.125 - 0.15 | 0.962 - 1.154 | 0.0033% |
| 10 | 0.15 - 0.175 | 1.154 - 1.346 | 0.0021% |
| 9 | 0.175 - 0.2 | 1.346 - 1.538 | 0.0019% |
| 2 | 0.2 - 0.225 | 1.538 - 1.731 | 0.0004% |
| 1 | 0.225 - 0.25 | 1.731 - 1.923 | 0.0002% |
| 4 | 0.4 - 0.425 | 3.077 - 3.269 | 0.0008% |
| 2 | 0.475 - 0.5 | 3.654 - 3.846 | 0.0005% |

11-7

**Table 11-3.  Change in IQ Loss and Hair Mercury from the CAMR Option 1 (No Threshold) Compared to the Baseline, and the Relative Probability of each Change Category**

| Number of Individuals | IQ Loss Range | Hair Mercury Range | Probability |
|---|---|---|---|
| 481,555 | 0 - 0.025 | 0 - 0.192 | 99.910% |
| 361 | 0.025 - 0.05 | 0.192 - 0.385 | 0.075% |
| 48 | 0.05 - 0.075 | 0.385 - 0.577 | 0.010% |
| 12 | 0.075 - 0.1 | 0.577 - 0.769 | 0.002% |
| 4 | 0.1 - 0.125 | 0.769 - 0.962 | 0.001% |
| 1 | 0.125 - 0.15 | 0.962 - 1.154 | 0.000% |
| 2 | 0.15 - 0.175 | 1.154 - 1.346 | 0.000% |
| 4 | 0.275 - 0.3 | 2.115 - 2.308 | 0.001% |

**Table 11-4.  Change in IQ Loss and Hair Mercury from the CAMR Option 2 (No Threshold) Compared to the Baseline, and the Relative Probability of each Change Category**

| Number of Individuals | IQ Loss Range | Hair Mercury Range | Probability |
|---|---|---|---|
| 481,324 | 0 - 0.025 | 0 - 0.192 | 99.862% |
| 558 | 0.025 - 0.05 | 0.192 - 0.385 | 0.116% |
| 72 | 0.05 - 0.075 | 0.385 - 0.577 | 0.015% |
| 22 | 0.075 - 0.1 | 0.577 - 0.769 | 0.004% |
| 2 | 0.1 - 0.125 | 0.769 - 0.962 | 0.000% |
| 4 | 0.125 - 0.15 | 0.962 - 1.154 | 0.001% |
| 2 | 0.15 - 0.175 | 1.154 - 1.346 | 0.000% |
| 4 | 0.3 - 0.325 | 2.308 - 2.5 | 0.001% |

## 11.8    Deriving Baseline Mercury Exposures from All Sources of Mercury

For this analysis, we assumed that the NHANES data provided coverage for recreational freshwater anglers (e.g., sampling of individuals from the general US population for inclusion within NHANES, include some fraction of recreational freshwater anglers).  However, we are unable to identify the specific location of recreational anglers within the full NHANES distribution for purposes of establishing total mercury exposure for those modeled individuals. Therefore, we had to make certain assumptions in "relating" the recreational anglers modeled for the RIA to the NHANES distribution for purposes of predicting total mercury exposure for this population.  Specifically, we assumed that the least exposed recreational angler would at least have total mercury exposure equal to the mercury exposure level they receive from the self-caught freshwater pathway (i.e., assuming they have zero background or commercial fish exposure). This is a reasonable lower-bound estimate of total mercury exposure for the recreational anglers modeled for the RIA and therefore represents a reasonable basis for establishing the lower bound of total recreational angler exposure within the NHANES distribution.  The next step is to determine how recreational anglers are distributed across percentiles of the NHANES distribution above that lower bound percentile

The NHANES data used was provided in percentiles, with an average blood mercury concentration for each 1 percent of the exposed population. The blood mercury level (in ppb) was converted to a hair mercury level (in ppm) using the hair:blood ratio of 200, as described in Chapter 9. This implies that hair mercury levels (in ppm) are one-fifth of blood mercury levels (in ppb). The lowest hair mercury level in Table 11-1 is 0.385 ppm. This represents the mercury exposure from freshwater fish alone. Since the total exposure must be above this level, these individuals must be associated with a NHANES percentile with a mercury concentration higher than 0.385 ppm. The lowest NHANES percentile above this level is the 77th percentile, with a value of 0.4 ppm. Therefore, the 481,987 individuals in the 2020 baseline are assumed to be evenly distributed over the 77th through the 100th percentile (24 bins) in the NHANES data.[6] The exact number of individuals in table 11-1 is 481,987.41. Divided by 24 implies 20,082.81 in each NHANES percentile.[7]

The mercury exposure from freshwater fish and total mercury exposure is estimated by combining the data from Table 11-1 and the NHANES data. These are listed in Table 11-5. The sum of individual for any freshwater fish exposure level must equal the number of individuals in Table 11-1 for that exposure. The sum of individuals for any total exposure level must equal the number of individuals in the NHANES percentile. In the upper tail of the freshwater fish consumption, the freshwater fish exposure exceeds the top hair mercury level from the NHANES data. For these individuals, the freshwater fish mercury exposure is also taken to be their total exposure value.

---

[6] These results suggest that the lowest modeled recreational fisher has total mercury exposure matching the 77th% US resident. In reality, if the threshold analysis had been conducted using the fully disaggregation set of 481,987 modeled individuals described in Chapter 10, the least exposed recreational angler would have been matched to a much lower NHANES percentile (probably less than the median). Note, however, that the mean for the recreational anglers would likely be larger than the NHANES mean and probably close to the 77th%, which is plausible given that recreational anglers consume self-caught fish in addition to their commercial fish exposure and therefore may reasonably be expected to have total fish consumption above the general population. The use of aggregated (clustered) data in the threshold analysis, while making the analysis tractable, did remove much of the inter-individual variability in modeled exposure from self-caught fish, which adds additional uncertainty into the threshold analysis both in terms of (a) predicting the number of individuals exceeding the threshold of concern due to total exposure and (b) estimating the fraction of total benefits exceeding those same thresholds. It is also important to note that the assumption that recreational anglers are evenly distributed across the 77th-100th percentiles of the NHANES distribution is also subject to uncertainty. Compelling arguments can be made that this assumption is either over- and under-conservative. Ultimately, without identifying data specifically defining the relationship between self-caught fish and commercial fish consumption for the recreational angler population, any assumptions regarding this relationship is subject to considerable uncertainty.

[7] We note that the conversion from blood mercury levels (in ppb) to hair mercury levels (in ppm) using a 5:1 ratio might produce higher values for hair mercury in the upper tail of the distribution than is found in the actual NHANES data on hair mercury levels. Since the NHANES data use for this analysis included only blood mercury levels, however, this type of conversion was necessary and is a common technique. If we were to try to account for this potential over-estimate, we might assume that individuals are at some lower percentile (say, the 50th) of the NHANES distribution and then impose the shape of the distribution beyond this point for total exposure. This would likely force more individuals into the lower exposure range and reduce the subsequent scaling factor. This type of sensitivity analysis, however, was not done.

**Table 11-5.  Joint Distribution of Mercury Exposure from Freshwater Fish and Total Mercury Exposure**

| Number of Individuals | Freshwater Fish Exposure | Total Exposure |
|---|---|---|
| 20082.81 | 0.385 | 0.400 |
| 20082.81 | 0.385 | 0.420 |
| 20082.81 | 0.385 | 0.420 |
| 20082.81 | 0.385 | 0.440 |
| 20082.81 | 0.385 | 0.460 |
| 20082.81 | 0.385 | 0.480 |
| 20082.81 | 0.385 | 0.520 |
| 20082.81 | 0.385 | 0.540 |
| 20082.81 | 0.385 | 0.560 |
| 20082.81 | 0.385 | 0.600 |
| 20082.81 | 0.385 | 0.640 |
| 20082.81 | 0.385 | 0.680 |
| 20082.81 | 0.385 | 0.740 |
| 20082.81 | 0.385 | 0.780 |
| 20082.81 | 0.385 | 0.860 |
| 20082.81 | 0.385 | 0.920 |
| 20082.81 | 0.385 | 0.980 |
| 20082.81 | 0.385 | 1.100 |
| 20082.81 | 0.385 | 1.220 |
| 20082.81 | 0.385 | 1.360 |
| 15188.66 | 0.385 | 1.540 |
| 4894.15 | 1.154 | 1.540 |
| 20082.81 | 1.154 | 1.980 |
| 20082.81 | 1.154 | 2.460 |
| 606.83 | 1.154 | 7.780 |
| 11157.90 | 1.923 | 7.780 |
| 4095.02 | 2.692 | 7.780 |
| 1870.15 | 3.462 | 7.780 |
| 899.31 | 4.231 | 7.780 |
| 432.62 | 5.000 | 7.780 |
| 339.36 | 5.769 | 7.780 |
| 206.28 | 6.538 | 7.780 |
| 176.41 | 7.308 | 7.780 |
| 74.69 | 8.077 | 8.077 |
| 68.73 | 8.846 | 8.846 |
| 15.76 | 9.615 | 9.615 |
| 23.49 | 10.385 | 10.385 |
| 31.21 | 11.154 | 11.154 |
| 22.41 | 11.923 | 11.923 |
| 9.77 | 12.692 | 12.692 |
| 11.20 | 13.462 | 13.462 |
| 17.96 | 14.231 | 14.231 |
| 1.56 | 15.000 | 15.000 |
| 0.92 | 15.769 | 15.769 |
| 3.84 | 16.538 | 16.538 |
| 5.07 | 17.308 | 17.308 |

| Number of Individuals | Freshwater Fish Exposure | Total Exposure |
|---|---|---|
| 1.35 | 18.077 | 18.077 |
| 2.17 | 19.615 | 19.615 |
| 1.39 | 23.462 | 23.462 |
| 1.00 | 38.077 | 38.077 |
| 3.97 | 39.615 | 39.615 |
| 2.44 | 44.231 | 44.231 |

*Thresholds*

The introductory sections of this chapter present background on our RfD, other agencies' risk benchmarks and the nature of thresholds in risk assessment. As discussed in these sections, we use the two benchmark levels of exposure as possible thresholds.

a.      0.1 µg/kg bw/day - A threshold equal to EPA's RfD
b.      0.2 µg/kg-day - A threshold in the neighborhood of the WHO and Health
        Canada benchmarks of .23 and .2 µg/kg bw/day respectively.

These were converted to ppm of hair mercury based on Eq. 2 (11 - Eq. 11.17 from the draft Chapter 11 on 2-17-05] in Chapter 10. Specifically,

$$CHgH = (0.08)^{-1} * HgIkg \qquad (11 \text{ Eq. } 2)$$

where

CHgH        = average mercury concentration in maternal hair (ppm)
HgIkg       = average daily mercury ingestion rate (mg/kg bw/day);

This conversion rate between average daily ingestion rate and maternal hair concentration is based on the one compartment model used by Swartout and Rice (2000) as described in Chapter 10. This implies the two thresholds of 1.25 ppm and 2.5 ppm.

As discussed above, there are other potential thresholds that could be considered. For example, from the Agency for Toxic Substances and Disease. These are not considered here because of the nature of the discrete nature of the NHANES data in percentile form. The 99th percentile of hair mercury in the NHANES data is 2.46 ppm. The 100th percentile data is 7.78 ppm. Because of this analysis is being conducted using data bins, the choice of any threshold between 2.46 and 7.78 ppm would produce the same results. Therefore, consideration of the benchmark values from these other agencies would produce the same results as our second threshold above.

## 11.9    Deriving Scaling Factors

Using the data from Table 11-5; the changes in Tables 11-2, 11-3, and 11-4 and the thresholds described above, it is possible to evaluate the effect of our two thresholds. Because of

a number of uncertainties, including the level of total exposure, this evaluation is best conducted using a Monte Carlo simulation.

In a Monte Carlo simulation a model is run many times using different values for uncertain input parameters. Prior to the simulation, each uncertain parameter is assigned a probability distribution. For each iteration of the simulation, a random input value is chosen for each uncertain parameter, using the assigned distribution and a realization of the output value is calculated. The output value is recorded and another iteration with a different random choice of input values is conducted. After a very large number of iterations, a probability distribution can be developed for the output value.

The analysis in Chapter 10 calculates the change in mercury exposure due to this rule. What is unknown is the total exposure level of the individuals experiencing this change. To address this uncertainty, we conduct a Monte Carlo simulation. In this case, we treat the change in exposure as the uncertain input variable. We assume that the distribution in the change in exposure is equal to the change in exposure from the Population Centroid Model results from Chapter 10. For example, for the results from CAMR, a separate change in exposure is randomly chosen for each data bin using the probabilities in 11-3. This change is then applied to data bin listed in Table 11-5. For the scenarios in which a threshold is applied, change in exposure is assumed to not occur for any data bin in which the total exposure is below the threshold. The resulting distribution of the decision variable can then be used to determine the scaling factors for each scenario.

This approach assumes zero correlation between the total mercury exposure and the change in mercury exposure as a consequence of the regulatory option. However, the individual level results from Chapter 10 suggest a high degree of correlation between the mercury exposure self-caught fish and the changes in mercury exposure. This means that the zero correlation assumption above could understate the scaling factor because the individuals experiencing the highest change are likely above the thresholds. To account for this potential underestimate, a second scaling factor is developed assuming perfect correlation between total mercury exposure and the changes in mercury exposure. Since the changes listed in Tables 11-2, 11-3, and 11-4 are given in ranges, a uniform distribution was assumed, so that each data bin in Table 11-5 is associated with a progressively larger change in mercury exposure from the regulatory option.

The scaling factors are listed in Table 11-6. The No Threshold scenario is the reference value, and has a scaling value of 100%. The lower bound is based on the mean value from the Monte Carlo simulation. The upper bound is based on the perfect correlation scenario. Due to the fact that over 99% of the changes for all three scenarios occur in the lowest change category (a change of 0.0 - 0.192 ppm in hair mercury), there is no difference in the scaling factors between regulatory scenarios. These values can be used to scale the detailed benefits estimates from Chapter 10.

**Table 11-6.  Scaling Factors**

|  | Zero Out | Option 1 | Option 2 |
|---|---|---|---|
| EPA RfD (Threshold = 0.1 μg/kg bw/day) | 21 - 34% | 21 - 34% | 21 - 34% |

| | | | |
|---|---|---|---|
| WHO / Health Canada (Threshold = 0.2 - 0.23 μg/kg bw/day) | 4 - 8% | 4 - 8% | 4 - 8% |
| No Threshold | 100% | 100% | 100% |

## 11.10   Monetization and Scaling of IQ Benefits

The IQ decrements associated with a change in mercury exposure are derived from the Dose-Response curve described in Chapter 9.  The slope of that dose response curve is 0.131, so each 1 ppm in hair mercury is assumed to cause a decrement of 0.131 of an IQ point.  The monetary value of losses resulting from IQ decrements are assessed in terms of foregone future earnings for the affected individuals and described in Chapter 10.  These monetary value of these losses were estimated to be $8,807 (in 1999$) per IQ point lost.  Therefore, the monetized benefit from a decrease in hair mercury is calculated as follows:

$$VN_i = N_i * VIQ * (0.131 * dCHgH_i) \qquad (11 - Eq.-3)$$

where

| | | |
|---|---|---|
| VN | = | Value of avoiding IQ loss for $N_i$ individuals in bin i; |
| $N_i$ | = | Number of individuals in bin i; |
| VIQ | = | Value per change in IQ point decrement (= $8,807 in 1999$); |
| dCHgH | = | Change in mercury concentration in maternal hair (ppm) for bin i. |

The dose-response slope coefficient of 0.131 was modeled assuming a no threshold case, in which the dose-response line passes through the origin, and a zero IQ response only occurs with a zero dose.  If there were a threshold, then ideally, we would reestimate the dose-response curve with the threshold assumption incorporated into the estimation procedure.  If this was done, the new linear dose response curve would have a steeper slope than the one estimated under a no threshold case.  This would affect the monetized benefits value from equation (11 Eq.-3).  Unfortunately, we do not have the original data to reestimate the dose-response with a threshold assumption.  However, since the coefficient enters this equation linearly, the benefits would simply be increased by the same proportion as the increase in the dose-response coefficient.

The benefits from Chapter 10 are used as inputs to our model to estimate benefits under our threshold cases.  The monetary benefits and reduction in IQ point decrements can be obtained for the two thresholds cases by multiplying the scaling factor from Table 11-6 times these benefits.  Tables 11-7 and 11-8 present our results for the two threshold models and for the no threshold case.  The benefits are presented in order of increasing uncertainty.  We are most certain of the benefits at high doses, given that the original data from the developmental studies fall mostly at high doses.   Accordingly, the benefits for the highest threshold are most certain, followed by the lower threshold equal to EPA's RfD.  The benefits estimated at exposure levels below the RfD are the most uncertain.  The derivation of the unit value for each IQ point is discussed in Chapter 10.  The monetized benefit of CAMR Option 1 over the baseline range from $.07 million to $2 million a year.  For Option 2, the benefits range from $.1 million to $4.6 million per year, depending on the dose-response model and the choice of discount rates.  The

tables also present "discounted" IQ points (IQ points gained discounted to present values at 3 and 7 percent.

**Table 11-7.  IQ Benefits for CAMR Option 1 under Established Health-Based Benchmarks**

| Uncertainty Regarding Threshold | Benchmark Source | Level of Threshold | Discount Rate | Scaling | Benefits (millions 1999$) | Discounted IQ Points |
|---|---|---|---|---|---|---|
| More Certain | WHO / Health Canada | 0.2 - 0.23 µg/kg bw/day | 3% | 4% | $0.07 - $0.12 | 8 - 14 |
| | | | | 8% | $0.14 - $0.24 | 15 - 27 |
| | | | 7% | 4% | $0.03 - $0.08 | 4 - 9 |
| | | | | 8% | $0.06 - $0.16 | 7 - 18 |
| | EPA RfD | 0.1 µg/kg bw/day | 3% | 21% | $0.36 - $0.63 | 41 - 72 |
| | | | | 34% | $0.58 - $1.0 | 66 - 116 |
| | | | 7% | 21% | $0.17 - $0.42 | 19 - 48 |
| | | | | 34% | $0.27 - $0.68 | 31 - 77 |
| Less Certain | No Threshold | N/A | 3% | 100% | $1.7 - $3.0 | 193 - 341 |
| | | | 7% | 100% | $0.8 - $2.0 | 91 - 277 |

**Table 11-8.  IQ Benefits for CAMR Option 2 under Established Health-Based Benchmarks**

| Uncertainty Regarding Threshold | Benchmark Source | Level of Threshold | Discount Rate | Scaling | Benefits (millions 1999$) | Discounted IQ Points |
|---|---|---|---|---|---|---|
| More Certain | WHO / Health Canada | 0.2 - 0.23 µg/kg bw/day | 3% | 4% | $0.1 - $0.18 | 11 - 21 |
| | | | | 8% | $0.2 - $0.37 | 23 - 42 |
| | | | 7% | 4% | $0.05 - $0.12 | 5 - 14 |
| | | | | 8% | $0.1 - $0.25 | 11 - 28 |
| | EPA RfD | 0.1 µg/kg bw/day | 3% | 21% | $0.53 - $0.97 | 60 - 110 |
| | | | | 34% | $0.85 - $1.56 | 97 - 178 |
| | | | 7% | 21% | $0.25 - $0.65 | 29 - 74 |
| | | | | 34% | $0.41 - $1.05 | 46 - 120 |
| Less Certain | No Threshold | N/A | 3% | 100% | $2.5 - $4.6 | 284 - 522 |
| | | | 7% | 100% | $1.2 - $3.1 | 136 - 352 |

## 11.11   Uncertainties

This benchmark analysis is subject to uncertainty reflecting a number of factors.  The first is the choice of the threshold value.  We simply do not have enough data to test whether a threshold does or does not exist.  The use of the RfD represents a best estimate of the population threshold.  Another area of uncertainty is that the lack of data characterizing the correlation between self-caught fish consumption and commercial fish consumption in determining total fish consumption for recreational freshwater anglers, prevents a truly representative analysis of total mercury exposure for this population.  The use of aggregated (clustered) exposure estimates for recreational freshwater anglers rather than the full set of block group-level results generated for the RIA introduces uncertainty into (a) the estimate of the number of individuals exceeding a given benchmark due to total mercury exposure and (b) the fraction of total Option 1 and Option 2 benefits exceeding that threshold.  Finally, failure to consider an upward adjustment to the IQ loss function under assumptions of various thresholds considered in this analysis resulted in an under-prediction of benefits above the threshold.

## 11.12   Conclusions

This chapter presents modeled estimates of IQ benefits for three scenarios.  (1) A threshold equal to EPA's Rfd of 0.1 ug/kg bw/day; (2) a threshold at a level near the Health Canada and World Health Organization's benchmark levels of 0.2 ug/kg bw/day and 0.23 ug/kg bw/day respectively; and (3) a no threshold benchmark.  The chapter presents IQ benefit estimates for the CAMR Option 1 and CAMR Option 2 that are incremental to the expected reduction in mercury  emissions under CAIR.

We are more confident of the likelihood of effects at higher exposures (i.e., above the WHO/ Health Canada value) because these exposure levels are closer to the observed level of exposures in the three underlying studies.  However, if the threshold were set above the RfD level, at a level equivalent to the WHO level, we would be ignoring the potential health effects that might be gained from exposures above the EPA RfD.  On the other hand, we are less certain of the benefits below the RfD in the no threshold analysis since the RfD identifies a level below which there is no appreciable risk of deleterious effects.  Based on the NAS review of the science and their endorsement of the RfD value as being scientifically justifiable for the protection of public health, EPA has adopted the RfD as an appropriate construct for expressing the level of daily exposure which is likely to be without an appreciable risk of deleterious effects during a lifetime.

Under the EPA's RfD threshold scenario, we found that under CAMR Option 1, total IQ points gained were between 19 and 116 IQ points for children of recreationally-caught fish consumers.  These IQ points were valued at a total benefit of $0.25 - $1.56 million.

We also simulated a threshold at a level near the Health Canada and World Health Organization  benchmark levels of .2 ug/kg bw/day and .23 ug/kg bw/day respectively.  The table indicates that benefits are indeed sensitive to the modeled thresholds.  Going from the EPA threshold to the higher threshold suggested by the WHO and Health Canada reduced benefits by 19 to 24 percent.

Finally, not surprisingly, the no threshold case – the more uncertain of the estimates – has the largest benefits – roughly four times the benefits as the EPA RfD threshold case.

## 11.13   References

Bellinger DC (2005). Neurobehavioral Assessments Conducted in the New Zealand, Faroe Islands, and Seychelles Islands Studies of Methylmercury Neurotoxicity in Children. Report to the U.S. Environmental Protection Agency.

NRC (2000). *Toxicological Effects of Methylmercury*, National Research Council.  Washington, DC.  National Academies Press.

Ryan, LM (2005). Effects of Prenatal Methylmercury on Childhood IQ: A Synthesis of Three Studies. Report to the U.S. Environmental Protection Agency

Swartout, J., and G. Rice. 2000. "Uncertainty Analysis of the Estimated Ingestion Rates Used to Derive the Methylmercury Reference Dose." *Drug and Chemical Toxicology* 23(1):293-306. 11-41

US EPA.  2001.  *Integrated Risk Information System: Methylmercury (MeHg) (CASRN 22967-92-6)*.  Downloaded on 2/25/05 from  http://www.epa.gov/iris/subst/0073.htm

U.S. Environmental Protection Agency (EPA). 2002.  *Mercury Neurotoxicity Workshop Notes*. Washington, DC. November 4, 2002. http://www.epa.gov/ttn/ecas/regdata/ Benefits/mercuryworkshop.pdf.

US EPA.  2004.  *Proposed National Emission Standards for Hazardous Air Pollutants; and, in the Alternative, Proposed Standards of Performance for New and Existing Stationary Sources, Electric Utility Steam Generating Units: Notice of Data Availability*. Federal Register / Vol. 69, No. 230 / Wednesday, December 1, 2004 / Proposed Rules.

SECTION 12  CO-BENEFITS RESULTING FROM REDUCTIONS IN
EMISSIONS OF PM2.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-1
    12.1    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-1
    12.2    Emissions Modeling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-3
    12.3    Air Quality Modeling and Population-Level Exposure Estimation . . . . . . . . 12-4
    12.4    Modeling Changes in Health Endpoint (Mortality) Incidence . . . . . . . . . . . 12-5
    12.5    Valuation of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-7
    12.6    Presentation of Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-8
    12.7    Discussion of Uncertainties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-8
    12.8    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-11

**Tables**

Table 12-1.  PM2.5 Co-Benefits Associated with CAMR Regulatory Options 1 and 2
    in 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-8

**SECTION 12**

**CO-BENEFITS RESULTING FROM REDUCTIONS IN EMISSIONS OF PM2.5**

## 12.1   Introduction

Emissions control strategies adopted by power plants to meet cap-and-trade regulations implemented under CAMR are likely to result in co-benefits including reductions in direct emissions of PM2.5.  These PM emissions reductions could result in decreased population-level exposure to PM2.5, which, in turn will produce reductions in adverse health effects including both morbidity and premature mortality for the U.S. population. Because of limitations associated with the Integrated Planning Model (IPM), EPA was not able to conduct a comprehensive assessment of health benefits associated with reductions in directly-emitted PM2.5 from coal-fired power plants (the IPM model, as currently configured, cannot project changes in directly emitted PM2.5 for the technology configurations relevant to this regulation). Instead, EPA conducted a illustrative analysis focused on direct PM2.5 and on the key health endpoint; premature adult mortality.  Despite the use of a simplified modeling approach, the illustrative methodology used in evaluating the adult mortality endpoint for this rule is still considered robust enough to provide perspective on the likely magnitude of PM-related co-benefits of CAMR if Activated Carbon Injection with the addition of a polishing baghouse (TOXECON^tm) is used.  In conducting the illustrative analysis, EPA has used standard methods, assumptions, and monetary values that are used in other EPA regulatory analyses and have undergone significant peer review.  See the CAIR for a detailed discussion of the derivation of assumptions used in PM benefit analyses conducted by EPA (EPA, 2005).

It is important to note that this analysis does not consider a number of health endpoints and welfare effects that would add to the overall co-benefits if modeled, including: (a) PM-related morbidity (e.g., chronic bronchitis, hospital admissions for respiratory and cardiovascular events, non-fatal myocardial infarctions), (b) infant mortality, and (c) welfare effects including visibility improvements. In other analyses of PM2.5 benefits, the mortality endpoint has typically accounted for 85-95% of the total quantified benefits.

In addition, this analysis does not consider potential co-benefits resulting from reductions inprecursors to PM2.5, including SO2.  In the case of SO2, given the SO2 caps under CAIR, we do not expect SO2 reductions beyond the CAIR levels under CAMR. There is also the potential that compliance with mercury regulations will simply shift the time-course of SO2 emissions changes, but not result in absolute changes in the magnitude of those emissions. Consequently, co-benefits resulting from reductions in the secondary formation of PM2.5 were not modeled.

Options Evaluated for Co-Benefits

As is discussed in Section 7 of this report, two scenarios were considered in the emissions modeling and thus modeled for the PM2.5 co-benefits analysis including (a) Option 1 (38 ton cap in 2010 and a 15 ton cap in 2018), and (b) Option 2 (38 ton cap in 2010 and a 15 ton cap in 2015).  We also examined the effects of the possibility that *advanced sorbents* (i.e., advanced carbon injection (ACI)) technology are available earlier than anticipated (assumed

12-1

available in 2013) with resulting reductions in PM2.5 co-benefits (see Section 7.5 for details on projected development/application of ACI technology and EPA, 2005).  Without advanced sorbents, Option 2 yields the greatest PM2.5 co-benefits (5671 tons in 2020) due to less opportunity for banking of mercury allowances by power plants which reduces the opportunity to delay installation of mercury control equipment.  Option 1 produces lower PM2.5 co-benefits (1920 tons in 2020) due to greater potential for banking which increases the potential for plants to delay installation of control equipment. With advanced sorbents, there are noticeably less PM2.5 emissions reductions (67 tons in 2020) due to the assumption that advanced sorbent technology will not require installation of additional bag houses (the source of the majority of the PM2.5 co-benefits predicted for these scenarios).[1]

Overview of Methodology

The PM co-benefits illustrative analysis was conducting using the following step-wise procedure:

The Integrated Planning Model (IPM) was used to estimate the fraction of coal-fired power plants expected to install bag houses (and the time course for those installations) for each of the regulatory scenarios under consideration.  This information was then combined with (a) information on the relevant characteristics of key coal types used by these facilities (i.e., heating values and ash content) and (b) emissions factors for bag houses and electrostatic percipitators installed at power plants, to generate estimates of direct PM2.5 emissions reductions for each scenario.

The Source-Receptor Matrix (SR-MATRIX) model (E. H. Pechan and Associates, 1997), was used to predict population-level changes in PM2.5 exposure given emissions reduction estimates for direct PM2.5 from coal-fired power plants.  The SR-MATRIX model uses a simplified methodology in conducting both air quality modeling and exposure modeling.  In a full-scale benefits analysis, these two steps would have been conducted using more rigorous and sophisticated models such as CMAQ (for air quality modeling) and BenMAP (for exposure modeling).

Changes in population-level exposure to PM2.5 were then combined with baseline incidence data for adult mortality and used together with the concentration-response function for mortality derived from Pope et al., 2002, to estimate reductions in premature adult mortality.  The Pope et al., 2002 -based concentration response function has been used in other benefits analysis including CAIR.

Adult mortality incidence reductions were then monetized using the value of statistical life (VSL) metric of 5.5 million dollars per statistical life saved that is used in other EPA regulatory analyses.  We also incorporate other elements of the benefit methodology from CAIR (EPA, 2005), including consideration for: (a) a mortality reduction lag of 20 years (i.e., the

---

[1]  Because of time and resource considerations, and because Option 1 was the preferred option for CAMR, we only ran the advanced sorbents sensitivity analysis for Option 1, but we believe the results for Option 2 would be similar to what is reported here for Option 1 (e.g., approximately 67 tons in 2020).

decrease in mortality incidence is distributed over 20 years after the emissions change), (b) income elasticity associated with the valuation function (i.e., degree to which willingness-to-pay (WTP) for a reduction in mortality changes as income grows), (c) real growth in per-capita income and (d) growth in the adult population cohort experiencing the mortality reduction.

Organization of this Section

The remainder of this section is organized as follows. Section 12.2 provides an overview of emissions modeling conducted using IPM and other data sources in order to generate estimates of emissions reductions in direct PM2.5 from power plants. Section 12.3 provides a brief overview of the SR-MATRIX model and its role in air quality modeling and predicting population-level changes in exposure for the study population. Section 12.4 describes the use of the Pope et al., 2002 study in modeling long-term exposure-based mortality reductions linked to reduced PM2.5 exposure. This section also describes the lag period used in modeling mortality reductions. Section 12.5 describes the valuation of benefits including the VSL metric used, the income elasticity and related factors. Section 12.6 presents the results of the illustrative analysis of PM-related co-benefits. Finally, Section 12.7 describes some of the uncertainties related to this analysis.

## 12.2    Emissions Modeling

Potentially, several different technologies could be selected by coal-fired power plants to reduce mercury emissions including: (a) optimized existing emission controls (no direct PM2.5 co-benefit), (b) injection of halogenated or standard (non-halogenated) powdered activated carbon (PAC) in front of an electrostatic precipitator (no direct PM co-benefit)[2], (c) injection of standard PAC in front of a retrofit polishing baghouse - TOXECON™ application (direct PM2.5 co-benefit), and (d) other technology (may or may not have an impact on direct PM2.5 emissions). In option "c" described above, a polishing baghouse is retrofitted in after an existing electrostatic precipitator. Since the baghouse is added as an additional PM control and is generally a more efficient collector of PM2.5 than an ESP, a direct PM2.5 co-benefit is likely in this option. Therefore, the first step in estimating possible co-benefits associated with reductions in emissions of direct PM2.5, was to estimate the power plant capacity likely to select option "c", which involves the addition of polishing baghouses with associated reductions in direct PM2.5 emissions. Because different coal types (e.g., bituminous, subbituminous) are used by power plants and these coal have different characteristics (e.g., *ash content*) that can impact direct PM2.5 emissions, it is important to consider the distribution of these coal types across the subset of power plants projected to install baghouses to control mercury. The IPM model, which is a linear programming model used to predict the behavior of the U.S. electric utility sector in response to air-pollution-control-related regulatory scenarios, was used to determine the coal-specific capacities of coal-fired power plants likely to install baghouses in response to the two regulatory scenarios under consideration

---

[2] Concerns have been raised (EPA, 2005) that this option (injection of PAC in front of an electrostatic precipitator (ESP) could actually result in dis-benefits by producing increased arcing in the ESP which can degrade ESP PM capture performance. However, at this point it is unclear whether the rates of PAC injection likely to be utilized under this scenario would produced sustained increases in arcing such that PM removal is significantly reduced. Research is currently on-going looking at this issue in the context of longer-term facility performance (EPA, 2005).

Once the capacities of power plants projected to install baghouses under the two regulatory scenarios were known, the next step was to estimate reductions in direct PM2.5 emissions associated with these capacities. Calculation of reductions in direct PM2.5 emissions involves combining data on (a) the utilization of the four coal types at power plants projected to install baghouses (*annual heat input values* for each coal type obtained from IPM), (b) the relevant attributes of those coal types, including *heating values* and *ash content* (from the Information Collection Request (ICR) database), and (c) the PM2.5 emissions *factors* for electrostatic precipitators and baghouses (from AP-42)[3].  For each regulatory scenario, the *annual heat input* and the *average heating values* for a specific coal type were combined to determine the amount of that coal type used by power plants of interest.  This usage value was then combined with the ash content value and emissions factors to generate the emissions reduction estimate for that coal type. Such estimates are obtained for each coal type. These estimates were then summed across the coal types to generate a single direct PM2.5 emissions reduction value for coal-fired power plants under the specific regulatory scenario.

EPA used the currently available information on mercury controls to develop the estimates of PM2.5 co-benefits described above (Note: EPA projects that, under Option 1, 13 units will have installed ACI by 2020 - see Section 7.5 for projections regarding installation of ACI devices). It is recognized, however, that mercury control technologies are under vigorous development and, therefore, control approaches other than those described above may be implemented in the future. Such actions may result in different PM2.5 co-benefits compared to estimates provided here.

## 12.3    Air Quality Modeling and Population-Level Exposure Estimation

The SR-MATRIX model (E. H. Pechan and Associates, 1997), uses county-to-county transfer factors to predict changes in PM2.5 air concentrations resulting from reductions in emissions of directly-emitted PM2.5 from (user-specified) source categories (Levi et al., 2003). These transfer factors are generated using an adjusted version of the Climatological Regional Dispersion Model (CRDM), which uses a sector-averaged dispersion model combined with summaries of 1990 meteorological data to produce these transfer factors.  SR-MATRIX can model secondary formation of PM2.5 including nitrates and sulfates, however this functionality was not used in this illustrative analysis.  All sources in the SR-MATRIX model are divided into four categories including three categories based on effective stack height and a forth category for all area sources.  The SR-MATRIX model has been shown to generate reasonable predictions of population-level changes in exposure resulting from changes in directly emitted PM and

---

[3] The PM2.5 emissions factors for electrostatic precipitators and baghouses are taken from Table 1.1.6 in AP-42, Fifth Edition, Volume 1 Chapter 1: External Combustion Sources, available at http://www.epa.gov/ttn/chief/ap42/ch01/final/c01s01.pdf. As is well known, emission factors are simply averages of all available data of acceptable quality, and are generally assumed to be representative of long-term averages for all facilities in the source category (i. e., a population average). In the absence of availability of specific data on direct PM2.5 co-benefit associated with TOXECON applications, EPA chose to use PM2.5 emission factors. It is noted however, that baghouse emission factor in AP-42 does not take into account any mercury-specific design changes that may take place. For example, if the baghouse to capture mercury-impregnated sorbent, with particles larger than PM2.5, was designed to use a fabric with a coarser weave (to keep pressure drop low), capture of PM2.5 in such a baghouse may be lower than that indicated in the emission factor. This, in turn, will result in reduced direct PM2.5 co-benefit.

consequently, this model was applied in modeling these direct PM-related co-benefits (Levy et al., 2003).

As applied in this analysis, the SR-MATRIX model was used for converting the estimates of reductions in direct PM2.5 emissions into changes in ambient PM2.5 concentrations. In modeling population-level exposure reductions, the SR-MATRIX generates results in the form of population-weighted PM2.5-related exposure reductions.  The model provides estimates by region throughout the U.S.  As with the benefit analysis of mercury reductions presented in Section 10, the eastern-half of the U.S. is analyzed, which is identified by the Midwest/Northeast (ME) and Southeast (SE) regions in the SR Matrix.  We then averaged the results in these regions to derive total PM benefits.  A more comprehensive analysis of power-plant related emissions reductions (and associated exposure reductions) conducted using BenMAP, would have used a more spatially-refined geographic grid that tracked both ambient PM2.5 reductions and associated exposure reductions with greater precision and specificity. Note, however, that it is not known whether the simplified modeling approach used here results in a net over- or under-prediction of population-level exposure since sources of uncertainty associated with this illustrative approach can result in both over- and under-predictions of ambient PM2.5 levels and population-level exposures.  However, the more generalized approach used here is considered reasonable for a illustrative analysis of potential benefits. The SR-MATRIX model can be used for health effects incidence estimation and valuation, but the version used in this analysis did not have the latest mortality functions (Pope et al., 2002) or the latest valuation functions and consequently, both mortality incidence changes and valuation of those incidence reductions were estimated outside of the model (as discussed in detail below).

## 12.4    Modeling Changes in Health Endpoint (Mortality) Incidence

Exposure to PM2.5 has been linked to a variety of morbidity endpoints (e.g., respiratory and cardiovascular hospital admissions, chronic bronchitis events, asthma exacerbations) as well as mortality (both child and adult) (NRC, 2002).  However, the majority of monetized benefits linked to health endpoints are associated with chronic (long-term exposure-related) mortality in adults.  Consequently, this illustrative analysis focuses on this endpoint exclusively.

Both long- and short-term exposure to PM2.5 has been associated with mortality in adults (NRC, 2002).  However, long-term exposure cohort studies, which are better able to capture the full public health impact of PM2.5 exposure over time and likely cover some of the shorter-term exposure mortality signal together with the longer-term exposure signal, have typically found higher levels of mortality risk than shorter-duration studies (Kunzli et al., 2001, NRC, 2002). Consequently, this illustrative analysis evaluated chronic exposure-related mortality in adults.

Long-term mortality studies examine the relationship between community-level exposure to PM2.5 over multiple years and annual mortality rates, also recorded at the community-level (NRC, 2002).  More recently-conducted prospective cohort studies allow for better control for key confounders associated with mortality including individual-level information on key risk-related factors such as diet, occupational exposure and smoking.  The EPA's Science Advisory Board recommends the use of long-term prospective cohort studies in estimating PM-related mortality (EPA-SAB-Council-ADV-99-005, 1999), a finding that was confirmed by the recent National Research Council Report (NRC, 2002).

The prospective cohort study selected for this illustrative analysis (Pope et al, 2002), has the broadest geographical coverage of the available prospective cohort studies examining PM-related mortality and uses the American Cancer Society's (ACS) dataset which has been subjected to extensive reexamination and reanalysis, and which has served to strengthen the confidence associated with its findings. The latest reanalysis of the ACS study data conducted by Pope (2002) provides additional refinements including (a) an extended follow-up period that triples the size of the mortality data set, (b) significant increase in the exposure dataset, including consideration for cohort exposure following implementation of the PM2.5 standard, (c) greater control for possible confounders (diet and workplace exposure) and (d) use of advanced statistical techniques to address concerns over spatial autocorrelation of survival times in communities located near each other. Both the NRC and SAB-HES recommended the use the Pope et al., 2002 study as the basis for modeling adult mortality linked to PM2.5 exposure as part of economic benefits analysis. The "all-cause" mortality category was selected as the endpoint modeled using this study.

Addressing Possible Mortality Reduction Lag

It is expected that reduction in ambient PM2.5 levels will produce a decrease in mortality that does not occur immediately, but is distributed over some number of years (i.e., lagged over time following the PM reduction) (NRC, 2002). However, the exact nature of the lag associated with PM-related mortality reductions is not currently known. Consideration of mortality-related lag periods is important since delays in reductions in mortality rates following PM reductions will result in discounting (lowering) of overall monetary benefits associated with those mortality reductions. Given limited information available for establishing a lag structure for PM-related mortality reductions, the SAB-HES has recommended the following provisional 20-year lag structure: 30% in the first year, 50% distributed over years 2-5 and 20% distributed over years 6-20. This structure reflects the following perspective towards PM-related mortality reduction: short-term exposure related reductions are assumed to occur in the first year, cardiovascular-related mortality reductions are assumed to occur in years 2-5 and longer-term respiratory as well as lung cancer mortality reductions are assumed to occur in years 5-20.

Consideration of Population Growth

The regulatory analysis (simulation) year for this illustrative analysis is 2020 for both Option 1 and Option 2 and for the Sensitivity Analysis scenario. Demographic change (growth in the adult-age population) needs to be considered in estimating mortality reductions for this future simulation year. Typically, in a comprehensive benefits analysis conducted using BenMAP, demographic growth would be projected separately for each geographic unit of analysis (e.g., county, or US Census block) for which mortality reductions are being projected. However, this illustrative analysis, does not include this level of spatial resolution and consequently, a simple demographic scaling ratio was being used to adjust mortality estimates to reflect potential growth in the adult-age cohort over the years leading up to the simulation year. This demographic scaling factor was simply the ratio of US adult population (>29yrs) predicted for the year 2020 divided by the adult population in 1999 (the year modeled in SR-MATRIX). Note, that because both Options being considered are modeled for the same simulation year, the same demographic scaling ratio was used in modeling each regulatory option.

Addressing Potential Uncertainty in the Mortality Function

The EPA is currently investigating uncertainty associated with the concentration-response function for chronic-duration PM2.5 mortality.  A number of methods are being considered, including the use of expert elicitation to develop quantitative assessments of overall uncertainty associated with PM2.5-related mortality estimates.  Because this analysis was conducted as an illustrative analysis, consideration of uncertainty in the mortality estimate was not quantitatively modeled. Section 12.6 provides a summary of the potential magnitude of uncertainty surrounding the mortality estimate based on benefit analysis of CAIR.  The reader is referred to the CAIR RIA (EPA, 2005) for an in-depth discussion of uncertainty associated with PM2.5-related mortality estimates and ongoing efforts to characterize that uncertainty.

## 12.5   Valuation of Benefits

Valuation of benefits involved monetizing of the reduction in adult premature mortality associated with PM2.5 using a value of statistical life (VSL) of 5.5$ million.  This value is based on several published meta-analyses examining value of statistical life (VSL) studies from the wage-risk literature (Mrozek and Taylor, 2002 and Viscusi and Aldy, 2003).  See the Final Non-Road Diesel Rule (EPA, 2004) for a detailed discussion of the derivation of this value.

Monetized values for avoided mortality are subject to several additional adjustments reflecting factors relevant to health effects valuation including (a) discounting over the lag period established for the mortality effect, (b) consideration of real-world growth in per-capita income over the period leading up to the regulatory analysis year (i.e., 2020) and (c) income elasticity for the mortality endpoint (i.e., the degree to which WTP to reduce mortality will match real-world income growth).   Following EPA and OMB guidelines for preparing economic analyses (EPA 2000b, OMB, 2003), discounting over the mortality lag period employed both 3% and 7% discount rates.  Modeling of real-world growth in per-capita income is based on a projection of GDP growth (obtained from Kleckner and Neuman, 1999 and Standard and Poor's, 2000) as well as population growth for the adult cohort.  With regard to income elasticity (for the mortality endpoint), research has shown that elasticity is related to the severity of the health endpoint.  This has lead to the development of elasticities for different categories of health effect including minor, severe/chronic and mortality (Kleckner and Neuman, 1999).  For this illustrative analysis, an income elasticity value of 1.2008 (in 2020) for mortality has been selected and applied in adjusting monetized estimates.

## 12.6   Presentation of Results

This illustrative analysis generated mortality incidence reduction estimates for the adult cohort for each regulatory option and provided two monetized benefits estimates for each regulatory option (a 3% discount-based estimate and a 7% discount-based estimate).  The discount values are applied in valuing mortality results that are distributed across the lag period with the higher discount rate of 7% resulting in a lower overall monetized value for aggregated mortality incidence reductions compared with the 3% rate.  Overall results for both options are presented in Table 12-1.  As presented in Table 12-1, benefits for Option 1 range from $1.5 million to $44 million depending on the availability of advanced sorbents technology.  Potential

benefits for Option 2 range from $1.5 million to $130 million, again depending on the status of advanced sorbent technology.

**Table 12-1.  PM2.5 Co-Benefits Associated with CAMR Regulatory Options 1 and 2 in 2020**

| Regulatory Option | | Annual Mortality Incidence Reduction (adults) | Benefits in 2020 (Millions of 1999 dollars) | |
|---|---|---|---|---|
| | | | 3% discount rate | 7% discount rate |
| Option 1 | | | | |
| | advanced sorbents not available | 7 | 44 | 40 |
| | advanced sorbents available | <1 | 1.5 | 1.4 |
| Option 2 | | | | |
| | advanced sorbents not available | 21 | 130 | 117 |
| | advanced sorbents available | <1 | 1.5 | 1.4 |

## 12.7    Discussion of Uncertainties

Characterization of health-related benefits associated with PM reductions is a complex process which is subject to a variety of potential sources of uncertainty.  Key assumptions underlying the estimate of avoided premature mortality include the following:

•    Inhalation of fine particles is causally associated with premature death at concentrations near those experienced by most Americans on a daily basis.  Although biological mechanisms for this effect have not yet been established, the weight of the available epidemiological and experimental evidence supports an assumption of causality.

•    All fine particles, regardless of their chemical composition, are equally potent in causing premature mortality.  This is an important assumption, because PM produced via transported precursors emitted from EGUs may differ significantly from direct PM released from automotive engines and other industrial sources.  However, no clear scientific grounds exist for supporting differential effects estimates by particle type.

•    The C-R function for fine particles is approximately linear within the range of ambient concentrations under consideration.  Thus, the estimates include health benefits from reducing fine particles in areas with varied concentrations of PM including both regions that are in attainment with the fine particle standards and those that do not meet the standard.

•    The forecasts for future emissions and associated air quality modeling are valid.  Although recognizing the difficulties, assumptions, and inherent uncertainties in the overall enterprise, these analyses are based on peer-reviewed scientific literature and up-to-date assessment tools, and we believe the results are highly useful in assessing this rule.

Overall uncertainty in mortality-related benefits can be increased when a simplified methodology such as the illustrative analysis described here is employed due to potential limitations in capturing important relationships and inter-dependencies between key factors (e.g., use of coarse geographic scale which may miss important spatial gradients in emissions, air quality impacts and the location and density of exposed populations).  Key sources of potential uncertainty associated with this illustrative analysis are briefly described below (Note: this discussion begins with a list of categories of potential benefits not considered quantitatively in this illustrative analysis):

•   *Predicting power plant (sector) behavior in relation to mercury controls*: As shown in table 12-1, the benefits are highly dependent on the assumptions about what mercury-specific technologies will be chosen. For example, in the control option chosen in the final rule (option 1), the benefits range from $1.5 million (assume ACI works without an additional baghouse) to $42 million (assume ACI requires a baghouse). Note that costs and benefits may co-vary; if H-PAC is used then costs and benefits are lower and if ACI requires a baghouse then costs and benefits are higher. PM2.5 cobenefits presented in this section are ultimately dependent on decisions made (collectively) by industry in controlling mercury emissions under different cap-and-trade scenarios.

•   *Unquantified benefits*: the illustrative approach used here, in focusing on the mortality endpoint, is likely to capture the majority of health-related benefits and the majority of total benefits (i.e., health plus welfare).  However, important categories of potential PM-related benefits have been excluded to simplify modeling including: morbidity (e.g., hospital admissions for respiratory and cardiovascular endpoints, chronic bronchitis episodes, asthma exacerbations, non-fatal myocardial infarctions) and visibility benefits. Had these additional benefits been evaluated, overall benefits would be higher.

•   *SR-MATRIX model*: In modeling population-level exposure reductions, the SR-MATRIX results in the form of population-weighted PM2.5-related exposure reductions generated for the Midwest/Northeast (ME) and Southeast (SE) regions were selected and averaged together, since these regions are where power plant-based emissions reductions are primarily expected to occur.  A more comprehensive analysis of power-plant related emissions reductions (and associated exposure reductions) conducted using BenMAP, would have used a more spatially-refined geographic grid that tracked both ambient PM2.5 reductions and associated exposure reductions with greater precision and specificity. However, the more generalized approach used here is considered reasonable for a illustrative analysis of potential benefits. While the SR-MATRIX model has been shown to produce reasonably accurate predictions of direct PM emissions-related changes in ambient PM2.5 concentrations, the decision to average together population-weighted exposure changes (for ambient PM2.5) generated at the highly-aggregated ME and SE levels to produce a single value for use in this analysis does introduce considerable uncertainty.  It is not known whether this simplifying approach biases the results in a more or less conservative direction.

•   *Long-term cohort-based mortality function:* Use of the Pope et al., 2002-derived mortality function to support this analysis is associated with uncertainty resulting from:

(a) potential of the study to incompletely capture short-term exposure-related mortality effects, (b) potential mis-match between study and analysis populations which introduces various forms of bias into the results, and (c) failure to identify all key confounders and effects modifiers, which could result in incorrect effects estimates relating morality to PM2.5 exposure.  EPA is researching methods to characterize all elements of uncertainty in the dose-response function for mortality.  As is discussed in detail in the CAIR RIA (EPA, 2005), EPA has used two methods to quantify uncertainties in the mortality function, including: the statistical uncertainty derived from the standard errors reported in the Pope et al., 2002 study, and the use of results of a pilot expert elicitation conducted in 2004 to investigate other uncertainties in the mortality estimate.  Because this analysis is a illustrative analysis, we do not quantify uncertainty with these two methods in this report.  In the CAIR benefit analysis, the statistical uncertainty from the standard error of the Pope et al, 2002 study was twice the mean benefit estimate at the 95th percentile and one-fourth of the mean at the 5th percentile, while the expert elicitation provided mean estimates that ranged in value from less than one-third of the mean estimate from the Pope et al, 2002 study-based estimate to two and one-half times the Pope et al., 2002-based estimate.  The confidence intervals from the pilot elicitation applied to the CAIR benefit analysis ranged in value from zero at the 5th percentile to a value at the 95th percentile that is seven times higher than the Pope et al., 2002-based estimate.  These results are highly dependent on the air quality scenarios applied to the concentration-response functions of the Pope et all, 2002 study and the pilot expert elicitation.  Thus, the characterization of uncertainty discussed in the CAIR RIA could differ greatly from what would be observed for CAMR due to differences in population-weighted changes in concentrations of PM2.5 (i.e., the location of populations exposure relative to the changes in air quality).  EPA is continuing its research of methods to characterize uncertainty in total benefits estimates, and is conducting a full-scale expert elicitation.  The full-scale expert elicitation is scheduled to be completed by the end of 2005.

- *Lag period for mortality reductions*: Failure to accurately capture the true lag period in mortality following reductions in ambient PM2.5 concentrations.  Although the distributed lag approach described in Section 12.4 is reasonable given our current understanding of disease endpoint behavior including lung cancer, cardiovascular disease and respiratory disease (all of which are associated with PM2.5 exposure), the actual lag period for specific mortality causes linked to PM2.5 exposure could differ from that used in this analysis.  In the CAIR RIA, we conducted sensitivity analyses to investigate how different lag structures could influence the total benefits, and concluded that substitution of the most plausible alternative lag structures had little overall impact on the estimate of total benefits (reductions are on the order of 5 to 15 percent).

- *WTP-based valuation for mortality*: The WTP-based value used in this analysis to monetize mortality incidence reductions is enhanced by being based on a variety of wage-risk studies evaluated using meta-analysis techniques.  However, this WTP-based value may misrepresent the actual societal value for reductions in PM-related mortality if societal perception of mortality risk related to PM exposure differs significantly from that associated with job-related hazards.

## 12.8    References

E.H. Pechan & Associates, Inc.  (1997b), "Integrated Ozone Particulate Matter and Regional Haze Cost Analysis: Methodology and Results."  Prepared for Innovative Strategies and Economics Group, Office of Air Quality Planning and Standards, U.S. EPA. Research Triangle Park, NC.  July 1997.

EPA-SAB-COUNCIL-ADV-99-005.  February 1999.  "An SAB Advisory on the Health and Ecological Effects Initial Studies of the Section 812 Prospective Study:  Report to Congress: Advisory by the Health and Ecological Effects Subcommittee."

Kunzli N., S. Medina, R. Kaiser, P. Quenel, F. Horak Jr, and M. Studnicka.  2001.  "Assessment of Deaths Attributable to Air Pollution: Should We Use Risk Estimates Based on Time Series or on Cohort Studies?"  *American Journal of Epidemio*logy 153(11):1050-55.

Levi J.I., A.M. Wilson, J.S. Evans, J.D. Spengler , 2003, "Estimation of Primary and Secondary Particulate Matter Intake Fractions for Power Plants in Georgia", Environmental Science and Technology, Vol. 37, pp. 5528-5536.

Mrozek J.R., and L.O. Taylor.  2002.  "What Determines the Value of Life?  A Meta-Analysis."  *Journal of Policy Analysis and Management* 21(2):253-270.

National Research Council (NRC).  2002.  *Estimating the Public Health Benefits of Proposed Air Pollution Regulations*.  Washington, DC:  The National Academies Press.

Pope, C.A., III, R.T. Burnett, M.J. Thun, E.E. Calle, D. Krewski, K. Ito, and G.D. Thurston.  2002.  "Lung Cancer, Cardiopulmonary Mortality, and Long-term Exposure to Fine Particulate Air Pollution."  *Journal of the American Medical Association* 287:1132-1141.

U.S. Environmental Protection Agency, 2005, "Regulatory Impact Analysis for the Final Clean Air Interstate Rule".

U.S. Environmental Protection Agency, February 2005, *Control of Mercury Emissions from Coal Fired Electric Utility Boilers: An Update*.  Air Pollution Prevention and Control Division, National Risk Management Research Laboratory, Office of Research and Development, US EPA, Research Triangle Park, NC.

U.S. Environmental Protection Agency.  September 2000b.  *Guidelines for Preparing Economic Analyses*.  EPA 240-R-00-003.

U.S. Office of Management and Budget (OMB). 2003. Circulate A-4 Guidance to Federal Agencies on Preparation of Regulatory Analysis.

Viscusi, V.K., and J.E. Aldy.  2003.  "The Value of a Statistical Life:  A Critical Review of Market Estimates Throughout the World."  *Journal of Risk and Uncertainty* 27(1):5-76.

APPENDIX A-1   MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR
EAGLE BUTTE (SOUTH DAKOTA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A1-1
A1.1   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A1-1
A1.2   Site Characteristics and Model Parameterization . . . . . . . . . . . . . . . . . . . . . .   A1-4
A1.3   SERAFM Simulations of Eagle Butte, Lee Dam . . . . . . . . . . . . . . . . . . . . . . . .   A1-5
A1.4   WASP7 Simulations of Eagle Butte, Lee Dam . . . . . . . . . . . . . . . . . . . . . . . . .   A1-6
A1.5   BASS Model Simulations of Methylmercury and Fish Dynamics in Lee Dam,
Eagle Butte, SD—Response to Changes in Mercury Loading . . . . . . . . . .   A1-13

APPENDIX A-2   MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR
PAWTUCKAWAY LAKE (NEW HAMPSHIRE) . . . . . . . . . . . . . . . . . . . . . . . . .   A2-1
A2.1   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A2-1
A2.2   SERAFM Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A2-2
A2.3   WASP Model Calibration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A2-3
A2.4   References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A2-10

APPENDIX A-3   MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR
LAKE WACCAMAW (NORTH CAROLINA) . . . . . . . . . . . . . . . . . . . . . . . . . . .   A3-1
A3.1   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A3-1
A3.2   Empirical Data from Lake Waccamaw . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A3-2
A3.3   SERAFM Application: Lake Waccamaw . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A3-4
A3.4   Lake Waccamaw WASP Model Calibration . . . . . . . . . . . . . . . . . . . . . . . . .   A3-6
A3.5   References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A3-13

APPENDIX A-4   MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR THE
BRIER CREEK WATERSHED (LOCATED IN THE SAVANNAH RIVER BASIN,
GEORGIA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-1
A4.1   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-1
A4.2   Mercury Deposition Network . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-3
A4.3   Watershed Hydrologic and Sediment Loading Model . . . . . . . . . . . . . . . . . .   A4-4
A4.4   Water Quality Fate and Transport Model . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-5
A4.5   Model Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-6
A4.5.1 Water Quality Model . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-6
A4.6   Brier Creek Watershed Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-8
A4.6.1 Brier Creek Soil Mercury Calibration . . . . . . . . . . . . . . . . . . . . . . . .   A4-9
A4.6.2 Mercury Loading Fluxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-10
A4.6.3 Future Projections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-11
A4.6.4 Sensitivity of Temporal Response . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-13
A4.7   Brier Creek Water Body Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-16
A4.7.1 Phase 1: Long Term Buildup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-16
A4.7.2 Phase 2: Response to 2002 Flows . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-17
A4.7.3 Phase 3: Future Attenuation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-20
A4.7.4 Sensitivity of Time Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-22

APPENDIX A-5   MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR
LAKE BARCO (FLORIDA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A5-1
A5.1   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A5-1

A5.2    Empirical Data from Lake Barco ................................... A5-1
A5.3    SERAFM Application: Lake Barco ................................. A5-1
A5.4    References ........................................................ A5-3

**Tables**

Table A1-1.  Observed Mercury Concentrations in Northern Pike from Lee Dam (DMA-80 results) ................................................................ A1-4
Table A1-2.  Statistical summary of northern pike length normalized BAF (4 years) for Eagle Butte (used in SERAFM) ............................................. A1-5
Table A1-3.  SERAFM Parameter Values for Eagle Butte ........................ A1-5
Table A1-4.  Calibrated SERAFM Rate Constants for Eagle Butte ................ A1-6
Table A1-5.  SERAFM 50% Load Reduction Scenario for Eagle Butte .............. A1-6
Table A1-6.  SERAFM Zero-Out Scenario for Eagle Butte (Removal of Deposition attributed to coal-fired utilities) in the CMAQ and REMSAD Models ..................... A1-6
Table A1-7.  WASP Forecasted Mercury Concentrations in Eagle Butte Sediments in Response to 50% Loading Reduction Scenario ...................................... A1-12
Table A2-1.  Summary of Yellow Perch Mercury Data from Pawtuckaway Lake ........ A2-1
Table A2-2.  Pawtuckaway Lake Parameter Values ............................... A2-2
Table A2-3.  A Comparison of Measured and Baseline Steady State Values for Pawtuckaway Lake ............................................................... A2-2
Table A2-4.  Lake Pawtuckaway SERAFM Calibrated Rate Constants ............... A2-3
Table A2-5.  Time to Reach 90% Steady State After 50% Reduction in Atmospheric Deposition ......................................................... A2-3
Table A2-6.  SERAFM Model Forecasts with Zero-Out Scenario for Coal-Fired Power Plants (Medium Response Time Scenario) ...................................... A2-3
Table A2-7.  Mercury Response Times for Lake Pawtuckaway, in years ............ A2-8
Table A3-1.  Observational Data from Lake Waccamaw .......................... A3-2
Table A3-2.  Raw Fish Tissue Data Collected from Lake Waccamaw ............... A3-3
Table A3-3.  Annual Wet Deposition of Mercury at Waccamaw 1998-2000 ........... A3-4
Table A3-4.  Model Parameter Values ....................................... A3-5
Table A3-5.  Measured and Baseline Steady State Values for Lake Waccamaw ........ A3-5
Table A3-6.  SERAFM Calibrated Rate Constants for Lake Waccamaw .............. A3-6
Table A3-7. SERAFM 50% Load Reduction Scenario for Lake Waccamaw ............ A3-6
Table A3-8.  SERAFM Zero-Out Scenario for Lake Waccamaw (Removal of Deposition Attributed to Coal-fired Utilities) in the CMAQ and REMSAD Models ........ A3-6
Table A3-9.  WASP Response Time Estimates for Lake Waccamaw .................. A3-11
Table A4-1.  Average Mercury Deposition Hg Concentrations and Depositions Rates .... A4-4
Table A4-2.  Specified and Calculated Reaction Rates and Coefficients ............. A4-6
Table A4-3.  Flows, Depths, Length and Volumes used in WASP Model ............. A4-7
Table A4-4.  Measured vs. Predicted for Sediment Components .................... A4-7
Table A4-5.  Predicted and Observed Mercury Concentrations under Annual Average Load and Flow ............................................................... A4-8
Table A4-6.  Soil Mercury Data in Local Region ............................... A4-8
Table A4-7.  June 2003 Survey vs WASP Predictions for Mercury .................. A4-18
Table A5-1.  Lake Barco Parameter Values .................................... A5-1
Table A5-2.  Measured and Baseline Steady State Values for Lake Barco ............ A5-2
Table A5-3.  Lake Barco SERAFM Calibrated Rate Constants ..................... A5-2
Table A5-4.  Time to Reach 90% Steady State After 50% Reduction in Atmospheric

Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A5-2

Table A5-5.  SERAFM Model Forecasts with Zero-Out Scenario for Coal-Fired Power
   Plants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A5-3

## Figures

Figure A1-1.  Location of Lee Dam (lower left quadrant) on La Plant SW quadrangle . . . .  A1-3
Figure A1-2.  WASP Water Column Solids Calibration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-7
Figure A1-3.  WASP Upper Sediment Solids Calibration . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-8
Figure A1-4.  WASP Burial Rate Calibration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-8
Figure A1-5.  WASP Total Mercury Buildup in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-9
Figure A1-6.  WASP Methyl Mercury Buildup in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-9
Figure A1-7.  WASP Total Mercury Buildup in Sediment . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-10
Figure A1-8.  WASP Methyl Mercury Buildup in Sediment . . . . . . . . . . . . . . . . . . . . . . . . .  A1-10
Figure A1-9.  WASP Total Mercury Attenuation in Water . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-11
Figure A1-10. WASP Total Mercury Attenuation in Surface Sediment . . . . . . . . . . . . . . .  A1-11
Figure A1-11. WASP Attenuation Sensitivity in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-12
Figure A1-12. WASP Attenuation Sensitivity in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A1-13
Figure A1-13. Base Case Response of Northern Pike to Methylmercury Exposure . . . . .  A1-14
Figure A1-14. Base case response of yellow perch to methylmercury exposure (0.5ng/L)  A1-14
Figure A1-15. Attenuation of Methylmercury in Northern Pike after Load Reduction . .  A1-15
Figure A1-16. Attenuation of Methylmercury in Yellow Perch after Load Reduction . . .  A1-15
Figure A2-1.  WASP Water Column Solids Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A2-4
Figure A2-2.  WASP Solids Simulation for Surface Sediment . . . . . . . . . . . . . . . . . . . . . . .  A2-5
Figure A2-3.  WASP Simulation of Burial Velocity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A2-5
Figure A2-4.  WASP Total Mercury Buildup in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A2-6
Figure A2-5.  WASP Methyl Mercury Buildup in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A2-7
Figure A2-6.  WASP Total Mercury Buildup in Sediment . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A2-7
Figure A2-7.  WASP Methyl Mercury Buildup in Sediment . . . . . . . . . . . . . . . . . . . . . . . . . .  A2-8
Figure A2-8.  WASP Total Mercury Attenuation in Epilimnion . . . . . . . . . . . . . . . . . . . . . . .  A2-9
Figure A2-9.  WASP Total Mercury Attenuation in Hypolimnion . . . . . . . . . . . . . . . . . . . . .  A2-9
Figure A2-10.  WASP Total Mercury Attenuation in Surface Sediment . . . . . . . . . . . . . . .  A2-10
Figure A3-1.  Southeastern North Carolina and Lake Waccamaw . . . . . . . . . . . . . . . . . . . .  A3-1
Figure A3-2.  WASP Water Column Solids Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A3-7
Figure A3-3.  WASP Solids Simulation for Surface Sediment . . . . . . . . . . . . . . . . . . . . . . .  A3-8
Figure A3-4.  WASP Simulation of Burial Velocity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A3-8
Figure A3-5.  WASP Total Mercury Buildup in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A3-9
Figure A3-6.  WASP Methyl Mercury Buildup in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A3-10
Figure A3-7.  WASP Total Mercury Buildup in Sediment . . . . . . . . . . . . . . . . . . . . . . . . . . .  A3-10
Figure A3-8.  WASP Methyl Mercury Buildup in Sediment . . . . . . . . . . . . . . . . . . . . . . . . .  A3-11
Figure A3-9.  WASP Total Mercury Attenuation in Epilimnion . . . . . . . . . . . . . . . . . . . . . .  A3-12
Figure A3-10. WASP Total Mercury Attenuation in Surface Sediment . . . . . . . . . . . . . . .  A3-12
Figure A4-1.  Brier Creek Watershed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A4-1
Figure A4-2.  Brier Creek Subwatersheds for Hg Loadings . . . . . . . . . . . . . . . . . . . . . . . . .  A4-2
Figure A4-3.  Brier Creek Watershed Landuses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A4-3
Figure A4-4.  Mercury Deposition Network Sampling Locations . . . . . . . . . . . . . . . . . . . .  A4-4
Figure A4-5.  Brier Creek Soil Mercury Buildup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A4-9
Figure A4-6.  Brier Creek Loading Flux Buildup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A4-10

Figure A4-7.  Upper Brier Creek Soil Mercury Attenuation . . . . . . . . . . . . . . . . . . . . . . . .   A4-11
Figure A4-8.  Brier Creek Loading Flux Attenuation . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-12
Figure A4-9.  Upper Brier Creek Soil Mercury Attenuation . . . . . . . . . . . . . . . . . . . . . . .   A4-13
Figure A4-10.  Upper Brier Creek Loading Flux Attenuation  . . . . . . . . . . . . . . . . . . . . . .   A4-14
Figure A4-11.  Watershed Loading Flux Attenuation considering Landuse Change  . . . . .   A4-15
Figure A4-12 Base Case Water Column Mercury Concentration for Brier Creek  . . . . . . .   A4-16
Figure A4-13.  Base Case Sediment Mercury Concentration for Brier Creek  . . . . . . . . . .   A4-17
Figure A4-14.  Brier Creek Total Mercury Water Column Concentration . . . . . . . . . . . .   A4-18
Figure A4-15.  Brier Creek Methyl Mercury Water Column Concentration  . . . . . . . . . .   A4-19
Figure A4-16.  Mercury Attenuation over Time in Water Column . . . . . . . . . . . . . . . . . .   A4-20
Figure A4-17.  Mercury Attenuation over Time in Sediments . . . . . . . . . . . . . . . . . . . . .   A4-21
Figure A4-18.  Sensitivity Range for Upstream Waters . . . . . . . . . . . . . . . . . . . . . . . . . .   A4-23
Figure A4-19.  Sensitivity Range for Downstream Waters . . . . . . . . . . . . . . . . . . . . . . . .   A4-24

APPENDIX A-1

**MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR EAGLE BUTTE (SOUTH DAKOTA)**

**A1.1   Introduction**

This appendix contains technical details of input parameters, model calibration and scenario projection in response to atmospheric mercury loading reduction in Eagle Butte, South Dakota.

Eagle Butte is located in north/central portion of South Dakota on the Cheyenne River Sioux Tribal (CRST) Lands. The USGS Hydrologic Unit Code (HUC) for this watershed is: 01010302 (Upper Lake Oahe).  The CRST inhabits the Cheyenne River Sioux Reservation, which is located within the former Dakota Territory, in an area that is known today as central South Dakota. The Reservation is over 2.8 million acres, comparable in size and shape to the State of Connecticut. The Reservation encompasses Dewey and Ziebach counties and is comprised of a portion of the aboriginal territory of the Great Sioux Nation and the United States. The boundaries of Cheyenne River Reservation are set forth in Section 5 of the Act of March 2, 1889, 25 Stat. 888 (1889). The Cheyenne River (Wakpa Waste) and the Missouri River (Mni Sose') form the southern and eastern Reservation boundaries, respectively. Bordering the Cheyenne River Sioux Reservation on the north is the Standing Rock Sioux Reservation.  The world's largest earthen dam was constructed by the U.S. Army Corps of Engineers (USACE) on the Missouri River downstream of the Cheyenne River Sioux Reservation in 1958 and formed Lake Oahe.

The climate of the Cheyenne River Basin is characterized as semi-arid continental, with large variations in precipitation and temperature. The high plains of eastern Wyoming are relatively dry. During the period from 1931 to 1990, the mean annual temperature was about 46 degrees Fahrenheit ($°F$). Orographic effects induced by the Black Hills are responsible for dramatic spatial changes in climate within western South Dakota. As elevation increases, precipitation generally increases and temperature generally decreases. Precipitation also varies spatially within the Black Hills, from a mean annual value of less than 12 inches in the southwest, to a maximum of more than 29 inches in the north.

The Cheyenne and Belle Fourche Rivers both originate in east-central Wyoming in areas of Eocene and Paleocene-age sedimentary rock exposures. The Paleocene-age rocks host thick, continuous coal seams. The two rivers around the domal Black Hills uplift where mostly metasedimentary rocks of precambrain age, carbonate rocks of Paleozoic age, and mixed sandstones and shales of early Mesozoic age are exposed. The two rivers stay within the outcrop belts of Late Cretaceous-age Pierre Shale, which is a marine shale that contains high concentrations of iron, manganese, and limestone concretions. The Pierre shale also is characterized by an abundance of low permeability bentonite clay. As a result, exposures of this unit are prone to high runoff during periods of intense or extended rainfall

The site modeled (Lee Dam), is a shallow, well-mixed system and has a water surface area of 0.2 km$^2$ and a watershed:lake area ratio of 22.6.  There are power plants in the vicinity of this site, although the prevailing meteorology likely transports most emissions east of the site.  Currently, consumption advisories are in place on reservation lands due to high levels of mercury in piscivorous fish.  Atmospheric deposition data, total and methylmercury concentrations in sediments, water and biota have all been collected as part of this research.  To mode this system, we used the empirical data collected at this site to parameterize both the SERAFM and WASP models.



**Figure A1-1.  Location of Lee Dam (lower left quadrant) on La Plant SW quadrangle**

Top map shows tribal lands in EPA Region 8 (highlighted in yellow)

## A1.2    Site Characteristics and Model Parameterization

Mercury dynamics at this site are currently being studied as part of an EPA Regional Office RARE Grant awarded in 2003 (http://www.epa.gov/osp/regions/RARE_Region8.pdf). Data used to parameterize ecosystem and food web models were obtained from this study (Unpublished Data, John Johnston, EPA/ORD ERD-Athens).

Table A1-1 presents Northern Pike sample data collected at the Lee Dam site that were used to characterize empirically calibrated BAFs for this site.  Data were normalized to correct for length/age variability, long transformed and summarized in Table A1-2.

**Table A1-1.  Observed Mercury Concentrations in Northern Pike from Lee Dam (DMA-80 results)**

| Sample ID | Weight | Height | [TOTHg] ppb | Mass Fish g | Length Fish mm |
|-----------|--------|--------|-------------|-------------|----------------|
| fpsd150401 | 0.1986 | 0.1829 | 683.96 | 1900 | 680 |
| fpsd150402 | 0.1943 | 0.2779 | 1094.07 | 1980 | 854 |
| fpsd150403a | 0.1520 | 0.1695 | 824.79 | 2460 | 730 |
| fpsd150403b | 0.1363 | 0.1350 | 725.34 | 2460 | 730 |
| fpsd150404 | 0.2250 | 0.2356 | 790.33 | 1272 | 590 |
| fpsd150405 | 0.1683 | 0.1427 | 622.06 | 1758 | 669 |
| fpsd150406 | 0.1885 | 0.2024 | 801.88 | 1184 | 580 |
| fpsd150407 | 0.1524 | 0.1947 | 951.94 | 1858 | 662 |
| fpsd150408 | 0.2157 | 0.2175 | 756.57 | 708 | 500 |
| fpsd150409 | 0.2378 | 0.1690 | 525.43 | 550 | 468 |
| fpsd150412 | 0.2898 | 0.0803 | 199.89 | n/a | n/a |
| fpsd150410 | 0.2066 | 0.0843 | 294.42 | n/a | n/a |
| fpsd150411 | 0.2616 | 0.0749 | 206.19 | n/a | n/a |

BAFs of both benthic macroinvertebrates and zooplankton were calculated directly from field data and used in the model.  The expression used for mercury exposures under atmospheric loading reduction (dissolved organic mean concentration from field data used was 0.5 ng $L^{-1}$) is as follows:

$$C_{water} \text{ (ng } L^{-1}) = 0.5 \exp(-0.0011*t(day))$$

This is consistent with the predictions of both SERAFM and WASP, such that after two years epilimnion concentrations were half of the starting concentration and after five years concentration reached a 90% reduction.

Annual water temperature was simulated by the following function:

$$T = 15 + 10*\sin[(0.0172*T(days)-0.280)], (T_0 = \text{April 1})$$

This is intended to capture the annual variability in temperature (which affects metabolic demand), matching minimum and maximum temperatures collected in the field data, as well as the lowest temperatures reached in January.

A1-4

**Table A1-2.  Statistical summary of northern pike length normalized BAF (4 years) for Eagle Butte (used in SERAFM)**

| Northern Pike | Value |
|---|---|
| BAF – MeHg water (kg $L^{-1}$) | $8.9 \times 10^5$ |
| Stdev BAF (kg $L^{-1}$) | $2.65 \times 10^5$ |
| N samples | 42 |
| N of age 4 pike for length correction | 10 |
| Normalized HgT ($\mu g\ g^{-1}$) | 0.89 |
| Stdev normalized Hg ($\mu g\ g^{-1}$) | 0.27 |

## A1.3    SERAFM Simulations of Eagle Butte, Lee Dam

The following tables and parameter values summarize the application of the SERAFM model to simulate mercury dynamics in Eagle Butte, Lee Dam.  The model was first run to steady state after being calibrated to the observed data and then used for scenario projections of 1) a 50% decline in atmospheric deposition and 2) removal of coal fired utilities from overall projected deposition using the CMAQ and REMSAD models.

**Table A1-3.  SERAFM Parameter Values for Eagle Butte**

| | Measured | | Predicted |
|---|---|---|---|
| Parameter | Range | Mean | |
| Water Column MeHg Unfiltered (ng $L^{-1}$) | 0.4 – 2.9 | 1.0 | 0.82 |
| Water Column HgT Unfiltered (ng $L^{-1}$) | 0.5 - 100 | 6.9 | 10.2 |
| | | | |
| Sediment MeHg (ng $g^{-1}$ dry) | 0. 062 – 1.74 | 0.40 | 0.29 |
| Sediment HgT (ng $g^{-1}$ dry) | 28.1 – 95 | 44.1 | 63.9 |
| Age 4 Northern Pike Tissue Hg ($\mu g/g$) | 0.5 – 2 | 0.89 | 0.97 |
| Observed BAF: FishHg/MeHg Water | | $8.9 \times 10^5$ | |

**Table A1-4.  Calibrated SERAFM Rate Constants for Eagle Butte**

| Eagle Butte: SERAFM Calibrated Rate Constants | | | |
|---|---|---|---|
| **Process** | **Media** | **Value** | **Units** |
| Methylation[*] | Epilimnion | 0.04 | per day |
| | Sediment | 0.001 | per day |
| Demethylation | Epilimnion | 0.1 | per day |
| | Sediment | 0.40 | per day |
| Biotic Reduction | Water Column | 0.03 | per day |
| Photo-Degradation | Water Column | 0.002 | Per day per E/m$^2$-day |
| Photo-Reduction (Vis) | Water Column | 0.003 | Per day per E/m$^2$-day |
| Photo-Reduction (UV-B) | Water Column | 2.825 | Per day per E/m$^2$-day |
| Photo-Oxidation (UV-B) | Water Column | 5.885 | Per day per E/m$^2$-day |
| Dark Oxidation | Water Column | 1.44 | per day |

[*]Note: Methylation rate constant in Lee Dam is increased to account for the reservoir effect of repeated flooding and drying, and the increased zone of redox potential where methylation is found to be increased.

**Table A1-5.  SERAFM 50% Load Reduction Scenario for Eagle Butte**

| Lee Dam, Eagle Butte 50% Loading Scenario | | | |
|---|---|---|---|
| | Slow | Medium | Fast |
| Water | 2 | 2 | 4 |
| Sediment | 3 | 4 | 6 |
| Fish | 2 | 3 | 4 |

*Note: Fast = 1 cm active sediment layer, D (macro-dispersion coefficient) = $10^{-4}$ cm$^2$ s$^{-1}$; Medium = 2 cm active sediment layer, D = $10^{-4}$ cm$^2$ s$^{-1}$; Slow –3 cm sediment, D = $5x10^{-5}$ cm$^2$ s$^{-1}$.*

**Table A1-6.  SERAFM Zero-Out Scenario for Eagle Butte (Removal of Deposition attributed to coal-fired utilities) in the CMAQ and REMSAD Models**

| Eagle Butte – Lee Dam | | | |
|---|---|---|---|
| | Slow | Med | Fast |
| Epilimnion | 2 | 3 | 4 |
| Hypolimnion | -- | -- | -- |
| Sediment | 3 | 4 | 6 |
| Fish | 2 | 3 | 4 |

## A1.4   WASP7 Simulations of Eagle Butte, Lee Dam

Simulations were set up with the basic parameters from the SERAFM model of Lee Dam. This water body receives watershed loadings of solids and mercury, but has no significant outflow.  Solids loadings from the watershed are balanced by in-lake mineralization and burial. Mercury loadings from direct deposition and from the watershed are subject to volatilization and burial losses.

WASP7 simulations were run for a total of 200 years.  The first 100 years represent the buildup of mercury to steady-state levels using present loadings.  Mercury loadings were then cut 50%, and the attenuation period was tracked for 100 years.

The solids balance is represented in the following figures (Figure 2-Figure 3).  The water column equilibrated at a silt concentration of just over 2 mg L$^{-1}$.  The organic matter (OM) represents biotic solids (including phytoplankton, periphyton, and macrophytes) and detritus.



**Figure A1-2.  WASP Water Column Solids Calibration.**

Sediment solids are balanced by the composition of the erosion load, the in-lake biotic production, and the mineralization of OM.  The sediment composition is primarily abiotic silt (70%), with a sand fraction just under 20% and an organic fraction just over 10%.



**Figure A1-3.  WASP Upper Sediment Solids Calibration**

A1-7

The burial rate is calculated internally from the solids balance.  Given the specified loads, production, and mineralization rates, burial stabilized at about 0.24 cm/yr.



**Figure A1-4.  WASP Burial Rate Calibration**

Total mercury built up over the first 100 years to 9.5 ng $L^{-1}$ in the water, and 180 ng $g^{-1}$ in the sediment.  The sediment levels are higher than observations, indicating an additional loss mechanism (e.g., faster burial or uptake by macrophytes).  Methyl mercury levels built up to reasonable concentrations in the water and the sediment.



**Figure A1-5.  WASP Total Mercury Buildup in Water**



**Figure A1-6.  WASP Methyl Mercury Buildup in Water**



**Figure A1-7.  WASP Total Mercury Buildup in Sediment**



**Figure A1-8.  WASP Methyl Mercury Buildup in Sediment**

After external mercury loads were reduced 50%, the mercury levels in the water column and surface sediment declined rapidly, on the order of years.  Mercury levels in the lower sediment layer declined slowly over the following decades due to burial.



**Figure A1-9.  WASP Total Mercury Attenuation in Water**



**Figure A1-10. WASP Total Mercury Attenuation in Surface Sediment**

Three scenarios were simulated representing fast, medium, and slow estimates of recovery.  The upper sediment layer thickness was varied from 1 cm, 2 cm, and 3 cm.  For the slow scenario, the sediment-water dispersion coefficient was reduced by half from $10^{-4}$ cm$^2$ sec$^{-1}$. Response times are summarized in the following table, and presented graphically for water and sediment.

A1-11

**Table A1-7.  WASP Forecasted Mercury Concentrations in Eagle Butte Sediments in Response to 50% Loading Reduction Scenario**

| Mercury Response Times for Lee Dam, in years | | | |
|---|---|---|---|
| Compartment | Fast | Medium | Slow |
| Epilimnion | 5 | 9 | 14 |
| Surface Sediment | 6 | 11 | 16 |



**Figure A1-11.  WASP Attenuation Sensitivity in Water**



**Figure A1-12.  WASP Attenuation Sensitivity in Water**

### A1.5   BASS Model Simulations of Methylmercury and Fish Dynamics in Lee Dam, Eagle Butte, SD—Response to Changes in Mercury Loading

The following figures illustrate the response time to both loadings and load reductions of mercury from atmospheric sources.  BASS is run in FGETS mode, i.e., without population dynamics, to simulate whole-body organic mercury chemical residues in weight and length classes of community members.  BASS is calibrated by adjusting species growth rates, dietary composition and concentrations and bioaccumulation factors of benthic macroinvertebrates and zooplankton. Field data for length, weight and ages of species are corroborated by the BASS model.  Predicted model concentrations for northern pike, yellow perch, black bass and black crappie agree with observed field concentrations for these species.  Exposure to mercury occurs through food and gill uptake only.  The macroinvertebrate BAF used is $1.14^x10^5$, and the zooplankton BAF used is $1.67^x10^5$, both of which are calculated from field data at Lee Dam.

Lee Dam is predominantly a northern pike/yellow perch community, but also includes subdominant black crappie, black bass and spottail shiner, all of which have been sampled for residue analysis over a two year period using a combination of gill nets and seine nets.  An abundance of submerged aquatic vegetation provides suitable cover for these species.  Northern pike is the top predator (SERAFM Level 4) in this lake system, feeding primarily on yellow perch.

Dissolved methylmercury concentrations are set at $0.5$ng L$^{-1}$ for the base case, and equilibrium is reached in 1500 days for length class 3 pike and 3500 days for length class 4 pike.



**Figure A1-13.  Base Case Response of Northern Pike to Methylmercury Exposure**

Dynamics of the community co-dominants to reductions in atmospheric loading were simulated by decreasing epilimnion dissolved methylmercury concentrations from 0.5ng $L^{-1}$ at time zero to approximately 0.25ng $L^{-1}$ at year 2 and approximately 0.05ng $L^{-1}$ at year 5 to be consistent with predicted water column dynamics from SERAFM and WASP for this lake system (reaching a 90% reduction on the order of 5 years).



**Figure A1-14.  Base case response of yellow perch to methylmercury exposure (0.5ng/L)**

A1-14

The response time of the concentration of mercury in fish is roughly twice the duration of the simulated water concentration response.  The largest northern pike length classes reach the action limit concentration of 0.3 ppm in approximately 5 - 10 years.  The largest yellow perch reach the 0.3 ppm level in a span of 5 to 8 years.  Note that a roughly equivalent time lag is predicted for the biotic response in this dynamic and relatively rapidly responding system (see SERAFM and WASP forecasts).



**Figure A1-15.  Attenuation of Methylmercury in Northern Pike after Load Reduction**



**Figure A1-16.  Attenuation of Methylmercury in Yellow Perch after Load Reduction**

APPENDIX A-2

**MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR PAWTUCKAWAY LAKE (NEW HAMPSHIRE)**

**A2.1   Introduction**

Pawtuckaway Lake is a medium sized, seepage lake in Nottiham, New Hamsphire.  This lake a water surface area of 3.6 km$^2$ and a watershed:lake area ratio of 13.7.  Lakes in this region are characteristic of undisturbed lakes within the Northeastern Highlands Ecoregion (Omernik, 1987; US EPA, 2000).  This lake was part of a recent study of mercury dynamics across a number of Vermont and New Hampshire Lakes funded by EPA's Office of Research and Development under the Regional Environmental Monitoring and Assessment Program (Kamman et al., 2004).  Site specific data used to parameterize the mercury cycling models developed for Pawtuckaway Lake were from Kamman and Engstrom (Kamman and Engstrom, 2002) and Kamman (2004) or http://www.vtwaterquality.org/lakes/docs/lp_remap-datareport.pdf.  An excerpt from Kamman and Engstrom (2002) describing the region is given below:

"Most lakes in this area occupy undisturbed forested catchments, which are a mix of deciduous or coniferous vegetation overlying soils ranging from stony to silty loams. Bedrock geology is largely schistose or granitic, and most watersheds are poorly buffered. Some shales and slates are in evidence near High Pond in Vermont, and the buffering capacity of this watershed is enhanced accordingly. These watersheds have experienced varying degrees of deforestation during settlement, but have regrown to forest in the past 75–150 years."

Fish data were normalized for age/length variability.  Details of data transformations can be found in Kamman (2004).  SERAFM was calibrated to forecast fish tissue concentrations in 4 year old yellow perch from this system.  These data are summarized in Table 1.

**Table A2-1.  Summary of Yellow Perch Mercury Data from Pawtuckaway Lake**

| Pawtuckaway Lake | Value |
|---|---|
| Mean normalized Yellow Perch Hg (ug/g) | 0.21 |
| Range Hg Yellow Perch (ug/g) | 0.12-0.40 |
| Mean MeHg Water Concentration Epilimnion (ng/L) | 0.19 |
| Range MeHg Epilimnion (ng/L) | 0.14-0.24 |
| HgT Water Concentration (ng/L) | |
| Mean | 1.65 |
| Log Mean | 0.18 |
| Range HgT water (ng/L) | 0.7-3.8 |

## A2.2   SERAFM Application

## Table A2-2.  Pawtuckaway Lake Parameter Values

| Parameter | Lake Pawtuckaway |
|---|---|
| Watershed Area | 50,007,406 m$^2$ |
| Percent Impervious | 1% |
| Percent Forest | 88% |
| Percent Riparian | 10% |
| Percent Upland | 1% |
| | |
| Lake Area | 3,6412,200 m$^2$ |
| Catchment/Lake Ratio | 13.73 |
| Epilimnion Depth | 2 m |
| Hypolimnion Depth | 3 m |
| Hypolimnion Anoxia | Yes |
| Hydraulic Residence Time | 0.45 yrs |
| Inflow/Outflow | 4.05x10$^7$ m$^3$/yr |
| | |
| Water pH | 6.45 |
| Epilimnion DOC | 5.46 mg/L |
| Hypolimnion DOC | 5.55 mg/L |
| Trophic Status | Dystrophic |
| | |
| Annual Precipitation | 102 cm/yr |
| HgII Conc. in Precip | 10 ng/L |
| Wet Deposition (HgII) | 10.2 ug/m2/yr |
| Dry Deposition (HgII) | 10.2 ug/m2/yr |
| Wet Deposition (HgII) | 0.153 ug/m2/yr |
| Dry Deposition (HgII) | 0.153 ug/m2/yr |

## Table A2-3.  A Comparison of Measured and Baseline Steady State Values for Pawtuckaway Lake

| Parameter | Measured Range | Mean | Predicted |
|---|---|---|---|
| EPI MeHg Unfiltered | 0.14 – 0.24 ng/L | 0.19 ng/L | 0.35 ng/L |
| EPI HgT Unfiltered | 0.71 – 3.8 ng/L | 2.26 ng/L | 3.57 ng/L |
| HYP MeHg Unfiltered | 2.38 – 3.44 ng/L | 2.91 ng/L | 0.38 ng/L |
| HYP HgT Unfiltered | 6.94 – 34.54 ng/L | 20.74 ng/L | 5.63 ng/L |
| Sediment MeHg | | 7 ng/g | 6 ng/g |
| Sediment HgT | | 290 ng/g | 237 ng/g |
| Perch Tissue Hg | 0.12 – 0.4 ug/g | 0.21 ug/g | 0.23 ug/g (0.21-0.26) |
| BAF: FishHg/MeHg | 1.11x10$^6$ | | |

**Table A2-4.  Lake Pawtuckaway SERAFM Calibrated Rate Constants**

| Process | Media | Value | Units |
|---|---|---|---|
| Methylation | Epilimnion | 0 | per day |
| | Hypolimnion | 0.01 | per day |
| | Sediment | 0.01 | per day |
| Demethylation | Epilimnion | 0.0001 | per day |
| | Hypolimnion | 0.001 | per day |
| | Sediment | 0.4 | per day |
| Biotic Reduction | Water Column | 0.03 | per day |
| Photo-Degradation | Water Column | 0.002 | per day per E/m²-day |
| Photo-Reduction (Vis) | Water Column | 0.003 | per day per E/m²-day |
| Photo-Reduction (UV-B) | Water Column | 2.825 | per day per E/m²-day |
| Photo-Oxidation (UV-B) | Water Column | 5.885 | per day per E/m²-day |
| Dark Oxidation | Water Column | 1.44 | per day |

**Table A2-5.  Time to Reach 90% Steady State After 50% Reduction in Atmospheric Deposition**

| Lake Pawtuckaway | Fast | Medium | Slow |
|---|---|---|---|
| Epiliminion | 59 | 115 | 179 |
| Hypolimnion | 79 | 154 | >180 |
| Sediments | 80 | 125 | >180 |
| Fish | 34 | 56 | 64 |

**Fast** = 1 cm active sediment layer, D (macro-dispersion coefficient) = $10^{-4}$ cm²/s
**Medium** = 2 cm active sediment layer, D = $10^{-4}$ cm²/s
**Slow** – Slow Responding Sediment: 3 cm sediment, D = $5 \times 10^{-5}$ cm²/s

**Table A2-6.  SERAFM Model Forecasts with Zero-Out Scenario for Coal-Fired Power Plants (Medium Response Time Scenario)**

| Lake Pawtuckaway | Time |
|---|---|
| Epilimnion HgT (ng/L) | 95 |
| Epilimnion MeHg (ng/L) | -- |
| Hypolimnion (ng/L) | 122 |
| Sediment MeHg (ng/g) | 125 |
| Fish (ng/g) | 47 |

## A2.3   WASP Model Calibration

WASP simulations of Lake Pawtuckaway were set up with the basic parameters from the SERAFM model.  In addition to direct deposition of mercury, this water body receives watershed loadings of solids and mercury.  Solids loadings from the watershed and internal production of organic matter are balanced by outflow, in-lake mineralization, and burial.  Mercury loadings from direct deposition and from the watershed are subject to outflow, volatilization and burial losses.  WASP simulations were run for a total of 200 years.  The first 100 years represent the buildup of mercury to steady-state levels using present loadings.  Mercury loadings were then cut 50%, and the attenuation period was tracked for 100 years.

WASP calibration was conducted for a base case scenario with an active sediment depth of 2 cm and a sediment macro-dispersion coefficient $(E) = 10^{-4}$ cm$^2$/sec.  This calibration employed the same deposition and resuspension velocities for silts and organic matter in the SERAFM model.  Solids were calibrated to match the observed porosity of 0.93, OM fraction of 35%, and burial rate of 0.05 cm/yr

The solids balance is represented in Figure 1 and Figure 4.  The epilimnion solids are mostly organic, including runoff and plankton.  Hypolimnion organic matter includes living periphyton and macrophytes, as well as detritus. Sediment solids are balanced by the composition of the erosion load, the in-lake biotic production, and the mineralization of OM. The sediment composition is a balance between silt and organic matter (35% each), and sand (30%). The burial rate is calculated internally from the solids balance.  Given the specified loads, production and mineralization rates, burial stabilized at 0.04 cm/yr, close to observations.



**Figure A2-1.  WASP Water Column Solids Calculation**



**Figure A2-2.  WASP Solids Simulation for Surface Sediment**



**Figure A2-3.  WASP Simulation of Burial Velocity**

WASP was calibrated to better match total mercury levels by adjusting the fractions of sand and silt in the watershed erosion load resulting in a silt/sand/OM erosion composition of 50/45/5 percent.  The hypolimnion methylation and demethylation rate constants were adjusted to try to obtain reasonable a MeHg concentration using reasonable coefficients.  The final

A2-5

hypolimnion rate constants were the same as in the active sediment layer, reasoning that the hypolimnion of this lake has a lot of plant substrate and organic matter.

Total mercury built up over the first 100 years to 8 ng/L in the epilimnion, 15 ng/L in the hypolimion, and 300 ng/g in the upper sediment. Methyl mercury levels built up to $0.5 - 1$ ng/L in the water, and 6 ng/g in the sediment. Although HgT is overpredicted in the epilimnion and MeHg is underpredicted in the hypolimnion, sediment levels match the data very well.

Note that while the model calculates high OM in the hypolimnion, much of it conceptually is macrophyte biomass. The epilimnion HgT concentration is high, while the hypolimnion HgT is reasonably good. The calculated sediment HgT for the upper 2 cm and the lower 10 cm bracket the observed value.



**Figure A2-4.  WASP Total Mercury Buildup in Water**



**Figure A2-5.  WASP Methyl Mercury Buildup in Water**



**Figure A2-6.  WASP Total Mercury Buildup in Sediment**



**Figure A2-7.  WASP Methyl Mercury Buildup in Sediment**

After external mercury loads were reduced 50%, the mercury levels in the water column and surface sediment declined at moderate rates.  Mercury attenuation seems to be controlled by the slow burial and by resuspension of silt and organic matter.  Three scenarios were simulated representing fast, medium, and slow estimates of recovery.  The upper sediment layer thickness was varied from 1 cm, 2 cm, and 3 cm.  For the slow scenario, the sediment-water dispersion coefficient was reduced by half from $10^{-4}$ cm$^2$/sec.  Response times are summarized in Table 7, and presented graphically for water and sediment in Figures A2-8 and A2-10.

**Table A2-7.  Mercury Response Times for Lake Pawtuckaway, in years**

| Compartment | Fast | Medium | Slow |
|---|---|---|---|
| Epilimnion | 20 | 36 | 55 |
| Hypolimnion | 23 | 43 | 66 |
| Surface Sediment | 24 | 44 | 69 |

WASP is 2-3 times faster in recovery than SERAFM, probably due to the treatment of sediment solids balance.  In particular, WASP resuspends silt and OM, which have high Kd's rather than bulk sediment (influenced by sand), which has a lower Kd.



**Figure A2-8.  WASP Total Mercury Attenuation in Epilimnion**



**Figure A2-9.  WASP Total Mercury Attenuation in Hypolimnion**



**Figure A2-10.  WASP Total Mercury Attenuation in Surface Sediment**

## A2.4    References

Kamman, N., Driscoll, C.T., Estabrook, B., Evers, D.C. and Miller, E.K., 2004. Biogeochemistry of Mercury in Vermont and New Hampshire Lakes An Assessment of Mercury in Water, Sediment and Biota of Vermont and New Hampshire Lakes Comprehensive Final Project Report May, 2004, Project Funding Provided by United States Environmental Protection Agency Office of Research and Development under the Regional Environmental Monitoring and Assessment Program.

Kamman, N.C. and Engstrom, D.R., 2002. Historical and present fluxes of mercury to Vermont and New Hampshire lakes inferred from Pb-210 dated sediment cores. Atmospheric Environment, 36: 1599-1609.

Omernik, J.M., 1987. Ecoregions of the conterminous United States. Map (scale 1:7,500,000). Annals of the Association ofAmerican Geographers, 77: 119-125.

US EPA, 2000. Level III ecoregions ofthe continental United States (revision of Omernik, 1987). US Environmental Protection Agency National Health and Environmental Effects Research Laboratory, Western Ecology Division, Corvallis, OR.

## APPENDIX A-3

## MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR LAKE WACCAMAW (NORTH CAROLINA)

### A3.1   Introduction

Lake Waccamaw is a Large Bay lake in southeastern North Carolina.  Lake Waccamaw has a water surface area of almost 35 km$^2$ and a catchment to lake area ratio of slightly more than six. In 1992, a survey of fish mercury concentrations North Carolina's Department of Environment, Health and Natural Resources in this region revealed that fish mercury concentrations exceeded 1 ppm in over 60% of the samples.

Waccamaw is a popular destination for recreational fishing and a fish consumption advisory is currently in place.   The area surrounding Lake Waccamaw is typical of the region: flat terrain with ubiquitous wetlands and waterways. Very little commercial or industrial activity takes place in the area immediately surrounding the park, population density is relatively low and roadways are lightly traveled.

The nearest town is Whiteville, NC, located approximately 15 kilometers to the west-northwest of Lake Waccamaw. A variety of mercury sources are located in this region including at least two coal-fired electric utility boilers, a large municipal waste incinerator, several large coal or oil-fired industrial boilers, and a pulp and paper mill. By far the largest source of historic mercury emissions was the HoltraChem mercury cell chlor-alkali operation located in Riegelwood, NC, approximately 25 kilometers east-northeast of Lake Waccamaw.



**Figure A3-1.  Southeastern North Carolina and Lake Waccamaw**

A3-1

**A3.2   Empirical Data from Lake Waccamaw**

Data in Tables 1 and 2 were provided by Debra A. Owen, Environmental Biologist, North Carolina Department of the Environment and Natural Resources, Department of Water Quality and Riggs et al., (Riggs et al., 2000).  Fish data were normalized to two year old large mouth bass assuming a length of 10 inches (http://animaldiversity.ummz.umich.edu/site/accounts/information/Micropterus_salmoides.html)

**Table A3-1.  Observational Data from Lake Waccamaw**

| Quarter | Date | Hg, ng/L | MeHg, ng/L | Diss Hg, ng/L | Diss MeHg, ng/L | DOC, mg/L | Sulfate, mg/L |
|---------|------|----------|------------|---------------|-----------------|-----------|---------------|
| 1-fall   | 11/20/02 | 4.380  | 0.317 |       |       | 31.90 | 13.40 |
| 2-winter | 01/22/03 | 2.740  | 0.150 |       |       | 21.10 | 32.60 |
| 3-spring | 05/13/03 | 18.400 | 4.040 |       |       | 49.80 | 1.37  |
| 4-summer | 07/24/03 | 10.100 | 1.480 | 7.350 | 1.680 | 36.30 | 1.41  |
| 1-fall   | 11/20/02 | 5.990  | 0.568 |       |       | 28.20 | 9.90  |
| 2-winter | 01/22/03 | 2.940  | 0.152 |       |       | 19.50 | 28.80 |
| 3-spring | 05/13/03 | 18.100 | 4.990 |       |       | 50.40 | 1.99  |
| 4-summer | 07/24/03 | 9.32   | 1.42  | 3.78  | 1.8   | 29.60 | 1.73  |
| 1-fall   | 11/20/02 | 1.060  | 0.132 |       |       | 8.63  | 5.40  |
| 2-winter | 01/22/03 | 3.890  | 0.230 |       |       | 9.96  | 8.40  |
| 3-spring | 05/13/03 | 2.680  | 0.233 |       |       | 14.00 | 4.60  |
| 4-summer | 07/24/03 | 1.990  | 0.132 | 1.210 | 0.120 | 12.00 | 4.11  |

**Table A3-2.  Raw Fish Tissue Data Collected from Lake Waccamaw**

| DATE SAMPLED | LENGTH (cm) | WEIGHT (g) | Hg ($\mu$g g$^{-1}$) | Common name | Scientific Name | Trophic Status |
|---|---|---|---|---|---|---|
| 10/7/2003 | 27.6 | 286 | 0.22 | BROWN BULLHEAD | ICTALURUS NEBULOSUS | Omnivore |
| | | | 0.22 | **BROWN BULLHEAD Average** | | |
| 10/7/2003 | 28.3 | 285 | 0.52 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 28.3 | 310 | 0.52 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 29.6 | 333 | 0.68 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 29.8 | 349 | 0.5 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 30.4 | 388 | 0.59 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 31.9 | 550 | 0.75 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 32.2 | 421 | 0.73 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 32.3 | 399 | 0.88 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 36.5 | 619 | 0.95 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 39.5 | 1055 | 0.87 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 27 | 295.3 | 0.77 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 29.5 | 428 | 0.84 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 40.5 | 1029 | 1 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 40.5 | 1229 | 1.1 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 43.5 | 1419 | 0.82 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| 10/7/2003 | 52 | 2685 | 2 | LARGEMOUTH BASS | MICROPTERUS SALMOIDES | Piscivore |
| | 34.4875 | 737.1438 | 0.845 | **LARGEMOUTH BASS Average** | | |
| 10/7/2003 | 23.2 | 272.5 | 0.11 | REDEAR SUNFISH | LEPOMIS MICROLOPHUS | Insectivore |
| 10/7/2003 | 25.5 | 385 | 0.2 | REDEAR SUNFISH | LEPOMIS MICROLOPHUS | Insectivore |
| 10/7/2003 | 28.5 | 421 | 0.48 | REDEAR SUNFISH | LEPOMIS MICROLOPHUS | Insectivore |
| 10/7/2003 | 24.3 | 376 | 0.31 | REDEAR SUNFISH | LEPOMIS MICROLOPHUS | Insectivore |
| 10/7/2003 | 25.4 | 453 | 0.29 | REDEAR SUNFISH | LEPOMIS MICROLOPHUS | Insectivore |
| | | | 0.278 | **REDEAR SUNFISH Average** | | |

| DATE SAMPLED | LENGTH (cm) | WEIGHT (g) | Hg (µg g$^{-1}$) | Common name | Scientific Name | Trophic Status |
|---|---|---|---|---|---|---|
| 10/7/2003 | 43.5 | 1189 | 0.12 | SPOTTED SUCKER | MINYTREMA MELANOPS | Insectivore |
| 10/7/2003 | 38.7 | 752 | 0.18 | SPOTTED SUCKER | MINYTREMA MELANOPS | Insectivore |
| 10/7/2003 | 41 | 925 | 0.41 | SPOTTED SUCKER | MINYTREMA MELANOPS | Insectivore |
| 10/7/2003 | 43.5 | 1072 | 0.4 | SPOTTED SUCKER | MINYTREMA MELANOPS | Insectivore |
| 10/7/2003 | 44 | 1339 | 0.24 | SPOTTED SUCKER | MINYTREMA MELANOPS | Insectivore |
| 10/7/2003 | 45.2 | 1228 | 0.4 | SPOTTED SUCKER | MINYTREMA MELANOPS | Insectivore |
| | | | 0.291667 | SPOTTED SUCKER Average | | |
| 10/7/2003 | 24 | 165.3 | 0.35 | YELLOW PERCH | PERCA FLAVESCENS | Piscivore |
| 10/7/2003 | 18.5 | 87.5 | 0.81 | YELLOW PERCH | PERCA FLAVESCENS | Piscivore |
| | | | 0.58 | YELLOW PERCH Average | | |

*Atmospheric Deposition Data*

The Mercury Deposition Network Monitoring (MDN) Site NC08 corresponds to Lake Waccamaw.  We averaged cumulative wet deposition between 1998 and 2000 to get wet deposition to Lake Waccamaw (North Carolina Division of Air Quality, 2002) and assumed that dry deposition is approximately half of total deposition.

**Table A3-3.  Annual Wet Deposition of Mercury at Waccamaw 1998-2000**

| Year | Cumulative Wet Deposition (ug/m$^2$/yr) | Precipitation (cm/yr) | Volume weighted concentration (Hg ng/L) |
|---|---|---|---|
| 1998 | 15.8 | 126.6 | 11.6 |
| 1999 | 14.8 | 185.4 | 7.8 |
| 2000 | 12.6 | 133.8 | 9.4 |

## A3.3   SERAFM Application: Lake Waccamaw

A3-4

**Table A3-4. Model Parameter Values**

| Parameter | Lake Waccamaw |
|---|---|
| Watershed Area | 216,789,552 $m^2$ |
| Percent Impervious | 1% |
| Percent Forest | 72% |
| Percent Riparian | 0% |
| Percent Upland | 27% |
| Lake Area | 34,706,448 $m^2$ |
| Catchment/Lake Ratio | 6.25 |
| Epilimnion Depth | 2.3 m |
| Hydraulic Residence Time | 0.66 yrs |
| Inflow/Outflow | $1.20 \times 10^8$ $m^3$/yr |
| Parameter | Lake Waccamaw |
| Water pH | 4.3 |
| Epilimnion DOC | 25.95 mg/L |
| Hypolimnion DOC | n/a |
| Trophic Status | Mesotrophic |
| | |
| Annual Precipitation | 120.4 cm/yr |
| HgII Conc. in Precip | 12.0 ng/L |
| Wet Deposition (HgII) | 14.4 ug/m2/yr |
| Dry Deposition (HgII) | 14.4 ug/m2/yr |
| Wet Deposition (HgII) | 0.22 ug/m2/yr |
| Dry Deposition (HgII) | 0.22 ug/m2/yr |

**Table A3-5.  Measured and Baseline Steady State Values for Lake Waccamaw**

| Parameter | Measured | | Predicted |
| | Range | Mean | |
|---|---|---|---|
| Water Column MeHg Unfiltered | 0.132 – 4.99 ng/L | 0.483 ng/L | 0.17 ng/L |
| Water Column HgT Unfiltered | 1.06 – 18.4 ng/L | 4.79 ng/L | 1.95 ng/L |
| Sediment MeHg | 0. 033 – 0.2 ng/g | 0.13 ng/g | 0.2 ng/g |
| Sediment HgT | 1.66 – 36.4 ng/g | 22.8 ng/g | 1.5 ng/g |
| Largemouth Bass Tissue Hg | 0.5 – 2 ug/g | 2 yr old lgmouth bass: 0.60 ug/g | 0.21 ug/g |
| Observed BAF: FishHg/MeHg | $1.24 \times 10^6$ | | |

A3-5

**Table A3-6.  SERAFM Calibrated Rate Constants for Lake Waccamaw**

| Process | Media | Value | Units |
|---|---|---|---|
| Methylation | Epilimnion | 0 | per day |
| | Sediment | 0.07 | per day |
| Demethylation | Epilimnion | 0.0001 | per day |
| | Sediment | 0.40 | per day |
| Biotic Reduction | Water Column | 0.03 | per day |
| Photo-Degradation | Water Column | 0.002 | per day per E/m$^2$-day |
| Photo-Reduction (Vis) | Water Column | 0.03 | per day per E/m$^2$-day |
| Photo-Reduction (UV-B) | Water Column | 2.825 | per day per E/m$^2$-day |
| Photo-Oxidation (UV-B) | Water Column | 5.885 | per day per E/m$^2$-day |
| Dark Oxidation | Water Column | 1.44 | per day |

**Table A3-7. SERAFM 50% Load Reduction Scenario for Lake Waccamaw**

| Compartment | Lake Waccamaw | | |
|---|---|---|---|
| | Fast | Medium | Slow |
| Epilimnion | 1 | 2 | 1 |
| Sediment | 3 | 6 | 12 |
| Fish | 1 | 1 | 2 |

*Note: Fast = 1 cm active sediment layer, D (macro-dispersion coefficient) = 10$^{-4}$ cm$^2$ s$^{-1}$; Medium = 2 cm active sediment layer, D = 10$^{-4}$ cm$^2$ s$^{-1}$; Slow –3 cm sediment, D = 5x10$^{-5}$ cm$^2$ s$^-$*

**Table A3-8.  SERAFM Zero-Out Scenario for Lake Waccamaw (Removal of Deposition Attributed to Coal-fired Utilities) in the CMAQ and REMSAD Models**

| Compartment | Response Time (yrs) |
|---|---|
| Epilimnion HgT (ng/L) | 2.8 |
| Epilimnion MeHg (ng/L) | -- |
| Sediment (ng/g) | 5.8 |
| Fish (ug/g) | 3.8 |

## A3.4   Lake Waccamaw WASP Model Calibration

WASP simulations of Lake Waccamaw were set up with the basic parameters from the SERAFM model.  In addition to direct deposition of mercury, this water body receives watershed loadings of solids and mercury.  Solids loadings from the watershed and internal production of organic matter are balanced by outflow, in-lake mineralization, and burial. Mercury loadings from direct deposition and from the watershed are subject to outflow, volatilization and burial losses.  WASP simulations were run for a total of 200 years.  The first 100 years represent the buildup of mercury to steady-state levels using present loadings. Mercury loadings were then cut 50%, and the attenuation period was tracked for 100 years.

WASP calibration was conducted for a base case scenario with an active sediment depth of 2 cm and a sediment macro-dispersion coefficient (E) = 10$^{-4}$ cm$^2$/sec.  This calibration employed the same deposition and resuspension velocities for silts and organic matter in the

SERAFM model.  Solids were calibrated to match the observed porosity of 0.93, OM fraction of 35%, and burial rate of 0.05 cm/yr

The solids balance is represented in Figure A3-2- Figure A3-4.  The epilimnion solids are mostly organic, including plankton, periphyton and macrophytes, as well as detritus. Sediment solids are balanced by the composition of the erosion load, the in-lake biotic production, and the mineralization of OM.  The predicted sediment composition is primarily sand (90%), with a residual of silt and organic matter (10% and 5%). The burial rate is calculated internally from the solids balance.  Given the specified loads, production and mineralization rates, burial rates averaged about 0.04 cm/yr.



**Figure A3-2.  WASP Water Column Solids Calculation**



**Figure A3-3.  WASP Solids Simulation for Surface Sediment**



**Figure A3-4. WASP Simulation of Burial Velocity**

A3-8

The WASP MeHg photo-degradation rate constant was adjusted to try to obtain more reasonable MeHg concentrations. Total mercury built up over the first 100 years to 8 ng/L in the epilimnion, 15 ng/L in the hypolimion, and 300 ng/g in the upper sediment. Methyl mercury levels built up to $0.5 - 1$ ng/L in the water, and 6 ng/g in the sediment. Although HgT is overpredicted in the epilimnion and MeHg is underpredicted in the hypolimnion, sediment levels match the data very well.

Note that while the model calculates high OM in the hypolimnion, much of it conceptually is macrophyte biomass. The epilimnion HgT concentration is high, while the hypolimnion HgT is reasonably good. The calculated sediment HgT for the upper 2 cm and the lower 10 cm bracket the observed value.



**Figure A3-5.  WASP Total Mercury Buildup in Water**



**Figure A3-6.  WASP Methyl Mercury Buildup in Water**



**Figure A3-7.  WASP Total Mercury Buildup in Sediment**



**Figure A3-8.  WASP Methyl Mercury Buildup in Sediment**

After external mercury loads were reduced 50%, the mercury levels in the water column and surface sediment declined at relatively rapid rates.  Mercury attenuation seems to be controlled by resuspension of silt and organic matter, followed by volatilization and export.  Three scenarios were simulated representing fast, medium, and slow estimates of recovery.  The upper sediment layer thickness was varied from 1 cm, 2 cm, and 3 cm.  For the slow scenario, the sediment-water dispersion coefficient was reduced by half from $10^{-4}$ cm$^2$/sec.  Response times are summarized in Table A3-9, and presented graphically for water and sediment in Figure A3-9 - Figure A3-10.

**Table A3-9.  WASP Response Time Estimates for Lake Waccamaw**

| Mercury Response Times for Waccamaw (years) | | | |
|---|---|---|---|
| Compartment | Fast | Medium | Slow |
| Epilimnion | 8 | 11 | 11 |
| Surface Sediment | 10 | 15 | 17 |

SERAFM is 2-3 times faster in recovery than WASP, probably due to the treatment of sediment solids balance.  In particular, WASP resuspends silt and OM, which have high Kd's rather than bulk sediment (influenced by sand), which has a lower Kd.



**Figure A3-9.  WASP Total Mercury Attenuation in Epilimnion**



**Figure A3-10.  WASP Total Mercury Attenuation in Surface Sediment**

**A3.5    References**

North Carolina Division of Air Quality, 2002. Waccamaw Atmospheric Mercury Study. Final Report to the United States Environmental Protection Agency Persistent Bioaccumulative and Toxic Chemical Program.  GRANT AGREEMENT # X98493600-1

3/19/2002.  http://daq.state.nc.us/toxics/studies/waccamaw/PBT_FINAL.pdf.

Riggs, S.R., Ames, D.V., Brant, D.R. and Sager, E.D., 2000. The Waccamaw Drainage System: Geology and Dynamics of a Coastal Wetland, Southeastern North Carolina, East Carolina University.  Submitted to North Carolina Department of Environment and Natural Resources, Dvision of Water Resources. September 2000.

**APPENDIX A-4**

**MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR THE BRIER CREEK WATERSHED (LOCATED IN THE SAVANNAH RIVER BASIN, GEORGIA)**

### A4.1    Background

The Brier Creek watershed is located in central/eastern portion of Georgia.  The USGS Hydrologic Unit Code (HUC) for this watershed is: 03060108 (Brier).  The Brier Creek watershed is presented in Figure A4-1.



**Figure A4-1.  Brier Creek Watershed**

The Brier Creek watershed has been divided into 11 subwatersheds for this analysis (Figure A4-3), representing all of the major tributaries to Brier Creek.  A total mercury load will be determined for each of these subwatersheds to determine the impact of atmospheric deposition on the Brier Creek.



**Figure A4-2.  Brier Creek Subwatersheds for Hg Loadings**

The watershed contains several different types of landuses.  The landuses for the Brier Creek watershed are given in Figure A4-3.  Different landuses collect and distribute mercury at different rates as a function of runoff and erosion.

**Figure A4-3.  Brier Creek Watershed Landuses**

This analysis covers all waterbodies in the Brier Creek watershed.  Because the spatial distribution of mercury contamination is not completely known in the streams and creeks throughout the watershed, and fish move throughout the watershed, this analysis is developed to protect all streams and creeks in the entire watershed from unacceptable accumulations of mercury in fish tissue.  As discussed in previous sections of this document, the State of Georgia has issued a Fish Consumption Guideline for a segment of the Brier Creek watershed.  This guideline was issued due to elevated levels of mercury found in fish flesh collected in the watershed.

## A4.2    Mercury Deposition Network

The objective of the Mercury Deposition Network (MDN) is to develop a national database of weekly concentrations of total mercury in precipitation and the seasonal and annual flux of total mercury in wet deposition. The data will be used to develop information on spatial and seasonal trends in mercury deposited to surface waters, forested watersheds, and other sensitive receptors.  Locations of the MDN sampling stations are shown on Figure A4-4. The sampling stations with the average mercury concentration in precipitation and mercury deposition are presented in Table A4-1.

**Table A4-1.  Average Mercury Deposition Hg Concentrations and Depositions Rates**

| Station Number | Station Name | Hg Conc in Precipitation (ng/L) | Hg Dry Deposition (ug/m²/yr) |
|---|---|---|---|
| GA09 | Okefenokee National Wildlife Refuge | 14.47 | 13.25 |
| GA22 | Jefferson Street | 15.7 | 13.15 |
| GA40 | Yorkville | 15.37 | 10.49 |
| SC03 | Savannah River | 13.63 | 12.07 |
| SC19 | Congaree Swamp | 14.46 | 11.35 |
| | Average | 14.73 | 12.06 |

Using the MDN data, the average annual wet deposition rate was determined to be 14.7 ug/sq. meter and the dry deposition rate was determined to be 12.1 ug/sq. meter/year.



**Figure A4-4.  Mercury Deposition Network Sampling Locations**

**A4.3   Watershed Hydrologic and Sediment Loading Model**

An analysis of watershed loading could be conducted at various levels of complexity, ranging from a simplistic gross estimate to a dynamic model that captures the detailed runoff from the watershed to the receiving waterbody.  Because of the limited amount of data available for the Brier Creek watershed to calibrate a detailed dynamic watershed runoff model, a more simplistic approach is taken to determine the mercury contributions to the Brier Creek from the surrounding watershed and atmospheric components.  Therefore, a scoping-level analysis of the watershed mercury load, based on an annual mass balance of water and sediment loading from the watershed is used for the analysis development.

Watershed-scale loading of water and sediment was simulated using the Watershed Characterization System (WCS).  The complexity of this loading function model falls between that of a detailed simulation model, which attempts a mechanistic, time-dependent representation of pollutant load generation and transport, and simple export coefficient models, which do not represent temporal variability.  The WCS provides a mechanistic, simplified simulation of precipitation-driven runoff and sediment delivery yet is intended to be applicable without calibration.  Solids load, and runoff, can then be used to estimate pollutant delivery to the receiving waterbody from the watershed.  This estimate is based on pollutant concentrations in wet and dry deposition and processed by soils in the watershed and ultimately delivered to the receiving waterbody by runoff, erosion and direct deposition.

**A4.4    Water Quality Fate and Transport Model**

WASP (Ambrose, et al., 1993) was chosen to simulate mercury fate in Brier Creek. WASP is a general dynamic mass balance framework for modeling contaminant fate and transport in surface waters.  Based on the flexible compartment modeling approach, WASP can be applied in one, two, or three dimensions with advective and dispersive transport between discrete physical compartments, or segments.  A body of water is represented in WASP as a series of discrete computational elements or segments.  Environmental properties and chemical concentrations are modeled as spatially constant within segments.  Each variable is advected and dispersed among water segments, and exchanged with surficial benthic segments by diffusive mixing.  Sorbed or particulate fractions may settle through water column segments and deposit to or erode from surficial benthic segments.  Within the bed, dissolved variables may migrate downward or upward through percolation and porewater diffusion.  Sorbed variables may migrate downward or upward through net sedimentation or erosion.

Two WASP models are provided with WASP.  The toxics WASP model combines a kinetic structure adapted from EXAMS2 with the WASP transport structure and simple sediment balance algorithms to predict dissolved and sorbed chemical concentrations in the bed and overlying waters.  WASP simulates the transport and transformation of one to three chemicals and one to three types of particulate material.  The three chemicals may be independent, such as isomers of PCB, or they may be linked with reaction yields, such as a parent compound-daughter product sequence.  Each chemical exists as a neutral compound and up to four ionic species.  The neutral and ionic species can exist in five phases:  dissolved, sorbed to dissolved organic carbon (DOC), and sorbed to each of the up to three types of solids.  Local equilibrium is assumed so that the distribution of the chemical between each of the species and phases is defined by distribution or partition coefficients.  The model, then, is composed of up to six systems, three chemical and three solids, for which the general WASP mass balance equation is solved.

The WASP model was parameterized to simulate the fate and transport of mercury for the development of this analysis.  Site specific and literature values were used to predict water column concentrations as a function of flow.

**A4.5   Model Results**

### A4.5.1 Water Quality Model

The WASP toxic chemical program was set up to simulate mercury in the mainstem of the Brier Creek. The mainstem of the river was divided into 8 reaches. Each reach was further divided into 2 vertical compartments representing surface water and surficial sediment. The 2 cm deep surficial sediment layer actively exchanges silt and clay-sized solids as well as chemicals within the water column. In addition, this layer is the site for active microbial transformation reactions. Sediment-water column diffusion coefficients were set at $10^{-5}$ cm$^2$/sec.

Two solids classes were simulated: sand and silt. Sand makes up most of the benthic sediment compartments, which have a dry bulk density of 0.5 g/ml. Given a particle density of 2.7 g/ml, the sediment porosity is about 0.8 and the bulk density is 1.3 g/ml. Silt is found both suspended in the water column and in the sediment. These simulations assumed that 10 mg/L of silt enters the mainstem from the subwatersheds, settling out at an assumed velocity of 0.3 m/day. Silt in the surficial sediment compartments is assumed to resuspend at a velocity of 0.006 m/day, giving a concentration of about 0.005 g/ml, or about 1% of the surficial sediment. The exchanging silt carries sorbed mercury between the water column and surficial sediment.

Mercury was simulated as 3 components – elemental mercury, Hg$^0$; inorganic divalent mercury, Hg(II); and monomethylmercury, MeHg. Hg(II) and MeHg partition to solids and dissolved organic carbon (DOC). These are represented as equilibrium reactions governed by specified partition coefficients. The three mercury components are also subject to several transformation reactions, including oxidation of Hg$^0$ in the water column, reduction and methylation of Hg(II) in the water column and sediment layer, and demethylation of MeHg in the water column and sediment layer. These are represented as first-order reactions governed by specified rate constants. Reduction and demethylation are driven by sunlight, and the specified surface rate constants are averaged through the water column assuming a constant light extinction coefficient (here, 0.5 m$^{-1}$). In addition to these transformations, Hg$^0$ is subject to volatile loss from the water column. This reaction is governed by a transfer rate calculated from velocity and depth, and by Henry's Law constant, which was set to $7.1 \times 10^{-3}$ L-atm/mole-K. Under average flow conditions, velocity ranges from 0.2 to 0.3 m/sec, while depth ranges from 0.37 to 0.69 m. The specified and calculated reaction coefficients used here are summarized in Table A4-2.

**Table A4-2. Specified and Calculated Reaction Rates and Coefficients**

| Component | Reaction | Compartment | Coefficient Value |
|---|---|---|---|
| Hg$^0$ | Volatilization | Water | 0.3 - 3.0 day$^{-1}$ (calc) |
| | Oxidation | Water | 0.001 day$^{-1}$ |
| Hg(II) | Reduction | Water surface <br> Water column | 0.10 day$^{-1}$ <br> 0.03-0.05 (calc) |
| | Methylation | Water | 0.001 day$^{-1}$ |
| | Methylation | Sediment | 0.0005 day$^{-1}$ |
| | Partitioning to silt | Water, Sediment | $1 \times 10^5$ L/kg |
| | Partitioning to sand | Water, Sediment | $1 \times 10^3$ L/kg |
| | Partitioning to DOC | Water, Sediment | $1 \times 10^5$ L/kg |

| | | | |
|---|---|---|---|
| MeHg | Demethylation to Hg(II) | Sediment | $0.005$ day$^{-1}$ |
| | Demethylation to Hg$^0$ | Water surface<br>Water column | $0.05$ day$^{-1}$<br>$0.015 - 0.025$ |
| | Partitioning to silt | Water, Sediment | $1 \times 10^5$ L/kg |
| | Partitioning to sand | Water, Sediment | $1 \times 10^2$ L/kg |
| | Partitioning to DOC | Water, Sediment | $2 \times 10^5$ L/kg |

The Brier Creek simulation was conducted using annual average flow and load. The average flow simulation was run for 30 years, so that steady-state conditions are achieved in the water and surficial sediment. The flows, depths, length, widths, and volumes used for annual average conditions are summarized in Table A4-3.

**Table A4-3.  Flows, Depths, Length and Volumes used in WASP Model**

| Segment | Length (m) | Width (m) | Depth (m) | Flow (cfs) | Volume (cubic meters) |
|---|---|---|---|---|---|
| Upper Brier/Bushy | 9494.0 | 64.0 | 1.2 | 360.0 | 729139.2 |
| Upper Middle | 13804.7 | 71.2 | 1.3 | 439.7 | 1295173 |
| Upper Middle 2 | 13804.7 | 78.3 | 1.4 | 519.3 | 1553562 |
| Upper Middle 3 | 13804.7 | 85.5 | 1.6 | 599.0 | 1835365 |
| Lower 1 | 13804.7 | 92.7 | 1.7 | 678.7 | 2140582 |
| Lower 2 | 13804.7 | 99.8 | 1.8 | 758.3 | 2469214 |
| Lower 4 | 13804.7 | 107.0 | 1.9 | 838.0 | 2821260 |
| Beaverdam | 18180.0 | 107.0 | 1.9 | 838.0 | 3715447 |

The Watershed Characterization System calculates mercury loadings to each reach. These values are specified as constant Hg(II) and MeHg loadings for each surface water compartment. Loadings for average flow conditions reflect both wet and dry deposition throughout the watershed, followed by runoff and erosion to the tributary stream network.

Table A4-4 compares the measured sediments characteristics in Brier Creek with the predicted concentrations and conditions from WASP.

**Table A4-4.  Measured vs. Predicted for Sediment Components**

| River Station | Wasp Segment | Measured TSS, mg/L | Calculated TSS, mg/L | Measured VolS fraction | Calculated OM fraction* |
|---|---|---|---|---|---|
| BC01 water | 1 | 16 | 15 | | |
| BC02 water | 8 | 4 | 8 | | |
| BC01 sediment | 9 | | | 0.09 | 0.07 |
| BC02 sediment | 16 | | | 0.02 | 0.04 |

Table A4-5 provides the predicted water column concentrations under annual average load and flow for the Brier Creek. The highest predicted water column concentration is used in the analysis calculation to determine the maximum annual average load that could occur and still achieve the target.

**Table A4-5.  Predicted and Observed Mercury Concentrations under Annual Average Load and Flow**

| Component | WASP Reach | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| HgT, ng/L | 7.75 | 7.67 | 7.51 | 7.49 | 7.38 | 7.30 | 7.21 | 6.92 |
| MeHg, ng/L | 0.74 | 0.84 | 0.91 | 1.03 | 1.08 | 1.12 | 1.17 | 1.20 |
| HgT, ng/g | 35.5 | 32.9 | 31.3 | 28.3 | 27.0 | 24.0 | 23.0 | 20.0 |
| MeHg, ng/g | 3.4 | 3.3 | 3.2 | 3.1 | 3.0 | 2.7 | 2.7 | 2.4 |

## A4.6   Brier Creek Watershed Results

Table A4-6 provides measured soil mercury concentrations for both the Brier Creek watershed and the larger Savannah River watershed which virtually surrounds Brier Creek.

**Table A4-6.  Soil Mercury Data in Local Region**

| Basin | Station | %VS | %Moisture | THg, ug/kg | MeHg ug/kg | % MeHg |
|---|---|---|---|---|---|---|
| Brier Creek | BC01 | 27.0 | 42 | 130.0 | 0.740 | 0.57 |
| | BC02 | 11.0 | 20 | 75.0 | 0.110 | 0.15 |
| Ogeechee | OG1 | 4.3 | 8.2 | 26.0 | 0.028 | 0.11 |
| | OG2 | 1.8 | 3.6 | 13.0 | 0.035 | 0.27 |
| | OG3 | 11.0 | 14 | 30.0 | 0.019 | 0.06 |
| | OG4 | 15.0 | 47 | 47.0 | 0.940 | 2.00 |
| Canoochee | CAN01 | 6.2 | 25 | 32.0 | 1.800 | 5.63 |
| | CAN02 | 14.0 | 23 | 71.0 | 0.010 | 0.01 |
| Savannah | Below Horse Cr. | 20.0 | 32.7 | 133.0 | 0.054 | 0.04 |
| | Below Horse Cr. | 16.0 | 32.4 | 41.2 | 0.065 | 0.16 |
| | Clarks Hill | | 29.8 | 67.2 | 2.050 | 3.05 |
| | Below Clarks Hill | | 24.3 | 78.6 | 0.042 | 0.05 |
| | Below Clarks Hill | | 24.3 | 80.8 | | 0.00 |
| | Below Butler Creek | 10.0 | 20.9 | 33.1 | 0.031 | 0.09 |
| | Below Upper Three Runs Creek | 3.9 | 17.5 | 22.7 | 0.052 | 0.23 |
| | Below Lower Three Runs Creek | 2.8 | 17.1 | 56.8 | 0.003 | 0.00 |
| | Below Brier Creek | 5.2 | 9.2 | 43.6 | 0.257 | 0.59 |
| | Clyo, USGS Gage | 5.2 | 21.9 | 71.8 | 0.949 | 1.32 |
| | Below Ebenezer Creek | 6.9 | 5.5 | 33.9 | 0.011 | 0.03 |
| | Butler Creek | 7.1 | 3 | 43.8 | 0.063 | 0.14 |
| | Horse Cr. | | 17.4 | 43.6 | 0.009 | 0.02 |
| | Upper Three Runs  Creek | 7.8 | 17.5 | 56.4 | 0.013 | 0.02 |
| | Lower Three Runs Creek | 16.0 | 33.9 | 137.7 | 0.543 | 0.39 |
| | Brier Creek | 4.4 | 16 | 26.3 | 0.319 | 1.21 |
| | Ebenezer Creek | 3.9 | 8.3 | 28.1 | 0.109 | 0.39 |
| Mean | | | 20.6 | 56.9 | 0.344 | 0.66 |
| Standard Deviation | | | 11.4 | 34.6 | 0.569 | 1.27 |

### A4.6.1 Brier Creek Soil Mercury Calibration

The WCS Mercury model was applied and run for 100 years to equilibrate the watershed soils with atmospheric conditions.  Figure A4-5 illustrates the buildup of mercury in the soils over the 100 year period.



**Figure A4-5.  Brier Creek Soil Mercury Buildup**

- Soil Partition Coefficient = 5000 L/kg
- Soil Reduction Rate Constant = 0.0005 day$^{-1}$
- Calibrated mean soil mercury concentration of 61 ng/g is close to the area mean of 57 ng/g.  Modeled variability in Hg (standard deviation of 4 ng/g) is significantly less than the measured variability in the area (SD of 35 ng/g).  The simulations used constant atmospheric wet and dry deposition fluxes, which suppressed the spatial variability.

***A4.6.2 Mercury Loading Fluxes***

Figure A4-6 illustrates the mercury loadings from the delineated subwatersheds as predicted by the WCS over the 100 year equilibration period.



**Figure A4-6.  Brier Creek Loading Flux Buildup**

There is significant variability in loading fluxes from the 11 subwatersheds in the Brier Creek watershed.  Loads at year 100 were used in the water body calibration.

### A4.6.3 Future Projections

For these projections, the atmospheric loads were cut in half, and the watershed response was followed for 100 years in the Upper Brier Creek subwatershed (Figure A4-7).



**Figure A4-7.  Upper Brier Creek Soil Mercury Attenuation**

The half life of the soil attenuation response is about 25 years.

The projected loading flux for Upper Brier Creek was projected over 100 years.  The loading fluxes for the other 10 subwatersheds were calculated over 50 years (Figure A4-8).



**Figure A4-8.  Brier Creek Loading Flux Attenuation**

### A4.6.4 Sensitivity of Temporal Response

The depth of soil incorporation significantly influences soil response time. The default of 1 cm was varied plus and minus 50% to get a range of response times. This parameter should not affect concentrations or loadings at steady-state. Figure A4-7 illustrates the response time of the upper soil layer to decreases in mercury loadings from the atmosphere.



**Figure A4-9.  Upper Brier Creek Soil Mercury Attenuation**

The half life of the soil mercury attenuation response for the base simulation in Upper Brier Creek was 25 years, and the 90% response was 90 years. Varying the incorporation depth 50% caused the half life to vary between 12 and 38 years. The 90% response time varied even more, between 45 and about 110 years.

The loading responses for Upper Brier Creek are given in Figure A4-10. An initial rapid drop-off in loading (due to instantaneous drop in deposition to water surfaces and impervious runoff) is followed by a slower drop-off in runoff and erosion fluxes, controlled by soil mercury concentrations. The 50% loading response varied between 8, 10, and 15 years for incorporation depths of 0.5, 1.0, and 1.5 cm. The 90% loading response times were much longer, varying between 35, 70, and 100 years, respectively.



**Figure A4-10.  Upper Brier Creek Loading Flux Attenuation**

  Land use changes can also significantly affect future loading response from a watershed. In particular, changing pervious land use areas to impervious areas will directly affect the delivery of atmospheric deposition fluxes to the water body.  In this model, impervious areas were assumed to deliver 100% of the deposition load, while pervious areas delivered a much smaller fraction through runoff and erosion.  Although the fraction of the Brier Creek watershed covered by impervious surfaces is small (about 3% of the upper watershed), even modest growth over many years could increase the total watershed delivery of deposited mercury, working against the overall reductions in atmospheric emissions.  The loading response of Upper Brier Creek to 3 land use scenarios is shown in the next figure.  All scenarios assume an immediate 50% cut in atmospheric deposition.  The base case assumes present land use patterns.  The other two scenarios assume modest impervious surface growth rates of 0.5 % per year and 1 % per year.  For the 0.5% scenario, total watershed loads reach a minimum in 80 years, with watershed loadings stalling at 40% of present levels.  For the 1% scenario, total watershed loads reach a reduction level of 33% in 50 years, and then increase significantly.  After 100 years, the 50% cut in atmospheric deposition would translate into a 25% drop in ambient watershed loading (Figure A4-11).



**Figure A4-11.  Watershed Loading Flux Attenuation considering Landuse Change**

## A4.7    Brier Creek Water Body Results

### *A4.7.1 Phase 1: Long Term Buildup*

Long-term predicted watershed loadings were applied to the Brier Creek water body network to simulate the long-term buildup of mercury in the water and sediment.  Average flows were used for this entire simulation.  The watershed loadings from year 30 to 100 in the watershed simulation were used in the first 70 years of this water body simulation.  For the last 20 years of the water body simulation, watershed loadings were held constant (Figure A4-12).



**Figure A4-12 Base Case Water Column Mercury Concentration for Brier Creek**

Initial low water column concentrations jumped quickly from a background of 1 ng/L to near 5 to 6 ng/L in response to the loadings.  Following this initial response to the industrial era loadings, the water column mercury slowly increased in proportion to the slowly increasing watershed loadings.

Mercury concentrations in the upper sediment (2 cm layer) followed the same pattern, increasing from an initial 5 ng/g to a steady 20 – 35 ng/g.  In response to slow internal mixing, mercury concentrations in the lower sediment (2 - 12 cm layer) slowly increased throughout the simulation from a background of 5 ng/g to the range of 10-20 ng/g.  Lower sediment concentrations were still increasing at the end of this 85 year simulation.

The model dynamics follow the expected pattern of a water column and upper sediment responding relatively quickly to external loads (a few years), and a lower sediment layer responding slowly (decades).



**Figure A4-13.  Base Case Sediment Mercury Concentration for Brier Creek**

### A4.7.2 Phase 2: Response to 2002 Flows

Mercury concentrations in Brier Creek were measured in a June, 2002 survey.  Table A4-7 illustrates the model predictions for water column and sediment concentrations versus model predictions.  Figure A4-14 - Figure A4-15 provide a graph of model predictions for both total mercury and methyl mercury over time.  A more dynamic simulation was conducted using daily stream flow data for December 2001 – July 2002.  Mercury loadings were assumed to be proportional to incremental inflows from the subwatersheds.  In response to changing flows and depths, but constant inflow concentrations, simulated water column mercury levels fluctuated mildly.  Sediment levels (not shown) changed very slowly, further buffering the water column from major fluctuations.  The predicted mercury levels compared favorably with the observations.

**Table A4-7.  June 2003 Survey vs WASP Predictions for Mercury**

| River Station | Wasp Segment | Measured HgT, ng/L | Calculated HgT, ng/* | Measured MeHg, ng/* | Calculated MeHg, ng/* | Measured MeHg fraction | Calculated MeHg fraction |
|---|---|---|---|---|---|---|---|
| BC01 water | 1 | 8.3 | 7.8 | 0.73 | 0.80 | 0.09 | 0.10 |
| BC02 water | 8 | 6.0 | 6.3 | 1.40 | 0.86 | 0.23 | 0.14 |
| BC01 sediment | 9+17 | 37.0 | 18.6 | 5.70 | 1.7 | 0.15 | 0.09 |
| BC02 sediment | 16+24 | 6.4 | 12.0 | 0.04 | 1.3 | 0.01 | 0.10 |
| | | | | * L or g | | | |



**Figure A4-14.  Brier Creek Total Mercury Water Column Concentration**



**Figure A4-15.  Brier Creek Methyl Mercury Water Column Concentration**

### A4.7.3 Phase 3: Future Attenuation

A 55 year simulation was conducted to explore mercury response to declining watershed loads due to an immediate decline in atmospheric deposition of 50% (year 5 of the water body simulation).  Figure 16 illustrates the change in mercury concentration as a function of load reduction in the water column.  Figure A4-17 illustrates the change in mercury concentration as a function of load reduction in the sediments.



**Figure A4-16.  Mercury Attenuation over Time in Water Column**



**Figure A4-17.  Mercury Attenuation over Time in Sediments**

Water body and upper sediment concentrations were predicted to decline more rapidly in the first 10 years, and then more slowly for the next 4 decades.  The initial decline is due to the rapid decline in direct loadings to the water surface and from impervious areas.  The later slow decline is due to the slowly dropping soil concentrations and the internal recycling of sediment mercury.  Ultimately, the predicted water body concentrations should decline proportionally to the declining loadings.  The first half of this response takes about a decade, while 90% of the response should take on the order of 50 years.  The remainder of the water body response should be even slower, as the lower sediment concentrations become the controlling factor.

Uncertainties in this response include watershed loadings and internal water body conditions, including infrequent occurrences of very high scouring flows, and sediment mixing characteristics.

A4-21

### A4.7.4 Sensitivity of Time Response

The depth of soil incorporation in the watershed significantly influences soil response time and loadings to the stream (see previous section), and thus concentrations in the stream. The default of 1 cm was varied plus and minus 50% to get a range of response times.  Within the water body, the sediment incorporation depth should have a similar influence.  The Brier Creek model was set up with a 2 cm active sediment layer and a 10 cm lower sediment layer. Transport between these layers was controlled by a bulk dispersion parameter, which mixes pore water, solids, and mercury. The calibrated base value of $10^{-8}$ cm$^2$/sec was varied between $10^{-6}$ and $10^{-9}$ cm$^2$/sec to get a range of response times.  These parameters should not affect concentrations or loadings at steady-state.

These sensitivity runs demonstrate that attenuation of mercury in the Brier Creek water will be controlled more by watershed loadings than by internal mixing processes.  The next figure shows the response of upper Brier Creek to the three reduction scenarios.  The 50% watershed loading responses of 8, 10, and 15 years for incorporation depths of 0.5, 1.0, and 1.5 cm produced 50% stream concentration responses of 9, 12, and 18 years.  The 90% loading response times were much longer.  The fast, medium, and slow stream response scenarios reached the 90% mark in 40, 74, and 113 years, respectively.

The mercury concentration response in lower Brier Creek follows a more complicated time trend, influenced not only by the watershed loadings and internal mixing, but also by the upper Brier Creek dynamics.  The 50% response times are 18, 15, and 22 years, for the fast, base, and slow scenarios.  The downstream base and slow scenarios are 3 to 4 years longer than the upstream response.  The downstream fast response scenario, however, takes 9 years longer than the upstream reach, as the enhanced mixing results in significant short term internal sediment fluxes.  The 90% response times for the fast, medium, and slow response scenarios were 58, 89, and 132 years, which is 9 - 18 years longer than the upstream response.



**Figure A4-18.  Sensitivity Range for Upstream Waters**



**Figure A4-19.  Sensitivity Range for Downstream Waters**

APPENDIX A-5

**MERCURY LOAD REDUCTION ANALYSIS AND RESPONSE FOR LAKE BARCO (FLORIDA)**

**A5.1   Introduction**

Lake Barco is a small, seepage lake in northeast Florida with has a water surface area of 0.12 km$^2$ and a negligible catchment area.  Lake Barco is located ca. 35 km east of Gainesville, Florida on the Ordway Preserve that is operated by the University of Florida. The Ordway is protected from direct human impacts, although some recreational fishing does take place. Hydrology and geochemistry of Lake Barco have been well characterized by past studies (Pollman, Lee et al. 1991; EPRI 2003).  There are several nearby mercury sources.  For example, Gainesville Regional Utilities (GRU) operates a medium-size coal-fired power plant approximately 40 km NW of Lake Barco.  Emissions of Hg from the Deerhaven Unit No. 2 facility averaged ca. 30 kg/yr between 1998 and 2002 (range 13 to 47 kg/yr).

**A5.2   Empirical Data from Lake Barco**

Site specific data used to model Lake Barco were obtained from an EPRI report (EPRI 2003), and unpublished data collected by Tetra Tech, Inc. (Schofield 1998) and associates (Pers. Comm., C. Pollman, Tetra Tech, Inc., 2005).

**A5.3   SERAFM Application: Lake Barco**

**Table A5-1.  Lake Barco Parameter Values**

| Parameter | Lake Barco |
|---|---|
| Watershed Area | 0 |
| Percent Impervious | n/a |
| Percent Forest | n/a |
| Percent Riparian | n/a |
| Percent Upland | n/a |
| Lake Area | 118,000 m$^2$ |
| Catchment/Lake Ratio | 0 |
| Epilimnion Depth | 3.7 m |
| Hypolimnion Depth | n/a |
| Hypolimnion Anoxia | n/a |
| Hydraulic Residence Time | n/a |
| Inflow/Outflow | 0 |
| Water pH | 4.5 |
| Epilimnion DOC | 0.85 mg/L |
| Trophic Status | Oligotrophic |
| Annual Precipitation | 134.8 cm/yr |
| HgII Conc. in Precip | 11.5 ng/L |
| Wet Deposition (HgII) | 15.5 ug/m2/yr |
| Dry Deposition (HgII) | 15.5 ug/m2/yr |
| Wet Deposition (HgII) | 0.23 ug/m2/yr |
| Dry Deposition (HgII) | 0.23 ug/m2/yr |

**Table A5-2.  Measured and Baseline Steady State Values for Lake Barco**

| Parameter | Measured | Predicted |
|---|---|---|
| Water Column MeHg Unfiltered | 0.018 ng/L | 0.040 ng/L |
| Water Column HgII Unfiltered | 1.03 ng/L | 0.96 ng/L |
| Sediment MeHg | 1.9 – 6.9 ng/g [dry] | 6.2 ng/g [dry] |
| Sediment HgII | 152 - 186 ng/g [dry] | 177.45 ng/g [dry] |
| Largemouth Bass Tissue Hg | 2 yr old lgmouth bass: 0.55 ± 0.25 ug/g [wet] | 1.2 ug/g (0.7-1.7) |
| Observed BAF: FishHg/MeHg | $3.06 \times 10^7$ | |

**Table A5-3.  Lake Barco SERAFM Calibrated Rate Constants**

| **Lake Barco Calibrated Rate Constants** | | | |
|---|---|---|---|
| **Process** | **Media** | **Value** | **Units** |
| Methylation | Epilimnion | 0 | Per day |
| | Sediment | 0.014 | Per day |
| Demethylation | Epilimnion | 0.0001 | Per day |
| | Sediment | 0.40 | per day |
| Biotic Reduction | Water Column | 0.03 | per day |
| Photo-Degradation | Water Column | 0.002 | per day per E/m²-day |
| Photo-Reduction (Vis) | Water Column | 0.0003 | per day per E/m²-day |
| Photo-Reduction (UV-B) | Water Column | 0.02825 | per day per E/m²-day |
| Photo-Oxidation (UV-B) | Water Column | 0.05885 | per day per E/m²-day |
| Dark Oxidation | Water Column | 1.44 | per day |

**Table A5-4.  Time to Reach 90% Steady State After 50% Reduction in Atmospheric Deposition**

| | Lake Barco | | |
|---|---|---|---|
| | Fast | Med | Slow |
| Epilimnion | 13 | 27 | 41 |
| Hypolimnion | -- | -- | -- |
| Sediment | 14 | 28 | 45 |
| Fish | 14 | 28 | 43 |

*Fast = 1 cm active sediment layer, D (macro-dispersion coefficient) = $10^{-4}$ cm²/s*
*Medium = 2 cm active sediment layer, D = $10^{-4}$ cm²/s*
*Slow = 3 cm sediment, D = $5 \times 10^{-5}$ cm²/s*

**Table A5-5.  SERAFM Model Forecasts with Zero-Out Scenario for Coal-Fired Power Plants**
 (Medium Response Time Scenario)

| Lake Barco | Time |
|---|---|
| Epilimnion | 27 |
| Epilimnion MeHg | -- |
| Hypolimnion | -- |
| Sediment | 28 |
| Fish | 28 |

## A5.4   References

EPRI (2003). Factors Affecting Predicted Responses of Fish Mercury Concentrations to Changes in Mercury Loading. Palo Alto, CA, Electric Power Research Institute Report 1005521.

Pollman, C., T. Lee, et al. (1991). "Preliminary analysis of the hydrologic and geochemical controls on acid-neutralizing capcity in two acidic seepage lakes in Florida." Water Resources Research 27(9): 2321-2355.

Schofield, C. (1998). Mercury Bioaccumulation in Lake Barco Centrachids.  Final Report. Gainesville, FL, Tetra Tech, Inc.

APPENDIX B   QUALITATIVE ECOLOGICAL REVIEW OF MERCURY LITERATURE B-1
B.1      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-1
B.2      Potential Exposure Media . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-2
         B.2.1   Mercury in Air . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-2
         B.2.2   Mercury in Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-2
         B.2.3   Mercury in Soil . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-2
B.3      Bioaccumulation of Mercury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-3
B.4      Exposure and Toxic Effects in Wildlife . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-4
         B.4.1   Aquatic Plant Species  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-4
         B.4.2   Aquatic Invertebrate Species  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-4
         B.4.3   Fish and Amphibian Species  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-6
         B.4.4   Terrestrial Plant Species  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-8
         B.4.5   Terrestrial Invertebrate Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-8
         B.4.6   Avian Species  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-9
         B.4.7   Mammalian Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-11
B.5      Ecosystems Potentially Affected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-13
B.6      Conclusions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-13
B.7      References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-14

**APPENDIX B**

**QUALITATIVE ECOLOGICAL REVIEW OF MERCURY LITERATURE**

## B.1    Introduction

Section 3 describes the Agency's approach for identifying ecological benefits that may result from reductions in mercury emissions. A comprehensive quantitative analysis is not possible at this time given the current state of the science. However, research on the ecological effects of mercury exposures provides some qualitative support to the notion that reductions in mercury emissions could contribute to improvements in overall ecosystem health. This Appendix expands on the analysis presented in Sections 2, 3 and Appendix A by reviewing some of the recent scientific findings, focusing on studies not included in and/or published since the release of the *Mercury Study Report to Congress: Volume VI* in December 1997. This review is not a quantitative ecological toxicity assessment and the information presented here does not identify a "safe" ecological exposure level. The bulk of this research, based on both laboratory and field studies, suggests that because mercury is persistent in the environment and biomagnifies up the food chain when methylated, a wide variety of species and ecosystems may be harmed by excessive levels of mercury in the environment. At the outset, however, it must be noted that these studies do not distinguish between mercury from emissions of U.S. coal-fired utilities, other current mercury emissions, and legacy mercury.

Numerous studies have generated field data on the levels of mercury in environmental media as well as a variety of wild species. Comparison of contemporary measurements of atmospheric mercury and historical measures from lake sediment indicate that the amount of global atmospheric mercury has risen by a factor of 2-5 since the start of the industrial period (Boening, 2000). However, both the sediment and glacier core record have shown declining trends in mercury deposition since the early 1990s (Schuster et al., 2002). The body of work examining the effects of these exposures is still incomplete. A large portion of the research conducted to date has been carried out in the laboratory setting rather than in the wild; conclusions about effects on natural populations and overall ecosystem health are difficult to make at this time.

Extensive laboratory-based studies of mercury toxicity using captive-bred animals (mice, rats, monkeys, etc.) have been conducted. From this research, much has been learned about the mechanisms of mercury toxicity; unfortunately, many of these captive-bred test species may be genetically different from their wild relatives since they are bred to ensure consistency in study results. Also, exposures of animals in laboratory-based studies are not always comparable to average exposures in wild. Often times, a laboratory-based study will identify a potential adverse effect in a specific species, but the ability to determine if this effect is present in the wild is limited by the understanding of mercury fate, transport and exposure dynamics in any given ecosystem. As a result, laboratory-based experiments using captive-bred animals lacking genetic variation and environmentally relevant exposures may not accurately reflect the effects of mercury toxicity in the natural environment. Further study of ecosystem-specific exposures will be necessary to determine the nature and magnitude of the risks posed to wild species by mercury.

The review that follows seeks to summarize some of the adverse effects seen in organisms exposed to mercury in both laboratory and wild settings.  The following review should help to illustrate that all living organisms and the ecosystems they co-inhabit are influenced to some degree by mercury pollution.  At this time, the magnitude of the power plant contribution to ecological exposures cannot be quantified nationally, and the corresponding risk for adverse effect is difficult to determine.  While the benefit of further reducing mercury emissions cannot be quantified for ecosystems at this time, we have described this benefit qualitatively for context.

## B.2    Potential Exposure Media

### B.2.1   Mercury in Air

Atmospheric deposition of elemental mercury ($Hg^0$) in the vapor phase is the primary pathway of global deposition (Boening, 2000).  Measurable concentrations of elemental mercury vapor may be detected in ambient air, especially near sources of mercury emission (U.S.EPA, 1997).  The rate and mechanism by which mercury is deposited to the earth's surface depends on the chemical form present in the air (U.S.EPA, 1997).  Atmospheric mercury also exists in the divalent ($Hg^{2+}$) state but is often associated with particulate matter when in this form.  Mercury associated with particulate matter typically settles out of the atmosphere at a faster rate than $Hg^0$ in the vapor phase.  Wet deposition of mercury with precipitation is also possible as $Hg^{2+}$ is soluble in water.

### B.2.2   Mercury in Water

Mercury can enter surface water as elemental mercury, divalent mercury, or methylmercury (MeHg or $CH_3HgCl$).  Once in aquatic systems, mercury can exist in dissolved forms or in complexes sorbed to particles and can undergo a variety of physical or chemical transformations (such as oxidation, reduction, methylation, and demethylation) depending on its form and conditions.  Dissolved $Hg^0$ can volatilize from the water back into the atmosphere, and particulate mercury forms can become buried in the sediment bed.  The percent of total mercury in surface waters that exists as methylmercury varies, but it has been estimated to average about eight percent, with some estimates as high as 20 percent (U.S.EPA, 1997).

Within a surface water body, contaminated sediments can act as an important mercury reservoir for decades, with mercury recycling from the sediment back into the aquatic ecosystem.  Biological processes, such as the methylation of $Hg^{2+}$ by sulfate-reducing bacteria and accumulation of mercury in benthic invertebrates, mediate the availability of mercury to other aquatic animals in the food chain (U.S.EPA, 1997).

### B.2.3   Mercury in Soil

Mercury compounds enter the soil through atmospheric deposition and form stable complexes with soil particles (U.S.EPA, 1997).  Both $Hg^{2+}$ and $Hg^0$ are present in soil; however, these mercury species may be transformed into methylmercury and back by bacteria or other living organisms (Jereb et al., 2003).  Both organic and inorganic forms of mercury undergo environmental transformation (Boening, 2000).  Aquatic organisms are known to be capable of

transforming mercury species (Gilmour and Henry, 1991).  Less is known about mercury transformation in soil ecosystems.  A recent *in vivo* laboratory study of the terrestrial isopod crustacean, *Porcellio scaber,* found that both methylation and demethylation of mercury compounds are possible in this organism (Jereb et al., 2003).[1]  Thus, many of the mechanisms affecting biomagnification in the aquatic ecosystem are also possible in terrestrial soil ecosystems.

## B.3     Bioaccumulation of Mercury

Mercury is one of the few metals that has been demonstrated to biomagnify in food chains (U.S.EPA, 1997), resulting in increasing tissue concentrations of mercury in organisms at successively higher trophic levels.  Three terms are commonly used to describe the mechanism by which a contaminant accumulates in living tissues – bioconcentration, biomagnification, and bioaccumulation.  The term "bioconcentration" refers to the accumulation of a chemical that occurs as a result of direct contact of an organism with its surrounding medium (e.g., uptake by a fish from water through the gills and epithelial tissue or uptake by earthworms from soil pore water through the skin) and does not include the ingestion of contaminated food.  The term "biomagnification" refers to the increase in chemical concentration in organisms at successively higher trophic levels as a result of the ingestion of contaminated organisms at lower trophic levels.  The term "bioaccumulation" refers to the net uptake of a contaminant from all possible pathways and includes the accumulation that may occur by direct exposure to contaminated media as well as uptake from food.  Mercury, in its various forms, can bioconcentrate, bioaccumulate, and biomagnify.  Biomagnification of mercury is apparent in many aquatic ecosystems, particularly in aquatic systems with food chains that depend on benthic organisms which live in the sediments, the primary site of methylation of inorganic mercury.  Mercury also magnifies in terrestrial food chains, but to a lesser extent than in aquatic ones owing to lower levels of mercury methylation, less accumulation of mercury in organisms at the base of the food chain, and shorter food chains.

All forms of mercury can bioaccumulate to some degree; however, methylmercury generally accumulates to a greater extent than other forms because of its ability to biomagnify.  Methylmercury is absorbed into tissues quickly, where it becomes sequestered.  Inorganic mercury can also be absorbed, but usually at a slower rate and with lower efficiency than methylmercury. Elimination of methylmercury from fish is so slow that long-term reductions of mercury concentrations in fish are often due mainly to growth of the fish ("growth dilution"), whereas other mercury compounds are eliminated relatively quickly. Therefore, methylmercury (and thus total mercury) concentrations tend to increase in aquatic organisms as the trophic level in aquatic food webs increases.  In addition, the proportion of total mercury that exists as methylmercury generally increases with trophic level (U.S.EPA, 1997).

## B.4     Exposure and Toxic Effects in Wildlife

---

[1] *In vivo* studies involve experiments on biochemical reactions inside living organisms or cells.  *In vitro* studies investigate reactions outside of cells, and therefore may be less representative of responses by organisms in the natural environment than *in vivo* studies.

A large portion of mercury research conducted to date has focused on the effects of mercury exposure on aquatic ecosystems.  In general, organic mercury species are more toxic to aquatic organisms than inorganic mercury, and toxicity increases with temperature and decreases with water hardness (Boening, 2000).

### B.4.1   Aquatic Plant Species

Accumulation of mercury in the primary producers at the base of the aquatic food web can have substantial impacts on the amount of mercury available to aquatic animals, not only via direct ingestion of the plants, but also from ingestion of detritus derived from the decomposition of plant material (Boening, 2000).  Effects of mercury on aquatic plants include senescence, growth inhibition, decreased chlorophyll content and dry weight, decreased protein and RNA content, inhibited catalase and protease activities, inhibited and abnormal mitotic activity, increased free amino acid production, discoloration of floating leaves, and leaf and root necrosis (U.S.EPA, 1997; Boening, 2000).  The level of mercury that results in toxic effects varies greatly among aquatic plant groups and species (U.S.EPA, 1997).  Inorganic mercury concentrations in water of approximately 1,000 µg/L can adversely affect aquatic plants.  In general, organic mercury compounds are more toxic to aquatic plants than inorganic forms (Boening, 2000).

Studies of inorganic mercury uptake by aquatic plants indicate that bioconcentration (as measured by the ratio of mercury concentration in tissue to mercury concentration in water) decreases with increasing concentrations of mercury in the water column.  In laboratory experiments with concentrations of mercuric chloride ($HgCl_2$) ranging from 50 to 20,000 µg/L, maximum bioconcentration in water cabbage (*Pistia stratiotes*) occurred at water concentrations of 6,000 µg/L or less (Boening, 2000).  Although mercury concentrations in the plants did increase with increasing mercury concentrations in the water column, only 20 percent accumulated at the highest concentration.  Other studies of vascular aquatic plants have shown that mercury uptake may occur in roots rather than stems or shoots, with two to four times the accumulation of mercury in the roots over the shoots (Boening, 2000).

### B.4.2   Aquatic Invertebrate Species

In general, aquatic invertebrate species vary widely in their susceptibility to mercury toxicity, although most are more sensitive during the larval stage than during other life stages (Boening, 2000).  The concentration and speciation of mercury, developmental stage of the organism, and the temperature, salinity, and hardness of the water all influence the toxicity to aquatic invertebrates (Boening, 2000).  Acute toxicity values (i.e., the lethal concentration for 50 percent of the population or $LC_{50}$) of inorganic mercury compounds identified in recent literature for freshwater invertebrates range from 2.2 µg $Hg^{2+}$/L for a cladoceran (*Daphnia pulex*) to 2,000 µg $Hg^{2+}$/L for the larval forms of three insects (U.S.EPA, 1997), with organic mercury compounds from 10 to 100 times more toxic than inorganic mercury (Boening, 2000). In marine invertebrates, the gastrula stage was found to be the most sensitive period of development in embryo toxicity tests (Bellas et al., 2001).

Bellas et al. (2001) examined the effects of mercuric chloride on sperm viability, fertilization, embryogenesis, and larval attachment of the ascidian (*Ciona intestinalis*), a minute sedentary marine invertebrate, at concentrations ranging from 8 to 256 µg /L $HgCl_2$.  Larval

attachment and embryogenesis were the most sensitive endpoints, showing effects at concentrations of 16 and 64 μg/L, respectively.  No significant differences across concentrations were observed in fertilization, and the authors noted that the effect of trace metals on sperm viability is controversial.  However, embryonic development was substantially affected and decreased larval attachment was observed in the newly hatched larvae.

The toxicity of different forms of mercury to aquatic invertebrates depends in part on the bioavailability of those forms to the animals.  Mercury speciation and concentration affect bioavailability; the organic content of the water and/or sediment also plays a role given the tendency of inorganic and organic mercury compounds to form complexes with dissolved organic matter and to sorb to organic particles.  Divalent mercury and methylmercury ($CH_3HgCl$) are both particle reactive and have a strong affinity for organic matter (Bellas et al., 2001).  Because particulate organic matter is a food source for many species of benthic invertebrates, it can serve as a source of mercury intake by benthic organisms.  On the other hand, organic matter tends to bind with mercury compounds, making them less bioavailable.  In experiments conducted with *Leptocheirus plumulosus*, Lawrence and Mason (2000) found that mercury accumulation in the estuarine amphipod was reduced in sediments enriched in organic matter. They also found that methylmercury was more readily available for uptake.  Sjoblom et al. (2000) showed that in freshwater, most dissolved inorganic mercury is bound to dissolved organic matter.  Dissolved humic substances in freshwater exert a strongly negative influence on the bioavailability of both inorganic mercury and methylmercury.

In addition, the beneficial role of consuming increased amounts of the algae (*Chlorella vulgaris*) was cited in one study.  Ramirez-Perez et al. (2004) tested the age-specific responses to mercuric chloride of a rotifer (Brachionus calyciflorus), an organism found between phytoplankton and fish larvae in aquatic food chains, using two algal densities.  With increasing mercury concentrations (ranging up to 5 μg/L $HgCl_2$), the researchers observed an increasingly negative effect on survivorship, reproduction, and lifespan of the rotifer, although less of an impact was seen when the food level (i.e., algal density) was higher.

Recent studies in aquatic invertebrates have demonstrated the ability of mercury to suppress the immune system.  In marine bivalves, the internal immune system is based on the ability of circulating cells known as hemocytes to fend off foreign bacteria and viruses using phagocytic and microbicidal mechanisms (Cooper and Knowler, 1992; Fournier et al., 2001). An *in vivo* study demonstrated that clams (*Mya arenaria*) accumulate methylmercury to a much greater extent than $HgCl_2$ and that methylmercury leads to greater immune suppression (Fournier et al., 2001).  Mercury exposure concentrations ranged from $10^{-9}$ to $10^{-5}$ M.  No detrimental effects were observed at concentrations below $10^{-6}$ M, but at higher concentrations, a clear relationship between increasing mercury accumulation and decreasing phagocytic activity of hemocytes was evident from 7 to 28 days after exposure.  In an *in vitro* analysis of a small aquatic worm (*Tubifex tubifex*), phagocytic responses were tested with methylmercury or mercuric chloride at concentrations from $10^{-9}$ to $10^{-4}$ M (Sauvé et al., 2002).  Although the authors noted that short-term *in vitro* assays are often not as realistic as *in vivo* tests, the results are similar to Fournier et al. (2001) in that immunotoxicity, expressed as the concentration that resulted in a 50 percent reduction in phagocytic activity relative to controls, was observed at mercury levels around $10^{-6}$ M.

### B.4.3   Fish and Amphibian Species

Effects of methylmercury on fish include reduced reproduction, impaired growth and development, behavioral abnormalities, altered blood chemistry, impaired osmoregulation and immunity, reduced feeding rates and predatory success, effects on oxygen exchange, and death (U.S.EPA, 1997).  Bacterial methylation of inorganic mercury can occur either in sediment or in bacteria associated with the fish gills or gut.  Greater than 90% of the mercury content in freshwater fish is in the methylmercury form (U.S.EPA, 1997).  Symptoms of acute mercury poisoning in fish include increased secretion of mucous, flaring of gill opercula, increased respiration rate, loss of equilibrium, and sluggishness.  When fish have been exposed to concentrations of mercury considered to be sublethal (i.e., below 30 µg/L), abnormalities ranging from physiological to reproductive to biochemical have been reported (Boening, 2000).  Signs of chronic poisoning include emaciation, brain lesions, cataracts, inability to capture food, abnormal motor coordination, and various erratic behaviors (e.g., altered feeding behavior) (U.S.EPA, 1997).

Accumulation of mercury in fish depends on several factors.  Although the highest mercury concentrations in fish generally occur in the blood, spleen, kidney, and liver, and may exceed those in muscle by 2 to 10 times, most of the mercury contained in a fish at any given time is associated with muscle tissues due to their larger mass relative to that of other tissues (U.S.EPA, 1997).  Mercury concentrations in fish tissues tend to increase in both marine and freshwater fish with increasing age and size.  For example, Redmayne et al. (2000) found that methylmercury concentrations in long-finned eels (*Anguilla dieffenbachia*) in New Zealand increase with both eel age and length.  Also, mercury accumulation in fish is higher in waters with higher levels of dissolved organic carbon, which may assist mercury in entering the food chain.  And at lower pH levels in water, methylmercury is a higher fraction of the total mercury in fish tissues than in waters at higher pH levels (Boening, 2000).

The toxicity of mercury to fish varies, depending on the fish's characteristics (e.g., species, life stage, age, and size), environmental factors (e.g., temperature, salinity, dissolved oxygen content, hardness, and the presence of other chemicals), and the form of mercury available. As with aquatic invertebrates, organomercury compounds, such as methylmercury, generally are much more acutely toxic than inorganic mercury to fish (U.S.EPA, 1997).

Recent studies provide examples of the toxic effects of mercury in fish at both laboratory and environmentally-relevant concentrations.  For example, Houck and Cech (2004) exposed juvenile blackfish (*Orthodon microlepidotus*) to varying levels of methylmercury (0.21, 0.52 , 22.2, and 55.5 µg/g) (from 0.21 to 5.5 µg/g) over a 70-day period and found that the two highest dose groups exhibited  decreased growth rates.  In walleye (*Stizostedion vitreum*), Latif et al. (2001) assessed methylmercury effects on embryonic and larval stages.  They found that increases in methylmercury concentrations at environmentally relevant concentrations in the water (from 0.0001, .002, 0.003, and 0.008 µg MeHg/L) were generally associated with linear declines in the hatching success of eggs; however, no statistical analysis was conducted.  Furthermore, hatching success was not correlated with methylmercury concentrations in the eggs.  In the embryonic stage, a decrease in heart rate was observed with higher waterborne methylmercury concentrations, but larval growth was not subsequently affected.  In addition, information on the toxicity of mercury to fish at environmentally-relevant levels is found in the

British Columbia Ministry of Environment, Lands and Parks (2001) ambient water quality criteria and guideline for mercury.

Recent experiments have demonstrated important sublethal effects of mercury toxicity that might affect fish populations in the field.  For example, Fjeld et al. (1998) found that although morphological disturbances were observed in only the group exposed to the highest level of methylmercury (i.e., 20 µg/L), there was long-term permanent impairment of feeding behavior in all exposed grayling (*Thymallus thymallus*) embryos dosed during the first 10 days of development to methylmercury at concentrations ranging from 0.8 to 20 µg/L.  Berntssen et al. (2003) demonstrated the relative susceptibility of the Atlantic salmon (*Salmo salar*) brain to methylmercury tissue concentrations above a threshold of 10,000 µg/kg, as compared to kidney and liver tissues. There was no evidence of reduced growth in the salmon, but substantial reductions in neural enzyme activity and alterations in feeding behavior were observed.  LeBlond and Hontela (1999) examined the effects of mercuric chloride and methylmercury on cellular synthesis of the hormone cortisol using an *in vitro* assay with rainbow trout (*Oncorhynchus mykiss*).  Although the specific cellular site of action was not determined for the two mercury species, both disrupted production of cortisol.

Samson et al. (2001) demonstrated effects ranging from delayed mortality syndrome to physical (e.g., faint heartbeats) and behavioral abnormalities in embryonic zebrafish (*Danio rerio*) exposed to methylmercury levels of 5, 10, and 15 µg/L for several different periods of time.  Prey capture ability was impaired in larvae exposed continuously to 10 µg/L, even after 4 days in clean water.  Although morphological defects were not always evident, the authors conclude that functional impairment is a more subtle response to developmental toxicants than mortality or the production of morphological defects, which may not be sensitive enough endpoints for determining safe levels of a toxicant in the environment.  Sweet and Zelikoff (2001) cite several *in vivo* and *in vitro* studies, with effect-inducing doses of 30 to 350 µg/L and 0.3 to 10 µM, respectively, that have demonstrated immunotoxic effects in fish due to mercury exposure ranging from depressed blood cell production and enzyme activity to enhanced cell death.

It is generally thought that toxic effects are unlikely to occur in fish in the environment, where the concentrations of mercury in surface waters are much lower than those in many of the laboratory experiments conducted.  For example, Friedmann et al. (1996) examined 14 northern pike (*Esox luclus*) from Lake Champlain for reproductive status and mercury concentrations in tissues.  This species tends to accumulate more mercury than many others because northern pike are top-level predators.  Despite the fact that the average muscle concentration was 325 µg Hg/kg wet-weight, higher than the national average of 100 µg Hg/kg, no correlation was observed between mercury content, gonadosomatic index, and gonadal sex steroid levels.  However, evidence on more subtle effects, including those discussed in the previous paragraph, shows that effects on behavior, reproduction, and development can occur at relatively low mercury concentrations in water (U.S.EPA, 1997).  Many of the earlier toxicity studies focused on endpoints related to growth, reproduction, and mortality.  More recent studies are demonstrating more subtle effects, including effects on neural and immunological endpoints.

Amphibians are similar to fish in sensitivity to mercury.  Acute toxicity (i.e., $LC_{50}$) values for a variety of embryo-larval stage amphibians exposed to inorganic mercury compounds range

from 1.3 to 107.5 µg Hg/L, which are similar to values found for fish (Boening, 2000).  The toxicity of mercuric chloride to tadpoles ranges from approximately 50 to 760 µg Hg/L for the frog (*Rana hexadactyla*), clawed toad (*Xenopus laevis*), and toad (*Bufo melanstictus*) (Boening, 2000).

### B.4.4   Terrestrial Plant Species

The effect of mercury pollution on terrestrial plants has not been studied as extensively as aquatic plants.  Terrestrial plants typically acquire mercury through contaminated soil.  The accumulation of mercury in terrestrial plants increases with increasing soil mercury concentration (Boening, 2000).  Methylmercury is more toxic to terrestrial plants than $Hg^{2+}$ (U.S. EPA, 1997).  Wild plant communities located in areas with soil contaminated with a sufficient amount of mercury atmospheric deposition may be at risk for exhibiting mercury-induced chronic effects.  It is probable that subtle disturbances to a community occur at lower concentrations (chronic exposures) of mercury than those suggested in the literature (based largely on acute exposures) (Boening, 2000).  Mosses have shown the ability to acquire mercury directly through atmospheric deposition (Boening, 2000).

Terrestrial plants accumulate mercury primarily in their root structures (Greger et al., 2005).  In a recent laboratory study, the soil of six plant species was dosed with a solution containing 200 µg/L $HgCl_2$.  The plants included white clover (*Trifolium repens*), spring wheat (*Triticum aestivum*), sugar beet (*Beta vulgaris*), oil-seed rape (*Brassica napus*), willow (*Salix viminalis*), and garden pea (*Pisum sativum*).  All of the examined plant species were able to take up mercury in the root.  However, transport of mercury from the root to the shoot was low (0.17 – 2.5%).  Mercury that reached the leaves was sequestered and not released into the ambient air through transpiration.  These findings indicate that the studied plant species may serve as a reservoir of mercury; however, they are not capable of remobilizing terrestrial soil mercury deposits into the atmosphere.  Such studies may eventually lead to development of plants to assist phytoremediation of mercury contaminated sites.

### B.4.5   Terrestrial Invertebrate Species

The available information regarding the toxicity of mercury on terrestrial invertebrate species is limited, and the topic needs further study.  Terrestrial invertebrates contribute to the diet of numerous species including birds and mammals.  Some terrestrial species are known to transform $Hg^{2+}$ to methylmercury and back (Jereb et al., 2003).  A better understanding of the toxicity of mercury on terrestrial invertebrates would help to characterize whether, and if so, how the health of lower trophic level species affects the overall health of the ecosystem.

The phagocytic immune response of terrestrial invertebrate worms was assessed following *in vitro* exposure to either mercuric chloride or methylmercury (Sauvé et al., 2002).  The authors dosed three earthworm species *(Lumbricus terrestris, Eisenia fetida, Aporrectodea turgida)* with methylmercury or mercuric chloride at concentrations from $10^{-9}$ to $10^{-4}$ M.  Both $HgCl_2$ and $CH_3HgCl$ inhibited the phagocytic immune response to challenge with carboxylate microsphere beads.  The concentration necessary to reduce the phagocytic response by 20% varied across species from approximately $10^{-8}$ to $10^{-6}$ M for methylmercury and from $10^{-6}$ to $10^{-7}$ M for $HgCl_2$.  Inhibition of the phagocytic response could potentially lead to increased infection

by opportunistic pathogens such as viruses and/or bacteria.  Species-specific considerations are clearly a factor when determining mercury immunotoxicity in invertebrate worm species.

Sauvé and Fournier (2005) continued the examination of the phagocytic immune response to methylmercury exposure in the earthworm (*Eisenia andrei*) and found age-specific differences.  Four age groups were studied in both *in vitro* and *in vivo* assays.  The youngest hatchling group exhibited lower *in vitro* phagocytic activity than that of adults.  Neither adults, nor hatchlings showed a significant decrease in phagocytosis at methylmercury concentrations up to $10^{-7}$ M in invertebrate worms.  Thus, hatchlings do not show a higher sensitivity to mercury exposure, but they have less capacity to respond to immune challenges requiring a phagocytic response.

A laboratory-based *in vivo* immune assay was employed in which *Eisenia andrei* worms were exposed to varying methylmercury concentrations for 5 days prior to evaluation of phagocytic response (Sauvé and Fournier, 2005).  Adult worms exposed to filter paper dosed with concentrations of methylmercury ($1 - 2\ \mu g/cm^2$ MeHg) showed an immune response ranging up to 300% greater than the control.  This could potentially mean that adult worms exposed to sublethal methylmercury may become more effective in dealing with immune challenges by opportunistic pathogens; however, the long term effects of sublethal exposures to methylmercury were not examined in this study of invertebrate worms.  The same effect was not observed in hatchling worms, and possible effects of elevated immune function over an extended period of time are not known.

### B.4.6   Avian Species

In exposed birds, the liver and kidney are typically the sites of highest mercury levels (Boening, 2000).  Sublethal effects of mercury on birds include neurobehavioral effects, reduced food consumption, liver and kidney damage, spinal cord damage, reduced cardiovascular function, impaired immunity, reduced muscular coordination, impaired growth and development, altered blood chemistry, and reproductive effects (U.S.EPA, 1997).  Bird species occupying top predator roles in aquatic ecosystems frequently exhibit elevated levels of mercury.  For example, mercury has been detected in adult spectacled (*Somateria fischeri*) eiders in northern Alaska and in German Northern Goshawks (*Accipiter gentiles*) (Kenntner et al., 2003; Wilson et al., 2004).  In non-pisciviorous bird species inhabiting strictly terrestrial ecosystems, the mercury body-burden are typically lower (Boening, 2000).  Nevertheless, terrestrial seed-eating bird species may be exposed through the application of methylmercury containing fungicides during agricultural practice (Boening, 2000).

The common loon (*Gavia immer*) has been used as a potential indicator of methylmercury contamination in lake ecosystems across the northern United States and Canada (Meyer et al., 1998; Evers et al., 2003).  In a long term field study of the adverse effects of mercury on the loon, eggs were collected across the northern United States between 1995 and 2001 (Evers et al., 2003).  Eggs collected in the same geographic territory showed adult female blood mercury concentrations that were highly correlated with blood mercury concentrations in eggs.  In the New England region, egg volume significantly decreased with increasing mercury concentration; however, the authors did not find a significant relationship between egg mercury concentration and reproductive success.  The average mercury concentration found in infertile

eggs (0.78 $\pm$ 0.5 μg/g, n = 201) was not significantly different from the average mercury concentration (0.74 $\pm$ 0.54 μg/g, n = 205) of the fertile eggs.  A previous study found chick production to be lower at lakes where chick blood mercury concentrations were elevated; however, decreased chick production was not associated with adult mercury exposures in the study (Meyer et al., 1998).

A dose-response laboratory study of common loons was conducted to investigate the adverse effects of mercury exposure on chick development (Kenow et al., 2003).  Eggs were collected in a four county region of northern Wisconsin during the summers of 1999 and 2000 and dosed from hatch to age 105 days with varying levels of methylmercury contaminated rainbow trout.  While the methylmercury administered was found to contain 20% ethyl mercury, no effect on food consumption, growth in body mass or body length was measured in any of the exposure groups following dosing.  Further, no signs of neurotoxic effects, such as behavioral abnormalities or loss of muscle coordination, were observed.  The authors speculated that rapid excretion of methylmercury during feather growth offered some protection against adverse effects during the first 105 days of loon development.

A field study conducted in Hong Kong, China examined the breeding success of two Ardeid bird species exposed to metals (Connell et al., 2002).  Ardeidae are fish-eating birds that include species such as herons, egrets and bitterns (De Luca-Abbott et al., 2001).  The feathers of the Little Egret (*Egretta garzetta*) and the Black-crowned Night Heron (*Nycticorax nycticorax*) were analyzed for concentrations of copper, iron, manganese, zinc, lead, cadmium, chromium, and mercury.  An examination of the possible adverse effects of metals exposure included a probabilistic assessment of breeding success.  The authors concluded that mercury (0.5 – 7.1 μg/g dry wt feathers) increased the likelihood of adverse effects on the breeding success of the Little Egret at one of the six sites monitored.  At this site, a maximum Risk Quotient (RQ) of 1.37 was calculated based on a 3.0 μg/g dry wt feathers No Observed Adverse Effect Level (NOAEL) and an average measured egret feather mercury concentration of 4.1 μg/g.  The 3.0 μg/g NOAEL was derived from the available scientific literature (Burger and Gochfeld, 1997; Connell et al., 2002).  The same analysis did not find any evidence of mercury effects on the breeding success of the Black-crowned Night Heron.

Burger and Gochfeld (1997) attempted to relate adverse effects of mercury exposures observed in the laboratory to field biomonitoring observations in birds.  The authors identify laboratory studies that indicate exposures as low as 1.5 ppm in eggs and/or 5 to 40 ppm in feathers are associated with adverse effects such as impaired reproduction (Burger and Gochfeld, 1997).  Egg mercury concentrations as low as 0.5 – 6.0 ppm wet weight are capable of causing decreased egg weight, embryo malformations, lowered hatchability, decreased chick growth and lowered chick survival (Burger and Gochfeld, 1997).

An examination of the total mercury (ppm, dry weight) in bird eggs from the New York City region show levels of mercury which exceed the 0.5 ppm adverse effect level identified by the authors for a number of species; however, not every studied location found the same result (Burger and Gochfeld, 1997).  At risk species included: Snowy Egret (*Egretta thula*), Black Skimmer (*Rynchops niger*), Common Tern (*Sterna hirundo*), Foraster's Tern (*Sterna forsteri*), Roseate Tern (*Sterna dougallii*), and Herring Gull (*Larus argentatus*).  The feathers of these same species were also analyzed for total mercury and were found to be within the range

identified in the scientific literature as being associated with reduced hatchability of eggs, behavioral abnormalities of adults, and infertility (Burger and Gochfeld, 1997).

Work by Wayland et al. (2002, 2003) examined the health of the northern common eider (*Somateria millisima borealis*). The common eider is a sea duck that inhabits coastal areas in Canada, Greenland as well as other Arctic territories. In a 1999 field analysis, measured liver mercury concentrations ranging from 1.3 to 6.5 $\mu$g/g dry weight were negatively correlated to abdominal fat mass, spleen mass and body mass in males at the time of capture (Wayland et al., 2002). Further study of this population in 2000 revealed that mercury concentrations were also negatively correlated with heart mass and body mass at the time of dissection (Wayland et al., 2003). Immune endpoints were also examined and no statistically significant relationship was found between mercury concentration and swelling response to an injection of the antigen, phytohemagglutinin-P.

A laboratory-based egg study in eighty pairs of mallard ducks (*Anas platyrhynchos*) exposed to 0, 5, 10 or 20 $\mu$g/g methylmercury found neurological effects in exposed offspring (Heinz and Hoffman, 2003). Females laid 15 eggs while unexposed and another 15 during the exposure period. Following the exposure period, another 30 eggs were laid and examined for mercury content. Even-numbered eggs were incubated and allowed to hatch while odd-numbered eggs were saved for mercury analysis. Mercury in the even-numbered eggs was estimated by averaging mercury content in the neighboring odd-numbered eggs. Neurological signs of mercury poisoning included loss of coordination and staggered gait. These altered behaviors were observed in ducklings hatching from eggs containing 2.3 $\mu$g/g estimated mercury on a wet-weight basis. Developmental deformities were also observed in eggs containing as little as 1 $\mu$g/g estimated mercury. The authors did not conduct a statistical analysis of the data; however, they conclude that methylmercury concentrations in excess of 2 $\mu$g/g on a wet-weight basis will harm the neurological development of sensitive mallard embryos.

### B.4.7   Mammalian Species

The effects of mercury on mammalian wildlife are similar to those found in humans, with the primary target being the central nervous system. Most mammalian studies have been conducted in laboratories. Relatively few studies of mammalian populations in the wild have been published (Boening, 2000). Mammals drawing all or a portion of their dietary intake from aquatic ecosystems will likely have greater exposure than those that do not. Thus, aquatic bioaccumulation is a factor in determining mammalian exposures. Some bioaccumulation may also occur in the terrestrial setting. Deer mice (*Peromyscus maniculatus*) sampled in Isle Royale National Park in the state of Michigan have liver mercury concentrations that may pose an exposure risk to higher trophic level predators such as the red fox (*Vulpes vulpes*) (Vucetich et al., 2001).

Extensive laboratory studies of monkeys (*Macaca fascicularis*) have been conducted in an attempt to elucidate the toxicity of mercury in humans. Sensory system impairment was observed in a cohort of monkeys dosed in utero with methylmercury through age four (Rice and Gilbert, 1990; Rice and Gilbert, 1995; Rice, 1998; Rice and Hayward, 1999). Exposure symptoms included impaired hearing, visual function, and ability to detect vibration. Doses of 10 or 25 $\mu$g/kg/day resulted in evidence of delayed neurotoxicity as well as impairment of

auditory function (Rice, 1998). These same mechanisms of toxicity described in the laboratory setting may also be present in the wild. However, the diet of the *M. fascicularis* monkey in the wild has not been extensively studied. The wild diet of *M. fascicularis* is speculated to consist primarily of fruit but they are believed to be opportunistic omnivores willing to consume terrestrial invertebrates and bird eggs (Kemp and Burnett, 2003). Regardless, estimates of mercury exposure in the wild are difficult to make, but mercury exposure is of less concern for primarily herbivorous mammals.

Concern has recently grown that mercury exposure may be a contributing factor to the decline in the endangered Florida Panther population (*Puma concolor coryl*) (Barron et al., 2004). Barron et al. (2004) performed a probabilistic risk assessment of retrospective and current mercury exposure using a dietary model that incorporated the variability and uncertainty in ingestion rate, diet, body weight, and mercury exposure of panthers. Under the worst-case modeling conditions, the current risk of panthers developing clinical symptoms that may lead to death was 4.6%. Thus, there was a 4.6% chance that any given panther would receive a lethal mercury dose under the worst case exposure scenario. The authors concluded that past mercury exposures likely did adversely affect panthers in the Florida Everglades, but current estimated risks are significantly lower than past risks because of an estimated 70-90% decline in mercury exposure over the past decade (Barron et al., 2004).

Mink (*Mustela vison*) are an example of a species acquiring a portion of their diet foraging in aquatic ecosystems. Fish compose about 25% of the mink diet (Ferreras and Macdonald, 1999; Yamaguchi et al., 2003). Yamaguchi et al. (2003) calculated Risk Quotients for mink at four locations along the Thames River after sampling for mercury contamination in perch (*Perca fluviatilis*), roach (*Rutilus rutilus*), dace (*Leuciscus leuciscus*), eel (*Anguilla anguilla*), and pike (*Esox lucius*). Not all species were available at each sampling site. An RQ greater than one indicates that the concentration of mercury in fish is likely greater than the No Observable Adverse Effects Concentration (NOAEC) threshold (Giesy et al., 1994; Henry et al., 1998; Yamaguchi et al., 2003) and thus poses a risk to the exposed species at the time of assessment. The calculated RQ values for each species consumed by the mink at each of the four locations ranged from less than one to near 8. The authors speculate that the RQ of mercury for mink may be closer to 1 since the fish sampled in the study were close to the upper limits of the prey size typically selected by mink.

## B.5   Ecosystems Potentially Affected

Ecosystems that could be affected by mercury exposure include those that already have high mercury levels, particularly those with top carnivore populations with high mercury loads; ecosystems with long aquatic food chains and piscivorous wildlife ; and ecosystems with soils or sediments low in organic content and high in minerals – promoting more soluble and bioavailable forms of mercury. Mercury levels in all of these ecosystems are likely declining as a result of recent regulations, but the quantitative effect on the ecosystems is unclear because the decline is slow, depending on sediment burial as a primary mechanism.

More pristine aquatic ecosystems tend to have longer food chains than eutrophic systems. Assuming equal inputs of mercury into the ecosystem from atmospheric deposition, biomagnification through multiple trophic levels may thus result in exposures to top carnivores

in pristine systems that are comparable to or higher than corresponding exposures in eutrophic systems.  In mixing zones (e.g., river entering lake, estuaries), the higher levels of suspended sediments with sorbed mercury compounds correlate with higher rates of bioaccumulation of mercury in zooplankton, and presumably the rest of the food chain.

## B.6     Conclusions

A quantitative analysis of the ecological benefits of reduced mercury emissions is not possible at this time given the current state of the science.  Recent research on the ecological effects of mercury exposures summarized in this appendix does provide qualitative support to the notion that reductions in mercury emissions from various sources could lead to  improvements in overall ecosystem health.  The bulk of this research, based on both laboratory and field studies, suggests that because mercury is persistent in the environment and biomagnifies up the food chain when methylated, a wide variety of species and ecosystems may be harmed by excessive levels of mercury in the environment.

To some degree, mercury contamination is present in virtually all environmental media, but aquatic systems appear to experience the greatest exposures due to higher rates of biomagnification possible in those systems.  Elimination of methylmercury from fish is so slow that long-term reductions of mercury concentrations in fish are often due to growth of the fish ("growth dilution"), whereas other mercury compounds are eliminated relatively quickly.  Piscivorous avian and mammalian wildlife are exposed to mercury mainly through the consumption of contaminated fish and, as a result, bioaccumulate mercury to levels greater than those in prey items (U.S.EPA, 1997).

Numerous studies have generated field data on the levels of mercury in a variety of wild species.  The body of work examining the effects of these exposures, particularly in real world settings, is growing, but our understanding of the consequences is still incomplete.  Much of the research conducted to date has been carried out in laboratory settings rather than in the wild; so EPA believes reliable conclusions about overall ecosystem health cannot be made at this time.  Nevertheless, numerous adverse effects have been identified at environmentally relevant doses as well as at doses slightly above environmental concentrations.  Although the magnitude of the power plant contribution to ecological exposures cannot be quantified so the corresponding risk for adverse effect cannot be determined, reducing the presence of mercury in the environment should reduce the potential for adverse ecological impacts.

## B.7     References

Barron, M. G., S. E. Duvall, et al. (2004). Retrospective and current risks of mercury to panthers in the Florida Everglades. *Ecotoxicology* 13(3): 223-9.

Bellas, J., E. Vazquez, et al. (2001). Toxicity of Hg, Cu, Cd, and Cr on early developmental stages of Ciona intestinalis (Chordata, Ascidiacea) with potential application in marine water quality assessment. *Water Res* 35(12): 2905-12.

Berntssen, M. H., A. Aatland, et al. (2003). Chronic dietary mercury exposure causes oxidative stress, brain lesions, and altered behaviour in Atlantic salmon (Salmo salar) parr. *Aquat Toxicol 65(1): 55-72.*

Boening, D. W. (2000). Ecological effects, transport, and fate of mercury: a general review. *Chemosphere* 40(12): 1335-51.

British Columbia Ministry of Environment, L. a. P. (2001). Ambient water quality guidelines for mercury: overview report - first update. http://wlapwww.gov.bc.ca/wat/wq/BCguidelines/mercury.html. E. a. R. D. Water Management Branch.

Burger, J. and M. Gochfeld (1997). Risk, mercury levels, and birds: relating adverse laboratory effects to field biomonitoring. *Environ Res* 75(2): 160-72.

Connell, D. W., B. S. Wong, et al. (2002). Risk to breeding success of Ardeids by contaminants in Hong Kong: evidence from trace metals in feathers. *Ecotoxicology* 11(1): 49-59.

Cooper, J. E. and C. Knowler (1992). Investigations into causes of death of endangered molluscs (Partula species). *Vet Rec* 131(15): 342-4.

De Luca-Abbott, S. B., B. S. Wong, et al. (2001). Review of effects of water pollution on the breeding success of waterbirds, with particular reference to ardeids in Hong Kong. *Ecotoxicology* 10(6): 327-49.

Evers, D. C., K. M. Taylor, et al. (2003). Common loon eggs as indicators of methylmercury availability in North America. *Ecotoxicology* 12(1-4): 69-81.

Ferreras, P. and D. W. Macdonald (1999). The impact of American Mink (Mustela vison) on water birds in the upper Thames. *Journal of Applied Ecology* 36(5): 701-709.

Fjeld, E., T. O. Haugen, et al. (1998). Permanent impairment in the feeding behavior of grayling (Thymallus thymallus) exposed to methylmercury during embryogenesis. *Sci Total Environ* 213(1-3): 247-54.Fournier, M., J. Pellerin, et al. (2001). Effects of *in vivo* exposure of Mya arenaria to organic and inorganic mercury on phagocytic activity of hemocytes. *Toxicology* 161(3): 201-11.

Friedmann, A. S., M. C. Watzin, et al. (1996). Effects of environmental mercury on gonadal function in Lake Champlain northern pike (Esox lucius). *Bull Environ Contam Toxicol* 56(3): 486-92.

Giesy, J. P., D. A. Verbrugge, et al. (1994). Contaminants in fishes from Great Lakes-influenced sections and above dams of three Michigan rivers. I: Concentrations of organo chlorine insecticides, polychlorinated biphenyls, dioxin equivalents, and mercury. *Arch Environ Contam Toxicol* 27(2): 202-12.

Gilmour, C. C. and E. A. Henry (1991). Mercury methylation in aquatic systems affected by acid deposition. *Environ Pollut* 71(2-4): 131-69.

Greger, M., Y. Wang, et al. (2005). Absence of Hg transpiration by shoot after Hg uptake by roots of six terrestrial plant species. *Environ Pollut* 134(2): 201-8.

Heinz, G. H. and D. J. Hoffman (2003). Embryotoxic thresholds of mercury: estimates from individual mallard eggs. *Arch Environ Contam Toxicol* 44(2): 257-64.

Henry, K. S., K. Kannan, et al. (1998). Concentrations and hazard assessment of organochlorine contaminants and mercury in smallmouth bass from a remote lake in the Upper Peninsula of Michigan. *Arch Environ Contam Toxicol* 34(1): 81-6.

Houck, A. and J. J. Cech, Jr. (2004). Effects of dietary methylmercury on juvenile Sacramento blackfish bioenergetics. *Aquat Toxicol* 69(2): 107-23.

Jereb, V., M. Horvat, et al. (2003). Transformations of mercury in the terrestrial isopod Porcellio scaber (Crustacea). *Sci Total Environ* 304(1-3): 269-84.

Kemp, N. J. and J. B. Burnett (2003). A biodiversity risk assessment and recommendations for risk management of Long-tailed Macaques (Macaca fascicularis) in New Guinea. www.indopacific.org/papuamacaques.pdf, Indo-Pacific Conservation Alliance.

Kenntner, N., O. Krone, et al. (2003). Environmental contaminants in liver and kidney of free-ranging northern goshawks (Accipiter gentilis) from three regions of Germany. *Arch Environ Contam Toxicol* 45(1): 128-35.

Kenow, K. P., S. Gutreuter, et al. (2003). Effects of methyl mercury exposure on the growth of juvenile common loons. *Ecotoxicology* 12(1-4): 171-82.

Latif, M. A., R. A. Bodaly, et al. (2001). Effects of environmental and maternally derived methylmercury on the embryonic and larval stages of walleye (Stizostedion vitreum). *Environ Pollut* 111(1): 139-48.

Lawrence, A. L. and R. P. Mason (2001). Factors controlling the bioaccumulation of mercury and methylmercury by the estuarine amphipod Leptocheirus plumulosus. *Environ Pollut* 111(2): 217-31.

Leblond, V. S. and A. Hontela (1999). Effects of in vitro exposures to cadmium, mercury, zinc, and 1-(2-chlorophenyl)-1-(4-chlorophenyl)-2,2-dichloroethane on steroidogenesis by dispersed interrenal cells of rainbow trout (Oncorhynchus mykiss). *Toxicol Appl Pharmacol* 157(1): 16-22.

Meyer, M. W., D. C. Evers, et al. (1998). Patterns of Common Loon (Gavia immer) Mercury Exposure, Reproduction, and Survival in Wisconsin, USA. *Environ Toxicol Chem* 17(2): 184-190.

Ramirez-Perez, T., S. S. Sarma, et al. (2004). Effects of mercury on the life table demography of the rotifer Brachionus calyciflorus Pallas (Rotifera). *Ecotoxicology* 13(6): 535-44.

Redmayne, A. C., J. P. Kim, et al. (2000). Methyl mercury bioaccumulation in long-finned eels, Anguilla dieffenbachii, from three rivers in Otago, New Zealand. *Sci Total Environ* 262(1-2): 37-47.

Rice, D. C. (1998). Age-related increase in auditory impairment in monkeys exposed in utero plus postnatally to methylmercury. *Toxicol Sci* 44(2): 191-6.

Rice, D. C. and S. G. Gilbert (1990). Effects of developmental exposure to methyl mercury on spatial and temporal visual function in monkeys. *Toxicol Appl Pharmacol* 102(1): 151-63.

Rice, D. C. and S. G. Gilbert (1995). Effects of developmental methylmercury exposure or lifetime lead exposure on vibration sensitivity function in monkeys. *Toxicol Appl Pharmacol* 134(1): 161-9.

Rice, D. C. and S. Hayward (1999). Comparison of visual function at adulthood and during aging in monkeys exposed to lead or methylmercury. *Neurotoxicology* 20(5): 767-84.

Samson, J. C., R. Goodridge, et al. (2001). Delayed effects of embryonic exposure of zebrafish (Danio rerio) to methylmercury (MeHg). *Aquat Toxicol* 51(4): 369-76.

Sauvé, S. and M. Fournier (2005). Age-specific immunocompetence of the earthworm Eisenia andrei: exposure to methylmercury chloride. *Ecotoxicol Environ Saf* 60(1): 67-72.

Sauvé, S., M. Hendawi, et al. (2002). Phagocytic response of terrestrial and aquatic invertebrates following *in vitro* exposure to trace elements. *Ecotoxicol Environ Saf* 52(1): 21-9.

Schuster, P. F., D. P. Krabbenhoft, et al. (2002). Atmospherc mercury deposition during the last 270 years: a glacial ice core record of natural and anthropogenic sources. *Environ Sci Technol* 36(11): 2303-10.

Sjoblom, A., M. Meili, et al. (2000). The influence of humic substances on the speciation and bioavailability of dissolved mercury and methylmercury, measured as uptake by Chaoborus larvae and loss by volatilization. *Sci Total Environ* 261(1-3): 115-24.

Sweet, L. I. and J. T. Zelikoff (2001). Toxicology and immunotoxicology of mercury: a comparative review in fish and humans. *J Toxicol Environ Health B Crit Rev* 4(2): 161-205.

U.S.EPA (1997). Mercury Study Report to Congress. Vol. 6: An Ecological Assessment for Anthropogenic Mercury Emissions in the United States. USEPA-452/R-97-008.

Vucetich, L. M., J. A. Vucetich, et al. (2001). Mercury concentrations in deer mouse (Peromyscus maniculatus) tissues from Isle Royale National Park. *Environ Pollut* 114(1): 113-8.

Wayland, M., H. G. Gilchrist, et al. (2002). Immune function, stress response, and body condition in arctic-breeding common eiders in relation to cadmium, mercury, and selenium concentrations. *Environ Res* 90(1): 47-60.

Wayland, M., J. E. Smits, et al. (2003). Biomarker responses in nesting, common eiders in the Canadian arctic in relation to tissue cadmium, mercury and selenium concentrations. *Ecotoxicology* 12(1-4): 225-37.

Wilson, H. M., M. R. Petersen, et al. (2004). Concentrations of metals and trace elements in blood of spectacled and king eiders in northern Alaska, USA. *Environ Toxicol Chem* 23(2): 408-14.

Yamaguchi, N., D. Gazzard, et al. (2003). Concentrations and hazard assessment of PCBs, organochlorine pesticides and mercury in fish species from the Upper Thames: river pollution and its potential effects on top predators. *Chemosphere* 50(3): 265-73.

APPENDIX C   CARDIOVASCULAR EFFECTS AND METHYLMERCURY . . . . . . . . . C-1
   C.1    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1
   C.2    Acute Myocardial Infarctions and Major Cardiovascular Effects . . . . . . . . . . . C-1
          C.2.1   The Kuopio Ischemic Heart Disease Risk Factor Study (KIHD) Cohort
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-2
          C.2.2   The European Multicenter Case Control Study on Antioxidants,
                Myocardial Infarction and Cancer of the Breast (EURAMIC) Cohort
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-4
          C.2.3   Mechanisms for Cardiovascular Impacts . . . . . . . . . . . . . . . . . . . . . . . C-4
          C.2.4   Other Studies Evaluating CVD and Mercury Levels . . . . . . . . . . . . . . C-5
   C.3    Other Cardiovascular Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-7
   C.4    Cardiovascular Health Benefits of Fish Consumption  . . . . . . . . . . . . . . . . . . . C-8
   C.5    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-9
   C.6    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-10

APPENDIX C

CARDIOVASCULAR EFFECTS AND METHYLMERCURY

## C.1     Introduction

Some recent epidemiological studies suggest that methylmercury may be a risk factor for myocardial events, such as acute myocardial infarction (AMI), coronary heart disease (CHD), cardiovascular disease (CVD) or other adverse cardiovascular effects such as carotid atherosclerosis, increased blood pressure, or decreased heart rate variability.  Other recent studies did not observe a relationship between methylmercury levels and myocardial events.[1]

This appendix presents a qualitative discussion of recent studies that have looked at the relationship between potential for cardiovascular impacts from chronic low-dose methylmercury exposures.  The results of several key peer-reviewed studies are summarized and study uncertainties and other relevant information are also discussed.  This section also includes a discussion of the beneficial effects of fish consumption.

The potential for adverse cardiovascular effects due to consumption of fish containing methylmercury is of particular interest given the evidence for the *protective* cardiovascular effect believed to occur from an increased dietary fish intake. Strong evidence indicates that consumption of fish, particularly fatty fish, has a cardio-protective effect (Wang et al. 2004; 2005 Dietary Guidelines Advisory Committee 2004; NRC 2000).  The presence of omega-3 (*n*-3) fatty acids in fish oils is hypothesized to drive the preventive effect on cardiovascular disease (Calder 2003).  Several mechanisms of action are recognized, including the stabilization of  the atherosclerotic plaque (which, when ruptured, may cause a heart attack) by reducing the infiltration of inflammatory and immune cells (lymphocytes and macrophages) into the plaque. However, those studies relevant to the general population show cardiovascular health benefits were for fish in the diet, not for isolated omega-3 fatty acids, such as in fish oil supplements, suggesting the potential for synergistic benefits.  Thus, consumption of fish containing methylmercury is not necessarily detrimental even though some evidence suggests that  the cardiovascular system may be a target system for methylmercury exposure.  The cardio-protective effect of fish consumption has not been observed in all studies (Curb and Reed 1985; Morris et al. 1992; Folsom and Demissie 2004).

## C.2     Acute Myocardial Infarctions and Major Cardiovascular Effects

Salonen et al. (1995), Virtanen et al. (2005), and Guallar et al. (2002) have reported an association between increased risk of AMI (or other major cardiovascular impacts) and exposures to methylmercury via fish consumption or mercury levels in the body.  The findings of these studies are summarized in this section.

---

[1] As described in detail by NRC (2000) and elsewhere, consumption fish containing methylmercury  is the primary route of exposure to methylmercury.

### C.2.1   The Kuopio Ischemic Heart Disease Risk Factor Study (KIHD) Cohort

Salonen et al. (1995) investigated the association between methylmercury and AMI in a study of a subset of men from the KIHD study group (n = 1,833 Finnish males age 42 to 60 years).  Rissanen et al. (2000) in a follow up to this study extended observation of the same cohort and Virtanen (2005) also utilized this cohort.  In theory, the findings could be specific only for men in Eastern Finland, who traditionally have a high intake of meat, fish and saturated animal fat and a low intake of selenium and vitamin C and, most likely, other vegetable-derived antioxidants.  However these studies provide new information about potential mechanisms in how methylmercury interacts with the cardiovascular system in humans, even though the consequences of methylmercury intake for the cardiovascular system may vary among populations due to different confounding factors (Salonen et al. 1995).

In the Salonen et al. (1995) study, all subjects' mercury levels were evaluated by hair analysis, and subjects were grouped into three exposure groups according to hair mercury levels.  Urinalysis was also conducted for a subset of men who either had an AMI during the follow-up or acted as the controls to that subset.  Fish consumption was measured through an interview-checked four-day food recording.  Daily fish intake ranged from 0 to 619.2 g/day, and hair concentrations ranged from 0 to 15.67 ppm ($\mu$g/g).  Stern (2005) observes that the estimated mean dietary methylmercury intake was 7.6 ug/day, which is only somewhat larger than the intake corresponding to the EPA RfD for a 70-kg (average) man of 7.0 ug/day (the corresponding  mean hair mercury concentration was 1.92 $\mu$g/g (ppm) (Stern 2005).  For the subset of men who had an AMI, two control subjects were matched to each patient according to age, municipality of residence, and date of baseline examination.  Occurrence of AMI and deaths due to CHD and CVD were recorded over the course of a seven-year period.  In the analysis of the results, Salonen et al. found that "the hair mercury (r = .27) and the urinary mercury (r = .47) correlated with the estimated fish intake."  Men with the highest hair mercury content ($\geq$ 2.0 $\mu$g/g and ranging up to 15.67 $\mu$g/g - Stern (2005) estimates that $\geq$ 2.0 $\mu$g/g is likely equivalent to the 90th percentile in U.S. men) had twice the risk of AMI when compared to men in the two lowest exposure groups when adjusting for age, examination year, ischemic exercise, electrocardiogram (ECG), and maximal oxygen uptake (relative risk [RR] 2.0; 95% confidence interval [CI] 1.2-3.1).  The risk of AMI decreased slightly for men within the highest hair mercury category ($\geq$ 2.0 $\mu$g/g) after adjusting for all confounders and risk factors[2] but was still statistically significant (RR = 1.7; 95% CI 1.03-2.8).  The relative risk was similar for coronary deaths but not statistically significant due to the smaller number of events.  However, men in this group also had elevated risks of cardiovascular death (RR = 2.9; 95% CI 1.2-6.6) and death by all causes (RR 2.3; 95% CI 1.4-3.6) after adjusting for all confounders and risk factors.  Urinary mercury levels were also significantly (and independently) associated with risk of AMI after adjusting for the strongest risk factors (for each $\mu$g mercury excreted daily, the risk of AMI increased by 36%; 95% CI 1% to 82%).  Based on these results, the study authors conclude that, "although consumption of fish may be healthy in general, some fish may contain agents that are

---

[2] Risk factors included age, examination year, ischemic exercise ECG, maximal oxygen uptake, family history of CHD, cigarette-years, mean systolic blood pressure, diabetes, socioeconomic status, place of residence (urban vs. rural), dietary iron intake, and serum apolipoprotein B, $HDL_2$ cholesterol, and ferritin concentrations.

not healthy for the human cardiovascular system." Further, the authors suggest that mercury is a risk factor for coronary and fatal CVD.

Two relevant follow-up studies have been conducted on the men in the KIHD population. Rissanen et al. (2000) examined the interaction of mercury and the serum *n*-3 end-product fatty acids docosahexaenoic acid (DHA) and docosapentaenoic acid (DPA). For this analysis, the men in the KIHD cohort study were divided into quintiles based on their level of serum fatty acids. Risk of acute coronary events was examined within the study cohort as a function of *n*-3 fatty acid levels. After adjusting for other risk factors,[3] men in the highest fifth (quintile) of *n*-3 fatty acid level exhibited a 44 percent reduced risk of acute coronary events (95% CI 11% to 65%) when compared to the lowest quintile. When the data were stratified by hair mercury concentration into those with hair mercury content above and below 2 μg/g, individuals with lower hair mercury who were also in the upper quintile of *n*-3 fatty acid level had a 67 percent reduced risk of acute coronary events (95% CI 19% to 87%) compared with men with higher hair mercury who were also in the upper quintile of *n*-3 fatty acid level. In each quintile, subjects with the higher hair mercury concentrations had a higher risk of acute coronary events, suggesting that the cardio-protective effects of the serum fatty acids was attenuated by the mercury. Based on these results, Rissanen et al. suggest that their data "provide for the concept that fish-oil derived fatty acids reduce the risk of acute coronary events. However, a high mercury concentration in fish could attenuate this protective effect."

In a more recent follow-up study of the KIHD cohort, the association between mercury and the risk of acute coronary events and mortality from CVD, CHD, and all causes was re-evaluated in a group of 1,887 men (Virtanen et al. 2005). The study also examined whether mercury could interfere with the beneficial effects of fish oils. The interaction between mercury and the serum *n*-3 end-product fatty acids DHA, DPA, and eicosapentaenoic acid was investigated. Deaths by CVD, CHD, and all-causes were recorded, and fish consumption was measured through an interview-checked 4-day food recording. Fish intake in men for those in the highest third (tertile) of hair mercury content was more than double that of the lowest tertile (65 vs. 30 g/day, respectively). High mercury content in hair was also most strongly associated with fish intake and serum DHA plus DPA concentrations. Men in the highest tertile of hair mercury content (>2.03 μg/g) had an increased risk for frank cardiovascular effects, including AMI (RR 1.60; 95% CI 1.24-2.06), CVD (RR 1.68; 95% CI 1.15-2.44), CHD (RR 1.56; 95% CI 0.99 to 2.46), and any death (RR 1.38; 95% CI 1.15-1.66), compared with men in the combined lower two thirds.[4] For each microgram of mercury in hair, the risk of acute coronary events increased, on average, by 11 percent (95% CI 6% to 17%). Based on these results, Virtanen et al. concluded that "high content of mercury in hair may be a risk factor for acute coronary events

---

[3] Risk factors included age, examination years, body mass index, maximal oxygen uptake, hair mercury content, serum ferritin, serum LDL cholesterol, systolic blood pressure, serum insulin, ADP-induced platelet aggregation, socioeconomic status, ischemic findings in exercise test, smoking, place of residence, and dietary energy intake.

[4] Estimated increased risks were adjusted for age, examination year, high-density lipoprotein (HDL) and low-density lipoprotein (LDL) cholesterol, body mass index (BMI), family history of ischemic heart disease, systolic blood pressure, maximal oxygen uptake, urinary excretion of nicotine metabolites, serum selenium, alcohol intake, serum DHA + DPA as a proportion of all fatty acids in serum, and intake of saturated fatty acids, fiber, and vitamin C and E.

and CVD, CHD, and all-cause mortality in middle-aged eastern Finnish men." Furthermore, the authors concluded that "mercury may also attenuate the protective effects of fish on cardiovascular health."

### C.2.2   The European Multicenter Case Control Study on Antioxidants, Myocardial Infarction and Cancer of the Breast (EURAMIC) Cohort

In a case-control study using subjects from the EURAMIC study population (n = 1,400 men from eight European countries and Israel), Guallar et al. (2002) investigated the relationship between the risk of a first myocardial infarction in men and mercury levels measured in toenail clippings[5] and DHA levels in adipose tissue. The investigators reported that mercury levels in patients who had suffered AMI were 15 percent higher (after adjusting for DHA level and coronary risk factors) than levels in controls. Additionally, men in the highest quintile of mercury exposures exhibited a risk-adjusted[6] 2.16-fold increased risk (odds ratio [OR]) of myocardial infarction (95% CI 1.09-4.29) when compared to the lowest quintile. DHA level also was inversely associated with the risk of myocardial infarction after adjusting for mercury level (OR 0.59; 95% CI 0.30-1.19). Consequently, toenail mercury level was directly associated with the risk of myocardial infarction and adipose tissue DHA level was inversely associated with the risk. One study location, which had higher mercury than the others, appeared to be influential in the analysis. Guallar et al. concluded that "high mercury content may diminish the cardio-protective effect of fish intake."

### C.2.3   Mechanisms for Cardiovascular Impacts

Currently, there is a general lack of mechanistic evidence for the role of methylmercury in heart disease (Stern 2005). However, Salonen et al. (1995), Virtanen (2005), and Guallar et al. (2002) summarize several mechanistic bases by which mercury may increase the risk of adverse cardiovascular impacts. The increased risk may be related to a reduction in the body's antioxidative capacity and the promotion of free radical stress and lipid peroxidation. A reduction in antioxidative capacity may be due to the high affinity of mercury for sulfhydryl groups (thereby inactivating antioxidative thiolic compounds) and mercury's tendency to bind to selenium and form an insoluble complex (selenium is believed to be a factor in catalyzing the formation of free-radical scavengers). Mercury is a transitional metal and therefore can promote the formation of free radicals via Fenton-type reactions. Additionally, Virtanen et al. (2005) note that mercury inactivates paraoxonase, an extracellular enzyme that may help prevent AMI. Mercury may also may promote ADP-induced platelet aggregation and blood coagulation, inhibit endothelial-cell formation and migration, and affect apoptosis (i.e., programmed cell death) and inflammatory responses.

---

[5] It should be noted that although measuring mercury exposure through toenail clippings appears to quantitatively reflect dietary intake, this method has not been well characterized in comparison to hair or blood mercury exposure. Consequently, it is not possible to distinguish elemental mercury exposure from that of methyl mercury (Stern 2005). Additionally, results from this study cannot be compared to those that measure mercury through hair or blood.

[6] Adjusted for age, DHA, BMI, waist:hip ratio, smoking status, alcohol intake, high-density lipoprotein cholesterol, diabetes, history of hypertension, parental myocardial infarction, α-tocopherol level, ß-carotene level, toenail selenium level, and toenail weight.

### C.2.4   Other Studies Evaluating CVD and Mercury Levels

In contrast with the aforementioned studies that may demonstrate a correlation between methylmercury and AMI, CHD, and CVD, Yoshizawa et al. (2002) conducted a study specifically addressing the relationship between total mercury exposure and the risk of coronary heart disease, and reported no significant association.  This study utilized the Health Professionals Follow-up Study as its study population and examined a subset of 470 patients, including men who had fatal coronary disease, nonfatal myocardial infarction, coronary-artery bypass surgery, or percutaneous transluminal coronary angioplasty, as well as controls.  Mercury levels were measured via toenail clippings.  After adjusting for age, smoking and other risk factors, toenail mercury was not associated with the risk of coronary heart disease (CHD).  Adjustment for intake of *n*-3 fatty acids from fish did not appreciably change these results.  When dentists were excluded from the analysis, an association of toenail mercury with CHD was observed by comparing the highest and lowest quintiles of mercury exposure (RR 1.27; 95% CI 0.62-2.59; *P* for trend = 0.43) (Yoshizawa et al. 2002).  This relationship, however, was not statistically significant (possibly due to the 53 percent reduction in total number of cases, to 220), suggesting that further study with a larger sample may be warranted.

In a recent review of the cardiovascular health effects of methylmercury, Stern (2005) noted  that interpretation of the Yoshizawa results may depend on whether it is hypothesized that total mercury exposure or specifically methylmercury exposure is responsible for the cardiovascular effects of mercury.   If only methylmercury is responsible for cardiovascular effects then the elevated exposure to elemental mercury of dentists would tend to confound the underlying association of methylmercury and cardiovascular effects.  Stern (2005) also notes that the strengthening of the association when an adjustment is made for n-3 fatty acids is consistent with the observations in other studies that overall risk occurs as a balance between the protective effect of n-3 fatty acids from fish and the adverse effects from methylmercury.

In a study that focused on inorganic mercury exposure from dental amalgams, Ahlqwist et al. (1999) examined associations between serum mercury and myocardial infarctions (among other health outcomes), among 1,462 Swedish women (ages 38 to 60 at study initiation) for 25 years.  Mercury concentration in serum was measured in all subjects at the beginning of the study and, 13 years later, for a subsample of 142 women from one age group (all born in 1922).  No statistically significant association between serum mercury and MI was found.  However, Stern (2005) notes that it is difficult to assess the significance of these findings for methylmercury exposures that occur through fish consumption as serum mercury disproportionally reflects inorganic mercury exposure.

In a case-control study of both men and women with a first-time MI from a longitudinal cohort in northern Sweden (n=78), Hallgren et al. (2001) analyzed erythrocyte mercury concentration in order to study a possible association between increased fish consumption and reduced coronary heart disease (concentration of mercury in erythrocytes is often used as an index of fish consumption).  The researchers summed the *n-3* fatty acids, EPA and DHA, to express the percentage of total plasma polyunsaturated fatty acids (P-PUFA).  Mean levels of mercury in erythrocytes were reported as 4.44 ng/g in cases and 5.42 ng/g in controls.  Stern (2005) notes that these concentrations translate to about 2.8 and 3.4 ng/L, respectively, for

mercury concentrations in whole blood.  Hallgren et al. (2001) concluded that erythrocyte mercury concentration alone was not significantly associated with the occurrence of MI but found that higher levels of P-PUFA's and erythrocyte mercury (which was used as a marker of fish intake) are significantly associated with lower risk of myocardial infarction.  Various combinations of high and low P-PUFA and high and low mercury concentration were assessed, and none of the combinations had a statistically significant odds ratio (OR) greater than 1.0, including the group of subjects with high mercury and low P-PUFA that might be expected to have a higher risk of heart disease.  The high mercury-low P-PUFA group did have an OR greater than 1.0, but this group consisted of only four individuals and the result was not considered statistically significant.

In two studies of death certificates in the region near Minamata City, Japan, Tamashiro et al. (1984 and 1986) investigated the significance of heart disease as a primary or secondary cause of death.  Tamashiro et al. (1984) studied the causes of death among those with official diagnoses of Minamata disease in a region including Minamata City in two groups:  those who died from 1954 to 1969 (n=44), and those who died from 1970 to 1980 (n=334).  In the first group, Minamata disease and diseases of the central nervous system were the underlying causes of death, but nonischemic heart disease accounted for 50 percent of the secondary causes of death (multiple causes of death could be reported).  Analysis of the second group constituted a case-control study by matching individuals with a control in the same city or town by age, sex, and year of death.  In no disease were the ORs observed to be significantly high or low.  However, when non-Minamata diseases and Minamata diseases were mentioned on the same death certificate, non-ischemic heart disease (for males and females combined) was the only statistically significant cause of death for this second group.

 Tamashiro et al. (1986) also investigated the causes of death from death certificates in the Minamata City area, but focused on fishermen and their families residing in a small coastal area of the city.  Certificates from 1970 to 1981 were examined and standard mortality rates (SMRs) were calculated using age-specific death rates for Minamata City as a standard.  The results showed that SMRs for all categories of heart disease and hypertensive disease were not significantly elevated in the study population.  Stern (2005) note several uncertainties associated with these results.  He notes that deaths from methylmercury-related cardiovascular death could have possibly peaked prior to 1970, even though incidence of  "Minamata disease" was observed to peak after this date in the study area (thus the selection of the study time period).  The exposure to methylmercury may have varied throughout the study area, and death rates in Minamata City itself were used as the denominator in calculating the SMRs.  Therefore, although overall deaths were more prevalent in this study area, lower exposures to methylmercury that resulted in higher rates of heart disease could have occurred.  Furthermore, there were no data reported on the type of fish consumed and the relative consumption of *n-3* fatty acids which may provide protection against the cardiovascular effects of methylmercury.  Stern (2005) also notes in his review that differences in the results from the two studies by Tamashiro et al. are probably related to study design, and the weaknesses of the Tamishiro 1986 study likely explain the differences in the studies with respect to the identification of heart diseases as potentially associated with highly elevated methylmercury exposures resulting in Minamata disease.  Stern also notes that for ischemic heart disease only males appear to be at risk.

## C.3    Other Cardiovascular Effects

Another possible adverse cardiovascular effect related to methylmercury exposure is accelerated progression of carotid atherosclerosis (i.e., the progressive narrowing and hardening of the arteries over time).  This effect was observed in men from the KIHD study population, in which high hair mercury content was the second strongest predictor for the four-year increase in the mean intima-media thickness (IMT), a marker of early artherosclerosis (Salonen et al. 2000).  Predictors for IMT ranked as follows:  systolic blood pressure > hair mercury content> antidyslipidemic medication> dietary iron intake > cigarette pack years > age.  Additionally, there was an 8 µm incremental increase in the four-year IMT for each µg/g increase in hair mercury content.

The case for mercury-induced blood pressure effects is not as strong, but some evidence suggests a possible link between methylmercury exposure and hypertension and heart rate variability.  Oka et al. (2003) reviewed electrocardiogram data, along with blood pressure and pulse pressure measurement, in Minamata patients who had been exposed to methylmercury *in utero* and were institutionalized for "fetal Minamata disease" as adults.  Subjects had a significantly elevated resting heart rate and a slightly (but not significantly) decreased variability in heart rate when compared to controls.  Blood pressure did not differ between the two groups, but pulse pressure was significantly decreased among the subjects.  Considering the limited data available, it is difficult to draw any conclusions at this time regarding heart rate variability and methylmercury exposure; more research is necessary to fully explore this area.

Cardiovascular effects have also been reported for children.  A decrease in heart rate variability, an important measure of the ability of the cardiovascular system to withstand stress, was reported for children in the Faroe Islands (917 seven-year-old children) exposed *in utero* to methylmercury through maternal consumption of fish and marine mammals (additional post-natal exposures, again though consumption of fish and marine mammals may have also occurred).  At seven years, children who had been exposed before birth to higher levels of cord blood mercury (up to 10 µg/L) had increased blood pressure as well as a decrease in heart rate variability (Sorensen et al. 1999).  Blood pressure was based upon a single measure for each child.  At fourteen years, the effect on blood pressure in this cohort was no longer observed but heart rate variability remained low (Grandjean et al. 2004).  It is unclear, however, whether this effect will persist beyond age 14 and what the significance of this finding is for adverse health outcomes later in life.

A recent study by Vupputuri et al. (2005) showed no statistically significant association between total blood mercury and blood pressure in a sample of 1,240 women aged 16 to 49 years from the National Health and Nutrition Examination Survey 1999-2000.  Additionally, no association was observed between total blood mercury and blood pressure in fish consumers when data were stratified by dietary fish intake (subjects were separated into those who consume fish and those who consume no fish).[7]  More research is required to reduce the uncertainty

---

[7] A weak association was observed, however, between total blood mercury and blood pressure among subjects who did *not* consume any fish (i.e., systolic blood pressure increased by 1.83 mm mercury per 1.3 µg/L increase in total blood mercury; 95% CI 0.36-3.30; $P$ = 0.018; adjusted for age, race, income, body mass index, pregnancy status, and dietary sodium, potassium, and total calories).  Vupputuri et al. (2205) suggest that the oils in fish may counteract

associated with the possibility of other cardiovascular effects, including blood pressure, from exposure to methylmercury in both adults and children.  A potential confounding effect in several of the dietary studies could be based on method of preparation of fish (Mozaffarian et al. 2004).

## C.4    Cardiovascular Health Benefits of Fish Consumption

Current federal dietary recommendations about fish consumption are found in the 2005 Dietary Guidelines for Americans (DHHS and USDA 2005).  The Guidelines were based on an expert scientific report from the 2005 Dietary Guidelines Advisory Committee (2005 Dietary Guidelines Advisory Committee 2004). The Advisory Committee report in turn references two major sources: the National Academy of Sciences Institute of Medicine (IOM) report on Dietary References Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (IOM 2002) and the DHHS Agency for Healthcare Research and Quality (AHRQ) evidence-based AHRQ Report Effects of Omega-3 Fatty Acids on Cardiovascular Disease (Wang et al. 2004). The main conclusions of the IOM and AHRQ reports are summarized below. The Advisory Committee also identified the main conclusions of six other national and international expert groups regarding recommendations for fish consumption.

Available evidence suggests that the cardiovascular health benefits of fish consumption are related to the long chain omega-3 polyunsaturated fatty acids in fish (LC omega-3 PUFA, also called LC omega-3 PUFA), which are unique nutrients in fish.  The specific omega-3 fatty acids are docosahexaenoic acid (DHA) and eicosahexaenoic acid (EPA).  In the general population (rather than in heart patients), most of the studies were observational (epidemiologic) studies of fish consumption and cardiovascular disease and not studies of omega-3 fatty acid supplements (for example, see Wang et al. 2004 and FDA 2004).  Therefore, although evidence indicates that the cardiovascular health benefits of fish consumption are related to the omega-3 fatty acids in fish oil, DHA and EPA, the actual studies, relevant to the general population, showing cardiovascular health benefits were for fish in the diet, not for fish oil supplements. According to the Dietary Guidelines, the current federal dietary recommendations are that most fats should come from sources of polyunsaturated and monounsaturated fatty acids, such as fish, nuts and vegetable oils.  Based on the scientific review of the Advisory Committee, the Dietary Guidelines note that limited evidence suggests an association between consumption of fatty acids in fish and reduced risks of mortality from cardiovascular disease for the general population. Other sources of EPA and DHA may provide similar benefit; however, more research is needed. The Dietary Guidelines further state that "evidence suggests that consuming approximately two servings of fish per week (approximately 8 ounces total) may reduce the risk of mortality from coronary heart disease and that consuming EPA and DHA may reduce the risk of mortality from cardiovascular disease in persons who have already experienced a cardiac event."  The Dietary Guidelines explain that the Food and Drug Administration and EPA are advising women of childbearing age who may become pregnant, pregnant women, nursing mothers, and young children to avoid some types of fish and shellfish and to eat fish and shellfish that are lower in mercury, and refer readers to the FDA telephone hotline and web site.

---

the potentially harmful effects of mercury on blood pressure.

The scientific review by the Dietary Guidelines Advisory Committee on fish consumption used as its starting point the comprehensive Institute of Medicine report on macronutrients (IOM 2002). The IOM report found that "a growing body of literature suggests that diets high in EPA and DHA may afford some degree of protection against CHD." The Advisory Committee review also relied upon an evidence-based review by AHRQ (Wang et al. 2004). The AHRQ report evaluated 22 prospective cohort studies that were conducted in the US and other developed countries. AHRQ noted that most of the cohorts had several thousand subjects; the range was 272 to 223,170 subjects, with most subjects at least age 40. AHRQ indicated that, despite some limitations, if viewed together, these studies provide evidence that is highly applicable to the U.S. population. Overall, AHRQ found that the evidence from the primary and secondary prevention studies supports the hypothesis that the consumption of omega-3 fatty acids, fish, and fish oil reduces all-cause mortality and various cardiovascular disease (CVD) outcomes. These outcomes include sudden death and cardiac death (coronary or myocardial infarct (MI) death). Thus, the AHRQ report concluded that the consumption of omega-3 fatty acids from fish or from supplements of fish oil reduces all-cause mortality and various CVD outcomes. Additionally, the Advisory Committee based its conclusions on its own analysis of epidemiologic studies of the cardioprotective effects of fish consumption among healthy populations, such as those by Dolecek (1992), Siscovick et al. (1995), Hu et al. (2002), and Mozaffarian et al. (2003) (cited in Dietary Guidelines Advisory Committee 2004).

FDA in 2004 (FDA 2004) announced the availability of a qualified health claim for reduced risk of coronary heart disease (CHD) on conventional foods that contain EPA and DHA omega-3 fatty acids. The FDA explained that, typically, EPA and DHA omega-3 fatty acids are contained in oily fish, such as salmon, lake trout, tuna and herring. FDA also stated that these fatty acids are not essential to the diet; however, scientific evidence indicates that these fatty acids may be beneficial in reducing CHD. An example of wording of the qualified health claim as it would appear on a food label would be, "Supportive but not conclusive research shows that consumption of EPA and DHA omega-3 fatty acids may reduce the risk of coronary heart disease. One serving of [name of food] provides [x] grams of EPA and DHA omega-3 fatty acids. [See nutrition information for total fat, saturated fat and cholesterol content.]"

## C.5    Conclusions

In summary:

- Studies investigating the relationship between methylmercury and cardiovascular impacts have reached different conclusions. The findings to date and the plausible biological mechanisms warrant additional research in this arena (Stern 2005; Chan and Egeland 2004).

- Some recent epidemiological studies of men suggest that methylmercury is associated with a higher risk of acute myocardial infarction, coronary heart disease and cardiovascular disease in some populations. Other recent studies have not observed this association.

- Some studies have suggested that methylmercury attenuates the beneficial effects of fish consumption. A further possible explanation is that the observed effect

may be present in certain populations but is not generalizable to other populations.

• There is a significant and well-recognized body of literature documenting the cardioprotective benefits of fish consumption.

• As the science on the impact of methylmercury on the risk of cardiovascular events remains uncertain, and the weight of the evidence, in fact, supports a positive association between fish consumption and potential cardiovascular benefits, the impacts of methylmercury from fish consumption are only discussed qualitatively.

## C.6    References

2005 Dietary Guidelines Advisory Committee, August, 2004. Report of the 2005 Dietary Guidelines Advisory Committee.
http://www.health.gov/dietaryguidelines/dga2005/default.htm
http://www.health.gov/dietaryguidelines/dga2005/report/

Ahlqwist M, Bengtsson C, Lapidus L, Bergdahl IA, and Schütz A.  1999.  Serum mercury concentration in relation to survival, symptoms, and diseases: results from the prospective population study of women in Gothenburg, Sweden.  Act Odontol Scand 57:168-174.

Calder PC.  2003.  New evidence in support of the cardiovascular benefit of long-chain n-3 fatty acids.  Italian Heart Journal, 4: 427-429.

Chan HM and Egeland GM.  2004.  Fish consumption, mercury exposure, and heart diseases. Nutrition Reviews 62(2):68-72.

Curb JD and DM Reed.  1985.  Fish consumption and mortality from cardiovascular disease.  N Engl J Med.  313:821-822.

Dolecek TA. 1992.  Epidemiological evidence of relationships between dietary polyunsaturated fatty acids and mortality in the Multiple Risk Factor Intervention Trial. Proc Soc Exp Biol Med 200:177-182. (as cited in Dietary Guidelines Advisory Committee 2004)

Folsom, AR and Z Demissie.  2004.  Fish intake, marine omega-3 fatty acids and mortality in a cohort of postmenopausal women. Am. Journal of Epidemiology. 160(10):1005-1010.

Food and Drug Administration, September 8, 2004. Qualified Health Claim for Omega-3 Fatty Acids in Foods. http://www.cfsan.fda.gov/~dms/lab-qhc.html
http://www.fda.gov/bbs/topics/news/2004/NEW01115.html.

Grandjean P, Murata K, Budtz-Jorgensen E, Weihe P.  2004.  Autonomic activity in methyl mercury neurotoxicity: 14-Year follow-up of a Faroese Birth Cohort.  J Pediatr 144:169-176.

Guallar E, Sanz-Gallardo I, Van't Veer P, Bode P, Aro A, Gomez-Aracena J, Kark JD, Riemersma RA, Martin-Moreno JM, Kok FK.  2002.  Mercury, fish oils, and the risk of myocardial infarction.  N Engl J Med 347(22):1747-1754.

Hallgren CG, Hallmans G, Jansson J-H, Marklund SL, Huhtasaari F, Schütz A, Strömberg U, Vessby B, and Skerfving S.  2001.  Markers of high fish intake are associated with decreased risk of a first myocardial infarction.  British Journal of Nutrition 86:397-404.

Hu FB, Bronner, W Willett, Stampfer MJ, Rexrode KM, Albert CM, Hunter D, Manson JE.  2002.  Fish and omega-3 fatty acid intake and risk of coronary heart diease in women.  JAMA. 287(14):1815-1821.  (as cited in Dietary Guidelines Advisory Committee 2004)

Morris, MC, J.E. Manson, B. Rosner et al.  1992.  A prospective study of fish consumption and cariovascular disease.  Circulation. 86 (Suppl. 1):1-163.

Mozaffarian D, Lemaitre RN, Kuller LH, Burke GL, Tracy RP, Siscovick DS; Cardiovascular Health Study. 2003.  Cardiac benefits of fish consumption may depend on type of fish meal consumed. Circulation 107:1372-7. (as cited in Dietary Guidelines Advisory Committee 2004)

Mozaffarian D, MP Bruce, Rimm EB, Lemaitre RN, Burke GL, Lyles MF, Lefkowitz D, Siscovick DS.  2004.  Fish Intake and Risk of Incident Atrial Fibrillation.  Circulation. 110:368-373.

National Academy of Sciences, Institute of Medicine (IOM). 2002. Dietary Reference Intakes: Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein and Amino Acids. The National Academy Press, Washington, DC.

National Research Council (NRC).  2000.  Toxicological Effects of Methylmercury. Committee on the Toxicological Effects of Methylmercury, Board on Environmental Studies and Toxicology, Commission on Life Sciences, National Research Council.  National Academy Press, Washington, DC.

Oka T, Matsukura M, Okamoto M, Harada N, Kitano T, Minke T, Futasuka M.  2003.  Autonomic nervous function in fetal type Minamata disease patients:  Assessment of heart rate variability.  Tohoku J. Exp. Med. 198:215–221.

Rissanen T, Vourilaninen S, Nyyssönen K, Lakka, T, Salonen, JT.  2000.  Fish oil-derived fatty acids, docosahexaenoic acid and docosapentaenoic acid, and the risk of acute coronary events.  The Kuopio Ischemic Heart Disease Risk Factor Study.  Circulation 102:2677-2679.

Salonen JT, Seppänen K, Nyssönen K, Korpela H, Kauhanen J, Kantola M, Tuomilehto J, Esterbauer H, Tatzber F, Salonen R.  1995.  Intake of mercury from fish, lipid peroxidation, and the risk of myocardial infarction and coronary, cardiovascular, and any death in eastern Finnish men.  Circulation 91:645-655.

Siscovick DS, Raghunathan TE, King I, Weinmann S, Wicklund KG, Albright J, Bovbjerg V, Arbogast P, Smith H, Kushi LH, et al. 1995. Dietary intake and cell membrane levels of long-chain n-3 polyunsaturated fatty acids and the risk of primary cardiac arrest. JAMA 274:1363-7. (as cited in Dietary Guidelines Advisory Committee 2004)

Salonen JT, Seppänen K, Lakka, TA, Salonen R, Kaplan GA. 2000. Mercury accumulation and accelerated progression of carotid atherosclerosis: A population-based prospective 4-year follow-up study in men in eastern Finland. Atherosclerosis 148:265-273.

Sorensen N, Murata K, Budtz-Jorgensen E, Weihe P, Grandjean P. 1999. Prenatal methyl mercury exposure as a cardiovascular risk factor at seven years of age. Epidemiol 10:370-375.

Stern AH. 2005. A review of the studies of the cardiovascular health effects of methylmercury with consideration of the suitability for risk assessment. Environmental Research 98(1):133-142.

Tamashiro H, Akagi H, Arakaki M, Futatsuka M, and Roht LH. 1984. Causes of death in Minamata disease: analysis of death certificates. Int Arch Occup Environ Health 54:135-146.

Tamashiro H, Arakaki M, Futatsuka M, and Lee ES. 1986. Methylmercury exposure and mortality in southern Japan: a close look at causes of death. Journal of Epidemiology and Community Health 40:181-185.

U.S. Department of Health and Human Services and U.S. Department of Agriculture (DHHS and USDA), January, 2005. 2005 Dietary Guidelines for Americans. http://www.healthierus.gov/dietaryguidelines/ http://www.health.gov/dietaryguidelines/dga2005/document/

Virtanen J, Voutilaninen S, Rissanen TH, Mursu J, Tuomainen T-P, Korhonen MJ, Valkonen V-P, Seppänen K, Laukkanen JA, Salonen JT. 2005. Mercury, fish oils, and risk of acute coronary events and cardiovascular disease, coronary heart disease, and all-cause mortality in mean in eastern Finland. Arterioscler Thromb Vasc Biol 25:228-233.

Vupputuri S, Longnecker MP, Daniels JL, Guo X, Sandler DP. 2005. Blood mercury level and blood pressure among US women: Results from the National Health and nutrition Examination Survey 1999-2000. Environmental Research 97:195-200.

Wang C, Chung M, Lichtenstein A, Balk E, Kupelnick B, DeVine D, Lawrence A, Lau J. 2004. Effects of Omega-3 Fatty Acids on Cardiovascular Disease. Summary, Evidence Report/Technology Assessment No. 94. (Prepared by the Tufts-New England Medical Center Evidence-based Practice Center, Boston, MA.) AHRQ Publication No. 04-E009-1. Rockville,MD: Agency for Healthcare Research and Quality. March 2004.Agency for Healthcare Research and Quality (AHRQ), DHHS March, 2004. Omega-3 Fatty Acids Effects on Cardiovascular Disease, http://www.ahrq.gov/clinic/epcindex.htm#dietsup

Yoshizawa K, Rimm EB, Morris S, Spate VL, Hsieh C-C, Spiegelman D, Stampfer MJ, Willett WC.  2002. Mercury and the risk of coronary heart disease in men.  N Engl J Med 347:1755-1760.

APPENDIX D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-1

NORMALIZATION OF MERCURY IN FISH TISSUE SAMPLES . . . . . . . . . . . . . . . . . . . . D-1
    D.1    Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-1
            D.1.1  National Descriptive Model of Mercury in Fish (NDMMF) . . . . . . . . D-1
    D.2    General Examination of Model Performance . . . . . . . . . . . . . . . . . . . . . . . . D-2
            D.2.1  NDMMF Estimated Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-2
            D.2.2  Accuracy of NDMMF Estimated Values . . . . . . . . . . . . . . . . . . . . . D-3
            D.2.3  Spatial Examination of Model Performance . . . . . . . . . . . . . . . . . . . D-5
            D.2.4  Predictive Examination of Model Performance (Withheld Data Set) . D-6
    D.3    References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-9

**Tables**
Table D-1.  Statistical Distribution of Residuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-3
Table D-2.  Differences between the Performance of Lake and River Samples Used as Inputs
               into the NDMMF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-5
Table D-3.  Statistical Distribution of Residuals from Withheld Data Set . . . . . . . . . . . . . . D-7

**Figures**
Figure D-1.  Box and Whisker Plots of the NLFWA Observed, NDMMF Estimated, and
               Residuals Measurements in ppm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-3
Figure D-2.  Scatterplot of Predicted vs. Observed Measurements . . . . . . . . . . . . . . . . . . . . D-4
Figure D-3.  Scatterplot of Residual vs. Observed Measurements . . . . . . . . . . . . . . . . . . . . D-4
Figure D-4.  Locations of Withheld Observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-7
Figure D-5.  Box and Whisker Plots of Observed, Predicted, and Residual (Error) Distributions
               for the Withheld Data Set . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-8
Figure D-6.  Scatterplot of Predicted vs. Observed Measurements . . . . . . . . . . . . . . . . . . . . D-8
Figure D-7.  Scatterplot of Residual vs. Observed Measurements . . . . . . . . . . . . . . . . . . . . D-9

# APPENDIX D

# NORMALIZATION OF MERCURY IN FISH TISSUE SAMPLES

This section of the appendix provides a detailed description of the procedures used to normalize the fish tissue data discussed in Section 5 using the National Descriptive Model of Mercury in Fish (NDMMF). We also provide a general examination of model performance. It should be noted that the examination of model performance is based on a normalization of the NLFA data for the years 1990 to 2002. The validation demonstrates that the NDMMF performs well with this set of data. Additional data recently became available for the year 2003 for the NLFA and for the first two years of the NLFTS after the validation was conducted. Therefore, EPA updated the normalization with the new data for application in the final benefit analysis presented in Section 10.

## D.1    Methods

### D.1.1    *National Descriptive Model of Mercury in Fish (NDMMF)*

The United States Geological Survey developed a procedure called the National Descriptive Model of Mercury and Fish Tissue (NDMMF) (Wente 2004). The NDMMF model provides a translation factor to convert a mercury concentration taken from one species/size/sample method to an estimated concentration for any other user pre-defined species/size/sample method. The model provides species/size/sample estimates for each sampling site and year. New concentrations can only be estimated by the NDMMF if at least one sample has already been taken at a particular location. In other words, predictions can only be made for locations and dates where at least one sample has already been recorded.

The NDMMF is a statistical model related to covariance. The model is designed to allow the prediction of different species, cuts, and lengths of fish for sampling events, even when those species/lengths/cuts of fish were not sampled during those sampling events.

The NDMMF models mercury concentration as a power function of fish length, i.e., $y = ax^b$, where $y$ = mercury concentration, $x$ = length, and a,b are parameters. Potentially, that could be done for each species at each site, but the data are far too sparse for that, and, further, he wanted to devise some way to predict mercury concentrations for a species that was not even collected at some given site. So, the assumptions are made that: (i) a universal, national value of "b" for each tissue type from each fish species, and (ii) the value of "a" at a given site at a given time is the same for all species. Thus a prediction of mercury concentration for a given tissue from a fish of an arbitrary species of length x could then be predicted by "looking up" the right value of "b" for that species and tissue and the value of "a" for that site and time. The following is the SAS code used to implement the NDMMF.

```
data Hg.nlfwaStepTwo (keep = rec dl hg leng spc event upper lower llength);
set Hg.nlfwaStepOne;
rec = rec;
dl = dl;
hg = hg;
leng = leng;
spc = spc;
event = event;
upper = log(hg*1000+1);
if DL = 1 then lower = .; else lower = upper;
if Leng > 0 then llength = log(leng+1); else delete;
run;

proc lifereg noprint data=Hg.nlfwaStepTwo outest=Hg.b6;
     Class SPC Event;
     Model (lower, upper) = SPC*Llength Event/ d=normal noint;
     output out=Hg.Mod6Pred p=pred6;
run;
quit;
```

_Code filename and variable Definitions:_
Hg.nlfwaStepOne is the data filename

| | | |
|---|---|---|
| rec | = | unique ID for each input record; |
| dl | = | if dl = 1 then the sampled MeHg was below detection limits; |
| hg | = | Sampled MeHg; |
| leng | = | length of the sampled fish; |
| spc | = | unique code for every unique species/sample method combination starting with 1 and ending at n where n = number of unique combinations; and |
| event | = | unique code for every unique location/date combination starting with 1 and ending at n where n = number of unique combinations. |

## D.2    General Examination of Model Performance

### D.2.1  NDMMF Estimated Values

The 2002 NLFA was cleaned and subset according to the methods described in chapter 5 and used to calibrate the NDMMF. The output slopes and intercepts were then used to estimate every observation that was an input to the model calibration. Thus, for this section, an input of a whole 3 in. chub sampled from waterbody A on January 1, 1992 is re-predicted using the NDMMF as a whole 3 in. chub sampled from waterbody A on January 1, 1992.

The input observed data characteristics and estimated NDMMF data characteristics are very similar. The mean fish tissue concentration of the observed input data set was a 0.39, and the mean of the NDMMF estimated fish tissue concentration was 0.36. The range changed from 0 to 9 ppm, to an NDMMF estimated 0 to 5 ppm. Hg fish tissue concentration. The standard deviation of the observed data was 0.4. The standard deviation of the estimated data was 0.36. Figure D-1 graphically depicts the characteristics of the observed and NDMMF estimated data through the use of box and whisker plots. These results include censored values (where input concentrations were below detection limits).

### D.2.2  Accuracy of NDMMF Estimated Values

The NDMMF was used to estimate every observation that was entered into the model. The estimated concentrations are then compared with the observed data inputs to obtain residuals (estimated − observed = residual).  Table D-1 details the statistical distribution of these residuals and compares them to the observed data.  Figure D-2 graphically displays the distribution of the observed, NDMMF estimated, and residual values in box and whisker plots.  The red x indicates the mean of the distributions.  Boxes are drawn around the 75th and 25th percentiles.  The ends of the whiskers are drawn at the minimum and maximum values.  Figures D-3 and D-4 are scatter plots of observed, predicted, and residual values.

**Table D-1.  Statistical Distribution of Residuals**

|  | NLFA Observed Data | NDMMF Estimated | Mean of Residual (Error) |
|---|---|---|---|
| Mean | 0.39 | 0.36 | −0.02 |
| Min | 0 | 0 | −4.80 |
| Max | 8.9 | 5.3 | 4.8 |
| Std. Dev. | 0.42 | 0.36 | 0.2 |



**Figure D-1.  Box and Whisker Plots of the NLFWA Observed, NDMMF Estimated, and Residuals Measurements in ppm**



**Figure D-2. Scatterplot of Predicted vs. Observed Measurements**



**Figure D-3. Scatterplot of Residual vs. Observed Measurements**

The box and whisker plots indicate that the distribution of the predicted data is a little narrower than the observed data.  In both cases there are extreme high-end outliers.  The distribution of the residuals from the NDMMF is centered around zero.  The whiskers do indicate that there are some outliers within the residual data.

The average residual value of -0.02 is relatively small and we believe this indicates a fairly even mix between over and under predictions.  The residual standard deviation of 0.2 indicates that most of the predictions are within 0.2 ppm. of the observed value.  0.2 ppm. is 51 percent of the mean fish tissue concentration.  Figure D-4 indicates a systematic underestimation of higher values.

### D.2.3    Spatial Examination of Model Performance

#### D.2.3.1  Accuracy Differences Between Lake and River Environments

The samples found within the NLFA, and used as inputs into the NDMMF, were taken from over 4,000 different locations across the U.S.  These sample locations range in ecological character from Florida lakes to Wisconsin rivers.

The type of waterbody sampled was not recorded in the NLFA.  To estimate the type of waterbody samples originated from, the distance to the nearest lake and nearest flowing water source was determined within a Geographic Information System (GIS).  The shortest distance source waterbody type was assigned to each geocoded sample point.  Approximately 1/3 of the observations in the NLFA were assigned a "lake" source type, and 2/3 were assigned "river" source type.

To examine if there is a difference in the performance or accuracy of estimates between observations originating from these two different types of sources, the observed concentrations, estimated concentrations, and residuals are reported by source type in Table D-2 below.

**Table D-2.  Differences between the Performance of Lake and River Samples Used as Inputs into the NDMMF**

|  |  | Observed | NDMMF Estimated | Residual |
|---|---|---|---|---|
| Lake |  |  |  |  |
|  | Mean | 0.36 | 0.33 | −0.02 |
|  | Min | 0 | 0 | −3.64 |
|  | Max | 5.7 | 2.8 | 1.16 |
|  | Std. Dev. | 0.36 | 0.3 | 0.18 |
| River |  |  |  |  |
|  | Mean | 0.4 | 0.38 | −0.02 |
|  | Min | 0 | 0 | −4.76 |
|  | Max | 8.9 | 5.3 | 4.79 |
|  | Std. Dev. | 0.45 | 0.39 | 0.22 |

An examination of the residuals shows that the NDMMF performs very similarly for lake and river source type predictions of Hg fish tissue concentrations. Any variability in model performance is not attributable to differences between rivers and lakes.

### D.2.4   Predictive Examination of Model Performance (Withheld Data Set)

The examination of residuals where the prediction fish type is equal to the observed sample fish type is useful for evaluative purposes, but does not exactly parallel the planned future application of the NDMMF for data preparation for benefits analysis. To calculate benefits from Hg fish tissue samples, where the method of exposure is consumption, we must have either observations, or predictions, of Hg fish tissue concentrations found in consumable fish. For this reason, the NDMMF will be used to predict concentrations for fish types (species, length, sample method) that may not be equal to the observed sample fish type.

For example, if a 5 in. sunfish were sampled using a whole fish sample method, the NDMMF may be used to predict what the Hg fish tissue concentration would have been had the sample been taken from the fillet of an 11 in. bass. In this case, and in the application of the NDMMF for benefits analysis, the prediction fish type is not the same as the observed sample fish type.

To examine the NDMMF's performance within the context of its application for benefits analysis, where the observed and estimated fish types are likely to be different, a subset of the data (approximately 10 percent) was withheld to use as a validation dataset. The NDMMF was then implemented utilizing the remaining observations as a training dataset. The output slopes and parameter estimates were then used to predict the Hg fish tissue concentrations of the withheld data set. Figure D-4 shows the spatial distribution of withheld data observations.[1]

---

[1]Lack of observations throughout Pennsylvania, Kentucky, West Virginia, Tennessee, Ohio, Virginia, Kansas, and Missouri reflect to a lack of input observations in those states into the NDMMF. Filters (described in detail in chapter 5) for the most part removed these observations because no fish length or weight were recorded with the Hg concentration.



**Figure D-4.  Locations of Withheld Observations**

The mean fish tissue concentration of the observed withheld data was 0.38 ppm.  The mean predicted fish tissue concentration for the same withheld observations was 0.35 ppm.  The range changed from 0 to 3.9 to 0 to 4.25.  The standard deviation of the fish tissue concentrations of the withheld observed data concentrations was 0.41.  The predicted concentration standard deviation was a 0.37.  Table D-3 details the statistical distribution of the observed predicted data, and the residuals.  Figure D-5 graphically depicts the characteristics of the withheld observed and predicted concentrations and the residuals.  Figures D-6 and D-7 are scatterplots of predicted and residual measurements vs. observed measurements for the withheld data.

**Table D-3.  Statistical Distribution of Residuals from Withheld Data Set**

|  | NLFA Observed Data | NDMMF Estimated | Residual |
|---|---|---|---|
| Mean | 0.39 | 0.35 | −0.03 |
| Min | 0 | 0 | −2.14 |
| Max | 3.9 | 4.25 | 3.05 |
| Std. Dev. | 0.41 | 0.37 | 0.24 |



**Figure D-5.  Box and Whisker Plots of Observed, Predicted, and Residual (Error) Distributions for the Withheld Data Set**



**Figure D-6.  Scatterplot of Predicted vs. Observed Measurements**



**Figure D-7.  Scatterplot of Residual vs. Observed Measurements**

An analysis of the residuals from the withheld predicted data set shows that the average residual is –0.03 ppm. fish tissue concentration.  EPA believes the closeness of the average residual to the mean, the visual analysis of the box and whisker plot, and the scatterplot of residual vs. observed measures, indicate that the model is neither systematically under or over-predicting the majority of the data.  There is a slight under-prediction of higher values; however EPA believes it is small enough, and the observations are few enough, to be acceptable for benefits analysis.  The range of individual observation prediction error is from –2.14 (an under-prediction) to 3.05 (an over-prediction).  A residual standard deviation of 0.24 (62 percent of mean observed concentration) indicates that a large portion of the observations were predicted to within 0.24 ppm. fish tissue concentration.

It is evident that there are many issues surrounding the NLFA and sample selection, and how that influences the outputs of the NDMMF.  Even given these less than ideal input data circumstances, EPA believes the NDMMF adds significantly to the value of a benefits analysis by generating a reasonably accurate estimate of Hg fish tissue concentrations from consumable fish too small for consumption or of a species not typically targeted by anglers.  This enables the more complete use of the NLFA data set and allows EPA to generate benefit estimates for a larger portion of the population.

## D.3     References

Wente, S.P.  2004.  A Statistical Model and National Data Set for Partitioning Fish-Tissue Mercury Concentration Variation between Spatiotemporal and Sample Characteristic Effects:  U.S. Geological Survey Scientific Investigations Report 2004-5199

APPENDIX E-1        ANALYSIS OF TRIP TRAVEL DISTANCE FOR FRESHWATER
                   ANGLERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E1-1
E1.1    Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E1-1
E1.2    Analysis of Travel Distance Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E1-2
E1.3    Summary Results Applied in the Population Centroid Approach . . . . . . . . . E1-4

APPENDIX E-2        METHODOLOGY FOR ESTIMATING FRESHWATER FISHING
                   DAYS BY WATERSHED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E2-1
E-2.1   Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E2-1

**Tables**
Table E1-1.  Reported Trip Travel Distance for Freshwater Anglers (miles) . . . . . . . . . . . . E1-2
Table E1-2.  Demographic Characteristics of Freshwater Anglers[a] . . . . . . . . . . . . . . . . . . . E1-3
Table E1-3.  Demographic Characteristics of Freshwater Anglers . . . . . . . . . . . . . . . . . . . . . E1-3
       Table E1-4.  OLS Regression Results for Determinants of Reported Trip Travel
Distance (miles) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E1-5
Table E1-5.  Travel Distance Frequencies by Demographic Group (Percentage in each Distance
       Category) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E1-6
Table E2-1.  Frequency Distributions for HUC Level-of Use Indicators . . . . . . . . . . . . . . . E2-4
Table E2-2.  Variable Definitions and Descriptive Statistics . . . . . . . . . . . . . . . . . . . . . . . E2-5
Table E2-3.  Estimated Determinants of HUC Level-of-Use Indicators for Lake Trips:  Negative
       Binomial Regressions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E2-6
Table E2-4.  Estimated Determinants of HUC Level-of-Use Indicators for River Trips:  Negative
       Binomial Regressions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E2-7
Table E2-5.  Predicted Level-of-Use Indicators for HUCs in Study Area:  Negative Binomial
       Regression Model Predictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E2-8

**Figures**
Figure E2-1.  U.S. Hydrologic Regions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E2-2

APPENDIX E-1

**ANALYSIS OF TRIP TRAVEL DISTANCE FOR FRESHWATER ANGLERS**

As described in Section 10.1.2, using the population centroid approach to estimate exposures to mercury in freshwater fish requires information about how far individuals typically travel for freshwater fishing. This appendix describes the data and methods used to analyze travel distance patterns by freshwater anglers, and it reports the results that were used in applying the population centroid approach.

**E1.1   Data**

To conduct an analysis of trip travel distance for freshwater anglers, we used data from the NSRE 1994. As described previously, this 16,000-person survey elicited information on water-based recreation activities—specifically boating, fishing, swimming, and wildlife viewing—during the previous year. Respondents were asked about *their most recent trip* taken in each of the four categories. Of particular interest to this analysis is data concerning fishing trip characteristics for all respondents who fished in freshwater bodies during the previous year. Of the 3,220 respondents who had reported fishing, 2,482 visited either a lake, pond, river, or stream on their most recent trip.

The fishing module elicited location information about most recent fishing trip taken during the preceding 12 months. This trip was recorded as either a single- or multiday trip to a specific water body ("site") identified by the respondent. Subsequently, a series of questions were asked to gather location data on the specific site visited, including the site name, the state in which the site was located, and the name of the city or town nearest the site. To identify potential determinants of travel distance for a freshwater fishing trip, we analyzed the 2,384 available responses to the following survey question: "What was the one way travel distance, in miles from your home, to your destination on *site*?" Table E1-1 presents summary statistics for travel distance, which are reported separately for single-day, multiday, and aggregated trips. As would be expected, median travel distance varied according to trip type, from 20 miles for a single-day trip to almost 140 miles for a multiday trip. Across both trip types, the average travel distance was slightly under 100 miles.

**Table E1-1.  Reported Trip Travel Distance for Freshwater Anglers (miles)**

|  | N | Min[a] | P5 | P25 | P50 | Mean | P75 | P95 | Max |
|---|---|---|---|---|---|---|---|---|---|
| All trip types | 2384[b] | 0 | 2 | 10 | 20 | 91.9 | 45 | 125 | 3000 |
| Single-day trips only | 1791 | 0 | 2 | 10 | 20 | 41 | 45 | 125 | 1100 |
| Multiday trips only | 586 | 3 | 18 | 70 | 138 | 248.2 | 300 | 850 | 3000 |

[a]   Seven respondents reported traveling 0 miles for their most recent trip; all were described as single-day trips.
[b]   Seven respondents did not report whether trip was single-day or multiday.
Note:   Ninety-eight respondents who visited freshwater bodies on their most recent fishing trip did not report the travel distance.

## E1.2    Analysis of Travel Distance Data

The influence of multiple demographic characteristics on travel distance was tested using multivariate regression analysis.  Table E1-2 reports descriptive statistics for the anglers included in this analysis.  As indicated by the table, over 90 percent of the sample is white; males comprise a higher percentage of the sample (62 percent) than females.  More than half the sample had completed at least some college and three-fourths of the sample reported being employed.  The survey asked respondents to classify their place of residence as either rural, suburban, or urban.  Approximately 40 percent described their area as rural, 37 percent as suburban, and 23 percent as urban.  Respondents were assigned to a U.S. Census geographic region by matching their zip code to a corresponding state.  The states were then aggregated to the appropriate Census region (http://www.census.gov/geo/www/us_regdiv.pdf).  The majority of respondents resided in the South and Midwest, followed by the West and Northeast.

Table E1-3 presents additional characteristics on the demographic distribution of the sample.  The average age of respondents was 38 years, while household size averaged approximately three members, with fewer than one person under the age of six.  Respondents' average weekly leisure time was 28 hours.  However, this varied significantly across the sample, from zero to 168 hours.  In the survey, family income is reported as a categorical variable, with respondents selecting the income range that reflected family income in the previous year.  The midpoint of this range was taken to produce a continuous income variable.  Subsequently, this value was converted to (2000$) using the consumer price index.  Median (mean) income was estimated to be $57,325 ($66,496) annually.

**Table E1-2.  Demographic Characteristics of Freshwater Anglers[a]**

|  | N | Frequency |
|---|---|---|
| Gender | 2267 | 62% Male |
| Race | 2250 | 91% White |
|  |  | 4% Black |
|  |  | 2% Hispanic |
|  |  | 2% Other |
| Education | 2262 | 11% Less than high school degree |
|  |  | 34% High school degree/equivalent |
|  |  | 55% Some college or more |
| Work status | 2263 | 75% Employed |
| Geography | 2237 | 23% Urban |
|  |  | 37% Suburban |
|  |  | 41% Rural |
| Region | 2205 | 13% Northeast |
|  |  | 33% South |
|  |  | 31% Midwest |
|  |  | 23% West |

[a]  In total, 2,384 respondents reported information on trip travel distance to a freshwater destination.
Note:  Values may not add to 100 percent due to rounding.

**Table E1-3.  Demographic Characteristics of Freshwater Anglers**

|  | N | Mean | SD | Min | Max |
|---|---|---|---|---|---|
| Age | 2245 | 38.4 | 14.5 | 16 | 92 |
| Household size | 2255 | 3.1 | 1.5 | 1 | 10 |
|    Persons $\leq 6$ yrs | 2270 | 0.3 | 0.7 | 1 | 5 |
|    Persons $\geq 16$ yrs | 2254 | 2.2 | 0.9 | 0 | 7 |
| Weekly leisure time (hrs) | 2025 | 27.7 | 23.9 | 0 | 168 |
| Family income (2000$) | 1851 | 66496 | 57324 | 8938 | 208547 |

Multivariate regression analysis was used to identify determinants of travel distance to freshwater fishing sites. The dependent variable in this analysis was the miles traveled to the most recent freshwater fishing site. The explanatory variables included several demographic and geographic characteristics of the respondents.

Separate regressions were conducted for the full sample (1), single-day trips only (2), and multiday trips only (3). The results are reported in Table E1-4. Family income was estimated to have a positive and highly significant effect in all three models. Dummy variables for urban and suburban location were also found to have positive and highly significant effects in all models. These results suggest that wealthier anglers and those living in or near metropolitan areas tend to travel further to fishing sites, relative to less-wealthy anglers and those living in rural areas. In models (1) and (2) dummy variables for the Midwest and West regions also had positive and highly significant effects on trip travel distance, relative to the South region. The Northeast region did not have a statistically significant effect on distance traveled. Education was estimated to be positively and significantly related to distance traveled in the first and second models. (Note that the respondent's level of education, recorded in the survey as a categorical variable, was recoded as a continuous variable for the regression analysis.) Neither age, race, nor gender had significant effects (at a 5 percent level) on travel distance in any of the models.

### E1.3   Summary Results Applied in the Population Centroid Approach

Given the high significance of geographic area and family income across the regressions, nonparametric results (frequency distributions) were generated for four mutually exclusive subgroups of respondents and five travel distance categories. The result are reported in Table E1-5. Respondents were categorized into the four following groups:

- G1: family income $\geq$$50,000 (in 2000 dollars) and urban or suburban resident
  - (N = 452 for single-day trips)
  - (N = 649 for single- and multiday trips)
- G2: family income $\leq$$50,000 and urban or suburban resident
  - (N = 329 for single-day trips)
  - (N = 417 for single- and multiday trips)
- G3: family income $\geq$$50,000 and rural resident
  - (N = 295 for single-day trips
  - (N = 376 for single- and multiday trips)
- G4: family income $\leq$$50,000 and rural resident
  - (N = 309 for single-day trips)
  - (N = 386 for single- and multiday trips)

**Table E1-4. OLS Regression Results for Determinants of Reported Trip Travel Distance (miles)**

| Variable Description | (1) Full Sample (both single- and multiday trips) | | (2) Single-Day Trips Only | | (3) Multiday Trips Only | |
|---|---|---|---|---|---|---|
| | Coefficient | t-stat | Coefficient | t-stat | Coefficient | t-stat |
| CONSTANT | 0.6966 | 1.54 | 1.7954 | 3.89** | 2.2493 | 3.26** |
| AGE | 0.0044 | 1.83* | 0.0011 | 0.44 | 0.001 | 0.28 |
| GENDER | 0.0572 | 0.83 | 0.0173 | 0.25 | 0.1446 | 1.39 |
| EDUC | 0.1729 | 2.48** | 0.1552 | 2.21** | 0.128 | 1.22 |
| MINORITY | −0.0437 | −0.36 | 0.0228 | 0.19 | −0.1391 | −0.76 |
| FAMILY INCOME (log) | 0.187 | 4.41** | 0.0827 | 1.92* | 0.1759 | 2.78** |
| URBAN | 0.3491 | 3.95** | 0.2799 | 3.12** | 0.2121 | 1.62* |
| SUBURBAN | 0.3422 | 4.48** | 0.193 | 2.50** | 0.4298 | 3.67** |
| NEAST | −0.0387 | −0.36 | −0.2549 | −2.42** | 0.1525 | 0.89 |
| MIDWEST | 0.3856 | 4.65** | 0.1 | 1.21 | 0.4923 | 3.63** |
| WEST | 0.6103 | 6.73** | 0.3374 | 3.59** | 0.3239 | 2.32** |
| | $R^2 = 0.077$ | | $R^2 = 0.041$ | | $R^2 = 0.112$ | |
| | N = 1,798 | | N = 1,360 | | N = 434 | |

** = significant at 5 percent level.
*  = significant at 10 percent level.

**Table E1-5.  Travel Distance Frequencies by Demographic Group (Percentage in each Distance Category)**

| Travel Distance (mi) | (G1) High-Income and Urban/Suburban Resident | (G2) Low-Income and Urban/Suburban Resident | (G3) High-Income and Rural Resident | (G4) Low-Income and Rural Resident |
|---|---|---|---|---|
| Single-day trips only (N = 1,385) | | | | |
| N | (N = 452) | (N = 329) | (N = 295) | (N = 309) |
| Distance ≤10 mi | 23% | 32% | 31% | 34% |
| >10 mi to 20 mi | 18% | 23% | 22% | 24% |
| >20 mi to 50 mi | 31% | 20% | 28% | 26% |
| >50 mi to 100 mi | 17% | 19% | 14% | 11% |
| Distance >100 mi | 11% | 6% | 5% | 5% |
| Full sample (both single- and multiday trips) (N = 1,828) | | | | |
| N | (N = 649) | (N = 417) | (N = 376) | (N = 386) |
| Distance ≤10 mi | 16% | 26% | 24% | 29% |
| >10 mi to 20 mi | 13% | 18% | 18% | 21% |
| >20 mi to 50 mi | 24% | 18% | 25% | 25% |
| >50 mi to 100 mi | 19% | 19% | 16% | 14% |
| Distance >100 mi | 27% | 18% | 17% | 11% |

These categories were selected because they match categories that can be easily identified in Census data and because they split the sample into roughly similar group sizes. Travel distance was categorized into ranges reported in the first column of Table E1-5.  The results are consistent with those generated from the regression analysis.  Among respondents on single-day trips, the number that traveled longer distances (greater than 100 miles) increased from the low-income rural cohort (5 percent) to the higher-income urban/suburban cohort (11 percent).  The same pattern holds for those taking either a single- or multiday trip.  The number traveling longer distances more than doubled, from 11 percent among low-income rural respondents to 27 percent among high-income urban/suburban respondents.  These results indicate higher-income urban/suburban anglers travel greater distances to freshwater destinations than lower-income urban/suburban anglers and rural anglers.

As described in Section 10.1.2, the trip frequency estimates reported in Table E1-5 for the full sample were used in the population centroid approach to weight exposures to mercury in fish according to distance from the Census Block Group centroid, income levels in the Block Group, and whether the Block Group is predominantly rural or urban/suburban.

## APPENDIX E-2

## METHODOLOGY FOR ESTIMATING FRESHWATER FISHING DAYS BY WATERSHED

This appendix describes how data from the NSRE and NSFHWR were used in our analysis to develop HUC-level approximations of fishing activity.  These methods were developed specifically to support the angler destination approach described in **Section 10.1.2** for estimating the size of exposed populations to mercury in freshwater fish.

As reported in Table 10-4, the NSFHWR provides estimates of the total number of lake- and river-fishing days *by state* (in 2001 for both resident and nonresident anglers).  These state-level estimates are informative for estimating exposures through fish consumption, but they are limited by a low degree of spatial resolution.  Particularly within larger states, there is likely to be considerable geographic variation in angler activity.  Accounting for this variation should improve estimates of mercury exposures by anglers.  Unfortunately, data comparable to the NSFHWR are not available for smaller or more homogeneous geographic units.

This appendix describes an empirically based method for distributing state-level estimates of fishing activity from the NSFHWR to the eight-digit HUCs within their boundaries.  This distribution method takes into account the varying attributes across watersheds, which make them more or less likely to attract anglers.  Using this approach we estimated lake- and river-fishing days for the 1,362 HUCs located in our 37-state study area.  These HUCs range in size from 0.02 to 7,939 square miles, with an average (median) of 1,353 (1,186) square miles.

### E-2.1  Data

To supplement the NSFHWR, the primary source of data for this analysis is the NSRE 1994.  Anglers responding to NSRE 1994 provided detailed information regarding their last fishing trip, including where the fishing site was located and the number of times they visited the site over the previous year.  The fishing site locations have been geocoded to identify the HUC corresponding to each trip.  There are 2,111 identified HUCs in the continental United States, which are grouped into 18 regional "hydrologic units."  Figure E2-1 shows the boundaries for hydrologic units in the United States.



**Figure E2-1.  U.S. Hydrologic Regions**
Source:  U.S. Geological Survey.  Hydrologic Unit Maps.  Last update February 17, 1999, accessed March 31, 1999.
     <http://water.usgs.gov/public/GIS/huc.html>.

In addition to detailed information about last fishing trip destinations, NSRE 1994 contains information on the type of waterbody visited on the last trip.  Waterbodies are broken down into four categories:  lakes, rivers and streams, wetlands, and coastal areas.  Of the 3,247 respondents who had fished in the continental United States in the previous year, 1,812 indicated that their last trip was to a lake, 694 to a river or stream, 5 to a wetland, and 598 to a coastal area.  (Type of waterbody visited was not available for 141 responses.)  Specific reach numbers, which include the HUC identifier, were able to be identified for 1,758 of the 2,506 noncoastal (i.e., freshwater) destinations.  For example, none of the 123 trips to hydroregion 17 (Pacific Northwest) were able to be assigned a reach index, because the reach indexing system does not include this region.

After selecting only the freshwater fishing destinations from the NSRE, we grouped them by HUC.  Using the freshwater last-trip destination information, we then constructed four "level-of-use" indicators.  For each HUC, the first and second indicators (RESP_COUNT_LAKE and RESP_COUNT_RIV) are equal to the number of *respondents* in the survey who reported the HUC as their last-trip destination for lake and river fishing, respectively.  The third and fourth indicators (TRIP_COUNT_LAKE and TRIP_COUNT_RIV) are equal to the total number of *trips* taken by respondents in the previous year to their last visited site, when this site was in the HUC.  In all four cases, the observed trip frequency from the NSRE sample is taken as an indicator of aggregate visitation to each HUC.

Table E2-1 reports frequency distributions for these four indicators across 1,892 HUCs (excluding hydroregion 17).  In all four cases, the number of HUCs in each level-of-use category gradually declines as the level-of-use indicator increases, which is broadly consistent with a Poisson/negative binomial distribution for this indicator.

To examine whether these level-of-use indicators are systematically related to other HUC-level characteristic, we use GIS along with geographic, Census, and EPA Reach File 3 data to create several HUC-level variables.  Summary statistics and descriptions of these variables are provided in Table E2-2.  These variables include continuous measures of the size of each HUC, the number of reach miles in each HUC (lake and river), and populations within 25 and 50 miles of the HUC centroid.  All of these measures are expected to have a positive effect on level of use.  We also included categorical variables to indicate whether a HUC is located along the coast, whether it is located along one of the Great Lakes, and which hydroregion it falls in.

To analyze the relationship between the HUC level-of-use indicators and these HUC-level characteristics, we used negative binomial regression analysis.  The negative binomial is a variant of the Poisson count model.  Using a simple Poisson regression model, we would assume that the probability of observing a given count (nonnegative integer value $t_h$) at HUC $h$ for one of the lake or river level-of-use indicators ($T_{lh}$ or $T_{rh}$) can be expressed as

$$\Pr(T_{ih} = t_h) = \frac{\exp(-\exp(\beta_i X_h))(\exp(\beta_i X_h)^{t_h}}{t_h!}$$

for i= r, l                                                                                            (E2.1)

**Table E2-1.  Frequency Distributions for HUC Level-of Use Indicators**

| Lake Trip Counts | | River Trip Counts | |
|---|---|---|---|
| RESP_COUNT_LAKE | Number of HUCs | RESP_COUNT_RIV | Number of HUCs |
| 0 | 1310 | 0 | 1554 |
| 1 | 317 | 1 | 234 |
| 2 | 112 | 2 | 61 |
| 3 | 64 | 3 | 32 |
| 4 | 39 | 4 | 6 |
| 5 | 20 | 5 | 4 |
| 6 | 12 | 6 | 0 |
| 7 | 4 | 7 | 1 |
| 8 | 4 | 8 | 0 |
| 9 | 2 | 9 | 0 |
| 10+ | 8 | 10+ | 0 |
| Total | 1892 | Total | 1892 |
| TRIP_COUNT_LAKE | Number of HUCs | TRIP_COUNT_RIV | Number of HUCs |
| 0 | 1312 | 0 | 1555 |
| 1 | 93 | 1 | 52 |
| 2 | 66 | 2 | 47 |
| 3 | 57 | 3 | 33 |
| 4 | 37 | 4 | 26 |
| 5 | 43 | 5 | 21 |
| 6 | 34 | 6 | 27 |
| 7 | 17 | 7 | 10 |
| 8 | 20 | 8 | 7 |
| 9 | 20 | 9 | 2 |
| 10 | 15 | 10 | 11 |
| 11–20 | 80 | 11–20 | 48 |
| 21–50 | 76 | 21–50 | 33 |
| 51–100 | 15 | 51–100 | 13 |
| 100+ | 7 | 100+ | 7 |
| Total | 1892 | Total | 1892 |

**Table E2-2.  Variable Definitions and Descriptive Statistics**

| Variables | Definitions | Mean | Standard Deviation |
|---|---|---|---|
| LAKEMILES | Number of lake shore miles (RF3) | 90.87 | 153.17 |
| RIVERMILES | Number of river/stream miles (RF3) | 499.82 | 542.92 |
| POP0_25 | Population within 25 miles of HUC centroid (2000 Census) | 197350 | 593910 |
| POP25_50 | Population between 25 and 50 miles of HUC centroid (2000 Census) | 566266 | 1121439 |
| HUCAREA | Surface area of the HUC (thousand square miles) | 1.429 | 0.892 |
| COASTHUC | =1 if HUC is located adjacent to the coast | 0.1317 | 0.3382 |
| GLAKEHUC | =1 if HUC is located adjacent to a Great Lake | 0.0375 | 0.1899 |
| H1-H18 | Hydrologic region dummy variables | — | — |

where $X_h$ represents a vector of HUC-level characteristics and $\beta_i$ represents a corresponding vector of coefficients.  The Poisson specification assumes that the mean and variance of the distribution are the same.  In contrast, the negative binomial allows the variance to differ and therefore includes an additional parameter ($\alpha$), which is referred to as the overdispersion parameter.  The coefficient vectors are estimated using maximum likelihood methods and are represented as $\left( \hat{\beta}_1 , \hat{\alpha}_1 \right)$ and $\left( \hat{\beta}_r , \hat{\alpha}_r \right)$.

The regression results are reported in Table E2-3 for lake trips and Table E2-4 for river trips.[1]  For lake use (both respondent- and trip-level indicators), as expected, the number of lake miles, size of proximate populations, geographic size, and Great Lakes proximity all have a positive and statistically significant (at a 10 percent level) effect.[2]  Proximity to the coast has a negative and significant effect.  For both river-use indicators, the number of river miles, size of population within 25 miles, and geographic size had positive and significant effects.  For the

---

[1]The variable listed in the tables but not included in the regression results were found to be jointly not significantly different from zero (at a 5 percent level) in previous regressions.

[2]The lake mile and population variables were included in logarithmic form because their distributions are heavily skewed to the right.

**Table E2-3. Estimated Determinants of HUC Level-of-Use Indicators for Lake Trips: Negative Binomial Regressions**

| | Dependent Variable: | | | |
|---|---|---|---|---|
| | RESP_COUNT_LAKE | | TRIP_COUNT_LAKE | |
| Explanatory Variables | Coefficient | Standard Error | Coefficient | Standard Error |
| Log(LAKEMILES) | 0.6339** | 0.0426 | 0.7506** | 0.0688 |
| Log(POP0_25) | 0.1517** | 0.0429 | 0.1730* | 0.0735 |
| Log(POP25_50) | 0.2317** | 0.0535 | 0.3290** | 0.0839 |
| HUCAREA | 0.0979* | 0.0528 | 0.2584* | 0.094 |
| COASTHUC | −0.6371** | 0.1291 | −1.2226** | 0.2531 |
| GLAKEHUC | 1.5940** | 0.1626 | 2.3050** | 0.4281 |
| H1 | — | — | 1.1766* | 0.5855 |
| H2 | — | — | 1.2429* | 0.5495 |
| H3 | -0.5832** | 0.1699 | 0.9615* | 0.5495 |
| H4 | — | — | 0.9022 | 0.5717 |
| H5 | — | — | 1.3917** | 0.5349 |
| H6 | — | — | 0.9678* | 0.5556 |
| H7 | — | — | 0.8245* | 0.4998 |
| H8 | 2.0139** | 0.2983 | 4.3948** | 0.6842 |
| H10 | — | — | 1.1988* | 0.5169 |
| H11 | — | — | 1.2947* | 0.5098 |
| H12 | — | — | 0.8991 | 0.5606 |
| H13 | — | — | 1.6459* | 0.5556 |
| H14 | 0.8110** | 0.2377 | 1.1379* | 0.4991 |
| H15 | 1.0561** | 0.308 | 2.0487* | 0.6292 |
| H16 | — | — | 1.0613 | 0.736 |
| H18 | 1.0318** | 0.205 | 2.8459** | 0.5889 |
| CONSTANT | −8.1065** | 0.4529 | −9.8803 | 1.0189 |
| alpha | 0.7761 | 0.1039 | 1.7149 | 0.064 |
| N | 1884 | | 1884 | |
| Pseudo R2 | 0.1735 | | 0.0737 | |

** Significant at 1 percent level.
* Significant at 10 percent level.

**Table E2-4.  Estimated Determinants of HUC Level-of-Use Indicators for River Trips: Negative Binomial Regressions**

| Explanatory Variables | RESP_COUNT_RIV | | TRIP_COUNT_RIV | |
| --- | --- | --- | --- | --- |
| | Coefficient | Standard Error | Coefficient | Standard Error |
| Log(RIVERMILES) | 0.6265** | 0.1123 | 0.5258** | 0.1483 |
| Log(POP0_25) | 0.1371* | 0.6511 | 0.4723** | 0.0749 |
| Log(POP25_50) | 0.1519* | 0.0802 | — | — |
| HUCAREA | 0.2977** | 0.073 | 0.4323* | 0.146 |
| COASTHUC | 0.2354* | 0.1426 | — | — |
| GLAKEHUC | 0.6069* | 0.2665 | — | — |
| H1 | — | — | — | — |
| H2 | 0.6038** | 0.1841 | 0.7030* | 0.3049 |
| H3 | — | — | 0.5763* | 0.33 |
| H4 | — | — | — | — |
| H5 | — | — | 0.6736* | 0.3231 |
| H6 | 0.6076* | 0.2854 | 1.0691* | 0.4612 |
| H7 | — | — | — | — |
| H8 | 3.8641** | 0.7789 | 3.3431** | 1.0372 |
| H10 | — | — | — | — |
| H11 | — | — | — | — |
| H12 | — | — | −1.1334** | 0.3553 |
| H13 | 0.8902* | 0.4855 | 1.2390* | 0.762 |
| H14 | 0.6823* | 0.3015 | 1.3690* | 0.6687 |
| H15 | — | — | — | — |
| H16 | — | — | 1.7103* | 0.9127 |
| H18 | 0.4614 | 0.3222 | — | — |
| CONSTANT | −9.4317** | 0.8285 | −8.9700** | 1.0066 |
| alpha | 0.8416 | 0.1947 | 2.5765 | 0.0762 |
| N | 1884 | | 1884 | |
| Pseudo R2 | 0.1335 | | 0.05 | |

** Significant at 1 percent level.
* Significant at 10 percent level.

respondent-level indicator, the size of the population beyond 25 miles, as well as the Great Lake and coastal dummy variables, were found to also have a positive and significant effect. In all cases, the overdispersion parameter ($\alpha$) was found to be significantly different from zero, which indicates that the negative binomial model is preferable to a simple Poisson.

Using the results of the regressions reported in Tables E2-3 and E2-4, level-of-use indicators were then *predicted* for each HUC (h) and waterbody type, based on differences in HUC-level characteristics. For example, based on the regression results, the models predict relatively higher angler activity in HUCs that have more river and lake miles, larger populations within 25 and 50 miles, and larger surface area. For lakes (l) and rivers (r) respectively, we refer to these predicted values as $\hat{T}_{lh}, \hat{T}_{rh}$. From Eq. (E2.1) it follows that

$$\hat{T}_{ih} = E(T_{ih} | X_h) = \exp(\hat{\beta}_i X_h) \qquad \text{for i= r, l.} \qquad \text{(E2.2)}$$

Table E2-5 provides a summary of the predicted level-of-use values.

**Table E2-5. Predicted Level-of-Use Indicators for HUCs in Study Area: Negative Binomial Regression Model Predictions**

| Predicted Indicator | min | p1 | p50 | mean | p99 | max |
|---|---|---|---|---|---|---|
| RESP_COUNT_LAKE $\hat{T}_l$ | 0.001 | 0.01 | 0.2788 | 0.6192 | 4.08 | 28.3667 |
| TRIP_COUNT_LAKE $\hat{T}_l$ | 0 | 0 | 1.2264 | 4.3204 | 38.1314 | 578.688 |
| RESP_COUNT_RIV $\hat{T}_r$ | 0 | 0 | 0.1507 | 0.241 | 1.5347 | 4.4308 |
| TRIP_COUNT_RIV $\hat{T}_r$ | 0 | 0.01 | 0.8551 | 2.2631 | 17.8171 | 85.3717 |

The predicted-use indicators were then used as measures of the *relative* level of angler activities across HUCs within each state (s). Specifically, they were used to approximate the percentage of state-level lake- and river-fishing days that occur in each HUC in the state as follows:

$$p_{lhs} = \frac{\hat{T}_{lh}}{\sum_{hs} \hat{T}_{lh}} \qquad \text{(E2.3)}$$

$$p_{rhs} = \frac{\hat{T}_{rh}}{\sum_{hs} \hat{T}_{rh}}. \qquad \text{(E2.4)}$$

The denominators in each of these two expressions is the sum of predicted-use indicators across HUCs in the state.[3]

For the analysis summarized in Section 11, the predicted level-of-use indicators from the trip-based models (TRIP_COUNT_LAKE and TRIP_COUNT_RIV) were applied in Eq. (E2.3) and (E2.4) to estimate HUC-level indicators.  The two models produce similar results regarding the spatial distribution of angler activity, but the trip-based model was selected because it includes more information about the frequency of specific trip destinations.  In the analysis, these predicted values were truncated at the 99th percentile of their distribution (see Table E2-5) to prevent a small number of outliers from skewing the results.

To estimate *absolute* levels of angler activity in each HUC, these estimated percentages of fishing activity were combined with total state-level fishing estimates from the NSFHWR.  In effect, the state-level estimates of lake- and river-fishing days by residents and nonresidents ($D_{ls}$ and $D_{rs}$; see **Table** 10-4) were distributed to HUCs based on the estimated percentages.  The number of lake- and river-fishing days in each HUC (in 2001) were estimated as:

$$A_{lh} = p_{lhs} * D_{ls} \qquad\qquad\qquad (E2.5)$$

$$A_{rh} = p_{rhs} * D_{rs} \qquad\qquad\qquad (E2.6)$$

For example, HUCs with a predicted level-of-use indicator of 3 were assumed to have three times as many angler days as HUCs with a predicted indicator of 1.  The results of these calculations are summarized in Section 10.1.2.

---

[3]For HUCs located in more than one state, the predicted-use indicators were distributed across states in proportion to the percentage of HUC surface area located in each state.

E2-9

United States
Environmental Protection
Agency

Office of Air Quality Planning and Standards
Air Quality Strategies and Standards Division (MD 339-01)
Research Triangle Park, NC 27711

Publication No.
EPA 452/R-05-003
March 2005

# Pls.' Exhibit 034

EPA – Regulatory Impact Analysis of the Proposed Revisions to the National Ambient Air Quality Standards for Lead, https://www3.epa.gov/ttn/ecas/docs/ria/naaqs-lead_ria_final_2008-10.pdf


United States
Environmental Protection
Agency

# Regulatory Impact Analysis of the Proposed Revisions to the National Ambient Air Quality Standards for Lead

(This page intentionally left blank)

October 2008

Regulatory Impact Analysis of the
Proposed Revisions to the
National Ambient Air Quality Standards

U.S. Environmental Protection Agency
Office of Air Quality Planning and Standards
Health and Environmental Impact Division
Air Benefit-Cost Group
Research Triangle Park, North Carolina

(This page intentionally left blank)

## ES.1  OVERVIEW

This Regulatory Impact Analysis (RIA) estimates the incremental costs and monetized human health benefits of attaining a revised primary lead (Pb) National Ambient Air Quality Standard (NAAQS).  There are important overall data limitations and uncertainties in these estimates.  They are described in section E.S.4 below.  Hypothetical control strategies were developed for final NAAQS of 0.15 µg/m³ plus several alternative lead standards.  These alternatives include at least one more stringent and one less stringent alternative than the selected standard, consistent with the OMB Circular A-4 Guidelines.  This summary outlines the basis for and approach used for estimating the incremental costs and monetized benefits of these standards, presents the key results of the analysis, and highlights key uncertainties and limitations.

This Regulatory Impact Analysis (RIA) provides illustrative estimates of the incremental costs and monetized human health benefits of attaining a revised primary lead (Pb) National Ambient Air Quality Standard (NAAQS) within the current monitoring network of 189 monitors representing 86 counties.  Many of the highest-emitting lead sources do not have nearby Pb-TSP monitors, and it is important to note that there may be many more potential nonattainment areas than have been analyzed in this RIA.

It is important to note at the outset that overall data limitations are very significant for this analysis, compared to other NAAQS reviews. One critical area of uncertainty is the limited TSP-Pb monitoring network (discussed in chapter 2).  Because monitors are present in only 86 counties nationwide, the universe of monitors exceeding the final NAAQS level of 0.15 µg/m³ represent only 16 counties.  It is important to note that data limitations prevented us from identifying a full range of controls which would bring eight of these counties all the way to attainment of the final NAAQS.  It is also important to note that because many of the highest-emitting Pb sources in the 2002 NEI do not have nearby Pb-TSP monitors (see section 2.1.7), it is likely that there may be many more potential nonattainment areas than have been analyzed in this RIA.

In addition, EPA would prefer to use a detailed air quality model that simulates the dispersion and transport of lead to estimate local ambient lead concentrations with the hypothetical alternative emission control strategies expected under the NAAQS.  Although models with such capabilities are available for pollutants for which EPA frequently conducts air quality analyses (e.g., particulate matter and ozone), regional scale models are currently neither available nor appropriate for lead.[1]  As discussed in Chapter 3, EPA developed an air quality assessment tool to estimate the air quality impacts of each lead emissions control strategy.

In setting primary ambient air quality standards, EPA's responsibility under the law is to establish standards that protect public health, regardless of the costs of implementing a new standard.  The Clean Air Act requires EPA, for each criteria pollutant, to set a standard that

---

[1] U.S. Environmental Protection Agency (2007c), Review of the National Ambient Air Quality Standards for Lead: Policy Assessment of Scientific and Technical Information, OAQPS Staff Paper, section 2.4, EPA-452/R-07-013, Office of Air Quality Planning and Standards, RTP, NC.

protects public health with "an adequate margin of safety." As interpreted by the Agency and the courts, the Act requires EPA to create standards based on health considerations only.

The prohibition against the consideration of cost in the setting of the primary air quality standard, however, does not mean that costs or other economic considerations are unimportant or should be ignored. The Agency believes that consideration of costs and benefits is essential to making efficient, cost effective decisions for implementation of these standards. The impacts of cost and efficiency are considered by states during this process, as they decide what timelines, strategies, and policies are most appropriate. This RIA is intended to inform the public about the potential costs and benefits associated with a hypothetical scenario that may result when a new lead standard is implemented, but is not relevant to establishing the standards themselves.

The analysis year for this regulatory impact analysis is 2016, consistent with the attainment year for the final lead NAAQS.  For the purposes of this analysis, we assess attainment by 2016 for all areas. Some areas for which we assume 2016 attainment may in fact need more time to meet one or more of the analyzed standards, while others will need less time. This analysis does not prejudge the attainment dates that will ultimately be assigned to individual areas under the Clean Air Act, which provides flexibility to postpone compliance dates, provided that the date is as expeditious as practicable.

EPA presents this RIA pursuant to Executive Order 12866 and the guidelines of OMB Circular A-4.[2] These documents present guidelines for EPA to assess the benefits and costs of the selected regulatory option, as well as one less stringent and one more stringent option. OMB Circular A-4 also requires both a benefit-cost, and a cost-effectiveness analysis for rules where health is the primary effect. Within this RIA we provide a benefit-cost analysis.

## ES.2  Summary of Analytic Approach

Our assessment of the selected lead NAAQS includes several key elements, including specification of baseline lead emissions and concentrations; development of illustrative control strategies to attain the standard in 2016; development of an air quality assessment tool to assess the air quality impacts of these control strategies; and analyses of the incremental impacts of attaining the alternative standards.  Figure ES-1 provides an illustration of the methodological framework of this RIA. Additional information on the methods employed by the Agency for this RIA is presented below.

*Overview of Baseline Emissions Forecast and Baseline Lead Concentrations*

The baseline lead emissions and lead concentrations for this RIA are based on lead emissions data from the 2002 National Emissions Inventory (NEI) and lead concentration values for 21 lead monitors included in the 2003-2005 Pb-TSP NAAQS-review database.  Consistent with the $PM_{2.5}$ NAAQS RIA and ozone RIA, no growth factors were applied to the 2002 NEI emissions estimates to generate the emissions or air quality projections for 2016.  Where

---

[2] U.S. Office of Management and Budget. Circular A-4, September 17, 2003. Found on the Internet at <http://www.whitehouse.gov/omb/circulars/a004/a-4.pdf>.

possible, however, we adjusted these values to reflect the estimated control efficiency of MACT standards with post-2002 compliance deadlines, because the 2002 NEI and observed lead concentrations during the 2003-2005 period would not reflect the impact of MACT controls reasonably anticipated to be in place by 2016.  The analysis includes similar adjustments for compliance measures simulated by the September 2006 revision to the $PM_{2.5}$ NAAQS (as included in the illustrative $PM_{2.5}$ control strategy described in the $PM_{2.5}$ NAAQS RIA) and measures listed in the 2007 Missouri Lead SIP revisions.[3]

*Development of Illustrative Control Strategies*

Our analysis of the emissions control measures required to meet the selected standard is limited to controls for point source emissions at active sources inventoried in the 2002 NEI.  To identify point source lead emissions controls for our analysis, we collected information on PM control technologies, assuming that the control efficiency for PM would also apply to lead emissions.  Most of this information was obtained from EPA's AirControlNET database, but a limited number of controls were identified from New Source Performance Standards and operating permits that apply to facilities with similar Source Classification Codes as the point sources included in our analysis.[4]  Controls identified through this process include major emissions controls, such as fabric filters, impingement-plate scrubbers, and electrostatic precipitators; and minor controls, such as increased monitoring frequency, upgrades to continuous emissions monitors, and diesel particulate filters for stationary sources. In addition, we modeled replacement of the large primary lead smelter in Jefferson County, Missouri with a more modern, lower-emitting smelter.

To identify the least-cost approach for reaching attainment in each area, EPA developed a linear programming optimization model that systematically evaluates the changes in air quality and costs associated with controlling each source to find the optimal control strategy for each area.  The optimization model first identifies the measures that each source would implement if it were controlled as part of a local lead attainment strategy.  Based on these controls, the optimization model then identifies sources to control such that each area would reach attainment at the least aggregate cost possible for the area.

It is important to remember that, compared to recent NAAQS RIAs, our current knowledge of the costs and nature of lead emissions controls is relatively poor.  Lead in ambient air has not been a focus for all but a few areas of the country for the last decade or more; the selected standard of 0.15 μg/m$^3$ represents a substantial tightening of the existing NAAQS.  As a result, although AirControlNET contains information on a large number of different point source controls, we would expect that State and local air quality managers would have access to additional information on the controls available to the most significant source.

---

[3] U.S. Environmental Protection Agency. (2006). *Final Regulatory Impact Analysis: PM$_{2.5}$ NAAQS*. Office of Air and Radiation, Research Triangle Park, NC.  The Missouri lead SIP was finalized by EPA on April 14, 2006 with a requirement that this SIP will provide attainment with the current lead standard by April 7, 2008.  The SIP is available at http://www.dnr.mo.gov/env/apcp/docs/2007revision.pdf.

[4] Source Classification Codes are the identifiers that EPA uses to classify different types of emissions activity.

In addition, as discussed in the final monitoring provisions, the existing monitoring network will need to be updated.  It is possible that some areas shown to be out of attainment based on the current monitoring information will be shown to be in attainment with more recent monitoring.  After the revised monitoring network is in place, other areas not identified in this analysis may be found to be violating the new standard.  Since many of the existing sources of ambient Pb are relatively small, states are likely to work closely with the sources to reduce emissions in a cost-effective manner.

Note also that in this RIA we have not accounted for the effect of improvements that tend to occur, such as technology improvement, process changes, efficiency improvements, materials substitution, etc.  We believe these typical improvements will tend to result in more cost effective approaches than simply adding extremely expensive pollution controls in many areas by the attainment date of 2016.  Many industrial sources of lead emissions emit very small quantities of lead in absolute terms.  Our cost modeling shows that some could face significant costs to reduce these low levels of lead, costs which could be prohibitively expensive.  Rather than applying additional controls, it may be possible for firms emitting small amounts of Pb to modify their production processes or other operational parameters, including pollution prevention techniques, which would be more cost effective than adding additional control technology. Such measures might include increasing the enclosure of buildings, increasing air flow in hoods, modifying operation and maintenance procedures, changing feed materials to lower Pb content, measures to suppress dust from tailings piles, etc.

Finally, some monitor areas are not projected to reach attainment with the proposed NAAQS or alternative standard through the application of identified controls alone.  (For the selected NAAQS, identified controls account for about 94% of the emission reductions needed to reach full attainment in all areas).  For the selected NAAQS and each alternative standard, we applied unspecified emission reductions to all sources until attainment was reached in each county that failed to reach attainment with identified controls alone.

**Analytic Sequence for Lead NAAQS RIA**



Figure ES-1.  The Process Used to Create this RIA

*Air Quality Assessment Tool*

To assess the air quality impact of the emissions controls implemented under the selected NAAQS, EPA would ideally use a detailed air quality model that simulates the dispersion and transport of lead to estimate local ambient lead concentrations. Although models with such capabilities are available for pollutants for which EPA frequently conducts air quality analyses (e.g., particulate matter and ozone), regional scale models are currently neither available nor appropriate for Pb.[5] Dispersion, or plume-based, models are recommended for compliance with the Pb NAAQS; however, dispersion models are data –intensive and more appropriate for local scale analyses of emissions from individual sources. It was not feasible to conduct such a large-scale data-intensive analysis for this RIA.

Our air quality assessment tool, developed for the purposes of this analysis, employs a source-apportionment approach to estimate the extent to which each of the following emissions sources contribute to observed lead concentrations in each monitor area:

- Background lead
- Miscellaneous, re-entrained dust
- Emissions from area non-point sources
- Indirect fugitive emissions from active industrial sites
- Point source emissions[6]

After allocating a portion of the observed lead concentration for each monitor area to the first four categories listed above, the assessment tool apportions the remaining concentration among all inventoried point sources within ten kilometers of each monitor location by distance-weighting individual source contributions to ambient Pb concentrations.[7] Through this process, the tool establishes a point source influence factor that can be used to translate changes in the lead emissions of individual point sources to changes in the lead concentration for each monitor area.

*Analysis of Benefits*

---

[5] See Chapter 2 of U.S. Environmental Protection Agency. (2007). Review of the National Ambient Air Quality Standards for Lead: Policy Assessment of Scientific and Technical Information – OAQPS Staff Paper. Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA-452/R-07-013.

[6] For the purposes of this analysis, airports servicing piston-engine aircraft that use leaded aviation gasoline are treated as point sources.

[7] Note that although the air quality assessment tool distinguishes between the portion of the observed lead concentration attributable to point source emissions and that attributable to indirect fugitive emissions from active point sources, this analysis assumes that the two contributions are directly related, and any reduction in the air quality impact of point source emissions would produce a corresponding reduction in the air quality impact of indirect fugitive emissions from point sources in that monitor area. The process used to relate the contributions of these two categories is described in further detail in Chapter 3 of this RIA.

Our analysis of the benefits associated with the selected NAAQS includes benefits related to reducing ambient lead concentrations and the ancillary benefits of reducing direct emissions of particulate matter. To assess benefits specific to reduced lead concentrations, we created a spreadsheet model that provides a screening-level assessment of health benefits occurring as a result of implementing the selected NAAQS level. The model uses various simplifying assumptions and is intended only to provide an approximate, preliminary estimate of the potential health benefits. For the purposes of this analysis, the model estimates the adverse health impact of blood lead levels on cognitive function (which is most often measured as changes in IQ) in young children below seven years of age. Cognitive effects are thought to strongly relate to a child's future productivity and earning potential.[8]

The model was constructed in Microsoft Excel and provides an integrated tool to complete five benefits estimation steps: 1) estimate lead in air concentrations for the "base case" and "control scenarios"; 2) estimate population exposures to air lead concentrations for each scenario; 3) estimate blood lead levels in the population for each scenario; 4) estimate avoided cases of health effects due to changes in blood lead levels; and 5) apply an economic unit value to each avoided case to calculate total monetized benefits.

Because most of the point source measures implemented to achieve the NAAQS standard are focused on controlling emissions of lead in particulate form, virtually all of these measures also have a significant impact on emissions of directly emitted particulate matter. To estimate the value of these $PM_{2.5}$ emissions reductions, EPA utilized $PM_{2.5}$ benefit-per-ton estimates. These $PM_{2.5}$ benefit-per-ton estimates provide the total monetized human health benefits (the sum of premature mortality and premature morbidity) of reducing one ton of $PM_{2.5}$ from a specified source. EPA has used a similar technique in previous RIAs, including the recent ozone NAAQS RIA.[9] The complete methodology for creating the benefit per-ton estimates used in this analysis is available in the Technical Support Document (TSD) accompanying the recent final ozone NAAQS RIA.[10]

*Analysis of Costs*

Consistent with our development of the illustrative control strategies described above, our analysis of the costs associated with the selected NAAQS focuses on point source PM controls. For the purposes of this analysis, these controls largely include measures from the AirControlNET control technology database, but also include additional measures associated with operating permits and/or New Source Performance Review standards applicable to sources similar to those included in our analysis. For controls identified in AirControlNET, we estimated

---

[8] U.S. Environmental Protection Agency. (2006b). *Economic Analysis for the Renovation, Repair, and Painting Program Proposed Rule*. Office of Pollution Prevention and Toxics. Washington, DC.

[9] U.S. Environmental Protection Agency. (2008). *Final Ozone NAAQS Regulatory Impact Analysis*. Office of Air and Radiation. Research Triangle Park, NC, March.

[10] The Technical Support Document, entitled: *Calculating Benefit Per-Ton Estimates*, can be found in EPA Docket EPA-HQ-OAR-2007-0225-0284.

costs based on the cost equations included in AirControlNET. Our cost estimates for controls associated with operating permits and/or New Source Performance Review standards are based on cost data compiled by EPA for previous analyses.

As indicated in the above discussion on illustrative control strategies, implementation of the PM control measures identified from AirControlNET and other sources does not result in attainment with the selected NAAQS in several areas. In these areas, additional unspecified emission reductions will likely be necessary to reach attainment. In order to bring these monitor areas into attainment, we calculated control costs using two different approaches. Under one approach, we extrapolated the cost of unspecified emission reductions by constructing a cost curve using data on identified control costs. We then derived a total cost equation in quadratic form which best fit the total cost curve. Under our second approach, we calculated the cost of unspecified emission reductions by deriving an average cost per microgram of air quality improvement obtained from identified controls. For each standard, we then selected all monitor areas that failed to reach attainment and applied unspecified emission reductions to all sources until attainment was reached.

## ES.3  <u>Results of Analysis</u>

*Air Quality*

Table ES-1 summarizes the number of monitor sites that reach attainment with the selected NAAQS and alternative standards in 2016 following the implementation of identified and unspecified emission reductions. According to the data presented in Table ES-2, 13 of the 21 monitor areas are expected to reach attainment with the selected NAAQS following implementation of identified controls. Table ES-2 also shows results for alternative NAAQS of 0.10 and 0.40 $\mu g/m^3$. (In the body of the RIA, we also provide analysis of three other alternative NAAQS.) For the alternative of 0.10 $\mu g/m^3$, only 9 of the 21 monitors are able to reach attainment from application of identified controls. By comparison, all but one monitor area reach attainment through the implementation of identified controls under the 0.40 $\mu g/m^3$ standard.

**Table ES-1. Number of Monitor Sites Reaching Attainment with Each Alternative Standard using Identified and Unidentified Controls**

| Standard | Number of Sites Analyzed | Number of Sites in Attainment with No Additional Controls | Number of Sites in Attainment with Identified Point Source Controls | Number of Sites in Attainment with Unspecified Emission Reductions and Identified Point Source Controls |
|---|---|---|---|---|
| 0.40 µg/m3 Second Maximum Monthly Mean | | 12 | 20 | 21 |
| 0.15 µg/m3 Second Maximum Monthly Mean | 21 | 5 | 13 | 21 |
| 0.10 µg/m3 Second Maximum Monthly Mean | | 0 | 9 | 20 |

The failure of certain areas to reach attainment with identified controls may partially reflect the lack of control information for point sources in these areas. Sources for which the AirControlNET analysis identified no controls make up a small portion of the ambient lead concentration in many of the areas not projected to reach attainment with the selected standard. For such sources in nonattainment areas, we assume that unspecified emission reductions will be obtained. When unspecified emission reductions are implemented in addition to identified controls, we project widespread attainment with the selected and alternative standards.

*Benefit and Cost Estimates*

Tables ES-2, ES-3 and ES-4 summarize the costs and benefits associated with the selected and alternative NAAQS standards in 2016, based on both 3 percent and 7 percent discount rates.

The results in Table ES-2 show that the assumptions used in estimating the unspecified emission reductions drive the cost estimates. Under the first approach, the majority of the costs for the selected standard (88%) come from our analysis of current known control technologies, with only 12% of the total costs coming from extrapolated costs. Under the second approach, 5% of the total costs come from our analysis of currently known control technologies, and the majority of the costs (95%) comes from our assumptions about the cost of controlling the last few ambient increments of Pb needed to reach full attainment. This reflects the limited information available to EPA on the control measures that lead sources may implement. It is important to remember that, compared to recent NAAQS RIAs, our current knowledge of the costs and nature of lead emissions controls is relatively poor. Lead in ambient air has not been a

focus for all but a few areas of the country for the last decade or more; the alternative standards represent a substantial tightening of the existing NAAQS.  As a result, although AirControlNET contains information on a large number of different point source controls, we would expect that State and local air quality managers would have access to additional information on the controls available to the most significant sources.

Table ES-3 presents the benefits of the proposed and alternative standards as a range to account for uncertainties associated with the benefits of the standards.  The range in the benefits estimates related to IQ gains reflects two estimates of the earnings impacts associated with such gains.  The low end of the range reflects an analysis by Schwartz, which estimated that a 1-point increase in IQ would increase earnings by 1.76 percent, while the high end of the range reflects the results of Salkever, which found that earnings increase by 2.38 percent for each 1-point increase in IQ.[11]  The range of estimates presented for PM-related benefits is based on the upper and lower ends of the range of $PM_{2.5}$ premature mortality functions obtained by EPA through its expert elicitation study on the PM-mortality relationship, as first reported by Industrial Economics and interpreted for benefits analysis in EPA's final RIA for the PM NAAQS, published in September 2006.[12]

Table ES-4 presents a comparison of costs and benefits.

---

[11] Schwartz, J. (1994). Societal Benefits of Reducing Lead Exposure. *Environmental Research* 66: 105-124 and Salkever, D.S. (1995). Updated Estimates of Earnings Benefits from Reduced Exposure of Children to Environmental Lead. *Environmental Research* 70:1-6.

[112] Industrial Economics, Inc. (2006). *Expanded Expert Judgment Assessment of the Concentration-Response Relationship between $PM_{2.5}$ Exposure and Mortality.* Prepared for: Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Research Triangle Park, NC; U.S. Environmental Protection Agency. (2006). *Final Regulatory Impact Analysis: $PM_{2.5}$ NAAQS.* Office of Air and Radiation, Research Triangle Park, NC.

**Table ES-2.  Summary of Costs for Regulatory Alternatives (Millions of 2006$)\***

| | | Alternative NAAQS: 0.4 µg/m³ 2nd Maximum Monthly Mean | | Final NAAQS: 0.15 µg/m³ 2nd Maximum Monthly Mean | | Alternative NAAQS: 0.1 µg/m³ 2nd Maximum Monthly Mean | |
|---|---|---|---|---|---|---|---|
| | | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| **Identified Control Costs** | | $46 | $57 | $130 | $150 | $160 | $180 |
| **Extrapolated Costs** | **Cost Curve Extrapolation** | $0.32 | $0.32 | $20 | $20 | $33 | $33 |
| | **Ambient Extrapolation** | $390 | $460 | $2,600 | $3,100 | $3,400 | $3,900 |
| **Total RIA Costs** | **Cost Curve** | **$46** | **$57** | **$150** | **$170** | **$190** | **$210** |
| | **Ambient** | **$430** | **$510** | **$2,800** | **$3,200** | **$3,500** | **$4,100** |
| **Monitoring Costs\*\*** | | $4.2 | $4.2 | $4.2 | $4.2 | $4.2 | $4.2 |

\* All estimates rounded to two significant figures. As such, totals will not sum down columns.

\*\* Consistent with the scope of this rulemaking, which includes monitoring provisions, monitoring costs are included here. See OMB 2060-0084, ICR #940.21 for a complete discussion.

**Table ES-3.  Summary of Benefits for Regulatory Alternatives (Millions of 2006$)**

| | Alternative Standard: 0.40 µg/m³ 2nd Maximum Monthly Mean | | Final NAAQS: 0.15 µg/m³ 2nd Maximum Monthly Mean | | Alternative Standard: 0.10 µg/m³ 2nd Maximum Monthly Mean | |
|---|---|---|---|---|---|---|
| | *3% Discount rate* | *7% Discount rate* | *3% Discount rate* | *7% Discount rate* | *3% Discount rate* | *7% Discount rate* |
| Annualized Benefit - IQ Gains (Range)\*\* | $2,000 - $2,800 | $250 - $490 | $3,500 - $5,000 | $440 - $870 | $4,500 - $6,400 | $560 - $1,100 |
| Annualized Benefit - PM Co-control (Range)\*\*\* | $100 - $880 | $100 - $800 | $230 - $1,900 | $210 - $1,700 | $260 - $2,200 | $240 - $2,000 |
| **Total Benefits** | $2,100 - $3,700 | $350 -$1,300 | $3,700 - $6,900 | $650 - $2,600 | $4,800 - $8,600 | $800 - $3,100 |

**Table ES-4.  Summary of Net Benefits for Regulatory Alternatives (Millions of 2006$)[13]**

| | Alternative Standard: 0.40 µg/m³ 2nd Maximum Monthly Mean | | Final NAAQS: 0.15 µg/m³ 2nd Maximum Monthly Mean | | Alternative Standard: 0.10 µg/m³ 2nd Maximum Monthly Mean | |
|---|---|---|---|---|---|---|
| | **3% Discount rate** | **7% Discount rate** | **3% Discount rate** | **7% Discount rate** | **3% Discount rate** | **7% Discount rate** |
| Total RIA Costs + Monitoring Costs | $50—$430 | $61—$510 | $150—$2,800 | $170—$3,200 | $190—$3,500 | $210—$4,100 |
| Total Benefits | $2,100—$3,700 | $350—$1,300 | $3,700—$6,900 | $650—$2,600 | $4,800—$8,600 | $800—$3,100 |
| **Net Benefits** | **$1,700 - $3,700** | **$(160) - $1,200** | **$900 - $6,800** | **$(2,600) - $2,400** | **$1,300 - $8,400** | **$(3,300) - $2,900** |

---

[13] Note that bounds of the full range of net benefits is derived by subtracting the high costs from the low benefits at the lower end, and subtracting the low costs from the high benefits at the upper end. This is the only way to fully represent the uncertainty.

To provide additional context for the results presented in Table ES-3, Table ES-5 presents the total number of IQ points expected to be gained in the US in the year 2016 by achieving each of the alternate NAAQS level options, relative to the "base case" (i.e., the lead NAAQS remains at its current level).  The results presented in the table demonstrate that lowering the current (1.5 μg/m³ maximum quarterly mean) lead NAAQS to the revised or alternative NAAQS would be expected to have a significant impact on the IQ of young children.  More specifically, the results indicate that the number of IQ points gained in 2016 ranges from 230,000 if a 0.4 μg/m³ second maximum monthly mean NAAQS is achieved up to 510,000 for a 0.10 μg/m³ second maximum monthly mean NAAQS.

**Table ES-5.  Number of IQ Points Gained in 2016**

| Standard | IQ Points Gained |
|---|---|
| 0.40 μg/m³ Second Maximum Monthly Mean | 230,000 |
| 0.15 μg/m³ Second Maximum Monthly Mean | 400,000 |
| 0.10 μg/m³ Second Maximum Monthly Mean | 510,000 |

Our analysis suggests that the benefits presented in Table ES-5 will be concentrated in a small number of counties.  Table ES-6 below shows the distribution of total benefits due to IQ points gained for the 0.15 μg/m³ second maximum monthly mean NAAQS alternative.  For this standard, approximately 60 percent of the total benefits are due to changes in lead air concentrations in three counties: Hillsborough, Florida; Delaware, Indiana; and Berks, PA.   In these areas, sources of lead exposure and the monitors that measure ambient lead appear to be in relatively close proximity to exposed populations.

**Table ES-6.  Percentage of Benefits by Monitor (0.15 μg/m³ Second Maximum Monthly Mean NAAQS)**

| County | State | Population of Children in Affected Area | Affected Population (%) | Percentage of Benefits (%) |
|---|---|---|---|---|
| Hillsborough | FL | 67,359 | 17% | 38% |
| Delaware | IN | 7,957 | 2% | 13% |
| Berks | PA | 27,966 | 7% | 13% |
| Collin | TX | 22,192 | 6% | 12% |
| Denton | TX | 8,243 | 2% | 5% |
| Cuyahoga | OH | 60,605 | 16% | 4% |
| Pike | AL | 2,621 | 1% | 4% |
| Jefferson | MO | 6,472 | 2% | 2% |
| Orange | NY | 9,186 | 2% | 2% |
| Dakota | MN | 23,216 | 6% | 1% |
| Beaver | PA | 9,120 | 2% | 1% |

| | | | | |
|---|---|---|---|---|
| **Fulton** | **OH** | **1,644** | **0%** | **1%** |
| **Rutherford** | **TN** | **707** | **0%** | **1%** |
| **Williamson** | **TN** | **804** | **0%** | **1%** |
| **Logan** | **OH** | **2,993** | **1%** | **1%** |

**Note: There were several other counties that constituted less than 1 percent of benefits that are not included in this table.**

The costs of the selected NAAQS are also expected to be concentrated in a limited number of areas, as summarized in chapter 6. Many of the monitor sites listed in the exhibit represent areas with the largest sources of lead emissions, such as primary or secondary lead smelters, mining operations, or battery manufacturers.

## ES.4  Caveats and Limitations

*Air Quality Data, Modeling and Emissions*

- ***Limited TSP-Pb monitoring network.*** Because monitors are present in only 86 counties nationwide, the universe of monitors exceeding the various target NAAQS levels is very small; only 21 counties exceeding the lowest alternative NAAQS level of 0.10 $\mu g/m^3$. Because we know that many of the highest-emitting Pb sources in the 2002 NEI do not have nearby Pb-TSP monitors (see section 2.1.7), it is likely that there may be many more potential nonattainment areas than have been analyzed in this RIA.

- ***Simplified Air Quality Assessment Approach***. Dispersion, or plume-based models are recommended for compliance with the Pb NAAQS; however, dispersion models are data–intensive and more appropriate for local scale analyses of emissions from individual sources. It was not feasible to conduct such a large-scale data intensive analysis for this RIA. As a result, the simplified analysis developed for this RIA while distance-weighting individual source contributions to ambient Pb concentrations, could not account for such locally critical variables as meteorology and source stack height.

- ***Analysis Only Considers Controls on Point Source Emission Reductions.*** Because the available data are not sufficiently detailed to assess the impact of indirect fugitive or area nonpoint source controls, the analysis of air quality impacts does not account for the potential implementation of such controls in areas where they might be effective. Although the analysis estimates the impact of point source controls on indirect fugitives, it does not consider the impact of controlling these emissions directly. This and the lack of control information for area nonpoint sources may have contributed to our projection of nonattainment in some areas. Additionally, for this analysis we have not modeled the effect of any potential changes in emissions at airports with lead emissions associated with use of leaded aviation gasoline by piston-engine powered aircraft. (EPA received a petition from Friends of the Earth requesting that the Agency find that aircraft lead emissions may reasonably be anticipated to endanger the public health or welfare, and to take action to control lead emissions from piston-engine aircraft. EPA, in coordination with FAA, is analyzing the petition.)

- ***Limited Point Source Controls Considered***. As discussed above, we were not able to obtain emissions control information for a large number of point sources in our analysis. Although these sources collectively accounted for less than one fourth of all lead emissions considered, many of those sources were located in areas that were not able to reach attainment with one or more of the standards using identified controls alone.

- ***Actual State Implementation Plans May Differ from our Simulation***.  In order to reach attainment with each selected NAAQS, each state will develop its own implementation plan implementing a combination of emissions controls that may differ from those simulated in this analysis.  This analysis therefore represents an approximation of the emissions reductions that would be required to reach attainment and should not be treated as a precise estimate.

- ***Unspecified Emissions Reductions***. In this RIA, we report emissions reductions from both identified controls and unspecified emission reductions.  We have taken care to report these separately, in recognition of the greater uncertainty associated with achieving emissions reductions from measures that may not be currently in use or known to EPA. Nonetheless, EPA believes it is reasonable to project that, with at least 10 years of lead time before a 2016 compliance deadline, a large number of existing measures will be adapted to be applicable to additional sources, and new measures may be developed that are specifically focused on cost-effectively reducing PM emissions with high lead content.  Because the current standard is attained in all but a few areas of the country, and has been for many years since the phase down of lead in gasoline, it is likely that very little effort has been devoted to development of lead emissions control technologies except for industries where regulations have been imposed to reduce lead (e.g., large MWC standard, primary and secondary lead smelter MACTs, etc.).

*Costs*

- ***Uncertainty associated with unspecified emission reductions.*** As indicated above, some areas are expected to rely on unspecified emission reductions to reach attainment with the standards.  The cost of implementing these measures, though estimated here based on the costs for identified controls, is uncertain. Many of these sources are already well-controlled for particulate matter, and additional control for the remaining increment of Pb might be difficult to achieve. Some sources have very low particulate matter (PM) emissions overall, and therefore controls are generally not applied at that emissions level.

- ***Uncertainty associated with emissions estimates for smaller sources.***  Note that there is often greater inherent uncertainty in reported emissions from smaller sources than from larger sources, and that a large portion of the lead emissions inventory consists of sources emitting less than five tons per year of lead.

- ***Uncertainty associated with estimating the extrapolated costs of unspecified emission reductions.*** The ambient extrapolation methodology emphasizes control costs that are the most expensive within an area, and assumes that knowledge of control costs from monitor areas that attain have no influence on the average control costs for areas that need unspecified emission reductions. It also assumes there will be no increased knowledge of sources or changed in technology between now and 2016.  Lastly, most of the costs are based upon areas that make less than 1% progress towards attainment, indicating what little knowledge we have about controls in those areas.

The cost curve methodology for unspecified emission reductions also presents a poor conceptual relationship between the costs of identified controls at a national level and the

costs of control at a local level.  The data underlying this curve contains data points which we believe to be invalid (presented as part of the distributional analysis in Section 6.1.3.3).  The estimated curve estimates negative costs over a portion of emission reductions. In addition this approach relies heavily on the control strategy for the tightest standard alternative analyzed in this RIA, and does not account for variability in control strategies across alternative standards analyzed.  Lastly, we do not believe this curve well represents the knowledge of how control costs behave over time.

*Benefits*

- **Exposure.** The benefits of IQ point gains in children were very sensitive to the method employed for estimating exposures to the population.  When comparing the default method, which involved concentrations that were interpolated from multiple monitors, to the method assuming a uniform concentration within a 10 km radius around an individual monitor, the results increase by 40 percent. Increasing the radius to include the entire county in which the monitor resides results in roughly 3-fold increase in benefits. Decreasing the radius size also has a large impact on benefits, decreasing the value by as much as 94 percent when a radius of 1 km is used.

- **Dose-response relationship**. The dose-response function selected for quantifying the number of IQ points gained as a result of achieving the alternative NAAQS levels affected the results.  Utilizing alternate epidemiological studies decreased the primary estimate by as much as 72 percent or increased it by 140 percent.

- **Earnings-based metric of IQ.**  The earnings-based value-per-IQ-point lost that we apply in this analysis most likely represents a lower bound on the true value of a lost IQ point, because it is essentially a cost-of-illness measure, not a measure of an individual's willingness-to-pay (WTP) to avoid the loss of an IQ point.  Welfare economics emphasizes WTP measures as the more complete estimate of economic value.

- **Co-control benefits related to PM.**  Co-control benefits estimated here reflect the application of a national dollar benefit per ton estimate of the benefits of reducing directly emitted fine particulates from point sources.  Because they are based on national-level analysis, the benefit-per-ton estimates used here do not reflect local meteorology, exposure, baseline health incidence rates, or other local factors that might lead to an over-estimate or under-estimate of the actual benefits of controlling directly emitted fine particulates.

## ES.5  Conclusions and Insights

Our analysis has estimated the health benefits of reductions in ambient concentrations of lead resulting from a set of illustrative control strategies to reduce emissions of lead at point sources.  The results suggest there will be significant additional health benefits arising from reducing emissions from a variety of sources in and around projected nonattaining counties in

2016. While 2016 is the latest date by which states would generally need to demonstrate attainment with the revised standards, it is expected that benefits (and costs) may begin occurring earlier, as states begin implementing control measures to show progress towards attainment.

**CHAPTER 1: INTRODUCTION AND BACKGROUND**

**Synopsis**

This document estimates the incremental costs and monetized human health benefits of attaining a revised primary lead (Pb) National Ambient Air Quality Standard (NAAQS) nationwide. This document contains illustrative analyses that consider limited emission control scenarios that states, tribes and regional planning organizations might implement to achieve a revised lead NAAQS.  EPA weighed the available empirical data to make judgments regarding the proposed attainment status of certain urban areas in the future. According to the Clean Air Act, EPA must use health-based criteria in setting the NAAQS and cannot consider estimates of compliance cost. This Regulatory Impact Analysis (RIA) is intended to provide the public a sense of the benefits and costs of meeting new alternative lead NAAQS, and to meet the requirements of Executive Order 12866 and OMB Circular A-4 (described below in Section 1.2.2).

This RIA provides illustrative estimates of the incremental costs and monetized human health benefits of attaining a revised primary lead (Pb) National Ambient Air Quality Standard (NAAQS) within the current monitoring network[1].  Many of the highest-emitting Pb sources do not have nearby Pb-TSP monitors, and it is important to note that there may be many more potential nonattainment areas than have been analyzed in this RIA.

1.1     Background

Two sections of the Clean Air Act ("Act") govern the establishment and revision of NAAQS. Section 108 (42 U.S.C. 7408) directs the Administrator to identify pollutants which "may reasonably be anticipated to endanger public health or welfare," and to issue air quality criteria for them. These air quality criteria are intended to "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of [a] pollutant in the ambient air." Lead is one of six pollutants for which EPA has developed air quality criteria.

Section 109 (42 U.S.C. 7409) directs the Administrator to propose and promulgate "primary" and "secondary" NAAQS for pollutants identified under section 108. Section 109(b)(1) defines a primary standard as "the attainment and maintenance of which in the judgment of the Administrator, based on [the] criteria and allowing an adequate margin of safety, [are] requisite to protect the public health." A secondary standard, as defined in section 109(b)(2), must "specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on [the] criteria, [are] requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of [the] pollutant in the ambient air." Welfare effects as defined in section 302(h) [42 U.S.C. 7602(h)] include but are not limited to "effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility and climate, damage to and deterioration of property, and

---

[1] There are currently 189 monitors representing 86 counties, but only 21 counties have monitors which exceed the final NAAQS of  0.15 ug/m$^3$.

hazards to transportation, as well as effects on economic values and on personal comfort and well-being."

Section 109(d) of the Act directs the Administrator to review existing criteria and standards at 5-year intervals. When warranted by such review, the Administrator is to retain or revise the NAAQS. After promulgation or revision of the NAAQS, the standards are implemented by the States.

## 1.2    Role of the Regulatory Impact Analysis in the NAAQS Setting Process

### 1.2.1    *Legislative Roles*

In setting primary ambient air quality standards, EPA's responsibility under the law is to establish standards that protect public health, regardless of the costs of implementing a new standard. The Clean Air Act requires EPA, for each criteria pollutant, to set a standard that protects public health with "an adequate margin of safety." As interpreted by the Agency and the courts, the Act requires EPA to create standards based on health considerations only.

The prohibition against the consideration of cost in the setting of the primary air quality standard, however, does not mean that costs or other economic considerations are unimportant or should be ignored. The Agency believes that consideration of costs and benefits are essential to making efficient, cost effective decisions for implementation of these standards. The impact of cost and efficiency are considered by states during this process, as they decide what timelines, strategies, and policies make the most sense. This RIA is intended to inform the public about the potential costs and benefits that may result when a new lead standard is implemented, but is not relevant to establishing the standards themselves.

### 1.2.2    *Role of Statutory and Executive Orders*

There are several statutory and executive orders that dictate the manner in which EPA considers rulemaking and public documents. This document is separate from the NAAQS decision making process, but there are several statutes and executive orders that still apply to any public documentation. The analysis required by these statutes and executive orders is presented in Chapter 8.

EPA presents this RIA pursuant to Executive Order 12866 and the guidelines of OMB Circular A-4.[2] These documents present guidelines for EPA to assess the benefits and costs of the selected regulatory option, as well as one less stringent and one more stringent option. OMB circular A-4 also requires both a benefit-cost, and a cost-effectiveness analysis for rules where health is the primary effect. Within this RIA we provide a benefit-cost analysis.  Methodological and data limitations prevent us from performing a cost-effectiveness analysis and a meaningful more formal uncertainty analysis for the final RIA.

---

[2] U.S. Office of Management and Budget. Circular A-4, September 17, 2003. Found on the Internet at <http://www.whitehouse.gov/omb/circulars/a004/a-4.pdf>.

### 1.2.3   Market Failure or Other Social Purpose

OMB Circular A-4 indicates that one of the reasons a regulation such as the NAAQS may be issued is to address market failure. The major types of market failure include: externality, market power, and inadequate or asymmetric information. Correcting market failures is one reason for regulation, but it is not the only reason. Other possible justifications include improving the function of government, removing distributional unfairness, or promoting privacy and personal freedom.

An externality occurs when one party's actions impose uncompensated benefits or costs on another party. Environmental problems are a classic case of externality. For example, the smoke from a factory may adversely affect the health of local residents while soiling the property in nearby neighborhoods. If bargaining was costless and all property rights were well defined, people would eliminate externalities through bargaining without the need for government regulation. From this perspective, externalities arise from high transaction costs and/or poorly defined property rights that prevent people from reaching efficient outcomes through market transactions.

Firms exercise market power when they reduce output below what would be offered in a competitive industry in order to obtain higher prices. They may exercise market power collectively or unilaterally. Government action can be a source of market power, such as when regulatory actions exclude low-cost imports. Generally, regulations that increase market power for selected entities should be avoided. However, there are some circumstances in which government may choose to validate a monopoly. If a market can be served at lowest cost only when production is limited to a single producer of local gas and electricity distribution services, a natural monopoly is said to exist. In such cases, the government may choose to approve the monopoly and to regulate its prices and/or production decisions. Nevertheless, it should be noted that technological advances often affect economies of scale. This can, in turn, transform what was once considered a natural monopoly into a market where competition can flourish.

Market failures may also result from inadequate or asymmetric information. Because information, like other goods, is costly to produce and disseminate, an evaluation will need to do more than demonstrate the possible existence of incomplete or asymmetric information. Even though the market may supply less than the full amount of information, the amount it does supply may be reasonably adequate and therefore not require government regulation. Sellers have an incentive to provide information through advertising that can increase sales by highlighting distinctive characteristics of their products. Buyers may also obtain reasonably adequate information about product characteristics through other channels, such as a seller offering a warranty or a third party providing information.

There are justifications for regulations in addition to correcting market failures. A regulation may be appropriate when there are clearly identified measures that can make government operate more efficiently. In addition, Congress establishes some regulatory programs to redistribute resources to select groups. Such regulations should be examined to ensure that they are both effective and cost-effective. Congress also authorizes some regulations to prohibit discrimination that conflicts with generally accepted norms within our society.

Rulemaking may also be appropriate to protect privacy, permit more personal freedom or promote other democratic aspirations.

From an economics perspective, setting an air quality standard is a straightforward case of addressing an externality, in this case where firms are emitting pollutants, which cause health and environmental problems without compensation for those suffering the problems. Setting a standard with a reasonable margin of safety attempts to place the cost of control on those who emit the pollutants and lessens the impact on those who suffer the health and environmental problems from higher levels of pollution.

### 1.2.4   Illustrative Nature of the Analysis

This Pb NAAQS RIA is an illustrative analysis that provides useful insights into a limited number of emissions control scenarios that states might implement to achieve a revised lead NAAQS. Because states are ultimately responsible for implementing strategies to meet any revised standard, the control scenarios in this RIA are necessarily hypothetical in nature. They are not forecasts of expected future outcomes. Important uncertainties and limitations are documented in the relevant portions of the analysis.

The illustrative goals of this RIA are somewhat different from other EPA analyses of national rules, or the implementation plans states develop, and the distinctions are worth brief mention. This RIA does not assess the regulatory impact of an EPA-prescribed national or regional rule such as the Clean Air Interstate Rule, nor does it attempt to model the specific actions that any state would take to implement a revised lead standard. This analysis attempts to estimate the costs and human and welfare benefits of cost-effective implementation strategies which might be undertaken to achieve national attainment of new standards. These hypothetical strategies represent a scenario where states use one set of cost-effective controls to attain a revised lead NAAQS. Because states—not EPA—will implement any revised NAAQS, they will ultimately determine appropriate emissions control scenarios. State implementation plans would likely vary from EPA's estimates due to differences in the data and assumptions that states use to develop these plans.

The illustrative attainment scenarios presented in this RIA were constructed with the understanding that there are inherent uncertainties in projecting emissions and controls. Furthermore, certain emissions inventory, control, modeling and monitoring limitations and uncertainties inhibit EPA's ability to model full attainment in all areas. Despite these limitations, EPA has used the best available data and methods to produce this RIA.

## 1.3   Overview and Design of the RIA

This Regulatory Impact Analysis evaluates the costs and benefits of hypothetical national strategies to attain several potential revised primary lead standards. The document is intended to be straightforward and written for the lay person with a minimal background in chemistry, economics, and/or epidemiology. Figure 1-1 provides an illustration of the framework of this RIA.

**Analytic Sequence for Lead NAAQS RIA**



**Figure 1-1: The Process Used to Create this RIA**

### 1.3.1   Baseline and Years of Analysis

The analysis year for this regulatory impact analysis is 2016, which represents the required attainment year under the Clean Air Act. Many areas will reach attainment of any alternative Pb standard by 2016. For purposes of this analysis, we assess attainment by 2016 for all areas. Some areas for which we assume 2016 attainment may in fact need more time to meet one or more of the analyzed standards, while others will need less time. This analysis does not prejudge the attainment dates that will ultimately be assigned to individual areas under the Clean Air Act, which contains a variety of potential dates and flexibility to move to later dates, provided that the date is as expeditious as practicable.

The methodology first estimates what baseline lead levels might look like in 2016 with existing Clean Air Act programs, including application of controls to meet the current Pb NAAQS, various maximum achievable control technology (MACT) standards, and the newly revised PM NAAQS standard, and then predicts the change in Pb levels following the application of additional controls to reach tighter alternative standards. This allows for an analysis of the incremental change between the current standard and alternative standards.  Since Pb is also a component of PM, it is important that we account for the impact on Pb concentrations of PM controls used in the hypothetical control scenario in the PM NAAQS RIA, so as to avoid double counting the benefits and costs of these controls.

### 1.3.2   Control Scenarios Considered in this RIA

Hypothetical control strategies were developed for the final Pb NAAQS of  $0.15 \, \mu g/m^3$. plus four alternative Pb standards encompassing a range of $0.10 \, \mu g/m^3$ to $0.50 \, \mu g/m^3$.  First, EPA developed an air quality assessment tool to estimate air quality changes that would result from the application of emissions control options that are known to be available to different types of sources in areas with monitoring levels currently exceeding the alternative standards. However, given the limitations of current technology and the amount of improvement in air quality needed to reach some alternative standards in some areas, it was also expected that applying these known controls would not reduce lead concentrations sufficiently to allow all areas to reach the more stringent standards. In order to bring these monitor areas into attainment, we calculated controls costs using two different approaches.  Under one scenario, we calculated the cost of unspecified emission reductions by extrapolating from current average national identified control costs.  Under our second scenario, we calculated the cost of unspecified emission reductions by deriving an average cost per microgram of air quality improvement obtained from identified controls. For each standard, we then selected all monitor areas that failed to reach attainment and applied unspecified emission reductions to all sources until attainment was reached.

### 1.3.3   Evaluating Costs and Benefits

Applying a two step methodology for estimating emission reductions needed to reach full attainment enabled EPA to evaluate nationwide costs and benefits of attaining a tighter Pb standard using hypothetical strategies, albeit with substantial additional uncertainty regarding the second step estimates. First, the costs associated with applying known controls were quantified.

Second, EPA estimated costs of the additional tons of extrapolated emission reductions estimated which were needed to reach full attainment.

It is important to note that this analysis did not estimate any separate costs or benefits of attaining a secondary NAAQS standard due to resource and time constraints. Since the secondary is being set to be equivalent to the primary standard, no additional costs and benefits are expected.

To streamline this RIA, this document refers to several previously published documents, including three technical documents EPA produced to prepare for promulgation of the Pb NAAQS. The first was a Criteria Document created by EPA's Office of Research and Development (published in 2006), which presented the latest available pertinent information on atmospheric science, air quality, exposure, dosimetry, health effect, and environmental effects of lead. The second was a "Staff Paper" (published in 2007) that evaluated the policy implications of the key studies and scientific information contained in the Criteria Document.  The third was a risk assessment for various standard levels. The Staff Paper also includes staff conclusions and recommendations to the Administrator regarding potential revisions to the standards.

## 1.4     Pb Standard Alternatives Considered

EPA has performed an illustrative analysis of the potential costs and human health and visibility benefits of nationally attaining the final NAAQS of 0.15 µg/m$^3$. Per Executive Order 12866 and the guidelines of OMB Circular A-4, this Regulatory Impact Analysis (RIA) also presents analyses of a more stringent option of 0.10 µg/m$^3$ and a less stringent option of 0.40 µg/m$^3$.  EPA also analyzed alternative Pb standards of  0.20 µg/m$^3$, 0.30 µg/m$^3$, and 0.50 µg/m$^3$. The benefit and cost estimates below are calculated incremental to a 2020 baseline that incorporates air quality improvements achieved through the projected implementation of existing regulations and full attainment of the existing Pb and particulate matter (PM) National Ambient Air Quality Standards (NAAQS). The baseline also includes the MACT program, which will help many areas move toward attainment of the current lead standard.

## 1.5     References

Henderson, R. 2006. October 24, 2006. Letter from CASAC Chairman Rogene Henderson to EPA Administrator Stephen Johnson, EPA-CASAC-07-001.

U.S. EPA. 1970. Clean Air Act. 40CFR50.

U.S. EPA. 2006. Air Quality Criteria for Lead and Related Photochemical Oxidants (Final). U.S. Environmental Protection Agency, Washington, DC, EPA-452/R-07-013.

U.S. EPA. 2007. Review of the National Ambient Air Quality Standards for Lead: Policy Assessment of Scientific and Technical Information. OAQPS Staff Paper. North Carolina. EPA-452/R-07-013, Office of Air Quality Planning and Standards, RTP, NC.

**CHAPTER 2.  CHARACTERIZING PB AIR QUALITY AND EMISSIONS DATA**

This chapter describes the available Pb air quality and emission data used to inform and develop the controls strategies outlined in this RIA.  We first describe data sources for air quality measurement.  We then provide an overview of data on Pb emission sources contained in available EPA emission inventories.  For a more in-depth discussion of Pb air quality and emissions data, see the OAQPS Staff Paper for the Pb NAAQS.[1]

## 2.1     Air Quality Monitoring Data

Ambient air Pb concentrations are measured by four monitoring networks in the United States, all funded in whole or in part by EPA.  These networks provide Pb measurements for three different size classes of airborne particulate matter (PM):  total suspended PM (TSP), PM less than or equal to 2.5 μm in diameter ($PM_{2.5}$), and PM less than or equal to 10 μm in diameter ($PM_{10}$).  The networks include the Pb TSP network, the $PM_{2.5}$ Chemical Speciation Network (CSN), the Interagency Monitoring of Protected Visual Environments (IMPROVE) network, and the National Air Toxics Trends Stations (NATTS) network.  The subsections below describe each network and the Pb measurements made at these sites.

In addition to these four networks, various organizations have operated other sampling sites yielding data on ambient air concentrations of Pb, often for limited periods and/or for primary purposes other than quantification of Pb itself.  Most of these data are accessible via EPA's Air Quality System (AQS):  http://www.epa.gov/ttn/airs/airsaqs/.  In an effort to gather as much air toxics data, including Pb, into one database, the EPA and National Association of Clean Air Agencies (NACAA) created the Air Toxics Data Archive.  The Air Toxics Data Archive can be accessed at: http://vista.cira.colostate.edu/atda/.

2.1.1   Ambient Pb Measurement Methods

A number of methods are used to collect Pb and measure Pb concentrations in the atmosphere.  Most methods use similar sample collection approaches.  Ambient air is drawn through an inlet for a predetermined amount of time (typically 24 hours) and the PM is collected on a suitable filter media.  After the sample has been collected, the filter may be used to determine the mass of PM collected prior to then being used for determination of Pb.  The filter is chemically extracted and analyzed to determine the Pb concentration in the particulate material.  The concentration of Pb found in the atmosphere, in μg/m$^3$, is calculated based on the concentration of Pb in the volume extracted, the size of the collection filter, and the volume of air drawn through the filter.

The primary factors affecting the measurements made are the sampling frequency, duration of sampling, type of inlet used, volume of air sampled, and the method of

---

[1] U.S. Environmental Protection Agency (2007c), Review of the National Ambient Air Quality Standards for Lead: Policy Assessment of Scientific and Technical Information, OAQPS Staff Paper, Chapter 2, EPA-452/R-07-013, Office of Air Quality Planning and Standards, RTP, NC.

analyzing the filter for Pb content.  The following paragraphs describe how these factors affect the Pb measurements.

### 2.1.2   Inlet Design

In ambient air monitors, a number of inlet designs have been developed that allow certain particle size ranges to be sampled.  The inlets use either impaction or cyclone techniques to remove particles larger than a certain size (the size cutpoint) from the sample stream.  Three particle size cutpoints are used in ambient Pb measurements including TSP, $PM_{2.5}$, $PM_{10}$.  The TSP inlet is designed to allow as much suspended particulate into the sampling device as possible while protecting against precipitation and direct deposition on to the filter (nominally 25 to 45 micrometers) (USEPA, 2004c).  Sampling systems employing inlets other than the TSP inlet will not collect Pb contained in the PM larger than the size cutpoint.  Therefore, they do not provide an estimate of the total Pb in the ambient air.  This is particularly important near sources which may emit Pb in the larger PM size fractions (e.g., fugitive dust from materials handling and storage).

### 2.1.3   Volume of Air Sampled

The amount of Pb collected is directly proportional to the volume of air sampled. Two different sampler types have evolved for PM and Pb sampling – a high-volume and a low-volume sampler.  High-volume samplers draw between 70 and 100 $m^3$/hr of air through an 8 inch by 10 inch filter (0.05 $m^2$ filter area).  Low-volume samplers typically draw 1 $m^3$/hr through a 47 mm diameter filter (0.002 $m^2$ filter area).  Currently all Federal Reference Method (FRM) and Federal Equivalence Method (FEM) for Pb-TSP are based on high-volume samplers.

### 2.1.4   Sampling Frequency

The frequency of Pb sampling used in the U.S. varies between one sample every day (1 in 1 sampling) to the more common frequency of one sample every 6 days (1 in 6 sampling).  Semi-continuous methods for the measurement of ambient metals (including Pb) are currently being explored which would allow for more frequent sampling (as frequent as 1 sample per hour), but much more work is needed on these methods before they can be deployed in a network setting.

More frequent sampling reduces the uncertainty in estimates of quarterly or annual averages associated with temporal variations in ambient concentrations. However, the costs of sampling and analysis are directly tied to sample frequency.  As such, it is necessary to evaluate the reduction in measurement error versus the increase in sampling and analysis costs when selecting the required sampling frequency.  A discussion of the observed temporal variation of Pb measurements is given later in this section.

### 2.1.5   Sample Analysis

After the samples have been collected on filters and the filters have been weighed, the filters are analyzed for Pb content.  A number of analytical methods can be used to analyze the filters for Pb content including x-ray fluorescence analysis (XRF), proton-

2

induced x-ray emission (PIXE), neutron activation analysis (NAA), atomic absorption (AA), or inductively-coupled plasma mass spectrometry (ICP/MS) (CD, pp. 2-80 to 2-81).  A detailed discussion of these methods was given in the 1986 CD (USEPA, 1986), and the reader is referred to that document for more information on these analytical methods.  A search conducted on the AQS database[2] shows that the method detection limits for all of these analytical methods (coupled with the sampling methods) are very low, ranging from 0.01 µg/m$^3$ to as low as 0.00001 µg/m$^3$, and are more than adequate for determining compliance with the current NAAQS.

### 2.1.6   Pb-TSP

This network is comprised of state and locally managed Pb monitoring stations which measure Pb in TSP, i.e., particles up to 25 to 45 microns.  These stations use samplers and laboratory analysis methods which have either FRM or FEM status.  The FRM and FEM method descriptions can be found in the U.S. Code of Federal Regulations, Section 40 part 50, Appendix G.  Sampling is conducted for 24-hour periods, with a typical sampling schedule of 1 in 6 days.  Some monitoring agencies "composite" samples by analyzing several consecutive samples together to save costs and/or increase detection limits.

### 2.1.7   Monitor Locations

The locations of Pb-TSP sites in operation between 2003 and 2005 are shown in Figure 2-1.  The state and local agencies which operate these sites report the data to EPA's AQS where they are accessible via several web-based tools.  EPA's series of annual air quality trends reports have used data from this network to quantify trends in ambient air Pb concentrations.  The most recent Trends report for Pb-TSP can be found at http://www.epa.gov/airtrends/lead.html.

A review of the Pb-TSP network's coverage of the highest Pb emitting sources (as identified in the current version of the 2002 NEI) was conducted as part of preparing this document.  This review indicates that many of the highest Pb emitting sources in the 2002 NEI do not have nearby Pb-TSP monitors.  This review indicates that only 2 of 26 facilities (both Pb smelters[3]) identified as emitting greater than 5 tpy have a Pb-TSP monitor within 1 mile.  The lack of monitors near large sources indicates we are likely currently underestimating the extent of occurrences of relatively higher Pb concentrations.  Additionally, none of the 189 Pb-TSP are located within a mile of airports identified in the NEI as an airport where piston-engine aircraft operate (i.e., aircraft that still use leaded aviation fuel).  However, there are historical data for 12 Pb-TSP monitoring sites operating within 1 mile of such airports (going back to 1993).  Nine of these sites reported maximum quarterly mean values (for 1993-2002) that ranged from 0.03 to 0.06 µg/m$^3$ and across all 12 sites, the maximum quarterly mean values ranged from 0.004 to 0.15 µg/m$^3$.

---

[2] EPA's AQS can be accessed at http://www.epa.gov/ttn/airs/airsaqs/

[3] Primary and secondary smelters were the source types given particular priority at the time of the last Pb NAAQS review (USEPA, 1990; USEPA, 1991).



**Figure 2-1.    Pb-TSP monitoring sites: 2003-2005.**

The number of sites in the Pb-TSP network has decreased significantly since the 1980s.  The number of sites in the network reached its highest point in 1981 (946 sites). About 250 sampling sites operated during 2005.  This decline in the number of Pb-TSP sites is attributable to the dramatic decrease in Pb concentrations observed since the 1980s and the need to fund new monitoring objectives (e.g., $PM_{2.5}$ and ozone monitoring).  Lead-TSP sites in lower concentration areas were shut down to free up resources needed for monitoring of other pollutants such as $PM_{2.5}$ and ozone.

## 2.2   Air Quality Modeling

As part of the Agency's national air toxics assessment (NATA) activities, a national scale assessment of hazardous air pollutants including Pb compounds has been performed twice over the past few years (USEPA 2006c, 2002c, 2001a).  These two assessments included the use of the NEI for the years 1996 and 1999, respectively, with atmospheric dispersion modeling to predict associated annual average Pb air concentrations across the country.  A national scale assessment is not yet available based on the 2002 NEI.  A number of limitations are associated with the 1996 and 1999 ambient concentration estimates and the underlying emissions estimates.

Historical studies show that Gaussian dispersion models, such as ASPEN, typically agree with monitoring data within a factor of 2 most of the time.  In the case of Pb in the NATA assessment, model estimates at monitor locations were generally lower than the

monitor averages for Pb, suggesting that the modeling system (i.e., emissions estimates, spatial allocation estimates, dispersion modeling) may be systematically underestimating ambient concentrations.  This may be particularly true for Pb as metals tend to deposit rapidly with distance from the source according to their particle size and weight.  The model-to-monitor analysis is described in detail at http://www.epa.gov/ttn/atw/nata1999/99compare.html.  The modeling system underestimation may also be due in part to a lack of accounting for emissions re-entrainment (these "re-entrained" particles may be observed by the monitors, but they are not accounted for in the emissions inventory, and thus would not contribute to the model estimate).  For more details on the limitations of the 1999 NATA national scale assessment, see http://www.epa.gov/ttn/atw/nata1999/limitations.html.

For more information on Pb modeling, see section 2.4 of the OAQPS Staff Paper for the Pb NAAQS.[4]  For reasons discussed in section 3.1.1, we did not use an air quality model for this analysis.

## 2.3   Sources of Pb Emissions to Ambient Air

The primary data source for this discussion is the National Emissions Inventory (NEI) for 2002 (USEPA, 2007a).  As a result of Clean Air Act requirements, emissions standards promulgated for many source categories that have taken effect since 2002 are projected to result in much lower emissions at the current time or in the near future.  For a more comprehensive discussion of Pb sources, see section 2.2 of the OAQPS Staff Paper for the Pb NAAQS.[5]

### 2.3.1   Types of Pb Sources

Lead is emitted from a wide variety of source types, some of which are small individually but the cumulative emissions of which are large, and some for which the opposite is true.  The categories of Pb sources estimated via the 2002 NEI to emit –as a category- more than five tons per year (tpy) of Pb are listed in Table 2-2.  Note that there is often greater inherent uncertainty in reported emissions from small sources than from larger sources, and that a large portion of the lead inventory consists of sources emitting less than than five tons per year of lead.

### 2.3.1.1   Stationary Sources

The main sources of emissions in the 2002 NEI are comprised primarily of combustion-related emissions and industrial process-related emissions.  Point source emissions account for about 66% of the national Pb emissions in the 2002 NEI.  The

---

[4] U.S. Environmental Protection Agency (2007c), Review of the National Ambient Air Quality Standards for Lead: Policy Assessment of Scientific and Technical Information, OAQPS Staff Paper, section 2.4, EPA-452/R-07-013, Office of Air Quality Planning and Standards, RTP, NC.

[5] *Ibid*., section 2.2.

point source emissions are roughly split between combustion and industrial processes, while mobile, non-road sources (e.g. piston-engine aircraft using leaded fuel) account for 29%.

Table 2-1 presents emissions estimates for stationary sources grouped into descriptive categories.  Presence and relative position of a source category on this list does not necessarily provide an indication of the significance of the emissions from individual sources within the source category.  A source category, for example, may be composed of many small (i.e., low-emitting) sources, or of just a few very large (high-emitting) sources.

**Table 2-1.   Source categories emitting greater than 5 tpy of Pb**

| ALL CATEGORIES - Total tons | 1371 | % of Total |
|---|---|---|
| Mobile sources | 623 | 45.44 |
| Iron and Steel Foundries | 83 | 6.05 |
| Primary Lead Smelting | 59 | 4.30 |
| Industrial/Commercial/ Institutional Boilers & Process Heaters | 53 | 3.87 |
| Hazardous Waste Incineration | 47 | 3.43 |
| Secondary Lead Smelting | 44 | 3.21 |
| Municipal Waste Combustors | 33 | 2.41 |
| Military Installations | 27 | 1.97 |
| Pressed and Blown Glass and Glassware Manufacturing | 26 | 1.90 |
| Utility Boilers | 23 | 1.68 |
| Secondary Nonferrous Metals | 22 | 1.60 |
| Portland Cement Manufacturing | 18 | 1.31 |
| Integrated Iron & Steel Manufacturing | 17 | 1.24 |
| Lead Acid Battery Manufacturing | 17 | 1.24 |
| Stainless and Nonstainless Steel Manufacturing (EAF) | 17 | 1.24 |
| Mining | 15 | 1.09 |
| Primary Metal Products Manufacturing | 13 | 0.95 |
| Waste Disposal - Solid Waste Disposal | 10 | 0.73 |
| Primary Copper Smelting | 10 | 0.73 |
| Secondary Aluminum Production | 9 | 0.66 |
| Fabricated Metal Products Manufacturing | 9 | 0.66 |
| Pulp & Paper Production | 9 | 0.66 |
| Transportation Equipment Manufacturing | 8 | 0.58 |
| Electrical and Electronics Equipment Manufacturing | 8 | 0.58 |
| Sewage Sludge Incineration | 7 | 0.51 |
| Nonferrous Foundries | 7 | 0.51 |
| Ferroalloys Production | 7 | 0.51 |
| Industrial Inorganic Chemical Manufacturing | 7 | 0.51 |
| Industrial and Commercial Machinery Manufacturing | 7 | 0.51 |
| Residential Heating | 6 | 0.44 |
| Secondary Copper Smelting | 6 | 0.44 |
| Miscellaneous Metal Parts & Products (Surface Coating) | 6 | 0.44 |
| Commercial and Industrial Solid Waste Incineration | 6 | 0.44 |
| Autobody Refinishing Paint Shops | 5 | 0.36 |
| Coke Ovens | 5 | 0.36 |
| Stationary Reciprocating Internal Combustion Engines | 5 | 0.36 |
| Other | 97 | 7.08 |

There are some 13,067 point sources (industrial, commercial or institutional) in the 2002 NEI, each with one or more processes that emit Pb to the atmosphere.  Most of these sources emit less than 0.1 tpy Pb.  There are approximately 1300 point sources of Pb in the NEI with estimates of emissions greater than or equal to 0.1 tpy and these point sources, combined, emit 1058 tpy, or 94% of the Pb point source emissions.  In other words, 94% of Pb point source emissions are emitted by the largest 10% of these sources.

7

Chapter 3 of this RIA discusses our methodology for characterizing the relative contributions of stationary point sources (defined in this analysis as sources emitting > 1 ton per year of Pb), area nonpoint sources (defined in this analysis as sources emitting less than 1 ton per year), and mobile sources.

### 2.3.1.2   Mobile Sources

Thirty-five years ago, combustion of leaded gasoline was the main contributor of Pb to the air. In the early 1970s, EPA set national regulations to gradually reduce the Pb content in gasoline. In 1975, unleaded gasoline was introduced for motor vehicles equipped with catalytic converters. EPA banned the use of leaded gasoline in highway vehicles after December 1995. Currently, tetraethyl lead (TEL) is still added to aviation gasoline (avgas) which is used in most piston-engine powered aircraft. TEL is added to avgas to increase octane, prevent knock[6], and prevent valve seat recession and subsequent loss of compression for engines without hardened valves. The 2002 National Emissions Inventory (NEI) estimates that lead emissions from the use of leaded aviation gasoline (commonly referred to as avgas) are 491 tons; this accounts for 29% of the air emission inventory for lead. These estimates are based on the volume of avgas supplied nationally, the concentration of lead in avgas and the retention of some lead in the engine and engine oil of these aircraft. The Department of Energy estimates that about 281 million gallons of avgas were supplied in the U.S. in 2002.[7] In 2006 the volume was about 280 million gallons. The majority of avgas contains up to 0.56 grams of lead per liter (2.12 grams of lead/ gallon); this is referred to as 100 Low Lead (100LL). There is another grade of 100 octane avgas that contains 1.12 grams of lead per liter, but this product is not widely available. Based on newly available information, the retention of lead in the engine and oil of piston-engine aircraft was recently revised from a value of 25% which was more related to lead retention in light-duty vehicles operating on leaded fuel to 5% retention for piston-engine aircraft.[8] Using these recently available data on lead retention, EPA now estimates that lead emissions from the use of avgas in 2002 were approximately 623 tons or 35% of the national inventory. This estimate is based on all leaded avgas used in the U.S. This estimate does not account for the fact that some lead is emitted in the local area of an airport facility and some lead is emitted at altitude. EPA's method for estimating airport-specific lead inventories is discussed in detail elsewhere.[9]

---

[6] Knocking is the sound produced when some of the unburned fuel in the cylinder ignites spontaneously resulting in rapid burning and a precipitous rise in cylinder pressure that creates the characteristic knocking or pinging sound (Chevron 2005 available at: http://www.chevronglobalaviation.com/docs/aviation_tech_review.pdf).

[7] data available at http://tonto.eia.doe.gov/dnav/pet/hist/mgaupus1A.htm

[8] For more information see the memo to the docket titled "Revised Methodology for Esimating Lead Emissions from Piston-Engine Aircraft Operating on Leaded Aviation Gasoline."

[9] See memo to the docket titled For more information see the memo to the docket titled "Revised Methodology for Esimating Lead Emissions from Piston-Engine Aircraft Operating on Leaded Aviation Gasoline."

Lead is also present as a trace contaminant in gasoline and diesel fuel and is a component of lubricating oil (CD, pp. 2-45 to 2-48). Inventory estimates from these sources are not currently available. Additional mobile sources of Pb include brake wear, tire wear, and loss of Pb wheel weights (CD, pp. 2-48 to 2-50). Emission rates for Pb from brake wear have been published but inventory estimates have not yet been developed from these data (Schauer et al., 2006). Robust estimates of Pb from tire wear and wheel weights are not available. Currently, Pb from combustion of leaded avgas is the only mobile source of Pb included in the 2002 NEI.

**CHAPTER 3.  AIR QUALITY ASSESSMENT METHODOLOGY**

This chapter presents the methods used to estimate the air quality impacts of the emissions control strategies outlined in Chapter 4 of this document.  To begin, we first describe the air quality assessment tool developed by EPA to relate lead emissions to ambient lead concentrations.  We then explain how this tool was used to estimate the air quality impacts of each hypothetical emissions control strategy.  The air quality impacts of these hypothetical control strategies are summarized in Chapter 4.

EPA used the air quality assessment methodology presented in this chapter to assess the final lead NAAQS of 0.15 µg/m³ and the five alternative standards included in this document.  We note that the Agency is setting the final standard as the maximum quarterly rolling average concentration, whereas the proposed rule included two options for the averaging time and form of the standard: the maximum quarterly average concentration across a three-year period (i.e., the maximum quarterly mean) and the second highest monthly average concentration across a three-year period (i.e., the second maximum monthly mean).   The decision to set the final standard as a maximum quarterly rolling average concentration, however, was made after much effort had been expended to assess the costs and benefits of the final and alternative standards as second maximum monthly mean concentrations.  Because this decision was reached late in the analytic process, EPA used the air quality assessment methodology presented in this chapter to assess the 0.15 µg/m³ standard as a second maximum monthly mean concentration rather than as a maximum quarterly rolling average concentration.

To assess the implications of using second maximum monthly mean concentrations for this analysis, we compared second maximum monthly mean concentrations to maximum quarterly concentrations.  Ideally, we would compare second maximum monthly concentrations for each monitor area to the corresponding maximum quarterly rolling average concentration, but historical data for the latter were not readily available.  In the absence of these data, we compared the second maximum monthly mean to the maximum quarterly mean.  For the full universe of 86 counties where monitor readings for lead were available, the second maximum monthly mean is, on average, 0.03 µg/m³ higher than the maximum quarterly mean.  In addition, when we statistically test the difference between the second maximum monthly mean and the maximum quarterly mean concentrations in these 86 counties, we confirm that the former is likely to be higher than the latter.[1]  When we limit the analysis to the 21 counties included in this analysis (i.e., the 21 counties with second maximum monthly mean concentrations above 0.1 µg/m³, which is the most stringent standard analyzed in this document), we reach the same general conclusion—that the second maximum monthly mean is, on average, higher than the maximum quarterly mean.[2]  This suggests that we may overestimate the emissions reductions,

---

[1] For all 86 counties where monitor data are available, the 95 percent confidence interval for the difference between the second maximum monthly mean and the maximum quarterly mean suggests that the former is 0.007 to 0.062 µg/m³ higher than the latter.

[2] For the 21 counties analyzed in this RIA, the 95 percent confidence interval for the difference between the second maximum monthly mean and the maximum quarterly mean suggests that the second maximum monthly mean is 0.002 to 0.146 µg/m³ higher than the maximum quarterly mean.

costs, and benefits associated with the final and alternative standards and that we may underestimate the number of areas able to attain each standard.

## 3.1     Air Quality Assessment Tool

To assess the air quality impact of the hypothetical emissions controls implemented under the final NAAQS, EPA would ideally use a detailed air quality model that simulates the dispersion and transport of lead to estimate local ambient lead concentrations. Although models with such capabilities are available for pollutants for which EPA frequently conducts air quality analyses (e.g., particulate matter and ozone), regional scale models are currently neither available nor appropriate for Pb.[3] Dispersion, or plume-based models, are recommended for compliance with the Pb NAAQS and were used for the Pb NAAQS risk assessment case studies. However, dispersion models are data-intensive and more appropriate for local scale analyses of emissions from individual sources. It was not feasible to conduct such a large-scale data intensive analysis for this RIA. As a result, the simplified analysis developed for this RIA, while distance-weighting individual source contributions to ambient Pb concentrations, could not account for such locally critical variables as meteorology and source stack height. Instead of using a data-intensive modeling approach, EPA developed a more simplified air quality assessment tool to estimate the air quality impacts of each lead emissions control strategy.

In general, air quality analyses conducted in support of the current Agency Pb NAAQS review focused on the Pb-TSP monitoring sites represented in the Air Quality System (AQS) database with sufficient 1-, 2-, or 3-year data records for the years 2003-2005; this database encompasses 189 monitoring sites located in 86 distinct counties. For this particular analysis, we concentrated on county maxima monitors exceeding the lowest alternative target NAAQS level (0.1 $\mu$g/m$^3$). The identification of the county maxima monitors and subsequent processing were based on the alternative NAAQS form of second maximum monthly Pb-TSP average over a 3-year period (in this case, 2003-2005).[4] Specifically, we identified 21 monitors (located in 21 counties) which we analyzed with the hereto described air quality assessment tool. This assessment tool employs a source-apportionment approach to estimate the extent to which each of the following emissions sources contribute to observed lead concentrations in the proximate areas of those 21 monitors:

---

[3] U.S. Environmental Protection Agency (2007c), Review of the National Ambient Air Quality Standards for Lead: Policy Assessment of Scientific and Technical Information, OAQPS Staff Paper, section 2.4, EPA-452/R-07-013, Office of Air Quality Planning and Standards, RTP, NC.

[4] In the Proposed Rule Analysis, monitors / counties were initially selected based on an alternative NAAQS form of maximum monthly Pb-TSP average. The Agency focus switched to second maximum monthly after considerable effort had already been made in the Proposed Rule RIA assessment. Although the metric values were switched for all monitors included in the analysis and reprocessed accordingly, the initial monitor selection was not repeated using the different metric. Thus, in some isolated instances, a monitor utilized for the Proposed Rule RIA was not the monitor with the county highest second maximum monthly average (though it was the one with the county highest maximum monthly average). For the Final Rule Analysis, the identification of monitors with maximum second monthly means was corrected; accordingly, some of the monitors in this analysis differ from those used in the Proposed Rule Analysis.

- Background lead
- Miscellaneous, re-entrained dust
- Emissions from area non-point sources
- Indirect fugitive emissions from active industrial sites
- Direct point source emissions[5]

After allocating a portion of the observed lead concentration for each monitor area to the first three categories listed above, the assessment tool apportions the remaining concentration among all inventoried point sources within ten kilometers of each monitor location.[6] Once the tool has determined the contribution of each point source to the observed lead concentration, it is then possible to determine how the application of pollution controls to individual point sources translates into changes in the observed lead concentration for each monitor area. To apportion the ambient lead concentration for each monitor area to the five categories presented above, the air quality assessment tool employs the following approach:

**Step 1:  Estimate baseline air quality value.** Drawing from the 2003-2005 Pb-TSP NAAQS-review database, the air quality assessment tool records the second maximum monthly mean ambient lead concentration for the 21 monitor locations where this concentration exceeds 0.1 $\mu g/m^3$, the most stringent of the NAAQS alternatives considered in this document. These concentrations, adjusted for the expected implementation of MACT controls implemented after 2002, $PM_{2.5}$ NAAQS controls included as part of the illustrative $PM_{2.5}$ control strategy described in the $PM_{2.5}$ NAAQS RIA,[7] and the controls listed in the 2007 Missouri Lead SIP revisions, serve as the baseline air quality values for this analysis.[8]

For the final rule, the specification of baseline air quality values differs from the proposed rule in two ways:

1. First, in some areas, monitor geo-coordinates and ambient lead concentration data were adjusted to reflect the air quality monitor with the limiting value for the alternative NAAQS form of second maximum monthly Pb-TSP average. For the Proposed Rule analysis, we incorrectly used the geo-coordinates and ambient lead

---

[5] For the purposes of this analysis, airports servicing piston-engine aircraft that use leaded aviation gasoline are treated as point sources. The volume of avgas produced in the U.S. in 2002 was 6,682 thousand barrels or 280,644,000 gallons. This information is provided by the DOE Energy Information Administration. Fuel production volume data obtained from http://tonto.eia.doe.gov/dnav/pet/hist/mgaupus1A.htm accessed November 2006.

[6] Note that although the air quality assessment tool distinguishes between the portion of the observed lead concentration attributable to point source emissions and that attributable to indirect fugitive emissions from active point sources, this analysis assumes that the two contributions are directly related, and any reduction in the air quality impact of point source emissions would produce a corresponding reduction in the air quality impact of indirect fugitive emissions from point sources in that monitor area. The process used to relate the contributions of these two categories is described in further detail below.

[7] U.S. Environmental Protection Agency. *Regulatory Impact Analysis: 2006 National Ambient Air Quality Standards for Particle Pollution.* October 2006.

[8] Note also that to estimate the value of the point source influence factor described above, the air quality assessment tool uses lead concentration data from 2003 through 2005 and lead emissions data for 2002. Ideally, this factor would be estimated based on concentration and emissions data for the same time period.

concentration data from the monitor in each geographic area of analysis with the highest maximum monthly Pb-TSP average, rather than the monitor with the highest *second* maximum monthly Pb-TSP average. In most areas, the limiting monitor was the same for both NAAQS forms, but in three monitor areas (Jefferson County, MO, Sullivan County, TN, and Dallas County, TX), the air quality monitor changed. Where the monitor location changed, the set of sources with emissions affecting each monitor area also changed to reflect the new range of influence surrounding the new monitor locations.

2. Secondly, because the 0.05 $\mu g/m^3$ standard examined in the proposed rule RIA is not considered in this analysis, monitors with lead concentrations exceeding only that standard (i.e., monitors with second maximum monthly Pb-TSP averages between 0.05 $\mu g/m^3$ and 0.1 $\mu g/m^3$) are excluded from the analysis. Thus, the number of monitor locations analyzed has therefore decreased from 36 in the proposed rule RIA to 21 in this analysis.

***MACT controls***: For most point sources, lead emissions as specified in the 2002 National Emissions Inventory (NEI) served as the base case emissions for our 2016 analysis; as with the $PM_{2.5}$ NAAQS RIA and ozone RIA, no growth factors were applied to the 2002 NEI emissions estimates for industrial sources to generate our emissions estimates for 2016. In general, lead emissions from these source categories are trending downward over time due to various factors including lack of growth in particular industrial sectors, implementation of alternative lower-emitting production practices at facilities, and/or recent regulations coming into effect. However, where possible, we adjusted the 2002 NEI lead emissions values to reflect the estimated control efficiency of MACT standards with post-2002 compliance deadlines, because the 2002 NEI would not reflect the impact of those controls reasonably anticipated to be in place by 2016.

We identified 41 existing MACT rules with post-2002 compliance deadlines that affect sources included in this analysis. Of these, we focused on rules affecting the 20 industries responsible for the largest lead emissions according to the 2002 NEI. Ideally, we would apply control efficiency data for each of these rules to the 2002 lead emissions estimates for the corresponding emissions sources. Consulting Federal Register documentation for these rules, as well as EPA's internal MACT rule summary data, we were able to identify control efficiency information for just nine of these rules. The sources affected by these nine rules, however, represent 78 percent of the lead emissions from sources affected by MACT rules with post-2002 compliance deadlines. For three of these rules, EPA expects no incremental reduction in lead emissions. For two of these rules (integrated iron & steel and pressed & blown glass), the control efficiency information that we identified is specific to metal Hazardous Air Pollutants (HAPs, e.g., lead). For the remaining four rules, we obtained information on their overall HAP control efficiency from the Federal Register and from EPA's internal MACT summary data. Table 3-1 summarizes the control efficiencies found for each of the nine MACT rules with available control efficiency data. Due to the uncertainty that future MACT rules may cover sources of Pb emissions, this analysis does not assume the promulgation of future MACT rules.

***$PM_{2.5}$ NAAQS controls***: In addition to adjustments for MACT rules, we also adjusted the 2002 NEI emissions estimates to account for compliance measures required by the

September 2006 revision to the $PM_{2.5}$ NAAQS included as part of the illustrative $PM_{2.5}$ control strategy described in the $PM_{2.5}$ NAAQS RIA. Because EPA expects PM emissions controls to be implemented at certain of these sources in order to reach attainment with the $PM_{2.5}$ standard, we incorporated them into the base case emissions values used in our analysis.

**Table 3-1.**
**CONTROL EFFICIENCIES FOR POST-2002 MACT RULES AFFECTING**
**SOURCES OF LEAD EMISSIONS**

| MACT Rule | Data Source | Control Efficiency | Observed Pollutant |
|---|---|---|---|
| Integrated Iron and Steel Manufacturing | 1 | 65.4% | Metal HAP |
| Iron and Steel Foundries | 2,3 | 36.5% | HAP |
| Petroleum Refineries | 4 | 86.6% | HAP |
| Secondary Aluminum Production | 4 | 68.6% | HAP |
| Industrial/Commercial/Institutional Boilers & Heaters – Coal | 4 | 33.3% | HAP |
| Pressed and Blown Glass and Glassware Manufacturing | 5 | 97.6% | Metal HAP |
| Primary Nonferrous Metals – Zinc, Cadmium, and Beryllium | 6 | 0% | N/A |
| Secondary Nonferrous Metals | 5 | 0% | N/A |
| Primary Copper Smelting | 6 | 0% | N/A |
| Key to Data sources: | | | |
| 1.  Economic Impact Analysis of Final Integrated Iron and Steel NESHAP, Center for Regulatory Economics and Policy Research, September 2002 | | | |
| 2.  67 FR 78273 | | | |
| 3.  Economic Impact Analysis of Final Iron and Steel Foundries NESHAP, RTI International, August 2003 | | | |
| 4.  EPA's internal MACT summary data | | | |
| 5.  72 FR 73179 | | | |
| 6.  72 FR 2929 | | | |

Of the 21 lead monitor areas considered in this RIA, five are located in counties predicted to be in nonattainment with the revised $PM_{2.5}$ standard in 2016, as specified in the $PM_{2.5}$ NAAQS RIA. For 20 point sources in these areas, EPA identified PM controls from the control technology database used in the controls and cost analysis for the PM NAAQS RIA. The controls anticipated to be applied consisted of fabric filters (with a 99 percent expected control efficiency), upgrades to electrostatic precipitators (67 percent), and the installation of capture hoods vented to a baghouse (85 percent). For each source with controls identified in the PM NAAQS RIA, we applied the control efficiency for the appropriate control technology to its 2002 NEI emissions to produce the new, PM NAAQS-adjusted baseline emissions for that source. For this analysis, we assume that these expected control efficiencies will remain constant throughout the relevant time period.

**Step 2: Estimate background lead concentration:** EPA estimates that the average background lead concentration is so small ($0.0005\ \mu g/m^3$) as to be irrelevant for the purposes of this analysis. Given the resolution of the lead monitoring devices supporting this analysis, the air quality assessment tool assumes that background lead concentrations have no measurable contribution to violations at the design value monitors. However, given the nature of the

conducted analysis for estimating "miscellaneous re-entrained dust" (see Step 3 below), background concentrations are, in fact, encompassed in that category.

**Step 3:  Estimate the contribution of miscellaneous re-entrained dust.**  Although the lead emissions constituting the miscellaneous re-entrained dust category are of uncertain origin, they are believed to encompass 1) re-entrained dust emitted from past stationary and past mobile sources (e.g., leaded gas), including the contribution from transport; and 2) dust emitted from demolition, construction, and/or sandblasting activities, and 3) uninventoried mobile-related emissions (e.g., from Pb wheel weights, brake wear and trace Pb from gas/diesel and lube oil consumption) .  Rather than estimating the site-by-site contribution of miscellaneous re-entrained dust, the air quality assessment tool applies a national estimate of the central tendency of the contribution of miscellaneous re-entrained dust to ambient lead concentrations.  EPA developed this national estimate by evaluating data from ambient TSP monitors with a negligible impact from NEI lead emission sources.  For the purposes of this analysis, EPA defines "negligible impact" to mean that NEI point and non-point lead-emitting sources, with associated fugitive emissions, have no contribution to the measured ambient lead concentration.  Accordingly, EPA judged the ambient lead concentration measured at these TSP monitors to be entirely due to miscellaneous re-entrained dust.

Of the 189 sites included in the 2003-2005 TSP NAAQS-review database, EPA deemed 90 sites to have negligible impact from active sources based on two criteria: 1) each site was not identified as "source oriented" in previous EPA analysis; and 2) each site had cumulative point and area non-point emissions of 0.01 tons per year or less within a one-mile radius of the monitor.[9]  As a central tendency of the contribution of miscellaneous, re-entrained dust, EPA found the median ambient lead concentration at these sites to be 0.0225 $\mu g/m^3$.  Although this represents the average concentration at the national level, actual concentrations associated with miscellaneous re-entrained dust may vary by area. Nevertheless, in general this value typically represents a small portion of the baseline concentration at each monitor, as indicated by Figure 3-1, which illustrates the composition of the baseline lead concentration at the Fulton County, Ohio monitor.

**Step 4:  Estimate the contribution of area nonpoint sources.**  A portion of observed lead concentrations results from emissions from area non-point sources (e.g., households).  The air quality assessment tool estimates the contribution of lead-emitting area non-point sources to ambient lead concentrations based on data from the 2002 area non-point lead emission inventory. This inventory is generally summarized at the county level, and EPA assumes that each county's area non-point emissions were uniformly distributed within each county.  Based on this assumption, the air quality assessment tool also assumes that the extent to which area non-point sources contribute to ambient lead concentrations is proportional to the ratio of county-level area non-point lead emissions to total county-level lead emissions.  Because this ratio differs by county, the area non-point source contribution to ambient lead concentrations also differs for each monitor site, but it generally composes a small portion of the overall concentration, as illustrated by the Fulton County, Ohio example in Figure 3-1.

---

[9] Sites classified as source oriented in previous EPA analysis were identified via a reference list used in EPA Trends Report analyses.  This list encompasses 119 sources and was last updated in 2003.

**Figure 3-1.**
**APPORTIONMENT OF THE BASELINE SECOND MAXIMUM MONTHLY MEAN LEAD CONCENTRATION AMONG SOURCE CATEGORIES IN FULTON COUNTY, OHIO**



Monitor 390510001: Fulton County, OH

**Step 5:  Estimate the residual concentration after removing the contributions of miscellaneous re-entrained dust and area non-point source emissions.**   Based on the results of the four previous steps, the air quality assessment tool estimates the intermediate remaining second maximum monthly mean lead concentration (hereafter, "residual concentration") by subtracting the contributions of miscellaneous re-entrained dust and area non-point source emissions from the baseline air quality value.  The residual concentration represents the total concentration fraction associated with emissions from inventoried point sources and indirect fugitive emissions from industrial sites.  In the case of Fulton County, Ohio, the residual concentration is 0.5053 $\mu g/m^3$, or the baseline concentration of 0.5300 $\mu g/m^3$ less the 0.0225 $\mu g/m^3$ and 0.0022 $\mu g/m^3$ concentration fractions associated with miscellaneous dust and area non-point sources, respectively.

**Step 6:  Determine the contribution of each inventoried point source to the ambient lead concentration at each monitor, accounting for indirect fugitive emissions from nearby active industrial sites.**  For each monitor area, the air quality assessment tool attributes the residual concentration derived in Step 5 to each point source according to its lead emissions as well as its distance from the monitor.  After weighting each source's emissions according to its distance from the monitor and applying an adjustment to account for the impact of indirect fugitive emissions, the air quality assessment tool then estimates the total contribution of each source to the ambient lead concentration at the nearest monitor.  We describe this approach in more detail below.

Step 6.1: Weight the emissions from each source by its distance from the monitor.

To account for the fact that, all else equal, lead emissions closer to the monitor have a greater impact on ambient lead concentrations, the tool assumes that each source's contribution to the concentration is proportional to its share of the total distance-weighted point source emissions for the monitor area.  [Note that the tool does not contain data sufficient to assess the influence of other factors, such as stackheight and local meteorological conditions, that could affect the relative contribution of each point source to monitored Pb concentrations.]

For each source, the tool calculates distance-weighted emissions using the following equation:

$$(\text{Equation 3-1}) \quad DWE_S = \frac{E_S}{D_S^{3/2}}$$

where:

- $DWE_S$  =  Distance-weighted 2002 NEI emissions for source $S$,
- $E_S$  =  2002 NEI emissions for source $S$, and
- $D_S$  =  Distance between source $S$ and the monitor location.

Step 6.2: Adjust the distance-weighted emissions to incorporate the impacts of indirect fugitive emissions.

After calculating the distance-weighted emissions for each source, the air quality assessment tool applies an additional adjustment to account for indirect fugitive emissions from active industrial sites near each monitor.[10]  These indirect fugitive emissions are thought to result from materials handling and on-site activities that re-entrain previously deposited lead-containing dust.  Unlike area non-point source emissions, indirect fugitive emissions are linked to point sources and are not captured in the 2002 NEI.  Indirect fugitive emissions, however, do not include fugitives associated with industrial processes at point sources, as these direct, process-based fugitive emissions are reflected in the 2002 NEI point source inventory.  Relative to point source emissions, fugitive emissions tend to consist of coarser particles that are emitted closer to the ground and are therefore assumed to have a more localized effect on ambient air

---

[10] Airport emissions are also reflected in the residual concentration.  For the purposes of this analysis, airports are treated as point sources, although as discussed further in chapter 4, no controls are applied to airports.

quality.  Reflecting this consideration, the air quality assessment tool assumes that only indirect fugitive emissions from sources within one mile of the monitor would have an impact on the monitor reading, and even then only in situations where the cumulative emissions of such nearby sources are "significant" (i.e., typically where the aggregate 1-mile radius point source emissions are greater than one ton).

To estimate the extent to which indirect fugitive emissions contribute to ambient lead concentrations near active industrial sites, EPA conducted a study of nine sites where previously active lead-emitting sources had ceased or paused production.  Assuming that activities conducive to re-entrainment continue for a short period after production had ceased, EPA compared ambient lead concentrations before and after these production stoppages.  After subtracting the contribution from un-inventoried miscellaneous dust (as in Step 3 above) and from area non-point sources (as in Step 4 above), EPA found that the average post-stoppage lead concentration represented approximately 15 percent of the average pre-stoppage concentration. For this analysis, therefore, EPA assumes that the contribution of indirect fugitive emissions from active industrial sites within one mile of the lead monitors represents approximately 15 percent of the total contribution attributable to these sources.

The air quality assessment tool estimates contribution of indirect fugitive emissions to observed lead concentrations as follows:

- First EPA identified large sources within one mile of the monitor location that were expected to have indirect fugitive emissions that would affect the monitor's air quality reading.

- For each identified source, EPA adjusted its distance-weighted emissions to account for the additional fugitive emissions emanating from that source. Reflecting the results of the analysis described above, EPA adjusted sources with indirect fugitive emissions by multiplying their distance-weighted emissions by 20/17, or 117.65 percent.[11]

For all sources, the air quality assessment tool applies the adjustment for indirect fugitive emissions using the following equation:

(Equation 3-2)  $fDWE_S = DWE_S \cdot \left(1 + f_S \cdot \dfrac{3}{17}\right)$

where:

- $fDWE_S$ = Distance-weighted 2002 NEI emissions for source $S$, adjusted to account for indirect fugitive emissions,
- $DWE_S$ =  Distance-weighted 2002 NEI emissions for source $S$,

---

[11] As stated above, EPA estimates that 15 percent of the total contribution from active industrial sites within one mile of lead monitors is attributable to indirect fugitive emissions.  Accordingly, 85 percent of the total contribution from these sites is attributable to direct emissions.  The ratio of the total contribution from these sources to the contribution from direct emissions is therefore 100/85, or 20/17.

- $f_S$ = Indicator for whether a source has indirect fugitive emissions affecting the monitor (assigned a value of 1 if a source is within one mile of the monitor and has indirect fugitive emissions, and 0 otherwise).

Step 6.3: Estimate contribution of each source to ambient lead concentrations based on fugitive-adjusted distance-weighted emissions.

After calculating the distance-weighted emissions for each source using Equation 3-1 and incorporating the impacts of indirect fugitive emissions using Equation 3-2, the air quality assessment tool estimates each source's contribution to the ambient lead concentration as follows:

(Equation 3-3) $C_S = C_P \cdot \dfrac{fDWE_S}{fDWE_P}$

where:

- $C_S$ = The portion of that monitor area's ambient lead concentration attributable to source $S$,
- $C_P$ = Total contribution of point source emissions (and associated industrial fugitives) to the ambient lead concentration (i.e., the remaining concentration after subtracting background and area source contributions from the baseline air quality value),
- $fDWE_S$ = Fugitive-adjusted, distance-weighted 2002 NEI emissions for source $S$, and
- $fDWE_P$ = Sum of fugitive-adjusted, distance-weighted 2002 NEI emissions for all point sources in the monitor area.

Continuing with the Fulton County, Ohio example presented in Figure 3-1, Table 3-2 illustrates the process by which the contribution of each point source in Fulton County is apportioned based on its emissions and distance from the monitor location. Note that the source contribution from Source B is several orders of magnitude larger than the source contribution from Source A, even though lead emissions from Source B are only twice those from Source A.

**Table 3-2.**
**APPORTIONMENT OF THE TOTAL POINT SOURCE CONTRIBUTION TO THE AMBIENT LEAD CONCENTRATION AMONG INVENTORIED POINT SOURCES IN FULTON COUNTY, OHIO**

| Monitor Location | Fulton County, OH | |
|---|---|---|
| Total Point Source Contribution to Ambient Lead Concentration ($\mu g/m^3$) [$C_P$] | 0.5053 | |
| Source | Source A | Source B |
| 2002 NEI Emissions (tpy) [$E_S$] | 0.1500 | 0.338 |
| Distance from Monitor to Source (km) [$D_S$] | 3.4707 | 0.0554 |
| 2002 NEI Distance-Weighted Emissions (tpy/km$^{3/2}$) [$DWE_S$] | 0.0232 | 25.8982 |
| Fugitive Emissions Affect Monitor? [$f_S$][1] | No | Yes |
| Distance-Weighted Emissions with Fugitive Adjustment (tpy/km$^{3/2}$) [$fDWE_S$] | 0.0232 | 30.4685 |
| Total Distance-Weighted Emissions (tpy/km$^{3/2}$) [$fDWE_P$] | 30.4917 | |
| Share of Total Distance-Weighted Emissions [$fDWE_S$ / $fDWE_P$] | 0.0761% | 99.9239% |
| Source Contribution to ambient lead concentration ($\mu g/m^3$) [$C_S = C_P * fDWE_S/fDWE_P$] | 0.0004 | 0.5049 |

[1] "No" and "Yes" in this row correspond to values of 0 and 1 for $f_S$, respectively, as defined in Equation 3-2.

In this analysis, airports were treated as point sources. Currently, there are 3,410 aviation facilities in the NEI of which, 24 are included in this analysis due to their proximity to one of the 24 monitors that were identified using the criteria described in Section 3.1. Among the 21 monitors in this analysis, there are 18 monitors with at least one airport located within ten kilometers of the monitor (six monitors have two airport facilities within ten kilometers). This analysis estimates that the contribution of leaded aviation gasoline to lead measured at the monitors ranges from 0.00002 to 0.047 $\mu g/m^3$. There are currently no TSP lead monitors located within one mile of an airport servicing aircraft that operate on leaded aviation gasoline. In addition to the 24 airport facilities within ten kilometers of the monitors in this analysis, there are heliport and airport facilities where piston-engine aircraft might operate that are not currently in the NEI and for which we do not currently have lead emissions estimates.[12]

---

[12] Memo to the RIA Docket -HQ-OAR-2008-0253 Titled 'Small airport facilities within ten kilometers of monitors in the Lead Regulatory Impact Analysis that are currently missing from EPA's National Emissions Inventory' submitted by Marion Hoyer, Meredith Pedde and Bryan Manning.

**3.2.     Using the Air Quality Assessment Tool to Estimate Impacts of Point Source Emissions Controls**

Through the process described in Chapter 4, we used a least-cost optimization model to estimate the extent to which point source lead emissions could decline under the control strategies developed for the final NAAQS and the alternative standards summarized in Chapter 1.[13]  To estimate the air quality impact of these reductions, we developed a three-step process for estimating ambient lead concentrations based on the air quality assessment tool described above. This process is as follows:

1.   For each alternative standard, we applied identified controls to individual point sources, according to the cost optimization model.  Because the air quality assessment tool translates lead emissions to air quality impacts by applying a constant distance-weighting for each source, the percent reduction in a source's contribution to ambient lead concentrations was the same as the combined control efficiency of all emissions controls applied to that source.  Based on these source-specific reductions, we estimated each point source's contribution (including the contribution from indirect fugitive emissions) to the ambient lead concentration following the implementation of emissions controls.

2.   For each monitor area, we summed the individual point source contributions estimated in Step 1 to obtain the total ambient lead concentration attributable to inventoried point sources (including ambient lead associated with indirect fugitive emissions).

3.   Holding the contributions from area non-point sources and miscellaneous re-entrained dust constant between the baseline and policy case, we added these to the total contribution from point sources (estimated in step 2) to yield the new estimate for the total ambient lead concentration.

---

[13] As described in Chapter 4, our analysis did not consider controls on lead emissions from airports.  Therefore, we kept lead emissions from airports constant in both the baseline and policy scenarios.

**CHAPTER 4.  EMISSIONS CONTROL ANALYSIS:  DESIGN AND ANALYTIC RESULTS**

This chapter documents the illustrative emission control strategy we applied to simulate attainment with the selected standard and alternative standards. Section 4.1 describes the approach we followed to select cost-effective emissions controls to simulate attainment in each geographic area of analysis. Section 4.2 summarizes the emission reductions we simulated in each area based on current knowledge of emissions controls applicable to existing sources of lead emissions, while Section 4.3 presents the air quality impacts of these emissions reductions. Section 4.4 discusses the application of additional controls, beyond those known to be available, that we estimate will be necessary to reach attainment in certain monitor areas. Section 4.5 discusses key limitations in the approach we used to estimate the optimal control strategies for each alternative standard.

**4.1**.     <u>**Estimation of Optimal Emissions Control Strategies**</u>

Our analysis of the emissions control measures required to meet the selected standard and alternative standards is limited to controls for point source emissions at active sources inventoried in the 2002 NEI.  [Note that while airports are included as point sources in the NEI, our analysis considers the impact of emissions from use of leaded aviation gasoline (avgas) at airports, but does not consider controls on those emissions as a strategy for compliance.  EPA received a petition from Friends of the Earth requesting that the Agency find that aircraft lead emissions may reasonably be anticipated to endanger the public health or welfare, and to take action to control lead emissions from piston-engine aircraft.  We published a <u>Federal Register</u> notice discussing the petition and requested comment on specific aspects of the use of leaded avgas and potential control of lead emissions from the consumption of avgas.[1]]  As discussed in Chapter 3, a portion of ambient lead concentrations can be attributed not to point sources but to miscellaneous re-entrained dust and area nonpoint emissions.  Nevertheless, this RIA deals only with the application of controls on emissions at active non-aviation point sources, including stack emissions and fugitive emissions from industrial processes.

---

[1] The petition requested that EPA find that such emissions cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare.  And, if EPA makes such a finding, the petitioner requested that EPA take steps to reduce lead emissions under the authority of the Clean Air Act Section 231  Approximately 70 different parties commented on the petition and the questions presented in the notice (72 FR 64570, November 16, 2007). These comments can be found in EPA public docket OAR-2007-0294 (at www.regulations.gov). A clear theme in many of the comments was the dependence of much of the current piston-powered aircraft fleet on leaded avgas either because of engine design, performance demands, or lack of mogas availability at airports. However, several comments identified potential near and longer term measures to reduce these lead emissions. These potential measures fall into five general categories: (1) Continued work on identifying fuel blends or additives which would provide the octane and other performance characteristics needed for a transparent fuel replacement, (2) Measures to ensure greater availability of ethanol-free unleaded avgas at airports for those aircraft which otherwise could use it, (3) Laboratory and field work to assess the potential to reduce the amount of lead now added to current leaded avgas, (4) Add-on engine technology or fuel management technology to allow for equivalent engine performance at lower avgas octane ratings and (5) Long-term measures or standards for new engines which provide the needed and desired performance characteristics using modified engine designs and calibrations on fuels or fuel blends not containing lead.  For more information about the petition, see http://www.epa.gov/otaq/aviation.htm.

To simulate attainment with the selected standard and the five regulatory alternatives considered in all 21 monitor areas, we first modeled the most cost-effective application of identified emissions controls in each area, using the following four-step process:

1. Specification of baseline emissions for inventoried point sources in each geographic area of analysis.

2. Identification of potential controls for inventoried point sources.

3. Identification of an alternative lead abatement strategy for the primary lead smelter in Jefferson County, Missouri.

4. Identification of the least cost strategy for using point source controls.

In areas where identified emissions controls were not sufficient to reach attainment with one or more of the alternative standards considered, we also simulated emission reductions needed beyond identified controls at inventoried point sources.  Further discussion of theseunspecified emission reductions is presented in Section 4.4.

The analysis used for the Final Rule differs from that presented in the Proposed Rule RIA in the following ways:

1. We no longer remove from consideration all identified controls with a cost/ton higher than the 98th percentile of control costs at point sources emitting more than 0.05 tons/year of lead. This was described as the "Stage 3 Filter in the Proposed Rule RIA."

2. We updated control efficiency and cost information for many of the identified emission controls used in the Proposed Rule RIA, after determining that the prior values were unlikely to reflect the performance and cost of these controls in 2016, the analysis year for this RIA.

3. Rather than applying PM emission controls to the primary lead smelter in Jefferson County, Missouri, we simulated a complete rebuild of the smelter to utilize a less-polluting smelting process.

4. We modified the analysis of emission reductions needed beyond identified controls such that these reductions are distributed across all sources in areas projected to violate any alternate standard.  In the Proposed Rule analysis, these reductions were achieved by controls applied to a limited number of sources.

These changes to the analysis relative to the Proposed Rule RIA are described in greater detail throughout this chapter.

### 4.1.1.  Specification of Baseline Lead Emissions for Inventoried Point Sources in Each Geographic Area of Analysis.

For most sources, lead emissions as specified in the 2002 National Emissions Inventory (NEI) served as the baseline for our analysis.  However, for some sources (e.g., natural gas-fired utility boilers), we corrected the 2002 NEI lead emissions data with updated information.  As discussed

in Chapter 2, we did not apply growth factors to the 2002 NEI emissions estimates to predict emissions in 2016 (the analysis year for this RIA) because we believe that the number of Pb emitting sources will not increase with population growth.  We did, however, adjust the 2002 NEI lead emissions values to reflect anticipated emissions controls necessary to comply with other regulations that have compliance deadlines after 2002, wherever possible.  These adjustments included application of MACT for air toxics rules with post 2002 compliance deadlines,[2] PM controls at sources in designated nonattainment areas in the 2006 revisions to the $PM_{2.5}$ NAAQS as modeled in the illustrative control strategy in the $PM_{2.5}$ NAAQS RIA,[3] and controls planned for the primary lead smelter in Jefferson County, Missouri, as part of the 2007 Missouri lead SIP (at the one current nonattainment area for ambient lead under the Federal CAA).[4]  After applying these adjustments to all affected point sources, the remaining lead emissions served as our baseline for the application of identified controls.  Table 4-1 illustrates the process used to specify the baseline lead emissions for inventoried point sources in the analysis.

**Table 4-1.**
**TOTAL BASELINE LEAD EMISSIONS FOR ALL INVENTORIED POINT SOURCES IN 23 DESIGNATED MONITOR AREAS**

| | |
|---|---|
| Original Baseline: 2002 NEI Emissions (point sources, excluding airports) | 109.2 tons/year (tpy) |
| 2002 NEI Emissions adjusted for PM NAAQS controls | 109.0 tpy |
| 2002 NEI Emissions adjusted for PM NAAQS and Missouri SIP controls | 101.2 tpy |
| Final Baseline: 2002 NEI Emissions adjusted for PM NAAQS, Missouri SIP, and MACT controls | 99.7 tpy |

Following the same process as described above, we also specified baseline $PM_{10}$ and $PM_{2.5}$ emissions for all inventoried point sources.  Although the non-lead fraction of PM emissions did not play a role in simulating attainment with the selected standard and alternative standards, we did use these baseline values to estimate the ancillary benefits of co-controlling PM emissions in the process of implementing lead control strategies, as discussed in Chapter 5.  Recent promulgation of mobile source rules that reduce PM is not relevant for this analysis.

## 4.1.2.   Identification of Potential Controls for Inventoried Point Sources.

To identify point source lead emissions controls for our analysis, we collected information on PM control technologies, assuming that the control efficiency for PM emissions would also apply to lead emissions.  We collected this information in the following way:

---

[2] The MACT standards included covered the following industries: Integrated Iron and Steel Manufacturing; Iron and Steel Foundries; Petroleum Refineries; Secondary Aluminum Production; Industrial/Commercial/Institutional Boilers & Heaters – Coal; Pressed and Blown Glass and Glassware Manufacturing; Primary Nonferrous Metals – Zinc, Cadmium, and Beryllium; Secondary Nonferrous Metals; and Primary Copper Smelting.

[3] Available at http://www.epa.gov/ttn/ecas/ria.html

[4] This lead SIP was finalized by EPA on April 14, 2006  with a requirement that this SIP will provide attainment with the current lead standard by April 7, 2008.  The SIP is available at: http://www.dnr.mo.gov/env/apcp/docs/2007revision.pdf

1. We queried EPA's AirControlNET database for information on potential PM controls available for each source, accounting for any control measures already in place, according to the 2002 NEI.[5]

2. For sources with Standard Industrial Classifications (SICs) but without identified NEI Source Classification Codes (SCCs), we used the SIC/SCC crosswalk in Appendix C of AirControlNET's Documentation Report to identify SCCs for those sources.[6]  We then found controls in AirControlNET's database associated with these SCCs.

3. EPA identified additional controls from technical documents prepared in support of New Source Performance Standards, EPA memos prepared to support analyses for the $PM_{2.5}$ RIA, and operating permits that apply to facilities with similar SCCs as the point sources in our analysis.  These controls include the following:

- ***Capture hoods vented to a baghouse at iron and steel mills.***  Virtually all iron and steel mills have some type of PM control measure, but there is additional equipment that could be installed to reduce emissions further. Capture hoods that route PM emissions from a blast furnace casthouse to a fabric filter can provide 80 to 90 percent additional emission reductions from an iron or steel mill.

- ***Diesel particulate filter (for stationary sources such as diesel generators).***  This control incorporates directly-emitted $PM_{2.5}$ reductions from stationary internal combustion engines that will be affected by the compression-ignition internal combustion engine new source performance standard (NSPS) promulgated on June 28, 2006.  Diesel particulate filters (DPF) are likely to be the control technology required for these engines to meet the NSPS requirements.  The control is applied here as a retrofit to existing stationary internal combustion engines in our inventory.  Based on the technical support documents prepared for the final compression-ignition NSPS, the $PM_{2.5}$ control efficiency for DPF is 90 percent.[7]

- ***Upgrade of CEMs and increased monitoring frequency of PM controls (for sources where not already identified as a control by ACN).***  This control is an upgrade to existing control measures or an improvement in control efficiency due to how existing control measures operate from increases in monitoring. Such controls can lead to small reductions in PM emissions (5 to 7 percent).[8]

---

[5]  Documentation available at http://www.epa.gov/ttnecas1/models/DocumentationReport.pdf.  AirControlNET's database of PM controls normally excludes sources emitting fewer than 10 tons/year of $PM_{10}$.  Because many of the point sources included in our analysis fall below this threshold and because this analysis focuses entirely on obtaining emission reductions from point sources,  we effectively reduced the threshold from 10 tons/year to zero in order to identify controls for a larger number of inventoried point sources.

[6] Available at http://www.epa.gov/ttnecas1/models/DocumentationReport.pdf.

[7]  U.S. Environmental Protection Agency.  "Emission Reduction Associated with NSPS for Stationary CI ICE." Prepared by Alpha-Gamma, Inc.  June 3, 2005, and U.S. Environmental Protection Agency.  "Cost per Ton for NSPS for Stationary CI ICE."  Prepared by Alpha-Gamma, Inc.  June 9, 2005.

[8] U.S. Environmental Protection Agency.  Regulatory Impact Analysis for the Particulate Matter NAAQS.  October, 2006.  Appendix E, pp. E-16 to E-24.  This document is available at http://www.epa.gov/ttn/ecas/regdata/RIAs/Appendix%20E--Controls%20List.pdf.

4.  In response to the degree of residual nonattainment found in a number of monitor areas in the Proposed Rule analysis, we reviewed the PM control measures in our databases in order to determine if the data for these measures were fully up to date and appropriate for an analysis year of 2016.   In the course of our review, we found that the control efficiencies for a variety of PM control measures as applied in our proposal RIA were quite conservative (i.e., more likely to be underestimates than overestimates) for control strategy analyses to be conducted for 2016.  A number of recent EPA references provided findings that showed that increases in PM control efficiencies from those applied in our proposal RIA were reasonable for a future year analysis.  Based on these findings, we increased the control efficiencies and costs for a number of the PM control measures in our database, as summarized below:[9]

- ***Dry and Wet ESPs:*** Control efficiency modified from 95 percent to 99 percent.

- ***Fabric Filters (pulse jet type and mechanical shaker type):*** Control efficiency modified from 99.5 percent to 99.9 percent.

- ***Venturi Scrubbers:*** For those source classification codes (SCCs) to which AirControlNET applies a control efficiency of 50 percent, we modified this value to 90 percent for the 2016 target year.  For SCCs, where the control efficiency in AirControlNET is 25 percent, we adjusted this value to 70 percent.

- ***Paper/Nonwoven Filters – Cartridge Collectors:*** The AirControlNET control efficiency value of 99 percent was modified to 99.5 percent.

Completion of the procedure outlined above yielded identified controls for about 43 percent of the total inventoried point sources in our analysis.  However, because of the skewed distribution of lead emissions in the 2002 NEI (the top 10 percent of inventoried point sources account for more than 97 percent of total lead emissions), these sources accounted for approximately 92 percent of total lead emissions, as shown in Table 4-2.

**Table 4-2.**
**PROFILE OF INVENTORIED POINT SOURCES, WITH AND WITHOUT IDENTIFIED CONTROLS**

| | Count | Percent of Total | Emissions  (tons/year) | Percent of Total |
|---|---|---|---|---|
| Sources with Identified Controls[1] | 266 | 42.6% | 91.8 | 92.1% |
| Sources without Identified Controls | 359 | 57.4% | 7.9 | 7.9% |
| **Total** | **625** | **100.0%** | **99.7** | **100.0%** |

[1] Identified controls, as represented in this table, include the potential rebuild of the primary lead smelter in Jefferson County, MO, as described in greater detail below.  Therefore, all emissions sources at this facility are included in this table as sources with identified controls.

---

[9] PM control efficiencies were increased for the following control measures: dry and wet ESPs, all types of fabric filters, venturi scrubbers, impingement-plate/tray-tower scrubbers, and paper/nonwoven filters - cartridge collectors. We also revised the capital and annualized costs for these control devices to reflect the increased control efficiencies associated with these control measures, as discussed in Chapter 6.

Controls identified through this process include major emissions controls, such as fabric filters, impingement-plate scrubbers, and electrostatic precipitators; and minor controls, such as increased monitoring frequency, upgrades to continuous emissions monitors, and diesel particulate filters.  For each identified control, we identified both the expected control efficiency for the technology and the annualized cost of installing and operating the control.[10]  For those point sources where the 2002 NEI indicated that control measures were already in place, we estimated the effective emissions control efficiency for each identified control by estimating the emissions reductions that would result if the pre-existing control were replaced by the identified control technology.  For example, while a fabric filter might have an expected control efficiency of 90 percent when installed in the absence of pre-existing controls, if it were applied at a source that already had an electrostatic precipitator with an 80 percent control efficiency, the *effective* control efficiency of the Fabric Filter would be 50 percent.[11]  We also assumed that each identified control technology would be installed in addition to any controls required under the 2006 $PM_{2.5}$ NAAQS and any MACT rules with enforcement dates after 2002, but before 2016.  We therefore applied each control's effective control efficiency to the adjusted baseline lead emissions at each inventoried point source.[12]

### 4.1.3.   Identification of an Alternative Lead Abatement Strategy for the Primary Lead Smelter in Jefferson County, Missouri.

In the Proposed Rule analysis, a significant portion of the estimated costs of the rule—ranging from 55 percent for the 0.05 $\mu g/m^3$ standard alternative to 95 percent for the 0.3 $\mu g/m^3$ standard alternative - represented reductions beyond identified controls at the primary lead smelter in Jefferson County, Missouri.  To reduce the extent to which the costs and emissions reductions associated with the lead NAAQS depend on reductions beyond identified controls for a single source, we have modeled the replacement of the primary lead smelter in Jefferson County with a more modern, lower-emitting smelter, utilizing the Kivcet smelting process, as a means of reducing the facility's lead emissions.  The Kivcet process is currently employed at the primary lead smelter operated by Teck Cominco in Trail, British Columbia, as well as in plants in Kazakhstan, Bolivia, and Italy.[13]  While it may be more cost-effective for the facility to implement more targeted emissions controls under the selected standard, information on such controls is not available.

To estimate the emissions reductions associated with transitioning to Kivcet technology at the smelter in Jefferson County, we relied on emissions data for Teck Cominco's Trail, British Columbia, facility, which began using the Kivcet process in 1997.  We derived lead emissions per ton of lead produced at this facility by obtaining lead emission values from Canada's

---

[10] See Chapter 6 for a detailed discussion of how annualized control costs were estimated.

[11] With the electrostatic precipitator, 20 percent of the source's original, uncontrolled emissions would remain uncontrolled, but with the fabric filter, only 10 percent of the source's original emissions would remain uncontrolled.  Thus, replacing the electrostatic precipitator with the fabric filter would represent a 50 percent (10/20 = 0.5) decrease in uncontrolled emissions.

[12] The one exception to this assumption is the installation of capture hoods vented to baghouses, a control included at some sites as part of the control strategies applied for the 2006 $PM_{2.5}$ revised NAAQS RIA.  Because baghouses are major controls which would be replaced by the installation of any other major control, we applied the effective control efficiency of major controls to the *unadjusted* baseline emissions at any site with a capture hood installed.

[13] The Eastern Mining and Metallurgical Research Institute for Non-Ferrous Metals, Pyrometallurgy. http://vcm.ukg.kz/eng/v3_6.htm. Accessed September 23, 2008.

National Pollutant Release Inventory (NPRI)[14] and annual lead production values from Teck Cominco's annual reports.  Taking the average value for the past five years for which NPRI data are available, we estimated that the Trail, BC, facility emits 0.07 pounds of lead for every ton of lead produced using its Kivcet smelter.  Applying this emissions rate to the facility in Jefferson County, which produced 150,000 thousand tons of lead in 2002, we estimate lead emissions of 5.50 tons per year for this facility.[15]  This represents an 89 percent reduction in lead emissions relative to the facility's baseline emissions of 51 tons per year.  When modeling this lead emissions control strategy, we divided these reductions among the emissions sources at the Jefferson County primary lead smelter in proportion to each source's 2002 NEI emissions.

### 4.1.4.   Identification of the Optimal Strategy for Using Point Source Controls to Reach Attainment in Each Area.

To identify the least-cost approach for reaching attainment in each area projected to violate the NAAQS, EPA developed a linear programming optimization model that systematically evaluates the air quality and cost information discussed below and in Chapter 6 to find the optimal control strategy for each area.  The optimization model first identifies the measures that each source would control if it were controlled as part of a local lead attainment strategy.  Based on these controls, the optimization model then identifies sources to control such that each area would reach attainment at the least aggregate cost possible for the area.  Minimizing total costs across all sources is not always equivalent to minimizing marginal costs at each source.  Therefore, although the model selects major controls for each source by minimizing the marginal cost/ton of lead controlled at the source, the objective for each area is to minimize total costs associated with reaching attainment.  It should be noted that unlike major controls, all minor controls identified can be implemented in conjunction with other controls, so the optimization model selects all minor controls as well.

Rather than considering all emissions controls at every inventoried point source, the optimization model utilizes a two-stage filtering process to select only the most cost-effective controls at sources making a significant impact on ambient air quality.  The stages are as follows:

1.  *Stage 1 filter:*  First, the model selects all controls at sources deemed "relevant" by virtue of the fact that they account for at least 0.001 percent of all point source contributions to the ambient lead concentration in their monitor area.  This stage mostly affects monitor areas with large numbers of inventoried point sources, such as Dakota County, Minnesota, where 105 out of 126 inventoried sources do not meet the 0.001 percent threshold.

2.  *Stage 2 filter:*  Because we identified multiple major emissions controls for many sources, the second stage of the model assumes that the most cost-effective major control for each relevant source would be installed, as determined by the cost/ton of lead emissions reduced.  For example, consider a source that could install either an electrostatic precipitator (ESP) that would reduce lead emissions by 0.1 tons/year with an annualized cost of $1 million or a

---

[14] Available at http://www.ec.gc.ca/pdb/npri/npri_home_e.cfm.  Communication with David Niemi, Head Emissions Inventory Reporting and Outreach at Environment Canada, confirmed that the methods used to collect the NPRI were comparable to the methods used to collect the NEI.

[15] The estimate of 2002 lead production at this smelter comes from The Doe Run Company, Primary Mining and Smelting Division, *2002 Annual Report to our Community.*

fabric filter that would reduce lead emissions by 0.11 tons/year at a cost of $2 million/year. Because the cost/ton is lower for the ESP, the optimization model assumes that the source would (potentially) install the ESP rather than the fabric filter.[16]

In the Proposed Rule RIA, we implemented a third filter, in which we removed from consideration all point source controls with a cost/ton higher than the 98th percentile of control costs at point sources emitting more than 0.05 tons/year of lead. For this analysis, we have eliminated that filter, in order to maximize the emission reductions achieved with identified controls.

After selecting the most cost-effective emissions controls at all relevant point sources for each monitor area, the model then proceeds to evaluate every possible combination of control technologies until the monitor area reaches attainment with the selected standard or alternative standard at the lowest possible cost. If the monitor area is already in attainment with the selected standard, the model applies no controls. On the other hand, if the monitor area is unable to reach attainment with the selected standard when all cost-effective controls at relevant sources are applied, then the model assumes that all sources in the area are controlled, including those that account for less than 0.001 percent of point source contributions in the area (i.e., the model eliminates the stage 1 filter described above and thus applies controls to smaller sources).

As indicated above, this approach is not the equivalent of moving up the marginal abatement cost curve for lead. If the control strategy were selected based on the marginal cost per $\mu g/m^3$ reduced, we would not necessarily identify the least-cost strategy for attainment in each area.

## 4.2.    Lead Emissions Reductions Achieved with each Control Strategy

Utilizing the optimization model described above, we determined the most cost-effective control strategies required to meet attainment at the largest number of monitor areas.[17] Table 4-3 presents the lead emissions reductions realized at each monitor area under the control strategies followed for each alternative standard.

## 4.3.    Impacts Using Identified Controls

Following the steps described in Section 3.2, we estimated the overall change in ambient air quality achieved as a result of each of the control strategies identified in the AirControlNET-based emissions analysis. Table 4-4 presents a detailed breakdown of the estimated ambient lead

---

[16] If there are two available control options, the least-cost approach chooses the option with a lower cost/ton. It does this even if a slightly more expensive control option can achieve greater emission reduction. Although in theory this filter could cause some emission reduction to be missed, in practice, the impact is negligible. For example, in the simulation of attainment with the 0.1 $\mu g/m^3$ standard, removal of this filter increases the emission reduction by less than 0.0001 tons per year.

[17] As will be discussed below, the application of identified controls was insufficient to bring all monitor areas into compliance with the selected standard and the alternative standards.

concentrations in 2016 at each of the 21 monitor sites under the selected standard and the five alternative standards described in Chapter 1.

According to the data presented in Table 4-4, 13 of the 21 monitor areas are expected to reach attainment with the selected standard of 0.15 µg/m$^3$ following implementation of the controls identified in the AirControlNET analysis (i.e., identified controls). In addition, 20 areas are expected to reach attainment with identified controls under a NAAQS of 0.5 or 0.4 µg/m$^3$. For the most stringent alternative considered, 0.1 µg/m$^3$, 9 of the 21 monitors are expected to reach attainment following the application of identified controls. For some areas, identified controls are not sufficient to reach attainment with the selected standard.

The failure of certain areas to reach attainment with identified controls partially reflects the lack of control information for point sources in these areas. As indicated in Table 4-5, emissions from sources for which the AirControlNET analysis identified no controls contribute to a significant portion of the ambient lead concentration in many of the areas not projected to reach attainment with the selected standard and four alternative standards. For such sources in areas projected to violate the NAAQS with the application of identified controls, we assume that emission reductions beyond identified controls will be applied, as discussed further below.

Table 4-6 presents the additional air quality change needed for monitor areas that did not attain at least one of the alternative standards analyzed in this RIA. In addition, Figure 1 presents the additional air quality improvement needed in each monitor area that did not attain the 0.15 ug/m3 selected standard with the application of identified controls. This figure illustrates that the progress made through the application of identified controls varies greatly by monitor area.

**FIGURE 1.**
**AIR QUALITY CHANGE ACHIEVED THROUGH APPLICATION OF IDENTIFIED CONTROLS AND ADDITIONAL INCREMENT NEEDED TO REACH ATTAINMENT OF SELECTED STANDARD 0.15 UG/M3**



**TABLE 4-3.**
**REDUCTION IN LEAD EMISSIONS UNDER ALTERNATIVE NAAQS AT EACH**
**MONITOR AREA, IDENTIFIED CONTROLS ONLY**

| Monitor State | Monitor County | Baseline Lead Emissions in 2016 | Reduction in Lead Emissions (tpy) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Standard Alternative: 0.5 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.4 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.3 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.2 µg/m³ 2nd Maximum Monthly Mean | Selected Standard: 0.15 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.1 µg/m³ 2nd Maximum Monthly Mean |
| AL | Pike | 4.45 | 4.02 | 4.02 | 4.02 | 4.13 | 4.31 | 4.31 |
| CO | El Paso | 0.95 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00* |
| FL | Hillsborough | 1.48 | 1.00 | 1.00 | 1.09 | 1.19 | 1.19 | 1.26 |
| IL | Madison | 0.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09* |
| IN | Delaware | 1.53 | 1.37 | 1.37 | 1.40 | 1.42 | 1.44 | 1.46 |
| MN | Dakota | 3.55 | 0.00 | 0.00 | 0.00 | 0.00 | 1.29 | 3.07 |
| MO | Iron | 16.12 | 12.26 | 12.26 | 12.26 | 12.26 | 12.26 | 12.26 |
| MO | Jefferson | 51.02 | 45.52 | 45.52 | 45.52 | 45.52* | 45.52* | 45.52* |
| NY | Orange | 1.80 | 0.00 | 0.00 | 0.00 | 1.39 | 1.39 | 1.39 |
| OH | Cuyahoga | 0.94 | 0.00 | 0.00 | 0.13* | 0.13* | 0.13* | 0.13* |
| OH | Fulton | 0.49 | 0.14* | 0.14* | 0.14* | 0.14* | 0.14* | 0.14* |
| OH | Logan | 0.12 | 0.00 | 0.00 | 0.00* | 0.00* | 0.00* | 0.00* |
| OK | Ottawa | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00* |
| PA | Beaver | 4.28 | 0.00 | 0.00 | 0.00 | 0.64 | 0.73* | 0.73* |
| PA | Berks | 2.16 | 1.00 | 1.02 | 1.61* | 1.61* | 1.61* | 1.61* |
| PA | Carbon | 0.45 | 0.00 | 0.00 | 0.00 | 0.00* | 0.00* | 0.00* |
| TN | Sullivan | 0.38 | 0.00 | 0.00 | 0.00 | 0.00* | 0.00* | 0.00* |
| TN | Williamson | 2.55 | 1.25 | 1.35 | 1.95 | 2.00 | 2.19 | 2.32 |
| TX | Collin | 3.18 | 2.19 | 2.19 | 2.20 | 2.69 | 2.75 | 2.95 |
| TX | Dallas | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00* |
| UT | Salt Lake | 3.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.62 |
| **Total** | | **99.7** | **68.74** | **68.86** | **70.31** | **73.11** | **74.96** | **77.87** |

\*   Indicates monitor area does not reach attainment using identified controls.

**Table 4-4.**
**AMBIENT LEAD CONCENTRATIONS ACHIEVED WITH IDENTIFIED CONTROLS**
**UNDER THE ALTERNATIVE STANDARDS IN 2016**

| Monitor State | Monitor County | Baseline Lead Concentration in 2016 | Ambient Lead Concentration ($\mu g/m^3$) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Standard Alternative: 0.5 $\mu g/m^3$ 2nd Maximum Monthly Mean | Standard Alternative: 0.4 $\mu g/m^3$ 2nd Maximum Monthly Mean | Standard Alternative: 0.3 $\mu g/m^3$ 2nd Maximum Monthly Mean | Standard Alternative: 0.2 $\mu g/m^3$ 2nd Maximum Monthly Mean | Selected Standard: 0.15 $\mu g/m^3$ 2nd Maximum Monthly Mean | Standard Alternative: 0.1 $\mu g/m^3$ 2nd Maximum Monthly Mean |
| AL | Pike | 2.420 | 0.256 | 0.256 | 0.256 | 0.197 | 0.098 | 0.098 |
| CO | El Paso | 0.131 | 0.131 | 0.131 | 0.131 | 0.131 | 0.131 | 0.131* |
| FL | Hillsborough | 1.380 | 0.327 | 0.327 | 0.222 | 0.123 | 0.123 | 0.049 |
| IL | Madison | 0.128 | 0.128 | 0.128 | 0.128 | 0.128 | 0.128 | 0.104* |
| IN | Delaware | 5.022 | 0.397 | 0.397 | 0.285 | 0.199 | 0.148 | 0.078 |
| MN | Dakota | 0.192 | 0.192 | 0.192 | 0.192 | 0.192 | 0.127 | 0.039 |
| MO | Iron | 1.454 | 0.091 | 0.091 | 0.091 | 0.091 | 0.091 | 0.091 |
| MO | Jefferson | 1.998 | 0.236 | 0.236 | 0.236 | 0.236* | 0.236* | 0.236* |
| NY | Orange | 0.240 | 0.240 | 0.240 | 0.240 | 0.085 | 0.085 | 0.085 |
| OH | Cuyahoga | 0.357 | 0.357 | 0.357 | 0.316* | 0.316* | 0.316* | 0.316* |
| OH | Fulton | 0.530 | 0.530* | 0.530* | 0.530* | 0.530* | 0.530* | 0.530* |
| OH | Logan | 0.360 | 0.360 | 0.360 | 0.360* | 0.360* | 0.360* | 0.360* |
| OK | Ottawa | 0.114 | 0.114 | 0.114 | 0.114 | 0.114 | 0.114 | 0.114* |
| PA | Beaver | 0.228 | 0.228 | 0.228 | 0.228 | 0.200 | 0.196* | 0.196* |
| PA | Berks | 0.518 | 0.404 | 0.400 | 0.331* | 0.331* | 0.331* | 0.331* |
| PA | Carbon | 0.294 | 0.294 | 0.294 | 0.294 | 0.294* | 0.294* | 0.294* |
| TN | Sullivan | 0.236 | 0.236 | 0.236 | 0.236 | 0.236* | 0.236* | 0.236* |
| TN | Williamson | 0.820 | 0.429 | 0.398 | 0.212 | 0.198 | 0.137 | 0.097 |
| TX | Collin | 0.891 | 0.302 | 0.302 | 0.300 | 0.168 | 0.150 | 0.098 |
| TX | Dallas | 0.101 | 0.101 | 0.101 | 0.101 | 0.101 | 0.101 | 0.101* |
| UT | Salt Lake | 0.107 | 0.107 | 0.107 | 0.107 | 0.107 | 0.107 | 0.093 |

\*    Indicates that this monitor area did not reach attainment with the alternative standard.

**TABLE 4-5.**
**BASELINE LEAD CONCENTRATIONS IN μg/m³ IN AREAS WITH MONITORED CONCENTRATIONS GREATER THAN ANY OF THE ALTERNATIVE STANDARDS USING ONLY IDENTIFIED CONTROLS**

| Monitor State | Monitor County | Baseline Pb Concentration in 2016 | Pb Concentration related to area non-point emissions and misc. re-entrained dust | Baseline Pb Concentration related to indirect fugitive and point source emissions | | Total concentration associated with sources for which no control information available |
|---|---|---|---|---|---|---|
| | | | | Point sources with no Identified Controls | Point sources with Identified Controls | |
| CO | El Paso | 0.131 | 0.024 | 0.101 | 0.006 | 0.125 |
| IL | Madison | 0.128 | 0.024 | 0.000 | 0.104 | 0.024 |
| MO | Jefferson | 1.998 | 0.023 | 0.000 | 1.975 | 0.023 |
| OH | Cuyahoga | 0.357 | 0.027 | 0.288 | 0.042 | 0.315 |
| OH | Fulton | 0.530 | 0.025 | 0.505 | 0.000 | 0.530 |
| OH | Logan | 0.360 | 0.027 | 0.333 | 0.000 | 0.360 |
| OK | Ottawa | 0.114 | 0.023 | 0.091 | 0.000 | 0.114 |
| PA | Beaver | 0.228 | 0.027 | 0.000 | 0.201 | 0.027 |
| PA | Berks | 0.518 | 0.037 | 0.275 | 0.205 | 0.312 |
| PA | Carbon | 0.294 | 0.036 | 0.259 | 0.000 | 0.294 |
| TN | Sullivan | 0.236 | 0.024 | 0.212 | 0.000 | 0.236 |
| TX | Dallas | 0.101 | 0.046 | 0.055 | 0.000 | 0.101 |

**TABLE 4-6.**
**ADDITIONAL AIR QUALITY INCREMENT ($\mu g/m^3$) POST APPLICATION OF IDENTIFIED CONTROLS IN AREAS WITH MONITORED CONCENTRATIONS GREATER THAN ANY OF THE ALTERNATIVE STANDARDS**

| Monitor State | Monitor County | Standard Alternative: 0.5 $\mu g/m^3$ 2nd Maximum Monthly Mean | Standard Alternative: 0.4 $\mu g/m^3$ 2nd Maximum Monthly Mean | Standard Alternative: 0.3 $\mu g/m^3$ 2nd Maximum Monthly Mean | Standard Alternative: 0.2 $\mu g/m^3$ 2nd Maximum Monthly Mean | Selected Standard: 0.15 $\mu g/m^3$ 2nd Maximum Monthly Mean | Standard Alternative: 0.1 $\mu g/m^3$ 2nd Maximum Monthly Mean |
|---|---|---|---|---|---|---|---|
| CO | El Paso | | | | | | 0.031 |
| IL | Madison | | | | | | 0.004 |
| MO | Jefferson | | | | 0.036 | 0.086 | 0.136 |
| OH | Cuyahoga | | | 0.016 | 0.116 | 0.166 | 0.216 |
| OH | Fulton | 0.030 | 0.130 | 0.230 | 0.330 | 0.380 | 0.430 |
| OH | Logan | | | 0.060 | 0.160 | 0.210 | 0.260 |
| OK | Ottawa | | | | | | 0.014 |
| PA | Beaver | | | | | 0.046 | 0.096 |
| PA | Berks | | | 0.031 | 0.131 | 0.181 | 0.231 |
| PA | Carbon | | | | 0.094 | 0.144 | 0.194 |
| TN | Sullivan | | | | 0.036 | 0.086 | 0.136 |
| TX | Dallas | | | | | | 0.001 |

### 4.4.    Emission Reductions Needed Beyond Identified Controls

As discussed above, some monitor areas did not reach attainment with the selected standard or alternative standards through the application of identified controls alone in these illustrative control scenarios.  In order to bring these monitor areas into attainment, we simulated the effects of unspecified emission reductions beyond identified controls. The manner in which these reductions would be achieved is yet to be determined.

### 4.4.1. Application of Unspecified Emission Reductions to Point Sources in Areas Projected to Violate the Standard Alternatives with the Application of Identified Controls

To model emission reductions beyond identified controls, we assumed that all point sources in an area projected to violate a standard alternative (excluding airports) would be controlled with measures employing the same control efficiency.  To simulate attainment with each standard alternative, we find the minimum control efficiency required to bring each area's second maximum monthly mean lead concentration exactly to the level of the standard alternative considered.  As a result, the effective control efficiency applied to point sources differs by area and by standard alternative.  For example, for the 0.2 µg/m$^3$ standard alternative, we apply a control efficiency of 16.9 percent to all sources in Sullivan County, Tennessee, but a control efficiency of 65.3 percent to all sources in Fulton County, Ohio.  We multiply the appropriate control efficiency by the remaining emissions for each point source in each county.  We then sum the point source emission reductions to get a total for each county.

This process differs from the method we used in the Proposed Rule RIA for modeling emission reductions beyond identified controls.  In that analysis, we applied controls to a limited number of point sources, beginning with those sources closest to the monitor and proceeding outward until each area reached attainment.  In this analysis, we instead apply the same control efficiency to all point sources within each area projected to violate any alternate standard.

### 4.4.2.   Lead Emission Reductions Needed Beyond Identified Controls

After applying unspecified emission reductions beyond identified controls using the process described above, all monitor areas reached attainment with the 0.5 µg/m$^3$, 0.4 µg/m$^3$, 0.3 µg/m$^3$, 0.2 µg/m$^3$, and 0.15 µg/m$^3$ alternative standards.  Under the 0.1 µg/m$^3$ standard alternative, however, Ottawa County, Oklahoma fails to reach attainment because there are no point sources of lead to control in this county.  Table 4-7 presents the lead emissions reductions required to bring the maximum number of monitor areas into attainment with each standard alternative.  Table 4-8 presents the lead emissions reductions realized for each monitor area based on both identified controls alone and emission reductions beyond identified controls.  Tables 4-9 and 4-10 present the air quality impacts of these emissions reductions and summarize the number of areas reaching attainment with the application of identified controls and emission reductions beyond identified controls.  Lastly, Figure 2 presents the quantity of emissions reductions

needed through the identified controls analysis, and the emissions reductions needed beyond identified controls.

**Table 4-7.**
**TOTAL LEAD EMISSIONS REMAINING AND LEAD EMISSIONS REDUCTIONS REQUIRED BEYOND IDENTIFIED CONTROLS TO REACH ATTAINMENT WITH THE ALTERNATIVE STANDARDS**

| Standard Alternative | Lead emissions Remaining after applying identified controls (Tons/Year) | Additional emission reductions needed beyond identified controls (Tons/Year) | Emissions remaining after applying identified controls and unspecified emission reductions beyond identified controls (Tons/Year) |
|---|---|---|---|
| 0.5 $\mu g/m^3$ 2nd Maximum Monthly Mean | 30.96 | 0.02 | 30.94* |
| 0.4 $\mu g/m^3$ 2nd Maximum Monthly Mean | 30.84 | 0.08 | 30.76* |
| 0.3 $\mu g/m^3$ 2nd Maximum Monthly Mean | 29.39 | 0.29 | 29.10* |
| 0.2 $\mu g/m^3$ 2nd Maximum Monthly Mean | 26.59 | 2.06 | 24.53* |
| 0.15 $\mu g/m^3$ 2nd Maximum Monthly Mean | 24.74 | 4.79 | 19.95* |
| 0.1 $\mu g/m^3$ 2nd Maximum Monthly Mean | 21.83 | 7.91 | 13.92** |

\*      21 out of 21 monitor areas reached attainment with this standard alternative using identified point source emissions controls and unspecified emission reductions.

\*\*    20 out of 21 monitor areas reached attainment with this standard alternative using identified point source emissions controls and unspecified emission reductions.

**Table 4-8.**
**REDUCTION IN LEAD EMISSIONS UNDER ALTERNATIVE STANDARDS AT EACH MONITOR AREA WITH IDENTIFIED CONTROLS AND UNSPECIFIED EMISSION REDUCTIONS BEYOND IDENTIFIED CONTROLS**

| Monitor State | Monitor County | Baseline Lead Emissions in 2016 | Reduction in Lead Emissions (tpy) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Standard Alternative: 0.5 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.4 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.3 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.2 µg/m³ 2nd Maximum Monthly Mean | Selected Standard: 0.15 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.1 µg/m³ 2nd Maximum Monthly Mean |
| AL | Pike | 4.45 | 4.02 | 4.02 | 4.02 | 4.13 | 4.31 | 4.31 |
| CO | El Paso | 0.95 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 |
| FL | Hillsborough | 1.48 | 1.00 | 1.00 | 1.09 | 1.19 | 1.19 | 1.26 |
| IL | Madison | 0.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 |
| IN | Delaware | 1.53 | 1.37 | 1.37 | 1.40 | 1.42 | 1.44 | 1.46 |
| MN | Dakota | 3.55 | 0.00 | 0.00 | 0.00 | 0.00 | 1.29 | 3.07 |
| MO | Iron | 16.12 | 12.26 | 12.26 | 12.26 | 12.26 | 12.26 | 12.26 |
| MO | Jefferson | 51.02 | 45.52 | 45.52 | 45.52 | 46.46 | 47.75 | 49.04 |
| NY | Orange | 1.80 | 0.00 | 0.00 | 0.00 | 1.39 | 1.39 | 1.39 |
| OH | Cuyahoga | 0.94 | 0.00 | 0.00 | 0.18 | 0.49 | 0.65 | 0.81 |
| OH | Fulton | 0.49 | 0.16 | 0.23 | 0.30 | 0.37 | 0.40 | 0.44 |
| OH | Logan | 0.12 | 0.00 | 0.00 | 0.02 | 0.06 | 0.08 | 0.09 |
| OK | Ottawa | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00* |
| PA | Beaver | 4.28 | 0.00 | 0.00 | 0.00 | 0.64 | 1.69 | 2.74 |
| PA | Berks | 2.16 | 1.00 | 1.02 | 1.66 | 1.86 | 1.95 | 2.05 |
| PA | Carbon | 0.45 | 0.00 | 0.00 | 0.00 | 0.16 | 0.25 | 0.34 |
| TN | Sullivan | 0.38 | 0.00 | 0.00 | 0.00 | 0.06 | 0.15 | 0.24 |
| TN | Williamson | 2.55 | 1.25 | 1.35 | 1.95 | 2.00 | 2.19 | 2.32 |
| TX | Collin | 3.18 | 2.19 | 2.19 | 2.20 | 2.69 | 2.75 | 2.95 |
| TX | Dallas | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 |
| UT | Salt Lake | 3.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.62 |
| **Total** | | 99.7 | 68.76 | 68.94 | 70.6 | 75.17 | 79.75 | 85.78 |

\* Indicates monitor area does not reach attainment with identified controls and unspecified emission reductions beyond identified controls. Ottawa, OK contains no point sources and a large Superfund site.

**Table 4-9.**
**AMBIENT LEAD CONCENTRATIONS ACHIEVED WITH IDENTIFIED CONTROLS AND UNSPECIFIED EMISSION REDUCTIONS  BEYOND IDENTIFIED CONTROLS UNDER ALTERNATIVE STANDARDS IN 2016**

| Monitor State | Monitor County | Baseline Lead Concentration in 2016 | Ambient Lead Concentration (μg/m3) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Standard Alternative: 0.5 μg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.4 μg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.3 μg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.2 μg/m³ 2nd Maximum Monthly Mean | Selected Standard: 0.15 μg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.1 μg/m³ 2nd Maximum Monthly Mean |
| AL | Pike | 2.420 | 0.256 | 0.256 | 0.256 | 0.197 | 0.098 | 0.098 |
| CO | El Paso | 0.131 | 0.131 | 0.131 | 0.131 | 0.131 | 0.131 | 0.100 |
| FL | Hillsborough | 1.380 | 0.327 | 0.327 | 0.222 | 0.123 | 0.123 | 0.049 |
| IL | Madison | 0.128 | 0.128 | 0.128 | 0.128 | 0.128 | 0.128 | 0.100 |
| IN | Delaware | 5.022 | 0.397 | 0.397 | 0.285 | 0.199 | 0.148 | 0.078 |
| MN | Dakota | 0.192 | 0.192 | 0.192 | 0.192 | 0.192 | 0.127 | 0.039 |
| MO | Iron | 1.454 | 0.091 | 0.091 | 0.091 | 0.091 | 0.091 | 0.091 |
| MO | Jefferson | 1.998 | 0.236 | 0.236 | 0.236 | 0.200 | 0.150 | 0.100 |
| NY | Orange | 0.240 | 0.240 | 0.240 | 0.240 | 0.085 | 0.085 | 0.085 |
| OH | Cuyahoga | 0.357 | 0.357 | 0.357 | 0.300 | 0.200 | 0.150 | 0.100 |
| OH | Fulton | 0.530 | 0.500 | 0.400 | 0.300 | 0.200 | 0.150 | 0.100 |
| OH | Logan | 0.360 | 0.360 | 0.360 | 0.300 | 0.200 | 0.150 | 0.100 |
| OK | Ottawa | 0.114 | 0.114 | 0.114 | 0.114 | 0.114 | 0.114 | 0.114* |
| PA | Beaver | 0.228 | 0.228 | 0.228 | 0.228 | 0.200 | 0.150 | 0.100 |
| PA | Berks | 0.518 | 0.404 | 0.400 | 0.300 | 0.200 | 0.150 | 0.100 |
| PA | Carbon | 0.294 | 0.294 | 0.294 | 0.294 | 0.200 | 0.150 | 0.100 |
| TN | Sullivan | 0.236 | 0.236 | 0.236 | 0.236 | 0.200 | 0.150 | 0.100 |
| TN | Williamson | 0.820 | 0.429 | 0.398 | 0.212 | 0.198 | 0.137 | 0.097 |
| TX | Collin | 0.891 | 0.302 | 0.302 | 0.300 | 0.168 | 0.150 | 0.098 |
| TX | Dallas | 0.101 | 0.101 | 0.101 | 0.101 | 0.101 | 0.101 | 0.093 |
| UT | Salt Lake | 0.107 | 0.107 | 0.107 | 0.107 | 0.107 | 0.107 | 0.093 |

\*    Indicates monitor area does not reach attainment with identified controls and unspecified emission reductions beyond identified controls.  Ottawa, OK contains no point sources and a large Superfund site.

**Table 4-10.**
**NUMBER OF MONITOR SITES REACHING ATTAINMENT WITH EACH ALTERNATIVE**
**STANDARD WITH IDENTIFIED CONTROLS AND EMISSION REDUCTIONS BEYOND IDENTIFIED**
**CONTROLS**

| Standard Alternative | Number of Sites Analyzed | Number of Sites in Attainment with No Additional Controls | Number of Sites in Attainment with Identified Point Source Controls | Number of Sites in Attainment with Identified Point Source Controls and Unspecified Emission Reductions |
|---|---|---|---|---|
| 0.50 µg/m³ Second Maximum Monthly Mean | 21 | 12 | 20 | 21 |
| 0.40 µg/m³ Second Maximum Monthly Mean | | 12 | 20 | 21 |
| 0.30 µg/m³ Second Maximum Monthly Mean | | 10 | 17 | 21 |
| 0.20 µg/m³ Second Maximum Monthly Mean | | 6 | 14 | 21 |
| 0.15 µg/m³ Second Maximum Monthly Mean | | 5 | 13 | 21 |
| 0.10 µg/m³ Second Maximum Monthly Mean | | 0 | 9 | 20 |

**FIGURE 2.**
**EMISSIONS REDUCTIONS FROM IDENTIFIED CONTROLS AND REDUCTIONS NEEDED BEYOND IDENTIFIED CONTROLS**



## 4.5 Key Limitations

The estimates of emission reductions associated with the control strategies described above are subject to important limitations and uncertainties. We summarize these limitations as follows:

- ***Analysis Only Considers Controls on Point Source Emissions.*** Because the available data are not sufficiently detailed to assess the impact of indirect fugitive or area nonpoint source controls, the analysis of air quality impacts does not account for the potential implementation of such controls in areas where they might be effective. Although the analysis estimates the impact of point source controls on indirect fugitives, it does not consider the impact of controlling these emissions directly. This and the lack of control information for area nonpoint sources may have contributed to our projection that some areas would violate the NAAQS.

- ***Actual State Implementation Plans May Differ from our Simulation***: In order to reach attainment with the selected standard, each state will develop its own implementation plan implementing a combination of emissions controls that may differ from those simulated in this analysis. This analysis therefore represents an approximation of the emissions

reductions that would be required to reach attainment and should not be treated as a precise estimate.

- *Limited Sources Considered*:  For this analysis we have not modeled the effect of any potential changes in emissions at airports with lead emissions associated with use of leaded aviation gasoline.  Furthermore, as discussed above, we were not able to obtain emissions control information for a large number of point sources in our analysis.  Although these sources collectively accounted for less than one tenth of all lead emissions considered, many of those sources were located in areas that were not able to reach attainment with one or more of the standard alternatives using identified controls alone.  If more emissions control information were available, it may not be necessary to rely on estimated emissions reductions beyond identified controls in order to simulate attainment with the alternative standards.

- *Emissions Reductions from the Rebuild of the Primary Lead Smelter in Jefferson County, Missouri:* To estimate the emissions reductions associated with the selected standard for Jefferson County, this analysis models the replacement of the primary lead smelter in this area with a more modern, lower emitting Kivcet smelter.  We estimate the emissions reductions that such a project would achieve based on the emissions performance of Teck Cominco's Kivcet smelter in Trail, British Columbia, scaling for differences in lead production volumes between the two facilities.  While this is a reasonable approach for estimating the extent to which the Jefferson County smelter's emissions may decline if it rebuilds its smelter, facility-specific characteristics not included in our analysis may influence lead smelter emissions.  Therefore, we may overestimate or underestimate the lead reductions that would be achieved by a rebuild of this smelter.

- *Emissions Reduction Beyond Identified Controls*: In this chapter we report both emissions reductions from identified emissions controls and unspecified emission reductions beyond identified controls.  We have taken care to report these separately, in recognition of the greater uncertainty associated with achieving emissions reductions from measures that may not be currently in use or known to EPA.  Nonetheless, EPA believes it is reasonable to project that, with at least seven years of lead time before a 2016 compliance deadline, a large number of existing measures will be adapted to be applicable to additional sources, and new measures may be developed that are specifically focused on cost-effectively reducing PM emissions with high lead content.  Because the current standard is attained in all but a few areas of the country, and has been for many years since the phase down of lead in gasoline, it is likely that very little effort has been devoted to development of lead emissions control technologies except in industries where regulations have been imposed to reduce lead (e.g., large MWC standard, primary and secondary lead smelter MACTs, etc.).  As a result, EPA believes that the projection of emission reductions beyond identified controls is particularly appropriate for compliance with a more stringent lead standard.

## Chapter 5 - Benefits Analysis Approach and Results

**Synopsis**

This chapter describes our analysis of the benefits associated with attaining the selected National Ambient Air Quality Standard (NAAQS) for lead and the alternative standards outlined in Chapter 1.[1]   The estimates outlined in this benefits analysis indicate that achieving a lower National Ambient Air Quality Standard (NAAQS) for lead from its current level of 1.5 μg/m³ maximum quarterly mean to a second maximum monthly value of 0.15 μg/m³ could result in significant reductions in adverse health effects due to reduced exposure from lead and fine particles ($PM_{2.5}$).  We estimate a potential increase in intelligence quotient (IQ) points across the population (approximately 400,000) with the selected NAAQS under various assumptions, including baseline non-air background blood lead levels at 2002 levels.

This Regulatory Impact Analysis (RIA) seeks to estimate benefits for the year 2016 using a 2002 baseline blood lead level; this may result in an under- or over-estimate of benefits in the year 2016.[2] State and federal regulatory interventions, including the recently promulgated Renovation and Repair Rule (RRP), are likely to reduce non-air background blood lead levels significantly. In the draft RIA, EPA committed to explore the possibility of updating the baseline to reflect expected effects on blood lead levels from other lead rules and potentially from an anticipated decline in population blood lead levels. EPA has determined that such a projection of baseline non-air background blood lead levels is not technically feasible in the time available. Specifically, EPA lacks data regarding the distribution of the housing stock and populations to which rules such as the RRP apply. As an alternative, we provide a sensitivity analysis, found in Table 5-8, which indicates that the total benefits estimate shows little sensitivity to alternate background non-air blood lead levels.

This RIA provides illustrative estimates of the incremental monetized human health benefits of attaining a revised primary lead (Pb) National Ambient Air Quality Standard (NAAQS) within the current monitoring network.[3]  Some of the highest-emitting Pb sources do not have nearby Pb-TSP monitors, and it is important to note that there may be more potential nonattainment areas than have been analyzed in this RIA.  Because monitors are present in only 86 counties nationwide, the universe of monitors exceeding the various target NAAQS levels is

---

[1] The costs presented in this chapter represent the direct pollution control expenditures associated with NAAQS compliance.  As such, they do not reflect the general equilibrium impacts of the proposed rule.

[2] The level of non-air background blood lead levels affects the portion of the health impact function curve on which IQ changes are estimated. A change in the background level may cause IQ changes to be estimated on a shallower or steeper portion of the curve.

[3] There are currently 189 monitors representing 86 counties, but only 21 counties have monitors which exceed 0.10 ug/m³.

very small; only 21 counties exceed the lowest alternate NAAQS level of 0.10 ug/m$^3$.  Because we know that Pb-TSP monitors are not located near some of the highest-emitting Pb sources in the 2002 NEI (see Chapter 2), it is likely that there may be more potential nonattainment areas than have been analyzed in this RIA.

As shown in Table 5-1 below, when applying a 3 percent discount rate, the monetary value of avoided IQ point loss for the least stringent standard alternative (0.5 μg/m$^3$) ranges between \$2.0 and \$2.8 billion (all values in 2006\$).[4]  If future non-air background blood levels change, benefits may be higher or lower.   For the selected standard of 0.15 μg/m$^3$, benefits range from \$3.5 to \$5.0 billion. For the most stringent standard alternative (0.1 μg/m$^3$), monetary benefits range from \$4.5 to \$6.4 billion.  Additional co-control benefits of reduced PM emissions are expected to range between \$0.1 and \$0.9 billion for the least stringent standard alternative, between \$0.2 and \$1.9 billion for the selected standard and up to a range of \$0.3 to \$2.2 billion for the most stringent standard alternative.  Therefore, the combined monetized health benefits from reductions in both lead and PM exposures as a result of lowering the current NAAQS range from \$2.1 to \$3.7 billion for the least stringent standard alternative, between \$3.7 and \$6.9 billion for the selected standard and between \$4.8 to \$8.6 billion for the most stringent standard alternative.

When applying a 7 percent discount rate, the monetary benefits for changes in IQ the least stringent standard alternative (0.5 μg/m$^3$) range between \$0.3 and \$0.5 billion.  For the selected standard, benefits range from \$0.4 and \$0.9 billion. For the most stringent standard alternative (0.1 μg/m$^3$), monetary benefits of IQ gains range from \$0.6 to \$1.1 billion. Additional co-control benefits of reduced PM emissions are expected to range between \$0.1 and \$0.8 billion for the least stringent standard alternative, between \$0.2 and \$1.7 billion for the selected standard and a range of \$0.2 to \$2 billion for the most stringent standard alternative. Therefore, the combined monetized health benefits from reductions in both lead and PM exposures as a result of lowering the current NAAQS range from \$0.4 to \$1.3 billion for the least stringent standard alternative, between \$0.7 and \$2.6 billion for the selected standard and between \$0.8 and \$3.1 billion for the most stringent standard alternative.

The benefits summarized in the table below are the product of the air quality change associated with both identified and unidentified emission controls. The proportion of benefits attributable to identified controls varies by standard alternative. At the less stringent alternatives of 0.5 μg/m$^3$, 0.4 μg/m$^3$, 0.3 μg/m$^3$ and 0.2 μg/m$^3$ the identified emission controls account for all, or nearly all, of the estimated benefits. For the selected standard of 0.15 μg/m$^3$, the identified controls represent about 85% of total benefits. Finally, the more stringent alternative standard of 0.1 μg/m$^3$, the identified controls represent about 80% of total benefits.

---

[4] When monetizing benefits, we applied two alternate valuation functions. These functions are discussed further in this chapter.

**Table 5-1. Monetary Benefits of Alternate Lead NAAQS (in Millions of 2006$) in 2016**

| Standard Alternative[1] | Estimated Net Present Value of IQ Points Gained[2][3] | | Monetized Benefits of Co-Controlled PM$_{2.5}$ Emissions[4] | | Total Benefits[5] | |
|---|---|---|---|---|---|---|
| | 3% Discount Rate | 7% Discount Rate | 3% Discount Rate | 7% Discount Rate | 3% Discount Rate | 7% Discount Rate |
| 0.5 µg/m³ | $2,000—$2,800 | $250—$490 | $110—$880 | $100—$790 | $2,100—$3,700 | $350—$1,300 |
| 0.4 µg/m³ | $2,000—$2,800 | $250—$490 | $100—$880 | $100—$800 | $2,100—$3,700 | $350—$1,300 |
| 0.3 µg/m³ | $2,400—$3,400 | $300—$580 | $190—$1,600 | $170—$1,400 | $2,600—$5,000 | $470—$2,000 |
| 0.2 µg/m³ | $3,200—$4,500 | $390—$780 | $220—$1,800 | $200—$1,600 | $3,400—$6,300 | $590—$2,400 |
| 0.15 µg/m³ | $3,500—$5,000 | $440—$870 | $230—$1,900 | $210—$1,700 | $3,700—$6,900 | $650—$2,600 |
| 0.1 µg/m³ | $4,500—$6,400 | $560—$1,100 | $260—$2,200 | $240—$2,000 | $4,800—$8,600 | $800—$3,100 |

[1] All standard alternatives are for a second maximum monthly mean concentration.

[2] Results reflect the use a 2002 derived non-air background blood lead applied to analysis year of 2016. To the extent that state and federal interventions such as the Renovation and Repair Rule (EPA, 2008c) reduce future non-air blood lead levels, the estimate of IQ change above may be different.

[3] The lower end of the range of presented values was calculated using the Schwartz (1994b) valuation estimate; the upper end was calculated using the Salkever (1995) valuation estimate.

[4] The range of presented values represent 14 different estimates from the PM epidemiological literature and an expert judgment study.

[5] Numbers are rounded to two significant figures.  Therefore, the sums in these columns may not total.

Figures 5-1 and 5-2 below display the health benefits from both lead and PM$_{2.5}$ exposure reductions for each of the six alternative standards using a 3 percent and 7 percent discount rate, respectively.[5]  Figures 5-3 and 5-4 below display some examples of the total health benefits from

---

[5] Note that these figures present the lead benefits results that incorporate valuation estimates from Schwartz (1994b) and PM co-control benefits using the Pope et al. (2002) epidemiological study and therefore do not represent the full range of uncertainty in the expected benefits.

both lead and PM2.5 exposure reductions using different input assumptions for each of the six alternative standards using a 3 percent and 7 percent discount rate, respectively.

**Figure 5-1.  Lead and PM $_{2.5}$ Benefits by Standard Alternative (3% Discount Rate)**



**Figure 5-2.  Lead and PM 2.5 Benefits by Standard Alternative (7% Discount Rate)**



## Example Combinations of Lead and PM2.5 Benefits by Standard Alternative (7% Discount Rate)

**Figure 5-3.  Example Combined Lead and Total PM$_{2.5}$ Monetized Benefits Estimates by**



**Standard Alternative (3% Discount Rate)**

**Figure 5-4.  Example Combined Lead and Total PM$_{2.5}$ Monetized Benefits Estimates by Standard**



## Introduction

This chapter documents our analysis of health benefits expected to result from achieving alternative levels of the lead NAAQS, relative to baseline ambient air lead levels. We first describe our approach for estimating and monetizing the health benefits associated with reductions of lead in air. Next, we provide a summary of our results, including an analysis of the sensitivity of the benefits model. We then review our approach to and results from estimating benefits from co-control of direct $PM_{2.5}$ emissions associated with implementing measures necessary to achieve alternative of the selected lead NAAQS. Finally, we discuss the key results of the benefits analysis and indicate areas of uncertainty in our approach.

## Benefits Approach

This section presents our approach for estimating avoided adverse health effects in humans resulting from achieving alternative levels of the lead NAAQS, relative to a base case ambient air lead level. We first review the epidemiological evidence concerning potential health effects of lead exposure and present the health endpoints we selected for our primary benefits estimate. We then describe our screening-level spreadsheet benefits model, including the data used and key assumptions. Finally, we describe our approach for assigning an economic value to the health benefits.

### Benefits Scenario

We calculated the economic benefits from annual avoided health effects expected to result from achieving alternative levels of the lead NAAQS (the "control scenarios") in the year 2016. We measured benefits in the control scenarios relative to the incidence of health effects consistent with ambient lead levels in air expected under the current standard (1.5 μg/m$^3$ maximum quarterly mean; the "base case") in 2016. Note that this "base case" reflects emissions reductions and ambient air quality improvements that we anticipate will result from implementation of other air quality rules, including compliance with all relevant Maximum Achievable Control Technology (MACT) rules and the recently revised NAAQS for $PM_{2.5}$.[6] We compared benefits across six alternative second maximum monthly mean NAAQS levels of 0.5, 0.4, 0.3, 0.2, 0.15, and 0.1 μg/m$^3$.

### Selection of Health Endpoints

Epidemiological researchers have associated lead exposure with adverse health effects in numerous studies, as described in the *Air Quality Criteria for Lead* (USEPA, 2006a; hereafter, *Lead Criteria Document*). Young children are particularly sensitive to lead exposures; neurobehavioral effects of lead exposure in infants and young children (less than 7 years of age)

---

[6] Development of this base case is described further in Chapter 3.

9

have been observed consistently across multiple studies that control for an array of confounding factors (USEPA, 2006a).

The Criteria Document provides a comprehensive review of the current evidence of health and environmental effects of Pb.  With regard to health effects, the Criteria document summarizes the evidence as follows (CD, Section 8.4.1):

"…Pb has been shown to exert a broad array of deleterious effects on multiple organ systems via widely diverse mechanisms of action. Truly remarkable progress has been made during the past several decades with regard to (a) more fully delineating over time the wide variety of pathophysiologic effects associated with Pb exposure of human population groups and laboratory animals and (b) the characterization of applicable exposure durations and dose-response relationships for the induction of the multifaceted Pb effects. This progress has been well documented by the previous Pb NAAQS criteria reviews carried out by EPA in the late 1970s and during the 1980s, as well as being well reflected by previous chapters of this document.

The 1977 Lead AQCD (U.S. Environmental Protection Agency, 1977) that provided key scientific bases for the setting in 1978 of the current Pb NAAQS included discussion of both:  (a) historical literature accumulated during several preceding decades that established Pb encephalopathy and other signs and symptoms of persisting severe central and/or peripheral nervous system damage, as well as renal and hepatic damage, and anemia as typifying the classic syndrome of acute and/or chronic high-level Pb poisoning among human pediatric and /or adult population groups, and (b) evaluation of then newly-emerging evidence for more subtle and difficult-to-detect "subclinical" Pb effects on IQ, other neurological endpoints, and moderate blood hemoglobin deficits or other erythropoietic indicators of heme synthesis impairment, which collectively were judged to constitute an array of adverse Pb health effects associated with Pb exposures indexed by blood Pb concentrations ranging down to ~30 µg/dL. The next Pb NAAQS criteria review during the 1980's, as contained in the 1986 Lead AQCD/Addendum and its 1990 Supplement (U.S. Environmental Protection Agency, 1986a, b, 1990) documented further rapid advances in Pb health effects research that provided (a) increasingly stronger evidence that substantiated still lower fetal and/or postnatal Pb-exposure levels (indexed by blood-Pb levels extending to as low as 10 to 15 µg/dL or, possibly, below) as being associated with slowed physical and neurobehavioral development, lower IQ, impaired learning, and/or other indicators of adverse neurological impacts and (b) other pathophysiological effects of Pb on cardiovascular function, immune system components, calcium and vitamin D metabolism, and other selected health endpoints.

Newly available scientific information published since the 1986 Lead AQCD/Addendum and the 1990 Supplement, as assessed in previous chapters of this document, further expands our understanding of a wide array of Pb-induced health effects, underlying mechanisms, and factors that enhance or lessen susceptibility to Pb effects. Very importantly, the newly available toxicologic and epidemiologic information, as integrated below, includes assessment of new evidence substantiating risks of deleterious effects on certain health endpoints being induced by distinctly lower than previously demonstrated Pb exposures indexed by blood-Pb levels extending well below 10 µg/dL in children and/or adults.

The ensuing subsections *[of the CD]* provide concise summarization and integrative synthesis of the most salient health-related findings and conclusions derived from the current criteria assessment.  This includes discussion of new toxicologic and/or epidemiologic evidence concerning Pb induced (a) effects on neurobehavioral development and other indicators of nervous system effects; (b) cardiovascular effects; (c) heme synthesis effects; (d) renal effects; (e) immune system functions; (f) effects on calcium and vitamin D metabolism; (g) inter-relationships to bone and teeth formation and demineralization; (h) effects on reproduction and other neuroendocrine effects; and (i) genotoxicity and carcinogenic effects."

The differing evidence and associated strength of the evidence for these different effects is described in detail in the Criteria Document.  The evidence with regard to adverse effects on plants and animals is also described in the Criteria Document.

Although a number of adverse health effects have been found to be associated with lead exposure, this benefits analysis only includes a subset, due to limitations in understanding and quantifying the dose-response relationship for some of these health endpoints and the fact that for some of these endpoints the science is less certain.  We analyzed only those endpoints with sufficient evidence to support a quantified dose-response relationship.  This determination was made using the information presented in the *Lead Criteria Document*, which contains an extensive literature review for several health endpoints related to lead exposure.  However, this document only included studies published or accepted for publication through December 2005.  Therefore, we performed supplemental searches in the online search engine PubMed to identify studies published between January 2006 and the present (see Appendix A for more information).  Finally, we reviewed previous EPA lead benefits analyses to identify dose-response relationships that have been used previously (USEPA, 1997, 2006b & 2007a).

Our analysis focuses primarily on children's health effects due to our use of child-specific data to convert air quality data to a blood lead level, which is the most common biomarker of exposure used in dose-response functions.

This human health benefits analysis does not attempt to estimate the changes in lead-related health effects among adults. Several key data limitations prevented EPA from quantifying these important endpoints:

- *The available peer reviewed air:blood ratios to estimate adult blood lead changes are dated.* Previous EPA analysis of the costs and benefits of the Clean Air Act (USEPA, 1997) utilized air:blood ratios for adults from based on Snee et al. (1981), a meta-analysis of  several studies, including Johnson et al..(1976), Fugas et al.(1973), and Nordman (1975). While these studies do provide insight into the responsiveness of adult blood lead levels to changes in lead concentrations in air, the age of these studies suggests that these ratios may not be appropriate for application in 2016.  The more-recent peer-reviewed estimates of air:blood ratios have been derived for children.

Applying these ratios to adults would be inappropriate given the important differences between the two populations in their ambient exposure to Pb.

- *There is a lack of current, peer reviewed non-air-related blood lead background estimates for adults.* Quantification of adult endpoints would require a non-air-related blood background for adults. CASAC recommends a range of values for children in their review of the Lead Risk Assessment.  However, due to differences between adults and children in the routes of exposure to lead, it is possible that background levels would differ between these two receptor groups.  Therefore, applying the child-specific non-air-related background blood lead levels to adults could misestimate the true adult background levels.

- *The adult health impact functions relating changes in blood lead to health outcomes are dated.* Certain adult health impact functions, such as those quantifying the relationship between blood lead and diastolic blood pressure (Nawrot, 2002) are current. However, the functions relating changes in blood pressure to changes in premature mortality, chronic heart disease and stroke were each drawn from studies published in the 1970s; advances in the treatment of high blood pressure suggest that these functions may over-predict of changes in these health effects in the current population. One newer study, Schober et al. (2006), quantifies the relationship between blood lead and cardiovascular mortality. However, according to the *Lead Criteria Document,* "…until the Schober et al. findings are replicated and more fully understood, the Schober et al. (2006) estimates for Pb-induced cardiovascular mortality should probably not be used for quantitative risk assessment" USEPA, 2006a, page 8-89.

Taken together, these data limitations make a credible quantified assessment of adult endpoints very challenging and subject to considerable uncertainty. The Agency is working to addressing these data limitations so that it may be possible to provide a quantitative estimate of the adult endpoints for the next Pb NAAQS review in approximately 5 years.

Table 5-3 below presents the health effects related to exposure to lead in the air that are quantified in this benefits analysis.  In addition, the table includes a list of other endpoints that potentially are linked to lead exposure, but which do not have dose-response functions available for quantifying benefits.

As shown in Table 5-3, our primary estimate is based on the effect of IQ loss on lifetime earnings.  There are several recent epidemiological analyses that have found potential adverse health impacts of blood lead levels on cognitive function (most often measured as changes in IQ) in young children under 7 years of age, as described in the *Lead Criteria Document*.  However, as also noted in that document, there has been conflicting evidence as to whether there exists a discrete period of neurological vulnerability to lead exposure during childhood.

For instance, the first three years of life represent the maximal period of lead ingestion as well as a period of time when important development of the central nervous system is occurring,

12

which suggests that biologically this could be a vulnerable period (USEPA, 2006a).  In addition, there are two major meta-analyses that focused on the association between school age IQ and blood lead concentrations at two years of age or average blood lead concentrations up to three years of age (Pocock et al., 1994; Schwartz, 1994a).   However, several recent prospective epidemiological studies have found concurrent blood lead level (i.e., blood lead measured at the same time as school age IQ) or lifetime average blood lead level (i.e., a mean of blood lead level from infancy to measurement of school age IQ) to be more strongly associated with school age IQ and other measures of neurodevelopment (Canfield et al., 2003; Dietrich et al., 1993; Tong et al., 1996, Wasserman et al., 2000).  In addition, a large, international meta-analysis by Lanphear et al. (2005) included four measures of blood lead level: concurrent, peak, lifetime average, and early childhood.  The authors found that the concurrent and lifetime blood lead levels were the strongest predictors of IQ deficits associated with lead exposure.

A study by Chen et al. (2005) specifically evaluated whether a window of enhanced susceptibility to lead exists. This study examined whether cross-sectional associations observed in school age children represent residual effects from two years of age or "new" effects emerging among these children (USEPA, 2006a). Chen et al. found that the blood lead metric with the strongest association with IQ was concurrent, and this relationship grew stronger with age.  The authors did not find any association between peak blood lead level and IQ measured at seven years of age.  In addition, a stronger relationship was found between IQ at seven years of age and blood lead level at seven years of age compared with blood lead at two years of age.  The *Lead Criteria Document* concluded that "[t]hese results support the idea that lead exposure continues to be toxic to children as they reach school age, and do not lend support to the interpretation that all damage is done by the time the child reaches two to three years of age" (USEPA, 2006a, page 6-63).  Based on this evidence, it is reasonable to assume that all children under seven years of age in the study area for this analysis will experience some cognitive benefit (i.e., IQ loss avoided) from reduced ambient air lead in 2016.  Therefore, we have designed our benefits analysis to measure benefits to all children under seven in our study area.

13

**Table 5-3.  Human Health Effects of Lead**

| *Quantified Health Effects* | *Unquantified Health Effects[a]* |
|---|---|
| -Intelligence Quotient (IQ) loss effect on lifetime earnings | -Other neurobehavioral and physiological effects |
| | -Delinquent and anti-social behavior |
| | -IQ loss effects on compensatory education |
| | -Hypertension |
| | -Non-fatal coronary heart disease |
| | -Non-fatal strokes |
| | -Premature mortality |
| | -Other cardiovascular diseases |
| | -Neurobehavioral function |
| | -Renal effects |
| | -Reproductive effects |
| | -Fetal effects from maternal exposure (including diminished IQ) |

[a] The categorization of unquantified toxic health effects is not exhaustive.  Health endpoints in this column include both a) those for which there is not consensus; and b) those for which associations, to various degrees, has been determined but empirical data are not available to allow calculation of benefits.

## Benefits Estimation Model

### *Overview*

For this benefits analysis, we created a spreadsheet model to provide a screening-level assessment of health benefits occurring as a result of implementing alternative NAAQS levels. The model uses various simplifying assumptions and is intended only to provide an approximate, preliminary estimate of the potential health benefits.

The model was constructed in Microsoft Excel and provides an integrated tool to complete five benefits estimation steps: 1) estimate lead in air concentrations for the "base case" and "control scenarios"; 2) estimate population exposures to air lead concentrations for each scenario; 3) estimate blood lead levels in the population for each scenario; 4) estimate avoided cases of health effects due to changes in blood lead levels; and 5) apply an economic unit value to each avoided case to calculate total monetized benefits.  These steps and the data inputs required are shown in Figure 5-5 and are discussed in further detail below.

### *Estimating Lead in Air Concentrations*

We used estimates of the second maximum monthly mean lead total suspended particles (TSP) for each monitor included in our study to characterize ambient air lead concentrations for the "base case" in 2016 (USEPA, 2007b).  These estimates were calculated by adjusting second maximum monthly mean lead TSP monitoring values for the years 2003 to 2005 to account for

14

emissions reductions due to compliance with MACT requirements and the NAAQS for $PM_{2.5}$ occurring by 2016 (see Chapter 4 for additional information).  We assumed that under the "control scenario" for each standard alternative, each monitor would meet the second maximum monthly mean level achieved under the cost analysis for that alternative described in Chapter 4.

While the alternative standards were specified in terms of second maximum monthly mean lead concentrations, the benefits model used estimates of maximum quarterly mean lead concentrations in order to calculate avoided cases of health endpoints. This decision was based on a number of studies outlined in EPA's 2007 Staff Paper (USEPA, 2007c; Section 5.5.2), which indicate that changes in blood lead levels resulting from changes in air lead concentrations occur within a relatively short timeframe (i.e., within a few weeks to months).  This finding is also supported by a simulation of changes in urban residential dust lead levels following a change in ambient air lead using the hybrid mechanistic empirical model developed for the *Lead Risk Assessment*. That analysis showed that changes in indoor dust lead levels (the primary source of children's exposure) tracked closely with changes in ambient lead air concentrations. The hybrid model developed for the general urban case study suggested that 90% of steady-state impacts will be recognized within the three months and take up to one year for a full change to be realized.

**Figure 5-5**

**OVERVIEW OF LEAD BENEFITS MODEL**



Therefore, for the "base case" estimates of lead air concentrations used in the model, we estimated the expected maximum quarterly mean air lead concentration in 2016 in each census block group based on the second maximum monthly mean values for the "base case." This was achieved by calculating census block group-specific ratios of the second maximum monthly mean to the maximum quarterly mean for the period 2003-2005 and then dividing the second maximum monthly mean for the "base case" by this ratio.[7]

For the "control scenario" we estimated the maximum quarterly mean lead in air concentration that would be expected in 2016, based on the second maximum monthly mean NAAQS concentration. As in the "base case," we used census block group-specific ratios of the second maximum monthly means to maximum quarterly means for 2003-2005 and then divided the selected NAAQS by this ratio.

***Estimating Population Exposure***

The first input to any benefits assessment is the estimated changes in ambient air quality expected to result from simulated attainment of a NAAQS. EPA typically relies upon air quality modeling to generate these data. For this analysis, time and technical limitations prevented us from performing formal air quality modeling. Instead, EPA employed two alternate approaches to approximate the air quality change resulting from attainment of alternate lead NAAQS. Each approach relies upon the lead monitoring network as the basis for subsequent air quality estimates. The first approach, which we employed to generate our primary benefits estimate, uses an interpolation method utilized in previous RIAs to estimate changes in lead concentrations in projected non-attainment areas. The second approach, which we utilized as a sensitivity analysis, applies a radius of a fixed size around each non-attaining lead monitor and estimates a fixed concentration of lead within that radius. We describe the process for using each approach below.

<u>Interpolation Method</u>

This approach applies an interpolation method to generate an air quality surface from available lead monitoring data to better represent the spatial heterogeneity of lead concentrations in a projected non-attainment area. It utilizes both the lead monitoring network as well as the lead-speciating TSP monitoring network; we added the lead-speciating monitors to increase the number of data points available for the interpolation. We interpolated lead concentrations to the census tract, rather than census block group, to increase the computational efficiency of the model.

---

[7] This ratio technique is detailed further in Chapter 3.

To create an air quality surface of ambient lead values we applied the Voronoi Neighborhood Averaging (VNA) method.[8] The VNA is an inverse-distance-weighting technique that interpolates point monitor data to a user-defined grid cell for the purpose of creating an air quality surface. The VNA approach is well suited for this type of analysis because the inverse distance weighting approach can approximate the gradient of ambient lead surrounding each monitor. VNA is a well-established technique that EPA has used in combination with modeled air quality changes to estimate the air quality change associated with full attainment of $PM_{2.5}$ and Ozone NAAQS (USEPA, 2006c & 2008a).

Figure 5-6 below summarizes how we applied the VNA method in this analysis. The VNA approach is expected to provide a better representation of the gradient of ambient lead around each monitor as compared to the radius approach. For this reason, we utilized this approach to generate our primary benefits estimate. However, this validity of this method is to some extent contingent upon the availability of a sufficient number of monitors to support an interpolation. In certain locations, such as Hillsborough County, FL, there are a sufficient number of lead and TSP monitors to generate an interpolation with a pronounced gradient around each monitor (see Figure 5-7). The lead and TSP monitoring network in other non-attainment areas can in some cases be sparse, and the resulting interpolation does not appear to generate a meaningful gradient, such as in Delaware County, IN (see Figure 5-8). To the extent that there was a denser lead monitoring network in such locations, the interpolation approach would produce a gradient that better represents actual ambient lead concentrations. While both the VNA and radius approaches exhibit limitations, we hold more confidence in the results of the interpolation approach and so rely upon it as our primary method of simulating air quality changes. As a means of acknowledging the limitations to the interpolation method we also provide sensitivity estimates using the radius method.

---

[8] For technical details of the VNA approach, see the technical appendices to the BenMAP User manual , found at: http://www.epa.gov/air/benmap/models/BenMAPTechnicalAppendicesDraftMay2005.pdf

**Figure 5-6**

**Steps in the VNA Interpolation Technique**



---

[*]This step required us to adjust the Pb-speciating TSP monitors to reflect the presence of PM RIA and MACT emission controls. The emissions controls team performed this adjustment for the Pb monitors. To make a conforming adjustment to the Pb-speciating TSP monitors, we used VNA to interpolate the PM RIA and MACT-related air quality improvement from the Pb monitors to the Pb-speciating TSP monitors.

**Figure 5-7. Air Lead Concentration Gradient in Hillsborough County, Florida**



**Figure 5-8. Air Lead Concentration Gradient in Delaware County, Indiana**



Radius Method

In this approach we focused on the 21 monitors in counties that potentially could be designated as non-attainment areas under at least one of these alternative lead NAAQS levels. These monitor concentration values likely only apply to the population of people living within the vicinity of these monitors, especially if the monitor is oriented near a source of lead contamination (e.g., a primary or secondary lead smelter). As a default, we defined the affected population as those individuals living within a 10-kilometer radius around the monitor. The 10-kilometer radius is consistent with source-specific modeling in the EPA *Lead Risk Assessment* case studies for primary and secondary sources (USEPA, 2007a). In the absence of detailed air quality modeling for the lead sources in the vicinity of each monitor, we assumed in this screening-level analysis that the lead concentrations in air measured at each monitor are uniform throughout the specified radius. To develop a conservative upper-bound estimate of lead benefits, we assumed the entire population of the county was exposed to the concentration measured at the monitor (the geographic extent of a county generally exceeds 10 km). Also, we performed sensitivity analysis using alternate, smaller radii of one, two, and five kilometers, since lead air concentrations can in some cases display significant gradients with distance from a source-oriented monitor. For example, second maximum monthly mean values measured at monitors in close proximity to the Herculaneum, MO lead smelter drop off 40 percent within roughly 1 km of the source and decrease by an additional 95 percent within 2 km.[9]

We used ArcGIS to establish the radii around each monitor. Our spatial dataset contained US Census population data at the block group level for the year 2000. We calculated the total population within each radius in 2000 by adding the population of each Census block group that at least partially resided within the radius. We then distributed the estimate of the total population for each radius in 2000 into gender- and age-specific groups (in five-year increments, consistent with the age ranges reported by the Census).[10]

Population Projections

For both the interpolation and radius methods, we extrapolated the 2000 age- and gender-specific population data to 2016, using Woods and Poole county-level projection data (Woods and Poole, 2001). We calculated a growth rate for each gender and age group combination by taking the ratio of the 2016 estimate from Woods and Poole to the corresponding 2000 county-level estimates from the Census. We applied the calculated growth rates to each gender and age group to estimate the total population in 2016 residing within each census tract or radius. This approach to population projection is consistent with previous EPA RIA's that estimate future-year human health benefits (USEPA 2006c, 2007c, 2008a). However EPA does not assume that

---

[9] This was assessed using second maximum monthly mean monitoring data between 2003-2005 for eight monitors located near the Herculaneum Lead Smelter (operated by the Doe Run Company) (USEPA, 2007b).

[10] The five-year age groups were 0-4, 5-9, 10-14, … up to 85 and above.

the number of Pb emitting sources will grow correspondingly with the population growth as discussed in Chapter 4.

In order to determine the number of children under the age of seven, we added the population of children in the 0-4 age group for both genders and then added two-fifths of the population in the 5-9 age group, assuming the population was uniformly distributed across all five ages in that group.

### *Estimating Blood Lead Levels*

The concentration-response functions we employ in this benefits analysis require estimates of blood lead levels in the exposed population to calculate avoided incidence of adverse health effects. We chose to develop a first approximation of the blood lead levels associated with reductions in air lead concentrations for each of the alternative NAAQS by using the air lead to blood lead ratio ("air:blood ratio") approach applied by EPA in deriving the current NAAQS in 1978 (43 FR 46246). These ratios predict geometric blood lead levels due to direct lead exposure via inhalation as well as indirect exposures via ingestion of dust and soils contaminated by lead deposition, based on comparisons of historical data on lead in ambient air and measured or modeled geometric mean blood lead levels in an exposed population. Table 5-4 lists the ratios considered for the current NAAQS analysis; for its primary estimate, EPA chose a ratio of 1:7 $\mu g/m^3$ to $\mu g/dl$. That is, for every one microgram per cubic meter reduction in air lead, EPA assumed that geometric mean blood lead levels would be reduced by seven micrograms per deciliter. We selected this value based on advice from the Clean Air Scientific Advisory Committee (CASAC) and analysis conducted as part of EPA's *Lead Risk Assessment* (USEPA, 2007a & 2007d).

CASAC in its March 2007 review of EPA's *Lead Risk Assessment* recommended that EPA apply these ratios as part of a population level lead risk analysis to inform alternative proposals for a new lead NAAQS (USEPA, 2007d; see Appendix D). In its previous NAAQS analysis, EPA used a ratio of 1:2 $\mu g/m^3$ to 1:6 $\mu g/dl$; however, CASAC suggested that ratios higher than 1:2 may be appropriate based on more recent literature. CASAC cites the use of a ratio of 1:5 by the World Health Organization (WHO) in 2000 to better account for lead deposition from air to dust and soil, and they cite a ratio of 1:9-1:10 based on the data in Schwartz and Pitcher (1989) on blood lead changes resulting from the phase-out of lead in gasoline.

As part of its *Lead Risk Assessment*, EPA calculated air:blood ratios based on the extensive modeling conducted for its case studies and compared these ratios to values reported in the literature (USEPA, 2007a). For the benefits analysis, we reviewed the ratios in Table 5-7 of the *Lead Risk Assessment* that compare the incremental reduction in air concentrations required to meet lower alternative NAAQS levels to the corresponding incremental change in blood lead. The ratios for the general urban and primary lead smelter case studies range from 1:2 to 1:6 for scenarios ranging from the current NAAQS to an alternative NAAQS of 0.05 $\mu g/m^3$ maximum monthly mean. EPA found these values to be similar to ratios available in the literature, specifically to ratios reported in a 1984 meta-analysis by Brunekreef (1:3 to 1:6) and to values

calculated from a more recent 2003 study by Hilts (1:7).  More recently, a study of changes in children's blood Pb levels associated with reduced Pb emissions and associated air concentrations near a Pb smelter in Canada (for children through age six in age) reports a ratio of 1:6 and additional analysis of the data by EPA for the initial time period of the study resulted in a ratio of 1:7 (CD, pp. 3-23 to 3-24; Hilts, 2003).[11] Ambient air and blood Pb levels associated with the Hilts (2003) study range from 1.1 to 0.03 µg/m3, and associated population mean blood Pb levels range from 11.5 to 4.7 µg/dL, which are lower than levels associated with the older studies cited in the 1986 Criteria Document (USEPA, 1986).

We also reviewed the ratio of 1:9-1:10 cited by CASAC that was based on the data in Schwartz and Pitcher (1989) on blood lead changes resulting from the phase-out of lead in gasoline.  Schwartz and Pitcher developed a regression equation to estimate blood lead levels from gasoline-based lead usage (hundreds of metric tons per day) in the period 1976-1980.  Their main analysis used a nationally representative sample of the U.S. population from the second National Health and Nutrition Examination Survey (NHANES II) and controlled for a range of factors such as age, income, smoking, educational attainment, nutrition, occupational exposure, alcohol intake,  and urban/rural status.[12]  (Another potential confounder, dietary lead intake, was found to exhibit no temporal trend over the study period and thus was not included in the model.) Schwartz and Pitcher's analysis found that for every 100 metric tons (MT) of gasoline lead used per day, the general population blood lead level would increase 2.14 µg/dL.  This finding was corroborated by a supplemental analysis by the authors of a dataset of blood lead screening results for inner-city children in Chicago over the same time period.  CASAC developed its ratio of 1:9 – 1:10 by first multiplying the 2.14 µg/dL per hundred MT of gasoline lead to an estimate of gasoline usage in 1976 (426 MT per day) to produce a blood lead attributable to lead in gasoline of 9.12 µg/dL.  CASAC then divided this value by EPA's estimated reduction in ambient air levels in urban cities of 1 µg/m[3] between 1976 and the elimination of lead in gasoline (USEPA, 1986) to produce the ratio.

We also considered a 1:5 air:blood ratio, which represented the ratio for the change in the urban case study from current (mean) conditions to an alternative NAAQS of 0.2 µg/m[3] maximum monthly mean. According to the Notice of Proposed Rulemaking, "There are a number of sources of uncertainty associated with these model-derived ratios.  The hybrid indoor dust Pb model, which is used in estimating indoor dust Pb levels for the urban case studies, uses a HUD dataset reflecting housing constructed before 1980 in establishing the relationship

---

[11] This study considered changes in ambient air Pb levels and associated blood Pb levels over a five-year period which included closure of an older Pb smelter and subsequent opening of a newer facility in 1997 and a temporary (3 month) shutdown of all smelting activity in the summer of 2001. The author observed that the air-to-blood ratio for children in the area over the full period was approximately 1:6. The author noted limitations in the dataset associated with exposures in the second time period, after the temporary shutdown of the facility in 2001, including sampling of a different age group at that time and a shorter time period (3 months) at these lower ambient air Pb levels prior to collection of blood Pb levels. Consequently, EPA calculated an alternate air-to blood Pb ratio based on consideration for ambient air Pb and blood Pb reductions in the first time period (after opening of the new facility in 1997).

[12] Race was addressed using stratified regression analysis and was not found to modify results by more than 10 percent (Schwartz and Pitcher, 1989).

between dust loading and concentration, which is a key component in the hybrid dust model (see Section Attachment G-1 of the Risk Assessment, Volume II). Given this application of the HUD dataset, there is the potential that the non-linear relationship between indoor dust Pb loading and concentration (which is reflected in the structure of the hybrid dust model) could be driven more by the presence of indoor Pb paint than contributions from outdoor ambient air Pb. We also note that only recent air pathways were adjusted in modeling the impact of ambient air Pb reductions on blood Pb levels in the urban case studies, which could have implications for the air-to-blood ratios." (US EPA, 2008b).

As a sensitivity analysis, we selected a lower bound of the 1:2 ratio from the U.S. EPA *Lead Risk Assessment* and an upper bound of 1:10 as upper bound of the CASAC Schwartz and Pitcher study-based estimates. We believe the inclusion of the 1:10 ratio as an upper bound is justified by the strengths of the design of the Schwartz and Pitcher study, which like the Hilts study, captured the effects of a natural experiment, by its extensive control for confounders, including dietary exposures, and by the robustness of its findings using national-level and urban inner-city samples.

We divided the maximum quarterly mean lead in air concentrations for each scenario by the air:blood ratio to estimate the blood lead level in the population due solely to exposure to ambient air.  We then added an estimate of non-air-related background blood lead level (e.g., from ingestion of indoor dust or outdoor soil contaminated by lead paint) to calculate the total geometric mean blood lead level expected in the population.[13]  For our estimate of non-air-related background, we selected the midpoint from a range of values reported by CASAC as being most appropriate for children under 7 years of age (USEPA, 2007d).[14] We apply this estimate of current-year non-air background blood lead for an analysis year of 2016. State and federal interventions such as the Renovation and Repair Rule (EPA, 2008c) may reduce future non-air blood lead to a level below this estimate. EPA alternate approaches to projecting non-air blood lead levels to reflect such regulatory interventions. However, data limitations prevented EPA from generating credible estimates.

The air:blood ratio provided us with an estimate of the geometric mean blood lead level across the population of exposed children, which we then used to estimate the magnitude of health effects benefits.  We assumed that the blood lead level changes in 2016 estimated in this way are a reasonable representation of lifetime average blood lead level for children under seven years of age in our study and were used with the selected dose-response functions without further adjustment.

---

[13] We estimated total blood lead level to be consistent with the epidemiological studies underlying the dose-response functions we used for estimating changes in IQ due to changes in lead exposure, which are based on total blood lead level.

[14] CASAC provided a range of non-air-related background geometric mean concentrations of 1.0 – 1.4 µg/dl in their comments on EPA's *Lead Risk Assessment* (USEPA, 2007a).  We selected the midpoint of this range, 1.2 µg/dl, for this analysis.

**Table 5-4. Air Lead to Blood Lead Ratios**

| Ratio | Source | Description |
|---|---|---|
| **1:2 to 1:6** | USEPA, 2007a | Ratios in Table 5-7 of EPA's current *Lead Risk Assessment* (USEPA, 2007a) estimated from modeling of exposures in urban areas and areas near lead smelters.  These ratios compare the incremental reduction in air concentrations required to meet lower alternative NAAQS levels to the corresponding incremental change in blood lead.  This ratio is likely to provide the best estimate of blood lead associated with recent changes in air lead concentrations.  These ratios for the general urban and primary lead smelter case studies range from 1:2 to 1:6 for scenarios ranging from the current NAAQS to an alternative NAAQS of 0.05 $\mu g/m^3$ maximum monthly mean, respectively. |
| **1:5** | USEPA, 2007a WHO, 2005 | Ratio applied by WHO to establish current lead Air Quality Guideline for Europe. Also reported in Table 5-7 of EPA's *Lead Risk Assessment* (USEPA, 2007a; see above) for the ratio for the change in the urban case study from current (mean) conditions to an alternative NAAQS of 0.2 $\mu g/m^3$ maximum monthly mean. |
| **1:3 to 1:6** | Brunekreef, 1984 | Ratios reported in a meta-analysis of surveys of smelters and urban areas. Based on older studies that typically reflect ratios for children with blood lead levels > 10 $\mu g/dl$. |
| **1:6 to 1:7** | Hilts, 2003[15] | Ratio calculated from more recent study of air concentrations and blood lead levels for children living near a British Columbia smelter during a period of decreasing lead emissions.  Blood lead levels in this study  (4 – 10 $\mu g/dl$) are lower than in the Brunekreef studies, but still higher than those modeled in EPA's 2007 *Lead Risk Assessment*. |
| **1:9-1:10** | USEPA, 2007d; Schwartz and Pitcher (1989) | Ratio cited by CASAC in its March 2007 advisory that was derived from calculations in Schwartz and Pitcher analysis of the impacts of phasing out lead in gasoline.  Reflects ratios for changes from higher baseline lead concentrations than expected under current conditions. |

[15] This study considered changes in ambient air Pb levels and associated blood Pb levels over a five-year period which included closure of an older Pb smelter and subsequent opening of a newer facility in 1997 and a temporary (3 month) shutdown of all smelting activity in the summer of 2001. The author observed that the air-to-blood ratio for children in the area over the full period was approximately 1:6. The author noted limitations in the dataset associated with exposures in the second time period, after the temporary shutdown of the facility in 2001, including sampling of a different age group at that time and a shorter time period (3 months) at these lower ambient air Pb levels prior to collection of blood Pb levels. Consequently, EPA calculated an alternate air-to blood Pb ratio based on consideration for ambient air Pb and blood Pb reductions in the first time period (after opening of the new facility in 1997).

*Estimating Avoided Health Effects*

The following section presents the approach we used to quantify the health benefits of lead due to reductions in the blood lead levels in the population resulting from lowering the NAAQS.  This analysis estimates the adverse health impact of blood lead levels on changes in IQ in young children below seven years of age.  Cognitive effects are thought to strongly relate to a child's future productivity and earning potential (USEPA, 2006b).

Multiple epidemiologic studies of Pb and child development have demonstrated inverse associations between blood Pb concentrations and children's IQ and other cognitive-related outcomes at successively lower Pb exposure levels over the past 30 years (as discussed in the CD, section 6.2.13). Numerous epidemiological studies have reported neurocognitive, neurobehavioral, sensory, and motor function effects in children with blood Pb levels below 10 µg/dL (CD, sections 6.2 and 8.4).   As discussed in the Criteria Document, "extensive experimental laboratory animal evidence has been generated that (a) substantiates well the plausibility of the epidemiologic findings observed in human children and adults and (b) expands our understanding of likely mechanisms underlying the neurotoxic effects" (CD, p. 8-25; section 5.3).

Threshold levels for neurological effects, in terms of blood Pb levels in individual children, cannot be discerned from the currently available studies (CD, pp. 8-60 to 8-63).  The Criteria Document states "[t]here is no level of Pb exposure that can yet be identified, with confidence, as clearly not being associated with some risk of deleterious health effects" (CD, p. 8-63).  The Criteria Document also notes that "a threshold for Pb neurotoxic effects may exist at levels distinctly lower than the lowest exposures examined in these epidemiologic studies" (CD, p. 8-67). The current evidence indicates the occurrence of a variety of health effects, including neurological effects in children, associated with blood Pb levels extending well below 10 µg/dL (CD, Sections 6.2, 8.4 and 8.5).  For example, as noted in the Criteria Document with regard to the neurocognitive effects in children, the "weight of overall evidence strongly substantiates likely occurrence of [this] type of effect in association with blood-Pb concentrations in range of 5-10 µg/dL, or possibly lower … Although no evident threshold has yet been clearly established for those effects, the existence of such effects at still lower blood-Pb levels cannot be ruled out based on available data." (CD, p. 8-61).  The Criteria Document further notes that any such threshold may exist "at levels distinctly lower than the lowest exposures examined in these epidemiological studies" (CD, p. 8-67).

In comparing across the individual epidemiological studies and the international pooled analysis, the Criteria Document observed that at higher blood Pb levels (e.g., above 10 µg/dL), the slopes (for change in IQ with blood Pb) derived for log-linear and linear models are almost identical, and for studies with lower blood Pb levels, the slopes appear to be steeper than those observed in studies involving higher blood Pb levels (CD, p. 8-78, Figure 8-7).

The current evidence reviewed in the Criteria Document with regard to the quantitative relationship between neurocognitive decrement, such as IQ, and blood Pb levels indicates that

the slope for Pb effects on IQ is nonlinear and is steeper at lower blood Pb levels, such that each µg/dL increase in blood Pb may have a greater effect on IQ at lower blood Pb levels (e.g., below 10 µg/dL) than at higher levels (CD, section 6.2.13; pp. 8-63 to 8-64; Figure 8-7).  As stated in the CD, "the most compelling evidence for effects at blood Pb levels <10 µg/dL, as well as a nonlinear relationship between blood Pb levels and IQ, comes from the international pooled analysis of seven prospective cohort studies (n=1,333) by Lanphear et al. (2005)" (CD, pp. 6-67 and 8-37 and section 6.2.3.1.11).  Using the full pooled dataset with concurrent blood Pb level as the exposure metric and IQ as the response from the pooled dataset of seven international studies, Lanphear and others (2005) employed mathematical models of various forms, including linear, cubic spline, log-linear, and piece-wise linear, in their investigation of the blood Pb concentration-response relationship (CD, p. 6-29; Lanphear et al., 2005).  They observed for this pooled dataset that the shape of the concentration-response relationship is nonlinear and the log-linear model provides a better fit over the full range of blood Pb measurements  than a linear one (CD, p. 6-29 and pp. 6-67 to 6-70; Lanphear et al., 2005).  In addition, they found that no individual study among the seven was responsible for the estimated nonlinear relationship between Pb and deficits in IQ (CD p. 6-30).  Others have also analyzed the same dataset and similarly concluded that, across the range of the dataset's blood Pb levels, a log-linear relationship was a significantly better fit than the linear relationship (p=0.009) with little evidence of residual confounding from included model variables (CD, section 6.2.13; Rothenberg and Rothenberg, 2005).

In order to quantify the expected changes in IQ points in the population of children due to the implementation of alternative NAAQS, we utilized available dose-response functions in the literature.  For our primary estimate, we selected a dose-response relationship from a pooled analysis of seven prospective studies in North America and Europe examining the effect of lead on full-scale IQ in children (Lanphear et al., 2005).[16,17]  Blood lead levels were measured in each study five times over early childhood (at 6, 12 (or 15), 36, 48, and 60 months).  Full-scale IQ was measured when the children were between 4 and 10 years of age.  Four measures of blood lead were examined by the authors: concurrent blood lead (defined as the blood lead measured closest to the IQ test), maximum blood lead (defined as the peak blood lead measured at any time before the IQ test), average lifetime blood lead (defined as the mean blood lead from six months to concurrent blood lead tests), and early childhood blood lead (defined as the mean blood lead from 6 to 24 months).  The authors found that the concurrent and lifetime blood lead levels were the strongest predictors of IQ deficits associated with lead exposure.

---

[16] Full-scale IQ is a composite score of verbal and performance tests.  Children were administered a version of the Wechsler Intelligence Scales for Children under uniform conditions within each study (Lanphear et al., 2005).

[17] The seven cohort studies included in this analysis include sites in Boston, Massachusetts (Bellinger et al., 1992); Cincinnati and Cleveland, Ohio (Dietrich et al., 1993 and Ernhart et al., 1989); Mexico City, Mexico (Schnaas et al., 2000); Rochester, New York (Canfield et al., 2003); and Yugoslavia (Wasserman et al., 1997).

We used an estimate from this study based on a log-linear relationship between lifetime blood lead level and IQ score.[18]  The log-linear relationship was found to be the best fit for the data and the lifetime blood lead levels exhibited a strong relationship with IQ.  In addition, we found this measure to be the most consistent with the benefits scenario (see the section in this chapter entitled "Selection of Health Endpoints for further information).  Lanphear reports an IQ decrement of 6.2 points for an increase in lifetime blood lead level from 6.1 to 47.0 µg/dl for the selected model.  However, the lowest measured lifetime blood lead level represented in the Lanphear pooled analysis was 1.47 µg/dl.  To estimate IQ effects at blood lead levels below this "cutpoint," we used a linearized slope, obtained by taking the tangent to the log-linear function at the point of departure (USEPA, 2007a).

To estimate IQ benefits from blood lead reductions, we first calculated the expected IQ point loss per child under each of the two scenarios (the "base case" and the "control scenarios") for each monitor (Equation 1).  We then subtracted the "base case" IQ loss from the "control scenario" IQ loss and multiplied by the population of children six years of age and younger living within the radius of influence of each monitor to estimate the total number of IQ points that would be gained by reducing the NAAQS (Equation 2).

## Equation 1

For blood lead levels $\geq$ cutpoint:

$$\text{IQ loss} = \beta_1 \times \ln(\text{PbB}/\text{cutpoint}) + \beta_2 \times \text{cutpoint}$$

For blood lead levels < cutpoint:

$$\text{IQ loss} = \beta_2 \times \text{PbB}$$

Where:

Cutpoint = 1.47 µg/dl (i.e., the lowest observed lifetime blood lead level);
$\beta_1$ = -3.04 (log-linear regression coefficient from Lanphear (2005), Table 4);
$\beta_2$ = -2.1 (linear slope); and
PbB = blood lead level (µg/dl).

## Equation 2

$$\Delta \text{ IQ} = (\text{IQ loss}_{\text{Control}} - \text{IQ loss}_{\text{Base}}) \times P$$

Where:

$\Delta$ IQ = total number of IQ points gained under the "control scenario" in comparison with the "base case" in 2016;

---

[18] The natural log of the blood lead levels were used for this analysis.

IQ loss $_{Control}$ = IQ point loss under the "control scenario" per child;

IQ loss $_{Base}$ = IQ point loss under the "base case" per child; and

P = the population of children aged 0 – 6 within the monitor's radius of influence.

To assess the sensitivity of selecting the log-linear model with low-exposure linearization from Lanphear et al. (2005), we estimated the IQ points gained using another function from this study.  This function represents an analysis performed by stratifying the study population based on the child's peak blood lead level measurement (i.e., maximal blood lead level above and below 7.5 µg/dl).  A linear slope was then was then fit to each group relating the concurrent blood lead level index to IQ score.  We used these slopes to calculate the IQ loss for each scenario on a per child basis, using Equation 3 below.  We then calculated the total IQ points gained as in the primary estimate, by using Equation 2 described above.

**Equation 3**

For blood lead levels $\geq$ cutpoint:

$$\text{IQ loss} = \beta_1 \times (\text{PbB - cutpoint}) + \beta_2 \times \text{cutpoint}$$

For blood lead levels $<$ cutpoint:

$$\text{IQ loss} = \beta_2 \times \text{PbB}$$

Where:

Cutpoint = 5.17 µg/dl;[19]

$\beta_1$ = -0.16 (linear coefficients from Lanphear et al. (2005) for blood lead levels greater than or equal to the cutpoint);

$\beta_2$ = -2.94 (linear coefficients from Lanphear et al. (2005) for blood lead levels below the cutpoint); and

PbB = blood lead level (µg/dl).

We also assessed the sensitivity of the IQ benefits to the epidemiological study selected, using alternative estimates from a study of 172 children in Rochester, New York (Canfield et al, 2003), a linear function developed for the Lead Renovation and Repair Rule (U.S. EPA, 2008c)

---

[19] This cutpoint refers to the lifetime average blood lead level.  Using the data presented in Table 1 of Lanphear et al. (2005), we multiplied the peak blood lead level cutpoint value of 7.5 µg/dl by the ratio of median lifetime average (12.4 µg/dl) to the median peak (18.0 µg/dl) blood lead levels in the study population.

and the linear function found in table 3 of the Lead NAAQS rule.  Using a linear model between lifetime blood lead level and IQ score, Canfield et al. (2003) found a decrement of 0.46 IQ points per 1 µg/dl increase in blood lead level.[20]  The RRP rule specified a linear function, finding a decrement of 0.88 IQ points per 1 µg/dl  increase in blood lead.[21] Finally, the Lead NAAQS cites four key studies that have "a mean blood Pb level closest to today's mean for U.S. children yields four slopes ranging from -1.56 to -2.94, with a median of -1.75 IQ points per µg/dL."[22] We summarize these studies below in table 5-5. We used the following equation (Equation 4) for these three linear dose-response functions:

**Equation 4**

$$\Delta IQ = [\beta \times (PbB_1 - PbB_2)] \times P$$

Where:

$\Delta IQ$ = total number of IQ points gained under the "control scenario" in comparison with the "base case" in 2016;

$\beta$ = linear regression coefficient (-0.46 for Canfield, -0.88 for RRP  and -1.75 for the lead NAAQS);

$PbB_1$ = blood lead level under the "control scenario" (µg/dl);

$PbB_2$ = blood lead level under the "base case" (µg/dl); and

P = the population of children aged 0 – 6 within the monitor's radius of influence.

---

[20] See table 3 of Canfield, R.L, Henderson, C.R., Cory-Slechta, D.A., et al. (2003). Intellectual Impairment in Children with Blood Lead Concentrations below 10 µg per Deciliter. *The New England Journal of Medicine* 348(16): 1517-26.

[21] Note that we include this function for comparative purposes. This function was designed to characterize IQ changes among children exposed to lead during renovation activities, a policy context that differs from the analysis here.

[22] U.S. Environmental Protection Agency (2008b) *National Ambient Air Quality Standards for Lead*. Office of Air and Radiation. EPA-HQ-OAR-2006-0735. Pp156.

**Table 5-5.  Summary of Quantitative Relationships of IQ and Blood Pb for Analyses with Blood Pb Levels Closest to those of Children in the U.S. Today.**

| Blood Pb Levels (µg/dL) | | | Average Linear Slope[A] |
| Geometric Mean | Range (min-max) | Study/Analysis | (IQ points per µg/dL) |
| --- | --- | --- | --- |
| 2.9 | 0.8 – 4.9 | Tellez-Rojo et al 2006, <5 subgroup | -1.71 |
| 3.24 | 0.9 – 7.4 | Lanphear et al 2005[B], <7.5 peak subgroup | -2.94 |
| 3.32 | 0.5 – 8.4 | Canfield et al 2003 [B], <10 peak subgroup | -1.79 |
| 3.8 | 1 - 9.3 | Bellinger and Needleman 2003 [B] , <10 peak subgroup | -1.56 |
| | | **Median value** | **-1.75** |

[A] Average linear slope estimates here are for relationship between IQ and concurrent blood Pb levels (BLL), except for Bellinger & Needleman for which study reports relationship fir 10 year old IQ with 24 month blood Pb levels.

[B] The Lanphear et al 2005 pooled International study includes blood Pb data from the Rochester and Boston cohorts, although for different ages (6 and 5 years, respectively) than the ages analyzed in Canfield et al 2003 and Bellinger and Needleman 2003.

**Benefit Valuation**

*Value of Avoided IQ decrements*

The valuation approach we apply for assessing monetary losses associated with IQ decrements is based on an approach applied in previous EPA analyses (USEPA, 1997, 2005 & 2006b).  The approach expresses the loss to an affected individual resulting from IQ decrements in terms of foregone future earnings for that individual.

To estimate the expected monetary value of these effects, we first estimated the median present value of future earnings at time of birth for a person born in the U.S., based on earnings and labor force participation rate data from the 2006 Current Population Survey (CPS).[23]  When calculating the lifetime earnings estimate, we assumed an individual born today would begin working at age 16 and retire at age 67.  We assumed a real growth rate for wages of one percent per year, as assumed in EPA's Section 812 retrospective analysis (US EPA, 1997); adjusted for survival probabilities based on current US vital statistics from the CDC's National Center for Health Statistics;[24] and adjusted for labor force participation by age.  We then discounted the

---

[23] See http://www.bls.gov/cps/home.htm - data.

[24] See http://www.cdc.gov/nchs/data/nvsr/nvsr54/nvsr54_14.pdf.

expected lifetime stream of wages using a three percent annual rate.  As in EPA's *Economic Analysis for the Renovation, Repair, and Painting Program Proposed Rule* (EPA, 2008c), we assumed children will be affected by lead at age three, the midpoint of the range during which children are thought to be most susceptible to lead.  Therefore, we discounted lifetime earnings back to age three.  We estimated present value median lifetime earnings to be $606,930 in 2006 dollars.

In the previous EPA analyses cited above, the Agency has applied an average estimate of the effect of IQ on earnings of 2.379 percent per IQ point from an analysis by Salkever (1995).[25] An analysis by Schwartz (1994b) estimated that a 1-point increase in IQ would increase earnings by 1.76 percent.  The percentage increases in both studies reflect both direct impact of IQ on hourly wages and indirect effects on annual earnings as the result of additional schooling and increased labor force participation.  A recent review of literature from the labor economics and environmental health fields by CDC economist Scott Grosse suggests that both of these studies may have overestimated the association of IQ with earnings (2007).  Specifically, he found the Salkever estimate of direct impacts of IQ on wages to be higher than estimates reported in the labor economics literature.  Grosse also found that the Schwartz study overestimates the cognitive impact of lead exposure on earnings, but he argues that the Schwartz estimate may still be appropriate for estimating the total effect of lead on earnings, because it includes the effects of lead on education and earnings that result from both cognitive and non-cognitive changes.  Thus, it may be a more comprehensive estimate than one based on cognitive changes alone.

In recognition of the fact that the economics literature continues to evolve, and because EPA has traditionally relied upon the Salkever (1995) estimate to value changes in IQ, for this analysis we provide a range of valuation estimates based on both the Salkever (1995) and the Schwartz (1994b) functions. Below we describe how we estimate the cost per IQ decrement using each function.

The 1.76 percent estimate from Schwartz represents a gross impact on earnings; it does not account for the costs of additional schooling.  EPA's Clean Air Mercury Rule (CAMR) RIA (USEPA, 2005) reported an estimate of $16,425 per additional year of schooling in 1992 dollars, based on U.S. Department of Education data reflecting both direct annual expenditures per student and annual average opportunity cost (i.e., lost income from being in school).  Consistent with the CAMR analysis, we assume that these costs are incurred when an individual born today turns 19, based on an average 12.9 years of education among people aged 25 and over in the U.S.  We discount the educational costs back to a present value at age 3, to be consistent with the present value of lifetime earnings.  We then adjust this value to 2006 dollars, resulting in an estimated $14,700 per additional year of schooling.  Schwartz reports an increase of 0.131 years of schooling per IQ point (1994b); thus the change in average education costs per IQ point is $14,700 × 0.131 = $1,930.

Using the Schwartz function, we calculated the present value of the median net earnings loss associated with one IQ point as the present value of median lost earnings per IQ point lost

---

[25] The 812 Retrospective analysis also included an estimate based on older work by Needleman et al. (1990).

($606,930 × 0.0176 = $10,682) minus the change in average education costs per IQ point ($1,930). These calculations yield a value of $8,760 of net earnings lost per a one-point decrease in IQ using a 3% discount rate and a value of $1,094 at a 7% discount rate.

To estimate the cost per IQ point using Salkever (1995), we followed the same set of steps as above, substituting the Salkever estimate of the change in lifetime earnings. These calculations yield a value of $12,512 of net earnings lost per a one point decrease in IQ using a 3% discount rate and a value of $2,156 at a 7% discount rate.

**Results**

This section presents the health effects results and the associated monetary benefits. We first present the expected IQ point gains in 2016, comparing each of the "control scenarios" to the "base case." We then provide the expected monetized value of those gains in IQ in 2016. We also describe an analysis we performed to assess the sensitivity of the model to the various inputs used and assumptions made. Finally, we explain the methodology we applied for estimating monetized health benefits from co-control of $PM_{2.5}$ and the results of that analysis.

*Changes in IQ*

Table 5-6 below presents the total number of IQ points expected to be gained in the US in the year 2016 by achieving each of the alternate NAAQS level options, when compared to the "base case" (i.e., the lead NAAQS remains at its current level). Our results indicate that the number of IQ points gained in 2016 ranges from 230,000 if a 0.5 maximum quarterly mean NAAQS is achieved up to 510,000 for a 0.1 maximum quarterly mean NAAQS. These IQ point gains are valued at between $2.0 and $6.4 billion at a 3% discount rate and between $0.3 and $1.1 billion at a 7% discount rate (2006$).

**Table 5-6.  Number of IQ Points Gained and Monetary Benefits (in Millions of 2006$) in 2016**

| Standard Alternative | IQ Points Gained | Estimated Net Present Value of IQ Points Gained* | |
|---|---|---|---|
| | | 3% Discount Rate | 7% Discount Rate |
| 0.5 Maximum Quarterly Mean | 230,000 | $2,000—$2,800 | $250—$490 |
| 0.4 Maximum Quarterly Mean | 230,000 | $2,000—$2,800 | $250—$490 |
| 0.3 Maximum Quarterly Mean | 270,000 | $2,400—$3,400 | $300—$580 |
| 0.2 Maximum Quarterly Mean | 360,000 | $3,200—$4,500 | $390—$780 |
| 0.15 Maximum Quarterly Mean | 400,000 | $3,500—$5,000 | $440—$870 |

34

| 0.1 Maximum Quarterly Mean | 510,000 | $4,500—$6,400 | $560—$1,100 |

*Lower end of range calculated using Schwartz (1994b) estimate; upper end calculated using Salkever (1995) estimate.

** Results reflect the use a 2002 derived non-air background blood lead applied to analysis year of 2016. To the extent that state and federal interventions such as the Renovation and Repair Rule (EPA, 2008c) reduce future non-air blood lead levels, the estimate of IQ change above may be overstated.

We also assessed the geographic distribution of these benefits.  We found that the benefits were concentrated in a small number of counties.  Table 5-7 below is an example of the distribution of total benefits due to IQ points gained for the selected 0.15 µg/m$^3$ maximum quarterly mean NAAQS standard.  For this standard, approximately 60 percent of the total benefits are due to changes in lead air concentrations in four counties: Hillsborough, FL; Delaware, IN; and  Berks, PA.

**Table 5-7.  Percentage of Benefits by County (0.15 µg/m³ Second Maximum Monthly Mean NAAQS)**

| County | State | Population of Children in Affected Area | Affected Population (%) | Percentage of Benefits (%) |
|--------|-------|----------------------------------------|-------------------------|----------------------------|
| Hillsborough | FL | 67,359 | 17% | 38% |
| Delaware | IN | 7,957 | 2% | 13% |
| Berks | PA | 27,966 | 7% | 13% |
| Collin | TX | 22,192 | 6% | 12% |
| Denton | TX | 8,243 | 2% | 5% |
| Cuyahoga | OH | 60,605 | 16% | 4% |
| Pike | AL | 2,621 | 1% | 4% |
| Jefferson | MO | 6,472 | 2% | 2% |
| Orange | NY | 9,186 | 2% | 2% |
| Dakota | MN | 23,216 | 6% | 1% |
| Beaver | PA | 9,120 | 2% | 1% |
| Fulton | OH | 1,644 | 0% | 1% |
| Rutherford | TN | 707 | 0% | 1% |
| Williamson | TN | 804 | 0% | 1% |
| Logan | OH | 2,993 | 1% | 1% |

Note: There were several other counties that constituted less than 1 percent of benefits that are not included in this table.

*IQ Sensitivity Analysis*

We performed a sensitivity analysis on the benefits model in order to assess the total range of potential benefits and to determine the sensitivity of the primary model results to various data inputs and assumptions.  We used the model to calculate the total monetary benefits due to gains in children's IQ for the 0.15 maximum quarterly monthly mean NAAQS option using our default model input assumptions.[26]  We then changed each default input one at a time and recalculated the total benefits to assess the percent change from the default.  Table 5-8 below presents the results of this sensitivity analysis.  The table indicates for each input parameter the value used as the default (in bold) and the values for the sensitivity analyses.  It then provides the total monetary benefits for each input and the percent change from the default value.

Our sensitivity analysis results indicate that the benefits model is most sensitive to the method used for assigning air lead exposure concentrations to the population of exposed children.  Our primary estimate relied on an interpolation method, where several monitor concentrations were used in determining the exposure concentration.  When the radius method

---

[26] Note that for the sensitivity analysis, we relied on the results that incorporated the valuation estimate for IQ from Schwartz (1994b).

36

was employed as part of the sensitivity analysis, the results varied.  We assumed that monitor concentration applied to the population residing within a 10 km radius as a best estimate of the exposed population, which as we noted above, produces a conservative upper-bound estimate of exposure.  When compared with the interpolation method, this increased results by 40 percent. The size of the radius assumed when using the radius method also had a large impact on the results.  When the radius size was reduced to 5, 2, and 1 km for monitors associated with a lead source, the benefits are significantly reduced (i.e., total monetary benefits are reduced by 48, 87, and 94 percent, respectively).  In addition, if the monitor concentration is assumed to apply to the population of the entire county in which that monitor resides, the benefits increase significantly (320 percent).

The discount rate also had a significant impact on results, because the benefits of lead on earnings occur over a lifetime, and the net present value of those earnings is highly sensitive to the discount rate applied.  When the discount rate was changed from the default (3 percent) to a rate of 7 percent, the benefits fell by 83 percent.

**Table 5-8.  Sensitivity Analysis for the Primary Estimate of Health Benefits (for the 0.15 µg/m$^3$ Maximum Quarterly Mean Results)**

|  | Model Input | Total Benefits (Millions 2006$) | Percent Change from Default |
|---|---|---|---|
| Exposure Estimation Method | Interpolation | $5,000 | N/A |
|  | County | $21,000 | 320% |
|  | 10 km Radius | $7,000 | 40% |
|  | 5 km Radius | $2,600 | -48% |
|  | 2 km Radius | $670 | -87% |
|  | 1 km Radius | $300 | -94% |
| Discount Rate | 3 Percent | $5,000 | N/A |
|  | 7 Percent | $870 | -83% |
| Epidemiological Study for IQ | Lanphear et. al (2005) | $5,000 | N/A |
|  | Canfield et. al (2003) Linear slope of -0.46 | $2,600 | -48% |
|  | Lanphear et al. (2005) Dual Linear | $12,000 | 140% |
|  | Median of 4 Functions in Rule | $10,000 | 100% |
|  | LRRP Function Linear slope of -0.88 | $5,000 | 0% |
| Air:Blood (µg/m3 in air:µg/dl in blood) | 1:7 | $5,000 | N/A |
|  | 1:10 | $5,900 | 18% |
|  | 1:2 | $2,500 | -50% |
| Non-Air-Related Background Geometric Mean Blood Lead Level (µg/dl) | 1.2 | $5,000 | N/A |
|  | 1.0 | $5,400 | 8% |
|  | 1.4 | $4,700 | -6% |
| Valuation Study | Salkever (1995) | $5,000 | N/A |
|  | Schwartz (1994) | $3,500 | -30% |

37

Finally, the results are also sensitivity to the selection of the concentration-response function. Compared to the default function, the use of the Canfield et al. (2003) estimate generates IQ change estimates that aer 48% lower. Conversely, the Lanphear dual-linear function generates an IQ change estimate that is 140% that of the default, while the function based on the median of the four functions in Table 5-5 generates an estimate twice that of the default.

Inputs that had a moderate impact on the benefits results include the air:blood ratio selected to convert lead air concentrations into blood lead levels in the population, the non-air-related geometric mean blood lead level used, as well as the IQ valuation function.

### PM Co-Control Benefits – Methodology and Results

As outlined in Chapter 4, most of the point source measures implemented to achieve the NAAQS standards are focused on controlling emissions of lead in particulate form.  As a result, virtually all of these measures also have a significant impact on emissions of directly emitted particulate matter.  Table 5-9 lists the PM-related health effects that are included in our monetized benefits estimate incorporating PM co-benefits.[27]

In Chapter 4 we identified control technologies to reduce emissions of lead that also reduce $PM_{2.5}$.  However, in some areas, more emission reductions are needed than can be achieved through identified control options (i.e., unidentified controls).  The identified and unidentified controls are shown in Table 5-10 below. These emission reduction estimates are incremental to a baseline that reflects emission reductions from MACT controls and the $PM_{2.5}$ NAAQS RIA.

---

[27] Because the PM co-benefits are estimated on a $-per-ton basis, we do not report quantitative estimates for individual PM health effects.

**Table 5-9. Health Effects of PM$_{2.5}$.**

| Effect | Quantified Health Effects | Unquantified Health Effects[e] |
|---|---|---|
| Health[a,b] | -Premature mortality based on both cohort study estimates and on expert elicitation[c,d]<br>-Bronchitis: chronic and acute<br>-Hospital admissions: respiratory and cardiovascular<br>-Emergency room visits for asthma<br>-Nonfatal heart attacks (myocardial infarction)<br>-Lower and upper respiratory illness<br>-Minor restricted-activity days<br>-Work loss days<br>-Asthma exacerbations (asthmatic population)<br>-Respiratory symptoms (asthmatic population)<br>-Infant mortality | -Subchronic bronchitis cases<br>-Low birth weight<br>-Pulmonary function<br>-Chronic respiratory diseases other than chronic bronchitis<br>-Non-asthma respiratory emergency room visits |

[a] Because the PM co-benefits are estimated on a $-per-ton basis, we do not report quantitative estimates for individual PM health effects.

[b] In addition to primary economic endpoints, there are a number of biological responses that have been associated with PM health effects, including morphological changes and altered host defense mechanisms.  The public health impact of these biological responses may be partly represented by our quantified endpoints.

[c] Cohort estimates are designed to examine the effects of long-term exposures to ambient pollution, but relative risk estimates may also incorporate some effects due to shorter-term exposures (see Kunzli et al., 2001).

[d] While some of the effects of short-term exposure are likely to be captured by the cohort estimates, there may be additional premature mortality from short-term PM exposure not captured in the estimates included in the primary analysis.

[e] The categorization of unquantified toxic health effects is not exhaustive.  Health endpoints in this column include both a) those for which there is not consensus on causality; and b) those for which causality has been determined but empirical data are not available to allow calculation of benefits.

**Table 5-10.  Summary of Estimated Co-Controlled PM$_{2.5}$ Emissions Reductions (in Tons)**

| Alternate NAAQS (Second Maximum Monthly Mean) | Identified Controls | Unidentified Controls | All Controls |
|---|---|---|---|
| 0.5 µg/m³ | 1,532 | 1 | 1,534 |
| 0.4 µg/m³ | 1,538 | 5 | 1,544 |
| 0.3 µg/m³ | 2,743 | 30 | 2,772 |
| 0.2 µg/m³ | 3,037 | 114 | 3,150 |
| 0.15 µg/m³ | 3,122 | 175 | 3,297 |
| 0.1 µg/m³ | 3,492 | 304 | 3,795 |

To estimate the value of these PM$_{2.5}$ emissions reductions, EPA utilized PM$_{2.5}$ benefit-per-ton estimates. These PM$_{2.5}$ benefit-per-ton estimates provide the total monetized human health benefits (the sum of premature mortality and premature morbidity) of reducing one ton of PM$_{2.5}$ from a specified source. EPA has used a similar technique in previous RIAs, including the recent ozone NAAQS RIA (USEPA, 2008a).  The fourteen estimates presented below derive from the application of three alternative methods:

- One estimate is based on the concentration-response (C-R) function developed from a study of the American Cancer Society (ACS) cohort reported in Pope et al. (2002), which has previously been reported as the primary estimate in recent RIAs (USEPA, 2006c).

- One estimate is based on Laden et al.'s (2006) reporting of the extended Six Cities cohort study; this study is a more recent PM epidemiological study that was used as an alternative in the PM NAAQS RIA.

- The other twelve estimates are based on the results of EPA's expert elicitation study on the PM-mortality relationship, as first reported in Industrial Economics (2006) and interpreted for benefits analysis in EPA's final RIA for the PM NAAQS, published in September 2006 (USEPA, 2006c).  For that study, twelve experts (labeled A through L) provided independent estimates of the PM-mortality C-R function.  EPA practice has been to develop independent estimates of PM-mortality estimates corresponding to the C-R function provided by each of the twelve experts.

Readers interested in reviewing the complete methodology for creating the benefit per-ton estimates used in this analysis can consult the Technical Support Document (TSD) accompanying the recent final ozone NAAQS RIA (USEPA 2008a).[28] As described in the documentation for the benefit per-ton estimates cited above, national per-ton estimates are developed for selected pollutant/source category combinations.  The per ton values calculated

---

[28] The Technical Support Document, entitled: *Calculating Benefit Per-Ton Estimates*, can be found in EPA Docket EPA-HQ-OAR-2007-0225-0284.

therefore apply only to tons reduced from those specific pollutant/source combinations (e.g., $SO_2$ emitted from electric generating units; $NO_x$ emitted from mobile sources).  Emissions controls modeled in this RIA are all applied to point sources; a few are at electric generating units (EGUs), but most are at industrial facilities involved in handling lead as a manufacturing product, byproduct, or input.  From among the list of pollutant/source combinations outlined in the TSD referenced above, the combination most appropriate for valuation of $PM_{2.5}$ emissions reductions from the sources controlled for lead emissions is the combination for $PM_{2.5}$ from EGU and non-EGU point sources.  Estimates of this per-ton value for a 3 percent discount rate vary from a low of $68,000 per ton to a high of $570,000 per ton (based on a change in emissions of 50 percent or less from a 2015 PM emissions base, in 2006$).  Our estimate of $PM_{2.5}$ co-control benefits is therefore based on the total $PM_{2.5}$ emissions controlled multiplied by this per-ton value.  The results of this calculation are provided in Table 5-11 below.  Figures 5-9 and 5-10 provide a graphical representation of the 14 estimates of PM co-control benefits for $PM_{2.5}$, using both a 3 percent and 7 percent discount rate.

**Table 5-11.  Monetized Benefits of Co-Controlled PM$_{2.5}$ Emissions (in Millions of 2006$)**

| Alternative | Pope et al. (2002) | Laden et al. (2006) | Expert A | Expert B | Expert C | Expert D | Expert E | Expert F | Expert G | Expert H | Expert I | Expert J | Expert K | Expert L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **3 Percent Discount Rate** | | | | | | | | | |
| 0.5 μg/m³ | $240 | $510 | $710 | $550 | $540 | $380 | $880 | $490 | $320 | $410 | $540 | $440 | $110 | $400 |
| 0.4 μg/m³ | $240 | $510 | $710 | $550 | $540 | $390 | $880 | $500 | $330 | $410 | $540 | $440 | $110 | $400 |
| 0.3 μg/m³ | $430 | $920 | $1,280 | $990 | $980 | $690 | $1,600 | $890 | $590 | $740 | $970 | $790 | $190 | $720 |
| 0.2 μg/m³ | $480 | $1,000 | $1,500 | $1,100 | $1,100 | $790 | $1,800 | $1,000 | $670 | $840 | $1,100 | $900 | $220 | $820 |
| 0.15 μg/m³ | $510 | $1,100 | $1,500 | $1,200 | $1,200 | $820 | $1,900 | $1,100 | $700 | $880 | $1,200 | $940 | $230 | $860 |
| 0.1 μg/m³ | $580 | $1,300 | $1,800 | $1,400 | $1,300 | $950 | $2,200 | $1,200 | $800 | $1,000 | $1,300 | $1,100 | $260 | $990 |
| | | | | | **7 Percent Discount Rate** | | | | | | | | | |
| 0.5 μg/m³ | $210 | $460 | $640 | $490 | $490 | $350 | $790 | $450 | $290 | $370 | $480 | $400 | $96 | $360 |
| 0.4 μg/m³ | $220 | $460 | $640 | $500 | $490 | $350 | $800 | $450 | $300 | $370 | $490 | $400 | $97 | $360 |
| 0.3 μg/m³ | $390 | $830 | $1,200 | $890 | $880 | $630 | $1,400 | $810 | $530 | $670 | $870 | $710 | $170 | $650 |
| 0.2 μg/m³ | $440 | $940 | $1,300 | $1,000 | $1,000 | $710 | $1,600 | $920 | $600 | $760 | $990 | $810 | $200 | $740 |
| 0.15 μg/m³ | $460 | $980 | $1,400 | $1,100 | $1,100 | $750 | $1,700 | $960 | $630 | $790 | $1,000 | $850 | $210 | $780 |
| 0.1 μg/m³ | $530 | $1,100 | $1,600 | $1,200 | $1,200 | $860 | $2,000 | $1,100 | $730 | $910 | $1,200 | $980 | $240 | $890 |

Note: All estimates have been rounded to two significant figures.  All estimates are incremental to the 2006 PM NAAQS RIA. These estimates do not include confidence intervals because they were derived through a scaling technique

**described in the text.**

**Figure 5-9.  Distribution of Total PM$_{2.5}$ Monetized Co-Benefits by Lead Standard Alternative (3% Discount Rate)**



**Figure 5-10.  Distribution of Total PM$_{2.5}$ Monetized Co-Benefits by Lead Standard Alternative (7% Discount Rate)**



**Discussion**

The results of this benefits analysis demonstrate that lowering the current (1.5 µg/m$^3$ maximum quarterly mean) lead NAAQS to the selected standard of 0.15 µg/m$^3$ would be expected to have a significant impact on the IQ of young children.  Lowering the standard could cause an increase in total IQ points to about 400,000 points in 2016, which would be valued at between $3.5 and $5.0 billion (2006$, 3% discount rate).  In addition, controls installed to achieve the lead NAAQS standards will also reduce emissions of fine particulates.  As a result, this analysis includes a screening level calculation that indicates each of the alternatives considered could have a significant benefit in terms of improved particulate air quality, reduced health effects, and increased economic welfare of currently exposed individuals.

This benefits analysis is intended to be a screening investigation to provide an estimate of the potential magnitude of the benefits of reducing the lead NAAQS.  Therefore, the results of this analysis are associated with a number of uncertainties.  The benefits of IQ point gains in children were very sensitive to the method employed for estimating exposures to the population. When comparing the default method, which involved concentrations interpolated from multiple monitors, to the method assuming a uniform concentration within a 10 km radius around an individual monitor, the results increase by 40 percent. Increasing the radius to include the entire county in which the monitor resides results in roughly 3-fold increase in benefits.  Decreasing the radius size also has a large impact on benefits, decreasing the value by as much as 94 percent when a radius of 1 km is used.  The results were also fairly sensitive to the discount rate selected. When a 7 percent discount rate was used in place of the default rate of 3 percent, results decreased by 83 percent.  This is in part because the benefits of lead on earnings occur over a lifetime, and the net present value of those earnings is highly sensitive to the discount rate applied.    The dose-response function selected for quantifying the number of IQ points gained as a result of achieving the alternative NAAQS levels affected the results.  Utilizing alternate epidemiological studies decreased the primary estimate by as much as 72 percent or increased the primary estimate by as much as 140 percent.  However, we believe the Lanphear et al. (2005) study was the best choice for our primary estimate.  This study was a meta-analysis that synthesized a range of existing information and is based on more recent data than the studies included in the Schwartz (1993) study.  In addition, the log-linear model was the most robust estimate from this study, in that it was the best fit for the data.

Additional uncertainties related to the benefits estimates include the following:

- For our primary estimate of the benefits due to gains in children's IQ, we used a log-linear estimate from a recently published pooled analysis of seven studies (Lanphear et al., 2005).  Using alternate estimates from other epidemiological studies examining the link between blood lead level and children's IQ has significant impact on benefits results.  We found the benefits to decrease by as much as 72 percent when an alternate estimate from a paper by Schwartz (1993) is used.  This is due in part to the underlying shape of the dose-response relationship assumed by each of the functions.  In the Lanphear study, a log-linear relationship was found to be the best fit for the data (i.e., the natural log-transformed blood lead level is used to predict changes in IQ score).  This model implies

that the magnitude of changes in IQ increases with lower blood lead levels.  However, in the Schwartz (1993) and Canfield et al. (2003) studies, a single linear model is assumed (i.e., untransformed blood lead levels are used to predict changes in IQ score).  The single linear model implies that the magnitude of change in IQ is constant over the entire range of blood lead levels.  Therefore, at lower blood lead levels, the log-linear model predicts larger changes in IQ than the linear model.  Note that CASAC, in their review of EPA's *Lead Risk Assessment* indicated that "studies show that the decrements in intellectual (cognitive) functions in children are proportionately greater at PbB concentrations <10 µg/dl" (USEPA, 2007d, page 3).  However, if the true dose-response relationship is linear, than our primary estimate of benefits is an overestimation.

- Some uncertainty is involved in the estimates of maximum quarterly mean lead air concentrations used for the benefits model.  We used ratios of second maximum monthly mean values to maximum quarterly mean values from lead monitoring data from 2003-2005 to convert the second maximum monthly mean values in 2016 into a maximum quarterly mean for the "base case" as well as to convert the alternative second maximum monthly mean NAAQS into a maximum quarterly mean for the "control scenarios."  If the true ratio between the second maximum monthly means to the maximum quarterly mean is different in 2016 than in 2003-2005 because the pattern and distribution of daily values differs, then our results could be either over- or underestimated.

- The interpolation method of estimating exposure concentrations that we used for our primary estimate is associated with some uncertainty.  The validity of this method is to some extent contingent upon the availability of a sufficient number of monitors to support an interpolation. In certain locations, such as Hillsborough County, FL, there are a sufficient number of lead and TSP monitors to generate an interpolation with a pronounced gradient around each monitor.  The lead and TSP monitoring network in other non-attainment areas can in some cases be sparse, and the resulting interpolation does not appear to generate a meaningful gradient, such as in Delaware County, IN.

- We assumed that the IQ point effects of a change in lifetime blood lead (i.e., the effects of a change in 2016) apply to all children in our study population that were under seven years of age in 2016.  If there is a critical window of exposure for IQ effects (e.g., between the ages of one and two), then we could potentially be overestimating benefits in 2016 because we would have overestimated the population affected by reduced lead exposure in that year.  However, if partial or full achievement of the alternative NAAQS levels might occur earlier than 2016, the children in our 0-6 age cohort who are past any critical window in 2016 would have realized the partial or full benefits of reduced lead exposures in those earlier years.  Thus, the issue of a potential critical developmental window reflects uncertainty in both the timing and size of benefits.

- The use of air:blood ratios represents an approximation to the impact of changes in ambient air concentrations of lead on concurrent blood lead levels, applied in the absence of modeling data on lead transport and deposition and the on direct and indirect human exposures.  While the values we apply match fairly well with available literature, there

47

are relatively few studies that report such values or provide sufficient data to calculate such ratios.  Further, the lead concentrations in those studies tend to be higher than those modeled here (USEPA, 2007a); thus uncertainty remains as to whether the same ratios would be expected at lower levels, or whether air exposures are more or less efficient at changing concurrent blood lead levels at these lower concentrations.

- If the air:blood ratio we apply for children or a similar value is also valid for estimating adult exposures, then our primary benefits understate the true health benefits accruing to the lead-exposed populations because they exclude impacts on morbidity and mortality impacts on adults as well as impacts on prenatal mortality.  Additional research is needed to improve our understanding of the impacts of adult air exposure on adult blood lead levels.

- The earnings-based value-per-IQ-point lost that we apply in this analysis most likely represents a lower bound on the true value of a lost IQ point, because it is essentially a cost-of-illness measure, not a measure of an individual's willingness-to-pay (WTP) to avoid the loss of an IQ point.  Welfare economics emphasizes WTP measures as the more complete estimate of economic value.

- The earnings-based estimate of the value-per-IQ-point lost is based on current data on labor-force participation rates, survival probabilities, and assumptions about educational costs and real wage growth in the future.  To the extent these factors diverge from these values in the future, our lifetime earnings estimate may be under- or overestimated.

- Co-control benefits estimated here reflect the application of a national dollar benefit per ton estimate of the benefits of reducing directly emitted fine particulates from point sources.  Because they are based on national-level analysis, the benefit-per-ton estimates used here do not reflect local meteorology, exposure, baseline health incidence rates, or other local factors that might lead to an over-estimate or under-estimate of the actual benefits of controlling directly emitted fine particulates.

# REFERENCES

Bellinger, D.C., Stiles, K.M., Needleman, H.L. (1992). Low-Level Lead Exposure, Intelligence, and Academic Achievement: A Long-Term Follow-Up Study. *Pediatrics* 90: 855-861.

Brunekreef, B. (1984). The Relationship between Air Lead and Blood Lead in Children: A Critical Review. *Science of the Total Environment* 38: 79-123.

Canfield, R.L, Henderson, C.R., Cory-Slechta, D.A., et al. (2003). Intellectual Impairment in Children with Blood Lead Concentrations below 10 µg per Deciliter. *The New England Journal of Medicine* 348(16): 1517-26.

Centers for Disease Control and Prevention (CDC). (1991). *Strategic Plan for Elimination of Childhood Lead Poisoning*. U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention. Atlanta, GA: February.

Centers for Disease Control and Prevention (CDC). (2005). Preventing Lead Poisoning in Young Children. U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention. Atlanta, GA: August.

Chen, A., Dietrich, K.N, Ware, J., et al. (2005). IQ and Blood Lead from 2 to 7 Years of Age: Are the Effects in Older Children the Residual of High Blood Lead Concentrations in 2-year-olds? *Environmental Health Perspectives* 113: 597-601.

Dietrich, K.N., Ris, M.D., Succop, P.A, et al. (1993a). The Developmental Consequences of Low to Moderate Prenatal and Postnatal Lead Exposure: Intellectual Attainment in the Cincinnati Lead Study Cohort Following School Entry. *Neurotoxicology and Teratology* 15: 37-44.

Dietrich, K.N., Berger, O.G., Succop, P.A. (1993b). Lead Exposure and the Motor Development Status of Urban Six-year-old Children in the Cincinnati Prospective Study. *Pediatrics* 91: 301-307.

Ernhart, C.B., Morrow-Tlucak, M., Wolf, A.W., et al. (1989). Low Level Lead Exposure in the Prenatal and Early Preschool Periods: Intelligence Prior to School Entry. *Neurotoxicology and Teratology* 11: 161-170.

Grosse, S. (2007). How Much Does IQ Raise Earnings? Implications for Regulatory Impact Analyses. Association of Environmental and Resource Economists (AERE) Newsletter 27 (2): 17-21.

Hilts, S.R. (2003). Effect of Smelter Emissions Reductions on Children's Blood Pb Levels. *Science of the Total Environment* 303: 51-58.

Industrial Economics, Inc. (2006). *Expanded Expert Judgment Assessment of the Concentration-Response Relationship between PM$_{2.5}$ Exposure and Mortality*. Prepared for: Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Research Triangle Park, NC.

Kunzli, N., Medina, S., et al. (2001). Assessment of Deaths Attributable to Air Pollution: Should We Use Risk Estimates Based on Time Series or Cohort Studies? *American Journal of Epidemiology* 153(11): 1050-1055.

Laden, F., Schwartz, J., Speizer, F.E., et al. (2006). Reduction in Fine Particulate Air Pollution and Mortality. *American Journal of Respiratory and Critical Care Medicine* 173: 667-672.

Lanphear, B.P., Hornung, R., Khoury, J., et al. (2005). Low-Level Environmental Lead Exposure and Children's Intellectual Function: An International Pooled Analysis. *Environmental Health Perspectives* 113(7): 894-899.

Needleman, H.L., et al. (1990). The Long-Term Effects of Exposure to Low Doses of Lead in Children. New England Journal of Medicine 322(2): 83-88.

Pocock, S.J., Smith, M., Baghurst, P. (1994). Environmental Lead and Children's Intelligence: A Systematic Review of the Epidemiological Evidence. *British Medical Journal* 309: 1189-1197.

Pope, C.A., III, Burnett, R.T., Thun, M.J., et al. (2002). Lung Cancer, Cardiopulmonary Mortality, and Long-Term Exposure to Fine Particulate Air Pollution. *Journal of the American Medical Association* 287: 1132-1141.

Salkever, D.S. (1995). Updated Estimates of Earnings Benefits from Reduced Exposure of Children to Environmental Lead. *Environmental Research* 70:1-6.

Schnaas, L., Rothenberg, S.J., Perroni, E., et al. (2000). Temporal Pattern in the Effect of Post-Natal Blood Lead Level in Intellectual Development of Young Children. *Neurotoxicology and Teratology* 22: 805-810.

Schober, S. E.; Mirel, L. B.; Graubard, B. I.; Brody, D. J.; Flegal, K. M. (2006) Blood lead levels and death from all causes, cardiovascular disease, and cancer: results from the NHANES III Mortality Study. Environ. Health Perspect: doi:10.1289/ehp.9123

Schwartz, J. (1993). Beyond LOEL's, p Values, and Vote Counting: Methods for Looking at the Shapes and Strengths of Associations. *NeuroToxicology* 14(23): 237-248.

Schwartz, J. (1994a). Low-level Lead Exposure and Children's IQ: A Meta-Analysis and Search for a Threshold. *Environmental Research* 65: 42-55.

Schwartz, J. (1994b). Societal Benefits of Reducing Lead Exposure. *Environmental Research* 66: 105-124.

Schwartz, J., Pitcher, H. (1989). The Relationship between Gasoline Lead and Blood Lead in the United States. *Journal of Official Statistics* 5:421-431.

Tong, S., Baghurst, P., McMichael, A., et al. (1996). Lifetime Exposure to Environmental Lead and Children's Intelligence at 11-13 years: the Port Pirie Cohort Study. *British Medical Journal* 312: 1569-1575.

U.S. Environmental Protection Agency. (1978) *National Primary and Secondary Ambient Air Quality Standards for Lead*. Federal Register 43(194): 46246-46263. Oct 5, 1978. Available at: http://www.epa.gov/ttn/naaqs/standards/pb/s_pb_pr_fr.html

U.S. Environmental Protection Agency. (1997). *The Benefits and Costs of the Clean Air Act, 1970 to 1990*. October.

U.S. Environmental Protection Agency. (2004). *Integrated Risk Information System (IRIS) Profile for Lead and Compounds (inorganic).* Office of Research and Development, Washington, DC. Last updated July 2004.

U.S. Environmental Protection Agency. (2005). *Regulatory Impact Analysis of the Clean Air Mercury Rule*. Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA-452/R-05-003.

U.S. Environmental Protection Agency. (2006a). *Air Quality Criteria for Lead*. Office of Research and Development, Research Triangle Park, NC. EPA/600/R-05/144aF.

U.S. Environmental Protection Agency. (2006b). *Economic Analysis for the Renovation, Repair, and Painting Program Proposed Rule*. Office of Pollution Prevention and Toxics. Washington, DC.

U.S. Environmental Protection Agency. (2006c). *Final Regulatory Impact Analysis: PM$_{2.5}$ NAAQS*. Office of Air and Radiation, Research Triangle Park, NC.

U.S. Environmental Protection Agency. (2007a). *Lead: Human Exposure and Health Risk Assessments for Selected Case Studies. Volume I: Human Exposure and Health Risk Assessments – Full-scale*. Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA-452/R-07-014a.

U.S. Environmental Protection Agency. (2007b). 2003-2005 Total Suspended Particle NAAQS Review Database. Sent via email to James Neumann of Industrial Economics, Inc. on December 20, 2007.

U.S. Environmental Protection Agency. (2007c). *Review of the National Ambient Air Quality Standards for Lead: Policy Assessment of Scientific and Technical Information – OAQPS Staff Paper*. Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA-452/R-07-013.

U.S. Environmental Protection Agency. (2007d). Letter from Rogene Henderson, Chair of the Clean Air Scientific Advisory Committee (CASAC) to Stephen L. Johnson, EPA Administrator re: CASAC's Review of the 1st Draft Lead Staff Paper and Draft Lead Exposure and Risk Assessments. March 27. EPA-CASAC-07-003.

U.S. Environmental Protection Agency. (2008a). *Final Ozone NAAQS Regulatory Impact Analysis*. Office of Air and Radiation. Research Triangle Park, NC, March.

U.S. Environmental Protection Agency (2008b) *National Ambient Air Quality Standards for Lead*. Office of Air and Radiation. EPA-HQ-OAR-2006-0735.

U.S. Environmental Protection Agency (2008c) *Economic Analysis for the TSCA Lead Renovation, Repair, and Painting Program Final Rule for Target Housing and Child-Occupied Facilities*. Economic and Policy Analysis Branch Economics, Exposure and Technology Division Office of Pollution Prevention and Toxics, 2008

Wasserman, G.A., Liu, X., Lolacono, N.J., et al. (1997). Lead Exposure and Intelligence in 7-Year-Old Children: the Yugoslavia Prospective Study. *Environmental Health Perspectives* 105: 956-962.

Wasserman, G.A., Liu, X., Popovac, D., et al. (2000). The Yugoslavia Prospective Lead Industry Study: Contributions of Prenatal and Postnatal Lead Exposure to Early Intelligence. *Neurotoxicology and Teratology* 22: 811-818.

Woods and Poole Economics, Inc. (2001). Population by Single Year of Age CD. CD-ROM. Woods & Poole Economics, Inc. Washington, D.C.

World Health Organization. (2000). *Air Quality Guidelines for Europe, Second Edition*. Regional Office for Europe, Copenhagen.

## CHAPTER 6.  COST ANALYSIS APPROACH AND RESULTS

This chapter describes our analysis of the engineering costs and monitoring costs associated with attaining the final National Ambient Air Quality Standard (NAAQS) for lead and the alternative standards outlined in Chapter 1.[1]  We present our analysis of these costs in four separate sections. Section 6.1 presents the cost estimates. Sections 6.2 and 6.3 summarize the economic and energy impacts of the Final Rule, respectively, while Section 6.4 outlines the main limitations of the analysis.

Section 6.1 breaks out discussion of cost estimates into five subsections.  The first subsection summarizes the data and methods that we employed to estimate the costs associated with the control strategies outlined in Chapter 4.  As indicated in Chapter 4, these strategies rely exclusively on the application of point source controls and, in the case of Jefferson County, Missouri, the rebuild of a primary lead smelter with modern, low-emitting lead smelting technology.  The second subsection presents county level estimates of the costs of identified controls associated with the regulatory alternatives examined in this RIA.  Following this discussion, the third subsection describes the two approaches used to estimate the extrapolated costs of unspecified emission reductions that may be needed to comply with the selected standard.  The fourth subsection provides a brief discussion of the monitoring costs associated with the NAAQS.  The fifth subsection provides the estimated total costs of the regulatory alternatives examined.   This section concludes with a discussion of technological change in regulatory cost estimates.

It should be noted again that overall data limitations are very significant for this analysis. One critical area of uncertainty is the limited TSP-Pb monitoring network (discussed in chapter 2). Because monitors are present in only 86 counties nationwide, the universe of monitors exceeding the various target NAAQS levels is very small—only 21 counties above 0.1 $\mu g/m^3$, the lowest alternative NAAQS level examined in this RIA.  Because we know that many of the highest-emitting Pb sources in the 2002 NEI do not have nearby Pb-TSP monitors (see section 2.1.7), it is likely that there may be many more potential nonattainment areas than have been analyzed in this RIA.  We should also emphasize that these cost estimates represent hypothetical emission control strategies that, in some cases, reflect assumptions about technological advances that will improve the effectiveness of specific control technologies.

It is important also to note that this chapter presents cost estimates associated with both identified point source measures and unspecified emission reductions needed to reach attainment. For the selected standard of 0.15 $\mu g/m^3$,  over 94% of the estimated emission reductions needed for attainment are achieved through application of identified controls, and less than 6% through unspecified emission reductions.   Identified point source controls include known measures for known sources that may be implemented to attain the selected standard, whereas the achievement of unspecified emission reductions requires implementation of hypothetical additional measures in areas that would not attain the selected standard following the implementation of identified controls to known sources.

---

[1] The costs presented in this chapter represent the direct pollution control expenditures associated with NAAQS compliance.  As such, they do not reflect the general equilibrium impacts of the final rule.

Note that the universe of sources achieving unspecified emission reductions beyond identified controls is not completely understood; therefore we are not able to identify known control devices or work practices to achieve these reductions.  We calculated extrapolated costs for unspecified emission reductions using two different methods.  Both acknowledge the lack of data for this analysis.  One estimates the extrapolated cost based upon recognition that the marginal cost of reducing progressively smaller amounts of emissions will increase over time.   This approach estimates a total cost curve given the identified control data and estimates the additional incremental extrapolated cost.  The other approach estimates extrapolated costs by costing the remaining air quality increment to attainment in each monitor area using an area-specific cost per microgram of air quality improvement.  Section 6.1 below describes in more detail our approaches for estimating both the costs of identified controls and the extrapolated costs of unspecified emission reductions needed beyond identified controls.

As is discussed throughout this RIA, the technologies and control strategies selected for this analysis are illustrative of one approach that nonattainment areas may employ to comply with the revised lead standard.  Potential control programs may be designed and implemented in a number of ways, and EPA anticipates that State and Local governments will consider those programs that are best suited for local conditions. As such, the costs described in this chapter generally cover the annualized costs of purchasing, installing, and operating the referenced technologies.  We also present monitoring costs.  Because we are uncertain of the specific actions that State Agencies will take to design State Implementation Plans to meet the revised standard, we do not estimate the costs that government agencies may incur to implement these control strategies.

The methods used in the analysis for the final NAAQS differ from those used in the analysis for the proposed NAAQS in the following ways:

1.  As discussed in Chapter 4, we updated the control efficiency and cost information for many of the identified emission controls used in the Proposed Rule RIA.  We determined that the values originally provided by AirControlNET were unlikely to reflect the performance and cost of these controls in 2016, the analysis year for this RIA.

2.  We changed the way we estimated extrapolated costs of unspecified emission reductions.  In the Proposed Rule analysis, we applied a fixed cost/ton of lead emissions reduced beyond identified controls, based on the 98th percentile of the cost/ton for identified controls at large point sources.  We recognize that a single fixed cost of control does not account for the different sets of conditions that might describe situations where controls are needed beyond identified controls. In this analysis, we instead estimate extrapolated costs by two approaches, the cost curve approach and the ambient extrapolation approach.

3.  Rather than applying particulate matter (PM) emission controls to the primary lead smelter in Jefferson County, Missouri, we simulated a complete rebuild of the smelter to utilize a less-polluting smelting process.  We estimated the cost of this rebuild based on the experience of a lead smelter in Trail, British Columbia that underwent a similar process in the mid 1990s.

We describe these changes to the analysis relative to the RIA for the proposed NAAQS in greater detail throughout this chapter.

## 6.1     Engineering Cost Estimates

### 6.1.1  Data and Methods: Identified Control Costs

Consistent with the emissions analysis presented in Chapter 3, our analysis of the costs associated with the final lead NAAQS focuses on point source particulate matter (PM) controls. For the purposes of this analysis, these controls largely include measures from the AirControlNET control technology database.  The analysis also includes additional measures associated with operating permits, upgrades to existing PM control devices, and/or New Source Performance Review standards applicable to sources similar to those included in our analysis.

### 6.1.1.1  AirControlNET Control Costs

AirControlNET, a PC based database tool that EPA has used extensively for previous analyses of air pollution control costs, served as the primary source of cost information for our analysis of the final lead NAAQS.  For the analysis of the final lead NAAQS, AirControlNET used one of two methods to estimate the costs of a given control:

1. *Dollar per ton of $PM_{10}$ controlled.*  For minor PM controls (i.e., increased monitoring frequency for PM controls and improvements to continuous emissions monitoring systems), AirControlNET estimates costs by applying a fixed cost per ton value to the tonnage of PM controlled.[2]

2. *Hybrid - cost per ton/detailed cost function.* For several PM emissions controls, AirControlNET includes a detailed cost equation that estimates costs as a function of several key engineering parameters, such as the source's capacity or stack flow rate. AirControlNET uses these equations only if a source's stack flow rate is at least 5 cubic feet/minute.  If the stack flow rate is below this threshold, AirControlNET applies a fixed cost per ton value to the tonnage of $PM_{10}$ controlled.[3]  AirControlNET employs this hybrid approach for most of the major PM controls included in our analysis.[4]

To estimate costs based on the cost per ton values described under items 1 and 2 above, it was necessary to first estimate the reduction in $PM_{2.5}$ or $PM_{10}$ emissions for each relevant source. Where possible, we developed these estimates based on the baseline PM emissions of each source, as adapted from the 2002 NEI, and the estimated control efficiency of each measure.[5] The 2002 NEI, however, does not include baseline PM emissions data for many of the sources

---

[2] In some cases, this cost/ton value is specific to $PM_{2.5}$, while in other cases it is specific to all PM.
[3] This stands in contrast to the cost/ton values for the controls summarized under method 1, which are estimated as a cost/ton of $PM_{2.5}$ controlled or cost/ton of total PM controlled.
[4] By major controls, we mean all controls except for increased monitoring frequency and improvements to continuous monitoring systems.
[5] Chapter 4 describes the adjustments that we made to the 2002 NEI to account for controls expected to be implemented prior to the 2016 target year for this analysis.

included in our analysis.  For each of these sources, we employed one of two approaches to estimate baseline PM emissions:

1.  *SPECIATE approach.*  EPA's SPECIATE database includes sample PM speciation profiles for a variety of sources and maps these profiles to individual source classification codes (SCCs).  For lead sources with SCCs represented by these profiles, we estimated baseline $PM_{2.5}$ and $PM_{10}$ emissions based on the baseline lead emissions of these sources and the corresponding PM speciation profile in SPECIATE.  For example, if a source has baseline lead emissions of 0.02 tons/year and the SPECIATE database suggests that lead, on average, represents two percent of the $PM_{10}$ emissions for other sources that share its SCC, we assume that the source emits one ton of $PM_{10}$/year in the baseline.  We used this approach to estimate the baseline $PM_{2.5}$ and $PM_{10}$ emissions of all sources for which the 2002 NEI includes no PM emissions data but that are represented by the speciation profiles in SPECIATE.[6]

2.  *Average speciation approach*.  Although SPECIATE includes speciation profiles for a wide range of sources, the database does not include profiles applicable to all of the sources included in our analysis.  Therefore, we were unable to use SPECIATE to estimate the baseline $PM_{2.5}$ and $PM_{10}$ emissions for several of the lead sources for which the 2002 NEI includes no PM data.  For these sources, we estimated baseline $PM_{2.5}$ and $PM_{10}$ emissions based on the PM speciation profile of lead sources included in our analysis for which the 2002 NEI includes PM emissions data.  Our analysis of these sources suggests that lead represents approximately 1.4 percent of their $PM_{10}$ emissions and 1.9 percent of their $PM_{2.5}$ emissions.  We assume that these values apply to all lead sources for which the 2002 NEI includes no PM emissions estimates and for which SPECIATE includes no relevant PM speciation profiles.

Within AirControlNET's standard format, the tool provides estimates of control costs for direct PM controls only for those sources emitting 10 or more tons of $PM_{10}$ per year.  Because many of the point sources included in our analysis fall below this emissions threshold, we have changed this standard format so that AirControlNET can apply direct PM controls to sources emitting any amount of $PM_{10}$.[7]  The cost equations and cost per ton values for major controls, however, do not necessarily apply with great accuracy to such controls for sources below this PM emissions threshold.

To better estimate the costs of direct PM controls for such small point sources, we used AirControlNET's technology-specific cost estimates for these sources in order to estimate cost per ton values for small sources.  Such costs may be quite high on a per ton basis; for example, applying a pulse-jet fabric filter on a $PM_{10}$ source with less than 10 tons per year yields a cost per ton of $558,000.  We expect that application of these point source controls to such small PM

---

[6] U.S. EPA, SPECIATE Version 4.0, updated January 18, 2007,

http://www.epa.gov/ttn/chief/software/speciate/index.html>.

[7] In this analysis, we apply controls to small point sources with emissions below the 10 tons per year $PM_{10}$ AirControlNET application threshold.  We apply controls to small point sources due to the extent of lead nonattainment associated with the alternative standards examined in this RIA and the lack of identified point source and other controls available to examine attainment with these standards as noted in Chapter 4.

sources will be highly limited in actual practice for lead SIPs.   More information on these point source controls can be found in the AirControlNET control measures documentation.[8]

As noted above, we adjusted AirControlNET's control efficiency values for a number of the emissions controls used in the Proposed Rule analysis to reflect improvements in control efficiency likely to be realized for these technologies by the 2016 target year of this analysis.[9]   A number of recent EPA references provided findings that showed that increases in PM control efficiencies from those applied in our proposal RIA were reasonable for a future year analysis. These references include EPA fact sheets published in 2003 that summarize the capabilities of PM control measures and associated data.   This information provided more recent data on control efficiencies and costs for PM control measures than is currently in AirControlNET.  All of these fact sheets can be found at http://www.epa.gov/ttn/catc/products.html#aptecfacts.   We revised the control efficiencies, and also the capital and annualized costs for these PM control devices as listed above to reflect the increased control efficiencies associated with these control measures.[10]

To account for the costs of these improvements, we also modified AirControlNET's cost estimates for these technologies as follows:

- *Fabric filters:* The estimated cost increase for fabric filters reflects an upgrade of fabric filter bags and an increase in the number of bags used by each fabric filter.
    - Pulse-Jet: Capital costs increased by 75 percent.  O&M costs increased by 20 percent.
    - Mechanical Shaker: Capital costs increased by 30 percent.  O&M increased by 7 percent.
    - Reverse-Air or Reverse-Jet: Capital costs increased by 40 percent.  O&M increased by 5 percent.

- *Paper/Nonwoven Filters - Cartridge Collector Type:* The estimated cost increase for these units reflects the incremental cost of a more advanced filter material.

---

[8] Available at http://www.epa.gov/ttnecas1/models/DocumentationReport.pdf.
[9] PM control efficiencies were increased for the following control measures: dry and wet ESPs, all types of fabric filters, venturi scrubbers, impingement-plate/tray-tower scrubbers, and paper/nonwoven filters - cartridge collectors.
[10] These fact sheets are the following:  U.S. EPA-CICA Air Pollution Technology Fact Sheet:  Paper/Nonwoven Filters - Cartridge Collector Type with Pulse-Jet Cleaning.  EPA-452/F-03-004.  2003.
U.S. EPA-CICA Air Pollution Technology Fact Sheet:  Impingement-Plate/Tray-Tower Scrubber.  EPA-452/F-03-012.  2003.
U.S. EPA-CICA Air Pollution Technology Fact Sheet:  Venturi Scrubber.   EPA-452/F-03-017.  2003.
U.S. EPA-CICA Air Pollution Technology Fact Sheet: Fabric Filter - Mechanical Shaker Cleaned Type.  EPA-452/F-03-024.  2003.
U.S. EPA-CICA Air Pollution Technology Fact Sheet: Fabric Filter - Pulse-Jet Cleaned Type.  EPA-452/F-03-025. 2003.
U.S. EPA-CICA Air Pollution Technology Fact Sheet: Fabric Filter - Reverse-Air Cleaned Type.  EPA-452/F-03-026.  2003.
U.S. EPA-CICA Air Pollution Technology Fact Sheet:  Dry Electrostatic Precipitator (ESP) - Wire-Plate Type.  EPA-452/F-03-028.  2003.
U.S. EPA-CICA Air Pollution Technology Fact Sheet:  Wet Electrostatic Precipitator (ESP) - Wire-Plate Type.  EPA-452/F-03-030.  2003.

- o  Capital cost increase: 75 percent.
- o  O&M increase: 10 percent.

- *Dry or Wet ESP:*  For ESPs, the estimated increase in costs reflects additional charging inside the ESP.
  - o  Capital cost increase: 25 percent.
  - o  O&M increase: 10 percent.

- *Venturi Scrubber:*  The cost increase for venturi scrubbers reflects an upgrade in scrubber material and higher operating pressure.
  - o  Capital cost increase: 35 percent.
  - o  O&M increase: 40 percent.

### 6.1.1.2 Control Measure Upgrades and Controls Identified from New Source Performance Standards and Recent Operating Permits

In addition to controls included in AirControlNET, our analysis of the costs associated with the final lead NAAQS reflects the potential implementation of controls identified from other sources.  These include measures enumerated in recent operating permits for sources similar to those included in this RIA as well as measures that new and modified/reconstructed sources of PM emissions are expected to implement for compliance with New Source Performance Standards.  The specific measures identified for these sources include the following:

- *Capture hoods vented to a baghouse at iron and steel mills:*
  - o  We estimate the annualized costs for this control measure at $5,000/ton of $PM_{2.5}$ emission reduction.[11]

- *Diesel particulate filter (DPF) (for stationary sources such as diesel generators);*
  - o  We have taken the control efficiency and cost data from technical support documents prepared for the U.S. EPA as part of analyses undertaken for the final compression-ignition NSPS.[12]  The annualized cost for $PM_{2.5}$ reductions from applying DPF is $9,000/ton.

- *Upgrade of CEMs and increased monitoring frequency of PM controls (for sources where not already identified as a control by ACN).*
  - o  The annualized costs for this control range from $600 to $5,200/ton of $PM_{2.5.}$  This control is applicable to ESPs and baghouses at both EGU and non-EGU sources.[13]  This

---

[11] U.S. Environmental Protection Agency.  Regulatory Impact Analysis for the Particulate Matter NAAQS. October, 2006.  Chapter 3, p. 3-13.  This document is available at http://www.epa.gov/ttn/ecas/regdata/RIAs/Chapter%203--Controls.pdf.

[12] U.S. Environmental Protection Agency.  "Emission Reduction Associated with NSPS for Stationary CI ICE." Prepared by Alpha-Gamma, Inc.  June 3, 2005, and U.S. Environmental Protection Agency.  "Cost per Ton for NSPS for Stationary CI ICE."  Prepared by Alpha-Gamma, Inc.  June 9, 2005.

[13] U.S. Environmental Protection Agency.  Regulatory Impact Analysis for the Particulate Matter NAAQS. October, 2006.  Appendix E, pp. E-16 to E-24.  This document is available at http://www.epa.gov/ttn/ecas/regdata/RIAs/Appendix%20E--Controls%20List.pdf.

control was applied to existing sources identified as having ESPs and baghouses according to their operating permits.

### 6.1.1.3 Costs of Rebuilding the Primary Lead Smelter in Jefferson County, Missouri

In the proposed rule RIA, a significant portion of the estimated costs of the rule— ranging from 55 percent for the 0.05 μg/m$^3$ standard to 95 percent for the 0.3 μg/m$^3$ standard—reflected the implementation of emission reductions beyond identified controls at the primary lead smelter in Jefferson County, Missouri.  To reduce the extent to which the estimated costs of the lead NAAQS depend on emission reductions beyond identified controls at a single facility, EPA estimated the cost of replacing the Jefferson County smelter's current lead smelting unit with a more modern, lower-emitting Kivcet furnace, similar to the unit that Teck Cominco built in the mid-1990s at the primary lead smelter it operates in Trail, British Columbia[15].  In addition to the facility in Trail, BC, the Kivcet process is currently employed at plants in Kazakhstan, Bolivia, and Italy.[14]  While more targeted measures may allow the smelter in Jefferson County to reduce its lead emissions more cost effectively than the replacement of its smelting unit, information on such measures is not available.  In the absence of this information, we use the estimated costs of building and opening a Kivcet furnace at the Jefferson County facility as a reasonable indicator of the facility's *potential* identified control lead abatement costs.  Our approach for estimating these costs is as follows:

1. *Obtain cost information on the Teck Cominco Kivcet furnace:* According to Cominco's 1996 annual report, the total cost of building the Kivcet furnace was approximately $152 million (year 1996 Canadian dollars).[15]  In addition, based on communications with the facility's management, we estimate that the facility incurred additional costs of approximately $30.4 million (year 1996 Canadian dollars) to address unanticipated operational problems with the Kivcet furnace after it was initially brought online in 1997, bringing the total cost of the project to approximately $182.4 million (year 1996 Canadian dollars).[16]  Converting to U.S. dollars and adjusting for inflation, this translates to approximately $184.5 million in year 2006 U.S. dollars.[17]

2. *Scale Teck Cominco's costs to reflect the capacity of the primary smelter in Jefferson County:* The capacity of the primary lead smelter in Jefferson County is significantly higher than that of Teck Cominco's Trail facility—250,000 tons per year for the Jefferson County smelter versus 132,000 tons per year for the Trail facility.  Scaling the cost of the Teck Cominco Kivcet furnace to account for this difference in capacity, we estimate that the total upfront cost of building a Kivcet furnace at the Jefferson County smelter would be approximately $349 million.

---

[14]  The Eastern Mining and Metallurgical Research Institute for Non-Ferrous Metals, Pyrometallurgy. http://vcm.ukg.kz/eng/v3_6.htm. Accessed September 23, 2008.

[15]  Cominco Ltd.  1996 Annual Report, p. 12.  Cominco and Teck Corporation merged in 2001 to form Teck Cominco Limited.

[16]  According to the general manager of Teck Cominco's Trail operations, these additional costs were equal to approximately 20 percent of the construction costs for the Kivcet furnace.  Personal communication with Mike Martin, general manager of Teck Cominco's Trail operations, August 25, 2008.

[17]  To adjust for inflation, we use the *Engineering News Record* construction cost index.

3. *Annualize Kivcet furnace construction costs:* To annualize the estimated $349 million in costs for the construction of a Kivcet furnace at the primary lead smelter in Jefferson County, we assume that the furnace would have a 30-year lifespan. Based on this assumption, we estimate annualized costs of $31.7 million, using a 3 percent discount rate, and $42.0 million, applying a 7 percent discount rate.

Based on Teck Cominco's experience, transitioning to a Kivcet furnace could potentially reduce O&M costs for the primary lead smelter in Jefferson County. After the Kivcet furnace went online at Teck Cominco's Trail facility in 1997, its O&M costs declined significantly, largely due to reduced labor costs.[18] We do not incorporate potential O&M savings into our cost assessment for the Jefferson County smelter; therefore, we may overestimate the *net* costs associated with installing a Kivcet furnace at the facility.

## 6.1.2   Engineering Cost Estimates for Identified Controls

Based on the data and methods outlined above, we estimated the costs associated with implementing the control strategies presented in Chapter 4. Table 6-1 summarizes these costs by monitor area. As indicated in the table, the estimated costs of these controls under the selected standard are approximately $150 million per year, assuming a discount rate of seven percent. Applying a three percent discount rate this value becomes $130 million per year. The annual costs of identified controls under the alternative standards included in Table 6-1 range from $57 million under the 0.5 $\mu g/m^3$ standard to $180 million under the 0.1 $\mu g/m^3$ standard, assuming a discount rate of seven percent. If we apply a three percent discount rate, these values adjust to $46 million and $160 million for the 0.5 and 0.1 $\mu g/m^3$ standards, respectively. Consistent with Chapter 4's summary of the air quality impacts associated with identified controls, the cost estimates in Table 6-1 reflect partial attainment with several of the standards examined in this RIA. For the selected standard of 0.15 $\mu g/m^3$, the costs in Table 6-1 reflect attainment in 13 of the 21 monitor areas included in this analysis.

The results in Table 6-1 illustrate that the costs of the selected standard are likely to vary by monitor area. The costs of identified measures are expected to be highest in Jefferson County, Missouri. As indicated in Chapter 4, Jefferson County has the highest baseline lead emissions of any county in the U.S. This largely reflects emissions from the primary lead smelter located in the county. Table 6-2 presents the costs of identified controls/pound of lead emissions avoided in each monitor area. The estimates presented in this table suggest that, in general, the cost/pound of avoided lead emissions increases significantly for a given monitor as the standard becomes more stringent. For example, the cost/pound for Delaware County, Indiana steadily increases from $700/pound under the 0.5 $\mu g/m^3$ standard to $3,100/pound under the 0.1 $\mu g/m^3$ standard, assuming a 7 percent discount rate. This is consistent with local areas first targeting sources where relatively low cost reductions may be achieved and subsequently achieving reductions from sources that are more costly to control (i.e., moving up the area's marginal abatement cost curve).

---

[18] Personal communication with Mike Martin, general manager of Teck Cominco's Trail operations, August 25, 2008.

**Table 6-1**
**ANNUAL COSTS RELATED TO IDENTIFIED CONTROLS**[*]

| Monitor State | Monitor County | Annual Cost of Identified Controls in 2016 (Millions of 2006$) | | | | | | | | | | | |
| | | Standard Alternative: 0.5 μg/m³ 2nd Maximum Monthly Mean** | | Standard Alternative: 0.4 μg/m³ 2nd Maximum Monthly Mean** | | Standard Alternative: 0.3 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.2 μg/m³ 2nd Maximum Monthly Mean | | Selected Standard: 0.15 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.1 μg/m³ 2nd Maximum Monthly Mean | |
| | | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL | Pike | $3.1 | $3.3 | $3.1 | $3.3 | $3.1 | $3.3 | $4.0 | $4.2 | $4.3 | $4.6 | $4.3 | $4.6 |
| CO | El Paso | - | - | - | - | - | - | - | - | - | - | $0.2 | $0.2 |
| FL | Hillsborough | <$0.1 | <$0.1 | <$0.1 | <$0.1 | $0.4 | $0.4 | $0.8 | $0.9 | $0.8 | $0.9 | $1.4 | $1.5 |
| IL | Madison | - | - | - | - | - | - | - | - | - | - | $13 | $14 |
| IN | Delaware | $1.8 | $1.9 | $1.8 | $1.9 | $3.6 | $3.8 | $5.4 | $5.7 | $6.1 | $6.5 | $8.5 | $9.0 |
| MN | Dakota | - | - | - | - | - | - | - | - | <$0.1 | <$0.1 | $2.4 | $2.5 |
| MO | Iron | $6.3 | $6.7 | $6.3 | $6.7 | $6.3 | $6.7 | $6.3 | $6.7 | $6.3 | $6.7 | $6.3 | $6.7 |
| MO | Jefferson | $32 | $42 | $32 | $42 | $32 | $42 | $32 | $42 | $32 | $42 | $32 | $42 |
| NY | Orange | - | - | - | - | - | - | <$0.1 | <$0.1 | <$0.1 | <$0.1 | <$0.1 | <$0.1 |
| OH | Cuyahoga | - | - | - | - | $30 | $32 | $30 | $32 | $30 | $32 | $30 | $32 |
| OH | Fulton | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 | $1.5 |
| OH | Logan | - | - | - | - | - | - | - | - | - | - | - | - |
| OK | Ottawa | - | - | - | - | - | - | - | - | - | - | - | - |
| PA | Beaver | - | - | - | - | - | - | $11 | $12 | $35 | $37 | $35 | $37 |
| PA | Berks | <$0.1 | <$0.1 | <$0.1 | <$0.1 | $11 | $12 | $11 | $12 | $11 | $12 | $11 | $12 |
| PA | Carbon | - | - | - | - | - | - | <$0.1 | <$0.1 | <$0.1 | <$0.1 | <$0.1 | <$0.1 |
| TN | Sullivan | - | - | - | - | - | - | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 |
| TN | Williamson | $1.0 | $1.1 | $1.0 | $1.1 | $1.3 | $1.4 | $1.3 | $1.4 | $2.8 | $3.0 | $3.4 | $3.6 |
| TX | Collin | <$0.1 | <$0.1 | <$0.1 | <$0.1 | <$0.1 | <$0.1 | $2.0 | $2.1 | $2.3 | $2.5 | $3.3 | $3.5 |
| TX | Dallas | - | - | - | - | - | - | - | - | - | - | $7.0 | $8.4 |
| UT | Salt Lake | - | - | - | - | - | - | - | - | - | - | <$0.1 | <$0.1 |
| **Total** | | **$46** | **$57** | **$46** | **$57** | **$89** | **$100** | **$110** | **$120** | **$130** | **$150** | **$160** | **$180** |

*All estimates rounded to two significant figures. As such, totals will not sum down columns.

** Identified Control Costs are the same for alternative standard 0.5 μg/m³ and for alternative standard 0.4 μg/m³. This is because the same monitor areas violate both standards and the same controls were chosen in the least cost optimization for both standard alternatives.

**Table 6-2.**
**ANNUAL COST/POUND OF REDUCED LEAD EMISSIONS:  IDENTIFIED CONTROLS**[*]

| Monitor State | Monitor County | Annual Cost/Pound for Identified Controls in 2016 (2006$) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Standard Alternative: 0.5 µg/m³ 2nd Maximum Monthly Mean** | | Standard Alternative: 0.4 µg/m³ 2nd Maximum Monthly Mean** | | Standard Alternative: 0.3 µg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.2 µg/m³ 2nd Maximum Monthly Mean | | Selected Standard: 0.15 µg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.1 µg/m³ 2nd Maximum Monthly Mean | |
| | | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| AL | Pike | $400 | $400 | $400 | $400 | $400 | $400 | $500 | $500 | $500 | $500 | $500 | $500 |
| CO | El Paso | - | - | - | - | - | - | - | - | - | - | $170,000 | $170,000 |
| FL | Hillsborough | <$100 | <$100 | <$100 | <$100 | $200 | $200 | $300 | $400 | $300 | $400 | $600 | $600 |
| IL | Madison | - | - | - | - | - | - | - | - | - | - | $75,000 | $79,000 |
| IN | Delaware | $700 | $700 | $700 | $700 | $1,300 | $1,400 | $1,900 | $2,000 | $2,100 | $2,200 | $2,900 | $3,100 |
| MN | Dakota | - | - | - | - | - | - | - | - | <$100 | <$100 | $400 | $400 |
| MO | Iron | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 |
| MO | Jefferson | $300 | $500 | $300 | $500 | $300 | $500 | $400 | $500 | $400 | $500 | $400 | $500 |
| NY | Orange | - | - | - | - | - | - | <$100 | <$100 | <$100 | <$100 | <$100 | <$100 |
| OH | Cuyahoga | - | - | - | - | $120,000 | $130,000 | $120,000 | $130,000 | $120,000 | $130,000 | $120,000 | $130,000 |
| OH | Fulton | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 |
| OH | Logan | - | - | - | - | - | - | - | - | - | - | - | - |
| OK | Ottawa | - | - | - | - | - | - | - | - | - | - | - | - |
| PA | Beaver | - | - | - | - | - | - | $8,300 | $9,000 | $24,000 | $25,000 | $24,000 | $25,000 |
| PA | Berks | <$100 | <$100 | <$100 | <$100 | $3,500 | $3,700 | $3,500 | $3,700 | $3,500 | $3,700 | $3,500 | $3,700 |
| PA | Carbon | - | - | - | - | - | - | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 |
| TN | Sullivan | - | - | - | - | - | - | $120,000 | $130,000 | $120,000 | $130,000 | $120,000 | $130,000 |
| TN | Williamson | $400 | $400 | $400 | $400 | $300 | $400 | $300 | $400 | $600 | $700 | $700 | $800 |
| TX | Collin | <$100 | <$100 | <$100 | <$100 | <$100 | <$100 | $400 | $400 | $400 | $500 | $600 | $600 |
| TX | Dallas | - | - | - | - | - | - | - | - | - | - | $90,000 | $1,100,00 |
| UT | Salt Lake | - | - | - | - | - | - | - | - | - | - | <$100 | <$100 |
| **Total** | | **$300** | **$400** | **$300** | **$400** | **$600** | **$700** | **$700** | **$800** | **$900** | **$1,000** | **$1,000** | **$1,200** |

[*]All estimates rounded to two significant figures. As such, totals will not sum down columns
** Identified Control Costs are the same for alternative standard 0.5 µg/m³ and for alternative standard 0.4 µg/m³.  This is because the same monitor areas violate both standards and the same controls were chosen in the least cost optimization for both standard alternatives.

### 6.1.3   Extrapolated Costs

Prior to presenting the methodology for estimating costs for unspecified emission reductions, it is important to provide information from EPA's Science Advisory Board Council Advisory on the issue of estimating costs of unidentified control measures.[19]

> *812 Council Advisory, Direct Cost Report, Unidentified Measures (charge question 2.a):*
>
> *"The Project Team has been unable to identify measures that yield sufficient emission reductions to comply with the National Ambient Air Quality Standards (NAAQS) and relies on unidentified pollution control measures to make up the difference. Emission reductions attributed to unidentified measures appear to account for a large share of emission reductions required for a few large metropolitan areas but a relatively small share of emission reductions in other locations and nationwide.*
>
> *"The Council agrees with the Project Team that there is little credibility and hence limited value to assigning costs to these unidentified measures. It suggests taking great care in reporting cost estimates in cases where unidentified measures account for a significant share of emission reductions. At a minimum, the components of the total cost associated with identified and unidentified measures should be clearly distinguished. In some cases, it may be preferable to not quantify the costs of unidentified measures and to simply report the quantity and share of emissions reductions attributed to these measures.*
>
> *"When assigning costs to unidentified measures, the Council suggests that a simple, transparent method that is sensitive to the degree of uncertainty about these costs is best. Of the three approaches outlined, assuming a fixed cost/ton appears to be the simplest and most straightforward. Uncertainty might be represented using alternative fixed costs per ton of emissions avoided."*

EPA has considered this advice and the requirements of E.O. 12866 and OMB circular A-4, which provides guidance on the estimation of benefits and costs of regulations.

EPA estimated the costs of unspecified future controls using two approaches.  The first is calculated by estimating a cost curve for the identified control costs and extrapolating the cost of the remaining unspecified emission reductions.  The second approach is the ambient extrapolation approach, this approach uses an average cost per microgram for each area. We

---

[19] U.S. Environmental Protection Agency, Advisory Council on Clean Air Compliance Analysis (COUNCIL), *Council Advisory on OAR's Direct Cost Report and Uncertainty Analysis Plan*, Washington, DC. June 8, 2007.

believe this approach best represents a fixed cost approach given the data limitations of this analysis.  Please note, the fixed cost methodology was preferred by EPA's Science Advisory Board over two other options, including a marginal cost-based approach.  Extrapolated costs were calculated for the recent Ozone NAAQS RIA, and they are calculated again here for the final Lead NAAQS.  EPA has developed a few approaches to try to estimate the extrapolated costs of future unspecified emissions reductions, which take into account the analysis context and data availability. Now that EPA has gained some additional experience in estimating the extrapolated costs for these two RIAs, we intend to seek additional SAB advice on extrapolated cost approaches after further investigation of these and other approaches.

As indicated above the identified control costs reflected in Tables 6-1 and 6-2 do not result in attainment of the selected or alternative standards in several areas.  In these areas, unspecified emission reductions needed beyond identified controls will likely be necessary to reach attainment.  As noted in chapter 4, the overwhelming majority of emissions reductions needed to attain the various target NAAQS levels would be obtained from identified controls (see table 4-6).  Also, the unspecified emission reductions needed beyond identified controls are small enough to fall within the expected error associated with the precision of the modeling of the emissions. Figure 6-1 below illustrates this point:  the percentage of remaining emissions after applying identified controls ranges from a low of 0.03% to a high of only 9.23%.

**Figure 6-1.**
**PERCENTAGE OF REMAINING EMISSION REDUCTIONS NEEDED POST APPLICATION OF IDENTIFIED CONTROLS**



The estimation of engineering costs for unspecified emission reductions needed to reach attainment many years in the future is inherently a difficult issue. As described later in this chapter, our experience with Clean Air Act implementation shows that technological advances

and development of innovative strategies can make possible emissions reductions that are unforeseen today, and to reduce costs of emerging technologies over time. But we cannot quantitatively predict the amount of technology advance in the future. For areas needing significant additional emission reductions, much of the control must be for sources that historically have not been controlled. The relationship of the cost of such control to the cost of control options available today is not at all clear. Available, current known control measures increase in cost beyond the range of what has ever been implemented and would still not provide the needed additional control for full attainment in the analysis year 2016.

The emission inventories, air quality modeling, and control options that would address these very small remaining increments of lead in ambient air are highly uncertain.  In the RIA for the proposed NAAQS, a fixed cost of $32 million/ton, or $16,000/lb. in 2006 dollars was applied to the unspecified emission reductions needed beyond identified controls.  This fixed cost was consistent with the 98th percentile of total possible emission reductions for identified controls.

We recognize that a single fixed cost of control does not account for the different sets of conditions that might describe situations where controls are needed beyond identified controls. Recall that we did not cap identified control costs in the final RIA analysis because we lack good information regarding lead emission controls on small emission sources.  This same lack of information also makes it difficult to extrapolated costs using either of the techniques described below.  Therefore in this RIA for the final Pb NAAQS, we take a broader approach to estimating the costs associated with the remaining increment to attainment.

Finally, it is also important to emphasize here that the universe of sources where unspecified emission reductions beyond identified controls are achieved is not completely understood; therefore, we are not able to identify known control devices or work practices to achieve these reductions.

We expect that additional control measures that we were not able to identify may be available today, or may be developed by 2016.  We believe such an expectation is reasonable for the following reasons:

1.  Because the revised Pb NAAQS is ten times lower than the previous standard, the Pb emission inventory has not been used in the past for estimating controls for such small sources of lead emissions.  Thus the quality control of data in the emission inventory may not have been appropriate for this use of the emission inventory.  For example, some sources for which we know of no control may be incorrectly characterized; leading us to believe, incorrectly, that no appropriate control is available.

2.  Our knowledge of add-on controls is greater than our knowledge of process modifications. For example in the months since proposal of the revised NAAQS, we conducted additional research and discovered the process modification used in the analysis for Herculaneum. There may be other similar modifications available today that we do not know about.

3.  Controls for emission sources other than point sources may be available but are not captured under the data constraints built into the air quality monitor to emissions source relationship used to estimate air quality improvement.

On the other hand, there are several reasons why identified controls may not be sufficient to reach attainment in a given monitor area:

1. There may be no other available controls that are similar to the identified controls. For example, the area might be characterized by emissions from several very large sources. This is true in only a few areas (e.g., Jefferson County, MO). In these areas, there may be large reductions achieved with identified or even pre-existing controls, but there are no further known controls available to reduce the remaining emissions after those identified controls are applied.

2. It is possible that fugitive dust emissions from area sources containing deposited Pb will also contribute to violations of the NAAQS, or that historically deposited Pb, when disturbed, may be re-entrained into the ambient air. These fugitive or area source controls may be more expensive than the identified controls.

3. More expensive process modifications may be the only way to reduce the remaining emissions.

Finally, there is uncertainty inherent in estimating the progress in development of control measures that will occur between today and 2016. For example:

1. Technological change unrelated to this regulation may lead to different baseline emissions or changes in industrial processes (e.g. will battery technology changes lead to fewer lead battery recycling facilities?).

2. Changes in pollution control technology may make more control options available or reduce the costs of current ones.

3. Some emissions sources may close rather than impose the identified controls (in this case the cost of identified controls has been overestimated and the emission reduction has been underestimated).

There are many limitations to each approach taken to estimate the extrapolated costs of unspecified emissions, for example:

- The ambient extrapolation methodology emphasizes control costs that are the most expensive within an area, and assumes that knowledge of control costs from monitor areas that attain have no influence on the average control costs for areas that need unspecified emission reductions. It also assumes there will be no increased knowledge of sources or changed in technology between now and 2016. Lastly, most of the costs are based upon areas that make less than 1% progress towards attainment, indicating what little knowledge we have about controls in those areas.

- The cost curve methodology presents a poor conceptual relationship between the costs of identified controls at a national level and the costs of control at a local level. The data this curve is developed upon contains data points which we believe to be invalid

(presented as part of the distributional analysis in Section 6.1.3.2).  The estimated curve estimates negative costs over a portion of emission reductions.  In addition this approach relies heavily on the control strategy for tightest standard alternative analyzed in this RIA, and does not account for variability in control strategies across alternative standards analyzed.  Lastly, we do not believe this curve well represents the knowledge of how control costs behave over time.

### 6.1.3.2  Estimated Cost Curve Approach

The cost curve method was used to estimate extrapolated costs and the associated total cost of meeting the selected and alternative standards analyzed. However, before describing this approach it is again important to note the EPA Science Advisory Board Council's position on the use of similar methods when estimating costs of unidentified control measures (U.S. Environmental Protection Agency. June 2007. Advisory Council on Clean Air Compliance Analysis (COUNCIL), Council Advisory on OAR's Direct Cost Report and Uncertainty Analysis Plan. Washington, DC).  The Council advises against any approach that deviates from using a fixed cost/ton estimate such as the approach described below.

This noted, in addition to the SAB advised fixed cost per ton in cases of extreme uncertainty presented earlier, an alternative methods was used to estimate extrapolated costs, involving the use of regression analysis to estimate a total cost curve for the identified controls. The portion of the curve extending beyond emission reductions achieved through identified controls up to the emission reductions required to meet the standard is the extrapolated cost curve. This curve is then appended to the total cost curve whose data was used in the regression to calculate a total cost estimate. These curves can be seen in Figure 6-2 below.

**Figure 6-2. COST CURVE APPROACH**



The regression approach to estimating extrapolated costs uses the data used to construct the cost curve and estimates the equation *Cumulative Total Cost = Cumulative Emissions Reduced + Cumulative Emissions Reduced$^2$*. The resulting regression equation is *Cumulative Total Cost = - 1,175,430 · Cumulative Emissions Reduced + 32,690 · Cumulative Emissions Reduced$^2$*, a graph of which can be seen in Figure 6-2. The adjusted R-squared value for this equation is 0.88, indicating a relatively good fit to the data. All variables are highly significant. Table 6-3 shows the extrapolated costs for each of the analyzed standard levels when using this regression to estimate the cost for the remaining tons required. These estimated costs range from $79,000 for the 0.5 standard to $33 million for the 0.1 standard. For the selected 0.15 standard, the costs are $20 million.

**Table 6-3.**
**EXTRAPOLATED COSTS USING TOTAL COST REGRESSION (7% Discount Rate)**

| Standard Alternative | Additional emission reductions needed) | Extrapolated cost (M 2006$) |
|---|---|---|
| 0.5 µg/m³ 2ⁿᵈ Maximum Monthly Mean | 0.02 | $0.08 |
| 0.4 µg/m³ 2ⁿᵈ Maximum Monthly Mean | 0.08 | $0.32 |
| 0.3 µg/m³ 2ⁿᵈ Maximum Monthly Mean | 0.29 | $1.1 |
| 0.2 µg/m³ 2ⁿᵈ Maximum Monthly Mean | 2.06 | $8.3 |
| 0.15 µg/m³ 2ⁿᵈ Maximum Monthly Mean | 4.79 | $20 |
| 0.1 µg/m³ 2ⁿᵈ Maximum Monthly Mean | 7.91 | $33 |

### 6.1.3.2.1 Regression Diagnostics

While the deletion of outliers is a controversial practice in statistics, especially when there is uncertainty as to the underlying distribution of the data, it is an accepted practice in regression to exclude data points that exhibit a large degree of influence on the resulting parameter estimates, while dutifully noting that such exclusions have taken place. Several statistics for measuring the influence of specific data points on estimation results are readily calculated, and for this analysis Cook's Distance, DFFITS, studentized residuals, and leverage statistics were used to identify potentially influential observations.

Before discussion of these results, it may be informative to analyze the descriptive statistics of the variables used to construct the cost curve upon which the extrapolated cost curve using the maximum marginal costs as well as the extrapolated cost curve from the regression analysis are based. These statistics are presented in Table 6-4 below.

**Table 6-4.**
**DESCRIPTIVE STATISTICS FOR VARIABLES USED IN COST CURVE**

| | Emissions Reduced | Cost per Ton |
|---|---|---|
| Number of Observations | 211 | 211 |
| Minimum | 0.000000039 | 2,656 |
| Median | 0.0042 | 12,277,347 |
| Mean | 0.37 | 34,754,959,220 |
| Max | 40.05 | 6,179,483,400,000 |
| Interquartile Range | 0.038 | 224,882,280 |
| Standard Error | 2.83 | 426,342,369,723 |
| Skewness | 13.31 | 14.40 |
| Kurtosis | 185.86 | 208.39 |

As can be seen by these statistics, these data exhibit a wide range with the median values considerably different from the mean values. The statistics together provide evidence that the distribution of these variables is non-normal. As a result, we may expect the presence of outliers that may bias the regression results.

Estimates of were Cook's Distance, DFFITS, studentized residuals, and leverage were calculated for the regression equation *Cumulative Total Cost = Cumulative Emissions Reduced + Cumulative Emissions Reduced*$^2$. The number of points identified by each of these techniques as influential varied slightly, as seen in Table 6-5.

**Table 6-5.**
**REGRESSION DIAGNOSTICS**

| Statistic | Cutoff | Identified observations |
|---|---|---|
| Cook's Distance | $4/n$ | 9 |
| DFFITS | $2 \cdot \sqrt{k/n}$ | 11 |
| Studentized Residuals | $\pm 2$ | 19 |
| Leverage | $(2k+2)/n$ | 0 |

All of the observations that were deemed influential under the various measures are at the upper portion of the cumulative cost curve (i.e., the last 9, 11, and 19 points on the curve for Cook's Distance, DFFITS, and studentized residuals, respectively). That no points are identified by the leverage statistic is puzzling, and provides some counter-evidence that these points are outliers. Nonetheless, there is significant evidence that the distributions of the underlying variables used to construct the variables used in the regression are non-normal, and three measures of influence identify the upper 10-20 observations as suspect. This calls into question the use of the estimated regression to calculate additional extrapolated costs.

### 6.1.3.3 Ambient Extrapolation Methodology

To derive costs using this ambient extrapolation methodology, we first examined the seven monitor areas that make some progress towards attainment with identified controls, but cannot reach the target NAAQS.  We calculated an average cost per microgram of air quality improvement for each area based upon the identified control costs analysis.  For each monitor area, we then applied its area-specific cost per microgram to the remaining air quality increment, in order to calculate the extrapolated cost of attainment. We performed these calculations for each target NAAQS in our analysis.

*(Additional ug needed to attain) x ($/ug for identified controls) = Additional cost to attain*

There were four areas that made little to no progress towards attainment with identified controls for one or more of the target NAAQS.  For these monitor areas, we did not have a cost/ug for identified controls to plug into the above equation.  As a surrogate cost/ug, we used the overall average cost/ug of the monitor areas that *had* made some progress towards attainment. To derive the extrapolated costs for each monitor area, we then multiplied that overall average cost/ug by the remaining air quality increment in each of the monitor areas.

*(Additional ug needed to attain) x (overall average $/ug for identified controls) = Additional cost to attain*

Table 6-6 presents the cost per air quality improvement for all 11 monitor areas.  Table 6-7 presents the total extrapolated costs for each monitor area.  As indicated in Table 6-7, the estimated extrapolated costs using this approach are approximately $3.1 billion per year, assuming a discount rate of seven percent.  Applying a three percent discount rate this value becomes $2.6 billion per year.  The annual extrapolated costs for the ambient approach under the each alternative standard analyzed included in Table 6-7 range from $100 million under the 0.5 $\mu g/m^3$ standard alternative to $3.9 billion under the 0.1 $\mu g/m^3$ standard alternative, assuming a discount rate of seven percent.  If we apply a three percent discount rate, these values adjust to $89 million and $3.4 billion for the 0.5 and 0.1 $\mu g/m^3$ standard alternatives, respectively.  These costs come out to be much larger than costs under the cost curve approach; this is because they are driven by extremely expensive controls that provide only a very small increment of air quality improvement.

**Table 6-6.**
**COST PER AIR QUALITY IMPROVEMENT BY MONITOR AREA**

| Monitor State | Monitor County | Annual Cost/Microgram (Millions of 2006$) | |
|---|---|---|---|
| | | 3% Discount rate | 7% Discount rate |
| CO | El Paso | $330 | $340 |
| IL | Madison | $550 | $580 |
| MO | Jefferson | $18 | $24 |
| OH | Cuyahoga | $730 | $780 |
| OH | Fulton * | $3,000 | $3,500 |
| OH | Logan * | $3,000 | $3,500 |
| PA | Beaver | $1,100 | $1,200 |
| PA | Berks | $60 | $63 |
| PA | Carbon* | $3,000 | $3,500 |
| TN | Sullivan* | $3,000 | $3,500 |
| TX | Dallas | $18,000 | $22,000 |

*Represents monitor areas that made less than 1% progress towards attainment with identified controls.

**Table 6-7.**
**AMBIENT APPROACH EXTRAPOLATED COSTS BY MONITOR AREA\***

| Monitor State | Monitor County | Annual Extrapolated Costs of Emission Reductions Needed Beyond Identified Controls in 2016 (Millions of 2006$) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Standard Alternative: 0.5 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.4 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.3 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.2 μg/m³ 2nd Maximum Monthly Mean | | Selected Standard: 0.15 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.1 μg/m³ 2nd Maximum Monthly Mean | |
| | | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| CO | El Paso | - | - | - | - | - | - | - | - | - | - | $10 | $10 |
| IL | Madison | - | - | - | - | - | - | - | - | - | - | $2.3 | $2.4 |
| MO | Jefferson | - | - | - | - | - | - | $0.7 | $0.9 | $1.6 | $2.1 | $2.5 | $3.3 |
| OH | Cuyahoga | - | - | - | - | $12 | $12 | $85 | $90 | $120 | $130 | $160 | $170 |
| OH | Fulton | $89 | $100 | $390 | $460 | $690 | $810 | $990 | $1,200 | $1,100 | $1,300 | $1,300 | $1,500 |
| OH | Logan | - | - | - | - | $180 | $210 | $480 | $560 | $630 | $740 | $780 | $920 |
| PA | Beaver | - | - | - | - | - | - | - | - | $49 | $53 | $100 | $110 |
| PA | Berks | - | - | - | - | $1.8 | $1.9 | $7.8 | $8.2 | $11 | $11 | $14 | $15 |
| PA | Carbon | - | - | - | - | - | - | $280 | $330 | $430 | $510 | $580 | $690 |
| TN | Sullivan | - | - | - | - | - | - | $110 | $130 | $260 | $300 | $410 | $480 |
| TX | Dallas | - | - | - | - | - | - | - | - | - | - | $19 | $23 |
| **Total** | | **$89** | **$100** | **$390** | **$460** | **$880** | **$1,000** | **$1,900** | **$2,300** | **$2,600** | **$3,100** | **$3,400** | **$3,900** |

\*All estimates rounded to two significant figures. As such, totals will not sum down columns.

### 6.1.4   Monitoring Costs

Consistent with the scope of this rulemaking, which includes monitoring provisions, monitoring costs are included here.  As part of the regulatory package accompanying the revised standard, revised lead monitoring requirements are being issued.  The rule includes revisions to the network design requirements, QA requirements, and the minimum sampling frequency for lead monitoring.  These changes will ensure that adequate lead monitoring will be performed to determine compliance with the proposed lead NAAQS.  In addition, the level of the standard and the averaging time for the standard directly affect the associated monitoring burden.  For the final Pb NAAQS, total monitoring costs are estimated to be $4.2 million, which include $3.2 million for expansion of the monitoring network.

In the final information collection request (ICR), EPA has estimated the potential burden for the final Pb NAAQS (i.e. 0.15 ug/m$^3$; rolling quarterly average).  EPA estimates that there are approximately 260 facilities that would require monitoring at a level of 0.15 µg/m$^3$ (see: http://www.epa.gov/oar/lead/pdfs/20080502_maps4.pdf).  Monitors will also be required in 52 urban areas (those metropolitan statistical areas with a population greater than one million).  For more detail, see OMB 2060-0084, ICR #940.21.

### 6.1.5   Summary of Cost Estimates

Table 6-9 provides a summary of total costs to achieve the selected standard and each alternative standard.  As suggested by Tables[20] 6-1, 6-8, the extent to which these costs exceed those associated with identified controls alone increases with the stringency of the standard.  This is consistent with the emissions analysis presented in Chapter 4, which suggests that local areas' reliance on emission reductions beyond identified controls would increase as the standard becomes more stringent.  Figures 6-3 and 6-4 present the portion of total costs that is represented by identified controls and the portion of costs that is represented by unspecified emission reductions.

The significant difference between the costs of identified controls alone and the cost of achieving attainment (i.e. including both identified controls and emission reductions beyond identified controls) in this and other areas reflects the limited information available to EPA on the control measures that sources may implement.  It is important to remember that, compared to recent NAAQS RIAs, our current knowledge of the costs and nature of lead emissions controls is relatively poor.  Lead in ambient air has not been a focus for all but a few areas of the country for the last decade or more; the alternative standards represent a substantial tightening of the existing NAAQS.  As a result, although AirControlNET contains information on a large number of different point source controls, we would expect that State and local air quality managers would have access to additional information on the controls available to the most significant sources.

It is important to remember also that these cost estimates are highly uncertain.  As discussed in the final monitoring provisions, the existing monitoring network will need to be updated.  It is possible that some areas shown to be out of attainment based on the current monitoring information will be shown to be in attainment with more recent monitoring.  After the revised

---

[20] Note there is no breakdown of costs by monitor area for the cost curve approach.  This approach was generated at an aggregate level and therefore does not break down costs to local areas.

monitoring network is in place, other areas not identified in this analysis may be found to be violating the new standard.  Since many of the existing sources of ambient Pb are relatively small, states are likely to work closely with the sources to reduce emissions in a cost-effective manner.

Note also that if any facility chooses to close rather than incur either the costs associated with identified controls or extrapolated costs then for that facility costs are overestimated and emission reductions are underestimated.  We would then also expect the required emission reductions and control costs for other facilities to be lower.  We did not attempt to quantify facility closures in this RIA.  However, in interpreting the costs, the possibility of savings from closures should be recalled.

Finally, many of the control techniques identified in this analysis do not appear to be cost effective because a high dollar value control has been added to reduce a small amount of Pb emissions – sometimes only a few pounds per year.  Rather than applying additional controls, it may be possible for firms emitting small amounts of Pb to modify their production processes or other operational parameters, including pollution prevention techniques, which would be more cost effective than adding additional control technology. Such measures might include increasing the enclosure of buildings, increasing air flow in hoods, modifying operation and maintenance procedures, changing feed materials to lower Pb content, etc. While we have estimated the cost of attainment of this revised NAAQS, we have not accounted for the effect of improvements that tend to occur, such as technology improvement, process changes, efficiency improvements, materials substitution, etc.  We believe these typical improvements will tend to result in more cost effective approaches than simply adding extremely expensive pollution controls in many areas by the attainment date of 2016.   It is also worth noting that it is possible that fugitive dust emissions from area sources containing deposited Pb will also contribute to violations of the NAAQS, or that historically deposited Pb, when disturbed, may be re-entrained into the ambient air.  For areas where point source controls are sufficient to reach attainment, we may have overestimated costs if more cost effective fugitive or area source controls are likely to be available in these areas.

To further inform our understanding of the potential difficulties in reaching attainment, EPA took a closer look at the eight counties for which identified controls are insufficient to attain the final NAAQS of 0.15 ug/m$^3$  in our analysis.  All eight counties contained some type of metals processing facilities, such as battery manufacturers, zinc smelters, and foundries.  Some have baghouses for controlling particulate matter, but for others we found no information on applicable controls (possibly because of their relatively low overall particulate emissions).  Three of the eight counties host contaminated industrial soil sites that are the focus of significant ongoing remediation efforts (Fulton, OH; Berks, PA; and Carbon, PA).  Many of those sites are associated with industrial metals sources including Pb battery manufacturing, Pb battery recycling and disposal, zinc processing, metal alloy production, and iron and steel manufacturing.

**Table 6-8.  ANNUAL TOTAL COSTS BY MONITOR AREA\***
**(INCLUDES IDENTIFIED CONTROL COSTS AND EXTRAPOLATED COSTS USING AMBIENT EXTRAPOLATION APPROACH)**

| Monitor State | Monitor County | Standard Alternative: 0.5 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.4 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.3 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.2 μg/m³ 2nd Maximum Monthly Mean | | Selected Standard: 0.15 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.1 μg/m³ 2nd Maximum Monthly Mean | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| AL | Pike | $3.1 | $3.3 | $3.1 | $3.3 | $3.1 | $3.3 | $4.0 | $4.2 | $4.3 | $4.6 | $4.3 | $4.6 |
| CO | Adams | - | - | - | - | - | - | - | - | - | - | $10 | $11 |
| CO | Denver | $0.01 | $0.01 | $0.01 | $0.01 | $0.38 | $0.40 | $0.81 | $0.87 | $0.81 | $0.87 | $1.4 | $1.5 |
| CO | El Paso | - | - | - | - | - | - | - | - | - | - | $16 | $16 |
| FL | Hillsborough | $1.8 | $1.9 | $1.8 | $1.9 | $3.6 | $3.8 | $5.4 | $5.7 | $6.1 | $6.5 | $8.5 | $9.0 |
| IL | Madison | - | - | - | - | - | - | - | - | $0.02 | $0.02 | $2.4 | $2.5 |
| IN | Delaware | $6.3 | $6.7 | $6.3 | $6.7 | $6.3 | $6.7 | $6.3 | $6.7 | $6.3 | $6.7 | $6.3 | $6.7 |
| MN | Dakota | $32 | $42 | $32 | $42 | $32 | $42 | $33 | $43 | $34 | $44 | $35 | $46 |
| MO | Iron | - | - | - | - | - | - | $0.02 | $0.02 | $0.02 | $0.02 | $0.02 | $0.02 |
| MO | Jefferson | - | - | - | - | $42 | $44 | $110 | $120 | $150 | $160 | $190 | $200 |
| NY | Orange | $90 | $110 | $390 | $460 | $690 | $810 | $990 | $1,200 | $1,100 | $1,300 | $1,300 | $1,500 |
| OH | Cuyahoga | - | - | - | - | $180 | $210 | $480 | $560 | $630 | $740 | $780 | $920 |
| OH | Fulton | - | - | - | - | - | - | - | - | - | - | - | - |
| OH | Logan | - | - | - | - | - | - | $11 | $12 | $84 | $90 | $140 | $150 |
| OK | Ottawa | $0.01 | $0.01 | $0.01 | $0.01 | $13 | $14 | $19 | $20 | $22 | $23 | $25 | $26 |
| PA | Beaver | - | - | - | - | - | - | $280 | $330 | $430 | $510 | $580 | $690 |
| PA | Berks | - | - | - | - | - | - | $110 | $130 | $260 | $300 | $410 | $480 |
| PA | Carbon | $1.0 | $1.1 | $1.0 | $1.1 | $1.3 | $1.4 | $1.3 | $1.4 | $2.8 | $3.0 | $3.4 | $3.6 |
| TN | Sullivan | $0.03 | $0.03 | $0.03 | $0.03 | $0.03 | $0.03 | $2.0 | $2.1 | $2.3 | $2.5 | $3.3 | $3.5 |
| TN | Williamson | - | - | - | - | - | - | - | - | - | - | $26 | $31 |
| TX | Collin | - | - | - | - | - | - | - | - | - | - | $0.01 | $0.01 |
| TX | Dallas | $3.1 | $3.3 | $3.1 | $3.3 | $3.1 | $3.3 | $4.0 | $4.2 | $4.3 | $4.6 | $4.3 | $4.6 |
| UT | Salt Lake | - | - | - | - | - | - | - | - | - | - | $10 | $11 |
| **Total** | | **$130** | **$160** | **$430** | **$510** | **$970** | **$1,100** | **$2,100** | **$2,400** | **$2,800** | **$3,200** | **$3,500** | **$4,100** |

\*All estimates rounded to two significant figures. As such, totals will not sum down columns.

Table 6-9.
TOTAL COSTS BY STANDARD*

| | | Annual Total Costs in 2016 (Millions of 2006$) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Standard Alternative: 0.5 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.4 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.3 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.2 μg/m³ 2nd Maximum Monthly Mean | | Selected Standard: 0.15 μg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.1 μg/m³ 2nd Maximum Monthly Mean | |
| | | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| Monitoring Costs** | | | | | | | | | | $4.2 | $4.2 | | |
| Identified Control Costs*** | | $46 | $57 | $46 | $57 | $89 | $100 | $110 | $120 | $130 | $150 | $160 | $180 |
| Extrapolated Costs | Cost Curve Extrapolation | $0.08 | $0.08 | $0.32 | $0.32 | $1.1 | $1.1 | $8.3 | $8.3 | $20 | $20 | $33 | $33 |
| | Ambient Extrapolation | $89 | $100 | $390 | $460 | $880 | $1,000 | $1,900 | $2,300 | $2,600 | $3,100 | $3,400 | $3,900 |
| Total Costs | Cost Curve Extrapolation**** | $46 | $57 | $46 | $57 | $90 | $100 | $110 | $130 | $150 | $170 | $190 | $210 |
| | Ambient Extrapolation | $130 | $160 | $430 | $510 | $970 | $1,100 | $2,100 | $2,400 | $2,800 | $3,200 | $3,500 | $4,100 |

* All estimates rounded to two significant figures. As such, totals will not sum down columns.

** Consistent with the scope of this rulemaking, which includes monitoring provisions, monitoring costs are included here.  See OMB 2060-0084, ICR #940.21 for a complete discussion.

*** Identified Control Costs are the same for alternative standard 0.5 μg/m³ and for alternative standard 0.4 μg/m³.  This is because the same monitor areas violate both standards and the same controls were chosen in the least cost optimization for both standard alternatives.

**** Estimates for the 0.5 μg/m³ and the 0.4 μg/m³ appear similar; this is due to rounding conventions.

**Figure 6-3.**
**PERCENTAGE OF TOTAL COSTS BY EXTRAPOLATED COST APPROACH**



**Figure 6-4.**
**TOTAL COSTS IN 2016 BY EXTRAPOLATED COST APPROACH**



### 6.1.6   Technology Innovation and Regulatory Cost Estimates

There are many examples in which technological innovation and "learning by doing" have made it possible to achieve greater emissions reductions than had been feasible earlier, or have reduced the costs of emission control in relation to original estimates. Studies[21] have suggested that costs of some EPA programs have been less than originally estimated due in part to inadequate inability to predict and account for future technological innovation in regulatory impact analyses.

Constantly increasing marginal costs are likely to induce the type of innovation that would result in lower costs than estimated early in this chapter. Breakthrough technologies in control equipment could by 2016 result in a rightward shift in the marginal cost curve for such equipment (Figure 6-5)[22] as well as perhaps a decrease in its slope, reducing marginal costs per unit of abatement, and thus deviate from the assumption of one constantly increasing marginal cost curve. In addition, elevated abatement costs may result in significant increases in the cost of

---

[21] Harrington et al. (2000) and previous studies cited by Harrington.
Harrington, W., R.D. Morgenstern, and P. Nelson. 2000. "On the Accuracy of Regulatory Cost Estimates." *Journal of Policy Analysis and Management* 19(2):297-322.
[22] Figure 5.2 shows a linear marginal abatement cost curve. It is possible that the shape of the marginal abatement cost curve is non-linear.

production and would likely induce production efficiencies, in particular those related to energy inputs, which would lower emissions from the production side.

**Figure 6-5.**
**TECHNOLOGICAL INNOVATION REFLECTED BY MARGINAL COST SHIFT**



### 6.1.6.1 Examples of Technological Advances in Pollution Control

There are numerous examples of low-emission technologies developed and/or commercialized over the past 15 or 20 years, such as:

- Selective catalytic reduction (SCR) and ultra-low NOx burners for NOx emissions

- Scrubbers which achieve 95% and even greater SO2 control on boilers

- Sophisticated new valve seals and leak detection equipment for refineries and chemical plans

- Low or zero VOC paints, consumer products and cleaning processes

- Chlorofluorocarbon (*CFC)* free air conditioners, refrigerators, and solvents

- Water and powder-based coatings to replace petroleum-based formulations

- Vehicles far cleaner than believed possible in the late 1980s due to improvements in evaporative controls, catalyst design and fuel control systems for light-duty vehicles; and treatment devices and retrofit technologies for heavy-duty engines

- Idle-reduction technologies for engines, including truck stop electrification efforts

- Market penetration of gas-electric hybrid vehicles, and clean fuels

These technologies were not commercially available two decades ago, and some were not even in existence. Yet today, all of these technologies are on the market, and many are widely employed. Several are key components of major pollution control programs.

What is known as "learning by doing" or "learning curve impacts" have also made it possible to achieve greater emissions reductions than had been feasible earlier, or have reduced the costs of emission control in relation to original estimates. Learning curve impacts can be defined generally as the extent to which variable costs (of production and/or pollution control) decline as firms gain experience with a specific technology. Such impacts have been identified to occur in a number of studies conducted for various production processes. Impacts such as these would manifest themselves as a lowering of expected costs for operation of technologies in the future below what they may have been.

The magnitude of learning curve impacts on pollution control costs has been estimated for a variety of sectors as part of the cost analyses done for the Draft Direct Cost Report for the second EPA Section 812 Prospective Analysis of the Clean Air Act Amendments of 1990.[23] In that report, learning curve adjustments were included for those sectors and technologies for which learning curve data was available. A typical learning curve adjustment example is to reduce either capital or O&M costs by a certain percentage given a doubling of output from that sector or for that technology. In other words, capital or O&M costs will be reduced by some percentage for every doubling of output for the given sector or technology.

T.P. Wright, in 1936, was the first to characterize the relationship between increased productivity and cumulative production. He analyzed man-hours required to assemble successive airplane bodies. He suggested the relationship is a log linear function, since he observed a constant linear reduction in man-hours every time the total number of airplanes assembled was doubled. The relationship he devised between number assembled and assembly time is called Wright's Equation (Gumerman and Marnay, 2004)[24]. This equation, shown below, has been shown to be widely applicable in manufacturing:

$$\text{Wright's Equation: } C_N = C_o * N^b,$$

Where:

$N$  =  cumulative production

$C_N$  =  cost to produce $N^{th}$ unit of capacity

$C_o$  =  cost to produce the first unit

$B$  =  learning parameter = $\ln(1-LR)/\ln(2)$, where

$LR$  =  learning by doing rate, or cost reduction per doubling of capacity or output.

---

[23] E.H. Pechan and Associates and Industrial Economics, Direct Cost Estimates for the Clean Air Act Second Section 812 Prospective Analysis: Draft Report, prepared for U.S. EPA, Office of Air and Radiation, February 2007. Available at http://www.epa.gov/oar/sect812/mar07/direct_cost_draft.pdf.
[24] Gumerman, Etan and Marnay, Chris. Learning and Cost Reductions for Generating Technologies in the National Energy Modeling System (NEMS), Ernest Orlando Lawrence Berkeley National Laboratory, University of California at Berkeley, Berkeley, CA. January 2004, LBNL-52559.

The percentage adjustments can range from 5 to 20 percent, depending on the sector and technology. Learning curve adjustments were prepared in a memo by IEc supplied to US EPA and applied for the mobile source sector (both onroad and nonroad) and for application of various EGU control technologies within the Draft Direct Cost Report.[25] Advice received from the SAB Advisory Council on Clean Air Compliance Analysis in June 2007 indicated an interest in expanding the treatment of learning curves to those portions of the cost analysis for which no learning curve impact data are currently available. Examples of these sectors are non-EGU point sources and area sources. The memo by IEc outlined various approaches by which learning curve impacts can be addressed for those sectors. The recommended learning curve impact adjustment for virtually every sector considered in the Draft Direct Cost Report is a 10% reduction in O&M costs for two doubling of cumulative output, with proxies such as cumulative fuel sales or cumulative emission reductions being used when output data was unavailable.

For this RIA, we do not have the necessary data for cumulative output, fuel sales, or emission reductions for sectors included in our analysis in order to properly generate control costs that reflect learning curve impacts. Clearly, the effect of including these impacts would be to lower our estimates of costs for our control strategies in 2016, but we are not able to include such an analysis in this RIA.

### 6.1.6.2 Influence on Regulatory Cost Estimates

Studies indicate that it is not uncommon for pre-regulatory cost estimates to be higher than later estimates, in part because of inability to predict technological advances. Over longer time horizons the opportunity for technical advances is greater.

- *Multi-rule study:* Harrington et al. of Resources for the Future[26] conducted an analysis of the predicted and actual costs of 28 federal and state rules, including 21 issued by EPA and the Occupational Safety and Health Administration (OSHA), and found a tendency for predicted costs to overstate actual implementation costs. Costs were considered accurate if they fell within the analysis error bounds or if they fall within 25 percent (greater or less than) the predicted amount. They found that predicted total costs were overestimated for 14 of the 28 rules, while total costs were underestimated for only three rules. Differences can result because of quantity differences (e.g., overestimate of pollution reductions) or differences in per-unit costs (e.g., cost per unit of pollution reduction). Per-unit costs of regulations were overestimated in 14 cases, while they were underestimated in six cases. In the case of EPA rules, the agency overestimated per-unit costs for five regulations, underestimated them for four regulations (three of these were relatively small pesticide rules), and accurately estimated them for four. Based on examination of eight economic incentive rules, "for those rules that employed economic incentive mechanisms, overestimation of per-unit costs seems to be the norm," the study said.

---

[25] Industrial Economics, Inc. Proposed Approach for Expanding the Treatment of Learning Curve Impacts for the Second Section 812 Prospective Analysis: Memorandum, prepared for U.S. EPA, Office of Air and Radiation, August 13, 2007.

[26] Harrington, W., R.D. Morgenstern, and P. Nelson. 2000. "On the Accuracy of Regulatory Cost Estimates." *Journal of Policy Analysis and Management* 19(2):297-322.

Based on the case study results and existing literature, the authors identified technological innovation as one of five explanations of why predicted and actual regulatory cost estimates differ: "Most regulatory cost estimates ignore the possibility of technological innovation … Technical change is, after all, notoriously difficult to forecast … In numerous case studies actual compliance costs are lower than predicted because of unanticipated use of new technology."

It should be noted that many (though not all) of the EPA rules examined by Harrington had compliance dates of several years, which allowed a limited period for technical innovation.

- *Acid Rain SO2 Trading Program*: Recent cost estimates of the Acid Rain SO2 trading program by Resources for the Future (RFF) and MIT have been as much as 83 percent lower than originally projected by EPA.[27] Note that the original EPA cost analysis also relied on an optimization model like IPM to approximate the results of emissions trading. As noted in the RIA for the Clean Air Interstate Rule, the ex ante numbers in 1989 were an overestimate in part because of the limitation of economic modeling to predict technological improvement of pollution controls and other compliance options such as fuel switching. The fuel switching from high-sulfur to low-sulfur coal was spurred by a reduction in rail transportation costs due to deregulation of rail rates during the 1990's Harrington et al. report that scrubbing turned out to be more efficient (95% removal vs. 80-85% removal) and more reliable (95% vs. 85% reliability) than expected, and that unanticipated opportunities arose to blend low and high sulfur coal in older boilers up to a 40/60 mixture, compared with the 5/95 mixture originally estimated.

| Phase 2 Cost Estimates | |
| --- | --- |
| Ex ante estimates | $2.7 to $6.2 billion[a] |
| Ex post estimates | $1.0 to $1.4 billion |
| [a] 2010 Phase II cost estimate in $1995. | |

- *EPA Fuel Control Rules:* A 2002 study by two economists with EPA's Office of Transportation and Air Quality[28] examined EPA vehicle and fuels rules and found a general pattern that "all ex ante estimates tended to exceed actual price impacts, with the EPA estimates exceeding actual prices by the smallest amount." The paper notes that cost is not the same as price, but suggests that a comparison nonetheless can be instructive.[29] An example focusing on fuel rules is provided:

---

[27] Carlson, Curtis, Dallas R. Burtraw, Maureen, Cropper, and Karen L. Palmer. 2000. "Sulfur Dioxide Control by Electric Utilities: What Are the Gains from Trade?" *Journal of Political Economy* 108(#6):1292-1326.
Ellerman, Denny. January 2003. Ex Post Evaluation of Tradable Permits: The U.S. SO2 Cap-and-Trade Program. Massachusetts Institute of Technology Center for Energy and Environmental Policy Research.
[28] Anderson, J.F., and Sherwood, T., 2002. "Comparison of EPA and Other Estimates of Mobile Source Rule Costs to Actual Price Changes," Office of Transportation and Air Quality, U.S. Environmental Protection Agency. Technical Paper published by the Society of Automotive Engineers. SAE 2002-01-1980.
[29] The paper notes: "Cost is not the same as price. This simple statement reflects the fact that a lot happens between a producer's determination of manufacturing cost and its decisions about what the market will bear in terms of price change."

**Table 6-10.**
**COMPARISON OF INFLATION-ADJUSTED ESTIMATED COSTS AND ACTUAL PRICE CHANGES FOR EPA FUEL CONTROL RULES** [A]

| | Inflation-adjusted Cost Estimates (c/gal) | | | | Actual Price Changes (c/gal) |
|---|---|---|---|---|---|
| | **EPA** | **DOE** | **API** | **Other** | |
| **Gasoline** | | | | | |
| Phase 2 RVP Control (7.8 RVP—Summer) (1995$) | 1.1 | 1.8 | | 0.5 | |
| Reformulated Gasoline Phase 1 (1997$) | 3.1-5.1 | 3.4-4.1 | 8.2-14.0 | 7.4 (CRA) | 2.2 |
| Reformulated Gasoline Phase 2 (Summer) (2000$) | 4.6-6.8 | 7.6-10.2 | 10.8-19.4 | 12 | 7.2 (5.1, when corrected to 5yr MTBE price) |
| 30 ppm sulfur gasoline (Tier 2) | 1.7-1.9 | 2.9-3.4 | 2.6 | 5.7 (NPRA), 3.1 (AIAM) | N/A |
| **Diesel** | | | | | |
| 500 ppm sulfur highway diesel fuel (1997$) | 1.9-2.4 | | 3.3 (NPRA) | 2.2 | |
| 15 ppm sulfur highway diesel fuel | 4.5 | 4.2-6.0 | 6.2 | 4.2-6.1 (NPRA) | N/A |

[a] Anderson, J.F., and Sherwood, T., 2002. "Comparison of EPA and Other Estimates of Mobile Source Rule Costs to Actual Price Changes," Office of Transportation and Air Quality, U.S. Environmental Protection Agency. Technical Paper published by the Society of Automotive Engineers. SAE 2002-01-1980.

- Chlorofluorocarbon (*CFC) Phase-Out:* EPA used a combination of regulatory, market based (i.e., a cap-and-trade system among manufacturers), and voluntary approaches to phase out the most harmful ozone depleting substances. This was done more efficiently than either EPA or industry originally anticipated. The phaseout for Class I substances was implemented 4-6 years faster, included 13 more chemicals, and cost 30 percent less than was predicted at the time the 1990 Clean Air Act Amendments were enacted.[30]

The Harrington study states, "When the original cost analysis was performed for the CFC phase-out it was not anticipated that the hydrofluorocarbon HFC-134a could be substituted for CFC-12 in refrigeration. However, as Hammit[31] notes, 'since 1991 most new U.S. automobile air conditioners have contained HFC-134a (a compound for which no commercial production technology was available in 1986) instead of CFC-12" (p.13). He cites a similar story for HCFRC-141b and 142b, which are currently substituting for CFC-11 in important foam-blowing applications."

---

[30] Holmstead, Jeffrey, 2002. "Testimony of Jeffrey Holmstead, Assistant Administrator, Office of Air and Radiation, U.S. Environmental Protection Agency, Before the Subcommittee on Energy and air Quality of the committee on Energy and Commerce, U.S. House of Representatives, May 1, 2002, p. 10.

[31] Hammit, J.K. (1997). "Are the costs of proposed environmental regulations overestimated? Evidence from the CFC phaseout." Unpublished paper, Center for Risk Analysis, Harvard School of Public Health, Cambridge, MA.

- Additional examples of decreasing costs of emissions controls include: SCR catalyst costs decreasing from $11k-$14k in 1998 to $3.5k-$5k in 2004, and improved low NOx burners reduced emissions by 50% from 1993-2003 while the associated capital cost dropped from $25-$38/kw to $15/kw[32].

We can not estimate the interplay between EPA regulation and technology improvement, but it is clear that a *priori* cost estimation often results in overestimation of costs because changes in technology (whatever the cause) make less costly control possible.

---

[32] ICF Consulting. October 2005. The Clean Air Act Amendment: Spurring Innovation and Growth While Cleaning the Air. Washington, DC. Available at http://www.icfi.com/Markets/Environment/doc_files/caaa-success.pdf.

## 6.2    **Economic Impacts**

The assessment of economic impacts was conducted simply based on those source categories which are controlled in this analysis. The impacts presented here are an extension of the engineering costs, where engineering costs are allocated to specific source categories by North American Industry Classification System (NAICS) code.  Although the costs outlined in the previous section may affect a range of industries, we expect that most of the costs associated with the selected standard will be concentrated in a limited number of industry sectors.  As indicated in Table 6-11, we estimate that primary smelters & refiners of nonferrous metals (NAICS 331419) are expected to incur most of the identified control costs associated with the alternative standards included in this RIA.  For primary smelters, the estimated costs of the alternative standards range from $32 million to $76 million per year, depending on the standard and the discount rate.  This represents 1.2 to 2.9 percent of the industry's value of shipments in 2002.  Table 6-11 also shows that other industry sectors expected to incur significant costs include secondary smelting, refining, and alloying of nonferrous metals excluding copper and aluminum (NAICS 331492); iron and steel mills (NAICS 331111); and steam and air-conditioning supply (NAICS 221330). The projected compliance costs for these industries range from 0.0 to 1.3 percent of their total shipments (or receipts, in the case of steam and air-conditioning supply) in 2002.

Table 6-12 presents capital and O&M costs by industry for identified measures under the Final NAAQS.[33]  Costs associated with emission reductions beyond identified controls are not reflected in the table because the distribution of costs between capital and O&M is uncertain for these measures.  As indicated in the table, O&M represents approximately 54 percent of costs under the selected standard of $0.15\mu g/m^3$.  This implies that although the upfront capital costs associated with the selected standard may be significant for affected industries, these costs are expected to represent a fraction of the selected standard's total costs.

---

[33] The costs presented in the table reflect a discount rate of seven percent.  Because the purpose of the table is to show the approximate distribution of costs between capital and O&M, the table presents costs based on just one discount rate for ease of presentation.

**Table 6-11.  ANNUAL COSTS OF IDENTIFIED CONTROLS BY INDUSTRY**

| NAICS Code | Industry Description | Standard Alternative: 0.5 µg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.4 µg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.3 µg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.2 µg/m³ 2nd Maximum Monthly Mean | | Selected Standard: 0.15 µg/m³ 2nd Maximum Monthly Mean | | Standard Alternative: 0.1 µg/m³ 2nd Maximum Monthly Mean | | Industry Revenue in 2005 (millions of 2006$)[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 3% Disc rate | 7% Disc rate | 3% Disc rate | 7% Disc rate | 3% Disc rate | 7% Disc rate | 3% Disc rate | 7% Disc rate | 3% Disc rate | 7% Disc rate | 3% Disc rate | 7% Disc rate | |
| 2211 | Electric Power Generation, Transmission and Distribution | - | - | - | - | $2 | $2.3 | $4.4 | $5.1 | $4.6 | $5.2 | $11.2 | $13.2 | $363,990 |
| 331419 | Primary Smelting and Refining of Nonferrous Metal (except Copper and Aluminum) | $31.7 | $42 | $31.7 | $42 | $31.7 | $42 | $40 | $50.8 | $63.9 | $76.3 | $63.9 | $76.3 | $2,649 |
| 331492 | Secondary Smelting, Refining, and Alloying of Nonferrous Metal (except Copper and Aluminum) | $12.3 | $13 | $12.3 | $13.1 | $23.3 | $24.7 | $28.4 | $30.2 | $31.2 | $33.3 | $35.8 | $38.1 | $3,009 |
| 331111 | Iron and Steel Mills | $1.5 | $1.5 | $1.5 | $1.5 | $22.1 | $23.3 | $22.1 | $23.3 | $22.1 | $23.3 | $24.4 | $25.8 | $51,762 |
| 221330 | Steam and Air-Conditioning Supply | - | - | - | - | $7.3 | $7.6 | $7.3 | $7.6 | $7.3 | $7.6 | $7.3 | $7.6 | $723 |
| 331491 | Nonferrous Metal (except Copper and Aluminum) Rolling, Drawing, and Extruding | - | - | - | - | - | - | - | - | - | - | $4.6 | $4.9 | $5,041 |
| 331513 | Steel Foundries (except Investment) | - | - | - | - | - | - | - | - | - | - | $3.9 | $4.0 | $2,941 |
| 331314 | Secondary Smelting and Alloying of Aluminum | - | - | - | - | - | - | - | - | <$0.1 | <$0.1 | $2.4 | $2.5 | $4,150 |
| 32511 | Petrochemical Manufacturing | - | - | - | - | - | - | - | - | - | - | $1.1 | $1.1 | $23,611 |
| 622110 | General Medical and Surgical Hospitals | - | - | - | - | - | - | - | - | - | - | - | - | $526,034 |
| 335911 | Storage Battery Manufacturing | - | - | <$0.1 | <$0.1 | $0.8 | $0.8 | $0.8 | $0.8 | $0.8 | $0.8 | $0.8 | $0.8 | $3,961 |
| 331511 | Iron Foundries | - | - | - | - | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.7 | $0.8 | $11,541 |
| Other Industries | | - | - | - | - | $1.5 | $1.8 | $2.2 | $2.5 | $2.2 | $2.5 | $3.8 | $4.2 | |
| Total | | $45.5 | $56.5 | $45.5 | $56.6 | $89.1 | $103 | $105.5 | $120.7 | $132.5 | $149.4 | $159.9 | $179.4 | |

1.     Source: U.S. Census Bureau 2002 Economic Census

**Table 6-12.**
**ANNUAL CAPITAL AND O&M COSTS BY INDUSTRY FOR IDENTIFIED CONTROLS**
**(7 percent discount rate)**

| SIC Code | Description | Annual Cost of Identified Controls in 2016 (Millions of 2006$) | | |
|---|---|---|---|---|
| | | Final NAAQS: 0.15 µg/m3 2nd Maximum Monthly Mean | | |
| | | Capital | O&M | Total Annual Cost |
| 2211 | Electric Power Generation, Transmission and Distribution | $3.1 | $2.2 | $5.2 |
| 331419 | Primary Smelting and Refining of Nonferrous Metal (except Copper and Aluminum) | $52.4 | $24 | $76.3 |
| 331492 | Secondary Smelting, Refining, and Alloying of Nonferrous Metal (except Copper and Aluminum) | $10 | $23.2 | $33.3 |
| 331111 | Iron and Steel Mills | $0.6 | $22.7 | $23.3 |
| 221330 | Steam and Air-Conditioning Supply | $1.5 | $6.2 | $7.6 |
| 331491 | Nonferrous Metal (except Copper and Aluminum) Rolling, Drawing, and Extruding | - | - | - |
| 331513 | Steel Foundries (except Investment) | - | - | - |
| 331314 | Secondary Smelting and Alloying of Aluminum | <$0.1 | <$0.1 | <$0.1 |
| 32511 | Petrochemical Manufacturing | - | - | - |
| 622110 | General Medical and Surgical Hospitals | - | - | - |
| 335911 | Storage Battery Manufacturing | $0.2 | $0.6 | $0.8 |
| 331511 | Iron Foundries | $0.1 | $0.3 | $0.4 |
| Other | | $0.6 | $1.9 | $2.5 |
| **Total** | | **$68.5** | **$80.9** | **$149.4** |

## 6.3    Energy Impacts

This section summarizes the energy consumption impacts of the final and alternative lead NAAQS.  The Pb NAAQS revisions do not constitute a "significant energy action" as defined in Executive Order 13211; this information merely represents impacts of the illustrative control strategies applied in the RIA.   The rule does not prescribe specific control strategies by which these ambient standards will be met.  Such strategies will be developed by States on a case-by-case basis, and EPA cannot predict whether the control options selected by States will include regulations on energy suppliers, distributors, or users.  Thus, EPA concludes that this rule is not likely to have any adverse energy effects.

For this RIA, implementation of the control measures needed for attainment with the alternative standards will likely lead to increased energy consumption among lead emitting facilities.  To control emissions effectively, these measures require a significant amount of electricity that affected facilities are not expected to consume under baseline conditions.  The available information on these controls suggests that they are not typically powered by natural gas or other fossil fuels; therefore, our analysis of energy impacts focuses exclusively on electricity consumption.  In addition, because the energy consumption associated with emission reductions beyond identified controls is uncertain, we only consider the energy impacts associated with

identified controls. Similarly, the electricity consumption associated with the construction of a Kivcet furnace at the primary lead smelter in Jefferson County, MO is also uncertain. We therefore exclude energy impacts for this facility from our analysis of energy impacts.

To assess the electricity consumption impacts associated with identified controls, we relied on the AirControlNET outputs generated for this analysis. For most identified controls, AirControlNET estimates electricity costs separately from other operating and maintenance (O&M) costs. Therefore, for sources expected to implement these controls, AirControlNET provides direct estimates of the additional electricity costs expected under the standard alternatives. We calculate the electricity consumption associated with these costs based on the unit cost of electricity assumed by AirControlNET (7.8 cents/kilowatt hour in 2006 dollars).

For a number of identified controls, AirControlNET does not separate the cost of electricity from other O&M costs. Similarly, the cost data for several controls identified from sources other than AirControlNET do not distinguish between electricity and other O&M costs. We estimate the electricity costs associated with these measures based on electricity's assumed share of total O&M, which we estimate based on AirControlNET's results for those controls where it separates electricity costs from other O&M costs. For some controls, O&M costs are not estimated separately from capital costs. In these cases, we assume that O&M represents a fixed share of annual costs based on the cost data for those controls where O&M and capital are calculated separately.

Table 6-13 summarizes the estimated energy impacts associated with the selected and alternative standards. As indicated in the table, we estimate that sources installing identified controls under the alternative standards will increase their electricity consumption in 2016 by approximately 121,800 megawatt-hours (MWh) under the selected standard. By comparison, the iron and steel industry alone is projected to purchase 66 million MWh of electricity in 2016.[34]

**Table 6-13.**
**SUMMARY OF ENERGY IMPACTS**

|  | Standard Alternative: 0.5 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.4 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.3 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.2 µg/m³ 2nd Maximum Monthly Mean | Selected Standard: 0.15 µg/m³ 2nd Maximum Monthly Mean | Standard Alternative: 0.1 µg/m³ 2nd Maximum Monthly Mean |
|---|---|---|---|---|---|---|
| Electricity Cost (millions of year 2006$) | $1.4 | $1.4 | $6.2 | $8.7 | $9.5 | $17.3 |
| Electricity Consumption (Megawatt-hours consumed in 2016) | 17,800 | 18,200 | 79,900 | 111,700 | 121,800 | 222,000 |

---

[34] U.S. Department of Energy, Energy Information Administration, *Annual Energy Outlook 2007*, February 2007.

### 6.4     Limitations

Although the cost analysis presented in this chapter provides a reasonable approximation of the costs associated with the final lead NAAQS using hypothetical control scenarios given the available information, we note the following limitations of the analysis:

- *Analysis limited to point source controls.* Because limited data are available on fugitive and area source emissions, our analysis of the costs associated with the final and alternative lead NAAQS does not consider area source and direct fugitive controls that may be implemented to comply with these standards.[35]  Therefore, in the few areas where point source controls are insufficient to attain the standard, and where we were unable to model full compliance with the revised NAAQS, it is possible that fugitive dust emissions from area sources containing deposited Pb will also contribute to violations of the NAAQS, or that historically deposited Pb, when disturbed, may be re-entrained into the ambient air.  For areas where point source controls are sufficient to reach attainment, we may have overestimated costs if more cost effective fugitive or area source controls are likely to be available in these areas.

- *Incomplete information for point source controls.* To assess the cost of reducing point source lead emissions, this analysis relies upon PM control cost information from AirControlNET.  For several sources, however, AirControlNET contains no information on the PM controls available, and we are unable to estimate costs for these sources.  Such sources represent approximately 9 percent of the point source lead emissions included in our analysis (i.e., AirControlNET contains control measure data for those lead sources that represent 91 percent of the lead emissions included in the analysis).  Costs to control lead emissions from these sources may be less than or greater than the costs to control emissions from other sources.

- *Uncertainty about methods for reaching tighter control levels in the future.*   It is not known whether industrial sources will in the future make improvements to existing particulate matter controls to control Pb emissions, whether there will be further application of existing control technology in series with controls that might already be employed at a source, or whether we might expect new control technology to be developed.

- *Uncertainty in the cost estimates for the primary lead smelter in Jefferson County, Missouri:* To estimate the costs of the selected standard for Jefferson County, Missouri, this analysis models the replacement of the primary lead smelter in that area with a modern, lower emitting Kivcet smelter.  We estimate the cost of this project based on the costs of Teck Cominco's Kivcet smelter in Trail, British Columbia, scaling for differences in lead production capacities between the Teck Cominco facility and the smelter in Jefferson County.  While this is a reasonable approach for estimating costs for the smelter in Jefferson County, our analysis may not capture facility-specific characteristics that would affect the

---

[35] Although our analysis considers the impact of point source controls on certain fugitive emissions, as described in Chapter 4, it does not consider direct fugitive controls.

costs of building and operating a Kivcet smelter at this facility.  Furthermore, more targeted measures for reducing lead emissions may be more cost-effective than the construction of a new Kivcet unit.  Given these uncertainties, we may overestimate or underestimate costs for Jefferson County.

- ***Uncertainty associated with extrapolated costs of emission reductions beyond identified controls.*** As indicated above, many areas are expected to rely heavily on emission reductions beyond identified controls to reach attainment with the selected and alternative standards. The cost of implementing these measures is uncertain. Many of these sources are already well-controlled for particulate matter, and additional control for the remaining increment of Pb might be difficult to achieve.  In addition to these uncertainties there are also many uncertainties associated with the two approaches used in this RIA to estimated extrapolated costs.  The ambient extrapolation methodology emphasizes control costs that are the most expensive within an area, and assumes that knowledge of control costs from monitor areas that attain have no influence on the average control costs for areas that need unspecified emission reductions.  It also assumes there will be no increased knowledge of sources or changed in technology between now and 2016.  Lastly, most of the costs are based upon areas that make less than 1% progress towards attainment, indicating what little knowledge we have about controls in those areas.  The cost curve methodology presents a poor conceptual relationship between the costs of identified controls at a national level and the costs of control at a local level.  The data this curve is developed upon contains data points which we believe to be invalid (presented as part of the distributional analysis in Section 6.1.3.2).  The estimated curve estimates negative costs over a portion of emission reductions. In addition this approach relies heavily on the control strategy for tightest standard alternative analyzed in this RIA, and does not account for variability in control strategies across alternative standards analyzed.  Lastly, we do not believe this curve well represents the knowledge of how control costs behave over time.

-

**CHAPTER 7.  ESTIMATES OF BENEFITS AND COSTS**

EPA has performed an illustrative analysis to estimate the costs and human health benefits of nationally attaining the selected lead National Ambient Air Quality Standards (NAAQS).  This chapter first presents benefits and costs for scenarios using consistent assumptions. We then discuss key uncertainties and limitations.  Finally, we provide a summary of key conclusions, considering both the primary results and key uncertainties.

This Regulatory Impact Analysis (RIA) provides illustrative estimates of the incremental costs and monetized human health benefits of attaining a revised primary lead (Pb) National Ambient Air Quality Standard (NAAQS) within the current monitoring network of 189 monitors representing 86 counties.  Many of the highest-emitting lead sources do not have nearby Pb-TSP monitors, and it is important to note that there may be many more potential nonattainment areas than have been analyzed in this RIA.

It is important to note at the outset that overall data limitations are very significant for this analysis, compared to other NAAQS reviews. One critical area of uncertainty is the limited TSP-Pb monitoring network (discussed in chapter 2).  Because monitors are present in only 86 counties nationwide, the universe of monitors exceeding the final NAAQS level of 0.15 µg/m$^3$ represent only 16 counties.  It is important to note that data limitations prevented us from identifying a full range of controls which would bring eight of these counties all the way to attainment of the final NAAQS.  It is also important to note that because many of the highest-emitting Pb sources in the 2002 NEI do not have nearby Pb-TSP monitors (see section 2.1.7), it is likely that there may be many more potential nonattainment areas than have been analyzed in this RIA.

In addition, as discussed in chapter 3 it is not appropriate to conduct regional scale modeling for Pb similar to the regional scale modeling conducted for PM and ozone.  Dispersion, or plume-based, models are recommended for compliance with the Pb NAAQS; however, dispersion models are data –intensive and more appropriate for local scale analyses of emissions from individual sources.  It was not feasible to conduct such a large-scale data intensive analysis for this RIA.  As a result, the simplified analysis developed for this RIA, while distance-weighting individual source contributions to ambient Pb concentrations, could not account for such locally critical variables as meteorology and source stack height.

**Benefits and Costs**

The estimates of benefits and costs presented here reflect illustrative scenarios of future lead NAAQS compliance that are consistent in most respects.  In all cases, estimates are based on a 2016 compliance date; as a result, such inputs as population and baseline emissions and air quality compliance with existing Clean Air Act requirements (including MACT rules affecting lead emissions and the recently promulgated PM NAAQS revision) are consistently applied in all

estimates presented here.  In addition, the two alternative discount rates - 3% and 7% - are used in all relevant components of both benefit and cost calculations, for all estimates presented here.

Consistent with our development of the illustrative control strategies described above, our analysis of the costs associated with the selected NAAQS focuses on point source PM controls. For the purposes of this analysis, these controls largely include measures from the AirControlNET control technology database, but also include additional measures associated with operating permits and/or New Source Performance Review standards applicable to sources similar to those included in our analysis.  For controls identified in AirControlNET, we estimated costs based on the cost equations included in AirControlNET.  Our cost estimates for controls associated with operating permits and/or New Source Performance Review standards are based on cost data compiled by EPA for previous analyses.

As indicated in the above discussion on illustrative control strategies, implementation of the PM control measures identified from AirControlNET and other sources does not result in attainment with the selected NAAQS in several areas.  In these areas, additional unspecified emission reductions will likely be necessary to reach attainment.  In order to bring these monitor areas into attainment, we calculated control costs using two different approaches.  Under one approach, we extrapolated the cost of unspecified emission reductions by constructing a total cost curve using data on identified control costs.  We then derived a total cost equation in quadratic form which best fit the total cost curve.  Under our second approach, we calculated the cost of unspecified emission reductions by deriving an average cost per microgram of air quality improvement obtained from identified controls. For each standard, we then selected all monitor areas that failed to reach attainment and applied unspecified emission reductions to all sources until attainment was reached.

For the selected standard and each alternative, we then selected all monitor areas that failed to reach attainment and applied unspecified emission reductions to all sources until attainment was reached. It is important to remember that under the first approach, the majority of the costs for the selected standard  (88%) come from our analysis of current known control technologies, with only 12% of the total costs coming from extrapolated costs.  Under the second scenario, 5% of the total costs come from our analysis of currently known control technologies, and the majority of the costs (95%) comes from our assumptions about the cost of controlling the last few ambient increments of Pb needed to reach full attainment.

Tables 7.1 and 7.2 presents total national primary estimates of costs and benefits for a 3% discount rate and a 7% discount rate.

**Table 7.1.  Summary of Costs  (Millions of 2006$)**

| | | Alternative NAAQS: 0.4 μg/m³ 2ⁿᵈ Maximum Monthly Mean | | Final NAAQS: 0.15 μg/m³ 2ⁿᵈ Maximum Monthly Mean | | Alternative NAAQS: 0.1 μg/m³ 2ⁿᵈ Maximum Monthly Mean | |
|---|---|---|---|---|---|---|---|
| | | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| **Identified Control Costs** | | $46 | $57 | $130 | $150 | $160 | $180 |
| **Extrapolated Costs** | **Cost Curve Extrapolation** | $0.32 | $0.32 | $20 | $20 | $33 | $33 |
| | **Ambient Extrapolation** | $390 | $460 | $2,600 | $3,100 | $3,400 | $3,900 |
| **Total RIA Costs** | **Cost Curve** | **$46** | **$57** | **$150** | **$170** | **$190** | **$210** |
| | **Ambient** | **$430** | **$510** | **$2,800** | **$3,200** | **$3,500** | **$4,100** |
| **Monitoring Costs**** | | $4.2 | $4.2 | $4.2 | $4.2 | $4.2 | $4.2 |

\* All estimates rounded to two significant figures. As such, totals will not sum down columns.

\*\* Consistent with the scope of this rulemaking, which includes monitoring provisions, monitoring costs are included here.  See OMB 2060-0084, ICR #940.21 for a complete discussion.


The ranges of benefits presented reflect uncertainty about the earnings impact associated with IQ gains and variability in the estimates of the PM mortality co-benefits across the available effects estimates.  The total benefits range of estimates was developed by first adding the low and high ends of the range of monetized lead IQ benefits to the low and high ends of the range of PM co-benefits, and then subtracting the total cost estimate from the low and high end of the resulting range of total benefits.

**Table 7.2.  Summary of Benefits (Millions of 2006$)**

| | Alternative Standard: 0.40 µg/m³ 2ⁿᵈ Maximum Monthly Mean | | Final NAAQS: 0.15 µg/m³ 2ⁿᵈ Maximum Monthly Mean | | Alternative Standard: 0.10 µg/m³ 2ⁿᵈ Maximum Monthly Mean | |
|---|---|---|---|---|---|---|
| | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| Annualized Benefit - IQ Gains (Range)** | $2,000—$2,800 | $250—$490 | $3,500—$5,000 | $440—$870 | $4,500—$6,400 | $560—$1,100 |
| Annualized Benefit - PM Co-control (Range)*** | $100—$880 | $100—$800 | $230—$1,900 | $210—$1,700 | $260—$2,200 | $240—$2,000 |
| **Total Benefits** | $2,100—$3,700 | $350—$1,300 | $3,700—$6,900 | $650—$2,600 | $4,800—$8,600 | $800—$3,100 |

Table 7.3 shows net benefits of the selected NAAQS and alternative standards.

**Table 7.3.  Summary of Net Benefits (Millions of 2006$)[1]**

| | Alternative Standard: 0.40 µg/m³ 2ⁿᵈ Maximum Monthly Mean | | Final NAAQS: 0.15 µg/m³ 2ⁿᵈ Maximum Monthly Mean | | Alternative Standard: 0.10 µg/m³ 2ⁿᵈ Maximum Monthly Mean | |
|---|---|---|---|---|---|---|
| | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| Total RIA Costs + Monitoring Costs | $50—$430 | $61—$510 | $150—$2,800 | $170—$3,200 | $190—$3,500 | $210—$4,100 |
| Total Benefits | $2,100—$3,700 | $350—$1,300 | $3,700—$6,900 | $650—$2,600 | $4,800—$8,600 | $800—$3,100 |
| **Net Benefits** | **$1,700 - $3,700** | **$(160) - $1,200** | **$900 - $6,800** | **$(2,600) - $2,400** | **$1,300 - $8,400** | **$(3,300) - $2,900** |

### Discussion of Uncertainties and Limitations

    As with other NAAQS RIAs, it should be recognized that all estimates of future costs and benefits are not intended to be forecasts of the actual costs and benefits of implementing revised standards. Ultimately, states and urban areas will be responsible for developing and implementing emissions control programs to reach attainment of the lead NAAQS, with the timing of attainment being determined by future decisions by states and EPA.  Our estimates are intended to provide information on the general magnitude of the costs and benefits of alternative

---

[1] Note that bounds of the full range of net benefits is derived by subtracting the high costs from the low benefits at the lower end, and subtracting the low costs from the high benefits at the upper end. This is the only way to fully represent the uncertainty.

standards, rather than precise predictions of control measures, costs, or benefits.  With these caveats, we expect that this analysis can provide a reasonable picture of the types of emissions controls that are currently available, the direct costs of those controls, the levels of emissions reductions that may be achieved with these controls, the air quality impact that can be expected to result from reducing emissions, and the public health benefits of reductions in ambient lead levels, as well as coincident reductions in ambient fine particulates.

Compared to recent NAAQS RIAs, however, our current knowledge of the costs and nature of lead emissions controls and the effects of changes in emissions on air quality and exposure is less robust.  Lead in ambient air has not been a focus for all but a few areas of the country for the last decade or more.  The proposed standards, while supported by and consistent with EPA's review of recent scientific research, represent a substantial tightening of the existing NAAQS.  As a result, many of the analyses conducted for this RIA could be significantly improved through enhanced research and data in these areas.  Perhaps the greatest need is for research on available pollution control technology, work practice changes, and pollution prevention options to most cost-effectively control lead emissions directly, rather than as a component of lead-bearing PM emissions.

It is important to note again that overall data limitations are very significant for this analysis, compared to other NAAQS reviews. One critical area of uncertainty is the limited TSP-Pb monitoring network (discussed in chapter 2).  Because monitors are present in only 86 counties nationwide, the universe of monitors exceeding the final NAAQS level of 0.15 $\mu g/m^3$ represent only 16 counties.  It is important to note that data limitations prevented us from identifying a full range of controls which would bring eight of these counties all the way to attainment of the final NAAQS.  It is also important to note that because many of the highest-emitting Pb sources in the 2002 NEI do not have nearby Pb-TSP monitors (see section 2.1.7), it is likely that there may be many more potential nonattainment areas than have been analyzed in this RIA.

In addition, as discussed in chapter 3 it is not appropriate to conduct regional scale modeling for Pb similar to the regional scale modeling conducted for PM and ozone.  Dispersion, or plume-based, models are recommended for compliance with the Pb NAAQS; however, dispersion models are data –intensive and more appropriate for local scale analyses of emissions from individual sources.  It was not feasible to conduct such a large-scale data intensive analysis for this RIA.  As a result, the simplified analysis developed for this RIA, while distance-weighting individual source contributions to ambient Pb concentrations, could not account for such locally critical variables as meteorology and source stack height. Note also that the emissions inventory has limitations for Pb sources  with very low emissions.

In the remainder of this section we re-state the most important limitations and uncertainties in the cost and benefit estimates.

Uncertainties specifically related to the cost estimates include the following:

- Because limited data are available on fugitive and area source emissions, our analysis of the costs associated with the proposed and alternative lead NAAQS does not consider fugitive and area source controls that may be implemented to comply with these standards.  For areas where point source controls are sufficient to reach attainment, we may have overestimated costs if more cost-effective fugitive or area source controls are likely to be available in these areas.

- To assess the cost of reducing point source lead emissions, this analysis relies upon PM control cost information from AirControlNET.  EPA's database of lead-focused controls is very limited, however, and there are no lead-specific controls in AirControlNET.  In addition, for several sources AirControlNET contains no information on PM controls either.  Such sources represent approximately 8 percent of the point source lead emissions included in our analysis (i.e., AirControlNET contains control measure data for those lead sources that represent 92 percent of the lead emissions included in the analysis).  Costs to control lead emissions from these sources may be less than or greater than costs to control emissions from other sources.

- The ambient extrapolation methodology emphasizes control costs that are the most expensive within an area, and assumes that knowledge of control costs from monitor areas that attain have no influence on the average control costs for areas that need unspecified emission reductions. It also assumes there will be no increased knowledge of sources or changed in technology between now and 2016.  Lastly, most of the costs are based upon areas that make less than 1% progress towards attainment, indicating what little knowledge we have about controls in those areas.

  The cost curve methodology for unspecified emission reductions also presents a poor conceptual relationship between the costs of identified controls at a national level and the costs of control at a local level.  The data underlying this curve contains data points which we believe to be invalid (presented as part of the distributional analysis in Section 6.1.3.3).  The estimated curve estimates negative costs over a portion of emission reductions. In addition this approach relies heavily on the control strategy for the tightest standard alternative analyzed in this RIA, and does not account for variability in control strategies across alternative standards analyzed.  Lastly, we do not believe this curve well represents the knowledge of how control costs behave over time.

Uncertainties related to the benefits estimates include the following:

- For our primary estimate of the benefits due to gains in children's IQ, we used a log-linear estimate from a recently published pooled analysis of seven studies (Lanphear et al., 2005).  Using alternate estimates from other epidemiological studies examining the link between blood lead level and children's IQ has significant impact on benefits results.  We found the benefits to decrease by as much as 72 percent when an alternate estimate from a paper by Schwartz (1993) is used.  This is due in part to the underlying shape of the dose-response relationship assumed by each of the functions.  In the Lanphear study, a log-linear relationship was found to be the best fit for the data (i.e., the natural log-transformed blood lead level is used to predict changes in IQ score).  This model implies that the magnitude of changes in IQ increases with lower blood lead levels.  However, in

the Schwartz (1993) and Canfield et al. (2003) studies, a single linear model is assumed (i.e., untransformed blood lead levels are used to predict changes in IQ score).  The single linear model implies that the magnitude of change in IQ is constant over the entire range of blood lead levels.  Therefore, at lower blood lead levels, the log-linear model predicts larger changes in IQ than the linear model.  Note that CASAC, in their review of EPA's *Lead Risk Assessment* indicated that "studies show that the decrements in intellectual (cognitive) functions in children are proportionately greater at Pb concentrations <10 μg/dl" (USEPA, 2007d, page 3).  However, if the true dose-response relationship is linear, than our primary estimate of benefits is an overestimation.

- Some uncertainty is involved in the estimates of maximum quarterly mean lead air concentrations used for the benefits model.  We used ratios of second maximum monthly mean values to maximum quarterly mean values from lead monitoring data from 2003-2005 to convert the baseline second maximum monthly mean values in 2016 into maximum quarterly mean for the "base case" as well as to convert the alternative second maximum monthly mean NAAQS into a maximum quarterly mean for the "control scenarios."  If the true ratio between the second maximum monthly means to the maximum quarterly mean is different in 2016 than in 2003-2005 because the pattern and distribution of daily values differs, then our results could be either over- or underestimated.

- The interpolation method of estimating exposure concentrations that we used for our primary estimate is associated with some uncertainty.  The validity of this method is to some extent contingent upon the availability of a sufficient number of monitors to support an interpolation. In certain locations, such as Hillsborough County, FL, there are a sufficient number of lead and TSP monitors to generate an interpolation with a pronounced gradient around each monitor.  The lead and TSP monitoring network in other non-attainment areas can in some cases be sparse, and the resulting interpolation does not appear to generate a meaningful gradient, such as in Delaware County, IN.

- We assumed that the IQ point effects of a change in concurrent blood lead (i.e., the effects of a change in 2016) apply to all children in our study population that were under seven years of age in 2016.  If there is a critical window of exposure for IQ effects (e.g., between the ages of one and two), then we could potentially be overestimating benefits in 2016 because we would have overestimated the population affected by reduced lead exposure in that year.  However, if partial or full achievement of the alternative NAAQS levels might occur earlier than 2016, the children in our 0-6 age cohort who are past any critical window in 2016 would have realized the partial or full benefits of reduced lead exposures in those earlier years.  Thus, the issue of a potential critical developmental window reflects uncertainty in both the timing and size of benefits.

- The use of air:blood ratios represents a first approximation to the impact of changes in ambient air concentrations of lead on concurrent blood lead levels, applied in the absence of modeling data on lead transport and deposition and the on direct and indirect human exposures.  While the values we apply match fairly well with available literature, there

are relatively few studies that report such values or provide sufficient data to calculate such ratios. Further, the lead concentrations in those studies tend to be higher than those modeled here (EPA, 2007a); thus uncertainty remains as to whether the same ratios would be expected at lower levels, or whether air exposures are more or less efficient at changing concurrent blood lead levels at these lower concentrations.

- If the air:blood ratio we apply for children or a similar value is also valid for estimating adult exposures, then our primary benefits understate the true health benefits accruing to the lead-exposed populations because they exclude impacts on morbidity and mortality impacts on adults as well as impacts on prenatal mortality. Additional research is needed to improve our understanding of the impacts of adult air exposure on adult blood lead levels.

- The earnings-based value-per-IQ-point lost that we apply in this analysis most likely represents a lower bound on the true value of a lost IQ point, because it is essentially a cost-of-illness measure, not a measure of an individual's willingness-to-pay (WTP) to avoid the loss of an IQ point. Welfare economics emphasizes WTP measures as the more complete estimate of economic value; for example, the earnings-based value does not include losses in utility due to pain and suffering, nor does it assess the costs of averting behaviors that may be undertaken by households to avoid or mitigate IQ loss from lead exposure.

- The earnings-based estimate of the value-per-IQ-point lost is based on current data on labor-force participation rates, survival probabilities, and assumptions about educational costs and real wage growth in the future. To the extent these factors diverge from these values in the future, our lifetime earnings estimate may be under- or overestimated. Another factor suggesting that our lifetime earnings estimate may be an underestimate is that it does not account for the value of productive services occurring outside the labor force (e.g., child rearing and housework).

- Because of the relatively strong relationship between $PM_{2.5}$ concentrations and premature mortality, PM co-benefits resulting from reductions in fine particulate emissions can make up a large fraction of total monetized benefits, depending on the specific PM mortality impact function used, and to a lesser extend on the relative magnitude of direct lead benefits. The lower end of the range assumes $PM_{2.5}$ benefits are based on the PM-mortality concentration-response relationship provided by Expert K; the upper end of the range assumes the relationship provided by Expert E. The relative share of co-control to primary lead benefits varies only modestly across the four alternative standards.

- Co-control benefits estimated here reflect the application of a national dollar benefit per ton estimate of the benefits of reducing directly emitted fine particulates from point sources. Because they are based on national-level analysis, the benefit-per-ton estimates used here do not reflect local meteorology, exposure, baseline health incidence rates, or other local factors that might lead to an over-estimate or under-estimate of the actual benefits of controlling directly emitted fine particulates.

**Conclusions and Insights**

EPA's analysis has estimated the health and welfare benefits of reductions in ambient concentrations of lead resulting from a set of illustrative control strategies to reduce emissions of lead at point sources. The results suggest there will be significant additional health and welfare benefits arising from reducing emissions from a variety of sources in and around projected nonattaining counties in 2016. While 2016 is the latest date by which states would generally need to demonstrate attainment with the revised standards, it is expected that benefits (and costs) will begin occurring earlier, as states begin implementing control measures to show progress towards attainment.

There are several important factors to consider when evaluating the relative benefits and costs of the attainment strategies for the six alternative standards assessed in this RIA:

- Benefits and costs are distributed differently across potential non-attainment counties. As presented in Chapter 5, most of the primary lead benefits of the standards are expected to be realized in a small number of areas. These are areas where the sources of lead exposure and the monitors that measure ambient lead appear to be in relatively close proximity to exposed populations. The identified control costs, on the other hand, are greatest in those areas with the largest sources of lead emissions - usually around primary or secondary lead smelters, mining operations, or battery manufacturers. PM co-control benefits tend to be distributed in better correlation to control costs. In general, PM co-control benefits tend to be highest in those areas where our attainment strategy suggests controls on combustion sources, rather than metals processing, are necessary.

- Our analysis considers controls on point source emissions only. Local areas might find that controls of area nonpoint sources would be more cost-effective or better demonstrated than the point source controls we model. In addition, at this time we have not considered whether Federal action might reduce the contribution of leaded aviation gasoline to local lead concentrations, particularly in areas where we find it difficult or impossible to reach attainment based on point sources controls alone.

# CHAPTER 8.  STATUTORY AND EXECUTIVE ORDER REVIEWS

### A.  *Executive Order 12866: Regulatory Planning and Review*

Under section 3(f)(1) of Executive Order (EO) 12866 (58 FR 51735, October 4, 1993), this action is an "economically significant regulatory action" because it is likely to have an annual effect on the economy of $100 million or more.  Accordingly, EPA submitted this action to the Office of Management and Budget (OMB) for review under EO 12866 and any changes made in response to OMB recommendations have been documented in the docket for this action (EPA-HQ-OAR-2006-0735).  In addition, EPA prepared this Regulatory Impact Analysis (RIA) of the potential costs and benefits associated with this action. However, the CAA and judicial decisions make clear that the economic and technical feasibility of attaining ambient air standards are not to be considered in setting or revising NAAQS, although such factors may be considered in the development of State plans to implement the standards.  Accordingly, although an RIA has been prepared, the results of the RIA have not been considered in issuing the final rule.

### B.  *Paperwork Reduction Act*

The information collection requirements in this final rule will be submitted for approval to the Office of Management and Budget (OMB) under the Paperwork Reduction Act, 44 U.S.C. 3501 et seq.  The information collection requirements are not enforceable until OMB approves them.

The information collected under 40 CFR part 53 (e.g., test results, monitoring records, instruction manual, and other associated information) is needed to determine whether a candidate method intended for use in determining attainment of the National Ambient Air Quality Standards (NAAQS) in 40 CFR part 50 will meet the design, performance, and/or comparability requirements for designation as a Federal reference method (FRM) or Federal equivalent method (FEM).  While this final rule amends the requirements for Pb FRM and FEM determinations, they merely provide additional flexibility in meeting the FRM/FEM determination requirements.  Furthermore, we do not expect the number of FRM or FEM determinations to increase over the number that is currently used to estimate burden associated with Pb FRM/FEM determinations provided in the current ICR for 40 CFR part 53 (EPA ICR numbers  0559.12).  As such, no change in the burden estimate for 40 CFR part 53 has been made as part of this rulemaking.

The information collected and reported under 40 CFR part 58 is needed to determine compliance with the NAAQS, to characterize air quality and associated health and ecosystem impacts, to develop emissions control strategies, and to measure progress for the air pollution program.  The proposed amendments would revise the technical requirements for Pb monitoring sites, require the siting and operation of additional Pb ambient air monitors, and the reporting of the collected ambient Pb monitoring data to EPA's Air Quality System (AQS).  We have estimated the burden based on the final

monitoring requirements of this rule.  Based on these requirements, the annual average reporting burden for the collection under 40 CFR part 58 (averaged over the first 3 years of this ICR) for 150 respondents is estimated to increase by a total of 42,165 labor hours per year with an increase of $3,207,407 per year.  Burden is defined at 5 CFR 1320.3(b).

### C.  Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.  Small entities include small businesses, small organizations, and small governmental jurisdictions.

For purposes of assessing the impacts of this rule on small entities, small entity is defined as:  (1) a small business that is a small industrial entity as defined by the Small Business Administration's (SBA) regulations at 13 CFR 121.201;  (2) a small governmental jurisdiction that is a government of a city, county, town, school district or special district with a population of less than 50,000; and (3) a small organization that is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field.

After considering the economic impacts of this final rule on small entities, the Administrator certified this action will not have a significant economic impact on a substantial number of small entities.  This final rule will not impose any requirements on small entities.  Rather, this rule establishes national standards for allowable concentrations of Pb in ambient air as required by section 109 of the CAA.  *American Trucking Ass'ns v. EPA,* 175 F. 3d 1027, 1044-45 (D.C. cir. 1999) (NAAQS do not have significant impacts upon small entities because NAAQS themselves impose no regulations upon small entities). Similarly, the amendments to 40 CFR part 58 address the requirements for States to collect information and report compliance with the NAAQS and will not impose any requirements on small entities.

### D.  Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104-4, establishes requirements for Federal agencies to assess the effects of their regulatory actions on State, local, and tribal governments and the private sector.  Unless otherwise prohibited by law, under section 202 of the UMRA, EPA generally must prepare a written statement, including a cost-benefit analysis, for proposed and final rules with "Federal mandates" that may result in expenditures to State, local, and tribal governments, in the aggregate, or to the private sector, of $100 million or more in any one year.  Before promulgating an EPA rule for which a written statement is required under section 202, section 205 of the UMRA generally requires EPA to identify and

consider a reasonable number of regulatory alternatives and to adopt the least costly, most cost-effective or least burdensome alternative that achieves the objectives of the rule.  The provisions of section 205 do not apply when they are inconsistent with applicable law.  Moreover, section 205 allows EPA to adopt an alternative other than the least costly, most cost-effective or least burdensome alternative if the Administrator publishes with the final rule an explanation why that alternative was not adopted.  Before EPA establishes any regulatory requirements that may significantly or uniquely affect small governments, including tribal governments, it must have developed under section 203 of the UMRA a small government agency plan.  The plan must provide for notifying potentially affected small governments, enabling officials of affected small governments to have meaningful and timely input in the development of EPA regulatory proposals with significant Federal intergovernmental mandates, and informing, educating, and advising small governments on compliance with the regulatory requirements.

This action is not subject to the requirements of sections 202 and 205 of the UMRA.  EPA has determined that this final rule does not contain a Federal mandate that may result in expenditures of $100 million or more for State, local, and tribal governments, in the aggregate, or the private sector in any one year.  The revisions to the Pb NAAQS impose no enforceable duty on any State, local or Tribal governments or the private sector.  The expected costs associated with the increased monitoring requirements are described in EPA's ICR document, but those costs are not expected to exceed $100 million in the aggregate for any year.  Furthermore, as indicated previously, in setting a NAAQS EPA cannot consider the economic or technological feasibility of attaining ambient air quality standards.  Because the Clean Air Act prohibits EPA from considering the types of estimates and assessments described in section 202 when setting the NAAQS, the UMRA does not require EPA to prepare a written statement under section 202 for the revisions to the Pb NAAQS.

EPA has determined that this final rule contains no regulatory requirements that might significantly or uniquely affect small governments because it imposes no enforceable duty on any small governments.  Therefore, this rule is not subject to the requirements of section 203 of the UMRA.

### E.  Executive Order 13132: Federalism

Executive Order 13132, entitled "Federalism" (64 FR 43255, August 10, 1999), requires EPA to develop an accountable process to ensure "meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications."  "Policies that have federalism implications" is defined in the Executive Order to include regulations that have "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government."

This final rule does not have federalism implications.  It will not have substantial direct effects on the States, on the relationship between the national government and the States,

or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132. The rule does not alter the relationship between the Federal government and the States regarding the establishment and implementation of air quality improvement programs as codified in the CAA. Under section 109 of the CAA, EPA is mandated to establish NAAQS; however, CAA section 116 preserves the rights of States to establish more stringent requirements if deemed necessary by a State. Furthermore, under CAA section 107, the States have primary responsibility for implementation of the NAAQS. Finally, as noted in section E (above) on UMRA, this rule does not impose significant costs on State, local, or tribal governments or the private sector. Thus, Executive Order 13132 does not apply to this rule.

### F. Executive Order 13175: Consultation and Coordination with Indian Tribal Governments

This action does not have tribal implications, as specified in Executive Order 13175 (65 FR 67249, November 9, 2000). It does not have a substantial direct effect on one or more Indian Tribes, since Tribes are not obligated to adopt or implement any NAAQS or monitoring requirements for NAAQS. Thus, Executive Order 13175 does not apply to this action.

### G. Executive Order 13045: Protection of Children from Environmental Health & Safety Risks

This action is subject to EO 13045 (62 FR 19885, April 23, 1997) because it is an economically significant regulatory action as defined by EO 12866, and we believe that the environmental health risk addressed by this action has a disproportionate effect on children. The final rule establishes uniform national ambient air quality standards for Pb; these standards are designed to protect public health with an adequate margin of safety, as required by CAA section 109. However, the protection offered by these standards may be especially important for children because neurological effects in children are among if not the most sensitive health endpoints for Pb exposure. Because children are considered a sensitive population, we have carefully evaluated the environmental health effects of exposure to Pb pollution among children. These effects and the size of the population affected are summarized in chapters 6 and 8 of the Criteria Document and sections 3.3 and 3.4 of the Staff Paper, and the results of our evaluation of the effects of Pb pollution on children are discussed in sections II.B and II.C of the notice of proposed rulemaking, and section II.A of this preamble.

### H.    Executive Order 13211: Actions that Significantly Affect Energy Supply, Distribution or Use

This rule is not a "significant energy action" as defined in Executive Order 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution,

or Use" (66 FR 28355 (May 22, 2001)) because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.  The purpose of this rule is to establish revised NAAQS for Pb.  The rule does not prescribe specific control strategies by which these ambient standards will be met.  Such strategies will be developed by States on a case-by-case basis, and EPA cannot predict whether the control options selected by States will include regulations on energy suppliers, distributors, or users.  Thus, EPA concludes that this rule is not likely to have any adverse energy effects.

### H.  National Technology Transfer and Advancement Act

Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (NTTAA), Public Law No. 104-113, §12(d) (15 U.S.C. 272 note) directs EPA to use voluntary consensus standards in its regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical.  Voluntary consensus standards are technical standards (e.g., materials specifications, test methods, sampling procedures, and business practices) that are developed or adopted by voluntary consensus standards bodies.  The NTTAA directs EPA to provide Congress, through OMB, explanations when the Agency decides not to use available and applicable voluntary consensus standards.

This final rule involves technical standards.  EPA has established low-volume $PM_{10}$ samplers coupled with XRF analysis as the FRM for Pb-$PM_{10}$ measurement.  While EPA identified the ISO standard "Determination of the particulate lead content of aerosols collected on filters" (ISO 9855: 1993) as being potentially applicable, the final rule does not permit its use.  EPA determined that the use of this voluntary consensus standard would be impractical because the analysis method does not provide for the method detection limits necessary to adequately characterize ambient Pb concentrations for the purpose of determining compliance with the revisions to the Pb NAAQS.

### J.    Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations

Executive Order 12898 (59 FR 7629; Feb. 16, 1994) establishes federal executive policy on environmental justice.  Its main provision directs federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations and low-income populations in the United States.

EPA has determined that this final rule will not have disproportionately high and adverse human health or environmental effects on minority or low-income populations because it increases the level of environmental protection for all affected populations without having any disproportionately high and adverse human health or environmental effects on any population, including any minority or low-income population.  The final rule

establishes uniform national standards for Pb in ambient air.   In the Administrator's judgment, the revised Pb NAAQS protect public health, including the health of sensitive groups, with an adequate margin of safety.

However, EPA believes that the newly strengthened Pb standards and the new requirements for ambient air monitoring for Pb will have the greatest benefit in reducing health risks associated with exposure to ambient air Pb in those areas where ambient air concentrations are currently the highest.   Thus, to the extent that any population groups, including minorities or low-income populations, are currently experiencing disproportionate exposure to ambient air-related Pb, those groups can be expected to experience relatively greater air quality improvements under the revised standards. Nationwide, these revised, more stringent standards will not have adverse health impacts on any population, including any minority or low-income population.

# Pls.' Exhibit 035

EPA – Economic Analysis of Toxic Substances Control Act Section 403: Lead-Based Paint Hazard Standards, https://www.epa.gov/sites/produ ction/files/documents/403_ea_d 21.pdf

# Economic Analysis

## Of

# Toxic Substances Control Act Section 403: Lead-Based Paint Hazard Standards

Economic and Policy Analysis Branch
Economics, Exposure and Technology Division
Office of Pollution Prevention and Toxics
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, DC 20460

December 21, 2000

## CONTRIBUTORS

The economist responsible for completion of this report was Nishkam Agarwal.  Analytical and draft preparation was provided by Abt Associates Inc. of Cambridge, MA, and Bethesda, MD, under EPA Contract Nos. 68-D2-0175, 68-W6-0021, and 68-W98-005.

# Table of Contents

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-1

    ES.1    Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-1

    ES.2    Analytic Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-3

        ES.2.1 Baseline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-5

        ES.2.2 Estimating Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-5

        ES.2.3 Estimating Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-5

        ES.2.4 Identifying Hazard Standards that Maximize Net Benefits . . . . . . . . . . . . . . . . ES-6

    ES.3    Sensitivity Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-8

    ES.4    Other Impacts of Section 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-9

        ES.4.1 The Regulatory Flexibility Act (RFA) and Small Business Regulatory Enforcement

            Fairness Act (SBREFA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-9

        ES.4.2 Unfunded Mandates Reform Act (UMRA) . . . . . . . . . . . . . . . . . . . . . . . . . . ES-10

        ES.4.3 Paperwork Reduction Act (PRA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-10

        ES.4.4 Executive Order 12898--Federal Actions to Address Environmental Justice . . . ES-11

        ES.4.5 Executive Order 13045--Protection of Children from Environmental

            Health Risk and Safety Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-11


**1.**    **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1

    1.1 Purpose of The Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1

    1.2 Goals of the Economic Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

    1.3 Organization of this Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-4


**2.**    **Regulatory Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1

    2.1 Lead as a Public Health Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1

    2.2 Regulation of Lead Products, Environmental and Workplace Releases of Lead,

        and Lead in Drinking Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2

        2.2.1    Lead in Paint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2

        2.2.2    Lead in Gasoline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2

        2.2.3    Other Products Containing Lead . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2

        2.2.4    Environmental and Workplace Releases of Lead . . . . . . . . . . . . . . . . . . . . . . 2-3

        2.2.5    Lead in Drinking Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3

        2.2.6    Resultant Reduction in Blood Lead Levels . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4

    2.3 Regulatory Efforts to Reduce Lead-Based Paint, Dust and Soil in Residential Areas . . . . . 2-4

        2.3.1    Current Estimates of Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4

        2.3.2    Federal Regulatory Activities to Decrease Exposure to Lead-Based Paint in Existing

            Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-5

        2.3.3    Federal Guidelines and Other Activities Related to Lead in Soil and Dust Guidelines

            for Levels of Lead in Soil and Dust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-8

        2.3.4    State and Local Programs to Reduce Exposure to Lead-Based Paint, Dust

            and Soil . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-9

    2.4 Non-Regulatory Initiatives to Reduce Lead-Based Paint, Dust and Soil Exposure . . . . . . 2-11

        2.4.1. Joint  Initiatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-11

        2.4.2 Blood Screening Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-11

        2.5 Benefits of Increasing Lead Awareness and Lead Poisoning Prevention Programs . . . . . 2-12
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-13

3.      **Problem Definition and Regulatory Options** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1
        3.1 Lead Contamination Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1
            3.1.1   Exposure Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1
            3.1.2   National Blood Lead Levels and Health Effects . . . . . . . . . . . . . . . . . . . . . . . . . 3-2
        3.2 Market Failure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-3
        3.3 Need for Federal Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-6
        3.4 Regulatory Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-8
            3.4.1   Information Provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-8
            3.4.2   Other Regulatory Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-9
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-11

4.      **Overview of Analytic Approach** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1
        4.1 Summary of Risk Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1
            4.1.1   Scope of Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1
            4.1.2   Characterization of Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1
            4.1.3   Determinations of Blood Lead Distributions: NHANES III and IEUBK and Empirical
                    Models . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-2
            4.1.4   Health Effect Endpoints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-3
        4.2 Linkages Between Risk and Economic Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-4
        4.3 Summary of Integrated Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5
            4.3.1   Lead Hazard Standards and Lead Hazard Reduction Interventions . . . . . . . . . . . 4-5
            4.3.2   Risk Assessment: Moving from Ambient Conditions to Blood Lead
                    Distributions to Health Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6
            4.3.3   Cost Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-7
            4.3.4   Benefit Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-8
            4.3.5   Discount Rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-9
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-13

5.      **Cost Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-1
        5.1 Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-1
        5.2 Estimating Aggregate Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-1
        5.3 EPA and HUD Approaches to Estimating Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-5
            5.3.1 EPA Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-5
            5.3.2 HUD Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6
            5.3.3 Differences Between the Approaches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6
        5.4 Data Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7
            5.4.1 Uncertainty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-8
            5.4.2 Multifamily Housing Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-8
        5.5 Hazard Evaluation Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-9
            5.5.1 Lead Hazard Screen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-10
            5.5.2 Risk Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-10

5.6 Intervention Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-11
    5.6.1 Dust Intervention Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-13
    5.6.2 Paint Intervention Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-14
    5.6.3 Soil Removal Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-17
    5.6.4 Overall Intervention Strategies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-22
    5.6.5. Enforcement Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-24
    5.6.6 Implementation Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-24
5.7 Number of Interventions and the Number of Housing Units that Exceed the Lead Hazard
    Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-24
    5.7.1 Number of Homes Performing Interventions for Alternative Floor
        Dust Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-25
    5.7.2 Number of Homes Performing Interventions for Alternative Windowsill
        Dust Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-26
    5.7.3 Number of Homes Performing Interventions for Alternative Soil Standards . . . . 5-28
5.8 Likely Rates of Intervention and Their Impact on the Cost Estimates . . . . . . . . . . . . . . . 5-29
**Appendix 5.A: Estimating Soil Removal Costs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-31
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-37

**6.**     **Benefits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-1
6.1 Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-1
6.2 Benefits as Reduced Exposure and Adverse Health Consequences . . . . . . . . . . . . . . . . . 6-2
6.3 Valuation of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-4
    6.3.1 Valuing Changes in IQ Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-5
    6.3.2 Valuing Increased Educational Resources . . . . . . . . . . . . . . . . . . . . . . . . . 6-11
    6.3.3 Valuing Increased Blood Lead Screening and Medical Treatment . . . . . . . . . . . 6-12
6.4 Aggregation of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-14
**Appendix 6.A  Screening and Medical Costs for Risk Groups** . . . . . . . . . . . . . . . . . . . . . . 6-15
**Appendix 6.B Aggregating Benefits from Environmental Lead Reduction** . . . . . . . . . . . . . . . 6-20
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-23

**7.**     **Net Benefits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-1
7.1 Costs, Benefits and Net Benefits for Various Candidate Floor Dust Hazard Standards . . . 7-3
7.2 Costs, Benefits and Net Benefits for Various Candidate Window Sill
    Dust Hazard Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-5
7.3 Costs, Benefits and Net benefits for Various Candidate Soil Hazard Standards . . . . . . . . 7-12
7.4 Hazard Standards that Maximize Net Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-17
**Appendix 7.A Analysis of Net Benefits Considering One Medium at a Time (Single Media Standards)** 7-20
**Appendix 7.B  Alternative Play Area Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-25
Reference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-33

**8. Sensitivity Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-1

   8.1  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-1

   8.2  Analyses Involving Parameter Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-2

      8.2.1  Discount rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-2

      8.2.2  Value of an IQ Point . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-4

      8.2.3  Hazardous Waste Disposal of Soil . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-5

   8.3  Analyses Involving Changes in Modeling Procedure . . . . . . . . . . . . . . . . . . . . . . . . . 8-8

      8.3.1  Benefits from Small IQ Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-8

      8.3.2  Transaction Trigger for Interventions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-11

      8.3.3  Single Medium Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-13

   8.4  Additional Elements of Uncertainty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-16

      8.4.1  Unit Costs of Interventions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-16

      8.4.2  Valuation of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-17

      8.4.3  Other Modeling Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-18

   References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-20


**9.**     **Supplemental Analyses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-1

   9.1  The Regulatory Flexibility Act (RFA) and Small Business Regulatory Enforcement
      Fairness Act (SBREFA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-1

      9.1.1 Impact of §403 on the Lead Testing and Abatement Industry . . . . . . . . . . . . . . . . . 9-2

      9.1.2 Impact of §403 on the Rental Real Estate Sector . . . . . . . . . . . . . . . . . . . . . . . . . 9-3

   9.2  Unfunded Mandates Reform Act (UMRA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-7

   9.3  Paperwork Reduction Act (PRA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-7

   9.4  Executive Order 12898 Federal Actions to Address Environmental Justice . . . . . . . . . . . 9-8

      9.4.1 The Distribution of Benefits and Costs by Race and Income . . . . . . . . . . . . . . . . 9-10

   9.5  Executive Order 13045--Protection of Children from Environmental Health Risk
      and Safety Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-12

   9.6.  Impact on Other Federal Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-13

   References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-16

# Table of Exhibits

Exhibit ES-1: Summary of Results for Final §403 Standards Analyzed in This Report . . . . . . . . . . ES-2
Exhibit ES-2: Linkages Between the Risk Assessment and Economic Methodologies . . . . . . . . . . . ES-4
Exhibit ES-3: Comparison of Standards Under Alternative Risk Assessment Models . . . . . . . . . . . ES-7
Exhibit ES-4: Summary of Results of Sensitivity Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ES-9
Exhibit ES-5: Beneficial Health Impacts on Children Resulting from §403 . . . . . . . . . . . . . . . . . . ES-11
Exhibit 3-1: The Demand for Abatements Under Alternative Information Scenarios . . . . . . . . . . . . . 3-4
Exhibit 3-2: Other Regulatory Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-10
Exhibit 4-1: Linkages Between the Risk Assessment and Economic Methodologies . . . . . . . . . . . . . 4-5
Exhibit 4-2: Duration for Each Intervention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-8
Exhibit 4-3: Post-Intervention Ambient Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-9
Exhibit 5-1A: Determining Total Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-3
Exhibit 5-1.B: Determining Total Costs — Estimating Present Value of Aggregate Costs . . . . . . . . . 5-4
Exhibit 5-2: Summary of Lead Hazard Evaluation Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-10
Exhibit 5-3: Summary of Intervention Costs for Lead in Dust, Paint, and Soil . . . . . . . . . . . . . . . . . 5-12
Exhibit 5-4: Unit Cost Estimates for Soil Removal - Single-Family . . . . . . . . . . . . . . . . . . . . . . . . . 5-18
Exhibit 5-5: Soil Abatement Costs - Single-Family Home . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-20
Exhibit 5-6: Unit Cost Estimates for Soil Removal - Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-21
Exhibit 5-7: Soil Abatement Costs - Multifamily Building of 30 Units . . . . . . . . . . . . . . . . . . . . . . 5-23
Exhibit 5-8: Number of Homes Performing Interventions (Over Model Period) . . . . . . . . . . . . . . . . 5-26
Exhibit 5-9: Number of Homes Performing Interventions (Over Model Period) . . . . . . . . . . . . . . . . 5-27
Exhibit 5-10: Number of Homes Performing Interventions (Over Model Period) . . . . . . . . . . . . . . . 5-28
Exhibit 5.11: Costs Under Alternative Assumptions About Intervention Rates:
    Final Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-30
Exhibit 5-A-1: Unit Cost Estimates for Soil Abatements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-32
Exhibit 5-A-2: Median Lot Sizes (sq. ft.) from the American Housing Survey . . . . . . . . . . . . . . . . . 5-33
Exhibit 5-A-3: Median Footprint Sizes (sq. ft.) Derived from the American Housing Survey . . . . . . 5-34
Exhibit 5-A-4: Perimeter Area Sizes (sq. ft.) Derived from the American Housing Survey . . . . . . . . 5-35
Exhibit 5-A-5: Remote Area Sizes (sq. ft.) Derived from the American Housing Survey . . . . . . . . . 5-35
Exhibit 5-A-6: Weighted Average Perimeter Areas and Remote Areas By Geographic Location . . . . 5-36
Exhibit 6-1: Summary of Post-Intervention Conditions for Various Intervention Alternatives
    (LBP refers to lead-based paint) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-3
Exhibit 6-2: Summary of Benefits Analysis Estimate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7
Exhibit 6-3: Risk Groups and Associated Screening and Medical Costs Per Child . . . . . . . . . . . . . . 6-13
Exhibit 7-1: Costs, Benefits and Net Benefits for Alternative Floor Dust Standards,
    With Other Media Set at Final Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-4
Exhibit 7-2: IEUBK-based Model Costs, Benefits, and Net Benefits . . . . . . . . . . . . . . . . . . . . . . . . . 7-6
Exhibit 7-3: Empirical-based Model Costs, Benefits, and Net Benefits . . . . . . . . . . . . . . . . . . . . . . . 7-7
Exhibit 7-4: Costs, Benefits and Net Benefits for Alternative Window Sill Dust Standards,
    With Other Media Set at Final Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8
Exhibit 7-5: IEUBK-based Model Costs, Benefits, and Net Benefits for Alternative
    Window Sill Dust Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-10
Exhibit 7-6: Empirical-based Model Costs, Benefits, and Net Benefits for Alternative
    Window Sill Dust Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-11

Exhibit 7-7 : Costs, Benefits and Net Benefits for Alternative Soil Standards,
    With Other Media Set at Final Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7-13
Exhibit 7-8: IEUBK-based Model Costs, Benefits, and Net Benefits for Alternative
    Soil Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7-15
Exhibit 7-9: Empirical-based Model Costs, Benefits, and Net Benefits for Alternative
    Soil Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7-16
Exhibit 7-10: Comparison of Standards Under Alternative Risk Assessment Models . . . . . . . . . . . .   7-19
Exhibit 7-A.1: Estimated Costs, Benefits, and Net Benefits for Dust-Lead Hazard Standard Alone
    - Using the IEUBK Model  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7-21
Exhibit 7-A.2: Estimated Costs, Benefits, and Net Benefits for Dust-Lead Hazard Standard Alone
    - Using the Empirical Model  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7-22
Exhibit 7-A.3:Estimated Costs, Benefits, and Net Benefits for Soil-Lead Hazard Standard Alone
    - Using the IEUBK Model  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7-23
Exhibit 7-A.4:  Estimated Costs, Benefits, and Net Benefits for Soil-Lead Hazard Standard Alone
    - Using the Empirical Model  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7-24
Exhibit 7-B.1: Parts of the Yard Addressed Under the Regulations  . . . . . . . . . . . . . . . . . . . . . . . . .   7-26
Exhibit 7-B.2: Costs, Benefits and Net Benefits for Alternative Soil Standards,
With Other Media Set at Final Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7-29
Exhibit 7-B.3: Costs, Benefits and Net Benefits for Alternative Floor Dust Standards . . . . . . . . . . .   7-30
Exhibit 7-B.4: Costs, Benefits and Net Benefits for Alternative Window Sill Dust Standards  . . . . . .   7-32
Exhibit 8-1a: Effects on Costs and Benefits of Final Standards due to
    Changing Discount Rate Assumption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8-3
Exhibit 8-1b: Effects on Net Benefit-Maximizing Standards due to
    Changing Discount Rate Assumption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8-4
Exhibit 8-2a: Effects on Costs and Benefits of Final Standards due to
    Changing IQ Valuation Assumption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8-4
Exhibit 8-2b: Effects on Net Benefit-Maximizing Standards due to
    Changing IQ Valuation Assumption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8-5
Exhibit 8-3a: Effects on Costs and Benefits of Proposed Standards due to Changing Assumptions
    Regarding Whether Removed Soil Must Ever Be Treated as Hazardous Waste . . . . . . . . . . .   8-6
Exhibit 8-3b: Effects on Net Benefit-Maximizing Standards due to Changing Assumptions
    Regarding Whether Removed Soil Must Ever Be Treated as Hazardous Waste . . . . . . . . . . .   8-7
Exhibit 8-4: Effects on Costs and Benefits of Not Counting Benefits
    from Individual IQ Point Changes of Less than One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8-10
Exhibit 8-5: Baseline/Post-Intervention Blood Lead Difference by Percentile Group
    for HUD Home 411207 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8-11
Exhibit 8-6a: Effects on Costs and Benefits due to Changing Assumption about
    Intervention Trigger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8-12
Exhibit 8-6b: Effects on Net Benefit-Maximizing Standards due to Changing Assumption about
    Intervention Trigger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8-13
Exhibit 8-7: Net Benefit-Maximizing Standards in a Single Medium Analysis . . . . . . . . . . . . . . . . . .   8-14
Exhibit 9-1: Characteristics of Establishments — Lead Testing and Abatement Firms . . . . . . . . . . . .   9-3
Exhibit 9-2: Frequency of Lead Interventions in Multi-Family Housing  . . . . . . . . . . . . . . . . . . . . . . .   9-5
Exhibit 9-3: Ratio of Annual Compliance Costs to Annual Rent Payments, by size of business  . . . . . .   9-7

        

Exhibit 9-4: Comparison of the Third National Health and Nutrition Examination Survey (NHANES) Phase 2, and the HUD Survey Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10

Exhibit 9-5: Percentage of Children Aged 1-5 with Blood-Lead Levels (BLLs) $\geq 10$ µg/dL, and Weighted Geometric Mean (GM) BLLs. — United States, Third National Health and Nutrition Examination Survey — Phase 2: 1991-94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-12

Exhibit 9-6: Beneficial Health Impacts on Children Resulting from §403 . . . . . . . . . . . . . . . . . . . . 9-13

Exhibit 9-7: Lead Soil Levels at Four Department of Defense Sites . . . . . . . . . . . . . . . . . . . . . . . . . . 9-15

# Executive Summary

This report presents an economic analysis of final regulations setting standards for lead-based paint hazards. The regulations are being finalized under authority of §403 of the Toxic Substances Control Act (TSCA). This section was established by the Residential Lead-Based Paint Hazard Reduction Act of 1992, also known as "Title X."

TSCA §403 requires that EPA promulgate regulations to "identify ... lead-based paint hazards, lead-contaminated dust and lead-contaminated soil" for purposes of other parts of Title X. The lead-based paint hazards addressed in this economic analysis include residential hazards from deteriorated paint and contaminated dust and soil[1]. These standards apply directly to "target housing" (most housing constructed prior to 1978) and child-occupied facilities. In addition, various parties may also apply the standards to newer residences.

The analysis compares alternative candidate standards in terms of their net benefits. Net benefits are based on the benefits of risk reduction minus the costs of control activities needed to achieve the reduction in risk. The analysis calculates net benefits for a wide range of alternative standards, including the final §403 hazard levels.

The final §403 standards define the level of lead in soil and dust, and the condition of lead-based paint, at which intervention activities should be undertaken. The final standards are listed in Exhibit ES-1 along with their estimated costs, benefits, net benefits, the number of homes affected, and number of children affected. There are two separate estimates of benefits, and thus net benefits, because two models were used to estimate differences in blood-lead levels resulting from differences in environmental lead levels due to the final standards. Since these two models predict different blood-lead levels, they result in different estimates of benefits.

## ES.1    Regulatory Background

Lead's advantageous properties, including its malleability, resistance to corrosion, good insulating properties, and low cost, have made it attractive for many applications; lead has been used in gasoline, ceramics, paint, and many other products. These uses have resulted in lead's release to and distribution through all environmental media, which has complicated efforts aimed at reducing lead in the environment.

As our understanding of the negative health effects of lead has increased, a variety of federal, state and local regulations have been developed to reduce exposure to lead. The presence of lead in certain consumer products, such as gasoline, has been prohibited or restricted by regulations. Environmental releases of lead to air and water, and lead concentrations in waste, also have been controlled. OSHA has set limits on allowable workplace concentrations of lead. In addition, regulatory efforts have been made to remediate exposure to lead through drinking water systems.

---

[1]    The final rule also defines "levels of concern." Levels of concern are set at lower levels of contamination than the hazard standards, and are intended for use in risk communication. They were based on health risks only and are not part of this economic analysis.

**Exhibit ES-1**
**Summary of Results for Final §403 Standards Analyzed in this Report**

| | |
|---|---|
| Interior Paint Standard | • More than 2 sq ft of deteriorated lead-based paint in an interior room<br>• Any visible deteriorated or abraded lead-based paint on friction or impact surfaces<br>• Any visible deteriorated lead-based paint on interior window sills up to five feet off the floor |
| Exterior Paint Standard | More than 10 sq ft of deteriorated lead-based paint on the exterior of a property |
| Floor Dust Standard | 40 µg/sq ft |
| Window Sill Dust Standard | 250 µg/sq ft |
| Soil Standard | 1200 ppm |
| Total Cost (over 50 year span, discounted at 3%) | $68.9 billion |
| Total Benefits based on the IEUBK Model (over 50 year span, discounted at 3%) | $192.2 billion |
| Net Benefits, based on IEUBK Model (over 50 year span, discounted at 3%) | $123.3 billion |
| Total Benefits, based on Empirical Model (over 50 year span, discounted at 3%) | $48.5 billion |
| Net Benefits, based on Empirical Model (over 50 year span, discounted at 3%) | $−20.3 billion |
| Number of Homes that Exceed the Standards | 26.7 million |
| Number of Children who will experience reduced exposure to household lead in soil, dust, and paint | 46.0 million |

 These values correspond to a play area standard of 1200 and a rest of the yard standard of 1200 ppm.  An analysis of a play area standard of 400 ppm is presented in Appendix 7A.  A play area standard of 400 ppm with a rest of the yard soil standard of 1200 ppm is estimated to have costs of $70.5 billion, IEUBK benefits of $175.6 billion with net benefits of $105.1 billion, and Empirical Model benefits of $44.8 billion with net benefits of $−25.7 billion.  The main text of Chapters 5, 6, and 7 addresses play area standards at the same level as the rest of the yard standard, not at a constant level of 400 ppm.

One of the largest remaining lead exposure sources for children is existing reservoirs of lead in paint, dust and soil present in many residential areas.  In an effort to reduce exposure to residential lead hazards, regulatory efforts to address these hazards have been increasing for several years.

**ES.2   Analytic Approach**

As envisioned by Congress, the lead hazard standards to be established under §403 are intended to tell people when they *should act for the safety of their children*, i.e. when interventions should take place. Thus, a normative analysis was conducted to identify lead hazard levels at which the interventions maximize net benefits. More specifically, in defining when intervention actions should occur, the relevant measure is *maximizing net benefits for children* (the population that is both at greatest risk from exposure and the most in need of protection since children are not in a position to protect themselves). Therefore, the birth of a child is used as the event that triggers intervention activities in the analysis used to evaluate alternative standards.

The factors considered in estimating the costs and benefits include:

- The adverse health effects to children from lead exposure -- what they are and how they differ with differing lead-related characteristics of the housing unit, and across demographic, geographic and/or socio-economic groups.

- The costs to individuals and society of interventions which reduce lead exposure.

- The effectiveness and duration of these interventions and the benefits resulting from reduced exposure and reduced adverse health effects.

- The value of these benefits to individuals and society.

By comparing the total present value of net benefits (benefits minus costs) for a reasonable array of standards, it is possible to identify the standard that yields the largest net benefits and to compare standards in terms of their net benefits. For example, as standards become more protective (i.e. more stringent), they also become more costly. By looking at net benefits, the analysis shows how much society is giving up to acquire more protection. Likewise, costs can be reduced by making the standards less stringent. The analysis estimates what benefits society is giving up with this reduction in costs.

The analysis considers children, from birth through the sixth birthday, living in homes that were built in 1997 or earlier.[2] Because the potential for lead exposure in currently contaminated homes may remain for some time, the analysis considers children born during the 50-year period, from 1997 to 2046. Exposure, health effects, and benefits are calculated separately for the cohorts born in each of the 50 model years.

The methodology used to evaluate the economic return from the §403 hazard levels has several linkages with the risk assessment methodology, which in turn relates paint condition and the amount of lead in dust and soil to blood lead levels and health effects. Exhibit ES-2 illustrates the basic linkages between the risk assessment and economic modeling. The primary links are those that connect candidate hazard standards

---

[2]     According to Title X, the regulations will apply to housing constructed before 1978. However, the analysis assumes that once EPA promulgates these standards, they will be generally applied to all housing regardless of year constructed. Of the over 25 million homes that exceed the final standards, only an estimated 890,000 (or 3.6 percent) were built after 1978.

and the presence of lead in each housing unit with hazard control choices and costs, and those that connect the presence of environmental lead to blood-lead levels and thus to health effects and economic damages and benefits.  The first set of linkages outlines the cost estimation process, while the latter describes the benefit estimation process.

In Exhibit ES-2, the boxes along the top represent the analysis of baseline conditions, yielding an estimate of the economic damages resulting from the baseline residential lead levels.  The boxes along the bottom of the exhibit represent the analysis of ex post conditions; each scenario or potential lead hazard definition is analyzed separately.  A comparison of the baseline economic damages and the ex post economic damages yields an estimate of the benefits of actions performed under the scenario.  This is represented by the far-right box in the middle row of Exhibit ES-2.  From these benefits, the analysis subtracts the corresponding costs to get net benefits.



**Exhibit ES-2**
**Linkages Between the Risk Assessment and Economic Methodologies**

The evaluation of candidate hazard standards consists of calculating net benefits for a wide range of levels for the candidate standards and then comparing the candidate hazard standards in terms of net benefits. The candidate hazard standard yielding the largest net benefits provides the greatest benefit to society.

### ES.2.1  Baseline

The benefit-cost analysis compares alternative futures over a 50-year time span: a baseline or "no-action" alternative for which it is assumed that no changes are made to current ambient lead exposure conditions, and a "post-action" alternative for which it is assumed that the ambient lead exposure conditions are reduced in specific ways in response to the §403 standards.  In other words, it is a marginal analysis with a baseline of no intervention.  The baseline residential lead conditions are defined by data on dust and soil lead levels, and condition of lead-based paint, collected by the U.S. Department of Housing and Urban Development for a representative sample of homes.  The baseline population blood-lead levels are defined by data from the NHANES III Part 2 survey.

### ES.2.2  Estimating Costs

Costs of hazard control are calculated using unit costs of individual intervention activities, in combination with the timing and number of interventions.  Unit costs are calculated for each of the testing and intervention activities and represent average costs of intervention nationwide.  Intervention activities include maintaining, removing or encapsulating deteriorated lead-based paint, removing dust, and removing and replacing soil.  Separate cost estimates are developed for single and multi-family housing units; multi-family unit costs are developed by adjusting the single family cost estimates to reflect the smaller size of multi-family units and the smaller yards of multi-family units.

The analysis assumes that when a child is born into a housing unit whose ambient lead levels exceed the candidate standards levels, the appropriate intervention will occur.  This initial intervention is repeated as necessary until the child turns six years of age, at which time additional interventions will cease unless an additional child has been born during this time period.  If needed, interventions in the home will recommence if another child is born after this period, and will follow the same repeat routine.

Costs incurred after the first year are discounted to the first year using an annual discount rate of 3 percent.[3]  The total cost estimate is the sum of the costs of hazard controls in all homes for each year and represents the present value of the assumed stream of intervention costs.

### ES.2.3  Estimating Benefits

Benefits of hazard control are calculated using estimates of  "avoided" economic damages corresponding to avoided adverse health effects.  The model defines "avoided" as the difference between the baseline scenario, which assumes no intervention activity and various intervention or ex post scenarios.  Each of the scenarios assumes a different specification of lead hazard standards, and hence intervention activities.  In the analysis, benefits are calculated for children whose exposure to lead is reduced for the period from birth to age six.

These avoided economic damages include reductions in IQ, plus increased educational and medical costs connected with high levels of exposure.  In each case, the economic value is a proxy for society's willingness to pay to avoid the health effect.  Changes in IQ levels make up the vast majority of benefits in this analysis.  The economic value of avoiding lost IQ points is approximated by using an estimate of the

---

[3]     The sensitivity analysis presents costs, benefits and net benefits calculated with a discount rate of 7 percent as well.

foregone lifetime income due to IQ point loss.  The estimated value per IQ point lost is $8,346 (1995 dollars).

Since lead exposure has been linked to a variety of health hazards for children and adults in addition to those analyzed here, the benefit estimates developed in the analysis understate the societal return from the §403 hazard levels.  Furthermore, secondary benefits such as improved energy efficiency due to new windows and increased aesthetic appeal due to repainting are not included.

Benefits accrue over time depending on hazard control choices and assumptions regarding exposure of children.  All benefit estimates are discounted to the present using an annual rate of 3 percent.  Total benefits are the sum of benefits calculated for each year or cohort of children protected and represent the present value of the stream of benefits from the hazard controls.  Net benefits are simply the difference between the total benefits estimate and the total cost estimate.  As such, they are an indicator of the societal gains from hazard controls.

### ES.2.4  Identifying Hazard Standards that Maximize Net Benefits

The analysis evaluates alternative standards for floor dust, window sill dust and soil, assuming the following responses to the paint standards:

| Medium | Amount of Deteriorated Lead-Based Paint | Intervention Activity |
|---|---|---|
| Deteriorated Interior Lead- Based Paint | 2 sq.ft. or more | Repair |
| | 50 sq.ft. or more | Abate |
| Deteriorated Exterior Lead- Based Paint: | 10 sq.ft. or more | Repair |
| | 100 sq.ft. or more | Abate |

The analysis assumes that homes receiving any lead intervention will receive interventions for all media (floor dust, window sill dust, paint and soil) that exceed the standards.  This assumption, combined with the fact that there are interactions among the interventions in terms of both costs and benefits, means that standards can not be accurately evaluated one at a time.  Instead, the standards for a single medium must be evaluated in the context of specified standards for all other media.  To allow for this, the analysis calculated costs, benefits and net benefits for all combinations of standards.   For each medium, the alternative standards were defined in terms of incremental changes in the levels of lead.  For example, floor dust standards varied by increments of 10 $\mu g/ft^2$ (e.g., 40 $\mu g/ft^2$, 50 $\mu g/ft^2$, 60 $\mu g/ft^2$, 70 $\mu g/ft^2$, etc.). Likewise, soil standards were analyzed in increments of 50 ppm (150 ppm. 200 ppm. 250 ppm, 300 ppm, etc.).  All combinations of standards were analyzed.

Two EPA blood-lead models (IEUBK and Empirical) were used in this analysis and they generate different benefit estimates for any given combination of standards.   In addition to differences in the overall size of benefits, the benefit estimates vary at different rates under the two models and thus the set of standards that maximize net benefits is different under the two models.   As a result, there is no unique answer to the question: which combination of standards maximize net benefits?  There is one answer when benefits are

estimated using the IEUBK Model and a different answer when the benefits are based on the results of the Empirical Model.

The two blood-lead models differ in several ways, including the incorporation of different variables and very different functional forms relating environmental lead levels to children's blood lead levels. Notably, the functional form of the IEUBK Model is such that it is much more sensitive to changes in environmental lead than the Empirical Model. Also, the IEUBK Model uses lead dust concentrations and the Empirical Model uses dust lead loadings as input variables. Since dust lead concentrations and loadings are not well correlated in the actual housing unit data collected by HUD and used for this analysis, these differences in input variables result in differences in estimated blood-lead changes and thus benefits.

For each of the two blood-lead models, Exhibit ES-3 presents the set of standards that maximize net benefits, along with the costs, benefits and net benefits for each standard. The net-benefit maximizing standards, based on the IEUBK Model, are much more stringent than the net benefit maximizing standards based on the Empirical Model. In addition, the exhibit presents the standards that this report refers to as the final standards, along with their cost, benefit and net benefits. These standards are shown twice, once with benefits calculated using the IEUBK Model and once using the Empirical Model.

**Exhibit ES-3**
**Comparison of Standards Under Alternative Risk Assessment Models**

| | IEUBK Model Results | |
| | Standards that Maximize Net Benefits | Final Standards |
|---|---|---|
| Floor Dust Standard | 40 µg/ft$^2$ | 40 µg/ft$^2$ |
| Window Sill Dust Standard | 100 µg/ft$^2$ | 250 µg/ft$^2$ |
| Soil Standard* | 250 ppm | 1200 ppm |
| Total Cost | $100.6 billion | $68.9 billion |
| Total Benefit | $274.0 billion | $192.2 billion |
| Net Benefit | $173.5 billion | $123.3 billion |
| | **Empirical Model Results** | |
| | Standards that Maximize Net Benefits | Final Standards |
| Floor Dust Standard | 80 µg/ft$^2$ | 40 µg/ft$^2$ |
| Window Sill Dust Standard | 310 µg/ft$^2$ | 250 µg/ft$^2$ |
| Soil Standard* | 1,650 ppm | 1200 ppm |
| Total Cost | $51.7 billion | $68.9 billion |
| Total Benefit | $46.5 billion | $48.5 billion |
| Net Benefit | −$5.2 billion | −$20.3 billion |

* These estimates assume that the play area standard is set equal to the rest of the yard standard.

The IEUBK net benefit maximizing standards are more stringent than the final standards. Because of the large number of homes in the lower range of environmental lead levels, the IEUBK standards would cost nearly 1.5 times as much as much as the final standards and the benefits would be nearly 1.5 times those of the final standards. In addition, the net benefits, at $174 billion, would be substantially higher than the net benefits of the final standards, at $123 billion.

The Empirical Model net benefit maximizing standards, on the other hand, are less stringent than the final standards. Since there are many fewer homes with environmental lead levels in the range of these standards, the Empirical Model net benefits maximizing set of standards would cost less ($52 billion as compared to $69 billion) and would produce smaller benefits ($47 billion as compared to $49 billion) than the final standard. However, its net benefits are somewhat larger than those of the final standard, while still negative.

## ES.3    Sensitivity Analysis

To gain a better understanding of the relationships embedded in the analysis, and the impact of certain parameter values, six sensitivity analyses were performed. The particular elements of the model chosen to include in the sensitivity analysis reflect those elements identified as likely to have significant effect on the results or for which there was a particular interest in determining what the potential effects might be. Three of the sensitivity analyses dealt with alternative values for specific parameters:

- Discount rate — 7% in place of 3%;
- Monetary value of an IQ point loss or gain — $6,847 in place of $8,346;
- Elimination of the additional cost of disposing of high-lead soil as a hazardous waste.

The other three sensitivity analyses involved changes in the modeling procedures used in the benefit-cost analysis:

- Exclude from the benefits small changes in IQ;
- Use real estate transactions, rather than pending birth, as the intervention trigger;
- Analyze standards for each medium, assuming there were no standards for other media.

The sensitivity analyses consider the effect on two outcomes of the benefit-cost modeling. The first outcome is the impact on the estimated costs and benefits of the standards. The second outcome is the effect on the determination of the set of standards that produce maximum net benefits. In some cases, both cost and benefit estimates are changed but there is no shift in the standard found to maximize net benefits. In other cases, there are changes in estimated costs and/or benefits that affect which standard maximizes net benefits. In all cases, the sensitivity analyses are conducted separately using the IEUBK and the empirical blood-lead models.

The results of the six sensitivity analyses are summarized in Exhibit ES-4. In the first three analyses costs and/or benefits are decreased; where there are changes in the net benefit maximizing standards, they become less stringent. The largest changes in the standards result from increasing the discount rate; the other two cases experience relatively small shifts in the standards that maximize net benefits.

The impacts of the other three sensitivity analyses are mixed. Excluding small changes in IQ reduces benefits while leaving costs unchanged. The net-benefit maximizing standards become less stringent. Assuming that real estate transactions, instead of births, trigger intervention activities, increases costs and decreases benefits because more actions take place but fewer occur where there is a child to benefit. Again, the impact is to reduce the stringency of the net-benefit maximizing standards. Due to the potential for double counting, neither costs nor benefits can be accurately estimated when standards are analyzed for one

medium at a time.  The impact on standards that maximize net benefits is to make the floor and soil standards more stringent when the Empirical Model is used to measure benefits, and to leave the rest of the standards unchanged.

**Exhibit ES-4**
**Summary of Results of Sensitivity Analysis**

| Factor Examined | Impact on Estimation of Costs | Impact on Estimation of Benefits | Impacts on Standards That Maximize Net Benefits |
|---|---|---|---|
| **Discount Rate**: 7% in place of 3% | Decrease in costs relatively less than decrease in benefits | Decrease in benefits relatively more than decrease in costs | Standards substantially less stringent |
| **Value of IQ Point**: decrease from $8,346 to $6,847 | No impact on costs | Decrease in benefits | IEUBK: No change in standards Empirical: Standards slightly less stringent |
| **Hazardous Waste Disposal of Soil**: not required | Decrease in costs | No impact on benefits | IEUBK: Soil standards slightly less stringent Empirical: Soil standards more stringent |
| **Exclude Small Changes in IQ** (i.e., less than 1 IQ point) **from Benefits** | No impact on costs | Decrease in benefits | Standards would become less stringent, with larger impact on Empirical than on IEUBK results |
| **Event That Triggers Interventions**: use real estate transaction rates in place of birth rates | Increase in costs (annual transaction rate greater than annual birth rate) | Decrease in benefits (most interventions occur where no child is present to benefit) | IEUBK: Floor dust and soil standards unchanged; window sill dust standard becomes less stringent Empirical: all standards become less stringent |
| **Single Medium Analysis**: standard for each medium set assuming no other standards in effect | NA | NA | IEUBK: No change in standards Empirical: Floor dust and soil standards become more stringent |

## ES.4    Other Impacts of Section 403

Several additional analyses were performed to estimate the impact of the §403 standards on various groups of particular concern.  These include its impact on small entities, on minority and low-income households, and on children.   The recording keeping and reporting burdens placed on state, local and tribal governments, as well as the private sector, were also estimated.  The results of these analyses are presented in the following sections.

### ES.4.1  The Regulatory Flexibility Act (RFA) and Small Business Regulatory Enforcement Fairness Act (SBREFA)

As described in the Preamble, the §403 standards do not require or mandate any actions by homeowners, landlords, or personnel performing lead-based paint identifications and interventions.  Instead, §403 standards inform decision-makers about what conditions constitute a hazard and recommend potential actions.  As a result, EPA is not required to conduct an analysis of small entity impacts under the Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA).  In situations where RFA requires an analysis of a rule's economic impact on the small entities that will be subject to the rule's requirements, it requires that the analysis identify the types, and estimate the numbers, of small entities "to which the proposed [or final] rule will apply."  It also requires that the analysis describe the rule "requirements" to which small entities "will be subject" and any regulatory alternatives, including exemptions and deferrals, which would lessen the rule's burden on small entities.  (Sections 603 and 604 of the RFA.)  Rules that do not establish requirements applicable to small entities are thus not susceptible to RFA analysis and may be certified as not having a significant economic impact on a substantial number of small entities, within the meaning of the RFA.  This is particularly true when the national standards do not themselves require any particular action, as is the case with §403.

Nevertheless, EPA has conducted a more limited analysis of the potential impact on small entities of these standards as they work within the market.  Two groups of entities are considered: lead-based paint inspection and abatement firms, and landlords.  To the extent that the §403 standards may increase the number of hazard identification and intervention actions, this is likely to help small businesses, who make up the majority of inspection and abatement firms.  In terms of impacts on landlords, the analysis found that there would not be a significant economic impact on a substantial number of small firms.

### ES.4.2  Unfunded Mandates Reform Act (UMRA)

Under Title II of the Unfunded Mandates Reform Act, the cost to state, local and tribal government or the private sector of compliance with federal regulations must be calculated and considered during the regulatory process.  Because §403 is a regulation which provides information to consumers about household lead safety and does not require households or public entities to take any action with respect to that information, no costs are imposed on state, local and tribal governments or the private sector.  As such, this action is not subject to the requirements of sections 202 and 205 of (UMRA) because this action does not contain any "federal mandates."  Similarly this regulation contains no regulatory requirements that might significantly or uniquely affect small governments, so no action is needed under Section 203 of UMRA.

### ES.4.3  Paperwork Reduction Act (PRA)

The Paperwork Reduction Act (PRA) requires EPA to prepare an Information Collection Request (ICR), which estimates the reporting and recordkeeping burden imposed by their regulations.  Under the PRA, "burden" means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency.  This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements; train personnel to be able to respond to a collection of information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information.

Section 403 contains no reporting or recordkeeping requirements, and thus no ICR is necessary for this rule.  However, an ICR was previously prepared and filed for the promulgation of regulations for TSCA §402(a) and 404, and these burden estimates were based on estimates of the number of lead-based paint identification and intervention activities anticipated.  EPA re-examined the §402(a) and 404 ICR and determined that these estimates would not change due to the §403 standards.

### ES.4.4 Executive Order 12898--Federal Actions to Address Environmental Justice

EPA investigated environmental justice related issues with regard to the potential impacts of this action on the environmental and health conditions in low-income and minority communities.  African-American households are more likely to live in housing with lead-based paint hazards and a larger proportion of their children will benefit from the standard.  Among households performing interventions, non-Hispanic white households face a higher average cost per household to bring their housing units up to the standard.  Lower-and upper-income households face roughly the same cost of compliance.  This means that lower-income households will have to forego a larger share of their income to comply with §403.  Depending on which blood-lead model is used, lower-income households will have either larger or smaller average benefits than higher-oncome households.

### ES.4.5  Executive Order 13045--Protection of Children from Environmental Health Risk and Safety Risks

The focus of the §403 regulation is on the protection of children's health.  The household lead standards were chosen based on an analysis of the health risks to children.  The benefits from §403 outlined in Chapter 5 are a reflection of benefits to children under 6 years old.

Of the estimated 173 million children born between 1997 and 2046, approximately 131 million children will be born into housing built prior to 1979.  It is estimated that §403 will result in reductions in exposure to household lead in soil, dust, and paint for 46.0 million children born over that 50 year span.  This reduction in exposure, in turn, will result in reductions in the incidence of elevated blood-lead levels and increases in average IQ.  Exhibit ES-5 presents blood-lead and IQ statistics for both the baseline and post-compliance scenarios.

**Exhibit ES-5**
**Beneficial Health Impacts on Children Resulting from §403**

|  | Mean blood-lead level (µg/dl) | Number with elevated blood-lead due to pica (millions) | Number with blood-lead greater than 10 µg/dl (millions) | Number with blood-lead greater than 20 µg/dl (millions) | Average IQ point gain | Number avoiding IQ less than 70 |
|---|---|---|---|---|---|---|
| Baseline | 4.12 | 2.4 | 10.0 | 1.0 | NA | NA |
| Post-§403 IEUBK | 3.18 | 1.1 | 2.5 | 0.1 | 0.90 | 30,000 |
| Post-§403 Empirical | 3.88 | 1.1 | 8.0 | 0.7 | 0.23 | 8,000 |

As shown, the health impacts of §403 are positive and substantial.  The reduction in the number of children suffering from elevated blood-lead levels due to pica (direct ingestion of paint chips) is on the order of 1.3 million.  The reduction in the number of children with elevated blood-lead levels (greater than 10 µg/dl)

from all sources is estimated at 2.0 to 7.5 million.  The increase in average IQ depends greatly on which benefits model is used but is between 0.23 and 0.90 points.  Similarly the number of children who will avoid an IQ less than 70 points is between 8,000 and 30,000, depending on the benefits model employed.

# 1.    Introduction

This report presents an economic analysis of final regulations setting standards for lead-based paint hazards. The regulations are being promulgated under authority of §403 of the Toxics Substances Control Act (TSCA).  This section was established by the Residential Lead-Based Paint Hazard Reduction Act of 1992, also known as "Title X."

Historically, use of lead-based paint in residences has been an important source of lead exposures. Production and sale of lead-based paint for residential use was banned in the United States in 1978. This ban, in combination with a phase-out of lead in gasoline, more stringent standards for lead in drinking water, and reduced use of lead as solder in food cans, has dramatically reduced environmental lead levels. Recent studies have suggested, however, that exposure to lead poses hazards at levels once thought to be safe.  In addition, past use of lead-based paint and other sources of lead have resulted in contamination that continues to pose human health hazards. Many older residences (especially those built before 1978) have lead-based paint that has chipped or peeled and become available for ingestion, especially by children. In addition, residential dust and soil are contaminated with lead from past lead-based paint use and other sources.

A variety of both voluntary and mandatory programs have been established at the federal, state and local levels to encourage remediation of these residual hazards.  The final rule considered here will support implementation of these programs, either directly or indirectly, by establishing a definition of lead paint-based hazards. By issuing these hazard definitions, EPA hopes to encourage improved targeting of programs that address residential lead problems, thereby enhancing the cost-effectiveness of lead-hazard programs as a whole.

## 1.1    Purpose of The Rule

TSCA §403 requires that EPA promulgate regulations to "identify ... lead-based paint hazards, lead-contaminated dust and lead-contaminated soil" for purposes of other parts of Title X.  This economic analysis evaluates the final §403 standards identifying lead-based paint hazards, which include residential hazards from deteriorated paint and contaminated dust and soil.[1]  These standards apply directly to "target housing" (most housing constructed prior to 1978).  In addition,  various parties may apply the standards to newer residences as well.

Property-owners are not required to take action to address lead-based paint hazards, as defined by this rule. However, it is expected to encourage such interventions by providing a specific definition of hazard, along with guidance on actions that can be taken to address the hazards.  The rule should encourage more effective targeting of activities under various federal, state and local programs, by communicating EPA's best judgement about conditions which require intervention.

---

[1]    The rule also defines "levels of concern."  Levels of concern are set at lower levels of contamination than the hazard standards, and are intended for use in risk communication.  They were based on health risks only and are not part of this economic analysis.

The lead-based paint hazard standards therefore define conditions of lead-based paint and levels of lead in dust and soil at which EPA believes hazards should be addressed[2]. Paint hazards should be addressed by repairing deteriorated paint, removing or enclosing the paint, or replacing the painted component. Dust-lead hazards should be addressed by intensive cleaning. Soil-lead hazards should be eliminated through soil removal or permanent cover of the soil. EPA is planning to develop a guidance document to describe the recommended responses in more detail.

The standards support implementation of key provisions of Title X, including eligibility criteria for the Department of Housing and Urban Development's (HUD's) abatement grant program and requirements that owners of HUD-associated housing and federal agencies evaluate and control lead-based paint hazards in residential properties being sold. In addition, sellers and lessors of housing built before 1978 are required to disclose known lead-based paint and lead-based paint hazards prior to sale or rental, under Title X §1018. Certified workers must be used for evaluation and cleanup where lead-based paint hazards are present.

The §403 standards will have broader uses, however. The standards communicate the Agency's best judgement about the identification of lead-based paint hazards to property owners, state and local officials, tenants and other decision-makers. EPA expects that public and private institutions may incorporate these standards into state and local laws, housing codes, and lending and insurance underwriting standards.

## 1.2 Goals of the Economic Analysis

The purpose of this report is to present the economic analysis used by the U.S. Environmental Protection Agency (EPA) in determining what standards should be established under §403 of the Toxic Substances Control Act. The report also meets the requirements for economic analysis in Executive Order 12866 -- *Regulatory Planning and Review*; the Regulatory Flexibility Act (RFA) and Small Business Regulatory Enforcement Fairness Act (SBREFA); Executive Order 12898 -- *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*; Executive Order 13045 -- *Protection of Children from Environmental Health Risks and Safety Risks*; the Unfunded Mandates Act and Executive Order 12875 -- *Enhancing the Intergovernmental Partnership*; and the Paperwork Reduction Act (PRA).

The analysis compares alternative candidate standards in terms of their net benefits. Net benefits are based on the benefits from risk reduction and the costs of hazard control activities needed to achieve the reduction in risk. Using a normative framework, the analysis calculates net benefits for a wide range of alternative standards, including the final §403 hazard levels.

The analysis does not attempt to predict precisely how much remediation of residential lead-based paint hazards will occur as a result of promulgating these standards. Rather, it is designed to provide comparisons of different standards rather than absolute measures of costs and benefits for the different standards.

---

[2]     The definition of lead-based paint itself has already been established by statute, and is not addressed by this rule. This standard focuses on the conditions under which lead in deteriorated paint surfaces and friction/impact surfaces constitutes a hazard.

The lead hazard standards to be established under §403 are intended to tell people when they *should act*, i.e. when interventions should take place. In the economic literature this is referred to as a normative analysis. As such, the analysis identifies hazard levels at which the interventions maximize net benefits. More specifically, in defining when intervention actions should occur, the relevant measure is *maximizing net benefits for children* (the population that is both at greatest risk from exposure and the most in need of protection since children are not in a position to protect themselves). Therefore, the birth of a child is used as the event that triggers intervention activities in the analysis used to evaluate alternative standards.

The factors considered in estimating the costs and benefits include:

- The adverse health affects from lead exposure -- what they are and how they differ with differing lead-related characteristics of the housing unit, and across demographic, geographic and/or socio-economic groups.

- The costs to individuals and society of interventions which reduce lead exposure.

- The effectiveness and duration of these interventions and the resulting benefits in terms of reduced exposure and reduced adverse health effects.

- The value of these benefits to individuals and society.

By comparing the total present value of net benefits (benefits minus costs) for each potential standard, it is possible to identify the standard that yields the largest net benefits and to compare standards with various levels of costs or benefits in terms of their net benefits. For example, as standards become more protective (i.e. more stringent), they also become more costly. By looking at net benefits, the analysis shows how much society would give up to acquire more protection than that offered by the standard that maximizes net benefits. Likewise, costs can be reduced by making the standards less stringent than the one that maximizes net benefits. The analysis estimates what society gives up with this reduction in costs. In focusing the estimations on interventions that take place at the time of the birth of a child, the analysis identifies the standards that maximize the net benefits to the population of greatest concern -- children.

It is important to emphasize that both the costs and the benefits calculated in this report are subject to substantial uncertainty. While the net benefits measure provides insight into the relationship between costs and benefits for different hazard levels, it does not represent true net social benefits. Important components of the benefits of reduced lead exposure could not be estimated. In addition, there is uncertainty about the relationship between environmental exposures and blood-lead levels. These uncertainties are highlighted by the fact that the two models of children's blood-lead yield very different estimates of risk.

Finally, both costs and benefits reflect simplifying assumptions about how and when property-owners will undertake interventions. Actual costs and benefits will vary, depending on how property-owners actually react to the hazard levels. For instance, if fewer interventions occur or they occur later in time than assumed in the analysis, both costs and benefits will be lower. While there is substantial uncertainty about the absolute estimates of aggregate costs and benefits, however, the estimated relationship between the two for different standards is more reliable. Whenever costs are incurred, benefits also result, although these benefits may occur at some time in the future.

**1.3     Organization of this Report**

Chapter 2 provides a historical overview of regulations that control lead use and risk. Programs that address residential lead-based paint hazards are described, including both regulations and non-regulatory initiatives. Many of these programs or regulations may be directly or indirectly affected by the lead hazard standards.

Chapter 3 describes the problems presented by lead-based paint hazards in residences, and discusses the rationale for federal action to address these problems. This chapter also describes possible approaches that might be used to address residual lead-based paint hazards.

Chapter 4 provides an overview of the entire economic analysis and its linkages with the risk assessment.

Chapter 5 describes in detail the methods used to calculate costs for different hazard standard levels. It describes the development of unit costs and the methods used to aggregate costs across home types and over time, and reports the predicted number of homes affected and number of interventions for alternative standards.

Chapter 6 describes in detail the methods used to estimate benefits, including the calculation of unit benefits and the aggregation of benefits across home types and over time. Finally, the chapter reports the number of children affected and the predicted differences in blood-lead and IQ distributions for the final standards.

Chapter 7 presents the estimated costs and benefits.  Aggregate costs and benefits are shown for different standards for dust and then for soil, holding constant the standards for the other media. The benefits estimated using the two blood-lead models are compared and reasons for their differences discussed.  Then net benefits are calculated for both blood-lead models, and these results are used to identify the standards with maximum net benefits.

Chapter 8 discusses the uncertainties of the analysis and estimates the sensitivity of the results to specific assumptions and input values. These include the discount rate, dollar values for lost IQ points, assumptions about hazardous wastes costs, assumptions about the timing of interventions, the valuation of fractional changes in IQ points, and other topics.

Finally, Chapter 9 presents findings relevant to specific rule-making requirements, including small business impacts, unfunded mandates, paperwork burdens, environmental justice, and protection of children.

# 2.    Regulatory Background

## 2.1    Lead as a Public Health Problem

Exposure to lead is one of the more serious public health problems currently facing the United States (USDHHS, 1988).  Lead's advantageous properties, including its malleability, resistance to corrosion, good insulation, and low cost, have made lead attractive for many applications; lead has been used in gasoline, ceramics, paint, and many other products.  These uses have resulted in lead's release to and distribution through all environmental media, which has complicated efforts aimed at reducing lead in the environment (USDHHS, 1988).  Much of the lead in the environment is accessible to humans through a variety of exposure pathways, and because it does not degrade, continued use of lead results in accumulation in the environment.  Human exposure to lead is of concern because lead interferes with the normal functioning of cells, causing a range of toxic effects in the nervous, red blood cell, and kidney systems (USDHHS, 1988).  Fetuses and young children exposed to lead are especially at risk from damages to the developing brain and nervous system (CDC, 1991a).

Knowledge of some of lead's negative health effects dates back hundreds of years.  In the United States, reproductive and developmental effects of lead were recognized in the 18th and 19th centuries in females working in the lead industry and wives of lead workers.  These women demonstrated health problems, including sterility, spontaneous abortion, stillbirth, and premature delivery, and their offspring exhibited high mortality, low birth weight, convulsions and other effects.  The  recognition of some of the health effects of lead resulted in better industrial hygiene, which in turn reduced reproductive problems (USDHHS, 1988).

The prevalence of direct lead poisoning in children was first examined in Australia in the 1890s and traced to exterior lead-based paint (USDHHS, 1988).  In the U.S., physicians eventually defined lead poisoning in children as a clinical entity in the early 20th century after a study reported that lead caused acute encephalopathy in a number of children.  In the 1930s and 1940s, epidemiologic data on childhood lead poisoning began to expand, and the accrual of such data accelerated through the 1960s.  Rudimentary screening of children in the 1950s and 1960s clearly showed that they were being exposed to excessive amounts of lead.  Prevalence of lead poisoning was especially high among inner city youth.  Increased screening in the 1970s resulted in the recognition of lead poisoning as a widespread public health problem (USDHHS, 1988).

Lead exposure's prominence as a public health concern is due to the magnitude of population blood lead levels.  The average blood lead levels in the U.S. population are estimated to have dropped in the last two decades (USEPA 1989, 1991).  However, the current geometric mean blood lead level in children is 3.1 µg/dL (USEPA, 1997), which is still about six times higher than the pre-industrial average of 0.5 µg/dL (USDHHS, 1998).

The recognition of lead's adverse health effects has resulted in a lowering of the blood lead level that triggers medical intervention.  In 1970, the U.S. Public Health Service published guidelines that set the level at 60 µg/dL (CDC, 1991b).  Shortly thereafter, the CDC set the guidelines at 40 µg/dL, then revised the recommendations to 20 µg/dL, and finally set them at the current level of 10 to 14 µg/dL in 1991.

Levels higher than this range should trigger various remedial actions; a child with a blood lead level between 15 to 19 µg/dL should have nutritional and education interventions; a blood lead level greater than 20 µg/dL should prompt medical evaluations and environmental investigations (CDC, 1991b).

The following two sections focus on existing regulations designed to decrease exposure to lead.  Section 2.2 discusses regulations pertaining to lead products, releases of lead in the environment and the workplace, and the concentration of lead in drinking water.  Section 2.3 focuses on efforts at the federal, state and local levels to decrease exposure to lead remaining in residential areas (including lead in paint, dust, and soil).  Section 2.4 describes a variety of non-regulatory initiatives that have been undertaken by governmental agencies.

## 2.2    Regulation of Lead Products, Environmental and Workplace Releases of Lead, and Lead in Drinking Water

The presence of lead in some consumer products has been prohibited or restricted by regulations.  Environmental releases of lead to air and water, and lead concentrations in waste, also have been controlled.  OSHA has set limits on allowable workplace concentrations of lead.  In addition, regulatory efforts have been made to remediate exposure to lead through drinking water systems.

### 2.2.1    Lead in Paint

In the 1950s, the paint industry voluntarily restricted sales of paint with lead content greater than one percent (Mushak and Crocetti, 1990).  Subsequently, the Lead-Based Paint Poisoning Prevention Act, enacted in 1971, prohibited the use of paint with greater than one percent lead (by weight of nonvolatile solids) in certain federally-owned or federally-assisted housing (HUD, 1990).  As a result of 1976 amendments to this Act, lead paint was redefined as paint containing more than 0.06 percent lead by weight (HUD, 1990).  In 1978, the U.S. Consumer Product Safety Commission banned both the sale of lead paint to consumers and the use of lead paint in residences or on other consumer-accessible surfaces (16 CFR 1303).

### 2.2.2    Lead in Gasoline

The concentration of lead in leaded gasoline decreased significantly in the 1970s and the first half of the 1980s.  In addition, the use of leaded gasoline decreased significantly.  The Clean Air Act of 1970 (CAA) first indirectly controlled the use of lead in gasoline.  Catalytic converters were necessary for automobiles to achieve air standards, but lead rendered catalytic converters on automobiles inoperative.  Therefore, beginning in 1974, "unleaded" gasoline was introduced as a fuel for automobiles equipped with catalytic converters.  This "unleaded" gasoline contained no more than 10 percent of the lead concentration found in leaded gasoline.  The concentration of lead in leaded gasoline for use in vehicles and equipment without catalytic converters went from unlimited, to 2 g/gal in 1978, to 1.1 g/gal in 1983, to 0.5 g/gal in 1985, to 0.1 g/gal in 1986.  In 1986, the U.S. acted to phase out the use of lead in gasoline entirely (51 FR 24606).

### 2.2.3    Other Products Containing Lead

The U.S. canning industry began voluntarily phasing out the use of lead solder in food cans in the 1970s because alternative, affordable processes for sealing the seams of tin containers became available (OECD, 1993).  U.S. industry and the U.S. Food and Drug Administration have also undertaken efforts to control

lead exposure from ceramic ware (USDHHS, 1991), foil on wine bottles, and crystalware (USDHHS, 1992).

### 2.2.4    Environmental and Workplace Releases of Lead

Under authority of the Clean Air Act, EPA has established standards of performance designed to limit emissions of air pollutants from lead smelting and processing facilities.  In addition, lead emissions from these and other industries are controlled via facility-specific permits written by states.  These permits are designed to reduce emissions to the extent needed to meet EPA's national ambient air quality standard for lead of 1.5 $\mu g/m^3$ (quarterly average), established in 1978 (43 FR 46246).

Under the Clean Water Act, federal effluent guidelines and pretreatment limits for lead-containing effluents have been established for over 20 industries.  These limits help achieve state-promulgated surface water quality standards (which may be based on water quality criteria published by EPA).  The effluent limits are implemented by states through facility-specific permits and, depending on state water quality standards, may be more stringent than federal effluent requirements.

Releases of lead as solid waste are regulated under the Resource Conservation and Recovery Act (RCRA).  A waste is defined as hazardous if, when tested, the leachate from the waste contains more than 5 ppm lead (40 CFR 261.24).  In addition, certain lead-containing wastes are separately listed as hazardous wastes.  All of these wastes must be properly managed and disposed of (40 CFR 260-270).

EPA also initiated a voluntary program to reduce lead emissions, based on the Toxics Release Inventory reporting. This project, called the "33/50 Program", encouraged industry to curtail emissions of 17 high-use toxic chemicals, including lead, which are reportable to the Toxics Release Inventory.  The program sought commitments from companies to voluntarily reduce releases and transfers of the 17 pollutants and publicly recognized companies and facilities achieving their goals.  The program's reduction goals were broken into two phases -- 33 percent reduction by 1992 and 50 percent by 1995 -- using 1988 as the baseline year.  A total of 1300 companies agreed to participate in this program, which ended in mid-September, 1996.  Several other similar voluntary toxic emissions reduction programs have been initiated by EPA (Environmental Science &Technology, 1996).

Efforts to reduce exposure to lead in the workplace have included setting permissible workplace air concentrations of lead.  The current Permissible Exposure Limit (PEL) is 50 $\mu g/m^3$ for most industries except the construction industry (OECD, 1993).  Under the Residential Lead-based Paint Hazard Reduction Act, passed in October 1992, OSHA is required to issue interim regulations lowering the limit for the construction industry (AECLP, 1993).  On May 4, 1994, OSHA issued an Interim Final Rule, Lead Exposures in Construction, setting the PEL to an 8-hour time weighted average of 50 $\mu g/m^3$.  The interim rule also includes a list of three categories of tasks that are commonly known to produce exposures above the PEL.  Performance of these tasks automatically triggers basic protective provisions (USEPA, 1994).

### 2.2.5    Lead in Drinking Water

Exposure to lead in drinking water has continued because of past use of lead in plumbing.  EPA has acted to reduce these exposures through comprehensive measures (Mushak and Crocetti, 1990).  In rules promulgated in 1991, EPA outlined new treatment requirements for drinking water systems (56 FR 26460).  The regulation requires tap water sampling from high risk homes (e.g., homes with lead service lines or

lead soldering installed since 1982). If at least 10 percent of home tap samples exceed 15 µg/l (the "action level"), corrosion control treatment and public education is required. Replacement of lead service lines is required if corrosion control fails to bring water lead levels below the "action level." EPA has also issued a maximum contaminant level goal of zero for lead in drinking water.

### 2.2.6    Resultant Reduction in Blood Lead Levels

As a result of these regulations, and other efforts, lead exposure and blood lead levels have decreased significantly. The most recent national study (NHANES III Part 2) measured the mean of children's blood lead levels to be 3.14 µg/dL. Thus, average blood lead concentrations have dropped over the last two decades from about 15-20 µg/dL (USEPA, 1991) to approximately 3 µg/dL. In particular, reductions of lead in gasoline have contributed dramatically to reductions in blood lead levels. Several studies have specifically examined the relationship between blood lead and the lead content of gasoline, and have found a strong positive correlation (Schwartz and Pitcher, 1989; Rabinowitz and Needleman, 1983). Annest et al. (1983) noted a 37 percent drop in blood lead levels from 1976 to 1980 correlated with a reduction in gasoline lead. Schwartz and Pitcher (1989) estimated that as much as 50 percent of blood lead in the U.S. in the late 1970s may have been attributable to lead in gasoline.

Reductions in dietary lead have also contributed to declining exposures. Dietary lead intake for a two-year-old child dropped from about 53 µg/day in 1978 to an estimated 13.1 µg/day in 1985; comparable declines have been seen in adults (USEPA, 1989). These trends are attributable to the reduction in gasoline lead emissions (and resulting reductions in deposition of lead from air to soil) and the voluntary phaseout of lead-soldered cans by U.S. manufacturers since the 1970s. It can be calculated that these changes in lead exposure from food have led to reductions of 1 to 2.5 µg/dL in average blood lead levels (USEPA, 1989).

## 2.3    Regulatory Efforts to Reduce Lead-Based Paint, Dust and Soil in Residential Areas

One of the largest remaining lead exposure sources for children is existing reservoirs of lead-based paint, dust and soil present in many residential areas (USDHHS, 1988). In an effort to reduce exposure to residential lead hazards, regulatory efforts to address these hazards have been increasing for several years.

### 2.3.1    Current Estimates of Exposure

Although paint containing lead was banned for use in residences in 1978, exposure to existing lead-based paint has continued due to prior use in residential and other buildings. In addition, leaded house paint can contribute to lead in interior dust and soil. There also remains a significant soil burden of lead from leaded gasoline and lead smelter emissions.

Several studies have demonstrated positive correlations between blood lead levels and lead in paint, soil and dust (Charney et al., 1980, Charney et al., 1983, and Bellinger et al., 1986 as cited in HUD, 1990; Clark et al., 1991). Blood lead levels are especially high in children. In a 1988 Report to Congress on the extent of lead poisoning in children, USDHHS stated that the existing leaded paint in U.S. housing and public buildings is "an untouched and enormously serious problem" (USDHHS, 1988). The Centers for Disease Control conveys the seriousness of home lead exposure as a contributor to elevated childhood blood lead by stating that lead poisoning exists in our society primarily because of exposure in the home (CDC, 1991a). Infants and toddlers are especially susceptible to lead in the home because they may ingest lead paint chips,

dust and soil and because of the way they metabolize lead. Older children, up to at least eight years old, are also at increased risk (USDHHS, 1988).

Exposure continues mainly from paint in older homes, since houses built after 1978 are presumed to be free of lead paint. Based on a 1987 HUD survey of 284 homes built before 1980, an estimated 64 million (83%) of all pre-1980 private homes have lead-based paint (defined as a measured lead concentration on any painted surface of 1.0 mg/cm$^2$ or greater) somewhere in the building (USEPA, 1995). Of these units, an estimated 12 million units have families with children younger than seven years old. Seventeen percent of pre-1980 housing have dust lead levels in excess of federal guidelines (listed below). Twenty-one percent of all pre-1980 homes have excessive soil lead levels (USEPA, 1995). Although a large majority of pre-1980 homes have lead-based paint, most have relatively small areas of it. Older homes have the most lead-based paint. Pre-1940 homes have about three times as much lead-based paint as units built between 1960 and 1979.

A significant number of public housing units also contain lead paint. Eighty-six percent of all pre-1980 public housing family units have lead-based paint somewhere in the building (USEPA, 1995). Families of any socioeconomic class may live in older housing, and thus be exposed to lead paint (USDHHS, 1988). However, families with the lowest incomes are disproportionately found in older housing (USDHHS, 1988).

### 2.3.2    Federal Regulatory Activities to Decrease Exposure to Lead-Based Paint in Existing Housing
Federal regulatory efforts and guidelines to limit exposure to lead-based paint in the existing housing stock have evolved over the past twenty years. The following two sections chronicle these activities in detail.

### The Lead-Based Paint Poisoning Prevention Act and Amendments
The Lead-Based Paint Poisoning Prevention Act of 1971 (LBPPPA) and subsequent amendments (1973, 1976, 1987, and 1988) have resulted in a number of federal regulatory activities to reduce exposures and risks from lead paint in housing. In addition to setting limits on the use of lead paint as described above, the Act established grants for lead-poisoning screening and treatment, and required a report to Congress on methods of abatement (HUD, 1990).

**Abatement of Lead-Based Paint Hazards in Federally-Associated, Public and Indian Housing**. The 1973 amendments required HUD to eliminate, as much as was practical, hazards of lead-based paint poisoning in pre-1950 housing covered by housing subsidies and applications for mortgage insurance and in all pre-1950 federally owned housing prior to sale. HUD acted by issuing regulations to warn tenants and purchasers of HUD-associated housing of the "immediate hazard" of lead-based paint (defined as conditions associated with deteriorating lead paint surfaces). A 1983 court action resulted in broadening the definition of "immediate hazard" to include intact paint; this definition was subsequently signed into law in 1987. In regulations issued by HUD in 1986 and 1987, the construction cutoff date was changed from 1950 to 1973 in most cases. HUD again changed the cutoff date in response to 1987 amendments to the LBPPPA; the new date became 1978 for all programs (HUD, 1990). The 1988 Amendments to the LBPPPA specified the level which defines a lead paint surface as 0.5% by weight or 1.0 mg/cm$^2$ (AECLP, 1993). HUD has also promulgated rules to eliminate lead paint hazards in public and Indian housing (Mushak and Crocetti, 1990). Where children younger than seven years old are present in these types of units, inspections for defective paint surfaces are required. If a child has an elevated blood lead level, then

the house must be inspected for chewable and defective surfaces, and abatement is required in dwellings, common areas, or public child care facilities within the public housing.

**Grants.**  The LBPPPA authorized funding for States and cities to conduct extensive screening programs to identify lead-poisoned children, refer them for medical treatment, investigate their houses for lead, and require abatement (HUD, 1990).

**Research and Reports to Congress.**  The 1971 LBPPPA required a report to Congress on the "nature and extent of the problem of lead-based paint poisoning" and methods of removal.  The 1987 amendments required an extensive research and demonstration project on lead-paint testing and abatement technologies in HUD-owned housing, as well as additional reports to Congress (HUD, 1990).  In response to another mandate of the 1987 amendments, HUD conducted a survey of the distribution of lead-based paint in the nation's housing stock and submitted a report on the results for privately-owned housing to Congress in a comprehensive plan for abating paint in private housing.  Additional amendments in 1988 required a demonstration of abatement techniques in public housing as well as a comprehensive plan to address abatement in public housing (HUD, 1990).

### *The Residential Lead-Based Paint Hazard Reduction Act*

The most recent statutory activity related to the reduction of lead paint hazards is the enactment of the Residential Lead-Based Paint Hazard Reduction Act in October of 1992.  Also known as Title X of the Housing and Community Development Act of 1992, this Act amends sections of the LBPPPA and adds a new section (Title IV) to the Toxic Substances Control Act (TSCA), in addition to other important new provisions.  Described as "the most comprehensive and significant lead poisoning prevention legislation in more than two decades" (AECLP, 1993), the Act aims to provide attainable goals for reducing lead hazards in residential settings by targeting specific housing in the greatest need of abatement (AECLP, 1993).

**Federally-owned and assisted housing.**  Title X allows for more targeted lead hazard evaluation and reduction activities in federally-owned and assisted housing (AECLP, 1993).  Whereas provisions under the 1987 amendments to LBPPPA indicated that any and all houses built before 1978 that contain lead-based paint constitute hazards that may be acted upon, Title X provides a more strategic approach to reducing the hazards from lead-based paint.  This approach involves requirements for risk assessments, inspections, and interim controls for pre-1978 housing (targeted housing) and also requires deadlines for action.  Title X also extends federal lead-based paint requirements to all housing that receives more than $5,000 in project-based assistance under any federal housing or community development program (in addition to the federally assisted and insured houses covered under previous Acts) (Section 1012); inclusion of these houses significantly expands the universe of federally-insured and assisted housing subject to lead-based paint related requirements (AECLP, 1993).

Additional provisions apply to federally-owned housing being sold (AECLP, 1993).  Properties built prior to 1978 must be inspected and their condition disclosed to the prospective buyer.  Units built before 1960 that have lead-based paint (defined as priority housing) must be abated (Section 1013).

**Private housing.**  Private housing has received greater focus under Title X than under LBPPPA. Although states, local governments or common law still determine whether landlords provide safe housing, Title X includes several features to encourage evaluation and reduction of lead-based paint hazards in

private housing. One feature included formalizing into law a grant program run by the Department of Housing and Urban Development for reducing lead-based paint hazards in low-income privately owned housing. Under Section 1014, State and local governments are required to develop a Comprehensive Housing Affordability Strategy (CHAS) before receiving Federal housing or community development grants. The CHAS must include an accurate estimate of the number of housing units that contain lead based paint that are occupied by low-income families (HUD, 1997).

Other Title X provisions also affect targeted private housing (AECLP, 1993). These mandates include integration of lead hazard evaluation and reduction into local housing programs, and certain disclosure and warning requirements to be met at the time of sale or rental of any pre-1978 housing unit (Sections 1014 and 1018. Under Section 1018, a rule has been passed that requires purchasers or lessees to receive an EPA pamphlet on hazards of lead in the home, and purchasers are allowed a 10 day period for inspection for lead-based paint hazards. The Act also requires establishment of a national task force on lead-based paint hazard reduction and financing; this group is to be made up of an array of groups involved in housing, real estate, insurance, lending, abatement, and other groups (Section 1015). This Task Force has published a report called *Putting the Pieces Together: Controlling Lead Hazards in the Nation's Housing*, which recommends methods for controlling lead hazards in housing.

**Safety of residents and workers.** This law requires promulgation of a number of regulations addressing the safety of workers undertaking interventions and the safety of families who live or will live in treated housing. Section 1021 amends TSCA by adding a new Title IV, which primarily addresses EPA requirements for contractor training and certification. The economic analysis presented in this document supports the development of the regulation that responds to TSCA §403 (in §1021); this regulation requires EPA to define a "lead-based paint hazard" and dangerous levels of lead in dust and soil.

EPA also must set standards of minimum performance for lead-based paint activities and ensure that individuals engaged in activities are trained, that training programs are accredited, and that contractors are certified (TSCA §402). On August 29, 1996, EPA promulgated final regulations under §402 of TSCA to apply to target housing and child-occupied facilities. The Agency is also developing additional §402 regulations, which will apply to training, certification and work practice standards for public buildings constructed before 1978, commercial buildings, and steel structures such as bridges and water tanks. These rules are under development and the promulgated regulations will deal with activities that are intended to abate, delead or remove lead-based paint. In addition, the Agency is developing §402 regulations to apply to renovation and remodeling projects. While renovation and remodeling projects are not specifically intended to remove lead-based paint hazards, they may create a risk of exposure to dangerous levels of lead.

HUD and EPA are to assist in funding state certification and training programs and issue standards for a model state program (TSCA §404). As of February 1997, $36.2 million dollars in grant money had been awarded to 46 States, the District of Columbia, and 27 Native American tribes for the purpose of certification and training programs (HUD, 1997). In addition, at the same time that rules were passed under Section 402, the Agency published final rules under TSCA §404 "that will allow States and Indian Tribes to seek authorization to administer and enforce the regulations developed under section 402."

OSHA published interim final regulations requiring that contractors protect their workers from excessive exposure to blood lead in May 1993.  In addition, the regulations require employers to determine lead exposure levels so that appropriate protective measures can be taken (HUD, 1997).

EPA must assure that a program is in place to certify environmental sampling laboratories and must provide for development of products and devices for testing and abatement (TSCA §405).  Organizations that have authority to accredit laboratories as well as a list of accredited laboratories have been established (NCSL, 1996b).  On the product side, EPA and HUD evaluated 13 different protocols for testing lead based encapsulants.  This research led to the establishment by the American Society for Testing Materials (ASTM) of two standard specifications for testing lead encapsulant products. (HUD, 1997).

**Education regarding lead paint hazards.**  Title X also mandates a variety of public educational efforts.  A hotline designed to inform the public about lead hazards was set up soon after passage of the 1992 Act.  The National Clearinghouse on Childhood Lead Poisoning was then established in April, 1993.  The Consumer Product Safety Commission, in coordination with EPA, published 'Reducing Lead Hazards When Remodeling Your Home" which has been distributed widely including placement in hardware stores such as Home Depot that sell paint removal products (HUD, 1997).  Under TSCA Section 406, regulations are currently being developed which require renovators and remodelers to inform residents of the hazards of renovation (NCSL, 1996b).  HUD published the "Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing" in August 1995 in fulfillment of Section 1017 of Title X.  This document is a comprehensive guide on how to identify and reduce lead-based paint hazards (HUD, 1997).

**Research and development.**  A variety of research is also required under Title X.  EPA is required to conduct a study on the hazard potential of renovation and remodeling (Section 1021:  TSCA 402).

Section 405(a) mandates EPA and other appropriate agencies to develop a program to promote safe, effective and affordable monitoring and abatement measures.  A wide variety of analyses and field studies have been done to support Section 405(a) (HUD, 1997).  Under Section 405(b) EPA has also developed studies to establish minimum performance standards for laboratory analysis of lead in paint films, soil and dust.

Section 405(c) requires the Centers For Disease Control and Prevention (CDC) to identify sources of lead exposure for children.  The CDC has numerous ongoing studies to evaluate the sources of lead exposure.  One such study is the NHANES III project which collected data regarding health indicators and environmental exposure on 30,000 persons over a six year period (HUD, 1997). Section 405(c)(2) mandates the National Institute for Occupation Health and Safety (NIOSH) develop studies on methods of reducing occupation lead exposure.

A comprehensive listing of all EPA, CDC, and NIOSH studies completed as of February 1997 can be found in "Moving Toward a Lead-Safe America" (HUD, 1997).

### 2.3.3    *Federal Guidelines and Other Activities Related to Lead in Soil and Dust Guidelines for Levels of Lead in Soil and Dust*

As mentioned above, under §403 EPA is required to determine dangerous levels of lead in dust and soil under Title X.  While developing these definitions,  interim guidelines specifying levels down to which lead-

based paint should be abated have been recommended by EPA. These levels are 100 µg/ft$^2$ for uncarpeted floors, 500 µg/ft$^2$ for window sills and 800 µg/ft$^2$ for window wells (Goldman, 1994). A level of 400 ppm has been set as the hazard level for soils; lead abated to this level is expected to result in no more than a 5% probability of a child having a blood lead level exceeding 10 µg/dL (Goldman, 1994).

### Other Activities

Under authority of Title III of the 1986 Superfund amendments, EPA has funded projects in Boston, Baltimore, and Cincinnati to test the health effects of abating soil with high lead content in residential areas. This research has been considered in developing the final guidance on soil clearance levels.

### 2.3.4    State and Local Programs to Reduce Exposure to Lead-Based Paint, Dust and Soil

Activity to address lead-based paint hazards has recently increased at the state and local levels. The following discussion is broken into two sections. The first examines the lead poisoning prevention activities undertaken by states and the key issues they address. The second discusses distinguishing features of local programs, and then takes a closer look at what has been done in San Francisco, California.

### State Activities

Forty-one states and the District of Columbia have laws pertaining to lead poisoning prevention activities (NCSL, 1999a). State policies tend to focus on several issues: establishing standards, blood-lead testing for children, training and/or certification requirements for inspectors, assessors, and/or R&R workers, and penalties.

The two states with the most extensive programs are California and Massachusetts. About 56 percent of states with lead poisoning prevention policies have programs and standards that are either partially or entirely linked to federal standards. The remaining 39 percent of states with programs have standards that are not explicitly linked to federal standards (NCSL, 1999a; Lexis-Nexis, 2000).

About 70 percent of all lead poisoning prevention policies address blood-lead levels of children. A majority of these states, 62 percent, provide funding for blood-lead testing for children (generally under the age of six). The remaining states require that doctors and/or schools report any cases of elevated blood-lead levels to the proper authorities as established by the legislation (NCSL, 1999a; Lexis-Nexis, 2000).

Roughly 74 percent of states with lead poisoning prevention policies have enacted, and are implementing, training and/or certification requirements for inspectors, assessors and/or R&R workers. (This includes Kansas, which is the only state with training and/or certification requirements that does not have lead poisoning prevention laws). Many of these requirements are in response to EPA §402/404 regulations, which define the elements of a model state program for lead inspection, risk assessment and abatement professionals. States have implemented policies with requirements ranging from approving training providers to comprehensive accreditation programs (NCSL, 1999b).

About 54 percent of states with lead poisoning prevention laws explicitly address penalties for those who violate the law. Penalties are an important factor in determining the effectiveness of a state's policy. Penalties can force actions which might not otherwise occur, especially among landlords (NCSL, 1999a; Lexis-Nexis, 2000).

*Local Programs*

Many local lead-poisoning programs have had limited resources with which to carry out their programs (HUD, 1990).  Differences between typical state schemes and selected city programs lie more in the extent than in the substance of the activities (HUD, 1990).  In general, city programs are more focused and seem to receive higher priority, which may be due to the urgency of the lead-paint problem in larger cities.

In the *Comprehensive and Workable Plan for the Abatement of Lead-Based Paint in Privately Owned Housing* (HUD, 1990), the Department of Housing and Urban Development outlined several distinguishing features of local programs as determined by investigation of ten selected cities:

- A city that is governed both by local ordinances and state regulations for lead-poisoning prevention and detection activities usually has local laws that are more stringent than state laws and may supersede the state requirements.

- In addition to providing intervention after cases of lead poisoning have been detected, local programs may require intervention as a result of targeted inspection or tenant complaints. Several cities, including Baltimore, Chicago, Louisville, New York, and Philadelphia, are authorized to take such preventive measures.

- In general, the city programs show more cooperation and coordination between agencies.

- City programs usually screen for high blood lead levels more systematically and target high-risk areas for screening.

In the City and County of San Francisco, Article 26 (Comprehensive Lead Poisoning Investigation, Management and Enforcement Programs) was passed in 1998.  Inspections of exterior R&R projects are conducted when either a citizen files a complaint, or the City calls for an inspection of a site.  Once a complaint is filed, the Department of Building Inspection (DBI) is responsible for inspecting the premise. Complaints filed by citizens led to the majority of lead inspections conducted in San Francisco in 1998 and 1999.  In 1998, 284 complaints were filed with 202 resulting in violations.  In 1999, 405 complaints were filed with 280 resulting in violations (DBI, 2000).  A small percentage of the total complaints filed each year were for interior violations (Kimbell, 2000).  Because Article 26 does not address interior lead-paint, no inspections were conducted in these cases.

Through blood-lead level screening programs, San Francisco's Department of Public Health is made aware of interior lead-based paint problems.  Under Article 26, children younger than the age of six are recommended to have their blood-lead level checked annually.  However, doctors and families are under no obligations to abide by this recommendation.  If a child has a blood-lead test and he or she tests greater than 20µg/dL, or has two tests of 15-20µg/dL within about a 3-month period, then the landlord or homeowner has 30 days to remediate the main lead poisoning hazard, as determined by a lead inspector.

The Department of Public Health is the primary administering and enforcing agency under Article 26. Any person who fails to comply with an order from the Director is civilly liable to the City for a penalty not to exceed $500 per day, and each day the violation continues constitutes a separate violation.  Any person who fails to comply with an order from the Director is also guilty of a misdemeanor.  Each day a violation

continues is considered a separate violation punishable by a fine not to exceed $1,000 and/or imprisonment not to exceed six months in the County jail.  In 1998, the first year Article 26 was in place, the City did not fine a majority of the violators.  Instead, the City in conjunction with the Citizens Advisory Committee decided to give violators the option of completing a comprehensive lead training course.  The goal was to educate contractors of the health hazards associated with lead paint removal.  In 1999, this option was no longer available, and violators were fined accordingly (Harrington, 1999).  As of January 2000 the number of fines had not yet been totaled.

The City is not only concerned with enforcement; incentive programs are also included in Article 26.  The Mayor's Office was to develop programs for grants, loan guarantees and no or low-interest loans for owners of property contaminated with lead by the end of 1999.

## 2.4 Non-Regulatory Initiatives to Reduce Lead-Based Paint, Dust and Soil Exposure

In addition to programs, policies and rules developed in response to Congressional mandates, several governmental agencies have undertaken programs to reduce lead exposure that go beyond the Title X and TSCA requirements.

### 2.4.1. Joint  Initiatives
The EPA has developed two initiatives in conjunction with several other federal, state and local agencies to reduce lead exposure in high-risk, low-income communities.  The Environmental Justice Initiative was constructed to: (a) demonstrate that an effectively designed program can reduce poor children's blood lead levels, (b) demonstrate the benefits of public, private and community organization cooperation in the fight against lead poisoning, (c) conduct lead screenings, hazard reduction and education efforts, (d) document the projects' successes and shortcomings and (e) foster self-sufficiency through job creation and empowerment.  To these ends the EPA formed an inter-agency work group which has committed $3.7 million for pilot programs to test community-based approaches to lead poisoning reduction (HUD, 1997).

The EPA has also designed the Whole House Initiative to establish and evaluate programs which reduce multimedia exposure to lead hazard in the home.  Again the EPA helped establish an inter-agency task force whose primary activities were developing a multimedia Geographic Information System (GIS) database  and creating a multimedia environmental training procedures (HUD, 1997).

### 2.4.2 Blood Screening Programs
The CDC State and Community-Based Childhood Lead Poisoning Prevention Program provides grant monies to state and local agencies for the formulation and execution of blood lead testing programs.  These programs not only screen young children for lead poisoning but also identify potential sources of lead, monitor the medical and environmental management of children who have been diagnosed with elevated blood lead, and provide information to the public on methods to reduce lead hazards (HUD, 1997).

In addition, the CDC is working with the State of Massachusetts to develop a model blood-lead database.  The database provides information on the health, housing, medical and environmental management of children diagnosed as having elevated blood lead levels (HUD, 1997).

The Health Care Finance Administration of the U.S. Health and Human Services Department also supports the Early and Periodic Screening, Diagnostic and Treatment (EPSDT) Program.  The EPSDT provides comprehensive and preventative health care benefits to lower income children through the State Medicare programs.  All Medicaid-eligible children between the ages of six months and 72 months are required to have their blood lead tested under this program.

## 2.5    Benefits of Increasing Lead Awareness and Lead Poisoning Prevention Programs

Although several states and localities have taken action on lead-based paint, many have no standards for paint, dust, or soil abatement.  In addition, among the states and local areas that do have standards, the levels of paint, dust, and soil considered unacceptable differ.  By providing definitions at the federal level for lead paint hazards and dangerous levels of lead in dust and soil, those states that do not have standards may be prompted to adopt standards more quickly.  In addition, the federal guidelines will provide consistency between the states.

In addition to federal regulation on lead hazards, there is clearly room for non-regulatory initiatives to reduce exposure to lead in paint, soil and dust.  The early evidence from non-regulatory measures to reduce lead hazards indicates that community-based, joint government-private programs can help fill the gaps left by statutory regulation alone.

# References

Alliance to End Childhood Lead Poisoning (AECLP).  1993.  Understanding Title X:  A Practical Guide to the Residential Lead-based Paint Hazard Reduction Act of 1992. AECLP, Washington, DC. January.

Annest, J., J. Pirkel, D. Makuc, J. Neese, D. Bayes, and M. Kovar.  1983.  Chronological Trend in Blood Lead Levels Between 1976 and 1980.  New England Journal of Medicine, 308:1373-1377.

Centers for Disease Control (CDC).  1991a.  U.S. Department of Health and Human Services, Public Health Service.  Strategic Plan for the Elimination of Childhood Lead Poisoning.  February.

Centers for Disease Control (CDC).  1991b.  Preventing Lead Poisoning in Young Children.  U.S. Department of Health and Human Services, Public Health Service.  Atlanta, GA.  October.

Clark, S., R. Bornschein, P. Succop, S. Roda, and B. Peace.  1991.  Urban Lead Exposures of Children in Cincinnati, Ohio.  Chemical Speciation and Bioavailability, 3(3):163-171.

Department of Building Inspection (DBI), City & County of San Francisco.  2000.  Work Practices for Exterior Lead-Based Paint, SFBC 3407.

Environmental Science and Technology.  1996.  33/50 Program Ends, EPA Declares Success. 30(11):482A-483A.

Florini, K.L., G.D. Krumbhaar, and E.K. Silbergeld.  1990.  Legacy of Lead:  America's Continuing Epidemic of Childhood Lead Poisoning.  Environmental Defense Fund, Washington, DC.  March.

Goldman, Lynn.  1994.  USEPA, Office of Prevention, Pesticides and Toxic Substances. Memorandum on Agency Guidance on Residential Lead-Based Paint, Lead-Contaminated Dust, and Lead-Contaminated Soil.  July 14.

Harrington, David.  1999.  Personal communication between David Harrington, M.P.H., Department of Health Services, Occupational Health Branch, and Dan Rosenfeld of Abt Associates Inc. December.

Kimbell, Louise.  2000.  Personal communication between Louise Kimbell, Department of Building Inspection, City & County of San Francisco, Health & Safety Division, and Dan Rosenfeld of Abt Associates Inc.  January.

Lexis-Nexis, 2000.  This is a private firm that specializes in providing credible, in-depth information for a variety of fields.  www.lexis-nexis.com

Mushak, P., and A. Crocetti. 1990.  Methods for reducing lead exposure in young children and other risk groups: an integrated summary of a report to the U.S. Congress on childhood lead poisoning. Environmental Health Perspectives, 89:125-135.

National Conference of State Legislatures (NCSL).  1999a.  State Lead Poisoning Prevention Statutes.  December 13.  Compiled by Doug Farquhar J.D., Cathy Atkins, J.D., and Carla Kohler J.D.

National Conference of State Legislatures (NCSL).  1999b.  State Training/Certification/ Accreditation Programs for Lead.  December 13.  Compiled by Doug Farquhar J.D., Cathy Atkins, J.D.

National Conference of State Legislatures (NCSL).  1996b.  Update on EPA Lead-Based Paint Activities.  Compiled by Doug Farquhar.

Organization for Economic Cooperation and Development (OECD).  1993.  Risk Reduction Monograph No. 1: Lead.  Background and National Experience with Reducing Risk.  Paris: Environment Directorate, OECD.  Document No. OCDE/GD(93)67.

Prenney, B.  1987.  The Massachusetts Lead Program: Moving Toward Phase 2.  Prevention Update.  Developed by the Maternal and Child Health Consortium Project and the National Coalition on Prevention of Mental Retardation.  April.

Rabinowitz, M. and H. Needleman.  1983.  Petrol Lead Sales and Umbilical Cord Blood Lead Levels in Boston, MA.  Lancet, 8314/5 (1):63.

Rhode Island Department of Health (RIDH).  1993.  R 23-24.6-PB:  Rules and Regulations for Lead Poisoning Prevention.

Schwartz, J. and H. Pitcher.  1989.  The Relationship Between Gasoline Lead and Blood Lead in the United States.  Journal of Official Statistics, 5:421-431.

U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry (USDHHS).  1988.  The Nature and Extent of Lead Poisoning in the United States:  A Report to Congress.  July.

U.S. Department of Health and Human Services, Public Health Service, Food and Drug Administration (FDA).  1991.  FDA Talk Paper: FDA Issues New Guidance on Lead in Ceramic Ware, November 11.

U.S. Department of Health and Human Services, Public Health Service, Food and Drug Administration (FDA).  1992.  Statement by Michael R. Taylor, Deputy Commissioner for Policy, Food and Drug Administration, Public Health Service, Department of Health and Human Services  Before the Ad Hoc Subcommittee on Consumer and Environmental Affairs, Committee on Government Affairs, U.S. Senate.  March 27.

U.S. Department of Housing and Urban Development (HUD). 1990.  Comprehensive and Workable Plan for the Abatement of Lead-Based Paint in Privately Owned Housing:  Report to Congress.  Washington, DC. December.

U.S. Department of Housing and Urban Development (HUD). 1997.  Moving Toward a Lead-Safe America: A Report to the Congress of the United States; Office of Lead Hazard Control. Washington, DC.  February.

U.S. Environmental Protection Agency (USEPA).  1989.  Review of the National Ambient Air Quality Standards for lead: Exposure Analysis Methodology and Validation.  Office of Air Quality Planning and Standards.  Research Triangle Park, N.C.  June.

U.S. Environmental Protection Agency (USEPA).  1991.  U.S. Environmental Protection Agency Strategy for Reducing Lead Exposures.  February 21.

U.S. Environmental Protection Agency (USEPA).  1994.  Lead; Requirements for Lead-based Paint Activities, Proposed Rule, *Federal Register,* Friday, September 2.

U.S. Environmental Protection Agency (USEPA).  1995.  Report on the National Survey of Lead-Based Paint in Housing.  Base Report.  USEPA, Office of Pollution Prevention and Toxics.  EPA 747-R95-003.  April.

U.S. Environmental Protection Agency (USEPA).  1997.  Risk Assessment for the Section 403 Rulemaking; USEPA, Chemical Management Division, Office of Pollution Prevention and U.S. EPA.  March 17.

# 3.    Problem Definition and Regulatory Options

This chapter begins by characterizing the lead contamination problem to be addressed under §403.  The various sources of exposure, along with related blood lead levels and health effects, are presented.  Section 3.2 discusses the sources of market failure, both on a theoretical basis and specifically how incomplete information has resulted in too few lead interventions taking place.  Section 3.3 also presents regulation as a reasonable solution for such a market failure, and discusses why regulation should take place at the federal level.  Alternative regulatory options are presented in Section 3.4.

## 3.1    Lead Contamination Problem

Despite recent reductions in air, water, and food contamination, important sources of lead exposure for children remain, largely due to the widespread presence of lead-based paint in home environments.  Exposure to lead results in elevated blood lead levels associated with a suite of health effects, most notably loss of IQ and other adverse cognitive effects.  Recent data suggest that the blood lead level in more than one in 200 children exceeds the threshold for lead poisoning as defined by the CDC, 20 µg/dL.

### 3.1.1    Exposure Sources

Although lead may cause adverse health effects in any individual, exposed at any stage of life (*in utero* through adulthood), the focus of §403 and this analysis is on children exposed from birth through the sixth birthday.  Young children are particularly susceptible to lead hazards because they are at a stage of rapid development of the central nervous system, and because their normal behavior is likely to result in greater exposure than older groups experience.

Currently the most significant high-dose source of lead exposure in children under school age is lead-based paint.  Through the 1940's, paint manufacturers used lead as a primary ingredient in many oil-based interior and exterior house paints.  During the 1950's and 1960's, the usage gradually decreased as new paints were developed, and in 1978 the Consumer Product Safety Commission (CPSC) ruled that paint used for residences, toys, furniture, and public areas must not contain more than 0.06% lead by weight.  Nevertheless, an estimated 64 million (or 83%) of privately-owned, occupied housing units and 86% of public housing units built prior to 1980 contain some components covered with lead-based paint (USEPA 1995).  Children's exposure to lead from lead-based paint is likely to be high when the paint is in a deteriorated state or is found on accessible, chewable, impact, or friction surfaces, making the lead paint available to children who ingest paint chips (USEPA 1986; CDC 1991).  This "pica" behavior appears to be rare, but likely causes most of the highest blood lead levels observed in children.

In addition to being a source of direct exposure, deteriorated lead-based paint or the improper removal of lead-based paint from a housing unit may contaminate soil and dust.  Children are exposed to lead from soil or dust in their homes as a result of typical hand-to-mouth activities.  Lead-contaminated dust and soil are thought to be the major pathway through which most young children are exposed to lead from lead-based paint hazards (USEPA 1986).

Young children are also exposed to a variety of other lead sources, which appear less important on a national scale.  Airborne lead is present in emissions from lead smelters, battery manufacturing plants, and solid waste incinerators.  The phase-out of leaded gasoline has contributed to the reduction of airborne lead

(CDC 1991).  Drinking water may become contaminated with lead after it leaves the treatment plant (CDC 1991).  Although lead levels in drinking water generally do not have a statistically significant effect on blood-lead concentrations as a result of the 1986 Safe Drinking Water Act, water is still considered an important localized exposure source where lead solder and/or brass plumbing fixtures are present, because of the high absorption rate of lead in water.  Lead exposure through food ingestion has declined greatly in importance due to the phase-out of lead-soldered food cans and public education (CDC 1991).  Despite these improvements in exposure from air, water, and food, however, many children still experience blood lead levels exceeding CDC health guidelines.

### 3.1.2   *National Blood Lead Levels and Health Effects*

Most studies of the health effects of lead use body-lead burden as a biomarker of lead exposure.  Measures of body-lead burden include lead in bones, teeth, and hair.  Each of these options, however, has a variety of disadvantages, including poor sensitivity and external surface contamination problems.  The most common measure used is blood-lead concentration.  Although blood lead level reflects a mixture of recent and past exposure, it has the advantage of being easily and inexpensively measured.

The widest recent survey of children's blood lead levels is the Third National Health and Nutrition Examination Survey (NHANES III), Phase 2.  It was conducted from 1991 to 1994 and included information from 987 children aged one to two years, the most appropriate age group for estimating the health effects studied in this analysis.  The national geometric mean and standard deviation blood lead levels for this group can be calculated as 3.14 $\mu$g/dL and 2.09 $\mu$g/dL, respectively (Battelle 1997).

Elevated blood lead levels are associated with an assortment of deleterious health effects, including IQ point loss, other cognitive effects, neurological disorders, anemia and impaired heme synthesis, and impaired hearing.

IQ point loss can be used to measure neurological loss that a child experiences due to any level of lead exposure.  Children's average IQ loss from lead exposure can be calculated from NHANES III data as described in the Risk Assessment.  Based on the one to two year olds surveyed, the national average decrement is 1.06 points (Battelle 1997).

The number of children with IQ less than 70 and the number of children with blood lead levels above 20 $\mu$g/dL can be used to measure cognitive effects seen mostly in children with high levels of lead exposure.  An IQ score of 70 is two standard deviations below the population mean; it is used as an indicator of mental retardation and as the cut-off for special education requirements.   Blood lead levels above 20 $\mu$g/dL are the level at which CDC recommends a complete medical evaluation, an environmental assessment, and necessary environmental remediation for the child and his/her environment.  Battelle (1997) has calculated the fraction of one to two-year olds falling within these categories, based on NHANES III data and certain assumptions.  The results are that 0.115 percent of children have IQ's under 70, and 0.588 percent have blood lead levels above 20 $\mu$g/dL.

### 3.2   Market Failure

From an economic perspective, one necessary condition for regulations is the existence of an inefficiency in the allocation of resources.  This inefficiency is commonly labeled a market failure since the market is the

mechanism assumed to make efficient resource allocations possible. A market failure can come from one or more of several sources. These include poorly defined property rights (such as negative externalities, common property resources, and public goods); imperfect markets for trading property rights (because of a lack of perfect information or of contingent markets; monopoly power; distortionary taxes and subsidies and other inappropriate government regulations); and the divergence of private and social discount rates.[1]

The occurrence of any of these conditions justifies further inquiry into the need for government regulation to reduce inefficiencies in the allocation of society's resources. This section considers whether any of these conditions are linked to excess exposures from lead contamination in residential soil, dust, and paint. If so, a better understanding of the nature of the inefficiencies involved may facilitate the design of effective regulations. The specific regulation considered here is the promulgation of hazard standards as mandated by §403.

The strongest case for the existence of a market failure can be built on the apparent lack of perfect information. Correct information is an important prerequisite to the demand for intervention and other forms of lead-based paint hazard controls.[2] The property owner making the intervention decision has to know the levels of lead in soil, dust, or paint; know what risks are implied by these levels; know the significances of these risks; and know what can be accomplished through various forms of intervention. Clearly, without knowing there is a lead problem, the owner will have too low a demand for intervention. Misinformation on the other attributes of the intervention decision can also distort the demand for intervention. Research into public views of risk indicate that misperceptions about latent risks, like those associated with lead contamination, are common. These misperceptions can be biased upward or downward, resulting respectively in excess and insufficient demand for intervention. Finally, reliable information on the relative and absolute effectiveness of different intervention alternatives could be a significant obstacle.

These relationships are illustrated in Exhibit 3.1, where the line labeled D represents the demand for intervention under the condition of complete and perfect information. With this information, consumers are able to accurately compare the value of intervention activities with their costs. In this case, the number of interventions performed would be Q. There are several circumstances, however,

---

[1]     This taxonomy was developed from (Axelrad, 1993), and (Boadway, 1979).

[2]     Throughout this section, the term intervention is used to refer to the entire range of lead-based paint hazard control activities.

**Exhibit 3.1. The Demand for Abatements under Alternative Information Scenarios**



Where:

D =     Demand for Interventions where consumers have complete information.

$D_1$ =     Demand for Interventions where risks from lead are overestimated and/or effectiveness of interventions are overestimated and/or cost of substitutes is overestimated.

$D_2$ =     Demand for Interventions where risks from lead are underestimated and/or effectiveness of interventions are underestimated and/or cost of substitutes is underestimated.

that would increase the demand for interventions above this optimal amount. If consumers overestimate the amount of risk they and their families are currently subject to due to their housing conditions, and/or overestimate the effectiveness of interventions, and/or overestimate the costs of alternative solutions (such as moving), then the demand for interventions would exceed that under complete/perfect information, as represented by line $D_1$. This situation would result in too many interventions occurring, at too high a price. Likewise, if consumers underestimate the amount of risk they and their families are currently subject to due to their housing conditions, and/or underestimate the effectiveness of interventions, and/or underestimate the costs of alternative solutions (such as moving), then the demand for interventions would be less than that under complete/perfect information, as represented by line $D_2$. This would result in too few interventions occurring.

The market itself has not provided a means for correcting this situation. Although businesses that offer testing or intervention services should find it in their vested interest to provide the kinds of information cited above, this possibility has not closed the information gaps for the public. One impediment may be public uncertainty about the reliability of the information that such businesses would provide. Their information may be unreliable because they are not fully competent to assess the lead contamination and what needs to be done, because the businesses are subject to moral hazard (which occurs, for example, when a firm tells a homeowner that there is a lead problem that warrants a certain intervention it can perform when the

intervention is not necessary or suitable), or both.  Since many property owners may lack easy access to independent sources of information to motivate their intervention decisions, doing nothing may be the likely response.

While lamentable, this lack of action is understandable given limits on the time and money that an owner can actually spend on obtaining information needed for many different decisions.  For example, even though homeowners, as parents, may be deeply concerned about the welfare of their children — a key target of exposure from lead contamination — there are a host of other issues besides lead that affect their children's welfare and for which parents need information to make important decisions.  These other information needs compete with the information needs of the lead intervention decision for scarce household resources.  Given how little intervention has been initiated by homeowners relative to the  prevalence of the problem, the likelihood that there is insufficient demand for intervention and that information gaps contribute to this circumstance appears to be high.  In conclusion, it appears that at least one condition associated with market failures holds and, consequently, that inefficiencies may characterize the market for lead testing and intervention.

Before a final determination can be made about the inefficiencies associated with the lack of information, the costs of spanning the information gaps must be considered.  One of the more important unknown variables in setting hazard standards under §403 is what constitutes an effective means of disseminating this information; what approaches to making information available will actually get owners to test, to consider the intervention alternatives, and to undertake intervention where appropriate.  Simply setting standards, without effective dissemination of the information, is likely to have little effect.

In attempting to answer the question of whether government regulation will make the market for reductions in lead-based paint hazards more efficient, it is helpful to consider the public good aspect of promulgating hazard standards.  To the extent that the public finds these hazard standards credible and takes steps to measure and reduce lead contamination, the standards are an independent benchmark for action, providing at least part of the information needed to make an appropriate intervention decision.  As such, hazard standards can qualify as a public intermediate good since they can be used simultaneously by many households in making their intervention decisions.[3]  Whether the hazard standards are a public good or not depends ultimately on whether the interventions induced by the standards result in benefits exceeding the costs.  If so, the hazard standards are a public good.  If not, they are a public bad.  The analysis in this report attempts to address this issue by discriminating among various forms and magnitudes of hazard standards based on the magnitudes of their net benefits.

Other potential causes of market failure are the result of the persistence of lead intervention in residences.  By undertaking intervention, the owner creates positive externalities for any occupants outside of his or her immediate family (such as renters if the owner is a landlord) and subsequent owners who are occupants of the home.  If these renters and subsequent owners are fully informed about the implications of lead contamination, the market may adequately compensate the original owner for undertaking lead intervention and no externalities impede the intervention decision.  If they are not fully informed, then the original owner will not be sufficiently compensated for services provided to the renters and subsequent owners.  Under these circumstances, too few interventions will be undertaken.  It is difficult to measure how large this

---

[3]        The term "public intermediate good" and its definition are adapted from Boadway, 1979.

problem is since it requires information on the stock of knowledge about lead problems held by tenants and purchasers today and in the future.[4]  Nevertheless, the development and wide dissemination of credible lead hazards will increase the likelihood that renters and subsequent owners will compensate the owners who undertook the interventions.

Compounding the problem of undercompensation is a divergence between social and private discount rates. Discount rates are particularly important, since this analysis anticipates that occupants as much as fifty years in the future could potentially benefit from the intervention of a given housing unit.  Even if each renter or subsequent owner is willing to pay the full market value of the externality provided by the original owner's lead intervention, it is likely that the private estimate of the present value of these future payments to the original owner will be smaller than the present value based on the social rate of discount. Consequently, by relying on private decisions, fewer interventions may be undertaken.  If credible lead hazard standards are widely disseminated, then the owner is likely to adopt these as his/her decision criteria, as opposed to spending the time and money to develop personal definitions of lead hazard standards.  By basing the §403 lead-hazard standards on the social discount rate, EPA will encourage a level of intervention consistent with maximizing net social benefits.

This review suggests that there is one or more market failures affecting decisions regarding the intervention of residential lead contamination.  The lack of perfect information is a primary culprit.  The ultimate determination of a market failure, however, depends on whether gains in efficiency can be accomplished by some form of regulation.  An allocation of resources is deemed inefficient if someone can be made better off without making someone else worse off.  That is a core question of this analysis.  The examination of risks from lead contamination does indicate a substantial potential for making individuals better off by reducing residential exposures from soil, dust, and paint.  The benefit-cost analysis presented in this report examines the questions of whether these actions would result in an increase in net benefits.  If the benefits of reducing lead exposures exceed costs, it is theoretically possible to increase efficiency without making anyone worse off.  The costs that have to be considered include the costs of getting the right people to decide to act, to choose the right intervention, and to perform and maintain the intervention in the specified manner as well as the direct costs of testing and intervention.

### 3.3    Need for Federal Regulation

In the Residential Lead-Based Hazard Reduction Act of 1992 ("the Act"), the United States Congress stated that the elimination of lead-based paint hazards was a national goal.  Congress found that the Federal Government must take a leadership role in building the required infrastructure, including an informed public, State and local delivery systems, certified inspectors, contractors, and laboratories, and trained workers (§1002(8)).  By identifying what constitutes a lead-based paint hazard (defined as paint, dust or soil conditions that would result in adverse human health effects), §403 creates a crucial link in the integrated federal regulatory approach necessary to adequately inform the public of the dangers of lead-based paint, and to implement other portions of the Act that require either mandatory action, or in some cases recommend voluntary action, if a lead-based paint hazard exists.

---

[4]    Gathering such information would require a survey of homeowners and landlords as to their knowledge about lead contamination and its adverse health effects.

Justifying the need for a federal regulation requires two findings. First, there must be a market failure that can be corrected through regulation. Second, it must be shown that this regulation should be carried out at the federal level. The prior section argued that imperfect information may result in an inefficient number of interventions. One of the objectives of the benefit-cost analysis presented in this report is to demonstrate that net benefits to society can be increased. In the case of lead-based paint hazards, the necessary information has two parts: identification of situations which present a hazard and selection of the appropriate response to address the principle source of the problem. A regulation in the nature of §403 promotes the efficient identification of lead-based paint hazards by providing a metric to use as an indicator of risk. This increases the amount of information available to the consumer at a very low cost to the consumer. In this analysis, maximizing net benefits is the principal criterion used to determine a range of possible candidate standards. In this way, actions under the rule can be targeted to address both the source(s) of lead (e.g., soil, paint, dust on floors, dust on window sills) that are generating the greatest risk within the housing unit and the households that will receive the greatest benefits (e.g. households with new born children).

As written by Congress, various sections of Title X address different parts of the imperfect information problem. By setting hazard standards, §403 helps consumers identify situations that subject them to risk. Without this information, consumers may be more likely to either underestimate or overestimate the value of an intervention. Hazard standards would provide necessary, although not sufficient, information for making an informed choice. In addition, the consumer needs information on the cost and effectiveness of the various lead hazard control options available (e.g. removal of lead-based paint or lead contaminated soil, encapsulation of lead-based paint, dust clean-up). This information need is addressed by §402, which assures a supply of trained and certified personnel to identify and control lead-based paint hazards, and §406 and §1018 which provide information about lead-based hazards to the population in general and in particular at the time of property transactions. In addition, §402 reduces transaction costs, by assuring consumers that the information provided to them about their particular situation will be accurate and complete.

Lead hazards are found in residences in all parts of the nation. Federal regulations can promote cost savings by encouraging coordination among jurisdictions with resulting economies of scale. For example, training and certification costs are reduced where states share the same requirements and provide for certification reciprocity. They also promote partnerships in developing the most cost-effective ways to address lead-paint hazards. In §404, the Act encourages the individual States to adopt the federal §403 regulations, as well as federal regulations from other sections of the Act, adapting them to the specific conditions that exist in the States. By establishing a benchmark, §403 sets a standard for action which holds throughout the nation, independent of state and local circumstances. States have the option of imposing requirements that are more stringent than the federal procedures. States and localities are in a better position to determine how the hazard standards are used and how to adapt their implementation to local circumstances.

In addition, the Act authorizes certain federal expenditures to partially achieve the national goal of eliminating lead-based paint hazards. Authorized federal expenditures include federal grants for evaluating and reducing lead-based paint hazards in non-publicly owned or assisted housing, risk assessments and interim controls in federally assisted housing, and inspections and intervention of lead-based paint hazards in all federally owned housing constructed prior to 1960. The §403 identification of lead-based paint

hazards is necessary to implement those federal expenditures in a manner that develops the most cost effective methods.

## 3.4    Regulatory Options

Options for government regulation fall into four general classes of instruments: (1) information provision and labeling, (2) performance or technical standards, (3) bans or restrictions on use, and (4) economic incentives.  The first of these is most closely linked to the primary condition contributing to a market failure, as described in Section 3.2.  Consequently, directly addressing the lack of adequate information will be the focus of this section and the analysis presented in this report.  Examples of how the other three classes of instruments might be applied are presented to illustrate their potential.  To some extent, these other instruments are used in other parts of Title X to provide an integrated approach.  For example, §402 of TSCA Title IV provides performance and technical standards in the form of training and certification requirements and standards for performing lead-based paint hazard identification and control activities.  Prior laws have banned the use of lead-based paint, and §402 restricts the use of certain hazard control techniques.

### 3.4.1    Information Provision

A draft regulator's guide on economic incentives under TSCA identifies three circumstances that are particularly favorable to making the provision of information an appropriate instrument for regulation (Eyraud, 1993).  The first circumstance — that there is a significant lack of information that generates exposure problems — has already been identified as a strong likelihood.  To rectify this circumstance, a corollary condition has to be met.  The new information has to be able to induce exposure-reducing behavior.  While additional information will alter the behavior of some portions of the population, it should not be assumed to completely bridge the gap between socially-desirable and observed exposure-reducing activites.  Information programs are appealing as a means of regulation in part because they do not impose direct burdens on the economy.  One of the dangers, though, is that the absence of a direct burden will come at the expense of being ineffective.  This does not have to be the case.  Collectively, environmental and other public health programs have amassed substantial experience in learning about what does work and what does not work in risk communication.  This expertise should be tapped to render any information approach effective.

The second circumstance favorable to effective information provision is situations where the exposure is not created by an externality beyond the exposed individuals' control.  In other words, the affected population has to be able to put the information to good use.  While externalities between current intervention and future beneficiaries were identified as a possible cause of market failure, these do not prevent information from being effective.  For example, if a house is not abated over the next 30 years,  the occupants at that future time can decide to undertake intervention if they have the right information to motivate their decision.  This circumstance appears to apply to the exposures from lead in residential soil, dust, and paint.  There is, however, at least one major exception.  Financial constraints can prevent even the best informed household from taking effective steps to reduce exposure.  As homeowners, households may not be able to afford intervention or other hazard controls.  As renters and buyers, they may not be able to afford housing free of lead-based paint hazards.  It is important to note, however, that this impediment is not unique to an information approach.

The third circumstance favorable to the use of an information approach is where other regulations would lead to greater adverse economic impacts.  Although its effects are indirect (working through changes in behavior rather than by direct enforcement), an information approach does create economic impacts. Whether these economic impacts are greater or less than those of other regulations is unknown at this time because other regulations have not been studied in as much depth.

The analysis presented in this report focuses on defining a particular type of information — hazard standards — by comparing the costs and benefits under assumed levels of activity by property owners. Promulgating such hazard standards is one means of implementing §403 of TSCA, which calls for EPA to identify lead-based paint standards, lead-contaminated dust, and lead-contaminated soil.  One objective in promulgating such hazard standards is to fill part of the information gap that has been linked to sluggish rates of intervention of lead-contaminated homes.  Specifically, these hazard standards are intended to indicate thresholds at which EPA recommends that certain forms of hazard controls take place.  As such, they can lower the information costs for homeowners making a decision about whether to act and thus increase the demand for intervention and other control measures.  It is important to note that by providing such hazard standards, EPA will not be eliminating the information costs altogether.  For example, the costs of testing for levels of lead in soil, dust, and paint are still substantial.  These costs are considered in this analysis.  Also, any public information campaign to motivate households to be concerned about and test for lead contamination (analogous possibly to the public campaign currently being waged for radon) will impose costs.  These have not been explicitly considered here.

### 3.4.2   Other Regulatory Options

Other regulatory instruments may also be effective for addressing the market failures that have led to the exposure of children to lead-based paint hazards.  While some of these alternative instruments are utilized in other parts of Title X, they have not been examined in the context of §403 to the same extent as the primary instrument considered — information provision.  Suggestions for alternatives that might be investigated further are provided in Exhibit 3.2.  The list is meant to be illustrative rather than exhaustive, particularly where economic incentives are concerned.  The feasibility and advisability of these alternatives could vary widely.

**Exhibit 3-2**
**Other Regulatory Alternatives**

| Type of Instrument | Possible Application |
| --- | --- |
| Labeling | Section 1018 of the Residential Lead-Based Paint Hazard Reduction Act of 1992 requires the disclosure of lead-based paint or any known paint hazards in the sale of target housing (any housing constructed prior to 1978). This provision could be extended to provide information on soil and dust hazards, not just paint, at the time of sale of *any* housing, not just target housing. |
| Technical and Performance Standards | Hazard levels could be enforced through performance or technical requirements. Owners of homes where children are present would, for example, have to keep paint in good condition, and reduce and keep soil and dust contamination below the hazard levels. Technical standards could specify exactly what control actions are necessary if hazard levels are exceeded. While §402 establishes training and certification requirements, and work standards, it does not target housing with young children. |
| Bans and Restrictions of Use | Restrictions could be placed on the access of young children to homes where lead contamination is of concern. These restrictions could include exclusion from occupying such homes or from spending extensive amounts of time in them, or prohibitions from accessing particular areas, such as rooms with paint in deteriorated condition or bare play areas outdoors where soil contamination is high. |
| Economic Incentives | A quota could be established for the numbers of homes allowed to have excess lead contamination. The quota could be allocated by a system of marketable allowances. Homes without allowances would have to undertake intervention or accept restrictions on their accessibility to young children. |

# References

Axelrad, D.  1993.  *Guidance on the Preparation of Economic Analyses and Regulatory Impact Analyses in OPPT*.  Regulatory Impacts Branch, Office of Pollution Prevention and Toxics, U.S. Environmental Protection Agency, Washington, D.C., January, pp.  26-27.

Battelle.  1997.  *Risk Assessment to Support Standards for Lead in Paint, Dust, and Soil.*  Prepared by Battelle, for National Program Chemicals Division, Office of Pollution Prevention and Toxics, U.S. Environmental Protection Agency.  EPA 747-R-97-006, December.

Boadway, R.W.  1979.  *Public Sector Economics*.  Little, Brown and Company (Inc.), Boston, MA, pp.  29-43.

Centers for Disease Control.  1991.  *Preventing Lead Poisoning in Young Children: A Statement by the Centers for Disease Control*.  Public Health Service, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, October 1991.

Eyraud, J.  1993.  Economic Incentives Under TSCA: A Regulator's Guide.  Volume I.  Review Draft.  For the U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, Regulatory Impacts Branch.  Washington, D.C., February, pp.  3-12.

Miceli, T.S.; Pancak, K.A.; and Sirmans, C.F. (1996).  An Economic Analysis of Lead Paint Laws, *Journal of Real Estate Finance and Economics*, 12:59-75.

United States Environmental Protection Agency (1986).  *Air Quality Criteria for Lead*, June, 1986.

United States Environmental Protection Agency (1995).  *Report on the National Survey of Lead-Based Paint in Housing*, April, 1995.

# 4.    Overview of Analytic Approach

This section summarizes key aspects of the risk assessment and its linkages with the economic analysis, and provides an overview of the methodologies used to estimate the costs and benefits of the §403 lead hazard levels.  The impetus for assessing the costs and benefits of lead hazard control is to provide EPA with an estimate of society's potential return from the regulation.  The cost estimates represent costs incurred by individuals, both testing and control costs to reduce lead exposure.  The benefit figures are estimates of the amount society will gain if the adverse health effects caused by exposure to lead hazards are avoided.  The evaluation based on a comparison of benefits and costs is straightforward.  If benefits exceed costs then the lead hazard levels are expected to result in a net gain to society.  Conversely, if costs exceed benefits then the lead hazard levels are expected to result in a net loss to society.

The analysis of costs and benefits of alternative standards is designed to provide an estimate of the number of interventions that would be optimal under alternative approved standards (i.e., interventions are assumed to be limited to those housing units with children present, and thus benefits will be realized).  This approach is based on a model that calculates the number of lead-related interventions based on the age of the housing stock, representative lead conditions, and the number of children born over a 50-year period.

## 4.1    Summary of Risk Assessment

The only category of benefits considered in the analysis is that of benefits to children under the age of six.  This section describes how risk assessment is used to estimate these benefits to children.

### 4.1.1    Scope of Analysis

This analysis considers children, from birth through the sixth birthday, living in homes that were built in 1997 or earlier.  Because the potential for lead exposure in the set of currently contaminated homes may remain for some time, the analysis considers children born during the next 50 years, from 1997 to 2046.  Exposure, health effects, and benefits are calculated separately for the cohorts born in each of the 50 model years.

### 4.1.2    Characterization of Exposure

The effects of children's exposure to dust and soil contaminated by lead-based paint are the focus of this study.  Pica, the direct ingestion of paint chips, is also analyzed as a source of childhood lead exposure.  Air, water and food sources of lead are not analyzed because of prior national reductions in their contamination.

The data source used for estimating exposure in children is the HUD National Survey of Lead-Based Paint in Housing  (USEPA 1995), referred to as the "HUD data" in this report.  Conducted in 1989-1990, this survey measured lead levels in paint, dust, and soil within 284 representative, privately-owned and occupied housing units built before 1980.  Each surveyed home was assigned a national sampling weight (USEPA, 1995).  Units built in 1980 or later were not included in the survey since they were assumed to be free of lead-based paint.  Because this analysis considers homes built through 1997, the 28 HUD survey units built between 1960 and 1979 and containing no lead-based paint were used as templates for describing homes built 1980-1997.  The total number of homes built during this latter period was simply divided by 28 to give an equal weight to each home type.

The unmodified characteristics of these total 312 "HUD home types" are used to represent the baseline lead levels found in US housing stock throughout the modeling period, 1997-2046.  To represent the "post-intervention" lead levels caused by the introduction of national lead hazard standards, the values for different HUD homes are reduced based on the candidate standards in question, the hazard control interventions that consequently take place, and the effectiveness of interventions as specified in the Risk Assessment (Battelle 1997).

### 4.1.3   Determinations of Blood Lead Distributions: NHANES III and IEUBK and Empirical Models

To characterize the baseline national distribution of blood-lead concentrations in each cohort of children, this analysis uses data for one to two year-olds  from the Third National Health and Nutrition Examination Survey (NHANES III), Phase 2.  These data yield a blood-lead geometric mean (GM) value of 3.14 µg/dL, and a geometric standard deviation (GSD) of 2.09 µg/dL.  It is assumed that these figures describe a lognormal distribution, and that without interventions, this baseline distribution would remain constant for all cohorts born during the 50-year model period.  The latter assumption is a basic premise of the risk assessment.

The NHANES-derived blood lead GM and GSD are assumed to stem from exposure to the baseline ambient lead levels reported in the HUD data.  So while NHANES data can be used to characterize the baseline blood lead level distribution, they cannot be used for post-intervention distributions, when environmental lead levels are reduced.  Instead, the EPA has two independent models for predicting the blood-lead GM and GSD from ambient lead conditions in a given population.  One model attempts to model the physical and biological processes underlying the relationship while the other uses a statistical/epidemiological approach.

Each model is used within separate analyses to calculate blood lead distributions for both baseline and post-intervention ambient lead levels.  Model inputs for the baseline come from the baseline HUD data for all 312 home types, while post-intervention inputs are based on reduced lead contamination levels in the same homes.  Predicted blood lead GM's and assumed GSD's for each HUD home type are weighted and aggregated using statistical formulas to derive a national predicted blood-lead distribution for both baseline and post-intervention scenarios.

Modeled post-intervention blood lead distributions cannot be directly compared to the baseline NHANES distribution in a meaningful way.  Therefore, the ratio of the predicted post-intervention blood lead GM to the predicted baseline GM is multiplied by the baseline NHANES GM to derive the final modeled post-intervention GM for each cohort.  The same procedure is repeated for GSD's in order to define a distribution, which is then compared to the baseline distribution and used to measure health effects resulting from the standards.

The first of the two models used to predict blood-lead distributions from ambient lead conditions is EPA's Integrated Exposure, Uptake, and Biokinetic (IEUBK) Model.   As its name implies, this model utilizes exposure, uptake and biokinetic information to predict a distribution of blood-lead levels in children corresponding to a specific combination of environmental levels.  Various parameters are fixed, including daily intake of dust and soil, and the intake of lead from other sources such as air, water, and diet.  The variable inputs for this analysis are floor dust lead concentration and soil lead concentration.  The effect of

lead-based paint on children who exhibit pica is estimated after the IEUBK model is run, following a procedure described in Battelle (1997).

The second model used to predict blood-lead distributions is an empirical model. This model was developed using data from the Rochester Lead-in-Dust Study to estimate the relationship between blood-lead levels in young children and the observed level of lead in environmental media (paint, dust and soil) from their primary residence. The empirical model as originally developed is log-linear in form, expressing the natural-log transformed blood-lead concentration as a linear combination of natural-log transformed exposure variables. The model was adapted slightly by Battelle to accommodate the HUD data. The final variable inputs are floor dust lead load, window sill dust lead load,  soil lead concentration, and an indicator for the presence of deteriorated lead-based paint *and* incidence of pica.

### 4.1.4   Health Effect Endpoints

This analysis considers the following health endpoints: reduction in IQ, cases of IQ less than 70, cases of blood lead levels greater than 20 µg/dL, and cases of blood lead levels falling into seven categories defined by the CDC. Avoidance of adverse health effects is then translated into monetary benefits. Reduction in IQ may stem from any level of exposure to lead hazards. The next two effects are used to represent cognitive effects more likely seen in children with unusually high levels of exposure. The seven blood lead categories correspond to different sets of general symptoms, each with a different screening and medical treatment protocol recommended by the CDC (CDC 1991).[1]

The IQ point loss for each cohort is determined by calculating the arithmetic mean total population blood lead level from the GM and GSD. The arithmetic mean is then multiplied by the size of the cohort and converted to the total number of IQ points lost using the factor 0.257 from Schwartz (1994). The difference between the IQ points lost for the baseline and post-intervention scenarios yields the IQ point loss avoided, which is the basis for benefits calculation.

The fraction of a cohort with IQ less than 70 is determined by a methodology based on Wallsten and Whitfield (1986), using the cohort blood-lead GM and GSD. The same two parameters and the same statistical procedure are used to calculate the fraction of each cohort with blood lead levels above 20 µg/dL, and the fraction falling within the seven categories defined by the CDC. The GM and GSD are log-transformed to the mean and standard deviation of a normal distribution; then the areas under the normal curve corresponding to the blood lead level ranges of interest are computed as percentages of the total area under the curve.

Cohort fractions are multiplied by cohort size to yield the number of children falling within a given health effect category. From the baseline to the post-intervention scenario, the difference in the population within each category -- IQ under 70, blood lead level over 20 µg/dL, or blood lead level within a CDC category -- is the basis for benefits calculation.

---

[1]   The categories cover all possible blood lead levels; children with blood lead under 20 µg/dL are not expected to show significant symptoms or require medical intervention.  Screening is still recommended.

## 4.2    Linkages Between Risk and Economic Analysis

The methodology used to evaluate the economic return from the §403 hazard standards has several linkages with the risk assessment methodology, which in turn relates paint condition and the amount of lead in dust and soil to blood lead levels and health effects.  Exhibit 4.1 illustrates the basic linkages between the risk assessment and economic modeling, and the scheme of the overall analysis.  The links that are most relevant to this overview are those that connect alternative hazard levels and the presence of lead in each housing unit with hazard control choices and costs, and those that connect the presence of lead to blood-lead levels and thus to health effects and economic damages and benefits.  The first set of linkages outlines the cost estimation process, while the latter describes the benefit estimation process.

Costs of controlling lead hazards are calculated using the unit costs of individual intervention activities, in combination with the timing and number of interventions.  The occurrence of interventions depends on a variety of factors linked with the risk assessment.  The primary intervention "trigger" is the birth of a child in a home.  When a child is born into a housing unit whose ambient lead levels exceed the standards, the appropriate intervention is assumed to occur.  This initial intervention is repeated as necessary until the child turns six years of age, at which time additional interventions will cease unless an additional child has been born during this time period.  Interventions in the home will recommence if another child is born after this period, and will follow the same repeat routine.

Benefits of lead hazard control are calculated using estimates of  "avoided" economic damages corresponding to avoided adverse health effects.  As described above, these avoided economic damages include foregone income due to reductions in IQ, as well as increased educational and medical costs connected with unusually high levels of exposure.  The model defines"avoided" as the difference between the baseline scenario (no interventions) and the ex post scenarios.  In the analysis, benefits are calculated for children whose exposure to lead is reduced for the period from birth to age six.  All interventions will have some level of benefit because it is assumed that there are no interventions if children are not present.

In Exhibit 4.1, the boxes along the top represent the analysis of baseline conditions, yielding an estimate of the economic damages resulting from the baseline conditions.  The boxes along the bottom of the exhibit represent the analysis of ex post conditions; each alternative standard is analyzed separately.  A comparison of the baseline economic damages and the ex post economic damages yields an estimate of the benefits of actions performed under the scenario.  This is represented by the far-right box in the middle row of Exhibit 4.1.  From these benefits, the analysis subtracts the corresponding costs to get net benefits.  The evaluation candidate standards consist of calculating net benefits for a wide range of standards and then comparing them in terms of net benefits.  The candidate hazard standard yielding the largest net benefits provides the greatest benefit to society.



**Exhibit 4.1**
**Linkages Between the Risk Assessment and Economic Methodologies**

## 4.3    Summary of Integrated Analysis

This section is divided into five parts; the first four correspond to the linkages delineated above.  The first part discusses the connection between lead hazard standards and intervention choices.  The second  briefly discusses the link between intervention choices, ex post ambient conditions, and new blood lead levels.  The third part focuses on the costs of interventions, while the fourth discusses the benefits of reducing lead hazards. The final part discusses the choice of discount rate.

### 4.3.1    Lead Hazard Standards and Lead Hazard Reduction Interventions

In §403 of TSCA Title IV, Congress instructs EPA to define hazard levels, or standards, for lead in soil, interior and exterior paint, and window sill and floor dust.   The primary analysis used to estimate the net benefits of alternative standards assumes that hazard standards induce specific intervention activities in homes where the standards are exceeded[2].  In other words, if there is a problem in a home with children under the age of six, then there is a response action, and there is a one-to-one relationship between the

---

[2]    This is a strong assumption (assuming hazard control occurs automatically) and overlooks factors such as informational problems, differences in income, and variation in individual preferences and behavior.

problem and the lead hazard control response.[3]  For example, if lead levels in the soil exceed the hazard levels, there will be an appropriate soil intervention, but there will not be an interior paint intervention in response to elevated levels of lead in soil.  Section 9 presents an alternative analysis that maintains the one-to-one relationship between the nature of the lead problem and the nature of the intervention, but makes different assumptions about the rate of intervention and the presence of children.

Six intervention or hazard control activities are considered.  These include high and low intensity interventions for interior paint and exterior paint, and a single intervention each for soil and dust.  High intensity hazard controls of interior and exterior paint hazards occur when deteriorated lead-based paint (LBP) is extensive.  Low intensity hazard controls of paint hazards occur when deteriorated LBP is present but not extensive.  Soil intervention activities occur when the soil-lead concentration exceeds the soil standard.  Dust hazard control occurs when the floor dust loading exceeds the floor dust standard, the window sill loading exceeds the window sill dust standard, or when it is required to accompany another intervention type, either high intensity interior paint control or soil removal.

To determine whether or not levels are exceeded and thus when interventions will occur, baseline ambient conditions for all homes represented in the HUD data are compared to the hazard standard. Hundreds of alternative sets of hazard standards were specified to permit the comparison of results and to examine the relative efficiency of different specifications.  The hazard standard is not varied for paint, however, and the level used in this model was determined by the US EPA.  Baseline ambient conditions are estimated using the US Department of Housing and Urban Development (HUD) National Survey Data.  See Battelle (1997) for a full description of the methodology used to characterize ambient dust, paint, and soil conditions within the US housing stock.

### 4.3.2   Risk Assessment: Moving from Ambient Conditions to Blood Lead Distributions to Health Effects

The baseline scenario assumes that no interventions will occur.  For each alternative standard evaluated, the model calculates ex post ambient conditions in each HUD home type.  Using the approach portrayed in Exhibit 4.1, these ex post ambient conditions are used to estimate a single ex post blood lead distribution for the entire cohort born each year of the model run, 1997-2046.  In other words, the "post-intervention" blood lead distribution reflects ambient conditions after induced intervention activities.  In addition, population blood lead distributions over time reflect changes in the housing stock that are expected to alter the distribution of lead exposure within homes.  This is because homes built before 1980, which may have lead-based paint, are older and are lost to demolition at a faster rate than homes built from 1980-1997, which do not have lead-based paint.   As lead-free homes comprise a greater percentage of the modeled national housing stock over time, exposure to lead hazards will drop regardless of regulations aimed at controlling health hazards.

The incidence of four health effects are estimated as a function of attributes of the blood lead distribution. These calculations are made for the baseline and "post-hazard control" blood lead distributions on an annual basis.  "Avoided" health effects represent the difference between the baseline and "post-hazard

---

[3]       A small portion of the homes will have no intervention even though the ambient lead levels are above the standards because no children will be born in them during the 50-year period analyzed.

control" incidence estimates for each model year cohort, and serve as the basis for monetized benefits calculations.

### 4.3.3   Cost Estimates[4]

Drawing on a variety of sources described in Chapter 5, unit cost estimates are derived for each of the hazard control activities, in terms of cost per intervention activity per home.  Hazard control activities include a combination of testing for lead content and specific interventions to reduce lead exposure. Interventions include maintaining, removing or encapsulating deteriorated lead-based paint, removing dust, and removing soil.   Representing average costs, unit costs are calculated for each of the testing and intervention activities.  Separate cost estimates are developed for single and multi-family housing units; multi-family unit costs are developed by adjusting the single family cost estimates to reflect the smaller size of multi-family units and the smaller yards of multi-family units.

For each hazard standard scenario, the choice of intervention activity in a home depends on its baseline ambient conditions and the alternative standard being evaluated.  The lead hazard standards work in conjunction with unit costs, the birth trigger, and repeat rules to determine the home's total cost of intervention during the model run period.  The repeat rules include the assumption that non-permanent interventions are repeated when their duration is exceeded if a child under six is present, with attendant costs.  Exhibit 4.2 presents the assumed duration for each intervention.  Thus, costs incurred by a particular housing unit accrue over time depending on the assumed hazard control choices.  For example, high intensity paint interventions are assumed to have a duration of 20 years.  Therefore, if a child under six is present 20 years after the initial high intensity interior paint intervention in a home, the intervention will be repeated at that time.  If no child is present, an intervention will not be performed until such future time as a new child is born into the home.[5]

Because the model reflects costs over time, costs incurred after the first year are discounted to the first year using an annual discount rate of 3 percent.[6]  The total model cost estimate is the sum of the cost of hazard controls in all homes for each year and represents the present value of the assumed stream of intervention costs.

---

[4]      A more detailed presentation of the estimation of costs appears in Chapter 5.

[5]      In some cases, repeat interventions will be performed after the last year of the modeling period, 2046, to protect children born in 2046 or earlier (*during* the modeling period).  For instance, if a high intensity interior paint intervention is performed in a home in 2028, it will be repeated in 2048 if a child under six is present who was born before 2047.

[6]      The sensitivity analysis presents costs, benefits and net benefits calculated with a discount rate of 7 percent as well.

**Exhibit 4.2**
**Duration for Each Intervention**

| Intervention | Duration in Years |
| --- | --- |
| High Intensity Interior Paint | Paint: 20 |
| Low Intensity Interior Paint | Paint: 4 |
| High Intensity Exterior Paint | Paint: 20 |
| Low Intensity Exterior Paint | Paint: 4 |
| Dust | Dust: 4 |
| Soil Removal | Soil:  Permanent |

### 4.3.4   Benefit Estimates[7]

Benefits are based on "avoided" health effects, meaning that a lead hazard standard is modeled as resulting in a lower level of exposure to lead, and thus avoiding health impacts that would have occurred under the baseline.  In order to estimate the incidence of health effects under alternative standards, each intervention is associated with a specific *ex post* ambient lead condition; these *ex post* conditions are presented in Exhibit 4.3.  The magnitude of avoided health effects (both changes in blood-lead concentrations and specific health endpoints) is calculated as the difference between the incidence of health effects in the baseline and under the specific standard being analyzed.  Monetary values are then estimated for the avoided health effects based on the costs of medical screening and treatment for a wide range of blood-lead level categories, as well as for three specific health endpoints: lost IQ points, IQ less than 70 points, and blood lead levels greater than 20 µg/dL.  In each case, the economic value is a proxy for society's willingness to pay to avoid the health effect.

Since lead hazards have been linked with a variety of health hazards for children and adults in addition to those analyzed here, the benefits estimates are likely to understate the societal return from the §403 hazard levels.  Furthermore, secondary benefits such as improved energy efficiency due to new windows and increased aesthetic appeal due to repainting are not included.

The economic value of avoiding cases of IQ less than 70 is approximated by using avoided special education costs.  As defined, these education costs are incurred from age 7 though age 18.  Similarly, the economic value of avoiding cases of blood lead levels above 20 µg/dL is proxied by using avoided compensatory education costs.  In this case, the education costs are assumed to be incurred from age 7 through age 9.  With increases in blood-lead, there are increases in monitoring and medical intervention costs as recommended by CDC.  The economic value of reducing the population-wide blood-lead levels is proxied by the reductions in these monitoring and medical costs.  (CDC 1991)

---

[7]        A more detailed presentation of the estimation of benefits appears in Chapter 6.

**Exhibit 4.3**
**Post-Intervention Ambient Conditions**

| Intervention | Assumed Post-Intervention Condition |
|---|---|
| High Intensity Interior Paint | • *Paint*: Deteriorated interior LBP made inaccessible<br>• *Dust*:  Floor dust lead loading level reduced to 40 µg/ft$^2$.<br> Window sill dust lead loading level reduced to 100 µg/ft$^2$.<br> Lead concentration level reduced by 80% |
| Low Intensity Interior Paint | • *Paint*: Deteriorated interior LBP made inaccessible<br>• *Dust*:  Lead concentration level reduced by 80% |
| High Intensity Exterior Paint | • *Paint*: Deteriorated exterior LBP made inaccessible<br>• *Dust*:  Lead concentration level reduced by 80% |
| Low Intensity Exterior Paint | • *Paint*: Deteriorated exterior LBP made inaccessible<br>• *Dust*:  Lead concentration level reduced by 80% |
| Dust | • *Dust*:  Floor dust lead loading level reduced to 40 ug/ft$^2$.<br> Window sill dust lead loading reduced to 100 ug/ft$^2$.<br> Effect on dust lead concentration depends on other<br> interventions implemented (see Battelle 1996) |
| High Intensity Soil | • *Soil*:   Soil lead concentration reduced to 150 ppm.<br>• *Dust*:  Floor dust lead loading level reduced to 40 µg/ft$^2$.<br> Window sill dust lead loading level reduced to 100 µg/ft$^2$.<br> Effect on dust lead concentration depends on other<br> interventions implemented (see Battelle 1996) |

Note: Lead levels remain constant in any case where starting levels are lower than assumed post-intervention ones.

Benefits accrue over time and are discounted to the present using an annual rate of 3 percent.  Total benefits are the sum of benefits calculated for each year or cohort of children protected, and represent the present value of the stream of benefits from the interventions taken under the standard.  Net benefits are simply the difference between the total benefits estimate and the total cost estimate.  As such, they are an indicator of the societal gains from alternative lead hazard standards.

### 4.3.5   Discount Rate

The analysis of the §403 standards uses discounting to provide estimates of costs and benefits (which will be realized at different points in time in the future) in present value terms.  Several characteristics of the actions affected by §403 require the use of discounting.  First, actions under this rule will occur over an extended period of time (the analysis considers 50 years).  Second, for any particular action, the costs and benefits might occur in different years.  Third, unit benefits from reduced exposure are estimated based on future medical and education costs avoided and higher future income streams experienced.  For accurate measures, future income and avoided future costs must be discounted to yield present values.

In estimating the total net benefits of alternative definitions of lead hazard levels, the model used in this analysis "assigns" intervention costs to the year in which an activity occurs, and "assigns" children's benefits to the year in which a child is born.  Due to the repetition of intervention activities, and births into

homes where interventions have already occurred, the costs and benefits may be assigned to different years. In the case of adult benefits, adults living in the housing unit in future years will benefit from the intervention taken in any given year. Thus discounting is used to:

- **Estimate the unit benefit value for each type of benefit.**[8]  These are:
    - the present value of the future increase in income for one newborn based on a one-point IQ increase;
    - the future foregone special education costs for one newborn who crosses the threshold from IQ under 70 to IQ over 70;
    - the future foregone compensatory education costs for one newborn who crosses the threshold from blood lead over 20 µg/dL to blood lead under this level;
    - the future foregone medical costs for one newborn who moves from a higher blood lead category to a lower one;[9] and
    - the future avoided medical costs and avoided lost wages based on reduced probability of certain adverse health effect.

- **Estimate the present value of the stream of costs and benefits resulting from §403 activities in the future.**   Since the model considers actions taken over the next 50 years, the benefits and costs from these future actions must be discounted so that they can be summed with actions taken in the first year. In some cases, children are born into housing units where interventions have occurred in earlier years and are still effective. Thus there would be benefits but no costs that year. In other cases, a repeat activity might occur to support benefits counted in earlier years, resulting in costs but no new benefits assigned that year.

While several factors affect discount rate estimates in general, the selection of the appropriate discount rate is considered in the context of each of these situations.

**General Considerations in Selecting the Discount Rate.**  Selection of the appropriate discount rate to use in benefit-cost analyses is a long running controversy and is the subject of a large amount of economic literature and government policies. The choice of discount rates can make a profound difference in the results of a benefit-cost analysis, especially for programs like this one where costs and benefits may accrue at different points over an extended period of time. Most economists currently believe that no single rate is fully appropriate to use in all situations, even though that might be desirable for pragmatic reasons. The debate on selecting a discount rate involves two distinct issues: what type of discount rate is appropriate in a particular situation, and what is the magnitude of the appropriate discount rate that is selected.

Some agencies specify a single rate to be used in all situations in order to promote consistency among different analyses. For example, the Congressional Budget Office (CBO) uses the real (i.e., inflation-free) rate on long-term government bonds to discount costs and benefits of proposed legislation and in preparing

---

[8]     Estimating the unit cost of an intervention activity does not involve discounting, since it is assumed that the costs will all be incurred at the time of the activity. Therefore no separate entry is listed for estimating unit cost values.

[9]     There are many unit benefits of this type depending on which two categories the newborn passes between; categories and their associated costs are described in chapter 5.

the annual budget of the United States.  The CBO identified two percent as the appropriate (and non-changing) discount rate (Hartman, 1990).  The Government Accounting Office recommends using the real rate of return on government bonds over one year in length.  Currently this rate ranges between 2.7 and 3.0 percent (US OMB 1996b).  The Office of Management and Budget (US OMB, 1996a) also recommends using a single constant discount rate that reflects the real marginal pre-tax rate of return on average private investments.  The recent OMB guidance refers the reader to its 1992 guidance, in which OMB identified seven percent as the appropriate discount rate to use for Regulatory Impact Analyses (and indicated that this may change in the future).

The recent OMB guidance also says that there are circumstances where different discount rates are appropriate, and encourages RIAs to include alternative calculations using other discount rates in an appendix when justified.  In the extended guidance on discounting procedures (US OMB, 1988), the OMB identified situations where the costs of the regulation are almost entirely borne by consumers as a situation where a different discount rate is more appropriate.  Such is the case for §403, where much of the costs and quantified benefits are the result of lead hazard reduction activities due to voluntary consumer action and paid for by the consumers.

The debate between using a rate of return on investment capital and the consumption rate of return focuses on whether investment is being displaced.  Some discounting theory emphasizes that one dollar diverted from productive investment reduces the stream of future production, while a dollar diverted from consumption would only substitute one type of consumption for another.  This diverted capital argument is the basis of the "shadow price of capital" approach to discounting, which treats displaced investment as "costing" more than displaced consumption.  The practical difficulty in implementing this approach is to identify which costs are diverted investments, and which are diverted consumption.  Various pragmatic approaches to this have been proposed and used by the EPA and other government agencies for regulatory analysis, including the "two-staged" discounting approach (Kolb and Scheraga, 1990), or a single "blended rate" somewhere between the rate of investment return and the rate of consumption return.

Recent developments in the economic literature have raised serious questions about the extent to which capital is actually "displaced" today.  The displaced capital approach holds that because regulation diverts funds from alternative investments, some investment opportunities are not undertaken.  In other words, the pool of available capital is assumed to be fixed, forcing some investment to be foregone when capital is diverted away from investment.  While the pool of available capital is relatively fixed (at least in the short run) in a closed economy, in an open economy capital can flow in from other countries.  The increased demand for investment capital in the United States (created in part to finance the federal deficit) has attracted large amounts of capital into the country, and most economists feel this has significantly reduced the pressure that federal borrowing has had on real interest rates.  While the supply of capital is not perfectly elastic, neither is it perfectly inelastic.  An elastic supply of capital reduces the difference between investment rates of return and consumer rates of return.

In addition, estimates of real financial rates of return are lower than many people believe.  The real rate of return on United States government bonds has been near zero percent for most of this century, while the annual return on a broad portfolio of stocks has averaged near four percent.  In general, stocks have done better since 1980 (averaging 4.26 percent) than in the other periods this century, but the rate of return may

return to historic norms in the future (Freeman, 1993).  Thus the range of real rates of return on investment opportunities range from near zero to four percent.

The issues involving the appropriate discount rates and procedures are very complex, and are not likely to be resolved soon.  Much of the recent economic literature summarizing the discount rate debate concludes that discount rates reflecting either the social rate of time preference or the rate of return on investments are the appropriate discount rates to use, and there is not that great a difference between the rates.  For example Moore and Viscusi (1990) find no evidence that the rate of time preference for environmental-related health effects differs from financial rates of return, and cite evidence that two percent rate is appropriate.  Lind (1990) recommends a range of one to three percent, and Freeman (1993) recommends two to three percent.

**Applying these Findings to the Selection of a Discount Rate for the §403 Analysis.**  In this analysis, best practice suggests that both benefits and costs should be measured as consumption foregone and thus the social rate of time preference has been used for discounting, although what the rate is called is a moot point if Moore and Viscusi's findings are correct.  The reasoning for basing the discount rate on foregone consumption is that the benefits of the rule (e.g., avoidance of an IQ decrement) will provide the beneficiary with a higher income and therefore greater consumption potential.  In the case of costs, the reasoning for using foregone consumption as the discount rate is based on the manner in which the funds spent for rule compliance would otherwise be used.   This is particularly true for homeowners, who are likely to view expenditures on improving their home as a consumption expenditure and would not divert funds from investments for lead hazard reduction activities.  On the other hand, the argument could be made that landlords would reduce investments to finance lead hazard reduction activities.  There are two responses to this argument.  First, since the action is voluntary under §403, it can be assumed that the rate of return (say in terms of increased property value) is at least as great as the landlord would realize on the alternative investment and thus there is no decline in the future stream of production.  Second, even if the landlord were to divert his own investment funds to these activities, owner-occupied housing units constitute the majority of properties affected by this rule, and thus the discount rate relevant to homeowners would dominate.

Based on the information presented above, a 3 percent discount rate has been adopted as the most appropriate rate for use in this analysis.   It is used in Chapters 5, 6, and 7 for the estimation of the present value of costs, benefits and net benefits.  Since a 7 percent rate is often used for government regulations, results using 7 percent are presented as a sensitivity analysis in Chapter 8 to facilitate comparison among rules.

# References

Battelle. 1996. *Procedures and Results for Input to the Economic Analysis for Section 403 and Addenda to Report on Inputs to Economic Analysis*. Prepared by Battelle, Columbus, OH, for U.S. EPA, Office of Pollution Prevention and Toxics, Chemical Management Division, June 17 and August 29.

Battelle. 1997. *Risk Assessment to Support Standards for Lead in Paint, Dust, and Soil.* Prepared by Battelle, for National Program Chemicals Division, Office of Pollution Prevention and Toxics, U.S. Environmental Protection Agency. EPA 747-R-97-006, December.

Centers for Disease Control. 1991. *Preventing Lead Poisoning in Young Children: A Statement by the Centers for Disease Control*. Public Health Service, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, October 1991.

Freeman, A. Myrick (1993). *The Measurement of Environmental and Resource Values: Theory and Methods*. Resources for the Future, Washington, DC.

Hartman, Robert W. (1990). One Thousand Points of Light Seeking a Number: A Case Study of CBO's Search for a Discount Rate Policy. *Journal of Environmental Economics and Management*, Vol 18(2):S3-S7.

Kolb, Jeffrey A. and Scheraga, Joel D. (1990). Discounting the Benefits and Costs of Environmental Regulations. *Journal of Policy Analysis and Management*. Vol 9(3):381-390.

Lind, Robert (1990). Reassessing the Government's Discount Rate Policy in Light of New Theory and Data in a World Economy with a High Degree of Capital Mobility. *Journal of Environmental Economics and Management*, Vol 18(2):S8-S28.

Moore, Michael J. and Viscusi, W. Kip. (1990). Discounting Environmental Health Risks: New Evidence and Policy Implications. *Journal of Environmental Economics and Management*, Vol 18(2):S51-S63.

Schwartz, J. 1994. Low-Level Lead Exposure and Children's IQ: A Meta-Analysis and Search for a Threshold. *Environmental Research*, Vol 65: 42-55.

United States Environmental Protection Agency (1995). *Report on the National Survey of Lead-Based Paint in Housing*, April, 1995.

United States Office of Management and Budget (1996a). *Economic Analysis for Federal Regulations under Executive Order 12866*, January 11, 1996.

United States Office of Management and Budget (1996b). *Guidelines and Discount Rates for Benefit-Cost Analysis of Federal Programs, Circular No A-94, Appendix C, Revised.* February 6, 1996.

United States Office of Management and Budget (1992).  *Guidelines and Discount Rates for Benefit-Cost Analysis of Federal Programs, Circular No A-94, Revised.*  October 29,1992.

United States Office of Management and Budget (1988).  Regulatory Impact Analysis Guidance *Regulatory Program of the United States Government.*

Wallsten, T.S. and Whitfield, R. G.  1986.  *Assessing the Risks to Young Children of Three Effects Associated with Elevated Blood-lead Levels.*  Report by Argonne National Laboratory.  Report No. ANL/AA-32.  Sponsored by the U.S. EPA Office of Air Quality Planning and Standards.

# 5.    Cost Analysis

## 5.1    Introduction

As described in Chapter 4, candidate hazard standards are ranked in terms of their net benefits (i.e., benefits minus costs) to determine which standards yield the maximum net benefits.  This chapter describes the methodology used to calculate the costs associated with each candidate hazard standard.

Two conditions are necessary for an initial intervention to occur in a housing unit. Interventions are assumed to occur in housing units where ambient lead levels exceed the lead hazard standards and a newborn child is expected in the ensuing year.  Interventions are repeated as necessary to provide six years of protection for the newborn child, plus protection for any children born in subsequent years.  Separate intervention activities are defined for interior and exterior paint, dust, and soil.  The overall intervention strategy for a housing unit is composed of a combination of the medium-specific interventions.  The appropriate combination of intervention activities is determined by comparing the lead levels in the housing unit's soil and dust, and the condition of its paint, to the lead hazard standard under consideration.  For each of the housing units covered in the HUD survey, the unit costs are applied to the specific intervention strategy appropriate to that housing type.  Summing across all 312 home types, weighted to represent the nation's housing supply, provides an estimate of the aggregate cost of the lead hazard standard.  All cost estimates in the subsequent sections are presented in 1995 dollars.[1]

## 5.2    Estimating Aggregate Costs

As described in the prior chapter, the analysis compares alternative futures over a 50-year time horizon: a baseline or "no-action" alternative, for which it is assumed that no changes are made to current ambient lead exposure conditions, and a "post-action" alternative for which it is assumed that the ambient lead exposure conditions are reduced in specific ways in response to the §403 standards.  In other words, this is a marginal analysis with a baseline of no intervention, and the marginal costs are the costs of inspecting and testing housing units for lead, and performing the various intervention activities.

The model used to estimate the aggregate costs of lead hazard standard analyzes each of the 312 home unit types in the HUD dataset separately (HUD 1993).  These 312 home types include housing constructed after 1978.  According to Title X, the regulations will apply to housing constructed before 1978.  However, the analysis assumes that once EPA promulgates these standards, they will be generally applied to all housing regardless of year constructed.[2]  While the use of lead-based paint was banned in 1978, dust and soil continue to be contaminated with lead from a variety of sources.  Since some homes built after 1978 may have lead levels that exceed the candidate hazard standards, it is likely that the legal system and lending institutions will adopt these standards for all housing.  For example, the §403 standards may be adopted by

---

[1]    The Gross Domestic Product (GDP) implicit price deflator was used to convert estimates to 1995 dollars (Office of the President, 1996).  The GDP implicit price deflator is estimated by the Department of Commerce's Bureau of Economic Analysis and incorporates real income and price inflation changes over time.

[2]    Of the almost 23 million homes that exceed the final standards, only about 890,000 (or 3.9 percent) were built after 1978.

courts in determining when a property owner's decision to not intervene is considered an act of negligence for which the owner can be held financially liable. Likewise, mortgage lenders are likely to be more hesitant to finance property acquisitions if the properties exceed the §403 standards. This was the reaction of lending institutions to the asbestos regulations.

By tracing intervention activities in a single housing unit over a 50-year period, the model estimates the total present value of costs for that unit. This calculation of total per-housing-unit costs is performed for each of the 312 housing unit types under each of the lead hazard standards. Using the weights assigned to each of the 312 housing unit types and the timing of initial interventions during the 50-year period, the results are extrapolated to a national estimate. In other words, the present values for each housing unit type are appropriately weighted and summed to provide an estimate of the aggregate national costs for the candidate standard.

The model is illustrated in Exhibit 5-1.A. For each of the 312 housing unit types, the first stage is to compare the unit's baseline or current ambient lead condition to the lead hazard standards under consideration. If the baseline conditions meet all the standards (presence and condition of lead-based paint, the amount or loading of lead in household dust, and the concentration of lead in soil), no interventions will occur in any housing units of that type and they will incur no intervention costs. In other words, these housing units drop out of the cost calculations for this lead hazard standard.[3] If the unit exceeds any of the hazard standards (e.g., has lead levels in its soil that are greater than the standard), then the housing unit type moves to stage 2 of the analysis.

Since the model assumes that testing and interventions begin only when a child is born into the home, the housing units are divided into two groups: 1) those where a birth is expected that year, and 2) all the rest. The housing units in the second group are subjected to this same bifurcation process in the next year, after their number has been reduced due to demolition. This cycle continues through the 50-year period, with some housing units receiving their initial intervention each year and units without an initial intervention that year moving on to be considered in the following year. The current national birth rate, adjusted in future years to reflect expected changes in the national birth rate, is applied to each of the 312 housing types used in this analysis. (Battelle, 1997)

Each year, the housing units in group one (those experiencing their first birth) move to stage 3. Initial intervention activities that will bring the unit into compliance with the lead hazard standard are identified. In addition, all activities that will need to be repeated for that housing unit are identified and their timing determined based on the assumptions that the newborn will live in the unit for at least six years, and assumptions about future birth and demolition rates (Battelle, 1997). Using the unit costs specific to each intervention activity, developed later in this chapter, and a 3 percent discount rate, the discounted present value of costs to be incurred due to this stream of activities is calculated (see Exhibit 5-1.B).

---

[3]   All units will need to be inspected at the time the birth of the initial child occurs in the unit, and inspection costs are incurred at that time.

**Exhibit 5-1.A**
**Determining Total Costs**

Each of the 312 housing unit types in the HUD dataset is analyzed year-by-year over a 50-year period, as follows:



**Exhibit 5-1.B**
**Determining Total Costs — Estimating Present Value of Aggregate Costs**



Since the present value of all costs to be incurred by a single housing unit over the life of the model is calculated at the time the initial intervention action is taken, this group of housing units drops out of any further cost calculations under the lead hazard standard.  Each year, another group of housing units of this type experiences their initial interventions and the present value of all the costs to be incurred by those units is calculated.[4]  The total costs for all units experiencing initial interventions in a given year are calculated.  The present value of the aggregate costs for all units over all years, is calculated by discounting the present value of intervention costs from the year the initial intervention takes place back to the first year of the model and summing discounted costs across all years.

The next sections of this chapter describe the development of the intervention-specific costs, including the matching of intervention activities to baseline conditions of housing units, and estimates of the number of homes exceeding the candidate hazard standards.  Section 5.3 summarizes the differences between EPA's approach to estimating costs (as presented in this document) and the approach employed by the U.S. Department of Housing and Urban Development (HUD) in its *Regulatory Impact Analysis of the Proposed Rule on Lead-Based Paint* (HUD, 1996).  Section 5.4 describes the data used in the cost analysis.  Section 5.5 presents cost estimates for each of the lead hazard evaluation activities, while Section 5.6 offers cost, duration, and effectiveness estimates for each of the intervention activities.  Section 5.7 presents the impact of alternative candidate hazard standards in terms of number of homes that exceed the candidate standards.  The final section compares the rate of intervention activities assumed in this normative analysis with likely rates of activity, and discusses the likely costs of interventions.

## 5.3      EPA and HUD Approaches to Estimating Costs

While this analysis draws on the cost estimates developed by HUD for its *Regulatory Impact Analysis of the Proposed Rule on Lead-Based Paint* (HUD, 1996), for reasons described below the analysis uses somewhat different estimates of unit- or activity-specific costs.

### 5.3.1  EPA Approach

The §403 regulations will designate separate lead hazard standards for soil, dust, and paint that protect the public from adverse health effects.  Given that hazard standards are set independently for each medium, costs were estimated on a medium-specific basis, and housing owners are assumed to respond to the hazard levels on a medium-by-medium basis.

It is difficult to predict the exact mix of actions the public will take in response to the lead hazard standards because the §403 regulations are voluntary and there are a variety of possible intervention approaches.  Therefore, for purposes of this analysis, a set of reasonable intervention choices was defined for each medium.  The types of intervention actions to be undertaken were designated as a function of the level and characteristics of the lead hazard (e.g., concentration of lead in the soil, condition of lead-based paint) in a housing unit.  This analysis estimated costs for two levels of paint intervention (high and low-intensity), and one each for dust and soil.

---

[4]     Since all the units of a given housing unit type have the same baseline characteristics, the discounted present value of the costs to be incurred by one of these units is the same for all units of this type experiencing their initial intervention in the same year.  The discounted present value of costs for this housing unit type will differ among different years of initial intervention, hazard standards, and across different housing unit types.

This approach represents a compromise between estimating a single cost for each medium (dust, soil, and paint) and establishing cost estimates for a range of detailed lead hazard reduction activities. Data limitations greatly complicated the cost estimation process. Few data were available on the public responsiveness to lead hazards. Secondly, variation in housing units confounded the derivation of unit costs. Furthermore, the limited environmental data collected in the HUD National Survey of Lead-Based Paint in Housing imposed constraints on the level of detail at which costs could be calculated.

### 5.3.2  HUD Approach

In its *Regulatory Impact Analysis of the Proposed Rule on Lead-Based Paint*, HUD presented a cost-benefit analysis of requirements for evaluation and hazard reduction activities in federally-owned and federally-assisted housing (HUD, 1996). To do this, HUD estimated costs for various intervention activities based on information from abatement experts and the Task Force Report (*Lead-Based Paint Hazard Reduction and Financing Task Force*, 1995). Costs were assigned to activities covered by the HUD requirements. This process was simplified by the fact that specific intervention activities (e.g., visual evaluation, interior paint repair, exterior paint repair, and area cleanup) were designated for each type of federally-owned and federally-assisted housing in the requirements.

### 5.3.3  Differences Between the Approaches

There are two significant differences between the EPA and HUD approaches to estimating costs. First, HUD estimated evaluation and intervention costs at a more disaggregated level than that used in this analysis. For example, cleanup activities, clearance testing, and window work were separate interventions in the HUD analysis, while they were combined and included within the medium-specific interventions of this analysis. The distinction arises because the HUD requirements specifically dictate which interventions occur and what activities comprise interventions. Because the §403 regulations are voluntary, they do not specify any particular actions that must be taken. These voluntary responses may not include all the activities specified under the HUD regulations. Alternatively, some people may choose to do more than HUD would require. This analysis, therefore, provides estimates of the costs associated with average or reasonable levels of hazard reduction work done voluntarily by housing owners.

A second notable difference is that HUD distinguished between the incremental costs associated with lead hazard reduction activities and the costs incurred in painting or other rehabilitation activities that would have been performed in the absence of the requirements. For example, the costs of scraping and repainting a room containing lead-based paint were compared with those of repainting a room without taking precautions for lead to derive the incremental cost of such an intervention. HUD assumed that paint and rehabilitation costs not associated with lead abatement were offset by the market value of benefits associated with improved housing conditions. Subsequently, their analysis only included the incremental costs in designating the net benefits of the rule. The analysis presented here does  not separate costs in this fashion largely because the housing units covered under the §403 regulations are privately owned. In contrast to private housing, public and federally assisted housing benefit from federally assisted painting and rehabilitation programs. This analysis assumes that private units are already maintained to the level at which additional expenditures do not return equal or greater offsetting financial benefits. Intervention costs

include the full costs of lead hazard reduction. Benefits in the form of increased market value were not considered.[5]

Where appropriate, this analysis combined the cost estimates developed by HUD for their RIA with other data to calculate intervention cost estimates.  Sources in addition to the HUD data were used because in some cases it was not clear what activities were included in the HUD estimates and because of the wide scope of the §403 regulations.  The HUD RIA (HUD, 1996) provided limited information on the sources of the cost data employed.  Alternative sources of data were located when the HUD RIA sources could not be identified or when the HUD RIA did not provide cost estimates for an activity (e.g., lead hazard screen, soil removal) included in this analysis.

## 5.4     Data Sources

Costs were estimated for specific evaluation and intervention activities.  Cost estimates were derived for three types of evaluation activities, two levels of intervention for interior and exterior paint, and one level of intervention for dust hazard reduction and one soil hazard intervention.  Separate cost estimates were generated to apply to alternative amounts of soil removed.  Primary sources of data used by this analysis included:

- the *Comprehensive and Workable Plan for the Abatement of Lead-Based Paint in Privately Owned Housing: Report to Congress* (HUD, 1990);
- the National Center for Lead-Safe Housing's SpecMaster Database of intervention costs (NCLSH, 1995) and a NCLSH report on lead hazard control for non-profit housing organizations (NCLSH, undated);
- the *Lead-Based Paint Hazard Reduction and Financing Task Force* report (Task Force, 1995)
- the 1996 HUD RIA on lead paint hazards in federally-owned and federally-assisted housing (HUD, 1996);
- *Hometech's Remodeling and Renovation Cost Estimator* (1996);
- *R.S. Means' Repair and Remodeling Cost Data* (1996);
- *American Housing Survey* (HUD, 1995);
- interviews with HUD research grantees (state and local governments) working on lead interventions; and
- selected interviews with lead testing and abatement firms, as well as landscapers, commercial cleaning services, and hazardous waste disposal firms.

Cost estimates are presented for the evaluation and intervention activities in Sections 5.5 and 5.6, respectively.  Where appropriate, estimates from various sources were combined to assure reasonable unit cost estimations.  Descriptions of lead hazard characteristics by housing units were based on the HUD National Survey data, and the extent of these lead hazard characteristics dictated the intervention activities that occurred in each unit.

---

[5]      Likewise, the analysis did not include any potential decline in market value for housing units that do not receive hazard reduction activities even though they exceed the §403 standards.

Housing conditions were compared with candidate hazard standards to determine the types of intervention activities conducted.  For interior and exterior paint hazards, alternative standards are not analyzed.  EPA has specified that high-intensity interventions for interior and exterior paint hazards will occur when damaged lead paint equals or exceeds 50 square feet and 100 square feet, respectively.  Low--intensity interventions for interior paint hazards will occur when damage is more than 22 square feet but less than 50 square feet, and for exterior paint hazards when damage is more than 10 square feet but less than 100 square feet.  Alternative lead hazard standards are analyzed for soil and dust interventions.  While dust interventions are always conducted as part of high-intensity interior paint and soil interventions, dust interventions were also conducted independently in homes with dust loading levels above the specified hazard level.

### 5.4.1 Uncertainty

The uncertainty associated with the cost estimates was largely due to data limitations. Point estimates of intervention costs were the most common data, and frequently the exact services and/or methods included in a single intervention estimate were not described in the data.  This lack of complete information occurred often for paint interventions, for which the information on the area and types of surfaces stabilized or abated and the post-intervention testing were not clearly specified.

Intervention methods will change over time, as information on effectiveness becomes available and technology changes.  This analysis applied unit cost estimates from the available data to the period from 1997 to 2046.  Future prices are unknown and it remains unclear whether the use of current prices will overstate or understate the real costs of testing and abating.  For example, with more competition in the intervention market, prices may decrease in the future.  Conversely, future prices may rise as standards are introduced, because of training costs and performance requirements.  In addition to the limitations imposed by the data and lack of knowledge about future costs of intervention methods, variation in the housing stock and regional prices introduced uncertainty into the costs of testing and conducting interventions to address lead hazards.

Additional uncertainty arose from the modeling of hazard reductions.  The impact of interventions was modeled using effectiveness and duration estimates provided by Battelle (1997).  In some cases, limited information was available on effectiveness or duration of intervention activities for lead hazards; some data on effectiveness with respect to changes in blood lead levels and dust lead loadings were available.  The assumptions about effectiveness and duration may have significant, but unknown, effects on the model results.   Effectiveness and duration estimates are presented for each intervention activity in Section 5.6.

### 5.4.2 Multifamily Housing Considerations

Single-family housing unit cost estimates served as the basis for multifamily housing unit cost estimates. Buildings with greater than four units were considered multifamily buildings by the HUD National Survey (Westat, 1995).  The same definition was adopted by this analysis.  Based on this definition,  multifamily units composed 17.5 percent of the U.S. housing stock in 1993 (DOC and HUD, 1993).  Typical multifamily housing intervention costs differ from single-family housing intervention costs for several reasons, including smaller average unit sizes, shared costs for soil interventions, and the possibilities for economies of scale in testing multiple units in a single building.  In conformance with HUD regulations and §402 training guidance, this analysis assumed that lead inspections in multifamily buildings use a random sampling approach, eliminating the need to test all units.  By doing so, the average per-unit costs for testing

were reduced in multifamily housing.[6]  It was assumed that multifamily housing is predominantly rental housing and that testing will be done by landlords on entire buildings.  This appeared to be a reasonable assumption because the American Housing Survey (AHS) indicated that 89 percent of multifamily units are rental units (DOC and HUD, 1993).

Adjustments for unit size, economies of scale in evaluation, and shared soil areas were made to derive multifamily cost estimates.  Cost estimates for hazard evaluation, paint inspection, interior lead paint intervention, and dust intervention were reduced to reflect the smaller average unit sizes.  On average, multifamily units were estimated to be 33 percent smaller than single-family units, so a factor of 0.67 was used to adjust costs.[7]  Additional reductions were made in hazard evaluation and paint inspection cost estimates to account for the fewer tests required.  A factor of 0.77 was used to scale costs for lead hazard screens, risk assessments, and paint inspections in multifamily housing.  This factor was based on an EPA (1995a) suggestion that 23 units out of 30 (the average number of units in multifamily buildings from DOC and HUD, 1993) be tested for a statistically valid sample.  If testing of multifamily units is done by individual renters or by landlords as units turn over, testing costs may have been underestimated.  Economies of scale for intervening in multiple units in a single building (e.g., simultaneous paint abatements in several units of a building) were not addressed as data were not available for this adjustment.  Cost estimates for exterior paint intervention were based on costs of window replacement as multifamily units do not contain much exterior LBP.  Likewise, cost estimates for soil interventions were based on estimated dimensions of areas in which soil work would be done.

## 5.5    Hazard Evaluation Costs

Exhibit 5-2 presents the costs estimated for two types of evaluations: lead hazard screen, and risk assessment.  Activities included and data sources are also displayed.  A lead hazard screen is a limited assessment used to determine the absence of lead hazards in a dwelling unit.  A risk assessment is a full inspection for lead hazards in a home and includes dust testing, soil testing, visual assessment of paint condition, and limited XRF or laboratory testing of paint in bad condition.  Testing scenarios were based upon the HUD guidelines (HUD, 1995), EPA's risk assessment training materials (U.S. EPA, 1995b), and EPA's regulations under Section 402 of Title IV of TSCA (Abt Associates, 1995a).

In estimating costs of each lead hazard standard, the model assumes that either a lead hazard screen (for single family units without deteriorated lead-based paint) or a risk assessment (all other units) is performed.  Testing is done at the time a childbirth is expected and testing is not repeated for a unit.

---

[6]    Costs for testing multifamily buildings may be reduced even further by using a targeted sampling approach in which units most likely to contain lead hazards are sampled, but the information needed by risk assessors to do this targeting is difficult to obtain.

[7]    American Housing Survey (AHS) data indicated that the median size of multifamily units was 1255 square feet, the median size of single family units was 1775 square feet  (DOC and HUD, 1993 as cited by HUD, 1996), and the mean size of multifamily units was 940 square feet as compared to 1,800 square feet for single family units (DOC and HUD, 1993, calculated by Abt Associates directly).  Because older units are likely to be smaller than new units and single family average sizes may be skewed by very large units, such as those built in recent decades, this analysis followed HUD (1996) in estimating multifamily units affected by lead hazard regulations to be 1,000 square feet and single family units to be 1,500 square feet.

**Exhibit 5-2**
**Summary of Lead Hazard Evaluation Costs**

| Type of Testing | Activities Included | Cost per Single-Family Housing Unit in 1995 Dollars | Cost per Multi-Family Housing Unit in 1995 Dollars | Source of Information |
|---|---|---|---|---|
| Lead Hazard Screen | inspection of paint condition, collection and analysis of two composite soil samples, collection and analysis of two composite dust samples | 212 | | Mean of NCLSH, undated and Task Force, 1995 |
| Risk Assessment | collection and analysis of ten individual dust samples, collection and analysis of two composite soil samples, visual inspection of paint condition, XRF and/or laboratory testing of deteriorated paint | 456 | 235 | Mean of NCLSH, 1995 and Task Force, 1995 |

### 5.5.1 Lead Hazard Screen

**Single-Family Unit Cost.** A lead hazard screen requires an inspection of paint condition, collection and analysis of two composite soil samples, and collection and analysis of a minimum of two composite dust samples. Two sets of estimates were identified for the cost of conducting a lead hazard screen. The first was from the NCLSH handbook (NCLSH, undated) which reported a cost of $199 for examination of paint condition, housekeeping standards, six lead dust wipe samples, and soil lead testing. The second was from the Task Force Report (Task Force, 1995), which estimates a cost for a lead hazard screen ranging from $150 to $300. The mid-point of this range was used ($225). The cost of a lead hazard screen was calculated as the average of the NCLSH (undated) and Task Force (1995) estimates: $212. The analysis assumes that all single-family housing units that do not contain deteriorated paint will perform a lead hazard screen rather than a risk assessment or paint inspection.

**Multifamily Housing Cost.** This analysis assumes that multifamily housing units only conduct risk assessments, rather than lead hazard screens, due to the prevalence of children in multifamily buildings as well as the risk of liability faced by landlords.

### 5.5.2 Risk Assessment

**Single-Family Unit Cost.** A risk assessment is a full inspection of lead hazards in a home, including: dust testing, soil testing, visual assessment of paint condition, and limited XRF or laboratory testing of paint in bad condition.[8] NCLSH (1995) provided a figure of $537 per dwelling unit but did not indicate the

---

[8]     A typical testing plan requires a visual inspection of paint condition and determination of the lead content of painted surfaces by either in situ analysis using a portable x-ray fluorescence (XRF) analyzer or by off-site laboratory analysis of paint chip samples. X-ray fluorescence analysis has the advantage of being faster, cheaper, and non-destructive when compared with laboratory paint chip analysis. However, XRF readings are not as accurate as laboratory analysis (HUD, 1990). Chemical spot testing is cheaper than XRF testing but is not accurate enough for quantitative analysis (HUD, 1995).

activities included in the assessment.  The Task Force (1995) indicated a range of risk assessment costs of $200 to $500, with an average of $375 for single-family units and $260 for multifamily units (assuming that composite dust sampling is used).  The risk assessment cost estimate for a single-family unit was calculated as the average of the NCLSH (1995) and Task Force (1995) single-family estimates: $456.  This analysis assumes that all single-family housing units containing deteriorated lead-based paint will perform a risk assessment rather than a lead hazard screen or paint inspection.

**Multifamily Housing Unit Cost.**  The cost of a risk assessment in a multifamily unit was estimated by multiplying the single-family cost of $456 by a factor of 0.67 to reflect the smaller size of multifamily units.  See Section 5.4.2 for a complete discussion of this factor.

$$\$306 = 0.67 \times \$456$$

The analysis calculates the total cost of evaluating a multifamily *building* based on the assumption that 23 units out of 30 (the average number of units in a multifamily building from DOC and HUD, 1993) require a risk assessment.  This ratio was based on an EPA (1995a) suggestion that 23 units out of 30 be tested for a statistically valid sample.  If testing of multifamily units is done by individual renters or by landlords as units turn over, testing costs may be higher.  Economies of scale in testing and intervening in multiple units in a single building were not addressed as data were not available for this adjustment.  In addition, given assumed birth rates, the normative analysis assumes that at least one child is born into every multifamily building in year one; thereby triggering a risk assessment in all multifamily buildings and soil removal where required in year one.  In contrast, interior actions taken to abate the lead hazards identified by the risk assessment occur on a unit-by-unit basis as children are born into the multifamily unit.

## 5.6    Intervention Costs

Exhibit 5-3 summarizes the intervention cost estimates for lead in dust, paint, and soil.  In addition to the cost estimates, Exhibit 5-3 lists the activities included and the data sources.  The approach used to estimate costs for the different intervention elements is discussed below.  High and low-intensity intervention methods are discussed where appropriate.  Duration and effectiveness assumptions are also addressed.  These assumptions were based on Battelle (1997).

**Exhibit 5-3**
**Summary of Intervention Costs for Lead in Dust, Paint, and Soil**

| Intervention | Activities Included | Cost per Single-family Housing Unit in 1995 Dollars | Cost per Multi-family Housing Unit in 1995 Dollars | Source of Information |
|---|---|---|---|---|
| Dust | HEPA vacuuming of all floors, woodwork, window wells, and furniture.  Wet wipe-down of unit with lead-specific detergent.  No replacement of contaminated furniture or carpets included. | 391 | 262 | Mean of NCLSH, 1995 and NCLSH, undated |
| High-intensity interior paint | Complete encapsulation, enclosure, or removal of LBP, including replacement of windows.  Includes post-intervention dust cleanup with HEPA vacuum and clearance testing.*  Multifamily cost includes disposal of hazardous waste. | 6,587 (4,744 in repeat years) | 4,687 (3,450 in repeat years) | Mean of Lim, 1996; HUD, 1996; and lower bound of range in NCLSH, undated |
| Low-intensity interior paint | Paint stabilization in one room: repair of damaged LBP, repainting, covering and sealing window wells and sills, post-intervention dust cleanup in room where work was done, and clearance testing.* | 437 | 437 | Mean of HUD, 1996 and NCLSH, undated |
| High-intensity exterior paint | Single-family: Complete encapsulation, enclosure, or removal of LBP.  No dust intervention afterwards in interior of unit.  Multifamily: Replacement of seven windows. | 5,706 | 2,275 | Mean of HUD, 1996 and NCLSH, undated for single-family; cost of window replacement from Santucci (pers. comm.)  for multifamily |
| Low-intensity exterior paint | Single-family: Repair of damaged LBP.  Multifamily: Stabilization of seven windows. | 807 | 182 | Mean of HUD, 1996 and NCLSH, undated for single-family; cost of window stabilization from NCLSH (1995) for multifamily |
| Soil removal | Soil removed up to a depth of six inches and disposal in a landfill.  Removal may be from area away from home and/or three feet around the perimeter.  Includes interior dust clean-up*. | | | Unit costs from *Hometech Remodeling and Renovation Cost Estimator* (1996) and R.S. Means' *Repair and Remodeling Cost Data* (1996) plus area estimates from HUD's America Housing Survey (1995) and Santucci (personal communication) . |
| | Removal and replacement of perimeter soil. | 2,046 | 399 | |
| | Removal and replacement of remote area soil. | 7,878 | 777 | |
| | Removal and replacement of both perimeter and remote area soil. | 9,008 | 901 | |
| | Removal and replacement of soil in play area | 1,460 | 314 | |

* The dust cleanings performed in conjunction with the high-intensity interior paint and the soil interventions are essentially the same as the full-house "stand-alone" dust intervention listed first on this table.  The dust cleaning performed in conjunction with the low-intensity interior paint intervention involves only the room where the paint intervention occurred.

### 5.6.1   Dust Intervention Costs

In practice, the cost of a dust intervention depends on the size of the dwelling unit and the thoroughness of the cleaning. For purposes of this analysis, dust intervention for controlling lead hazards from dust includes cleaning of the unit with a HEPA vacuum and wet mopping.

**Single-family Dust Cleaning Cost.** In addition to thoroughness and size of area cleaned, the cost of dust intervention depends on whether carpeting and upholstered furniture are replaced. For this analysis, the dust intervention was defined as the vacuuming of all rooms in the unit, including floors, woodwork, window wells, and furniture, with a high-efficiency particle accumulator (HEPA) vacuum, followed by a wet wipe-down of the unit with a lead-specific detergent. No replacement of furniture or carpeting was included, although this may be necessary for full cleaning of a highly-contaminated unit. NCLSH (undated) estimated a cost of $484 for cleaning a three bedroom, one-and-a-half bathroom house of moderate size after a "medium-intensity abatement." A second NCLSH (1995) source provided an estimate of $48 per room for HEPA vacuuming followed by a wash with TSP (a lead-specific detergent) and a second HEPA vacuuming. At an average of 6.2 rooms per single-family house (DOC and HUD,1993), this yielded an estimate of $298 per house. The final cost estimate for dust intervention in a single-family home is $391, the average of the two values.

$$\$391 \ = \ \frac{\$484 \ + \ (\$48 \ \times \ 6.2)}{2}$$

**Multifamily Housing.** The single-family cost for dust intervention was multiplied by a factor of 0.67 to reflect the smaller size of multifamily units. The resulting cost estimate is $262, as shown below. See Section 5.4.2 for a complete discussion of this factor.

$$\$262 \ = \ 0.67 \ \times \ \$391$$

**Effectiveness.** The effectiveness of dust cleaning depends on the circumstances in which it is used and whether post-intervention lead levels are measured in terms of loadings or concentrations. Battelle (1997) estimated that a single cleaning would bring floor dust lead loading levels to 40 $\mu g/ft^2$ or the pre-intervention levels, whichever is less. Window sill dust lead loadings would be brought to either 100 $\mu g/ft^2$ or the pre-intervention levels. Based on Battelle (1997), post-intervention dust-lead concentrations will vary depending on:

- whether or not a soil intervention also occurs;
- whether or not a paint intervention has occurred, and, if not, whether any deteriorated lead-based paint exists in the housing unit;
- whether or not a dust cleaning has occurred in a situation where no soil or paint intervention occurred and no deteriorated lead-based paint exists in the housing unit.

See Battelle (1997) for details on calculating post-intervention concentration levels.

**Duration.**  The duration of dust abatement also depends on the circumstances in which it is used. The dust intervention was assumed to be effective for four years based on a report by Battelle (1997).  In situations where a dust cleaning is performed immediately preceding the birth of a child, and no soil nor paint intervention occur, then the dust cleaning is repeated in four years to continue the protection of that child.

### 5.6.2   Paint Intervention Costs

Estimated costs of interior lead paint intervention vary widely, in part due to differences in the extent of intervention.  For example, replacing windows is less expensive than removing all the molding, doors and wall paint.  Additional variation is due to the size of the homes abated and regional price variations. Several general cost estimates for lead paint intervention existed, but few could be used here because the work included in the interventions was not specified.  Instead, estimated costs from sources that provided information on the specific activities involved and the size of the unit abated were employed.  Two degrees of paint intervention are considered: high-intensity, where paint damage is extensive, and low-intensity, where paint damage is limited to a relatively small area.

### Interior Paint Intervention

**Single-Family High-Intensity Cost.**  A high-intensity paint intervention involves encapsulation, enclosure or removal of LBP in the housing unit, including removal of windows with LBP, and post-intervention cleaning using a HEPA vacuum.  Several estimates from the literature were used to construct the high-intensity paint cost estimate.  Lim (1996) provided a cost estimate of $6,809 for window replacement, floor smoothing, wall/door/trim treatment including encapsulation and enclosure, and unit cleanup for a small unit of up to 1,200 square feet.  A second estimate was developed by combining HUD's (1996) cost estimates for interior abatement, unit cleanup, and clearance testing, plus an independent estimate of $242 for replacement of each wooden window (NCLSH, 1995) and an assumption of 12 windows, yielding a total cost of $6,504.

$$\$6,504 = \$3,000 + \$450 + \$150 + (12 \times \$242)$$

NCLSH (undated) estimated a range of $6,449 to $16,122 for work on a three bedroom house of moderate size.  Their estimated cost included window replacement, enclosure of walls with gypsum, occupant relocation, and unit cleanup as well as numerous other activities.  The lower bound of this range ($6,449) was used in this analysis because some of the intervention activities included in deriving the higher cost estimates (e.g., $8,383 for the abatement of a 2-story townhouse) were not included as part of the defined high-intensity paint intervention.  Averaging the Lim estimate ($6,809), the HUD estimate ($6,504), and the lower bound of the NCLSH estimate ($6,449) provided a cost estimate of $6,587 for a high-intensity paint intervention in a single-family home.  While this estimate may be low for removal of LBP from all surfaces of all rooms in a large unit, it is reasonable for units with a mixture of LBP and non-LBP and for encapsulation methods.

The analysis estimates costs over a 50-year time frame; therefore, high intensity interior abatements (assumed to have a duration of 20 years) may occur up to three times in one home.  However, the estimated cost of a high intensity interior abatement includes some permanent measures that are not recurring, such as the replacement of windows.  The cost estimates for repeat high-intensity paint interventions, therefore, exclude window replacement costs.  Deducting window replacement costs used in each estimate from Lim

(1996) and HUD (1996) results in an estimated cost of $5,646 and $3,842, respectively.  The final cost estimate for a repeat high intensity paint intervention is $4,744, the average of the two values.

**Single-Family Low-Intensity Cost**.  Low-intensity paint intervention includes stabilization of the deteriorated interior LBP in a room, including repair of the LBP, covering and sealing the window sills and wells to ensure cleanability, and cleanup in the room.  Using cost estimates from NCLSH (undated) for paint repair, work on two windows, and dust cleanup in the room, a cost of $311 was estimated for a single-family unit.

$$311 = $215 + (2 \times $27) + $43$$

Combining cost estimates from HUD (1996) for interior paint repair ($500), window work on two windows ($50), and area cleanup ($13 based on $0.05 per square foot for non-HEPA vacuuming from Task Force (1995)), a second cost estimate of $563 was developed.  The analysis assumes an average room size of 250 ft$^2$ for a single-family home.

$$563 \ = \ $500 \ + \ (2 \times $25) \ + \ \left( \frac{$0.05}{\text{ft}^2} \times 250 \ \text{ft}^2 \right)$$

The average of these two values was $437, and this was employed  as the estimate of the cost of low-intensity paint intervention in a single-family home.  As indicated, the cost estimate for low-intensity paint intervention included dust cleanup only in the area where work was completed.

**Multifamily High-Intensity Cost.**  The estimate of intervention costs for high-intensity paint intervention for multifamily housing was based on the single-family cost adjusted by a factor of 0.67 to reflect the smaller size of multifamily units.  This scaling resulted in an estimate of $4,413 for high-intensity intervention in multifamily housing units.

$$4,413 = 0.67 \times $6,587$$

Again, the analysis estimates costs over a 50 year time frame; therefore, an estimate was required that excluded any permanent measures undertaken the first time the house was abated.  This was accomplished by scaling the single-family repeat intervention costs (i.e., $4,744) by a factor of 0.67, generating a value of $3,178.  In cases where exterior interventions are triggered at the same time interior paint interventions are occurring, the scaled cost of $3,178 is used in order to avoid the double counting of window replacement costs incurred as a result of the exterior abatement.

Portions of the waste generated from abatements on multifamily housing units may be subject to Resource Conservation and Recovery Act (RCRA) hazardous waste requirements.  Under current regulations, only those portions of the waste that fail the Toxicity Characteristic Leaching Procedure (TCLP) for lead are considered hazardous waste.  Disposal costs depend on the quantity being discarded.  In the HUD abatement demonstration project, which involved extensive abatement, 217 pounds of hazardous waste, not including architectural debris, were generated per housing unit, and cost $274 to discard (U.S. EPA, 1992).  All high-intensity, interior multifamily abatements are assumed to incur this incremental waste disposal

cost.  The cost estimates assume that architectural debris is not handled as hazardous waste (Abt Associates, 1995b).

**Multifamily Low-Intensity Cost.**  Since low-intensity paint intervention was limited to work in one room, costs were not assumed to vary between single-family and multifamily housing.  Therefore, the single-family estimate of $437 was used for multifamily units.

This analysis assumes that all interior hazard control work (high and low-intensity) in multifamily homes will be conducted on a unit-by-unit basis as children are born into the home.

**Effectiveness**.  High-intensity interior paint interventions were assumed to have an effectiveness equivalent to that of the dust intervention described earlier in terms of dust lead load.  All paint interventions reduce dust lead concentration as specified by Battelle (1997), and eliminate the source lead that would otherwise be available to children exhibiting pica.

**Duration.**  The high-intensity paint intervention was assumed to have a duration of 20 years.  Low-intensity paint interventions and the accompanying dust cleanup of the room where the work occurred were assumed to last for four years.  In other words, to provide continued protection from exposure, low-intensity paint interventions will need to become repeated once during the first six years of a child's life.

### *Exterior Paint Intervention*
**Single-Family High-Intensity Cost.**  High-intensity exterior paint intervention involves full encapsulation or removal of all exterior LBP from a housing unit.  Cost estimates reported in the literature varied according to the activities undertaken and the size of the area abated.  HUD (1996) estimated the cost of encapsulation or removal of exterior LBP and interior cleanup from a single-family home of about 1,500 square feet and interior cleanup as $5,500.  The NCLSH handbook (undated) provided an estimate of $5,911 to $16,122 as the cost of a complete exterior paint job designed to fully enclose LBP on the exterior of a three bedroom house of moderate size.  The associated duration of interventions was reported to range from 20 to 60 years (NCLSH, undated).  The lower bound of the NCLSH estimates was used since this analysis is interested in a 20 year duration.  The average of the HUD (1996) estimate ($5,500) and the lower bound of the NCLSH estimate ($5,911) was $5,706, which was used for the single-family unit cost of high-intensity exterior paint intervention.

**Single-Family Low-Intensity Cost.**  The low-intensity paint intervention cost was derived by averaging two cost estimates.  Low-intensity exterior paint intervention involved repair of all damaged exterior LBP.  The first estimate of $613 was reported in the NCLSH handbook for exterior paint repair plus complete paint work up to a height of five feet (NCLSH, undated).  The second cost of $1,000 was estimated in HUD (1996) and included exterior paint repair for one side of a single-family house of 1,500 square feet.  The average of these estimates ($807) was the cost estimate used by this analysis for low-intensity paint intervention in single-family homes.  While this estimate may be low for homes needing extensive paint repair, it was likely to be reasonable for homes needing a moderate level of work.

**Multifamily Housing**.  Multifamily buildings are not likely to have extensive amounts of exterior LBP, based on data from the HUD survey and the American Housing Survey (AHS).  HUD (1990) indicated that multifamily units account for 5.5 percent of the total amount of exterior LBP, even though these units

(greater than four units per structure) represented 17.3 percent of the total housing units in the 1993 AHS. The cost consultant for the National Center for Lead-Safe Housing indicated that most exterior LBP on multifamily buildings would be present on windows and fire escapes, since most multifamily buildings, and particularly the larger ones, are masonry structures (Santucci, pers. comm.).  For this analysis, exterior paint intervention was considered to be repair or replacement of the windows in the multifamily unit; information about the prevalence of fire escapes in multifamily buildings was not available.  Using an estimate of seven windows per unit,[9] and using the cost of stabilizing a window of  $26 (NCLSH, 1995), the cost for low-intensity exterior paint intervention for multifamily units was $182.  For high-intensity exterior paint abatement, the cost was estimated as the cost of replacing seven windows.  Santucci (pers. comm.)  estimated a cost of $250 to $400 for replacement of a window opening in a multifamily building.  Using the midpoint of this range, the cost for the whole unit was $2,275.  For those units that need encapsulation or enclosure of exterior walls or work on fire escapes, this estimate may be low.  For other units, this cost may be high as not all windows may need replacement.  For example, NCLSH (1995) estimated the cost of encapsulation of both interior and exterior window components at a cost of $43 per window, which was much cheaper than replacement.  All multi-family *buildings* are assumed to conduct exterior paint interventions in year one if required by lead-hazard levels.

**Effectiveness.**  All exterior paint interventions reduce dust lead concentrations as specified by Battelle (1997) and eliminate the source of lead that would otherwise be available to children exhibiting pica.

**Duration.**  Low-intensity exterior paint intervention measures are assumed to have a duration of four years based on a report by Battelle (1997).  A high-intensity exterior paint intervention is assumed to have a duration of 20 years, again, based on Battelle (1997).

### 5.6.3   Soil Removal Costs

The costs of soil intervention vary with the size of the area treated, the method used, and whether or not the waste is considered hazardous under RCRA.  Residential soil intervention is a relatively new industry and no standards have been established on what constitutes an effective intervention other than removal.

**Single-Family Soil Removal Cost**.  This analysis defines a soil intervention as the removal of topsoil to a depth of six inches, replacement with uncontaminated soil, raking and seeding, and disposal of lead contaminated soil.  Three areas of the yard are potentially subject to a soil removal: around the perimeter of the unit, which is the area likely to be affected by the chipping of exterior LBP, remote areas away from the foundation, and the play area (if any).  Unit costs for soil removal and replacement are based on the

---

[9]     This estimate of seven windows was based on personal communication with Gopaul Ahluwalia at the National Association of Home Builders, 1993.  Mr. Ahluwalia estimated the average number of windows in a new single-family home (17) and the average number per unit in a new multifamily apartment building (9) based on a recent construction-material-usage data base.  There were two trends in home building that needed to be considered before using these estimates as the number of windows present in homes built prior to 1980 (our population of interest for lead abatement).  The first is that new homes are larger now than in the past and second, homes are currently built with more windows to increase light in the house.  No quantitative information was available about the latter trend, but the former trend, was compensated for by multiplying the 1993 average number of windows by the ratio of the average square feet per single-family home in 1980 to the footage estimated for 1993 ($1600 \text{ ft}^2/2100 \text{ ft}^2$).  This  resulted in an estimate of 13 windows per average single-family home and 7 windows per unit for a multifamily dwelling built in 1980.

*Hometech Remodeling and Renovation Cost Estimator* (1996).  Removal and replacement activities include: soil removal using a small backhoe, backfilling using a small backhoe, replacement soil costs, and raking and seeding of the yard.  The Hometech Cost Estimator recommends an opportunity cost of $525 for use of a backhoe.  In addition, costs are included for the transport and disposal of lead contaminated soil.  Landfill disposal costs are based on Perket (1994) and are specific to non-hazardous waste.  U.S. EPA provides an estimate of $0.22 per ton-mile for the transport of bulk solids.  Unit costs are presented in Exhibit 5-4.

**Exhibit 5-4**
**Unit Cost Estimates for Soil Removal - Single-Family**

| Abatement Activity | Unit Cost |
|---|---|
| Soil removal using a small backhoe* | $6.08/yd$^3$ (+$525) |
| Backfill using a small backhoe* | $0.20/ft$^2$ |
| Replacement soil cost | $40.00/yd$^3$ |
| Raking and seeding (by hand) | $0.30/ft$^2$ |
| Landfill (non-hazardous) | $35/ton |
| Soil Transportation | $0.22/ton-mile |

\*   A small backhoe is defined to have a 1/2 cubic yard bucket.

In order to calculate the total cost of conducting a soil abatement, the unit cost estimates were combined with estimates of the size of the area likely to treated.  As described above, three areas of the yard are potentially subject to a soil removal -- perimeter areas and two types of yard areas away from the foundation (i.e., remote areas).  The HUD data do not provide any information on the size of the yard or perimeter area; therefore, data from the American Housing Survey (AHS) were used to estimate these values for an average single-family home based on lot size, square feet within the house, and the number of floors in the house.  To summarize the methodology: 1) the house's footprint (i.e., the amount of land covered by the building) was estimated by dividing the square footage of the house by the number of floors in the home; 2) from the footprint of the house, a perimeter was extrapolated (assuming a uniform shape for all homes); 3) from the perimeter of the home, an estimate of the perimeter area extending three feet from the foundation of the home was calculated; and 4) the remote area was based on yard size (calculated by subtracting the perimeter and footprint areas from the total size of the lot).  The average area addressed in the removal of soil from the perimeter of a single-family home is 417 ft$^2$ and the average remote area is 2,571 ft$^2$.  For a detailed description of the methodology, refer to Appendix 5.A.  In addition, EPA assumed that the average single-family home play area is 200 ft$^2$.

Exhibit 5-5 provides a summary of the total soil removal costs for abating the perimeter area, remote area, perimeter and remote areas together, and play area alone.  Added to each of these costs is the cost of a single-family interior dust cleanup ($391) described in Section 5.6.1.  Soil transportation costs are calculated assuming a distance of 100 miles to the landfill.  Economies of scale are achieved if soil is removed from both the perimeter and remote area due to the opportunity cost of using a backhoe as well as the cost of an interior dust cleanup.

**Single-Family Hazardous Waste Disposal of Soil.**  In cases of highly-contaminated soil, the cost of disposal of soil as hazardous waste is added to the soil intervention cost.  Soil is considered hazardous if it

fails the Toxicity Characteristic Leaching Procedure (TCLP) for lead.  Many factors affect the leaching characteristics of lead in soil, including the soil type and pH.  While there is great variability in response to the TCLP test, soil is unlikely to fail the test if concentrations of lead are less than 2000 ppm (Spittler, pers. comm.).  The analysis conservatively assumes that houses with a soil lead level greater than 2000 ppm will fail the test, and these houses will incur the additional soil disposal costs.  The incremental costs triggered by the handling of soil as hazardous waste are calculated based upon: 1) the average quantity of soil likely to be removed during a soil intervention; and 2) the per ton price for bulk treatment and disposal of waste at a RCRA Subtitle C facility.  As discussed above, the analysis assumes an area of 417 ft$^2$, 2,571 ft$^2$, and 200 ft$^2$ for soil removal from the perimeter, total remote, and play area, respectively. Assuming that six inches of topsoil are removed, a volume of 8 yd$^3$ is removed from the foundation and/or 48 yd$^3$ from areas away from the foundation, or 3.7 yd$^3$ if only the play areaa is being addressed.

Perket (1994) estimated a cost of $174 per ton for bulk waste disposal, including treatment costs, in a RCRA Subtitle C facility based on a survey of hazardous waste landfill prices.  A portion of this cost is deducted to calculate the incremental cost of handling and disposing of the soil as a hazardous waste.  The data used to estimate the cost of a soil abatement already include the cost of disposing of the soil as a non-hazardous waste.  To avoid double counting, the disposal cost of $174 per ton for hazardous waste was reduced by $35 (i.e., the per ton cost for landfilling as non-hazardous waste), resulting in a cost of $139 per ton.

Assuming 1.3 tons per cubic yard, results in the disposal of 10 tons of contaminated soil from the perimeter of the home and/or 62 tons from the remote area of the yard or 4.8 tons from the play area alone. Multiplying these quantities by the incremental cost of disposal ($139), resulted in a total incremental cost of hazardous soil disposal of $1,397 (perimeter only), $8,608 (remote area only),  $10,005 (both perimeter and remote area) and $669 (play area).  If soil is removed from both perimeter and remote areas, but only one of the two areas exceeds the lead concentration of 2000 ppm, hazardous waste disposal costs may or may not be incurred.  They will not be incurred if the average lead concentration of all soil removed is under 2,000 ppm, following soil mixing.  If mixing could not reduce soil lead concentration beneath this threshold, then it will not be performed, and hazardous waste disposal costs will be incurred only for the soil fraction exceeding 2000 ppm.

**Exhibit 5-5**
**Soil Abatement Costs - Single-Family Home**

| Abatement Activity | Unit Cost ($) | Perimeter (area or soil quantity) | Remote (area or soil quantity) | Play Area (area or soil quantity) | Total Perimeter Cost ($) | Total Remote Area Cost ($) | Total Perimeter and Remote Area Cost ($)* | Total Play Area Cost ($) |
|---|---|---|---|---|---|---|---|---|
| Soil removal using small backhoe | 6.08/yd$^3$ (+$525) | 8 yd$^3$ | 48 yd$^3$ | 3.7 yd$^3$ | 572 | 814 | 861 | 547 |
| Backfill using small backhoe | 0.20/ft$^2$ | 417 ft$^2$ | 2,571 ft$^2$ | 200 ft$^2$ | 81 | 501 | 583 | 40 |
| Replacement soil cost | 40.00/yd$^3$ | 8 yd$^3$ | 48 yd$^3$ | 3.7 yd$^3$ | 309 | 1,904 | 2,213 | 148 |
| Raking and seeding (by hand) | 0.30/ft$^2$ | 417 ft$^2$ | 2,571 ft$^2$ | 200 ft$^2$ | 125 | 771 | 896 | 60 |
| Landfill (non-hazardous) | 35/ton | 10 tons | 62 tons | 4.81 tons | 352 | 2,166 | 2,518 | 168 |
| Soil transportation costs | 22/ton (100 miles to landfill) | 10 tons | 62 tons | 4.81 tons | 216 | 1,330 | 1,546 | 106 |
| Interior dust cleanup | 391/home | NA | NA | NA | 391 | 391 | 391 | 391 |
| Total (non-hazardous) | | | | | 2,046 | 7,878 | 9,008 | 1,460 |

\* Represents certain economies of scale if soil is removed from both perimeter and remote area.

**Multifamily Soil Removal Cost.**  Estimating soil removal costs for multifamily units required knowledge of the average number of units in a multifamily building, the size of the area being abated, and the unit costs for each of the soil removal activities (e.g., raking and seeding).  Again, three areas of the yard are potentially subject to soil removal: perimeter areas and yard areas away from the foundation (either the entire remote area or the play area only).  A different approach was used to estimate these areas for multifamily homes because the AHS does not report lot size for homes with two or more units.  Santucci (pers. comm.) estimated a perimeter of 400 to 450 feet (or 1,275 ft$^2$ assuming an area extending three feet from the foundation of the unit) for a multifamily building of 40 units, or about 11 feet of perimeter per unit.  Flaherty (pers. comm.) estimated that yards for urban multifamily buildings in the Minneapolis area were likely to be up to twice as large as single-family yards, suggesting a maximum remote area for the building of 5,142 ft$^2$, or 171 ft$^2$ per unit, based on an average of 30 units per multifamily dwelling, as estimated from the 1993 AHS.  EPA assumed that the average mutli-family play area is bout 400 ft$^2$.

Total soil removal costs were calculated by combining these area estimates with unit costs from R.S. Means' *Repair and Remodeling Cost Data* (1996) book.  The R.S. Means Cost Data book is recommended for residential, commercial, and industrial repair and remodeling projects costing between $10,000 and $1 million, and was therefore used in estimating multifamily costs.  As with single family homes, removal and replacement activities include: soil removal using a small backhoe, backfilling using a small backhoe, replacement soil costs, and raking and seeding of the yard.  The R.S. Means Cost Data book recommends an opportunity cost of $390 for use of a backhoe.[10]  In addition, costs are included for the transport and disposal of lead contaminated soil.  Landfill disposal costs are based on Perket (1994) and are specific to non-hazardous waste.  U.S. EPA provides an estimate of $0.22 per ton-mile for the transport for bulk solids. Unit costs are presented in Exhibit 5-6.

**Exhibit 5-6**
**Unit Cost Estimates for Soil Removal - Multifamily**

| Abatement Activity | Unit Cost |
|---|---|
| Soil removal using a small backhoe* | $7.00/yd$^3$ (+$390) |
| Backfill using a small backhoe* | $0.46/ft$^2$ |
| Replacement soil cost | $40.00/yd$^3$ |
| Raking and seeding (by hand) | $0.24/ft$^2$ |
| Landfill (non-hazardous) | $35/ton |
| Soil Transportation | $0.22/ton-mile |

\*    A small backhoe is defined to have a 1/2 cubic yard bucket.

Exhibit 5-7 provides a summary of the total soil removal costs for abating the perimeter area, remote area, perimeter and remote areas together, and play area.  Added to each of these costs is the cost of a

---

[10]    The fixed cost portion of a soil removal is greater for single family jobs than for multifamily jobs. Presumably, this reflects the fact that larger jobs provide a greater return on equipment use and thus the opportunity cost of the backhoe is less.

mutlifamily interior dust cleanup ($262 per unit) described in Section 5.6.1.  Soil transportation costs are calculated assuming a distance of 100 miles to the landfill.  Economies of scale are achieved if soil is removed from both the perimeter and remote area due to the opportunity cost of using a backhoe as well as the cost of an interior dust cleanup.  All multifamily *buildings* are assumed to conduct soil abatements in year one if required by lead-hazard levels.

**Multifamily Hazardous Waste Disposal of Soil.**  As discussed above, in certain cases, the cost of disposal of soil as hazardous waste is added to the soil intervention cost.  Soil is considered hazardous if it fails the Toxicity Characteristic Leaching Procedure (TCLP) for lead.  It is assumed that multifamily buildings with a soil lead level greater than 2000 ppm will fail the test, and will, therefore, incur the additional soil disposal costs.  Soil disposal costs are calculated based upon the average quantity of soil removed and the per ton disposal cost estimated in the "Single-Family Hazardous Waste Disposal of Soil" section above.  Assuming that six inches of topsoil are removed, a volume of 24 yd$^3$ is removed from the foundation and/or 95 yd$^3$ from areas away from the foundation or 7.4 yd$^3$ from play areas.  The incremental cost of disposing of soil as hazardous waste is estimated to be $4,269 (perimeter only), $17,217 (remote area only), $21,486 (both perimeter and remote area) and $1,337 (play area) for an average 30-unit building.  The same mixing principles apply as apply to single-family hazardous waste disposal of soil.

**Effectiveness.**  Soil removal was assumed to reduce the soil lead level to 150 ppm in areas where soil was removed, based on the average of the lead levels in the replacement soil in the Urban Soil Lead Abatement Demonstration Project (Elias, 1993).  Soil removal was also assumed to affect dust.  The reduction of dust lead concentration was variable, depending on other interventions performed (see Battelle 1997).  The dust cleaning that accompanies soil removal was assumed to reduce dust loads to 40 μg/ft $^2$.

**Duration.**  Soil removal was assumed to be permanent since the topsoil containing lead was removed based on Battelle (1997).  The dust effects were also assumed to be permanent as the presumed source of lead had been removed.

### 5.6.4   Overall Intervention Strategies

Assumptions regarding evaluation activities and intervention work determined which unit costs were associated with different housing populations.  As stressed in the introduction, this analysis followed the language of the §403 regulations and assumed that individual housing owners respond to hazards on a medium-specific basis.  In cases where multiple hazard levels were exceeded, adjustments were made to avoid multiple counting of costs.  For example, the costs for high-intensity interior and exterior paint intervention in multifamily homes both include costs for window replacement, so adjustments were necessary in units performing both interventions.

**Exhibit 5-7**
**Soil Abatement Costs - Multifamily Building of 30 Units**

| Abatement Activity | Unit Cost ($) | Perimeter (area or soil quantity) | Remote (area or soil quantity) | Play Area (area or soil quantity) | Total Perimeter Cost ($) | Total Remote Area Cost ($) | Total Perimeter and Remote Area Cost ($)* | Total Play Area Cost ($) |
|---|---|---|---|---|---|---|---|---|
| Soil removal using small backhoe | 7.00/yd$^3$ (+$390) | 24 yd$^3$ | 95 yd$^3$ | 7.4 yd$^3$ | 555 | 1,057 | 1,222 | 442 |
| Backfill using small backhoe | 0.46/ft$^2$ | 1,275 ft$^2$ | 5,142 ft$^2$ | 400 ft$^2$ | 587 | 2,365 | 2,952 | 184 |
| Replacement soil cost | 40.00/yd$^3$ | 24 yd$^3$ | 95 yd$^3$ | 7.4 yd$^3$ | 944 | 3,809 | 4,753 | 296 |
| Raking and seeding (by hand) | 0.24/ft$^2$ | 1,275 ft$^2$ | 5,142 ft$^2$ | 400 ft$^2$ | 305 | 1,228 | 1,533 | 96 |
| Landfill (non-hazardous) | 35/ton | 31 tons | 124 tons | 9.62 tons | 1,074 | 4,333 | 5,407 | 337 |
| Soil transportation costs | 22/ton (100 miles to landfill) | 31 tons | 124 tons | 9.62 tons | 660 | 2,661 | 3,321 | 212 |
| Interior dust cleanup | 7,852/Building (30 units per building) | NA | NA | NA | 7,852 | 7,852 | 7,852 | 7,852 |
| Total (non-hazardous) | | | | | 11,977 | 23,304 | 27,039 | 9,418 |

* Represents certain economies of scale if soil is removed from both perimeter and remote area.

### 5.6.5. Enforcement Costs

There are no enforcement costs associated with §403 since it requires that the Agency set hazard standards for lead in paint, soil and dust that will be used in other sections of Title X to trigger interventions. The enforcement costs of these actions, however, are not attributable to §403 but to the section of the rule requiring the intervention. All intervention activity under §403 is voluntary and thus incurs no enforcement cost.

### 5.6.6   Implementation Costs

The implementation costs associated with §403 are of two types. The first is the cost of setting and promulgating the §403 hazard levels themselves; a negligible cost compared to the funding appropriated in Title X for intervention ($250 million in 1994). The second implementation cost is incurred by states or localities that voluntarily use the lead hazard standards set by the Agency as action levels in their own lead management programs. The size of these costs depends on the current level of activity at the state and local level, whether the hazard standards that the Agency sets are above or below those of the programs in place, and the number of programs that implement the hazard standards. If the Agency standards are more stringent than current practice, implementation costs could be significant. However, if the Agency standards are higher (i.e., less stringent) than those in practice, implementation costs will be negligible. If implementation costs are proportional to the number of homes affected, which could be the case if state or local authorities decided to track homes to assure intervention, then the inclusion of implementation costs in the benefit-cost analysis would favor higher hazard standards over lower ones, all other things being equal, since the number of homes to be tracked would be lower under higher hazard levels.

## 5.7 Number of Interventions and the Number of Housing Units that Exceed the Lead Hazard Standards

Using the normative model, the cost of any particular lead hazard standard is a function of the number of intervention actions of each type that occur and the unit cost for each of these actions. The number of intervention actions, in turn, is a function of the number of housing units that exceed the hazard standard under consideration. This section estimates the number of interventions; chapter 7 presents the resulting estimated costs and compares them to the monetary value of the benefits for various hazard standards.

As described in chapter 4, the model estimates net benefits of every combination of lead hazard standards and compares these estimates to determine which combination of standards maximizes net benefits. Due to the interactions among particular intervention actions, and the assumption that households will address all media which exceed the standards at the time of the arrival of a child, net benefits are estimated in the context of responding to each of the individual standards (paint, floor dust, windowsill dust and soil). Net benefits are not estimated for a single medium alone. For example, all soil interventions include a dust clean-up following the removal and replacement of soil. Where a soil intervention is performed, therefore, a separate dust cleaning is not required regardless of the pre-intervention level of lead in the dust. If dust standards were evaluated independent of soil interventions, the number of dust interventions would be overestimated, since it would include homes that are actually receiving their dust cleaning as part of their soil interventions. Likewise, homes that exceed both the floor and the windowsill dust standards would receive one dust cleaning not two. To avoid this potential double counting, and to properly assign costs and benefits to specific combinations of standards, the analysis estimates costs, benefits and net benefits for combinations of hazard standards.

The following subsections explore how the number and mix of interventions varies under alternative combinations of lead hazard standards.  Since we are interested in illustrating the relationship between changes in a specific standard and the number of homes that exceed that standard as well as a reasonable combination of standards, each medium is investigated under the assumption that the standards for the other media are set at the option which EPA has chosen.   The final option, and the number of interventions for that combination of lead hazard standards, are:

| Intervention Activity | Final Standard | Number of Homes with Interventions during the Model Duration |
|---|---|---|
| Paint Repair/Maintenance | **Interior**: 2 sq ft or more, but less than 50 sq ft, of damaged paint<br>**Exterior**: 10 sq ft or more, but less than 100 sq ft, of damaged paint | 7.0 million homes with paint interventions |
| Paint Abatement | **Interior**: 50 sq ft or more of damaged paint<br>**Exterior**: 100 sq ft or more of damaged paint | |
| Dust Cleaning | floor dust loading = 40 µg/ft$^2$, or windowsill dust loading = 250 µg/ft$^2$, or both | 19.0 million homes with dust interventions |
| Soil Removal and Replacement | lead in soil  = 1200 ppm | 3.8 million homes with soil interventions |

### 5.7.1    Number of Homes Performing Interventions for Alternative Floor Dust Standards

As shown in Exhibit 5-8, the number of homes performing dust interventions (not including dust cleaning associated with either paint or soil abatements), and the total number of homes performing any intervention varies only slightly with variations in the floor dust standard.  The standards (shown on the horizontal axis) become less stringent as we move from left to right.  The horizontal axis gives the loading of lead in the floor dust at which interventions are called for, the higher this number, the more homes that "pass" the test (i.e. the fewer homes that exceed the standard).  The number of homes performing soil abatements (about 3.8 million homes at the soil standard given above -- 1200 ppm) and the number performing any form of paint intervention (about 7 million homes at the paint standard given above) do not change with changes in the floor dust standard.  The total number of homes performing some form of intervention is less than the sum of homes performing soil, dust or paint interventions because some homes will perform multiple types of intervention activities.

In this exhibit, the floor dust standard varies between 40 µg/ft$^2$ (the assumed post-intervention dust lead loading) and 380 µg/ft$^2$ (the highest pre-intervention loading in the data set).  The number of homes performing dust interventions is relatively insensitive to the stringency of the floor dust standards. The number of homes that perform a dust cleaning, over the model period, declines slowly for standards between 40 and 90 µg/ft$^2$, dipping at a standard of 100 µg/ft$^2$ , and declining slowly after that, approaching but staying above the number of homes that perform some form of paint interventions.

**Exhibit 5-8**
**Number of Homes Performing Interventions (Over Model Period)**



Other standards:
Soil: 1200 ppm
Sill Dust: 250 µg/ft²
Paint damage interior:
Maintenance: 2 ft²
Abatement: 50 ft²
exterior:
Maintenance: 10 ft²
Abatement: 100 ft²

Note: the "Dust Cleaning" values do not include homes with cleaning done accompanying soil removal of interior

The line which represents the total number of homes performing an intervention over the model period traces a very similar path, but overall declines slightly less, indicating that some of the homes that no longer do dust interventions, as the floor dust standards become less stringent, continue to do soil and/or paint interventions. Because both paint and soil interventions are much more expensive than dust cleaning, the costs will not decline as rapidly as the total number of homes performing an intervention. At highly stringent floor dust standards (the left-hand end of the horizontal axis), homes with dust cleaning comprise a much larger percentage of total homes with any intervention than is true at the other end of the spectrum.

### 5.7.2  *Number of Homes Performing Interventions for Alternative Windowsill Dust Standards*

The next exhibit (Exhibit 5-9) presents the same type of information for variations in the windowsill dust standard. The windowsill dust standards vary over a much broader range than the floor dust standards. The minimum value (100 µg/ft²) equals the assumed post-intervention lead loading. The maximum pre-intervention loadings in the data set are substantially higher than the 1,000 µg/ft² shown on the exhibit, but the number of homes performing dust cleaning is nearly constant above the 1,000 µg/ft² standard. Again, the number of homes performing soil interventions and the number performing paint interventions do not change with changes in the windowsill dust standards.

The number of homes performing dust cleaning is very sensitive to the windowsill dust standards. It declines rapidly at the most stringent standards, levels out slightly, and then declines even more at the 200-210 µg/ft² level.  After that steep drop, the number of homes declines more gradually with decreasing stringency of the windowsill dust standards.

As with the floor dust standards, the line representing the total number of homes performing an intervention over the model period traces a very similar path, but overall declines slightly less than the number of homes performing dust cleanings.  This indicates that some of the homes that no longer do dust interventions, as the windowsill dust standards become less stringent, continue to do soil and/or paint interventions.  Again, costs should not decline as rapidly as number of homes, because the mix of interventions shifts towards the more expensive ones as the stringency of the windowsill standards decreases.

**Exhibit 5-9**
**Number of Homes Performing Interventions (Over Model Period)**



### 5.7.3   *Number of Homes Performing Interventions for Alternative Soil Standards*

The story for variations in soil standards is a little more complicated.  As above, the number of paint interventions that occur remains constant over the variations in soil standards.  There are, however, apparent tradeoffs between soil and dust interventions.  As explained at the beginning of this section, soil abatements include a dust cleaning.  Some homes that would perform a soil abatement under a stringent standard, may not perform the soil intervention but would perform a dust cleaning alone under a less stringent soil standard.  Thus, homes might switch from the soil intervention to the dust intervention category.

In Exhibit 5-10, soil standards range from 150 ppm (the assumed post-intervention soil lead concentration) to slightly over 7000 ppm (the highest pre-intervention soil lead level in the data set).  Homes are highly concentrated at low soil lead levels, with the number of homes performing soil interventions dropping by about one-half as soil standards decrease from 150 ppm to about 500 ppm.  The decline in the number of homes continues only slightly less rapidly to about 900 ppm; it declines more gently to about 3000 ppm.

**Exhibit 5-10**
**Number of Homes Performing Interventions (Over Model Period)**



While the number of homes performing soil abatements is declining rapidly as the soil standard becomes less stringent, the number of homes performing dust cleaning is increasing at a substantial rate.  The result is that the total number of homes performing some form of intervention falls as soil standards become less stringent in the 150 - 1000 ppm range.  Then the total number of homes performing interventions levels off, as the majority of homes that no longer warrant a soil intervention now require a dust cleaning under the floor dust standards of 40 µg/ft$^2$  and windowsill dust standards of 250 µg/ft$^2$ .  In this case, costs should fall more rapidly than the number of homes performing an intervention because the relatively expensive soil interventions are being replaced with less expensive dust cleaning.

## 5.8 Likely Rates of Intervention and Their Impact on the Cost Estimates

As described in Chapter 4, alternative hazard standard candidates are evaluated in terms of the net benefits they would generate under a set of specific assumptions about the behavior of residential property owners and managers.  The results of this analysis are intended to inform decision-makers about the relative merits of the alternative standards by providing a set of comparable estimates.  The analysis, however, does not provide estimates of the likely rates of intervention, and thus the likely costs of interventions, under these standards.

The main objective of this section is to provide estimates of the likely costs that would result from the establishment of the hazard standards.  Data limitations preclude defining a baseline that accurately reflects future intervention activity levels in the absence of §403 hazard standards.  Likewise, data are not available on which to base an estimate of the effectiveness of the hazard standards in changing behavior, especially since the behavior changes will largely depend on the effectiveness of the information programs that will accompany the standards.  Therefore, the costs estimated in this section represent an estimate of total post-regulation costs, not the incremental costs due to the §403 standards.

The most complete data currently available on intervention rates are data from the state of Massachusetts.  For nearly ten years, Massachusetts has required that all residential lead inspections and interventions be reported to the state.  This is the only state with data on all such activities for an extended period of time.  In many ways, the Massachusetts regulations are very similar to the §403 hazard standards.  In addition, Massachusetts vigorously enforces state regulations that require that landlords abate lead-based paint.  State programs that provide long-term, interest-free loans to low-income households to pay for lead abatements, a tax on real estate transfers that supports the state Childhood Lead-Based Paint Protection Program, mandatory testing of children's blood for lead, and active local public health programs further promote the removal of lead-based paint.  Given all this support, it is unlikely that national intervention rates will exceed those seen in Massachusetts.

Thus, the costs of interventions were estimated assuming that the §403 standards were in effect, but using an intervention rate consistent with that found in Massachusetts, as opposed to the birth rate.  Since the Massachusetts program contains several factors that promote interventions that may not be present in the federal program, a second intervention rate was also used to estimate costs.  This second rate was set at one-half of the Massachusetts rate.  Exhibit 5.11 presents the total costs (over 50 years discounted at 3 percent) and the total number of homes with interventions for the three alternative rates of intervention activity: the rate in the analysis model, a rate equivalent to the Massachusetts rate, and one-half the Massachusetts rate.  If the rate of interventions were equivalent to the average rate in Massachusetts, and

the mix of interventions were consistent with the §403 standards, the total costs would be approximately 42 percent of the costs estimated by the "birth-trigger" model.  It is likely that the actual rate, and thus the actual total costs, will fall below the Massachusetts rate.  As shown in Exhibit 5.11, if the actual rate were to fall between the Massachusetts rate and one-half of the Massachusetts rate, between 6.4 and 12.8 million homes would experience an intervention during the 50-year period, or an average of 128,000 to 254,000 homes a year.  The present value of the 50-year costs would range from $15.3 to $29.0 billion.

**Exhibit 5.11**
**Costs Under Alternative Assumptions About Intervention Rates: Final Standards***

| Intervention Rate | Present Value of Total Costs over 50 Years, Discounted at 3 Percent ($billion) | Number of Homes With Interventions (million) |
|---|---|---|
| Model used in Chapter 6 | $68.9 | 21.6 |
| Equivalent to Massachusetts Rate | $29.0 | 12.8 |
| Equivalent to One-Half of Massachusetts Rate | $15.3 | 6.4 |

* Final Standards:
    Interior paint: 2 sq ft or more — repair, 50 sq ft or more — abate
    Exterior paint: 10 sq ft or more — repair, 100 sq ft or more — abate
    Window sill dust: 250 sq ft$^2$
    Floor dust: 40 µg/ft$^2$
    Soil: 1,200 ppm

# Appendix 5.A: Estimating Soil Removal Costs

The following discussion describes the methodology used to estimate soil intervention costs for single-family homes.  As described in the risk assessment, soil removal occurs when the average of the foundation (near) and remote soil-lead concentrations or the play area alone exceeds the lead hazard standard.  When the lead hazard standard is exceeded, the intervention strategies are determined by: 1) the average of the pre-intervention soil-lead concentration in samples taken at the dripline and entryway sampling areas (i.e., the foundation); and 2) the pre-intervention soil-lead concentration in samples taken at the remote areas.  If the average pre-intervention soil concentrations exceed the lead hazard standard, one of the following three scenarios will result:

- The pre-intervention soil lead concentration at the foundation of the house is greater than the hazard standard, thereby triggering a soil removal intervention at the foundation of the house;
- The pre-intervention soil lead concentration in yard areas away from the foundation of the house is greater than the hazard standard, thereby triggering a soil removal intervention in yard areas away from the foundation; or
- Both the pre-intervention soil lead concentrations at the foundation of the house and yard areas away from the foundation exceed the hazard standard, thereby triggering a soil removal in both areas.

If the average pre-intervention soil-lead concentration does not exceed the lead hazard standard, then the remote sample is compared to the standard.  If it exceeds the standard, then removal of soil from the play area is triggered.

To account for each of these possible scenarios, a unit cost methodology was developed to estimate the total cost of abating the foundation and remote areas of the yard both together and individually, as well as the play area.  The following discussion describes the methodology used to estimate the unit costs and the size of the areas likely to be treated, respectively.

## Unit Cost Estimates

Unit costs for soil abatement were estimated based on standard reference manuals used in construction cost estimation: 1) *Hometech Remodeling and Renovation Cost Estimator* (1996); and 2) R.S. Means' *Repair and Remodeling Cost Data* (1996).  The R.S. Means' *Repair and Remodeling Cost Data* book is recommended for residential, commercial, and industrial repair and remodeling projects costing between $10,000 and $1 million, and was therefore used in estimating multi-family costs.  The *Hometech Remodeling and Renovation Cost Estimator* was used to generate costs for a single-family home, as suggested by Robert Santucci, cost consultant to the National Center for Lead-Safe Housing (NCLSH). Exhibit 5-A-1 presents the unit cost values used in this analysis.

**Exhibit 5-A-1**
**Unit Cost Estimates for Soil Abatements**

| Abatement Activity | Single-family Home | Multi-family Building |
|---|---|---|
| | **Unit Costs** | **Unit Costs** |
| Soil removal using small backhoe* | $6.08/yd$^3$ (+$525) | $7.00/yd$^3$ (+$390) |
| Backfill using small backhoe* | $0.20/ft$^2$ | $0.46/ft$^2$ |
| Replacement soil cost | $40.00/yd$^3$ | $40.00/yd$^3$ |
| Raking and seeding (by hand) | $0.30/ft$^2$ | $0.24/ft$^2$ |
| Soil transportation costs | $22/ton | $22/ton |
| Landfill (non-hazardous) | $35/ton | $35/ton |
| Interior dust cleanup | $391 | $7,852 |
| Landfill (hazardous) | $139/ton | $139/ton |

\* A small backhoe is defined to have a ½ cubic yard bucket.

The fixed cost portion of a soil removal, shown in parentheses in the first row of Exhibit 5-A-1, is greater for single-family jobs than for multi-family jobs.  Presumably, this reflects the fact that larger jobs provide a greater return on equipment use and thus the opportunity cost of the backhoe is less.  Alternatively, the larger per cubic yard cost for multi-family jobs may compensate for the lower fixed cost.  Also, note that the cost of the one-time dust clean-up constitutes a larger percent of total costs for multi-family jobs than for single-family jobs.  This is reasonable given that the amount of soil removed from a multi-family site is proportionally much less than the number of units at the same site.

**Area Calculations**

In order to calculate the total cost of conducting a soil abatement, the unit cost estimates described above were combined with estimates of the size of the area likely to treated.  The following sections describe the methodology used to estimate these areas for single-family homes.

*Area Calculations — Single Family Homes*
As described above, soil lead concentrations are measured for two areas of the yard -- perimeter areas and yard areas away from the foundation (i.e., remote areas) -- and are therefore potentially subject to a soil removal.  Because the HUD data used in the analysis does not include data on the size of either the home nor yard, average areas and average costs must be calculated for use in the analysis.  Data were not available to directly generate national level estimates of the average perimeter area and remote area for single-family homes in the United States; however, data were available from the American Housing Survey (AHS) to estimate these values based on lot size, square feet within the house or apartment, and the number of floors in the house or apartment.[11]  To briefly summarize the methodology: 1) the house's footprint (i.e., the amount of land covered by the building) was estimated by dividing the square footage of the house by the number of floors in the home; 2) from the footprint of the house, a perimeter was extrapolated (assuming a uniform shape for all homes); 3) from the perimeter of the home, an estimate of the *perimeter area* extending three feet from the foundation of the home was calculated; and 4) the *remote area* was

---

[11]     The AHS, conducted by the Census Bureau, collects detailed data on the Nation's housing stock using a sample of roughly 55,000 homes.  Weights are assigned to each record in order to extrapolate values to the Nation.

calculated by subtracting the foundation and footprint areas from the total size of the lot.  Single-family home play areas were assumed to average 200 square feet in size.  The following sections describe each of these steps in greater detail, with each section building upon the values calculated in the previous section.

### *Median Lot Size Calculation*

Median lot sizes were calculated for both single-family attached and single-family detached homes and three geographical categories (to be used later in the analysis) using data from the 1995 American Housing Survey (AHS).  Buildings with 2-4 units were also included in this analysis to maintain consistency with other parts of the analysis and HUD's definition of a single-family home: a residence with 1 to 4 units.  The AHS does not report lot sizes for 2-4 unit buildings; therefore, the mid-point of the single-family attached and single-family detached lot size range was used in the absence of any alternative data.  According to the AHS, units in buildings with 2-4 units make up only thirteen percent of all units in buildings with 1-4 units.  Median lot sizes are summarized in Exhibit 5-A-2 with response rates  indicated in parentheses.  Response rates are not applicable to buildings containing 2-4 units because these data were not available from the AHS.

**Exhibit 5-A-2**
**Median Lot Sizes (sq. ft.) from the American Housing Survey**

| Central City | | | Suburb | | | Non-Metro | | |
|---|---|---|---|---|---|---|---|---|
| S.F. Detached | S.F. Attached | 2-4 unit building | S.F. Detached | S.F. Attached | 2-4 unit building | S.F. Detached | S.F. Attached | 2-4 unit building |
| 8,400 (63 percent) | 3,000 (21 percent) | 5,700 (not applicable) | 15,000 (76 percent) | 5,500 (22 percent) | 10,250 (not applicable) | 40,000 (70 percent) | 11,000 (25 percent) | 25,500 (not applicable) |

Geographic categories are defined as follows based on the categorization used in the American Housing Survey -- *Central City*: Central City; *Suburb*: Urbanized Suburb, Other Urban Suburb, Rural Suburb; *Non-metro*: Urbanized Non-Metro, Other Urban Non-Metro, Rural Non-Metro.

### *Median Footprint Calculation*

Median footprint values were calculated for both single-family attached and single-family detached homes using data from the 1995 and 1985 AHS.  Median footprint values were then subtracted from the median lot size calculations (described above) to generate estimates of yard size.[12]  As previously discussed, buildings with 2-4 units were also included in this analysis.  However, a different methodology was used to estimate the median footprint of a building with 2-4 units.

The AHS does not report the footprint of a home; therefore, the value was derived for single-family attached and single-family detached homes by dividing square footage values (extracted from the 1995 AHS) by the number of floors in the home (extracted from the 1985 or 1995 AHS).  This methodology requires the assumption that the square footage of a multi-story, single-family home is uniformly distributed across all stories.  Fifty percent of the single-family homes reporting floors data contain only one story and are therefore unlikely to be affected by this assumption.

---

[12]     This methodology does not account for the presence of garages, porches, and paved areas that would not be subject to a lead abatement.

Data on the number of floors were extracted from both the 1985 and 1995 surveys because the Census Bureau returns to the same housing units each year the survey is conducted and since 1985 has not collected floors data when units had been visited during a previous survey year.  Therefore limited floor data were available from the 1995 survey alone, and the 1985 floor values were merged with the 1995 records using a unique ID number assigned to each housing unit sampled by the AHS.  All usable records -- records with square footage and number of floors -- were combined to form one data set.

A different methodology was used to calculate the footprint of a 2-4 unit building because the AHS reports square footage values on a unit basis and does not report the square footage of an entire multi-family building.  The analysis assumes that all 2-4 unit buildings are configured vertically with equal sized units one above the other (similar to a Boston triple-decker).[13]  By making this assumption, the square footage of an individual unit could be used to represent the entire footprint of the building.  No data were available from the AHS to test the strength of this assumption.  Median square footage values were used to estimate the footprint for 2-4 unit buildings in each of the geographic areas considered in this analysis (central city, suburb, and non-metro).  Median footprint values are presented in Exhibit 5.A-3.

**Exhibit 5-A-3**
**Median Footprint Sizes (sq. ft.) Derived from the American Housing Survey**

| | Central City | | | Suburb | | | Non-Metro | |
|---|---|---|---|---|---|---|---|---|
| S.F. Detached | S.F. Attached | 2-4 unit building | S.F. Detached | S.F. Attached | 2-4 unit building | S.F. Detached | S.F. Attached | 2-4 unit building |
| 1,135 (83 percent) | 667 (46 percent) | 900 (46 percent) | 1,150 (81 percent) | 700 (60 percent) | 946 (57 percent) | 1,090 (86 percent) | 671 (65 percent) | 840 (59 percent) |

Geographic categories are defined as follows based on the categorization used in the American Housing Survey -- *Central City*: Central City; *Suburb*: Urbanized Suburb, Other Urban Suburb, Rural Suburb; *Non-metro*: Urbanized Non-Metro, Other Urban Non-Metro, Rural Non-Metro.

*Perimeter Area Calculation*
Calculating the perimeter area required three pieces of information: 1) the perimeter of the home, 2) the configuration or shape of the home, and 3) the distance from the foundation that would likely be subject to a soil removal.  Santucci estimated that an abatement action would likely involve an area extending three feet from the foundation of the home.  This value, coupled with the median footprint sizes estimated above, allowed us to extrapolate a measure of the home's perimeter, assuming a rectangular home with a front to side ratio of 2:3.  For example, to calculate the perimeter of a central city, single-family detached home with a footprint of 1,135 square feet, the following formula was used to calculate the length of the home's front and side :

---

[13]     This is equivalent to assuming that the number of floors in the building equaled the number of units, and that each floor of a unit was the same size.  Examples are side-by-side, two-story duplexes.

$$FRONT = \sqrt{\frac{FOOTPRINT}{1.5}} \quad where\ FOOTPRINT = 1,135\ sq.\ ft.;$$

$$SIDE = \sqrt{\frac{FOOTPRINT}{0.666}} \quad where\ FOOTPRINT = 1,135\ sq.\ ft.$$

The perimeter areas calculated for single-family detached, single-family attached, and 2-4 unit buildings are presented in Exhibit 5-A-4. Based on Santucci, single-family attached homes are assumed to only have soil present in the front or back of the home; therefore, perimeter areas were calculated based upon the FRONT length only. Perimeter areas for 2-4 unit buildings were converted to per unit values assuming three units per building.

**Exhibit 5-A-4**
**Perimeter Area Sizes (sq. ft.) Derived from the American Housing Survey**

| | Central City | | | Suburb | | | Non-Metro | | |
|---|---|---|---|---|---|---|---|---|---|
| | S.F. Detached | S.F. Attached | 2-4 unit building | S.F. Detached | S.F. Attached | 2-4 unit building | S.F. Detached | S.F. Attached | 2-4 unit building |
| | 496 | 63 | 147 | 499 | 65 | 151 | 486 | 63 | 142 |

Geographic categories are defined as follows based on the categorization used in the American Housing Survey -- *Central City*: Central City; *Suburb*: Urbanized Suburb, Other Urban Suburb, Rural Suburb; *Non-metro*: Urbanized Non-Metro, Other Urban Non-Metro, Rural Non-Metro.

### *Remote Area Calculation*

The remote area is defined by this analysis as the yard area away from the foundation of the home. Estimates of remote areas for single-family attached, single-family detached, and 2-4 unit homes were calculated by subtracting the median footprint values and perimeter areas from the median lot size values for each of the geographic categories (central city, suburb, and non-metro). Calculations of perimeter areas, footprint areas, and lot sizes are described above. Remote areas for 2-4 unit buildings were converted to per unit values assuming three units per building. Remote area values for all single-family building types are presented in Exhibit 5.A-5.

**Exhibit 5-A-5**
**Remote Area Sizes (sq. ft.) Derived from the American Housing Survey**

| Central City | | | Suburb | | | Non-Metro | | |
|---|---|---|---|---|---|---|---|---|
| S.F. Detached | S.F. Attached | 2-4 unit building | S.F. Detached | S.F. Attached | 2-4 unit building | S.F. Detached | S.F. Attached | 2-4 unit building |
| 6,769 | 2,270 | 1,551 | 13,351 | 4,735 | 3,051 | 38,424 | 10,265 | 8,173 |

Geographic categories are defined as follows based on the categorization used in the American Housing Survey -- *Central City*: Central City; *Suburb*: Urbanized Suburb, Other Urban Suburb, Rural Suburb; *Non-Metro*: Urbanized Non-Metro, Other Urban Non-Metro, Rural Non-Metro.

### *Bottom Line Remote Area and Perimeter Area Calculation - Single Family Home*

A weighted average of the perimeter area and remote area was calculated for each of the three geographic categories based on the prevalence of single-family attached and single-family detached homes as well as the prevalence of units in 2-4 unit buildings. Average perimeter areas and remote areas are summarized in Exhibit 5-A-6. As the perimeter areas varied little across the three geographic locations, a straight average of the three values was used in the final cost calculation: 417 square feet. Remote area values varied significantly across the three geographic categories; therefore, the central city value was used assuming a higher incidence of lead contaminated soil in central city areas. One-half the central city value (i.e., 2,571 square feet) was used in the final cost calculation because, where lots are very large, it is likely that soil would be removed from only a portion of the entire yard. In addition, paved areas, which were not accounted for in the area estimates, would not be subject to soil removal.

**Exhibit 5-A-6**
**Weighted Average Perimeter Areas and Remote Areas By Geographic Location**

| Abatement Area | Weighted Average Area (sq. ft.) | | |
|---|---|---|---|
| | Central City | Suburb | Non-Metro |
| Perimeter | 373 | 432 | 447 |
| Remote | 5,142 | 11,700 | 35,220 |

Geographic categories are defined as follows based on the categorization used in the American Housing Survey -- *Central City*: Central City; *Suburb*: Urbanized Suburb, Other Urban Suburb, Rural Suburb; *Non-Metro*: Urbanized Non-Metro, Other Urban Non-Metro, Rural Non-Metro.

# References

Abt Associates.  1995a.  TSCA Title IV, Sections 402(a) and 404: Target Housing and Child-Occupied Facilities Final Rule Regulatory Impact Analysis.  Prepared for U.S. EPA, Office of Pollution Prevention and Toxics, Regulatory Impacts Branch.  September.

Abt Associates.  1995b.  Exemption of Lead-Based Paint Architectural Debris from Subtitle C of RCRA, Analysis of Costs, Benefits, and Risks.  Prepared for Office of Solid Waste, U.S. EPA.  September 11.

Battelle.  1997.  *Risk Assessment to Support Standards for Lead in Paint, Dust, and Soil.*  Prepared by Battelle, for National Program Chemicals Division, Office of Pollution Prevention and Toxics, U.S. Environmental Protection Agency.  EPA 747-R-97-006, December.

Elias, R. 1993.  Personal communication between Rob Elias, U.S. Environmental Protection      Agency, Office of Research and Development and Alice Tome, Abt Associates Inc.  March 16.

Flaherty, P.  1995, 1996.  Personal communication between Pat Flaherty, Specialty Construction, Fridley, MN and Chris Paciorek, Abt Associates Inc.  October, 1995 and July, 1996.

Hometech.  1996.  *Remodeling and Renovation Cost Estimator.*

Lead-Based Paint Hazard Reduction and Financing Task Force (Task Force).  1995.  Putting the Pieces Together: Controlling Lead Hazards in the Nation's Housing.  HUD-1547-LBP.  July.

Lim, B.  1996.  Lead paint abatement and repair and maintenance study in Baltimore.  Materials from the Quality Assurance Project Plan sent by Benjamin Lim of U.S. EPA, Office of Pollution Prevention and Toxics (OPPT), Chemical Management Division to Nishkam Agarwal, U.S. EPA, OPPT, Regulatory Impacts Branch.  February.

Means, R.S.  1996.  *Repair and Remodeling Cost Data.*

National Center for Lead-Safe Housing (NCLSH).  1995.  SpecMaster Database.  Provided to Chris Paciorek, Abt Associates by Jonathon Wilson, NCLSH. December.

National Center for Lead-Safe Housing (NCLSH).  Undated.  Creating a Lead-Based Paint Hazard Control Policy: A Practical, Step-by-Step Approach for Nonprofit Housing Organizations.  Technical Assistance Bulletin 2.

Office of the President.  1996.  Economic Report of the President.

Perket, C.  1994.  Hazardous Waste Landfill Prices, 1989-1994.  EI Digest, November, pp.  33-36.

Santucci, R.  1996.  Personal communication between Robert Santucci, cost consultant to the National Center for Lead-Safe Housing and president of Urban Restoration Corporation, North Carolina, and Chris Paciorek, Abt Associates Inc.   July.

Spittler, T.  1993.  Personal communication between Tom Spittler, U.S. EPA Region I, and Alice Tome, Abt Associates Inc.

U.S. Department of Commerce (DOC) and U.S. Department of Housing and Urban Development (HUD). 1993.  American Housing Survey for the United States in 1993.  U.S. Department of Commerce, Economics and Statistics Administration and Bureau of the Census and U.S. Department of Housing and Urban Development, Office of Policy Development and Research.  Current Housing Reports H150/93.  Issued February 1995.

U.S. Department of Commerce (DOC) and U.S. Department of Housing and Urban Development (HUD). 1995.  American Housing Survey for the United States in 1995.  U.S. Department of Commerce, Economics and Statistics Administration and Bureau of the Census and U.S. Department of Housing and Urban Development, Office of Policy Development and Research.  Issued 1997.

U.S. Department of Housing and Urban Development (HUD). 1990.  Comprehensive and Workable Plan for the Abatement of Lead-Based Paint in Privately Owned Housing:  Report to Congress.  Washington, DC. December.

U.S. Department of Housing and Urban Development (HUD).  1993.  National Survey of Lead-Based Paint in Housing: Documentation of Analytical Data Files.  Prepared for U.S. Department of Housing and Urban Development by Westat, Inc..  November 30.

U.S. Department of Housing and Urban Development (HUD). 1995.  Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing.  Office of Lead-Based Paint Abatement and Poisoning Prevention.  June.  Available from HUD USER (800-245-2691).

U.S. Department of Housing and Urban Development (HUD). 1996.  Regulatory Impact Analysis of the Proposed Rule on Lead-Based Paint: Requirements for Notification, Evaluation and Reduction of Lead-Based Paint Hazards in Federally-Owned Residential Property and Housing Receiving Federal Assistance.  Prepared by ICF for Office of Lead-Based Paint Abatement and Poisoning Prevention, U.S. Department of Housing and Urban Development.

U.S. Environmental Protection Agency (EPA). 1992.  Applicability of RCRA Disposal Requirements to Lead-based Paint Abatement Wastes. Office of Pollution Prevention and Toxics. June.

U.S. Environmental Protection Agency (EPA).  1994.  Estimating Costs for the Economic Benefits of RCRA Noncompliance.  Office of Regulatory Enforcement.  Obtained by Abt Associates from DPRA, Incorporated, St. Paul, MN.

U.S. Environmental Protection Agency (EPA).  1995a.  Guidance on Identification of Lead-Based Paint Hazards.  Federal Register 60 (175): 47248-47256, September 11.

U.S. Environmental Protection Agency (EPA).  1995b.  Lead-Based Paint Risk Assessment Model Curriculum.  Prepared for the Chemical Management Division by The National Center for Lead-Safe Housing.  June.  AVI-0006700-1 and AVI-0006700-2.

Westat, Inc.  1995.  Report on the National Survey of Lead-Based Paint in Housing.  Prepared for U.S. EPA.  March 17.

# 6. Benefits

## 6.1 Introduction

Chapter 4 provided a description of the analytic approach used to conduct this benefit-cost analysis, and in particular the linkage between the economic analysis and the risk assessment performed in support of the §403 standards (Battelle, 1997).  For a thorough discussion of the health hazards associated with lead focusing on those effects that are addressed in the benefits estimates provided here, the reader is referred to Chapter 2 of the Battelle risk assessment document.  The reader is also referred to Chapters 3 and 4 of the risk assessment document for further details on the exposure modeling and dose-response modeling incorporated into the estimation of the benefits of §403 standards discussed both in this Chapter and subsequently in Chapter 7.

As described in Chapter 4, the benefit-cost analysis essentially compares alternative futures over a 50 year time horizon: a baseline or "no-action" alternative  for which it is assumed that no changes are made to current ambient lead exposure conditions, and a "post-action" alternative for which it is assumed that the ambient lead exposure conditions are reduced in specific ways in response to the promulgation of §403 standards.

The benefits of implementing the §403 standards can be expressed in several ways.  These include estimates of:

- The reduction in environmental lead levels (i.e., in paint, soil and dust) to which children are exposed;

- The number of children who experience lower exposure levels than they would have in the baseline;

- The reduction in blood lead levels in children resulting from lowered exposure levels;

- The reduction in the incidence of specific adverse effects or consequences associated with elevated blood lead levels in children (including IQ changes, medical interventions, remedial or compensatory education); and

- The monetary value associated with the reduction of the incidence of those adverse effects.

The remainder of this chapter presents these §403 benefits in two sections.   Section 6.2 addresses the benefits as noted in the first four bullets above, which deal with reductions in environmental lead levels and changes in the incidence of adverse health consequences associated with the exposure reductions.  Section 6.3 addresses the valuation or monetization of these benefits to allow for a comparison with the costs of the §403 standards.

Note that within this chapter, the benefits are presented only for the final §403 standards, namely:

> Floor dust: 40 μg/ft$^2$
> Windowsill dust: 250 μg/ft$^2$
> Soil: 1200 ppm (does not include benefits for play area standard of 400 ppm)
> Paint: Interior lead paint >2 ft$^2$ of damage; Exterior lead paint >10 ft$^2$ of damage

In Chapter 7, where benefits are compared directly with costs, the monetized value of the benefits are presented for a range of §403 alternatives.

## 6.2 Benefits as Reduced Exposure and Adverse Health Consequences

As noted above, this section provides estimates of the benefits of the final §403 standards in terms of reduced exposure to children and the associated reduction in adverse health consequences. In all cases, these are reductions measured against a baseline of no changes in the ambient lead exposure conditions. In other words, this is a marginal analysis with a baseline of no intervention.

As described in Chapter 4, the choice of the intervention strategy (i.e. the specific actions to be taken in a housing unit to reduce lead levels) is a function of the particular lead hazard standard under analysis and the lead conditions of that housing unit. Also, the timing of interventions in the analysis is a function of the timing of childbirths. In homes where hazard standards are exceeded, it is assumed that the interventions will be carried out just prior to the arrival of a newborn child. Furthermore, they are repeated when necessary as long as any child under age 6 is still present in the home.

Six intervention actions are considered in this analysis. These include two interior paint interventions (high-intensity and low-intensity interior paint interventions); two exterior paint interventions (high-intensity and low-intensity paint interventions); one soil intervention; and one dust intervention. Depending on the conditions of the housing unit, various intervention elements were combined to form an intervention strategy. The effectiveness and duration levels associated with interventions determine the post-intervention conditions. These levels were discussed in Chapter 4 and at greater length in Battelle (1997). The assumed post-intervention conditions for each alternative are summarized in Exhibit 6-1.

Chapter 5 provides estimates of the number of homes over the course of 50 years where these interventions would take place in response to both the anticipated presence of a new child and the existence of environmental lead levels exceeding alternative standards.

In the benefit-cost model it is estimated that over the course of the 50 year period, approximately 173 million children will be born and occupy the approximately 98 million homes estimated to comprise the current US housing stock. Of these, it is estimated that 131 million children will occupy target housing stock built prior to 1979. Assuming interventions are performed as set forth in the model, approximately 46.0 million children, 34.7% of the 131 million children occupying target housing stock, will experience a reduction in exposure to environmental lead levels from paint, soil, and/or dust as a result of the §403 standards. Also, it is estimated that in the baseline, approximately 2.36 million children will experience elevated blood lead levels due to direct ingestion of paint chips over the 50 year period; with the final §403

standards it is estimated that only 1.09 million children will experience elevated blood lead due to direct ingestion of paint chips.

**Exhibit 6-1**
**Summary of Post-Intervention Conditions for Various Intervention Alternatives**
**(LBP refers to lead-based paint)**

| Abatement Alternative | Assumed Post-Intervention Conditions |
|---|---|
| High-Intensity Interior Paint | • Paint: Deteriorated interior LBP made inaccessible for 20 years<br>• Dust:  Floor dust lead loading level reduced to 40 µg/ft$^2$.<br>Window sill dust lead loading level reduced to 100 µg/ft$^2$.<br>Lead concentration level reduced to 20% of pre-intervention level for 20 years |
| Low-Intensity Interior Paint | • Paint: Deteriorated interior LBP made inaccessible for 4 years<br>• Dust:  Lead concentration level reduced to 20% of pre-intervention level for 4 years |
| High-Intensity Exterior Paint | • Paint: Deteriorated exterior LBP made inaccessible for 20 years<br>• Dust:  Lead concentration level reduced to 20% of pre-intervention level for 20 years |
| Low-Intensity Exterior Paint | • Paint: Deteriorated exterior LBP made inaccessible for 4 years<br>• Dust:  Lead concentration level reduced to 20% of pre-intervention level for 4 years |
| Dust | • Dust:  Floor dust lead loading level reduced to 40 µg/ft$^2$.<br>Window sill dust lead loading level reduced to 100 µg/ft$^2$.<br>Duration is 4 years in both cases.<br>Effect on dust lead concentration depends on other interventions implemented (see Battelle 1996) |
| Soil Removal | • Soil:   Soil lead concentration permanently reduced to 150 ppm areas where soil is removed<br>• Dust:  Floor dust lead loading level reduced to 40 µg/ft$^2$.<br>Window sill dust lead loading level reduced to 100 µg/ft$^2$.<br>Duration is permanent in both cases.<br>Effect on dust lead concentration depends on other interventions implemented (see Battelle 1996) |

Note: Lead levels remain constant in any case where starting levels are lower than assumed post-intervention ones.

In the baseline analysis, it is assumed that the blood lead levels of children would continue to reflect levels observed in the NHANES III, Phase 2 analysis characterized as a lognormal distribution with a geometric mean (GM) of 3.14 µg/dl, a geometric standard deviation (GSD) of 2.09, and a resulting expected value (arithmetic mean) of 4.12 µg/dl.  As discussed previously, EPA has employed two blood lead models (the IEUBK and the Empirical models) in the risk assessment to predict the effects of the reduction in environmental exposure levels.  Using the IEUBK model, it is estimated that the blood lead GM will be 2.66 µg/dl with a GSD of 1.84 (arithmetic mean of 3.20 µg/dl).  Using the Empirical model, it is estimated that the blood lead GM will be 3.02 µg/dl with a GSD of 2.04 (arithmetic mean of 3.89 µg/dl).

For the overall population of 173 million children for which these blood lead distributions apply, this is an average reduction of 0.92 µg/dl with the IEUBK model and 0.23 µg/dl for the empirical model. However, when it is recognized that these blood lead reductions are expected to occur only in the 46.0 million children noted above as being in target housing affected by these standards, it is estimated that the average blood lead reductions among those children affected are 3.49 µg/dl from the IEUBK model and 0.86 µg/dl from the Empirical model.

As noted in Chapter 2, the selected health end-points used in the assessment of the benefits of these standards include several specific blood lead levels identified by the CDC (1991) as critical values above which various levels of follow-up monitoring and/or specific medical interventions should be undertaken. Key among these are blood lead levels of 10 µg/dl and 20 µg/dl. It is estimated that for the baseline analysis approximately 10 million (of the 173 million children) born into current housing stock will have blood lead levels above 10 µg/dl, and 1 million will have blood lead levels above 20 µg/dl. With the §403 standards, these numbers are reduced to 2.6 and 8.1 million exceeding 10 µg/dl (for the IEUBK and Empirical models, respectively) and 0.08 and 0.7 million exceeding 20 µg/dl (again for the IEUBK and Empirical models, respectively).

Critical components of the estimated benefits of reduced blood lead levels in children are the potential improvement in IQ scores in general and the associated reduction in the incidence of low IQ scores (<70) in particular. As a result of the estimated reduction in average blood lead levels (coupled with the relationship between blood lead and IQ scores discussed in Chapters 2 and 4), it is estimated that the average improvement in IQ score among the 46.0 million children affected by the standards over the 50 year period would be 0.87 points based on the IEUBK model and 0.22 points based on the Empirical model.

It is also estimated that over the 50 year modeling period, the number of children avoiding IQ scores below 70 resulting from the §403 standards ranges from approximately 30,000 children (from the IEUBK model) to 8,000 children (from the Empirical model).

It is important to note that these are not the only benefits anticipated to result from the §403 standards, but rather are those considered the key benefits that are most directly measurable in this analysis.[1] These are the benefits addressed in the §403 risk assessment. The reader is referred to the Hazard Identification discussion in Chapter 2 of the risk assessment document (Battelle, 1997) for a more thorough discussion of the potential benefits of reducing environmental lead levels.

The following section of this chapter describes the approach to placing a monetary value on the benefits of reduced blood lead levels in children, including those associated with medical interventions, education, and IQ point changes.

## 6.3    Valuation of Benefits

The benefits are assigned monetary values to facilitate comparison with the costs of conducting interventions. The approach used by this analysis defines benefits as avoided health damages and avoided elevated blood lead levels. The main health effects considered are reductions in IQ and cognitive effects

---

[1]    Adult benefits are estimated in Chapter 9 of this RIA.

from lead exposure.  Available economic research provides little empirical data for society's willingness to pay to avoid decreases in IQ or adverse cognitive effects.  To represent some portion of society's full willingness to pay, alternative measures were calculated that considered three consequences of lead exposure for children: decreased expected lifetime earnings, increased educational resources expended, and costs of increased medical intervention.  Foregone earnings are examined in  Section 6.4.1.  Increased educational expenditures are addressed in Section 6.4.2.  Costs due to increased medical intervention are presented in Section 6.4.3.  All estimates are presented in 1995 dollars.  Exhibit 6-2 summarizes the components used to provide values for the health effects considered by the benefits analysis.

### 6.3.1    Valuing Changes in IQ Points

The valuation of changes in IQ was completed in two steps.  First, an estimate of the present value of the earnings stream of an average newborn was calculated.  Second, available economic literature was used to estimate the percentage increase in lifetime earnings one would expect from a one point increase in IQ.

**Average Earnings.**  To calculate the present value of the earnings stream of an average newborn, it was assumed that at any given age the child will receive annual earnings in real terms equal to average earnings "currently" received by persons of the same age.  Data from the 1992 Current Population Survey (CPS) were inflation adjusted to 1995 dollars.  The projected annual earnings stream was adjusted to take three factors into account.  First, some real increases in earnings were assumed to occur through general increases in productivity.  Second, projected earnings were lowered to take into account probabilities of survival.  Finally, the lifetime earnings stream was discounted to express the stream in present value terms.

Average earnings calculations were performed for ages ranging from 18 to 64 using 1992 CPS data on the average annual earnings, total persons, and the number of persons with earnings by gender, age, and education group (US Department of Commerce, 1993).  Average earnings were calculated for those in a particular age group as a weighted average of  average earnings in each gender and education sub-group. The weights used were the fractions of the age group represented by each gender and education group. Average annual earnings for those with earnings, total number of persons with earnings, and total number of persons were typically reported by gender for various age groups (e.g., 18-24; 25-34; 35-44; 45-54; 55-64; and 18-24; 25-29; 30-34; 35-39; 40-44; 45-49; 50-54; 55-59; 60-64) and education groups (less than 9th grade, 9-12 grade with no diploma, high school graduate, some college, associate degree, bachelor's degree, master's degree, professional degree, and doctorate).  Employment rates were estimated based on estimates of total persons and of total persons with earnings.  Estimates of zero earnings for the unemployed were incorporated into the calculation of average earnings.

Several assumptions had to be made to calculate the average earnings stream because of limited data:

•        First, the CPS data only includes some information for those with professional degrees and doctorates.  In instances where numbers were not reported, earnings and employment rates were inferred by comparing information on those with at least a BA to information on those with a BA alone and those with an MA alone.

•        Second, the CPS data reported total counts of persons in 10-year age groups, but earnings for those with earnings and counts of those with earnings in 5-year age groups.  For the purposes of this analysis, it was assumed that employment rates within the 5-year age groups were equal to those of

the 10-year age groups.  The CPS data, however, did not include an estimate of the total persons, and thus employment rates, in each education group for individuals  in the 18-24 age group.  Since employment rates for both men and women, age 18-24, are available, this analysis assumes that the employment rate within each education group of the 18-24 age group was equal to the overall employment rate for that age group.

•      Third, the analysis assumes that the 1992 distributions of earnings and educational attainment will hold constant over several decades (with some minor exceptions concerning educational attainment) and are representative of those faced by children born in 1997.  It was assumed that the educational distribution remains the same as the current distribution until those born in 1997 are older than age 49.  After that age, the assumed educational distribution is fixed at the distribution of those aged 45-49 in the CPS data.  The data beyond age 49 reveal significant declines in educational attainment and it is for this reason that this age was selected as the cutoff.  Because average years of schooling have tended to rise over this century, older people often have fewer years of schooling than younger people.  If this assumption were not made, the model would  have individuals losing years of education over time.  With these assumptions, it was possible to calculate the average earnings for persons in the 18-24 age group and in the five year age groups ranging from 25-29 through 60-64.

**Present Value of Lifetime Earnings.**  The estimated average earnings were used to predict the present value of future annual earnings over the lifetimes of those born in 1997, by using appropriate survival rates, productivity increases, and discount rates.  Survival rates (P) are the probability that a newborn person will survive to a given age N.  Survival rates are the multiplication of two probabilities: the probability that a newborn survives to age N-1 and the probability that the individual will survive from age N-1 to age N.  The US Department of Commerce (1992b) provided the probability that a person of a particular age dies some time in that age year.  This is sufficient information to calculate survival rates for all ages as described above.  Because the model is evaluating future populations, there were some uncertainties associated with these probabilities.  The  model assumed that real earnings will increase by one percent  per  year to reflect the fact that some portion of productivity increases (X) are reflected in real earnings increases.  The nation's productivity or output per capita tends to rise over time as the capital stock rises.  As explained in Chapter 3, the discount rate (r) used in this analysis is 3 percent.

**Exhibit 6-2**
**Summary of Benefits Analysis Estimate**

| Type of Effect | Description | Estimate | Source |
|---|---|---|---|
| Effect of a Single Point Reduction in IQ | Sum of the direct and indirect effects on the percent of earnings lost (2.379 percent) and express the effect in terms of the present value of average lifetime earnings | $9,360 in 1995 dollars | Product of the estimate of the present value of average lifetime earnings based on US Department of Commerce ($366,021 (1992 $)) and the assumed percentage loss of earnings from a single point reduction in IQ of 2.379 percent (Salkever 1995) |
| Cost of Additional Education | Sum of the direct costs ($316) and opportunity costs ($627) of additional education | $1,014 in 1995 dollars | Sum of the estimate of the direct and opportunity costs of additional education based on US Department of Education (1993) data |
| Total Effect of a Single Point Reduction in IQ | Subtract the costs of additional education from the effects on earnings lost | $8,346 in 1995 dollars | Accounting for the cost of additional education was based on Salkever (1995) |
| Special Education (IQ less than 70 points) | Cost of special education beginning at age 7 and ending at age 18 | $53,836 in 1995 dollars | Kakalik et al. (1981) estimate annual incremental regular classroom costs of $6,458 in 1995 dollars for special education. This estimate is the discounted value of such costs for age 7 through 18. |
| Compensatory Education (Blood-lead greater than 20) | Cost of compensatory education beginning at age 7 and ending at age 9 | $15,298 in 1995 dollars | Kakalik et al. (1981) estimate annual incremental regular classroom costs of $6,458 in 1995 dollars for compensatory education. This estimate is the discounted value of such costs for age 7 through 9. |
| Medical Intervention (for several blood lead ranges) | Cost of blood lead screening and medical intervention for children less than six years old (by blood lead risk group) | (All in $1995) Risk Group I:$58 R.G. IIA: $70 R.G. IIB: $227 R.G. IIIA: $417 R.G. IIIB: $678 R.G. IV: $9843 R.G. V: $9843 | Recommendations and actual practice based on information from CDC (1991), AAP (1995), and medical practitioners. These estimates are the discounted costs per newborn associated with each blood lead Risk Group. |

The following formula estimates the present value of average earnings at age A, for a male or female born in 1997.  It is important to note that female and male earnings were calculated separately.

$$PV_A = \sum_{N=A}^{64} Y_N P_N (1+X)^{N-A+0.5} / ((1+r)^{N-A+1})$$

where:

PV = present value of the total sum of earnings of a male or female received between ages A and 64;

A = current age of male or female;

N = successive ages of male or female in the future (A+1, ..., 64);

Y = average annual earnings of male or female for a particular age (N);

P = survival rate of male or female for a particular age (N);

X = productivity rate of male or female assumed at the midpoint of age N; and

r = discount rate for the beginning of age N.

The present value average earnings are based on the 1992 CPS data, survival rates, an assumed discount rate of 3 percent, and an assumed increase in productivity of 1 percent per year.  The average earnings for males was $485,946 and $250,797 for women.  The average earnings for the entire population was $366,021.  This is a participation-weighted average obtained using the following equation:

Ave. Earnings for Pop. = % pop. male x male earnings + % pop. female × female earnings

There are several uncertainties associated with this approach to calculating the present value of the average earnings stream:

- First, uncertainties arise concerning the earnings distribution mainly because it is a projection of lifetime earnings.  Children born in 1997 and after will not enter the labor market for several decades.  The type of labor market that will exist and the distribution of skills and education of this future labor force are both unknown.  In addition, labor force participation rates, a real wage growth rate of one percent, and year-to-year survival probabilities are all assumed to stay the same until the year 2110.  This includes the 64 year full working life for children born in year 2046, the last year of the model run.  Labor force participation rates of women, the elderly, and other groups will most likely continue to change over the next decades.  Real earnings of women will probably continue to rise relative to real earnings of men.  Unpredictable fluctuations in the economy's growth rate will probably affect labor force participation rates and real wage growth of all groups.  Medical advances will probably raise survival probabilities.  Presently, the model uses information on the 1992 distribution of education and earnings by age groups to characterize the future labor market.  This involves making the assumption that present trends will continue in the future and it is unclear how this might bias results.

- Second, this approach assumes that what individuals are paid in the market truly reflects their marginal product as laborers.  Earnings is used in place of marginal product in this model because the latter value is a much more involved calculation.  However, there is concern that certain groups of people are discriminated against (e.g., women and minorities) in the labor

market such that they do not receive their true marginal product.  For this reason, the average earnings calculated here may be an underestimate of the true marginal product.

- Third, the use of earnings is an incomplete measure of an individual's value to society.  This is particularly true for individuals who choose to not participate in the labor force for all of their working years.  If the opportunity cost of non-wage compensated work is assumed to be the average wage earned by persons of the same sex, age, and education, the average lifetime earnings estimates for these people would be significantly higher.

- Fourth, the current model uses the earnings of all persons to determine average earnings.  If the exposed population are significantly different then the national population (i.e., minority populations) then the current model may be misrepresenting their future earnings streams.  For example, if  the exposed population earn lower earnings relative to the national population for reasons other than their lead exposure, then  the average used by this analysis may be an over estimate.  Yet, as emphasized in the previous comment on discrimination, it might be more appropriate to use the sample of the national population that best reflects the marginal product of labor to assess the benefits of preventing IQ reductions.

**Effects on Earnings from Changes in IQ.**  The second part of the benefits estimation for IQ changes relies on the Salkever (1995) study.  The value of avoiding a single IQ point loss was modeled as a loss in expected lifetime earnings.  Direct and indirect effects on earnings were considered in valuing lost IQ points.  The direct effect is the sum of the effects of IQ test scores on employment and earnings for employed persons, with the years of schooling held constant.  The indirect attributes are the effect of IQ test scores on years of schooling attained, and the subsequent effect of years of schooling on the probability of employment, and on earnings for employed people.

Salkever (1995) provides updated estimates of all the necessary parameters using the most recent available data set, the National Longitudinal Survey of Youth (NLSY).  Three regression equations provide these parameters.  The years of schooling regression shows the association between IQ scores and the highest grade achieved, holding background variables constant.  The employment regression shows the association between IQ test scores, highest grade, and background variables on the probability of receiving  earned income.  This regression provides an estimate of the effect of IQ score on employment when schooling is held constant, and the effect of years of schooling on employment, when IQ is held constant.  The earnings regression shows the association between IQ test scores, highest grade achieved, and background variables on earnings, for people with earned income.

These three regressions provide the parameters needed to estimate the total effect of a loss of an IQ point on earnings.  The direct effects of IQ on employment and earnings for employed persons, holding schooling constant, come from the employment and earnings regressions.  The indirect effect of IQ on employment through schooling is the product of the effect of IQ on years of schooling, from the years of schooling regression, and the effect of highest grade on employment, from the employment regression.  The indirect effects of IQ on earnings for employed persons through schooling is the product of the effect of IQ on years of schooling, from the years of schooling regression, and the effect of highest grade achieved on earnings for employed persons, from the earnings regression.

Based on the Salkever (1995) study, the most recent estimate of the effect of an IQ point loss is a reduction in earnings of 1.93 percent for men and 3.22 percent for women, which is a participation-weighted average of 2.379 percent.

There are numerous uncertainties associated with implementing this approach. Several assumptions were necessary to estimate the foregone earnings associated with IQ reductions. First, it was assumed that IQ decrements incurred through lead exposure persist throughout the exposed child's lifetime. Second, it was assumed that population changes in IQ have effects analogous to individual changes in IQ. This assumption suggests that every unit decrease in IQ has an equal effect regardless of where an individual is in the IQ distribution and what the total magnitude of the person's IQ change is. Additional uncertainties associated with specific components are discussed in the following sections.

**Value of Foregone Earnings**. The next step for determining the value of an IQ point involves combining the percent earnings loss estimate with an estimate of the present value of expected lifetime earnings. The present value average earnings of $366,021 is multiplied by the 2.379 percent earnings loss to yield an average value of $8,708 per IQ point.

This IQ point value of $8,708, however, does not account for the costs associated with additional years of education. The increase in lifetime earnings from additional education is the gross return to education. The cost of the marginal education must be subtracted from the gross return in order to obtain the net benefit per IQ point. There are two components of the cost of marginal education; the direct cost of the education, and the opportunity cost of lost income during education. An estimate of the educational cost component is obtained from the U.S. Department of Education (1993). The marginal cost of education used in this analysis is assumed to be $5,500 per year. This figure is derived from the Department of Education's reported ($5,532) average per-student annual expenditure (current plus capital expenditures) in public primary and secondary schools in 1989-90. For comparison, the reported annual cost of college education (tuition, room and board) in 4 year public institutions is $4,975, and $12,284 for private institutions.

Salkever estimated 0.1007 reduced years of schooling per IQ point lost. Therefore, the estimated cost of an additional 0.1007 years of education per IQ point where one year costs $5,500 is $554. Because this marginal cost occurs at the end of formal education, it must be discounted to the time the exposure and damage is modeled to occur (age zero). The average level of educational attainment in the population over age 25 is 12.9 years (U.S. Department of Education, 1993). Therefore, the marginal educational cost is assumed to occur at age 19, resulting in a discounted present value cost of $316.

The other component of the marginal cost of education is the opportunity cost of lost income while in school. Income loss is frequently cited as a major factor considered in the decision to terminate education, and must be subtracted from the gross returns to education. An estimate of the loss of income is derived assuming that people in school are employed part time, but people out of school are employed full-time. The opportunity cost of lost income is the difference between median annual full-time income of $16,501, and $5,576 for part-time employment (U.S. Department of Commerce, 1993a). The lost income associated with being in school an additional 0.1007 years is $1,100, which has a present discounted value at age zero of $627.

The net benefit per IQ point in 1992 dollars is the gross value of an IQ point minus the costs of education. This relationship is shown in the equation:

$$\$8,708 - \$316 - \$627 = \$7,765.$$

The GDP price inflator was used to adjust the 1992 dollars to 1995 dollars. This results in an IQ point value of $8,346.

### 6.3.2  Valuing Increased Educational Resources

Two categories of increased educational resources needed as a result of lead exposure are considered as additional effects from lead exposure. First, lead exposure results in an increase in the number of children with IQs less than 70, an indicator of mental handicap (Battelle 1997). During all their school years, these children are likely to require special education tailored to the mentally handicapped. In addition, some children whose blood lead is greater than 20 μg/dL may be less impaired but will still be affected enough to need several years of compensatory education in addition to regular schooling. The following sections describe the approaches used to obtain estimates of increased educational resources needed. Exhibit 6-2 summarizes the data used to derive educational resource expenditure estimates.

**Special Education for Children with IQs less than 70.** To assign a value to the reduction in the number of infants with IQs less than 70, an estimate of the reduction in education costs was calculated using available data on educational expenditures. This approach is a clear underestimate of the total benefits associated with avoiding cases of IQ less than 70.[2] Kakalik et al. (1981) used data from a study prepared for the Department of Education's Office of Special Education Programs. They estimated that part-time special education costs for children who remained in regular classrooms were $3,064 on an annual basis in 1978 (in addition to regular class costs). Adjusting for changes in the GDP implicit price deflator yields an estimate of $6,458 per child in 1995 dollars. This incremental estimate of the cost of part-time special education was used to estimate the annual cost per child needing special education as a result of impacts of lead on mental development. Costs were assumed to be incurred from ages 7 through 18. Discounting future expenses at a rate of 3 percent yields an expected present value cost of approximately $53,836 per child. This is the benefit assigned for each case of IQ under 70 avoided. It is an underestimate of the benefit since Kakalik et al. (1981) measured the increased cost to educate children attending regular school. The costs of attending a special education program were not considered and are most likely considerably higher than those associated with regular schooling.

The total cost of special education is simply the reduction in the probability a child will have an IQ less than 70 multiplied by the number of children born in a specified year and then multiplied by the cost of special education. For example, if the baseline probability of an IQ less than 70 is 0.5% and the post-intervention probability falls to 0.3% and there were a total of 1,000 children born, then the benefit society accrues from reduced special education costs is $107,672 ([0.005-0.003] × 1,000 × $53,836 = $107,672).

**Compensating Education for Children with Blood Lead Levels Greater Than 20 μg/dL.** When calculating the cost of compensatory education, three relatively conservative assumptions were made. First,

---

[2]     The largest part of this benefit is not captured in this analysis — the parents' willingness to pay to avoid having their child become mentally handicapped, above and beyond the increased educational costs.

it was assumed that no children with blood lead levels below 20 μg/dL would require compensatory education later in life.  This is conservative since many studies show cognitive effects at 15 μg/dL. Second, it was assumed that only 20 percent of the children above 20 μg/dL would be severely affected enough to require and receive some compensatory education.  Third, it was assumed that each child who needed compensatory education would require it for three years (age 7 through 9). Studies of the persistence of cognitive effects indicate this is a  conservative estimate and that effects often last longer than three years.

Benefits were calculated by assuming that 20 percent of the children with blood lead levels greater than 20 μg/dL  received compensatory education for three years.  After this time, no further blood lead related educational expenditures were incurred by those children.[3]  The Kakalik et al. (1981) estimate of part-time special education costs for children who remained in regular classrooms was also used to estimate the cost of compensatory education for children suffering low-level cognitive damage.  As indicated above, adjusting for changes in the GDP implicit price deflator yields an estimate of $6,458 per child per year in 1995 dollars.  Discounting future costs at a rate of 3 percent annually to account for the age at which costs are incurred yields a present value estimate of $15,298 in 1995 dollars.

The total value to society from a reduction in the probability of blood-lead concentrations greater than 20 μg/dl is the difference in the probability of having a blood-lead concentration greater than 20 μg/dl, times 20% of the number of children born in a specified year, times the present value per child.  For example, if the probability is reduced by .05% and there are 1,000 children born then the total value is $1,530 (0.0005 × 0.20 × 1,000 × $15,298 = $1,530).

### 6.3.3    Valuing Increased Blood Lead Screening and Medical Treatment

Blood lead screening programs have been established in many public health programs because children may remain asymptomatic even though blood lead levels are elevated.  Screening programs attempt to identify children who are at risk of developing lead exposure related illnesses.  Once elevated blood lead levels are detected, treatment costs are incurred to reduce blood lead to less serious levels, thereby avoiding or mitigating adverse health effects.  Follow-up blood lead tests are used to ensure that intervention has accomplished the intended risk reduction.

The model calculates benefits as the reduction in these screening and medical intervention costs caused by lead interventions.

The Centers for Disease Control (CDC), in their 1991 statement *Preventing Lead Poisoning in Young Children,* has recommended protocols for blood lead screening and medical treatment for several categories of blood lead levels, called risk groups (CDC, 1991; see Exhibit 6-3 for risk grouping).  The costs and assumptions used to determine the total cost per child are based primarily on treatment protocols recommended in the 1991 CDC statement and the American Academy of Pediatrics (AAP, 1995).  Recommended treatments may differ from typical treatments.  However, the recommended protocols are expected to serve as a reasonable approximation of typical treatment profiles.  In cases where information was lacking in the 1991 CDC recommendations, assumptions about the percent of children treated in a given risk group were made based on actual practice.

---

[3]     See U.S. EPA (1986) for more detail on the data sources and the nature of the assumptions made to quantify this benefit category.

**Exhibit 6-3**
**Risk Groups and Associated Screening and Medical Costs Per Child**

| Risk Group | Blood-Lead Concentration | Screening Costs | Medical Costs |
|:---:|:---:|:---:|:---:|
| I | 0-9 $\mu$g/dL | $58 | $0 |
| IIA | 10-14 $\mu$g/dL | $70 | $0 |
| IIB | 15-19 $\mu$g/dL | $169 | $58 |
| IIIA | 20-24 $\mu$g/dL | $169 | $248 |
| IIIB | 25-44 $\mu$g/dL | $325 | $353 |
| IV | 45-69 $\mu$g/dL | $1,450 | $8,393 |
| V | $\geq$70 $\mu$g/dL | $1,450 | $8,393 |

In addition, although CDC does recommend all children younger than six should be screened, actual practice suggests screening rates that are much lower. Therefore, this analysis assumes that the percent of children screened is based on actual practice. Information from blood lead screening programs indicates the level of screening in recent years (1994, 1995) is about 15 percent (MDDE, 1996; ILDPH, 1995). This level of screening represents the percent of children six years and younger who are screened in a given year, whether they are being screened for the first time or are given repeat screening. This value compares with an average screening rate of 17 percent from nine programs in 1983 (U.S. EPA, 1987). For the current analysis, a screening rate of 15 percent was assumed for both initial as well as repeat screenings for risk groups I to IIIB.

Children are grouped into different risk groups based on their blood lead levels. The unit costs determined for each risk group assume that each child is initially screened at age one, that elevated blood lead levels are identified at the initial screening, and that children who are not medically treated remain in the same risk group through age five. It was assumed that the total percent of children initially screened were rescreened once a year from ages two through five, resulting in a total of five screenings per child. Specific treatment elements include blood lead screening and other tests, medical treatment, and health education. Where there were uncertainties regarding the percentage of children treated or the exact treatment protocol used, conservatively low estimates for treatments and costs were made.

The medical costs listed in Exhibit 6-2 are based on costs of individual treatments presented in U.S. EPA (1987), incorporate the probability that a child will be treated, and are updated from 1985 to 1995 dollars using the average medical care cost index reported by the Bureau of Labor Statistics.[4] A cost of $42 for screening was taken from U.S. EPA (1987), updated to $81 in 1995 dollars. The cost of $42 includes the full annual clinic fee of $20 per child presented in Table 4-2 of U.S. EPA (1987).[5] The screening costs

---

[4]     The average medical care cost index increased from 113.5 in 1985 to 220.4 in 1990 (1982=100) (CEA, 1996). As 220.4/113.5 = 1.94, a medical cost (1995$) = 1.94 × medical cost (1985$).

[5]     The analysis presented in U.S. EPA (1987) assumed that this annual fee was divided among four children. However, because the current analysis assumes abatement decisions are based on blood lead levels of children newly born into a household (rather than existing children in a household), it was assumed that the full clinic fee may apply to one child only.

encountered after the first year were discounted to 1995 dollars, using a 3% discount rate. Additional information on the percent of children treated in different groups has been obtained from health care practitioners and public health departments.  The procedure used to determine these costs is presented in Appendix 6.A.

The total benefit to society resulting from a reduction in the probability of being in a particular risk group is simply the decrease in probability multiplied by the number of children born multiplied by the reduction in screening costs.  For example, if the reduction in the probability of being in risk group IIB is 0.2%  and a total of 1,000 children are born, then the benefit to society from reduced screening and medical costs is $454 ($0.002 \times 1,000 \times (169 + 58) = \$454$).

### 6.4      Aggregation of Benefits

The values provide in Section 6.3 are the per-child benefits resulting from the reduction in household lead levels.  However, in order to calculate the net benefits of §403 it is necessary to aggregate the benefits accruing to all children born during the years 1997 to 2047.

In order to calculate the total present value of benefits one first calculates the value of benefits for each cohort of children separately.  A cohort of children is defined as all children born in a given year.   Benefits for each cohort are determined using information on the number of children born as well as information on the per-child benefits from household lead reduction discussed in the previous section.  More specifically, the present value of total benefits for each cohort is calculated as the number of children born in that cohort multiplied by the sum of the following benefit values:   the  value of foregone earnings,  the value of the decrease in the probability of an IQ less than 70, the value of the decrease in probability of a blood-lead level greater than 20 µg/dl, and the value of a decrease in the probability of falling into the high risk groups[6].  The value of benefits for each cohort is then discounted back to 1997 dollars.  Finally the  present value of total benefits for each individual cohort are summed together to generate the total present value of benefits from the §403 rule.

The aggregate monetary benefit of the final §403 standards are estimated to be $191 billion based on the blood lead changes predicted using the IEUBK model.  Of this amount, nearly $188 billion is associated with the overall IQ point benefits related to future earnings.

Using the Empirical model, the estimated aggregate benefits of the final §403 standards are $49 billion, of which $47 billion is associated with the overall IQ point benefits related to future earnings.

---

[6]       A more detailed series of aggregation equations can be found in Appendix 6.B of this chapter.

# Appendix 6.A  Screening and Medical Costs for Risk Groups

This Appendix presents the screening costs and other medical costs, such as treatment for anemia, neuropsychological evaluation, and chelation therapy for each of the blood lead level risk groups described in Chapter 6.  Where applicable, any assumptions that were made in calculating these costs are discussed. Please note that the procedures for estimating the incidence of blood lead levels falling in various ranges used in the process of estimating screening and medical intervention costs were provided in the risk assessment document (Battelle, 1997).

**Risk Group I (PbB 0 - 9 µg/dL).**  CDC recommends all children younger than six years old be screened for elevated blood lead levels.  In addition, CDC recommends yearly repeat testing for children in this risk group.  In actual practice, universal screening is not being achieved. Therefore, the proportion of children screened was multiplied by the screening cost and discounted to 1995 dollars.  The resulting cost per child for Risk Group I is $58.

**Risk Group IIA (PbB 10 - 14  µg/dL).**  As with Risk Group I, Risk Group IIA also requires repeated blood lead screening.  The CDC recommends that children in this risk group be screened more frequently during the first year than children in Risk Group I .  Specifically, children should be tested every 3 to 4 months. After three consecutive tests indicate that blood lead levels remain below 15 µg/dL,  the child should be tested again a year later (CDC, 1991).   This analysis assumes that children are tested once every four months during the first year, that blood lead levels remain below 15 µg/dL, and that children are then tested once in each of the four subsequent years (at ages two through five.)  Multiplying the proportion of children expected to be screened, the cost of one test, and discounting to 1995 dollars results in a cost per child for Risk Group IIA of $70.

**Risk Group IIB (PbB 15 - 19  µg/dL).**  Based on the CDC recommendation that children in this risk group need repeat screenings every three or four months, this analysis assumes the frequency of screening for Risk Group IIB is three times per year (for ages one through five).

An additional cost not estimated for Risk Group I and IIA includes the cost of health education.  CDC notes that it is prudent for parents to use simple interventions to decrease hazardous levels of lead in the home. Education about the types of intervention that can be done may be achieved through a face-to-face interview with the family (CDC, 1991).  U.S. EPA (1987) presents the cost of a one-time personal evaluation by a professional as $200.  Updating this cost to $1995 results in health education costs of $388.

The total cost for this risk group (incorporating the probability that a child will be screened and treated) is $227 per child.

**Risk Group IIIA (PbB 20 - 24 µg/dL).**  CDC recommends that children in this risk group be rescreened every three to four months; the current analysis assumes that children are screened once every four months. Health education costs are assumed to be the same as Risk Group IIB.

In addition to the screening and education costs, CDC recommends that children with blood lead levels greater than or equal to 20 µg/dL be tested for iron deficiency.  A cost for this test of $20 (1985 dollars) from U.S. EPA (1987) was updated to a value of $38 (1995 dollars).  Based on results of the iron deficiency

test, children in this group may need treatment for anemia. Medical practice indicates that about half of children who are screened for elevated blood lead levels are treated for anemia (Shannon, 1996; McCord, 1996). This information does not specify whether a greater proportion (than 50 percent) of children in higher blood lead level ranges require treatment for anemia; therefore, the current analysis assumes that half of the children with blood lead levels of 20-24 µg/dL are anemic and would require treatment for anemia. A cost of $63 for anemia treatment was presented in U.S. EPA (1987). Updating this cost to 1995 dollars results in a cost of $122.

In addition to these costs, CDC recommends that children with blood lead levels $\geq$ 20 µg/dL should have a pediatric evaluation, with special attention given to neurologic examination and psychosocial and language development (CDC, 1991). In this analysis, it is assumed that all children in this risk group receive this neuropsychological evaluation. For children given chelation therapy, this examination may be important both at the time of diagnosis and when the child approaches school age; however, this analysis assumes only one neurological evaluation is performed. U.S. EPA (1987) provides a cost of $600 ($1164 in 1995 dollars) for this evaluation.

Because only minimal data exist about chelating children with blood lead levels less than 20 µg/dL, CDC recommends that these children should not be chelated (CDC, 1991). In addition, AAP (1995) notes that chelation treatment is not indicated in patients with blood lead levels less than 25 µg/dL. Therefore, it is assumed that all children in this risk group (and lower risk groups) are not chelated.

Incorporating probabilities of screening and anemia treatment, the total cost per child for this risk group is $417.

**Risk Group IIIB (PbB 25 - 44 µg/dL).** CDC recommends that children in this risk group be rescreened every three to four months; health education costs, tests for iron deficiency for this risk group, and a neuropsychological evaluation are also recommended. However, costs for this risk group differ depending on whether or not a child is chelated. Depending on results of blood lead and further testing, some children in this group may require chelation therapy to lower their blood lead levels to acceptable levels. The costs and assumptions for blood lead screening, education, anemia treatment, and neuropsychological evaluation are the same for nonchelated children in this group as for children in Risk Group IIIA. Frequency of screening differs for chelated children compared with non-chelated children (as described below). In addition, treatment for anemia is assumed to be included as part of the chelation therapy, and is therefore not included as a separate cost for chelated children.

Children in this risk group must undergo an edetate disodium calcium (CaNa2 EDTA) provocation test to determine whether they will respond to chelation therapy. The cost of performing this test on an outpatient basis was presented as $150 in U.S. EPA (1987). This cost is used in the current analysis and updated to 1995 dollars for a resulting value of $291.

There are varying recommendations about whether children in this risk group should be chelated. CDC recommends that children in this risk group who have positive CaNa2 EDTA provocation test results should undergo a 5-day course of chelation (CDC, 1991). Information suggests that about seventy-six percent of children with blood lead levels 35-44 µg/dL and 35 percent of children with blood lead levels 25 - 34 µg/dL had positive provocation test results as noted in one source (CDC, 1991 as cited in Markowitz and Rosen,

1991).  Additional information indicates varying protocols of chelation requirements for this risk group.  At Children's Hospital in Boston, Massachusetts all children in this risk group are chelated (Shannon, 1996).  At Children's Health Care of St. Paul, Minnesota where most children in Minnesota with elevated blood lead levels are treated, chelation is not recommended for blood lead levels lower than 40 µg/dL (McCord, 1996).  Based on the information above, this analysis assumes that fifty percent of children in this risk group require chelation.

Information suggests that an oral method of chelation performed on an outpatient basis can be used for children in this Risk Group.  Although CDC (1991) does not give a strong recommendation about whether to chelate these children on an inpatient or outpatient basis or the type of chelating agent that should be used, they do note that some practitioners use an oral chelating agent.  The American Academy of Pediatrics suggests that children in this risk group may benefit from oral therapy, which can be done on an outpatient basis (AAP, 1995).  Other information also suggests that chelation for blood lead levels in this range may be performed on an outpatient basis (U.S. EPA, 1987; McCord, 1996) if the child can be kept away from the source of exposure (U.S. EPA, 1987).  Based on these recommendations, this analysis uses an outpatient chelation cost from U.S. EPA (1987); the cost is $582 in 1995 dollars (updated from $300 in 1985 dollars).

Children chelated once may need additional chelation treatment to bring blood lead down to acceptable levels on a long-term basis (CDC, 1991).  This analysis assumes that fifty percent of children who receive a first chelation will require a second treatment based on information from U.S. EPA (1987).

Children who receive chelation therapy should be followed closely for at least a year or more to recheck blood lead levels.  CDC (1991) recommends retesting every other week for 6-8 weeks, and then once a month for 4-6 months (or more often depending on the type of chelation performed.)  Based on this information, the current analysis assumes that seven repeat tests will be performed within the year following chelation.  Chelation is expected to decrease blood lead levels to below 25 µg/dL (CDC, 1991).  For this analysis, it was assumed that lead levels are decreased to below 25 µg/dL but remain at levels above 15 µg/dL.  Therefore, in addition to the seven repeat screenings in the year following chelation, chelated children require screenings once every four months (after the first year) through age five as suggested by CDC for children with blood lead levels greater than 15 µg/dL (CDC, 1991).   Follow up testing costs are the same as initial screening costs, at $81 in 1995 dollars.

The total cost per child for this risk group, incorporating probabilities of screening and treatment, is $678.

**Risk Group IV (PbB 45 - 69 µg/dL).**  Only fifteen percent of children in lower risk groups are expected to be screened.  However, children in this group may present symptoms of lead poisoning, such as lethargy, anorexia, vomiting, abdominal pain (CDC, 1991).  For this analysis, it is assumed that all children in this risk group will exhibit symptoms and will require follow up blood lead level testing.

CDC (1991) recommends that children in this group should not be given a provocation test, but should be referred for appropriate chelation therapy immediately upon identification of this blood lead level.  Several sources suggest that chelation may be done on an inpatient or an outpatient basis for children in this risk group.  Although AAP (1995) suggests that children in this group may be orally chelated and McCord (1996) notes that most chelations done in St. Paul are done on an outpatient basis, CDC (1991) discusses a treatment regimen limited to CaNa2EDTA for this group of children because experience using other

treatments is limited.  AAP (1995) recommends against performing CaNa2EDTA on an outpatient basis, and in addition, suggests that children in this group may need to be hospitalized for the initiation of therapy. Based on this information, the current analysis assumes that chelation for this risk group is performed using CaNa2EDTA on an inpatient basis.  U.S. EPA (1987) lists a cost for inpatient CaNa2EDTA therapy at $1,500.  Based on CDC recommendations, increased frequency of follow up blood lead testing after chelation is assumed to be the same as for Risk Group IIIB.

As with Risk Group IIIB, there may also be a need for repeat chelations.  CDC (1991) indicates that a second chelation may be needed, and perhaps a third chelation may be required if blood lead levels return to levels greater than 45 µg/dL.  For children with elevated blood lead levels, U.S. EPA (1987) assumes that fifty percent of children who have one chelation will require a second chelation, and that fifty percent of those who receive a second chelation will require a third.  The same assumptions are used in this analysis.

As noted under Risk Group IIIB, chelation is assumed to decrease blood lead levels below 25 µg/dL. Therefore, after the first year of increased testing following chelation, testing is assumed to occur once every four months for the subsequent years through age five (recommended for children with blood lead levels greater than 15 µg/dL).

Costs of health education, tests for iron deficiency, and neuropsychological evaluation are the same as for Risk Group IIIB.   As noted under Risk Group IIIB, the cost of anemia treatment is assumed to be covered in the cost of chelation.

The total cost for a child in this risk group, incorporating probabilities of medical treatment,  is $9,843.

**Risk Group V (PbB > 70 µg/dL).**  The lead poisoning symptoms listed for Risk Group IV are most commonly associated with blood lead levels of 70 µg/dL and greater.  In addition, encephalopathy may be associated with blood lead levels as low as 70 µg/dL  (CDC, 1991).   It is assumed that for this analysis, children in this category would exhibit symptoms, and therefore all children in this risk group would be screened.

Children in this risk group represent a medical emergency and should be hospitalized and chelated immediately (CDC, 1991).   Therefore, children in this group would require inpatient chelation.  A cost of $2,000 for inpatient chelation was listed in U.S. EPA (1987);  the equivalent cost updated to 1995 dollars is $3880 and is used in the current analysis.  The same assumptions about the need for repeated chelations and follow up screenings after chelation are used for this group as for Risk Group IV.

Children in this risk group also require an iron deficiency test, health education and neuropsychological evaluations, as indicated for Risk Groups IIIB and IV (CDC, 1991).  Also, as with the previous two risk groups, costs for anemia treatments are not included because the protocol of chelation treatment is expected to alleviate iron deficiency (U.S. EPA, 1987).

The total cost for a child in this risk group, incorporating probabilities of medical treatment,  is $9,843.

**Use of Costs per Child in Benefits Analysis.**  The above monetary values determined for each risk group are used to estimate benefits associated with the change in the number of children in each risk group

resulting from a change in geometric mean blood lead level.  The monetary values of the avoided health effects used in the benefits estimation are summarized in Exhibit 6-2.  The results of this benefits analysis are presented in Chapter 7.

# Appendix 6.B Aggregating Benefits from Environmental Lead Reduction

As stated previously, this study assumes that after §403 is implemented, all children born into homes exceeding the standard will have their homes appropriately treated to insure the children's protection during the first six years of life.  Accordingly, all children born post-§403 will be protected at least up to the level mandated by the standard.  (Not all childbirths will trigger interventions, however, because many children will be born into homes that already meet the standard.)

The benefits analysis is based on calculating benefits for all children born in the same year, referred to as a cohort of children.  Aggregating the benefits of all children born between 1997 and 2046 involves summing the total present value of benefits for all cohorts.  The expected blood lead distribution must be calculated separately for each cohort (based on either the IEUBK or empirical model), because in each year different home types are demolished at different rates.  As a result, a changing mix of homes causes the post-§403 blood-lead distributions to vary slightly from one year to the next.  Basically, the measurement of health benefits is repeated 50 times -- once for each cohort of children.  The expected benefits from §403 will consequently differ by a small amount for each group of children born between 1997 and 2046, even before discounting is taken into account.

To illustrate how benefits are determined for each cohort, equations are shown for children born in 1997, 1998, and 2046 (years 1, 2, and 50, respectively).  The following variables are used in each equation:

let     $TB(Cohort\ t)$ = total benefits for the cohort born in year t (Cohort t)

$N$ = total number of households in 1997

$P_t$ = probability that a child is born into a household in year t

$\epsilon_t$ = number of homes demolished from 1997 to year t

$\Delta IQ_t$ = predicted increase in average IQ (post-§403 IQ minus pre-§403 IQ) for Cohort t

$\Delta 70_t$ = predicted decrease in the probability of IQ less than 70 for Cohort t

$\Delta 20_t$ = predicted decrease in the probability of blood-lead greater than 20 µg/dl for Cohort t

$\Delta T1_t$, ..., and $\Delta T7_t$ = the predicted change in the probability of belonging to risk group I, ..., and V, respectively for Cohort t.

$PV_{IQ}$ = present value of an increase in IQ of one point per child in 1995 dollars

$PV_{70}$ = present value of part-time special education costs for years 7-18 per child in 1995 dollars

$PV_{20}$ = present value of part-time special education costs for years 7-9 per child in 1995 dollars

$PV_{T1}$, ..., and $PV_{T7}$ = the present value of screening and medical treatment in risk group I, ..., and V, respectively (per child in 1995 dollars)

$r$ = discount rate (3%)

Note that the variable for housing demolition was based on information provided in Battelle (1996) and that the variables for changes in IQ and blood lead were based on information provided in Battelle (1996) and Battelle (1997).

The first example shows the calculation for benefits to children born in 1997 (Cohort 1). These benefits are represented in Equation 1:

Equation 1:

TB(Cohort 1)=

$P_1 \times (N - \epsilon_1) \times ((\Delta IQ_1) \times (PV_{IQ}) + (\Delta 70_1) \times (PV_{70}) + 0.20 \times (\Delta 20_1) \times (PV_{20}) + (\Delta T1_1) \times (PV_{T1}) + ... + (\Delta T7_1) \times (PV_{T7}))$

This equation simply takes the number of children born in 1997 ($P_1 \times (N - \epsilon_1)$) and assigns to them values from four benefit categories. A reduction in number of homes from attrition ($\epsilon_1$) is included even in 1997 because the analysis assumes that attrition takes place at the beginning of each year. The four benefit categories are the following:

1.    Foregone earnings regained because of reduced loss of IQ points;
2.    Decrease in the probability of an IQ score less than 70;
3.    Decrease in the probability of a blood-lead level greater than 20 µg/dL; and
4.    Decreases in the probabilities of falling into CDC's high blood lead risk groups.

Again, these four benefit calculations are based on the blood lead distribution changes calculated using the IEUBK or empirical model analysis associated with Cohort 1.

Total benefits to subsequent cohorts are slightly more involved because the benefits must be discounted back to 1997. The total benefits for Cohort 2 (children born in 1998) are shown in equation 2:

Equation 2:

TB(Cohort 2)=

$$\frac{P_2 \times (N - \epsilon_2) \times ((\Delta IQ_2) \times (PV_{IQ}) + (\Delta 70_2) \times (PV_{70}) + 0.20 \times (\Delta 20_2) \times (PV_{20}) + (\Delta T1_2) \times (PV_{T1}) + ... + (\Delta T7_2) \times (PV_{T7}))}{(1+r)}$$

Again, this equation states that the number of children born into pre-1997 housing ($P \times (N - \epsilon_2)$) are assigned benefits from an increase in IQ, a reduction in the probability of an IQ less than 70, a reduction in the probability of a blood-lead concentration greater than 20 µg/dl, and the reduced probability of belonging to a high risk group. These benefits accrue when the children are born in 1998 so they are discounted back 1 year to 1997.

The total benefits for Cohort 50 (children born in 2046) are shown in equation 3:

Equation 3:

TB(Cohort 50) =

$$\frac{P_{50}\times(N\text{-}\epsilon_{50})\times((\Delta IQ_{50})\times(PV_{IQ}) + (\Delta 70_{50})\times(PV_{70}) + 0.20\times(\Delta 20_{50})\times(PV_{20}) + (\Delta T1_i)\times(PV_{T1}) + ... + (\Delta T7_i)\times(PV_{T7}))}{(1+r)^{49}}$$

The number of children born into pre-1997 housing $(P\times(N\text{-}\epsilon_{50}))$ are assigned benefits.  The benefits occur when the children are born in the year 2046 so they are discounted back 49 years to 1997.

The final step involves summing the present value of total benefits for all 50 cohorts:

Total Benefits = TB(Cohort 1)+ TB(Cohort 2)+ . . . +TB(Cohort 50).

# References

American Academy of Pediatrics (AAP).  1995.  Treatment Guidelines for Lead Exposure in Children. *Pediatrics*.  96(1): 155-160.

Ashenfelter, O. and J. Ham. 1979.  Education, Unemployment, and Earnings.  *Journal of Political Economy* 87(5):99-131.

Barnett, W.S.  1992.  Benefits of Compensatory Preschool Education.  *The Journal of Human Resources* 27(2): 279-312.

Battelle.  1996.  *Procedures and Results for Input to the Economic Analysis for Section 403.*  Prepared for TCB, CMD, OPPT, US EPA, May 13.

Battelle.  1997.  *Risk Assessment to Support Standards for Lead in Paint, Dust, and Soil.*  Prepared by Battelle, for National Program Chemicals Division, Office of Pollution Prevention and Toxics, U.S. Environmental Protection Agency.  EPA 747-R-97-006, December.

Bishop, J.  1992.  *The Impact of Academic Competencies on Wages, Unemployment, and Job Performance.*  Carnegie-Rochester Series on Public Policy 37: 127-194.

Blackburn, M.L. and D. Neumark.  1993.  Omitted-Ability Bias and the Increase in Return to Schooling. *Journal of Labor Economics* 11(3): 521-544.

Blackburn, M.L. and D. Neumark.  1992.  Unobserved Ability, Efficiency Wages, and Interindustry Wage Differentials.  *The Quarterly Journal of Economics*, 1421-1436.

Centers for Disease Control (CDC).  1991.  *Preventing Lead Poisoning in Young Children.*  U.S. Department of Health and Human Services, Public Health Service.  Atlanta, GA.  October.

Centers for Disease Control (CDC).  1991.  *Strategic Plan for the Elimination of Childhood Lead Poisoning*, February.

Chamberlain, G. and Z. Griliches.  1976.  *More on Brothers.*  Harvard Institute of Economic Research Discussion Paper No. 469.  Cambridge, MA.

Council of Economic Advisors (CEA).  1996.  *Economic Report of the President.*  Government Printing Office.  Washington, D.C.  February.

Cropper and Krupnick.  1989.  *The Social Costs of Chronic Heart and Lung Disease.*  Washington, DC: Resources for the Future.

Ganderton, P. and P. Griffin.  1993.  Impact of Child Quality on Earnings and the Productivity of Schooling Hypothesis.  *Contemporary Policy Issues* 11(July): 39-47.

Griliches, Z.  1977.  Estimating the Returns to Schooling: Some Economic Problems.  *Econometrics* 45:1-22.

Grogger, J. and E. Eide.  1995.  Changes in College Skills and the Rise in the College Wage Premium.  *The Journal of Human Resources* 30(2): 280-310.

Hanushek, E.A., Rivkin, S.G., and D.T. Jamison.  1992.  *Improving Educational Outcomes While Controlling Costs.*  The Carnegie-Rochester Series on Public Policy 37: 205-238.

Illinois Department of Public Health (ILDPH).  1995.  *Get the Lead Out:  Illinois Childhood Lead Poisoning Surveillance Report.*  ILDPH, Childhood Lead Poisoning Prevention Program.  Springfield, IL.

Kakalik, J. et al. 1981.  *The Cost Of Special Education.*  Rand Corporation Report N-1791-ED.

Krupnick, A.J. and M.L. Cropper.  1989.  *Valuing Chronic Morbidity Damages: Medical Costs and Labor Market Effects.*  Draft Final Report to the US Environmental Protection Agency, OPPE.  June 26, 1989.

Markowitz, M.E. and J.F. Rosen.  1991.  Need for the Lead Mobilization Test in Children with Lead Poisoning.  *Journal of Pediatrics.*  119: 305-310. [As cited in CDC, 1991.]

Maryland Department of the Environment (MDDE).  1996.  Facsimile from Environmental Analysis Division to Amy Benson of Abt Associates Inc.  *Childhood Lead Registry (CLR) Occurrence of Lead Poisoning in Children 0-72 Months; Report for 1/94 - 12/94.*  Sent November 15.

McCord, James.  1996.  Personal Communication between Dr. James McCord, Children's Health Care of St. Paul, MN and Amy Benson of Abt Associates Inc. November 25.

McGee and Gordon.  1976.  The Results of the Framingham Study Applied to Four Other U.S.-based Epidemiologic Studies of Coronary Heart Disease.  *The Framingham Study: An Epidemiological Investigation of Cardiovascular Disease*, Section 31, April.

Murnane, R.J., Willet, J.B., and F. Levy.  1995.  The Growing Importance of Cognitive Skills in Wage Determination.  *The Review of Economics and Statistics*, 77(2): 251-266.

Needleman, H.J., Schell, A., Bellinger, D., Leviton, A., and E. Allred.  1990.  The Long-Term Effects of Exposure to Low Doses of Lead in Childhood: An 11-Year Follow-up Report.  *The New England Journal of Medicine* 322(2): 83-88.

Piomelli et al. 1984.  Management of Childhood Lead Poisoning.  *Pediatrics* 4:105.

Pirkle, J.L., J.  Schwartz, J.R. Landis, and W.R. Harlan.  1985.  The Relationship between Blood Lead Levels and Blood Pressure and its Cardiovascular Risk Implications.  *American Journal of Epidemiology*, 121: 246-258.

Pockock, S.J., Smith, M., and P. Bagrhurst.  1994.  Environmental Lead and Children's Intelligence: A Systematic Review of the Epidemiological Evidence.  *BMJ* 309: 1189-1197.

Pooling Project Research Group.  1978.  Relationship of blood pressure, serum cholesterol, smoking habit, relative weight and ECG abnormalities to incidence of major coronary events: final report of the Pooling Project.  *Journal of Chronic Disease*, 31.

Salkever, D.  1995.  Updated Estimates of Earnings Benefits from Reduced Exposure of Children to Environmental Lead.  *Environmental Research* 70: 1-6.

Schwartz, J.  1993.  Beyond LOELs, p Values and Vote Counting: Methods for Looking at the Shapes and Strengths of Association.  *Neurotoxicity*, 14(2-3), 237-246, Summer/Fall.

Schwartz, J.  1994.  Societal Benefits of Reducing Lead Exposure.  *Environmental Research*  66: 105-24.

Shannon, M.  1996.  Personal Communication between Dr. Michael Shannon, Children's Hospital in Boston, MA and Amy Benson of Abt Associates Inc.  November 25.

Shurtleff, D.  1974.  Some Characteristics Related to the Incidence of Cardiovascular Disease and Death. *The Framingham Study: An Epidemiological Investigation of Cardiovascular Disease*, Section 30, February.

Silbergeld, E.K., J. Schwartz, and K.  Mahaffey.  1988.  Lead and osteoporosis: mobilization of lead from bone in postmenopausal women.  *Environmental Research*, 47, 79-94.

U.S. Department of Commerce.  1993.  Money Income of Households, Families, and Persons in  the United States: 1992.  *Current Population Reports, Consumer Income*, Series P60-184.

U.S. Department of Commerce.  1992.  *Statistical Abstract of the United States*.  US Department of Commerce.

U.S. Department of Education.  1993.  *Digest of Education Statistics*. US Department of Commerce.

U.S. Environmental Protection Agency.  1984.  *A Survey of Literature Regarding the Relationship Between Measures of IQ and Income.*  Prepared by ICF, Inc., Report to US EPA, Office of Policy Analysis, June.

U.S. Environmental Protection Agency.  1986.  *Reducing Lead in Drinking Water: A Benefit Analysis. Office of Policy Planning and Evaluation*, Draft Final Report, December.

U.S. Environmental Protection Agency.  1987.  *Methodology for Valuing Health Risks of Ambient Lead Exposure*.  Prepared by: Mathtech, Inc.  Prepared for: Ambient Standards Branch, Office of Air Quality Planning and Standards, under EPA Contract No.  68-02-4323.  December.

U.S. Environmental Protection Agency.  1990.  *Review of the National Ambient Air Quality Standards for Lead: Assessment of Scientific and Technical Information.*  OAQPS Staff Paper, Air Quality Management Division, Research Triangle Park, NC., December.

U.S. Office of Management and Budget.  1992.  *Guidelines and Discount Rates for Benefit-Cost  Analysis of Federal Programs,* Circular No A-94, Revised.  October 29, 1992.

# 7.    Net Benefits

The normative model described in Chapters 4, 5, and 6 was developed to provide estimates of the costs, benefits, and net benefits, under a set of specific assumptions about the behavior of residential property owners and managers, for alternative definitions of lead hazard standards addressing paint, floor dust, window sill dust, and soil.  The estimates obtained from the model are intended to inform the decision-makers about the relative merits of the alternative standards from a benefit-cost perspective.  Since both the costs and the benefits of compliance increase as hazard standards become more stringent (i.e. more protective), neither costs nor benefits by themselves provide a sufficient means for evaluating the relative merits of  alternative standards.  Net benefits, however, which are calculated as the difference between the benefits to society and the corresponding costs to society of compliance with a particular standard, can serve as a measure of the degree to which society is better or worse off due to compliance with alternative hazard standards, and thus better inform the decision.

By estimating net benefits for a broad range of alternative hazard standards, the analysis can identify one (or more) combinations of paint, dust and soil standards that maximizes net benefits (i.e. is the most efficient standard in economic terms).  The net benefits analysis can also measure the relative degree to which society is made worse off from a standard that is less costly, but also less protective, than the one generating maximum net benefits.  Conversely, it can also indicate when a set of standards that is more protective than the one that maximizes net benefit yields that greater degree of protection at a cost that exceeds the value of the additional benefits.

Because the objective of Title X is to protect children, and the objective of §403 is to provide guidance to parents and property owners to that end, the benefit-cost model focuses on how to maximize net benefits to children.  In other words, the intent of §403 is to inform people about what they should do -- and when -- in the arena of protecting their children from the adverse affects of lead exposure.  The consideration of when actions are taken is important in the calculation of net benefits.  The model assumes that intervention actions are timed to happen just before a newborn child is introduced into the home.  If interventions were to occur later, the child would experience some exposure to lead levels that exceed the standards.  This would reduce the benefits that the child would otherwise receive.  If interventions were to occur well before the appearance of the infant, money would be spent with no immediate benefits to the child, thus increasing the costs relative to the benefits.  For these reasons, the model assumes that hazard testing and intervention will occur just before the appearance of the newborn.  Although it is recognized that this is not necessarily how individuals will behave with respect to these standards, structuring the analysis in this way provides a systematic approach to estimating what the net benefits of these standards might be if affected parties do behave in a manner that both maximizes the potential benefits and minimizes the potential costs of acting to reduce lead exposure to children.   Therefore, all of the net benefits estimates presented in this chapter must be viewed in the context of the above fixed assumptions concerning the timing of actions taken.

The remainder of this chapter addresses how the costs and benefits vary across alternative candidate hazard standards, identifies the candidate standards that maximize net benefits, and compares the maximum net benefits to the values estimated for the particular set of final standards established by EPA, presented in the table below.

| Media | Final Standards |
|---|---|
| Paint Condition<br><br>    Interior Paint Standard | • More than 2 sq ft of deteriorated lead-based paint in an interior room<br>• Any visible deteriorated or abraded lead-based paint on friction of impact surfaces<br>• Any visible deteriorated lead-based paint on interior window sills up to five feet off the floor |
|     Exterior Paint Standard | • More than 10 sq ft of deteriorated lead-based paint on the exterior of a property |
| Floor Dust | 40 µg/ft$^2$ |
| Window Sill Dust | 250 µg/ft$^2$ |
| Soil | 1200 ppm |
| * For the analysis the following values were used:<br>    Damaged Paint: Interior:    2 sq.ft. or more -- Repair<br>                                     50 sq.ft. or more -- Abatement<br>    Damaged Paint : Exterior:    10 sq.ft. or more -- Repair<br>                                     100 sq.ft. or more -- Abatement | |

Sections 7.1 through 7.3 examine the trends in costs, benefits, and net benefits when the numerical standards for floor dust, window sill dust, and soil are varied individually, with the remaining standards being fixed at their respective final values.  As explained in Chapter 4, the analysis assumes that homes that receive any lead intervention will receive interventions for all media (floor dust, window sill dust, paint and soil) that exceed the standards.  This, combined with the fact that there are interactions among the interventions for both the costs and the benefits, means that standards can not be accurately evaluated one at a time.  Instead, the standards for a single medium must be evaluated in the context of specified standards for all other media.  To allow for this, the analysis calculated costs, benefits and net benefits for all possible combinations of standards.[1]  For simplicity of presentation, however, this chapter presents the results of the analysis varying the standard for one medium at a time, while holding the standards for the other media constant at the level of their final standard.  The purpose of these sections is to provide the reader with some insights regarding the relationship between reducing exposure from these media and the resulting net benefits.

It is also important to note that the net benefit results are presented separately here for the two different blood lead models used by EPA in the risk assessment, and the differences in the results obtained from these two models are explored.  In general, the analysis using the IEUBK model generates higher estimates of blood-lead changes, suggests larger net benefits at any particular set of standards,  and points toward more stringent standards as maximizing net benefits, than suggested by the Empirical model.

---

[1]     For each medium, the alternative standards were defined in terms of incremental changes in the levels of lead.  For example, floor dust standards varied by increments of 10 µg/ft$^2$ (e.g., 40 µg/ft$^2$, 50 µg/ft$^2$, 60 µg/ft$^2$, 70 µg/ft$^2$, etc.).  Likewise, soil standards were analyzed in increments of 50 ppm (150 ppm. 200 ppm. 250 ppm, 300 ppm, etc.).  All combinations of standards were analyzed.

The differences in the estimates resulting from the two models are due to several factors including the incorporation of different variables and very different functional forms to relate environmental lead levels to children's blood lead levels. Notably, the functional form of the IEUBK Model is such that it is much more sensitive to changes in environmental lead than the Empirical Model. Also, the IEUBK Model uses lead dust concentrations and the Empirical Model uses dust lead loadings as input variables. Since dust lead concentrations and loadings are not well correlated in the actual housing unit data collected by HUD and used for this analysis, these differences in input variables result in differences in estimated blood-lead changes and thus benefits. Loading and concentration are not necessarily correlated: loading means the mass of lead in dust per unit area, and concentration means the mass of lead per mass of dust. In a home with a very low *dust* load, dust *lead* loading must also be small; but it is quite possible for the concentration of lead in the dust present to be high.

A third major cause of the difference between IEUBK and Empirical Model-based results are the changes in dust contamination that result from paint interventions. Based on the risk assessment, dramatic reductions in dust lead concentration accompany all paint interventions, while reductions in dust lead loadings accompany only the interior paint abatements. These interior paint abatements are relatively rare occurrences. Consequently, paint interventions lead to very large benefits under the IEUBK Model, whereas they lead to negligible benefits under the Empirical Model.

The reader is referred to Chapters 4 and 6 and to the Risk Assessment document prepared for this rule (Battelle 1997) for further discussion of these two blood lead models.

## 7.1 Costs, Benefits and Net Benefits for Various Candidate Floor Dust Hazard Standards

The §403 standards will define lead-based paint hazards, as well as levels of lead in floor dust, window sill dust, and soil considered to be hazards. As described in Chapters 4 and 5, when floor and/or window sill dust lead levels exceed their standards, the assumed intervention is a lead-specific dust cleaning. In addition, the same type of dust cleaning is assumed to be performed in conjunction with soil interventions and interior paint abatements (but not paint repair nor exterior paint abatements). These soil and paint related dust cleanings are performed regardless of the pre-intervention lead levels in the dust. Therefore, interventions in response to the floor and window sill dust standards occur only in cases where there is no interior paint abatement nor soil abatements. Under most of the candidate hazard standards analyzed, there will be a relatively large number of these "stand-alone" dust cleanings.

As shown in Exhibit 5.8 of Chapter 5, the number of homes performing a dust cleaning intervention is not only relatively large, but also relatively insensitive to the floor dust hazard standards. The number of homes predicted by the model to perform a dust cleaning declines slowly for floor dust standards between 40 $\mu$g/ft$^2$ and 90 $\mu$g/ft$^2$, dipping at a standard of 100 $\mu$g/ft$^2$, and declining very slowly after that.

While the number of homes receiving "stand-alone" dust cleanings is far larger than either the number of homes receiving paint interventions or soil interventions, dust cleanings are much less costly than either paint or soil interventions. Thus costs change very little as floor dust standards vary. The table labeled Exhibit 7-1 presents the costs for a representative selection of floor dust standards, assuming that the paint, window sill dust and soil standards are set at the final standards. The two graphs (Exhibits 7.2 and 7.3) present these same costs for a wider range of floor dust standards. As shown in the table, the costs for all

interventions range from about $67.2 billion, when floor dust standards are set at their least stringent levels, up to about $68.9 billion for the most stringent (40 µg/ft$^2$). The most stringent level is set at the assumed post-intervention lead level, the level of lead assumed to be present in floor dust after the dust intervention occurs. The least stringent standard shown in the table is at the level where costs have leveled off, they do not drop below this level within the data set (see Exhibits 7.2 and 7.3). Note that the highest cost is only about 2.5 percent greater than the lowest cost. Thus there is little basis for choosing among floor dust standards on the basis of cost alone.

**Exhibit 7-1**
**Costs, Benefits and Net Benefits for Alternative Floor Dust Standards,**
**With Other Media Set at Final Standards***

| Floor Dust Standards (µg/ft$^2$) | Total Cost of All Interventions ($ Billion) | IEUBK Model | | Empirical Model | |
|---|---|---|---|---|---|
| | | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) |
| 40 | 68.9 | 192.2 | 123.3 | 48.5 | -20.3 |
| 50 | 68.7 | 190.8 | 122.1 | 48.5 | -20.3 |
| 60 | 68.5 | 188.9 | 120.4 | 48.3 | -20.2 |
| 70 | 68.5 | 188.9 | 120.4 | 48.3 | -20.2 |
| 80 | 68.2 | 185.3 | 117.0 | 48.0 | -20.2 |
| 100 | 67.5 | 178.7 | 111.3 | 46.6 | -20.8 |
| 120 | 67.3 | 160.6 | 93.3 | 46.3 | -21.0 |
| 140 | 67.2 | 160.2 | 93.0 | 46.2 | -21.1 |
| 160 | 67.2 | 160.2 | 93.0 | 46.2 | -21.1 |
| 180 | 67.2 | 160.2 | 93.0 | 46.2 | -21.1 |
| 200 | 67.2 | 158.1 | 90.9 | 46.1 | -21.1 |
| 220 | 67.2 | 158.1 | 90.9 | 46.1 | -21.1 |

\* Final Standards:
    Interior paint: 2 sq ft or more — repair, 50 sq ft or more — abate
    Exterior paint: 10 sq ft or more — repair, 100 sq ft or more — abate
    Window sill dust: 250 µg/ft$^2$
    Soil: 1,200 ppm

Exhibits 7.1, 7.2 and 7.3 also present the estimated benefits and net benefits for alternative floor dust standards. Total benefits, as estimated using the IEUBK Model, range from about $158.1 billion to $192.2 billion with increasing stringency in floor dust standards. The highest level of benefits is about 22 percent larger than the lowest benefits, with benefit levels about constant up to a standard of 120 µg/ft$^2$ and increasing with increasing stringency after that. Under this risk model, the benefits are still increasing much more rapidly than the costs at the most stringent levels. Therefore, net benefits are maximized at the most stringent floor dust standard of 40 µg/ft$^2$. Net benefits at this set of standards are estimated to be $123.3 billion.

The Empirical Model generates lower estimates of benefits, and the benefit estimates change less with changes in the floor dust standards. Using the Empirical Model, total benefits range from about $46.1 billion to $48.5 billion with changes in the floor dust standards. The highest level benefits are only about 5 percent higher than the lowest benefit level. The Empirical Model provides lower estimates of benefits, and

the net benefits corresponding with each floor standard are negative (i.e. costs exceed benefits). Nevertheless, these results can be used to identify the floor dust standard that generates the maximum net benefits (i.e. the least negative net benefits).   Under this risk model, net benefit levels are about constant up to 120 $\mu g/ft^2$, and increase as the floor dust standard becomes more stringent up to the standards of 80 and 60 $\mu g/ft^2$.  Net benefits are nearly identical for these two standards.   Net benefits are slightly worse for the 40 $\mu g/ft^2$ level.

Comparing the results of the two blood-lead models, the floor dust standard that maximizes net benefits (when the other standards are set at their final levels) appears to be in the range of 40 - 80 $\mu g/ft^2$, with about a 1.0 percent difference in costs over this range.

**7.2 Costs, Benefits and Net Benefits for Various Candidate Window Sill Dust Hazard Standards**

Dust cleaning interventions occur when either the floor dust or the window sill dust standard is exceeded. Unlike the floor dust standards, however, the number of homes performing a dust cleaning in response to the window sill dust standards is quite sensitive to the window sill standards.  As shown in Exhibit 5.9, the number of interventions falls rapidly as window sill dust standards are reduced in stringency from 100 to 220  $\mu g/ft^2$ and then falls less rapidly until about 450 $\mu g/ft^2$, after which the number remains about constant.

Because of the relatively low cost of a dust cleaning, the percentage change in total costs of all interventions is much smaller than the percentage change in the total number of homes receiving a dust intervention.  The table presented in Exhibit 7-4, and the graphs presented in Exhibits 7.5 and 7.6, give the total costs of all interventions for a range of window sill dust standards, with the other media set at the final standards.  As shown in Exhibit 7-4, the costs for all interventions range from about $65.9 billion for the least stringent window sill dust standards up to about $75.4 billion for the most stringent (100 $\mu g/ft^2$).  The most stringent level is set at the assumed post-intervention lead level, the level of lead assumed to be present in window sill dust after the dust intervention occurs.  The least stringent standard shown in the table is at the level where costs have leveled off (see Exhibits 7.5 and 7.6).  Note that the highest cost is almost 14 percent larger than the lowest cost.  This range in costs is larger than the range associated with floor dust standards in part because the range of window sill dust lead levels in the data is much wider than the range of floor dust lead levels in the data.  In addition, a much larger proportion of homes in the data have window sill dust lead levels above the minimum standards than have floor dust levels above the minimum floor dust standard.

**Exhibit 7.2: IEUBK-based Model Costs, Benefits, and Net Benefts**



**Exhibit 7.3: Empirical-based Model Costs, Benefits, and Net Benefits**



Other standards:
Soil: 1200 ppm
Sill Dust: 250 (μg/ft²)
Paint damage interior:
Maintenance: 2 ft²
Abatement: 50 ft²
exterior:
Maintenance: 10 ft²
Abatement: 100 ft²

**Floor Dust Standard (μg/ft²)**

**Exhibit 7-4**

**Costs, Benefits and Net Benefits for Alternative Window Sill Dust Standards, With Other Media Set at Final Standards\***

| Window Sill Dust Standards ($\mu g/ft^2$) | Total Cost of All Interventions ($ Billion) | IEUBK Model | | Empirical Model | |
|---|---|---|---|---|---|
| | | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) |
| 100 | 75.4 | 210.0 | 134.6 | 52.0 | -23.4 |
| 150 | 72.5 | 201.5 | 129.0 | 50.7 | -21.8 |
| 200 | 72.2 | 200.5 | 128.3 | 50.6 | -21.7 |
| 250 | 68.9 | 192.2 | 123.3 | 48.5 | -20.3 |
| 300 | 68.4 | 191.9 | 123.4 | 48.1 | -20.3 |
| 310 | 67.6 | 190.2 | 122.6 | 47.4 | -20.2 |
| 350 | 66.9 | 188.6 | 121.6 | 46.7 | -20.3 |
| 400 | 66.9 | 188.6 | 121.6 | 46.7 | -20.3 |
| 450 | 66.6 | 186.6 | 120.0 | 46.1 | -20.5 |
| 500 | 66.5 | 186.5 | 120.0 | 46.0 | -20.5 |
| 550 | 66.1 | 185.8 | 119.7 | 45.6 | -20.6 |
| 600 | 66.1 | 185.8 | 119.7 | 45.6 | -20.6 |
| 650 | 65.9 | 185.6 | 119.7 | 45.1 | -20.8 |
| 700 | 65.9 | 185.6 | 119.7 | 45.1 | -20.8 |
| 750 | 65.9 | 185.6 | 119.7 | 45.1 | -20.8 |

\* Final Standards:
Interior paint: 2 sq ft or more — repair, 50 sq ft or more — abate
Exterior paint: 10 sq ft or more — repair, 100 sq ft or more — abate
Floor dust: 40 $\mu g/ft^2$
Soil: 1200 ppm

Exhibits 7.4, 7.5 and 7.6 also present the estimated benefits and net benefits corresponding with alternative window sill dust standards. Total benefits, as estimated using the IEUBK Model, range from about $185.6 billion to $210 billion with changes in window sill dust standards. Benefit levels increase steadily with increasing stringency, with a jump at the most stringent window sill dust standard. The highest level of benefits is about 13 percent larger than the lowest benefits. Under this risk model, net benefits are maximized at the most stringent window sill dust standard of 100 $\mu g/ft^2$. Net benefits at this set of standards are estimated to be $134.6 billion.

The Empirical Model generates lower estimates of benefits than the IEUBK Model. Using the Empirical Model, total benefits range from about $45.1 billion to $52 billion with changes in the window sill dust standards. As with the IEUBK results, benefits increase fairly steadily with increases in stringency. The highest level benefits are about 15 percent higher than the lowest benefit level. The Empirical Model provides lower estimates of benefits, and the net benefits corresponding with each window sill standard are negative (i.e. costs exceed benefits). Nevertheless, these results can be used to identify the window sill dust standard that generates the maximum net benefits (i.e. the least negative net benefits). Under this risk model, net benefits increase as the window sill dust standard becomes more stringent up to the standard of 310 $\mu g/ft^2$ and then decline as window sill dust standards become increasingly stringent.

The two blood-lead models generate more divergent estimates of the window sill dust standard that maximizes net benefits (when the other standards are set at their final levels) than was true for the floor dust standards. Nevertheless, the two estimates of 100 $\mu g/ft^2$ and 310 $\mu g/ft^2$ are both toward the lower end of the entire range of window sill dust lead levels present in the HUD sample of homes. The majority of homes with window sill dust lead levels above 100 $\mu g/ft^2$, however, are within this range. Thus, the selection of a standard within this range can affect a great many homes. This is shown in Exhibit 5.9 and by the range of costs represented. The cost for a window sill dust standard of 100 $\mu g/ft^2$ is 12 percent higher than the cost at 310 $\mu g/ft^2$.

**Exhibit 7.5: IEUBK-based Model Costs, Benefits, and Net Benefts for Alternative Window Sill Dust Standards**



Other standards:
Soil: 1200 ppm
Floor Dust: 40  ($\mu$g/ft$^2$)
Paint damage interior:
Maintenance: 2 ft$^2$
Abatement: 50 ft$^2$
exterior:
Maintenance: 10 ft$^2$
Abatement: 100 ft$^2$

Window Sill Standard ($\mu$g/ft$^2$)

**Exhibit 7.6: Empirical-based Model Costs, Benefits, and Net Benefits for Alternative Window Sill Dust Standards**



**7.3 Costs, Benefits and Net benefits for Various Candidate Soil Hazard Standards**

While floor dust and window sill dust standards are related to each other by the fact that the same intervention action is taken in response to either one, changes in the floor or window sill dust standards do not induce changes in the number of paint or soil interventions performed.  Soil dust standards, however, do affect the number of dust interventions performed.  As explained in chapter 5, when soil standards become less stringent, the number of homes performing a soil abatement declines.  Some of those homes, however, will have floor and/or window sill dust lead levels that exceed the dust standards and so will continue to do a dust cleaning.  In other words, with the decline in the soil standards, some homes will switch from the soil intervention (with dust cleaning) category to the dust only intervention category.  As shown in Exhibit 5.10, when the stringency of the soil standard declines from 150 ppm to about 900 ppm, the number of homes performing soil interventions declines very rapidly.  From there, the number performing soil interventions declines less rapidly until the standard reaches about 3000 ppm, at which point the number levels off.  Over the entire range, the number of homes performing soil abatements falls from greater than 25 million to nearly zero.  At the same time, assuming the other media are set at their final standards, the total number of homes performing any kind of intervention falls only until the soil standard reaches about 700 ppm, after which it changes very little.  The total number of homes performing any type of intervention falls from about 32 million to 20 million with changes in the stringency of the soil standards.  These differences between soil interventions and total interventions are due to the homes that switch from soil to dust only interventions.

Because soil interventions are much more expensive than dust only interventions, costs also fall fairly rapidly as soil standards become less stringent.  The table presented in Exhibit 7-7, and the graphs presented in Exhibits 7.8 and 7.9, give the total costs of all interventions for a range of soil standards, with the other media set at the final standards.  As shown in Exhibit 7-7, the costs for all interventions range from about $46.1 billion, when soil standards are set at their least stringent level, up to about $94.6 billion for the most stringent (250 ppm).  The most stringent level is set just above the assumed post-intervention soil lead level of 150 ppm, the level of lead assumed to be in the replacement soil used in the soil intervention.  The least stringent standard shown in the table is at the level where costs have leveled off (see Exhibits 7.8 and 7.9). Note that the highest cost is over twice the lowest cost.  This range is so large both because soil abatements are relatively expensive and because the number of homes that exceed the standards increases very rapidly as standards become more stringent than the 1500 ppm level.  Note, in particular, that the number of homes that exceed the soil standard increases by 62 percent as the soil standards increase in stringency from 500 ppm to 250 ppm.

Exhibits 7.7, 7.8 and 7.9 also present the estimated benefits and net benefits for alternative soil standards. Total benefits, as estimated using the IEUBK Model, range from about $138.8 billion to $257.9 billion with changes in soil standards.  The highest level of benefits is almost twice the lowest level.  Benefits increase slowly with increasing stringency in the soil standards up to about 3,000 ppm.  After that point, benefits increase more rapidly, with a sizeable jump between 1,000 and 500 ppm.   Under this risk model, net benefits are maximized at a very stringent standard; in this case a soil standard of 250 ppm.  Net benefits at this set of standards are estimated to be $163.2 billion.

**Exhibit 7-7**
**Costs, Benefits and Net Benefits for Alternative Soil Standards,**
**With Other Media Set at Final Standards***

| Soil Standards (ppm) | Number of Soil Removals | Total Cost of All Interventions ($ Billion) | IEUBK Model | | Empirical Model | |
|---|---|---|---|---|---|---|
| | | | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) |
| 250 | 16.2 | 94.6 | 257.9 | 163.2 | 63.6 | -31.0 |
| 500 | 10.0 | 84.1 | 239.5 | 155.4 | 58.9 | -25.2 |
| 1000 | 4.7 | 71.3 | 197.6 | 126.3 | 50.6 | -20.7 |
| 1200 | 3.8 | 68.9 | 192.2 | 123.3 | 48.5 | -20.3 |
| 1500 | 3.5 | 60.0 | 189.9 | 129.9 | 48.1 | -11.9 |
| 2000 | 3.5 | 53.4 | 189.0 | 135.6 | 47.8 | -5.7 |
| 2500 | 2.1 | 50.6 | 167.9 | 117.3 | 42.8 | -7.8 |
| 3000 | 0.6 | 49.6 | 140.3 | 90.7 | 38.3 | -11.3 |
| 3500 | 0.6 | 49.6 | 140.3 | 90.7 | 38.3 | -11.3 |
| 4000 | 0.6 | 49.6 | 140.3 | 90.7 | 38.3 | -11.3 |
| 4350 | 0.6 | 46.3 | 140.3 | 93.9 | 38.3 | -8.1 |
| 4500 | 0.6 | 46.3 | 140.3 | 93.9 | 38.3 | -8.1 |
| 5000 | 0.5 | 46.1 | 138.8 | 92.7 | 38.0 | -8.1 |

* Final Standards:
    Interior paint: 2 sq ft or more — repair, 50 sq ft or more — abate
    Exterior paint: 10 sq ft or more — repair, 100 sq ft or more — abate
    Window sill dust: 250 sq ft$^2$
    Floor dust: 40 µg/ft$^2$

As was the case with the other media, the Empirical Model generates lower estimates of benefits. Using the Empirical Model, total benefits range from about $38 billion to $63.6 billion with changes in the soil standards. The highest level benefits are about 67 percent higher than the lowest benefit level. Similar to the IEUBK Model results, benefits increase steadily with increases in soil standard stringency, with an additional jump between 1,000 ppm and 500 ppm. Because the Empirical Model provides lower estimates of benefits, the net benefits corresponding with each soil standard are negative (i.e. costs exceed benefits). Nevertheless, these results can be used to identify the soil standard that generates the maximum net benefits (i.e. the smallest in absolute value terms). Under this risk model, net benefits are maximized at a soil standard of 2000 ppm. As the soil standards increase in stringency from that point, net benefits decline. As the soil standards decrease in stringency from 2000 ppm, net benefit decline somewhat, then increase to a secondary net benefit maximum at a soil standard of 4350-4500 ppm.

Some of the apparent kinks in the costs and benefits shown in Exhibits 7.8 and 7.9 are due to the relative thinness of data in certain ranges (i.e., there are few observations for certain soil lead levels), and some are due to the role of play area abatements. Under the final §403 standards, three areas of a yard potentially receive attention: the perimeter of the building, the remote yard in general, and the play area in particular.

If the average soil lead concentration does not exceed the standard, but the play area alone does, then the play area is assumed to be abated. A play area abatement yields benefits equivalent to abating the remote

yard, but at a much lower cost. Thus, as the soil standards become less stringent, some homes will shift from a remote and/or perimeter abatement to a play area abatement. This is particularly true in the 1200 to 2000 ppm range, where there is a significant shift of homes from remote area to play area only abatements. In this range, costs decline while benefits are nearly unchanged, resulting in an increase in net benefits. In addition, there is a plateau in the 1700 to 2000 ppm range because there are no observations with soil lead levels between 1617 ppm and 2000 ppm.

The two blood-lead models generate very divergent estimates of the soil standard that maximizes net benefits (when the other standards are set at their final levels). The two estimates are either a very stringent soil standard of 250 ppm (using the IEUBK Model) or a less stringent soil standard of 2000 ppm (using the Empirical Model).

**Exhibit 7.8: IEUBK-based Model Costs, Benefits, and Net Benefits for Alternative Soil Standards**



Exhibit 7.9: Empirical-based Model Costs, Benefits, and Net Benefits for Alternative Soil Standards



Other standards:
Floor Dust: 40   (μg/ft²)
Sill Dust: 250   (μg/ft²)
Paint damage
interior:
Maintenance: 2 ft²
Abatement: 50 ft²
exterior:
Maintenance: 10 ft²
Abatement: 100 ft²

— Net Benefits
- - - Total Benefits
— Total Costs

**7.4 Hazard Standards that Maximize Net Benefits**

The prior sections of this chapter have discussed standards for each of three media, in each case assuming that the other media would be held constant at the final standards.  In addition to floor and window sill dust and soil, these final standards include paint standards of:

| Medium | Final Standard | Intervention Activity |
|---|---|---|
| Deteriorated Interior Lead- Based Paint | 2 sq.ft. or more<br>50 sq.ft. or more | Repair<br>Abate |
| Deteriorated Exterior Lead- Based Paint: | 10 sq.ft. or more<br>100 sq.ft. or more | Repair<br>Abate |

The economic analysis did not consider costs and benefits of alternative paint standards in terms of the amount of deteriorated interior or exterior paint.  Data limitations prevented EPA from quantifying the health risks (and therefore the benefits associated with risk reduction) as an explicit function of the extent of interior and exterior lead paint deterioration.  The deterioration amounts used in the paint standard values shown in the above table were provided by EPA to approximate the actual final standards.

This final section of Chapter 7 presents the standards that maximize net benefits overall (i.e., lets the floor dust, window sill dust and soil standards vary independently).  These standards are compared to the final standards.

As described in the earlier sections of this chapter, and shown in Exhibit 7-10, the two blood-lead models generate different benefit estimates for any given combination of standards.  In addition, the benefit estimates change at different rates under the two models and thus the set of standards that maximize net benefits is different under the two models.   The final standards fall in between the standards that maximize net benefits under the two models, except the final floor dust standard, which is the same as the standard under the IEUBK model that maximizes net benefits..  The three standards presented are:

| | Floor Dust Standard | Window Sill Dust Standard | Soil Standard |
|---|---|---|---|
| Standards that Maximize Net Benefits under IEUBK Model | 40 $\mu$g/ft$^2$ | 100 $\mu$g/ft$^2$ | 250 ppm |
| Final Standards | 40 $\mu$g/ft$^2$ | 250 $\mu$g/ft$^2$ | 1200 ppm |
| Standards that Maximize Net Benefits under Empirical Model | 80 $\mu$g/ft$^2$ | 310 $\mu$g/ft$^2$ | 1650 ppm |

For each of the two blood-lead models, Exhibit 7-10 presents the set of standards that maximize net benefits, along with the costs, benefits and net benefits for that standard.  In addition, the exhibit presents the final standard with its cost, benefit and net benefits.  The final standard is shown twice, once with

benefits calculated using the IEUBK Model and once using the Empirical Model.  The top half of the table presents results using the IEUBK Model.  The IEUBK net benefit maximizing standards are more stringent than the final standards, except for the floor dust standard, which is the same.  Because of the large number of homes in the lower range of environmental lead levels, the IEUBK standards would cost about 46 percent more than the final standard and the benefits would be nearly 43 percent greater than those of the final standard.  In addition, the net benefits, at $173.5 billion, would be substantially higher than the net benefits of the final standard, at $123.3 billion.

The Empirical Model net benefit maximizing standards, on the other hand, are less stringent than the final standard.  There are many fewer homes in these ranges of environmental lead.  The Empirical Model net benefits maximizing set of standards would cost less ($51.7 billion as compared to $68.9 billion) and would produce smaller benefits ($46.5 billion as compared to $48.5 billion) than the final standard.  However, its net benefits are larger than those of the final standard, while still negative.

Appendix A to this chapter presents the costs, benefits, and net benefits for alternative candidate hazard standards, when the costs and benefits of paint interventions and testing costs are excluded from the estimates.

**Exhibit 7-10**
**Comparison of Standards Under Alternative Risk Assessment Models**

| | IEUBK Model Results | |
| --- | --- | --- |
| | Standards that Maximize Net Benefits | Final Standards |
| Floor Dust Standard | 40 µg/ft$^2$ | 40 µg/ft$^2$ |
| Window Sill Dust Standard | 100 µg/ft$^2$ | 250 µg/ft$^2$ |
| Soil Standard | 250 ppm | 1,200 ppm |
| Total Cost | $100.6 billion | $68.9 billion |
| Total Benefit | $274 billion | $192.2 billion |
| Net Benefit | $173.5 billion | $123.3 billion |
| | Empirical Model Results | |
| | Standards that Maximize Net Benefits | Final Standards |
| Floor Dust Standard | 80 µg/ft$^2$ | 40 µg/ft$^2$ |
| Window Sill Dust Standard | 310 µg/ft$^2$ | 250 µg/ft$^2$ |
| Soil Standard | 1,650 ppm | 1,200 ppm |
| Total Cost | $51.7 billion | $68.9 billion |
| Total Benefit | $46.5 billion | $48.5 billion |
| Net Benefit | -$5.2 billion | -$20.3 billion |

# Appendix 7A.  Analysis of Net Benefits Considering One Medium at a Time (Single Media Standards)

As explained in the beginning of Chapter 7, standards for all of the media (dust, paint, and soil) must be analyzed jointly due to the presence of various interaction effects.  Therefore hazard standard candidates have not been evaluated one medium at a time up to this point in the report.  Nevertheless, some readers may be interested in the contribution to total costs and benefits that are made by each medium separately.  While there are significant limitations to estimating benefits and costs for a single medium, it is possible to develop approximate values.  This Appendix presents estimates for such a single media analysis.

Two types of single media interventions are considered in this Appendix: dust interventions and soil interventions.  A similar analysis for paint interventions has not been undertaken since only a single candidate standard was considered for paint interventions.  The single media analysis is run assuming that the standard for the media under consideration is set at one of the candidate levels and that standards for all other media are non-existent.  For example, the single media analysis for soil interventions analyzes the range of soil standards under consideration, while assuming the absence of any standards for dust and paint intervention.  Thus any intervention activities occurring under such a scenario are due to homes exceeding the soil standard under consideration.  However, if the yard (other than just the play area) exceeds the soil standard, a dust intervention is assumed to occur and the costs and benefits of that intervention are included.  This analysis omits any testing and risk assessment costs in order to permit a clearer presentation of the incremental changes in costs and benefits that are associated with changes in candidate standards for the media under consideration.

Calculations for the range of dust hazard standards considered for floor and window sill dust are presented in Exhibit 7-A.1 and Exhibit 7-A.2 for the IEUBK and the Empirical model respectively.  In summary, under the IEUBK model total benefits increase in step manner as options become increasing stringent, ranging from $44.2 billion to $89.4 billion.  Benefits increase at an increasing rate because, as dust levels decline, the number of homes at given environmental lead levels increases more quickly.  For example, with the floor dust standard set at 40 $\mu g/ft^2$, moving from a sill standard of 1000 $\mu g/ft^2$ to 500 $\mu g/ft^2$ increases the number of homes exceeding the standard from about 14.4 million to about 16.7 million (an increase of about 2.3 million housing units), while moving from 250 $\mu g/ft^2$ to 100 $\mu g/ft^2$ increases the number of homes exceeding the standard from about 21.7 million to 34.4 million (an increase of about 12.7 housing units).  Since total benefits increase at a faster rate than total costs, net benefits also increase as the dust standards becomes increasingly stringent, ranging from $38.2 billion to $70.1 billion.

**Exhibit 7-A.1: Estimated Costs, Benefits, and Net Benefits for Dust-Lead Hazard Standard Alone - Using the IEUBK Model (Soil and Paint Interventions are assumed not to occur.)**

| Floor Dust | Sill Dust | Number of Homes Exceeding Sill Dust Option (Millions) | IEUBK Model Results (50-years; $Billion) | | |
|---|---|---|---|---|---|
| | | | Costs | Benefit | Net Benefit |
| 40 | 100 | 34.4 | 19.3 | 89.4 | 70.1 |
| 40 | 250 | 21.7 | 12.1 | 70.6 | 58.5 |
| 40 | 500 | 16.7 | 9.2 | 64.5 | 55.3 |
| 40 | 1000 | 14.4 | 7.9 | 62.0 | 54.1 |
| 50 | 100 | 34.1 | 19.2 | 87.9 | 68.7 |
| 50 | 250 | 21.4 | 11.9 | 69.0 | 57.1 |
| 50 | 500 | 16.3 | 9.0 | 62.9 | 53.9 |
| 50 | 1000 | 13.8 | 7.6 | 57.7 | 50.1 |
| 100 | 100 | 33.1 | 18.6 | 81.7 | 63.2 |
| 100 | 250 | 19.0 | 10.5 | 55.6 | 45.1 |
| 100 | 500 | 13.8 | 7.5 | 49.5 | 42.0 |
| 100 | 1000 | 11.1 | 6.0 | 44.2 | 38.2 |

Note:  Rows may not add due to rounding.
This table does not include estimated costs or benefits of paint and soil interventions, or any testing or risk assessment costs.

Under the Empirical model, total benefits increase in step manner as the dust standards increase in stringency, ranging from $23.5 billion to $36.4 billion.  As is the case in the IEUBK model-based analysis, the rate at which benefits increase rises as the stringency of the standard considered increases, because the number of homes exceeding the standard increases more quickly and thus more children are protected.  The rate at which benefits increase, however, is tempered somewhat because the relationship between dust-lead and blood-lead under the Empirical model remains relatively constant across the range of dust standards considered.  The increasing number of children protected by more stringent standards is counterbalanced by decreasing risk reduction predicted for children living in homes with low dust levels. Thus there are smaller changes in blood lead because there are smaller changes in environmental lead between baseline dust and post-intervention levels.  Net benefits range from $17.1 billion to $20.5 billion.

**Exhibit 7-A.2: Estimated Costs, Benefits, and Net Benefits for Dust-Lead Hazard Standard Alone - Using the Empirical Model**
**(Soil and Paint Interventions are assumed not to occur.)**

| Floor Dust | Sill Dust | Number of Homes Exceeding Sill Dust Option (Millions) | Empirical Model Results (50-years; $Billion) | | |
|---|---|---|---|---|---|
| | | | Costs | Benefit | Net Benefit |
| 40 | 100 | 34.4 | 19.3 | 36.4 | 17.1 |
| 40 | 250 | 21.7 | 12.1 | 32.5 | 20.4 |
| 40 | 500 | 16.7 | 9.2 | 29.2 | 20.0 |
| 40 | 1000 | 14.4 | 7.9 | 26.7 | 18.8 |
| 50 | 100 | 34.1 | 19.2 | 36.3 | 17.2 |
| 50 | 250 | 21.4 | 11.9 | 32.4 | 20.5 |
| 50 | 500 | 16.3 | 9.0 | 29.1 | 20.0 |
| 50 | 1000 | 13.8 | 7.6 | 26.1 | 18.5 |
| 100 | 100 | 33.1 | 18.6 | 35.8 | 17.2 |
| 100 | 250 | 19.0 | 10.5 | 30.3 | 19.8 |
| 100 | 500 | 13.8 | 7.5 | 26.6 | 19.1 |
| 100 | 1000 | 11.1 | 6.0 | 23.5 | 17.4 |

Note:  Rows may not add due to rounding.
This table does not include estimated costs or benefits of paint and soil interventions, or any testing or risk assessment costs.

Calculations for the range of soil hazard standards considered are presented in Exhibit 7-A.3 and Exhibit 7-A.4 for the IEUBK and the Empirical model respectively.  Under the IEUBK model, benefits and net benefits increase as the soil standard becomes increasingly stringent, ranging from $15.9 billion to $145.0 billion.  In addition, benefits appear to increase at an increasing rate as the standard becomes more stringent.  Net benefits also reveal both these trends, increasing from $15.1 billion to $103.0 billion.

**Exhibit 7-A.3: Estimated Costs, Benefits, and Net Benefits for Soil-Lead Hazard Standard Alone - Using the IEUBK Model**
**(Independent dust and paint interventions are assumed not to occur.)**

| Soil Option (ppm) | Number of Homes Exceeding Soil Option (Millions) | IEUBK Model Results (50-years; $Billion) | | |
|---|---|---|---|---|
| | | Costs | Benefit | Net Benefit |
| 500 | 12.0 | 41.9 | 145.0 | 103.0 |
| 1000 | 5.8 | 27.8 | 87.6 | 59.7 |
| 1200 | 4.7 | 25.3 | 78.0 | 52.7 |
| 1500 | 4.3 | 16.3 | 75.4 | 59.1 |
| 2000 | 4.3 | 9.7 | 73.3 | 63.5 |
| 2500 | 2.6 | 6.3 | 48.5 | 42.2 |
| 3000 | 0.7 | 4.2 | 17.5 | 13.3 |
| 3500 | 0.7 | 4.2 | 17.5 | 13.3 |
| 4000 | 0.7 | 4.2 | 17.5 | 13.3 |
| 4500 | 0.7 | 1.0 | 17.5 | 16.5 |
| 5000 | 0.6 | 0.8 | 15.9 | 15.1 |

Note: Rows may not add due to rounding.
This table does not include estimated costs or benefits of paint and dust interventions (other than some dust interventions that occur as a result of soil abatement, as described in the text), or any testing or risk assessment costs.

Results for the soil hazard standard analysis under the Empirical model follow a pattern similar to that of the IEUBK model. Total benefits increase as the soil standard increases in stringency, ranging from $2.3 billion to $34.7 billion. The rate at which benefits increase, however, is again tempered somewhat because the relationship between soil-lead and blood-lead under the Empirical model remains relatively constant across the range of dust standards considered, with the increasing number of children being protected by more stringent standards being counterbalanced by decreasing risk reduction predicted for children living in homes with low soil-lead levels. Net benefits range from negative $7.6 billion to positive $6.8 billion, approaching the maximum level near 2000 ppm. Below 2000 ppm, net benefits decrease in a marked manner because total benefits increase at a slower rate than total costs. The increased number of children protected at more stringent standards is offset by a smaller predicted reduction in risk at lower environmental lead levels.

**Exhibit 7-A.4:  Estimated Costs, Benefits, and Net Benefits for Soil-Lead Hazard Standard Alone - Using the Empirical Model**
**(Independent dust and Paint Interventions are assumed not to occur.)**

| Soil Option (ppm) | Number of Homes Exceeding Soil Option (Millions) | Empirical Model Results (50-years; $Billion) | | |
|---|---|---|---|---|
| | | Costs | Benefit | Net Benefit |
| 500 | 12.0 | 41.9 | 34.7 | -7.3 |
| 1000 | 5.8 | 27.8 | 20.3 | -7.6 |
| 1200 | 4.7 | 25.3 | 17.7 | -7.6 |
| 1500 | 4.3 | 16.3 | 17.0 | 0.6 |
| 2000 | 4.3 | 9.7 | 16.6 | 6.8 |
| 2500 | 2.6 | 6.3 | 9.9 | 3.6 |
| 3000 | 0.7 | 4.2 | 2.5 | -1.7 |
| 3500 | 0.7 | 4.2 | 2.5 | -1.7 |
| 4000 | 0.7 | 4.2 | 2.5 | -1.7 |
| 4500 | 0.7 | 1.0 | 2.5 | 1.5 |
| 5000 | 0.6 | 0.8 | 2.3 | 1.5 |

Note:  Rows may not add due to rounding.
This table does not include estimated costs or benefits of paint and dust interventions (other than some dust interventions that occur as a result of soil abatement, as described in the text), or any testing or risk assessment costs.

It is important to note that the above analyses assumed that lead levels in all other media were held constant at baseline levels from HUD National Survey data.  Controlling for other contributors to the blood lead levels presents a different picture of the net benefits that result from moving to a more stringent standard than does the approach used in Chapter 7.

# Appendix 7B:  Alternative Play Area Analysis

In addition to the play area analysis presented in the main body of this report (referred to as the main play area analysis from here on), an alternative analysis for play area soil abatement was undertaken.  This alternative analysis reflects the assumption that children receive a disproportionate amount of exposure from the play area since they are likely to spend a disproportionate amount of outdoor time in the play area, as opposed to time spent in the rest of the yard.  Specifically, this analysis uses a different averaging algorithm for soil lead levels in estimating exposure levels of children from lead-contaminated soil.  This change results in differing estimates of the geometric mean blood-lead levels, differing estimates of benefits and net benefits, and differing estimates of the number of children with blood-lead levels that exceed 10 µg/dL.  To fully develop this model the alternative analysis considers standards for the play area that are separate and independent of the standards for the rest of the yard.  This appendix describes the alternative play area analysis and its results.

**Decision Rule for Soil Interventions**

The main play area analysis assumed the play area standard would equal the standard set for the rest of the yard.  It also assumed that under certain circumstances, only the play area and none of the rest of the yard would receive any soil intervention.  This section describes the circumstances under which a play area intervention is to be undertaken.  The "decision rule" for the main play area analysis and the alternative analysis presented in this appendix are the same.  Exhibit 7-B.1 provides a clearer understanding of what parts of the yard will be addressed under the regulations.

Both the main analysis and this alternative analysis calculate the rest of the yard soil lead average in the same manner.  Data on lead levels in soil were measured at three points in the yard.  Two samples were taken near the home: one at the entry and one to reflect lead levels in the soil under the roof's drip line.  The third sample was taken out in the middle of the yard and is referred to as the remote sample.  The rest of the yard average soil lead level is the simple average of the perimeter soil lead level (itself an average of the dripline and entry lead levels) and the remote soil lead level.  This analysis used the lead levels as measured for the remote soil area as a proxy for lead levels in the play area.  This assumption was made since no separate play area lead measures are available in the HUD national survey.

The first step is to examine the overall lead level for the home's soil as measured by the rest of the yard lead level.  If the home's rest of the yard soil lead level does not exceed the soil standard, then the model assumes that no soil abatement would occur in the rest of the yard.  If on the other hand the rest of the yard soil concentration does exceed the soil standard then the next step involves a comparison of the perimeter and the remote soil lead levels to the soil standard to determine which type of soil intervention would occur.  This decision depends on whether the soil lead levels for the perimeter area only, remote area only, or for both areas exceeded the soil standard, and they would respectively lead to soil abatements that were restricted to the perimeter area only, remote area only, or to both the perimeter and the remote areas.

**Exhibit 7-B.1: Parts of the Yard Addressed Under the Regulations**

Explanation of drawings of house and yard.

1.    Perimeter area    of house shown in gray.

2.    Remote area (everything but house and 3-foot perimeter), shown in gray.

3.    Play area shown in gray.

4.    Rest of yard (everything but house and play area) shown in gray.







If the rest of the yard soil concentration is below the soil standard for the rest of the yard, then the play area soil concentration is compared to the play area standard.  If this exceeds the play area standard, then the model assumes that the play area soil would be removed and replaced.  In addition, if the perimeter area received a soil abatement but the remote area did not under the rest of the yard standard, then the play area soil concentration is compared to the play area standard.  If the play area exceeds its standard then a play area abatement is also performed.

**Changes in the Exposure Models**

The difference between the two play area analyses arises in the manner in which the average soil lead level is calculated for input into the IEUBK and the Empirical models.  These models form the basis for estimating differences in blood-lead levels and thus the benefits.  The rest of the yard soil lead average is calculated for both pre-abatement and the post-abatement lead levels, and is used by the two models to determine shifts in the geometric mean (GM) and geometric standard deviation (GSD) of the NHANES blood lead levels to provide estimates of benefits from soil abatement and the number of children with blood-lead levels over 10 µg/dL.

In the main play area analysis, the average rest of the yard soil lead level is estimated as the simple average of the lead levels in the perimeter and the remote areas of the yard:

$$[(\text{dripline lead level} + \text{entry lead level})/2 + \text{remote area lead level}]/2$$

In addition, the play area is treated as a smaller version of the remote area, and exposure changes due to a play area abatement are considered equivalent to the exposure changes due to a remote area abatement. Thus for homes that receive a play area abatement, the post-abatement play area lead level (150 ppm) replaces the remote area lead level in the above equation when estimating the post-abatement average rest of the yard soil lead level.  As a result, in the main play area analysis, play area abatement is assumed to yield the same benefits as a remote area abatement, but at much lower costs.

In the alternative play area analysis, the above equation is changed to reflect the assumption that children spend a disproportionate amount of time in the play area, as opposed to the rest of the yard.  Thus lead levels in the play area are given disproportionate weight in the estimation of average soil lead levels used in the IEUBK and the Empirical models.  An alternative soil averaging equation is used:

$$0.5 \times [(\text{dripline lead level} + \text{entry lead level})/2 + \text{remote area lead level}]$$
$$+ 0.5 \times (\text{play area lead level})$$

The above equation assumes that 50 percent of a child's exposure occurs from the play area and the other 50 percent from the rest of the yard.  The greater weight given in the above equation to the play area soil lead level is clearly evident since the play area comprises only 10 percent of the yard.

In developing the alternative play area analysis, various alternative assumptions for the size of the play area and the amount of exposure occurring from the play area and the rest of the yard were considered. These assumptions included play areas comprising 50 percent and 90 percent of the yard,  exposure from the play area causing 66.6 percent of the exposure (33.3 percent from the rest of the yard) and exposure being proportional to the size of the play area.  Due to a lack of evidence to support a particular choice of play area size and play area contribution to exposure, however, the analysis is based only on a single play area size (10 percent of the yard) and contribution to exposure (50 percent exposure from play area).

**Cost, Benefits, and Net Benefits for Alternative Play Area Analysis**

Both versions of the play area analysis use the same size for the play area: 200 square feet for single-family homes and 400 square feet for multifamily buildings. For both housing types this play area size represents 10 percent of the yard. Since the size of the play areas for single-family and multifamily housing units do not differ between the two play area analyses, the unit cost for play area soil removal do not change from those estimated in Chapter 5. Play area intervention costs are estimated to be: $1,460 for a single family house ($2,129 if the soil is hazardous), and $9,418 for a multifamily building or $314 per multifamily housing unit ($10,755 per building or $359 per unit if the soil is hazardous). In addition, since the two analyses use the same decision rule for soil intervention, total costs of all interventions are also equal under both analyses.

Due to differences in the way the average soil lead levels are calculated for use in the IEUBK and the Empirical models under the two play area analyses, both the baseline (blood-lead levels and children affected) and the effect of a given set of standards differs between the two analyses. Thus the benefits and net benefits for the alternative play area analysis are not comparable to those presented in the report with the main play area analysis.

Exhibit 7-B.2 presents the estimated number of soil abatements, costs, benefits, and net benefits for alternative play area standards and rest of the yard standards. Three alternative standards have been considered for the play area (400 ppm, 1200 ppm, and 2000 ppm). The primary interest here was to assess the benefits and costs of a play area standard that was stricter than the rest of the yard standard. A stricter play area standard reinforces the underlying assumption behind the alternative play area analysis that the play area is responsible for a disproportionate amount of exposure and therefore should be abated at a stricter hazard level.

Exhibit 7-B.2 shows that while holding the play area standard constant at 400 ppm, the total number of soil abatements is expected to decrease from 10.3 million to 6.6 million as the stringency of the rest of the yard standard decreases from 500 ppm to 5000 ppm. This decrease is much smaller than is the case when the play area and the rest of the yard standards are varied together over a similar range. The results of such a scenario are presented in Exhibit 7-7, and the number of soil abatements decrease from 10 million to just 0.5 million. Clearly, a play area standard of 400 ppm is associated with a significant number of soil interventions no matter what the rest of the yard standard.

This also explains why, as the rest of the yard standard is made more stringent, the overall number of soil abatements occurring increases at a slower rate than in the main play area analysis. Increasing the stringency of the rest of the yard standard, at least up to 2500 ppm, results in many homes switching from a play area only intervention to an intervention which covers a much larger section of the yard. The addition of homes not already undertaking a play area intervention is very limited. As the stringency of the rest of the yard standard exceeds 2500 ppm and moves towards 500 ppm it is evident that additional homes start undertaking soil interventions. As expected the less stringent play area standards of 1200 ppm and 2000 ppm, with the rest of the yard also set at the same level, result in a much smaller number of soil abatements, 3.8 million and 3.5 million respectively. The apparent lack of variation seen in the number of soil abatements expected between the two less stringent play area standards is likely caused by the relative thinness of data in this soil lead range.

**Exhibit 7-B.2:  Costs, Benefits and Net Benefits for Alternative Soil Standards, With Other Media Set at Final Standards***

| Soil Standards (ppm) | | | | IEUBK Model | | Empirical Model | |
|---|---|---|---|---|---|---|---|
| Play Area | Rest of Yard | Number of Soil Removals (Million) | Total Cost of All Interventions ($ Billion) | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) |
| 400 | 500 | 10.3 | 84.4 | 186.0 | 101.7 | 46.8 | -37.6 |
| 400 | 1000 | 8.8 | 72.8 | 177.4 | 104.6 | 46.0 | -26.9 |
| 400 | 1200 | 8.2 | 70.5 | 175.6 | 105.1 | 44.8 | -25.7 |
| 400 | 1500 | 8.0 | 61.7 | 174.9 | 113.1 | 44.7 | -17.0 |
| 400 | 2000 | 8.0 | 55.2 | 175.6 | 120.4 | 44.8 | -10.4 |
| 400 | 2500 | 7.3 | 52.9 | 170.7 | 117.8 | 42.8 | -10.1 |
| 400 | 3000 | 6.7 | 51.9 | 166.4 | 114.5 | 41.8 | -10.1 |
| 400 | 3500 | 6.7 | 51.9 | 166.4 | 114.5 | 41.8 | -10.1 |
| 400 | 4000 | 6.7 | 51.9 | 166.4 | 114.5 | 41.8 | -10.1 |
| 400 | 4350 | 6.7 | 48.7 | 167.0 | 118.3 | 41.9 | -6.8 |
| 400 | 4500 | 6.7 | 48.7 | 167.0 | 118.3 | 41.9 | -6.8 |
| 400 | 5000 | 6.6 | 48.5 | 166.0 | 117.5 | 41.8 | -6.7 |
| 1200 | 1200 | 3.8 | 68.9 | 159.3 | 90.4 | 41.9 | -27.0 |
| 2000 | 2000 | 3.5 | 53.6 | 159.3 | 105.7 | 41.9 | -11.5 |

* Final Standards:
Interior paint: 2 sq ft or more — repair, 50 sq ft or more — abate
Exterior paint: 10 sq ft or more — repair, 100 sq ft or more — abate
Window sill dust: 250 sq ft$^2$
Floor dust: 40 µg/ft$^2$

The most interesting cost comparisons are among scenarios where the play area standard is varied.  The analysis found that with the rest of the yard standard set at 1200 ppm, moving from the 1200 ppm to the 400 ppm play area standard only increased costs from $68.9 billion to $70.5 billion.  Similarly, with the rest of the yard standard set at 2000 ppm, moving from the 2000 play area standard to the 400 ppm play area standard only increased costs from $53.6 billion to $55.2 billion.  Under each of these cases, moving to the 400 ppm play area standard results in a small increase in costs while more than doubling the number of homes protected as a result of soil abatements.

The above conclusion is also highlighted in the estimated benefits and net benefits from the two exposure models.  Under the IEUBK model total benefits increase from around $159.3 billion to $175.6 billion when the play area standard is changed from 1200 ppm to 400 ppm.  Similarly, under the Empirical model total benefits increase from around $41.9 billion to $44.8 billion when the play area standard is changed from 1200 ppm to 400 ppm.  Net benefits under the IEUBK model increase from $90.4 billion to $105.1 billion when the play area standard changes from 1200 ppm to 400 ppm, and from $105.7 billion to $120.4 billion when the play area standard changes from 2000 ppm to 400 ppm.  Similarly, under the Empirical model net benefits increase from negative $27.0 billion to negative $25.7 billion when the play area standard changes from 1200 ppm to 400 ppm, and from negative $11.5 billion to negative $10.4 billion when the play area standard changes from 2000 ppm to 400 ppm.  The findings of the alternative play area analysis indicate that a play area standard that is stricter than the rest of the yard standard will

result in both a substantial increase in the number of homes protected through soil interventions and higher net benefits according to both exposure models.

**Cost, Benefits, and Net Benefits for Various Candidate Floor Dust Hazard Standards**

In this section the costs, benefits, and net benefits for alternative floor dust standards are assessed under the alternative play area assumptions. This analysis assumes a play area standard of 400 ppm and a rest of the yard standard of 1200 ppm. In addition, the window sill dust hazard standard and the paint standards are set at their final standards. Section 7.1 and Exhibit 7-1 present the results of a similar analysis which was undertaken based on assumptions used in the main play area analysis.

Exhibit 7-B.3 presents the results of varying the floor dust standard under the alternative analysis. At each standard level, the analysis found only a marginal ($1-2 billion) increase in the total costs of all interventions compared to costs in the main analysis. This cost increase results from the increased number of soil interventions occurring due to the stricter play area standard, as was highlighted in the previous section. As the floor dust standard increases in stringency from 220 $\mu g/ft^2$ to 40 $\mu g/ft^2$, costs increase from $69.0 billion to $70.5 billion under the alternative analysis. Thus, costs under the most stringent standard only exceeds costs under the least stringent standard by $1.5 billion (2 percent).

**Exhibit 7-B.3**
**Costs, Benefits and Net Benefits for Alternative Floor Dust Standards***

| Floor Dust | Total Costs of All Interventions ($ Billion) | IEUBK Model | | Empirical Model | |
|---|---|---|---|---|---|
| | | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) |
| 40 | $70.5 | $175.6 | $105.1 | $44.8 | $(25.7) |
| 50 | $70.3 | $174.2 | $103.8 | $44.7 | $(25.6) |
| 60 | $70.2 | $172.2 | $102.0 | $44.6 | $(25.6) |
| 70 | $70.2 | $172.2 | $102.0 | $44.6 | $(25.6) |
| 80 | $70.0 | $169.5 | $99.5 | $44.5 | $(25.6) |
| 100 | $69.3 | $162.1 | $92.9 | $43.1 | $(26.2) |
| 120 | $69.2 | $144.0 | $74.8 | $42.8 | $(26.3) |
| 140 | $69.1 | $143.6 | $74.5 | $42.7 | $(26.4) |
| 160 | $69.1 | $143.6 | $74.5 | $42.7 | $(26.4) |
| 180 | $69.1 | $143.6 | $74.5 | $42.7 | $(26.4) |
| 200 | $69.0 | $141.3 | $72.2 | $42.6 | $(26.4) |
| 220 | $69.0 | $141.3 | $72.2 | $42.6 | $(26.4) |

* Final Standards:
Interior paint: 2 sq ft or more — repair, 50 sq ft or more — abate
Exterior paint: 10 sq ft or more — repair, 100 sq ft or more — abate
Window sill dust: 250 sq $ft^2$
Soil: Play area 400 ppm, rest of yard 1200 ppm
Play area is 10% of yard, i.e., SF 200 sq ft, MF 400 sq ft and Post Soil = .50 (Post Ply) + .50 (Post Soil)

Under the IEUBK model, total benefits and net benefits increase throughout the range as the floor dust standard increases in stringency.  This is the same pattern shown by benefits and net benefits under the main analysis.  Total benefits increase from $141.3 billion to $175.6 billion and net benefits from $72.2 billion to $105.1 billion, as the floor dust standard is varied from 220 µg/ft$^2$ to 40 µg/ft$^2$.  Net benefits are maximized at the most stringent floor dust standard (40 µg/ft$^2$) and equal $105.1 billion.

Under the Empirical Model, total benefits also increase throughout the range as the floor dust standard is made increasing more stringent.  Total benefits increase from $42.6 billion (220 µg/ft$^2$) to $44.8 billion (40 µg/ft$^2$).  The lower estimates of total benefits and smaller changes in benefits as the floor dust standard is varied, compared to the IEUBK model, are consistent with results for the Empirical model found in this report.  Net benefits under the Empirical model are negative throughout the range of floor dust standards considered, however, they can still be used to identify the floor dust standard that generates the maximum net benefits (i.e., the least negative benefits).  Net benefits are relatively constant for standards between 220 µg/ft$^2$ to 100 µg/ft$^2$, are maximized at standards between 80 µg/ft$^2$ and 50 µg/ft$^2$, and decrease thereafter.

While total benefits and net benefits for both exposure models appear to be lower in this analysis than in the main analysis, these estimates are not comparable for reasons cited earlier in this Appendix.  Comparing the results for the two exposure models in this analysis, the floor dust standard that maximizes net benefits (when the other standards are set at their final standards) appears to lie in the range 40 µg/ft$^2$ to 80 µg/ft$^2$.  This is the same range in which net benefits are maximized in the main analysis.

**Cost, Benefits, and Net Benefits for Various Candidate Window Sill Dust Hazard Standards**

In this section the costs, benefits, and net benefits for alternative window sill dust standards are assessed under the alternative play area assumptions.  Similar to the analysis in the preceding section, this analysis assumes a play area standard of 400 ppm and a rest of the yard standard of 1200 ppm.  In addition, the floor dust hazard standard and the paint standards are set at their final standards.  Section 7.2 and Exhibit 7-4 present the results of a similar analysis which was undertaken based on assumptions used in the main play area analysis.

Exhibit 7-B.4 presents the results of varying the window sill dust standard under the alternative analysis.  Similar to the results in the previous section, at each standard level, the analysis found only a marginal ($1-2 billion) increase in the total costs of all interventions compared to costs in the main analysis.  As the window sill dust standard increases in stringency from 750 µg/ft$^2$ to 100 µg/ft$^2$, costs increase from $67.6 billion to $76.8 billion under the alternative analysis.  Thus in the alternative analysis, costs under the most stringent standard exceeds costs under the least stringent standard by $9.2 billion (13.5 percent).

Under the IEUBK model, total benefits and net benefits increase throughout the range as the window sill dust standard increases in stringency.  This is the same pattern shown by benefits and net benefits under the main analysis.  Total benefits increase from $168.6 billion to $194.5 billion and net benefits from $101.0 billion to $117.6 billion, as the window sill dust standard is varied from 750 µg/ft$^2$ to 100 µg/ft$^2$.  Net benefits are maximized at the most stringent window sill dust standard (100 µg/ft$^2$) and equal $117.6 billion.

**Exhibit 7-B.4**
**Costs, Benefits and Net Benefits for Alternative Window Sill Dust Standards***

| | | IEUBK Model | | Empirical Model | |
|---|---|---|---|---|---|
| Sill Dust | Total Costs of All Interventions ($ Billion) | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) | Total Benefits of All Interventions ($ Billion) | Net Benefits of All Interventions ($ Billion) |
| 100 | $76.8 | $194.5 | $117.6 | $48.0 | $(28.8) |
| 150 | $74.0 | $185.4 | $111.4 | $46.8 | $(27.2) |
| 200 | $73.7 | $184.4 | $110.7 | $46.6 | $(27.1) |
| 250 | $70.5 | $175.6 | $105.1 | $44.8 | $(25.7) |
| 300 | $70.1 | $175.3 | $105.2 | $44.4 | $(25.7) |
| 310 | $69.2 | $173.6 | $104.3 | $43.7 | $(25.5) |
| 350 | $68.6 | $171.9 | $103.3 | $43.0 | $(25.6) |
| 400 | $68.6 | $171.9 | $103.3 | $43.0 | $(25.6) |
| 450 | $68.3 | $169.8 | $101.5 | $42.5 | $(25.8) |
| 500 | $68.2 | $169.6 | $101.4 | $42.4 | $(25.8) |
| 550 | $67.8 | $168.9 | $101.1 | $41.9 | $(25.9) |
| 600 | $67.8 | $168.9 | $101.1 | $41.9 | $(25.9) |
| 650 | $67.6 | $168.6 | $101.0 | $41.4 | $(26.2) |
| 700 | $67.6 | $168.6 | $101.0 | $41.4 | $(26.2) |
| 750 | $67.6 | $168.6 | $101.0 | $41.4 | $(26.2) |

* Final Standards:
Interior paint: 2 sq ft or more — repair, 50 sq ft or more — abate
Exterior paint: 10 sq ft or more — repair, 100 sq ft or more — abate
Floor dust: 40 µg/ft$^2$
Soil: play area 400 ppm, rest of yard 1200 ppm
Play area is 10% of yard, i.e., SF 200 sq ft, MF 400 sq ft and Post Soil = .50 (Post Ply) + .50 (Post Soil)

Under the Empirical Model, total benefits increase throughout the range as the window sill dust standard is made increasing more stringent.  Total benefits increase from $41.4 billion (750 µg/ft$^2$) to $48.0 billion (100 µg/ft$^2$).  Similar to the results for the floor dust standards under the Empirical model, net benefits are negative throughout the range of window sill dust standards that were considered. However, the standard at which the least negative net benefits is generated can be identified.  This occurs when the window sill dust standard is set at 310 µg/ft$^2$ and net benefits are maximized at negative $25.5 billion.

The benefit and net benefit estimates in this analysis are once again not comparable to the estimates in the main analysis.  Comparing the results for the two exposure models in this analysis, the window sill dust standard that maximizes net benefits (when the other standards are set at their final standards) appears to lie in the range 100 µg/ft$^2$ to 310 µg/ft$^2$.  This is the same range in which net benefits are maximized in the main analysis.

# Reference

Battelle.  1997.  Risk Assessment to Support Standards for Lead in Paint, Dust, and Soil.  Prepared by
        Battelle, for National Program Chemicals Division, Office of Pollution Prevention and Toxics,
        U.S. Environmental Protection Agency.  EPA 747-R-97-006, December.

# 8. Sensitivity Analysis

## 8.1    Introduction

The estimation of the impacts of the §403 standards presented in the preceding chapters of this report includes a large number of inputs and assumptions concerning various aspects of both the potential costs and benefits of these standards.  Most of these inputs and assumptions carry with them some degree of uncertainty.  In some cases, the alternative values or approaches to modeling the impacts of these rules could conceivably lead to results that are different from those presented in Chapters 5 through 7.  In some cases it is possible to perform alternative calculations of the impacts using different assumptions to quantify the magnitude of the difference in outcome.  In other cases, it is only possible to address the uncertainties in a qualitative manner and provide some indication based on judgment of the likely effect of those uncertainties on the impact estimates.

This chapter focuses primarily on the results of several specific sensitivity analyses that were conducted to measure the effect of particular aspects of the model on model results.[1]  "Sensitivity" is an uncertainty measure that reflects the rate or degree to which the results of the analysis change relative to changes made in a particular input variable or assumption.  Sensitivity analyses are not necessarily intended to provide a measure of the uncertainty in the input variable itself (that is, how well that value is known) but rather to assess how important that variable is with respect to the outcome obtained and by extension how important it is to have a particular degree of confidence in the value used for that variable in the main analysis.

As is evident from the description of the benefit-cost model presented previously (as well as the risk assessment model incorporated into it), there are numerous model elements that could have been selected for sensitivity analyses.   The particular elements of the model chosen to be included in the sensitivity analysis presented here reflect those identified by EPA as likely to have a significant effect on the results or for which there was a particular interest in determining what the potential effects might be.  Six particular elements were chosen for these sensitivity analyses[2]:

•    Discount rate
•    Monetary value of an IQ point loss/gain
•    Inclusion of hazardous waste disposal costs for some soil removal
•    Exclusion of small IQ point changes
•    Real estate transactions rather than pending birth as the intervention trigger
•    Considering dust and soil impacts independent of each other and paint impacts

---

[1]    It should be noted that the use of both the IEUBK and the Empirical models for predicting children's blood lead levels incorporated into the main part of the benefit-cost analysis is in effect a form of uncertainty analysis as well.

[2]    Several sensitivity analyses, mostly relating to the characterization of population blood lead levels, are included in the §403 risk assessment document prepared by Battelle (1997).

The first three elements for which sensitivity analyses were conducted are parametric inputs for which alternative values are used. The second three elements involve changes in the modeling procedures used in the main benefit-cost analysis.

The sensitivity analyses consider the effect of changes in these elements on two outcomes of the benefit-cost modeling. The first is consideration of the effect of alternative specifications on the costs and benefits of the final §403 standards. The second is consideration of the effect of these alternative specifications on the determination of the set of §403 standards that produce maximum net benefits. In both cases, the analyses are conducted separately using the IEUBK and the Empirical blood lead models.

In addition to these six specific sensitivity analyses, this chapter also provides a more qualitative summary assessment of the uncertainty in various components of the benefit-cost model and the potential impact those uncertainties might have in the outcomes of the analysis.

## 8.2     Analyses Involving Parameter Changes

This section of the sensitivity analysis focuses on three parameters: value of the discount rate, value of each IQ point, and the cost of disposing of soil removed during soil interventions. Each of these parameters is of interest for a different reason, but in each case the question is what is the appropriate value of the parameter, not how is it used in the analysis. Because the model estimates costs and benefits over a 50-year period, and the resulting benefit streams stretch even further into the future, the results may be very sensitive to the discount rate used in the analysis. The second parameter, value of each IQ point, is likely to have a substantial impact on the benefits estimation because changes in population IQ levels account for the great majority of monetary benefits (over 98 percent at the option selected). While the third parameter is not likely to have as large an impact on results, EPA may be making a change in the hazardous waste disposal regulations that would affect the costs of soil interventions. The third parameter sensitivity analysis looks at the potential impact of such a change. In each case, the costs, benefits and net benefits for the standards are used to demonstrate the impact of the alternative parameter values. Furthermore, net benefit-maximizing standards are shown for each alternative.

### 8.2.1     Discount rate

A 3 percent discount rate has been adopted as the most appropriate rate for use in this analysis, based on a rationale presented in section 4.5.3 of this report. However, OMB recommends the use of a 7 percent discount rate in benefit-cost analyses for government regulations. This section presents results using 7 percent and compares them against costs, benefits, and net benefits in the baseline (3 percent) analysis. Exhibit 8-1a gives these results for the final standards.

Using a 7 percent discount rate reduces the present value of both total costs and total benefits, with the reduction in benefits relatively greater than the reduction in costs. This relative difference in declines is due to the differences in the timing of costs and benefits -- the benefits occur further in the future than their related costs, thus the higher discount rate has a bigger impact on benefits. The difference is greatest for soil removals, where the interventions are permanent (i.e. costs incurred today generate benefits for all future cohorts), and lowest for dust interventions and paint repairs, where the

interventions last only four years (costs incurred today generate benefits for children present over the next four years).

**Exhibit 8-1a**

**Effects on Costs and Benefits of Final Standards due to Changing Discount Rate Assumption**

|  | Base (3% Discount Rate) | | Alternative (7% Discount Rate) | | Alternative as % of Base | |
|---|---|---|---|---|---|---|
|  | Empirical | IEUBK | Empirical | IEUBK | Empirical | IEUBK |
| Costs ($ billion) | $68.9 | $68.9 | $45.3 | $45.3 | 66% | 66% |
| Benefits ($ billion) | $48.5 | $192.2 | $5.9 | $23.0 | 12% | 12% |
| Net Benefits ($ billion) | -$20.3 | $123.3 | -$39.3 | -$22.2 | n/a | n/a |

Figures may not add due to rounding error.

The reductions in net benefits under both the IEUBK and Empirical models is a function of the reductions in costs and benefits under each model. While the relative changes in costs and in benefits are the same across models, the relative changes in net benefits are different, because of the different magnitudes of costs and benefits for each model. The negative net benefits under the Empirical Model nearly double in absolute value, while the net benefits under the IEUBK Model shift from strongly positive to negative.

Exhibit 8-1b compares the net benefit-maximizing standards assuming a 7 percent discount rate, versus the same for a 3 percent discount rate. Since the analysis identifies standards for each of three media, using two different risk assessment models, there are six cases to be considered in this comparison. In five out of six, standards are less stringent under a 7 percent regime; in the other case, standards are the same between scenarios. This is the expected trend given that when standards are fixed at a constant level (e.g. the option selected), the cost-to-benefit ratio for interventions is higher with a 7 percent rate than a 3 percent rate. Interventions will lead to positive net benefits only in homes with very high levels of contamination, where large improvements in conditions and in expected occupant IQ take place following intervention. The one standard that does not change between discount rates -- floor dust under the IEUBK model -- is associated with very high positive net benefits to begin with.

**Exhibit 8-1b**

**Effects on Net Benefit-Maximizing Standards due to Changing Discount Rate Assumption**

| | | Standards | | | Values ($ billion) | | |
|---|---|---|---|---|---|---|---|
| Scenario | Model | Floor Dust (µg/ft²) | Sill Dust (µg/ft²) | Soil (ppm) | Costs | Benefits | Net Benefits |
| Base (3% Discount Rate) | Empirical | 80 | 310 | 1650 | 51.7 | 46.5 | -5.2 |
| | IEUBK | 40 | 100 | 250 | 100.6 | 274 | 173.4 |
| Alternative (7% Discount Rate) | Empirical | none* | none* | none* | 23.4 | 1.5 | -21.9 |
| | IEUBK | 40 | none* | 2050 | 29.9 | 19.7 | -10.2 |

*Net benefits are maximized when no interventions are triggered through the standard in question.
Figures may not add due to rounding error.

### 8.2.2   Value of an IQ Point

The economic analysis presented in chapters 4, 5, 6 and 7, uses the most recent data and approach for assessing the value of an IQ point. This value, in 1995 dollars, is $8,346 (assuming a 3 percent discount rate -- see chapter 6). However, earlier EPA analyses have used an alternative, and lower, value of $6,847, in 1995 dollars. (USEPA 1985, 1986)   Exhibit 8-2a compares costs and benefits of the analysis for these two different IQ point values.

**Exhibit 8-2a**

**Effects on Costs and Benefits of Final Standards due to Changing IQ Valuation Assumption**

| | Base (IQ Value = $8,346) | | Alternative (IQ Value= $6,847) | | Alternative as % of Base | |
|---|---|---|---|---|---|---|
| | Empirical | IEUBK | Empirical | IEUBK | Empirical | IEUBK |
| Costs ($ billion) | $68.9 | $68.9 | $68.9 | $68.9 | 100% | 100% |
| Benefits ($ billion) | $48.5 | $192.2 | $40.0 | $158.2 | 82% | 82% |
| Net Benefits ($ billion) | -$20.3 | $123.3 | -$28.9 | $89.3 | n/a | 72% |

Figures may not add due to rounding error.

Costs are not affected by a change in IQ point value, because unit costs are not affected nor are the number or timing of interventions. In turn, the number of children protected and post-intervention blood lead levels remain unchanged. Benefits, however, are reduced by essentially the same percentage as the reduction in IQ value ($6,847 is 82 percent of $8,346). While there are several categories of monetized benefits in this analysis which are not directly linked to changes in IQ, these categories

combined make up under two percent of benefits for the option selected, under both the IEUBK and empirical models.  Thus, the relative reduction in benefits is nearly the same as the relative reduction in IQ point value, for both models.  Net benefits reduce as a function of the change in benefits.

Exhibit 8-2b compares the net benefit-maximizing standards under both IQ point value assumptions.  Standards that maximize net benefits are set at the margin.  In other words, given one standard, the standard which is one unit more stringent is preferable if the additional homes affected by that standard yield greater marginal benefits than costs.[3]  In this sensitivity analysis of IQ point value, all marginal benefits are reduced by a nearly uniform factor, 18 percent, while marginal costs are not affected.  As a result, when the lower IQ point value is used, the net benefit-maximizing standards should be equal to or less stringent than they are in the base analysis.  The results in Exhibit 8-2b match this prediction.  Two out of three standards become slightly less stringent under the Empirical model, and no standards change under the IEUBK model.  The latter result may appear surprising, but is a reflection of the fact that marginal homes with relatively low dust lead loads and soil lead concentrations generally experience strongly positive net benefits when the IEUBK model is used.

**Exhibit 8-2b**
**Effects on Net Benefit-Maximizing Standards due to Changing IQ Valuation Assumption**

| Scenario | Model | Floor Dust (µg/ft²) | Sill Dust (µg/ft²) | Soil (ppm) | Costs | Benefits | Net Benefits |
|---|---|---|---|---|---|---|---|
| | | Standards | | | Values ($ billion) | | |
| Base (IQ Value = $8,346) | Empirical | 80 | 310 | 1650 | 51.7 | 46.5 | -5.2 |
| | IEUBK | 40 | 100 | 250 | 100.6 | 274 | 173.4 |
| Alternative (IQ Value= $6,847) | Empirical | 80 | 340 | 2050 | 48.4 | 35.1 | -13.3 |
| | IEUBK | 40 | 100 | 250 | 100.6 | 225.4 | 124.8 |

Figures may not add due to rounding error.

### 8.2.3   Hazardous Waste Disposal of Soil

This sensitivity analysis assumes that there is no cost premium for the disposal of soil with very high levels of lead.  The base analysis assumes that soil with a lead concentration greater than 2000 ppm

---

[3]     Given the structure of the economic analysis, benefits cannot be directly calculated for any specific home or group of homes smaller than the entire set.  Total benefits are calculated based on the blood lead distribution as aggregated across all homes in the analysis.  However, the concept of marginal benefits is very useful for understanding numerous model results.  It can be construed in the following way.  The marginal benefit generated by a new intervention X in a home Y is the total benefits under this scenario, minus the total benefits under a scenario identical in every way except that intervention X does not take place in home Y.

must be disposed of as hazardous waste, at a great supplement to the standard cost of soil disposal (see chapter 5 for itemization of costs).   Exhibit 8-3a gives a comparison of results under each scenario.

**Exhibit 8-3a**

**Effects on Costs and Benefits of Final Standards due to Changing Assumptions Regarding Whether Removed Soil Must Ever Be Treated as Hazardous Waste**

|  | Base (Soil with >2000 ppm Lead is Disposed of as Hazardous Waste) | | Alternative (No Soil Disposed of as Hazardous Waste, thus Reducing Costs of Disposal) | | Alternative as % of Base | |
|---|---|---|---|---|---|---|
|  | Empirical | IEUBK | Empirical | IEUBK | Empirical | IEUBK |
| Costs ($ billion) | $68.9 | $68.9 | $56.3 | $56.3 | 82% | 82% |
| Benefits ($ billion) | $48.5 | $192.2 | $48.5 | $192.2 | 100% | 100% |
| Net Benefits ($ billion) | -$20.3 | $123.3 | -$7.8 | $135.9 | 39% | 110% |

Since this change in assumption does not affect the number of homes getting interventions nor the effectiveness of those interventions, benefits remain constant.  Total costs decrease, however, because costs for soil removal decrease.  For the option selected, with a standard of 1200 ppm for soil removal, about two million homes performing soil interventions are affected by the relaxed soil disposal requirements of the sensitivity analysis and costs decline by $12.6 million nationally.

Exhibit 8-3b compares the net benefit-maximizing standards assuming no hazardous waste disposal of soil, versus the base analysis.  Since, relative to the base case, some unit soil costs decrease, and benefits are unaffected at each standard, the expected consequence of this exercise is that soil standards should become more stringent if they change at all.  Analysis with the Empirical model yields this result; however, the IEUBK model produces the opposite pattern.

**Exhibit 8-3b**

**Effects on Net Benefit-Maximizing Standards due to Changing Assumptions Regarding Whether Removed Soil Must Ever Be Treated as Hazardous Waste**

| Scenario | Model | Standards | | | Values ($ billion) | | |
|---|---|---|---|---|---|---|---|
| | | Floor Dust (µg/ft²) | Sill Dust (µg/ft²) | Soil (ppm) | Costs | Benefits | Net Benefits |
| Base (as 8-3a) | Empirical | 80 | 310 | 1650 | 51.7 | 46.5 | -5.2 |
| | IEUBK | 40 | 100 | 250 | 100.6 | 274 | 173.4 |
| Alternative (as 8-3a) | Empirical | 80 | 310 | 1650 | 47.6 | 46.5 | -1.1 |
| | IEUBK | 40 | 100 | 300 | 88.1 | 266.3 | 178.2 |

Figures may not add due to rounding error.

The IEUBK result suggests that when no soil is treated as hazardous waste, soil removal at homes where the yard average concentration is between 250 ppm and 300 ppm produces negative net benefits on the whole. Similarly, when soil above 2000 ppm is treated as hazardous waste, it would appear that this collection of homes produces positive net benefits from soil removal. However, these two statements cannot both be true, because no home in the HUD survey with a yard average soil lead concentration in the 250-300 ppm range contains any soil above 2000 ppm. Thus neither costs nor benefits stemming from this group of homes should be affected by the changed assumption in this analysis. This case is a special exception to the rule that net benefit-maximizing standards are set at the margin.

The reason for the paradoxical finding under the IEUBK model has to do with the possibility of mixing soil to avoid hazardous waste disposal costs (in the case that there is a definition for soil as hazardous waste). As described in chapter 5 (section 5.6.3), special disposal of soil removed from a yard is not required in two cases. These are either none of the soil removed exceeds the hazardous waste definition, or the following conditions are met:

• Soil is removed from both the home perimeter and remote areas;
• Soil from one of the two areas exceeds the hazardous waste definition; and
• Mixed together, the soil removed from both areas does not exceed the hazardous waste definition.

Based on the HUD survey, there are 1.1 million homes where one area of the yard exceeds 2000 ppm, but the other falls between 250 and 300 ppm. They all exceed the basic soil standards in question. Of these, 931 thousand perform interventions during the course of the 50-year analysis. This means that if the hazardous waste definition of soil is 2000 ppm, these homes must incur the major expense of hazardous waste disposal when the soil standard is 300 ppm. However, when the standard is 250 ppm, soil is removed from both yard areas and may be mixed to avoid this extra cost. The supplemental cost of removing a greater volume of soil is small in comparison; overall savings for this set of homes is $2.6 billion.

Thus it appears that in the base analysis, the net benefit connected with removing soil from homes with soil lead concentrations between 250 and 300 ppm is somewhat negative. There are 2.3 million homes in this category, of which 2.0 million would perform soil interventions at a cost of $7.7 billion. The benefit associated with these interventions is, in fact, slightly less -- $7.2 billion (as calculated by the technique described in footnote 3). However, this deficit is more than offset by the $2.6 billion reduction in the cost of soil removal in 931 thousand homes, precipitated by changing the soil standard from 300 ppm to 250 ppm. These interrelations explain why net benefits are maximized at a standard of 250 ppm in the base analysis, but at 300 ppm when there is no definition for hazardous waste disposal of soil.

## 8.3     Analyses Involving Changes in Modeling Procedure

In addition to alternative assumptions about certain parameter values, three sets of sensitivity analyses were performed to investigate the impact of making certain structural changes in the model. Each of these changes addresses an important assumption in the analysis. The first question is how much of the benefits are the result of very small changes in IQ levels. While the value assigned to a given change in IQ can be altered simply by changing a single parameter, as in 8.2.2, eliminating small IQ changes from the estimation of benefits requires a basic restructuring in methodology. The second structural sensitivity analysis proposes an alternative "trigger" for intervention events. The model used in the analysis presented up to this point assumes that any and all interventions needed to bring the housing unit into compliance with the standards occurs just before the arrival of a newborn child in that unit. There is evidence, however, that interventions do not necessarily occur then, and do occur at other times. In particular, another type of event that frequently triggers interventions is property transaction. A "transaction trigger" model was constructed, therefore, to compare to the "birth trigger" model used in the baseline analysis. The third set of structural sensitivity analyses attempt to investigate each medium one by one, completely independent of the standards for the other media.

### 8.3.1     Benefits from Small IQ Changes

The core analysis assumes that a difference in average blood lead levels between two populations, no matter how small that difference is and regardless of the magnitude of blood lead levels involved, is associated with a corresponding difference in average IQ scores. The cost-benefit analysis performed for these standards is essentially a comparison of the blood-lead distributions that would occur between two populations: one with the 403 standards versus one without the 403 standards. Furthermore, the analysis relies on the empirical finding that a difference in average IQ scores between two populations, again no matter how small, is associated with a difference in average lifetime earnings. Note that it is not possible to say that for any pair of individuals, a difference in blood lead will necessarily reflect a difference in IQ scores or lifetime earnings. The available research, however, does demonstrate that such differences do occur on the average for groups of individuals.

Notwithstanding the fact that the risk assessment and benefit-cost analysis were constrained to address population <u>average changes</u>, it was recognized that there might be an interest in considering the contribution to those population average changes made by subgroups in the population whose particular blood lead and IQ point improvements might be considered small.

This analysis poses special problems for procedure. In the normal calculation of benefits, a blood lead distribution for each entire cohort born is calculated under baseline and post-intervention scenarios. Most children are born into homes that meet standards and thus experience no interventions. These children have the same blood lead levels between scenarios. Since this group is included in the calculation of aggregate blood lead distributions, the difference between baseline and post-intervention mean blood lead levels for each cohort tends to be quite small. It is always much smaller than the average blood lead change for children in homes where interventions do take place. Therefore, the blood lead-difference "screen" cannot be applied to the population average difference.

One way around this would be to break up the population distribution into one hundred percentiles, and then take the difference between matching percentiles for baseline and post-intervention scenarios. These differences could then be compared against the screen. The problem with this approach is that children do not remain in the same percentile groups between scenarios, so the differences are not meaningful. Children in lead-contaminated home types will be in the upper percentiles of the baseline scenario, but in the post-intervention scenario, due to the effectiveness of interventions, they may exhibit lower blood lead levels than children in home types that never exceeded any standards and performed no interventions.

The approach adopted was to consider each home type individually, and split its baseline and post-intervention blood lead distribution into one hundred percentiles.[4] It is more reasonable to assume these percentile groups stay in order. The blood lead changes in each percentile group were "scaled" so that in the aggregate (that is, across all percentiles and all housing groups) the overall average blood lead change matched the average changed obtained in the baseline analysis for the aggregate population. Then, a "screen" was applied to these scaled blood changes observed in each percentile group so that only those percentile groups where a blood lead change of 3.89 µg/dL were used to estimate the IQ point improvement benefits.

The final results of this sensitivity analysis are presented in Exhibit 8-4, alongside the core analysis results. Costs are not affected by the IQ point difference screen, because unit costs are not affected, and neither are the number or timing of interventions. Benefits are reduced, as a natural consequence of the fact that the screen excludes benefits from many children with small changes in IQ point reduction, who contribute to the core analysis benefits total.

---

[4]    In homes with damaged lead-based paint, children are divided into separate groups according to the presence and extent of pica behavior exhibited. These pica groups are then each split into one hundred percentiles. Otherwise, children would not plausibly remain in the same percentile group from baseline to post-intervention: children exhibiting pica would move from the highest blood lead percentiles to the middle of the range, after paint ingestion exposures were eliminated.

**Exhibit 8-4**
**Effects on Costs and Benefits of Not Counting Benefits**
**from Individual IQ Point Changes of Less than One**

| | Base (No IQ Screen) | | IQ Difference Screen | | % of Base | |
|---|---|---|---|---|---|---|
| | Empirical | IEUBK | Empirical | IEUBK | Empirical | IEUBK |
| Costs ($ billion) | $68.9 | $68.9 | $68.9 | $68.9 | 100% | 100% |
| Benefits ($ billion) | $48.5 | $192.2 | $7.4 | $187.4 | 15% | 98% |
| Net Benefits ($ billion) | -$20.3 | $123.3 | -$61.5 | $118.5 | n/a | 96% |

Figures may not add due to rounding error.

A striking feature of the results is that a substantially greater portion of benefits is lost when the empirical model is used, as opposed to the IEUBK model. This is because given the same interventions, the changes in blood lead distributions for each home type are much greater under the IEUBK than the empirical model (see chapter 7 and Battelle (1997)). Thus, the Empirical model generates a much higher proportion of cases of small blood lead or IQ point changes that do not exceed the screen, and are not counted.

To clarify why this difference between models exists, it is helpful to take the example of an actual home type from the HUD dataset -- for example, home ID number 411207, which performs a dust intervention only. Using the IEUBK model, the baseline blood lead geometric mean for children living in this home type is 15.83 µg/dL, and the geometric standard deviation is 1.6. The post-intervention figures are 10.03 µg/dL and 1.6. The analysis assumes that these distributions can each be approximately scaled to become compatible with NHANES data, and divided into one hundred percentiles. These percentiles represent small groups of children with identical blood lead levels, and the percentile groups are assumed to stay in the same rank order from the baseline to the post-intervention scenario. Values for a small number of the percentile groups are shown in Exhibit 8-5. Thus, the baseline/post-intervention difference for the first percentile is 1.05 µg/dL, and for the 100th percentile is 12.89 µg/dL. Children represented by the first percentile through the 56th percentile are excluded from IQ-related benefits, because their blood lead change falls under the screen of 3.89 µg/dL.

Using the empirical model, the blood lead figures are much smaller. In the baseline, the geometric mean is 4.47 µg/dL and the geometric standard deviation is 1.6. The geometric mean reduces to 4.06 µg/dL in the post-intervention scenario. Percentile breakdowns are given in Exhibit 8-5. Children represented by all percentiles are excluded from IQ-related benefits -- a much greater portion than was the case under the IEUBK model.

**Exhibit 8-5**
**Baseline/Post-Intervention Blood Lead Difference by**
**Percentile Group for HUD Home 411207**

| Percentile | Difference Between Baseline and Post-Intervention Blood Lead Levels (µg/dL) | |
|---|---|---|
| | IEUBK Model | Empirical Model |
| 1 | 1.05 | 0.15 |
| 25 | 2.63 | 0.37 |
| 50 | 3.62 | 0.51 |
| 56 | 3.886 | 0.55 |
| 57 | 3.93 | 0.55 |
| 75 | 4.96 | 0.70 |
| 100 | 12.89 | 1.81 |

New net benefit-maximizing standards were not determined in this analysis due to its high degree of complexity and computational intensiveness.  However, based on results at the option selected, qualitative predictions are possible.  Under the Empirical model, eliminating small IQ changes reduces benefits as sharply as changing the discount rate to 7 percent (by 88 percent).  The discount rate change also reduces costs, but the small IQ adjustments do not.  It is reasonable to expect, therefore, that when small IQ benefits are not counted, the net benefit-maximizing standards under the Empirical model should be less stringent than they are in the 7 percent discount rate analysis.

Under the IEUBK model, the reduction in benefits is not nearly so great when small IQ changes are screened out (by 2 percent).  In addition, it is moderately smaller than the benefits reduction when a smaller IQ value is used (section 8.2.2 -- by 16 percent).  Neither sensitivity analysis affects costs.  Thus it is reasonable to expect that when small IQ benefits are not counted, the net benefit-maximizing standards under the IEUBK model should be somewhat less stringent than they are in the low IQ value analysis, where they do not change at all.  In other words, there should be little or no change from the optimal standards in the baseline analysis.

### 8.3.2   *Transaction Trigger for Interventions*

The base analysis assumes that the birth of a child triggers interventions in homes that exceed §403 standards.  This assumption results in maximum efficiency: each intervention performed is matched with a child to benefit from it, and is implemented at the last possible moment for maximum overlap with the child's development, and for least present value of cost (due to discounting).  Furthermore, all children born into homes exceeding standards are protected.  If a child under six is still present when the effectiveness of an intervention lapses, the intervention is repeated.

An alternative way to imagine response to §403 standards is that interventions will be performed at times of real estate transaction.  These may be particularly convenient times to intervene because homes are likely to be unoccupied, and other renovations may be taking place as well.  Additionally, Section 1018 of Title X, "Disclosure of Information Concerning Lead upon Transfer of Residential

Property," provides a new incentive for lead abatement during real estate transaction.  Section 1018 requires that home sellers or lessors must tell home buyers or renters everything already known about the presence of lead in the home.  The future occupant must also be granted ten days to conduct a risk assessment or inspection.  Thus, it is reasonable to imagine that all parties will be aware of possible lead risks at the time of transaction, and may be likely to perform interventions to increase home saleability or safety.

Like the birth trigger model, the transaction trigger model operates on the assumption that if a child under six is present when the effectiveness of an intervention lapses, the intervention is repeated.

Exhibit 8-6a compares results between the birth trigger model (the base analysis) and the transaction trigger model (the sensitivity analysis).  Costs are greater in the transaction trigger model, and benefits are lower, using either the IEUBK or empirical model for predicting blood lead levels.

**Exhibit 8-6a**
**Effects on Costs and Benefits due to Changing Assumption about Intervention Trigger**

|  | Base (Birth Trigger) | | Transaction Trigger | | % of Base | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Empirical | IEUBK | Empirical | IEUBK | Empirical | IEUBK |
| Costs ($bil) | $68.9 | $68.9 | $96.9 | $96.9 | 141% | 141% |
| Benefits ($bil) | $48.5 | $192.2 | $24.6 | $104.7 | 51% | 54% |
| Net Benefits | -$20.3 | $123.3 | -$72.3 | $7.8 | n/a | 6% |

Figures may not add due to rounding error.

Costs increase because interventions occur at a faster rate in the transaction trigger model than in the birth trigger model.  Under the transaction trigger, they occur whenever a property changes hands or the tenant moves out: 8.15 percent a year for single-family homes and 28.45 percent a year for multi-family housing units (USDOC and HUD 1989).  By contrast, the birth rate is projected to be less than four percent per household every year of the model run (Battelle 1996).  As a result, more total interventions take place in the transaction trigger model (by 19 percent), and they are more crowded toward the early years.  They therefore receive little discounting compared to the more spread-out costs of the birth trigger model.

At the same time, benefits are lower under the transaction trigger model than the birth trigger model.  This is because, with the former, many children are born into homes which exceed section 403 standards, but which have not had a recent transaction.  These children receive no benefits, whereas they would be protected in the birth trigger model, in which all children born into homes exceeding standards receive protection.

Exhibit 8-6b compares the net benefit-maximizing standards assuming a transaction trigger, versus the same for the birth trigger.  For the Empirical model, standards are considerably less stringent across the board with the transaction trigger.  This is the expected pattern, since for any set of interventions at any set of homes, costs are higher and benefits lower assuming a transaction trigger.  For the IEUBK model, the window sill dust standard is less stringent, while the floor dust and soil standards remain

constant.  Marginal net benefits in the latter two standards are strongly positive under the birth trigger, large enough to remain positive despite the switch to a transaction trigger.

**Exhibit 8-6b**
**Effects on Net Benefit-Maximizing Standards due to Changing Assumption about Intervention Trigger**

| Scenario | Model | Floor Dust (µg/ft²) | Sill Dust (µg/ft²) | Soil (ppm) | Costs | Benefits | Net Benefits |
|---|---|---|---|---|---|---|---|
| | | Standards | | | Values ($ billion) | | |
| Base (Birth Trigger) | Empirical | 80 | 310 | 1650 | 51.7 | 46.5 | -5.2 |
| | IEUBK | 40 | 100 | 250 | 100.6 | 274 | 173.4 |
| Alternative (Transaction Trigger) | Empirical | 130 | none* | 4650 | 51.3 | 7.8 | -43.5 |
| | IEUBK | 40 | none* | 250 | 125 | 162.2 | 37.1 |

*Net benefits are maximized when no interventions are triggered through the standard in question.
Figures may not add due to rounding error.

### 8.3.3   Single Medium Analysis

This section presents an alternative method of determining which standards among many may maximize net benefits -- a method that is different than the technique used in chapter 7.  In both chapter 7 and this analysis, the standards for paint remain fixed, but standards for lead content in floor dust, window sill dust, and soil may vary.

In Chapter 7, alternative standards for each medium are explored independently.  However, while one medium's standard is varied, the other media also have standards in effect, which go into model calculations.  This sensitivity analysis explores what happens when the standard for one medium is varied, but no other standards are in effect.  In other words, no interventions take place except for those triggered by the single medium standard being considered.  Exhibit 8-7 summarizes the results.

**Exhibit 8-7**
**Net Benefit-Maximizing Standards in a Single Medium Analysis**

| Model | Medium | Net Benefit-Maximizing Standard | |
|---|---|---|---|
| | | Base Analysis* | Single Medium Analysis |
| IEUBK | Floor Dust | 40 µg/ft² | 40 µg/ft² |
| | Window Sill Dust | 100 µg/ft² | 100 µg/ft² |
| | Soil | 250 ppm | 250 ppm |
| Empirical | Floor Dust | 80 µg/ft² | 40 µg/ft² |
| | Window Sill Dust | 310 µg/ft² | 310 µg/ft² |
| | Soil | 4350 ppm | 1650 ppm |

Figures may not add due to rounding error.

As a general rule, net benefit-maximizing standards for the single medium analysis are expected to be equally or more stringent than standards in the base analysis. This is because of partial redundancy between different standards or intervention types. When there is no window sill dust standard, for instance, under the Empirical model, the optimal floor dust standard may become more stringent if moderately contaminated floors are associated with highly contaminated window sills in some homes.

**Empirical model results**
This is, in fact, the case. The optimal floor dust standard drops from 80 to 40 µg/ft² between the base and single medium analyses under the empirical model. Based on the HUD dataset, 3.8 million homes have floor dust lead loads between 40 and 80 µg/ft². Of these, 2.5 million (65.2 percent) have window sill dust lead loads over 250 µg/ft². This set (set A) receives dust cleanings under both scenarios, the base analysis (where the floor dust standard is 80 µg/ft² and the sill dust standard is 250 µg/ft²), and the single medium analysis (where the floor dust standard is 40 µg/ft²). For set A, the marginal benefits of cleaning outweigh the marginal costs. However, for the other homes with floor dust lead levels between 40 and 80 µg/ft², that have low sill dust lead levels (the remaining 34.8 percent -- set B), the marginal costs of cleaning outweigh the benefits. This is why the net benefit-maximizing floor dust standard in the base analysis is 80 µg/ft². The optimal standard in the single medium analysis is 40 µg/ft² because the positive marginal net benefits from set A outweigh the negative marginal net benefits from set B. In other words, window sill dust contamination drives the choice between floor dust standards in the two scenarios described. There is no interaction with soil contamination, and little with damaged lead-based paint, in the homes considered here.

Finally, the difference between net benefit-maximizing soil standards under the Empirical model stems from the fact that 80.1 percent of the 2.1 million homes with soil lead concentrations between 1650 ppm and 4350 ppm have highly contaminated window sill dust, with lead loads well above 250 µg/ft². Soil removals are accompanied by dust cleanings, which result in reduced dust lead loads and concentrations. The soil-related benefits for homes in the 1650-4350 ppm range do not match the costs of soil removal, but when dust-related benefits are added in, marginal net benefits are positive for the

group.  Dust benefits are added at the margin in the single medium analysis, and that is why the optimum soil standard is 1650 ppm in that analysis.  In the base analysis, however, the window sill standard is 250 µg/ft², so dust cleaning takes place in the group of homes characterized by 1650-4350 ppm soil lead and high window sill lead, even in the absence of removing soil.  Since dust cleaning is less expensive than soil removal, it is more efficient in a multimedia scenario for the soil standard to remain high, at 4350 ppm, and for the dust standards to trigger dust cleaning in the homes that need it.

**IEUBK model results**

In contrast to the Empirical model results, all net benefit-maximizing standards remain the same under the IEUBK model, whether they are calculated using the base methodology or the single medium analysis.  The reason the single medium approach does not make either dust standard more stringent is elementary: each is already at its most stringent possible value based on the baseline methodology.  40 µg/ft² is the minimum allowed standard for floor dust because it is the assumed post-intervention floor dust lead load in the risk assessment.  Similarly, 100 µg/ft² is the assumed post-intervention window sill dust lead load (Battelle 1997).

The soil standard, 250 ppm, is also very close to its minimum value, 150 ppm, the assumed lead concentration in replacement soil (Battelle 1997).  However, some further explanation can be offered as to why it does not drop further in the single medium analysis.

In homes with soil lead concentrations in the vicinity of 250 ppm, very little benefit can be realized directly from soil removal.  However, substantial benefits may accrue following the associated dust cleaning, from reductions in dust lead concentrations.  The average dust lead concentration for HUD survey homes with soil lead concentrations between 250 and 300 ppm is 562 ppm.  This high value helps to explain why the net benefit-maximizing soil standard is so low in the baseline analysis.  However, for homes with soil between 200 and 250 ppm, the dust average is only 213 ppm, and it is just slightly greater for homes with soil between 150 and 200 ppm.  Therefore, it is not surprising that the single medium analysis does not generate a lower soil standard than 250 ppm.

Finally, lowering the soil standard may be beneficial because it can lead to soil mixing and the elimination of soil hazardous waste disposal costs.  This kind of cost reduction is substantial when the soil standard changes from 300 ppm to 250 ppm  (see section 7.2.3); however, no further such advantages accrue when the soil standard drops further, as far as 150 ppm.  Additionally, any advantages which might have existed, would have been equal between the single medium and baseline analysis.  In sum, there is no reason why the soil standard should drop any lower than 250 ppm in the single medium analysis.

**Combining single medium analyses**

This section has focused on the effect that a single medium analysis has on net benefit-maximizing standards chosen.  Costs and benefits have not been presented because they may be misleading.  They cannot be combined across media in most cases.  For instance, many homes which incur costs for repeated dust interventions in a single medium analysis of floor dust, may not incur these costs in a multimedia situation because a soil removal takes place.  Also, benefits cannot be added among different analyses, because they are generated based on population-wide blood lead distributions calculated from conditions in all homes.  Even if there were no overlap in which home types receive

interventions in different single medium analyses, it would not be appropriate to add benefits across analyses because benefits cannot be directly assigned to specific homes.

## 8.4      Additional Elements of Uncertainty

This section presents a qualitative assessment of additional elements of uncertainty associated with inputs to the economic analysis of §403. In many cases, the analysis is limited to a qualitative assessment because data are not available on which to base a quantitative sensitivity analysis. In other cases, the complexity of the analysis precludes it being undertaken at this time. The inputs investigated in this qualitative assessment include the unit costs of interventions, the valuation of different types of benefits, and the design of the overall analysis. These were selected because they are unique to the benefit-cost analysis, whereas other uncertainties stem from the risk assessment. In this section, first the sources of uncertainty are presented, and then an assessment of their likely impact on the estimations of costs, benefits, net benefits, and net benefit-maximizing standards are discussed.

### 8.4.1 Unit Costs of Interventions
**Sources of Uncertainty**
There are three basic sources of uncertainty with regards to the unit costs of interventions. First, inaccurate estimation of any of the inputs used to develop unit costs, as described in chapter 5, would lead to the underestimation or overestimation of those costs. There is one special case where the bias is known. The unit costs for paint abatement used in the analysis do not reflect the possibility that home occupants may need to move out temporarily during intervention. This would result in increased costs. Based on the HUD survey data, however, very few homes require paint abatements. Therefore, this source of uncertainty may not have a significant effect on total rule costs even if temporary relocation of families proves to be common during paint abatement.

Second, it is not known how future economic forces will affect unit costs. Section 403 standards are likely to result in an increased demand for intervention services: will this drive their prices up, or lead to innovation and cost reduction?

Third, it may not be appropriate to assign average unit costs to all single family, or multi-family homes. The unit costs for soil removal were calculated to reflect the fact that soil contamination is systematically and positively associated with smaller yards. However, no such adjustments were made with regards to paint or dust interventions. For instance, if dust contamination is associated primarily with the oldest homes, and if very old homes are typically larger than newer pre-78 ones, then the dust intervention unit cost should reflect the need to clean a larger home than the national average size, or different unit costs should be assigned to homes in different age classes. A similar situation may arise if the geographic regions where homes are most likely to exceed the standards are also the regions with the highest intervention costs.

**Effect of Uncertainty on Benefits Estimates**
For any given set of standards -- for example, the option selected -- changes in unit costs of intervention will have no effect on benefits estimates.

**Effect of Uncertainty on Cost Estimates**

For any given set of standards, changes in unit costs of intervention will have simple, predictable effects on total cost estimates. For example, if the estimated unit cost of exterior paint maintenance were to be raised by 30 percent, then the portion of the total estimated rule cost associated with exterior paint maintenance would increase by 30 percent. The relative increase of total costs would depend on the portion of total costs made up by exterior paint maintenance costs.

**Effect of Uncertainty on Net Benefits and Net Benefit-Maximizing Standards**

For any given set of standards, the effect of unit cost uncertainty on net benefits will be a direct function of its effect on cost estimates. Net benefits will decline by the amount that costs increase.

The effect on net benefit-maximizing standards is more difficult to predict. To the extent that the unit cost for an intervention type increases, however, the net benefit-maximizing standard for that intervention type will tend to become more lenient; to the extent that the unit cost for an intervention type declines, the related standard will tend to become more stringent. This is because net benefit maximizing standards are set at the margin, with the cost of each marginal intervention compared against the associated benefit, which is unaffected by any uncertainty in the costs. Uncertainty in unit costs of paint intervention will have no effect on standards that maximize net benefits in this analysis because alternative paint standards are not considered.

### 8.4.2 Valuation of Benefits

**Sources of Uncertainty**

There are two basic sources of uncertainty in the monetary values associated with reduced incidence of adverse health effects considered in this analysis. First, inaccurate estimation of any of the inputs used to develop these values, as described in chapter 6, would lead to their incorrect estimation. Second, it is impossible to know how future economic forces will affect the inputs. For instance, will expected lifetime earnings change in the future? This would affect the valuation of an IQ point.

In addition, the benefits are underestimated because certain benefits categories are not included in this analysis, such as benefits to children age six and older, to other children spending time at homes with interventions, to adults, and to ecosystem health. The size of these excluded benefits, however, is not known so the degree of underestimation is uncertain.

**Effect of Uncertainty on Benefits Estimates**

The potential effects of changes in the valuation of IQ have already been discussed in depth earlier in this chapter. Anything less than a major change in the other values used to calculate benefits -- the expenses assigned to special or remedial education, or to medical treatment -- should have a very small effect on benefits estimates. This is because only a small fraction of the population receives special education or medical intervention, and therefore benefits from reduction in the associated expenses, between scenarios, are low. At the option selected, these benefits account for under two percent of total monetized benefits.

The addition of benefits not previously counted in the analysis would clearly have the effect of increasing total benefits estimates, potentially by a significant amount, because the population age six and older is much larger than the population under six. This is shown in Chapter 9. However, per-

individual damage from lead exposure is believed to be the greatest in young children, whose nervous system is still developing.  (Battelle 1997)

**Effect of Uncertainty on Cost Estimates**
For any given set of standards, changes in the valuation of benefits will have no effect on cost estimates.

**Effect of Uncertainty on Net Benefits and Net Benefit-Maximizing Standards**
For any given set of standards, the effect of uncertainty in benefits valuation on net benefits will be a direct function of its effect on total benefits estimates.  Thus, net benefits are not likely to change significantly due to changes in the cost of special education or medical intervention; however, they can increase substantially when new benefits categories are added.

Likewise, the effect of uncertainty on net benefit-maximizing standards is likely to be negligible with regards to education and medical costs, but could be significant with regards to new benefits categories.  In the latter case, increased benefits may lead to more stringent standards for dust and soil.

*8.4.3 Other Modeling Issues*
Several analytic components in addition to cost and benefit inputs contain important elements of uncertainty.  These uncertainties include the appropriate time frame of analysis, the probability of future interventions taking place even in the absence of national standards for household lead hazards, and the likely rate of interventions after standards are issued.  Each area of uncertainty is addressed briefly in turn.

**Appropriate Time Frame of Analysis**
The economic analysis considers costs and benefits relating to cohorts of children born over the fifty year period, 1997 to 2046.  This choice of time frame has effects on total costs, benefits, and net benefits, and possibly also on the standards that maximize net benefits.  A shorter time frame would result in smaller absolute magnitudes of costs, benefits, and net benefits, because fewer interventions would take place, and fewer cohorts of children would benefit from them.  Similarly, a longer time frame would lead to greater magnitudes.

The effect of time frame changes on net benefit-maximizing standards is less clear.  When the analysis period changes, even though cost and benefit totals move in the same direction, their ratio changes.  The longer the frame of analysis, the greater the ratio of benefits to the total cost of interventions.  This is in large part because soil removals are assumed to have permanent effectiveness.  Thus, one intervention paid for and performed in 1997 conveys benefits to a child born at the same home in 2040.  Under such circumstances, the longer the period considered, the better the investment in soil removal appears.

Longer time frames, then, will tend to favor more stringent soil standards as the standards that maximize net benefits; and shorter time frames will lead to less stringent soil standards.  Dust standards may move in the opposite direction, because dust interventions have short durations, and soil interventions include dust cleanings (thus preempting dust interventions that would have been triggered by dust standards).  For example, if soil standards become less stringent, then homes that no longer

perform soil interventions no longer receive the benefits from associated dust cleaning.  This may result in an increase in the stringency of dust standards to capture dust-related benefits from these same homes.

Using a long time frame for the economic analysis has the advantage of favoring an appropriate balance between short-term and permanent interventions.  However, it also carries the increased general uncertainty which comes with projections made far into the future.

**Interventions without Section 403**

The baseline assumes that no interventions will take place in the absence of national standards.  This assumption makes possible its corollary, that the NHANES III Phase 2 national blood lead distribution will remain constant over the entire analysis duration in the baseline scenario of "no action."[5]  In turn, this corollary is critical to the methodology used for projecting future national blood lead distributions in scenarios *with* interventions, and thus, for calculating benefits.

However, interventions to remove lead hazards are already taking place in the pre-standards world.  How would model results change if some interventions were included as part of the baseline scenario?  Because fewer interventions would be occurring as a result of 403, the costs, benefits, and net benefits would decrease.

The effect that baseline interventions might have on net benefit-maximizing standards is not as clear, especially considering the limited information available on where interventions currently do take place.  However, there is reason to believe that the effect should be small or none.  Standards that maximize net benefits are set at the margin.  Thus, unless baseline interventions are disproportionately concentrated among homes with contamination levels near the current net benefit-maximizing standards, these standards should not be perturbed.

**Intervention Rates**

Two different triggers for interventions in homes that exceed standards have been presented -- births or real estate transactions.  As the model is constructed, however, each trigger *always* leads to intervention in a home exceeding standards at the time of the trigger event.  This results in modeled national intervention rates which are substantially greater than current known regional rates, a discrepancy which does not appear realistic even in the aftermath of the issuance of national standards.  It is useful to consider briefly how the net benefit-maximizing standards would be affected by an assumed lower rate of intervention.

Clearly, costs, benefits, and net benefits would all decrease in rough proportion to the decrease in interventions, since interventions are what engender both costs and benefits.  The effect on net benefit-maximizing standards, however, is more difficult to assess.  Especially if the decrease in intervention rates were applied uniformly across different home types, there is no clear reason to suspect that these standards should indeed change from the current analysis results.

---

[5]     The distribution will remain constant within the housing stock considered in the analysis: homes built before 1997.

# References

Battelle.  (1996). Procedures and Results for Input to the Economic Analysis for Section 403. Prepared for  TCB, CMD, OPPT, US EPA, June 17.

Battelle.  (1997.)  Risk Assessment for the Section 403 Rulemaking.  Draft Report.  Volume 1, Chapters 1 to 7.  Prepared by Battelle, Columbus, Ohio for U.S. EPA, Office of Pollution Prevention and Toxics, Chemical Management Division. July 1.

Schwartz, J.  (1994.)  Low-Level Lead Exposure and Children's IQ: A Meta-Analysis and Search for a Threshold.  Environmental Research, Vol 65: 42-55.

U.S. Department of Commerce and U.S. Department of Housing and Urban Development. (1989.) American Housing Survey for the United States in 1989.  DOC, Economic and Statistics Administration and Bureau of the Census and HUD, Office of Policy Development and Research.

U. S. Environmental Protection Agency.   (1985.)  *Costs and Benefits of Reducing Lead in Gasoline: Final Regulatory Impact Analysis.*  Prepared by the U.S. Environmental Protection Agency, Office of Policy Analysis, Economic Analysis Division. February.

U. S. Environmental Protection Agency.  (1986.)  *Reducing Lead in Drinking Water: A Benefit Analysis.*  Prepared by U.S. Environmental Protection Agency, Office of Policy Planning and Evaluation, Draft Final Report. December.

# 9.    Supplemental Analyses

While cost-benefit analyses provide a way to estimate society's net gain as a result of a regulation, they do not examine the distributional effects of the rule.  In other words, the cost-benefit analysis looks at the total costs imposed by the standards and the total benefits generated; it does not look at who pays these costs nor who are the direct beneficiaries.  Thus a series of separate analyses were performed to estimate the impact of the standards on groups who are of particular interest.  These include the rule's financial impact on small entities (governmental and business), its potential for imposing unfunded mandates on state and local governments, the paperwork burden imposed by the standards, and finally, the distribution of costs and benefits by race and income as a measure of the "environmental justice" of the standards, as well as the impacts on children.  This chapter presents the results of these supplementary analyses.

Another area of interest is the potential impact of these standards on the level and composition of abatement activity.  While not examined in detail, some factors are fairly well established.  Based on the limited data available, the current annual number of abatements is relatively small.  While this number is likely to increase after the promulgation of the §403 standards, the number will continue to be far less than that assumed in the cost-benefit analysis.  In addition, while lead-based paint abatements are more likely to occur where there are small children, and this is likely to increase with the promulgation of the 403 standards, not all abatements occur under such circumstances.  Thus, both the costs and the benefits to children of these standards are likely to be less than the estimated costs and benefits presented in chapter 7, with the benefits to children probably declining more than the decline in costs.  In addition to the neurological benefits to children estimated by the cost-benefit analysis, however, there will be benefits to teenagers and adults from the reduced incidence of lead in residential environments.  These benefits to teenagers and adults will help offset the costs of abatements even where there are no children in the housing unit.

## 9.1    The Regulatory Flexibility Act (RFA) and Small Business Regulatory Enforcement Fairness Act (SBREFA)

As described in the Preamble and earlier chapters of this report, the §403 standards do not require or mandate any actions by homeowners, landlords, or personnel performing lead-based paint identifications and interventions.  Instead, §403 standards inform decision-makers about what conditions constitute a hazard and recommend potential actions.  As a result, EPA is not required to conduct a Regulatory Flexibility Analysis under the Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA).

When an economic impact on the small entities is necessitated by the RFA, it requires that the analysis identify the types, and estimate the numbers, of small entities "to which the proposed [or final] rule will apply," and describe the rule "requirements" to which small entities "will be subject" and any regulatory alternatives, including exemptions and deferrals, which would lessen the rule's burden on small entities.  (Sections 603 and 604 of the RFA.)  Rules that do not establish requirements applicable to small entities (e.g., rules establishing or revising national ambient air quality standards under the CAA or water quality standards under the Clean Water Act) are thus not susceptible to RFA analysis and may be certified as not having a significant economic impact on a substantial number of small

entities.  This is particularly true when the national standards do not themselves require any particular action, as is the case with §403.

Nevertheless, EPA has conducted a more limited analysis of the potential impact on small entities of these standards as they work within the market.  Two groups of entities are considered: lead-based paint inspection and abatement firms, and landlords.   The small entity impacts of §403 on the lead testing and abatement sector are presented in Section 9.1.1 and the small entity impacts on the real estate sector are presented in Section 9.1.2.

### 9.1.1 Impact of §403 on the Lead Testing and Abatement Industry

The impact of §403 on small lead testing and abatement firms is likely to be positive (i.e., to improve their markets).  In general, it is expected that the information dissemination facilitated by §403 will result in additional household lead interventions[1].  Even if it were possible to estimate how many additional interventions will occur, it is not known whether these additional interventions would result in relatively more business for small testing and abatement firms.  Data on the size distribution of firms in this industry can allow for some informed speculation regarding the likely impact of §403 on small businesses.

There is no North American Industry Classification System (NAICS) code that uniquely corresponds to the lead testing and intervention industry.  Based on the types of activities performed, however, most of the firms affected by this regulation are likely to be part of two NAICS groups:

- NAICS 54138: Professional, Scientific, and Technical Services: Testing Laboratories, or

- NAICS 56291: Administrative and Support, Waste Management and Remediation Services: Remediation Services.

Inferences about the potential impact of §403 on the lead testing and intervention industry can be made based on data available from the Census on these two NAICS codes.

The Small Business Administration (SBA) defines the small business threshold for the testing industry (NAICS 54138) as firms earning less than $5 million per year, while the small business threshold for the remediation services industry (NAICS 56291) is defined as firms earning less than $11.5 million .  Exhibit 9-1 provides data from the Economic Census (1997) on the size distribution of firms in these two industries.

---

[1]    It is possible, although unlikely, that §403 will result in fewer household lead interventions.  This would occur if households are currently intervening at lead levels below those outlined in the §403 standards and if those interventions stopped occurring once the §403 standards were distributed.  Given the current low rate of interventions and the persistence of lead levels in excess of those warranting intervention under the standards, it is expected that interventions will not decrease after promulgation.

Notice that 95.67% of the firms in the testing industry (NAICS 54138) are small businesses and at least 95.48% of the firms in the remediation services industry (NAICS 56291) are small businesses.[2] To the degree that §403 will increase demand for lead testing and abatement services, the fact that almost all firms in these two industries are small businesses implies that the impact on small businesses will be positive and potentially substantial.  In other words, the §403 rule may potentially expand the markets available to these small firms.

**Exhibit 9-1**
**Characteristics of Establishments — Lead Testing and Abatement Firms**

| | Number of Establishments | Percent of Total Establishments | Average Sales ($) | Average Number Employees |
|---|---|---|---|---|
| **NAICS 54138: Small Businesses** | | | | |
| Less than $100k | 534 | 10.85% | 59,588 | 1.7 |
| $100 to $249k | 1,005 | 20.42% | 169,623 | 3.1 |
| $250 to $499k | 975 | 19.81% | 363,574 | 6.0 |
| $500 to $999k | 920 | 18.69% | 709,592 | 10.6 |
| $1 to $2.49 mil | 888 | 18.04% | 1,576,164 | 20.8 |
| $2.5 to $4.9 mil | 387 | 7.86% | 3,422,282 | 42.1 |
| *Total - Small* | 4,709 | 95.67% | 835,349 | 11.5 |
| **NAICS 54138: Large Businesses** | | | | |
| $5 to $9.99 mil | 150 | 3.05% | 6,887,873 | 78.2 |
| $10+ mil | 63 | 1.28% | 20,773,143 | 218.1 |
| *Total - Large* | 213 | 4.33% | 10,994,784 | 119.6 |
| **NAICS 56291: Small Businesses** | | | | |
| Less than $100k | 102 | 7.09% | 53,402 | 2.3 |
| $100 to $249k | 186 | 12.93% | 167,849 | 3.4 |
| $250 to $499k | 187 | 13.00% | 364,930 | 5.8 |
| $500 to 999k | 217 | 15.08% | 699,816 | 10.2 |
| $1 to $2.49 mil | 354 | 24.60% | 1,644,969 | 19.3 |
| $2.5 to $4.99 mil | 198 | 13.76% | 3,528,722 | 35.2 |
| $5 to $9.99 mil | 130 | 9.03% | 7,134,769 | 63.1 |
| *Total - Small* | 1,374 | 95.48% | 1,794,247 | 19.1 |
| **NAICS 56291: Large Businesses** | | | | |
| $10+ mil | 65 | 4.52% | 47,832,446 | 217.4 |
| *Total - Large* | 65 | 4.52% | 47,832,446 | 217.4 |

1.  The Economic Census for the remediation services industry groups all establishments with receipts of $10 million or more within a single category; therefore, an accurate assessment of the number of small establishments could not be made.  The reported figure of 95.48% is thus a lower-bound estimate of the proportion of small businesses in the remediation services industry (NAICS 56291).

---

[2]     The Economic Census for the remediation services industry groups all establishments with receipts of $10 million or more within a single category; therefore, an accurate assessment of the number of small establishments could not be made.  The reported figure of 95.48% is thus a lower-bound estimate of the proportion of small businesses in the remediation services industry (NAICS 56291).

### 9.1.2  Impact of §403 on the Rental Real Estate Sector

The analysis of the impact of the §403 rule on the real estate sector is restricted to owners of multi-family residential properties.  Even though §403 does not mandate any intervention activity and, as a result, carries no direct legal mechanism to ensure that homes exceeding the standard are abated, these standards will become part of Federal mortgage programs administered by the U.S. Department of Housing and Urban Development.  In addition, it is likely that an indirect legal enforcement mechanism will develop through the threat of tort law liability suits.  While §403 was developed to provide guidance for homeowners to determine when a lead intervention is warranted, it can also serve as guidance for the courts in determining when a property owner's decision to not intervene is an act of negligence for which the owner can be held financially liable.

Furthermore, mortgage lenders are likely to be more hesitant to fund property acquisitions if those properties exceed the §403 standards.  This reluctance stems from the mortgage lenders desire to ensure that they are not held liable for any adverse health impacts that lead levels in excess of the standard may induce[3].  The combination of tort liability suits and mortgage lending requirements indicates that landlords are the group most likely to follow §403 to the letter, intervening whenever the standard is exceeded and not intervening when lead levels are deemed "acceptable" by §403.

### Definition of Small Entity

The focus in this section is on the cost to multi-family residential property owners of complying with §403 and any potential difference in the cost burden likely to fall on owners of smaller rental businesses.  To do this it is necessary to define what constitutes a small rental business.  The Small Business Administration defines the small business threshold for "Lessors of Residential Buildings and Dwellings" at $5 million in rental revenue.

Data from the Property Owners and Managers Survey (POMS) is used to determine if property meets the small business criteria and whether owners are able to absorb intervention costs associated with §403 out of their rent streams.  POMS is a national survey of rental units conducted from November 1995 to June 1996 by the U.S. Census Bureau.  The sample consists of 16,300 rental units in 5,754 properties which were stratified and assigned weights to reflect the national stock of rental units.  Publicly owned, military, owner-occupied and vacation units were excluded from the study.[4]

Total rental revenue per owner was determined by multiplying the rent of the unit surveyed by the number of units in all properties owned by the landlord. Using the SBA definition of a small rental business, nearly all of the properties (99.6%) surveyed by POMS were owned by small businesses.

---

[3]   The presumption the mortgage lenders may be hesitant to lend for purchases of property with lead standards in excess of §403 standards stems from the experience with the asbestos regulations.  After promulgation of the asbestos regulations, mortgage lenders made asbestos abatement a condition of lending.  While this conditional lending has declined over time, it is anticipated that a similar initial response will result from the potential liability issues implied by the §403 standards.

[4]   A separate survey, asking a different set of questions, was performed for single-family rental units.  Since the number of single family rental units is very small, the analysis here relies solely on multi-family rental units.

**Expected Impacts**

The ratio of annual compliance costs to annual rent streams gives an indication of the ability of a rental business to comply with the §403 standards. In order to calculate this ratio one needs data on the lead levels in the property (this determines what interventions, if any, must be performed), the number of units in the building, the rate at which interventions occur, and the total rent from all units in this property. Unfortunately no single data source contains all of this information. The HUD data set described in Chapter 4 provides data on household lead levels for 63 multi-family properties. The POMS data set provides data on the rent for each rental unit sampled, as well as the number of units in the property. Using these data, the analysis calculates the annual costs each landlord would incur for testing and intervention, and compares this to the landlord's annual rent. The ratio of costs to rents is then compared against standard benchmarks to evaluate whether or not the impact would be characterized as significant.

In order to make combined use of the HUD and POMS data, the analysis exploited the fact that each sample was representative of multi-family housing nationwide. Hence, the frequency of interventions predicted based on the HUD data set reflect nationwide frequency, and these frequencies could then be applied to the properties found in the POMS data set. Exhibit 9-2 below gives the percentage of multi-family properties that require various lead interventions according to the HUD data, the frequency with which those interventions need to be repeated to insure that a child is protected for six years, and the cost of each intervention.

As with the cost and benefit estimation in Chapters 5 and 6, the cost of compliance calculated here assumes that units are tested and interventions are performed whenever a child is about to be born into a unit. The birth rate of 3.8% determines the frequency of testing and the birth rate combined with the probability of requiring different lead interventions given in Exhibit 9-2 determine the frequency of lead interventions within a property.

**Exhibit 9-2**
**Frequency of Lead Interventions in Multi-Family Housing**

|  | Probability of occurrence in multi-family housing | Frequency of intervention required to protect child for 6 years | Cost of each intervention |
|---|---|---|---|
| Low-intensity Interior Paint | 0.4% | 2 | $437 |
| High-Intensity Interior Paint | 0.0% | 1 | $4,687 |
| Low-Intensity Exterior Paint | 2.1% | 2 | $182 |
| High-Intensity Exterior Paint | 0.0% | 1 | $2,275 |
| Dust | 29.6% | 2 | $262 |
| Removal & Replacement of Perimeter Soil | 1.8% | 1 | $399 |
| Removal & Replacement of Remote Area | 0.0% | 1 | $777 |
| Removal & Replacement of Both Perimeter | 0.0% | 1 | $901 |
| Removal & Replacement of Soil in Play | 0.0% | 1 | $314 |

| Testing | 100.0% | 1 | $235 |

For example, a dust intervention must be repeated every four years, and hence, two dust interventions are required per child born (on average).[5]  Using a birth rate of 3.8% and a probability of occurrence of 29.6%, the annual number of dust interventions in a 100 unit building is 2.25 units (100*.296*.038*2=2.25) at a cost of $590 (2.25*$262=$590).  Similar calculations are performed for low-intensity interior and exterior paint interventions and testing.  The annual costs for each type of intervention are summed together with the testing costs to determine the total annual compliance cost.  This calculation is performed for each property in the POMS data set based on the number of units in the property.

The annual rent stream for each property is calculated as the rental revenue from the single unit surveyed in the POMS study multiplied by the number of units in the building.  This calculation assumes that the unit surveyed in the POMS study is representative of the other units in the building.  There is no means of determining whether this assumptions leads to an over or underestimation of the rent stream.

The ratio of annual compliance costs to annual rent payments is equivalent to the commonly used ratio of compliance cost to sales, and it determines the degree to which the property owner will be capable of complying with the §403 standards.  For the purposes of determining small business impacts it is assumed that business can accept a compliance cost to rent ratio of less than 3%.  Exhibit 9-3 provides the number of property owners experiencing a compliance cost to rent ratio greater than 3%, between 3% and 1%, and less than 1%.

Notice that no property owners experience a cost to rent ratio larger than 3%.  No large businesses experience a compliance cost to rent ratio greater than 1%.  Just over 22,000 small rental businesses are expected to have an annual compliance cost to rent ratio greater than 1% but less than 3%.  While 22,000 may appear to be a large number of businesses, there are over 2.2 million small rental businesses in existence.  Thus, only 1% of all the small rental businesses experience a cost to rent ratio greater than 1%.  Given the relatively small impact on the rental real estate sector in general, and small rental businesses in particular, the §403 rule will not have significant economic impact on a substantial number of small entities.

---

[5]    An exception to this occurs if any given unit has more than one child under 6.  For example if a couple has 2  children 2 years apart then only 2 interventions will be performed and both children will be protected for 6 years.  However, for the small business analysis, we assume that 2 interventions are performed for each child born.  This leads to an overestimation of compliance costs for property owners.

**Exhibit 9-3**
**Ratio of Annual Compliance Costs to Annual Rent Payments, by size of business**

| | Comparative Ratios | | Large Businesses | Small Businesses |
|---|---|---|---|---|
| 1% | Annual Compliance Cost / Annual Rent Payments | < 1% | 15,060 | 2,192,394 |
| | Annual Compliance Cost / Annual Rent Payments | < 3% | 0 | 22,191 |
| | Annual Compliance Cost / Annual Rent Payments | ≥3% | 0 | 0 |
| | *Total Number of Businesses* | | 15,060 | 2,214,585 |

## 9.2  Unfunded Mandates Reform Act (UMRA)

Under Title II of the Unfunded Mandates Reform Act, the cost to state, local and tribal government or the private sector of compliance with federal regulations must be calculated and considered during the regulatory process.  Because §403 is a regulation which provides information to consumers about household lead safety and does not require households or public entities to take any action with respect to that information, this action is not subject to the requirements of sections 202 and 205 of UMRA.  It does not contain any "federal mandates."  Similarly this regulation contains no regulatory requirements that might significantly or uniquely affect small governments, so no action is needed under Section 203 of UMRA.

## 9.3  Paperwork Reduction Act (PRA)

The Paperwork Reduction Act (PRA) requires EPA to prepare an Information Collection Request (ICR), which estimates the reporting and recordkeeping burden imposed by their regulations.  Under the PRA, "burden" means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency.  This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements; train personnel to be able to respond to a collection of information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information.

Section 403 contains no reporting or recordkeeping requirements, and thus no ICR is necessary for this rule.  However, an ICR was prepared and filed for the promulgation of regulations for TSCA §402(a) and 404, and these burden estimates were based on estimates of the number of lead-based paint identification and intervention activities anticipated.  EPA re-examined the §402(a) and 404 ICR and

determined that these estimates would not change due to the §403 standards.  The §402(a)/404 RIA and ICR estimated lead-based paint identification and intervention rates based on activity levels in Massachusetts.  Massachusetts standards are similar to EPA's final standards, and Massachusetts has a very aggressive enforcement program coupled with state loan programs to encourage abatements in units occupied by low-income families.  Therefore, national rates under §403 are unlikely to be higher than these.  In addition to number of events, the reporting and recordkeeping burden is affected by the number of people trained and filing for certification, and the number of firms offering training.  Again, the §402(a)/404 RIA and ICR based these numbers on Massachusetts estimates.  The analysis determined, and state officials confirmed, that there was significant overcapacity in the state.  Both because the number of events and the number of persons and firms were overestimates for §402(a)/404, and because the §403 standards are similar to the Massachusetts standards, EPA determined that the §402(a)/404 ICR did not need to be revised to reflect the §403 standards.

## 9.4  Executive Order 12898 Federal Actions to Address Environmental Justice

Increasingly questions of equity are playing a role in crafting environmental regulations.  Two questions are of particular interest.  First, what is the relationship between who receives the benefits of regulation and who bears the costs?  Second, do these net benefits help the poor and otherwise disadvantaged populations?  Initially one might assert that the voluntary nature of this rule ensures that those who bear the costs of §403 also receive the benefits and, hence, the distribution of costs and benefits across any demographic or socioeconomic group would mirror the distribution of the lead problem these regulations are seeking to solve.  However, two households performing the same intervention with the same costs may receive different benefit levels.  For example, a reduction of soil lead from 5000 ppm to 150 ppm will yield greater benefits than a reduction from 2100 ppm to 150 ppm despite the fact that the cost of the soil interventions are the same.  This section seeks to determine how the costs and benefits of §403 are distributed across race and income groups.

Two sources of data are available that might help answer these questions: the HUD national survey of lead in homes and the NHANES III (Part 2) survey.  Data on race and income were collected during the HUD survey along with information on lead levels in interior and exterior paint, dust, and soil.  The HUD sample was stratified and weights were assigned so that the sample represents the housing characteristics of the nationwide housing stock.  Data on race were also collected which permit assigning home types to four major categories: non-Hispanic white, African-American, Hispanic, plus an Other category.  Data on income from the HUD survey can be used to form two income categories: households with an annual income of more or less than $30,000.

The HUD survey, however, was not designed to be used for an environmental equity analysis.  Given the relatively small size of the HUD sample, it cannot be assumed that the data are representative of the demographic characteristics of the nation's households.  The results of the NHANES III (Phase 2) survey, on the other hand, provide a more accurate representation of blood-lead levels for various racial and income groups.  Since the remaining major sources of lead exposure for children are residential in nature (condition of lead-based paint, amount of lead in dust and soil), there is a close correlation between current blood-lead levels and environmental lead levels.  Thus, the HUD data can be compared to the NHANES data to determine if the HUD data present an accurate picture of the conditions faced by various racial and income groups.  If it does, then the HUD data can be used to perform a detailed

analysis of who gains and who loses under the §403 standards.  The relevant comparisons are discussed below.

- **Is the HUD sample demographically representative of the national population?**  Because demographic analysis was not the purpose for which the data were originally collected, the sample was not stratified to represent the demographic make-up of the nationwide population but rather to reflect the characteristics of the national housing stock.  Thus, the first assumption required to use the HUD data for the equity analysis is that the HUD sample is a reasonable representation of the population living in the housing units.  This would be a strong assumption because the HUD survey substantially under represents the number of African Americans living in the United States.  Based on the HUD survey weights, there are approximately 7.2 million African-American households while in actuality the figure is closer to 10.2 million.  This discrepancy could be overcome somewhat by focusing strictly on percentage of households and per-household measures of equity.

- **Does the HUD sample accurately reflect the housing conditions and environmental lead levels experienced by each demographic and socio-economic group?**  While this comparison is somewhat more difficult to make, the HUD data appear to be a poor representation of environmental lead levels experienced by the various racial and income groups.  Blood-lead levels for each demographic group  are estimated by applying the IEUBK and Empirical Models to the home types in which members of the demographic group reside.  If the HUD data were representative of demographic group-specific housing conditions, then the predicted blood-lead levels and benefits would mirror those in the NHANES data.  However, even at the national level, the geometric mean of the blood-lead distributions estimated by the IEUBK and Empirical Models using the HUD data do not match the NHANES geometric mean.  Even so, it would be expected that the ranking of groups would agree between the two data sources.  Based on the NHANES data of actual blood-lead levels, the African American population has higher blood-lead levels than the white population.  However, predicted blood-lead levels based on the HUD data appear to indicate the opposite, that African Americans have lower blood-lead levels than non-Hispanic whites.  Likewise, the blood-lead levels by income groups are reversed.  According to NHANES, blood-lead levels are inversely related to income.  Based on the HUD data, however, higher income households have slightly higher blood-lead levels than lower-income households.  See Exhibit 9-4.

    Extending this comparison to homes that exceed the standards, the ranking of income groups, based on HUD data, appears to be inconsistent with the ranking based on NHANES data.  For race, the results are mixed.  The HUD data indicate that the largest percentage of homes that exceed the standards are among African-Americans, which is consistent with their having the highest blood-lead levels.  The results for Whites and Hispanics are not consistent between the two data sources, however.

**Exhibit 9-4: Comparison of the Third National Health and Nutrition Examination Survey (NHANES) Phase 2, and the HUD Survey Data**

|  | NHANES Blood-lead Levels | Blood-lead Levels Estimated, Based on HUD Data | Percent of Homes Exceeding the Standards, Based on HUD Data |
|---|---|---|---|
| **Race** | | | |
| Highest value | Non-Hispanic Blacks | Non-Hispanic Whites | African-Americans |
| Middle value | Mexican Americans | African-Americans | Non-Hispanic Whites |
| Lowest value | Non-Hispanic Whites | Hispanic | Hispanic |
| **Income** | | | |
| Highest value | Low Income | High Income | Low Income |
| Middle value | Middle Income | N/A | N/A |
| Lowest value | High Income | Low Income | High Income |

• **Do birth rates vary across racial and income groups?** The advantage of using the HUD data would be that costs and benefits for each home type (and the various racial and income groups) could be estimated. Consistent with the rest of the analysis presented in this report, these calculations would be based on the "birth-trigger" model, which assumes that interventions occur when a child is born into a housing unit with lead levels that exceed the §403 standards. No differentiation in birth rates across race or income is incorporated in the models. If birth rates differ by race or income, then costs and more particularly benefits would be underestimated for groups with higher birth rates.

Given the response to these questions, the analysis has chosen to reduce its emphasis on the HUD data in evaluating the equity impacts of these rules. Since the HUD survey provides the only compilation of data on both lead characteristics of homes and demographic composition of the members of the household, this analytic decision limits the degree to which the impacts on specific racial and income groups can be quantified.

### 9.4.1 The Distribution of Benefits and Costs by Race and Income

In the national analysis, the percentage change in the national blood-lead distribution (calculated using the IEUBK and the Empirical Models) is applied to the NHANES blood-lead distribution to estimate the actual expected change in blood-lead levels due to interventions undertaken. This estimated change in the NHANES blood-lead distribution measures the benefits of the standards.

The NHANES data report blood-lead levels by race and income, as well as for the nation as a whole. As shown in Exhibit 9-5, a higher percentage of non-Hispanic Black children have blood-lead levels over 10µg/dL than is true for other racial groups. Likewise, they tend to have higher blood-lead levels (as measured by the geometric mean). The same is also true for low-income children, as compared to children from households with moderate or high incomes.

Because the §403 lead hazard standards apply to all housing units, a disproportionate number of Black and low-income children will benefit from these regulations.  White and high-income children already have the lowest blood-lead levels, implying that they already tend to live in homes with relatively low lead levels.  Thus, they will not receive as great a benefit from these regulations.  Hispanic or Mexican American children tend to fall in the middle.  This may reflect the fact that many Hispanics live in parts of the country with relatively new housing (e.g., Florida, Texas, and California).

The benefit cost analysis for §403 assumes that a home which exceeds any of the four environmental lead standards (levels of lead in floor dust, window sill dust, or soil, and condition of lead-based paint) established by the §403 standard will perform the appropriate interventions at the birth of a child.  Thus the cost of compliance with §403 is a function of the condition of the housing stock--older homes with paint in deteriorating condition or homes with high soil lead levels will have higher costs of compliance than newer homes or homes with low soil lead levels.

The distribution of the costs can be evaluated by using the percentage of any given race or income group that lives in housing that exceeds the §403 standards.  As described above, the available data do not allow for a reliable analysis of the distribution of costs by race or income.  Under these circumstances, inferences about the cost distribution are drawn from the NHANES data.  Based on the blood-lead numbers presented in Exhibit 9-5, Blacks are most likely to be living in units with elevated levels of lead, followed by Hispanics.  Non-Hispanic Whites are least likely to be living in units that expose their children to lead. In other words, owners of properties where African American or Hispanic families live are more likely to bear the costs of the rule.  Also, low income households are more likely than middle or high income households to bear the costs of the rule.  These cost impacts will be lessened, however, by Federal and state/local programs (e.g. HUD grantee programs) that use the §403 lead hazard standards in distributing grants and low-cost loans to subsidize the costs of lead abatements

**Exhibit 9-5.  Percentage of Children Aged 1-5 with Blood-Lead Levels (BLLs) ≥10 µg/dL, and Weighted Geometric Mean (GM) BLLs. — United States, Third National Health and Nutrition Examination Survey — Phase 2: 1991-94**

| Characteristics | Percent with BLLs ≥10 µg/dL | GM BLLs (µg/dL) |
|---|---|---|
| Race/Ethnicity* | | |
| Black, non-Hispanic | 11.2% | 4.3 |
| Mexican American | 4.0% | 3.1 |
| White, non-Hispanic | 2.3% | 2.3 |
| Income** | | |
| Low | 8.0% | 3.8 |
| Middle | 1.9% | 2.3 |
| High | 1.0% | 1.9 |

\*   Data for other racial/ethnic groups were too small for reliable estimates.
\*\*  Income categories were defined using the poverty-income ratio (PIR), where: low income was defined as PIR  1.300, middle income as PIR=1.301-3.500, high income as PIR ≥3.501.
Source: Table 2, Morbidity and Mortality Report, CDC, February 21, 1997, Vol. 46 No. 7.

## 9.5     Executive Order 13045--Protection of Children from Environmental Health Risk and Safety Risks

Executive Order 13045 requires that regulations undergo review by the Office of Management and Budget (OMB) if the regulatory action is economically significant and concerns an environmental health risk or safety risk that an agency has reason to believe may disproportionately affect children. The focus of the §403 regulation is on the protection of children's health and the household lead standards were chosen based on an analysis of the health risks to children only.  The benefits from §403 outlined in Chapter 6 are a reflection of benefits to children under 6 years old only.

Of the estimated 173 million children born between 1997 and 2046, approximately 131 million children will be born into housing built prior to 1979.  It is estimated that §403 will result in reductions in exposure to household lead in soil, dust, and paint for 46.0 million children over the next 50 years. This reduction in exposure, in turn, will reduce the incidence of elevated blood-lead levels and increase average IQ.  Exhibit 9-6 presents blood-lead and IQ statistics for both the baseline and post-compliance scenarios.

Notice that the health impacts of §403 are often substantial.  The reduction in the number of children suffering from elevated blood-lead levels due to pica (direct ingestion of paint chips) is on the order of 1.3 million.  The reduction in the number of children with elevated blood-lead levels (greater than 10 µg/dL) from all sources is estimated at 2.0 to 7.5 million.  The increase in average IQ depends greatly on which benefits model is used but is estimated to be between 0.23 and 0.90 points for the 46.0

million children estimated to be affected by interventions.  The number of children who will avoid an IQ less than 70 points is between 8,000 and 30,000 depending on the benefits model employed.

**Exhibit 9-6**
**Beneficial Health Impacts on Children Resulting from §403**

|  | Mean blood-lead level (µg/dL) | Number with elevated blood-lead due to pica (millions) | Number with blood-lead greater than 10 µg/dL (millions) | Number with blood-lead greater than 20 µg/dL (millions) | Average IQ point gain | Number avoiding IQ less than 70 |
|---|---|---|---|---|---|---|
| Baseline | 4.12 | 2.4 | 10.0 | 1.0 | NA | NA |
| Post-§403 IEUBK | 3.18 | 1.1 | 2.5 | 0.1 | 0.90 | 30,000 |
| Post-§403 Empirical | 3.88 | 1.1 | 8.0 | 0.7 | 0.23 | 8,000 |

## 9.6.  Impact on Other Federal Agencies

The lead hazard standards established under §403 will apply to other federal agencies.  Primary among these are the Department of Housing and Urban Development (HUD), the Department of Defense (DoD), and potentially the Department of Energy (DoE).  This section of the Economic Impact Analysis addresses the likely impact of the final §403 regulations on DoD.  The Department of Housing and Urban Development has already performed their own analysis of the impact of §403 on their operations (HUD 1999).  Discussions with the Department of Energy indicate that they have few if any residential properties that will be affected by the §403 standards.

In December, 1999, DoD and Environmental Protection Agency jointly issued a guidance document (known as the "Field Guide"[6]) for use by DoD and EPA personnel in the evaluation and control of lead-based paint at DoD residential real property scheduled for disposition under the base realignment and closure (BRAC) program[7].  EPA and DoD have agreed that Title X would govern for residential property.  The Field Guide states that "Although EPA concluded that the release of lead to soil from lead-based paint from structures falls within the CERCLA definition of a hazardous substance release, EPA and DoD agree that for the majority of situations involving target housing, Title X is sufficiently protective to address the hazards posed by lead-based paint."  Based on the Guide, DoD is currently following the lead level in the Proposed Title X rule.  When the rule is finalized, the Field Guide will reflect the level stated in the final rule.

At this time, there is no agreement between EPA and DoD as to lead standards for non-residential property.  DoD has no guidance on lead-based paint for non-residential property, and the Department

---

[6]     Department of Defense and U. S. Environmental Protection Agency "Lead-Based Paint Guidelines for Disposal of Department of Defense Residential Real Property - A Field Guide" Interim Final, December 1999.

[7]     BRAC facilities are transfers and closures, excluding Superfund and National Priorities List (NPL) sites.

feels they do not have specific limits to meet with regard to such property. DoD interprets §403 as applying only to residential property. EPA would like to see deed restrictions requiring property to remain non-residential if it is transferred without being remediated. DoD does not want any deed restrictions.

There are only limited data available on which to base an estimate of the potential costs of the final §403 standards. Data have been collected by EPA Region IX for four DoD sites, measuring lead concentration in soil for a number of locations at each site. This study looked at non-residential property, such as water towers, buildings, etc.[8] It is being assumed by DoD and EPA that the concentrations are representative of lead levels at DoD facilities nationwide.[9]

The Region IX sampling did not follow TSCA standards. The data were collected in areas that would be expected to have the highest lead concentrations (i.e., at roof driplines, on the soil surface, and/or close to the structure), and no averaging was done. Thus the data represents the "worst cases". The results of the study show that lead concentrations ranged widely, from background to 10,000 ppm (see Exhibit 9-7). No correlations were found between type of building, age of building, maintenance or any other factors and lead concentration. In short, no patterns were found in the data. Also, an exposure pathway could not be established by EPA.

Because the data taken at the four DoD non-residential sites are being treated as representative of what may be found at residential sites, the analysis compared these results to the final standards. In all four cases, the average soil lead level for the building locations sampled are above 1200 ppm. In two cases, Mare Island and Moffett NAS, these averages are inflated due to one very contaminated location at each site. Never the less, of the 64 building locations where samples were taken, 27 of them (42%) have average lead levels over 1200 ppm. While these data do not provide a basis for estimating specific costs to DoD, they clearly indicate that a soil standard of 1200 ppm could involve substantial costs for base conversion.

---

[8]     Data on lead levels collected by DoD from the inside of buildings has either not been collected, or is spotty and informal (depending on who you ask). Each service does it separately.

[9]     The EPA FFRR Office had begun a pilot study on DoD Brownfield and Superfund facilities (all non-residential) to assess the risk of exposure to lead from lead-based paint. This pilot study has been canceled because EPA is considering the levels found in the Region IX study to be representative.

**Exhibit 9-7**
**Lead Soil Levels at Four Department of Defense Sites\***

| Presidio Lead Based Paint Survey Other than Residential | | | | Mare Island Lead Based Paint Survey Other than Residential | | | |
|---|---|---|---|---|---|---|---|
| Building | Date Constructed | XRF Dripline/ Near Bldg Avg (mg/kg) | Number Samples | Building | Date Constructed | XRF Dripline/ Near Bldg Avg (mg/kg) | Number Samples |
| 2 | 1864 | 4,928 | 31 | H-1 | 1889 | 10,427 | 23 |
| 38 | 1940 | 188 | 36 | H-71 | 1927 | 1,399 | 26 |
| 40 | 1941 | 2,446 | 13 | H-72 | 1926 | 1,318 | 24 |
| 45 | 1863 | 399 | 9 | H-80 | 1939 | 486 | 4 |
| 47 | 1940 | 309 | 9 | H-83 | 1943 | 1,853 | 22 |
| 116 | 1885 | 4,466 | 9 | H-84 | 1943 | 1,978 | 17 |
| 563 | 1903 | 1,870 | 17 | Tank 188 | 1915 | 5,056 | 8 |
| 567 | 1903 | 1,530 | 16 | 396 | 1941 | 900 | 24 |
| 569 | 1903 | 2,245 | 14 | 571 | 1942 | 797 | 31 |
| 682 | 1902 | 3,223 | 20 | 617 | 1942 | 445 | 6 |
| 1040 | 1900 | 1,097 | 10 | 621 | 1942 | 419 | 42 |
| 1182 | 1919 | 1,625 | 8 | 650 | 1985 | 59 | 8 |
| 1216 | 1912 | 598 | 18 | 653 | 1943 | 365 | 6 |
| 1218 | 1912 | 423 | 16 | 658 | 1936 | 338 | 8 |
| 1224 | 1912 | 802 | 11 | 755 | 1945 | 237 | 6 |
| 1243 | 1941 | 555 | 12 | 892 | 1935 | 2,478 | 20 |
| 1340 | 1917 | 366 | 15 | 926 | 1939 | 1,250 | 40 |
| 1802 | 1928 | 97 | 2 | 928 | 1941 | 567 | 8 |
| 1807 | unknown[c] | 387 | 12 | 1294 | 1970 | 90 | 44 |
| 1903 | unknown[c] | 792 | 12 | **Average** | | **1,603.3** | |
| **Average** | | **1,417.3** | | | | | |

| Mather AFB Lead Based Paint Survey Other than Residential | | | | Moffett NAS Lead Based Paint Survey Other than Residential | | | |
|---|---|---|---|---|---|---|---|
| Building | Date Constructed | XRF Dripline/ Near Bldg Avg (mg/kg) | Number Samples | Building | Date Constructed | XRF Dripline/ Near Bldg Avg (mg/kg) | Number Samples |
| 2389 | 1942 | 2,910 | 6 | 2 | 1933 | 1,898 | 6 |
| 2400 | 1958 | 713 | 6 | 50 | 1958 | 320 | 8 |
| 2460 | 1953 | 572 | 33 | 64/85 | 1940/1944 | 744 | 7 |
| 2470 | 1942 | 1,357 | 8 | 82 | 1944 | 1,857 | 3 |
| 2474 | 1942 | 3,307 | 6 | 107 | 1948 | 102 | 4 |
| 2480 | 1963 | 78 | 4 | 126 | 1944 | 8,252 | 21 |
| 3306 | 1942 | 2,436 | 16 | 151 | 1953 | 97 | 14 |
| 3335 | 1942 | 584 | 14 | 934 | 1940 | 127 | 6 |
| 3374 | 1942 | 2,691 | 9 | **Average** | | **1,674.6** | |
| 3430 | 1942 | 510 | 23 | | | | |
| 3455 | 1942 | 428 | 10 | | | | |
| 3494 | 1942 | 1,310 | 20 | | | | |
| 3550 | 1942 | 2,008 | 11 | | | | |
| 3686 | 1942 | 1,087 | 26 | | | | |
| 3790 | 1942 | 3,351 | 14 | | | | |
| 7005 | 1963 | 268 | 17 | | | | |
| 7024 | 1962 | 259 | 30 | | | | |
| **Average:** | | **1,404.1** | | | | | |

*DoD data are reported in mg/kg, which is the equivalent of ppm..

# References

Massachusetts Childhood Lead Poisoning Prevention Program.  1996.  Inspection and Deleading databases.

United States Department of Commerce.  1994.  *Current Population Survey: Lead-based Paint Awareness Supplement*.  Public Use file.  December.

United States Department of Commerce.  1996  *Current Population Reports*, P25-1130, as cited in Statistical Abstract of the United States (Washington, DC, U.S. Government Printing Office, p.20.

United States Department of Commerce and U.S. Department of Housing and Urban Development.  1996  *Property Owners and Managers Survey, Multi-housing Unit Properties.*

United States Department of Housing and Urban Development (HUD).  1993.  National Survey of Lead-Based Paint in Housing: Documentation of Analytical Data Files.  Prepared for U.S. Department of Housing and Urban Development by Westat, Inc..  November 30.

United States Department of Housing and Urban Development (HUD).  1999. Economic Analysis of the Final Rule on Lead-Based Paint: Requirements for Notification, Evaluation and Reduction of Lead-Based Paint Hazards in Federally Owned Residential Property and Housing Receiving Federal Assistance.  Prepared for the Office of Lead Hazard Control, U.S. Department of Housing and Urban Development by ICF Consulting, September 7.

United States Environmental Protection Agency.  1996.  *TSCA Title IV, Sections 402(a) and 404: Target Housing and Child Occupied Facilities Final Rule, Regulatory Impact Analysis.*

United States Small Business Administration.  1993.  *Small Business Thresholds by 4-digit Standard Industrial Classification.*

# Pls.' Exhibit 037

# EPA Website – "NRC Risk Assessment Paradigm," https://www.epa.gov/fera/nrc-risk-assessment-paradigm.

An official website of the United States government.

We've made some changes to EPA.gov. If the information you are looking for is not here, you may be able to find it on the EPA Web Archive or the January 19, 2017 Web Snapshot.

Close

 United States Environmental Protection Agency

# The NRC Risk Assessment Paradigm

## Dose-Response Assessment for Assessing Health Risks Associated With Exposure to Hazardous Air Pollutants

- Summary and Tables
- Sources of Chronic Dose-Response Information
- Prioritization of Data Sources for Chronic Exposure
- Additional Information, Adjustments and Special Cases for Dose-Response Values in Tables 1 and 2
- Sources of Acute Dose-Response Information
- **The NRC Risk Assessment Paradigm**
- Risk Assessment for Carcinogenic Effects
- Risk Assessment for Other Effects

To estimate potential health impacts associated with environmental exposures, EPA scientists and others have spent more than two decades developing an extensive set of risk assessment methods, tools, and data to estimate environmental health risks. Although significant uncertainties remain, this risk assessment methodology has been extensively peer-reviewed, is widely used and understood by the scientific community, and continues to expand and evolve as scientific knowledge advances.

EPA's framework for assessing and managing risks reflects the risk assessment and risk management paradigm set forth by the National Academy of Sciences (NRC) in 1983 [ , ], shown in Figure 1 below. The NRC concluded that risk assessment and risk management are "two distinct elements" between which agencies should maintain a clear conceptual distinction. The 1983 NRC report

Case 3:17-cv-02162-EMC   Document 188-2   Filed 05/05/20   Page 1333 of 1525

identified four steps integral to any risk assessment: 1) hazard identification, 2) dose-response assessment, 3) exposure assessment, and 4) risk characterization. The NRC paradigm for risk assessment serves as the basis for OAQPS risk assessments under the air toxics program.

Figure 1. Diagram of NRC risk assessment/risk management paradigm.



Source: EPA Office of Research and Development.

Within the NRC paradigm, the evaluation of toxicity in a risk assessment is based on two sequential analyses. The first is the hazard identification, which identifies contaminants that may pose health hazards at environmentally relevant concentrations, and qualitatively describes the effects that may occur in humans. The second analysis is the human health dose-response assessment, which characterizes the relationship between the exposure to a pollutant and the resultant health effects.

Hazard Identification. The types of effects relevant to each chemical (e.g., cancer, or effects other than cancer) are determined as part of the hazard identification. Factors such as the experimental route of exposure, the type and severity of the effects, the biological plausibility of findings, and the consistency of findings across studies all contribute to the hazard identification statement.

Dose-Response Assessment. Generally, the dose-response assessment consists of two parts: the evaluation of data in the observable range, and the extrapolation from the observable range to low doses/risks. Recent terminology refers to the result of analysis in the observable range as the "point of departure" from which extrapolation begins. The approaches used for evaluation in the observable range are similar for all types of effects, but EPA's current extrapolation methods differ for effects concluded to have linear and nonlinear modes of action. Further details of dose-response assessment are provided in the web pages on risk assessment for carcinogenicity and other endpoints.

The nature of the dose-response assessment typically varies among pollutants. Sufficient data may exist for some criteria air pollutants, such as ozone or carbon monoxide, so that relatively complete dose-response relationships can be characterized. In such cases, there is no need for extrapolation to lower doses because adequate human health effects data are available at environmentally relevant levels. However, this has not often been the case for air toxics. Epidemiologic and toxicologic data for air toxics have typically resulted from exposure levels that were high relative to environmental levels.

Case 3:17-cv-02162-EMC   Document 188-2   Filed 05/05/20   Page 1334 of 1525

1. National Research Council. 1983. Risk assessment in the federal government. Managing the process. National Academy Press, Washington, DC.
2. National Research Council. 1994. Science and Judgment in Risk Assessment. National Academy Press, Washington, DC."

LAST UPDATED ON JANUARY 31, 2017

# Pls.' Exhibit 040

# EPA Website - EPA-FDA Fish Advice: Technical Information, https://www.epa.gov/fish-tech/epa-fda-fish-advice-technical-information

An official website of the United States government.

Close

We've made some changes to EPA.gov. If the information you are
looking for is not here, you may be able to find it on the EPA Web
Archive or the January 19, 2017 Web Snapshot.

 United States
Environmental Protection
Agency

# EPA-FDA Fish Advice: Technical Information

This webpage contains detailed information on the underlying calculations for the fish advice for women
of childbearing age (about 16-49 years old), pregnant and breastfeeding women, and parents and
caregivers of young children.  It contains the following information:

1. How the chart for FDA's and EPA's fish advice was derived.
2. Sortable table of fish species that contains data used in separating the fish into categories, such as
   mercury concentrations and the number of weekly servings.
3. Recommended portion sizes for children based on age.

## How FDA and EPA derived the categories in the fish chart

The agencies decided which category each fish belonged to by calculating the highest average amount of
mercury that could be in a fish when eaten one, two, and three times a week without going over the
maximum acceptable mercury intake amount for an average pregnant woman.  The agencies determined
the maximum acceptable intake amount by comparing the reference dose (RfD) developed by EPA to the
predicted exposure from the consumption of different fish species.  An RfD is determined to be a rate of
exposure that a person can experience over a lifetime without appreciable risk of harm; however, the RfD
for mercury is protective of neurodevelopmental effects from a critical window of development for a fetus
during pregnancy.  The RfD includes a 10-fold uncertainty factor to allow for variability among
individuals and groups, including individuals who are not pregnant.  By expressing the advice in terms of
recommendations for weekly intake of fish based on the RfD, the agencies aim to help consumers reduce
exposure to mercury, while also enabling them to achieve the health benefits from eating fish.  We
describe the equations and results for determining which fish we placed in each category below.

## Equations for determining which category each fish went in

The boundaries for each category (or screening values) were calculated using equation 5-4 from EPA's
*Guidance for Assessing Chemical Contaminant Data for Use in Fish Advisories, Volume 1: Fish
Sampling and Analysis Third Edition* (November 2000).

$$SV = \frac{RfD * BW}{CR}$$

where
SV = screening value for a noncarcinogen (µg/g)

RfD = reference dose (µg mercury/kg-d)
BW = body weight (kg)
CR = mean daily consumption rate of the species of interest (g/d)

For this fish advice, we used the screening value as the highest average amount of mercury in fish that would not exceed the reference dose at a given consumption rate.  The consumption rate (CR) was calculated using the following equation:

$$Daily\ consumption\ rate \left(\frac{g}{d}\right) = serving\ size\left(\frac{oz}{serving}\right) * \frac{28.3\ g}{oz} * weekly\ servings\left(\frac{servings}{wk}\right) * \frac{1\ wk}{7\ d}$$

## Factors used in the calculations

Reference dose for chronic oral exposure to methylmercury = 0.1 µg mercury / kg body weight / day. Taken from EPA's Integrated Risk Information System (IRIS).

Body weight = 75 kilograms (165 pounds) = average weight of a pregnant woman.  Taken from Table 8-29 of EPA's *Exposure Factors Handbook: 2011 Edition*.  This weight is supported by 2003-2010 NHANES data (2-day dietary recall) for pregnant women of 78 kg and coincides with average female adult body weight of 166 pounds from CDC's *Anthropometric Reference Data for Children and Adults: United States, 2007–2010* (PDF)  (48 pp, 1 MB, About PDF)(Oct 2012).

Serving size = 4 ounces (113 grams) before cooking based on the FDA reference amounts customarily consumed per eating occasion (RACC) for fish and shellfish without sauce in 21 CFR 101.12[1].  The RACC for this category of food is 85 g for cooked fish and 110 g for raw fish. RACCs  are used as the basis for nutrient declarations on Nutrition Facts labels on food packages.

Serving size is also consistent with the recommendation of 8-12 ounces of a variety of seafood per week from choices lower in methyl mercury found in the *Dietary Guidelines for Americans 2015* and USDA's. This is equivalent to 2-3 four-ounce servings per week.

Weekly servings = 1, 2, or 3

## Screening Values for Fish Categories

| Weekly fish servings | Screening value (µg/g) | Chart category |
|---|---|---|
| 0 | > 0.46 | Choices to Avoid |
| 1 | ≤ 0.46 | Good Choices |
| 2 | ≤ 0.23 | |
| 3 | ≤ 0.15 | Best Choices |

The screening value is the highest allowable average amount of mercury in fish at a given consumption rate. Therefore:

Highest allowable average mercury concentration in fish per serving when eating 3 servings per week = 0.15 µg/g. Any fish with an average mercury concentration less than or equal to 0.15 µg/g was placed in the "best choices – eat 2-3 servings a week" category.

Highest allowable average mercury concentration in fish per serving when eating 2 servings per week = 0.23 µg/g. In order to be protective, any fish with an average mercury concentration greater than 0.15 µg/g up to 0.23 µg/g was placed in the "good choices – eat 1 serving a week" category because it could not be eaten 3 times a week without exceeding the reference dose.

Highest allowable average mercury concentration in fish per serving when eating 1 serving per week = 0.46 µg/g. Any fish with an average mercury concentration greater than 0.23 µg/g up to 0.46 µg/g was placed in the "good choices – eat 1 serving a week" category. Any fish with an average mercury concentration greater than 0.46 µg/g was placed in the "choices to avoid" category.

## Sortable table of fish species, fish data, and weekly servings

The table can be sorted by column. We primarily used fish data from FDA's monitoring database of mercury levels in commercial fish and shellfish (found at Mercury Levels in Commercial Fish and Shellfish (1990-2012) and Mercury Concentrations in Fish: FDA Monitoring Program (1990-2010)) with support from other sources referenced below. All values for mercury are for fish before cooking except for those cooked during processing (e.g., canned fish). However, please remember that the fish advice recommends the consumption of only cooked fish for pregnant women; pregnant women should avoid eating raw fish. For those who are interested, mercury concentrations for cooked fish can be roughly approximated using the following formula: (µg mercury/ g uncooked fish) × (1 g uncooked fish/ 0.75 g cooked fish) × (28.3 g/ 1 oz)

For any fish species that had fewer than 30 samples in FDA's dataset, we examined the following datasets: Karimi et al. (2012), EPA's Mercury in Marine Life Database, EPA National Coastal Assessment (NCA): NCA/ National Coastal Condition Assessment (NCCA) data, Health Canada (2007), and a USDA-funded study by Cladis et al. 2014. We calculated the 95th percent confidence intervals on the mean for all fish species with available data based on a boot strap analysis using the statistical software 'R' (library boot). We then considered whether the upper 95th percent confidence interval exceeded the screening value for that category. If the concentration for the 95th percent upper confidence interval fell in a different category, we looked at the means and sample sizes for that fish in those other datasets. If this supplemental data indicated a fish should change categories, then we moved it. If the supplemental data indicated a fish should remain in its calculated category, then we did not move it. If there were no supplemental data or if the sample sizes of that supplemental data were small, then we moved the fish based on the 95th percent upper confidence interval concentration. If the concentration for the 95th percent upper confidence interval did not fall in a different category but the supplemental data indicated a fish should change categories, then we moved it.

| Fish species | Mercury concentration, average (µg/g or ppm) | Mercury concentration, 95% confidence interval (µg/g or ppm) | Number of samples | Fish category |
|---|---|---|---|---|

| Fish species | Mercury concentration, average (µg/g or ppm) | Mercury concentration, 95% confidence interval (µg/g or ppm) | Number of samples | Fish category |
|---|---|---|---|---|
| Anchovy | 0.02 | 0.01, 0.02 | 15 | Best choice |
| Atlantic croaker | 0.07 | 0.06, 0.08 | 90 | Best choice |
| Atlantic mackerel | 0.05 | NC | 80 | Best choice |
| Black sea bass | 0.13 | 0.10, 0.16 | 29 | Best choice |
| Bluefish | 0.37 | 0.33, 0.42 | 94 | Good choice |
| Buffalofish | 0.14 | 0.10, 0.19 | 17 | Good choice |
| Butterfish | 0.06 | NC | 89 | Best choice |
| Carp | 0.11 | 0.06, 0.16 | 14 | Good choice |
| Catfish | 0.02 | 0.01, 0.04 | 59 | Best choice |
| Chilean sea bass/Patagonian toothfish | 0.35 | 0.29, 0.43 | 74 | Good choice |
| Clam | 0.01 | 0.00, 0.01 | 15 | Best choice |
| Cod | 0.11 | 0.09, 0.14 | 115 | Best choice |
| Crab | 0.06 | 0.05, 0.09 | 93 | Best choice |
| Crawfish | 0.03 | 0.03, 0.04 | 46 | Best choice |
| Flatfish (flounder, plaice, sole) | 0.06 | 0.04, 0.07 | 71 | Best choice |

| Fish species | Mercury concentration, average (µg/g or ppm) | Mercury concentration, 95% confidence interval (µg/g or ppm) | Number of samples | Fish category |
|---|---|---|---|---|
| Grouper | 0.45 | 0.38, 0.52 | 53 | Good choice |
| Haddock | 0.06 | 0.05, 0.06 | 50 | Best choice |
| Hake | 0.08 | 0.06, 0.10 | 49 | Best choice |
| Halibut | 0.24 | 0.20, 0.29 | 101 | Good choice |
| Herring | 0.08 | 0.04, 0.13 | 27 | Best choice |
| King mackerel | 0.73 | NC | 213 | Avoid |
| Lobster | 0.10 | 0.06, 0.14 | 22 | Best choice |
| Mahi mahi / dolphinfish | 0.18 | 0.14, 0.22 | 29 | Good choice |
| Marlin | 0.49 | 0.38, 0.60 | 16 | Avoid |
| Monkfish | 0.16 | 0.11, 0.21 | 11 | Good choice |
| Mullet | 0.05 | 0.02, 0.09 | 20 | Best choice |
| Orange roughy | 0.57 | 0.53, 0.61 | 81 | Avoid |
| Oyster | 0.01 | 0.00, 0.02 | 61 | Best choice |
| Pacific chub mackerel | 0.09 | NC | 30 | Best choice |
| Perch, freshwater | 0.15 | 0.10, 0.20 | 19 | Best choice |

| Fish species | Mercury concentration, average (µg/g or ppm) | Mercury concentration, 95% confidence interval (µg/g or ppm) | Number of samples | Fish category |
|---|---|---|---|---|
| Perch, ocean | 0.12 | 0.08, 0.17 | 31 | Best choice |
| Pickerel | 0.09 | 0.05, 0.14 | 16 | Best choice |
| Pollock | 0.03 | 0.02, 0.05 | 95 | Best choice |
| Rockfish | 0.23 | 0.17, 0.30 | 19 | Good choice |
| Sablefish | 0.36 | 0.28, 0.45 | 26 | Good choice |
| Salmon, canned | 0.01 | 0.005, 0.02 | 19 | Best choice |
| Salmon, fresh/frozen | 0.02 | 0.02, 0.03 | 94 | Best choice |
| Sardine | 0.01 | 0.01, 0.02 | 90 | Best choice |
| Scallop | <0.01 | 0.00, 0.01 | 39 | Best choice |
| Shad | 0.04 | 0.02, 0.06 | 15 | Best choice |
| Shark | 0.98 | 0.91, 1.05 | 356 | Avoid |
| Sheepshead | 0.09 | 0.06, 0.12 | 8 | Good choice |
| Shrimp | 0.01 | 0.01, 0.01 | 40 | Best choice |
| Skate | 0.14 | NC | 56 | Best choice |
| Smelt | 0.08 | 0.05, 0.13 | 23 | Best choice |

| Fish species | Mercury concentration, average (µg/g or ppm) | Mercury concentration, 95% confidence interval (µg/g or ppm) | Number of samples | Fish category |
|---|---|---|---|---|
| Snapper | 0.17 | 0.12, 0.23 | 67 | Good choice |
| Spanish mackerel | 0.35 | NC | 109 | Good choice |
| Squid | 0.02 | 0.02, 0.03 | 36 | Best choice |
| Striped bass (ocean) | 0.07 | 0.04, 0.11 | 41 | Good choice |
| Swordfish | 1.00 | 0.95, 1.04 | 636 | Avoid |
| Tilapia | 0.01 | 0.01, 0.02 | 32 | Best choice |
| Tilefish (from Gulf of Mexico) | 1.45 | NC | 60 | Avoid |
| Tilefish (from Atlantic Ocean) | 0.14 | 0.11, 0.19 | 32 | Good choice |
| Trout, freshwater | 0.07 | 0.03, 0.12 | 35 | Best choice |
| Tuna, albacore / white tuna, canned | 0.35 | 0.34, 0.36 | 451 | Good choice |
| Tuna, albacore / white tuna, fresh/frozen | 0.36 | 0.32, 0.40 | 43 | Good choice |
| Tuna, bigeye | 0.69 | 0.56, 0.84 | 21 | Avoid |
| Tuna, light, canned (includes skipjack) | 0.13 | 0.12, 0.14 | 548 | Best choice |

| Fish species | Mercury concentration, average (µg/g or ppm) | Mercury concentration, 95% confidence interval (µg/g or ppm) | Number of samples | Fish category |
|---|---|---|---|---|
| Tuna, yellowfin | 0.35 | 0.33, 0.39 | 231 | Good choice |
| Weakfish/sea trout | 0.23 | 0.18, 0.30 | 46 | Good choice |
| White croaker/Pacific croaker | 0.29 | 0.25, 0.32 | 15 | Good choice |
| Whitefish | 0.09 | 0.06, 0.12 | 37 | Best choice |
| Whiting | 0.05 | 0.03, 0.07 | 13 | Best choice |

NC = not calculated

## Recommended serving sizes for children based on age

We recommend serving fish to children 1-2 times a week, but the serving sizes should be smaller than adult portions and right for your child's age and physical activity level.  This chart shows the weekly amount of fish (in ounces per week) that children should eat based on either caloric need or to keep the fish consumption below the maximum acceptable mercury intake (RfD) based on fish in the "best choices" category.  The calorie need range is based on males and females combined, based on USDA-recommended consumption amounts and USDA-recommended calorie levels at different ages.[2]  The mercury RfD range of intakes is based on the average body weight of females in each age range to be more protective because girls generally weigh less than boys.



Recommended weekly fish consumption based on caloric need varies depending on a child's age and physical activity level. Source: *2015 Dietary Guidelines*. See footnote 2 for more details. Recommended weekly fish consumption based on the mercury RfD varies depending on a child's body weight, where female body weights were used to be more health protective. For children less than two years of age, the American Academy of Pediatrics includes fish in the list of protein foods that are appropriate for toddlers 1-3 years of age, and states that the average toddler eats two 1-ounce servings of protein foods per day. However, the American Academy of Pediatrics does not recommend a specific fish consumption amount for toddlers in this age range.

## Equations for determining children's serving sizes based on the mercury reference dose

The maximum allowable fish consumption rate was calculated using equation 3-3 from EPA's *Guidance for Assessing Chemical Contaminant Data for Use in Fish Advisories, Volume 2: Risk Assessment and Fish Consumption Limits Third Edition* (PDF) (383 pp, 2 MB, About PDF) (November 2000).

$$CR_{lim} = \frac{RfD * BW}{c_m}$$

where
$CR_{lim}$ = maximum allowable fish consumption rate (g/d)
$RfD$ = reference dose (µg mercury/kg-d)
$BW$ = body weight (kg)

$C_m$ = measured concentration of chemical contaminant m in a given species of fish (µg/g)

# Factors used in the equations

RfD = reference dose for chronic oral exposure to methylmercury = 0.1 µg mercury/kg body weight/day. Taken from EPA's Integrated Risk Information System (IRIS).

BW = average body weight for girls (kg) from CDC's *Anthropometric Reference Data for Children and Adults: United States, 2007–2010* (Oct 2012) - Table 1 (PDF) (48 pp, 1 MB, About PDF), based on data from National Health and Nutrition Examination Surveys (NHANES)

$C_m$ = highest average concentration of mercury in fish in "Best Choices" group = 0.15 µg/g

The results were converted from a daily fish consumption rate in grams per day to a serving size in ounces per serving using the following equation and a weekly serving rate of 2 servings per week:

$$serving\ size \left( \frac{oz}{serving} \right) = \frac{consumption\ rate \left( \frac{g}{d} \right) * 7 \frac{d}{wk}}{2 \frac{serving}{wk} * 28.3 \frac{g}{oz}}$$

*Results* - **Child's serving size if eating 2 servings per week from "best choices," when serving size is based on mercury intake**

| Age (years) | Average female weight (kilograms) | Serving size (ounces) for child eating 2 servings with 0.15 µg/g of mercury |
|---|---|---|
| 2 | 13.4 | 1.1 |
| 3 | 15.7 | 1.3 |
| 4 | 17.7 | 1.5 |
| 5 | 21.1 | 1.7 |
| 6 | 23.6 | 1.9 |
| 7 | 26.8 | 2.2 |
| 8 | 31.9 | 2.6 |
| 9 | 35.5 | 2.9 |

| Age (years) | Average female weight (kilograms) | Serving size (ounces) for child eating 2 servings with 0.15 µg/g of mercury |
|---|---|---|
| 10 | 41.1 | 3.4 |
| 11 | 47.5 | 3.9 |

To prevent children from exceeding the RfD for mercury, these are recommended serving sizes of fish for various age groups when eating fish 2 times a week from the "best choices" category:

- Age 2: 1 ounce per serving
- Age 6: 2 ounces per serving
- Age 9: 3 ounces per serving
- Age 11 and up: 4 ounces per serving

# References

Cladis, D.P., Kleiner, A.C., and Santerre, C.R. (2014). *Mercury content in commercially available finfish in the United States*. J Food Prot 77, 1361-1366.  FDA/EPA obtained the raw data from the study authors for analysis.

Health Canada. (2007)  Human Health Risk Assessment of Mercury in Fish and Health Benefits of Fish Consumption, Bureau of Chemical Safety Food Directorate Health Products and Food Branch, Ottawa, Ontario, Canada

Karimi, R., Fitzgerald, T.P., and Fisher, N.S. (2012). *A quantitative synthesis of mercury in commercial seafood and implications for exposure in the United States*. Environ Health Perspect 120, 1512-1519.

U.S. Environmental Protection Agency (U.S. EPA). (2016),  National Coastal Condition Assessment (NCCA)  Office of Water & Office of Research and Development,  EPA 841-R-15-006, Washington, D.C. 2010 Results.

U.S. Environmental Protection Agency. (U.S.EPA) (2016). National Coastal Assessment (NCA): Northeast 2000-2006 Summary Data.

U.S. Environmental Protection Agency (U.S.EPA) 2003. Mercury in Marine Life Database. Office of Wetlands, Oceans and Watersheds.

[1] The RACC we used was for entrees without sauce, e.g., plain or fried fish and shellfish, fish and shellfish cake.

[2] Dietary Guidelines estimate that calorie needs depend on children's age, whether children are "sedentary," "moderately active" or "active," and whether they are male or female.  Dietary Guidelines also recommend children consume specified amounts of seafood per week (in ounces per week) based on their calorie needs.  In developing this chart, FDA and EPA considered the calorie need ranges that the Dietary Guidelines estimate for each age group and the amount of seafood consumption that the Dietary Guidelines recommend at different calorie levels.  For example, for children ages 4 to 8 years, the Dietary Guidelines estimate that to maintain calorie balance females need between 1200 and 1800 calories per day

and males need between 1200 and 2000 calories per day, depending on whether they are sedentary or physically active.  For individuals with a calorie level of 1,200 per day, Dietary Guidelines recommend consumption of 4 ounces of seafood per week.  For individuals with a calorie level of 2,000 per day, Dietary Guidelines recommend 8 ounces of seafood consumption per week.  Therefore, the recommended fish consumption per week for the 4-8 year-old age group ranges from 4 oz per week (based on 1200 calories for sedentary females) to 8 oz per week (based on 2000 calories for active males).

LAST UPDATED ON NOVEMBER 7, 2018

# Pls.' Exhibit 041

# Federal Register, Volume 76, Number 12 (January 19, 2011), Pages 3,422-3,449: Sulfuryl Fluoride; Proposed Order Granting Objections to Tolerances and Denying Request for a Stay

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 180

[EPA–HQ–OPP–2005–0174; FRL–8857–9]

### Sulfuryl Fluoride; Proposed Order Granting Objections to Tolerances and Denying Request for a Stay

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed Order.

**SUMMARY:** In this document, EPA is making available its proposed resolution of objections and a stay request with regard to sulfuryl fluoride and fluoride tolerances promulgated in 2004 and 2005 under section 408(d) of the Federal Food, Drug, and Cosmetic Act (FFDCA). The objections and stay request were filed by the Fluoride Action Network, the Environmental Working Group, and Beyond Pesticides. Notwithstanding the fact that this document is a proposed resolution, and regulatory assessment requirements do not apply, EPA is inviting public comment on all aspects of the proposed resolution of objections, including the underlying scientific evaluations.

**DATES:** Comments must be received on or before April 19, 2011.

**ADDRESSES:** Submit your comments, identified by docket identification (ID) number EPA–HQ–OPP–2005–0174, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the on-line instructions for submitting comments.

• *Mail:* Office of Pesticide Programs (OPP) Regulatory Public Docket (7502P), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001.

• *Delivery:* OPP Regulatory Public Docket (7502P), Environmental Protection Agency, Rm. S–4400, One Potomac Yard (South Bldg.), 2777 S. Crystal Dr., Arlington, VA. Deliveries are only accepted during the Docket Facility's normal hours of operation (8:30 a.m. to 4 p.m., Monday through Friday, excluding legal holidays). Special arrangements should be made for deliveries of boxed information. The Docket Facility telephone number is (703) 305–5805.

*Instructions:* Direct your comments to docket ID number EPA–HQ–OPP–2005–0174. EPA's policy is that all comments received will be included in the docket without change and may be made available on-line at *http://www.regulations.gov,* including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through regulations.gov or e-mail. The regulations.gov Web site is an "anonymous access" system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an e-mail comment directly to EPA without going through regulations.gov, your e-mail address will be automatically captured and included as part of the comment that is placed in the docket and made available on the Internet. If you submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters, any form of encryption, and be free of any defects or viruses.

*Docket:* All documents in the docket are listed in the docket index available at *http://www.regulations.gov.* Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either in the electronic docket at *http://www.regulations.gov,* or, if only available in hard copy, at the OPP Regulatory Public Docket in Rm. S–4400, One Potomac Yard (South Bldg.), 2777 S. Crystal Dr., Arlington, VA. The hours of operation of this Docket Facility are from 8:30 a.m. to 4 p.m., Monday through Friday, excluding legal holidays. The Docket Facility telephone number is (703) 305–5805.

**FOR FURTHER INFORMATION CONTACT:** Meredith Laws, Registration Division (7505P), Office of Pesticide Programs, Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001; telephone number: 703–308–7038; e-mail address: *laws.meredith@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. General Information

### A. Does this action apply to me?

You may be potentially affected by this action if you are an agricultural producer, food manufacturer, pesticide manufacturer, or consumer. Potentially affected entities may include, but are not limited to:

• Food manufacturing (NAICS code 311), *e.g.,* grain and oilseed milling; animal food manufacturing; flour milling; bread and bakery product manufacturing; cookie, cracker, and pasta manufacturing; snack food manufacturing.

• Pesticide manufacturing (NAICS code 32532), *e.g.,* pesticide manufacturers; commercial applicators.

• Community Food Services (NAICS code 624210), *e.g.,* food banks.

• Farm Product Warehousing and Storage (NAICS code 493130), *e.g.,* grain elevators, private and public food warehousing and storage.

This listing is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be affected by this action. Other types of entities not listed in this unit could also be affected. The North American Industrial Classification System (NAICS) codes have been provided to assist you and others in determining whether this action might apply to certain entities. If you have any questions regarding the applicability of this action to a particular entity, consult the person listed under **FOR FURTHER INFORMATION CONTACT.**

### B. What should I consider as I prepare my comments for EPA?

1. *Submitting CBI.* Do not submit this information to EPA through regulations.gov or e-mail. Clearly mark the part or all of the information that you claim to be CBI. For CBI information in a disk or CD–ROM that you mail to EPA, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD–ROM the specific information that is claimed as CBI. In addition to one complete version of the comment that includes information claimed as CBI, a copy of the comment that does not contain the information claimed as CBI must be submitted for inclusion in the public docket. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR part 2.

2. *Tips for preparing your comments.* When submitting comments, remember to:

i. Identify the document by docket ID number and other identifying information (subject heading, **Federal Register** date and page number).

ii. Follow directions. The Agency may ask you to respond to specific questions or organize comments by referencing a Code of Federal Regulations (CFR) part or section number.

iii. Explain why you agree or disagree; suggest alternatives and substitute language for your requested changes.

iv. Describe any assumptions and provide any technical information and/or data that you used.

v. If you estimate potential costs or burdens, explain how you arrived at your estimate in sufficient detail to allow for it to be reproduced.

vi. Provide specific examples to illustrate your concerns and suggest alternatives.

vii. Explain your views as clearly as possible, avoiding the use of profanity or personal threats.

viii. Make sure to submit your comments by the comment period deadline identified.

*C. What are the acronyms used in this order?*

The following is a list of acronyms used in this order:

CAA—Clean Air Act
CAAA—Clean Air Act Amendments of 1990
CSFII—Continuing Survey of Food Intakes by Individuals
CUE—Critical Use Exemption
EPA—Environmental Protection Agency
FACA—Federal Advisory Committee Act
FAN—Fluoride Action Network
FDA—Food and Drug Administration
FIFRA—Federal Insecticide, Fungicide, and Rodenticide Act
FFDCA—Federal Food, Drug, and Cosmetic Act
FQPA—Food Quality Protection Act of 1996
IOM—Institute of Medicine
L—liter
LOAEL—Lowest Observed Adverse Effect Level
MCL—Maximum contaminant level
MCLG—Maximum contaminant level goal
mg—milligram
MOE—Margin of Exposure
MRID—Master Record Identification
NAS—National Academy of Sciences
NOAEL—No Observed Adverse Effect Level
NPDWR—National Primary Drinking Water Regulations
NRC—National Research Council
NRDC—Natural Resources Defense Council
OPP—EPA's Office of Pesticide Programs
OW—EPA's Office of Water
PAD—Population Adjusted Dose
ppm—parts per million
RED—Reregistration Eligibility Decision
RfD—Reference Dose
SDWA—Safe Drinking Water Act
SMCL—Secondary maximum contaminant level
SOP—Standard Operating Procedure
USDA—United States Department of Agriculture

## II. Introduction

*A. What action is the agency taking?*

In this document, EPA is making available for comment a proposed order granting objections and denying a stay request with regard to tolerances

established for sulfuryl fluoride and fluoride in 2004 (69 FR 3240, January 23, 2004) (FRL–7342–1) and 2005 (70 FR 40899, July 15, 2005) (FRL–7723–7) under FFDCA section 408 (21 U.S.C. 346a). (*See* 40 CFR 180.145(c); 180.575). These objections were first filed by the Fluoride Action Network (FAN) and Beyond Pesticides/National Coalition Against the Misuse of Pesticides. (Ref. 1). FAN and Beyond Pesticides also requested a hearing on their objections. At a later date, FAN and Beyond Pesticides were joined by the Environmental Working Group (hereinafter the three parties are referred to as "the Objectors") (Refs. 2 and 3). The Objectors argue that the sulfuryl fluoride and fluoride tolerances should not have been established by EPA because aggregate exposure to fluoride is unsafe under FFDCA section 408. The stay request as to the tolerances was filed by the Objectors in June, 2006, following release of a report by the National Research Council (NRC) of the National Academy of Sciences (NAS) concerning the risk of fluoride. (71 FR 38125, July 5, 2006) (FRL–8075–6).

After reviewing the objections and the NRC Report, EPA is proposing to grant the objections because it agrees that aggregate exposure to fluoride for certain major identifiable population subgroups does not meet the safety standard in FFDCA section 408. Because EPA is proposing to grant the Objectors' objections a hearing is not warranted. Finally, EPA is proposing to deny the Objectors' request for a stay because the risks from continued sulfuryl fluoride use in the short term is insignificant while the environmental and economic consequences from a sudden withdrawal of sulfuryl fluoride, a methyl bromide replacement, are considerable.

*B. What is the agency's authority for taking this action?*

The procedure for filing objections to tolerance actions and EPA's authority for acting on such objections is contained in section 408(g) of FFDCA (21 U.S.C. 346a(g)) and regulations at 40 CFR part 178. That same authority governs hearing and stay requests.

## III. Statutory and Regulatory Background

In this Unit, EPA provides background on the relevant statutes and regulations governing the Objectors' objections, requests for hearing, and request for a stay as well as on pertinent Agency policies and practices.

Unit III.A. summarizes the requirements and procedures in section 408 of FFDCA and applicable

regulations pertaining to pesticide tolerances, including the procedures for objecting to EPA tolerance actions and the substantive standards for evaluating the safety of pesticide tolerances. This unit also discusses the closely-related statute under which EPA regulates the sale, distribution, and use of pesticides, the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. 136 *et seq.*).

Unit III.B. provides an overview of the risk assessment process followed by EPA's Office of Pesticide Programs (OPP). It contains an explanation of how EPA identifies the hazards posed by pesticides, how EPA determines the level of exposure to pesticides that pose a concern (level of concern), how EPA measures human exposure to pesticides, and how hazard, level of concern conclusions, and human exposure estimates are combined to evaluate risk. Further, this unit presents background information on two Agency policies with particular relevance to this action.

Unit III.C. provides a brief overview of the Safe Drinking Water Act (SDWA) and the Montreal Protocol on Substances that Deplete the Ozone Layer (Montreal Protocol) and Title VI of the Clean Air Act (CAA) addressing Stratospheric Ozone Protection. These statutory schemes and international treaty are relevant to this proceeding because EPA regulates fluoride, a sulfuryl fluoride degradate, under SDWA, and because sulfuryl fluoride has played an important role in the United States fulfilling its obligations under the Montreal Protocol and CAA. Specifically, sulfuryl fluoride is a substitute for the ozone-depleting pesticide, methyl bromide.

*A. FFDCA/FIFRA and Applicable Regulations*

1. *In general.* EPA establishes maximum residue limits, or "tolerances," for pesticide residues in food under section 408 of FFDCA. (21 U.S.C. 346a). Without such a tolerance or an exemption from the requirement of a tolerance, a food containing a pesticide residue is "adulterated" under section 402 of FFDCA and may not be legally moved in interstate commerce. (21 U.S.C. 331, 342). Monitoring and enforcement of pesticide tolerances are carried out by the U.S. Food and Drug Administration (FDA) and the U.S. Department of Agriculture (USDA). Section 408 was substantially rewritten by the Food Quality Protection Act of 1996 (FQPA), which added the provisions establishing a detailed safety standard for pesticides, additional protections for infants and children, and the estrogenic substances screening

program. (Pub. L. 104–170, 110 Stat. 1489 (1996)).

EPA also regulates pesticides under FIFRA (7 U.S.C. 136 *et seq.*). While FFDCA authorizes the establishment of legal limits for pesticide residues in food, FIFRA requires the approval of pesticides prior to their sale and distribution, (7 U.S.C. 136a(a)), and establishes a registration regime for regulating the use of pesticides. FIFRA regulates pesticide use in conjunction with its registration scheme by requiring EPA review and approval of pesticide labeling and specifying that use of a pesticide inconsistent with its labeling is a violation of Federal law. (7 U.S.C. 136j(a)(2)(G)). In the FQPA, Congress integrated action under the two statutes by requiring that the safety standard under FFDCA be used as a criterion in FIFRA registration actions as to pesticide uses which result in dietary risk from residues in or on food, (7 U.S.C. 136(bb)), and directing that EPA coordinate, to the extent practicable, revocations of tolerances with pesticide cancellations under FIFRA. (21 U.S.C. 346a(l)(1)).

2. *Safety standard for pesticide tolerances.* A pesticide tolerance may only be promulgated by EPA if the tolerance is "safe." (21 U.S.C. 346a(b)(2)(A)(i)). "Safe" is defined by the statute to mean that "there is a reasonable certainty that no harm will result from aggregate exposure to the pesticide chemical residue, including all anticipated dietary exposures and all other exposures for which there is reliable information." (21 U.S.C. 346a(b)(2)(A)(ii)). Section 408(b)(2)(D) directs EPA, in making a safety determination, to:

Consider, among other relevant factors— * * *

* * * available information concerning the aggregate exposure levels of consumers (and major identifiable subgroups of consumers) to the pesticide chemical residue and to other related substances, including dietary exposure under the tolerance and all other tolerances in effect for the pesticide chemical residue, and exposure from other non-occupational sources.* * *

(21 U.S.C. 346a(b)(2)(D)(v), (vi) and (viii)). EPA must also consider, in evaluating the safety of tolerances, "safety factors which * * * are generally recognized as appropriate for the use of animal experimentation data." (21 U.S.C. 346a(b)(2)(D)(ix).

Risks to infants and children are given special consideration. Specifically, section 408(b)(2)(C)(i)(II) requires that EPA assess the risk to pesticides based on "available information concerning the special susceptibility of infants and children to the pesticide chemical

residues, including neurological differences between infants and children and adults, and effects of *in utero* exposure to pesticide chemicals.* * * " (21 U.S.C. 346a(b)(2)(C)(i)(II)). This provision also creates a presumption that EPA will use an additional safety factor for the protection of infants and children. Specifically, it directs that "[i]n the case of threshold effects, * * * an additional tenfold margin of safety for the pesticide chemical residue and other sources of exposure shall be applied for infants and children to take into account potential pre- and post-natal toxicity and completeness of the data with respect to exposure and toxicity to infants and children." (21 U.S.C. 346a(b)(2)(C)). EPA is permitted to "use a different margin of safety for the pesticide chemical residue only if, on the basis of reliable data, such margin will be safe for infants and children." (*Id.*). The additional safety margin for infants and children is referred to throughout this Order as the "children's safety factor."

3. *Procedures for establishing, amending, or revoking tolerances.* Tolerances are established, amended, or revoked by rulemaking under the unique procedural framework set forth in FFDCA. Generally, a tolerance rulemaking is initiated by the party seeking to establish, amend, or revoke a tolerance by means of filing a petition with EPA. (*See* 21 U.S.C. 346a(d)(1)). EPA publishes in the **Federal Register** a notice of the petition filing and requests public comment. (21 U.S.C. 346a(d)(3)). After reviewing the petition, and any comments received on it, EPA may issue a final rule establishing, amending, or revoking the tolerance, issue a proposed rule to do the same, or deny the petition. (21 U.S.C. 346a(d)(4)).

Once EPA takes final action on the petition by either establishing, amending, or revoking the tolerance or denying the petition, any person may file objections with EPA and seek an evidentiary hearing on those objections. (21 U.S.C. 346a(g)(2)). Objections and hearing requests must be filed within 60 days. (*Id.*). The statute provides that EPA shall "hold a public evidentiary hearing if and to the extent the Administrator determines that such a public hearing is necessary to receive factual evidence relevant to material issues of fact raised by the objections." (21 U.S.C. 346a(g)(2)(B)). EPA regulations make clear that hearings will only be granted where it is shown that there is a "genuine and substantial issue of fact," the requestor has identified evidence "which, if established, resolve one or more of such issues in favor of

the requestor," and the issue is "determinative" with regard to the relief requested. (40 CFR 178.32(b)). EPA's final order on the objections and requests for hearing is subject to judicial review. (21 U.S.C. 346a(h)(1)). The statute directs that tolerance regulations shall take effect upon publication unless EPA specifies otherwise. (40 U.S.C. 346a(g)(1)). EPA is authorized to stay the effectiveness of the tolerance if objections are filed. (*Id.*).

*B. EPA Risk Assessment for Tolerances—Policy and Practice*

1. *The safety determination—risk assessment.* To assess risk of a pesticide tolerance, EPA combines information on pesticide toxicity with information regarding the route, magnitude, and duration of exposure to the pesticide. The risk assessment process involves four distinct steps:

(1) Identification of the toxicological hazards posed by a pesticide;

(2) Determination of the "level of concern" with respect to human exposure to the pesticide;

(3) Estimation of human exposure to the pesticide; and

(4) Characterization of risk posed to humans by the pesticide based on comparison of human exposure to the level of concern.

a. *Hazard identification.* In evaluating toxicity or hazard, EPA reviews toxicity data, typically from studies with laboratory animals, to identify any adverse effects on the test subjects. Where available and appropriate, EPA will also take into account studies involving humans, including human epidemiological studies. For most pesticides, the animal toxicity database usually consists of studies investigating a broad range of endpoints including gross and microscopic effects on organs and tissues, functional effects on bodily organs and systems, effects on blood parameters (such as red blood cell count, hemoglobin concentration, hematocrit, and a measure of clotting potential), effects on the concentrations of normal blood chemicals (including glucose, total cholesterol, urea nitrogen, creatinine, total protein, total bilirubin, albumin, hormones, and enzymes such as alkaline phosphatase, alanine aminotransfersase and cholinesterases), and behavioral or other gross effects identified through clinical observation and measurement. EPA examines whether adverse effects are caused by different durations of exposure ranging from short-term (acute) to long-term (chronic) pesticide exposure and different routes of exposure (oral, dermal, inhalation). Further, EPA evaluates potential adverse effects in

different age groups (adults as well as fetuses and juveniles). (Ref. 4 at 8–10).

EPA also considers whether the adverse effect has a threshold—a level below which exposure has no appreciable chance of causing the adverse effect. For effects that have no threshold, EPA assumes that any exposure to the substance increases the risk that the adverse effect may occur.

b. *Level of concern/dose-response analysis.* Once a pesticide's potential hazards are identified, EPA determines a toxicological level of concern for evaluating the risk posed by human exposure to the pesticide. In this step of the risk assessment process, EPA essentially evaluates the levels of exposure to the pesticide at which effects might occur. An important aspect of this determination is assessing the relationship between exposure (dose) and response (often referred to as the dose-response analysis). EPA follows differing approaches to identifying a level of concern for threshold and non-threshold hazards.

i. *Threshold effects.* In examining the dose-response relationship for a pesticide's threshold effects, EPA evaluates an array of toxicity studies on the pesticide. In each of these studies, EPA attempts to identify the lowest observed adverse effect level (LOAEL) and the no observed adverse effect level (NOAEL), which by definition is the next lower tested dose level below the LOAEL. Generally, EPA will use the lowest NOAEL from the available studies as a starting point (called "the Point of Departure") in estimating the level of concern for humans. (Ref. 4 at 9 (The Point of Departure "is simply the toxic dose that serves as the 'starting point' in extrapolating a risk to the human population.")). At times, however, EPA will use a LOAEL from a study as the Point of Departure when no NOAEL is identified in that study and the LOAEL is close to, or lower than, other relevant NOAELs. The Point of Departure is in turn used in choosing a level of concern. EPA will make separate determinations as to the Points of Departure, and correspondingly levels of concern, for both short and long exposure periods as well as for the different routes of exposure (oral, dermal, and inhalation).

In recent years, EPA has increasingly used a more scientifically sophisticated approach to choosing the Point of Departure. This approach, called a benchmark dose, or BMD, estimates a point along a dose-response curve that corresponds to a specific response level. (Ref. 5). For example, a $BMD_{10}$ represents a 10% change from the background or typical value for the

response of concern. In contrast to the NOAEL/LOAEL approach, a BMD is calculated using a range of dose response data and thus better accounts for the variability and uncertainty in the experimental results due to characteristics of the study design, such as dose selection, dose spacing, and sample size. In addition to a BMD, EPA generally also calculates a "confidence limit" in the BMD. Confidence limits express the uncertainty in a BMD that may be due to sampling and/or experimental error. The lower confidence limit on the dose used as the BMD is termed the BMDL, which the Agency often uses as the Point of Departure. Use of the BMDL for deriving the Point of Departure rewards better experimental design and procedures that provide more precise estimates of the BMD, resulting in tighter confidence intervals. It also provides a health protective conservative estimate of the safe dose. Numerous scientific peer review panels over the last decade have supported the Agency's application of the BMD approach as a scientifically supportable method for deriving Points of Departure in human health risk assessment, and as an improvement over the historically applied approach of using NOAELs or LOAELs. (Refs. 6 and 7).

In estimating and describing the level of concern, the Point of Departure is at times used differently depending on whether the risk assessment addresses dietary or non-dietary exposures. For dietary risks, EPA uses the Point of Departure to calculate an acceptable level of exposure or reference dose (RfD). The RfD is calculated by dividing the Point of Departure by all applicable safety or uncertainty factors. Typically, EPA uses a baseline safety/uncertainty factor of 100X in assessing pesticide risk. That value includes a factor of 10 (10X) where EPA is using data from laboratory animals to account for the possibility that humans potentially have greater sensitivity to the pesticide than animals and another factor of 10X to account for potential variations in sensitivity among members of the human population. Additional safety factors may be added to address data deficiencies or concerns raised by the existing data. Under the FQPA, an additional safety factor of 10X is presumptively applied to protect infants and children, unless reliable data support selection of a different factor. This FQPA additional safety factor largely replaces pre-FQPA EPA practice regarding additional safety factors. (Ref. 8 at 4–11).

In implementing FFDCA section 408, EPA's Office of Pesticide Programs, also

calculates a variant of the RfD referred to as a Population Adjusted Dose (PAD). APAD is the RfD divided by any portion of the FQPA safety factor that does not correspond to one of the traditional additional safety factors used in general Agency risk assessments. (*Id.* at 13–16). The reason for calculating PADs is so that other parts of the Agency, which are not governed by FFDCA section 408, can, when evaluating the same or similar substances, easily identify which aspects of a pesticide risk assessment are a function of the particular statutory provisions in FFDCA section 408. Today, RfDs and PADs are generally calculated for both acute and chronic dietary risks although traditionally RfDs and PADs were only calculated for chronic risks. Throughout this document general references to OPP's calculated safe dose are denoted as an RfD/PAD.

For non-dietary, and combined dietary and non-dietary, risk assessments of threshold effects, the toxicological level of concern is not expressed as an RfD/PAD but in terms of an acceptable (or target) margin of exposure (MOE) between human exposure and the Point of Departure. The "margin" of interest is the ratio between human exposure and the Point of Departure which is calculated by dividing human exposure into the Point of Departure. An acceptable MOE is generally considered to be a margin at least as high as the product of all applicable safety factors for a pesticide. For example, if a pesticide needs a 10X factor to account for potential inter-species differences, 10X factor for potential intra-species differences, and 10X factor for the FQPA children's safety provision, the safe or target MOE would be a MOE of at least 1,000. What that means is that for the pesticide in the example to meet the safety standard, human exposure to the pesticide would generally have to be at least 1,000 times smaller than the Point of Departure. Like RfD/PADs, specific target MOEs are selected for exposures of different durations. For non-dietary exposures, EPA typically examines short-term, intermediate-term, and long-term exposures. Additionally, target MOEs may be selected based on both the duration of exposure and the various routes of non-dietary exposure—dermal, inhalation, and oral.

ii. *Non-threshold effects.* For risk assessments for non-threshold effects, EPA does not use the RfD/PAD or MOE approach to choose a level of concern if quantification of the risk is deemed appropriate. Rather, EPA calculates the slope of the dose-response curve for the non-threshold effects from relevant

studies frequently using a linear, low-dose extrapolation model that assumes that any amount of exposure will lead to some degree of risk. This dose-response analysis will be used in the risk characterization stage to estimate the risk to humans of the non-threshold effect.

c. *Estimating human exposure.* Risk is a function of both hazard and exposure. Thus, equally important to the risk assessment process as determining the hazards posed by a pesticide and the toxicological level of concern for those hazards is estimating human exposure. Under FFDCA section 408, EPA is concerned not only with exposure to pesticide residues in food but also exposure resulting from pesticide contamination of drinking water supplies and from use of pesticides in the home or other non-occupational settings. (*See* 21 U.S.C. 346a(b)(2)(D)(vi)). Additionally, EPA must take into account non-occupational exposure from "other related substances." (*Id.*).

i. *Exposure from food.* There are two critical variables in estimating exposure in food:

• The types and amount of food that is consumed; and

• The residue level in that food.

Consumption is estimated by EPA based on scientific surveys of individuals' food consumption in the United States conducted by the USDA. (Ref. 4 at 12). Information on residue values comes from a range of sources including crop field trials, data on pesticide reduction (or concentration) due to processing, cooking, and other practices, information on the extent of usage of the pesticide, and monitoring of the food supply. (*Id.* at 17).

In assessing exposure from pesticide residues in food, EPA, for efficiency's sake, follows a tiered approach in which it, in the first instance, assesses exposure using the worst case assumptions that 100% of the crop or commodity in question is treated with, or exposed to, the pesticide and 100% of the food from that crop or commodity contains pesticide residues at the tolerance level (*Id.* at 11). When such an assessment shows no risks of concern, a more complex risk assessment is unnecessary. By avoiding a more complex risk assessment, EPA's resources are conserved and regulated parties are spared the cost of any additional studies that may be needed. If, however, a first tier assessment suggests there could be a risk of concern, EPA then attempts to refine its exposure assumptions to yield a more realistic picture of residue values

through use of data on the percent of the crop or commodity actually treated with, or exposed to, the pesticide and data on the level of residues that may be present on the treated crop or commodity. These latter data are used to estimate what has been traditionally referred to by EPA as "anticipated residues."

Use of percent crop/commodity treated data and anticipated residue information is appropriate because EPA's worst-case assumptions of 100% treatment and residues at tolerance value significantly overstate residue values. There are several reasons why this is true. First, all growers of a particular crop would rarely choose to apply the same pesticide to that crop (some may apply no pesticide; some may apply an alternative pesticide); generally, the proportion of the crop treated with a particular pesticide is significantly below 100%. (70 FR 46706, 46731, August 10, 2005) (FRL–7727–4). This is true with food and structural fumigants such as sulfuryl fluoride as well, especially with regard to the structural fumigant use in food processing facilities because such use incurs infrequently and only potentially affects a small portion of the food processed in the facility. Second, the tolerance value represents a high end or worst case value. Tolerance values are chosen only after EPA has evaluated data from experimental trials in which the pesticide has been used in a manner, consistent with the draft FIFRA label, that is likely to produce the highest residue in the crop or food in question (*e.g.*, maximum application rate, maximum number of applications, minimum pre-harvest interval between last pesticide application and harvest). (Refs. 4 and 9). These experimental trials are generally conducted in several locations and involve multiple samples. (*Id.* at 5, 7 and Tables 1 and 5). The results from such experimental trials invariably show that the residue levels for a given pesticide use will vary from as low as non-detectable to measurable values in the parts per million (ppm) range with the majority of the values falling at the lower part of the range. (70 FR 46731) (FRL–7727–4). EPA uses a statistical procedure to analyze the experimental trial results and identify the upper bound of expected residue values. This upper bound value is typically used as the tolerance value. (Ref. 10). There may be some commodities from a treated crop or commodity that approach the tolerance value where the maximum label rates are followed, but most generally fall significantly below the tolerance value.

If less than the maximum legal rate is applied, residues will be even lower. Third, residue values measured at the time of treatment do not take into account the lowering of residue values that frequently occurs as a result of degradation over time and through food processing and cooking.

EPA uses several techniques to refine residue value estimates. (Ref. 4 at 17–28). First, where appropriate, EPA will take into account all the residue values reported in the experimental trials, either through use of an average or individually. Second, EPA will consider data showing what portion of the crop or commodity is not treated with, or exposed to, the pesticide. Third, data can be produced showing pesticide degradation and decline over time, and the effect of commercial and consumer food handling and processing practices. Finally, EPA can consult monitoring data gathered by the FDA, the USDA, or pesticide registrants, on pesticide levels in food at points in the food distribution chain distant from the farm, including retail food establishments.

Another critical component of the exposure assessment is how data on consumption patterns are combined with data on pesticide residue levels in food. Traditionally, EPA has calculated exposure by simply multiplying average consumption by average residue values for estimating chronic risks and high-end consumption by maximum residue values for estimating acute risks. Using average residues is a realistic approach for chronic risk assessment due to the fact that variations in residue levels and consumption amounts average out over time especially given the nationwide market for food in the United States. Using average values is inappropriate for acute risk assessments, however, because in assessing acute exposure situations it matters how much of each treated food a given consumer eats in the short-term and what the residue levels are in the particular foods consumed. Yet, using maximum residue values for acute risk assessment tends to greatly overstate exposure because it is unlikely that a person would consume at a single meal multiple food components bearing high-end residues. To take into account the variations in short-term consumption patterns and food residue values for acute risk assessments, EPA uses probabilistic modeling techniques for estimating exposure when more simplistic models appear to show risks of concerns.

All of these refinements to the exposure assessment process, from use of food monitoring data through probabilistic modeling, can have dramatic effects on the level of exposure

predicted, typically reducing worst case estimates by at least 1 or 2 orders of magnitude. (Ref. 11 at 16–17; 70 FR 46706, 46732, August 10, 2005) (FRL–7727–4).

ii. *Exposure from water.* EPA may use either or both field monitoring data and mathematical water exposure models to generate pesticide exposure estimates in drinking water. Monitoring and modeling are both important tools for estimating pesticide concentrations in water and can provide different types of information. Monitoring data can provide estimates of pesticide concentrations in water that are representative of specific agricultural or residential pesticide practices and under environmental conditions associated with a sampling design. Although monitoring data can provide a direct measure of the concentration of a pesticide in water, it does not always provide a reliable estimate of exposure because sampling may not occur in areas with the highest pesticide use, and/or the sampling may not occur when the pesticides are being used.

In estimating pesticide exposure levels in drinking water, EPA most frequently uses mathematical water exposure models. EPA's models are based on extensive monitoring data and detailed information on soil properties, crop characteristics, and weather patterns. (69 FR 30042, 30058–30065, May 26, 2004) (FRL–7355–7). These models calculate estimated environmental concentrations of pesticides using laboratory data that describe how fast the pesticide breaks down to other chemicals and how it moves in the environment. These concentrations can be estimated continuously over long periods of time, and for places that are of most interest for any particular pesticide. Modeling is a useful tool for characterizing vulnerable sites, and can be used to estimate peak concentrations from infrequent, large storms.

Unlike assessments of exposure to pesticides in food, assessments of exposure to pesticides in drinking water conducted under FIFRA and FFDCA section 408 do not assume there is a nationwide market for drinking water. A person's source of drinking water is primarily local and often the pesticide use is quite localized as well. Thus, generally EPA assesses drinking water exposure to pesticides under FIFRA and FFDCA section 408 based on the most vulnerable watersheds and not on a national or even regional average. (*See* 74 FR 59608, 59618–59619, 59658, November 18, 2009) (FRL–8797–6). Further, these assessments commonly use high-end residue estimates from

models and assume average consumption levels.

In the case of fluoride, however, the primary source of exposure is not from pesticide use. Additionally, as described in Unit V.A.2., EPA has an extensive monitoring database from across the United States on fluoride levels in drinking water. These factors have been taken into account in how EPA has conducted its FFDCA section 408 risk assessment for fluoride.

d. *Risk characterization.* The final step in the risk assessment is risk characterization. In this step, EPA combines information from the first three steps (hazard identification, level of concern/dose-response analysis, and human exposure assessment) to quantitatively estimate the risks posed by a pesticide. Separate characterizations of risk are conducted for different durations of exposure. Additionally, separate and, where appropriate, aggregate characterizations of risk are conducted for the different routes of exposure (dietary and non-dietary).

For threshold risks, EPA estimates risk in one of two ways. Where EPA has calculated a RfD/PAD, risk is estimated by expressing human exposure as a percentage of the RfD/PAD. Exposures lower than 100% of the RfD/PAD are generally not of concern. Alternatively, EPA may express risk by comparing the MOE between estimated human exposure and the Point of Departure with the acceptable or target MOE. As described previously, the acceptable or target MOE is the product of all applicable safety factors. To calculate the actual MOE for a pesticide, estimated human exposure to the pesticide is divided into the Point of Departure. In contrast to the RfD/PAD approach, higher MOEs denote lower risk. Accordingly, if the target MOE for a pesticide is 100, MOEs equal to or exceeding 100 would generally not be of concern.

As a conceptual matter, the RfD/PAD and MOE approaches are fundamentally equivalent. For a given risk and given exposure of a pesticide, if exposure to a pesticide were found to be acceptable under an RfD/PAD analysis it would also pass under the MOE approach, and vice-versa. However, for any specific pesticide, risk assessments for different exposure durations or routes may yield different results. This is a function not of the choice of the RfD/PAD or MOE approach but of the fact that the levels of concern and the levels of exposure may differ depending on the duration and route of exposure.

For non-threshold risks (generally, cancer risks), EPA uses the slope of the

dose-response curve for a pesticide in conjunction with an estimation of human exposure to that pesticide to estimate the probability of occurrence of additional adverse effects. Under FFDCA section 408, for non-threshold cancer risks, EPA generally considers cancer risk to be negligible if the probability of increased cancer cases falls within the range of 1 in 1 million. EPA describes this quantitative standard as a "range" because it does not want to impart a false precision to numerical cancer risk estimates. EPA seeks to identify risks differing significantly from a 1 in 1 million risk and that involves both a quantitative as well as qualitative assessment of what a risk estimate represents.

2. *EPA policy on the children's safety factor.* As the previous brief summary of EPA's risk assessment practice indicates, the use of safety factors plays a critical role in the process. This is true for traditional 10X safety factors to account for potential differences between animals and humans when relying on studies in animals (inter-species safety factor) and potential differences among humans (intra-species safety factor) as well as the FQPA's additional 10X children's safety factor.

In applying the children's safety factor provision, EPA has interpreted it as imposing a presumption in favor of applying an additional 10X safety factor. (Ref. 8 at 4, 11). Thus, EPA generally refers to the additional 10X factor as a presumptive or default 10X factor. EPA has also made clear, however, that this presumption or default in favor of the additional 10X is only a presumption. The presumption can be overcome if reliable data demonstrate that a different factor is safe for children. (*Id.*). In determining whether a different factor is safe for children, EPA focuses on the three factors listed in section 408(b)(2)(C)—the completeness of the toxicity database, the completeness of the exposure database, and potential pre- and post-natal toxicity. In examining these factors, EPA strives to make sure that its choice of a safety factor, based on a weight-of-the-evidence evaluation, does not understate the risk to children. (*Id.* at 24–25, 35).

*C. SDWA and the Montreal Protocol/CAA*

1. *SDWA.* SDWA (42 U.S.C. 300f *et seq.*) was enacted to assure that water supply systems serving the public meet minimum national standards for the protection of public health and to protect the underground sources of drinking water upon which the public

relies. (*See generally A Legislative History of the Safe Drinking Water Act,* Committee Print, 97th Cong., 2d Sess. (1982) at 533–541). Under SDWA, EPA is authorized to set "National primary drinking water regulations" (NPDWRs) governing contaminants which the Administrator determines may have an adverse effect on the health of persons. NPDWRs apply to "public water systems" nationwide and include monitoring and reporting requirements. (42 U.S.C. 300g–1).

"Public water systems" are defined as systems that provide water to the public through pipes or other constructed conveyances for human consumption and that have at least 15 service connections or regularly serve at least 25 individuals. (42 U.S.C. 300f(4)(A)). By regulation, EPA has interpreted "regularly serve at least 25 individuals" to mean providing water to an average of at least 25 individuals daily at least 60 days of the year. (40 CFR 141.2). There are over 160,000 public water systems in the United States. The vast majority of these systems (95%) are small (*i.e.* serve populations of 3,300 persons or less) and these systems only serve about 10% of the population. Many of these small systems rely on groundwater as a water source. The largest 2% of the public water systems serve 80% of the population and include the large metropolitan water systems such as in New York City, Washington, DC, Boston and Chicago. Most of these systems rely on surface waters as their primary water source. Public drinking water systems provide water to roughly 85 to 90% of the U.S. population.

In promulgating a NPDWR for a contaminant, EPA must establish both a maximum contaminant level goal (MCLG) for that contaminant as well as either a maximum contaminant level (MCL) or a treatment technology requirement. (42 U.S.C. 300g–1(a)(3) and 300g–1(b)(4)(7)). MCLGs are not regulatory requirements and do not impose any obligations on public water systems. Rather, MCLGs are health goals that are to be set at a level at which, in the Administrator's judgment, "no known or anticipated adverse effects on the health of persons occur and which allows for an adequate margin of safety." (42 U.S.C. 300g–1(b)(4)(A)).

A MCL sets a level of the contaminant not to be exceeded by public water systems and, with some exceptions is to be set as close to the MCLG as is "feasible." (42 U.S.C. 300g–1(b)(4)(B)). The Act defines feasible to mean "feasible with the use of the best technology, treatment techniques or other means which the Administrator

finds * * * are available (taking costs into consideration)." (42 U.S.C. 300g–(b)(4)(D)). The legislative history for this provision makes it clear that "feasibility" is to be defined relative to "what may reasonably be afforded by large metropolitan or regional public water systems." (A Legislative History of the Safe Drinking Water Act, Committee Print, 97th Cong., 2d Sess. (1982) at 550. MCLs appear at 40 CFR part 141, subparts B and G).

A treatment technique requirement imposes an obligation on public water systems to use an identified treatment technology and it must "prevent known or anticipated adverse effects on the health of persons to the extent feasible." (42 U.S.C. 300g–1(b)(7)(A). EPA may establish treatment technique requirements in lieu of an MCL only if it is not economically or technologically feasible to ascertain the level of the contaminant. (*Id.*).

SDWA also authorizes EPA to set "secondary" drinking water standards or "SMCLs." Such standards specify levels which are necessary to protect "the public welfare," (42 U.S.C. 300f(2)), but are not Federally enforceable (*see A Legislative History of the Safe Drinking Water Act,* Committee Print, 97th Cong., 2d Sess. (1982) at 557). For example, such a contaminant level might be one which adversely affects the odor or appearance of water so that a large number of people discontinue using that source. SMCLs may vary by geography or other circumstances. EPA has established SMCLs for 15 contaminants, which are intended to be guidelines for the States. (40 CFR part 143).

Every 6 years, EPA is required to review and revise "as appropriate" its existing drinking water standards. (42 U.S.C. 300g–1(b)(9)).

There is a long history of regulation of fluoride under SDWA. In 1975, EPA established a MCL for fluoride at a level varying between 1.4 milligrams (mg)/ liter (L) and 2.4 mg/L depending on annual ambient air temperature. (40 FR 59566, December 24, 1975). These levels were set to prevent objectionable dental fluorosis. In 1981, South Carolina petitioned EPA to revoke the fluoride MCL arguing that dental fluorosis is merely a cosmetic effect not an adverse health effect. (*See* 50 FR 20164, May 14, 1985). In response to that petition, EPA took a series of actions. First, in 1985, EPA established a MCLG for fluoride at 4 mg/L. (50 FR 47142, November 14, 1985) (At that time MCLGs were termed "recommended maximum contaminant levels" (RMCLs) under SDWA.). The MCLG was set to protect against crippling skeletal fluorosis, an adverse health effect associated with high levels

of fluoride exposure. EPA concluded that dental fluorosis, which had formed the basis for the earlier MCL, was not an adverse health effect under SDWA but only a cosmetic effect. Second, in 1986, EPA established a MCL for fluoride at 4 mg/L, again based on the crippling skeletal fluorosis endpoint. (51 FR 11396, April 2, 1986). Finally, also in 1986, EPA established a SMCL for fluoride at 2 mg/L to protect against objectionable dental fluorosis. (*Id.*). Judicial review of the MCLG was sought by both the Natural Resources Defense Council (NRDC) and by South Carolina. (*NRDC* v. *EPA,* 812 F.2d 721 (DC Cir. 1987)). NRDC argued that the level was too high because, among other reasons, the MCLG should have been set on dental fluorosis. Taking the opposite position, South Carolina claimed that no MCLG at all was appropriate because the evidence did not support that fluoride caused any adverse health effects. The DC Circuit upheld EPA's regulation ruling that EPA had reasonably interpreted SDWA term adverse health effect to be limited to functional impairments and that EPA had reasonably concluded that effects of dental fluorosis were cosmetic in nature and did not result in functional impairment. South Carolina's challenge was dismissed based on the court's conclusion that EPA had made a "permissible administrative judgment" based on the evidence before it. (*Id.* at 725).

Subsequent to these rulemakings, EPA has on two occasions asked NAS to reevaluate the potential risks of fluoride exposure in regard to the MCLG/MCL. The NRC Report on the second request is discussed extensively in Unit IV.D.

2. *The Montreal Protocol/CAA and methyl bromide.* The Montreal Protocol is the international agreement aimed at reducing and eliminating the production and consumption of stratospheric ozone-depleting substances. The stratospheric ozone layer protects humans from overexposure to harmful ultraviolet radiation. The United States was one of the original signatories to the 1987 Montreal Protocol and the United States ratified the Protocol in April, 1988. Congress then enacted the Clean Air Act Amendments (CAAA) of 1990 which included Title VI on Stratospheric Ozone Protection, codified as 42 U.S.C. Chapter 85, Subchapter VI, to ensure that the United States could satisfy its obligations under the Montreal Protocol. EPA issued regulations in 40 CFR part 82 to implement this legislation and has since modified and updated the regulations as needed. In 2009, the Montreal Protocol became the first

universally ratified international environmental treaty.

Methyl bromide was added to the Montreal Protocol as an ozone-depleting substance in 1992 through the Copenhagen Amendment to the Protocol. The Parties to the Montreal Protocol (Parties) agreed that each developed country's level of methyl bromide production and consumption in 1991 should be the baseline for establishing a freeze. Under the Montreal Protocol and Title VI of the CAAA the term "consumption" is a calculated amount equal to production plus imports minus exports. EPA published a final rule in the **Federal Register** on December 10, 1993 (58 FR 65018), listing methyl bromide as a Class I, Group VI controlled substance, freezing U.S. production and consumption at this 1991 baseline level of 25,528,270 kilograms, and setting forth the percentage of baseline allowances for methyl bromide granted to companies in each control period (each calendar year) until 2001, when the complete phase-out would occur. This phase-out date was established in response to a petition filed in 1991 under sections 602(c)(3) and 606(b) of CAAA of 1990, requesting that EPA list methyl bromide as a Class I substance and phase out its production and consumption. This date was consistent with section 602(d) of CAAA of 1990, which, for newly listed Class I ozone-depleting substances, provides that "no extension [of the phase-out schedule in section 604] under this subsection may extend the date for termination of production of any class I substance to a date more than 7 years after January 1 of the year after the year in which the substance is added to the list of class I substances."

At the Seventh Meeting of the Parties (MOP) in 1995, the Parties made adjustments to the methyl bromide control measures and agreed to reduction steps and a 2010 phase-out date for industrialized countries with exemptions permitted for critical uses. At that time, the United States continued to have a 2001 phase-out date in accordance with section 602(d) of CAAA of 1990. At the Ninth MOP in 1997, the Parties agreed to further adjustments to the phase-out schedule for methyl bromide in industrialized countries, with reduction steps leading to a 2005 phase-out.

In October 1998, the U.S. Congress amended CAA to conform the U.S. schedule to the schedule specified under the Protocol for developed countries by requiring EPA to move the date for ending production to January 1, 2005 and authorizing EPA to provide certain exemptions. These amendments were contained in section 764 of the 1999 Omnibus Consolidated and Emergency Supplemental Appropriations Act (Pub. L. 105–277, October 21, 1998) and were codified in section 604 of CAA. (42 U.S.C. 7671c). The amendment that specifically addresses the critical use exemption (CUE) appears at section 604(d)(6), 42 U.S.C. 7671c(d)(6). EPA revised the phase-out schedule for methyl bromide production and consumption in a direct final rulemaking on November 28, 2000 (65 FR 70795) (FRL–6906–4), which allowed for the phased reduction in methyl bromide consumption specified under the Protocol and extended the phase-out to 2005. EPA again amended the regulations to allow for an exemption for quarantine and preshipment purposes with an interim final rule on July 19, 2001 (66 FR 37752)(FRL–7014–5) and with a final rule on January 2, 2003 (68 FR 238)(FRL–7434–1).

On December 23, 2004 (69 FR 76982)(FRL–7850–8), EPA published a final rule that established the framework for the CUE; set forth a list of approved critical uses for 2005; and specified the amount of methyl bromide that could be supplied in 2005 from stocks and new production or import to meet the needs of approved critical uses. EPA subsequently published rules applying the CUE framework to the 2006, 2007, 2008, 2009, and 2010 control periods.

Since its introduction in 2004, sulfuryl fluoride has served as an alternative to methyl bromide with regard to methyl bromide's use as a post-harvest commodity fumigant and fumigant for food processing warehouses and facilities. Introduction of sulfuryl fluoride has played a significant role in the United States' reduction of the postharvest methyl bromide CUEs by almost 80% over the last 6 years.

## IV. Regulatory History of Sulfuryl Fluoride

### A. In General

Sulfuryl fluoride is a fumigant that is used to kill insect pests, rodents, birds, and snakes. It is used both for the treatment of structures as well as stored food. Sulfuryl fluoride was initially registered under FIFRA as Vikane®, a fumigant to treat drywood termites and other wood boring insects in 1959. More recently, sulfuryl fluoride was identified as a potential alternative for uses of methyl bromide as a food fumigant and as a fumigant of food processing facilities. It was registered under the name of ProFume® by Dow AgroSciences for these uses in 2004 and 2005. Sulfuryl fluoride has achieved significant penetration of several methyl bromide markets. EPA and Dow AgroSciences have concluded that sulfuryl fluoride is used in approximately 40% of mills and food processing facilities and is used on 100% of cocoa beans. More recently, sulfuryl fluoride has been used extensively in fumigating walnuts and dried fruit other than raisins.

Sulfuryl fluoride rapidly breaks down to form sulfate and the fluoride anion.

### B. 2004 Registration and Tolerances

In 2004, EPA registered sulfuryl fluoride for use as a direct fumigant of various grains and dried fruits under FIFRA and established corresponding tolerances under FFDCA section 408. (69 FR 3240, January 23, 2004)(FRL–7342–1). Tolerances were established for both the parent chemical, sulfuryl fluoride, and the breakdown product, fluoride. (For convenience, both the sulfuryl fluoride and fluoride tolerances established in association with the use of sulfuryl fluoride are, hereinafter, referred to in this document as sulfuryl fluoride tolerances.) Separate risk assessments were conducted for sulfuryl fluoride and fluoride.

In assessing the risk of fluoride, EPA relied on the MCLG that had been established under SDWA to establish a RfD-like value for fluoride. Established in 1986, the fluoride MCLG is 4 mg/L and is based on the adverse effect of crippling skeletal fluorosis. (40 CFR 141.41). As was the case with the MCLG, EPA determined that dental fluorosis was not an adverse effect and thus was not an appropriate benchmark for evaluating the safety of fluoride under FFDCA. EPA also determined that, "given the wealth of reliable human data on fluoride," the presumptive additional 10X children's safety factor could be removed. (69 FR 3253) (FRL–7342–1). Using the MCLG in combination with high-end water consumption information and body weights for age subgroups from infants through adults, EPA calculated safe fluoride levels on a milligram of fluoride per kilogram of body weight per day (mg/kg/day) basis. (69 FR 3248) (FRL–7342–1). These RfD-like values were compared to estimated aggregate exposure levels to fluoride from numerous sources: From use of the pesticides sulfuryl fluoride and cryolite on food; from natural and artificial levels of fluoride in drinking water; from background levels of fluoride in beverages, food, and ambient air; and from fluoride in dental products. Because aggregate exposure for each of

the age-based population subgroups fell below the calculated RfD-like values, EPA concluded that the tolerances were safe.

Although FAN did not submit comments on the notice announcing Dow AgroSciences' petition for tolerances, FAN had submitted objections to an earlier sulfuryl fluoride tolerance action. That earlier tolerance action was the establishment of temporary tolerances for sulfuryl fluoride on various grains and dried fruits in conjunction with an experimental use permit for sulfuryl fluoride under FIFRA section 5. (7 U.S.C. 136c). Sulfuryl fluoride was never used under that experimental permit and the temporary tolerances were revoked with the establishment of the 2004 tolerances. However, EPA treated the FAN objections as comments on the petition for tolerances and responded to them in detail in promulgating the 2004 tolerances. (Refs. 13, 14 and 15). Because EPA recognized that the NAS was undertaking a comprehensive evaluation of the latest data on fluoride, EPA noted that its review of the data submitted by FAN was preliminary and subject to reevaluation once the NRC Report was complete. (Ref. 14).

On March 23, 2004, FAN, joined by Beyond Pesticides, filed objections to the 2004 tolerances and requested a hearing on those objections. (*See* Unit IV.D.).

### C. 2005 Registration and Tolerances

In 2005, EPA registered sulfuryl fluoride for use as a direct fumigant on additional commodities and also as a structural fumigant for food processing facilities under FIFRA and established corresponding tolerances under FFDCA section 408. (70 FR 40899, July 15, 2005) (FRL–7723–7). Again, EPA relied on the MCLG in assessing the aggregate risk to fluoride, taking into account the additional fluoride exposure from the new uses. (*Id.* at 40905). EPA also assessed fluoride risk using the Point of Departure suggested by NAS' Institute of Medicine for evaluating the risk of crippling skeletal fluorosis. (*Id.* at 40906). Under both approaches, EPA concluded that the tolerances were safe.

FAN submitted comments on the notice announcing Dow AgroSciences' petition for tolerances. EPA prepared a detailed response to these comments. (Ref. 16).

On September 13, 2005, FAN, joined by Beyond Pesticides and the Environmental Working Group, filed objections to the 2005 tolerances and requested a hearing on those objections. (*See* Unit IV.D.).

### D. The 2006 NRC Report

In 2003, EPA's Office of Water (OW) asked the NRC to review new research on fluoride to determine whether the MCLG and SMCL for fluoride established under SDWA adequately protect the public health. (Ref. 17 at xii). Specifically, EPA asked NRC "to review toxicologic, epidemiologic, and clinical data on fluoride—particularly data published since NRC's previous (1993) report—and exposure data on orally ingested fluoride from drinking water and other sources * * *," and "to evaluate independently the scientific basis of EPA's MCLG of 4 mg/L and SMCL of 2 mg/L in drinking water and the adequacy of those guidelines to protect children and others from adverse health effects." (*Id.* at 2). NRC was also asked to identify data gaps and to make recommendations for future research relevant to setting the MCLG and SMCL for fluoride." (*Id.*).

NRC completed its report in March 2006. Its overall conclusions were that: (1) "EPA's MCLG of 4 mg/L should be lowered;" (2) further study was needed to assess the protectiveness of the SMCL of 2 mg/L; and (3) "EPA should update the risk assessment of fluoride to include new data on health risks and better estimates of total exposure (relative source contribution) in individuals and to use current approaches to quantifying risk, considering susceptible subpopulations, and characterizing uncertainties and variability." (*Id.* at 352).

NRC's decision as to the MCLG was driven by its concern regarding the fluoride exposure levels that produce the following effects: Severe enamel fluorosis (referred to in this document generally as severe dental fluorosis); clinical stage II skeletal fluorosis; and bone fractures. (*Id.*). Previously, all forms of dental fluorosis had been regarded merely as cosmetic effects and thus not properly considered in setting a MCLG. In the 2006 Report, NRC stated that: "The damage to teeth caused by severe enamel fluorosis is a toxic effect that the majority of the committee judged to be consistent with prevailing risk assessment definitions of adverse health effects." (*Id.* at 127). NRC reasoned as follows:

Severe enamel fluorosis is characterized by enamel loss and pitting. This damage compromises enamel's protective barrier and can make the teeth more susceptible to environmental stresses and to caries formation because it allows bacteria, plaque, and food particles to become entrapped in the enamel. Caries is dental decay caused by bacterial infection. When the infection goes unchecked, cavities may form that can cause toothache and tooth sensitivity to

temperature and sweets. If cavities are untreated, the infection can lead to abscess, destruction of bone, and spread of the infection to other parts of the body. While increased risk of caries has not been firmly established, the majority of the committee found that destruction of the enamel and the clinical practice of treating the condition even in the absence of caries provide additional lines of evidence for concluding that severe enamel fluorosis is an adverse health effect.

(*Id.* at 346) (citation omitted).

Two of the 12 members of the NRC committee "did not agree that severe enamel fluorosis should now be considered an adverse health effect" and would have characterized it as an "adverse dental effect." (*Id.*). Nonetheless, these two committee members concurred in the overall NRC conclusion that the MCLG should protect against this effect. Specifically, the Report stated: "Despite their disagreement on characterization of the condition, these two members concurred with the committee's conclusion that the MCLG should prevent the occurrence of this unwanted condition." (*Id.*). Turning to the level of exposure that can cause severe dental fluorosis, NRC concluded that such fluorosis occurs at an "appreciable frequency" in communities with water supplies containing at or near 4 mg/L but that "the prevalence of severe enamel fluorosis would be reduced to nearly zero by bringing the water fluoride levels in these communities down to below 2 mg/L." (*Id.* at 127– 128).

As to skeletal fluorosis, NRC concluded that the MCLG should not be based solely on stage III (crippling) skeletal fluorosis but also take into account stage II skeletal fluorosis (the stage before mobility is significantly affected). Although the data on what level of fluoride exposure was need to cause stage II skeletal fluorosis was inconclusive, NRC ventured that the data "suggest[] that the MCLG might not protect all individuals from the adverse stages of the condition." (*Id.* at 347). NRC advised that "more research is needed to clarify the relationship between fluoride ingestion, fluoride concentrations in bone, and stage of skeletal fluorosis." (*Id.*).

NRC found the evidence on the level of fluoride exposure which could lead to an increased risk of bone fracture to be somewhat more compelling. There was general agreement by NRC with the proposition "that there is scientific evidence that under certain conditions fluoride can weaken bone and increase the risk of fractures." (*Id.* at 348). Further, "the majority of the committee

concluded that lifetime exposure to fluoride at drinking water concentrations of 4 mg/L or higher is likely to increase fracture rates in the population, compared with exposure to 1 mg/L, particularly in some demographic subgroups that are prone to accumulate fluoride into their bones (*e.g.*, people with renal disease)." (*Id.*). Three members of the NRC committee reached a more tempered conclusion suggesting that "the evidence only supported a conclusion that the MCLG *might not* be protective against bone fracture." (*Id.*) (emphasis in original).

Turning to the SMCL, NRC noted that, even if this standard now only addresses, at worst, moderate dental fluorosis, the 2 mg/L "SMCL does not completely prevent the occurrence of moderate enamel fluorosis." (*Id.* at 352). Specifically, NRC found that "[p]ast evidence indicated an incidence range of 4% to 15% (50 FR 20164 [1985])." (Ref. 17 at 130). NRC indicated that "[t]he prevalence of moderate cases that would be classified as being of aesthetic concern (discoloration of the front teeth) is not known but would be lower than 15%." (*Id.*). In the end, NRC recommended further study of U.S. communities with drinking water fluoride levels of greater than 1 mg/L to better characterize the degree and consequences of moderate dental fluorosis and the levels at which these effects occur. (*Id.* at 352–353).

NRC also examined in detail whether fluoride caused reproductive, developmental, neurotoxic, neurobehavioral, or cancer effects or had adverse effects on the endocrine, gastrointestinal, renal, hepatic, and immune systems. Although NRC recommended further study with regard to many of these effects, it did not conclude that any of these potential effects warranted a lowering of the MCLG.

A substantial portion of the NRC Report is devoted to examining fluoride exposure in the United States. NRC considered exposures from drinking water; background levels in food, beverages, soil, and air; residues in food from pesticide usage; and dental products. Drinking water was generally the most significant source but certain age groups' exposures from background levels in food and water and from dental products were not insubstantial. (*Id.* at 60, Fig.2–1). NRC summarized the information on fluoride levels in water from public systems as follows:

Of the 144 million people with fluoridated public water supplies in 1992, approximately 10 million (7%) received naturally fluoridated water, the rest had artificially fluoridated water. Of the population with artificially fluoridated water in 1992, more than two-thirds had a water fluoride concentration of 1.0 mg/L, with almost one-quarter having lower concentrations and about 5% having concentrations up to 1.2 mg/L.

Of the approximately 10 million people with naturally fluoridated public water supplies in 1992, approximately 67% had fluoride concentrations ≤ 1.2 mg/L. Approximately 14% had fluoride concentrations between 1.3 and 1.9 mg/L and another 14% had between 2.0 and 3.9 mg/L; 2% (just over 200,000 persons) had natural fluoride concentrations equal to or exceeding 4.0 mg/L.

(*Id.* at 25) (citations omitted).

As to persons who rely on private water sources, NRC noted:

Little information is available on the fluoride content of private water sources, but the variability can reasonably be expected to be high and to depend on the region of the country. Fluoride measured in well water in one study in Iowa ranged from 0.06 to 7.22 mg/L (mean, 0.45 mg/L); home-filtered well water contained 0.02–1.00 mg/L (mean, 0.32 mg/L). Hudak (1999) determined median fluoride concentrations for 237 of 254 Texas counties (values were not determined for counties with fewer than five observations). Of the 237 counties, 84 have median groundwater fluoride concentrations exceeding 1 mg/L; of these, 25 counties exceed 2 mg/L and five exceed 4 mg/L. Residents in these areas (or similar areas in other States) who use groundwater from private wells are likely to exceed current guidelines for fluoride intake.

(*Id.* at 25–26).

### E. The Objectors' Objections and Hearing Requests

1. *Procedural history.* The Objectors have filed several sets of objections and hearing requests on the 2004 and 2005 tolerance actions as a result of various preliminary responses by EPA to FAN's requests for hearing. As noted, the Objectors filed objections and hearing requests on March 23, 2004, as to the 2004 tolerance action. On June 4, 2005, EPA responded by letter to the Objectors' hearing request noting numerous potential flaws in the request and giving the Objectors 90 days to respond to the issues raised. On July 15, 2005, EPA issued additional tolerances for sulfuryl fluoride/fluoride and on September 13, 2005, the Objectors submitted objections and hearing requests as to these tolerances. Then, on December 16, 2005, Objectors submitted a revised set of objections and hearing requests in response to EPA's earlier letter. EPA responded to the December 16, 2005 filing on February 13, 2006, seeking further clarification on several issues and giving the Objectors 90 days to respond. On November 6, 2006, the Objectors filed a second set of revised objections and hearing requests that consolidated their objections to both the 2004 and 2005 tolerance actions. (Ref. 3).

The Objectors have made two additional filings with EPA. First, on June 1, 2006, the Objectors filed with EPA a motion for a stay of 2004 and 2005 tolerance actions. (Ref. 2). This stay request was largely in response to the NRC Report on fluoride. Second, in February 2009, the Objectors filed a collection of 18 studies addressing potential effects of fluoride exposure on IQ levels in children. (Ref. 18).

2. *Consolidated objections and hearing requests.* The Objectors' consolidated objections and hearing requests filed in November, 2006, raise six main arguments:

• The fluoride MCLG is not protective of the effects of fluoride on teeth and bones;

• The fluoride MCLG is not protective of other neurotoxic, endocrine, and renal effects of fluoride;

• EPA has not adequately protected children;

• EPA cannot determine the safety of sulfuryl fluoride and fluoride in the absence of a developmental neurotoxicity study;

• EPA has underestimated exposure to fluoride; and

• EPA has committed procedural errors in violation of the Administrative Procedures Act (APA) (5 U.S.C. 551 *et seq.*).

The Objectors argue that the 4 mg/L MCLG for fluoride does not provide adequate protection against severe dental fluorosis, pre-crippling skeletal fluorosis, and increased risk of bone fractures. The Objectors cite to government and literature studies documenting the significant consequences from severe dental fluorosis: "The enamel of the teeth become so porous that the teeth are 'prone to fracture and wear' (ATSDR 2003), 'subject to extensive mechanical breakdown of the surface' (Aoba & Fejerskov 2002), with a 'friable enamel that can result in loss of dental function' (Burt & Eklund 1999)." (Ref. 3 at 16). On pre-crippling skeletal fluorosis, the Objectors assert that pre-crippling skeletal fluorosis can be a painful condition for some people. (*Id.* at 19). Finally, the Objectors cite to many studies on the risk of increased bone fractures from fluoride exposure that allegedly show that these increased risks occur at fluoride exposure levels lower than those in communities with drinking water levels of 4 mg/L. (*Id.* at 22–24).

The Objectors also argue that the 4 mg/L MCLG for fluoride does not

protect against fluoride's effects on the brain, the endocrine system, and the kidneys. The Objectors cited a study in rats allegedly showing brain damage at a fluoride exposure level in water of 1 ppm [1 mg/L] and epidemiological studies showing reductions in IQ levels in children at a fluoride exposure level of 0.9 ppm [0.9 mg/L] in iodine-deficient areas and 1.8 ppm [1.8 mg/L] in areas with sufficient iodine in the diet. (*Id.* at 25–26). As to the endocrine system, the Objectors reference the NRC Report's conclusion that fluoride is an "endocrine disruptor" and argue that fluoride can have adverse effects on insulin secretion and on the thyroid. (*Id.* at 31–35). The Objectors argue that fluoride can affect insulin secretion where drinking water contains 4 mg/L or less of fluoride, (*Id.* at 33), and that NRC has concluded that thyroid effects can occur at exposure levels as low as 0.01–0.03 mg/kg/day for iodine-deficient humans, (*Id.* at 35). As to the kidneys, the Objectors claim that data show that adverse effects can occur when exposure levels in water are at the 1 and 2 mg/L level. (*Id.* at 38–39).

With regard to the safety of children, the Objectors assert that EPA, without basis or explanation, has applied a significantly less protective RfD to infants and children than the RfD applicable to adults. The Objectors note that prior to the promulgation of the 2004 fluoride tolerances EPA had utilized a RfD of 0.114 mg/kg/day for all population age groups. (*Id.* at 59). The Objectors point out, however, that, in both the 2004 and 2005 tolerance actions, EPA increased the RfD for several of the infant and children age groups to levels that are allegedly as much as 10 times higher than the RfD for adults. This higher RfD for infants and children, the Objectors argue, is inconsistent with the statutory requirement for providing an additional margin of safety for infants and children, the basic toxicological principle that bodyweight affects the impact of a chemical, data showing adverse effects at levels below the RfD levels, and data showing that children's bones are more sensitive to fluoride than adult's bones. (*Id.* at 58–67). Further, the Objectors assert that EPA failed to take into account, in its decision on the safety of fluoride to infants and children, the uncertainty in the database concerning fluoride's neurotoxic effects, and fluoride's effects on the endocrine system. (*Id.* at 68–70).

A developmental neurotoxicity study on sulfuryl fluoride, the Objectors claim, is critical to understanding the potential harmful effects of sulfuryl fluoride and fluoride. They argue that EPA's reasons for waiving the study lack merit and that a developmental neurotoxicity study is mandated given NRC's conclusion that fluoride is neurotoxic and that effects on the brain, including nerve and severe effects, were seen in animal studies with sulfuryl fluoride. (*Id.* at 72–79).

Turning to human exposure to fluoride, the Objectors argue that EPA has underestimated fluoride exposure and corrected fluoride values show that some people are exposed to unsafe levels of fluoride. The Objectors claim EPA made numerous errors in estimating fluoride exposure: (1) EPA underestimated average fluoride levels in water, (*Id.* at 81–82); (2) EPA considered only average water and food consumption levels instead of taking into account the full range of consumption amounts, (*Id.* at 82–84, 105–106); (3) EPA underestimated fluoride exposures from toothpaste, (*Id.* at 88–91); and (4) EPA had insufficient data to estimate residues of fluoride on food from fumigation with sulfuryl fluoride (*Id.* at 106). The Objectors contend that a risk assessment using corrected exposure values will show that hundreds of thousands of people exceed the 0.114 mg/kg/day RfD and that millions of people would exceed a RfD set based on an endpoint of severe dental fluorosis. (*Id.* at 86, 94–95).

Finally, the Objectors claim that EPA has made several procedural errors that violate the dictates of the APA. First, the Objectors argue that EPA has unreasonably delayed responding to their objections and hearing requests filed in March 2004. Second, the Objectors argue that EPA erred by not making its risk assessment available at the time of issuance of the 2005 tolerance action. Third, EPA's failure to place all requested documents in the record, according to the Objectors, has thwarted full public participation. Fourth, the Objectors assert it was a procedural error for EPA to issue sulfuryl fluoride tolerances without first obtaining the advice of NRC.

The Objectors have also sought an adjudicatory hearing on each of these objections. In support of their hearing request, the Objectors have submitted all the data referenced in their consolidated objections.

### F. The Objectors' Stay Request

On June 1, 2006, the Objectors filed a motion with EPA seeking a stay of the effectiveness of the 2004 and 2005 final rules establishing sulfuryl fluoride tolerances. A stay of the effectiveness of these rules would essentially ban use of sulfuryl fluoride because if the tolerances are not effective then any sulfuryl fluoride or fluoride residue remaining in treated foods would render the food adulterated under FFDCA and subject to seizure. This stay request appears to have been triggered by the March 2006 release of the NRC Report on fluoride. (Ref. 2 at 4). The Objectors argued they were entitled to a stay because they had demonstrated (1) that they were likely to prevail on the merits of their objections; (2) the tolerances posed an imminent, substantial and irreparable harm; (3) no other parties would be substantially harmed by a stay; and (4) the public interest supported a stay. (*Id.* at 2). EPA held a 30-day comment period on the stay request. (71 FR 38125, July 5, 2006) (FRL–8075–6).

To support their likelihood of success on the merits argument, the Objectors make similar arguments to those contained in their consolidated objections. As to irreparable harm, the Objectors cite to the NRC Report claiming it linked fluoride not just to adverse effects on bones and teeth but also to interactive and synergistic toxic effects with other chemicals, cancer, and diabetes, as well as adverse effects on the brain, thyroid, pineal gland, kidney, liver, and the endocrine, immune, gastrointestinal, and reproduction systems. (Ref. 2 at 11, 13–15). Further, the Objectors cite to the "high levels of fluoride from pesticides" arguing that "[a]s a result of these broad-reaching, staggeringly high fluoride tolerances, EPA's own data show that sulfuryl fluoride will become the second largest daily source of fluoride in the US." (*Id.* at 3, 35). The Objectors assert that other parties, including Dow AgroSciences, will not be substantially harmed "in view of the overwhelming concern for public health at the heart of the statute." (*Id.* at 36). Finally, the Objectors argue the public interest favors a stay because a stay would protect the public health. (*Id.* at 37).

### G. Comments of Dow AgroSciences

Dow AgroSciences has filed two sets of comments on these matters. First, Dow AgroSciences filed comments on the Objectors' request for a stay of the effectiveness of the sulfuryl fluoride tolerances during the public comment period during mid-2006. (Ref. 19). Second, in October 2006, Dow AgroSciences submitted a memorandum to EPA arguing that the Objectors' were not entitled to a hearing on their objections. (Ref. 20).

1. *Comments on stay request.* In its comments, Dow AgroSciences offered a series of reasons as to why a stay was not warranted. First, Dow AgroSciences argues that EPA should follow the

already-established process for how the sulfuryl fluoride/fluoride tolerances would be reviewed in light of the NRC Report. This process, according to Dow AgroSciences, involves an analysis of the NRC Report by EPA's OW followed by a re-evaluation of the tolerances by EPA's OPP. (Ref. 19 at 6–7). Dow AgroSciences asserts that "[a]bandoning now a process established by the Agency and relied upon by SF registrants and the scientific community would be arbitrary, unfair and unwarranted." (*Id.* at 7).

Second, Dow AgroSciences argues that the stay request is delinquent because it was not filed within 60 days of issuance of the final tolerance actions. (*Id.* at 8). Dow AgroSciences bases this claim on the statutory requirement that objections to a tolerance must be filed within 60 days of issuance.

Third, Dow AgroSciences claims that a stay of the tolerance action is inappropriate because the stay request does not address "the underlying ProFume registration under FIFRA * * *." (*Id.* at 10). According to Dow AgroSciences, "[b]ypassing the hearing rights and other procedural requirements provided by FIFRA would deny Dow AgroSciences and other adversely affected parties their due process rights under the U.S. Constitution." (*Id.* at 9).

Fourth, Dow AgroSciences argues that the NRC Report only indicates a concern for "that small, localized segment of the population exposed to high *natural* fluoride levels." (*Id.* at 12). Such "an exceedingly small, isolated number of individuals," Dow AgroSciences contends, would not constitute a "major identifiable" subgroup which is the regulatory focus under FFDCA section 408. (*Id.*).

Fifth, Dow AgroSciences challenged the Objectors' claims that the NRC Report showed that there is a safety concern with fluoride. Dow AgroSciences noted that as to many potential health effects the NAS had either concluded that no risks were present from exposure in drinking water at 4 mg/L or there was insufficient data showing effects and more study was necessary. (*Id.* at 14). With regard to fluoride's effects on the risk of bone fractures, Dow AgroSciences argues that EPA had previously dismissed the value of two studies on which NRC relied and implies that NRC did not give proper weight to a recent study from the University of Michigan. (*Id.* at 15–16). Further, Dow AgroSciences claims that NRC actually had little concern for a potential link between fluoride and stage II skeletal fluorosis. According to

Dow AgroSciences, NRC emphasized insufficiency of data on this effect and merely called for more research. (*Id.* at 18). Finally, Dow AgroSciences contends that NRC stepped beyond its competence in offering advice on the legal conclusion of whether severe dental fluorosis is an adverse health effect. (*Id.* at 19). Dow AgroSciences notes that a prior NRC panel had declined to make this ultimate conclusion and that a prior court ruling had indicated this was a question of statutory interpretation under SDWA. (*Id.* at 19–20). Switching tacks, Dow AgroSciences then argues there is a dispute within the scientific community as to whether severe dental fluorosis is an adverse effect. (*Id.* at 20).

Sixth, Dow AgroSciences argues that EPA is not authorized to consider exposure to fluoride from artificial fluoridation of public water supplies in evaluating the safety of the sulfuryl fluoride/fluoride tolerances. (*Id.* at 21). Although acknowledging that FFDCA section 408 directs EPA to consider "aggregate exposure" to both pesticides and other related substances, Dow AgroSciences contends that "[i]t is unnecessarily strained and counterintuitive to set tolerances for pesticides in or on food by looking at the therapeutic use of chemically related substances in humans." (*Id.*). As support for this proposition, Dow AgroSciences asserts that the definition of "pesticide chemical residue" limits EPA to considering pesticide chemicals and their degradates and metabolites. Further, Dow AgroSciences claims that the most plausible reading of the term "other related substances" is that this term covers other related "pesticidal" substances. (*Id.*at 22).

Finally, Dow AgroSciences claims that EPA overestimated exposure to fluoride from use of sulfuryl fluoride. Specifically, Dow AgroSciences states that its records show that sulfuryl fluoride has been utilized less extensively than EPA projected and at lower rates than EPA expected. (*Id.* at 34–35). When more realistic values are used in the exposure assessment, Dow AgroSciences contends that fluoride exposure from use of sulfuryl fluoride declines by over 80%. (*Id.* at 35).

2. *Comments on the hearing requests.* In a memorandum submitted to EPA in October 2006, Dow AgroSciences offered several reasons as to why the Objectors were not entitled to a hearing on their claims. First, Dow AgroSciences argues that many of the issues raised by the Objectors fail to state a material issue of fact because they are contingent in nature or otherwise fail to raise a disputed matter.

(Ref. 20 at 9). Second, Dow AgroSciences claims that a number of the Objectors' issues dispute science policy determinations by EPA and thus do not constitute a matter of fact to be resolved at a hearing. (*Id.* at 11). For example, Dow AgroSciences identifies EPA conclusions regarding issues such as what constitutes a "conservative assumption," a "significant subpopulation," or an "adverse health effect" as decisions based on policy, as opposed to factual, reasons. Third, Dow AgroSciences asserts that the Objectors' claim of procedural errors by EPA is a legal issue not appropriate for a hearing. Fourth, Dow AgroSciences argues that many of the Objectors' claims are "no more than mere disagreements with Agency determinations made in earlier stages of the rulemaking process." (*Id.* at 12–13). According to Dow AgroSciences:

In many instances, Objectors support their issues by citing to studies that have already been reviewed by EPA and have, either expressly or effectively, been found scientifically inadequate, procedurally flawed, or lacking in the requisite amount of empirical support. Objectors cite to these studies in spite of the clear edict that "[m]ere differences in the weight or credence given to particular scientific studies * * * are insufficient" to prompt EPA to hold a hearing. [citation omitted]. Clearly, Objectors disagree with EPA's interpretations of these studies, but such disagreement is irrelevant in the Agency's decision to grant a hearing on the objections submitted.

(*Id.* at 13).

Fifth, Dow AgroSciences contends that the Objectors have not submitted sufficient evidence in support of their claims based on Dow AgroSciences' conclusion that the NRC Report, upon which the Objectors rely, does not in fact substantiate the Objectors' position. (*Id.*) Finally, even where the NRC Report does support the Objectors' claims, Dow AgroSciences asserts that a hearing is not appropriate because the NRC Report was performed under the aegis of SDWA to review the fluoride MCLG and SMCL and not the sulfuryl fluoride/fluoride tolerances and because the NRC Report did not generate new data but simply reviewed studies already examined by EPA. (*Id.* at 17–18). Dow AgroSciences concludes that the "NRC's differences in opinion on the three issues detailed below [bone fracture, skeletal fluorosis, severe dental fluorosis] are just that—mere differences of opinion—and should be evaluated as such." (*Id.* at 18).

**V. EPA's Proposed Response to the Objections**

EPA is proposing to grant the objections to the establishment of the

sulfuryl fluoride/fluoride tolerances based on EPA's agreement with the Objectors that (1) fluoride risks should be assessed based upon a more sensitive endpoint than crippling skeletal fluorosis; and (2) assessing fluoride risks on a more sensitive endpoint shows that aggregate exposure to fluoride for major identifiable subgroups does not meet the safety standard in FFDCA section 408. In reaching this conclusion, EPA has taken into account, in addition to the arguments and data submitted by the Objectors, the 2006 NRC Report on fluoride, the detailed analysis of that Report and followup peer-reviewed assessment of fluoride by EPA's OW, and a revised risk assessment of fluoride performed by EPA's OPP in light of the NRC Report, and usage information submitted by Dow AgroSciences. (All of these materials have been included in the docket for this action.). The conclusions of the NRC Report are described in Unit IV.D. In Units V.A. and V.B., EPA summarizes OW's reassessment of fluoride risk undertaken on the recommendation of NRC, OPP's revised fluoride risk assessment, and sets forth EPA's proposed findings on the safety of the sulfuryl fluoride tolerances. Unit V.C. addresses comments from Dow AgroSciences pertaining to the safety of fluoride, and in particular, the conclusions of the NRC Report on fluoride safety. EPA is inviting public comment on all aspects of this proposal, including the underlying scientific documents discussed in Units V.A and V.B.

*A. OW's Reassessment of Fluoride Risk*

One of the principal conclusions of the NRC Report was that EPA "should update the risk assessment of fluoride to include new data on health risks and better estimates of total exposure (relative source contribution) in individuals and to use current approaches to quantifying risk, considering susceptible subpopulations, and characterizing uncertainties and variability." (Ref. 17 at 352). As the NRC Report was prepared in the context of evaluating the fluoride MCLG and SMCL for drinking water, EPA's OW took the lead in preparing this revised fluoride risk assessment. OW's risk assessment was broken into two parts: (1) A dose-response analysis directed at establishing a RfD for fluoride; and (2) an exposure and relative source contribution analysis that catalogued and estimated the various sources of fluoride exposure and characterized the risk of that exposure. EPA's OPP contributed information on exposure to fluoride from use of the pesticides sulfuryl fluoride and cryolite (which

also breaks down to fluoride). Both parts of the OW risk assessment were subjected to an external peer review by scientific experts.

1. *Dose-response analysis.* OW's dose-response analysis focused on "examining available dose-response data for the critical noncancer effects of fluoride on teeth and bone identified by NRC (2006) as adverse health effects." (Ref. 21 at 1). For the most part, OW relied on the extensive database of epidemiological studies evaluating the relationship between the level of fluoride in drinking water and severe dental fluorosis, dental caries, and stage II skeletal fluorosis. OW noted a preference for older studies because determination of fluoride exposure levels in more recent studies is made more difficult by "the widespread use of fluoride-containing dentifrices and mouth rinses, the use of fluoride supplements in early childhood, and the potential presence of fluoride in processed foods and beverages (a result of the use of fluoridated water in the preparation of these products)." (*Id.* at 9).

a. *Dental fluorosis.* OW reviewed dozens of epidemiological studies bearing on the relationship of fluoride exposure to severe dental fluorosis. OW concluded that these studies supported the NRC Report conclusion that "the weight of evidence indicates that the threshold for severe dental fluorosis occurs at a water fluoride level of about 2 mg/L." (*Id.* at 35). OW also concluded that one study in particular, Dean (1942), provided the best data set for conducting a dose-response analysis. (*Id.*). In reaching this conclusion, OW undertook a detailed examination of the strengths and weaknesses of the study. OW summarized the strengths as follows:

[The study was selected] due to its large size and geographic scale (22 U.S. communities in 10 States; 5824 children), range of fluoride concentrations evaluated (from 0.0 to 14.1 mg/L), and selection of an appropriate age class (school children primarily between the ages of 9 and 14; an age class in which a very high percentage of permanent teeth have erupted). In addition, every tooth per subject was examined using the same scoring protocol, and the community water supplies were tested for fluoride content by the same chemist. This dataset is sufficiently large and robust to support statistical analysis, the protocol is sound, and there were few alternate sources of commercially available fluoride (*e.g.,* mouthwash, detrifrice, *etc.*) or fluoridated community water supplies to confound the dental fluorosis data collected by Dean (1942) at the time this study was conducted (late 1930's and early 1940's).

(*Id.* at 92) (citations and internal cross-references omitted). Study weaknesses, identified by OW, included the lack of data on water intake amounts and fluoride exposure from food and the fact that the analytical method used for measuring fluoride was not as sensitive to fluoride and free from sensitivity to interfering substances as current fluoride methods. (*Id.* at 12–13). Additionally, although the time period of the study (late 1930's through early 1940's) makes assessing fluoride exposure levels relatively easier than it is today, the time period also raises uncertainties due to differences between the late 1930's/early 1940's and today with regard to "dental hygiene, dietary intakes, body weights and puberty/hormonal condition (*e.g.,* age of menarche)." (*Id.* at 13). OW concluded that the lack of information relating to exposure from food and water could be overcome, to a large extent, by other data. (*Id.* at 103–105; Appendix C). As to the analytical method, OW found that it was "sensitive to small increments of fluoride over a range of 0.0 ppm to 3.0 ppm, the critical range for assessing the threshold for severe [dental] fluorosis. * * * " (*Id.* at 13). A full discussion of the study can be found in the OW's dose-response report. (*Id.* at 10–13, 87–94, 103–107).

OW also reviewed a smaller set of studies examining the relationship between dental fluorosis and dental caries and the relationship between fluoride levels in drinking water and dental caries. These data were examined to assess whether "[t]he relationship between caries and fluoride exposure displays the U-shaped dose-response that characterizes many nutrients where there are adverse effects with intakes that are below those that confer a benefit and adverse effects with intakes that are greater than those with benefit." (*Id.* at 37). After closely examining all of the data, OW concluded:

Although the data are supportive of NRC (2006) conclusions regarding enamel pitting they are moderately rather than strongly consistent with the hypothesis that the pitting of the enamel leads to an increased risk for caries. Socioeconomic status, availability of dental care, and personal dental hygiene habits are likely to confound the results from individual studies of the caries relationship. For this reason, OW has selected the pitting of the dental enamel as the critical effect for the dose-response analysis. EPA finding on the caries association is consistent with NRC (2006) that the "available evidence is mixed but generally supportive".

(*Id.* at 64).

b. *Skeletal fluorosis.* After reviewing the limited data available on the

relationship between fluoride exposure and stage II skeletal fluorosis, OW concluded that "the currently available data are not sufficiently robust to support a dose-response analysis of the effects of fluoride in drinking water on the skeletal fluorosis." (*Id.* at 84). Specifically, OW found that the limited data "suggested that a daily fluoride dose in excess of 10 mg may be required to produce signs of stage II skeletal fluorosis (except possibly in the case of individuals with renal disease)." (*Id.* at 83). OW also noted that the NRC Report called attention to the fact that a drinking water fluoride level of 4 mg/L can result in bone fluoride levels similar to those associated with stage II or III skeletal fluorosis; however, OW concluded that "because of inconsistencies in the entire data set, it is unlikely that bone fluoride concentration can be used in a dose-response analysis of skeletal fluorosis." (*Id.* at 65).

c. *Bone fractures.* OW found that more data were available on fluoride's potential effect on bone fractures than skeletal fluorosis. OW concluded that these data (1) "in general, support the conclusions of NRC that relative risk of fracture increases with increasing fluoride concentration * * *." (*Id.* at 84); and (2) "indicate[ ] that exposure to concentrations of fluoride in drinking water of 4 mg/L and above is suggestive of and appears to be positively associated with increased relative risk of bone fractures in susceptible populations when compared to populations exposed to 1 mg F/L." (*Id.* at 86). Nonetheless, OW also determined that "there is no clear evidence that fluoride will cause * * * bone fractures at levels as low as those associated with severe dental fluorosis." (*Id.* at 86). In a parallel to fluoride's effect on the frequency of dental caries, OW noted that there are some data suggesting that there is a U-shaped dose-response curve for fluoride's effect on the risk of bone fracture. Agreeing with the NRC Report, OW stated that fluoride in drinking water at 1 mg/L may result in a reduction of bone fractures compared to either higher or lower fluoride exposures. (*Id.* at 84).

d. *Quantification of dose response.* OW's examination of the data on severe dental fluorosis, stage II skeletal fluorosis, and bone fractures led it to conclude that severe dental fluorosis was the adverse effect due to fluoride exposure likely to occur at the lowest exposure level. (*Id.* at 87). As indicated previously, OW also identified the 1942 Dean study as presenting the most useful data for conducting a dose-response assessment. (*Id.*). To confirm

the appropriateness of using the data from the Dean study for a dose-response analysis, OW analyzed the data under a statistical procedure known as categorical analysis. That analysis showed that "fluoride concentration in this dataset is significantly and positively associated with severity of effect ($\chi 2 = 1101.86$, p <0.0001)." (*Id.* at 89). OW then used the Benchmark Dose approach to compute a benchmark dose (BMD) and a benchmark dose confidence limit (BMDL) for severe dental fluorosis at various severe dental fluorosis response rates. The lowest response rate of severe dental fluorosis within the range of probability that the dataset could support was severe dental fluorosis affecting at least 0.5% of the population exposed to fluoride at a particular level in drinking water. (*Id.* at 90–91). At a severe dental fluorosis response rate of 0.5%, the BMD for the concentration of fluoride in drinking water was 2.14 mg/L and the BMDL was 1.87 mg/L. OW ran various sensitivity analyses to confirm these results including comparing them to the NOAEL/LOAEL approach. These analyses supported the use of the BMDL from the Dean study data.

To establish a RfD, it was necessary to convert the 1.87 mg/L fluoride concentration in drinking water into an exposure value in terms of milligram of exposure per kilogram of body weight per day (mg/kg/day) and to take into account any other sources of fluoride exposure (also in terms of mg/kg/day). Because the Dean study did not record drinking water intakes or body weight, OW converted the 1.87 mg/L level using more recent data on drinking water intake and body weight. OW calculated exposure values from consumption of drinking water containing 1.87 mg/L for different age groups of children and at different levels of water intake within those age groups. After examining the range of values produced by this exercise, OW chose the value of 0.07 mg/kg/day as the contribution of drinking water to the fluoride RfD at the time of the Dean (1942) study (values ranged from 0.04 mg/kg/day to 0.19 mg/kg/day). That value was chosen because it was the most protective value assuming average water intake that provided some margin of safety above the IOM's minimum adequate intake level for fluoride of 0.05 mg/kg/day. (*Id.* at 101–102). OW concluded that the only other meaningful fluoride exposure at the time of the Dean study was from fluoride in food and OW estimated that exposure to be 0.01 mg/kg/day based on data collected in the same time period of the Dean study. (*Id.* at 104).

Combining these two values yields 0.08 mg/kg/day. Because the 0.08 mg/kg/day value only marginally exceeds the adequate intake value of fluoride and the value was primarily derived from a human study with a large sample size, OW determined that no safety or uncertainty factors were needed in computing the RfD for fluoride. (*Id.* at 105–106) Thus, 0.08 mg/kg/day was chosen as the fluoride RfD. Although the RfD is based on the endpoint of severe dental fluorosis in children, OW concluded that "the RfD is applicable to the entire population since it is protective for the endpoints of severe fluorosis of primary teeth, skeletal fluorosis and increased risk of bone fractures in adults." (*Id.* at 107).

OW described its confidence in the RfD as "medium." (*Id.*). OW's degree of confidence turned on its analysis of the data in the Dean study. On one hand, OW noted that the Dean study was:

• Internally consistent as evidenced by the BMD stability when end points at the high and low end of the curve were removed,

• Supported by later studies on some of the same water sources showing similar concentrations,

• Used average concentration values from 12 consecutive months for all but the three systems with the highest prevalence of severe dental fluorosis, thereby compensating for potential individual and seasonal variation,

• Based on water quality data from the same time period, and not likely to have been compromised by high levels of interfering substances.

(*Id.* at 106–107) On the other hand, OW found that some uncertainty flowed from its reliance on the Dean study because of the difficulties encountered in converting the concentration-response data to dose estimates for the RfD derivation. (*Id.* at 107).

2. *Exposure assessment.* In evaluating exposure to fluoride, OW focused on the following potentially significant sources:

• Drinking water from public drinking water systems;

• Solid foods and beverages such as milk and juices not from concentrate;

• Residues from the use of sulfuryl fluoride;

• Beverages prepared with commercial water which in some cases may have been fluoridated;

• Infant formula made from powdered concentrate;

• Toothpaste; and

• Incidentally ingested soil.

OW determined fluoride exposure from ambient air, dietary supplements, dental treatments, and pharmaceuticals was

minimal or too episodic to be of consideration for assessing long-term exposure. (Ref. 22).

OW evaluated fluoride levels in drinking water based on the largest and most comprehensive set of drinking water compliance monitoring data ever compiled and analyzed by the Agency. The data include records from approximately 136,000 public drinking water systems, many of which include reports of fluoride concentrations. The data span 8 years (1998–2005), with up to quarterly sample analysis for fluoride, depending on the system and reporting requirements. This amounts to approximately 7,000 to 12,000 quarterly samples depicting fluoride residues. There was an increase in the number of States reporting for the subset of data from 2002–2005; therefore, OW focused on those data when estimating exposure to fluoride from drinking water. For that time period, the average of the quarterly means is 0.87 ppm and the average for the quarterly 90th percentile values is 1.43 ppm. OW has also sub-sampled the monitoring data to focus on systems that had at least one detection equal to or greater than 2 ppm fluoride. Those systems represent 4.6 to 8.3% of the reporting systems, annually, during the 2002–2005 time frame and, over the 4-year reporting period, served approximately 10 million people. For water consumption information, OW relied on data from the CSFII for those consumers reporting consumption of drinking water. OW estimated fluoride exposure amounts for mean and 90th percentile consumers of drinking water from public systems considering both mean and 90th percentile fluoride levels. These values ranged from 0.26 mg/day for infants (mean consumption (all consumers), mean fluoride value) to 1.99 mg/day for adults (90th percentile consumption (consumers-only and mean fluoride level . (Ref. at 68–69,

Tables 3–5 and 3–6). For 90th percentile consumers consuming mean fluoride levels, the values ranged from 0.63 mg/day for children 1 to 3 years old to 1.74 mg/day for adults. (*Id.* at 94, Table 6–3).

For exposure to fluoride from food, milk, and non-concentrated juices, OW relied on market basket data, dietary surveys, and national food consumption data, for various age groups. OW estimated that fluoride exposure from these sources ranged from 0.25 mg/day for infants to 0.47 mg/day for teenagers. (*Id.* at 90, Table 6–1).

Fluoride exposure from residues of sulfuryl fluoride in food was estimated by OPP based on usage data and residue data relevant to both sulfuryl fluoride's use as a direct commodity fumigant and as a structural fumigant. Estimated exposure values ranged from 0.03 mg/day for infants to 0.09 mg/day for children 7 to 10 years old. (*Id.* at 96, Table 6–5).

OW estimated fluoride exposure from beverages other than milk and non-concentrated juices from various studies and national consumption data, where appropriate. Fluoride exposure levels from beverages ranged from 0.36 mg/day for 1–<4 year olds to 0.60 mg/day for 7 to 11 year olds. (*Id.* at 92, Table 6–2).

Fluoride exposure from toothpaste was estimated by OW using studies that measure fluoride intake by subtracting the amount of toothpaste left on the toothbrush after brushing and the amount expectorated from the amount initially placed on the toothbrush. OW found a high level of uncertainty with these data because "the confidence bounds around the mean values are indicative of high inter-individual variability," and because the studies were conducted not long after release of FDA recommendations "for children to use only a pea-sized amount of toothpaste when brushing." (*Id.* at 94). OW also relied on data showing that

generally young children only brushed their teeth once per day. Toothpaste label directions send different signals on this point, both recommending for children 2 years of age and older that teeth should be brushed "preferably after each meal or at least twice a day" and stating that for younger children a dentist or doctor should be consulted. 21 CFR 355.50(d)(1). Estimated fluoride exposure values ranged from 0.07 mg/day for 0.5 to 1 year olds to 0.34 mg/day for 1 to 4 year olds. (*Id.* at 94, Table 6–4).

OW concluded that other sources of fluoride exposure (*e.g.,* air, dental treatments) were insignificant with the exception of exposure to children through consumption of soil. Fluoride concentrations in the soil in the United States range from less than 10 ppm to 70,000 ppm, with mean or typical levels in the 300–430 ppm range. (*Id.* at 86). Assuming mean levels of fluoride in the soil, OW estimated fluoride exposure for children less than 1 year old to be 0.02 mg/day and for children in the 0–14 age group to be 0.04 mg/day. (*Id.* at 95).

3. *Risk characterization.* In characterizing the risk from fluoride for the purpose of evaluating the fluoride MCLG, OW compared the revised fluoride RfD (0.08 mg/kg/day) to the significant sources of fluoride exposure described previously. OW used average exposure values as to all sources of exposure other than drinking water. For drinking water, OW, examined several different variations of concentration level and consumption level, but principally relied on the approach in long-held OW policy in establishing national drinking water standards that recommends use of average fluoride concentrations in water and 90th percentile consumption levels. (*Id.* at 107–110). OW's characterization of risk using these assumptions is shown in Figure 1.

Figure 1. Total Daily Fluoride Intake Estimates Relative to the Proposed RfD (in mg/day) Using 90th Percentile Drinking Water Intake Data for Consumers Only and the Mean Drinking Water Fluoride Concentration (0.87 mg/L)



(*Id.* at 105, Figure 8–1).

OW explained the meaning of Figure 1 in the following manner:

When examining Figure [1] it is important to remember that the RfD represents an exposure that is estimated to provide the anticaries benefits from fluoride without causing severe dental fluorosis in 99.5% of the children who drink water with 0.87 ng/L F at a 90th percentile intake level and have average intakes from other media during the period of secondary tooth formation. Based on the dose-response for severe dental fluorosis in EPA (2010a) only 0.5% or fewer of children consistently ingesting fluoride at a level equivalent to the RfD for a several month period would be at risk of experiencing severe dental fluorosis in two or more teeth.

(*Id.* at 104–105).

OW noted that the data show both that fluoride exposure has increased over time and that the incidence of all types of dental fluorosis has also increased. According to OW, "The prevalence of dental fluorosis has increased from 10–12% in the areas with about 1 mg/L in drinking water at the time of Dean to 23% in 1986/87 and to 32% in the 1999–2002 NHANES survey."

(*Id.* at 108) (citations omitted).

OW summarized its overall conclusions as follows:

• Some young children are being exposed to fluoride up to about age 7 at levels that increase the risk for severe dental fluorosis.

• The contribution of residential tap water to total ingested fluoride is lower than it was in the past.

• Use of fluoridated water for commercial beverage production has likely resulted in increased dietary fluoride in purchased beverages, adding to the risk for over-exposure.

• The increase of fluoride in solid foods because of fluoridated commercial process water is more variable than that for beverages.

• Incidental toothpaste ingestion is an important source of fluoride exposure in children up to about 4-years of age. However, use of fluoridated toothpaste is not recommended for children under age 2 according to FDA guidance and package labeling suggesting the need for greater parental awareness of the FDA (2009) recommendations.

• Ambient air, soils, and sulfuryl fluoride residues in foods are minor contributions to total fluoride exposure. (*Id.* at 108–109).

*B. OPP's Revised Fluoride Risk Assessment*

In light of the revised fluoride risk assessment by EPA's OW, EPA's OPP has conducted a revised aggregate assessment of fluoride exposure and risk under FFDCA section 408. (Ref. 23). EPA is inviting public comment on all aspects of the revised aggregate assessment.

1. *Hazard/dose-response assessment.* OPP agrees with OW's choice of severe dental fluorosis as the endpoint for assessing chronic risk from fluoride exposure. As noted, both OW and OPP had treated several dental fluorosis as a cosmetic effect and not an adverse health effect. Following the NRC Report and the re-examination of this issue by both OW and OPP, EPA has concluded that severe dental fluorosis is an adverse effect due to the fact that the pitting it causes in the permanent teeth is a structural defect to the teeth. As OW's analysis explains:

Pitting of the enamel is a structural defect that weakens the barrier between the oral environment and the dentin of the teeth. It is progressive in that the enamel can flake off from the sides of the pits allowing them to become progressively larger. Furthermore, the dentin of teeth with severe dental

fluorosis is hypomineralized and structurally variant increasing the importance of the enamel's protective function.

(Ref. 21 at 64) (citations omitted).

OPP also agrees with OW's choice of 0.08 mg/kg/day as a NOAEL for severe dental fluorosis relying on the Dean study, and the use of that value as a Point of Departure for calculating the RfD. Further, OPP concurs that neither an inter- or intra-species safety factor should be used in the RfD calculation. An inter-species factor is unnecessary because the endpoint is from a human epidemiological study; an intra-species factor is not needed given the extensiveness of the data and the fact that it studied the subpopulations of concern, children of different ages.

Given these findings, OPP concludes that the Objectors were correct in contesting the reliance on the endpoint of crippling skeletal fluorosis to set a RfD for fluoride. OPP agrees that the RfD should be based on a more sensitive endpoint—severe dental fluorosis. It follows that the Objectors were also correct to object to use of children-specific RfD values based on the endpoint of crippling skeletal fluorosis. A RfD based on the Dean study is appropriate for children, however, because such a RfD is derived from data on the effects of fluoride on children.

2. *Exposure assessment.* OPP's revised exposure analysis depends heavily on OW's Relative Source Contribution Analysis. A brief description of how that data and analysis have been incorporated into a FFDCA section 408 risk assessment is provided in the following sections.

a. *Fluoride from sulfuryl fluoride.* In the exposure assessments for the 2004 and 2005 tolerance actions, EPA conducted a somewhat refined exposure assessment of fluoride exposure in food from use of sulfuryl fluoride as both a commodity fumigant and as a structural fumigant for food handling facilities. Taking into account comments OPP has received from Dow AgroSciences, OPP has further refined this aspect of the exposure assessment. (Ref. 24). The three main refinements are:

(1) OPP used a regression analysis to estimate residue values of fluoride in food that occur from actual use rates rather than assuming residue values as measured under maximum application rates;

(2) OPP used a probabilistic analysis to estimate residues resulting from possible sequential treatment of food (*e.g.*, fumigation of raw commodity, incidental treatment during fumigation of structure, fumigation of the processed commodity) rather than conservatively

assuming that 100% of food was sequentially treated; and

(3) OPP used more extensive data on the percent of food treated with sulfuryl fluoride. EPA used methyl bromide usage as the basis for estimating the percent usage of sulfuryl fluoride because sulfuryl fluoride was introduced as a replacement for methyl bromide. The refinements to this aspect of the exposure assessment result in a reduction of estimated exposure values to fluoride from sulfuryl fluoride use of roughly an order of magnitude.

Consistent with its well-established practice for chronic exposure assessments, OPP assessed exposure to fluoride residues in food based on average residue values and average food consumption values. Given the national food distribution patterns in the United States, exposure to foods with different residue levels average out over time. Further, because different people eat different foods in different amounts, it would dramatically overstate exposure to assume that a single person consumed all foods at a high end consumption value. The revised exposure values for fluoride from sulfuryl fluoride are presented in Table 1.

TABLE 1—SUMMARY OF SULFURYL FLUORIDE CONTRIBUTIONS TO DIETARY FLUORIDE EXPOSURE

| Age range, years | Average estimated exposure (mg/day) | | | Average estimated exposure mg/kg/day | | |
|---|---|---|---|---|---|---|
| | SF structural [a] | SF food [b] | Total | SF structural [a] | SF food [b] | Total |
| 0.5–<1 ............................ | 0.0087 | 0.021 | 0.030 | 0.0008 | 0.0019 | 0.0027 |
| 1–<4 ................................ | 0.012 | 0.033 | 0.045 | 0.0008 | 0.0022 | 0.0030 |
| 4–<7 ................................ | 0.015 | 0.047 | 0.062 | 0.0007 | 0.0022 | 0.0029 |
| 7–<11 .............................. | 0.017 | 0.054 | 0.071 | 0.0005 | 0.0017 | 0.0022 |
| 11–<14 ............................ | 0.018 | 0.068 | 0.086 | 0.0004 | 0.0014 | 0.0018 |
| 14+ .................................. | 0.019 | 0.058 | 0.076 | 0.0003 | 0.0008 | 0.0011 |

[a] Reflecting residues resulting from fumigation of structures that may contain human food products.
[b] Reflecting residues resulting from intentional fumigation of human foods.

(Ref. 23 at 10, Table 1).

b. *Fluoride from cryolite.* Previously, OPP estimated fluoride exposure from use of the pesticide cryolite using residue data from cryolite field trials and data on the percent of food treated with cryolite. Since cryolite has been in use for 17 years, cryolite residues in food are captured by the monitoring data OW collected on fluoride data in food generally. As discussed in the next

section, OPP is using this monitoring data in its exposure assessment and thus a separate assessment of fluoride from cryolite would result in double-counting.

c. *Fluoride in food and beverages.* OPP is relying on the comprehensive OW analysis of the extensive fluoride monitoring data in published literature in estimating fluoride exposure from foods and beverages. The food

monitoring data predates sulfuryl fluoride use and thus does not capture those residue levels. Consistent with how it conducts chronic exposure assessments for pesticide residues in food, OPP has used central-tendency values in estimating exposure. Exposure estimates for fluoride from background levels in food (including cryolite residues) and in prepared beverages are presented in Table 2.

TABLE 2—SUMMARY OF ESTIMATED FLUORIDE EXPOSURES ATTRIBUTABLE TO BACKGROUND LEVELS IN FOOD AND BEVERAGES

| Age range, years | Body weight, kg | Estimated fluoride exposure (mg/day) | | | Estimated fluoride exposure (mg/kg/day) | | |
|---|---|---|---|---|---|---|---|
| | | Solid food * | Beverages | Total | Solid food * | Beverages | Total |
| 0.5–<1 ...................... | 9 | 0.26 | * | 0.26 | 0.029 | * | 0.029 |
| 1–<4 ...................... | 14 | 0.16 | 0.36 | 0.52 | 0.011 | 0.026 | 0.037 |
| 4–<7 ...................... | 21 | 0.35 | 0.54 | 0.89 | 0.017 | 0.026 | 0.042 |
| 7–<11 ...................... | 32 | 0.41 | 0.60 | 1.01 | 0.013 | 0.019 | 0.032 |
| 11–<14 ...................... | 51 | 0.47 | 0.38 | 0.85 | 0.0092 | 0.0075 | 0.017 |
| 14+ ...................... | 70 | 0.38 | 0.59 | 0.97 | 0.0054 | 0.0084 | 0.014 |

* Solid food includes milk as well as fruit and vegetable juices not made from concentrate. These are not categorized as beverages in the FDA Total Diet Study (Egan *et al.*, 2007). For the age range 0.5–<1 year, all fluoride was considered to be from powdered formula and falls into the food category.

(Ref. 23 at 15, Table 6).

d. *Fluoride from public drinking water systems.* People are exposed to fluoride from public drinking water both by direct consumption of the water and from indirect consumption of the water after its use in the preparation of foods and beverages in the home. References in this section to drinking water exposure are intended to capture both of these types of exposure. Exposure to fluoride from water containing fluoride residues that is used in the commercial preparation of food and beverages is accounted for in the estimates of fluoride in food and beverages. (*See* Unit V.B.2.c). To estimate exposure, OPP has coupled average, per-capita consumption from the CSFII with the fluoride concentrations for the water systems described previously. The CSFII consumption estimates include drinking water (direct water) and water used for in-home preparation of foods and beverages (indirect water).

In the earlier exposure assessments, OPP assumed that fluoride in drinking water was present at 2 mg/L. Extensive monitoring data on fluoride levels in drinking water, however, have now been collected and analyzed by OW in conducting its Relative Source Analysis in response to the NRC Report. OPP has relied on these data in estimating exposure. (Ref. 23 at 10–15).

Generally, OPP estimates pesticide exposure from drinking water by focusing on watersheds that are likely to have high end residue levels. This approach is based on several factors. First, pesticide residues in watersheds can have widely different values based on their regional relationship with agricultural areas and environmental factors (*e.g.*, soil type, rainfall amount). Second, consumption of drinking water, unlike food, is mainly a local phenomenon—*i.e.*, tap water is not an amalgam from drinking water systems around the country. Thus, focusing on watersheds with high-end residue levels is critical to fulfilling EPA's statutory obligation to consider aggregate exposure to "major identifiable subgroups of consumers * * *." (21 U.S.C. 346a(b)(2)(D)(vi)). Accordingly, in the first instance, OPP has used OW's drinking water monitoring data to identify drinking water systems with high-end fluoride levels. OPP has focused on water systems that have had at least one measured fluoride value of greater than 2 mg/L, at least one measured value of greater than 3 mg/L, and at least one measured value of greater than 4 mg/L. These groupings of water systems were used because of the significant population groups served by these systems—from well over 1 million

to roughly 10 million. OPP believes it is reasonable to use average monitoring values from these groups of water systems because of the relative stability of fluoride levels in water. Importantly, these average values bracket OPP's prior assumption of 2 mg/L with the average values ranging from 1.76 mg/L to 2.58 mg/L.

Given the unusual circumstances of fluoride—not only are there multiple sources in addition to pesticidal sources but several sources are the result of intentional actions designed to result in wide-spread national exposure—OPP believes that OW's approach to assessing fluoride exposure in its Relative Source Analysis under SDWA has relevance to its aggregate exposure analysis under FFDCA section 408. OW's Relative Source Analysis focuses on high-end water consumers who are exposed to average exposures calculated on a national basis. Because the population concerned here is so large, roughly 300 million people, even looking at high-end consumers (OW's traditional approach is to use the 90th percentile) represents consideration of a large population subgroup.

Table 3 provides exposure estimates for fluoride in drinking water from both OPP and OW approaches.

TABLE 3—FLUORIDE EXPOSURE ESTIMATES (MG/KG/DAY) FROM MUNICIPAL WATER [1]

| Age range, years | Fluoride concentration in drinking water (mg/L); consumption percentile | | | |
|---|---|---|---|---|
| | 0.87 90th | 1.76 Average | 2.28 Average | 2.59 Average |
| 0.5–<1 ...................................... | 0.093 | 0.077 | 0.10 | 0.11 |
| 1–<4 ...................................... | 0.045 | 0.040 | 0.052 | 0.059 |
| 4–<7 ...................................... | 0.039 | 0.033 | 0.043 | 0.049 |
| 7–<11 ...................................... | 0.027 | 0.024 | 0.031 | 0.035 |
| 11–<14 ...................................... | 0.024 | 0.018 | 0.024 | 0.027 |
| 14+ ...................................... | 0.025 | 0.026 | 0.033 | 0.038 |

[1] Includes drinking water as well as water for in-home preparation of foods and beverages. Estimates are based on 90th percentile consumer only or average *per capita* consumption, as indicated, and do not include fluoride from toothpaste, from soil, or from sulfuryl fluoride.

(Ref. 23 at 11, Table 3; 14, Table 5). e. *Fluoride from toothpaste.* OW has comprehensively reanalyzed the data on

fluoride exposure from toothpaste taking into consideration all available

studies. The results of that analysis are presented in Table 4.

TABLE 4—SUMMARY OF ESTIMATED FLUORIDE EXPOSURES FROM INCIDENTAL INGESTION OF FLUORIDATED TOOTHPASTE

| Age range, years | Estimated fluoride exposure (mg/day) | | Estimated fluoride exposure (mg/kg/day*) | |
|---|---|---|---|---|
| | 1 brushing per day | 2 brushings per day | 1 brushing per day | 2 brushings per day |
| 0.5 − <1 | 0.07 | 0.14 | 0.0078 | 0.016 |
| 1 − <4 | 0.34 | 0.68 | 0.024 | 0.049 |
| 4 − <7 | 0.22 | 0.44 | 0.010 | 0.021 |
| 7 − <11 | 0.18 | 0.36 | 0.0056 | 0.011 |
| 11 − <14 | 0.2 | 0.4 | 0.0039 | 0.0078 |
| 14+* | 0.1 | 0.2 | 0.0014 | 0.0029 |

*No data were available for this age group. The exposure estimate is one half that of the 11 to 14 year group.

(Ref. 23 at 16, Table 7). OW was also able to identify limited data on the frequency of teeth brushing

by children. Those data are presented in Table 5.

TABLE 5—NUMBER OF TOOTHBRUSHINGS PER DAY REPORTED FOR CHILDREN (SIX MONTHS TO FIVE YEARS OLD)

| Study | N = | Age (years) | Percentages* | | |
|---|---|---|---|---|---|
| | | | 1 time/day | 2 times/day | 3 times/day |
| Simard *et al.,* 1989 | 23 | 2 to 5 | 4.8 | 71.4 | 23.8 |
| Simard *et al.,* 1991 | 15 | 1 to 2 | 60 | 32 | 8 |
| Levy *et al.,* 1997 | 899 | 0.5 | 41.2 | 16.9 | 6.3 |
| | 665 | 0.75 | 33.2 | 17 | 3.1 |
| | 508 | 1 | 37 | 14.7 | 3.5 |
| Franzman *et al.,* 2006 | 90 | 1.3 | 48 | 14 | 4 |
| | 100 | 2 | 51 | 23 | 2 |
| | 100 | 3 | 51 | 24 | 1 |

*Some studies also reported those brushing their teeth less than once per day and more than three times per day. In these cases the percentages do not add up to 100%.

(Ref. 22 at 81, Table 4–10). Based on the fact that a substantial portion of children brush two or more times per day and that brushing twice per day is consistent with health care recommendations, OPP is assuming two brushings per day in its assessment.

f. *Fluoride from soil.* Young children are exposed to fluoride from inadvertent consumption of soil. OPP estimated fluoride exposure from soil using standard EPA estimates on soil consumption and assuming average fluoride residues in soil. These estimates are presented in Table 6.

TABLE 6—SUMMARY OF ESTIMATED FLUORIDE EXPOSURES FROM INCIDENTAL INGESTION OF SOIL AND OUTDOOR DUST

| Age range, years | Estimated fluoride exposure* (mg/day) | Estimated fluoride exposure* (mg/kg/day) |
|---|---|---|
| 0.5–<1 | 0.02 | 0.0022 |
| 1–<4 | 0.04 | 0.0029 |
| 4–<7 | 0.04 | 0.0019 |
| 7–<11 | 0.04 | 0.0013 |

TABLE 6—SUMMARY OF ESTIMATED FLUORIDE EXPOSURES FROM INCIDENTAL INGESTION OF SOIL AND OUTDOOR DUST—Continued

| Age range, years | Estimated fluoride exposure* (mg/day) | Estimated fluoride exposure* (mg/kg/day) |
|---|---|---|
| 11–<14 | 0.04 | 0.00078 |
| 14+ | 0.02 | 0.00029 |

*Assumes soil and dust contains 400 ppm fluoride.

(Ref. 23 at 17, Table 8).

g. *Other sources of fluoride exposure.* Although people are also potentially exposed to fluoride from fluoride in ambient air, fluoride dental treatments, and pharmaceuticals, among other things, OW concluded that these sources of exposure are insignificant compared to other sources of fluoride exposure. Accordingly, OPP is not including such exposures in its aggregate assessment. (Ref. 23 at 16).

3. *Children's safety factor.* In choosing a revised RfD for fluoride, OW did not apply any uncertainty or safety factors

to the BMDL for severe dental fluorosis. OW reasoned that uncertainty factors were not warranted due to the extensive human epidemiological data on the effects of fluoride, including extensive data on children, the population of greatest concern. Decisions on pesticide tolerances, however, require OPP to apply special provisions for protection of children. Specifically, section 408(b)(2)(C) of FFDCA provides that EPA shall apply an additional tenfold (10X) margin of safety for infants and children in the case of threshold effects to account for prenatal and postnatal toxicity and the completeness of the database on toxicity and exposure unless EPA determines based on reliable data that a different margin of safety will be safe for infants and children. In making determinations on this children's safety factor, OPP has focused on the statutory factors of data completeness with regard to toxicity and exposure and evidence bearing on pre- and post-natal toxicity.

As with so many other aspects of the fluoride risk assessment, application of

the children's safety factor provision to fluoride presents unique issues. OPP considered the following factors in determining whether reliable data show that an additional safety factor other than the default 10X value would be safe:

a. *Toxicity data.* As a result of the decades-long water fluoridation program in the United States as well as the substantial areas with high natural levels of fluoride in drinking water, OPP has an epidemiological dataset for fluoride that is far more extensive than for any other pesticide. EPA also has an extensive set of animal data on sulfuryl fluoride and to the extent that sulfuryl fluoride breaks down to the fluoride anion during testing, these studies capture the effects of fluoride (dental fluorosis was observed in a number of studies). On the other hand, OPP has recently requested additional studies on sulfuryl fluoride, a developmental neurotoxicity study and an immunotoxicity study, and the NRC Report identified several areas, notably brain and endocrine effects, where further study would be useful. On the whole, however, OPP concludes that the completeness of the database with regard to fluoride exceeds what is generally available even on the most well-studied pesticides.

b. *Exposure data.* OPP has an extremely extensive database on fluoride levels in drinking water due to the water monitoring data OW has collected. OPP also has reliable data on fluoride exposure from sulfuryl fluoride and on background levels of fluoride in food. To the extent sulfuryl fluoride has not replaced methyl bromide as a fumigant the fluoride estimate from sulfuryl fluoride overstates exposure. There is some uncertainty as to the amount of fluoride exposure from toothpaste. There are several factors here: Data on fluoride exposure from toothpaste are less extensive and are highly variable; the data may not reflect the latest recommendations on the amount of toothpaste children should use; label directions for adults and children 2 years old and above state that teeth should be brushed "thoroughly, preferably after each meal or at least twice a day;" and label directions for children below 2 years of age state that a dentist or doctor should be consulted. However, by assuming two brushings per day and relying on studies that may have used greater amounts of toothpaste than is used today as well as focusing on high-end exposure groups for drinking water, OPP believes it has addressed any uncertainties regarding fluoride exposure from toothpaste.

c. *Pre- and post-natal toxicity.* Not only does OPP have extensive data identifying fluoride's effects in humans and the dose at which those effects occur, but fluoride, unlike most pesticides or their metabolites, is considered a human nutrient. Fluoride's classification as a nutrient—especially its role at certain doses in protecting teeth—cannot be ignored in the safety factor calculation. OPP is averse to choosing a safety factor that would result in the choice of a PAD that indicates that fluoride is harmful at levels below the adequate intake level for beneficial effects. The Objectors have raised concerns about potential other effects of fluoride—for example, brain, endocrine, kidney, and reproductive effects. Nonetheless, data on these effects generally either shows effects only at considerably higher levels than the levels causing severe dental fluorosis or are very equivocal.

On balance, the extensiveness of the data on toxicity of fluoride and human exposure to it, the clear data defining the safe level for the effect of concern on children, and fluoride's status as a human nutrient at levels only slightly below the level that is protective against severe dental fluorosis lead OPP to conclude that reliable data show that an additional safety factor for the protection of children is not necessary. Accordingly, OPP has not used an additional safety factor in its fluoride risk assessment. Hence, the PAD for fluoride is equivalent to the RfD (0.08 mg/kg/day). (Ref. 23 at 9).

4. *Risk characterization.* To characterize the risk of fluoride, OPP has aggregated exposure to fluoride from sulfuryl fluoride, background levels in food (including from cryolite), beverages, drinking water, toothpaste, and soil, and compared that aggregated exposure to the PAD. In evaluating exposure to major identifiable subgroups of consumers, OPP believes that for fluoride it is appropriate to consider the aggregate exposure of at least four different subgroups:

a. Communities served by a water system with at least one sample showing fluoride levels greater than 2 mg/L (2 mg/L communities);

b. Communities served by a water system with at least one sample showing fluoride levels greater than 3 mg/L (3 mg/L communities);

c. Communities served by a water system with at least one sample showing fluoride levels greater than 4 mg/L (4 mg/L communities); and

d. High-end water consumers generally.

The aggregate exposure of these subgroups relative to the RfD/PAD is shown in Table 7:

TABLE 7—AGGREGATE EXPOSURE COMPARED TO RfD BY AGE GROUPS (MG/KG/DAY)

| Age groups | RfD/PAD | High-end water consumers | 2 mg/L community | 3 mg/L community | 4 mg/L community |
|---|---|---|---|---|---|
| 0.5–<1 | 0.08 | 0.13 | 0.13 | 0.15 | 0.16 |
| 1–<4 | 0.08 | 0.11 | 0.13 | 0.14 | 0.15 |
| 4–<7 | 0.08 | 0.097 | 0.10 | 0.11 | 0.12 |
| 7–<11 | 0.08 | 0.068 | 0.070 | 0.077 | 0.081 |
| 11–<14 | 0.08 | 0.047 | 0.045 | 0.051 | 0.054 |
| 14+ | 0.08 | 0.042 | 0.044 | 0.051 | 0.056 |

(Ref. 23 at 21, Table 9).

This risk assessment shows that aggregate fluoride exposure to young children exceeds the RfD/PAD under various different methods of identifying major population subgroups. In evaluating this assessment at least two other factors are relevant. First, the assessment of the 2–4 mg/L communities deviates from OPP's traditional approach to assessing exposure in drinking water in that it averages exposures from systems that are surface water-based and systems that are groundwater-based. EPA generally assesses drinking water exposure on the higher value from surface water or groundwater because people get the majority of their drinking water exposure from one location. For fluoride, focusing only on groundwater-based systems would modestly increase the exposure estimate. Second, this assessment does not take into account those people that depend on private drinking water wells and not public drinking water systems. Drinking water

wells in certain portions of the United States can have fluoride levels exceeding those used in the assessments discussed previously.

Based on these assessments, EPA cannot conclude that there is a reasonable certainty of no harm for certain major identifiable groups of consumers from aggregate exposure to fluoride. Therefore, EPA cannot make the required finding that the sulfuryl fluoride and fluoride tolerances are "safe" and is proposing to grant the Objectors' objections to the establishment of the sulfuryl fluoride and fluoride tolerances promulgated on January 23, 2004, and July 15, 2005.

### C. Comments From Dow AgroSciences

As noted previously, Dow AgroSciences has filed comments contesting the Objectors' claims regarding the safety of fluoride. First, Dow AgroSciences argues that the Objectors have only potentially shown that small, localized groups of people are exposed to unsafe levels of fluoride and such small groups do not constitute a "major identifiable" subgroup under FFDCA. EPA disagrees with Dow AgroSciences that the groups of people exposed at levels that exceed the RfD are not major identifiable subgroups of consumers. As noted previously, the subgroups OPP relies upon include at least 1 million, and in some cases, many millions of people. Although the individuals within these subgroups facing unacceptable risks from aggregate fluoride exposure are limited to infants and children up to the age of 7, the persons at risk remain substantial.

Second, Dow AgroSciences challenges whether the NRC Report showed that there is a more sensitive endpoint than crippling skeletal fluorosis. Dow AgroSciences' comments on this issue focused on the endpoints of bone fracture, stage II skeletal fluorosis, and severe dental fluorosis.

1. *Bone fracture.* Dow AgroSciences argued that the NRC Report did not place sufficient weight on a 2005 observational study from the University of Michigan (Sowers) and placed too much weight on two other studies (Alarcon and Li) that were judged unreliable by OPP. OW undertook a comprehensive review of all of the available data. Like NRC, it found certain weaknesses in the 2005 Sowers study but overall considered it along with the Li study and several other studies to be one of the key studies for assessing the risk of bone fractures. The Alarcon study was given less weight. Also similar to the NRC Report, OW concluded that "the available data indicate that exposure to concentrations

of fluoride in drinking water of 4 mg/L and above is suggestive of and appears to be positively associated with increased relative risk of bone fractures in susceptible populations when compared to populations exposed to 1 mg mg/L." (Ref. 21 at 86). OW also noted, however, that "there are insufficient data to conclude that this increase in relative risk would also apply if comparisons were made to groups exposed to negligible fluoride concentrations or if comparisons were made based on total fluoride intake rather than on the basis of drinking water concentrations." (*Id.*). Ultimately, OW concluded that the fluoride RfD should be based on severe dental fluorosis and that this endpoint was protective of any risk of bone fractures and thus a more definite resolution of this issue is unnecessary.

2. *Stage II skeletal fluorosis.* Dow AgroSciences emphasized that the NRC Report's finding on fluoride's link to stage II skeletal fluorosis were equivocal. OW's conclusions on stage II skeletal fluorosis were similar to those of NRC. OW found that "[t]he results of the limited epidemiological studies and case histories suggest that a daily fluoride dose in excess of 10 mg may be required to produce signs of stage II skeletal fluorosis (except possibly in the case of individuals with renal disease)." (Ref. 21 at 83). But OW concluded that "the currently available data are not sufficiently robust to support a dose-response analysis of the effects of fluoride in drinking water on skeletal fluorosis." (*Id.*). As with risk of bone fractures, because OW determined that the fluoride RfD should be based on severe dental fluorosis and that this endpoint was protective of any risk of stage II skeletal fluorosis, a more definite resolution of this issue is unnecessary.

3. *Severe dental flurosis.* Dow AgroSciences challenged the competency of NRC to make the legal conclusion that severe dental fluorosis is an adverse health effect and also argued that there is dispute within the scientific community regarding the adversity of severe dental fluorosis. Without question, it is EPA that is charged with interpreting SDWA and making legal findings in implementation of that Act. Nonetheless, EPA does not view NRC as stepping beyond its scientific advisory role in its report. OW has previously defined adverse health effects as involving functional impairment and NRC focused on whether the data showed functional impairment in reaching a conclusion on whether severe dental fluorosis is an adverse

health effect. For example, the NRC Report states:

> One of the *functions* of tooth enamel is to protect the dentin and, ultimately, the pulp from decay and infection. Severe enamel fluorosis compromises this health-protective *function* by causing structural damage to the tooth. The damage to teeth caused by severe enamel fluorosis is a toxic effect that the majority of the committee judged to be consistent with prevailing risk assessment definitions of adverse health effects.

(Ref. 17 at 127) (emphasis added).

Finally, while there may be a dispute within the scientific community about how to characterize the adversity of severe dental fluorosis, there does not appear to be any significant dispute over the science question of whether severe dental fluorosis results in the pitting of dental enamel. As Dow AgroSciences has pointed out, it is EPA's responsibility to make the legal determination of whether this effect should be categorized as an adverse health effect.

Third, Dow AgroSciences argues that EPA is not authorized to aggregate fluoride added to drinking water for therapeutic purposes with fluoride from sulfuryl fluoride because fluoride from water fluoridation is neither a "pesticide chemical" under FFDCA nor an "other related substance." Dow AgroSciences claims that FFDCA's reference to "other related substances" means other related "pesticidal" substances. EPA disagrees with Dow AgroSciences' interpretation of FFDCA section 408 for several reasons. First, there is no exclusion from the aggregate exposure requirements for substances that have a therapeutic effect at certain levels. Second, there is no serious dispute that at certain levels exposure to fluoride is not therapeutic but harmful, and Dow AgroSciences cannot be contending that exposure to fluoride for water fluoridation does not aggregate within the body with fluoride from other exposures. Third, a significant portion of the U.S. population is exposed to fluoride in water that is naturally-occurring rather than added for therapeutic purposes. Finally, EPA has previously rejected attempts to limit the plain meaning of "other related substances" and does not believe that Dow AgroSciences has offered any compelling legal, policy, or scientific reasoning for adopting an interpretation that would bar EPA from considering the full effects of aggregate exposure to a substance. (*See* 69 FR 30042, 30073, May 26, 2004)(FRL–7355–7).

Dow AgroSciences also claims that EPA overestimated exposure to fluoride from use of sulfuryl fluoride. EPA agrees with this comment and, as described

previously, EPA has incorporated information from Dow AgroSciences on sulfuryl fluoride usage in its sulfuryl fluoride/fluoride exposure assessment.

## VI. EPA's Proposed Response to Requests for Hearing

Because EPA is agreeing with the Objectors that the sulfuryl fluoride tolerances do not meet the safety standard and is proposing to grant their objections to the establishment of those tolerances, no further action is needed with regard to the Objectors' hearing requests. At this point, there is no material dispute of fact with regard to the Objectors' claims that warrants a hearing.

## VII. EPA's Proposed Response to Request for a Stay and EPA's Proposed Expiration Date for Tolerances

Following release of the NRC Report, the Objectors filed a motion with EPA requesting a stay of the sulfuryl fluoride tolerances. (Ref. 2). In arguing for a stay, the Objectors relied on the four factors contained in *Virginia Petroleum Jobbers Ass'n* v. *FPC,* 259 F.2d 921 (DC Cir. 1958):

(1) Has the petitioner made a strong showing that it is likely to prevail on the merits;

(2) Has the petitioner shown that without such relief it will be irreparably harmed;

(3) Would issuance of the stay substantially harm other parties interested in the proceedings;

(4) Wherein lies the public interest.

In prior tolerance proceedings EPA has indicated it would consider the criteria in FDA's regulations pertaining to stay requests. (*See, e.g.,* 61 FR 39528, 39540, July 29, 1996). Those regulations provide that a stay shall be granted if a petitioner can show all of the following:

(1) The petitioner will otherwise suffer irreparable injury.

(2) The petitioner's case is not frivolous and is being pursued in good faith.

(3) The petitioner has demonstrated sound public policy grounds supporting the stay.

(4) The delay resulting from the stay is not outweighed by public health or other public interests.

(21 CFR 10.35).

The criteria under either approach are quite similar. Thus, in evaluating the stay request EPA will concentrate on an amalgam of the four factors:

• What are the merits of the Objectors' claims;

• Have the Objectors' shown that irreparable harm will occur in the absence of a stay;

• Would a stay substantially harm other parties or cause other effects on the public health; and

• Wherein lies the public interest.

EPA also believes that these factors are relevant in choosing an effective date for its proposed grant of the objections.

### A. Merits of the Objectors' Claims

As indicated, EPA agrees with the Objectors that the sulfuryl fluoride tolerances do not meet the safety standard when aggregate fluoride exposure is considered and thus this factor supports granting the stay and making EPA's proposed grant of the objections effective relatively quickly.

### B. Irreparable Harm to Objectors

The Objectors argue that the public is irreparably harmed by the sulfuryl fluoride tolerances because aggregate exposure to fluoride poses a long litany of threats to health. According to the Objectors, the NRC Report linked fluoride not just to adverse effects on bones and teeth but also other effects ranging from neurological impacts to cancer. (Ref. 2 at 11, 13–15). The weight of this argument, however, is undermined by two factors.

First, it is beyond dispute that NRC, after a comprehensive evaluation of all of the possible adverse effects of fluoride, recommended that OW lower the fluoride MCLG due to only three very specific health risks: severe dental fluorosis; stage II skeletal fluorosis; and bone fractures. (Ref. 17 at 345–346, 352). Although the NAS recommended further research on some of the other health risks cited by the Objectors, the NAS did not find sufficient evidence on any of them to support a lowering of the MCLG.

Second, and more importantly, the threat that fluoride poses to teeth and bones is due to aggregate exposure to fluoride not the fluoride in food resulting from use of sulfuryl fluoride when viewed in isolation. Use of sulfuryl fluoride is responsible for a tiny fraction of aggregate fluoride exposure. For example, for the most highly-exposed age groups in the populations examined in the revised risk assessment, fluoride from sulfuryl fluoride accounts for about 2 to 3% of aggregate fluoride exposure. Given the aggregate level of fluoride exposure, termination of the use of sulfuryl fluoride would not change the fact that aggregate fluoride levels would still exceed the safe level for highly-exposed subpopulations.

### C. Harm to Others/Other Public Health Harms

1. *Overview.* Immediate termination of sulfuryl fluoride tolerances will lead to some combination of the following negative consequences depending how food processors and distributors for the various affected commodities respond: an increase in the use of inventories of the stratospheric ozone-depleting pesticide, methyl bromide; a disruption in the amount and availability of certain commodities; an increase in contamination of commodities with insect parts and waste posing potential health risks; and/or increased short-term and long-term costs for food processors, distributors, and consumers. To the extent that methyl bromide cannot be obtained in sufficient quantities to fill the void left by the absence of sulfuryl fluoride, the other potential negative impacts will be heightened.

In the following discussion, EPA first describes the likely effects that would occur in individual food markets if sulfuryl fluoride use is terminated. Then EPA presents more general information on the availability of methyl bromide, the potential disruption that can occur when food is contaminated with insect parts and waste, and potential health effects from such contamination.

2. *Likely effects in specific markets.* OPP analyzed three uses of sulfuryl fluoride that provide a representative view of how the food industries relying on sulfuryl fluoride may respond to a loss of that pesticide and the impacts of that response:

• Use of sulfuryl fluoride as a structural treatment in flour mills;

• Use of sulfuryl fluoride as a food fumigant for cocoa beans; and

• Use of sulfuryl fluoride as a food fumigant for walnuts.

Each of these uses is discussed in more detail in the next section. (Refs. 25 and 26).

a. *Flour mills.* Generally, flour mills and other food processing facilities are fumigated two to three times per year to control insect populations (the primary pests are the red flour beetle and the confused flour beetle). In the absence of sulfuryl fluoride, there are potentially three possible alternative options whose costs and efficacy differ from sulfuryl fluoride: (1) Use of another chemical pesticide; (2) use of non-chemical controls; or (3) complete removal of all food from the facility during fumigation with sulfuryl fluoride.

i. *Chemical control.* The only chemical alternative for use throughout food processing facilities is methyl bromide. As explained later in this document, mills and food processing

structures that do not have approved critical uses for a given year may not obtain methyl bromide produced under a critical use exemption. To the extent facilities have an approved critical use or can obtain methyl bromide from pre-phase-out inventories, mills will likely switch to methyl bromide if sulfuryl fluoride uses are immediately eliminated. Costs for use of methyl bromide and sulfuryl fluoride appear to be fairly similar at this time. No other chemical pesticides are a viable alternative. Phosphine is a commonly-used food fumigant that could be used in some portions of a flour mill; however, phosphine is highly corrosive to silver and copper metals and their alloys and thus cannot be used in the production areas of mills that contain electronic and electrical equipment which heavily rely on these metals. In terms of total area, the portion of a mill devoted to production is substantial and a failure to effectively dis-infest the production area would quickly result in re-infestation of the entire facility. Thus, phosphine is not an alternative to the use of sulfuryl fluoride. (Ref. 25 at 6–7).

ii. *Non-chemical control.* The leading non-chemical control option for use in flour mills is temperature manipulation. Either heat or cold can be used to destroy insect pests. Use of cooling to control pests in flour mills, however, is unlikely because cold temperatures can damage electronic equipment in production areas. Use of heat is a more likely option. Temperatures of 120–130 degrees Fahrenheit will kill most stored-product insect pests. Heat, however, would not be appropriate for mills principally constructed of wood because heat at these levels will shrink, crack, and warp wood. This can result in structural damage to the facility and may also render the heat treatment ineffective due to leakage of heat from the facility. Approximately 25% of the total number of flour mills in the United States fall in this category. These tend to be the older and smaller mills and thus probably represent less than 25% of mill capacity. Newer mills are generally constructed primarily of concrete or similar materials which would be appropriate for use with heat disinfestation techniques. Initially, use of heat will involve higher costs due to capital investment in heaters and plant modifications. However, in the long run, use of heat may be less costly than chemical pesticides. Switching to heat will also require transition time for the industry. Not only will mills have to purchase (or rent) heaters but modifications may be necessary to the mill to insure that heat is evenly

distributed. Individual mills will have to go through a trial and error process to determine how the heating technique can be effective in each unique facility. Because disinfestations are commonly needed only two to three times per year, mills are likely to need an extended transition time to implement the technology effectively. If chemical alternatives are not available during that timeframe, processed food contaminated with insect parts and waste due to failure of initial attempts at heat disinfestation will have to be destroyed. (Ref. 25 at 6).

iii. *Product removal.* A third option that combines chemical and non-chemical control would be complete removal of all food from a facility before fumigation with sulfuryl fluoride. Currently, the sulfuryl fluoride label requires that food in facilities be minimized prior to fumigation. Only food that is not practical to remove may remain during the fumigation. Removal of food is also essential to the efficacy of sulfuryl fluoride. However, if all food is removed such that use of sulfuryl fluoride would not result in fluoride residues in food, no pesticide tolerance would be needed for this use and aggregate exposure to fluoride would not be increased. Currently, Canada has imposed restrictions on the use of sulfuryl fluoride for the fumigation of food processing facilities that are designed to insure that no residues result in food. Two obstacles remain, however, to adoption of this alternative. First, OPP's analysis of this alternative indicates there may be substantial costs. Second, at this time, sulfuryl fluoride's FIFRA label does not contain application instructions sufficient to eliminate residues on food. Thus, if the objections are granted as is proposed, EPA will pursue cancellation of all uses associated with the tolerances which are removed. Unless Dow AgroSciences, the registrant for sulfuryl fluoride, were to seek an amendment of its registration that imposes label restrictions insuring no residues in food, and OPP can determine that the proposed registration changes would achieve that result, this use would not be available to flour mills in the United States. (Ref. 25 at 10).

b. *Fumigation of cocoa and walnuts.* Any food that is stored, processed, or packaged is subject to attack by insects, generally beetles or moths. Phosphine is the dominant fumigant in the commodity market for use against such pests because it is efficacious, cost-effective, and easy to apply. However, phosphine fumigation takes 4 to 7 days to be effective. A fumigant that can work much more quickly, such as sulfuryl

fluoride, is used when rapid fumigation is necessary.

Fumigation of harvested walnuts to destroy pests is primarily used for in-shell walnuts. Fumigation can kill pests in in-shell walnuts that are otherwise eliminated from shelled walnuts by shelling and processing of the nutmeat. The available data indicate that a high percentage of in-shell walnuts are fumigated one or more times. Fumigation is primarily not conducted with phosphine because, at peak harvest time, existing fumigation chambers do not have sufficient capacity to allow timely fumigation. Although historically most of this rapid fumigation was done with methyl bromide under a CUE, more recent information suggests that the industry is using sulfuryl fluoride almost entirely. (Ref. 26 at 4).

For cocoa beans, rapid fumigation is necessary due to the circumstances where fumigation is conducted. Cocoa beans are imported to the United States from Africa and South America. Upon arrival, they are taken to a warehouse at the port and fumigated under tarpaulins. To minimize risk to port employees, fumigations typically occur over weekends when the ports and warehouses are closed. One hundred percent of cocoa beans are fumigated with sulfuryl fluoride. (*Id.* at 5). In 2009, approximately $1.2 billion worth of cocoa beans were imported to the United States.

The primary chemical alternative to sulfuryl fluoride for walnuts and cocoa is phosphine. However, as indicated, there are insufficient fumigation chambers for walnuts at peak harvest time. For cocoa, existing facilities do not allow for use of phosphine because they are part of an ongoing port operation and cannot be shut down for more than 2 days at a time and often contain other articles that may be affected by phosphine's corrosive properties. Non-chemical alternatives either take too long (cold, modified atmosphere), may damage the stored commodity (heat), lack market acceptability (irradiation), or are largely untested for the commodities and pests in question (heat). Construction of fumigation chambers for walnuts and cocoa may take several years. (*Id.* at 5).

EPA requests information on whether other commodities treated in the United States or other imported commodities would be affected by elimination of sulfuryl fluoride.

3. *Availability of methyl bromide.* Due to the constraints of CAA and the Montreal Protocol, pesticide users would have very limited ability to use methyl bromide in lieu of sulfuryl fluoride if the sulfuryl fluoride

tolerances were abruptly withdrawn. Methyl bromide is an ozone depleting substance whose production has been banned under the Clean Air Act for domestic use since 2005. Along with other developed countries, the United States is also subject to the methyl bromide production phase-out under the Montreal Protocol. Production of methyl bromide for U.S. use other than for quarantine and preshipment purposes is not allowed under the Montreal Protocol and EPA's Clean Air Act implementing regulations unless the Parties to the Montreal Protocol agree to authorize additional new production for uses that have been demonstrated to be critical under the criteria adopted by the Parties.

The criteria for critical use exemptions (CUEs) are demanding and not easily met. Under Decision IX/6 of the Parties to the Montreal Protocol "a use of methyl bromide should qualify as 'critical' only if the nominating Party determines that: (i) The specific use is critical because the lack of availability of methyl bromide for that use would result in a significant market disruption; and (ii) there are no technically and economically feasible alternatives or substitutes available to the user that are acceptable from the standpoint of environment and public health and are suitable to the crops and circumstances of the nomination." Decision IX/6 para. 1(a). Additionally, Decision IX/6 specifies that:

[P]roduction and consumption, if any, of methyl bromide for critical uses should be permitted only if:

(i) All technically and economically feasible steps have been taken to minimize the critical use and any associated emission of methyl bromide;

(ii) Methyl bromide is not available in sufficient quantity and quality from existing stocks of banked or recycled methyl bromide, also bearing in mind the developing countries' need for methyl bromide;

(iii) It is demonstrated that an appropriate effort is being made to evaluate, commercialize and secure national regulatory approval of alternatives and substitutes.* * *

Decision IX/6 para. 1(b).

EPA's stratospheric protection regulations contain essentially the same criteria (40 CFR 82.3). Decisions on these criteria are made following a careful review by both the United States and the Parties to the Montreal Protocol.[1] Importantly, because the CUE

process is an exception to the phase-out, it has been implemented in a manner that recognizes the importance of the technical substantiation of critical need relative to the criteria agreed upon by the Parties. Between the 2005 and 2011 CUE Nominations, the United States post harvest CUE amount authorized by the Parties has declined by nearly 80% (784,936 kilograms (kg) to 161,394 kg). (Ref. 27). Given the potential availability of alternatives in a few years, taking into consideration the full suite of chemical and non-chemical pest control options for post harvest uses, technical and economic substantiation for methyl bromide would be limited under CUE criteria for uses that had transitioned to sulfuryl fluoride.

Finally, the ability of any given user group to use methyl bromide will also be constrained in any given year by a number of other factors. First, it is impermissible for any person to sell critical use methyl bromide to an end user without receiving a certification that it will be used for an approved critical use. (40 CFR 82.4(p)(1)(i)). Second, although there is no legal restriction on a non-critical user purchasing and using pre-phase-out stocks (the quantity of stored methyl bromide produced prior to the U.S. phase-out in 2005), (75 FR 23167, 23181, May 3, 2010) (FRL–9144–5), whether or not such stocks could be commercially obtained quickly given long-term contracting for stocks is another question. In any event, pre-phase-out inventory has declined substantially and it is unclear at this time how much of it could be purchased for use in the post-harvest market.

Thus, in the short-term, production and import of methyl bromide is restricted with no opportunities for immediate change. In the longer term, given the historical trajectory of the critical use exemption under the Montreal Protocol, there likely will be less, not more, methyl bromide available. Current users of sulfuryl fluoride may attempt to purchase

methyl bromide from pre-phase-out inventories if sulfuryl fluoride becomes unavailable; however, the feasibility of obtaining significant quantities from this source is uncertain.

4. *Disruption of the marketplace.* Food containing insect parts and waste may be considered adulterated under FFDCA section 402(a)(4) and subject to seizure by FDA. (21 U.S.C. 342(a)(4); *see* 21 CFR 110.110 (Defect Action Levels)). As the recent recall of the infant formula Similac shows, contamination with insect parts can result in extensive disruption of the market for consumers and significant costs for the food industry. (Ref. 28 ("Worried parents have bombarded the maker of Similac with phone calls and peppered Facebook and Twitter pages over fears about insects in the top-selling baby formula after millions of cans were recalled."); Refs. 29 and 30 (reporting that recall involved "up to 5 million Similac-brand powder formulas" and "Abbot expects to lose $100 million in connection with the recall.")).

5. *Harm to health.* There is a real potential for adverse human health impacts if sulfuryl fluoride is not available for treatment of food commodities, food mills, and other food processing facilities where sulfuryl fluoride is used. Without sulfuryl fluoride, there would be re-infestation of those commodities or facilities if facilities are not able to find suitable alternatives and thus more contamination of food products by the pests controlled by sulfuryl fluoride. Contamination would include whole insects, insect body parts, and insect waste, mainly from various flour beetles, moths, and cockroaches. Some of these contaminants (*e.g.,* from cockroaches) have been identified as allergens. (Ref. 31). Other beetles have been associated with gastrointestinal illness and discomfort. (Ref. 32 and 33). Contamination also could include food-borne pathogens that cause disease, such as *E. coli* or *Salmonella,* introduced by flies that would no longer be controlled by sulfuryl fluoride. (*Id.*)

6. *Conclusion.* In the absence of sulfuryl fluoride tolerances, current sulfuryl fluoride users will, in the first instance, turn to methyl bromide if methyl bromide can be obtained. Users' ability to obtain methyl bromide will depend on a complex mix of factors including: when a final decision is made on the sulfuryl fluoride tolerances; whether the use is an approved critical use for a given year and, if so, the amount of methyl bromide available either from new

---

[1] Before U.S. production may legally occur, a specific use must receive a CUE through the authorization of the Parties to the Montreal Protocol and then through EPA's regulations. The CUE process takes three years to complete for one control period (one calendar year). Methyl bromide users who wished to obtain a CUE to allow production in 2011 submitted their applications to

EPA in 2008. The U.S. Government reviewed those applications and submitted a Critical Use Nomination to the United Nations Environment Programme Ozone Secretariat in early 2009. During 2009, the Methyl Bromide Technical Options Committee (MBTOC) and the Technology and Economic Assessment Panel (TEAP), which are independent advisory bodies to the Parties to the Montreal Protocol, reviewed the Critical Use Nomination and made recommendations to the Parties. In the fall of 2009, the Parties met and approved CUEs for the following post-harvest uses in the U.S.: mills and food processing structures; country ham; dried fruit; and nuts. In 2010, EPA initiated notice-and-comment rulemaking to exempt the approved uses from its regulatory ban on methyl bromide production. The final rule will address what uses qualify for the exemption in 2011 and what amounts may be produced or imported for approved critical uses.

production or from pre-phase-out inventory under the CUE Rule for that year; and whether users have access to pre-phase-out inventory sold for non-critical exemption uses. To the extent that methyl bromide is used as a sulfuryl fluoride replacement, such a reversion to a stratospheric-ozone depleting chemical is a negative public health impact because it will add to damage to the ozone layer and contribute to additional health effects caused by exposure to ultraviolet radiation, including skin cancers and cataracts.

If both sulfuryl fluoride and methyl bromide are unavailable, or supplies are limited, there is likely to be some disruption of the food supply as to the affected commodities and/or there is a greater likelihood of contaminated food being released for public consumption. The extent of disruption and/or contamination varies based on the type of processing facility and the commodities involved. For newer flour mills and other food processing facilities (*i.e.*, ones made principally of concrete), use of heat should eventually be a successful alternative to sulfuryl fluoride. In the interim, food may become contaminated with insect parts and waste as facility owners use trial and error in adapting heat technology to their individual facilities.

Older processing facilities constructed mainly of wood may have no options other than to cease production unless Dow AgroSciences seeks and obtains a registration amendment for sulfuryl fluoride that insures that sulfuryl fluoride is used in a manner not resulting in residues in food. Even so, it is unknown whether use of sulfuryl fluoride under such an approach is economically feasible. EPA expects similar impacts on other food handling facilities that rely on sulfuryl fluoride or methyl bromide fumigation to control pests.

As to cocoa, impacts are likely to be very substantial. Currently, 100% of the imported cocoa in the United States is disinfested using sulfuryl fluoride. The likelihood of switching to methyl bromide is quite low. As of June 29, 2007 for the 2009 CUE control period, cocoa bean users of methyl bromide ceased seeking CUEs. Cocoa is not currently an approved critical use, and thus any methyl bromide produced under a CUE cannot be used on cocoa. Cocoa importers' only avenue for using methyl bromide would be to purchase methyl bromide from the dwindling pre-phase-out inventories. Eventually, fumigation chambers for phosphine could be constructed for cocoa but it may be a matter of years before they are

operational and phosphine use is not feasible at existing sulfuryl fluoride fumigation sites. In the absence of an alternative to sulfuryl fluoride for disinfestation of cocoa, cocoa imports (which in 2009 were valued at approximately $1.2 billion) would be lost due to either destruction or refusal of shipments by warehouse operators to comply with FDA regulations. Walnuts may also face significant impacts because of the need for rapid fumigation with either methyl bromide or sulfuryl fluoride. Without sulfuryl fluoride or methyl bromide, a significant portion of the crop may be lost simply due to insufficient fumigation capacity given the relatively long time needed for fumigation with phosphine. Other commodities facing a similar situation to walnuts include dried fruits other than raisins.

### D. The Public Interest

Determining where the public interest lies in this matter involves a complex weighing of inter-related environmental and health impacts and cost effects upon commercial interests and consumers. OPP attempts to capture each of these impacts in the following summary, some of which have been described previously. Others are discussed for the first time because they do not neatly fit under factors discussed previously.

1. *Harm from fluoride exposure.* Aggregate exposure to fluoride exceeds the safe level for several major identifiable population subgroups. Of principal concern here are children up to the age of 7.

2. *Sulfuryl fluoride's contribution to fluoride exposure.* Use of sulfuryl fluoride results in a minimal contribution to fluoride exposure. Elimination of sulfuryl fluoride does not solve, or even significantly decrease, the fluoride aggregate exposure problems identified earlier.

3. *Increase in the use of methyl bromide inventories.* There is a worldwide consensus that the use of chemicals that deplete the stratospheric ozone, such as methyl bromide, should be eliminated. Termination of sulfuryl fluoride will increase demand for methyl bromide and may result in an increase of use of methyl bromide inventories.

4. *Impacts on the food supply.* To the extent that neither methyl bromide nor sulfuryl fluoride is available, there are likely to be impacts on the food supply, either through disruption of food availability or contamination of food with insect parts and waste, because other feasible alternatives to sulfuryl

fluoride and methyl bromide will not be immediately available.

5. *Other atmospheric effects of sulfuryl fluoride.* EPA acknowledges that recent research has identified the potential for sulfuryl fluoride to contribute to the greenhouse effect; however there does not appear to be consensus yet in the scientific community on its global warming potential.

6. *International consequences.* As explained previously, the United States agreed to end domestic production of methyl bromide in 2005, along with other developed countries that are Parties to the Montreal Protocol. Since 2005, the United States has—along with a handful of other developed countries—been requesting limited continued amounts of methyl bromide to satisfy needs that Parties agree to be 'critical'. Also since 2005, U.S. requests for continued uses have been large, relative to those of other countries. At the beginning of the post-phase-out period, in 2005, 17 developed countries requested and obtained such exemptions; currently, the United States is one of only four developed countries that have not yet eliminated methyl bromide CUEs. (Ref. 27). The United States historically used a majority of the world's methyl bromide; therefore, the challenge faced by U.S. agriculture in this transition has been formidable. Still, enormous progress has been made in adopting alternatives for all major uses, allowing the United States to substantially reduce the size and number of its CUE requests. Sulfuryl fluoride has been an important component in this process. A sudden reversal by the United States in its efforts to reduce the use of methyl bromide may have broad ramifications on the success of the treaty. U.S. authorizations have been reduced further by the Parties to the Montreal Protocol, based on recommendations from the relevant technical committees of the Montreal Protocol. Rapid termination of sulfuryl fluoride tolerances would be at odds with the careful, deliberate, and well-established CUE process. The process is protracted and the relevant criteria demand technical justifications that require time to develop and substantiate. In reality, the multi-step CUE process is not designed with the expectation that it would allow a Party to the Montreal Protocol requesting a CUE for a given year to rapidly adjust either to the introduction of a new alternative or to the withdrawal of an existing alternative. An additional international consequence is that the lack of sulfuryl fluoride to treat imported commodities

such as cocoa could lead to shipments of imported commodities being rejected and trade with some economically vulnerable countries may be negatively affected.

*E. Conclusion*

Taking all of these factors into account involves weighing EPA's proposed conclusion that Objectors' have meritorious objections and the potential beneficial impacts on the public interest if a stay was granted against the negative impacts on the public interest from a stay approval. The beneficial impacts from granting a stay would be a slight reduction in fluoride exposure and other potential atmospheric effects. On the other hand, granting a stay would potentially cause the following negative impacts:

1. A possible increase in use of methyl bromide inventories, with attendant negative known atmospheric effects;

2. An undermining of the substantial progress made in reducing methyl bromide critical use exemptions in the postharvest market and potential disruption in implementation of an important international treaty, and

3. Significant impacts on several food industries and related effects on the public, including potential health effects on the public.

Despite the health risks posed by overall aggregate fluoride exposure and the Objectors' likelihood of success on the merits, OPP believes that each of the potential negative impacts on the public interest outweigh the beneficial public effects from a stay. Viewed in this light, EPA concludes that the public interest strongly, in fact overwhelmingly, supports denial of the Objectors' stay request.

**VIII. Proposed Effective Date of Order**

EPA proposes to make this order effective 60 days following publication. However, EPA is also proposing a staggered implementation for withdrawal of the affected tolerances in 40 CFR 180.145(c) and 180.575 taking into account the discussion in Unit VII. concerning the Objectors' stay request. This staggered implementation is proposed to be accomplished by including an expiration/revocation date in 40 CFR 180.145(c) and 180.575 for each of the tolerances not proposed for withdrawal upon the effective date of the order. Given the potential disruption or contamination of some commodities in the food supply, severely limited availability of methyl bromide, and prospect of difficulties in implementing an important international treaty, EPA is proposing to withdraw tolerances under

the following implementation or phaseout schedule:

1. *Tolerances for canceled uses: immediately.* For uses that have been removed from the sulfuryl fluoride registration, there is no reason the proposed order should not take effect upon the effective date of the order. These tolerances are: Dried eggs; milk, powdered.

2. *Tolerances for commodities where there is little to no use of sulfuryl fluoride: 90 days.* EPA's analysis and information from Dow AgroSciences indicate that sulfuryl fluoride is not currently used in significant amounts, if at all, on numerous commodities for which direct fumigation is allowed under the sulfuryl fluoride registration. EPA is proposing a termination of tolerances associated with these uses 90 days from the effective date of the order. Ninety days should be sufficient for all affected parties to come into compliance with the revised situation. Tolerances in this category are: barley, bran, postharvest; barley, flour, postharvest; barley, grain, postharvest; barley, pearled barley, postharvest; cattle, meat, dried; cheese; coconut, postharvest; coffee, bean, green, postharvest; corn, field, flour, postharvest; corn, field, grain, postharvest; corn, field, grits, postharvest; corn, field, meal, postharvest; corn, pop, grain, postharvest; cotton, undelinted seed, postharvest; ginger, postharvest; grain, aspirated fractions, postharvest; grape, raisin, postharvest; herbs and spices group 19, postharvest; hog, meat; millet, grain, postharvest; nut, pine, postharvest; nut, tree, Group 14, postharvest (revised to cover only walnuts, postharvest); oat, flour, postharvest; oat, grain, postharvest; oat, groat/rolled oats; peanut, postharvest; pistachio, postharvest; sorghum, grain, postharvest; triticale, grain, postharvest; vegetable, legume, group 6, postharvest; wheat, bran, postharvest; wheat, flour, postharvest; wheat, germ, postharvest; wheat, grain postharvest; wheat, milled byproducts, postharvest; wheat, shorts, postharvest.

3. *Tolerances for commodities directly treated where there is significant sulfuryl fluoride use and no readily-available alternative: 3 years.* For several commodities, sulfuryl fluoride is used on all, or a substantial portion, of the crop and there is no readily-available alternative. These commodities are cocoa, walnuts, and dried fruits other than raisins. Although there is a feasible alternative available for sulfuryl fluoride in the long-term, phosphine, in the short-term that alternative is not available due to the lack of fumigation capacity. The

situation for cocoa is perhaps the most dire in that 100% of the crop is treated, the space used for sulfuryl fluoride fumigation is not appropriate for phosphine use, and, given that cocoa is not currently an approved critical use, methyl bromide produced under a CUE may not be used on cocoa. While not facing quite such catastrophic consequences, walnuts are nonetheless in essentially the same situation because the only realistic treatment option in the near term (*i.e.*, methyl bromide) can only be obtained, if at all, from pre-phase-out inventories or from production under the sharply-limited postharvest CUE, and another alternative will not be available until additional fumigation capacity is created. The situation appears similar for dried fruits other than raisins as well; however, EPA requests that information be submitted during the comment period documenting the amount of sulfuryl fluoride use on dried fruits and the availability of alternatives including the availability of capacity for alternative fumigations. EPA is proposing termination of tolerances associated with these uses 3 years from the effective date of the order. Construction of fumigation chambers may take several years.

4. *Tolerances for commodities receiving residues from incidental treatment during structural fumigation—3 years.* The situation for foods requiring tolerances as a result of incidental treatment from structural fumigations is more complicated. Different types of facilities will face different hurdles in transitioning from sulfuryl fluoride to other methods of pest control. For most facilities, use of heat may prove an adequate pest control strategy. However, implementation of heat technology is not expected to be seamless and the availability of sulfuryl fluoride as a backup to avoid potential disruption or contamination is important. OPP expects that, after the first year, use of sulfuryl fluoride in these facilities will be the exception rather than the rule as the technology comes online and facility operators gain experience with it. In other words, sulfuryl fluoride would only be used when difficulties arise in perfecting the use of heat technology in individual facilities. Given the cost of sulfuryl fluoride treatment, facility operators, having invested in heat technology, will have a strong incentive to avoid use of sulfuryl fluoride unless absolutely necessary. A relatively short transition period may be appropriate for these facilities. For wooden structures, however, where heat is not an option,

no chemical or non-chemical alternative is immediately available. These facilities face an uncertain future with perhaps the best alternative being pursuit by Dow AgroSciences of restrictions on the sulfuryl fluoride registration that would eliminate the possibility of residues in food and thus permit continued use of sulfuryl fluoride as a structural fumigant in food handling facilities. Nonetheless, even this approach is in question due to feasibility issues. Thus, to some degree, owners of wooden food handling facilities face the most serious consequences of any producer group and, due to their relatively large share of the market, there could be similarly serious consequences for the public. For that reason, EPA is proposing termination of tolerances associated with these uses 3 years from the effective date of the order. To insure that this extended transition period will not encourage owners of concrete facilities to maintain the status quo, EPA plans to pursue registration modifications for sulfuryl fluoride that differentiate between sulfuryl fluoride use in concrete and wooden structures. EPA's goal would be to allow sulfuryl fluoride use in concrete facilities for a period no longer than necessary to accomplish the transition to heat technology.

EPA specifically requests comment on the potential impacts from the loss of sulfuryl fluoride including any available and additional information on pest control alternatives to sulfuryl fluoride. Such information is important to EPA's decision on the proposed effective dates for this order. Further, EPA recognizes that sulfuryl fluoride is only one of many sources of exposure to fluoride. To the extent that new information indicates that overall fluoride exposure has decreased, including as a result of other government actions, EPA would consider revisiting the determinations in this proposed order.

## IX. Request for Public Comment

EPA requests public comment on all aspects of this proposed order: Its hazard, exposure, and risk assessments of fluoride; its evaluation of the factors bearing on whether a stay should be granted; and its proposed effective dates for the order.

## X. Regulatory Assessment Requirements

As indicated previously, this action announces the Agency's proposed order regarding objections filed under section 408 of FFDCA. As such, this action is an adjudication and not a rule. The regulatory assessment requirements imposed on rulemaking do not, therefore, apply to this action.

## XI. Submission to Congress and the Comptroller General

The Congressional Review Act, (5 U.S.C. 801 *et seq.*), as added by the Small Business Regulatory Enforcement Fairness Act of 1996, does not apply to this order because this action is not a rule for purposes of 5 U.S.C. 804(3).

## XII. References

As indicated under **ADDRESSES**, a docket has been established for this rulemaking under docket ID number EPA–HQ–OPP–2005–0174. The following is a listing of the documents that are specifically referenced in this document. The docket includes these documents and other information considered, including documents that are referenced within the documents that are included in the docket, even if the referenced document is not physically located in the docket. For assistance in locating these other documents, please consult the technical contact listed under **FOR FURTHER INFORMATION CONTACT**.

1. Fluoride Action Network and Beyond Pesticides/National Coalition Against the Misuse of Pesticides, Written Objections and Request for Hearing in the matter of: Sulfuryl Fluoride; Pesticide Tolerance; Final Rule. (March 23, 2004).

2. Motion of Objectors for Stay of Final Rules Establishing Tolerances For Residues of Sulfuryl Fluoride and Fluoride Anion; (Docket Nos. OPP–2005–0174 and OPP–2003–0373) (June 1, 2006).

3. Objectors' Consolidated Objections to Final Rules Establishing Tolerances for Residues of Sulfuryl Fluoride and Fluoride Anion (November 6, 2006).

4. USEPA, *A User's Guide to Available EPA Information on Assessing Exposure to Pesticides in Food* (June 21, 2000).

5. USEPA. Office of Research and Development. 2000. Benchmark Dose Technical Guidance Document. Draft report. Risk Assessment Forum, Office of Research and Development, U.S. Environmental Protection Agency. Washington, DC. EPA/630/R-00/001.

6. FIFRA Science Advisory Panel. 2002. Methods Used to Conduct a Preliminary Cumulative Risk Assessment for Organophosphate Pesticides. Final Report from the FIFRA Scientific Advisory Panel Meeting of February 5–7, 2002 (Report dated March 19, 2002). FIFRA Scientific Advisory Panel, Office of Science Coordination and Policy, Office of Prevention, Pesticides and Toxic Substances, U.S. Environmental Protection Agency. Washington, DC. SAP Report 2002–01.

7. FIFRA Science Advisory Panel. 2005b. Final report on Preliminary *N*-Methyl Carbamate Cumulative Risk Assessment. Final Report from the FIFRA Scientific Advisory Panel Meeting of August 23–25, 2005 (Report dated October 13, 2005).

Available at: *http://www.epa.gov/scipoly/sap/2005/august/minutes.pdf.*

8. Office of Pesticide Programs, USEPA, Office of Pesticide Programs' Policy on the Determination of the Appropriate FQPA Safety Factor(s) For Use in the Tolerance Setting Process (February 28, 2002).

9. USEPA, Residue Chemistry Test Guidelines: OPPTS 860.1500 Crop Field Trials (August 1996).

10. Office of Pesticide Programs, USEPA and Pest Regulatory Management Agency, Health Canada, NAFTA Guidance Document for Guidance for Setting Pesticide Tolerances Based on Field Trial Data (September 28, 2005).

11. Office of Pesticide Programs, USEPA, Choosing a Percentile of Acute Dietary Exposure as a Threshold of Regulatory Concern (March 16, 2000).

12. Office of Pesticide Programs, USEPA, Standard Operating Procedures (SOPs) for Residential Exposure Assessments (Draft December 19, 1997).

13. Office of Prevention, Pesticides, and Toxic Substances, USEPA, "Response To Public Comments Concerning The Use Of Sulfuryl Fluoride As A Post-Harvest Fumigant" (January 16, 2004).

14. Baetcke *et al.*, Office of Pesticide Programs, USEPA, "A Preliminary Evaluation of Articles Related to Fluoride Cited by the Fluoride Action Network (FAN) as Objections to the Sulfuryl Fluoride Pesticide Tolerance Rule" (November 18, 2003).

15. Office of Prevention, Pesticides, and Toxic Substances, USEPA, Memorandum from Vicki L. Dellarco to Dennis McNeilly, Review of Five Recent Papers on Fluoride Submitted by the Fluoride Action Network (January 8, 2004).

16. Office of Prevention, Pesticides, and Toxic Substances, USEPA, "Response to Public Comments Concerning the Use of Sulfuryl Fluoride In Food Handling Facilities" (July 14, 2005).

17. National Research Council of the National Academies, "Fluoride in Drinking Water: A Scientific Review of EPA's Standards" (March 2006).

18. Objectors' Submission to Docket: 18 IQ Studies (posted February 17, 2009).

19. Dow AgroSciences LLC, "Response to Request for Public Comments; Sulfuryl Fluoride; Request for Stay of Tolerances; Public Docket Identification Numbers: EPA–HQ–OPP–2005–0174 and EPA–HQ–OPP–2003–0373 (August 4, 2006).

20. Dow AgroSciences LLC, Memorandum, "Standard for Granting a Hearing under the Federal Food, Drug, and Cosmetic Act Concerning Objections to Tolerances Established by EPA for Profume™ Gas Fumigant" (October 31, 2006).

21. Health and Ecological Criteria Division, Office of Water, USEPA, "Fluoride: Dose-Response Analysis for Non-cancer Effects" (December 2010).

22. Health and Ecological Criteria Division, Office of Water, USEPA, "Fluoride: Exposure and Relative Source Contribution Analysis" (December 2010).

23. Office of Chemical Safety and Pollution Prevention, US EPA, Memorandum from Michael A. Doherty to Meredith Laws, "Sulfuryl Fluoride—Revised Human Health

Risk Assessment for Fluoride to Incorporate New Hazard and Exposure Information" (January 7, 2011).

24. Office of Prevention, Pesticides, and Toxic Substances, US EPA, Memorandum from Colwell A. Cook, Jonathan Becker, and Elisa Rim to Kable Davis/Venus Eagle and Michael Doherty/Christina Swartz, "Revised Assessment of Percent Commodity Treated Values used in the Registrant's Dietary Exposure Assessment for Fluoride (DP# 361041)" (May 1, 2009).

25. Office of Chemical Safety and Pollution Prevention, US EPA, Memorandum from Michelle Ranville and Colwell Cook to Meredith Laws, "Assessment of Impacts on Flour Mills Operators of a Stay in Sulfuryl Fluoride Food Tolerances" (January 7, 2011).

26. Office of Chemical Safety and Pollution Prevention, US EPA, Memorandum from Colwell Cook and Michelle Ranville to Meredith Laws, "Assessment of Impacts of a Stay of Food Tolerances for Sulfuryl Fluoride on Selected Post-Harvest Commodities" (January 7, 2011).

27. Office of Chemical Safety and Pollution Prevention, US EPA, Memorandum from Colwell Cook and Michelle Ranville to Jonathan Fleuchaus, Post Harvest Methyl Bromide Grant to the United States by the Parties to the Montreal Protocol, 2005–2011 (December 16, 2010).

28. Washington Post, "Bugs in Baby Formula? Parents Worried About Recall" (September 24, 2010) (available at *http:// www.washingtonpost.com/wp-dyn/content/ article/2010/09/24/ AR2010092402044.html?waporef=obinsite*).

29. U.S. FDA Consumer Update, "Abbott Recalls Some Similac Formulas (September 23, 2010) (available at *http://www.fda.gov/ ForConsumers/ConsumerUpdates/ ucm226941.htm*).

30. Washington Post, "Bug Contamination Sparks Baby Formula Recall" (September 23, 2010) (available at *http:// www.washingtonpost.com/wp-dyn/content/ article/2010/09/22/ AR2010092206070.html?waporef=obinsite*).

31. Olsen *et al.,* Regulatory Action Criteria for Filth and Other Extraneous Materials, V.

Strategy for Evaluating Hazardous and Nonhazardous Filth (Jan. 12, 2001).

32. U.S. FDA Consumer Update, "Abbott Recalls Some Similac Formulas" (September 23, 2010) (available at *http://www.fda.gov/ ForConsumers/ConsumerUpdates/ ucm226941.htm*).

33. Olsen, Alan, FDA Teamwork Uncovers Insect Infestation, FDA Consumer, Vol. 25, Jul.–Aug. 1991).

## List of Subjects in 40 CFR Part 180

Environmental protection, Administrative practice and procedure, Agricultural commodities, Pesticides and pests, Reporting and recordkeeping requirements.

Dated: January 7, 2011.

**Steve Bradbury,**

*Director, Office of Pesticide Programs.*

[FR Doc. 2011–917 Filed 1–18–11; 8:45 am]

**BILLING CODE 6560–50–P**

# Pls.' Exhibit 042

# Federal Register, Volume 73, Number 219 (November 12, 2008), Pages 66,964–67,062. National Ambient Air Quality Standards for Lead; Final Rule

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 50, 51, 53 and 58**

**[EPA–HQ–OAR–2006–0735; FRL–8732–9]**

**RIN 2060–AN83**

## National Ambient Air Quality Standards for Lead

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** Based on its review of the air quality criteria and national ambient air quality standards (NAAQS) for lead (Pb), EPA is making revisions to the primary and secondary NAAQS for Pb to provide requisite protection of public health and welfare, respectively. With regard to the primary standard, EPA is revising the level to 0.15 $\mu g/m^3$. EPA is retaining the current indicator of Pb in total suspended particles (Pb-TSP). EPA is revising the averaging time to a rolling 3-month period with a maximum (not-to-be-exceeded) form, evaluated over a 3-year period. EPA is revising the secondary standard to be identical in all respects to the revised primary standard.

EPA is also revising data handling procedures, including allowance for the use of Pb-$PM_{10}$ data in certain circumstances, and the treatment of exceptional events, and ambient air monitoring and reporting requirements for Pb, including those related to sampling and analysis methods, network design, sampling schedule, and data reporting. Finally, EPA is revising emissions inventory reporting requirements and providing guidance on its approach for implementing the revised primary and secondary standards for Pb.

**DATES:** This final rule is effective on January 12, 2009.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2006–0735. All documents in the docket are listed on the *www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, e.g., confidential business information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Air and Radiation Docket and Information Center, EPA/DC, EPA West, Room 3334, 1301 Constitution Ave.,

NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744 and the telephone number for the Air and Radiation Docket and Information Center is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** For further information in general or specifically with regard to sections I through III or VIII, contact Dr. Deirdre Murphy, Health and Environmental Impacts Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Mail code C504–06, Research Triangle Park, NC 27711; *telephone:* 919–541–0729; *fax:* 919–541–0237; *e-mail: Murphy.deirdre@epa.gov.* With regard to section IV, contact Mr. Mark Schmidt, Air Quality Analysis Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Mail code C304–04, Research Triangle Park, NC 27711; *telephone:* 919–541–2416; *fax:* 919–541–1903; *e-mail: Schmidt.mark@epa.gov.* With regard to section V, contact Mr. Kevin Cavender, Air Quality Analysis Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Mail code C304–06, Research Triangle Park, NC 27711; *telephone:* 919–541–2364; *fax:* 919–541–1903; *e-mail: Cavender.kevin@epa.gov.* With regard to section VI, contact Mr. Larry Wallace, Ph.D., Air Quality Policy Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Mail code C539–01, Research Triangle Park, NC 27711; *telephone:* 919–541–0906; *fax:* 919–541–0824; *e-mail: Wallace.larry@epa.gov.* With regard to section VII, contact Mr. Tom Link, Air Quality Policy Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Mail code C539–04, Research Triangle Park, NC 27711; *telephone:* 919–541–5456; *e-mail: Link.tom@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

The following topics are discussed in this preamble:

I. Summary and Background
  A. Summary of Revisions to the Lead NAAQS
  B. Legislative Requirements
  C. Review of Air Quality Criteria and Standards for Lead
  D. Current Related Control Requirements
  E. Summary of Proposed Revisions to the Lead NAAQS
  F. Organization and Approach to Final Lead NAAQS Decisions
II. Rationale for Final Decisions on the Primary Lead Standard
  A. Introduction
  1. Overview of Multimedia, Multipathway Considerations and Background
  2. Overview of Health Effects Information
  a. Blood Lead
  b. Array of Health Effects and At-risk Subpopulations
  c. Neurological Effects in Children
  3. Overview of Human Exposure and Health Risk Assessments
  B. Need for Revision of the Current Primary Lead Standard
  1. Introduction
  2. Comments on the Need for Revision
  3. Conclusions Regarding the Need for Revision
  C. Conclusions on the Elements of the Primary Lead Standard
  1. Indicator
  a. Basis for Proposed Decision
  b. Comments on Indicator
  c. Conclusions on Indicator
  2. Averaging Time and Form
  a. Basis for Proposed Decision
  b. Comments on Averaging Time and Form
  c. Conclusions on Averaging Time and Form
  3. Level
  a. Basis for Proposed Range
  b. Comments on Level
  c. Conclusions on Level
  D. Final Decision on the Primary Lead Standard
III. Secondary Lead Standard
  A. Introduction
  1. Overview of Welfare Effects Evidence
  2. Overview of Screening Level Ecological Risk Assessment
  B. Conclusions on the Secondary Lead Standard
  1. Basis for Proposed Decision
  2. Comments on the Proposed Secondary Standard
  3. Administrator's Conclusions
  C. Final Decision on the Secondary Lead Standard
IV. Appendix R—Interpretation of the NAAQS for Lead
  A. Ambient Data Requirements
  1. Proposed Provisions
  2. Comments on Ambient Data Requirements
  3. Conclusions on Ambient Data Requirements
  B. Averaging Time and Procedure
  1. Proposed Provisions
  2. Comments on Averaging Time and Procedure
  3. Conclusions on Averaging Time and Procedure
  C. Data Completeness
  1. Proposed Provisions
  2. Comments on Data Completeness
  3. Conclusions on Data Completeness
  D. Scaling Factors to Relate Pb-TSP and Pb-$PM_{10}$
  1. Proposed Provisions
  2. Comments on Scaling Factors
  3. Conclusions on Scaling Factors
  E. Use of Pb-TSP and Pb-$PM_{10}$ Data
  1. Proposed Provisions
  2. Comments on Use of Pb-TSP and Pb-$PM_{10}$ Data
  3. Conclusions on Use of Pb-TSP and Pb-$PM_{10}$ Data

F. Data Reporting and Rounding
1. Proposed Provisions
2. Comments on Data Reporting and Rounding
3. Conclusions on Data Reporting and Rounding
G. Other Aspects of Data Interpretation
V. Ambient Monitoring Related to Revised Lead Standards
A. Sampling and Analysis Methods
1. Pb-TSP Method
a. Proposed Changes
b. Comments on the Pb-TSP Method
c. Decisions on Pb-TSP Method
2. Pb-PM$_{10}$ Method
a. Proposed FRM for Pb-PM$_{10}$ Monitoring
b. Comments on Proposed Pb-PM$_{10}$ FRM
c. Decisions on Pb-PM$_{10}$ FRM
3. FEM Requirements
a. Proposed FEM Requirements
b. Comments
c. Decisions on FEM Requirements
4. Quality Assurance Requirements
a. Proposed Changes
b. Comments
c. Decisions on Quality Assurance Requirements
B. Network Design
1. Proposed Changes
2. Comments on Network Design
a. Source-oriented monitoring
b. Non-source-oriented monitoring
c. Roadway Monitoring
d. Use of Pb-PM$_{10}$ Monitors
e. Required timeline for monitor installation and operation
3. Decisions on Network Design Requirements
C. Sampling Frequency
D. Monitoring for the Secondary Standard
E. Other Monitoring Regulation Changes
1. Reporting of Average Pressure and Temperature
2. Special Purpose Monitoring
3. Reporting of Pb-TSP Concentrations
VI. Implementation Considerations
A. Designations for the Lead NAAQS
1. Proposal
2. Comments and Responses
3. Final
B. Lead Nonattainment Area Boundaries
1. Proposal
2. Comments and Responses
3. Final
C. Classifications
1. Proposal
2. Comments and Responses
3. Final
D. Section 110(a)(2) Lead NAAQS Infrastructure Requirements
1. Proposal
2. Final
E. Attainment Dates
1. Proposal
2. Comments and Responses
3. Final
F. Attainment Planning Requirements
1. RACM/RACT for Lead Nonattainment Areas
a. Proposal
b. Comments and Responses
c. Final
2. Demonstration of Attainment for Lead Nonattainment Areas
a. Proposal
b. Final

3. Reasonable Further Progress (RFP)
a. Proposal
b. Comments and Responses
c. Final
4. Contingency Measures
a. Proposal
b. Comments and Responses
c. Final
5. Nonattainment New Source Review (NSR) and Prevention of Significant Deterioration (PSD) Requirements
a. Proposal
b. Comments and Responses
c. Final
6. Emissions Inventories
a. Proposal
b. Comments and Responses
c. Final
7. Modeling
a. Proposal
b. Comments and Responses
c. Final
G. General Conformity
1. Proposal
2. Final
H. Transition From the Current NAAQS to a Revised NAAQS for Lead
1. Proposal
2. Final
VII. Exceptional Events Information Submission Schedule for Lead NAAQS
A. Proposal
B. Comments and Responses
C. Final
VIII. Statutory and Executive Order Reviews
A. Executive Order 12866: Regulatory Planning and Review
B. Paperwork Reduction Act
C. Regulatory Flexibility Act
D. Unfunded Mandates Reform Act
E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
G. Executive Order 13045: Protection of Children From Environmental Health & Safety Risks
H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use
I. National Technology Transfer and Advancement Act
J. Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations
K. Congressional Review Act
References

## I. Summary and Background

### A. Summary of Revisions to the Lead NAAQS

Based on its review of the air quality criteria and national ambient air quality standards (NAAQS) for lead (Pb), EPA is making revisions to the primary and secondary NAAQS for Pb to provide requisite protection of public health and welfare, respectively. With regard to the primary standard, EPA is revising various elements of the standard to provide increased protection for children and other at-risk populations against an array of adverse health effects, most notably including neurological effects in children, including neurocognitive and neurobehavioral effects. EPA is revising the level to 0.15 μg/m³. EPA is retaining the current indicator of Pb in total suspended particles (Pb-TSP). EPA is revising the averaging time to a rolling 3-month period with a maximum (not-to-be-exceeded) form, evaluated over a 3-year period.

EPA is revising the secondary standard to be identical in all respects to the revised primary standard.

EPA is also revising data handling procedures, including allowance for the use of Pb-PM$_{10}$ data in certain circumstances, and the treatment of exceptional events, and ambient air monitoring and reporting requirements for Pb, including those related to sampling and analysis methods, network design, sampling schedule, and data reporting.

### B. Legislative Requirements

Two sections of the Clean Air Act (Act) govern the establishment and revision of the NAAQS. Section 108 (42 U.S.C. 7408) directs the Administrator to identify and list each air pollutant, emissions of which "in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health and welfare" and whose "presence * * * in the ambient air results from numerous or diverse mobile or stationary sources" and to issue air quality criteria for those that are listed. Air quality criteria are to "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of [the] pollutant in ambient air * * *". Section 109 (42 U.S.C. 7409) directs the Administrator to propose and promulgate "primary" and "secondary" NAAQS for pollutants listed under section 108. Section 109(b)(1) defines a primary standard as one "the attainment and maintenance of which in the judgment of the Administrator, based on [air quality] criteria and allowing an adequate margin of safety, are requisite to protect the public health." [1] A secondary standard, as defined in section 109(b)(2), must "specify a level of air quality the attainment and

---

[1] The legislative history of section 109 indicates that a primary standard is to be set at "the maximum permissible ambient air level * * * which will protect the health of any [sensitive] group of the population," and that for this purpose "reference should be made to a representative sample of persons comprising the sensitive group rather than to a single person in such a group." S. Rep. No. 91–1196, 91st Cong., 2d Sess. 10 (1970).

maintenance of which, in the judgment of the Administrator, based on criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of [the] pollutant in the ambient air.'' [2]

The requirement that primary standards include an adequate margin of safety was intended to address uncertainties associated with inconclusive scientific and technical information available at the time of standard setting. It was also intended to provide a reasonable degree of protection against hazards that research has not yet identified. *Lead Industries Association* v. *EPA*, 647 F.2d 1130, 1154 (D.C. Cir 1980), *cert. denied*, 449 U.S. 1042 (1980); *American Petroleum Institute* v. *Costle*, 665 F.2d 1176, 1186 (D.C. Cir. 1981), *cert. denied*, 455 U.S. 1034 (1982). Both kinds of uncertainties are components of the risk associated with pollution at levels below those at which human health effects can be said to occur with reasonable scientific certainty. Thus, in selecting primary standards that include an adequate margin of safety, the Administrator is seeking not only to prevent pollutant levels that have been demonstrated to be harmful but also to prevent lower pollutant levels that may pose an unacceptable risk of harm, even if the risk is not precisely identified as to nature or degree. The CAA does not require the Administrator to establish a primary NAAQS at a zero-risk level or at background concentration levels, see *Lead Industries Association* v. *EPA*, 647 F.2d at 1156 n. 51, but rather at a level that reduces risk sufficiently so as to protect public health with an adequate margin of safety.

The selection of any particular approach to providing an adequate margin of safety is a policy choice left specifically to the Administrator's judgment. *Lead Industries Association* v. *EPA*, 647 F.2d at 1161–62. In addressing the requirement for an adequate margin of safety, EPA considers such factors as the nature and severity of the health effects involved, the size of the population(s) at risk, and the kind and degree of the uncertainties that must be addressed. In setting standards that are ''requisite'' to protect public health and welfare, as provided in section 109(b), EPA's task is to establish standards that are neither more

nor less stringent than necessary for these purposes. *Whitman* v. *American Trucking Associations*, 531 U.S. 457, 473. Further the Supreme Court ruled that ''[t]he text of § 109(b), interpreted in its statutory and historical context and with appreciation for its importance to the CAA as a whole, unambiguously bars cost considerations from the NAAQS-setting process * * *'' *Id.* at 472.[3]

Section 109(d)(1) of the Act requires that ''[n]ot later than December 31, 1980, and at 5-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under section 108 and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section 108 and subsection (b) of this section.'' Section 109(d)(2)(A) requires that ''The Administrator shall appoint an independent scientific review committee composed of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies.'' Section 109(d)(2)(B) requires that, ''[n]ot later than January 1, 1980, and at five-year intervals thereafter, the committee referred to in subparagraph (A) shall complete a review of the criteria published under section 108 and the national primary and secondary ambient air quality standards promulgated under this section and shall recommend to the Administrator any new national ambient air quality standards and revisions of existing criteria and standards as may be appropriate under section 108 and subsection (b) of this section.'' Since the early 1980's, this independent review function has been performed by the Clean Air Scientific Advisory Committee (CASAC) of EPA's Science Advisory Board.

## C. Review of Air Quality Criteria and Standards for Lead

On October 5, 1978, EPA promulgated primary and secondary NAAQS for Pb under section 109 of the Act (43 FR 46246). Both primary and secondary standards were set at a level of 1.5

micrograms per cubic meter ($\mu g/m^3$), measured as Pb in total suspended particulate matter (Pb-TSP), not to be exceeded by the maximum arithmetic mean concentration averaged over a calendar quarter. This standard was based on the 1977 *Air Quality Criteria for Lead* (USEPA, 1977).

A review of the Pb standards was initiated in the mid-1980s. The scientific assessment for that review is described in the 1986 *Air Quality Criteria for Lead* (USEPA, 1986a), the associated Addendum (USEPA, 1986b) and the 1990 Supplement (USEPA, 1990a). As part of the review, the Agency designed and performed human exposure and health risk analyses (USEPA, 1989), the results of which were presented in a 1990 Staff Paper (USEPA, 1990b). Based on the scientific assessment and the human exposure and health risk analyses, the 1990 Staff Paper presented options for the Pb NAAQS level in the range of 0.5 to 1.5 $\mu g/m^3$, and suggested the second highest monthly average in three years for the form and averaging time of the standard (USEPA, 1990b). After consideration of the documents developed during the review and the significantly changed circumstances since Pb was listed in 1976, the Agency did not propose any revisions to the 1978 Pb NAAQS. In a parallel effort, the Agency developed the broad, multi-program, multimedia, integrated *U.S. Strategy for Reducing Lead Exposure* (USEPA, 1991). As part of implementing this strategy, the Agency focused efforts primarily on regulatory and remedial clean-up actions aimed at reducing Pb exposures from a variety of nonair sources judged to pose more extensive public health risks to U.S. populations, as well as on actions to reduce Pb emissions to air, such as bringing more areas into compliance with the existing Pb NAAQS (USEPA, 1991).

EPA initiated the current review of the air quality criteria for Pb on November 9, 2004 with a general call for information (69 FR 64926). A project work plan (USEPA, 2005a) for the preparation of the Criteria Document was released in January 2005 for CASAC and public review. EPA held a series of workshops in August 2005, inviting recognized scientific experts to discuss initial draft materials that dealt with various lead-related issues being addressed in the Pb air quality criteria document. In February 2006, EPA released the *Plan for Review of the National Ambient Air Quality Standards for Lead* (USEPA 2006c) that described Agency plans and a timeline for reviewing the air quality criteria, developing human exposure and risk

---

[2] Welfare effects as defined in section 302(h) (42 U.S.C. 7602(h)) include, but are not limited to, ''effects on soils, water, crops, vegetation, man-made materials, animals, wildlife, weather, visibility and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being.''

[3] In considering whether the CAA allowed for economic considerations to play a role in the promulgation of the NAAQS, the Supreme Court rejected arguments that because many more factors than air pollution might affect public health, EPA should consider compliance costs that produce health losses in setting the NAAQS. *Whitman* v. *American Trucking Associations*, 531 U.S. at 466. Thus, EPA may not take into account possible public health impacts from the economic cost of implementation. *Id.*

assessments and an ecological risk assessment, preparing a policy assessment, and developing the proposed and final rulemakings.

The first draft of the Criteria Document (USEPA, 2005b) was released for CASAC and public review in December 2005 and discussed at a CASAC meeting held on February 28–March 1, 2006. A second draft Criteria Document (USEPA, 2006b) was released for CASAC and public review in May 2006, and discussed at the CASAC meeting on June 28, 2006. A subsequent draft of *Chapter 7—Integrative Synthesis* (chapter 8 in the final Criteria Document), released on July 31, 2006, was discussed at an August 15, 2006 CASAC teleconference. The final Criteria Document was released on September 30, 2006 (USEPA, 2006a; cited throughout this preamble as CD). While the Criteria Document focuses on new scientific information available since the last review, it integrates that information with scientific information from previous reviews.

In May 2006, EPA released for CASAC and public review a draft *Analysis Plan for Human Health and Ecological Risk Assessment for the Review of the Lead National Ambient Air Quality Standards* (USEPA, 2006d), which was discussed at a June 29, 2006 CASAC meeting (Henderson, 2006). The May 2006 assessment plan discussed two assessment phases: a pilot phase and a full-scale phase. The pilot phase of both the human health and ecological risk assessments was presented in the draft *Lead Human Exposure and Health Risk Assessments and Ecological Risk Assessment for Selected Areas* (ICF, 2006; henceforth referred to as the first draft Risk Assessment Report) which was released for CASAC and public review in December 2006. The first draft Staff Paper, also released in December 2006, discussed the pilot assessments and the most policy-relevant science from the Criteria Document. These documents were reviewed by CASAC and the public at a public meeting on February 6–7, 2007 (Henderson, 2007a).

Subsequent to that meeting, EPA conducted full-scale human exposure and health risk assessments, although no further work was done on the ecological risk assessment due to resource limitations. A second draft Risk Assessment Report (USEPA, 2007a), containing the full-scale human exposure and health risk assessments, was released in July 2007 for review by CASAC at a meeting held on August 28–29, 2007. Taking into consideration CASAC comments (Henderson, 2007b) and public comments on that document, we conducted additional human

exposure and health risk assessments. A final Risk Assessment Report (USEPA, 2007b) and final Staff Paper (USEPA, 2007c) were released on November 1, 2007.

The final Staff Paper presents OAQPS staff's evaluation of the public health and welfare policy implications of the key studies and scientific information contained in the Criteria Document and presents and interprets results from the quantitative risk/exposure analyses conducted for this review. Further, the Staff Paper presents OAQPS staff recommendations on a range of policy options for the Administrator to consider concerning whether, and if so how, to revise the primary and secondary Pb NAAQS. Such an evaluation of policy implications is intended to help "bridge the gap" between the scientific assessment contained in the Criteria Document and the judgments required of the EPA Administrator in determining whether it is appropriate to retain or revise the NAAQS for Pb. In evaluating the adequacy of the current standard and a range of alternatives, the Staff Paper considered the available scientific evidence and quantitative risk-based analyses, together with related limitations and uncertainties, and focused on the information that is most pertinent to evaluating the basic elements of national ambient air quality standards: Indicator,[4] averaging time, form,[5] and level. These elements, which together serve to define each standard, must be considered collectively in evaluating the public health and welfare protection afforded by the Pb standards. The information, conclusions, and OAQPS staff recommendations presented in the Staff Paper were informed by comments and advice received from CASAC in its reviews of the earlier draft Staff Paper and drafts of related risk/exposure assessment reports, as well as comments on these earlier draft documents submitted by public commenters.

Subsequent to completion of the Staff Paper, EPA issued an advance notice of proposed rulemaking (ANPR) that was signed by the Administrator on December 5, 2007 (72 FR 71488). The ANPR is one of the key features of the new NAAQS review process that EPA has instituted over the past two years to help to improve the efficiency of the

process the Agency uses in reviewing the NAAQS while ensuring that the Agency's decisions are informed by the best available science and broad participation among experts in the scientific community and the public. The ANPR provided the public an opportunity to comment on a wide range of policy options that could be considered by the Administrator.

A public meeting of CASAC was held on December 12–13, 2007 to provide advice and recommendations to the Administrator based on its review of the ANPR and the previously released final Staff Paper and Risk Assessment Report. Transcripts of the meeting and CASAC's letter to the Administrator (Henderson, 2008a) are in the docket for this review and CASAC's letter is also available on the EPA Web site (*http://www.epa.gov/sab*).

A public comment period for the ANPR extended through January 16, 2008 and comments received are in the docket for this review. Comments were received from nearly 9000 private citizens (roughly 200 of them were not part of one of several mass comment campaigns), 13 State and local agencies, one federal agency, three regional or national associations of government agencies or officials, 15 nongovernmental environmental or public health organizations (including one submission on behalf of a coalition of 23 organizations) and five businesses or industry organizations.

The proposed decision (henceforth "proposal") on revisions to the Pb NAAQS was signed on May 1, 2008 and published in the **Federal Register** on May 20, 2008. Public teleconferences of the CASAC Pb Panel were held on June 9 and July 8, 2008 to provide advice and recommendations to the Administrator based on its review of the proposal notice. CASAC's letter to the Administrator (Henderson, 2008b) is in the docket for this review and also available on the EPA Web site (*http://www.epa.gov/sab*).

The EPA held two public hearings to provide direct opportunities for oral testimony by the public on the proposal. The hearings were held concurrently on June 12, 2008 in Baltimore, Maryland and St. Louis, Missouri. At these public hearings, EPA heard testimony from 33 individuals representing themselves or specific interested organizations. Transcripts from these hearings and written testimony provided at the hearings are in the docket for this review. Additionally, a large number of written comments were received from various commenters during the public comment period on the proposal. Comments were received from EPA's

---

[4] The "indicator" of a standard defines the chemical species or mixture that is to be measured in determining whether an area attains the standard.

[5] The "form" of a standard defines the air quality statistic that is to be compared to the level of the standard in determining whether an area attains the standard.

Children's Health Protection Advisory Committee, the American Academy of Pediatrics, the American Medical Association, the American Thoracic Society, two organizations of state and local air agencies (National Association of Clean Air Agencies and Northeast States for Coordinated Air Use Management), approximately 40 State, Tribal and local government agencies, approximately 20 environmental or public health organizations or coalitions, approximately 20 industry organizations or companies, and approximately 6200 private citizens (roughly 150 of whom were not part of one of several mass comment campaigns). Significant issues raised in the public comments are discussed throughout the preamble of this final action. A summary of all other significant comments, along with EPA's responses (henceforth "Response to Comments"), can be found in the docket for this review.

The schedule for completion of this review has been governed by a judicial order in *Missouri Coalition for the Environment* v. *EPA* (No. 4:04CV00660 ERW, Sept. 14, 2005). The court-ordered schedule governing this review, entered by the court on September 14, 2005 and amended on April 29, 2008 and July 1, 2008, requires EPA to sign, for publication, a notice of final rulemaking concerning its review of the Pb NAAQS no later than October 15, 2008.

Some commenters have referred to and discussed individual scientific studies on the health effects of Pb that were not included in the Criteria Document (EPA, 2006a) ("'new' studies"). In considering and responding to comments for which such "new" studies were cited in support, EPA has provisionally considered the cited studies in conjunction with other relevant "new" studies published since the completion of the Criteria Document in the context of the findings of the Criteria Document.

As in prior NAAQS reviews, EPA is basing its decision in this review on studies and related information included in the Criteria Document and Staff Paper, which have undergone CASAC and public review. In this Pb NAAQS review, EPA also prepared an ANPR, consistent with the Agency's new NAAQS process. The ANPR discussed studies that were included in the Criteria Document and Staff Paper. The studies assessed in the Criteria Document and Staff Paper, and the integration of the scientific evidence presented in them, have undergone extensive critical review by EPA, CASAC, and the public. The rigor of that review makes these studies, and

their integrative assessment, the most reliable source of scientific information on which to base decisions on the NAAQS, decisions that all parties recognize as of great import. NAAQS decisions can have profound impacts on public health and welfare, and NAAQS decisions should be based on studies that have been rigorously assessed in an integrative manner not only by EPA but also by the statutorily mandated independent advisory committee, as well as the public review that accompanies this process. EPA's provisional consideration of these studies did not and could not provide that kind of in-depth critical review.

This decision is consistent with EPA's practice in prior NAAQS reviews and its interpretation of the requirements of the CAA. Since the 1970 amendments, the EPA has taken the view that NAAQS decisions are to be based on scientific studies and related information that have been assessed as a part of the pertinent air quality criteria, and has consistently followed this approach. This longstanding interpretation was strengthened by new legislative requirements enacted in 1977, which added section 109(d)(2) of the Act concerning CASAC review of air quality criteria. *See* 71 FR 61144, 61148 (October 17, 2006) (final decision on review of PM NAAQS) for a detailed discussion of this issue and EPA's past practice.

As discussed in EPA's 1993 decision not to revise the NAAQS for ozone, "new" studies may sometimes be of such significance that it is appropriate to delay a decision on revision of a NAAQS and to supplement the pertinent air quality criteria so the studies can be taken into account (58 FR at 13013–13014, March 9, 1993). In the present case, EPA's provisional consideration of "new" studies concludes that, taken in context, the "new" information and findings do not materially change any of the broad scientific conclusions regarding the health effects and exposure pathways of ambient air Pb made in the air quality criteria. For this reason, reopening the air quality criteria review would not be warranted even if there were time to do so under the court order governing the schedule for this rulemaking.

Accordingly, EPA is basing the final decisions in this review on the studies and related information included in the Pb air quality criteria that have undergone CASAC and public review. EPA will consider the "new" studies for purposes of decision-making in the next periodic review of the Pb NAAQS, which EPA expects to begin soon after the conclusion of this review and which

will provide the opportunity to fully assess these studies through a more rigorous review process involving EPA, CASAC, and the public. Further discussion of these "new" studies can be found in the Response to Comments document.

*D. Current Related Lead Control Programs*

States are primarily responsible for ensuring attainment and maintenance of national ambient air quality standards once EPA has established them. Under section 110 of the Act (42 U.S.C. 7410) and related provisions, States are to submit, for EPA approval, State implementation plans (SIPs) that provide for the attainment and maintenance of such standards through control programs directed to sources of the pollutants involved. The States, in conjunction with EPA, also administer the prevention of significant deterioration program (42 U.S.C. 7470–7479) for these pollutants. In addition, Federal programs provide for nationwide reductions in emissions of these and other air pollutants through the Federal Motor Vehicle Control Program under Title II of the Act (42 U.S.C. 7521–7574), which involves controls for automobile, truck, bus, motorcycle, nonroad engine, and aircraft emissions; the new source performance standards under section 111 of the Act (42 U.S.C. 7411); and the national emission standards for hazardous air pollutants under section 112 of the Act (42 U.S.C. 7412).

As Pb is a multimedia pollutant, a broad range of Federal programs beyond those that focus on air pollution control provide for nationwide reductions in environmental releases and human exposures. In addition, the Centers for Disease Control and Prevention (CDC) programs provide for the tracking of children's blood Pb levels nationally and provide guidance on levels at which medical and environmental case management activities should be implemented (CDC, 2005a; ACCLPP, 2007).[6] In 1991, the Secretary of the Health and Human Services (HHS) characterized Pb poisoning as the "number one environmental threat to the health of children in the United States" (Alliance to End Childhood Lead Poisoning, 1991). In 1997, President Clinton created, by Executive Order 13045, the President's Task Force on Environmental Health Risks and Safety Risks to Children in response to

---

[6] As described in section II.A.2.a below the CDC stated in 2005 that no "safe" threshold for blood Pb levels in young children has been identified (CDC, 2005a).

increased awareness that children face disproportionate risks from environmental health and safety hazards (62 FR 19885).[7] By Executive Orders issued in October 2001 and April 2003, President Bush extended the work for the Task Force for an additional three and a half years beyond its original charter (66 FR 52013 and 68 FR 19931). The Task Force set a Federal goal of eliminating childhood Pb poisoning by the year 2010 and reducing Pb poisoning in children was identified as the Task Force's top priority.

Federal abatement programs provide for the reduction in human exposures and environmental releases from in-place materials containing Pb (*e.g.*, Pb-based paint, urban soil and dust, and contaminated waste sites). Federal regulations on disposal of Pb-based paint waste help facilitate the removal of Pb-based paint from residences (68 FR 36487). Further, in 1991, EPA lowered the maximum levels of Pb permitted in public water systems from 50 parts per billion (ppb) to 15 ppb measured at the consumer's tap (56 FR 26460).

Federal programs to reduce exposure to Pb in paint, dust, and soil are specified under the comprehensive federal regulatory framework developed under the Residential Lead-Based Paint Hazard Reduction Act (Title X). Under Title X and Title IV of the Toxic Substances Control Act (TSCA), EPA has established regulations and associated programs in the following five categories: (1) Training and certification requirements for persons engaged in lead-based paint activities; accreditation of training providers; authorization of State and Tribal lead-based paint programs; and work practice standards for the safe, reliable, and effective identification and elimination of lead-based paint hazards; (2) ensuring that, for most housing constructed before 1978, lead-based paint information flows from sellers to purchasers, from landlords to tenants, and from renovators to owners and occupants; (3) establishing standards for identifying dangerous levels of Pb in paint, dust and soil; (4) providing grant funding to establish and maintain State and Tribal lead-based paint programs, and to address childhood lead poisoning in the highest-risk communities; and (5) providing information on Pb hazards to the public, including steps that people can take to protect themselves and their families from lead-based paint hazards.

Under Title IV of TSCA, EPA established standards identifying hazardous levels of lead in residential paint, dust, and soil in 2001. This regulation supports the implementation of other regulations which deal with worker training and certification, Pb hazard disclosure in real estate transactions, Pb hazard evaluation and control in Federally-owned housing prior to sale and housing receiving Federal assistance, and U.S. Department of Housing and Urban Development grants to local jurisdictions to perform Pb hazard control. The TSCA Title IV term "lead-based paint hazard" implemented through this regulation identifies lead-based paint and all residential lead-containing dust and soil regardless of the source of Pb, which, due to their condition and location, would result in adverse human health effects. One of the underlying principles of Title X is to move the focus of public and private decision makers away from the mere presence of lead-based paint, to the presence of lead-based paint hazards, for which more substantive action should be undertaken to control exposures, especially to young children. In addition the success of the program will rely on the voluntary participation of States and Tribes as well as counties and cities to implement the programs and on property owners to follow the standards and EPA's recommendations. If EPA were to set unreasonable standards (*e.g.*, standards that would recommend removal of all Pb from paint, dust, and soil), States and Tribes may choose to opt out of the Title X Pb program and property owners may choose to ignore EPA's advice believing it lacks credibility and practical value. Consequently, EPA needed to develop standards that would not waste resources by chasing risks of negligible importance and that would be accepted by States, Tribes, local governments and property owners. In addition, a separate regulation establishes, among other things, under authority of TSCA section 402, residential Pb dust cleanup levels and amendments to dust and soil sampling requirements (66 FR 1206).

On March 31, 2008, the Agency issued a new rule (Lead: Renovation, Repair and Painting [RRP] Program, 73 FR 21692) to protect children from lead-based paint hazards. This rule applies to renovators and maintenance professionals who perform renovation, repair, or painting in housing, child-care facilities, and schools built prior to 1978. It requires that contractors and maintenance professionals be certified; that their employees be trained; and that they follow protective work practice standards. These standards prohibit certain dangerous practices, such as open flame burning or torching of lead-based paint. The required work practices also include posting warning signs, restricting occupants from work areas, containing work areas to prevent dust and debris from spreading, conducting a thorough cleanup, and verifying that cleanup was effective. The rule will be fully effective by April 2010. The rule contains procedures for the authorization of States, territories, and Tribes to administer and enforce these standards and regulations in lieu of a federal program. In announcing this rule, EPA noted that almost 38 million homes in the United States contain some lead-based paint, and that this rule's requirements were key components of a comprehensive effort to eliminate childhood Pb poisoning. To foster adoption of the rule's measures, EPA also intends to conduct an extensive education and outreach campaign to promote awareness of these new requirements.

Programs associated with the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA or Superfund) and Resource Conservation Recovery Act (RCRA) also implement abatement programs, reducing exposures to Pb and other pollutants. For example, EPA determines and implements protective levels for Pb in soil at Superfund sites and RCRA corrective action facilities. Federal programs, including those implementing RCRA, provide for management of hazardous substances in hazardous and municipal solid waste (see, *e.g.*, 66 FR 58258). Federal regulations concerning batteries in municipal solid waste facilitate the collection and recycling or proper disposal of batteries containing Pb.[8] Similarly, Federal programs provide for the reduction in environmental releases of hazardous substances such as Pb in the management of wastewater (*http:// www.epa.gov/owm/*).

A variety of federal nonregulatory programs also provide for reduced environmental release of Pb-containing materials through more general encouragement of pollution prevention, promotion of reuse and recycling, reduction of priority and toxic chemicals in products and waste, and

---

[7] Co-chaired by the Secretary of the HHS and the Administrator of the EPA, the Task Force consisted of representatives from 16 Federal departments and agencies.

[8] *See, e.g.*, "Implementation of the Mercury-Containing and Rechargeable Battery Management Act" *http://www.epa.gov/epaoswer/hazwaste/ recycle/battery.pdf* and "Municipal Solid Waste Generation, Recycling, and Disposal in the United States: Facts and Figures for 2005" *http:// www.epa.gov/epaoswer/osw/conserve/resources/ msw-2005.pdf.*

conservation of energy and materials. These include the Resource Conservation Challenge (*http://www.epa.gov/epaoswer/osw/conserve/index.htm*), the National Waste Minimization Program (*http://www.epa.gov/epaoswer/hazwaste/minimize/leadtire.htm*), "Plug in to eCycling" (a partnership between EPA and consumer electronics manufacturers and retailers; *http://www.epa.gov/epaoswer/hazwaste/recycle/electron/crt.htm#crts*), and activities to reduce the practice of backyard trash burning (*http://www.epa.gov/msw/backyard/pubs.htm*).

As a result of coordinated, intensive efforts at the national, state and local levels, including those programs described above, blood Pb levels in all segments of the population have dropped significantly from levels observed around 1990. In particular, blood Pb levels for the general population of children 1 to 5 years of age have dropped to a median level of 1.6 µg/dL and a level of 3.9 µg/dL for the 90th percentile child in the 2003–2004 National Health and Nutrition Examination Survey (NHANES) as compared to median and 90th percentile levels in 1988–1991 of 3.5 µg/dL and 9.4 µg/dL, respectively (*http://www.epa.gov/envirohealth/children/body_burdens/b1-table.htm*). These levels (median and 90th percentile) for the general population of young children [9] are at the low end of the historic range of blood Pb levels for general population of children aged 1–5 years. However, as recognized in section II.A.2.b, levels have been found to vary among children of different socioeconomic status and other demographic characteristics (CD, p. 4–21) and racial/ethnic and income disparities in blood Pb levels in children persist. The Agency has continued to grapple with soil and dust Pb levels from the historical use of Pb in paint and gasoline and from other sources.

In addition to the Pb control programs summarized above, EPA's research program, with other Federal agencies, identifies, encourages and conducts research needed to locate and assess serious risks and to develop methods and tools to characterize and help reduce risks. For example, EPA's Integrated Exposure Uptake Biokinetic Model for Lead in Children (IEUBK model) for Pb in children and the Adult Lead Methodology are widely used and accepted as tools that provide guidance in evaluating site specific data. More recently, in recognition of the need for a single model that predicts Pb concentrations in tissues for children and adults, EPA is developing the All Ages Lead Model (AALM) to provide researchers and risk assessors with a pharmacokinetic model capable of estimating blood, tissue, and bone concentrations of Pb based on estimates of exposure over the lifetime of the individual. EPA research activities on substances including Pb focus on better characterizing aspects of health and environmental effects, exposure, and control or management of environmental releases (see *http://www.epa.gov/ord/researchaccomplishments/index.html*).

*E. Summary of Proposed Revisions to the Lead NAAQS*

For reasons discussed in the proposal, the Administrator proposed to revise the current primary and secondary Pb standards. With regard to the primary Pb standard, the Administrator proposed to revise the level of the Pb standard to a level within the range of 0.10 µg/m³ to 0.30 µg/m³, in conjunction with retaining the current indicator of Pb in total suspended particles (Pb-TSP) but with allowance for the use of Pb-PM$_{10}$ data. With regard to the averaging time and form, the Administrator proposed two options: to retain the current averaging time of a calendar quarter and the current not-to-be-exceeded form, revised to apply across a 3-year span; and to revise the averaging time to a calendar month and the form to the second-highest monthly average across a 3-year span. With regard to the secondary standard for Pb, the Administrator proposed to revise the standard to make it identical to the proposed primary standard.

*F. Organization and Approach to Final Lead NAAQS Decisions*

This action presents the Administrator's final decisions regarding the need to revise the current primary and secondary Pb standards. Revisions to the primary standard for Pb are addressed below in section II. The secondary Pb standard is addressed below in section III. Related data completeness, data handling, data reporting and rounding conventions are addressed in section IV, and related ambient monitoring methods and network design are addressed below in section V. Implementation of the revised NAAQS is discussed in section VI, and the exceptional events information submission schedule is described in section VII. A discussion of statutory and executive order reviews is provided in section VIII.

Today's final decisions are based on a thorough review in the Criteria Document of scientific information on known and potential human health and welfare effects associated with exposure to Pb in the environment. These final decisions also take into account: (1) Assessments in the Staff Paper and ANPR of the most policy-relevant information in the Criteria Document as well as quantitative exposure and risk assessments based on that information; (2) CASAC Panel advice and recommendations, as reflected in its letters to the Administrator, its discussions of drafts of the Criteria Document and Staff Paper, and of the ANPR and the notice of proposed rulemaking at public meetings; (3) public comments received during the development of these documents, either in connection with CASAC Panel meetings or separately; and (4) public comments received on the proposed rulemaking.

**II. Rationale for Final Decision on the Primary Standard**

*A. Introduction*

This section presents the rationale for the Administrator's final decision that the current primary standard is not requisite to protect public health with an adequate margin of safety, and that the existing Pb primary standard should be revised. In developing this rationale, EPA has drawn upon an integrative synthesis in the Criteria Document of the entire body of evidence published through late 2006 on human health effects associated with Pb exposure. Some 6000 studies were considered in this review. This body of evidence addresses a broad range of health endpoints associated with exposure to Pb (EPA, 2006a, chapter 8), and includes hundreds of epidemiologic studies conducted in the U.S., Canada, and many countries around the world since the time of the last review (EPA, 2006a, chapter 6).

As discussed below, a significant amount of new research has been conducted since the last review, with important new information coming from epidemiological, toxicological, controlled human exposure, and dosimetric studies. Moreover, the newly available research studies evaluated in the Criteria Document have undergone intensive scrutiny through multiple layers of peer review, with extended opportunities for review and comment by the CASAC Panel and the public. As with virtually any policy-relevant scientific research, there is uncertainty

---

[9] The 5th percentile, geometric mean, and 95th percentile values for the 2003–2004 NHANES are 0.7, 1.8 and 5.1 µg/dL, respectively (Axelrad, 2008a,b).

in the characterization of health effects attributable to exposure to ambient Pb. While important uncertainties remain, the review of the health effects information has been extensive and deliberate. In the judgment of the Administrator, this intensive evaluation of the scientific evidence provides an adequate basis for regulatory decision making at this time. This review also provides important input to EPA's research plan for improving our future understanding of the relationships between exposures to ambient Pb and health effects.

The health effects information and quantitative exposure and health risk assessment were summarized in sections II.B and II.C of the proposal (73 FR at 29193–29220) and are only briefly outlined below in sections II.A.2 and II.A.3. Responses to public comments specific to the material presented in sections II.A.1 through II.A.3 below are provided in the Response to Comments document.

Subsequent sections of this preamble provide a more complete discussion of the Administrator's rationale, in light of key issues raised in public comments, for concluding that the current standard is not requisite to protect public health with an adequate margin of safety and that it is appropriate to revise the current primary Pb standard to provide additional public health protection (section II.B), as well as a more complete discussion of the Administrator's rationale for retaining or revising the specific elements of the primary Pb standards (section II.C), namely the indicator (section II.C.1), averaging time and form (section II.C.2), and level (section II.C.3). A summary of the final decisions on revisions to the primary Pb standards is presented in section II.D.

1. Overview of Multimedia, Multipathway Considerations and Background

This section briefly summarizes the information presented in section II.A of the proposal and chapter 2 of the Staff Paper on multimedia, multipathway and background considerations of the Pb NAAQS review. As was true in the setting of the current standard, multimedia distribution of and multipathway exposure to Pb that has been emitted into the ambient air play a key role in the Agency's consideration of the Pb NAAQS. Some key multimedia and multipathway considerations in the review include:

(1) Lead is emitted into the air from many sources encompassing a wide variety of stationary and mobile source types. Lead emitted to the air is predominantly in particulate form, with the particles occurring in various sizes. Once emitted, the particles can be transported long or short distances depending on their size, which influences the amount of time spent in aerosol phase. In general, larger particles tend to deposit more quickly, within shorter distances from emissions points, while smaller particles will remain in aerosol phase and travel longer distances before depositing. As summarized in sections II.B.1 and II.E.1 of the proposal, airborne concentrations of Pb at sites near sources are much higher, and the representation of larger particles is greater, than at sites not known to be directly influenced by sources.

(2) Once deposited out of the air, Pb can subsequently be resuspended into the ambient air and, because of the persistence of Pb, Pb emissions contribute to media concentrations for some years into the future.

(3) Exposure to Pb emitted into the ambient air (air-related Pb) can occur directly by inhalation, or indirectly by ingestion of Pb-contaminated food, water or other materials including dust and soil.[10] This occurs as Pb emitted into the ambient air is distributed to other environmental media and can contribute to human exposures via indoor and outdoor dusts, outdoor soil, food and drinking water, as well as inhalation of air. These exposure pathways are described more fully in the proposal.

(4) Air-related exposure pathways are affected by changes to air quality, including changes in concentrations of Pb in air and changes in atmospheric deposition of Pb. Further, because of its persistence in the environment, Pb deposited from the air may contribute to human and ecological exposures for years into the future. Thus, because of the roles of both air concentration and air deposition in human exposure pathways, and because of the persistence of Pb once deposited, some pathways respond more quickly to changes in air quality than others. Pathways most directly involving Pb in ambient air and exchanges of ambient air with indoor air respond more quickly while pathways involving exposure to Pb deposited from ambient air into the environment generally respond more slowly.

Additionally, as when the standard was set, human exposures to Pb include nonair or background contributions in addition to air-related pathways. Some key aspects of the consideration of air and nonair pathways in the review (described in more detail in the proposal) are summarized here:

(1) Human exposure pathways that are not air-related are those in which Pb does not pass through ambient air. These pathways as well as air-related human exposure pathways that involve natural sources of Pb to air are considered ''policy-relevant background'' in this review.

(2) The pathways of human exposure to Pb that are not air-related include ingestion of indoor Pb paint,[11] Pb in diet as a result of inadvertent additions during food processing, and Pb in drinking water attributable to Pb in distribution systems, as well as other generally less prevalent pathways, as described in the proposal (73 FR 29192) and Criteria Document (CD, pp. 3–50 to 3–51).

(3) Some amount of Pb in the air derives from background sources, such as volcanoes, sea salt, and windborne soil particles from areas free of anthropogenic activity and may also derive from anthropogenic sources of airborne Pb located outside of North America (which would also be considered policy-relevant background). In considering contributions from policy-relevant background to human exposures and associated health effects, however, policy-relevant background in air is likely insignificant in comparison to the contributions from exposures to nonair media.

(4) The relative contribution of Pb from different exposure media to human exposure varies, particularly for different age groups. For example, some studies have found that dietary intake of Pb may be a predominant source of Pb exposure among adults, greater than consumption of water and beverages or inhalation, while for young children, ingestion of indoor dust can be a significant Pb exposure pathway (e.g., via hand-to-mouth activity of very young children).

(5) Estimating separate contributions to human Pb exposure from air and nonair sources is complicated by the existence of multiple and varied air-related pathways, as well as the persistent nature of Pb. For example, Pb that is a soil or dust contaminant today may have been airborne yesterday or many years ago. The studies currently available and reviewed in the Criteria Document that evaluate the multiple pathways of Pb exposure, when considering exposure contributions from indoor dust or outdoor dust/soil,

---

[10] In general, air-related pathways include those pathways where Pb passes through ambient air on its path from a source to human exposure.

[11] Weathering of outdoor Pb paint may also contribute to soil Pb levels adjacent to the house.

do not usually distinguish between air-related and other sources of Pb or between air-related Pb associated with historical emissions and that from recent emissions.[12]

(6) Relative contributions to a child's total Pb exposure from air-related exposure pathways compared to other (nonair-related) Pb exposures depends on many factors including ambient air concentrations and air deposition in the area where the child resides (as well as in the area from which the child's food derives) and access to other sources of Pb exposure such as Pb paint, tap water affected by plumbing containing Pb, and lead-tainted products. Studies indicate that in the absence of paint-related exposures, Pb from other sources such as stationary sources of Pb emissions may dominate a child's Pb exposures. In other cases, such as children living in older housing with peeling paint or where renovations have occurred, the dominant source of Pb exposure may be lead paint used in the house in the past. Depending on Pb levels in a home's tap water, drinking water can sometimes be a significant source. In still other cases, there may be more of a mixture of contributions from multiple sources, with no one source dominating.

## 2. Overview of Health Effects Information

This section summarizes information presented in section II.B of the proposal pertaining to health endpoints associated with the range of exposures considered to be most relevant to current exposure levels. In recognition of the role of multiple exposure pathways and routes and the use of an internal exposure or dose metric in evaluating health risk for Pb, the following section summarizes key aspects of the internal disposition or distribution of Pb, the use of blood Pb as an internal exposure or dose metric, and the evidence with regard to the quantitative relationship between air Pb and blood Pb levels (section II.A.2.a). This is followed first by a summary of the broad array of Pb-induced health effects and recognition of at-risk subpopulations (section II.A.2.b) and then by a summary of neurological effects in children and quantitative concentration-response relationships for blood Pb and IQ (section II.A.2.c).

### a. Blood Lead

#### (i) Internal Disposition of Lead

Lead enters the body via the respiratory system and gastrointestinal tract, from which it is quickly absorbed into the blood stream and distributed throughout the body.[13] Lead bioaccumulates in the body, with the bone serving as a large, long-term storage compartment; soft tissues (e.g., kidney, liver, brain, etc.) serve as smaller compartments, in which Pb may be more mobile (CD, sections 4.3.1.4 and 8.3.1). During childhood development, bone represents approximately 70% of a child's body burden of Pb, and this accumulation continues through adulthood, when more than 90% of the total Pb body burden is stored in the bone (CD, section 4.2.2). Throughout life, Pb in the body is exchanged between blood and bone, and between blood and soft tissues (CD, section 4.3.2), with variation in these exchanges reflecting ''duration and intensity of the exposure, age and various physiological variables'' (CD, p. 4–1).

The bone pool of Pb in children is thought to be much more labile than that in adults due to the more rapid turnover of bone mineral as a result of growth (CD, p. 4–27). As a result, changes in blood Pb concentration in children more closely parallel changes in total body burden (CD, pp. 4–20 and 4–27). This is in contrast to adults, whose bone has accumulated decades of Pb exposures (with past exposures often greater than current ones), and for whom the bone may be a significant source long after exposure has ended (CD, section 4.3.2.5).

#### (ii) Use of Blood Pb as Dose Metric

Blood Pb levels are extensively used as an index or biomarker of exposure by national and international health agencies, as well as in epidemiological (CD, sections 4.3.1.3 and 8.3.2) and toxicological studies of Pb health effects and dose-response relationships (CD, chapter 5). The U.S. Centers for Disease Control and Prevention (CDC), and its predecessor agencies, have for many years used blood Pb level as a metric for identifying children at risk of adverse health effects and for specifying particular public health recommendations (CDC, 1991; CDC, 2005a). Most recently, in 2005, with consideration of a review of the evidence by their advisory committee, CDC revised their statement on

Preventing Lead Poisoning in Young Children, specifically recognizing the evidence of adverse health effects in children with blood Pb levels below 10 μg/dL[14] and the data demonstrating that no ''safe'' threshold for blood Pb had been identified, and emphasizing the importance of preventative measures (CDC, 2005a, ACCLPP, 2007).[15]

Since 1976, the CDC has been monitoring blood Pb levels in multiple age groups nationally through the National Health and Nutrition Examination Survey (NHANES).[16] The NHANES information has documented the dramatic decline in mean blood Pb levels in the U.S. population that has occurred since the 1970s and that coincides with regulations regarding leaded fuels, leaded paint, and Pb-containing plumbing materials that have reduced Pb exposure among the general population (CD, sections 4.3.1.3 and 8.3.3; Schwemberger *et al.*, 2005). The

---

[12] The exposure assessment for children performed for this review employed available data and methods to develop estimates intended to inform a characterization of these pathways (as described in the proposal and the final Risk Assessment Report).

[13] Additionally, Pb freely crosses the placenta resulting in continued fetal exposure throughout pregnancy, with that exposure increasing during the latter half of pregnancy (CD, section 6.6.2).

[14] As described by the Advisory Committee on Childhood Lead Poisoning Prevention, ''In 1991, CDC defined the blood lead level (BLL) that should prompt public health actions as 10 μg/dL. Concurrently, CDC also recognized that a BLL of 10 μg/dL did not define a threshold for the harmful effects of lead. Research conducted since 1991 has strengthened the evidence that children's physical and mental development can be affected at BLLS <10 μg/dL'' (ACCLPP, 2007).

[15] With the 2005 statement, CDC did not lower the 1991 level of concern and identified a variety of reasons, reflecting both scientific and practical considerations, for not doing so, including a lack of effective clinical or public health interventions to reliably and consistently reduce blood Pb levels that are below 10 μg/dL, the lack of a demonstrated threshold for adverse effects, and concerns for deflecting resources from children with higher blood Pb levels (CDC, 2005a, pp. 2–3). The preface for the CDC statement included the following: ''Although there is evidence of adverse health effects in children with blood lead levels below 10 μg/dL, CDC has not changed its level of concern, which remains at levels >10 μg/dL. We believe it critical to focus available resources where the potential adverse effects remain the greatest. If no threshold level exists for adverse health effects, setting a new BLL of concern somewhere below 10 μg/dL would be based on an arbitrary decision. In addition, the feasibility and effectiveness of individual interventions to further reduce BLLs below 10 μg/dL has not been demonstrated.'' [CDC, 2005a, p. ix] CDC further stated ''Nonetheless, the sources of lead exposure and the population-based interventions that can be expected to reduce lead exposure are similar in children with BLLs <10 μg/ dL and >10 μg/dL, so preventive lead hazard control measures need not be deferred pending further research findings or consensus.'' [CDC, 2005a, p. 2] CDC's Advisory Committee on Childhood Lead Poisoning Prevention recently provided recommendations regarding interpreting and managing blood Pb levels below 10 μg/dL in children and reducing childhood exposures to Pb (ACCLPP, 2007).

[16] This information documents a variation in mean blood Pb levels across the various age groups monitored. For example, mean blood Pb levels in 2001–2002 for ages 1–5, 6–11, 12–19 and greater than or equal to 20 years of age, are 1.70, 1.25, 0.94, and 1.56 μg/dL, respectively (CD, p. 4–22).

Criteria Document summarizes related information as follows (CD, p. E–6).

In the United States, decreases in mobile sources of Pb, resulting from the phasedown of Pb additives created a 98% decline in emissions from 1970 to 2003. NHANES data show a consequent parallel decline in blood-Pb levels in children aged 1 to 5 years from a geometric mean of ~15 μg/dL in 1976–1980 to ~1–2 μg/dL in the 2000–2004 period.

While blood Pb levels in the U.S. general population, including geometric mean levels in children aged 1–5, have declined significantly, levels have been found to vary among children of different socioeconomic status (SES) and other demographic characteristics (CD, p. 4–21), and racial/ethnic and income disparities in blood Pb levels in children persist. For example, as described in the proposal, blood Pb levels for lower income and African American children are higher than those for the general population. The recently released RRP rule (discussed above in section I.C) is expected to contribute to further reductions in blood Pb levels for children living in houses with Pb paint.

(iii) Air-to-Blood Relationships

As described in section II.A.1 above and discussed in section II.A of the proposal, Pb in ambient air contributes to Pb in blood by multiple pathways, with the pertinent exposure routes including both inhalation and ingestion (CD, sections 3.1.3.2, 4.2 and 4.4; Hilts, 2003). The quantitative relationship between ambient air Pb and blood Pb (discussed in section II.B.1.c of the proposal), which is often termed a slope or ratio, describes the increase in blood Pb (in μg/dL) estimated to be associated with each unit increase of air Pb (in μg/m³).[17]

The evidence on this quantitative relationship is now, as in the past, limited by the circumstances in which the data are collected. These estimates are generally developed from studies of populations in various Pb exposure circumstances. The 1986 Criteria Document discussed the studies available at that time that addressed the relationship between air Pb and blood Pb,[18] recognizing that there is significant variability in air-to-blood ratios for different populations exposed to Pb through different air-related exposure pathways and at different exposure levels.

In discussing the available evidence, the 1986 Criteria Document observed that estimates of air-to-blood ratios that included air-related ingestion pathways in addition to the inhalation pathway are "necessarily higher", in terms of blood Pb response, than those estimates based on inhalation alone (USEPA 1986a, p. 11–106). Thus, the extent to which studies account for the full set of air-related inhalation and ingestion exposure pathways affects the magnitude of the resultant air-to-blood estimates, such that fewer pathways included as "air-related" yields lower ratios. The 1986 Criteria Document also observed that ratios derived from studies focused only on inhalation pathways (e.g., chamber studies, occupational studies) have generally been on the order of 1:2 or lower, while ratios derived from studies including more air-related pathways were generally higher (USEPA, 1986a, p. 11–106). Further, the current evidence appears to indicate higher ratios for children as compared to those for adults (USEPA, 1986a), perhaps due to behavioral differences between the age groups.

Reflecting these considerations, the 1986 Criteria Document identified a range of air-to-blood ratios for children that reflected both inhalation and ingestion-related air Pb contributions as generally ranging from 1:3 to 1:5 based on the information available at that time (USEPA 1986a, p. 11–106). Table 11–36 (p. 11–100) in the 1986 Criteria Document (drawn from Table 1 in Brunekreef, 1984) presents air-to-blood ratios from a number of studies in children (i.e., those with identified air monitoring methods and reliable blood Pb data). For example, air-to-blood ratios from the subset of those studies that used quality control protocols and presented adjusted slopes [19] include

adjusted ratios of 3.6 (Zielhuis *et al.*, 1979), 5.2 (Billick *et al.*, 1979, 1980); 2.9 (Billick *et al.*, 1983), and 8.5 (Brunekreef et al., 1983).

Additionally, the 1986 Criteria Document noted that ratios derived from studies involving higher blood and air Pb levels are generally smaller than ratios from studies involving lower blood and air Pb levels (USEPA, 1986a. p. 11–99). In consideration of this factor, the proposal observed that the range of 1:3 to 1:5 in air-to-blood ratios for children noted in the 1986 Criteria Document generally reflected study populations with blood Pb levels in the range of approximately 10–30 μg/dL (USEPA 1986a, pp. 11–100; Brunekreef, 1984), much higher than those common in today's population. This observation suggests that air-to-blood ratios relevant for today's population of children would likely extend higher than the 1:3 to 1:5 range identified in the 1986 Criteria Document.

More recently, a study of changes in children's blood Pb levels associated with reduced Pb emissions and associated air concentrations near a Pb smelter in Canada (for children through age six in age) reports a ratio of 1:6, and additional analysis of the data by EPA for the initial time period of the study resulted in a ratio of 1:7 (CD, pp. 3–23 to 3–24; Hilts, 2003).[20] Ambient air and blood Pb levels associated with the Hilts (2003) study range from 1.1 to 0.03 μg/m³, and associated population mean blood Pb levels range from 11.5 to 4.7 μg/dL, which are lower than levels associated with the older studies cited in the 1986 Criteria Document (USEPA, 1986).

---

[17] Ratios are presented in the form of 1:x, with the 1 representing air Pb (in μg/m³) and x representing blood Pb (in μg/dL). Description of ratios as higher or lower refers to the values for x (i.e., the change in blood Pb per unit of air Pb). Slopes are presented as simply the value of x.

[18] We note that the 2006 Criteria Document did not include a discussion of more recent studies relating to air-to-blood ratios; more recent studies were discussed in the Staff Paper, including discussion by CASAC in their review of those documents.

[19] Brunekreef *et al.* (1984) discusses potential confounders to the relationship between air Pb and blood Pb, recognizing that ideally all possible confounders should be taken into account in deriving an adjusted air-to-blood relationship from a community study. The studies cited here adjusted for parental education (Zielhuis *et al.*, 1979), age and race (Billick *et al.*, 1979, 1980) and additionally measuring height of air Pb (Billick *et al.*, 1983); Brunekreef *et al.* (1984) used multiple regression to control for several confounders. The authors conclude that "presentation of both unadjusted and (stepwise) adjusted relationships is advisable, to allow insight in the range of possible values for the relationship" (p. 83). Unadjusted ratios were presented for two of these studies, including ratios of 4.0 (Zielhuis *et al.*, 1979) and 18.5 (Brunekreef *et al.*, 1983). The proposal noted that the Brunekreef *et al.*, 1983 study is subject to a number of sources of uncertainty that could result in air-to-blood Pb ratios that are biased high, including the potential

for underestimating ambient air Pb levels due to the use of low volume British Smoke air monitors and the potential for higher historical ambient air Pb levels to have influenced blood Pb levels (see Section V.B.1 of the 1989 Pb Staff Report for the Pb NAAQS review, EPA, 1989). In addition, the 1989 Staff Report notes that the higher air-to-blood ratios obtained from this study could reflect the relatively lower blood Pb levels seen across the study population (compared with blood Pb levels reported in other studies from that period).

[20] This study considered changes in ambient air Pb levels and associated blood Pb levels over a five-year period which included closure of an older Pb smelter and subsequent opening of a newer facility in 1997 and a temporary (3 month) shutdown of all smelting activity in the summer of 2001. The author observed that the air-to-blood ratio for children in the area over the full period was approximately 1:6. The author noted limitations in the dataset associated with exposures in the second time period, after the temporary shutdown of facility in 2001, including sampling of a different age group at that time and a shorter time period (3 months) at these lower ambient air Pb levels prior to collection of blood Pb levels. Consequently, EPA calculated an alternate air-to-blood Pb ratio based on consideration for ambient air Pb and blood Pb reductions in the first time period (after opening of the new facility in 1997).

The proposal identified sources of uncertainty related to air-to-blood ratios obtained from Hilts (2003). One such area of uncertainty relates to the pattern of changes in indoor Pb dustfall (presented in Table 3 in the article) which suggests a potentially significant decrease in Pb impacts to indoor dust prior to closure of an older Pb smelter and start-up of a newer facility in 1997. Some have suggested that this earlier reduction in indoor dustfall suggests that a significant portion of the reduction in Pb exposure (and therefore, the blood Pb reduction reflected in air-to-blood ratios) may have resulted from efforts to increase public awareness of the Pb contamination issue (e.g., through increased cleaning to reduce indoor dust levels) rather than reductions in ambient air Pb and associated indoor dust Pb contamination. In addition, notable fluctuations in blood Pb levels observed prior to 1997 (as seen in Figure 2 of the article) have raised questions as to whether factors other than ambient air Pb reduction could be influencing decreases in blood Pb.[21]

In addition to the study by Hilts (2003), we are aware of two other studies published since the 1986 Criteria Document that report air-to-blood ratios for children (Tripathi *et al.*, 2001 and Hayes *et al.*, 1994). These studies were not cited in the 2006 Criteria Document, but were referenced in public comments received by EPA during this review.[22] The study by Tripathi *et al.* (2001) reports an air-to-blood ratio of approximately 1:3.6 for an analysis of children aged six through ten in India. The ambient air and blood Pb levels in this study (geometric mean blood Pb levels generally ranged from 10 to 15 µg/dL) are similar to levels reported in older studies reviewed in the 1986 Criteria Document and are much higher than current conditions in the U.S. The study by Hayes *et al.* (1994) compared patterns of ambient air Pb

reductions and blood Pb reductions for large numbers of children in Chicago between 1971 and 1988, a period when significant reductions occurred in both measures. The study reports an air-to-blood ratio of 1:5.6 associated with ambient air Pb levels near 1 µg/m³ and a ratio of 1:16 for ambient air Pb levels in the range of 0.25 µg/m³, indicating a pattern of higher ratios with lower ambient air Pb and blood Pb levels consistent with conclusions in the 1986 Criteria Document.[23]

In their advice to the Agency prior to the proposal, CASAC identified air-to-blood ratios of 1:5, as used by the World Health Organization (2000), and 1:10, as supported by an empirical analysis of changes in air Pb and changes in blood Pb between 1976 and the time when the phase-out of Pb from gasoline was completed (Henderson, 2007a).[24]

In the proposal, beyond considering the evidence presented in the published literature and that reviewed in Pb Criteria Documents, we also considered air-to-blood ratios derived from the exposure assessment for this review (summarized below in section II.A.3 and described in detail in USEPA, 2007b). In that assessment, current modeling tools and information on children's activity patterns, behavior and physiology (e.g., CD, section 4.4) were used to estimate blood Pb levels associated with multimedia and multipathway Pb exposure. The results from the various case studies included in this assessment, with consideration of the context in which they were derived (e.g., the extent to which the range of air-related pathways were simulated), are also informative to our understanding of air-to-blood ratios.

For the general urban case study, air-to-blood ratios ranged from 1:2 to 1:9 across the alternative standard levels assessed, which ranged from the current standard of 1.5 µg/m³ down to a level of 0.02 µg/m³. This pattern of model-derived ratios generally supports the

range of ratios obtained from the literature and also supports the observation that lower ambient air Pb levels are associated with higher air-to-blood ratios. There are a number of sources of uncertainty associated with these model-derived ratios. The hybrid indoor dust Pb model, which is used in estimating indoor dust Pb levels for the urban case studies, uses a U.S. Department of Housing and Urban Development (HUD) survey dataset reflecting housing constructed before 1980 in establishing the relationship between dust loading and concentration, which is a key component in the hybrid dust model (as described in the Risk Assessment Report, Volume II, Appendix G, Attachment G–1). Given this application of the HUD dataset, there is the potential that the nonlinear relationship between indoor dust Pb loading and concentration (which is reflected in the structure of the hybrid dust model) could be driven more by the presence of indoor Pb paint than contributions from outdoor ambient air Pb. We also note that only recent air pathways were adjusted in modeling the impact of ambient air Pb reductions on blood Pb levels in the urban case studies, which could have implications for the air-to-blood ratios.

For the primary Pb smelter (subarea) case study, air-to-blood ratios ranged from 1:10 to 1:19 across the same range of alternative standard levels, from 1.5 down to 0.02 µg/m³.[25] Because these ratios are based on regression modeling developed using empirical data, there is the potential for these ratios to capture more fully the impact of ambient air on indoor dust Pb, and ultimately blood Pb, including longer timeframe impacts resulting from changes in outdoor deposition. Therefore, given that these ratios are higher than ratios developed for the general urban case study using the hybrid indoor dust Pb model (which only considers reductions in recent air), the ratios estimated for the primary Pb smelter (subarea) support the evidence-based observation discussed above that consideration of more of the exposure pathways relating ambient air Pb to blood Pb, may result in higher air-to-blood Pb ratios. In considering this case study, some have suggested, however, that the regression modeling fails to accurately reflect the temporal relationship between reductions in ambient air Pb and indoor dust Pb, which could result in an over-estimate

---

[21] In the publication, the author acknowledges that remedial programs (e.g., community and home-based dust control and education) may have been responsible for some of the blood Pb reduction seen during the study period (1997 to 2001). However, the author points out that these programs were in place in 1992 and he suggests that it is unlikely that they contributed to the sudden drop in blood Pb levels occurring after 1997. In addition, the author describes a number of aspects of the analysis which could have implications for the air-to-blood ratios including a tendency over time for children with lower blood Pb levels to not return for testing, and inclusion of children aged 6 to 36 months in Pb screening in 2001 (in contrast to the wider age range up to 60 months as done in previous years).

[22] EPA is not basing its decisions on these two studies, but notes that these estimates are consistent with other studies that were included in the 1986 and 2006 Criteria Documents and considered by CASAC and the public.

[23] As with all studies, we note that there are strengths and limitations for these two studies which may affect the specific magnitudes of the reported ratios, but that the studies' findings and trends are generally consistent with the conclusions from the 1986 Criteria Document.

[24] The CASAC Panel stated ''The Schwartz and Pitcher analysis showed that in 1978, the midpoint of the National Health and Nutrition Examination Survey (NHANES) II, gasoline Pb was responsible for 9.1 µg/dL of blood Pb in children. Their estimate is based on their coefficient of 2.14 µg/dL per 100 metric tons (MT) per day of gasoline use, and usage of 426 MT/day in 1978. Between 1976 and when the phase-out of Pb from gasoline was completed, air Pb concentrations in U.S. cities fell a little less than 1 µg/m³ (24). These two facts imply a ratio of 9–10 µg/dL per µg/m³ reduction in air Pb, taking all pathways into account.'' (Henderson, 2007a, pp. D–2 to D–3).

[25] Air-to-blood ratios for the full study area of the primary Pb smelter range from 1:3 to 1:7 across the range of alternative standard levels from 1.5 down to 0.02 µg/m³ (USEPA, 2007b).

of the degree of dust Pb reduction associated with a specified degree of ambient air Pb reduction, which in turn could produce air-to-blood Pb ratios that are biased high.

In summary, EPA's view in the proposal was that the current evidence in conjunction with the results and observations drawn from the exposure assessment, including related uncertainties, supports consideration of a range of air-to-blood ratios for children ranging from 1:3 to 1:7, reflecting multiple air-related pathways beyond simply inhalation and the lower air and blood Pb levels pertinent to this review. EPA invited comment on this range as well as the appropriate weight to place on specific ratios within this range. Advice from CASAC and comments from the public on this issue are discussed below in section II.C.3.

b. Array of Health Effects and At-Risk Subpopulations

Lead has been demonstrated to exert "a broad array of deleterious effects on multiple organ systems via widely diverse mechanisms of action" (CD, p. 8–24 and section 8.4.1). This array of health effects includes effects on heme biosynthesis and related functions; neurological development and function; reproduction and physical development; kidney function; cardiovascular function; and immune function. The weight of evidence varies across this array of effects and is comprehensively described in the Criteria Document. There is also some evidence of Pb carcinogenicity, primarily from animal studies, together with limited human evidence of suggestive associations (CD, sections 5.6.2, 6.7, and 8.4.10).[26]

This review is focused on those effects most pertinent to ambient exposures, which, given the reductions in ambient Pb levels over the past 30 years, are generally those associated with individual blood Pb levels in children and adults in the range of 10 µg/dL and lower. These key effects include neurological, hematological, and immune[27] effects for children, and

hematological, cardiovascular and renal effects for adults (CD, Tables 8–5 and 8–6, pp. 8–60 to 8–62). As evident from the discussions in chapters 5, 6 and 8 of the Criteria Document, "neurotoxic effects in children and cardiovascular effects in adults are among those best substantiated as occurring at blood Pb concentrations as low as 5 to 10 µg/dL (or possibly lower); and these categories are currently clearly of greatest public health concern" (CD, p. 8–60).[28 29] The toxicological and epidemiological information available since the time of the last review "includes assessment of new evidence substantiating risks of deleterious effects on certain health endpoints being induced by distinctly lower than previously determined Pb exposures indexed by blood Pb levels extending well below 10 µg/dL in children and/or adults" (CD, p. 8–25). Some health effects associated with individual blood Pb levels extend below 5 µg/dL, and some studies have observed these effects at the lowest blood levels considered. With regard to population mean levels, the Criteria Document points to studies reporting "Pb effects on the intellectual attainment of preschool and school age children at population mean concurrent blood-Pb levels ranging down to as low as 2 to 8 µg/dL" (CD, p. E–9).

We note that many studies over the past decade, in investigating effects at lower blood Pb levels, have utilized the CDC advisory level or level of concern for individual children (10 µg/dL)[30] as a benchmark for assessment, and this is reflected in the numerous references in the Criteria Document to 10 µg/dL. Individual study conclusions stated with regard to effects observed below 10 µg/dL are usually referring to individual blood Pb levels. In fact, many such study groups have been restricted to

individual blood Pb levels below 10 µg/dL or below levels lower than 10 µg/dL. We note that the mean blood Pb level for these groups will necessarily be lower than the blood Pb level they are restricted below.

Threshold levels, in terms of blood Pb levels in individual children, for neurological effects cannot be discerned from the currently available studies (CD, pp. 8–60 to 8–63). The Criteria Document states "There is no level of Pb exposure that can yet be identified, with confidence, as clearly not being associated with some risk of deleterious health effects" (CD, p. 8–63). As discussed in the Criteria Document, "a threshold for Pb neurotoxic effects may exist at levels distinctly lower than the lowest exposures examined in these epidemiologic studies" (CD, p. 8–67).[31]

As described in the proposal, physiological, behavioral and demographic factors contribute to increased risk of Pb-related health effects. Potentially at-risk subpopulations, also referred to as sensitive sub-populations, include those with increased susceptibility (i.e., physiological factors contributing to a greater response for the same exposure), as well as those with greater vulnerability (i.e., those with increased exposure such as through exposure to higher media concentrations or resulting from behavior leading to increased contact with contaminated media), or those affected by socioeconomic factors, such as reduced access to health care or low socioeconomic status.

While adults are susceptible to Pb effects at lower blood Pb levels than previously understood (e.g., CD, p. 8–25), the greater influence of past exposures on their current blood Pb levels (as summarized above in section II.A.2.a) leads us to give greater prominence to children as the sensitive subpopulation in this review. Children are at increased risk of Pb-related health effects due to various factors that enhance their exposures (e.g., via the hand-to-mouth activity that is prevalent in very young children, CD, section 4.4.3) and susceptibility. While children are considered to be at a period of

---

[26] Lead has been classified as a probable human carcinogen by the International Agency for Research on Cancer (inorganic lead compounds), based mainly on sufficient animal evidence, and as reasonably anticipated to be a human carcinogen by the U.S. National Toxicology Program (lead and lead compounds) (CD, Section 6.7.2). U.S. EPA considers Pb a probable carcinogen (*http://www.epa.gov/iris/subst/0277.htm*; CD, p. 6–195).

[27] At mean blood Pb levels, in children, on the order of 10 µg/dL, and somewhat lower, associations have been found with effects to the immune system, including altered macrophage activation, increased IgE levels and associated increased risk for autoimmunity and asthma (CD, Sections 5.9, 6.8, and 8.4.6).

[28] With regard to blood Pb levels in individual children associated with particular neurological effects, the Criteria Document states "Collectively, the prospective cohort and cross-sectional studies offer evidence that exposure to Pb affects the intellectual attainment of preschool and school age children at blood Pb levels <10 µg/dL (most clearly in the 5 to 10 µg/dL range, but, less definitively, possibly lower)." (p. 6–269)

[29] Epidemiological studies have consistently demonstrated associations between Pb exposure and enhanced risk of deleterious cardiovascular outcomes, including increased blood pressure and incidence of hypertension. A meta-analysis of numerous studies estimates that a doubling of blood-Pb level (e.g., from 5 to 10 µg/dL) is associated with ~1.0 mm Hg increase in systolic blood pressure and ~0.6 mm Hg increase in diastolic blood pressure (CD, p. E–10).

[30] This level has variously been called an advisory level or level of concern (*http://www.atsdr.cdc.gov/csem/lead/pb_standards2.html*). In addressing children's blood Pb levels, CDC has stated "Specific strategies that target screening to high-risk children are essential to identify children with BLLs ≥ 10 µg/dL." (CDC, 2005, p.1)

[31] In consideration of the evidence from experimental animal studies with regard to the issue of threshold for neurotoxic effects, the CD notes that there is little evidence that allows for clear delineation of a threshold, and that "blood-Pb levels associated with neurobehavioral effects appear to be reasonably parallel between humans and animals at reasonably comparable blood-Pb concentrations; and such effects appear likely to occur in humans ranging down at least to 5–10 µg/dL, or possibly lower (although the possibility of a threshold for such neurotoxic effects cannot be ruled out at lower blood-Pb concentrations)" (CD, p. 8–38).

maximum exposure around 18–27 months, the current evidence has found even stronger associations between blood Pb at school age and IQ at school age. The evidence "supports the idea that Pb exposure continues to be toxic to children as they reach school age, and [does] not lend support to the interpretation that all the damage is done by the time the child reaches 2 to 3 years of age" (CD, section 6.2.12). The following physiological and demographic factors can further affect risk of Pb-related effects in some children.

• Children with particular genetic polymorphisms (e.g., presence of the δ-aminolevulinic acid dehydratase-2 [ALAD-2] allele) have increased sensitivity to Pb toxicity, which may be due to increased susceptibility to the same internal dose and/or to increased internal dose associated with same exposure (CD, p. 8–71, sections 6.3.5, 6.4.7.3 and 6.3.6).

• Some children may have blood Pb levels higher than those otherwise associated with a given Pb exposure (CD, section 8.5.3) as a result of nutritional status (e.g., iron deficiency, calcium intake), as well as genetic and other factors (CD, chapter 4 and sections 3.4, 5.3.7 and 8.5.3).

• Situations of elevated exposure, such as residing near sources of ambient Pb, as well as socioeconomic factors, such as reduced access to health care or low socioeconomic status (SES) (USEPA, 2003, 2005c) can also contribute to increased blood Pb levels and increased risk of associated health effects from air-related Pb.

• As described in the proposal (sections II.B.1.b and II.B.3), children in poverty and black, non-Hispanic children have notably higher blood Pb levels than do economically well-off children and white children, in general.

### c. Neurological Effects in Children

Among the wide variety of health endpoints associated with Pb exposures, there is general consensus that the developing nervous system in children is among the, if not the, most sensitive. While blood Pb levels in U.S. children have decreased notably since the late 1970s, newer studies have investigated and reported associations of effects on the neurodevelopment of children with these more recent blood Pb levels (CD, chapter 6). Functional manifestations of Pb neurotoxicity during childhood include sensory, motor, cognitive and behavioral impacts. Numerous epidemiological studies have reported neurocognitive, neurobehavioral, sensory, and motor function effects in children with blood Pb levels below 10

µg/dL (CD, sections 6.2 and 8.4).[32] As discussed in the Criteria Document, "extensive experimental laboratory animal evidence has been generated that (a) substantiates well the plausibility of the epidemiologic findings observed in human children and adults and (b) expands our understanding of likely mechanisms underlying the neurotoxic effects" (CD, p. 8–25; section 5.3).

Cognitive effects associated with Pb exposures that have been observed in epidemiological studies have included decrements in intelligence test results, such as the widely used IQ score, and in academic achievement as assessed by various standardized tests as well as by class ranking and graduation rates (CD, section 6.2.16 and pp 8–29 to 8–30). As noted in the Criteria Document with regard to the latter, "Associations between Pb exposure and academic achievement observed in the above-noted studies were significant even after adjusting for IQ, suggesting that Pb-sensitive neuropsychological processing and learning factors not reflected by global intelligence indices might contribute to reduced performance on academic tasks" (CD, pp 8–29 to 8–30).

With regard to potential implications of Pb effects on IQ, the Criteria Document recognizes the "critical" distinction between population and individual risk, identifying issues regarding declines in IQ for an individual and for the population. The Criteria Document further states that a "point estimate indicating a modest mean change on a health index at the individual level can have substantial implications at the population level" (CD, p. 8–77).[33] A downward shift in the mean IQ value is associated with both substantial decreases in percentages achieving very high scores and substantial increases in the percentage of individuals achieving very low scores (CD, p. 8–81).[34] For an individual functioning in the low IQ range due to the influence of developmental risk

factors other than Pb, a Pb-associated IQ decline of several points might be sufficient to drop that individual into the range associated with increased risk of educational, vocational, and social failure (CD, p. 8–77).

Other cognitive effects observed in studies of children have included effects on attention, executive functions, language, memory, learning and visuospatial processing (CD, sections 5.3.5, 6.2.5 and 8.4.2.1), with attention and executive function effects associated with Pb exposures indexed by blood Pb levels below 10 µg/dL (CD, section 6.2.5 and pp. 8–30 to 8–31). The evidence for the role of Pb in this suite of effects includes experimental animal findings (discussed in CD, section 8.4.2.1; p. 8–31), which provide strong biological plausibility of Pb effects on learning ability, memory and attention (CD, section 5.3.5), as well as associated mechanistic findings.

The persistence of such Pb-induced effects is described in the proposal and the Criteria Document (e.g., CD, sections 5.3.5, 6.2.11, and 8.5.2). The persistence or irreversibility of such effects can be the result of damage occurring without adequate repair offsets or of the persistence of Pb in the body (CD, section 8.5.2). It is additionally important to note that there may be long-term consequences of such deficits over a lifetime. Poor academic skills and achievement can have "enduring and important effects on objective parameters of success in real life", as well as increased risk of antisocial and delinquent behavior (CD, section 6.2.16).

Multiple epidemiologic studies of Pb and child development have demonstrated inverse associations between blood Pb concentrations and children's IQ and other cognitive-related outcomes at successively lower Pb exposure levels over the past 30 years (as discussed in the CD, section 6.2.13). For example, the overall weight of the available evidence, described in the Criteria Document, provides clear substantiation of neurocognitive decrements being associated in children with mean blood Pb levels in the range of 5 to 10 µg/dL, and some analyses indicate Pb effects on intellectual attainment of children for which population mean blood Pb levels in the analysis ranged from 2 to 8 µg/dL (CD, sections 6.2, 8.4.2 and 8.4.2.6). Thus, while blood Pb levels in U.S. children have decreased notably since the late 1970s, newer studies have investigated and reported associations of effects on the neurodevelopment of children with blood Pb levels similar to the more recent, lower blood Pb levels (CD,

---

[32] Further, neurological effects in general include behavioral effects, such as delinquent behavior (CD, sections 6.2.6 and 8.4.2.2), sensory effects, such as those related to hearing and vision (CD, sections 6.2.7 and 8.4.2.3), and deficits in neuromotor function (CD, p. 8–36).

[33] As an example, the Criteria Document states "although an increase of a few mmHg in blood pressure might not be of concern for an individual's well-being, the same increase in the population mean might be associated with substantial increases in the percentages of individuals with values that are sufficiently extreme that they exceed the criteria used to diagnose hypertension" (CD, p. 8–77).

[34] For example, for a population mean IQ of 100 (and standard deviation of 15), 2.3% of the population would score above 130, but a shift of the population to a mean of 95 results in only 0.99% of the population scoring above 130 (CD, pp. 8–81 to 8–82).

chapter 6; and as discussed in section II.B.2.b of the proposal).

The current evidence reviewed in the Criteria Document with regard to the quantitative relationship between neurocognitive decrement, such as IQ, and blood Pb levels indicates that the slope for Pb effects on IQ is nonlinear and is steeper at lower blood Pb levels, such that each µg/dL increase in blood Pb may have a greater effect on IQ at lower blood Pb levels (e.g., below 10 µg/dL) than at higher levels (CD, section 6.2.13; pp. 8–63 to 8–64; Figure 8–7). As stated in the CD, ''the most compelling evidence for effects at blood Pb levels <10 µg/dL, as well as a nonlinear relationship between blood Pb levels and IQ, comes from the international pooled analysis of seven prospective cohort studies (n=1,333) by Lanphear et al. (2005)'' (CD, pp. 6–67 and 8–37 and section 6.2.3.1.11). Using the full pooled dataset with concurrent blood Pb level as the exposure metric and IQ as the response from the pooled dataset of seven international studies, Lanphear and others (2005) employed mathematical models of various forms, including linear, cubic spline, log-linear, and piece-wise linear, in their investigation of the blood Pb concentration-response relationship (CD, p. 6–29; Lanphear et al., 2005). They observed for this pooled dataset that the shape of the concentration-response relationship is nonlinear and the log-linear model provides a better fit over the full range of blood Pb measurements [35] than a linear one (CD, p. 6–29 and pp. 6–67 to 6–70; Lanphear et al., 2005). In addition, they found that no individual study among the seven was responsible for the estimated nonlinear relationship between Pb and deficits in IQ (CD p. 6–30). Others have also analyzed the same dataset and similarly concluded that, across the range of the dataset's blood Pb levels, a log-linear relationship was a significantly better fit than the linear relationship (p=0.009) with little evidence of residual confounding from included model variables (CD, section 6.2.13; Rothenberg and Rothenberg, 2005).

As noted in the Criteria Document, a number of examples of non- or supralinear dose-response relationships exist in toxicology (CD, pp. 6–76 and 8–38 to 8–39). With regard to the effects of Pb on neurodevelopmental outcome such as IQ, the Criteria Document suggests that initial neurodevelopmental

effects at lower Pb levels may be disrupting very different biological mechanisms (e.g., early developmental processes in the central nervous system) than more severe effects of high exposures that result in symptomatic Pb poisoning and frank mental retardation (CD, p. 6–76). The Criteria Document describes this issue in detail with regard to Pb (summarized in CD at p. 8–39). Various findings within the toxicological evidence, presented in the Criteria Document (described in the proposal), provide biologic plausibility for a steeper IQ loss at low blood levels, with a potential explanation being that the predominant mechanism at very low blood-Pb levels is rapidly saturated and that a different, less-rapidly-saturated process, becomes predominant at blood-Pb levels greater than 10 µg/dL.

The current evidence includes multiple studies that have examined the quantitative relationship between IQ and blood Pb level in analyses of children with individual blood Pb concentrations below 10 µg/dL. In comparing across the individual epidemiological studies and the international pooled analysis, the Criteria Document observed that at higher blood Pb levels (e.g., above 10 µg/dL), the slopes (for change in IQ with blood Pb) derived for log-linear and linear models are almost identical, and for studies with lower blood Pb levels, the slopes appear to be steeper than those observed in studies involving higher blood Pb levels (CD, p. 8–78, Figure 8–7). In making these observations, the Criteria Document focused on the curves from the models from the 10th percentile to the 90th percentile saying that the ''curves are restricted to that range because log-linear curves become very steep at the lower end of the blood Pb levels, and this may be an artifact of the model chosen''.

The quantitative relationship between IQ and blood Pb level has been examined in the Criteria Document using studies where all or the majority of study subjects had blood Pb levels below 10 µg/dL and also where an analysis was performed on a subset of children whose blood Pb levels have never exceeded 10 µg/dL (CD, Table 6–1).[36] The datasets for three of these

studies included concurrent blood Pb levels above 10 µg/dL; the concentration-response (C–R) relationship reported for one of the three was linear while it was log-linear for the other two. For the one study among these three that reported a linear C-R relationship, the highest blood Pb level was just below 12 µg/dL and the population mean was 7.9 µg/dL (Kordas et al., 2006). Of the two studies with log-linear functions, one reported 69% of the children with blood Pb levels below 10 µg/dL and a population mean blood Pb level of 7.44 µg/dL (Al-Saleh et al., 2001), and the second reported a population median blood Pb level of 9.7 µg/dL and a 95th percentile of 33.2 µg/dL (Lanphear et al., 2005). In order to compare slopes across all of these studies (linear and log-linear) in the Criteria Document, EPA estimated, for each, the average slope of change in IQ with change in blood Pb between the 10th percentile [37] blood Pb level and 10 µg/dL (CD, Table 6–1). The resultant group of reported and estimated average linear slopes for IQ change with blood Pb levels up to 10 µg/dL range from -0.4 to -1.8 IQ points per µg/dL blood Pb (CD, Tables 6–1 and 8–7), with a median of -0.9 IQ points per µg/dL blood Pb (CD, p. 8–80).[38] These slopes from

---

[35] The median of the concurrent blood Pb levels modeled was 9.7 µg/dL; the 5th and 95th percentile values were 2.5 and 33.2 µg/dL, respectively (Lanphear et al., 2005).

[36] The tests for cognitive function in these studies include age-appropriate Wechsler intelligence tests (Lanphear et al., 2005; Bellinger and Needleman, 2003), the Stanford-Binet intelligence test (Canfield et al., 2003), the Test of Non-Verbal Intelligence (Al-Saleh et al., 2001), an abbreviated form of the Wechsler tests (Kordas et al., 2006) and the Bayley Scales of Infant Development (Tellez-Rojo et al., 2006). The Wechsler and Stanford-Binet tests are widely used to assess neurocognitive function in children and adults, however, these tests are not

appropriate for children under age three. For such children, studies generally use the age-appropriate Bayley Scales of Infant Development as a measure of cognitive development.

[37] In the Criteria Document analysis, the 10th percentile was chosen as a common point of comparison for the loglinear (and linear) models at a point prior to the lowest end of the blood Pb levels.

[38] One of these slopes (CD, Table 6–1) is for the IQ-blood Pb (concurrent) relationship for children whose peak blood Pb levels are below 10 µg/dL in the international pooled dataset studied by Lanphear and others (2005); these authors reported this slope along with the companion slope, from the same (piece-wise) model, for the remaining children whose peak blood Pb level equals or is above 10 µg/dL (Lanphear et al., 2005). In the economic analysis for EPA's recent Lead Renovation, Repair and Painting (RRP) Program rule (described above in section I.C) for children living in houses with lead-based paint, changes in IQ were estimated as a function of changes in lifetime average blood Pb level using the corresponding piece-wise model for lifetime average blood Pb derived from the pooled dataset (USEPA, 2008; USEPA, 2007d). The piecewise models that gave greater weight to impacts in this blood Pb range were chosen because peak blood Pb levels are likely to be less than 10 µg/dL for the vast majority of children exposed to Pb during renovation activities. Further, while Lanphear et al. (2005) used peak blood Pb concentrations to determine which segment of a model to apply, for the hypothetical children to whom the approach is discussed in the RRP Program rule, only lifetime averages were used (in the RRP analysis). To counter the impact of assigning additional hypothetical RRP children to the steeper of the two slopes than would have been the case if they could be assigned based on peak blood Pb levels (as a child's lifetime average blood Pb is lower than peak blood Pb), the RRP analysis
Continued

Tables 6–1 and 8–7 of the Criteria Document are presented in the second set of slopes in Table 1 below (adapted from Table 1 of the proposal). In this second set are studies (included in the Criteria Document Table 6–1) that examined the quantitative relationships of IQ and blood Pb in study populations for which most blood Pb levels were below 10 μg/dL and for which a linear slope restricted to blood Pb levels below about 10 μg/dL could be estimated.

Among this group of quantitative IQ-blood Pb relationships examined in the Criteria Document (CD, Tables 6–1 and 8–7), the steepest slopes for change in IQ with change in blood Pb level are those derived for the subsets of children in the Rochester and Boston cohorts for which peak blood Pb levels were <10 μg/dL; these slopes, in terms of IQ points per μg/dL blood Pb, are −1.8 (for concurrent blood Pb influence on IQ)

and −1.6 (for 24-month blood Pb influence on IQ), respectively. The mean blood Pb levels for children in these subsets of the Rochester and Boston cohorts are 3.32 (Canfield, 2008) and 3.8 μg/dL (Bellinger, 2008), respectively, which are the lowest population mean levels among the datasets included in the table. Other studies with analyses involving similarly low blood Pb levels (e.g., mean levels below 4 μg/dL) also had slopes steeper than −1.5 points per μg/dL blood Pb. These include the slope of −1.71 points per μg/dL blood Pb [39] for the subset of 24-month old children in the Mexico City cohort with blood Pb levels less than 5 μg/dL (n=193), for which the mean concurrent blood Pb level was 2.9 μg/dL (Tellez-Rojo et al. 2006, 2008),[40] and the slope of −2.94 points per μg/dL blood Pb for the subset

of 6–10 year old children whose peak blood Pb levels never exceeded 7.5 μg/dL (n=112), and for which the mean concurrent blood Pb level was 3.24 μg/dL (Lanphear et al. 2005; Hornung 2008a). Thus, from these subset analyses, the slopes range from −1.71 to −2.94 IQ points per μg/dL of concurrent blood Pb, as shown in the first set of slopes in Table 1. In this first set are studies that included quantitative relationships for IQ and blood Pb that focused on lower individual blood Pb levels (below 7.5 μg/dL). We also note that for blood Pb levels up to approximately 3.7 μg/dL, the slope of the nonlinear C–R function in which greatest confidence is placed in estimating IQ loss in the quantitative risk assessment (the LLL function) [41] falls intermediate between these two values.

TABLE 1—SUMMARY OF QUANTITATIVE RELATIONSHIPS OF IQ AND BLOOD PB FOR TWO SETS OF STUDIES DISCUSSED ABOVE

| Study/analysis | Study cohort | Analysis dataset | N | Range BLL [A] (μg/dL) | Geometric mean BLL [A] (μg/dL) | Form of model from which average slope derived | Average linear slope [B] (points per μg/dL) |
|---|---|---|---|---|---|---|---|
| **Set of studies from which steeper slopes are drawn in the proposal** | | | | | | | |
| Tellez-Rojo <5 sub-group. | Mexico City, age 24 mo. | Children—BLL<5 μg/dL. | 193 | 0.8–4.9 ......... | 2.9 ............... | Linear ........... | −1.71 |
| based on Lanphear et al 2005 [C], Log-linear with low-exposure linearization (LLL). | Dataset from which the log-linear function is derived is the pooled International dataset of 1333 children, age 6–10 yr, having median blood Pb of 9.7 μg/dL and 5th–95th percentile of 2.5–33.2 μg/dL. | | | | | LLL [D]: −2.29 at 2 μg/dL −1.89 at 3 μg/dL | |
| Lanphear et al. 2005 [C], <7.5 peak subgroup. | Pooled International, age 6–10 yr. | Children—peak BLL <7.5 μg/dL. | 103 | 0.9–7.4 ......... | 3.24 .............. | Linear ........... | −2.94 |

used the piece-wise model with node at 10 μg/dL, for which the steeper of the two slopes is less steep than it is for the model with node at 7.5 μg/dL. As stated in the RRP economic analysis document, "[s]electing a model with a node, or changing one segment to the other, at a lifetime average blood Pb concentration of 10 μg/dL rather than at 7.5 μg/dL, is a small protection against applying an incorrectly rapid change (steep slope with increasingly smaller effect as concentrations lower) to the calculation" (USEPA, 2008). We note here that the slope for the less-than-10 μg/dL portion of the model used in the RRP analysis (-0.88) is similar to the median for the slopes included in the Criteria Document analysis of quantitative relationships for studies in which the majority of blood Pb levels were below 10 μg/dL.

[39] This slope reflects effects on cognitive development in this cohort of 24-month old children based on the age-appropriate test described earlier, and is similar in magnitude to slopes for the cohorts of older children described here. The strengths and limitations of this age-appropriate test, the Mental Development Index (MDI) of the Bayley Scales of Infant Development (BSID), were

discussed in a letter to the editor by Black and Baqui (2005). The letter states that "the MDI is a well-standardized, psychometrically strong measure of infant mental development." The MDI represents a complex integration of empirically-derived cognitive skills, for example, sensory/perceptual acuities, discriminations, and response; acquisition of object constancy; memory learning and problem solving; vocalization and beginning of verbal communication; and basis of abstract thinking. Black and Baqui additionally state that although the MDI is one of the most well-standardized, widely used assessment of infant mental development, evidence indicates low predictive validity of the MDI for infants younger than 24 months to subsequent measures of intelligence. They explain that the lack of continuity may be partially explained by "the multidimensional and rapidly changing aspects of infant mental development and by variations in performance during infancy, variations in tasks used to measure intellectual functioning throughout childhood, and variations in environmental challenges and opportunities that may influence development." Martin and Volkmar (2007) also noted that correlations between BSID

performance and subsequent IQ assessments were variable, but they also reported high test-retest reliability and validity, as indicated by the correlation coefficients of 0.83 to 0.91, as well as high interrater reliability, correlation coefficient of 0.96, for the MDI. Therefore, the BSID has been found to be a reliable indicator of current development and cognitive functioning of the infant. Martin and Volkmar (2007) further note that "for the most part, performance on the BSID does not consistently predict later cognitive measures, particularly when socioeconomic status and level of functioning are controlled".

[40] In this study, the slope for blood Pb levels between 5 and 10 μg/dL (population mean blood Pb of 6.9 μg/dL; n=101) was −0.94 points per μg/dL blood Pb but was not statistically significant, with a p value of 0.12. The difference in the slope between the <5 μg/dL and the 5–10 μg/dL groups was not statistically significant (Tellez-Rojo et al., 2006; Tellez-Rojo, 2008).

[41] The LLL function is the loglinear function from Lampshear et al. (2005), with linearization at low exposures (as described in sections 2.1.5 and 4.1.1.2 of the Risk Assessment Report).

TABLE 1—SUMMARY OF QUANTITATIVE RELATIONSHIPS OF IQ AND BLOOD Pb FOR TWO SETS OF STUDIES DISCUSSED ABOVE—Continued

| Study/analysis | Study cohort | Analysis dataset | N | Range BLL [A] (µg/dL) | Geometric mean BLL [A] (µg/dL) | Form of model from which average slope derived | Average linear slope [B] (points per µg/dL) |
|---|---|---|---|---|---|---|---|
| **Set of studies with shallower slopes (Criteria Document Table 6–1) presented in the proposal [E]** |||||||| 
| **Canfield et al 2003** [C], <10 peak subgroup. | Rochester, age 5 yr | Children—peak BLL <10 µg/dL. | 71 | 0.5–8.4 | 3.32 | Linear | −1.79 |
| Bellinger and Needleman 2003 [C]. | Boston [B] [F] | Children—peak BLL <10 µg/dL. | 48 | 1–9.3 [F] | [F] 3.8 | Linear | −1.56 |
| Tellez-Rojo et al. 2006. | Mexico City, age 24 mo. | Full dataset | 294 | 0.8–9.8 | 4.28 | Linear | −1.04 |
| Tellez-Rojo et al. 2006 full—loglinear. | Mexico City, age 24 mo. | Full dataset | 294 | 0.8–9.8 | 4.28 | Log-linear | [G] −0.94 |
| Lanphear et al. 2005 [C], <10 peak [C] subgroup. | Pooled International, age 6–10 yr. | Children—peak BLL <10 µg/dL. | 244 | 0.1–9.8 | 4.30 | Linear | −0.80 |
| Al-Saleh et al 2001 full—loglinear. | Saudi Arabia, age 6–12 yr. | Full dataset | 533 | 2.3–27.36 [H] | 7.44 | Log-linear | [G] −0.76 |
| Kordas et al 2006, <12 subgroup. | Torreon, Mexico, age 7 yr. | Children—BLL <12 µg/dL. | 377 | 2.3–<12 | 7.9 | Linear | −0.40 |
| Lanphear et al 2005 [C] full—loglinear. | Pooled International, age 6–10 yr. | Full dataset | 1333 | 0.1–71.7 | 9.7 (median) | Log-linear | [G] −0.41 |
| Median value | | | | | | | [D] −0.9 |

[A] Blood Pb level (BLL) information provided here is drawn from publications listed in table, in some cases augmented by study authors (Bellinger, 2008; Canfield, 2008a,b; Hornung, 2008a,b; Kordas, 2008; Tellez-Rojo, 2008).

[B] Average linear slope estimates here are for relationship between IQ and concurrent blood Pb levels (BLL), except for Bellinger & Needleman which used 24 month BLLs with 10 year old IQ.

[C] The Lanphear et al. 2005 pooled International study includes blood Pb data from the Rochester and Boston cohorts, although for different ages (6 and 5 years, respectively) than the ages analyzed in Canfield et al 2003 and Bellinger and Needleman 2003.

[D] The LLL function (described in section II.C.2.b) was developed from Lanphear et al 2005 loglinear model with a linearization of the slope at BLL below 1 µg/dL. In estimating IQ loss with this function in the risk assessment (section II.A.3) the nonlinear form of the model with varying slope was used for all BLL above 1 µg/dL. The slopes shown are the average slopes (IQ points per µg/dL blood Pb) associated with application of the LLL functions from zero to the blood Pb levels identified (2 and 3 µg/dL).

[E] These studies and quantitative relationships are discussed in the Criteria Document (CD, sections 6.2, 6.2.1.3 and 8.6.2).

[F] The BLL for Bellinger and Needleman (2003) are for age 24 months.

[G] For nonlinear models, this is the estimated average slope for change in IQ with change in blood Pb over the range from the 10th percentile blood Pb value in study to 10 µg/dL (CD, p. 6–65). The shape of these models is such that the average slopes from the 10th percentiles to a value lower than 10 µg/dL are larger negative values than those shown here (e.g., the slopes to 5 µg/dL are 50% larger negative values).

[H] 69% of children in Al-Saleh et al. (2001) study had BLL<10 µg/dL.

3. Overview of Human Exposure and Health Risk Assessments

To put judgments about risk associated with exposure to air-related Pb in a broader public health context, EPA developed and applied models to estimate human exposures to air-related Pb and associated health risk for various air quality scenarios and alternative standards. The design and implementation of the risk assessment needed to address significant limitations and complexity that go far beyond the situation for similar assessments typically performed for other criteria pollutants. The multimedia and persistent nature of Pb and the role of multiple exposure pathways add significant complexity as compared with other criteria pollutants that focus only on the inhalation exposure. Not only was the risk assessment constrained by the timeframe allowed for this review in the context of the breadth of information to address, it was also constrained by significant limitations in data and modeling tools for the assessment, as described in section II.C.2.h of the proposal.

The scope and methodology for this assessment were developed over the last few years with considerable input from the CASAC Pb Panel and the public, as described in the proposal (section II.C.2.a).[42] The following sections

[42] In their review of the final risk assessment, CASAC expressed strong support, stating that "[t]he Final Risk Assessment report captures the breadth of issues related to assessing the potential public health risk associated with lead exposures; it competently documents the universe of knowledge and interpretations of the literature on lead toxicity, exposures, blood lead modeling and approaches for conducting risk assessments for lead" (Henderson, 2008a, p. 4).

provide a brief summary of the quantitative exposure and risk assessment and key findings. The complete full-scale assessment, including the associated uncertainties, is more fully summarized in section II.C of the proposal and described in detail in the Risk Assessment Report (USEPA, 2007b).

a. Design Aspects and Associated Uncertainties

As discussed in section II.C.2 of the proposal, EPA conducted exposure and risk analyses to estimate blood Pb and associated IQ loss in children exposed to air-related Pb. As recognized in section II.A.2 above and discussed in the proposal notice and Criteria Document, among the wide variety of health endpoints associated with Pb exposures, there is general consensus

that the developing nervous system in children is among, if not, the most sensitive, and that neurobehavioral effects (specifically neurocognitive deficits), including IQ decrements, appear to occur at lower blood Pb levels than previously believed. The selection of children's IQ for the quantitative risk assessment reflects consideration of the evidence presented in the Criteria Document as well as advice received from CASAC (Henderson, 2006, 2007a).[43]

The brief summary provided here focuses on blood Pb and risk estimates for five case studies[44] that generally represent two types of population exposures: (1) More highly air-pathway exposed children (as described below) residing in small neighborhoods or localized residential areas with air concentrations somewhat near the standard being evaluated, and (2) location-specific urban populations with a broader range of air-related exposures.

The case studies representing the more highly air-pathway exposed children are the general urban case study and the primary Pb smelter case study. The general urban case study case study is not based on a specific geographic location and reflects several simplifications in representing exposure including uniform ambient air Pb levels associated with the standard of interest across the hypothetical study area and a uniform study population. Additionally, the method for simulating temporal variability in air Pb concentrations in this case study relied on national average estimates of the relationships between air concentrations in terms of the statistics considered for different forms of the standard being assessed and the annual ambient air concentrations required for input to the blood Pb model.[45] Thus, while this case study provides characterization of risk to children that are relatively more highly air pathway exposed (as

compared to the location-specific case studies), this case study is not considered to represent a high-end scenario with regard to the characterization of ambient air Pb levels and associated risk. The primary Pb smelter case study provides risk estimates for children living in a specific area that is currently not in attainment with the current NAAQS. We have focused on a subarea within 1.5 km of the facility where airborne Pb concentrations are closest to the current standard and where children's air-related exposures are most impacted by emissions associated with the Pb smelter from which air Pb concentrations were estimated.

The three location-specific urban case studies focus on specific residential areas within Cleveland, Chicago, and Los Angeles to provide representations of urban populations with a broader range of air-related exposures due to spatial gradients in both ambient air Pb levels and population density. For example, the highest air concentrations in these case studies (i.e., those closest to the standard being assessed) are found in very small parts of the study areas, while a large majority of the case study populations reside in areas with much lower air concentrations.

Based on the nature of the population exposures represented by the two categories of case study, the first category (the general urban and primary Pb smelter case studies) relates more closely to the air-related IQ loss evidence-based framework described in the proposal (sections II.D.2.a.ii and II.E.3.a) with regard to estimates of air-related IQ loss. As mentioned above, these case studies, as compared to the other category of case studies, include populations that are relatively more highly exposed by way of air pathways to air Pb concentrations somewhat near the standard level evaluated.

The air quality scenarios assessed include (a) the current NAAQS (for all five case studies);[46] (b) current

conditions for the location-specific[47] and general urban case studies (which are below the current NAAQS); and (c) a range of alternate standard levels (for all case studies). The alternative NAAQS scenarios included levels of 0.50, 0.20, 0.05 and 0.02 $\mu g/m^3$, with a form of maximum monthly average, as well as a level of 0.20 $\mu g/m^3$, with a form of maximum quarterly average. Details of the assessment scenarios, including the Pb concentrations for other media are presented in Sections 2.3 and 5.1.1 of the Risk Assessment Report (USEPA, 2007b).

Exposure and associated blood Pb levels were simulated using the IEUBK model, as more fully described and presented in the Risk Assessment Report (USEPA, 2007b). Because of the nonlinear response of blood Pb to exposure and also the nonlinearity reflected in the C–R functions for estimation of IQ loss, this assessment first estimated total blood Pb and risk (air- and nonair-related), and then separated out those estimates of blood Pb and associated risk associated with the pathways of interest in this review. We separated out the estimates of total (all-pathway) blood Pb and IQ loss into a background category and two air-related categories (referred to as "recent air" and "past air"). However, significant limitations in our modeling tools and data resulted in an inability to parse specific risk estimates into specific pathways, such that we have approximated estimates for the air-related and background categories.

Those Pb exposure pathways tied most directly to ambient air, which consequently have the potential to respond relatively more quickly to changes in air Pb (i.e., inhalation and ingestion of indoor dust Pb derived from the infiltration of ambient air Pb indoors), were placed into the "recent air" category. The other air-related Pb exposure pathways, all of which are associated with atmospheric deposition, were placed into the "past air" category. These include ingestion of Pb in outdoor dust/soil and ingestion of the portion of Pb in indoor dust that after deposition from ambient air outdoors is carried indoors with humans (as noted in section II.A.1 above).

Among the limitations affecting our estimates for the air-related and background categories is the apportionment of background (nonair) pathways. For example, while conceptually indoor Pb paint

---

[43] CASAC advice on the design of the risk assessment is summarized in section II.C.2.a of the proposal.

[44] A sixth case study (the secondary Pb smelter case study) is also described in the Risk Assessment Report. However, as discussed in Section 4.3.1 of that document (USEPA, 2007a), significant limitations in the approaches have contributed to large uncertainties in the corresponding estimates.

[45] As the blood Pb model used in the risk assessment was limited in that it did not accept inputs of a temporal time step shorter than annual average, ratios of relationships in the available air monitoring data between different statistical forms being considered for the standard and an annual average were employed for the urban case studies (that did not rely on dispersion modeling) as a method of simulating the temporal variability in air Pb concentrations that occurs as a result of meteorology, source and emissions characteristics.

[46] The current NAAQS scenario for the urban case studies assumes ambient air Pb concentrations higher than those currently occurring in nearly all urban areas nationally. While it is extremely unlikely that Pb concentrations in urban areas would rise to meet the current NAAQS and there are limitations and uncertainties associated with the roll-up procedure used for the location-specific urban case studies (as described in Section II.C.2.h of the proposal), this scenario was included for those case studies to provide perspective on potential risks associated with raising levels to the point that the highest level across the study area just meets the current NAAQS. This scenario was simulated for the location-specific urban case studies using a proportional roll-up procedure. For the general urban case study, the maximum quarterly average ambient air concentration was set equal to the current NAAQS.

[47] Current conditions for the three location-specific urban case studies in terms of maximum quarterly average air Pb concentrations were 0.09, 0.14 and 0.36 $\mu g/m^3$ for the study areas in Los Angeles, Chicago and Cleveland, respectively.

contributions to indoor dust Pb would be considered background and included in the "background" category for this assessment, due to technical limitations related to indoor dust Pb modeling, dust from Pb paint was included as part of "other" indoor dust Pb (*i.e.*, as part of past air exposure). The inclusion of indoor paint Pb as a component of "other" indoor dust Pb (and consequently as a component of the "past air" category) represents a source of potential high bias in our prediction of exposure and risk associated with the "past air" category because conceptually, exposure to indoor paint Pb is considered part of background exposure. At the same time, Pb in ambient air does contribute to the exposure pathways included in the "background" category (drinking water and diet), and is likely a substantial contribution to diet (CD, p. 3–48). We could not separate the air contribution from the nonair contributions, and the total contribution from both the drinking water and diet pathways are categorized as "background" in this assessment. As a result, our "background" risk estimate includes some air-related risk representing a source of potential low bias in our predictions of air-related risk.

Further, we note that in simulating reductions in exposure associated with reducing ambient air Pb levels through alternative NAAQS (and increases in exposure if the current NAAQS was reached in certain case studies) only the exposure pathways categorized as "recent air" (inhalation and ingestion of that portion of indoor dust associated with outdoor ambient air) were varied with changes in air concentration. The assessment did not simulate decreases in "past air" exposure pathways (*e.g.*, reductions in outdoor soil Pb levels following reduction in ambient air Pb levels and a subsequent decrease in exposure through incidental soil ingestion and the contribution of outdoor soil to indoor dust).[48] These exposures were held constant across all air quality scenarios.[49]

In summary, because of limitations in the assessment design, data and modeling tools, our risk estimates for

the "past air" category include both risks that are truly air-related and potentially, some background risk. Because we could not sharply separate Pb linked to ambient air from Pb that is background, some of the three categories of risk are underestimated and others overestimated. On balance, we believe this limitation leads to a slight overestimate of the risks in the "past air" category. At the same time, as discussed above, the "recent air" category does not fully represent the risk associated with all air-related pathways. Thus, we consider the risk attributable to air-related exposure pathways to be bounded on the low end by the risk estimated for the "recent air" category and on the upper end by the risk estimated for the "recent air" plus "past air" categories.

As discussed in the proposal notice and in greater detail in the Staff Paper and Risk Assessment Report, exposure and risk modeling conducted for this analysis was complex and subject to significant uncertainties due to limitations, data, models and time available. Key assumptions, limitations and uncertainties, which were recognized in various ways in the assessment and presentation of results, are listed here, beginning with those related to design of the assessment or case studies, followed by those related to estimation of Pb concentrations in ambient air, indoor dust, outdoor soil/dust, and blood, and estimation of Pb-related IQ loss.

• *Temporal Aspects:* During the 7-year exposure period, media concentrations remain fixed and the simulated child remains at the same residence (while exposure factors and physiological parameters are adjusted to match the age of the child).

• *General Urban Case Study:* The design for this case study employs assumptions regarding uniformity that are reasonable in the context of a small neighborhood population, but would contribute significant uncertainty to extrapolation of these estimates to a specific urban location, particularly a relatively large one. Thus, the risk estimates for this general urban case study, while generally representative of an urban residential population exposed to the specified ambient air Pb levels, cannot be readily related to a specific large urban population.

• *Location-Specific Urban Case Studies:* Limitations in the ambient air monitoring network limit our characterization of spatial gradients of ambient air Pb levels in these case studies.

• *Air Quality Simulation:* The proportional roll-up and roll-down

procedures used in some case studies to simulate current NAAQS and alternate NAAQS levels, respectively, assume proportional changes in air concentrations across the study area in those scenarios for those case studies. EPA recognizes that it is extremely unlikely that Pb concentrations would rise to just meet the current NAAQS in urban areas nationwide and that there is substantial uncertainty with our simulation of such conditions in the urban location-specific case studies. There is also significant uncertainty in simulation conditions associated with the implementation of emissions reduction actions to meet a lower standard.

• *Outdoor Soil/Dust Pb Concentrations:* Uncertainty regarding soil/dust Pb levels and the inability to simulate the influence of changing air Pb levels related to lowering the NAAQS contributes uncertainty to air-related risk estimates.

• *Indoor Dust Pb Concentrations:* Limitations and uncertainty in modeling of indoor dust Pb levels, including the impact of reductions in ambient air Pb levels, contributes uncertainty to air-related risk estimates.

• *Interindividual Variability in Blood Pb Levels:* Uncertainty related to population variability in blood Pb levels and limitations in modeling of this introduces significant uncertainty into blood Pb and IQ loss estimates for the 95th percentile of the population.

• *Pathway Apportionment for Higher Percentile Blood Pb and IQ Loss:* Limitations in data, modeling tools and assessment design introduce uncertainty into estimates of air-related blood Pb and IQ loss for the upper ends of population distribution.

• *IQ Loss Concentration-Response Functions:* Specification of the quantitative relationship between blood Pb level and IQ loss is subject to significant uncertainty at lower blood Pb levels (*e.g.*, below 5 µg/dL concurrent blood Pb).

b. Summary of Blood Pb Estimates

Key observations regarding the blood Pb estimates from this analysis are noted here:

• As shown in Table 2 of the proposal (73 FR 29215), median blood Pb levels for the current conditions air quality scenario in the urban case studies ranged from 1.7–1.8 µg/dL for the location-specific case studies up to 1.9 µg/dL for the general urban case study. These values are slightly larger than the median value from NHANES for children aged 1–5 years old in 2003–2004 of 1.6 µg/dL (*http://www.epa.gov/ envirohealth/children/body_burdens/*

---

[48] Similarly, since dietary Pb was included within "background", reductions in dietary Pb, *e.g.*, as a result of reduced deposition to crops, were also not simulated.

[49] In comparing total risk estimates between alternate NAAQS scenarios, this aspect of the analysis will tend to underestimate the reductions in risk associated with alternative NAAQS. However, this does not mean that overall risk has been underestimated. The net effect of all sources of uncertainty or bias in the analysis, which may also tend to under-or overestimate risk, could not be quantified.

b1-table.htm). Blood Pb level estimates for the 90th percentile in the urban case studies are also higher than the NHANES 90th percentile blood Pb levels. We note, however, that ambient air Pb levels in the urban case studies are higher than those at most monitoring sites in the U.S., as described in section II.C.3.a of the proposal.

• With regard to air-to-blood ratios, estimates for the general urban case study ranged from 1:2 to 1:9 with the majority of the estimates ranging from 1:4 to 1:6.[50] Because the risk assessment only reflects the impact of reductions on recent air-related pathways in predicting changes in indoor dust Pb for the general urban case study (as noted in section II.C.3.a of the proposal), however, the ratios generated are lower than they would be if they had also reflected other air-related pathways (e.g., changes in outdoor surface soil/ dust and dietary Pb with changes in ambient air Pb).

• Air-to-blood ratios estimated for the primary Pb smelter subarea ranged from 1:10 and higher.[51] One reason for these estimates being higher than those for the urban case study may be that the dust Pb model used may somewhat reflect ambient air-related pathways other than that of ambient air infiltrating a home.

c. Summary of IQ Loss Estimates

As described more fully in the proposal notice and in the Risk Assessment Report (USEPA, 2007b, section 5.3.1), four sets of IQ loss estimates were derived from the blood Pb estimates, one for each of four concentration-response functions derived from the international pooled analysis by Lanphear and others (2005). Each of these four functions utilizes a different approach for characterizing low-exposure IQ loss, thereby providing a range of estimates intended to reflect the uncertainty in this key aspect of the risk assessment. As described in section II.C.2.b of the proposal (and in more detail in section 2.1.5 of the Risk Assessment Report), we have placed greater confidence in the log-linear function with low-exposure linearization (LLL) and present risk estimates based on that function here.[52]

The risk estimates summarized here are those considered most relevant to the review in considering whether the current NAAQS and potential alternative NAAQS provide protection of public health with an adequate margin of safety (i.e., estimates of IQ loss associated with air-related Pb exposure). In considering these estimates, we note that IQ loss associated with air-related Pb is bounded on the low end by risk associated with the recent air category of exposure pathways and on the upper end by the recent plus past air categories of pathways (as described above in section II.A.3.a). Key observations regarding the median estimates[53] of air-related risk for the current NAAQS and alternative standards include:

• As shown in Table 2 below (Table 3 in the proposal), in all five case studies, the lower bound of population median air-related risk associated with the current NAAQS exceeds 2 points IQ loss, and the upper bound is near or above 4 points.[54]

• Alternate standards provide substantial reduction in estimates of air-related risk across the full set of alternative NAAQS considered, particularly for the lower bound of air-related risk which includes only the pathways that were varied with changes in air concentrations (as shown in Table 2).

• In the general urban case study, the estimated population median air-related risk falls between 1.9 and 3.6 points IQ loss for an alternative NAAQS of 0.50 µg/m³, maximum monthly average, between 1.2 and 3.2 points IQ loss for an alternative NAAQS of 0.20 µg/m³ and between 0.5 and 2.8 points IQ loss for an alternate NAAQS of 0.05 µg/m³, maximum monthly average, (as shown in Table 2). Higher risk estimates are associated with a maximum quarterly averaging time (USEPA, 2007b).

• At each NAAQS level assessed, the upper bound of population median air-related risk for the primary Pb smelter subarea, which due to limitations in modeling is the only air-related risk estimate for this case study, is generally higher than that for the general urban case study, likely due to differences in the indoor dust models used for the two case studies (as discussed in section II.C.3.b of the proposal).

• Compared to the other case studies, the air-related risk for the location-specific case studies is smaller because of the broader range of air-related exposures and the population distribution. For example, the majority of the populations in each of the location-specific case studies resides in areas with ambient air Pb levels well below each standard level assessed, particularly for standard levels above 0.05 µg/m³, maximum monthly average. Consequently, risk estimates for these case studies indicate little response to alternative standard levels above 0.05 µg/m³ maximum monthly average (as shown in Table 2).

TABLE 2—SUMMARY OF RISK ATTRIBUTABLE TO AIR-RELATED Pb EXPOSURE

| NAAQS level simulated (µg/m³ max monthly, except as noted below) | Median air-related IQ loss[A] | | | | |
|---|---|---|---|---|---|
| | General urban case study | Primary Pb smelter (sub-area) case study[B C] | Location-specific urban case studies | | |
| | | | Cleveland (0.56 µg/m³) | Chicago (0.31 µg/m³) | Los Angeles (0.17 µg/m³) |
| 1.5 max quarterly[D] ................................................... | 3.5–4.8 (1.5–7.7) | <6 <(3.2–9.4) | 2.8–3.9[E] (0.6–4.6) | 3.4–4.7[E] (1.4–7.4) | 2.7–4.2[E] (1.1–6.2) |
| 0.5 ................................................... | 1.9–3.6 (0.7–4.8) | <4.5 <(2.1–7.7) | 0.6–2.9 (0.2–3.9) | (F) | (F) |
| 0.2 ................................................... | 1.2–3.2 (0.4–4.0) | <3.7 <(1.2–5.1) | 0.6–2.8 (0.1–3.2) | 0.6–2.9 (0.3–3.6) | 0.7–2.9[G] (0.3–3.5) |

[50] The ratios increase as the level of the alternate standard decreases. This reflects the nonlinearity in the Pb response, which is greater on a per-unit basis for lower ambient air Pb levels.

[51] For the primary Pb smelter (full study area), for which limitations are noted in section II.C.2.c of the proposal, the air-to-blood ratio estimates, presented in section 5.2.5.2 of the Risk Assessment Report (USEPA, 2007b), ranged from 1:3 to 1:7. As in the other case studies, ratios are higher at lower ambient air Pb levels. It is noted that the underlying changes in both ambient air Pb and blood Pb across standard levels are extremely small, introducing uncertainty into ratios derived using these data.

[52] As shown in the presentation in the Staff Paper (section 4.4), risk estimates for the LLL function are generally bounded by estimates based on the other three C–R functions included in the assessment.

[53] Because of greater uncertainty in characterizing high-end population risk, and specifically related to pathway apportionment of IQ loss estimates for high-end percentiles, results discussed here focus on those for the population median.

[54] As noted in Table 2 below and sections II.C.2.d and II.C.2.h of the proposal, with regard to associated limitations and uncertainties, a proportional roll-up procedure was used to estimate air Pb concentrations in this scenario for the location-specific case studies.

TABLE 2—SUMMARY OF RISK ATTRIBUTABLE TO AIR-RELATED Pb EXPOSURE—Continued

| NAAQS level simulated (µg/m³ max monthly, except as noted below) | Median air-related IQ loss [A] | | | | |
|---|---|---|---|---|---|
| | General urban case study | Primary Pb smelter (sub-area) case study [B C] | Location-specific urban case studies | | |
| | | | Cleveland (0.56 µg/m³) | Chicago (0.31 µg/m³) | Los Angeles (0.17 µg/m³) |
| 0.05 ............... | 0.5–2.8 (0.2–3.3) | <2.8 <(0.9–3.4) | 0.1–2.6 (<0.1–3.1) | 0.2–2.6 (0.1–3.2) | 0.3–2.7 (0.1–3.2) |
| 0.02 ............... | 0.3–2.6 (0.1–3.1) | <2.9 <(0.9–3.3) | <0.1–2.6 (<0.1–3.0) | 0.1–2.6 (<0.1–3.1) | 0.1–2.6 (<0.1–3.1) |

[A]—Air-related risk is bracketed by "recent air" (lower bound of presented range) and "recent" plus "past air" (upper bound of presented range). While differences between standard levels are better distinguished by differences in the "recent" plus "past air" estimates (upper bounds shown here), these differences are inherently underestimates. The term "past air" includes contributions from the outdoor soil/dust contribution to indoor dust, historical air contribution to indoor dust, and outdoor soil/dust pathways; "recent air" refers to contributions from inhalation of ambient air Pb or ingestion of indoor dust Pb predicted to be associated with outdoor ambient air Pb levels, with outdoor ambient air also potentially including resuspended, previously deposited Pb (see section II.C.2.e of the proposal). Boldface values are estimates generated using the log-linear with low-exposure linearization function. Values in parentheses reflect the range of estimates associated with all four concentration-response functions.

[B]—In the case of the primary Pb smelter case study, only recent plus past air estimates are available.

[B]—In the case of the primary Pb smelter case study, only recent plus past air estimates are available.

[C]—Median air-related IQ loss estimates for the primary Pb smelter (full study area) range from <1.7 to <2.9 points, with no consistent pattern across simulated NAAQS levels. This lack of a pattern reflects inclusion of a large fraction of the study population with relatively low ambient air impacts such that there is lower variation (at the population median) across standard levels (see section 4.2 of the Risk Assessment, Volume 1).

[D]—This corresponds to roughly 0.7–1.0 µg/m³ maximum monthly mean, across the urban case studies.

[E]—A "roll-up" was performed so that the highest monitor in the study area is increased to just meet this level.

[F]—A "roll-up" to this level was not performed.

[G]—A "roll-up" to this level was not performed; these estimates are based on current conditions in this area.

## B. Need for Revision of the Current Primary Standard

The initial issue to be addressed in the current review of the primary Pb standard is whether, in view of the advances in scientific knowledge reflected in the Criteria Document and Staff Paper, the existing standard should be revised. In evaluating whether it is appropriate to revise the current standard, the Administrator builds on the general approach used in the initial setting of the standard, as well as that used in the last review, and reflects the broader body of evidence and information now available. The approach used is based on an integration of information on health effects associated with exposure to ambient Pb; expert judgment on the adversity of such effects on individuals; and policy judgments as to when the standard is requisite to protect public health with an adequate margin of safety, which are informed by air quality and related analyses, quantitative exposure and risk assessments when possible, and qualitative assessment of impacts that could not be quantified. The Administrator has taken into account both evidence-based and quantitative exposure- and risk-based considerations in developing conclusions on the adequacy of the current primary Pb standard.

The Administrator's proposed conclusions on the adequacy of the current primary standard are summarized below in the Introduction (section II.B.1), followed by consideration of comments received on the proposal (section II.B.2) and the Administrator's final decision with regard to the need for revision of the current primary standard (II.B.3).

### 1. Introduction

As described in section II.D.1.a of the proposal, the current standard was set in 1978 to provide protection to the public, especially children as the particularly sensitive population subgroup, against Pb-induced adverse health effects (43 FR 46246). The standard was set to provide protection against anemia (as well as effects associated with higher exposures), with consideration of impacts on the heme synthesis pathway leading to anemia (43 FR 46252–46253). In setting the standard, EPA determined that "the maximum safe level of blood lead for an individual child" should be no higher than 30 µg/dL, and described 15 µg/dL Pb as "the maximum safe blood lead level (geometric mean) for a population of young children" (43 FR 46247, 46253). The basis for the level, averaging time, form and indicator are described in section II.D.1.a of the proposal.

As noted in the proposal, the body of available evidence today, summarized above in section II.A.2 and in section II.B of the proposal, and discussed in the Criteria Document, is substantially expanded from that available when the current standard was set three decades ago. The Criteria Document presents evidence of the occurrence of health effects at appreciably lower blood Pb levels than those demonstrated by the evidence at the time the standard was set. Further, subsequent to the setting of the standard, the Pb NAAQS criteria review during the 1980s and the current review have provided "(a) increasingly stronger evidence that substantiated still lower fetal and/or postnatal Pb-exposure levels (indexed by blood-Pb levels extending to as low as 10 to 15 µg/dL or, possibly, below) as being associated with slowed physical and neurobehavioral development, lower IQ, impaired learning, and/or other indicators of adverse neurological impacts; and (b) other pathophysiological effects of Pb on cardiovascular function, immune system components, calcium and vitamin D metabolism and other selected health endpoints" (CD, pp. 8–24 to 8–25). This evidence is discussed fully in the Criteria Document.

In the proposal, EPA explained its evidence-based considerations regarding the adequacy of the current standard. With regard to the sensitive population, while the sensitivity of the elderly and other particular subgroups is recognized, as at the time the current standard was set, young children continue to be recognized as a key sensitive population for Pb exposures.

With regard to the exposure levels at which adverse health effects occur, the proposal noted that the current evidence demonstrates the occurrence of adverse health effects at appreciably lower blood Pb levels than those demonstrated by the evidence at the time the standard was set. This evidence is reflected in

changes over the intervening years in the CDC's identification and description of their advisory level for Pb in individual children's blood (as described above in section II.A.2.a). The current evidence indicates the occurrence of a variety of health effects, including neurological effects in children, associated with blood Pb levels extending well below 10 µg/dL (CD, sections 6.2, 8.4 and 8.5). For example, as noted in the Criteria Document with regard to the neurocognitive effects in children, the "weight of overall evidence strongly substantiates likely occurrence of [this] type of effect in association with blood-Pb concentrations in range of 5–10 µg/dL, or possibly lower * * * Although no evident threshold has yet been clearly established for those effects, the existence of such effects at still lower blood-Pb levels cannot be ruled out based on available data." (CD, p. 8–61). The Criteria Document further notes that any such threshold may exist "at levels distinctly lower than the lowest exposures examined in these epidemiological studies" (CD, p. 8–67).

In considering the adequacy of the current standard, the Staff Paper considered the evidence in the context of the framework used to determine the standard in 1978, as adapted to reflect the current evidence. In so doing, the Staff Paper recognized that the health effects evidence with regard to characterization of a threshold for adverse effects has changed since the standard was set in 1978, as have the Agency's views on the characterization of a safe blood Pb level. As summarized in the proposal (73 FR 29237–38) and described in the Staff Paper (section 5.4.1), parameters for this framework include estimates for average nonair blood Pb level, and air-to-blood ratio, as well as a maximum safe individual and/ or geometric mean blood Pb level. For this last parameter, the Staff Paper for the purposes of this evaluation considered the lowest population mean blood Pb levels with which some neurocognitive effects have been associated in the evidence.

Based on the current evidence, the Staff Paper first concluded that young children remain the sensitive population of primary focus in this review and that "there is now no recognized safe level of Pb in children's blood and studies appear to show adverse effects at population mean concurrent blood Pb levels as low as approximately 2 µg/dL (CD, pp. 6–31 to 6–32; Lanphear *et al.*, 2000)" (USEPA, 2007c). The Staff Paper further stated that "while the nonair contribution to blood Pb has declined, perhaps to a

range of 1.0–1.4 µg/dL, the air-to-blood ratio appears to be higher at today's lower blood Pb levels than the estimates at the time the standard was set, with current estimates on the order of 1:3 to 1:5 and perhaps up to 1:10" (USEPA, 2007c). Adapting the framework employed in setting the standard in 1978, the Staff Paper concluded that "the more recently available evidence suggests a level for the standard that is lower by an order of magnitude or more" (USEPA, 2007c, p. 5–17).

Since completion of the Staff Paper and ANPR, the Agency further considered the evidence with regard to adequacy of the current standard using an approach other than the adapted 1978 framework considered in the Staff Paper. This alternative evidence-based [55] framework, referred to as the air-related IQ loss framework, shifts focus from identifying an appropriate target population mean blood lead level and instead focuses on the magnitude of effects of air-related Pb on neurocognitive functions. This framework builds on a recommendation by the CASAC Pb Panel to consider the evidence in a more quantitative manner, and is discussed in more detail in section II.E.3.a.ii of the proposal.

In this air-related IQ loss framework, EPA draws from the entire body of evidence as a basis for concluding that there are causal associations between air-related Pb exposures and population IQ loss.[56] We also draw more quantitatively from the evidence by using evidence-based C–R functions to quantify the association between air Pb concentrations and air-related population mean IQ loss. Thus, this framework more fully considers the evidence with regard to the concentration-response relationship for the effect of Pb on IQ than does the adapted 1978 framework, and it also

draws from estimates for air-to-blood ratios.

In the proposal, while we noted the evidence of steeper slope for the C–R relationship for blood Pb concentration and IQ loss at lower blood Pb levels (described above in sections II.A.2.c), we stated that for purposes of consideration of the adequacy of the current standard we were concerned with the C–R relationship for blood Pb levels that would be associated with exposure to air-related Pb at the level of the current standard. For this purpose, we focused on a median linear estimate of the slope of the C–R function from study populations for which most blood Pb levels were below 10 µg/dL and for which a linear slope restricted to blood Pb levels below about 10 µg/dL could be estimated (described in CD, pp. 6–65 to 6–66 and summarized in section II.B.2.b of the proposal). The median slope estimate is −0.9 IQ points per µg/dL blood Pb (CD, p. 8–80). Applying estimates of air-to-blood ratios ranging from 1:3 to 1:5, drawing from the discussion of air-to-blood ratios in section II.B.1.c of the proposal, to a population of children exposed at the current level of the standard is estimated to result in an average air-related blood Pb level above 4 µg/dL.[57] Multiplying these blood Pb levels by the slope estimate, identified above, for blood Pb levels extending up to 10 µg/dL (−0.9 IQ points per µg/dL), would imply an average air-related IQ loss for such a group of children on the order of 4 or more IQ points.

In the proposal, EPA also explained its exposure- and risk-based considerations regarding the adequacy of the current standard. EPA estimated exposures and health risks associated with air quality that just meets the current standard (as described in the Risk Assessment Report) to help inform judgments about whether or not the current standard provides adequate protection of public health, taking into account key uncertainties associated with the estimated exposures and risks (summarized above in section II.C of the proposal and more fully in the Risk Assessment Report). In considering the adequacy of the standard, the Staff Paper considered exposure and risk estimates from the quantitative risk assessment, taking into account associated uncertainties. The Staff Paper

---

[55] The term "evidence-based" as used here refers to the drawing of information directly from published studies, with specific attention to those reviewed and described in the Criteria Document, and is distinct from considerations that draw from the results of the quantitative exposure and risk assessment.

[56] For example, as stated in the Criteria Document, "Fortunately, there exists a large database of high quality studies on which to base inferences regarding the relationship between Pb exposure and neurodevelopment. In addition, Pb has been extensively studied in animal models at doses that closely approximate the human situation. Experimental animal studies are not compromised by the possibility of confounding by such factors as social class and correlated environmental factors. The enormous experimental animal literature that proves that Pb at low levels causes neurobehavioral deficits and provides insights into mechanisms must be considered when drawing causal inferences (Bellinger, 2004; Davis *et al.*, 1990; U.S. Environmental Protection Agency, 1986a, 1990)." (CD, p. 6–75).

[57] This is based on the calculation in which 1.5 µg/m³ is multiplied by a ratio of 3 µg blood Pb per 1 µg/m³ air Pb to yield an air-related blood Pb estimates of 4.5 µg/dL; using a 1:5 ratio yields an estimate of 7.5 µg/dL. As with the 1978 framework considered in the Staff Paper, the context for use of the air-to-blood ratio here is a population being exposed at the level of the standard.

first considered exposure/risk estimates associated with air-related risk, which as recognized in section II.C.2.e of the proposal and described more fully in the Risk Assessment Report) are approximated estimates, provided in terms of upper and lower bounds. The Staff Paper described the magnitude of these estimates for the current NAAQS as being indicative of the levels of IQ loss associated with air-related risk that may ''reasonably be judged to be highly significant from a public health perspective'' (USEPA, 2007c).

As discussed in section II.D.2.b of the proposal, the Staff Paper also describes a different risk metric that estimated differences in the numbers of children with different amounts of Pb-related IQ loss between air quality scenarios for current conditions and for the current NAAQS in the three location-specific urban case studies. The Staff Paper concluded that these estimated differences ''indicate the potential for significant numbers of children to be negatively affected if air Pb concentrations increased to levels just meeting the current standard'' (USEPA, 2007c). Beyond the findings related to quantified IQ loss, the Staff Paper recognized the potential for other, unquantified adverse effects that may occur at similarly low exposures as those quantitatively assessed in the risk assessment. In summary, the Staff Paper concluded that taken together, ''the quantified IQ effects associated with the current NAAQS and other, nonquantified effects are important from a public health perspective, indicating a need for consideration of revision of the standard to provide an appreciable increase in public health protection'' (USEPA, 2007c).

In their letter to the Administrator subsequent to consideration of the ANPR, the Staff Paper and the Risk Assessment Report, the CASAC Pb Panel advised the Administrator that they unanimously and fully supported ''Agency staff's scientific analyses in recommending the need to substantially lower the level of the primary (public-health based) Lead NAAQS, to an upper bound of no higher than 0.2 μg/m³ with a monthly averaging time'' (Henderson, 2008a, p. 1). The Panel additionally advised that the current Pb NAAQS ''are totally inadequate for assuring the necessary decreases of lead exposures in sensitive U.S. populations below those current health hazard markers identified by a wealth of new epidemiological, experimental and mechanistic studies'', and that ''it is the CASAC Lead Review Panel's considered judgment that the NAAQS for Lead must be decreased to

fully-protect both the health of children and adult populations'' (Henderson, 2007a, p. 5). CASAC drew support for their recommendation from the current evidence, described in the Criteria Document, of health effects occurring at dramatically lower blood Pb levels than those indicated by the evidence available when the standard was set and of a recognition of effects that extend beyond children to adults.

At the time of proposal, in considering whether the current primary standard should be revised, the Administrator carefully considered the conclusions contained in the Criteria Document, the information, exposure/ risk assessments, conclusions and recommendations presented in the Staff Paper, the advice and recommendations from CASAC, and public comments received on the ANPR and other documents to date. In so doing, the Administrator noted the following: (1) A substantially expanded body of available evidence, described briefly in section II.A above and more fully in section II.B of the proposal and discussed in the Criteria Document, from that available when the current standard was set three decades ago; (2) evidence of the occurrence of health effects at appreciably lower blood Pb levels than those demonstrated by the evidence at the time the standard was set in 1978; (3) the currently available robust evidence of neurotoxic effects of Pb exposure in children, both with regard to epidemiological and toxicological studies; (4) associations of effects on the neurodevelopment of children with blood Pb levels notably decreased from those in the late 1970s;[58] (5) toxicological evidence including extensive experimental laboratory animal evidence that substantiates well the plausibility of the epidemiologic findings observed in human children; (6) current evidence that suggests a steeper dose-response relationship at recent lower blood Pb levels than at higher blood Pb levels, indicating the potential for greater incremental impact associated with exposure at these lower levels.

In addition to the evidence of health effects occurring at significantly lower blood Pb levels, the Administrator recognized in the proposal that, as at the time the standard was set, the current health effects evidence together with findings from the exposure and risk assessments (summarized above in

section II.A.3) supports a finding that air-related Pb exposure pathways contribute to blood Pb levels in young children by inhalation and ingestion. Furthermore, the Administrator took note of the information that suggests that the air-to-blood ratio (i.e., the quantitative relationship between air concentrations and blood concentrations) is now likely larger, when air inhalation and ingestion are considered, than that estimated when the standard was set.

At the time of proposal, the Administrator first considered the current evidence in the context of an adaptation of the 1978 framework, as presented in the Staff Paper, recognizing that the health effects evidence with regard to characterization of a threshold for adverse effects has changed dramatically since the standard was set in 1978. As discussed in the proposal, however, limitations in the application of that framework to the current situation, where (unlike when the standard was set in 1978) there is not an evidentiary basis to determine a safe level for individual children with respect to the identified health effect, led the Administrator to focus primarily instead on the air-related IQ loss evidence-based framework, described in section II.D.2.a.ii of the proposal, in considering the adequacy of the current standard.

As discussed in the proposal, the Administrator judged that air-related IQ loss associated with exposure at the level of the current standard is large from a public health perspective and that this evidence-based framework supports a conclusion that the current standard does not protect public health with an adequate margin of safety. Further, the Administrator provisionally concluded that the current evidence indicates the need for a standard level that is substantially lower than the current level to provide increased public health protection, especially for at-risk groups, including most notably children, against an array of effects, most importantly including effects on the developing nervous system.

At the time of proposal, the Administrator also considered the results of the exposure and risk assessments conducted for this review as providing some further perspective on the potential magnitude of air-related IQ loss, although, noting uncertainties and limitations in the assessments, the Administrator did not place primary reliance on the exposure and risk assessments. Nonetheless, the Administrator observed that in areas projected to just meet the current standard, the quantitative estimates of

---

[58] As noted in the proposal (73 FR 29228), while blood Pb levels in U.S. children have decreased notably since the late 1970s, newer studies have investigated and reported associations of effects on the neurodevelopment of children with these more recent blood Pb levels.

IQ loss associated with air-related Pb indicate risk of a magnitude that in his judgment is significant from a public health perspective and also recognized that, although the current monitoring data indicate few areas with airborne Pb near or just exceeding the current standard, there are significant limitations with the current monitoring network and thus there exists the potential that the prevalence of such Pb concentrations may be underestimated by currently available data.

Based on all of these considerations, the Administrator provisionally concluded that the current Pb standard is not requisite to protect public health with an adequate margin of safety because it does not provide sufficient protection, and that the standard should be revised to provide increased public health protection, especially for members of at-risk groups.

2. Comments on the Need for Revision

In considering comments on the need for revision, the Administrator first notes the advice and recommendations from CASAC with regard to the adequacy of the current standard. In the four letters that CASAC has sent the Agency providing advice on the Pb standard, including the most recent one on the proposal, all have repeated their unanimous view regarding the need for substantial revision of the Pb NAAQS (Henderson, 2007a, 2007b, 2008a, 2008b). For example, as stated in their letter of March 2007, the ''*unanimous judgment of the Lead Panel is that * * * both the primary and secondary NAAQS should be substantially lowered*'' (Henderson, 2007a).

General comments based on relevant factors that either support or oppose any change to the current Pb primary standard are addressed in this section. Comments on elements of the proposed primary standard and on studies that relate to consideration of the appropriate indicator, averaging time and form, and level are addressed below in sections II.C.1, II.C.2, and II.C.3, respectively. Other specific comments related to the standard setting, as well as general comments based on implementation-related factors that are not a permissible basis for considering the need to revise the current standards are addressed in the Response to Comments document.

The vast majority of public comments received on the proposal generally asserted that, based on the available scientific information, the current Pb standard is insufficient to protect public health with an adequate margin of safety and revisions to the standard are appropriate. Among those calling for

revisions to the current standards are medical groups, including the American Academy of Pediatrics, the American Medical Association and the American Thoracic Society, as well as two groups of concerned physicians and scientists, and the Agency's external Children's Health Protection Advisory Committee (Marty, 2008). Similar conclusions were also submitted in comments from many national, state, and local environmental and public health organizations, including, for example, the Natural Resources Defense Council (NRDC), the Sierra Club, and the Coalition to End Childhood Lead Poisoning. All of these medical, public health and environmental commenters stated that the current Pb standard needs to be revised to a level well below the current level to protect the health of sensitive population groups. Many individual commenters also expressed such views. Additionally, regional organizations of state agencies, including the National Association of Clean Air Agencies (NACAA), and Northeast States for Coordinated Air Use Management (NESCAUM) urged that EPA revise the Pb standard. State and local air pollution control authorities or public health agencies who commented on the Pb standard also supported revision of the current Pb standard, including the New York Departments of Health and Environmental Conservation, Iowa Departments of Natural Resources and Public Health, the Missouri Departments of Natural Resources and Health and Senior Services, as well as the Missouri Office of the Attorney General, among others. All tribal governments and tribal air and environmental agencies commenting on the standard, including the InterTribal Council of Arizona, Inc. (an organization of 20 tribal governments in Arizona), the Lone Pine Paiute-Shoshone Reservation, as well as the Fond du Lac Band of Lake Superior Chippewa, commented in support of revision of the Pb NAAQS.

In general, all of these commenters agreed with EPA's proposed conclusions on the importance of results from the large body of scientific studies reviewed in the Criteria Document and on the need to revise the primary Pb standard as articulated in EPA's proposal. Many commenters cited CASAC advice on this point. The EPA generally agrees with CASAC and these public commenters' conclusions regarding the need to revise the primary Pb standard. EPA agrees that the evidence assessed in the Criteria Document and the Staff Paper provides a basis for concluding that the current

Pb standard does not protect public health with an adequate margin of safety. Comments on specific aspects of the level for a revised standard are discussed below in section II.C.3 below.

Some of these commenters also identified ''new'' studies that were not included in the Criteria Document as providing further support for the need to revise the Pb standards. As noted above in section I.C, as in past NAAQS reviews, the Agency is basing the final decisions in this review on the studies and related information included in the Pb air quality criteria that have undergone CASAC and public review, and will consider the newly published studies for purposes of decision making in the next Pb NAAQS review. Nonetheless, in considering these comments related to these more recent studies (further discussed in the Response to Comments document), EPA notes that our provisional consideration of these studies concludes that this new information and findings do not materially change any of the broad scientific conclusions regarding neurotoxic and other health effects of lead exposure made in the 2006 Criteria Document. For example, ''new'' studies cited by commenters on neurocognitive and neurobehavioral effects add to the overall weight of evidence and focus on findings of such effects beyond IQ in study groups with some studies including lower blood Pb levels than were available for review in the Criteria Document.

Three industry associations (National Association of Manufacturers, Non-Ferrous Founders' Society, and Wisconsin Manufacturers & Commerce) commented in support of retaining the current primary Pb standard. These commenters generally state that most health risks associated with Pb exposures are more likely to result from past air emissions or nonair sources of Pb, such as lead-based paint, and that reduction of the Pb standard will not provide meaningful benefits to public health. They additionally cite costs to those industries on whose part action will be required to meet a reduced standard. While EPA recognizes that nonair sources contribute Pb exposure to today's population, EPA disagrees with the commenters' premise that Pb exposures associated with any past air emissions are not relevant to consider in judging the adequacy of the current standard. Further, EPA disagrees with commenters, regarding the significance of health risk associated with air-related Pb exposures allowed by the current standard. As discussed in summarized in section II.B.1 above and discussed in section II.B.3 below, EPA has concluded

that the health risk associated with air-related Pb exposures allowed by the current standard is of such a significant magnitude that a revision to the standard is needed to protect public health with an adequate margin of safety. EPA further notes that, as discussed above in section I.B, under the CAA, EPA may not consider the costs of compliance in determining what standard is requisite to protect public health with an adequate margin of safety.

3. Conclusions Regarding the Need for Revision

Having carefully considered the public comments, as discussed above, the Administrator believes the fundamental scientific conclusions on the effects of Pb reached in the Criteria Document and Staff Paper, briefly summarized above in section II.B.1, remain valid. In considering whether the primary Pb standard should be revised, the Administrator places primary consideration on the large body of scientific evidence available in this review concerning the public health impacts of Pb, including significant new evidence concerning effects at blood Pb concentrations substantially below those identified when the current standard was set. As summarized in section II.A.2.b, Pb has been demonstrated to exert a broad array of adverse effects on multiple organ systems, with the evidence across this array of effects much expanded since the standard was set, with the key effects most pertinent to ambient exposures today including neurological, hematological and immune effects for children and hematological, cardiovascular and renal effects for adults. The Administrator particularly notes the robust evidence of neurotoxic effects of Pb exposure in children, both with regard to epidemiological and toxicological studies. While blood Pb levels in U.S. children have decreased notably since the late 1970s, newer studies have investigated and reported associations of effects on the neurodevelopment of children with these more recent blood Pb levels. The toxicological evidence includes extensive experimental laboratory animal evidence that substantiates well the plausibility of the epidemiologic findings observed in human children and expands our understanding of likely mechanisms underlying the neurotoxic effects. Further, the Administrator notes the current evidence that suggests a steeper dose-response relationship at these lower blood Pb levels than at higher blood Pb levels, indicating the potential for greater incremental impact

associated with exposure at these lower levels.

In addition to the evidence of health effects occurring at significantly lower blood Pb levels, the Administrator recognizes that the current health effects evidence together with findings from the exposure and risk assessments (summarized above in section II.A.3), like the information available at the time the standard was set, supports our finding that air-related Pb exposure pathways contribute to blood Pb levels in young children, by inhalation and ingestion. Furthermore, the Administrator takes note of the information that suggests that the air-to-blood ratio (i.e., the quantitative relationship between air concentrations and blood concentrations) is now likely larger, when all air inhalation and ingestion pathways are considered, than that estimated when the standard was set.

The Administrator has considered the evidence in the record, and discussed above, in the context of an adaptation of the 1978 framework, as presented in the Staff Paper, recognizing that the health effects evidence with regard to characterization of a threshold for adverse effects has changed dramatically since the standard was set in 1978. As discussed in the proposal (73 FR 29229), however, the Administrator recognizes limitations to this approach and has focused primarily instead on the air-related IQ loss evidence-based framework described in section II.B.1 above, in considering the adequacy of the current standard.

In considering the application of the air-related IQ loss framework to the current evidence as discussed above in section II.B.1, the Administrator concludes that in areas projected to just meet the current standard, the quantitative estimates of IQ loss associated with air-related Pb indicate risk of a magnitude that in his judgment is significant from a public health perspective, and that this evidence-based framework supports a conclusion that the current standard does not protect public health with an adequate margin of safety. Further, the Administrator believes that the current evidence indicates the need for a standard level that is substantially lower than the current level to provide increased public health protection, especially for at-risk groups, including most notably children, against an array of effects, most importantly including effects on the developing nervous system.

In addition to the primary consideration given to the available evidence, the Administrator has also

taken into consideration the Agency's exposure and risk assessments to help inform his evaluation of the adequacy of the current standard. As at the time of proposal, the Administrator believes the results of those assessments provide some further perspective on the potential magnitude of air-related IQ loss and thus inform his judgment on the adequacy of the current standard to protect against health effects of concern. While taking into consideration the uncertainties and limitations in the risk assessments, the Administrator again observes that in areas projected to just meet the current standard, the quantitative estimates of IQ loss associated with air-related Pb indicate risk of a magnitude that in his judgment is significant from a public health perspective. Further, although the current monitoring data indicate few areas with airborne Pb near or just exceeding the current standard, the Administrator recognizes significant limitations with the current monitoring network and thus there is the potential that the prevalence of such Pb concentrations may be underestimated by currently available data. The Administrator thus finds that the exposure and risk estimates provide additional support to the evidence-based conclusion, reached above, that the current standard needs to be revised.

Based on these considerations, and consistent with the CASAC Panel's unanimous conclusion that EPA needed to substantially lower the level of the primary Pb NAAQS to fully protect the health of children and adult populations, the Administrator agrees with the vast majority of public commenters that the current standard is not sufficient and thus not requisite to protect public health with an adequate margin of safety and that revision is needed to provide increased public health protection, especially for members of at-risk groups.

*C. Conclusions on the Elements of the Standard*

The four elements of the standard—indicator, averaging time, form, and level—serve to define the standard and must be considered collectively in evaluating the health and welfare protection afforded by the standard. In considering comments on the proposed revisions to the current primary Pb standard, as discussed in the following sections, EPA considers each of the four elements of the standard as to how they might be revised to provide a primary standard for Pb that is requisite to protect public health with an adequate margin of safety. The basis for the proposed decision, comments on the

Case 3:17-cv-02162-EMC   Document 188-2   Filed 05/05/20   Page 1402 of 1525

proposal, and the Administrator's final decision on indicator are discussed in section II.C.1, on averaging time and form in section II.C.2, and on a level for the primary Pb NAAQS in section II.C.3.

### 1. Indicator

#### a. Basis for Proposed Decision

In setting the current standard in 1978, EPA established Pb-TSP as the indicator.[59] In comments on the 1977 proposal, EPA received comments expressing concern that because only a fraction of airborne particulate matter is respirable, an air standard based on total air Pb would be unnecessarily stringent and therefore the standard should be limited to respirable size Pb particulate matter. Such a standard might have led to a Pb NAAQS with an indicator of Pb in particulate matter less than or equal to 10 μm in diameter (Pb-PM$_{10}$)[60] as the indicator. The Agency considered this recommendation, but did not accept it. Rather, EPA reemphasized that larger particles of air-related Pb contribute to Pb exposure through ingestion pathways, and that ingestion pathways, including those associated with deposition of Pb from the air, can be a significant component of Pb exposures. In addition to these ingestion exposure pathways, nonrespirable Pb that has been emitted to the ambient air may, at some point, become respirable through weathering and mechanical action, thus subsequently contributing to inhalation exposures. EPA concluded that total airborne Pb, both respirable and nonrespirable fractions, should be addressed by the air standard (43 FR 46251). The federal reference method (FRM) for Pb-TSP specifies the use of the high-volume sampler.

In the 1990 Staff Paper, this issue was again considered in light of information regarding limitations of the high-volume sampler used for the Pb-TSP measurements, such as the variability discussed below. The continued use of Pb-TSP as the indicator was recommended in the Staff Paper (USEPA, 1990b):

Given that exposure to lead occurs not only via direct inhalation, but via ingestion of deposited particles as well, especially among young children, the hi-vol provides a more complete measure of the total impact of ambient air lead. * * * Despite its shortcomings, the staff believes the high-volume sampler will provide a reasonable indicator for determination of compliance * * *

As in the past, and discussed in the proposal, the evidence available today indicates that Pb in all particle size fractions, not just respirable Pb particles, contributes to Pb in blood and to associated health effects. Further, the evidence and exposure/risk estimates in the current review indicate that ingestion pathways dominate air-related exposure. Lead is unlike other criteria pollutants, where inhalation of the airborne pollutant is the key contributor to exposure. For Pb it is the quantity of Pb in ambient particles with the potential to deposit indoors or outdoors, thereby leading to a role in ingestion pathways, that is the key contributor to air-related exposure. The evidence additionally indicates that airborne Pb particles are transported long or short distances depending on their size, such that the representation of larger particles is greater at locations near sources than at sites not directly influenced by sources.

In the current review, the Staff Paper evaluated the evidence with regard to the indicator for a revised primary standard. This evaluation included consideration of the basis for using Pb-TSP as the current indicator, information regarding the sampling methodology for the current indicator, and CASAC advice with regard to indicator (described below). Based on this evaluation, the Staff Paper recommended retaining Pb-TSP as the indicator for the primary standard. The Staff Paper also recommended activities intended to encourage collection and development of datasets that will improve our understanding of national and site-specific relationships between Pb-PM$_{10}$ (collected by low-volume sampler)[61] and Pb-TSP to support a more informed consideration of indicator during the next review. The Staff Paper suggested that such activities might include describing a federal

equivalence method (FEM) in terms of PM$_{10}$ and allowing its use for a TSP-based standard in certain situations, such as where sufficient data are available to adequately demonstrate a relationship between Pb-TSP and Pb-PM$_{10}$ or, in combination with more limited Pb-TSP monitoring, in areas where Pb-TSP data indicate Pb levels well below the NAAQS level.

The ANPR further identified issues and options associated with consideration of the potential use of Pb-PM$_{10}$ data for judging attainment or nonattainment with a Pb-TSP NAAQS. These issues included the impact of controlling Pb-PM$_{10}$ for sources predominantly emitting Pb in particles larger than those captured by PM$_{10}$ monitors (i.e., ultra-coarse)[62] and the options included potential application of Pb-PM$_{10}$ FRM/FEMs at sites with established relationships between Pb-TSP and Pb-PM$_{10}$, and use of Pb-PM$_{10}$ data, with adjustment, as a surrogate for Pb-TSP data. The ANPR broadly solicited comment in these areas.

As noted in the proposal, the Agency in setting the standard and CASAC in providing their advice (described below) both recognized that ingestion pathways are important to air-related Pb exposures and that Pb particles contributing to these pathways include ultra-coarse particles. Thus, as noted in the proposal, choosing the appropriate indicator requires consideration of the impact of the indicator on the protection provided from exposure to air-related Pb of all particle sizes, including ultra-coarse particles, by both the inhalation and ingestion pathways.

As discussed in the proposal (sections II.E.1 and V.A), the Agency recognizes the body of evidence indicating that the high-volume Pb-TSP sampling methodology contributes to imprecision in resultant Pb measurements due to variability in the efficiency of capture of particles of different sizes and thus, in the mass of Pb measured. Variability is most substantial in samples with a large portion of Pb particles greater than 10 microns, such as those samples collected near sources with emissions of ultra-coarse particles. As noted in the proposal, this variability contributes to a clear risk of underestimating the ambient level of total Pb in the air,

---

[59] The current standard specifies the measurement of airborne Pb with a high-volume TSP federal reference method (FRM) sampler with atomic absorption spectrometry of a nitric acid extract from the filter for Pb, or with an approved equivalent method (40 CFR 50.12, Appendix G).

[60] For simplicity, the discussion in this notice speaks as if PM$_{10}$ samplers have a sharp size cut-off. In reality, they have a size selection behavior in which 50% of particles 10 microns in size are captured, with a progressively higher capture rate for smaller particles and a progressively lower capture rate for larger particles. The ideal capture efficiency curve for PM$_{10}$ samplers specifies that particles above 15 microns not be captured at all, although real samplers may capture a very small percentage of particles above 15 microns. TSP samplers have 50% capture points in the range of 25 to 50 microns (Wedding *et al.*, 1977), which is broad enough to include virtually all sizes of particles capable of being transported any significant distance from their source except under extreme wind events.

[61] "Low-volume PM$_{10}$ sampling" refers to sampling using any of a number of monitor models that draw 16.67 liters/minute (1 m³/hour) of air through the filter, in contrast to "high-volume" sampling of either TSP or PM$_{10}$ in which the monitor draws 1500 liters/minute (90 m³/hour).

[62] In this notice, we use "ultra-coarse" to refer to particles collected by a TSP sampler but not by a PM$_{10}$ sampler. We note that CASAC has variously also referred to these particles as "very coarse" or "larger coarse-mode" particles. This terminology is consistent with the traditional usage of "fine" to refer to particles collected by a PM$_{2.5}$ sampler, and "coarse" to refer to particles collected by a PM$_{10}$ sampler but not by a PM$_{2.5}$ sampler, recognizing that there will be some overlap in the particle sizes in the three types of collected material.

especially in areas near sources of ultra-coarse particles, by underestimating the amount of the ultra-coarse particles. This variability also contributes to a risk of not consistently identifying sites that fail to achieve the standard.

The Agency also recognizes, as discussed in the proposal, that the low-volume $PM_{10}$ sampling methodology does not exhibit such variability [63] due both to increased precision of the monitor and the decreased spatial variation of Pb-$PM_{10}$ concentrations, associated with both the more widespread distribution of $PM_{10}$ sources and aerodynamic characteristics of particles of this size class which contribute to broader distribution from sources. Accordingly, there is a lower risk of error in measuring the ambient Pb in the $PM_{10}$ size class than there is risk of error in measuring the ambient Pb in the TSP size class using Pb TSP samplers. We additionally noted in the proposal that, since Pb-$PM_{10}$ concentrations have less spatial variability, such monitoring data may be representative of Pb-$PM_{10}$ air quality conditions over a larger geographic area (and larger populations) than would Pb-TSP measurements. The larger scale of representation for Pb-$PM_{10}$ would mean that reported measurements of this indicator, and hence designation outcomes, would be less sensitive to exact monitor siting than with Pb-TSP as the indicator.

As discussed in the proposal, however, there is a different source of error associated with the use of Pb-$PM_{10}$ as the indicator, in that larger Pb particles not captured by $PM_{10}$ samplers would not be measured. As noted above, these particles contribute to the health risks posed by air-related Pb, especially in areas influenced by sources of ultra-coarse particles. As discussed in the proposal, there is uncertainty as to the degree to which control strategies put in place to meet a NAAQS with a Pb-$PM_{10}$ indicator would be effective in controlling ultra-coarse Pb-containing particles. Additionally, the fraction of Pb collected with a TSP sampler that would not be collected by a $PM_{10}$ sampler varies depending on proximity to sources of ultra-coarse Pb particles and the size mix of the particles they emit, as well as the sampling variability inherent in the method discussed above.

Thus, this error is of most concern in locations in closer proximity to such sources, which may also be locations with some of the highest ambient air levels.

Accordingly, we stated in the proposal that it is reasonable to consider continued use of a Pb-TSP indicator, focusing on the fact that it specifically includes ultra-coarse Pb particles among the particles collected, all of which are of concern and need to be addressed in protecting public health from air-related exposures. We additionally recognized that some State, local, or tribal monitoring agencies, or other organizations, for the sake of the advantages noted above, and described more fully in the proposal, may wish to deploy low-volume Pb-$PM_{10}$ samplers rather than Pb-TSP samplers. Thus, we also considered several approaches that would allow the use of Pb-$PM_{10}$ data in conjunction with retaining Pb-TSP as the indicator. These approaches, discussed more fully in the proposal (sections II.E.1 and IV), include the development and use of site-specific scaling factors and the use of default scaling factors for particular categories of monitoring sites (e.g., source-oriented, non-source-oriented). Additionally, we solicited comment on changing the indicator to Pb in $PM_{10}$, in recognition of the potential benefits of such a revision discussed above.

In their advice to the Agency during the current review, the CASAC Pb Panel provided recommendations to the Agency on the indicator for a revised standard in conjunction with their recommendations for revisions to level and averaging time. As noted above in section II.B and below in section II.C.3, the Panel recommended a significant lowering of the level for the standard, which they noted would lead to a requirement for additional monitoring over that currently required, with distribution of monitors over a much larger area. In consideration of this, prior to the proposal, the CASAC Pb Panel, as well as the majority of the CASAC Ambient Air Monitoring and Methods (AAMM) Subcommittee, recommended that EPA consider a change in the indicator to Pb-$PM_{10}$, utilizing low-volume $PM_{10}$ sampling (Henderson, 2007a, 2007b, 2008a, 2008b; Russell, 2008a). They found support for their recommendation in a range of areas, as summarized in the proposal (73 FR 29230). In advising a revision to the indicator, CASAC also stated that they "recognize the importance of coarse dust contributions to total Pb ingestion and acknowledge that TSP sampling is likely to capture additional very coarse particles which

are excluded by $PM_{10}$ samplers" (Henderson 2007b). They suggested that an adjustment of the NAAQS level would accommodate the loss of these ultra-coarse Pb particles, and that development of such a quantitative adjustment might appropriately be based on concurrent Pb-$PM_{10}$ and Pb-TSP sampling data [64] (Henderson, 2007a, 2007b, 2008a).

For reasons discussed in the proposal and recognized above, and taking into account information and assessments presented in the Criteria Document, Staff Paper, and ANPR, the advice and recommendations of CASAC and of members of the CASAC AAMM Subcommittee, and public comments received prior to proposal, the Administrator proposed to retain the current indicator of Pb-TSP, measured by the current FRM, a current FEM, or an FEM approved under the proposed revisions to 40 CFR part 53. The Administrator also proposed an expansion of the measurements accepted for determining attainment or nonattainment of the Pb NAAQS to provide an allowance for use of Pb-$PM_{10}$ data, measured by the new low-volume Pb-$PM_{10}$ FRM specified in the proposed appendix Q to 40 CFR part 50 or by a FEM approved under the proposed revisions to 40 CFR part 53, with site-specific scaling factors. The Administrator also solicited comment on providing States the option of using default scaling factors instead of conducting the testing that would be needed to develop the site-specific scaling factors. Additionally, the Administrator invited comment on an alternative option of revising the indicator to Pb-$PM_{10}$.

b. Comments on Indicator

In considering comments received on the proposal, EPA first notes the advice provided by CASAC concerning the proposal in a July 2008 letter to the Administrator (Henderson, 2008b). In that advice, CASAC repeated their prior recommendations regarding the indicator and level of the revised standard, and emphasized that these recommendations "were based, in part on an *assumption* that the level of the primary Pb NAAQS would be 'substantially' lowered to the EPA Staff-

---

[63] Low-volume $PM_{10}$ samplers are equipped with an omni-directional (cylindrical) inlet, which reduces the effect of wind direction, and a sharp particle separator which excludes most of the particles greater than 10–15 microns in diameter whose collection efficiency is most sensitive to wind speed. Also, in low-volume samplers, the filter is protected from post-sampling contamination.

[64] In their advice, CASAC recognized the potential for site-to-site variability in the relationship between Pb-TSP and Pb-$PM_{10}$ (Henderson, 2007a, 2007b). They also stated in their September 2007 letter, "The Panel urges that $PM_{10}$ monitors, with appropriate adjustments, be used to supplement the data. * * * A single quantitative adjustment factor could be developed from a short period of collocated sampling at multiple sites; or $PM_{10}$ Pb/TSP Pb 'equivalency ratio' could be determined on a regional or site-specific basis".

recommended range (with an TSP indicator) of between 0.1 to 0.2 µg/m³ as an upper bound and 0.02 to 0.05 µg/m³ as a lower bound (with the added consideration that the selection be made somewhat 'conservatively' within this range to accommodate the potential loss of ultra-coarse lead with a PM₁₀ Pb indicator)'' (emphasis in original) (Henderson, 2008b). They additionally noted that ''at most population-oriented monitoring sites, levels of PM₁₀ Pb are essentially the same as TSP Pb, but at source-oriented monitoring sites with high coarse mode particulate lead emissions, TSP Pb was roughly twice as high as PM₁₀ Pb'' and that this ''factor-of-two difference * * * could be readily accommodated by considering a slightly more conservative upper bound of 0.1 µg/m³ rather than 0.2 µg/m³'' (Henderson, 2008b). The CASAC panel concluded that ''a transition to a PM₁₀ indicator would be preferable, but only at a level conservatively below an upper bound of 0.2 µg/m³ or lower'' (Henderson, 2008b). EPA interprets this advice on the whole to be supportive of Pb-TSP as the indicator for any standard level greater than 0.10 µg/m³, particularly when the level has been selected with recognition of the inclusion of ultra-coarse particles in Pb-TSP measurements.

The EPA received many public comments on issues related to the indicator for Pb. The large majority of public comments were in support of EPA's proposal to retain Pb-TSP as the indicator for Pb. Represented in this group were many state agencies, as well as some Tribes and tribal environmental agencies, and local environmental agencies. Many commenters supported Pb-TSP as the indicator regardless of a level for the standard, variously citing evidence also cited by EPA in the proposal notice, such as the relevance of all sizes of Pb particles to exposures, blood Pb levels and effects and the omission of ultra-coarse particles with PM₁₀ samples. In support of Pb-TSP as the indicator, a few commenters also stated that air-to-blood ratios used in the evidence-based framework for considering a level for the standard are generally based on Pb-TSP data. Some comments, similar to CASAC, supported Pb-TSP as the indicator for levels above the lower end of the proposed range (*i.e.*, above 0.10 µg/m³), including a level of 0.15 µg/m³. One commenter (NESCAUM) specifically recommended an indicator of Pb-TSP for a NAAQS with a level of 0.15 µg/m³, recommending a revision to Pb-PM₁₀ only if some other, much lower, level (0.05 µg/m³) was selected.

EPA generally agrees with CASAC and the large number of public commenters with regard to the appropriateness of a Pb-TSP indicator for the level of the standard identified for the revised standard in section II.C.3 below. This conclusion is supported by the current scientific evidence, discussed above in section II.C.1.a, recognizing the range of particle sizes inclusive of ultra-coarse particles which contribute to Pb exposures, evidence of the presence of ultra-coarse particles in some areas, particularly near sources, and variation in the relationship between Pb-TSP and Pb-PM₁₀ at such sites, which together contribute to uncertainty about the sufficiency of public health protection associated with a Pb-PM₁₀ standard at the level of 0.15 µg/m³.

A few commenters (including the National Association of Clean Air Agencies) recommended transition to a Pb-PM₁₀ indicator for the standard at levels below 0.2 µg/m³. These commenters stated that low-volume PM₁₀ samplers measure Pb much more accurately than high-volume TSP samplers, referring to EPA's discussion in the proposal that recognized the variability of Pb-TSP measurements associated with wind speed and direction, and also referred to support among CASAC AAMM members and the July 2008 comments from CASAC on indicator. These commenters, however, did not provide rationales as to why a Pb-PM₁₀ indicator might be justified in light of the health considerations identified by EPA in the proposal. Further, as noted above, EPA interprets CASAC's July 2008 comments on the whole to be supportive of Pb-TSP as the indicator for any standard level greater than 0.10 µg/m³.

A few commenters, including both state and industry commenters, recommended transition to Pb-PM₁₀ without reference to a particular level. Some of these commenters, like CASAC, noted concerns with the high-volume TSP sampling methodology and advantages of the PM₁₀ monitoring method in reduced variability of the measurements. Two industry commenters additionally suggested consideration of an indicator based on Pb-PM₂.₅, stating as their rationale that almost all airborne Pb in air is in ''the small size fraction'', ambient sampling for PM₁₀ and PM₂.₅ size fractions is already required, and precision which might be greater with PM₁₀ monitors is needed for ''lower'' standards. None of this group of commenters provided a rationale as to why a Pb-PM₁₀ indicator might be justified in light of the health

considerations identified by EPA in the proposal.

EPA disagrees with this group of commenters, noting the potential presence at some sites of particles that would not be captured by PM₁₀ or PM₂.₅ samplers yet would contribute to human exposure to Pb and associated health effects. As discussed below, EPA believes that, in light of the evidence of all particle sizes of Pb contributing to blood Pb and health effects by both ingestion and inhalation pathways, the available data on relationships between Pb-TSP and Pb-PM₁₀ (discussed in section II.E.1 of the proposal and in section IV.C below) are inadequate to support development of a Pb-PM₁₀-based NAAQS that would provide sufficient but not more than necessary protection of public health, with an adequate margin of safety, across the wide variety of ambient Pb circumstances affecting this relationship, and at the level selected by the Administrator. Although EPA did not consider relationships between Pb-TSP and Pb-PM₂.₅ in the proposal, EPA notes the more restricted particle size range associated with PM₂.₅ measurements than with PM₁₀ measurements, and the associated omission of substantially more Pb that contributes to blood Pb and associated health effects.[65]

A number of comments were received regarding the potential use of site-specific or default scaling factors to relate Pb-PM₁₀ data to a Pb-TSP-based standard, with the large majority of these comments being opposed to these options. With regard to site-specific scaling factors, commenters note the temporal variability of the relationship between Pb-TSP and Pb-PM₁₀ at individual sites, raise concerns about defensibility of attainment and nonattainment decisions based on the use of scaling factors, and question whether there are benefits associated with allowance of such scaling factors.

As discussed below in section IV, EPA generally agrees with these commenters and has not adopted a provision allowing the use of site-specific scaling factors. A few commenters supported the use of default scaling factors that would be developed by EPA, as an approach that would be most easily implemented. EPA, however, concludes that the limited available data on relationships between Pb-TSP and Pb-PM₁₀ are inadequate to support development of

---

[65] Data from collocated TSP and PM₂.₅ monitors are generally presented in the Staff Paper (section 2.3.5).

appropriate default scaling factors as described below in section IV.

Although commenters generally opposed the use of scaling factors that would relate Pb-PM$_{10}$ data to specific corresponding levels of Pb-TSP for all levels of Pb-PM$_{10}$ and for all purposes related to implementation of the standard, many commenters supported some uses of Pb-PM$_{10}$ monitoring with a Pb-TSP-based NAAQS. One example of such a use that was suggested by commenters is at sites well below the standard and in areas without ultra-coarse particle sources. EPA agrees with these commenters that such a limited use of Pb-PM$_{10}$ data in such areas is desirable in light of the advantages of Pb-PM$_{10}$ monitoring described in section II.C.1.a above, and does not raise the concerns discussed above about sufficiency of public health protection when considering ambient air Pb concentrations that are closer to the level of the standard. Such uses allowed by this rulemaking are recognized below in section II.C.1.c and discussed more fully in sections IV and V below.

Some States noted agreement with the view expressed by EPA in the proposal that low-volume TSP sampling offers advantages over high-volume TSP sampling (the federal reference method for Pb). Issues regarding the sample collection method for the TSP indicator are discussed in section V below.

### c. Conclusions on Indicator

Having carefully considered the public comments, as discussed above, and advice and recommendations from CASAC on this issue, the Administrator concludes that it is appropriate to retain Pb-TSP as the indicator for the Pb NAAQS at this time. The Administrator agrees with CASAC that use of a Pb-TSP indicator is necessary to provide sufficient public health protection from the range of particle sizes of ambient air Pb, including ultra-coarse particles, in conjunction with the selected level (see section II.C.3 below). The Administrator recognizes that Pb in all particle sizes contributes to Pb in blood and associated health effects (as discussed in section II.E.1 of the proposal and II.C.1.a above). The Administrator additionally notes that selection of the standard level does not include an adjustment or accommodation for the difference in Pb particles captured by TSP and PM$_{10}$ monitors which, as discussed elsewhere (section II.E.1 of the proposal, section II.C.1.a above, and section IV.D below) may be on the order of a factor of two in some areas. The Administrator also recognizes the quite limited dataset,

particularly for source-oriented sites,[66] that is available to the Agency from which to characterize the relationship between Pb-TSP and Pb-PM$_{10}$ for purposes of identifying the appropriate level for a Pb-PM$_{10}$ based standard. Further, the Administrator recognizes there is uncertainty with regard to whether a Pb-PM$_{10}$-based NAAQS would also effectively control ultra-coarse Pb particles, which, as noted above, may have a greater presence in areas near sources where Pb concentrations are highest. In light of these considerations, the Administrator concludes that it is appropriate to retain Pb-TSP as the indicator to protect against health risks from ultra coarse particulate Pb emitted to ambient air.

With regard to the use of scaling factors to relate Pb-PM$_{10}$ data to a Pb-TSP indicator, the Administrator concludes that the limited available data on relationships between Pb-TSP and Pb-PM$_{10}$ are inadequate to support a use of scaling factors to relate all valid Pb-PM$_{10}$ measurements to specific levels of Pb-TSP concentrations for all purposes of a Pb-TSP-based standard.

The Administrator concurs with the comments from CASAC and public commenters that recognize the potential value of providing a role for Pb-PM$_{10}$ in the monitoring required for a Pb-TSP standard. Such comments emphasize the similarity of Pb-TSP and Pb-PM$_{10}$ measurements at non-source-oriented locations, while recognizing the potential for differences at sites near sources, and recognize the sufficiency of public health protection when Pb-PM$_{10}$ levels are well below the level of the standard. EPA believes that use of Pb-PM$_{10}$ measurements at sites not influenced by sources of ultra-coarse Pb and where Pb concentrations are well below the standard would take advantage of the increased precision of these measurements and decreased spatial variation of Pb-PM$_{10}$ concentrations, without raising the same concerns over a lack of protection against health risks from all particulate Pb emitted to the ambient air that support retention of Pb-TSP as the indicator. Accordingly, the Administrator is expanding the types of measurements which may be considered with regard to implementation of the Pb NAAQS. This expansion, as discussed more fully in sections IV and V below, provides a role for Pb-PM$_{10}$ data under

certain limited circumstances and with certain conditions. The circumstances and conditions under which such data are allowed, as described in sections IV and V below, are those in which the Pb concentrations are expected to be substantially below the standard and ultra-coarse particles are not expected to be present.

### 2. Averaging Time and Form

#### a. Basis for Proposed Decision

The averaging time and form of the current standard is a not-to-be-exceeded or maximum value, averaged over a calendar quarter. The basis for this averaging time and form reflects consideration of the evidence available when the Pb NAAQS were promulgated in 1978. At that time, the Agency had concluded that the level of the standard, 1.5 µg/m³, would be a "safe ceiling for indefinite exposure of young children" (43 FR 46250), and that the slightly greater possibility of elevated air Pb levels for shorter periods within the quarterly averaging period, as contrasted to the monthly averaging period proposed in 1977 (43 FR 63076), was not significant for health. These conclusions were based in part on the Agency's interpretation of the health effects evidence as indicating that 30 µg/dL was the maximum safe level of blood Pb for an individual child, and the Agency's views that the distribution of air concentrations made it unlikely there could be sustained periods greatly above the average value and that the multipathway nature of Pb exposure lessened the impact of short-term changes in air concentrations of Pb.

In the 1990 Staff Paper, this issue was again considered in light of the evidence available at that time. The 1990 Staff Paper concluded that "[a] monthly averaging period would better capture short-term increases in lead exposure and would more fully protect children's health than the current quarterly average" (USEPA, 1990b). The 1990 Staff Paper further concluded that "[t]he most appropriate form of the standard appears to be the second highest monthly average in a 3-year span. This form would be nearly as stringent as a form that does not permit any exceedances and allows for discounting of one 'bad' month in 3 years which may be caused, for example, by unusual meteorology." In their review of the 1990 Staff Paper, the CASAC Pb Panel concurred with the staff recommendation to express the lead NAAQS as a monthly standard not to be exceeded more than once in three years.

As summarized in section II.A above and discussed in detail in the Criteria

---

[66] As described in the proposal (73 FR29233), collocated data from source-oriented sites were available from just three locations near three different types of sources and include data from as long ago as 1988 (Schmidt and Cavender, 2008). A limited amount of additional data has been provided in comments on the proposal.

Document, the currently available health effects evidence [67] indicates a wider variety of neurological effects, as well as immune system and hematological effects, associated with substantially lower blood Pb levels in children than were recognized when the standard was set in 1978. Further, the health effects evidence with regard to characterization of a threshold for adverse effects has changed since the standard was set in 1978, as have the Agency's views on the characterization of a safe blood Pb level.[68]

In the proposal (section II.E.2), we noted various aspects of the current evidence that are pertinent to consideration of the averaging time and form for the Pb standard. We noted those aspects pertaining to the human physiological response to changes in Pb exposures and also aspects pertaining to the response of air-related Pb exposure pathways to changes in airborne Pb. The latter aspects are more complex for Pb than for other criteria pollutants because the exposure pathways for air-related Pb include both inhalation pathways and deposition-related ingestion pathways, which is not the case for other criteria pollutants. The persistence of Pb in multiple media and in the body [69] provides an additional complication in the case of Pb.

With regard to the human physiological response to changes in Pb exposures, as summarized in the Staff Paper and discussed in more detail in the Criteria Document, the evidence indicates that blood Pb levels respond quickly to increased Pb exposures, such that an abrupt increase in Pb uptake results in increased blood Pb levels. Contributing to this response is the absorption through the lungs and the gastrointestinal tract (which is both greater and faster in children as compared to adults), and the rapid distribution (within days), once absorbed, from plasma to red blood cells and throughout the body. As noted in the proposal, while the evidence with regard to sensitive neurological effects is limited in what it indicates regarding the specific duration of exposures associated with effects, it indicates both the sensitivity of the first three years of

life and a sustained sensitivity throughout the lifespan as the human central nervous system continues to mature and be vulnerable to neurotoxicants (CD, section 8.4.2.7). In general, the evidence indicates the potential importance of exposures on the order of months (CD, section 5.3). The evidence also indicates increased vulnerability during some developmental periods (e.g., prenatal), the length of which indicates a potential importance of exposures as short as weeks to months.

As noted in the proposal with regard to the response of human exposure pathways to changes in airborne Pb, data from NHANES II and an analysis of the temporal relationship between gasoline consumption and blood Pb indicate a month lag between changes in Pb emissions from leaded gasoline and the response of children's blood Pb levels and the number of children with elevated blood Pb levels (EPA, 1986a, p. 11–39; Rabinowitz and Needleman, 1983; Schwartz and Pitcher, 1989; USEPA, 1990b). As noted in the proposal with regard to consideration of air-related Pb exposure pathways, the evidence described in the Criteria Document and the quantitative risk assessment indicate that today ingestion of dust can be a predominant exposure pathway for young children to air-related Pb. Further, the proposal noted that a recent study of dustfall near an open window in New York City indicates the potential for a response of indoor dust Pb loading to ambient airborne Pb on the order of weeks (Caravanos *et al.*, 2006; CD, p. 3–28).

In the proposal, we additionally noted that the health effects evidence identifies varying durations in exposure that may be relevant and important to the selection of averaging time. In light of uncertainties in aspects such as response times of children's exposure to airborne Pb, we recognized, as in the past, that this evidence provides a basis for consideration of both quarterly and monthly averaging times.

In considering both averaging time and form in the proposal, EPA combined the current calendar quarter averaging time with the current not-to-be exceeded (maximum) form and also combined a monthly averaging time with a second maximum form, so as to provide an appropriate degree of year-to-year stability that a maximum monthly form would not provide. We also observed in the proposal (73 FR 29235) that the second maximum monthly form provides a roughly comparable degree of protection on a broad national scale to the current maximum calendar quarter averaging

time and form. This observation was based on an analysis of the 2003–2005 monitoring data set that found a roughly similar number of areas not likely to attain alternate levels of the standard for these two combinations of averaging time and form (although a slightly greater number of sites would likely exceed the levels based on the second maximum monthly average). We also noted, however, that the relative protection provided by these two averaging times and forms may differ from area to area. Moreover, we noted that control programs to reduce average Pb concentrations across a calendar quarter may not have the same protective effect as control programs aimed at reducing average Pb concentrations on a monthly basis. Given the limited scope of the current monitoring network, which lacks monitors near many significant Pb sources, and uncertainty about Pb source emissions and possible controls, the proposal noted that it is difficult to more quantitatively compare the protectiveness of standards defined in terms of the maximum calendar quarter average versus the second maximum monthly average.

In their advice to the Agency prior to the proposal, CASAC recommended that consideration be given to changing from a calendar quarter to a monthly averaging time (Henderson, 2007a, 2007b, 2008a). In making that recommendation, CASAC has emphasized support from studies that suggest that blood Pb concentrations respond at shorter time scales than would be captured completely by a quarterly average. With regard to form of the standard, CASAC has stated that one could "consider having the lead standards based on the second highest monthly average, a form that appears to correlate well with using the maximum quarterly value", while also indicating that "the most protective form would be the highest monthly average in a year" (Henderson, 2007a). Among the public comments the Agency received on the discussion of averaging time in the ANPR, the majority concurred with the CASAC recommendation for a revision to a monthly averaging time.

On an additional point related to form, the 1990 Staff Paper and the Staff Paper for this review both recommended that the Administrator consider specifying that compliance with the NAAQS be evaluated over a 3-year period. As described in the proposal, a monitor would be considered to be in violation of the NAAQS based on a 3-year period, if, in any of the three previous calendar years with sufficiently complete data (as

---

[67] The differing evidence and associated strength of the evidence for these different effects is described in the Criteria Document.

[68] For example, EPA recognizes today that "there is no level of Pb exposure that can yet be identified, with confidence, as clearly not being associated with some risk of deleterious health effects" (CD, p. 8–63).

[69] Lead accumulates in the body and is only slowly removed, with bone Pb serving as a blood PB source for years after exposure and as a source of fetal Pb exposure during pregnancy (CD, sections 4.3.1.4 and 4.3.1.5).

explained in detail in section IV of the proposal), the value of the selected averaging time and form statistic (e.g., second maximum monthly average or maximum quarterly average) exceeded the level of the NAAQS. Thus, a monitor, initially or after once having violated the NAAQS, would not be considered to have attained the NAAQS until three years have passed without the level of the standard being exceeded. In discussing the merits of this approach in the proposal, we noted that variations in Pb source emissions and in meteorological conditions contribute to the potential for a monitor to record an exceedance of a particular level in one period but not in another, even if no permanent controls have been applied to the nearby source(s). We further noted that it would potentially reduce the public health protection afforded by the standard if areas fluctuated in and out of nonattainment status so frequently that States do not have opportunity and incentive to identify sources in need of more emission control and to require those controls to be put in place. We noted that the 3-year approach would help ensure that areas initially found to be violating the NAAQS have effectively controlled the contributing lead emissions before being redesignated to attainment.

At the time of proposal, the Administrator considered the information summarized above (described in more detail in Criteria Document and Staff Paper), as well as the advice from CASAC and public comments on the ANPR. The Administrator recognized that there is support in the evidence for an averaging time as short as monthly consistent with the following observations: (1) The health evidence indicates that very short exposures can lead to increases in blood Pb levels, (2) the time period of response of indoor dust Pb to airborne Pb can be on the order of weeks, and (3) the health evidence indicates that adverse effects may occur with exposures during relatively short windows of susceptibility, such as prenatally and in developing infants.[70] The Administrator also recognized

[70] The health evidence with regard to the susceptibility of the developing fetus and infants is well documented in the evidence as described in the 1986 Criteria Document, the 1990 Supplement (e.g. chapter III) and the 2006 Criteria Document. For example, "[n]eurobehavioral effects of Pb-exposure early in development (during fetal, neonatal, and later postnatal periods) in young infants and children ≤7 years old) have been observed with remarkable consistency across numerous studies involving varying study designs, different developmental assessment protocols, and diverse populations." (CD, p. E–9)

limitations and uncertainties in the evidence including the limited available evidence specific to the consideration of the particular duration of sustained airborne Pb levels having the potential to contribute to the adverse health effects identified as most relevant to this review, as well as variability in the response time of indoor dust Pb loading to ambient airborne Pb.

Based on these considerations and the air quality analyses summarized above, the Administrator concluded that this information provided support for an averaging time no longer than a calendar quarter. Further, the Administrator recognized that if substantial weight is given to the evidence of even shorter times for response of key exposure pathways, blood Pb, and associated effects to airborne Pb, a monthly averaging time may be appropriate. Accordingly, the Administrator proposed two options with regard to the form and averaging time for the standard, and with both he proposed that three years be the time period evaluated in considering attainment. One option was to retain the current not-to-be-exceeded form with an averaging time of a calendar quarter, and the second option was to revise the averaging time to a calendar month and the form to the second highest monthly average.

b. Comments on Averaging Time and Form

In considering comments on averaging time for the revised standard, the Administrator first notes that the CASAC Pb Panel, in their comments on the proposal, restated their previous recommendation to reduce the averaging time from calendar quarter to monthly (Henderson, 2008b). In repeating this recommendation in their July 2008 letter, CASAC noted that "adverse effects could result from exposures over as few as 30 days' duration" (Henderson, 2008b). Many public commenters also supported the option of a monthly averaging time, generally placing great weight on the recommendation of CASAC. Some of these commenters also provided additional reasons for their support for a monthly averaging time. These reasons variously included concerns regarding the lack of a "safe" blood Pb level; evidence that children's blood Pb concentrations respond over time periods shorter than three months; evidence for very short windows of susceptibility to some effects during prenatal and infant development; concerns that dust Pb responds relatively quickly to air Pb; and concerns for large near-source temporal

variability in airborne Pb concentrations and the exposure and risk contributed by "high" months, which, given the persistence of Pb, may occur for some time subsequent to the "high" month.

Some other commenters supported retaining the current quarterly averaging time stating that the proposed option of a monthly averaging time is not well founded in the evidence. In supporting this view, the commenters variously stated that no evidence has been presented to show a relationship between a shorter-term air concentration and air-related blood Pb levels contributing to neurological effects; there is little known regarding the relationship between neurocognitive effects such as IQ and a monthly exposure period; there is uncertainty regarding the time over which indoor dust, a key pathway for air-related Pb, responds to indoor air; and, the World Health Organization or European Community air criteria or guidelines for Pb are based on a yearly average.

In considering advice from CASAC and comments from the public, EPA recognizes that the evidence indicates the potential for effects pertinent to this review to result from Pb exposures (e.g., from ingestion and inhalation routes) on the order of one to three months, as summarized in section II.C.2.a and described more fully in the proposal. EPA additionally notes the greater complexity inherent in considering the averaging time for the primary Pb standard, as compared to other criteria pollutants, due to the persistence and multimedia nature of Pb and its multiple pathways of human exposure. Accordingly, in considering averaging time in this review, in addition to considering the evidence with regard to exposure durations related to blood Pb levels associated with neurological effects, a key consideration for the Agency is how closely Pb exposures via the major air-related Pb exposure pathways reflect temporal changes in ambient air Pb concentrations, recognizing that the averaging period involves the duration over time of ambient air concentrations, and is not a direct measure of the duration or degree of exposure.

With regard to exposure durations related to blood Pb levels associated with neurocognitive effects, EPA notes that, as described in section II.A.2.c above, the concurrent blood Pb metric (i.e., blood Pb measured at the time of IQ test) has been found to have the strongest association with IQ response. Further, a concurrent blood Pb measurement is most strongly related to a child's exposure events within the past few (e.g., one to three) months. This

is supported by multiple aspects of the evidence (e.g., CD, chapter 4; USEPA, 1986a, chapter 11), including evidence cited by CASAC and commenters, such as the findings of the significant contribution to blood Pb of gasoline Pb sales in the past month (e.g., Schwartz and Pitcher, 1989; Rabinowitz and Needleman, 1983).

EPA also recognizes, as noted by some commenters and discussed in the Criteria Document and summarized in the Staff Paper, ANPR and proposal, that the evidence demonstrates sensitivity of the early years of life and increased vulnerability of specific types of effects during some developmental periods (e.g., prenatal) which may be shorter than a calendar quarter. EPA notes uncertainty, however in some aspects of the linkages between airborne Pb concentrations and these physiological responses, including time-related aspects of the exposure pathways contributing to such effects.

In considering the evidence regarding how blood Pb levels respond to changes in ambient air Pb concentrations along the multiple exposure pathways to blood, EPA recognizes several pertinent aspects of the evidence. First, the evidence in this area does not specify the duration of a sustained air concentration associated with a particular blood Pb contribution. Accordingly, we are uncertain as to the precise duration of air concentration(s) reflected in any one air-to-blood ratio and the ways in which an air-to-blood ratio may vary with the duration of the air Pb concentration. However, as discussed in section II.C.2.a above, the evidence supports the importance of time periods on the order of three months or less, and as discussed below, in light of the prominent role of deposition-related pathways today, EPA concludes the evidence most strongly supports a time period of approximately three months.

Given the varying complexities of the multiple air-related exposure pathways summarized in section II.A.1 above, exposure durations pertinent for each pathway may be expected to vary. The most immediate and direct exposure pathway is the inhalation pathway, while the ingestion pathways are more indirect and to varying degrees (across the range of pathways) less immediate. For example, as mentioned above, when leaded gasoline was a predominant source of air-related exposure for people in the U.S., the evidence indicates that blood Pb levels were strongly associated with average sales of leaded gasoline during the previous month (e.g., Schwartz and Pitcher, 1989). We note that exposures to the generally fine

particles produced by combustion of leaded gasoline, which remain suspended in the atmosphere for many days (USEPA, 1986a, p. 5–10), provide a greater role for inhalation pathways (e.g., as compared to deposition-related ingestion pathways, such as indoor dust ingestion) than would exposures to generally larger Pb particles (which tend to more readily deposit). Further, as recognized in the Staff Paper and the proposal, air-related ingestion pathways are necessarily slower to respond to changes in air concentrations than the immediate and direct pathway of inhalation. The ingestion pathways are affected by a variety of factors that play a lesser, if any, role in inhalation exposure. For example, human behavior (e.g., activity, cleaning practices and frequency) and other building characteristics (e.g., number of windows, presence of screens, air conditioning) would be expected to modulate the response of indoor dust to changes in ambient air Pb (Caravanos et al., 2006; CD, p. 3–28).

As noted previously, the evidence and the results of the quantitative risk assessment indicate a greater role for ingestion pathways than inhalation pathways in contributing to the air-related exposures of children today. Accordingly, the relatively greater focus today (than at the time of leaded gasoline usage) on deposition-related pathways of exposure to air-related Pb such as indoor dust ingestion would tend to support consideration of an averaging time longer than a month. We additionally note results from dust Pb modeling analyses performed as part of the quantitative risk assessment. These results provide an estimate of approximately four months as the time over which an increase in air Pb will reach 90% of the final steady-state change in dust Pb (USEPA, 2007b, section G.3.2.2). Additionally, we note that multiple studies have observed blood Pb levels to exhibit seasonal patterns, perhaps related to seasonality in exposure variables (e.g., Rabinowitz et al., 1985).

Some commenters who supported a monthly averaging time cited concern for the potential for the occurrence of single month average air Pb concentration, within a quarter that met the standard, to be substantially above the level of the standard. For example, one commenter suggested that a monthly averaging time would be more likely to capture exceedances related to periodic activities (such as industrial activity, construction or demolition). Another commenter submitted examples of such temporal variability in ambient air concentrations at specific

monitoring sites, one of which indicated a quarter in which the current standard of 1.5 μg/m³ was met, while a single month within that quarter was some 30% percent higher (2.07 μg/m³). In considering this example, we consider the likelihood of differing blood Pb responses between children in two different situations: one in which the 3-month average Pb concentration just met the level of the standard but a single month within the quarter was 30% higher than that level (with the other two months below the standard level), and the other in which each of three consecutive monthly average Pb concentrations just met the level of the standard. The current evidence is limited with regard to the consideration of this issue. Given the range of air-related blood Pb exposure pathways and the processes involved in their relationships with airborne Pb (e.g., the response of indoor dust Pb to ambient air Pb), it is highly uncertain, based on the evidence available today, whether there would be appreciable differences in blood Pb levels between the children in these two scenarios as a result of these different 3-month periods. That is, in this example, we consider it unlikely that a single relatively higher month of air Pb followed by two months of relatively lower air Pb would translate into a similar single high month of blood Pb followed by two months of relatively low blood Pb. Rather, it is expected that the high month would tend to be modulated into a more extended and less pronounced month-to-month change in blood Pb levels.

In considering this issue, however, we recognize that greater month-to-month variability in air concentrations than that described by this example is possible, and as such variability increases, it becomes more likely that a month's air Pb concentration might result in a more pronounced impact on blood Pb concentrations.

Another example offered by the commenter described more extreme month-to-month variability in a quarter in which the current standard was met. This example indicated a monthly average that was more than 3 times the average for the quarter. The allowance for this seemingly implausible occurrence results from the current calculation method for the current quarterly average standard. The current method takes an average across all valid measurements in a quarter, without according equal weight to each month's measurements. In situations where a significantly different number of measurements occur in each month of the quarter, the current method can have the effect of giving greater weight

to multiple measurements occurring over a relatively short period. In the specific example cited by the commenter, the few very high measurements in a single month were outweighed by a much larger number of lower measurements occurring in each of the other two months of the quarter, thus biasing the resulting quarterly average. EPA agrees with the commenter that the allowance of such significant month-to-month variability within a 3-month period is inappropriate and may not provide appropriate protection of public health. In consideration of this issue, the Agency has identified changes to the method used to derive the 3-month average that would yield an average that is more representative of air quality over the 3-month period and lessen the likelihood and frequency of occurrence of cases where such extremely high months would be allowed in a 3-month averaging period that met the standard. More specifically, as discussed below in section IV, the Agency considers it appropriate to average the measurements within each month prior to deriving the 3-month average as a way to avoid the allowance of such large monthly variability as noted by the commenter.

In considering comments specifically on the current use of a block calendar quarter average, the Administrator first notes that the CASAC Pb Panel, in their comments on the proposal, stated that "there is no logic for averaging only by 'calendar' quarter as there is nothing unique about those effects that may occur exclusively during the four calendar seasons" and that a "'rolling' three-month (or 90-day) average would be more logical than a 'calendar' quarter" (Henderson, 2008b). Comments from a state environmental agency also recommended use of a 3-month rolling average, rather than the current block calendar quarter average.

EPA agrees with CASAC as to the stronger basis for a "rolling" 3-month average as compared to a block calendar quarter. A 3-month average not constrained to calendar quarters would consider each of the twelve 3-month periods associated with a given year, not just the four calendar years within that year. We agree with CASAC that the averaging time of calendar quarter inappropriately separates air concentrations occurring in months such as March and April that span two calendar quarters. For example, under the calendar quarter approach, two consecutive "high" months that occur in different calendar quarters (e.g., March and April) may be mitigated by "low" months in those calendar quarters (i.e., January and February for

March, May and June for April). Thus, the same air quality data could cause an exceedance of the calendar quarter standard if it occurred in February and March but could meet the calendar quarter standard if it occurred in March and April. EPA believes there is no evidence-based justification for this potential disparity in outcomes. By contrast, with a rolling 3-month averaging time, each month contributes to three separate 3-month periods, through separate combinations with three different pairs of months (e.g. January-March, February-April, and March-June), thus providing a more complete consideration of air quality during that month and the periods in which it falls. EPA also notes that analyses of air quality data for 2005–2007 indicate a greater degree of protection is afforded by a rolling 3-month average as compared to a block calendar quarter average (Schmidt, 2008).

CASAC also provided advice on a form for a monthly average standard, noting that a "monthly or 'rolling' 30-day averaging time with a 'not to be exceeded' form would be more protective against adverse short-term effects than a form (such as a 'second-highest month in three years') that periodically allows a month of exposures to much higher concentrations" (Henderson, 2008b). Public comments also included recommendations for a not-to-be-exceeded maximum form for a monthly average (e.g., NACAA), as well as some recommendations for a second maximum monthly average (e.g., NESCAUM). While these comments are instructive on the relative merits of a maximum and a second maximum form for a monthly averaging time, given the Administrator's selection of a 3-month averaging time (as described in section II.C.2.c below), and his reasons for this selection, including his consideration of the issue of short-term changes in ambient air concentrations over the 3-month averaging time, EPA believes it is unnecessary to address comments on the appropriate form for a monthly averaging time further here.

EPA notes, however, that a maximum rolling 3-month average would be expected to provide greater protection from deposition-related pathways in an area of highly variable air concentrations than the proposed second maximum monthly average because the former does not allow for the "discounting" or omitting of airborne Pb in any month. While the averaging time for a maximum rolling 3-month average is longer than the monthly averaging time recommended

by CASAC and several commenters, the combination of a rolling 3-month averaging time with a maximum form would be expected to offer greater protection from deposition-related exposure pathways than the proposed option of a second maximum monthly average, because each month contributes to three 3-month averages and no month is omitted from the calculation of averages for comparison to the standard. Results of analyses of air quality data for 2005–2007 are consistent with this view, in that a greater percentage of monitors meeting data completeness criteria are not likely to meet the revised standard based on a maximum rolling 3-month average as compared to a second maximum monthly average (Schmidt, 2008).[71]

More detailed responses to some of the public comments described above, as well as responses to other comments related to averaging time and form not considered here, are provided in the Response to Comments document.

c. Conclusions on Averaging Time and Form

Having carefully considered CASAC's advice and the public comments on the appropriate averaging time and form for the standard, the Administrator concludes that the fundamental scientific conclusions pertaining to averaging time described in the Criteria Document and Staff Paper, briefly summarized above in section II.C.2.a and discussed more fully in section II.E.2 of the proposal remain valid. In light of all of the evidence, the Administrator concludes that the appropriate averaging time for the standard is no longer than a 3-month period.

In considering the option of a monthly averaging time, the Administrator recognizes the complexity inherent in considering the averaging time and form for the primary Pb standard, which is greater than in the case of the other criteria pollutants, due to the multimedia nature of Pb and its multiple pathways of human exposure. Accordingly, while the Administrator recognizes there are some factors that might support a period as short as a month for the averaging time, other factors support use of a longer averaging time, as discussed in section II.C.2.b above. The Administrator believes that in the complex multimedia, multi-pathway situation for Pb, it is necessary to consider all of the relevant factors, both those pertaining to the human

---

[71] These analyses incorporate the revised averaging method identified above and discussed more fully in section IV below.

physiological response to changes in Pb exposures and those pertaining to the response of air-related Pb exposure pathways to changes in airborne Pb, in an integrated manner.

The Administrator recognizes that the evidence as well as the results of the quantitative risk assessment for this review indicate a greater role for ingestion pathways than inhalation pathways in contributing to children's air-related exposure. He further recognizes that ingestion pathways are influenced by more factors than inhalation pathways, and those factors are considered likely to lessen the impact of month-to-month variations in airborne Pb concentrations on levels of air-related Pb in children's blood. Accordingly, while the evidence is limited as to our ability to characterize these impacts, this evidence suggests that the multiple factors affecting ingestion pathways, such as ingestion of indoor dust, are likely to lead to response times (*e.g.,* for the response of blood to air Pb via these pathways) extending longer than a month. In addition, there remains uncertainty over the period of time needed for air Pb concentrations to lead to the health effects most at issue in this review.

Further, it is important to note, as discussed above, that a rolling 3-month averaging time is likely to be somewhat more protective from a broad national perspective than a calendar quarter averaging time. Over a 3-year time frame, the rolling 3-month averaging time is also likely to be more protective with regard to air-related Pb exposures than would be a form that allows one month in three years to be greater than the level of the standard (*i.e.,* a monthly averaging time with a second maximum form). In combination with the additional changes in form discussed below, this means that a rolling 3-month average can be expected to provide a high degree of control over all of the months of a three-year period, with few individual months exceeding the level of the standard. This expectation appears to be generally supported by analyses of air quality data for 2005–2007 comparing percentages of monitors not likely to meet a revised standard with different averaging times and forms (Schmidt, 2008).

The Administrator further notes that, as discussed in section II.C.2.b above, the rolling three-month average eliminates the possibility for two consecutive "high" months falling in two separate calendar quarters to be considered independently (perhaps being mitigated by "low" months falling in each of the same calendar quarters). Rather, the same month, in the rolling

three-month approach, would contribute to three different 3-month periods through separate combinations with three different pairs of months, thus providing a more complete consideration of air quality during that month and the 3-month periods in which it falls. Taking these considerations into account, the Administrator concludes that a rolling 3-month averaging time is appropriate. This conclusion to revise from a block calendar quarter average to a rolling 3-month average is consistent with the views of CASAC and some commenters on this issue.

In recognition of the uncertainty in the information on which the decision to select a 3-month averaging time is based, the Administrator further concludes that the month-to-month variability allowed by the current method by which the 3-month average metric is derived is not sufficiently protective of public health. Accordingly, he concludes it is appropriate to modify the method by which the 3-month average metric is derived, as described in section IV below, to be the average of three monthly average concentrations, as compared to the current practice by which the average is derived across the full dataset for a quarter, without equally weighting each month within the quarter. Thus, in consideration of the uncertainty associated with the evidence pertinent to averaging time discussed above, the Administrator notes that the two changes in form for the standard (to a rolling 3-month average and to providing equal weighting to each month in deriving the 3-month average) both afford greater weight to each individual month than does the current form, tending to control both the likelihood that any month will exceed the level of the standard and the magnitude of any such exceedance.

Based on the evidence and air quality considerations discussed above, EPA concludes that a monthly averaging time is not warranted. Furthermore, the Administrator concludes that the appropriate averaging time and form for the revised primary Pb standard is a not-to-be-exceeded (maximum) 3-month rolling average evaluated over a 3-year span, derived in accordance with calculation methods described below in section IV.

### 3. Level

As noted in the proposal, EPA recognizes that in the case of Pb there are several aspects to the body of epidemiological evidence that add complexity to the selection of an appropriate level for the primary standard. As summarized above and

discussed in greater depth in the Criteria Document (CD, sections 4.3 and 6.1.3), the epidemiological evidence that associates Pb exposures with health effects generally focuses on blood Pb for the dose metric.[72] In addition, exposure to Pb comes from various media, only some of which are air-related, and through both inhalation and ingestion pathways. These complexities are in contrast to the issues faced in the reviews for other air pollutants, such as particulate matter and ozone, which involve only inhalation exposures. Further, for the health effects receiving greatest emphasis in this review (neurological effects, particularly neurocognitive and neurobehavioral effects, in children), no threshold levels can be discerned from the evidence. As was recognized at the time of the last review, estimating a threshold for toxic effects of Pb on the central nervous system entails a number of difficulties (CD, pp. 6–10 to 6–11). The task is made still more complex by support in the evidence for a nonlinear rather than linear relationship between blood Pb and neurocognitive decrement, with greater risk of decrement-associated changes per μg/dL of blood Pb at the lower levels of blood Pb in the exposed population (CD, section 6.2.13). In this context EPA notes that the health effects evidence most useful in determining the appropriate level of the NAAQS is the large body of epidemiological studies discussed in the Criteria Document. The discussion in the proposal and below therefore focuses on the epidemiological studies, recognizing and taking into consideration the complexity and resulting uncertainty in using this body of evidence to determine the appropriate level for the NAAQS.

The Administrator's proposed conclusions on range of levels for the primary standard are summarized below in the Introduction (section II.C.3.a), followed by consideration of comments received on the proposal (section II.C.3.b) and the Administrator's final decision with regard to level for the current primary standard (II.C.3.c).

#### a. Basis for Proposed Range

For the reasons discussed in the proposal and summarized below, and taking into account information and assessments presented in the Criteria Document, Staff Paper, and ANPR, the advice and recommendations of CASAC, and the public comments received prior to proposal, the

---

[72] Among the studies of Pb health effects, in which blood Pb level is generally used as an index of exposure, the sources of exposure vary and are inclusive of air-related sources of Pb such as smelters (e.g., CD, chapter 6).

Administrator proposed to revise the existing primary Pb standard. Specifically, the Administrator proposed to revise the level of the primary Pb standard, defined in terms of the current Pb-TSP indicator, to within the range of 0.10 to 0.30 $\mu g/m^3$, conditional on judgments as to the appropriate values of key parameters to use in the context of the air-related IQ loss evidence-based framework summarized below (and discussed in section II.E.3.a.ii of the proposal). Further, in recognition of alternative views of the science, the exposure and risk assessments, the uncertainties inherent in the science and these assessments, and the appropriate public health policy responses based on the currently available information, the Administrator solicited comments on alternative levels of a primary Pb-TSP standard within ranges from above 0.30 $\mu g/m^3$ up to 0.50 $\mu g/m^3$ and below 0.10 $\mu g/m^3$. In addition, the Administrator solicited comments on when, if ever, it would be appropriate to set a NAAQS for Pb at a level of zero.

The Administrator's consideration of alternative levels of the primary Pb-TSP standard built on his proposed conclusion, discussed above in section II.B.1, that the overall body of evidence indicates that the current Pb standard is not requisite to protect public health with an adequate margin of safety and that the standard should be revised to provide increased public health protection, especially for members of at-risk groups, notably including children, against an array of adverse health effects. These effects include IQ loss, decrements in other neurocognitive functions, other neurological effects and immune system effects, as well as cardiovascular and renal effects in adults, with IQ loss the health outcome quantified in the risk assessment. In reaching a proposed decision about the level of the Pb primary standard, the Administrator considered: The evidence-based considerations from the Criteria Document, Staff Paper, and ANPR, and those based on the air-related IQ loss evidence-based framework discussed in the proposal; the results of the exposure and risk assessments summarized in section II.A.3 above and in the Staff Paper, giving weight to the exposure and risk assessments as judged appropriate; CASAC advice and recommendations, as reflected in discussions of the Criteria Document, Staff Paper, and ANPR at public meetings, in separate written comments, and in CASAC's letters to the Administrator; EPA staff recommendations; and public

comments received during the development of these documents, either in connection with CASAC meetings or separately. In considering what standard is requisite to protect public health with an adequate margin of safety, the Administrator noted at the time of proposal that he was mindful that this choice requires judgment based on an interpretation of the evidence and other information that neither overstates nor understates the strength and limitations of the evidence and information nor the appropriate inferences to be drawn.

In reaching a proposed decision on a range of levels for a revised standard, as in reaching a proposed decision on the adequacy of the current standard, the Administrator primarily considered the evidence in the context of the air-related IQ loss evidence-based framework as described in the proposal (section II.E.3.a.ii). The air-related IQ loss evidence-based framework considered by the Administrator in the proposal focuses on the contribution of air-related Pb to the neurocognitive effect of IQ loss in children, with a public health goal of identifying the appropriate ambient air level of Pb to protect exposed children from health effects that are considered adverse, and are associated with their exposure to air-related Pb. In this air-related IQ loss evidence-based framework, the Agency drew from the entire body of evidence as a basis for concluding that there are causal associations between air-related Pb exposures and IQ loss in children. Building on recommendations from CASAC to consider the body of evidence in a more quantitative manner, the framework additionally draws more quantitatively from the evidence by combining air-to-blood ratios with evidence-based C–R functions from the epidemiological studies to quantify the association between air Pb concentrations and air-related population mean IQ loss in exposed children. This framework was also premised on a public health goal of selecting a proposed standard level that would prevent air-related IQ loss (and related effects) of a magnitude judged by the Administrator to be of concern in populations of children exposed to the level of the standard. The framework explicitly links a public health goal regarding IQ loss with two key parameters—a C–R function for population IQ response associated with blood Pb level and an air-to-blood ratio.

As a general matter, in considering this evidence-based framework, the Administrator recognized that in the case of Pb there are several aspects to the body of epidemiological evidence that add complexity to the selection of

an appropriate level for the primary standard. As discussed above, these complexities include evidence based on blood Pb as the dose metric, multimedia exposure pathways for both air-related and nonair-related Pb, and the absence of any discernible threshold levels in the health effects evidence. Further, the Administrator recognized that there are a number of important uncertainties and limitations inherent in the available health effects evidence and related information, including uncertainties in the evidence of associations between total blood Pb and neurocognitive effects in children, especially at the lowest blood Pb levels evaluated in such studies, as well as uncertainties in key parameters used in the evidence-based framework, including C–R functions and air-to-blood ratios. In addition, the Administrator recognized that there are currently no commonly accepted guidelines or criteria within the public health community that would provide a clear basis for reaching a judgment as to the appropriate degree of public health protection that should be afforded to neurocognitive effects in sensitive populations, such as IQ loss in children.

Based on the discussion of the key parameters used in the framework, as discussed in the proposal, the Administrator concluded that, in considering alternative standard levels below the level of the current standard, it was appropriate to take into account two sets of C–R functions (described in section II.E.3.a.ii of the proposal), recognizing uncertainties in the related evidence. In the proposal, the first set of C–R functions was described as reflecting the evidence indicative of steeper slopes in relationships between blood Pb and IQ in children, and the second set of C–R functions as reflecting relationships with shallower slopes between blood Pb and IQ in children.[73] In addition, the Administrator concluded that it was appropriate to consider various air-to-blood ratios within a range of values considered to be generally supported by the available evidence, again recognizing the uncertainties in the relevant evidence.[74]

---

[73] As described in section II.E.3.a.ii of the proposal, the first set focused on C–R functions from analyses involving population mean concurrent blood Pb levels of approximately 3 $\mu g/dL$ (closer to current mean blood Pb levels in U.S. children). The second set (CD, pp. 8–78 to 8–80) considered functions descriptive of the C–R relationship from a larger set of studies that include population mean blood Pb levels ranging from a mean of 3.3 up to a median of 9.7 $\mu g/dL$ (see Table 1).

[74] In considering alternative levels for the standard within the air-related IQ loss framework, the Agency focused on estimates using an air-to-

Continued

With regard to making a public health policy judgment as to the appropriate level of protection against air-related IQ loss and related effects, the Administrator first noted that ideally air-related (as well as other) exposures to environmental Pb would be reduced to the point that no IQ impact in children would occur. The Administrator recognized, however, that in the case of setting a NAAQS, he is required to make a judgment as to what degree of protection is requisite to protect public health with an adequate margin of safety. The NAAQS must be sufficient but not more stringent than necessary to achieve that result, and does not require a zero-risk standard. Considering the advice of CASAC and public comments on this issue, notably including the comments of the American Academy of Pediatrics (AAP, 2008), the Administrator proposed to conclude that an air-related population mean IQ loss within the range of 1 to 2 points could be significant from a public health perspective, and that a standard level should be selected to provide protection from air-related population mean IQ loss in excess of this range.

In reaching his proposed decision, the Administrator considered the application of this air-related IQ loss framework with this target degree of protection in mind, drawing from the information presented in Table 7 of the proposal (section II.E.3.a.ii) which addresses a broad range of standard levels. In so doing, the Administrator considered estimates associated with both sets of C–R functions and the range of air-to-blood ratios identified in the proposal, and noted those that would limit the estimated degree of impact on population mean IQ loss from air-related Pb to the proposed range of protection.

Taking these considerations into account, and based on the full range of information presented in Table 7 of the proposal on estimates of air-related IQ loss in children over a broad range of alternative standard levels, the Administrator concluded that it was appropriate to propose a range of standard levels, and that a range of levels from 0.10 to 0.30 μg/m³ would be consistent with the target for protection from air-related IQ loss in children identified in the proposal. In recognition of the uncertainties in the key parameters of air-to-blood ratio and C–R functions, the Administrator stated that the selection of a standard level from within this range was conditional

blood ratio of 1:5 and also provided IQ loss estimates using higher and lower estimates (i.e., 1:3 and 1:7).

on judgments as to the most appropriate parameter values to use in the context of this evidence-based framework. He noted that placing more weight on the use of a C–R function with a relatively steeper slope would tend to support a standard level in the lower part of the proposed range, while placing more weight on a C–R function with a shallower slope would tend to support a level in the upper part of the proposed range. Similarly, placing more weight on a higher air-to-blood ratio would tend to support a standard level in the lower part of the proposed range, whereas placing more weight on a lower ratio would tend to support a level in the upper part of the range. In soliciting comment on a standard level within this proposed range, the Administrator specifically solicited comment on the appropriate values to use for these key parameters in the context of this evidence-based framework.

The Administrator also considered the results of the exposure and risk assessments conducted for this review to provide some further perspective on the potential magnitude of air-related IQ loss.[75] The Administrator found these quantitative assessments to provide a useful perspective on the risk from air-related Pb. However, in light of the important uncertainties and limitations associated with these assessments, as discussed in sections II.A.3 above and section II.E.3.b of the proposal, for purposes of evaluating potential new standards, the Administrator placed less weight on the risk estimates than on the evidence-based assessments. Nonetheless, the Administrator found the risk estimates to be roughly consistent with and generally supportive of the evidence-based air-related IQ loss estimates discussed in section II.E.3.b of the proposal, lending support to the proposed range based on this evidence-based framework.

In the proposal, the Administrator noted his view that the above considerations, taken together, provided no evidence- or risk-based bright line that indicates a single appropriate level. Instead, he noted, there is a collection of scientific evidence and judgments

[75] In considering the risk estimates in light of IQ loss estimates based on the air-related IQ loss evidence-based framework in the proposal, the Agency focused on risk estimates for the general urban and primary Pb smelter subarea case studies as these case studies generally represent population exposures for more highly air-pathway exposed children residing in small neighborhoods or localized residential areas with air concentrations nearer the standard level being evaluated, as compared to, the location-specific case studies in which populations have a broader range of air-related exposures including many well below the standard level being evaluated.

and other information, including information about the uncertainties inherent in many relevant factors, which needs to be considered together in making this public health policy judgment and in selecting a standard level from a range of reasonable values. Based on consideration of the entire body of evidence and information available at the time of proposal, as well as the recommendations of CASAC and public comments, the Administrator proposed that a standard level within the range of 0.10 to 0.30 μg/m³ would be requisite to protect public health, including the health of sensitive groups, with an adequate margin of safety. He also recognized that selection of a level from within this range was conditional on judgments as to what C–R function and what air-to-blood ratio are most appropriate to use within the context of the air-related IQ loss framework. The Administrator noted that this proposed range encompasses the specific level of 0.20 μg/m³, the upper end of the range recommended by CASAC and by many public commenters on the ANPR. The Administrator provisionally concluded that a standard level selected from within this range would reduce the risk of a variety of health effects associated with exposure to Pb, including effects indicated in the epidemiological studies at low blood Pb levels, particularly including neurological effects in children, and cardiovascular and renal effects in adults.

The proposal noted that there is no bright line clearly directing the choice of level within this reasonable range, and therefore the choice of what is appropriate, considering the strengths and limitations of the evidence, and the appropriate inferences to be drawn from the evidence and the exposure and risk assessments, is a public health policy judgment. To further inform this judgment, the Administrator solicited comment on the air-related IQ loss evidence-based framework considered by the Agency and on appropriate parameter values to be considered in the application of this framework. More specifically, we solicited comment on the appropriate C–R function and air-to-blood ratio to be used in the context of the air-related IQ loss framework. The Administrator also solicited comment on the degree of impact of air-related Pb on IQ loss and other related neurocognitive effects in children considered to be significant from a public health perspective, and on the use of this framework as a basis for selecting a standard level.

The Administrator further noted that the evidence-based framework, with the inputs illustrated at the time of

proposal, indicated that for standard levels above 0.30 μg/m³ up to 0.50 μg/m³, the estimated degree of impact on population mean IQ loss from air-related Pb would range from approximately 2 points to 5 points or more with the use of the first set of C–R functions and the full range of air-to-blood ratios considered, and would extend from somewhere within the proposed range of 1 to 2 points IQ loss to above that range when using the second set of C–R functions and the full range of air-to-blood ratios considered. The Administrator proposed to conclude in light of his consideration of the evidence in the framework discussed above that the magnitude of air-related Pb effects at the higher blood Pb levels that would be allowed by standards above 0.30 up to 0.50 μg/m³ would be greater than what is requisite to protect public health with an adequate margin of safety.

In addition, the Administrator noted that for standard levels below 0.10 μg/m³, the estimated degree of impact on population mean IQ loss from air-related Pb would generally be somewhat to well below the proposed range of 1 to 2 points air-related population mean IQ loss regardless of which set of C–R functions or which air-to-blood ratio within the range of ratios considered are used. The Administrator proposed to conclude that the degree of public health protection that standards below 0.10 μg/m³ would likely afford would be greater than what is requisite to protect public health with an adequate margin of safety.

Having reached these proposed decisions based on the interpretation of the evidence, the evidence-based frameworks, the exposure/risk assessment, and the public health policy judgments described above, the Administrator recognized that other interpretations, frameworks, assessments, and judgments are possible. There are also potential alternative views as to the range of values for relevant parameters (*e.g.*, C–R function, air-to-blood ratio) in the evidence-based framework that might be considered supportable and the relative weight that might appropriately be placed on any specific value for these parameters within such ranges. In addition, the Administrator recognized that there may be other views as to the appropriate degree of public health protection that should be afforded in terms of air-related population mean IQ loss in children that would provide support for alternative standard levels different from the proposed range. Further, there may be other views as to the appropriate weight and

interpretation to give to the exposure/risk assessment conducted for this review. Consistent with the goal of soliciting comment on a wide array of issues, the Administrator solicited comment on these and other issues.

In the proposal, the Administrator also recognized that Pb can be considered a non-threshold pollutant[76] and that, as discussed in section I.B above, the CAA does not require that NAAQS be established at a zero-risk level, but rather at a level that reduces risk sufficiently so as to protect public health with an adequate margin of safety. However, expecting that, as time goes on, future scientific studies will continue to enhance our understanding of Pb, and that such studies might lead to a situation where there is very little if any remaining uncertainty about human health impacts from even extremely low levels of Pb in the ambient air, the Administrator recognized that there is the potential in the future for fundamental questions to arise as to how the Agency could continue to reconcile such evidence with the statutory provision calling for the NAAQS to be set at a level that is requisite to protect public health with an adequate margin of safety. In light of such considerations, EPA solicited comment on when, if ever, it would be appropriate to set a NAAQS for Pb at a level of zero.

b. Comments on Level

In this section we discuss advice and recommendations received from CASAC and the public on the proposed range of levels for the primary Pb standard with a Pb-TSP indicator,[77] including comments on specific levels and ranges appropriate for the standard, comments pertaining to the use of the evidence-based framework and inputs to the framework, and comments related to the risk assessment. More detailed responses to some of the public comments on level described below, as well as responses to other comments related to level not discussed here, are provided in the Response to Comments document.

---

[76] Similarly, in the most recent reviews of the NAAQS for ozone and PM, EPA recognized that the available epidemiological evidence neither supports nor refutes the existence of thresholds at the population level, while noting uncertainties and limitations in studies that make discerning thresholds in populations difficult (e.g., 73 FR 16444, March 27, 2008; 71 FR 61158, October 17, 2006).

[77] Some commenters provided recommendations with regard to a level for a Pb-PM₁₀-based standard. While these comments are instructive on that issue, the Administrator has decided to retain the current indicator of Pb-TSP, and therefore they do not need to be addressed here.

(i) General Comments on Range of Levels

In considering comments received on the proposal related to the standard level, EPA first notes the general advice provided by CASAC concerning the proposal in a July 2008 letter to the Administrator (Henderson, 2008b). In that letter, CASAC emphasized their unanimous recommendation (initially stated in their March 2007 letter) regarding "*the need to substantially lower the level*" of the primary Pb standard such that the upper bound should be "*no higher than 0.2 μg/m³*" (emphasis in originals).

The vast majority of public comments that addressed a level for the standard recommended standard levels below, or no higher than 0.2 μg/m³. Many of these commenters noted the advice of CASAC and recommended that EPA follow this advice. Specific rationales provided by this large group of commenters included various considerations, such as recognition that the current evidence indicates Pb effects at much lower exposure levels than when the current standard was set and in multiple systems (*e.g.*, neurological effects in children, cardiovascular and renal effects in adults), and does not indicate a threshold; impacts associated with some neurological effects can persist into adulthood; and there is now evidence of a greater air-to-blood ratio than was considered when the standard was set. Many of these commenters recommended a specific level or range of levels for the standard that was equal to or below 0.2 μg/m³. In recommending levels below 0.2 μg/m³, some of these stated that CASAC's recommendation for an upper bound of 0.2 μg/m³ should not be read to imply that CASAC supported a standard level of 0.2 μg/m³ if that level did not account for CASAC's other specific recommendations on the framework and its inputs. Some commenters' specific recommendations for level (including a standard level of 0.15 μg/m³) were based on consideration of the air-related IQ loss evidence-based framework and their application of it using their recommended parameter inputs and public health policy goal. The specific recommendations on application of the framework are discussed separately below. Some commenters (including EPA's Children's Health Protection Advisory Committee, NESCAUM, several States and Tribes, and several environmental or public health organizations) specified levels below 0.2 μg/m³ as necessary to protect public health with an adequate margin of safety, with some of these additionally

stating that in assuring this level of protection, EPA must take into account susceptible or vulnerable subgroups. In discussing these subgroups, some commenters noted factors such as nutritional deficiencies as contributing to susceptibility and identified minority and low-income children as a sensitive subpopulation for Pb exposures. Some of these commenters recommended much lower levels, such as 0.02 μg/m³, based on their views as to the level needed to protect public health with an adequate margin of safety in light of their interpretation of the advice of CASAC and EPA Staff and the evidence, including the lack of identifiable threshold. Some of these commenters recommending much lower levels expressed the view that the standard should be as protective as possible.

A second, much smaller, group of comments (including some industry comments and some state agency comments), recommended levels for the standard that are higher than 0.2 μg/m³. Among this group, some commenters provide little or no health-based rationale for their comment. Other commenters, in recommending various levels above 0.2 μg/m³, generally state that there is no benefit to be gained by setting a lower level for the standard. In support of this general conclusion, the commenters variously stated that there is substantial uncertainty associated with the slope of the blood Pb-IQ loss concentration-response function at lower blood Pb levels, such that EPA should not rely on estimates that indicate a steeper slope at lower blood Pb levels; that the risk assessment results for total risk at alternative standard levels indicate no benefit to be achieved from a standard level below 0.5 μg/m³; that levels derived from the evidence-based framework need upward adjustment for use with an averaging time less than a year and that IQ loss estimates derived from the evidence-based framework presented in the proposal for levels from 0.10 to 0.50 μg/m³ do not differ much (*e.g.*, from 2 to 4.1 points IQ loss [steeper slopes] and from 1.1 to 2.2 points IQ loss [shallower slope] for the two sets of C–R functions).

For the range of reasons summarized in section II.C.3.a above, and the reasons described more fully in section II.C.3.c below, EPA does not believe that a level for the standard above 0.2 μg/m³ would protect public health with an adequate margin of safety. Rather, EPA concludes that such a level for the standard would not be protective of public health with an adequate margin of safety. Further, EPA disagrees with the industry comment that levels identified using the evidence-based framework should be

adjusted upward; this and other specific aspects of comments summarized above are discussed further in the Response to Comments document.

(ii) Use of Air-related IQ Loss Evidence-based Framework

As noted above, EPA received advice and recommendations from CASAC and comments from the public with regard to application of the air-related IQ loss evidence-based framework in the selection of a level for the primary standard. In the discussion that follows, we first describe CASAC advice and public comments on the appropriate degree of public health protection that should be afforded to at-risk populations in terms of IQ loss in children as estimated by this framework, We then describe CASAC advice and public comments on the specific parameters of C–R function and air-to-blood ratio.

In their July 2008 advice to the Agency on the proposal notice, CASAC characterized the target degree of protection proposed for use with the air-related IQ loss framework to be inadequate (Henderson, 2008a). As basis for this characterization, they repeat the advice they conveyed with their March 2007 letter, that they considered that *"a population loss of 1–2 IQ points is highly significant from a public health perspective"* and that *"the primary lead standard should be set so as to protect 99.5% of the population from exceeding that IQ loss"* (emphasis in original). They further emphasized their view that an IQ loss of 1–2 points should be "prevented in all but a small percentile of the population—and certainly not accepted as a reasonable change in *mean* IQ scores across the entire population" (emphasis in original).

Recommendations from several commenters, including the American Academy of Pediatrics, and state health agencies that commented on this issue, are in general agreement with the view emphasized by CASAC that air-related IQ loss of a specific magnitude, such as on the order of 1 or 2 points, should be prevented in a very high percentage (e.g., 99.5%) of the population.

EPA generally agrees with CASAC and the commenters that emphasize that the NAAQS should prevent air-related IQ loss of a significant magnitude in all but a small percentile of the population. However, it is important to note that in selecting a target degree of public health protection from air-related IQ loss in children for the purposes of this review, EPA is addressing this issue more specifically in the context of this evidence-based framework. In so doing, EPA is not determining a specific

quantitative public health policy goal in terms of an air-related IQ loss that is acceptable or unacceptable in the U.S. population *per se*, but instead is determining what magnitude of estimated air-related IQ loss should be used in conjunction with the specific air-related IQ loss evidence-based framework being applied in this review, recognizing the uncertainties and limitations in this framework. As discussed later, the estimated air-related IQ loss resulting from the application of this evidence-based framework should not be viewed as a bright line estimate of expected IQ loss in the population that would or would not occur. Nonetheless, these results provide a useful guide for the Administrator to use in making the basically qualitative public health policy judgment about the risk to public health that could reasonably be expected to result from exposure to the ambient air quality patterns that would be allowed by varying levels of the standard, in light of the averaging time, form, and indicator specified above.

In that context, it is important to recognize that the air-related IQ loss framework provides estimates for the mean of a subset of the population. It is an estimate for a subset of children that are assumed to be exposed to the level of the standard. The framework in effect focuses on the sensitive subpopulation that is the group of children living near sources and more likely to be exposed at the level of the standard. The evidence-based framework estimates a mean air-related IQ loss for this subpopulation of children; it does not estimate a mean for all U.S. children.

EPA is unable to quantify the percentile of the U.S. population of children that corresponds to the mean of this sensitive subpopulation. Nor is EPA confident in its ability to develop quantified estimates of air-related IQ loss for higher percentiles than the mean of this subpopulation. EPA expects that the mean of this subpopulation represents a high, but not quantifiable, percentile of the U.S. population of children. As a result, EPA expects that a standard based on consideration of this framework would provide the same or greater protection from estimated air-related IQ loss for a high, albeit unquantifiable, percentage of the entire population of U.S. children.

One industry association commenter noted agreement with EPA's focus on population mean (or median) for the framework, and the statement of greater confidence in estimates for air-related (as contrasted with total Pb-related) IQ loss at a central point in the distribution

than at an upper percentile. This commenter also stated the view that there is likely little difference in air-related IQ loss between the mean and the upper percentiles of the exposed population, based on their interpretation of EPA risk estimates for the location-specific urban case studies. While EPA disagrees with the commenter's view and interpretation of the risk estimates from these case studies (as seen by differences in median and 95th percentile estimates presented in section 5.3.2 of the Risk Assessment Report), EPA agrees that there is a much higher level of confidence in estimates of air-related IQ loss for the mean as compared to that for an upper percentile, consistent with the Agency's recognition of such limitations in the blood Pb estimates from the risk assessment, due to limitations in the available data (as noted in section II.C.h of the proposal).

(iii) Air-to-Blood Ratio

Regarding the air-to-blood ratio, CASAC, in their July 2008 advice to the Agency on the proposal, objected to constraining the range of ratios used with the framework to the range from 1:3 to 1:7 (Henderson, 2008a). In so doing, they noted that the Staff Paper concluded that while ''there is uncertainty and variability in the absolute value of an air-to-blood relationship, the current evidence indicates a notably greater ratio [than the value of 1:2 used in 1978] * * * e.g., on the order of 1:3 to 1:10'' (USEPA, 2007, p. 5–17). With regard to the range of 1:3 to 1:7 emphasized in the proposal, CASAC stated that the lower end of the range (1:3) ''reflects the much higher air and blood levels encountered decades ago'' while ''the upper end of the range (1:7) fails to account for the higher ratios expected at lower current and future air and blood Pb levels, especially when multiple air-related lead exposure pathways are considered.'' With particular recognition of the analysis of declining blood Pb levels documented by NHANES that reflected declines in air Pb levels associated with declining use of leaded gasoline over the same period and from which CASAC notes a ratio on the order of 1:10 (Schwartz and Pitcher, 1989, as cited in Henderson, 2007a), CASAC recommended that EPA consider an air-to-blood ratio ''closer to 1:9 to 1:10 as being most reflective of current conditions'' (Henderson, 2008b).

Similar to the advice from CASAC, many commenters, including EPA's Children's Health Protection Advisory Committee, NESCAUM and Michigan Department of Environmental Quality

recommended that EPA consider ratios higher than the upper end of the range used in the proposal (1:7), such as values on the order of 1:9 or 1:10 or somewhat higher and rejected the lower ratios used in the proposal as being inappropriate for application to today's children. In support of this recommendation, commenters cite ratios resulting from the study noted by CASAC (Schwartz and Pitcher, 1989), as well as others by Hayes *et al.* (1994) and Brunekreef *et al.* (1983), and also air-to-blood ratio estimates from the exposure/risk assessment.

EPA agrees with CASAC and these commenters that an upper end air-to-blood ratio of 1:7 does not give appropriate weight to the air-to-blood ratios derived from or reported by the studies by Schwartz and Pitcher (1989) and Brunekreef *et al.* (1983)[78] and on ratios derived from the risk assessment results, which extend higher than the range identified in the proposal for consideration with the framework. Accordingly, EPA agrees that the range of air-to-blood estimates appropriate for consideration in using the air-related IQ loss evidence-based framework should extend up to ratios greater than the 1:7 ratio presented as an upper end in the proposal, such that the evidence-based framework should also consider values on the order of 1:10.

Alternatively, two industry commenters supported the range presented in the proposal of 1:3 to 1:7.[79] These two and another industry commenter asserted that higher air-to-blood ratios are not supported by the evidence. Specifically, one commenter disagrees with CASAC's interpretation of the Schwartz and Pitcher (1989) study with regard to air-to-blood ratio, stating that the study indicates a potential ratio of 1:7.8, rather than 1:9 or 1:10 as stated by CASAC, and that there is a weak association between air Pb associated with leaded gasoline usage and blood Pb, making the Schwartz and Pitcher study inappropriate to consider. EPA considers both the CASAC approach and the alternate approach presented by the commenter to generally represent conceptually sound strategies for translating the relationship between gasoline usage and blood Pb (provided in the Schwartz and Pitcher, 1989

study) to air-to-blood Pb ratios. In addition, EPA notes that these approaches support both the commenters ratio of approximately 1:8 and the CASAC recommendation for EPA to use an estimate ''closer to 1:9 to 1:10''. Further, EPA disagrees with the commenter's view that the association between gasoline-related air Pb and blood Pb is weak. On the contrary, the body of evidence regarding this relationship is robust (e.g., USEPA, 1986a, sections 11.3.6 and 11.6). As stated in the 1986 Criteria Document, ''there is strong evidence that changes in gasoline lead produce large changes in blood lead'' (USEPA, 1986a, p. 11–187). Further, EPA notes that the analysis by Hayes et al. (1994), cited by the commenter as basis for their view regarding leaded gasoline, recognizes the role of leaded gasoline combustion in affecting blood Pb levels through pathways other than the inhalation pathway (e.g., via dust, soil and food pathways).[80]

Additionally, two commenters stated that the ''higher ratios'' have been generated inappropriately, citing ratios reported by Brunekreef (1984) or those derived from NHANES data (e.g., Schwartz and Pitcher, 1989 or Hayes *et al.*, 1994) as inappropriately including blood Pb not associated with air Pb concentrations in the derivation of the air-to-blood ratio. Last, two of the three industry commenters suggested that some of the air-to-blood ratios derived from the risk assessment are overstated as a result of the methodology employed.

EPA generally disagrees with these commenters' assertions that nonair sources of blood Pb are a source of bias in studies indicating ratios above 1:7 that were identified in the proposal, and emphasized by CASAC and by other commenters, as described above. For example, in section II.B.1.c of the proposal, the proposal noted ratios of 1:8.5 (Brunekreef *et al.*, 1983; Brunekreef, 1984), as well as a ratio of approximately 1:10 (presented by CASAC in consideration of Schwartz and Pitcher, 1989). In reporting these ratios, authors of these studies described how consideration was given or what adjustments were made for other sources of blood Pb, providing strength to their conclusion that the reported air-to-blood ratio reflects air Pb contributions, with little contribution from nonair sources. In addition, the study by Hilts (2003) includes an analysis that provides control for potential confounders, including

---

[78] EPA agrees that the study by Hayes *et al.* (1994), cited by CASAC and commenters, presents an air-to-blood ratio greater 1:10, but notes that we are not relying on this study in our decision as it has not been reviewed as part of the Criteria Document or Staff Paper (as described in Section I.C).

[79] A ratio of 1:5 was recommended by one of these commenters (Doe Run Resources Corp.).

[80] See previous footnote regarding Hayes *et al.* (1994).

alternate sources of Pb exposure, through study design (i.e., by following a similar group of children located within the same study area over a period of time). As discussed in section II.A.2.a above, the study authors report a ratio of 1:6 from this study and additional analysis of the data by EPA for the initial time period of the study resulted in a ratio of 1:7.

With regard to air-to-blood ratios derived from the risk assessment, while EPA recognizes uncertainties in these estimates, particularly those extending substantially above 1:10 (as described in the Risk Assessment Report and section II.C of the proposal), EPA disagrees with commenters' conclusions that they do not provide support for estimates on the order of 1:10.

In summary, while EPA agrees with the industry commenters that a ratio of 1:5 or 1:7.8 is supportable for use in the evidence-based framework, as noted above, EPA interprets the current evidence as providing support for use of a higher range than that described in the proposal that is inclusive at the upper end of estimates on the order of 1:10 and at the lower end on the order of 1:5. Further, EPA agrees with CASAC that the lower end of the range in the proposal, an air-to-blood ratio of 1:3, is not supported by the evidence for application to the current population of U.S. children, in light of the multiple air-related exposure pathways by which children are exposed, in addition to inhalation of ambient air, and of today's much lower air and blood Pb levels. Taking these factors into consideration, we conclude that the air-related IQ loss evidence-based framework should consider air-to-blood ratios of 1:10 at the upper end and 1:5 at the lower end.

*(iv) Concentration—Response Functions*

Regarding the appropriate C–R functions to consider with the evidence-based framework, CASAC, in their July 2008 advice to the Agency on the proposal notice (Henderson, 2008a), objected to EPA's consideration of C–R functions based on analyses of populations *"exhibiting a much higher blood Pb levels than is appropriate for current U.S. populations"* (emphasis in original). They note that the second set of C–R functions, while including some drawn from analyses of U.S. children with mean blood Pb levels below 4 µg/ dL, also includes studies with mean or median blood Pb levels ranging up to 9.7 µg/dL. Further, they emphasize that we are concerned *"with current blood Pb levels in the setting of a health-protective NAAQS, not with blood Pb levels of the past"* (emphasis in original). In conclusion, they state that

''the selection of C–R function should be based on determining which studies indicate slopes that best reflect the current, lower blood Pb levels for children in the U.S.—which, in this instance, are those studies from which *steeper* slopes are drawn'' (emphasis in original) (Henderson, 2008a).

A number of commenters (including EPA's Children's Health Protection Advisory Committee, NESCAUM and some state agencies) made recommendations with regard to C–R functions that were similar to those of CASAC. These commenters recommended consideration of C–R functions with slopes appreciably steeper than the median value representing the second set of functions in the proposal, giving greater weight to steeper slopes drawn from analyses involving children with lower blood Pb levels, closer to those of children in the U.S. today. Some of these commenters (e.g., NESCAUM) additionally suggested alternate approaches to identify a slope estimate relevant to today's blood Pb levels, considering lower blood Pb level studies across both sets of functions presented in the proposal, and to avoid placing inappropriate weight on a single highest value.

Based on the evidence described in detail in the Criteria Document and briefly summarized in section II.A.2.c above, EPA agrees with CASAC and these commenters that, given the nonlinearity of the blood Pb-IQ loss relationship (steeper slope at lower blood Pb levels), the C–R functions appropriate to use with the air-related IQ loss framework are those drawn from analyses of children with blood Pb levels closest to those of children in the U.S. today. As a result of this nonlinear relationship, a given increase in blood lead levels (e.g., 1 µg/dl of Pb) is expected to cause a greater incremental increase in adverse neurocognitive effects for a population of children with lower blood Pb levels than would be expected to occur in a population of children with higher blood Pb levels. Thus, estimates of C–R functions drawn from analyses of children with blood Pb levels that are more comparable to blood Pb levels in today's U.S. children are likely to better represent the relationship between health effects and blood Pb levels that would apply for children in the U.S. now and in the future, as compared to estimates derived from analyses of children with higher blood lead levels. As discussed in section II.A.2.a.ii above, blood Pb levels in U.S. children have declined dramatically over the past thirty years. The geometric mean blood Pb level for U.S. children aged five years and below,

reported for NHANES in 2003–04 (the most recent years for which such an estimate is available), is 1.8 µg/dL and the 5th and 95th percentiles are 0.7 µg/ dL and 5.1 µg/dL, respectively (Axelrad, 2008a, 2008b). The mean blood Pb levels in all of the analyses from which C–R functions were drawn and described in the proposal (presented in Table 1 of section II.A.2.c above) are higher than this U.S. mean and some are substantially higher.

In consideration of the advice from CASAC and comments from the public, we have further considered the analyses presented in Table 1 of section II.A.2.c above from which quantitative relationships between IQ loss and blood Pb levels are described in the proposal (section II.B.2.b) for the purpose of focusing on those analyses that are based on blood Pb levels that best reflect today's population of children in the U.S. Given the evidence of nonlinearity and of steeper slopes at lower blood Pb levels (summarized in section II.A.2.c above), a focus on children with appreciably higher blood Pb levels could not be expected to identify a slope estimate that would be reasonably representative for today's population of children. More specifically, in applying the evidence-based framework, we are focused on a subpopulation of U.S. children, those living near air sources and more likely to be exposed at the level of the standard. While the air-related Pb in the blood of this subpopulation is expected to be greater than that for the general population given their greater air-related Pb exposure, we do not have information on the mean total blood Pb level (or, more specifically, the nonair component) for this subpopulation. However, even if we were to assume, as an extreme hypothetical example, that the mean for the general population of U.S. children included zero contribution from air-related sources, and added that to our estimate of air-related Pb for this subpopulation, the result would still be below the lowest mean blood Pb level among the set of quantitative C–R analyses.[81] Thus, our goal in considering these quantitative analyses was to identify C–R analyses with mean blood Pb levels closest to those of today's U.S. children, including the at-risk subpopulation.[82]

---

[81] Using the ratio of 1:7 identified above as central within the reasonable range of air-to-blood ratios, the estimate of air-related blood Pb associated with a standard level of 0.15 µg/m³ would be approximately 1 µg/dL. Adding this to the mean total blood Pb level for the U.S. population would yield a mean total blood Pb estimate of 2.8 µg/dL.

[82] As noted above, we also recognize that blood Pb levels are expected to further decline in response

Among the analyses presented in the proposal (Table 1), we note that six study groups from four different studies have blood Pb levels appreciably closer to the mean blood Pb levels in today's young children. Mean blood Pb levels for these study groups range from 2.9 to 4.3 µg/dL, while mean blood Pb levels for the other three study groups considered in the proposal range from 7.4 up to 9.7 µg/dL. Further, among the six slopes from analyses with blood Pb levels closest to today's blood Pb levels, four come from two studies, with these two studies each providing two analyses of differing blood Pb levels. Focusing on the single analysis from each of the four studies that has a mean blood Pb level closest to today's mean for U.S. children yields four slopes ranging from −1.56 to −2.94, with a median of −1.75 IQ points per µg/dL (Table 3). Consistent with the evidence for nonlinearity in the C–R relationship, the slopes for the C–

R functions from these four analyses are steeper than the slopes for the other higher blood Pb level analyses. In considering the C–R functions from these four analyses with the air-related IQ loss framework in section II.C.3.c below, we have placed greater weight on the median of the group, giving less weight to the minimum or maximum values, recognizing the uncertainty in determining the C–R relationship.

TABLE 3—SUMMARY OF QUANTITATIVE RELATIONSHIPS OF IQ AND BLOOD Pb FOR ANALYSES WITH BLOOD Pb LEVELS CLOSEST TO THOSE OF CHILDREN IN THE U.S. TODAY

| Blood Pb levels (µg/dL) | | Study/analysis | Average linear slope [A] (IQ points per µg/dL) |
| --- | --- | --- | --- |
| Geometric mean | Range (min–max) | | |
| 2.9 | 0.8–4.9 | Tellez-Rojo et al. 2006, <5 subgroup | −1.71 |
| 3.24 | 0.9–7.4 | Lanphear et al. 2005 [B], <7.5 peak subgroup | −2.94 |
| 3.32 | 0.5–8.4 | Canfield et al. 2003 [B], <10 peak subgroup | −1.79 |
| 3.8 | 1–9.3 | Bellinger and Needleman 2003 [B], <10 peak subgroup | −1.56 |
| Median value | | | −1.75 |

[A] Average linear slope estimates here are for relationship between IQ and concurrent blood Pb levels except for Bellinger & Needleman for which study reports relationship for 10-year-old IQ with 24-month blood Pb levels.

[B] The Lanphear et al. (2005) pooled International study includes blood Pb data from the Rochester and Boston cohorts, although for different ages (6 and 5 years, respectively) than the ages analyzed in Canfield *et al.* (2003) and Bellinger and Needleman (2003).

Some commenters representing a business or industry association recommended that EPA rely on the median estimate from the second set of C–R functions presented in the proposal. As their basis for this view, these commenters made several points. For example, they stated that the extent and magnitude of nonlinearity in the IQ-blood Pb C–R relationship is "highly uncertain," and as part of their rationale for this statement they cited studies by Jusko *et al.* (2007) and Surkan *et al.* (2007) as not providing support for a nonlinear C–R function. Other statements made by these commenters in support of their view are that the maximum slope in the first set is an "outlier," that the second set reflects a greater number of studies and subjects than the first set, and that simply being closer to the blood Pb levels of today's children does not provide a better estimate than the median of the second set, with some noting that the second set is inclusive of some analyses with blood Pb levels similar to those in first set.

EPA disagrees with these commenters' view that a focus on analyses of children with blood Pb levels closer to today's children is not an important criterion for selecting a C–R function for use with the IQ loss framework. On the contrary, as stated

above, EPA agrees with CASAC that this is an essential criterion for this analysis. While EPA recognizes uncertainty in the quantitative characterization of the nonlinearity in the blood Pb-IQ loss relationship, the weight of the current evidence (described in detail in the Criteria Document) supports our conclusion that the blood Pb-IQ loss relationship is nonlinear, with steeper slopes at lower blood Pb levels. While EPA agrees there are a greater number of studies and subjects in the second set, the nonlinearity of the relationship at issue means that a focus on C–R functions from the studies in that set involving children with appreciably higher blood Pb levels could not be expected to identify a slope estimate that would be reasonably representative for today's population of children. In reviewing the available studies with this important criterion in mind, as described above, we have identified four different studies from which C–R functions can be drawn, and in considering these functions in the context of the air-related IQ loss framework, have focused on the median estimate for the group, consequently avoiding focus on a single estimate that may be unduly influenced by one single analysis.

With regard to the "new" studies cited by commenters above, EPA notes that we are not relying on them in this review for the reasons stated above in section I.C. After provisional consideration of these studies cited by commenters (discussed further in the Response to Comments document), EPA has determined that the more recent cited studies provide only limited information with regard to the shape of the C–R curve and, in light of other recent provisionally considered studies and those studies reviewed in the Criteria Document, do not materially change EPA's conclusion regarding nonlinearity that is well founded in the evidence described in the Criteria Document.

(v) Role of Risk Assessment

Some commenters recommended that the Administrator place greater weight on the risk estimates derived in the quantitative risk assessment, with some (e.g., the Association of Battery Recyclers) concluding that these estimates supported a level for the standard above the proposed range and some (e.g., NRDC and Missouri Coalition for the Environment) concluding that they supported a level at the lower end or below the proposed range. For the reasons identified in the

to this and other public health protection actions, including those described above in section I.D.

proposal and noted in section II.C.3.c below, the Administrator has placed primary weight on the air-related IQ loss evidence-based framework in his decision with regard to level, and less weight on risk estimates from the quantitative risk assessment. At the same time, as stated in section II.C.3.c below, he finds those estimates to be roughly consistent with and generally supportive of the estimates from the evidence-based framework.

c. Conclusions on Level

Having carefully considered the public comments on the appropriate level of the Pb standard, as discussed above, the Administrator believes the fundamental scientific conclusions on the effects of Pb reached in the Criteria Document and Staff Paper, briefly summarized above in sections II.A.1 and II.A.2 and discussed more fully in sections II.A and II.B of the proposal, remain valid. In considering the level at which the primary Pb standard should be set, as in reaching a final decision on the need for revision of the current standard, the Administrator considers the entire body of evidence and information, in an integrated fashion, giving appropriate weight to each part of that body of evidence and information. In that context the Administrator continues to place primary consideration on the body of scientific evidence available in this review on the health effects associated with Pb exposure. In so doing, the Administrator primarily focuses on the air-related IQ loss evidence-based framework summarized in section II.C.3.a above and described in the proposal, recognizing that it provides useful guidance for making the public health policy judgment on the degree of protection from risk to public health that is sufficient but not more than necessary.

As described in section II.E.3.d of the proposal and recognized in section II.C.3.a above, the air-related IQ loss framework is used to inform the selection of a standard level that would protect against air-related IQ loss (and related effects) of a magnitude judged by the Administrator to be of concern in subpopulations of children exposed to the level of the standard, taking into consideration uncertainties inherent in such estimates. This framework calls for identifying a target degree of protection in terms of an air-related IQ loss for such subpopulations of children (discussed further below), as well as two other parameters also relevant to this framework—a C–R function for population IQ response associated with blood Pb level and an air-to-blood ratio.

With regard to estimates for air-to-blood ratio, the Administrator has further considered the evidence regarding air-to-blood relationships described in section II.A.2.a.iii above in light of advice from CASAC and comments from the public as described in section II.C.2.b above. Accordingly, he recognizes that the evidence includes support for ratios greater than 1:7 (the upper end of the range focused on in the proposal), including estimates ranging from 1:8 to 1:10. He also recognizes that the estimates developed from the quantitative exposure and risk assessments also include values greater than 1:7, including values ranging up to 1:10 and some higher. Additionally, as noted in section II.A.2.a.iii above, the evidence as a whole also indicates that variation in the value of the ratios appears to relate to the extent to which the range of air-related pathways are included and the magnitude of the air and blood Pb levels assessed, such that higher ratios appear to be associated with more complete assessments of air-related pathways and lower air and blood Pb levels. Taking all of these considerations into account, the Administrator concludes that the reasonable range of air-to-blood estimates to use in the air-related IQ loss framework includes ratios of 1:5 up to ratios on the order of 1:10. He does not consider lower ratios to be representative of the full range of air-related pathways and the ratios expected at today's air and blood Pb levels. The Administrator also concludes that it is appropriate to focus on 1:7 as a generally central value within this range.

With regard to C–R functions, the Administrator has further considered the evidence regarding quantitative relationships between IQ loss and blood Pb levels described in section II.A.2.c above, in light of advice from CASAC and comments from the public as described in section II.C.3.b above. He recognizes the evidence of nonlinearity and of steeper slopes at lower blood Pb levels (summarized in section II.A.2.c above), and as a result, he believes it is appropriate to focus on those analyses that are based on blood Pb levels that most closely reflect today's population of children in the U.S., recognizing that the evidence does not include analyses involving mean blood Pb levels as low as the mean blood Pb level for today's children. He notes that, as described in section II.C.3.b above, a review of the evidence with this focus in mind has identified four analyses that have a mean blood Pb level closest to today's mean for U.S. children and that yield

four slopes ranging from −1.56 to −2.94, with a median of −1.75 IQ points per µg/dL (Table 3). The Administrator concludes that it is appropriate to consider this set of C–R functions for use in the air-related IQ loss evidence based framework, as this set of C–R functions best represents the evidence pertinent to children in the U.S. today. In addition, the Administrator determines that it is appropriate to give more weight to the central estimate for this set of functions, which is the median of the set of functions, and not to rely on any one function.

As noted in the proposal, in considering this evidence-based framework, the Administrator recognizes that there are currently no commonly accepted guidelines or criteria within the public health community that would provide a clear basis for reaching a judgment as to the appropriate degree of public health protection that should be afforded to protect against risk of neurocognitive effects in sensitive populations, such as IQ loss in children. With regard to making a public health policy judgment as to the appropriate protection against risk of air-related IQ loss and related effects, the Administrator believes that ideally air-related (as well as other) exposures to environmental Pb would be reduced to the point that no IQ impact in children would occur. The Administrator recognizes, however, that in the case of setting a NAAQS, he is required to make a judgment as to what degree of protection is requisite to protect public health with an adequate margin of safety.

The Administrator generally agrees with CASAC and the commenters who emphasize that the NAAQS should prevent air-related IQ loss of a significant magnitude in all but a small percentile of the population. However, as discussed above in section II.C.3.b, it is important to note that in selecting a target degree of public health protection that should be afforded to at-risk populations of children in terms of air-related IQ loss as estimated by the evidence-based framework being applied in this review, the Administrator is not determining a specific quantitative public health policy goal for air-related IQ loss that would be acceptable or unacceptable for the entire population of children in the United States. Instead, he is determining what magnitude of estimated air-related IQ loss should be used in conjunction with this specific framework, in light of the uncertainties in the framework and the limitations in using the framework.

In that context, the air-related IQ loss framework provides estimates for the mean air-related IQ loss of a subset of the population of U.S. children, and there are uncertainties associated with those estimates. It provides estimates for that subset of children likely to be exposed to the level of the standard, which is generally expected to be the subpopulation of children living near sources who are likely to be most highly exposed. In providing estimates of the mean air-related IQ loss for this subpopulation of children, the framework does not provide estimates of the mean air-related IQ loss for all U.S. children. The Administrator recognizes, as discussed above, that EPA is unable to quantify the percentile of the U.S. population of children that corresponds to the mean of this sensitive subpopulation, nor can EPA confidently develop quantified estimates for upper percentiles for this subpopulation. EPA expects that the mean of this subpopulation represents a high, but not quantifiable, percentile of the U.S. population of children. As a result, the Administrator expects that a standard based on consideration of this framework would provide the same or greater protection from estimated air-related IQ loss for a high, albeit unquantifiable, percentage of the entire population of U.S. children.[83]

In addition, EPA expects that the selection of a maximum, not to be exceeded, form in conjunction with a rolling 3-month averaging time over a three-year span, discussed in section II.C.2. above, will have the effect that the at-risk subpopulation of children will be exposed below the level of the standard most of the time. In light of this and the significant uncertainty in the relationship between time period of ambient level, exposure, and occurrence of a health effect, the choice of an air-related IQ loss to focus on in applying the framework should not be seen as a decision that a specific level of air-related IQ loss will occur in fact in areas where the revised standard is just met

or that such a loss has been determined as acceptable if it were to occur. Instead, the choice of such an air-related IQ loss is one of the judgments that need to be made in using the evidence-based framework to provide useful guidance in making the public health policy judgment on the degree of protection from risk to public health that is sufficient but not more than necessary, taking into consideration the patterns of air quality that would likely occur upon just meeting the standard as revised in this rulemaking.

In considering the appropriate air-related IQ loss to accompany application of the framework, the Administrator has considered the advice of CASAC and public comments on this issue, discussed above in section II.C.3.b. The Administrator recognizes that comments on the proposal have highlighted the ambiguity in using an air-related IQ loss for the framework that is phrased in terms of a range. For example, if a range of 1–2 points IQ loss is selected, it is unclear whether the intent is to limit points of air-related IQ loss to below 1, below 2, or below some level in between. For clarity, it is more useful to use a specific level as compared to a range. In addition, recognizing the uncertainties inherent in evaluating the health impact of an IQ loss across a population, as well as the uncertainties in the inputs to the framework, the Administrator believes it is appropriate to use a whole number for the air-related IQ loss level.

In consideration of comments from CASAC and the public and in recognition of the uncertainties in the health effects evidence and related information, as well as the role of a selected air-related IQ loss in the application of the framework, the Administrator concludes that an air-related IQ loss of 2 points should be used in conjunction with the evidence-based framework in selecting an appropriate level for the standard. Given the uncertainties in the inputs to the framework, the uncertainties in the

relationship between ambient levels, exposure period, and occurrence of health effects, and the focus of the framework on the sensitive subpopulation of more highly exposed children, a standard level selected using this air-related IQ loss, in combination with the selected averaging time and form, would significantly reduce and limit for a high percentage of U.S. children the risk of experiencing an air-related IQ loss of that magnitude.

With this specific air-related IQ loss in mind, the Administrator considered the application of this framework to a broad range of standard levels, using estimates for the two key parameters—air-to-blood ratio and C–R function—that are appropriate for use within the framework, as shown in Table 4 below. In so doing, the Administrator recognized that, relying on the median of the four C–R functions from analyses with blood Pb levels closest to those of today's children, a standard level in the lower half of the proposed range (0.10–0.20 µg/m³) would limit the estimated mean IQ loss from air-related Pb to below 2 points, depending on the choice of air-to-blood ratio within the range from 1:5 to 1:10.

As noted above, however, the Administrator does not believe it is appropriate to consider only a single air-to-blood ratio. Using the air-to-blood ratio of 1:7, a generally central estimate within the well supported range of estimates, the estimates of air-related IQ loss are below a 2-point IQ loss for standard levels of 0.15 µg/m³ and lower. At a level of 0.15 µg/m³, the Administrator recognizes that use of a 1:10 ratio produces an estimate greater than 2 IQ points and use of a 1:5 ratio produces a lower IQ loss estimate. Given the uncertainties and limitations in the air-related IQ loss framework, the Administrator views it as appropriate to place primary weight on the results from this central estimate rather than estimates derived using air-to-blood-ratios either higher or lower than this ratio.

TABLE 4—ESTIMATES OF AIR-RELATED MEAN IQ LOSS FOR THE SUBPOPULATION OF CHILDREN EXPOSED AT THE LEVEL OF THE STANDARD

| Potential level for standard (µg/m³) | Air-related mean IQ loss (points) for the subpopulation of children exposed at level of the standard | | |
| | IQ loss estimate is based on median slope of 4 C–R functions with blood Pb levels closer to those of to-day's U.S. children (range shown for estimates based on lowest and highest of 4 slopes) | | |
| | Air-to-blood ratio | | |
| | 1:10 | 1:7 | 1:5 |
| 0.50 | >5 * | >5 * | 4.4 (3.9–7.4) |

[83] Further, in determining what level of estimated IQ loss should be used for evaluating the results obtained from this specific evidence-based framework, the Administrator is not determining that such an IQ loss is appropriate for use in other contexts.

TABLE 4—ESTIMATES OF AIR-RELATED MEAN IQ LOSS FOR THE SUBPOPULATION OF CHILDREN EXPOSED AT THE LEVEL OF THE STANDARD—Continued

| Potential level for standard ($\mu$g/m³) | Air-related mean IQ loss (points) for the subpopulation of children exposed at level of the standard | | |
|---|---|---|---|
| | IQ loss estimate is based on median slope of 4 C–R functions with blood Pb levels closer to those of to-day's U.S. children (range shown for estimates based on lowest and highest of 4 slopes) | | |
| | Air-to-blood ratio | | |
| | 1:10 | 1:7 | 1:5 |
| 0.40 | | 4.9 (4.4–8.2) | 3.5 (3.1–5.9) |
| 0.30 | 5.3 (4.7–8.8) | 3.7 (3.3–6.2) | 2.6 (2.3–4.4) |
| 0.25 | 4.4 (3.9–7.4) | 3.1 (2.7–5.1) | 2.2 (2.0–3.7) |
| 0.20 | 3.5 (3.1–5.9) | 2.5 (2.2–4.1) | 1.8 (1.6–2.9) |
| 0.15 | 2.6 (2.3–4.4) | 1.8 (1.6–3.1) | 1.3 (1.2–2.2) |
| 0.10 | 1.8 (1.6–2.9) | 1.2 (1.1–2.1) | 0.9 (0.8–1.5) |
| 0.05 | 0.9 (0.8–1.5) | 0.6 (0.5–1.0) | 0.4 (0.4–0.7) |
| 0.02 | 0.4 (0.3–0.6) | 0.2 (0.2–0.4) | 0.2 (0.2–0.3) |

*For these combinations of standard levels and air-to-blood ratios, the appropriateness of the C–R function applied in this table becomes increasingly uncertain such that no greater precision than ">5" for the IQ loss estimate is warranted.

The Administrator has also considered the results of the exposure and risk assessments conducted for this review to provide some further perspective on the potential magnitude of risk of air-related IQ loss. The Administrator finds that these quantitative assessments provide a useful perspective on the risk from air-related Pb. However, in light of the important uncertainties and limitations associated with these assessments, as summarized in section II.A.3 above and discussed in sections II.C and II.E.3.b of the proposal, for purposes of evaluating potential standard levels, the Administrator places less weight on the risk estimates than on the evidence-based assessment. Nonetheless, the Administrator finds that the risk estimates are roughly consistent with and generally supportive of the evidence-based air-related IQ loss estimates summarized above.[84]

In the Administrator's view, the above considerations, taken together, provide no evidence-or risk-based bright line that indicates a single appropriate level. Instead, there is a collection of scientific evidence and other information, including information about the uncertainties inherent in many relevant factors, which needs to be considered together in making the public health policy judgment to select the appropriate standard level from a range of reasonable values. In addition, the results of the evidence-based framework are seen as a useful guide in determining whether the risks to public health from exposure to ambient levels of Pb in the air, in the context of a specified averaging time and form, provide a degree of protection from risk with an adequate margin of safety that is sufficient but not more than necessary.

Based on consideration of the entire body of evidence and information available at this time, as well as the recommendations of CASAC and public comments, the Administrator has decided that a level for the primary Pb standard of 0.15 $\mu$g/m³, in combination with the specified choice of indicator, averaging time, and form, is requisite to protect public health, including the health of sensitive groups, with an adequate margin of safety. The Administrator notes that this level is within the range recommended by CASAC, the Staff Paper, and by the vast majority of commenters. The Administrator concludes that a standard with a level of 0.15 $\mu$g/m³ will reduce the risk of a variety of health effects associated with exposure to Pb, including effects indicated in the epidemiological studies at low blood Pb levels, particularly including neurological effects in children, and the potential for cardiovascular and renal effects in adults.

The Administrator notes that the evidence-based framework indicates that for standard levels above 0.15 $\mu$g/ m³, the estimated mean air-related IQ loss in the subpopulation of children exposed at the level of the standard would range in almost all cases from above 2 points to 5 points or more with the range of air-to-blood ratios considered. He concludes, in light of his consideration of all of the evidence, including the framework discussed above, that the protection from air-related Pb effects at the higher blood Pb levels that would be allowed by standards above 0.15 $\mu$g/m³ would not be sufficient to protect public health with an adequate margin of safety.

In addition, the Administrator notes that for standard levels below 0.15 $\mu$g/ m³, the estimated mean IQ loss from air-related Pb in the subpopulation of children exposed at the level of the standard would generally be somewhat to well below 2 IQ points regardless of which air-to-blood ratio within the range of ratios considered was used. The Administrator concludes in light of all of the evidence, including the evidence-based framework, that the degree of public health protection that standards below 0.15 $\mu$g/m³ would likely afford would be greater than what is necessary to protect public health with an adequate margin of safety.

The Administrator also recognizes that several commenters expressed concern that the proposal did not adequately address the need for the standard to be set with an adequate margin of safety. As noted above, in section I, the requirement that primary standards include an adequate margin of safety was intended to address uncertainties associated with inconclusive scientific and technical information available at the time of standard setting. It was also intended to provide a reasonable degree of protection against hazards that research has not yet identified. Both kinds of uncertainties are components of the risk associated with pollution at levels below those at which human health effects can be said to occur with reasonable scientific certainty. Thus, in

[84] For example, in considering a standard level of 0.2 $\mu$g/m³, we note that the risk assessment provides estimates falling within the range of 1.2 to 3.2 points IQ loss for the general urban case study and <3.7 for the primary Pb smelter subarea. These estimates are inclusive of the range of estimates for the 0.20 standard level presented in Table 4 based on the median C–R slope applied in the air-related IQ loss framework. As noted in section II.A.3 above, these case studies, based on the nature of the population exposures represented by them, relate more closely to the air-related IQ loss evidence-based framework than other case studies assessed.

selecting a primary standard that includes an adequate margin of safety, the Administrator is seeking not only to prevent pollutant levels that have been demonstrated to be harmful but also to prevent lower pollutant levels that may pose an unacceptable risk of harm, even if the risk is not precisely identified as to nature or degree.

Nothing in the Clean Air Act, however, requires the Administrator to identify a primary standard that would be protective against demonstrated harms, and then identify an additional "margin of safety" which results in further lowering of the standard. Rather, the Administrator's past practice has been to take margin of safety considerations into account in making decisions about setting the primary standard, including in determining its level, averaging time, form and indicator, recognizing that protection with an adequate margin of safety needs to be sufficient but not more than necessary.

Consistent with past practice, the Administrator has taken the need to provide for an adequate margin of safety into account as an integral part of his decision-making on the appropriate level, averaging time, form, and indicator of the standard. As discussed above, the consideration of health effects caused by different ambient air concentrations of Pb is extremely complex and necessarily involves judgments about uncertainties with regard to the relationships between air concentrations, exposures, and health effects. In light of these uncertainties, the Administrator has taken into account the need for an adequate margin of safety in making decisions on each of the elements of the standards. Consideration of the need for an adequate margin of safety is reflected in the following elements: selection of TSP as the indicator and the rejection of the use of $PM_{10}$ scaling factors; selection of a maximum, not to be exceeded form, in conjunction with a 3-month averaging time that employs a rolling average, with the requirement that each month in the 3-month period be weighted equally (rather than being averaged by individual span) and that a 3-year span be used for comparison to the standard; and, the use of a range of inputs for the evidence-based framework, that includes a focus on higher air-to-blood ratios than the lowest ratio considered to be supportable, and steeper rather than shallower C-R functions, and the consideration of these inputs in selection of 0.15 μg/m³ as the level of the standard. The Administrator concludes based on his review of all of the evidence (including the evidence-based framework) that when taken as a whole the standard selected today, including the indicator, averaging time, form, and level, will be sufficient but not more than necessary to protect public health, including the health of sensitive subpopulations, with an adequate margin of safety.

Thus, after carefully taking the above comments and considerations into account, and fully considering the scientific and policy views of the CASAC, the Administrator has decided to revise the level of the primary Pb standard to 0.15 μg/m³. In the Administrator's judgment, based on the currently available evidence, a standard set at this level and using the specified indicator, averaging time, and form would be requisite to protect public health with an adequate margin of safety. The Administrator judges that such a standard would protect, with an adequate margin of safety, the health of children and other at-risk populations against an array of adverse health effects, most notably including neurological effects, particularly neurobehavioral and neurocognitive effects, in children. A standard set at this level provides a very significant increase in protection compared to the current standard. The Administrator believes that a standard set at 0.15 μg/m³ would be sufficient to protect public health with an adequate margin of safety, and believes that a lower standard would be more than what is necessary to provide this degree of protection. This judgment by the Administrator appropriately considers the requirement for a standard that is neither more nor less stringent than necessary for this purpose and recognizes that the CAA does not require that primary standards be set at a zero-risk level, but rather at a level that reduces risk sufficiently so as to protect public health with an adequate margin of safety.

### D. Final Decision on the Primary Lead Standard

For the reasons discussed above, and taking into account information and assessments presented in the Criteria Document and Staff Paper, the advice and recommendations of CASAC, and the public comments, the Administrator is revising the various elements of the standard to provide increased protection for children and other at-risk populations against an array of adverse health effects, most notably including neurological effects in children, including neurocognitive and neurobehavioral effects. Specifically, the Administrator has decided to revise the level of the primary standard to a level of 0.15 μg/m³, in conjunction with retaining the current indicator of Pb-TSP. The Administrator has also decided to revise the form and averaging time of the standard to a maximum (not to be exceeded) rolling 3-month average evaluated over a 3-year period.

Corresponding revisions to data handling conventions, including allowance for the use of Pb-$PM_{10}$ data in certain circumstances, and the treatment of exceptional events are specified in revisions to Appendix R, as discussed in section IV below. Corresponding revisions to aspects of the ambient air monitoring and reporting requirements for Pb are discussed in section V below, including sampling and analysis methods (e.g., a new Federal reference method for monitoring Pb in $PM_{10}$, quality assurance requirements), network design, sampling schedule, data reporting, and other miscellaneous requirements.

## III. Secondary Lead Standard

### A. Introduction

The NAAQS provisions of the Act require the Administrator to establish secondary standards that, in the judgment of the Administrator, are requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of the pollutant in the ambient air. In so doing, the Administrator seeks to establish standards that are neither more nor less stringent than necessary for this purpose. The Act does not require that secondary standards be set to eliminate all risk of adverse welfare effects, but rather at a level requisite to protect public welfare from those effects that are judged by the Administrator to be adverse.

This section presents the rationale for the Administrator's final decision to revise the existing secondary NAAQS. In considering the currently available evidence on Pb-related welfare effects, there is much information linking Pb to potentially adverse effects on organisms and ecosystems. However, given the evaluation of this information in the Criteria Document and Staff Paper which highlighted the substantial limitations in the evidence, especially the lack of evidence linking various effects to specific levels of ambient Pb, the Administrator concludes that the available evidence supports revising the secondary standard but does not provide a sufficient basis for establishing a secondary standard for Pb that is different from the primary standard.

1. Overview of Welfare Effects Evidence

A secondary NAAQS addresses welfare effects and "effects on welfare" include, but are not limited to, effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being. CAA section 302(h). A qualitative assessment of welfare effects evidence related to ambient Pb is summarized in this section, drawing from the Criteria Document, Chapter 6 of the Staff Paper and from the Proposed Rule. The presentation here summarizes several key aspects of the welfare evidence for Pb. Lead is persistent in the environment and accumulates in soils, aquatic systems (including sediments), and some biological tissues of plants, animals and other organisms, thereby providing long-term, multi-pathway exposures to organisms and ecosystems. Additionally, EPA recognizes that there have been a number of uses of Pb, especially as an ingredient in automobile fuel but also in other products such as paint, lead-acid batteries, and some pesticides, which have significantly contributed to widespread increases in Pb concentrations in the environment, a portion of which remains today (e.g., CD, Chapters 2 and 3).

Ecosystems near smelters, mines and other industrial sources of Pb have demonstrated a wide variety of adverse effects including decreases in species diversity, loss of vegetation, changes to community composition, decreased growth of vegetation, and increased number of invasive species. These sources may have multiple pathways for discharging Pb to ecosystems, and apportioning effects between air-related pathways and other pathways (e.g., discharges to water) in such cases is difficult. Likewise, apportioning these effects between Pb and other stressors is complicated because these point sources also emit a wide variety of other heavy metals and sulfur dioxide which may cause toxic effects. There are no field studies which have investigated effects of Pb additions alone but some studies near large point sources of Pb have found significantly reduced species composition and altered community structures. While these effects are significant, they are spatially limited: The majority of contamination occurs within 20 to 50 km of the emission source (CD, section AX7.1.4.2).

By far, the majority of air-related Pb found in terrestrial ecosystems was deposited in the past during the use of Pb additives in gasoline. Many sites receiving Pb predominantly through such long-range transport of gasoline-derived small particles have accumulated large amounts of Pb in soils (CD, p. AX7–98). There is little evidence that terrestrial sites exposed as a result of this long range transport of Pb have experienced significant effects on ecosystem structure or function (CD, section AX7.1.4.2 and p. AX7–98). Strong complexation of Pb by soil organic matter may explain why few ecological effects have been observed (CD, p. AX7–98). Studies have shown decreasing levels of Pb in vegetation which seems to correlate with decreases in atmospheric deposition of Pb resulting from the removal of Pb additives to gasoline (CD, section AX 7.1.4.2).

Terrestrial ecosystems remain primarily sinks for Pb but amounts retained in various soil layers vary based on forest type, climate, and litter cycling (CD, section 7.1). Once in the soil, the migration and distribution of Pb is controlled by a multitude of factors including pH, precipitation, litter composition, and other factors which govern the rate at which Pb is bound to organic materials in the soil (CD, section 2.3.5).

Like most metals the solubility of Pb is increased at lower pH. However, the reduction of pH may in turn decrease the solubility of dissolved organic material (DOM). Given the close association between Pb mobility and complexation with DOM, a reduced pH does not necessarily lead to increased movement of Pb through terrestrial systems and into surface waters. In areas with moderately acidic soil (i.e., pH of 4.5 to 5.5) and abundant DOM, there is no appreciable increase in the movement of Pb into surface waters compared to those areas with neutral soils (i.e., pH of approximately 7.0). This appears to support the theory that the movement of Pb in soils is limited by the solubilization and transport of DOM. In sandy soils without abundant DOM, moderate acidification appears likely to increase outputs of Pb to surface waters (CD, section AX 7.1.4.1).

Lead exists in the environment in various forms which vary widely in their ability to cause adverse effects on ecosystems and organisms. Current levels of Pb in soil also vary widely depending on the source of Pb but in all ecosystems Pb concentrations exceed natural background levels. The deposition of gasoline-derived Pb into forest soils has produced a legacy of slow moving Pb that remains bound to organic materials despite the removal of Pb from most fuels and the resulting dramatic reductions in overall deposition rates. For areas influenced by point sources of air Pb, concentrations of Pb in soil may exceed by many orders of magnitude the concentrations which are considered harmful to laboratory organisms. Adverse effects associated with Pb include neurological, physiological and behavioral effects which may influence ecosystem structure and functioning. Ecological soil screening levels (Eco-SSLs) have been developed for Superfund site characterizations to indicate concentrations of Pb in soils below which no adverse effects are expected to plants, soil invertebrates, birds and mammals. Values like these may be used to identify areas in which there is the potential for adverse effects to any or all of these receptors based on current concentrations of Pb in soils.

Atmospheric Pb enters aquatic ecosystems primarily through the erosion and runoff of soils containing Pb and deposition (wet and dry). While overall deposition rates of atmospheric Pb have decreased dramatically since the removal of Pb additives from gasoline, Pb continues to accumulate and may be re-exposed in sediments and water bodies throughout the United States (CD, section 2.3.6).

Several physical and chemical factors govern the fate and bioavailability of Pb in aquatic systems. A significant portion of Pb remains bound to suspended particulate matter in the water column and eventually settles into the substrate. Species, pH, salinity, temperature, turbulence and other factors govern the bioavailability of Pb in surface waters (CD, section 7.2.2).

Lead exists in the aquatic environment in various forms and under various chemical and physical parameters which determine the ability of Pb to cause adverse effects either from dissolved Pb in the water column or Pb in sediment. Current levels of Pb in water and sediment also vary widely depending on the source of Pb. Conditions exist in which adverse effects to organisms and thereby ecosystems may be anticipated given experimental results. It is unlikely that dissolved Pb in surface water constitutes a threat to ecosystems that are not directly influenced by point sources. For Pb in sediment, the evidence is less clear. It is likely that some areas with long term historical deposition of Pb to sediment from a variety of sources as well as areas influenced by point sources have the potential for adverse effects to aquatic communities. The long residence time of Pb in sediment and its ability to be

resuspended by turbulence make Pb likely to be a factor for the foreseeable future. Criteria have been developed to indicate concentrations of Pb in water and sediment below which no adverse effects are expected to aquatic organisms. These values may be used to identify areas in which there is the potential for adverse effects to receptors based on current concentrations of Pb in water and sediment.

## 2. Overview of Screening Level Ecological Risk Assessment

This section presents a brief summary of the screening-level ecological risk assessment conducted by EPA for this review. The assessment is described in detail in *Lead Human Exposure and Health Risk Assessments and Ecological Risk Assessment for Selected Areas, Pilot Phase* (ICF, 2006). Various limitations have precluded performance of a full-scale ecological risk assessment. The discussion here is focused on the screening level assessment performed in the pilot phase (ICF, 2006) and takes into consideration CASAC recommendations with regard to interpretation of this assessment (Henderson, 2007a, b). The following summary focuses on key features of the approach used in the assessment and presents only a brief summary of the results of the assessment.

A screening level risk assessment was performed to estimate the potential for ecological risks associated with exposures to Pb emitted into ambient air. A case study approach was used which included areas surrounding a primary Pb smelter and a secondary Pb smelter, as well as a location near a nonurban roadway. Soil, surface water, and/or sediment concentrations were estimated for each of the three initial case studies from available monitoring data or modeling analysis, and then compared to ecological screening benchmarks to assess the potential for ecological impacts from Pb that was emitted into the air. A national-scale screening assessment was also used to evaluate surface water and sediment monitoring locations across the United States for the potential for ecological impacts associated with atmospheric deposition of Pb. An additional case study was identified to look at gasoline derived Pb effects on an ecologically vulnerable ecosystem but various limitations precluded any analyses.

The ecological screening values used in this assessment to estimate the potential for ecological risk were developed from the Eco-SSLs methodology, EPA's recommended ambient water quality criteria, and sediment screening values developed by

MacDonald and others (2000, 2003). Soil screening values were derived for this assessment using the Eco-SSL methodology with the toxicity reference values for Pb (USEPA, 2005d, 2005e) and consideration of the inputs on diet composition, food intake rates, incidental soil ingestion, and contaminant uptake by prey (details are presented in section 7.1.3.1 and Appendix L, of ICF, 2006). Hardness specific surface water screening values were calculated for each site based on EPA's recommended ambient water quality criteria for Pb (USEPA, 1984). For sediment screening values, the assessment relied on sediment ''threshold effect concentrations'' and ''probable effect concentrations'' developed by MacDonald et al. (2000). The methodology for these sediment criteria is described fully in section 7.1.3.3 and Appendix M of the pilot phase Risk Assessment Report (ICF, 2006).

A Hazard Quotient (HQ) was calculated for various receptors to determine the potential for risk to that receptor. The HQ is calculated as the ratio of the media concentration to the ecotoxicity screening value, and represented by the following equation:

HQ = (estimated Pb media concentration) ÷ (ecotoxicity screening value)

For each case study, HQ values were calculated for each location where either modeled or measured media concentrations were available. Separate soil HQ values were calculated for each ecological receptor group for which an ecotoxicity screening value has been developed (i.e., birds, mammals, soil invertebrates, and plants). HQ values less than 1.0 suggest that Pb concentrations in a specific medium are unlikely to pose significant risks to ecological receptors. HQ values greater than 1.0 indicate that the expected exposure exceeds the ecotoxicity screening value and that there is a potential for adverse effects.

There are several uncertainties that apply across case studies noted below:
• The ecological risk screen is limited to specific case study locations and other locations for which Pb data were available. Efforts were made to ensure that the Pb exposures assessed were attributable to airborne Pb and not dominated by nonair sources. However, there is uncertainty as to whether other sources might have actually contributed to the Pb exposure estimates.
• A limitation to using the selected ecotoxicity screening values is that they might not be sufficient to identify risks to some threatened or endangered species or unusually sensitive aquatic ecosystems (e.g., CD, p. AX7–110).

• The methods and database from which the surface water screening values (i.e., the AWQC for Pb) were derived is somewhat dated. New data and approaches (e.g., use of pH as indicator of bioavailability) may now be available to estimated the aquatic toxicity of Pb (CD, sections X7.2.1.2 and AX7.2.1.3).
• No adjustments were made for sediment-specific characteristics that might affect the bioavailability of Pb in sediments in the derivation of the sediment quality criteria used for this ecological risk screen (CD, sections 7.2.1 and AX7.2.1.4; Appendix M, ICF, 2006). Similarly, characteristics of soils for the case study locations were not evaluated for measures of bioavailability.
• Although the screening value for birds used in this analysis is based on reasonable estimates for diet composition and assimilation efficiency parameters, it was based on a conservative estimate of the relative bioavailability of Pb in soil and natural diets compared with water soluble Pb added to an experimental pellet diet (Appendix L, ICF, 2006).

The following is a brief summary of key observations related to the results of the screening-level ecological risk assessment. A complete discussion of the results is provided in Chapter 6 of the Staff Paper and the complete presentation of the assessment and results is presented in the pilot phase Risk Assessment Report (ICF, 2006).

For the case studies, the concentrations of Pb in soil and sediments in various locations exceeded screening values for these media indicating potential for adverse effects to terrestrial organisms (plants, birds and mammals) and to sediment dwelling organisms. While it was not possible to dissect the contributions of air Pb emissions from other sources, it is likely that, at least for the primary smelter, that the air contribution is significant. For the other case studies, the contributions of current air emissions to the Pb burden, is less clear.

The national-scale screen of surface water data initially identified 15 areas for which water column levels of dissolved Pb were greater than hardness adjusted chronic criteria for the protection of aquatic life indicating a potential for adverse effect if concentrations were persistent over chronic periods. Acute criteria were not exceeded at any of these locations. The extent to which air emissions of Pb have contributed to these surface water Pb concentrations is unclear. In the national-scale screen of sediment data associated with the 15 surface water sites described above, threshold effect

concentration-based HQs at nine of these sites exceeded 1.0. Additionally, HQs based on probable effect concentrations exceeded 1.0 at five of the sites, indicating probable adverse effects to sediment dwelling organisms. Thus, sediment Pb concentrations at some sites are high enough that there is a likelihood that they would cause adverse effects to sediment dwelling organisms. However, the contribution of air emissions to these concentrations is unknown.

*B. Conclusions on the Secondary Lead Standard*

1. Basis for the Proposed Decision

The current standard was set in 1978 to be identical to the primary standard (1.5 μg Pb/m³, as a maximum arithmetic mean averaged over a calendar quarter), the basis for which is summarized in section II.C.1. At the time the standard was set, the Agency concluded that the primary air quality standard would adequately protect against known and anticipated adverse effects on public welfare, as the Agency stated that it did not have evidence that a more restrictive secondary standard was justified. In the rationale for this conclusion, the Agency stated that the available evidence cited in the 1977 Criteria Document indicated that ''animals do not appear to be more susceptible to adverse effects from lead than man, nor do adverse effects in animals occur at lower levels of exposure than comparable effects in humans'' (43 FR 46256). The Agency recognized that Pb may be deposited on the leaves of plants and present a hazard to grazing animals. With regard to plants, the Agency stated that Pb is absorbed but not accumulated to any great extent by plants from soil, and that although some plants may be susceptible to Pb, it is generally in a form that is largely unavailable to them. Further the Agency stated that there was no evidence indicating that ambient levels of Pb result in significant damage to manmade materials and Pb effects on visibility and climate are minimal.

The secondary standard was subsequently considered during the 1980s in development of the 1986 Criteria Document (USEPA, 1986a) and the 1990 Staff Paper (USEPA, 1990b). In summarizing OAQPS staff conclusions and recommendations at that time, the 1990 Staff Paper stated that a qualitative assessment of available field studies and animal toxicological data suggested that ''domestic animals and wildlife are as susceptible to the effects of lead as laboratory animals used to investigate human lead toxicity risks.'' Further, the 1990 Staff Paper highlighted concerns

over potential ecosystem effects of Pb due to its persistence, but concluded that pending development of a stronger database that more accurately quantifies ecological effects of different Pb concentrations, consideration should be given to retaining a secondary standard at or below the level of the then-current secondary standard of 1.5 μg/m³.

Given the full body of current evidence, despite wide variations in Pb concentrations in soils throughout the country, Pb concentrations are in excess of concentrations expected from geologic or other non-anthropogenic forces. There are several difficulties in quantifying the role of recent air emissions of Pb in the environment: Some Pb deposited before the standard was enacted is still present in soils and sediments; historic Pb from gasoline continues to move slowly through systems as does current Pb derived from both air and nonair sources. Additionally, the evidence of adversity in natural systems is limited due in no small part to the difficulty in determining the effects of confounding factors such as multiple metals or factors influencing bioavailability in field studies.

The evidence summarized above, in the Proposed Rule, in section 4.2 of the Staff Paper, and described in detail in the Criteria Document, informs our understanding of Pb in the environment today and evidence of environmental Pb exposures of potential concern. For areas influenced by point sources of air Pb that meet the current standard, concentrations of Pb in soil may exceed by many orders of magnitude the concentrations which are considered harmful to laboratory organisms (CD, sections 3.2 and AX7.1.2.3). In addition, conditions exist in which Pb associated adverse effects to aquatic organisms and thereby ecosystems may be anticipated given experimental results. While the evidence does not indicate that dissolved Pb in surface water constitutes a threat to those ecosystems that are not directly influenced by point sources, the evidence regarding Pb in sediment is less clear (CD, sections AX7.2.2.2.2 and AX7.2.4). It is likely that some areas with long term historical deposition of Pb to sediment from a variety of sources as well as areas influenced by point sources have the potential for adverse effects to aquatic communities. The Staff Paper concluded, based on laboratory studies and current media concentrations in a wide range of areas, that it seems likely that adverse effects are occurring, particularly near point sources, under the current standard. The long residence time of Pb in sediment and its ability to

be resuspended by turbulence make Pb contamination likely to be a factor for the foreseeable future. Based on this information, the Staff Paper concluded that the evidence suggests that the environmental levels of Pb occurring under the current standard, set nearly thirty years ago, may pose risk of adverse environmental effect.

In addition to the evidence-based considerations described in the previous section, the screening level ecological risk assessment is informative, taking into account key limitations and uncertainties associated with the analyses. As discussed in the previous section, as a result of its persistence, Pb emitted in the past remains today in aquatic and terrestrial ecosystems of the United States. Consideration of the environmental risks associated with the current standard is complicated by the environmental burden associated with air Pb concentrations that exceeded the current standard, predominantly in the past. Concentrations of Pb in soil and sediments associated with the case studies exceeded screening values for those media, indicating potential for adverse effect in terrestrial organisms (plants, birds, and mammals) and in sediment dwelling organisms. While the contribution to these Pb concentrations from air as compared to nonair sources has not been quantified, air emissions from the primary smelting facility at least are substantial (Appendix D, USEPA 2007b; ICF 2006).

The national-scale screens, which are not focused on particular point source locations, indicate the ubiquitous nature of Pb in aquatic systems of the United States today. Further, the magnitude of surface water Pb concentrations in several aquatic systems exceeded screening values and sediment Pb concentrations at some sites in the national-scale screen were high enough that the likelihood that they would cause adverse effects to sediment dwelling organisms may be considered ''probable''. A complicating factor in interpreting the findings for the national-scale screening assessments is the lack of clear apportionment of Pb contributions from air as compared to nonair sources, such as industrial and municipal discharges. While the contribution of air emissions to the elevated concentrations has not been quantified, documentation of historical trends in the sediments of many water bodies has illustrated the sizeable contribution that airborne Pb can have on aquatic systems (e.g., Staff Paper, section 2.8.1). This documentation also indicates the greatly reduced contribution in many systems as compared to decades ago (presumably

reflecting the phase-out of Pb-additives from gasoline used by cars and trucks). However, the timeframe for removal of Pb from surface sediments into deeper sediment varies across systems, such that Pb remains available to biological organisms in some systems for much longer than in others (Staff Paper, section 2.8; CD, pp. AX7–141 to AX7–145).

The case study locations included in the screening assessment, with the exception of the primary Pb smelter site, are currently meeting the current Pb standard, yet Pb occurs in soil and aquatic sediment in some locations at concentrations indicative of a potential for harm to some terrestrial and sediment dwelling organisms. While the role of airborne Pb in determining these Pb concentrations is unclear, the historical evidence indicates that airborne Pb can create such concentrations in sediments and soil.

Based on its review of the Staff Paper, CASAC advised the Administrator that ''*The Lead Panel unanimously affirms its earlier judgments that, as with the primary (public-health based) Lead NAAQS, the secondary (public-welfare based) standard for lead also needs to be substantially lowered* * * * Therefore at a minimum, the level of the secondary Lead NAAQS should be at least as low as the level of the recommended primary lead standard.'' (Henderson, 2008a). CASAC also recognized that EPA lacked data to provide a clear quantitative basis for setting a secondary standard that differed from the primary standard. (Henderson 2007a, 2008a).

In considering the adequacy of the current standard in providing protection from Pb-related adverse effects on public welfare, the Administrator considered in the proposal the body of available evidence (briefly summarized above in section III.). The proposal indicated that depending on the interpretation, the available data and evidence, primarily qualitative, suggests that there was the potential for adverse environmental impacts under the current standard. Given the limited data on Pb effects in ecosystems, it is necessary to look at evidence of Pb effects on organisms and extrapolate to ecosystem effects. Therefore, taking into account the available evidence and current media concentrations in a wide range of areas, the Administrator concluded in the proposal that there is potential for adverse effects occurring under the current standard, although there are insufficient data to provide a quantitative basis for setting a secondary standard different than the primary. While the role of current airborne

emissions is difficult to apportion, deposition of Pb from air sources is occurring and this ambient Pb is likely to be persistent in the environment similarly to that of historically deposited Pb which has persisted, although location specific dynamics of Pb in soil result in differences in the timeframe during which Pb is retained in surface soils or sediments where it may be available to ecological receptors (USEPA, 2007b, section 2.3.3).

Based on these considerations, and taking into account the observations, analyses, and recommendations discussed above, the Administrator proposed to revise the current secondary Pb standard by making it identical in all respects to the proposed primary Pb standard (described in section II.D above).

## 2. Comments on the Proposed Secondary Standard

EPA notes that CASAC, in their July 2008 letter, did not provide comments on the discussion and proposal regarding the secondary standard. Commenters who expressed an opinion on the proposed revision to the secondary standard, including a number of national organizations, individual States, Tribal organizations, and local organizations, and combined comments from various environmental groups supported the position that the secondary Pb standard should be revised to the level of the primary standard. Some commenters recommended that the secondary standard be no less stringent than the primary, one commenter recommended that the standard be no more stringent than the primary, and some commenters recommended that the secondary standard be identical to the primary. One commenter concurred with the Agency's finding, consistent with CASAC's prior advice, that the current scientific knowledge was lacking and that further research was necessary to quantitatively inform an appropriate secondary standard. For the reasons discussed above and in the proposal, we agree with commenters that the secondary standard should be at this time set equal to the primary in indicator, level, form and averaging time and that more research is needed to further inform the development of a secondary Pb standard.

## 3. Administrator's Conclusions

In considering the adequacy of the current secondary standard in providing requisite protection for public welfare from adverse effects on public welfare, the Administrator has considered the body of available evidence (briefly

summarized above and in the proposal). The screening-level risk assessment, while limited and accompanied by various uncertainties, suggests occurrences of environmental Pb concentrations existing under the current standard that could have adverse environmental effects in terrestrial organisms (plants, birds and mammals) and in sediment dwelling organisms. Environmental Pb levels today are associated with atmospheric Pb concentrations and deposition that have combined with a large reservoir of historically deposited Pb in environmental media.

In considering this evidence, as well as the views of CASAC, summarized above, the Staff Paper and associated support documents, and views of public commenters on the adequacy of the current standard, the Administrator concurs with CASAC's recommendation that the secondary standard should be substantially revised and concludes that given the current state of evidence, the current secondary standard for Pb is not requisite to protect public welfare from known or anticipated adverse effects.

## C. Final Decision on the Secondary Lead Standard

The secondary standard is defined in terms of four basic elements: Indicator, averaging time, level and form, which serve to define the standard and must be considered collectively in evaluating the welfare protection afforded by the standards. With regard to the pollutant indicator for use in a secondary NAAQS, EPA notes that Pb is a persistent pollutant to which ecological receptors are exposed via multiple pathways. While the evidence indicates that the environmental mobility and ecological toxicity of Pb are affected by various characteristics of its chemical form, and the media in which it occurs, information is insufficient to identify an indicator other than total Pb that would provide protection against adverse environmental effect in all ecosystems nationally. Thus, the same rationale for retaining Pb-TSP for the indicator apply here as for the primary standard.

Lead is a cumulative pollutant with environmental effects that can last many decades. There is a general lack of data that would indicate the appropriate level of Pb in environmental media that may be associated with adverse effects. The EPA notes the influence of airborne Pb on Pb in aquatic systems and of changes in airborne Pb on aquatic systems, as demonstrated by historical patterns in sediment cores from lakes and Pb measurements (section 2.8.1; CD, section AX7.2.2; Yohn *et al.*, 2004; Boyle *et al.*, 2005), as well as the

comments of the CASAC Pb panel that a significant change to current air concentrations (e.g., via a significant change to the standard) is likely to have significant beneficial effects on the magnitude of Pb exposures in the environment and Pb toxicity impacts on natural and managed terrestrial and aquatic ecosystems in various regions of the U.S., the Great Lakes and also U.S. territorial waters of the Atlantic Ocean (Henderson, 2007a, Appendix E). The Administrator concurs with CASAC's conclusion that the level of the secondary standard should be set at least as low as the level of the primary standard and that the Agency lacks the relevant data to provide a clear, quantitative basis for setting a secondary Pb NAAQS that differs from the primary in indicator, averaging time, level, or form. Based on these considerations, and taking into account the observations, analyses, and recommendations discussed above, the Administrator is revising the current secondary Pb standard by making it identical in all respects to the primary Pb standard.

## IV. Appendix R—Interpretation of the NAAQS for Lead

EPA proposed to add Appendix R, Interpretation of the National Ambient Air Quality Standards for Pb, to 40 CFR part 50 in order to provide data handling procedures for the proposed Pb standard. The proposed Appendix R detailed the computations necessary for determining when the proposed Pb NAAQS would be met. The proposed appendix also addressed data reporting; sampling frequency and data completeness considerations; the use of scaled low-volume Pb-PM$_{10}$ data as a surrogate for Pb-TSP data (or vice versa), including associated scaling instructions; and rounding conventions. The purpose of a data interpretation guideline in general is to provide the practical details on how to make a comparison between multi-day, possibly multi-monitor, and (in the unique instance of the proposed Pb NAAQS) possibly multi-parameter (i.e., Pb-TSP and/or low-volume Pb-PM$_{10}$) ambient air concentration data to the level of the NAAQS, so that determinations of compliance and violation are as objective as possible. Data interpretation guidelines also provide criteria for determining whether there are sufficient data to make a NAAQS level comparison at all. When data are insufficient, for example because of failure to collect valid ambient data on enough days in enough months (because of operator error or events beyond the control of the operator), no

determination of current compliance or violation is possible.

In the proposal, proposed rule text was provided only for the example of a Pb NAAQS based on a Pb-TSP indicator, a monthly averaging time, and a second maximum form. The preamble discussed how the rule text would be different to accommodate a Pb-PM$_{10}$ indicator and/or a quarterly averaging time with a not-to-be-exceeded form.

### A. Ambient Data Requirements

#### 1. Proposed Provisions

Section 3 of the proposed Appendix R, Requirements for Data Used for Comparisons with the Pb NAAQS and Data Reporting Considerations, specified that all valid FRM/FEM Pb-TSP data and all valid FRM/FEM Pb-PM$_{10}$ data submitted to EPA's Air Quality System (AQS), or otherwise available to EPA, meeting specified monitoring requirements in 40 CFR part 58 related to quality assurance, monitoring methods, and monitor siting shall be used in design value calculations.[85] Because 40 CFR 58 requirements were revised in 2006 and were proposed for further revision in this rulemaking, and because the FRM/FEM criteria for Pb-PM$_{10}$ are being established for the first time in this rulemaking, EPA wanted to provide clarity about whether data collected before the effective dates of the 2006 revisions and of this final rule could be used for comparisons to the NAAQS. The proposal therefore provided that Pb-TSP and Pb-PM$_{10}$ data representing sample collection periods prior to January 1, 2009 (i.e., "pre-rule" data) would also be considered valid for NAAQS comparisons and related attainment/nonattainment determinations if the sampling and analysis methods that were utilized to collect those data were consistent with the provisions of 40 CFR part 58 that were in effect at the time of original sampling or that are in effect at the time of the attainment/nonattainment determination, and if such data are submitted to AQS prior to September 1, 2009.

This section of the proposed rule also required that in the future Pb data be reported in terms of local temperature and pressure conditions, but provided that Pb data collected prior to January 1, 2009 and reported to AQS in terms of standard temperature and pressure conditions would be compared directly

to the level of the NAAQS without re-adjustment to local conditions, unless the monitoring agency voluntarily re-submitted them with such adjustment.

Finally, this section provided for the taking of make-up samples within seven days after a scheduled sampling day fails to produce valid data. It also specified that all data, including scheduled samples, make-up samples, and any extra samples (i.e., non-scheduled samples that are not eligible to be considered make-up samples because they either were taken too long after the missed sample or another non-scheduled sample is already being used as the make-up sample) would be used in calculating the monthly average concentration.

#### 2. Comments on Ambient Data Requirements

One commenter argued that Pb concentrations should continue, as in the past, to be reported in terms of standard temperature and pressure conditions and that only those values should be compared to the level of the NAAQS. In support of this view, this commenter claimed generally that ambient air Pb concentrations used in deriving relationships between air Pb concentrations and blood Pb levels were in terms of standard temperature and pressure. Another commenter expressed a similar but less specific concern about consistency between the conditions for reporting concentrations and the logic used by the Administrator to set the level of the NAAQS. For reasons described in the Response to Comments document, EPA rejects these arguments.

Another commenter supported the requirement for Pb concentrations to be submitted in terms of local conditions and the option of monitoring agencies to resubmit older data in those terms, but wanted EPA to restrain monitoring agencies which do resubmit data from withdrawing the data submitted earlier in terms of standard conditions. EPA agrees that the previously submitted data should not be withdrawn, but we will instruct states to this effect through guidance rather than by regulation, since nowhere now do the air monitoring or data interpretation regulations address the possibility of data withdrawal.

As proposed, 40 CFR 50.3 is amended to say that Pb-TSP concentrations are to be reported in terms of local conditions of temperature and pressure. The corresponding requirement for Pb-PM$_{10}$ data is contained in the FRM method specification in Appendix Q. Appendix R retains a statement that this is the manner in which both types of data are submitted.

---

[85] As explained below, under the proposal sufficiently complete Pb-TSP data would take precedence over Pb-PM$_{10}$ data, so not all Pb-PM$_{10}$ data would necessarily be actually used in the design value calculations.

3. Conclusions on Ambient Data Requirements

The final provisions of Appendix R regarding what ambient data are to be used for comparisons to the NAAQS are as proposed. Sections IV.C and IV.D of this preamble also address certain related issues involving what ambient data are to be used in making comparisons to the NAAQS.

*B. Averaging Time and Procedure*

1. Proposal on Averaging Time and Procedure

EPA proposed in the alternative two averaging times for the revised NAAQS: A monthly period and a calendar quarter. In both approaches, the averaging time would be based on non-overlapping periods, the 12 individual calendar months in the case of a monthly averaging time and the 4 conventional calendar quarters (January–March, etc.) in the case of calendar quarter. In the case of a monthly averaging time all valid 24-hour Pb concentration data from the month would be arithmetically averaged to calculate the average concentration, and the average would be considered valid depending on the completeness of the data relative to the monitoring schedule, see section IV.C. Similarly, in the case of a quarterly average, all valid 24-hour data would be averaged to calculate the quarterly average concentration.

2. Comments on Averaging Time and Procedure

There were many public comments on the selection of the averaging time, addressed in section II.C.2. For the reasons discussed in that section, the final rule establishes the averaging time as a rolling 3-month period. Also, the final rule contains a 2-step procedure for calculating the 3-month average concentration, in which the average concentration for individual calendar months are calculated from all available valid 24-hour data in each month, and then three adjacent monthly averages are summed and divided by three to form the 3-month average concentration. In this way, each month's average will be weighted the same in calculating the 3-month average even if the months have different numbers of days with valid 24-hour concentration data. As explained in section II.C.2, this reduces the possibility that any one month's concentration could be very high compared to the 3-month average, compared to the proposed 1-step approach to calculating an average over three months.

3. Conclusions on Averaging Time and Procedure

The final rule establishes the averaging time as a rolling 3-month period. The final rule contains a 2-step procedure for calculating the average concentration for a 3-month period. First, the average concentration for individual calendar months are calculated from all available valid 24-hour data in each month giving equal weight to each day with valid monitoring data. Then, the three adjacent monthly averages are summed and divided by three to form the 3-month average concentration.[86]

The final text of Appendix R also includes a provision that gives the Administrator discretion to use an alternate 3-step approach to calculating the 3-month average concentration instead of the 2-step approach described above. The Administrator will have this discretion only in a situation in which the number of extra sampling days during a month within the 3-month period is greater than the number of successfully completed scheduled and make-up sample days in that month. In such a situation, including all the available valid sampling days in the calculation of a monthly average concentration (and thereby into the calculation of a 3-month average concentration) might in result in an unrepresentative value for the monthly average concentration. This provision is to protect the integrity of the monthly and 3-month average concentration values in situations in which, by intention or otherwise, extra sampling days are concentrated in a period or periods during which ambient concentrations are particularly high or low. As explained in section IV.C, the final version of Appendix R does not apply a completeness requirement to individual months, but instead applies the completeness criteria to each 3-month averaging period as a whole. As a result, it is conceivable that a month

used to form a valid 3-month average may itself have as few as two scheduled sampling days with valid data if the other two months have valid data for all five scheduled sampling days. In such a case, even a small number of extra samples could dominate the monthly average, which would then in turn contribute to the 3-month average with a weighting of one-third. The extra sampling days, however, may systematically tend to have been higher or lower Pb concentration days.[87] For example, a monitoring agency might have deliberately increased sampling frequency during episodes of high Pb concentration in order to better understand the scope and causes of high concentrations. It is also possible for a monitoring agency to pick days for extra sampling in ways that make those days tend to have lower Pb concentrations, for example by paying attention to wind direction or source operations. If extra sampling days are systematically related to concentration, the average of all data during a month might not fairly represent the average of the daily concentrations actually occurring across all the days in the month. The potential for the monthly average to become seriously distorted increases as the number of extra sampling days increases. Therefore, the final rule does not trigger the discretion to use the alternate 3-step approach described below unless the number of extra sampling days is greater than the number of scheduled and make-up days that have valid data.

In the case of a Pb sampling schedule in which an ambient sample is scheduled to be taken every sixth day, the first step in the 3-step approach is to average all scheduled, make-up, and extra samples taken on a given scheduled sample day and on any of the five days following that sampling day. Typically, there will be up to five such 6-day averages in a month; there can be fewer 6-day averages if one or more of the 6-day periods yielded no valid data. The second step is to average these 6-day averages together to calculate the monthly average. This approach has the effect of giving equal weight to each 6-day period during a month regardless of how many samples were actually obtained during the 6 days, which mitigates the potential for the monthly average to be distorted. The third step in calculating the 3-month average would be to average the three monthly averages giving equal weight to each

---

[86] In the final Appendix R, there is a provision to calculate a "3-month" average based on only one (or two) months of data if two (or one) of the months in the 3-month period have no valid reported data at all. In this case, the sum of the available monthly averages is divided by the number of months contributing data. Because a lack of data for an entire month (or two) would mean that the completeness over a 3-month period cannot be higher than 67 percent (or 33 percent), which is less than the normal requirement for 75 percent completeness, a situation like this could result in a valid 3-month average concentration only via application of the "above NAAQS" diagnostic data substitution test described in section IV.C. With that test, if substituting historically low data for the month (or two months) of missing data still results in a 3-month average above the level of the NAAQS, then the 3-month mean computed from only two (or one) months of data is deemed valid and complete.

[87] The scheduled sampling days, in contrast, are expected to be uncorrelated with Pb concentration, since they do not emphasize any particular day of the week.

month, as described above in the standard 2-step approach to calculating the 3-month mean.

The above discussion has been simplified for easier understanding, by not addressing all the possible situations that can arise and that are addressed explicitly or implicitly by the final rule text. The following provides additional details.

(1) The example presumes a one-in-six sampling schedule, which is the minimum required in the final rule. If the site is operating on a one-in-three schedule, the first step in the alternate approach is to average the daily concentrations over periods of three days, then those three-day averages (up to 10, typically) are averaged to get the monthly average.

(2) The first day of scheduled one-in-six sampling typically will not fall on the first day of the calendar month, and there may be make-up or extra samples on the 1 to 5 days (1 or 2 days in the case of one-in-three sampling) of the same calendar month that precede the first scheduled sampling day of the month. These samples will stay associated with their actual calendar month as follows. Any extra and make-up samples taken within the month but before the first scheduled sampling day of the month will be associated with and averaged with the last scheduled sampling day of the month and any days in the month following the last scheduled sampling day. In a 30-day month, this approach will always associate the last scheduled day of the month with five unscheduled days within the same month just as for the other scheduled sampling days, even when it is less than five days from the start of the next month, preserving the concept of giving equal weight to equal calendar time.

(3) In February, with 28 or 29 days, under the final rule's alternate approach one of the scheduled sampling days will end up associated with fewer than five unscheduled days, but those days will nevertheless carry equal weight with the four 6-day periods. EPA recognizes this slight departure from the concept of giving equal weight to equal calendar time.

(4) In months with 31 days, there will also be a departure from the concept of equal weight to equal calendar time. Most often, one of the "6-day" periods will actually have 7 days included in it. Rarely, the last day of a 31-day month will be a scheduled sampling day, and the effect will be to give the Pb measurement from this day equal weight in the monthly average as the five 6-day averages. In such a case, the Administrator may choose not to exercise the discretion to use the alternate 3-step approach, for example if the measurement on the last day of a 31-day month is unusually high or low.

*C. Data Completeness*

1. Proposed Provisions

EPA proposed that if a monthly averaging time were selected, the basic completeness requirement for a monthly average concentration to be valid would be that at least 75 percent of the scheduled sampling days have produced valid reported data. EPA also proposed that if the maximum quarterly average concentration were selected, each month in the quarter would be required to meet this completeness test. Two "diagnostic" tests involving data substitution were proposed, which in some cases would allow a reasonably confident conclusion about the existence of an exceedance or lack thereof to be made despite data completeness of less than 75 percent.

EPA also asked for comment, but did not propose any specifics for, two other tests that could allow conclusions about exceedances to be made in additional situations when data completeness was substandard. One of these would compare the average monthly concentration to an unspecified fraction of the level of the NAAQS, in effect applying a safety margin to offset the risk of error caused by the small sample size of measured concentrations. The other test would create a statistically derived confidence interval for the average monthly concentration based on the daily data and then would test whether that interval was entirely above (indicating an exceedance) or entirely below (indicating the lack of an exceedance) the level of the NAAQS. These same tests would be used under the alternative proposal of a quarterly averaging time. However, in the proposal, EPA described these completeness tests only in the context of a monthly average concentration (i.e., for the proposed second maximum monthly average form).

2. Comments on Data Completeness

No comments were received directly on the details of the proposal regarding data completeness. One commenter expressed concern that the two diagnostic tests for use when data are less than 75 percent complete could leave an indeterminate outcome even when the weight of evidence indicates an exceedance or a lack of an exceedance. EPA believes that a proposed provision of Appendix R, which is included in the final rule, allowing for case-by-case use of incomplete data with the approval of the Administrator allows EPA to appropriately address such a situation.

3. Conclusions on Data Completeness

The final rule differs from the monthly averaging time version of the proposal in the following aspects. These changes have been made to align Appendix R with the selected maximum rolling 3-month averaging time and form of the NAAQS and the final requirement for one-in-six day sampling (discussed in section V of this preamble). Because one-in-six sampling means that typically only five samples will be scheduled each month, only a single sample could be missed (and not made up) without completeness falling below the 75 percent level. Therefore, requiring 75 percent completeness at the monthly level could easily result in one month in a 3-year period being judged incomplete, making it impossible to make a finding of attainment of the NAAQS even when the available data in that and other months strongly suggest attainment.[88] To avoid this, the final rule applies the 75 percent completeness requirement at the 3-month level by averaging the three monthly completeness values to get the 3-month completeness value. Specifically, under the final rule 3-month completeness would be calculated and tested for every 3-month period. This reduces the likelihood of an incompleteness situation for an entire 3-year evaluation period due to as few as two missed samples in a single month.

In the proposed rule, the two diagnostic tests based on data substitution were applied within an individual month that has incomplete data relative to the 75 percent requirement. In the final rule, the tests remain and data are still substituted within the individual month (i.e., if a day of concentration data is missing from January in one of the three years, the missing concentration is substituted with the highest or lowest (depending on which diagnostic test is being applied) available measured Pb concentration from other days in the three Januarys). However, the last step of the diagnostic test, comparison of the substituted average concentration to the level of the NAAQS, is done for the 3-month average concentration not the monthly average concentration since a 3-month averaging time has been selected.

[88] Incomplete data for one month of a 3-year period would not necessarily prevent a finding of a NAAQS violation, because a single 3-month average concentration above the NAAQS level in any period not affected by that month's incompleteness would constitute a violation.

EPA is not finalizing any version of either of the two incompleteness approaches on which comment was sought, described above, because they may potentially result in incorrect conclusions regarding violations or the lack thereof. Because the number of valid daily concentration values remaining after even only a few missed days of monitoring would be quite small, a missing sample on a high-concentration day might make a confidence interval derived from the available data appear smaller than the actual variability of the daily concentrations, leading to an incorrect conclusion about the probability of a NAAQS violation. EPA may continue to study these or similar approaches for application in future NAAQS reviews. Another possible application of these approaches could be to inform the Administrator's case-by-case decisions on whether to use data that are incomplete for comparison to the NAAQS, as was proposed and as the final rule allows the Administrator to do.[89]

### D. Scaling Factors To Relate Pb-TSP and Pb-PM₁₀

*D. Scaling Factors To Relate Pb-TSP and Pb-PM$_{10}$*

### 1. Proposed Provisions

EPA proposed that Pb-PM$_{10}$ monitoring could be conducted to meet Pb monitoring requirements at the option of the monitoring agency, but that site-specific scaling factors would have to be developed to adjust the Pb-PM$_{10}$ concentrations to represent estimated Pb-TSP concentrations before comparison to the level of the Pb-TSP NAAQS. One year of side-by-side measurement with both types of samplers would be required to collect paired data for developing these scaling factors, and Pb-TSP monitoring could not be discontinued at a Pb-PM$_{10}$ monitoring site until the factor for that site had been approved. The proposed Appendix R contained detailed requirements for the number of data pairs successfully collected during the year of testing, the degree of correlation required between the two types of measurements, and the stability of the ratio of concentration averages from month to month, and also provided the formula for calculating the scaling factor.

EPA also asked for comment on the possibility of adopting a default scaling factor, or a set of factors applicable in different situations, instead of requiring the development of site-specific factors. EPA noted in the proposal that paired

Pb-TSP and Pb-PM$_{10}$ data from three historical monitoring sites suggested that site-specific scaling factors for source-oriented monitoring sites may vary between 1.1 and 2.0, but that the range may also be greater. EPA asked for comment on possible default scaling factor values within a range of 1.1 to 2.0 for application to Pb-PM$_{10}$ data collected at source-oriented monitoring sites. EPA also noted in the proposal that it appears that site-specific factors generally have ranged from 1.0 to 1.4 for non-source-oriented monitoring sites (with the factors for three sites ranging from 1.8 to 1.9), and that the ratios may be influenced by measurement variability in both samplers as well as by actual air concentrations. EPA asked for comment on possible default scaling factor values within a range of 1.0 to 1.9 for application to Pb-PM$_{10}$ data collected at monitoring sites that are not source-oriented.

### 2. Comments on Scaling Factors

Many commenters addressed the scaling factor issues raised in the proposal, often as part of overarching comments on the interrelated issues of the choice of indicator[90], whether and for what locations the final rule should allow Pb-PM$_{10}$ monitoring instead of TSP-Pb monitoring, and whether and how Pb-PM$_{10}$ data, if collected, should be considered in determining compliance with or violation of the Pb-TSP NAAQS. Comments on the specific subject of scaling factors to relate Pb-PM$_{10}$ measurements to Pb-TSP concentrations are addressed here. Other comments related to the Pb-PM$_{10}$ versus TSP-Pb monitoring and data use aspects of the proposal are addressed in section IV.E.

Comment on scaling factors were overwhelmingly negative towards EPA's proposal to allow Pb-PM$_{10}$ monitoring in place of Pb-TSP monitoring at any site on the condition that the monitoring agency first develop a scaling factor. Most commenters also did not support the alternative of establishing default scaling factors. Some commenters proposed that instead of allowing Pb-PM$_{10}$ monitoring in place of Pb-TSP monitoring and then applying site-specific or default scaling factors to Pb-PM$_{10}$ concentrations before comparison to the NAAQS, Pb-PM$_{10}$ monitoring only be allowed at certain types of sites.

Some commenters said that it would be burdensome on state monitoring

agencies to have to develop site-specific scaling factors because two kinds of monitoring equipment would have to be deployed at each site, one set of which would become superfluous whether or not a scaling factor was successfully developed. Concerns were also expressed that the actual ratio of the two parameters could vary over time, and therefore that EPA's proposal that a scaling factor could be used indefinitely once developed on the basis of one year of paired measurements would not be protective of public health. No comments were received on the specifics of the proposal regarding the amount and type of data that would be required to be collected or the specific correlation criteria and formula for developing a site-specific scaling factor.

The final rule does not contain any provisions for the development of site-specific scaling factors, for two reasons. The proposed requirement for a year of paired measurements would require considerable initial investment of equipment, labor time, and laboratory costs by a monitoring agency for paired measurement of both Pb-PM$_{10}$ and Pb-TSP in hopes of obtaining the option of indefinitely monitoring only for Pb-PM$_{10}$ thereafter. The lack of any interest in this approach on the part of monitoring agencies is one of the reasons it is not included in the final rule. Second, given the considerations leading to retaining Pb-TSP as the indicator for the NAAQS, considerable caution should be applied on any scaling factor approach because of the uncertainty associated with the development and use of scaling factors.

Since issuing the proposal, EPA has engaged a statistical consultant to review whether the proposed criteria regarding the amount and type of data that would be required to be collected and the specific correlation criteria and formula for developing a site-specific scaling factor were practical and scientifically sound. This assessment examined both the proposed criteria which were structured around the proposed monthly averaging time and a modified approach structured around a 3-month averaging time. The consultant's report has been submitted to the public docket.[91] This assessment was able to "test drive" the proposed criteria and formula only on a relatively small number of data sets containing a sufficient number of Pb-TSP and *high-volume* Pb-PM$_{10}$ data pairs, and as such could not be completely definitive regarding the merits of the criteria and formula when applied to *low volume*

---

[89] No public comment was received on this provision.

[90] Comments regarding whether Pb-TSP or Pb-PM$_{10}$ should be the indicator for the NAAQS and EPA's response to them are discussed in section II.C.1.

[91] Scaling Factor: PM$_{10}$ versus TSP, Neptune and Company, Inc., Final Report, September 30, 2008.

Pb-PM$_{10}$ data. Also, EPA does not necessarily endorse every aspect of the assessment or its conclusions even apart from this data type disparity. However, EPA believes based on our review of the consultant's work that there are significant unresolved issues with the proposed criteria and formula with respect to their scientific adequacy and appropriateness for the intended purpose, and that these issues could result in not providing the protection intended by the Pb NAAQS.[92] This is another reason why the site-specific scaling factor approach is not included in the final rule. One finding in the consultant's report is that among the 21 sites where sufficient paired exist to meet the proposed data requirements for development of site-specific scaling factors, the proposed criteria for month-to-month consistency of the ratios of the two types of measurement and for overall correlation between the two measurements across the year were met at only four sites, three of which appear to be non-source-oriented.[93] For the non-source-oriented sites and years of data for which all the proposed criteria were met, the scaling factors fell in the range of 1.2 to 1.4. This indicates that while the observation at proposal was true that there are three non-source-oriented sites with some paired data that result in ratios in the range of 1.8 to 1.9, the data from these sites would be inadequate for developing site-specific scaling factors under the criteria of the proposed rule.

The alternative approach of establishing default scaling factors was also opposed by virtually all commenters who addressed it, and no

commenter supported any specific default factor or set of default factors. Many commenters asserted that no reliable default factor or factors could be developed and that all Pb measurements for comparison to the NAAQS should be Pb-TSP measurements because of the possible presence of ultra-coarse particles containing significant amounts of Pb. One commenter did not oppose the concept of default scaling factors but even that commenter said that EPA should conduct more testing before developing such factors. A number of commenters said that if scaling factors are used, they should be conservative, health protective factors to ensure that the use of Pb-PM$_{10}$ monitors does not result in increased lead exposures; some of these commenters pointed to the case of a particular Pb monitoring site that was reported in the preamble to the proposed rule to have a scaling factor of 2.0. Other commenters argued that the data set from the site (in East Helena, MT) suggesting such a high ratio of Pb-TSP to Pb-PM$_{10}$ was not representative of the current emissions profile of sources subject to emission standards adopted since that data set was collected, and that a scaling factor for future application should be lower than 2.0.

The final rule does not provide a default scaling factor or set of factors for relating the two types of Pb concentration measurements. Any default factor or factors would be subject to greater technical pitfalls than would site-specific scaling factors. EPA believes, considering the data presented at the time of the proposal, the comments, and the consultant's assessment described above, that the variability and thus the uncertainty in the relationship of the two types of Pb measurement is not conducive to developing a default scaling factor to address all situations in which it might be applied, unless it were set so large that it effectively discouraged Pb-PM$_{10}$ monitoring (see below). Also, while in concept multiple default scaling factors applicable to different situations should be more successful in avoiding this problem, they could never be as good as site-specific factors about which EPA has the technical reservations described above, in addition to the practical reservations expressed by all monitoring agencies which commented on the subject. For these reasons, EPA is not adopting either site specific or default scaling factors for use as described in the proposal.

However, as discussed below, the final rule does permit the use of Pb-PM$_{10}$ monitoring, and direct comparison of Pb-PM$_{10}$ concentrations to the Pb-TSP

NAAQS, in certain situations in which EPA can be confident that such monitoring and data comparisons will in fact be a protective approach, and where such monitoring may be attractive for other reasons that were described in the proposal and also noted by commenters. Several commenters supported allowing Pb-PM$_{10}$ monitoring to meet Pb monitoring requirements in some situations and, in only those situations, comparing Pb-PM$_{10}$ data directly without any scaling factor to the Pb-TSP indicator-based NAAQS. The thrust of these comments was that this approach to making use of Pb-PM$_{10}$ monitors and their data would be an acceptably protective approach provided that Pb-PM$_{10}$ monitoring and associated comparison to the NAAQS is limited to sites where there is good reason to expect that Pb-TSP concentrations are well below the level of the NAAQS and/or that based on the nature of the nearby sources the fraction of ultra-coarse Pb in Pb-TSP would be low. Some commenters recommended this approach to monitoring only if the NAAQS has been set at a particular level. Because an appropriate response to these comments involves many of the same facts and considerations that EPA has taken into account in addressing the comments explicitly about scaling factors, above, we address these comments here as part of the discussion of data interpretation, noting that section V of this preamble discusses in more detail the changes to 40 CFR 58 associated with our disposition of these comments.

EPA agrees that given the several attractions of low-volume Pb-PM$_{10}$ monitoring as far as accuracy and representativeness over an area, it is appropriate to allow for the use of Pb-PM$_{10}$ monitors instead of Pb-TSP monitors at locations where there is very little likelihood that Pb-TSP levels will exceed the NAAQS. We also believe that in general the non-source-oriented monitoring sites required in CBSAs with populations over 500,000 (see Section V) meet this condition. Our experience with paired data at apparently non-source-oriented sites, as detailed in the Staff Paper and the preamble to the proposal, augmented by the statistical consultant's report mentioned above, supports the conclusion that the ratio of Pb-TSP concentrations to Pb-PM$_{10}$ concentrations at non-source-oriented sites is consistently within the range of 1.0 to 1.4.[94] The corresponding range of

---

[92] The issues include but are not limited to the following: The available paired data sets with enough pairs of data to apply the criteria are all from sites where Pb-TSP concentrations were well below the final level of the revised NAAQS so there is uncertainty about how well they represent sites for which the accuracy of the scaling factor is critical to compliance with or violation of the NAAQS; many of the available data sets were not able to meet the proposed criteria for the correlation between parameters and for consistency of the ratio between parameter averages from month to month, meaning that no valid scaling factors could be derived following the terms of the proposed Appendix R; proposed methods are sensitive to how measurements below the method detection limit are reported and it is not clear how this reporting was done in the available sets of paired data, and EPA did not propose any particular reporting conventions for public comment; the site-specific scaling factors in some cases varied from year to year in those few cases where more than one year had enough pairs of data; and there are indications that a linear relationship between the two parameters with a non-zero intercept may be a better representation than a scaling factor which inherently presumes a zero intercept.

[93] The consultant's report does not characterize the orientation of the monitoring sites, but based on other information it appears that sites 060250005, 260770905, and 261390009 are non-source oriented.

[94] Of 20 sites with paired data which EPA believed at the time of the proposal to not be influenced by nearby industrial sources, only 3 had

ultra-coarse Pb fraction is zero to 0.3. Also, a new EPA staff analysis, completed since proposal, of recent Pb-TSP concentrations at existing monitoring sites that appear to be non-source-oriented (including all sites with complete data from at least one Pb-TSP monitor, not just sites with paired data) shows that nearly all of them have been well below the final level of the NAAQS; in fact, nearly all have had 3-month average Pb-TSP concentrations in 2005–2007 that do not exceed 50 percent of the NAAQS.[95] Therefore there is in, in the Administrator's judgment, little risk to the protective effect of the NAAQS in allowing the use of Pb-PM$_{10}$ monitors at such sites and in comparing the Pb-PM$_{10}$ measurements directly to the Pb-TSP NAAQS. The final rule allows this, with two safeguards to further ensure the protection intended by the Pb-TSP NAAQS. The first protection is a pre-condition that the available Pb-TSP monitoring data at the site during the previous three years, if any are available, do not show any 3-month average concentrations equal to or greater than 0.10 µg/m$^3$, which is 67 percent of the final NAAQS level.[96] Thus unlike the proposed use of scaling factors, where an approved scaling factor could have been applied to any and all recorded measured levels of Pb-PM$_{10}$, increasing the concern over the protectiveness of this approach, here the use of Pb-PM$_{10}$ data does not raise similar concerns. To guard against the possibility that any of these required sites may be different in a way that contradicts the previous experience at such sites and against the possibility that source conditions around one or more of these monitoring sites may change over time, the final rule also provides that if any 3-month average

concentration of Pb-PM$_{10}$ is ever observed to be equal to or greater than 0.10 µg/m$^3$, a Pb-TSP monitor must be installed.[97] This 33 percent margin against the level of the NAAQS is protective for the long run situation, given that the available data strongly suggest that scaling factors will rarely if ever be greater than 1.4 at non-source-oriented sites. If the 3-month average Pb-PM$_{10}$ concentration at a site was below 0.10 µg/m$^3$ and the scaling factor at that site was 1.4, the 3-month Pb-TSP concentration would be below the level of the NAAQS. EPA notes that some commenters suggested that this flexibility be pre-conditioned on there being site-specific affirmative evidence that Pb-TSP concentrations are less than 50 percent of the NAAQS. However, for many of the required monitoring sites of this type there will be no pre-existing Pb monitoring data and in the absence of a dominant nearby industrial source attempts to estimate Pb concentrations using air quality modeling techniques would be very uncertain. EPA believes that the evidence from the many existing non-source-oriented sites is sufficient to support allowing this flexibility without a site-specific hurdle, other than the provision tied to existing monitoring data if there are any.

EPA has also considered whether any of the required source-oriented sites should be allowed to be monitored for Pb-PM$_{10}$ rather than Pb-TSP, also with the Pb-PM$_{10}$ concentrations compared directly to the Pb-TSP NAAQS. As explained in Section V, the final requirements for monitoring near sources of Pb are based on the quantity of Pb emitted being above an emissions threshold. We are extending the allowance for the use of Pb-PM$_{10}$ monitors to allow Pb-PM$_{10}$ monitors without the use of scaling factors for source-oriented monitors where Pb concentrations are expected to be less than 0.10 µg/m$^3$ (based on modeling or historic data) and where the ultra-course Pb fraction is expected to be low. We are also requiring, as for non-source-oriented sites, that a Pb-TSP monitor be required at a source-oriented site if at some point in the future the Pb-PM$_{10}$ monitor shows that Pb-PM$_{10}$ concentrations are equal to or greater than 0.10 µg/m$^3$.[98] A state may also operate non-required Pb monitors at any

other locations of its choosing, and these may be of any type.

3. Conclusions on Scaling Factors

The final version of Appendix R eliminates all reference to scaling factors. As explained in detail in section V, the final rule allows Pb-PM$_{10}$ monitoring as a surrogate for Pb-TSP monitoring under certain specified conditions, with continuation of such monitoring being contingent on measured 3-month average Pb-PM$_{10}$ concentrations remaining without application of any scaling factor staying less than 0.10 µg/m$^3$. Section IV.E discusses how Pb-PM$_{10}$ monitoring data will be used as a surrogate for Pb-TSP in comparisons to the Pb-TSP NAAQS to determine compliance with or violation of the NAAQS.

*E. Use of Pb-TSP and Pb-PM$_{10}$ Data*

1. Proposed Provisions

The proposed text of Appendix R provided that complete Pb-TSP data would be given precedence over both incomplete and complete (scaled) Pb-PM$_{10}$ data, when both were collected in the same month at the same site, and prohibited the mixing of the two types of data in calculating the average Pb concentration for a single month. Pb-TSP data would be used in preference to Pb-PM$_{10}$ data to form a monthly average Pb concentration whenever the Pb-TSP data meets the test for completeness and valid monthly average, i.e., whenever 75 percent of scheduled samples have valid data or one or the other of the two diagnostic tests in the case of less than 75 percent completeness results in a valid monthly average. If the Pb-TSP data were not complete enough to allow development of a monthly average, the available scaled Pb-PM$_{10}$ data from the site for that month would be used provided they were complete enough. Scaled Pb-PM$_{10}$ data could be used to show both compliance and violation of the NAAQS.

2. Comments on Use of Pb-TSP and Pb-PM$_{10}$ Data

No comments were received specifically on the proposed provisions of Appendix R addressing the precedence between Pb-TSP and Pb-PM$_{10}$ data. However, the elimination of scaling factors from the final rule and the inclusion of flexibility for Pb-PM$_{10}$ monitoring only in limited situations, done by EPA in the final rule in response to comments summarized above, have required EPA to reconsider the proposed provisions on the use of

---

ratios of average concentrations of Pb-TSP to Pb-PM$_{10}$ greater than 1.4. One of these sites had only 13 data pairs. The other two sites had very low concentrations of both parameters, such that the ratio may reflect the influence of data rounding/truncation or censoring of data below the method detection limit more than actual atmospheric concentration ratios. Also, these paired data were from 2001 or earlier. (Development of Pb-PM$_{10}$ to Pb-TSP Scaling Factors, Mark Schmidt, 4/22/08.) Also, as noted above, the data from these sites are not adequate for the development of site-specific scaling factors if the proposed criteria for such data are applied to them.

[95] M. Schmidt and P. Lorang (October 15, 2008). Memo to Lead NAAQS Docket, Analysis of Expected Range of Pb-TSP Concentrations at Non-Source Oriented Monitoring Sites in CBSAs with Population Over 500,000.

[96] Based on the analysis described in the memo referenced in the previous footnote, EPA estimates that this provision might have the effect of prohibiting the use of Pb-PM$_{10}$ monitoring for at most only a few existing Pb monitoring sites which otherwise might be eligible for Pb-PM$_{10}$ monitoring instead of Pb-TSP monitoring.

[97] When the Pb-TSP monitor is installed, the monitoring agency would have the option of discontinuing the Pb-PM$_{10}$ monitor, and we expect that most agencies would do so for cost reasons.

[98] If three years of TSP monitoring results in no 3-month average Pb concentration equal to or greater than 0.10 µg/m$^3$, as might occur after the source improves its control of Pb emissions, the site would again be eligible for Pb-PM$_{10}$ monitoring.

Pb-PM$_{10}$ data and to make changes in the final version of Appendix R.

First, EPA has considered whether a comparison of Pb-PM$_{10}$ monitoring data to the NAAQS should be able to result in a conclusion that the NAAQS has been violated if the comparison shows that a 3-month average Pb-PM$_{10}$ concentration is above the level of the Pb-TSP NAAQS. This situation could occur at a site that is required by the final rule's Pb monitoring requirement which is allowed to use Pb-PM$_{10}$ monitoring in place of Pb-TSP monitoring, although EPA believes it is unlikely given the preconditions in the final rule regarding which required sites may use Pb-PM$_{10}$ monitoring. It might also occur at a non-required site, where the rule does not attempt to restrict the monitoring agency's flexibility to use Pb-PM$_{10}$ monitoring and thus a monitoring agency might choose not to adhere to the same preconditions. Given that a Pb-PM$_{10}$ monitor will generally capture somewhat less or at most the same quantity of Pb as would a Pb-TSP monitor on a given day, EPA believes that if a 3-month average of Pb-PM$_{10}$ concentrations is based on data that meets the 75 percent completeness test, including the associated diagnostic data substitution tests described in IV.B, and is above the level of the NAAQS, that situation should be considered to be a NAAQS violation.

This should be the case even if a Pb-TSP monitor at the same site has recorded a complete, valid 3-month average Pb-TSP concentration below the NAAQS for the same 3-month period. As just stated, a Pb-PM$_{10}$ monitor will generally capture somewhat less or at most the same quantity of Pb as would a Pb-TSP monitor on a given day. While it is conceivable that a malfunction of a Pb-PM$_{10}$ monitor, an operator error, or simple variability could cause a single measured Pb-PM$_{10}$ concentration to be higher than a valid same-day collocated Pb-TSP concentration measurement, EPA expects based on experience that this will be rare, particularly because 40 CFR part 58 appendix A and EPA quality assurance guidance contain required and recommended procedures to avoid equipment malfunctions and operator errors and to invalidate any data affected by them before submission to EPA's air quality data base. Also, since 3-month averages will be based on multiple measurements, a significant effect on 3-month average concentrations from such factors is an even more remote possibility. EPA believes that the only situation at all likely to arise in which a complete 3-month average of Pb-PM$_{10}$ indicates a NAAQS violation while a complete 3-

month average of Pb-TSP for the same period does not would be when the Pb-PM$_{10}$ average includes more days of monitoring than the Pb-TSP average, and those additional days tend towards high concentrations. This can occur if the Pb-PM$_{10}$ measurements are being taken on a more frequent schedule, if they are missing fewer days of scheduled data than for the Pb-TSP measurements (counting make-up samples), or if more extra samples are taken for Pb-PM$_{10}$ than for Pb-TSP. Regardless of which cause or causes are responsible, EPA believes that the Pb-PM$_{10}$ average based on more days of sampling would generally be the more robust indication of ambient concentrations, and the site should be considered to have violated the NAAQS.

Next, EPA has considered whether a comparison of Pb-PM$_{10}$ monitoring data to the NAAQS should be able to result in a conclusion that the NAAQS has been met if the comparison shows that all the 3-month average Pb-PM$_{10}$ concentrations over a 3-year period are below the level of the Pb-TSP NAAQS and there is no Pb-TSP data showing a violation, or should such a comparison only lead to the more limited conclusion that there has not been a demonstrated NAAQS violation.[99] In considering this issue, EPA notes that while the final rule allows the use of Pb-PM$_{10}$ monitoring in place of Pb-TSP monitoring only at required non-source-oriented monitoring sites that by their nature are expected to have a low fraction of ultra-coarse Pb, even a low fraction is not a zero fraction. Also, the expectation of a low ultra-coarse fraction may turn out to be incorrect due to unexpected causes. Also, monitoring agencies may also deploy Pb-PM$_{10}$ monitors at non-required sites which may have higher or unknown fractions of ultra-coarse Pb. Appendix R must anticipate the availability of data from such sites, as EPA believes that such data should not be ignored and that states should know in advance how it will be used if collected. Because Pb-PM$_{10}$ data may include data from sites with non-zero ultra-coarse fractions and may include data from sites with high or unknown ultra-coarse factions, EPA believes it would undermine the protectiveness of the NAAQS to always allow any Pb-PM$_{10}$ data from any monitoring site to demonstrate compliance with the NAAQS. Some site applicability restriction and/or compliance margin when using Pb-PM$_{10}$

data to show compliance would be needed to avoid undermining the protectiveness of the NAAQS. The technical issues to be overcome in designing site applicability restrictions and/or compliance margins would be the same as the issues that arise when considering default scaling factors, described above.

EPA is also mindful that the distinction between a finding of compliance with the NAAQS and not making a finding of violation is much more theoretical than practical. The distinction is not important to the initial stages of the implementation process for a revised NAAQS, because (1) by the time of the initial designations very few Pb-PM$_{10}$ monitoring sites will have three years of data so a finding of compliance would not be possible anyway[100], and (2) there is no practical difference in planning or implementation requirements between areas that have been found to be in compliance with the NAAQS and areas for which it can only be said that they have not been found to be in violation of the NAAQS. However, later, for an area initially designated nonattainment, an affirmative finding that the area is complying with the NAAQS is required in order for the area to be redesignated attainment (also referred to as maintenance) after emission controls are implemented. In the latter situation, however, a Pb-TSP monitor should be operating at any site that has initially shown a violation based on either Pb-TSP or Pb-PM$_{10}$, since Pb-TSP monitoring must begin at any site where Pb-PM$_{10}$ concentrations have exceeded even 50 percent of the NAAQS. This makes it moot whether Pb-PM$_{10}$ data alone can be used to redesignate a nonattainment area to attainment after emission controls are implemented. In light of the technical issues and the lack of any substantive consequences, the final version of Appendix R does not allow Pb-PM$_{10}$ data to be used to show affirmative compliance with the NAAQS.

The above discussion addresses the compliance versus violation consequences of comparing Pb-PM$_{10}$ and Pb-TSP data to the Pb-TSP NAAQS. EPA has also considered the issue of how design values should be determined when there is only Pb-PM$_{10}$ data or there is a mixture of Pb-PM$_{10}$ data and Pb-TSP data for a single monitoring site over a given period. In

---

[99] Such a comparison based on actual Pb-TSP data would of course be able to support a compliance conclusion, because Pb-TSP is the actual indicator for the NAAQS.

[100] Only a handful of low-volume Pb-PM$_{10}$ monitoring sites are now operational none of which indicate NAAQS violations. In addition, any sites which begin operation in response to the final monitoring requirements cannot collect three years of data by the time designations must be completed.

addition to conveying the compliance or noncompliance status of a monitoring site, design values are also used as an informative indicator of pollutant levels more generally. For the revised Pb NAAQS, the design value in simple terms is the highest valid 3-month average concentration at a monitoring site over whatever period of three years is being reported.[101] It is necessary to be specific in Appendix R about whether and when Pb-PM$_{10}$ data can be used in the calculation of the design value. In the proposal, the simple principle applied was that complete Pb-TSP data for a month or quarter always would have precedence over scaled Pb-PM$_{10}$ data, but that in the absence of complete Pb-TSP data, scaled Pb-PM$_{10}$ data would be used regardless of the resulting value of the design value. For the same reason described above that Pb-PM$_{10}$ data will not be allowed to support a finding of compliance with the NAAQS, it would be inappropriate to use such data to develop a design value whose value is below the level of the NAAQS. Therefore, the final version of Appendix R provides that the only situation in which Pb-PM$_{10}$ data will be used to calculate the design value is when doing so results in a higher design value than using only Pb-TSP data and that design value is above the level of the NAAQS.

3. Conclusions on Use of Pb-TSP and Pb-PM$_{10}$ Data

The final version of Appendix R specifies that the NAAQS is violated whenever Pb-PM$_{10}$ data or Pb-TSP data result in a 3-month average concentration above the NAAQS level, but that compliance with the NAAQS can only be demonstrated using Pb-TSP data. Pb-PM$_{10}$ data will be used in the calculation of a design value only when doing so results in a higher design value than using only Pb-TSP data and that design value is above the level of the NAAQS.

*F. Data Reporting and Rounding*

1. Proposed Provisions

EPA proposed that individual daily concentrations of Pb be reported to the nearest thousandth µg/m³ (0.xxx) with additional digits truncated, and that monthly averages calculated from the daily averages would be rounded to the nearest hundredth µg/m³ (0.xx). Decimals 0.xx5 and greater would be

rounded up, and any decimal lower than 0.xx5 would be rounded down. E.g., a monthly average of 0.104925 would round to 0.10 and a monthly average of 0.10500 would round to 0.11. Because the proposed NAAQS level would be stated to two decimal places, no additional rounding beyond what is specified for monthly averages would be required before a design value selected from among rounded monthly averages would be compared to the level of the NAAQS.

2. Comments on Data Reporting and Rounding

No comments were received on this aspect of the proposal.

3. Conclusions on Data Reporting and Rounding

The final version of Appendix R differs from that proposed because the proposed version addressed a single month as the averaging time for the NAAQS and the final NAAQS is based on a 3-month average concentration. In the preamble to the proposal, EPA did not specifically address whether and how, in the case of the NAAQS being based on a 3-month averaging time, calculated monthly averages would be rounded before being used to calculate the 3-month average. The final version of Appendix R specifies that all digits of the monthly average shall be retained for the purpose of calculating the 3-month average, with the 3-month average then rounded to the nearest hundredth µg/m³, i.e., 3-month average decimals 0.xx5 and greater would be rounded up and any decimal lower than 0.xx5 would be rounded down. Because individual monthly averages are never compared to the level of the NAAQS there is no need to specify a rounding convention for them, and retaining all digits until the final comparison of the 3-month average to the NAAQS allows a more precise determination of compliance compared to rounding at both the monthly and 3-month levels.

*G. Other Aspects of Data Interpretation*

One implication of the selection of a rolling 3-month period as the averaging time of the NAAQS is that there will be two 3-month periods that span each pair of adjacent calendar years: November-January and December-February. EPA has considered whether, for any three-calendar-year period, the 3-month averaging periods including one or both of the two months of the year prior to those three years and/or the averaging periods including one or both of the two months following those three years will be included in determining whether a monitoring site has met or violated the

NAAQS. This issue was not discussed in the proposal, because the monthly average and calendar quarterly average options discussed in the proposal do not raise this issue. The final version of Appendix R provides that the 3-month averages which include either of the two months prior to a three-calendar-year period will be associated with that 3-year period, and that the 3-month averages which include either of the two months after the three-calendar-year period will not be associated with it. The latter two months would be within the next 3-year period and their data would affect compliance during that next 3-year period. Thus, for example, the thirty-six 3-month averages that will be considered in determining compliance with the NAAQS for the 3-year "2010–2012" evaluation period will be based on data from November and December of 2009, and all of 2010, 2011, and 2012. Data from November 2009 will be used as part of the calculation of one 3-month average, and data from December 2009 will be used as part of the calculation of two 3-month averages. Data from November and December of 2012 will be used but only for 3-month averages which are made up solely of months in 2012. Thus, for the 2010–2012 period, November 2009 through January 2010 is the first 3-month period and October through December 2012 is the last 3-month period.

This approach has been selected for practical reasons, because the once-per-year deadline for certifying data submitted to AQS means that data from January and February of the year after a three-calendar-year period will most often still be preliminary and uncertified as to completeness and accuracy for 12 months beyond when data from the three-calendar-year period itself (and the two previous months) are final and ready to be used for compliance determinations.

Generally, a violation will have occurred if any of the 36 three-month average concentrations of either Pb-TSP or Pb-PM$_{10}$ exceeds the level of the NAAQS,[102] and a finding of compliance will require that all 36 3-month averages of Pb-TSP be at or below the level of the NAAQS. The final Appendix R addresses the special situation of a new monitoring site which has started sampling by January 15 of a certain year. After the first three years of data collection, only 34 3-month average concentrations will be available. In this

---

[101] It is also possible for a period of less than three years to have a valid design value, but only if the procedures in Appendix R when applied to that shorter period result in a design value greater than the level of the NAAQS. It is possible to establish a violation of the NAAQS on a monitoring period as short as three months but three years are needed to establish compliance with the NAAQS.

[102] A violation will exist as soon as any 3-month average exceeds the level of the NAAQS. It is not required that three years of data collection be completed before a site can be found in violation. This is consistent with the proposal.

situation, Appendix R provides that a finding of compliance will be made if all 34 available 3-month average concentrations of Pb-TSP are at or below the level of the NAAQS.

As discussed in Section V on monitoring requirements, EPA proposed and is finalizing a change to the Pb monitoring requirements to no longer allow monitoring agencies to combine several daily Pb-TSP filters for chemical analysis, at required Pb monitoring sites.[103] The proposed Appendix R presumed this change and did not address how data from such ''composite'' samples would be used in comparisons to the NAAQS. However, on further reflection EPA believes that whatever composite sample data have been collected and submitted to AQS before the prohibition on using the composite sample approach takes effect should be considered for purposes of initial designations under the revised NAAQS, if those data fall within the period on which designations will be based. The final version of Appendix R therefore includes specific provisions addressing how to account for composite sample data in determining data completeness and in calculating a monthly and 3-month average concentration value. These provisions will also govern the use of any composite sample data that are collected at non-required monitoring sites, indefinitely. The only noteworthy issue EPA had to consider in developing these provisions was what to do when the submitted data for a monitoring site includes both a composite sample Pb value and one or more individual daily sample Pb values. Because it is impossible to tell the exact days represented by a composite sample, Appendix R specifies that either the composite sample or the available daily data (if complete daily data were collected) will be used depending on which has the lower pollutant occurrence code,[104] but they will not be

combined because that might give double weight to some days.

## V. Ambient Monitoring Related to Revised Lead Standards

We are finalizing several changes to the ambient air monitoring and reporting requirements for Pb to account for the revised NAAQS and to update the Pb monitoring network. Ambient Pb monitoring data are used for comparison to the Pb NAAQS, for analysis of trends and accountability in areas with sources that have implemented controls, in the assessment of control strategies, for evaluating spatial variation of Pb concentrations across an area, and as an input to health studies used to inform reviews of the NAAQS. Ambient data are collected and reported by state, local, and tribal monitoring agencies (''monitoring agencies'') according to the monitoring requirements contained in 40 CFR parts 50, 53, and 58. This section summarizes the proposed changes to the monitoring requirements in the May 20, 2008 notice of proposed rulemaking, the major comments received on the proposed changes, and the final changes to the Pb monitoring regulations being promulgated with this action. This section is divided into discussions of the monitoring requirements for the sampling and analysis methods (including quality assurance requirements), network design, sampling schedule, data reporting, and other miscellaneous requirements.

### A. Sampling and Analysis Methods

We are finalizing changes to the sampling and analysis methods for the Pb monitoring network. Specifically, we are continuing to use the current Pb-TSP Federal Reference Method (FRM, 40 CFR part 50 Appendix G), but are finalizing a new Federal Reference Method (FRM) for monitoring Pb in $PM_{10}$ (Pb-$PM_{10}$) for the limited situations where it will be permitted, lowering the Pb concentration range required during Pb-TSP and Pb-$PM_{10}$ candidate Federal Equivalent Method (FEM) comparability testing, and finalizing changes to the quality assurance requirements for Pb monitoring. The following paragraphs provide background, rationale, and details for the final changes to the sampling and analysis methods.

### 1. Pb-TSP Method

No substantive changes are being made to the Pb-TSP method. The current FRM for Pb sampling and analysis is based on the use of a high-volume TSP FRM sampler to collect the particulate matter sample and the use of

atomic absorption (AA) spectrometry for the analysis of Pb in a nitric acid extract of the filter sample (40 CFR 50 Appendix G). There are 21 FEMs currently approved for Pb-TSP.[105] All 21 FEMs are based on the use of high-volume TSP samplers and a variety of approved equivalent analysis methods.[106]

#### a. Proposed Changes

We stated in the NPR that if the final standard is based on Pb-TSP, we believed it would be appropriate to continue use of the current high-volume FRM for measuring Pb-TSP. We proposed to make several minor changes in 40 CFR 50 Appendix G to correct reference citations. However, we did not propose any substantive changes to Appendix G.

In addition, we stated in the NPR that we believe that low-volume Pb-TSP samplers might be superior to high-volume TSP samplers. We pointed out that presently, a low-volume TSP sampler cannot obtain FRM status, because the FRM is specified in design terms that preclude designation of a low-volume sampler as a FRM. We also suggested that a low-volume Pb-TSP monitoring system (including an analytical method for Pb) could be designated as a FEM Pb-TSP monitor, if side-by-side testing were performed as prescribed by 40 CFR 53.33. We proposed amendments to 40 CFR 53.33 (described below in section V.A.3) to make such testing more practical and to clarify that both high-volume and low-volume TSP methods could use this route to FEM status. We also held a consultation with the CASAC Ambient Air Monitoring and Methods (AAMM) Subcommittee on approaches for the development of a low-volume TSP sampler FRM or FEM.

#### b. Comments on Pb-TSP Method

This section addresses comments we received on our proposal to continue the use of the Pb-TSP FRM as the monitoring method for the Pb NAAQS, and comments on the use of low-volume TSP samplers as either a FEM or FRM for Pb-TSP. We also received comments on a number of related topics that are not discussed in this section. We received comments on the use of Pb-$PM_{10}$ as the Pb indicator, and those comments are addressed in Section II.C.1 of this preamble. We received comments on the use of scaled Pb-$PM_{10}$,

---

[103] The FRM specification in the new Appendix Q for Pb-$PM_{10}$ monitoring excludes the possibility of composite sampling for Pb-$PM_{10}$, so this in an issue that applies only to Pb-TSP.

[104] The pollutant occurrence code is a numerical code (1, 2, 3, etc.) used to distinguish the data from two or more monitors for the same parameter at a single monitoring site. For example, if a monitoring agency has been using both composite analysis for filters from one sampler and individual sample analysis for filters from a collocated sampler, data from these would be distinguished using this code. Choosing which set of data to use based on which has the lower code value is an approach chosen for its simplicity, to avoid specifying what would have to be a complicated set of procedures to determine which set of data or combination of the two sets actually is the more robust for determining whether the NAAQS is met.

[105] For a list of currently approved FRM/FEMs for Pb-TSP refer to: http://www.epa.gov/ttn/amtic/criteria.html.

[106] The 21 distinct approved FEMs represent less than 21 fundamentally different analysis methods, as some differ only in minor aspects.

or other ways to supplement Pb-TSP monitoring data with Pb-PM$_{10}$ data, and those comments are addressed in Section IV.D, and in Section V.B of this preamble.

We received a number of comments on our proposal to continue the use of high-volume TSP samplers as the sampling method for Pb. In their comments on the proposed rule, CASAC reiterated their concerns over the measurement uncertainty due to effects of wind speed and wind direction on sampling efficiency.[107] These concerns were discussed in detail in our proposed rule, and as such are not reiterated here. However, CASAC stated that if the final level of the NAAQS were to be set at 0.10 μg/m³ or above, then the high-volume Pb-TSP sampler should be used. Some public commenters also stated similar concerns with the performance of the Pb-TSP sampler.

A large number of other commenters stated that the high-volume TSP sampler should continue to be the sampler for determining compliance with the Pb NAAQS. They expressed concerns that PM$_{10}$ samplers would not capture ultra-coarse particles (i.e., particulate matter with an aerodynamic diameter greater than 10 μm), and could greatly underestimate Pb concentrations in the ambient air, especially near Pb sources.

Despite some limitations with sampler performance and consistent with CASAC advice for methods at the level of the NAAQS we have chosen, we believe the high-volume sampler is the most appropriate currently available sampler for the measurement of Pb-TSP in ambient air. Ultra-coarse particulate matter (larger than PM$_{10}$) can contribute to a significant portion of the total Pb concentration in ambient air, especially near Pb sources (Schmidt, 2008) where Pb-TSP concentrations may be as much as twice as high as Pb-PM$_{10}$. Furthermore, we believe the precision and bias of the high-volume TSP sampler are acceptable and similar to those for other PM samplers (Camalier and Rice, 2007).

We received several comments supporting the need for the development of a low-volume Pb-TSP sampler. However, in our consultation with CASAC's AAMM Subcommittee, we were cautioned against finalizing a new low-volume Pb-TSP FRM without an adequate characterization of the

sampler's performance over a wide range of particle sizes.[108] We agree with the interest for a low-volume Pb-TSP sampler and the desire for such a sampler to be adequately characterized prior to being promulgated as a new FRM. Accordingly, we plan to further investigate the possibility of developing a low-volume FRM in the future.

### c. Decisions on Pb-TSP Method

We are maintaining the current FRM and FEMs for Pb-TSP as the sampling and analysis methods for monitoring for the Pb NAAQS. As proposed, we are making minor editorial changes to 40 CFR 50 Appendix G (the FRM for Pb-TSP) to correct some reference citations. We are not making any other substantive changes to Appendix G.

### 2. Pb-PM$_{10}$ Method

We are finalizing a new FRM for Pb-PM$_{10}$ monitoring based on the use of the low-volume PM$_{10C}$ FRM (40 CFR part 50, Appendix O) coupled with energy dispersive x-ray fluorescence (XRF) as the analysis method. This section describes the proposed Pb-PM$_{10}$ FRM, the comments we received, and the final Pb-PM$_{10}$ FRM requirements being promulgated with this action.

### a. Proposed FRM for Pb-PM$_{10}$ Monitoring

We proposed a new Pb-PM$_{10}$ FRM based on the use of the already promulgated PM$_{10C}$ FRM coupled with XRF as the analysis method. We proposed to use the low-volume PM$_{10C}$ sampler for the FRM for Pb-PM$_{10}$ rather than the existing PM$_{10}$ FRM specified by Appendix J, for several reasons. The low-volume PM$_{10C}$ FRM sampler meets more demanding performance criteria (Appendix L) than are required for the PM$_{10}$ samplers described in Appendix J. PM$_{10C}$ samplers can be equipped with sequential sampling capabilities (i.e, the ability to collect more than one sample between operator visits). The low-volume PM$_{10C}$ sampler can also precisely maintain a constant sample flow rate corrected to actual conditions by actively sensing changes in temperature and pressure and regulating sampling flow rate. Use of a low-volume sampler for the Pb-PM$_{10}$ FRM would also provide network efficiencies and operational consistencies with the samplers that are in widespread use for the PM$_{2.5}$ FRM network, and that are seeing growing use in the PM$_{10}$ and

PM$_{10-2.5}$ networks. Finally, the use of a low-volume sampler is consistent with the comments and recommendations from CASAC and members of CASAC's AAMM Subcommittee (Henderson 2007a, Henderson 2008a, Russell 2008b).

We proposed XRF as the FRM analysis method because we believe that it has several advantages which make it a desirable analysis method. XRF does not require sample preparation or extraction with acids prior to analysis. It is a non-destructive method; therefore, the sample is not destroyed during analysis and can be archived for future re-analysis if needed. XRF analysis is a cost-effective approach that could be used to simultaneously analyze for many additional metals (e.g., arsenic, antimony, and iron) which may be useful in source apportionment. XRF is also the method used for the urban PM$_{2.5}$ Chemical Speciation Network (required under Appendix D to 40 CFR part 58) and for the Interagency Monitoring of Protected Visual Environments (IMPROVE) rural visibility monitoring program in Class I visibility areas, and is being considered by EPA for a role in PM$_{10-2.5}$ coarse speciation monitoring. Based on data from the PM$_{2.5}$ speciation monitoring program, the XRF analysis method when coupled with the low-volume PM$_{10C}$ sampler, is expected to have an adequate method detection limit (MDL, the lowest quantity of a substance that can be distinguished from the absence of that substance) and meet the measurement uncertainty goals for precision and bias as determined through the data quality objective (DQO) analysis (Papp, 2008), as explained later in this preamble.

### b. Comments on the proposed Pb-PM$_{10}$ FRM

We received a number of comments on the proposed FRM for Pb-PM$_{10}$. In addition, the CASAC AAMM Subcommittee provided a peer review of the proposed Pb-PM$_{10}$ FRM. The following paragraphs describe the comments received and our responses.

The CASAC AAMM Subcommittee agreed with our proposed use of the PM$_{10C}$ sampler. Other comments on our proposed use of the low-volume PM$_{10C}$ sampler for the Pb-PM$_{10}$ FRM were in support of the PM$_{10C}$ as an appropriate sampler for the FRM. We are promulgating the Pb-PM$_{10}$ FRM based on the use of the low-volume PM$_{10C}$ sampler.

We also received comments on our proposed use of XRF as the analysis method for the Pb-PM$_{10}$ FRM, including comments from CASAC's AAMM

---

[107] Sampling efficiency refers to the percentage of total Pb (or PM) that is collected by the sampler. For the TSP sampler, research shows that the sampling efficiency varies for particulates greater than PM$_{10}$ as a function of wind speed and wind direction.

[108] Proper characterization of a new Pb-TSP FRM sampler would require extensive wind-tunnel testing and field testing. Wind tunnel testing would be complicated by the difficulty in quantifiably generating and delivering precise amounts of ultra-coarse PM in a wind-tunnel setting.

Subcommittee during the peer review of the proposed FRM. Several commenters agreed with our proposed use of XRF as the analysis method, citing several of the advantages we identified in the preamble to the proposed rule. However, several other commenters suggested that Inductively Coupled Plasma-Mass Spectrometry (ICP-MS) would be a more appropriate analysis method for the FRM.

The AAMM Subcommittee and other commenters raised concerns with the potential for measurement bias due to non-uniform filter loadings. They noted that the analysis beam of the XRF analyzer does not cover the entire filter collection area; therefore, it is possible for the measurement to be biased if the Pb particles deposit more (or less) on the edge of the filter as compared to the center of the filter. To address these concerns, EPA's Office of Research and Development (ORD) conducted qualitative and quantitative tests of filter deposits generated in the laboratory under controlled conditions. Although test results confirmed prior reports of formation of a deposition band at the circumference of the $PM_{10C}$ filters, this band comprises only 5 percent of the filter's deposition area. Quantitative analysis of collected calibration aerosols in the 0.035 micrometer to 12.5 micrometer size range revealed that use of either a centrally located 10 mm or 20 mm spot size can accurately represent the filter's mean mass concentration within approximately 2 percent. Similar results were obtained using a $PM_{2.5}$ FRM sampler and a "total particulate sampler" (a $PM_{2.5}$ sampler with the internal separator removed). Based on these results, it can be concluded that any non-uniformity of particle deposition on $PM_{10C}$ filters will represent a small fraction of the overall uncertainty in ambient Pb concentration measurement. As such, we believe the concerns associated with non-uniform filter loading are sufficiently addressed to allow XRF as an appropriate analysis method for the FRM.

The AAMM Subcommittee and other commenters suggested ICP-MS as an alternative to the XRF analysis method. Advantages identified with ICP-MS included the analysis of the entire filter deposit and a higher sensitivity (i.e., lower MDL.) We agree that the ICP-MS analysis method is also an appropriate method for the analysis of Pb. However, ICP-MS (and other analysis methods requiring the extraction of Pb prior to analysis) also has potential bias due to uncertainty in the percentage of total Pb that is extracted. While this bias can be minimized by use of very strong acids (i.e., hydrogen fluoride), many

laboratories wish to avoid these strong acids due to the damage they can do to the analyzer and due to safety concerns. In addition, ICP-MS is a destructive method and samples cannot be saved for further analysis. We agree that the ICP-MS method is more sensitive than the XRF method. However, the XRF method detection limit provides sufficient sensitivity for use in determining compliance with the Pb NAAQS being promulgated today. As pointed out in our preamble to the proposed rule, we estimated the method detection limit for XRF and ICP-MS coupled with low-volume sampling to be 0.001 $\mu g/m^3$ and 0.00006 $\mu g/m^3$, respectively. No commenters disagreed with these estimates.

Several states requested approval for alternative analysis methods because their laboratories are already equipped to perform those analysis methods. Our decision to use XRF as the FRM analysis method does not prevent monitoring agencies from using alternative analysis methods. However, before these alternative analysis methods can be used they must be approved as FEMs for the measurement of Pb-$PM_{10}$. Monitoring agencies can seek FEM approval for alternative analysis methods by following the FEM requirements (40 CFR Part 53.33). In addition, we plan to approve (after conducting the necessary testing and developing the necessary applications ourselves) FEMs for ICP-MS and Graphite Furnace Atomic Absorption (GFAA) to support monitoring agencies that prefer to use these analysis methods.

We also received comments on the specific details of the proposed XRF analysis method. The AAMM Subcommittee and one other commenter raised concerns about the lack of a thin-film XRF National Institute of Standards and Technology (NIST)-traceable Pb standard. NIST currently offers Standard Reference Material (SRM) 2783, "Air Particulate on Filter Media", that is a polycarbonate filter that contains a certified concentration for Pb equivalent to 0.013 ± 0.002 $\mu g/m^3$. Calibration materials for XRF are not destroyed during analysis; therefore, the SRM should be stable over time and can be reused multiple times if properly handled and protected.

The AAMM Subcommittee raised concerns regarding lot-specific laboratory blanks, field blanks, and possible contamination of filters. The commenters suggested that the laboratory blanks (the results of Pb analysis of "clean" filters that have not been used in a sampler) that are used for XRF background measurement and

correction be lot-specific. The addition of lot-specific laboratory blanks will help minimize contamination that may be due to new filter lots and the analytical system. A few commenters suggested the addition of field blanks in order to minimize the Pb contamination of filters in the field. Field blanks are filter blanks that are sent to the field and are placed into the sampler for the sampling duration without ambient air flow. We agree with the suggestions to make laboratory blanks lot-specific and to add the collection of field blanks. A comment to add annual MDL determinations and filter-lot specific MDL determinations was received. We agree that the addition of annual MDL estimates and lot-specific MDL determinations is an improvement to the proposed FRM text. In addition, several editorial comments were received that related to modifying existing statements to add clarity and help to ensure consistency across laboratories. We are making changes to the XRF analysis method to address these editorial comments.

We received one comment related to the need for data quality objectives (DQOs). We agree with the commenter on the need for DQOs for the Pb-$PM_{10}$ FRM. Since the time of proposal, we have completed the DQO analysis to evaluate the acceptable measurement uncertainty for precision and bias. The DQO report is in the docket. As part of that process, the recommended goals for precision were defined as an upper 90 percent confidence limit for the coefficient of variation of 20 percent and the goals for bias were defined as an upper 95 percent confidence limit for the absolute bias of 15 percent. We have reflected this in our final regulation.

### c. Decision on Pb-$PM_{10}$ FRM

We are finalizing the FRM for Pb-$PM_{10}$ as proposed with the exception of the following amendments and additions. Changes to the XRF analysis method are being made to address comments received during the public comment period and peer review of the proposed Pb-$PM_{10}$ FRM. These changes include a revision to the Pb-$PM_{10}$ FRM text to include reference to the SRM 2783 NIST-traceable calibration standard. The FRM text was modified to add a section that requires the collection of field blanks, and clarify that the laboratory blanks used for background measurement and correction shall be lot-specific. We added the requirements for annual MDL estimates and lot-specific MDL determinations. Several minor changes were made to address editorial comments received that related to modifying existing statements to add

clarity and help to ensure consistency across laboratories. Examples of these changes include the addition of other commercial XRF instrumentation vendors; clarification of the maximum filter loading for Pb analysis which is based on the maximum mass loading (200 µg/m³) for a PM$_{10C}$ sampler; inclusion of additional references for spectral processing methods; and clarification that the FRM applies specifically to Pb. A reference was included for additional guidance if multi-elemental analysis is performed. To ensure consistency in reporting uncertainties for Pb by XRF across laboratories, an equation to calculate uncertainties was added and follows the same procedure used for XRF in the PM$_{2.5}$ speciation program. Based on the DQO process, the FRM precision and bias requirements were modified to reflect the measurement uncertainty goals of 20 percent and 15 percent, respectively.

### 3. FEM Requirements

We are finalizing changes to the FEM requirements for Pb. These requirements will apply for both Pb-TSP and Pb-PM$_{10}$ methods. This section discusses the proposed changes to the FEM requirements, comments received on the proposed changes, and the final FEM requirements being promulgated with this action.

### a. Proposed FEM Requirements

The current FEM requirements state that the ambient Pb concentration range at which the FEM comparability testing must be conducted to be valid is 0.5 to 4.0 µg/m³. Currently there are few locations in the United States where FEM testing can be conducted with assurance that the ambient concentrations during the time of the testing would exceed 0.5 µg/m³. In addition, the Agency proposed to lower the Pb NAAQS level to between 0.10 and 0.30 µg/m³. Consistent with this proposed revision, we also proposed to revise the Pb concentration requirements for candidate FEM testing to a range of 30 percent of the revised level to 250 percent of the revised level in µg/m³. The requirements were changed from actual concentration values to percentages of the NAAQS level to allow the FEM requirements to remain appropriate if subsequent changes to NAAQS levels occur during future NAAQS reviews.

The current FEM does not have a requirement for a maximum MDL. In order to ensure that candidate analytical methods have adequate sensitivity or MDLs, we proposed adding a requirement for testing of a candidate

FEM. The applicant must demonstrate that the MDL of the method is less than 1 percent of the level of Pb NAAQS.

We proposed to modify the FEM requirements for audit samples. Audit samples are the known concentration or reference samples provided by EPA and used to verify the accuracy with which a laboratory conducts the FRM analytical procedure before it may be compared to the candidate FEM. The current requirements are that audit samples be analyzed at levels that are equal to 100, 300, and 750 µg per spiked filter strip (equivalent to 0.5, 1.5, and 3.75 µg/m³ of sampled air). We proposed to revise the levels of the audit concentrations to percentages (30 percent, 100 percent and 250 percent) of the level of the Pb NAAQS to provide for reduced audit concentrations that are more appropriate for a reduced level of the revised NAAQS.

The existing FEM requirements are based on the high-volume TSP sampler, and as such, refer to ³⁄₄-inch × 8-inch glass fiber strips. In order to also accommodate the use of low-volume sample filters, we proposed to add references to 46.2 mm filters where appropriate. For FEM candidates that differ only from the FRM with respect to the analysis method for Pb, pairs of these filters will be collected by a pair of FRM samplers.

### b. Comments

We received few comments on the proposed amendments to the FEM requirements for Pb. One commenter suggested that the proposed MDL requirement, 1 percent of the NAAQS, was overly stringent, and that an MDL of 5 percent would be sufficient. Another commenter suggested that an MDL at 10 percent would be more achievable. After reviewing these comments, we have reconsidered the requirement for the MDL to be 1 percent of the NAAQS or less and now believe that the requirement may be unduly restrictive. The MDL represents an estimate of the lowest Pb concentration that can be reliably distinguished from a blank. The concept of the ''limit of quantitation'' (LOQ), the level at which we can reasonably tell the difference between two different values, is often used to determine the concentration at which we have confidence in the accuracy of the measurement. The LOQ is usually estimated at 5 to 10 times the MDL. At a MDL of 5 percent (i.e., 0.0075 µg/m³), the maximum LOQ would still be less than one half of the NAAQS (i.e., 0.075 µg/m³). We believe this is adequate for the purposes of determination of compliance with the NAAQS. The three most commonly

used Pb-PM$_{10}$ analysis methods (XRF, ICP-MS, and GFAA) all have estimated method detection limits below 5 percent of the revised Pb NAAQS. We note, however, that for areas where concentrations may frequently be well below the NAAQS such as at non-source-oriented sites it may be desirable to use a FEM with a more sensitive analysis method (such as ICP-MS) to assure fewer non-detect measurements and to provide better accuracy at concentrations well below the NAAQS.

We received two comments supporting the development and consideration of the use of continuous Pb monitors. We agree that the FEM testing requirements should include language regarding FEM testing and approval of continuous or semi-continuous monitors.

### c. Decisions on FEM Requirements

We are finalizing the FEM requirements for Pb as proposed except for the addition of certain language including FEM testing and approval of continuous or semi-continuous monitors.

### 4. Quality Assurance Requirements

We are finalizing changes to the quality assurance (QA) requirements for Pb. These requirements will apply for both Pb-TSP and Pb-PM$_{10}$ measurements. This section discusses the proposed changes to the QA requirements, comments received on the proposed changes, and the final QA requirements being promulgated with this action.

### a. Proposed Changes

We proposed modifications to the quality assurance (QA) requirements for Pb in 40 CFR part 58 Appendix A paragraph 3.3.4 in order to accommodate Pb-PM$_{10}$ monitoring. In addition, we proposed to consolidate several existing requirements for PM samplers (TSP and PM$_{10}$ samplers) into paragraph 3.3.4 to clarify that these requirements also apply to Pb-TSP and Pb-PM$_{10}$ samplers. The following paragraphs detail the QA requirements we proposed to amend.

The collocation requirement for all TSP samplers (15 percent of a primary quality assurance originations sites at a 1 in 12 day sampling frequency, paragraph 3.3.1) applies to TSP samplers used for Pb-TSP monitoring. These requirements are the same for PM$_{10}$ (paragraph 3.3.1); thus, no changes are needed to accommodate low-volume Pb-PM$_{10}$ samplers. However, to clarify that this requirement applies to Pb-PM$_{10}$ monitoring, in addition to mass measurements for PM$_{10}$, we proposed to

add a reference to this requirement in paragraph 3.3.4. The current requirement for selecting the collocated site requires that the site be selected from the sites having annual mean concentrations among the highest 25 percent of the annual mean concentration for all sites in the network.

The sampler flow rate verifications requirement (paragraph 3.3.2) for low-volume PM$_{10}$ and for TSP are at different intervals. To clarify that this requirement also applies to Pb monitoring (in addition to sample collection for TSP and PM$_{10}$ mass measurements) we proposed to add a reference to this requirement in paragraph 3.3.4.

Paragraph 3.3.4.1 has an error in the text that suggests an annual flow rate audit for Pb, but then includes reference in the text to semi-annual audits. The correct flow rate audit frequency is semi-annual. We proposed to correct this error. We also proposed to change the references to the Pb FRM to include the proposed Pb-PM$_{10}$ FRM.

Paragraph 3.3.4.2 discusses the audit procedures for the Pb analysis method. This section assumes the use of a high-volume TSP sampler, and we proposed edits to account for the proposed Pb-PM$_{10}$ FRM.

We proposed to require one audit at one site within each primary quality assurance organization (PQAO) once per year. We also proposed that, for each quarter, one filter of a collocated sample filter pair from one site within each PQAO be sent to an independent laboratory for analysis, for a total of 5 audits per year. The independent measurement on one filter from each pair would be compared to the monitoring agency's routine laboratory's measurement on the other filter of the pair, to allow estimation of any bias in the routine laboratory's measurements.

b. Comments

We received one comment on the proposed QA requirements specifically addressing the overall sampling and analysis bias. The commenter was concerned that the proposal to implement one independent performance evaluation audit (similar to the PM$_{2.5}$ Performance Evaluation Program (PEP)) and then augment that sample with four samples from collocated precision site would be inadequate. The commenter suggested that in order for the audit program to be successful it would require the same independent laboratory be used by all monitoring agencies across the country.

We believe it is important to have a measurement of the bias of the overall method for Pb (including both sampling and analysis aspects). We proposed five audits per PQAO per year (one independent audit and four collocated samples all analyzed at an independent lab). This proposal was based on data evaluations of PM$_{2.5}$ bias information, and the assumption that no PQAO would have more than 5 Pb sites. However, we now recognize that some PQAO are likely to have more than 5 sites, and as part of our consideration of this comment, we are revising the audit requirements to require 1 additional audit per PQAO and an additional 2 collocated sample filters for PQAO's with more than 5 sites. This sampling frequency would parallel the PM$_{2.5}$ performance evaluation. Based on our review of PM$_{2.5}$ bias information, five audits per year for PQAOs with five or fewer monitoring sites provide an adequate assessment of bias over a 3-year period. We believe we can provide an adequate three-year estimate of bias with this approach since it will yield the same number of audit results as the PM$_{2.5}$ PEP program. In addition, the statistic used to assess bias for PM$_{10-2.5}$ and the gaseous pollutants (section 4.1.3) will be used for the Pb bias assessment and will be referenced in section 4.4.2. This will eliminate the need to assess bias by combining data from the flow rate audits and Pb audit strips as discussed in sections 4.4.2 through 4.4.5, so this assessment will be removed. The use of the flow rate audits and Pb audit strips will be able to be assessed separately using statistics already available in Appendix A. Sections 4.2.2 and 4.2.3 for flow rate information and section 4.1.3 will be used for the Pb strip assessment.

Like the PM$_{2.5}$ PEP program, we are planning to implement an audit program for monitoring agencies requesting federal implementation of the audits, but allow monitoring agencies to implement their own audit program. We plan to utilize one laboratory for the analysis of the Pb audit samples for those monitoring organization requesting federal implementation of these audits. However, we expect some states will elect to implement their own audits. Independent laboratory services will be offered to monitoring organizations that are self-implementing this performance evaluation program, however, they may use other independent labs. Based on the current PM$_{2.5}$ PEP program, we expect the majority of monitoring agencies will elect to make use of the federally implemented audit program.

We also received comments on our proposed precision and bias goals from individual members of the CASAC

AAMM Subcommittee as part of the consultation on March 25, 2008. The AAMM Subcommittee members indicated that we should base the precision and bias goals on the findings of the ongoing DQO analysis identified in our proposal. We have completed the DQO analysis as described in the proposed rule, and a copy of the report is in the docket for this rule. Based on the findings from the DQO analysis, we are finalizing a goal for precision and bias of 20 percent and 15 percent, respectively. These values allow for slightly higher uncertainty than the proposed values and reflect the finding that the existing high-volume samplers may not routinely be capable of meeting the proposed precision and bias goals.

c. Decisions on Quality Assurance Requirements

We are finalizing amendments to the QA requirements for Pb measurements as proposed with the following differences. Based on the DQO analysis, the goal for acceptable measurement uncertainty will be defined for precision as an upper 90 percent confidence limit for the coefficient of variation (CV) of 20 percent and as an upper 95 percent confidence limit for the absolute bias of 15 percent. The evaluation of precision will also be limited to those data greater than or equal to 0.02 μg/m$^3$. These goals are included in section 2.3.1 of 40 CFR Part 58 Appendix A. We are requiring 1 PEP audit per year per PQAO with 5 or fewer sites, and 2 PEP audits per year per PQAO with more than 5 sites. Due to the addition of the Pb performance evaluation, a reference to the statistical assessment of bias used for PM$_{10-2.5}$ and the gaseous pollutants (section 4.1.3) has been included in section 4.4.2 and the requirement for the bias calculation using the Pb strips in combination with the flow rate audits, as discussed in sections 4.4.2 through 4.4.5, has been removed and sections 4.2.2 and 4.2.3 have been used to assess flow rate information and section 4.1.3 has been used for the Pb strip laboratory bias assessment.

B. Network Design

As a result of this Pb NAAQS review and the tightening of the standards, EPA recognizes that the current network design requirements are inadequate to assess compliance with the revised NAAQS. Accordingly, we are promulgating new network design requirements for the Pb NAAQS surveillance network. The following sections provide background, rationale, and details for the final changes to the Pb network design requirements.

## 1. Proposed Changes

We proposed to modify the existing network design requirements for the Pb surveillance monitoring network to achieve better understanding of ambient Pb air concentrations near Pb emission sources and to provide better information on exposure to Pb in large urban areas. We proposed that monitoring be presumptively required at sites near sources that have Pb emissions (as identified in the latest National Emissions Inventory (NEI) or by other scientifically justifiable methods and data) that exceed a Pb "emission threshold". This monitoring requirement would apply not only to existing industrial sources of Pb, but also to fugitive sources of Pb (e.g., mine tailings piles, closed industrial facilities) and airports where leaded aviation gasoline is used. In this context, the "emission threshold" was intended to be the lowest amount of Pb emissions per year for a source that may reasonably be expected to result in ambient air concentrations at a nearby monitoring site in excess of the proposed Pb NAAQS (as discussed later, based on reasonable worst case scenarios). We conducted an analysis to estimate the appropriate emission threshold (Cavender 2008a) which is available in the docket for this rulemaking. Using the results from this analysis, we proposed that the emission threshold be set in the range of 200 kg– 600 kg per year total Pb emissions (including point, area, and fugitive emissions and including Pb in all sizes of PM), corresponding to the proposed range of levels for the Pb NAAQS, with the final selection of the threshold to be dependent on the final level for the NAAQS.

We recognized that a number of factors influence the actual impact a source of Pb has on ambient Pb concentrations (e.g., local meteorology, emission release characteristics, and terrain). Accordingly, we also proposed to allow monitoring agencies to petition the EPA Regional Administrator to waive the requirement to monitor near a source that emits less than 1000 kilograms per year where it can be shown that ambient air concentrations at that site are not expected to exceed 50 percent of the NAAQS during a three-year period (through modeling, historical monitoring data, or other means). We proposed that for facilities identified as emitting more than 1000 kilograms per year in the NEI, a waiver would only be provided for those sites at which it could be demonstrated that actual emissions are less than the emission threshold.

We proposed that source-oriented monitors be located at locations of maximum impact classified primarily as microscale monitors representative of small hot-spot areas adjacent or nearly adjacent to facility fence-lines. We also indicated that source-oriented monitors may be located at locations of maximum impact but which are representative of larger areas and classified as middle scale. Additionally we sought comments on the appropriateness of requiring monitors near Pb sources.

We also proposed a small network of non-source-oriented monitors in urban areas in addition to the source-oriented monitors discussed above, in order to gather additional information on the general population exposure to Pb in ambient air. While it is expected that these non-source-oriented monitors will show lower concentrations than source-oriented monitors, data from these non-source-oriented monitors will be helpful in better characterizing population exposures to ambient air-related Pb and may assist in determining nonattainment boundaries. We proposed to require one non-source-oriented monitor in each Core Based Statistical Area (CBSA, as defined by the Office of Management and Budget [109]) with a population of 1,000,000 people or more as determined in the most recent census estimates. Based on the most current census estimates, 52 CBSAs would be required to have non-source-oriented population monitors (see *http://www.census.gov/ popest/metro/index.html* for the latest census estimates.)

We noted in our proposal that monitoring agencies would need to install new Pb monitoring sites as a result of the proposed revisions to the Pb monitoring requirements. We estimated that the size of the required Pb network would range between approximately 160 and 500 sites, depending on the level of the final standard. If the size of the final network is on the order of 500 sites, we proposed to allow monitoring agencies to stagger the installation of newly required sites over two years, with at least half the newly required Pb monitoring sites being installed and operating by January 1, 2010 and the remaining newly required monitoring sites installed and operating by January 1, 2011. As proposed, monitors near the highest Pb emitting sources would need to be installed in the first year, with monitors near the lower Pb emitting sources and non-source-oriented monitors being

[109] For the complete definition of CBSA refer to: *http://www.census.gov/population/www/estimates/ aboutmetro.html.*

installed in the second year. We also proposed to allow monitoring agencies one year following the release of updates to the NEI or an update to the census to add new monitors if these updates would trigger new monitoring requirements.

We also proposed to allow States to use Pb-$PM_{10}$ monitors to meet the network design requirements if our proposed use of scaled Pb-$PM_{10}$ data was adopted in the final rule.

## 2. Comments on Network Design

We received several comments on the proposed network design requirements. These comments and our responses are broken down into the following categories: source-oriented monitoring, non-source-oriented monitoring, roadway monitoring, the use of Pb-$PM_{10}$ samplers, and the required timeline for installing newly required monitors.

### a. Source-oriented monitoring

We received several comments supporting the need for monitoring near Pb sources. Alternatively, one commenter suggested that near source monitoring is not necessary because "the EPA and the State already know where and what the problems are" and "EPA should * * * develop control standards to deal with the problem * * *" We note individual sources do not violate a NAAQS but that under the CAA a primary method to achieve control of emissions at sources contributing to an exceedance of the NAAQS is the State Implementation Plan (SIP). We expect the highest concentrations of Pb to be near sources of Pb due to its dispersion characteristic. Monitoring data are important evidence used to designate areas as non-attainment of the NAAQS. Thus, monitoring near Pb sources is needed to properly designate areas that violate or contribute to air quality in a nearby area that does not meet the Pb NAAQS.

We received a comment that the methods used in developing the emission thresholds estimated ambient impacts over different averaging periods, and that the emission thresholds should be recalculated for all methods using the final averaging period. We recognized this issue in our memorandum documenting the analysis (Cavender, 2008a), and we have recalculated the estimate of the lowest Pb emission rate that under reasonable worst-case conditions could lead to Pb concentrations exceeding the NAAQS, based on the final level and form of the standard (Cavender, 2008b).

We also received comments on the approach used in developing the

proposed emission thresholds that would trigger placement of a monitoring site near a Pb source. Commenters expressed concerns that the approach overestimated the potential impact of Pb sources, and would result in either unnecessary burden on monitoring agencies or worse yet, monitoring agencies would install and operate monitors at sources that had little to no potential to exceed the NAAQS. Several commenters suggested various alternative levels, including a threshold of 1 ton or higher, basing their recommendations on concerns such as the reliability of data in the NEI. Other commenters suggested that EPA was in the best position to determine which sources had the potential to exceed the NAAQS.

We note that the approach used in developing the emission threshold in the proposal was intended to represent a reasonable worst case scenario. As such, we recognize that many Pb sources which emit at or above the proposed emission threshold will have Pb impacts that are below the Pb NAAQS. To account for this, we proposed to allow monitoring agencies to request monitoring waivers if they could demonstrate that facilities would not contribute to a Pb impact of greater than 50 percent of the NAAQS. However, upon further consideration, we agree that by basing the threshold on these worse case condtions we will be placing an unnecessary burden on monitoring agencies to evaluate or monitor around sources that may not have a significant potential to exceed the NAAQS. As a result, we are finalizing changes to our approach for requiring source-oriented monitors. We are including a requirement that monitoring agencies conduct monitoring taking into account sources that are expected to exceed or shown to have contributed to a maximum concentration that exceeded the NAAQS, the potential for population exposure, and logistics. In addition, specifically we are requiring monitoring agencies to conduct monitoring at sources which emit Pb at a rate of 1.0 or more tons per year. This emissions rate corresponds to two times the estimate of the lowest Pb emission rate that under reasonable worst-case conditions could lead to Pb concentrations exceeding the NAAQS. This recognizes the thresholds used in the proposal represented reasonable worst case scenarios, and that a more appropriate approach to balance the factors important in designing a network is to use a higher threshold that is more likely to clearly identify sources that

would contribute to exceedences of the NAAQS. In addition, the State, and the Agency working together will identify what additional sources should be taken into account because they are expected to or have been shown to contribute to maximum concentrations that contribute to exceedences.

To account for the other sources that may contribute to a maximum Pb concentration in ambient air in excess of the NAAQS, we are retaining the authority granted to the EPA Regional Administrator in the existing monitoring requirements to require monitoring "where the likelihood of Pb air quality violations is significant or where the emissions density, topography, or population locations are complex and varied." We believe that these final monitoring requirements are adequate to ensure that monitoring will be conducted respecting facilities that have the potential to exceed the NAAQS without placing undue burden on monitoring agencies.

We received several comments supporting the need for monitoring waivers, and one comment that did not support waivers. Those in favor of the waivers pointed out that, as discussed above, many Pb sources will result in much lower Pb impacts than the "worst case" Pb source. They argued that the states need flexibility in meeting the source-oriented monitoring requirements, and agreed that it is appropriate to focus on sites near those Pb sources with the greater potential to result in Pb concentrations that exceed the Pb NAAQS. The commenter who cautioned against the allowance of monitoring waivers expressed concerns that modeling results are not exact and this uncertainty could result in waivers being granted when actual Pb concentrations could exceed the NAAQS. We took the uncertainty of modeled results into account when proposing to limit waivers to situations where the modeled data indicated maximum concentrations would be 50 percent of the NAAQS, rather than at 100 percent of the NAAQS, and we believe this provides a sufficiently protective approach to account for uncertainty in modeling and other assessments estimating a Pb source's expected impacts.

We received comments questioning the need to restrict the provision of waivers to sites near sources emitting less than 1000 kg/yr. We agree it is possible for sources greater than 1000 kg/yr to have an impact less than 50 percent of the NAAQS under certain conditions. We also acknowledge the need for flexibility in implementing the Pb NAAQS monitoring network. As

such, we have reconsidered our proposed restriction limiting waivers to those for sources emitting less than 1000 kg/yr, and we are not finalizing a restriction on the size of sources near sites eligible for a waiver from the source-oriented monitoring requirement.

We received comments on relying on the National Emission Inventory (NEI) to identify Pb sources with emissions greater than the emission threshold. In general, several commenters said better data should be used to identify Pb sources emitting above the proposed emission threshold. Several commenters expressed concerns with the accuracy of the NEI, and recommended allowing states to use "the best available information" on emissions from Pb sources. Some commenters pointed to differences in Pb emissions data reported in the Toxics Release Inventory and the NEI as evidence that the NEI was inaccurate. One commenter said current practices to reduce toxic emissions are not reflected in the NEI and wanted the opportunity to update the information. Commenters said EPA should correct the errors in the NEI or allow states to submit revised local data that more accurately reflect Pb emissions before emissions inventory data are used to determine which sources exceed the threshold.

We agree that the most current Pb emissions information should be used when making final decisions about which sources exceed the emission threshold. This may include datasets that could include sources not contained in the NEI. We acknowledge that many of the NEI emission estimates likely would be improved with more site specific data (e.g., emissions test data). We have added the phrase "or other scientifically justifiable methods and data" to the monitoring requirements to clarify that NEI emissions estimates are not the only emission estimates that can be used to estimate emissions.

We received comments that the proposed source-oriented monitoring requirements did not address situations where multiple sources contribute to Pb concentrations at one location. Our proposed waiver requirements do take into account the impacts from multiple sources. The proposed language stated that waivers could only be granted for source-oriented sites that did not "contribute to a maximum Pb concentration in ambient air in excess of 50 percent of the NAAQS". We recognize that exceedances of the standard may be caused by emissions from a number of smaller sources none of which would cause a violation in

isolation, but we expect it is unlikely that violations would occur when all of the sources in an area are below the emissions threshold due to the rapid decrease in Pb concentrations with distance from a Pb source. However, the purposes of the monitoring network would be undermined if multiple sources in a single area were able to receive waivers, with the result that no monitor was required even though Pb concentrations in the area were in excess of 50 percent of the standard. Accordingly, EPA expects that Regional Administrators, in deciding whether to grant waivers, will take into account whether other waivers have been granted or sought for sources in the same area, and whether the cumulative emissions of the sources in the area warrant at least one monitor being sited.

Several monitoring agencies expressed concern about the need for flexibility in implementing the source-oriented monitoring requirements. We believe that the proposed rule provides significant flexibility to monitoring agencies for the implementation of the monitoring requirements. One area where we believe it is appropriate to provide additional flexibility is for situations where multiple sources above the emission threshold contribute to a single maximum impact. A strict reading of the proposed source-oriented monitoring requirement could be that monitoring agencies would be required to monitor each Pb source separately. This was not intended, and our existing monitoring guidance is clear that a single monitor can be used to monitor multiple sources where the maximum impact is influenced by multiple sources. Nonetheless, we believe it is appropriate to clarify this point in the rule language. As such, we are adding a clause to the source-oriented monitoring requirement that specifies that a single monitor can be used to monitor multiple Pb sources where they contribute to a single maximum impact.

We received two comments that source-oriented monitors should be located at the location of maximum estimated Pb concentration without consideration for the potential for population exposure, and six comments that source-oriented monitors should be located in an area where population exposure occurs. In their comments on the proposed rule, one commenter argued that monitors "should be located in or around only those Pb point sources with a nearby population base" because "air Pb concentrations have regulatory importance largely in those areas where significant groups of children are exposed for considerable time periods." The commenter argued that as an

example "a rural road going by a lead mining facility is an unlikely place that children will spend considerable amounts of time" and as such "placing a monitoring site on such a road would have de minimis, if any, value." Another commenter suggested that "monitors should be located near playgrounds, sports fields, long-established highways, and the like."

Siting of required monitors at the expected maximum concentration in ambient air is consistent with how all NAAQS pollutants are monitored.[110] In considering the siting criteria for the required Pb source-oriented monitors, we recognize that Pb is a persistent, multimedia pollutant, such that deposited Pb from current emissions can contribute to human exposures over extended amounts of time. Also, Pb deposited in one area can be transported to another area by "tracking" from vehicle and foot traffic. In addition, unlike the case for other criteria pollutants, ingestion of deposited Pb is a major Pb exposure pathway. Given these complexities, it is appropriate to allow siting agencies to also consider the potential for population exposure in siting monitors near sources.

In our proposed rule, we recognized that there are reasons for not requiring monitoring at the location of expected maximum concentration such as logistical limitations (i.e., the location of expected maximum concentration occurs in the middle of a lake). In consideration of public comments on this issue and due to the complexities of Pb, we believe it is appropriate, in the final rule, to also allow states to consider the potential for population exposure as a factor (in addition to other factors such as logistical considerations) when siting required source-oriented monitors. Thus, we are including the potential for population exposure as a factor that monitoring agencies can consider when siting a maximum concentration source-oriented monitoring site required under part 58.

b. Non-source-oriented monitoring

We received a number of comments on our proposed non-source-oriented monitoring requirement. One state and several tribes commented that the proposed population limit would result in no required non-source-oriented monitors in low population states and tribal lands. One commenter expressed concerns that the population limit was

too high, and would result in environmental justice concerns since many poor communities would not be monitored.

As stated in the proposed rule, it is unlikely that exceedences of the Pb NAAQS will occur at sites distant from Pb sources. As such, our non-source-oriented monitoring requirements satisfy monitoring objectives in addition to ensuring compliance with the Pb NAAQS. For the most part, these monitoring sites should be sited to represent neighborhood scale exposures. We are requiring non-source-oriented Pb monitors to provide additional information that will be useful in better characterizing air-related Pb exposures in neighborhoods. Sources affecting neighborhoods may include re-entrained dust from roadways, closed industrial sources which previously were significant sources of Pb, hazardous waste sites, construction and demolition projects, or other fugitive sources of Pb. Non-source sites will also support the next Pb NAAQS review by providing additional information on the spatial variations in Pb concentrations between areas that affected by sources to a significant degree and those that are not.

We believe it is most appropriate to focus the non-source monitoring requirements in large urban areas since high population locations are most used in health and epidemiological studies. We proposed to require one non-source-oriented monitor in each CBSA with a population of 1,000,000 or more based on the latest available census figures. That proposed requirement would have resulted in approximately 50 CBSAs required to have non-source Pb monitors. EPA notes the comments that the proposed population limit of 1,000,000 was too high, and may result in the lack of non-source-oriented monitors in smaller urban communities. Accordingly, we have decreased the population limit for requiring non-source monitors to CBSAs with a population of 500,000 people or more, thereby increasing the number of required non-source Pb monitors from approximately 50 to approximately 100 (based on 2007 population estimates from the Census Bureau).

We also note that these requirements are minimum monitoring requirements, and that state and tribal monitoring agencies may operate additional non-source-oriented monitors beyond the minimum number of required monitors. Data that meet the quality assurance requirements that are collected from non-required FRM or FEM monitors will also be used to determine compliance with the Pb NAAQS. Additionally, as

---

[110] Required $PM_{2.5}$ sites have additional criteria where monitoring sites are to represent community-wide air quality [40 CFR part 58, appendix D paragraph 4.7.1(b)] with at least one required site in a population-oriented area of expected maximum concentration.

described previously, source-oriented monitoring would be required in rural and small communities if a Pb source emitting 1 ton per year or more is present.

### c. Roadway Monitoring

The majority of commenters agreed with our finding that the available data on Pb concentrations near roadways do not indicate the potential for exceedances of the proposed range of Pb NAAQS levels and requirements for monitors near roadways were not needed to ensure compliance with the NAAQS. However, one commenter argued that our finding that activity on roadways would not likely contribute to air Pb concentrations in exceedance of the proposed levels for the standard was based on data from monitors that did not represent the maximum impact from roadways.

While some of the monitors used in our analysis of air Pb impacts from activity on roadways may not represent the site of maximum impact, we believe they are representative of locations where roadway monitoring might be conducted. As we indicated in our proposal, these monitors indicate that Pb concentrations are slightly elevated near roadways, but do not occur at levels approaching the Pb NAAQS being finalized today. Nonetheless, we agree that more information on Pb concentrations near roadways would be valuable, and we encourage monitoring agencies to consider placing Pb monitors near population centers heavily impacted by roadways in some of the CBSAs required to install and operate non-source-oriented monitors to provide information for use in future NAAQS reviews. In addition, the EPA has research initiatives investigating Pb concentrations near roadways that will provide additional information that can be used in future NAAQS reviews.

### d. Use of Pb-$PM_{10}$ Monitors

Comments were received on the use of Pb-$PM_{10}$ monitoring in lieu of required Pb-TSP under certain circumstances. Several commenters suggested an approach for the use of Pb-$PM_{10}$ monitors as an alternative to the proposed use of scaling factors. Commenters suggested that Pb-$PM_{10}$ monitoring would only be allowed in certain instances. Specifically, Pb-$PM_{10}$ monitoring would be allowed where estimated Pb concentrations were predicted to be less than 50 percent of the NAAQS and where Pb in ultra-coarse particulate was expected to be low. These commenters also suggested that if at some point in the future the monitor were to show that Pb-$PM_{10}$

concentrations exceeded 50 percent of the NAAQS, the monitoring agency would be required to replace the Pb-$PM_{10}$ monitor with a Pb-TSP monitor.

We support this suggested approach, noting that it allows for the use of Pb-$PM_{10}$ in areas where we do not expect Pb concentrations to exceed the Pb NAAQS without the burden and uncertainty associated with the development and use of site-specific scaling factors. As noted in section II.C.1, use of Pb-$PM_{10}$ monitors in these locations offers the advantages of increased monitor precision and decreased spatial variation of Pb-$PM_{10}$ concentrations, without raising the same concerns over a lack of protection against health risks from all particulate Pb emitted to the ambient air that support retention of Pb-TSP as the indicator.

However, we feel the combined requirements for allowing use of Pb-$PM_{10}$ monitors only in areas where the concentration is expected to be less than 50% of the NAAQS and where Pb in ultra-coarse particles is expected to be low may be too restrictive, especially in light of the fact that a monitoring agency may request a waiver from monitoring altogether if the expected concentration is less than 50% of the NAAQS. We believe it is appropriate to allow Pb-$PM_{10}$ in lieu of Pb-TSP where the maximum 3-month arithmetic mean Pb concentration is expected to be less than 0.10 μg/m³ (i.e., two thirds of the NAAQS) and where sources are not expected to emit ultra-coarse Pb. By limiting the use of Pb-$PM_{10}$ monitoring to locations where the Pb concentrations are less than 0.10 μg/m³ on a 3-month arithmetic mean and where ultra-coarse Pb is expected to be low, we believe that the Pb-TSP concentrations will also be less than 100% of the NAAQS. Examples of locations where Pb-$PM_{10}$ monitoring may be more representative of Pb-TSP levels than others are urban areas away from Pb sources (i.e., non-source-oriented monitoring locations), near airports, combustion sources, and other Pb sources which are expected to only emit Pb in the fine PM size fraction. Locations where it would not be appropriate to monitor using Pb-$PM_{10}$ samplers include near smelters, roadways, and sources with significant fugitive dust emissions.

We are revising the proposed allowance for the use of Pb-$PM_{10}$ monitors to allow Pb-$PM_{10}$ monitors without the use of scaling factors for non-source-oriented monitors (unless existing data indicates maximum 3-month arithmetic mean Pb concentration has exceeded 0.10 μg/m³ in the last three years) and for source-

oriented monitors where maximum 3-month arithmetic mean Pb concentration is expected to be less than 0.10 μg/m³ (based on modeling or historic data) and where ultra-coarse Pb is expected to be low. We are also requiring that a Pb-TSP monitor be required at the site if at some point in the future the Pb-$PM_{10}$ monitor shows that the maximum 3-month arithmetic mean Pb-$PM_{10}$ concentration was equal to or greater than 0.10 μg/m³. Section IV.E of this preamble discusses how data from Pb-$PM_{10}$ monitors will be used in comparison to the Pb NAAQS.

### e. Required Timeline for Monitor Installation and Operation

We received several comments from monitoring agencies regarding the proposed timeline for monitor installation. Commenters supported the need for a staggered network deployment, especially if a large number of new monitors would be required. Two commenters argued that even the proposed two-year deployment would not provide enough time for monitoring agencies to site and install the number of monitors needed.

Based on the network design requirements being finalized with this action, we estimate that approximately 135 facilities emit Pb at levels over the "emissions threshold" of 1 ton per year and would result in required monitoring. We are also requiring urban areas with populations over 500,000 to site non-source-oriented monitors, thus another 101 monitors are required. Together the required source-oriented and non-source-oriented monitors are expected to total 236 monitors. Some of the existing 133 lead monitoring stations will be useful to support the required network, but other stations may need to move. We are estimating that approximately 90 of the existing stations are in locations that are of benefit to other monitoring objectives, even when well below the NAAQS (e.g., long-term trends or for use in a health study) and are not part of the minimum network requirements being finalized in today's action. Once the network is fully operational the 236 required stations plus an additional 90 stations in existing locations that are not required results in an expected network of 326 lead monitoring stations to adequately support characterization of lead across the country.

We believe it would be unrealistic to require monitoring agencies to site and install the required 240 new monitoring stations within one year, even if some of these are already in the right locations. However, we do believe it is reasonable to require monitoring

agencies to site and install half of these stations in one year with the remaining stations deployed in the following year. Accordingly, and as discussed further below, we are finalizing a two-year monitor deployment schedule for required monitoring.

### 3. Decisions on Network Design Requirements

We are finalizing new network design requirements for the Pb NAAQS monitoring network that differ from those proposed in the following aspects. The differences from the proposal reflect our consideration of the comments on the proposed network design requirements and consideration of the level, form, and averaging time for the final NAAQS being promulgated today.

We are adding a requirement that monitoring agencies conduct ambient air Pb monitoring taking into account Pb sources which are expected to or have been shown to contribute to a maximum Pb concentration in ambient air in excess of the NAAQS, the potential for population exposure, and logistics. At a minimum, there must be one source-oriented SLAMS site located to measure the maximum Pb concentration in ambient air resulting from each Pb source which emits 1.0 or more tons per year based on either the most recent NEI or other scientifically justifiable methods and data (such as improved emissions factors or site-specific data). We are maintaining the existing authority for the EPA Regional Administrator to require additional monitoring where the likelihood of Pb air quality violations is significant or where the emissions density, topography, or population locations are complex and varied. In addition, we are adding a clause to the source-oriented monitoring requirement to clarify that a single monitor may be used to monitor multiple Pb sources when the sources contribute to a single maximum Pb concentration.

In addition, monitoring agencies may consider the potential for population exposure when siting source-oriented monitors. While this change does not restrict monitoring agencies from monitoring at any location meeting the definition of ambient air, this provision allows monitoring agencies to consider the potential for population exposure when siting the required source-oriented monitors at the maximum Pb concentration.

We are removing the proposed restriction that waivers may only be granted for sites near sources emitting less than 1000 kg/yr. The EPA Regional Administrator may approve waivers for the source-oriented monitoring requirement for any site where the monitoring agency demonstrates that the emissions from the source will not contribute to a Pb-TSP concentration greater than 50 percent of the final NAAQS (based on historic data, monitoring data, or other means).

We are requiring one non-source-oriented monitor in every CBSA with a population of 500,000 people or more. In addition, we are requiring these monitors be placed in neighborhoods within urban areas impacted by re-entrained dust from roadways, closed industrial sources which previously were significant sources of Pb, hazardous waste sites, construction and demolition projects, or other fugitive dust sources of Pb.

Monitoring agencies may use Pb-PM$_{10}$ monitors to meet the non-source-oriented monitoring requirements tied to CBSA population provided that historical monitoring does not indicate Pb-TSP or Pb-PM$_{10}$ concentrations greater than an arithmetic 3-month mean of 0.10 µg/m³, and to meet the source-oriented monitoring requirements where Pb concentrations are expected (based on historic data, monitoring data, or other means) to be less than 0.10 µg/m³ on an arithmetic 3-month mean, and ultra-coarse Pb is expected to be low. However, monitoring agencies are required to begin monitoring for Pb-TSP within six months of a measured Pb-PM$_{10}$ arithmetic 3-month mean concentration of 0.10 µg/m³ or more. For example, if a Pb-PM$_{10}$ monitoring site measures an arithmetic 3-month mean concentration of 0.10 µg/m³ or more for the period March–May 2011, the responsible monitoring agency would be required to install and begin operation of a Pb-TSP monitor at the site no later than December 1, 2011.

We are allowing monitoring agencies to stagger installation of any newly required monitors over a two-year period. Each monitoring agency is required to install and operate the required source-oriented monitors by January 1, 2010. The non-source-oriented monitors are required to be installed and operated by January 1, 2011. The annual monitoring plan due July 1, 2009 must describe the planned monitoring that will begin by January 1, 2010, and the plan due July 1, 2010 must describe the planned monitoring that will begin by January 1, 2011.

### C. Sampling Frequency

We proposed to maintain the 1-in-6 day sampling frequency if the final averaging time for the NAAQS standard was based on a quarterly average. We

did not receive any comments on our proposed sampling frequency for a NAAQS based on a quarterly average. While the final NAAQS is based on a moving 3-month average rather than a quarterly average, the statistical and practical monitoring considerations are the same. As such, we are maintaining the current 1-in-6 day minimum sampling frequency as proposed (i.e., monitoring agencies will be required to collect at least one 24-hour Pb sample every six days).

### D. Monitoring for the Secondary Standard

We did not propose any specific additional monitoring requirements for the secondary standard because based on the available data, we do not expect exceedances of either the primary or the secondary NAAQS away from the point sources that will be addressed by the monitoring requirements already described. We also noted that the Pb-PM$_{2.5}$ data collected as part of the Interagency Monitoring of Protected Visual Environments (IMPROVE) program provide useful information on Pb concentrations in rural areas that can be used to track trends in ambient air Pb concentrations in rural areas including important ecosystems. We received one comment supporting our proposed reliance on the IMPROVE network Pb-PM$_{2.5}$ data. We did not receive any other comments on additional monitoring needs to support the secondary Pb NAAQS. Thus, we are not finalizing any additional requirements for Pb monitoring specifically for the secondary Pb NAAQS.

### E. Other Monitoring Regulation Changes

We are finalizing two other proposed changes to the monitoring requirements for Pb, and making one editorial revision for ease of reference. We are changing the reporting requirements to require the reporting of average pressure and temperature for each Pb sample collected. We are also removing Pb from the list of criteria pollutants where data from special purpose monitors can be excluded from consideration for designations. The proposed changes, comments received, and final amendments are described in the following paragraphs.

### 1. Reporting of Average Pressure and Temperature

We proposed revisions to 40 CFR 58.16(a) to add a requirement that the monitoring agency report the average pressure and temperature during the time of sampling for both Pb-TSP monitoring and Pb-PM$_{10}$ monitoring. We did not receive any comments on this

proposed requirement. As such, we are finalizing this requirement as proposed. Monitoring agencies may use site specific meteorological measurements generated by on-site equipment (meteorological instruments, or sampler generated), a representative nearby monitoring station, or measurements from the nearest airport reporting ambient pressure and temperature.

2. Special Purpose Monitoring

We proposed to revise 40 CFR 58.20(e) by removing the specific reference to Pb in the rule language. We proposed to make this change because the form of the proposed Pb NAAQS would allow a non-attainment finding to be based on as little as 3-months of data which would have to be considered during mandatory designations. We did not receive any comments on this proposed revision to the special purpose monitoring requirements. As such, we are finalizing the revision to 40 CFR Section 58.20(e) as proposed.

**VI. Implementation Considerations**

This section of the final rule discusses the specific CAA requirements related to implementation of the revised Pb NAAQS based on the structure outlined in the CAA, existing rules, existing guidance, and in some cases revised guidance.

The CAA assigns important roles to EPA, states, and tribal governments in implementing NAAQS. States have the primary responsibility for developing and implementing State Implementation Plans (SIPs) that contain state measures necessary to achieve the air quality standards in each area. EPA provides assistance to states and tribes by providing technical tools, assistance, and guidance, including information on the potential control measures.

A SIP is the compilation of regulations and control programs that a state uses to carry out its responsibilities under the CAA, including the attainment, maintenance, and enforcement of the NAAQS. States use the SIP development process to identify the emissions sources that contribute to the nonattainment problem in a particular area, and to select the emissions reduction measures most appropriate for the particular area in question. Under the CAA, SIPs must ensure that areas reach attainment as expeditiously as practicable, but by no later than the statutory attainment date that is set for the area.

The EPA's analysis of the available Pb monitoring data suggests that a large percentage of recent Pb ambient air concentrations in excess of 0.15 µg/m³ have occurred in locations with active industrial sources of lead emissions. Accordingly, we anticipate that many areas may be able to attain the revised NAAQS by implementing air pollution control measures on lead emitting industrial sources only. These controls could include measures such as particulate matter fabric filter control devices and industrial fugitive dust control measures applied in plant buildings and on plant grounds. However, it may become necessary in some areas to also implement controls on non-industrial, or former industrial, type sources. Based on these considerations, EPA believes that the regulations and guidance currently being used to implement the pre-existing Pb NAAQS are still appropriate to implement the revised Pb NAAQS with modifications in some cases.

The regulations and guidance which address the implementation of the pre-existing NAAQS for Pb are mainly provided in the following documents: (1) "State Implementation Plans; General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990", 57 FR 13549, April 16, 1992, (2) "State Implementation Plans for Lead Nonattainment Areas; Addendum to the General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990", 58 FR 67748, December 22, 1993, and (3) regulations listed at 40 CFR 51.117. These documents address requirements such as designating areas, setting nonattainment area boundaries, promulgating area classifications, nonattainment area SIP requirements such as Reasonably Available Control Measures (RACM), Reasonably Available Control Technology (RACT), New Source Review (NSR), Prevention of Significant Deterioration (PSD), and emissions inventory requirements. The EPA believes that the existing guidance and regulations are sufficient to implement the revised Pb NAAQS at this time. As discussed below, EPA is finalizing some changes to the existing guidance and regulations, and EPA will, as appropriate, review, and revise or update these policies, guidance, and regulations to ensure effective implementation of the Pb NAAQS.

Several commenters submitted comments stating that the usual agency practice for revising the NAAQS has been to first promulgate a rule setting the health and welfare based standards, and then to promulgate a rule that addresses the numerous implementation issues relating to the NAAQS. These commenters stated that the lead NAAQS proposal, however, combines these two rulemakings into one compressed rule.

Commenters stated that they theoretically believe that this two-in-one rule approach could benefit states and localities by preventing the types of delays that have been encountered with the implementation of other pollutants. The commenters, however, stated that they believe that the lead NAAQS implementation provisions in the proposed rule are insufficient to give state and local agencies adequate guidance to implement the revised standard. Commenters further stated that they believe that EPA should particularly update lead control strategy and emissions inventory guidance documents to account for the change to the level of the standard.

As stated in the proposed rule, EPA believes that the regulations and guidance currently being used to implement the pre-existing Pb NAAQS are generally still appropriate to address the issues required to begin implementing the revised Pb NAAQS. As discussed in the proposal, EPA is revising the emission inventory requirements of 40 CFR 51.117(e)(1). In some areas, as discussed below, EPA is providing additional guidance in response to comments. The EPA believes that these policies, guidance and regulations should be used by states, local, and Tribal governments as a basis for implementing the revised Pb NAAQS. Also, as stated in the proposed rule, EPA will as appropriate, further review and revise or update these policies, guidance, and regulations in the future to ensure that states, local, and Tribal governments have the appropriate information necessary to fully implement the revised Pb NAAQS in a timely manner.

As discussed below, the EPA is generally finalizing the guidance concerning the implementation of the revised Pb NAAQS consistent with the proposed rule.

*A. Designations for the Lead NAAQS*

1. Proposal

As discussed in the proposed rule, after EPA establishes or revises a primary and/or secondary NAAQS, the CAA requires EPA and the states to begin taking steps to ensure that the new or revised NAAQS are met. The first step is to identify areas of the country that do not meet the new or revised NAAQS. The CAA defines EPA's authority to designate areas that do not meet a new or revised NAAQS. Section 107(d)(1) provides that "By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised NAAQS for any pollutant under

section 109, the Governor of each state shall * * * submit to the Administrator a list of all areas (or portions thereof) in the state'' that designates those areas as nonattainment, attainment, or unclassifiable. Section 107(d)(1)(B)(i) further provides, ''Upon promulgation or revision of a NAAQS, the Administrator shall promulgate the designations of all areas (or portions thereof) * * * as expeditiously as practicable, but in no case later than 2 years from the date of promulgation. Such period may be extended by up to one year in the event the Administrator has insufficient information to promulgate the designations.'' The term ''promulgation'' has been interpreted by the courts to mean the signature and dissemination of a rule.[111] By no later than 120 days prior to promulgating final designations, EPA is required to notify states or Tribes of any intended modifications to their boundaries as EPA may deem necessary. States and Tribes then have an opportunity to comment on EPA's tentative decision. It should be noted that, whether or not a state or a Tribe provides a recommendation, EPA must promulgate the designation that it deems appropriate.

In the proposal, EPA indicated that Governors and tribal leaders would be required to submit their initial designation recommendations to EPA no later than September 2009, and the initial designation of areas for the new Pb NAAQS would occur no later than September 2010, although that date may be extended by up to one year under the CAA (or no later than September 2011) if EPA has insufficient information to promulgate the designations. These dates were based on the court-ordered schedule in effect at the time of proposal, which required a final rule to be signed no later than September 15, 2008. The court-ordered schedule was subsequently amended to require a notice of final rulemaking to be signed no later than October 15, 2008.

In the proposed rule, EPA also discussed issues related to possible schedules for designations, and EPA took comment on issues related to the anticipated designation schedule. The proposal identified two ''key considerations'' in establishing a schedule for designations: ''(1) The advantages of promulgating all designations at the same time; and (2) the availability of a monitoring network and sufficient monitoring data to identify areas that may be violating the NAAQS'' (73 FR 29267). The EPA then

stated its view that ''there are important advantages to promulgating designations for all areas at the same time'' and expressed its intention to do so.

The proposal also discussed EPA's belief that the existing Pb monitoring network is not adequate to evaluate attainment of the revised Pb NAAQS at locations consistent with EPA's proposed new monitoring network siting criteria and data collection requirements. These new requirements would result in a more strategically targeted network that would begin operation by January 1, 2010. The proposal pointed out that taking the additional year provided under section 107(d)(1)(B)(i) of the CAA (which would allow up to 3 years to promulgate initial designations following the promulgation of a new or revised NAAQS) would allow the first year of data from the new monitoring network to be available. The proposal also stated that, due to the updated monitoring network design requirements, this additional data would be of significant benefit for designating areas for the new NAAQS.

Accordingly, the proposal identified an initial designation schedule under which states (and Tribes) would be required to submit designation recommendations to EPA no later than one year following promulgation of the new NAAQS. States would be able to consider ambient data collected with the existing network FRM and FEM samplers through the end of calendar year 2008 when formulating their recommendations. The proposal further indicated that if, as EPA anticipated, EPA needed an additional year to make designations due to insufficient information, EPA would have access to Pb air quality monitoring data from calendar year 2010, which state monitoring officials have certified as being complete and accurate, since the deadline for such certification is May 1, 2011. Under this schedule, EPA would be able to consider data from calendar years 2008–2010 in formulating its proposed revisions, if any, to the designations recommended by states and Tribes. States and Tribes would then have an opportunity to comment on EPA's proposed modifications, if any, prior to the promulgation of designations by Fall 2011. The EPA solicited comment on whether EPA has the authority to determine in this final rule that three years would be necessary to make designations. The EPA also solicited comment on making designations within two years from promulgation of a revised NAAQS.

2. Comments and Responses

Several commenters suggested that EPA should require that states with current nonattainment or maintenance areas submit designation recommendations for those counties or Metropolitan Statistical Areas (MSAs) with nonattainment or maintenance areas within 120 days of promulgation of the rule.

Section 107(d)(1)(A) provides that States shall submit recommendations for areas to be designated attainment, nonattainment, and unclassifiable ''[b]y such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 109.'' EPA's consistent practice in revising NAAQS has been to allow states a year to prepare their lists of designations, and the proposal likewise indicated EPA's intent to allow a year for states to prepare their recommendations. It is often true that when a standard is made more stringent there will be existing nonattainment and maintenance areas that may be expected to be nonattainment for the new standard as well. Furthermore, EPA notes that the most recent three years of available monitoring data for East Helena, MT, one of the two current nonattainment areas, showed no violations of the current standard, although the monitors were shut down in December 2001 following the shutdown of the large stationary source of lead emissions there. The EPA also notes that preparing designation recommendations is a complex task, and the magnitude of the reduction in the Pb NAAQS, and the long interval since the last revision to the standard is likely to add to the difficulty for states.

Thus, while EPA considers the increased stringency of the standard to be relevant to the question of when states should submit designation recommendations, EPA does not believe that under the current circumstances it would be reasonable to require states to submit a list of areas to be designated attainment, nonattainment, or unclassifiable sooner than one year following promulgation year.

Therefore, pursuant to section 107(d)(1)(A), states shall, and Tribes may, provide area designation recommendations to EPA no later than October 15, 2009.[112] In some areas, EPA

---

[111] *American Petroleum Institute* v. *Costle*, 609 F.2d 20 (D.C. Cir. 1979).

[112] Under the CAA and the Tribal Authority Rule (TAR), eligible Indian Tribes may develop and submit Tribal Implementation Plans (TIPs) for EPA approval, to administer requirements under the CAA on their reservations and in nonreservation
Continued

anticipates that state and Tribal officials will be able to base their recommendations on existing monitoring data, and can therefore identify an area as "attainment" or "nonattainment." EPA also anticipates that there will be other areas where state and Tribal officials will not have sufficient information to make such a determination. State and Tribal officials are advised to identify such areas as "unclassifiable." For these areas EPA may wait until sufficient ambient air quality data from the newly deployed Pb monitoring network are available to take final action on the state and Tribal recommendations.

Several commenters stated that EPA should promulgate designations for the revised Pb NAAQS within the 2 year period provided in the CAA. Commenters further stated that they do not understand why EPA needs to take an additional year beyond the two years provided under the CAA to do the designations. In addition, the commenters stated that they believe EPA does not have the authority to take the additional year (i.e., the 3rd year provided under section 107(d)(1)(B)(i) of the CAA) to do designations for the Pb NAAQS because sufficient monitoring data is available to do the designations within 2 years of promulgation of the NAAQS.

Other commenters stated that they agree with EPA that, given that the current monitoring network for the Pb NAAQS is insufficient to base designations on for the new NAAQS, EPA should not promulgate designations until there is sufficient data from the new monitoring network.

Section 107(d)(1)(B)(i) provides that the Administrator shall promulgate the designations of all areas as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard. Such period may be extended by up to one year in the event the Administrator has insufficient information to promulgate the designations.

After considering the comments, and recognizing that in some locations there may be monitoring data sufficient to determine whether or not the area is attaining the standard, EPA now

believes that the benefits of identifying nonattainment areas as soon as possible, in some areas as discussed shortly below, outweigh the potential administrative benefits of designating all areas at the same time.

At the same time, EPA continues to believe that the current monitoring network is inadequate for making designations in many, if not most, areas of the country, and agrees with those commenters who stated that it would be preferable to wait until additional monitoring data was available for those areas than to proceed to designate areas based only on data from the current insufficient monitoring network. The EPA notes that any delay in designations beyond two years would be based on the lack of monitoring data (and the expectation that additional monitoring data would be available if designations were delayed) and would not be based on staffing and other non-data resource issues.

Accordingly, EPA believes that the most appropriate approach to designations for the Pb NAAQS is for EPA to complete final designations as expeditiously as possible, and to recognize that "as expeditiously as possible" may result in making nonattainment designations at different times for different areas. In some areas, EPA expects that it will be possible to do designations within two years based on currently available monitoring data. In other areas, EPA expects that taking the additional year will prove necessary in order to collect the necessary monitoring data before making designations.

3. Final

After considering the comments and for the reasons discussed above, EPA no longer plans to make all designations, and particularly all nonattainment designations, at the same time. The EPA intends to make designations as expeditiously as possible in areas where monitoring data is currently sufficient, or will be sufficient in the immediate future, to accurately characterize the areas as either not attaining or attaining the new Pb NAAQS. In some cases this will be possible as expeditiously as practicable, but no later than two years following promulgation of the final rule. In other cases this will not be possible until additional data are collected from the newly deployed monitoring network, and may take up to three years.

*B. Lead Nonattainment Area Boundaries*

1. Proposal

The process for initially designating areas following the promulgation of a

new or revised NAAQS is prescribed in section 107(d)(1) of the CAA. This section of the CAA provides each state Governor an opportunity to recommend initial designations of attainment, nonattainment, or unclassifiable for each area in the state. Section 107(d)(1) of the CAA also directs the state to provide the appropriate boundaries to EPA for each area of the state, and provides that EPA may make modifications to the boundaries submitted by the state as it deems necessary. A lead nonattainment area must consist of that area that does not meet (or contributes to ambient air quality in a nearby area that does not meet) the Pb NAAQS. Thus, a key factor in setting boundaries for nonattainment areas is determining the geographic extent of nearby source areas contributing to the nonattainment problem. For each monitor or group of monitors that exceed a standard, nonattainment boundaries must be set that include a sufficiently large enough area to include both the area judged to be violating the standard as well as the source areas that are determined to be contributing to these violations.

Historically, Pb NAAQS violations have been the result of lead emissions from large stationary sources and mobile sources that burn lead-based fuels. In some locations, a limited number of area sources have also been determined to have contributed to violations. Since lead has been successfully phased out of motor vehicle gasoline, these sources are no longer a significant source of ambient lead concentrations. At the revised standard level, EPA expects stationary sources to be the primary contributor to violations of the NAAQS. However, it is possible that fugitive dust emissions from area sources containing deposited lead will also contribute to violations of the revised Pb NAAQS. The location and dispersion characteristics of these sources of ambient lead concentrations are important factors in determining nonattainment area boundaries.

In the proposed rule, EPA proposed to presumptively define the boundary for designating a nonattainment area as the perimeter of the county associated with the air quality monitor(s) which records a violation of the standard. This presumption was also EPA's recommendation for defining the nonattainment boundaries for the 1978 Pb NAAQS, and is described in the 1992 General Preamble (57 FR 13549). In the proposed rule, EPA also requested comment on an option to presumptively define the nonattainment boundary using the OMB-defined Metropolitan Statistical Area (MSA) associated with

---

areas under their jurisdiction. However, Tribes are not required to develop TIPs or otherwise implement relevant programs under the CAA. In cases where a Tribal air quality agency has implemented an air quality monitoring network which is affected by Pb emissions, the criteria and procedures identified in this rule may be applied for regulatory purposes. Certain Tribes may implement all relevant components of an air quality program for purposes of meeting the various requirements of this rule.

the violating monitor(s). This presumption was used historically, by the CAA requirement, for the 1-hr ozone and CO NAAQS nonattainment boundaries, and was also recommended by EPA as the appropriate presumption for the 1997 8-hour ozone and $PM_{2.5}$ NAAQS nonattainment boundaries. In the proposed rule we stated that under either option, the state and EPA may conduct additional area-specific analyses that could lead EPA to depart from the presumptive boundary. The factors relevant to such an analysis are described below.

For the proposed Pb NAAQS, EPA recommended that nonattainment area boundaries that deviate from presumptive county boundaries should be supported by an assessment of several factors, which are discussed below. The factors for determining nonattainment area boundaries for the Pb NAAQS under this recommendation closely resemble the factors identified in recent EPA guidance for the 1997 8-hour ozone NAAQS, the 1997 $PM_{2.5}$ NAAQS, and the 2006 $PM_{2.5}$ NAAQS nonattainment area boundaries. For this particular option of the proposal, EPA would consider the following factors in assessing whether to exclude portions of a county and whether to include additional nearby areas outside the county as part of the designated nonattainment area:

• Emissions in areas potentially included versus excluded from the nonattainment area.

• Air quality in potentially included versus excluded areas.

• Population density and degree of urbanization including commercial development in included versus excluded areas.

• Expected growth (including extent, pattern and rate of growth).

• Meteorology (weather/transport patterns).

• Geography/topography (mountain ranges or other air basin boundaries).

• Jurisdictional boundaries (e.g., counties, air districts, reservations, etc.).

• Level of control of emission sources.

The proposal indicated that analyses of these factors may suggest nonattainment area boundaries that are either larger or smaller than the county boundary. A demonstration supporting the designation of boundaries that are less than the full county would be required to show both that violation(s) are not occurring in the excluded portions of the county and that the excluded portions are not source areas that contribute to the observed violations. Recommendations to designate a nonattainment area larger

than the county should also be based on an analysis of these factors. The proposal stated that EPA would consider these factors as well in evaluating state and Tribal recommendations and assessing whether any modifications are appropriate.

Under previous Pb implementation guidance, EPA advised that Governors could choose to recommend lead nonattainment boundaries by using any one, or a combination of the following techniques, the results of which EPA would consider when making a decision as to whether and how to modify the Governors' recommendations: (1) Qualitative analysis, (2) spatial interpolation of air quality monitoring data, or (3) air quality simulation by dispersion modeling. These techniques are more fully described in ''Procedures for Estimating Probability of Nonattainment of a $PM_{10}$ NAAQS Using Total Suspended Particulate or $PM_{10}$ Data,'' December 1986 (see 57 FR 13549). In the proposed rule, EPA solicited comments on the use of these factors and modeling techniques, and other approaches, for adjusting county boundaries in designating nonattainment areas.

### 2. Comments and Responses

Several commenters submitted comments stating that the nonattainment boundaries should be limited to the smallest political boundary that possesses an ambient monitor-based design value above the standard, unless subsequent analyses demonstrate that the boundaries should be larger or smaller. Commenters also stated that because lead does not transport over long distances, monitoring data from upwind and downwind sites illustrate that violations of the lead NAAQS are most commonly isolated within a specific geographic area in close proximity to a major source.

The EPA agrees with the commenter that lead emissions do not generally transport over long distances (as compared, e.g., to fine particulate matter). In the proposed rule, EPA proposed to presumptively define the boundary for designating a nonattainment area as the perimeter of the county associated with the air quality monitor(s) which records a violation of the standard. In the proposed rule, EPA also stated that, at the revised level of the standard, EPA expects stationary sources to be the primary contributor to violations of the NAAQS, although we also believe that nearby area sources may also contribute to concentrations of lead emissions that

may affect a violating monitor. In light of the possibility that a number of smaller sources may collectively contribute to concentrations in excess of the NAAQS, EPA believes that adopting the county boundary as the presumptive boundaries for lead nonattainment areas is appropriate. However, as stated in the proposed rule, a state, Tribe, or EPA may conduct additional area-specific analyses that could lead to the boundary for an area either being increased or decreased from the presumptive county boundary. In situations where a single source, rather than multiple sources, is causing a NAAQS violation, the EPA believes that a state may well be able to use area-specific analyses to identify whether a nonattainment area that is smaller than the county boundary is appropriate.

Several commenters stated that EPA should use the MSA as the presumptive boundary for designating areas for the Pb NAAQS in order for a broader range of source emissions to be taken into consideration when the state develops its SIP for the nonattainment area.

As stated previously, at the revised level of the standard, EPA expects stationary sources to be the primary contributor to violations of the Pb NAAQS, although we also expect that in some areas a number of smaller sources may collectively contribute to concentrations in excess of the NAAQS. MSAs are frequently composed of several counties. Recognizing that lead emissions, particularly ultracoarse particles, deposit relatively short distances from the proximity of their initial source, EPA believes that adopting the county boundary surrounding a violating monitor as the presumptive boundary for any given lead nonattainment area is more appropriate than presuming the larger MSA boundary. Furthermore, as stated in the proposed rule (and the previous response), a state, Tribe, or EPA may conduct additional area-specific analyses that could lead to the boundary for an area either being increased or decreased from the presumptive boundary. Thus, where it appears that emissions from one or more sources are contributing to nonattainment throughout an MSA, the site-specific analysis may result in the boundaries of the nonattainment area overlapping with those of the MSA.

### 3. Final

The EPA is finalizing the option to presumptively define the boundary for designating a nonattainment area as the perimeter of the county associated with the air quality monitor(s) which records a violation of the standard as proposed.

This presumption was also EPA's recommendation for defining the nonattainment boundaries for the pre-existing Pb NAAQS, and is described in the 1992 General Preamble (57 FR 13549). As a part of the county boundary presumption for nonattainment areas, the state and/or EPA may conduct additional area-specific analyses that could lead EPA to depart from the presumptive county boundary. The EPA is also finalizing the factors relevant to such an analysis as described in the proposed rule because we believe that they will allow for both the State as well as EPA in some cases to define better the appropriate boundaries for an area. The state may, in addition to submitting recommendations for boundaries based on the factor analysis, also choose to recommend lead nonattainment boundaries using any one, or a combination of the following techniques, the results of which EPA would consider when making a decision as to whether and how to modify the Governors' recommendations: (1) Qualitative analysis, (2) spatial interpolation of air quality monitoring data, or (3) air quality simulation by dispersion modeling, as described more fully in "Procedures for Estimating Probability of Nonattainment of a $PM_{10}$ NAAQS Using Total Suspended Particulate or $PM_{10}$ Data," December 1986 (see 57 FR 13549).

*C. Classifications*

1. Proposal

Section 172(a)(1)(A) of the CAA authorizes EPA to classify areas designated as nonattainment for the purpose of applying an attainment date pursuant to section 172(a)(2), or for other reasons. In determining the appropriate classification, EPA may consider such factors as the severity of the nonattainment problem and the availability and feasibility of pollution control measures (see section 172(a)(1)(A) of the CAA). The EPA may classify lead nonattainment areas, but is not required to do so.

While section 172(a)(1)(A) provides a mechanism to classify nonattainment areas, section 172(a)(2)(D) provides that the attainment date extensions described in section 172(a)(2)(A) do not apply to nonattainment areas having specific attainment dates that are addressed under other provisions of the part D of the CAA. Section 192(a), of part D, specifically provides an attainment date for areas designated as nonattainment for the Pb NAAQS. Therefore, EPA has legal authority to classify lead nonattainment areas, but

the 5 year attainment date under section 192(a) cannot be extended pursuant to section 172(a)(2)(D). Based on this limitation, EPA proposed not to establish classifications within the 5 year interval for attaining any new or revised NAAQS. This approach is consistent with EPA's previous classification decision for Pb in the 1992 General Preamble (*See* 57 FR 13549, April 16, 1992).

2. Comments and Responses

Several commenters stated that they disagreed with EPA's proposal not to classify lead nonattainment areas under CAA section 172(a)(1)(A). The commenters stated that existing nonattainment areas, meaning areas that have not yet achieved the pre-existing Pb NAAQS, would benefit from more rigorous SIP requirements associated with classifications. The commenters stated that such classifications are appropriate not only for deadline extensions (not applicable in this case, as EPA notes), but "for other purposes". The commenters state that such purposes should include lower emissions thresholds for defining major stationary sources, higher offset ratios, and a more ambitious definition of reasonable further progress.

EPA stated in the proposed rule, that while section 172(a)(1)(A) provides a mechanism to classify nonattainment areas, section 172(a)(2)(D) provides that the attainment date extensions described in section 172(a)(2)(A) do not apply to nonattainment areas having specific attainment dates that are addressed under other provisions of part D of the CAA. Based on this limitation, EPA proposed not to establish classifications within the 5 year interval for attaining any new or revised NAAQS. This approach is consistent with EPA's previous classification decision for Pb in the 1992 General Preamble (*See* 57 FR 13549, April 16, 1992) notes that subpart 2 of part D of the CAA specifies mandatory control measures required for areas with different classifications for the ozone standard, including such items as higher offset ratios and specific percentage requirements for reasonable further progress. Areas with higher classifications are subject to more stringent controls, but also receive additional time to attain the standard. Subpart 5 of part D contains no such provisions, but instead requires submittal of a SIP within 18 months of designation of an area as nonattainment, and requires attainment for all areas as expeditiously as practicable, but no later than 5 years following designation. Although EPA does have authority to

establish classifications for Pb, EPA continues to believe, taking into consideration these differing statutory schemes (and particularly the requirement to attain as expeditiously as practicable, but no later than 5 years from designation) that it is not appropriate or necessary to establish classifications for the revised Pb NAAQS.

3. Final

The EPA is finalizing the guidance for classifications as provided in the proposed rule. Therefore, there will be no classifications under the revised Pb NAAQS.

*D. Section 110(a)(2) Lead NAAQS Infrastructure Requirements*

1. Proposal

Under section 110(a)(1) and (2) of the CAA, all states are required to submit plans to provide for the implementation, maintenance, and enforcement of any new or revised NAAQS. Section 110(a)(1) and (2) require states to address basic program elements, including requirements for emissions inventories, monitoring, and modeling, among other things. States are required to submit SIPs to EPA which demonstrate that these basic program elements have been addressed within 3 years of the promulgation of any new or revised NAAQS. Subsections (A) through (M) of section 110(a)(2) listed below, set forth the elements that a state's program must contain in the SIP.[113] The list of section 110(a)(2) NAAQS implementation requirements are the following:

• Ambient air quality monitoring/data system: Section 110(a)(2)(B) requires SIPs to provide for setting up and operating ambient air quality monitors, collecting and analyzing data and making these data available to EPA upon request.

• Program for enforcement of control measures: Section 110(a)(2)(C) requires SIPs to include a program providing for enforcement of measures and regulation and permitting of new/modified sources.

• Interstate transport: Section 110(a)(2)(D) requires SIPs to include provisions prohibiting any source or

---

[113] Two elements identified in section 110(a)(2) are not listed below because, as EPA interprets the CAA, SIPs incorporating any necessary local nonattainment area controls would not be due within 3 years, but rather are due at the time the nonattainment area planning requirements are due. These elements are: (1) Emission limits and other control measures, section 110(a)(2)(A), and (2) Provisions for meeting part D, section 110(a)(2)(I), which requires areas designated as nonattainment to meet the applicable nonattainment planning requirements of part D, title I of the CAA.

other type of emissions activity in the state from contributing significantly to nonattainment in another state or from interfering with measures required to prevent significant deterioration of air quality or to protect visibility.

• Adequate resources: Section 110(a)(2)(E) requires states to provide assurances of adequate funding, personnel and legal authority for implementation of their SIPs.

• Stationary source monitoring system: Section 110(a)(2)(F) requires states to establish a system to monitor emissions from stationary sources and to submit periodic emissions reports to EPA.

• Emergency power: Section 110(a)(2)(G) requires states to include contingency plans, and adequate authority to implement them, for emergency episodes in their SIPs.

• Provisions for SIP revision due to NAAQS changes or findings of inadequacies: Section 110(a)(2)(H) requires states to provide for revisions of their SIPs in response to changes in the NAAQS, availability of improved methods for attaining the NAAQS, or in response to an EPA finding that the SIP is inadequate.

• Section 121 consultation with local and Federal government officials: Section 110(a)(2)(J) requires states to meet applicable local and Federal government consultation requirements of section 121.

• Section 127 public notification of NAAQS exceedances: Section 110(a)(2)(J) requires states to meet applicable requirements of section 127 relating to public notification of violating NAAQS.

• PSD and visibility protection: Section 110(a)(2)(J) also requires states to meet applicable requirements of title I part C related to prevention of significant deterioration and visibility protection.

• Air quality modeling/data: Section 110(a)(2)(K) requires that SIPs provide for performing air quality modeling for predicting effects on air quality of emissions of any NAAQS pollutant and submission of data to EPA upon request.

• Permitting fees: Section 110(a)(2)(L) requires the SIP to include requirements for each major stationary source to pay permitting fees to cover the cost of reviewing, approving, implementing and enforcing a permit.

Consultation/participation by affected local government: Section 110(a)(2)(M) requires states to provide for consultation and participation by local political subdivisions affected by the SIP.

2. Final

The EPA is finalizing the guidance related to the submittal of SIPs to address the infrastructure requirements of section 110(a)(1) and (2) as stated in the proposed rule.

*E. Attainment Dates*

1. Proposal

As discussed in the proposal, the maximum deadline date by which an area is required to attain the Pb NAAQS is determined by the effective date of the nonattainment designation for the area. For areas designated nonattainment for the revised Pb NAAQS, SIPs must provide for attainment of the NAAQS as expeditiously as practicable, but no later than 5 years from the date of the nonattainment designation for the area (see section 192(a) of the CAA). In the proposed rule, EPA stated it would determine whether an area had demonstrated attainment of the Pb NAAQS by evaluating air quality monitoring data from the one, two, or three previous years as available.

2. Comments and Responses

A commenter stated that the attainment deadline for the current nonattainment and maintenance areas should be three years.

Under the CAA, states are required to attain as expeditiously as practicable (but in no case later than five years). If it is practicable for a nonattainment area to attain the standard within three years, then the SIP must provide for attainment within three years. If, however, attainment within three years is not practicable, then EPA has no authority to require attainment by that deadline.

3. Final

The EPA is generally finalizing the guidance related to attainment dates as provided in the proposed rule. States with nonattainment areas will be required to attain the standard as expeditiously as practicable, but in no event later than five years from the effective date of the nonattainment designation. EPA wishes to clarify that it will be considering air quality monitoring data from the three previous years, as available, in determining whether areas have demonstrated attainment (i.e., EPA would only consider data for less than the three previous years in situations where the data for all three years was unavailable).

*F. Attainment Planning Requirements*

Any state containing an area designated as nonattainment with respect to the Pb NAAQS must develop for submission, a SIP meeting the requirements of part D, Title I, of the CAA, providing for attainment by the applicable deadline (see sections 191(a) and 192(a) of the CAA). As indicated in section 191(a) all components of the lead part D SIP must be submitted within 18 months of the effective date of an area's designation as nonattainment. Additional specific plan requirements for lead nonattainment areas are outlined in 40 CFR 51.117.

The general part D nonattainment plan requirements are set forth in section 172 of the CAA. Section 172(c) specifies that SIPs submitted to meet the part D requirements must, among other things, include Reasonably Available Control Measures (RACM) (which includes Reasonably Available Control Technology (RACT)), provide for Reasonable Further Progress (RFP), include an emissions inventory, require permits for the construction and operation of major new or modified stationary sources (see also CAA section 173), contain contingency measures, and meet the applicable provisions of section 110(a)(2) of the CAA related to the general implementation of a new or revised NAAQS. It is important to note that lead nonattainment SIPs must meet all of the requirements related to part D of the CAA, including those specified in section 172(c), even if EPA does not provide separate specific guidance for each provision.

1. RACM/RACT for Lead Nonattainment Areas

a. Proposal

Lead nonattainment area SIPs must contain RACM (including RACT) that address sources of ambient lead concentrations. In general, EPA believes that lead NAAQS violation issues will usually be attributed to emissions from stationary sources. In EPA's 2002 National Emissions Inventory (NEI), there were 12 stationary sources in the country with lead emissions over 5 tons per year, and 124 sources over 1 ton of lead emissions per year.

Some emissions that contribute to violations of the Pb NAAQS may also be attributed to smaller area sources. At primary lead smelters, the process of reducing concentrated ore to lead involves a series of steps, some of which are completed outside of buildings, or inside of buildings that are not totally enclosed. Over a period of time, emissions from these sources have been deposited in neighboring communities (e.g., on roadways, parking lots, yards, and off-plant property). This historically deposited lead, when disturbed, may be

re-entrained into the ambient air and may contribute to violations of the Pb NAAQS in affected areas.

The first step in addressing RACM for lead is identifying potential control measures for sources of lead in the nonattainment area. A suggested starting point for specifying RACM in lead nonattainment area SIPs is outlined in appendix 1 of the guidance entitled ''State Implementation Plans for Lead Nonattainment Areas; Addendum to the General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990'', 58 FR 67752, December 22, 1993. If a state is aware of facts, or receives substantive public comments, that demonstrate through appropriate documentation, that additional control measures may be reasonably available in a specific area, the measures should be added to the list of available measures for consideration in that particular area.

While EPA does not presume that these control measures are reasonably available in all areas, a reasoned justification for rejection of any available control measure should be prepared. If it can be shown that measures, considered both individually as well as in a group, are unreasonable because emissions from the affected sources are insignificant, then the measures may be excluded from further consideration as they would not be representative of RACM for the affected area. The resulting control measures should then be evaluated for reasonableness, considering their technological feasibility and the cost of control in the area for which the SIP applies. In the case of public sector sources and control measures, this evaluation should consider the impact and reasonableness of the measures on the municipal, or other governmental entity that must assume the responsibility for their implementation. It is important to note that a state should consider the feasibility of implementing measures in part when full implementation would be infeasible. A reasoned justification for partial or full rejection of any available control measure, including those considered or presented during the state's public hearing process, should be prepared. The justification should contain a detailed explanation, with appropriate documentation, as to why each rejected control measure is deemed infeasible or otherwise unreasonable for implementation.

Economic feasibility considers the cost of reducing emissions and the difference between the cost of the emissions reduction approach at the particular source in question and the costs of emissions reduction approaches that have been implemented at other similar sources. Absent other indications, EPA as a general matter expects that it is reasonable for similar sources to bear similar costs of emissions reduction. Economic feasibility for RACT purposes is largely determined by evidence that other sources in a particular source category have in fact applied the control technology or process change in question. The EPA also encourages the development of innovative measures not previously employed which may also be technically and economically feasible.

The capital costs, annualized costs, and cost effectiveness of an emissions reduction technology should be considered in determining whether a potential control measure is reasonable for an area or state. One available reference for calculating costs is the EPA Air Pollution Control Cost Manual,[114] which describes the procedures EPA uses for determining these costs for stationary sources. The above costs should be determined for all technologically feasible emission reduction options. States may give substantial weight to cost effectiveness in evaluating the economic feasibility of an emission reduction technology. The cost effectiveness of a technology is its annualized cost ($/year) divided by the emissions reduced (i.e., tons/year) which yields a cost per amount of emission reduction ($/ton). Cost effectiveness provides a value for each emission reduction option that is comparable with other options and other facilities. With respect to a given pollutant, a measure is likely to be reasonable if it has a cost per ton similar to other measures previously employed for that pollutant. In addition, a measure is likely to be reasonable from a cost effectiveness standpoint if it has a cost per ton similar to that of other measures needed to achieve expeditious attainment in the area within the CAA's timeframes.

The fact that a measure has been adopted or is in the process of being adopted by other states is also an indicator (though not a definitive one) that the measure may be technically and economically feasible for another state. We anticipate that states may decide upon RACT and RACM controls that differ from state to state, based on the state's determination of the most effective strategies given the relevant mixture of sources and potential

controls in the relevant nonattainment areas, and differences in difficulty of attaining expeditiously. Nevertheless, states should consider and address RACT and RACM measures developed for other areas, as part of a well reasoned RACT and RACM analysis. The EPA's own evaluation of SIPs for compliance with the RACT and RACM requirements will include comparison of measures considered or adopted by other states.

In considering what level of control is reasonable, EPA is not adopting a specific dollar per ton cost threshold for RACT. Areas with more serious air quality problems typically will need to obtain greater levels of emissions reductions from local sources than areas with less serious problems, and it would be expected that their residents could realize greater public health benefits from attaining the standard as expeditiously as practicable. For these reasons, we believe that it will be reasonable and appropriate for areas with more serious air quality problems and higher design values to impose emission reduction requirements with generally higher costs per ton of reduced emissions than the cost of emissions reductions in areas with lower design values. In addition, where essential reductions are more difficult to achieve (e.g., because many sources are already controlled), the cost per ton of control may necessarily be higher.

The EPA believes that in determining appropriate emission control levels, the state should consider the collective public health benefits that can be realized in the area due to projected improvements in air quality. Because EPA believes that RACT requirements will be met where the state demonstrates timely attainment, and areas with more severe air quality problems typically will need to adopt more stringent controls, RACT level controls in such areas will require controls at higher cost effectiveness levels ($/ton) than areas with less severe air quality problems.

In identifying the range of costs per ton that are reasonable, information on benefits per ton of emission reduction can be useful as one factor to consider. It should be noted that such benefits estimates are subject to significant uncertainty and that benefits per ton vary in different areas. Nonetheless this information could be used in a way that recognizes these uncertainties. If a per ton cost of implementing a measure is significantly less than the anticipated benefits per ton, this would be an indicator that the cost per ton is reasonable. If a source contends that a source-specific RACT level should be

---

[114] *EPA Air Pollution Control Cost Manual—Sixth Edition* (EPA 452/B–02–001), EPA Office of Air Quality Planning and Standards, Research Triangle Park, NC, Jan. 2002.

established because it cannot afford the technology that appears to be RACT for other sources in its source category, then the source should support its claim by providing detailed and verified information regarding the impact of imposing RACT on:

• Fixed and variable production costs ($/unit),

• Product supply and demand elasticity,

• Product prices (cost absorption vs. cost pass-through),

• Expected costs incurred by competitors,

• Company profits, and

• Employment costs.

The technical guidance entitled ''Fugitive Dust Background Document and Technical Information Document for Best Available Control Measures'' (EPA–450/2–92–004, September 1992) provides an example for states on how to analyze control costs for a given area.

Once the process of determining RACM for an area is completed, the individual measures should then be converted into a legally enforceable vehicle (e.g., a regulation or permit program) (see section 172(c)(6) and section 110(a)(2)(A) of the CAA). The regulations or other measures submitted should meet EPA's criteria regarding the enforceability of SIPs and SIP revisions. These criteria were stated in a September 23, 1987 memorandum (with attachments) from J. Craig Potter, Assistant Administrator for Air and Radiation; Thomas L. Adams, Jr., Assistant Administrator for Enforcement and Compliance Monitoring; and S. Blake, General Counsel, Office of the General Counsel; entitled ''Review of State Implementation Plans and Revisions of Enforceability and Legal Sufficiency.'' As stated in this memorandum, SIPs and SIP revisions that fail to satisfy the enforceability criteria should not be forwarded for approval. If they are submitted, they will be disapproved if, in EPA's judgment, they fail to satisfy applicable statutory and regulatory requirements.

The EPA's historic definition of RACT is the lowest emissions limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility.[115] RACT applies to the

---

[115] *See* for example, 44 FR 53762 (September 17, 1979) and footnote 3 of that notice. Note that EPA's emissions trading policy statement has clarified that the RACT requirement may be satisfied by achieving ''RACT equivalent'' emission reductions in the aggregate from the full set of existing stationary sources in the area. *See* also EPA's economic incentive proposal which reflects the Agency's policy guidance with respect to emissions trading, 58 FR 11110, February 23, 1993.

''existing sources'' of lead in an area including stack emissions, industrial process fugitive emissions, and industrial fugitive dust emissions (e.g., on-site haul roads, unpaved staging areas at the facility, etc.) (see section 172(c)(1)). The EPA's previous guidance for implementing the pre-existing Pb NAAQS recommends that stationary sources which emit a total of 5 tpy of lead or lead compounds, measured as elemental lead, be the minimum starting point for RACT analysis (see 58 FR 67750, December 22, 1993). Further, EPA's existing guidance recommends that available control technology be applied to those existing sources in the nonattainment area that are reasonable to control in light of the attainment needs of the area and the feasibility of such controls. Thus, under existing guidance, a state's control technology analysis may need to include sources which actually emit less than 5 tpy of lead or lead compounds in the area, or other sources in the area that are reasonable to control, in light of the attainment needs and feasibility of control for the area.

Given the proposal to promulgate a revised Pb NAAQS that is significantly lower than the current level of 1.5 μg/m³, EPA requested comment on the appropriate threshold for the minimum starting point for future Pb RACT analyses for stationary lead sources in nonattainment areas. In the proposed rule, EPA requested comment on the emissions level associated with the minimum network source monitoring requirements. These source levels range from 200 kg/yr to 600 kg/yr. The EPA also stated that one possible approach for RACT is to recommend that RACT analyses for Pb sources be consistent with sources that are required to monitor such that all stationary sources above 200 kg/yr to 600 kg/yr should undergo a RACT review. EPA also requested comment on source monitoring for stationary sources that emit lead emissions in amounts that have potential to cause ambient levels at least one-half the selected NAAQS level. This suggests another potential recommendation for the starting point for the RACT analysis. The EPA sought comment on these ideas as well as any information which commenters could provide that would help inform EPA's recommendation on an appropriate emissions threshold for initiating RACT analyses.

b. Comments and Responses

Several commenters stated that given the proposed level of the lead NAAQS that EPA should set the threshold for RACT analysis for stationary sources at

a threshold level similar to the level being considered for the source monitoring requirements, which is between 200 kg/yr–600 kg/yr. Several commenters suggested a lower threshold (such as 45 kg/year) or stated that depending on the attainment needs for the affected area, it may be necessary to evaluate control technology that is reasonably available for sources with actual emissions that are lower than the recommended RACM/RACT threshold to take into consideration the actual attainment needs for the affected area. One commenter suggested the threshold should be set only at a level at which an exceedance of the NAAQS is expected, while another suggested it should be set no higher than that level.

The EPA believes that it is appropriate to set the recommended threshold for the RACT analysis for the new standard at 0.5 tpy. The existing Pb NAAQS is set at 1.5 μg/m³ and the existing threshold for RACT analysis is 5 tpy. Since the standard is being reduced by a factor of ten, from 1.5 μg/m³ to 0.15 μg/m³, it is appropriate to also reduce the threshold for RACT analysis by a factor of 10, from 5 tpy to 0.5 tpy. Furthermore, the monitor siting criteria include a requirement for monitoring agencies to conduct monitoring taking into account sources that are expected to exceed the NAAQS, and require monitoring for sources which emit Pb at a rate of one ton per year. Although EPA expects that sources emitting less than one tpy may also contribute to violations of the revised Pb NAAQS, EPA believes that the one tpy requirement in the monitor siting criteria provides a benchmark that is more likely to clearly identify sources that would contribute to exceedances of the NAAQS. Accordingly, using 50% of that figure (0.5 tpy) as the threshold for RACT analysis is generally consistent with EPA's consideration in the proposal of setting the RACT threshold to include those stationary sources that emit lead emissions in amounts that have the potential to cause ambient levels at least one-half the selected NAAQS.

EPA believes that setting the RACT threshold higher (e.g., at 1 tpy) would not be appropriate because it is likely that in a nonattainment area sources emitting less than one tpy are contributing to the nonattainment of the NAAQS. EPA also does not believe a lower threshold is warranted as a general matter, but EPA agrees with commenters that the state's control technology analysis should also include, as appropriate, sources which actually emit less than the threshold level of 0.5 tpy of lead or lead compounds in the

area, or other sources in the area that are reasonable to control, in light of the attainment needs and feasibility of controls for the affected area.

Several commenters stated that in the proposed rule EPA suggests that the 1993 guidance document, which lists control measures as a starting point for states' consideration, puts the burden on the public to demonstrate through appropriate documentation that additional control measures may be reasonably available in a particular circumstance for an area. The commenters further stated that in light of an anticipated substantial reduction in the Pb NAAQS, as well as the failure of the remaining two existing nonattainment areas to achieve attainment of the pre-existing (1978) NAAQS under the 1993 guidance, that both EPA and the states should bear the principal responsibility for developing an updated roster of successful control measures.

As stated in the proposed rule, EPA believes that the regulations, policies, and guidance currently in place for the implementation of the pre-existing Pb NAAQS are still appropriate to address the issues required to implement the revised Pb NAAQS. The EPA believes that these guidance, policies, and regulations should be used by states, local, and Tribal governments as a starting point to begin implementation of the revised Pb NAAQS. The EPA expects that as states gain additional experience with implementing the revised NAAQS, additional information on successful control measures will become available to states, EPA, and the public. The EPA will, as appropriate, review, and revise or update policies, guidance, and regulations to provide for effective implementation of the Pb NAAQS.

c. Final

The EPA is finalizing the guidance related to RACM (including RACT) for lead nonattainment areas consistent with the proposed rule. Based upon the above considerations regarding the scale of the reduction in the standard, the final monitor siting criteria, and the public comments received related to the starting point for a RACT analysis, EPA is recommending a threshold for RACT analysis such that at least all stationary sources emitting 0.5 tpy or more should undergo a RACT review.

2. Demonstration of Attainment for Lead Nonattainment Areas

a. Proposal

The SIPs for lead nonattainment areas should provide for the implementation of control measures for point and area sources of lead emissions which demonstrate attainment of the Pb NAAQS as expeditiously as practicable, but no later than the applicable statutory attainment date for the area (*see* also 40 CFR 51.117(a) for additional control strategy requirements). Therefore, if a state adopts less than all available measures in an area but demonstrates, adequately, that reasonable further progress (RFP), and attainment of the Pb NAAQS are assured, and the application of all such available measures would not result in attainment any faster, then a plan which requires implementation of less than all technologically and economically available measures may be approved (*see* 44 FR 20375 (April 4, 1979) and 56 FR 5460 (February 11, 1991)). The EPA believes that it would be unreasonable to require that a plan which demonstrates attainment include all technologically and economically available control measures even though such measures would not expedite attainment. Thus, for some sources in areas which demonstrate attainment, it is possible that some available control measures may not be ''reasonably'' available because their implementation would not expedite attainment for the affected area.

b. Final

The EPA is finalizing the guidance related to demonstration of attainment for lead nonattainment areas as stated in the proposed rule. Further discussion of modeling for attainment and other topics is presented below.

3. Reasonable Further Progress (RFP)

a. Proposal

Part D SIPs must provide for RFP (see section 172(c)(2) of the CAA). Section 171 of the CAA defines RFP as ''such annual incremental reductions in emissions of the relevant air pollution as are required by part D, or may reasonably be required by the Administrator for the purpose of ensuring attainment of the applicable NAAQS by the applicable attainment date.'' Historically, for some pollutants, RFP has been met by showing annual incremental emission reductions generally sufficient to maintain linear progress toward attainment by the applicable attainment date. The EPA believes that RFP for lead nonattainment areas should be met by ''adherence to an ambitious compliance schedule'' which is expected to periodically yield significant emission reductions, and as appropriate, linear progress.[116] The EPA recommends that SIPs for lead nonattainment areas provide a detailed schedule for compliance of RACM (including RACT) in the affected areas and accurately indicate the corresponding annual emission reductions to be achieved. In reviewing the SIP, EPA believes that it is appropriate to expect early implementation of less technology-intensive control measures (e.g., controlling fugitive dust emissions at the stationary source, as well as required controls on area sources) while phasing in the more technology-intensive control measures, such as those involving the installation of new hardware. Finally, failure to implement the SIP provisions required to meet annual incremental reductions in emissions (i.e., RFP) in a particular area could result in the application of sanctions as described in section 179(b) of the CAA (pursuant to a finding under section 179(a)(4)), and the implementation of contingency measures required by section 172(c)(9) of the CAA.

b. Comments and Responses

Several commenters stated that EPA's proposal related to RFP would allow states to avoid the need to demonstrate linear progress towards attainment, departing from the typical method used, and statutorily required in some cases, for other criteria pollutants. These commenters further state that the recognition that some nonattainment urban areas have numerous sources contributing to excessive ambient levels of lead which undermines the reasoning employed to justify a non-linear approach in the context of single source nonattainment areas. If areas with large sources install key controls early on in the attainment process, and thus achieve attainment ahead of schedule, that would advance the goals and requirements of the CAA.

Historically, for some pollutants, RFP has been met by showing annual incremental emission reductions generally sufficient to maintain linear progress toward attainment by the applicable attainment date. As EPA has previously noted, we expect that some nonattainment designations will be attributable to a single stationary source, and others may be attributable to a number of smaller sources. Where a single source is the cause of

---

[116] As previously stated in the proposed rule, EPA believes that most lead nonattainment problems will most likely be due to emissions from stationary sources of lead. For this reason EPA believes that the RFP for Pb should parallel the RFP policy for SO2 (*see* General Preamble, 57 FR 13545, April 16, 1992).

nonattainment, EPA would not expect linear progress towards attainment. Rather, there may be relatively less progress while the source adopts non-technological control measures and begins to install necessary technological controls, and then significant progress towards attainment in a short period of time once all the controls are operational. EPA expects that, since states are required to attain the standard as expeditiously as practicable, the SIP will require large sources to install "key controls" as expeditiously as practicable. At the same time, where a number of sources are contributing to nonattainment, it is more reasonable to expect that controls (both technological and non-technological) may be adopted at different times, making linear progress a more reasonable expectation. To accommodate both of these possible situations, EPA concludes it is appropriate that RFP for lead nonattainment areas should be met by the strict adherence to an ambitious compliance schedule which is expected to periodically yield significant emission reductions and, to the extent appropriate, linear progress.

c. Final

The EPA is finalizing the guidance related to reasonable further progress (RFP) consistent with the proposed rule. The EPA believes that RFP for lead nonattainment areas should be met by the strict adherence to an ambitious compliance schedule which is expected to periodically yield significant emission reductions, and to the extent appropriate, linear progress. The EPA recommends that SIPs for lead nonattainment areas provide a detailed schedule for compliance of RACM (including RACT) and accurately indicate the corresponding annual emission reductions to be achieved. In reviewing the SIP, EPA believes that it is appropriate to expect early implementation of less technology-intensive control measures (e.g., work practices to control fugitive dust emissions at the stationary sources) while phasing in the more technology-intensive control measures, such as those involving the installation of new hardware. The EPA believes that the expeditious implementation of RACM/RACT at affected sources within the nonattainment area is an appropriate approach to assure attainment of the Pb NAAQS in an expeditious manner.

4. Contingency Measures

a. Proposal

Section 172(c)(9) of the CAA defines contingency measures as measures in a

SIP that are to be implemented if an area fails to achieve and maintain RFP, or fails to attain the NAAQS by the applicable attainment date. Contingency measures must be designed to become effective without further action by the state or the Administrator, upon determination by EPA that the area has failed to achieve, or maintain reasonable further progress (RFP), or attain the Pb NAAQS by the applicable statutory attainment date. Contingency measures should consist of available control measures that are not already included in the primary control strategy for the affected area.

Contingency measures are important for lead nonattainment areas, which may violate the NAAQS generally due to emissions from stationary sources, for several reasons. First, process and fugitive emissions from these stationary sources, and the possible re-entrainment of historically deposited emissions, have historically been difficult to quantify. Therefore, the analytical tools for determining the relationship between reductions in emissions, and resulting air quality improvements, can be subject to some uncertainties. Second, emission estimates and attainment analysis can be influenced by overly optimistic assumptions about fugitive emission control efficiency.

Examples of contingency measures for controlling area source fugitive emissions may include measures such as stabilizing additional storage piles. Examples of contingency measures for process-related fugitive emissions include increasing the enclosure of buildings, increasing air flow in hoods, modifying operation and maintenance procedures, etc. Examples of contingency measures for stack sources include reducing hours of operation, changing the feed material to lower lead content, and reducing the occurrence of malfunctions by modifying operation and maintenance procedures, etc.

Section 172(c)(9) provides that contingency measures should be included in the state SIP for a lead nonattainment area and shall "take effect without further action by the state or the Administrator." The EPA interprets this requirement to mean that no further rulemaking actions by the state, or EPA, would be needed to implement the contingency measures (*see* generally 57 FR 12512 and 13543–13544). The EPA recognizes that certain actions, such as the notification of sources, modification of permits, etc., may be needed before a measure could be implemented. However, states must show that their contingency measures can be implemented with only minimal further action on their part and with no

additional rulemaking actions such as public hearings or legislative review. After EPA determines that a lead nonattainment area has failed to maintain RFP or timely attain the Pb NAAQS, EPA generally expects all actions needed to affect full implementation of the measures to occur within 60 days after EPA notifies the state of such failure. The state should ensure that the measures are fully implemented as expeditiously as practicable after the requirement takes effect.

b. Comments and Responses

Several commenters stated that EPA noted in the proposed rulemaking that "contingency measures are important for lead nonattainment areas" and that the CAA requires that contingency measures must "take effect without further action" by the state or the Administrator." However, the commenters stated that EPA then interprets the "take effect without further action" requirement too broadly, indicating that it is satisfied if the contingency measure can take effect without further rulemaking. The EPA would allow contingency measures that require a state to undertake a permit modification before the contingency measures would go into effect.

As stated in the proposed rule, section 172(c)(9) of the CAA defines contingency measures as measures in a SIP that are to be implemented if an area fails to achieve and maintain RFP, or fails to attain the NAAQS by the applicable attainment date. Contingency measures must be designed to become effective without further action by the state or the Administrator, upon determination by EPA that the area has failed to achieve, or maintain reasonable further progress, or attain the Pb NAAQS by the applicable statutory attainment date. As stated in the proposed rule, the EPA believes that this requirement means that no further rulemaking actions by the state, or EPA, would be needed to implement the contingency measures (*see* generally 57 FR 12512 and 13543–13544). The EPA recognizes that in some circumstances minimal actions, such as the notification of sources, modification of permits, etc., may be needed before a measure could be implemented. However, as also stated in the proposed rule, states must show that their contingency measures can be implemented with only minimal further action on their part and that no additional rulemaking actions will be required, such as public hearings or legislative review, which will delay the expeditious implementation of the

contingency measures in the affected area. To the extent that modifications in title V operating permits would be required to implement contingency measures, the SIP should provide that those permits will be issued or modified prior to the time such contingency measures may be needed to include alternative operating scenarios providing for implementation of the contingency measures if necessary. *See* 40 CFR 70.6(a)(9). The EPA generally expects that all actions, including those actions related to modification of permits, that are needed to affect full implementation of the contingency measures, must occur within 60 days following EPA's notification to the state of such failure.

c. Final

The EPA is finalizing the guidance related to contingency measures for lead nonattainment areas as stated in the proposed rule. The key requirements associated with contingency measures are: (1) Contingency measures must be fully adopted rules or control measures that are ready to be implemented as expeditiously as practicable upon a determination by EPA that the area has failed to achieve, or maintain reasonable further progress, or attain the Pb NAAQS by the applicable statutory attainment date; (2) The SIP should contain trigger mechanisms for the contingency measures and specify a schedule for implementation; and (3) The SIP must indicate that the measures will be implemented without further action (or only minimal action) by the state or by the Administrator. The contingency measures should also consist of control measures for the area that are not already included in the control strategy for the attainment demonstration of the SIP. The EPA believes that the measures should provide for emission reductions that are at least equivalent to one year's worth of reductions needed for the area to meet the requirements of RFP, based on linear progress towards achieving the overall level of reductions needed to demonstrate attainment.

5. Nonattainment New Source Review (NSR) and Prevention of Significant Deterioration (PSD) Requirements

a. Proposal

The PSD and nonattainment NSR programs contained in parts C and D of Title I of the CAA govern preconstruction review and permitting programs for any new or modified major stationary sources of air pollutants regulated under the CAA as well as any precursors to the formation of that pollutant when identified for regulation by the Administrator. The EPA rules addressing these regulations can be found at 40 CFR 51.165, 51.166, 52.21, 52.24, and part 51, appendix S.

States containing areas designated as nonattainment for the Pb NAAQS must submit SIPs that address the requirements of nonattainment NSR. Specifically, section 172(c)(5) of the CAA requires that states which have areas designated as nonattainment for the Pb NAAQS must submit, as a part of the nonattainment area SIP, provisions requiring permits for the construction and operation of new or modified stationary sources anywhere in the nonattainment area, in accordance with the permit requirements pursuant to section 173 of the CAA. Likewise, areas designated attainment must submit infrastructure SIPs that address the requirements of PSD pursuant to section 110(a)(2)(C).

Stationary sources that emit lead are currently subject to regulation under existing requirements for the preconstruction review and approval of new and modified stationary sources. The existing requirements, referred to collectively as the New Source Review (NSR) program, require all major and certain minor stationary sources of any air pollutant for which there is a NAAQS to undergo review and approval prior to the commencement of construction.[117] The NSR program is composed of three different permit programs:

• Prevention of Significant Deterioration (PSD).
• Nonattainment NSR (NA NSR).
• Minor NSR.

The PSD program and nonattainment NSR programs, contained in parts C and D, respectively, of Title I of the CAA, are often referred to as the major NSR program because these programs regulate only major sources.

The PSD program applies when a major source, that is located in an area that is designated as attainment or unclassifiable for any criteria pollutant, is constructed, or undergoes a major modification.[118] The nonattainment NSR program applies when a major source of a criteria pollutant that is located in an area that is designated as nonattainment for that pollutant is constructed or undergoes a major modification. The minor NSR program addresses both major and minor sources that undergoes construction or modification activities that do not qualify as major, and it applies regardless of the designation of the area in which a source is located.

The national regulations that apply to each of these programs are located in the CFR as shown below:

| | Applications |
|---|---|
| PSD ........................ | 40 CFR 52.21, 40 CFR 51.166, 40 CFR 51.165(b). |
| NA NSR ................. | 40 CFR 52.24, 40 CFR 51.165, 40 CFR part 51, Appendix S. |
| Minor NSR ............ | 40 CFR 51.160–164. |

The PSD requirements include but are not limited to the following:

• Installation of Best Available Control Technology (BACT);
• Air quality monitoring and modeling analyses to ensure that a project's emissions will not cause or contribute to a violation of any NAAQS or maximum allowable pollutant increase (PSD increment);
• Notification of Federal Land Manager of nearby Class I areas; and
• Public comment on permit.

Nonattainment NSR requirements include but are not limited to:

• Installation of Lowest Achievable Emissions Rate (LAER) control technology;
• Offsetting new emissions with creditable emissions reductions;
• A certification that all major sources owned and operated in the state by the same owner are in compliance with all applicable requirements under the CAA;
• An alternative siting analysis demonstrating that the benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification; and
• Public comment on the permit.

Minor NSR programs must meet the statutory requirements in section 110(a)(2)(C) of the CAA which requires "* * * regulation of the modification and construction of any stationary source * * * as necessary to assure that the [NAAQS] are achieved."

Areas which are newly designated as nonattainment for the Pb NAAQS as a result of any changes made to the NAAQS will be required to adopt a nonattainment NSR program to address major sources of lead where the program does not currently exist for the Pb NAAQS. Prior to adoption of the SIP

---

[117] The terms "major" and "minor" define the size of a stationary source, for applicability purposes, in terms of an annual emissions rate (tons per year, tpy) for a pollutant. Generally, a minor source is any source that is not "major." "Major" is defined by the applicable regulations—PSD or nonattainment NSR.

[118] In addition, the PSD program applies to non-criteria pollutants subject to regulation under the Act, except those pollutants regulated under section 112 and pollutants subject to regulation only under section 211(o).

revision addressing NSR for lead nonattainment areas, the requirements of 40 CFR part 51, appendix S will apply.

### b. Comments and Responses

Several commenters stated that given the significant changes being proposed for the revised Pb NAAQS, EPA must promptly undertake rulemaking action in order to satisfy the PSD requirements related to the revised Pb NAAQS. The commenters further stated that EPA should revise the current regulations related to the establishment of maximum allowable increases or increments for lead under 40 CFR 51.166(a), and a substantial reduction in the significant/de minimis emissions levels for lead set forth in 40 CFR 51.166(b)(23)(i) and 40 CFR 52.21(b)(23)(i).

As stated previously, the EPA believes that generally, there is sufficient guidance and regulations already in place to fully implement the revised Pb NAAQS. The EPA notes that, under section 110(a)(2)(D), every minor source NSR program must be sufficiently complete and stringent ''to assure that the [NAAQS] are achieved.'' The EPA will as appropriate review and revise and update policies, guidance, and regulations for implementing the revised Pb NAAQS following the promulgation of the NAAQS.

### c. Final

The EPA is finalizing the guidance related to nonattainment NSR and PSD requirements for lead nonattainment areas as provided in the proposed rule.

### 6. Emissions Inventories

#### a. Proposal

States must develop and periodically update a comprehensive, accurate, current inventory of actual emissions affecting ambient lead concentrations. The emissions inventory is used by states and EPA to determine the nature and extent of the specific control strategy necessary to help bring an area into attainment of the NAAQS. Emissions inventories should be based on measured emissions or documented emissions factors. Generally, the more comprehensive and accurate the inventory, the more effective the evaluation of possible control measures can be for the affected area (see section 172(c)(3) of the CAA).

Pursuant to its authority under section 110 of Title I of the CAA, EPA has long required states to submit emission inventories containing information regarding the emissions of criteria pollutants as well as their precursors. The EPA codified these

requirements in 40 CFR part 51, subpart Q in 1979 and amended them in 1987. The 1990 Clean Air Act Amendments (CAAA) revised many of the provisions of the CAA related to attainment of the NAAQS. These revisions established new emission inventory requirements applicable to certain areas that were designated as nonattainment for certain pollutants.

In June 2002, EPA promulgated the Consolidated Emissions Reporting Rule (CERR) (67 FR 39602, June 10, 2002). The CERR consolidates the various emissions reporting requirements that already exist into one place in the Code of Federal Regulations (CFR), and establishes new requirements for the statewide reporting of area (non-point) source and mobile source emissions. The CERR establishes two types of required emissions inventories: (1) Annual inventories, and (2) 3-year cycle inventories. The annual inventory requirement is limited to reporting statewide emissions data from the larger point sources. For the 3-year cycle inventory, states will need to report data from all of their point sources plus all of the area (non-point) and mobile sources on a statewide basis.

By merging emissions information from relevant point sources, area sources, and mobile sources into a comprehensive emission inventory, the CERR allows State, local and tribal agencies to do the following:

• Set a baseline for SIP development.
• Measure their progress in reducing emissions.
• Answer the public's request for information.

The EPA uses the data submitted by the states to develop the National Emission Inventory (NEI). The NEI is used by EPA to show national emission trends, as modeling input for analysis of potential regulations, and other purposes.

Most importantly, states need these inventories to help in the development of control strategies and demonstrations to attain the Pb NAAQS. While the CERR sets forth requirements for data elements, EPA guidance complements these requirements and indicates how the data should be prepared for SIP submissions. Our current regulations at 40 CFR 51.117(e) require states to include in the SIP inventory all point sources that emit 5 or more tons of lead emissions per year. As stated previously, in the proposed rulemaking EPA took comment on whether the recommended threshold for RACT analysis should be less than the current 5 tons/yr (see section VI.F.1), and proposed that if EPA lowered the recommended threshold for RACT in

the final rulemaking, we would also revise, to be consistent, the emissions threshold for including sources in the inventory pursuant to 40 CFR 51.117(e). In the proposed rule, we solicited comment on the appropriate threshold for Pb point source inventory reporting requirements.

The SIP inventory must be approved by EPA as a SIP element and is subject to public hearing requirements, whereas the CERR inventory is not. Because of the regulatory significance of the SIP inventory, EPA will need more documentation on how the SIP inventory was developed by the state as opposed to the documentation required for the CERR inventory. In addition, the geographic area encompassed by some aspects of the SIP submission inventory will be different from the statewide area covered by the CERR emissions inventory.

The EPA has proposed the Air Emissions Reporting Rule (AERR) at 71 FR 69 (Jan. 3, 2006). When finalized, the AERR will update, consolidate, and harmonize new emissions reporting requirements with preexisting sets of reporting requirements under the CERR and the NO$_X$ SIP Call. The AERR is expected to be a means by which the Agency will implement additional data reporting requirements for the Pb NAAQS SIP emissions inventories.

#### b. Comments and Responses

One commenter stated that states currently work with regional offices in developing nonattainment area inventories and that this approach should be encouraged. The commenter further indicated that states should be allowed to start with the National Emissions Inventory (NEI) and customize their nonattainment area inventories to analyze nonattainment problems.

The EPA encourages the states to continue to work closely with the EPA Regional Offices in developing their nonattainment area emissions inventories as well as any enhancements that need to be made to the NEI. The EPA encourages the use of the NEI as a tool to assist states in developing their nonattainment area SIP emissions inventory. States, however, are reminded that the nonattainment area SIP emissions inventory is required pursuant to 40 CFR 51.117(e) and must be approved by EPA pursuant to the CAA, and is subject to the public hearing requirements pursuant to section 110(a)(2).

One commenter stated that EPA should develop additional guidance on emission inventories related to the nonattainment area SIP submittal

because the requirements under the CERR and the AERR may not be enough to adequately address the emissions inventory requirements related to the attainment demonstration for the SIP.

The EPA will review the need for additional guidance concerning the emissions inventories related to the nonattainment area SIP submittal on an ongoing basis. As stated previously, EPA believes that the current guidance, policies, and regulations provide a sufficient basis for states to implement the revised Pb NAAQS at this time. The EPA, as appropriate, will review and revise or update these policies, guidance, and regulations to provide for effective implementation of the Pb NAAQS.

Several commenters stated that EPA should revise 40 CFR 51.117(e)(1), relating to the emissions reporting threshold level for lead nonattainment area SIPs. The current threshold level as stated in 51.117(e)(1), requires that the point source inventory on which the summary of the baseline lead emissions inventory is based must contain all sources that emit 5 or more tpy of lead.

The EPA agrees with the commenters that the requirement for the emissions inventory reporting threshold for lead nonattainment SIPs, as stated in 40 CFR 51.117(e)(1), should be revised to reflect the stringency of the revised Pb NAAQS. In the proposed rule, EPA proposed to revise the current threshold level for emissions inventory reporting from 5 tpy to be consistent with the threshold for the analysis of RACM/RACT control measures. As discussed above, EPA is setting the threshold for RACT analysis at 0.5 tpy. EPA concludes it is also appropriate to set the threshold level of the emissions inventory reporting requirement at 0.5 tpy.

c. Final

The EPA is finalizing the guidance contained related to the emissions inventories requirements for the Pb NAAQS as provided in the proposed rule. The EPA is updating the emissions reporting requirements for lead nonattainment area SIPs stated in 40 CFR 51.117(e)(1) by revising the source emission inventory reporting threshold from 5 tpy to 0.5 tpy.

7. Modeling

a. Proposal

The lead SIP regulations found at 40 CFR 51.117 require states to employ atmospheric dispersion modeling for the demonstration of attainment for areas in the vicinity of point sources listed in 40 CFR 51.117(a)(1). To complete the

necessary dispersion modeling, meteorological, and other data are necessary. Dispersion modeling should follow the procedures outlined in EPA's latest guidance document entitled "Guideline on Air Quality Models". This guideline indicates the types and historical records for data necessary for modeling demonstrations (e.g., on-site meteorological stations, 12 months of meteorological data are required in order to demonstrate attainment for the affected area).

b. Comments and Responses

One commenter stated that the SIPs for lead nonattainment areas should provide for the implementation of control measures for point and area sources of lead emissions which demonstrate attainment of the lead NAAQS as expeditiously as practicable, but no later than the applicable statutory attainment date for the area. The commenter further stated that they believe that the requirements currently stated under 40 CFR 51.117(a)(1), related to additional control strategy requirements, should be revised to reflect the stringency of the revised lead NAAQS. The commenter stated that specifically, the threshold level of 25 tpy as stated in 40 CFR 51.117(a)(1), related to modeling for point source emissions, should be revised to reflect the stringency of the revised NAAQS.

The EPA agrees with the commenter that lead nonattainment area SIPs must provide for the implementation of control measures for point and area source emissions of lead in order to demonstrate attainment of the Pb NAAQS as expeditiously as practicable, but no later than the attainment date for the affected area. EPA notes that 40 CFR 51.117(a) provides that states must include, as a part of their attainment modeling demonstration, an analysis showing that the SIP will attain and maintain the standard in areas in the vicinity of certain point sources that are emitting at the level of 25 tpy, and also in "any other area that has lead air concentrations in excess of the national ambient air quality standard concentration." EPA does not believe it is necessary to amend the 25 tpy threshold in 40 CFR 51.117(a)(1) because the provisions of 40 CFR 51.117(a)(2) are sufficient to ensure an adequate attainment demonstration. Accordingly, EPA believes that the current requirements concerning control strategy demonstration as stated in 40 CFR 51.117(a) are adequate for states to develop SIPs which address attainment of the revised Pb NAAQS. In doing the analysis, required under 40 CFR 51.117(a)(2), EPA expects the state will

take into consideration all sources of lead emissions within the nonattainment area that may be required to be controlled, taking into consideration the attainment needs of the area.

c. Final

The EPA is finalizing the guidance related to modeling attainment demonstrations for lead nonattainment area SIPs as proposed. The EPA will continue to review whether any additional changes related to modeling demonstrations or applicable modeling guidance are appropriate.

*G. General Conformity*

1. Proposal

Section 176(c) of the CAA, as amended (42 U.S.C. 7401 *et seq.*), requires that all Federal actions conform to an applicable implementation plan developed pursuant to section 110 and part D of the CAA. Section 176(c) of the CAA requires EPA to promulgate criteria and procedures for demonstrating and assuring conformity of Federal actions to a SIP. For the purpose of summarizing the general conformity rule, it can be viewed as containing three major parts: Applicability, procedure, and analysis. These are briefly described below.

The general conformity rule covers direct and indirect emissions of criteria pollutants, or their precursors, that are caused by a Federal action, are reasonably foreseeable, and can practicably be controlled by the Federal agency through its continuing program responsibility. The general conformity rule generally applies to Federal actions except: (1) Actions covered by the transportation conformity rule; (2) Actions with respect to associated emissions below specified de minimis levels; and (3) Certain other actions that are exempt or presumed to conform.

The general conformity rule also establishes procedural requirements. Federal agencies must make their conformity determinations available for public review. Notice of draft and final general conformity determinations must be provided directly to air quality regulatory agencies and to the public by publication in a local newspaper.

The general conformity determination examines the impacts of direct and indirect emissions related to Federal actions. The general conformity rule provides several options to satisfy air quality criteria, such as modeling or offsets, and requires the Federal action to also meet any applicable SIP requirements and emissions milestones. Each Federal agency must determine

that any actions covered by the general conformity rule conform to the applicable SIP before the action is taken. The criteria and procedures for conformity apply only in nonattainment and maintenance areas with respect to the criteria pollutants under the CAA: [119] Carbon monoxide (CO), lead (Pb), nitrogen dioxide ($NO_2$), ozone ($O_3$), particulate matter ($PM_{2.5}$ and $PM_{10}$), and sulfur dioxide ($SO_2$). The general conformity rule establishes procedural requirements for Federal agencies for actions related to all NAAQS pollutants, both nonattainment and maintenance areas and will apply one year following the promulgation of designations for any new or revised Pb NAAQS.[120]

2. Final

The EPA is finalizing the guidance related to general conformity as provided in the proposed rule.

*H. Transition From the Current NAAQS to a Revised NAAQS for Lead*

1. Proposal

As discussed in the proposal, EPA believes that Congress's intent, as evidenced by section 110(l), 193, and section 172(e) of the CAA, was to ensure that continuous progress, in terms of public health protection, takes place in transitioning from a current NAAQS for a pollutant to a new or revised NAAQS. Therefore, EPA proposed that the existing NAAQS be revoked one year following the promulgation of designations for any new NAAQS, except that the existing NAAQS will not be revoked for any current nonattainment area until the affected area submits, and EPA approves, an attainment demonstration which addresses the attainment of the new Pb NAAQS.

The CAA contains a number of provisions that indicate Congress's intent to not allow states to alter or remove provisions from implementation plans if the plan revision would jeopardize the air quality protection being provided by the plan. For example, section 110(l) provides that EPA may not approve a SIP revision if

it interferes with any applicable requirement concerning attainment and RFP, or any other applicable requirement under the CAA. In addition section 193 of the CAA prohibits the modification of a control, or a control requirement, in effect or required to be adopted as of November 15, 1990 (i.e., prior to the promulgation of the Clean Air Act Amendments (CAAA) of 1990), unless such a modification would ensure equivalent or greater emissions reductions. One other provision of the CAA provides additional insight into Congress's intent related to the need to continue progress towards meeting air quality standards during periods of transition from one standard to another. Section 172(e) of the CAA, related to future modifications of a standard, applies when EPA promulgates a new or revised NAAQS and makes it less stringent than the previous NAAQS. This provision of the CAA specifies that in such circumstances, states may not relax control obligations that apply in nonattainment area SIPs, or avoid adopting those controls that have not yet been adopted as required.

The EPA believes that Congress generally did not intend to permit states to relax levels of pollution control when EPA revises a standard until the new or revised standard is implemented. Therefore, we believe that controls that are required under the current Pb NAAQS, or that are currently in place under the current Pb NAAQS, should generally remain in place until new designations are established and, for current nonattainment areas, new attainment SIPs are approved for any new or revised standard. As a result, EPA proposed that the current Pb NAAQS should stay in place for one year following the effective date of designations for any new or revised NAAQS before being revoked, except in current nonattainment areas, where the existing NAAQS will not be revoked until the affected area submits, and EPA approves, an attainment demonstration for the revised Pb NAAQS. Accordingly, the CAA mechanisms, including sanctions, that help ensure continued progress toward timely attainment would remain in effect for the existing Pb NAAQS, and would apply to existing Pb nonattainment areas.

Pursuant to CAA section 110(l), any proposed SIP revision being considered by EPA after the effective date of the revised Pb NAAQS would be evaluated for its potential to interfere with attainment or maintenance of the new standard. The EPA believes that any area attaining the revised Pb NAAQS would also attain the existing Pb NAAQS, and thus reviewing proposed

SIP revisions for interference with the new standard will be sufficient to prevent backsliding. Consequently, in light of the nature of the proposed revision of the Pb NAAQS, the lack of classifications (and mandatory controls associated with such classifications pursuant to the CAA), and the small number of nonattainment areas, EPA believes that retaining the current standard for a limited period of time until SIPs are approved for the new standard in current nonattainment areas, or one year after designations in other areas, will adequately serve the anti-backsliding goals of the CAA.[121]

2. Final

The EPA is finalizing the guidance related to transition from the current NAAQS to the new Pb NAAQS generally consistent with the proposal that the existing standard be retained until one year following the effective date of designations, except that for current nonattainment areas the standard would remain in effect until approval of a SIP for the new standard. EPA notes that the most recent three years of available monitoring data from the East Helena nonattainment area showed no violations of the current standard, although the monitors were shut down in December, 2001 following the shutdown of the large stationary source of lead emissions there. Accordingly, it is unclear whether East Helena will be designated nonattainment for the new standard, or whether it could possibly receive another designation. In the event East Helena is designated unclassifiable or attainment for the new standard, EPA believes it is still appropriate to retain the existing standard until the state submits, and EPA approves, a maintenance SIP for the new standard. Accordingly EPA has amended the proposed text of 40 CFR 50.12 to reflect the possibility that in this specific set of circumstances, the old standard could be revoked upon EPA's approval of a maintenance SIP for the new standard.

**VII. Exceptional Events Information Submission Schedule for Lead NAAQS**

EPA proposed changes to the original dates for submitting and documenting exceptional event data claims and the Agency is adopting the proposed changes with some minor revisions and they are described below.

Section A presents the information stated in the proposal. Section B

---

[119] Criteria pollutants are those pollutants for which EPA has established a standard under section 109 of the CAA.

[120] Transportation conformity is required under CAA section 176(c) (42 U.S.C. 7506(c) to ensure that federally supported highway and transit project activities are consistent with ("conform to") the purpose of the SIP. Transportation conformity applies to areas that are designated nonattainment, and those areas redesignated to attainment after 1990 ("maintenance areas" with plans developed under CAA section 175A) for transportation-related criteria pollutants. In light of the elimination of Pb additives from gasoline, transportation conformity does not apply to the Pb NAAQS.

[121] The areas that are currently nonattainment for the pre-existing Pb NAAQS are East Helena, Montana and Jefferson County (part)/Herculaneum, Missouri. (*See http://www.epa.gov/oar/oaqps/greenbk/Inc.html*)

summarizes and responds to all comments received regarding exceptional events data submission. Section C provides the final preamble text considering comments received and incorporating final revisions to the proposal.

*A. Proposal*

The EPA proposed Pb-specific changes to the deadlines, in 40 CFR 50.14, by which States must flag ambient air data that they believe has been affected by exceptional events and submit initial descriptions of those events, and the deadlines by which States must submit detailed justifications to support the exclusion of that data from EPA determinations of attainment or nonattainment with the NAAQS. The deadlines in 40 CFR 50.14 are generic, and are not always appropriate for Pb given the anticipated schedule for the designations of areas under the proposed Pb NAAQS.

For the specific case of Pb, EPA anticipates that designations under the revised NAAQS may be made in September 2011 based on 2008–2010 data, (or possibly in September 2010 based on 2007–2009 data if sufficient data are available), and thus will depend in part on air quality data collected as late as December 2010 (or December 2009). (Section IV.C of the proposed preamble had a more detailed discussion of the designation schedule and what data EPA intends to use.) There is no way for a State to flag and submit documentation regarding events that happen in October, November, and December 2010 (or 2009) by one year before designation decisions that are made in September 2011 (or 2010).

The proposed revisions to 40 CFR 50.14 involved only changes in submission dates for information regarding claimed exceptional events affecting Pb data. The proposed rule text showed only the changes that would apply if designations are made three years after promulgation; where a deadline would be different if designations were made at the two-year point, the difference in deadline was noted in the proposed preamble. We proposed to extend the generic deadline for flagging data (and providing a brief initial description of the event) of July 1 of the year following the data collection, to July 1, 2009 for data collected in 2006–2007. The proposed extension extended 2006 and 2007 data because Governors' designation recommendations will consider 2006–2008 data, and possibly EPA will consider 2006–2008 or 2007–2009 data if complete data for 2008–2010 are not available at the time of final designations. EPA noted that it does not intend to use data prior to 2006 in making Pb designation decisions. The generic event flagging deadline in the Exceptional Events Rule would continue to apply to 2008 and later years following the promulgation of the revised Pb NAAQS. The Governor of a State would be required to submit designation recommendations to EPA a year after promulgation of the revised NAAQS (i.e., in Fall 2009). States would therefore have enough time to flag data and submit their demonstrations and know what 2008 data need to be excluded due to exceptional events when formulating their recommendations to EPA.

For data collected in 2010 (or 2009), we proposed to move up the generic deadline of July 1 for data flagging to May 1, 2011 (or May 1, 2010) (which is also the applicable deadline for certifying data in AQS as being complete and accurate to the best knowledge of the responsible monitoring agency head). This would give a State less time, but EPA believes still sufficient time, to decide what 2010 (or 2009) data to flag, and would allow EPA to have access to the flags in time for EPA to develop its own proposed and final plans for designations.

Finally, EPA proposed to make the deadline for submission of detailed justifications for exclusion of data collected in 2006 through 2008 be September 15, 2010 for the three year designation schedule, or September 15, 2009 under the two year designation schedule. EPA generally does not anticipate data from 2006 and 2007 being used in final Pb designations. Under the three year designation schedule, for data collected in 2010, EPA proposed to make the deadline for submission of justifications be May 1, 2011. This is less than a year before the designation decisions would be made, but we believe it is a good compromise between giving a State a reasonable period to prepare the justifications and EPA a reasonable period to consider the information submitted by the State. Similarly, under the two year designation schedule, for data collected in 2009, EPA proposed to make the deadline for submission of justifications be May 1, 2010. Table 5 summarizes the three year designation deadlines in the proposal and discussed in this section, and Table 6 summarizes the two year designation deadlines.

TABLE 5—PROPOSED SCHEDULE FOR EXCEPTIONAL EVENT FLAGGING AND DOCUMENTATION SUBMISSION IF DESIGNATIONS PROMULGATED IN THREE YEARS

| Air quality data collected for calendar year | Event flagging deadline | Detailed documentation submission deadline |
|---|---|---|
| 2006 | July 1, 2009 * | September 15, 2010. * |
| 2007 | July 1, 2009 * | September 15, 2010. |
| 2008 | July 1, 2009 | September 15, 2010. * |
| 2009 | July 1, 2010 | September 15, 2010. * |
| 2010 | May 1, 2011 * | May 1, 2011. * |

* Indicates proposed change from generic schedule in 40 CFR 50.14.

TABLE 6—PROPOSED SCHEDULE FOR EXCEPTIONAL EVENT FLAGGING AND DOCUMENTATION SUBMISSION IF DESIGNATIONS PROMULGATED IN TWO YEARS

| Air quality data collected for calendar year | Event flagging deadline | Detailed documentation submission deadline |
|---|---|---|
| 2006 | July 1, 2009 * | September 15, 2009. |
| 2007 | July 1, 2009 * | September 15, 2009. * |
| 2008 | July 1, 2009 | September 15, 2009. * |

TABLE 6—PROPOSED SCHEDULE FOR EXCEPTIONAL EVENT FLAGGING AND DOCUMENTATION SUBMISSION IF DESIGNATIONS PROMULGATED IN TWO YEARS—Continued

| Air quality data collected for calendar year | Event flagging deadline | Detailed documentation submission deadline |
|---|---|---|
| 2009 ............................................................ | May 1, 2010 * ................................................................ | May 1, 2010. * |

* Indicates proposed change from generic schedule in 40 CFR 50.14.

EPA invited comment on these proposed changes in the exceptional event flagging and documentation submission deadlines.

*B. Comments and Responses*

EPA received only one comment on the proposed revision to the schedule for flagging and documenting exceptional event data which could affect Pb designation decisions. The comment from the North Carolina Department of Environment and Natural Resources' (NCDENR) Division of Air Quality (DAQ) stated that: "NCDAQ

believes states need proper time to provide exceptional events documentation before designations are made."

EPA believes that the final schedule provides states with adequate time for flagging exceptional values and providing documentation to support exceptional event claims. Also, NCDAQ did not specifically state either that the proposed deadlines were inadequate or ask for more time; nor did it provide any alternative schedules for the Agency's consideration.

*C. Final*

EPA's final schedule for flagging and documenting exceptional event data claims is shown in the tables that follow. Table 7 summarizes the final deadlines for areas where final designations occur no later than October 15, 2011 (i.e., no later than three years after promulgation of a new NAAQS). Table 8 summarizes the final dealines for areas where final designations occur no later than October 15, 2010 (i.e., no later than two years after promulgation of a new NAAQS).

TABLE 7—FINAL SCHEDULE FOR EXCEPTIONAL EVENT FLAGGING AND DOCUMENTATION SUBMISSION IF DESIGNATIONS PROMULGATED WITHIN THREE YEARS

| Air quality data collected for calendar year | Event flagging deadline | Detailed documentation submission deadline |
|---|---|---|
| 2006 ............................................................ | July 1, 2009 * ................................................................ | October 15 2010. * |
| 2007 ............................................................ | July 1, 2009 * ................................................................ | October 15, 2010. |
| 2008 ............................................................ | July 1, 2009 ................................................................ | October 15, 2010. * |
| 2009 ............................................................ | July 1, 2010 ................................................................ | October 15, 2010. * |
| 2010 ............................................................ | May 1, 2011 * ................................................................ | May 1, 2011. * |

* Indicates change from generic schedule in 40 CFR 50.14.

TABLE 8—FINAL SCHEDULE FOR EXCEPTIONAL EVENT FLAGGING AND DOCUMENTATION SUBMISSION IF DESIGNATIONS PROMULGATED WITHIN TWO YEARS

| Air quality data collected for calendar year | Event flagging deadline | Detailed documentation submission deadline |
|---|---|---|
| 2006 ............................................................ | July 1, 2009 * ................................................................ | October 15, 2009. |
| 2007 ............................................................ | July 1, 2009 * ................................................................ | October 15, 2009. * |
| 2008 ............................................................ | July 1, 2009 ................................................................ | October 15, 2009. * |
| 2009 ............................................................ | May 1, 2010 * ................................................................ | May 1, 2010. * |

* Indicates change from generic schedule in 40 CFR 50.14.

**VII. Statutory and Executive Order Reviews**

*A. Executive Order 12866: Regulatory Planning and Review*

Under section 3(f)(1) of Executive Order (EO) 12866 (58 FR 51735, October 4, 1993), this action is an "economically significant regulatory action" because it is likely to have an annual effect on the economy of $100 million or more. Accordingly, EPA submitted this action to the Office of Management and Budget (OMB) for review under EO 12866 and

any changes made in response to OMB recommendations have been documented in the docket for this action (EPA–HQ–OAR–2006–0753). In addition, EPA prepared a Regulatory Impact Analysis (RIA) of the potential costs and benefits associated with this action. A copy of the analysis is available in the RIA docket (EPA–HQ–OAR–2008–0253) and the analysis is briefly summarized here. The RIA estimates the costs and monetized human health and welfare benefits of attaining four alternative Pb NAAQS

nationwide. Specifically, the RIA examines the alternatives of 0.50 µg/m³, 0.40 µg/m³, 0.30 µg/m³, 0.20 µg/m³, 0.15 µg/m³ and 0.10 µg/m³. The RIA contains illustrative analyses that consider a limited number of emissions control scenarios that States and Regional Planning Organizations might implement to achieve these alternative Pb NAAQS. However, the CAA and judicial decisions make clear that the economic and technical feasibility of attaining ambient standards are not to be considered in setting or revising

NAAQS, although such factors may be considered in the development of State plans to implement the standards. Accordingly, although an RIA has been prepared, the results of the RIA have not been considered in issuing this final rule.

### B. Paperwork Reduction Act

The information collection requirements in this final rule will be submitted for approval to the Office of Management and Budget (OMB) under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.* The information collection requirements are not enforceable until OMB approves them.

The information collected under 40 CFR part 53 (e.g., test results, monitoring records, instruction manual, and other associated information) is needed to determine whether a candidate method intended for use in determining attainment of the National Ambient Air Quality Standards (NAAQS) in 40 CFR part 50 will meet the design, performance, and/or comparability requirements for designation as a Federal reference method (FRM) or Federal equivalent method (FEM). While this final rule amends the requirements for Pb FRM and FEM determinations, they merely provide additional flexibility in meeting the FRM/FEM determination requirements. Furthermore, we do not expect the number of FRM or FEM determinations to increase over the number that is currently used to estimate burden associated with Pb FRM/FEM determinations provided in the current ICR for 40 CFR part 53 (EPA ICR numbers 0559.12). As such, no change in the burden estimate for 40 CFR part 53 has been made as part of this rulemaking.

The information collected and reported under 40 CFR part 58 is needed to determine compliance with the NAAQS, to characterize air quality and associated health and ecosystem impacts, to develop emissions control strategies, and to measure progress for the air pollution program. The proposed amendments would revise the technical requirements for Pb monitoring sites, require the siting and operation of additional Pb ambient air monitors, and the reporting of the collected ambient Pb monitoring data to EPA's Air Quality System (AQS). We have estimated the burden based on the final monitoring requirements of this rule. Based on these requirements, the annual average reporting burden for the collection under 40 CFR part 58 (averaged over the first 3 years of this ICR) for 150 respondents is estimated to increase by a total of 22,376 labor hours per year

with an increase of $1,910,059 per year. Burden is defined at 5 CFR 1320.3(b).

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations in 40 CFR are listed in 40 CFR part 9. When this ICR is approved by OMB, the Agency will publish a technical amendment to 40 CFR part 9 in the **Federal Register** to display the OMB control number for the approved information collection requirements contained in this final rule.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Small entities include small businesses, small organizations, and small governmental jurisdictions.

For purposes of assessing the impacts of this rule on small entities, small entity is defined as: (1) A small business that is a small industrial entity as defined by the Small Business Administration's (SBA) regulations at 13 CFR 121.201; (2) a small governmental jurisdiction that is a government of a city, county, town, school district or special district with a population of less than 50,000; and (3) a small organization that is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field.

After considering the economic impacts of this final rule on small entities, I certify that this action will not have a significant economic impact on a substantial number of small entities. This final rule will not impose any requirements on small entities. Rather, this rule establishes national standards for allowable concentrations of Pb in ambient air as required by section 109 of the CAA. *American Trucking Ass'ns* v. *EPA,* 175 F. 3d 1027, 1044–45 (D.C. cir. 1999) (NAAQS do not have significant impacts upon small entities because NAAQS themselves impose no regulations upon small entities). Similarly, the amendments to 40 CFR part 58 address the requirements for States to collect information and report compliance with the NAAQS and will not impose any requirements on small entities.

### D. Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, establishes requirements for Federal agencies to assess the effects of their regulatory actions on State, local, and tribal governments and the private sector. Unless otherwise prohibited by law, under section 202 of the UMRA, EPA generally must prepare a written statement, including a cost-benefit analysis, for proposed and final rules with "Federal mandates" that may result in expenditures to State, local, and tribal governments, in the aggregate, or to the private sector, of $100 million or more in any one year. Before promulgating an EPA rule for which a written statement is required under section 202, section 205 of the UMRA generally requires EPA to identify and consider a reasonable number of regulatory alternatives and to adopt the least costly, most cost-effective or least burdensome alternative that achieves the objectives of the rule. The provisions of section 205 do not apply when they are inconsistent with applicable law. Moreover, section 205 allows EPA to adopt an alternative other than the least costly, most cost-effective or least burdensome alternative if the Administrator publishes with the final rule an explanation why that alternative was not adopted. Before EPA establishes any regulatory requirements that may significantly or uniquely affect small governments, including tribal governments, it must have developed under section 203 of the UMRA a small government agency plan. The plan must provide for notifying potentially affected small governments, enabling officials of affected small governments to have meaningful and timely input in the development of EPA regulatory proposals with significant Federal intergovernmental mandates, and informing, educating, and advising small governments on compliance with the regulatory requirements.

This action is not subject to the requirements of sections 202 and 205 of the UMRA. EPA has determined that this final rule does not contain a Federal mandate that may result in expenditures of $100 million or more for State, local, and tribal governments, in the aggregate, or the private sector in any one year. The revisions to the Pb NAAQS impose no enforceable duty on any State, local or tribal governments or the private sector. The expected costs associated with the increased monitoring requirements are described in EPA's ICR document, but those costs are not expected to exceed $100 million in the aggregate for any year. Furthermore, as

indicated previously, in setting a NAAQS EPA cannot consider the economic or technological feasibility of attaining ambient air quality standards. Because the Clean Air Act prohibits EPA from considering the types of estimates and assessments described in section 202 when setting the NAAQS, the UMRA does not require EPA to prepare a written statement under section 202 for the revisions to the Pb NAAQS.

With regard to implementation guidance, the CAA imposes the obligation for States to submit SIPs to implement the Pb NAAQS. In this final rule, EPA is merely providing an interpretation of those requirements. However, even if this rule did establish an independent obligation for States to submit SIPs, it is questionable whether an obligation to submit a SIP revision would constitute a Federal mandate in any case. The obligation for a State to submit a SIP that arises out of section 110 and section 191 of the CAA is not legally enforceable by a court of law, and at most is a condition for continued receipt of highway funds. Therefore, it is possible to view an action requiring such a submittal as not creating any enforceable duty within the meaning of 2 U.S.C. 658 for purposes of the UMRA. Even if it did, the duty could be viewed as falling within the exception for a condition of Federal assistance under 2 U.S.C. 658.

EPA has determined that this final rule contains no regulatory requirements that might significantly or uniquely affect small governments because it imposes no enforceable duty on any small governments. Therefore, this rule is not subject to the requirements of section 203 of the UMRA.

## E. Executive Order 13132: Federalism

Executive Order 13132, entitled "Federalism" (64 FR 43255, August 10, 1999), requires EPA to develop an accountable process to ensure "meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications." "Policies that have federalism implications" is defined in the Executive Order to include regulations that have "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government."

This final rule does not have federalism implications. It will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132. The rule does not alter the relationship between the Federal government and the States regarding the establishment and implementation of air quality improvement programs as codified in the CAA. Under section 109 of the CAA, EPA is mandated to establish NAAQS; however, CAA section 116 preserves the rights of States to establish more stringent requirements if deemed necessary by a State. Furthermore, under CAA section 107, the States have primary responsibility for implementation of the NAAQS. Finally, as noted in section E (above) on UMRA, this rule does not impose significant costs on State, local, or tribal governments or the private sector. Thus, Executive Order 13132 does not apply to this rule.

## F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action does not have tribal implications, as specified in Executive Order 13175 (65 FR 67249, November 9, 2000). It does not have a substantial direct effect on one or more Indian Tribes, since Tribes are not obligated to adopt or implement any NAAQS or monitoring requirements for NAAQS. Thus, Executive Order 13175 does not apply to this action.

Although Executive Order 13175 does not apply to this action, EPA contacted tribal environmental professionals during the development of this rule. EPA staff participated in the regularly scheduled Tribal Air Call sponsored by the National Tribal Air Association during the spring of 2008 as the proposal was under development, and also offered several informational briefings on the proposal to Tribal environmental professionals in Summer 2008 during the public comment period on the proposed rule. EPA sent individual letters to all federally recognized Tribes within the lower 48 states and Alaska to give Tribal leaders the opportunity for consultation, and EPA staff also participated in Tribal public meetings, such as the National Tribal Forum meeting in June 2008, where Tribes discussed their concerns regarding the proposed rule. EPA received comments from a number of Tribes on the proposed rule; these comments are addressed in the relevant sections of the preamble and Response to Comments for this rulemaking.

## G. Executive Order 13045: Protection of Children from Environmental Health & Safety Risks

This action is subject to EO 13045 (62 FR 19885, April 23, 1997) because it is an economically significant regulatory action as defined by EO 12866, and we believe that the environmental health risk addressed by this action has a disproportionate effect on children. The final rule establishes uniform national ambient air quality standards for Pb; these standards are designed to protect public health with an adequate margin of safety, as required by CAA section 109. However, the protection offered by these standards may be especially important for children because neurological effects in children are among if not the most sensitive health endpoints for Pb exposure. Because children are considered a sensitive population, we have carefully evaluated the environmental health effects of exposure to Pb pollution among children. These effects and the size of the population affected are summarized in chapters 6 and 8 of the Criteria Document and sections 3.3 and 3.4 of the Staff Paper, and the results of our evaluation of the effects of Pb pollution on children are discussed in sections II.B and II.C of the notice of proposed rulemaking, and section II.A of this preamble.

## H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use

This rule is not a "significant energy action" as defined in Executive Order 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use" (66 FR 28355 (May 22, 2001)) because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. The purpose of this rule is to establish revised NAAQS for Pb. The rule does not prescribe specific control strategies by which these ambient standards will be met. Such strategies will be developed by States on a case-by-case basis, and EPA cannot predict whether the control options selected by States will include regulations on energy suppliers, distributors, or users. Thus, EPA concludes that this rule is not likely to have any adverse energy effects.

## I. National Technology Transfer and Advancement Act

Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (NTTAA), Public Law No. 104–113, § 12(d) (15 U.S.C. 272 note) directs EPA to use voluntary consensus

standards in its regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., materials specifications, test methods, sampling procedures, and business practices) that are developed or adopted by voluntary consensus standards bodies. The NTTAA directs EPA to provide Congress, through OMB, explanations when the Agency decides not to use available and applicable voluntary consensus standards.

This final rule involves technical standards. EPA has established low-volume $PM_{10}$ samplers coupled with XRF analysis as the FRM for Pb-$PM_{10}$ measurement. While EPA identified the ISO standard "Determination of the particulate lead content of aerosols collected on filters" (ISO 9855: 1993) as being potentially applicable, the final rule does not permit its use. EPA determined that the use of this voluntary consensus standard would be impractical because the analysis method does not provide for the method detection limits necessary to adequately characterize ambient Pb concentrations for the purpose of determining compliance with the revisions to the Pb NAAQS.

### J. Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations

Executive Order 12898 (59 FR 7629; Feb. 16, 1994) establishes federal executive policy on environmental justice. Its main provision directs federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations and low-income populations in the United States.

EPA has determined that this final rule will not have disproportionately high and adverse human health or environmental effects on minority or low-income populations because it increases the level of environmental protection for all affected populations without having any disproportionately high and adverse human health or environmental effects on any population, including any minority or low-income population. The final rule establishes uniform national standards for Pb in ambient air. In the Administrator's judgment, the revised Pb NAAQS protect public health, including the health of sensitive groups,

with an adequate margin of safety. As discussed earlier in this preamble (see section II) and in the Response to Comments, the Administrator expressly considered the available information regarding health effects among vulnerable and susceptible populations in making the determination about which standards are requisite.

Some commenters expressed concerns that EPA had failed to adequately assess the environmental justice implications of its proposed decision. These commenters asserted specifically that low-income and minority populations constitute susceptible subpopulations and that the proposed revisions to the primary Pb standards would be insufficient to protect these subpopulations with an adequate margin of safety. In addition, some commenters stated that EPA had failed to adequately evaluate or address the disproportionate adverse impact of Pb exposure on poor and minority populations as required by EO 12898. These commenters assert that in spite of significant scientific evidence indicating that the burden of lead exposure is higher in poor communities and communities of color, EPA has not taken the differing impacts of lead exposure into account in revising the Pb NAAQS.

At the time of proposal, EPA prepared a technical memo to assess the socio-demographic characteristics of populations living near ambient air Pb monitors and stationary sources of Pb emissions (Pekar *et al.*, 2008). Due to limitations in the available data, most significantly limitations on information regarding whether current ambient air concentrations of Pb (as measured by fixed-site monitors or proximity to stationary sources of Pb) are associated with elevated exposure or increased risk for any socio-demographic group, EPA was not able to draw conclusions regarding the impact of Pb air pollution on minority and low-income populations in this analysis [or "memo"]. However, EPA believes that the newly strengthened Pb standards and the new requirements for ambient air monitoring for Pb will have the greatest benefit in reducing health risks associated with exposure to ambient air Pb in those areas where ambient air concentrations are currently the highest. Thus, to the extent that any population groups, including minorities or low-income populations, are currently experiencing disproportionate exposure to ambient air-related Pb, those groups can be expected to experience relatively greater air quality improvements under the revised standards. Nationwide, these revised, more stringent standards will

not have adverse health impacts on any population, including any minority or low-income population.

### K. Congressional Review Act

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA submitted a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is a "major rule" as defined by 5 U.S.C. 804(2). This rule will be effective January 12, 2009.

### References

Advisory Committee on Childhood Lead Poisoning Prevention (ACCLPP) (2007) Interpreting and managing blood lead levels <10 µg/dL in children and reducing childhood exposures to lead: Recommendations of CDC's Advisory Committee on Childhood Lead Poisoning Prevention. Morbidity and Mortality Weekly Report. 56(RR–8). November 2, 2007.

Alliance to End Childhood Lead Poisoning. 1991. The First Comprehensive National Conference; Final Report. October 6, 7, 8, 1991.

American Academy of Pediatrics. 2008. Letter to Stephen Johnson from Renee R. Jenkins. January 16, 2008. Available in docket number EPA–HQ–OAR–2006–0735.

Axelrad, D. 2008a. E-mail message to Deirdre Murphy, U.S. EPA. January 4, 2008. Docket number EPA–HQ–OAR–2006–0735.

Axelrad, D. 2008b. E-mail message to Deirdre Murphy, U.S. EPA. August 12, 2008. Docket number EPA–HQ–OAR–2006–0735.

Bellinger, D.C. and Needleman, H.L. (2003) Intellectual impairment and blood lead levels [letter]. N. Engl. J. Med. 349: 500.

Bellinger, D. 2008. E-mail message to Jee-Young Kim, U.S. EPA. February 13, 2008. Docket number EPA–HQ–OAR–2006–0735.

Billick, I.H.; Curran, A.S.; Shier, D.R. (1979) Analysis of pediatric blood lead levels in New York City for 1970–1976. Environ. Health Perspect. 31: 183–190.

Billick, I.H.; Curran, A.S.; Shier, D.R. (1980) Relation of pediatric blood lead levels to lead in gasoline. Environ. Health Perspect. 34: 213–217.

Billick, I.H. (1983) Sources of lead in the environment. In: Rutter, M.; Russell Jones, R., eds. Lead versus health: sources and effects of low level lead exposure. New York, NY: John Wiley and Sons, Ltd; pp. 59–77.

Black M.M. and Baqui A.G. (2005) Reply to E. Pollitt question regarding are the

psychologically tests valid. Am J Clin Nutr. 2005. Jul;82(1):201–2.

Boyle, E.A., Bergquist, B.A., Kayser, R.A. and Mahowald, N. (2005) Iron, manganese, and lead at Hawaii Ocean Time-series station ALOHA: Temporal variability and an intermediate water hydrothermal plume. Geochimica et Cosmochimica Acta, Vol. 69, No. 4, pp. 933–952.

Brunekreef, B.; Noy, D.; Biersteker, K.; Boleij, J. (1983) Blood lead levels of Dutch city children and their relationship to lead in the environment. J. Air Pollut. Control Assoc. 33: 872–876.

Brunekreef, B. (1984) The relationship between air lead and blood lead in children: a critical review. Science of the total environment, 38: 79–123.

Camalier, L.; Rice, J. (2007) Evaluation of the Precision and Bias for Lead in Total Suspended Particulate (TSP). Memorandum to the Lead NAAQS Review Docket. EPA–HQ–OAR–2006–0735.

Canfield, R.L.; Henderson, C.R., Jr.; Cory-Slechta, D.A.; Cox, C.; Jusko, T.A.; Lanphear, B.P. (2003a) Intellectual impairment in children with blood lead concentrations below 10 µg per deciliter. N. Engl. J. Med. 348: 1517–1526.

Canfield, R.L. 2008a. E-mail message to Jee-Young Kim, U.S. EPA. February 7, 2008. Docket number EPA–HQ–OAR–2006–0735.

Canfield, R.L. 2008b. E-mail messages to Jee-Young Kim, U.S. EPA. August 11 and 12, 2008. Docket number EPA–HQ–OAR–2006–0735.

Caravanos, J.; Weiss, A.L.; Jaeger, R.J. (2006) An exterior and interior leaded dust deposition survey in New York City: results of a 2-year study. Environ. Res. 100: 159–164.

Cavender, K. (2008a) Lead NAAQS Ambient Air Monitoring Network: Network Design Options Under Consideration. Memorandum to the Lead NAAQS Review Docket. EPA–HQ–OAR–2006–0735.

Cavender, K. (2008b). Development of Final Source-oriented Monitoring Emission Threshold. Memorandum to the Lead NAAQS Review Docket. EPA–HQ–OAR–2006–0735.

Centers for Disease Control (1991) Preventing lead poisoning in young children: A statement by the Centers for Disease Control. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service; October 1. *http://wonder.cdc.gov/wonder/prevguid/p0000029/p0000029.asp.*

Centers for Disease Control and Prevention (2005a) Preventing lead poisoning in young children: A statement by the Centers for Disease Control and Prevention. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service. August.

Clean Air Scientific Advisory Committee (1990) Report of the Clean Air Scientific Advisory Committed (CASAC), Review of the OAQPS Lead Staff Paper and the ECAO Air Quality Criteria Document Supplement. EPA–SAB–CASAC–90–002. Washington, DC. January.

Hayes, E.B.,; McElvaine, M.D.; Orbach, H.G.; Fernandez, A.M.; Lyne, S.; Matte, T.D. (1994) Long-term trends in blood lead levels among children in Chicago: Relationship to air lead levels. Pediatrics 93:195–200.

Henderson, R. (2006) Letter from Dr. Rogene Henderson, Chair, Clean Air Scientific Advisory Committee, to Administrator Stephen L. Johnson. Re: Clean Air Scientific Advisory Committee (CASAC) Lead Review Panel's Consultation on EPA's draft Analysis Plan for Human Health and Ecological Risk Assessment for the Review of the Lead National Ambient Air Quality Standards. July 26, 2006.

Henderson, R. (2007a) Letter from Dr. Rogene Henderson, Chair, Clean Air Scientific Advisory Committee, to Administrator Stephen L. Johnson. Re: Clean Air Scientific Advisory Committee's (CASAC) Review of the 1st Draft Lead Staff Paper and Draft Lead Exposure and Risk Assessments. March 27, 2007.

Henderson, R. (2007b) Letter from Dr. Rogene Henderson, Chair, Clean Air Scientific Advisory Committee, to Administrator Stephen L. Johnson. Re: Clean Air Scientific Advisory Committee's (CASAC) Review of the 2nd Draft Lead Human Exposure and Health Risk Assessments. September 27, 2007.

Henderson, R. (2008a) Letter from Dr. Rogene Henderson, Chair, Clean Air Scientific Advisory Committee, to Administrator Stephen L. Johnson. Re: Clean Air Scientific Advisory Committee's (CASAC) Review of the Advance Notice of Proposed Rulemaking (ANPR) for the NAAQS for lead. January 22, 2008.

Henderson, R. (2008b) Letter from Dr. Rogene Henderson, Chair, Clean Air Scientific Advisory Committee, to Administrator Stephen L. Johnson. Re: Clean Air Scientific Advisory Committee's (CASAC) Review of the Notice of Proposed Rulemaking for the NAAQS for lead. July 18, 2008.

Hilts, S.R. (2003) Effect of smelter emission reductions on children's blood lead levels. Sci. Total Environ. 303: 51–58.

Hornung, R. 2008a. E-mail message to Jee-Young Kim, U.S. EPA. February 11, 2008. Docket number EPA–HQ–OAR–2006–0735.

Hornung, R. 2008b. E-mail message to Jee-Young Kim, U.S. EPA. August 19, 2008. Docket number EPA–HQ–OAR–2006–0735.

ICF International. (2006) Lead Human Exposure and Health Risk Assessments and Ecological Risk Assessment for Selected Areas. Pilot Phase. Draft Technical Report. Prepared for the U.S. EPA's Office of Air Quality Planning and Standards, Research Triangle Park, NC. December.

Jusko T.A., Henderson C.R., Lanphear B.P., Cory-Slechta D.A., Parsons P.J., Canfield R.L. (2008) Blood lead concentrations < 10 microg/dL and child intelligence at 6 years of age. Environ Health Perspect 116(2): 243–8.

Kordas, K. 2008. E-mail message to Jee-Young Kim, U.S. EPA. February 29, 2008. Docket number EPA–HQ–OAR–2006–0735.

Lanphear, B.P.; Dietrich, K.N.; Auinger, P.; Cox, C. (2000) Cognitive deficits associated with blood lead concentrations <10 µg/dL in U.S. children and adolescents. Public Health Reports. 115: 521–529.

Lanphear, B.P.; Hornung, R.; Khoury, J.; Yolton, K.; Baghurst, P.; Bellinger, D.C.; Canfield, R.L.; Dietrich, K.N.; Bornschein, R.; Greene, T.; Rothenberg, S.J.;

Needleman, H.L.; Schnaas, L.; Wasserman, G.; Graziano, J.; Roberts, R. (2005) Low-level environmental lead exposure and children's intellectual function: An international pooled analysis. Environ. Health Perspect. 113: 894–899.

MacDonald, D.D., Ingersoll, C.G., and Berger, T.A. (2000) Development and evaluation of consensus-based sediment quality guidelines for freshwater ecosystems. Archives of Environmental Contamination and Toxicology. 39: 20–31.

MacDonald, D.D., Ingersoll, C.G., Smorong, D.E., Lindskoog, R.A., Sloane, G., and Biernacki, T. (2003) Development and Evaluation of Numerical Sediment Quality Assessment Guidelines for Florida Inland Waters. British Columbia: MacDonald Environmental Sciences, Lt. Columbia, MO: U.S. Geological Survey. Prepared for: Florida Department of Environmental Protection, Tallahassee, FL. January.

Martin, A.; Volkmar, F.R. [eds] (2007) Lewis's Child and Adolescent Psychiatry, A comprehensive textbook. Fourth Edition. Section IV. Nosology, Classification and Diagnostic Assessment, Chapter 4.2.1. Lippincott, Williams and Wilkins, Philadelphia, PA.

Marty, M.A. (2008) Letter from Dr. Melanie Marty, Chair, Children's Health Protection Advisory Committee. Re: Proposed Rulemaking for the National Ambient Air Quality Standard for Lead. June 16, 2008.

Neptune and Company, Inc. (2008) Scaling Factor: PM$_{10}$ versus TSP. Final Report. Submitted to U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards. September 30, 2008.

Papp, M. (2008) Documentation of DQO Process Outputs and Proposals for Quality Control of Pb data from SLAMS sites. Memorandum to the Lead NAAQS Review Docket. EPA–HQ–OAR–2006–0735.

Pekar, Z., Sasser, E, Ashley, J. (2008) Analysis of Socio-Demographic Factors for Populations Living Near Pb TSP Monitors and Larger Pb Point Sources. Memorandum to the Lead NAAQS Review Docket. EPA–HQ–OAR–2006–0735.

Rabinowitz, M. and Needleman, H.L. (1983) Petrol Lead sales and umbilical cord blood lead levels in Boston, Massachusetts [Letter]. Lancet 1(8314/5: 63).

Rabinowitz, M. Leviton, A., Needleman, H.L., Bellinger, D., Waternaux, C. (1985) Environmental correlates of infant blood lead levels in Boston. Environ Res 38: 96–107.

Rice, J. (2007) Summary of Method Detection Limits for Ambient Lead Methods. Memorandum to the Lead NAAQS Review Docket. EPA–HQ–OAR–2006–0735.

Rothenberg, S.J.; Rothenberg, J.C. (2005) Testing the dose-response specification in epidemiology: Public health and policy consequences for lead. Environ. Health Perspect. 113: 1190–1195.

Russell, T. (2008a) Letter from Dr. Armistead (Ted) Russell, Chair, Clean Air Scientific Advisory Committee Ambient Air Monitoring and Methods Subcommittee, to Administrator Stephen L. Johnson. Re: Clean Air Scientific Advisory (CASAC) Ambient Air Monitoring & Methods

(AAMM) Subcommittee Consultation Concerning Ambient Air Monitoring Issues related to the Lead NAAQS. April 14, 2008.

Russell, T. (2008b) Letter from Dr. Armistead (Ted) Russell, Chair, Clean Air Scientific Advisory Committee Ambient Air Monitoring and Methods Subcommittee, to Administrator Stephen L. Johnson. Re: Clean Air Scientific Advisory (CASAC) Ambient Air Monitoring & Methods (AAMM) Subcommittee Consultation on Approaches for Developing a Low-Volume Ambient Air Monitor for Lead in Total Suspended Particulate (Pb-TSP) Federal Reference Method (FRM) or Federal Equivalent Method (FEM). August 12, 2008.

Schmidt, M. (2008) Lead NAAQS Review: Comparison of numbers/percents of sites/counties/populations that are not likely to meet various potential NAAQS levels using various averaging times and forms. Memorandum to the Lead NAAQS Review Docket. EPA–HQ–OAR–2006–0735.

Schmidt, M., Lorang, P. (2008) Analysis of Expected Range of Pb-TSP Concentrations at Non-Source Oriented Monitoring Sites in CBSAs with Population of at least 500,000. Memorandum to the Lead NAAQS Review Docket. EPA–HQ–OAR–2006–0735.

Schwartz, J., and Pitcher, H. (1989) The relationship between gasoline lead and blood lead in the United States. J Official Statistics 5(4): 421–431.

Schwemberger, MS, JE Mosby, MJ Doa, DE Jacobs, PJ Ashley, DJ Brody, MJ Brown, RL Jones, D Homa. May 27, 2005 Mortality and Morbidity Weekly Report 54(20): 513–516.

Surkan P.J., Zhang A., Trachtenberg F., Daniel D.B., McKinlay S., Bellinger D.C. (2007) Neuropsychological function in children with blood lead levels <10 microg/dL. Neurotoxicology. 28(6): 1170–7.

Téllez-Rojo, M.M.; Bellinger, D.C.; Arroyo-Quiroz, C.; Lamadrid-Figueroa, H.; Mercado-García, A.; Schnaas-Arrieta, L.; Wright, R.O.; Hernández-Avila, M.; Hu, H. (2006) Longitudinal associations between blood lead concentrations < 10 μg/dL and neurobehavioral development in environmentally-exposed children in Mexico City. Pediatrics 118: e323–e330.

Téllez-Rojo, M. 2008. E-mail message to Jee-Young Kim, U.S. EPA. February 11, 2008. Docket number EPA–HQ–OAR–2006–0735.

Tripathi, R.M.; Raghunath, R.; A.V. Kumar; V.N. Sastry; S. Sadasivan. (2001) Atmospheric and children's blood lead as indicators of vehicular traffic and other emission sources in Mumbai, India. Sci Total Enviro 267: 101–108.

U.S. Environmental Protection Agency. (1977) Air quality criteria for lead. Research Triangle Park, NC: Health Effects Research Laboratory, Criteria and Special Studies Office; EPA report no. EPA–600/8–77–017. Available from: NTIS, Springfield, VA; PB–280411.

U.S. Environmental Protection Agency (USEPA). (1984) Ambient Water Quality Criteria for Lead—1984. Washington, DC: Office of Water Regulations and Standards, Criteria and Standards Division. EPA 440/5–B4–027.

U.S. Environmental Protection Agency. (1986a) Air quality criteria for lead.

Research Triangle Park, NC: Office of Health and Environmental Assessment, Environmental Criteria and Assessment Office; EPA report no. EPA–600/8–83/028aF–dF. 4v. Available from: NTIS, Springfield, VA; PB87–142378.

U.S. Environmental Protection Agency. (1986b) Lead effects on cardiovascular function, early development, and stature: An addendum to U.S. EPA Air Quality Criteria for Lead (1986). In: Air quality criteria for lead, v. 1. Research Triangle Park, NC: Office of Health and Environmental Assessment, Environmental Criteria and Assessment Office; pp. A1–A67; EPA report no. EPA–600/8–83/028aF. Available from: NTIS, Springfield, VA; PB87–142378.

U.S. Environmental Protection Agency. (1989) Review of the national ambient air quality standards for lead: Exposure analysis methodology and validation: OAQPS staff report. Research Triangle Park, NC: Office of Air Quality Planning and Standards; report no. EPA–450/2–89/011. Available on the Web: *http://www.epa.gov/ttn/naaqs/standards/pb/data/rnaaqsl_eamv.pdf.*

U.S. Environmental Protection Agency. (1990a) Air quality criteria for lead: Supplement to the 1986 addendum. Research Triangle Park, NC: Office of Health and Environmental Assessment, Environmental Criteria and Assessment Office; report no. EPA/600/8–89/049F. Available from: NTIS, Springfield, VA; PB91–138420.

U.S. Environmental Protection Agency. (1990b) Review of the national ambient air quality standards for lead: Assessment of scientific and technical information: OAQPS staff paper. Research Triangle Park, NC: Office of Air Quality Planning and Standards; report no. EPA–450/2–89/022. Available from: NTIS, Springfield, VA; PB91–206185. Available on the Web: *http://www.epa.gov/ttn/naaqs/standards/pb/data/rnaaqsl_asti.pdf.*

U.S. Environmental Protection Agency. (1991) U.S. EPA Strategy for Reducing Lead Exposure. Available from U.S. EPA Headquarters Library/Washington, DC (Library Code EJBD; Item Call Number: EAP 100/1991.6; OCLC Number 2346675).

U.S. Environmental Protection Agency. (2003) Framework for Cumulative Risk Assessment. Risk Assessment Forum, Washington, DC, EPA/630/P–02/001F. May.

U.S. Environmental Protection Agency. (2005a) Project Work Plan for Revised Air Quality Criteria for Lead. Research Triangle Park, NC: National Center for Environmental Assessment-RTP; report no. NCEA–R–1465. CASAC Review Draft.

U.S. Environmental Protection Agency. (2005b) Air Quality Criteria for Lead (First External Review Draft). Washington, DC, EPA/600/R–05/144aA–bA. Available online at: *http://www.epa.gov/ncea/.*

U.S. Environmental Protection Agency. (2005c) Review of the National Ambient Air Quality Standards for Particulate Matter: Policy Assessment of Scientific and Technical Information, OAQPS Staff Paper. EPA–452/R–05–005a. Office of Air Quality

Planning and Standards, Research Triangle Park.

U.S. Environmental Protection Agency. (2005d) Guidance for Developing Ecological Soil Screening Levels. Washington, DC: Office of Solid Waste and Emergency Response. OSWER Directive 9285.7–55. November.

U.S. Environmental Protection Agency. (2005e) Ecological Soil Screening Levels for Lead, Interim Final. Washington, DC: Office of Solid Waste and Emergency Response. OSWER Directive 9285.7–70. Available at *http://www.epa.gov/ecotox/ecossl/pdf/eco-ssl_lead.pdf.*

U.S. Environmental Protection Agency. (2006a) Air Quality Criteria for Lead. Washington, DC, EPA/600/R–5/144aF. Available online at: *http://www.epa.gov/ncea/.*

U.S. Environmental Protection Agency. (2006b) Air Quality Criteria for Lead (Second External Review Draft). Washington, DC, EPA/600/R–05/144aB–bB. Available online at: *http://www.epa.gov/ncea/.*

U.S. Environmental Protection Agency. (2006c) Plan for Review of the National Ambient Air Quality Standards for Lead. Office of Air Quality Planning and Standards, Research Triangle Park, NC. Available online at: *http://www.epa.gov/ttn/naaqs/standards/pb/s_pb_cr_pd.html.*

U.S. Environmental Protection Agency. (2006d) Analysis Plan for Human Health and Ecological Risk Assessment for the Review of the Lead National Ambient Air Quality Standards. Office of Air Quality Planning and Standards, Research Triangle Park, NC. Available online at: *http://www.epa.gov/ttn/naaqs/standards/pb/s_pb_cr_pd.html.*

U.S. Environmental Protection Agency. (2007a) Lead Human Exposure and Health Risk Assessments for Selected Case Studies (Draft Report) Volume I. Human Exposure and Health Risk Assessments—Full-Scale and Volume II. Appendices. Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA–452/D–07–001a and EPA–452/D–07–001b. July.

U.S. Environmental Protection Agency. (2007b) Lead: Human Exposure and Health Risk Assessments for Selected Case Studies, Volume I. Human Exposure and Health Risk Assessments—Full-Scale and Volume II. Appendices. Office of Air Quality Planning and Standards, Research Triangle Park, NC. EPA–452/R–07–014a and EPA–452/R–07–014b.

U.S. Environmental Protection Agency. (2007c) Review of the National Ambient Air Quality Standards for Lead: Policy Assessment of Scientific and Technical Information, OAQPS Staff Paper. EPA–452/R–07–013. Office of Air Quality Planning and Standards, Research Triangle Park.

U.S. Environmental Protection Agency. (2007d) E-mail Correspondence between Elizabeth Margosches of USEPA and Richard Hornung of Cincinnati Children's Hospital Medical Center. Title of e-mail: Piecewise model with lifetime average. July 20, 2007. Available in docket number EPA–HQ–OPPT–2005–0049.

U.S. Environmental Protection Agency. (2008) Economic Analysis for the TSCA

Lead Renovation, Repair, and Painting Program Final Rule for the Target Housing and Child-Occupied Facilities. Office of Pollution Prevention and Toxics. March 2008.

Vanderpool, R.; Kaushik, S.; Houyoux, M. (2008) Laboratory Determination of Particle Deposition Velocities on Filters Collected Using Federal Reference Method Samplers. U.S. EPA, Offices of Research and Development and Air and Radiation. October 7, 2008. Available in docket: EPA–HQ–OAR–2006–0735.

Wedding, J.B.; McFarland, A.R.; Cermak, J.E. (1977) Large Particle Collection Characteristics of Ambient Aerosol Samplers. Environ. Sci. Technol. 11: 387–390.

World Health Organization. (2000) Air Quality Guidelines for Europe. Chapter 6.7 Lead. WHO Regional Publications, European Series, No. 91. Copenhagen, Denmark.

Yohn, S.; Long, D.; Fett, J.; Patino, L. (2004) Regional versus local influences on lead and cadmium loading to the Great Lakes region. Appl. Geochem. 19: 1157–1175.

Zielhuis, R.L.; del Castilho, P.; Herber, R.F.M.; Wibowo, A.A.E.; Salle, H.J.A. (1979) Concentrations of lead and other metals in blood of two- and three-year-old children living near a secondary smelter. Int. Arch. Occup. Environ. Health 42: 231–239.

## List of Subjects

### 40 CFR Part 50

Environmental protection, Air pollution control, Carbon monoxide, Lead, Nitrogen dioxide, Ozone, Particulate matter, Sulfur oxides.

### 40 CFR Part 51

Environmental protection, Administrative practice and procedure, Air pollution control, Carbon monoxide, Intergovernmental relations, Lead, Nitrogen dioxide, Ozone, Particulate matter, Reporting and recordkeeping requirements.

### 40 CFR Part 53

Environmental protection, Administrative practice and procedure, Air pollution control, Intergovernmental relations, Reporting and recordkeeping requirements.

### 40 CFR Part 58

Environmental protection, Administrative practice and procedure, Air pollution control, Intergovernmental relations, Reporting and recordkeeping requirements.

Dated: October 15, 2008.

**Stephen L. Johnson,**
*Administrator.*

■ For the reasons stated in the preamble, title 40, chapter I of the code of Federal regulations is amended as follows:

## PART 50—NATIONAL PRIMARY AND SECONDARY AMBIENT AIR QUALITY STANDARDS

■ 1. The authority citation for part 50 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Section 50.3 is revised to read as follows:

### § 50.3   Reference conditions.

All measurements of air quality that are expressed as mass per unit volume (e.g., micrograms per cubic meter) other than for particulate matter ($PM_{2.5}$) standards contained in §§ 50.7 and 50.13 and lead standards contained in § 50.16 shall be corrected to a reference temperature of 25 (deg) C and a reference pressure of 760 millimeters of mercury (1,013.2 millibars). Measurements of $PM_{2.5}$ for purposes of comparison to the standards contained in §§ 50.7 and 50.13 and of lead for purposes of comparison to the standards contained in § 50.16 shall be reported based on actual ambient air volume measured at the actual ambient temperature and pressure at the monitoring site during the measurement period.

■ 3. Section 50.12 is amended by designating the existing text as paragraph (a) and adding paragraph (b) to read as follows:

### § 50.12   National primary and secondary ambient air quality standards for lead.

*   *   *   *   *

(b) The standards set forth in this section will remain applicable to all areas notwithstanding the promulgation of lead national ambient air quality standards (NAAQS) in § 50.16. The lead NAAQS set forth in this section will no longer apply to an area one year after the effective date of the designation of that area, pursuant to section 107 of the Clean Air Act, for the lead NAAQS set forth in § 50.16; except that for areas designated nonattainment for the lead NAAQS set forth in this section as of the effective date of § 50.16, the lead NAAQS set forth in this section will apply until that area submits, pursuant to section 191 of the Clean Air Act, and EPA approves, an implementation plan providing for attainment and/or maintenance of the lead NAAQS set forth in § 50.16.

■ 4. Section 50.14 is amended by:
■ a. Revising paragraph (a)(2);
■ b. Revising paragraph (c)(2)(iii);
■ c. Redesignating paragraph (c)(2)(v) as paragraph (c)(2)(vi) and adding a new paragraph (c)(2)(v); and
■ d. Redesignating existing paragraphs (c)(3)(iii) and (c)(3)(iv) as paragraphs

(c)(3)(iv) and (c)(3)(v), respectively, and adding a new paragraph (c)(3)(iii).

The additions and revisions read as follows:

### § 50.14   Treatment of air quality monitoring data influenced by exceptional events.

(a) *   *   *

(2) Demonstration to justify data exclusion may include any reliable and accurate data, but must demonstrate a clear causal relationship between the measured exceedance or violation of such standard and the event in accordance with paragraph (c)(3)(iv) of this section.

*   *   *   *   *

(c) *   *   *

(2) *   *   *

(iii) Flags placed on data as being due to an exceptional event together with an initial description of the event shall be submitted to EPA not later than July 1st of the calendar year following the year in which the flagged measurement occurred, except as allowed under paragraph (c)(2)(iv) or (c)(2)(v) of this section.

*   *   *   *   *

(v) For lead (Pb) data collected during calendar years 2006–2008, that the State identifies as resulting from an exceptional event, the State must notify EPA of the flag and submit an initial description of the event no later than July 1, 2009. For Pb data collected during calendar year 2009, that the State identifies as resulting from an exceptional event, the State must notify EPA of the flag and submit an initial description of the event no later than July 1, 2010. For Pb data collected during calendar year 2010, that the State identifies as resulting from an exceptional event, the State must notify EPA of the flag and submit an initial description of the event no later than May 1, 2011.

*   *   *   *   *

(3) *   *   *

(iii) A State that flags Pb data collected during calendar years 2006–2009, pursuant to paragraph (c)(2)(v) of this section shall, after notice and opportunity for public comment, submit to EPA a demonstration to justify exclusion of the data not later than October 15, 2010. A State that flags Pb data collected during calendar year 2010 shall, after notice and opportunity for public comment, submit to EPA a demonstration to justify the exclusion of the data not later than May 1, 2011. A state must submit the public comments it received along with its demonstration to EPA.

*   *   *   *   *

■ 5. Section 50.16 is added to read as follows:

**§ 50.16 National primary and secondary ambient air quality standards for lead.**

(a) The national primary and secondary ambient air quality standards for lead (Pb) and its compounds are 0.15 micrograms per cubic meter, arithmetic mean concentration over a 3-month period, measured in the ambient air as Pb either by:

(1) A reference method based on Appendix G of this part and designated in accordance with part 53 of this chapter or;

(2) An equivalent method designated in accordance with part 53 of this chapter.

(b) The national primary and secondary ambient air quality standards for Pb are met when the maximum arithmetic 3-month mean concentration for a 3-year period, as determined in accordance with Appendix R of this part, is less than or equal to 0.15 micrograms per cubic meter.

■ 6. Appendix G is amended as follows:
■ a. In section 10.2 the definition of the term ''$V_{STP}$'' in the equation is revised,
■ b. In section 14 reference 10 is added and reference 15 is revised:

**Appendix G to Part 50—Reference Method for the Determination of Lead in Suspended Particulate Matter Collected From Ambient Air**

\*      \*      \*      \*      \*

10.2 \* \* \*

$V_{STP}$ = Air volume from section 10.1.

\*      \*      \*      \*      \*

14. \* \* \*

10. Intersociety Committee (1972). Methods of Air Sampling and Analysis. 1015 Eighteenth Street, N.W. Washington, D.C.: American Public Health Association. 365–372. \* \* \*

15. Sharon J. Long, et al., ''Lead Analysis of Ambient Air Particulates: Interlaboratory Evaluation of EPA Lead Reference Method'' APCA Journal, 29, 28–31 (1979).

\*      \*      \*      \*      \*

■ 7. Appendix Q is added to read as follows:

**Appendix Q to Part 50—Reference Method for the Determination of Lead in Particulate Matter as PM₁₀ Collected From Ambient Air**

This Federal Reference Method (FRM) draws heavily from the specific analytical protocols used by the U.S. EPA.

1. *Applicability and Principle*

1.1 This method provides for the measurement of the lead (Pb) concentration in particulate matter that is 10 micrometers or less (PM₁₀) in ambient air. PM₁₀ is collected on an acceptable (see section 6.1.2) 46.2 mm diameter polytetrafluoroethylene (PTFE) filter for 24 hours using active sampling at local conditions with a low-volume air sampler. The low-volume sampler has an average flow rate of 16.7 liters per minute (Lpm) and total sampled volume of 24 cubic meters (m³) of air. The analysis of Pb in PM₁₀ is performed on each individual 24-hour sample. Gravimetric mass analysis of PM₁₀ₑ filters is not required for Pb analysis. For the purpose of this method, PM₁₀ is defined as particulate matter having an aerodynamic diameter in the nominal range of 10 micrometers (10 μm) or less.

1.2 For this reference method, PM₁₀ shall be collected with the PM₁₀ₑ federal reference method (FRM) sampler as described in Appendix O to Part 50 using the same sample period, measurement procedures, and requirements specified in Appendix L of Part 50. The PM₁₀ₑ sampler is also being used for measurement of PM₁₀ − ₂.₅ mass by difference and as such, the PM₁₀ₑ sampler must also meet all of the performance requirements specified for PM₂.₅ in Appendix L. The concentration of Pb in the atmosphere is determined in the total volume of air sampled and expressed in micrograms per cubic meter (μg/m³) at local temperature and pressure conditions.

1.3 The FRM will serve as the basis for approving Federal Equivalent Methods (FEMs) as specified in 40 CFR Part 53 (Reference and Equivalent Methods). This FRM specifically applies to the analysis of Pb in PM₁₀ filters collected with the PM₁₀ₑ sampler. If these filters are analyzed for elements other than Pb, then refer to the guidance provided in the EPA Inorganic Compendium Method IO–3.3 (Reference 1 of section 8) for multi-element analysis.

1.4 The PM₁₀ₑ air sampler draws ambient air at a constant volumetric flow rate into a specially shaped inlet and through an inertial particle size separator, where the suspended particulate matter in the PM₁₀ size range is separated for collection on a PTFE filter over the specified sampling period. The Pb content of the PM₁₀ sample is analyzed by energy-dispersive X-ray fluorescence spectrometry (EDXRF). Energy-dispersive X-ray fluorescence spectrometry provides a means for identification of an element by measurement of its characteristic X-ray emission energy. The method allows for quantification of the element by measuring the intensity of X-rays emitted at the characteristic photon energy and then relating this intensity to the elemental concentration. The number or intensity of X-rays produced at a given energy provides a measure of the amount of the element present by comparisons with calibration standards. The X-rays are detected and the spectral signals are acquired and processed with a personal computer. EDXRF is commonly used as a non-destructive method for quantifying trace elements in PM. A detailed explanation of quantitative X-ray spectrometry is described in references 2, 3 and 4.

1.5 Quality assurance (QA) procedures for the collection of monitoring data are contained in Part 58, Appendix A.

2. *PM₁₀ Pb Measurement Range and Detection Limit.* The values given below in section 2.1 and 2.2 are typical of the method capabilities. Absolute values will vary for individual situations depending on the instrument, detector age, and operating conditions used. Data are typically reported in ng/m³ for ambient air samples; however, for this reference method, data will be reported in μg/m³ at local temperature and pressure conditions.

2.1 *EDXRF Pb Measurement Range.* The typical air measurement range is 0.001 to 30 μg Pb/m³, assuming an upper range calibration standard of about 60 μg Pb per square centimeter (cm²), a filter deposit area of 11.86 cm², and an air volume of 24 m³. The top range of the EDXRF instrument is much greater than what is stated here. The top measurement range of quantification is defined by the level of the high concentration calibration standard used and can be increased to expand the measurement range as needed.

2.2 *Detection Limit (DL).* A typical estimate of the one-sigma detection limit (DL) is about 2 ng Pb/cm² or 0.001 μg Pb/m³, assuming a filter size of 46.2 mm (filter deposit area of 11.86 cm²) and a sample air volume of 24 m³. The DL is an estimate of the lowest amount of Pb that can be reliably distinguished from a blank filter. The one-sigma detection limit for Pb is calculated as the average overall uncertainty or propagated error for Pb, determined from measurements on a series of blank filters from the filter lot(s) in use. Detection limits must be determined for each filter lot in use. If a new filter lot is used, then a new DL must be determined. The sources of random error which are considered are calibration uncertainty; system stability; peak and background counting statistics; uncertainty in attenuation corrections; and uncertainty in peak overlap corrections, but the dominating source by far is peak and background counting statistics. At a minimum, laboratories are to determine annual estimates of the DL using the guidance provided in Reference 5.

3. *Factors Affecting Bias and Precision of Lead Determination by EDXRF*

3.1 *Filter Deposit.* X-ray spectra are subject to distortion if unusually heavy deposits are analyzed. This is the result of internal absorption of both primary and secondary X-rays within the sample; however, this is not an issue for Pb due to the energetic X-rays used to fluoresce Pb and the energetic characteristic X-rays emitted by Pb. The optimum mass filter loading for multi-elemental EDXRF analyis is about 100 μg/cm² or 1.2 mg/filter for a 46.2-mm filter. Too little deposit material can also be problematic due to low counting statistics and signal noise. The particle mass deposit should minimally be 15 μg/cm². The maximum PM₁₀ filter loading or upper concentration limit of mass expected to be collected by the PM₁₀ₑ sampler is 200 μg/m³ (Appendix O to Part 50, Section 3.2). This equates to a mass loading of about 400 μg/cm² and is the maximum expected loading for PM₁₀ₑ filters. This maximum loading is acceptable for the analysis of Pb and other high-Z elements with very energetic characteristic X-rays. A properly collected sample will have a uniform deposit over the entire collection area. Samples with physical deformities (including a visually non-

uniform deposit area) should not be quantitatively analyzed. Tests on the uniformity of particle deposition on $PM_{10C}$ filters showed that the non-uniformity of the filter deposit represents a small fraction of the overall uncertainty in ambient Pb concentration measurement. The analysis beam of the XRF analyzer does not cover the entire filter collection area. The minimum allowable beam size is 10 mm.

3.2 *Spectral Interferences and Spectral Overlap.* Spectral interference occurs when the entirety of the analyte spectral lines of two species are nearly 100% overlapped. The presence of arsenic (As) is a problematic interference for EDXRF systems which use the Pb $L_\alpha$ line excessively to quantify the Pb concentration. This is because the Pb $L_\alpha$ line and the As $K_\alpha$ lines severely overlap. The use of multiple Pb lines, including the $L_\beta$ and/or the $L_\gamma$ lines for quantification must be used to reduce the uncertainty in the Pb determination in the presence of As. There can be instances when lines partially overlap the Pb spectral lines, but with the energy resolution of most detectors these overlaps are typically de-convoluted using standard spectral de-convolution software provided by the instrument vendor. An EDXRF protocol for Pb must define which Pb lines are used for quantification and where spectral overlaps occur. A de-convolution protocol must be used to separate all the lines which overlap with Pb.

3.3 *Particle Size Effects and Attenuation Correction Factors.* X-ray attenuation is dependent on the X-ray energy, mass sample loading, composition, and particle size. In some cases, the excitation and fluorescent X-rays are attenuated as they pass through the sample. In order to relate the measured intensity of the X-rays to the thin-film calibration standards used, the magnitude of any attenuation present must be corrected for. See references 6, 7, and 8 for more discussion on this issue. Essentially no attenuation corrections are necessary for Pb in $PM_{10}$: Both the incoming excitation X-rays used for analyzing lead and the fluoresced Pb X-rays are sufficiently energetic that for particles in this size range and for normal filter loadings, the Pb X-ray yield is not significantly impacted by attenuation.

4. *Precision*

4.1 Measurement system precision is assessed according to the procedures set forth in Appendix A to part 58. Measurement method precision is assessed from collocated sampling and analysis. The goal for acceptable measurement uncertainty, as precision, is defined as an upper 90 percent confidence limit for the coefficient of variation (CV) of 20 percent.

5. *Bias*

5.1 Measurement system bias for monitoring data is assessed according to the procedures set forth in Appendix A of part 58. The bias is assessed through an audit using spiked filters. The goal for measurement bias is defined as an upper 95 percent confidence limit for the absolute bias of 15 percent.

6. *Measurement of PTFE Filters by EDXRF*

6.1 *Sampling*

6.1.1 *Low-Volume $PM_{10c}$ Sampler.* The low-volume $PM_{10c}$ sampler shall be used for

$PM_{10}$ sample collection and operated in accordance with the performance specifications described in Part 50, Appendix L.

6.1.2 *PTFE Filters and Filter Acceptance Testing.* The PTFE filters used for $PM_{10c}$ sample collection shall meet the specifications provided in Part 50, Appendix L. The following requirements are similar to those currently specified for the acceptance of $PM_{2.5}$ filters that are tested for trace elements by EDXRF. For large filter lots (greater than 500 filters) randomly select 20 filters from a given lot. For small lots (less than 500 filters) a lesser number of filters may be taken. Analyze each blank filter separately and calculate the average lead concentration in $ng/cm^2$. Ninety percent, or 18 of the 20 filters, must have an average lead concentration that is less than 4.8 ng $Pb/cm^2$.

6.1.2.1 *Filter Blanks.* Field blank filters shall be collected along with routine samples. Field blank filters will be collected that are transported to the sampling site and placed in the sampler for the duration of sampling without sampling. Laboratory blank filters from each filter lot used shall be analyzed with each batch of routine sample filters analyzed. Laboratory blank filters are used in background subtraction as discussed below in Section 6.2.4.

6.2 *Analysis.* The four main categories of random and systematic error encountered in X-ray fluorescence analysis include errors from sample collection, the X-ray source, the counting process, and inter-element effects. These errors are addressed through the calibration process and mathematical corrections in the instrument software. Spectral processing methods are well established and most commercial analyzers have software that can implement the most common approaches (references 9–11) to background subtraction, peak overlap correction, counting and deadtime corrections.

6.2.1 *EDXRF Analysis Instrument.* An energy-dispersive XRF system is used. Energy-dispersive XRF systems are available from a number of commercial vendors. Examples include Thermo (*www.thermo.com*), Spectro (*http://www.spectro.com*), Xenemetrix (*http://www.xenemetrix.com*) and PANalytical (*http://www.panalytical.com*).[1] The analysis is performed at room temperature in either vacuum or in a helium atmosphere. The specific details of the corrections and calibration algorithms are typically included in commercial analytical instrument software routines for automated spectral acquisition and processing and vary by manufacturer. It is important for the analyst to understand the correction procedures and algorithms of the particular system used, to ensure that the necessary corrections are applied.

6.2.2 *Thin film standards.* Thin film standards are used for calibration because they most closely resemble the layer of particles on a filter. Thin films standards are typically deposited on Nuclepore substrates.

The preparation of thin film standards is discussed in reference 8, and 10. The NIST SRM 2783 (Air Particulate on Filter Media) is currently available on polycarbonate filters and contains a certified concentration for Pb. Thin film standards at 15 and 50 $\mu g/cm^2$ are commercially available from MicroMatter Inc. (Arlington, WA).

6.2.3 *Filter Preparation.* Filters used for sample collection are 46.2-mm PTFE filters with a pore size of 2 microns and filter deposit area 11.86 $cm^2$. Cold storage is not a requirement for filters analyzed for Pb; however, if filters scheduled for XRF analysis were stored cold, they must be allowed to reach room temperature prior to analysis. All filter samples received for analysis are checked for any holes, tears, or a non-uniform deposit which would prevent quantitative analysis. Samples with physical deformities are not quantitatively analyzable. The filters are carefully removed with tweezers from the Petri dish and securely placed into the instrument-specific sampler holder for analysis. Care must be taken to protect filters from contamination prior to analysis. Filters must be kept covered when not being analyzed. No other preparation of filter samples is required.

6.2.4 *Calibration.* In general, calibration determines each element's sensitivity, *i.e.,* its response in x-ray counts/sec to each $\mu g/cm^2$ of a standard and an interference coefficient for each element that causes interference with another one (See section 3.2 above). The sensitivity can be determined by a linear plot of count rate versus concentration ($\mu g/cm^2$) in which the slope is the instrument's sensitivity for that element. A more precise way, which requires fewer standards, is to fit sensitivity versus atomic number. Calibration is a complex task in the operation of an XRF system. Two major functions accomplished by calibration are the production of reference spectra which are used for fitting and the determination of the elemental sensitivities. Included in the reference spectra (referred to as ''shapes'') are background-subtracted peak shapes of the elements to be analyzed (as well as interfering elements) and spectral backgrounds. Pure element thin film standards are used for the element peak shapes and clean filter blanks from the same lot as routine filter samples are used for the background. The analysis of Pb in PM filter deposits is based on the assumption that the thickness of the deposit is small with respect to the characteristic Pb X-ray transmission thickness. Therefore, the concentration of Pb in a sample is determined by first calibrating the spectrometer with thin film standards to determine the sensitivity factor for Pb and then analyzing the unknown samples under identical excitation conditions as used to determine the calibration. Calibration shall be performed annually or when significant repairs or changes occur (e.g., a change in fluorescers, X-ray tubes, or detector). Calibration establishes the elemental sensitivity factors and the magnitude of interference or overlap coefficients. *See* reference 7 for more detailed discussion of calibration and analysis of shapes standards for background correction, coarse particle absorption corrections, and spectral overlap.

6.2.4.1 *Spectral Peak Fitting.* The EPA uses a library of pure element peak shapes

---

[1] These are examples of available systems and is not an all inclusive list. The mention of commercial products does not imply endorsement by the U.S. Environmental Protection Agency.

Case 3:17-cv-02162-EMC Document 188-2 Filed 05/05/20 Page 1468 of 1525

(shape standards) to extract the elemental background-free peak areas from an unknown spectrum. It is also possible to fit spectra using peak stripping or analytically defined functions such as modified Gaussian functions. The EPA shape standards are generated from pure, mono-elemental thin film standards. The shape standards are acquired for sufficiently long times to provide a large number of counts in the peaks of interest. It is not necessary for the concentration of the standard to be known. A slight contaminant in the region of interest in a shape standard can have a significant and serious effect on the ability of the least squares fitting algorithm to fit the shapes to the unknown spectrum. It is these elemental peak shapes that are fitted to the peaks in an unknown sample during spectral processing by the analyzer. In addition to this library of elemental shapes there is also a background shape spectrum for the filter type used as discussed below in section 6.2.4.2 of this section.

6.2.4.2 *Background Measurement and Correction.* A background spectrum generated by the filter itself must be subtracted from the X-ray spectrum prior to extracting peak areas. Background spectra must be obtained for each filter lot used for sample collection. The background shape standards which are used for background fitting are created at the time of calibration. If a new lot of filters is used, new background spectra must be obtained. A minimum of 20 clean blank filters from each filter lot are kept in a sealed container and are used exclusively for background measurement and correction. The spectra acquired on individual blank filters are added together to produce a single spectrum for each of the secondary targets or fluorescers used in the analysis of lead. Individual blank filter spectra which show atypical contamination are excluded from the summed spectra. The summed spectra are fitted to the appropriate background during spectral processing. Background correction is automatically included during spectral processing of each sample.

7. *Calculation.*

7.1 *PM$_{10}$ Pb concentrations.* The PM$_{10}$ Pb concentration in the atmosphere (μg/m³) is calculated using the following equation:

$$M_{Pb} = \frac{C_{Pb} \times A}{V_{LC}}$$

Where,

$M_{Pb}$ is the mass per unit volume for lead in μg/m³;

$C_{Pb}$ is the mass per unit area for lead in μg/ cm² as measured by XRF;

A is the filter deposit area in cm²;

$V_{LC}$ is the total volume of air sampled by the PM$_{10c}$ sampler in actual volume units measured at local conditions of temperature and pressure, as provided by the sampler in m³.

7.2 *PM$_{10}$ Pb Uncertainty Calculations.* The principal contributors to total uncertainty of XRF values include: field sampling; filter deposit area; XRF calibration; attenuation or loss of the x-ray signals due to the other components of the particulate sample; and determination of the Pb X-ray emission peak area by curve fitting. See reference 12 for a detailed discussion of how uncertainties are similarly calculated for the PM$_{2.5}$ Chemical Speciation program.

The model for calculating total uncertainty is:

$$\delta_{tot} = (\delta_f^2 + \delta_a^2 + \delta_c^2 + \delta_v^2)^{1/2}$$

Where,

$\delta_f$ = fitting uncertainty (XRF-specific, from 2 to 100+%);

$\delta_a$ = attenuation uncertainty (XRF-specific, insignificant for Pb);

$\delta_c$ = calibration uncertainty (combined lab uncertainty, assumed as 5%);

$\delta_v$ = volume/deposition size uncertainty (combined field uncertainty, assumed as 5%);

8. *References*

1. Inorganic Compendium Method IO–3.3; Determination of Metals in Ambient Particulate Matter Using X-ray Fluorescence (XRF) Spectroscopy; U.S. Environmental Protection Agency, Cincinnati, OH 45268. EPA/625/R–96/010a. June 1999.

2. Jenkins, R., Gould, R.W., and Gedcke, D. Quantitative X-ray Spectrometry: Second Edition. Marcel Dekker, Inc., New York, NY. 1995.

3. Jenkins, R. X-Ray Fluorescence Spectrometry: Second Edition in Chemical Analysis, a Series of Monographs on Analytical Chemistry and Its Applications, Volume 152. Editor J.D.Winefordner; John Wiley & Sons, Inc., New York, NY. 1999.

4. Dzubay, T.G. X-ray Fluorescence Analysis of Environmental Samples, Ann Arbor Science Publishers Inc., 1977.

5. Code of Federal Regulations (CFR) 40, Part 136, Appendix B; Definition and Procedure for the Determination of the Method Detection Limit—Revision 1.1.

6. Drane, E.A, Rickel, D.G., and Courtney, W.J., "Computer Code for Analysis X-Ray Fluorescence Spectra of Airborne Particulate Matter," in Advances in X-Ray Analysis, J.R. Rhodes, Ed., Plenum Publishing Corporation, New York, NY, p. 23 (1980).

7. Analysis of Energy-Dispersive X-ray Spectra of Ambient Aerosols with Shapes Optimization, Guidance Document; TR–WDE–06–02; prepared under contract EP–D–05–065 for the U.S. Environmental Protection Agency, National Exposure Research Laboratory. March 2006.

8. Billiet, J., Dams, R., and Hoste, J. (1980) Multielement Thin Film Standards for XRF Analysis, X-Ray Spectrometry, 9(4): 206–211.

9. Bonner, N.A.; Bazan, F.; and Camp, D.C. (1973). Elemental analysis of air filter samples using x-ray fluorescence. Report No. UCRL–51388. Prepared for U.S. Atomic Energy Commission, by Univ. of Calif., Lawrence Livermore Laboratory, Livermore, CA.

10. Dzubay, T.G.; Lamothe, P.J.; and Yoshuda, H. (1977). Polymer films as calibration standards for X-ray fluorescence analysis. Adv. X-Ray Anal., 20:411.

11. Giauque, R.D.; Garrett, R.B.; and Goda, L.Y. (1977). Calibration of energy-dispersive X-ray spectrometers for analysis of thin environmental samples. In X-Ray Fluorescence Analysis of Environmental Samples, T.G. Dzubay, Ed., Ann Arbor

Science Publishers, Ann Arbor, MI, pp. 153–181.

12. Harmonization of Interlaboratory X-ray Fluorescence Measurement Uncertainties, Detailed Discussion Paper; August 4, 2006; prepared for the Office of Air Quality Planning and Standards under EPA contract 68–D–03–038. *http://www.epa.gov/ttn/amtic/ files/ambient/pm25/spec/xrfdet.pdf.*

■ 8. Appendix R is added to read as follows:

**Appendix R to Part 50—Interpretation of the National Ambient Air Quality Standards for Lead**

*1. General.*

(a) This appendix explains the data handling conventions and computations necessary for determining when the primary and secondary national ambient air quality standards (NAAQS) for Pb specified in § 50.16 are met. The NAAQS indicator for Pb is defined as: lead and its compounds, measured as elemental lead in total suspended particulate (Pb-TSP), sampled and analyzed by a Federal reference method (FRM) based on appendix G to this part or by a Federal equivalent method (FEM) designated in accordance with part 53 of this chapter. Although Pb-TSP is the lead NAAQS indicator, surrogate Pb-TSP concentrations shall also be used for NAAQS comparisons; specifically, valid surrogate Pb-TSP data are concentration data for lead and its compounds, measured as elemental lead, in particles with an aerodynamic size of 10 microns or less (Pb-PM$_{10}$), sampled and analyzed by an FRM based on appendix Q to this part or by an FEM designated in accordance with part 53 of this chapter. Surrogate Pb-TSP data (i.e., Pb-PM$_{10}$ data), however, can only be used to show that the Pb NAAQS were violated (i.e., not met); they can not be used to demonstrate that the Pb NAAQS were met. Pb-PM$_{10}$ data used as surrogate Pb-TSP data shall be processed at face value; that is, without any transformation or scaling. Data handling and computation procedures to be used in making comparisons between reported and/ or surrogate Pb-TSP concentrations and the level of the Pb NAAQS are specified in the following sections.

(b) Whether to exclude, retain, or make adjustments to the data affected by exceptional events, including natural events, is determined by the requirements and process deadlines specified in §§ 50.1, 50.14, and 51.930 of this chapter.

(c) The terms used in this appendix are defined as follows:

*Annual monitoring network plan* refers to the plan required by section 58.10 of this chapter.

*Creditable samples* are samples that are given credit for data completeness. They include valid samples collected on required sampling days and valid "make-up" samples taken for missed or invalidated samples on required sampling days.

*Daily values* for Pb refer to the 24-hour mean concentrations of Pb (Pb-TSP or Pb-PM$_{10}$), measured from midnight to midnight (local standard time), that are used in NAAQS computations.

*Design value* is the site-level metric (i.e., statistic) that is compared to the NAAQS level to determine compliance; the design value for the Pb NAAQS is selected according to the procedures in this appendix from among the valid three-month Pb-TSP and surrogate Pb-TSP (Pb-PM$_{10}$) arithmetic mean concentration for the 38-month period consisting of the most recent 3-year calendar period plus two previous months (i.e., 36 3-month periods) using the last month of each 3-month period as the period of report.

*Extra samples* are non-creditable samples. They are daily values that do not occur on scheduled sampling days and that can not be used as ''make-up samples'' for missed or invalidated scheduled samples. Extra samples are used in mean calculations. For purposes of determining whether a sample must be treated as a make-up sample or an extra sample, Pb-TSP and Pb-PM$_{10}$ data collected before January 1, 2009 will be treated with an assumed scheduled sampling frequency of every sixth day.

*Make-up samples* are samples taken to replace missed or invalidated required scheduled samples. Make-up samples can be made by either the primary or collocated (same size fraction) instruments; to be considered a valid make-up, the sampling must be conducted with equipment and procedures that meet the requirements for scheduled sampling. Make-up samples are either taken before the next required sampling day or exactly one week after the missed (or voided) sampling day. Make-up samples can not span years; that is, if a scheduled sample for December is missed (or voided), it can not be made up in January. Make-up samples, however, may span months, for example a missed sample on January 31 may be made up on February 1, 2, 3, 4, 5, or 7 (with an assumed sampling frequency of every sixth day). Section 3(e) explains how such month-spanning make-up samples are to be treated for purposes of data completeness and mean calculations. Only two make-up samples are permitted each calendar month; these are counted according to the month in which the miss and not the makeup occurred. For purposes of determining whether a sample must be treated as a make-up sample or an extra sample, Pb-TSP and Pb-PM$_{10}$ data collected before January 1, 2009 will be treated with an assumed scheduled sampling frequency of every sixth day.

*Monthly mean* refers to an arithmetic mean, calculated as specified in section 6(a) of this appendix. Monthly means are computed at each monitoring site separately for Pb-TSP and Pb-PM$_{10}$ (i.e., by site-parameter-year-month).

*Parameter* refers either to Pb-TSP or to Pb-PM$_{10}$.

*Pollutant Occurrence Code (POC)* refers to a numerical code (1, 2, 3, etc.) used to distinguish the data from two or more monitors for the same parameter at a single monitoring site.

*Scheduled sampling day* means a day on which sampling is scheduled based on the required sampling frequency for the monitoring site, as provided in section 58.12 of this chapter.

*Three-month means* are arithmetic averages of three consecutive monthly means. Three-month means are computed on a rolling, overlapping basis. Each distinct monthly mean will be included in three different 3-month means; for example, in a given year, a November mean would be included in: (1) The September-October-November 3-month mean, (2) the October-November-December 3-month mean, and (3) the November-December-January(of the following year) 3-month mean. Three-month means are computed separately for each parameter per section 6(a) (and are referred to as 3-month parameter means) and are validated according to the criteria specified in section 4(c). The parameter-specific 3-month means are then prioritized according to section 2(a) to determine a single 3-month site mean.

*Year* refers to a calendar year.

2. *Use of Pb-PM$_{10}$ Data as Surrogate Pb-TSP Data.*

(a) As stipulated in section 2.10 of Appendix C to 40 CFR part 58, at some mandatory Pb monitoring locations, monitoring agencies are required to sample for Pb as Pb-TSP, and at other mandatory Pb monitoring sites, monitoring agencies are permitted to monitor for Pb-PM$_{10}$ in lieu of Pb-TSP. In either situation, valid collocated Pb data for the other parameter may be produced. Additionally, there may be non-required monitoring locations that also produce valid Pb-TSP and/or valid Pb-PM$_{10}$ data. Pb-TSP data and Pb-PM$_{10}$ data are always processed separately when computing monthly and 3-month parameter means; monthly and 3-month parameter means are validated according to the criteria stated in section 4 of this appendix. Three-month ''site'' means, which are the final valid 3-month mean from which a design value is identified, are determined from the one or two available valid 3-month parameter means according to the following prioritization which applies to all Pb monitoring locations.

(i) Whenever a valid 3-month Pb-PM$_{10}$ mean shows a violation and either is greater than a corresponding (collocated) 3-month Pb-TSP mean or there is no corresponding valid 3-month Pb-TSP mean present, then that 3-month Pb-PM$_{10}$ mean will be the site-level mean for that (site's) 3-month period.

(ii) Otherwise (i.e., there is no valid violating 3-month Pb-PM$_{10}$ that exceeds a corresponding 3-month Pb-TSP mean),

(A) If a valid 3-month Pb-TSP mean exists, then it will be the site-level mean for that (site's) 3-month period, or

(B) If a valid 3-month Pb-TSP mean does not exist, then there is no valid 3-month site mean for that period (even if a valid non-violating 3-month Pb-PM$_{10}$ mean exists).

(b) As noted in section 1(a) of this appendix, FRM/FEM Pb-PM$_{10}$ data will be processed at face value (i.e., at reported concentrations) without adjustment when computing means and making NAAQS comparisons.

3. *Requirements for Data Used for Comparisons With the Pb NAAQS and Data Reporting Considerations.*

(a) All valid FRM/FEM Pb-TSP data and all valid FRM/FEM Pb-PM$_{10}$ data submitted to EPA's Air Quality System (AQS), or otherwise available to EPA, meeting the requirements of part 58 of this chapter including appendices A, C, and E shall be used in design value calculations. Pb-TSP and Pb-PM$_{10}$ data representing sample collection periods prior to January 1, 2009 (i.e., ''pre-rule'' data) will also be considered valid for NAAQS comparisons and related attainment/nonattainment determinations if the sampling and analysis methods that were utilized to collect that data were consistent with previous or newly designated FRMs or FEMs and with either the provisions of part 58 of this chapter including appendices A, C, and E that were in effect at the time of original sampling or that are in effect at the time of the attainment/nonattainment determination, and if such data are submitted to AQS prior to September 1, 2009.

(b) Pb-TSP and Pb-PM$_{10}$ measurement data are reported to AQS in units of micrograms per cubic meter ($\mu g/m^3$) at local conditions (local temperature and pressure, LC) to three decimal places; any additional digits to the right of the third decimal place are truncated. Pre-rule Pb-TSP and Pb-PM$_{10}$ concentration data that were reported in standard conditions (standard temperature and standard pressure, STP) will not require a conversion to local conditions but rather, after truncating to three decimal places and processing as stated in this appendix, shall be compared ''as is'' to the NAAQS (i.e., the LC to STP conversion factor will be assumed to be one). However, if the monitoring agency has retroactively resubmitted Pb-TSP or Pb-PM$_{10}$ pre-rule data converted from STP to LC based on suitable meteorological data, only the LC data will be used.

(c) At each monitoring location (site), Pb-TSP and Pb-PM$_{10}$ data are to be processed separately when selecting daily data by day (as specified in section 3(d) of this appendix), when aggregating daily data by month (per section 6(a)), and when forming 3-month means (per section 6(b)). However, when deriving (i.e., identifying) the design value for the 38-month period, 3-month means for the two data types may be considered together; see sections 2(a) and 4(e) of this appendix for details.

(d) Daily values for sites will be selected for a site on a size cut (Pb-TSP or Pb-PM$_{10}$, i.e., ''parameter'') basis; Pb-TSP concentrations and Pb-PM$_{10}$ concentrations shall not be commingled in these determinations. Site level, parameter-specific daily values will be selected as follows:

(i) The starting dataset for a site-parameter shall consist of the measured daily concentrations recorded from the designated primary FRM/FEM monitor for that parameter. The primary monitor for each parameter shall be designated in the appropriate state or local agency annual Monitoring Network Plan. If no primary monitor is designated, the Administrator will select which monitor to treat as primary. All daily values produced by the primary sampler are considered part of the site-parameter data record (i.e., that site-parameter's set of daily values); this includes all creditable samples and all extra samples. For pre-rule Pb-TSP and Pb-PM$_{10}$ data, valid data records present in AQS for the monitor with the lowest occurring Pollutant Occurrence Code (POC), as selected on a site-parameter-daily basis, will constitute the site-

parameter data record. Where pre-rule Pb-TSP data (or subsequent non-required Pb-TSP or Pb-PM$_{10}$ data) are reported in "composite" form (i.e., multiple filters for a month of sampling that are analyzed together), the composite concentration will be used as the site-parameter monthly mean concentration if there are no valid daily Pb-TSP data reported for that month with a lower POC.

(ii) Data for the primary monitor for each parameter shall be augmented as much as possible with data from collocated (same parameter) FRM/FEM monitors. If a valid 24-hour measurement is not produced from the primary monitor for a particular day (scheduled or otherwise), but a valid sample is generated by a collocated (same parameter) FRM/FEM instrument, then that collocated value shall be considered part of the site-parameter data record (i.e., that site-parameter's monthly set of daily values). If more than one valid collocated FRM/FEM value is available, the mean of those valid collocated values shall be used as the daily value. Note that this step will not be necessary for pre-rule data given the daily identification presumption for the primary monitor.

(e) All daily values in the composite site-parameter record are used in monthly mean calculations. However, not all daily values are given credit towards data completeness requirements. Only "creditable" samples are given credit for data completeness. Creditable samples include valid samples on scheduled sampling days and valid make-up samples. All other types of daily values are referred to as "extra" samples. Make-up samples taken in the (first week of the) month after the one in which the miss/void occurred will be credited for data capture in the month of the miss/void but will be included in the month actually taken when computing monthly means. For example, if a make-up sample was taken in February to replace a missed sample scheduled for January, the make-up concentration would be included in the February monthly mean but the sample credited in the January data capture rate.

4. *Comparisons With the Pb NAAQS.*

(a) The Pb NAAQS is met at a monitoring site when the identified design value is valid and less than or equal to 0.15 micrograms per cubic meter (μg/m³). A Pb design value that meets the NAAQS (i.e., 0.15 μg/m³ or less), is considered valid if it encompasses 36 consecutive valid 3-month site means (specifically for a 3-year calendar period and the two previous months). For sites that begin monitoring Pb after this rule is effective but before January 15, 2010 (or January 15, 2011), a 2010–2012 (or 2011–2013) Pb design value that meets the NAAQS will be considered valid if it encompasses at least 34 consecutive valid 3-month site means (specifically encompassing only the 3-year calendar period). See 4(c) of this appendix for the description of a valid 3-month mean and section 6(d) for the definition of the design value.

(b) The Pb NAAQS is violated at a monitoring site when the identified design value is valid and is greater than 0.15 μg/m³, no matter whether determined from Pb-TSP or Pb-PM$_{10}$ data. A Pb design value greater

than 0.15 μg/m³ is valid no matter how many valid 3-month means in the 3-year period it encompasses; that is, a violating design value is valid even if it (i.e., the highest 3-month mean) is the only valid 3-month mean in the 3-year timeframe. Further, a site does not have to monitor for three full calendar years in order to have a valid violating design value; a site could monitor just three months and still produce a valid (violating) design value.

(c)(i) A 3-month parameter mean is considered valid (i.e., meets data completeness requirements) if the average of the data capture rate of the three constituent monthly means (i.e., the 3-month data capture rate) is greater than or equal to 75 percent. Monthly data capture rates (expressed as a percentage) are specifically calculated as the number of creditable samples for the month (including any make-up samples taken the subsequent month for missed samples in the month in question, and excluding any make-up samples taken in the month in question for missed samples in the previous month) divided by the number of scheduled samples for the month, the result then multiplied by 100 but not rounded. The 3-month data capture rate is the sum of the three corresponding unrounded monthly data capture rates divided by three and the result rounded to the nearest integer (zero decimal places). As noted in section 3(c), Pb-TSP and Pb-PM$_{10}$ daily values are processed separately when calculating monthly means and data capture rates; a Pb-TSP value cannot be used as a make-up for a missing Pb-PM$_{10}$ value or vice versa. For purposes of assessing data capture, Pb-TSP and Pb-PM$_{10}$ data collected before January 1, 2009 will be treated with an assumed scheduled sampling frequency of every sixth day.

(ii) A 3-month parameter mean that does not have at least 75 percent data capture and thus is not considered valid under 4(c)(i) shall be considered valid (and complete) if it passes either of the two following "data substitution" tests, one such test for validating an above NAAQS-level (i.e., violating) 3-month Pb-TSP or Pb-PM$_{10}$ mean (using actual "low" reported values from the same site at about the same time of the year (i.e., in the same month) looking across three or four years), and the second test for validating a below-NAAQS level 3-month Pb-TSP mean (using actual "high" values reported for the same site at about the same time of the year (i.e., in the same month) looking across three or four years). Note that both tests are merely diagnostic in nature intending to confirm that there is a very high likelihood if not certainty that the original mean (the one with less than 75% data capture) reflects the true over/under NAAQS-level status for that 3-month period; the result of one of these data substitution tests (i.e., a "test mean", as defined in section 4(c)(ii)(A) or 4(c)(ii)(B)) is not considered the actual 3-month parameter mean and shall not be used in the determination of design values. For both types of data substitution, substitution is permitted only if there are available data points from which to identify the high or low 3-year month-specific values, specifically if there are at least 10 data points

total from at least two of the three (or four for November and December) possible year-months. Data substitution may only use data of the same parameter type.

(A) The "above NAAQS level" test is as follows: Data substitution will be done in each month of the 3-month period that has less than 75 percent data capture; monthly capture rates are temporarily rounded to integers (zero decimals) for this evaluation. If by substituting the lowest reported daily value for that month (year non-specific; e.g., for January) over the 38-month design value period in question for missing scheduled data in the deficient months (substituting only enough to meet the 75 percent data capture minimum), the computation yields a recalculated test 3-month parameter mean concentration above the level of the standard, then the 3-month period is deemed to have passed the diagnostic test and the level of the standard is deemed to have been exceeded in that 3-month period. As noted in section 4(c)(ii), in such a case, the 3-month parameter mean of the data actually reported, not the recalculated ("test") result including the low values, shall be used to determine the design value.

(B) The "below NAAQS level" test is as follows: Data substitution will be performed for each month of the 3-month period that has less than 75 percent but at least 50 percent data capture; if any month has less than 50% data capture then the 3-month mean can not utilize this substitution test. Also, incomplete 3-month Pb-PM$_{10}$ means can not utilize this test. A 3-month Pb-TSP mean with less than 75% data capture shall still be considered valid (and complete) if, by substituting the highest reported daily value, month-specific, over the 3-year design value period in question, for all missing scheduled data in the deficient months (i.e., bringing the data capture rate up to 100%), the computation yields a recalculated 3-month parameter mean concentration equal or less than the level of the standard (0.15 μg/m³), then the 3-month mean is deemed to have passed the diagnostic test and the level of the standard is deemed not to have been exceeded in that 3-month period (for that parameter). As noted in section 4(c)(ii), in such a case, the 3-month parameter mean of the data actually reported, not the recalculated ("test") result including the high values, shall be used to determine the design value.

(d) Months that do not meet the completeness criteria stated in 4(c)(i) or 4(c)(ii), and design values that do not meet the completeness criteria stated in 4(a) or 4(b), may also be considered valid (and complete) with the approval of, or at the initiative of, the Administrator, who may consider factors such as monitoring site closures/moves, monitoring diligence, the consistency and levels of the valid concentration measurements that are available, and nearby concentrations in determining whether to use such data.

(e) The site-level design value for a 38-month period (three calendar years plus two previous months) is identified from the available (between one and 36) valid 3-month site means. In a situation where there are valid 3-month means for both parameters

(Pb-TSP and Pb-PM$_{10}$), the mean originating from the reported Pb-TSP data will be the one deemed the site-level monthly mean and used in design value identifications unless the Pb-PM$_{10}$ mean shows a violation of the NAAQS and exceeds the Pb-TSP mean; see section 2(a) for details. A monitoring site will have only one site-level 3-month mean per 3-month period; however, the set of site-level 3-month means considered for design value identification (i.e., one to 36 site-level 3-month means) can be a combination of Pb-TSP and Pb-PM$_{10}$ data.

(f) The procedures for calculating monthly means and 3-month means, and identifying Pb design values are given in section 6 of this appendix.

5. *Rounding Conventions.*

(a) Monthly means and monthly data capture rates are not rounded.

(b) Three-month means shall be rounded to the nearest hundredth µg/m³ (0.xx). Decimals 0.xx5 and greater are rounded up, and any decimal lower than 0.xx5 is rounded down. E.g., a 3-month mean of 0.104925 rounds to 0.10 and a 3-month mean of .10500 rounds to 0.11. Three-month data capture rates, expressed as a percent, are round to zero decimal places.

(c) Because a Pb design value is simply a (highest) 3-month mean and because the NAAQS level is stated to two decimal places, no additional rounding beyond what is specified for 3-month means is required before a design value is compared to the NAAQS.

6. *Procedures and Equations for the Pb NAAQS.*

(a)(i) A monthly mean value for Pb-TSP (or Pb-PM$_{10}$) is determined by averaging the daily values of a calendar month using equation 1 of this appendix, unless the Administrator chooses to exercise his discretion to use the alternate approach described in 6(a)(ii).

Equation 1

$$\overline{X}_{m,y,s} = \frac{1}{n_m}\sum_{i=1}^{n_m} X_{i,m,y,s}$$

Where:

$X_{m,y,s}$ = the mean for month m of the year y for sites; and

$n_m$ = the number of daily values in the month (creditable plus extra samples); and

$X_{i,m,y,s}$ = the i$^{th}$ value in month m for year y for site s.

(a)(ii) The Administrator may at his discretion use the following alternate approach to calculating the monthly mean concentration if the number of extra sampling days during a month is greater than the number of successfully completed scheduled and make-up sample days in that month. In exercising his discretion, the Administrator will consider whether the approach specified in 6(a)(i) might in the Administrator's judgment result in an unrepresentative value for the monthly mean concentration. This provision is to protect the integrity of the monthly and 3-month mean concentration values in situations in which, by intention or otherwise, extra sampling days are concentrated in a period

during which ambient concentrations are particularly high or low. The alternate approach is to average all extra and make-up samples (in the given month) taken after each scheduled sampling day ("Day X") and before the next scheduled sampling day (e.g., "Day X+6", in the case of one-in-six sampling) with the sample taken on Day X (assuming valid data was obtained on the scheduled sampling day), and then averaging these averages to calculate the monthly mean. This approach has the effect of giving approximately equal weight to periods during a month that have equal number of days, regardless of how many samples were actually obtained during the periods, thus mitigating the potential for the monthly mean to be distorted. The first day of scheduled sampling typically will not fall on the first day of the calendar month, and there may be make-up and/or extra samples (in that same calendar month) preceding the first scheduled day of the month. These samples will not be shifted into the previous month's mean concentration, but rather will stay associated with their actual calendar month as follows. Any extra and make-up samples taken in a month before the first scheduled sampling day of the month will be associated with and averaged with the last scheduled sampling day of that same month.

(b) Three-month parameter means are determined by averaging three consecutive monthly means of the same parameter using Equation 2 of this appendix.

Equation 2

$$\overline{X}_{m1,m2,m3;s} = \frac{1}{n_m}\sum_{i=1}^{n_m} \overline{X}_{m,y:s}$$

Where:

$\overline{X}_{m1,m2,m3;s}$ = the 3-month parameter mean for months m1, m2, and m3 for site s; and

$n_m$ = the number of monthly means available to be averaged (typically 3, sometimes 1 or 2 if one or two months have no valid daily values); and

$X_{m,y;z,s}$ = The mean for month m of the year y (or z) for site s.

(c) Three-month site means are determined from available 3-month parameter means according to the hierarchy established in 2(a) of this appendix.

(d) The site-level Pb design value is the highest valid 3-month site-level mean over the most recent 38-month period (i.e., the most recent 3-year calendar period plus two previous months). Section 4(a) of this appendix explains when the identified design value is itself considered valid for purposes of determining that the NAAQS is met or violated at a site.

## PART 51—REQUIREMENTS FOR PREPARATION, ADOPTION, AND SUBMITTAL OF IMPLEMENTATION PLANS

■ 9. The authority citation for part 51 continues to read as follows:

**Authority:** 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

■ 10. Section 51.117 is amended by revising paragraph (e)(1) to read as follows:

## §51.117   Additional provisions for lead.

\* \* \* \* \*

(e) \* \* \*

(1) The point source inventory on which the summary of the baseline for lead emissions inventory is based must contain all sources that emit 0.5 or more tons of lead per year.

\* \* \* \* \*

## PART 53—AMBIENT AIR MONITORING REFERENCE AND EQUIVALENT METHODS

■ 11. The authority citation for part 53 continues to read as follows:

**Authority:** Sec. 301(a) of the Clean Air Act (42 U.S.C. sec. 1857g(a)), as amended by sec. 15(c)(2) of Pub. L. 91–604, 84 Stat. 1713, unless otherwise noted.

## Subpart C—[Amended]

■ 12. Section 53.33 is revised to read as follows:

## §53.33   Test Procedure for Methods for Lead (Pb).

(a) *General.* The reference method for Pb in TSP includes two parts, the reference method for high-volume sampling of TSP as specified in 40 CFR 50, Appendix B and the analysis method for Pb in TSP as specified in 40 CFR 50, Appendix G. Correspondingly, the reference method for Pb in PM$_{10}$ includes the reference method for low-volume sampling of PM$_{10}$ in 40 CFR 50, Appendix O and the analysis method of Pb in PM$_{10}$ as specified in 40 CFR 50, Appendix Q. This section explains the procedures for demonstrating the equivalence of either a candidate method for Pb in TSP to the high-volume reference methods, or a candidate method for Pb in PM$_{10}$ to the low-volume reference methods.

(1) Pb in TSP—A candidate method for Pb in TSP specifies reporting of Pb concentrations in terms of standard temperature and pressure. Comparisons of candidate methods to the reference method in 40 CFR 50, Appendix G must be made in a consistent manner with regard to temperature and pressure.

(2) Pb in PM$_{10}$—A candidate method for Pb in PM$_{10}$ must specify reporting of Pb concentrations in terms of local conditions of temperature and pressure, which will be compared to similarly reported concentrations from the reference method in 40 CFR 50 Appendix Q.

(b) *Comparability.* Comparability is shown for Pb methods when the differences between:

(1) Measurements made by a candidate method, and

(2) Measurements made by the reference method on simultaneously collected Pb samples (or the same sample, if applicable), are less than or equal to the values specified in table C–3 of this subpart.

(c) *Test measurements.* Test measurements may be made at any number of test sites. Augmentation of pollutant concentrations is not permitted, hence an appropriate test site or sites must be selected to provide Pb concentrations in the specified range.

(d) *Collocated samplers.* The ambient air intake points of all the candidate and reference method collocated samplers shall be positioned at the same height above the ground level, and between 2 meters (1 meter for samplers with flow rates less than 200 liters per minute (L/min)) and 4 meters apart. The samplers shall be oriented in a manner that will minimize spatial and wind directional effects on sample collection.

(e) *Sample collection.* Collect simultaneous 24-hour samples of Pb at the test site or sites with both the reference and candidate methods until at least 10 sample pairs have been obtained.

(1) A candidate method for Pb in TSP which employs a sampler and sample collection procedure that are identical to the sampler and sample collection procedure specified in the reference method in 40 CFR part 50, Appendix B, but uses a different analytical procedure than specified in 40 CFR Appendix G, may be tested by analyzing pairs of filter strips taken from a single TSP reference sampler operated according to the procedures specified by that reference method.

(2) A candidate method for Pb in $PM_{10}$ which employs a sampler and sample collection procedure that are identical to the sampler and sample collection procedure specified in the reference method in 40 CFR part 50, Appendix O, but uses a different analytical procedure than specified in 40 CFR Appendix Q, requires the use of two $PM_{10}$ reference samplers because a single 46.2-mm filter from a reference sampler may not be divided prior to analysis. It is possible to analyze a 46.2-mm filter first with the non-destructive X-ray Fluorescence (XRF) FRM and subsequently extract the filter for other analytical techniques. If the filter is subject to XRF with subsequent extraction for other analyses, then a single $PM_{10}$ reference sampler may be used for sample collection.

(3) A candidate method for Pb in TSP or Pb in $PM_{10}$ which employs a direct reading (e.g., continuous or semi-continuous sampling) method that uses the same sampling inlet and flow rate as the FRM and the same or different analytical procedure may be tested. The direct measurements are then aggregated to 24-hour equivalent concentrations for comparison with the FRM. For determining precision in section (k), two collocated direct reading devices must be used.

(f) *Audit samples.* Three audit samples must be obtained from the address given in § 53.4(a). For Pb in TSP collected by the high-volume sampling method, the audit samples are ¾ x 8-inch glass fiber strips containing known amounts of Pb in micrograms per strip (µg/strip) equivalent to the following nominal percentages of the National Ambient Air Quality Standard (NAAQS): 30%, 100%, and 250%. For Pb in $PM_{10}$ collected by the low-volume sampling method, the audit samples are 46.2-mm polytetrafluorethylene (PTFE) filters containing known amounts of Pb in micrograms per filter (µg/filter) equivalent to the same percentages of the NAAQS: 30%, 100%, and 250%. The true amount of Pb (Tqi), in total µg/strip (for TSP) or total µg/filter (for $PM_{10}$), will be provided for each audit sample.

(g) *Filter analysis.*

(1) For both the reference method samples (e) and the audit samples (f), analyze each filter or filter extract three times in accordance with the reference method analytical procedure. This applies to both the Pb in TSP and Pb in $PM_{10}$ methods. The analysis of replicates should not be performed sequentially, i.e., a single sample should not be analyzed three times in sequence. Calculate the indicated Pb concentrations for the reference method samples in micrograms per cubic meter (µg/m³) for each analysis of each filter. Calculate the indicated total Pb amount for the audit samples in µg/strip for each analysis of each strip or µg/filter for each analysis of each audit filter. Label these test results as $R_{1A}$, $R_{1B}$, $R_{1C}$, $R_{2A}$, $R_{2B}$, etc., $Q_{1A}$, $Q_{1B}$, $Q_{1C}$, etc., where R denotes results from the reference method samples; Q denotes results from the audit samples; 1, 2, 3 indicate the filter number; and A, B, C indicate the first, second, and third analysis of each filter, respectively.

(2) For the candidate method samples, analyze each sample filter or filter extract three times and calculate, in accordance with the candidate method, the indicated Pb concentration in µg/m³ for each analysis of each filter. The analysis of replicates should not be performed sequentially. Label these test results as $C_{1A}$, $C_{1B}$, $C_{2C}$, etc., where C denotes results from the candidate

method. For candidate methods which provide a direct reading or measurement of Pb concentrations without a separable procedure, $C_{1A}=C_{1B}=C_{1C}$, $C_{2A}=C_{2B}=C_{2C}$, etc.

(h) *Average Pb concentration.* For the reference method, calculate the average Pb concentration for each filter by averaging the concentrations calculated from the three analyses as described in (g)(1) using equation 1 of this section:

### Equation 1

$$R_{iave} = \frac{(R_{iA} + R_{iB} + R_{iC})}{3}$$

Where, i is the filter number.

(i) *Analytical Bias.*

(1) For the audit samples, calculate the average Pb concentration for each strip or filter analyzed by the reference method by averaging the concentrations calculated from the three analyses as described in (g)(1) using equation 2 of this section:

### Equation 2

$$Q_{iave} = \frac{(Q_{iA} + Q_{iB} + Q_{iC})}{3}$$

Where, i is audit sample number.

(2) Calculate the percent difference ($D_q$) between the average Pb concentration for each audit sample and the true Pb concentration ($T_q$) using equation 3 of this section:

### Equation 3

$$D_{qi} = \frac{Q_{iave} - T_{qi}}{T_{qi}} \times 100$$

(3) If any difference value ($D_{qi}$) exceeds ±5 percent, the bias of the reference method analytical procedure is out-of-control. Corrective action must be taken to determine the source of the error(s) (e.g., calibration standard discrepancies, extraction problems, etc.) and the reference method and audit sample determinations must be repeated according to paragraph (g) of this section, or the entire test procedure (starting with paragraph (e) of this section) must be repeated.

(j) *Acceptable filter pairs.* Disregard all filter pairs for which the Pb concentration, as determined in paragraph (h) of this section by the average of the three reference method determinations, falls outside the range of 30% to 250% of the Pb NAAQS level in µg/m³ for Pb in both TSP and $PM_{10}$. All remaining filter pairs must be subjected to the tests for precision and comparability in paragraphs (k) and (l) of this section. At least five filter pairs

must be within the specified concentration range for the tests to be valid.

(k) *Test for precision.*

(1) Calculate the precision (P) of the analysis (in percent) for each filter and for each method, as the maximum minus the minimum divided by the average of the three concentration values, using equation 4 or equation 5 of this section:

Equation 4

$$P_{Ri} = \frac{R_{i\max} - R_{i\min}}{R_{iave}} \times 100$$

or

Equation 5

$$P_{Ci} = \frac{C_{i\max} - C_{i\min}}{C_{iave}} \times 100$$

Where, i indicates the filter number.

(2) If a direct reading candidate method is tested, the precision is determined from collocated devices using equation 5 above.

(3) If any reference method precision value ($P_{Ri}$) exceeds 15 percent, the precision of the reference method analytical procedure is out-of-control. Corrective action must be taken to determine the source(s) of imprecision, and the reference method determinations must be repeated according to paragraph (g) of this section, or the entire test procedure (starting with paragraph (e) of this section) must be repeated.

(4) If any candidate method precision value ($P_{Ci}$) exceeds 15 percent, the candidate method fails the precision test.

(5) The candidate method passes this test if all precision values (*i.e.*, all $P_{Ri}$'s and all $P_{Ci}$'s) are less than 15 percent.

(l) *Test for comparability.*

(1) For each filter or analytical sample pair, calculate all nine possible percent differences (D) between the reference and candidate methods, using all nine possible combinations of the three determinations (A, B, and C) for each method using equation 6 of this section:

Equation 6

$$D_{in} = \frac{C_{ij} - R_{jk}}{R_{jk}} \times 100$$

Where, i is the filter number, and n numbers from 1 to 9 for the nine possible difference combinations for the three determinations for each method (j = A, B, C, candidate; k = A, B, C, reference).

(2) If none of the percent differences (D) exceeds ±20 percent, the candidate method passes the test for comparability.

(3) If one or more of the percent differences (D) exceed ±20 percent, the candidate method fails the test for comparability.

(4) The candidate method must pass both the precision test (paragraph (k) of this section) and the comparability test (paragraph (l) of this section) to qualify for designation as an equivalent method.

(m) *Method Detection Limit (MDL).* Calculate the estimated MDL using the guidance provided in 40 CFR, Part 136 Appendix B. It is essential that all sample processing steps of the analytical method be included in the determination of the method detection limit. Take a minimum of seven blank filters from each lot to be used and calculate the detection limit by processing each through the entire candidate analytical method. Make all computations according to the defined method with the final results in µg/m³. The MDL of the candidate method must be equal to, or less than 5% of the level of the Pb NAAQS.

■ 13. Table C–3 to Subpart C of Part 53 is revised to read as follows:

TABLE C–3 TO SUBPART C OF PART 53—TEST SPECIFICATIONS FOR Pb IN TSP AND Pb IN PM₁₀ METHODS

| | |
|---|---|
| Concentration range equivalent to percentage of NAAQS in µg/m³. | 30% to 250% |
| Minimum number of 24-hr measurements. | 5 |
| Maximum reference method analytical bias, $D_o$. | ±5% |
| Maximum precision, $P_R$ or $P_C$ ... | ≤15% |
| Maximum difference (D) .......... | ±20% |
| Estimated Method Detection Limit (MDL), µg/m³. | 5% of NAAQS level. |

**PART 58—AMBIENT AIR QUALITY SURVEILLANCE**

■ 14. The authority citation for part 58 continues to read as follows:

**Authority:** 42 U.S.C. 7403, 7410, 7601(a), 7611, and 7619.

**Subpart B—[Amended]**

■ 15. Section 58.10, is amended by added paragraph subsections (a)(4) and adding paragraph (b)(9) to read as follows:

**§ 58.10   Annual monitoring network plan and periodic network assessment.**

*       *       *       *       *

(a) * * *

(4) A plan for establishing Pb monitoring sites in accordance with the requirements of appendix D to this part shall be submitted to the EPA Regional Administrator no later than July 1, 2009 as part of the annual network plan required in paragraph (a)(1) of this section. The plan shall provide for the required source-oriented Pb monitoring sites to be operational by January 1, 2010, and for all required non-source-oriented Pb monitoring sites to be operational by January 1, 2011. Specific locations for the sites to be operational by January 1, 2011 are not required as part of the July 1, 2009 annual network plan, but shall be included in the annual network plan due to be submitted to the EPA Regional Administrator on July 1, 2010.

*       *       *       *       *

(b) * * *

(9) The designation of any Pb monitors as either source-oriented or non-source-oriented according to Appendix D to 40 CFR part 58.

(10) Any source-oriented monitors for which a waiver has been requested or granted by the EPA Regional Administrator as allowed for under paragraph 4.5(a)(ii) of Appendix D to 40 CFR part 58.

(11) Any source-oriented or non-source-oriented site for which a waiver has been requested or granted by the EPA Regional Administrator for the use of Pb-PM₁₀ monitoring in lieu of Pb-TSP monitoring as allowed for under paragraph 2.10 of Appendix C to 40 CFR part 58.

*       *       *       *       *

■ 16. Section 58.13 is amended by revising paragraph (b) to read as follows:

**§ 58.13   Monitoring network completion.**

*       *       *       *       *

(b) Not withstanding specific dates included in this part, beginning January 1, 2008, when existing networks are not in conformance with the minimum number of required monitors specified in this part, additional required monitors must be identified in the next applicable annual monitoring network plan, with monitoring operation beginning by January 1 of the following year. To allow sufficient time to prepare and comment on Annual Monitoring Network Plans, only monitoring requirements effective 120 days prior to the required submission date of the plan (i.e., 120 days prior to July 1 of each year) shall be included in that year's annual monitoring network plan.

■ 17. Section 58.16 is amended by revising paragraph (a) to read as follows:

**§ 58.16   Data submittal and archiving requirements.**

(a) The State, or where appropriate, local agency, shall report to the Administrator, via AQS all ambient air quality data and associated quality assurance data for $SO_2$; CO; $O_3$; $NO_2$;

NO; $NO_Y$; $NO_X$; Pb-TSP mass concentration; Pb-$PM_{10}$ mass concentration; $PM_{10}$ mass concentration; $PM_{2.5}$ mass concentration; for filter-based $PM_{2.5}$ FRM/FEM the field blank mass, sampler-generated average daily temperature, and sampler-generated average daily pressure; chemically speciated $PM_{2.5}$ mass concentration data; $PM_{10-2.5}$ mass concentration; chemically speciated $PM_{10-2.5}$ mass concentration data; meteorological data from NCore and PAMS sites; average daily temperature and average daily pressure for Pb sites if not already reported from sampler generated records; and metadata records and information specified by the AQS Data Coding Manual (*http://www.epa.gov/ttn/airs/airsaqs/manuals/manuals.htm*). The State, or where appropriate, local agency, may report site specific meteorological measurements generated by onsite equipment (meteorological instruments, or sampler generated) or measurements from the nearest airport reporting ambient pressure and temperature. Such air quality data and information must be submitted directly to the AQS via electronic transmission on the specified quarterly schedule described in paragraph (b) of this section.

\* \* \* \* \*

## Subpart D—[Amended]

■ 18. Section 58.20 is amended by revising paragraph (e) to read as follows:

### §58.20   Special purpose monitors (SPM).

\* \* \* \* \*

(e) If an SPM using an FRM, FEM, or ARM is discontinued within 24 months of start-up, the Administrator will not designate an area as nonattainment for the CO, $SO_2$, $NO_2$, or 24-hour $PM_{10}$ NAAQS solely on the basis of data from the SPM. Such data are eligible for use in determinations of whether a nonattainment area has attained one of these NAAQS.

\* \* \* \* \*

■ 19. Appendix A to Part 58 is amended to read as follows:
■ a. Revising paragraph 1,
■ b. Adding paragraph 2.3.1.4,
■ c. Revising paragraph 3.3.4,
■ d. Revising paragraph 4c,
■ e. Revising paragraph 4.4,
■ f. Removing paragraph 4.5 and
■ g. Revising Table A–2.

## Appendix A to Part 58—Quality Assurance Requirements for SLAMS, SPMs and PSD Air Monitoring

\* \* \* \* \*

1. *General Information.*
This appendix specifies the minimum quality system requirements applicable to SLAMS air monitoring data and PSD data for the pollutants $SO_2$, $NO_2$, $O_3$, CO, Pb, $PM_{2.5}$, $PM_{10}$ and $PM_{10-2.5}$ submitted to EPA. This appendix also conforms with the 40 CFR part 58 appendix A requirements for SLAMS stations using FRM, FEM, or ARM methods which also meet the requirements of Appendix E of this part. Monitoring organizations are encouraged to develop and maintain quality systems more extensive than the required minimums. The permit-granting authority for PSD may require more frequent or more stringent requirements. Monitoring organizations may, based on their quality objectives, develop and maintain quality systems beyond the required minimum. Additional guidance for the requirements reflected in this appendix can be found in the "Quality Assurance Handbook for Air Pollution Measurement Systems", volume II, part 1 (see reference 10 of this appendix) and at a national level in references 1, 2, and 3 of this appendix.

\* \* \* \* \*

2.3.1.4   *Measurement Uncertainty for Pb Methods.* The goal for acceptable measurement uncertainty is defined for precision as an upper 90 percent confidence limit for the coefficient variation (CV) of 20 percent and for bias as an upper 95 percent confidence limit for the absolute bias of 15 percent.

\* \* \* \* \*

3.3.4   *Pb Methods.*
3.3.4.1   *Flow Rates.* For the Pb Reference Methods (40 CFR Part 50, appendix G and appendix Q) and associated FEMs, the flow rates of the Pb samplers shall be verified and audited using the same procedures described in sections 3.3.2 and 3.3.3 this appendix.

3.3.4.2   *Pb Analysis Audits.* Each calendar quarter or sampling quarter (PSD), audit the Pb Reference Method analytical procedure using filters containing a known quantity of Pb. These audit filters are prepared by depositing a Pb solution on unexposed filters and allowing them to dry thoroughly. The audit samples must be prepared using batches of reagents different from those used to calibrate the Pb analytical equipment being audited. Prepare audit samples in the following concentration ranges:

| Range | Equivalent ambient Pb concentration, μg/m³ |
| --- | --- |
| 1 ........ | 30–100% of Pb NAAQS. |
| 2 ........ | 200–300% of Pb NAAQS. |

(a) Audit samples must be extracted using the same extraction procedure used for exposed filters.

(b) Analyze three audit samples in each of the two ranges each quarter samples are analyzed. The audit sample analyses shall be distributed as much as possible over the entire calendar quarter.

(c) Report the audit concentrations (in μg Pb/filter or strip) and the corresponding measured concentrations (in μg Pb/filter or strip) using AQS unit code 077. The percent differences between the concentrations are used to calculate analytical accuracy as described in section 4.1.3 of this appendix.

(d) The audits of an equivalent Pb method are conducted and assessed in the same manner as for the reference method. The flow auditing device and Pb analysis audit samples must be compatible with the specific requirements of the equivalent method.

3.3.4.3   *Collocated Sampling.* The collocated sampling requirements for Pb-TSP and Pb-$PM_{10}$ shall be determined using the same procedures described in sections 3.3.1 of this appendix with the exception that the first collocated Pb site selected must be the site measuring the highest Pb concentrations in the network. If the site is impractical, alternative sites, approved by the EPA Regional Administrator, may be selected. If additional collocated sites are necessary, collocated sites may be chosen that reflect average ambient air Pb concentrations in the network.

3.3.4.4   *Pb Performance Evaluation Program (PEP) Procedures.* Each year, one performance evaluation audit, as described in section 3.2.7 of this appendix, must be performed at one Pb site in each primary quality assurance organization that has less than or equal to 5 sites and two audits at primary quality assurance organizations with greater than 5 sites. In addition, each year, four collocated samples from primary quality assurance organizations with less than or equal to 5 sites and six collocated samples at primary quality assurance organizations with greater than 5 sites must be sent to an independent laboratory, the same laboratory as the performance evaluation audit, for analysis.

\* \* \* \* \*

4. *Calculations for Data Quality Assessment.*

\* \* \* \* \*

(c) At low concentrations, agreement between the measurements of collocated samplers, expressed as relative percent difference or percent difference, may be relatively poor. For this reason, collocated measurement pairs are selected for use in the precision and bias calculations only when both measurements are equal to or above the following limits:

(1) TSP: 20 μg/m³.
(2) Pb: 0.02 μg/m³.
(3) $PM_{10}$ (Hi-Vol): 15 μg/m³.
(4) $PM_{10}$ (Lo-Vol): 3 μg/m³.
(5) $PM_{10-2.5}$ and $PM_{2.5}$: 3 μg/m³.

4.4   *Statistics for the Assessment of Pb.*
4.4.1   *Precision Estimate.* Follow the same procedures as described for $PM_{10}$ in section 4.2.1 of this appendix using the data from the collocated instruments. The data pair would only be considered valid if both concentrations are greater than the minimum values specified in section 4(c) of this appendix.

4.4.2   *Bias Estimate.* For the Pb analysis audits described in section 3.3.4.2 and the Pb Performance Evaluation Program described in section 3.3.4.4, follow the same procedure as described in section 4.1.3 for the bias estimate.

4.4.3   *Flow rate calculations.* For the one point flow rate verifications, follow the same procedures as described for $PM_{10}$ in section 4.2.2; for the flow rate audits, follow the

same procedures as described in section 4.2.3.

\*       \*       \*       \*       \*

## TABLE A–2 OF APPENDIX A TO PART 58—MINIMUM DATA ASSESSMENT REQUIREMENTS FOR SLAMS SITES

| Method | Assessment method | Coverage | Minimum frequency | Parameters reported |
|---|---|---|---|---|
| **Automated Methods** | | | | |
| 1-Point QC for $SO_2$, $NO_2$, $O_3$, CO. | Response check at concentration 0.01–0.1 ppm $SO_2$, $NO_2$, $O_3$, and 1–10 ppm CO. | Each analyzer .................. | Once per 2 weeks ............. | Audit concentration [1] and measured concentration [2]. |
| Annual performance evaluation for $SO_2$, $NO_2$, $O_3$, CO. | See section 3.2.2 of this appendix. | Each analyzer .................. | Once per year .................. | Audit concentration [1] and measured concentration [2] for each level. |
| Flow rate verification $PM_{10}$, $PM_{2.5}$, $PM_{10-2.5}$. | Check of sampler flow rate | Each sampler .................. | Once every month ........... | Audit flow rate and measured flow rate indicated by the sampler. |
| Semi-annual flow rate audit $PM_{10}$, $PM_{2.5}$, $PM_{10-2.5}$. | Check of sampler flow rate using independent standard. | Each sampler .................. | Once every 6 months ......... | Audit flow rate and measured flow rate indicated by the sampler. |
| Collocated sampling $PM_{2.5}$, $PM_{10-2.5}$. | Collocated samplers ......... | 15% .................................... | Every 12 days .................. | Primary sampler concentration and duplicate sampler concentration. |
| Performance evaluation program $PM_{2.5}$, $PM_{10-2.5}$. | Collocated samplers ......... | 1. 5 valid audits for primary QA orgs, with ≤5 sites. 2. 8 valid audits for primary QA orgs, with >5 sites. 3. All samplers in 6 years | Over all 4 quarters ............ | Primary sampler concentration and performance evaluation sampler concentration. |
| **Manual Methods** | | | | |
| Collocated sampling $PM_{10}$, TSP, $PM_{10-2.5}$, $PM_{2.5}$, Pb-TSP, Pb-$PM_{10}$. | Collocated samplers ......... | 15% .................................... | Every 12 days PSD— every 6 days. | Primary sampler concentration and duplicate sampler concentration. |
| Flow rate verification $PM_{10}$ (low Vol), $PM_{10-2.5}$, $PM_{2.5}$, Pb-$PM_{10}$. | Check of sampler flow rate | Each sampler .................. | Once every month ........... | Audit flow rate and measured flow rate indicated by the sampler. |
| Flow rate verification $PM_{10}$ (High-Vol), TSP, Pb-TSP. | Check of sampler flow rate | Each sampler .................. | Once every quarter ......... | Audit flow rate and measured flow rate indicated by the sampler. |
| Semi-annual flow rate audit $PM_{10}$, TSP, $PM_{10-2.5}$, $PM_{2.5}$, Pb-TSP, Pb-$PM_{10}$. | Check of sampler flow rate using independent standard. | Each sampler, all locations | Once every 6 months ......... | Audit flow rate and measured flow rate indicated by the sampler. |
| Pb audit strips Pb-TSP, Pb-$PM_{10}$. | Check of analytical system with Pb audit strips. | Analytical ........................... | Each quarter ................... | Actual concentration and audit concentration. |
| Performance evaluation program $PM_{2.5}$, $PM_{10-2.5}$. | Collocated samplers ......... | 1. 5 valid audits for primary QA orgs, with ≤5 sites. 2. 8 valid audits for primary QA orgs, with >5 sites. 3. All samplers in 6 years | Over all 4 quarters ............ | Primary sampler concentration and performance evaluation sampler concentration. |
| Performance evaluation program Pb-TSP, Pb-$PM_{10}$. | Collocated samplers ......... | 1. 1 valid audit and 4 collocated samples for primary QA orgs, with >5 sites. 2. 2 valid audits and 6 collocated samples for primary QA orgs, with >5 sites. | Over all 4 quarters ............ | Primary sampler concentration and performance evaluation sampler concentration. Primary sampler concentration and duplicate sampler concentration. |

[1] Effective concentration for open path analyzers.
[2] Corrected concentration, if applicable, for open path analyzers.

■ 20. Appendix C to Part 58 is amended by adding paragraph 2.10 to read as follows:

\*       \*       \*       \*       \*

2.10   *Use of Pb-$PM_{10}$ at SLAMS Sites.*

2.10.1   The EPA Regional Administrator may approve the use of a Pb-$PM_{10}$ FRM or Pb-$PM_{10}$ FEM sampler in lieu of a Pb-TSP

sampler as part of the network plan required under part 58.10(a)(4) in the following cases.

2.10.1.1   Pb-$PM_{10}$ samplers can be approved for use at the non-source-oriented sites required under paragraph 4.5(b) of

Appendix D to part 58 if there is no existing monitoring data indicating that the maximum arithmetic 3-month mean Pb concentration (either Pb-TSP or Pb-PM$_{10}$) at the site was equal to or greater than 0.10 micrograms per cubic meter during the previous 3 years.

2.10.1.2 Pb-PM$_{10}$ samplers can be approved for use at source-oriented sites required under paragraph 4.5(a) if the monitoring agency can demonstrate (through modeling or historic monitoring data from the last 3 years) that Pb concentrations (either Pb-TSP or Pb-PM$_{10}$) will not equal or exceed 0.10 micrograms per cubic meter on an arithmetic 3-month mean and the source is expected to emit a substantial majority of its Pb in the fraction of PM with an aerodynamic diameter of less than or equal to 10 micrometers.

2.10.2 The approval of a Pb-PM$_{10}$ sampler in lieu of a Pb-TSP sampler as allowed for in paragraph 2.10.1 above will be revoked if measured Pb-PM$_{10}$ concentrations equal or exceed 0.10 micrograms per cubic meter on an arithmetic 3-month mean. Monitoring agencies will have up to 6 months from the end of the 3-month period in which the arithmetic 3-month Pb-PM$_{10}$ mean concentration equaled or exceeded 0.10 micrograms per cubic meter to install and begin operation of a Pb-TSP sampler at the site.

■ 22. Appendix D to Part 58 is amended by revising paragraph 4.5 to read as follows:

## Appendix D to Part 58—Network Design Criteria for Ambient Air Quality Monitoring

\*    \*    \*    \*    \*

4.5 *Lead (Pb) Design Criteria.* (a) State and, where appropriate, local agencies are required to conduct ambient air Pb monitoring taking into account Pb sources which are expected to or have been shown to contribute to a maximum Pb concentration in ambient air in excess of the NAAQS, the potential for population exposure, and logistics. At a minimum, there must be one source-oriented SLAMS site located to measure the maximum Pb concentration in ambient air resulting from each Pb source which emits 1.0 or more tons per year based on either the most recent National Emission Inventory (*http://www.epa.gov/ttn/chief/eiinformation.html*) or other scientifically justifiable methods and data (such as

improved emissions factors or site-specific data) taking into account logistics and the potential for population exposure.

(i) One monitor may be used to meet the requirement in paragraph 4.5(a) for all sources involved when the location of the maximum Pb concentration due to one Pb source is expected to also be impacted by Pb emissions from a nearby source (or multiple sources). This monitor must be sited, taking into account logistics and the potential for population exposure, where the Pb concentration from all sources combined is expected to be at its maximum.

(ii) The Regional Administrator may waive the requirement in paragraph 4.5(a) for monitoring near Pb sources if the State or, where appropriate, local agency can demonstrate the Pb source will not contribute to a maximum Pb concentration in ambient air in excess of 50% of the NAAQS (based on historical monitoring data, modeling, or other means). The waiver must be renewed once every 5 years as part of the network assessment required under 58.10(d).

(b) State and, where appropriate, local agencies are required to conduct Pb monitoring in each CBSA with a population equal to or greater than 500,000 people as determined by the latest available census figures. At a minimum, there must be one non-source-oriented SLAMS site located to measure neighborhood scale Pb concentrations in urban areas impacted by re-entrained dust from roadways, closed industrial sources which previously were significant sources of Pb, hazardous waste sites, construction and demolition projects, or other fugitive dust sources of Pb.

(c) The EPA Regional Administrator may require additional monitoring beyond the minimum monitoring requirements contained in 4.5(a) and 4.5(b) where the likelihood of Pb air quality violations is significant or where the emissions density, topography, or population locations are complex and varied.

(d) The most important spatial scales for source-oriented sites to effectively characterize the emissions from point sources are microscale and middle scale. The most important spatial scale for non-source-oriented sites to characterize typical lead concentrations in urban areas is the neighborhood scale. Monitor siting should be conducted in accordance with 4.5(a)(i) with respect to source-oriented sites.

(1) Microscale—This scale would typify areas in close proximity to lead point

sources. Emissions from point sources such as primary and secondary lead smelters, and primary copper smelters may under fumigation conditions likewise result in high ground level concentrations at the microscale. In the latter case, the microscale would represent an area impacted by the plume with dimensions extending up to approximately 100 meters. Pb monitors in areas where the public has access, and particularly children have access, are desirable because of the higher sensitivity of children to exposures of elevated Pb concentrations.

(2) Middle scale—This scale generally represents Pb air quality levels in areas up to several city blocks in size with dimensions on the order of approximately 100 meters to 500 meters. The middle scale may for example, include schools and playgrounds in center city areas which are close to major Pb point sources. Pb monitors in such areas are desirable because of the higher sensitivity of children to exposures of elevated Pb concentrations (reference 3 of this appendix). Emissions from point sources frequently impact on areas at which single sites may be located to measure concentrations representing middle spatial scales.

(3) Neighborhood scale—The neighborhood scale would characterize air quality conditions throughout some relatively uniform land use areas with dimensions in the 0.5 to 4.0 kilometer range. Sites of this scale would provide monitoring data in areas representing conditions where children live and play. Monitoring in such areas is important since this segment of the population is more susceptible to the effects of Pb. Where a neighborhood site is located away from immediate Pb sources, the site may be very useful in representing typical air quality values for a larger residential area, and therefore suitable for population exposure and trends analyses.

(d) Technical guidance is found in references 4 and 5 of this appendix. These documents provide additional guidance on locating sites to meet specific urban area monitoring objectives and should be used in locating new sites or evaluating the adequacy of existing sites.

\*    \*    \*    \*    \*

[FR Doc. E8–25654 Filed 11–10–08; 8:45 am]
**BILLING CODE 6560–50–P**

Pls.' Exhibit 043

Federal Register, Volume 84, Number 123 (June 26, 2019), Pages 30,524-30,569) National Primary Drinking Water Regulations: Perchlorate; Proposed rule, request for public comment

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Parts 141 and 142

[EPA–HQ–OW–2018–0780; FRL–9994–68–OW]

RIN 2040–AF28

## National Primary Drinking Water Regulations: Perchlorate

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule, request for public comment.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing a drinking water regulation for perchlorate and a health-based Maximum Contaminant Level Goal (MCLG) in accordance with the Safe Drinking Water Act (SDWA). The EPA is proposing to set both the enforceable Maximum Contaminant Level (MCL) for the perchlorate regulation and the perchlorate MCLG at 0.056 mg/L (56 μg/L). The EPA is proposing requirements for water systems to conduct monitoring and reporting for perchlorate and to provide information about perchlorate to their consumers through public notification and consumer confidence reports. This proposal includes requirements for primacy agencies that implement the public water system supervision program under the SDWA. This proposal also includes a list of treatment technologies that would enable water systems to comply with the MCL, including affordable compliance technologies for small systems serving 10,000 persons or less.

**DATES:** Comments must be received on or before August 26, 2019. Under the Paperwork Reduction Act (PRA), comments on the information collection provisions are best assured of consideration if the Office of Management and Budget (OMB) receives a copy of your comments on or before July 26, 2019.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–HQ–OW–2018–0780, at *https://www.regulations.gov*. Follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov*. The EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment.

The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.*, on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *http://www2.epa.gov/dockets/commenting-epa-dockets.*

**FOR FURTHER INFORMATION CONTACT:** Samuel Hernandez, Office of Ground Water and Drinking Water, Standards and Risk Management Division (Mail Code 4607M), Environmental Protection Agency, 1200 Pennsylvania Avenue NW, Washington, DC 20460; telephone number: (202) 564–1735; email address: *hernandez.samuel@epa.gov*.

**SUPPLEMENTARY INFORMATION:** In addition to the proposed regulation, the EPA is requesting comment on three alternatives: (1) Whether the MCL and MCLG for perchlorate should be set at 0.018 mg/L (18 μg/L), (2) whether the MCL and MCLG for perchlorate should be set at 0.090 mg/L (90 μg/L), or (3) whether instead of issuing a national primary drinking water regulation, the EPA should withdraw the Agency's February 11, 2011, determination to regulate perchlorate in drinking water based on new information that indicates that perchlorate does not occur in public water systems with a frequency and at levels of public health concern and there may not be a meaningful opportunity for health risk reduction through a drinking water regulation. Under this last alternative, the final action would be a withdrawal of the determination to regulate and there would be no MCLG or national primary drinking water regulation for perchlorate. This proposed rule is organized as follows:

I. General Information
  A. What is the EPA proposing?
  B. Does this action apply to me?
II. Background
  A. What is perchlorate?
  B. Statutory Authority
  C. Statutory Framework and Regulatory History
III. Assessment and Modeling of the Health Effects of Perchlorate
  A. 2008 Preliminary Regulatory Determinations
  B. 2009 Supplemental Request for Comment and 2011 Final Regulatory Determination
  C. Science Advisory Board Recommendations
  D. Perchlorate Model Development and Peer Reviews

  E. Sensitive Population for Deriving MCLG
  F. BBDR Model Specification for the Sensitive Population
  G. Epidemiological Literature
  H. Identifying a Point of Departure for Developing the MCLG
  I. Translate PODs to RfDs
  J. Translate RfD Into an MCLG
IV. Maximum Contaminant Level Goal and Alternatives
V. Maximum Contaminant Level and Alternatives
VI. Occurrence
VII. Analytical Methods
VIII. Monitoring and Compliance Requirements
  A. What are the proposed monitoring requirements?
  B. Can States grant monitoring waivers?
  C. How are system MCL violations determined?
  D. When must systems complete initial monitoring?
  E. Can systems use grandfathered data to satisfy the initial monitoring requirements?
IX. Safe Drinking Water Act Right to Know Requirements
  A. What are the Consumer Confidence Report requirements?
  B. What are the public notification requirements?
X. Treatment Technologies
  A. What are the best available technologies?
  B. What are the small system compliance technologies?
XI. Rule Implementation and Enforcement
  A. What are the requirements for primacy?
  B. What are the State record keeping requirements?
  C. What are the State reporting requirements?
XII. Health Risk Reduction Cost Analysis
  A. Identifying Affected Entities
  B. Method for Estimating Costs
  C. Method for Estimating Benefits
  D. Comparison of Costs and Benefits
XIII. Uncertainty Analysis
  A. Uncertainty in the MCLG Derivation
  B. Uncertainty in the Economic Analysis
XIV. Request for Comment on Proposed Rule
XV. Request for Comment on Potential Regulatory Determination Withdrawal
XVI. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563 Improving Regulation and Regulatory Review
  B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs
  C. Paperwork Reduction Act
  D. Regulatory Flexibility Act (RFA)
  E. Unfunded Mandates Reform Act
  F. Executive Order 13132: Federalism
  G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  H. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
  I. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use
  J. National Technology Transfer and Advancement Act of 1995

K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
XVII. Consultations with the Science Advisory Board, National Drinking Water Advisory Council, and the Secretary of Health and Human Services
XVIII. References

## I. General Information

### A. What is the EPA proposing?

This action contains a proposal and three alternatives for public comment. First, the EPA proposes to establish a Maximum Contaminant Level Goal (MCLG) and National Primary Drinking Water Regulation (NPDWR) for perchlorate in public water supplies. The EPA proposes an MCLG of 56 μg/L, and to regulate perchlorate in drinking water at an enforceable maximum contaminant level (MCL) of 56 μg/L.

Second, as explained in more detail below, the EPA is soliciting comment on

The EPA is proposing an NPDWR for perchlorate in accordance with its February 11, 2011, (76 FR 7762) determination to regulate perchlorate under the SDWA. Based on the best available peer reviewed science at that time, the EPA found that perchlorate met the SDWA's three criteria for regulating a contaminant: (1) The contaminant may have an adverse effect on the health of persons, (2) the contaminant is known to occur or there is a substantial likelihood that the contaminant will occur in public water systems (PWSs) with a frequency and at levels of public health concern, and (3) in the sole judgment of the Administrator, regulation of such contaminant presents a meaningful opportunity for health risk reduction for persons served by PWSs.

two alternative MCLG/MCL values of 18 μg/L and 90 μg/L respectively. Third, in light of new considerations that have come to the EPA's attention since it issued its positive regulatory determination in 2011, including information on lower levels of occurrence of perchlorate than the EPA had previously believed to exist and new analysis of the concentration that represents a level of health concern, this action also discusses and requests comment on an alternative action under which the EPA would withdraw its 2011 determination to regulate perchlorate. Under this alternative, there would be no MCLG or NPDWR for perchlorate.

### B. Does this action apply to me?

Entities that could potentially be affected include the following:

| Category | Examples of potentially affected entities |
|---|---|
| Public water systems ........................................... | Community water systems: Non-transient, non-community water systems. |
| State and tribal agencies ..................................... | Agencies responsible for drinking water regulatory development and enforcement. |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities that could be affected by this action. To determine whether your facility or activities could be affected by this action, you should carefully examine this proposed rule. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

## II. Background

### A. What is perchlorate?

Perchlorate is a negatively charged inorganic ion that is comprised of one chlorine atom bound to four oxygen atoms ($ClO_4-$), which is highly stable and mobile in the aqueous environment. Perchlorate comes from both natural and manmade sources. It is formed naturally via atmospheric processes and can be found within mineral deposits in certain geographical areas. It is also produced in the United States, and the most common compounds include ammonium perchlorate and potassium perchlorate used primarily as oxidizers in solid fuels to power rockets, missiles, and fireworks. For the general population, most perchlorate exposure is through the ingestion of contaminated food or drinking water.

### B. Statutory Authority

Section 1412(b)(1)(A) of the SDWA requires the EPA to establish NPDWRs

for contaminants that may have an adverse effect on the health of persons; that are known to occur or there is a substantial likelihood that the contaminant will occur in public water systems with a frequency and at levels of public health concern; and where in the sole judgment of the Administrator, regulation of such contaminant presents a meaningful opportunity for health risk reduction for persons served by public water systems.

### C. Statutory Framework and Regulatory History

Section 1412(b)(1)(B)(i) of the SDWA requires the EPA to publish every five years a Contaminant Candidate List (CCL). The CCL is a list of drinking water contaminants that are known or anticipated to occur in public water systems and are not currently subject to the EPA drinking water regulations. The EPA uses the CCL to identify priority contaminants for regulatory decision-making and information collection. Contaminants listed on the CCL may require future regulation under the SDWA. The EPA included perchlorate on the first, second, and third CCLs published in 1998, 2005, and 2009.

Once listed on the CCL, the Agency continues to collect data on CCL contaminants to better understand their potential health effects and to determine the levels at which they occur in drinking water. Section 1412(b)(1)(B)(ii) requires that, every five years, the EPA,

after public comment, issue a determination whether or not to regulate at least five contaminants on the CCL. For any contaminant that the EPA determines meets the criteria for regulation, under Section 1412(b)(1)(E), the EPA must issue a proposed national primary drinking water regulation within two years and issue a final regulation 18 months after the proposal (which may be extended by 9 months).

As part of its responsibilities under the SDWA, the EPA implements section 1445(a)(2), "Monitoring Program for Unregulated Contaminants." This section requires that once every five years, the EPA issue a list of no more than 30 unregulated contaminants to be monitored by public water system. This monitoring is implemented through the Unregulated Contaminant Monitoring Rule (UCMR), which collects data from community water systems (CWS) and non-transient, non-community water systems (NTNCWS). The UCMR collects data from a census of large water systems (serving more than 10,000 people) and from a statistically representative sample of small water systems. On September 17, 1999, the EPA published its first UCMR (64 FR 50556) which required all large systems and a representative sample of small systems to monitor for perchlorate and 25 other contaminants (USEPA, 1999, 2000b).

The EPA and other federal agencies asked the National Research Council

(NRC) to evaluate the health implications of perchlorate ingestion. The NRC concluded that perchlorate exposure inhibits the transport of iodide [1] into the thyroid by a protein molecule know as the sodium/iodide symporter (NIS), which may lead to decreases in two hormones, thyroxine (T3) and triiodothyronine (T4) and increases in thyroid-stimulating hormone (TSH) (National Research Council (NRC), 2005b). Additionally, the NRC concluded that the most sensitive population to perchlorate exposure are ''the fetuses of pregnant women who might have hypothyroidism or iodide deficiency'' (p. 178). The EPA established a reference dose (RfD) consistent with the recommended National Research Council RfD of 0.7 µg/kg/day for perchlorate. The reference dose is an estimate of a daily exposure to humans that is likely to be without an appreciable risk of adverse effects. This RfD was based on a study (Greer, Goodman, Pleus, & Greer, 2002) of perchlorate's inhibition of radioactive iodine uptake in healthy adults and the application of an uncertainty factor of 10 for intraspecies variability (USEPA, 2005b).

In October 2008, the EPA published a preliminary regulatory determination not to regulate perchlorate in drinking water and requested public comment (73 FR 60262). In that preliminary determination, the EPA tentatively concluded that perchlorate did not occur with a frequency and at levels of public health concern and that development of a regulation did not present a meaningful opportunity for health risk reduction for persons served by public water systems. The EPA derived and used a Health Reference Level (HRL) of 15 µg/L based on the RfD of 0.7 µg/kg/day in making this conclusion (USEPA, 2008a). Based primarily on the UCMR 1 occurrence data, the EPA estimated that less than 1% of drinking water systems (serving approximately 1 million people) had perchlorate levels above the HRL of 15 µg/L. Based on this information the Agency determined that perchlorate did not occur frequently at levels of health concern. The EPA also determined that there was not a meaningful opportunity for a NPDWR to reduce health risks.

In January 2009 the EPA published an interim health advisory for perchlorate of 15 µg/L, consistent with the HRL derivation for perchlorate of 15 µg/L

described above. Health Advisories are non-enforceable and non-regulatory and provide technical information to state agencies and other public health officials on health effects, analytical methodologies, and treatment technologies associated with drinking water contamination. Health Advisories provide the public, including the most sensitive populations, with a margin of protection from a lifetime of exposure. For perchlorate, the health advisory was developed for subchronic exposure (USEPA 2008d).

In August 2009, the EPA published a supplemental request for comment with a new analysis that derived potential alternative HRLs for 14 life stages, including infants and children. The analysis used the RfD of 0.7 µg/kg/day and life stage-specific bodyweight and exposure information (74 FR 41883; USEPA, 2009a). After careful consideration of public comments on the October 2008 and August 2009 notices, on February 11, 2011, the EPA published its determination to regulate perchlorate (76 FR 7762; USEPA, 2011a). The Agency stated then that when considering the alternative HRL benchmarks described in the 2009 notice, the likelihood of perchlorate to occur at levels of concern had significantly increased in comparison to the levels described on the 2008 preliminary negative determination. The EPA concluded that as many as 16 million people could potentially be exposed to perchlorate at levels of concern, up from 1 million people originally described in the 2008 notice.

In its 2011 determination, the Agency found that perchlorate may have an adverse effect on the health of persons, that it is known to occur in public drinking water systems with a frequency and at levels that present a public health concern, and in the judgment of the Administrator, regulation of perchlorate presented a meaningful opportunity for health risk reduction for persons served by public water systems. As a result of the determination, and as required by Section 1412(b)(1)(E), the EPA initiated the process to develop an MCLG and NPDWR for perchlorate as described in this notice.

In September 2012, the U.S. Chamber of Commerce (the Chamber) submitted to the EPA a Request for Correction under the Information Quality Act regarding the EPA's regulatory determination. In the request, the Chamber claimed that the UCMR 1 data did not comply with data quality guidelines and were not representative of current conditions. In response to this request, the EPA reassessed the data and removed certain source water samples

that could be paired with appropriate follow-up samples located at the entry point to the distribution system. The EPA also updated the UCMR 1 data for systems in California and Massachusetts using state compliance data to reflect current occurrence conditions after state regulatory limits for perchlorate were implemented.

In response to a lawsuit brought to enforce the deadlines in Section 1412(b)(1)(E), the U.S. District Court for the Southern District of New York entered a consent decree, requiring the EPA to propose an NPDWR with a proposed MCLG for perchlorate in drinking water no later than October 31, 2018, and finalize an NPDWR and MCLG for perchlorate in drinking water no later than December 19, 2019. The deadline for the EPA to propose an NPDWR with a proposed MCLG for perchlorate in drinking water was later extended to May 28, 2019. The consent decree is available in the docket for today's proposed rule.

## III. Assessment and Modeling of the Health Effects of Perchlorate

Perchlorate inhibits uptake of iodide into the thyroid gland by competitively binding to the NIS (ATSDR, 2008; Greer et al., 2002; NRC, 2005; SAB 2013; Taylor et al., 2013). Iodide is necessary for the synthesis of thyroid hormones and decreased iodide uptake into the thyroid can adversely affect thyroid hormone production (SAB for the U.S. EPA, 2013; Blount et al., 2006; Steinmaus et al., 2007, 2013, 2016, McMullen et al., 2017; Knight et al., 2018). These changes in thyroid hormone levels in a pregnant woman may be linked to changes in the neurodevelopment of her offspring (SAB for the U.S. EPA, 2013; Korevaar et al., 2016; Fan and Wu, 2016; Wang et al., 2016; Alexander et al., 2017; Thompson et al., 2018). In addition, alterations in thyroid homeostasis may impact other body systems including the reproductive (Alexander et al., 2017; Hou et al., 2016; Maraka et al., 2016) and cardiovascular systems (Asvold et al., 2012; Sun et al., 2017).

The mode of action of perchlorate toxicity has been proposed as follows: exposure to perchlorate is known to inhibit the uptake of iodide by the thyroid gland through the NIS (NRC, 2005; SAB for the U.S. EPA, 2013). A sufficient inhibition of iodide uptake results in iodide deficiency within the thyroid. Given that T3 and T4 require iodide for production, a decrease in intra-thyroidal iodide can result in decreased production of these hormones. This could in turn result in increased TSH, the hormone that acts on

---

[1] For the purposes of this FRN, ''iodine'' will be used to refer to dietary intake before entering the body. Once in the body, ''iodide'' will be used to refer to the ionic form.

the thyroid gland to stimulate iodide uptake to increase thyroid hormone production (Blount, Pirkle, Osterloh, Valentin-Blasini, & Caldwell, 2006; National Research Council (NRC), 2005; Steinmaus, Miller, Cushing, Blount, & Smith, 2013; Steinmaus et al., 2016). For populations with developing brains (e.g., fetuses, neonates, and children), disruptions in homeostatic thyroid hormone function can result in adverse neurodevelopmental effects (Alexander et al., 2017; Glinoer & Delange, 2000; Glinoer & Rovet, 2009; SAB for the U.S. EPA, 2013). Specifically, decreased maternal thyroid hormone levels during pregnancy, including in the hypothyroxinemic range,[2] have been linked to decrements in neurocognitive function in offspring (Alexander et al., 2017; Thompson et al., 2018; Wang et al., 2016). There is also limited evidence to suggest an association with other adverse neurodevelopmental outcomes including ADHD, expressive language delay, reduced school performance, autism, and delayed cognitive development (Alexander et al., 2017; Ghassabian, Bongers-Schokking, Henrichs, Jaddoe, & Visser, 2011; Gyllenberg et al., 2016; Henrichs et al., 2010; Korevaar et al., 2016, Noten et al., 2015; Pop et al., 2003, 1999; SAB for the U.S. EPA, 2013; van Mil et al., 2012).

The difficulty in estimating the likelihood and magnitude of the potential implications of perchlorate's mode of action on expressed neurodevelopmental health effects in humans exposed to perchlorate during development is the lack of robust epidemiological studies, especially in sensitive populations. Therefore, based on the known mode of action of perchlorate the Agency estimated potential health risks using a novel approach suggested by the EPA's Science Advisory Board (SAB for the U.S. EPA, 2013). The EPA's approach to estimating perchlorate risks has evolved over time with improved research and modeling capabilities. The following sections describe information sources the EPA used in its assessment as well as the regulatory process followed by the Agency in its decision making.

### A. 2008 Preliminary Regulatory Determinations

In 2005, at the request of the EPA and other federal agencies, the NRC evaluated the health implications of

perchlorate ingestion. The NRC concluded that perchlorate exposure could inhibit the transport of iodide into the thyroid, leading to thyroid hormone deficiency (NRC, 2005). A significant inhibition of iodide uptake results in intra-thyroid iodide deficiency, decreased synthesis of T3 and T4, and increased TSH. The NRC also concluded that a prolonged decrease of thyroid hormones is potentially more likely to have adverse effects in sensitive populations (e.g., the fetuses of pregnant women who might have hypothyroidism or iodide deficiency). Based on these findings, the NRC recommended a reference dose of 0.7 µg/kg/day.

Based on NRC's analysis, the EPA established a perchlorate reference dose (RfD) of 0.7 µg/kg/day in 2005 (USEPA, 2005). This value was based on a no observed effect level (NOEL) of 7 µg/kg/day identified from a study (Greer, Goodman, Pleus, & Greer, 2002) of perchlorate's inhibition of radioactive iodine uptake in healthy adults and the application of an uncertainty factor of 10 for intraspecies variability.

As discussed above, in 2008, the EPA derived an HRL of 15 µg/L using the RfD of 0.7 µg/kg/day, a default bodyweight of 70 kg, a default drinking water consumption rate of 2 L/day, and a perchlorate-specific relative source contribution (RSC) of 62 percent that was derived for a pregnant woman (USEPA, 2008a) (73 FR 60262). The RSC is the percentage of the RfD remaining for drinking water after other sources of exposure to perchlorate (i.e., food) have been considered. The EPA's HRL was calculated to offer a margin of protection against adverse health effects to the subpopulation identified by the NAS as likely the most sensitive to the effects of perchlorate exposure, fetuses.

### B. 2009 Supplemental Request for Comment and 2011 Final Regulatory Determination

The EPA received over 33,000 comments in response to its 2008 preliminary determination to not regulate perchlorate (USEPA, 2011a). After reviewing the comments, the EPA developed alternative HRLs for other sensitive populations in addition to fetuses of pregnant women. The EPA developed alternative HRLs for 14 life stages including infants and children. The EPA also evaluated the occurrence of perchlorate at levels above these alternative HRLs using the UCMR 1 occurrence data.

The analysis used the RfD of 0.7 µg/ kg/day and life stage-specific bodyweight and exposure information (i.e., drinking water intake, RSC) for

each of the 14 life stages evaluated. The resulting HRLs ranged from 1 µg/L to 47 µg/L. In August 2009, the EPA published a supplemental request for comment with the new analysis and HRLs (74 FR 41883; USEPA, 2009a). After careful consideration of public comments, on February 11, 2011, the EPA published its final determination to regulate perchlorate (76 FR 7762; USEPA, 2011a).

### C. Science Advisory Board Recommendations

As required by Section 1412(d) of the SDWA, as part of the NPDWR development process, the EPA requested comments from the Science Advisory Board (SAB) in 2012, seeking guidance on how best to consider and interpret the life stage information, the epidemiologic and biomonitoring data since the NRC report, physiologically-based pharmacokinetic (PBPK) analyses, and the totality of perchlorate health information to derive an MCLG for perchlorate. The SAB recommended the following:

• Derive a perchlorate MCLG that addresses sensitive life stages through physiologically based pharmacokinetic/ pharmacodynamic (PBPK/PD) modeling based upon perchlorate's mode of action rather than the default MCLG approach using the RfD and specific chemical exposure parameters;

• expand the modeling approach to account for thyroid hormone perturbations and potential adverse neurodevelopmental outcomes from perchlorate exposure;

• utilize a mode-of-action framework for developing the MCLG that links the steps in the proposed mechanism leading from perchlorate exposure through iodide uptake inhibition—to thyroid hormone changes—and finally to neurodevelopmental impacts; and

• "Extend the [BBDR] model expeditiously to . . . provide a key tool for linking early events with subsequent events as reported in the scientific and clinical literature on iodide deficiency, changes in thyroid hormone levels, and their relationship to neurodevelopmental outcomes during sensitive early life stages" (SAB for the U.S. EPA, 2013, p. 19).

This SAB-proposed framework would incorporate the previous endpoint of iodide uptake inhibition that was the basis for the RfD as part of a broader and more comprehensive framework that links perchlorate exposure to adverse neurodevelopmental outcomes. It also focuses on the smaller changes in thyroid hormones (specifically free T4 (fT4)) that are associated with maternal hypothyroxinemia and subsequent

---

[2] Maternal hypothyroxinemia is defined as TSH in the reference range and fT4 in the lower percentiles. The SAB notes that hypothyroxinemia has been defined by a "variety of cutoffs . . . ranging from fT4 below the 10th or 5th percentiles to below the 2.5th percentile" (SAB, 2013, p.10) in the population.

adverse neurodevelopmental health effects rather than the significant changes in thyroid hormones (both fT4 and TSH) that are associated with hypothyroidism.

*D. Perchlorate Model Development and Peer Reviews*

To address the SAB recommendations, the EPA revised an existing PBPK/PD model that describes the dynamics of perchlorate, iodide, and thyroid hormones in a woman during the third trimester of pregnancy (Lumen, Mattie, & Fisher, 2013; USEPA, 2009b). The EPA also created its own Biologically Based Dose Response (BBDR) models that included the additional sensitive life stage identified by the SAB, *i.e.*, breast- and bottle-fed neonates and infants (SAB for the U.S. EPA, 2013, p. 19).

To determine whether the Agency had implemented the SAB recommendations for modeling thyroid hormone changes, the EPA convened an independent peer review panel to evaluate the BBDR models in January 2017 (External Peer Reviewers for USEPA, 2017). In addition to estimating effects on breast fed infants, several reviewers recommended that the EPA shift the primary focus of its analysis to modeling the exposure implications to the fetus during early pregnancy. This was based on the knowledge that fetuses lack a functioning thyroid gland until approximately 16 gestational weeks and the substantial epidemiological evidence linking early pregnancy low fT4 levels with adverse neurodevelopmental outcomes (Endendijk et al., 2017, Korevaar et al., 2016; Morreale de Escobar, Obregón, & Escobar del Rey, 2004, Pop et al., 1999; Pop et al., 2003). Specifically, the SAB recommended that the EPA use specific sensitive populations to develop the MCLG for perchlorate: "the fetuses of hypothyroxinemic pregnant women, and infants exposed to perchlorate through either water-based formula preparations or the breast milk of lactating women" (SAB for the U.S. EPA, 2013, p. 19).

The EPA considered all recommendations from the 2017 peer review. The previously developed BBDR model describing perchlorate's effects in the third trimester (Lumen, Mattie, & Fisher, 2013; USEPA, 2009b) was calibrated only for that phase of pregnancy, not for the first trimester, and lacked a description of TSH signaling (feedback) that becomes significant as individuals become hypothyroxinemic or hypothyroid. In particular, this signaling was considered necessary to accurately predict

responses of women with very low iodine intake, which was also part of the 2017 peer review recommendations. Therefore, the Lumen et al., (2009b) model needed to be revised to address these recommendations and the EPA implemented those changes needed to increase the scientific rigor of the model and modeling results. These modifications include:

• Extending the model to early pregnancy;

• Incorporating biological feedback control of hormone production via TSH signaling, such that the model can describe lower levels of iodide nutrition;

• Calibrating the model and evaluating its behavior for upper and lower percentiles of the population, as well as the population median; and

• Conducting an uncertainty analysis for key parameters.

The EPA convened a second independent peer review panel in January 2018 to evaluate these updates to the BBDR model. The EPA also presented several approaches in the draft *Proposed Approaches to Inform the Derivation of a Maximum Contaminant Level Goal for Perchlorate in Drinking Water* (MCLG Approaches Report) to link the thyroid hormone changes in a pregnant mother predicted by the BBDR model to neurodevelopmental effects using evidence from the epidemiological literature (External Peer Review for U.S. EPA, 2018). The 2018 peer review identified a variety of strengths and limitations of the modeling (to be discussed in more detail later in this notice). The peer review panel was largely supportive of the efforts described in the MCLG Approaches Report, as evidenced by the following from the peer review final report:

*Overall, the panel agreed that the EPA and its collaborators have prepared a highly innovative state-of-the-science set of quantitative tools to evaluate neurodevelopmental effects that could arise from drinking water exposure to perchlorate. While there is always room for improvement of the models, with limited additional work to address the committee's comments [in the peer-reviewed report], the current models are fit-for-purpose to determine an MCLG (External Peer Reviewers for U.S. EPA, 2018, p. 2).*

The EPA also presented an alternative, population-based approach evaluating the shift in the proportion of the population that would fall below a hypothyroxinemic cut point, given exposure to perchlorate (Section 7 of the MCLG Approaches Report). This approach does not directly connect the

BBDR output to a neurodevelopmental endpoint. However, for pregnant women in early pregnancy, this shift could be related to avoiding an increase in the population of offspring's risk of adverse neurodevelopmental impacts. The 2018 peer review identified strengths associated with this approach, including

*(1) the central premise, that hypothyroxinemia is associated with adverse neurodevelopmental effects is supported by a large number of studies, including categorical studies; (2) this approach encompasses a variety of adverse neurodevelopmental outcomes, as indicated by these studies, rather than focusing on one or a limited number of adverse outcomes, as with the two-stage approach; and (3) this approach avoids all of the uncertainties associated with determining a quantitative relationship between a specific maternal fT4 level and the magnitude an adverse neurodevelopmental effect.* (*External Peer Reviewers for U.S. EPA, 2018, p. 7*)

The peer reviewers expressed concern about hypothyroxinemia being a precursor effect, rather than an adverse health outcome, which they argued may create difficulties in explaining the basis for an MCLG based on this approach to some audiences. However, the EPA has used precursor effects as the basis for setting regulatory and non-regulatory limits previously. The peer-review panel also expressed concern that a standard definition of hypothyroxinemia has not yet been established, as clinicians use varying fT4 thresholds to define their own working definition of the condition. This also could lead to difficulties communicating the population at risk for developing this precursor effect as a result of perchlorate exposure.

Ultimately, the EPA chose to develop the MCLG using dose-response functions from the epidemiological literature to estimate neurodevelopmental impacts in the offspring of pregnant women exposed to perchlorate. The EPA selected this proposed approach because it is consistent with the SDWA's definition of an MCLG to avoid adverse health effects and because it is most consistent with the SAB recommendations. The EPA is requesting public comment in Section XIV on the adequacies and uncertainties of the methodology to derive the MCLG including the decision not to pursue this population-based approach for setting the MCLG.

Based on the comments of the peer reviewers, the EPA's final analysis informing the derivation of the MCLG and benefits of avoided perchlorate exposure is based upon a 2-step

approach to modeling the neurodevelopmental effects on offspring of pregnant women exposed to perchlorate in drinking water (see Figure 1). In summary, because of the known mode of action, the lack of epidemiological studies particularly in the sensitive populations and the direction of the SAB to use a ''data-driven approach [which] represents a more rigorous way to address differences in biology and exposure between adults and sensitive life stages'' (p. 2, SAB 2013 for U.S. EPA), the EPA uses a combination of the BBDR model that simulates perchlorate potential impacts on maternal thyroid hormones during pregnancy and the epidemiology literature that relates incremental changes in maternal thyroid hormones to neurodevelopmental outcomes in children. The following sections describe the approach in greater detail, highlighting each step in which decisions and assumptions were made.



Note: Process figure does not imply the strength of scientific evidence.

### E. Sensitive Population for Deriving MCLG

SDWA 1412(b)(4)(A) requires MCLGs to be set at a concentration in water ''at which no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety.'' SDWA 1412(b)(3)(C)(V) further requires that the EPA ''consider the effects of the contaminant on the general population and on groups within the general population such as infants, children, pregnant women, the elderly, individuals with a history of serious illness, or other subpopulations that are identified as likely to be at greater risk of adverse health effects due to exposure to contaminants in drinking water than the general population.'' The EPA has interpreted these requirements to establish MCLGs that avoid adverse effects within the portions of the population that are at greater risk of adverse effects from exposure to the contaminant. The EPA is proposing an MCLG that is developed to protect the fetuses of a first trimester pregnant mother with low-iodine intake levels (*i.e.,* 75 μg/kg/day), low fT4 levels (*i.e.,* 10th percentile of an fT4 distribution for individuals with 75 μg/day iodine intake), and weak TSH feedback strength (*i.e.,* TSH feedback is reduced to be approximately 60 percent less effective than for the median individual). The choice of this population is consistent with discussion by the NRC (2005), and the SAB (2013). The EPA believes that by protecting this population, the other sensitive populations (*i.e.,* breast- and bottle-fed infants) will also be protected. This conclusion is based on the EPA's analysis of predictions of the impact of

perchlorate on fT4 levels from the original EPA BBDR model (which was peer reviewed in January of 2017) and an analysis of the literature on the connection between altered thyroid hormones in these life stages, and neurodevelopmental outcomes.

The EPA's original BBDR model demonstrated that perchlorate had minimal impact on the thyroid hormone levels for 30-, 60-, and 90-day formula-fed infants, even at doses as high as 20 μg/kg/day. Specifically, the model demonstrated that ''the range of iodine levels in formula is sufficient to almost entirely offset the effects of perchlorate exposure at 30, 60 and 90 days'' (USEPA, 2017; p. 73). As a result of these findings the EPA concluded that any MCLG based on the fetus of the first trimester hypothyroxinemic pregnant mother would also protect the formula-fed infant.

To determine if the same would be true for the breast-fed infant, the EPA compared the predicted percent change in fT4 experienced at given doses of perchlorate for both the breast-fed infant and the first trimester pregnant mother at varying doses of iodine intake[3] (50 to 100 μg/day). Assuming 2 or 4 μg/kg/day of perchlorate, the first trimester hypothyroxinemic pregnant mother has a greater percent change in fT4 compared to the 30 and 60 day breast-fed infant at all maternal iodine intake levels evaluated, except for the 30 day breast-fed infant of a mother consuming only 50 μg/day iodine. However, given that the original BBDR model did not have a TSH feedback loop, T4, fT4, T3 and fT3 predictions for lactating

mothers with less than 75 μg/day iodine intake were considered highly uncertain because the thyroid hormone levels had fallen into the hypothyroid range.

The Agency found that there are reports in the scientific literature suggesting that minor perturbations in thyroid hormone levels in the first trimester mother may adversely impact her offspring's neurodevelopment. Specifically, some studies show that children exposed gestationally to maternal hypothyroxinemia (without hypothyroidism) have a higher risk of reduced levels of global and specific cognitive abilities, as well as increased rates of behavior problems including greater dysregulation in early infancy and attentional disorders in childhood (Kooistra, Crawford, van Baar, Brouwers, & Pop, 2006; Man, Brown, & Serunian, 1991; Pop et al., 2003; Pop et al., 1999). Notably these effects are correlated with both degree (Henrichs et al., 2010; Pop et al., 1999) and duration (Pop et al., 2003) of maternal hypothyroxinemia (SAB for the U.S. EPA, 2013, p. 10).

The EPA did not find analogous evidence linking minor perturbations in thyroid hormones during infancy to adverse neurodevelopmental outcomes in infants. This finding is consistent with conclusions by the California Environmental Protection Agency (CalEPA) in their assessment of a public health goal for perchlorate (California Environmental Protection Agency, 2011, p. 90).

Specifically, two studies evaluated both the impact of maternal hypothyroxinemia and infant fT4 levels on subsequent neurodevelopmental outcomes. Costeira et al. (2011) found that children born to mothers with low fT4 in the first trimester had increased odds of mild-to-severe delays in

---

[3] Given that the current version of the BBDR model contains a TSH feedback loop and the infant models previously developed did not contain this feedback loop, this comparison is done with the feedback loop turned off.

Case 3:17-cv-02162-EMC Document 188-2 Filed 05/05/20 Page 1484 of 1525

psychomotor development compared to children born to mothers with normal fT4 levels. However, the authors found that neonatal thyroid status (measured on day 3 after birth) did not influence development. Additionally, Henrichs et al. (2010) found in their evaluation that although maternal hypothyroxinemia was associated with language delay and nonverbal cognitive delay, the neonatal thyroid status (thyroid hormones measured in cord blood) did not explain the relationship between maternal hypothyroxinemia, early pregnancy, and children's cognitive impairment.

The SAB pointed to two lines of evidence supporting their suggestion of the infant as a potentially sensitive population to perchlorate: Preterm infants that experience transient hypothyroxinemia of prematurity (THOP) and infants that experience congenital hypothyroidism (SAB for the U.S. EPA, 2013). Thus, sufficient thyroid hormone levels in infancy are necessary for the infant brain to develop properly. However, the best evidence linking perturbations in thyroid hormone levels to disrupted neurodevelopment for infants are in individuals with significant thyroid deficiencies manifesting as clinical conditions (*e.g.,* THOP and congenital hypothyroidism). It is unclear and unknown if minor perturbations in thyroid hormones in infants, such as those that could be caused by environmental levels of perchlorate, would result in adverse neurodevelopmental outcomes similar to those seen in the literature for the offspring of first trimester pregnant mothers with hypothyroxinemia. Given the lack of evidence demonstrating minor perturbations in infant fT4 levels as being associated with neurodevelopmental outcomes, the EPA has concluded that it is appropriate to derive the perchlorate MCLG to protect the first trimester fetus of a pregnant mother with low-iodine intake. The EPA concludes that an MCLG calculated to offer a margin of protection against adverse health effects to these fetuses targets the most sensitive lifestage and will be protective of other potentially sensitive life stages as well.

### F. BBDR Model Specification for the Sensitive Population

The BBDR model used to develop the proposed MCLG has two main components:

• A pharmacokinetic model for perchlorate and iodide, which describes chemical absorption, distribution, metabolism, and excretion of perchlorate and iodide; and

• A pharmacodynamic model, which describes the joint effect of varying perchlorate and iodide blood concentrations on thyroidal uptake of iodide and subsequent production of thyroid hormones, including fT4.

The pharmacokinetic model component contains a physiological description of a human mother and fetus during pregnancy (*e.g.,* organ volumes, blood flows) and chemical-specific information (*e.g.,* partition coefficients, volume of distribution, rate constants for transport, metabolism, and elimination) that enable a prediction of perchlorate and iodide internal concentration at the critical target (*i.e.,* thyroidal sodium-iodide symporter of the mother) in association with a particular exposure scenario (route of exposure, age, dose level). This component of the model is similar to many other PBPK models. Because perchlorate does not undergo metabolism in vivo (Clewell et al., 2007), potential uncertainty from this factor of the model is avoided since it does not need to be described.

The pharmacodynamic component of the model uses this internal concentration to simulate how the chemical will act within a known mechanism of action to perturb host systems and lead to a toxic effect.

Thus, the BBDR model estimates serum thyroid hormone levels in the mother at specific gestational weeks, given specific levels of iodine intake, the TSH feedback loop strength, and perchlorate doses. As noted above, to be health protective the EPA chose to model a sensitive individual (an adult woman with low iodine through the first trimester of pregnancy) to derive an MCLG, thereby protecting both this target sensitive population with an adequate margin of safety and those who are less sensitive with an even larger margin of safety.

The BBDR model simulates perchlorate's impact on thyroid hormones at each gestational week from conception to week 16. To derive the MCLG, the EPA selected outputs for gestational week 13 to correspond with the thyroid hormone data reported in Korevaar et al., (2016), which is the basis for the Agency's quantitative relationship between maternal thyroid hormone levels and neurodevelopmental impacts.

Individuals with low iodine intake have increased sensitivity to perchlorate's impact on thyroid hormone levels because the functional iodide reserve of the hypothalamic-pituitary-thyroid (HPT) system is limited (Blount et al., 2006, Steinmaus et al., 2007; Leung, Pearce, &

Braverman, 2010). The EPA selected an iodine intake level of 75 µg/day to simulate an individual with low-iodine intake. This value represents an intake between the 15th and 20th percentile of the women of child bearing age population distribution of estimated iodine intake from the National Health and Nutrition Examination Survey (NHANES). The EPA considered using a lower iodine intake level of 50 µg/day, which represents approximately the 5th percentile of the NHANES distribution. At 50 µg/day of iodine intake, however, the BBDR model predicts TSH levels that would be elevated to within the clinically hypothyroid range before exposure to any perchlorate [4] (TSH ranges between 4.51 and 5.41 milli-international units per liter (mIU/L) at zero dose of perchlorate when evaluating gestational weeks 12 or 13). In contrast, at 75 µg/day iodine, the BBDR model concentrations of serum fT4 and TSH are significantly reduced from the population mean but are still within the euthyroid range. Thus, the intake of 75 µg/day is a better approximation of the sensitive population—the offspring of pregnant women who have low fT4.

TSH increases in response to decreases in T4 have been captured in numerous studies that document the relationship between these hormones (Blount et al., 2006; Steinmaus et al., 2013, 2016). The EPA designed the BBDR model to depict this feedback regulation by adjusting a set of three parameters: The number of sodium-iodide symporter sites, the T4 synthesis rate, and the T3 synthesis rate. The BBDR model allows for variability in the strength of the TSH feedback by varying these parameters with a variable called "pTSH." For the MCLG analysis, the EPA used a pTSH value of 0.398, which is the ratio of a median value for TSH

---

[4] For the purposes of this analysis, the EPA evaluated the American Thyroid Association's (ATA's) 2017 recommendations for defining hypothyroidism (Alexander et al., 2017). Specifically the ATA recommends "in the pregnancy setting, maternal hypothyroidism is defined as a TSH concentration elevated beyond the upper limit of the pregnancy-specific reference range" (Alexander et al., 2017, p. 332). ATA goes on to state, in the absence of population- and trimester-specific reference ranges defined by a provider's institute or laboratory, that the TSH reference ranges should be obtained from similar patient populations. From their recommended studies with trimester-specific data on a U.S. population, Lambert-Meserlian et al. (2008) is the largest U.S.-based population with a reference range upper bound of 3.37 mIU/L for the first trimester (and 3.35 mIU/L for the second trimester). Therefore, these values were used to compare to BBDR output TSH values in the first trimester (or second trimester in cases of gestational weeks 15 and 16) to determine the presence of hypothyroidism.

from NHANES (non-pregnant women) to the 97.5 percentile value from NHANES (non-pregnant women). This value represents an assumption that sensitive individuals with high TSH and average fT4 levels exist, and this is

because the stimulus strength of TSH is proportionally weaker. The EPA chose to use a low TSH feedback coefficient to ensure the MCLG is protective of the sensitive population.

Example output from the BBDR model for gestational week 13 and a low TSH feedback coefficient is presented in Table III–1.

TABLE III–1—SUMMARY OF BBDR MODEL RESULTS FOR fT4 LEVELS: PREGNANT WOMEN AT GESTATIONAL WEEK 13, ASSUMING LOW (75 µg/day) IODINE INTAKE AND WITH MUTED TSH FEEDBACK STRENGTH [A]

| Perchlorate dose (µg/kg/day) | Percentile fT4 (pmol/L) [b] (% decrease from 0 dose) | | | |
|---|---|---|---|---|
| | 2.5th | 5th | 10th | 50th |
| 0 | 5.57 | 6.09 | 6.70 | 8.84 |
| 1 | 5.50 (−1.26%) | 6.02 (−1.15%) | 6.63 (−1.04%) | 8.77 (−0.79%) |
| 2 | 5.43 (−2.45%) | 5.96 (−2.24%) | 6.56 (−2.04%) | 8.71 (−1.54%) |
| 3 | 5.37 (−3.59%) | 5.96 (−3.28%) | 6.50 (−2.98%) | 8.64 (−2.26%) |
| 4 | 5.31 (−4.68%) | 5.83 (−4.28%) | 6.44 (−3.89%) | 8.58 (−2.95%) |
| 5 | 5.25 (−5.73%) | 5.77 (−5.23%) | 6.38 (−4.76%) | 8.52 (−3.60%) |
| 6 | 5.19 (−6.73%) | 5.72 (−6.14%) | 6.33 (−5.59%) | 8.47 (−4.23%) |
| 7 | 5.14 (−7.69%) | 5.66 (−7.02%) | 6.27 (−6.39%) | 8.41 (−4.84%) |

[a] pTSH = 0.398; see USEPA, (2018b) for additional information on pTSH.

[b] The 50th percentile is direct output from the BBDR model, and additional percentiles are estimated by assuming a normal distribution with a SD of 1.63. All of the examined study data demonstrated a positive skew, and the lognormal function demonstrated a better fit than a normal distribution. Despite this, the available study data only accounted for variation due to gestation week and did not account for variation in perchlorate and iodine intake in the measured populations. Because perchlorate and iodine can affect fT4 levels, and this relationship produced the estimated median BBDR values, the distribution around values estimated by the model from perchlorate and iodine intake should account for a small reduction in variation due to the effect of perchlorate and iodine intake. Additionally, as iodine has a demonstrated lognormal distribution with strong right skew (e.g., Blount et al., 2007) and is predicted to have a stronger effect on fT4 than perchlorate (see Section 3). The EPA assumed the error around predicted fT4 would likely be closer to normal than lognormal after accounting for perchlorate and iodine intake.

When modeling changes in fT4, the baseline level of fT4 affects the magnitude of changes seen as a result of perchlorate exposure. Therefore, to predict the impact of perchlorate exposure on the population distribution of fT4 for the identified sensitive population, the EPA estimated a distribution for fT4 plasma concentrations around the median modeled values based on fT4 data from studies that were used to calibrate the BBDR model (C. Li et al., 2014; Männistö et al., 2011; Zhang et al., 2016). The EPA assumed the variation around predicted fT4 concentrations for women with low fT4 of childbearing age would likely be close to normal after accounting for perchlorate and iodine intake, and thus estimated a combined standard deviation (SD) using the distributional information from each of the studies (C. Li et al., 2014; Männistö et al., 2011; Zhang et al., 2016). The EPA then used the estimated combined SD to predict a distribution of fT4 around the median fT4 estimated by the BBDR model. To protect the most sensitive population from adverse effects, the EPA chose to use the 10th percentile from this distribution of baseline fT4 to conduct its analyses to account for variability in thyroid hormones in the population.[5]

### G. Epidemiological Literature

The SAB recommended that the EPA integrate BBDR model results with data on neurodevelopmental outcomes from epidemiological studies. There is substantial epidemiological evidence that early pregnancy hypothyroxinemia is a risk factor for a variety of adverse neurodevelopmental outcomes, including those related to both cognition and behavior (Costeira et al., 2011; Finken, van Eijsden, Loomans, Vrijkotte, & Rotteveel, 2013; Ghassabian et al., 2014; Gyllenberg et al., 2016; Henrichs et al., 2010; Júlvez et al., 2013; Kooistra, Crawford, van Baar, Brouwers, & Pop, 2006; Korevaar et al., 2016; Y. Li et al., 2010; Oostenbroek et al., 2017; Päkkilä et al., 2015; Pop et al., 2003, 1999; Roman et al., 2013; van Mil et al., 2012). These individual studies showing that maternal hypothyroxinemia is associated with offspring neurodevelopment are also supported by three meta-analyses (including one full systematic review), all of which conclude maternal hypothyroxinemia is associated with increased risk of cognitive delay, intellectual impairment, or lower scores on performance tests when considering the entire body of evidence on this topic (Fan & Wu, 2016; Thompson et al., 2018; Wang et al., 2016). Additionally,

the American Thyroid Association concludes that ''overall, available evidence appears to show an association between hypothyroxinemia and cognitive development of the offspring'' (Alexander et al., 2017, p. 337).

The EPA did not conduct a full systematic review and weight of evidence evaluation between maternal thyroid hormones and neurodevelopmental outcomes given: (1) The body of scientific literature regarding this association, and (2) the SAB recommendation that the EPA ''consider available data on potential adverse health effects (neurodevelopmental outcomes) due to thyroid hormone level perturbations regardless of the cause of those perturbations'' (p. 25). Instead, the EPA conducted a ''methodologic approach to reviewing the literature'' to evaluate the body of literature on this topic. This approach assisted in extrapolating the relationship modeled by the BBDR model to neurodevelopmental outcomes by concentrating on studies that allowed for evaluation of incremental changes in fT4 as they relate to incremental changes in neurodevelopmental outcomes. More specifically, the EPA only used studies that had sufficient data to show a quantitative relationship between maternal fT4 and a neurodevelopmental outcome. The EPA acknowledges that by not giving any weight to the studies that did not show

[5] For a discussion on the details of the BBDR model, including uncertainties associated with the model the reader is directed to section 3.5 of the MCLG Approaches Report.

a quantitative relationship between fT4 and neurodevelopmental outcomes, the Agency may be overestimating the dose of perchlorate that may be associated with adverse neurodevelopmental outcomes. This is a health protective decision that adds to the margin of safety.

Ultimately, the EPA developed a dose-response function that estimates incremental changes in a neurodevelopmental endpoint based on a given change in thyroid hormone concentration (fT4), which could be linked to a given dose of perchlorate using the BBDR model.

The specifics of this "methodologic approach to reviewing the literature" follow. First, the EPA identified and screened the available 71 epidemiological studies, which potentially pertained to altered maternal thyroid hormone levels and offspring neurodevelopment to identify candidates based on the following criteria:

• Compatible with the sensitive life stages identified by the NRC and SAB;

• Continuous measure of thyroid hormone values (versus categorical values);

• Low risk of bias based on analysis using the National Toxicology Program's Office of Health Assessment and Translation (OHAT) Risk of Bias (ROB) tool score; and

• Access to underlying data.

Second, using these screening steps, the EPA categorized all 71 studies into three groups. One group consisted of studies that were not compatible[6] with extending the BBDR model (40 studies). Another group consisted of papers that were relevant to the pertinent life stages but did not have data from which a dose-response analysis could be conducted (15 studies). This includes studies that compared differences between groups, for example studies of offspring of mothers with hypothyroxinemia versus offspring of mothers without hypothyroxinemia. Consequently, these studies may have provided insight into the maternal thyroid hormone and offspring neurodevelopment relationship but did not have enough information to develop a continuous dose-response function.

The last group of papers had data that may inform a dose-response function (16 studies). This last group of papers included publications that may have had categorical analyses but also presented data that assessed fT4 as a continuous variable and the outcome of interest. In most instances, the continuous fT4 variable encompassed the full range for fT4 and not just the hypothyroxinemic range. After excluding one paper due to a high risk of bias (Kastakina et al., 2006) 15 papers remained that potentially had dose-response data between a continuous measure of fT4 and various neurodevelopmental outcomes describing cognition, behavior and other outcomes. The EPA notes that by selecting the papers that potentially had dose response data the Agency is deviating from the systematic weight of evidence review approach to identify those studies that the SAB recommended we examine to derive the MCLG.

Third, from these 15 papers five were selected for dose response assessment—four related to cognition (Finken et al., 2013; Korevaar et al., 2016; Pop et al., 2003, 1999) and one related to behavior (Endendijk, Wijnen, Pop, & van Baar, 2017). The other ten papers were excluded for a variety of reasons including updated analyses being presented in a different paper for which dose-response analysis was being conducted, lack of all the data needed to complete a dose-response assessment (e.g., dose-response results were presented as "per standard deviation of fT4" but the standard deviation needed to fully interpret the results for a continuous function was not presented in the paper, statistical methods presented in the paper were insufficient to allow for the derivation of a concentration response function), or a lack of a relationship between maternal fT4 as a continuous variable and the outcome of interest evaluated in the paper. For example, Noten et al., (2015) found a relationship between maternal hypothyroxinemia and offspring arithmetic test performance. However, maternal fT4 as a continuous variable across the entire fT4 range was not

associated with arithmetic test performance. Given this null finding, as well as the lack of published literature evaluating maternal fT4 as a continuous variable and arithmetic test performance, it would be difficult for the Agency to justify setting an MCLG based on changes in this endpoint.

As laid out for the peer reviewers, for each study that met the criteria identified above for dose-response modeling, a relationship between maternal thyroid hormone levels (specifically fT4) and offspring neurodevelopment was derived (see USEPA, 2018b). These relationships were either presented in the original published paper or derived by the EPA through either the digitization of figures or through re-analysis of data provided by the study authors. The EPA used the upper effect estimate (the upper bound of the 95th percent confidence interval) from each study to assure consideration of the populations likely to be at greater risk from the dose of perchlorate associated with a given change in fT4.

Table III–2 provides a summary of the changes in fT4 predicted to produce a 1, 2, and 3 percent decrease in any given neurodevelopmental effect and corresponding perchlorate doses. The choice of 1, 2, and 3% is based on the analyses for IQ, Mental Development Index (MDI), and Psychomotor Development Index (PDI). Specifically, a 1%, 2%, or 3% change from the standardized mean for each test (i.e., 100 points) equates to a 1, 2, or 3 point change, respectively. The analyses for anxiety/depression score and SD of reaction time are based on a 1%, 2%, or 3% change from the study mean of each measure, which for anxiety/depression is 0.01, 0.02, or 0.03 points, respectively, and for reaction time is 2.7, 5.4, and 8.1 milliseconds (study mean SD of reaction time = 270 ms), respectively (Endendijk et al., 2017; Finken et al., 2013).

These results provide the potential impacts of perchlorate on maternal fT4 (as predicted by the BBDR model) and subsequent neurodevelopmental impacts (derived from the epidemiologic literature[7]).

---

[6] For example, if the study evaluated the impact of only neonatal thyroid hormones (i.e., at a potentially sensitive life stage), it cannot be used because the BBDR model is specific to early pregnancy. Further, if the study evaluates a population with an existing disease (i.e., hypothyroidism) that may have a different response to perchlorate compared to the euthyroid population, it was not considered compatible with BBDR model results. Additionally, if the study does not include information on T4 or fT4, it does not assist in understanding the implications of the BBDR modeling results. Another reason for exclusion at this stage include that the study does not have a population with an exposure window (i.e., when the thyroid hormone measurements are taken) that overlaps with the outputs for the BBDR model. Specifically, the study should evaluate thyroid hormone levels in pregnant mothers between conception and gestational week 16. The

neurodevelopmental outcomes could be measured at any life stage.

[7] For a more complete description of all the studies evaluated the reader is directed to Sections 5 and 6 of the MCLG Approaches Report. For a discussion on the uncertainties related to the approach the reader is directed specifically to section 6.5.

**Table III-2. Estimated Dose of Perchlorate per 1, 2, and 3 Percent Decrease[a] in Neurodevelopment for the Population of Low-Iodine Intake Women of Reproductive Age Based on Upper Effect Estimates at the 10th Percentile fT4 Level[b]**

| Study | End-point | Dose-Response Function | $\beta$ (95% CI) | $\Delta$fT4 in pmol/L Associated with a 1% to 3% Decrease in Endpoint (% $\Delta$fT4 from 0 dose perchlorate, iodine intake = 75 µg/day)[a,b,c] | | | Dose of Perchlorate per 1% to 3% Decrease in Endpoint (µg/kg/day)[a,b,c] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 1% | 2% | 3% | 1% | 2% | 3% |
| Korevaar et al., (2016) Quadratic | IQ | $\Delta IQ = (\beta_1 \times lnfT4_2 + \beta_2 \times ln(fT4_2)^2) - (\beta_1 \times lnfT4_1 + \beta_2 \times ln(fT4_1)^2)$ | $\beta1 = 33.8$ (9.8, 57.8) $\beta2 = -6.2$ (-10.6, -1.9) | -0.13 (1.9%) | -0.25 (3.8%) | -0.38 (5.7%) | 1.9 | 3.9 | 6.1 |
| Korevaar et al., (2016) EPA independent analysis | IQ | $\Delta IQ = (\beta_1 \times \ln(fT4_2)) - (\beta_1 \times \ln(fT4_1))$ | 17.26 (3.77, 30.75) | -0.21 (3.1%) | -0.41 (6.2%) | -0.61 (9.2%) | 3.1 | 6.7 | 10.8 |
| Pop et al., (2003) | MDI | $\Delta MDI = \beta \times \Delta fT4$ | 6.3 (1.92, 10.6) | -0.09 (1.0%) | -0.19 (2.8%) | -0.28 (4.2%) | 1.3 | 2.8 | 4.3 |
| Pop et al., (2003) | PDI | $\Delta PDI = \beta \times \Delta fT4$ | 8.4 (4.0, 12.8) | -0.08 (0.9%) | -0.16 (2.4%) | -0.23 (3.5%) | 1.1 | 2.3 | 3.5 |
| Pop et al., (1999) | PDI | $\Delta PDI = \beta \times \Delta fT4$ | 8.5 (0.01, 17.0) | -0.06 (0.6%) | -0.12 (1.8%) | -0.18 (2.6%) | 0.8 | 1.7 | 2.6 |

| Study | End-point | Dose-Response Function | $\beta$ (95% CI) | $\Delta$fT4 in pmol/L Associated with a 1% to 3% Decrease in Endpoint (% $\Delta$fT4 from 0 dose perchlorate, iodine intake = 75 µg/day)[a,b,c] | | | Dose of Perchlorate per 1% to 3% Decrease in Endpoint (µg/kg/day)[a,b,c] | | |
|---|---|---|---|---|---|---|---|---|---|
| Endendijk et al., (2017) | Anxiety/ depression score | $\Delta AD = \left(\dfrac{1}{\beta * fT4_2}\right) - \left(\dfrac{1}{\beta * fT4_1}\right)$ | 0.12 (0.11, 0.13) | -0.03 (0.45%) | -0.08 (1.2%) | -0.12 (1.9%) | 0.4 | 1.1 | 1.8 |
| Finken et al., (2013) | SD of reaction time | $\Delta$SD Reaction Time (ms) = $\beta \times \Delta$ fT4 | -4.9 (-9.5, -0.2) | -0.28 (4.2%) | -0.57 (8.5%) | -0.85[d] (12.7%) | 4.4 | 9.8 | 16.5[d] |

[a]. The analyses for IQ, Mental Development Index (MDI), and Psychomotor Development Index (PDI) are based on a 1%, 2%, or 3% change from the standardized mean for each test (i.e., 100 points), which equates to a 1, 2, or 3 point change, respectively. The analyses for anxiety/depression score and SD of reaction time are based on a 1%, 2%, or 3% change from the study mean of each measure, which for anxiety/depression is 0.01, 0.02, or 0.03 points, respectively, and for reaction time is 2.7, 5.4, and 8.1 milliseconds (study mean SD of reaction time = 270 ms), respectively.

[b]. This is based on the regression analysis for the range of fT4 data within each study using the upper beta estimates from the 95% CI. These results are for the low-iodide intake population of 75 µg/day. In all functions, fT4 is in units of pmol/L.

[c]. The BBDR model with a pTSH of 0.398 was used for these analyses.

[d]. The value which results in a 3% change in the standard deviation of reaction time falls between 16 and 17 µg/kg/day. Because data was not available on the changes of fT4 at doses between 16 and 17 µg/kg/day perchlorate, the EPA took the midpoint of the range of values for the change in fT4 at 16 and 17 µg/kg//day and assumed the dose of perchlorate associated with this change was the midpoint between 16 and 17 µg/kg/day.

*H. Identifying a Point of Departure for Developing the MCLG*

From the seven analyses presented in Table III–2 above, the EPA chose to use its independent analysis of the Korevaar et al., (2016) data (comprising of 3,600 useable mother/child data pairs) as the basis for calculating the point of departure (POD) for the MCLG. There are three reasons for this selection: (1) There is sufficient quantitative data to derive a health impact function for the sensitive population of concern; (2) the analysis adjusts for an appropriate set of confounders, and (3) the neurodevelopmental endpoint—intelligence quotient (IQ)—is more straightforward to interpret because there is more national and cross-national data available (more on the selection of this endpoint below). The other studies presented in Table III–2 do not provide one or more of these features (USEPA, 2018b).

The five identified papers evaluated a variety of endpoints with Korevaar et al., (2016) evaluating IQ, Pop, Kuijpens,

et al., (1999) and Pop, Brouwers, et al., (2003) using the Bayley Scale to evaluate PDI and MDI, Finken, van Eijsden, Loomans, Vrijkotte, and Rotteveel (2013) evaluating the SD of reaction time, and Endendijk, Wijnen, Pop, and van Baar (2017) evaluating anxiety/depression scores using the Child Behavioral Check List (CBCL). The SD of reaction time from Finken et al., (2013) was not well-received by the peer reviewers (External Peer Review for U.S. EPA, 2018) because it is difficult to ascertain the true implications of a change in the SD of reaction time. The Endendijk et al., (2017) study was identified after the peer review so no feedback was given on the appropriateness of the endpoint; however, the anxiety/depression raw score is not an intuitively interpretable endpoint. Further, neither the Endendijk et al., (2017) nor the Finken et al., (2013) analyses had functions for the sensitive life stage (i.e., their analyses were based on the full range of fT4 levels and did not concentrate on

the impacts of low-end fT4 levels). For these reasons, the Endendijk et al., (2017) and Finken et al., (2013) papers were not selected for further evaluation.

The Korevaar et al., (2016) original and independent analyses are preferable compared to the Pop, Kuijpens, et al., (1999) and Pop, Brouwers, et al., (2003) studies because neither function derived from the Pop et al., studies was adjusted for confounders. Additionally, both Pop et al., papers have an N <50 compared to the Korevaar et al., analyses, which have an N of greater than 3,600.[8]

Although the original Korevaar et al., (2016) analysis was the most rigorous analysis available in the literature to date, the Korevaar et al., (2016) EPA reanalysis was chosen over the original analysis because it included modifications to the analysis at the suggestion of the peer review panel. The

[8] The original Korevaar et al. (2016) analysis included 3,839 mother/child pairs. The EPA reanalysis of the Korevaar et al. (2016) data had a slightly lower N of 3,609 due to the exclusion of subjects with imputed values for maternal fT4.

revised analysis controls for a more parsimonious set of confounders (e.g., previously included variables such as infant gender, maternal parity, birthweight, mother's body mass index (BMI), and gestational age at blood draw that are not related to both the exposure and the outcome were excluded), thus decreasing the chances of overfitting the estimation of the association between maternal fT4 and child IQ. The EPA was prompted to revisit the original Korevaar et al., (2016) model because of the feedback received during the peer review of the MCLG Approaches Report. Specifically, a member of the peer-review panel expressed the following suggestion:

*Korevaar et al., [2016] controlled for instrumental variables (e.g. gestational week at [fT4 measurement] as well as variables that are consequences of altered fT4 (e.g. maternal BMI), which may have biased estimates. This study also assumed a log-linear relation between fT4 and the outcome but it is unclear whether the data fit this functional form better than a linear form. Reanalysis of the data performed by EPA should not include the variables noted above, which may have driven measures of association towards the null, and should investigate the most appropriate functional form to inform decisions about transformation of fT4 values* (External Peer Reviewers for U.S. EPA, 2018, pp. 61–62).

The EPA responded to this suggestion by developing a causal model for the effect of maternal fT4 on child IQ to identify the minimum set of confounding variables, testing the proper functional form of the relationship between maternal fT4 and child IQ in the Korevaar et al., (2016) data, and making decisions about data quality and influential data points in the analysis. That is, the EPA determined that there were values of the independent variable of interest, fT4, in the original analysis that were imputed using multiple imputations. This could have impacted the effect estimate of the independent variable of interest with data that were not directly measured. The EPA reanalysis excludes these non-measured values. Subsequently, the EPA selected the Korevaar et al., (2016) reanalysis as the most appropriate function from which to assess the relationship between fT4 and IQ.[9]

As indicated above, the EPA has utilized a health protective approach to this analysis consistent with the SDWA

definition of the MCLG. The peer reviewers commented that this approach was fit-for-purpose. In particular, the Agency assumed it could estimate risk reductions based on evidence of a quantifiable relationship between thyroid hormone changes and neurodevelopmental outcomes. The existence of a quantifiable relationship between thyroid hormone changes and neurodevelopmental outcomes has strong support from the literature on the subject; however, not every study identified an association between maternal fT4 and the specified outcome of interest, and the state of the science on this relationship is constantly evolving. As explained earlier, the results of the EPA's dose-response literature review identified 31 studies that evaluated the association between maternal thyroid hormone levels and offspring neurodevelopment, with neurodevelopment defined using a variety of endpoints related to cognition, behavior, and other outcomes such as autism. Among these studies, only 16 were deemed to potentially possess information that could inform a dose-response relationship. The other 15 only presented data on categorical analyses assessing the impact of maternal hypothyroxinemia on the neurodevelopmental outcomes of interest. Therefore, because the data presented was only a comparison of two groups, there was not information that could be used to inform a dose-response function.

Of the 16 studies that potentially had data to inform a dose-response function, 10 evaluated cognition using a variety of tests including various IQ tests (three papers; Ghassabian et al., 2014; Korevaar et al., 2016; Moleti et al., 2016), Bayley Scales of Infant Development (two papers; Pop et al., 1999; Pop et al., 2003), and other validated tests associated with child cognition such as expressive language delay or test performance (five papers; Finken et al., 2013; Henrichs et al., 2010; Kastakina et al., 2006; Noten et al., 2015; Oken et al., 2009). Six of these papers found a statistically significant relationship between maternal fT4, as a continuous variable, and offspring cognitive outcome (Korevaar et al., 2016; Pop et al., 1999; Pop et al., 2003; Finken et al., 2013; Henrichs et al., 2010, Kastakina et al., 2006). However, there were studies where maternal fT4 as a continuous variable was not significantly associated with the outcome of interest. For example, in Ghassabian et al., (2014) the authors found maternal hypothyroxinemia to be associated with an average of a 4.3-point

reduction in IQ in their offspring compared to offspring of non-hypothyroxinemic mothers. Nevertheless, when assessing the relationship between the continuous measure of maternal fT4 as a continuous variable (across the entire range of fT4 levels) and child IQ, the authors did not find a significant relationship. Additionally, Moleti et al., (2016) found the relationship between maternal fT4 and child IQ to be consistently inversely associated with IQ scores, but their assessment failed to reach statistical significance. This study included fewer than 60 study participants and was considered by the authors to be a pilot assessment.

In addition to the cognitive effects assessed and modeled, the EPA identified four papers that assessed maternal fT4 status and behavioral outcomes (Endendijk et al., 2017; Ghassabian et al., 2011; Modesto et al., 2015; Oostenbroek et al., 2017), one paper that assessed maternal fT4 status and autism (Roman et al., 2013) and one paper that evaluated odds of a schizophrenia diagnosis as associated with maternal thyroid hormone status (Gyllenberg et al., 2016). From this group of papers, the majority of papers found an association either between maternal hypothyroxinemia or maternal fT4 as a continuous variable and the outcome of interest (Endendijk et al., 2017; Modesto et al., 2015; Oostenbroek et al., 2017; Roman et al., 2013; Gyllenberg et al., 2016). However, this was not always the case as exemplified by Ghassabian et al., (2011) and Gyllenberg et al., (2016). Although Endendijk et al., (2017) found maternal fT4 to have a significant adverse impact on anxiety/depression using the Child Behavioral Check List (CBCL), Ghassabian et al., (2011) did not find any association between maternal thyroid hormone status and offspring score on various components of the CBCL. Additionally, Gyllenberg et al., (2016) found maternal hypothyroxinemia during early to mid-gestation was associated with 70% increased odds of schizophrenia diagnosis in offspring of hypothyroxinemic mothers compared to the offspring of non-hypothyroxinemic mothers. Gyllenberg et al., (2016) also found an association with odds of schizophrenia diagnosis using conditional logistic regression when assessing fT4 as a continuous variable across the entire fT4 range (i.e., not just the hypothyroxinemic range); however, this relationship was attenuated after controlling for smoking.

Not every paper the EPA located in its literature review found a statistically

---

[9] A more complete description of the EPA independent analysis of the Korevaar et al. (2016) data can be found in Section 6.3.2 of the MCLG Approaches Report.

significant association between maternal fT4 as a continuous variable (*i.e.*, the initially identified 16 studies identified as potentially useful to inform a dose-response function) and the neurodevelopmental outcome of interest. However, many studies located in the EPA literature review, several meta-analyses (Fan & Wu, 2016; Thompson et al., 2018 and Wang et al., 2016), the American Thyroid Association (Alexander et al., 2017) and the U.S. EPA's SAB (2013) have concluded there is a relationship between maternal hypothyroxinemia and various neurodevelopmental outcomes. The relationship between maternal fT4 levels and neurodevelopmental outcomes appears strongest in the hypothyroxinemic range, and when looking at the entire range of fT4 as a continuous variable (as opposed to a categorical cut off), the significant relationship between the two variables may dissipate. Therefore, the EPA has concentrated on the neurodevelopmental impacts of changes in fT4 in the lower range of fT4 from Korevaar et al., (2016) data. In an attempt to minimize uncertainty, the EPA reanalyzed the data collected by Korevaar et al., (2016) using a spline function that estimates a coefficient specifically for the low range of the fT4 data.

There are a variety of neurodevelopmental endpoints used to examine behavior and cognition in children (*e.g.*, intelligence quotient (IQ), motor skills, vocabulary and language development, stimulus responsiveness, etc.). The EPA selected IQ decrements because this was the endpoint evaluated in the Korevaar et al., (2016) study. The EPA determined that the Korevaar study was the most rigorous analysis that examined the relationship between decreased thyroid hormones and neurodevelopmental effects. As such, in the derivation of the MCLG, IQ is a surrogate for a suite of potential neurodevelopmental effects that might occur to the offspring of hypothyroxinemic and iodine deficient mothers.

There are several different tests that are widely used to measure IQ in children, including the Stanford-Binet and the Wechsler Intelligence Scale for Children (WISC) (Sternberg et al., 2001). Each of these tests is intended to assess a child's global functioning and uses a numerical IQ point scale (Beres et al., 2000). IQ scores are standardized by age and sex group with a mean score of 100 points and a standard deviation of 15 (Beres et al., 2000). Although the specific tasks differ by test, all IQ tests contain a number of tasks to assess

diverse skills (Sternberg et al., 2001). For example, the WISC test evaluates full-scale IQ using a combination of verbal and performance scales (verbal IQ and performance IQ may also be assessed separately) (Beres et al., 2000). The verbal scale includes tasks such as arithmetic, vocabulary, and comprehension, while the performance scale includes tasks such as picture completion, block design, and object assembly (Beres et al., 2000). The WISC was standardized using a sample of 2200 U.S. children aged 6 to 16 years old (Seashore et al., 1950). It has been well validated and has demonstrated high reliability, with a reliability coefficient of 0.96 observed across age groups (Beres et al., 2000).

Associations have been found between IQ scores and both educational achievement and attainment, though observed correlations vary widely. In a review of the literature, Sternberg et al., (2001) suggest that IQ scores explain approximately 25% of the variance in academic achievement. Evidence also suggests that IQ is linked to career outcomes and job performance, with observed correlations ranging from approximately 0.2 to 0.6 (Sternberg et al., 2001). Research suggests that children's rearing environment, including parental education, while growing up may increase IQ scores in adolescence by several points (*e.g.*, Kendler et al., 2015).

IQ scores have been used to help diagnose disorders such as intellectual disability and to identify children for placement into specialized learning programs (Beres et al., 2000). For example, in the Diagnostic and Statistical Manual of Mental Disorders, fifth edition (DSM–V) IQ scores are used in an individual's comprehensive assessment to determine intellectual disability, which pairs standardized testing of intelligence with a clinical assessment of adaptive functioning. Intellectual disability is considered for individuals with an IQ score of about 70 or below (American Psychiatric Association, 2013).

The EPA uses a variety of science policy approaches to select points of departure for developing regulatory values. For instance, in noncancer risk assessment the EPA often uses a percentage change in value. When assessing toxicological data, a 10 percent extra risk (for discrete data), or a 1 standard deviation (*i.e.*, 15 IQ points) change from the mean (for continuous data) is often used (USEPA, 2012). A smaller response to inform a POD has been applied when using epidemiological literature because there is an inherently more direct relationship

between the study results and the exposure context and health endpoint. Given the difficulty in identifying a response below which no adverse impact occurs when considering a continuous outcome in the human population, the EPA looked to its Benchmark Dose Guidance (2012) for insight regarding a starting point. Specifically, ''[a] BMR of 1% has typically been used for quantal human data from epidemiology studies'' (p. 21, USEPA, 2012).

For the specific context of setting an MCLG for perchlorate, the EPA made a policy decision to evaluate the level of perchlorate in water associated with a 1 percent decrease, a 2 percent decrease, and a 3 percent decrease in the mean population IQ (*i.e.*, 1, 2 and 3 IQ points). The EPA selected IQ as a surrogate for neurodevelopmental effects based upon its evaluation of the epidemiological literature describe above. The need to utilize the best available peer reviewed data to inform scientific assumptions and policy choices to meet the statutory requirements associated with developing an MCLG under the SDWA highlights the challenges associated with regulating chemicals for which potential effects are indirect, and scientific data do not address all uncertainties. The Agency must make a policy decision informed by science, consistent with statutory requirements even in situations where the data do not provide clear choices. To develop the proposed MCLG for perchlorate, the EPA made a policy decision to use a 2 IQ point decrement in the population-distribution of IQ for the sensitive population. By selecting this approach, the EPA is not establishing a precedent for future Agency actions on other contaminants for which there is concern about potential thyroid effects, either under the SDWA or other statutory frameworks.

Applying these response rates to the results from the reanalysis of Korevaar et al., (2016), results in a POD dose of 3.1 μg/kg/day for a 1 point decrease in the sensitive population's IQ, a POD dose of 6.7 μg/kg/day for a 2 point decrease in the sensitive population's IQ, and a POD dose of 10.8 μg/kg/day for a 3 point decrease in the sensitive population's IQ. These PODs associated with a 1, 2, or 3 point decrease from the standardized mean IQ are calculated for the most sensitive population. Specifically, the POD is designed to provide an adequate margin of safety for the fetuses of mothers with fT4 at the 10th percentile of a population with iodine intake of 75 μg/day and a TSH feedback loop that is less than 60% as effective as individuals with median

TSH feedback loop efficacy. That is, the analysis is designed to protect the population of fetuses of mothers with suboptimal thyroid functioning. For these reasons, and for the methodological reasons described previously, the EPA believes that the selection of these parameters and this point of departure assures no known or anticipated adverse effects on the health of the most sensitive population and allows for an adequate margin of safety.

*I. Translate PODs to RfDs*

When deriving an RfD the EPA evaluates whether to apply uncertainty/variability factors to account for heterogeneity of effect in the target population and data gaps (USEPA, 2002). As presented in *A Review of the RfD & RfC Processes* (USEPA, 2002) the EPA considers the following uncertainty factors: Inter-individual variability, interspecies uncertainty, extrapolating from subchronic to chronic exposure, extrapolating from a lowest-observed adverse effect level (LOAEL) rather than from a no-observed-adverse-effect-level (NOAEL), and an incomplete database. The factors are intended to account for: (1) Variation in susceptibility among the members of the human population (*i.e.,* inter-individual or intraspecies variability); (2) uncertainty in extrapolating animal data to humans (*i.e.,* interspecies uncertainty); (3) uncertainty in extrapolating from data obtained in a study with less-than-lifetime exposure (*i.e.,* extrapolating from subchronic to chronic exposure); (4) uncertainty in extrapolating from a LOAEL rather than from a NOAEL; and (5) uncertainty associated with extrapolation when the database is incomplete. (U.S. EPA, 2011b) The EPA has considered each of these factors in deriving an RfD to inform an MCLG for perchlorate.

The EPA considered variation and uncertainty in the relationship between exposure and response among the members of the human population (*i.e.,* uncertainty factor (UF) for within-human variability/inter-individual variability, $UF_H$). For this analysis a UF of 3 is used. The approach taken to derive the RfD attempts to address variability between the general population and the sensitive population. Specifically, the EPA was able to modify the strength of the TSH feedback loop and iodine intake levels in the BBDR model and concentrate on the dose-response relationship between lower level (as opposed to median level) fT4 and neurodevelopmental outcomes. However, there is still uncertainty in the relationship between perchlorate exposure and subsequent neurodevelopmental outcomes.[10] There are very few toxicokinetic calibration data available for the perchlorate to thyroid hormone relationship described in the BBDR model. On the toxicodynamic side of the BBDR model, aspects such as competitive inhibition at the NIS, depletion of iodide stores under different iodine intake levels and physiological states, and the ability of the TSH feedback loop to compensate for perturbations in thyroid function each have their own uncertain features. There are also uncertainties linking maternal fT4 levels to offspring IQ. These uncertainties include the population for which dose-response information is available (*i.e.,* no study is U.S. based), a lack of study information on the iodine intake status for the population for which the dose-response information is available, uncertainties around the methods used to assess maternal fT4 measurement during pregnancy, and uncertainties related to the true distribution of fT4 for a given iodine intake.

Further, as discussed in section III.C of this preamble the EPA believes that protecting the fetus of a hypothyroxinemic woman will protect other identified sensitive life stages. However, there is some uncertainty due to the lack of information linking incremental changes in infant thyroid hormone levels to adverse neurodevelopmental outcomes. In addition, this analysis is assuming that protecting a first trimester fetus from alterations in maternal fT4 will protect the fetus throughout pregnancy. This is based on epidemiologic evidence that shows the relationship between first trimester maternal fT4 and neurodevelopmental outcomes. This is potentially because before mid-gestation, the mother is the only source of thyroid hormone for the fetus (Morreale de Escobar et al., 2004). Therefore, when evaluating maternal fT4 as associated with neurodevelopmental outcomes it is critical to understand the first-trimester levels. Later in gestation, when the fetal thyroid begins secreting thyroid hormones, maternal fT4 may no longer be a good surrogate for the thyroid hormone levels available to the fetus. Given that the fetal thyroid has had little time to develop, its iodine storage is much less than that of an adult, hence there may be more sensitivity to short-term fluctuations in iodine availability and uptake that may have little impact on maternal levels. Therefore, there is some uncertainty about the impact perchlorate may have on the fetal thyroid gland, and subsequent neurodevelopmental impacts, in later trimesters of pregnancy. The immature fetal HPT axis has very limited capacity to increase output of thyroid hormones (Savin, Cvejić, Nedić, & Radosavljević, 2003; van Den Hove, Beckers, Devlieger, De Zegher, & De Neyer, 1999), so the fetal HPT may not be able to adjust output in the face of reduced maternal fT4 supply and perchlorate exposure. Therefore, as described above, the EPA selected an intraspecies UF of 3 to account for the uncertainties in modeling the impacts of perchlorate ingestion on the thyroid hormone levels for pregnant mothers with low iodide intake, and the uncertainties in predicting the neurodevelopmental effects of these thyroid hormone changes on their children.

The EPA considered but did not derive a Data-Dependent Extrapolation Factor (DDEF) for this analysis. As described above, the UFs are applied based on the uncertainties in the perchlorate to thyroid hormone and thyroid hormone to neurodevelopment relationship.[11] As noted above, the Agency has opted to apply a UF of 3 to the POD, which adds an adequate margin of safety to the MCLG derivation. Section 4.4.5.3 (p. 4–42) of *A Review of the RfD & RfC Processes* recommends reducing the intraspecies UF from a default of 10 "only if data are sufficiently representative of the exposure/dose-response data for the most susceptible subpopulation(s)" (p. xviii, USEPA, 2002). The EPA selected a UF of 3 instead of the full 10 because the modeled groups within the population that are identified as likely to be at greater risk to perchlorate in drinking water (*i.e.,* the fetus of the iodide deficient pregnant mother) and has selected model parameters to account for the most sensitive individuals in that group (*i.e.,* muted TSH feedback, low fT4 values, low-iodine intake).

Below we list the other uncertainty factors added and the justification.

• Uncertainty in extrapolating animal data to humans (*i.e.,* interspecies uncertainty) (uncertainty factor, animal-to-human, $UF_A$). For this analysis an UF of 1 is used because this factor is not applicable since animal studies were

---

[10] For a more complete discussion on the uncertainties in the analysis the reader is directed to Sections 3.5 and 6.5 of the MCLG Approaches Report.

[11] As explained in U.S. EPA, 2014 "UFs incorporate both extrapolation components that address variability (heterogeneity between species or within a population) and components that address uncertainty (*i.e.,* lack of knowledge) . . . whereas DDEFs focus on variability" (p. 7, US EPA, 2014).

not used to develop the BBDR model nor were they used to relate alterations in maternal fT4 to IQ.

• Uncertainty in extrapolating data obtained in a study with less-than-lifetime exposure to lifetime exposure (*i.e.,* extrapolating from subchronic to chronic exposure, UF$_S$). An uncertainty factor of 1 is used. Extrapolation from subchronic to chronic exposures did not occur as the BBDR model was designed to assess long-term steady-state conditions in the non-pregnant woman and week-to-week variation in pregnancy, rather than short-term (hour-to-hour or day-to-day) fluctuations.

• Uncertainty in extrapolating from a LOAEL rather than from a NOAEL (uncertainty factor, LOAEL-to-NOAEL, UF$_L$). A more sophisticated BBDR modeling approach, coupled with extrapolation to changes in IQ using linear regression, was used to determine a POD that would not be expected to represent an adverse effect. Subsequently an uncertainty factor of 1 is used. LOAELs and NOAELs were not identified or used in this approach.

• Uncertainty factor for database deficiency to address the potential for deriving an inadequately protective RfD in the instance where the available database provides an incomplete

characterization of the chemical's toxicity (database deficiency, UF$_D$; USEPA, 2002). An uncertainty factor of 1 is used as ''[t]he mode of action of perchlorate toxicity is well understood'' (SAB for the U.S. EPA, 2013, p. 2).

• The product of all the uncertainty factors (UF$_H$) is 3 ($3 \times 1 \times 1 \times 1$).

Below we generate RfD's for each of the points of departure.

Using the POD of 6.7 μg/kg/day based on a 2 percent decrease in the population standardized mean IQ from the EPA's independent analysis of the Korevaar et al., (2016) data, the EPA can derive a RfD by incorporating the UF$_H$, which results in the following:

$$RfD = \frac{POD}{UF_H} = \frac{6.7}{3} = 2.2 \ \frac{\mu g/kg}{day}$$

Using an alternative POD of 3.1 μg/day based on a 1 percent decrease in population standardized mean IQ from

the EPA's independent analysis of the Korevaar et al., (2016) data, the EPA can

derive an RfD by incorporating the UF$_H$. This results in the following:

$$RfD = \frac{POD}{UF_H} = \frac{3.1}{3} = 1.0 \ \frac{\mu g/kg}{day}$$

Using an alternative POD of 10.8 μg/kg/day based on a 3 percent decrease in the population standardized mean IQ

from the EPA's independent analysis of the Korevaar et al., (2016), the EPA

can derive an RfD by incorporating the UF$_H$. This results in the following:

$$RfD = \frac{POD}{UF_H} = \frac{10.8}{3} = 3.6 \ \frac{\mu g/kg}{day}$$

*J. Translate RfD Into an MCLG*

To translate the RfD (μg/kg/day) to a concentration in drinking water (μg/L), the EPA used the following equation:

$$W \left(\frac{\mu g}{L}\right) = \frac{RfD}{DWI} \times RSC_w$$

Where:

W = drinking water concentration of perchlorate in micrograms per liter (μg/L);

RfD = reference dose (1.03 μg/kg/day for a 1 percent decrease in IQ, 2.23 μg/kg/day for a 2 percent decrease in IQ, or 3.6 μg/kg/day for a 3 percent decrease in IQ);

DWI = bodyweight-adjusted drinking water ingestion rate (L/kg/day); and

RSC$_w$ = relative source contribution of drinking water to overall perchlorate exposure.

To calculate the MCLGs, the EPA selected the 90th percentile body-weight adjusted drinking water ingestion rate

specific to women of childbearing age (*i.e.,* non-pregnant, non-lactating, 15–44 years of age (0.032 L/kg/day). This decision is consistent with the analysis used in deriving an RSC, which was performed using food consumption information for a population of women of childbearing age from NHANES. The 90th percentile is chosen to account for variability in drinking water ingestion rates, but also adds another layer of health protection for 90% of women (Table III–3).

The EPA did not use water intake data for pregnant women because the sample

sizes were too small to be statistically stable. The use of the drinking water intake for 15–44 year old women is consistent with the analysis used in deriving an RSC$_w$ (described below), which was performed using food consumption information for a population of women of childbearing age from NHANES. The EPA acknowledges there is a difference in the age range defining women of childbearing age used to develop the drinking water ingestion rate and that used to develop the RSC (20–44 years of age). The age range used to develop the

RSC was based on the range of ages used to define women of childbearing age in developing the BBDR model. However, the EPA's Exposure Factors Handbook (USEPA, 2011c) identifies drinking water ingestion rates for women 15–44 years of age as corresponding to women of childbearing age.

The age range used for women of childbearing age in the BBDR model fits within the age range used to develop the ingestion rates provided in the Exposure Factors Handbook. Thus, the Agency believes the difference in the age ranges will have minimal impact on the resulting MCLG analysis.

TABLE III–3—CONSUMERS-ONLY ESTIMATED DIRECT AND INDIRECT COMMUNITY WATER INGESTION RATES FROM KAHN AND STRALKA (2008)

[L/kg/day]

| Female population categories | Sample size | Mean | 90th Percentile | 95th Percentile |
|---|---|---|---|---|
| Pregnant ............................................................................ | 65 | [a] 0.014 | [a] 0.033 | [a] 0.043 |
| Lactating .......................................................................... | 33 | [a] 0.026 | [a] 0.054 | [a] 0.055 |
| Non-pregnant, non-lactating, 15 to 44 years of age ...................................... | 2,028 | 0.015 | 0.032 | 0.038 |

[a] The sample size does not meet minimum reporting requirements to make statistically reliable estimates as described in the *Third Report on Nutrition Monitoring in the United States,* 1994–1996 (FASEB/LSRO, 1995).

Individuals are exposed to perchlorate through ingestion of both food and drinking water (ATSDR 2008, Huber et al., 2011). In calculating the MCLGs, the EPA applies a relative source contribution (RSC) to the RfD to account for the percentage of the RfD remaining for drinking water after other sources of exposure to perchlorate have been considered. Thus, the RSC for drinking water is based on the following equation where "Food" is the perchlorate dose from food ingestion:

$$RSC = \frac{RfD - Food}{RfD} \times 100\%$$

To estimate the dose of perchlorate for women of childbearing age coming from food, the EPA implemented a data integration methodology that combined demographic variables, food consumption estimates, and perchlorate contamination estimates in food from multiple sources (USEPA, 2019c). These sources include:

• The NHANES data available from the Centers for Disease Control and Prevention's (CDC) National Center for Health Statistics (NCHS) including the What We Eat in America (WWEIA) 24-hour food diary data (CDC & NCHS, 2007, 2009, 2011); and

• The Food and Drug Administration's (FDA's) Total Diet Study (TDS) (U.S. Food and Drug Administration (FDA), 2015), which analyzes contaminants in about 280 kinds of food and beverages commonly consumed by the U.S. population.

The NHANES data provided individual food consumption profiles for female participants ages 20–44 (the women of childbearing age range used for the BBDR model). The EPA matched TDS perchlorate concentrations with each food consumed by a participant

and calculated each participant's daily perchlorate dose (µg/kg/day) from food using the participant's body weight. The EPA estimated each participant's perchlorate dose using both mean and 95th percentile perchlorate concentrations in food. The details of these assumptions are explained on page 5–5 of the Technical Support Document: Deriving a Maximum Contaminant Level Goal for Perchlorate in Drinking Water (USEPA 2019c). Specifically, the EPA calculated both the mean and the 95th percentile of the perchlorate levels in each food based on the 20 samples included in the TDS data. In order to estimate the 95th percentile from the 20 samples, the EPA used the second-highest test result for each food to represent the 95th percentile concentration. While simple, this method avoids the need to assume a distributional shape for the samples, and has been used in recent publications of TDS data for iodine (Carriquiry et al., 2016). The aforementioned method for identifying the 95th percentile concentration of perchlorate from food was selected over other, more "statistically based" methods for estimating percentiles as it avoids the need to assume a distributional shape for the samples. The EPA determined that it was more reliable to assume the empirically derived distribution as the basis for selecting the 95th percentile (*i.e.*, assuming the distribution was equal to the distribution of samples collected in the TDS), as opposed to forcing a distributional shape, such as normal or log-normal, onto the data that may not necessarily be appropriate. With the chosen method, we can at least be sure that the distributional shape is appropriate for the data at hand,

whereas by choosing the alternative that assumes a distributional shape, in many instances we would not even be certain of that. The EPA used these individual bodyweight-adjusted perchlorate doses from food to calculate distributions of perchlorate dose from food for the population of women age 20–44.

Table III–4 presents the mean and selected percentiles of the distribution of perchlorate dose from food for women ages 20–44, for both mean and 95th percentile perchlorate concentrations in food based on the TDS. To calculate the RSC, the EPA selected the 90th percentile dose of perchlorate from food, assuming a scenario where the food contained the 95th percentile perchlorate concentration. This corresponds to a perchlorate dose for food of 0.45 µg/kg/day. The EPA chose to use the 90th percentile bodyweight-adjusted perchlorate consumption from food using the 95th percentile TDS results to estimate the perchlorate RSC from drinking water. The EPA believes this is the most appropriate value for perchlorate consumption from food to ensure the protection of potentially highly exposed individuals. Given the range of perchlorate concentrations in food, and that food is the only other exposure source being considered in the RSC analysis, the EPA believes it is sufficiently protective to estimate the MCLG for drinking water using the 90th percentile bodyweight-adjusted perchlorate consumption based on the 95th percentile perchlorate food concentrations in TDS. This assures that highly exposed individuals from this most sensitive population are considered in the evaluation of whether perchlorate is found at levels of health concern.

TABLE III–4—PERCHLORATE DOSE FROM FOOD (µg/kg/day) IN U.S. WOMEN AGES 20–44 USING THE MEAN AND 95TH PERCENTILE TDS RESULTS [1]

| Level of bodyweight adjusted perchlorate consumption from population distribution | Perchlorate dose from food (µg/kg/day) | |
|---|---|---|
| | Based on mean concentrations of perchlorate in food | Based on 95th percentile concentrations of perchlorate in food |
| Mean .......................................................... | 0.09–0.12 | 0.23–0.24 |
| 50th Percentile ............................................. | 0.08–0.10 | 0.17–0.19 |
| 90th Percentile ............................................. | 0.18–0.21 | **0.45** |
| 99th Percentile ............................................. | 0.33–0.38 | 1.16–1.17 |

[1] Ranges are due to various approaches for handling values level of detection. If no range is presented all approaches resulted in the same value.

**Bolded** value represents the selected value.

The EPA used the drinking water intake and perchlorate dose from food to calculate MCLGs for the three RfD values. Table III–5 shows the RSC values for the three RfD values and the corresponding MCLGs calculated using the EPA's standard equation.

**Table III-5. Estimates for RSC and MCLG by RfD**

| RfD[a] (µg/kg/day) | RSC$_W$[b] (percent) | DWI (L/kg/day) | MCLG[c] (µg/L) |
|---|---|---|---|
| 1.0 | 56% | 0.032 | 18 |
| 2.2 | 80% | 0.032 | 56 |
| 3.6 | 80%[d] | 0.032 | 90 |

a. The RfD values corresponding to protecting the fetus of a first trimester pregnant mother with low-iodine intake levels (i.e., 75 µg/kg/day), low fT4 levels (i.e., 10th percentile of a fT4 distribution for individuals with 75 µg/day iodine intake), and weak TSH feedback strength (i.e., TSH feedback is reduced to be approximately 60 percent less effective than for the median individual) from either a 1-point IQ loss, 2-point IQ loss, or a 3-point IQ loss, respectively.

b. The EPA calculated RSC values based on the following equation given a Food intake of 0.45 µg/kg/day:

$$RSC = \frac{RfD - Food}{RfD} \times 100\%$$

c. The EPA calculated the MCLG values based on the following equation given the respective RfD and RSC values and the DWI:

$$W\left(\frac{\mu g}{L}\right) = \frac{RfD}{DWI} \times RSC_w$$

d. The calculated RSC value using the equation in footnote b is 88 percent. However, the EPA has opted to follow previously established recommendations which employs a ceiling of 80 percent for the RSC value (USEPA 2000d).

## IV. Maximum Contaminant Level Goal and Alternatives

Section 1412(a)(3) of the SDWA requires the EPA to propose a maximum contaminant level goal (MCLG) simultaneously with the NPDWR. The MCLG is defined in Section 1412(b)(4)(A) as ''the level at which no known or anticipated adverse effects on the health of persons occurs and which allows an adequate margin of safety.'' The EPA is proposing an MCLG of 56 µg/L based on the rationale and methology described in Section III above. The derivation of the proposed MCLG uses a point of departure based upon a two percent decrease in IQ for offspring of hypothyroxinemic women of child bearing age have with low iodine intake. The EPA selected a 2 percent decrease in IQ for the proposed

perchlorate MCLG because this represents a small change in IQ, well below one standard deviation for the subpopulation of interest.

As described in Section III, the EPA has selected model parameters and other factors for the derivation of the MCLG that are health protective, including the focus on the most sensitive life stage. The EPA believes that the selection of the combination of protective parameters and this point of departure assures no known or anticipated adverse effects on the health of the most sensitive subpopulation and allows for an adequate margin of safety. The EPA also acknowledges the uncertainties in the derivation of the proposed (and alternative) MCLGs. The EPA acknowledges in particular the challenge associated with selecting the decrement of IQ that represents an adverse effect at the population level and the uncertainties in predicting the dose of perchlorate that may result in a particular IQ decrement given the absence of robust human epidemiological data directly linking perchlorate exposure to IQ decrements. The Agency seeks comment on the alternative MCLG values of 18 µg/L and 90 µg/L, which the EPA derived using the methodology described in Section III based on a one percent and three percent decrease in IQ, respectively.

## V. Maximum Contaminant Level and Alternatives

Under section 1412(b)(4)(B) of the SDWA, the EPA must establish a maximum contaminant level (MCL) as close to the MCLG as is feasible. The EPA evaluated available analytical methods to determine the lowest concentration at which perchlorate can be measured and evaluated the treatment technologies for perchlorate that have been examined under field conditions (USEPA 2018a, 2019b). The EPA determined that setting an MCL equal to the proposed MCLG of 56 µg/L is feasible given that the approved analytical method for perchlorate for UCMR 1 has a minimum reporting level (MRL) of 4 µg/L (USEPA 1999, 2000c) and that available treatment technologies can treat to concentrations well below 56 µg/L (USEPA, 2018c). Therefore, the EPA is proposing to set the MCL for perchlorate at 56 µg/L.

Because the EPA is taking comment on alternative MCLG values of 18 µg/L and 90 µg/L the Agency evaluated the feasibility of setting an MCL at these levels. The EPA determined that the proposed MCL of 56 µg/L is feasible, therefore a higher MCL alternative such as 90 µg/L is also feasible. The EPA has concluded that analytical methods are

capable of measuring perchlorate at 18 µg/L and that treatment technologies have been demonstrated to achieve this level under field conditions (USEPA 2018a, 2019b). Therefore, the EPA is requesting comment on the feasibility of the proposed MCL of 56 µg/L as well as the feasibility of the alternative MCLs of 18 µg/L and 90 µg/L.

As the occurrence analysis in section VI demonstrates, there is infrequent occurrence of perchlorate at 18 µg/L, 56 µg/L, or 90 µg/L. Therefore, the EPA did not evaluate alternative MCL values greater than the corresponding MCLG values. The purpose for evaluating alternative MCL values is to determine whether there is an MCL at which benefits justify the costs of setting an MCL. Given infrequent occurrence, the majority of the costs associated with establishing an NPDWR for perchlorate are for administrative and initial monitoring activities (see section XI.B), which will not be significantly affected by MCL values greater than corresponding MCLG values.

When proposing an MCL, the EPA must publish, and seek public comment on, the health risk reduction and cost analyses (HRRCA) of each alternative MCL considered (SDWA Section 1412(b)(3)(C)(i)), including: The quantifiable and nonquantifiable health risk reduction benefits attributable to MCL compliance; the quantifiable and nonquantifiable health risk reduction benefits of reduced exposure to co-occurring contaminants attributable to MCL compliance; the quantifiable and nonquantifiable costs of MCL compliance; the incremental costs and benefits of each alternative MCL; the effects of the contaminant on the general population and sensitive subpopulations likely to be at greater risk of exposure; any adverse health risks posed by compliance; and other factors such as data quality and uncertainty. The EPA provides this information in section XII in this preamble. The EPA must base its action on the best available, peer-reviewed science and supporting studies, taking into consideration the quality of the information and the uncertainties in the benefit-cost analysis (SDWA Section 1412(b)(3)). The following sections, as well as the health effects discussion in section III document the science and studies that the EPA relied upon to develop estimates of benefits and costs and understand the impact of uncertainty on the Agency's analysis.

## VI. Occurrence

The UCMR 1 is the primary source of occurrence data the EPA relied on to estimate the number of water systems

(and associated population) expected to be exposed at levels of perchlorate which could potentially exceed the proposed and alternative MCL levels. Since UCMR 1 data was first used to inform the Agency actions on the 2008 preliminary regulatory determination and the 2011 final regulatory determination, the Agency has modified its analysis of the UCMR 1 data set in response to concerns raised by stakeholders regarding the data quality and to represent current conditions at some States that have enacted perchlorate regulations since the UCMR 1 data was collected. Despite these updates, the EPA continues to rely on the UCMR 1 data because they are the best available data collected in accordance with accepted methods from a census of the large water systems (serving more than 10,000 people) and a statistically representative sample of small water systems that provides the best available, national assessment of perchlorate occurrence in drinking water.

In 1999, the EPA developed the first round of the UCMR program in accordance with SDWA requirements to provide national occurrence information on unregulated contaminants (USEPA, 1999, 2000b). The UCMR 1 required sampling from systems in all 50 States, the District of Columbia, four U.S. territories, and tribal lands in five EPA Regions including:

• All 3,097 large (serving more than 10,000 people) CWSs and NTNCWSs, which analyzed either four quarterly samples collected at 3-month intervals (surface water sources), or two samples collected 5 to 7 months apart (ground water sources); and

• a statistically representative selection of 800 small CWSs and NTNCWSs, which analyzed either four quarterly samples collected at 3-month intervals (surface water sources) or two samples collected 5 to 7 months apart (ground water sources).

Water systems submitted UCMR 1 sampling results to the EPA from 2001 until 2005. Water systems were required to analyze samples for 26 contaminants including perchlorate. The EPA established a minimum reporting level of 4 µg/L for perchlorate in the UCMR.

The EPA conducted a data quality review of the UCMR 1 data submitted by systems prior to analyzing the occurrence data for the 2011 perchlorate regulatory determination. The UCMR 1 dataset used by the EPA included 34,331 samples with 637 measurements of perchlorate above the minimum reporting level from 3,865 systems.

In September of 2012, the EPA received a ''Request for Correction''

letter from the United States Chamber of Commerce regarding information and data (*i.e.,* the occurrence of perchlorate in drinking water) used by the EPA in its 2011 determination to regulate perchlorate. The U.S. Chamber of Commerce letter stated that the EPA relied upon: (1) Data that did not comply with data quality guidelines and (2) data that was not representative of current conditions.

In response [12] to the U.S. Chamber of Commerce, the EPA conducted a detailed assessment of the source water sample detections and determined that it was most appropriate to exclude the source water sample detections from the UCMR 1 perchlorate data set when those samples had appropriate follow-up entry point samples that were included in the UCMR 1 perchlorate data set. In contrast, any source water sample perchlorate detections for which no follow-up entry point sampling was conducted by PWSs were retained in the UCMR 1 perchlorate data set. As a result of the assessment, the EPA removed 199 source water samples (97 detections) that could be paired with a second follow-up sample located at the entry point to the distribution system. Following this convention, the resulting UCMR 1 data set contains 34,132 perchlorate samples from 3,865 systems with a total of 540 detections from 149 PWSs.

Table VI–1 shows sample distribution by system size category and measurement status. It also shows the number of entry points and systems where perchlorate measurements were reported. The entry point estimates differ from the system estimates because many water systems have more than one entry point. For example, a ground water system with two wells that has separate connections to the distribution system has two entry points.

In response to the U.S. Chamber of Commerce request, the EPA has also reassessed the UCMR 1 data in light of the adoption of regulatory limits in two states. Massachusetts promulgated a drinking water standard for perchlorate of 2 µg/L in 2006 (MassDEP, 2006), and California promulgated a drinking water standard of 6 µg/L in 2007 (California Department of Public Health, 2007). Systems in these states are now required to keep perchlorate levels in drinking water below their state limits, which are lower than the proposed MCL and alternative MCLs. Therefore, the UCMR 1 sampling results from systems in these states do not reflect the current occurrence and exposure conditions. For the purpose of estimating the costs and benefits of the proposed rule, the EPA assumed that no additional monitoring and treatment costs would be incurred by the systems in the States of California and Massachusetts. Systems in California account for some of the perchlorate measurements reported below. The notes in the tables below indicate whether results include or exclude systems in California and Massachusetts.

To update the occurrence data for systems sampled during UCMR 1 from the States of California and Massachusetts, the EPA identified all systems and corresponding entry points which had reported perchlorate detections in UCMR 1. Once the systems and entry points with detections were appropriately identified, the EPA then used a combination of available data from Consumer Confidence Reports (CCRs) and perchlorate compliance monitoring data from California (*https://sdwis.waterboards.ca.gov/PDWW/*) and Massachusetts (*https://www.mass.gov/service-details/public-water-supplier-document-search*) to match current compliance monitoring data (where available) to the corresponding water systems and entry points sampled during UCMR 1.

Out of the 540 detections previously described the EPA updated data for 321 detections (320 from California systems and 1 from a Massachusetts system). The convention used by the EPA to accomplish the substitution of data was to match entry points with compliance data for active entry points based on most recently reported compliance monitoring data, if more than one data point was reported for an entry point, the assigned value is an average of the annual monitoring results at the entry point. In cases were the EPA could not find updated entry point data, then the original data from UCMR 1 for such entry point was kept.

### TABLE VI–1—UCMR 1 DATA SUMMARY STATISTICS

| Item | Small system sample | Large system census | Sum |
|---|---|---|---|
| Total samples | 3,295 | 30,837 | 34,132 |
| Sample measurements ≥4 µg/L | 15 | 525 | 540 |
| Sample measurements >18 µg/L | 1 | 16 | 17 |
| Sample measurements >56 µg/L | 0 | 2 | 2 |
| Sample measurements >90 µg/L | 0 | 1 | 1 |
| Total entry points | 1,454 | 13,482 | 14,936 |
| Entry points at which measurements ≥4 µg/L | 8 | 328 | 336 |
| Entry points at which measurements >18 µg/L | 1 | 16 | 17 |
| Entry points at which measurements >56 µg/L | 0 | 2 | 2 |
| Entry points at which measurements >90 µg/L | 0 | 1 | 1 |
| Total systems | 797 | 3,068 | 3,865 |
| Systems at which measurements ≥4 µg/L | 8 | 141 | 149 |
| Systems at which measurements >18 µg/L | 1 | 14 | 15 |
| Systems at which measurements >56 µg/L | 0 | 2 | 2 |
| Systems at which measurements >90 µg/L | 0 | 1 | 1 |

Source: (USEPA, 2019b). The total row counts and counts of measurements ≥4 µg/L identify all instances where perchlorate was detected at or above the minimum reporting level, including water systems in California and Massachusetts, which account for 537 systems in total and 51 systems at which measurements ≥4 µg/L. The instances where perchlorate measurements equal or exceed either 18 µg/L, 56 µg/L, or 90 µg/L exclude results from California and Massachusetts because water systems in these States must meet limits below 18 µg/L. The small system counts reflect sample results that have not been extrapolated to small systems nationwide.

---

[12] See the EPA response letter at *https://www.epa.gov/sites/production/files/2017-08/documents/12004-response_0.pdf*.

Table VI–2 shows the service populations that correspond with the occurrence summary in Table VI–1. The entry point population estimates reflect the assumption that system population is uniformly distributed across entry points; *e.g.*, the entry point population for a system with two entry points is one-half the total system population.

TABLE VI–2—UCMR1 DATA SERVICE POPULATION SUMMARY STATISTICS

| Item | Small system sample | Large system census | Sum |
|---|---|---|---|
| Total entry point population ........................................................... | 2,760,570 | 222,853,101 | 225,613,671 |
|   Population served by entry points at which measurements ≥4 μg/L ..................................... | 9,484 | 4,281,937 | 4,291,420 |
|   Population served by entry points at which measurements >18 μg/L ..................................... | 2,155 | 618,406 | 620,560 |
|   Population served by entry points at which measurements >56 μg/L ..................................... | 0 | 32,432 | 32,432 |
|   Population served by entry points at which measurements >90 μg/L ..................................... | 0 | 25,972 | 25,972 |
| Total system population ................................................................. | 2,760,570 | 222,853,101 | 225,613,671 |
|   Population served by systems at which measurements ≥4 μg/L .............................................. | 13,483 | 16,159,082 | 16,172,565 |
|   Population served by systems at which measurements >18 μg/L .............................................. | 4,309 | 696,871 | 701,180 |
|   Population served by systems at which measurements >56 μg/L .............................................. | 0 | 64,733 | 64,733 |
|   Population served by systems at which measurements >90 μg/L .............................................. | 0 | 25,972 | 25,972 |

Source: (USEPA, 2019b). The populations for entry points/systems with measurements ≥4 μg/L identify all instances where perchlorate was detected at or above the minimum reporting level, including water systems in California and Massachusetts, which account for 39.6 million of the 225.6 million total population in UCMR 1, and 1.9 million of the 4.3 million population served by entry points at which measurements ≥4 μg/L. The instances where perchlorate measurements equal or exceed either 18 μg/L, 56 μg/L, or 90 μg/L exclude results from California and Massachusetts because water systems in these States must meet limits below 18 μg/L. The small system counts reflect sample results that have not been extrapolated to small systems nationwide.

As shown in the tables, 149 systems serving 16.2 million people had measured levels of perchlorate greater than the minimum reporting level. However, many of these systems have several entry points with no measured levels of perchlorate greater than the minimum reporting level; at the entry point level, the exposed population is approximately 4.3 million people served by 336 entry points. Because the uniform population distribution assumption may over or underestimate the service population of any particular entry point, the entry point estimates are uncertain. The system population estimates serve as upper bounds on exposure.

The EPA used entry point maximum measurements to estimate potential baseline occurrence and exposure at levels that exceed the proposed MCL and alternative MCLs. The maximum measurements indicate perchlorate levels that occurred in at least one quarterly sample among surface water systems and at least one semi-annual sample among ground water systems.

Table VI–3 through Table VI–5 show the occurrence and exposure estimates based on the 56 μg/L, 18 μg/L MCL, and 90 μg/L values, respectively. Each table provides estimates of the entry points at which the maximum perchlorate concentrations exceed the MCL value. The tables also report the system-level information for these entry points.

TABLE VI–3—ESTIMATED PERCHLORATE OCCURRENCE AND EXPOSURE: ENTRY POINT MAX EXCEEDS 56 μg/L

| Affected entity | Small systems | Large systems | Total systems |
|---|---|---|---|
| Entry points ........................................................................................ | 0 | 2 | 2 |
| Population served ................................................................................ | 0 | 32,432 | 32,432 |
| Water systems ..................................................................................... | 0 | 2 | 2 |
| Population served ................................................................................ | 0 | 64,733 | 64,733 |

Source: (USEPA, 2019b).

TABLE VI–4—ESTIMATED PERCHLORATE OCCURRENCE AND EXPOSURE: ENTRY POINT MAX EXCEEDS 18 μg/L

| Affected entity | Small systems[1] | Large systems | Total systems |
|---|---|---|---|
| Entry points ........................................................................................ | 1 | 16 | 17 |
| Population served ................................................................................ | 2,155 | 618,406 | 620,560 |
| Water systems ..................................................................................... | 1 | 14 | 15 |
| Population served ................................................................................ | 4,309 | 696,871 | 701,180 |

Source: (USEPA, 2019b).

[1] The values shown in the table are estimates based on the UCMR 1 data. The EPA also applied the statistical sampling weights to the results to extrapolate results to national results. The entry point at which a measurement exceeds 18 μg/L is one of 20 in its sample stratum; no other sample in the stratum had a measurement of perchlorate greater than the minimum reporting level. The entry point population of 2,155 represents 5.31% of the total population served by the six UCMR 1 systems in the stratum (40,574). Currently, the stratum population of 774,780 accounts for 1.32% of the 58.7 million national population served by small systems. Thus, the UCMR 1 results indicate that 0.07% (5.31% × 1.32%) of small system customers (approximately 41,100) may be exposed to perchlorate greater than 18 μg/L.

TABLE VI–5—ESTIMATED PERCHLORATE OCCURRENCE AND EXPOSURE: ENTRY POINT MAX EXCEEDS 90 µg/L

| Affected entity | Small systems [1] | Large systems | Total systems |
|---|---|---|---|
| Entry points | 0 | 1 | 1 |
| Population served | 0 | 25,972 | 25,972 |
| Water systems | 0 | 1 | 1 |
| Population served | 0 | 25,972 | 25,972 |

Source: (USEPA, 2019b).

In summary, the perchlorate occurrence information suggests that at an MCL of 56 µg/L, two systems (0.004% of all water systems in the U.S.) would exceed the regulatory threshold. One of these two systems would exceed the alternative MCL of 90 µg/L. In addition, at an MCL of 18 µg/L, there would be 15 systems (0.03% of all water systems in the U.S.) that would exceed the regulatory threshold.

## VII. Analytical Methods

The SDWA directs the EPA to set a contaminant's MCL as close to its MCLG as is "feasible", the definition of which includes an evaluation of the feasibility of performing chemical analysis of the contaminant at standard drinking water laboratories. Specifically, the SDWA directs the EPA to determine that it is economically and technologically feasible to ascertain the level of the contaminant being regulated in water in public water systems (Section 1401(1)(C)(i)). NPDWRs are also to contain "criteria and procedures to assure a supply of drinking water which dependably complies with such [MCLs]; including accepted methods for quality control and testing procedures to insure compliance with such levels." (Section 1401(1)(D)).

To comply with these requirements, the EPA considers method performance under relevant laboratory conditions, their likely prevalence in certified drinking water laboratories, and the associated analytical costs. The EPA has developed five analytical methods for the identification and quantification of perchlorate in drinking water that meet these criteria. The proposed EPA methods for perchlorate are: 314.0, 314.1, 314.2, 331.0, and 332.0. A detailed description of these methods is presented in the Perchlorate Occurrence and Monitoring Report (USEPA, 2019b).

The EPA Methods 314.0, 314.1, 314.2, 331.0, and 332.0 underwent the EPA's analytical method development and validation processes. The validation process includes a protocol for modifications to any existing EPA-approved analytical methods and a protocol for new determinative techniques. Both validation protocols are rigorous and consider many technical aspects of analytical method performance, including: Detection limits; instrument calibration; precision and analyte recovery; analyte retention times; evaluation of blanks; development of Quality Control acceptance criteria; analysis of field samples; and other technical aspects of sample analysis and data reporting. All of the proposed EPA analytical methods provide performance data to demonstrate their capability to reliably and consistently measure perchlorate in drinking water at the proposed and alternate MCLs.

EPA Method 314.0, "Determination of Perchlorate in Drinking Water Using Ion Chromatography" (Revision 1.0, USEPA, 1999a) has a method detection limit (MDL) of 0.53 µg/L. Single-laboratory mean percent recovery in various aqueous matrices range from 86% to 113% with Relative Standard Deviations (RSDs) of 1.0% to 12.8%. A minimum reporting level (MRL) is not specified in the method; however, a range of 3.0 to 5.0 µg/L is cited as a benchmark range for quality assurance/quality control (QA/QC) procedures. The MRL is to be established as either a concentration that is greater than three times the laboratory MDL or at a concentration that yields a response greater than a signal to noise ratio of five. In either case, the MRL must not be below the lowest instrument calibration standard (USEPA, 1999a). Method 314.0 was widely adopted as the standard perchlorate method.

After the EPA published Method 314.0, the Agency adopted additional method development goals for the analysis of perchlorate in drinking water including: (1) Reducing MRL to less than 1 µg/L through the application of sample concentration techniques, microbore analytical columns, and advanced detection systems (*i.e.*, mass spectrometry), (2) further increasing the tolerance for high ionic strength matrices, and (3) enhancing measurement selectivity.

EPA Method 314.1, "Determination of Perchlorate in Drinking Water Using Inline Column Concentration/Matrix Elimination Ion Chromatography with Suppressed Conductivity Detection" (Revision 1.0, USEPA, 2005b) documents the EPA single-laboratory Lowest Concentration Minimum Reporting Levels (LCMRLs) of less than 0.2 µg/L (DL = 0.03 µg/L) using online sample pre-concentration. The method uses matrix diversion to handle high ionic strength matrices (up to 1,000 mg/L TDS) and added confirmation analysis using a second analytical column (USEPA, 2005b).

EPA Method 314.2, "Determination of Perchlorate in Drinking Water Using Two-Dimensional Ion Chromatography with Suppressed Conductivity Detection" (USEPA, 2008c) documents the EPA single-laboratory LCMRLs of less than 0.1 µg/L (DLs <0.02 µg/L) using large volume injection. The method uses 2–D chromatography to handle high ionic strength matrices (up to 1,000 mg/L total dissolved solids [TDS]) and eliminates the need for separate confirmation analysis (USEPA, 2008c).

EPA Method 331.0, "Determination of Perchlorate in Drinking Water by Liquid Chromatography Electrospray Ionization Mass Spectrometry" (Revision 1.0, USEPA, 2005c) documents the EPA single-laboratory LCMRLs of less than 0.1 µg/L (DLs <0.01 µg/L), applied multiple analytical advancements to a liquid chromatography (LC) analysis including a perchlorate selective LC column (AS–21), mass spectrometry (MS) or MS/MS detection for selectivity and sensitivity, and a custom labeled internal standard ($Cl^{18}O_4^-$) (USEPA, 2005c).

EPA Method 332.0, "Determination of Perchlorate in Drinking Water by Ion Chromatography with Suppressed Conductivity and Electrospray Ionization Mass Spectrometry" (USEPA, Revision 1.0, 2005d) documents the EPA single-laboratory LCMRL of 0.1 µg/L (DL = 0.02 µg/L), applied multiple analytical advancements in an IC analysis including suppressed conductivity IC, MS or MS/MS selectivity and sensitivity, and a custom labeled internal standard ($Cl^{18}O_4$) (USEPA, 2005d).

## VIII. Monitoring and Compliance Requirements

### A. What are the proposed monitoring requirements?

The EPA is proposing to require CWS and NTNCWSs to monitor for perchlorate in accordance with the standardized monitoring framework set out in 40 CFR 141 Subpart C (Standardized Monitoring Framework). Public water systems must sample entry points to the distribution system consistent with requirements in 40 CFR 141.23(a).

Under the Standardized Monitoring Framework, the monitoring frequency for a public water system is dependent on previous monitoring results and whether a monitoring waiver has been granted. The EPA is proposing that consistent with the standardized monitoring framework water systems would be initially required to monitor quarterly for perchlorate. The EPA is also proposing that based upon the monitoring results States would be able to reduce the monitoring frequency to annually, once every three years or once every nine years if the State concludes that the system is reliably and consistently below the MCL. If a water system exceeds the perchlorate MCL, the system is in violation and triggered into quarterly monitoring for that sampling point in the next quarter after the violation occurred (40 CFR 141.23(c)(7)). The state may allow the system to return to the reduced monitoring frequency when the state determines that the system is reliably and consistently below the MCL. However, the state cannot make a determination that the system is reliably and consistently below the MCL until a minimum of 2 consecutive ground water or 4 consecutive surface water samples below the MCL have been collected (40 CFR 141.23(c)(8)). All systems must comply with the sampling requirements, unless a waiver has been granted in writing by the state (40 CFR 141.23(c)(6)).

### B. Can states grant monitoring waivers?

Under this proposal, water systems may apply to the state, and states may grant, a 9-year monitoring waiver for perchlorate if the conditions described in 40 CFR 141.23(c)(3)–(6) are met. A state may grant a waiver for surface water systems after three rounds of annual monitoring with results less than the MCL and for groundwater systems after conducting three rounds of monitoring with results less than the MCL. One sample must be collected during the nine-year compliance cycle that the waiver is effective, and the

waiver must be renewed every nine years.

### C. How are system MCL violations determined?

Under this proposal, violations of the perchlorate MCL would be determined in a manner consistent with 40 CFR 141.23(i)(3). Compliance with the perchlorate MCL would be determined based on one sample if the level is below the MCL. If the level of perchlorate exceeds the MCL at any entry point in the initial sample, a confirmation sample is required within two weeks of the system's receipt of notification of the analytical result of the first sample, in accordance with 141.23(f)(1). Compliance shall be determined based on the average of the initial and confirmation samples.

### D. When must systems complete initial monitoring?

Pursuant to Section 1412(b)(10), this rule would be effective three years after promulgation. To satisfy initial monitoring requirements, CWS serving populations greater than 10,000 persons must collect 4 quarterly samples for perchlorate during the second compliance period of the fourth compliance cycle (January 1, 2023–December 31, 2025) of the Standardized Monitoring Framework. NTNCWS and CWSs serving 10,000 persons or less must collect 4 quarterly samples during the third compliance period of the fourth compliance cycle (January 1, 2026–December 31, 2028) of the Standardized Monitoring Framework.

### E. Can systems use grandfathered data to satisfy the initial monitoring requirements?

As proposed today, systems would be allowed to use grandfathered perchlorate data collected after January 1, 2020, to satisfy the initial monitoring requirements. To satisfy initial perchlorate monitoring requirements, a system with appropriate historical monitoring data for each entry point to the distribution system could use the monitoring data from the compliance monitoring period between January 1, 2020, and December 31, 2022, for CWSs serving greater than 10,000 persons and between January 1, 2023, and December 31, 2025, for NTNCWs and for CWSs serving 10,000 or fewer persons.

## IX. Safe Drinking Water Act Right to Know Requirements

### A. What are the Consumer Confidence Report requirements?

A community water system must prepare and deliver to its customers an annual Consumer Confidence Report

(CCR) in accordance with requirements in 40 CFR 141 Subpart O. A CCR provides customers with information about their local drinking water quality as well as information regarding the water system compliance with drinking water regulations. Under this proposal CWSs would be required to report perchlorate information in their CCR.

### B. What are the public notification requirements?

All public water systems must give the public notice for all violations of NPDWRs and for other situations. Under this proposal, violations of the perchlorate MCL would be designated as Tier 1 and as such, public water systems would be required to comply with 40 CFR 141.202. As described in Section III of this proposal, fetuses of first trimester pregnant women with low iodine are the most sensitive subpopulation, therefore, per 40 CFR 141.202(b)(1), notification of an MCL violation should be provided as soon as practicable but no later than 24 hours after the system learns of the violation under this proposal.

## X. Treatment Technologies

Systems that exceed the perchlorate MCL will need to adopt new treatment or another strategy to reduce perchlorate to a level that meets the MCL. When the EPA establishes an MCL for a drinking water contaminant, Section 1412(b)(4)(E) of the SDWA requires that the Agency "list the technology, treatment techniques, and other means which the Administrator finds to be feasible for purposes of meeting [the MCL]," which are referred to as best available technologies (BAT). These BATs are used by states to establish conditions for source water variances under Section 1415(a). Furthermore, Section 1412(b)(4)(E)(ii) requires that the Agency identify small system compliance technologies (SSCT), which are affordable treatment technologies, or other means that can achieve compliance with the MCL (or treatment technique, where applicable). The lack of an affordable SSCT for a contaminant triggers certain additional procedures which can result in states issuing small system variances under Section 1412(e) of the SDWA.

The Agency solicits public comment on the choice of available treatment technologies discussed in this section.

### A. What are the best available technologies?

The Agency identifies the best available technologies (BAT) as those meeting the following criteria: (1) The capability of a high removal efficiency;

(2) a history of full-scale operation; (3) general geographic applicability; (4) reasonable cost based on large and metropolitan water systems; (5) reasonable service life; (6) compatibility with other water treatment processes; and (7) the ability to bring all of the water in a system into compliance. The Agency is proposing the following technologies as BAT for removal of perchlorate from drinking water based its review of the treatment and cost literature (USEPA, 2018a):

• Ion exchange;
• biological treatment; and
• centralized reverse osmosis.

There are also non-treatment options that might be used for compliance in lieu of installing and operating treatment technologies. These include blending existing water sources, replacing a perchlorate-contaminated source of drinking water with a new source (e.g., a new well), and purchasing compliant water from another system. Below are brief descriptions of each proposed BAT.

## Ion Exchange

Ion exchange is a physical and chemical separation process that can achieve high perchlorate removal rates. Feed water passes through a vessel containing a bed of resin made of synthetic beads or gel. As feed water moves through the resin, an ionic contaminant such as perchlorate exchanges for an ion (typically chloride) on the resin. Demonstrated removal efficiencies for perchlorate are typically in the high 90 percent range and can achieve concentrations less than 4 μg/L in treated water (Drago & Leserman, 2011; Membrane Technology, 2006; Siemens Water Technologies, 2009; The Interstate Technology & Regulatory Council (ITRC) Team, 2008). The operation continues until enough of the resin's available ion exchange sites have ions from the feed water and the resin no longer effectively removes the target contaminant, i.e., the contaminant ''breaks through'' the treatment process. At this point, the resin must be disposed and replaced or regenerated. The length of time until resin must be replaced or regenerated is known as bed life and is a critical factor in the cost effectiveness of ion exchange as a treatment technology. One measurement of bed life is the volume of water that can be treated before breakthrough—called bed volumes—the number of times the resin bed can be filled before breakthrough. Several factors affect bed life, including the presence of competing ions such as nitrate and the type of resin used. Resin types tested for perchlorate removal include strong-base polyacrylic, strong-base polystyrenic (including nitrate-selective), weak-base polyacrylic, weak-base polystyrenic, and perchlorate-selective. Based on studies of the effect of competing ions on performance, perchlorate-selective resins can achieve bed lives ranging from 105,000 to 170,000 bed volumes (Blute, Seidel, McGuire, Qin, & Byerrum, 2006; Russell, Qin, Blute, McGuire, & Williams, 2008; Wu & Blute, 2010).

Perchlorate-selective resin cannot be easily regenerated for reuse; the exhausted resin must be disposed (i.e., operated on a 'throw-away' basis). This mode of operation, however, avoids the production of liquid residuals in the form of spent regenerant. Therefore, in combination with the long bed life, single-use perchlorate-selective ion exchange can be a cost-effective treatment option in spite of the need to dispose of the perchlorate-contaminated resin. Build-up of arsenic or uranium on the resin may affect waste disposal options, although studies of perchlorate-selective resins show that arsenic concentrations remain below regulatory limits for hazardous waste disposal and uranium concentrations generally remain below those that require special handling as radioactive waste (Blute et al., 2006; Russell et al., 2008; Wu & Blute, 2010). Ion exchange can increase the corrosivity of treated water (Berlien, 2003; Betts, 1998; USEPA, 2005b) because of the addition of chloride ions and/or removal of carbonates and bicarbonates. Such instances can be addressed by adding or adjusting corrosion control.

## Biological Treatment

Biological treatment uses bacteria to reduce perchlorate to chlorate, chlorite, chloride, and oxygen. Biological treatment can destroy the perchlorate ion, eliminating the need for management of perchlorate-bearing waste streams. Removal effectiveness exceeds 90 percent for bench-scale tests and full-scale treatment plant studies (Kotlarz, Upadhyaya, Togna, & Raskin, 2016; Upadhyaya, Kotlarz, Togna, & Raskin, 2015; U.S. Department of Defense (U.S. DoD), 2008, 2009; T.D. Webster & Crowley, 2010, 2016; T.D. Webster & Litchfield, 2017). Although biological treatment is a relatively new technology for treatment of drinking water in the United States, the State of California has identified biological treatment (along with ion exchange) as one of two best available technologies for achieving compliance with its standard for perchlorate in drinking water (California Code of Regulations, Title 22, Chapter 15, Section 64447.2). The California BAT specifies a fluidized bed, although studies suggest that a fixed bed is also effective. The first full-scale fluidized bed facility using biological treatment of perchlorate to supply municipal drinking water began operation in 2016 (T. D. Webster & Crowley, 2016; T. D. Webster & Litchfield, 2017). Raw water quality will affect process design, in particular, temperature affects the rate of biomass growth; at temperatures below 10 degrees Celsius, growth is inhibited and bioremediation becomes infeasible (Dugan, 2010b, 2010a; Dugan et al., 2009). This factor limits the feasibility of biological treatment in areas that experience low water temperatures during winter. In addition, bacteria in bioreactors require nutrients to grow and effectively reduce perchlorate. Therefore, some source waters may require supplemental addition of nutrients such as nitrogen or phosphorus (Harding Engineering and Environmental Services (ESE), 2001; U.S. Department of Defense (U.S. DoD), 2008a, 2009).

Although the process does not produce perchlorate-contaminated wastes, periodic removal of excess biomass, e.g., through backwash, will be required. The backwash water is non-toxic and can be discharged to a sanitary sewer (U.S. Department of Defense (U.S. DoD), 2008, 2009) or recycled following clarification. Typically, post-treatment of treated water also will be required because biological treatment increases soluble microbial organic products, depletes oxygen, and can add turbidity and sulfides (Dordelmann, 2009; Harding Engineering and Environmental Services (ESE), 2001; U.S. Department of Defense (U.S. DoD), 2008; T. D. Webster & Crowley, 2016; T. D. Webster & Litchfield, 2017). The treatment process, however, can result in removal of co-occurring contaminants such as nitrate (Upadhyaya et al., 2015; Webster and Crowley, 2010; Webster and Lichfield, 2017).

## Reverse Osmosis

Reverse osmosis is a membrane filtration process that physically removes perchlorate ions from drinking water. This process separates a solute such as perchlorate ions from a solution by forcing the solvent to flow through a membrane at a pressure greater than the normal osmotic pressure. The membrane is semi-permeable, transporting different molecular species at different rates. Water and low-molecular weight solutes pass through the membrane and are removed as permeate, or filtrate. Dissolved and suspended solids are rejected by the membrane and are removed as

concentrate or reject. This technique does not destroy the perchlorate ion and, therefore, creates a subsequent need for disposal or treatment of perchlorate-contaminated waste (the concentrate).

Membranes may remove ions from feed water by a sieving action (called steric exclusion), or by electrostatic repulsion of ions from the charged membrane surface. Across multiple bench- and pilot-scale studies, reverse osmosis membranes consistently achieve perchlorate removal greater than 80 percent and up to 98 percent (Liang, Scott, Palencia, & Bruno, 1998; Nam *et al.*, 2005; Yoon, Amy, & Yoon, 2005; Yoon, Yoon, Amy, & Her, 2005).

While water quality affects process design (*e.g.*, recovery rate, cleaning frequency, and antiscalant selection), it has relatively little effect on perchlorate removal effectiveness of reverse osmosis membranes. Reverse osmosis generates a relatively large concentrate stream, which will contain perchlorate as well as other rejected dissolved solids, which will require disposal. The large concentrate stream also means less treated water is available for distribution (*e.g.*, 70 to 85 percent of source water), which is a disadvantage for systems with limited water supply. Because reverse osmosis can increase the corrosivity of the treated water, it may require post-treatment or blending

with bypass water. Reverse osmosis can, however, remove co-occurring contaminants including arsenic and chromium-VI (Amy, Yoon, and Amy, 2005).

*B. What are the small system compliance technologies?*

The EPA is proposing the SSCT shown in Table X–1. The table shows which of the BAT listed above are also affordable for each small system size category listed in Section 1412(b)(4)(E)(ii) of the SDWA. The Agency identified these technologies based on an analysis of treatment effectiveness and affordability (USEPA, 2018a).

TABLE X–1—PROPOSED SSCT FOR PERCHLORATE REMOVAL

| System size (population served) | Ion exchange | Biological treatment | Reverse osmosis | Point-of-use reverse osmosis |
|---|---|---|---|---|
| 25–500 | Yes | No | No | Yes. |
| 501–3,300 | Yes | Yes | Yes | Yes. |
| 3,301–10,000 | Yes | Yes | Yes | Not applicable.[a] |

[a] For perchlorate, the EPA has determined that implementing and maintaining this option for systems larger than 3,300 people (greater than 1 MGD design flow) is likely to be impractical.

The SSCT listed in Table X–1 include a point-of-use (POU) version of reverse osmosis in addition to the ion exchange, biological treatment and reverse osmosis technologies described in the previous section. This technology can be used by small systems to comply with the proposed MCL and, therefore, meets the effectiveness requirement for an SSCT. For perchlorate removal, NSF/ANSI Standard 58: Reverse Osmosis Drinking Water Treatment Systems includes a protocol that requires a reverse osmosis unit to be able to reduce perchlorate from a challenge level of 130 µg/L to a target level of 4 µg/L (NSF, 2004). Organizations (*e.g.*, NSF International, Underwriters Laboratories, Water

Quality Association) provide third-party testing and certification that POU devices meet drinking water treatment standards. There are no perchlorate certification standards for other types of POU devices such as those using ion exchange media.

The operating principle for POU reverse osmosis devices is the same as centralized reverse osmosis: Steric exclusion and electrostatic repulsion of ions from the charged membrane surface. In addition to a reverse osmosis membrane for dissolved ion removal, POU reverse osmosis devices often have a sediment pre-filter and a carbon filter in front of the reverse osmosis membrane, a 3- to 5-gallon treated water

storage tank, and a carbon filter between the tank and the tap.

The EPA identified the SSCT using the affordability criteria methodology it developed for drinking water rules (USEPA, 1998). The analysis method is a comparison of estimated incremental household costs for perchlorate treatment to an expenditure margin, which is the difference between baseline household water costs and a threshold equal to 2.5% of median household income. Table X–2 shows the expenditure margins derived for the analysis. These margins show the cap on affordable incremental annual expenditures.

TABLE X–2—EXPENDITURE MARGINS FOR SSCT AFFORDABILITY ANALYSIS

| System size (population served) | Median household income[a] | Affordability threshold[b] | Baseline water cost[c] | Expenditure margin |
|---|---|---|---|---|
| | (a) | (b) = 2.5% × a | (c) | (d) = b − c |
| 25–500 | $52,791 | $1,320 | $341 | $979 |
| 501–3,300 | 51,093 | 1,277 | 395 | 883 |
| 3,301–10,000 | 55,975 | 1,399 | 412 | 987 |

Source: *Best Available Technologies and Small System Compliance Technologies for Perchlorate in Drinking Water* (USEPA, 2018a).
[a] MHI based on U.S. Census 2010 American Community Survey (ACS) 5-year estimates (U.S. Census Bureau, 2010) stated in 2010 dollars, adjusted to 2017 dollars using the CPI (for all items) for areas under 50,000 persons (Bureau of Labor Statistics (BLS), 2018b).
[b] Affordability threshold equals 2.5 percent of MHI.
[c] Household water costs derived from 2006 Community Water System Survey (USEPA, 2009c), based on residential revenue per connection within each size category, adjusted to 2017 dollars based on the CPI (for all items) for areas under 50,000 persons.

Table X–3 shows the estimates of per-household costs by treatment

technology and size category generated using the treatment cost method

described in section XII.B as well as *Best Available Technologies and Small*

*System Compliance Technologies for Perchlorate in Drinking Water* (USEPA, 2018a) and *Technologies and Costs for Treating Perchlorate-Contaminated Waters* (USEPA, 2018c). Costs in bold font do not exceed the corresponding expenditure margin and, therefore, meet the SSCT affordability criterion. Therefore, the EPA has determined that there are affordable small system compliance technologies available and the Agency is not proposing any variance technologies.

TABLE X–3—ANNUAL INCREMENTAL COST ESTIMATES FOR SSCT AFFORDABILITY ANALYSIS

| System size (population served) | Ion exchange | Biological treatment | Reverse osmosis | Point-of-use reverse osmosis |
|---|---|---|---|---|
| 25–500 | $378 to $610 | $2,146 to $3,709 | $2,272 to $2,671 | $265 to $271. |
| 501–3,300 | $98 to $148 | $324 to $566 | $561 to $688 | $250 to $251. |
| 3,301–10,000 | $104 to $153 | $211 to $315 | $431 to $493 | Not applicable.[a] |

Source: *Best Available Technologies and Small System Compliance Technologies for Perchlorate in Drinking Water* (USEPA, 2018a), which describes the different WBS model input assumptions that result in ranges of per-household costs shown; bold font indicates cost estimates that do not exceed the corresponding expenditure margin.

[a] For perchlorate, the EPA has determined that implementing and maintaining a POU program for systems larger than 3,300 people (greater than 1 MGD design flow) is likely to be impractical.

## XI. Rule Implementation and Enforcement

### A. What are the requirements for primacy?

This section describes the regulations and other procedures and policies primacy entities must adopt, or have in place, to implement the proposed perchlorate rule. States must continue to meet all other conditions of primacy in 40 CFR part 142. Section 1413 of the SDWA establishes requirements that primacy entities (States or Indian Tribes) must meet to maintain primary enforcement responsibility (primacy) for its public water systems. These include: (1) Adopting drinking water regulations that are no less stringent than federal NPDWRs in effect under sections 1412(a) and 1412(b) of the Act, (2) Adopting and implementing adequate procedures for enforcement, (3) Keeping records and making reports available on activities that the EPA requires by regulation, (4) Issuing variances and exemptions (if allowed by the State) under conditions no less stringent than allowed by SDWA Sections 1415 and 1416, and (5) Adopting and being capable of implementing an adequate plan for the provision of safe drinking water under emergency situations.

40 CFR part 142 sets out the specific program implementation requirements for States to obtain primacy for the Public Water Supply Supervision Program, as authorized under section 1413 of the Act.

To implement the perchlorate rule, States would be required to adopt revisions at least as stringent as the proposed provisions in 40 CFR 141.6 (Effective Dates); 40 CFR 141.23 (Inorganic chemical sampling and analytical requirements); 40 CFR 141.51 (Maximum contaminant level goals for inorganic contaminants); 40 CFR 141.60 (Effective Dates); 40 CFR 141.62

(Maximum contaminant levels for inorganic contaminants); Appendix A to Subpart O ([Consumer Confidence Report] Regulated contaminants); Appendix A to Subpart Q (NPDWR violations and other situations requiring public notice); Appendix B to Subpart Q (Standard health effects language for public notification); and 40 CFR 142.62 (Variances and exemptions from the maximum contaminant levels for organic and inorganic contaminants). Under 40 CFR 142.12(b), all primacy States/territories/tribes would be required to submit a revised program to the EPA for approval within two years of promulgation of any final perchlorate NPDWR or could request an extension of up to two years in certain circumstances.

### B. What are the State recordkeeping requirements?

The current regulations in 40 CFR 142.14 require States with primary enforcement responsibility (*i.e.,* primacy) to keep records of analytical results to determine compliance, system inventories, sanitary surveys, State approvals, vulnerability and waiver determinations, monitoring requirements, monitoring frequency decisions, enforcement actions, and the issuance of variances and exemptions. The State record keeping requirements remain unchanged and would apply to perchlorate as with any other regulated contaminant.

### C. What are the State reporting requirements?

Currently, States must report to the EPA information under 40 CFR 142.15 regarding violations, variances and exemptions, enforcement actions and general operations of State public water supply programs. The State reporting requirements remain unchanged and would apply to perchlorate as with any

other regulated contaminant. However, the perchlorate MCL could result in a greater frequency of reporting by certain states. See discussion of Paperwork Reduction Act compliance in Section XVI for more information.

## XII. Health Risk Reduction Cost Analysis

Section 1412(b)(3)(C) of the 1996 Amendments to the SDWA requires the EPA to prepare a Health Risk Reduction and Cost Analysis (HRRCA) in support of any NPDWR that includes an MCL. This section addresses the HRRCA requirements as indicated:

• Quantifiable and non-quantifiable health risk reduction benefits for which there is a factual basis in the rulemaking record to conclude that such benefits are likely to occur as the result of treatment to comply with each level (Sections XII.C and XII.D);

• Quantifiable and non-quantifiable health risk reduction benefits for which there is a factual basis in the rulemaking record to conclude that such benefits are likely to occur from reductions in co-occurring contaminants that may be attributed solely to compliance with the MCL, excluding benefits resulting from compliance with other proposed or promulgated regulations (Section XII.C);

• Quantifiable and non-quantifiable costs for which there is a factual basis in the rulemaking record to conclude that such costs are likely to occur solely as a result of compliance with the MCL, including monitoring, treatment, and other costs, and excluding costs resulting from compliance with other proposed or promulgated regulations (Section XII.B and XII.D);

• The incremental costs and benefits associated with each alternative MCL considered (Section XII.D);

• The effects of the contaminant on the general population and on groups within the general population, such as

infants, children, pregnant women, the elderly, individuals with a history of serious illness, or other sensitive populations that are identified as likely to be at greater risk of adverse health effects due to exposure to contaminants in drinking water than the general population (Section XII.C and Section III);

• Any increased health risk that may occur as the result of compliance, including risks associated with co-occurring contaminants (Section XII.C); and

• Other relevant factors, including the quality and extent of the information, the uncertainties in the analysis, and factors with respect to the degree and nature of the risk (Section XII.E).

### A. Identifying Affected Entities

If the EPA issues a final NPDWR for perchlorate, it would affect the following entities: CWSs and NTNCWSs that must meet the proposed MCL and monitoring and reporting requirements; and primacy agencies that must adopt and enforce the MCL as well as the monitoring and reporting requirements. All of these entities would incur costs, including administrative costs, monitoring and reporting costs, and—in a limited number of cases—costs to reduce perchlorate levels in drinking water to meet the proposed MCL using treatment or nontreatment options. Section B below summarizes the method the EPA used to estimate these costs.

The systems that reduce perchlorate concentrations will reduce associated health risks. The EPA developed a method to estimate the potential benefits of reduced perchlorate exposure among the service populations of systems with elevated baseline perchlorate levels. Section C below summarizes this method used to estimate these benefits.

Section D below provides the cost and benefit estimates. The EPA prepared the Health Risk Reduction Cost Analysis of the Proposed Perchlorate Rule (USEPA, 2019a), which is available in the docket for the proposed rule. Section XIII summarizes and discusses key uncertainties in the cost and benefit analyses.

### B. Method for Estimating Costs

Some costs associated with an NPDWR are incurred by all CWS and NTNCWS (e.g., monitoring and reporting) while others are only incurred by systems with perchlorate levels exceeding the MCL. The EPA estimated costs for CWS and NTNCWS to monitor and report perchlorate levels and also estimated the costs for a subset of public water systems with perchlorate levels greater than the proposed MCL to install and operate treatment. The EPA assumed that affected water systems would adopt ion exchange treatment because it is the most cost-effective treatment option and easy to operate on a 'throw-away' basis. If site-specific nontreatment options are available and lower cost, then this assumption might overstate costs. The EPA also estimated the costs for States and other primacy agencies to assure systems implement the rule and to report information to the EPA.

The EPA estimated initial costs for all CWS and NTNCWS operators to read and understand the rule and provide training to their staff to implement the proposed rule. The EPA also estimated the recurring costs for all CWS and NTNCWS operators to conduct monitoring, report results, and apply for waivers. For the purpose of these estimates, the EPA assumed that both small and large systems would require the same amount of time to read the rule, apply for a waiver, and collect a water sample but that it would take large systems twice as long to provide initial training to their staff. Table XII–1 summarizes the frequency and labor hour assumptions for this analysis.

#### TABLE XII–1—LABOR HOURS FOR DRINKING WATER SYSTEMS ADMINISTRATIVE AND MONITORING REQUIREMENTS

| Activity | Frequency | Small system hours | Large system hours |
|---|---|---|---|
| Read the rule | one time per system | 4 | 4 |
| Provide initial training | one time per system | 16 | 32 |
| Apply to State for monitoring waiver | once every 9 years per eligible system | 16 | 16 |
| Collect a single finished water sample [1] | per monitoring event | 1 | 1 |

Source (USEPA, 2000a). The EPA's cost analysis reflects full MCL compliance and therefore the EPA did not estimate Tier 1 notification costs.

[1] The estimate is per sample. Therefore, a system conducting a year of quarterly monitoring at three entry points incurs a total of 12 hours of labor to complete the task (3 entry points × 4 samples × 1 hour per sample).

Systems will incur monitoring costs over the analysis period. The EPA estimated monitoring frequency based on the proposed initial monitoring requirements, the standard monitoring framework requirements for inorganic contaminants, and the proposed implementation schedule. The estimated number of monitoring samples over the analysis period shown in Table XII–2 reflect the following phases:

1. Initial monitoring; four quarterly samples at every CWS and NTNCWS entry point.

2. Preliminary regular monitoring before waiver application: Three regular monitoring samples for every CWS and NTNCWS entry point (collected annually at surface water system entry points and triennially at ground water system entry points).

3. Long-term monitoring at either (a) regular monitoring frequency for entry points at systems not granted waivers (60% of surface water system and 10% of ground water systems), or (b) reduced monitoring frequency for entry points at systems receiving waivers from primacy agencies (40% of surface water systems and 90% of ground water systems), which is one sample during every nine-year compliance monitoring cycle.

#### TABLE XII–2—ESTIMATES OF COMPLIANCE MONITORING SAMPLES BY PHASE AND SYSTEM TYPE, SIZE, AND SOURCE WATER

| Monitoring phase (sampling frequency) | System type, size, and source water | Number of entry points [1] | Aggregate samples [2] |
|---|---|---|---|
| 1. Initial monitoring (4 quarterly samples in one year) | All CWS and NTNCWS | 92,656 | 370,624 |

TABLE XII–2—ESTIMATES OF COMPLIANCE MONITORING SAMPLES BY PHASE AND SYSTEM TYPE, SIZE, AND SOURCE WATER—Continued

| Monitoring phase (sampling frequency) | System type, size, and source water | Number of entry points [1] | Aggregate samples [2] |
|---|---|---|---|
| 2. Preliminary regular monitoring (3 annual entry point samples for surface water systems and 3 triennial entry point samples for ground water systems). | All CWS and NTNCWS ................................................ | 92,654 | 277,962 |
| 3a. Long-term monitoring, no waiver (annual entry point samples). | 60% of large surface water CWS ................................ | 3,324 | 86,424 |
| | 60% of small surface water CWS and all surface water NTNCWS. | 6,064 | 139,472 |
| 3a. Long-term monitoring, no waiver (triennial entry point samples). | 10% of large ground water CWS ................................ | 680 | 4,080 |
| | 10% of small ground water CWS and all ground water NTNCWS. | 7,021 | 35,105 |
| 3b. Long-term monitoring, waiver (1 sample every 9 years). | 40% of large surface water CWS ................................ | 2,216 | 4,432 |
| | 40% of small surface water CWS and all surface water NTNCWS. | 4,043 | 8,086 |
| 3b. Long-term monitoring, waiver (1 sample every 9 years). | 90% of large ground water CWS ................................ | 6,117 | 12,234 |
| | 90% of small ground water CWS and all ground water NTNCWS. | 63,189 | 63,189 |

Source: Perchlorate Benefit-Cost Analysis Spreadsheet available in the proposed rule docket (EPA–HQ–OW–2018–0780).

[1] The EPA estimated a total of 92,656 entry points based on the total number of potentially affected systems in SDWIS/FED and the average number of entry points per system in the UCMR 1 data by size category and source water. The initial monitoring phase includes all entry points. The EPA assumed that the two entry points with MCL exceedances at the proposed MCL of 56 μg/L would continue to take quarterly samples for the duration of the analysis period, for a total of 232 samples. Thus, they are excluded from the estimates for the subsequent phases of regular and long-term monitoring. Primacy agencies may, however, allow monitoring to return to a regular schedule if treatment process operation can reliably and consistently reduce perchlorate below the MCL.

[2] For Phase 3, the estimate of aggregate samples is the product of the number of entry points and the frequency of sampling during the remaining years of the analysis period. For example, large surface water CWS without a waiver conduct long-term annual monitoring for 26 years because they complete preliminary regular monitoring in year 9. In contrast, large ground water CWS without a waiver begin long-term triennial monitoring in year 16 because their preliminary regular monitoring phase lasts for 9 years (3 triennial samples) instead of 3 years (3 annual samples). The estimates also reflect schedule differences by size because large CWS begin monitoring schedules three years earlier than small CWS and all NTNCWS.

To estimate costs to CWSs and NTNCWSs associated with time spent on compliance monitoring and other administrative costs, the EPA generally uses the labor rate [13] for full-time treatment plant operators in CWSs from USEPA (2011c), which vary based on the size of the system. The EPA calculated a weighted average fully loaded hourly wage rate for water systems of $34.71.

Additionally, the EPA assumed that systems will incur an average analytical cost of $64 per sample, which is the average cost per sample obtained from multiple laboratories for perchlorate quantitation using Method 314.0.

To estimate treatment cost, the EPA utilized the occurrence data described in Section VI to estimate the number of system entry points that exceed the proposed and alternative MCLs. The EPA estimated costs that those water systems would incur to install and maintain treatment using its work breakdown structure (WBS) cost estimating models. The WBS models are spreadsheet-based engineering models for individual treatment technologies, linked to a central database of component unit costs. The WBS approach involves breaking a process down into discrete components for the

purpose of estimating costs and produce a comprehensive assessment of the capital and operating requirements for a treatment system.[14] The EPA used the WBS models to generate total capital and O&M cost estimates for each technology and nontreatment option for up to 49 different system flow rates. The EPA generated separate estimates that correspond to different water sources (groundwater or surface water), three different cost levels (low, mid, and high), and different technology-specific scenarios (e.g., 105,000 or 170,000 bed volumes for ion exchange). The EPA used the mid-cost estimates for ion exchange to generate expected costs for all entry points requiring perchlorate removal. This technology cost-effectively removes perchlorate, but its ability to remove co-occurring contaminants depends on influent characteristics and process design. Therefore, the EPA did not assume that treatment might result in ancillary quantifiable or non-quantifiable benefits of removing co-occurring ions such as nitrate. Treatment costs include waste disposal for spent resin, but do not include post-treatment costs for corrosion control because blending rates at most entry points should not result in

much chloride addition or changes in corrosivity.

For purposes of estimating the costs and benefits, the EPA assumed that CWSs and NTNCWSs in California and Massachusetts would not incur additional cost or realize benefits because these States currently regulate perchlorate at a more stringent level than the proposed MCL and alternative MCL. For each entry point in the UCMR 1 dataset outside of these two States, the EPA compared the maximum observed perchlorate concentration to the MCL to identify those that have an exceedance of the proposed MCL. The EPA assumed that these entry points would incur costs for an additional confirmation sample and would need to implement treatment to meet the MCL. For each entry point, the EPA estimated the design flow and the average flow by service populations based on the Agency's prior analysis of the relationships between these values (USEPA, 2000b). The Agency assumed blending of treated water and untreated water would be used to meet an average treatment target equal to 80 percent of the MCL (for an MCL of 56 μg/L the blending target would be 45 μg/L) given a 95 percent removal effectiveness until perchlorate breakthrough. The Agency applied the capital cost and O&M cost curves from the WBS models to the design and average flows adjusted for

[13] Updated to 2017$ using the BLS Employment Cost Index for Total Compensation for Private industry workers in Utilities.

[14] The document *Technologies and Costs for Treating Perchlorate-Contaminated Waters* (USEPA, 2018c) contains more complete discussion of the WBS models and the cost estimating approach.

blending. When small systems in the UCMR 1 sample incurred treatment costs, the EPA extrapolated the costs on a per capita basis to the estimate of national population exposure derived using the small system population sampling weights.

For the primacy agencies that will implement and enforce the rule (including 49 States, one tribal nation and 5 territories), the EPA estimated upfront costs incurred during the three years between rule promulgation and the effective date to read and understand the rule, adopt regulatory changes, and provide training to CWSs and NTNCWSs and Agency staff.

Primacy agencies will also have recurring costs to review waiver applications and monitoring reports. Table XII–3 summarizes the labor hour assumptions for these activities. The EPA requests comments on these assumptions.

### TABLE XII–3—LABOR HOURS FOR PRIMACY AGENCY ADMINISTRATIVE REQUIREMENTS

| Activity | Frequency | Hours |
|---|---|---|
| Read and understand the rule, adopt regulatory changes [1] | one time per Agency | 416 |
| Provide initial training and assistance to water systems [2] | total per Agency | 2,080 |
| Provide initial training to staff [2] | total per Agency | 250 |
| Review waiver applications | once every 9 years per eligible system | 8 |
| Review monitoring reports | per monitoring event | 1 |

Source (USEPA, 2000a).

[1] The EPA assumed that two States that already regulate perchlorate in drinking water would not incur the incremental burdens in this table to regulate perchlorate under the proposed rule because they already incur baseline costs for perchlorate regulation including monitoring costs. The Agency assumed, however, that the two States would incur an average of 40 hours to confirm that their existing requirements are at least as protective as the proposed rule.

[2] The EPA assumed that all training hours occur in a single year, although the hours may actually occur over time. The total hour estimates are average values across States.

State labor rates are based on the mean hourly wage rate from Bureau of Labor Statistics (BLS) Standard Occupational Classification code 19–2041 (State Government—Environmental Scientists and Specialists, Including Health). Wages are loaded using a factor calculated from the BLS Employer Costs for Employee Compensation report (Bureau of Labor Statistics (BLS), 2016 Table 3), for a fully loaded hourly wage rate for States of $50.67. The EPA requests comments on these labor rate assumptions.

The proposed rule provides three years between the effective dates and compliance dates for systems. For the purpose of estimating costs, the EPA assumed that large CWSs would phase in administrative costs, including initial monitoring, and upfront administrative costs uniformly over the 3 years following the effective date (i.e., years 4 to 6 of the analysis period). Similarly, the EPA assumed that small CWSs and NTNCSs will phase in these costs over the subsequent three-year period (i.e., years 7 to 9 of the analysis period). The EPA assumed that, within these periods, all systems would conduct initial monitoring—one year of quarterly monitoring to determine whether perchlorate concentrations are consistently and reliably below the proposed MCL. Thereafter, systems with MCL exceedances would continue to monitor quarterly, while systems below the MCL that obtain waivers will monitor annually for three years (surface water systems) or triennially for 9 years (ground water systems), then incur costs for a waiver application.

Thereafter, these systems will continue reduced monitoring—once every nine years—under subsequent waivers. Systems that are below the MCL without waivers will monitor once per year (surface water systems) or once every three years (groundwater). Consistent with USEPA (2008b), the EPA assumed that 90% of groundwater and 40% of surface water systems that have all entry points below the MCL would obtain waivers.

The EPA estimated the costs over a 35-year analysis period, which includes a 3-year period prior to the effective date to allow for State rule adoption activities, a 3-year period after the effective date to allow initial monitoring among large CWSs, and a 3-year period after that to allow initial monitoring for small CWSs and NTNCWSs. Evaluating costs over 35 years covers a full life cycle of the capital investments that large systems make in the 6th year; the WBS estimates of composite useful life of the equipment and infrastructure investment is approximately 30 years. The EPA assumed that treatment modifications will be completed in the final year of the initial monitoring period (i.e., year 6 of the analysis for large CWSs and year 9 for small CWSs and NTNCWSs). The EPA calculated the present value of total costs in each year of the analysis period and discounted to year 1 using both a 3% and 7% discount rate and annualized total present value of costs at the same rates over 35 years to obtain a constant total annual cost estimate to compare to total annual benefits.

Water systems typically recover costs through increased household rates, resulting in increased costs at the household level.[15] To calculate the magnitude of the cost increase for systems that exceed the proposed MCL or alternative MCL, the EPA first estimated the number of households that may incur costs as a result of the rule based on the population served by affected CWSs and NTNCWSs and the average household size (U.S. Census Bureau, 2017b). The EPA divided the total annual system-level costs by the number of households served by the system.

### C. Method for Estimating Benefits

The EPA has taken an approach in evaluating the benefits for perchlorate that is consistent with the SAB's recommendations for the methodology to inform the MCLG for perchlorate. This approach involves (a) using a BBDR model to estimate the impact of perchlorate on maternal thyroid hormone levels during the first trimester of pregnancy, and (b) using a dose-response function from the epidemiological literature to model the relationship between altered maternal thyroid hormone levels and offspring IQ. Currently available science has limited this quantitative benefits assessment to the relationship between perchlorate and IQ. Given that alterations in thyroid hormones have been associated with other adverse outcomes, including reproductive outcomes (Alexander et al., 2017; Hou et

---

[15] For systems with monitoring costs only, household-level costs will be negligible.

al., 2016; Maraka et al., 2016) and effects on cardiovascular systems (Asvold et al., 2012; Sun et al., 2017) there are likely non-quantified effects of risk reductions for other endpoints or reduced exposure to co-occurring contaminants, which are addressed below. Uncertainties regarding the quantifiable benefits are also addressed below.

The population impacted by the rule for which benefits can be quantified is specific to live births from mothers who were served by a CWS or NTNCWS with perchlorate concentrations above the potential MCLs. To determine the nationwide population of children that will experience a quantifiable benefit of avoided IQ decrements from reducing maternal perchlorate exposure during pregnancy, the EPA first estimated the total population being served by systems above the MCL based on data from UCMR 1. The EPA then multiplied the total population served for each affected CWS and NTNCWS by the proportion of women of childbearing age (aged 15–44) in the US, which is 19.7 percent (U.S. Census Bureau, 2017a). The number of women of childbearing age for each entry point was then multiplied by the annual number of live births in the US, or 62 births per 1,000 women (6.2 percent) (Martin, Hamilton, & Osterman, 2017).

The EPA used a two-step dose-response model to estimate health benefits of a reduction in perchlorate exposure as a result of regulating perchlorate in drinking water not to exceed the proposed MCL of 56 µg/L and alternative MCLs of 18 µg/L and 90 µg/L. The first step relates changes in perchlorate to changes in maternal free-thyroxine (fT4) during the first trimester of pregnancy using the EPA's BBDR model. Because the dose-response relationship between perchlorate exposure and maternal fT4 is dependent

on maternal iodine intake status, this first-step analysis is repeated for several categories of iodine intake. For the BBDR simulations, the EPA used the 90th percentile ingestion rate to be consistent with the MCLG modeling approach, which may overstate the exposure in the simulation.

The second step of the dose-response model subsequently relates the predicted changes in maternal fT4 from the BBDR model to changes in child IQ using the function estimated in the EPA independent analysis of the Korevaar et al., (2016) study data. Ultimately, the changes in IQ are estimated for each impacted iodine intake group, and all of the impacted iodine intake groups' IQ decrements are averaged together based on the proportion of individuals in each iodine intake category. Table XII–4 shows the specific iodine intake groups and the proportion of non-pregnant women of childbearing age that fall into each group.

TABLE XII–4—PROPORTION OF POPULATION BASED ON MATERNAL IODINE INTAKE STATUS

| Iodine intake range (µg/day) used for benefits analysis | Proportion of the population (%) |
|---|---|
| 0 to <55 | 7.14 |
| 55 to <60 | 2.15 |
| 60 to <65 | 1.06 |
| 65 to <70 | 1.86 |
| 70 to <75 | 1.31 |
| 75 to <80 | 3.10 |
| 80 to <85 | 2.62 |
| 85 to <90 | 1.20 |
| 90 to <95 | 1.83 |
| 95 to <100 | 2.94 |
| 100 to <125 | 13.56 |
| 125 to <150 | 9.08 |
| 150 to <170 | 10.31 |
| 170 to <300 | 24.47 |
| ≥300 | 17.36 |

Source: U.S. EPA (2019a).

These changes in child IQ are then monetized using the EPA's estimate of

the value of an IQ point. This estimate reflects the discounted present value of lifetime income reductions attributable to a 1-point reduction in IQ at birth. Therefore, the present value depends on the discount rate. At a 3 percent discount rate, the estimate is $18,686 per IQ point; at a 7 percent discount rate the estimate is $3,631.

Other potential benefits not quantified or monetized include additional avoided health effects which cannot currently be monetized, improved public perception of water quality, as well as a possible reduction of other co-occurring contaminants that target the thyroid, such as nitrate, as a result of water treatment for removal of perchlorate. For example, all of the treatment technologies evaluated for this rule (ion exchange, biological treatment, and reverse osmosis) can also remove co-occurring nitrate from drinking water. Section XIII provides additional discussion of uncertainties in this analysis.

*D. Comparison of Costs and Benefits*

This section provides the estimates of costs and benefits that the EPA derived using the methods described above. It includes estimates for the proposed and alternative MCLs.

For the proposed MCL of 56 µg/L, Table XII–5 summarizes the total estimated cost of the proposed rule to water systems and primacy agencies, and Table XII–6 summarizes the estimated per-household cost for the system incurring treatment costs.[16] Table XII–7 summarizes the estimated benefits. In both instances, the estimates based on the UCMR 1 sample are also national estimates because treatment costs occur only at large systems; there are no small system treatment costs or related benefits to extrapolate.

TABLE XII–5—SUMMARY OF TOTAL ANNUALIZED COSTS AT MCL OF 56 µg/L

[Millions; 2017$]

| Cost component | 3% Discount | 7% Discount |
|---|---|---|
| Drinking Water Systems Treatment Costs | $0.65 | $0.70 |
| Drinking Water Systems Monitoring and Administration Costs[1] | 5.93 | 6.38 |
| Drinking Water Systems Costs Subtotal | 6.58 | 7.07 |
| State Administration Costs | 3.09 | 3.20 |
| Total Costs | 9.67 | 10.28 |

Source: (USEPA, 2019a). Detail may not sum to total because of independent rounding.

---

[16] For all households served by all of the systems subject to the monitoring costs as well as MCL compliance, the average annual cost is less than $0.20.

[1] Costs include monitoring for all CWS and NTNCWS. Some consecutive systems that purchase 100% of their water from wholesale systems may not be required to monitor for perchlorate provided States allow integrated system agreements to include perchlorate among the monitoring requirements that the wholesale system fulfills for the consecutive system. The potential number of consecutive systems excluded from perchlorate monitoring depends on system and State decisions and, therefore, is unknown. Excluding monitoring costs for approximately 8,400 consecutive systems that do not report a water source facility (*e.g.,* well or intake) in SDWIS/FED from the monitoring cost analysis reduces annualized monitoring costs by $0.8 million.

TABLE XII–6—SUMMARY OF HOUSEHOLD-LEVEL ANNUAL COSTS FOR SYSTEMS TREATING TO COMPLY WITH MCL AT 56 µg/L

[2017$]

| Cost range | 3% Discount | 7% Discount |
|---|---|---|
| Minimum | $11 | $14 |
| Average | 40 | 47 |
| Maximum | 69 | 80 |

Source: (USEPA, 2019a).

TABLE XII–7—SUMMARY OF TOTAL ANNUALIZED BENEFITS OF AVOIDED LOST IQ DECREMENTS AT MCL OF 56 µg/L

[Millions; 2017$]

| Korevaar β distribution | Annual delta IQ | 3% Discount | 7% Discount |
|---|---|---|---|
| Upper | 243 | $3.57 | $0.60 |
| Central | 136 | 2.00 | 0.34 |
| Lower | 30 | 0.44 | 0.07 |

Source: (USEPA, 2019a).

For the alternative MCL of 18 µg/L, Table XII–8 summarizes the total cost of the proposed rule to water systems and primacy agencies, and Table XII–9 summarizes the per-household cost for systems requiring treatment, which vary across the systems. Table XII–10 summarizes the quantified benefits. At this threshold, one entry point for one small system in the UCMR 1 data had an exceedance. Therefore, the EPA extrapolated the treatment costs and benefits from the UCMR 1 estimates to national estimates based on sampling weights.

TABLE XII–8—SUMMARY OF TOTAL ANNUALIZED COSTS AT MCL OF 18 µg/L

[Millions; 2017$]

| Cost component | 3% Discount (UCMR 1)[1] | 7% Discount (UCMR 1)[1] | 3% Discount (national)[1] | 7% Discount (national)[1] |
|---|---|---|---|---|
| Drinking Water Systems Treatment Costs | $6.92 | $7.29 | $7.92 | $8.37 |
| Drinking Water Systems Monitoring and Administration Costs | 5.94 | 6.38 | 5.94 | 6.38 |
| Drinking Water Systems Subtotal | 12.85 | 13.67 | 13.86 | 14.75 |
| State Administration Costs | 3.09 | 3.21 | 3.09 | 3.21 |
| Total Costs | 15.95 | 16.88 | 16.95 | 17.96 |

Source: (USEPA, 2019a). Detail may not sum to total because of independent rounding.

[1] The EPA applied statistical sampling weights to the results to extrapolate small system results to national results. The entry point at which a measurement exceeds 18 µg/L is one of 20 in its sample stratum; no other sample in the stratum had a measurement of perchlorate greater than the minimum reporting level. The entry point population of 2,155 represents 5.31% of the total population served by the six UCMR 1 systems in the stratum (40,574). Currently, the stratum population of 775,000 accounts for 1.32% of the 58.7 million national population served by small systems. Thus, the UCMR 1 results indicate that 0.07% (5.31% × 1.32%) of small system customers (approximately 41,100) may be exposed to perchlorate greater than 18 µg/L. The EPA calculated per-capita costs for the system and extrapolated to national level based on this population estimate.

[2] Costs include monitoring for all CWS and NTNCWS. Under 40 CFR 141.29 some consecutive systems that purchase 100% of their water from wholesale systems may not be required to monitor for perchlorate provided primacy agencies, with EPA concurrence, allow integrated system agreements to include perchlorate among the monitoring requirements that the wholesale system fulfills for the consecutive system. The potential number of consecutive systems excluded from perchlorate monitoring depends on system and primacy agency decisions and, therefore, is unknown. Excluding monitoring costs for approximately 8,400 consecutive systems that do not report a water source facility (*e.g.,* well or intake) in SDWIS/FED from the monitoring cost analysis reduces annualized monitoring costs by $0.8 million.

TABLE XII–9—SUMMARY OF HOUSEHOLD-LEVEL ANNUAL COSTS FOR SYSTEMS TREATING TO COMPLY WITH THE MCL AT 18 µg/L

[2017$]

| Cost range | 3% Discount (UCMR 1)[1] | 7% Discount (UCMR 1)[1] | 3% Discount (national)[1] | 7% Discount (national)[1] |
|---|---|---|---|---|
| Minimum | $18 | $24 | $18 | $24 |
| Average | 38 | 46 | 38 | 46 |

TABLE XII–9—SUMMARY OF HOUSEHOLD-LEVEL ANNUAL COSTS FOR SYSTEMS TREATING TO COMPLY WITH THE MCL AT 18 µg/L—Continued

[2017$]

| Cost range | 3% Discount (UCMR 1)[1] | 7% Discount (UCMR 1)[1] | 3% Discount (national)[1] | 7% Discount (national)[1] |
|---|---|---|---|---|
| Max ................................................................. | 72 | 84 | 72 | 84 |

Source: (USEPA, 2019a).

[1] National cost estimates include extrapolation for one small system entry point to national estimates based on sampling weights. The per-household costs are the same for the sample and national extrapolations because the small system cost extrapolation occurs on a per-capita basis.

TABLE XII–10—TOTAL AND ANNUALIZED BENEFITS OF AVOIDED LOST IQ DECREMENTS AT 18 µg/L

[Millions; 2017$]

| Korevaar β distribution | Annual delta IQ | | UCMR 1 | | National[1] | |
|---|---|---|---|---|---|---|
| | UCMR 1 | National[1] | 3% Discount | 7% Discount | 3% Discount | 7% Discount |
| Upper ........................................... | 442 | 447 | $6.50 | $1.10 | $6.56 | $1.11 |
| Central ........................................ | 248 | 251 | 3.65 | 0.62 | 3.68 | 0.62 |
| Lower .......................................... | 54 | 55 | 0.80 | 0.13 | 0.80 | 0.14 |

Source: (USEPA, 2019a).

[1] The EPA applied statistical sampling weights to the results to extrapolate small system results to national results. The entry point at which a measurement exceeds 18 µg/L is one of 20 in its sample stratum; no other sample in the stratum had a measurement of perchlorate greater than the minimum reporting level. The entry point population of 2,155 represents 5.31% of the total population served by the six UCMR 1 systems in the stratum (40,574). Currently, the stratum population of 774,780 accounts for 1.32% of the 58.7 million national population served by small systems. Thus, the UCMR 1 results indicate that 0.07% (5.31% × 1.32%) of small system customers (approximately 41,100) may be exposed to perchlorate greater than 18 µg/L. The EPA assumed that this population would incur benefits equivalent to the sampled entry point's population.

For the alternative MCL of 90 µg/L, Table XII–11 summarizes the total cost of the proposed rule to water systems and primacy agencies, and Table XII–12 summarizes the per-household cost for systems requiring treatment, which vary across the systems. Table XII–13 summarizes the quantified benefits. At this threshold, no small systems in the UCMR 1 data had an exceedance. Therefore, treatment costs and benefits for the UCMR 1 data are the national estimates.

TABLE XII–11—SUMMARY OF TOTAL ANNUALIZED COSTS AT MCL OF 90 µg/L

[Millions; 2017$]

| Cost component | 3% discount | 7% discount |
|---|---|---|
| Drinking Water Systems Treatment Costs ........................................................... | $0.49 | $0.52 |
| Drinking Water Systems Monitoring and Administration Costs[1] ......................... | 5.93 | 6.37 |
| Drinking Water Systems Costs Subtotal ............................................................. | 6.42 | 6.89 |
| State Administration Costs ................................................................................. | 3.09 | 3.20 |
| Total Costs ................................................................................................. | 9.51 | 10.10 |

Source: (USEPA, 2019a). Detail may not sum to total because of independent rounding.

[1] Costs include monitoring for all CWS and NTNCWS. Some consecutive systems that purchase 100% of their water from wholesale systems may not be required to monitor for perchlorate provided States allow integrated system agreements to include perchlorate among the monitoring requirements that the wholesale system fulfills for the consecutive system. The potential number of consecutive systems excluded from perchlorate monitoring depends on system and State decisions and, therefore, is unknown. Excluding monitoring costs for approximately 8,400 consecutive systems that do not report a water source facility (e.g., well or intake) in SDWIS/FED from the monitoring cost analysis reduces annualized monitoring costs by $0.8 million.

TABLE XII–12—SUMMARY OF HOUSEHOLD-LEVEL ANNUAL COSTS FOR SYSTEMS TREATING TO COMPLY WITH MCL AT 90 µg/L

[2017$]

| Cost range | 3% Discount | 7% Discount |
|---|---|---|
| Minimum ............................................................................................................. | $65 | $76 |
| Average .............................................................................................................. | 65 | 76 |
| Maximum ............................................................................................................ | 65 | 76 |

Source: (USEPA, 2019a). There is no variation in costs because treatment costs occur at one entry point. The household costs are slightly lower compared to the maximum cost at 56 µg/L because treatment costs to meet an MCL of 90 µg/L are lower than the costs to meet an MCL of 56 µg/L.

Table XII–13—Summary of Total Annualized Benefits of Avoided Lost IQ Decrements at MCL of 90 μg/L

[Millions; 2017$]

| Korevaar β distribution | Annual delta IQ | 3% Discount | 7% Discount |
|---|---|---|---|
| Upper | 222 | $3.26 | $0.55 |
| Central | 124 | 1.83 | 0.31 |
| Lower | 27 | 0.40 | 0.07 |

Source: (USEPA, 2019a).

Table XII–14 provides a comparison of benefits and costs for three MCL values. First, the table shows the total annual costs and total annual benefits for each MCL. In all cases, the total costs are substantially higher than the potential range of quantifiable benefits. The table also shows the incremental impact on costs and benefits between an MCL of 56 μg/L and an MCL of 18 μg/L and between an MCL of 90 μg/L and 56 μg/L.

Section 1412(b)(4)(C) of the SDWA requires that when proposing a national primary drinking water regulation, "the Administrator shall publish a determination as to whether the benefits of the maximum contaminant level justify, or do not justify, the costs." The infrequent occurrence of perchlorate at levels of health concern imposes high monitoring and administrative cost burdens on public water systems and the States. Based on a comparison of costs and benefits estimated at the proposed MCL of 56 μg/L using the best available science and data, the EPA Administrator has determined based upon the available information that the benefits of establishing an NPDWR for perchlorate do not justify the associated costs.

Under these circumstances, Section 1412(b)(6)(A) of the SDWA provides, with exceptions not relevant here, that "the Administrator *may*, after notice and opportunity for public comment promulgate a maximum contaminant level for the contaminant that maximizes health risk reduction benefits at a cost that is justified by the benefits." The EPA has evaluated the benefits and costs of alternative MCL values of 18 μg/L and 90 μg/L. However, based upon the available information the Administrator also finds that the benefits of an NPDWR at the alternative MCL values would not justify the resulting rule costs. The alternative MCLs would not increase net benefits, while compliance costs associated mainly with nationwide CWS monitoring requirements would remain relatively similar. Consistent with the discretion afforded the Agency by SDWA Section 1412(b)(6)(A) to decide whether or not to adjust an MCL to a level where the benefits justify the costs, the EPA is however proposing, and may finalize, the MCL of 56 μg/L notwithstanding the Agency's determination that benefits would not justify the costs.

Table XII–14—Comparison of Annual Costs and Benefits by MCL

[Millions; 2017$]

| MCL value | Cost 3% discount | Benefit 3% discount | Cost 7% discount | Benefit 7% discount |
|---|---|---|---|---|
| UCMR 1: | | | | |
| 90 μg/L | $9.51 | $0.40–$3.26 | $10.10 | $0.07–$0.55 |
| 56 μg/L | 9.67 | 0.44–3.57 | 10.28 | 0.07–0.60 |
| 18 μg/L | 15.95 | 0.80–6.50 | 16.88 | 0.13–1.10 |
| Incremental (from 90 μg/L to 56 μg/L) | 0.16 | 0.04–0.31 | 0.18 | 0.0–0.05 |
| Incremental (from 56 μg/L to 18 μg/L) | 6.28 | 0.36–2.93 | 6.60 | 0.06–0.50 |
| National: | | | | |
| 90 μg/L | 9.51 | 0.40–3.26 | 10.10 | 0.07–0.55 |
| 56 μg/L [1] | 9.67 | 0.44–3.57 | 10.28 | 0.07–0.60 |
| 18 μg/L | 16.95 | 0.80–6.56 | 17.96 | 0.14–1.11 |
| Incremental (from 90 μg/L to 56 μg/L) | 0.16 | 0.04–0.31 | 0.18 | 0.0–0.05 |
| Incremental (from 56 μg/L to 18 μg/L) | 7.28 | 0.36–2.99 | 7.69 | 0.07–0.51 |

Source: (USEPA, 2019a). Detail may not sum to total because of independent rounding.
[1] For the proposed MCL of 56 μg/L and the alternative MCL of 90 μg/L, the national estimates are the same as the estimates based on UCMR 1 data because there were no small system sample results to extrapolate to national system estimates. At an MCL of 18 μg/L, national estimates include extrapolation for one small system entry point to national estimates based on sampling weights described above.

## XIII. Uncertainty Analysis

The EPA has presented an extensive discussion of the uncertainties in the key analyses informing this proposal in the uncertainty section of the MCLG Approaches Report and the uncertainties section of the Economic Analysis document (*USEPA, 2018b; USEPA, 2019a*). A summarized description of these uncertainties are presented below.

### A. Uncertainty in the MCLG Derivation

Each input into the analysis to inform the MCLG is a decision point associated with uncertainty. There is uncertainty in different aspects of the BBDR model, ranging from structural and functional relationships to specific parameter values for early pregnancy. There are very few data available to calibrate the pharmacokinetic aspects of the model, particularly at the life stage of interest.

Also, the BBDR model does not explicitly consider the effect of the presence of other goitrogens (*e.g.*, thiocyanate, nitrate) or effects of thyroid disease states. Toxicodynamic aspects such as competitive inhibition at the NIS, depletion of iodide stores under different iodine intake levels and physiological states, and the ability of the TSH feedback loop to compensate for perturbations in thyroid function

each have their own uncertain features. Additional uncertainty is introduced by linking the BBDR model estimates of maternal fT4 to altered neurodevelopment in offspring. None of the studies used to evaluate potential adverse neurodevelopmental outcomes in offspring born to hypothyroxinemic mothers was performed in the U.S. None of the studies measured perchlorate exposure. Not all the studies measured iodide levels in the study populations. The state of the science on the relationship between maternal fT4

levels and offspring neurodevelopment is constantly evolving. There are numerous indices used to assess neurodevelopmental impacts and there is some uncertainty regarding the selection of IQ as the critical endpoint for setting the MCLG.

A recently published paper evaluating the EPA's BBDR model and MCLG Approaches, reiterated the uncertainties the Agency identified in its analyses and questions the use of these quantitative tools for perchlorate in a regulatory context (Clewell et al., 2019).

### B. Uncertainty in the Economic Analysis

The EPA provides discussions regarding several sources of uncertainty in the benefit and cost estimates in the Health Risk Reduction and Cost Analysis (USEPA, 2019a). Table XIII–1 provides a summary of sources of uncertainty and their potential effects on estimated costs and benefits. The following discussion addresses uncertainties specific to the benefits analysis.

### TABLE XIII–1—SOURCES OF UNCERTAINTY IN ECONOMIC ANALYSIS

| Description | Potential effect [1] |
|---|---|
| **Baseline Occurrence** | |
| UCMR 1 data are more than one decade old; actual occurrence could be lower (e.g., because of contaminant cleanup) or higher (e.g., because new systems use perchlorate-contaminated source water). | ± (benefits and costs will change in the same direction). |
| UCMR 1 data include a sample of small systems; the Stage 1 results (entry point maximums) indicate that no small systems would exceed 56 µg/L or 90 µg/L, and that one small system would exceed 18 µg/L; it is possible that there are additional small systems where the baseline perchlorate is greater than the MCLs that are not captured in the national extrapolation results. | − (benefits and costs will change in the same direction). |
| The EPA assumed a uniform distribution of system population served across the entry points; the actual entry point service population could be greater than or less than the estimates. | ± (benefits and costs will change in the same direction). |
| **Benefits Analysis** | |
| The health risks and risk reductions are based on maximum recorded concentration estimates and thus do not account for exposures to concentrations greater than or less than this recorded maximum. | ± (benefits only). |
| The EPA assumed that baseline fT4 is equal to the median, which likely underestimates disease benefits as the logarithmic relationship between maternal fT4 and child IQ leads to larger relative changes in fT4, with increasing levels of perchlorate and lower levels of baseline fT4. | − (benefits only). |
| The EPA assumed a median TSH feedback loop strength for the exposed population does not incorporate the variability in the feedback mechanism of the body's creation of TSH in response to decreasing fT4. | ± (benefits only). |
| The EPA used a 90th percentile water intake rate to derive the MCLG and the dose-response equations for the benefits analysis. This approach results in a protective MCLG value, but may overstate intake for the benefits analysis [2]. | + (benefits only). |
| The IQ valuation uses estimates that the EPA derived using the same approach as Salkever (1995). Results from other IQ valuation studies might result in higher or lower benefit estimates. | ± (benefits only). |
| The benefits analysis is based on a single health endpoint and the value of the endpoint is based solely on lost earnings. | − (benefits only). |
| **Cost Analysis** | |
| The EPA assumed that systems requiring treatment would incorporate a safety factor—treating to 80% of the proposed MCL or alternative MCL, which increases costs and benefits. | + (benefits and costs will change in the same direction). |
| The EPA assumed that all entry points requiring treatment would implement ion exchange, which may overestimate costs if non-treatment is an option for one or more entry points or underestimate costs if site-specific conditions result in higher costs at one or more entry points. | ± (costs only). |
| The EPA developed a monitoring schedule that assumed a uniform distribution of initial monitoring costs over three years; actual costs will vary. | ± (costs only). |
| The EPA assumed that long-term monitoring costs would occur in the last year of the applicable three-year monitoring period or nine-year monitoring cycle; systems may conduct monitoring in an earlier year of the period or cycle. | − (costs only). |
| The EPA assumed that 90% of ground water systems and 40% of surface water systems obtain perchlorate monitoring waivers; the actual percentages may vary. | ± (costs only). |

[1] A "−" symbol indicates that benefits and/or costs will tend to be underestimated. A "+" symbol indicates that benefits and/or costs will tend to be overestimated. A "±" symbol indicates an unknown direction of uncertainty, *i.e.,* benefits and/or costs could be underestimated or overestimated.

[2] The EPA did not include a perchlorate dietary dose in the benefits analysis, which would be unchanged between baseline and proposed MCL scenarios if many areas do not irrigate with drinking water. For people who obtain a significant portion of their fruit, vegetables, and milk from areas irrigated with the water from the same sources as the drinking water, we would expect their exposure may drop with the reduction of perchlorate in food products used locally. Because of this and the natural log form of the IQ response function, this approach may slightly understate the avoided IQ decrement estimates.

The EPA acknowledges the uncertainty regarding the quantitative health risk reduction. In particular, the

Agency assumed it could estimate risk reductions based on evidence of a quantifiable relationship between

thyroid hormone changes and neurodevelopmental outcomes.

There are a number of potential benefits of reducing perchlorate in drinking water that were not quantified as part of this analysis, which may result in an underestimate of actual benefits. As described by the SAB "children exposed gestationally to maternal hypothyroxinemia (without hypothyroidism) show reduced levels of global and specific cognitive abilities, as well as increased rates of behavior problems including greater dysregulation in early infancy and attentional disorders in childhood (Man et al., 1991; Pop et al., 1999; Pop et al., 2003; Kooistra et al., 2006)" (p. 10, SAB for the U.S. EPA, 2013). The EPA's literature review identified potential relationships between maternal thyroid hormone alterations and the risk of schizophrenia, ADHD, expressive language delay, reduced school performance and increased odds of autism, among others, none of which are being currently quantified in this assessment. Other potentially omitted benefits include risks associated with effects of thyroid disorders in adults, including cardiovascular disease risk; changes in thyroid hormone levels and their relationship with total cholesterol, LDL cholesterol, and triglycerides; as well as a possible relationship between increases in TSH and risk of fatal coronary heart disease. Treating for perchlorate in drinking water could also potentially remove nitrate, which is a co-occurring contaminant and a goitrogen. These additional potential health endpoints are not monetized in this benefits analysis. The assumptions used to account for the previously mentioned variability of the BBDR model inputs and uncertainty surrounding the relationship between maternal fT4 and child IQ discussed above may result in an overestimate of the monetized benefits. Because IQ is a surrogate for broad range of potential neurodevelopmental risks, it is unclear whether the analysis as a whole over- or under-estimates the monetized benefits of a reduction of perchlorate in drinking water.

## XIV. Request for Comment on Proposed Rule

While all comments relevant to the national primary drinking water regulation for perchlorate proposed today will be considered by the EPA, comments on the following issues will be especially helpful to the EPA in developing a final rule. The EPA specifically requests comment on the following topics.

• The adequacy and uncertainties of the BBDR model developed by the EPA to predict thyroid hormone level changes caused by perchlorate exposure to pregnant women with low iodide intake, including the model and model parameters and assumptions (Section III and Approaches Report).

• The adequacy and uncertainties of the EPA's review and application of the epidemiologic literature to quantify the relationship between thyroid hormone changes in pregnant women and neurodevelopmental effects including the assumptions, the selection of the approach used, and the study used (Section III and Approaches Report).

• The adequacy and uncertainties of the methodology to derive the MCLG including points of departure, assumptions, uncertainty factor, and relative source contribution (Section III and Technical Support Document: Deriving a Maximum Contaminant Level Goal for Perchlorate in Drinking Water).

• The proposed MCLG and MCL of 56 µg/L as well as the alternative MCLG and MCL values of 18 µg/L and of 90 µg/L.

• The feasibility of the proposed MCL of 56 µg/L as well as the feasibility of the alternative MCLs of 18 µg/L and 90 µg/L.

• The adequacy of the underlying assumptions and analysis of occurrence (Section VI).

• The costs and availability of Treatment Technologies (Section X).

• The adequacy of the underlying estimates, assumptions and analysis used to estimate costs and describe unquantified costs including the estimates of monitoring frequency, likelihood of systems receiving a monitoring waiver, the administrative labor rate and the operator labor rate. (Section XII and the Health Risk Reduction Cost Analysis).

• The adequacy of the underlying estimates, assumptions and analysis used to estimate benefits and describe unquantified benefits (Section XII and the Health Risk Reduction Cost Analysis).

• Potential implementation challenges associated with the proposed perchlorate regulation that the EPA should consider, specifically for small systems.

• The Administrator's finding in accordance with Section 1412(b)(4)(C) of the SDWA that the benefits of the proposed 56 µg/L MCL for perchlorate do not justify the costs, and the information that supports that determination as described in Section XII of this notice.

• The Administrator's proposal to, consistent with the discretion afforded him by SDWA Section 1412(b)(6)(A), adopt an MCL of 56 µg/L

notwithstanding the Agency's SDWA Section 1412(b)(4)(C) determination that the benefits of the MCL would not justify its costs.

• The Agency's conclusion that no alternative MCL, including the alternative MCL values of 18 µg/L and 90 µg/L discussed above, would "maximize health risk reduction benefits at a cost that is justified by the benefits" and the information and analytical approaches used to arrive at that conclusion. The EPA is especially interested in comments suggesting other approaches to deriving an MCL for which the benefits justify the costs.

## XV. Request for Comment on Potential Regulatory Determination Withdrawal

The EPA is soliciting comments on withdrawing the 2011 Regulatory Determination (see Section II–C, Regulatory History) based on several factors. First, the findings, described in the occurrence section (section VI) and in the updated health effects assessment (Section III), suggest that perchlorate does not occur in public water systems with a frequency and at levels of public health concern [17] and suggest that the regulation of perchlorate does not present a meaningful opportunity for health risk reduction for persons served by public water systems. The proposed regulation would require over sixty thousand public water systems to monitor for perchlorate, but the available data indicates that very few would find it at levels of public health concern. Specifically, perchlorate occurrence information suggests that at an MCL of 56 µg/L only 2 systems (0.004% of all water systems in the U.S.) would exceed the regulatory threshold. Even at an MCL of 18 µg/L, there would only be 15 systems (0.03% of all water systems in the U.S.) that would exceed the regulatory threshold. Only one system would exceed the alternative MCL of 90 µg/L.

The EPA notes that in 2008, the EPA stated in its preliminary regulatory determination that perchlorate did not occur with a frequency and at levels of public health concern in public water systems based upon the health effects and occurrence information available at that time, which indicated that 0.8% of public water system had perchlorate at levels exceeding the HRL of 15 µg/L. The EPA also stated that there was not a meaningful opportunity for a NPDWR to reduce health risks based upon the estimates at that time that 0.9 million

---

[17] As shown in Section VI of this notice there is infrequent occurrence of perchlorate at either 56 µg/L, 18 µg/L or 90 µg/L, which are the possible levels expected to cause adverse human health effects.

people had perchlorate levels above the HRL.

The EPA further notes that the Agency has previously determined CCL1 and CCL2 contaminants did not occur with frequency at levels of public health concern when the percentage of water systems exceeding the HRL were greater than the frequency of perchlorate occurrence level at the proposed MCL (0.004% of all water systems in the U.S.). For example, in 2003 the EPA determined that aldrin did not occur with a frequency and at levels of public health concern based upon data that showed 0.2% of water systems had aldrin at levels greater than the HRL. The EPA also concluded that there was not a meaningful opportunity for health risk reduction for persons served through a drinking water regulation based on this occurrence data and the estimate that these systems above the HRL served approximately 1 million people (USEPA, 2003). In 2008 the EPA determined that DCPA Mono- and Di-Acid degradates did not occur with a frequency and at levels of public health concern based on data that showed 0.03% of water systems exceeded the HRL. The EPA also included that there was not a meaningful opportunity for health risk reduction through a drinking water regulation based on this occurrence data and the estimate that these systems above the HRL served approximately 100,000 people (USEPA, 2008e).

SDWA Section 1412(b)(1)(A)(iii) states that the determination regarding the meaningful opportunity is "in the sole judgement of the Administrator" and therefore there may be other factors that contribute to this determination for any given contaminant.

If, after consideration of public comment, the EPA withdraws the perchlorate regulatory determination, there will be no NPDWR for perchlorate, although the EPA can re-list perchlorate on the CCL and proceed to regulation in the future if the occurrence or risk information changes. As with other unregulated contaminants, the EPA could address the limited instances of elevated levels of perchlorate by working with the states or using its SDWA Section 1431 imminent and substantial endangerment or Section 1412(b)(1)(f) health assessment authorities, as appropriate. The EPA also requests comments on what guidance it could provide the public if the regulatory determination for perchlorate is withdrawn.

## XVI. Statutory and Executive Order Reviews

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is a significant regulatory action since it raises novel legal or policy issues. It was submitted to the Office of Management and Budget (OMB) for review. Any changes made in response to OMB recommendations have been documented in the docket.

The EPA evaluated the potential costs to States and utilities and the potential benefits of the proposed rule. This analysis, *Health Risk Reduction Cost Analysis of the Proposed Perchlorate Rule* (*USEPA, 2019a*) is available in the docket and is summarized in section XI.

### B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs

This action is expected to be an Executive Order 13771 regulatory action. Details on the estimated costs of this proposed rule can be found in the EPA's analysis of the potential costs and benefits associated with this action.

### C. Paperwork Reduction Act

The information collection requirements in this proposed rule have been submitted for approval to the Office of Management and Budget (OMB) under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.* The information collection requirements are not enforceable until OMB approves them.

The monitoring information collected as a result of this rule will allow the States and the EPA to evaluate compliance with the rule. For the first 3-year period following rule promulgation, the major information requirements concern primacy agency activities to implement the rule including adopting the NPDWR into state regulations, providing training to state and PWS employees, updating their monitoring data systems, and reviewing system monitoring data and waiver requests. Compliance actions for drinking water systems (including monitoring, administration, and treatment costs) would not begin until after Year 3 due to the proposed effective date of this rule.

The estimate of annual average burden hours for the proposed rule during the first three years following promulgation is 48,539 hours. The annual average cost estimate is $7.4 million for labor. The burden hours per response is 2,648 hours and the cost per response is $134,159. The frequency of response (average responses per respondent) is 1 for primacy agencies, annually (for upfront administrative activities to implement the rule). The estimated number of likely respondents is 55 over the three-year period (for an average of 18.3 each year).

Burden means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a federal agency. This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements; train personnel to be able to respond to a collection of information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information.

An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations are listed in 40 CFR part 9.

Submit your comments on the Agency's need for this information, the accuracy of the provided burden estimates, and any suggested methods for minimizing respondent burden, including the use of automated collection techniques, to the EPA at the public docket established for this rule, which includes the ICR, Docket ID No. EPA–HQ–OW–2018–0780. You may also send your ICR-related comments to OMB's Office of Information and Regulatory Affairs via email to *OIRA_submission@omb.eop.gov*, Attention: Desk Officer for the EPA. Since OMB is required to make a decision concerning the ICR between 30 and 60 days after receipt, OMB must receive comments no later than [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE **FEDERAL REGISTER**]. The EPA will respond to any ICR-related comments in the final rule.

### D. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. The Agency has determined that the proposed MCL of 56 µg/L will not result in annual costs that exceed one percent of revenue for small systems affected by the proposed rule.

The small entities subject to the requirements of this action are public

water systems serving 10,000 or fewer persons. This is the threshold specified by Congress in the 1996 Amendments to the Safe Drinking Water Act for small system flexibility provisions. In accordance with the RFA requirements, the EPA proposed using this alternative definition in the **Federal Register**, (63 FR 7620, February 13, 1998), requested public comment, consulted with the Small Business Administration (SBA), and expressed its intention to use the alternative definition for all future drinking water regulations in the Consumer Confidence Reports regulation (63 FR 44511, August 19,

1998). As stated in that final rule, the alternative definition is applied to this proposed regulation.

The proposed rule contains provisions that would affect 58,325 CWS and NTNCWS serving 10,000 or fewer people. In order to meet the proposed rule requirements, all of these systems will need to conduct perchlorate monitoring. At the proposed MCL of 56 µg/L, the UCMR 1 monitoring data indicate that no small systems would be required to incur costs to reduce the levels of perchlorate in drinking water, therefore, all small PWSs will incur monitoring costs only.

Impacts on small entities are described in more detail in Chapter 7 of the Health Risk Reduction Cost Analysis of the Proposed Perchlorate Rule (USEPA, 2019a). Table XII–1 and Table XII–2 show the annual compliance costs of the proposed rule on the small entities by system size for public and private systems, respectively. Based on a comparison of annual costs with annual revenue estimates, the EPA has determined that no small systems will experience an impact of one percent or greater of average annual revenues (USEPA 2019a).

TABLE XII–1—ANNUALIZED MONITORING AND ADMINISTRATIVE COSTS AS A PERCENTAGE OF AVERAGE ANNUAL REVENUE FOR SMALL PUBLIC CWSs BY SIZE CATEGORY

| Size category | Average annual revenues[a] | 3% Discount[b] | 7% Discount[b] |
|---|---|---|---|
| Population served <100 | $224,248 | $88 (0.04%) | $94 (0.04%) |
| Population served 101–500 | 197,315 | 88 (0.04%) | 94 (0.05%) |
| Population served 501–3,300 | 202,382 | 88 (0.04%) | 94 (0.05%) |
| Population served 3,301–10,000 | 1,092,187 | 88 (0.01%) | 94 (0.01%) |

Source: Perchlorate Benefit-Cost Analysis Spreadsheet available in the proposed rule docket (EPA–HQ–OW–2018–0780).

[a] Based on the CWSS (USEPA, 2009c Table 65) and updated to 2017$ based on the chained consumer price index for fuels and utilities in U.S. city average, all urban consumers (BLS, 2018a). Revenues include all sources of revenue including water revenue, non-water revenue, and municipal transfers to water systems.

[b] Total annual monitoring and administrative costs for PWSs are approximately $6.6 million to $7.1 million annually (Exhibit 5 5), with $5.1 million to $5.5 million accruing to small PWSs. Based on 58,325 small systems, this yields an average annual per-system cost of $88 (3% discount rate) to $94 (7% discount rate).

TABLE XII–2—ANNUALIZED MONITORING AND ADMINISTRATIVE COSTS AS A PERCENTAGE OF AVERAGE ANNUAL REVENUE FOR SMALL PRIVATE CWSs BY SIZE CATEGORY

| Size category | Average annual revenues[a] | 3% Discount[b] | 7% Discount[b] |
|---|---|---|---|
| Population served <100 | $139,911 | $88 (0.06%) | $94 (0.07%) |
| Population served 101–500 | 351,974 | 88 (0.03%) | 94 (0.03%) |
| Population served 501–3,300 | 254,706 | 88 (0.03%) | 94 (0.04%) |
| Population served 3,301–10,000 | 951,692 | 88 (0.01%) | 94 (0.01%) |

Source: Perchlorate Benefit-Cost Analysis Spreadsheet available in the proposed rule docket (EPA–HQ–OW–2018–0780).

[a] Based on the CWSS (USEPA, 2009c Table 65) and updated to 2017$ based on the chained consumer price index for fuels and utilities in U.S. city average, all urban consumers (BLS, 2018a). Revenues include all sources of revenue including water revenue and non-water revenue.

[b] Total annual monitoring and administrative costs for PWSs are approximately $6.6 million to $7.1 million annually (Exhibit 5 5), with $5.1 million to $5.5 million accruing to small PWSs. Based on 58,325 small systems, this yields an average annual per-system cost of $88 (3% discount rate) to $94 (7% discount rate).

*E. Unfunded Mandates Reform Act*

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538. The action imposes minimal enforceable duty on any state, local or tribal governments or the private sector.

Based on the cost estimates detailed in Section XI, the EPA determined that compliance costs in any given year would be below the threshold set in UMRA, with maximum single-year costs of approximately $10.2 million. The EPA has determined that this rule contains a federal mandate that would not result in expenditures of $100

million or more for State, local, and Tribal governments, in the aggregate, or the private sector in any one year.

*F. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects of greater than $25 million on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government. Annual costs are estimated to range from $9.6 million at a 3 percent discount rate to $10.2 million using a 7 percent, with $6.5 million to $7.0 million annually

accruing to public entities. The EPA has concluded that this proposed rule may be of interest because it may impose direct compliance costs on State or local governments, and the federal government will not provide the funds to pay those costs.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

The EPA has concluded that this proposed rule may have Tribal implications, because it may impose direct compliance costs on Tribal governments, and the federal government would not provide the

funds necessary to pay those costs. The EPA has identified 768 water systems with 1,167 entry points under Native American ownership that may be subject to the proposed rule. They would bear an estimated total annualized cost of $74,100 at a 3 percent discount rate ($79,625 at 7 percent) to implement this rule as proposed, with all costs attributable to monitoring and administrative costs. Estimated average annualized cost per system ranges from $96 at a 3 percent discount rate to $104 at a 7 percent discount rate.

Accordingly, the EPA provides the following Tribal summary impact statement as required by section 5(b) of Executive Order 13175. The EPA consulted with representatives of Tribal officials early in the process of developing this proposed regulation to permit them to have meaningful and timely input into its development. The EPA conducted consultation with Indian Tribes which included a webinar with interested tribes on February 28, 2012, to request input and provide rulemaking information to interested parties. A meeting summary report is available on the docket for public inspection (USEPA 2012a). The EPA notes that 751 of the 768 Tribal systems identified by the Agency as subject to the proposed rule are small systems that are expected to incur only monitoring costs. Due to the health risks associated with perchlorate, capital expenditures needed for compliance with the rule would be eligible for federal funding sources, specifically the Drinking Water State Revolving Fund. In the spirit of Executive Order 13175, and consistent with the EPA policy to promote communications between the EPA and Tribal governments, the EPA specifically solicits additional comment on this proposed rule from Tribal officials.

## H. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks

This action is not subject to Executive Order 13045 because it is not economically significant as defined in Executive Order 12866; however, the environmental health risk addressed by this action may have a disproportionate effect on children. Accordingly, the EPA evaluated the environmental health or safety effects of perchlorate on children. The results of this evaluation are contained in the Health Effects Technical Support Document (USEPA 2018a) and described in section III of this preamble. The EPA has evaluated the risk associated with perchlorate in drinking water for the sensitive subpopulation—offspring of pregnant women exposed to perchlorate during the first trimester—and established a proposed MCLG that is protective of this subpopulation as well as other children. The EPA also estimated the health risk reduction of the proposed and alternative MCLs. This analysis is described in the Health Risk Reduction and Cost Analysis for the proposed rule (USEPA 2019a) and is summarized in section XI of this preamble. Copies of the Health Effects Technical Support Document and Economic Analysis and supporting information are available in the public docket for today's proposal.

## I. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use

This rule is not a "significant energy action" as defined in Executive Order 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use" (66 FR 28355 (May 22, 2001)) because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. This determination is based on the following analysis.

The first consideration is whether the proposed rule would adversely affect the supply of energy. The proposed rule does not regulate power generation, either directly or indirectly. The public and private water systems that the proposed rule regulates do not generate power. Further, the cost increases borne by customers of water utilities as a result of the proposed rule are a low percentage of the total cost of water, except for a few water systems that might install treatment technologies and would likely spread that cost over their customer base. In sum, the proposed rule does not regulate the supply of energy, does not generally regulate the utilities that supply energy, and is unlikely to affect significantly the customer base of energy suppliers. Thus, the proposed rule would not translate into adverse effects on the supply of energy.

The second consideration is whether the proposed rule would adversely affect the distribution of energy. The proposed rule does not regulate any aspect of energy distribution. The water systems that are regulated by the proposed rule already have electrical service. At the proposed MCL, one entry point at one system may require incremental power to operate new treatment processes. The increase in peak electricity demand at water utilities is negligible. Therefore, the EPA estimates that the existing connections are adequate and that the proposed rule has no discernable adverse effect on energy distribution.

The third consideration is whether a proposed rule would adversely affect the use of energy. Because only one system is expected to add treatment technologies that use electrical power, this potential impact on sector demand or overall national demand for power is negligible.

Based on its analysis of these considerations, the EPA has concluded that proposed rule is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

## J. National Technology Transfer and Advancement Act of 1995 and 1 CFR Part 51

The proposed rule could involve voluntary consensus standards in that it would require monitoring for Perchlorate. The EPA proposed five analytical methods for the identification and quantification of perchlorate in drinking water. The EPA methods 314.0, 314.1, 314.2, 331.0, and 332.0 incorporate quality control criteria which allow accurate quantitation of perchlorate. Additional information about the analytical methods is available in section VII of this notice. The EPA has made, and will continue to make, these documents generally available through *www.regulations.gov* and at the U.S. Environmental Protection Agency Drinking Water Docket, William Jefferson Clinton West Building, 1301 Constitution Ave. NW, Room 3334, Washington, DC 20460, call (202) 566–2426.

The EPA's monitoring and sampling protocols generally include voluntary consensus standards developed by agencies such as ASTM International, Standard Methods and other such bodies wherever the EPA deems these methodologies appropriate for compliance monitoring. The EPA welcomes comments on this aspect of the proposed rulemaking and, specifically, invites the public to identify potentially-applicable voluntary consensus standards and to explain why such standards should be used in this regulation. The Director of the Federal Register approved the voluntary consensus standards incorporated by referenced in § 141.23 of the proposed regulatory text as of April 11, 2007.

## K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

The EPA has determined that this proposed rule would not have disproportionately high and adverse

human health or environmental effects on minority or low-income populations because it would increase the level of environmental protection for all affected populations without having any disproportionately high and adverse human health or environmental effects on any population, including any minority or low-income population.

The public is invited to comment on this aspect of the proposed rulemaking and, specifically, to recommend additional methods to address Environmental Justice concerns from establishing a drinking water rule for perchlorate in drinking water.

## XVII. Consultations With the Science Advisory Board, National Drinking Water Advisory Council, and the Secretary of Health and Human Services

In accordance with sections 1412(d) and 1412(e) of the Safe Drinking Water Act (SDWA), the Agency consulted with the National Drinking Water Advisory Council (NDWAC or the Council); the Secretary of Health and Human Services; and with the EPA Science Advisory Board. The Agency consulted with NDWAC during the Council's October 4–5, 2012 meeting. A summary of the NDWAC recommendations is available in the National Drinking Water Advisory Council, Fall 2012 Meeting Summary Report (NDWAC, 2012b) and the docket for this proposed rule. The EPA carefully considered NDWAC recommendations during the development of a proposed drinking water rule for perchlorate.

On May 29, 2012, the EPA sought guidance from the EPA Science Advisory Board (SAB) on how best to consider and interpret life stage information, epidemiological and biomonitoring data since the publication of the National Research Council 2005 report, the Agency's physiologically-based pharmacokinetic (PBPK) analyses, and the totality of perchlorate health information to derive a Maximum Contaminant Level Goal (MCLG) for perchlorate (USEPA, 2012; NRC, 2005). On May 29, 2013, the EPA received significant input from SAB, summarized in the report, SAB Advice on Approaches to Derive a Maximum Contaminant Level Goal for Perchlorate (USEPA, 2013a).

On July 15, 2013, the EPA responded by stating that the Agency would consider all the recommendations from the SAB, as it continued working on the development of the rulemaking process for perchlorate (USEPA 2013b). To address SAB recommendations, the EPA collaborated with Food and Drug Administration (FDA) scientists to develop PBPK/pharmacodynamic (PD), or biologically based dose-response (BBDR), models that incorporate all available health related information on perchlorate to predict changes in thyroid hormones in sensitive life stages exposed to different dietary iodide and perchlorate levels (USEPA 2017). As recommended by SAB, the EPA developed these models based upon perchlorate's mode of action (*i.e.,* iodide uptake inhibition by the thyroid) (USEPA 2013a). Additional details are in section III.C. of this notice and in the Health Effects of Perchlorate support document located in the docket for this proposed rule.

In accordance with SAB recommendations, the EPA developed a two-stage approach to integrate BBDR model results with data on neurodevelopmental outcomes from epidemiological studies, this approach allowed the Agency to link maternal thyroid hormones levels as a result of low iodine intake and perchlorate exposure, to derive an MCLG that directly addresses the most sensitive life stage (USEPA 2013a).

On March 25, 2019, the EPA consulted with the Department of Health and Human Services (HHS). The EPA provided information to HHS officials on the draft proposed perchlorate regulation and considered HHS input as part of the interagency review described in section XVII.A.

## XVIII. References

Alexander, E.K., Pearce, E.N., Brent, G.A., Brown, R.S., Chen, H., Dosiou, C., & Sullivan, S. (2017). 2017 guidelines of the American Thyroid Association for the diagnosis and management of thyroid disease during pregnancy and the postpartum. *Thyroid, 27*(3), 315–389.

American Psychiatric Association. (2013). Diagnostic and statistical manual of mental disorders (5th ed., Text Revision). Washington, DC.

Asvold, B., Vatten, L.J., Nilsen, T., & Bjoro, T. (2007). The association between TSH within the reference range and serum lipid concentrations in a population-based study. The HUNT study. *European Journal of Endocrinology, 156,* 181–186.

Asvold, B., Bjoro, T., Platou, C., Vatten, L. (2012). Thyroid function and the risk of coronary heart disease: 12-year follow-up of the HUNT Study in Norway. *Clinical Endocrinology.* Vol. 77, 911–917.

ATSDR. Toxicological Profile for Perchlorates (2008).

Becker, C. (1985). Hypothyroidism and atherosclerotic heart disease: Pathogenesis, medical management, and the role of coronary artery bypass surgery. *Endocrine Reviews, 6*(3), 432–440. *https://doi.org/10.1210/edrv-6-3-432.*

Beres, K.A., Kaufman, A.S., & Perlman, M.D. (2000). Assessment of child intelligence.

*Handbook of psychological assessment, 3,* 65–96.

Berlien, M.J. (2003). *La Puente Valley County Water District's Experience with ISEP* (Presentation of Carollo Engineers, Inc. and Association of California Water Agencies).

Betts, K.S. (1998). Rotation ion-exchange system removes perchlorate, *32,* 454A–455A.

Blount, B.C., Pirkle, J.L., Osterloh, J.D., Valentin-Blasini, L., & Caldwell, K.L. (2006). Urinary perchlorate and thyroid hormone levels in adolescent and adult men and women living in the United States. *Environmental Health Perspectives, 114*(12), 1865–1871. *https://doi.org/10.1289/ehp.9466.*

Blute, N.K., Seidel, C.J., McGuire, M.J., Qin, D., & Byerrum, J. (2006, June). *Bench and Pilot Testing of High Capacity, Single-Pass Ion Exchange Resins for Perchlorate Removal.* Presented at the 2006 AWWA Annual Conference & Exposition, San Antonio, TX.

Bureau of Labor Statistics (BLS). (2016). Employer Cost for Employee Compensation—September 2016.

Bureau of Labor Statistics (BLS). (2018a). Chained consumer price index for fuels and utilities in U.S. city average, all urban consumers, 2000 to 2018.

Bureau of Labor Statistics (BLS). (2018b). CPI—All Urban Consumers (all items), for areas under 50,000 persons.

California Department of Public Health. (2007). State Adoption of a Perchlorate Standard. Retrieved from *https:// www.waterboards.ca.gov/drinking_ water/certlic/drinkingwater/documents/ perchlorate/ AdoptionMemotoWaterSystems-10-2007.pdf.*

California Environmental Protection Agency (CalEPA). (2011). Draft: Public Health Goal for Perchlorate in Drinking Water.

CDC & NCHS. (2007). *National Health and Nutrition Examination Survey Data.* Hyattsville, MD: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention. Retrieved from *https://wwwn.cdc.gov/ nchs/nhanes/continuousnhanes/ default.aspx?BeginYear=2007.*

CDC & NCHS. (2009). *National Health and Nutrition Examination Survey Data.* Hyattsville, MD: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention. Retrieved from *https://wwwn.cdc.gov/ nchs/nhanes/continuousnhanes/ default.aspx?BeginYear=2009.*

CDC & NCHS. (2011). *National Health and Nutrition Examination Survey Data.* Hyattsville, MD: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention. Retrieved from *https://wwwn.cdc.gov/ nchs/nhanes/continuousnhanes/ default.aspx?BeginYear=2011.*

Clewell, R.A., Merrill, E.A., Gearhart, J.M., Robinson, P.J., Sterner, T.R., Mattie, D.R., & Clewell, H.J. (2007). Perchlorate and radioiodide kinetics across life stages in the human: Using PBPK models to predict dosimetry and thyroid inhibition

and sensitive subpopulations based on developmental stage. *Journal of Toxicology and Environmental Health, Part A: Current Issues, 70*(5), 408–428. doi:10.1080/15287390600755216.

Clewell III., H.H., Gentry, P.R., Hack, C.E., Greene, T., Clewell, R.A., (2019). An evaluation of the USEPA Proposed Approaches for applying a biologically based dose-response model in a risk assessment for perchlorate in drinking water, *Regulatory Toxicology and Pharmacology* (2019), *https://doi.org/10.1016/j.yrtph.2019.01.028*.

Costeira, M.J., Oliveira, P., Santos, N.C., Ares, S., Sáenz-Rico, B., de Escobar, G.M., & Palha, J.A. (2011). Psychomotor development of children from an iodine-deficient region. *Journal of Pediatrics, 159*(3), 447–453. *https://doi.org/10.1016/j.jpeds.2011.02.034*.

Dordelmann, O. (2009, November). *Full-Scale Biological Denitrification Plants in Germany, Austria and Poland.* Presented at the 2009 AWWA Water Quality Technology Conference & Exposition, Seattle, WA.

Drago, J.A., & Leserman, J.R. (2011). Castaic Lake Water Agency Operating Experience with Lead-Lag Anion Exchange for Perchlorate Removal. In *Proceedings of the American Water Works Association Water Quality Technology Conference.*

Dugan, N.R. (2010a, December 8). Supporting data for presentation: The Impact of Temperature on Biological Perchlorate Removal and Downstream Effluent Polishing. U.S. Environmental Protection Agency, Office of Research and Development, National Risk Management Research Laboratory.

Dugan, N.R. (2010b, December). *The Impact of Temperature on Biological Perchlorate Removal and Downstream Effluent Polishing.* U.S. Environmental Protection Agency, Office of Research and Development, National Risk Management Research Laboratory.

Dugan, N.R., Williams, D.J., Meyer, M., Schneider, R.R., Speth, T.F., & Metz, D.H. (2009). *The Impact of Temperature on Anaerobic Biological Perchlorate Treatment.* Presented at the 2009 AWWA Water Quality Technology Conference & Exposition, Seattle, WA.

Endendijk, J.J., Wijnen, H.A., Pop, V.J., & van Baar, A.L. (2017). Maternal thyroid hormone trajectories during pregnancy and child behavioral problems. *Hormones and Behavior, 94*, 84–92.

External Peer Reviewers for U.S. EPA. (2017). *External Peer Review of EPA's Draft Biologically Based Dose-Response Model and Draft BBDR Model Report for Perchlorate in Drinking Water.*

External Peer Reviewers for U.S. EPA. (2018). *External peer review for U.S. EPA's proposed approaches to inform the derivation of a maximum contaminant level goal for perchlorate in drinking water.*

Fan, X., & Wu, L. (2016). The impact of thyroid abnormalities during pregnancy on subsequent neuropsychological development of the offspring: a meta-

analysis. *The Journal of Maternal-Fetal & Neonatal Medicine, 29*(24), 3971–3976. *https://doi.org/10.3109/14767058.2016.1152248*.

FASEB/LSRO. (1995). *Third report on nutrition monitoring in the United States.* Washington, DC. Retrieved from *https://www.cdc.gov/nchs/data/misc/nutri95_1acc.pdf*.

Finken, M.J.J., van Eijsden, M., Loomans, E.M., Vrijkotte, T.G.M., & Rotteveel, J. (2013). Maternal hypothyroxinemia in early pregnancy estimates reduced performance in reaction time tests in 5- to 6-year-old offspring. *The Journal of Clinical Endocrinology & Metabolism, 98*(4), 1417–1426. *https://doi.org/10.1210/jc.2012-3389*.

Ghassabian, A., Bongers-Schokking J.J., Henrichs, J., Jaddoe, V.W., & Visser, T.J. (2011). Maternal thyroid function during pregnancy and behavioral problems in the offspring: The Generation R Study. *Pediatric Research, 69*(5).

Ghassabian, A., Marroun, H.E., Peeters, R.P., Jaddoe, V.W., Hofman, A., Verhulst, F.C., . . . White, T. (2014). Downstream effects of maternal hypothyroxinemia in early pregnancy: nonverbal IQ and brain morphology in school-age children. *Journal of Clinical Endocrinology and Metabolism, 99*(7), 2383–2390. *https://doi.org/10.1210/jc.2013–4281*.

Glinoer, D., & Delange, F. (2000). The potential repercussions of maternal, fetal, and neonatal hypothyroxinemia on the progeny. *Thyroid, 10*(10), 871–887.

Gilinoer, D., & Rovet, J. (2009). Gestational hypothyroxinemia and the beneficial effects of early dietary iodine fortification. *Thyroid, 19*(5), 431–434.

Greer, M.A., Goodman, G., Pleus, R.C., & Greer, S.E. (2002). Health effects assessment for environmental perchlorate contamination: the dose response for inhibition of thyroidal radioiodine uptake in humans. *Environmental Health Perspectives, 110*(9), 927.

Gyllenberg, D., Sourander, A., Surcel, H.-M., Hinkka-Yli-Salomäki, S., McKeague, I.W., & Brown, A.S. (2016). Hypothyroxinemia during gestation and offspring schizophrenia in a national birth cohort. *Biological Psychiatry, 79*(12), 962–970. *https://doi.org/10.1016/j.biopsych.2015.06.014*.

Harding Engineering and Environmental Services (ESE). (2001). *Final: Phase 2 Treatability Study Report, Aerojet GET E/F Treatment Facility, Sacramento, California* (Prepared for U.S. Environmental Protection Agency Region IX and Baldwin Park Operable Unit Cooperating Respondents, San Gabriel Basin, California).

Hou, J., Ping Yu, Huijuan Zhu, Hui Pan, et al. (2016). The impact of maternal hypothyroidism during pregnancy on neonatal outcomes: a systematic review and meta-analysis, Gynecological Endocrinology, 32:1, 9–13.

Henrichs, J., Bongers-Schokking, J.J., Schenk, J.J., Ghassabian, A., Schmidt, H.G., Visser, T.J., . . . Tiemeier, H. (2010). Maternal thyroid function during early

pregnancy and cognitive functioning in early childhood: the Generation R Study. *Journal of Clinical Endocrinology and Metabolism, 95*(9), 4227–4234. *https://doi.org/10.1210/jc.2010-0415*.

Júlvez, J., Alvarez-Pedrerol, M., Rebagliato, M., Murcia, M., Forns, J., Garcia-Esteban, R., . . . Sunyer, J. (2013). Thyroxine levels during pregnancy in healthy women and early child neurodevelopment. *Epidemiology, 24*(1), 150–157. *https://doi.org/10.1097/EDE.0b013e318276ccd3*.

Kahn, H.D., & Stralka, K. (2008). Estimates of water ingestion for women in pregnant, lactating, and non-pregnant and non-lactating child-bearing age groups based on USDA's 1994–96, 1998 continuing survey of food intake by individuals. *Human and Ecological Risk Assessment: An International Journal, 14*(6), 1273–1290. *https://doi.org/10.1080/10807030802494618*.

Kendler, Kenneth & Turkheimer, Eric & Ohlsson, Henrik & Sundquist, Jan & Sundquist, Kristina. (2015). Family environment and the malleability of cognitive ability: A Swedish national home-reared and adopted-away cosibling control study. *Proceedings of the National Academy of Sciences.* Vol 112, No. 15.

Kasatkina, E.P., Samsonova, L.N., Ivakhnenko, V.N., Ibragimova, G.V., Ryabykh, A.V., Naumenko, L.L., & Evdokimova, Y.A. (2006). Gestational hypothyroxinemia and cognitive function in offspring. *Neuroscine and Behavioral Physiology, 36*(6), 619–624.

Kooistra, L., Crawford, S., van Baar, A.L., Brouwers, E., & Pop, V. (2006). Neonatal effects of maternal hypothyroxinemia during early pregnancy. *Pediatrics, 117*(1), 161–167.

Korevaar, T.I.M., Muetzel, R., Medici, M., Chaker, L., Jaddoe, V.W.V., de Rijke, Y.B., . . . Peeters, R.P. (2016). Association of maternal thyroid function during early pregnancy with offspring IQ and brain morphology in childhood: a population-based prospective cohort study. *The Lancet Diabetes & Endocrinology, 4*(1), 35–43. *https://doi.org/10.1016/S2213-8587(15)00327-7*.

Kotlarz, N., Upadhyaya, G., Togna, P., & Raskin, L. (2016). Evaluation of electron donors for biological perchlorate removal highlights the importance of diverse perchlorate-reducing populations. *Environmental Science: Water Research & Technology, 2*, 1049–1063.

Lambert-Messerlian, G., McClain, M., Haddow, J.E., Palomaki, G.E., Canick, J.A., Cleary-Goldman, J., . . . FaSTER Research Consortium. (2008). First- and second-trimester thyroid hormone reference data in pregnant women: a FaSTER (First- and Second-Trimester Evaluation of Risk for aneuploidy) Research Consortium study. *American Journal of Obstetrics and Gynecology, 199*(1), 62.e1–6. *https://doi.org/10.1016/j.ajog.2007.12.003*.

Leung, A.M., Pearce, E.N., & Braverman, L. (2010). Perchlorate, iodine and the thyroid. *Best Practice & Research*

*Clinical Endocrinology & Metabolism, 24*(1), 133–141.

Li, C., Shan, Z., Mao, J., Wang, W., Xie, X., Zhou, W., . . . Teng, W. (2014). Assessment of thyroid function during first-trimester pregnancy: What is the rational upper limit of serum TSH during the first trimester in Chinese pregnant women? *The Journal of Clinical Endocrinology & Metabolism, 99*(1), 73–79. *https://doi.org/10.1210/jc.2013–1674.*

Li, Y., Shan, Z., Teng, W., Yu, X., Li, Y., Fan, C., . . . Hua, T. (2010). Abnormalities of maternal thyroid function during pregnancy affect neuropsychological development of their children at 25–30 months. *Clinical Endocrinology, 72*, 825–829. *https://doi.org/10.1111/j.1365–2265.2009.03743.x.*

Liang, S., Scott, K.N., Palencia, L.S., & Bruno, J. (1998). Investigation of Treatment Options for Perchlorate Removal. Presented at the AWWA Water Quality Technology Conference, San Diego, CA: La Verne, CA: Metropolitan Water District of Southern California.

Lumen, A., Mattie, D.R., & Fisher, J.W. (2013). Evaluation of perturbations in serum thyroid hormones during human pregnancy due to dietary iodine and perchlorate exposure using a biologically based dose-response model. *Toxicological Sciences, 133*(2), 320–341. *https://doi.org/10.1093/toxsci/kft078.*

Männistö, T., Surcel, H.-M., Ruokonen, A., Väärasmäki, M., Pouta, A., Bloigu, A., . . . Suvanto, E. (2011). Early pregnancy reference intervals of thyroid hormone concentrations in a thyroid antibody-negative pregnant population. *Thyroid, 21*(3), 291–298.

Maraka, S., Ospina, N., O'Keeffe, D., Ycaza, A., (2016). Subclinical Hypothyroidism in Pregnancy: A Systematics Review and Meta-Analysis. *Thyroid.* Vol. 26, Number 4.

Martin, J.A., Hamilton, B.E., & Osterman, M.J. (2017). Births in the United States, 2016. NCHS Data Brief No. 287. Retrieved from *https://www.cdc.gov/nchs/data/databriefs/db287.pdf.*

MassDEP. (2006). Letter to Public Water Suppliers concerning new perchlorate regulations. Retrieved from *https://www.mass.gov/lists/perchlorate-background-information-and-standards#perchlorate---final-standards-.*

Membrane Technology. (2006, April). News: Ion-Exchange System Removes Perchlorate. Membrane Technology.

Modesto, T., Tiemeier, H., Peeters, R.P., Jaddoe, V.W., Hofman, A., Verhulst, F.C., & Ghassabian, A. (2015). Maternal mild thyroid hormone insufficiency in early pregnancy and attention-deficit/hyperactivity disorder symptoms in children. *JAMA Pediatrics, 169*(9), 838–845. doi:10.1001/jamapediatrics.2015.0498.

Moleti, M., Trimarchi, F., Tortorella, G., Candia Longo, A., Giorgianni, G., Sturniolo, G., . . . Vermiglio, F. (2016). Effects of maternal iodine nutrition and thyroid status on cognitive development in offspring: A pilot study. *Thyroid, 26*(2), 296–305. doi:10.1089/thy.2015.0336.

Morreale de Escobar, G., Obregón, M.J., & Escobar del Rey, F. (2004). Role of thyroid hormone during early brain development. *European Journal of Endocrinology, 151*(Suppl 3). U25–U37. *https://doi.org/10.1530/eje.0.151U025.*

Nam, S., Kim, S., Choi, H., Yoon, Silverstein, J., & Amy, G. (2005). Perchlorate Rejection by High-Pressure Membranes and Brine Stream Treatment by Chemical and Biological Processes. Presented at the American Water Works Association Membrane Technology Conference, Phoenix, AZ.

National Research Council (NRC). (2005). *Health Implications of Perchlorate Ingestion.* Washington, DC: National Academies Press.

Noten, A.M.E., Loomans, E.M., Vrijkotte, T.G.M., van de Ven, P.M., van Trotsenburg, A.S.P., Rotteveel, J., . . . Finken, M.J.J. (2015). Maternal hypothyroxinaemia in early pregnancy and school performance in 5-year-old offspring. *European Journal of Endocrinology, 173*(5), 563–571. *https://doi.org/10.1530/EJE-15-0397.*

Oken, E., Braverman, L., Platek, D., Mitchell, M.L., Lee, S.L., & Pearce, E.N. (2009). Neonatal thyroxine, maternal thyroid function, and child cognition. *Journal of Clinical Endocrinology and Metabolism, 94*(2), 497–503. doi:10.1210/jc.2008–0936.

Oostenbroek, M.H.W., Kersten, R.H.J., Tros, B., Kunst, A.E., Vrijkotte, T.G.M., & Finken, M.J.J. (2017). Maternal hypothyroxinaemia in early pregnancy and problem behavior in 5-year-old offspring. *Psychoneuroendocrinology, 81,* 29–35.

Päkkilä, F., Männistö, T., Hartikainen, A.-L., Ruokonen, A., Surcel, H.-M., Bloigu, A., . . . Suvanto, E. (2015). Maternal and child's thyroid function and child's intellect and scholastic performance. *Thyroid: Official Journal of the American Thyroid Association, 25*(12), 1363–1374. *https://doi.org/10.1089/thy.2015.0197.*

Pop, V.J., Brouwers, E.P., Vader, H.L., Vulsma, T., van Baar, A.L., & de Vijlder, J.J. (2003). Maternal hypothyroxinaemia during early pregnancy and subsequent child development: a 3-year follow-up study. *Clinical Endocrinology, 59*(3), 282–288.

Pop, V.J., Kuijpens, J.L., van Baar, A.L., Verkerk, G., van Son, M.M., de Vijlder, J.J., . . . Vader, H.L. (1999). Low maternal free thyroxine concentrations during early pregnancy are associated with impaired psychomotor development in infancy. *Clinical Endocrinology, 50*(2), 149–155.

Roman, G.C., Ghassabian, A., Bongers-Schokking, J., Jaddoe, V.W.V., Hofman, A., de Rijke, Y.B., . . . Tiemeier, H. (2013). Association of gestational maternal hypothyroxinemia and increased autism risk. *Annals of Neurology, 74*(5), 733–742. *https://doi.org/10.1002/ana.23976.*

Russell, C.G., Qin, G., Blute, N.K., McGuire, M.J., & Williams, C. (2008, November). *Pilot Testing of Single Pass Perchlorate-Selective Ion Exchange Resins at Three*

*Utilities in the Main San Gabriel Basin.* Presented at the AWWA Water Quality Technology Conference & Exposition, Cincinnati, OH.

SAB for the U.S. EPA. (2013). SAB Advice on Approaches to Derive a Maximum Contaminant Level Goal for Perchlorate. EPA–SAB–13–004.

Savin, S., Cvejić, D., Nedić, O., & Radosavljević, R. (2003). Thyroid hormone synthesis and storage in the thyroid gland of human neonates. *Journal of Pediatric Endocrinology and Metabolism, 16*(4), 521–528.

Seashore, H., Wesman, A., & Doppelt, J. (1950). The standardization of the Wechsler intelligence scale for children. *Journal of Consulting Psychology, 14*(2), 99.

Siemens Water Technologies. (2009). *Case Study: Municipality in the State of Massachusetts.*

Steinmaus, C., Miller, M.D., & Howd, R. (2007). Impact of smoking and thiocyanate on perchlorate and thyroid hormone associations in the 2001–2002 National Health and Nutrition Examination Survey. *Environmental Health Perspectives, 1333–1338.*

Steinmaus, C., Miller, M.D., Cushing, L., Blount, B.C., & Smith, A.H. (2013). Combined effects of perchlorate, thiocyanate, and iodine on thyroid function in the national health and nutrition examination survey 2007–8. *Environmental Research, 123. https://doi.org/10.1016/j.envres.2013.01.005.*

Steinmaus, C., Pearl, M., Kharrazi, M., Blount, B.C., Miller, M.D., Pearce, E.N., . . . Liaw, J. (2016). Thyroid hormones and moderate exposure to perchlorate during pregnancy in women in southern California. *Environmental Health Perspectives, 124*(6), 861–867. *https://doi.org/10.1289/ehp.1409614.*

Sternberg, R.J., Grigorenko, E.L., & Bundy, D.A. (2001). The predictive value of IQ. *Merrill-Palmer Quarterly (1982–),* 1–41.

Sun, J., Yao, L., Fang, Y., Chen, Y., et al. (2017). Relationship between Subclinical Thyroid Dysfunction and the Risk of Cardiovascular Outcomes: A Systematic Review and Meta-Analysis of Prospective Cohort Studies. Int J Endocrinol. 2017:8130796.

Taylor, P., Razvi, S., Pearce, S.H., & Dayan, C.M. (2013). Clinical review: A review of the clinical consequences of variation in thyroid function within the reference range. *J Clin Endocrinol Metab, 98*(9), 3562–3571. doi:10.1210/jc.2013–1315.

The Interstate Technology & Regulatory Council (ITRC) Team. (2008, March). Technical/Regulatory Guidance: Remediation Technologies for Perchlorate Contamination in Water and Soil. Retrieved from *http://www.eosremediation.com/download/Perchlorate/ITRC%20PERC-2.pdf.*

Thompson, W., Russell, G., Baragwanath, G., Matthews, J., Vaidya, B., & Thompson-Coon, J. (2018). Maternal thyroid hormone insufficiency during pregnancy and risk of neurodevelopmental disorders in offspring: A systematic review and meta-analysis. *Clinical Endocrinology.*

Upadhyaya, G., Kotlarz, N., Togna, P., & Raskin, L. (2015). Carbohydrate-Based Electron Donor for Biological Nitrate and Perchlorate Removal From Drinking Water. *Journal—American Water Works Association, 107*(12), E674–E684. *https://doi.org/10.5942/jawwa.2015.107.0143.*

U.S. Census Bureau. (2010). American Community Survey, 5-year Estimates (2006–2010).

U.S. Census Bureau. (2017a). Annual estimates of the resident population by single year of age and sex for the United States: April 1, 2010 to July 1, 2016.

U.S. Census Bureau. (2017b). Average Household Size of Occupied Housing Units by Tenure. American Community Survey 1-Year Estimates: Table B25010.

U.S. Department of Defense (U.S. DoD). (2008). *Perchlorate Removal, Destruction, and Field Monitoring Demonstration (Drinking Water—Pilot Scale)* (ESTCP Cost and Performance Report (ER–0312)).

U.S. Department of Defense (U.S. DoD). (2009). *Demonstration of a Full-Scale Fluidized Bed Bioreactor for the Treatment of Perchlorate at Low Concentrations in Groundwater* (Environmental Security Technology Certification Program (ESTCP) Final Report (ER–0543)).

U.S. Food and Drug Administration (FDA). (2015). Total diet study—study design. Retrieved from *http://www.fda.gov/food/foodscienceresearch/totaldietstudy/ucm184232.htm#.*

USEPA. (1991, February). Standardized Monitoring Framework.

USEPA. (1998). Variance Technology Findings for Contaminants Regulated Before 1996. EPA 815–R–98–003. September.

USEPA. (1999). Revisions to the Unregulated Contaminant Monitoring Regulation for Public Water Systems; Final Rule. 64 FR 80, p. 50556. September 17, 1999.

USEPA. (2000a). Arsenic in Drinking Water Economic Analysis. EPA 815–R–00–026.

USEPA. (2000b). Geometries and Characteristics of Public Water Systems. EPA 815–R–00–024.

USEPA. (2000c). Unregulated Contaminant Monitoring Regulation Analytical Methods and Quality Control Manual. EPA 815–R–00–006.

USEPA. (2000d). Methodology for Deriving Ambient Water Quality Criteria for the Protection of Human Health. EPA–822–B–00–004.

USEPA. (2002). A review of the reference dose and reference concentration process.

USEPA. (2003). Contaminant Candidate List Regulatory Determination Support Document for Aldrin and Dieldrin. EPA–815–R–03–010. *https://www.epa.gov/sites/production/files/2014-09/documents/support_cc1_aldrin-dieldrin_ccl_regdet.pdf.*

USEPA. (2004). The Standardized Monitoring Framework: A Quick Reference Guide. EPA–816–F–04–010.

USEPA. (2005a). Integrated Risk Information System (IRIS) Chemical Assessment Summary: Perchlorate (ClO4 − ) and

Perchlorate Salts. USEPA National Center for Environmental Assessment.

USEPA. (2005b, May). Perchlorate Treatment Technology Update: Federal Facilities Forum Issue Paper. Office of Solid Waste and Emergency Response. EPA 542–R–05–015.

USEPA. (2008a). Drinking water: Preliminary regulatory determination on perchlorate. **Federal Register**, 73 (198).

USEPA. (2008b, June). Draft Information Collection Request for the Disinfectants/Disinfection Byproducts, Chemical, and Radionuclides Rule.

USEPA. (2008c, November 12). National Ambient Air Quality Standards for Lead. 73 FR 66964, p. 66964–67062. Retrieved from *https://www.federalregister.gov/articles/2008/11/12/E8-25654/national-ambient-air-quality-standards-for-lead.*

USEPA (2008d). Interim Drinking Water Health Advisory for Perchlorate. Retrieved from: *https://nepis.epa.gov/Exe/ZyPDF.cgi/P1004X7Q.PDF?Dockey=P1004X7Q.PDF.*

USEPA. (2008e). Regulatory Determinations Support Document for Selected Contaminants from the Second Drinking Water Contaminant Candidate List (CCL 2). EPA–815–R–03–010. *https://www.epa.gov/sites/production/files/2014-09/documents/chapter_4_dcpa_mono_and_di-acid_degradates.pdf.*

USEPA. (2009a). Drinking Water: Perchlorate Supplemental Request for Comments.

USEPA. (2009b). *Inhibition of the Sodium-Iodide Symporter By Perchlorate: An Evaluation of Lifestage Sensitivity Using Physiologically Based Pharmacokinetic (PBPK) Modeling (Final Report)* (EPA/600/R–08/106A). Washington, DC.

USEPA. (2009c, May). 2006 Community Water System Survey—Volume II: Detailed Tables and Survey Methodology. Retrieved from *https://www.epa.gov/dwstandardsregulations/community-water-system-survey.*

USEPA. (2011a). Drinking Water: Regulatory Determination on Perchlorate. **Federal Register** Notice. 76 FR No. 29. Pages 7762–7767. (February 11, 2011) (to be codified at 40 CFR pt. 141). Retrieved from *https://www.federalregister.gov/articles/2011/02/11/2011-2603/drinking-water-regulatory-determination-on-perchlorate.*

USEPA. (2011b). *Exposure Factors Handbook 2011 Edition (Final Report)* (p. Chapter 8). Retrieved from *https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=236252.*

USEPA. (2011c). Labor Cost for National Drinking Water Rules.

USEPA. (2012). Benchmark dose technical guidance.

USEPA. (2012a). Perchlorate Tribal Stakeholder Meeting Summary. February 28, 2012.

USEPA. (2017). Biologically Based Dose Response Models for the Effect of Perchlorate on Thyroid Hormones in the Infant, Breast Feeding Mother, Pregnant Mother, and Fetus: Model Development, Revision, and Preliminary Dose-Response Analyses. (T.L. Paul Schlosser and Santhini Ramasamy, Ed.). Peer Review Draft.

USEPA. (2017). *Draft Report: Proposed Approaches to Inform the Derivation of a Maximum Contaminant Level Goal for Perchlorate in Drinking Water.*

USEPA. (2018a). Best Available Technologies and Small System Compliance Technologies for Perchlorate in Drinking Water. EPA 816–R–19–006.

USEPA. (2018b). *Proposed Approaches to Inform the Derivation of a Maximum Contaminant Level Goal for Perchlorate in Drinking Water.* EPA 816–R–19–008.

USEPA. (2018c). Technologies and Costs for Treating Perchlorate-Contaminated Waters. EPA 816–R–19–005.

USEPA. (2019a). Health Risk Reduction and Cost Analysis of the Proposed Perchlorate National Primary Drinking Water Regulation. EPA 816–R–19–004.

USEPA. (2019b). Perchlorate Occurrence and Monitoring Report. EPA 816–R–19–003.

USEPA. (2019c). Technical Support Document: Deriving a Maximum Contaminant Level Goal for Perchlorate in Drinking Water. EPA 816–R–19–007.

van Den Hove, M.F., Beckers, C., Devlieger, H., De Zegher, F., & De Nayer, P. (1999). Hormone synthesis and storage in the thyroid of human preterm and term newborns: Effect of thyroxine treatment. *Biochimie, 81*(5), 563–570.

van Mil, N.H., Steegers-Theunissen, R.P.M., Bongers-Schokking, J.J., El Marroun, H., Ghassabian, A., Hofman, A., . . . Tiemeier, H. (2012). Maternal hypothyroxinemia during pregnancy and growth of the fetal and infant head. *Reproductive Sciences, 19*(12), 1315–1322. *https://doi.org/10.1177/1933719112450338.*

Wang, P., Gao, J., Zhao, S., Guo, Y., Wang, Z., & Qi, F. (2016). Maternal thyroxine levels during pregnancy and outcomes of cognitive development in children. *Molecular Neurobiology, 53*(4), 2241–2248. *https://doi.org/10.1007/s12035-015-9189-z.*

Webster, T.D., & Crowley, T.J. (2010, November). *Full-Scale Implementation of a Biological Fluidized Bed Drinking Water Treatment Plant for Nitrate and Perchlorate Treatment.* Presented at the 2010 Water Education Foundation Water Quality and Regulatory Conference, Ontario, CA.

Webster, T.D., & Crowley, T.J. (2016, June). *Biological treatment of perchlorate in groundwater.* Presented at the AWWA Annual Conference and Exposition.

Webster, T.D., & Litchfield, M.H. (2017). Full-scale biological treatment of nitrate and perchlorate for potable water production. *Journal AWWA, 109*(5), 30–40.

Wu, X., & Blute, N.K. (2010, March). *Perchlorate Removal Using Single-Pass Ion Exchange Resin—Pilot Testing Purolite A532E at the San Gabriel B6 Plant.* Presented at the 2010 California-Nevada AWWA Spring Conference, Hollywood, CA.

Yoon, J., Amy, G., & Yoon, Y. (2005). Transport of target anions, chromate (Cr (VI)), arsenate (As (V)), and perchlorate (ClO4), through RO, NF, and UF membranes. *Water Science and Technology, 51*(6–7), 327–334.

Yoon, J., Yoon, Y., Amy, G., & Her, N. (2005). Determination of perchlorate rejection and associated inorganic fouling (scaling) for reverse osmosis and nanofiltration membranes under various operating conditions. *Journal of Environmental Engineering, 726–733.*

Zhang, X., Yao, B., Li, C., Mao, J., Wang, W., Xie, X., . . . Shan, Z. (2016). Reference intervals of thyroid function during pregnancy: self-sequential longitudinal study versus cross-sectional study. *Thyroid, 26*(12), 1786–1791. *https://doi.org/10.1089/thy.2016.0002.*

## List of Subjects

### 40 CFR Part 141

Chemicals, Incorporation by reference, Indians—lands, Intergovernmental relations, Radiation protection, Reporting and recordkeeping requirements, Water supply.

### 40 CFR Part 142

Administrative practice and procedure, Chemicals, Indians—lands, Radiation protection, Reporting and recordkeeping requirements, Water supply.

Dated: May 23, 2019.

**Andrew R. Wheeler,**

*Administrator.*

For the reasons stated in the preamble, the Environmental Protection Agency proposes to amend 40 CFR parts 141 and 142 as follows:

## PART 141—NATIONAL PRIMARY DRINKING WATER REGULATIONS

■ 1. The authority citation for part 141 continues to read as follows:

**Authority:** 42 U.S.C. 300f, 300g–1, 300g–2, 300g–3, 300g–4, 300g–5, 300g–6, 300j–4, 300j–9, and 300j–11.

■ 2. Amend § 141.6 by revising paragraph (a) and adding paragraph (l) to read as follows:

### Subpart A—General

#### § 141.6   Effective dates.

(a) Except as provided in paragraphs (b) through (l) of this section the regulations set forth in this part shall take effect on June 24, 1977.

\*      \*      \*      \*      \*

(l) The regulations contained in the revisions to §§ 141.23(a)(4)(i), 141.23(a)(5), 141.23(c),141.23(f)(1), 141.23(i)(1)–(2), 141.23(k)(1)–(3), 141.23(k)(3)(ii), 141.51(b), 141.60(b)(5), 141.62(b), 141.62(c), 141.62(e), Appendix A to Subpart O and Appendix A and B to Subpart Q are effective for the purposes of compliance on [DATE OF PUBLICATION OF FINAL RULE IN THE **FEDERAL REGISTER**].

■ 3. Amend § 141.23 by:
■ a. In paragraph (a)(4)(i) table:
■ i. Revising the table heading; and
■ ii. Adding an entry for ''Perchlorate'' in alphabetical order;
■ b. In paragraph (a)(5), after the text ''nickel,'' adding the text ''perchlorate,'';
■ c. In paragraph (c), after the text ''nickel,'' adding the text ''perchlorate,'';

■ d. Adding paragraph (c)(10);
■ e. In paragraph (f)(1), after the text ''nickel,'' adding the text ''perchlorate,'';
■ f. In paragraphs (i)(1) and (2), after the text ''nickel,'' adding the text ''perchlorate,'';
■ g. Revising paragraph (i)(3);
■ h. In paragraph (k)(1):
■ i. Revising the introductory text; and
■ ii. In the table, adding the table designation, redesignating entries 21 through 26 as 22 through 27, and adding a new entry 21;
■ i. In paragraph (k)(2):
■ i. In the introductory paragraph, after the text ''nitrite,'' adding the text ''perchlorate,''; and
■ ii. In the table, adding the table designation and adding, in alphabetical order, an entry for ''Perchlorate'';
■ j. In paragraph (k)(3):
■ i. In the introductory paragraph, after the text ''nitrite'' adding the text '', perchlorate,''; and
■ ii. In paragraph (ii) table, adding the table designation, and adding in alphabetical order, an entry for ''Perchlorate'';

The revisions and additions read as follows:

### Subpart C—Monitoring and Analytical Requirements

#### § 141.23   Inorganic chemical sampling and analytical requirements.

\*      \*      \*      \*      \*

(a) \* \* \*

(4) \* \* \*

(i) \* \* \*

### TABLE 1 TO PARAGRAPH (a)(4)(i)— DETECTION LIMITS FOR INORGANIC CONTAMINANTS

[Composited samples]

| Contaminant | MCL (mg/l) | Methodology | Detection limit (mg/l) |
|---|---|---|---|
| \* | \* | \* | \* |
| Perchlorate ............. | 0.056 | Ion Chromatography ................................................ | 0.00053. |
| | | Inline Column Concentration/Matrix Elimination Ion Chromatography with Suppressed Conductivity Detection. | 0.00003. |
| | | Two-Dimensional Ion Chromatography with Suppressed Conductivity Detection. | 0.000012–0.000018. |
| | | Liquid Chromatography Electrospray Ionization Mass Spectrometry. | 0.000005 (Tandem Mass Spectrometry [MS/MS]) 0.000008 (Selected Ion Monitoring [SIM]). |
| | | Ion Chromatography with Suppressed Conductivity and Electrospray Ionization Mass Spectrometry. | 0.00002. |
| \* | \* | \* | \* |

\*      \*      \*      \*      \*

(c) \* \* \*

(10) Community water systems and non-transient non-community water systems must conduct initial monitoring for perchlorate as follows:

(i) Community water systems serving greater than 10,000 persons without acceptable historic data, as defined below, must collect four consecutive quarterly samples at all sampling points between January 1, 2023 and December 31, 2025.

(ii) Community water systems serving 10,000 or fewer persons and non-transient non-community water systems without acceptable historic data, as defined below, must collect four consecutive quarterly samples at all

sampling points between January 1, 2026 and December 31, 2028.

(iii) Grandfathering of data: States may allow historical monitoring data collected at a sampling point to satisfy the initial sampling requirements for that sampling point, for the following situations.

(A) To satisfy initial monitoring requirements, community water systems serving greater than 10,000 persons having only one entry point to the distribution system may use the monitoring data from the compliance monitoring period between January 1, 2020 and December 31, 2022. Community water systems serving 10,000 or fewer persons and non-transient non-community water systems having only one entry point to the distribution system may use the monitoring data from the compliance monitoring period between January 1, 2023 and December 31, 2025.

(B) To satisfy initial monitoring requirements, a system with multiple entry points and having appropriate historical monitoring data for each entry point to the distribution system may use the monitoring data from the compliance monitoring period that began between January 1, 2020 and December 31, 2022, for community water systems serving greater than 10,000 persons and between January 1, 2023 and December 31, 2025, for community water systems serving 10,000 or fewer persons and for non-transient non-community water systems.

(C) To satisfy initial monitoring requirements, a system with appropriate historical data for a representative point in the distribution system may use the monitoring data from the compliance monitoring period between January 1, 2020 and December 31, 2022, for community water systems serving greater than 10,000 persons and between January 1, 2023 and December 31, 2025, for community water systems serving 10,000 or fewer persons and for non-transient non-community water systems, provided that the State finds that the historical data satisfactorily demonstrate that each entry point to the distribution system is expected to be in compliance based upon the historical data and reasonable assumptions about the variability of contaminant levels between entry points. The State must make a written finding indicating how the data conforms to these requirements.

(iv) The State may waive the final two quarters of initial monitoring for perchlorate for a sampling point if the results of the samples from the previous two quarters are below the detection limit.

\*       \*       \*       \*       \*

(i) \* \* \*

(3) Compliance with the maximum contaminant level for nitrate, nitrite and perchlorate is determined based on one sample if the levels of these contaminants are below the MCLs. If the level of perchlorate exceeds the MCL in the initial sample, a confirmation sample is required in accordance with paragraph (f)(1) of this section and compliance shall be based on the average of the initial and confirmation sample. If the levels of nitrate and/or nitrite exceed the MCLs in the initial sample, a confirmation sample is required in accordance with paragraph (f)(2) of this section and compliance shall be based on the average of the initial and confirmation sample.

\*       \*       \*       \*       \*

(k) \* \* \*

(1) Analysis for the following contaminants shall be conducted in accordance with the methods in the following table, or the alternative methods listed in Appendix A to Subpart C of this part, or their equivalent as determined by the EPA. Criteria for analyzing arsenic, barium, beryllium, cadmium, calcium, chromium, copper, lead, nickel, selenium, sodium, and thallium with digestion or directly without digestion, and other analytical test procedures are contained in Technical Notes on Drinking Water Methods, EPA–600/R–94–173, October 1994. This document is available from the National Service Center for Environmental Publications (NSCEP), P.O. Box 42419, Cincinnati, OH 45242–0419 or *http://www.epa.gov/nscep/*.

### Table 2 to Paragraph (k)(1)

| Contaminant | Methodology [13] | EPA | ASTM [3] | SM [4] (18th, 19th ed.) | SM [4] (20th ed.) | SM Online [22] | Other |
|---|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* | \* |
| 21. Perchlorate ...... | Ion Chromatography ................ | [23] 314.0 | | | | | |
| | Inline Column Concentration/ Matrix Elimination Ion Chromatography with Suppressed Conductivity Detection. | [24] 314.1 | | | | | |
| | Two-Dimensional Ion Chromatography with Suppressed Conductivity Detection. | [25] 314.2 | | | | | |
| | Liquid Chromatography Electrospray Ionization Mass Spectrometry. | [26] 331.0 | | | | | |
| | Ion Chromatography with Suppressed Conductivity and Electrospray Ionization Mass Spectrometry. | [27] 332.0 | | | | | |
| \* | \* | \* | \* | \* | \* | \* | \* |

[3] *Annual Book of ASTM Standards,* ASTM International, 100 Barr Harbor Drive, West Conshohocken, PA 19428, *http://www.astm.org.*; Annual Book of ASTM Standards 1994, Vols. 11.01 and 11.02; Annual Book of ASTM Standards 1996, Vols. 11.01 and 11.02; Annual Book of ASTM Standards 1999, Vols. 11.01 and 11.02; Annual Book of ASTM Standards 2003, Vols. 11.01 and 11.02.

[4] *Standard Methods for the Examination of Water and Wastewater,* American Public Health Association, 800 I Street NW, Washington, DC 20001–3710; *Standard Methods for the Examination of Water and Wastewater,* 18th edition (1992); *Standard Methods for the Examination of Water and Wastewater,* 19th edition (1995); *Standard Methods for the Examination of Water and Wastewater,* 20th edition (1998).The following methods from this edition cannot be used: 3111 B, 3111 D, 3113 B, and 3114 B.

[13] Because MDLs reported in EPA Methods 200.7 and 200.9 were determined using a 2x preconcentration step during sample digestion, MDLs determined when samples are analyzed by direct analysis (*i.e.*, no sample digestion) will be higher. For direct analysis of cadmium and arsenic by Method 200.7, and arsenic by Method 3120 B, sample preconcentration using pneumatic nebulization may be required to achieve lower detection limits. Preconcentration may also be required for direct analysis of antimony, lead, and thallium by Method 200.9; antimony and lead by Method 3113 B; and lead by Method D3559–90D, unless multiple in-furnace depositions are made.

[22] Standard Methods Online, American Public Health Association, 800 I Street NW, Washington, DC 20001, available at *http://www.standardmethods.org*. The year in which each method was approved by the Standard Methods Committee is designated by the last two digits in the method number. The methods listed are the only online versions that may be used.

[23] Determination of Perchlorate in Drinking Water Using Ion Chromatography (Revision 1.0, USEPA, 1999a).

[24] Determination of Perchlorate in Drinking Water Using Inline Column Concentration/Matrix Elimination Ion Chromatography with Suppressed Conductivity Detection (Revision 1.0, USEPA, 2005b).

[25] Determination of Perchlorate in Drinking Water Using Two-Dimensional Ion Chromatography with Suppressed Conductivity Detection (USEPA, 2008c).

[26] Determination of Perchlorate in Drinking Water by Liquid Chromatography Electrospray Ionization Mass Spectrometry'' (Revision 1.0, USEPA, 2005c).

[27] Determination of Perchlorate in Drinking Water by Ion Chromatography with Suppressed Conductivity and Electrospray Ionization Mass Spectrometry'' (USEPA, Revision 1.0, 2005d).

The approved compliance methods for determining perchlorate in drinking water listed in table 1 to paragraph (k) of this section, are incorporated by reference. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. Copies of the material incorporated by reference in this paragraph (k) may be inspected at the U.S. Environmental Protection Agency, EPA Headquarters Library, in the Water Docket, at the EPA Docket Center (EPA/DC), EPA WJC West, Room 3334, 1301 Constitution Ave. NW, Washington, DC 20460. If you wish to obtain this material from the EPA Docket Center, call (202) 566–2426.

Copies of this material also may be inspected at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call (202) 741–6030, or go to *www.archives.gov/federal-register/cfr/ibr-locations.html.*

\*    \*    \*    \*    \*

(2) \* \* \*

### TABLE 3 TO PARAGRAPH (k)(2)

| Contaminant | Preservative [1] | Container [2] | Time [3] |
|---|---|---|---|
| \* | \* | \* | \* |
| Perchlorate [7] | 4 °C | P or G | 28 days. |
| \* | \* | \* | \* |

[1] For cyanide determinations samples must be adjusted with sodium hydroxide to pH 12 at the time off collection. When chilling is indicated the sample must be shipped and stored at 4 °C or less. Acidification of nitrate or metals samples may be with a concentrated acid or a dilute (50% by volume) solution of the applicable concentrated acid. Acidification of samples for metals analysis is encouraged and allowed at the laboratory rather than at the time of sampling provided the shipping time and other instructions in Section 8.3 of EPA Methods 200.7 or 200.8 or 200.9 are followed.

[2] P = plastic, hard or soft; G = glass, hard or soft.

[3] In all cases samples should be analyzed as soon after collection as possible. Follow additional (if any) information on preservation, containers or holding times that is specified in method.

\*    \*    \*    \*    \*

[7] Sample collection for perchlorate shall be conducted following the requirements specified in the approved methods in 141.23(k)(1) or the alternative methods listed in appendix A of subpart C of this part, or their equivalent as determined by the EPA.

\*    \*    \*    \*    \*

(3) \* \* \*

(ii) \* \* \*

### TABLE 4 TO PARAGRAPH (k)(3)(ii)

| Contaminant | Acceptance limit |
|---|---|
| \* \* \* \* \* | |
| Perchlorate | ±20% at ≥0.004 mg/L. |
| \* \* \* \* \* | |

\* \* \* \* \*

■ 4. In § 141.51 amend paragraph (b) by adding a designation to the table and by adding in alphabetical order, an entry for ''Perchlorate'' to read as follows:

## Subpart F—Maximum Contaminant Level Goals and Maximum Residual Disinfectant Level Goals

### § 141.51 Maximum contaminant level goals for inorganic contaminants.

\*    \*    \*    \*    \*

(b) \* \* \*

### TABLE 1 TO PARAGRAPH (b)

| Contaminant | MCLG (mg/l) |
|---|---|
| \* \* \* \* \* | |
| Perchlorate | 0.056 |
| \* \* \* \* \* | |

\* \* \* \* \*

■ 5. Amend § 141.60 by adding paragraph (b)(5) to read as follows:

## Subpart G—National Primary Drinking Water Regulations: Maximum Contaminant Levels and Maximum Residual Disinfectant Levels

### § 141.60 Effective dates.

\*    \*    \*    \*    \*

(b) \* \* \*

(5) The effective date for § 141.62(b)(17) is [DATE OF PUBLICATION OF FINAL RULE IN THE **FEDERAL REGISTER**].

■ 6. Amend § 141.62 by:

■ a. In the table in paragraph (b), adding a designation to the table and an entry for ''(17) Perchlorate'' at the end of the table;

■ b. In the table in paragraph (c), adding a designation to the table, an entry for ''Perchlorate'' in alphabetical order, and an entry for ''14 = Biological Treatment'' under the undesignated heading entitled ''Key to BATs; and

■ c. Adding paragraph (e).

The revisions and additions read as follows:

§ 141.62  Maximum contaminant levels for inorganic contaminants.

\*      \*      \*      \*      \*

(b) \* \* \*

TABLE 1 TO PARAGRAPH (b)

| Contaminant | MCL (mg/l) |
|---|---|
| \*      \*      \*      \*      \* | |
| (17) Perchlorate .................... | 0.056 |

(c) \* \* \*

TABLE 2 TO PARAGRAPH (c)—BAT FOR INORGANIC COMPOUNDS LISTED IN SECTION 141.62(B)

| Chemical name | BAT(s) |
|---|---|
| \*      \*      \*      \*      \* | |
| Perchlorate ......................... | 5, 7, 14. |
| \*      \*      \*      \*      \* | |

\*      \*      \*      \*      \*

Key to BATs in Table

\*      \*      \*      \*      \*

14 = Biological Treatment

(e) The Administrator, pursuant to section 1412 of the Act, hereby identified in the following table the affordable technology, treatment technique, or other means available to systems serving 10,000 persons or fewer for achieving compliance with the maximum contaminant level for perchlorate:

TABLE 3 TO PARAGRAPH (e)—SMALL SYSTEM COMPLIANCE TECHNOLOGIES (SSCTS) FOR PERCHLORATE

| Small system compliance technology | Affordability for listed small system categories |
|---|---|
| Ion exchange ............ | All size categories. |
| Reverse osmosis (point of use). | All size categories. |

■ 7. Amend Appendix A to Subpart O of Part 141 table, under ''Inorganic contaminants'', by adding an entry for ''Perchlorate'' in alphabetical order to read as follows:

Subpart O—Consumer Confidence Reports

APPENDIX A TO SUBPART O OF PART 141—REGUATED CONTAMINANTS

| Contaminant (units) | Traditional MCL in mg/L | To convert for CCR, multiply by | MCL in CCR units | MCLG | Major sources in drinking water | Health effects language |
|---|---|---|---|---|---|---|
| \* | \* | | \* | \* | \* | \* | \* |
| Inorganic contaminants Perchlorate ............. | 0.056 | 1000 | 56 | 56 | Perchlorate is commonly used in solid rocket propellants, munitions, fireworks, airbag initiators for vehicles, matches and signal flares. Perchlorate may occur naturally, particularly in arid regions such as the southwestern United States and is found as a natural impurity in nitrate salts used to produce nitrate fertilizers, explosives and other products. | Offspring of pregnant women and infants who drink water containing perchlorate in excess of the MCL could experience delays in their physical or mental development. |
| \* | \* | \* | \* | \* | \* | \* |

■ 8. Amend Appendix A to Subpart Q of Part 141 table, under ''B. Inorganic contaminants'', by adding an entry for ''Perchlorate'' in alphabetical order to read as follows:

Subpart Q—Public Notification of Drinking Water Violations

\*      \*      \*      \*      \*

APPENDIX A TO SUBPART Q OF PART 141—NPDWR VIOLATIONS AND OTHER SITUATIONS REQUIRING PUBLIC NOTICE [1]

| Contaminant | MCL/MRDL/TT violations [2] | | Monitoring & testing procedure violations | |
|---|---|---|---|---|
| | Tier of public notice required | Citation | Tier of public notice required | Citation |
| \* | \* | \* | \* | \* | \* |
| **B. Inorganic Chemicals (IOCs)** | | | | |
| \* | \* | \* | \* | \* |
| 14. Perchlorate ....... | 1 | 141.62(b) ..................................................... | 3 | 141.23(a), (c), 141.23(f)(1). |

APPENDIX A TO SUBPART Q OF PART 141—NPDWR VIOLATIONS AND OTHER SITUATIONS REQUIRING PUBLIC NOTICE [1]—Continued

| Contaminant | MCL/MRDL/TT violations [2] | | Monitoring & testing procedure violations | |
|---|---|---|---|---|
| | Tier of public notice required | Citation | Tier of public notice required | Citation |
| * | * | * | * | * | * | * |

[1] Violations and other situations not listed in this table (e.g., failure to prepare Consumer Confidence Reports), do not require notice, unless otherwise determined by the primacy agency. Primacy agencies may, at their option, also require a more stringent public notice tier (e.g., Tier 1 instead of Tier or Tier 2 instead of Tier 3) for specific violations and situations listed in this Appendix, as authorized under 141.202(a) and 141.203(a).

[2] MCL-Maximum contaminant level, MDRL-Maximum residual disinfectant level, TT-treatment technique

*    *    *    *    *

■ 9. Amend Appendix B to Subpart Q of Part 141 table, under "C. Inorganic contaminants", by adding an entry for "Perchlorate" in alphabetical order to read as follows:

APPENDIX B TO SUBPART Q OF PART 141—STANDARD HEALTH EFFECTS LANGUAGE FOR PUBLIC NOTIFICATION

| Contaminant | MCLG [1] mg/L | MCL [2] mg/L | Standard health effects language for public notification |
|---|---|---|---|
| * | * | * | * | * | * | * |
| **C. Inorganic Chemicals (IOCs)** | | | |
| * | * | * | * | * | * | * |
| 21. Perchlorate ....... | 0.056 | 0.056 | Offspring of pregnant women and infants who drink water containing perchlorate in excess of the MCL could experience delays in their physical or mental development. |
| * | * | * | * | * | * | * |

[1] MCLG—Maximum contaminant level goal.
[2] MCL—Maximum contaminant level.

## PART 142—NATIONAL PRIMARY DRINKING WATER REGULATIONS IMPLEMENTATION

■ 10. The authority citation for part 142 continues to read as follows:

**Authority:** 42 U.S.C. 300f, 300g–1, 300g–2, 300g–3, 300g–4, 300g–5, 300g–6, 300j–4, 300j–9, and 300j–11.

■ 11. In § 142.62 amend the table in paragraph (b) by adding a designation to the table, an entry for "Perchlorate" in alphabetical order; and an entry "13 = Biological Treatment" under the undesignated heading entitled "Key to BATs".

### Subpart G—Identification of Best Technology, Treatment Techniques or Other Means Generally Available.

*    *    *    *    *

**§ 142.62   Variances and exemptions from the maximum contaminant levels for organic and inorganic chemicals.**

*    *    *    *    *
(b) * * * *

TABLE 1 TO PARAGRAPH (b)—BAT FOR INORGANIC COMPOUNDS LISTED IN § 141.62(b)

| Chemical name | BAT(s) |
|---|---|
| * | * | * | * |
| Perchlorate ................................... | 5, 7, 14 |

TABLE 1 TO PARAGRAPH (b)—BAT FOR INORGANIC COMPOUNDS LISTED IN § 141.62(b)—Continued

| Chemical name | BAT(s) |
|---|---|
| * | * | * | * |

*    *    *    *    *

*Key to BATs in Table*

*    *    *    *    *

13 = Biological Treatment

[FR Doc. 2019–12773 Filed 6–25–19; 8:45 am]

**BILLING CODE 6560–50–P**

# Pls.' Exhibit 051

# Letter from EPA Assistant Administrator, Robert Perciasepe, July 25, 1997



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

WASHINGTON, D.C. 20460

JUL 25 1997

Mr. George C. Glasser
3016 23rd Street, North
St. Petersburg, Florida 33713

OFFICE OF
WATER

Dear Mr. Glasser:

Thank you for your letter of July 5, 1997, to Carol M. Browner, Administrator of the Environmental Protection Agency (EPA), informing us that the American Dental Association Internet Web Site lists EPA as a supporter of fluoridation. You are correct in stating that the Safe Drinking Water Act (SDWA) prohibits EPA from requiring or supporting the addition of any substance (including fluoride) to drinking water for preventative health care purposes. Fluoridation decisions are made at the State or local level and are frequently the result of a public referendum on the issue. EPA will write to the American Dental Association informing them of the error in the Web Site information.

Fluoride in drinking water is regulated by EPA under Section 1412 of the SDWA. On April 2, 1986, EPA set a revised Maximum Contaminant Level (MCL), an enforceable Federal primary standard, at 4 mg/L to protect against crippling skeletal fluorosis, an adverse health effect. In addition, EPA set a nonenforceable Secondary Maximum Contaminant Level of 2 mg/L to protect against objectionable dental fluorosis (tooth discoloration). Depending on local conditions, fluoridation in this country is practiced at a level of about 1 mg/L which is well below the current 4 mg/L SDWA Federal standard. Thus, in cases where States or local governments choose to fluoridate, those localities are not in violation of the SDWA and do not come under the jurisdiction of EPA.

EPA has prepared a regulatory fact sheet on Fluoride to provide information regarding fluoride and fluoridation. A copy of the fact sheet is enclosed. If you have additional questions, please feel free to contact me or call Dr. Joyce Donohue in our Health and Ecological Criteria Division, at 202/260-5389.

Sincerely,

Robert Perciasepe
Assistant Administrator

Enclosure



EXHIBIT
155
5/31/19