Pages 1 - 122

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

FOOD AND WATER WATCH, INC., et al, )
)
)
        Plaintiffs,            )
)
  vs.                          ) No. C 17-2162 EMC
)
U.S. ENVIRONMENTAL PROTECTION  )
AGENCY, et al,                 )
)  San Francisco, California
        Defendants.            )  Friday
)  May 8, 2020
_____)  1:00 p.m.

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:          WATERS KRAUS & PAUL
                         222 North Pacific Coast Highway
                         Suite 1900
                         El Segundo, California 90245
                 BY:  **MICHAEL P. CONNETT, ESQ.**
                      **CHARLES ANDREW WATERS, ESQ.**


                         NIDEL AND NACE, PLLC
                         5335 Wisconsin Avenue, NW
                         Suite 440
                         Washington, DC 20015
                 BY:  **CHRISTOPHER THOMAS NIDEL, ESQ.**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported By:    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

**For Plaintiffs:**          NATURAL RESOURCES DEFENSE COUNCIL
                             111 Sutter Street
                             21st Floor
                             San Francisco, California 94104
                    BY:  **MICHAEL E. WALL, ESQ.**


**For Defendants:**          U.S. DEPARTMENT OF JUSTICE
                             Environmental Defense Section
                             601 D Street, NW
                             Room 8814
                             Washington, DC 20004
                    BY:  **DEBRA J. CARFORA, ESQ.**


                             U.S. DEPARTMENT OF JUSTICE
                             Environment & Natural Resources Div.
                             P.O. Box 7611
                             Washington, DC 20044
                    BY:  **BRANDON N. ADKINS. ESQ.**
                         **SIMI BHAT, ESQ.**
                         **JOHN THOMAS H. DO, ESQ.**

                              _   _   _

| | |
|---|---|
| 1 | **Thursday - May 8, 2020**                                    **1:01 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Good afternoon, everyone.  This meeting |
| 5 | is being recorded.  This is a Zoom webinar. |
| 6 | One thing to remember, please mute your audio until you |
| 7 | speak.  This will help any interference that the court reporter |
| 8 | may be experiencing.  And also, as in line with the court's |
| 9 | policy, the audience may not record these proceedings. |
| 10 | Court is now in session, the Honorable Edward M. Chen is |
| 11 | presiding.  Calling Civil Action 17-2162, Food & Water Watch |
| 12 | versus EPA. |
| 13 | Counsel, please state your appearances for the record. |
| 14 | **THE COURT:**  You are muted, Mr. Waters. |
| 15 | **MR. WATERS:**  My apologies.  Andy Waters for the |
| 16 | plaintiffs. |
| 17 | **THE COURT:**  Thank you. |
| 18 | **MR. CONNETT:**  Good afternoon, Your Honor.  Michael |
| 19 | Connett for the plaintiffs. |
| 20 | **THE COURT:**  Good afternoon, Mr. Connett. |
| 21 | **MR. NIDEL:**  Good afternoon.  Chris Nidel for the |
| 22 | plaintiffs. |
| 23 | **THE COURT:**  Thank you, Mr. Nidel. |
| 24 | **MS. CARFORA:**  Good afternoon, Your Honor.  Debra |
| 25 | Carfora from the Department of Justice on behalf of EPA. |

1          **THE COURT:**  Good afternoon Ms. Carfora.

2          **MR. ADKINS:**  Good afternoon, Your Honor.  Brandon

3    Adkins for the U.S. Department of Justice for defendant EPA.

4          **THE COURT:**  All right.  Good afternoon, Mr. Adkins.

5          **MS. BHAT:**  Good afternoon, Your Honor.  Simi Bhat for

6    EPA.

7          **THE COURT:**  Thank you, Ms. Bhat.

8          **MR. DO:**  Good afternoon.  John Do for EPA.

9          **THE COURT:**  All right.  Thank you, Mr. Do.

10         All right.  You're on for our final -- although I don't

11   know if anything is ever final these days -- pretrial

12   conference in this matter.  And what I want to do is -- and I

13   appreciate the extensive stipulations of fact that you've all

14   entered into.  I think that's very helpful and will help move

15   things along.

16         I do want to go through the Motions in Limine because that

17   may shape what the trial is going to look like to a large

18   extent.  I want to take on the first issue, which is the

19   plaintiff's motion with respect to exclusion of evidence of

20   benefits, the question of whether benefits comes into play or

21   not.

22         And let me say -- I'll tell you what my tentative views

23   are and I'll let the parties respond -- I find that the

24   plaintiff's arguments are pretty persuasive.  You've got the

25   plain meaning of the statute that talks about not considering

 1    costs or non-risk factors; the structure of the statute where

 2    the word "benefit" appears in Subsections (c) and (g), but not

 3    in (b).  So the old rule that when Congress wanted to use a

 4    certain term, they knew how to use it.

 5         The whole purpose and structure of having a bifurcated

 6    proceeding in which there is an initial determination of

 7    whether there is an unreasonable risk; and if there is, then

 8    you go through the administrative process, the rule making

 9    process, at which point you consider such things as benefits

10    and alternatives, and that seems to make a lot of coherent

11    sense.

12         The EPA final rule makes no reference to benefits, even

13    though it lists a comprehensive -- fairly comprehensively those

14    factors which were deemed worthy to list.  They were

15    significant.  They did include benefits.

16         And the framework for metals risk in some ways I think it

17    actually cuts against the EPA because it shows that, again,

18    when Congress wanted to, it made explicit reference and

19    exception, a very prescriptive exception, for metals which are

20    essential.  That concept is confined to metals.  It's not used

21    anywhere else that I could see in the statute.

22         So, yes, it may be that you look at the -- not general

23    benefits, but the essentiality of certain claims, such as

24    metals, and that is taken into account in Subsection (b) in the

25    unreasonable risk; but that seems to be an exception, not the

1     rule.

2          So I -- I guess I'm going to leave it to the Government to

3     respond.  I want to be up front.  But after looking at this,

4     the language of the statute, it's not clear to me why we would

5     be considering benefits at this first stage.

6          So I'll let the Government respond to that.

7               **MR. DO:**  Yes, Your Honor.  I'll take that one.

8          So I think it's important -- your original minute order

9     asked about how the term "unreasonable risk" is used in common

10    law and other statutes.  Certainly, if one were to look at

11    that, it is quite capacious with regards to what is considered.

12         I say that in the sense that I think it's important to

13    look at when -- the pre-amended TSCA did have a very large

14    capacious room for EPA considered a wide range of costs and

15    benefits.  And specifically when EPA amended the TSCA, it

16    carved out what it would not consider was specifically economic

17    costs.  And so I -- I would direct the Court to focus on the

18    fact that it deals with unreasonable risk without regards to

19    cost and non-risk factors.

20         And in this instance a benefit -- we have been using the

21    term "benefit" merely because that is a term that plaintiffs

22    initially proposed.  But a benefit is another way of saying

23    it's a reduction of risk.  A benefit of fluoride is a reduction

24    of the risk of tooth decay.  Less fluoride would lead to more

25    of a hazard.

```
 1        And EPA's risk evaluation process concerns a synthesis of
 2   an examination of those hazards and of health effects.  We
 3   agree a risk evaluation process concerns health effects, and
 4   that includes benefits.
 5        Now, you certainly named metals as -- perhaps was a very
 6   specific and was caged specifically with regard to that.  But
 7   certainly metals aren't the only essential element out there
 8   that a human body may need, et cetera.  So it would be odd if
 9   it was just essential metals, as opposed to other chemicals
10   that have a general benefit -- reduction of risk, or another
11   way of saying it is benefits.
12        And I would also emphasize that --
13        THE COURT:  The statute makes express reference to
14   the framework for metals specimen in subpart (e).  Why would it
15   need to do that if it was so capacious?  If Section 6 were so
16   capacious as to allow, you know, general consideration of
17   essentiality and benefits?  I mean, this seems redundant.
18        MR. DO:  What I mean is it would be odd also if it
19   was only limited to metals, essential metals, as opposed to
20   other essential chemicals as well, which we contend would
21   include full ride for the benefit of --
22        THE COURT:  It may be odd, but Congress enacted
23   subsection (e).  I mean, Congress does a lot of odd things.  So
24   we have to deal with the language.  It may not be -- one could
25   question it, but I mean, here it's a matter of interpretation.
```

```
 1            MR. DO:  Well, that's fair, Your Honor.  And I think

 2    it's also important to keep in mind that, again, when we have

 3    the risk evaluation stage, and then we have the risk management

 4    phase.  The risk management stage is built upon the work that

 5    is done at the risk evaluation phase.

 6        So EPA -- it would be problematic for EPA to do that -- do

 7    the work with regard to looking at the dose response or -- or

 8    benefits, doing a systematic review of benefits at the risk

 9    management phase when EPA has much tighter timelines and is

10    premised on all that legwork being done at the risk evaluation

11    stage, as opposed to EPA trying to go back and do it again,

12    which is not the way that the statute is structured.

13            THE COURT:  Well, I guess the counter argument on

14    that is that then contemplates the duplication at the

15    management stage of the risk assessment stage or evaluation

16    stage.

17        How long does -- what is the time frame again for coming

18    up with rules once you've found it unreasonable?  One year?

19            MR. DO:  The exact timeline is, Your Honor, it's --

20    there is more time for risk evaluation, but I believe a year is

21    right.  Sorry.  I'm looking the specific part up.

22        My point is that there shouldn't be a duplication that's

23    done at the risk evaluation stage -- excuse me, at the risk

24    management stage.  It would be premised on the work done at the

25    risk evaluation stage.
```

1          Ands plaintiffs would just have us skip all of that, and

2     EPA would be in the tight position with regards to trying to do

3     that -- all that work all over again.  For the same reasons

4     that the Court, Your Honor, indicated why it would make sense

5     for the Court to heed EPA's counsel on ensuring that, you know,

6     best available evidence and systematic review is done at the

7     risk evaluation stage and that would be equally applicable to

8     consideration of benefits as well.

9          **THE COURT:**  Let me ask you.  Congress used the words

10    "without consideration of cost or other non-risk factors."

11         What would be an example of a "non-risk factor" other than

12    cost?

13         **MR. DO:**  That would be, for example, unlike a health

14    benefit, there would could be an industrial use.  So many

15    chemicals, admittedly -- I shouldn't say "admittedly."  But

16    it's very common with the chemicals thus far the EPA is

17    considering regulation don't have any type of health benefits.

18    They often have a commercial or industrial benefit.

19         So Congress was intentionally carving out for EPA in

20    the -- any type of balancing test not to consider financial

21    cost, economic cost and those industrial or commercial

22    benefits.

23         **THE COURT:**  So why would it carve out industrial

24    benefits, but not health benefits?

25         **MR. DO:**  Because the risk evaluation, which

```
 1   plaintiffs will concede in their brief, concerns with health.

 2   It's a scientific health assessment.  It deals specifically

 3   with the effects of a particular chemical, which is laid out in

 4   the risk evaluation rule.

 5        While although not providing a comprehensive list,

 6   purposefully not providing a comprehensive list, providing a

 7   list of considerations, which include plainly effects of

 8   chemicals.

 9             THE COURT:  All right.  And you say that common

10   law -- apart from the pre-amendment language of TSCA, is there

11   a general backdrop of common law or other well-known statutory

12   use of the notion or term "unreasonable risk" that arguably

13   was -- was looked to or incorporated by Congress when it used

14   those terms?

15             MR. DO:  Sure.  Of course.

16        First, I want to confirm your initial inclination, Your

17   Honor, of a year to proposal.  That is the timeline for risk

18   management.

19             THE COURT:  Anything in response --

20             MR. DO:  But in response to your specific question,

21   yes, Congress did absolutely have in mind the specific ideas of

22   unreasonable risk.  And if you were to look at other statutes

23   or common law, unreasonable risk absolutely considers the

24   advantages and disadvantages, pros and cons.

25        An example of that certainly would be a quintessential --
```

```
1   you know, we looked to the restatement of torts on

2   reasonableness that looks at the utility and the drawbacks of a

3   particular act.

4       I would direct the Court to specific case law.  And I'm

5   going to do this, but I do want to emphasize how TSCA deviates

6   from this.

7       But to set the background, if the Court were to look at

8   some of the regulations that use the term "unreasonable risk,"

9   there are some regulations that the FTA considers.

10      For example, in Mark v Integra -- that would be 545 U.S.

11  193, the pin cite is 203 -- the Court determined that:

12              "An unreasonable risk determines both the

13          benefits and the drawbacks."

14      I would -- and that dealt with the Federal Food, Drug and

15  Cosmetic Act.

16      I would also lastly highlight the Dietary Supplement

17  Health and Education Act.  Both the 11th and the 10th Circuit

18  say that:

19              "The plain language of the word 'unreasonable

20          risk' means a consideration of both hazards and

21          benefits."

22      The citations for that would be 459 F.3d 1033.  Pin cite

23  is 1038.

24      And then the other case would be 544 F.3d 1187.  Pin cite

25  would be note one, which cites back to the District Court case,
```

1    which, again, said:

2              "Plain language of unreasonable risk means both

3         advantages and disadvantages, pros and cons."

4              **THE COURT:**  Which act does that pertain to?

5              **MR. DO:**  That -- it's regulation supplements.

6    Dietary supplemental -- excuse me, Dietary Supplement Health

7    and Education Act.

8         Certainly, under other acts with regards to FIFRA, that

9    deals with pesticides, et cetera, both adverse and beneficial

10   impacts are considered.

11        But I want to emphasize within that context that is how

12   unreasonable risk is traditionally considered.  But Congress

13   did expressly in the amendments, and I cite to the Senate

14   report at Page 3516, discussing the common law understanding of

15   unreasonable risk and expressly discussing how it did not want

16   EPA in the balancing test to consider economic considerations.

17   Leaving, of course, consideration of health benefits, which is

18   another way of essentially saying a health risk.

19        Less fluoride means an increase in the hazard of dental

20   decay.  And the health evaluation -- excuse me, the risk

21   evaluation stage is where EPA would need the synthesis of that

22   information to inform whether or not -- the risk

23   characterization of it and the ultimate unreasonable risk

24   determination.  And once it has that, later on it can use some

25   of that information -- use that information at the risk

1    management stage.

2        So that is why at the risk management stage there is more

3    express language with regards to benefits.  It's for the

4    purpose of -- maybe I'll put this more concretely.

5        Let's just say in theory if the hazard -- there is a

6    threshold hazard at 2.0, that the benefits come in at 1.5, that

7    legwork has been done at the risk evaluation stage.  And at the

8    risk management stage EPA can manage that risk in consideration

9    of where the benefits come in.

10           THE COURT:  You're saying the Senate report expressly

11   limits the deviation from common law to economic

12   considerations?

13           MR. DO:  Correct.  So it would be -- it would be the

14   middle column S-3516.  It discusses how previously EPA would

15   have considered economic impacts, but that Congress wants to

16   ensure now that it does not.

17           THE COURT:  Well, let me ask you something else.  If

18   the term "unreasonable" is capacious, as you argue, yet you've

19   argued that you want to exclude evidence about alternatives

20   because that's -- it's so far ranging, et cetera, et cetera.

21   But if "unreasonable" really means unreasonable within the

22   meaning of sort of common law and other -- other statutory

23   contexts, excluding economic benefits, it's very common to

24   consider availability of alternatives and the efficacy and

25   effect of alternatives.  That's what reasonableness usually

 1    looks at.

 2         So it seems to me you can't have it both ways.

 3         **MR. DO:**  I can -- I appreciate that.

 4         Again, it's a health assessment.  It's hard to do a health

 5    assessment on an alternative, where the condition of use here

 6    is fluoridation of drinking water.

 7         So this is all in the context of a condition of use.  The

 8    condition of use is not toothpaste.  The condition of use is

 9    not fluoride supplements, et cetera.  So that would be

10    considered at the management stage.

11         But because of the risk evaluation -- we're doing a

12    scientifically based health risk evaluation -- you can do a

13    dose response or, you know, the benefits of community water

14    fluoridation, et cetera, but a vague consideration of

15    alternatives is not -- does not lend itself to such an

16    assessment there.

17         And, again, I would focus on the fact that it's a

18    condition of use specifically that's looked at for the risk

19    evaluation stage, not alternatives -- not alternatives to those

20    conditions.

21         **THE COURT:**  Well, but if you look at the

22    reasonableness of that alternative use and you can find that,

23    well, we can accomplish the exact same purpose by doing X

24    instead of Y, that would seem to make that condition of use

25    less reasonable, if it has -- if it poses some threat.

```
 1          So I don't know why logically you would exclude

 2   alternative conditions, other than the condition of use, to

 3   evaluate the reasonableness of that condition of use.

 4   Logically I'm not sure I understand that.

 5          MR. DO:  Sure.  Well, certainly, in this case, Your

 6   Honor, I think EPA's position would be -- it certainly would be

 7   -- benefits should be considered in this context.

 8          And to the extent the Court certainly is unconvinced with

 9   regards to the alternatives, then I suppose that would -- we

10   would put that again in the risk evaluation stage then.

11   Although, again, it is expressly named in the risk management

12   component of it.

13          THE COURT:  All right.

14          MR. DO:  That's where EPA would consider it.  So

15   that's why it would -- that specific provision of alternatives

16   is -- is in the risk management, and that's why EPA believes

17   it's most appropriate to consider it there, as opposed to the

18   risk evaluation stage.

19          THE COURT:  All right.  Let me hear from the

20   plaintiffs.  Particularly the point about this general backdrop

21   of how the generally unreasonable risk -- you weigh utility

22   benefits versus the burdens and the costs.  And so it's an

23   unusual mode in that the Senate report seems to preserve that

24   outside of economic considerations.

25          MR. CONNETT:  Yes, Your Honor.
```

```
 1        And I think for this discussion if I could share the
 2   actual Senate report.  This might give us an opportunity to see
 3   how the document sharing goes.  Could I share that?
 4              THE COURT:  Yes, yes.  You can do that.
 5        (Document displayed.)
 6              MR. CONNETT:  So this, Your Honor, is the Senate
 7   report that Mr. Do was referring to.  It's actually EPA
 8   Exhibit 543.
 9        And you can see -- and, Your Honor, can you see the
10   document on the screen?
11              THE COURT:  Yep.
12              MR. CONNETT:  You'll see here that EPA discusses the
13   unreasonable risk analysis under tort law.  And as Your Honor
14   noted, under tort law you do have utility assessment.  There is
15   a balancing test.  You look at the risks, you look at the
16   benefits, and you do a balancing test.
17        And in here EPA is referring to a District of Columbia
18   circuit decision interpreting another federal statute.  And I
19   agree with counsel that other federal statutes that use the
20   term "unreasonable risk" have a balancing test, but TSCA is
21   very unique, and the amendments that Congress made in 2016 are
22   very clear.  And there is no distinction drawn here, Your
23   Honor, as to, well, you -- you get rid of the balancing test
24   for economic benefits, but you keep the balancing test for
25   health benefits.  There is nothing here.
```

1          Your Honor, if you look at this last paragraph in the

2     section of the document, it says:

3               "The Frank R. Lautenberg chemical safety for the

4          21st century act clearly rejects that approach."

5          Meaning the balancing test.

6          And the last statement here says:

7               "In this manner, Congress has ensured that when

8          EPA evaluates a chemical to determine whether it poses

9          an unreasonable risk, the agency may not apply the

10         sort of balancing test described above."

11         Again, there is no distinction here between, well, you can

12    do a balancing test for some benefits, but not other benefits.

13         And, Your Honor, if I could, I'm going to share another

14    Senate report that EPA has attached to its Exhibit List, which

15    is Exhibit 540.

16         (Document displayed.)

17         And here, Your Honor, it's the -- it's another Senate

18    report.  I'm going to turn to Page 17.

19         And here the Senate talks criticizes the prior

20    interpretation of the act, under the pre-amendment version of

21    the act, where EPA was blurring the lines between what, quote,

22    should be pure safety reviews with non-risk factors.

23         So they were blurring purely safety reviews with reviews

24    that considered risk factors.

25         And if you look further down the page, Your Honor, the

```
1    Senate says here:
2             "EPA must determine that a chemical substance
3         meets the safety standard or not based solely on risk
4         to human health."
5         It goes on to say:
6             "... not on the basis of other factors, such as
7         consideration of the costs or benefits of the
8         substance."
9         So here, Your Honor, the Senate explicitly uses the word
10   "benefits" and explicitly commands that benefits not be part of
11   the analysis, which again is consistent with Congress's
12   rejection of the balancing test under common law.
13        And I'll point Your Honor to one last document here, which
14   is actually EPA's website.
15        (Document displayed.)
16        This here, Your Honor, is from -- as you can see, it's
17   EPA's website, and in their website concerning how EPA
18   evaluates the safety of existing chemicals under TSCA.
19        And I think it's notable, Your Honor, that if you scroll
20   down the page to where it talks about risk evaluation, right
21   here, EPA in its own words says:
22            "TSCA prohibits EPA from considering non-risk
23        factors (for example, costs/benefits) during risk
24        evaluation."
25        So EPA by its own admission has interpreted the phrase
```

```
 1   "non-risk factor" to encompass benefits.
 2        So I -- so for the -- I think, Your Honor, the legislative
 3   history is clear.  EPA has recognized the plain meaning in its
 4   own public documents.  And so I -- I'll rest on that, Your
 5   Honor.
 6             THE COURT:  The website you just put up, that's a
 7   live website?  That's not an exhibit, but a live --
 8             MR. CONNETT:  Yes, it's a live website, Your Honor.
 9   For the record, the title of the page is "Assessing and
10   Managing Chemicals Under TSCA."
11        Then subtitle is, "How EPA Evaluates the Safety of
12   Existing Chemicals."
13             THE COURT:  All right.  Response.
14        MR. DO:  Sure, Your Honor.
15        One, would you mind if my colleague, Ms. Carfora, shared
16   the screen as well?
17             THE COURT:  Sure.
18        MR. DO:  It would be pretty much the same screen.
19   But while she does that, I think it's -- there are two points I
20   would like to emphasize.
21        One is, all this information with regard to a refined
22   view, Your Honor, is within the context in which by and large
23   the chemicals which EPA will be regulating do not have any
24   health benefits.  And so many of these documents are written in
25   that context.  And EPA hasn't had the opportunity yet to -- to
```

1    address a chemical which does have a health benefit.

2        My second point primarily is I think this is all about

3    wording and semantics.  Say the word "benefits," but, again,

4    the word "benefits" is essentially a risk consideration.  A

5    health benefit is a risk consideration.

6        Fluoride provides a reduction of risk to the hazard of

7    tooth decay.  That's why it's a non-risk consideration.  It is

8    a risk consideration instead.

9        You call it -- and so when there is some discussion of

10   benefits, again that is with regards to -- in the context of

11   pure utility.

12       And, again, we are not suggesting that any utility should

13   be considered at the risk evaluation stage.  It's specifically

14   economic utility and, you know, industrial uses, et cetera.  So

15   if we were to go back to the Congressional record, what it's

16   discussing -- so, Ms. Carfora, if you want to share that?

17       (Document displayed.)

18       **MR. DO:**  So the language right where the cursor is,

19   or right in the middle, this is all -- this is the same page

20   that opposing counsel cited earlier that I also brought up.

21       When it discusses the rejection of a balancing test, right

22   before that it discusses the tort concept of that balancing

23   test, and specifically it names the environmental, economic and

24   social impact of any action.  That is what Congress was

25   intending to be not considered at the risk evaluation stage,

```
 1    not health benefits.

 2        And the idea of a balancing test is perhaps more

 3    appropriate at the risk management stage, again, when EPA is

 4    examining alternatives, but at the risk evaluation stage it is

 5    a scientific health assessment that needs to be synthesized in

 6    terms of what the exposures are, the severity of the effect,

 7    et cetera.  It isn't necessarily it scores a ten on benefits,

 8    and it scores an 11 on risk.  It's all risk.  It's all a

 9    different form of risk.  Whether it would be a risk of

10    neurotoxicity, a risk of -- of dental decay, a risk to

11    reduction of IQ.  It's all a health risk, health benefit.

12        And, again, I appreciate that we have been using the word

13    "benefit," but, again, that means the same as the health risk.

14            THE COURT:  All right.  I'd like the plaintiffs to

15    respond.

16        I mean, what if the chemical were even more sort of

17    central.  It was something to do with cardiovascular health or

18    something that had some real obvious benefits.  Wouldn't

19    unreasonable risk have to take into account those benefits?

20            MR. CONNETT:  Your Honor, I think that's exactly what

21    Congress was getting at with the metals risk assessment

22    framework, because what you're dealing with there is you are

23    dealing with substances that are essential to human health;

24    that if you have a deficiency of those chemicals, a human

25    disease will result.
```

```
 1        And in this case, Your Honor, EPA's 30(b)(6)
 2   representative testified that EPA agrees that fluoride is not
 3   an essential nutrient.
 4        So whatever benefits fluoride may have, it's not within
 5   the universe of what Congress contemplated in the very narrow
 6   class of compounds for which benefits could be considered.
 7            MR. DO:  Your Honor, that's a point of dispute with
 8   the degree of essentiality, and we have expert witnesses to
 9   speak to that point, but of course they can only do so if we're
10   allowed to proceed.
11            THE COURT:  Well, it is clear that the -- fluoride is
12   not covered by the metals exception under Subsection (e);
13   correct?
14            MR. DO:  It is correct that fluoride is not -- is not
15   a metal, an essential metal.  That is correct under that.
16   Again, that was more illustrative that, of course -- that
17   benefits for a reduction of risk can be considered.
18        Again, I would highlight that plaintiffs have made this an
19   issue.  Plaintiff's position was -- their own risk assessor
20   doing a purported risk evaluation, has entire sections on
21   benefits.  They have made this an issue, and certainly we
22   should be able to critique how they assessed benefits in their
23   own risk evaluation.
24            THE COURT:  Well, critiquing the -- using that as
25   impeachment to say that this expert is way off, look at what
```

```
 1   they said on this matter, doesn't necessarily mean that --
 2   that's an impeachment function, not a substantive function.
 3        And I don't see an estoppel argument here, if that's what
 4   you're implying.  I think our duty is to try to interpret the
 5   act.  And so there is no judicial estoppel.  There has been no
 6   reliance that warrants an estoppel notion.
 7        I think I still get back to trying to interpret the
 8   statute, and the fact that, you know, this clearly was a
 9   deviation from the backdrop of tort law and other statutes.
10   The question is how far of a deviation.  And the Government
11   takes a view that it only deviated with respect to economic and
12   social impact, not health impact; and plaintiff takes a
13   position that it goes beyond that.
14        The problem I have with the Government's position is that
15   there just is nothing in the language of the statute.  I mean,
16   that's the starting point.  That other than the term itself
17   "unreasonable risk," which, of course, is then amended by
18   the -- you not considering non-risk factors -- well, let me ask
19   the plaintiff to respond to the this is a risk factor.  It's
20   kind of an inverse risk argument.  That is, by not having
21   fluoride, you can create a health risk in and of itself.
22             MR. CONNETT:  Well, Your Honor, I asked EPA's expert
23   on TSCA risk evaluations in this case about this issue, and she
24   was at a loss for words to explain how you could ever consider
25   a benefit as part of a risk evaluation.
```

1          And I could point Your Honor to the actual testimony where

2     she -- she could not -- she basically said:  I don't even know

3     how you would do that in a risk evaluation.

4          So I'll point Your Honor to -- if I could share the screen

5     again, this is an exhibit to plaintiff's motion, and this is

6     deposition testimony from Tala Henry.

7          So the question was posed:

8          **"QUESTION:**  So as of right now, there will be no

9          template or example that you could use in applying

10         health benefits for a chemical that might have them?

11         **"ANSWER:**  No.  And, again, I think that there would

12         need to be internal discussion with counsel as to

13         whether or not and how that would even be possible."

14         So, and there is more testimony on that, but she is the

15    expert at TSCA.  She's EPA's expert and when asked, she had no

16    idea how to even explain how to go about it.

17         Now, later on, several months later, EPA got a declaration

18    from her where her position changed, but when she was asked at

19    her deposition, she had no explanation for how you could do

20    that.

21              **THE COURT:**  Well, let me ask the Government this

22    question about your, what I'll call the inverse benefits

23    argument.

24         Isn't the answer to that is the rule-making provision?

25    You could -- look at the rule-making provision.  It's kind of a

```
 1   savings clause.  That is, having found the threshold
 2   determination that there is an unreasonable risk, it doesn't
 3   mean that you do away with it.  There's all sorts of things.
 4   There is a fair amount of room in the rule-making procedure to
 5   allow it.
 6        And, in fact, under Subsection (b) the range of actions
 7   that are required, that are available to the administrator, are
 8   wide ranging.  Some of them are just labels and notifications.
 9   It's not necessarily a ban.
10        So to assume that there is a -- a risk of non-availability
11   of fluoride is not a fair assumption because you have the
12   rule-making process, the whole savings process.  So you can't
13   assume that.
14        And it may be that it continues to be used, but there's
15   warnings given or maybe in certain -- you know, under certain
16   conditions there -- you know, certain areas there are
17   geographic limitations that can be used.  There's all sorts of
18   other things.  So I -- or levels.  It could be you drop the
19   level of fluoridation.
20        And so it almost takes -- if you want to weigh the
21   benefits, you have to almost look head and see, well,
22   benefits -- under the inverse benefit theory, you have to kind
23   of know, well, what's the end product?  And you have to almost
24   incorporate prospectively what the rule-making process will
25   yield in order to know what the inverse risk is.
```

1        **MR. DO:**  Your Honor, everything that you just

2   described are things that would be done in risk evaluation,

3   where you would look at the wide range, a dose response of

4   where -- of where -- what effect occurs at what amount.  That's

5   exactly what risk evaluation is for.

6        And I understand the Court struggled to find perhaps

7   better language with regards to addressing health benefits,

8   but, again, the reason -- the very reasonable reason for that

9   is because by and large the chemicals that TSCA concerns do not

10  have health benefits, and it's -- this is cases about

11  unreasonable risk to health.

12       So, again, benefits are -- concern health.  Those are

13  health benefits, and --

14       **THE COURT:**  Except you're saying that part of the

15  risk in the threshold determination of unreasonable risk is the

16  risk of not having fluoride; that that's a -- and so all I'm

17  saying is that we don't know that yet.  It may be that you can

18  have fluoride at different levels.  You can have it with

19  labeling and warnings.  You can have it -- we don't know.  It

20  may be no effect at the end of the rule-making process.

21       So how do you weigh in the threshold determination this

22  alleged benefit or the putative benefit of not losing fluoride

23  when you don't know what's going to happen until you complete

24  the rule-making process?

25       **MR. DO:**  I, of course, concede I am not a risk

```
 1   assessor.

 2        And going back to Mr. Connett's point about Dr. Tala

 3   Henry, I would direct the Court to the footnote -- the first

 4   footnote in our briefing, which weighs out how, when she was

 5   testifying, she was confirming that economic benefits are not

 6   considered, but left the door open with regards to, of course,

 7   health benefits.  And as counsel pointed out, she did

 8   subsequently explain in a declaration how that can be done.

 9        And, again, the most I can say that -- because it has not

10   been done yet, this would be potentially the first time,

11   because fluoride is a unique chemical which has a health

12   benefit that is being sought to be regulated.  That synthesis,

13   which isn't necessarily a straight comparison of, you know, a

14   ten versus an eight.  That synthesis needs to be done at risk

15   evaluation where EPA actually has time to do it or, in the case

16   of a petition here, the plaintiffs have done that legwork.

17        Because it can't be done -- it would be problematic for

18   that to be done at the risk management stage.  That's not how

19   the statute weighs out.  Because all those -- the

20   considerations of the potential neurotoxic risk, all those

21   considerations you would want to do for the reduction of risk

22   of tooth decay.  That systematic review.  That -- all that,

23   which is risk evaluation.

24        And, again, I would point to the hazard -- risk evaluation

25   rule, which is again cited in our brief, which does not --
```

```
 1   which does not -- which does provide a list of examples of
 2   considerations, and it deals primarily with health effects.
 3   That's the language that is used, which, of course, reflects
 4   what's the language in the statute itself, which is
 5   unreasonable risk to health.
 6             THE COURT:  All right.  Well, I am very still of
 7   inclined to grant the motion, and I still have a view that
 8   benefits is not appropriate at this stage.  It will come in
 9   later.
10        But let's move to another -- we have several motions I
11   want to cover.  We may not be able to cover all of them.
12        But the question about deferral rule-making evidence.  It
13   seems to me it makes eminent sense to defer the question of
14   rule-making and how things will operate if there is a finding
15   of -- of unreasonable risk.  And as much as I don't like to
16   bifurcate things because there's some inefficiency, it makes
17   sense not to mix apples and oranges, and we ought to get
18   through this first stage.
19        And so I'm inclined to say, yes, we're not going to
20   consider -- we're going to put off to another day deferral.
21   I'm not going to preclude the Government -- I know plaintiffs
22   want to preclude the Government from introducing evidence of --
23   in support of a deferral, but I don't think that ought to be on
24   the plate.  I will take your reaction to that, but my intent is
25   to limit this first phase of trial to the unreasonable risk
```

1  question.

2      Any comments on that?

3          **MR. CONNETT:**  Yes, Your Honor.

4      So here is a situation -- EPA in its expert disclosures

5  identified an expert in this case to address relative risk.

6  They used that exact term in her disclosure.  And this, again,

7  is Dr. Henry.

8      So I see that as an acknowledgment and a recognition that

9  the question of relative risk is part of this case.  They

10  presented an expert to address the issue.

11      So we get to the deposition, and we -- we asked Dr. Henry

12  for her position on this, and she reveals that she doesn't have

13  any.

14      And so it's short of shifting goal posts here, Your Honor,

15  where it seems like EPA went in to expert discovery with the

16  intention of putting on evidence on this issue, ended up not

17  having an argument on it, and now is saying we should

18  inherently be deferring til a later point in time.

19      So I understand your -- I understand the reasoning of the

20  Court, but that's -- you know, going back a year from -- you

21  know, going back a year in time, we looked at those expert

22  disclosures.  They teed up relative risk.  We deposed them on

23  that.  They didn't have any evidence.

24          **THE COURT:**  All right.  So as a matter of expert

25  disclosure, they should be barred from introducing further

1    evidence should we get to stage two; is what you're saying?

2              **MR. CONNETT:**  Yes.

3              **THE COURT:**  All right.  Government's response?

4              **MS. BHAT:**  Your Honor, should we get to stage two, we

5    do believe that this expert that we presented will be able to

6    relative risk.

7         Plaintiffs have been on notice for at least the last three

8    years that EPA has not published any final risk evaluations

9    under this section of TSCA.  So that is the reason that there

10   is no final opinion by this expert on the comparative risks of

11   other chemicals that EPA is taking action on.

12        So, you know, in general I think for this type of action,

13   it would be appropriate to bifurcate, but particularly here

14   when this trial comes really hot off the heels of the amended

15   TSCA and EPA hasn't yet taken action, hasn't yet published

16   those final risk evaluations, it just makes even more sense to

17   address the question of imperative risk after this first phase

18   of unreasonable risk.

19             **THE COURT:**  Well, essentially you're asking for an

20   evidentiary bar for failure to disclose timely.

21        And the question typically in an evidence question such as

22   this is:  What's the prejudice?  If there is irreparable

23   prejudice and now, you know, parties is not in a position to

24   defend a particular position because of surprise at trial or

25   something, exclusion is allowed.  It's a pretty heavy sanction.

```
 1         And if we take this thing in phases and I were to find in
 2    the plaintiff's favor, we would have another phase.  I think at
 3    the -- at the very least the plaintiffs would be entitled --
 4    there would have to be, I think, a rapid disclosure process,
 5    and the plaintiffs would be able to take the depositions again
 6    of any expert that the EPA poses.
 7         So I don't -- I don't -- if we're not going to bifurcate,
 8    I don't see irreparable harm here.  That's how I would proceed.
 9    I think if we knew this, I would want to follow on with a quick
10    second phase very focused, and the parties should be prepared
11    to present its -- disclose its evidence with respect to that
12    and be prepared to submit -- or subject their declarants to
13    quick depositions.
14              MS. BHAT:  Understood, Your Honor.
15              THE COURT:  Okay.  Let's go to the -- just so I
16    understand, to skip to the fifth Motion in Limine about the
17    psychological reviews and draft risk evaluations.
18         So the Government has withdrawn its Motion in Limine
19    number five, but reserved its right to object on hearsay.  Why
20    don't you clarify exactly what's happening in that.
21              MS. CARFORA:  Your Honor, we have no objections to
22    those documents.
23              THE COURT:  Okay.
24              MR. CONNETT:  And just for purposes of clarity, can
25    Counsel clarify, when you say no objection to the documents,
```

 1   does that include the draft risk evaluations under TSCA?

 2           MS. CARFORA:  I was under the impression that was

 3   where the documents the Court were referring, the draft

 4   evaluations under TSCA identified on the Exhibit List, and we

 5   have no objections to those documents at this time.

 6           MR. CONNETT:  So all the draft risk evaluations under

 7   TSCA?

 8           MS. CARFORA:  No.  We have no objection to the draft

 9   risk evaluations that have been identified on the Exhibit List.

10           MR. CONNETT:  Okay.

11           THE COURT:  All right.  I just want to clarify for

12   trial purposes that, as I understand the purpose of these,

13   since these pertain to non-fluoride chemicals, that it is

14   really about the process, the EPA's process.  This is sort of a

15   tool to look at how sort of the EPA has been implementing its

16   own -- internally its own -- I guess in a way implementing the

17   guidelines, implementing the statute; is that right?

18           MR. CONNETT:  Right, Your Honor.

19       And so the -- you know, we do have the final rule that EPA

20   issued in 2017 on risk evaluations.  These draft risk

21   evaluations sort of flesh it out, give you details to sort of

22   better understand in practice how EPA goes about doing these.

23       And, you know, it's -- for example, the documents show,

24   you know, under the statute EPA needs to protect highly exposed

25   populations, and these risk evaluations show how EPA has

```
 1   defined that.  It's defined highly exposed populations as being

 2   populations with a 95th percentile exposure in certain subsets.

 3       So that becomes a very useful metric for the Court when

 4   looking at, well, how do we define a highly exposed population.

 5   Well, this is how EPA has done it in its draft risk

 6   evaluations.

 7       So it's those kind of methods and principles that we would

 8   be looking to in the case.

 9           THE COURT:  All right.  So it's a further

10   interpretive tool.  Sometimes you have the agencies, for

11   instance, in a normal administrative law context.  You have the

12   formal regulations, but then you have guidelines thereunder.

13   You have actual practice.

14       So I understand that as an interpretive tool, they may be

15   relevant, even though the subject matter is -- is very

16   different.

17       And so I want to make clear, I'm not interested in sort of

18   transposing the result of any one particular study or draft to

19   this.  It's the methodology.

20       And to the extent it is a tool to help interpret, an

21   administrative law tool, what the guidelines mean and what the

22   statute means.  In that regard if -- I don't know how -- what

23   stage you're going to bring these up, but I'm not interested in

24   having hundreds and hundreds of pages.  I want you to zero in

25   on precisely what am I supposed to glean from any one
```

1    particular study.   Is there a key paragraph or key illustration

2    of what the EPA has done that has transferable application

3    process-wise to this case.

4            MR. CONNETT:   Exactly, Your Honor.   And the parties

5    have met-and-conferred on this issue, because as you could see

6    from this week's submission of exhibits, some of these EPA

7    documents are very long.   And the vast majority of these

8    documents are not relevant, and we would agree with that.

9            So what we -- the parties have met-and-conferred, and the

10   process that we envision, Your Honor, is at trial plaintiffs,

11   if we are to, you know, admit these documents, we would admit

12   certain portions.   And then EPA, if it felt that the excerpt

13   that we are submitting needs further context for the Court to

14   accurately understand the material, EPA would have that right

15   to submit that additional information.

16           So, we've also talked, Your Honor, about on May 20th when

17   the parties submit their exhibits, the agreement by the parties

18   is to give you the entire document for all of these exhibits.

19           Personally I would be happy if we didn't have to submit

20   the whole document, but EPA desired that approach and we were

21   amenable to it.   But actually at trial we would just be

22   submitting the relevant portions as we see them, and EPA would

23   be able to supplement if it felt we were misrepresenting

24   anything.

25           THE COURT:   All right.   Well, it may be helpful if

```
 1   you submit the entirety of exhibits to highlight or flag or
 2   whatever those pages that are most relevant.
 3        I understand that at trial there may be a little bit of
 4   deviation or something depending on how things come out, but,
 5   you know, it doesn't do me much good to get a 400 page
 6   document.  I'm not going to look at it.
 7             MR. CONNETT:  Right.  And we don't -- that's the --
 8   we have been thinking through the logistics of this, because
 9   there are documents, Your Honor, that we would submit that are
10   400 pages, and I can tell you that at most we would use a
11   paragraph or two.
12        So it's -- you know, sort of the approach that the parties
13   have thought about is we would give you the full documents.
14   You would have them there in the record, but at trial we would
15   only be introducing subsets of those documents in a very
16   focused way.
17             THE COURT:  All right.  All right.  Well, that's
18   helpful.
19        Let's briefly address -- on the matter of number four, the
20   alternatives, if I exclude benefits, we're not going to
21   consider alternatives.  That only comes in if you're talking
22   about benefits.
23             MR. CONNETT:  That's correct, Your Honor.
24             THE COURT:  Okay.  That leaves kind of these
25   evidentiary type objections about the testimony of various
```

1    experts.

2       So with respect to number -- defendant's Motion in Limine

3    number one, as to Dr. Grandjean, you know, it seems to me that

4    as long as his methodology, and even if he adopts others, his

5    calculation is clear.  It seems to me it would pass the *Daubert*

6    test.  And there may be grounds for cross examination,

7    impeachment and other things, but it seems to me that what I've

8    seen goes to weight more than admissibility.

9       But if there is something specific that the Government

10   wants to raise in that regard, I'll hear that now.

11      **MR. ADKINS:**  Thank you, Your Honor.  Brandon Adkins

12   for the Department of Justice.

13      Your Honor, I think in the normal course of events that

14   may be true.  If an expert disclosed even a small amount of

15   methodology or the reasons underlying an opinion, that opinion

16   could be admissible under Rule 702 and the *Daubert* standard.

17      What we have here is something completely different.

18   Plaintiff's expert testified at his deposition that he wouldn't

19   trust himself to do the calculations and that he wanted someone

20   else to, quote, be responsible for those calculations.

21      The scientist who actually did the work is not a witness

22   in this trial.  And allowing Dr. Grandjean to testify about the

23   BMD calculation would prevent EPA from having an opportunity to

24   test that evidence through cross examination of the actual

25   person who did that calculation.

1          The law here is clear, and we cited it in our motion on

2     this, on this issue.  An expert may not testify to the opinions

3     of other experts.

4          That's something different than I think what Your Honor

5     may have in mind where an expert relies or adopts in part the

6     opinion of a different expert.  That's not the situation that

7     we have here.

8          Dr. Grandjean wholly imported a calculation, which is so

9     complex he admitted he wouldn't have trusted himself to do it,

10    without first disclosing that in his report and now trying to

11    rely on it in trial.

12         So this isn't -- this doesn't go to weight.  There is no

13    methodology that was disclosed or that we could use to cross

14    examine this expert on.

15              **THE COURT:**  Well, is that calculation disclosed?

16    Regardless of who did it, is it there that you could look at it

17    and you could have your expert look at it and say:  This is

18    hogwash.

19              **MR. ADKINS:**  Yes, that's correct, Your Honor.

20              **THE COURT:**  So it's true he didn't do it and said he

21    couldn't do it, but he relied on somebody else.

22         And the actual calculation is there.  What you don't have

23    is somebody there to sort of, I guess, answer questions; is

24    that right?  Is that the problem?

25         You look at a particular aspect, the third phase or

```
 1   whatever it is, or in some equation.  I don't know exactly what
 2   it is, but you have nobody to sort of question, you know:  Why
 3   did you do this?  Did you consider this?  That's the main
 4   argument there?
 5             MR. ADKINS:  Yes, that's absolute correct, Your
 6   Honor.
 7        What's important here, and as you'll hear at trial,
 8   sometimes it's not, you know, what did you do, but it is why
 9   did you do it?  And those are the sorts of questions that we
10   can't ask of this person who performed the BMD calculation.
11        But the BMD isn't the only issue that we raised in our
12   motion.  Dr. Grandjean is also offering an opinion on the
13   generalized ability of prospective cohort studies from Mexico
14   City and Canada.  He is offering an opinion that the total
15   exposure identified in those studies is comparable to the
16   United States population.
17        In his disclosures in this case he hasn't offered any
18   reasoning or methodology to support what he says is an
19   assumption.  The studies themselves state that a generalized
20   ability opinion of this sort is not possible because the data
21   weren't available.
22        Now, plaintiffs have offered, in response to our motion
23   here, a declaration from Dr. Grandjean where they attempt to
24   supplement and address the opinion and the lack of disclosure
25   that he made throughout the discovery period.  And I would like
```

1    to offer two responses to that disclosure.

2        The first is this.  Dr. Grandjean says that the

3    methodologies and principles that he used to make this

4    generalized ability finding are obvious.  That's a quote,

5    obvious.  If it's true that it is obvious, we don't need an

6    expert to testify to it.

7        If it isn't true that it's obvious, which is EPA's

8    position here, then the expert who's offering that opinion has

9    to disclose at least some methodology that would allow the

10   Court to make a reliability finding under Rule 702.

11       The second point is this.  Dr. Grandjean, again, goes back

12   to a California study which you heard brief argument on at the

13   summary judgment hearing.

14           **THE COURT:**  USCF study?

15           **MR. ADKINS:**  Yes.  That's correct, Your Honor.

16       In his declaration, this is the first analysis that we've

17   seen that the -- that the study performed in California has any

18   bearing on total exposure identified in the prospective Birth

19   Cohort Studies.

20       This is not a disclosed opinion that is properly allowed

21   at trial; that an expert cannot supplement its opinion in a

22   declaration tied to a Motion in Limine on the eve of trial.

23       Even if the Court were to allow Dr. Grandjean to offer

24   this opinion, he still hasn't disclosed any methodologies about

25   why those prospective Birth Cohort Studies are relevant to this

1    California study and how that California study is relevant to

2    those prospective Birth Cohort Studies.   There is no disclosure

3    of his scientific methodology.   There is zero explanation of

4    the principles that he's relied on.

5        And so this isn't something that goes to weight, as

6    plaintiffs have argued.   There is just nothing there that would

7    even allow the Court to make a Rule 702 determination.

8        THE COURT:   All right.   Let me ask for a response to

9    the question about cross examination, unavailability of a

10   meaningful cross examination as to methodology on the

11   calculations, and then the question of whether there was

12   sufficient methodology revealed in the supplemental declaration

13   that allows a generalization based on the UCSF study.

14       MR. CONNETT:   Absolutely, Your Honor.

15       You know, I will just start by saying we are in a

16   remarkable position here, Your Honor.   The EPA, who based its

17   mercury regulation, that is still in effect today to protect

18   children from the neurodevelopmental effects of mercury, EPA

19   based that regulation on a BMD analysis that Dr. Grandjean did

20   with his colleague.   Dr. Grandjean did the BMD analysis at the

21   request of the EPA, and the regulation is based on

22   Dr. Grandjean's BMD analysis and not --

23       THE COURT:   Okay.   I'm not -- I'm not here to

24   question his qualifications.   He could have done five of these,

25   but he's got to show some methodology here.   That's the

1    question.

2          **MR. CONNETT:**   Okay.   And, Your Honor, I'm going to

3    show you now pages that EPA omitted from its motion.   EPA, I

4    think, attached five or six pages from Dr. Grandjean's report.

5    Didn't attach the actual relevant pages where Dr. Grandjean

6    actually explains his methodology.

7          So here is Dr. Grandjean's initial report.

8          (Document displayed.)

9          And you'll see, Your Honor, this is a page discussing the

10   BMD analysis.

11         Here he says:

12            "Our previous benchmark analysis on the effect of

13            lead exposure used a BMR" -- benchmark response -- "of

14            one IQ point and we followed the same procedure for

15            fluoride."

16         So Dr. Grandjean told EPA exactly what method he used.   He

17   gave them the citation.

18         Your Honor, at the deposition EPA did not ask

19   Dr. Grandjean a single question about that method.   Not a

20   single one.   Not a single question.   They never asked Dr.

21   Grandjean to explain this equation; what it meant, why he did

22   it, not once.

23         Now, Your Honor, this citation 198, Dr. Grandjean is a

24   coauthor of it.   This is his method that he published with his

25   biostatistician colleague.   It's his method.   It's been

1   published in the peer-reviewed literature.

2       He told EPA:  EPA, this is the method I'm using for my

3   benchmark dose analysis.  They never asked him about it.

4           **THE COURT:**  So what you're saying in short is that

5   the method -- methodology was disclosed.  The actual

6   implementation of that methodology, the calculations, was what

7   he delegated.

8           **MR. CONNETT:**  Yes.  But as you know, Your Honor,

9   under Federal Rule of Evidence 703, experts are allowed to rely

10  on what experts in this field reasonably rely upon.

11      Now, Dr. Grandjean's biostatistician colleague, he -- as a

12  matter of practice, Dr. Grandjean always works with this

13  colleague on all of his papers where he's doing these

14  calculations.  This is the way he does his work.  So he didn't

15  do anything different in this case than he does in his standard

16  practice.

17      And Dr. Grandjean has published a number of very seminal

18  BMD analyses in the literature.  So the idea that Dr. Grandjean

19  is not qualified to opine on BMD analysis when the EPA actually

20  retained him to do that very thing is -- EPA can use it for

21  cost.  It goes to weight.  I don't think it has any weight at

22  all, but that's something that they can explore on cross.

23          **THE COURT:**  All right.  What about the generalization

24  question?

25          **MR. CONNETT:**  Yes.  On generalization, Your Honor,

```
 1   Dr. Grandjean has a lengthy discussion in his first report --

 2   which I will scroll up to here -- on exposures.  Fluoride

 3   exposure.  Biomarkers.  He talks about urine, and he talks

 4   about the available studies on urinary fluoride levels in

 5   humans.

 6        And he talks about how in the United States the early

 7   data -- now, again, one of the issues we have here, Your Honor,

 8   is there are no nationally representative current studies on

 9   urinary fluoride in the United States.  The Government has not

10   collected that data.  So we just don't have that.

11        But Dr. Grandjean in his report talks about earlier large

12   scale studies from the United States which found that the

13   fluoride in urine generally mirrors the fluoride in water.  So

14   if you have one part per million fluoride in your water, you

15   generally have one part per million fluoride in your urine.

16        And, in fact, when you look at the Canadian data, which

17   Dr. Grandjean relied upon for his benchmark dose analysis,

18   that's almost exactly what they found.  That for women drinking

19   water with about .7 or .6 parts per million in the water, they

20   had about .6, .7, .8 parts per million fluoride in the urine.

21        So you see the same relationship that had previously been

22   identified in the U.S. population.

23        Now, counsel had mentioned that Dr. Grandjean never talked

24   about or never discussed the California study, and that's not

25   correct.  He discussed the UCSF study in both of his reports,
```

```
 1   in the initial report and the supplemental report.

 2        Now, in the initial report, Your Honor, Dr. Grandjean had

 3   not yet received an actual copy of the manuscript.  It was a

 4   personal communication.

 5        So here he says, Your Honor, on Page -- I'll get the

 6   page -- 13:

 7             "While not yet published, I understand that

 8        Dr. Pamela Denbesten recently measured urine fluoride

 9        in 50 pregnant women from Northern California and

10        found levels similar to those reported from Canada."

11        I will show you -- I will now show you his supplemental

12   report.

13        (Document displayed.)

14        MR. CONNETT:  Here is -- can you see, Your Honor,

15   this report on your screen?

16        THE COURT:  Yes.

17        MR. CONNETT:  This is from Dr. Grandjean's

18   supplemental report.  And you see the heading here is "New Data

19   on Western Fluoride Exposures."

20        And at this point, Your Honor, Dr. Grandjean had received

21   an actual manuscript of the study.

22        I should also note, Your Honor, that this UCSF study was

23   just published a month ago in the peer-reviewed literature.  So

24   it's now a published study.

25        But here Dr. Grandjean writes:
```

 1          "I am also aware of recent fluoride exposure

 2     assessments carried out in California.  In pregnant

 3     women, fluoride concentrations in urine and serum were

 4     significantly higher in pregnant women living in

 5     optimally fluoridated communities, as compared with

 6     communities with lower fluoride concentrations in

 7     their drinking water.  And the same was true for

 8     amniotic fluoride concentrations, thus confirming the

 9     transplacental passage of fluoride.  Overall the

10     maternal urinary fluoride concentrations were similar

11     to those reported from Canada."

12     So it's incorrect to say that Dr. Grandjean did not

13 address and did not discuss this California study and its

14 relevance to interpreting the Canadian data.

15     And, again, this --

16          **THE COURT:**  So let me ask Mr. Adkins.  Why isn't that

17 enough?  It seems to me that's enough to pass *Daubert*; that

18 it's enough at least to present at trial and any cross

19 examination will go to weight.

20          **MR. ADKINS:**  So first with respect to the first

21 disclosure.  I know counsel doesn't have it up, but it wasn't

22 clear to us whether Dr. Grandjean had even read the California

23 study, and it now appears that counsel has confirmed that he

24 didn't.

25     So he put the words "I understand that there's a study,"

1   and he didn't read it or conduct any analysis.  Saying I

2   understand there is something that exists out there is not an

3   analysis and a generalized ability opinion of this sort --

4        THE COURT:  Now we have he's read it.  We've got it.

5   The analysis is done.  You know what he's going to say at

6   trial.

7        I'm going to measure *Daubert* by where we are today.  If he

8   relies on that, why isn't that a sufficient disclosure of

9   methodology?  Not that that's going to carry the day, but that

10  gets us through the gate of *Daubert*.

11       MR. ADKINS:  So Dr. Grandjean looked at the study,

12  saw a number, and says here that it was similar to those

13  reported from Canada.  He hasn't even said what number from

14  those Canada studies he's comparing to.  And each of the

15  studies has a different average maternal urinary fluoride

16  value.

17       This is much more complicated than just saying something

18  is similar to the others.  That's not -- that's not an expert

19  opinion.  That's not disclosure of methodology.  There must be

20  something more than this.

21       MR. CONNETT:  Your Honor, if you look at the two

22  papers, the California study, this is how complicated it is.

23  In the fluoridated communities the average level of fluoride in

24  the urine was .72 parts per million.  .72.

25       In the Canadian study the average concentration was .71.

```
1          I think most penal can look at those two numbers and say:
2     Oh, yeah.  They are pretty similar.  In fact, they are almost
3     identical.
4          And they used -- they used the same adjustment methods and
5     they were tested in the same laboratory by Dr. Angeles
6     Martinez, who is the gold standard lab for testing fluoride in
7     urine.
8          And actually, Your Honor, the EPA sought to retain
9     Dr. Angeles Martinez Mier in this case.  So EPA recognizes that
10    Dr. Angeles Martinez Mier is an expert in the field, and that's
11    the data that Dr. Grandjean is relying upon.
12         So when Dr. Grandjean --
13             THE COURT:  I've heard enough.  I'm going to overrule
14    the objection.  I'm going to deny the Motion in Limine.  Allow
15    the testimony.  That's without prejudice.
16         If I find that on cross that -- that Dr. Grandjean doesn't
17    even need a Daubert standard, because it's not a jury trial,
18    it's a bench trial, I will exercise my discretion at that point
19    and I can exclude his testimony.  But at this point I've heard
20    enough and I'm not going to grant a pretrial Motion in Limine.
21         Let's go on to the last one, which is doctor -- or
22    Mr. Hugh, Dr. Hugh and Dr. Lanphear.  They were involved in the
23    ELEMENT and MIREC studies, as I understand it; is that right?
24             MR. ADKINS:  That's correct, Your Honor.
25             THE COURT:  I'm not sure I understand the objection.
```

```
1    They are going to talk primarily about those two studies?

2              MR. ADKINS:  Well, that's what we thought.  There are

3    two categories of testimony that plaintiffs have disclosed for

4    these non-retained experts.

5         And the first is plaintiffs have offered Dr. Hu to testify

6    regarding studies he's coauthored of the prospective Birth

7    Cohort Study in Mexico City.

8         Let me similarly disclose Dr. Lanphear to testify to

9    studies he coauthored regarding the prospective Birth Cohort in

10   Canada.

11             THE COURT:  All right.

12             MR. ADKINS:  And their testimony is unnecessarily

13   cumulative in this respect.

14        There are no fewer than three experts in this case who are

15   offering opinions at trial based on their analysis of these

16   underlying studies.  And bringing in the coauthors of all the

17   studies that the experts who are offering opinions relied on is

18   cumulative and a waste of time.

19        We've made other arguments that it's irrelevant and would

20   unfairly skew the presentation of evidence.  I'm happy to go

21   into those, but in order to be brief, I'll leave it at that.

22             THE COURT:  Well, you know, I don't see what the

23   problem is.  Yes, people rely on it, but one could argue that

24   it's best to have the actual coauthor there.  I mean, you may

25   want to cross examine and find out that perhaps the expert's
```

reliance was misplaced because there's some problematic

matters.

I would think normally it's the opposite.  Normally the

cross-examiner wants to get to the original Real McCoy and say:

Let's get him or her on the stand and let me at him or at her.

So I don't understand how it's necessarily cumulative.

And because I -- this is a bench trial, number one.

Number two, I've imposed the time limits, which we'll have

to discuss.

You know, I'm less concerned about cumulative.  If one

party wants to waste their hours repeating a point over and

over again.

And, plus, if it's actually cumulative at trial, I'll cut

it off.  I don't want to hear stuff over and over again.

       **MR. ADKINS:**  Understood.

       **THE COURT:**  You know, I can exercise that discretion.

       **MR. ADKINS:**  The second category is actually more

concerning.

       **THE COURT:**  Okay.

       **MR. ADKINS:**  The second category is a new opinion

that plaintiffs have disclosed in supplemental disclosures.

And I say it's new because of this.

Plaintiffs initially explained that Dr. Hu and

Dr. Lanphear would testify to their, quote, percipient

knowledge.  They were going to testify about the facts of the

 1   studies that they coauthored.

 2        In supplemental disclosures plaintiffs revealed that they

 3   now seek to elicit opinion evidence that goes beyond the scope

 4   of those underlying studies.

 5        With respect to Dr. Hu, he's expected to testify and offer

 6   an opinion that the studies he conducted in Mexico City are

 7   generalizable to the United States population.  Very similar to

 8   the issue we were discussing with respect to Dr. Grandjean.

 9        Dr. Hu hasn't -- has not conducted or disclosed any

10   principles that back up this generalized ability opinion.  He

11   mentioned the United States once in this context in his

12   supplemental disclosures.

13        All of the studies that he's published and relied of the

14   ELEMENT cohort in Mexico City, they state that such a

15   generalized ability opinion is not possible based on the data

16   that existed at that time.

17        By the way, Dr. Hu has not disclosed that he reviewed the

18   California study, so that's not an out for plaintiffs here.

19        Dr. Hu further testified at his deposition that he has

20   never conducted a study of fluoride in a U.S. population.

21        For those reasons Dr. Hu's opinion testimony, at least,

22   should be excluded from this trial.

23        With respect to Dr. Lanphear, he's disclosed a new opinion

24   where he will opine regarding his personal recommendation as a

25   doctor that pregnant women should reduce their intake of

```
 1    fluoridated water.

 2         Similarly with Dr. Lanphear, he's offered no scientific

 3    analysis for which the Court could judge the reliability of

 4    this, quote, medical opinion, other than the bald statement

 5    that the convergence of findings from the cohort study support

 6    his opinion.

 7         More concerning here is that Dr. Hu -- Dr. Lanphear, Dr.

 8    Lanphear's opinion appears to be a veiled attempt to disclose

 9    an opinion about risk, but Dr. Lanphear has not done a risk

10    assessment.  That's a critical issue to this case and allowing

11    something like this in would be unfairly prejudicial to EPA for

12    that reason.

13         This isn't an issue where -- as plaintiffs have argued,

14    that goes to weight.  Again, this is an issue where EPA's

15    position is there is not sufficient disclosure here regarding

16    methodology that would allow the Court to make a *Daubert*

17    determination.

18         So both -- if the Court is inclined not to grant our

19    motion with respect to the fact testimony, we believe that

20    there are independent reasons and even more powerful reasons

21    why the Court should prevent this opinion evidence.

22              THE COURT:  All right.  What's the response to the --

23    first with Dr. Hu?  It sounds like a newly disclosed opinion

24    testimony.

25              MR. CONNETT:  It's not a newly disclosed opinion,
```

1    Your Honor.

2        And, also, I'm very concerned right now by what counsel

3    has just done, which is that argument he just made, Your Honor,

4    is not their motion.  There is nowhere in that motion where

5    they say these are undisclosed opinions.  Nowhere.  So they are

6    now rewriting this motion to make it something that it was not.

7        I would ask counsel to point the Court to anywhere in that

8    motion where they claim that these are undisclosed opinions.

9              MR. ADKINS:  If I may respond, Your Honor?

10             THE COURT:  Well, I want to hear the merits.  Tell me

11   what's been disclosed.  You're arguing for a waiver argument,

12   and I'm more interested in the merits.

13             MR. CONNETT:  Yeah.  And, Your Honor, it's -- these

14   are absolutely disclosed opinions.

15       So by way of background, Dr. Hu and Dr. Lanphear are both

16   non-retained experts.  And we had a long back-and-forth with

17   counsel last summer, where there was some initial -- you know,

18   when we first disclosed the opinions of Dr. Hu and

19   Dr. Lanphear, EPA did express some concerns about they wanted

20   more details, more specifics for the basis of Dr. Hu and

21   Dr. Lanphear's opinions.

22       And we did that, Your Honor.  We gave them, I think, a 20

23   to 25-page summary of Dr. Hu's opinions and, you know, I don't

24   know, a 15 or 20-page summary of Dr. Lanphear's opinions.

25   There was no dispute raised at that time.  EPA never came back

1    to us and said:  Sorry, these are not sufficient.  We need more

2    information.  They went ahead and they deposed both Dr. Hu and

3    Dr. Lanphear.

4        So this is literally, Your Honor, the first time I am

5    hearing since August of last year from counsel that these

6    opinions are either non-disclosed or not sufficiently

7    documented.  This is the first time I am hearing that at this

8    hearing.

9            **MR. ADKINS:**  Your Honor, I really think we're going

10   down a line that's not relevant here.

11           **THE COURT:**  Let me ask -- hold on.

12       I'm looking at it.  And I don't care when it was raised.

13   I want to know what is the basis on a *Daubert* -- let's get

14   right to it.

15           **MR. CONNETT:**  Yes.

16           **THE COURT:**  Dr. Hu's generalization, if he hadn't

17   done any studies, what is his methodology that survives

18   *Daubert*?

19           **MR. CONNETT:**  Right.  So, Your Honor, as Dr. Hu

20   discusses at his deposition, and as he will explain at trial

21   consistent with his deposition, is when you look at -- urinary

22   fluoride levels are an internalized dose of fluoride.  And

23   Dr. Hu recognizes, and EPA has sort of latched onto a

24   particular statement in his studies where Dr. Hu talks about

25   the limitations of back calculating the external intake of

 1    fluoride that produces the internalized dose.

 2         So there is some -- there is a data gap there.  We can't

 3    definitively say the Mexican children, because they -- or the

 4    Mexican mothers, because they had .7 ppm in their urine were

 5    exposed to 1 milligram of fluoride per day.  We don't have that

 6    precise information.

 7         But what Dr. Hu did at his deposition, Your Honor, is he

 8    explained that to compare the effects in the Mexican population

 9    with the Canadian population and the U.S. population the key

10    thing is the internalized dose.

11         The key thing is the urinary fluoride level, because that

12    shows you, Your Honor, how much fluoride that you've ingested

13    is actually circulating in the body.

14         So it's Dr. Hu's professional opinion that it's the

15    urinary fluoride levels that are more important than the total

16    daiy intake, because the urinary fluoride levels control --

17              **THE COURT:**  So what does he use to then generalize

18    that to the U.S., he UCSF study or what?

19              **MR. CONNETT:**  He uses -- there's two things.  One is

20    the Canadian data.

21         Your Honor, there is a huge national study in Canada.

22    1500 women looking at urinary fluoride levels in pregnant

23    women, in fluoridated areas and non-fluoridated areas.

24         The urinary fluoride levels in the Mexican cohort are

25    virtually identical to the urinary fluoride levels in the water

 1   fluoridated areas of Canada.  So that's the first thing.

 2       So when you look at a water fluoridation population in

 3   North America and you have virtually identical urinary fluoride

 4   levels as a salt fluoridation population in Mexico.  That's

 5   number one.

 6       Number two, Dr. Hu explained at his deposition that you

 7   would expect that.  And the reason why you would expect that is

 8   because salt fluoridation is designed to replicate the doses

 9   that water fluoridation provides.

10           THE COURT:  All right.  So how is that generalized to

11   U.S.?  It's generalized to Canada.  How does he generalize that

12   to the U.S.?

13           MR. CONNETT:  Well, because, Your Honor, it goes

14   to -- there is no reason why the urinary fluoride levels in

15   United States fluoridated areas are going to be materially

16   different than water fluoridated areas in Canadian cities.

17   It's the same concentration of fluoride in the water.

18           THE COURT:  So he relies on the fact that the same

19   concentration of fluoridation is used in the U.S. as in Canada?

20           MR. CONNETT:  Correct.

21           THE COURT:  To infer that the Canadian levels are

22   reflective of U.S. to further then infer that because of

23   equivalence with Mexico, that that is -- there is a commonality

24   there.

25           MR. CONNETT:  That's correct.

1    **THE COURT:**  So he doesn't base it on the UCSF actual

2    urinary concentration stat.

3    **MR. CONNETT:**  He doesn't.  But we're going to close

4    that gap with other testimony from Dr. Grandjean.

5    So, you know, Dr. Hu sort of fills in the first sort of

6    part of the chain and our other experts will fill in the rest.

7    **THE COURT:**  Why isn't that a sufficient revelation of

8    methodology?

9    **MR. ADKINS:**  I'm not sure if counsel was testifying

10   for Dr. Hu or if that's what he thinks Dr. Hu says.  But I can

11   say in the supplemental disclosure where I agree, Dr. Hu first

12   disclosed this generalized ability opinion.

13   This is a range, referring to the MIREC cohort in Canada,

14   that is encompassed by the range of maternal urinary fluoride

15   content in areas with artificially fluoridated water.  It

16   doesn't even say the United States.  It doesn't say he compared

17   -- he did this comparison that plaintiffs are saying.

18   He made no effort to compare the populations in Mexico to

19   Canada.  He made no effort to then compare the populations in

20   Canada to the United States and how those populations could be

21   comparable.

22   Just saying out of thin air that there are areas in Canada

23   that have the same water fluoridation as areas in the United

24   States is not a scientific method.  That's something that comes

25   with --

1          **THE COURT:**  Well, I'm not sure.  I'm not sure.  If

2   you're looking at actual intake concentrations as measured by

3   urinary concentrations and you have two geographic areas where

4   the intake appears to be the same fluoridation levels,

5   concentration levels in water, I'm not sure why that's at least

6   not a fair inference, at least enough to get by *Daubert*.

7          You may ask all sorts of questions about, well, it could

8   be affected by metabolism rates, all sort of other things, but

9   I don't know why that then wouldn't be at least a -- get you

10  through the gate.

11         **MR. ADKINS:**  The reason is it's actually a negative

12  inference.  What they are inferring, and you heard counsel say,

13  is there is no reason to think it would be different.  But they

14  haven't looked at any studies and they haven't considered any

15  scientific methods on this.

16         **THE COURT:**  All right.  Well, I'm going to do the

17  same thing.  I think that based on what he's disclosed, that

18  it's enough at least to be able to give that testimony or

19  attempt to give that testimony at trial, but subject to

20  possible -- without prejudice to this Court striking that

21  opinion if I find that there is no -- on cross that there is

22  not a sufficient *Daubert* basis.

23         What about the Lanphear?  This person -- characterized as

24  a personal recommendation about women?  What's the methodology

25  there?

 1          MR. CONNETT:  Well, there's quite a few steps to the

 2    methodology here, Your Honor.  And first is that Dr. Lanphear,

 3    who is the principal investigator of the NIH funded study in

 4    Canada, they did a large scale study of urinary fluoride levels

 5    in Canada.  And they found -- going back to what we were just

 6    discussing, they found that that the urinary fluoride levels in

 7    pregnant women in Canada are virtually identical to the urinary

 8    fluoride levels in Mexico.

 9          Both the study in Canada, which is an NIH funded study,

10    and the study in Mexico, which is an NIH funded study, they

11    both examined, Your Honor, the impact of prenatal fluoride,

12    which they measured through the urinary fluoride levels of the

13    mother.

14          And both of these prospective cohort studies -- and you're

15    going to hear a lot in this case, Your Honor, about prospective

16    cohort studies and how they are the most reliable type of

17    epidemiological study.  And both of these prospective studies

18    in Canada and Mexico have both found significant adverse

19    associations between prenatal fluoride exposure and IQ in the

20    offspring.

21          So what Dr. Lanphear -- and Dr. Lanphear, Your Honor, is

22    one of the world's -- I would say one of the leading

23    authorities on the impact of environmental chemicals on the

24    developing brain in children's health.  He just published

25    papers, one of which is in his reliance materials in his

1    report, from 2015 talking about the vulnerability of the

2    developing brain during the in utero period.

3        Dr. Lanphear is going to talk about when you combine the

4    vulnerability of the developing brain, you look at these

5    prospective cohort studies in both Mexico and Canada, both

6    finding significant adverse associations between prenatal

7    fluoride exposure and childhood IQ.  He's going to testify,

8    Your Honor, that as the public health expert, he -- this is

9    enough evidence.  This is sufficiently compelling evidence to

10   at least warrant a warning to pregnant moms.

11       And as Dr. Lanphear explained at his deposition, the

12   editor of *JAMA Pediatrics*, which is the journal, the number one

13   pediatrics journal, which is the journal that published

14   Dr. Lanphear's study, the editor agrees with Dr. Lanphear on

15   that point and the data study was published.  The editor issued

16   a recommendation that he does think that pregnant moms should

17   be warned to not drink fluoridated water during their

18   pregnancy.

19           **THE COURT:**  So the methodology -- first, the

20   methodology to get to the adverse association with IQ are the

21   studies themselves in Mexico and Canada, which show not just

22   levels, but the impact of levels.

23           **MR. CONNETT:**  Absolutely.

24           **THE COURT:**  So that -- but why does that lead -- I

25   mean, why isn't it enough for him to say, to testify why -- I'm

```
 1   not sure what the relevance of his opinion about what the

 2   resolution should be or what the -- that almost goes to the

 3   rule-making function.

 4          MR. CONNETT:  Well, because, Your Honor, one of the

 5   arguments that EPA is going to make in this case, and they've

 6   made it here today, is, you know, these studies in Canada and

 7   Mexico, they are not relevant to the United States.  They

 8   don't -- they are not sufficient to be -- to demonstrate a

 9   risk.

10      I think it's highly relevant and probative that the actual

11   scientists who are doing these studies are very concerned about

12   these findings and think they are very relevant to

13   fluoridated --

14          THE COURT:  But he can testify as to the facts, the

15   facts of what the association is.  What is the impact on IQ?

16   How translatable?  How generalizable?  All we have been talking

17   about.

18      Are there holes in the sterilization attempt.  How many

19   links are there, and how reliable is that?  That all can come

20   out.

21      But the ultimate conclusion of what you should do, that's

22   like telling the administrator at Phase 2:  You should post

23   warnings.  You should do this.  Do that.  I, frankly, don't see

24   how that's relevant.

25          MR. CONNETT:  Well, there is one thing, Your Honor.
```

```
 1    I should explain.  In Dr. Lanphear's review that he published
 2    in the Annals of Public Health in 2015, he talks about this
 3    question of how do we grapple with uncertainty in -- when
 4    dealing with the impact of environmental chemicals on health.
 5    And he talks about, what is the level of evidence that you need
 6    before you can start to take protective action.
 7         So Dr. Lanphear, who is a medical doctor and has a Master
 8    in Public Health, and he's been on many science advisory boards
 9    to the EPA to advise EPA on issues of risk, he will explain to
10    Your Honor how we -- to sort of -- how we navigate, how the
11    environmental health community navigates these issues where you
12    have uncertainty.  There is always going to be uncertainty in
13    epidemiological data and when you go from having sufficiently
14    compelling data, what that takes to warrant protective action.
15         And I think, Your Honor, that's a very relevant thing in
16    this case when we're dealing with this issue of unreasonable
17    risk.  This is a case about when does a risk to health become
18    unreasonable.
19         And when you have a medical doctor, one of the -- who's
20    received many grants from the EPA to study the effects of
21    chemicals on human health, when you have a medical doctor,
22    leading epidemiologist come to the Court and say:  Your Honor,
23    the data that we have here is -- you know, he will explain why
24    it's compelling to warrant action.  It's -- that is part of the
25    scale that you look at to reasonableness.  It goes to
```

```
 1    unreasonableness.
 2        And I think it's highly relevant, again, that you have
 3    the -- the scientists doing these studies who are very
 4    concerned.  EPA wants to -- they want to -- obviously, they
 5    want to exclude that testimony.  They want to make it seem like
 6    these studies have no relevance to the U.S. population, which
 7    is completely at odds with what the scientists actually think.
 8        So I do think, Your Honor, it goes to this issue of
 9    reasonableness.  Is the risk of reasonable one?
10        THE COURT:  Well, so he wants to offer testimony on
11    the ultimate question, whether it's reasonable or not.  Not
12    just the magnitude -- not just the magnitude of the
13    consequences, which he can lay out, but -- and the level of
14    uncertainty, but at what level is action warranted that it
15    becomes, quote, unreasonable as to warrant action.
16        MR. CONNETT:  Yes.  But to be clear, Dr. Lanphear
17    does not use the -- you know, the magic phrase "unreasonable
18    risk" --
19        THE COURT:  No.  But that's essentially what you're
20    arguing.  You, yourself, just used the word it informs what's
21    under.  He's opining ultimately on what's unreasonable from a
22    policy perspective.
23        MR. CONNETT:  Yes.  And I would say that it is
24    relevant.  He's not opining on what's a reasonable risk and
25    unreasonable risk, but he is providing a metric for the Court
```

1    to consider when it looks at the reasonableness inquiry; that

2    here you have this medical doctor, epidemiologist, NIH funded

3    scientist, who believes the data is sufficiently compelling to

4    begin taking protective action.

5         I think that is an indicia of unreasonableness.  Although

6    we're not offering Dr. Lanphear to opine on the ultimate

7    question of unreasonable risk, but he -- he is laying some

8    foundation for Your Honor to consider that issue.

9              THE COURT:  What's the response, Mr. Adkins?

10             MR. ADKINS:  I think you've heard a couple times from

11   plaintiff's counsel "these authors."  And it's important to

12   note here, as with Dr. Hu, but focus on Dr. Lanphear, the

13   authors of these studies didn't make this recommendation.

14        And, yes.  The editor the *JAMA Pediatrics* agrees with

15   Dr. Lanphear.  I'm sure there are others out there who do as

16   well.  That doesn't mean that he can offer that opinion here.

17        I think the Court is right to think about this, the

18   difference between facts and opinions with Dr. Lanphear.  I

19   think this falls on the wrong side of that line.

20        And I would just close by saying that plaintiff's

21   characterization of how EPA views these studies is misinformed

22   and not consistent with the stipulated facts that we entered

23   into in this case.  If you look at Paragraph 10 of the

24   stipulated facts, we stipulated with plaintiffs that the Mexico

25   City and Canada studies are the most methodologically reliable

1   human studies to date on the impact of fluoride on

2   neurodevelopment.

3       So this isn't really an issue that's in dispute and his

4   testimony isn't needed here.  Thank you.

5           THE COURT:  All right.  I'm going to allow -- or hear

6   his testimony about when it comes to actual degrees, metrics,

7   if there is quantitative, you know, metrics or benchmarks or

8   things that are used in the field.  His assessment of the

9   degree of the risks.  What are the risks.

10      But to the point that he gets to saying, you know, here is

11  what should be done about it.  Here is the level -- you know,

12  at this level there has to be -- there ought to be warnings,

13  et cetera, et cetera, to me that goes to the legal question.

14  It goes to the ultimate question.  It goes to really what to do

15  with -- if there is a finding.

16      So I know that line is not particularly clear, but I will

17  be alert to it at trial.  I'm more interested in what he has to

18  say substantively in his opinion about the ultimate question.

19  And at some point if there is an objection, I may sustain it as

20  it gets close to that line.

21      All right.  I think that -- that deals with the Motions in

22  Limine.

23      There are objections to exhibits, but -- and there are

24  objections to deposition testimony.  But I want to talk --

25  because I want to get out these evidentiary objections, these

```
 1   bellwether ones, and we're -- we have now been at it for almost
 2   an hour and 40 minutes, and I need to move forward here.
 3               MR. DO:  Your Honor?
 4               THE COURT:  Yeah.
 5               MR. DO:  There's one remaining Motion in Limine
 6   issue, just for clarity's sake, if I may raise it now?
 7               THE COURT:  Which one is that?
 8               MR. DO:  It's Motion in Limine three of EPA, that
 9   plaintiffs withdrew their opposition to regarding the draft and
10   the peer review.
11               THE COURT:  Yes.
12               MR. DO:  I just wanted to ensure that the Court
13   understood that plaintiffs made the representation in their
14   withdrawal that they reserve the right to ask such questions on
15   cross.  We'd hate to have the Court have the impression that
16   EPA was in agreement with that, and that there may be grounds
17   for that being objectionable as well if that were to come about
18   at trial.
19               THE COURT:  Well, give me a preview what -- how might
20   it play out?  Why don't you give me an example what you're
21   thinking of.
22               MR. DO:  Well, I suppose I would gift that to the
23   plaintiff's in this.  They say they -- they say they intend to
24   bring it in, and I'm not sure how yet.
25               MR. CONNETT:  Just --
```

1          MR. DO:  Just to imply that we've pre-approved it in

2     a way.

3          THE COURT:  Comments, Mr. Connett?

4          MR. CONNETT:  Yes.  The parties have

5     met-and-conferred on this, and the understanding is is that we

6     reserve the right to potentially inquire into the NTP report on

7     cross examination, and EPA has reserved the right to object to

8     those inquiries.

9          So I can say that I can envision situations where they

10    have experts on the stand who have relied extensively in this

11    case on the national toxicology program's research on fluoride.

12    And I think there could be circumstances where inquiry into the

13    NTP's recent findings are appropriate for those experts, since

14    they have clearly found the NTP to be, you know, a reliable

15    authority for their opinions, I think we should be able to, you

16    know, inquire into the NTP's most recent findings.

17         THE COURT:  And what's the Government's response?

18         MR. DO:  Well, again, that's a hypothetical about

19    getting into specifics.

20         I can envision there being -- it being objectionable on

21    multiple grounds.  One merely on it's outside the scope of any

22    expert's opinion in this case.  So it would be eliciting a

23    potentially undisclosed expert opinion.  There would be some

24    foundational issues.

25         And it could be just for the same reasons of the

1   underlying Motion in Limine itself.  The Motion in Limine

2   itself, it's a draft document; that there are certainly some

3   conclusion that EPA likes, and there are ones that perhaps

4   plaintiffs like.

5       But what, in particular, I would have a problem with is if

6   there were -- if this would be used as a back door to get in

7   the draft NTP review without also the peer review, which, of

8   course, put the NTP in context itself.  And we want to ensure

9   certainly that that wouldn't be the case where one comes in

10  without the other through cross.

11          MR. CONNETT:  To be clear, we had withdrawn the NTP

12  draft from our Exhibit List.  We have no intention of offering

13  it into evidence.  So I don't think that will be an issue, Your

14  Honor.

15          THE COURT:  Well, all right.  My antennas will be up.

16  Since it's not going to be in evidence, I -- it's not obvious

17  to me how it's going to be a proper subject of cross.

18      And, again, since this is a bench trial and not a jury

19  trial, the risk of sort of infecting the finder of fact

20  hopefully is minimized, but we'll have to cross that bridge

21  when we get there.

22      All right.

23          MR. CONNETT:  Thank you, Your Honor.

24          MR. DO:  Thank you, Your Honor.

25          THE COURT:  Okay.  We have another 15 minutes here.

 1    Let me ask about some of the objections to the bellwether.  The

 2    first group concerns, I guess, what alleges to be a violation

 3    of the stipulation on the MCL and MCLG.

 4         As I understand it, the plaintiff -- the purpose of this

 5    has to do with certain factual -- underlying factual findings?

 6    Maybe the plaintiff can explain.  These are Exhibits 29, 30 and

 7    51.

 8              MR. CONNETT:  Yes, Your Honor.

 9         The background to this is the plaintiffs were initially

10    intending to introduce deposition testimony -- sorry, live

11    testimony, as well as documents, that talked about some of the

12    political pressures in the agency that resulted in what we

13    believe to be an excessively high fluoride standard, and so we

14    were prepared to introduce that evidence.

15         The parties came to an agreement that we wouldn't -- we

16    would not introduce that evidence, which we always understood

17    to be about the politics.  How do we get such a high water

18    fluoride standard of four parts per million?  And we withdrew

19    all of that, and we came to some stipulated facts that provided

20    some basic background as to the scientific basis of the MCLG

21    and its current status.

22         Now, EPA from our vantage point is -- we excluded that

23    evidence.  It's gone.  It's not coming into this case.  I think

24    EPA is trying to take advantage of that by really expanding it

25    beyond certainly what I ever envisioned.

1           And to give you an example.  You have this -- Exhibit 29,

2     Your Honor, is, you know, an extensive review of the scientific

3     literature that EPA did in 2010.  And it has a number of

4     findings about how fluoride affects human health, how fluoride

5     affects teeth, the exposures to fluoride, that are -- the

6     relevance of those facts are separate and apart from the MCLG.

7     The MCLG is discussed on a handful of pages.

8           So our position, Your Honor, would be even if there's some

9     pages in that report which discussed the MCLG, although in a

10    very benign way, even if those somehow came within the scope of

11    the stipulation, there is an easy remedy, and that is we just

12    introduce the relevant scientific facts that have nothing to do

13    with the MCLG.

14           **THE COURT:**  Give me an example of a scientific fact

15    in Exhibit 29 that you would like to get in.

16           **MR. CONNETT:**  All right.  Let me just pull up our

17    brief, Your Honor, one of which may now no longer be an issue,

18    and I recognize that based on the Court's tentative on our

19    first motion.

20           But one is, in the document EPA states that fluoride's

21    predominant benefit for teeth is topical, not systemic.  And

22    they actually base that statement on plaintiff's dental expert

23    Dr. Ole Fejerskov.

24           And that statement, that admission, Your Honor, is

25    actually -- contradicts the litigation experts that EPA have in

1    this case who are opining that the benefits, the systemic

2    benefits and the topical benefits are basically a wash.  They

3    are about the same.

4         So it's a material admission on the benefits, although I

5    recognize that benefits may no longer be in the case.

6              THE COURT:  All right.  Why don't you find an example

7    that is live?

8              MR. CONNETT:  Okay.  So another one, Your Honor, is

9    the EPA has about a five-page discussion on the various factors

10   that make humans more susceptible to the chronic toxic effects

11   of fluoride exposure.  And they talk about, for instance,

12   kidney disease, and diabetes, and pathological conditions that

13   increase a person's water consumption.

14        And, as you know, this is a case where the -- our burden

15   is to prove an unreasonable risk to the general public or to

16   susceptible subsets of the population.  So having EPA's

17   admissions with respect to factors that increase a person's

18   susceptibility to fluoride is obviously a relevant -- a matter

19   to this case.

20             THE COURT:  All right.  So that's an example of the

21   kind of specific findings, exposure levels for various

22   populations, et cetera.  It's something you want to be able to

23   use this for, as opposed to reasoning or the MCL.

24             MR. CONNETT:  Absolutely.  I will not introduce a

25   single thing in that document to talk about the MCL.  I have no

 1    interest in doing that whatsoever.

 2              THE COURT:   Okay.   So if it's so limited, is there

 3    still an objection?

 4              MS. CARFORA:   Yes, Your Honor.

 5         I appreciate plaintiff's -- Mr. Connett's zealousness for

 6    his plaintiff.   The problem is, though, there is a lot of

 7    misrepresentations.   And I'd like to try to unwind a lot of

 8    this for the Court, if I could.   So just bear with me for a

 9    second.

10         The issue of the MCLG is a fluoride regulation that is

11    passed by EPA's Office of Water under the Safe Drinking Water

12    Act.   The Safe Drinking Water Act is a completely different

13    statute with a completely different standard and a completely

14    different objective.   And the Office of Water is a completely

15    different program than the OPPT, which is the program that

16    administers TSCA.

17         And we have from the very start of this litigation a

18    dispute as to whether the MCLG was relevant here and, in fact,

19    in front of Your Honor at a number of discovery disputes from

20    very early on that we had to brief for the Court, and there was

21    a lot of energy and a lot of testimony on this MCLG.

22         Ultimately we got to a place where despite EPA's

23    insistence that this was not relevant whatsoever, in order to,

24    you know, really streamline this evidence for the Court, we got

25    to a place where we were able to agree on a number of

```
 1    stipulated facts that we would include in the undisputed facts

 2    in the pretrial statement.  And for that we negotiated a very

 3    broad stipulation that prohibited plaintiffs from putting in

 4    any more evidence on that issue.

 5         And the problem is that what plaintiffs asked EPA to do,

 6    and EPA has said from the start safe drinking water regulations

 7    aren't relevant here because the office -- the OPPT program

 8    would not rely on that.  It would conduct its own risk

 9    assessment.  It would do its own evaluation of the most recent,

10    best available, scientific studies to determine whether there

11    was unreasonable risk, and it would do so independent of any

12    other statute or any other program and any other work that that

13    program had done.  And we have been consistent with that.

14         And for that we gave up any right to rely on anything in

15    the MCLG documents or the Safe Drinking Water Act documents to

16    help disprove plaintiff's case or help defend our own case, I

17    should say, because it's not our burden to disprove, of course.

18         So, and now what plaintiffs have done, after all that time

19    and energy, plaintiffs have now said:  Okay, EPA.  You can't

20    use it at all.  You can't rely on it at all, but we can to

21    prove our case.

22         And I think the broadness in paragraph No. 2 of the

23    stipulation, which I will show to the Court right here, is

24    exactly what we negotiated for.

25         (Document displayed.)
```

1              "Plaintiffs agree and stipulate not to elicit or
2        introduce any testimony or evidence, including but not
3        limited to, any witness testimony on direct or cross
4        examination, appearing live or by deposition, or any
5        exhibit, demonstrative, or written discovery,
6        concerning or relating to EPA's MCL, MCLG and the 2010
7        RfD for fluoride."
8        Now, having said all of that and putting that in context
9   for you, let me tell you this.  The two documents plaintiffs
10  seek to introduce here are the actual basis for EPA's MCL, MCLG
11  and 2010 RfD.  They are the agency's justification for those
12  regulations.
13       And despite the broadness of this stipulation, plaintiffs
14  now seek to introduce that into evidence to prove facts.  And
15  whether those facts are relevant or not, we leave it in dispute
16  here.  Two of the facts that are in this briefing, Your Honor,
17  are not even in dispute.
18       But despite that, it doesn't matter.  He has an obligation
19  at this point, having the benefit of this stipulation, to now
20  go and find that proof or that evidence in other documents.
21  But he cannot use these documents because that is the agreement
22  that we made.
23       That's all I have, Your Honor, on that.
24            THE COURT:  Well, his response is that he's not
25  introducing it for the purposes of visiting the question of MCL

```
1    or MCLG.  It's to get at, I don't know, embedded facts in there
2    about some point.
3         And I understand if this were a jury trial, it would be a
4    403 question, because you're trying to shoehorn a bunch of
5    stuff, you know, use a large vehicle to get to a point.
6         But, again, since this is a bench trial, and I understand
7    that MCL and MCLG is off the table, I don't care about all that
8    stuff.  But if there is some relevant fact, you know, I'm not
9    sure why I would exclude that.
10        Now, on the other hand, it seems to me Ms. Carfora's point
11   is many of these facts that you're trying to prove, I don't
12   think they are in dispute.  You can stipulate to, rather than
13   going through these documents.
14            MR. CONNETT:  And we've offered to do that, Your
15   Honor.  And we have -- you know, so I am happy -- I mean, we
16   haven't yet -- to be fair to counsel, we have both talked about
17   it in principle, that we were open to discussions on that
18   point.
19        I'm happy -- I could slim this hundred page document down
20   to three or four paragraphs and I'm happy to stipulate to the
21   facts.  It sounds like, you know, as counsel just mentioned,
22   they are not in dispute, so I suspect we should be able to do
23   that.
24        But I have no interest in introducing this hundred page
25   document.  As I mentioned, Your Honor, I went to counsel and I
```

```
 1    said:  I don't want to introduce the full documents.  I just
 2    want to introduce the relevant material admissions.  But EPA
 3    has been the one to say:  No, you have to introduce the entire
 4    document.
 5        So on one hand, they are saying it's overbroad, and the
 6    other hand --
 7            THE COURT:  Well, all right.  It seems to me this is
 8    something that can be resolved based on what I've just said.
 9    That is, I'm not going to take these documents certainly as a
10    whole, and certainly not going to look at any discussion of MCL
11    or MCLG.  But if there is something embedded in there that is a
12    fact that has relevance to the inquiry here, that fact will
13    remain relevant and -- but it seems like --
14            MS. CARFORA:  Your Honor, I would like to be heard on
15    that.  Just one more.  I was -- I was cut off before my second
16    point.  I apologize, but I would like to be heard.
17            THE COURT:  Go ahead and make it.
18            MS. CARFORA:  My second point is this.  These
19    documents are highly technical documents.  And the reason why
20    EPA has consistently maintained that the entire document needs
21    to be put into record, as opposed to paragraph or sentences, is
22    because they are technical documents.  And each part of the
23    document is subsequent to decisions that were made in other
24    parts of the document.  That is, you can't just take these
25    documents or these sentences or paragraphs alone without
```

```
 1    consideration of the rest of the document.

 2         The document is a justification document.  It sets up

 3    justification for each --

 4              THE COURT:  Let's get specific.  Let's get specific.

 5         Mr. Connett, give me -- show me the sentence in here, and

 6    I can determine whether or not that's dependent and requires

 7    for completeness everything else.

 8              MR. CONNETT:  So let me share the screen, Your Honor.

 9    This is Government's Exhibit 29, and I am going to go to

10    Page 32.

11         (Document displayed.)

12              MR. CONNETT:  Okay.  So down here, Your Honor, you'll

13    see there is a paragraph titled "Pathological Conditions."  And

14    it lists a long string of medical conditions that increase the

15    consumption of water that thereby make children more

16    susceptible to excessive fluoride exposure.

17         And EPA says here that:

18              "Over 1 million children in the U.S. may be

19         affected by one of these conditions."

20         So I can tell you, Your Honor, there is not a single place

21    in this report -- I've read the whole thing multiple times.

22    EPA would never be able to point you to a single page on this

23    report that would contradict that.  That's just a statement of

24    fact.  It's there.  It's not disputed or further discussed

25    somewhere else.
```

```
 1          So, and those are the kind of statements -- this has come

 2    up in other contexts, Your Honor, where we -- we were seeking

 3    to introduce a statement of biologic fact that EPA has claimed

 4    requires a reading of the whole document.  And I think that EPA

 5    sometimes takes the general principle too far.  It overlooks

 6    some of the --

 7          THE COURT:  Let's use that example, Ms. Carfora.

 8    What about that?

 9          MS. CARFORA:  Yes.  Well, the problem is, Your Honor,

10    is that he's citing to pathological conditions, except what's

11    happening is this paragraph is talking about children who might

12    have higher exposures to skeletal effects from fluoride.  So

13    he's taken the entire document out of context.

14          This document -- the risks and the adverse health effects

15    that this document is referring to and that this document

16    studies and that the underlying studies address are skeletal

17    effects of fluoride.

18          And so what plaintiffs want to do now is try to take that

19    statement and present that statement to the Court and suggest

20    that these children with these underlying conditions are

21    somehow more at risk for neurological adverse health effects.

22    And that is not the case, and that is how he's taking the

23    document out of context.

24          THE COURT:  Well, the only thing this paragraph says

25    is that those with these disorders can experience abnormal
```

 1    increase in consumption of water.  It doesn't say anything

 2    about quantity.  It doesn't say anything about effect.

 3         Frankly, I'm not sure what -- I don't think that's

 4    disputed.  If somebody has diabetes, there probably is going to

 5    be a higher consumption of water than average.  And you can

 6    infer from that -- it doesn't tell you anything.  I mean, it

 7    doesn't tell you at the end what the ultimate consumption rate

 8    is, what the impact is.  I understand that, but I don't see

 9    why -- and it may that be that this sentence alone has very

10    little probative value, but it has some.  And I don't know why

11    that couldn't be introduced.

12         MS. CARFORA:  And herein lies the actual problem,

13    Your Honor, is that -- what I said before is that these are

14    highly technical documents.  And here now is Your Honor, I'm

15    sure is perfectly capable, but is making scientific inferences

16    from this document.

17         THE COURT:  No, I didn't make any inferences.  I'm

18    just saying I'm not making inferences.  One will have to draw

19    those inferences for the Court.  But it states one fact, that

20    those with certain disorders may be prone to drink more water.

21         MS. CARFORA:  Well, Your Honor, I don't have the

22    scientific expertise to help inform the Court why that's an

23    inappropriate scientific conclusion to make just based on

24    isolated sentences that plaintiff's counsel has argued.

25         And what I'm suggesting is we would need an expert to tell

 1   us whether it's appropriate or not to even make the conclusion.

 2   And we haven't even read the rest of the page.  We don't even

 3   know if that is, that single sentence, exactly what they are

 4   taking.

 5        But I think we're getting outside the scope here because

 6   ultimately if plaintiff's argument or plaintiffs want to

 7   introduce that statement to say that there are susceptible

 8   populations, that's -- we could -- that's not a disputed fact.

 9   EPA agrees there are susceptible populations.

10        But the other thing that's happening here now is that

11   EPA -- or plaintiff's argument is based on IQ effects from

12   exposure in utero.  This document is not talking about -- I

13   mean, this document is so far outside the relevance and scope

14   of the scientific considerations that we're -- that are going

15   to be in front of the Court that it's just -- it's just -- we

16   need scientific expertise to be able to put all of these things

17   in context for the Court, and --

18             **THE COURT:**  Is this case limited to in utero

19   consumption, in effect?

20             **MR. CONNETT:**  No, Your Honor, it's not.

21        We certainly do believe that the in utero period is the

22   most critical life stage where the susceptibility is the

23   highest.

24        But, you know, just to respond briefly to counsel's point.

25   You know, to the extent that we were taking a fact and

1    misrepresenting it in some way, you know, there is an easy cure

2    for that, which is EPA could point -- you know, we would not

3    object to EPA introducing something in the document that in any

4    way challenges or, you know, corrects the way we're

5    representing the document.

6          The other thing is, you know, I'm happy to work with

7    counsel, Your Honor, to see if there is just -- some of the

8    statements that we would seek to introduce, if we could just

9    reach stipulations on them.

10          **THE COURT:**  All right.  Well, I'm going to direct --

11   we've got to move on.  I'm going to direct the parties to

12   meet-and-confer and see if you could reach that stipulation.

13   If not, then what I'm going to want is the plaintiff, instead

14   of just naming these documents -- it's not helpful to name the

15   entirety of the document.  I want to see exactly what it is

16   that you intend to introduce so I can judge whether it has any

17   probative value, whether it's contextual, and the fight over

18   context is not worth it.

19          And so -- so I'm going to ask for greater specificity if

20   you can't reach a stipulation.  I would rather you reach a

21   stipulation.  I'll send these points.   And it may be that they

22   don't have a whole lot of probative value to the ultimate

23   question, but they have some value.  And I would like you to

24   reach a stipulation.

25          The letter.  No. 51, the letter from the EPA.  I didn't

1    see the relevance of that.   I don't understand that.

2         **MR. CONNETT:**  It's -- Your Honor, it's just basically

3    to highlight -- I think at this point it's no longer relevant.

4    It's only relevant to the extent that benefits were a

5    consideration.   Because it basically sort of provides some

6    indicia of the importance of health risks over benefits from

7    EPA's vantage point.

8         But, Your Honor, based on -- I know we have a lot of other

9    issues to discuss.   I'm happy to withdraw that.

10        **THE COURT:**  All right.   Great.   Thank you.

11        The next set have to do with the draft documents.   There's

12   No. 34, 41, et cetera, having to do with lead, sulfuryl

13   chloride.   Is this covered by MIL 5 for the most part?

14        **MS. CARFORA:**  Well, Your Honor, these are separate.

15   I think we didn't really have a full understanding of how

16   plaintiff's counsel intended to use them, which is why we had

17   the broad relevance objection.

18        So now that we have seen plaintiff's most recent filing, I

19   can address -- I think the best way to do this is to address

20   this kind of by purpose.

21        The first category or bucket I have them in that

22   plaintiffs identified was adverse nature of IQ.   And basically

23   in that bucket, for the Court's notes, it would be Exhibits 42,

24   34, 43, 33 and 35.   And basically what plaintiff's counsel

25   argues is that these are -- first, he suggests that they are

 1   risk documents, but they are not.  They are mostly -- at least

 2   Exhibit No. 42 is a regulatory standard.  So it's not a risk

 3   document.

 4        Exhibits 34, 43 and 33, plaintiff's counsel proposes

 5   putting them in so that -- to prove the economic valuation of

 6   avoided IQ deficit.  And basically the problem there is that

 7   economic evaluation of avoided IQ deficits is a benefit of any

 8   potential regulation.  These documents all considered the

 9   economic valuation of avoided IQ deficits as benefits of

10   regulations and, therefore, none of them are relevant here for

11   the reasons everyone already discussed earlier, but also

12   because -- specifically because TSCA prohibits the

13   consideration of costs in unreasonable risk.

14        And finally the last exhibit, No. 35, is an economic

15   analysis of TSCA Section 403.  It is a pre-TSCA document.  It

16   was published in December of 2000 and it also talks about the

17   benefits of avoided health effects from hazard.  It goes

18   through and assigns monetary values, estimates for avoided

19   health effects, and talks about the economic value of being a

20   proxy for society's willingness to pay to avoid the health

21   effects.  Basically these are all regulations and they all

22   consider benefits.

23             THE COURT:  All right.  What about that?

24             MR. CONNETT:  Yes, Your Honor.  We believe these

25   documents, Your Honor, are exceptionally probative to the

 1   ultimate analysis in this case, which is, is the risk a

 2   reasonable one or an unreasonable one?

 3        Now, obviously, I know, Your Honor, that we need to prove

 4   there is a risk.  So, but once we do, then the question becomes

 5   is the risk unreasonable or not?

 6        And I really would like to focus here to start with on the

 7   final -- the lead standard, the national air lead standard.

 8   Because, Your Honor, there the EPA was considering something

 9   very analogous to what we're considering in this case.  The

10   health effect at issue here is IQ loss.

11        Plaintiff's experts are going to introduce evidence and

12   data showing that water fluoridation, fluoridation chemical

13   exposure during the in utero period produces an average IQ loss

14   of about two points.

15        And so one of the questions that the Court is going to

16   need to consider is, you know, is that an acceptable IQ loss?

17   Is that a reasonable?  Like, it -- and EPA has recognized in

18   its final rule for risk evaluation that you look -- when you're

19   looking at the reasonableness inquiry, you look at the severity

20   of the effect, the nature of the effect.

21        And in the lead standard the EPA grappled with this very

22   question.  It was looking at what is the degree of

23   population-wide IQ loss that would be unacceptable.  And it has

24   a number of admissions in there about the -- about how a loss

25   of one to two IQ points should be avoided in all but a very

```
 1    small percentage of the population.

 2        So there is a discussion here, Your Honor, which is very

 3    analogous to the discussion that's going to be in this case,

 4    which is when you're dealing with, you know, what may at first

 5    seem like modest reductions in overall IQ, how do we assess the

 6    public health significance of that?  And EPA, that's exactly

 7    what it does in this document.

 8        So I think it's a highly probative document, Your Honor.

 9    It really tracks what we're doing in this case.  It's not an

10    air standard.  It's a water standard, but it's a national

11    analysis.

12            THE COURT:  All right.  What's the Government's

13    response to that?

14        MS. CARFORA:  I'm not sure.  I think he's talking

15    about the air standard for lead, which is Exhibit No. 42.  And

16    I'll show the Court exactly the issue here.

17        Number one, it's the final regulation, right, so it's risk

18    management.  That's what these documents are.  That's the first

19    problem.  And we've already had the conversation about

20    separating those two issues.

21        (Document displayed.)

22        MS. CARFORA:  The Court will notice right here that

23    what EPA said was that:

24            "EPA is addressing the issue more specifically in

25        the context of the evidence based framework.  In doing
```

1            so EPA is not determining a specific quantitative

2            public health policy goal in terms of an air related

3            IQ loss that is acceptable or unacceptable in the U.S.

4            population per se, but instead is determining what

5            magnitude of estimated air related IQ loss should be

6            used in conjunction with the specific air related IQ

7            loss evidence based framework being applied in this

8            review, recognizing the uncertainties and limitations

9            in this framework."

10       Which is exactly our point with all of these documents, is

11   that what's important here is what's -- what are the risks of

12   fluoride?  What happened -- you know, what is appropriate for

13   fluoride?

14       What plaintiffs are trying to do here is avoid talking

15   about the merits of the reasonableness of fluoride and pointing

16   the Court to a whole bunch of unrelated rules.

17            **THE COURT:**  Well, let me ask.  Let me ask.

18   Mr. Connett raised the question that if there is evidence of

19   some quantification of IQ loss attributable or related to some

20   level of, let's say, fluoridization of water.  The question is,

21   you know, what constitutes a, quote, unreasonable risk.

22       And so the question is whether or not there is anything in

23   these documents that sheds some light on what's reasonable or

24   unreasonable.

25       And I guess I would like to ask Mr. Connett.  It may be

```
 1    that it's unreasonable in light of various factors about how --
 2    what the alternatives are to lead, et cetera, et cetera.  Is
 3    there something you can point to in one of these documents that
 4    shows that it's going to guide -- it should guide the EPA?  It
 5    should guide this Court in determining what is an
 6    unreasonable -- whether, for instance, a two-point loss of IQ
 7    is unreasonable.
 8            MR. CONNETT:  Yes, there is, Your Honor.
 9            THE COURT:  Show me something specific, that's not
10    context related in terms of having to weigh the cost and
11    benefits, for instance, of lead and looking at alternatives.
12            MR. CONNETT:  Right.  I can't share the screen right
13    now until, I guess --
14            MS. CARFORA:  I'm sorry.
15        (Document removed from display)
16            THE COURT:  Okay.
17            MS. CARFORA:  Your Honor, unless Mr. Connett is teed
18    up and ready to go, can I just address -- oh, it looks like he
19    is.
20        (Document displayed.)
21            THE COURT:  Okay.
22            MR. CONNETT:  So here, Your Honor, is -- and there's
23    a number of points in this document.  I'm just going to start
24    here though.
25        Here is a passage -- you know, because --
```

1          **THE COURT:**  What is this?

2          **MR. CONNETT:**  This is still Exhibit 42, Your Honor,

3    which is the national -- the final rule for the lead air

4    standard.

5          **MS. CARFORA:**  Your Honor, it's the same page we were

6    just looking at.

7          **THE COURT:**  All right.

8          **MR. CONNETT:**  So here you'll see in their July 2008

9    advice to the agency on the proposal notice, the Clean Air

10   Science Advisory Council characterized a target degree of

11   protection proposed for use with the air related IQ loss

12   framework to be inadequate.

13        As basis for this characterization, they repeat the advice

14   they conveyed with their March 2007 letter; that they

15   considered a population loss of one to two IQ points is highly

16   significant from a public health perspective, and that the

17   primary lead standard should be set so as to protect

18   99.5 percent of the population from exceeding that IQ loss.

19        And then they go on to say, Your Honor:

20          "Recommendations from several commenters,

21        including the American Academy of Pediatrics, and

22        state health agencies that commented on this issue are

23        in general agreement with the view emphasized by the

24        Clean Air Science Advisory Council that air related IQ

25        loss of a specific a magnitude, such as on the order

```
 1          of one or two points, should be prevented in a very

 2          high percentage, e.g., 99.5 percent of the

 3          population."

 4          And it goes on to say:

 5              "EPA generally agrees with the Clean Air Science

 6          Advisory Council and the commenters that emphasize

 7          that the standard should prevent air related IQ loss

 8          in a significant magnitude in all by a small

 9          percentile of the population."

10          So there's other statements in here, but, Your Honor,

11   that -- that discussion there, seeing how EPA was grappling

12   with a question that's very analogous to what we're dealing

13   with in this case.  What is an acceptable degree of IQ loss?

14          THE COURT:  That is, is what is acceptable, though,

15   contextual, depending upon the full analysis of what's

16   feasible, what the alternatives are, how to address lead, or is

17   this an absolute?

18          MR. CONNETT:  I think that question, Your Honor,

19   would ultimately be a question for rule-making.

20          But for the -- for the risk evaluation the -- under the

21   reasonableness inquire EPA has -- in its own final rule talks

22   about you need to consider the nature of the effect.  You need

23   to consider the severity of the effect.

24          And here you have an admission that a loss of IQ of one to

25   two points is highly significant from a public health
```

```
 1    perspective.

 2              THE COURT:  Well, that's the one sentence that seems

 3    to stand on its own as an absolute.

 4         I would like Ms. Carfora to respond.  If it's deemed

 5    highly significant, that seems to me highly significant whether

 6    the cause is airborne lead or water-based fluoride or arsenic

 7    or whatever it is.  What's wrong with that?

 8              MS. CARFORA:  If I could share?  Mr. Connett, do you

 9    mind releasing your screen, please?

10         (Document removed from display.)

11              MS. CARFORA:  So two points I want to make for the

12    Court.  Bear with me here.

13         The very first point, so the Court can see it, what's

14    highlighted in yellow on my screen is what Mr. Connett just

15    read for you.

16         (Document displayed.)

17              MS. CARFORA:  What's highlighted in red on my screen

18    is the contextual part of that document that I read for you.

19         So you see, what Mr. Connett has done here is he's

20    suggested that this is a position that EPA has taken.  And if

21    you actually look at the text and read it through, what this is

22    is this is EPA discussing the recommendation that it got from

23    its Air Council in terms of how to deal with the -- the air

24    related IQ loss from lead.

25         What's in red right there is the contextual piece where
```

```
 1    EPA says:  We're going to make this decision in this context,

 2    but we're only making this decision in this context.  And EPA

 3    was very, very careful about setting out that context in this

 4    document.  It said:  We're only going to do this in this

 5    framework because this is what we found was important based on

 6    the underlying scientific data.  That's point number one.

 7              THE COURT:  Can you pull up your document?  Can you

 8    enlarge that?  Hit the full screen for that document?  I can't

 9    read it.

10              MS. CARFORA:  Just bear with me for a second.

11         (Document enlarged))

12              MS. CARFORA:  Does that help, Your Honor?

13              THE COURT:  It helps.  You also have a --

14              MS. CARFORA:  Let me try one thing here.  One second.

15         (Brief pause.)

16              MR. CONNETT:  Briefly, Your Honor -- while counsel is

17    looking at this -- I will just briefly note there is another

18    relevant point to that passage that I read, which is that our

19    expert, Bruce Lanphear, was a member of that Science Advisory

20    Council.  And so it also is relevant to showing and

21    highlighting, you know, his expertise and credentials on these

22    issues.

23              MS. CARFORA:  Your Honor, I apologize.  This is

24    the...

25         (Brief pause.)
```

```
 1              THE COURT:  Well, what page of --

 2              MS. CARFORA:  Yeah.  It's Page 1414 of the exhibit

 3    binder, Exhibit B.  188-2, Page 1414.

 4         I'm getting back there, I apologize.

 5         (Brief pause.)

 6              THE COURT:  So it's Page --

 7              MS. CARFORA:  1414.

 8              THE COURT:  I'm not able to find this.

 9              MS. CARFORA:  And here is the -- this is the best I

10    can do now, unless my colleagues want to try to help out,

11    but...

12              THE COURT:  Okay, 1414.  Is it the paragraph that

13    starts, "In general, all of these commentators agreed"?

14              MS. CARFORA:  It's the middle column.  I started, "In

15    their July 2008 advice to agency."

16              THE COURT:  Okay.  Well, I guess I'm looking at

17    something else.

18              MS. CARFORA:  But also, Your Honor, I think the more

19    salient point is that this -- plaintiff's counsel said

20    population IQ loss, which is a societal impact, which we've

21    already all agreed that societal impact is a non-risk factor or

22    a cost that is divorced purposefully from the risk

23    determination stage.

24         And so regardless of whether these documents are relevant,

25    and we maintain that they are not, relevant to population IQ
```

1   loss or economic valuation of IQ loss, those are non-risk

2   factors as defined by the non-risk considerations.

3        **THE COURT:**  How is that -- are you saying that the

4   impact on the population -- not economic value.  I understand

5   that, perhaps.  But if you could say something has a 10 percent

6   risk of cancer to the general population versus a .1 percent

7   chance, that's not relevant to the unreasonable risk?  Doesn't

8   that go to the severity and magnitude of the problem?

9        **MS. CARFORA:**  No.  It goes to -- it goes to the

10  societal impact.  When you're talking about severity or

11  magnitude of the problem, you're talking about the risk to

12  individual person.

13       **THE COURT:**  You mentioned that by some percentage,

14  and often it's by a percentage of the population.  Just the

15  chance of being infected with COVID-19.  I mean, we want to

16  know what's the percentage?  What's the mortality rate?

17       I don't see how you divorce those two.  Do you just ignore

18  aggregate statistics and just look at any individual?  That

19  doesn't make any sense at all.

20       **MS. CARFORA:**  What's interesting about what you're

21  saying -- and this circles all the way back.  So what's

22  interesting about what you're saying is that the -- risk

23  calculation.  When we are in the risk characterization stage of

24  risk assessment, what EPA does is -- and what you will see at

25  trial is this margin of exposure.  Okay?  The margin of

 1   exposure is what measures the risk.

 2        So we talk about, here is your exposure.  You know, here

 3   is your exposure dose.  Here is your adverse effect dose.  And

 4   we're going to margin out those two things and see what the

 5   margin is.  And then based on that, okay, we have other

 6   considerations that we apply to this.

 7        When you're talking about magnitude and severity of effect

 8   and all of those things, that goes into the risk

 9   characterization process, and it's all combined into the margin

10   of exposure calculation.

11        Now, when I take this all the way back, let's take this

12   back to Dr. Grandjean's BMR.  The basemark dose response is

13   what BMR stands for.  Okay?  What Dr. Grandjean is going to

14   testify to is that he has determined that an IQ point loss of

15   one is appropriate to base this margin of exposure on.

16        It is up to Dr. Grandjean and plaintiffs and their experts

17   to demonstrate for the Court why a BMR of one is appropriate.

18   Okay?  And they need to do that through their experts using the

19   scientific information that's available, not -- and that's how

20   the MOE works.  That's why that risk characterization process

21   is there.  It's to allow the margin and the severity and all of

22   those things are considered in that process.

23        This is something different.  This population IQ loss,

24   economic valuation, that is something different.  That is

25   considered in the risk management phase, and it is exactly --

1    societal impact and economic costs are exactly the terms we saw

2    in the Congressional report that suggested that was supposed to

3    be taken out of the risk evaluation.

4           THE COURT:  How does -- you're the administrator and

5    you're doing a Rule 6 evaluation.  Forget Rule -- Section 21.

6    Section 6 evaluation.  And you find out and you've concluded

7    that on average there is a high probability, whether you base

8    it on aggregate statistics or you individualize that, to me,

9    that's just the same coin, different sides.  But there is a

10   substantial risk of a two-point drop in IQ.

11          How do you then determine whether that is -- and the

12   ultimate question, this is, quote, an unreasonable risk within

13   the meaning of Section 6?

14          MS. CARFORA:  So what happens is when you do -- when

15   you're in a risk characterization section, okay, and you run

16   this calculation and the calculation is based on the underlying

17   scientific data.  So, for example, if the underlying scientific

18   data suggests -- credible scientific data suggests that there

19   is an IQ loss of two points from X exposure to fluoride, then

20   what we do is we calculate -- using these sophisticated models

21   and sophisticated calculations, we calculate the margin of the

22   exposure and the adverse effect.  And that's one step.

23          The next stage is when we're going to the risk

24   determination, okay, what we do is we look at all of those

25   things.  So we say:  When I conducted my margin of exposure, I

1    explained in my narrative what underlying data I relied on, why

2    the underlying data was reliable, the uncertainties and

3    limitations of that data, if any exist, or the strengths and

4    weaknesses of that data, if any exist.  And then when I'm

5    making my risk determination, I consider all of that together.

6        So I do that, Your Honor, in every single step of the risk

7    evaluation process.

8        So bear with me for a second.  There's four stages and

9    we're going to talk about this.  We have the hazard assessment.

10   For the hazard assessment, I'm going to do the same thing.  I'm

11   going to look at all the underlying data.  I'm going to come to

12   the conclusion, and I'm going to justify my conclusion with the

13   strengths and limitations of all that data.

14       Next I'm going to go to the dose response assessment.  I'm

15   going to do the exact same step.  I'm going to look at all the

16   underlying data.  I'm going to show Your Honor why it's

17   appropriate to rely on one setting over the other, and I'm

18   going to make that scientific argument to you.

19       Next step I do is I go to the risk characterization step.

20   In the risk characterization step I consider the strength and

21   limitations of hazards.  I consider the strength and

22   limitations of the dose.  And then I combine those things

23   together into a margin of exposure calculation.

24       After I do that -- I'm sorry.  In that step I also explain

25   to and scientifically justify why I've relied on everything

1    I've relied on to calculate it.

2        The last step I do, which is the risk determination step,

3    is I consider all of the limitations.  As the Court says -- as

4    EPA says right here in this sentence, the last sentence that's

5    highlighted in red.

6            "In this review recognizing the uncertainties and

7            limitations in this framework."

8        So what EPA does in the risk evaluation step is we say:

9    Okay.  Why do with pick X study?  EMR of two IQ points, why

10   didn't we pick that study?  What was the strength and

11   weaknesses of that study?  Is two IQ points reasonable given

12   the scientific information we have to base a dose on?  Is that

13   reasonable?  What's the uncertainty?  What's the strength?

14   That's what we decide.

15       So that by the time you get to risk determination, you're

16   putting all those pieces together and you're making a

17   determination based in the framework that you've just spent all

18   that time.  This is why --

19           **THE COURT:**  One of the inputs you've just mentioned

20   is determining whether a two-point drop in IQ is -- I don't

21   want to paraphrase it, is significant.  I mean, the degree,

22   whether it's one point or five points, must inform the ultimate

23   analysis; right?

24           **MS. CARFORA:**  That's right, but it's the --

25           **THE COURT:**  Input.  It's an input.  So why isn't it

1   relevant to have pieces of input?

2       I understand the methodology and the four phases and the

3   systematic review and all that sort of stuff, but this is an

4   input point.  And to the extent that there is prior analysis

5   that shows, at least, the EPA in a different context found

6   that two -- you know, two-point loss is significant from a

7   public health perspective.  Why isn't that at least relevant?

8           MS. CARFORA:  Because it's -- it's not -- it does not

9   go into the risk determination phase.  What EPA -- how the EPA

10  regulated.  This is a regulation.  This is not a risk

11  determination.  This is not a determination of risk.

12      Before this document is done, the risk determination for

13  lead based paint has been done.  What they are doing is they

14  are taking that framework and they are taking the evaluation.

15  They are taking the risk evaluation framework and they are now

16  justifying their regulation.

17          THE COURT:  So are you suggesting that with a

18  different substance, instead of two points, the -- given

19  everything you've said, the margin of error and everything

20  else, that for some other substance it might be five points

21  that's used or for some it might be .5.  Is that what you're

22  saying?  This is completely contextual.

23          MS. CARFORA:  That is exactly what I'm saying.  And

24  it is the underlying scientific data that supports the risk

25  assessment that makes that determination.

```
 1            And so that's why it's a risk management factor.  It's
 2     because EPA does all of that work in risk management without
 3     considering the population IQ loss  or the economic valuation.
 4     It does all of that work and then it takes all of that work
 5     with it into the risk management stage, where at that point it
 6     says:  Okay, the scientific value in the -- the scientific data
 7     told us there is a five point IQ loss from -- from exposure to
 8     fluoride.  And is that -- how do we manage that risk?  Is that
 9     a risk we want managed?  How do we want to manage it?
10            And if it's the case that we think that that's too much of
11     an impact to the population, then we'll ban it; or if we say
12     it's not -- the argument counsel was making is an argument he
13     needs to make to the D.C. Circuit Court of Appeals if the
14     fluoride -- if fluoride is ever banned and somebody, you know,
15     says that EPA acted irrationally or not.  What EPA is going to
16     have to do is go back to the underlying scientific data.  This
17     is a risk management issue.
18            THE COURT:  Well, isn't it relevant though -- isn't
19     it relevant that at least in one context, and I don't know if
20     there are others, that a two-point loss in IQ was deemed highly
21     significant and not acceptable?  And it may be that that's not
22     dispositive.  It may be that there are differences with the
23     fluoride.  It may be that, you know, that was key to some -- to
24     something particular about the analysis.
25            But why isn't that at least an indicator?  Otherwise, how
```

1    do we know?  Otherwise, you just balance things?  I mean, there

2    is no formula.

3            **MS. CARFORA:**  There is a formula.

4            **THE COURT:**  How do you know what's acceptable,

5    whether one point or two points?  Let's say that science shows

6    there is a correlation.  There is a causative impact.

7        How do you make that ultimate determination?  You say you

8    weigh this.  You weigh that.  You weigh this.  You look at the

9    margin, what's here.  At the end of the day you still have to

10   make a determination what's acceptable.  What's unreasonable.

11   In the end there is a qualitative nature.

12       This is not strictly quantitative.  You can't just put it

13   into a computer without programming what factors you are going

14   to weigh, how you're going to calculate it.  There is always

15   some judgment involved.

16           **MS. CARFORA:**  Okay.  So let me try and explain to

17   Your Honor this way.  Okay?  You have to follow the science.

18   Let me just -- you have to follow the science.  So if the

19   science says two points IQ loss, that's what you get from

20   exposure to fluoride.  Okay.  That's the science.  And so the

21   margin of exposure is based on the science.

22       So assume EPA says:  Okay.  Here is what the science says.

23   Here is my calculation.  Here is the margin of exposure.  This

24   is all science based.  Okay?  I'm going to come up with a

25   number.  And when I look at that number, I have to determine

1  risk based on that number.  And I have a couple of -- all of

2  these factors I can decide.

3       And when I'm looking at -- when I'm deciding whether that

4  number quantitatively, the -- the margin of exposure, not the

5  actual BMR.  The BMR, the benchmark dose response, is what

6  you're referring to, Your Honor.  That's the one point or

7  two-point.  That's the response.

8       So we've already seen how Dr. Grandjean had designed his

9  benchmark dose analysis based on the benchmark response.  So we

10  follow the science on that and we come to a number.  We come to

11  this margin of exposure number.

12       Okay?  And then when the EPA makes the unreasonable risk,

13  the unreasonable risk is how strong is this number?  How much

14  confidence do we have in this margin of exposure?  How much

15  confidence do we have in the underlying data?

16       Once EPA makes that decision, its confident in the

17  science.  It follows the science all the way through.  The

18  unreasonable risk decision is based on the confidence in the

19  science.

20       Well, once it makes that decision, it then moves to risk

21  management.  And in risk management it is then allowed to

22  include population IQ loss as a societal impact in terms of how

23  it will manage the risk.

24       And I will go back through the Congressional report that

25  we had up earlier that has those exact frames in it, words in

 1   it, "cost" and "societal impact."  And those are the two things

 2   that are purposefully divorced from the risk determination in

 3   the amended TSCA.  In fact --

 4              THE COURT:  Well, you haven't answered my question.

 5   You repeated yourself ten times about the analysis.  I

 6   understand that.

 7        My simple question is:  How does one determine -- once you

 8   have all the inputs, you know what the rate of incidents is.

 9   You know what it can cause.  How does one make the

10   determination whether one point or two points or five points

11   constitutes an unreasonable risk?  You have enough scientific

12   certainty.  You're confident that there is a relationship

13   between the current level of fluoridation in water and a

14   two-point drop in IQ.

15              MS. CARFORA:  Well, I mean, I think this is what

16   makes -- it's a scientific process, Your Honor.  I appreciate

17   that --

18              THE COURT:  That's what I guess I don't understand.

19   You say it's -- and there is a qualitative judgment that has to

20   be made.  The question is:  Why isn't it relevant?  I

21   understand it's not dispositive.  It may have very little

22   probative value.

23        Why isn't it of some value to know that in a different

24   context, be it lead, be it something else, that at least the

25   agency found a two point drop in IQ was concerning.

 1          MS. CARFORA:  Because the amended TSCA says so on the

 2     face of the statute.  That's what --

 3          THE COURT:  Says what?  Says what?

 4          MS. CARFORA:  The amended TSCA says you cannot

 5     consider cost or non-risk factors when considering unreasonable

 6     risk.

 7          THE COURT:  That is the risk.  The risk is two

 8     points.

 9          MS. CARFORA:  The risk -- when you -- I'm going to

10     try very hard not to repeat myself.

11          The whole point of the phrase "risk characterization,"

12     when I think about that for a second, it -- it's the step that

13     characterizes the risk.

14          I understand Your Honor wants a quantitative number.  And

15     when we get into trial, you are going to see why it is so

16     complicated in terms of plaintiffs not following systematic

17     review.  I mean, the systematic review is there to characterize

18     the risk.  So it is there to provide the Court with a

19     quantitative number and then determine the -- the Court needs

20     to determine.  It's stepping into the shoes EPA.  Otherwise EPA

21     would -- after it has characterized the risk with that

22     quantitative number, then it would make a determination based

23     on the confidence in the underlying data.

24          And the reason why the Court I think is having -- is

25     getting frustrated with me is because you don't have the

 1    benefit of seeing the evidence we're going to put forward on

 2    how exactly you do this.

 3         And I think that these are technical documents.  They are

 4    not risk factors.  The statute says so on its face.  And this

 5    is not -- this is why this is confusing.  This is why it should

 6    be kicked out under 403.

 7              THE COURT:  All right.  Other than the -- let's move

 8    on.

 9         Other than the IQ documents, what other categories do you

10    need guidance on, or do you want to talk to me about in the

11    next five minutes?

12              MS. CARFORA:  So we have the declarations or

13    plaintiffs have Exhibits No. 14 and 16, which are -- one is a

14    declaration of the FDA, and one is a stipulation of certain

15    manufacturers of fluoridation chemicals.

16         And basically, Your Honor, it's the same issue.  Basically

17    even if the documents are minimally probative, they are

18    unfairly prejudicial because they are being used to create

19    three misconceptions for the Court.

20              THE COURT:  Simply because there has been no

21    independent research concerning neurotoxicity associated with

22    fluoride.  The FDA hasn't done that.  But it's the FDA, not the

23    EPA; right?

24              MS. CARFORA:  That's one reason.

25              THE COURT:  And this is done as a preventative

1   measure, I guess, so to protect against the impeachment of its

2   experts if there is a claim that they did omit material

3   studies.

4        Is that the idea, Mr. Connett?

5            MR. CONNETT:  Yes, in part, Your Honor.  We, in this

6   case --

7            THE COURT:  We don't need to address that unless they

8   are impeached.

9            MR. CONNETT:  Well, but it goes to the fact.  We went

10  to the EPA.  We went to the CDC.  We went to the FDA.  We went

11  to the manufacturers of fluoridation chemicals.  We went to

12  each of these agencies and organizations and asked them one

13  simple question:  Do you have any data that shows that

14  fluoridation chemicals are neurologically safe?  And every

15  single one of them said no.

16       And I think we're entitled, Your Honor, to present that to

17  the Court for context.

18       We're not in a situation where we're going to be

19  presenting you expert testimony in this case which contradicts

20  prior information or prior studies, because there are none.

21            THE COURT:  And you can elicit that on direct

22  examination.  Why do you need these documents?

23            MR. CONNETT:  Because they --

24            THE COURT:  If the defendant comes back and says:

25  Oh, oh, well you missed X, Y and Z.  You're not such a hot

1    researcher after all.  Then you can bring this in to impeach

2    the impeachment.  But on direct you just elicit.  There is

3    nothing out there.

4            **MR. CONNETT:**  Well, I would --

5            **THE COURT:**  Why do we have to go five steps ahead?

6            **MR. CONNETT:**  Well, if you look at the other

7    reasonableness inquiry that counsel was just talking about, one

8    of them is confidence.  How much confidence do we have in this

9    assessment.

10           **THE COURT:**  And I'm saying your expert can be -- can

11   give direct testimony that they are aware of no study that's

12   been done.

13           **MR. CONNETT:**  Well, the -- I mean, and we -- yeah.  I

14   guess it's our position, Your Honor, that knowing that the FDA

15   has no safety data, knowing that the CDC has no safety data,

16   knowing that the manufacturers of fluoridation chemicals have

17   no safety data, and knowing that the EPA has no safety data is

18   relevant to the reasonableness of this risk.

19       We are adding this chemical to water kind of like we're

20   flying blind on this issue, because we don't have any

21   assurances of safety on this issue.

22       So I think it goes, Your Honor, not just to the competence

23   of the plaintiff's experts.  It's another indicia of

24   reasonableness.  Is it reasonable to be adding this chemical to

25   so many people's water supply where we don't have any safety

1    data?

2           **THE COURT:**  All right.  What's the Government's

3    response?

4           **MS. CARFORA:**  Well, first problem is that it --

5    plaintiffs are trying to create the impression that these

6    organizations somehow cover the range of sources in which

7    toxicological data could be found, and that's just not the

8    case.

9           Number two.  Plaintiffs are trying to promote the

10   misconception that somehow these organizations have some legal

11   obligation to demonstrate or support neurological safety of

12   fluoridated chemicals, and that's certainly not the case.

13          And the material issue in this litigation is going to be

14   whether plaintiff's experts have followed the scientific

15   methodologies for establishing credibility in not only their

16   literature search, but every step of the risk assessment.  And

17   plaintiffs are trying to use this evidence as an end-around

18   around the scientific obligations of their experts in terms of

19   basing credibility on their literature searches.

20          And it is also an intent to try to shift that burden to

21   EPA; that EPA somehow should be responsible for conducting

22   the --

23          **THE COURT:**  I understand that argument.  I understand

24   that argument.  And I'm not going to be swayed by any attempted

25   shift.  I understand who's got the burden of proof here.

```
 1        I think the bottom line is these are documents that
 2   plaintiffs want to introduce in anticipation of potential
 3   impeachment, which hasn't come to pass yet.  And so I don't --
 4   and, frankly, that's not the core issue in this case.
 5        So I -- it may come up on cross.  If you have to use it on
 6   cross to -- or on redirect after cross, perhaps they could be
 7   relevant to rehabilitate the witness, but I don't see them as
 8   coming in in the first instance.  So those will not be admitted
 9   in the first instance.
10        Is there anything else that we need to talk about?  I will
11   issue rulings on all 30 or so of the bellwethers.  I want to
12   get those out so that you can look at exactly what you're going
13   to introduce at trial, because I would like this to be as
14   streamlined as possible.
15        Anything else that we need to -- any major categories you
16   want to discuss?
17              MS. CARFORA:  I have no other major categories.
18              THE COURT:  All right.  Then let's do this.  Let me
19   talk to you about the trial itself at this point.
20        I'm going to exclude the evidence and testimony on
21   benefits.  My interpretation of the statute is that that
22   doesn't come in at this stage.
23        That means -- and both of you talk about the number of
24   witnesses that are going to be testifying on benefits, and
25   those -- that testimony now will not come in at this stage.
```

1        Also, we're not going to have testimony on the deferral

2    question.  That's going to be deferred to the second stage, if

3    necessary.

4        So my question is, I've given you, what did I say, 13

5    hours?  Plus the 50,000 words of expert testimony, which now

6    you can devote more of it to the merits of this case and not to

7    the benefits question.  My question is:  Do we still need that

8    amount of time?

9            MR. DO:  Our position, Your Honor, if you're asking

10   for defendants is that it would make sense for there to be a

11   commensurate reduction of time in light of the reduction of

12   witnesses.  That's a reduction of at least four witnesses right

13   there.

14           THE COURT:  How much time does that -- what's your

15   estimate what that saves?

16           MR. DO:  I would -- if you were to consider

17   cross-examination of those four, and let's just say an hour

18   apiece, that's already four hours.

19           THE COURT:  Okay.  Mr. Connett, from you?

20           MR. CONNETT:  You know, I disagree, Your Honor.  This

21   case is -- I think would benefit from a vetting of the

22   opinions.  And I think -- obviously, we're not going to be

23   presenting as much testimony, clearly, but there's still a --

24   you know, we have basically the luxury of a more vetting of the

25   expert testimony.  And I think cross examination in this case

 1    becomes crucial to understanding and getting to the merits.

 2        So I do think there is obviously room for some reduction,

 3    but definitely not four hours.  I would propose, Your Honor, 12

 4    hours for both sides.  I think that's -- and maybe we don't end

 5    up using the 12 hours, but I think that's a reasonable amount

 6    of time for a case with this level of scientific detail, number

 7    of declarations that will be in evidence.  I think that's a

 8    reasonable amount of time Your Honor.

 9            THE COURT:  All right.  I'm going to reduce it to 12

10    hours at this point.  I'm not sure I actually expect you to use

11    all of it, because I do want this to be efficient.

12        And I know there are a lot of side issues that we have

13    been talking about.  We spent the last three hours now.  A lot

14    of it is not core, frankly, in my mind.

15        I mean, the core is going to be, I think, the cohort

16    studies, the UCSF question.  I mean, there's a kind of a core

17    piece of evidence here that I would like you to concentrate on.

18    And even though I'm going to allow -- I'm likely going to allow

19    some evidence about, for instance, IQ loss in other contexts,

20    that's going to have probably low probative value in my mind.

21    I really want to get to the core question.

22        So you can keep that in mind.  That's where I think you'd

23    benefit, by focusing on the ones that are most directly apt

24    here.

25            MR. CONNETT:  Thank you, Your Honor.  I appreciate

```
 1    that.

 2           THE COURT:  So I will get out rulings.  I think my

 3    priority is to get out rulings on the bellwethers, because I

 4    promised you that, because I know you have to meet-and-confer

 5    and try to hopefully slim down and firm up the evidence.  And

 6    hopefully you can also stipulate to some of these, like the

 7    first group that we talked about.

 8         Then I also will endeavor to get out the formalized

 9    rulings on the Motions in Limine, but the main ones I've told

10    you where I'm at, which is the benefit question, as well as the

11    deferral matters, and give you an indication of what I'm likely

12    to allow, at least in the first instance in terms of the

13    experts.  Subject to renewed Daubert objections at trial.

14         All right.  Anything else we need to talk about?

15           MR. DO:  Your Honor, there are a couple more

16    logistical questions I'm not sure you would like to entertain

17    at this time.

18           THE COURT:  Well, I'm wondering whether we -- we

19    probably should have another conference before the actual trial

20    to talk about the logistics and mechanics and everything else.

21    There's a lot of those terms or is this --  is that something

22    we can --

23           MR. DO:  Yes.  I guess the -- perhaps the only one

24    that is not pure logistics, but we want to confirm the trial

25    days.  I ask this because the Court's ECF notices did not mark
```

1    June 12, which is a Friday.  But when we look on your calendar,

2    it is marked as a trial date and we want to confirm whether

3    that is --

4               THE COURT:  Yeah.  Yeah, June 12th.  8th, 9th, 10th,

5    12th, 15th, 16th, 17th, and I think the 19th, if necessary.

6               MR. DO:  All right.  The other question with regards

7    to trial date and time is whether or not the Court has a

8    specific allotment for opening and closing.  I think our

9    recommendation would be it be inclusive of trial time, and I

10   would propose an hour total for both of them together, and how

11   the parties want to divvy that up is up to them.

12              THE COURT:  Well, the question is whether there

13   should be a sub limit imposed.  Economy says, well, if you want

14   to spend it on openings as opposed to real evidence, I guess

15   that's your prerogative.

16       I will say that -- you know, were you suggesting one hour

17   together or one hour each?

18              MR. DO:  One hour together, Your Honor.

19              THE COURT:  Okay.

20              MR. DO:  20 -- for example, you get 20 minutes for

21   your opening, 40 for your closing.

22              THE COURT:  Oh, all right.  Well, I'm not going to

23   impose a limit at this point.  I may on closings when we get

24   there.

25       I will say that if you spend more than 30 minutes on your

 1    opening, you're probably not doing a very good job.  I'm not

 2    going to tell you, but I would -- especially it's not a jury

 3    trial, like I said, and we've now gone through -- I've heard, I

 4    think, a rendition of some of your points.  So hopefully we can

 5    be more efficient.  I would rather hear testimony.

 6        We should set another date to talk about logistics.  I

 7    mean, it's good that you actually did the share.  That is,

 8    we're going to have to be able to zoom in, figure out how to

 9    look at -- given the size of my screen, it's -- if you don't

10    blow it up, if you can't figure out a way to enlarge, it's

11    going to be pretty hard to read.

12            THE CLERK:  Your Honor, I can Zoom on my end.

13            THE COURT:  You can?

14            THE CLERK:  Yes.

15            THE COURT:  With shared?

16            THE CLERK:  Yes.  If someone would like to share a

17    document right now, I will demonstrate.

18            MR. CONNETT:  Yeah.  Could we do that?  That would be

19    great.

20            MR. DO:  While she does that, I would note that we

21    all have our tech personnel who have programs specifically

22    meant to be able to zoom.  So we don't anticipate having a

23    problem with that.

24            THE COURT:  Okay.

25            MR. DO:  We just didn't have that ability today.

```
 1        (Document displayed.)

 2            THE COURT:  Just out of curiosity, Angie, do you have

 3   a way to focus in one of those yellow pages, for instance, you

 4   have?

 5            THE CLERK:  This is what I can do.  I can make it

 6   larger and I can move.

 7            THE COURT:  Can you make it larger?

 8            THE CLERK:  Yes.  Can you see it on your -- how large

 9   do you see it on your end?

10            THE COURT:  Well, it's about half the -- it's

11   two-thirds of the screen.

12        (Brief pause.)

13            MR. CONNETT:  Could we try?  Because I can't see,

14   Your Honor, how this looks for others because I'm sharing the

15   document.  Could I switch over to defense counsel so I can see

16   how this is appearing?

17            THE COURT:  Yeah.  Why don't -- defense, why don't

18   you put up one?

19            MR. ADKINS:  From my end, I didn't see a difference

20   actually.

21            THE COURT:  Yeah.  I didn't either.

22            THE CLERK:  Okay.  So it's just individual screen.

23   So you do have the capability, Your Honor, to, up at the top,

24   "View Options."  Click that.

25            THE COURT:  Yeah.  Okay.  "Zoom Ratio"?
```

1          THE CLERK:  Yes.

2          THE COURT:  Oh, I do.  Do the participants have that

3   opportunity, too, or just the host?

4          THE CLERK:  I believe just the host and co-host.

5          THE COURT:  Okay.  Well, that is nice.  I can enlarge

6   it here.  I have a "View Option."  I guess, unfortunately, the

7   panelists don't have that option.

8          MR. NIDEL:  Your Honor, Chris Nidel here.  It does

9   look like we have that option.

10          THE CLERK:  Okay.

11          THE COURT:  Oh, you do?

12          MR. NIDEL:  Yeah.

13          THE COURT:  "View Option," you go "Zoom Ratio."  I

14   can go 200 percent if I need to.  That's excellent.

15          MR. CONNETT:  One question, Your Honor, is is there

16   an option -- I think defense counsel had mentioned this at our

17   last hearing, but when we have a witness, you know, on the

18   stand, is there a way to make the screen for the witness larger

19   vis-a-vis everyone else so that we can better see the witness?

20   Is there some option?

21          THE COURT:  There is "Speaker View," right, where

22   only the person speaking gets seen and everybody else is a

23   small box?

24          MR. CONNETT:  I guess.  Does that apply when you have

25   a document on the screen?

1          **THE COURT:**  That's a good question.

2          **MR. DO:**  I can answer that question, Your Honor.

3   From our understanding there is no way to have a -- for a

4   panelist to control that view.  The host can pin a certain

5   video, go back and forth.

6      So the best way to do what Mr. Connett is suggesting is to

7   unshare your screen when you're not talking about the document

8   and go back and forth.  Alternatively, we have previously

9   suggested if the Court were inclined to offer hosting

10  opportunities, but the Court understandably was not inclined to

11  do that.

12         **THE COURT:**  You're saying the host can have the

13  shared document on the screen and then also enlarge the

14  witnesses?

15         **MR. DO:**  Yeah.  They can compel that everyone sees a

16  particular witness's face, as opposed to a document, and can

17  easily go back and forth between that.

18         **THE COURT:**  Back and forth, but not side-by-side.

19         **MR. DO:**  If you're asking for a 50 percent

20  side-by-side, no, that is not --

21         **THE COURT:**  Okay.

22         **MR. DO:**  I'm not aware of that.

23         **THE COURT:**  So when we're sharing a document, looking

24  at a document, inevitably we either look at a document, look at

25  the witness, but not both at the same time with the witness,

1   let's say, being 25 percent of the screen?

2          MR. DO:  Let's see if I can expand.  You, on an

3   individual basis, would have to increase or decrease the size

4   of the witness.  I don't know.  The host may have the ability

5   to do that for everybody, but on an individual basis you can

6   drag -- you get a little corner, you can drag a window so that

7   you're on par with the -- with the document.  For example,

8   right now, Your Honor, you have about 25 percent of my screen.

9          THE COURT:  Oh, really?  You're able to do that?

10          MR. DO:  Yes.  So in terms of the -- there is a "Grid

11   View," which is the far right.  And then the second to the far

12   left is -- I'm not sure which this is called.  "Show small

13   active speaker."  Then I am just seeing one person.  And then I

14   can go to the corner of that screen and enlarge or decrease

15   that one speaker view.

16          THE COURT:  I got -- I was able to get a view -- I'm

17   looking at you full screen.  Now the document is in the upper

18   right-hand corner.  I wish I could invert that.

19      I don't see how I can -- there is probably a way.  Well,

20   we're going to have to do a little more research.

21          MR. CONNETT:  Your Honor?

22          THE COURT:  Yeah.

23          MR. CONNETT:  I do have one question on the Zoom.

24   The -- it's sort of a scheduling logistics issue.  Obviously it

25   was -- initially it was our practice to have this in person,

 1   but we are set and want to do this by Zoom.

 2       I guess the question I had is since we're now reaching a

 3   point where, let's just say -- and I don't think it's likely,

 4   but let's just say California opens up.  There is no travel

 5   restrictions, that somehow it was feasible for us to be there

 6   in person.  This may surprise you, but we would at this point

 7   in time would prefer that we just confirm this is going to be

 8   by Zoom.

 9       And the reason I say that is because I don't know if I

10   could get my experts -- it's going to be a real scheduling

11   problem to sort of change things at the last minute.

12       So I just wanted to just raise the issue with Your Honor

13   as to whether we just go ahead and just confirm this is going

14   to be by Zoom webinar.

15              THE COURT:  Yeah.  Well, I'll confirm that.  It will

16   be by Zoom.

17       The Court has been meeting, and we have a General Order

18   now expanding the pretty much court closure through June 1st,

19   to be revisited between now and then.  But it's clear that if

20   we open up at all, it will be for criminal proceedings where

21   there is a constitutional statutory right to be present.

22       I think it's a pretty clear sentiment from the court that

23   we're not going to open up to civil proceedings for some time,

24   unfortunately.  So that's -- it won't be in Phase 1 or Phase 2,

25   whatever you call it.  It will be in a later phase.

1        So come June, I -- we're going to have to do it -- if

2   we're going to do it in June, we're going to have to do this by

3   Zoom.  So that's what we're going to do.

4        Well, I think we need some -- I guess, Angie, we've got a

5   little more research to do, see what we can do on our end and

6   see if we can get more equipped to do some of that.

7        I think it is important to have -- I will have hard copies

8   of exhibits with me.  I will figure out a way of getting

9   another screen.  Hopefully, you will give hard copies of

10  whatever you need to give to your witnesses so they have --

11  they don't have to just depend on a screen.  I think it's

12  useful if they have hard copies if they need to work with any

13  of it.

14       We will have to align what they are looking at with what

15  you're showing.  Confirm it's on Page 1469 or whatever it is,

16  but I think it's useful to make sure that whoever your

17  witnesses are, that they have the key.  Like, a witness binder

18  that you would normally give.

19       So let's -- why don't we figure out a time closer to

20  trial, still enough time to make some adjustments.  Let's see.

21  Maybe the week of -- the last week of May?  What about -- let's

22  see.  What about Friday, the 29th?

23            **MR. CONNETT:**  That works from my end, Your Honor.

24            **THE COURT:**  Do it at the same time, 1:00 o'clock?

25            **MR. DO:**  That should be acceptable to us, Your Honor.

1        In light of that date, there are a couple of logistical

2   questions that may need to be answered before then.  I could go

3   through those right now, if you don't mind.

4              **THE COURT:**  Sure.

5              **MR. DO:**  We owe you some delivery, some hard copies

6   of the exhibits.  So I imagine we can work with your Deputy

7   Courtroom -- your Courtroom Deputy --

8              **THE COURT:**  We have to arrange for somebody to be

9   available.

10             **THE CLERK:**  Yes.

11             **THE COURT:**  We had a problem the other day with

12  another case where luckily somebody happened to be there, but

13  otherwise the doors are literally closed to the Clerk's Office,

14  but we can arrange.

15       Right, Angie?

16             **THE CLERK:**  Yes, we can.

17             **MR. DO:**  Understood.

18       The parties would like to ask, can we -- as of right now

19  we haven't identified any dispute with regards to the

20  transcript of depositions.  Can we forego delivery of the

21  original sealed versions to you all?  We can certainly provide

22  a copy of the deposition, but forego the original sealed

23  versions?

24             **THE COURT:**  No objection to that.

25             **MR. CONNETT:**  No objection, Your Honor.

1          **THE COURT:**  That's fine.

2          **MR. DO:**  And when would Your Honor -- would Your

3    Honor like that on the 20th as well, I would imagine?

4          **THE COURT:**  Yeah, I would.  I need some time to kind

5    of sort through those.  Hopefully, it won't be a lot.

6          **MR. DO:**  And with the Court's permission, we would

7    appreciate the opportunity to work with you with regards to a

8    document sharing site.  We have been using Box.com.  It would

9    require setting the Court up with an account.  And that would

10   make sense, for example, when we are disclosing our witness

11   binders for the Court.  We'll also provide it to the witnesses

12   as well the day before that particular witness will go, or

13   any -- if there are demonstratives, et cetera, we can set it up

14   through Box.com.  We can coordinate with the Court on that.

15         **THE COURT:**  That serves as kind of a repository then?

16         **MR. DO:**  It can be a repository, if you would like,

17   but it would also give you the opportunity to download the

18   documents, since they may be voluminous and we can't email

19   them.

20         **THE COURT:**  All right.  If you could send a quick

21   email to us, to Angie, the CRD, and she can just run that by

22   our IT people, make sure there is for some reason no security

23   concern or no -- I don't think there would be, but if you could

24   just summarize what it is and what the site is and we can run

25   that by them and make sure it's okay.  That would be great.

```
 1            MR. DO:  Last thing, Your Honor, related again to

 2   deposition designations.  We are doing primarily video and

 3   there are a few that will be read in.

 4        We will advise that we will update Appendix C, which had

 5   the deposition designations, because the parties have

 6   subsequently reduced them, and we will be reordering them so

 7   that they will appear as they will be read in and, also, refer

 8   to trial exhibits.  I imagine that would be acceptable to the

 9   Court.  So you have a transcript of what will actually be read,

10   which I believe is consistent with your standing order.

11            THE COURT:  Yeah, that would be great.  I would like

12   in the final analysis, you know, final -- after we whittle it

13   all down, deposition transcript that you are going to use, the

14   discovery excerpt that you're going to use and, of course, the

15   final list of exhibits, which I hope will be slimmer than what

16   was originally proposed.

17            MR. DO:  I believe so.  We're down to, I think, EPA

18   has got about 40.  We were up to over 100 before, so we're

19   getting there.

20            THE COURT:  Yes.

21            MR. DO:  And lastly, I do want to confer with my

22   colleagues.  Is there anything with regards to standing

23   witnesses or anything left to discuss with the Court?

24        Ms. Bhat, are we good?

25            MS. BHAT:  We do still have objections to the
```

*Official Reporter - U.S. District Court - San Francisco*
*(415) 431-1477*

1    depositions of the standing witnesses and, also, the

2    declarations, but we can deal with that at a later time.

3              **THE COURT:**  All right.  Otherwise, we will reconvene

4    on the 29th at 1:00 o'clock.  All right?

5              **MR. CONNETT:**  Thank you, Your Honor.

6              **THE COURT:**  All right.  Thank you all.

7              **THE CLERK:**  Court is adjourned.

8         (Proceedings adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, May 14, 2020