1

2

3

4               UNITED STATES DISTRICT COURT

5              NORTHERN DISTRICT OF CALIFORNIA

6

7    FOOD & WATER WATCH, INC., et al.,        Case No. 17-cv-02162-EMC

8              Plaintiffs,

9         v.

10   UNITED STATES ENVIRONMENTAL            **FURTHER PRETRIAL CONFERENCE**
     PROTECTION AGENCY, et al.,             **ORDER**
11
              Defendants.
12

13

14              **I.      TRIAL DATE AND LENGTH OF TRIAL**

15         A bench trial shall be held beginning on June 8, 2020 at 8:30 AM before Judge Edward M.

16   Chen.  In light of the challenges presented by the COVID-19 pandemic, the trial will be conducted

17   via Zoom webinar.  The Court notes that the trial will not be livestreamed, but anyone wishing to

18   join the webinar may do so.  The Court's license for Zoom webinar will be reserved for 500

19   people capacity. *See* Docket No. 181.  The parties are reminded that recording court proceedings

20   is prohibited.  There shall be a total of up to eight trial days, including June 8; the length of trial is

21   subject to further modification by the Court.

22         Trial days shall last from 8:30 a.m. to 1:30 p.m.  The Court may determine that certain full

23   trial days may be necessary as the trial progresses.  Thursdays are dark.

24         Trial dates are set for June 8, 2020, June 9, 2020, June 10, 2020, June 12, 2020, June 15,

25   2020, June 16, 2020, June 17, 2020, and June 19, 2020.

26         The Court has worked closely with the parties to determine the most effective and efficient

27   ways for the parties to present their arguments and evidence in this case, given the circumstances.

28   Pursuant to the Clerk's notice posted on April 24, 2020, the Court has permitted the parties to

submit expert declarations in lieu of some direct testimony.  *See* Docket No. 177.  Each side is limited to a total of 50,000 words for expert declarations (total per side) to be apportioned between experts as each side sees fit.  The expert declarations are to be filed by May 20, 2020; any evidentiary objections thereto are due May 27, 2020.  Those objections will be resolved at the hearing on June 5, 2020 (along with any unresolved objections to exhibits and discovery excerpts, as discussed below).  Each side is limited to 12 hours of testimony in addition to the expert declarations.

As is discussed in greater detail below, with respect to EPA's Second Motion *in Limine*, the Court has decided to bifurcate the trial such that—if it concludes that an unreasonable risk of harm exists—it will permit the EPA to present evidence related to the deferral of rulemaking at a later stage of the proceeding.  If necessary, the Court will address whether to bar the introduction of additional evidence (*i.e.* evidence that has not yet been disclosed to Plaintiffs) on the issue of deferral.

## II.     STIPULATIONS OF FACT

The parties stipulate to the following facts:

1.  According to the United States Centers for Disease Control and Prevention (CDC), as of 2014, approximately 200,000,000 people in the United States live in communities that add fluoridation chemicals to the drinking water.

2.  Plaintiffs' Citizen Petition sought to prohibit the addition of fluoridation chemicals to water on the grounds that this condition of use presents an unreasonable risk of neurologic harm.

3.  Fluoridation chemicals are added to drinking water to prevent tooth decay (*i.e.*, dental caries).  In addition to being added to water, fluoride is added to dental products and certain pesticides.

4.  In epidemiology, a cross-sectional study is a comparison of the prevalence of a specific health outcome across levels of a specific exposure in study subjects (or vice versa), with the exposure and outcome both measured at a given time, providing a "snapshot" of the association between the exposure and the health

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1      outcome at one time.

2    5. In epidemiology, a cohort study is a comparison of incidence rates of a specific

3      health outcome between study subjects with various levels of a specific exposure

4      who are observed over time.

5    6. A person's individual response to fluoride exposure depends on factors such as age,

6      kidney function, body weight, activity level, nutrition, and other factors.

7    7. Human urine fluoride concentrations (biomonitoring) measures an internal dose.

8    8. Various factors can affect the concentration of fluoride in a urine sample, such as

9      an individual's metabolism, when a urine sample is collected, and the time since

10      the last void of the individual who provided the sample.

11    9. Historically, most studies to investigate the impact of fluoride on IQ in humans

12      have used cross-sectional study designs. Most of these cross-sectional studies have

13      been conducted in China, and other countries with elevated levels (>1.5 mg/L) of

14      naturally occurring fluoride in water. By contrast, fluoride is added to water in the

15      United States to reach a concentration of 0.7 mg/L.

16   10. Prospective cohort studies have been conducted in Mexico City (ELEMENT

17      cohort), where fluoride is added to salt, and Canada (MIREC cohort), where

18      fluoride is added to water. These studies are the most methodologically reliable

19      human studies to date on the impact of fluoride on neurodevelopment.

20   11. Risk assessment is the process by which scientific judgments are made concerning

21      the potential for toxicity in humans.

22   12. The National Research Council (NRC, 1983) has defined risk assessment as

23      including the following components: hazard identification, dose-response

24      assessment, exposure assessment, and risk characterization.

25   13. The term "risk evaluation" is a specialized term under TSCA.

26   14. Together, the components of EPA's risk assessment process, coupled with the

27      ultimate risk determination, constitute a "risk evaluation" under TSCA.

28   15. The final step of a risk evaluation is to weigh a variety of factors to determine

whether the chemical substance, under the conditions of use, presents an unreasonable risk of injury to health or the environment, referred to as the "risk determination" step in the TSCA risk-evaluation process.

16. EPA does not require that human exposure levels exceed a known adverse effect level to make an unreasonable risk determination under TSCA.  For example, if human exposure levels exceed a known no-adverse effect level divided by combined uncertainty factors, EPA may make an unreasonable risk determination under TSCA.

17. In the ideal world, all risk assessments would be based on a very strong knowledge base (*i.e.*, reliable and complete data on the nature and extent of contamination, fate and transport processes, the magnitude and frequency of human and ecological exposure, and the inherent toxicity of all of the chemicals).  However, in real life, information is usually limited on one or more of these key data needed for risk assessment calculations.  This means that risk assessors often have to make estimates and use judgment when performing risk calculations, and consequently all risk estimates are uncertain to some degree.  For this reason, a key part of all good risk assessments is a fair and open presentation of the uncertainties in the calculations and a characterization of how reliable (or how unreliable) the resulting risk estimates really are.

18. EPA's *Guidelines for Neurotoxicity Risk Assessment* were designed in 1998 to guide EPA's evaluation of substances that are suspected to cause neurotoxicity, in line with substantive standards established in the statutes administered by the Agency.

19. EPA's *Guidelines for Neurotoxicity Risk Assessment* preceded the 2016 TSCA amendments.

20. The current non-enforceable health goal for fluoride under the Safe Drinking Water Act ("SDWA"), or Maximum Contaminant Level Goal (MCLG), of 4.0 mg/L was promulgated in 1985 to protect against a condition known as crippling skeletal

United States District Court
Northern District of California

fluorosis (*i.e.*, "stage III skeletal fluorosis").  Crippling fluorosis is the final, and most severe, stage of skeletal fluorosis.

21. Based on its 2006 review, the National Research Council (NRC) of the National Academies of Science (NAS) recommended that the MCLG of 4 mg/L be lowered to prevent children from developing severe dental fluorosis and reduce the lifetime accumulation of fluoride into bone that the majority of the committee concluded is likely to put individuals at increased risk of bone fracture and possibly skeletal fluorosis.

22. Based on the NRC's recommendation, in 2010, EPA's Office of Water completed a dose-response analysis using available data between 2000 and 2010 to calculate a reference dose ("RfD")—an estimate of the fluoride dose protective against severe dental fluorosis, stage II skeletal fluorosis, and increased risk of bone fractures—of 0.08 milligrams per kilograms per day (mg/kg/day), a measure of daily intake by body weight.

23. In addition to the tooth and bone effects, the NRC also evaluated neurotoxicity as an effect of fluoride exposure, among other health effects.  The NRC concluded that the available data were inadequate to demonstrate a risk for neurotoxicity at 4.0 mg/L and made recommendations for additional research.  Since that time, additional research has been conducted and the scientific database for studies that have examined neurotoxicity as an effect of fluoride exposure has grown.

24. In determining whether adding fluoridation chemicals to drinking water presents an unreasonable risk of neurotoxic effects under TSCA, EPA's Office of Pollution Prevention and Toxics would not rely on the 2010 RfD, but would instead apply a weight of the scientific evidence approach for identifying and characterizing the best available science from the most up-to-date scientific database of studies that have examined neurotoxicity as an effect of fluoride exposure.

25. In conducting TSCA risk evaluations, EPA generally uses the Margin-of Exposure (MOE) approach to characterize the risk as a step in the risk assessment process.

5

1          Using this approach, an MOE is calculated by comparing (dividing) the point-of

2          departure directly to the expected exposure level.  The MOE is then compared to a

3          benchmark MOE, which is the product of all relevant uncertainty factors.

4     26. EPA considers the MOE, relative to the benchmark MOE, in addition to other

5          factors, in determining whether risks are unreasonable under TSCA.

6     27. The National Research Council has stated that "the inference that results from

7          animal experiments are applicable to humans is fundamental to toxicologic

8          research."

9     28. EPA agrees that effects observed in animals are relevant to humans unless human

10          data counterindicate.

11     29. The developing brain is distinguished by the absence of a blood-brain barrier.  The

12          development of this barrier is a gradual process, beginning in utero and complete at

13          approximately 6 months of age.

14     30. Fluoride passes through the placenta and gets into the fetal brain.

15     31. Whether harm would actually occur depends on the dose and nature of exposure.

16 *See* Docket No. 150 ("Joint Pretrial Conference Statement").  Furthermore, at the hearing on May

17 8, 2020, the Court urged the parties to agree to further stipulations, if possible, and the parties

18 indicated that they will endeavor to do so.

19                 **III.      MOTIONS *IN LIMINE***

20 A.     Plaintiffs' Motion *in Limine*

21      1.     First Motion *in Limine* to Exclude Evidence of Fluoridation Chemicals' Alleged

22            Benefits (or Lack Thereof) (Docket No. 144)

23         Section 21 specifies that determinations of "unreasonable risk of injury to health" must be

24 made "without consideration of costs or other nonrisk factors."  15 U.S.C. § 2620(b)(4)(B)(ii).

25 The statute does not define "costs" or "nonrisk factors," and the parties disagree as to whether this

26 applies to the health benefits of fluoridation.  Plaintiffs wish to exclude evidence of benefits, while

27 EPA seeks to introduce it.  For the reasons outlined below, the Court **GRANTS** Plaintiffs' First

28 Motion *in Limine*; the introduction of evidence intended to demonstrate the benefits of fluoride

1    will not be permitted.

2                    a.        Statutory Language, Structure, and Purpose

3              Plaintiffs contend that "the plain language, structure, purpose, and legislative history of

4    TSCA support the interpretation that benefits are a 'nonrisk' factor that cannot be considered as

5    part of an unreasonable risk determination."  Plaintiffs' First Motion *in Limine* ("First Motion *in*

6    *Limine* to Exclude Evidence of Fluoridation Chemicals' Alleged Benefits (or Lack Thereof)")

7    (hereinafter PMIL 1), Docket No. 144.  They believe that benefits should "only be considered

8    during EPA's rulemaking proceeding," which follows risk evaluation.  *Id.*  The plain language,

9    structure, purpose, and legislative history of TSCA are each addressed in turn; the Court then turns

10   to EPA's promulgated regulation on risk evaluations, as well as the parties' discussion of the

11   *Framework for Metals Risk Assessment*.

12             Beginning with the plain language of TSCA, the statute—as noted above—states that the

13   relevant inquiry is whether "the chemical substance or mixture . . . presents an unreasonable risk

14   of injury to health or the environment, *without consideration of costs or other nonrisk factors*."  15

15   U.S.C. § 2620(b)(4)(B)(ii) (emphasis added).  Plaintiffs contend that "an ordinary plain meaning

16   interpretation is that 'nonrisk' is anything that is not a risk" and that "[b]enefits come within this

17   umbrella."  PMIL 1 at 2.  For its part, EPA argues that "any plain reading of '*unreasonable* risk of

18   injury to *health*' would entail some *weighing* of *health* benefits."  PMIL 1 Opp. at 5–6.  The

19   Agency contends that "without a counterbalancing consideration" of benefits "any risk would be

20   unreasonable."  *Id.*  While EPA's phrase "*unreasonable* risk" could imply some amount of

21   weighing of costs and benefits, that is not the only reasonable interpretation.  Unreasonable could

22   be a relative measure of risk, *e.g.*, something more than *de minimis*.  Moreover, even if the term

23   could imply weighing various factors, it does not dictate *what may be considered* in that weighing

24   process.  A weighing process does not inherently require consideration of benefits.  TSCA's broad

25   preclusion of "nonrisk factor" literally encompasses benefits; benefit after all is a nonrisk factor.

26             EPA advances the argument that health-related benefits are properly considered "risk

27   factors, not nonrisk factors" and are therefore properly considered during risk evaluation.  PMIL 1

28   Opp. at 3.  Specifically, EPA asserts:

                                                    7

> For chemical substances that provide a health benefit, the absence of
> those chemical substances may be characterized as a risk to human
> health.  And the presence of those chemicals can be characterized as
> a risk reduction.  In other words, when a chemical has direct
> biological health benefits, that health benefit can be a risk factor—in
> effect, the reducing or cancelling out a health risk/hazard—instead
> of a nonrisk factor (*e.g.*, economic benefits) that can only be
> considered in risk management.

*Id.*  Because it is "undisputed that fluoride reduces dental caries to some degree," EPA contends that the health benefits of water fluoridation are properly considered as part of a TSCA risk evaluation.  *Id.*[1]  One might label this position an "inverse benefits" argument: barring the substance creates a health risk.  The trouble with EPA's contention is that in asserting the existence of the inverse risk, it presumes the absence of the fluoridation if an unreasonable risk is found.  However, the rulemaking process does not require that a substance which poses an unreasonable risk be banned outright.  It merely triggers a rulemaking process, in which the costs and benefits of the substance are considered in determining how to manage that risk.  As a result of that rulemaking, the EPA may choose from a wide range of management tools other than an outright ban, including less expansive restrictions or warning label requirements.  That the inverse risk cannot be determined at the "unreasonable risk" juncture (because the ultimate rule will not be determined until the subsequent rulemaking process is completed) undermines EPA's inverse risk construct.

Turning to the structure of the statute, Plaintiffs focus on two points. First, they contend that "[t]he only places in the statute where the word 'benefit(s)' appears are sections that govern the rulemaking phase."  PMIL 1 at 2.  In discussing rulemaking, the statute explicitly mentions benefits on three occasions: (1) "In proposing and promulgating a rule . . . the Administrator shall consider and publish a statement based on reasonably available information with respect to . . . the

---

[1] EPA contends that benefits could properly be considered during the risk characterization process, which could permit evaluation of "the dose-response relationship for both the health benefit and any adverse impacts."  *See* Defendants' Trial Brief, Docket No. 154.  Alternatively, benefits could be considered during the "risk determination" part of the risk-evaluation process.  PMIL 1 Opp. at 3.  Risk determination is the final step in the risk evaluation process, during which the EPA "may weigh a variety of factors in determining unreasonable risk."  Procedures for Chemical Risk Evaluation Under the Amended Toxic Substances Control Act, 82 Fed. Reg. 33,726 (July 20, 2017) (codified at 40 C.F.R. pt. 702).

**benefits** of the chemical substance or mixture for various uses[,] and [2] the reasonably

ascertainable economic consequences of the rule, including consideration of . . . the costs and

**benefits** of the proposed and final regulatory action," and (3) "The Administrator may, as part of a

rule promulgated . . . grant an exemption from a requirement . . . for a specific condition of use of

a chemical substance or mixture, if the Administrator finds that . . . the specific condition of use of

the chemical substance or mixture, as compared to reasonably available alternatives, provides a

substantial **benefit** to health, the environment, or public safety."  15 U.S.C. § 2605(c) and (g)

(emphases added).  In contrast to the explicit identification of benefits in Sections 6(c) and 6(g),

the *absence* of any mention of benefits in Section 6(b) (which outlines the risk evaluation

procedures that EPA is to follow) proves benefits should not be considered as part of risk

evaluation procedures under Section 21.  PMIL 1 at 2.  Section 6(b) identifies a number of other

factors that must be considered by the EPA (*e.g.* "available information on hazards and exposures

for the conditions of use of the chemical substance" and "information on potentially exposed or

susceptible subpopulations identified as relevant by the Administrator") but does not mention

"benefits"; that section also prohibits EPA from "consider[ing] costs or other nonrisk factors," as

in Section 21.  15 U.S.C. § 2605(b)(4)(F).  Thus, when Congress wanted the EPA to consider

benefits, it so stated.  It did not do so in Section 6(b) or Section 21.  *See Bates v. United States*,

522 U.S. 23, 29–30 (1997) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) (internal

quotation marks and modification omitted) ("Where Congress includes particular language in one

section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *see also Pit*

*River Tribe v. Bureau of Land Mgmt.*, 939 F.3d 962, 971 (9th Cir. 2019) (quoting *Barnhart v.*

*Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)) (same text).

      Turning to statutory purpose, Plaintiffs point to the distinction in TSCA between a

determination that an unreasonable risk exists and any decision about how to manage such a risk

as mentioned above.  The bifurcated structure of TSCA strongly suggests that any consideration of

benefits is properly deferred to the risk management (*i.e.* rulemaking) stage.  As plaintiffs argue:

      The requirement that the *determination* of risk precede the

United States District Court
Northern District of California

1

2

3

4

> *management* of the risk serves several purposes, including (1) eliminating the redundancy of performing two separate risk-benefit analyses, and (2) making a clear delineation between the (strictly science-based) determination of *whether there is a risk* and the (policy-influenced) decision of *if and how to manage the risk.* These purposes would be frustrated by requiring risk-benefit analyses in both phases.

5   PMIL 1 at 3.  This construct is perfectly sensible: if the Court determines that an unreasonable risk

6   exists, then the Agency is directed to go through the rulemaking process and at that point takes

7   benefits into account in tailoring a management plan accordingly.  This approach also coheres

8   with the statutory text and (as is discussed next) with the legislative history of TSCA.

9          Finally, Plaintiffs argue that their position is supported by legislative history.  *See* PMIL 1

10   at 3.  Specifically, they look to comments submitted by Senate Democratic negotiators intended to

11   clarify "the intent of the negotiators on elements of the final bill text."  162 Cong. Rec. S3517

12   (daily ed. June 7, 2016) (statement of S. Democratic negotiators).  At the hearing, the parties

13   directed the Court's attention to the following portion of those comments:

14

15

16

17

18

> TSCA as in effect before the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act authorized EPA to regulate chemical substances if it determined that the chemical substance "presents or will present an unreasonable risk of injury to health or the environment."  In its decision in *Corrosion Proof Fittings vs EPA*, the U.S. Court of Appeals, 5th Circuit over-turned EPA's proposed ban on asbestos, in part because it believed that

19

20

21

> In evaluating what is 'unreasonable,' the EPA is required to consider the costs of any proposed actions and to 'carry out this chapter in a reasonable and prudent manner [after considering] the environmental, economic, and social impact of any action.'  15 U.S.C. § 2601(c).

22

23

24

25

26

27

28

> As the District of Columbia Circuit stated when evaluating similar language governing the Federal Hazardous Substances Act, '[t]he requirement that the risk be 'unreasonable' necessarily involves a balancing test like that familiar in tort law:  The regulation may issue if the severity of the injury that may result from the product, factored by the likelihood of the injury, offsets the harm the regulation itself imposes upon manufacturers and consumers.'  *Forester v. CPSC*, 559 F.2d 774 789 (D.C.Cir. 1977).  We have quoted this language approvingly when evaluating other statutes using similar language.  *See, e.g.*, *Aqua Slide, 569 F.2d at*

United States District Court
Northern District of California

10

*839.*

> The Frank R Lautenberg Chemical Safety for the 21st Century Act
> clearly rejects that approach to determining what "unreasonable risk
> of injury to health or the environment" means, by adding text that
> directs EPA to determine whether such risks exist "without
> consideration of costs or other nonrisk factors" and, if they do, to
> promulgate a rule that ensures "that the chemical substance no
> longer presents such risk."  In this manner, Congress has ensured
> that when EPA evaluates a chemical to determine whether it poses
> an unreasonable risk to health or the environment and regulates the
> chemical if it does, the Agency may not apply the sort of "balancing
> test" described above.

162 Cong. Rec. S3516 (daily ed. June 7, 2016) (statement of S. Democratic negotiators).  This

statement strongly suggests an intention to move away from a free ranging "balancing test."

In their briefing, Plaintiffs also highlight the portion of the negotiators' statement that

"addressed a question that arose regarding how EPA is to carry out its responsibilities under

Section 6(c)(2)" (which governs rulemaking).  *Id.* at 3–4.  Section 6(c)(2) lays out four factors that

the Administrator must consider and address in a published statement when proposing and

promulgating a rule under TSCA. *See* 15 U.S.C. § 2605(c)(2)(A).  The pertinent portion of the

negotiators' statement notes:

> Senate Democratic negotiators clarify that sections 6(c)(2)(A)(i)
> ["the effects of the chemical substance or mixture on health and the
> magnitude of the exposure of human beings to the chemical
> substance or mixture"] and (ii) ["the effects of the chemical
> substance or mixture on the environment and the magnitude of the
> exposure of the environment to such substance or mixture"] do not
> require EPA to conduct a second risk evaluation-like analysis to
> identify the specified information, but rather, can satisfy these
> requirements on the basis of the conclusions regarding the
> chemical's health and environmental effects and exposures in the
> risk evaluation itself.

162 Cong. Rec. S3517 (daily ed. June 7, 2016) (statement of S. Democratic negotiators).  As

Plaintiffs note, the Senate report "makes no mention" of EPA relying on risk evaluation findings

for evidence related to 6(c)(2)(A)(iii) and (iv), which pertain to the "the benefits of the chemical

substance" and the "economic consequences of the rule, including . . . the costs and benefits of the

proposed and final regulatory action."  *See* PMIL 1 at 4.  Here, too, the omission of the benefits-

related factors suggests that the Senate had an "understanding that the issue of benefits w[ould]

1  not be raised during the risk evaluation" process.  *Id.*

2          Taking all of this together, the plain text of the statute, the structure of the statute, and its

3  legislative history all indicate that consideration of benefits at the risk evaluation stage is

4  inappropriate.

5                          b.          Agency Interpretation

6          Plaintiffs contend that EPA's own regulation relating to risk evaluation also supports the

7  exclusion of benefits evidence at the risk evaluation stage.  As required by Section 6(b)(4) of

8  TSCA, EPA promulgated a rule "that establishes a process for conducting risk evaluations to

9  determine whether a chemical substance presents an unreasonable risk of injury to health or the

10  environment, without consideration of costs or other non-risk factors."  Procedures for Chemical

11  Risk Evaluation Under the Amended Toxic Substances Control Act, 82 Fed. Reg. 33,726 (July 20,

12  2017) (codified at 40 C.F.R. pt. 702) (hereinafter "Final Rule").  The Final Rule included factors

13  that EPA would consider in conducting risk evaluations, but it does not explicitly mention

14  benefits.  In relevant part, the Rule states:

15                  To make a risk determination, EPA may weigh a variety of factors
                    in determining unreasonable risk.  The Administrator will consider
16                  relevant factors including, but not limited to: The effects of the
                    chemical substance on health and human exposure to such substance
17                  under the conditions of use (including cancer and non-cancer risks);
                    the effects of the chemical substance on the environment and
18                  environmental exposure under the conditions of use; the population
                    exposed (including any susceptible populations), the severity of
19                  hazard (the nature of the hazard, the irreversibility of hazard), and
                    uncertainties.
20

21  *Id.*  Here, too, the factors to be considered explicitly include the (risk-related) factors noted in

22  Section 6(c)(2)(A)(i) and (ii) of the statute but do *not* mention the benefit-related factors in Section

23  6(c)(2)(A)(iii) and (iv).  While the Court acknowledges that the Rule does put a great deal of

24  emphasis on flexibility, *see id.* ("the Agency did not think it was appropriate to define

25  'unreasonable risk' because each risk evaluation will be unique"; "This is not intended as an

26  exhaustive list, but merely identifies some of the considerations that are likely to be among the

27  most commonly used."; "To make a risk determination, EPA may weigh a variety of factors in

28  determining unreasonable risk."), that general orientation toward customization does not overcome

United States District Court
Northern District of California

12

1    the fact that the rule enumerated certain factors obviously considered to be important in

2    conducting risk evaluations and, in doing so, did not mention benefits.[2]

3            The parties also address whether the *Framework for Metals Risk Assessment* (authored by

4    the Office of the Science Advisor) ("*Framework*") compels consideration of the benefits

5    associated with water fluoridation.  In relevant part, Section 6 of TSCA states:

6            In identifying priorities for risk evaluation and conducting risk
             evaluations of metals and metal compounds, the Administrator shall
7            use the Framework for Metals Risk Assessment of the Office of the
             Science Advisor, Risk Assessment Forum, and dated March 2007,
8            or a successor document that addresses metals risk assessment and is
             peer reviewed by the Science Advisory Board.
9

10   15 U.S.C. § 2605(b)(2)(E).  Although the *Framework* directs that the essentiality of a metal to

11   health be considered, the statute specifically makes the *Framework* relevant to risk evaluations of

12   "metals and metal compounds," and fluoride is neither a metal nor a metal compound.  The

13   *Framework* is therefore irrelevant unless reference to the *Framework* was intended to convey a

14   broader mode of analysis applicable to non-metals.

15           The Court concludes it does not.  "Where Congress includes particular language in one

16   section of a statute but omits it in another section of the same Act, it is generally presumed that

17   Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Bates*, 522

18   U.S. at 29–30 (quoting *Russell*, 464 U.S. at 23) (internal quotation marks and modification

19   omitted); *see also Pit River Tribe*, 939 F.3d at 971 (quoting *Barnhart*, 534 U.S. at 452).  Thus, had

20   Congress intended to apply the *Framework* to other portions of TSCA, it knew how to do so;

21   instead, the fact that it did not mention the *Framework* in any other provisions suggests that it

22   intended the *Framework* to apply narrowly, and prescriptively only to metals.

23           Moreover, even if the *Framework* mode of analysis were applied to non-metals like

24   fluoride, the *Framework* only examines whether a substance is essential for—rather than merely

25

26   ────────────────

27   [2] Notably, the EPA's own website includes a page entitled *How EPA Evaluates the Safety of
     Existing Chemicals*, which states: "TSCA prohibits EPA from considering non-risk factors (e.g.,
     costs/benefits) during risk evaluation."  *How EPA Evaluates the Safety of Existing Chemicals*,
28   U.S. ENVTL. PROT. AGENCY, https://www.epa.gov/ assessing-and-managing-chemicals-under-
     tsca/how-epa-evaluates-safety-existing-chemicals (last visited May 11, 2020).

United States District Court
Northern District of California

beneficial to—human health.  As Plaintiffs contend, under the *Framework*, "only 'essentiality' can be considered in risk assessment, not mere benefit."  PMIL 1 at 5.  The *Framework for Metals Risk Assessment* distinguishes between metals that are essential and those which are merely beneficial: "Metals that are currently deemed nutritionally essential for humans are Co, Cr III, Cu, Fe, Mg, Mn, Mo, Se and Zn (Table 4-1).  Some metals (e.g., B, Ni, Si, V, and perhaps As), while not essential to human health, may have some beneficial effects at low levels of exposure (NAS/IOM, 2003)," but those non-essential benefits are not considered under the Framework.  *Framework for Metals Risk Assessment* at 4-16; *see also* Table 6-3.  The *Framework* does not employ a general cost/benefit analysis.[3]

c.     Conclusion

Accordingly, the Court **GRANTS** Plaintiffs' First Motion *in Limine*.  However, the Court notes that it will still permit EPA to challenge Plaintiffs' experts on the topic of benefits, to the extent those experts wrote extensively about benefits in their expert reports for the limited purpose of challenging the credibility of these expert reports.  However, since this is a collateral matter, any such inquiry will be limited.

2.     Second Motion *in Limine* to Exclude Any Evidence in Support of a Deferral of Rulemaking Under 15 U.S.C. § 2620(b)(4)(B)(ii) (Docket No. 145)

In the event that the Court finds that fluoridation chemicals pose an unreasonable risk of injury to health, the Court must "order the Administrator to initiate the action requested by the petitioner."  15 U.S.C. § 2620(b)(4)(B).  However, Section 21 of TSCA contains a provision that affords the Court some leeway in ordering that action.  Specifically, Section 21 enables to the Court to "permit the Administrator to defer initiating the action requested by the petitioner until such time as the court prescribes" if it finds "[1] that the extent of the risk to health or the

---

[3] The EPA concedes that fluoride is not an essential substance.  In his deposition, Edward Ohanian (EPA's 30(b)(6) representative) was asked: "I understand you believe there's a benefit to ingesting fluoride, but EPA recognizes that fluoride is not an essential nutrient, correct?"  To which he answered: "That's right."  *See* Exhibit 3 (Deposition of Edward Ohanian) to Plaintiff's First Motion *in Limine*, Docket No. 144.  EPA's assertion that "fluoride is essential to the prevention of dental caries" does not establish that fluoride is "an essential nutrient" in the way that term is used in the *Framework*.

United States District Court
Northern District of California

1    environment alleged by the petitioner is less than the extent of risks to health or the environment

2    with respect to which the Administrator is taking action under this chapter *and* [2] there are

3    insufficient resources available to the Administrator to take the action requested by the petitioner."

4    *Id.* (emphasis added).

5         Here, the parties appear to be in agreement that no evidence regarding deferral of

6    rulemaking should be permitted at this time.  *See generally* Plaintiffs' Second Motion *in Limine*

7    ("Second Motion *in Limine* to Exclude Any Evidence in Support of a Deferral of Rulemaking

8    Under 15 U.S.C. § 2620(b)(4)(B)(ii)") (hereinafter PMIL 2), Docket No. 145; *see also*

9    Defendants' Opposition to Plaintiffs' Motion *in Limine* No. 2 (hereinafter PMIL 2 Opp.) at 2

10   ("[W]hether rulemaking should be deferred is not ripe for inquiry until the Court determines the

11   extent of risk, if any, posed by adding fluoridation chemicals to drinking water."), Docket No.

12   145.

13        EPA's proposal to postpone a determination about whether EPA will be permitted to defer

14   rulemaking makes imminent sense.  There is little reason to address this issue prior to a finding by

15   the Court that an unreasonable risk exists.  And the relevant inquiries (into the resources available

16   at EPA and into the other substances the Administrator is currently acting upon) may very well

17   continue to change during the time when this Court is adjudicating the issue of unreasonable risk.

18   As stated at the hearing, the Court does not intend—should this issue become relevant—to

19   preclude EPA from introducing evidence that the Agency should be permitted to defer rulemaking.

20   At the appropriate time, the Court will make the requisite inquiry into whether Plaintiffs' have

21   been prejudiced by EPA's conduct in not timely disclosing evidence on this issue.  Absent a

22   showing of irreparable prejudice, the Court contemplates that Plaintiffs would likely be entitled to

23   a rapid disclosure process and an opportunity to take depositions prior to that stage of litigation.

24        Accordingly, the Court **GRANTS** Plaintiffs' Second Motion *in Limine* to the extent that—

25   at this stage—evidence related to the deferral of rulemaking will be excluded from trial.  However,

26   if the Court determines that fluoridation chemicals pose an unreasonable risk of injury to health,

27   the EPA may be permitted to present evidence on that issue at a subsequent proceeding if

28   appropriate.

United States District Court
Northern District of California

15

B.      Defendants' Motions *in Limine*

      1.      First Motion *in Limine* to Exclude or Limit the Testimony of Philippe Grandjean

          (Docket No. 139)

Through their First Motion *in Limine*, Defendants seek to limit or exclude the testimony of Dr. Philippe Grandjean.  *See* Defendants' First Motion *in Limine* ("DMIL 1"), Docket No. 139. They do so pursuant to Federal Rule of Evidence 702, on the grounds that "Dr. Grandjean relies entirely on his experience as the basis for his opinions but cannot explain how that experience is a sufficient basis or how it is reliably applied to the facts."  *Id.* at 1 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)).  Dr. Grandjean is a physician and environmental epidemiologist; according to Plaintiffs' Expert Disclosure, he will testify (consistent with his expert report) that "(1) the neurotoxicity of fluoride is supported by studies of occupationally exposed workers, laboratory animals, and communities exposed to elevated levels of fluoride in water and polluted air; (2) recent prospective cohort studies of prenatal fluoride exposure and IQ, funded by the National Institutes of Health, are high quality studies that leave little doubt that developmental neurotoxicity is a serious risk associated with elevated fluoride exposure; (3) fluoridated drinking water is associated with IQ losses that are substantial and of economic and societal concern; and (4) application of the benchmark dose (BMD) method to the new prospective data shows that the levels of fluoride added to water in fluoridation programs exceed the science-based limit needed to protect against developmental neurotoxicity."  *See* Exhibit D (Expert Disclosures) to DMIL 4, Docket No. 142.

Defendants contend that, through his expert report, Dr. Grandjean offers two opinions, which they challenge: "(1) that recent studies on IQ deficits in children studied in birth cohorts in Mexico City and Canada permit a calculation of a benchmark dose ('BMD'), . . . and (2) that recent prospective studies of birth cohorts in Mexico City and Canada support that there is a risk of developmental neurotoxicity from fluoride exposure at levels that occur widely in North America."  DMIL 1 at 1.  However, they allege that "Dr. Grandjean failed to rely on any stated principles or methods to support his opinions regarding the underlying science in his reports. Instead, as he testified at his deposition, he relied entirely on his scientific experience to support

16

1    those opinions." *Id.* (citing Grandjean Dep. 116:3–5 (Sept. 13, 2019), Ex. B ("I have a reasonable

2    experience so that I can judge the quality and the reliability, the weight of the evidence.")).

3                    a.    The BMD Calculation in His Opening Report

4            A benchmark dose ("BMD") is one approach that can be used to determine a substance's

5    point of departure, which can then be used to derive a reference dose.  Dr. Grandjean provided a

6    BMD in his expert report, but rather than performing the BMD calculation himself, he asked the

7    "chairman of biostatistics [to] be responsible for the calculations because he is a world expert on

8    benchmark dose."  *See* Exh. B (Deposition of Dr. Phillip Grandjean) to DMIL at 94–95, Docket

9    No. 139.  Dr. Grandjean also stated: "I wouldn't trust myself [to do the calculation]."  *Id.*

10   Pursuant to Federal Rule of Evidence 702, EPA now seeks to exclude Dr. Grandjean's testimony

11   on the topic of the BMD calculation because it contends that "Dr. Grandjean . . . conceded at his

12   deposition that calculating a BMD is outside the scope of his expertise."  DMIL 1 at 2.  EPA

13   argues he is therefore "not qualified to offer testimony regarding the BMD analysis described in

14   his expert report."  *Id.*

15           Defendants' BMD argument is premised on the fact that Rule 702 requires that an expert

16   be "qualified as an expert by knowledge, skill, experience, training, or education."  *Id.* (quoting

17   Fed. R. Evid. 702).  EPA argues that Dr. Granjean's deposition indicates that he lacks

18   "knowledge, skill, experience, training, or education" as it relates to BMD calculations and

19   therefore that he should not be permitted to testify regarding the BMD calculation in his report.

20   Plaintiffs make several points in response: First, in 1999, the EPA hired Dr. Grandjean to assist the

21   Agency in determining a new reference dose for methylmercury, a project for which he did the

22   same type of BMD calculation that EPA now seeks to exclude.  Plaintiffs' Opposition to

23   Defendants' First Motion *in Limine* ("DMIL 1 Opp.") at 1–2, Docket No. 139.  The Agency then

24   utilized "Dr. Grandjean's BMD analysis as the basis for the new dose."  *Id.*  Second, Plaintiffs also

25   note that Dr. Grandjean explained during his deposition: "I can do them [BMD calculations], and I

26   know how to do it. The formula is here. So it's easy to do."  *Id.*  Plaintiffs also submitted a

27   declaration from Dr. Grandjean in which he discussed having approximately 20 years of

28   experience doing BMD analysis.  *See* Exh. 2 (Declaration of Philippe Grandjean, MD, DMSc) to

United States District Court
Northern District of California

17

1    DMIL 1 Opp., Docket No. 139.  Dr. Grandjean has the "knowledge, skill, experience, training, or

2    education" necessary to qualify as an expert on BMD calculations and therefore that he is

3    qualified to offer testimony on the BMD calculation in his expert report.

4           As to his methodology, Plaintiffs have pointed to instances in which Dr. Grandjean

5    discussed his BMD methodologies in his expert report.  Plaintiffs noted that Dr. Grandjean

6    professed to have utilized the same BMD techniques he used in the methylmercury analysis he did

7    for the EPA in 1999.  That is sufficient disclosure of methodology.  In addition, an expert is

8    permitted to "rely on the opinions of other experts." *Calva-Cerqueira v. United States*, 281 F.

9    Supp. 2d 279, 300 (D.D.C. 2003); *see also* Fed. R. Evid. 703 (permitting an expert to rely on

10   another expert's opinion "[i]f experts in the particular field would reasonably rely on those kinds

11   of facts or data in forming an opinion on the subject").  Thus, as Plaintiffs contend, "rely[ing] on

12   biostatisticians to do statistical calculations" is "standard practice for epidemiologists," and the

13   BMD calculation in Dr. Grandjean's report is "precisely the type of 'facts and data' that FRE 703

14   permits an expert to rely upon."  DMIL 1 Opp. at 1.

15          Accordingly, as noted at the hearing, the Court finds that Dr. Grandjean has sufficient

16   knowledge and has disclosed sufficient information about his methodologies related to the BMD

17   calculation to satisfy *Daubert*.  However, should it become clear on cross examination that Dr.

18   Grandjean does not meet the *Daubert* standard as to the BMD calculation, EPA will be permitted

19   to renew its motion and the Court will exclude his testimony on this topic.

20                    b.       The Generalizability of Recent Studies to the U.S. Population

21          Defendants also contend that "Dr. Grandjean's conclusion that studies conducted in birth

22   cohorts in Mexico City and Canada are generalizable to the U.S. population is not 'the product of

23   reliable principles and methods.'"  DMIL 1 at 3 (quoting Fed. R. Evid. 702(c)).  More specifically,

24   Plaintiffs contend that "Dr. Grandjean assumes without explanation that the total exposure to

25   fluoride observed in studies conducted in Mexico City and Canada is comparable to the U.S.

26   population."  *Id.* (citing Grandjean Report at 42 ("assuming that the U.S. population in fluoridated

27   areas have similar urine-fluoride concentrations as Canadians")).  Likewise, they argue that "the

28   scientific community has rejected making the same assumption that Dr. Grandjean offers" and

United States District Court
Northern District of California

18

"some of the studies that Dr. Grandjean relied upon specifically acknowledge limitations in the data that prevent extrapolating the results to other populations." *Id.*[4]

However, Dr. Grandjean—in both his original and his supplemental expert reports— mentions a study done by researchers at UC San Francisco that examined urine-fluoride concentrations for pregnant women across California; the findings of that study permit a comparison (albeit a limited one) between populations in the United States and populations in Mexico and Canada. In addition, Plaintiffs also note that Dr. Grandjean provided extensive discussion of large-scale studies in the United States, which found that the fluoride in urine generally mirrors the fluoride in water, which aligns with the findings from the Canadian MIREC studies. In addition to relying on the UCSF study, Dr. Grandjean also relied on the results of those large-scale urinary fluoride studies to draw inferences about whether generalization from the Canada and Mexico studies was permissible. Here, too, the Court finds that these disclosures and the methodology to justify generalization of the studies satisfy *Daubert*. Any deficiencies therein or challenges thereto go to the weight of the testimony.

Accordingly, Defendants' First Motion *in Limine* is **DENIED.**

2.    Second Motion *in Limine* to Exclude Howard Hu and Bruce Lanphear (Docket No. 140)

In Defendants' Second Motion *in Limine*, EPA seeks to "exclude the summaries and proposed testimony of Dr. Howard Hu and Dr. Bruce Lanphear." Defendants' Second Motion *in Limine* ("DMIL 2") at 1, Docket No. 140. They contend that the testimony that Dr. Hu and Dr. Lanphear intend to offer pertains to "the design, conduct, and findings of studies on which they were [each] a co-author" and that such testimony "is irrelevant, needlessly cumulative, and unfairly prejudicial." *Id.* Furthermore, where that testimony extends beyond the scope of the doctors' studies, Defendants contend that no principles or methods have been offered that would

---

[4] *See, e.g.*, Bashash (2017) ([O]ur ability to extrapolate our results to how exposures may impact on the general population is limited given the lack of data on fluoride pharmacokinetics during pregnancy. There are no reference values for urinary fluoride in pregnant women in the United States."); Bashash (2018) ("Therefore, while urinary fluoride is a valid biomarker to identify differences in exposure levels in pregnant women, it is not possible, with the currently available data, to estimate how concentration levels relate to intake.").

United States District Court
Northern District of California

allow the Court to assess the reliability of such an opinion.  *Id.*

        a.     Summaries of and Testimony Regarding the Design, Conduct, and Findings of Dr. Hu's and Dr. Lanphear's Studies

      With respect to the allegedly cumulative testimony, EPA contends that "Dr. Hu's and Dr. Lanphear's testimony is expected to reprise the design and findings of a small number of studies they co-authored.  Those studies are already before the Court, and the parties' retained experts reviewed and considered the studies in forming their opinions."  *Id.*  Specifically, Dr. Hu will address three papers that he co-authored stemming from research in the ELEMENT project in Mexico; Dr. Lanphear will address three papers that he co-authored stemming from the MIREC project in Canada.  *Id.*  Those papers relate to early-life fluoride exposure.  *Id.*  However, as explained at the hearing, particularly in light of the facts that this is a bench trial and that the Court has imposed strict time limits on testimony, the Court is less concerned about excluding evidence that might be cumulative.  If a party devotes its precious time to presenting evidence that is cumulative in nature, that will be to the detriment of that party's case overall; as such, the Court declines to exclude the testimony of Dr. Hu and Dr. Lanphear on the grounds that it is unnecessarily cumulative.

        b.     Opinions Extending Beyond the Scope of Dr. Hu's and Dr. Lanphear's Studies

      EPA also argues that opinions offered by Dr. Hu and Dr. Lanphear that extend beyond the scope of the studies they conducted should be excluded.  DMIL 2 at 1.  As to Dr. Hu, this includes testimony that his studies of populations in Mexico City are "consistent with and support the conclusion that fluoride is a development neurotoxicant at levels of exposure seen in the general population of the USA."  *Id.* at 1–2.  As to Dr. Lanphear, this includes testimony that "he recommends 'for pregnant women to begin taking steps to reduce their fluoride intake, including but not limited to reducing their consumption of fluoridated water."  *Id.* at 2.

      With respect to Dr. Hu, EPA contends that there is "no basis either in Dr. Hu's summaries or deposition testimony from which the Court can determine that his generalizability opinion is reliable."  *Id.* at 5.  It is true that his studies explicitly state that data that would permit

United States District Court
Northern District of California

United States District Court
Northern District of California

extrapolation to the United States was unavailable at the time the studies were published.  *Id.* (citing Bashash 2017 at 11 ("[O]ur ability to extrapolate our results to how exposures may impact on the general population is limited given the lack of data on fluoride pharmacokinetics during pregnancy. There are no reference values for urinary fluoride in pregnant women in the United States."); Bashash 2018 at 664 ("[W]hile urinary fluoride is a valid biomarker to identify differences in exposure levels in pregnant women, it is not possible, with the currently available data, to estimate how concentration levels relate to intake.")).

However, in Dr. Hu's supplemental disclosure, he provides information about why he believes the findings of the MIREC and ELEMENT studies are applicable to the United States: namely "[t]he MIREC cohort included pregnant women from across Canada of which about 40% lived in communities with fluoridated water at a concentration of about 0.6 mg/L, slightly less than the concentration currently used in most fluoridated communities in the USA, which is 0.7 mg/L."  *See* Exh. C (Supplemental Disclosure of Dr. Howard Hu) to DMIL 2, Docket No. 140.  At the hearing, the Court inquired into the basis of Dr. Hu's assertions about generalizability and his methodology.  In response, Plaintiffs asserted that Dr. Hu discussed his methodology at his deposition, where he noted that the key comparison is the internalized dose (as represented by urinary levels) because that shows how much fluoride is circulating in the body; Plaintiffs also asserted that Dr. Hu further explained that he compared urinary fluoride levels between Mexico and Canada and between Canada and the United States, which permitted him to make inferences between the three populations.  (Plaintiffs conceded that Dr. Hu had not reviewed the UCSF study that looked at urinary fluoride levels of women in California.)  The Court **DENIES** EPA's Second Motion *in Limine* as it relates to Dr. Hu's testimony regarding generalizability; however, the Court remains open to renewing a *Daubert* challenge if it becomes clear that there is no sufficient basis for his testimony.

With respect to Dr. Lanphear, EPA contends that he "offers no principle or method from which the Court can determine whether his recommendation that pregnant women should reduce their intake of fluoridated water is reliable."  DMIL 2 at 6.  Instead, EPA argues that his recommendation "is a thinly veiled attempt to enter an opinion regarding risk without actually

21

conducting a risk assessment." *Id.*  Plaintiffs respond that there is no need for Dr. Lanphear to conduct a risk assessment before offering an opinion on risk; they add that his "opinions were formed entirely independent of this litigation" and that his advice "is the kind of practical, informed opinion that doctors have to make in the real world to navigate the intersection between science and clinical practice."  DMIL 2 Opp. at 7.  For his part, Dr. Lanphear explains his opinion as follows: "Based on the convergent results from the MIREC and ELEMENT cohorts, the *in utero* period appears to be a susceptible period of life vis-à-vis fluoride toxicity.  In light of these findings, I believe it is advisable and prudent for pregnant women to begin taking steps to reduce their fluoride intake, including but not limited to reducing their consumption of fluoridated water." *See* Exh. B (Expert Report of Bruce Lanphear, MD, MPH), Docket No. 140.

At the hearing, the Court explained that Dr. Lanphear would be permitted to testify as to the scientific findings that Dr. Lanphear has made in his studies, but he is not permitted to testify as to his opinion that pregnant women should avoid fluoridated water.  That conclusion is not relevant or helpful to the question whether fluoridation of water presents an unreasonable risk under TSCA.  Accordingly, the Court **DENIES** EPA's Second Motion in Limine to the extent it seeks to exclude Dr. Lanphear's testimony as to the findings of his studies; however, the Court **PROHIBITS** Dr. Lanphear from testifying as to his conclusion that pregnant women should avoid drinking fluoridated water.

      3.      Third Motion *in Limine* to Exclude the Draft National Toxicology Program Monograph (Docket No. 141, *see also* Docket No. 167)

On May 1, 2020, Plaintiffs filed a notice withdrawing opposition to EPA's Third Motion *in Limine*.  *See* Docket No. 182.  In that notice Plaintiffs note: "Plaintiffs reserve the right to inquire about the NTP Draft Monograph on cross-examination." *Id.* at 1.  Accordingly, EPA's Third Motion *in Limine* is **DENIED** as moot.

      4.      Fourth Motion *in Limine* to Exclude Irrelevant Evidence on Alternatives to Fluoridated Water and Cumulative Testimony on Lack of Benefits (Docket No. 142)

Because the Court has granted Plaintiffs' First Motion in Limine and disallowed the

United States District Court
Northern District of California

1    presentation of evidence related to fluoride's benefits, EPA's Fourth Motion in Limine is

2    **DENIED** as moot.  This is because Plaintiffs only intended to introduce evidence regarding

3    alternatives to water fluoridation is evidence of benefits was permitted.  *See* Plaintiffs' Opposition

4    to Defendants' Fourth Motion *in Limine* ("DMIL 4 Opp.") at 4, Docket No. 142.

5              5.        Fifth Motion *in Limine* to Exclude Toxicological Reviews and Draft Risk

6                        Evaluations (Docket No. 143; Docket No. 162)

7          A few days prior to the hearing, EPA indicated that it was withdrawing its Fifth Motion *in

8    Limine*.  *See* Docket No. 188.  However, it noted that "[w]hile [the Agency was] withdrawing its

9    relevance objections to the Draft Risk Evaluations, EPA maintains its hearsay objections and its

10   objections based on the draft/proposed nature of the documents."  *Id.* at 2.  Nonetheless, at the

11   hearing, EPA indicated that it had no objections to these exhibits.  Plaintiffs inquired as to whether

12   that included the draft risk evaluations conducted under TSCA, and EPA responded that it has no

13   objection to the draft risk evaluations listed on the exhibit list.  Accordingly, EPA's Fifth Motion

14   *in Limine* is **DENIED** as moot.  As noted in the Court's order relating to the parties' bellwether

15   evidentiary objections, Plaintiffs are reminded that –to the extent they seek to introduce evidence

16   that evinces EPA practices, methodologies, and/or aspects of how EPA has carried out its duties

17   under TSCA—they must identify with precision only the pertinent portion of any such document,

18   together with sufficient context to demonstrate that the statement has not been taken out of

19   context.

20                               **IV.        WITNESSES**

21         The parties have submitted the following list of witnesses (*see* Docket No. 151); the Court

22   notes that—given its determination that evidence regarding benefits has been disallowed—these

23   lists are likely to change.  It therefore **ORDERS** the parties to submit updated witness lists within

24   two days of the filing of this order:

25   A.   Plaintiffs' Witnesses (as anticipated in view of the Court's ruling)

26              Expert Witnesses

27              1.   **Philippe Grandjean, MD, DMSc**, is an expert in environmental epidemiology at

28                   Harvard School of Public Health.

United States District Court
Northern District of California

United States District Court
Northern District of California

2. **Howard Hu, MD, MPH, ScD**, is an expert in the field of environmental medicine, epidemiology, and general public health.

3. **Bruce Lanphear, MD, MPH**, is a clinician scientist and epidemiologist who is an expert on the impact of environmental chemicals on children's health.

4. **Kathleen Thiessen, PhD** is a risk assessment scientist at the Oak Ridge Center for Risk Analysis.

Fact Witnesses

5. **Casey Hannan, MPH**. Mr. Hannan is CDC's 30(b)(6) representative in this litigation regarding CDC's position on certain matters related to fluoride and health.

6. **Linda Birnbaum, PhD**, is the recently retired director of the National Institute of Environmental Health Sciences (NIEHS).

7. **Kristina Thayer, PhD**. Dr. Thayer is expected to testify regarding principles of EPA risk assessment, the findings of NTP's 2016 systematic review on fluoride neurotoxicity in animals, and her own assessment of the fluoride literature.

8. **Joyce Donohue, PhD**. Dr. Donohue is the lead scientist on fluoride issues at EPA's Office of Water.

9. **Amanda Phelka, PhD**, is the 30(b)(6) representative of NSF International, Inc. (NSF) the private organization that certifies the safety of water treatment chemicals in the United States, including fluoridation chemicals.

B.      Defendants' Witnesses

Expert Witnesses

1. **Ellen T. Chang, Sc.D.**, Principal Scientist at Exponent is an expert in epidemiology.

2. **Tala Henry, PhD**, is a toxicologist with over twenty-five years of technical and managerial experience at EPA.

3. **Joyce Tsuji, Ph.D., DABT, Fellow ATS, Principal Scientist at Exponent**, is an expert in toxicology.

Fact Witnesses

4. **Kristina Thayer, Ph.D.**, is the Director of EPA's Integrated Risk Information System (IRIS) Division.

5. **Julie Simms** (Plaintiff) by deposition.

6. **Audrey Adams** (Plaintiff) by deposition.

7. **Casey Hannan, MPH**. If evidence concerning the position of CDC is proffered, Mr. Hannan, CDC's 30(b)(6) representative can testify to CDC's long-standing support of community water fluoridation.

8. **Any Plaintiff and Standing Witness**.[5]

## V.   EXHIBITS

A.   Exhibit List

The parties first submitted a list identifying 344 proposed exhibits and the parties' objections thereto.  *See* Docket No. 159-1.  However, after a productive meet-and-confer process, the parties submitted an updated exhibit list with only 104 exhibits.  *See* Docket No. 184-1.  The Court understands that the parties are continuing to meet and confer in an effort to reach further stipulations.  The Court has directed the parties to submit paper copies of the Exhibits to the Court by May 20, 2020.  *See* Docket No. 177.  All Exhibits shall also be provided to the Court in an electronic format.  (Exhibits shall be provided to the Court in two formats: one set of exhibits shall be organized by binder for each witness; one set shall be a complete set of exhibits.)

Pursuant to the Court's order on April 24, 2020, the parties identified and submitted fifteen bellwether exhibit objections for which they seek a ruling.  *See* Docket Nos. 183, 185.  The Court noted that it will not allow the admission of expert reports through direct testimony, although it will permit the admission of CVs in order to save time.  *Id.*  The Court issued a ruling on these

---

[5] The parties agree that "EPA will remove Dr. Robert Carton, PhD., from its list of potential witnesses to be called at trial" and that "Plaintiffs will not elicit or introduce any testimony or evidence, including but not limited to, any witness testimony on direct or cross examination, appearing live or by deposition, or any exhibit, demonstrative, or written discovery, concerning or relating to the EPA Professional Union, including the Union's activities concerning the Safe Drinking Water Act standards or the practice of community water fluoridation in the United States."  If Plaintiffs introduce such evidence, EPA will be permitted to call Dr. Carton.  *See* Docket No. 149.

United States District Court
Northern District of California

1    bellwether objections after the Final Pretrial Conference on May 8.  *See* Docket No. 191.  The

2    parties were directed to meet and confer to resolve remaining evidentiary objections.  To the

3    extent that any objections cannot be resolved through the parties' meet-and-confer process, the

4    Court will address outstanding objections at the hearing schedule for June 5, 2020.  The parties

5    must identify any unresolved objections by May 27, 2020.  The Court implores the parties to do

6    what they can to resolve all evidentiary objections without the assistance of the Court.

7    B.    Objections to Discovery

8          Together with their Joint Pretrial Conference Statement, the parties submitted an appendix

9    of discovery responses.  *See* Docket No. 150-1.  That document raises several additional

10   objections.  The first four can be resolved fairly easily:

11   - EPA's Objection to Plaintiffs' Written Discovery Designation No. 5 (EPA's

12     Response to Plaintiffs' Second Interrogatory) – this objection pertained to the same

13     subject as EPA's Fifth Motion *in Limine*, and as noted above, EPA has withdrawn

14     its relevancy objections to these documents.  *See* Docket No. 188.

15   - EPA's Objection to Plaintiffs' Written Discovery Designation Nos. 1 to 3 and 6 to

16     12 (EPA's Response to Plaintiffs' Sixth, Eleventh, and Twelfth Interrogatories and

17     Requests for Admission #9–13 and #15–16) – this objection pertains to

18     interrogatories and requests for admission requesting that EPA identify or admit

19     that it is not aware of any "primary studies" related to the safety of fluoride for

20     certain populations.  *See* Docket No. 150-1 at 124.  EPA first argues that the

21     definition of "Primary Study" is vague and ambiguous, but Plaintiffs' definition

22     ("PRIMARY STUDIES means studies that collect or generate new data. By way of

23     example, a study that measures fluoride exposure and IQ in a group of children and

24     analyzes the relationship between fluoride exposure and IQ in said children is a

25     primary study. By contrast, a document which simply reviews, critiques, and/or

26     provides an opinion about existing studies on fluoride and IQ is not a primary

27     study.") is adequate to notify EPA of the relevant studies.  EPA next argues that the

28     Agency would be required "to conduct an exhaustive search," but the requests are

1   limited to identifying studies "that EPA is aware of"; thus, this objection is

2   baseless.  Lastly, EPA contends that Plaintiffs are "attempt[ing] to shift their

3   burden of proof."  However, in light of the fact that this is a bench trial and the

4   Court is cognizant of who bears the burden of proof, the Court is not overly

5   concerned about this possibility.  Nonetheless, the Court **OVERRULES** EPA's

6   objection.

7   • EPA's Objection to [Joyce] Donohue Deposition Designations – This issue also

8   arose in the context of EPA's objections to Exhibits 29 and 30.  In that instance, the

9   Court directed the parties to meet and confer to see if they could agree to further

10  stipulations.  *See* Docket No. 191.  Here, EPA objects to the inclusion of this

11  testimony on the grounds that it violates the parties' stipulation in which "Plaintiffs

12  agreed and stipulated not to elicit or introduce any testimony or evidence, including

13  but not limited to, any witness testimony on direct or cross examination, appearing

14  live or by deposition, or any exhibit, demonstrative, or written discovery,

15  concerning or relating to EPA's Maximum Containment Level ('MCL') and

16  Maximum Containment Level Goal ('MCLG') and EPA's 2010 reference dose for

17  fluoride," which are determined pursuant to the Safe Drinking Water Act

18  ("SDWA").  *See* Docket No. 150-1 at 125.  Plaintiffs contend that "EPA is

19  extending the stipulation beyond the context in which it arose" because the

20  stipulation was limited to testimony regarding the SDWA and did not include

21  testimony about *all* safety standards.  *Id.* at 126.  As with Exhibits 29 and 30, the

22  Court directs the parties to meet and confer to see if they can resolve this objection.

23  If they cannot, the parties should include this objection in the list of unresolved

24  objections to be filed with the Court by May 27, 2020.

25  • EPA's Objection to [Amanda] Phelka Deposition Designations – EPA objects to

26  the testimony of NSF International ("NSF"), which is represented by Amanda

27  Phelka, in its entirety.  *See id.* at 127.  (Because the designation of Ms. Phelka was

28  made after the deadline for serving Motions *in Limine*, the parties agreed that

27

objections to her testimony would be made through their joint memorandum.)  The focus of Plaintiffs' deposition of Ms. Phelka focuses almost entirely on the fact that NSF has never conducted a "toxicological evaluation of fluoride" or a "risk assessment of fluoride."  *Id.* at 70–76.  Consequently, EPA reiterates its position that this evidence "seeks to shift Plaintiffs' burden of proof" and that "EPA is not required to demonstrate the absence of a risk."  *Id.* at 127.  The Court **OVERRULES** EPA's objection.

In addition, to the above objections, EPA has also raised two additional objections that require more detailed discussion.  First, EPA objects to parts of Julie Simms's deposition testimony ("EPA's Objection to [Julie] Simms Deposition Designations") (although the objection encompasses two documents as well).  Within that objection, EPA first objects to the testimony in which Ms. Simms "states what she believes her doctors to have told her."  *Id.* at 128.  The statements at issue with respect to this objection are:

> **41:23–42:3**: . . . mean, in some cases, like the doctor saying have you thought about red wine, but yes, it's also self-reporting.  I reported I got headaches from my wine.  She said maybe you shouldn't drink it.  It might trigger your headaches or is triggering headaches, yes.

> **42:10–42:13**: . . . she said oh, okay, so fluoride is a trigger. And I thought well, yeah, that's the trigger, that's right.

> **49:14–22:** My medical doctor, Dr. Davison, agreed with my belief -- well, she agreed with my reporting of fluoride, water fluoridation chemicals causing migraines as she noted when I saw her at the next visit, that my migraines were good and gone enough that I was no longer taking any medication.  So I don't take any headache medication after many, many years of taking meds.  So I believe she believed also that I had found a remedy in fluoride.

> **104:11–12:** . . . I can recall my doctor saying, that you don't just get a general headache.  You're getting migraines.

*Id.* 78–80.  Plaintiffs argue that the objection to Ms. Simms's testimony about Dr. Davison's comments should be overruled because (1) EPA "opened the door to the issues by asking the questions," and (2) "excluding this testimony while allowing EPA to introduce testimony to suggest the diagnosis is without any medical support, would create an incomplete and misleading

picture as to the credibility of Ms. Simms' injury." *Id.* at 128.  Because Ms. Simms's testimony as

to Dr. Davison's comments is intended to counter the contention that her "diagnosis is without any

medical support," it appears that these statements are offered for "the truth of the matter asserted"

and are hearsay.  Without an exception to the prohibition against hearsay, these statements must be

excluded; the EPA's objection is **SUSTAINED** as to Ms. Simms' statements regarding what Dr.

Davison told her.

      In addition to objecting to the admissibility of Ms. Simms's statements regarding what she

believes Dr. Davison told her, EPA also objects to her "discussion of her doctor's notes and the

notes themselves, which are hearsay for the same reason." *Id.*  In Ms. Simms's statements

describing chart notes written by Dr. Davison and a letter written by her pain management doctor

(Dr. Joel Konikow) (*see* Docket No. 150-1 at 80–85), Ms. Simms generally describes the contents

of those documents, which focus on her history of migraines, her symptoms, and the prescriptions

that she has taken.  *Id.* at 80–85.

      Turning first to Ms. Simms's testimony regarding Dr. Davison's chart notes and the chart

notes themselves, Plaintiffs contend that "the objection violates the parties' stipulation on

standing.  These written notes were attached as exhibits to Ms. Simms' declaration, and pursuant

to the parties' stipulation, EPA agreed to forego making evidentiary objections thereto." *Id.*  In

relevant part, the parties' stipulation on standing says:

> The Parties agree and stipulate that Julie Simms will rely
> exclusively on her declaration . . . and certain excerpts from her
> deposition testimony, to establish the factual basis in support of her
> claim of standing. . . . The Parties agree and stipulate that the
> respective declarations or excerpts of deposition transcripts
> [submitted by Julie Simms] will be submitted to the Court, without
> objection, in lieu of live direct testimony, as evidence in support of
> Plaintiffs' claims of standing at trial. . . . Notwithstanding the
> stipulations herein, EPA is not waiving, and expressly reserves, its
> right to make evidentiary objections as to the deposition exhibits.

Docket No. 102.  Plaintiffs note that "[t]he one, and **only**, exception that EPA carved out for itself

is that . . . it reserved the 'right to make evidentiary objections as to the **deposition exhibits**.'  The

stipulation provides no such exception for **declaration exhibits**." Docket No. 150-1 at 129

(emphasis in original).  As a result, Plaintiffs contend that because the chart notes were attached to

Ms. Simms's *declaration*, not to her *deposition*, EPA waived any objections as to the documents themselves or Ms. Simms's testimony regarding them.

It does appear that EPA limited its right to object to only deposition exhibits through the parties' stipulation, thereby foreclosing other objections, such as the one raised here.  EPA seems to come close to admitting as much where it notes: "At least one exhibit attached to the declaration is also a deposition exhibit . . . ." *Id.*  Whether so intended or not, the face of the stipulation is unambiguous.  As a result, the Court **OVERRULES** EPA's objection as to Ms. Simms's testimony regarding Dr. Davison's chart notes and **OVERRULES** its objection as to the notes contained in Exhibit 61.  However, the Court **SUSTAINS** the EPA's objection to the chart notes that were also attached to Ms. Simms's deposition as Exhibit 63 (since such an objection appears to have been permitted by the parties' stipulation, which allowed for objections to exhibits attached to depositions); that document is hearsay.

Turning next to Ms. Simms's testimony about Dr. Konikow's letter, Plaintiffs first clarify that the letter itself "was not attached as an exhibit to Ms. Simms's declaration." *Id.* at 128.  With respect to Ms. Simms's testimony regarding the letter, Plaintiffs contend that the testimony "is Ms. Simms's own recollection, and is thus based on first-hand personal knowledge, not hearsay." *Id.* In that testimony, Plaintiffs' counsel elicits testimony about the contents of that letter as it related to Ms. Simms's symptoms, their frequency, and various medications that she tried, as well as whether those medications were successful; however, counsel also elicits testimony about Ms. Simms's own recollection of her symptoms. *Id.* at 82–84.  Thus, Ms. Simms's deposition testimony contains both statements about the contents of a letter from one of her doctors, and her own statements about what her symptoms were at various points and what treatments she sought (and whether such treatments are effective).  Any statements that Ms. Simms made about the contents of the letter written by Dr. Konikow which are offered to show that Ms. Simms's experienced particular symptoms or tried particular treatments are hearsay and are **EXCLUDED**. However, any testimony that Ms. Simms offered that was based on first-hand personal knowledge will be permitted.  For example, Ms. Simms testified that the letter stated: "Julie currently takes nortriptyline 75 milligrams for headache prevention with questionable efficacy."  That statement

1    would be excluded as hearsay.  However, she also answered "Yes" to the question "So you

2    experimented it appears with a number of different pharmaceuticals for headaches and

3    migraines?" and "No" to "And did any of them provide you sustaining significant relief from your

4    symptoms?"  *See id.* at 83.  To the extent that those statements reflect Ms. Simms' own

5    recollection and not the contents of her doctor's letter, they would be permitted, and EPA's

6    objection is **OVERRULED**.

7           Finally, EPA objects to several exhibits attached to the declarations of Julie Simms and

8    Audrey Adams ("EPA's Objection to Declaration of Julie Simms; Declaration of Audrey

9    Adams").  *See id.* at p. 128–30. This objection overlaps somewhat with the previous one, as it also

10   addresses the medical records attached (as Exhibits E and F) to Declaration of Julie Simms.

11   Because those documents have already been addressed above, only the conclusion is repeated here

12   for clarity's sake: With respect to Exhibit F (chart notes from Dr. Davison), EPA did not waive its

13   right to object to that Exhibit through the parties' stipulation on standing because it was also

14   attached as Exhibit 63 to Ms. Simms's deposition; that document is inadmissible hearsay and does

15   not come in through any of the exceptions to the prohibition against hearsay.  With respect to

16   Exhibit E (more chart notes from Dr. Davison), it appears that EPA waived its right to object to

17   that Exhibit because the parties' stipulation on standing does not permit objections to documents

18   attached to declarations.

19          With respect to the Declaration of Audrey Adams, EPA objects to five of the documents

20   attached thereto.  *See id.* at 129–30.  One is a doctor's note stating that Ms. Adams's son, Kyle,

21   has a "well documented sensitivity" to fluoride; one is a collection of after-visit summaries noting

22   an intolerance to "FLORIDE" [sic]; one is a letter from a naturopathic doctor, who attests to

23   treating Kyle for "autism and fluoride sensitivity; one is a letter from that same naturopathic

24   doctor recommending that Kyle "avoid fluoride"; and the last one is an appointment summary

25   from the naturopathic doctor directing Kyle to "make sure to drink filtered water."  *See* Docket

26   No. 100-7.  Although these documents would be inadmissible as hearsay, the stipulation prohibits

27   EPA from objecting to documents that have not been attached to depositions.  Because these

28   documents are attached to declarations only, the EPA has waived its right to object to them.  Thus,

1    the Court **OVERRULES** EPA's objection.

2         This order disposes of Docket Nos. 139, 140, 141, 142, 143, 144, 145, and 150-1.

3

4         **IT IS SO ORDERED**.

5

6    Dated: May 19, 2020

7

8    _____

9                               EDWARD M. CHEN
                                United States District Judge