1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

FOOD & WATER WATCH, INC., et al.,

        Plaintiffs,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

        Defendants.

Case No. 3:17-cv-02162 EMC

**TRIAL DECLARATION OF TALA HENRY**

**TABLE OF CONTENTS**

I.      Dr. Henry's Qualifications. ........................................................................................3

II.     Focus of Dr. Henry's Opinions in this Case. ............................................................5

III.    Summary of Dr. HENRY's Opinions. ......................................................................5

IV.     Declaration Structure. ..............................................................................................6

V.      Background on TSCA and the 2016 Amendments. ...................................................7

VI.     Plaintiff's Petition. ...................................................................................................10

VII.    Risk Assessment. .....................................................................................................12

VIII.   Risk Evaluation. ......................................................................................................14

IX.     Agency Guidance Documents ..................................................................................17

X.      Risk Evaluation Steps. ............................................................................................18

        A.      Scope. ............................................................................................................18

        B.      Hazard Assessment. ......................................................................................20

        C.      Exposure Assessment ....................................................................................29

                1. Explanation of Exposure and Dose Terms ..............................................29

                2. Dr. Thiesseu's Exposure Assessment Methodology .................................30

                3. Dr. Grandjean's Statements on Exposure. ...............................................31

        D.      Risk Characterization. ...................................................................................31

                1. Dr. Thiessen's Inappropriate Application of Risk Characterization Methodology. ....32

                2. Dr. Grandjean's Risk Characterization. ..................................................34

        E.      Risk Determination. ......................................................................................35

XI.     Conclusions ..............................................................................................................36

1.     I, Tala R. Henry, Ph.D., submit the following declaration in support of my testimony at trial in the above-referenced case:

**I.     DR. HENRY'S QUALIFICATIONS.**

2.     I am a toxicologist and risk assessor with over 25 years of technical and managerial experience at the United States Environmental Protection Agency (Hereinafter "EPA" or "the Agency"). During my 25 years at EPA, I have provided toxicology and risk assessment expertise and guidance, led development of both science policy and regulatory policy, and provided program development, management, and oversight to multiple chemical management programs across EPA, with other federal agencies, and in several international fora.

3.     I am currently the Deputy Director for Programs within the Agency's Office of Pollution Preventions and Toxics ("OPPT"). This is a career Senior Executive Service position within EPA. With the Office Director, I lead and direct OPPT in developing and implementing both scientific and policy approaches for conducting risk evaluation and risk management activities mandated by the Toxic Substances Control Act ("TSCA") and its implementing regulations.

4.     For example, I provide executive leadership for the implementation of new chemical review provisions of TSCA. As such, I direct and oversee development or modification of technical methods, science policy supporting risk evaluations and policy and procedures for risk management under TSCA.

5.     Previously, I served as Director of the Risk Assessment Division (hereinafter "RAD") within OPPT. In this position, I directed and oversaw the Division's risk assessment and risk evaluation efforts, including development of scopes, hazard assessments, exposure assessments, and risk assessments/evaluations for new and existing chemical substances under TSCA.

6.     In June 2016, TSCA was amended. These amendments imposed numerous new assessment requirements, enforceable deadlines, and scientific standards that must be met in conducting risk evaluations under TSCA. In the first year of implementation, I directed and oversaw the Division's work to meet statutory deadlines, to identify and publish scopes for the

first 10 chemical risk evaluations under the amended TSCA section 6, assess approximately 290 new chemicals under TSCA section 5, and develop guidance to assist interested persons in developing and submitting draft risk evaluations which shall be considered by the Administrator. In addition, I directed and oversaw technical support analyses to support EPA's development of risk management regulations for chemical substances.

7.      Before becoming Director of the RAD, I was Director of the National Program Chemicals Division ("NPCD") within OPPT. In this position, I directed and oversaw the Division's efforts to develop both regulatory (*i.e.*, rulemaking) and non-regulatory risk management approaches for managing risks of chemicals of high priority to the Agency. Each of these risk management activities relied on underlying technical support analyses, which I also was responsible to understand and review for their scientific quality and applicability or relevance for supporting risk management decisions and regulations under TSCA.

8.      From 2004-2012, I served on EPA's Risk Assessment Forum ("RAF"), a standing committee of senior EPA scientists established to promote Agency-wide consensus on difficult and controversial risk assessment issues and to ensure that this consensus is incorporated into appropriate Agency risk assessment guidance. The RAF assembles Agency risk assessment experts in a formal process to study and report on a range of issues from an Agency-wide scientific perspective. Major RAF guidance documents are developed in accordance with the Agency's regulatory and policy development process and become Agency policy upon approval by EPA's Science Advisor. RAF products include: risk assessment guidelines, technical panel reports on special risk assessment issues, and peer consultation and peer review workshops addressing controversial risk assessment topics.

9.      I have served on editorial boards of several scientific journals and as a technical reviewer for several more. I have been a contributing author of numerous peer-reviewed EPA reports related to conducting chemical risk assessments. I have published peer-reviewed scientific literature on chemical toxicology, chemical risk assessment, application of toxicology and risk assessment within a regulatory context, and assessing and improving the reliability and relevance of scientific studies for regulatory decision-making.

4

10.     Trial Exhibit 511 is a true and correct copy of my curriculum vitae ("CV").

11.     Since submitting my CV in this matter, I have published a peer-reviewed scientific article on improving the usability of ecotoxicology in regulatory decision-making. *Improving Environmental Risk Assessments of Chemicals: Steps Towards Evidence-based Ecotoxicology*. *Environ Internat* 128: 210–217.

**II.     FOCUS OF DR. HENRY'S OPINIONS IN THIS CASE.**

12.     Counsel for EPA asked me to provide expert opinions on EPA's implementation of the 2016 TSCA amendments, risk evaluation guidance and principles, risk assessment, and toxicology.

13.     I am offering an expert opinion in response to the expert opinion offered by Dr. Kathleen Thiessen on the application of methods for conducting risk assessments.

14.     I am offering an expert opinion in response to the expert opinions offered by Dr. Kathleen Thiessen and Dr. Phillipe Grandjean making conclusions regarding the risk posed by exposure to fluoride through community water fluoridation programs.

15.     I reviewed, among other things, the reports of Plaintiffs' designated experts Philippe Grandjean and Kathleen M. Thiessen and the reports of EPA's designated experts Dr. Joyce Tsuji and Dr. Ellen Chang regarding the alleged unreasonable risk of neurotoxicity posed by community water fluoridation in the United States.

16.     In arriving at my conclusions, I applied my extensive experience and expertise in scientific and policy approaches for conducting risk assessment for public policy decision making.

**III.     SUMMARY OF OPINIONS.**

17.     Because neither Dr. Thiessen nor Dr. Grandjean evaluated the scientific evidence according to accepted scientific methodologies, their analyses cannot be relied upon to reach conclusions concerning the risks posed from community water fluoridation.

18.      Because neither Dr. Thiessen nor Dr. Grandjean evaluated the scientific evidence according to the procedures and scientific standards required under TSCA, their analysis cannot be relied upon to inform risk management options under TSCA.

19.     In relying upon my review of the analysis conducted by Dr. Tsuji and Dr. Chang, I

concluded that there are very few studies of high quality to assess neurotoxic effects in developing animals or humans, especially at exposure levels near 0.7 milligrams of fluoride per liter (mg/L), the recommended level for community water fluoridation in the United States. On that basis, I further conclude that there is inadequate evidence to identify neurotoxic effects as a hazard of community water fluoridation.

## IV.    DECLARATION STRUCTURE

20.     This declaration is structured to demonstrate how OPPT achieves its statutory mandates, within the context of Plaintiffs' TSCA section 21 petition and this litigation.

21.     *First*, I provide the Court with a brief background on OPPT's implementation of the 2016 TSCA amendments to demonstrate the reasonableness of OPPT's handling of the Plaintiffs' petition and to explain EPA's rationale for declining to conduct a risk evaluation in response to this litigation.

22.     *Second*, I provide the Court with a brief background on how the science of risk assessment informs public policy in the area of environmental public health to highlight the importance of each risk assessment step to risk-based decision making.

23.     *Third*, I explain the Congressional mandates imposed on EPA to ensure that risk-based decision making for the regulation of chemical substances and mixtures in commerce under TSCA are based on the most up-to-date scientific developments or understandings with respect to information sources, technical procedures, measures, methods, protocols, methodologies, or models.

24.     *Fourth*, I discuss Plaintiffs' inability to meet their burden of demonstrating unreasonable risk posed by the practice of community water fluoridation due to critical omissions in the methodologies employed to assess risk.

25.     A key theme throughout my declaration is the adherence to four principles: transparency, clarity, consistency, and reasonableness.

i.   Transparency provides explicitness in the risk assessment process. It ensures that any reader understands all the steps, logic, key assumptions, limitations, and decisions in the risk assessment, and comprehends the supporting rationale that leads to the outcome.

ii.   Clarity makes the assessment easy to understand by all readers inside and outside of the risk assessment process.

iii.   Consistency provides a context for the reader and refers to the presentation of the material in the risk assessment. For example, are the conclusions of the risk assessment characterized in harmony with relevant policy, procedural guidance, and scientific rationales and if not, why the conclusions differ. However, consistency should not encourage blindly following the procedural guidance for risk assessment and characterization.

iv.   Reasonableness refers to the findings of the risk assessment in the context of the state-of-the science, the default assumptions, and the scientific judgment made in the risk assessment. It demonstrates that the risk assessment process followed an acceptable, overt logic path and retained common sense in applying relevant guidance. The assessment is based on sound judgment.

## V.   BACKGROUND ON TSCA AND THE 2016 AMENDMENTS.

26.   TSCA is the primary chemicals management law in the United States and was enacted to help ensure the protection of health and the environment against unreasonable risks of injury from chemical substances. Within EPA, the responsibilities for implementing this law belong to OPPT within the Office of Chemical Safety and Pollution Prevention. My responsibilities as Deputy Director for Programs in OPPT require me to interpret and implement the provisions of TSCA consistent with Congressional intent.

27.   On June 22, 2016, the Frank R. Lautenberg Chemical Safety for the 21st Century Act (Pub. L. 114-182) was signed into law. It included substantial changes to EPA's authorities and responsibilities under TSCA. These amendments – including new mandatory deadlines for EPA to evaluate chemical substances; a risk-based standard for addressing unreasonable risks of injury to health or the environment; increased transparency for chemical information; new and

expanded information gathering authorities; and the authority to collect fees from chemical manufacturers to help defray the costs of implementation – have necessitated substantial changes within OPPT and require significant time, effort, and resources to implement.

28.     OPPT's work under TSCA can broadly be divided into two areas: (1) new chemical substances (*i.e.,* those chemicals that are not yet in commerce and not listed on the TSCA inventory) under section 5; and (2) existing chemicals (*i.e.,* those chemicals that are in commerce and listed on the TSCA inventory) under section 6.

29.     With respect to existing chemicals, the changes to section 6 of TSCA were substantial. A defining feature of the amended TSCA is the requirement that EPA must now systematically prioritize and review tens of thousands of existing chemical substances in commerce and manage unreasonable risks where identified.

30.     Section 6's scheme is divided into three parts: prioritization, risk evaluation, and risk management. EPA must complete each action within specific timeframes.

31.     Prioritization is a nine to twelve-month screening review and public comment process to designate a chemical substance as either high- or low-priority substance for risk evaluation. Pursuant to a Congressional mandate, EPA was initially required to prioritize a minimum of 40 chemical substance (20 high-priority and 20 low-priority substances).

32.     High-priority substances will immediately enter the risk evaluation phase. Once initiated, EPA has 3 years to complete the final risk evaluation, with a possible extension not to exceed 6 months. The risk evaluation phase includes several requirements with statutorily or regulatory defined milestones and timeframes.

33.     *First*, EPA must publish a draft "scope" document that includes, amongst other information, the hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations the Administrator expects to consider in the risk evaluation. EPA has committed to taking public comment on the draft scope of each evaluation for 45 days. EPA must then compile and consider the input received from the public and stakeholders and make any adjustments to the scope based on that input prior to publishing the final scope document no later than six months after initiation of the risk evaluation phase.

34.     *Next*, EPA must develop, publish, and solicit public comment, as per 40 C.F.R. 702.49(a), for no less than 60 days, on a draft risk evaluation. Furthermore, EPA has committed, as described in 40 CFR 702.45, to submit the draft risk evaluation to an independent scientific peer review prior to finalizing risk evaluations. To date, EPA has met this commitment using the Scientific Advisory Committee on Chemicals—chartered per the requirements of TSCA section 26(o).

35.     Upon completion of a risk evaluation, EPA must have another chemical substance ready to designate as a high-priority substance, such that there will always be at least 20 risk evaluations ongoing at any given time.

36.     *Finally*, once a determination of unreasonable risk of injury to health or the environment is made, EPA must manage those risks through rulemaking. The Agency must propose a rule under section 6(a) within 1 year after the date on which the final risk evaluation is published and a final rule within 2 years after the date on which the final risk evaluation is published.

37.     These requirements effectively create a continuous pipeline for existing chemical review and management, intended to drive steady forward progress in assessing existing chemical substances left largely unaddressed by the original law.

38.     Following the 2016 TSCA amendments, OPPT spent a good portion of the first two years developing the framework rules, policies, procedures, and guidance to implement its new responsibilities related to existing chemical substances, including rules for how the Agency will prioritize chemicals, conduct risk evaluations, and a reporting rule related to whether substances on the TSCA Inventory are still active in commerce. At the same time, EPA was required to begin the risk evaluation process for 10 chemical substances, while also conducting the scientific analyses and gathering the documentation needed to prioritize 20 additional high-priority candidate substances for risk evaluation and to designate an additional 20 chemicals as low-priority substances.

39.     While OPPT has in the past conducted a few existing chemical risk assessments under TSCA, the volume of ongoing and expected future work is unprecedented. For example,

1  when I first became the Director of RAD, OPPT was conducting risk assessments for just 5 existing

2  chemical substances.

3  **VI.    PLAINTIFFS' PETITION.**

4        40.    In November 2016, Plaintiffs petitioned EPA under TSCA section 21 to ban the

5  purposeful addition of fluoridation chemicals into drinking water.

6        41.    After careful consideration OPPT denied the petition in February 2017 on the

7  grounds that, among other deficiencies, the petition itself did not set forth facts demonstrating that

8  the use of fluoridation chemicals in drinking water presents an unreasonable risk to health or the

9  environment.

10        42.    As one of the primary authors of the response to the petition, much of the technical

11  basis for EPA's response to the petition reflect my expert opinion regarding approaches and

12  methods used in applying scientific evidence within the context of EPA's risk assessment guidance

13  for supporting regulatory decision-making.

14        43.    In my expert opinion, one of the greatest shortcomings of the petition is that it

15  ignored a number of basic data quality issues associated with the studies it relied on and did not

16  properly account for the relatively poor quality of the exposure and effects data in the cited human

17  studies (*e.g.,* it appears to give all studies equivalent weight, regardless of their quality).

18        44.    In my opinion, the expert analysis of Dr. Chang and Dr. Tsuji support EPA's

19  analysis and conclusions in its response to Plaintiffs' petition. The expert reports of Dr. Chang and

20  Dr. Tsuji also provide a detailed review of the studies on neurotoxicity that have been published

21  since EPA responded to the petition.

22        45.    EPA has not conducted a risk evaluation for fluoridation chemicals either in

23  response to Plaintiffs section 21 petition or in response to this litigation.

i.      *First*, OPPT simply does not have the resources to conduct risk evaluations in response to section 21 petitions while also meeting the demands of implementing amended TSCA;

ii.     *Second*, doing so would effectively allow any petitioner to disrupt the statutory scheme for prioritization; and

iii.    *Third*, in my opinion, OPPT correctly interprets TSCA section 21 as requiring a petitioner to present a scientific basis for section 6(a) rules that is reasonably comparable, in its quality and scope, to an EPA risk evaluation under TSCA section 6(b).

46.     OPPT could not conduct the necessary level of analyses to inform risk management decisions within the 90 day period required by Congress to grant or deny a petition. Yet sections 6(a) and 6(c)(3) require EPA to promulgate a final rule that is informed and justified by the process for conducting risk evaluations. Additionally, TSCA section 26(l)(5) directs EPA to develop guidance to assist interested persons (hereafter referred to as "external parties") in developing and submitting draft risk evaluations, including the quality of the information and the process to be followed in developing draft risk evaluations. I am not aware of any statutory mechanism for external parties to submit draft risk evaluations for consideration by EPA, other than citizen petitions submitted under section 21 or included as part of a submission for a manufacturer requested risk evaluation.

47.     In responding to the Plaintiffs' petition and after reviewing the Complaint and expert reports in this litigation, I understand that Plaintiffs allege that the artificial fluoridation of drinking water supplies presents an unreasonable risk of neurotoxic injury to children.

48.     Fluoridation chemicals are added to community water systems for the purpose of achieving a water fluoride concentration that the U.S. Public Health Service (PHS) recommends as optimal for dental caries prevention.  For community water systems that add fluoride to their water, PHS recommends a fluoride concentration of 0.7 mg/L to maintain caries prevention benefits and reduce the risk of dental fluorosis.

49.     Exhibit 516 is a true and correct copy of 80 Fed. Reg. 24936 (May 1, 2015), *Public Health Service Recommendation for Fluoride Concentration in Drinking Water for the Prevention of Dental Caries*.

50.     Thus, although not clearly identified by Plaintiffs as such, it is my expert opinion that the applicable condition of use for fluoride in commerce is the purposeful addition of fluoridation chemicals to drinking water at the concentration recommended as optimal for dental caries prevention (currently 0.7 mg/L).

51.     In my expert opinion, for chemical substances that have beneficial health effects, such as fluoridation chemicals, consideration of those effects should be included as part of the risk evaluation. To date, EPA has yet to conduct a TSCA risk evaluation on a chemical substance that has direct biological health benefits.

52.     In my expert opinion, Plaintiffs have failed to provide a credible scientific basis to support a finding of unreasonable risk of injury to human health or the environment posed by the practice of community water fluoridation due to critical limitations in the methodologies employed to assess risk, including but not limited to, their failure to demonstrate transparency, clarity, consistency, and reasonableness in assembling the relevant information, evaluating the information for quality and relevance, and synthesizing and integrating the different streams of evidence to support their conclusions.

53.     Moreover, if the Court were to make a finding of unreasonable risk in the absence of a process that employs the most up-to-date scientific developments or understandings in risk assessment or their inappropriate application, OPPT risk managers will not have the necessary information to properly inform and justify risk management options under TSCA.

## VII.     RISK ASSESSMENT.

54.     EPA has been using risk assessments since its inception. The purpose of risk assessment in the risk management and public policy context is to provide the best possible scientific characterization of human health and/or environmental risk, based on a rigorous analysis of reasonably available information and knowledge.

55.     In my experience, changes in legislation as well as in science have shaped the evolution of requirements for conducting risk assessments to support regulation at EPA. The current methods and approaches of risk assessment, both across EPA and as articulated in TSCA, have been built upon decades of expert development, scientific peer review, refinement, and

scientific advances.

56.     In developing and refining risk assessment processes, frameworks, and guidance documents, EPA has incorporated recommendations from expert technical panels, internal and external peer reviews, and a number of influential reports from the National Academy of Sciences (NAS) National Research Council (NRC).

57.     Specifically, in 1983, the NAS published *Risk Assessment in the Federal Government: Managing the Process*. In this groundbreaking report, the NRC defined the risk assessment paradigm to include: hazard identification, dose-response assessment, exposure assessment, and risk characterization.

58.     EPA has integrated the principles of risk assessment from this groundbreaking report into its practices to this day. In 1984, EPA published *Risk Assessment and Management: Framework for Decision Making*, which emphasizes the principles of transparency through descriptions of the assessment's strengths and weaknesses and providing for plausible alternatives within the assessment.

59.     EPA's 1992 *Framework for Ecological Risk Assessment* and the 1998 *Guidelines for Ecological Risk Assessment* introduced the concept of the Problem Formulation step in risk assessment. The Problem Formulation step establishes the goals, breadth, and focus of the assessment. It is the systematic planning step that identifies the major factors to be considered in a particular assessment, and it is linked to the regulatory and policy context of the assessment. The outcome of problem formulation is a conceptual model that describes how a stressor may affect exposure and an analysis plan describing the data required and the methodologies that will be used to analyze the data. Problem formulation, as described in these EPA documents are analogous to the requirements of the *Scope* for a TSCA risk evaluation.

60.     Over time, the NAS expanded its risk assessment principles in a series of subsequent reports, including *Science and Judgement in Risk Assessment* (1994) and *Understanding Risk: Informing Decisions in a Democratic Society* (1996). Included in these reports, NAS placed equal emphasis on fully characterizing the scope, uncertainties, limitations, and strengths of the assessment.

1    61.    In 2009, NRC published *Science and Decisions: Advancing Risk Assessment*. This

2  report recommends the use of a framework that "maximizes the utility of risk assessment," with a

3  focus on assuring that risk assessments are well-tailored to the problems and decisions at hand so

4  that they can inform the decision-making process most meaningfully. Risk assessment is not an

5  end in itself, but a means to develop policies that make the best use of resources to protect the

6  health of the public.

7    62.    In 2014, EPA answered this charge by developing a *Framework for Human Health

8  *Risk Assessment to Inform Decision Making*. This Framework introduces the concept of "fit for

9  purpose" risk assessments that are designed to maximize the utility of risk assessments for their

10  intended purpose of informing risk-based decision making.

11    63.    Exhibit 544 is a true and correct copy of EPA's *Framework for Human Health Risk

12  *Assessment to Inform Decision Making*.

13    64.    Beginning in 2011, the NRC began working with EPA's IRIS program to examine

14  the state of the science of systematic review methodology to improve approaches for evidence

15  identification, evidence evaluation, evidence integration, and advances in quantitative methods.

16  The NRC has encouraged EPA to integrate systematic review into its risk assessment processes to

17  enhance the transparency of scientific literature review that support chemical specific risk

18  assessments to inform regulatory decision making.

19    65.    In 2018, EPA issued a document entitled *Application of Systematic Review in TSCA

20  *Risk Evaluations* setting out the general principles to guide EPA's application of systematic review

21  in the risk evaluation process under TSCA.

22    66.    In my expert opinion, risk assessment is the most widely accepted scientific

23  methodology for characterizing the nature and magnitude of health risks to humans from chemical

24  contaminants in the environment. Systematic review is the most up-to-date method for increasing

25  the transparency and rigor of the risk assessment by using pre-specified methods for integrating

26  and assessing evidence of risk.

27  **VIII.   RISK EVALUATION.**

28    67.    Environmental statutes often detail the kinds of information, analyses, and formal

documentation required in the rule-making record and the 2016 TSCA amendments included quite a few details that have and continue to influence the content and practice of developing risk assessments at EPA.

68.     But, as with many other environmental statutes, not all terms and procedures are defined. The term risk assessment appears in TSCA when describing actions taken prior to the 2016 amendments, but the statute does not provide an in-depth explanation of the process for conducting one. Instead, Congress directed that EPA shall establish, by rule, a process to conduct risk evaluations.

69.     In TSCA section 6(b)(4)(F), Congress enumerated the minimum components of risk evaluation including by description the scientifically accepted tenets of risk assessment, amongst other requirements. Further, the end purpose of a risk evaluation is to determine whether a substance presents an unreasonable risk of injury to health or the environment. Thus, risk evaluation requires a step beyond the customary components of a risk assessment to include a "risk determination," that is, an ultimate determination of whether a chemical substance presents unreasonable risk of injury to health or the environment under the conditions of use.

70.     The traditional components of the risk assessment paradigm together with a risk determination constitute a risk evaluation under TSCA.

71.     Additionally, Congress included in amended TSCA a requirement that decisions based on science, made under TSCA sections 4, 5, and 6, must be based on the "weight of the scientific evidence," section 26(i), 15 U.S.C. § 2625(i), and the science be employed in a manner consistent with the "best available science," section 26(h), 15 U.S.C. § 2625(h).

72.     As enumerated in the text of TSCA section 26(h), TSCA's new scientific standards are not limited to the best available and most current scientific information but also mandates consideration of: (1) whether the analyses are consistent with the intended use of the information/data; (2) the extent that the information is relevant to the risk evaluation; (3) how clear and complete the information/data and analyses are; and (4) the extent that the uncertainty of the information/data and associated analyses are evaluated and characterized.

73.     Although not defined in the statute, weight of the scientific evidence is not a new

1  concept. Weight of the scientific evidence is used to describe the process of evidence synthesis
2  and integration to reach conclusions. However, compared to traditional narrative reviews,
3  systematic review is aimed at minimizing subjectivity and enhancing transparency, rigor, and
4  consistency in the way weight of the scientific evidence is conducted and reported by using pre-
5  specified methods for integrating and assessing different streams of data (*i.e.*, animal, human,
6  mechanistic). The use of systematic review in risk evaluation is supported by the Senate
7  Congressional Record, which describes the term "weight of evidence" as systematic review
8  method that uses a pre-established protocol to evaluate each stream of evidence and to integrate
9  evidence as necessary and appropriate based upon strengths, limitations, and relevance.

10  74.  Pursuant to these Congressional mandates, EPA promulgated *Procedures for*
11  *Chemical Risk Evaluation Under the Amended Toxic Substances Control Act* ("Risk Evaluation
12  Rule" or "the Rule") identifying the components of the risk evaluation process including: scope,
13  hazard assessment, exposure assessment, risk characterization, and finally, a risk determination.

14  75.  Thus, consistent with the statutory scheme, the Risk Evaluation Rule couples the
15  scientifically accepted tenets of risk assessment with a final risk determination as the basis for
16  determining whether a chemical substance presents an unreasonable risk of injury to health or the
17  environment under the conditions of use. The Rule incorporates TSCA's new scientific standards
18  related to "best available science" and "weight of the scientific evidence."

19  76.  The Rule defines "best available science" as science that is reliable and unbiased.

20  77.  The Rule also explains that "weight of the scientific evidence" is a systematic
21  review method, applied in an integrative and interpretive process that requires more than simply
22  tallying the number of positive and negative studies. The Rule identifies certain principles of
23  weight of the scientific evidence that are universal, including a general process for assembling the
24  relevant information, evaluating the information for quality and relevance, and synthesizing and
25  integrating the different lines of evidence to support conclusions. Finally, the Rule's definition of
26  weight of the scientific evidence is taken directly from TSCA's legislative history.

27  78.  The Risk Evaluation Rule was subject to extensive public comment prior to being
28  finalized.

## IX.     AGENCY GUIDANCE DOCUMENTS.

79.     EPA has a number of existing guidance documents that inform risk assessment. A collection is available to the public on EPA's Web site.

80.     While recognizing that the existing guidance is relevant and available for use in conducting a risk evaluation under TSCA, EPA is not required to use any specific guidance to ensure that there is flexibility in each risk evaluation based on the specific circumstances surrounding the chemical being assessed.

81.     This is consistent with EPA's long-standing approach in publishing risk assessment guidance to (1) recognize that new scientific data, methods and models continuously become available; (2) not be overly prescriptive regarding applications of specific methods or models; and (3) advise risk assessors not to apply default assumptions indiscriminately, but rather to first consider all available mechanistic and pharmacokinetic data in order to determine whether default assumptions and/or uncertainty factors need be applied, and if so, whether they should be adjusted from the default value.

82.     The 1998 Guidelines for Neurotoxicity Risk Assessment ("1998 Guidelines") set forth the scientific thinking and approaches for conducting and evaluating neurotoxic risk. The 1998 Guidelines expressly recognize that the risk-assessment practices in each of the Agency's program offices are grounded in the policies and procedures established in the enabling legislation. Further, they emphasize that risk assessments must be conducted on a case-by-case basis such that experts study scientific information on each chemical under review and use the most scientifically appropriate interpretation to assess risk. The Guidelines also stress that this information will be fully presented in Agency risk assessment documents, and that Agency scientists will identify the strengths and weaknesses of each assessment by describing uncertainties, assumptions, and limitations, as well as the scientific basis and rationale for each assessment.

83.     As described in the Risk Evaluation Rule, when conducting risk evaluations, EPA will take advantage of existing guidance, tools, models and/or approaches that are relevant and available for use in conducting a risk evaluation under TSCA as long as they are consistent with the various requirements of section 26 of TSCA, including conforming to the best available science

1   and weight of the evidence requirements.

2          84.     The *Guidance to Assist Interested Persons in Developing and Submitting Draft Risk*

3   *Evaluation Under the Toxic Substances Control Act* urges external parties to use systematic review

4   approaches when developing draft TSCA risk evaluations, including a pre-established systematic

5   review protocol as the beginning of the draft risk evaluation with pre-specified criteria for

6   identifying, selecting, assessing, and summarizing the findings of studies including strengths,

7   limitations, and relevance of each study, and how the evidence with be integrated.

8          85.     Trial Exhibit 538 is a true and correct copy of the *Guidance to Assist Interested*

9   *Persons in Developing and Submitting Draft Risk Evaluation Under the Toxic Substances Control*

10  *Act*.

11         86.     EPA's *Application of Systematic Review in TSCA Risk Evaluations* sets out general

12  principles intended to guide application of systematic review in the TSCA risk evaluation process.

13         87.     In summary, EPA has a long history and many examples of existing risk assessment

14  policies, procedures, and guidance that describe key analysis components of risk assessment

15  generally. Additionally, within 2 years of enactment of the TSCA amendments EPA published

16  numerous documents providing a roadmap for preparing draft risk evaluations that are "fit-for-

17  purpose" to support regulatory action under TSCA.

18         88.     These documents are not meant to replace scientific judgment, but are developed to

19  guide the basis for scientific judgments throughout the assessment process to demonstrate

20  transparency, clarity, consistency, and reasonableness in support of conclusions.

21  **X.      RISK EVALUATION STEPS.**

22         **A.      Scope.**

23         89.     Consistent with the emphasis of problem formulation principles in risk assessment,

24  the first step of a TSCA risk evaluation is the development of the scope.

25         90.     TSCA also includes an explicit requirement for EPA to publish the *scope* for any

26  risk evaluation it will conduct at section 6(b)(4)(D), 15 U.S.C. § 2605(b)(4)(D). The scope must

27  include the hazards, exposures, conditions of use, and the potentially exposed or susceptible

28  subpopulations expected to be considered.

91.     In scoping a draft risk evaluation, external parties should follow the principles and approaches laid out in the Risk Evaluation Rule (40 CFR Part 702) and the accompanying preamble.

92.     The Risk Evaluation Rule is consistent with EPA's risk assessment frameworks explaining that the outcome of problem formulation is a conceptual model and an analysis plan. Hence, problem formulation has essentially the same function as scoping under amended TSCA, thereby aligning the requirements of the scope for a TSCA risk evaluation with the components of a problem formulation in risk assessment. Thus, EPA guidance documents on problem formulation are relevant and useful to external parties in scoping draft risk evaluations.

93.     Scoping is intended to convey the assessor's expectations regarding the overall scope, level of detail, and approach for the risk evaluation. This initial planning effort is critical to developing clear objectives and assessment questions to support quantitative risk analyses, and to define the steps expected to take in the different components of the risk evaluation.

94.     The conceptual model describes the actual or predicted relationships between the chemical substance, the conditions of use, and the human receptors and identifies the human health hazard expected to be evaluated.

95.     The other important outcome of the scoping phase is an analysis plan to help shape the systematic review approaches and/or methods that will be used. Prior to conducting any evaluation, systematic review requires that the scope and focus of the topic is defined. The evaluation is then structured to answer these key questions that guide the systematic-review process for the literature search, study selection, data extraction, and synthesis. Thus, the analysis plan guides the basis for scientific judgments throughout the evaluation. To conduct systematic review in a logical and efficient manner, the scope of the risk assessment must be defined prior to beginning the assessment.

96.     Neither Dr. Thiessen nor Dr. Grandjean clearly defined the question being assessed or provided an analysis plan as part of their assessments. Consequently, both Dr. Thiessen and Dr. Grandjean have omitted a critical step for conducting risk assessment and for systematic review.

97.     In my opinion, this omission underlies many of the shortcomings in the subsequent

steps of their analysis. For example, while Dr. Thiessen's report discusses the potential neurotoxic effects, including IQ loss, from exposure to fluoride, based on animal toxicology studies, Dr. Grandjean reaches conclusions concerning the potential for neurodevelopmental and cognitive effects from exposure to fluoride, based on the available human epidemiological studies.

98.     Thus, although not explicitly stated in the petition, the Complaint, or the Plaintiffs' experts reports, I have to assume that the single condition of use identified in the complaint is the addition of fluoridation chemicals in public drinking water, the exposure being assessed is specifically and exclusively via drinking water, the hazard assessed is neurotoxicity, and children are a potentially exposed or susceptible subpopulation.

**B.     Hazard assessment.**

99.     Consistent with the NRC's risk assessment paradigm, and as expressly required in TSCA section 6(b)(4)(F), the second step of risk evaluation is a hazard assessment for the chemical substance under the conditions of use.

100.     A hazard assessment (also called effects assessment in some EPA guidance documents) identifies the types of adverse health or environmental effects or hazards that can be caused by exposure to the chemical substance in question, and characterizes the quality and weight of the evidence supporting this identification.

101.     The significant issues, strengths, and limitations of the data and the uncertainties that require consideration will be presented, and the major points of interpretation will be highlighted. Scientific judgment will be used at every step of the process and must be applied transparently, clearly documented, and to the extent possible, follow principles and procedures that are articulated prior to conducting the assessment.

102.     The principles of transparency require that external parties document all aspects of the human health hazard identification and dose-response assessments including, but not limited to, the following information: the individual and overall strengths and limitations of the hazard evidence, along with a discussion on the uncertainties, variability, degree of confidence, and underlying assumptions supporting the hazard values.

103.     Consistent with this approach, execution of systematic review should be applied to

hazard assessment across and within the multiple data streams (*e.g.*, human, animal, and cell-based studies) supporting the risk evaluations. Execution of a systematic review methodology for each step of the risk assessment process, across and within each stream of evidence requires that:

    i.    Data are collected under a defined literature search strategy that is developed to fit the needs of the different data streams supporting the risk evaluation;

    ii.    data are reviewed according to pre-determined inclusion and exclusion criteria to identify information potentially relevant for the risk evaluation process;

    iii.    quantitative and qualitative data or information are identified from each relevant data or information source and extracted using structured forms or templates; and

    iv.    the study quality of individual studies is assessed using the evaluation strategies, including pre-determined criteria, documented in the scoping stage;

104.    Data integration is the stage where the analysis, synthesis, and integration of multiple evidence streams takes place by considering quality, consistency, relevancy, coherence and biological plausibility within the context of the assessment question being evaluated.

105.    A hazard assessment includes two components: hazard identification and dose-response assessment.

**1.    Hazard Identification.**

106.    Hazard identification is the process of determining whether exposure to a chemical stressor can cause an increase in the incidence of specific adverse health or environmental effects.

107.    To presuppose a specific toxicity endpoint to the exclusion of all others is not consistent with conducting a hazard assessment of a chemical under TSCA. However, for the purpose of forming my opinion, I had to assume the hazard or outcome of interest is neurotoxic effects under a specific condition of use (community water fluoridation).

108.    The scientific strategies for assessing the quality of data sources use a structured framework with predefined criteria for each type of data source. The goal is to provide transparency and consistency to the evaluation process along with creating evaluation strategies that meet the TSCA science standards for various data streams.

109.    The general structure of the TSCA evaluation strategies is composed of evaluation

domains, metrics, and criteria. Evaluation domains represent general categories of attributes that are evaluated in each data source (e.g., test substance, test conditions, reliability, representativeness). Each domain contains a unique set of metrics, or sub-categories of attributes, intended to assess an aspect of the methodological conduct of the data/information source. Each metric specifies criteria expressing the relevant elements or conditions for assessing confidence that, along with professional judgement, will guide the identification of study strengths and limitations/deficiencies. Every study or data set is unique and therefore the individual metrics and domains may have various degrees of importance.

110.    The risk assessor documents concerns, uncertainties, strengths, limitations, deficiencies and any additional comments observed for each metric. Based on the strengths, limitations, and deficiencies of each data/information source, the risk assessor assigns a confidence level. The basis for the conclusion(s), recommendation(s), and any uncertainties are fully described and may ultimately be relied upon to inform risk management options under TSCA.

111.    Neither Dr. Thiessen nor Dr. Grandjean demonstrated pre-established criteria to guide a structured analysis of the identified data sources. Further, upon review of their expert reports, I cannot determine what criteria either designated expert employed to determine the strengths, limitations, and uncertainties associated with the reasonably available information within either the animal or human data streams. Further, Plaintiffs do not offer any attempt to synthesize and integrate the data streams in support of their conclusions on hazard identification.

112.    Because neither Dr. Thiessen nor Dr. Grandjean applied transparent criteria, their analyses are not credible sources of evidence for making conclusions regarding unreasonable risk and cannot be relied upon to inform risk management options under TSCA.

113.    In my opinion, in relying upon the transparency of Dr. Tsuji, Dr. Chang, and the NTP 2016 systematic evaluation of the reasonably available information, there are very few studies of high quality to assess neurotoxic effects in animals or humans, especially at exposure levels near 0.7 mg/L, the recommended level for community water fluoridation in the United States.

114.    Based on the strengths, limitations, and uncertainties reported by Dr. Tsuji and Dr. Chang, and the conclusion of the NTP 2016 systematic review demonstrating only a low level of

evidence of neurotoxic hazard, combined with the fact that most of the available data sources assess exposure to higher levels of fluoride than the fluoride concentrations achieved in community water fluoridation programs, it is my opinion that the overall poor quality of the reasonably available information weighs against reaching hazard identification conclusions for fluoride and neurotoxic effects under the condition of use described in the petition.  In other words, I conclude that there is inadequate evidence to link the exposure to fluoride under the condition of use of community water fluoridation with adverse neurotoxic effects.

115.    Where the scientific analysis is so uncertain that it cannot be relied upon to identify a hazard under the condition of use, there can be no scientific justification for regulating that use. That is the case here with regard to fluoridation chemicals. Additionally, the uncertainty carries forward to each subsequent step in the risk evaluation. In the absence of a hazard identification, additional information will not add to the certainty of the assessment and cannot be relied upon to inform risk management options.

### 2.    Dose-response Assessment.

116.    Once a hazard is identified, the dose-response assessment answers the question: how does the likelihood of the adverse response change as dose (or exposure) changes?

117.    For many chemicals, at low doses there may be no response. At some level of dose the responses begin to occur in a small fraction of the study population or at a low probability rate. Typically, as the dose increases, the measured response also increases.

118.    A necessary first step is the critical evaluation of all pertinent and relevant human and animal data that are available in the open literature to characterize the available database including its strengths and limitations and to document the dose-response relationship(s) over the range of observed doses. Thus, as with the previous steps of any risk assessment, systematic review is a critical methodology for characterizing the available data relevant for deriving dose estimates.

119.    Adequate human data are the most relevant for assessing risks to humans. When sufficient human data are available to describe the dose-response relationship for an adverse outcome, reference values should be based on human data.

120.    Once a study or group of studies is judged relevant for use in developing toxicity

values for each data set, a point-of-departure ("POD") dose is usually derived from the available database by one of two primary approaches—either the No-Observed-Adverse-Effect Level ("NOAEL") approach or the Benchmark dose ("BMD") modeling approach.

121.     Thus, the first step in developing toxicity values is identifying, for each data set, a point-of-departure (POD) dose.

122.     The application of the BMD approach involves dose-response modeling to obtain benchmark doses. BMD modeling is a highly technical exercise. The availability of software to facilitate the analysis can make the modeling appear deceptively simple, but often the application of the BMD approach and the interpretation of the results are not trivial.

123.     Because it is a more sophisticated analysis, the BMD approach is preferred, but if data are not amenable to dose response modeling, the NOAEL (or absent that, the Lowest-Observed-Adverse-Effect Level (LOAEL)) may then be used as the POD.

**3.     Dr. Thiessen's dose-response methodology.**

124.     Despite conceding that animal data would not be the preferred source for identifying a POD and then opining that the recent human epidemiological studies concerning fluoride are sufficient to establish a POD for fluoride neurotoxicity, Dr. Thiessen's dose-response analysis focused on deriving a range of POD values based on three LOAELs and two NOAELs derived from a number of animal studies.

125.     Dr. Thiessen's dose-response methodology is critically flawed for four reasons:

i.     Dr. Thiessen did not identify pre-established criteria to guide a structured analysis of the identified data sources to demonstrate the reasonableness and relevance of the key studies used to derive POD values;

ii.     Dr. Thiessen did not include an evaluation of the strengths, limitations, and uncertainties associated with the key studies used to derive POD values that can be carried forward to the risk characterization component of the assessment;

iii.     the assumptions, limitations, and uncertainties in the underlying animal studies makes those data unsuitable for establishing a POD for the reasons identified by Dr. Tsuji; and

iv.     based on Dr. Thiessen's own opinion that the recent human epidemiological studies concerning fluoride are sufficient for dose-response analysis, Dr. Thiessen's use of animal data is not consistent with the best available science.

### 4.  Dr. Grandjean's dose-response analysis.

126.  Dr. Grandjean's dose-response analysis focused on calculating benchmark doses (BMDs).

127.  The BMD approach was developed as an alternative to the NOAEL/LOAEL approach.

128.  BMD calculations are meant to provide an approximate threshold level which can be interpreted as a NOAEL. A BMD lower confidence limit ("BMDL") takes into account the uncertainty in the estimation of the relationship between dose and effect.

129.  BMD modeling, a process of fitting a model to dose–response data, estimates a POD that is associated with a predefined level of biological response (*i.e.*, the benchmark response (BMR)).

130.  EPA has published a *Benchmark Dose Technical Guidance* to provide guidance for the Agency and the outside community on consistent application of the BMD approach for deriving BMDs for a variety of uses, including the determination of PODs for different types of health effects data.  This guidance provides a step-by-step process to be used in evaluating studies and endpoint types that are suitable for modeling, selecting the benchmark response ("BMR") level, model fitting and BMD computation, judging the fit of the model, and calculating the BMDL.

131.  EPA's guidance document outlines a number of issues that need to be addressed to support consistent application of the BMD approach:

i.        determination of studies and endpoints on which to base BMD calculations;

ii.      selection of the benchmark response value;

iii.     choice of the model(s) to use in computing the BMD;

iv.     model fitting, assessment of model fit, and model comparison;

v.      computation of the confidence limit for the BMD (*i.e.*, the BMDL); and

vi.     reporting recommendations for the presentation of BMD and BMDL computations.

132.    A summary of EPA's guidance with regard to reporting is presented here as the basis for review of Dr. Grandjean's analysis. There is a section of EPA's guidance that is dedicated to reporting recommendations because a thorough justification of the choices made to support the chosen approach and values should be presented. For any computation of a BMD or BMDL, the following elements are recommended:

i.        study or studies selected for BMD calculation(s), including the rationale for study selection, rationale for selection of endpoints (effects) and a list of the dose-response data used;

ii.      dose-response model(s) chosen for each case, including rationale for the selection, the estimation procedure (e.g., maximum likelihood, least squares, generalized estimating equations), estimates of model parameters (*i.e.*, inputs to the modeling, Goodness-of fit (*e.g.*, chi-squared statistics), log-likelihood, and AIC and standardized residuals (observed minus predicted response/SE);

iii.     choice of BMR for each case, including the rationale for the choice and the procedure used if for continuous data;

iv.     computation of the BMD for each case;

v.      calculation of the lower confidence limit for the BMD (*i.e.*, the BMDL) for each case including the confidence limit procedure (*e.g.*, likelihood profile, delta method, bootstrap) and the BMDL value(s);

vi.     graphics for each case, including a plot of fitted dose-response curve with data points and error (SD) bars, plot of confidence limits for the fitted curve (optional, but if included,

the narrative describes the methods used to compute them) and identification of the BMD and BMDL;

vii.    BMDs and BMDLs for standardized BMRs (for comparisons) for (1) dichotomous data, the BMD and BMDL for an extra risk of 0.10; and (2) continuous data, the BMD and BMDL corresponding to a change in the mean response equal to 1 control SD from the control mean; and

viii.    BMDU (upper confidence limit for the BMD), depending on the application and feasibility of estimation.

133.    A BMD analysis intended to support regulatory decision-making under TSCA includes the aforementioned information in order to be applied in a manner consistent with best available science. This type of information is required for a transparent presentation and in order for a peer reviewer to reconstruct and evaluate the model output values.

134.    It is long-standing EPA practice for BMD analyses to include the information listed in its dose-response analyses. Recent draft TSCA Risk Evaluations include:

i.    the data set used for modeling;

ii.    the models evaluated;

iii.    the model selected with the best fit; and

iv.    the model fit criteria.

135.    All of the TSCA draft risk evaluations that have employed BMD analysis to date provide the information identified above in a supplemental file.

136.    Dr. Grandjean's BMD analysis, in both his original and supplemental reports is lacking the majority of the reporting elements recommended to accompany any BMD analysis.

137.    While Dr. Grandjean identified the studies he selected for his BMD analyses, he did not provide a list of the data used. Thus, a critical review of the BMD analysis is not possible based on the information provided in Dr. Grandjean's reports. Additionally, a critical review of the BMD analysis is also prohibited by my inability to access the raw data. In fact, Dr. Grandjean conceded the use of benchmark dose algorithms to estimate the approximate BMD and BMDL, rather than use of the raw data.

138.     In Dr. Grandjean's two BMD analyses, he vaguely describes, without citation, the dose-response model(s) chosen for each case, but does not provide the rationale for the selection, the estimation procedure (e.g., maximum likelihood, least squares, generalized estimating equations), estimates of model parameters (*i.e.*, inputs to the modeling, Goodness-of fit (e.g., chi-squared statistics), log-likelihood, or AIC and standardized residuals (observed minus predicted response/SE).

139.     Moreover, Dr. Grandjean's rationale for selection of BMR is flawed.   To extrapolate a recommendation to EPA by the Clean Air Scientific Advisory Committee (CASAC) considering the well- and long-established impact of lead on IQ, and studies that have quantified blood lead-IQ relationships for multiple study populations to the more limited evidence base for fluoride is not justified.  The CASAC opinion was based on (1) a well-established and robust measure of exposure (i.e., blood), (2) a very large data base of decades of studies, (3) datasets that reflect specific US population groups and for similar blood lead levels compare well across time, (4) rigorous analyses conducted using a variety of models and repeated peer review, and (5) well described variability and uncertainty. This contrasts sharply with the urine-fluoride IQ relationship which is based on (1) a highly variable measure of exposure, (2) a very small data base, (3) a database consisting of relatively small, non-US subpopulations at one time, (4) single analyses based on the data for one specific study population, and (5) little understanding of variability and narrow (within single-study) characterization of uncertainty.

140.     Because Dr. Grandjean presents BMDs without specifying the model(s) specified, it is not clear what the computation method(s) are. BMDLs are provided, but not the confidence limit procedures (*e.g.*, likelihood profile, delta method, bootstrap) by which they were calculated.

141.     No graphics illustrating the fitted (modeled) dose-response curves, data points, error (SD) bars are provided.

142.     Each of these reporting omissions alone, and, furthermore, in total, are not consistent with conducting a BMD analysis in a manner consistent with the best available science because without this data it is impossible for anyone to critically review the modeling approach or reproduce the modeling results.

143.     In summary, the numerous limitations associated with Dr. Grandjean's BMD assertions preclude the BMD estimates for use in supporting a conclusion of unreasonable risk and cannot be relied upon to inform risk management options.

**C.     Exposure Assessment.**

144.     Consistent with the NRC's risk assessment paradigm, and as described in TSCA section 6(b)(4)(F)(iv), the third step of risk evaluation requires an exposure assessment for the chemical substance under the conditions of use. Exposure assessment is the process of estimating or measuring the magnitude, frequency and duration of exposure to an agent and the size and characteristics of the population exposed.

145.     A credible exposure assessment, fit for the purpose of informing risk management decisions under TSCA, must include an integrative discussion based on the best available science and the weight of the evidence, including the strengths and limitations of the exposure evidence along with a discussion on the uncertainties, variability, degree of confidence, and underlying assumptions, including science policy assumptions, supporting the exposure estimates.

**1.     Explanation of Exposure and Dose Terms.**

146.     The term "exposure" means the contact between an agent and the external boundary (exposed surface) of person for a specific duration. The exposure point concentration is an estimate of exposure parameters in specific media (*e.g.*, air, water, sediment). A specific example of the exposure point concentration for fluoridation chemicals in water is the concentration expressed in mg/L.

147.     Ingestion exposure events usually are expressed in terms of an intake per event (*e.g.*, liter, L) times the frequency of ingestion event (*e.g.*, per day).

148.     The term "dose" refers to the amount of a chemical that enters a person after crossing an external exposure surface. A specific example of the unit measurement for "dose" to fluoridation chemicals is mg/day. The dose is almost also expressed on the basis of body weight, (*i.e.*, mg/kg/day).

149.     Depending on the purpose for which an exposure assessment will be used, the exposure assessment may provide an estimate of either exposure or dose. For example, a person

may be exposed to fluoride in water at an exposure point concentration expressed in milligrams of fluoride per liter (mg/L). If ingested, the ingestion exposure would be calculated as the exposure point concentration in milligrams of fluoride per liter of water (mg/L) times the ingestion rate in liters per day (L/day), to provide a dose of milligrams of fluoride per day (mg/day) or, when divided by body weight, would be milligrams of fluoride per kilogram of bodyweight per day (mg/kg-day).

### 2. Dr. Thiessen's exposure assessment methodology.

150. Dr. Thiessen's initial report includes estimated fluoride exposure, expressed as doses (mg/kg/day), at varied percentiles of consumption for certain subpopulations. These estimates were taken directly from the work done by the NRC in 2006, along with estimates from other studies, to summarize fluoride intake that would result from ingestion of community water for the mean, 90th, 95th, and 99th percentiles of consumption among these subpopulations.

151. Dr. Thiessen did not conduct a literature search to determine whether additional or newer data on fluoride exposures have become available since the 2006 report. Additionally, Dr. Thiessen did not provide evidence or discussion on the extent to which the variability and uncertainty in the information or the sources were evaluated and characterized.

152. Dr. Thiessen also did not explain the scientific rationale for her selection of particular ingestion rates for each of the subpopulations for which she estimated exposures. Without a rationale for selection of ingestions rates, there is no basis on which to determine whether her exposure estimates are reliable and unbiased.

153. Seven months after reading a summary of my opinions highlighting the omission of scientific information, protocols, and methodologies in a manner consistent with the best available science or weight of evidence (*e.g.*, lacked a documented literature search and evaluation of the full body of available data), Dr. Thiessen supplemented her report in an attempt to bolster her scientific judgment in relying on the NRC 2006 estimated fluoride intake.

154. Dr. Thiessen's second supplemental report includes estimated fluoride exposure estimates, expressed as doses (mg/kg/day), that she calculated assuming a fluoride exposure point concentration of 0.7 mg/L, which she multiplied by more recent water ingestion rates for a variety

of subpopulations taken from EPA's Exposure Factors Handbook (EFH). The fact that the most recent data reported in EPA's EFH was publicly available at the time of Dr. Thiessen's original report underscores the importance of conducting a literature search to identify best available information.

### 3.    Dr. Grandjean's Statements on Exposure.

155.    Dr. Grandjean does not offer an exposure assessment.

156.    Dr. Grandjean's initial report consists of a comparison to a single exposure point concentration of fluoride in drinking water calculated by EPA's Office of Water pursuant to its implementation of the Safe Drinking Water Act ("SDWA"). His analysis is devoid of the likely duration, intensity, frequency, and number of exposures under the conditions of use, which are expected components of an exposure assessment conducted according to the widely accepted risk assessment science and are required to be included in a risk evaluation under TSCA.

157.    Dr. Grandjean's second report consists of summaries of studies describing the relationship between fluoride and various biological endpoints, (*i.e.*, they are discussions of dose-response analyses, not exposure assessments).

158.    Thus, Dr. Grandjean's assertions concerning exposure are not supported with the best available science and are unreliable as a source of information for making conclusion about risk under TSCA.

### D.    Risk Characterization.

159.    Consistent with the NRC's risk assessment paradigm, and as described in TSCA section 6(b)(4)(F)(i), the fourth step of risk evaluation requires risk characterization.

160.    Risk characterization is the culmination of the risk assessment process. The risk characterization step integrates information from the preceding components of the risk assessment and synthesizes an overall conclusion about risk that is complete, informative, and useful for risk managers.

161.    If, after consideration of the reliability (quality), relevance, and the weight of the scientific evidence approach associated with the data being used for the dose-response analysis, it is determined which data is the most reasonable and relevant for estimating risk, then the potential

risk is estimated by calculating a ratio between the dose resulting from exposure and the dose identified in the hazard assessment to have no adverse effects (or POD). The calculation is referred to as the Margin of Exposure approach and the resulting estimate is referred to as a Margin of Exposure ("MOE").

162.    A MOE is compared to a benchmark MOE to interpret the risk estimate.

163.    The benchmark MOE is the result of multiplying all relevant uncertainty factors (UFs) to account for (1) the variation in susceptibility among the members of the human population (i.e., inter- individual or intraspecies variability); (2) the extrapolation from animal data to humans (i.e., interspecies extrapolation); (3) the extrapolation from data in a  study with less-than-lifetime exposure (i.e., extrapolating from sub-chronic to chronic exposure); (4) the extrapolation from a LOAEL rather than from a NOAEL; and (5) the potential derivation of an under-protective value as a result of an incomplete characterization of the chemical's toxicity.

164.    Determining appropriate uncertainty factors is based on the quality and relevance associated with the data used for the dose-response analysis. For example, while certain default uncertainty factors may be appropriate to account for uncertainties and variability in the data, without a systematic and transparent evaluation of the reliability and relevance of the available data, the reasonableness of applying uncertainty factors cannot be assessed. Thus, while EPA guidance documents permit the use of default uncertainty factors, risk assessors must justify their use by documenting the strengths, limitations, and uncertainties associated with the key studies used to derive the POD.

165.    While the MOE calculation itself is straight forward, the risk characterization should communicate all relevant information for reaching a final determination of risk, including the nature and weight of the scientific evidence for each preceding step of the risk evaluation, the estimated uncertainty of the component parts, and the assumptions contained within the estimates. The purpose of this step is to ensure that the assessment will be useful for risk managers.

**1.    Dr. Thiessen's Inappropriate Application of Risk Characterization Methodology.**

166.    This entire section of Dr. Thiessen's report is flawed in that it endeavors to support

32

an unreasonable risk determination for an existing chemical substance in commerce using approaches developed to assess new chemical substances. The Plaintiffs specifically request that EPA take action under section 6 of TSCA. However, Dr. Thiessen relies on seven documents that set forth risk evaluation methodologies developed to review new chemical substances under section 5 of TSCA.

167.    Because TSCA does not require that new toxicity data be generated or provided with section 5 notices, the vast majority of new chemical risk evaluations are based on chemicals that are similar (*i.e.,* analogs) in structure to the proposed new chemical, or on estimates made using predictive models.

168.    The framework EPA applies in conducting risk evaluations under section 5 is based on the fundamental risk assessment principles described in this declaration. However, the methods and assumptions are different in application due to: (1) substantial differences in the quantity and types of data typically available for new chemical substances and (2) the short timeframe (*i.e.*, 45 to 90 days) TSCA imposes for completing new chemical substance reviews.

169.    For example, Dr. Thiessen calculated MOEs for selected human population subgroups based on experimental animal data. To justify her derivation of Benchmark MOEs, Dr. Thiessen cites to EPA's application of UFs in assessment of new chemical substances which have very limited toxicological data. However, application of her UFs to the existing toxicological data base for fluoride are unjustified.

170.    Additionally, the absence of clear and transparent scientific judgement for relying on the specific exposure values presented in either her first or second reports, prevents reaching any conclusions regarding whether Dr. Thiessen's exposure analysis was conducted in a manner consistent with the best available science. Thus, Dr. Thiessen's analysis is not useful for characterizing risk and could not be relied upon to inform risk management options under TSCA.

171.    Due to these fundamental flaws, Dr. Thiessen's report cannot be used to support a conclusion of unreasonable risk for fluoridation chemicals, which are existing chemicals in commerce that are on the TSCA chemical inventory, and cannot be relied upon to inform risk management options.

### 2.      Dr. Grandjean's Risk Characterization.

172.     Similarly, Dr. Grandjean's use of an indiscriminate default UF is flawed.

173.     In fact, EPA guidance indicates that default uncertainty factors should *not* be applied indiscriminately. Rather, the size of the final UF used will vary from agent to agent and will require the exercise of scientific judgment, taking into account interspecies differences, the shape of the dose-response curve, and the neurotoxicity endpoints observed.

174.     UFs are typically multiples of 10 and are used to compensate for human variability in sensitivity (intraspecies UF), the need to extrapolate from animals to humans (interspecies UF), and the need to extrapolate from less than lifetime to lifetime exposures (subchronic-to-chronic UF). An additional factor of up to 10 may be included when only a LOAEL (and not a NOAEL) is available from a study.

175.     However, none of these UFs need be applied to Dr. Grandjean's BMDL. First, there is no need for an intraspecies UF to compensate for human variability given that Dr. Grandjean concludes that developing children are the most susceptible subpopulation to neurotoxic effects of fluoride and the data used is from children. There is also no need for an interspecies UF since there is no extrapolation from animal data, *i.e.*, the BMDL was derived using human data. There is no need for a subchronic-to-chronic UF given that Dr. Grandjean asserts fluoride neurotoxicity occurs during development, a subchronic exposure duration, not a lifetime. Finally, there is no need for application of a LOAEL-to-NOAEL UF given the purpose of the BMD analysis is to identify a BMDL in lieu of a NOAEL.

176.     Thus, on the basis of Dr. Grandjean's own opinions, there is no basis for indiscriminately applying any UFs to his BMDL.

177.     Although Dr. Grandjean calculates a "crude estimate" of BMDL in his original report and purports to refine the calculation in his supplemental report, Dr. Grandjean does not offer any quantitative description of the potential for toxicity associated with the exposure. Instead, in his original report, Dr. Grandjean compares his BMDL to an exposure point calculated by EPA's Office of Water's pursuant to its implementation of the SDWA. He simply asserts that his calculations provide a basis for comparing the dose-dependent risk of cognitive deficits with

34

current exposure levels in the United States. However, given the limitations associated with the BMDL analysis described previously, it is my opinion that this assertion is not supported. A risk characterization for fluoride should be based on the dose resulting from exposure to the fluoride, specifically applicable to the condition of use, to the dose of fluoride identified in the hazard assessment to have no adverse effects.

178.    In my opinion, because Dr. Grandjean has not estimated risk in a manner fit for purpose under TSCA, his methodology cannot be relied upon to reach a final determination of risk or to properly inform risk management options under TSCA.

**E.    Risk Determination.**

179.    The final step of a risk evaluation if to determine whether the chemical substance, under the condition of use, presents an unreasonable risk of injury to health or the environment.

180.    In general, this step weighs a variety of factors in determining unreasonable risk, including but not limited to: the effects of the chemical substance on health and human exposure to such substance under the conditions of use; the population exposed; the severity of the hazard (the nature of the hazard, the irreversibility of the hazard); and uncertainties.

181.    EPA also takes into consideration the Agency's confidence in the data used in the risk estimate.

182.    Both Dr. Thiessen and Dr. Grandjean ignore a number of basic data quality issues and fail to account for the relatively poor quality of the exposure and effects data identified by Dr. Chang and Dr. Tsuji.

183.    EPA and other authoritative bodies have previously reviewed many of the studies relied upon as evidence of neurotoxic effects of fluoride and found significant limitations in using them to draw conclusions on whether neurotoxicity is associated with the fluoridation of drinking water.

184.    Dr. Grandjean asserts that the purported risks of drinking water fluoridation are unreasonable in part because they are borne by a large population. He estimates an average decrease in lifetime earnings (which is an analysis of costs, which cannot be part of a risk evaluation under TSCA) associated with IQ point loss to calculate the overall potential IQ point

loss and associated decrease in lifetime earnings for the segment of the U.S. population potentially exposed to artificially fluoridated water. However, Dr. Grandjean fails to establish that any persons have suffered neurotoxic harm as a result of exposure to fluoride in the United States through the purposeful addition of fluoridation chemicals to drinking water. The fact that a purported risk relates to a large population is not a basis to relax otherwise applicable scientific standards in evaluating the evidence of that purported risk.

185.    Without setting forth the strengths and limitations associated with each study and the weight of evidence provided by the available database, it is not possible to determine whether the studies relied upon as evidence of neurotoxic effects of fluoride are suitable for any of the preceding components of risk assessment.

## XI.    CONCLUSIONS

186.    Based on the expert reports of Dr. Joyce Tsuji and Dr. Ellen Chang examining the neurotoxicity of fluoride based on animal toxicology and human epidemiological studies, it is my opinion that these studies, either individually and or collectively, do not support the assertion that exposure to fluoridated water presents unreasonable risks for neurotoxicity.

187.    Neither Dr. Thiessen nor Dr. Grandjean provides a credible source of evidence for making conclusions regarding unreasonable risks under TSCA due to critical limitations in their analysis, including but not limited to, failing to conduct a systematic review and omitting critical steps in the risk assessment process. A critical flaw in the analysis offered by Plaintiffs' experts is their failure to demonstrate transparency, clarity, consistency, and reasonableness in assembling the relevant information, evaluating the information for quality and relevance, and synthesizing and integrating the different lines of evidence to support their conclusions.

188.    Both Dr. Thiessen and Dr. Grandjean omit critical steps necessary for demonstrating clarity and completeness with which the data, assumptions, methods, quality assurance, and analyses was employed to generate their conclusions. Thus, their analyses cannot be used to support a determination of unreasonable risk of injury to human health or inform risk management decisions under TSCA section 6.

189.    Based on my review of the expert reports of Dr. Joyce Tsuji and Dr. Ellen Chang

examining the neurotoxicity of fluoride based on animal toxicology and human epidemiological studies, it is my opinion that the recent experimental animal and epidemiological studies do not support the assertion that exposure to fluoridated water presents unreasonable risks for neurotoxicity.

190.    Based on the word count feature of Microsoft Word, this declaration consists of no more than 11,482 words, excluding bibliography, tables, charts, figures, and other graphics.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 20, 2020, in Washington, D.C.

_____
Tala Henry, Ph.D.