# Exhibit D

and very fulfilling day up and down the State of Delaware.

With that, I thank my colleague from Rhode Island.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oklahoma.

---

## TSCA MODERNIZATION ACT OF 2015

Mr. INHOFE. Mr. President, I ask that the Chair lay before the Senate the message to accompany H.R. 2576.

The Presiding Officer laid before the Senate the following message from the House of Representatives:

*Resolved,* That the House agree to the amendment of the Senate to the bill (H.R. 2576) entitled "An Act to modernize the Toxic Substances Control Act, and for other purposes." with an amendment to the Senate amendment.

MOTION TO CONCUR

Mr. INHOFE. Mr. President, I move to concur in the House amendment to the Senate amendment.

I ask unanimous consent that there now be 45 minutes of debate on the motion, and that following the use or yielding back of time, the Senate vote on the motion to concur.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. INHOFE. For the information of Senators, this will allow us to pass this bill tonight by voice vote.

Mr. President, I ask unanimous consent that for that 45 minutes of debate, the Senator from California, Mrs. BOXER, be recognized for 10 minutes; followed by the Senator from Louisiana, Mr. VITTER; and then go back and forth in 5-minute increments.

The PRESIDING OFFICER. Is there objection?

The Senator from California.

Mrs. BOXER. Reserving the right to object, Mr. President, I want to make a little clarification.

Senator UDALL has asked for 10 minutes. If we could use our time, allowing this Senator 10 minutes, and then after Senator VITTER's time, we would go to Senator UDALL for 10 minutes and then back to the other side. Then Senator MARKEY wanted 5 minutes and Senator WHITEHOUSE wanted 5 minutes as well—if it would go in that order as stated, with 10 for myself, 10 for Senator UDALL, 5 for Senator MARKEY, and 5 for Senator WHITEHOUSE.

Mr. INHOFE. I believe that adds up to our 45 minutes, and I will just not speak until after the vote.

The PRESIDING OFFICER. Is there objection to modifying the request?

Mrs. BOXER. There would be 5 minutes left, if that is all right.

Mr. INHOFE. I will amend my unanimous consent request.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mrs. BOXER. Mr. President, I want to start off by thanking my dear friend, Senator INHOFE. We have had a wonderful relationship when it comes to the infrastructure issues. We have not worked terribly well together on environmental issues, but because of both of our staffs and the Members of our committee on both sides of the aisle, we were able to tough it out and come up with a bill that I absolutely believe is better than current law.

I will be entering into the RECORD additional views by four leading Democratic negotiators—myself, Senator UDALL, Senator MERKLEY, and Senator MARKEY.

I rise in support of H.R. 2576, the Frank R. Lautenberg Chemical Safety for the 21st Century Act. I spoke at length about this before, so I won't go on for a long time. But I do want to reiterate that the journey to this moment has been the most complicated journey I have ever had to take on any piece of legislation, and I have been around here for a long time.

It was a critical journey. When naming a bill after Senator Lautenberg, who fought for the environment all his life, the bill must be worthy of his name, and, finally, this bill is.

It didn't start out that way. I used every prerogative I had, every tool in my arsenal to bring it down until it got better, and it is better. It is better than current law.

Asbestos, for example, is one of the most harmful chemicals known to humankind, and it takes 15,000 lives a year. It is linked to a deadly form of lung cancer called mesothelioma. People can breathe in these fibers deep into their lungs where they cause serious damage. We have addressed asbestos in this bill. We didn't ban it on this bill, which I support—and I have standalone legislation to do that—but we have made asbestos a priority in this bill.

Flame retardants are another category of dangerous chemicals. They have been linked to a wide array of serious health problems, including cancer, reduced IQ, developmental delays, obesity, and reproductive difficulties. These harmful chemicals have been added to dozens of everyday items such as furniture and baby products. So when we are talking about TSCA reforming the toxic laws, we are not just talking about a conversation, we are not just talking about a theory, we are not talking about something you would address in a classroom. We are talking about our families.

Now, the negotiations have been challenging. Many organizations in many States stood strong despite the pressure to step back, and I am so grateful to them for their persistence. I especially want to thank the 450 organizations that were part of the Safer Chemicals, Healthy Families coalition that worked with me, as well as the Asbestos Disease Awareness Organization for their efforts. Without them, I would not have had the ability to negotiate important improvements.

Let me highlight briefly a few of the most important changes in the final bill. I can't go one more minute without thanking the two people who are sitting right behind me, Bettina Poirier, who is my chief of staff on the committee and chief counsel, and Jason Albritton, who is my senior adviser. They worked tirelessly—through the night sometimes—with Senator INHOFE's staff. Without their work, we never would have gotten to this point, and we never would have gotten to a bill worthy of Frank's name, and it means a great deal to me.

The first major area of improvement is the preemption of State restrictions on toxic chemicals. In the final bill, we were able to make important exceptions to the preemption provisions.

First, the States are free to take whatever action they want on any chemical until EPA has taken a series of steps to study a particular chemical. Second, when EPA announces the chemicals they are studying, the States still have up to a year and a half to take action on these particular chemicals to avoid preemption until the EPA takes final action.

Third, even after EPA announces its regulation, the States have the ability to get a waiver so they can still regulate the chemical, and we have made improvements to that waiver to make it easier for States to act.

For chemicals that industry has asked EPA to study, we made sure that States are not preempted until EPA issues a final restriction on the chemical, and for that I really want to thank our friends in the House. They put a lot of effort into that.

The first 10 chemicals EPA evaluates under the bill are also exempted from preemption until the final rule is issued. Also, State or local restrictions on a chemical that were in place before April 22, 2016, will not be preempted.

So I want to say, as someone who comes from the great State of California—home to almost 40 million people and which has a good strong program—we protected you. Would I rather have written this provision myself? Of course, and if I had written it myself I would have set a floor in terms of this standard and allowed the States to take whatever action they wanted to make it tougher. But this was not to be. This was not to be. So because I couldn't get that done, what we were able to get done were those four or five improvements that I cited.

The States that may be watching this debate can really gear up and move forward right now. There is time. You can continue the work on regulations you passed before April. You can also have a year and a half once EPA announces the chemical, and if they don't announce anything, you can go back to doing what you did before. An EPA that is not funded right, I say to my dearest friend on the floor today, is not going to do anything. So the States will have the ability to do it. I would hope we would fund the EPA so we have a strong Federal program and strong State programs as well. But we will have to make sure that the EPA doesn't continually get cut.

U.S. EXHIBIT 543
Food & Water v. EPA
3:17-cv-02162-EMC

The second area of improvement concerns asbestos. I think I have talked about that before. It is covered in this bill.

The third area of improvement concerns cancer clusters. This one is so dear to my heart and to the heart of my Republican colleague, Senator CRAPO. We wrote a bill together called the Community Disease Cluster Assistance Act, or ''Trevor's Law.'' Trevor's Law provides localities that ask for it a coordinated response to cancer clusters in their communities.

What Trevor taught us from his experience with a horrible cancer is that sometimes these outbreaks occur and no one knows why. Yet it is considered a local issue. Now, if the local community requests it—if they request it—they will get help.

Fourth, we have something called persistent chemicals. Those are chemicals that build up in your body. You just don't get rid of them. They are a priority in this legislation.

Fifth, another one that is dear to my heart and dear to the heart of Senator MANCHIN and Senator CAPITO is this provision that ensures that toxic chemicals stored neared drinking water are prioritized. This provision was prompted by the serious spill that contaminated the drinking water supplies in West Virginia in 2014, causing havoc and disruption. They didn't know what the chemical was. It got into the water. They didn't know what to do. As we all remember, it was a nightmare for the people there—no more. Now we are going to make sure that the EPA knows what is stored near drinking water supplies.

The sixth is very important and is something that got negotiated in the dead of night. I want to thank Senator INHOFE's staff for working with my staff on this. The bill enables EPA to order independent testing if there are safety concerns about a chemical, and these tests will be paid for by the chemical manufacturer. I also want to thank Members of the House who really brought this to us.

Finally, even the standard for evaluating whether a chemical is dangerous is far better than in the old TSCA. The bill requires EPA to evaluate chemicals based on risks, not costs, and considers the impact on vulnerable populations. This is really critical. The old law was useless. So all of these fixes make this bill better than current Federal law.

Looking forward, I want to make a point. This new TSCA law will only be as good as the EPA is good. With a good EPA, we can deliver a much safer environment for the American people—safer products, less exposure to harmful toxics, and better health for our people. With a bad EPA that does not value these goals, not much will get done. But, again, if a bad EPA takes no action, States will be free to act.

Mr. President, I ask for 30 additional seconds, and I will wrap this up.

Mr. INHOFE. Reserving the right to object, we do have this down with five people.

Mrs. BOXER. I ask unanimous consent for 30 seconds. I am just going to end with 30 seconds, and I will add 30 seconds to your side.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mrs. BOXER. I say to the States: You are free to act with a bad EPA. Compared to where we started, we have a much better balance between the States and the Federal Government. It is not perfect. The bills I worked on with Frank did not do this. They did not preempt the States. But because of this challenging journey, we respected each other on both sides, we listened to each other on both sides, and today is a day we can feel good about.

We have a decent bill, a Federal program, and the States will have a lot of latitude to act.

I yield the floor.

The PRESIDING OFFICER. The Senator from Louisiana.

Mr. VITTER. Mr. President, I rise also to laud a really significant achievement that we are going to finalize tonight with the final passage of the Frank R. Lautenberg Chemical Safety for the 21st Century Act.

This much needed bill will provide updates that have been due literally for decades to the Toxic Substances Control Act of 1976, known as TSCA for short, which has been outdated and overdue for updating since almost that time. Now, getting to where we are tonight, about to pass this by an overwhelming vote, following the 403-to-12 vote in the House a few weeks ago, did not happen overnight. In fact, it took about 5-plus years.

In 2011 I started discussions with a broad array of folks, certainly including Senator Lautenberg. That is when I first sat down with Frank and started this process in a meaningful way and when we agreed that we would try to bridge the significant differences between our two viewpoints and come up with a strong bipartisan bill.

That same year I also sat down with JOHN SHIMKUS of Illinois to let him know that Frank and I were going to put in a lot of effort to come up with this framework, and we wanted him to be a full and equal and contributing partner. Over the next year and a half, we slogged through that process of trying to come up with a strong bipartisan bill. It wasn't easy. Between Senator Lautenberg and myself and our staffs and other staffs, there was an often brutal stretch of difficult negotiations and challenging times, testing everybody's patience.

Several times we walked away to come back together again. Finally, it did come together. In early 2013, that really started taking shape. Toward the end of April 2013, we were far enough along to lock a small group of staff and experts in a room to finalize that first bipartisan bill. There were folks like Bryan Zumwalt, my chief counsel then; Dimitri Karakitsos, who is my counsel and is now a key staffer who continues on the EPW Committee; Senator Lautenberg's chief counsel, Ben Dunham; and his chemical adviser, Brendan Bell.

That led finally to this first bipartisan bill that we introduced on May 23, 2013. Now, that wasn't the end of our TSCA journey. Unfortunately, in many ways, the most difficult segment of that journey was soon after that introduction on May 23, because on June 3, just a few weeks later, Frank passed. The single greatest champion of reforming how chemicals are regulated died at 89 years of age.

That was heartbreaking. But it was a moment when all of us who had been involved only redoubled our commitment to following this through to the end. Soon after Frank's unfortunate passing, our colleague TOM UDALL really stepped up to the plate in a major way to take Frank's role as the Democratic lead in this effort. We had a quiet dinner one night here on Capitol Hill to talk about our commitment to carry on this fight and get it done. We formed a partnership and a friendship that was really built around this work with an absolute commitment to get that done. I will always be so thankful to TOM and his partnership and also to his great staff, including their senior policy adviser, Jonathan Black.

As with most major undertakings, we had a lot of other help all along the way. Early on, at that stage of the process, Senators CRAPO and ALEXANDER were extremely helpful. Also, a little later on, Senators BOOKER, MERKLEY, and MARKEY did a lot to advance the ball and refine the product. Of course, at every step of the way, I continued to meet and talk with Congressman JOHN SHIMKUS. He was a persistent and a reliable partner in this process, as was his senior policy adviser, Chris Sarley.

Throughout this process, staff was absolutely essential and monumental. They did yeoman's work in very, very difficult and trying circumstances. I mentioned Bryan Zumwalt, my former chief counsel. He was a driving force behind this. I deeply appreciate and acknowledge his work, as well as someone else I mentioned, Dimitri Karakitsos, who continues to work as a key staffer on the committee and who is seeing this over the goal line.

Let me also thank Ben Dunham, the former chief counsel to Senator Lautenberg. I think in the beginning, particularly, Ben, Bryan, and Dimitri gave each other plenty of help but worked through very difficult negotiations to get it done.

Also, I want to thank Jonathan Black and Drew Wallace in Senator UDALL's office and Michal Freedhoff and Adrian Deveny in Senator MARKEY's office.

On the outside, there are a lot of experts from all sorts of stakeholders across the political spectrum, certainly including industry representatives with the American Chemistry Council.

I want to thank Mike Walls, Dell Perelman, Rudy Underwood, Amy DuVall, Robert Flagg, and, of course their leader, Cal Dooley.

Finally, there is one enormous figure who is owed a great debt of gratitude and a lot of credit for seeing this over the goal line tonight; that is, Frank's better half—and I say that with deep respect and admiration to Frank, but surely his better half—Bonnie Lautenberg. She has been called the 101st Senator, particularly on this issue. She was devoted to seeing Frank's work completed. I thank her for her relentless effort reaching out to Members in the House and Senate and stakeholders to make sure this happened.

As I mentioned at the beginning, this is long overdue. All stakeholders across the political spectrum agreed for decades that this aspect of the law needed to be updated. We needed to fully protect public health and safety, which we all want to do. We also needed to ensure that American companies, which are world leaders today in science, research, and innovation remain so and do not get put behind a regulatory system which is overly burdensome and unworkable.

This TSCA reform bill, properly named after Frank Lautenberg, achieves those goals. It is a positive, workable compromise in the best sense of that term, so that we will achieve public health and safety. It ensures that our leading American companies, great scientists, great innovators, and great world leaders in this sector remain just that and that they remain the world leaders we want and need them to continue to be.

So I thank all of those who have contributed to this long but ultimately successful and worthwhile effort. With that, I look forward to our vote.

I yield the floor.

The PRESIDING OFFICER. The Senator from New Mexico.

Mr. UDALL. Mr. President, let me just initially, while Senator VITTER is still on the floor here, thank him so much. He was a great partner in terms of working on this piece of legislation thoroughly through the process over 3 years. We met, I think, about 3 years ago and had a dinner and decided, after Frank Lautenberg had died—he did a lot of work on the bill—that we would pick it up and make it happen. He has been a man of his word, and it has been a real pleasure working with him.

Let me just say about Chairman INHOFE that what they say in the Senate is that if you have a strong chairman, you can get a bill done. He has been remarkable in terms of his strength and his perseverance in terms of moving this bill. So we are at a very, very historic point today. I think I would call it a historic moment. I thank the Senator. It has been a pleasure working with the Senator. I enjoined working with the Senator when I was on the committee, and I am going to enjoy working with Chairman INHOFE in the future in terms of many other issues that come before us in the Senate.

I don't have any doubt that this is a historic moment several years and Congresses in the making. For the first time in 40 years, the United States of America will have a chemical safety program that works and that protects our families from dangerous chemicals in their daily lives. This is significant. Most Americans believe that when they buy a product at the hardware store or the grocery store, that product has been tested and determined to be safe. But that is not the case.

Americans are exposed to hundreds of chemicals from household items. We carry them around with us in our bodies and even before we are born. Some are known as carcinogens, others as highly toxic. But we don't know the full extent of how they affect us because they have never been tested. When this bill becomes law, there will finally be a cop on the beat.

Today, under the old TSCA, reviewing chemicals is discretionary. When this bill is law, the EPA will be required to methodically review all existing chemicals for safety, starting with the worst offenders. Today, the old law requires that the EPA consider the costs and benefits of regulation when studying the safety of chemicals. Very soon, EPA will have to consider only the health and environmental impacts of a chemical. If they demonstrate a risk, EPA will have to regulate.

Very soon, it will be enshrined in the law that the EPA most protect the most vulnerable people—pregnant women, infants, the elderly, and chemical workers. Today, the old TSCA puts burdensome testing requirements on the EPA. To test a chemical, the EPA has to show a chemical possesses a potential risk, and then it has to go through a long rulemaking process.

Very soon, EPA will have authority to order testing without those hurdles. Today, the old TSCA allows new chemicals to go to market without any real review, an average of 750 a year. Very soon, the EPA will be required to determine that all chemicals are safe before they go to the market.

Today, the old TSCA allows companies to hide information about their products, claiming it is confidential business information, even in an emergency. Very soon, we will ensure that companies can no longer hide this vital information.

States, medical professionals and the public will have access to the information they need to keep communities safe. Businesses will have to justify when they keep information confidential. That right will expire after 10 years. Today, the old TSCA underfunds the EPA so it doesn't have the resources to do its job.

Very soon, there will be a dedicated funding stream for TSCA. It will require industry to pay its share, $25 million a year. In addition, this new law will ensure victims can get access to the courts if they are hurt. It will revolutionize unnecessary testing on animals, and it will ensure that States can continue to take strong action on dangerous chemicals.

The Senate is about to pass this legislation. It is going to the President, and he will sign it. Over the past several days, I have gotten the same question over and over: What made this legislation different? Why was the agreement possible when other bills stalled? I thought about it quite a bit. It wasn't that the bill was simple. This was one of the most complex environmental pieces of legislation around. It certainly wasn't a lack of controversy. This process almost fell apart many times. It certainly wasn't a lack of interest from stakeholders. Many groups were involved, all with strong and passionate views and some with deep distrust. We faced countless obstacles, but I think what made this possible was the commitment and the willpower by everyone involved to see good legislation through and endure the slings and the arrows. I say a heartfelt thank-you to everyone involved.

I remember having dinner with Senator VITTER one evening early on when I was trying to decide whether I would take up Frank Lautenberg's work on this bill. There was already plenty of controversy and concern about the bill. Senator VITTER and I were not used to working with each other. In fact, we have almost always been on opposite sides. But I left that dinner with the feeling that Senator VITTER was committed, that he wanted to see this process through and was willing to do what it would take. For 3 years, I never doubted that. Both of us took more than a little heat. We both had to push hard and get important groups to the table and make sure they stayed at the table. I thank Senator VITTER. He has been a true partner in this process.

There are many others to thank, and I will, but before I do that, I want to say a few words about this bill's namesake. Frank Lautenberg was a champion for public health and a dogged, determined leader for TSCA reform. He cared so much for his children and grandchildren that he wanted to leave a better, healthier, safer environment for them. He always said that TSCA reform would save more lives than anything he ever worked on.

This is a bittersweet moment for all of us because Frank isn't here to see this happen, but I have faith that he is watching us and he is cheering us on. His wife Bonnie has been here working as the 101st Senator. She has been a force and inspiration, keeping us going, pushing us when we needed it. She helped us fulfill Frank's vision.

In the beginning, we thought the bill might not ever get introduced in the Senate. We entered this Congress after the Republicans took the majority. Many felt that strong environmental legislation was impossible. They urged us to wait. But many of us felt that 40 years was already too long to wait. We knew we could do it, make it better, and get it passed.

Senator CARPER was one of those key members on the Environment Committee. He gave us legs to get out of the gate. He and Senators MANCHIN and COONS were among our original cosponsors. They recognized that we had a great opportunity before us, and I thank them all.

They say that in order to get things done in Washington, you need a good, strong chairman, and Chairman INHOFE fits that description. I thank Chairman INHOFE and especially his staff, Ryan Jackson and Dimitri Karakitsos. Chairman INHOFE's team was instrumental in moving things forward and working with me to ensure that we built the broadest possible support. They knew that with broad support, we could do better than get it out of committee, we could get it across the finish line.

There are days when we all feel discouraged by gridlock here in Washington, but Chairman INHOFE and Senator VITTER rose above that. They saw the value of working together across party and across House and Senate.

Senators BOOKER, MERKLEY, and WHITEHOUSE all understood that we could work together. I thank them, too, for sticking with this bill and working through differences. As a result of their efforts, the bill gives States stronger protections, it helps reduce unnecessary testing on animals, and it includes a number of other improvements. Their staff—Adam Zipkin, Adrian Deveny, and Emily Enderle, among others—were key.

A strong bipartisan vote of 15 to 5 out of the committee set us up for action on floor. As many of you know, floor time is valuable and hard to come by and subject to nonpertinent issues. We needed to work to ensure the broadest possible support. We did that with Senators DURBIN and MARKEY, our 59th and 60th cosponsors of our legislation. I thank them and their staff members, Jasmine Hunt and Michal Freedhoff, for their important work to improve key aspects of the Federal program, such as fees and implementation dates, and to ensure that we could pass this bill through the Senate.

The PRESIDING OFFICER (Mr. ROUNDS). The time of the Senator has expired.

Mr. UDALL. Mr. President, has my time expired?

The PRESIDING OFFICER. Yes, it has.

Mr. UDALL. Thank you very much.

Let me just say that I am going to stay over. I thank the two Senators. I am going to stay with Senator INHOFE and thank additional people because I think it is that important, but we have this time agreement, and we need to move on.

I yield to Senator MARKEY for 5 minutes, and then we are going to Senator WHITEHOUSE for 5 minutes unless there is a Republican to intervene. Chairman INHOFE, is that correct?

Mr. INHOFE. That is right.

I would also say that I will forgo my remarks in order to give them more time until after the vote.

The PRESIDING OFFICER. Who yields time?

Mr. UDALL. I yield time to—the agreement, as I understand it, is that Senator MARKEY will speak for 5 minutes and Senator WHITEHOUSE for 5 minutes and then back to the Chair.

Mr. INHOFE. Yes, that is already a unanimous consent.

The PRESIDING OFFICER. The Senator from Massachusetts.

Mr. MARKEY. Mr. President, today Congress stands ready to reform the last of the core four environmental statutes. It may do so with a stronger bipartisan vote than any other major environmental statute in recent American history.

For a generation, the American people have been guinea pigs in a terrible chemical experiment. Told that all the advances in our chemistry labs would make us healthier, happier, and safer, American families have had to suffer with decades of a law that did nothing to ensure that was true. That is because when the industry successfully overturned the EPA's proposed ban on asbestos, it also rendered the Toxic Substance Control Act all but unusable. Children shouldn't be unwitting scientific subjects. Today we have a chance to protect them by reforming this failed law.

As ranking Democrat on the Senate subcommittee of jurisdiction, I was one of a handful of Members who participated in an informal conference with the House. With Senators UDALL, BOXER, and MERKLEY, I have prepared a document that is intended to memorialize certain agreements made in the bicameral negotiations that would typically have been included in a conference report.

In our work with the House, we truly did take the best of both bills when it came to enhancing EPA's authority to regulate chemicals.

The degree to which States will be preempted as the Federal Government regulates chemicals has been a source of considerable debate since this bill was first introduced. I have always been a very strong supporter of States' rights to take actions needed to protect their own residents. For many of us, accepting preemption of our States was a difficult decision that we only made as we also secured increases to the robustness of the EPA chemical safety program.

I am particularly pleased that efforts I helped lead resulted in the assurance that Massachusetts' pending flame retardant law will not be subjected to pause preemption and that there is a mechanism in the bill to ensure that States' ongoing work on all chemicals can continue while EPA is studying those chemicals.

The fact that the bill is supported by the EPA, the chemical industry, the chamber of commerce, and the trial lawyers tells you something. The fact that a staggering 403 Members of the House of Representatives voted for this TSCA bill—more than the number who agreed to support the Clean Air Act, the Clean Water Act, or the Safe Drinking Water Act amendments when those laws were reauthorized—tells you something. What it tells you is that we worked together on a bipartisan and bicameral basis to compromise in the way Americans expect us to.

Although there are many people who helped to create this moment, I wish to thank some whose work over the past few months I especially want to recognize.

I thank Bonnie Lautenberg. On behalf of her husband Frank, she was relentless.

Senator INHOFE and his staffers, Ryan Jackson and Dimitri Karakitsos, remained as committed to agreements they made about Senate Democratic priorities as they were to their own commitment priorities throughout this process. I couldn't have imagined a stronger or more constructive partnership.

I would like to thank Senator UDALL and his staffers, Drew Wallace and Jonathan Black, whose leadership—especially during these challenging moments—was very important.

I also thank Senator MERKLEY and his staff, Adrian Deveny, whose creativity often led us to legislative breakthroughs, especially when it came to crafting certain preemption compromises.

My own staff, Michal Freedhoff, has done little but this for 1 consecutive year. This is her 20th year on my staff. With her Ph.D. in biochemistry—it was invaluable in negotiating with the American Chemistry Council and all other interests.

I want to thank many other Members: Senator BOXER; Senator WHITEHOUSE and his staff, Bettina, along with BARBARA BOXER; Senator MCCONNELL; Senator REID; Senator DURBIN—all central players in making sure this legislation was here today.

I thank the spectacular and hard-working EPA team, all of whom provided us with technical assistance and other help, often late at night and before the dawn.

I thank Gina McCarthy, Jim Jones, Wendy Cleland-Hamnet, Ryan Wallace, Priscilla Flattery, Kevin McLean, Brian Grant, David Berol, Laura Vaught, Nicole Distefano, Sven-Erik Kaiser, and Tristan Brown.

The PRESIDING OFFICER. The time of the Senator has expired.

Mr. MARKEY. Mr. President, I ask unanimous consent for 1 additional minute.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mr. MARKEY. I also thank Ryan Schmit, Don Sadowsky, and Scott Sherlock.

I want to thank Stephenne Harding and Andrew McConville at CEQ, whose day-to-day engagement helped us, especially in these last few weeks.

There are some outside stakeholders who worked particularly closely with

my staff and with me, including Andrew Rogers, Andrew Goldberg, Richard Denison, Joanna Slaney, Mike Walls, Rich Gold, and Scott Faber.

I have enjoyed meeting, working with, and partnering with each one of these outstanding people over the last year.

This is a huge bill. It is a historic moment. It is going to make a difference in the lives of millions of Americans. It is the most significant environmental law passed in this generation.

The PRESIDING OFFICER. The time of the Senator has expired.

Mr. MARKEY. The old law did not work. This one is going to protect the American people.

I yield back the remainder of my time.

The PRESIDING OFFICER. The Senator from Rhode Island.

Mr. WHITEHOUSE. Mr. President, as the song said, it has been a long, strange trip getting here, and it has had its share of near-death experiences, as Senator UDALL is intimately aware of. I was involved with Senator MERKLEY and Senator BOOKER in one of those near-death experiences. If this was a rocket with stages, one of the major stages was the Merkley-Booker-Whitehouse effort in the committee. I just wanted to say it was the first time the three of us worked together as a triumvirate. They were wonderful to work with. They were truly a pleasure. We had a lot on our plates. We made about a dozen major changes in the bill.

I want to take just a moment to thank Emily Enderle on my staff, who was terrific through all of the negotiations and renegotiations and counter-negotiations in that stage. But this was obviously a rocket that had many more stages than that one.

I thank Chairman INHOFE and his staff for their persistence through all of this.

Ranking Member BOXER was relentless in trying to make this bill as strong as she could make it through every single stage, and it is marked by that persistence.

Senator VITTER and Senator UDALL forged the original notion that this compromise could be made to happen, and they have seen it through, so I congratulate them.

The House had a rather different view of how this bill should look. Between Senator INHOFE, Senator UDALL, Representative PALLONE, and Representative UPTON, they were able to work out a bicameral as well as a bipartisan compromise that we all could agree to.

There are a lot of thanks involved, but I close by offering a particular thank-you to my friend Senator UDALL. In Greek mythology there is a Titan, Prometheus, who brought fire to humankind. His penalty for bringing fire to humankind was to be strapped to the rock by chains and have Zeus send an eagle to eat his liver every single day. It is an image of persisting through pain. I do have to say Senator VITTER may have had his issues on his side—I do not know how that looked—but I can promise on our side TOM UDALL persisted through months and months of pain, always with the view that this bill could come to the place where this day could happen.

There are times when legislation is legislation, and there are times when legislation has a human story behind it. This is a human story of courage, foresight, persistence, patience, and willingness to absorb a considerable number of slings and arrows on the way to a day when slings and arrows are finally put down and everybody can shake hands and agree we have, I think, a terrific victory. While there is much credit in many places, my heart in this is with Senator TOM UDALL of New Mexico.

Mr. President, I yield the floor.

The PRESIDING OFFICER. The Senator from Oregon.

Mr. MERKLEY. Mr. President, today, while the Nation has been focused on the final six primaries across the Nation, the final six State primaries across the Nation, something extraordinary is unfolding here on the floor of the Senate. The Senate is taking the final congressional act to send the Frank R. Lautenberg Chemical Safety for the 21st Century Act to the President's desk.

This is landmark legislation that honors the legacy of our dear colleague Frank Lautenberg. This is landmark legislation that will make a real difference for the health and safety of every American. This is the first significant environmental legislation to be enacted by this Chamber in 25 years.

This bill—this extraordinary bill—brought Democrats and Republicans together to take action to protect public health. I have been honored to be a part of this coalition as we have worked toward a final bill for over a year. It hasn't been easy, but things worth doing are rarely easy.

A huge thank-you to Senators UDALL and VITTER, who cosponsored this bill, lead the way; Senators BOXER and INHOFE, the chair and ranking member of the Environment Committee; and Senators MARKEY, WHITEHOUSE, and BOOKER for their leadership and contributions throughout this entire process.

Also, a special thank-you to the staff who worked day and night. I know I received calls from my staff member Adrian Deveny at a variety of hours on a variety of weekends as he worked with other staff members to work out, iron out the challenges that remained, so a special thank-you to Adrian Deveny.

Just a short time ago, I had the chance to speak to Bonnie Lautenberg, Frank Lautenberg's wife. She would have loved to have been here when we took this vote, but she is going to be down in the Capitol next week with children and grandchildren. I hope to get a chance to really thank her in person for her husband's leadership but also for her leadership, her advocacy that we reached this final moment. She said to me: It appears it takes a village to pass a bill. Well, it does. This village was a bipartisan village. This was a bicameral village. It has reached a successful conclusion.

In the most powerful Nation on Earth, we should not be powerless to protect our citizens from toxic chemicals in everyday products. Today marks a sea shift in which we finally begin to change that. For too long, we have been unable to protect our citizens from toxic chemicals that hurt pregnant women and young children, chemicals that hurt our children's development, chemicals that cause cancer.

The Frank R. Lautenberg Chemical Safety for the 21st Century Act will tremendously improve how we regulate toxic chemicals in the United States—those that are already in products and should no longer be used and those new chemicals that are invented that should be thoroughly examined before they end up in products—and make sure that toxic chemicals don't find their way into our classrooms, into our bedrooms, into our homes, into our workplaces. Now the Environmental Protection Agency will have the tools and resources needed to evaluate the dangerous chemicals and to eliminate any unsafe uses.

My introduction to this issue began with a bill in the Oregon State Legislature about the cancer-causing flame retardants that are in our carpets and our couches and the foam in our furniture that should not be there. This bill gives us the ability to review that and to get rid of those toxic chemicals.

It was enormously disturbing to me to find out that our little babies crawling on the carpet, their noses 1 inch off the ground, were breathing in dust from the carpet that included these cancer-causing flame retardants. It should never have happened, but we did not have the type of review process that protects Americans. Now we will.

So, together, a bipartisan team has run a marathon, and today we cross the finish line. In short order, this bill will be sitting in the Oval Office, on the President's desk, and he will be putting ink to paper and creating this new and powerful tool for protecting the health of American citizens. That is an enormous accomplishment.

Mr. President, on behalf of Senator BOXER, the printing cost of the statement of additional views with respect to H.R. 2576, TSCA, will exceed the two-page rule and cost $2,111.20.

I ask unanimous consent that the Boxer statement of additional views be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

DETAILED ANALYSIS AND ADDITIONAL VIEWS OF DEMOCRATIC MEMBERS ON THE MOTION TO CONCUR IN THE HOUSE AMENDMENT TO THE SENATE AMENDMENT TO THE BILL H.R. 2576 ENTITLED "AN ACT TO MODERNIZE THE TOXIC SUBSTANCES CONTROL ACT, AND FOR OTHER PURPOSES" JUNE 7, 2016

As the lead Senate Democratic negotiators on H.R. 2576, (hereinafter referred to as the Frank R. Lautenberg Chemical Safety for the 21st Century Act), we submit the following additional views that describe the intent of the negotiators on elements of the final bill text.

1. "WILL PRESENT"

Existing TSCA as in effect before the date of enactment of Frank R Lautenberg Chemical Safety for the 21st Century Act includes the authority, contained in several sections (see, for example, section 6(a)), for EPA to take regulatory actions related to chemical substances or mixtures if it determines that the chemical substance or mixture "presents or will present" an unreasonable risk to health or the environment.

The Frank R. Lautenberg Chemical Safety for the 21st Century Act includes language that removes all instances of "will present" from existing TSCA and the amendments thereto. This does not reflect an intent on the part of Congressional negotiators to remove EPA's authority to consider future or reasonably anticipated risks in evaluating whether a chemical substance or mixture presents an unreasonable risk to health or the environment. In fact, a new definition added to TSCA explicitly provides such authority and a mandate for EPA to consider conditions of use that are not currently known or intended but can be anticipated to occur:

'(4) The term 'conditions of use' means the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of";

2. MIXTURES

In section 6(b) of TSCA, as amended by the Frank R Lautenberg Chemical Safety for the 21st Century Act, EPA is directed to undertake risk evaluations on chemical substances in order to determine whether they pose an unreasonable risk to health or the environment. Some have questioned whether the failure to explicitly authorize risk evaluations on mixtures calls into question EPA's authority to evaluate the risks from chemical substances in mixtures.

The definition of 'conditions of use' described above plainly covers all uses of a chemical substance, including its incorporation in a mixture, and thus would clearly enable and require, where relevant, EPA to evaluate the risks of the chemical substance as a component of a mixture.

3. NEW CHEMICALS

While existing TSCA does not preclude EPA from reviewing new chemicals and significant new uses following notification by the manufacturer or processor, it does not require EPA to do so or to reach conclusions on the potential risks of all such chemicals before they enter the marketplace. EPA has authority to issue orders blocking or limiting production or other activities if it finds that available information is inadequate and the chemical may present an unreasonable risk, but the burden is on EPA to invoke this authority; if it fails to do so within the 90–180 day review period, manufacture of the new chemical can automatically commence. This bill makes significant changes to this passive approach under current law: For the first time, EPA will be required to review all new chemicals and significant new uses and make an affirmative finding regarding the chemical's or significant new use's potential risks as a condition for commencement of manufacture for commercial purposes and, in the absence of a finding that the chemical or significant new use is not likely to present an unreasonable risk, manufacture will not be allowed to occur. If EPA finds that it lacks sufficient information to evaluate the chemical's or significant new use's risks or that the chemical or significant new use does or may present an unreasonable risk, it is obligated to issue an order or rule that precludes market entry or imposes conditions sufficient to prevent an unreasonable risk. EPA can also require additional testing. Only chemicals and significant new uses that EPA finds are not likely to present an unreasonable risk can enter production without restriction. This affirmative approach to better ensuring the safety of new chemicals entering the market is essential to restoring the public's confidence in our chemical safety system.

4. UNREASONABLE RISK

TSCA as in effect before the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act authorized EPA to regulate chemical substances if it determined that the chemical substance "presents or will present an unreasonable risk of injury to health or the environment." In its decision in Corrosion Proof Fittings vs EPA, the U.S. Court of Appeals, 5th Circuit overturned EPA's proposed ban on asbestos, in part because it believed that

"In evaluating what is "unreasonable," the EPA is required to consider the costs of any proposed actions and to "carry out this chapter in a reasonable and prudent manner [after considering] the environmental, economic, and social impact of any action." 15 U.S.C. §2601(c).

As the District of Columbia Circuit stated when evaluating similar language governing the Federal Hazardous Substances Act, "[t]he requirement that the risk be 'unreasonable' necessarily involves a balancing test like that familiar in tort law: The regulation may issue if the severity of the injury that may result from the product, factored by the likelihood of the injury, offsets the harm the regulation itself imposes upon manufacturers and consumers." Forester v. CPSC, 559 F.2d 774 789 (D.C.Cir.1977). We have quoted this language approvingly when evaluating other statutes using similar language. See, e.g., Aqua Slide, 569 F.2d at 839."

The Frank R Lautenberg Chemical Safety for the 21st Century Act clearly rejects that approach to determining what "unreasonable risk of injury to health or the environment" means, by adding text that directs EPA to determine whether such risks exist "without consideration of costs or other nonrisk factors" and, if they do, to promulgate a rule that ensures "that the chemical substance no longer presents such risk." In this manner, Congress has ensured that when EPA evaluates a chemical to determine whether it poses an unreasonable risk to health or the environment and regulates the chemical if it does, the Agency may not apply the sort of "balancing test" described above.

5. PRIORITIZATION

Section 6(b) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, defines high-priority chemical substances and low-priority chemical substances as follows:

"(i) HIGH–PRIORITY SUBSTANCES.—The Administrator shall designate as a high-priority substance a chemical substance that the Administrator concludes, without consideration of costs or other nonrisk factors, may present an unreasonable risk of injury to health or environment because of a potential hazard and a potential route of exposure under the conditions of use, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator.

"(ii) LOW–PRIORITY SUBSTANCES.—The Administrator shall designate a chemical substance as a low-priority substance if the Administrator concludes, based on information sufficient to establish, without consideration of costs or other nonrisk factors, that such substance does not meet the standard identified in clause (i) for designating a chemical substance a high-priority substance."

The direction to EPA for the designation of low-priority substances is of note in that it requires such designations to be made only when there is "information sufficient to establish" that the standard for designating a substance as a high-priority substance is not met. Clear authority is provided under section 4(a)(2)(B), as created in the Frank R Lautenberg Chemical Safety for the 21st Century Act, to enable EPA to obtain the information needed to prioritize chemicals for which information is initially insufficient. The bill text also goes on to state that if "the information available to the Administrator at the end of such an extension [for testing of a chemical substance in order to determine its priority designation] remains insufficient to enable the designation of the chemical substance as a low-priority substance, the Administrator shall designate the chemical substance as a high-priority substance."

These provisions are intended to ensure that the only chemicals to be designated low-priority are those for which EPA both has sufficient information and, based on that information, affirmatively concludes that the substance does not warrant a finding that it may present an unreasonable risk.

6. INDUSTRY REQUESTED CHEMICALS

Sec. 6(b)(4)(E) sets the percentage of risk evaluations that the Administrator shall conduct at industry's request at between 25 percent (if enough requests are submitted) and 50 percent. The Administrator should set up a system to ensure that those percentages are met and not exceeded in each fiscal year. An informal effort that simply takes requests as they come in and hopes that the percentages will work out does not meet the requirement that the Administrator "ensure" that the percentages be met. Also, clause (E)(ii) makes clear that industry requests for risk evaluations "shall be" subject to fees. Therefore, if at any point the fees imposed by the Frank Lautenberg Act (which are subject to a termination in section 26(b)(6)) are allowed to lapse, industry's opportunity to seek risk evaluations will also lapse and the minimum 25 percent requirement will not apply.

7. PACE OF AND LONG-TERM GOAL FOR EPA SAFETY REVIEWS OF EXISTING CHEMICALS

Existing TSCA grandfathered in tens of thousands of chemicals to the inventory without requiring any review of their safety. The Frank R. Lautenberg Chemical Safety for the 21st Century Act sets in motion a process under which EPA will for the first time systematically review the safety of chemicals in active commerce. While this will take many years, the goal of the legislation is to ensure that all chemicals on the market get such a review. The initial targets for numbers of reviews are relatively low, reflecting current EPA capacity and resources. These targets represent floors, not ceilings, and Senate Democratic negotiators expect that as EPA begins to collect fees, gets procedures established and gains experience, these targets can be exceeded in furtherance of the legislation's goals.

8. "MAXIMUM" EXTENT PRACTICABLE

Several sections of the Frank R. Lautenberg Chemical Safety for the 21st Century Act include direction to EPA to take certain actions to "the extent practicable", in contrast to language in S 697 as reported by the Senate that actions be taken to "the maximum extent practicable." During House-Senate negotiations on the bill, Senate negotiators were informed that House Legislative Counsel believed the terms "extent practicable" and "maximum extent practicable" are synonymous, and ultimately Congress agreed to include "extent practicable" in the Frank R. Lautenberg Chemical Safety for the 21st Century Act with the expectation that no change in meaning from S 697 as reported by the Senate be inferred from that agreement.

9. COST CONSIDERATIONS IN RULEMAKING

Section 6(c)(2) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act lists what is required in analysis intended to support an EPA rule for a chemical substance or mixture:

"(2) REQUIREMENTS FOR RULE.—"(A) STATEMENT OF EFFECTS.—In proposing and promulgating a rule under subsection (a) with respect to a chemical substance or mixture, the Administrator shall consider and publish a statement based on reasonably available information with respect to—

"(i) the effects of the chemical substance or mixture on health and the magnitude of the exposure of human beings to the chemical substance or mixture;

"(ii) the effects of the chemical substance or mixture on the environment and the magnitude of the exposure of the environment to such substance or mixture;

"(iii) the benefits of the chemical substance or mixture for various uses; and

"(iv) the reasonably ascertainable economic consequences of the rule, including consideration of—

"(I) the likely effect of the rule on the national economy, small business, technological innovation, the environment, and public health;

"(II) the costs and benefits of the proposed and final regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator; and

"(III) the cost effectiveness of the proposed regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator.

The language above specifies the information on effects, exposures and costs that EPA is to consider in determining how to regulate a chemical substance that presents an unreasonable risk as determined in EPA's risk evaluation.

Senate Democratic negotiators clarify that sections 6(c)(2)(A)(i) and (ii) do not require EPA to conduct a second risk evaluation-like analysis to identify the specified information, but rather, can satisfy these requirements on the basis of the conclusions regarding the chemical's health and environmental effects and exposures in the risk evaluation itself.

The scope of the statement EPA is required to prepare under clauses (i)–(iv) is bounded in two important respects. First, it is to be based on information reasonably available to EPA, and hence does not require new information collection or development. Second, EPA's consideration of costs and benefits and cost-effectiveness is limited to the requirements of the rule itself and the 1 or more "primary" alternatives it considered, not every possible alternative. The role of the statement required under subparagraph (c)(2)(A) in selecting the restrictions to include in its rule is delineated in subparagraph (c)(2)(B). Under this provision, EPA must "factor in" the considerations described in the statement "to the extent practicable" and "in accordance with subsection (a)." As revised, subsection (a) deletes the paralyzing "least burdensome" requirement in the existing law and instructs that EPA's rule must ensure that the chemical substance or mixture "no longer presents"' the unreasonable risk identified in the risk evaluation. Thus, it is clear that the considerations in the statement required under subparagraph (c)(2)(A) do not require EPA to demonstrate benefits outweigh costs, to definitively determine or select the least-cost alternative, or to select an option that is demonstrably cost-effective or is the least burdensome adequately protective option. Rather, it requires only that EPA take into account the specified considerations in deciding among restrictions to impose, which must be sufficient to ensure that the subject chemical substance no longer presents the unreasonable risk EPA has identified. The Frank R. Lautenberg Chemical Safety for the 21st Century Act clearly rejects the regulatory approach and framework that led to the failed asbestos ban and phase-out rule of 1989 in Corrosion Proof Fittings v. EPA 947 F.2d 1201 (5th Cir. 1991).

10. "MINIMUM" LABELING REQUIREMENTS

Section 6(a) of TSCA, as amended by the Frank R Lautenberg Chemical Safety for the 21st Century Act, ensures that the requirements EPA can impose to address an unreasonable risk to health or the environment include requiring "clear and adequate minimum" warnings. The addition of the word "minimum" was intended to avoid the sort of litigation that was undertaken in Wyeth v. Levine, 555 U.S. 555 (2009), when a plaintiff won a Supreme Court decision after alleging that the harm she suffered from a drug that had been labeled in accordance with FDA requirements had nevertheless been inadequately labeled under Vermont law. This ensures that manufacturers or processors of chemical substances and mixtures can always take additional measures, if in the interest of protecting health and the environment, it would be reasonable to do so.

11. CRITICAL USE EXEMPTIONS

Section 6(g) of TSCA, as amended by the Frank R Lautenberg Chemical Safety for the 21st Century Act, authorizes EPA to exempt specific conditions of use from otherwise applicable section 6(a) rule requirements, if EPA makes specified findings. Section 6(g)(4) in turn requires EPA to include in such an exemption conditions that are "necessary to protect health and the environment while achieving the purposes of the exemption." It is Congress' intent that the conditions EPA imposes will protect health and the environment to the extent feasible, recognizing that, by its nature, an exemption will allow for activities that present some degree of unreasonable risk.

12. REGULATORY COMPLIANCE

Several sections of the Frank R. Lautenberg Chemical Safety for the 21st Century Act clarify the Congressional intent that compliance with federal EPA standards, rules or other requirements shall not preclude liability in circumstances where a reasonable manufacturer or processor or distributor of a chemical substance or mixture could or should have taken additional measures or precautions in the interest of protecting public health and the environment.

13. TSCA AS THE PRIMARY STATUTE FOR THE REGULATION OF TOXIC SUBSTANCES

EPA's authorities and duties under section 6 of TSCA have been significantly expanded under the Frank R. Lautenberg Chemical Safety for the 21st Century Act, now including comprehensive deadlines and throughput expectations for chemical prioritization, risk evaluation, and risk management. The interagency referral process and the intra-agency consideration process established under Section 9 of existing TSCA must now be regarded in a different light since TSCA can no longer be construed as a "gap-filler" statutory authority of last resort. The changes in section 9 are consistent with this recognition and do not conflict with the fundamental expectation that, where EPA concludes that a chemical presents an unreasonable risk, the Agency should act in a timely manner to ensure that the chemical substance no longer presents such risk. Thus, once EPA has reached this conclusion, Section 9(a) is not intended to supersede or modify the Agency's obligations under Sections 6(a) or 7 to address risks from activities involving the chemical substance, except as expressly identified in a section 9(a) referral for regulation by another agency which EPA believes has sufficient authority to eliminate the risk and where the agency acts in a timely and effective manner to do so.

Regarding EPA's consideration of whether to use non-TSCA EPA authorities in order to address unreasonable chemical risks identified under TSCA, the new section 9(b)(2) merely consolidates existing language which was previously split between section 6(c) and section 9(b). It only applies where the Administrator has already determined that a risk to health or the environment associated with a chemical substance or mixture could be eliminated or reduced to a sufficient extent by additional actions taken under other EPA authorities. It allows the Administrator substantial discretion to use TSCA nonetheless, and it certainly does not reflect that TSCA is an authority of last resort in such cases. Importantly, the provision adds a new qualification, not in original TSCA, that the required considerations are to be "based on information reasonably available to the Administrator" to ensure that such considerations do not require additional information to be collected or developed. Furthermore, none of these revisions were intended to alter the clear intent of Congress, reflected in the original legislative history of TSCA, that these decisions would be completely discretionary with the Administrator and not subject to judicial review in any manner.

14. DISCLOSURE OF CONFIDENTIAL BUSINESS INFORMATION

S. 697 as passed by the Senate included several requirements as amendments to sections 8 and 14 of existing TSCA that direct EPA to "promptly" make confidential business information public when it determines that protections against disclosure of such information should no longer apply. The Frank R. Lautenberg Chemical Safety for the 21st Century Act instead directs EPA to remove the protections against disclosure when it determines that they should no longer apply. Because EPA informed Senate negotiators that its practice is to promptly make public information that is no longer protected against disclosure, we see no difference or distinction in meaning between the language in S. 697 as passed and the Frank R. Lautenberg Chemical Safety for the 21st Century Act, and expect EPA to continue its current practice of affirmatively making public information that is not or no longer protected from disclosure as expeditiously as possible.

Subsection 14(d)(9) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, further clarifies the Congressional intent that any information required pursuant to discovery, subpoena, court order, or any other judicial process is always allowable and discoverable under State and Federal law, and not protected from disclosure.

15. CHEMICAL IDENTITY

Section 14(b)(2) of the bill retains TSCA's provision making clear that information from health and safety studies is not protected from disclosure. It also retains TSCA's two existing exceptions from disclosure of information from health and safety studies: for information where disclosure would disclose either how a chemical is manufactured or processed or the portion a chemical comprises in a mixture. A clarification has been added to the provision to note explicitly that the specific identity of a chemical is among the types of information that need not be disclosed, when disclosing health and safety information, if doing so would also disclose how a chemical is made or the portion a chemical comprises in a mixture. This clarification does not signal any Congressional intent to alter the meaning of the provision, only to clarify its intent.

16. "REQUIREMENTS'"

Subsection 5(i)(2) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act clarifies the Congressional intent to ensure that state requirements, including legal causes of action arising under statutory or common law, are not preempted or limited in any way by EPA action or inaction on a chemical substance.

Subsection 6(j) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, clarifies the Congressional intent to ensure that state requirements, including legal causes of action arising under statutory or common law, are not preempted or limited in any way by EPA action or inaction on a chemical substance.

17. STATE-FEDERAL RELATIONSHIP

Sections 18(a)(1)(B) and 18(b)(1) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, refer to circumstances under which a state may not establish or continue to enforce a "statute, criminal penalty, or administrative action" on a chemical substance. Section 18(b)(2) states that "this subsection does not restrict the authority of a State or political subdivision of a State to continue to enforce any statute enacted, criminal penalty assessed, or administrative action taken". In an email transmitted by Senate Republican negotiators at 11:45 AM on May 23, 2016, the Senate requested that House Legislative Counsel delete the word "assessed," but this change was not made in advance of the 12 PM deadline to file the bill text with the House Rules Committee. The Senate's clear intent was not to change or in any way limit the meaning of the phrase "criminal penalty" in section 18(b)(2).

Section 18(d)(I) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, references "risk evaluations'" on chemical substances that may be conducted by states or political subdivisions of states with the clear intent to describe the circumstances in which such efforts would not be preempted by federal action. The term "Risk Evaluation" may not be universally utilized in every state or political subdivision of a state, but researching each analogous term used in each state or political subdivision of a state in order to explicitly list it was neither realistic nor possible. The use of this term is not intended to be in any way limiting.

Section 18(d)(1)(A)(ii) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, fully preserves the authority of states or political subdivisions of states to impose "information obligation" requirements on manufacturers or processors with respect to chemicals they produce or use. The provision cites examples of such obligations: reporting and monitoring or "other information obligations." These may include, but are not limited to, state requirements related to information, such as companies' obligations to disclose use information, to provide warnings or to label products or chemicals with certain information regarding risks and recommended actions to reduce exposure or environmental release.

Section 18(d)(2) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, specifies that nothing in this section shall modify the preemptive effect of any prior rule or order by the Administrator prior to the effective date, responding to concerns that prior EPA action on substances such as polychlorinated biphenyls would be potentially immunized from liability for injury or harm.

Section 18(e) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, grandfathers existing and enacted state laws and regulatory actions, and requirements imposed now or in the future under the authority of state laws that were in effect on August 31, 2003.

Section 18(f) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, provides discretionary and mandatory waivers which exempt regulatory action by states and their political subdivisions from any federal preemptive effect. In particular, Subsection 18(f)(2)(B) specifies that, where requested, EPA shall grant a waiver from preemption under subsection (b) upon the enactment of any statute, or the proposal or completion of a preliminary administrative action, with the intent of prohibiting or otherwise restricting a chemical substance or mixture, provided these actions occur during the 18-month period after EPA initiates the prioritization process and before EPA publishes the scope of the risk evaluation for the chemical substance (which cannot be less than 12 months after EPA initiates the prioritization process).

Section 18(g) of TSCA, as amended by the Frank R Lautenberg Chemical Safety for the 21st Century Act, specifies that no preemption of any common law or statutory causes of action for civil relief or criminal conduct shall occur, and that nothing in this Act shall be interpreted as dispositive or otherwise limiting any civil action or other claim for relief. This section also clarifies the Congressional intent to ensure that state requirements, including legal causes of action arising under statutory or common law, are not preempted or limited in any way by EPA action or inaction on a chemical substance. This section further clarifies Congress' intent that no express, implied, or actual conflict exists between any federal regulatory action and any state, federal, or maritime tort action, responding to the perceived conflict contemplated in Geier v. American Honda Motor Co., 529 U.S. 861 (2000) and its progeny.

18. FEES

Fees under section 26(b), as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, are authorized to be collected so that 25% of EPA's overall costs to carry out section 4, 5, and 6, and to collect, process, review, provide access to and protect from disclosure information, are defrayed, subject to a $25,000,000 cap (that itself can be adjusted for inflation or if it no longer provides 25% of EPA's costs listed above). While the collection of fees is tied to the submission of particular information under sections 4 and 5 or the manufacturing or processing of a particular chemical substance undergoing a risk evaluation under section 6, in general the use of these fees is not limited to defraying the cost of the action that was the basis for payment of the fee. The exception to this general principle is for fees to defray the cost of conducting manufacturer requested risk evaluations, which are independent of the $25 million cap or 25% limit. These must be spent on the particular risk evaluation that was the basis for payment of the fee. This limitation applies only to the fee collected for the purpose of conducting the risk evaluation and does not prevent EPA from collecting further fees from such persons for other purposes for which payment of fees are authorized under the section. For example, if a manufacturer-requested risk evaluation later leads to risk management action, EPA may assign further fees to manufacturers and processors of that substance, subject to the $25,000,000 cap and the requirement to not exceed 25% of overall program costs for carrying out sections 4, 5, and 6, and to collect, process, review, provide access to and protect from disclosure information.

We also note that some have raised the possibility that section 26(b)(4)(B)(i)(I), as amended by the Frank R Lautenberg Chemical Safety for the 21st Century Act, could be read to exclude the cost of risk evaluations, other than industry-requested risk evaluations, from the costs that can be covered by fees. This was not the intent and is not consistent with the statutory language. As clearly indicated in section 26(b)(1), the amended law provides that manufacturers and processors of chemicals subject to risk evaluations be subject to fees, and that fees be collected to defray the cost of administering sections 4, 5, and 6, and of collecting, processing, reviewing and providing access to and protecting from disclosure information. Risk evaluations are a central element of section 6. And as demonstrated by section 6(b)(4)(F)(i), the intent of the bill is that the EPA-initiated risk evaluations be defrayed at the 25% level (subject to the $25,000,000 cap), in contrast to the industry-initiated evaluations, which are funded at the 50% or 100% level. The final citation in section 26(b)(4)(B)(i) should be read as section 6(b)(4)(C)(ii), as it is in section 6(b)(4)(F)(i), not to section 6(b) generally.

19. SCIENTIFIC STANDARDS

The term "weight of evidence" refers to a systematic review method that uses a pre-established protocol to comprehensively, objectively, transparently, and consistently, identify and evaluate each stream of evidence, including strengths, limitations, and relevance of each study and to integrate evidence as necessary and appropriate based upon strengths, limitations, and relevance.

This requirement is not intended to prevent the Agency from considering academic studies, or any other category of study. We expect that when EPA makes a weight of the evidence decision it will fully describe its use and methods.

20. PARTIAL RISK EVALUATIONS

Section 26(1)(4) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, states

"(4) CHEMICAL SUBSTANCES WITH COMPLETED RISK ASSESSMENTS.—With respect to a chemical substance listed in the 2014 update to the TSCA Work Plan for Chemical Assessments for which the Administrator has published a completed risk assessment prior to the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act, the Administrator may publish proposed and final rules under section 6(a) that are consistent with the scope of the completed risk assessment for the chemical substance and consistent with other applicable requirements of section 6."

EPA has completed risk assessments on TCE, NMP, and MC, but has not yet proposed

or finalized section 6(a) rules to address the risks that were identified. The risk assessments for these chemicals were not conducted across all conditions of use. During the bi-cameral negotiations, EPA expressed the view that, rather than reexamine and perhaps broaden the scope of these assessments, it is better to proceed with proposed and final rules on the covered chemicals to avoid any delay in the imposition of important public health protections that are known to be needed. Congress shared these concerns. The language House-Senate negotiators included above is intended to allow EPA to proceed with the regulation of these substances if the scope of the proposed and final rules is consistent with the scope of the risk assessments conducted on these substances.

21. SNURS FOR ARTICLES

Section 5(a)(5) addresses the application of significant new use rules (SNURs) to articles or categories of articles containing substances of concern. It provides that in promulgating such SNURs, EPA must make "an affirmative finding . . . . that the reasonable potential for exposure to the chemical substance through the article or category of articles subject to the rule justifies notification." This language clarifies that potential exposure is a relevant factor in applying SNURs to articles. Exposure is a relevant factor in identifying other significant new uses of a chemical substance as well. It is not intended to require EPA to conduct an exposure assessment or provide evidence that exposure to the substance through the article or category of articles will in fact occur. Rather, since the goal of SNURs is to bring to EPA's attention and enable it to evaluate uses of chemicals that could present unreasonable risks, a reasonable expectation of possible exposure based on the nature of the substance or the potential uses of the article or category of articles will be sufficient to "warrant notification." EPA has successfully used the SNUR authority in the existing law to provide for scrutiny of imported articles (many of which are widely used consumer products) that contain unsafe chemicals that have been restricted or discontinued in the U.S. and it's critical that SNURs continue to perform this important public health function under the amended law.

22. COMPLIANCE DEADLINES

The amended law expands on existing section 6(d) by providing that rules under section 6 must include "mandatory compliance dates." These dates can vary somewhat with the type of restriction being imposed but, in general, call for compliance deadlines that "shall be as soon as practicable, but not later than 5 years after the promulgation of the rule." While EPA could in unusual circumstances delay compliance for as long as five years, this should be the exception and not the norm. To realize the risk reduction benefits of the rule, it is expected that compliance deadlines will be as soon as practicable after the rule's effective date as directed in new paragraph 6(d)(1).

Senator Barbara Boxer, Ranking Member, Environment and Public Works Committee.

Senator Edward J. Markey, Ranking Member, Subcommittee on Superfund, Waste Management and Regulatory Oversight, Environment and Public Works Committee, and cosponsor, Frank R. Lautenberg Chemical Safety for the 21st Century Act.

Senator Tom Udall, lead Democratic author and sponsor, Frank R. Lautenberg Chemical Safety for the 21st Century Act.

Senator Jeffrey A. Merkley, cosponsor, Frank R. Lautenberg Chemical Safety for the 21st Century Act.

Mr. MERKLEY. I yield the floor.

Mrs. GILLIBRAND. Mr. President, I know that everyone here shares a desire to fix our chemical safety law, the Toxic Substances Control Act, and I appreciate the years of hard work that my colleagues, starting with the late Senator from New Jersey, Frank Lautenberg, put in to try to make this bill the best bipartisan compromise it could be.

So many parts of this bill strengthen the standards and review process for chemicals, and I am pleased that we will finally be able to effectively regulate chemicals on a Federal level.

However, there is one part of the bill that still concerns me: the preemption of State laws.

Right now, a number of States, including New York, have taken the lead in chemical safety and have set standards for their own citizens that are higher than the standards set by the EPA.

These State actions have brought the chemical companies to the table to finally create a strong federal system for reviewing chemicals for safety.

But this bill would significantly limit the rights of individual States to set their own chemical safety standards from this day forward.

It would prevent a State from regulating or enforcing regulations on a chemical if the EPA is studying but has not yet ruled on the safety of that chemical.

But the EPA's review process can take far longer than a State's review process.

As a result, if a Governor or a State legislature wanted to develop their own rules to protect their citizens from a particular chemical that they knew was toxic and posing an imminent threat, their hands would be tied because of this law, and it would be left to the EPA to determine whether the State's science is valid.

Why would we take away this right from our States?

The only recourse for States is a burdensome waiver process that does not guarantee that a State will prevail in obtaining a waiver to continue to protect the health of its families. That is not enough.

When it comes to protecting public health, I firmly believe that Federal laws should set a floor, not a ceiling, and States should continue to have the right to protect their citizens from toxic chemicals—especially while they wait for the EPA to complete their own lengthy studies.

No State should be prevented from acting to protect the health and safety of its people when the Federal Government fails to act.

No State should be prevented from banning a dangerous chemical, simply because the EPA is taking time to review the substance.

So despite all the hard work of my colleagues and the progress that has been made, I cannot vote to undermine my State's ability to protect our constituents, and I will vote no on this bill.

Thank you.

CONGRESSIONAL INTENT BEHIND SPECIFIC PROVISIONS OF THE BILL

Mr. INHOFE. Senator VITTER and I rise today to discuss a few provisions in the bill with the desire of clarifying what the Congressional intent was behind specific provisions of the legislation. Senator VITTER, I would like to start with a question to you on the purpose of the term "conditions of use" and how that term is supposed to be applied by EPA in risk evaluations?

Mr. VITTER. Thank you Senator INHOFE. There are many important provisions of this law and I think clarifying what Congress intended is very important to ensure the legislative intent is understood and followed. To specifically address your first question, the term "conditions of use" is specifically defined as 'the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of.' The conditions of use of a chemical substance drive the potential for exposure to a chemical. Exposure potential, when integrated with the hazard potential of a chemical, determines a chemical's potential for risk. So EPA's understanding of a chemical's conditions of use—and importantly it is the circumstances 'the Administrator' determines—will be critical to EPA's final determination of whether a chemical is safe or presents an unreasonable risk that must be controlled. Finally, to address your question of how this is supposed to be applied by EPA in risk evaluations, it is important to note that many TSCA chemicals have multiple uses—industrial, commercial and consumer uses. EPA has identified subcategories of chemical uses for regular chemical reporting requirements, so the Agency is well aware that some categories of uses pose greater potential for exposure than others and that the risks from many categories of uses are deemed negligible or already well controlled. The language of the compromise makes clear that EPA has to make a determination on all conditions of use considered in the scope but the Agency is given the discretion to determine the conditions of use that the Agency will address in its evaluation of the priority chemical. This assures that the Agency's focus on priority chemicals is on conditions of use that raise the greatest potential for risk. This also assures that the Agency can effectively assess and control priority chemicals and meet the new law's strict deadlines. Without this discretion to focus chemical risk assessments on certain conditions of use, the Agency's job would be more difficult.

Mr. INHOFE. Thank you, Senator VITTER. That response raised an interesting follow up question I would like

to ask. If EPA's final Section 6(a) risk management rule includes a restriction or prohibition on some of the conditions of use identified in EPA's scope of the risk evaluation, but not all of them, is it final agency action as to those other conditions of use?

Mr. VITTER. That is a very important question and the clear intent of Congress is the answer is yes. This is because, to be legally sufficient according to EPA's own technical assistance, EPA's Section 6(a) rule must ensure that the chemical substance or mixture no longer presents an unreasonable risk. A Section 6(i) order, determining that a chemical substance does not present an unreasonable risk under conditions of use, is similarly final Agency action applicable to all those conditions of use that were identified in the scope of EPA's risk evaluation on the chemical substance. To be clear, every condition of use identified by the Administrator in the scope of the risk evaluation must, and will be either found to present or not present an unreasonable risk.

Mr. INHOFE, this brings me to a question on the testing EPA has the authority require manufacturers to conduct under this compromise. One of the major flaws in TSCA is the so-called 'catch 22' under which EPA cannot require testing of chemicals without first making a finding that the chemical may present an unreasonable risk. In TSCA's history, EPA has been able to make that finding only for about 200 chemicals. Does the compromise remedy that provision of TSCA?

Mr. INHOFE. It is clear that the compromise directs EPA to systematically evaluate more chemicals than ever before. To help the Agency meet that objective, the compromise does two things. First, EPA can issue a test rule or order if it finds that a chemical substance may present an unreasonable risk to human health or the environment. In this case, an EPA order would be a final agency action subject to judicial review. EPA would be well-advised to consider the practice of issuing a 'statement of need' similar to that required under section 4(a)(3) when using this authority.

The section also provides EPA discretionary authority to require testing—by rule, order or consent agreement—when EPA determines that new information is necessary to review a premanufacture notice under section 5, to conduct a risk evaluation under section 6, or to implement rules or orders under those sections. The compromise also recognizes that EPA may need new information to prioritize a chemical substance for review, to assess certain exports, and at the request of another federal agency. To use this discretionary order authority, EPA must issue a 'statement of need' that explains the need for new testing/exposure information. It must describe how available information has informed the decision to require new information, whether vertebrate animal testing is needed, and why an order is preferred to a rule.

Section 4 of the compromise also requires EPA to use 'tiered' screening and testing processes. This means EPA must require less expensive, less complex screening tests to determine whether higher level testing is required. This is an efficient approach to testing chemicals that is based on EPA experience in other testing programs Tiered testing will also help assure that EPA is meeting the objective to minimize animal testing that is set out in the compromise.

Finally, section 4 prohibits the creation of a 'minimum information requirement' for the prioritization of chemicals. That is a very important provision that should be applied to any and all testing by the Agency regardless of which authority it uses.

Senator VITTER, in addition to new testing authorities the bill also makes changes to TSCA in the new chemicals program under section 5 which has been largely viewed as one of the major strengths of existing law. It has been credited with spurring innovation in chemistry used for new products and technologies throughout the value chain. The industry we're regulating in TSCA is highly innovative: 17 percent of all US patents are chemistry or chemistry related. Clearly Congress has an interest in preserving the economic engine that is the business of U.S. chemistry, while ensuring that EPA appropriately reviews new chemical substances and significant new uses. How does the compromise balance these interests?

Mr. VITTER. Protecting innovation and not materially altering the new chemicals process was a critical part of the final compromise. Every effort was made to ensure EPA has the right tools to review new chemical substances but the amendments to this section were intended to conform closely with EPA's current practice and maintain the Agency's timely reviews that allow substances to market within the statutory deadlines. First, the compromise retains the 90-day review period for EPA to make a risk-based decision on a new chemical, without consideration of costs or other non-risk factors. Second, when EPA does not have the information sufficient for the evaluation of a new chemical, or when EPA determines that a new chemical may present an unreasonable risk, the compromise requires EPA regulate the new chemical to the extent necessary to protect against unreasonable risk. Once sufficient information is available, of course, EPA must make a decision. These requirements largely reflect EPA's practice today, under which EPA can allow the new chemical on the market but with limits. Finally, if EPA determines that a new chemical is not likely to present an unreasonable risk, EPA must make a statement to that effect before the end of the 90 day period. This provision ensures that chemicals considered not likely to pose an unreasonable risk are not delayed in getting to market.

Importantly, EPA would not stop reviewing new chemical notices while it develops any policies, procedures and guidance needed to implement these new provisions in Section 5. The compromise is very clear: EPA should not stop or slow its review of new chemicals while it develops any needed new policies procedures or guidance for Section 5. Also by amending Section 5 to require EPA make an affirmative finding before manufacturing or processing of a substance may commence, Congress did not intend to trigger the requirements of any other environmental laws. This again maintains the consistency with how EPA currently administers the new chemicals program under existing law.

Senator INHOFE, this leads me to another question on a provision that is rather technical and has been misunderstood by many and that is nomenclature. After the TSCA Inventory was established in 1979, questions arose about the appropriate chemical 'nomenclature' to be used to list these chemical substances. EPA addressed many of these questions in a series of guidance documents. The compromise includes a provision on nomenclature. What is this provision intended to do?

Mr. INHOFE. Thank you, Senator VITTER. These provision are very important to many major domestic producers including manufacturers of products like glass, steel, cement, along with domestic energy producers across the country. The chemical nomenclature provision in section 8 of the compromise addresses several issues critical to the efficient functioning of the new chemical regulatory framework.

For the purposes of the TSCA Inventory, a single, defined molecule is simple to name. For example, ethanol is a Class 1 chemical on the TSCA Inventory. Its identity does not depend on how it is made. Since one ethanol is chemically the same as another ethanol, a new producer of ethanol can use the existing ethanol chemical listed on the TSCA Inventory. For other substances known as Class 2 chemicals, nomenclature is more complex. For those substances, the name of the substance typically includes either—or both—The source material and the process used to make it. The compromise requires EPA to maintain the Class 2 nomenclature system, as well as certain nomenclature conventions in widespread use since the early days of TSCA.

The compromise also directs EPA to continue to recognize the individual members of categories of chemical substances as being on the TSCA inventory. The individual members of these categories are defined in inventory descriptions developed by EPA. In addition, the compromise permits manufacturers or processors to request that EPA recognize a chemical substance

currently identified on the TSCA Inventory under multiple nomenclatures as 'equivalents.'

Importantly, the equivalency provision relates only to chemical substances that are already on the TSCA Inventory. Although the equivalency provision specifically references substances that have Chemical Abstract Service (CAS) numbers, EPA could usefully apply an equivalency approach to substances on the Inventory that do not have CAS numbers as well, such as for naturally-occurring substances.

Now, Senator VITTER, once a chemical is on the inventory, information about the substance that is provided to EPA often contains sensitive proprietary elements that need protecting. There has been a significant debate in recent years regarding the protection from public disclosure of a confidential chemical identity provided in a health and safety study under TSCA section 14(b). Although new section 14(b) is substantially similar to the existing statute, what is the intent behind the additional language related to formulas?

Mr. VITTER. It was the Congressional intent of the legation to balance the need to ensure public access to health and safety studies with the need to protect from public disclosure valuable confidential business information (CBI) and trade secrets that are already exempt from mandatory disclosure under the Freedom of Information Act. Striking the appropriate balance between public disclosure on the one hand, and the protection of a company's valuable intellectual property rights embodied in CBI and trade secrets on the other hand, is essential to better informing the public regarding decisions by regulatory authorities with respect to chemical, while encouraging innovation and economic competitiveness.

The compromise retains the language of existing section 14(b) to make clear that the Administrator is not prohibited from disclosing health and safety studies, but that certain types of CBI and trade secrets disclosed within health and safety studies must always be protected from disclosure. The new, additional language in this section is intended to clarify that confidential chemical identities—which includes chemical names, formulas and structures—may themselves reveal CBI or trade secret process information. In such cases, the confidential chemical identity must always be protected from disclosure. The new language is not limiting; it makes clear that any other information that would reveal proprietary or trade secret processes is similarly protected. In other cases involving confidential chemical identities, EPA should continue to strike an appropriate balance between protection of proprietary CBI or trade secrets, and ensuring public access to health and safety information.

In addition to the protection of confidential information, another critically important provision in the deal was preemption. Senator Inhofe could you describe how the compromise address the relationship between State governments and the Federal government?

Mr. INHOFE. As we all recognize, the preemption section of this bill was the most contentious issue of the negotiations as well as the most important linchpin in the final deal. The compromise includes several notable provisions. First, it is clear that when a chemical has undergone a risk evaluation and determined to pose no unreasonable risk, any state chemical management action to restrict or regulate the substance is preempted. This outcome furthers Congress's legislative objective of achieving uniform, risk-based chemical management nationally in a manner that supports robust national commerce. Federal determinations reached after the risk evaluation process that a chemical presents no significant risk in a particular use should be viewed as determinative and not subject to different interpretations on a state-by-state or locality-by-locality basis. Further, under the new legislation, EPA will make decisions based on conditions of use, and must consider various conditions of use, so there could be circumstances where EPA determines that a chemical does not present an unreasonable risk in certain uses, but does in others. Preemption for no significant risk determinations would apply as these determinations are made on a use-by-use basis.

Second, to promote the engagement of all stakeholders in the risk evaluation process—including State governments—thee compromise creates a temporary preemption period for identified high priority chemicals moving through EPA's risk evaluation process. The period only runs from the time EPA defines the scope of the evaluation to the time that EPA finishes the evaluation, or the agency deadline runs out. It does not apply to the first 10 TSCA Work Plan chemicals the EPA reviews, and it does not apply to manufacturer-requested risk evaluations. It does apply to any and all other chemical substances EPA choses to review through a risk evaluation. States with compelling circumstances can request and be granted a vysaiver by EPA. These waiver and scope limitations ensure that the piause has its intended effect—to ensure that there is one, comprehensive, nationally-led risk evaluation occurring at a time, allowing EPA and affected manufacturers to focus on and complete the work on a timely basis, and to ensure a uniform and consistent federal approach to risk evaluation and risk management.

Senator VITTER, despite the fact that this law regulates products in commerce and Congress has the authority and Constitutional duty to protect interstate commerce, efforts were made to give States a role in this process, and even to get waivers from preemption where State actions are adequately justified. It should be noted that nothing precludes State action on chemical substances that are not the subject of an EPA risk evaluation or decision. There is also nothing in the compromise that precludes states from offering opinions, advice, or comment during the risk evaluation process. The risk evaluation process anticipates numerous opportunities for public comment. It is our hope that States with an interest in a particular chemical substance will in fact bring forward relevant scientific information on chemical hazards, uses and exposures to inform an effective federal decision. This will ensure that EPA is making the most informed decisions for the citizens of the United States as a whole, rather than one State affording protection to only a fraction of the country.

Senator VITTER, before we conclude our discussion on preemption, I would to ask you to help clarify the intent of the preemption provision as it relates to actions taken prior to enactment of the Frank Lautenberg bill.

Mr. VITTER. Thank you, Senator INHOFE, for those important clarifications to preemption and for another question that is very important to clarify in order to capture the full conngressional intent of the bills preemption section. This Act is intended to change the preemption provisions of TSCA only with respect to regulations promulgated and actions taken under this Act after its effective date. This Act is not intended to alter any preemptive effect on common law or state positive law of regulations promulgated or administrative actions taken under preexisting authorities, and is not intended to make any statement regarding legal rights under preexisting authorities, including TSCA sections 6 and 17 in effect prior to the effective date of this Act.

Mr. INHOFE. I appreciate your clarification on the intent of an important aspect of preemption under this act and also wanted to follow up with a question on judicial review. Specifically, what changes to TSCA's judicial review provisions have been made in the compromise?

Mr. VITTER. When TSCA was first enacted in 1976, the Act created a higher level of judicial review for certain rulemakings that would restrict chemicals in commerce. Congress took this approach because it wanted to ensure that rulemakings that would directly affect commerce by imposing restrictions on chemicals would be well supported with substantial evidence. The substantial evidence standard requires an agency rule to be supported by substantial evidence in the rulemaking record taken as a whole. The compromise legislation makes no changes to the process for judicial review of rulemakings or the standard of review.

The compromise now provides EPA with expanded authority to pursue certain administrative actions by order in

addition to by rule. This new order authority is intended to allow EPA greater flexibility to move quickly to collect certain information and take certain actions. It is intended that an agency order constitute final agency action on issuance and be subject to judicial review. Orders under Sections 4, 5, and 6 of TSCA constitute final agency action on issuance, and continue to be reviewed under the standards established by the Administrative Procedures Act. The intention is that regulatory actions that result in total or partial bans of chemicals, regardless of whether such action is by rule or order authority, be supported by substantial evidence in the rulemaking record taken as a whole.

Senator INHOFE, before we are done I think there are a few other sections of the bill that have been less discussed that it would be important to touch on. The first is Section 9 of TSCA which discusses the relationship between this and other laws. Could you please speak to what the intent of this bill with regards to Section 9 is?

Mr. INHOFE. The Senate Report language states that section 9 of TSCA provides EPA with discretionary authority to address unreasonable risks of chemical substances and mixtures under other environmental laws. "For example, if the Administrator finds that disposal of a chemical substance may pose risks that could be prevented or reduced under the Solid Waste Disposal Act, the Administrator should ensure that the relevant office of the EPA receives that information."

Likewise, the House Report on section 9 of TSCA states: "For example, if the Administrator determines that a risk to health or the environment associated with disposal of a chemical substance could be eliminated or reduced to a sufficient extent under the Solid Waste Disposal Act, the Administrator should use those authorities to protect against the risk."

This act states in new section 9(a)(5) of TSCA that the Administrator shall not be relieved of any obligation to take appropriate action to address risks from a chemical substance under sections 6(a) and 7, including risks posed by disposal of the chemical substance or mixture. Consistent with the Senate and House reports, this provision means that the Administrator should use authorities under the other laws such as the Solid Waste Disposal Act to prevent or reduce the risks associated with disposal of a chemical substance or mixture.

Senator VITTER, I know another section that is very important to you is the language around sound science and we all know you have worked to ensure that this bill fixes the scientific concerns of the National Academy of Science and other scientific bodies who have raised concerns with the way EPA has reviewed chemicals in the past. Could you please discuss the Congressional intent of the bills science provisions?

Mr. VITTER. Thank you Senator INHOFE, the sound science provisions were a critical part of TSCA reform in my opinion and I hope this bill serves as a model for how to responsibly reform other laws administered by EPA and other Federal Agencies that are tasked to make decisions based on science. For far too long Federal agencies have manipulated science to fit predetermined political outcomes, hiding information and underlying data, rather than using open and transparent science to justify fair and objective decision making. This Act seeks to change all of that and ensure that EPA uses the best available science, bases scientific decisions on the weight of the scientific evidence rather than one or two individual cherry-picked studies, and forces a much greater level of transparency that forces EPA to show their work to Congress and the American public.

Congress recognized the need to use available studies, reports and recommendations for purposes of chemical assessments rather than creating them from whole cloth. We do believe, however, that the recommendations in reports of the National Academy of Sciences should not be the sole basis of the chemical assessments completed by EPA. Rather, the EPA must conduct chemical assessments consistent with all applicable statutory provisions and agency guidelines, policies and procedures. Further, in instances where there were other studies and reports unavailable at the time of the NAS recommendations, EPA should take advantage of those studies and reports in order to ensure that the science used for chemical assessments is the best available and most current science.

Mr. INHOFE. Thank you for clarifying the Congressional intent of the important science provisions in this bill. I wanted to ask you one final question that is another key element to reforming this outdated law. It should be clear to all that H.R. 2576 attempts to ensure that the Environmental Protection Agency takes the possible exposures to sensitive subpopulations into account when prioritizing, assessing and regulating high priority chemical substances. The goal, of course, is to ensure that factors that may influence exposures or risk are considered as the Agency assesses and determines the safety of chemical substances.

A concern, however, could be that the language regarding sensitive subpopulations may be read by some to promote the concept of "low dose linearity" or "no threshold" for many chemicals, including substances that are not carcinogens. This concept has not been firmly established in the scientific community. Does H.R. 2576 address this concern?

Mr. VITTER. That is an important question Senator INHOFE and I appreciate the opportunity to clarify. The Lautenberg bill tries to address the concern about forcing paralysis by analysis in several ways. First, the bill establishes that 'unreasonable risk under the conditions of use' as the safety standard to be applied by EPA. "Unreasonable risk" does not mean no risk; it means that EPA must determine, on a case-by-case basis, whether the risks posed by a specific high priority substance are reasonable in the circumstances of exposure and use. Second, the bill requires EPA to specifically identify the sensitive subpopulations that are relevant to and within the scope of the safety assessment and determination on the substance in question. At the same time, EPA should identify the scientific basis for the susceptibility, to ensure transparency for all stakeholders. In this way, the legislation affords EPA the discretion to identify relevant subpopulations but does not require—or expect—that all hypothetical subpopulations be addressed.

While a principle element of this compromise is including protections for potentially susceptible subpopulations to better protect pregnant women and children, a core of the bill since it was first introduced by Senator Lautenberg and I was never to require the national standard to be protective of every identified subpopulation in every instance. If a chemical substance is being regulated in a condition of use that we know has no exposure to a subpopulation, EPA should apply the "unreasonable risk" standard appropriately. In addition, it is clear that the concept of low dose linearity is not firmly established by the science, and the concept is not appropriate to apply as a default in risk evaluations.

Mr. INHOFE. Thank you very much for that explanation, Senator VITTER.

MERCURY-SPECIFIC PROVISIONS IN THE BILL

Mr. WHITEHOUSE. Mr. President, we rise to highlight two mercury-specific provisions—the creation of a mercury inventory and expansion of the export ban to certain mercury compounds—in the Frank R. Lautenberg Chemical Safety for the 21st Century Act that the Senate will approve tonight. These provisions are sections of the Mercury Use Reduction Act that we introduced in the 112th Congress with the late Senator Frank Lautenberg, after whom this legislation is named, and with then-Senator John Kerry. Senator LEAHY and Senator MERKLEY have been longtime partners in these efforts. Senator LEAHY was a leader in the Senate's consideration of a resolution of disapproval concerning the Bush administration's mercury rule. I yield to Senator LEAHY.

Mr. LEAHY. Mr. President, I thank Senator WHITEHOUSE. His leadership in this area has been paramount.

Under the mercury inventory provision, the EPA will be required to prepare an inventory of mercury supply, use, and trade in the United States every 3 years. Despite an EPA commitment in 2006 to collect this data, there is not yet any good data on mercury

supply and uses in the United States. This lack of data has impacted our ability to reduce health risks from mercury exposure and would compromise our ability to comply with the Minamata Convention of Mercury, which will come into force next year and to which the U.S. Government has agreed to become a party. When preparing the inventory, EPA shall identify the remaining manufacturing and product uses in the United States and recommend revisions to federal laws or regulations for addressing the remaining uses. The term ''revisions'' in this provision includes both new laws or regulations or modifications to existing law.

To provide the data needed to compile the inventory, companies producing or importing mercury or mercury compounds or using mercury or mercury compounds will be required to report on this activity under a rule to be issued by the Administrator. To minimize any reporting burden, EPA must coordinate its reporting with State mercury product reporting requirements through the Interstate Mercury Education and Reduction Clearinghouse, IMERC. In addition, the provision excludes waste management activities already reported under the Resource Conservation and Recovery Act, RCRA, from this reporting, unless the waste management activity produces mercury via retorts or other treatment operations. A company engaged in both waste generation or management and mercury manufacture or use must report on the mercury manufacture and use activity, since that data would not be provided under the RCRA reporting. I yield to Senator MERKLEY.

Mr. MERKLEY. Mr. President, I thank Senator LEAHY.

The second mercury provision builds upon the Mercury Export Ban Act of 2008, expanding the export ban currently in effect for elemental mercury to certain mercury compounds previously identified by EPA or other regulatory bodies as capable of being traded to produce elemental mercury in commercial quantities and thereby undermine the existing export ban. The mercury compound export ban would go into effect in 2020, providing EPA and companies ample preparation time. An exemption is provided to allow the landfilling of these compounds in Canada, a member country to the Organization for Economic Co-operation and Development, OECD, with which we have a bilateral arrangement to allow these cross-border transfers. The export is only authorized for landfilling; no form of mercury or mercury compound recovery, reuse, or direct use is permitted. EPA must evaluate whether such exports should continue within 5 years, in part based upon available domestic disposal options, and report to Congress on this evaluation so we may revise the law as needed. I have been happy to partner with Senator WHITEHOUSE and Senator LEAHY on these issues.

Mr. WHITEHOUSE. Mr. President, I thank Senator MERKLEY. We are pleased these provisions were included in a bill and believe it is fitting they are included in a package designed to protect the public from toxic chemicals, like mercury, and named after the late Frank Lautenberg, one of the original cosponsors of the Mercury Use Reduction Act.

The PRESIDING OFFICER (Mr. DAINES). The Senator from Oklahoma.

Mr. INHOFE. Mr. President, may I inquire as to how much time is remaining?

The PRESIDING OFFICER. There is 7½ minutes remaining.

Mr. WHITEHOUSE. I will yield the time.

The PRESIDING OFFICER. That is all the time remaining.

Mr. INHOFE. That is all the time remaining; is that correct?

The PRESIDING OFFICER. That is correct.

Mr. INHOFE. I will not use 7½ minutes, but I will be using that after the vote. I do want to include one more person who has not been thanked, and that is Senator MCCAIN.

Right now we are in the middle of the must-pass bill every year, the Defense authorization bill. He was kind enough to allow us to work this in during his very busy schedule on this bill, which we are trying to get through this week. So I do thank him very much.

It is important, even though we thank the same people over and over again. When it gets to Dimitri, I am going to pronounce his name right, and I will be thanking him and several others. With that, I yield our time back.

I see the Senator from Massachusetts.

Mr. MARKEY. Will the Senator yield?

Mr. INHOFE. Of course.

Mr. MARKEY. I just want to once again compliment Senator INHOFE and Senator VITTER. It didn't have to wind up this way. It wound up this way because you reached across the aisle, because you ensured that all sides were given a fair hearing, and that at the end of the day there would be this result.

I have been doing this for 40 years. I have been on the Environment Committee for 40 years. This is not easy. From my perspective, it is historic and it is unprecedented in terms of ultimately how easy the Senator made this process. I was there at the table of Superfund, Clean Air Act, all the way down the line. You—you, my friend, have distinguished yourself, and along with Senator VITTER you have made it possible for all of us to hold hands here as this historic bill tonight will pass on the Senate floor.

I just wanted to compliment the Senator.

Mr. INHOFE. I appreciate the remarks of the Senator from Massachusetts very much.

Mr. President, I yield back our time and ask for the vote.

The PRESIDING OFFICER. The question is on agreeing to the motion to concur.

The motion was agreed to.

The PRESIDING OFFICER. The Senator from Oklahoma.

Mr. INHOFE. Mr. President, let me go through the list. As I made the statement, it is important that people recognize how long staff works around here. Quite frankly, I have often said, when they come around for a report from our committee—the Environment and Public Works Committee, the committee that has the largest jurisdiction in the entire U.S. Senate—we are the committee that gets things done.

If we look at the variety of philosophies that are present praising this work that is being done, we had the very most conservative to the very most progressive of Members, and it is not just this bill. We did the highway reauthorization bill, something that had to wait for about 8 years to get done, the largest one since 1998. We had the WRDA bill, which we anticipate is going to be a reality. It has come out of our committee. This committee also has jurisdiction over the Nuclear Regulatory Commission and then all of the public works. As my ranking member, Senator BOXER, has said several times during this process, we get things done.

Now, we do disagree on a lot of the issues on the environment. As I say to my good friends on the other side of the aisle, you have every right to be wrong, but we get things done, and I appreciate that very much.

Senator MCCAIN, I already thanked you for yielding to us to allow us to pass one of the most significant bills which we just passed by voice vote.

Mr. MCCAIN. I would be glad to be thanked again.

Mr. UDALL. I am ready to do that also, if the Senator will yield.

Mr. INHOFE. I yield the floor.

Mr. UDALL. Mr. President, I will just also—has the Senator finished?

I just wanted to say a few closing words and thank a few more people staying to the end, but of course the chairman needs to finish his remarks.

Mr. INHOFE. Let me just quickly say—because I do want to make sure we get on the record on this, Senators Vitter and Udall, certainly the Senator from New Mexico. The way we have worked together is remarkable. The Senator has brought in Bonnie to do the work she has done. I know she wanted to be here as we are voting on this bill, but it got down to do we want to get it done tonight or do we want to take a chance for later.

Dimitri Karakitsos, all these were working. Jonathan Black with Senator UDALL's office has been great, and Andrew Wallace so ably represented Senator UDALL in those negotiations. I thank Michal Freedhoff in Senator MARKEY's office for the hours of work he poured into this bill. I also thank Adrian Deveny with Senator MERKLEY for his work in these negotiations and Adam Zipkin representing Senator

BOOKER. A special thanks goes to Bill Ghent and Emily Spain with Senator CARPER. Senator CARPER has not been mentioned much tonight, but he has been very active in getting this done. Emily Enderle with Senator WHITEHOUSE. Senators Carper, Whitehouse, Merkley, and Booker have been partners in getting this completed. Finally, I appreciate, as I have said many times before, Senator BOXER and her team, Bettina Poirier and Jason Albritton, for working with us in support of this bill. We have done not just this bill but a lot of bills in the committee, and these same characters keep coming up. So it is the staff who has driven this thing. I have to say, my chief of staff, the one most prominent on the committee, obviously did so much of the work on this. So, Ryan Jackson, you did a great job.

With that, I yield the floor.

Mr. UDALL. I thank the chairman. I just want to say to Chairman INHOFE, the bipartisanship he showed is incredible, and it showed what a significant accomplishment we could have.

I also want to thank so much Senator MCCAIN for allowing us to fit a little slice here in the middle of this very important bill, the NDAA, which I know he works on all year long. He does a terrific job. He allowed us to come in.

He knew my uncle, Mo Udall. They served together in the House. I said: I hope you will do this for Mo. He just got a very big smile on his face because he spent so much time with him.

Mr. INHOFE. Will the Senator yield?

Mr. UDALL. I will yield.

Mr. INHOFE. I save one of the best for last, and that is Alex Herrgott. I neglected to mention him.

Mr. UDALL. Of course, Alex, thank you.

Mr. President, I ask unanimous consent to use enough time here to just get through my thank-yous.

The PRESIDING OFFICER. Without objection, it so ordered.

Mr. UDALL. The House and the Senate passed bills. We didn't actually go through conference committee, but we worked hard on those differences from late December through just a few weeks ago. We faced challenges working out a final agreement with the House. We had two very different bills. Both had broad bipartisan support, but they took very different paths to fix our broken chemical safety program, but we worked through those issues too. Although this was not a formal conference, it was a true bicameral process with a lot of give-and-take. To that end, I want to ensure the record reflects a number of views that I and some of my colleagues have about the final product.

We are not filing a traditional conference report, but Senators BOXER, MARKEY, MERKLEY, and I have prepared a document to enshrine the views we have on the compromised language. That will be added to the RECORD for posterity on our final product.

I thank all of our Senate and House colleagues who were instrumental in pulling this together. Again, Chairman INHOFE was a driving force, and Senators VITTER, CRAPO, CAPITO, and Senators MERKLEY, MARKEY, and BOXER. Throughout this entire process, Ranking Member BOXER and I didn't always agree. We are of the same party, but we also have different opinions about the most important aspects of this legislation. I want to say I sincerely appreciate her work and advocacy, especially on State preemption. She is a force. All of my colleagues know that. She worked hard to improve this bill. The legislative process is an important one, and I believe it played out to a good resolution.

I also thank her and her staff, Bettina Poirier and Jason Albritton, for their dedication and work. Then, my staff members who have been mentioned here several times were crucial: Jonathan Black, Andrew Wallace, Mike Collins, Bianca Ortiz Wertheim, and all my staff who over these 3 years kicked in and helped out when the heavy burden was on the folks I have mentioned.

On the House side, I thank Chairman FRED UPTON, Subcommittee Chairman JOHN SHIMKUS, of course Leader PELOSI, Democrat Whip HOYER, Ranking Member PALLONE, and Representatives DEGETTE and GREEN. They all worked tirelessly to advocate for reform.

I would like to mention their staff members as well: Republican staff, Dave McCarthy, Jerry Couri, Tina Richardson, Chris Sarley, and the Democratic staff, Rick Kessler, Jackie Cohen, Tuley Wright, Jean Frucci, and especially Mary Frances Repko with Representative HOYER's office, and Eleanor Bastion and Sergio Espinosa with Representatives DEGETTE's and GREEN's offices. All these staff and so many more worked tirelessly to advocate for their members and shape and move this complex and important legislation, and of course my own staff and many more whom I did not mention, many Senate and House staff who have come and gone over the long process but played very important roles. There are too many to try and list, but let me say thanks to the good folks at the House and Senate legislative counsel offices. Throughout this process, we used both offices a tremendous amount and appreciated their patience and good work, especially Michelle Johnson-Weider, Maureen Contreni, and Deanna Edwards at the Senate legislative counsel.

A law like this takes so much work from all these offices and staff. I know my own staff could not have possibly done it without the expertise and advice of the experts at the Environmental Protection Agency. Of course, Administrator Gina McCarthy and her top assistant, Administrator Jim Jones, deserve a great deal of gratitude for all they did to help support our efforts and ensure we got it right, and many congressional liaisons, program officers, and lawyers from the general counsel's office. My staff and others spent many evenings and weekends with EPA experts on calls to make sure we were getting the text right. Here are just a few: Wendy Cleland-Hamnet, Ryan Wallace, Priscilla Flattery, Kevin McLean, Brian Grant, David Berol, Laura Vaught, Nichole Distefano, Sven-Erik Kaiser, Tristan Brown, Ryan Schmit, Don Sadowsky, and Scott Sherlock. I thank them all and put them on alert: The real job for the EPA is only beginning.

I am about finished, Senator MARKEY.

Mr. MARKEY. One second. I just wanted to reinforce what the Senator just said. On the House side, FRED UPTON, FRANK PALLONE, NANCY PELOSI, and STENY HOYER, that incredible staff, Mary Frances Repko, over there, just indispensable. That is why it happened. It is bipartisan, bicameral.

I thank the Senator for yielding.

Mr. UDALL. I thank the Senator. He knows, because he has served so many years, how important it is to have good staff. I want to make sure we get them thanked here. I appreciate that.

Implementation of this law is going to be extremely important. As the ranking member on the Appropriations Committee with jurisdiction over EPA, I will remain very involved in ensuring that this law gets implemented well.

Finally, I also recognize all the great advocates for reform who pushed Congress to act and kept pushing until we did act. Of course, I need to start by thanking the Environmental Defense Fund. In particular, Fred Krupp and his staff, Richard Denison, Joanna Slaney, and Jack Pratt. Let me also thank Dr. Lynn Goldman, the dean of Public Health at George Washington University, and the good advocates at Moms Clean Air Force, the Humane Society, the National Wildlife Federation, the March of Dimes, the Physicians Committee for Responsible Medicine, the Building Trades, the American Association of Justice, and so many others. They reminded us that we are working for reform that would improve the lives of countless mothers, fathers, and children. From New Mexico to Michigan, from California to Maine, they reminded us that the American people need a working chemical safety program.

I know there are many other groups in the environmental and public health community that took a different approach to our bill. I understand and appreciate where they were coming from—groups like Safer Chemicals, Healthy Families, and the Natural Resources Defense Council. They brought passion and conviction to the debate and stood firm on principles. They played a great and important role, and I want to thank them for that.

Good legislation takes work. It takes give-and-take from everyone, including industry groups, the American Chemistry Council, the American Cleaning Institute, and over 100 other members of the American Alliance for Innovation. Thank you for engaging in the

process to get this done. Many thousands of Americans have worked for chemical safety reform over the last four decades. I am thanking you for not giving up.

My dad always said—and Senator MCCAIN knew my father Stewart Udall—"Get it done, but get it done right." And today I can say that not only did we get it done, but we got it done right. Let's not forget, this is just one step in the process. We must find a way to work collaboratively as we turn to the next step—implementation. Implementation needs to be done and needs to be done right.

I look forward to working with all of these members and groups to ensure we have a strong, workable chemical safety program.

Thank you, Senator MCCAIN. I am sorry if this went longer than you expected. I know my Uncle Mo is looking down and saying thank you to you and my father Stewart and the long relationship you have had with the Udall family and the chapters in your books about Mo Udall and that relationship. So thank you so much, and I thank also Ranking Member JACK REED for his patience. I know the hour is getting late. Thank you so much.

I yield the floor.

Mr. MCCAIN. Will the Senator yield? I just wonder if there is anyone left in America whom he has not thanked.

Mr. UDALL. I did my best.

---

## NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2017—Continued

The PRESIDING OFFICER. The Senator from Rhode Island.

AMENDMENT NO. 4549 TO AMENDMENT NO. 4229

Mr. REED. Mr. President, I call up amendment No. 4549 to McCain amendment No. 4229, and I ask unanimous consent that it be reported by number.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will report the amendment by number.

The senior assistant legislative clerk read as follows:

The Senator from Rhode Island [Mr. REED] proposes an amendment numbered 4549 to amendment No. 4229.

The amendment is as follows:

(Purpose: To authorize parity for defense and nondefense spending pursuant to the Bipartisan Budget Act of 2015)

At the end, add the following:

**SEC. 1513. OTHER OVERSEAS CONTINGENCY OPERATIONS MATTERS.**

(a) ADJUSTMENTS.—Section 101(d) of the Bipartisan Budget Act of 2015 (Public Law 114–74; 129 Stat. 587) is amended—

(1) by striking paragraph (2)(B) and inserting the following:

"(B) for fiscal year 2017, $76,798,000,000."; and

(2) by inserting after paragraph (2) the following:

"(3) For purposes authorized by section 1513(b) of the National Defense Authorization Act of 2017, $18,000,000,000.".

(b) ADDITIONAL PURPOSES.—In addition to amounts already authorized to be appropriated or made available under an appropriation Act making appropriations for fiscal year 2017, there are authorized to be appropriated for fiscal year 2017—

(1) $2,000,000,000 to address cybersecurity vulnerabilities, which shall be allocated by the Director of the Office of Management and Budget among nondefense agencies;

(2) $1,100,000,000 to address the heroin and opioid crisis, including funding for law enforcement, treatment, and prevention;

(3) $1,900,000,000 for budget function 150 to implement the integrated campaign plan to counter the Islamic State of Iraq and the Levant, for assistance under the Food for Peace Act (7 U.S.C. 1721 et seq.), for assistance for Israel, Jordan, and Lebanon, and for embassy security;

(4) $1,400,000,000 for security and law enforcement needs, including funding for—

(A) the Department of Homeland Security—

(i) for the Transportation Security Administration to reduce wait times and improve security;

(ii) to hire 2,000 new Customs and Border Protection Officers; and

(iii) for the Coast Guard;

(B) law enforcement at the Department of Justice, such as the Federal Bureau of Investigation and hiring under the Community Oriented Policing Services program; and

(C) the Federal Emergency Management Agency for grants to State and local first responders;

(5) $3,200,000,000 to meet the infrastructure needs of the United States, including—

(A) funding for the transportation investment generating economic recovery grant program carried out by the Secretary of Transportation (commonly known as "TIGER grants"); and

(B) funding to address maintenance, construction, and security-related backlogs for—

(i) medical facilities and minor construction projects of the Department of Veterans Affairs;

(ii) the Federal Aviation Administration;

(iii) rail and transit systems;

(iv) the National Park System; and

(v) the HOME Investment Partnerships Program authorized under title II of the Cranston-Gonzalez National Affordable Housing Act (42 U.S.C. 12721 et seq.);

(6) $1,900,000,000 for water infrastructure, including grants and loans for rural water systems, State revolving funds, and funds to mitigate lead contamination, including a grant to Flint, Michigan;

(7) $3,498,000,000 for science and technology, including—

(A) $2,000,000,000 for the National Institutes of Health; and

(B) $1,498,000,000 for the National Science Foundation, the National Aeronautics and Space Administration, the Department of Energy research, including ARPA-E, and Department of Agriculture research;

(8) $1,900,000,000 for Zika prevention and treatment;

(9) $202,000,000 for wildland fire suppression; and

(10) $900,000,000 to fully implement the FDA Food Safety Modernization Act (Public Law 111–353; 124 Stat. 3885) and protect food safety, the Every Student Succeeds Act (Public Law 114–95; 129 Stat. 1802), the Individuals with Disabilities Education Act (20 U.S.C. 1400), the Workforce Innovation and Opportunity Act (29 U.S.C. 3101 et seq.), and for college affordability.

Mr. REED. Mr. President, I look forward to a very thoughtful debate tomorrow. Senator MCCAIN has introduced an amendment that would increase spending with respect to the Department of Defense and related functions. In this amendment, we are proposing an additional increase in nondefense programs. I look forward to tomorrow.

I thank the chairman for his consideration through the process of this floor debate.

The PRESIDING OFFICER. The Senator from Arizona.

Mr. MCCAIN. Mr. President, I thank my friend from Rhode Island and look forward to vigorous debate on both the initial amendment and the second-degree amendment proposed by my friend from Rhode Island. I would like to engage in very vigorous debate on both, and hopefully, for the benefit of my colleagues, cloture on both will be filed by the majority leader and hopefully we can finish debate on it either late morning tomorrow or early afternoon, if necessary, so we can move on to other amendments.

Let's have no doubt about how important this debate and discussion on this amendment will be tomorrow. We are talking about $18 billion. In the case of the Senator from Rhode Island, I am sure there are numerous billions more as well. I think it deserves every Members' attention and debate.

I say to my friend from Rhode Island, I certainly understand the point of view and the position they have taken, and from a glance at this, it looks like there are some areas of funding that are related to national security that I think are supportable. There are others that are not, but we look forward to the debate tomorrow, and hopefully any Member who wants to be involved will come down and engage in this debate. We would like to wrap it up tomorrow because there are a number of other amendments pending.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oregon.

Mr. WYDEN. Mr. President, it was extraordinary to watch this bipartisan effort on TSCA.

An hour ago, Senator PETERS and I thought we were going to have floor time for some brief remarks. I would like to ask unanimous consent that Senator PETERS have the chance to address the issues he thought he was going to address, and he is going to be brief. I will go next. I will be brief. I ask unanimous consent that following Senator PETERS' remarks, I be allowed to address the Senate briefly.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

The Senator from Michigan.

AMENDMENT NO. 4138

Mr. PETERS. Mr. President, I rise to thank Chairman MCCAIN and Ranking Member REED for their support and for their help in passing the Peters amendment No. 4138 to the National Defense Authorization Act. I also would like to thank my colleagues Senators DAINES, TILLIS, and GILLIBRAND for joining me in this important bipartisan amendment. I would also like to thank all the

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF
CALIFORNIA

Case Number: 3:17-cv-02162-EMC

PLTF / DEFT EXHIBIT
NO.____543______

Date
Admitted:________________________

By:________________________________

Angella Meuleman, Deputy Clerk