# **<u>Exhibit A</u>**



**Rebuttal Report of
Ellen T. Chang, Sc.D.**

*In the matter of*

**Food & Water Watch,** *et al.*
**v.**
**U.S. Environmental Protection
Agency,** *et al.*

**DJ # 90-5-1-4-21106**

Ellen T. Chang, Sc.D.
August 1, 2019

lack of measurement of actual fluoride exposures (82 FR 11882–11885). In light of the studies' limitations and the "relatively poor quality of the exposure and effects data in the cited human studies" (82 FR 11882). U.S. EPA concluded that the available scientific evidence was inadequate to evaluate a dose-response relationship for risk assessment, or to rule out confounding or bias in favor of a causal effect (82 FR 11882–11886). The Agency also pointed out that fluoride exposure levels evaluated in most of those studies were "well above those found in fluoridated U.S. drinking water" (82 FR 11883), which prevents inference relevant to exposures in the U.S. Regarding two studies cited in the petition that were based in Western populations (Malin and Till 2015, Peckham et al. 2015), U.S. EPA also identified several major methodological limitations and concluded that "causal inference cannot be made from these studies" regarding the potential health effects of exposure to fluoridated drinking water in the U.S. (82 FR 11883–11884).

On April 18, 2017, the Plaintiffs filed suit against U.S. EPA to compel the initiation of rulemaking pursuant to Section 6 of TSCA, 15 U.S.C. §2605, to prohibit the addition of fluoridation chemicals to drinking water supplies. On June 27, 2019, Plaintiffs' retained experts Dr. Jacqueline Calderón Hernández, Dr. Philippe Grandjean, and Dr. Kathleen Thiessen, as well as non-retained experts Dr. Howard Hu and Dr. Bruce Lanphear, filed expert reports pertaining at least in part to the epidemiological evidence on the association between exposure to fluoride and human developmental neurotoxicity.

Accordingly, I have been asked by counsel for U.S. EPA to assess and respond to the Plaintiffs' expert opinions on the epidemiological evidence regarding the association between exposure to fluoride and human developmental neurotoxicity. As described below, a thorough and objective response to the Plaintiffs' expert opinions on epidemiology requires a systematic review and causal analysis of the epidemiological literature on fluoride exposure and developmental neurotoxicity in humans. Therefore, this rebuttal report describes the process that I used to identify and review the relevant epidemiological literature on this topic, as well as my analysis of the overall weight of all available studies to make a scientifically reliable conclusion on whether a causal relationship has been established between human developmental neurotoxicity and exposure to fluoride. My causal analysis is focused particularly on fluoride exposure at the target level attained from artificial fluoridation of drinking water (i.e., 0.7 mg/L, based on the U.S. Public Health Service Drinking Water Standards (DHHS 2015)), but it also takes into consideration studies of higher levels of fluoride found naturally in drinking water elsewhere in the world.

   developmental neurotoxicity are of poor quality and insufficient to establish
   causal effects of fluoride exposure due to their methodological limitations,
   including their cross-sectional design, high potential for selection bias,
   ecological or otherwise non-specific assessment of fluoride exposure, and
   minimal control for confounding.

   o Most of the available epidemiological studies were conducted in populations
     where average fluoride exposure levels were well above those attained through
     artificial fluoridation in the U.S., such that their findings cannot reliably be
     extrapolated to the potential health effects of consuming artificially fluoridated
     drinking water in the U.S

   o Concerns about editorial and publication bias also undermine the reliability of
     conclusions based on many of the available published epidemiological studies of
     fluoride exposure and developmental neurotoxicity.

   o In the past two years, the available epidemiological literature has been
     augmented by higher-quality studies in Western populations with lower levels of
     fluoride in drinking water, including some studies that found statistically
     significant adverse associations. However, the number of such studies is
     relatively small; methodological uncertainties remain about the assessment of
     fluoride exposure and neurodevelopmental outcomes; and the reported findings
     are plausibly explained by confounding, bias, and chance.

- Dr. Calderón Hernández's, Dr. Grandjean's, and Dr. Thiessen's opinions on the
  association between fluoride exposure and human developmental neurotoxicity are not
  based on a rigorous causal analysis of the relevant scientific literature.

   o In contrast and in response to Plaintiffs' experts, I conducted a causal analysis of
     the overall weight of the relevant epidemiological and related scientific literature
     on fluoride exposure and developmental neurotoxicity, using the generally
     accepted Bradford Hill considerations and focusing on the higher-quality studies
     set in Western populations with lower levels of fluoride in drinking water. ==Based
     on this analysis, I conclude that the current scientific evidence is not sufficient to
     demonstrate a causal effect== of consumption of fluoridated drinking water,
     including at the recommended concentration of 0.7 mg/L in U.S. community
     water, on human developmental neurotoxicity, including impaired IQ, behavioral
     or conduct problems, attention-deficit disorder or attention-deficit hyperactivity
     disorder (ADD/ADHD), and other adverse neurodevelopmental outcomes.

9

1807950.000 – 7057

- children. These associations remain large and significant when controlling for relevant covariates."
- "(5) Based on the convergent results from the MIREC and ELEMENT cohorts, the *in utero* period appears to be a susceptible period of life vis-à-vis fluoride toxicity …"

Dr. Thiessen's opinions:

- "A systematic review of the human literature was not considered necessary nor particularly helpful, since systematic reviews have already been conducted, and those few studies reporting no effects are well known to people familiar with fluoride research. As those familiar with the literature know, there are many more studies reporting associations of fluoride exposure with neurotoxic outcomes than the reverse. The number of studies reporting no association between fluoride and neurotoxic outcomes is quite small, and, as such, a systematic review was not considered necessary to identify and address them."
- "Identifiable subsets of the population have heightened susceptibility to the risk of harm from fluoridation chemicals. These populations include the fetus; bottle-fed infants; the elderly; individuals with nutrient deficiencies, kidney disease, and/or high-water intake; and populations with specific genotypes."

I rely on Dr. Joyce Tsuji's analysis of the experimental animal and related toxicological evidence on the potential developmental neurotoxicity of fluoride.

## Overview of Response to Plaintiffs' Experts' Opinions

My overarching response to Plaintiffs' experts' opinions on the association between fluoride exposure and human developmental neurotoxicity is that a scientifically informed opinion regarding this association should be based on a systematic review and synthesis of the relevant epidemiological literature, including the methodological quality and results of the available studies, combined with a critical assessment of whether this literature establishes a causal effect.

Epidemiology is the scientific study of the distribution and determinants of diseases in populations. Epidemiological research is required to measure disease occurrence, to identify the causes of specific health outcomes in humans, to assess the contribution of various causal factors to the occurrence of diseases that can be induced by multiple agents, and to determine exposure-response relationships between causes and human health effects. Therefore, epidemiological studies are the most relevant and informative scientific basis on which to evaluate the relationship between fluoride exposure and developmental neurotoxicity in humans. In Appendix C to this report, I provide a brief introduction to epidemiology that identifies and defines some technical terms that are used by epidemiologists to describe the

15

# Evaluation of Causality According to the Hill Guidelines

The ultimate goal of epidemiological research is to identify the causes of human health problems and, ideally, the means of preventing them. Therefore, a systematic review of epidemiological literature naturally leads to the question of whether the available evidence supports a conclusion of cause and effect. However, a conspicuous gap in the Plaintiffs' experts' reports in this matter is that none of them present a structured causal analysis of the relevant epidemiological studies of fluoride exposure and developmental neurotoxicity. Without such an analysis, the question remains unaddressed whether the statistical associations observed in many of the available epidemiological studies are due to a causal impact of fluoride exposure. Besides minimizing the possibility of bias, confounding, and chance as explanations for a given statistically significant association observed in an individual epidemiological study, establishing whether an association is causal also requires an evaluation of the overall weight of the scientific evidence from relevant epidemiological studies, taking into account evidence from relevant toxicological and mechanistic studies. Therefore, to address the deficiency left by Plaintiffs' experts, I conducted a formal causal evaluation of the association between fluoride exposure and human developmental neurotoxicity, as described below.

As a framework for this causal analysis I used the set of general guidelines formulated by Sir Austin Bradford Hill (Hill 1965); these guidelines or "viewpoints" are commonly used by epidemiologists and accepted in the scientific community and in legal settings (Cole 1997, Rothman et al. 2008, NRC 2011). Hill's nine considerations are described briefly below.

- *Strength*: Magnitude of the observed association between the exposure and the health outcome of interest; all else being equal, strong associations are less likely than weak associations to be due to confounding or bias.
- *Consistency*: Repeated observation of an association between the exposure and the health outcome of interest by different investigators across different study settings; repetition helps to reduce the probability of chance as an explanation for an observed association.
- *Specificity*: Limitation of an observed association to a single exposure and a single health effect; absence of specificity does not necessarily reduce the likelihood of causality.
- *Temporality*: Sequence by which a cause must precede an effect in time.
- *Biological gradient*: Exposure-response trend by which occurrence of the health outcome increases in accordance with greater exposure.
- *Plausibility*: Credibility of a causal relationship based on current knowledge in toxicology, biology, and other fields; depends on present scientific evidence, which is subject to change.

# Conclusions

As summarized earlier in this report, Plaintiffs' experts express opinions that fluoride exposure is adversely associated with neurodevelopment in children. However, they do not explicitly conclude that this association is causal in nature.

Specifically, Dr. Calderón Hernández states that fluoride exposure is "consistently associated with cognitive deficits in children" in her research studies, and that the dose-response data from prospective cohort studies performed by her research team (Valdez Jiménez et al. 2017) and by the Mexico City team (Bashash et al. 2017, Bashash et al. 2018) "suggests that fluoride poses a neurologic risk at the urinary fluoride levels found in pregnant women living in artificially fluoridated communities."

Dr. Grandjean states that epidemiological studies have "identified links" between fluoride exposure and cognitive deficits in children; and that studies in recent years "document that adverse effects on brain development happen at elevated exposure levels" commonly found in North America, leaving "little doubt that developmental neurotoxicity is a serious risk associated with elevated fluoride exposure."

Dr. Lanphear states that his research team's findings (Green et al. in press, Till et al. in review), along with those in Mexico City (Bashash et al. 2017), show that "prenatal fluoride exposure was significantly associated with lower intellectual abilities in 3-4 year old children," thereby indicating that "the *in utero* period appears to be a susceptible period of life vis-à-vis fluoride toxicity."

Dr. Hu is described in Plaintiffs' Amended Expert Disclosures as holding the opinion that the "methodologically rigorous" and "scientifically reliable and robust" findings from his research team "are consistent with and support the conclusion that fluoride is a developmental neurotoxicant at levels of exposure seen in the general population."

Dr. Thiessen states that "there is sufficient evidence to conclude that neurotoxicity is a hazard of fluoride exposure," but she notes that according to U.S. EPA (1998), "the purpose of the hazard identification analysis is to determine from the collective data whether a neurotoxicity hazard 'could exist' for the chemical [U.S. EPA 1998]. The Guidelines provide that 'the minimum evidence sufficient would be data on a single adverse endpoint from a well-conducted study.'" Thus, identification of a hazard according to these guidelines does not require sufficient evidence of a causal effect.

In support of their opinions, Plaintiffs' experts cite their own (except for Dr. Thiessen) and selected other epidemiological studies of the association between fluoride exposure and developmental neurotoxicity. However, they have not conducted a systematic literature review of this topic to assess the totality of relevant epidemiological evidence currently available, nor do they indicate that they have conducted a formal causal analysis of this collective evidence. Therefore, I conducted a systematic literature review and causal analysis to address the gaps in the epidemiological evidence base presented by Plaintiffs' experts, and to provide an unbiased, comprehensive, transparent, and reproducible summary of the epidemiological evidence on this topic.

My systematic literature review shows that few rigorously conducted epidemiological studies are relevant to the question of whether artificial drinking water fluoridation in the U.S. causes developmental neurotoxicity. Dozens of poor-quality, cross-sectional, often ecological studies have been conducted in China, India, and other regions with high natural or anthropogenic levels of fluoride in water and/or air. These studies are of minimal relevance to the present matter due to their disparate sociodemographic, geographical, cultural, and environmental settings, their substantial potential for publication and editorial bias, and their high exposure levels. In light of their major methodological limitations, which could readily produce spurious statistical associations due to confounding or bias, these studies are not sufficient to establish a causal relationship between relatively high-concentration, naturally fluoridated drinking water and developmental neurotoxicity in humans.

In the relatively more informative, methodologically superior epidemiological studies conducted in Western regions, some statistically significant associations were observed between early-life low-level fluoride exposure and subsequent adverse neurodevelopmental outcomes, including some monotonic exposure-response trends. However, these associations were modest, inconsistent, of questionable biological plausibility, and not coherent with secular trends in IQ. In addition, concerns persist about potential selection bias, uncertainties and variation in exposure assessment, heterogeneity and limited reliability in outcome assessment, and high potential for confounding in these studies. Therefore, bias, confounding, and chance are reasonable explanations for the observed associations, which cannot reliably be attributed to causation.

In conclusion, in the absence of a systematic literature review and causal analysis, Plaintiffs' experts do not provide sufficient evidence to show a causal effect of fluoride exposure on developmental neurotoxicity in humans. To address the scientific gaps left by the Plaintiffs' expert reports, I conducted a systematic literature review and causal analysis of the available epidemiological studies on this issue. My assessment shows that the overall weight of scientific evidence does not demonstrate a causal effect of consumption of fluoridated drinking water on developmental neurotoxicity, including impaired IQ, behavioral or conduct problems,

ADD/ADHD, and other adverse neurodevelopmental outcomes, especially at a fluoride concentration of 0.7 mg/L in U.S. community drinking water.

1807950.000 – 7057