# Exhibit G

U.S. FEDERAL COURT

ACTION NO. 17-CV-02162

FOOD AND WATER WATCH, *et al.* v. U.S. EPA

REBUTTAL AND SUPPLEMENTAL REPORT OF
PHILIPPE GRANDJEAN, MD, DMSc

PREPARED ON BEHALF OF
PLAINTIFFS

14 August 2019

although several errors and omissions mentioned above suggest that her review of my report was rather superficial.

As a conclusion, Dr. Chang claims: "I conducted a causal analysis of the overall weight of the relevant epidemiological and related scientific literature on fluoride exposure and developmental neurotoxicity, using the generally accepted Bradford Hill considerations and focusing on the higher-quality studies set in Western populations with lower levels of fluoride in drinking water" (p. 9). Again, this analysis is superficial and pays lip service only to Sir Austin's wise advice. The depth of Dr. Chang's analysis is problematic when considering the wealth of evidence and the risks of possible bias that are likely to occur toward the null. Dr. Chang cites Kenneth Rothman's textbook [23] in support for her causal analysis but fails to acknowledge Rothman's prudent criticism of the superficial type of checklist analysis that Dr. Chang relies on in her report. As Rothman has noted, "checklists lend a deceptive kind of mindless authority to an imperfect and creative process" (p.34). I also refer to an excellent review of the causality aspects published in a legal journal [24] that again argues against superficial assessments. As I shall now discuss, Dr. Chang's "causal analysis" is primitive and unbalanced, and her conclusions are biased.

*Strength*: Dr. Chang dismisses the strength of the association between fluoride and IQ on the grounds that a loss of 3 to 5 IQ points is "relatively small in comparison with normal, expected variation" (p. 69). Under this arbitrarily high standard, other well-known neurotoxicants (e.g., lead, methylmercury, arsenic) would fail Dr. Chang's strength criterion. In fact, a similar criticism that was once used to dismiss the epidemiological data on lead and IQ was appropriately rejected [25]. In the context of neurotoxicants, a population-wide loss of 3-to-5 IQ points is very large, and—as explained in my report (p. 38-39)—would produce enormous economic losses on a population level, as also recognized by the EPA. In accordance with the EPA view of preventable IQ deficits, I must disagree with Dr. Chang that the association is small and can be ignored.

*Consistency*: Dr. Chang highlights non-informative findings from studies that made no attempt to measure or investigate prenatal or early postnatal fluoride exposures [3, 4, 9, 26, 27] as contradicting the highly significant findings from the prospective ELEMENT [16] and MIREC [17] birth cohort studies (pp. 70-71). Dr. Chang fails to acknowledge the inappropriate apples-to-oranges nature of this comparison and cites the "mixed" nature of the findings as a basis to conclude that the consistency factor has not been met. Further, Dr. Chang fails to mention that every single prospective birth cohort study to date has found a significant adverse effect of prenatal fluoride exposure on neurodevelopment [16, 17, 28-30]. Moreover, Dr. Chang gives short shrift to the consistent association between fluoride exposure and reduced IQ reported in the cross-sectional studies [2, 31, 32]. I already mentioned how Dr. Chang's misunderstanding of our meta-analysis [2] resulted in an erroneous claim that the reviews did not result in consistent conclusions. Dr. Chang also entirely ignored the findings from occupational studies, as well as the neuropathology data from examinations of fetal brain abnormalities. As I explained in my report, each of these types of studies is consistent with, and provide support for, fluoride being a neurotoxic agent at current levels of exposures.

*Specificity*: As Rothman and others have explained, and as Dr. Chang recognizes, lack of specificity "does not weight against or in favor of a causal conclusion" (p. 74).

11

*Temporality*: Dr. Chang's assessment of temporality mirrors her assessment of consistency in that she cites the New Zealand studies as contradicting the findings from the ELEMENT and MIREC cohorts. Once again, Dr. Chang fails to acknowledge the absence of prenatal or early postnatal fluoride exposure assessments in the New Zealand studies, nor any of the other shortcomings. Instead, Dr. Chang focuses on non-differential measurement uncertainties of the urinary fluoride data in the ELEMENT and MIREC cohorts to cast doubt on the findings of these studies. As already discussed, however, the imprecision of the urinary fluoride parameters would likely bias the results toward the null, not the reverse. The temporality requirement is thus met with fluoride, as each of the prospective birth cohort studies has found a significant association between early-life exposure to fluoride and the offspring's subsequent performance on neurobehavioral testing. In short, the exposure preceded the effect in these studies, which is what the temporality factor is supposed to assess.

*Biological Gradient*: Dr. Chang dismisses the biological gradient of fluoride's neurotoxicity effects by showing scatterplots from the ELEMENT and MIREC cohorts without the trend lines (pp. 77-81). However, this approach proves little, other than the undisputed fact that there is substantial natural variation in IQ across the population and that an appropriate statistical analysis is needed to extract a reliable estimate of the effect of the toxicant exposure. I am aware that similar scatterplots have been published showing the effects, e.g., of lead and IQ [33], and I believe that such scattering of results would not convince the EPA that lead is not neurotoxic. Dr. Chang also argues that outliers may have distorted the effects seen in the ELEMENT and MIREC cohorts (p. 77-78), without acknowledging that statistical analyses on the impact of exposure outliers have been conducted and that "the results did not change in any meaningful way" [16].

*Plausibility*: Dr. Chang limits her assessment of biologic plausibility to NTP's assessment of learning and memory [34] in animal models, and Dr. Tsuji's expert report (p. 83). In so doing, Dr. Chang completely ignores the large body of animal literature showing adverse neuroanatomical and neurochemical effects from fluoride exposure, as reviewed by the National Research Council (NRC) [35] and by Dr. Thiessen in her report. The NRC concluded that the neuroanatomical and neurochemical effects are sufficient to determine that fluoride interferes with brain function. Since the NRC reached this conclusion in 2006, much additional mechanistic research has been published. Dr. Chang ignores these data in favor of the NTP's narrower assessment, which found a "moderate" level of evidence for adult neurotoxicity, but a "low" level of evidence for developmental effects due largely to fewer studies being available.

I note that Dr. Chang (p. 83) relies on Dr. Tsuji's opinion when reaching her conclusion that there is no convincing evidence of fluoride neurotoxicity from experimental toxicology studies. I would rather rely on the conclusions drawn by the EPA's own experts on developmental neurotoxicity, including internationally recognized scientists such as William R. Mundy and Kevin M. Crofton [36]. These experts recently considered fluoride to be a chemical with substantial evidence of developmental neurotoxicity. I thus stand by the conclusion in my report that the animal data provide biologic plausibility for fluoride being a developmental neurotoxicant in humans.

*Coherence*: Dr. Chang dismisses the coherence of fluoridated water reducing IQ on the grounds that IQ scores in US children steadily improved throughout the 20th century (the

12