# Exhibit A



**Rebuttal Report of
Ellen T. Chang, Sc.D.**

*In the matter of*

**Food & Water Watch,** *et al.*
**v.**
**U.S. Environmental Protection
Agency,** *et al.*

**DJ # 90-5-1-4-21106**

Ellen T. Chang, Sc.D.
August 1, 2019

# Conclusions

As summarized earlier in this report, Plaintiffs' experts express opinions that fluoride exposure is adversely associated with neurodevelopment in children. However, they do not explicitly conclude that this association is causal in nature.

Specifically, Dr. Calderón Hernández states that fluoride exposure is "consistently associated with cognitive deficits in children" in her research studies, and that the dose-response data from prospective cohort studies performed by her research team (Valdez Jiménez et al. 2017) and by the Mexico City team (Bashash et al. 2017, Bashash et al. 2018) "suggests that fluoride poses a neurologic risk at the urinary fluoride levels found in pregnant women living in artificially fluoridated communities."

Dr. Grandjean states that epidemiological studies have "identified links" between fluoride exposure and cognitive deficits in children; and that studies in recent years "document that adverse effects on brain development happen at elevated exposure levels" commonly found in North America, leaving "little doubt that developmental neurotoxicity is a serious risk associated with elevated fluoride exposure."

Dr. Lanphear states that his research team's findings (Green et al. in press, Till et al. in review), along with those in Mexico City (Bashash et al. 2017), show that "prenatal fluoride exposure was significantly associated with lower intellectual abilities in 3-4 year old children," thereby indicating that "the *in utero* period appears to be a susceptible period of life vis-à-vis fluoride toxicity."

Dr. Hu is described in Plaintiffs' Amended Expert Disclosures as holding the opinion that the "methodologically rigorous" and "scientifically reliable and robust" findings from his research team "are consistent with and support the conclusion that fluoride is a developmental neurotoxicant at levels of exposure seen in the general population."

Dr. Thiessen states that "there is sufficient evidence to conclude that neurotoxicity is a hazard of fluoride exposure," but she notes that according to U.S. EPA (1998), "the purpose of the hazard identification analysis is to determine from the collective data whether a neurotoxicity hazard 'could exist' for the chemical [U.S. EPA 1998]. The Guidelines provide that 'the minimum evidence sufficient would be data on a single adverse endpoint from a well-conducted study.'" Thus, identification of a hazard according to these guidelines does not require sufficient evidence of a causal effect.

87

1807950.000 – 7057

In support of their opinions, Plaintiffs' experts cite their own (except for Dr. Thiessen) and selected other epidemiological studies of the association between fluoride exposure and developmental neurotoxicity. However, they have not conducted a systematic literature review of this topic to assess the totality of relevant epidemiological evidence currently available, nor do they indicate that they have conducted a formal causal analysis of this collective evidence. Therefore, I conducted a systematic literature review and causal analysis to address the gaps in the epidemiological evidence base presented by Plaintiffs' experts, and to provide an unbiased, comprehensive, transparent, and reproducible summary of the epidemiological evidence on this topic.

My systematic literature review shows that few rigorously conducted epidemiological studies are relevant to the question of whether artificial drinking water fluoridation in the U.S. causes developmental neurotoxicity. Dozens of poor-quality, cross-sectional, often ecological studies have been conducted in China, India, and other regions with high natural or anthropogenic levels of fluoride in water and/or air. These studies are of minimal relevance to the present matter due to their disparate sociodemographic, geographical, cultural, and environmental settings, their substantial potential for publication and editorial bias, and their high exposure levels. In light of their major methodological limitations, which could readily produce spurious statistical associations due to confounding or bias, these studies are not sufficient to establish a causal relationship between relatively high-concentration, naturally fluoridated drinking water and developmental neurotoxicity in humans.

In the relatively more informative, methodologically superior epidemiological studies conducted in Western regions, some statistically significant associations were observed between early-life low-level fluoride exposure and subsequent adverse neurodevelopmental outcomes, including some monotonic exposure-response trends. However, these associations were modest, inconsistent, of questionable biological plausibility, and not coherent with secular trends in IQ. In addition, concerns persist about potential selection bias, uncertainties and variation in exposure assessment, heterogeneity and limited reliability in outcome assessment, and high potential for confounding in these studies. Therefore, bias, confounding, and chance are reasonable explanations for the observed associations, which cannot reliably be attributed to causation.

In conclusion, in the absence of a systematic literature review and causal analysis, Plaintiffs' experts do not provide sufficient evidence to show a causal effect of fluoride exposure on developmental neurotoxicity in humans. To address the scientific gaps left by the Plaintiffs' expert reports, I conducted a systematic literature review and causal analysis of the available epidemiological studies on this issue. My assessment shows that the overall weight of scientific evidence does not demonstrate a causal effect of consumption of fluoridated drinking water on developmental neurotoxicity, including impaired IQ, behavioral or conduct problems,