# Exhibit B

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

FOOD & WATER WATCH, INC., et al.,

    Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

    Defendants.

Case No. 3:17-cv-02162 EMC

**TRIAL DECLARATION OF TALA HENRY**

steps of their analysis. For example, while Dr. Thiessen's report discusses the potential neurotoxic effects, including IQ loss, from exposure to fluoride, based on animal toxicology studies, Dr. Grandjean reaches conclusions concerning the potential for neurodevelopmental and cognitive effects from exposure to fluoride, based on the available human epidemiological studies.

98. Thus, although not explicitly stated in the petition, the Complaint, or the Plaintiffs' experts reports, I have to assume that the single condition of use identified in the complaint is the addition of fluoridation chemicals in public drinking water, the exposure being assessed is specifically and exclusively via drinking water, the hazard assessed is neurotoxicity, and children are a potentially exposed or susceptible subpopulation.

**B.     Hazard assessment.**

99. Consistent with the NRC's risk assessment paradigm, and as expressly required in TSCA section 6(b)(4)(F), the second step of risk evaluation is a hazard assessment for the chemical substance under the conditions of use.

100. A hazard assessment (also called effects assessment in some EPA guidance documents) identifies the types of adverse health or environmental effects or hazards that can be caused by exposure to the chemical substance in question, and characterizes the quality and weight of the evidence supporting this identification.

101. The significant issues, strengths, and limitations of the data and the uncertainties that require consideration will be presented, and the major points of interpretation will be highlighted. Scientific judgment will be used at every step of the process and must be applied transparently, clearly documented, and to the extent possible, follow principles and procedures that are articulated prior to conducting the assessment.

102. The principles of transparency require that external parties document all aspects of the human health hazard identification and dose-response assessments including, but not limited to, the following information: the individual and overall strengths and limitations of the hazard evidence, along with a discussion on the uncertainties, variability, degree of confidence, and underlying assumptions supporting the hazard values.

103. Consistent with this approach, execution of systematic review should be applied to

20

hazard assessment across and within the multiple data streams (*e.g.*, human, animal, and cell-based studies) supporting the risk evaluations. Execution of a systematic review methodology for each step of the risk assessment process, across and within each stream of evidence requires that:

    i. Data are collected under a defined literature search strategy that is developed to fit the needs of the different data streams supporting the risk evaluation;

    ii. data are reviewed according to pre-determined inclusion and exclusion criteria to identify information potentially relevant for the risk evaluation process;

    iii. quantitative and qualitative data or information are identified from each relevant data or information source and extracted using structured forms or templates; and

    iv. the study quality of individual studies is assessed using the evaluation strategies, including pre-determined criteria, documented in the scoping stage;

104. Data integration is the stage where the analysis, synthesis, and integration of multiple evidence streams takes place by considering quality, consistency, relevancy, coherence and biological plausibility within the context of the assessment question being evaluated.

105. A hazard assessment includes two components: hazard identification and dose-response assessment.

### 1. Hazard Identification.

106. Hazard identification is the process of determining whether exposure to a chemical stressor can cause an increase in the incidence of specific adverse health or environmental effects.

107. To presuppose a specific toxicity endpoint to the exclusion of all others is not consistent with conducting a hazard assessment of a chemical under TSCA. However, for the purpose of forming my opinion, I had to assume the hazard or outcome of interest is neurotoxic effects under a specific condition of use (community water fluoridation).

108. The scientific strategies for assessing the quality of data sources use a structured framework with predefined criteria for each type of data source. The goal is to provide transparency and consistency to the evaluation process along with creating evaluation strategies that meet the TSCA science standards for various data streams.

109. The general structure of the TSCA evaluation strategies is composed of evaluation

    ii.    Dr. Thiessen did not include an evaluation of the strengths, limitations, and uncertainties associated with the key studies used to derive POD values that can be carried forward to the risk characterization component of the assessment;

    iii.    the assumptions, limitations, and uncertainties in the underlying animal studies makes those data unsuitable for establishing a POD for the reasons identified by Dr. Tsuji; and

    iv.    based on Dr. Thiessen's own opinion that the recent human epidemiological studies concerning fluoride are sufficient for dose-response analysis, Dr. Thiessen's use of animal data is not consistent with the best available science.

### 4. Dr. Grandjean's dose-response analysis.

126. Dr. Grandjean's dose-response analysis focused on calculating benchmark doses (BMDs).

127. The BMD approach was developed as an alternative to the NOAEL/LOAEL approach.

128. BMD calculations are meant to provide an approximate threshold level which can be interpreted as a NOAEL. A BMD lower confidence limit ("BMDL") takes into account the uncertainty in the estimation of the relationship between dose and effect.

129. BMD modeling, a process of fitting a model to dose–response data, estimates a POD that is associated with a predefined level of biological response (*i.e.*, the benchmark response (BMR)).

130. EPA has published a *Benchmark Dose Technical Guidance* to provide guidance for the Agency and the outside community on consistent application of the BMD approach for deriving BMDs for a variety of uses, including the determination of PODs for different types of health effects data. This guidance provides a step-by-step process to be used in evaluating studies and endpoint types that are suitable for modeling, selecting the benchmark response ("BMR") level, model fitting and BMD computation, judging the fit of the model, and calculating the BMDL.

131. EPA's guidance document outlines a number of issues that need to be addressed to support consistent application of the BMD approach:

    i.    determination of studies and endpoints on which to base BMD calculations;

    ii.    selection of the benchmark response value;

    iii.    choice of the model(s) to use in computing the BMD;

    iv.    model fitting, assessment of model fit, and model comparison;

    v.    computation of the confidence limit for the BMD (*i.e.*, the BMDL); and

    vi.    reporting recommendations for the presentation of BMD and BMDL computations.

132. A summary of EPA's guidance with regard to reporting is presented here as the basis for review of Dr. Grandjean's analysis. There is a section of EPA's guidance that is dedicated to reporting recommendations because a thorough justification of the choices made to support the chosen approach and values should be presented. For any computation of a BMD or BMDL, the following elements are recommended:

    i.    study or studies selected for BMD calculation(s), including the rationale for study selection, rationale for selection of endpoints (effects) and a list of the dose-response data used;

    ii.    dose-response model(s) chosen for each case, including rationale for the selection, the estimation procedure (e.g., maximum likelihood, least squares, generalized estimating equations), estimates of model parameters (*i.e.*, inputs to the modeling, Goodness-of fit (*e.g.*, chi-squared statistics), log-likelihood, and AIC and standardized residuals (observed minus predicted response/SE);

    iii.    choice of BMR for each case, including the rationale for the choice and the procedure used if for continuous data;

    iv.    computation of the BMD for each case;

    v.    calculation of the lower confidence limit for the BMD (*i.e.*, the BMDL) for each case including the confidence limit procedure (*e.g.*, likelihood profile, delta method, bootstrap) and the BMDL value(s);

    vi.    graphics for each case, including a plot of fitted dose-response curve with data points and error (SD) bars, plot of confidence limits for the fitted curve (optional, but if included,

    the narrative describes the methods used to compute them) and identification of the BMD and BMDL;

 vii. BMDs and BMDLs for standardized BMRs (for comparisons) for (1) dichotomous data, the BMD and BMDL for an extra risk of 0.10; and (2) continuous data, the BMD and BMDL corresponding to a change in the mean response equal to 1 control SD from the control mean; and

 viii. BMDU (upper confidence limit for the BMD), depending on the application and feasibility of estimation.

133. A BMD analysis intended to support regulatory decision-making under TSCA includes the aforementioned information in order to be applied in a manner consistent with best available science. This type of information is required for a transparent presentation and in order for a peer reviewer to reconstruct and evaluate the model output values.

134. It is long-standing EPA practice for BMD analyses to include the information listed in its dose-response analyses. Recent draft TSCA Risk Evaluations include:

 i. the data set used for modeling;

 ii. the models evaluated;

 iii. the model selected with the best fit; and

 iv. the model fit criteria.

135. All of the TSCA draft risk evaluations that have employed BMD analysis to date provide the information identified above in a supplemental file.

136. Dr. Grandjean's BMD analysis, in both his original and supplemental reports is lacking the majority of the reporting elements recommended to accompany any BMD analysis.

137. While Dr. Grandjean identified the studies he selected for his BMD analyses, he did not provide a list of the data used. Thus, a critical review of the BMD analysis is not possible based on the information provided in Dr. Grandjean's reports. Additionally, a critical review of the BMD analysis is also prohibited by my inability to access the raw data. In fact, Dr. Grandjean conceded the use of benchmark dose algorithms to estimate the approximate BMD and BMDL, rather than use of the raw data.

138. In Dr. Grandjean's two BMD analyses, he vaguely describes, without citation, the dose-response model(s) chosen for each case, but does not provide the rationale for the selection, the estimation procedure (e.g., maximum likelihood, least squares, generalized estimating equations), estimates of model parameters (*i.e.*, inputs to the modeling, Goodness-of fit (e.g., chi-squared statistics), log-likelihood, or AIC and standardized residuals (observed minus predicted response/SE).

139. Moreover, Dr. Grandjean's rationale for selection of BMR is flawed. To extrapolate a recommendation to EPA by the Clean Air Scientific Advisory Committee (CASAC) considering the well- and long-established impact of lead on IQ, and studies that have quantified blood lead-IQ relationships for multiple study populations to the more limited evidence base for fluoride is not justified. The CASAC opinion was based on (1) a well-established and robust measure of exposure (i.e., blood), (2) a very large data base of decades of studies, (3) datasets that reflect specific US population groups and for similar blood lead levels compare well across time, (4) rigorous analyses conducted using a variety of models and repeated peer review, and (5) well described variability and uncertainty. This contrasts sharply with the urine-fluoride IQ relationship which is based on (1) a highly variable measure of exposure, (2) a very small data base, (3) a database consisting of relatively small, non-US subpopulations at one time, (4) single analyses based on the data for one specific study population, and (5) little understanding of variability and narrow (within single-study) characterization of uncertainty.

140. Because Dr. Grandjean presents BMDs without specifying the model(s) specified, it is not clear what the computation method(s) are. BMDLs are provided, but not the confidence limit procedures (*e.g.*, likelihood profile, delta method, bootstrap) by which they were calculated.

141. No graphics illustrating the fitted (modeled) dose-response curves, data points, error (SD) bars are provided.

142. Each of these reporting omissions alone, and, furthermore, in total, are not consistent with conducting a BMD analysis in a manner consistent with the best available science because without this data it is impossible for anyone to critically review the modeling approach or reproduce the modeling results.

143. In summary, the numerous limitations associated with Dr. Grandjean's BMD assertions preclude the BMD estimates for use in supporting a conclusion of unreasonable risk and cannot be relied upon to inform risk management options.

### C. Exposure Assessment.

144. Consistent with the NRC's risk assessment paradigm, and as described in TSCA section 6(b)(4)(F)(iv), the third step of risk evaluation requires an exposure assessment for the chemical substance under the conditions of use. Exposure assessment is the process of estimating or measuring the magnitude, frequency and duration of exposure to an agent and the size and characteristics of the population exposed.

145. A credible exposure assessment, fit for the purpose of informing risk management decisions under TSCA, must include an integrative discussion based on the best available science and the weight of the evidence, including the strengths and limitations of the exposure evidence along with a discussion on the uncertainties, variability, degree of confidence, and underlying assumptions, including science policy assumptions, supporting the exposure estimates.

#### 1. Explanation of Exposure and Dose Terms.

146. The term "exposure" means the contact between an agent and the external boundary (exposed surface) of person for a specific duration. The exposure point concentration is an estimate of exposure parameters in specific media (*e.g.*, air, water, sediment). A specific example of the exposure point concentration for fluoridation chemicals in water is the concentration expressed in mg/L.

147. Ingestion exposure events usually are expressed in terms of an intake per event (*e.g.*, liter, L) times the frequency of ingestion event (*e.g.*, per day).

148. The term "dose" refers to the amount of a chemical that enters a person after crossing an external exposure surface. A specific example of the unit measurement for "dose" to fluoridation chemicals is mg/day. The dose is almost also expressed on the basis of body weight, (*i.e.*, mg/kg/day).

149. Depending on the purpose for which an exposure assessment will be used, the exposure assessment may provide an estimate of either exposure or dose. For example, a person

an unreasonable risk determination for an existing chemical substance in commerce using approaches developed to assess new chemical substances. The Plaintiffs specifically request that EPA take action under section 6 of TSCA. However, Dr. Thiessen relies on seven documents that set forth risk evaluation methodologies developed to review new chemical substances under section 5 of TSCA.

167. Because TSCA does not require that new toxicity data be generated or provided with section 5 notices, the vast majority of new chemical risk evaluations are based on chemicals that are similar (*i.e.,* analogs) in structure to the proposed new chemical, or on estimates made using predictive models.

168. The framework EPA applies in conducting risk evaluations under section 5 is based on the fundamental risk assessment principles described in this declaration. However, the methods and assumptions are different in application due to: (1) substantial differences in the quantity and types of data typically available for new chemical substances and (2) the short timeframe (*i.e.*, 45 to 90 days) TSCA imposes for completing new chemical substance reviews.

169. For example, Dr. Thiessen calculated MOEs for selected human population subgroups based on experimental animal data. To justify her derivation of Benchmark MOEs, Dr. Thiessen cites to EPA's application of UFs in assessment of new chemical substances which have very limited toxicological data. However, application of her UFs to the existing toxicological data base for fluoride are unjustified.

170. Additionally, the absence of clear and transparent scientific judgement for relying on the specific exposure values presented in either her first or second reports, prevents reaching any conclusions regarding whether Dr. Thiessen's exposure analysis was conducted in a manner consistent with the best available science. Thus, Dr. Thiessen's analysis is not useful for characterizing risk and could not be relied upon to inform risk management options under TSCA.

171. Due to these fundamental flaws, Dr. Thiessen's report cannot be used to support a conclusion of unreasonable risk for fluoridation chemicals, which are existing chemicals in commerce that are on the TSCA chemical inventory, and cannot be relied upon to inform risk management options.