# Exhibit D

```
 1              THE UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    AT SAN FRANCISCO

 4   FOOD & WATER WATCH, et al.    *

 5      Plaintiffs                 *   Civ. No.

 6   v.                            *   17-CV-02162-EMC

 7   U.S. ENVIRONMENTAL PROTECTION *

 8   AGENCY, et al.                *

 9      Defendants                 *

10                *   *   *   *   *

11              VIDEOTAPED DEPOSITION OF

12               TALA RAE HENRY, Ph.D.

13                 AUGUST 20th, 2019

14                  WASHINGTON, D.C.

15

16          Reported by:  Dawn M. Hyde
```

CERTIFIED COPY

1  neurotoxicity is the critical effect, right?

2      A   Not quite.  If you have a chemical

3  you're assessing risk of, you need to, based

4  on the evidence, figure out which endpoints

5  are of concern.

6      Q   And which endpoint occurs at the

7  lowest dose level, right?

8      A   Right.

9      Q   So under the current RfD, the RfD

10 that was proposed in 2010, the critical effect

11 is assumed to be severe dental fluorosis,

12 correct?

13     A   Correct.

14     Q   So is it relevant for the risk

15 evaluation in this case to understand whether

16 severe dental fluorosis is the critical

17 effect?

18     A   In this case, you're talking about

19 the petition case?

20     Q   Yes.

21     A   Repeat the question, please.

1   Q   Is it relevant to the risk
2   evaluation in this case to know whether severe
3   dental fluorosis is the effect that occurs at
4   the lowest dose level?
5   A   I think that the severe dental
6   fluorosis would be one endpoint that was
7   explored based on the data available.
8   Q   Okay.  But move to strike as
9   nonresponsive.
10      Is it relevant for the risk
11  evaluation in this case to understand whether
12  neurotoxicity occurs at a lower dose level
13  than severe dental fluorosis?
14  A   Yes.  But among all other possible
15  endpoints.
16  Q   Okay.  So then -- strike that.
17      Now, on page 21 and 22 you provide
18  your criticisms of Dr. Thiessen's risk
19  characterization, right?
20  A   Yes.
21  Q   And you're -- one of your criticisms

1  is that Dr. Thiessen used criteria that are

2  generally applied for Section 5 analyses,

3  right?

4       A    The criteria as well as the entire

5  procedure, yes.

6       Q    Now, do you dispute that fluoride

7  would qualify as a high health hazard under

8  the Section 5 factors?

9       A    Again, I would need to see all the

10 data arrayed to make that call.

11      Q    So you don't have an opinion one way

12 or the other whether fluoride would satisfy

13 the Section 5 criteria?

14      A    Not here today.

15      Q    Okay.  Now, on page 22 of your

16 report you state that this entire section of

17 Dr. Thiessen's report is "flawed in that it

18 claims to support an unreasonable risk

19 determination using risk assessment approaches

20 and a regulatory framework that EPA uses for

21 new chemicals rather than for existing

1   chemicals," right?

2       A   Right.

3       Q   But Dr. Thiessen also used an MOE

4   analysis, correct?

5       A   Sitting here at this moment, I don't

6   recall.

7       Q   Okay.  Fair enough.  So let's move

8   on to some of your criticisms of

9   Dr. Grandjean's report, and let's turn to

10  page 23.  And the first full sentence of the

11  page you say, "It is Dr. Henry's opinion that

12  Dr. Grandjean selectively cited literature

13  including data from his own publications to

14  support bias and preconceived conclusions

15  about the neurotoxicity of fluoride."

16      A   Correct.

17      Q   Is that your opinion, Dr. Henry?

18      A   Yes.

19      Q   Did you read the reports that were

20  written by EPA's experts, Charlotte Lewis and

21  Gary Slade?

```
 1        A    No.

 2        Q    Never read those?

 3        A    No.

 4        Q    Okay.  In the second paragraph on

 5   the page you talk about Dr. Grandjean's

 6   reference to the NRC report and

 7   Dr. Grandjean's assertion that fluoride's

 8   predominant benefit to teeth comes from

 9   topical contact, right?

10        A    Yes.

11        Q    Now, EPA itself has stated that

12   fluoride's primary benefit to the teeth is

13   topical, right?

14        A    I don't have any knowledge of that.

15        Q    Are you disputing that fluoride's

16   primary benefit to teeth is topical?

17        A    I don't have an opinion on that.

18        Q    Would you defer to EPA on that

19   question?

20        A    Again, I would need to know the

21   context.
```

1  Q   Which particular methods that
2  Dr. Grandjean used are in your view limited to
3  deriving MCL, not --
4   A   I would have to look back at exactly
5  what he presented versus Thiessen, but both of
6  them as I recall spend a fair bit of time on
7  RfD which we explain -- I explain isn't
8  something that we -- that's not the construct
9  of the hazard assessment that we do under
10 TSCA.
11  Q   Okay.  Now, Dr. Grandjean in his
12 report, he did a BMD analysis; do you
13 understand that.
14  A   Okay.  That's right.  He didn't
15 provide the data, however, as I recall.
16  Q   He did a BMD analysis.
17  A   Thank you for the reminder, yes.
18  Q   So is it your testimony that a BMD
19 analysis is irrelevant to a TSCA risk
20 evaluation?
21  A   No.

1    Q    Would you agree that EPA does BMD
2 analyses in making a risk determination under
3 TSCA?
4    A    Yes.  My critique of his BMD
5 analysis was that he stated it was based on
6 data which he did not present or provide to us
7 so we could not possibly even look at that.
8    Q    Where is that criticism that you
9 have just stated?  Where is that provided in
10 your written report?
11    A    It's going down the path of MCL.
12    Q    I want you -- you can take your
13 time.  I want you to read this and tell me
14 where that criticism is identified in this
15 report.  And I can tell you that your analysis
16 of Grandjean is on page 22 to 24.  So take
17 your time, look at this and tell me where you
18 make that statement.
19         MS. CARFORA:  There's also a summary
20 of opinions on page one, Counsel, if you're
21 pointing her to --

1        BY MR. CONNETT:
2        Q    Fine.  Look at page one too.
3        A    Say what?
4        Q    If you look at page one and page 22
5   to 24, tell me where you provide that
6   criticism that you just stated in this report.
7        A    So on part A of 22 that he is not
8   providing -- he's not supported his
9   presentation of the scientific information
10  under anything about the peer review.  Again,
11  he didn't even provide the data, let alone
12  what reference it came from.
13       Q    Point me to the specific sentence
14  you're referring to.
15       A    It's midsentence, "Dr. Grandjean's
16  statement is not supported by his presentation
17  of the scientific information."
18       Q    Well, you're referring here to
19  Dr. Grandjean's statement about following the
20  general approaches used by the World Health
21  Organization and EPA, right?

1    A    It's a generalized comment about all
2  of his statements.  He also stated -- does not
3  describe his principles and methods used.  He
4  did in fact reference BMD analysis as I recall
5  but not in any sort of depth and he did not
6  also present the actual results.  Does not
7  cite all reports that may be relevant.
8  Doesn't describe methods and criteria used to
9  review studies or conduct weight of evidence.
10        Again, this is all leading up to the
11 data that he then uses which we have --
12 there's no transparency whatsoever.
13    Q    Where do you say that Dr. Grandjean
14 does not adequately present the data that his
15 BMD analysis is based on?
16    A    He doesn't -- in that paragraph
17 under B he doesn't talk about conditions of
18 use specifically.  He doesn't get to -- in
19 his -- "using this comparison, the risk
20 characterization would indicate the margin of
21 exposure."  And we use that risk estimate to

1  make an unreasonable risk.  But "his
2  associated calculation exercise and the
3  conclusions for making that unreasonable risk
4  determination are not fit for purpose."
5      Q    So is it your testimony that
6  **Dr. Grandjean does not identify the conditions**
7  **of use of the exposure route that he --**
8  **that --**
9      A    Not in those terms, but we admitted
10 that he understood that they meant adding
11 fluoride chemicals to drinking water.
12     Q    Okay.
13     A    But when he gets down to that
14 section there's been no systematic review or
15 presentation of where that data came from.
16     Q    What data?
17     A    The data that he used for his BMD
18 modeling.
19     Q    So you're saying that Dr. Grandjean
20 **doesn't adequately disclose where he got the**
21 **data that he used for his BMD analysis?**

1    very quickly tell us what the basis for that
2    opinion is?
3         A    I think -- I mean, what it's saying
4    here is because the reasonably available
5    information don't provide the evidence to
6    conclude around the hazard, how can I
7    integrate something I don't have with exposure
8    to make a risk characterization.
9         Q    So is your opinion that
10   neurotoxicity is not a hazard of fluoride?
11              MR. CONNETT:  Lack of foundation and
12   leading.
13        A    No, but this sentence is very
14   specific around what concentration and what
15   effect.
16        BY MS. CARFORA:
17        Q    Okay.  So the basis for this opinion
18   is not based on hazard; it's based on dose
19   assessment.  Is that right?
20        A    Yes.
21        Q    Okay.

1     A    I mean, it's not just hazard.  It's
2  very specifically stated as a specific
3  concentration causing a specific effect, and
4  because the reasonably available information
5  do not provide that evidence, I don't have
6  anything to integrate into a risk
7  characterization.
8            MS. CARFORA:  Okay.  I just -- I
9  think that's it.  I just need two minutes.  I
10 just want to go off the record very quickly
11 and verify.
12           THE VIDEOGRAPHER:  We're going off
13 the record.  The time on the video 7:26 p.m.
14           (Recess taken from 7:26 p.m.
15           until 7:28 p.m.)
16           THE VIDEOGRAPHER:  We're back on the
17 record.  The time on the video is 7:28 p.m.
18           MR. CONNETT:  Okay.
19           MS. CARFORA:  Let me just for the
20 record conclude my portion of the questioning.
21

1        FURTHER EXAMINATION

2    BY MR. CONNETT:

3    Q    The ten chemicals that are currently

4    undergoing risk evaluation by EPA, are any of

5    those draft evaluations limited to a single

6    use?  A single condition of use?

7    A    The drafts that are out there

8    publicly right now?

9    Q    Not the drafts that are out there

10   publicly.  I mean of the ten risk evaluations

11   that EPA is in the process of doing, which

12   includes those which it's released drafts of

13   and those which it has not yet released drafts

14   of, are any of those risk evaluations limited

15   to a single condition of use?

16   A    I can't answer that with 100 percent

17   certainty.

18   Q    What's your understanding?

19   A    I believe there's one that has very

20   limited but I can't testify that it's exactly

21   one.