# Exhibit E

```
1              IN THE UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
3                       AT SAN FRANCISCO
4
5    FOOD & WATER WATCH, et al., )
                                 )
6            Plaintiffs,         )
                                 )
7      vs.                       ) Case No.
                                 ) 17-CV-02162-EMC
8    U.S. ENVIRONMENTAL PROTECTION)
     AGENCY, et al.,             )
9                                )
             Defendants.         )
10                          ____ )
11
12
13
14     VIDEOTAPED DEPOSITION of Ellen Chang, Sc.D., taken on
15       behalf of Plaintiff, commencing from 9:11 a.m. to
16     6:26 p.m. on Thursday, August 29, 2019, before Katie
17       Hron, Certified Shorthand Reporter, No. 13483.
18
19
20
21
22
23
24
25
```

```
 1            MS. CARFORA:  Objection.  Mischaracterizes.
 2            THE WITNESS:  Not that it's not associated
 3   with neurotoxic risks.  That is not the purpose of a
 4   reference dose.  I think what we concluded was that
 5   the reference dose was sufficiently protective, not
 6   only for the noncancer endpoint that it was
 7   originally designed for --
 8   BY MR. CONNETT:
 9       Q.   Right.
10       A.   -- as you indicated, skin lesions.
11       Q.   Right.
12       A.   But that it would also cover
13   neurodevelopmental outcomes in children.
14       Q.   Right.  Okay.
15            So if --
16            MR. CONNETT:  Let's move on to Exhibit 274.
17            I'll put the exhibit sticker in the top
18   right of the page.
19            (Whereupon Plaintiff's Exhibit 274
20             was marked for identification by
21             the Court Reporter and is attached
22             hereto.)
23   BY MR. CONNETT:
24       Q.   And this is a systematic review that you
25   published in 2016?
```

1  A. Yes.

2  Q. And this was a systematic review that

3  looked at the relation- -- the epidemiological

4  evidence on perfluorinated chemicals and

5  immunological health conditions?

6  A. Yes.

7  Q. And specifically, the PFOA and PFOS that we

8  talked about earlier, correct?

9  A. Right.

10 Q. Okay. And you understand that the National

11 Toxicology Program has concluded that PFOA and PFOS

12 are presumed to be immune hazards in humans?

13       Do you understand that?

14 A. So my understanding is that the NTP has

15 several classifications of potential immune hazards

16 to humans, and that they include, I think, four

17 categories where it's not -- the categories are not

18 an immune hazard, suspected to be an immune hazard,

19 presumed to be an immune hazard, or known to be an

20 immune hazard.

21       And so, yes, my understanding is that NTP

22 has classified PFOA and PFOS into the second

23 category that is not known to be immune hazard to

24 humans, but rather presumed to be, where they have a

25 specif- -- a very technical specific definition of

1   the word presumed.
2        Q.   Okay.  And this systematic review that you
3   conducted here was funded by 3M, correct?
4        A.   That is correct.
5        Q.   And 3M, as we discussed earlier, had been a
6   manufacturer of PFOA and PFOS for many years,
7   correct?
8        A.   That's correct.
9        Q.   Okay.  And I'm looking here at the
10  abstract, six lines from the bottom.  You -- you
11  concluded that, quote, "The available epidemiologic
12  evidence is insufficient to reach a conclusion about
13  a causal relationship between exposure to PFOA and
14  PFOS and any immune-related health condition in
15  humans."
16            That was your conclusion, correct?
17       A.   That's right.  It's consistent with the NTP
18  conclusion.
19       Q.   It's your position that this conclusion is
20  consistent with the NTP?
21       A.   Yes.
22       Q.   And, in fact, you wrote to the NTP, right?
23            You wrote a --
24            You wrote comments to the NTP?
25       A.   Did I?

```
 1              I don't remember.
 2       Q.     I --
 3              They're on the Internet.
 4       A.     Okay.
 5       Q.     And you disputed their conclusion that it
 6  was a presumed immuno- -- immune hazard in humans,
 7  correct?
 8       A.     I don't know that that's a correct
 9  characterization.
10       Q.     Well, so do you recall your comments to the
11  NTP?
12              MS. CARFORA:  Asked and answered.
13              THE WITNESS:  No, I don't.
14  BY MR. CONNETT:
15       Q.     You don't recall your comments to the NTP?
16              MS. CARFORA:  Asked and answered.
17              THE WITNESS:  No, I don't remember what the
18  substance of those comments might be.
19  BY MR. CONNETT:
20       Q.     Okay.  Those comments, you were funded by
21  the 3M in producing those comments?
22              MS. CARFORA:  Objection.  Mischaracterizes
23  the testimony.
24              THE WITNESS:  I don't recall the substance
25  of such comments.  Um.  I -- yeah, that's --
```

1  A. I would say, again, it depends. If the
2  method that you're talking about is, for example,
3  you know, like the directions that you gave, or
4  measuring some -- like a standard length that is
5  known to be 100 centimeters, you know, precisely.
6  Then something that simple should be able to be
7  reproduced with a very small degree of error, you
8  know, almost all the time.
9  When it's more complicated and involves
10  scientific judgment and expertise, then it will
11  depend on the scientific judgment and expertise of
12  the individuals involved. And you may arrive at
13  different conclusions a higher proportion of the
14  time than you would when you are doing something as
15  simple as measuring distance or measuring length.
16  **Q. Okay. So you can envision scenarios where**
17  **a scientific method that produces -- that results in**
18  **50 scientists reaching one conclusion and 50**
19  **scientists reaching the opposite conclusion, you can**
20  **contemplate the scenario where that would be**
21  **considered still a scientifically reliable method.**
22  A. I think it does not necessarily call the
23  method into question. You could have -- I think it
24  depends on -- I think that's, I guess, just too
25  vague a scenario or, perhaps, too simple. It's -- I

1  think the method can be completely clear and
2  reliable and valid, and yet be -- due to differences
3  in the individuals attempting to follow that method.
4  Again, in -- in terms of their judgment and their
5  qualifications and background and expertise, as well
6  as, how well they followed the method and -- and
7  that sort of thing.  I think you can lead -- you can
8  obtain different results despite following the same
9  valid method.
10         I would also say that reaching a conclusion
11 that evidence is insufficient to establish a causal
12 effect and a conclusion that evidence is sufficient
13 to establish a causal effect are not necessarily
14 opposite conclusions, but they are different.  But
15 not diametrically opposed, necessarily.
16      Q.   Okay.  Can you explain how --
17           So how is it that a conclusion that there
18 is insufficient evidence of caus- -- causation, how
19 is that not opposite the conclusion that there is
20 sufficient evidence of causation?  Can you explain
21 that a little bit more?
22      A.   Sure.  I think if you conclude that there
23 is insufficient evidence, you could conclude -- that
24 could be a conclusion that there is, for example, a
25 statistical association that is observed.  If we're

1  talking about epidemiology.  There could be a
2  conclusion that there is a statistically significant
3  association observed.  Even that it's consistent
4  across a number of studies, not necessarily all
5  studies, but in -- in multiple studies.  And yet --
6  and it could be suggestive of a causal association,
7  but not yet sufficient.
8           So, you know, it could fall short, for
9  example, in terms of uncertainties in exposure
10 assessment or in control for confounders.
11          And so I think that conclusion -- it's
12 similar to, for example, an NTP conclusion that
13 there's a presumed health hazard, or an IARC
14 conclusion that a given agent is a probable human
15 carcinogen, but not a definite human carcinogen.
16 There are degrees of classification of the level of
17 evidence.
18      Q.   Uh-huh.
19      A.   And so for me, the opposite conclusion
20 would be that there is evidence that it is not a
21 causal effect.
22          So that would be like the Group 4
23 classification for IARC, which my understanding is
24 they've only classified one agent ever as a Group 4
25 carcinogen where, you know, they said the

1    evidence -- there -- there's good evidence, and it
2    suggests it's not a carcinogen.  And then NTP, that
3    would be their classification that something is
4    not -- or not likely to be, I think is their lowest
5    classification.  Not likely to be a health hazard.
6    That, to me, would be closer to the opposite
7    conclusion than, you know, the -- the sort of
8    higher -- higher levels.
9        Q.   So insufficient evidence of causation, for
10   epidemiology sake, is not inconsistent with the
11   chemical being a presumed cause of the outcome.
12       A.   That is correct.  So presumed under NTP's
13   definition of presumed health hazard is -- is
14   actually specifically not known to be a health
15   hazard.  So it's specifically not a causal effect.
16   And so insufficient evidence is -- is consistent
17   with, you know, not known to be a cause.
18       Q.   Right.
19            So when you used the phrase insufficient
20   evidence of causation from the epidemiological
21   literature, you're not saying the chemical doesn't
22   cause the effect; is that correct?
23            MS. CARFORA:  Objection.  Mischaracterizes.
24            THE WITNESS:  It says -- when I say it's
25   insufficient, I'm saying that there's not enough

1  compelling evidence to reach a definitive
2  conclusion, one way or the other.
3  BY MR. CONNETT:
4     Q.   **Okay.  And your conclusion that there's**
5  **insufficient evidence of epidemiological -- sorry,**
6  **strike that.**
7        **Your conclusion, in any of your systematic**
8  **reviews that there is insufficient epidemiological**
9  **evidence of causation, is not inconsistent with the**
10 **chemical being a presumed cause of the effect.**
11    A.   Where presumed -- here we're using
12 presumed, I guess, do you mean it the way NTP means
13 it?  Where they have a specific technical
14 definition?
15    Q.   **No, let's use it more generally.**
16    A.   So presumed more generally, I would not use
17 that term because I think it's -- it's -- it can be
18 misinterpreted.
19    Q.   **Okay.**
20    A.   I think NTP can use it because they
21 specifically --
22    Q.   **Right.**
23    A.   -- define out what presumed means.
24    Q.   **Okay.**
25    A.   And then I'm comfortable -- I'm more