Pages 1 - 50

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

```
FOOD & WATER WATCH, INC., et al,    )
                                     )
                                     )
            Plaintiffs,              )
                                     )
    vs.                              ) No. C 17-2162 EMC
                                     )
U.S. ENVIRONMENTAL PROTECTION        )
AGENCY, et al,                       )
                                     )  San Francisco, California
            Defendants.              )  Friday
                                     )  June 5, 2020
_____ )  9:30 a.m.
```

**TRANSCRIPT OF REMOTE ZOOM BENCH TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:          WATERS KRAUS & PAUL
                         222 North Pacific Coast Highway
                         Suite 1900
                         El Segundo, California 90245
                    BY:  **MICHAEL P. CONNETT, ESQ.**
                         **CHARLES ANDREW WATERS, ESQ.**


                         NIDEL AND NACE, PLLC
                         5335 Wisconsin Avenue, NW
                         Suite 440
                         Washington, DC 20015
                    BY:  **CHRISTOPHER THOMAS NIDEL, ESQ.**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
          Official Reporter - US District Court
          Computerized Transcription By Eclipse

**APPEARANCES:   (CONTINUED)**

**For Defendants:**          U.S. DEPARTMENT OF JUSTICE
                            Environmental Defense Section
                            601 D Street, NW
                            Room 8814
                            Washington, DC 20004
                  **BY:  DEBRA J. CARFORA, ESQ.**


                            U.S. DEPARTMENT OF JUSTICE
                            Environment & Natural Resources Div.
                            P.O. Box 7611
                            Washington, DC 20044
                  **BY:  BRANDON N. ADKINS. ESQ.**
                       **SIMI BHAT, ESQ.**
                       **JOHN THOMAS H. DO, ESQ.**

                            —   —   —

```
 1                 P R O C E E D I N G S

 2   JUNE 5, 2020                                    9:32 A.M.

 3                        ---oOo---

 4          THE CLERK:  Court is now in session.  The Honorable

 5   Edward M. Chen is presiding.

 6       Calling Civil Action 17-2162, Food & Water Watch versus

 7   Environmental Protection Agency.  Counsel, please state your

 8   appearances for the record, beginning with plaintiff's counsel.

 9          MR. WATERS:  Andy Waters for the plaintiffs.

10          THE COURT:  Good morning Mr. waters.

11          MR. WATERS:  Good morning.

12          MR. CONNETT:  Good morning, Your Honor.  Michael

13   Connett on behalf of the plaintiffs.

14          THE COURT:  Good morning Mr. Connett.

15          MS. CARFORA:  Good morning, Your Honor.  Debra

16   Carfora on behalf of EPA.

17          THE COURT:  Good morning, Ms. Carfora.

18          MR. ADKINS:  Good morning, Your Honor.  Brandon

19   Adkins on behalf of defendant EPA.

20          THE COURT:  Good morning, Mr. Adkins.

21          MS. BHAT:  Simi Bhat on behalf of EPA.

22          THE COURT:  All right.  Good morning Ms. Bhat.  On.

23          MR. DO:  John Do on behalf of EPA.  Good morning.

24          THE COURT:  Good morning Mr. Do.

25          MS. CARFORA:  Your Honor, if I could inform the Court
```

 1  very quickly.

 2      As you can tell, Mr. Adkins and I are actually in the same

 3  room and we did work with the Court's technical staff

 4  yesterday.  We are using a different connection.  We did test

 5  it with the Court's technical staff, and we don't expect that

 6  there is going to be any problems; but I wanted the Court to

 7  know that we have changed, and we're testing to ensure that

 8  there is no hiccups today.

 9      THE COURT:  So are you planning to be together then

10  during trial and using the same platform?

11      MS. CARFORA:  Yes, Your Honor.  This is -- how we are

12  appearing today is exactly how we intend to appear at trial.

13      THE COURT:  All right.  But other parts of the team

14  will be in different locations then?

15      MS. CARFORA:  Yes, Your Honor.  Unfortunately, the

16  trial team is split up.  We're actually in different parts of

17  the country.

18      THE COURT:  Okay.  All right.  Good.

19      Let me say something about the scheduling.  Angie, we

20  issued a notice about if this case goes on til Wednesday, the

21  16th -- or Tuesday, the 16th, we need to change the session to

22  the afternoon.

23      THE CLERK:  We did that, Your Honor.  We changed it

24  from 8:30 in the morning til 1:30 in the afternoon.

25      THE COURT:  And I don't mean to inconvenience the

1  parties, but because of the pandemic we have a new procedure in

2  the courthouse and live appearances in criminal cases, which

3  are mandated by rule, statute and Constitution, we're going to

4  start those up again, and there is only going to be one

5  courtroom available in the entire building, and we're going to

6  rotate, and my rotation day now is Tuesday morning.

7          So I have a sentencing that morning and that's why we are

8  we have to shift to the afternoon.  So I did want to give you

9  fair warning about that.

10         The other slight scheduling change is that the -- I sit on

11 the Executive Committee of our court, and we are meeting Monday

12 as things arise, and that meeting is at -- in the afternoon.

13 So I have to adjourn early on Monday.  And I don't know about

14 the following Monday.  We're taking it week by week.

15         I am open to starting a little bit early so we can at

16 least try to approximate close to the number of hours we would

17 have gotten.  So if you want to start, for instance, at 8:00

18 o'clock, if everybody is available, hopefully that won't shift

19 the witnesses around too much, I'm happy to convene a little

20 bit earlier so we can at least get in, hopefully, four hours of

21 -- close to four hours of testimony.

22         Does that work with everyone, to move to 8:00 o'clock?

23             **MR. CONNETT:**  That works for plaintiffs, Your Honor.

24             **THE COURT:**  Okay.  EPA, is that all right?

25             **MS. CARFORA:**  Yes, Your Honor.

1          **THE COURT:**  All right.  So we'll start at 8:00 on

2   Monday, Western time, Pacific time.  And we'll have to adjourn

3   around noon that day.

4          **MR. CONNETT:**  Your Honor?

5          **THE COURT:**  Yeah.

6          **MR. CONNETT:**  On another scheduling housekeeping

7   note.  I've spoken with counsel for defense and -- and

8   potentially this scheduling change for Monday may affect.

9       This.  But we are in agreement that to the extent that the

10  plaintiff's case -- to the extent that we close our case on

11  Wednesday, that if we were to close before 1:00 o'clock, that

12  we are in agreement -- you know, subject to the Court's

13  permission -- to start the defense case on Friday morning.

14         **THE COURT:**  Right.  Now, that's consistent with our

15  normal schedule, right, or is there some adjustment you're

16  suggesting?

17         **MR. CONNETT:**  Yes.  Just, for instance, if we were to

18  finish our case at, say, noon on Wednesday, we would still

19  have, I think, another hour of court.

20         **THE COURT:**  Oh, I see.  Rather than jumping right

21  into the defense, we take a break, a pause, and then we

22  would -- well, if you do end by Wednesday, that shows that

23  we're short of a little bit ahead of schedule and I don't have

24  any problem with that.  It's sort of the back end that I'm

25  worried about.  So I don't have a problem with that, if it's

1   just like an hour here or there.

2       It may be because we're cutting off an hour at the

3   beginning, you may need that extra hour; but that's fine.

4           **MR. CONNETT:**  And, Your Honor, so we had also worked

5   out -- the parties had agreed -- and, obviously, this is

6   affected by the scheduling change that the Court has on Monday,

7   but one of our witnesses, there is a scheduling issue that we

8   were, hopefully, intending to go maybe a half hour longer on

9   Monday, but now that won't -- so I'm wondering if we could also

10  start early on Tuesday as well.  If we could start at 8:00 a.m.

11  on Tuesday.

12      There is a somewhat tricky scheduling issue that we have

13  with one of our experts and having an earlier start time on

14  Tuesday could be helpful to avoid --

15          **THE COURT:**  Okay.  Yes, I can do that.

16          **MS. CARFORA:**  Yes.  No objection, Your Honor.

17          **THE COURT:**  Okay.  Let's do that.

18      Angie, make a note for the calendar.  We'll start at 8:00

19  o'clock on Monday and Tuesday.

20          **THE CLERK:**  Okay.

21          **THE COURT:**  Okay?

22          **MS. CARFORA:**  Can I just clarify though?  We will

23  start at 8:00 a.m., but also have the entire trial day.  So we

24  won't end early.

25          **THE COURT:**  We'll end at the usual 1:30.  So we'll --

1    we'll kind of get back an hour.  So we're pretty close at that

2    point.  All right?

3          **MS. CARFORA:**  Yes, Your Honor.

4        And while we're talking about this, one other thing I

5    think we've discussed with plaintiffs is Kristina Thayer is a

6    fact witness that's going to be called by both parties.  And

7    given the platform that we have now, the parties have agreed

8    and are proposing that Kristina Thayer actually appear twice as

9    opposed to only once.

10          **THE COURT:**  That's fine.  I mean, yeah.  If this were

11   a live trial, I would encourage you to try to, you know, take

12   both the plaintiff's examination and defense examination, you

13   know, with the same witness.  But if we're going to do it this

14   way, that's fine.

15          **MS. CARFORA:**  Great.  Thank you, Your Honor.

16          **THE COURT:**  All right?

17       All right.  Any other scheduling or logistical questions

18   that people have?

19          **MR. CONNETT:**  Not at this time, Your Honor.

20          **THE COURT:**  Okay.  All right.

21       And I did -- I was able to use Box.com and was able to

22   download from there the documents.  So I do have them on my

23   laptop available, and I appreciate the organization into

24   witness or witness folders.  That's very helpful.

25          **MS. CARFORA:**  Great.

1          **THE COURT:**  All right.   Let's talk about the -- the

2    objections to exhibits and expert declarations.

3          Let's start with exhibits.  And the first one is the

4    portion of the Congressional record.  It seems to me I -- why

5    is this different from any other aspect of the Congressional

6    record?  I mean, this -- you could always say that everything

7    in a Congressional record is hearsay, et cetera, et cetera.

8          It seems to me the fundamental point is that these are

9    being introduced not for what's been known in the

10   administrative world as a judicatory fact, but a legislative

11   fact.

12         Isn't this all intended to shed light on the meaning of

13   the statute and the legislative intent?  Am I missing something

14   here?

15         **MR. CONNETT:**  I agree, Your Honor.  There is no

16   question, and plaintiffs agree with EPA, that the legislative

17   history is relevant to an understanding of the statute and

18   constructing the statute.

19         However, we don't see this as evidence for trial.  In the

20   post trial briefing or in any briefing related to this case,

21   plaintiffs certainly intend to point to and cite legislative

22   history for understanding the statute, but that is -- it's akin

23   to citing case law.  It helps to inform the legal analysis, but

24   it's not a fact or evidence for trial.

25         So we certainly don't object to EPA citing any of the

legislative history that they think is pertinent, and we will

do the same.  We just don't see it as an exhibit for trial.

         **THE COURT:**  Well, I'm not sure it makes a difference

one way or the other.  I'm going to treat it as legislative

history.  If this were a jury trial, I could see the point, but

here it's all going to come to the same place, me.  I'm going

to treat it as legislative like anything else.

     As you know, legislative history, you know -- varying

degrees of consideration in the -- the legislative history.

And there is also -- within the legislative history itself

there is a hierarchy of persuasiveness.  You know, joint

committee reports are entitled something.  Statements on the

floor, entitled something different.  Statement by the

sponsors.  You know, I mean, letters.  There is kind of a

hierarchy, and I'm aware of that, and you can argue that when

you make your argument.

     But I think the bottom line is, you know, if it's relevant

to legislative history and statutory intent, I'm going to

consider it whether it's an exhibit or not.  I don't really

care if it's an exhibit, frankly.

         **MR. CONNETT:**  And, Your Honor, I guess the only --

the only additional point that plaintiffs would make here is so

long as it doesn't prejudice plaintiffs from citing in our

briefing other parts of the legislative record, we're fine with

that.

1       I just don't want there to be, I guess, sort of a two -- a

2   two-tiered treatment of this material based on whether it's in

3   evidence or not.

4           **THE COURT:**  All right.  Well, I will state that --

5   I'm going to treat them the same whether they are an exhibit,

6   whether it's a post trial brief.  Whatever it is, legislative

7   history I will treat as I have always had, as legislative

8   history.

9       So I don't really care.  If you want to introduce it as a

10  Trial Exhibit, it doesn't -- it's not going to be given any

11  more weight than if you just send it in after the trial.  So I

12  don't -- you know, I don't care.

13      I guess I'll overrule the objection, but if you want to

14  keep it out to keep the record cleaner, that's fine with me,

15  and that may make sense.  And we're not prejudiced, obviously,

16  to me actually looking at this at some point when it becomes

17  relevant.

18      The deposition designation portions of Joyce Donohue --

19  Donohue, maybe you can explain to me.  I guess the question is

20  whether this contravenes the stipulation not to elicit

21  testimony regarding the MCL or the MCLG.

22      Is the question whether this segment pertains to that or

23  is broader than that?  That seems to be the question.  Does it

24  pertain to the MCL or is it a broader point and, therefore, not

25  necessarily covered by that stipulation?

```
 1        That's the issue; right?

 2            MR. CONNETT:  I think that's part of the issue, Your

 3   Honor, and it is certainly -- Dr. Donohue's testimony goes far

 4   beyond the MCLG.  She specifically states in her testimony on

 5   Page 258 that she's not just referring to the MCLG.  She's

 6   referring not just to standards in the United States.  She is

 7   referring to all current fluoride safety standards which share

 8   a common nexus.  The common nexus for how fluoride is currently

 9   regulated in the U.S. and abroad is to protect against skeletal

10   and dental effects.

11        So what Dr. Donohue is saying is:  Listen, these new

12   studies warrant a whole reassessment of how we are currently

13   approaching fluoride.

14        So it's not an indictment at all on the MCLG.  The MCLG

15   is, in effect, no different than any other safety standard for

16   fluoride because it, too, is --

17        (Court reporter clarification due to audio

18         interference.)

19        ...because it, too, the MCLG is based on regulated

20   fluoride to protect against dental and skeletal effects.  And

21   so our concern is EPA here is just interpreting the stipulation

22   in such a broad way that just -- just so --

23        (Audio interference.)

24            THE COURT:  There is some shuffling of papers.  Maybe

25   you can mute yourself when you're not -- everybody should mute
```

 1  themselves when they are not talking.  That will be better.

 2      Okay.

 3          MR. CONNETT:  And, Your Honor, so what EPA is doing

 4  here is they are saying:  Well, this testimony could -- you

 5  know, encompasses the MCLG and, thus, must be barred.  And it's

 6  just reading a stipulation far beyond the intent.

 7      And I would also note that Dr. Donohue's testimony here is

 8  not just relevant to the -- to safety standars.  If you take a

 9  look at Page 257, Lines 1 through 8, Dr. Donohue starts her

10  response there by talking about -- unsolicited, she brings up

11  Dr. Bruce Lanphear's name, because he is an author of the

12  paper.

13      And unsolicited she says:  Oh, it has Bruce Lanphear's

14  name on it.

15      And I asked her:  Well, what's the importance of that?

16      And she goes:  He's an important lead person.

17      Well, at that time in the litigation it wasn't known that

18  Dr. Lanphear was an expert appearing for plaintiffs.

19      And I think that's probative testimony, Your Honor.  That

20  here you have EPA's in-house expert on fluoride vouching for

21  the credibility of plaintiff's expert in this case.

22      So if EPA's objection is granted, probative testimony

23  about plaintiff's expert will be stricken from this case.

24      So, again, it kind of goes back to EPA is reading the

25  stipulation far -- far broader than its intent.

1              **THE COURT:**  Let me ask, what was the purpose?  What

2      led to this particular stipulation?  What was trying to be

3      accomplished?

4              **MR. CONNETT:**  Your Honor, it arose from -- the

5      plaintiffs in this case through discovery -- we did a 30(b)(6)

6      deposition of EPA.  And we spent a lot of time in that

7      deposition asking the representative about the MCLG, some of

8      the -- some of maybe the political pressures, the history of

9      it, the basis of it.

10          We also deposed some fact witnesses, who also testified

11     about the history of the standard, and we scrutinized that

12     standard in some of the depositions.  And we -- and there was a

13     dispute.  EPA disputed the relevance of that throughout the

14     case, and I -- there was clearly a dispute from the get-go as

15     to the relevance of that evidence.

16          And we ultimately came to a compromise.  Plaintiffs

17     agreed, okay, we are not going to introduce this -- you know,

18     this history of the MCLG.  We're not going to -- we're not

19     going to introduce any documents, any witnesses to talk about

20     it.  In fact, Your Honor, in our expert reports, in our

21     declarations, we have stricken all their references to the

22     MCLG.

23          So I believe plaintiffs have in good faith operated to

24     withdraw from this case a lot of evidence that we intended

25     initially to introduce.

1     **THE COURT:**  That is in exchange for the EPA's sort of

2    non-reliance on the MCLG?  Is that the idea, or what's...

3     **MR. CONNETT:**  That was -- yes.  Well, what we got --

4    so what EPA did in exchange for our agreement to not introduce

5    that evidence, EPA agreed to stipulate to certain facts which

6    are now part of the undisputed facts in this case.  And those

7    facts basically spell out that the MCLG is not relevant to an

8    assessment of the neurological effects of fluoride because it

9    really wasn't dealing with that.  So those stipulated facts

10   basically preclude in this case anyone saying:  Well, the MCLG

11   is four parts per million and so it's obviously safe to add

12   fluoride at .7.  So that's -- that's sort of the --

13    **THE COURT:**  In exchange you agreed not to make a

14   collateral issue out of it by not attacking the MCLG.

15    **MR. CONNETT:**  Correct.

16    **THE COURT:**  In other words, it takes that general

17   issue off the table as an indicator, as something that's

18   particularly relevant to the issue here.

19    Is that the -- is that your understanding?

20    **MR. CONNETT:**  Specifically with the MCLG, Your Honor,

21   yes.

22    **THE COURT:**  All right.  Let me hear the Government's.

23   If that was the intent, why does testimony from Ms. Donohue

24   about the need to reassess safety standards -- and implicitly

25   that would include the MCLG, but it's not -- the purpose of

1  that is more of new studies warrant new assessments, as opposed

2  to here is what's good or bad about the MCLG.

3       So, I guess, tell me what's the flaw in that analysis?

4       **MS. CARFORA:**  Well, the first issue is that when you

5  talk about safety standards, safety standards is not the same

6  as a risk standard; right?  So all of these different statutes

7  have different standards for how we assess these things.

8       And one of the issues in this case has always been this

9  conflation of the way EPA regulates fluoride under one

10  particular statute or program, you know, can be compared across

11  the board without regard for the particular objectives of the

12  statute here, which is TSCA, and the particular standard for

13  assessing risk and/or safety.

14      Now, there is no safety standard under TSCA.  It's a risk

15  standard.

16      And what happened was from the very beginning -- so you

17  understand the history on this, Your Honor, the Fluoride Action

18  Network, who is a plaintiff here, has been attacking the

19  credibility of the MCLG for nearly 30 years.  And, in fact, in

20  their petition, when they petitioned EPA in this case, the

21  petition that's under review in front of Your Honor, they also

22  made an issue of the Safe Drinking Water Act and the MCLG, the

23  existing MCLG.

24      And the concern here is not just the conflation of all

25  those issues and how that might confuse or impact public

1    perception on this issue, but then, quite frankly, the attack

2    on the MCLG itself.

3         Now, that -- Dr. Donohue is a -- a lead scientist in the

4    Office of Water.  She works only in the Office of Water and

5    only on Safe Drinking Water Act issues.  And what the Safe

6    Drinking Water Act does is it requires a refreshing of the

7    scientific evidence every six years.

8         And so one of Ms. Donohue's responsibilities at EPA is to

9    keep up on this scientific evidence, and make sure she's aware

10   of it, and make sure that every six years they have a full

11   suite of studies to look at.  That's under the Safe Drinking

12   Water Act.

13        And what he -- what this entire deposition was was an

14   attack on the MCLG.  And it can hardly be argued that

15   Ms. Donohue did not understand that she was talking about the

16   MCLG.  And what plaintiffs are doing here is, in fact, through

17   this entire testimony, in fact, attacking the MCLG and

18   addressing the crudeness of the MCLG, as plaintiffs have said.

19        So if you read this in context, which is why I highlighted

20   for the Court at Page 243, you know, plaintiff's counsel

21   directly asked:

22        "QUESTION:  And you would agree that this study

23        justifies a reassessment of the current MCLG for

24        fluoride; correct?"

25        And so he -- he omitted that from his -- you know, to his

 1  credit, he omitted that from his designations, but it doesn't

 2  change the fact that that entire line of questioning was

 3  clearly about the MCLG.

 4      Now, he -- you know, the evidence about Bruce Lanphear and

 5  all those sorts of stuff, we're not objecting to that.  That

 6  can all come in.  I was very specific about 11 lines of

 7  evidence that directly attacks the MCLG and is directly asking

 8  Ms. Donohue:

 9      "QUESTION:  You would agree that this study justifies

10      a reassessment of the current MCLG?"

11      And so he was clearly talking about -- it's clear that

12  Dr. Donohue understood that that's what she was testifying to,

13  and now -- you know, I had a conversation with plaintiff's

14  counsel about this, and he told me he, just quite frankly,

15  didn't understand what the ramifications would be of this

16  stipulation all the way through the litigation.

17      And now here we are where he got some, in his impression,

18  fairly strong testimony from Dr. Donohue that it somehow gives

19  credit to his experts.  But that doesn't allow him to disregard

20  the stipulation that we worked very hard to reach.  And it took

21  us a very long time to get there.  So now --

22      THE COURT:  Let me ask you -- but let me ask you.  I

23  understand your point, and I understand that at the beginning

24  of the line of questioning it was all about specifically the

25  MCLG for fluoride and that the safety standards that related to

```
 1    fluoride, the only ones that exist, are the Safe Drinking Water
 2    Act.
 3          However, towards the end of this excerpt, on Page 258,
 4    when she says:  Well, I think -- it's a reason for doing not
 5    just the United States, I think it's a reason for doing an
 6    update to the fluoride assessment.
 7          I mean, she seems to be -- her opinion seems to transcend
 8    just the Safe Water Drinking Act, the United States.  And if
 9    that's true, then some of the predicate things she says about
10    why she feels that way would flow into that.
11          So, yes.  I agree in a way it implicates the Safe Water
12    Drinking Act and the MCLG, but it seems to me she has also
13    testified to something broader than that.  And if she does,
14    that's really not -- and frankly, again, this is a bench trial.
15    I understand the MCLG is off the table.  The Government is not
16    going to rely on that to say this is the standard and,
17    therefore, it's per se safe or whatever.  And the plaintiffs
18    are not going to attack the MCLG in that sense.
19          But if an expert says:  Well, there is some new studies
20    and we have to change our thinking -- she may not be saying
21    this, but if someone were to say:  We have to change our
22    thinking of this.  We have to reassess everything.  And that
23    may include what we have done in the United States.  That may
24    include what needs to be done outside the United States.
25    That's kind of the point.
```

1          **MS. CARFORA:**  Your Honor, one point of clarification.

2     Your Honor seems to be under the impression, and I'm not

3     sure if Dr. Donohue is being offered as an expert in this

4     matter.  That is not -- that's not happening.

5     Dr. Donohue is a fact witness and plaintiff is producing,

6     you know, his deposition designations.

7     So she is not an expert in this case.  She's not been

8     designated as an expert by EPA or anybody else.  She is merely

9     a staff scientist working in the Office of Water that plaintiff

10    deposed in fact discovery.

11    But I would say that if the Court is inclined to allow

12    this testimony in, I would ask permission to re-designate then

13    our response designations because I -- we had been -- EPA has

14    been prejudiced by relying on the stipulation and not -- we did

15    not really designate in response to this testimony because

16    plaintiff's counsel agreed via stipulation that he would not

17    elicit testimony.  It is clear that he is eliciting testimony

18    on the MCLG.

19    What Ms. Donohue may have testified to that, you know,

20    beyond that doesn't change the fact that he was, in fact,

21    eliciting testimony on the MCLG, which was barred by the

22    stipulation that we agreed to.

23    So if it comes in, we should be permitted to put that into

24    better context for the Court and re-designate our rebuttal

25    designations.

1      **MR. CONNETT:**  Your Honor, if I could.  This is the

2  first time I have even heard this idea from defense counsel.

3  We designated this testimony back in December.

4      They had -- you know, it's common procedure.  If you have

5  an objection to testimony, you go ahead and object, and then

6  you also provide a counter designation should that objection be

7  overruled.

8      We are intending, Your Honor, to play that video,

9  Dr. Donohue's video, on Monday.  So, and we have a case to put

10  on on Monday, Tuesday and Wednesday.

11      The idea that EPA, the Friday before trial is going to

12  start, is going to now designate who knows what when they could

13  have designated that six months ago is really troubling.  I

14  mean, it's -- we have a case to put on on Monday morning.

15  There's nothing that would have stopped EPA from doing this

16  last December.

17      **THE COURT:**  All right.  So here is what we're going

18  to do.  I'm going to overrule the objection.  I'm going to take

19  this in context, and I'm going to -- to the extent I hear

20  testimony that takes on the specific standards of the -- the

21  purposes to take on the MCLG, I'm going to disregard it.

22      To the extent it transcends that, it makes a broader

23  statement, which I will ascertain once I hear the video, I will

24  allow that to stand.  But I will give the Government a chance

25  to re-designate -- to designate for their case, as part of

 1   their case.  We're not going to have time to do it as part of

 2   cross examination, but I'll allow the Government to do that.

 3   But.

 4        They should also submit what the designation is in case

 5   there is an objection to that designation.  But I'm going to

 6   allow the Government presumably a roughly equal or less length.

 7   Hopefully, it's not going to be -- this is not going to entail

 8   a lengthy contextual rebuttal.  But I'll let you do that.  But

 9   I'll allow the Government in its -- in its case-in-chief to

10   designate portions.

11        But I want that disclosed -- I would like you to designate

12   that and have that ready by Monday to give to the plaintiff's

13   counsel, so they can object by Tuesday, so I can rule on it by

14   Wednesday.

15            MR. CONNETT:  Your Honor --

16            THE COURT:  I'm going to overrule the objection, but

17   I will going to keep in mind I understand the stipulation.

18            MR. CONNETT:  Your Honor, just one clarification.

19        In addition to objecting to the designations that EPA

20   offered, may we reserve the right to cross designate to the

21   extent that testimony designated by EPA is -- we believe,

22   additional context is wanted to understand that testimony?

23            THE COURT:  Well, you know, I'm going do reserve that

24   question.  The short of it is, the more likely answer is going

25   to be no.  The longer it is, the more likely I might allow --

1    you want a rebuttal designation.  And we are getting sort of

2    far afield because as it is, you know, we're not allowing all

3    that much in in the first place, and it's for a very limited

4    purpose.  So at some point 403 is going to come into play and

5    I'm going to say enough is enough.

6        So you can make that motion at the time, but that will

7    turn in part upon how much cross designation there is from the

8    Government.  Okay?

9            MR. CONNETT:  Thank you, Your Honor.

10           THE COURT:  Let's go to the expert -- sorry.  Is

11   there something else?

12       (No response.)

13           THE COURT:  No?  All right.

14       Let's go to the objection to the expert declarations.

15   First Dr. Hu.  The question about whether or not his --

16   his disclosures that were at his depositions were sufficient

17   to -- should have raised the issue here.

18       I mean, it seems to me that, you know, some reference was

19   made to the lead context, and the lead context is not unknown,

20   was not unknown.  I mean, it was, seems to me, something that

21   was somewhat evident.  And it appears that Dr. Lanphear and

22   Grandjean is -- you know, also have some testimony on this.

23       So I'm not sure why this is not -- and he did say in his

24   deposition that:  I would characterize this as being similar

25   magnitude of lead or mercury.  EPA could have crossed him on

1    that.

2        So, frankly, it seems to me that there is a sufficient

3    disclosure here.  There is not -- I mean, there is not enough

4    nondisclosure to completely bar the testimony.  That's my

5    initial take, but I'll listen to the EPA's response.

6        **MR. ADKINS:**  Thank you, Your Honor.  This is Brandon

7    Adkins for the Department of Justice standing where Debra was

8    now.

9        So A couple of responses for that.  First, Dr. Hu did not

10   disclose this comparison to lead.  As you recognize,

11   Dr. Lanphear, a different expert, and Dr. Grandjean did.  And

12   EPA did not object and does not object to those experts

13   offering opinions that compare the fluoride exposure studies to

14   lead exposure studies.  So the disclosure that those two

15   different experts made does not satisfy Dr. Hu's disclosure

16   obligation here.

17       It is true that plaintiff's counsel asked one question of

18   Dr. Hu, and Dr. Hu's response described the effects of exposure

19   seen in the fluoride studies in terms of the magnitude of

20   effects identified in lead disclosure studies.  But a single

21   question raised at the end of a full day's deposition cannot

22   stand in for Rule 26(a) disclosure.  And there is no legal

23   basis that plaintiffs have put forward in their papers that

24   would permit -- that suggest that that can be a stand in.

25       **THE COURT:**  Is this testimony in substance any

 1    different from Dr. Grandjean's or Lanphear's testimony?

 2          **MR. ADKINS:**  It is different, Your Honor, in two

 3    important ways.  First, Dr. Hu compares -- there are parts of

 4    it that are consistent.  So the effects -- the magnitude of

 5    effects, that's consistent with Dr. Lanphear's testimony.  I

 6    believe also Dr. Grandjean.

 7          But there are two distinctions.  Dr. Hu compares the

 8    scatter plots of fluoride exposure studies in the Mexico City

 9    cohorts with scatter plots from Dr. Hu's lead exposure studies

10    also conducted in Mexico, but which were not disclosed.

11          And the reason for this is because Dr. Hu has tried to

12    rebut an opinion that was offered by EPA's expert

13    epidemiologist Dr. Allen Chang.  But that rebuttal was never

14    disclosed and other experts that plaintiffs have offered have

15    responded to the opinions of EPA's experts.  So they had an

16    opportunity to challenge that.  And doing it this way, which

17    was not disclosed, is not the way to do it.

18          The second way it's distinct from the opinions that

19    Dr. Lanphear and Dr. Grandjean disclosed is with respect to the

20    loss of lifetime I.Q. from lead exposure.  This is an opinion

21    that Dr. Hu has referred to in his declaration that is

22    completely new.  It refers to the Gould study, and it is not

23    anything that Dr. Hu ever mentions in his disclosure or even at

24    his deposition.

25          **THE COURT:**  And Dr. Grandjean did discuss the Gould

```
 1   study?
 2            MR. ADKINS:  I'm not sure I'm in a position where I
 3   can answer that question for the Court.
 4            THE COURT:  Do you know, Mr. Connett?
 5            MR. CONNETT:  Yes.  Dr. Grandjean, in his expert
 6   report, estimated that the loss of a single I.Q. point is about
 7   $18,000 of lifetime earnings, which is the same --
 8        (Court reporter clarification due to audio
 9         interference.)
10        Dr. Hu in his declaration did mention in one sentence that
11   the loss of one I.Q. point is associated with the loss of
12   $18,000 in lifetime earnings.  That is the same figure that
13   Dr. Grandjean has used in his expert report in this case.
14            THE COURT:  So why do you need his testimony on that,
15   even if it wasn't disclosed in advance, that specifically?
16            MR. CONNETT:  Well, so one -- I guess within thing
17   that I find troubling here is EPA is using a double standard.
18        In their objection -- in their response to our objections
19   EPA says:  Well, hey, Dr. Henry is a non-retained expert.  So a
20   non-retained expert doesn't -- you know, they just need to give
21   you a basic summary of the facts and that's good enough.
22        And, in fact, EPA -- counsel just noted that my question
23   to Dr. Hu during my part of the deposition of Dr. Hu is not a
24   sufficient basis for disclosure.  And yet in EPA's response to
25   our objections in Exhibit D, they cite their questions to
```

1    Dr. Henry, their non-retained expert, in their part of the

2    deposition, testimony that was not part of her report.

3         So they are holding us to a standard that they are not

4    prepared to hold themselves to.

5         So either a non-retained expert has to disclose

6    everything, every little detail, or they -- they don't.  And

7    EPA, I think, is straddling two different standards here.

8         Now, for Dr. Hu -- I mean, I could live without that

9    statement, Your Honor.  I can go ahead.  I'm fine.  If we want

10   to just take that out of the declaration, we can live without

11   it.  But EPA needs to be held to the same standard.

12        And when we look at Dr. Henry, she has offered in her

13   declaration not just a passing statement to a fact already in

14   evidence.  She has offered detailed expert opinions that are

15   nowhere to be found in her deposition and expert report.

16        So we are happy to -- if the rule is that every fact needs

17   to be disclosed in a -- in a disclosure in the deposition, if

18   that's the rule, then EPA is going to lose a lot of Dr. Henry's

19   testimony.  So they need to pick which standard they want.

20            THE COURT:  Let me mention, say something about my

21   overall impression about these objections.

22        Technically some of these objections may have merit

23   because one could question the adequacy of disclosure.

24        On the other hand, the substance of the matters objected

25   to didn't appear to me that any of this should come as a

```
 1   surprise to anyone, whether it's lack of disclosure on the
 2   plaintiff's side or on the defense side.  Some of this is
 3   duplicative of what others have said.  Some of this is -- you
 4   know, as the plaintiff argues, is right in the EPA's own
 5   records, et cetera, et cetera.
 6        The question is, you know, whether there is an opportunity
 7   here to cross examine, sufficient time to prepare cross
 8   examination.  And these disclosures, you know, have now been
 9   made for some point, but it's not like this is a brand new
10   piece of evidence that nobody ever heard of.
11        It seems to me true on both sides.  And, yeah, maybe it
12   requires a little extra work and fancy footwork in terms of,
13   you know, preparing for cross examination.  Some cross
14   examination that might have been saved for Dr. Grandjean or
15   Dr. Lanphear may have to be advanced and enhanced and maybe
16   tailored to Dr. Hu.
17        And similarly comments made by Dr. Henry, to the extent
18   that certain things -- you know, she's making certain points.
19   These are not like shocking points that come completely out
20   of -- these are all predictable stuff.
21        And maybe the disclosure should have been more robust,
22   but, again, since this is a bench trial and it's one that has
23   time.  You've got the weekend before we start, and you'll have
24   another weekend.  You know, plaintiff will get a short chance
25   at rebuttal.  You know, everybody will get two weekends to
```

```
 1   prepare, or at least a significant amount of time to prepare.

 2        And, frankly, I just don't see anything that's shockingly

 3   new here that is out of the blue.  Like, disclosure of some new

 4   piece of study -- new study that nobody knew about or something

 5   else.

 6        So I'm inclined, frankly, to just overrule the objections,

 7   even though there may be some technical propriety to it.  This

 8   is a bench trial, and I'm looking at the question of prejudice,

 9   and I'm not sure I see sufficient prejudice on either side to

10   say -- to bar this testimony.

11             MR. CONNETT:  Your Honor, if I could.

12        We believe -- there is one opinion -- Dr. Henry's opinion

13   on BMD that she provided in her declaration, as well as

14   Dr. Chang's opinion on hazard, absolutely came as a very

15   significant surprise to plaintiffs.

16        Dr. Henry in her declaration provides substantial and

17   detailed testimony about BMD, a subject that -- it's absolutely

18   nowhere in the record in this case.  I've never once heard in

19   this case up until that declaration that EPA is going to be

20   providing testimony on a whole series of issues related to

21   benchmark dose.  It's not been in any of their expert reports.

22   None.

23        That's in contrast to the objections that EPA has, where

24   each of their objections, we've disclosed it in one way or the

25   other through one or more of our experts.
```

```
 1        And, also, with Dr. Chang, who is a retained expert in
 2   this case.  Dr. Chang, Your Honor, her specialty -- and it's in
 3   all of her systematic reviews that she has published prior to
 4   this case, and it's what she did for her expert report in this
 5   case -- she focuses on causation.  It's all about causation.
 6   It's distinguishing association from causation.  That's her
 7   standard that she uses.
 8        And I've looked, Your Honor, through every single one of
 9   Dr. Chang's published systematic reviews.  She has never once
10   ever used this standard of hazard.  What's likely to be a
11   hazard.  What's not likely to be a hazard.
12        THE COURT:  Well, that's a legal argument,
13   Mr. Connett.  You're saying causation has nothing to do with
14   determination of hazard, and that -- I'm going to allow it in,
15   because you can make your argument that it's irrelevant.
16        My reaction is that I don't think it is irrelevant.  I
17   think causation is a factor because if it -- if there is no
18   causation, mere association was due to a confounding factor,
19   I'm not so sure that that's irrelevant under TSCA.  But we can
20   have that argument later.
21        You want me to exclude this testimony from the outset on a
22   relevance ground, and I'm not going to do that.
23        MR. CONNETT:  Your Honor, let me clarify, because I
24   have misspoke or there is a misunderstanding.  I think it's
25   important for me to clarify this.
```

 1          We are not -- we are not arguing, Your Honor, that

 2     testimony on causation is irrelevant.  That is not part of our

 3     brief.  We have not made that argument.  In fact, we believe

 4     that Dr. Chang should be able to testify about causation.  We

 5     have no objection to that at all.

 6          Our objection is that Dr. Chang in her declaration, in

 7     addition to her opinion on causation -- which we do not object

 8     to.  In addition to her opinion on causation, she is now

 9     offering a new opinion on  -- on hazard, which we don't -- Your

10     Honor, if I knew that she was offering an upon hazard in this

11     case, I would have asked her many, many questions at her

12     deposition that I did not have the opportunity to ask.

13          EPA in its brief says:  Well, plaintiffs will have the

14     opportunity to learn what Dr. Chang's hazard standard is when

15     they cross examine her.  And in a case which has as much time

16     constraints as we have, that puts me in a really difficult

17     position to both learn what her standard is for hazard, which

18     she's never published on in her life, which she did not

19     disclose in this case, and then to also cross examine her on

20     causation.

21          So, yes, we think causation is relevant, Your Honor.  It's

22     not dispositive, but it is relevant.  But we should not have to

23     contest a new standard that was never disclosed in this case.

24          **THE COURT:**  All right.  Tell me where her in her

25     declaration does she venture beyond, and where's -- what's the

1    most succinct page that I can find that is about hazard?

2            MR. CONNETT:  Right.  Let me -- Your Honor, it will

3    be in Exhibit --

4            THE COURT:  I have her declaration.

5            MR. CONNETT:  Right.  So, your Honor, a good example

6    here as to where you will see very clearly that Dr. Chang is

7    offering two distinct opinions is in Paragraph -- one example

8    will be, Your Honor, if you look at Paragraph 202 of

9    Dr. Chang's declaration, you will see there -- and when you're

10   there, if you could let me know.

11           THE COURT:  202, the one I'm looking at says:

12           "This factor does not weigh in favor of a true

13       causal relationship."

14           MR. CONNETT:  Yes.  And now, Your Honor, look at the

15   preceding sentence.

16           THE COURT:  From 201?

17           MR. CONNETT:  Yes.

18       (Brief pause.)

19           MR. CONNETT:  So what you see here, Your Honor, is

20   she's saying:

21           "The evidence does not persuasively demonstrate

22       that fluoride, this is likely to be a hazard."

23       And then she says:

24           "And this factor also does not weigh in favor of

25       a true causal relationship."

```
 1          So we now have these two standards.  We have the not

 2     likely to be a hazard, and we have it's not a true causal

 3     relationship.

 4          So we -- we absolutely agree, Your Honor, that Dr. Chang

 5     should be able to testify to Paragraph 202; that it does not

 6     weigh in favor of a true causal relationship.

 7          She should not be able to testify to the preceding

 8     opinion, which is all throughout her declaration, that the

 9     evidence does not persuasively demonstrate that

10     neurodevelopmental harm is likely to be a hazard.  That phrase,

11     Your Honor, "likely to be a hazard," is not anywhere in

12     Dr. Chang's expert report.  She never mentioned it once in her

13     deposition.  We now have two standards where there was once

14     one.

15          THE COURT:  So the paragraph 201 is about

16     association, strength of the association?  Which is, she treats

17     it -- you're saying she treats it independent of a causal

18     analysis?

19          MR. CONNETT:  Right.  She has a hazard analysis, and

20     I don't -- to be clear, Your Honor I'm not entirely sure how

21     Dr. Chang even defines what is not likely to be a hazard.  But

22     however she defines it, she clearly recognizes there is a

23     distinction between something that is not likely to be a hazard

24     and something which does not have a true causal relationship.

25          THE COURT:  Well, a hazard seems to be the strength
```

 1    of the statistical association, exclusive of confounding

 2    factors and bias.

 3              **MR. CONNETT:**  Well, in that particular instance, Your

 4    Honor -- in that particular -- she uses that's phrase "not

 5    likely to be a hazard" throughout her declaration in many

 6    different contexts.  She never used that standard in any of her

 7    expert disclosures in this case.  She always, always used the

 8    not causal effect.

 9              **THE COURT:**  Are you saying that in her earlier

10    disclosures she didn't talk about the question of how strong

11    the statistical association is, standard deviations, average

12    values, confounding factors, potential for bias?

13              **MR. CONNETT:**  She never -- in her expert report, Your

14    Honor, she never challenged whether there is an association.

15    She never challenged that.

16         What she did is, she goes:

17              "The plaintiff's experts have talked about the

18         association between fluoride and neurotoxicity.  I am

19         going to talk about whether that association is

20         causal."

21         She put the focus not on interrogating the association,

22    but on interrogating whether the association is causal.

23              **THE COURT:**  Did she disclose a view that the

24    magnitude of the observed associations was relatively small in

25    comparison to the normal expected variation, as indicated by

```
1   standard deviations and average values?  Just that statistical

2   point.

3            MR. CONNETT:  Yes, she did, Your Honor.  And that is

4   fair game for Dr. Chang to testify about her view; that the

5   magnitude of the association is not very large.  That's fair.

6        But she used that observation, Your Honor, in her expert

7   report to challenge whether the association is causal.  She

8   didn't use that observation to challenge whether there is an

9   association --

10           THE COURT:  Well, that's a predicate.  That's a

11  predicate.  If you don't have a strong association taking into

12  account confounding factors, degree, you never get to

13  causation.  So it seems to me, no surprise to you.  You can

14  cross examine her.

15       Now, whether she interprets -- I don't see -- your point

16  seems technical to me.  If she disclosed the substance of her

17  analysis of the degree and the magnitude of the association,

18  taking into account confounding factors, bias, et cetera,

19  et cetera, then a statistician in the end can draw conclusions

20  about causation.  That's the whole purpose of multiple

21  regression, is to isolate out other causative and confounding

22  factors.

23       So I -- whether she calls it causation, whether she calls

24  it association, I'm interested in whether she disclosed the

25  methodology.  And so far your argument doesn't convince me
```

 1   otherwise.

 2          **MR. CONNETT:**  Okay.  Well, I agree, Your Honor.  She

 3   does disclose the factual predicates.  All the factual

 4   predicates that are in her declaration are in her expert

 5   report.

 6       But she has added a new opinion based on those factual

 7   predicates that it's not likely to be a hazard.

 8          **THE COURT:**  Very easy to cross.  The base of her

 9   opinion is there.  It was disclosed.

10       So, again, no grand surprise.  You've got plenty of time.

11   Objection overruled.

12       Let's go on to the next one.  The BMD Guidelines.  That is

13   a public record.  That's a business -- that's a public record

14   exception.  Experts can rely on it.  I don't see an objection

15   to that either.

16          **MR. CONNETT:**  Understood.  Your Honor, Dr. Henry, in

17   her expert report, did disclose a long list of EPA guidance.

18   She never disclosed that BMD guidance.  And that's consistent

19   with the fact that in her expert report she never once

20   mentioned BMD, once mentioned -- she never once criticized

21   Dr. Grandjean for his BMD analysis.

22       And at her deposition when I asked her:  What methods are

23   you criticizing that Dr. Grandjean did?  She couldn't -- she

24   couldn't cite for me a method.  We spent five pages of

25   deposition just to get to the point where I had to remind her

1  that Dr. Grandjean had done a BMD.  And then at that point she

2  only could offer the testimony that:  Well, he didn't present

3  the -- he didn't present the data upon which he based his

4  analysis.

5       And so now she has a declaration, which goes in great

6  detail, Your Honor, into her criticisms of Dr. Grandjean's BMD

7  analysis.  And I effectively had no opportunity to explore

8  those opinions with Dr. Henry at her deposition.

9            THE COURT:  All right.  Let me hear the EPA's

10  response to that.

11       The argument is that she made general criticisms, but

12  never got specific and didn't cite the BMD analysis, and now

13  she does.  Is that accurate?

14            MS. CARFORA:  Not entirely, Your Honor.

15       And I -- I would say that, you know, that's why we moved

16  in limine, to exclude that testimony, is consistent with what

17  was disclosed and what Dr. Henry said on our deposition, which

18  was we didn't get any information about the methodology on BMD

19  to be able to offer an informed opinion on that, either in

20  procedure or in substance.

21       So we never got the underlying data, and we never got the

22  procedure.  And we did move in limine on that and that issue

23  has -- I think plaintiffs are fairly on notice of that issue.

24       And Dr. Henry is, you know, EPA's expert.  She has the

25  personal knowledge of what EPA's standards are for doing those

```
 1   methodologies.
 2       We have on Page 4 -- I'm sorry.  It's on Page 5 of our
 3   brief.  It's ECF 212 on Page 5.  We have quoted there
 4   Dr. Henry's answer to Mr. Connett's question at declaration.
 5       Are you there, Your Honor?
 6           THE COURT:  I'm getting there.
 7           MS. CARFORA:  I'll wait.
 8           THE COURT:  I have it in two different places.  Hold
 9   on I'm trying to...
10           MS. CARFORA:  Sure.
11       (Brief pause.)
12           MS. CARFORA:  It's ECF 212.
13           THE COURT:  Yep.
14           MS. CARFORA:  That is Page 5.  Top of Page 5.
15           THE COURT:  Okay.
16           MS. CARFORA:  And this is in response to
17   Mr. Connett's question about BMD.
18       And Dr. Henry says:
19           "It's a generalized comment about all of his
20       statements."
21       He also stated:
22           "Does not describe his principles and methods
23       used.  He did, in fact, reference BMD analysis, as I
24       recall, but not in any sort depth.  And he did not
25       also present the actual results.  Does not cite all
```

 1            reports that may be relevant.  Doesn't describe

 2            methods and criteria used to review studies or conduct

 3            weight of the evidence.  And, again, this is all

 4            leading up to the data that he then uses, which we

 5            have.  There is no transparency whatsoever."

 6         So instead of probing that further -- she had clearly

 7    offered the same opinion that's in her declaration.  Instead of

 8    probing that further, plaintiff's counsel decided to just probe

 9    her:  Show me where it is in your report.  Show me where it is

10    in your report.

11         And she did point out places in her report where that was

12    the opinion she was expressing.

13         But plaintiff's counsel had the opportunity at that point

14    to further probe this question, and this answer is consistent

15    with her testimony in the declaration.

16            **THE COURT:**  All right.  I'll let you reply,

17    Mr. Connett.

18            **MR. CONNETT:**  Yes, Your Honor.

19         In that same line of questions with Dr. Henry -- first

20    off, in that testimony that counsel just pointed you to, that

21    is -- except for that one sentence on BMD, it's her general

22    overall criticism of Dr. Grandjean's whole report.

23         I mean, that was the nature of her expert report in this

24    case, is her view that in general Dr. Grandjean did not do a

25    systematic review, did not consider and discuss all data.  It

 1   was a very generalized statement.

 2        Here she does talk -- there is a reference there to BMD.

 3   But in the more specific testimony, Your Honor, that we cite in

 4   our brief, when I asked her:  What is the -- what is the data

 5   that he did not present?  Your Honor, her testimony was much

 6   more specific.  Her testimony was:  Dr. Grandjean did not -- he

 7   was relying on unpublished data.  He didn't provide the -- all

 8   the data that he was relying upon.

 9        And, Your Honor, that statement -- there is a paragraph in

10   Dr. Henry's declaration.  It is Paragraph 137.  And to be fair,

11   that paragraph was disclosed by Dr. Henry in her deposition.

12        And we would not object to Paragraph 137 in Dr. Henry's

13   report from being in evidence in this case.  Because that

14   paragraph, Your Honor, 137, is Dr. Henry saying what she told

15   me about BMD, which is that he didn't present all the data that

16   he was relying upon.

17        And, but the rest of Dr. Henry's declaration on BMD

18   goes -- goes -- counsel won't be able to point you to any part

19   of her expert report or deposition where she talks about any of

20   it.

21        And, in fact, Your Honor, in her declaration she

22   specifically criticizes Dr. Grandjean for his BMR, her

23   benchmark response.

24        And I can show you, Your Honor, testimony from Dr. Henry's

25   deposition where I asked her:  Do you have an opinion on

1   Dr. Grandjean's use of one I.Q. point for the BMR?

2        And her answer, Your Honor, was:  No, I don't have an

3   opinion on that.

4        Now, in her declaration she's offering this detailed

5   opinion that Dr. Grandjean didn't adequately document his BMR.

6        So I -- Paragraph 137 in Dr. Henry's declaration is fair

7   game.  It's what she said at her deposition.  The rest goes far

8   beyond what she ever disclosed.

9            **THE COURT:**  What's the prejudice?  You can cross

10  examine her.  You know what her new, quote/unquote, testimony

11  is.

12       You can prepare Dr. Grandjean in advance to testify as to

13  why she's wrong about the BMR.  The specificity in which she --

14  she did make reference to the general points of it.  It wasn't

15  the level of specificity.  What's the prejudice?

16           **MR. CONNETT:**  The prejudice, Your Honor -- if

17  this was -- it would be one thing if we were dealing with some

18  of the jury trials that we have with our firm in personal

19  injury cases, which sometimes go on for over a month.  And you

20  can have an expert on the stand for eight hours, even more.

21       This is a case where time is a premium.  I have a lot of

22  matters that I need to discuss with Dr. Henry on the stand.  I

23  have a lot.  And it is going to be a stretch for me to get

24  through all that I need to talk with Dr. Henry about and then

25  address this 15 point critique on BMD.

1          **MR. WATERS:**  Well, it's time?  It's a lack of time?

2    That is the problem?

3          **MR. CONNETT:**  Absolutely, absolutely.

4          **THE COURT:**  Well, we can fix that.  I mean, if it

5    ends up on your cross you're finding -- and I have your

6    estimates that it's going to take longer because of her now

7    expanded testimony that opens up an arena and you need some

8    more time to examine her, you'll get more time.

9          **MR. CONNETT:**  Okay.

10          **THE COURT:**  Right now you've allotted, let's see...

11          **MR. CONNETT:**  Two hours, Your Honor.

12          **THE COURT:**  Yeah.  So your cross, two hours.  You

13    may -- if you need an extra half an hour or something, you

14    know, I think that's fair.

15          **MR. CONNETT:**  Okay.  And, Your Honor, I -- I know you

16    had mentioned that you are amenable to *Daubert* motions being

17    brought during trial.  And I can say that plaintiffs definitely

18    intend to bring a *Daubert* motion with Dr. Henry because we do

19    not believe she has the expertise to justify any expert

20    testimony on BMD.

21      So I just want to make that clear, that that will be

22    something we intend to pursue during her testimony.

23          **THE COURT:**  Well, you have a right to bring a *Daubert*

24    motion.  You know, we're not going to spend hours on a *Daubert*

25    motion.  It will be fairly quick.

```
 1        And I think the EPA has notice that there may be a Daubert
 2   motion for Dr. Henry.  So you should be prepared to prepare
 3   whatever voir dire you need to do to make sure she meets the
 4   Daubert gate.  But, yeah, I did say that.
 5        So I am going to -- I favor -- unless there is something
 6   completely brand new that you cannot in all reason defend
 7   against, I am going to overrule the objections.
 8        I understand there may be some relevance questions.  There
 9   may be some others.  But I -- for the most part these -- these
10   facts do seem relevant.  They have some bearing on the
11   question.  They have been disclosed in one way or another or
12   seen in documents or predictable to a certain extent.  We can
13   make some adjustments in time, if necessary.  But for the most
14   part I -- I don't see any objections here.
15        Now, some of this stuff I admit -- you know, there is a
16   diminimus argument about this one point.  Frankly, again, it's
17   a bench trial.  I don't care.  You know, those things -- that's
18   why I'm erring on the side of admission, and I will take into
19   account relevance.
20        And your objections are stated for the record.  And so we
21   will just go from there.
22        MR. CONNETT:  Okay.
23        THE COURT:  All right.  So I'll just get out a quick
24   minute order summarizing what we've done today, but I think you
25   should be prepared to go forward.
```

```
 1          You're each going to start with some opening statement, I
 2    take it, on Monday?
 3               MR. CONNETT:  Yes, Your Honor.
 4               MS. CARFORA:  Yes, Your Honor.
 5               THE COURT:  Okay.  And then your first -- who will be
 6    your witness that you think on Monday that you will be calling?
 7               MR. CONNETT:  Yes, Your Honor.  On Monday we -- we
 8    have an agreement with EPA that we would be disclosing Sunday
 9    morning, but we're certainly happy to disclose right now, Your
10    Honor, if you would prefer.
11               THE COURT:  Well, just give me an idea of who you
12    have.  I'm not going to bind you to it, but at least I can
13    prepare.
14               MR. CONNETT:  Okay.  So, Your Honor, we intend to
15    call Joyce Donohue through her videotaped deposition.
16          And we intend to call Dr. Howard Hu and Dr. Bruce
17    Lanphear.
18               THE COURT:  Okay.  And that should take up the day, I
19    take it?
20               MR. CONNETT:  Yes.
21          And, Your Honor, we did have a question for you.  We had
22    touched upon this recently at one of our hearings, and we just
23    wanted to follow up and get guidance from, Your Honor.  That is
24    with respect to Rule 615 of the Federal Rules of Evidence with
25    respect to experts listening in on other witness testimony in
```

 1   the case.

 2          And it's our understanding, and it would be our

 3   proposal -- and to be clear, I have not yet spoken with defense

 4   counsel about this.  I don't know their position.  But it's our

 5   understanding that the rule would forbid experts from listening

 6   to other expert testimony in the case.  That's what we have --

 7   you know, that's our intention to abide by that rule, but we

 8   just wanted to be clear that that's what Your Honor expects and

 9   if that will be the rule for the case.

10          **THE COURT:**  Does the Government have a view?

11          **MS. CARFORA:**  Yeah, Your Honor.  I have -- this is

12   the first I'm hearing of this, and I'm trying to grab my Rules

13   of Evidence.

14          I understood that rule to be -- to require a party to

15   request that.  Not an automatic.  And I appreciate if that is

16   what Mr. Connett is, in fact, requesting.

17          You know, our -- Dr. Henry, her -- she's a risk manager,

18   and she's a risk assessor, and her job and expertise requires

19   her to rely on and assess what other people are doing, other

20   people's expertise, for example.

21          So with respect to Dr. Henry, it is actually critical for

22   her to listen to all of the testimony so that she can

23   accurately apply her expertise in responding to that testimony

24   both in direct examination and cross.

25          **THE COURT:**  All right.  Your response?

1           **MR. CONNETT:**  Yes, Your Honor.

2      That sounds to me like we can expect additional

3   undisclosed opinions from Dr. Henry.

4      Dr. Henry currently has at her disposal the declarations

5   of plaintiff's experts.  And I just -- it worries me, Your

6   Honor, that we are now going to see yet another series of

7   opinions from Dr. Henry.

8      And, Your Honor, if I could also briefly.  Our concern

9   with Dr. -- we're becoming -- Dr. Henry is -- she's a Deputy

10  Director for EPA.  And our concern is that we're really dealing

11  with a 30(b)(6) representative, where Dr. Henry is becoming the

12  voice of -- effectively of the attorneys in this matter.

13     Dr. Henry should be an expert.  She should be -- her

14  testimony should be limited to expertise.  And I'm concerned

15  that Dr. Henry is becoming something beyond an expert.

16          **THE COURT:**  Well, your question was about Rule 615.

17  And Rule 615 does require the exclusion upon request, but one

18  exception is subsection (c):

19          "A person whose presence a party shows to be

20          essential to presenting the party's claim or defense."

21     Now, I haven't looked at the case law to figure out

22  whether that might apply to a situation like this, but it seems

23  to me that we should have a rule that applies to either one or

24  all.

25     I don't have any objection necessarily, at least not at

1   the outset, if -- if each side wanted to make an exception for

2   one or more experts.  Sometimes, you know, rather than -- when

3   you have the witness on the stand, the expert, rather than

4   recounting the testimony of some other expert or somebody else

5   and asking would that change your opinion or what's your -- you

6   know, we can skip that if the person is -- has listened to the

7   testimony.

8          Balanced against that is the idea that we don't want

9   people changing their testimony, you know, but that -- that has

10  particular force to fact witnesses, percipient witnesses.  It's

11  less when it comes to experts who have already given their

12  testimony to a certain extent, you know, and made disclosures.

13  Arguably some of it not as robust as others, but nonetheless.

14         So there's -- there's -- it seems to me that -- you could

15  rationally say:  Well, experts who are going to testify should

16  be able to listen in.  So I don't have a strong feeling.  If

17  the parties want to stipulate, I think it should apply to

18  everyone.  And whichever expert you want to be able to listen

19  to, I think each side should have that prerogative.

20         On the other hand, you know, if we can't get that

21  agreement, I'm inclined to follow Rule 615.

22         **MS. CARFORA:**  Well, your Honor, EPA -- EPA hasn't

23  requested it and is -- is fine to waive.  If plaintiff's

24  experts want to listen to the testimony, EPA has no objection

25  to that.

 1      But we do think -- we haven't had a chance to look at the

 2   rule either, Your Honor, or the case law.  And without really

 3   understanding -- you know, Dr. Henry -- I think this is not

 4   just for Dr. Henry, but our other experts, Dr. Chang and

 5   Dr. Tsuji, both rely on each other.  I mean, our whole case is

 6   around the fact that all of this evidence needs to be reviewed

 7   and considered together and integrated and synthesized.  I

 8   mean, that's really the essence of our case here.  And to

 9   exclude our witnesses to be able to hear what everybody else

10   says, I think really prejudices our theory of the case.

11          **THE COURT:**  Well, let me say this, too.  Under TSCA,

12   I mean, we're sitting as a court, but we're almost playing the

13   role of what a regulatory agency would do.  I mean, that's what

14   TSCA does under Section 21.  We're sort of sitting there -- I'm

15   sitting there as, you know, having to do the task that the

16   administrator would normally do.  And in normal administrative

17   proceedings you don't have the exclusionary rules.  You don't

18   preclude an expert from hearing the evidence.

19      So it does seem to me for this particular kind of case, if

20   there is a case not to invoke Rule 615 for experts, this would

21   be it.  This is not a police case where you've got ballistics

22   experts or forensics.  You know, this is a case where we're

23   trying to, you know, find the scientific truth, frankly.

24   That's what the mission is.

25      So I would favor, and maybe you would agree, Mr. Connett,

 1   that the EPA has offered to not invoke 615, maybe we should not

 2   invoke it then.  All experts should be able to listen in.

 3          **MR. CONNETT:**  Your Honor, a concern I have with this

 4   is that there is an advantage here to EPA because, obviously,

 5   they go -- their case comes after our case.

 6          **THE COURT:**  You will get a rebuttal.  You get to

 7   rebut.

 8          **MR. CONNETT:**  Okay.  So we would be able to put on a

 9   rebuttal witness who will be able to listen to EPA's experts

10   and then provide some rebuttal?

11          **THE COURT:**  Yeah.  I mean, you have a rebuttal right

12   at trial anyway, within your time limits.  Subject to that one

13   adjustment I said with regard to Dr. Henry.

14      But, I mean, yeah.  No, you're not going to get an extra

15   five hours.  You're the moving party.  You have a right of

16   rebuttal.

17          **MS. CARFORA:**  Your Honor, we can clarify, I think,

18   that Mr. Connett doesn't get to introduce a new undisclosed

19   expert in rebuttal.  He can use his experts that he has already

20   designated.  EPA has designated rebuttal experts.  I don't

21   think that --

22          **THE COURT:**  There won't be any new witnesses, period.

23   It's been designated.

24      And rebuttal, remember, it's within the scope of the

25   defendant's case.  I mean, you can't bring in brand new stuff.

1    It's to rebut, not to bring in new stuff, so...  But, yeah, you

2    have a rebuttal.

3         So I -- unless some party feels strongly, I'm going to not

4    invoke 615 for experts here.  I think any percipient witness,

5    we should treat like anybody else.  They should not listen in.

6              **MR. CONNETT:**  Thank you, Your Honor.

7              **MS. CARFORA:**  Thank you, Your Honor.

8              **THE COURT:**  All right?  Unless there's any other

9    questions, we'll see you Monday at 8:00 o'clock.

10             **MS. CARFORA:**  Great.  Thank you very much, Your

11   Honor.

12             **MR. CONNETT:**  Thank you, Your Honor.

13             **THE COURT:**  Great.  Thank you.

14             **THE CLERK:**  Court is adjourned.

15        (Proceedings adjourned.)

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Sunday, June 7, 2020