Volume 1

Pages 1 - 133

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

FOOD & WATER WATCH, INC., et al,  )
                                       )
                                       )
         Plaintiffs,     )
                                       )
  vs.                     ) No. C 17-2162 EMC
                                       )
U.S. ENVIRONMENTAL PROTECTION   )
AGENCY, et al,             )
                                     ) San Francisco, California
         Defendants.     ) Monday
                                     ) June 8, 2020
_____) 8:00 a.m.

**TRANSCRIPT OF REMOTE ZOOM BENCH TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          WATERS KRAUS & PAUL
                           222 North Pacific Coast Highway
                           Suite 1900
                           El Segundo, California 90245
                BY:  **MICHAEL P. CONNETT, ESQ.**
                     **CHARLES ANDREW WATERS, ESQ.**

                           NIDEL AND NACE, PLLC
                           5335 Wisconsin Avenue, NW
                           Suite 440
                           Washington, DC 20015
                BY:  **CHRISTOPHER THOMAS NIDEL, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

**For Defendants:**               U.S. DEPARTMENT OF JUSTICE
                                  Environmental Defense Section
                                  601 D Street, NW
                                  Room 8814
                                  Washington, DC 20004
                          **BY:  DEBRA J. CARFORA, ESQ.**


                                  U.S. DEPARTMENT OF JUSTICE
                                  Environment & Natural Resources Div.
                                  P.O. Box 7611
                                  Washington, DC 20044
                          **BY:  BRANDON N. ADKINS. ESQ.**
                                **SIMI BHAT, ESQ.**
                                **JOHN THOMAS H. DO, ESQ.**

                                  —   —   —

```
 1                   P R O C E E D I N G S

 2   JUNE 8, 2020                              8:00 A.M.

 3                       ---oOo---

 4        THE CLERK:  Court is now in session.  The Honorable

 5   Edward M. Chen is presiding.

 6        Calling Civil Action 17-2162, Food & Water Watch versus

 7   Environmental Protection Agency.

 8        Counsel, please state your appearances for the record,

 9   beginning with plaintiff's counsel.

10        MR. WATERS:  Andy Waters for the plaintiffs.

11        THE COURT:  Good morning.

12        MR. CONNETT:  Good morning, Your Honor.  Michael

13   Connett on behalf of the plaintiffs.

14        THE COURT:  All right.  Good morning, Mr. Connett.

15        MR. NIDEL:  Good morning, Your Honor.  Chris Nidel on

16   behalf of the plaintiffs.

17        THE COURT:  All right.  Good morning, Mr. Nidel.

18        MS. CARFORA:  Good morning, Your Honor.  Debra

19   Carfora on behalf of EPA.

20        THE COURT:  Good morning, Ms. Carfora.

21        MR. ADKINS:  Good morning, Your Honor.  Brandon

22   Adkins on behalf of the defendant EPA.

23        THE COURT:  Good morning, Mr. Adkins.

24        MS. BHAT:  Good morning, Your Honor.  Simi Bhat on

25   behalf of EPA.
```

PROCEEDINGS

```
1              THE COURT:  Good morning, Ms. Bhat.

2              MR. DO:  Good morning, Your Honor.  John Do for the

3    defendants.

4              THE COURT:  All right.  Thank you, Mr. Do.

5         And thank you for loading all the documents in Box.com.  I

6    think I was able to access all of them and download it in some

7    fashion here.  So it's very helpful.

8         So ready to proceed, counsel?

9              MR. CONNETT:  Yes, Your Honor.

10        There is one matter that we wanted to bring to your

11   attention.  It's a scheduling matter.

12             THE COURT:  Okay.

13             MR. CONNETT:  We have -- tomorrow morning we intend

14   to call Dr. Phillippe Grandjean, and he is located in Denmark,

15   which is nine hours ahead of us.  And I had spoke with him this

16   weekend, and he has asked if -- his strong preference would be

17   to start first thing tomorrow at 8:00 a.m.

18        And the -- the potential issue that that creates, Your

19   Honor, is that based on today's shortened trial schedule, it is

20   quite possible that we will not have -- be able to finish Bruce

21   Lanphear, Dr. Lanphear's testimony today.  We may be able to

22   start him, but it's very likely that we would have to stop it

23   today.  And we would ask for the Court's leave to permit -- if

24   that was to happen, to permit us to take Dr. Grandjean a bit

25   out of turn and begin him first thing in the morning and
```

1  then -- then complete Dr. Lanphear's testimony after

2  Dr. Grandjean is finished tomorrow.

3      And the other thing, Your Honor, is that depending on when

4  Dr. Lanphear is able to take the stand today, depending on when

5  we're done with Dr. Hu's testimony, we think it might be -- for

6  instance, if it's 11:15, 11:30, that it would be preferable to

7  just do Dr. Lanphear's testimony in total tomorrow versus

8  cutting it off.

9      So we just wanted to bring that to Your Honor's attention

10  because we do see it as a potential scheduling issue later

11  today.

12          THE COURT:  Well, I have no problem with taking

13  Dr. Grandjean out of order since, again, it's a bench trial,

14  not a jury trial.

15      And whether we adjourn early or not, that will kind of

16  depend on where it is.  If there's a natural break point that's

17  a little bit early, I don't mind.

18      On the other hand, I don't want to lose too much time.  So

19  why don't we just play it by ear and see where we are.

20      Because you're going to -- probably your direct is only

21  going to be how long for Dr. Lanphear?

22          MR. WATERS:  Approximately 45 minutes, Your Honor,

23  give or take.

24          THE COURT:  If there is a way that you could at least

25  conclude the direct?  That might be a natural break point.  If

**PROCEEDINGS**

 1   you can't, like I said, we'll play it by ear.

 2             **MR. WATERS:**  Very well.

 3             **THE COURT:**  All right?

 4             **MS. CARFORA:**  Your Honor, I have one issue.

 5             **THE COURT:**  Yes.

 6             **MS. CARFORA:**  You know, we never got around to

 7   testing the sidebar, which is probably not going to be an

 8   issue, but we also did not receive any type of link or

 9   invitation to the Zoom meeting should we need that.

10             **THE COURT:**  Okay.  Angie, can you -- do you need me

11   to set that up?

12             **THE CLERK:**  I can.  I can set it up.

13             **THE COURT:**  If you could set that up and then invite

14   -- well, everyone, but obviously we'll have to figure out one

15   team at a time.

16       The good thing about Zoom, you'll know who's in the

17   meeting, so there is no spying or anything.

18       If you could set that up and just send out the invite.  I

19   guess you have to host it; right?

20             **THE CLERK:**  I believe I do or because I'm hosting

21   this -- these proceedings, you may have to host it.

22             **THE COURT:**  Oh, I would have to host it?  Can you

23   have me host it then?

24             **THE CLERK:**  Yes.

25             **THE COURT:**  All right.  We'll work on that while we

 1    start.  Sorry about that.  Yeah, we promised to do that.  But

 2    we'll have that set up in case you need a sidebar.

 3        The other thing you can do is the old-fashioned way.  You

 4    can text or WhatsApp or whatever each other, or you can phone

 5    each other actually.

 6        So why don't we -- while we set that up, why don't we just

 7    go ahead and start with your opening statements?

 8            **MS. CARFORA:**  Yes, Your Honor.

 9            **THE COURT:**  All right.

10            **MR. CONNETT:**  Your Honor, before we begin here, if I

11    could just share the screen and make sure that is working.

12            **THE COURT:**  Okay.

13        (Document displayed.)

14            **MR. CONNETT:**  Can you see that okay, Your Honor?

15            **THE COURT:**  Yeah.  And I'm moving my sidebar pictures

16    over to the side so it doesn't obstruct.

17        And just a reminder.  Angie will -- she actually has a

18    little chess clock, and she will keep time.  At various breaks

19    she will let you know how much time you've used.  Okay?

20        You may begin.

21                    <u>**OPENING STATEMENT**</u>

22            **MR. CONNETT:**  Good morning, Your Honor, and may it

23    please the Court.

24        This morning I'd like to speak about five issues.

25        First is the key questions that we believe this case

OPENING STATEMENT / CONNETT

 1    presents.

 2         Second is the experts that you will be hearing from.

 3         The third is the methods.

 4         The fourth is the evidence.

 5         And the fifth is the determination that we believe the

 6    evidence in this case compels.

 7         First, Your Honor, the questions.  The first question,

 8    Your Honor, is:  Is neurotoxicity a hazard of fluoride

 9    exposure?  What that means is does fluoride at some level of

10    exposure cause harm to the brain, adverse effects on the brain?

11         The second question, Your Honor, is:  Do fluoridation

12    chemicals in drinking water present a risk of this hazard?

13         And the third question, Your Honor is:  Is the risk of

14    neurotoxicity presented by fluoridation chemicals an

15    unreasonable one?

16         And, Your Honor, in considering this question of

17    unreasonable risk, it's important to consider that the Toxic

18    Substances Control Act, TSCA, commands that the EPA protect not

19    just the general public, but susceptible subpopulations.  So if

20    there is one unreasonable risk to one susceptible public

21    population, EPA must take regulatory action to protect the

22    public from harm.  And, Your Honor, we believe we will meet

23    this burden.

24         So I'll talk now about the experts who will be appearing

25    in this trial.

1    The three experts that the EPA has called in this case

2    have never published a single study on fluoride, let alone

3    fluoride neurotoxicity.  By their own admission, Your Honor,

4    EPA's experts in this case were not experts on fluoride prior

5    to this litigation.

6        By contrast, Your Honor, the scientists that plaintiffs

7    will be calling to the stand were investigating fluoride's

8    effects on human health long before this litigation began and

9    have performed the highest quality studies on fluoride

10   neurotoxicity that have ever been done.

11       The first expert that plaintiffs will be calling to the

12   stand today is Dr. Howard Hu.  Dr. Hu is an esteemed

13   epidemiologist who has conducted two prospective cohort studies

14   on fluoride and neurodevelopmental.  These studies, Your Honor,

15   have been funded by the National Institutes of Health, as well

16   as the EPA.

17       The second scientist that plaintiffs will be calling to

18   the stand is Dr. Bruce Lanphear, a scientist whose research on

19   lead and neurodevelopmental has shaped Government regulations

20   and guidelines in the United States and around the world.

21       Dr. Lanphear has now completed two prospective cohort

22   studies on fluoride and IQ.  Both of these studies have been

23   funded by the NIH.

24       The third scientist, Your Honor, that plaintiffs will be

25   calling to the stand is Dr. Phillippe Grandjean of the Harvard

1   School of Public Health.  Dr. Grandjean is an esteemed

2   environmental epidemiologist who serves as a technical advisor

3   to the World Health Organization.  Dr. Grandjean has studied

4   the effects of fluoride on human health for 40 years.

5       And lastly, Your Honor, the plaintiffs will be calling

6   Dr. Kathleen Thiessen, who is a risk assessment scientist, who

7   conducted a health assessment on fluorides for the EPA and who

8   is a coauthor of the National Research Council's landmark 2006

9   report on fluoride.

10      Your Honor, the plaintiff's experts in this case have

11  devoted their professional careers to understanding the impact

12  of environmental chemicals on human health, and they have done

13  so almost exclusively on behalf of the public.

14      So let's talk now about the experts that EPA has retained

15  in this case.

16      The two experts that EPA has retained to testify on

17  neurotoxicity do not come from the EPA.  They do not come from

18  any federal health agency.  Nor do they come from any public

19  health institution.  Instead, they come from an entity known as

20  Exponent.

21      And you will hear in this case, Your Honor, about

22  Exponent's reputation in the public health community and the

23  clients it represents, including Dow Chemical, Monsanto,

24  American Petroleum Institute, and a long list of polluting

25  industries.

1    Now, EPA has called one expert witness who does work at

2    the EPA.  Her name is Dr. Tala Henry.  Dr. Henry has admitted

3    that she's not an expert on fluoride; that she has never once

4    worked on any fluoride project, study or regulation prior to

5    this case.

6    Now, Dr. Henry will be offering opinions in this case

7    criticizing plaintiff's experts.  But, Your Honor, the

8    evidence, I believe, will suggest that Dr. Henry never even

9    read plaintiff's expert reports before she offered her

10   criticism.

11   One of the questions in this case, Your Honor, is about

12   expert judgment.  Which experts are more credible?

13   And I would submit, Your Honor, that to answer that

14   question you can look to the EPA's own actions in practice.  If

15   you look to EPA's own actions in practice, you will see that

16   the two most well-established neurotoxicants in human beings,

17   which are lead and mercury, the EPA has established its

18   regulations on lead and mercury to protect the public based on

19   the research conducted by Dr. Lanphear, by Dr. Hu and

20   Dr. Grandjean.

21   And if you look at who EPA has funded to investigate the

22   impact of environmental chemicals on human health, you will see

23   that the EPA has awarded tens of millions of dollars in

24   research funding to Dr. Hu, to Dr. Lanphear, and Dr. Grandjean.

25   And if you look at who EPA has asked, outside of

1    litigation, to review the health effects of fluoride, you will

2    see that EPA contracted with Dr. Thiessen to write a health

3    assessment on fluoride compounds.

4         And lastly, Your Honor, if you look at who EPA has invited

5    many times to serve on its science advisory boards, to advise

6    the agency on how to protect public health, you will see that

7    the EPA has repeatedly invited Dr. Hu, Dr. Lanphear and

8    Dr. Grandjean.

9         So let's turn now to the EPA-related work of Exponent

10   scientists who have been called as experts in this case.  Let's

11   start with Dr. Ellen Chang.

12        Dr. Ellen Chang was paid by a pesticide company to provide

13   comments to the EPA.  And Dr. Chang was hired by an asbestos

14   producing company to criticize EPA's risk assessment on

15   fluoride.

16        In fact, Your Honor, if you look at Dr. Chang's C.V., the

17   only reference to EPA is to her criticism of EPA's attempt to

18   protect the public from asbestos.

19        Let's turn now to Dr. Joyce Tsuji and let's look at some

20   of other EPA-related work.  Well, as with Dr. Chang, Dr. Tsuji

21   has been paid by multiple pesticide companies to provide

22   comments to the EPA.  And Dr. Tsuji has also worked on behalf

23   of industrial clients during EPA's supervised clean up of their

24   Superfund sites.

25        So I'll now discuss in brief the methods that our experts,

1    the plaintiff's experts, have used in this case.

2         And I will start with Dr. Phillippe Grandjean, who in the

3    past, Your Honor, has conducted a systematic review of the

4    epidemiological literature on fluoride and IQ.  And in this

5    case Dr. Grandjean conducted an extensive weight of the

6    evidence analysis, where he focused on the best available

7    science.  And while Dr. Grandjean did not conduct a formal

8    systematic review in this case, he relied upon and fully

9    considered and addressed the systematic review that Dr. Chang

10   conducted on behalf of the EPA.  And as he will explain, her

11   review, once you correct for the errors in judgment, fully

12   supports his assessment.

13        Now, lastly, Dr. Grandjean conducted a benchmark dose

14   analysis, which is the method that EPA uses to set the safe

15   levels of chemicals to prevent human health hazards.

16        Next, Dr. Kathleen Thiessen, Your Honor, conducted a risk

17   assessment, according to EPA's guidelines for neurotoxicity

18   risk assessment.  And as you will see, the EPA has stated that

19   it will follow these guidelines when evaluating the

20   neurotoxicity of environmental toxicants.

21        But despite this, none of EPA's experts that you will hear

22   from in this case applied these guidelines or even considered

23   them.  Dr. Thiessen is the only scientist in this case who did

24   a risk assessment according to these guidelines.

25        Now, you will see, Your Honor, that in the EPA's

 1   guidelines they recognize that a prospective cohort study,

 2   which is the very type of study that Dr. Hu and Dr. Lanphear

 3   have conducted, is the strongest type of human study to

 4   investigate the health effects of environmental chemicals.  The

 5   guidelines state that prospective studies permit a direct

 6   estimate of the risk and should weigh heavily in the risk

 7   assessment process.

 8        The guidelines also, Your Honor, set forth the standard

 9   that EPA uses in practice to determine whether a chemical is a

10   neurotoxicant.  And as you can see here, they set forth what is

11   sufficient human evidence to do so.

12        And as you will see, the EPA considers sufficient evidence

13   of neurotoxicity to the epidemiological studies with a focus on

14   cohort studies, prospective cohort studies, which are

15   sufficient to judge that some neurotoxic effect is associated

16   with exposure.

17        And importantly, Your Honor, the EPA distinguishes

18   association here from causality, which the EPA recognizes to be

19   a more stringent standard.

20        EPA does not require proof of causation, Your Honor,

21   because if you wait for the final proof of harm, you will not

22   prevent the harm from occurring, which, unlike Exponent, is

23   what EPA is supposed to do to protect the public.

24        Now, Your Honor, I will discuss what we, the plaintiffs,

25   expect the evidence to show in this case.

OPENING STATEMENT / CONNETT

1        First, it is undisputed, Your Honor, that fluoride passes

2   through the placenta and gets into the fetal brain.  And what

3   this means is that when a pregnant mother drinks a glass of

4   fluoridated water, the fluoride in the water will have access

5   to the child, including the brain.

6        It is also undisputed, Your Honor, that unlike older

7   children and healthy adults, a young child does not have the

8   protection of the blood-brain barrier in utero and in early

9   infancy.  In fact, the blood-brain barrier is not fully

10  developed until six months after birth.  Again, this is an

11  undisputed fact in the case.

12       Now, because the young child does not have the protection

13  of the blood-brain barrier in utero and during infancy,

14  chemicals that are circulating in their blood can get into

15  their brain.

16       Here, Your Honor, is a statement from EPA, an EPA

17  document, that says:

18            "Because the blood-brain barrier limits the

19       passage of substances from blood to brain, in its

20       absence, toxic agents can freely enter the developing

21       brain."

22       And because the blood-brain barrier is not fully developed

23  until six months of age, we need to be very careful about

24  exposing young infants to environmental chemicals.  Yet that

25  is, Your Honor, precisely what happens when we add fluoridation

1    chemicals to drinking water.

2         It will be undisputed in this case that babies who were

3    bottle fed with fluoridated water received the highest doses of

4    fluoride of any age group in the population.  So at the moment

5    of their greatest vulnerability, we are exposing infants, often

6    from the poorest and most disadvantaged communities, to a very

7    high burden of fluoride.  So there will be no dispute that

8    fluoride gets into the brain of the young child.

9         That leaves us with the question:  Does fluoride affect

10   the brain?

11        And here, Your Honor, the evidence is exceptionally

12   compelling.  I'll start with the National Research Council's

13   2006 report, which is considered the most comprehensive review

14   of fluoride toxicity ever conducted.

15        The NRC concluded in no uncertain terms that fluoride

16   interferes with the functions of the brain.  The NRC made this

17   finding based on a large number of anatomical and neurochemical

18   changes that have been documented in the brains of laboratory

19   animals exposed to fluoride.

20        So as to the first question in this case, Your Honor, can

21   fluoride cause neurotoxic effects, the NRC has already answered

22   that question for us.

23        Now, to be clear, the NRC did not draw any conclusions

24   about the risk of neurotoxicity in humans.  This is because at

25   the time they did their review, there were not many studies yet

1    available.  But the NRC did express concern about the potential

2    for fluoride to reduce IQ and called on the scientific

3    community to research the issue further, and the scientific

4    community has listened.

5         As you'll see, Your Honor, many research teams throughout

6    the world have published studies on fluoride on IQ subsequent

7    to the NRC's analysis.  In total there are now 92 studies on

8    fluoride and neurodevelopment, which is a very large number of

9    studies, particularly when you compare this to other chemicals

10   that EPA has found to be neurotoxic -- sorry, that EPA has

11   found to be neurotoxic.

12        And here, Your Honor, we have listed some of the chemicals

13   that EPA has found to be neurotoxic.  And you'll see that most

14   of the studies didn't have any -- sorry.  Most of the chemicals

15   didn't have any human studies at all.  So the quantity of human

16   studies available for fluoride is very large.

17        And plaintiffs recognize, Your Honor, that many of the

18   human studies on fluoride do have methodological limitations.

19   In some cases they are quite severe.  And these limitations do

20   need to be considered.

21        But the compelling fact, Your Honor, is the consistency.

22   It is the consistency with which these studies, including

23   studies with weak designs and studies with strong designs, are

24   finding significant associations between fluoride and adverse

25   neurological effects.

 1          The most important studies in this case, Your Honor, are

 2     the NIH funded studies by the research teams lead by Dr. Hu and

 3     Dr. Lanphear.   There will be no dispute in this case that these

 4     are the most reliable studies ever conducted on fluoride and

 5     neurodevelopment.   In total, there are now four of them and

 6     each and every one of these four studies have found significant

 7     associations between fluoride and adverse neurodevelopmental

 8     effects.

 9          Now, here you'll see, Your Honor, that the -- Dr. Hu's

10     prospective studies have been conducted on a cohort of pregnant

11     mothers in Mexico City.   Dr. Lanphear's prospective cohort

12     studies have been conducted in Canada.

13          And in each of these studies the mothers were exposed to

14     so-called optimal levels of fluoride; meaning, the levels of

15     fluoride recommended for caries prevention.   These are the same

16     levels of exposure, Your Honor, that pregnant women ingest in

17     fluoridated areas in the United States.

18          So I won't -- I'll just briefly describe, Your Honor, some

19     of the key facts about these studies and why they are so

20     important.

21          First, as you will hear, before these studies are ever

22     approved by the NIH, they undergo extensive vetting by experts

23     in the field.   And in addition to the extensive peer review

24     that the NIH provided to the methodology of these studies,

25     these studies also went -- underwent extensive peer review

1    before they were published in leading scientific journals.

2          So they had effectively, Your Honor, two stages of peer

3    review:  Both to get the study accepted for an NIH grant, and

4    then later to get the studies published in scientific journals.

5          And if you look at the actual study designs, Your Honor --

6    and you will hear this at length from Dr. Hu and

7    Dr. Lanphear -- they have extensive control for potential

8    confounders.

9          They had individual measurements of prenatal fluoride

10   exposure.

11         They used blinded examinations, which eliminates the

12   potential for examiner bias.

13         They focused on low -- quote, low levels of fluoride

14   exposure, meaning the levels of fluoride exposure that we see

15   in fluoridated communities.

16         They found large effect sizes.  Large effects of fluoride

17   on IQ and ADHD behaviors.

18         And they found and confirmed dose response relationships,

19   linear dose response relationships in the exposure range that

20   we see in fluoridated communities.

21         Your Honor, you will hear this morning from EPA's own

22   in-house expert on fluoride, Dr. Joyce Donohue, and she agrees.

23   These studies, these NIH funded studies are well conducted and

24   warrant a reassessment of all existing fluoride standards.  EPA

25   did not call Dr. Joyce Donohue as an expert in this case.

 1        In addition to the human studies, Your Honor, you have

 2   many animal studies that you will be hearing about in this

 3   case.  You will hear that the U.S. National Library of Medicine

 4   has indexed over 105 animal studies on fluoride neurotoxicity

 5   since the NRC's 2016 review, and that the overwhelming majority

 6   of these studies have reported adverse effects.

 7        You will hear a lot, Your Honor, about the National

 8   Toxicology Program's systematic review of some of the animal

 9   studies, a small subsets of the studies.  NTP completed this

10   review in 2016.  As you will hear, the NTP, while it found a

11   number of methodological limitations in these studies,

12   concluded that they are suggestive of an effect on learning and

13   memory.

14        You will hear from Dr. Kristina Thayer, who is now an EPA

15   scientist, was the principal author of the NTP report.  She

16   will describe for you that the animal data on fluoride does

17   support the biologic plausibility of fluoride causing

18   neurologic effects in humans.

19        Your Honor, one thing that you will not be seeing in this

20   case is safety data.  And by that I mean studies which

21   demonstrate or support the neurological safety of fluoride,

22   particularly during the prenatal period.  You will see this,

23   Your Honor, through the admissions of the CDC, the FDA, and the

24   defendant EPA.

25        Finally, Your Honor, I will discuss some of the evidence

1   that we believe demonstrates that fluoridation chemicals do, in

2   fact, present an unreasonable risk to human health.

3       Your Honor, I would submit that the situation that we now

4   find ourselves in today with fluoridation chemicals is very

5   analogous to the situation this nation once faced with leaded

6   gasoline.  There, as here, we have a widespread dispersal of a

7   neurotoxic agent resulting in exposure to an enormous number of

8   people, including the most vulnerable.

9       Your Honor, approximately 200 million people live in

10  communities where fluoridation chemicals are added to water and

11  many more drink processed beverages that have been contaminated

12  with fluoridation chemicals.  To put this number in context,

13  the EPA has found unreasonable risks for chemicals under

14  Section 6 that impact less than 2,000 people, and those have

15  been industrial workers.

16      Because of the widespread reach of fluoridation, you have

17  a situation where millions of susceptible people are being

18  exposed on a daily basis, including 2 million pregnant mothers

19  who live in fluoridated communities, and over 400,000

20  exclusively formula fed babies.  These are babies who, for

21  their first six months of life, are never breastfed.  They are

22  reliant solely on tap water to reconstitute their formula.

23      Now, EPA's experts in this case have focused their

24  opinions on whether there is conclusive proof that fluoridation

25  causes neurotoxic effects.  But this is not and never has been

1    the standard EPA uses to assess risk.

2        Indeed, it is an undisputed fact in this case, and I'm

3    showing here undisputed fact number 16 in this case, that EPA

4    does not require that human exposure levels exceed a known

5    adverse effect level to make an unreasonable risk determination

6    under TSCA.

7        Now, Your Honor, while plaintiffs do not need to prove

8    causation at .7 ppm to prevail, the evidence actually supports

9    this conclusion.  So we can go above and beyond our burden in

10   this case, which makes the case for an unreasonable risk

11   finding even more compelling.

12       Dr. Grandjean will explain this in part through his

13   assessment of the Bradford Hill factors.

14       Dr. Grandjean has also done a benchmark dose analysis.

15   And as he will explain, Your Honor, pregnant women in

16   fluoridated communities, in both Canada and the United States,

17   have exposure levels that substantially exceed the levels that

18   have been associated with IQ loss in the best quality studies,

19   the NIH funded studies.

20       This is quintessential evidence of a clear risk.  This is

21   the type of method that EPA uses in the ordinary course of

22   business to assess whether human exposures are causing risk.

23       Now, all risk assessments, Your Honor, have uncertainties.

24   Uncertainties are not the exception to risk assessment.  They

25   are the rule.  They are pervasive to the practice of risk

1     assessment.  The existence of uncertainties does not mean there

2     is no risk.

3          Now, as you will hear, Exponent specializes in exploiting

4     uncertainties to thwart regulations.  This is what Exponent

5     does.  And they have done so in this case, as they have done in

6     many cases that have come before.

7          The Exponent scientists in this case will identify a long

8     laundry list of reasons to doubt the findings of the studies.

9     And if all of that fails, they might even argue that, well,

10    most studies are just expected to be false.

11         But what you won't hear from the Exponent scientists is

12    any cogent explanation that can explain the consistent,

13    consistent results that we see across many study settings, many

14    study designs in both humans and in animals.

15         So we would submit, Your Honor, that the most likely

16    explanation for why you see this consistent and significant and

17    large association between fluoride exposure and neurotoxicity

18    in both animals and humans is that fluoride is a neurotoxicant.

19    And fluoride can reduce IQ, including at the levels that are

20    added to drinking water in this nation.  And this effect is

21    strong enough to be detected even in the studies with weak

22    study designs.

23         So, Your Honor, I believe the preponderance of evidence in

24    this case will demonstrate convincingly that fluoridation

25    chemicals present an unreasonable risk of harm.

1       We look forward to presenting our case, Your Honor, and I

2   thank you for this opportunity.

3           **THE COURT:**  All right.  Thank you, Mr. Connett.  I

4   appreciate it.

5       For the Government?

6                       **OPENING STATEMENT**

7           **MR. DO:**  Good morning, Your Honor.

8       Now, in approaching this case EPA is asking the Court to

9   first recall where this matter started and then to consider the

10  larger picture, the larger body of evidence.

11      Now, looking back, this case began with a Section 21

12  petition filed by Fluoride Action Network back in 2016.  It was

13  drafted by counsel, and the petition presented EPA with a

14  hodgepodge of 191 studies looking at different health effects

15  in lab rats and humans, mainly in China, India and Iran.  Now,

16  this is before the Mexico City cohort study and the Canadian

17  cohort studies were published.

18      But even then, without doing a risk assessment, plaintiffs

19  claimed that water fluoridation was leading to neurotoxic harm

20  and that its benefits were overstated.

21      Now, after EPA denied their petition, detailing how poorly

22  designed the vast bulk of the studies that plaintiffs presented

23  were, plaintiffs tried again by bringing this lawsuit with the

24  exact same studies in tow.

25      Now, two major failings still remain with this second

OPENING STATEMENT / DO

1    attempt.

2        First, plaintiffs still lack standing, as their complained

3    of injuries are speculative and they are divorced from the

4    neurotoxic harms that are before the Court.

5        Second, on the merits, despite having guidance on how to

6    support a Citizen Petition, plaintiffs still have not presented

7    a TSCA caliber evaluation of the evidence.

8        Now, then during discovery and after discovery, the Mexico

9    City cohort studies came out, as did the Canadian cohort

10   studies were published, providing plaintiffs with what they see

11   as their last two puzzle pieces that complete their

12   unreasonable risk picture.

13        Now, we recognize that these are relatively good

14   studies, but having a handful of informative pieces of

15   information isn't enough to meet their burden here.  So even

16   after supplementing their expert opinions multiple times, they

17   still failed to demonstrate an unreasonable risk.

18        Let's be 100 percent clear.  If EPA could conclude that

19   there was an unreasonable risk from water fluoridation, EPA

20   would regulate.  But as of today, there are still too many

21   uncertainties and inconsistencies and potential for bias in the

22   evidence there to have confidence in plaintiff's case or

23   otherwise make an unreasonable risk finding.

24        That's why EPA rejected plaintiff's original petition for

25   rule-making and why Dr. Henry, a 25-year veteran of EPA, will

1    be testifying in this case.

2         Now, EPA is asking the Court to consider the larger

3    picture.  Not just the Mexico and Canadian cohort studies, to

4    examine the complete body of evidence out there and see where

5    each piece of evidence fits or doesn't and to examine the

6    quality of that evidence.  Because when these studies are

7    viewed together with the other human and animal data, a

8    different picture takes shape.

9         So now that the Court is sitting in the place of the EPA

10   administrator, how do you answer the question of whether

11   community water fluoridation presents an unreasonable risk to

12   human health?

13        The parties agree that the Court, like the EPA, must

14   consider a risk assessment process that weighs the scientific

15   evidence.

16        The parties dispute what weight of scientific evidence

17   means in practice today and for TSCA.

18        Now, to minimize bias, both the human kind and the

19   statistical variety, and to account for those uncertainties and

20   inconsistencies, to have the confidence in a risk

21   determination, it must be supported by a risk assessment

22   utilizing a systematic review of the evidence.

23        EPA's witnesses will impress upon the Court that assessing

24   risk with the systematic review of the evidence is not a

25   process of check -- taking checklists or accounting individual

 1    studies.  It's a science in and of itself.

 2         Now, plaintiffs will testify that such review is

 3    unnecessary, a recent development.  And, yes, it is relatively

 4    new, Your Honor, because as our experts will explain, the

 5    science of assessing risk has evolved, particularly in the last

 6    five to ten years.

 7         So compared to the traditional narrative reviews, which is

 8    what plaintiffs have presented here, systematic reviews are

 9    comprehensive and rigorous, meant to enhance confidence in a

10    conclusion.  It does this by establishing a predefined

11    framework to guide scientific judgment in a structured way,

12    providing the scientific basis for those judgments to

13    ultimately develop evidence based conclusions.

14         In other words, by having a scientist craft this framework

15    in advance, it ensures you don't make up a criteria as you go

16    along or reverse engineer your criteria to match your own

17    preconceived opinions on a topic.

18         As all of EPA's witnesses will explain, it's now the

19    well-established method to assess risk and is advocated by

20    major science organizations, including the National Academy of

21    Sciences, the National Research Council, the World Health

22    Organization, among others.

23         So that's why Congress spoke to it for TSCA and why

24    regulatory bodies, like the Food and Drug Administration and

25    EPA, have adopted it, to make public policy decisions, as

1    Dr. Henry of EPA will speak to.

2         So it's only after structuring your risk assessment before

3    you start can you more confidently and objectively answer

4    fundamental questions of risk.  Like, whether there is a true

5    relationship between X and Y?

6         At what dose are those relationships seen?

7         What are people actually exposed to?

8         How do you characterize that risk?

9         And, finally, is it unreasonable?

10        Now, it's through this lens of risk assessment with a

11   systematic review of the evidence that is most helpful to the

12   Court.  Right now the witnesses in this case will be opining

13   upon over 100 studies with different study designs, different

14   populations, different ages, different exposure metrics,

15   different health outcomes.  It's a chaotic storm that leaves

16   the biased impression that the quantity of pieces of evidence,

17   not the quality, is what matters.

18        So to review this full body of evidence, to see how each

19   piece fits or does not, EPA retained outside experts, Dr. Chang

20   and Dr. Tsuji, well-respected epidemiologists and

21   toxicologists, who approached this problem with fresh eyes,

22   without any other prior opinions to confirm.

23        They approached this question in the same objective way

24   that EPA would and the way the Court should, without knowing

25   the evidence in advance or the end result.

1    So before searching for a single study in this case, they

2    carefully designed a search criteria to define all irrelevant

3    studies.  Doing so, they found over a thousand possible puzzle

4    pieces.

5        Now, before reading a single study, they thought about how

6    to assess the quality of each study, its strength and

7    weaknesses, and then they went to work.  They put in the hours,

8    and they extracted the data from all the studies and analyzed

9    them according to a predefined criteria.

10       And before reaching any conclusions in this case, they

11   selected a criteria on how to synthesize and integrate this

12   full body of evidence and reached certain conclusions.

13       They complete a systematic review.  They will bring order

14   to the chaos and show you exactly how they did it, in a

15   structured and transparent manner, so the Court can have

16   confidence in their conclusions.

17       The Court will be able to understand why these are the

18   more relevant studies to examine and how to compare, say, a

19   study in New Zealand with one in Mexico, or how to compare a

20   cross-sectional study with a cohort study, and how to

21   appreciate why there are so many low quality studies out there.

22   It's because of the results of editorial and publication bias,

23   and that many of these are found in a journal that's

24   underwritten by the lead plaintiff in this case, Fluoride

25   Action Network.

1    This is why the Court can ultimately have confidence in

2 Dr. Chang's and Dr. Tsuji's testimony, that there is not

3 sufficient evidence to support a true relationship between

4 community water fluoridation and neurotoxicity.

5    And as a result, Dr. Henry, who's EPA's risk assessor and

6 charged with risk management, will testify that no valid risk

7 assessment with an unreasonable risk finding can be supported

8 either.

9    So what did plaintiffs do here, Your Honor?  They -- their

10 testimony will be unequivocal, that they did not do a risk

11 evaluation with a systematic review.

12    Dr. Thiessen will testify:  I focused on the animal

13 studies, because Dr. Grandjean looked at the human studies.

14    She will testify:  I did not conduct a formal systematic

15 review.  Because she didn't have the time or a contract to do

16 so.

17    So their own risk assessor didn't even integrate the human

18 data herself and had to rely on others to gather critical

19 information when offering a risk opinion.

20    Dr. Grandjean will testify -- he did a narrative review --

21 and that, quote:

22        "In light of my familiarity with the scientific

23        literature on fluoride neurotoxicity, I did not

24        conduct a formal systematic review."

25    In other words, I'm an expect.  Trust me.  But having

1    years of experience, as all the experts in this case have, does

2    not eliminate a major concern here, which is bias.

3         Again, I'm referring to the very human kind of personal

4    bias and also statistical bias.

5         And they will admit, Dr. Thiessen and Dr. Grandjean, that

6    they developed their anti-fluoridation opinions decades ago,

7    well before they were retained in this case.

8         And being an expert doesn't ensure that you actually

9    critically assess the information, notwithstanding having

10   preconceived opinions.

11        Now, risk assessment with systematic review is not about

12   one or two studies, but it does involving examining different

13   streams of data, like, human and animal data.

14        The Court will hear about how each side interpreted this

15   data, about whether neurotoxicity is a hazard of water

16   fluoridation.

17        Now, you'll hear a lot from plaintiff's counsel just now

18   about the Mexico City and Canadian cohort studies, what

19   plaintiffs believes are the critical pieces to their picture

20   here.  Let's talk about them.

21        These are the two more methodologically sound cases out

22   there, but there are still some biases and uncertainties and

23   inconsistencies left that limit confidence in them.

24        To begin with, those are inconsistencies.  For example,

25   the Canadian studies identified an association between fluoride

1    exposure and reduced IQ in boys, but not for girls.

2         Yet, that same study did not see that difference when

3    using alternative metric of fluoride exposure.  These pieces

4    don't match up.

5         Dr. Lanphear, the study coauthor, will admit he doesn't

6    know the cause of these discrepancies.

7         Dr. Grandjean and Dr. Thiessen overlooked this, as it

8    doesn't match their master picture of what they envisioned.

9         Some of the associations in these studies were so weak

10   that the adjustment of just two or three data points made an

11   association vanish.  That's how razor thin some of the margins

12   are, Your Honor.

13        Now, contrary to what plaintiffs may suggest, the Mexico

14   City and Canadian cohort studies are not the only informative

15   pieces of evidence out there.  Dr. Chang identified other

16   western populations that have been studied.

17        Four of these, including other cohort studies, found no

18   connection between fluoridated drinking water and IQ, learning

19   disabilities, neurobehavioral problems, ADHD, ADD, with one

20   study even finding increased IQ associated with fluoride.

21        So that's a Christchurch, New Zealand study, finding no

22   association.  A Dunedin, New Zealand study, no association.

23   Another study in Canada, no association.  And one in Boston, no

24   association.  These are more pieces that don't fit plaintiff's

25   case.

1        And unlike plaintiffs, Dr. Chang assessed all of these

2   studies together and used a well-accepted criteria to examine,

3   among other things, the strength the association, the

4   consistency within and between the studies, and whether the

5   findings are even biologically plausible.

6        With that Dr. Chang methodically concluded there is not

7   sufficient support to find a true relationship between

8   fluoridated drinking water and neurotoxicity.

9        Now, for the animal data the most prominent comprehensive

10  studies are the NTP 2016 and the McPherson 2018.

11       Dr. Thayer, the co-project leader of the NTP 2016, will

12  explain how the National Toxicology Program published a

13  comprehensive systematic review of the animal data.  Dr. Thayer

14  and NTP concluded that the evidence on developmental neurotoxic

15  effects was, quote, low.

16       The systematic review confirms that even when you have

17  multiple studies showing associations, the big take-away can

18  still leave little to no confidence in those individual study

19  conclusions.

20       Now, NTP researchers conducted several follow-up animal

21  experiments to examine lower levels of fluoride exposure and to

22  replicate exposure in the United States.  That's McPherson

23  2018.

24       Now, those results, as Dr. Tsuji will explain, are

25  telling, as they did not find an association between

1   neurotoxicity and increased fluoride exposure.

2        So the animal data can't save plaintiff's case.

3   Dr. Thiessen can't escape these very plain conclusions that the

4   most recent and comprehensive studies on the animal evidence

5   undercuts her risk assessment.

6        Now, regardless of whether plaintiffs did a systematic

7   review, like Dr. Chang or Dr. Tsuji or Dr. Thayer, and

8   regardless of whether neurotoxicity is a potential hazard of

9   water fluoridation, EPA's risk assessor, Dr. Henry, will

10  explain how plaintiff's failure to critically and objectively

11  examine the body of evidence carried over into the rest of

12  their supposed risk evaluation.

13       For example, their dose response assessment, which asks

14  how an effect changes as exposure changes.  Dr. Thiessen used

15  animal data measuring varying health endpoints, despite

16  acknowledging in the same breath that human data was superior.

17  And the trustworthiness of the data that she did rely upon is

18  questionable in light of the NTP 2016 and McPherson 2018.

19       Dr. Grandjean meanwhile didn't disclose his data, his

20  model or his criteria for either.  So by not showing his work,

21  it can't be validated, much like many of his opinions.

22       For the exposure assessment, which examines how much a

23  population is exposed to a chemical, Dr. Thiessen repeatedly

24  failed to look for the best available evidence, the best

25  available data.  She needed multiple supplemental reports, and

1    receiving data from counsel instead.  And so she can't justify

2    the water intake rates that she ultimately chose.

3        As for risk characterization, which is the synthesis of

4    the prior steps, plaintiffs undeniably applied the less

5    stringent Section 5 of TSCA, which concerns new chemicals with

6    little to no data.  And we all agree that's not the case here.

7        This is also where uncertainty factors come into play,

8    which plaintiffs applied indiscriminately.  Dr. Grandjean can't

9    have it both ways.  He can't assume that the science is rock

10   solid and then apply an uncertainty factor to be extra

11   protective just in case it's not.

12       And Dr. Grandjean and Dr. Thiessen can't double count.

13   They shouldn't apply an extra precaution when they are already

14   examining what they believe to be the most susceptible

15   subpopulation.

16       And finally risk determination, on whether a risk is

17   unreasonable.  First off, plaintiffs considered prohibitive

18   factors, like lost economic productivity.  But more critically,

19   plaintiffs failed to consider the uncertainties in the body of

20   evidence in each step of their supposed risk assessment for the

21   very obvious reason they never systematically assessed them to

22   begin with.  That matters.

23       Anyone can plug numbers into a formula.  Any data can be

24   used to make, say, a reference dose, with the result at the end

25   of the formula it's useless if the data wasn't critically and

1    objectively evaluated.

2        So regardless of whether or not plaintiffs correctly

3    completed a calculation, their foundations are poor and the

4    Court can't have confidence in their risk conclusion.

5        Now, ultimately public health initiatives are not always

6    without controversy and passionate opponents are expected,

7    obviously from vaccines to the current evolving

8    shelter-in-place requirements.

9        And here plaintiffs and Dr. Grandjean and Dr. Thiessen

10   have advocated against fluoride for decades, and their claims

11   have been rejected.  This is their latest attempt.

12       And we remind this Court that this case is being driven by

13   plaintiffs, whose main purported basis for standing are

14   self-reported allergies to fluoride and injuries other than

15   neurotoxicity.

16       Now, earlier plaintiff's counsel showed images of pregnant

17   women, infants and elderly persons.  That's not plaintiffs.

18   These plaintiffs, and Dr. Grandjean and Dr. Thiessen, are not

19   the right people to be presenting this case.  Despite having

20   the time, the funds and multiple opportunities, they still

21   haven't conducted a comprehensive rigorous analysis of the

22   evidence on water fluoridation.

23       And all the witnesses that have, that includes Dr. Chang

24   and Dr. Tsuji with their systematic review, and Dr. Thayer with

25   the 2016 NTP, have concluded that the evidence is not there.

1    Ultimately what's before the court is EPA's predefined

2    methodology that produces more objective results versus

3    plaintiff's preconceived prejudices and foregone conclusions.

4    It's a systematic review that examined the full body of

5    evidence versus a more limited narrative one.

6    Now, the studies that plaintiffs emphasize are new.  Some

7    were published in the middle of discovery or after.  They

8    haven't been replicated in populations studied.  The results

9    themselves are inconsistent with each other.  And no one has

10   yet to publish a similar study about the United States.  It's

11   too early to rely on them and have confidence in them,

12   particularly in a world where over half the scientists report

13   being unable to repeat one of their own prior studies.

14   So one or two studies may be good enough for a newspaper

15   headline, but it's not good enough for a proper risk assessment

16   or to meet the scientific standards of TSCA, to make public

17   policy for the country and compel a regulation.

18   Now to be clear, EPA is not arguing that the science stop

19   or that further research end.  Indeed, Your Honor, since the

20   close of discovery, there have been more studies published on

21   this topic.  And there is at least one comprehensive systematic

22   review being conducted by NTP right now that may help answer

23   the question, just the initial question, of whether or not

24   neurotoxicity is a hazard of fluoride, or whether neurotoxicity

25   should be added to the pile of false alarms and debunked

PROCEEDINGS

 1    theories.

 2         The system isn't broken.  As plaintiffs stated earlier,

 3    scientists and studies identify data gaps and uncertainties,

 4    and then other scientists and other studies picked up to answer

 5    those questions.

 6         Now, right now in this country we -- we add iodine to

 7    salt.  We fortify our milk.  Some places disinfect our water

 8    with chlorine.  Some require vaccinations for schools.  And at

 9    the same time there is no nationwide mandate to fluoridated

10    drinking water.

11         And this isn't a run-of-the-mill product that consumers

12    buy off the shelf.  Instead local governments made informed

13    decisions to pursue this well-established public health

14    initiative of fluoridated drinking water, and they can

15    appreciate the very same science that plaintiffs and EPA will

16    be presenting today, this week.

17         So today there is not enough unbiased reliable evidence.

18    So today is not the day for the Court to intervene.

19         We're asking the Court for prudence to allow the evolving

20    science to play out and for the Court to reject plaintiff's

21    unsupported and rash claim.

22         Thank you.

23              **THE COURT:**  Thank you, Mr. Do.

24         Angie, you have a question?

25              **THE CLERK:**  No.  There were several attendees who

1   raised their hands.

2          THE COURT:  All right.  Are the parties aware of

3   anybody in the attendees' section that belongs in the well

4   here?

5      We have all counsel; right?  Is there any counsel missing?

6          MR. DO:  None for defendants.

7          MR. CONNETT:  No counsel is missing for plaintiffs,

8   Your Honor, but we do -- actually, I'm sorry.  I apologize,

9   Your Honor.

10     Kay Reeves, a co-counsel, if she's not already been

11  brought in as a participant, if we could bring Kay in as a

12  participant.

13         THE CLERK:  Okay.  Ms. Reeves, please raise your

14  hand.

15     (Brief pause.)

16         THE CLERK:  Ms. Reeves is promoted to panelist.

17         THE COURT:  All right.  Nobody recognizes anybody

18  else?  There are no other counsel that need to be in the well?

19         MR. CONNETT:  No other counsel, your Honor.  To the

20  extent that we run into any difficulties with the video

21  depositions that we are going to play, we have -- we may need

22  to bring in some of our technical assistants, but I guess we

23  can wait for that if that issue arises.

24         THE COURT:  All right.  Why don't you just alert us

25  to that.

**JOYCE DONOHUE - VIDEOTAPED TESTIMONY**

1      There are people raising their hands, but we're not going

2 to recognize them unless counsel recognizes them.  And if they

3 are part of the team, I'm sure they can find a way to

4 communicate with counsel and counsel can alert us.

5      But reminder that those who are in the attendee section

6 are really part of the audience and are not permitted to

7 participate without permission of the Court.

8      And unless somebody, one of the attorneys indicates that

9 there is somebody that needs to be brought into -- onto the

10 panel, into the well, the Court is going to proceed.  Okay?

11      All right.  So you can start your case.  Mr. Connett?

12      **MR. CONNETT:**  Thank you, Your Honor.

13      At this time plaintiffs call their first witness via

14 videotaped deposition.  This is Dr. Joyce Donohue, a staff

15 scientist at the EPA.

16                  **JOYCE DONOHUE**,

17 called as a witness for the Plaintiff herein, testified

18 via videotaped deposition played in open court, not reported.)

19      **THE COURT:**  We have lost video there -- I mean,

20 audio.

21      (Brief pause.)

22      **MR. CONNETT:**  Sorry, your Honor.  Can I ask you, is

23 the sound okay?

24      **THE COURT:**  It was okay and then we lost her audio

25 after about 15 seconds.

**JOYCE DONOHUE - VIDEOTAPED TESTIMONY**

1      MR. CONNETT:  Okay.  This is our first technical

2   snafu of the case.  Hopefully, the last.

3      THE COURT:  Okay.

4      MR. CONNETT:  Can I bring it back about ten seconds,

5   Your Honor?

6      THE COURT:  Yes.

7      MR. CONNETT:  Should we just start from the

8   beginning?

9      THE COURT:  Why don't you start, yeah.

10     (Videotaped deposition resumed, not reported.)

11     MR. WATERS:  Your Honor, that concludes the

12   deposition.

13     THE COURT:  It will be useful if you could list the

14   exhibits.  The exhibits that were shown in the depo, it would

15   be helpful to us to know what exhibit number at trial those

16   were.  Maybe you can make a list of those exhibits.  I didn't

17   see -- is there such a list?

18     MR. CONNETT:  Your Honor, yes.  The one document that

19   was shown during Dr. Donohue's deposition that is an exhibit in

20   this case is the National Research Council report.

21     The other documents, Your Honor, which were the studies,

22   individual studies discussed, are not actual trial exhibits in

23   this case.

24     THE COURT:  All right.  So there are no exhibits in

25   trial, other than the first reference.

1           MR. CONNETT:  Correct.

2           MR. DO:  Your Honor, if I may.  We will likely be

3    filing another iteration of the deposition designations in

4    light of Dr. Donohue's testimony, which you permitted.  And in

5    doing so, we can add in the trial exhibit numbers in that

6    transcript.

7           THE COURT:  That would be helpful.  Any time -- and

8    this is -- would work for any future videotaped deposition.  If

9    at some point -- I don't know if you can do this, either splice

10   in or put at the bottom a subtitle or something saying "this

11   corresponds to Trial Exhibit X," that would be helpful for us.

12          MR. CONNETT:  Will do, Your Honor.

13          THE COURT:  All right.  So why don't we go ahead and

14   take a ten-minute break at this point.  Your next witness will

15   be?

16          MR. WATERS:  Dr. Howard Hu.

17          THE COURT:  Okay.  Dr. Hu.

18      Why don't we resume in ten minutes and you can commence

19   with your direct of Dr. Hu.

20          THE CLERK:  Court is in recess.

21      (Whereupon there was a recess in the proceedings

22       from 9:27 a.m. until 9:41 a.m.)

23          THE COURT:  Are plaintiffs prepared to go forward

24   with Dr. Hu?

25          MR. WATERS:  Yes, Your Honor.  I don't see his image

```
 1   yet.

 2             THE COURT:  Okay.

 3             MR. WATERS:  I'm not sure --

 4             THE COURT:  Is he in the attendee section?

 5             MR. WATERS:  No.

 6             MR. CONNETT:  No.  Its not appearing yet, Your Honor,

 7   on our screen.

 8             THE CLERK:  Yes, he is.  I am promoting him right

 9   now.

10             THE COURT:  Excellent.

11             THE CLERK:  Mr. Howard Hu?

12             MR. WATERS:  Doctor, yes.

13             THE CLERK:  Doctor.

14             THE COURT:  Okay.  I see Dr. Hu's name.  He has to

15   start his video and unmute his microphone.

16             MR. WATERS:  I still don't see him.

17        Dr. Hu, can you hear us?

18             THE WITNESS:  I can.

19             THE COURT:  Now, is your video -- we're not seeing

20   your video yet.

21        There you are.  Great.

22             MR. WATERS:  There he is.

23             THE COURT:  Great.

24             THE WITNESS:  Howdy.

25             THE COURT:  How are you doing?  Thank you for joining
```

**HU - DIRECT / WATERS**

```
 1   us.

 2        So who is going to conduct the examination?

 3             MR. WATERS:  Myself, Your Honor.  Mr. Waters.

 4             THE COURT:  Okay, Mr. Waters.

 5        We'll have to swear the witness in.  Why don't you

 6   formally call your witness and we will swear Dr. Hu in.

 7             MR. WATERS:  At this time the plaintiffs would call

 8   Dr. Howard Hu.

 9             THE COURT:  All right.  Angie, if you could

10   administer the oath?

11                          HOWARD HU,

12   called as a witness for the Plaintiff, having been duly sworn,

13   testified as follows:

14             THE WITNESS:  I do.

15             THE CLERK:  Thank you.

16             MR. WATERS:  May I proceed, Your Honor?

17             THE COURT:  Yes, you may.  Thank you.

18                     DIRECT EXAMINATION

19   BY MR. WATERS

20   Q.   Doctor, what does it mean to be a physician scientist in

21   the context of your career?

22   A.   It means that in my career I have one foot in medicine,

23   where I actually still continue to see patients and have

24   intimate knowledge of how disease processes work; and one foot

25   in epidemiology, which is my science, in which I conduct large
```

HU - DIRECT / WATERS

1    studies in substantial populations of individuals.

2    **Q.**   Now, your C.V. is already in evidence, so I'm not going to

3    spend a lot of time with you on that, but I did want to ask

4    what your current position is.  Where you're employed and what

5    type of research have you been involved with?

6    **A.**   Sure.  I was most recently at the University of Toronto as

7    the dean of the School of Public Health.  Then went on an

8    extended sabbatical at the University of Washington, where I

9    have been working on several global health initiatives.

10        And starting July 1st I will be the Flora Thornton Chair

11   of the Department of Preventive Medicine at the University of

12   Southern California.  And that's where I'll continue as an

13   academic leader and as a scientist.

14   **Q.**   To be clear, Doctor, are you being compensated in any way

15   for your time today, your time visiting with us away from your

16   practice and your normal routine?

17   **A.**   No.

18   **Q.**   Do you do clinical work at this stage of your career?

19   **A.**   I do.

20   **Q.**   Can you give us a little understanding of that?

21   **A.**   Sure.  I practice in occupational environmental medicine.

22   It's one of my board certifications, where I see patients who

23   are exposed to toxicants like lead, mercury, asbestos,

24   solvents.

25        And I also volunteer at a primary care clinic for the

**HU - DIRECT / WATERS**

1    homeless and those who are recent immigrants.

2    **Q.**    You mentioned that you were board certified.  Are there

3    any additional board certifications that you have achieved?

4    **A.**    Yes.  I'm also board certified in internal medicine.

5    **Q.**    Do you teach, Doctor?  Have you taught recently?

6    **A.**    Recently?  Since I have been sabbatical, I have been

7    relieved of that responsibility, although I have guest lectured

8    in various courses.

9        But normally I teach.  In my last academic leadership

10   position I taught the introductory course in public health and

11   a specialty course in environmental epidemiology.

12   **Q.**    That would have included biostatistics as well?

13   **A.**    That's correct.

14   **Q.**    All right.  For how long have you been involved with

15   epidemiological research founded by the National Institutes of

16   Health?

17   **A.**    Well, my first grant from NIH was in 1991.  That was to

18   conduct a study of lead and chronic disease when I was at the

19   Harvard School of Public Health.

20   **Q.**    And have you continued to be funded, your research to be

21   funded by the National Institutes of Health to this very day?

22   **A.**    Yes.

23   **Q.**    Have you also received research funding from the

24   Environmental Protection Agency?

25   **A.**    Yes.

**HU - DIRECT / WATERS**

1   Q.   Okay.  I want to ask you, what is the -- excuse me.  The

2   judge has heard reference to something called ELEMENT.  What is

3   ELEMENT?

4   A.   ELEMENT is an acronym.  It stands for the Early Life

5   Exposures in Mexico to Environmental Toxicants.  It's a

6   so-called birth cohort study in which women are followed during

7   pregnancy with the -- during the prenatal period when they give

8   birth, and then the mother/offspring pairs are followed over

9   the years.

10       And this study is designed specifically to try to

11  understand what the early life influences are in the child

12  development trajectories, whether it's neurobehavioral

13  development or physical development or other organ system

14  development.

15  Q.   As part of that research, extended research effort, have

16  you and your team published peer-reviewed papers as a result of

17  that research?

18  A.   Yes.  ELEMENT has produced over 80 peer-reviewed

19  scientific publications on the early life impacts of a whole

20  number of different toxicants.

21       We also look at nutrition.  We look at genetic influences.

22  We look at interactions between genes and environmental

23  factors.  Things like that.

24  Q.   And did ELEMENT -- was ELEMENT involved or was ELEMENT

25  cited, your study cited by the EPA with respect to their final

1  lead rule in 2008?

2  A.   Yes.

3  Q.   Now, the research that you did on fluoride that we're

4  going to be talking about today was also funded in part by the

5  EPA; correct?

6  A.   It began as a study, the ELEMENT study, and it was

7  partially funded by the EPA during the 1990s and middle 2000s,

8  but I believe the EPA portion of funding for ELEMENT then

9  dropped out in the 2010s.

10  Q.   Okay.  With respect to the EPA, have you been invited by

11  the EPA to provide expert advice from time to time with various

12  committees and the like?

13  A.   Yes.

14  Q.   Has that happened recently?

15  A.   Yeah.  Just a couple of weeks ago I was invited to serve

16  as a peer reviewer for their STAR grants.  That's science to

17  action sort of grants related to child health.

18  Q.   I want to ask you a few questions about the NIH and the

19  grant proposal and award process.  I take it that's something

20  that you're fairly familiar with?

21  A.   Yes.

22  Q.   Can you describe briefly the process that a researcher

23  like you goes through when making application or seeking a

24  grant from the NIH?

25  A.   Sure.  We have to submit a grant that -- grant proposal

HU - DIRECT / WATERS

 1   that has an abstract, a very specific and pithy set of specific

 2   gains, and then a research plan that includes the background,

 3   the methodology, the statistics, the calculation of things like

 4   the statistical power of the study to test the hypothesis being

 5   proposed.

 6        And that grant goes through a study section of peer

 7   review, typically anywhere from 15 to 25 scientists who are

 8   expert in the field of inquiry, and they will be assigned to

 9   review the grant.  There is typically four primary reviewers

10   who read it in detail and submit a written summary of their

11   critiques.  And then all of the reviewers discuss the grant

12   proposal at length during the two- to three-day study section

13   meeting and then score the grant as to the -- as to the -- the

14   quality of the study and design.

15        Then it goes to the national institute, which is of

16   interest to the topic, and the interest matches the score given

17   by the study section with their priority list of topics for --

18   for funding.  And if the study is high scoring and it matches

19   their list of priorities, then we get funded.

20   Q.   So you've got to go through the study section first to get

21   to the second phase in terms of the NIH scoring and

22   prioritization?

23   A.   Yes.

24   Q.   All right.  What is an NIH R01 grant?

25   A.   An R01 grant is so-called investigator initiated.  The

**HU - DIRECT / WATERS**

1    investigator proposes the topic, and they are allowed to apply

2    for one of the more generous budgets that the NIH awards

3    researchers with.  Typically, it's for a large epidemiology

4    study, which tends for expensive.  It's about $500,000 in

5    direct costs each year for up to five years.

6        And they are, you know, among the most highly sought after

7    grants by principal investigators.

8    **Q.**   With respect to your fluoride work, were those this type

9    of grants that we have just been describing?

10   **A.**   Yes.  It was an R01 grant.

11   **Q.**   Did you get an understanding through the grant application

12   and approval process as to why the NIH, which is obviously

13   based in the United States, would fund a study on fluoride and

14   IQ in Mexico?

15   **A.**   Yeah, sure.  So we have been conducting the ELEMENT study

16   since 1993 and have been funded by NIH since then continuously.

17   But each time that we have a grant that scores well, it's in

18   the priority of -- area of NIH, we have to address two

19   additional questions before we get funded.

20       One of them is, well, is the research -- why does it have

21   to be done in Mexico?  Why couldn't it be done in the United

22   States?

23       In our case, because our birth cohort study specifically

24   looked at neurobehavioral development and archived all these

25   biological samples that allowed us to reconstruct what the

1    fluoride exposures were early in life, as well as after birth,

2    we successfully argued that this is one of the unique resources

3    in which the NIH didn't have to, you know, wait for another 10,

4    20 years and pour millions of dollars into constructing a whole

5    new study.

6        And the second question is:  Well, you're doing this study

7    of Mexicans.  Is it relevant to the health of Americans?  And

8    here is where we pointed out that there is no basis for -- for

9    assuming that there is any difference in the response of

10   Americans to a potential neurotoxicant, like fluoride, than

11   Mexicans.

12       And after answering those two questions adequately, NIH

13   proceeded to fund us.

14   **Q.**   What does NIH's approval in the context of a study in

15   Mexico -- sorry?  Objection?

16       What does NIH's approval of your grant application mean in

17   the context of the U.S. -- relevancy to the U.S. population.

18           **MR. ADKINS:**  Objection, hearsay.  Calls for hearsay

19   rather.

20           **THE COURT:**  Overruled.

21   **A.**   Well, as I mentioned, since the second question involved

22   us directly addressing what was the relevance of our research

23   on Mexicans and Americans and we addressed it adequately, the

24   assumption here is that the -- the findings would be relevant

25   to our understanding of fluoride impacts on neurobehavioral

1   development in Americans.

2   **Q.**   And, Doctor, on a personal level, were you interested

3   in -- obviously interested in fluoride effects, people living

4   in Mexico City, or were your more interested in how fluoride

5   would affect or could effect human beings wherever they may

6   reside?

7   **A.**   The latter.

8   **Q.**   Doctor, were you also able to demonstrate to the

9   satisfaction of the NIH that a -- that your studies, fluoride

10  studies, would make -- regardless of what they found, would

11  make a major contribution or could make a major contribution to

12  regulatory policies and decision making?

13  **A.**   Well, that was our argument when we proposed the study.

14  We had read the 2006 NRC document on fluoride and water, I

15  think that was referenced earlier in this trial.  And that

16  immediately posed a question to us:  Gee, you know, the

17  document says we need more research on this whole area of

18  potential neurotoxicity.  Our birth cohort study happens to be

19  in a uniquely well-qualified position to try to address that

20  question.

21       And that's why we decided to proceed with our grant

22  application, and we're glad that it was funded.

23  **Q.**   Have your previous works -- were your previous work with

24  the ELEMENT cohort impacted public policy?

25  **A.**   Yes --

```
 1              MR. ADKINS:  Objection, foundation.

 2              THE COURT:  Why don't you go ahead and lay the

 3    foundation.

 4              MR. WATERS:  Certainly, Your Honor.

 5    BY MR. WATERS

 6    Q.   Following some of your studies based -- the early ELEMENT

 7    studies based on lead, did the EPA, for example, make changes,

 8    public policy changes based on some of the research that you

 9    provided?

10              MR. ADKINS:  Objection, leading.

11              THE COURT:  Overruled.

12    A.   Well, the EPA did include our studies on lead and its

13    impacts on IQ as part of their deliberations.  And I'll also

14    add that our work was critical for a Centers for Disease

15    Control policy document regarding lead and pregnancy.

16    BY MR. WATERS

17    Q.   During your -- you mentioned the CDC lead and pregnancy

18    guidelines.  Did anybody at the CDC every question the

19    generalizability of your findings in Mexico City to the U.S.

20    population?

21    A.   No.

22              MR. ADKINS:  Objection, leading.

23              THE COURT:  Overruled.

24    A.   No.

25
```

1   BY MR. WATERS

2   Q.   All right.  And did the EPA itself ever question the

3   generalizability of your lead findings to the United States

4   population?

5   A.   Not that I'm aware of.

6   Q.   To your knowledge, prior to your involvement in this case,

7   has EPA ever once questioned or criticized the generalizability

8   of any of your findings from the ELEMENT cohort to the United

9   States population?

10  A.   Not that I'm aware of.

11  Q.   I want to turn our attention to what we will refer to as

12  Bashash 2017.  That's the -- your initial fluoride IQ study;

13  correct?

14  A.   Correct.

15  Q.   What was your role with respect to that research and the

16  publication of that paper?

17  A.   I was and remain the principal investigator of the set of

18  studies in ELEMENT that address fluoride.  And I hired Morteza

19  Bashash, who was a post doc fellow at the time, and worked with

20  him on the analysis, along with our many other colleagues.  He

21  was the first author, but I was ultimately responsible for the

22  product.

23  Q.   Was that article submitted and accepted for publication?

24  A.   Yes.

25  Q.   What journal was that?

1   **A.**   *Environmental Health Perspectives*.  It's the official

2   journal of the National Institute of Environmental Health and

3   Sciences.

4   **Q.**   Does it receive funding from the NIH as well?

5   **A.**   It does.

6   **Q.**   And do you consider it to be a high quality journal?

7   **A.**   It's the number one environmental health journal in the

8   world, in my opinion.

9        And, also, in the opinion of the Reuters Scientific

10   Citation Index, which scores it having the highest impact

11   pattern.

12   **Q.**   Now, Doctor, I took a look at your C.V. before the trial,

13   and the copy I have is maybe a year or so old.  It indicated

14   that at that time you had published 326 studies in

15   peer-reviewed journals.

16        And I wanted to just ask you:  Have you had any additional

17   publications within the last year or so?

18   **A.**   Yes.

19   **Q.**   And with respect to the fluoride IQ study, could you

20   compare your observations with the peer-review process, with

21   that paper, as compared to other studies you published in your

22   career?

23   **A.**   I have to say it was one of the most heavily reviewed

24   papers in my career, and I think that's because the

25   editor-in-chief and the science editor of *EHP* recognized the

1  importance of the paper in a very controversial area.  So they

2  subjected it to three rounds of reviews, and asked us for

3  additional analyses, and allowed us to publish in the main text

4  of the paper a -- you know, a research article that was

5  substantially longer than what their usual word limitations are

6  so that we could display as much of the results and discuss

7  them as we could.

8  Q.   Let's talk a bit about the results of your study, Doctor.

9  Did you find an association between prenatal fluoride exposure

10  and IQ?

11  A.   We did.

12  Q.   Can you briefly summarize your findings -- actually,

13  before we do that, did you find the association remained

14  significant after controlling for potential confounding

15  factors?

16  A.   Yes.

17  Q.   Would it be correct to say that you found a dose response

18  relationship between prenatal fluoride and IQ?

19  A.   Yes.

20  Q.   And did you take any steps to determine whether or not the

21  dose response relationship was linear; and if so, can you

22  describe what you did?

23  A.   Yes.  What we did was used the statistical technique

24  called nonparametric smoothing to try to look at the dose

25  response relationship, not assuming linearity.

HU - DIRECT / WATERS

 1        And this particular statistical approach, generally

 2    speaking, is basically using the best statistical methodology

 3    to draw a line, a curve -- curve a linear line or linear line,

 4    whatever the data reflects.

 5        And the way it's done is that the model essentially takes

 6    sequential windows across the graph, if you will, and uses a

 7    regression technique to look at what the shape of that

 8    relationship is.  And that creates this general plot of what

 9    the smooth relationship looks like.

10        And when we did that, we found that, for the most part, it

11    was quite close to linear, which is why we felt justified in

12    using a multivariable linear regression model to essentially

13    estimate the quantitative impacts of increase in fluoride

14    exposure and declines in IQ.

15    Q.    Well, let me ask you about that.  Can you give us a sense

16    of the magnitude of the association that you found in terms of

17    how many IQ points were lost per fluoride exposure?

18    A.    Yeah, sure.  So to try and put this into context, we used

19    a metric called the interquartile range, which is the

20    difference between the 25th percentile and the 75th percentile

21    in fluoride exposure in the young offspring who we studied.

22        And then we projected that onto points of IQ lost.  And

23    the points of IQ lost were similar between -- let me just check

24    my notes here -- 2.5 and 3.15 points of IQ lost within that

25    range, depending on whether you're using the general cognitive

1   index of the McCarthy Scales of Intelligence at four years of

2   age or the Wechsler Intelligence Test that we administered

3   between the ages of 6 and 12 as the outcome of neurobehavioral

4   development.

5   **Q.**   Now, this effect size that you described, how does that

6   compare to other neurotoxicants; like, for example lead?

7   **A.**   It's pretty much in the same range.  If you look at some

8   of the research that's been done and gone through extensive

9   peer review, one of the most heavily quoted dose response

10  papers for lead is the so-called *Pooled International Analysis*

11  that Bruce Lanphear and colleagues published in 2005.

12       In that analysis, the interquartile range of blood lead

13  was somewhere around 8 to 10 micrograms per deciliter.  And

14  during that range, the points of IQ lost was around 5.

15       If you look at the studies we did on neurobehavioral

16  development and lead exposure, the lead exposure range was

17  lower and the interquartile range, which is around 5 micrograms

18  per deciliter, was associated with about 2.2 -- 2.2 points of

19  IQ lost.

20       So our finding of 2.5 to 3.1 points of IQ lost in the

21  interquartile range for fluoride is somewhere smack in the

22  middle of what has been estimated for the interquartile range

23  of IQ points lost for lead.

24  **Q.**   So that effect, would you consider on balance, to be a

25  relatively large one?

HU - DIRECT / WATERS

1   A.   Well, I'll just say that it's a significant one.  I don't

2   like to use qualitative words like "large."

3        But to put that into perspective, when the -- the U.S.

4   Congress was thinking about the importance of changing the

5   standard for lead and for removing lead out of gasoline, it was

6   very clear that that was a significant impact, particularly if

7   you consider that lead, and fluoride for that matter, is a

8   population-wide exposure.

9        One of the arguments made, and there are several other

10  arguments, was that, well, if you look at the cumulative

11  distribution of IQ in this country, you know, some people --

12  most people are in the middle, some around an IQ of 100.  Some

13  are really smart, with IQs over 125.  Some are wards of the

14  state, they have IQs under 80.

15       If you shift the whole curve over three or four points,

16  all of a sudden you've tripled the number of people who are

17  effectively wards of the state and really severely crimped the

18  number of people who have, you know, high IQs and arguably are

19  major contributors towards progress and society.

20       And that alone was one of the arguments that, as I

21  understand it, lead to the changes in lead standards.

22  Q.   Thank you, Doctor.

23       (Brief pause.)

24            THE COURT:  Mr. Waters, can you wait for just a

25  second?

 1         I don't want to change the order of your presentation.  I

 2    know some of this may be covered in cross, but every now and

 3    then it will help me if I get my notes clear.  I want to

 4    clarify something.

 5              **MR. WATERS:**  Certainly.

 6              **THE COURT:**  Dr. Hu, the interquartile range of 25

 7    versus 75 percentile in fluoride exposure, what does that

 8    correspond to in terms of value?  Concentration or whatever it

 9    is, what does that mean in absolute terms?

10              **THE WITNESS:**  Oh, good question.  Let me see if I can

11    dig that up here in my paper.

12              **MR. ADKINS:**  And for clarification, can the witness

13    explain what documents he's reviewing?

14              **THE COURT:**  Yeah.  I think that's a fair question.

15    Are you looking at your paper?

16              **THE WITNESS:**  Yeah.  I'm looking at the one that they

17    are discussing right now.

18              **THE COURT:**  Very well.

19              **THE WITNESS:**  Yeah.  Thank you.

20         (Brief pause.)

21              **THE WITNESS:**  So the interquartile range, as

22    displayed on Table 1, is from the 25th percentile, which is

23    0.64 to 1.07.

24              **THE COURT:**  And then the -- the 1.07 is the

25    75 percentile?

**HU - DIRECT / WATERS**

```
 1                 THE WITNESS:  Yes.

 2                 THE COURT:  Okay.  And that's expressed in?

 3                 THE WITNESS:  Yeah.  That's expressed in milligrams

 4    per liter of urinary fluoride creatinine corrected.

 5                 THE COURT:  All right.

 6                 THE WITNESS:  Of the mother, during pregnancy.

 7                 THE COURT:  All right.  Thank you.  Appreciate it.

 8                 THE WITNESS:  My pleasure.

 9                 THE COURT:  All right.  You may resume, Mr. Waters.

10                 MR. WATERS:  Thank you, Your Honor.

11    BY MR. WATERS

12    Q.   In the course of your public health research and

13    involvement, have you become familiar with an entity known as

14    Exponent?

15    A.   Yes.

16    Q.   And if so, can you tell us a little bit about your

17    understanding of their reputation in the scientific community?

18                 MR. ADKINS:  Objection, foundation.

19                 THE COURT:  Why don't you lay a foundation.  Then he

20    can express his opinion.

21                 MR. WATERS:  Very well.

22    BY MR. WATERS

23    Q.   From time to time, Doctor, have you had dealings with or

24    reviewed work product or seen people at conferences that are

25    with this outfit called Exponent?
```

1   **A.**   Yes.

2   **Q.**   And have you had an opportunity from time to time to

3   review or read about their involvement with science and who

4   they do work for?

5   **A.**   Yes.

6   **Q.**   Okay.  And can you tell us, based on that, what -- what is

7   your understanding as to their reputation in the scientific

8   community?

9              **MR. ADKINS:**  Objection, Your Honor.  This calls for

10  hearsay.  And it's attacking the credibility of a witness that

11  hasn't even testified yet.

12      And this is not within the scope of what Dr. Hu is

13  intending to be testifying about today.

14             **MR. WATERS:**  Your Honor, it's an exception to the

15  hearsay Rule 803(21), reputation, and also Rule 608 --

16      (Court reporter clarification due to audio

17       interference.)

18             **THE COURT:**  Yeah, if you could --

19             **MR. WATERS:**  Yes.  I'm sorry.

20      Rule 803(21) is an exception to the hearsay rule related

21  to reputation, and Rule 608(a) is also on this point.

22             **THE COURT:**  What about the response that this was not

23  within the scope of his report?

24             **MR. WATERS:**  Your Honor, as a non-retained expert

25  witness, I think we're in a position where he can comment on

1  something like this.

2      I don't know that the requirement, as the Court has ruled

3  previously, would extend to a non-retained expert who is here

4  to talk about his paper for the most part.

5          THE COURT:  Well, I'm going to do this.  This is the

6  kind of testimony that might be proper on rebuttal.

7      Technically I could say that I'm going to sustain the

8  objection now and allow it for rebuttal, but, again, since this

9  is a bench trial, not a jury trial, I'm going to allow things

10  to be taken out of order.  I think it is appropriate and it is

11  admissible under 803(21).

12      However, I don't think the foundation has been

13  sufficiently laid.  I need to know more details about what

14  Dr. Hu's interactions have been, what's the basis of his

15  information, whether he's had -- come up against them as

16  counter experts in other cases or just read newspaper articles.

17  I need to know more foundation-wise.

18          MR. WATERS:  Very well, Your Honor.

19  BY MR. WATERS

20  Q.   Doctor, have you become familiar with Exponent or -- I'm

21  sorry.  Strike that.

22      How have you become familiar with Exponent in the context

23  of your own work?

24  A.   Through just seeing some of their reports and meeting some

25  of their staff scientists at scientific meetings.

1    Q.   Have you ever seen a report or research or any work

2    product from Exponent where they found -- where they stated a

3    position contrary to industry?

4    A.   No.

5              THE COURT:  Well, you don't know how many reports

6    he's seen.  I don't know if that's out of one, two, ten,

7    hundred.

8    BY MR. WATERS

9    Q.   How frequently, Dr. Hu, or how many times, if you can give

10   us an estimate, have you become aware of some of their results

11   or their interpretations on which to form a basis for your

12   opinion on reputation?

13   A.   Well, some of their reports are published in the

14   literature, and some of their reports arise in the course of

15   policy debates or litigation.

16        I'd say I've seen maybe around 10 or 15 that I can recall

17   on various topics.

18   Q.   Very well.

19             MR. WATERS:  Your Honor, may I proceed?

20             THE COURT:  Yes.

21             MR. ADKINS:  Your Honor, may I place one more

22   objection.

23        None of this testimony is specific to Dr. Chang or

24   Dr. Tsuji.  And Rule 608 speaks specifically to a witness's

25   credibility, not that witness's employer.

1    Exponent is a large firm that employs many people, and

2    there has been no testimony from Dr. Hu that he even knows

3    Dr. Tsuji or Dr. Chang.

4         **THE COURT:**  Well, I'll take that into account, but it

5    goes to the weight.

6         If there is -- if you want to develop further testimony

7    specific to the two experts here, that's -- you can do that,

8    Mr. Waters.  Otherwise, you understand what weight I might give

9    to this testimony if I'm going to allow it to be given.

10        **MR. WATERS:**  Thank you, Your Honor.

11   **BY MR. WATERS**

12   **Q.**   What is your understanding based on your own insights,

13   Doctor, and experience as to the reputation of Exponent and

14   what it is that they do and what it is that they provide?

15   **A.**   I can't really say much about reputation.  All I can say

16   is that, you know, they are well known to represent industry in

17   all of their work.

18   **Q.**   Very well.  Thank you, Doctor.

19        We anticipate that there will be testimony in this case

20   from an Exponent scientist that a loss of three to five IQ

21   points is relatively small because it's less than the standard

22   deviation of 15 IQ points.

23        Do you have any thoughts or opinions on this, Doctor?

24        **MR. ADKINS:**  Objection.  Objection, hearsay.  Calls

25   for -- it's speculation, Your Honor.

1           **THE COURT:**  Well, he can answer the hypothetical

2    question.  Whether it actually applies or not, we'll find out,

3    but he can answer the hypothetical question.

4    **A.**    Yeah, sure.  So I go back to what happened during the lead

5    policy debates.  I already talked about how three to five

6    points of IQ has a profound effect on what could be -- what can

7    happen in the extremes of the distribution of IQ in the

8    population.

9           But the other reasons why three to four to five points of

10   IQ in this context are important are, number one, three to five

11   points of IQ is the result of epidemiologic studies that

12   average over the entire population.  So the reality is that

13   there will probably be some people who only lose one or two

14   points, and there will be some people who lose six, seven or

15   eight points.  And that is a reality of the diversity of our

16   population and the diversity of their response to something

17   like neurotoxicants.

18          The other point that I will make is that the majority of

19   studies, including ours, are based on one, maybe two, maybe

20   three measures of the exposure during the entire period of

21   exposure.  In this case pregnancy.  But we also know that those

22   exposures fluctuate during pregnancy.

23          And the question is for both lead and fluoride -- lead

24   also had the same thing.  They measured blood lines in children

25   at various points in time.  How well does one, two or three

1    measures of the exposure represent the entire exposure period?

2    You know, whether it's the entire childhood or entire

3    pregnancy?

4         And the answer is, well, it's kind of averaging.  It's --

5    it is -- there's certainly some random error in terms of what

6    it signifies in terms of the overall cumulative total exposure.

7         And one of the general principles of biostatistics and

8    epidemiology is that when you have that kind of random error,

9    you tend to actually lower the effect estimates.

10        So I guess my worry, based on what we know statistically,

11   is that the effect estimates we found underestimate the true

12   impact of fluoride and IQ.  So I think those three -- those

13   three dimensions to this question refer to relief.  You know,

14   the statement that, well, three to five points of IQ doesn't

15   mean much.

16   **Q.**   Are you aware of any neurotoxicant that produces an

17   average reduction in IQ of 15 IQ points in the general

18   population?

19   **A.**   No.

20   **Q.**   I want to --

21             **THE COURT:**  Let me -- this is for my benefit.  Let me

22   ask Dr. Hu.

23        Would you explain the last point about the averaging and

24   the random errors in measuring the entire exposure would tend

25   to lower the effect estimates?  Is that because the -- the

HU - DIRECT / WATERS

1    degree of exposure that is measured and averaged out is higher

2    or lower than what actually might happen?

3              THE WITNESS:  Actually, there is a graph that might

4    help.  Do we have that, Mr. Connett, or Mr. Waters?

5              MR. WATERS:  Give us a moment.  Yeah.  We can pull

6    that up.

7         (Brief pause.)

8    A.   The general principle is that we call it either random

9    misclassification or random error, and the exposure measurement

10   tends bias the effects estimate towards the null.  That's the

11   sort of mantra that our students learn as they go through

12   epidemiology.

13        (Document displayed.)

14   A.   And this graph, which is actually from my colleague,

15   Lianne Shepherd, she's a biostatistician here at the University

16   of Washington, was intended -- this was published in a

17   peer-reviewed journal.

18             THE COURT:  What is this from?  Counsel, is this from

19   a --

20             MR. WATERS:  Your Honor, this is the demonstrative

21   that Dr. Hu had provided to us.  We had provided it to counsel.

22             THE COURT:  So it's a demonstrative.  It's not an

23   exhibit.

24             MR. WATERS:  Correct.

25             THE COURT:  Okay.

1  **A.**   So what you're looking at is essentially a modeling effort

2  to try to illustrate this point.

3      If air pollution measures, in this case PM 2.5, which is a

4  small particulate size, which measured really accurately

5  against the -- the outcome in this case, I think it was bad

6  cardiovascular outcomes, then you would see this dotted line

7  with the points tightly clustered around the dose response

8  relationship of increases in PM 2.5 and bad impacts on

9  cardiovascular outcomes.

10     But then if you actually have random error in the air

11  pollution measurement -- and that's what the red dots are;

12  we've introduced random error -- and then you do a regression

13  line, you'll see that the regression line is now tilted

14  downwards.  That is, the effect estimates that is the

15  incremental impact on cardiovascular disease from a unit

16  increase in PM 2.5 is now lowered.

17     And this is the illustration of how the error associated

18  with a -- the random error associated with an exposure

19  measurement will bias the effect estimates towards the null;

20  that is, keep going downwards towards zero.

21         **THE COURT:**  Is that because the predictive power of

22  that variant which has this random error is lessened, or that

23  actually changed the shape of the curve or of the line?

24         **THE WITNESS:**  Both.  Both, in fact.  It will change

25  the shape of the line, and it will start to impinge upon the

**HU - DIRECT / WATERS**

1    so-called statistical significance.

2         You will start to see a decline in the so-called P value

3    because, you know, there's less of the variation in

4    cardiovascular disease that can be explained by the PM 2.5 or

5    the exposure variable.

6              **THE COURT:**  Well, I can understand why the predictive

7    value or the P level is diminished, because you have more

8    variation.

9         I guess I'm not sure I understand why the slope of the

10   curve is different.  I notice at the bottom end of the curve,

11   it actually sort of over predicts to a certain extent.

12             **THE WITNESS:**  Well, I guess -- I'm not -- you know, I

13   don't have the ability to statistically show you other

14   representations of this and how this might -- how this might be

15   true.  But I would be happy to provide the Court with more

16   documentation of that effect, if that's helpful.

17             **THE COURT:**  Okay.  Well, let's see how it goes.  I'm

18   sure you're going to be asked about this on cross examination.

19             **THE WITNESS:**  Okay.

20             **THE COURT:**  All right.  Thank you.

21             **THE WITNESS:**  You're welcome.

22   **BY MR. WATERS**

23   **Q.**   Following up on that point.  If we could share the screen

24   with EPA -- I'm sorry, Plaintiff's Exhibit 33-A.

25             (Brief pause.)

```
 1              MR. CONNETT:  Sorry, Your Honor.  We're trying to

 2    share the screen here.

 3         (Document displayed)

 4    BY MR. WATERS

 5    Q.    Can you see the document now, Doctor?

 6    A.    Yes.

 7    Q.    And for the record, Plaintiff's 33-A is titled -- it's EPA

 8    document "Regulatory Impact Analysis of the Clean Air Mercury

 9    Rule."

10         Do you see that?

11    A.    Yes.

12    Q.    All right.  And we'll scroll down to Page 9-11, it looks

13    like.  Do you see the reference that:

14              "Presence of exposure measurement error could

15              introduce a bias in the results, most likely towards

16              the null."

17         Do you see that reference?

18    A.    Yes.

19    Q.    And when you were talking about Epidemiology 101 and you

20    made a reference, is this what you were referring to with

21    respect to measurement errors could -- would likely make the

22    results go towards the null?

23    A.    Yes.

24              MR. ADKINS:  Objection, foundation.  Witness hasn't

25    even seen this document before it seems.
```

1            THE COURT:  Well, why don't you explain a little more

2    about this document and what his knowledge is of this document.

3            THE WITNESS:  I'm sorry.  Was that a question for me?

4            THE COURT:  Yeah.  The attorney needs to reask some

5    questions.

6    BY MR. WATERS

7    Q.   This document is in evidence, and it states the EPA's

8    position with respect to bias in the results as a result of

9    measurement error, most likely to the null.

10            And my question to you, Dr. Hu, is simply whether or not

11    you agree with this statement from EPA.

12            MR. ADKINS:  Objection, foundation.

13            THE COURT:  Overruled.

14    A.   Yes.

15    BY MR. WATERS

16    Q.   And is this what you were talking about a little while ago

17    with respect to your epidemiology students; that this was sort

18    of a classic or a -- what's the word I'm looking for?  This is

19    something that's taught epidemiologists as a matter of course?

20    A.   Yes.

21    Q.   And if you'll look down a little further under the --

22    we'll move on, Doctor.

23        (Document removed from display)

24    Q.   I want to now ask you some questions about the 2018 ADHD

25    study, which I'll call Bashash 2018?

**HU - DIRECT / WATERS**

1    **A.**    Okay.

2    **Q.**    In that study what did you find with respect to the

3    relationship between prenatal fluoride exposure and ADHD

4    behaviors?

5    **A.**    We found that the higher levels of fluoride exposure in

6    our cohort were associated with more symptoms of inattention

7    and with global measures of Attention Deficit Hyperactivity

8    Disorder.

9    **Q.**    Did you continue to find the association that you just

10   described -- or let me ask this way.  The association, did it

11   remain significant after controlling for potential confounding

12   factors?

13   **A.**    Yes.

14   **Q.**    And would it be correct to say that you found a dose

15   response relationship between prenatal fluoride exposure and

16   some ADHD behaviors?

17   **A.**    Yes.

18   **Q.**    Did you take any steps to scrutinize whether this

19   particular dose response relationship was linear?

20   **A.**    Yes.

21   **Q.**    And what did you find in that regard?

22   **A.**    We found that the relationship appeared linear.  There's

23   some evidence of flattening of the curve at the highest levels.

24   **Q.**    And how did you scrutinize that relationship?

25   **A.**    Using the same methodology as I discussed with the 2017

1    Bashash paper, we used nonparametric smoothing techniques to

2    look at the relationship and statistical test to determine

3    whether linearity assumptions were appropriate.

4    Q.   Your findings on fluoride and ADHD, did they provide

5    further support for the proposition that fluoride is, in fact,

6    a developmental neurotoxant -- neurotoxicant, I should say?

7    A.   Yes.

8    Q.   And I want to ask you, in the ELEMENT cohort what was the

9    main source of fluoride that was considered?

10   A.   Well, we do know that the main source of fluoride in

11   Mexico is salt, because the public health authorities, aware

12   that relatively few people drink tap water in Mexico, that the

13   more strategic pathway to getting fluoride into the population

14   was adding it to salt.

15   Q.   And does that -- what implication does that have with

16   respect to your findings?  Does it mean they are not relevant

17   somehow to communities where fluoride is added to water?

18            MR. ADKINS:  Objection, leading.

19            THE COURT:  Why don't you rephrase that.

20            MR. WATERS:  I will rephrase.

21   BY MR. WATERS

22   Q.   Can you tell us what relevancy, if any, your findings

23   would have to communities where fluoride is added to water?

24   A.   We believe our findings are completely relevant to

25   communities who fluoridate water.  That was an argument we made

1   when we got our NIH grant funding.

2       And the reason is that, you know, fluoride gets absorbed,

3   whether it's from food or water, into the body.  It's what

4   circulates in blood and gets to the brain.  That's the critical

5   factor.

6       And, you know, by taking the measures that we did of

7   internally absorbed fluoride and then excreted into urine, we

8   knew that we were essentially measuring a biomarker that was

9   indicative of internal fluoride dose, much as the other

10  epidemiology that's been done using maternal urinary fluoride

11  in the United States or Canada or anywhere else.

12      So it doesn't matter what the external source of the

13  dietary fluoride is.  What matters is the internal dose.

14  **Q.**  Does the internalized dose relate more directly to what's

15  going to pass to the fetus?

16  **A.**  Yes.

17  **Q.**  In 2017, when you published the Bashash 2017, your IQ

18  results, did you look at that time to see if there were any

19  studies on maternal urinary fluoride levels in North America?

20  **A.**  We did.

21  **Q.**  And were there any at that time?

22  **A.**  We didn't see anything that was directly relevant to

23  pregnant women, which was our target cohort.

24  **Q.**  Did any new data become available after you published your

25  2017 and 2018 papers?

 1   A.   Yes.

 2   Q.   Sorry.  Between the time you published the 2017 and 2018?

 3   A.   Yes.

 4   Q.   And what data was that that became available?

 5   A.   That was the data on urinary fluoride levels that came out

 6   of the nationally representative sample.

 7        In Canada the MIREC study, the so-called Maternal Infant

 8   Research on Environmental Chemicals, birth cohort study.

 9   Q.   And what did the Canadian study show that would be

10   relevant to your considerations?

11   A.   Well, the urinary fluoride levels for women who were in

12   water fluoridated communities were very similar to the urinary

13   fluoride levels of the pregnant women we studied in Mexico.

14   Q.   All right.  Dr. Hu, do you believe -- let's -- Dr. Hu, do

15   you have an opinion as to whether your findings on fluoride and

16   neurodevelopment are relevant to communities that add fluoride

17   to their water?

18   A.   I do.

19   Q.   And what is that opinion?

20   A.   They are relevant.

21   Q.   I want to ask you, Doctor, is there any epidemiologic

22   study that does not have some sorts of limitations?

23   A.   No.  We make sure that our students understand that when

24   we teach then epidemiology.

25   Q.   And I just want to ask you, in 2014 was there a member of

 1   your team working on a PhD dissertation that was addressing

 2   some of the data in the ELEMENT cohort?

 3   A.   Yes.

 4   Q.   And who was that, that member of your team?

 5   A.   Her name is Jean Thomas.

 6   Q.   And did Ms. Thomas's, I guess now -- was her dissertation

 7   published?

 8   A.   Well, her dissertation came out.  It was printed to the

 9   University of Michigan library, and I understand that that

10   gets -- it comes into the public domain.

11   Q.   Okay.  Well, did her analysis find a significant

12   association between fluoride and neurodevelopmental effects?

13   A.   No.

14   Q.   And does exposure imprecision help us to explain the

15   results of her dissertation?

16   A.   Yes.

17   Q.   And if so, can you explain?

18   A.   Sure.  Well, at the time that Deena was trying to

19   graduate, we did not have the urinary creatinine levels to add

20   to the dataset.  And she was -- well, we wanted to get her out

21   the door pretty quickly.  She had already been taking quite a

22   bit of time.  So we allowed her to proceed with defending her

23   thesis using just urinary fluoride levels without creatinine

24   correction.

25        The problem with that is that the creatinine correction is

**HU - DIRECT / WATERS**

1    so important to adjusting for the effects of urinary dilution.

2    In other words, your urinary creatinine level, given the same

3    amount of exposure -- if you woke up in the morning and were

4    dehydrated -- would be very different than later in the day

5    after you drank, you know, a good half liter or liter of fluids

6    or tanked up.  And that's not because your fluoride intake has

7    changed, but rather the dilution of the urine has changed.  So

8    that introduces random error, if you will, into the measurement

9    of urinary fluoride.

10       Precisely why when we went to finalize those analyses, we

11   were able to creatinine correct the urinary fluoride levels and

12   found different results, pollution and abstract, a couple years

13   ago and that we're working on pollution in a manuscript going

14   forward.

15   Q.   Generally speaking, Doctor, would your exposure estimates

16   have been more precise if, for example, you intentionally dosed

17   the pregnant women with known quantities of fluoride?

18   A.   Well, sure.  You know, environmental health, however, is

19   not typically ever in the position of conducting a trial or a

20   randomized trial of a potential neurotoxicant, particularly in

21   pregnant women.

22       So, unfortunately, we're never in that position, so we

23   have to use these observational studies to understand what the

24   impacts are.

25   Q.   Would your urinary fluoride measurements have been more

 1    precise if you were able to use 24-hour samples?

 2    **A.**    Yes.  And we have used 24-hour urinary samples for other

 3    research.  The problem with that is that they are difficult to

 4    collect.  And it's hard to get, you know, volunteers who work,

 5    who have to go shopping, who have to do all sorts of things, to

 6    drag around a big 2- or 3-liter plastic bottle with them and

 7    collect all their urine and adhere to a protocol like that.

 8         So in the interests of maximizing our sample size, we

 9    relied on the one point in time urine collection.

10         But it was a morning voided sample.  And the literature

11    also shows that a morning voided sample and the manner in which

12    you collected it, works quite well with 24-hour urinary

13    fluoride.  So we felt quite satisfied with using that

14    measurement.

15    **Q.**    Now, Doctor, is it plausible that the association you

16    found between fluoride and adverse neurodevelopmental effects,

17    is it plausible that that may be the result of selection bias

18    in terms of which -- who participated in the ELEMENT cohort?

19    **A.**    We don't think so.  We have -- like any birth cohort

20    study, have had eventual mother/offspring pairs drop out of the

21    study.  They move or, you know, junior grows up and takes a job

22    and does something else, or there is a divorce in the family,

23    or whatever.

24         But in order to understand whether there is selection

25    bias, you need to carefully look at whether the variables, the

 1  covariates that are known to impact on the outcome of interest,

 2  neurodevelopment, have changed substantially and, more

 3  importantly, changed in a way so that the folks with higher

 4  exposure are somehow different than those with lower exposure

 5  in a way that can't be adequately explained.  And, you know, we

 6  have done that.  And both cohort studies have to do that in

 7  order to defend the integrity of their results against a charge

 8  of selection bias.

 9        And to our satisfaction, and the satisfaction of our peer

10  reviewers, we all felt comfortable that our -- our final

11  participants were free of selection bias.

12            THE COURT:  Let me ask on that point, Mr. Waters.

13        What did you do?  You checked for bias or you did some

14  statistical adjustment for any potential bias?  Maybe you can

15  explain that.

16            THE WITNESS:  Yes, sure.  So we -- if you look at our

17  paper -- let me just pull this out now.

18        On Table 2 we have compared the various covariates, things

19  like sex, birth order, maternal education, maternal IQ,

20  et cetera, maternal smoking, cohort, the various covariates in

21  our sensitivity analyses, comparing those subjects who we're

22  able to include in the analysis because they had all of the

23  variables of interest versus those who were excluded, and those

24  included people who dropped out or had missing data.

25        And for the most part there is little to no difference in

**HU - DIRECT / WATERS**

1  the distribution of these variables -- that's Table 2, if you

2  want to put it up -- between the included and excluded, either

3  for the general cognitive index analysis or the IQ analysis.

4  And that built confidence that we weren't subject to selection

5  bias.

6          THE COURT:  Say that part again.  There was no

7  difference in what now?

8          THE WITNESS:  In the various covariates that you --

9  that were potential confounders.  There are things that might

10  impact on neurobehavioral development or on the fluoride

11  exposures themselves.

12          THE COURT:  So I think you mentioned about no

13  difference in the covariables for included or excluded.

14      Does that mean that for a high exposure and low exposure

15  there was no pattern?  There was no difference in these

16  variables?

17          THE WITNESS:  No.  No.  That's a somewhat different

18  question.  That's a question that is addressed in Table 3 that

19  is looking at the distribution of the variate -- of variables

20  across different levels of maternal urinary fluoride.

21          THE COURT:  Oh, okay.  That's a different table.

22          THE WITNESS:  Yes.

23          THE COURT:  But you found the same thing, there was

24  no systemic variance.

25          THE WITNESS:  Well, what we found in two to three --

1  let's see if we can go over that -- is that, in fact, there

2  were some differences in maternal urinary fluoride in relation

3  to the sex of the children, which is precisely why we then

4  control for sex of the child in our analyses.

5       But other than that, there was no meaningful difference

6  for the -- between the levels of urinary fluoride and the

7  potential confounders of interest.

8       Of course, in Table 3 we do see a difference in -- let's

9  see, in some of the variables, like their maternal IQ, but we

10  control for that in the analysis.

11      And same thing with HOME score.  We controlled for that in

12  the analysis as well.

13      So, in general, Table 3 provides evidence for why it was

14  important for us to control for the confounders that we did in

15  our analysis.

16          **THE COURT:**  All right.  Thank you.

17      And going back to that Table 2, what does that show in

18  contrast to Table 3 again?

19          **THE WITNESS:**  Table 2 shows that -- the distribution

20  of covariates; that is, the -- sort of the levels of the

21  various potential confounders.

22          **THE COURT:**  Yeah.

23          **THE WITNESS:**  Comparing the -- those offspring who

24  are within our analyses of IQ versus those who were not in it

25  because they had missing data on whatever.

1           There were no meaningful differences, which builds

2     confidence that we didn't have selection bias and ended up with

3     a group of individuals that were more prone to show a fluoride

4     IQ relationship.

5           **THE COURT:**  I see.  So it appears that the included

6     subset is sort of representative of the entire subset?  Because

7     you looked at the included and excluded, found no real

8     difference.  So there is no reason to think that the included

9     were not representative.

10          **THE WITNESS:**  Exactly.  And this is the typical

11    procedure an epidemiologist uses to bolster the confidence of

12    their representativeness of the studied population versus the

13    whole cohort.

14          **THE COURT:**  Thank you.

15       Mr. Waters, you may continue.

16          **MR. WATERS:**  Yes.  Thank you.

17       We would like to share the screen.

18       (Document displayed.)

19    **BY MR. WATERS**

20    **Q.**   This is Exhibit 544, EPA Exhibit 544.

21       I want to read to you, Doctor, a definition provided by

22    the TSCA statute, Toxic Substances Control Act, where it says:

23            "Best available science means science that is

24         reliable and unbiased."

25       Do you have an opinion as to whether your research

HU - DIRECT / WATERS

1   generally, and your fluoride research specifically, can be

2   considered reliable and unbiased?

3   **A.**   Yes.

4          **MR. ADKINS:**  Objection, calls for a legal conclusion.

5          **THE COURT:**  Overruled.

6   **BY MR. WATERS**

7   **Q.**   You can answer, Doctor?

8   **A.**   Yes.  In my opinion, our studies produced by the ELEMENT

9   birth cohort study, including those related to fluoride are

10  reliable and unbiased.

11  **Q.**   And the definition continues:

12         "Use of best available science involves the use

13     of supporting studies conducted in accordance with

14     sound and objective science practices, including, when

15     available, peer-reviewed science and supporting

16     studies and data collected by accepted methods or best

17     available methods (if the reliability of the method

18     and the nature of the decision justifies use of the

19     data)."

20         Now, I read quite a bit there, Doctor.  But can you tell

21  us whether you and your team used the best available science as

22  defined by what I just read?

23  **A.**   We did.

24  **Q.**   Thank you, Dr. Hu.

25         **MR. WATERS:**  We have no further questions at this

**HU - DIRECT / WATERS**

1    time, Your Honor.

2              **THE COURT:**  All right.  I don't know if you need a

3    break.  We've got an hour left.  We can keep going forward,

4    unless the court reporter also needs a break before we do

5    cross.

6         All right.  Why don't we take a short break, five minutes,

7    and we'll come back with cross.

8              **MR. WATERS:**  Your Honor?

9              **THE COURT:**  Yes.

10             **MR. WATERS:**  Just one question to be clear.  Are we

11   charged for the time taken on your questions as well?

12             **THE COURT:**  Well, unfortunately, yes.  But believe

13   me, I'll be an equal opportunity questioner on both sides.

14             **MR. WATERS:**  Very well, Your Honor.

15             **THE COURT:**  Thank you.

16             **THE CLERK:**  Court is in recess.

17        (Whereupon there was a recess in the proceedings

18         from 10:49 a.m. until 10:56 a.m.)

19             **THE COURT:**  All right.

20             **THE CLERK:**  Please come to order.

21             **THE COURT:**  Okay.  Mr. Waters, you may resume.

22        No, it's not Mr. Waters.  It's Mr. Adkins.  That's right.

23   Okay.  You may commence.

24             **MR. ADKINS:**  Thank you.

25

HU - CROSS / ADKINS

1                          <u>**CROSS-EXAMINATION**</u>

2     **BY MR. ADKINS**

3     Q.   Dr. Hu, you've never offered an expert opinion in a case

4     before today related to fluoride exposure; is that correct?

5     A.   No.  Although I think you might have deposed me, or

6     someone, a few months ago.

7     Q.   That was me that deposed you.  Before -- and that

8     deposition was with respect to this case; correct?

9     A.   I think so.

10    Q.   Okay.  And so before this case, you've never offered an

11    expert opinion on fluoride exposure in a legal matter; is that

12    correct?

13    A.   Correct.

14    Q.   Okay.  Now, you're not a pediatrician; correct?

15    A.   I am not.

16    Q.   And you're not an expert in psychology; correct?

17    A.   I am not.

18    Q.   You're not an expert in neuropsychology, contribute?

19    A.   I am not.

20    Q.   You're not an expert in cognitive sciences?

21    A.   Can you be a bit more specific?  That's pretty broad.

22    Q.   You don't consider yourself to be an expert in cognitive

23    sciences; is that correct?

24    A.   By "cognitive sciences" do you mean neurology,

25    neurophysiology?

HU - CROSS / ADKINS

1    Q.    I can strike the question.

2          You're not an expert in toxicology, correct?

3    A.    I have had a lot of training in toxicology, but I'm not a

4    board certified toxicologist, if that's what you mean.

5    Q.    You wouldn't yourself to be a card carrying member of a

6    toxicological society?

7    A.    I have been a member of the Society of Toxicology, but

8    hadn't paid my membership dues, I think, for a few years.

9    Q.    Okay.  And you haven't a PhD in toxicology; correct?

10   A.    I do not.

11   Q.    Now, you've never treated a patient regarding fluoride

12   exposure; is that correct?

13   A.    Not that I recall, no.

14   Q.    And you've never conducted research regarding fluoride

15   exposure in a United States population; is that correct?

16   A.    Correct.

17   Q.    Okay.  So we spoke at length this morning about the

18   ELEMENT project, and I have some questions to ask you about

19   your studies in the ELEMENT project.

20         Just to put this in scope, there are three fluoride

21   studies that you published using data from the ELEMENT cohort:

22   Thomas 2016, Bashash 2017 and Bashash 2018; is that correct?

23   A.    Yes.  And there's an abstract that showed up in, I think

24   it was 2019, but that's it.

25   Q.    And the -- the ELEMENT project studied samples, biological

1    samples provided by pregnant women who attended health clinics

2    in Mexico City; is that correct?

3    A.    Correct.

4    Q.    And the hospitals in Mexico City or the clinics at which

5    these participants provided urine samples and other biological

6    samples, they all served low to moderate income populations; is

7    that correct?

8    A.    Correct.

9    Q.    Now, the ELEMENT participants provided -- they provided

10   urine samples throughout their pregnancy; is that right?

11   A.    Correct.

12   Q.    And those urine samples were collected using a particular

13   methodology; correct?

14   A.    Yes.

15   Q.    And I think I heard you say this morning that the samples

16   were collected using an early morning second voided sample; is

17   that correct?

18   A.    Not sure if I used those exact words, but that's more or

19   less correct.

20   Q.    Okay.  So is that the methodology that was used in the

21   ELEMENT cohort?

22   A.    Yes.

23   Q.    Okay.  So that means that the participants were expected

24   to urinate once in the morning, and then hold their urine until

25   they arrived at the clinic to provide a sample; is that

HU - CROSS / ADKINS

1    correct?

2    A.   Correct.

3    Q.   Now, there are methods other than a second voided urine

4    sample; is that right?

5    A.   Yes.

6    Q.   There's a 24-hour sample?

7    A.   Yes.

8    Q.   And there is a spot sample that could be provided at any

9    time of the day; is that correct?

10   A.   Yes.

11   Q.   And another methodology would be to provide a spot sample,

12   a first voided spot sample in the morning; is that correct?

13   A.   Yes.

14   Q.   Okay.  Now, a first voided sample methodology -- excuse

15   me, a first void sample methodology, that would probably have

16   less variation in fluoride concentration compared to a second

17   voided methodology; is that correct?

18   A.   That may be true.

19   Q.   Now, the participants in the ELEMENT cohort, they weren't

20   required to fast before they provided their urine samples; is

21   that right?

22   A.   Correct.

23   Q.   Okay.  And the absence of a fasting requirement could

24   introduce -- could have introduced variability in the urinary

25   fluoride measurements in the ELEMENT cohort; is that correct?

**HU - CROSS / ADKINS**

1   **A.**   I agree with that.

2   **Q.**   And that variability would tend to make the fluoride

3   measurements less precise; correct?

4   **A.**   Correct.

5   **Q.**   A better study design, in your view, would have been to

6   require each participant who provided a urine sample to be in a

7   fasting state before providing that sample; is that correct?

8   **A.**   You can argue that might be better, uh-huh.

9   **Q.**   Okay.  But it's your view that that would be a better

10  methodology; is that correct?

11  **A.**   Theoretically.  I haven't exactly looked at the data on

12  this particular subject with respect to fluoride, but

13  theoretically yes.

14  **Q.**   Dr. Hu, this isn't the first time you and I have met, is

15  it?

16  **A.**   No.

17  **Q.**   I took your deposition in this case, didn't I?

18  **A.**   I believe you did.

19  **Q.**   And you recall that plaintiff's counsel attended that

20  deposition with you?

21  **A.**   Yes.

22  **Q.**   And there was also a court reporter at that deposition;

23  right?

24  **A.**   Yes.

25  **Q.**   And you gave an oath to tell the truth at that deposition;

**HU - CROSS / ADKINS**

1   correct?

2   **A.**   Yes.

3   **Q.**   And you were offered an opportunity to review and sign

4   your deposition transcript, and you did review and sign your

5   deposition transcript; correct?

6   **A.**   I -- if I did, I did.  I don't specifically recall it at

7   this time.

8   **Q.**   Okay.

9          MR. ADKINS:  Your Honor, I would like to read into

10  the record Page 78, Lines 6 through 9 of the witness's

11  deposition.

12         THE COURT:  Plaintiff's counsel has had a chance to

13  see that?

14         MR. WATERS:  I'm just looking it up, Your Honor.

15         MR. CONNETT:  Yes, Your Honor.

16         THE COURT:  Go ahead.

17         MR. ADKINS:  There are objections?

18         THE COURT:  I assume no objections.

19         MR. WATERS:  No objection.

20  **BY MR. ADKINS**

21  **Q.**   (As read:)

22      "**QUESTION:**  Would a better study design have been

23      requiring that each participant be in a fasting state

24      before providing their urine samples?

25      "**ANSWER:**  I think that would have been ideal."

1          **MR. ADKINS:**  Okay.  You can clear the screen.

2      (Document removed from display)

3  **BY MR. ADKINS**

4  **Q.**   Now, Dr. Hu, you stated in your declaration that the

5  average creatinine adjusted urinary fluoride level across all

6  three trimesters in the ELEMENT cohort was .91 milligrams per

7  liter; is that correct?

8  **A.**   Right.

9  **Q.**   I'm sorry.  I didn't hear the answer.

10  **A.**   You said in my deposition?

11  **Q.**   No, in your declaration.

12  **A.**   Oh, okay.

13  **Q.**   Is what I'm asking.

14  **A.**   Well, I don't have it in front of me, but if that's what's

15  written there, then I'll stand that by that.

16          **MR. ADKINS:**  Mr. Hambrick, could you please put up

17  Dr. Hu's declaration?  This is ECF No. 198-1, and your internal

18  reference is U-01.  And please show the witness Paragraph 40.

19      (Document displayed.)

20  **BY MR. ADKINS**

21  **Q.**   Okay.  Dr. Hu, would reviewing this paragraph help refresh

22  your memory?

23  **A.**   Thank you.  Yes.

24  **Q.**   Okay.  So I'm going to restate the question.

25      You stated in your declaration that the average creatinine

1    adjusted urinary fluoride level across all three trimesters in

2    the ELEMENT cohort was .91 milligrams per liter; is that

3    correct?

4    **A.**    Yes.

5    **Q.**    Okay.  So only 71 mothers provided urine samples for all

6    three trimesters in this calculation; is that correct?

7    **A.**    Correct.

8    **Q.**    And creatinine adjustment is used to account for urine

9    dilution; correct?

10   **A.**    Yes.

11   **Q.**    That method assumes that creatinine is excreted at a

12   relatively uniform rate in a healthy human body; is that

13   correct?

14   **A.**    Yes.

15   **Q.**    And Thomas 2016, so the first study that we mentioned

16   earlier, conducted this adjustment by multiplying the ratio of

17   fluoride in individual samples by the -- to creatinine

18   concentration and multiplied that ratio by the average

19   creatinine concentration in all the samples for each trimester

20   of pregnancy; is that correct?

21   **A.**    I believe that's true.

22             **MR. ADKINS:**  Mr. Hambrick, could you please put up on

23   the screen U.S. Demonstrative 1?

24        (Document displayed.)

25

1    BY MR. ADKINS

2    Q.    Okay.  Dr. Hu, do you see this document?  It's entitled

3    "Urinary Creatinine Adjustment Formula, ELEMENT and MIREC

4    Cohort Studies."

5    A.    Yes.

6    Q.    And you see there is a formula in the center of that page?

7    A.    Right.

8    Q.    MUF divided by MUC times MUC average.  And there is a key

9    at the bottom.

10        MUF is fluoride concentration in maternal urine sample.

11        MUC, creatinine concentration in urine sample.

12        And MUC average, the average creatinine concentration of

13   samples at each trimester.

14        Do you see all that, Dr. Hu?

15   A.    Yes.

16   Q.    And is the formula in the center of that screen, does that

17   accurately represent the formula used in the ELEMENT cohort

18   studies to adjust for creatinine?

19   A.    I believe it does.

20   Q.    Okay.  I want to draw your attention to one of the

21   variables in this document here, the MUC average variable.

22        Now, the Thomas 2016 study reported the values used for

23   MUC average; is that accurate?

24   A.    I'll have to pull up her paper.

25   Q.    I can do you one better.  Would it be helpful to refresh

**HU - CROSS / ADKINS**

1  your memory if I showed you Thomas 2016?

2  **A.**   Yes.

3          **MR. ADKINS:**   Mr. Hambrick, could you please put up

4  U-04 and show the witness the end of Section 2.3?   This should

5  be on Page 491.

6      (Document displayed.)

7  **BY MR. ADKINS**

8  **Q.**   Okay.   So the Thomas 2016 study reported the values used

9  for MUC average; correct?

10  **A.**   Right.

11  **Q.**   And those values are each stage of pregnancy -- or at each

12  trimester of pregnancy were 100.8, 81.6 and 72.4 milligrams per

13  liter; correct?

14  **A.**   I see that.

15  **Q.**   Now, this document, Thomas 2016, cited to a publication by

16  the World Health Organization in support of this creatinine

17  adjustment methodology; correct?

18  **A.**   Right.

19  **Q.**   And that document is listed here, Petersen, et al 2014;

20  correct?

21  **A.**   I'll take your word for it.

22  **Q.**   Okay.

23          **MR. ADKINS:**   Mr. Hambrick, can you show the witness

24  Page 495, the references?

25      And focus in on the Petersen citation under -- should be

HU - CROSS / ADKINS

```
 1   lower.  They are in alphabetical order.
 2        (Document displayed.)
 3   BY MR. ADKINS
 4   Q.   Okay.  So the Petersen citation is a World Health
 5   Organization document; correct?
 6   A.   Yes.
 7   Q.   In that publication the WHO explained that:
 8            "An estimate of 24-hour urinary excretion of
 9        fluoride can be calculated from spot urine samples by
10        multiplying the ratio of fluoride to creatinine in a
11        sample by a creatinine reference value."
12        Isn't that correct?
13   A.   Right.
14   Q.   Okay.
15            MR. ADKINS:  Mr. Hambrick, can you please put up U.S.
16   Demonstrative 2?
17        (Document displayed)
18   BY MR. ADKINS
19   Q.   Now, the WHO methodology -- excuse me.  Dr. Hu, do you see
20   this document?
21   A.   Yes.
22   Q.   Okay.  And it's entitled "Urinary Creatinine Adjustment
23   Formula World Health Organization."
24        There is a formula in the center.  UF divided by UC times
25   CRV.
```

1          Again, a key at the bottom.  UF being fluoride

2    concentration in urine sample.

3          UC creatinine concentration in urine sample.

4          And CRV creatinine reference value.

5          Do you see that, Dr. Hu?

6    **A.**    Yes.

7    **Q.**    Now, does this formula reflected in this document

8    accurately reflect the estimation formula that's in the WHO

9    publication that we just looked at?

10   **A.**    I think so.

11   **Q.**    Would looking at the publication help refresh your memory?

12   **A.**    If you'd like to go there, we can go there, but I think it

13   does.

14   **Q.**    I want to be sure, Dr. Hu, because this is important.

15             **MR. ADKINS:**  So, Mr. Hambrick, can you please pull up

16   U-06?

17        And page 66 of this document, please?

18        Okay.  Could you focus in on the paragraph under 8.1

19   "Creatinine"?

20        (Document displayed)

21   **BY MR. ADKINS**

22   **Q.**    Okay.  Dr. Hu, why don't you give this a read, and I'll

23   reask the question so we can be sure.

24        (Witness complied.)

25   **A.**    Okay.

1    **Q.**    Okay.  Mr. Hambrick, could you please put up U.S.

2    Demonstrative No. 2?

3          (Document displayed.)

4    **BY MR. ADKINS**

5    **Q.**    Okay.  So the formula in this document accurately reflects

6    the WHO methodology; correct?

7    **A.**    Correct.

8    **Q.**    And the WHO methodology for -- suggests the creatinine

9    reference value from an independent study that determined daily

10   creatinine excretion in healthy adults; correct?

11   **A.**    Correct.

12   **Q.**    Now, by contrast, the Thomas 2016 study used average

13   creatinine concentrations for each trimester of pregnancy; is

14   that correct?

15   **A.**    Correct.

16   **Q.**    Now, the methodology that the ELEMENT studies use for

17   creatinine correction is a variation of this WHO methodology;

18   correct?

19   **A.**    Yes.

20   **Q.**    And compared to the WHO methodology, the Thomas 2016

21   methodology was more specific to the Mexico City population

22   study; correct?

23   **A.**    That's correct.

24   **Q.**    And Thomas 2016 did not cite any studies that use a

25   creatinine adjustment approach that varied from the WHO

1    methodology in this same way; correct?

2    A.   Correct.

3    Q.   Now, creatinine levels can be confounded by a number of

4    factors; correct?

5    A.   That is in general true, and mostly in relation to people

6    with specific conditions.

7    Q.   Right.  And so some of those factors that can confound

8    creatinine excretion are muscularity, physical activity, urine

9    flow, time of day, diet and other health issues; correct?

10   A.   Correct.

11   Q.   Now, a potential confounder, in your view, is a factor

12   that is associated with the exposure and the outcome, and

13   potentially explains the apparent relationship between the two;

14   correct?

15   A.   Correct.

16   Q.   And Thomas 2016 didn't do anything to determine whether

17   creatinine adjustment confounders, including those that I just

18   mentioned, were associated with the exposure and the outcome of

19   interest in the urine samples studied in Thomas 2016; is that

20   correct?

21   A.   Would you repeat?

22        MR. WATERS:  Objection to the question.

23        MR. ADKINS:  I'm happy to rephrase.

24   BY MR. ADKINS

25   Q.   So Thomas 2016 didn't do anything --

HU - CROSS / ADKINS

1  **A.**   Not that.  The previous sentence.  You mentioned the

2  things that tend to influence creatinine concentration.

3  **Q.**   Oh, sure.  So I asked you whether creatinine levels can be

4  confounded by factors; is that correct?

5  **A.**   Correct.

6  **Q.**   And some of those variables that can confound creatinine

7  levels include muscularity, physical activity, urine flow, time

8  of day, diet and diseases; correct?

9  **A.**   Correct.

10 **Q.**   Okay.  A potential confounder is a factor that's

11 associated with both the exposure and the outcome and can

12 potentially explain the apparent relationship between the two.

13 Do you agree with that characterization?

14 **A.**   I agree with that, yeah.

15 **Q.**   So Thomas 2016 didn't do anything to determine whether

16 creatinine adjustment confounders, including those that I just

17 mentioned, were associated with both the exposure and the

18 outcome metric in the population studied; correct?

19 **A.**   We did not feel that was necessary.

20 **Q.**   Okay.  So you spoke shortly about the Deena Thomas

21 dissertation, the graduate thesis; correct?

22 **A.**   Correct.

23 **Q.**   Deena Thomas was the lead author in --

24      **THE COURT:**  Hold on for a second.  Hold on for a

25 second, Mr. Adkins.

HU - CROSS / ADKINS

1          MR. ADKINS:  Sure.

2          THE COURT:  Normally I wouldn't do this in a jury

3    trial, but I'd like an explanation from Dr. Hu.  When he just

4    said it wasn't necessary, I would like an explanation why it

5    wasn't necessary to adjust for the numbers.

6          THE WITNESS:  Sure.  Like the counselor said, a

7    potential confounder is one that's associated both at the

8    exposure and the outcome.

9          There is no evidence that I'm aware of that either of

10   the -- any of the variables that he just cited are associated

11   with both the exposure and the outcome.

12         If he has such evidence, I'd like to see it.  But in the

13   absence of that evidence, just raising it as a theoretical

14   confounder is irrelevant, because otherwise you have to control

15   for everything in the entire world.

16         So, no.  We have no reason to suspect those were potential

17   confounders and did not adjust for them.

18         THE COURT:  So take an issue like diet.  *A priori* you

19   saw no reason to think that that was going to be an influential

20   confounder here.

21         THE WITNESS:  Well, I mean, fluoride is obviously, in

22   this case, a component of the diet in which the people ate,

23   because it's added to salt.

24         But is there evidence that, in particular, other component

25   of diet is both related to fluoride as well as the

**HU - CROSS / ADKINS**

1  neurodevelopmental outcome of interest, I'm not aware of it.

2          THE COURT:  All right.  Thank you.

3  BY MR. ADKINS

4  Q.   Okay.  And to follow up though, Dr. Hu, you didn't do

5  anything to determine whether that creatinine was potentially

6  being confounded in this population; correct?

7  A.   Well, for the reason I just stated, I felt it was not

8  necessary.

9  Q.   Okay.  But you didn't even do anything to determine

10  whether it would be necessary or not; correct?

11  A.   Well, we reviewed the literature to see whether, in fact,

12  what you were just saying, these factors might be related to

13  both fluoride and the neurodevelopmental outcomes and found no

14  evidence for that.

15      So that was the background work we did to understand the

16  universe of potential confounders we needed to control for.

17          MR. ADKINS:  I would like to move on to Deena

18  Thomas's graduate thesis, unless there are any additional

19  questions from the Court.

20          THE COURT:  No.  Go ahead.

21  BY MR. ADKINS

22  Q.   So Deena Thomas is the lead author on Thomas 2016;

23  correct?

24  A.   Yes.

25  Q.   And as part her doctoral these, she studied whether

**HU - CROSS / ADKINS**

1    maternal urine samples in the ELEMENT cohort were associated

2    with cognitive effects in the offspring; correct?

3    **A.**   Okay.  Wait a minute.  Are you referring to her thesis or

4    are you referring to the paper she published in 2016 on the

5    levels of fluoride in urine and blood.

6    **Q.**   I'm referring to her thesis.

7    **A.**   Her thesis, okay.  Thesis.

8    **Q.**   I might have said dissertation.  So if I say

9    "dissertation," will you understand that to be thesis?

10   **A.**   Okay.  Sure.

11   **Q.**   I'm now referring to the publication Thomas 2016 at this

12   point.

13   **A.**   Okay.

14   **Q.**   Now, I think you mentioned this before.  Dr. Thomas's

15   dissertation did not find an association between unadjusted

16   maternal urinary fluoride levels and cognitive outcomes;

17   correct?

18   **A.**   Correct.

19   **Q.**   Okay.  And Deena Thomas also considered plasma fluoride

20   levels; is that right?

21   **A.**   That's right.

22   **Q.**   And plasma fluoride levels also did not have a significant

23   impact on cognitive test scores of the children at ages one,

24   two and three; correct?

25   **A.**   That's correct.

**HU - CROSS / ADKINS**

1    Q.   Okay.  Let's turn to Bashash 2017.  This is the IQ study

2    in the ELEMENT cohort; correct?

3    A.   Right.

4    Q.   Now, Bashash 2017 measured cognitive outcomes in two

5    groups, four year olds and six to 12 year olds; correct?

6    A.   Correct.

7    Q.   And Bashash 2017 measured cognitive outcomes in the four

8    year olds using the general cognitive or GCI index; correct?

9    A.   Yes.

10   Q.   For the six to 12 year olds Bashash 2017 used a Spanish

11   version of the Wechsler abbreviated scale of intelligence.

12   That's an IQ test; correct?

13   A.   Yes.

14   Q.   Now, you stated at Paragraph 19 of your declaration that

15   Bashash 2017 investigated fluoride's relationship with

16   intelligence among 299 mother/offspring pairs.

17        Now, to clarify, there were 299 mother/offspring pairs

18   that had data on either the GCI or this IQ test and data on the

19   covariates that you tested for; correct?

20   A.   Correct.

21   Q.   So let's talk about the completeness of the maternal

22   urinary data in this study.

23        Now, there were only 25 five year olds -- four year olds,

24   excuse me, who had data for the GCI test and maternal fluoride

25   samples for all three trimesters from their mothers; correct?

1   A.   Fair.

2   Q.   And there were only ten 6 to 12 years olds who had data on

3   the IQ test in maternal urinary fluoride samples for all three

4   trimesters for their mothers; correct?

5   A.   Fair.

6   Q.   So in total there were 35 of -- 35 of those 299

7   mother/offspring pairs had urine samples for all three

8   trimesters; correct?

9   A.   Correct.

10  Q.   Let's talk about the results.   In your declaration you

11  reported that Bashash 2017 observed negative associations

12  between maternal urinary fluoride and the GCI scores in the

13  four year olds and IQ scores in the 6 to 12 year olds; correct?

14  A.   Correct.

15  Q.   And Bashash 2017 did not observe divergent results by sex

16  in the GCI scores or the IQ scores between boys and girls who

17  participated; correct?

18  A.   Correct.

19  Q.   In your declaration you stated that there was some

20  suggestion of a threshold at approximately .8 milligrams per

21  liter among the 6 to 12 year olds.   This is at Paragraph 24 of

22  your declaration.

23       So, in other words, there were -- there was no clear

24  association between IQ scores and fluoride values below

25  approximately .8 milligrams per liter; correct?

1    A.    Correct.

2    Q.    And Bashash 2017 conducted a sensitivity analysis for IQ

3    using contemporaneous urinary fluoride exposure levels -- or

4    values for the children you studied; correct?

5    A.    Correct.

6    Q.    And there are about -- there were 189 children who had

7    this data, correct?  Or for whom you had this data, I should

8    say.

9    A.    I don't remember the precise figure, but if you're taking

10   it from the paper, I'll stand by that.

11   Q.    I know you trust me, Dr. Hu, and that's great, but I want

12   to show you the document.

13   A.    Okay.

14        MR. ADKINS:  Mr. Hambrick, can you please put up

15   U-07?  This is Bashash 2017.  And point the witness to Page 9,

16   "Sensitivity Analysis."

17        THE COURT:  Counsel, when you refer to U-69, and

18   you've done this in the other one, what exhibit number does

19   that correspond to for me?

20        MR. ADKINS:  Sure.  So these exhibits actually were

21   objected to, and they are not coming in as evidence.

22        They are the underlying studies that Dr. Hu published and

23   that he's offered opinions on.

24        So I don't have exhibit numbers for these.  But to help

25   the Court, if you look at the binder for the "Howard Hu Cross

1    Examination," there should be the deposition exhibit number.

2         For this it would be deposition Exhibit 342.

3             THE COURT:  For some reason -- I'm looking at your

4    binder.  I guess I have something else.  I'm looking at your

5    Trial Exhibit binders by witness, and for Dr. Hu I only see two

6    documents in there.  I think I'm missing something.

7             MR. ADKINS:  There should be separate witness binders

8    for today's testimony.

9             THE COURT:  Okay.

10        (Brief pause.)

11            THE COURT:  I may have to -- when was that submitted?

12            MR. ADKINS:  I believe they arrived to the Court on

13   Thursday or Friday last week.  And if it's of any help at all,

14   I believe there is also electronic copies on the Box.com

15   server.

16            THE COURT:  All right.  Well, I may need to -- I may

17   need to go to Box.com.  That was posted in Box.com recently?

18            MR. ADKINS:  Yes.

19        (Brief pause.)

20            THE COURT:  Okay.  God it.  Witness binders, here we

21   go.  United States?  Under United States?

22            MR. ADKINS:  Yes.

23            THE COURT:  All right.  Okay.  Got it.  Which one are

24   we looking at now?

25            MR. ADKINS:  So we're now looking at -- this would be

HU - CROSS / ADKINS

1  Howard Hu's Deposition Exhibit 341.

2          THE COURT:  Okay.

3          MR. ADKINS:  Excuse me.  I already made a mistake

4  there, 342.

5          THE COURT:  Oh, 342.  All right.

6          MR. ADKINS:  And if you go to Page 9, we're now

7  looking at, on the first column, under the heading "Sensitivity

8  Analysis."

9          THE COURT:  Page 9.

10          MR. ADKINS:  There should be three scatter plots at

11  the top.

12          THE COURT:  I see it now.  All right.  Okay.  Thank

13  you.

14          MR. ADKINS:  No problem.  Thank you.

15  BY MR. ADKINS

16  Q.   Okay.  So, Doctor, I'll repeat the question.  There were

17  189 children with data of -- for the sensitivity analysis;

18  correct?

19  A.   Yes.

20  Q.   Now, after running this adjustment, this sensitivity

21  analysis, Bashash 2017 found no clear evidence of an

22  association for maternal urinary fluoride values below

23  1.0 milligrams per liter and the IQ scores for these 189

24  children; correct?

25  A.   Correct.

**HU - CROSS / ADKINS**

1  Q.   Now, Bashash 2017 did not attempt to generalize its

2  findings to Canada; correct?

3  A.   No.

4  Q.   And Bashash 2017 did not attempt to generalize its

5  findings to the United States; correct?

6  A.   We did not.

7  Q.   Now, you and your coauthors lacked information regarding

8  the fluoride content in the water of the participants in the

9  ELEMENT study; correct?

10 A.   At the time we published this, yes, but since then we have

11 been collecting that data.

12 Q.   Now, a potential limitation that the study identified and

13 that the authors noted in Bashash 2017 was the lack of

14 information about iodine and salt, which could modify

15 associations between fluoride and cognition; correct?

16 A.   Yes.

17 Q.   And Bashash 2017 did not conclude that fluoride causes

18 neurodevelopmental harm; correct?

19 A.   We made no such conclusion.

20 Q.   Okay.  I'd like to turn to Bashash 2018.

21      Now, Dr. Hu, in this study, Bashash 2018, there were 214

22 participants that the study analyzed; is that correct?

23 A.   I'm looking at the abstract.  It says 213.

24 Q.   That's correct.  The abstract does say 213, and I can --

25 so --

HU - CROSS / ADKINS

```
 1           MR. ADKINS:  Mr. Hambrick, could you please show the

 2   witness 208?

 3       And this is Bashash 2018 from Dr. Hu's deposition

 4   Exhibit 343, Your Honor.

 5       (Document displayed.)

 6   BY MR. ADKINS

 7   Q.   Okay.  You said -- in the abstract it says 213; correct?

 8   A.   Yes.

 9   Q.   Okay.

10           MR. ADKINS:  Mr. Hambrick, could you please show the

11   witness Page 660, Subsection 3.1.

12       (Document displayed.)

13   BY MR. ADKINS

14   Q.   "Population Characteristics."  Dr. Hu, can you see that?

15   A.   Yes.

16   Q.   Okay.  So was there a typo, or an error?

17   A.   It looks like there was a typo in the abstract.

18   Q.   Okay.  So there were 214 participants that the study

19   analyzed; correct?

20   A.   Yes.

21   Q.   And those 214 participants had a minimum of one creatinine

22   adjusted urinary fluoride measurement; correct?

23   A.   Yes.

24   Q.   Now, the number of participants with creatinine adjusted

25   urinary fluoride measurements for all three trimesters was less
```

1    than 214; correct?

2    **A.**    Yes.

3    **Q.**    In fact, only 14 participants, or 6.5 percent of the 214,

4    had maternal urinary fluoride samples for all three trimesters;

5    correct?

6    **A.**    Correct.

7    **Q.**    And the majority of the participants, or 57 percent, only

8    had one maternal fluoride sample; correct?

9    **A.**    Correct.

10   **Q.**    Now, a study that collects urine samples from each

11   trimester has the benefit of being able to express fluoride

12   across the entire time of pregnancy; correct?

13   **A.**    Say that again, counselor.  Sorry.

14   **Q.**    No problem.

15        The study that collects urine samples from each trimester

16   has the benefit of being able to express fluoride exposure

17   across a pregnancy; correct?

18   **A.**    It's a more complete measure, yes.

19   **Q.**    In fact, it's able to express fluoride exposure across

20   pregnancy; correct?

21   **A.**    Yes.

22   **Q.**    Okay.  And a study that collects urine samples from each

23   trimester also allows one to reduce inter-individual

24   variability; correct?

25   **A.**    Allows one to reduce intra-individual variability.  That

HU - CROSS / ADKINS

1    is measurement error associated with the individual's fluoride

2    exposure.

3    **Q.**   Okay.  I'd like to read from the witness's deposition

4    transcript, Page 210, Lines 10 through 16.

5               **THE COURT:**  Any objection?

6               **MR. WATERS:**  If you could, Your Honor, just give us

7    one second here.

8         (Brief pause.)

9               **MR. WATERS:**  That was Page 210?

10              **MR. ADKINS:**  Yes, Line 10 through 16.

11        (Brief pause.)

12              **MR. WATERS:**  No objection.

13              **THE COURT:**  All right.  Go ahead.

14   **BY MR. ADKINS**

15   **Q.**   (As read:)

16        "**QUESTION:**  Why would you want to do that?

17        "**ANSWER:**  Just so that I can express the fluoride

18        exposure, both as one that's integrated across the

19        entire time of pregnancy, as well as fluoride exposure

20        that's specific to any particular trimester, and it

21        also allows one to reduce any inter-individual

22        variability."

23        Is that an error in the transcript?

24              **THE COURT:**  What does the "that" refer to?  I didn't

25   see a predicate to that.  It's just why would you do that?  I

HU - CROSS / ADKINS

1    don't know what "that" is.

2            MR. ADKINS:  May I read an additional line from the

3    transcript, Page 209, Line 24, up to what we just read?

4            THE COURT:  Okay.

5            MR. WATERS:  Put it back on the screen.

6        (Document displayed.)

7    BY MR. ADKINS

8    Q.   (As read:)

9        "QUESTION:  And for context you were speaking in terms

10       of one urinary fluoride sample compared to, for

11       example, three -- or samples across all three

12       trimesters of pregnancy.  Now, when you're doing

13       scientific research and you aim to -- if you were --

14       if you were designing a study to measure fluoride's

15       effects in -- from prenatal exposure effects of

16       fluoride, would your aim to be collect one sample or

17       more than one sample?

18       "ANSWER:  I think if I was going to design a *de novo*

19       study, I would want to collect samples from each

20       trimester."

21           THE COURT:  Okay.  Thank you.

22   BY MR. ADKINS

23   Q.   So, Dr. Hu, you testified that it would reduce

24   intra-individual variability, and your deposition says

25   inter-individual variability.  Is that an error in your

HU - CROSS / ADKINS

1    deposition transcript?

2    **A.**   Yeah.  That's clearly a typo or a mistranslation, and I

3    failed to see it and correct it on the transcript.

4    **Q.**   Okay.  And so your testimony is that a study that collects

5    urine samples from each trimester allows one to reduce

6    intra-individual variability; correct?

7    **A.**   That's correct.  It gives you more complete and you could

8    say averaged, if you want, representation of what the fluoride

9    exposure was over pregnancy.

10   **Q.**   Now, because so many of these participants only provided

11   one urine sample, the authors, including yourself of Bashash

12   2018, couldn't rule out that the single sample represented

13   exposure through the entire pregnancy, rather than what was

14   happening around the time that the sample was offered; correct?

15   **A.**   That was kind of a convoluted question.

16         **THE COURT:**  I didn't understand the question.  Can

17   you rephrase that question?  I'm not sure I understood the

18   question either.

19   **BY MR. ADKINS**

20   **Q.**   So Bashash 2018 noted that there were very few

21   participants who only provided one maternal urinary sample;

22   correct?

23   **A.**   Right.

24   **Q.**   And because of that, the authors couldn't rule out that

25   that single sample was representing what was happening around

**HU - CROSS / ADKINS**

```
 1  the time that the sample was offered versus what was happening
 2  throughout the entirety of the pregnancy; correct?
 3  A.   I think that's reasonable.
 4  Q.   And that's, in fact, what the Bashash 2018 authors noted
 5  in their article; correct?
 6  A.   Yes.
 7  Q.   So genetics plays an important role in an individual's
 8  susceptibility to ADHD; correct?
 9  A.   Yes.
10  Q.   And Bashash 2018 did not control for an individual's
11  genetic susceptibility to ADHD; correct?
12  A.   We did not.
13  Q.   Certain environmental factors have also been shown to play
14  a role in an individual's susceptibility to ADHD; correct?
15  A.   Yes.
16  Q.   And some of those environmental factors include chemical
17  exposures, including to organochlorines, air pollution and
18  nutritional factors; correct?
19  A.   Yes.
20  Q.   Bashash 2018 did not control for organochlorine exposures;
21  correct?
22  A.   Correct.
23  Q.   And Bashash 2018 did not control for the effects of air
24  pollution; correct?
25  A.   Correct.
```

HU - CROSS / ADKINS

1  Q.   And Bashash 2018 did not control for nutritional factors;

2  correct?

3  A.   Correct.

4  Q.   Okay.  So let's turn to the results of Bashash 2018.  Now,

5  you used two assessments of ADHD-like behaviors; correct?

6  A.   Yes.

7  Q.   One assessment was the Conners' Rating Scales - Revised,

8  which I will say is CRS-R.  Okay?

9  A.   Yes.

10 Q.   Now, is it accurate that one of the assessments was CRS-R?

11 A.   Yes.

12 Q.   There were seven measures assessed using the CRS-R;

13 correct?

14 A.   I'll have to refresh my memory.

15 Q.   Would it help if I showed you Bashash 2018, Dr. Hu?

16 A.   Sure.

17 Q.   Okay.

18        MR. ADKINS:  Mr. Hambrick, would you please put up

19 U-08?

20     And, Your Honor, this is Mr. Hu's -- Dr. Hu's deposition

21 Exhibit 343.

22     Now, please show the witness Table 2 on Page 663.

23     (Document displayed.)

24 BY MR. ADKINS

25 Q.   Do you see that, Dr. Hu?

**HU - CROSS / ADKINS**

1    A.    Yes.

2    Q.    Okay.  So I will reask the question.  There were seven

3    measures assessed using the CRS-R scales; correct?

4    A.    Well, these are seven measures that were analyzed and

5    presented in this table, and we gave a specific rationale for

6    that in the methods.

7    Q.    So there were seven measures that were reported in Bashash

8    2018; correct?

9    A.    That's correct.

10   Q.    The CRS-R assessments were completed by the children or

11   the offspring's mothers; correct?

12   A.    Yes.

13   Q.    And reports by their teachers were not used in the CRS-R

14   assessment; correct?

15   A.    Too difficult to obtain in Mexico.

16   Q.    And so they were not used; correct?

17   A.    Correct.

18   Q.    You agree that there can be variation between parent

19   reports and teacher reports in the CRS-R scales; correct?

20   A.    Yes.

21   Q.    And so let's talk about the second measurement, the

22   Conners' Continuous Performance Test - II.  That's the second

23   assessment that Bashash 2018 reported; correct?

24   A.    Yes.

25   Q.    Okay.  And I'll refer to that as CPT II; do you understand

HU - CROSS / ADKINS

1    that?

2    **A.**    Yes.

3    **Q.**    The CPT II was a computer administered test; correct?

4    **A.**    Correct.

5    **Q.**    And the children who completed the CPT II assessment on a

6    computer, they completed this test on a computer during

7    follow-up visits to the clinic; correct?

8    **A.**    Correct.

9    **Q.**    Now, Bashash 2018 found significant associations between

10   maternal urinary fluoride and parent endorsed symptoms for four

11   of the seven measures in the CRS assessment that Bashash 2018

12   reported; correct?

13   **A.**    Correct.

14   **Q.**    And for all the other measures used there were no

15   significant associations found; correct?

16   **A.**    Not that I recall.

17   **Q.**    And Bashash 2018 did not find a significant association

18   for any of the CPT II assessment scores; correct?

19   **A.**    Correct.

20   **Q.**    Bashash 2018 concluded, among other things, that

21   replication of these findings in other populations was

22   warranted; correct?

23   **A.**    Yes.

24   **Q.**    Okay.  You can set that aside, Dr. Hu.  Thank you.

25        Now, in your declaration you stated that the maternal

HU - CROSS / ADKINS

 1  urinary fluoride values in Christine Till's 2018 paper

 2  regarding the MIREC cohort are similar to the levels in the

 3  participants studied in the ELEMENT cohort; correct?

 4  A.   Yes.

 5  Q.   You also stated in your declaration that both the Mexico

 6  City and Canada populations were receiving, quote, optimal, end

 7  quote, levels of fluoride through fluoridation programs; salt

 8  fluoridation in Mexico City, water fluoridation in Canada,

 9  correct?

10  A.   Yes.  I mean, that's optimal based on the planners who

11  added fluoride to either water or food.

12  Q.   Well, you stated in your declaration that it was a

13  reasonable first order expectation that populations living in

14  salt fluoridation and water fluoridated areas will receive

15  similar doses of fluoride; correct?

16  A.   Yes.

17  Q.   Now, a reasonable first order expectation, that's another

18  way to say you were making an assumption; correct?

19  A.   I guess you could say that.  I mean, again, both the

20  public -- the dental public health authorities in the U.S. and

21  Mexico were aiming for the same goal; that is, a certain level

22  of fluoridation to protect from cavities.

23       So, you know, I think it's an expectation that they have

24  done their job and the required amount of fluoride was

25  provided.

HU - CROSS / ADKINS

1    Q.    Now, the primary exposure in Mexico City is by fluoridated

2    salt; correct?

3    A.    Correct.

4    Q.    The individuals who participated in the ELEMENT project

5    were also exposed to varying degrees of naturally occurring

6    fluoride; correct?

7    A.    That would be the assumption; right.

8    Q.    And that was through fluoridated water; correct?

9    A.    No.  Like I said, water is not fluoridated in Mexico.

10   This would be from things like toothpaste or, I don't know,

11   other sources of water.

12   Q.    Okay.  So why don't -- I'm going to show you what you and

13   your coauthor said in Bashash 2017.

14         MR. ADKINS:  Mr. Hambrick, can you please pull up

15   U-07?  And this is from Dr. Hu's deposition, Exhibit 342.

16      (Document displayed.)

17   BY MR. ADKINS

18   Q.    On Page 2 under "Exposure Assessment," I'd like to read

19   these sentences into the record.

20         THE COURT:  Is this already in the record, this

21   exhibit?

22         MR. WATERS:  No, Your Honor.

23         THE COURT:  All right.  Go ahead.

24         MR. WATERS:  We'll object to this on hearsay, but we

25   also ask that the witness be able to respond to this statement,

HU - CROSS / ADKINS

```
 1   because I think there is updated data.

 2           THE COURT:  All right.  Go ahead and read it.

 3   BY MR. ADKINS

 4   Q.  (As read:)

 5           "By virtue of living in Mexico, individuals

 6       participating in the study have been exposed to

 7       fluoridated salt at 250 ppm" -- and then there is a

 8       citation -- "and to varying degrees of naturally

 9       occurring fluoride in drinking water.  Previous

10       reports, based on samples sizes from different urban

11       and rural areas, indicate that natural water fluoride

12       levels in Mexico City may range from .15 to

13       1.38 milligrams per liter."

14       Did I read that correctly, Dr. Hu?

15   A.  Yes.

16   Q.  Okay.  So fluoride content is not reported as part of the

17   water control -- water quality programs in Mexico; correct?

18   A.  Right.

19   Q.  And based on what I just read, the studies that have

20   sampled water have found that natural water fluoride levels in

21   Mexico City's may range from .15 to 1.38 milligrams per liter;

22   correct?

23   A.  Right.

24   Q.  Now, you've also published another study called -- under

25   the name Canterol 2019; correct?
```

HU - CROSS / ADKINS

1    A.   Right.

2    Q.   And that study found average concentration of fluoride in

3    tap water in Mexico City was about 1.6 -- .16 milligrams per

4    liter; correct?

5    A.   I don't have that study in front of me, but I can trust

6    you.  If you want to bring it up, I could look at it.

7    Q.   Okay.  I'd like to read from the witness's deposition,

8    Page 202, Lines 5 through 10.

9             THE COURT:  Any objection?

10            MR. CONNETT:  Give us one second, Your Honor.

11        (Brief pause.)

12            MR. CONNETT:  What were the lines?

13            MR. ADKINS:  Page 202 Lines 5 through 10.

14            MR. CONNETT:  No objection.

15            THE COURT:  All right.

16        (Document displayed.)

17   BY MR. ADKINS

18   Q.   For clarity in the record, this portion of the deposition

19   transcript was examination by Mr. Connett.

20            "QUESTION:  And the average concentration of fluoride

21        in tap water is 16 micrograms per hundred grams?

22            "ANSWER:  Yes."

23        Does that refresh your recollection at all, Dr. Hu?

24   A.   Yes.  And now I just brought up on my own computer the

25   Canterol, et al paper that we published.  And, yes, that

1   comports with our -- our reporting of the level of fluoride in

2   tap water samples that are listed in Table 1.

3              **THE COURT:**  Hold on for a second.  This is in Mexico

4   City?

5              **THE WITNESS:**  Yes.

6              **THE COURT:**  Okay.  Thank you.

7   **BY MR. ADKINS**

8   **Q.**   Now, the foods and water that were analyzed in Canterol,

9   they were -- they were analyzed after recruitment for the

10  ELEMENT cohort; correct?

11  **A.**   That's correct.

12  **Q.**   And you don't have a thought on what the actual exposures

13  were from water for the ELEMENT cohort participants; correct?

14  **A.**   No.

15  **Q.**   Now, data regarding the source of fluoride exposure for

16  the ELEMENT birth cohorts, it wasn't available during the time

17  of the Thomas and Bashash studies; correct?

18  **A.**   Fluoridated water, did you say?

19  **Q.**   No.  From the source of fluoride exposure to the ELEMENT

20  participants, that data was not available during the Thomas and

21  Bashash studies; correct?

22  **A.**   Correct.

23  **Q.**   Without data regarding source of fluoride exposure, one

24  cannot do a complete exposure assessment.  Do you agree with

25  that, Dr. Hu?

HU - CROSS / ADKINS

 1   **A.**   Well, it depends what the goal is.  If the exposure

 2   assessment is what is an individual's dose of fluoride, we did

 3   a biomarker study.  That answers that question.

 4       If the question is what are the sources of exposure, I

 5   think you might have been referring to a source, a portion of

 6   the assessment, then, no, we can't.

 7   **Q.**   And in your opinion, maternal urinary fluoride values are

 8   a biomarker that integrates exposure from multiple fluoride

 9   sources; correct?

10   **A.**   Correct.

11   **Q.**   Also, in your view there is little reason to consider lack

12   of information regarding source as a limitation when comparing

13   neurodevelopmental studies; correct?

14   **A.**   Correct.

15   **Q.**   And you're not aware of any studies that have looked at

16   whether the absorption rate of fluoride in the body differs by

17   source; correct?

18   **A.**   I haven't looked at that literature, so I defer.  I don't

19   know.

20   **Q.**   So sitting here today, you're not aware of any studies

21   that look at that; correct?

22   **A.**   Correct.

23   **Q.**   You agree that we cannot estimate what fluoride intake is

24   for the participants based only on their spot urine samples;

25   correct?

1    A.    Correct.

2    Q.    And part of the reason for that is because information

3    regarding absorption rates of fluoride is unknown; correct?

4    A.    I don't know if it's unknown to the scientific world, but,

5    I mean, that's not a subject I've looked at personally.

6    Q.    So you agree that whether the source of exposure from

7    fluoride is from food or water or some other source, it could

8    also impact the concentration observed in a spot urine sample;

9    correct?

10   A.    Can you say that question again?

11   Q.    You would agree that whether the source of fluoride

12   exposure is from salt or water or some other source could

13   affect the concentration of fluoride observed in a spot urine

14   sample; correct?

15   A.    I guess that would be true, yes.

16   Q.    And so if a concentration of fluoride was consumed by a

17   test subject by salt and the same concentration was consumed by

18   an identical test subject by water, all else being equal, you

19   don't know whether the spot urine sample would reflect the same

20   amount of fluoride; correct?

21   A.    Well, since you're comparing, you know, concentration in a

22   solid with a concentration in a liquid, it's really like

23   comparing apples and oranges.  So you can't really make that

24   kind of comparison.

25   Q.    Now, til 2018 the MIREC cohort study analyzed urine

1    samples collected during all three trimesters for over 1500

2    pregnant women; correct?

3    **A.**    Yes.   That's what I recall.

4    **Q.**    And compare that with the Thomas 2016 study, which had 71

5    participants who provided fluoride -- urine samples for all

6    three trimesters; correct?

7    **A.**    Which Thomas study are you referring to?

8    **Q.**    The Thomas 2016 study.

9    **A.**    You mean, her thesis?

10   **Q.**    No.   This is Thomas 2016 publication.

11   **A.**    Environmental research?   I -- we had a pretty large sample

12   size.   But are you referring to just women who had all three

13   trimester samples?

14   **Q.**    Who had all three trimesters; correct.

15   **A.**    That might be true.   I'd have to look at the paper to

16   refresh my memory about the exact count.   But I can go ahead

17   and trust you again.

18          **MR. ADKINS:**   Mr. Hambrick, could you please show the

19   witness U-04.   This is his deposition, Exhibit 339.

20      Can you please show the witness Section 3 "Results" on

21   Page 491, the second paragraph beginning "The number of

22   mothers."

23      (Document displayed)

24          **THE WITNESS:**   Can you blow that up?

25          **MR. ADKINS:**   We're trying to.

1          (Document enlarged))

2    **A.**    Okay.  Thank you.

3    **BY MR. ADKINS**

4    **Q.**    Okay.  So only 71 participants in the Thomas 2016 study

5    provided urine samples for all three trimesters of pregnancy;

6    correct?

7    **A.**    And for whom we had creatinine-adjusted values.  If you

8    read that sentence, it says we actually had 184 measures, but

9    of those only 71 had the data of creatinine for the creatinine

10   adjustment.

11   **Q.**    Okay.  Well, you've reported a mean adjusted urinary

12   fluoride value in your declaration, and that was based on the

13   71 participants and the others who had urine creatinine

14   adjusted samples; correct?

15   **A.**    Umm...

16   **Q.**    I'll strike the question.

17        Put another way, when you reported the mean urinary

18   fluoride value from the Thomas 2016 study in your declaration,

19   that value consisted of 71 participants who had provided urine

20   samples for all three trimesters; correct?

21   **A.**    I don't recall.  I frankly don't recall.

22   **Q.**    Okay.  I'd like to show the witness Page 152, Lines 6

23   through 11, of his deposition transcript.

24            **THE COURT:**  Any objection?

25            **MR. CONNETT:**  One moment, Your Honor.  What was the

HU - CROSS / ADKINS

1    page number again?

2              MR. WATERS:  152.

3              MR. CONNETT:  And the lines?

4              MR. ADKINS:  6 through 11.

5              MR. CONNETT:  No objection.

6         (Document displayed.)

7    BY MR. ADKINS

8    Q.   (As read:)

9         "QUESTION:  Okay.  Till 2018 analyzed fluoride levels

10        in urine samples collected during all three trimesters

11        from over 1500 pregnant women; whereas, only 71

12        participants in Thomas 2016 provided urine samples for

13        all three stages of pregnancy; correct?

14        "ANSWER:  Correct."

15        Dr. Hu, do you agree that Till's collection methodology

16   was more complete than the ELEMENT birth cohort; correct?

17   A.   Yes.

18   Q.   And in formulating your opinion in comparing the element

19   in the MIREC studies, you're not troubled by differences from

20   Tills using a second void sample collection methodology and the

21   methodology used in the Thomas study; correct?

22   A.   Troubled?  No.

23   Q.   And both studies used a creatinine adjustment methodology;

24   correct?

25   A.   Yes.

1   Q.   And in formulating your opinion that the fluoride values

2   from the ELEMENT studies are comparable to 2018 -- Till 2018,

3   you did not compare the average creatinine values across those

4   two studies; correct?

5   A.   The average creatinine values?  You mean, the

6   concentration of creatinine in urine, or total creatinine, or

7   what?

8           MR. ADKINS:  Mr. Hambrick, could you please show the

9   witness U.S. declaration one?

10      (Document displayed.)

11          MR. ADKINS:  I didn't mean declaration.  I'm sorry,

12  demonstrative one.

13      (Document displayed.)

14  BY MR. ADKINS

15  Q.   Okay.  I mean, the MUC average in this formula.  You

16  didn't compare those values across the Till and the ELEMENT

17  studies; correct?

18  A.   I'm -- I don't recall if I did or not, but I -- you know,

19  I certainly didn't publish anything about it.

20  Q.   And you didn't consider differences in the age of the

21  mothers who provided samples in the two studies; correct?

22  A.   I think we noted the ages, but we didn't comment on them.

23  Q.   And you agree that age could have an effect on the

24  secretion of fluoride in urine of pregnant mothers; correct?

25  A.   Age would have -- say that again?  I'm sorry, counselor.

HU - CROSS / ADKINS

1   Q.   You agree that age could have an effect on the secretion

2   of fluoride in the urine of pregnant mothers; correct?

3   A.   Fluoride?  I'm not sure fluoride is actively secreted by

4   the kidneys.  I think it's just a passive diffusion, frankly.

5   I'm not sure how to answer your question.

6   Q.   Okay.  Well, do you agree that age probably has an effect

7   on the secretion of creatinine in the urine of pregnant

8   mothers?

9   A.   Somewhat agree.

10  Q.   And you agree that differences in creatinine secretion by

11  maternal age might be a factor that you would want to consider

12  when comparing populations; correct?

13       (Brief pause.)

14  Q.   You agree that differences in creating secretion by

15  maternal age might be a factor that you would want to consider

16  when comparing populations; correct?

17  A.   I think that any differences in creatinine secretion in

18  pregnant women of the net -- fairly narrow age ranges between

19  Mexico and Canada would be probably very similar.

20  Q.   But you didn't consider those differences; correct?

21  A.   No.

22  Q.   And you didn't --

23       THE COURT:  Hold on a second.  We're at the noon

24  hour, so I do have to recess at this point.

25       I'll let you ask a final question before we go on to

```
 1   tomorrow.

 2   BY MR. ADKINS

 3   Q.   Dr. Hu, you didn't consider differences in pre-pregnancy

 4   body mass index; correct?

 5   A.   In terms of?

 6   Q.   When comparing the MIREC cohort with the ELEMENT cohort.

 7   A.   We did not.

 8              MR. ADKINS:  Okay.

 9              THE COURT:  All right.

10              MR. ADKINS:  Actually, I have no further questions,

11   Your Honor.  That's the end of my cross examination.

12              THE COURT:  Okay.  Great.  Good timing.

13        All right.  Thank you everyone.

14        I hate to drag you back, Dr. Hu, but I think attorneys for

15   the plaintiff may have some further questions for you.  Are you

16   available tomorrow?

17              THE WITNESS:  Tomorrow?

18              THE COURT:  Yeah.

19              THE WITNESS:  What time?

20              THE COURT:  Well, we were going to resume at the same

21   time, at 8:00 o'clock.  And I know that the plaintiffs have

22   another witness.

23        Let me ask plaintiff's counsel.  What is your plan at this

24   point?

25              MR. CONNETT:  Your Honor, at this point, since we
```

1  don't expect many follow-up questions for Dr. Hu, we would

2  anticipate calling Dr. Hu first thing in the morning --

3         **THE COURT:**  I'm sorry.  Somebody shuffled papers.  I

4  didn't hear your comment.  Say it again.

5         **MR. CONNETT:**  Our anticipation would be to call

6  Dr. Hu first thing in the morning, tomorrow at 8:00 a.m., if he

7  is available.

8         **THE COURT:**  All right.  Are you available, Dr. Hu?  I

9  hate to impinge on your schedule, but...

10        **THE WITNESS:**  Hold on a second.

11     (Brief pause.)

12        **THE WITNESS:**  I will make myself available.

13        **THE COURT:**  Well, we appreciate that.  Hopefully,

14  this won't be long.

15     So why don't we resume tomorrow 8:00 o'clock sharp and

16  we'll complete your testimony, Dr. Hu, and then we'll go on to

17  the plaintiff's next witness.  All right?

18        **THE WITNESS:**  Thank you for the opportunity.

19        **THE COURT:**  Great.  Thank you.  Thank you everyone.

20  Somewhere.

21        **MS. CARFORA:**  Thank you, Your Honor.

22        **THE CLERK:**  Court is adjourned.

23     (Whereupon at 12:01 p.m. further proceedings were

24        adjourned until Tuesday, June 9, 2020 at 8:00 a.m.)

25

**I N D E X**

MONDAY, JUNE 8, 2020 - Volume 1

|  | PAGE | VOL. |
|---|---|---|
| Opening Statement by Mr. Connett | 7 | 1 |
| Opening Statement by Mr. Do | 24 | 1 |

- - -

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|

**DONOHUE, JOYCE**
VIDEOTAPED TESTIMONY                          40    1

**HU, HOWARD**
(SWORN)                                       44    1
Direct Examination by Mr. Waters              44    1
Cross-Examination by Mr. Adkins               86    1

- - -

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, June 8, 2020