Volume 2

Pages 134 - 325

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

FOOD & WATER WATCH, INC., et al,  )
                                   )
                                   )
            Plaintiffs,            )
                                   )
   vs.                             ) No. C 17-2162 EMC
                                   )
U.S. ENVIRONMENTAL PROTECTION      )
AGENCY, et al,                     )
                                   )  San Francisco, California
            Defendants.            )  Tuesday
                                   )  June 9, 2020
_____)  8:00 a.m.

### TRANSCRIPT OF REMOTE ZOOM BENCH TRIAL PROCEEDINGS

**APPEARANCES**:

**For Plaintiffs:**           WATERS KRAUS & PAUL
                              222 North Pacific Coast Highway
                              Suite 1900
                              El Segundo, California 90245
                        BY:   **MICHAEL P. CONNETT, ESQ.**
                              **CHARLES ANDREW WATERS, ESQ.**


                              WATERS & KRAUS LLP
                              3141 Hood Street
                              Suite 700
                              Dallas, Texas 75219
                        By:   **KAY GUNDERSON REEVES, ESQ.**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

**For Plaintiffs:**          NIDEL AND NACE, PLLC
                             5335 Wisconsin Avenue, NW
                             Suite 440
                             Washington, DC 20015
             BY:  **CHRISTOPHER THOMAS NIDEL, ESQ.**


**For Defendants:**          U.S. DEPARTMENT OF JUSTICE
                             Environmental Defense Section
                             601 D Street, NW
                             Room 8814
                             Washington, DC 20004
             BY:  **DEBRA J. CARFORA, ESQ.**


                             U.S. DEPARTMENT OF JUSTICE
                             Environment & Natural Resources Div.
                             P.O. Box 7611
                             Washington, DC 20044
             BY:  **BRANDON N. ADKINS. ESQ.**
                  **SIMI BHAT, ESQ.**
                  **JOHN THOMAS H. DO, ESQ.**

                          _   _   _

PROCEEDINGS

<u>**P R O C E E D I N G S**</u>

| | |
|---|---|
1 | 
2 | **JUNE 9, 2020**                                                8:02 A.M.
3 | ---oOo---
4 |       **THE CLERK:**  Court is now in session.  The Honorable
5 | Edward M. Chen is presiding.  Calling Civil Action 17-2162,
6 | Food & Water Watch versus Environmental Protection Agency.
7 |    Counsel, please state your appearances for the record.
8 |       **MR. WATERS:**  Andy Waters and Michael Connett for the
9 | plaintiffs.
10 |       **THE COURT:**  All right.  Good morning, Mr. Waters.
11 |       **MR. WATERS:**  Good morning.
12 |       **MR. NIDEL:**  Chris Nidel on behalf of the plaintiffs.
13 |       **THE COURT:**  All right.  Thank you, Mr. Nidel.
14 |       **MS. CARFORA:**  Good morning, Your Honor.  Debra
15 | Carfora from DOJ on behalf of EPA.
16 |       **THE COURT:**  All right.  Good morning, Ms. Carfora.
17 |       **MR. ADKINS:**  Good morning, Your Honor.  Brandon
18 | Adkins of the Department of Justice for EPA.
19 |       **THE COURT:**  All right.  Good morning, Mr. Adkins.
20 |       **MS. BHAT:**  Good morning, Your Honor.  Simi Bhat for
21 | EPA.
22 |       **THE COURT:**  Good morning, Ms. Bhat.
23 |       **MR. DO:**  Good morning, Your Honor.  John Do with the
24 | Justice Department for EPA.
25 |       **THE COURT:**  Good morning Mr. Do.

PROCEEDINGS

 1          THE CLERK:  Your Honor, we have one more to state an

 2   appearance.

 3       (Brief pause.)

 4          THE CLERK:  Ms. Reeves.

 5          MS. REEVES:  Yes, hi.  I'm sorry.  I am here this

 6   morning.  Thank you.

 7          MR. CONNETT:  Your Honor, it looks like we have now

 8   encountered another -- a technical issue here which we want to

 9   bring to your attention.

10       Dr. Hu, apparently, he has been unable -- the Zoom link

11   was not working for him this morning.  I just sent an email to

12   the court with his email address.  If a direct email could be

13   sent to him, I think it might work.

14          THE CLERK:  It was.  It was just sent.

15          MR. ADKINS:  Okay.

16          THE COURT:  Does that also have the I.D., meeting

17   I.D. number and password in case he wants to do it manually?

18   He can always join that way, I guess.

19          THE CLERK:  Yes, Your Honor.  He was sent an

20   invitation just a few minutes ago.

21          THE COURT:  All right.  We'll need to watch out in

22   case he comes in as an attendee.  Sometimes that happens, and

23   we have to then move him over.

24          MR. ADKINS:  I think I made a mistake with the email.

25   Its UW.edu at the end.

**PROCEEDINGS**

1        **MS. CARFORA:**  Your Honor, I have one housekeeping

2  matter, if now is a good time since we're waiting.

3        **THE COURT:**  Go ahead.

4        **MS. CARFORA:**  Your Honor, we would like to voir dire

5  Dr. Grandjean before he gives any opinion testimony, and I just

6  wanted to know how the Court wanted to handle that.

7        **THE COURT:**  Is this on a *Daubert* basis or what's the

8  purpose of the voir dire?

9        **MS. CARFORA:**  It is a *Daubert* basis on two

10  methodologies that he asserted in his trial declaration.

11        **MR. CONNETT:**  Your Honor, we think that that kind of

12  voir dire can be done on their cross.

13      I think it's appropriate for us to lay the foundation for

14  Dr. Grandjean on direct.  They will have all the opportunity

15  they want to ask any questions they want in their cross.

16        **THE COURT:**  Yeah.  Again, if this were a jury trial

17  and we're trying to prevent the jury from hearing an

18  appropriate testimony or unqualified testimony, that would be

19  one thing.  We would have to handle that gatekeeping function

20  up front.  But given the nature of this trial, being a bench

21  trial, you can always make a *Daubert* motion based on your

22  cross.

23      I don't see a need to break things up.  And you can make

24  your motion at any time.  I have the ability to weigh.  And if

25  I grant the motion, I will disregard any testimony that doesn't

PROCEEDINGS

1  pass the *Daubert* screen.

2          **MS. CARFORA:**  Okay.  And one point of clarification I

3  would offer for the Court is that right now I think we have

4  almost three hours set aside for Dr. Grandjean.  And I think

5  that if I can be permitted 30 minutes to voir dire, we may be

6  able to save two-and-a-half hours of trial time.

7          **MR. CONNETT:**  Your Honor, that doesn't change the

8  assessment at all from her vantage point.

9          **THE COURT:**  I don't -- I've read his declaration,

10  first of all.  So in terms of prejudice or effect of hearing

11  something, I mean, that's water under the bridge.

12      In terms of saving time, I -- I think we should just go

13  forward and do it in the normal course of things, probably

14  because we've got to make a record for appeal and rather than

15  doing this by proffer or something else, you know.

16      I mean, in your cross you could -- that could be the first

17  thing.  You could make a motion early in your cross.  If you

18  were talking about saving all your cross time, you could do

19  that.

20          **MS. CARFORA:**  Okay.

21          **THE COURT:**  What I didn't want to do is take things

22  out of order frankly.

23          **MS. CARFORA:**  Thank you, Your Honor.

24          **THE COURT:**  Yeah.

25      Did we get the email back to Dr. Hu, Angie?

PROCEEDINGS

1    **THE CLERK:**  Yes, Your Honor.  We did.

2    **THE COURT:**  Okay.  And that has the --

3    **THE CLERK:**  It has everything in it.

4    **THE COURT:**  Okay.  We'll give him a couple minutes.

5    How long do you think you'll have on redirect,

6    Mr. Connett?

7    **MR. WATERS:**  Your Honor, I think approximately 10 to

8    15 minutes, somewhere in that range.

9    **THE COURT:**  Okay.  And then Mr. Grandjean is ready to

10   proceed?

11   **MR. CONNETT:**  Yes, Your Honor.  He is ready now.  To

12   the extent that we -- you know, Dr. Hu is not able to connect

13   now, one option might be to proceed with Dr. Grandjean, but

14   hopefully Dr. Hu will be able.

15   **THE COURT:**  Okay.  Well, why don't we give him a

16   couple of minutes and see if we can do that.

17   If he can't, we can proceed with Dr. Grandjean and then --

18   you know, it's not that hard to interrupt, find some point

19   there.  When Dr. Hu is available, we can insert him back in.

20   But obviously it would be better if we can get him on now.

21   So do you know if he responded, Angie?  Did he get your

22   email?

23   **THE CLERK:**  I sent the invitation.  It does not tell

24   me whether or not he received it.

25   **THE COURT:**  All right.  Mr. Connett, do you want to

PROCEEDINGS

1   just give him a call and see whether or not he got it?

2          **MR. CONNETT:**  Yes, Your Honor.  I'll go give him a

3   call right now.

4          **THE COURT:**  I will say, this is -- from where I sit

5   anyway, the Zoom trial, though not as good as in-live event, is

6   fairly effective.  I think, you know, with the ability, you

7   share a screen and everything else.

8       The harder part, frankly, for me is I've got now the

9   exhibits spread out through three different files:  In Box.com,

10  in one drive, and on my hard drive.  Sometimes it's not all in

11  one place.

12      And it would be useful, by the way, when you're using an

13  exhibit in your direct or your cross to just make sure you

14  identify where it is, whether it is an exhibit.  Because some

15  of these things are not exhibits; and things that are, make

16  sure we know where that is.

17         **MS. CARFORA:**  So for clarification for you, Your

18  Honor, what we have been doing is when we share a witness

19  binder with plaintiff's counsel, we also upload it to Box.com.

20  So you do have a version.  Even though it's not admitted Trial

21  Exhibits, you should have a version in Box.com of everything we

22  shared with plaintiff's counsel in preparation for the witness.

23  And those go up every evening prior to the witness appearing.

24         **THE COURT:**  All right.  So I'm seeing witness

25  binders.  And we're in the plaintiff's case.  And so for

PROCEEDINGS

1   Dr. Hu, there wasn't much there. I mean, there were five things

2   in there, maybe six.

3       I see now there is the demonstratives.  I didn't see that

4   yesterday.

5       All right.  Well, that's very helpful.  I can just stay

6   with Box.com and go by witness then.

7           **MS. CARFORA:**  Yes, Your Honor.

8           **THE COURT:**  All right.  Good.  I won't be scrambling

9   around looking for five different things.

10      (Brief pause.)

11          **THE COURT:**  Are you all able, when we have screen

12  shared, to manipulate the view of the speakers?  Move it over

13  so it doesn't obscure and all that kind of stuff?  You can

14  change it to panel, to single, to speaker?

15      Good.

16          **MR. WATERS:**  Getting better, Judge.  Slowly, but

17  surely.

18      Mr. Connett has just returned.

19          **THE COURT:**  Okay.

20          **MR. WATERS:**  What do you know?

21          **MR. CONNETT:**  Your Honor, we do have an update.  This

22  is officially, I think, our first significant technical snafu

23  of this trial.

24      It looks like Dr. Hu has a VPN connection that was

25  activated this morning.  He thinks it is interfering with his

PROCEEDINGS

1  ability to connect to Zoom.  So he is working to resolve this

2  right now.  He will contact us as soon as he does.

3      But we are ready to proceed with Dr. Grandjean.  So our

4  suggestion would be we can proceed with Dr. Grandjean now.  And

5  whatever Your Honor's preference is, we can stop when Dr. Hu is

6  ready and finish with Dr. Hu, or Dr. Hu has stated he's

7  available first thing in the morning tomorrow as well.

8          **THE COURT:**  All right.  Well, maybe we should just --

9  if that's easier for him and he has more time to make sure he

10  can get past his VPN problem, we should just go ahead and do

11  Dr. Grandjean today, because it's going to take the bulk of the

12  day; right?

13          **MR. CONNETT:**  I think it will take at least the

14  better part of the morning, Your Honor.

15          **THE COURT:**  Okay.

16          **MR. CONNETT:**  And, Your Honor, on a note of levity a

17  little bit.  I was informed yesterday that my hair is a tad

18  long.  And I just -- it is in normal course of business, I do

19  make -- you know, I do get a hair cut in time for a trial.

20      And I -- and I -- it was also brought to my attention

21  yesterday that the -- that the barber shops are now open in

22  L.A., and I did not realize that.

23      So I just wanted to really emphasize to the Court that I

24  mean no disrespect by having longer hair than I normally would

25  in a trial.

**PROCEEDINGS**

1    **THE COURT:**  Well, you're not the only one out there.

2    You know, you turn on the TV and you see this.  So it's -- I

3    did notice that.  I noticed that partly because, I have to say,

4    of all the cameras yours is the highest resolution.  It's

5    interesting.  I have a very large monitor.  I have a 32-inch

6    high definition monitor.  I'm looking at all you guys.  And

7    when it blows up, I can see very fine details.  Your camera is

8    better than mine.  I can tell you that.  I don't know what it

9    is, but it's a very high definition, almost broadcast quality,

10   so...

11          **MR. CONNETT:**  Maybe it's the wrong sometime for us to

12   get a high resolution camera.

13          **THE COURT:**  Well, and I'll tell you.  It's actually

14   interesting because when you do speaker view and you see the

15   whole person, I'm seeing witnesses in better view than I do in

16   the courtroom.  I mean, in the courtroom I'm on the side.  I

17   can't really see.  There is stuff in the way half the time, and

18   maybe get a little body language.

19       But actually I get a pretty good view of the speaker.  So

20   I'm kind of enjoying this myself.  So you might warn your

21   witnesses that I'm looking at them very closely.

22          **MR. CONNETT:**  Thank you, Your Honor.

23          **THE COURT:**  So you do want to go ahead and call

24   Mr. Grandjean then?

25          **MR. CONNETT:**  Yes.  At this time, Your Honor,

```
 1    plaintiffs call Dr. Phillippe Grandjean.

 2              THE COURT:  All right.  He needs to be promoted then.

 3              THE CLERK:  I don't see a raised hand.

 4              THE COURT:  There it is.

 5         (Brief pause.)

 6              THE COURT:  All right.  We can see Dr. Grandjean.

 7    Good morning.

 8              THE WITNESS:  Good morning.  Is my hair okay?

 9              THE COURT:  Great.  Looks great.

10         All right.  Okay.  Why don't you swear the witness, Angie?

11              THE CLERK:  Dr. Grandjean, place raise your right

12    hand.

13                        PHILLIPPE GRANDJEAN,

14    called as a witness for the Plaintiff, having been duly sworn,

15    testified as follows:

16              THE WITNESS:  I do.

17              THE CLERK:  Thank you.

18              THE WITNESS:  Thank you.

19                        DIRECT EXAMINATION

20    BY MR. CONNETT

21    Q.   Good evening, Dr. Grandjean.  I know you are in Denmark

22    now, so it's a bit later than it is here in California.

23         Dr. Grandjean, can you explain why you, as a medical

24    doctor, became an environmental epidemiologist?

25    A.   I was a bird watcher as a child, and I've always had a --
```

GRANDJEAN - DIRECT / CONNETT

```
 1  you know, an interest in nature.
 2       And when I graduated from medical school, I was inspired
 3  to do a PhD thesis on lead exposure because a big problem in
 4  the 1970's, and all over the world, was lead from leaded
 5  gasoline.
 6       And having done that, I was invited to come to New York
 7  City to work with Irving Selikoff, the father of asbestos
 8  disease, at Mount Sinai Hospital.  And I stayed there for two
 9  years and learned about asbestos, dioxin, lead of course.
10  Things that I never met at the medical school.
11       So I realized that there was a need for somebody to do
12  something about prevention rather than just diagnosing and
13  treating disease, and that became my call.
14  Q.   In your declaration I note that you have served as an
15  advisor on environmental health issues to the World Health
16  Organization, European Commission, Food and Drug
17  Administration, White House Office of Science And technology,
18  and other organizations.
19       Dr. Grandjean, have you also served as an expert advisor
20  to the United States Environmental Protection Agency?
21  A.   Yes, numerous times.  And, also, to the Department of
22  Justice.
23  Q.   And has the EPA ever given you research funding to
24  investigate the impact of environmental toxicants on human
25  health?
```

**GRANDJEAN - DIRECT  / CONNETT**

1  **A.**   Right.   They gave me a STAR grant to conduct a prospective

2  study of a birth cohort.

3  **Q.**   Now, in this case, EPA is represented by the U.S.

4  Department of Justice, and I suspect the DOJ attorneys will be

5  asking you some questions in a little bit.

6       Dr. Grandjean, have you ever been retained by the DOJ to

7  serve as an expert on environmental health issues?

8  **A.**   I have.   Twice actually.

9  **Q.**   So we are here today to talk about developmental

10  neurotoxicity.   What in your view are the two most

11  well-established developmental neurotoxicants in human beings?

12  **A.**   It's hard for me to select two because, as you can see

13  from the most recent *Lancet* article that we wrote, there are at

14  least 12 and I'd say the number is growing.

15       The traditional developmental new toxicant is lead.   And I

16  would like to say, because that's how I -- one of the issues

17  that I worked with EPA on.   So the other example could be

18  mercury.

19  **Q.**   Okay.   And has EPA established a reference dose for

20  mercury?

21  **A.**   Oh, yes, indeed.

22  **Q.**   And whose study did EPA base their reference dose on?

23  **A.**   It's embarrassing.   It's my own work.

24  **Q.**   And what kind of study did you conduct that EPA used for

25  its reference dose on mercury?

1  **A.**   Right.  This was a prospective study of children.  It was

2  a birth cohort, like the one that EPA awarded me a STAR grant

3  to continue.

4       So we looked at the mercury exposure prenatally.  And in

5  this case for mercury we analyzed the umbilical cord blood for

6  mercury, and then we followed up the children for -- actually,

7  the most recent follow-up was at age 28.

8       But the study that EPA used at the recommendation of the

9  National Academy of Sciences, the National Research Council,

10  was the seven-year examination of the children's cognitive

11  development in relation to the prenatal mercury exposure.

12  **Q.**   Where did you conduct that study?

13  **A.**   That was in the Faroe Islands.  It's a community.  It's a

14  nation between Iceland and Norway in the North Atlantic.

15  **Q.**   In EPA's discussions of your study, did EPA ever once

16  question the generalizability of your findings from the Faroe

17  Islands to the United States?

18  **A.**   No.  I believe that their assessment was that the study

19  that we were able to conduct in that community was superior to

20  a study that one could, you know, plan to do in the United

21  States.  We had much better participation of the children.

22  Like, 90 percent came in at seven years of age for a

23  reexamination.  It like -- I think the quality of the research

24  that we did was what EPA was after.

25  **Q.**   Dr. Grandjean, what is the Faroes Statement?

 1   **A.**   This was a consensus statement by major researchers from

 2   around the world who had come actually to the Faroe Islands

 3   because I called for a conference to see if there was agreement

 4   on issues related to prenatal programming and toxicity.  That

 5   is the early development where the organ functions are laid

 6   down, and actually also later life disease risks are laid down.

 7        And so I wanted to have a meeting where we could exchange

 8   information about nutritional deficiencies, environmental

 9   contaminants, occupational health issues; like, pregnant women

10   at work, issues like that.

11        And so the idea was proposed that we should summarize our

12   findings in a document, and that became the Faroes Statement.

13   **Q.**   And who sponsored the conference that gave rise to the

14   Faroes Statement?

15   **A.**   Well, this was -- we tried to get support to be able to

16   bring in all these great people.  So we -- we sent applications

17   to the U.S. EPA.  The EPA supported us.  The National

18   Institutes of Health.  We got from two of the institutes, the

19   World Health Organization, the European Commission.  I think

20   some others, too.  I mean, they should be mentioned in the

21   document, the published article.

22   **Q.**   Okay.  Well, I'm going to go ahead and put a document on

23   the screen.

24        (Document displayed)

25   **Q.**   And can you see that, Dr. Grandjean?

GRANDJEAN - DIRECT / CONNETT

 1   **A.**    Mm-hmm.

 2   **Q.**    What is --

 3   **A.**    Yes, I can.

 4   **Q.**    What are we looking at here?

 5   **A.**    Well, this is the published version of the Faroes

 6   Statement, the consensus report by -- and you can see the

 7   authorship here.  There is a fair number of Americans listed.

 8   Like, my colleague Philip Landrigan, who was Selikoff's

 9   successor at Mount Sinai Hospital in New York City.

10   **Q.**    And were some of these attendees from the National

11   Institutes of Health?

12   **A.**    Let me see.  Oh, yeah.  Terry Huang was -- he's on the

13   second line on the right.  He was from the National Institute

14   for Childhood Disease.  I think there's another one, too.

15   **Q.**    I'm going to point you to the first statement that we see

16   here in the Faroes Statement, and it reads:

17          "The periods of embryonic fetal and infant

18       development are remarkably susceptible to

19       environmental hazards."

20       Is this a well-accepted principle in the environmental

21   health field?

22   **A.**    It is.  And like we talked about before, lead is really

23   the key example of this, as is the evidence on the so-called

24   DOHaD phenomenon, Developmental Origins of Health And Disease.

25   That first came up as an issue following the studies of the

1    Dutch hunger winter.  That is during the Second World War when

2    there was widespread famine in the Netherlands.  And then when

3    the children, who were in the mother's womb during that famine,

4    when they were later followed up, it turned out that that

5    nutritional deficiency that they had suffered was translated

6    into certain disease risks, very marked and very significant

7    disease risks.

8        And the same experience has been seen, for example, with

9    mercury from Minamata disease because that was, again,

10   something that happened prenatally.

11   Q.    And, Dr. Grandjean, towards the bottom of this paragraph

12   that we see here on the first page, it says:

13           "The timing of exposure during early life has,

14        therefore, become a crucial factor to be considered in

15        toxicological assessments."

16       Is that also a well-accepted principle in the

17   environmental health field?

18   A.    It is.  Like Paracelsus said, the dose makes the poison.

19   So the dose is important.

20       But, likewise, the target organ is of importance.

21       And, thirdly, the timing of exposure.

22       So these are the three key factors when you want to do a

23   risk assessment for a particular toxicant.

24   Q.    Looking here at the second page of the Faroes Statement,

25   and this first highlighted piece says:

1            "The brain is particularly sensitive to toxic

2        exposures during development, which involves a complex

3        series of steps that must be completed in the right

4        sequence and at the right time.  Slight decrements in

5        brain function may have serious implications for

6        future social functioning and economic activities even

7        in the absence of mental retardation or obvious

8        disease".

9        Dr. Grandjean, is this also a well-accepted principle in

10   the environmental health field?

11            **MS. CARFORA:**  Objection.  Relevance.

12            **THE COURT:**  Overruled.

13   **A.**    It is a principle.  The fact is that the human brain is

14   the most advanced central nervous system in the animal world.

15   And because our brain is so complex, so advanced, it is also

16   incredibly vulnerable, because there are so many steps that

17   have to be completed in the right sequence and the right time

18   that you don't find in rats and cockroaches.

19        So this is why our brain functions are so vulnerable.

20   And, clearly, if we suffer IQ losses, for example, or we have

21   some learning disabilities, you know that will impact our

22   potentials of functioning in society and, also, playing a role

23   in -- and contributing to the economy of the society.  So --

24   well, I guess that's what I wanted to say.

25   **Q.**    Thank you.

1        I'm just looking here lastly under "Recommendations" in

2   the Faroes Statement.  It says:

3            "Studies on the aetiology of human disease need

4        to incorporate early development and characterize

5        appropriately the factors that determine organ

6        functions and subsequent disease risks.  Such

7        associations can best be examined in long-term

8        prospective studies, and existing and planned

9        pregnancy or birth cohorts should be utilized for this

10       purpose.

11       Dr. Grandjean, is this also a well-accepted principle in

12   the environmental health field?

13   **A.**   I believe so.  And I believe that I've seen similar

14   wording in -- in writings from the U.S. EPA.

15   **Q.**   So when did you first begin studying fluoride?

16   **A.**   Oh, that was -- after I had been at Mount Sinai for two

17   years, Selikoff sent to me -- he said:  When you go back to

18   Copenhagen, why don't you look at the cryolite factory?

19       I said:  The cryolite factory?

20       Yes, he said.  Because that was where the only Danish

21   occupational disease was discovered, fluoride poisoning.

22       So the workers in Copenhagen, they were purifying cryolite

23   oil from Greenland.  And because cryolite oil is an aluminum,

24   sodium, hexafluoride, and the dust obviously contained a lot of

25   fluoride, and the workers inhaling that dust got diseases.

1        And what was most apparent was the bone disease.  They

2   were concerned about pulmonary disease, like silicosis.  And so

3   they took X-rays of the chest, and it was like the -- the ribs

4   looked like marble.  And it -- well, that was how the bone

5   disease was discovered.

6        So Selikoff said:  Why don't you look and see if they have

7   any excess cancer or other courses of mortality?

8        And this is what I did.

9   **Q.**   So that would have been in the early 1980s?

10  **A.**   Right.  That was in the -- yeah, early 1980s.

11  **Q.**   Back then in the early 1980s, was there much discussion or

12  concern amongst public health researchers like yourself about

13  fluoride causing neurotoxicity?

14  **A.**   Not that I remember.

15  **Q.**   So I'm going to show another document here.

16       **MS. CARFORA:**  Your Honor, can we ask that Mr. Connett

17  just identify documents before he puts them on the screen and

18  shares them?

19       **THE COURT:**  Yes, do that.  If they are an exhibit,

20  you should identify it.  If they are not, you should let the

21  Court and counsel know where what it is.

22       **MR. CONNETT:**  Okay.  Yes, Your Honor.  This is not an

23  exhibit.  It is a document that we've put in the witness binder

24  and disclosed yesterday to counsel.  It is Dr. Grandjean's 2006

25  review in the *Lancet*.

1           **THE COURT:**  Okay.  So it is not in evidence?

2           **MR. CONNETT:**  No, it's not, Your Honor.

3           **THE COURT:**  Okay.

4       (Document displayed.)

5           **MS. CARFORA:**  Your Honor, we have no foundation for

6   this document at all right now.

7           **THE COURT:**  Well, I'll let him lay the foundation --

8   I'm not sure how you're going to use it either.  Is this --

9           **MR. CONNETT:**  Well, it's going to be brief, Your

10  Honor.

11  **BY MR. CONNETT**

12  **Q.**  Dr. Grandjean, can you just briefly describe,

13  Dr. Grandjean, what you did in this review that you published

14  in the *Lancet* in 2006?

15  **A.**  This is a document that I prepared with Professor Phil

16  Landrigan on developmental neurotoxicity.

17       The point is that I was working with the *Danish Medical*

18  *Journal*, and we had a joint meeting with the editor of the

19  *Lancet*.  I told him about my concern, that developmental

20  neurotoxicity was a very serious environmental health issue.

21       And the editor said:  Why don't you submit a manuscript

22  about this and we'll take a look?

23       And so I asked Dr. Landrigan if he might be willing to

24  coauthor this.  So we did a systematic search of compounds that

25  might affect brain development, and we ended up with five

GRANDJEAN - DIRECT  / CONNETT

1  different compounds that we thought were well documented.

2  **Q.**   And in this review, do you discuss fluoride?

3  **A.**   Yeah.  Fluoride didn't quite pass the bar at that point.

4  So we -- we had a section called "Emerging Neurotoxicants," I

5  believe it was called.

6  **Q.**   Okay.  Let's go ahead, and I'm going to show that section

7  and just ask you a few questions about it.

8  **A.**   Okay.

9      (Document displayed.)

10  **Q.**   So I'm looking here at the section that you wrote on

11  fluoride --

12          **MS. CARFORA:**  Your Honor, I object.  I'm not sure

13  that he -- to throw a document up here, I'm not sure for what

14  purpose he's using that.

15          **THE COURT:**  Yeah.  First of all, I'm going to sustain

16  the objection because this is not an exhibit.  And it's not

17  clear to me how this is being used.

18          **MR. CONNETT:**  Okay.

19  **BY MR. CONNETT**

20  **Q.**   Dr. Grandjean, in your 2006 review, you talked about --

21  did you identify fluoride as having -- as showing neurotoxicity

22  in animals?

23  **A.**   I did.

24  **Q.**   And at that time was your assessment consistent with the

25  assessment of the National Research Council?

1   **A.**   Right.  They came out the same year, but -- but I don't

2   think that I had -- I mean, I was a reviewer of the National

3   Academy document, but I don't think that I saw it in time to

4   consider it for my *Lancet* paper.

5   **Q.**   And in your 2006 review did you identify some

6   methodological limitations in the then available

7   epidemiological studies?

8   **A.**   Right.  Phil and I agreed on that; that the evidence at

9   the time was cross sectional and that we needed better

10  documentation in order to ascertain whether fluoride, inorganic

11  fluoride, was a human developmental neurotoxicant.

12  **Q.**   Okay.  And, Dr. Grandjean, in 2012 you published a study

13  on fluoride; is that correct?

14  **A.**   Right.  That was a systematic assessment, a systematic

15  review and meta analysis of the literature that was available

16  back then.

17  **Q.**   And was that also a meta analysis?

18  **A.**   Right.  That means that we sort of combined all of the

19  evidence from, I think, 27 different studies that had been

20  carried out, mainly in China.  And then we would look to see,

21  when we put all this together, what is the average effect of

22  fluoride, or as association what is the difference between low

23  fluoride, high fluoride in terms of IQ points.

24  **Q.**   And what was the average difference in IQ points between

25  the high fluoride areas and the control areas?

1   **A.**   Right.   Right.   The average was close to seven IQ points.

2   So, I mean, that's -- that's a very high number.   I mean, we

3   have to go back to the early lead studies to find something

4   that large.   So we were very concerned.

5   **Q.**   And you mentioned you reviewed 27 studies as part of that

6   meta analysis.   How does that compare to the number of studies

7   that the National Research Council had reviewed in its 2006

8   report?

9   **A.**   Oh, I think they had, like, three or four.   They had a

10   couple of articles.

11       The difference is that a young colleague, who became a

12   science doctor at Harvard, Anna Choi, was born in Hong Kong and

13   she spoke Cantonese.   And I had already met Professor Guifan

14   Sun, a professor of medicine at China Medical University, just

15   north of Beijing.

16       And Dr. Sun was also the chair of the government

17   commission on endemic disease.   And fluoride poisoning is an

18   endemic disease in China.   So we proposed to him to do a joint

19   study of, you know, all of the reports on fluoride toxicity,

20   neurotoxicity; that is, mental deficits, cognitive deficits in

21   children exposed during development.

22   **Q.**   And which journal published the meta analysis?

23   **A.**   That came out in the *Environmental Health Prospectives*,

24   the journal that the National Institutes of Health is

25   sponsoring.

**GRANDJEAN - DIRECT  / CONNETT**

1   **Q.**   How would you characterize the peer review that your meta

2   analysis underwent?

3   **A.**   Oh, that journal is very thorough.  It -- nothing comes

4   through without having often three external reviewers

5   dissecting the manuscript.  So we went through a thorough

6   review.

7   **Q.**   Now, in your meta analysis do you discuss some of the

8   methodological limitations that these studies from China had?

9   **A.**   Yes, we did.  And I must say we relied to a great extent

10  on Professor Sun and, of course, Anna Choi, who reads Chinese,

11  because they could look -- they could assess all of the

12  original reports as originally published in the Chinese

13  language and Chinese journals, which I couldn't.

14       Anyway, Professor Sun knew the occurrence of arsenic

15  exposure, lead exposure, iron deficiency.  So we relied both on

16  what the report says and, also, on Professor Sun's knowledge of

17  the communities around the country.

18       And so I must say we did a very thorough review of this

19  evidence that went way, way, way beyond what the National

20  Research Council did.

21  **Q.**   Now, what importance would you ascribe to the fact that

22  the vast bulk of the studies that you identified were recording

23  associations between elevated fluoride exposure and reduced IQ.

24             **MS. CARFORA:**  Objection.  Leading.

25             **THE COURT:**  Objection overruled.

1  **A.**    I think most of the studies, if not every one had one

2  deficit or another.  Mainly, because they were cross-sectional.

3       But -- but the advantage of the Chinese studies was that

4  they were conducted mostly in the countryside.  And fluoride

5  exposure was a new phenomenon in China after the, I think,

6  five-year plan that provided clean drinking water to the

7  population.  Unfortunately, that was by making wells, drilling

8  down to get groundwater where people could get

9  microbiologically safe water, but, unfortunately, many places

10 it was -- it contained excess fluoride from minerals in the

11 ground, in the soil.

12      And so this phenomenon was sort of slowly discovered and

13 then followed by a wealth of cross-sectional studies because

14 that was what could easily be done without much research

15 support.

16      But so when -- just about all of these studies showed that

17 there was a clear and often times statistically significant

18 association with lower IQ, that was to me very, very

19 convincing.  I mean, to do 27, albeit somewhat deficient

20 studies, but that they all reached that conclusion was

21 stunning.

22 **Q.**    And what -- in your declaration you talk about the

23 importance of the fact that in many of these studies you have

24 stable populations with stable water fluoride levels.  Why is

25 that important?

**GRANDJEAN - DIRECT  / CONNETT**

1   **A.**   Well, I mean, they were cross-sectional studies, and they

2   measured the fluoride in the water today, you know, at the time

3   of assessing the children's health.

4        And because -- in these communities the families had

5   stayed in the same community all the time.  And that means

6   that -- and some of the studies actually mentioned that.  They

7   say specifically these children have been exposed since

8   conception essentially.

9        And that means we're talking about cross-sectional studies

10  that are sort of semi-prospective, or you could say

11  retrospective because it's going back in time.

12       This is like a long-term exposure to high fluoride water.

13  It's not a matter of being as close to high fluoride water

14  currently, but a lifetime of developmental exposure to this

15  neurotoxicant.

16  **Q.**   Dr. Grandjean, are you familiar with the terms "hazard"

17  and "risk"?

18  **A.**   Right, right.  Our paper was essentially a hazard

19  assessment.  That is the potential for fluoride also at lower

20  exposures to cause neurotoxicity.

21       You would need a risk assessment that measured the exact

22  dose at the right time to conduct a proper risk assessment for

23  this hazard.

24  **Q.**   And can you define, Dr. Grandjean, what a hazard is versus

25  what a risk is?

1  **A.**   Well, I rely on the National Academy of Sciences, and EPA

2  does as well.   A hazard represents an environmental factor that

3  has the propensity of being able to cause some adverse effect.

4  So it -- it's not -- risk is really the degree that that effect

5  is actually happening at the particular exposure to the hazard.

6  **Q.**   So in your meta analysis in 2012, did you draw any

7  conclusions about the risk of neurotoxicity in communities in

8  the United States with water fluoridation?

9  **A.**   No, we did not.

10  **Q.**   Now, in your -- in your meta analysis did you make any

11  recommendations as to what type of studies you felt were

12  necessary to have -- to be able to make a determination of

13  risk?

14  **A.**   Right.   I mean, we use similar wordings as in the Faroes

15  Statement.   We essentially call for prospective studies to get

16  the proper association between specific exposures at specific

17  times and the outcome.

18  **Q.**   Did you identify any specific period of time that you

19  thought was important to understand with respect to fluoride

20  neurotoxicity?

21  **A.**   I don't remember the report by heart, but I believe we

22  said prenatal would be essential.

23  **Q.**   Now, Dr. Grandjean, in 2015, three years later, did you

24  publish your own study on fluoride neurotoxicity in China?

25  **A.**   Right.   I had long discussions with my colleagues and,

1    also, with Professor David Bellinger, who is an internationally

2    known neuroscience researcher from Harvard.  And we agreed with

3    David that we should carry out our own study in China in

4    collaboration with Guifan Sun and the Chinese CDC.

5        And so we were looking for a community where there were

6    different -- there were grades of fluoride exposure, not just

7    high and low; but high, of course, and then several in between

8    plus the low, so that we could see if there were associations,

9    you know, along that whole range.

10       And so the Sichuan CDC helped us in finding the Miao Ming

11   community, which is actually the place where Mao Tse-tung

12   started his long march.  So it's historically a very important

13   community.  But we went there because of the fluoride.

14       So we went to the local school and recruited the children

15   in the first grade and we got blood samples.  We got urine

16   samples.  We made sure to give them a bottle of fluoride-free

17   water to drink the night before they came for the examination

18   because we didn't want the morning urine to be affected by

19   whatever water they had been drinking during the morning and,

20   of course, the night before.

21       Because fluoride in the urine reflects, in part, the

22   burden in the bones, because fluoride is stored in the skeleton

23   and the calcified tissues.  And that was what we wanted to see

24   in the urine samples.

25       We also had a dentist that was looking at the dental

1   fluorosis, the spots on the teeth that happen when fluoride is

2   present in elevated amounts during enamel formation.  And we

3   knew the -- from the Sichuan CDC we knew the exact

4   concentration in the household water.

5       So with these three measurements of the exposure, we then

6   carried out of neuropsychological testing according to western

7   standards.  So we used slightly different tests, and those are

8   the commonplace in China simply because we wanted to replicate

9   or assess if replication was possible the findings that the

10  Chinese colleagues had reported on.

11  **Q.**   And were you able to, Dr. Grandjean, in your study

12  replicate this association between fluoride and neurotoxicity?

13  **A.**   Right.  We were.  I mean, the study only included 51

14  children.  So it takes a lot to get statistical significance.

15      We saw the same trends for all three measurements of

16  fluoride, but it was only the dental fluorosis that happened to

17  be significant.  Anyway, the joint effect was clear.

18  **Q.**   Now, the Court has already heard testimony on the ELEMENT

19  study and will be hearing, hopefully later today, from

20  Dr. Lanphear about the MIREC study.  So I won't ask you about

21  the details here --

22          **THE COURT:**  Mr. Connett, can you hang on a second?

23  Let me make sure I got that last point, that statistically

24  significant results were obtained only with respect to dental

25  fluorosis; is that right?  But what else was found?

1          **THE WITNESS:**  So dental fluorosis was a marker of

2   developmental early life exposure to fluoride.

3       And it so happened that that was the marker that was

4   significantly associated with cognitive deficits in these

5   seven-year-old children.

6       While the urine fluoride, which was only one sample, and

7   the current water fluoride, which may depend on water intake,

8   et cetera, they were -- they showed the same tendency, but they

9   were not -- they were not statistically significant.

10         **THE COURT:**  I see.  So the statistically significant

11  association was obtained from dental fluorosis and IQ?

12         **THE WITNESS:**  Yes, yes.

13         **THE COURT:**  Thank you.

14         **THE WITNESS:**  Thank you.

15  **BY MR. CONNETT**

16  **Q.**   Dr. Grandjean, are the ELEMENT and MIREC studies the kind

17  of studies that you had recommended to be done in your 2012

18  analysis?

19  **A.**   They are.

20  **Q.**   Dr. Grandjean, having reviewed these studies, do you find

21  the ELEMENT and MIREC birth cohort studies to be well

22  conducted?

23  **A.**   I do.

24  **Q.**   Do you find them to be the best available science today on

25  the issue of fluoride neurotoxicity?

```
1              MS. CARFORA:  Objection.  Foundation.
2              THE COURT:  Why don't you lay the foundation and then
3    he can comment.
4    BY MR. CONNETT
5    Q.   Well, let me ask:  Dr. Grandjean, you had held off on
6    making any risk determinations in your earlier papers.  Do the
7    ELEMENT and MIREC studies permit you to make an assessment of
8    risk?
9    A.   They do.  And, actually, the author is -- laid out the
10   results very well so that the EPA could conduct its own risk
11   analysis, if they were so inclined.
12   Q.   And could you just briefly describe, Dr. Grandjean, what
13   you find to be the important strengths of these birth cohort
14   studies?
15   A.   Right.  The important aspect is the fluoride exposure
16   assessment.  And both the ELEMENT study and the MIREC study
17   relied on maternal urine samples collected during pregnancy.
18        And, I mean, the people who conducted those studies didn't
19   know that fluoride would be an issue.  They kept the samples
20   and put them in the freezer.  And Howard Hu and Dr. Lanphear,
21   they discovered the urine samples were there and pulled them
22   out.  This was after the children had been examined.
23        So it was very clear that the exposure happened before,
24   but was only revealed after the results of the cognitive tests,
25   the IQ testing, et cetera, had been done.
```

1      So, and I think the ELEMENT study had up to three urine

2  samples from the mothers during pregnancy; and I think the

3  Canadian study had three, one from each semester, as far as I

4  remember.

5      So they were very much aware that fluoride exposure can

6  vary over time and, likewise, water intake.

7      But as I said before, the fluoride in urine -- and this

8  has been well documented.  This is what the World Health

9  Organization has said all the time.  About half of the

10  fluoride, on average, in the urine comes from the skeleton,

11  because our bones are constantly being remodeled and then

12  fluoride is released and some other fluoride is built into the

13  neuro tropicals or cortex of the bones.  But that means that

14  the urine fluoride is actually a good indication of the

15  lifetime exposure of the mother and what's present in her serum

16  where she's sharing the fluoride with the fetus.

17      So fluoride is an excellent measure of the fetus's

18  prenatal exposure to fluoride.  And I'd say having three

19  samples is really luxury.

20  **Q.**   At the very end there, Dr. Grandjean, you said that:

21  Fluoride is an excellent measure of fluoride exposure during

22  the prenatal period.  Did you mean to say "urine" is an

23  excellent measure?

24  **A.**   Yeah.  The urine fluoride, yes.  I'm sorry.

25  **Q.**   Now, in your declaration you talk about two prospective

1    studies that were done on fluoridation and neurological effects

2    in New Zealand.

3        Did you consider these studies as part of your weight of

4    the evidence analysis in this case?

5    A.    I was aware of them, you know, when they were reported.

6    So I knew them very well.  They -- I considered them, but they

7    don't contribute any evidence of any weight.

8    Q.    And why is that?  Can you just summarize why you find

9    these New Zealand studies to not warrant as much weight in your

10   assessment?

11   A.    Right.  One study -- I mean, both studies recruited the

12   children during preschool age, and they did not -- neither of

13   them considered prenatal exposure.  And then they simply

14   required any period during the first seven years of life of

15   being fluoridated or non-fluoridated.  I mean, a very crude

16   ecological, as we call it, assessment without individual data.

17       So it was just the residents that counted.  And one study

18   counted the number of years from three to seven, I think it

19   was, of residents in fluoridated or non-fluoridated.

20       It's very clear that the colleagues were unaware that

21   prenatal exposure to fluoride was the key issue.  And I don't

22   know why that didn't daunter them, but the way that they

23   designed the studies, they -- at least in today's perspective,

24   they were non-informative.

25   Q.    Now, in your declaration you talk about that in New

1  Zealand.  At the time that the children were born in the

2  Broadbent study, that there was a high level of tea consumption

3  in New Zealand at that time?

4  **A.**   Right.

5  **Q.**   What's the significance of that to your assessment?

6  **A.**   Yeah.  It depends where the tea is grown.  There are parts

7  of Asia where you can get tea with a fairly low fluoride

8  content, but most black tea -- not so much green tea, but most

9  black tea, which is the tea -- preferred tea type in New

10  Zealand contains fluoride.  And if -- and I've measured

11  fluoride contents in various types of tea myself in my own lab.

12  So I know that very well.

13       In New Zealand the statistics of national tea consumption

14  suggest that each adult every day would drink what corresponds

15  to three or four tea bags.  That's a lot of fluoride.  And on

16  average I would say each tea bag probably contains like 0.3,

17  0.4 milligrams fluoride.  So you can see this can easily add

18  up.

19       And some mothers during pregnancy may have lived in

20  non-fluoridated communities, but because of their tea

21  consumption their fluoride exposure might be just as high as

22  those mothers who lived in the fluoridated community.

23       So they -- this is a serious matter that has resulted in

24  misclassification of the children.  And, again, it is a reason

25  not to consider these New Zealand studies as evidence of any

GRANDJEAN - DIRECT  / CONNETT

```
 1  weight.
 2  Q.   And just to be clear, if the mothers in the
 3  non-fluoridated areas are drinking the tea, would that make it
 4  harder to find a difference in IQ between the fluoridated group
 5  and the non-fluoridated group?
 6  A.   It certainly does because some children would be
 7  classified as non-fluoride, despite their mothers having been
 8  drinking a lot of tea.  I mean, I have been to New Zealand.  I
 9  know they drink a lot of tea.
10       And so the -- these kids are not fluoride free because of
11  the mother's tea drinking.  And those in the high fluoride --
12  in the fluoridated water communities, there may have been some
13  women, who for some reason, didn't like tea.  And so the -- the
14  children may have been misclassified.
15  Q.   Now, you, Dr. Grandjean, conducted a BMD analysis in this
16  case; is that correct?
17  A.   Right, I did.
18  Q.   And which studies did you select for your -- as the data
19  that you used?
20  A.   Right.  I --I selected the Bashash study that reported on
21  cognitive performance in childhood and older school age, and
22  the -- the Canadian MIREC study that was released by JAMA this
23  fall.
24  Q.   And in your declaration you talk about a risk assessment
25  that was conducted by EPA scientists -- or EPA experts in this
```

1  case, Dr. Joyce Tsuji and Dr. Ellen Chang.

2      What relevance does that assessment have to your BMD

3  analysis in this case?

4          **MS. CARFORA:**  Objection.  Relevance.

5          **THE COURT:**  Overruled.

6  **A.**   I'm not sure I understood the question.

7  **BY MR. CONNETT**

8  **Q.**   In your declaration you talk about Dr. Joyce Tsuji's 2015

9  risk assessment on arsenic.  What relevance does that have to

10  your BMD in this case?

11  **A.**   Okay.  That's a published paper of a report that was

12  supported by industry.  And they wanted to conduct a risk

13  assessment -- they didn't do a benchmark analysis, but

14  something very similar to benchmark.  And they identified a

15  study that they chose to rely on from similar criteria as those

16  that I have used.

17      What they relied on was a study conducted in Bangladesh,

18  an excellent study in Bangladesh, but the problem was, I would

19  say, that the arsenic exposures were much higher in Bangladesh

20  than they are in North America.  So they essentially used a

21  well-conducted prospective study, but the exposures were

22  higher.

23      I'd also say that I think they had two urine samples from

24  the mothers during pregnancy.  So that was excellent.

25      And this way they were able to say:  We believe that the

1   reference dose, which is the safe level of exposure that EPA

2   allows for arsenic, should be at a particular level.  And they

3   found that by identifying something similar to the benchmark

4   dose and then dividing that with an uncertainty factor.  I

5   think it was ten, which is the standard that EPA uses.

6   Q.   So they derived -- Dr. Tsuji derived a reference does

7   doing a quantitative dose-response analysis of a prospective

8   cohort study?

9   A.   Right.  And Dr. Chang was a coauthor with Dr. Tsuji.

10  Q.   What did they use for their benchmark for IQ loss to do

11  that analysis?

12          MS. CARFORA:  Objection.  Foundation.

13          THE COURT:  Well, why don't you have Dr. Grandjean

14  explain how he knows whatever he is going to testify to.

15  BY MR. CONNETT

16  Q.   Dr. Grandjean, have you read this risk assessment?

17  A.   I have read it.  I think I have it somewhere.

18      According to my recollection, they used a loss of one IQ

19  point as the response; that is, the adverse outcome that should

20  be prevented.

21  Q.   How does that compare with the benchmark response that you

22  used in this case?

23  A.   Well, it's similar.  And I believe EPA has used one IQ

24  point similarly in regard to lead, for example.

25      And we used it in an international study where we collated

1   all of the lead studies from Australia or Yugoslavia, you know,

2   from various countries to generate a joint risk assessment and

3   benchmark analysis based on all of these studies, prospective

4   studies in children.

5   **Q.**   And, Dr. Grandjean, lastly on this risk assessment from

6   Dr. Tsuji.  How did would compare the quality of the MIREC and

7   ELEMENT studies to the Bangladeshi study that they relied upon

8   to derive the RFD for that assessment?

9            **MS. CARFORA:**  Objection.  Foundation.

10           **THE COURT:**  Overruled.

11  **A.**   I would say that the two North American studies are

12  superior because the cultural setting -- which is important

13  when you want to assess a child's cognitive capabilities.  The

14  tests applied are very appropriate for the North American

15  studies.  The exposure levels are similar to what they are in

16  the United States.

17       And the Bangladesh study had much higher exposures, and

18  there were issues, like nutritional deficits and issues like

19  that.  So there may be some residual confounding that was not

20  adjusted for, and that's -- that makes the two North American

21  studies superior.

22  **Q.**   Now, for your BMD analysis in this case you worked with a

23  biostatistician by the name of Dr. Budtz-Jorgensen.  Am I

24  pronouncing that correctly.

25  **A.**   Right.

1   Q.   Who is Dr. Budtz-Jorgensen?

2   A.   We have collaborated since he worked on his PhD.   He

3   worked on Faroese data.   He and I jointly conducted or

4   developed the document that EPA contracted us to develop on

5   benchmark dose analysis for mercury.

6        And so Dr. Budtz-Jorgensen, who is now a chairman of

7   biostatistics at the University of Copenhagen, he is considered

8   a world expert on benchmark dose and how exposure, imprecision,

9   how confounding, et cetera, issues like that may affect the

10  calculations.

11       So I turned to him and said:   Kindly can you look at this

12  data and see if you can derive a meaningful benchmark dose that

13  can guide the U.S. EPA in regard to fluoride?   And he,

14  fortunately, agreed.

15  Q.   Now, during your deposition in this case, you said

16  something like:   I wouldn't trust myself to do a BMD analysis.

17       Now, counsel never asked you what you meant by that.   So

18  let me ask you:   Did you mean that literally?

19  A.   No, no.   I mean -- the point is that -- this is a key

20  issue, benchmark dose calculation.   And I would simply say that

21  for me, having done all of the epidemiology and risk

22  assessment, it's much better to have an impartial colleague who

23  is a recognized international expert do the assessment.   And

24  this is what he had agreed to do.

25       And -- and I included an acknowledgment of his efforts,

**GRANDJEAN - DIRECT  / CONNETT**

1  and I did that also in the published paper.  I think that that

2  is my way of assuring that the calculation was done at the top

3  quality that you would desire for this purpose.

4  **Q.**   So at this time I'm going to put up a figure from your

5  declaration.  I want to ask you if you could explain it for the

6  Court.

7       And I'm going to put up, it's Figure 2A from your

8  declaration.

9            **THE COURT:**  Oh, from the declaration, okay.

10      (Document displayed.)

11 **BY MR. CONNETT**

12 **Q.**   Dr. Grandjean, can you see the figure on the screen?

13 **A.**   I can.

14 **Q.**   So can you explain for the Court what this figure shows?

15 **A.**   Okay.  This is from the MIREC study.  And the vertical

16 scale is the fluoride concentration in the maternal urine,

17 adjusted for specific gravity with the unit milligrams per

18 liter.  And it compares the distribution of results in Canadian

19 cities with non-fluoridated drinking water and, on the

20 right-hand side, the fluoridated communities.

21      What you see here is a bold horizontal line in that yellow

22 square or rectangle.  That bold line indicates the median --

23 that is, the central value -- where half of the results were

24 above that and half of them were below.  And the central

25 distribution -- that is, if the -- 50 percent between the 25th

1   percentile and the 75th percentile are within that yellow

2   rectangle.  And you can see that the -- that yellow rectangle

3   from the fluoridated communities is higher than the yellow

4   rectangle in the non-fluoridated.

5       And there are some outliers, some of whom my be tea

6   drinkers.  But they drink a lot less tea in Canada than in New

7   Zealand.  So that's just my guess.

8   **Q.**  We see here the non-fluoridated area here.  They have what

9   seems to be some elevated fluoride levels.  In your declaration

10  you talk about something called the halo effect.

11      Can you explain for the Court what the halo effect is and

12  how it may affect these urinary fluoride levels that we see

13  here in the non-fluoridated area?

14  **A.**  Right, right.  I mean, if you drank surface water -- I

15  mean, surface water is contained, like, 0.1 milligrams of

16  fluoride per liter.  Surface water is inherently low in

17  fluoride.  It depends when you dig your well, where you -- if

18  you get into fluoride-containing minerals, that can release

19  fluoride to your -- your drinking water.

20      So the non-fluoridated may be anything from 0.1 and up to

21  or perhaps even higher than the 0.6, 0.7 in the fluoridated

22  communities.  So there is a range already.

23      But then if you drank soft drinks, you know, like Coke or

24  reconstituted fruit juices, some of them will have been

25  prepared with fluoridated water.  And if you buy canned food.

**GRANDJEAN - DIRECT  / CONNETT**

1    Again, it may have been prepared with fluoridated water.

2         And oftentimes people may work in a different community

3    that may be fluoridated and different from the non-fluoridated

4    residence community.

5         So because of that, it's called the halo effect.  So

6    fluoridation will effect also people who are residing in a

7    non-fluoridated community.

8    **Q.**   Okay.  So this red line, the horizontal red line that we

9    see here, can you explain to the Court what this is and what it

10   represents?

11   **A.**   Right.  This is a benchmark dose level.  That is the lower

12   95th confidence limit for the benchmark dose.

13        And I -- I put that indication, that it's like about 0.15

14   because it's based on four or five different calculations and

15   estimates.

16        And I think we should -- and it has already been agreed

17   with Dr. Hu and Dr. Lanphear.  We won't do a joint study where

18   we rely on the raw data from both, both studies, and calculate

19   the real benchmark dose levels in accordance with EPA's

20   recommendation.

21        My numbers here are based on those calculations that

22   Dr. Budtz-Jorgensen and did I jointly.  And I'm sort of

23   indicating that with the sort of a hazy line.  It may be the

24   correct number is 0.16 or 0.13.  I don't know.  But it's in

25   that order of magnitude.

1    Q.   Now, during opening counsel for defense implied that you

2    applied an uncertainty factor for your risk assessment here.

3         So let me ask you:  Does this BMDL that we see here on

4    this figure, does this include an uncertainty factor of ten or

5    some other uncertainty factor?

6    A.   No.

7    Q.   So -- well, let me ask you.  You had mentioned that

8    this -- urinary fluoride levels is adjusted for specific

9    gravity.  There were some questions yesterday that maybe raised

10   the possibility that factors that influence creatinine may

11   confound the association between fluoride and IQ.

12        Would that apply, Doctor -- assuming that there is any --

13   would that apply to urinary fluoride levels that are adjusted

14   for specific gravity?

15   A.   No, no.  And I think that argument is flawed.

16   Q.   And so --

17             THE COURT:  Can you hang on just for a second?  Let

18   me ask, I want to clarify something.

19        Dr. Grandjean, you just mentioned that you were planning

20   to do a study based on raw data agreed to by Drs. Hu and

21   Lanphear to use raw data.

22        How is that different from what you did here, to derive

23   the approximation of the .15?  What did you do that's different

24   than what you're planning to do, as I understand it?

25             THE WITNESS:  Right, right.  So in regard to the

GRANDJEAN - DIRECT  / CONNETT

1   ELEMENT study, we actually read the exact numbers from one of

2   the figures in the published article and calculated from those

3   raw data the exact benchmark dose and benchmark dose level, the

4   lower confidence limit.

5       However, because the way that that figure was reproduced

6   we had one fewer observations than they reported.  So probably

7   there were two observations, one on top of the other that we

8   couldn't distinguish.

9           THE COURT:  Okay.

10          THE WITNESS:  But that calculation was -- the

11  benchmark dose that we calculated from the raw data that we

12  read from that figure is almost the same as the number we

13  calculated just looking at the calculated values from the

14  paper.

15      So essentially we have done something very close to this.

16  The reason we have not done this yet is that the Canadian study

17  is -- I mean, it's done with Health Canada, and they do not

18  allow access to the raw data on the protected server.

19      What we have to do is to upload the ELEMENT data onto that

20  very same server, and then conduct the BMD calculation, you

21  know, through Canada.

22      We have the permission from the Mexican study and the --

23  at least we have an indication from the MIREC colleagues that

24  if we want to pursue this, they are willing to help and they

25  will -- will recommend that we get the permission.  But you can

1  understand this is kind of complicated, so we haven't done it

2  yet.

3            THE COURT:  What you're trying to get is the raw

4  individualized data from the MIREC study?

5            THE WITNESS:  Right, right.  We would like to have

6  the exact data so that we can say the BMDL is not about 0.15.

7  It is exactly 0.157, or whatever the result is.  It's going to

8  be about that.

9       As we demonstrated with the ELEMENT study, I think it's in

10 a table from -- in my declaration that -- that using the

11 calculated values from the published paper, we get just

12 about -- it's a third digit after the comma that is slightly

13 different when we use the raw data that we read digitally from

14 the published figure, the plot.

15           THE COURT:  So there was raw data available in the

16 ELEMENT study?

17           THE WITNESS:  The data that I stole away by

18 digitizing the published plot, where all of these little dots

19 represented one child's fluoride exposure and IQ.

20           THE COURT:  I see.  I see.  So you got it from the

21 chart.

22           THE WITNESS:  Right, right.

23           THE COURT:  That was individualized.  Each dot was

24 individualized?

25           THE WITNESS:  Yeah, yeah.

1          And I asked my colleagues -- I mean, Dr. Hu and the

2     coauthors, I asked for their approval that we did that.  And

3     they essentially said:  Those figures are publicly available.

4     You can do what you want, as long as you refer back to us and

5     that figure as a source.

6              THE COURT:  But you weren't able to do that with

7     the -- you didn't have those dots for the MIREC study.

8              THE WITNESS:  It -- we actually didn't try because

9     we -- we -- that study only came out last fall.

10         And I communicated with the authors and said:  Hey, I

11    already have the agreement with Dr. Hu, that they will allow us

12    actual access total raw data.  Are you willing to help us

13    similarly?

14         And then the answer was:  Of course, we're happy to help.

15    But it has to go through the Health Canada safe server, where

16    you would have to upload your data and, also, your software to

17    do the calculations through a Canadian server.

18             THE COURT:  All right.  So the BMDL that you have at

19    0.15 is based on the ELEMENT study data, not the MIREC at this

20    point?

21             THE WITNESS:  I have two tables in my declaration;

22    one is for ELEMENT, one is for MIREC.

23             THE COURT:  Okay.

24             THE WITNESS:  And --

25         (Document displayed.)

 1              **THE WITNESS:**  Okay.  Here is the MIREC.  And you can

 2    seat BMDL is about 0.1.

 3        And the bottom line is based on the data that we read

 4    digitally from the plot.  But that's just the GCI.  We didn't

 5    did it for the IQ.  It looked like there were several dots on

 6    top of each other, so we gave up.

 7        But you can see the 0.102 is very close to the tabular

 8    values, or the calculation based on the tabular values of

 9    0.099.

10        It may just be that there was a missing observation.  It

11    may also be that there was -- it was not exactly linear or some

12    other minor uncertainty, but the fact that they are so close is

13    very convincing to me.

14        And this table -- the second table -- here.

15        (Document displayed)

16        This is from the MIREC study.  And the right-hand column,

17    you can see the BMDL.

18        And as we already know, the girls for some reason didn't

19    show a significant association with regard to fluoride effects

20    on the IQ.  The boys did.

21        And, I mean, the same observation was made in the arsenic

22    study we just talked about, that there was a gender difference.

23              **THE COURT:**  So how did you derive the BMD and the

24    BMDL for the MIREC study?  What data did you use for that?

25              **THE WITNESS:**  Okay.  And it's in the -- there is a

1  box in my declaration, a couple pages before this one.  There

2  is a box that shows the mathematics.  And the idea is -- yeah.

3  This is the one, yeah.

4       (Document displayed)

5       So the beta value is the regression coefficient, and

6  that's the one that tells you the loss of IQ points per

7  milligram of fluoride per liter of maternal urine after

8  adjustments.

9       And those regression coefficients were published from both

10  studies.  And because the BMR is one, all we need to do is to

11  calculate the BMR divided by the regression coefficient.  And

12  to get the BMDL, we divide by the lower confidence limit for

13  the regression coefficient.

14      So essentially this is -- this is something that you can

15  do on the back of an envelope.  It doesn't require the chairman

16  of biostatistics at a university.

17      But, anyway, this is the formal calculation that we also

18  used for the international study on lead, and it is -- it is in

19  accordance with EPA's recommendations for such calculations.

20           THE COURT:  All right.  So it's based essentially on

21  the regression coefficients that were published in the MIREC

22  study?

23           THE WITNESS:  Right, right.  There are tables that

24  give you the regression coefficients and the standard deviation

25  for the regression coefficient.  I'm sorry.  This gets a little

GRANDJEAN - DIRECT  / CONNETT

1   sort of specialized.

2         And because we had the standard deviation, we could

3   calculate what the lower confidence limit for that beta value,

4   what that was.  And so that way we could derive the BMDL.

5   Because both studies were quite large and the associations were

6   highly significant, then the BMDL is not a whole lot lower than

7   the BMR -- than the BMD, I'm sorry.

8         THE COURT:  All right.  Got it.  Thank you.

9         THE WITNESS:  Thank you.

10  BY MR. CONNETT

11  Q.   So, Dr. Grandjean, going back to this figure that we were

12  looking at a few minutes ago.

13        Sorry.

14        (Document displayed.)

15  Q.   So this BMDL, this red line that we see at the bottom, am

16  I correct in understanding that represents the level of

17  fluoride associated with the loss of one IQ point?

18  A.   Right.  The lower confidence limit for that loss, yes.

19  Q.   In your experience reviewing data on neurotoxicants, is it

20  common to see human exposure to a chemical that exceeds the

21  BMDL to the extent that we see here in fluoridated communities?

22  A.   I'm not an expert on worldwide exposures to all of the

23  human neurotoxicants.

24        Let me just say that lead exposures in America oftentimes

25  exceed the BMDL, and we have some unfortunate reminders

1   happening all the time.  Like, Flint Michigan and several

2   places in New Jersey.  I mean, so lead is an example where we

3   exceed it.  And we are -- we all work toward limiting

4   children's lead exposure.

5        It does happen with mercury as well.  I don't think in

6   America, though, that in -- in countries, like in the Amazon,

7   in the Faroe Islands, in Greenland, the BMDL is exceeded

8   sometimes by a margin as large as this.

9        But for a -- you know, for fluoridated communities -- and

10  there are some in Ireland, in England, in Australia, New

11  Zealand.  For fluoridated communities worldwide to exceed the

12  BMDL by this much is, I think, a serious public health problem.

13  **Q.**   Okay.  Dr. Grandjean, I'm going to move now to the next

14  figure in your declaration, which is Figure 2B.

15       (Document displayed)

16       And this figure looks very similar to what we were just

17  looking at.  What is the difference between this figure and the

18  last one?

19  **A.**   The vertical scale is a fluoride intake, as calculated by

20  the Canadian researchers.  And they took into regard green tea

21  and black tea and a total water intake, you know, per day.  And

22  the tea, fluoride levels they obtained from the Food and Drug

23  Administration in the U.S.

24       And so you can see the calculated intakes are -- for the

25  non-fluoridated community are still above that hazy red line,

**GRANDJEAN - DIRECT   / CONNETT**

1   but it is substantially higher in the fluoridated communities.

2   **Q.**   So earlier I asked you about this suggestion that the

3   factors that influence creatinine could really be the cause of

4   the association between urinary fluoride and IQ.

5        Now, here we're looking at fluoride intake.

6   **A.**   Right.

7   **Q.**   What that does that -- what does this data suggest as to

8   that argument, that it is the creatinine that's causing the

9   association?

10  **A.**   It's physiologically impossible that creatinine would do

11  this.  And, also, think of the Barberio study, where creatinine

12  actually removed the significance.

13       So if that argument would say, we should believe the

14  unadjusted results.  So that is significant.  So it's not --

15  let's forget about creatinine.  It's not relevant.

16       This is the intake, and what's important to me is that the

17  urine, urinary fluoride excretion of the mother during

18  pregnancy, as well as the calculated fluoride intake per day of

19  the mother during pregnancy.  Both of them were strongly

20  associated with decreases in IQ, cognitive deficits.

21       And, in fact, the fluoride intake, boys and girls were

22  similar in regard to their fluoride associated losses in IQ.

23  **Q.**   So let me see just if I have this right.  The factors that

24  influence creatinine in the urine, would those factors that

25  influence creatinine in urine have anything to do with the

1 relationship between fluoride ingestion from beverages and IQ?

2 **A.**    I can't think of any.

3 **Q.**    So let's turn now to your -- the third figure in your

4 report, and it's Figure 3.

5      And, Dr. Grandjean, can you explain what this figure

6 shows?

7 **A.**    Right.  This is a comparison of urine-fluoride

8 measurements in the MIREC study on the left and the recent

9 study carried out in California.  Both of them pregnant women

10 in -- residing in fluoridated communities.  So it's Canada on

11 the left and the U.S. study on the right.

12 **Q.**    And did the data for the U.S. study, is that from the

13 recent University of California San Francisco study?

14 **A.**    Yes.

15 **Q.**    And one of the authors of the UCSF study is Dr. Pamela

16 Den Besten.  Are you familiar with Dr. Den Besten's research on

17 fluoride?

18 **A.**    Oh, she's really a well-published researcher on fluoride.

19 And I think she is or was the president of the International --

20 I forgot the name.  International Society for Fluoride

21 Research, something like that -- no, Dental Research.

22      So, I mean, she's a highly respected dental researcher.

23 **Q.**    How would you characterize here the similarity or lack

24 thereof between the average urinary fluoride levels in the

25 fluoridated communities and Canada versus the average urinary

GRANDJEAN - DIRECT  / CONNETT

1    fluoride levels in fluoridated areas of California?

2    **A.**   I mean, they -- they are very much the same.  It's like

3    there is a greater variation in Canada.  It may have to do with

4    some tea drinking or something.  But, I mean, basically they

5    are the same.

6    **Q.**   Were you surprised?  I mean, were you surprised to see

7    that they measured the urinary fluoride levels in pregnant

8    women in fluoridated areas of the United States and found

9    similar levels as in the pregnant women in the fluoridated

10   areas of Canada?

11   **A.**   No.  Because they are drinking fluoride containing water

12   where the fluoride concentration is approximately the same.

13   There will be a little bit of variation depending on the water

14   works.  It may be a little lower in Canada on average.

15        But I would expect them to be the same because -- I mean,

16   the World Health Organization has a long time ago concluded

17   that if water is the main source of fluoride exposure, then the

18   fluoride concentration in the urine will be approximately the

19   same as the concentration in the drinking water.  And if the

20   concentration in drinking water is 0.7, which I believe it is,

21   you would get results like these.

22        So these are very much in agreement with what the World

23   Health Organization concluded decades ago.

24   **Q.**   Is there any national data on urinary fluoride levels

25   among pregnant women in the United States?

GRANDJEAN - DIRECT  / CONNETT

1   **A.**   I haven't seen any.  But, I mean, I think CDC is working

2   on it, but I haven't seen them published.

3   **Q.**   And the CDC conducts what are called NHANES surveys; is

4   that correct?

5              **MS. CARFORA:**  Objection.  Foundation.  Leading.

6              **THE COURT:**  Sustained.

7   **BY MR. CONNETT**

8   **Q.**   Are you familiar with something called NHANES surveys,

9   Dr. Grandjean?

10  **A.**   Yes.  These are a national cross-sectional studies that

11  are carried out across the United States to generate national

12  averages of exposures to environmental chemicals, and they are

13  conducted in a way so that the statistics are reliable also for

14  subpopulations.  Let's say, pregnant women or for Hispanics or

15  whatever subgroups.  They are even looking at children of

16  various age groups.

17  **Q.**   Have these NHANES surveys yet published any urinary

18  fluoride data in the population?

19              **MS. CARFORA:**  Objection.  Foundation.

20              **THE COURT:**  Ask the basis of his knowledge, if he

21  knows.

22  **BY MR. CONNETT**

23  **Q.**   Dr. Grandjean, in your work in preparing your reports in

24  this case, did you look to see if there is any urinary fluoride

25  data published in any of the NHANES reports?

1   **A.**   They are not in the -- published in the NHANES reports.  I

2   think there's something -- I think CDC has been analyzing serum

3   or plasma from children and, obviously, in regard to the dental

4   health interest.  But I haven't seen any national data on

5   urinary fluoride.

6   **Q.**   Now, Dr. Grandjean, is it possible that the average

7   maternal urinary fluoride concentration in pregnant women in

8   the United States -- would be below -- could be below this

9   BMDL?  Is that possible?

10          **MS. CARFORA:**  Objection.  Foundation.

11          **THE COURT:**  I'll let him answer it, but he's got to

12   explain the basis of any such opinion.

13          **THE WITNESS:**  Do you want me to respond?

14          **THE COURT:**  You can answer, but you have to explain,

15   if you have an answer, what the basis of that response.

16          **THE WITNESS:**  Okay.

17   **A.**   As I just said, the World Health Organization has already

18   concluded that the urinary fluoride concentration on average

19   will be the same as the one in the drinking water, assuming

20   that the drinking water is a major source of fluoride.

21          I would think that to get -- and, remember, here we're

22   looking at the specific gravity adjusted fluoride

23   concentration.  So it's not going to work to drink some

24   fluoride-free Coke or something to dilute the urine.

25          I can't think of any way that one could push that average

1  below 0.15.  It is physiologically impossible.

2      Unless the people that you recruit for the study drink

3  water that does not come from their own faucet, but bottled

4  water, example, for some fluoride-free source.  Or surface

5  water, if they were drinking surface water.

6      I can't see this happening if you're relying on community

7  drinking water for your, you know, daily beverage intake, be it

8  coffee or gravy, whatever you use the potable water for.  There

9  is no way that this can happen unless it's not the community

10  water that is the major source of daily water intake.

11  **Q.**    Okay.  Now, I'd like to turn to a separate portion of your

12  declaration, Paragraph 31, which is on --

13          **THE COURT:**  While you do that, counselor, I do have a

14  quick question.

15      Dr. Grandjean, if you cook with tap water and it's --

16  water is boiled, obviously, at some point, does that dissipate?

17  What does that do to fluoride?

18          **THE WITNESS:**  Nothing.  The concentration will be the

19  same after you have boiled the water, unless you boil it for a

20  long time so that water will disappear.  Then the fluoride

21  concentration will increase.

22          **THE COURT:**  All right.  So it doesn't change -- it

23  doesn't reduce -- in other words, fluoride doesn't sort of

24  disappear at high temperatures.

25          **THE WITNESS:**  Yeah.  No, no.

GRANDJEAN - DIRECT / CONNETT

1          **THE COURT:**  Thank you.

2  **BY MR. CONNETT**

3  **Q.**   Okay.  Dr. Grandjean, we're here on Page 6 of your

4  declaration, Paragraph 31.  And you write here:

5            "Observational studies will rarely" --

6          **MS. CARFORA:**  Objection, Your Honor.  I mean, this is

7  his declaration.  It's in testimony -- I mean, it's already in

8  evidence.

9      I'm not sure that Your Honor -- I don't know where

10  Mr. Connett is going with this question, but I feel like it's

11  leading, and I object to him reading directly from the

12  declaration.

13          **THE COURT:**  It's already in, the declaration.  It's

14  hard to make a leading objection.  Overruled.

15  **BY MR. CONNETT**

16  **Q.**   Dr. Grandjean, you write here that:

17            "Observational studies will rarely, if ever,

18        provide definitive proof of causation, and it is

19        always possible for someone to raise doubts and

20        uncertainties that require additional or improved data

21        to resolve."

22      What is the problem with waiting for definitive proof of

23  causation before we take action to protect the public from

24  chemical risks?

25  **A.**   This is something that was debated, I guess, the first

 1  time in regard to lead exposure and children.

 2      But it has been debated also in regard to many other

 3  hazards, like asbestos.  And there has been a tendency from the

 4  private sector to raise doubt.  It was clearly and most

 5  obviously done by the tobacco industry.

 6      And so I'm here referring to Professor David Michaels, who

 7  is now at the George Washington University.  But he was the

 8  longest sitting administrator for the Occupational Safety and

 9  Health Administration in the U.S.

10      And he wrote a book in 2008 that was dubbed, I think,

11  *Doubt Is Their Product*.  Because he had seen so many

12  examples -- not just of the tobacco industry, but so many

13  examples that -- of vested interests were trying to raise

14  doubt.  And sometimes ridiculous, unbelievable doubts and

15  uncertainties.  Claimed, alleged uncertainties in order to

16  confuse the regulatory agencies and the political bodies.  So

17  he wrote a book about it.

18      And he also mentioned the so-called -- the firms that have

19  made it a business to defend products.  Like tobacco.  So he

20  called them product defense firms.  Like Exponent, that I think

21  has been mentioned before.

22  **Q.**  So David Michaels does -- in this book discusses this

23  entity known as Exponent?

24  **A.**  Yeah.  He -- I remember he did mention Exponent as one of

25  the entities that has made it a business to raise doubt.  And

**GRANDJEAN - DIRECT   / CONNETT**

1  they always conclude on the side of the preferred conclusion

2  that the sponsor wants, being the arsenic polluting industry

3  or -- I mean, they have done a report on some of my work on

4  perfluorinated compounds and their adverse effects on vaccines,

5  and they completely rejected my findings.  My work has been the

6  basis of regulation in Europe, and they totally ignored this

7  doubt that was raised by this firm and -- I mean, as a

8  scientist, I have to say I don't rely on these professional

9  doubt-makers so to say.

10  **Q.**   Now, in this case EPA has retained scientists from

11  Exponent.  And did you have an opportunity, Dr. Grandjean, to

12  review the systematic review that Dr. Ellen Chang conducted in

13  this case?

14  **A.**   I did review it.

15  **Q.**   And does Dr. Chang's systematic review support and give

16  you any additional confidence for the -- to your opinions that

17  you've offered in this case?

18  **A.**   I mean, she had -- she had actually done a thorough -- or

19  the firm had done a thorough review of the literature that

20  actually complemented my own.  And so I was pleased to see that

21  they had done it, because when -- when I read the literature,

22  including those additional references that Dr. Chang

23  highlighted, because I had not picked them up, it was clear to

24  me that my conclusions are supported, not the opposite.

25  **Q.**   Did Dr. Chang find -- sorry, strike that.

1        Did Dr. Chang identify any studies that you did not

2   consider in your weight of the evidence analysis that in any

3   way changed your opinions?

4   **A.**    Right.  She did identify a couple of dozen studies.  But,

5   I mean, some were abstract.  Some were repeat publications.

6   Some were simply not contributing a whole lot to the evidence.

7        So overall she did find some additional references.  But,

8   if anything, they added to my own confidence that fluoride is a

9   definite human neurotoxic agent and that the toxicity starts at

10   very low exposure levels.

11  **Q.**   Now, in her review Dr. Chang cites a number of

12   methodological limitations in the studies.  Did you find any of

13   the methodological limitations that she discusses to provide a

14   likely explanation for the observed association between

15   fluoride and adverse neurodevelopmental effects?

16  **A.**    No.

17  **Q.**   Dr. Chang cites exposure imprecision as one of the

18   limitations that could explain the association between fluoride

19   and reduced IQ.  Do you think that this is a credible

20   assumption?

21  **A.**    No.  And I note that Dr. Chang misquotes me, and then says

22   that I'm wrong, but it's her misquote that is wrong.

23  **Q.**   So how does she -- how does she misstate your opinion?

24  **A.**    She -- and I'm citing from my memory.  She claims that I

25   say that exposure misclassification or imprecision inevitably,

1    always, results in an underestimation of the risk.

2        I didn't say that it always resulted in that.  I said that

3    the tendency was that the effect would be underestimated.

4        So it is possible on occasion that there could be a slight

5    overestimation, but the overall trend is an underestimation.

6        This is what I said, but she misquoted me and then said

7    that I was wrong.  I think that's improper.  I'm sorry.  I

8    think it's improper.

9    **Q.**   Now, if exposure imprecision can occasionally bias the

10   results away from the null, why is it that exposure imprecision

11   does not provide a credible explanation for the studies on

12   fluoride and IQ?

13   **A.**   It is because just about all of the studies agree.  They

14   all show that there is a tendency toward fluoride being

15   associated with IQ losses.

16       If there was -- and they are all associated with some

17   likely misclassification, some imprecise assessment of the

18   exposure.  But let's say that an occasional study would

19   overestimate, but then the rest would have underestimated.  And

20   so this explanation is inappropriate.

21   **Q.**   Now, Doctor, I am going to show you -- put on the screen

22   here an exhibit that the plaintiffs have introduced in this

23   case.  It's Plaintiff's Exhibit 33-A.  I'm going to put on the

24   screen.

25       (Document displayed)

**GRANDJEAN - DIRECT / CONNETT**

1   Q.   Doctor, can you see this document?

2   A.   I see it.

3   Q.   This is EPA's "Regulatory Impact Analysis of the Clean Air

4   Mercury Rule."  I'm going to direct your attention to Page 911.

5        And, Doctor, on this page EPA states:

6             "Presence of exposure measurement error could

7        introduce a bias in the results, most likely towards

8        the null."

9        Doctor, do you agree with the EPA that exposure

10  measurement error is most likely to bias the results towards

11  the null?

12  A.   I think I am a coauthor of the paper that the chairman of

13  biostatistics from University of Copenhagen is the first author

14  of.  I must say I wholeheartedly agree with the sentence that

15  the EPA has phrased here.

16  Q.   And you have made reference to this study that the EPA is

17  citing by Budtz-Jorgensen?

18  A.   Yeah.

19  Q.   And the reference is here.  Are you a coauthor of that

20  study, Dr. Grandjean?

21  A.   I seem to recognize my own name there.

22  Q.   Now, in your study, Dr. Grandjean, of the Faroe Islands,

23  did you make any attempt to assess the impact of exposure

24  imprecision in that cohort study?

25  A.   Yeah, yeah, we did.  I don't know.  Do you really want the

GRANDJEAN - DIRECT  / CONNETT

1  detailed answer?  Because I can talk about mercury for a long

2  time.

3  Q.   I appreciate that, because we are running short on time.

4  So if you could maybe give a short -- if it's possible, a very

5  brief summary of how you went about assessing the impact of

6  exposure imprecision?

7  A.   Okay.  Okay.  Mercury is excreted in hair.  And,

8  fortunately, women who give birth in the Faroe Islands have

9  long hair usually.  So we could cut the hair close to the root,

10 and then centimeter by centimeter.  One centimeter represents

11 one month of mercury exposure.

12      So we could see during the -- those 9 centimeters was a

13 lot of variability in mercury exposure, in comparison to the

14 first centimeter that we used as our preferred indicator of

15 exposure, because ours is the one closest to the birth, the

16 third trimester.

17      And we saw that women who had variable mercury exposures,

18 they had a lower -- the mercury estimate, exposure estimate,

19 had a flatter association with the IQ deficits in their

20 children than those who had a more constant exposure.

21      So this was an empirical replication of the biostatistical

22 prediction.

23 Q.   So I'd like to close now Dr. Grandjean, but discussing

24 some of the Bradford Hill factors that you have considered as

25 part of your weight of the evidence analysis.

1    I'd like to ask you about some of the -- some of the --

2    some of the opinions that Dr. Chang has offered on this.

3    And let's start first with the strength of association

4    factor.  Dr. Grandjean, Dr. Chang has offered the opinion that

5    the magnitude of association between fluoride and IQ is, quote,

6    relatively small in comparison with normal expected variations

7    in each outcome measure as indicated by average values and

8    standard deviation.

9    So let me start, Dr. Grandjean, and ask you:  What is the

10   standard deviation for IQ tests?

11   **A.**   It's 15.  That's the way the IQ scale was generated by

12   David Wechsler way back in early history of psychometrics.

13   Fifteen is the standard deviation.

14   So you would have about 95 percent of the variation

15   between 70 and 130.  Two standard deviations on each side of

16   the average, which is supposed to be 100.

17   **Q.**   So the standard deviation is 15 IQ points; correct?

18   **A.**   Right, right.

19   **Q.**   Are you aware of any neurotoxicant that causes an average

20   loss of IQ points in the general population of 15 IQ points?

21   **A.**   No.

22   **Q.**   So if Dr. Chang's criteria for strength of association was

23   applied to lead, would lead pass the test?

24           **MS. CARFORA:**  Objection.  Foundation.

25           **THE COURT:**  Overruled.

1  **A.**   Can you repeat the question, please?

2  **BY MR. CONNETT**

3  **Q.**   Yes.  If Dr. Chang's criteria that she has used for the

4  strength of association assessment, that the IQ -- in the case

5  of fluoride, that the magnitude of association is relatively

6  small because it's three to five IQ points, which is less than

7  the standard deviation, if that test was applied to lead, would

8  lead past the test?

9  **A.**   No, no.

10  **Q.**   What --

11  **A.**   I think it's inappropriate.  And she also claimed that we

12  had shown that the difference between high fluoride exposure

13  and low fluoride exposure was 0.45 IQ points.

14       This is a misinterpretation.  It's misleading, actually.

15  She's trying to explain away our report from 2012, the

16  systematic review we did and the meta analysis, where the

17  standardized deviation was found to be 0.4, 0.45, but that was

18  in relation to the 15.  So it's -- it's not 0.45 IQ points like

19  she claims.

20       And, I mean, it's unbelievable that she would make that

21  misjudgment.  It is 0.45 times the standard deviation, as we

22  explained very clearly in the paper.

23       So this is why I'm saying it's 6.75., because that's 0.45

24  times 15.

25  **Q.**   So, Doctor --

**GRANDJEAN - DIRECT  / CONNETT**

1   **A.**   Just to set the record straight.  I'm sorry.

2   **Q.**   So Dr. Chang in her expert report in this case said that

3   your meta analysis found an average difference in IQ of .45 IQ

4   points?

5   **A.**   Right.

6   **Q.**   Okay.  So what does -- the fact that Dr. Chang's criteria

7   for the strength of association, the fact that lead would fail

8   that test, what does it tell you about Dr. Chang's assessment

9   on the strength of association?

10  **A.**   I hate to say this, but -- but, I mean -- I wish that I

11  could compare my report to a report of a respected colleague,

12  but what she has written is, in my mind, inappropriate.  That

13  report should not be relied upon.

14      I'm embarrassed that the EPA would recruit Dr. Chang, who

15  has already killed or trying to kill some of my work on

16  perfluorinated compounds; that they would recruit her to write

17  this report with all of those errors and biases in it.  I'm

18  very sorry I have to argue against that.  This is not science.

19  This is simply a misleading report.

20      I'm sorry.  I mean, I get a little upset about this,

21  because I -- I am sad to see that -- what has happened to a

22  colleague who works for a product defense firm.

23  **Q.**   So let's talk now about Dr. Chang's assessment on the

24  consistency of the epidemiological evidence on fluoride and IQ.

25      In her analysis Dr. Chang compares the results of the

1    New Zealand studies that we talked about earlier with the

2    results of the ELEMENT and MIREC cohort studies and says that

3    those studies are inconsistent.

4         What is your assessment of Dr. Chang's analysis on that?

5    A.   She's comparing apples to grapes.  The good studies are

6    the apples.  That's the MIREC study and the ELEMENT study.  The

7    grapes are -- it's a whole different story.

8         The New Zealand studies, we already talked about them.

9    They have misclassification of the exposure and, therefore, the

10   conclusions are unreliable.  The studies are not informative.

11        And so comparing highly qualified, excellent, prospective

12   studies with individual exposure assessment and with assessment

13   of prenatal exposures, to compare them with studies that didn't

14   have individual exposures, didn't assess prenatal exposures,

15   it's inappropriate.  I'm sorry.

16   Q.   Okay.  So let's talk now about Dr. Chang's assessment on

17   the biological gradient factor of the Bradford Hill analysis.

18        Dr. Chang in her report takes the scatter plots from the

19   MIREC cohort and the ELEMENT cohort and she removes the

20   regression line.  And then she says:  There is a lot of scatter

21   here, and it's not visually apparent that fluoride is

22   associated with reduced IQ.

23        Let me stop there and ask you:  Does the existence of

24   scatter in these figures in any way call into question the

25   dose-response relationship between fluoride and IQ?

GRANDJEAN - DIRECT  / CONNETT

```
 1   A.    No.
 2   Q.    Can a similar degree of scatter that we see in the ELEMENT
 3   and MIREC cohort studies be found in the scatter plots of lead
 4   and IQ?
 5   A.    Yes.  And we found it for mercury, too.
 6   Q.    So if we applied Dr. Chang's criteria for the biological
 7   gradient, if we applied that test to lead, would lead pass the
 8   test?
 9   A.    I would warn against that.  I mean, this is what we teach
10   in Epidemiology 101.  I mean, don't rely on the visual
11   impression of scatter plots.
12   Q.    So would lead pass Dr. Chang's scatter plot test?
13   A.    No, no.
14   Q.    Would mercury pass Dr. Chang's scatter plot test?
15   A.    No.
16   Q.    So let's move on.
17         THE COURT:  Can I ask an question?
18   Can I assume that the amount of scattering on a plot would
19   inform the confidence level of the standard deviation analysis?
20         THE WITNESS:  Right.  The scatter means that there
21   is, of course, a confidence interval around -- let's say, we
22   have a regression line like this.  Then you will have a
23   confidence range around that.  But the statistical test will
24   tell you if the slope is significant or not.  And so you can --
25   you can visually see that the line may have various angles.
```

1        But if the confidence interval does not include a flat

2   line or one going the opposite direction, it's, of course,

3   statistically significant.

4        That's why we use statistics to assess this.  You can't

5   rely on your own visual impression from, let's say, 500 spots

6   on a piece of paper.

7              THE COURT:  So the visual, the amount of scattering

8   is taken into account in the statistical analysis through the

9   analysis.

10             THE WITNESS:  Yes, yes.

11             THE COURT:  So arguably the more scattered and

12  seemingly to the eye it is, that will be taken into account

13  through the statistical analysis, whether it comes out in terms

14  of confidence intervals or something else; is that right?

15             THE WITNESS:  Exactly, exactly.

16             THE COURT:  So why would one even look at the visual?

17  What does that give you?  If you run it through a statistical

18  analysis, you will generate a confidence interval.

19             THE WITNESS:  Right.  I'm -- I mean, we warn against

20  it.  I mean, this is very simple.  You don't rely on your

21  vision.  You test this, because we have biostatistical methods

22  that can assess this precisely and give you a P value.

23             THE COURT:  Okay.

24  BY MR. CONNETT

25  Q.   So what is more powerful, Dr. Grandjean, biostatistics or

GRANDJEAN - DIRECT  / CONNETT

1    the naked eye when looking at a scatter plot?

2    **A.**   With all due process, Mr. Connett, I don't rely on your

3    naked eye, nor do I rely on my own.  I rely on a biostatistical

4    assessment.

5    **Q.**   So let's -- I'm going to ask you now about Dr. Chang's

6    assessment on the biological plausibility of fluoride causing

7    neurodevelopmental effects.

8        In Dr. Chang's assessment she provides no discussion of

9    fluoride's passage to the blood-brain barrier or potential

10   effects on the thyroid gland.

11       How does that compare with your weight of the evidence

12   assessment in this case?

13   **A.**   Okay.  My assessment is more comprehensive.  And this is

14   what I have done for the World Health Organization in the past

15   and the European Commission.

16       We are looking both at the uptake of fluoride, its

17   distribution, and how fluoride from serum is passing through

18   the placenta into the fetal circulation, passing into the fetal

19   brain.  And there are studies that have documented the presence

20   of fluoride in the brain tissue from aborted fetuses.  This is

21   important information to document the plausibility And.

22       Likewise, the passage into the child's body, let's say,

23   from a formula that the child is fed as an infant.

24       So this is what I took into account in my report.  And

25   though Dr. Chang repeatedly says that she has done a systematic

GRANDJEAN - DIRECT   / CONNETT

1  review, she avoided discussing these matters, and I don't

2  understand why.

3  **Q.**   So let's turn now to Dr. Chang's assessment of the

4  experimental evidence factor under Bradford Hill.

5       In your declaration you know that the NRC in its 2006

6  report discusses case reports that have found neurological

7  manifestation subsequent to fluoride exposure.

8       Why is that important to you, Dr. Grandjean, in

9  considering the experimental factor under Bradford Hill?

10 **A.**   All right.   I agree with the NRC, the NRC's assessment

11 that there is experimental evidence.

12      I think Dr. Wolcott was one of the authors of individual

13 cases where a subject had been exposed to a high fluoride level

14 in the water and developed headaches and whatever neurological

15 symptoms, and where they then disappeared after the fluoride

16 had been -- fluoride exposure had been removed, and then

17 reappeared again.

18      And I think the NRC wrote that very well.   I referred to

19 some of the occupational health evidence, where there is

20 similar experiences from workers who developed similar central

21 nervous system symptoms.

22 **Q.**   And in the occupational workers who have developed

23 symptoms from fluoride exposure, those symptoms, have they

24 included headaches?

25 **A.**   Yeah.   This is -- this goes back to Carl Rohan's thesis

GRANDJEAN - DIRECT  / CONNETT

1    from 1939.  If those were the workers whose cancer experience

2    and mortality that I assessed in the 1980s, so I know that work

3    very well.

4    **Q.**   So getting right to the end here.  I know it's getting

5    late your time.  So I'm going to ask you about Dr. Chang's

6    assessment of coherence.

7              **THE COURT:**  Before you go, let me -- that last point.

8    Did you say that there were -- there have been studies that

9    looked at symptoms such as headaches going back to the 1930s,

10   Dr. Grandjean?

11             **THE WITNESS:**  Right, right.  These were the very same

12   workers who had those skeletal problems that I looked at.

13        I got records from workers back to 1928 -- I mean, 1924.

14   And I followed them up.

15        Rohan, a Danish physician, did clinical examinations.  And

16   in his report from 1939 he also wrote about headaches and

17   dissonance and symptoms like that in the workers.

18             **THE COURT:**  Thank you.

19   **BY MR. CONNETT**

20   **Q.**   In Dr. Chang's assessment of coherence, she points to data

21   indicating that IQs have increased over the 20th century and

22   argues that this is not coherent with water fluoridation

23   reducing IQ.

24        Dr. Grandjean, do you have any -- do you take any issue or

25   do you disagree with Dr. Chang's assessment on that?

A.   Once again, I think Dr. Chang is raising an
inappropriate -- inappropriate issue.

If the Flynn Effect, as it's called, from a professor -- I
think he was in New Zealand, Dr. Flynn.  He was essentially
looking at the performance on IQ tests.  And over time -- you
remember in one of the Wechsler tests you were shown a map of
America, just the contour of the U.S.  And the subject was
supposed to point at what was missing on that.  And the test
had cut off Florida.

And the difference between the time when Dr. Wechsler
developed that test -- there was no television -- and today is
that every day we see the map of America on the weather
forecast and everybody can see, hey, Florida is missing on that
drawing.

And that has nothing to do with IQ.  It has to do with
performance and the -- the background of the test individuals,
the children, if you want.

And, of course, the tests have been modernized over time.
Studies have been done looking at reaction time as a neutral
measurement rather than looking for Florida on the American
map.

And with reaction time, there is no such tendency that the
kids are better.  They have a faster reaction time.  There is
no such tendency.

In contrast, there are actually many studies that show

1   that the reaction time is increasing; that is, performance is

2   worse.  For example, associated with lead exposure and mercury.

3   I'm not sure it has been done on fluoride yet.  But anyway, so

4   the Flynn argument is inappropriate.

5   **Q.**   So when was leaded gasoline entered into the market?

6   **A.**   I think in 1924.

7   **Q.**   And leaded gasoline was banned about what, in the 1980s?

8   **A.**   Yeah.  It was phased out around 1980.

9   **Q.**   If we applied the Flynn test to leaded gasoline, would

10   leaded gasoline pass the test?

11   **A.**   No.

12   **Q.**   And is leaded gasoline well recognized and well

13   established to have reduced IQ in the United States?

14   **A.**   It is.

15   **Q.**   And yet IQ scores under the Flynn test were increasing

16   during the time that leaded gasoline was on the market; is that

17   correct?

18   **A.**   Yeah.

19   **Q.**   Okay.  So lastly, Dr. Grandjean, based on your weight of

20   the evidence analysis, do you have an opinion on whether the

21   association between fluoride in drinking water and neurotoxic

22   effects is a causal one?

23   **A.**   I have a strong opinion based on solid evidence.

24   **Q.**   And what is your opinion?

25   **A.**   My opinion is that fluoride is a definite causal factor in

GRANDJEAN - DIRECT  / CONNETT

1  regard to cognitive deficits in children exposed during early

2  development to this human neurotoxicant.

3  **Q.**   And does your opinion apply to the levels of fluoride that

4  are added to drinking water for fluoridation?

5  **A.**   It does, and it applies to the whole scale.  I think that

6  EPA allows up to 4 milligrams of fluoride per liter.  And it's

7  a limit that has not been changed for many decades.

8       And I think we must now conclude that is outdated, and

9  fluoridation needs to be reevaluated taking into regard this

10  new information.

11       And if fluoridation is going to be continued, I would

12  recommend that the level of fluoride in drinking water respect

13  the BMDL that I have calculated and settle for a much lower

14  concentration than what is currently used.

15  **Q.**   Thank you, Dr. Grandjean.

16          **MR. CONNETT:**  I have no further questions at this

17  time, Your Honor.

18          **THE COURT:**  All right.  Thank you.

19       This is the time that -- why don't we go ahead and take a

20  15-minute break at this time, and we will resume with cross

21  examination.

22          **MS. CARFORA:**  Thank you.

23          **THE COURT:**  Thank you.

24       (Whereupon there was a recess in the proceedings

25        from 10:14 a.m. until 10:31 a.m.)

1           THE CLERK:  Please come to order, court is now in

2    session.

3           THE COURT:  All right.  We're going to resume now

4    with the government's cross examination of Dr. Grandjean.

5           MS. CARFORA:  Thank you, Your Honor.

6                    **CROSS-EXAMINATION**

7    BY MS. CARFORA

8    Q.   Good afternoon, Dr. Grandjean.

9    A.   Good afternoon.

10   Q.   You are not an expert in toxicokinetics; are you, sir?

11   A.   I'm sorry.  I'm not an expert in what?

12   Q.   Toxicokinetics?

13   A.   Well, toxicokinetics is part of my background.

14   Q.   Well, you're not an expert in that area; are you, sir?

15   A.   I would say I'm a sufficient expert in toxicokinetics to

16   assess the impact of toxicokinetics of fluoride in the human

17   body in regard to the risk assessment that I've conducted.

18   Q.   Okay.  Thank you.

19        So you are not an expert in toxicokinetics; is that

20   correct?

21   A.   You are misstating my background.  I just told you that I

22   know enough of toxicokinetics as part of my toxicological

23   background.

24        I have been the advisory toxicology to the Danish

25   Government for over 30 years.  I do know toxicokinetics.

GRANDJEAN - CROSS / CARFORA

```
 1        I think it's inappropriate to state that I'm not an expert
 2   in toxicokinetics.  I'm sorry.  This is inappropriate.
 3   Q.   Sir, do you have an advanced degree or a degree in
 4   toxicokinetics?
 5   A.   There is no such.
 6   Q.   What field does toxicokinetics fall in?
 7   A.   In what field?
 8   Q.   Yes, sir.
 9   A.   I -- I don't understand the question.
10   Q.   Sir, are you -- you are adjunct professor at Harvard; is
11   that correct?
12   A.   I'm an adjunct professor of environmental health at
13   Harvard Chan School of Public Health.
14   Q.   And your professorship is mainly limited to academic
15   research; is that correct?
16   A.   No.
17   Q.   Is -- you do not teach classes at Harvard; is that
18   correct, sir?
19   A.   No.
20   Q.   You -- you do not teach a full academic schedule at
21   Harvard; is that correct, sir?  You only teach -- you only fill
22   in to teach seminars; is that correct, sir?
23   A.   I don't think you understand the teaching at Harvard from
24   the way you're expressing yourself.
25        I do teach when I'm around, and when I -- my talents are
```

1  useful for the degree programs that we have at Harvard School

2  of Public Health.

3  **Q.**   Dr. Grandjean, you have a PhD; is that correct?

4  **A.**   You can call it a PhD if you want.

5  **Q.**   So you do not have a PhD?

6  **A.**   No.  What I say is I am a Doctor of Medical Sciences.  And

7  that was a degree that was available in Scandinavia before the

8  PhD thesis degree was formally instituted.  That, the Doctor of

9  Medical Sciences, is actually a more advanced degree than a PhD

10  because it involves several years of independent research.

11  **Q.**   And is it true, Dr. Grandjean, that in the academic, the

12  academic tradition is to list senior authors last on academic

13  papers; is that true?

14  **A.**   I -- that -- the -- I don't know.  You're generalizing.

15  And it may be that that's the case sometimes.  It may not be

16  the case all the time.

17  **Q.**   Okay.  You and I met back in September; is that correct?

18  I conducted a deposition of you here in Washington D.C.; is

19  that right, sir?

20  **A.**   Ms. Carfora, I recognize you.

21  **Q.**   Great.  And that was on September 13th.

22        **MS. CARFORA:**  And, Your Honor, I'd like permission to

23  read deposition transcript, Lines 92/11 through 93/1?

24        **THE COURT:**  And the purpose of that is for

25  impeachment or what?

```
 1              MS. CARFORA:  Yes, Your Honor.

 2              THE COURT:  Well, let me see if there is...

 3         (Brief pause.)

 4              THE COURT:  Is there any objection?

 5              MR. CONNETT:  No, Your Honor.

 6              THE COURT:  All right.  Hold on for a second.  I got

 7    locked out of Box.com here.

 8              MS. CARFORA:  And, Your Honor, I can have

 9    Mr. Hambrick bring it up on the screen.

10              THE COURT:  Why don't you do that while I'm trying to

11    recover that here?

12         (Document displayed.)

13              THE COURT:  Just for my reference, would I find this

14    in a witness binder?  When you cross, where would I find

15    something like this?

16              MS. CARFORA:  So, actually, the deposition

17    transcript, I know, Your Honor, we actually sent you a hard

18    copy of that last Friday.  You would have gotten them in your

19    witness binders.

20         And I know that we did include -- what we sent you in hard

21    copies we put on Box.com.  So they --

22              THE COURT:  Just go to the depositions.  It's not

23    going to be in the -- all right.  All right.  I have got

24    Dr. Grandjean's.  Thank you.

25              MS. CARFORA:  Okay.  Your Honor, please let me know
```

```
 1    when to proceed.
 2              THE COURT:  Go ahead.
 3              MS. CARFORA:  Okay.
 4    BY MS. CARFORA
 5    Q.   (As read)
 6         "QUESTION:  But you're not listed as the main author
 7         on that paper?
 8         "ANSWER:  I'm saying I was senior author.
 9         "QUESTION:  What does that mean?  How would I, looking
10         at that, know?
11         "ANSWER:  We speak different languages.  Okay?  A
12         senior author -- and I think I was also corresponding
13         author.  A senior author is the one listed last.  So
14         usually the person who has been doing, you know, the
15         field work or whatever it is, is listed first.  And it
16         can be a graduate student, but then the supervisor is
17         listed last.  That's the sort of academic tradition."
18              THE COURT:  Okay.
19              MS. CARFORA:  You can clear the screen, Mr. Hambrick.
20         Thank you.
21         (Document removed from display)
22    BY MS. CARFORA
23    Q.   Well, Dr. Grandjean, in your initial expert report setting
24    forth your opinions and the basis thereof, that was dated
25    June 21st 2019; is that correct?
```

1    A.    I don't recall.  But you're probably right.

2          MS. CARFORA:  And, your Honor, could I have

3    permission to put the cover page on that shows the date?

4          THE COURT:  Yes.

5          MS. CARFORA:  Mr. Hambrick, that's U-30.  If you

6    could zoom in there on the date?

7          (Document displayed.)

8    A.    I see the date.  Thank you.

9    BY MS. CARFORA

10   Q.    June 21st 2019.

11         Now, isn't it true --

12         MS. CARFORA:  And you can clear that.  Thank you.

13         (Document removed from display)

14   BY MS. CARFORA

15   Q.    Dr. Grandjean, isn't it true that you did not offer a

16   Bradford Hill causation analysis for the purposes of forming

17   your opinion in this litigation?

18   A.    What I did was to assess the best available evidence and

19   conduct a weight of the evidence assessment.  And the Bradford

20   Hill aspects, which I teach also, were in the back of my head.

21         So whether I highlighted them or not does not detract from

22   the fact that I did a weight of the evidence assessment, like

23   the EPA says that should be done.

24   Q.    And isn't it true, Dr. Grandjean, that you first saw

25   Dr. Chang's report on August 2nd, 2019?

1    A.    I don't recall.

2            MS. CARFORA:  Your Honor, permission to refresh the

3    witness's memory.

4            THE COURT:  Okay.

5            MS. CARFORA:  Mr. Hambrick it's U-61.

6        (Document displayed.)

7    BY MS. CARFORA

8    Q.    Dr. Grandjean, this is an email from Mr. Connett.  It has

9    the expert reports of Dr. Chang, Dr. Tsuji and Dr. Henry.  And

10   the email is dated August 2nd, 2019.

11       Does that help you refresh your memory?

12   A.    I've seen this email before.  So the date is probably

13   correct.

14           MS. CARFORA:  If you could clear the screen, please?

15       (Document removed from display)

16   BY MS. CARFORA

17   Q.    Isn't it true that you provided a supplemental report

18   responding to Dr. Chang's analysis on August 15th, 2019?

19   A.    I don't recall the date, but I recall that I offered a

20   rebuttal report.

21           MS. CARFORA:  Permission, Your Honor, to refresh the

22   witness's memory.

23           THE COURT:  Yes.

24           MS. CARFORA:  U-47.

25       If we could zoom In on the date.

```
 1          (Document displayed)

 2   A.   I see it.  Thank you.

 3   Q.   Thank you.

 4          MS. CARFORA:  Clear the screen, please.

 5          (Document removed from display)

 6   BY MS. CARFORA

 7   Q.   So then it's true, Dr. Grandjean, that you formed your

 8   opinions in this matter prior to reviewing Dr. Chang's

 9   systematic review; is that correct?

10   A.   I don't recall.

11   Q.   Okay.  So you issued a report in June 21 that had your

12   opinions in it; right?  We've established that; is that true?

13   A.   Can you repeat yourself?

14   Q.   Your report, your initial report that had your opinions

15   included, that was disclosed to the EPA in June of 2019; is

16   that correct, sir?

17   A.   Yeah.  We just agreed on that.

18   Q.   Okay.  And we also just agreed that you first saw Ellen

19   Chang's report on August 2nd, 2019; is that true, sir?

20   A.   That's what that email says.  So I -- I'm not sure if that

21   was the first time I saw it.  I don't remember.

22   Q.   Okay.  Did you -- is your testimony that you seen and

23   considered Dr. Chang's systematic review prior to forming an

24   opinion in this matter?

25          MR. CONNETT:  Overbroad.
```

```
 1              THE COURT:  Overruled.
 2    A.    Forming an opinion on this matter?  I'm not sure what
 3    you're referring to.  I don't understand your question.
 4    BY MS. CARFORA
 5    Q.    Sir, did you have an opportunity to review Dr. Chang's
 6    systematic review before you issued a report in this
 7    litigation?
 8    A.    You know, this is like a long time ago.  A lot has
 9    happened.  I don't remember the details.
10    Q.    Okay.  But you do know that we just established, correct,
11    that you issued your initial report in June and you didn't get
12    Ellen Chang's report until August; is that right?
13    A.    Well, that's what the email indicates.  I don't remember
14    the exact dates.  I'm sorry.
15    Q.    Okay.  So, you know, it is true that you had already
16    formed an opinion on the causation of fluoride exposure prior
17    to offering a critique to Dr. Chang's Bradford Hill causation
18    analysis; is that true?
19    A.    That's what's in my June report.  That was my opinion.
20    Q.    Okay.  Now, so your critique of Dr. Chang's Bradford Hill
21    analysis was conducted after you had already formed and reached
22    your causation conclusions; is that right, sir?
23    A.    I did, and I had the Bradford Hill aspects in the back of
24    my mind.  I don't remember if I went through them in my first
25    opinion, but I did in the rebuttal, and it was very easy for me
```

 1   to do.

 2   **Q.**   In your trial declaration you asserted that your

 3   assessment in this matter follows the general approach applied

 4   by EPA in the sense that you did a weight of the scientific

 5   evidence that focused in on best available science.  Is that

 6   your testimony, sir?

 7   **A.**   That is my testimony today as well.

 8   **Q.**   Okay.  And you cite in your declaration, you cite to EPA

 9   2017, which is the TSCA regulatory rule for conducting risk

10   evaluations under TSCA 6(b); is that correct, sir?

11   **A.**   I'm a physician.  I'm not a lawyer.  I cited the best

12   available reference that I could find.

13   **Q.**   Okay.  And that reference was EPA's risk evaluation rule;

14   is that right, sir?

15   **A.**   I don't recall.

16           **MS. CARFORA:**  And, Your Honor, permission to refresh

17   the witness's recollection.

18           **THE COURT:**  All right.

19           **MS. CARFORA:**  Mr. Hambrick, if you could bring up

20   U-25, beginning at Paragraph 25.

21       (Document displayed.)

22   **BY MS. CARFORA**

23   **Q.**   You see the cite there to EPA 2017?

24           **MS. CARFORA:**  And then, Mr. Hambrick, if you could go

25   to Page 60?

1   A.   I see that, and I apologize if I chose the wrong

2   reference.

3   **BY MS. CARFORA**

4   Q.   On Page 60, it should be towards the bottom.  It's around

5   Line 18 -- Line 21, actually.

6        (Document displayed.)

7   Q.   There we go.

8             "EPA 2017 Procedures for Chemical Risk Evaluation

9        Under the Toxic Substances Control Act."

10       So that's what you cited to; right, sir?

11  A.   It appears so.  I -- honestly, I don't recall the details.

12            **MS. CARFORA:**  Okay.  You can clear the screen,

13  please.

14       (Document removed from display)

15  **BY MS. CARFORA**

16  Q.   And are you aware, Dr. Grandjean, that the risk evaluation

17  rule says that:

18            "Integrating systematic review into a weight of

19       the scientific evidence approach is critical to meet

20       the statutory requirements of TSCA."

21       Are you aware that, sir?

22  A.   I think it should be critical, so I agree.

23  Q.   Okay.  And record that -- and you did not do a systematic

24  review in this -- in forming your opinion; is that right, sir?

25  A.   I did a systematic review in 2012, and then I did a

GRANDJEAN - CROSS / CARFORA

1  comprehensive updated review in my June report from last year.

2  **Q.**    Okay.  But you did not conduct a systematic review in

3  forming your opinion for this litigation; is that right, sir?

4  **A.**    You are misquoting me.  I did a systematic review in 2012,

5  and then I did a comprehensive updated review for my June

6  report.

7  **Q.**    Okay.

8         **MS. CARFORA:**  Mr. Hambrick, can you we -- Your Honor,

9  permission to bring up the witness's trial declaration?

10         **THE COURT:**  All right.

11     (Brief pause.)

12         **MS. CARFORA:**  Paragraph 26 in the declaration,

13  please, Mr. Hambrick.

14     (Document displayed.)

15  **BY MS. CARFORA**

16  **Q.**    You see there.  You say:

17         "In light of my familiarity with the scientific

18         literature on fluoride and neurotoxicity, I did not

19         conduct a formal systematic review on this occasion.

20         Instead, my conclusions relied on a comprehensive and

21         thorough review supplemented by a benchmark dose

22         analysis of the recent prospective data."

23         **MS. CARFORA:**  Thank you.  You can clear the screen.

24     (Document removed from display)

25  **A.**    I stand by that statement.

GRANDJEAN - CROSS / CARFORA

1   BY MS. CARFORA

2   Q.   And, Dr. Grandjean, are you aware that the risk evaluation

3   rule lists key elements of systematic review that would meet

4   that methodology?

5              MR. CONNETT:   That misstates the record.

6              THE COURT:   Why don't you ask it in a different way.

7   BY MS. CARFORA

8   Q.   Dr. Grandjean, are you aware that the risk evaluation rule

9   lists key elements of systematic review?

10  A.   Again, I'm a physician.   I'm sure that given my report,

11  EPA could do the proper documentation according to the legal

12  practices that they prefer.   I'm not a lawyer.

13       So I -- what I've done is to obtain the best available

14  evidence and conduct a weight of the evidence assessment.   And

15  this is exactly what EPA is calling for.

16       And I apologize if I have cited a wrong reference or

17  expressed myself in terms that are not exactly in accordance

18  with EPA's preferences.

19       I have looked at the science, and that's what should count

20  when we assess whether or not fluoride is a hazard to the next

21  generation's intelligence.

22  Q.   Okay.   So it is true then that you have not followed the

23  general approaches applied by EPA under the EPA risk evaluation

24  rule; is that correct?

25  A.   I don't know if it's correct.   I have done what I just

1   told you.  And it -- I admit, it may not be exactly what EPA

2   would like to do, but given what I have produced --

3        (Court reporter clarification due to audio

4         interference.)

5            THE COURT:  We couldn't hear you, Dr. Grandjean.  If

6   you could finish what you were saying.

7   A.   Okay.  So I have provided what EPA is asking for.  Namely,

8   an assessment of the best available evidence.  And I have

9   conducted a weight of the evidence assessment, exactly like EPA

10  is calling for, and that the National Academy of Sciences has

11  called for, for assessment of environmental chemicals.

12       And I apologize if my wording and the fact that I didn't

13  conduct a systematic -- or something that the EPA would call

14  systematic review of the evidence for the last seven or eight

15  years.  We did one in 2012.

16       And as you already understand, there is nothing that I may

17  have overlooked that changes my mind at all.  In fact, the few

18  references that Dr. Chang was able to find helped consolidate

19  my conclusions, not the opposite, as he has claimed.

20            MS. CARFORA:  Mr. Hambrick, can you bring up EPA's

21  Trial Exhibit No. 544, please?  Page 9, middle column.

22       (Document displayed.)

23  BY MS. CARFORA

24  Q.   Now, Dr. Grandjean, this is what we were just talking

25  about, where EPA says it:

1              "Sees weight of the scientific evidence approach

2         as an interrelated part of systematic review, and

3         further believes that integrating systematic review

4         into TSCA risk evaluations is critical to meet the

5         statutory requirements of TSCA."

6         So that's in this document here that you cited to;

7    correct?

8    A.   I don't recall.

9    Q.   Okay.

10             MS. CARFORA:   And then, Mr. Hambrick, can you go

11   further down?   Page 9, middle column, starts with "key elements

12   of systematic review," and goes onto the next section?

13        (Document displayed.)

14   BY MS. CARFORA

15   Q.   Now, you see, Dr. Grandjean, in the first element of

16   systematic review here in EPA's document that you cited to, it

17   calls for a "clearly stated set of objectives defining the

18   question."

19        Now, if I understand correctly, the scope of your

20   evaluation for this litigation is focused on developmental

21   neurotoxicity; is that correct?

22   A.   I went beyond that.

23   Q.   Okay.  So -- and isn't it true, Dr. Grandjean, that your

24   dose-response analysis focused on reporting -- reported

25   cognitive deficiencies associated with maternal urinary

1    fluoride concentrations?

2    A.    I went beyond that, too.

3    Q.    In the BMD analysis you went beyond that?

4    A.    No, not the BMD analysis.  That was based on the critical

5    life stage in regard to the most sensitive outcomes.

6    Q.    And the critical life stage being fetal -- infancy and

7    fetal development?

8    A.    And early infancy.

9    Q.    Now, you're not offering an opinion today about fluoride

10   causes IQ loss in adults, are you?

11   A.    That was not the task I was given.

12   Q.    Okay.  And your causal analysis was based on the observed

13   relationship between elevated fluoride exposure and IQ loss; is

14   that correct?

15   A.    That is correct.

16   Q.    Okay.

17           MS. CARFORA:  I'm sorry, Mr. Hambrick.  I'm going to

18   ask you to put that back up.

19       (Document displayed.)

20   BY MS. CARFORA

21   Q.    When you see the next key element of systematic review is:

22           "Developing a protocol which describes the

23       specific criteria and approaches that will be used

24       throughout this process."

25       Now, you did not offer that in your report for this

1  litigation; did you, sir?

2  **A.**   I am sure you can find the many deviations from EPA's

3  practice.

4       I think EPA has to publish this in the Federal Register.

5  I didn't do that.  I'm sorry.  So I -- my assessment, which is

6  based on the science, is not relying on some legal criteria.

7       I'm sorry, I couldn't do that.  I'm -- I'm a mere

8  physician and, therefore, not aware of these legal aspects.

9  **Q.**   Okay.  Sir, and you see the next element.  It says:

10          "Applying the search strategy criteria in a

11          literature search."

12       Now, you did not conduct a literature search for this

13  litigation; did you?

14  **A.**   I did.

15  **Q.**   Okay.  You did.  Okay.  But you did not write down your

16  search criteria in any of your reports or declaration; did you,

17  sir?

18  **A.**   I did not because we did that in the 2012 paper and I

19  simply continued the systematic search up to 2019.  And so

20  it's -- I'm a scientist, and I use scientific methods.  And for

21  me to express everything in great detail when it's obvious what

22  I did, I'm sorry I didn't provide that detail.

23  **Q.**   Okay.  And you see on the column that's on my right-hand

24  side, I'm not sure if it's on everybody else's, the second box.

25  It says:

1              "Assessing the quality of the studies using a

2         predefined criteria."

3         Now, you did not assess each of these studies using a

4     pre-defined criteria; is that correct?

5     **A.**   No.

6              **MS. CARFORA:**  You can clear the screen, Mr. Hambrick.

7     Thank you.

8         (Document removed from display)

9     **BY MS. CARFORA**

10    **Q.**   Now, Dr. Grandjean, you are not an expert in

11    biostatistics; is that correct?

12    **A.**   Where do you know that from?  I use biostatistics every

13    day.

14    **Q.**   Are you being offered as an expert in this litigation as

15    an expert in biostatistics?

16    **A.**   No.  I am here as an expert in the risk assessment of

17    human developmental neurotoxicants and as an expert appropriate

18    for this case on fluoride.  I, of course, rely in part on my

19    biostatistical background, which was part of the education I

20    took way back as a young physician when I was going for my

21    doctorate of medical sciences.

22    **Q.**   Dr. Grandjean, you testify in Paragraph 18 of your

23    declaration that you have published seven articles in

24    international biostatistician and biomedical journals in

25    collaboration with Dr. Budtz-Jorgensen; is that correct?

1    A.   I think so.  I don't remember the number.  But seven or

2    eight, something like that.

3            MS. CARFORA:  Mr. Hambrick, can you bring up U-25,

4    Paragraph 18, please?

5        (Document displayed.)

6    A.   Okay.

7            MS. CARFORA:  You can clear that, Mr. Hambrick.

8    Thank you.

9        (Document removed from display)

10   BY MS. CARFORA

11   Q.   Dr. Grandjean, how many of those seven articles were your

12   listed as first author?

13   A.   I don't remember.  I think my biostatistical colleague,

14   Esben Budtz-Jorgensen, was listed first because he has some

15   education and a PhD of biostatistics and is now chairman of the

16   department in Copenhagen.

17   Q.   So you do not have an education and PhD in biostatistics;

18   is that right?

19   A.   I have taken what you would call PhD classes in

20   biostatistic, yes.

21   Q.   Did you earn a PhD degree in biostatistics?

22   A.   There was no such degree when I graduated.

23   Q.   Dr. Grandjean, isn't it true that the BMD analysis for

24   methylmercury was conducted by your biostatic colleagues, Dr.

25   Esben Budtz-Jorgensen and Professor Niels Keiding; isn't that

1  right?

2  **A.**   We collaborated, all three of us.  And my two biostat

3  colleagues were responsible for the equations with the Greek

4  letters.  I understand them, and so I signed on as coauthor.

5       I was actually the one who got the contract with EPA in

6  agreement with my biostat colleagues.  So, yes, we did this in

7  collaboration.

8  **Q.**   Okay.  And it's true that you did not conduct the actual

9  statistical interpretation of the modeling approach that was

10  used for calculating BMD for methylmercury; is that correct?

11  **A.**   Once again, I prefer to leave this to the people with

12  degrees in biostatistics to take responsibility for that,

13  because it would be inappropriate for a mere physician like me

14  to say:  I did it.

15       While we collaborated, and I understand exactly what they

16  wanted to do, but it is better for me and for them and for the

17  audience that they are listed first because the message is

18  primarily biostatistical, but it has a public health angle that

19  I was responsible for.

20       And that is also for the interpretation of benchmark dose

21  calculations and the, you know, relevance to decisions in

22  public health and society.

23  **Q.**   Dr. Grandjean, you would agree that BMD -- I'm going to

24  refer to benchmark dose as BMD.  You're okay with that; is that

25  right?

GRANDJEAN - CROSS / CARFORA

1  A.    I'm very much okay.

2  Q.    You would agree that BMD modeling is a highly technical

3  exercise; isn't that correct?

4  A.    It can be.  It depends on the data at hand.

5  Q.    Okay.  And you cited -- in your declaration you actually

6  cited to EPA's 2012 benchmark dose technical guidance; is that

7  correct?

8  A.    That's the standard reference, yes.

9  Q.    What do you mean by "standard reference"?

10 A.    Because it's an EPA guidance and EPA made software

11 available.  So I think it's the only one that EPA has released,

12 so I would call it standard.

13 Q.    And did you follow those -- that guidance while you were

14 conducting your BMD calculations in this litigation?

15 A.    I believe so.

16 Q.    Now, isn't it true, Dr. Grandjean, that you did not

17 conduct the actual computation of BMDs that serves as the basis

18 for your opinion in this litigation?

19 A.    Once again, I prefer to leave this to a biostatistical

20 expert who is internationally recognized, because I think that

21 adds to the confidence that you can have that those

22 calculations are correct --

23 Q.    Isn't it --

24 A.    -- because I relied on an impartial expert colleague.

25 Q.    I apologize for interrupting you, sir.

1           Isn't it true that you did not conduct the actual
2   statistical interpretation of the modeling approach that serves
3   the basis of your opinion in this litigation?
4   **A.**   No.
5   **Q.**   No, it's not true; or no, you didn't do it?
6   **A.**   I mean, I could have sent this report to you without
7   mentioning my colleague, Dr. Budtz-Jorgensen.  Because as I
8   also -- when the judge asked me about the details of the
9   calculation, it's actually quite simple.
10          And you can see that it's a matter of dividing the BMR by
11  the beta value.  You can do this on the back of an envelope.
12  You could do it.  I mean, I don't know you -- if you have a
13  math degree as a background, you don't even need that.  You can
14  do it on the back of an envelope.
15          So I did the calculations myself, and Dr. Budtz-Jorgensen
16  and I ended up with the same result.  He did, and I couldn't
17  have done that.  He scanned the figure from the ELEMENT study
18  where he extracted the data points where we were missing one.
19  And then he applied the software, the statistical approach,
20  which is similar to EPA's software, to actually calculate on
21  the basis of the raw data the exact BMD and the exact BMDL,
22  except that we were missing one data point.
23          So it may not be exact anyway.  But you could see that
24  what I call the back-of-the-envelope calculation is almost the
25  same as the advanced biostatistical calculation based on the

1    multitude of raw data.

2    **Q.**   Dr. Grandjean, did you or Dr. Budtz-Jorgensen do the

3    calculation for the Green 2019 study?  Which one of you ran

4    that calculation?

5    **A.**   We did it both of us.  It's the same.  Because it's a BMR

6    divided by the beta, beta value.

7    **Q.**   And which calculation, your calculation or

8    Dr. Budtz-Jorgensen's, which calculations did you put into your

9    trial declaration, sir?

10   **A.**   Our own joint result, which were the same.

11   **Q.**   Okay.

12          **MS. CARFORA:**  Your Honor, can I share for impeachment

13   purposes an email dated August 2nd, 2019 from Esben

14   Budtz-Jorgensen to Dr. Grandjean?

15          **THE COURT:**  Okay.

16          **MS. CARFORA:**  That is, Mr. Hambrick, U-35.

17          **THE COURT:**  What is this again?

18          **MS. CARFORA:**  This is an email from

19   Dr. Budtz-Jorgensen to Dr. Grandjean on August 2nd, 2019.  And,

20   unfortunately, this is in Danish.  So I have run a rough

21   interpretation.

22       I'm looking actually at the bottom part there, Mr.

23   Hambrick, the email from Mr.Grandjean -- or Dr. Grandjean to

24   Dr. Jorgensen.

25          (Document displayed.)

1  BY MS. CARFORA

2  Q.   I have a rough calculation.  But, Mr. Grandjean -- or,

3  Dr. Grandjean, do you want to translate this for us?

4  A.   I don't recall this email.  And you can see that it's

5  after I submitted the June report.

6  Q.   That's right.  And you did not conduct your Green BMD

7  analysis in your initial report; correct?  You did that in your

8  supplemental report; is that right?

9  A.   I don't recall.  But I can see the date is later than any

10  June report.  So I don't remember these details.

11  Q.   Okay.  Is this your email address?

12       MS. CARFORA:  Mr. Hambrick, can you zoom in on the

13  email address, please?

14  A.   I can see it from here.  It's my email address.  I haven't

15  looked at that email for a very long time.

16  BY MS. CARFORA

17  Q.   Okay.  And can you very quickly interpret for me -- I can

18  do it if you want me to, but can you interpret for us just

19  right there what that says?

20  A.   I'm not prepared to do that because I've not looked at

21  this for a long time.  So would you allow me several minutes

22  to, and perhaps find the original email so that I'm -- I'm sure

23  that we're talking about the same thing?

24  Q.   I -- this email, this document that I got was produced to

25  me from Mr. Connett.  And I'm sure Mr. Connett can tell you

1  that that's what happened.  And, you know, I'm not sure it's

2  appropriate that you should be looking at your computer in the

3  middle of cross-examination.

4          **THE COURT:**  Well, what are you -- are you asking him

5  to interpret the -- literally translate, or are you asking him

6  to give an interpretation?  I'm not sure what you're asking him

7  to do.

8          **MS. CARFORA:**  Well, I just wanted to him to let the

9  Court know what this email says.  What he's asking

10 Dr. Budtz-Jorgensen to do I would like him to tell the Court.

11         **THE COURT:**  That's a different question.  The witness

12 can look at it.  If it takes you a couple minutes to look at

13 it, it's on the screen.

14     The precise question is what, Ms. Carfora.

15         **MS. CARFORA:**  What he was asking Dr. Budtz-Jorgensen

16 to do for him in this email.

17         **THE COURT:**  Okay.  All right.  That's the question.

18     And you can look at it, Doctor, and then answer that

19 question.

20     (Brief pause.)

21 **A.**  It does mention a benchmark dose.  So I don't know what

22 we're talking about here.

23         **MS. CARFORA:**  Your Honor, I could do a couple things.

24 I can ask Mr. Hambrick, he can throw it into a Google

25 translator for us on the screen so we can all see it together.

```
 1    I can tell you what my quick interpretation is.
 2         How would the Court like me to handle this?
 3              THE COURT:  Well, all right.  So you are talking
 4    about the first paragraph.  You want it actually translated, is
 5    what you're saying.
 6              MS. CARFORA:  Yes, Your Honor.
 7              THE COURT:  All right.  Are you able to do that?
 8              THE WITNESS:  Oh, I can do that.
 9              THE COURT:  Would you just read that?  I know you're
10    not a court interpreter, but if you could use your language
11    skills and help me understand what it says.
12              THE WITNESS:  Oh, okay.  Okay.
13         I'm saying to Esben:  Here are the Canadian results where
14    MUF -- as you can see, the first column of the table.  MUF is
15    maternal urine-fluoride in milligrams per liter of full scale
16    IQ.  FS/IQ is the full scale IQ.  Can we use the same formula
17    as you used for the Mexican data?  There is clearly an effect
18    on the boys, but using your (audio interference) there is none
19    for the girls.  Both sexes show an effect if you instead use a
20    calculated daily intake of fluoride, including tea.
21         So this is what I wrote in Danish.
22         I don't remember if I copied that table or if it's
23    something that Esben supplied, but it apparently shows the beta
24    values.
25
```

1    BY MS. CARFORA

2    Q.    And that was part of your email to Dr. Budtz Jorgensen; is

3    that right?

4    A.    That's what it appears.  But apparently it says

5    "confidential" on this piece and maybe that's why I don't

6    remember it.

7    Q.    Doesn't it say confidential, Dr. Grandjean, because the

8    Green 2019 manuscript had not yet been published at the time

9    you were using this data to run a BMD analysis; isn't that

10   right?

11   A.    It was not officially published, but it was circulated,

12   because it had been accepted for publication and the results

13   had been presented at the International Society for

14   Environmental Epidemiology meeting.

15   Q.    Okay.

16          MS. CARFORA:  And, Mr. Hambrick, can you just pull

17   out a little bit?

18      (Document displayed)

19   BY MS. CARFORA

20   Q.    This is the email that Dr. Budtz-Jorgensen sent back to

21   you; is that right?  That's the calculation that he apparently

22   completed.  Would you agree with that?

23   A.    Okay.  He says:  Hi Phillipe.  Here is a quick

24   calculation.  The unit is milligram."

25      And then you can see the BMD and the BMDL.

1    Q.   And you used that BMDL, that email from

2    Dr. Budtz-Jorgensen, and you used that in your export report in

3    your trial declaration; is that right, sir?

4    A.   I don't recall because he went back and forth a few times.

5    So this is from August 2nd.  And, again, I don't remember.

6    This is a long time ago.

7    Q.   And do you remember the date you --

8         MS. CARFORA:  You can clear this, Mr. Hambrick.

9    Thank you.

10        (Document removed from display)

11   BY MS. CARFORA

12   Q.   Do you remember the date, Mr. Grandjean, that you

13   submitted your supplemental expert report?

14   A.   No.

15        MS. CARFORA:  Your Honor, can I have permission to

16   refresh the witness's memory?

17        THE COURT:  Yes:

18        MS. CARFORA:  Mr. Hambrick, do you have the cover

19   page of Dr. Grandjean's rebuttal report?

20        THE WITNESS:  It's actually Grandjean.

21        MS. CARFORA:  Grandjean.  I'm sorry, sir.

22        (Document displayed.)

23   A.   I've seen this before.

24   BY MS. CARFORA

25   Q.   I'm sorry?

1    A.    We've seen this before.  I just didn't learn the date by

2    heart, so...

3    Q.    Okay.  And the date on this supplemental report is

4    August 14th, 2019; is that right?

5    A.    Right.

6    Q.    Okay.  And that's about 12 days after Dr. Budtz-Jorgensen

7    sent you this email with the BMD calculations in it; is that

8    correct?

9    A.    What I don't remember is -- because he said in the email,

10   as I translated for you, it was a rough calculation.

11          And what I don't remember is if he went over the data

12   again and gave me some better numbers and if my calculations

13   were different, but at least we agreed on the table that I have

14   also copied in my declaration.

15   Q.    Okay.

16          MS. CARFORA:  You can clear the screen, please.

17          (Document removed from display)

18   BY MS. CARFORA

19   Q.    Dr. Grandjean -- I'm sorry, I'm going to do my best to get

20   that right for you, sir -- you did offer two benchmark dose

21   calculations that you prepared in anticipation of this

22   litigation; is that correct?

23   A.    One for the ELEMENT study and one for the Canadian study.

24   Q.    And the ELEMENT study is Bashash 2017; is that right, sir?

25   A.    That is correct.

1   Q.   And the MIREC study is Green 2019, is that right, sir?

2   A.   Right.  It's actually 2020, if you want the formal

3   publication date.  But it was -- as I already said to you

4   before, it was widely available in 2019.

5   Q.   And I think we talked about this, but your opinion is that

6   Bashash 2017 and Green 2019 data analyzed fluorides,

7   toxicities, critical effect, right, in the most highly

8   vulnerable subpopulation.

9        Is that your testimony, sir?

10  A.   I think that's an appropriate summary, yes.

11  Q.   And the term "critical effect," that refers to an

12  endpoint; is that correct?

13  A.   Yes.  I refer to developmental neurotoxicity as a critical

14  endpoint.  And this is -- I mean, you can read about it in my

15  book called *Only One Chance*.  You only have one chance to

16  develop the brain you're going to live with the rest of your

17  life.  And this is common knowledge in environmental health

18  sciences.

19  Q.   And the endpoint that you were concerned with in your BMD

20  analysis, that was loss of IQ; correct?

21  A.   That was what?

22  Q.   Loss of IQ?

23  A.   Loss of IQ, yes.  And the benchmark response was one IQ

24  point.

25  Q.   And you did not conduct a BMD analysis for any other

1   endpoints; is that correct?

2   A.   We did one for a five, just to see where the numbers were.

3   But since EPA has recognized that the loss of one IQ point is

4   an adverse effect, there is no reason for us to choose two or

5   1.3 or 0.7.  We choose one, because that's what EPA has done

6   and this is what others have done.  The European Food Safety

7   Authority has done it.  Others have relied on one IQ point.

8        You could argue that the loss of a half IQ point is bad,

9   also, but we -- we did the calculation for one.

10  Q.   Now, the BMR is the IQ point, but did you do a BMD

11  analysis on any other neurotoxic endpoints, ADHD or ADD,

12  anything like that?

13  A.   No.  We chose not to do that.  I mean, I would suggest to

14  EPA that when they go for a final rule on fluoride, that they

15  look at the ADHD data because there is actually a lot of

16  information there.

17       We decided to go for IQ because everybody knows that

18  losses of IQ points in the next generation is an adverse

19  effect.  So, and since EPA had already said that one IQ point

20  is an adverse effect, that's the -- easy to go for.

21       With the ADHD it's like a scale and their diagnostic

22  criteria, and so that could be used for supplementary argument.

23  But the primary argument should be IQ losses.

24  Q.   Okay.  So I agree that EPA, if EPA were reviewing, doing a

25  risk assessment on fluoride, that it should consider other

1    neurotoxic effects other than loss of IQ; is that correct.

2    **A.**    It will be up to -- again, I'm just a physician.   If EPA

3    thinks in order to satisfy the TSCA legislation that it's

4    important to look at other aspects of neurotoxicity, I'm

5    whole-hearted behind them.

6    **Q.**    Okay.   And do you know, does the BMD dose-response

7    guidance that you relied on in conducting your BMD analysis

8    here, do you know if that guidance suggests that BMD be run on

9    other endpoints or just one endpoint?

10   **A.**    I don't recall.

11   **Q.**    Okay.   Now, you agree, Dr. Grandjean, that BMD

12   calculations normally require access to original raw data;

13   isn't that correct?

14   **A.**    I would think that that should be required.   And that's

15   why we read the raw data from the published information, from

16   the Bashash study.

17        And since the numbers that -- we could calculate from the

18   digitized data, but we were missing one data point.   Since our

19   result was in almost perfect agreement with the one just based

20   on the tabular information in the Bashash paper, I would say

21   that the tabular information is sufficient.

22        We didn't do that for the MIREC study because we couldn't

23   read the data from the figures.   And in the meantime, we had

24   agreed with both research groups that we should together do a

25   BMD calculation on both studies and the joint evidence.

1   Q.   Now, isn't it true, sir, that Budtz-Jorgensen, he sent you

2   a description of the BMD calculations that he ran.  And what he

3   told you was:  Because you obtained only 286 endpoints, the

4   following calculations will not be completely accurate; isn't

5   that what he told you?

6   A.   Are you referring to the Bashash paper?

7   Q.   Yes.  That is correct.

8   A.   Yeah, because we were missing one data point.

9   Q.   And Dr. Budtz-Jorgensen told you because you were missing

10  the data points, your BMD is not going to be completely

11  accurate; is that correct?

12  A.   Well, I already told you.  In my table I have the data for

13  the digitized data, but we were missing one data point.

14       And I also give you the results where we're just using the

15  tabular information.  And you can see those numbers are almost

16  indistinguishable.

17       And so as a biostatistician, he has to say there could be

18  some inaccuracy here because we're missing one datapoint out of

19  two hundred and something.  Clearly, the results on those two

20  lines -- we've already seen that table this morning, your time.

21       All I'm saying -- and that's why that red line on the

22  figures is sort of hazy, because I can't say if the BMDL is

23  exactly 0.15 or if it's 1.53, or 1.42, or something.  I can't

24  say that for sure.

25       But we will calculate this, the two research groups in the

1    Canadian and Howard Hu's group that did the Mexico study, they

2    have agreed we'll do this.  It's just that it's more

3    complicated than we envisioned because we have to work out of a

4    safe server, so this has not been done yet.  But, hopefully,

5    with economic support from EPA we can do it.

6    Q.   Okay.  Now, the first step in your BMD analysis was the

7    selection of a benchmark response; is that correct.

8    A.   I think we've been through this.  This is the one IQ point

9    that is an adverse effect.  That is a benchmark response.

10   Q.   Okay.  And if I refer to that as a BMR, you understand

11   what I'm talking about; is that true, sir?

12   A.   Indeed.

13   Q.   Okay.  And is it also true that a higher BMD would be

14   possible if you chose a higher BMR; is that correct?

15   A.   I think I wrote that in my original report.

16   Q.   Now, you testified a couple minutes ago that your

17   justification for choosing a BMR of one IQ point is based on

18   EPA a regulation that used one IQ point; is that right?

19   A.   I think I provide a proper reference to EPA in regard to

20   lead.

21   Q.   Sir, isn't it true that EPA concluded that an air-related

22   IQ loss of two points will be used in conjunction with the

23   evidence based framework in selecting an appropriate level for

24   the lead max; isn't that true?

25   A.   You may well be right, but I don't remember the exact

GRANDJEAN - CROSS / CARFORA

1   wording.

2   **Q.**   When you were conducting your BMR analysis, you said that

3   you -- your justification was that EPA had chosen one BMR

4   before; is that right?

5   **A.**   That's my understanding.  And this is what has been used

6   in multiple other occasions.

7   **Q.**   Okay.

8           MS. CARFORA:  Can we put up Plaintiff's Trial

9   Exhibit 42, please?  I believe it's PDF Page 43.

10      Middle column, bottom, begins with, "The administrator

11  concludes."

12      (Document displayed.)

13  **BY MS. CARFORA**

14  **Q.**   It says here:  "The administrator concludes" -- I'm sorry.

15          MS. CARFORA:  Even better.  Thank you, Mr. Hambrick.

16  **BY MS. CARFORA**

17  **Q.**   (As read:)

18           "The administrator concludes that an air-related

19       IQ loss of two points should be used in conjunction

20       with the evidence based framework in setting an

21       appropriate level for the lead standard."

22      Do you see that, sir?

23  **A.**   I see that.  It's new to me.

24  **Q.**   Okay.

25          MS. CARFORA:  Can you clear the screen, please?

1          (Document removed from display)

2    BY MS. CARFORA

3    Q.   Are you also aware, Dr. Grandjean, that EPA proposed a two

4    point IQ decrement for establishing the MCLG for perchlorate?

5    A.   I'm not an expert on perchlorate, so I haven't seen that.

6          I would personally, as a physician -- and I'm sure that

7    you would agree with me as a mother -- that you would not agree

8    that your child should lose two IQ points without that being

9    called an adverse effect that should be prevented.

10   Q.   And, Dr. Grandjean --

11          MS. CARFORA:   Mr. Hambrick, can we put up Plaintiff's

12   Trial Exhibit 43, please?

13          It would be at Page 13, third column top.  Beginning with,

14   "To develop."

15          Mr. Hambrick, can you zoom in on third column top,

16   beginning with, "To develop the proposed MCLG for perchlorate."

17          (Document displayed)

18   BY MS. CARFORA

19   Q.   It says:

20          "To develop the proposed MCLG for perchlorate the

21          EPA made a policy decision to use a two IQ point

22          decrement in the population of distribution of IQ for

23          the sensitive population."

24          Do you see that, sir?

25   A.   I see that.  I've not seen it before.  And I personally

1    would warn against that because two IQ points, in my mind, is

2    excessive.

3              MS. CARFORA:  Would you clear the screen, please?

4         (Document removed from display)

5    BY MS. CARFORA

6    Q.   And in your analysis here -- I think you already said

7    this, but I just want to make sure.

8         In your analysis here you did not present a range of BMDs

9    associated with the BMR, or a range of BMRs; is that correct?

10   A.   It is correct.  But if you look at my explanation of

11   benchmark dose calculations, you will see that you can adjust

12   the findings.  You can adjust my results.  It will be a

13   back-of-the-envelope calculation, if you insist.  I warn

14   against it.

15        But if you insist two IQ points is admissible, that the

16   next generation could lose two IQ points without anybody

17   batting an eyelash, you can do the calculation.  You know what

18   you do?  You multiply my numbers in the table by two.

19   Q.   Okay.  And, Dr. Grandjean, is it your testimony that the

20   methodology employed for calculating the BMD in this litigation

21   is the same methodology employed in your prior BMD assessment

22   of lead; is that correct?

23   A.   In my prior?  I'm sorry, what?

24   Q.   BMD assessment of lead.

25   A.   Yeah.  This is the 2013 by the international collaboration

1    on lead neurotoxicity.

2    Q.    And that article was called an "International Pooled

3    Analysis for Obtaining a BMD for Environmental Lead Exposure in

4    Children."

5         Is that the paper you're referring to?

6    A.    Yeah.  Yes, it is.

7    Q.    Okay.  And is it -- can I refer to that as the 2013 lead

8    paper?  Is that okay?

9    A.    That's fine.

10   Q.    Okay.  Now, you were listed as a senior author on that

11   paper; is that right?

12   A.    Yeah.  My name was before we said "and the international

13   collaboration."

14   Q.    And Dr. Budtz-Jorgensen, he was listed as the lead author;

15   is that correct?

16   A.    That is correct.

17   Q.    Now, isn't it true that your role in the 2013 -- 2013 lead

18   BMD paper was coordinating your international colleagues

19   together so that they could collaborate on this project; is

20   that right?

21   A.    That's a simplified version.  I can agree with that.

22   Q.    Okay.  And is it your testimony that the methodology

23   described in the 2013 lead paper is reliable?

24   A.    It is.  And you will see that we jointly, all of these

25   authors, agreed that a benchmark response of one IQ point was

```
 1   appropriate.
 2   Q.   And is it your testimony that the methodology described in
 3   the 2013 lead paper is generally accepted by the risk
 4   assessment community; is that correct?
 5   A.   I haven't gauged that, but I -- I don't see anything that
 6   we did which could be in contrast to any of my colleague's
 7   opinions.
 8   Q.   Now, the 2013 lead analysis presented statistical methods
 9   for calculating BMDs based on combined data from seven
10   prospective epidemiology studies; is that correct?
11   A.   That is correct.
12   Q.   And in 2013 you said that this approach was superior for
13   estimating exposure limits because uncertainty in regard to the
14   true level of BMD will decrease; is that correct?
15   A.   I don't recall the exact phrasing, but it sounds right.
16        MS. CARFORA:  Okay.  Your Honor, can I refresh
17   recollection please?
18        THE COURT:  Go ahead.
19        MS. CARFORA:  All right.  U-43, Page 10.  First
20   column beginning with "if information is pooled."
21        THE COURT:  By the way, is this in evidence?  When
22   you say U-43, what --
23        MS. CARFORA:  This is not, Your Honor.  This is
24   reliance material.
25        THE COURT:  Okay.
```

```
 1              MS. CARFORA:  Mr. Hambrick, can you zoom in for us?

 2         Mr. Hambrick, can you find "if the information is pooled"?

 3    It should be...

 4         (Document displayed.)

 5              MS. CARFORA:  There we go.  Thank you very much.

 6    BY MS. CARFORA

 7    Q.   This says:

 8              "If the information is pooled, then the

 9         uncertainty in regard to the true level of BMD will

10         decrease as a result of the larger dataset from an

11         increased number of studies."

12         Is that right, Mr. -- Dr. Grandjean?

13    A.   Yeah, that's what it says here.

14    Q.   Okay.  And it says -- goes on to say:

15              "In comparison BMDLs from individual studies will

16         suggest a greater degree of uncertainty with most BMDL

17         values being lower than the BMDL for the combined

18         dataset."

19         Is that right?

20    A.   Right.  And it's a simple effect of the certainty being

21    greater when you have a larger material to work on, and that

22    means that the lowered confidence limit will be closer to the

23    BMD.

24         And so I would predict that when we do the joint analysis

25    for ELEMENT and MIREC, that we'll find about the same BMD, but
```

1  that the BMDL will be a little bit higher.  I mean, it will

2  still be low.  It will still be below the BMD, but it will be

3  closer, a little bit closer to the BMD simply because there is

4  less statistical variability.

5  Q.  Okay.

6       MS. CARFORA:  You can clear the screen, please.

7       (Document removed from display)

8  BY MS. CARFORA

9  Q.  And so you agree, Dr. Grandjean, that you did not employ

10  the same pooled methodology in this litigation that you did in

11  the 2013 paper, is that right?

12  A.  I think I've already explained that we plan to do this,

13  but we haven't managed to do it because we have to work out of

14  a safe server in Canada.

15  Q.  Okay.  And then in the 2013 lead paper you also considered

16  and presented a wide range of different dose-response models;

17  is that correct?

18  A.  I don't remember.  This is now seven years ago.

19  Q.  Okay.

20       MS. CARFORA:  Mr. Hambrick, can you bring up U-43

21  again?  We'll go to Page 42.

22       Do the second column in the middle -- I'm sorry.  I must

23  have...

24       If we can start with "In addition, we considered."  It

25  should be second column in the middle, column on the right.

GRANDJEAN - CROSS / CARFORA

```
1              (Document displayed.)

2    BY MS. CARFORA

3    Q.    (As read)

4              "In addition, we considered a wide range of

5         different dose-response models and discussed potential

6         advantages of the so-called hybrid approach to

7         benchmark modeling."

8         Do you see that, sir?

9    A.    Yes.

10             MS. CARFORA:  Can you clear the screen, please?

11             (Document removed from display)

12   BY MS. CARFORA

13   Q.    And you did not present different dose-response models in

14   your BMD analysis here; isn't that right?

15   A.    No.   That's not right.

16   Q.    I'm sorry?  It's not right?

17   A.    You are misquoting me.

18   Q.    Okay.  Well, what models did you present in your BMD

19   analysis?

20   A.    We had the occasion with the MIREC data -- because we had

21   the digitized data, so we had the occasion to look at a split

22   curve and a long curve.  So we tried different approaches.

23        And the point is that the fit did not improve and the BMD

24   result did not change much.  So we stayed with the default

25   version that EPA recommends; namely, the linear curve.
```

1    Q.   Dr. Grandjean, this is the first I'm hearing of this.  I'm

2    wondering where did you disclose that?

3        Was that in your initial report?  Was it in your trial

4    declaration?  Where have you told us that before?

5    A.   Frankly, I don't remember, but it should be right below

6    the table where we reveal -- or I reveal our results from the

7    ELEMENT study.

8    Q.   And is that in your -- are you talking about your report

9    or your trial declaration?

10   A.   With all these documents, I can't separate them all.  I

11   don't really -- I don't remember.  It should be -- just look at

12   the table and the text just below the table.

13   Q.   Okay.  In which -- what document, sir, should I be looking

14   at that?  I'm happy to bring it up.

15   A.   You asked me already.  I don't remember.  But there are

16   three pages to look at.  Just find the table and the -- you

17   seem to have scanned my reports very carefully.  It's right

18   below that table.

19   Q.   Okay.  Let's --

20           MS. CARFORA:  Mr. Hambrick, can you please bring up

21   Dr. Grandjean's trial declaration?

22       Let's took a look at Table 2.  It's on the next page, Mr.

23   Hambrick.  If you have can highlight the table and maybe the

24   paragraph underneath it?

25       (Document displayed.)

1        MR. CONNETT:  Why don't you show the full page to be

2   fair to the witness.

3        MS. CARFORA:  Okay.  I'm sorry.  Show him the full

4   page.

5        THE COURT:  The other thing we can do to short

6   circuit this, Mr. Connett.  If you know -- rather than our

7   trying to go through every document, do you know if it exists

8   and which declaration?

9        MR. CONNETT:  I do, Your Honor.  It's on the page

10  we're looking at right now.  It's Paragraph 140, and it was

11  also in the expert report.

12        THE COURT:  All right.  Let's take a look 140.  Let's

13  just cut to the chase here.

14        (Document displayed.)

15  BY MS. CARFORA

16  Q.   Now, 140 -- well, you say:

17            "To assess the robustness of the calculation, we

18        included a logarithmic conversion of the exposure

19        parameter.  We also used a split linear dose-response

20        curve, as in one of our previous studies."

21        But you then refer to:

22            "These sensitivity analyses showed results that

23        deviated only marginally."

24        So now he's not -- given those response models, that was a

25  sensitivity analysis of the one linear model that you used; is

GRANDJEAN - CROSS / CARFORA

1  that correct?

2  **A.**   All right.   You asked me if we used different

3  dose-response curves, and we did.   And this is explained here

4  very clearly.

5  **Q.**   This, to me, says that you conducted a sensitivity

6  analysis on the linear dose-response model.

7       Is your testimony that you ran some other model than the

8  linear dose-response model?

9  **A.**   We tested other appropriate models and they were not

10  superior to the default linear model that is the default that

11  EPA recommends.

12  **Q.**   Okay.   And where did you disclose that you tested other

13  dose-response models?

14  **A.**   Right --

15       **MS. CARFORA:**   I'm happy for Mr. Connett to tell us,

16  if that helps us.

17       **MR. CONNETT:**   It's the paragraph that we're looking

18  at.

19  **BY MS. CARFORA**

20  **Q.**   Let me just back up a little bit.   I'm a little confused.

21       This paragraph says that you conducted sensitivity

22  analysis on the linear model calculation.   Isn't this what this

23  paragraph is saying, or is this saying something different?

24  **A.**   I think you understand it now.

25       **THE COURT:**   Maybe it would be helpful, what does it

1    mean to include a "logarithmic conversion of the exposure

2    parameter?"  Is that something you can explain in kind of lay

3    language?

4            THE WITNESS:  Okay.  So here we have this scatter

5    plot.  And EPA says:  Use a linear dose-response curve because

6    that's what we assume is appropriate as the default.

7        We said:  Oh, but maybe it's logarithmic, so it's a curve.

8    And we say:  Maybe it bends so that it's flat.

9        Let's say, there is a threshold-like effect so that it's

10   flatter at lower exposures and then it goes steeper.

11       So we tried these different versions and the BMD was

12   almost the same and the fit of the curve to the data was not

13   better for these curves or split linear versions.

14       And we called that a sensitivity analysis because we are

15   testing the assumptions, the basic assumptions, if they are

16   correct.  And we couldn't improve on the linear model, and so

17   we relied on EPA's recommendation.

18           THE COURT:  And is a split linear dose-response curve

19   as it sounds like?  We have kind of a change in two -- not one

20   straight linear response, but a change in that linearity?  Or

21   what does that mean?  What does a split linear dose-response

22   mean.

23           THE WITNESS:  Yeah.  It's like you -- instead of

24   having one straight line, you allow the data to have a split

25   linear.  So it's -- it has a different degree of change for

1    lower exposures compared to higher exposures.

2         We've seen that in some analysis, that it happens.   It

3    does happen with lead.   It does happen with mercury.

4         We tried that for the fluoride data.   And it's like the

5    incline here.   Appears to be the same throughout the range of

6    exposures that we were looking at.

7              THE COURT:   And the logarithmic conversion is the one

8    with the curved -- was a curve.   So you tried different

9    combinations:   A straight linear, a split linear, curve

10   logarithmic.

11             THE WITNESS:   Exactly.

12             THE COURT:   Thank you.

13             MS. CARFORA:   Mr. Hambrick, you can clear the screen

14   please?

15        And can you bring back up the 2013 lead paper, which is

16   U-43, I believe.

17        And can you go to Page 5, Table 2?

18        (Document displayed)

19   BY MS. CARFORA

20   Q.   Dr. Grandjean, in this lead paper here you reported here

21   you have each dose-response model, right?   Concurrent lead.

22   Peak lead.   Lifetime lead.   You have each dose-response model,

23   and then you have BMD, BMDL.   Then you have the fit range

24   included on this table; right?

25        So you reported out in your paper what the actual fit was

1    for each of these dose-response models; is that true?

2    A.    As you can see, this is what we reported.

3    Q.    And you did not report this in either your trial

4    declaration or any of your expert reports?  You do not report

5    the goodness of the fit; is that right?

6    A.    This is what we plan to do when we look at all of the data

7    on a safe server in Canada, which we haven't come around to

8    doing yet.  And which I predict is not going to show results

9    that are any different from the ones I've already provided and

10   as shown by our sensitivity analysis on the digitized data from

11   the Bashash paper.

12        So, I mean, in an ideal world we would have all of these

13   raw data available.

14        I didn't do those two studies.  Formally I don't have

15   access to the raw data.  I'm sure that EPA could generate an

16   agreement with the authors so that EPA would be part of this

17   collaboration, and then we could jointly work out of the safe

18   server in Canada and then get the exact numbers with the fits.

19        Unfortunately, I just have one set of data, and that's

20   where I'm missing an observation, as we've already talked about

21   at length.  And, therefore, I don't have access to the raw

22   data.  And, therefore, it's not appropriate for me to show fits

23   for the long curve and the split linear.

24        All I can say is that there was no improvement, but we

25   plan to, you know, generate those data so that everybody can be

```
 1   content that EPA's recommendation of the linear dose-response
 2   curve is appropriate.
 3            MS. CARFORA:  Can you clear the screen, please?
 4        (Document removed from display)
 5   BY MS. CARFORA
 6   Q.   And, Dr. Grandjean, your 2013 lead analysis, you also
 7   determined the upper bound confidence limit for IQ loss; isn't
 8   that correct?
 9   A.   I don't remember.  It was probably just to be complete and
10   not to hide anything.  I don't know what to use it for.  I
11   would use the BMDL, the lower confidence limit.
12   Q.   Okay.  And you did not -- in this litigation you did not
13   provide an upper bound confidence limit for the IQ loss; is
14   that correct?
15   A.   I see no justification.  It could be done.  I can -- I can
16   do the calculations for you, if you want.
17        But I'm already saying that I am not certain that the data
18   I have provided to you are very exact.  I'm saying that about
19   0.15.  It could be 0.16.  And it could be 0.13.  It's about
20   0.15.
21        And the key here is that this is way, way below the
22   current fluoride exposures of the American population,
23   including the pregnant women, especially those in fluoridated
24   cities and in the parts of America where there are high
25   fluoride contents in the groundwater.
```

1   Q.   And, Dr. Grandjean, the MIREC study reported results for

2   full scale IQ; is that correct?

3   A.   Yeah --

4   Q.   And your --

5   A.   Yeah, that's right.

6   Q.   I'm sorry.  That was a bad -- I'm sorry to interrupt you.

7   And that was my fault.

8   A.   I'm sorry.  I interrupted you.

9   Q.   Lets try again, should we?

10      Your Green BMD analysis was based on the full scale IQ

11  reporting out of the MIREC cohort; is that correct?

12  A.   According to my memory, yes.

13  Q.   Okay.  And the MIREC study reported an increase of one

14  milligram per liter in maternal urinary fluoride adjusted for

15  specific gravity, and that was associated with a lower full

16  scale IQ in boys; correct?

17  A.   I think that's correct.  I don't remember the details, but

18  it's in my report.

19  Q.   There is a full scale IQ effect in boys, but not in girls;

20  is that correct?

21  A.   Just like it could happen in the Hamadani arsenic study

22  that Dr. Chang relied on.  So sometimes there is some

23  deviation.

24      But you will also see that when they relied on the

25  fluoride intake, boys and girls were not different.

1    **Q.**   Okay.  But your BMD is based on maternal urinary fluoride;

2    is that correct?

3    **A.**   On both.  I used maternal urinary fluoride and the

4    calculated fluoride intake.

5    **Q.**   Where is your BMD calculation for the intake values?

6    **A.**   I think it's Table 3 in my declaration.

7    **Q.**   Dr. Grandjean, you're just comparing the intake values to

8    the BMD that you had already calculated based on full scale IQ,

9    isn't that right, in Table 3?

10   **A.**   I think we better look at Table 3 so that we can make sure

11   you're not misunderstanding.

12   **Q.**   Okay.

13          **MS. CARFORA:**  Mr. Hambrick, can you pull up Page 45

14   of Dr. Grandjean's declaration?  Highlight Figure 3 for us.

15          **THE WITNESS:**  It's the bottom line.  The bottom line

16   of Table 3.

17          **MS. CARFORA:**  Thank you, sir.

18      (Document displayed)

19   **BY MS. CARFORA**

20   **Q.**   I was looking at Figure 3, not Table 3.  So let's

21   highlight Table 3.

22      Okay.  Thank you for clearing that up.

23          **MS. CARFORA:**  Can you clear the screen, please?

24      (Document removed from display)

25

```
 1    BY MS. CARFORA
 2    Q.   Now the MIREC study also reported results for two domains
 3    of IQ; is that correct?
 4    A.   That's standard.
 5    Q.   And it was the verbal IQ and performance IQ scores; isn't
 6    that correct?
 7    A.   That's, again, standard in psychometrics, yes.
 8    Q.   And an increase in 1 milligram per liter in maternal
 9    urinary fluoride adjusted for specific gravity was not
10    significant associated with the verbal IQ in boys or girls; is
11    that true?
12    A.   I don't recall, but the tendency was in accordance with
13    what was found for performance IQ.
14             MS. CARFORA:  Your Honor, permission to refresh
15    recollection.
16             THE COURT:  All right.
17             MS. CARFORA:  Can you please put up U-44, Page 6,
18    right-hand column bottom.
19             THE COURT:  What is this from?  What is this?
20             MS. CARFORA:  This is actually Green 2002, Your
21    Honor.  This is the MIREC cohort.
22             THE COURT:  Okay.
23             MS. CARFORA:  And beginning with "maternal urinary
24    fluoride concentration and IQ."
25         I'm sorry.  You're in the right place.
```

GRANDJEAN - CROSS / CARFORA

1          (Document displayed)

2    BY MS. CARFORA

3    Q.   Right column top:

4              "An increase of 1 milligram per liter was not

5         significantly associated with verbal IQ in boys or

6         girls."

7         Do you see that, Dr. Grandjean?

8    A.   I see that.  It's not surprising.

9    Q.   Okay.  And on the left-hand column --

10         MS. CARFORA:  Mr. Hambrick, if you could go over to

11   the left-hand column bottom.

12   BY MS. CARFORA

13   Q.   And it starts with just the third line up:

14             "An increase of 1 milligram per liter of maternal

15        urinary fluoride adjusted for specific gravity was

16        associated with lower PIQ score in boys, but the

17        association was not significant in girls."

18        Do you see that, sir?

19   A.   I think we have been over this.  And so this is just a

20   finding, and I would say that it's better to rely on the full

21   scale IQ because that is based on approximately 12 different

22   subtests.  And whether you split them into performance IQ and

23   verbal IQ is of less significance.

24        We're talking about IQ points here, and my preference

25   would be to rely on the full scale IQ.

1    Q.   Dr. Grandjean, isn't it true, though, if we base a BMD on

2    the full scale IQ, that you're going to mask the difference

3    between a decrease in IQ between boys and girls?

4         So you could decrease a girl's IQ, but increase the boy's

5    IQ, in other words?

6    A.   What I would say is in this respect I would agree with

7    Dr. Chang, because she evaluated arsenic and she said that --

8    in that case I think it was the girls that showed the effect.

9    And she said that the risk assessment should be based on the

10   most vulnerable population.

11        And in that case with arsenic and the study by Hamadani in

12   Bangladesh, she said:  We should rely on protecting the girls

13   because they were, for whatever reason, more vulnerable.

14        Here with fluoride, it appears that boys are more

15   vulnerable.

16        Well, fine.  I don't think it's appropriate to say:  Let's

17   rely on the findings in the girls and don't give a damn about

18   the boys' intelligence in the next generation.

19        I think that's improper, and I think EPA would agree with

20   me that we've got to protect the IQs of both boys and girls of

21   the next generation.

22   Q.   And, Dr. Grandjean, just one more question on this topic.

23   You did not run the BMD models for the full set of data in the

24   ELEMENT cohort either; did you, sir?

25   A.   Well, I've shown you this -- I think it's called Table 2,

1   where we extracted -- we digitized the data from one of the

2   plots.  And we did that simply as quality control to see if our

3   calculations that were based on the tabulated information, if

4   that was correct.  And we got almost the same.

5        And clearly down the road we should look into all of these

6   details.  I predict, given the stability of these data and the

7   sensitivity analysis we already conducted, I predict that the

8   results would be basically the same, and that is that the BMD

9   and BMDL are vastly below current exposures in America.

10           MS. CARFORA:  Your Honor, I'd like permission to

11  share the ELEMENT study, Table 4 that Dr. Grandjean based his

12  BMD analysis on.

13           THE COURT:  All right.

14           MS. CARFORA:  U-25 -- I'm sorry.  It's U-46 at

15  Page 8, looking at Table 4.

16       (Document displayed.)

17  BY MS. CARFORA

18  Q.   Now, isn't it true, Dr. Grandjean, that the only data you

19  used off of this table was the first two lines; is that true?

20  A.   I don't recall.  I think we described it -- or I described

21  it in my report and that we used the beta values.  Actually, we

22  used both the unadjusted and the adjusted results.  And you can

23  see that they are pretty much the same.

24       (Brief pause.)

25  A.   I can't hear you.

1  Q.   I apologize.  I closed my spot, too.  I was talking on

2  mute.

3  A.   I can clarify if you want.  Because if you want additional

4  adjustments, you lose numbers.

5        And you can see that second column, the end column, that

6  you go from 287 down to half that many or, you know, some other

7  losses of observations, if you require certain parameters to be

8  available.

9        So we used -- this is my recollection.  We used the

10  unadjusted, the first line, and the Model A that had the major

11  covariates.  And you can see those numbers are both

12  significant.  And the BMD calculations are also pretty much the

13  same.

14  Q.   Okay.  Thank you.

15        MS. CARFORA:  Mr. Hambrick, you can clear the slide.

16  (Document removed from display)

17        MS. CARFORA:  At this time, Your Honor, without

18  prejudice to finishing our cross examination, I'm going to move

19  to exclude Dr. Grandjean's testimony in full on failure to

20  reliably apply two methodologies.

21        The first is the methodology he cited to in the EPA risk

22  evaluation rule.  That was not applied here, according to his

23  testimony.

24        And the second reason is for his --

25        THE COURT:  Are you talking about -- you're talking

1    about the systematic assessment?

2              MS. CARFORA:  Yes, Your Honor.

3         Dr. Grandjean testified in his declaration that he

4    conducted a weight of the scientific evidence and best

5    available science according to EPA's procedures.  He cited to

6    EPA's risk evaluation rule.

7         The risk evaluation rule, as we saw, clearly requires that

8    systematic review, formal systematic review with the key

9    elements listed in that document be conducted in a TSCA risk

10   evaluation.

11        It is clear that Dr. Grandjean did not conduct a foreman

12   systematic review in compliance with the risk evaluation rule.

13   That's problem number one.

14        Problem number two is that Dr. Grandjean testified, both

15   in his declaration and here at trial, that he conducted a BMD

16   analysis on the basis of the methodology that was employed in

17   the 2013 lead paper.

18        It is clear, when you compare what was presented and

19   analyzed in the 2013 lead paper, that he did not do that same

20   methodology here.  Not only did he not do it, but he's

21   testified to the Court that it was impossible to do because he

22   didn't have the data.

23        And on that basis I think Dr. Grandjean's testimony should

24   be excluded in full.

25              THE COURT:  All right.  Response.

1          **MR. CONNETT:**  Yes, Your Honor.

2      First off, Dr. Grandjean's testimony in his declaration

3  and today said he followed the general approach that EPA has

4  used historically with risk assessments, which is the weight of

5  the evidence analysis and based on the best available science.

6      Now, Dr. Grandjean has made it clear that he did not

7  conduct a formal systematic review in this case, which counsel

8  is correct under the risk evaluation rule EPA now defines.  Now

9  defines systematic review to include a systematic -- sorry, EPA

10  now defines weight of the evidence to include a formal --

11  sorry, to include a systematic review method.

12      But the fact that Dr. Grandjean used a method that EPA has

13  used up through 2018, and which scientists like Dr. Grandjean

14  use every day in practice, there's nothing about that that is

15  unreliable for purposes of the law, for purposes of whether

16  Dr. Grandjean is an expert who can provide helpful and reliable

17  information to this Court.

18      Dr. Grandjean -- the bar for admissibility of

19  Dr. Grandjean's testimony is not whether he is a TSCA expert

20  who knows every single detail about what EPA does now under the

21  risk evaluation rule.  So that would be the first thing.

22      They have not pointed to anything inherent to

23  Dr. Grandjean's weight of the evidence method, which EPA has

24  always used in the past, that is unreliable.

25      In fact, Dr. Grandjean has gone one step further.

 1  Dr. Grandjean has explained today that after he did the weight

 2  of the evidence analysis in this case he reviewed and

 3  considered the systematic review that EPA's expert did in this

 4  case, and he has explained to Your Honor that that systematic

 5  review fully supports his opinions in this case.

 6       Now, with respect to the BMD analysis, I'd like to point

 7  Your Honor to what -- I didn't hear anything from counsel as to

 8  what Dr. Grandjean did in this case for his BMD analysis was in

 9  any way unreliable or inadequate.

10       The only thing I saw counsel produce and demonstrate is

11  that he did not provide the same degree of specificity in the

12  details that he had provided in his 2013 paper.

13       Now, that's a separate question.  I mean, did he -- did

14  Dr. Grandjean provide an encyclopedia of 500 pages of BMD

15  charts and numbers?  No, he did not.  But counsel did not

16  establish today that anything he did is unreliable.

17       And, Your Honor, I would like to point the Court -- if I

18  could share the screen, I would like to point the Court to

19  something that counsel did not discuss with respect to the risk

20  evaluation rule.  And it's the -- it's page -- and, Your Honor,

21  can you see this on the screen?

22            THE COURT:  Yes.

23            MR. CONNETT:  Your Honor, under the risk evaluation

24  rule, EPA has a concept, and it says it's very important for

25  risk evaluations under TSCA today.  This concept is called fit

1    for purpose.

2        You're going to be hearing more about this concept of fit

3    for purpose in this case.  But what EPA says here -- so EPA

4    says, as you can see in the highlighted portion:

5            "When information and analysis are sufficient to

6        make a risk determination using assumptions,

7        uncertainty factors, and models or screening

8        methodologies -- screening methodologies -- EPA may

9        decide not to refine its analysis any further."

10       What this means, Your Honor, is when the data is so clear

11   and obvious on its face, you don't need to write an

12   encyclopedia.  You don't need to write a 10,000 page treatise

13   to confirm that the obvious is, in fact, correct.

14       And, Your Honor, if I have could, I could show you

15   deposition testimony from Dr. Tala Henry in this case, where

16   she says in her own words what this means.

17       Your Honor, could I show that testimony?

18            **THE COURT:**  No.  I'm ready to rule.

19       The motion is denied.  What the government complains of

20   can go to the weight of the evidence, but it does not establish

21   inadmissibility under *Daubert*.  *Daubert* is a gatekeeping

22   function.

23       There is no showing here of fundamental unreliability of

24   the methodology.  It may not accord with the best methodology

25   as now implemented by the EPA, but even something short of what

1    is prescribed by the EPA does not mean it doesn't meet *Daubert*.

2        This was a method that's been used for many, many, many

3    years.  And I heard nothing that suggests that Dr. Grandjean's

4    testimony is so methodically flawed or based on such lack of

5    information that it warrants exclusion under *Daubert*.

6        Similarly the fact that the BMD analysis here was not as

7    robust as in the lead 2013 study does not mean it's not

8    admissible.  Some of that was due to the limitations of data

9    available.

10       What I would need to see is whether the data was so

11   lacking, so unreliable, so scarce that one could not reliably

12   perform a BMD type analysis, and I didn't hear that here.

13       Or that the methodology, the equations used, that the

14   various parameters that were used in the shape of the curves,

15   et cetera, et cetera, were not something that other scientists

16   in the field would use, and I didn't hear that either.

17       So the motion, the *Daubert* motion is denied.

18       **MS. CARFORA:**  Thank you, Your Honor.

19       I just want to, for the record, clarify one point.  And I

20   would, also, like the opportunity to cite some case law on this

21   issue, just so the record is clear on this.

22       **THE COURT:**  If you want to -- if you want to cite

23   something, go ahead.

24       **MS. CARFORA:**  Yes, Your Honor.  I just want to

25   clarify.

1    My point is not that Dr. Grandjean had to follow the EPA

2    procedures or, quite frankly, that he had to follow the 2013

3    methodology.

4        My point is simply that Dr. Grandjean's testimony is that

5    those are the methodologies he applied.

6        And in *United States v McKinzie*, out of the Central

7    District of California, what the Court is citing to the Eighth

8    Circuit, and the Third Circuit said that:

9            "The failure to properly apply a scientific

10           principle will provide the basis for exclusion of an

11           expert where a reliable methodology was so altered

12           that it skewed the methodology itself."

13       And I just want the record clear on that.

14           **THE COURT:**  All right.

15           **MS. CARFORA:**  Our argument is that he simply skewed

16   the methodologies he said he applied.

17           **THE COURT:**  All right.  Well, I think the record is

18   clear.  To the extent he purported to apply or believed he was

19   applying the current methodology prescribed by the EPA, I think

20   it's clear that he did not follow all of the key critical

21   components, at least in his declaration to the Court.  And that

22   may go to the weight of the evidence, but it does not go to

23   admissibility.

24       Thank you.

25           **MS. CARFORA:**  Thank you.

```
 1   BY MS. CARFORA
 2   Q.   Now, Dr. Grandjean, isn't it true that the
 3   fluoride-related work you did in the 1980s involved
 4   occupational exposures to cryolite workers?
 5   A.   That's true.
 6   Q.   And the health effect of focus was primarily skeletal
 7   fluorosis; is that correct?
 8   A.   No.
 9   Q.   Okay.  The primary focus was skeletal fluorosis, but you
10   also considered cancer effect; is that correct?
11   A.   No.
12   Q.   Okay.  And you also studied a potential association of
13   occupationally exposed cryolite workers for cancer morbidity
14   and mortality; is that correct?
15   A.   That is correct.
16   Q.   And occupationally exposed cryolite workers had an
17   estimated daily uptake of about 30 milligrams per day; is that
18   correct?
19   A.   About so, yeah.  That's approximately correct.
20   Q.   Okay.
21        MS. CARFORA:  Your Honor, permission to bring up the
22   deposition transcript.
23        THE COURT:  Is this for impeachment purposes?
24        MS. CARFORA:  Yes, Your Honor.
25        U-26 please, Lines 67 to -- I'm sorry.  Page 67, Lines 13
```

1    through 16.

2              MR. CONNETT:  Your Honor, if I could just review

3    this?

4              THE COURT:  Yes.

5              MR. CONNETT:  Counsel, what was the lines on that?

6              MS. CARFORA:  67/13 to 16.

7              THE COURT:  Your Honor, I would object that this is

8    just what the witness just testified to.  I don't see this as

9    impeachment.

10             MS. CARFORA:  Okay.  Your Honor, I will withdraw

11   that.

12             THE COURT:  Okay.

13   BY MS. CARFORA

14   Q.   Dr. Grandjean, if you go back to the 1930s and '40s, the

15   workers who developed skeletal fluorosis, the daily uptakes

16   were on the order of a magnitude of 30 milligrams per day; is

17   that correct?

18   A.   Approximately.

19   Q.   Is it true that in 1984 you worked on an environmental

20   criteria document on fluoride that was sponsored by the WHO?

21   A.   The World Health Organization and the International Labor

22   Office.

23   Q.   But you withdrew from that committee before the criteria

24   document was published; is that correct?

25   A.   I had to, because I was being misquoted and it was a very

1  bad atmosphere for some reason.

2  Q.   And you withdrew your name from the final criteria

3  document; is that right?

4  A.   That is correct.  And you can see in the published version

5  that the name of the author of the draft is given as Robert

6  Lawrence (phonetic spelling), who was a professor of

7  occupational medicine in Brussels.

8       And I called Robert after the publication and thanked him

9  for saving the face of the World Health Organization by lending

10  his name to the fluoride report.

11      And he said:  What fluoride report?

12      So there was a problem, because the World Health

13  Organization named oral health experts -- that is, dental

14  health experts -- to a committee that was supposed to look at

15  fluoride toxicity, and they demanded changes in my manuscript

16  to delete evidence that suggested that fluoride could be toxic

17  to humans.

18      And that ended up in a conflict where I had to tell my

19  good friend from WHO who had invited me, I have to withdraw.  I

20  can't participate in this, because I'm here as a scientist, but

21  clearly these people have a hidden agenda.  That's the true

22  story.

23  Q.   Now, we talked about this earlier.  In 2006 you published

24  a paper called "Developmental Neurotoxicity of Industrial

25  Chemicals;" is that correct?

GRANDJEAN - CROSS / CARFORA

```
 1    A.    We had discussed that paper previously; correct.

 2    Q.    And in that paper you said that:

 3              "Neurotoxicity in laboratory studies probably

 4          exceeds 1,000 chemical substances, and that the

 5          physiology of the brain development suggests that

 6          developmental neurotoxicity is likely for all of

 7          them."

 8          Is that right?

 9              MR. CONNETT:  Compound.  Vague and ambiguous.

10              THE COURT:  Why don't you break it down, so it's not

11    compound.

12              MS. CARFORA:  Yes.  Thank you, Your Honor.

13    BY MS. CARFORA

14    Q.    In 2006, Dr. Grandjean, you said that:

15              "The number of chemicals that can cause

16          neurotoxicity in laboratory studies probably exceeds

17          1,000."

18          Is that correct?

19    A.    I think that's correct.

20    Q.    And you said that:

21              "The physiology of brain development suggests

22          that all 1,000 of those chemical substances are likely

23          to also cause developmental neurotoxicity."

24          Is that correct?

25    A.    That's a hazard assessment.  And in that regard the
```

1    statement is correct.

2    **Q.**    And you described this brain physiology that you talk

3    about in your 2006 paper.  You talk about that in your trial

4    declaration; is that right?

5    **A.**    I did.

6    **Q.**    Now, in your 2006 paper, you took the position that:

7              "Exposure limits for chemical substances that

8         show an early indication of potential for

9         developmental neurotoxicity should be met with strict

10        regulation, which could later be relaxed should

11        subsequent documentation show less harm than

12        anticipated."

13        Is that correct?

14   **A.**    I think that statement is in accordance with what's

15   sometimes called the precautionary principle.  Namely, that you

16   don't want to take the next generation hostage and wait and see

17   how many IQ points are lost before you try to prevent such IQ

18   losses.

19        So just expressed in a different way; that is the essence

20   of that statement.

21   **Q.**    And that statement was in your 2006 paper; correct?

22   **A.**    I think Phil Landrigan and I agreed on that wording.

23   **Q.**    Now, specific to fluoride, you said that:

24             "Fluoride can cause neurotoxicity in laboratory

25        animals, but was not proven to be neurotoxic in man."

1          Is that correct?

2     A.   Not yet.

3     Q.   Now, in that 2006 paper you had identified only five

4     industrial chemicals that fulfilled your criteria for

5     demonstrating a known causal relationship between fluoride

6     exposure and developmental neurotoxicity in humans; is that

7     correct?

8     A.   We didn't have the definite causal evidence in 2006, but,

9     you know, we visited the issue eight years later.

10    Q.   Okay.  And so it's true that -- I'm sorry.

11         And this is in 2014 then, twelve years later; right?  Is

12    my math -- no, eight years later.

13         In 2014, you had then identified fluoride as meeting your

14    criteria for demonstrating a known causal relationship between

15    exposure and developmental neurotoxicity; is that true?

16    A.   Right.  And, again, I stress this was a hazard assessment.

17    Q.   So it's true that when you formed an opinion on the causal

18    relationship between fluoride and developmental neurotoxicity,

19    was in 2014; is that right?

20    A.   Right.  Again, it was a hazard assessment.

21    Q.   And Grandjean 2014, that was not -- that was not a review

22    of fluoride; correct?

23              THE COURT:  Overbroad.

24    A.   In 2014, is that the systematic review?

25

**GRANDJEAN - CROSS / CARFORA**

```
 1  BY MS. CARFORA
 2  Q.    The 2014 *Lancet* paper that you wrote with --
 3  A.    The *Lancet* paper.
 4  Q.    -- Dr. *Lancet*.
 5  A.    Yeah.
 6  Q.    Was that a review of fluoride?
 7            MR. CONNETT:  Overbroad.
 8            THE COURT:  Well, let him answer, and I'll figure
 9  that out.
10  A.    It included a brief review of fluoride.
11  BY MS. CARFORA
12  Q.    And do you recall -- well, the basis for identifying
13  fluoride as a substance to be a known causal developmental
14  neurotoxicant in humans was your 2012 meta analysis in which
15  you collaborated with first author Anna Choi; is that correct?
16  A.    That is correct.
17  Q.    And that was your only basis in 2014 for concluding that
18  fluoride was a known neurotoxicant, developmental
19  neurotoxicant; is that true?
20            MR. CONNETT:  Overbroad.
21            THE COURT:  Overruled.  Go ahead.
22            THE WITNESS:  I'm sorry.
23            THE COURT:  Yeah, go ahead.
24  A.    We were relying on a systematic review that included 27
25  studies and included a meta analysis.  And because of the
```

1    *Lancet's* requirements that we keep the number of references

2    low, we decided that a reference to a single paper that covered

3    27 was quite appropriate.  And the reviewers and the editors

4    agreed.

5    **BY MS. CARFORA**

6    **Q.**    Now, it's true that in Choi 2012, I'm going to -- the

7    report that you published with Anna Choi in 2012, I'm going to

8    refer to that as Choi 2012.  Are you okay with that?

9    **A.**    That's fine.

10   **Q.**    Okay.  Now, it's true that you reported in Choi 2012 that

11   most of the 27 studies were fairly brief, and complete

12   information on covariates was not available.  Was that what you

13   said in that paper, sir?

14   **A.**    I mean, we wrote that, and I agree with my own wording.

15   **Q.**    Okay.  Now, you do also agree that if there is no

16   confounding, even if there is no confounding, an adjustment for

17   covariates can improve the reliability of a study; isn't that

18   right?

19   **A.**    It can improve, yes.  But sometimes we find that even if

20   we add covariates, there is no confounding.  And we did not

21   suspect that there was a law of confounding in these studies

22   because those that did include confounded control didn't show

23   any deviation from those that didn't.

24   **Q.**    Now, Choi 2012 reported that fluoride may be a

25   developmental neurotoxicant that effects the brain; isn't that

1  right?

2  A.    I don't recall the exact wording, but it sounds right.

3  Q.    And then you went on further to say that:

4          "Each of the articles reviewed, each of the 27

5       articles reviewed had deficiencies, in some cases

6       rather serious ones, that limited the conclusions that

7       could be drawn."

8       Isn't that what you said?

9  A.    That could be drawn from the individual study, and we

10 reviewed 27.  And it was the total information that we

11 evaluated with the help of Professor Guifan Sun from China

12 Medical University.  He knew all of the circumstances of these

13 studies and helped us interpret when there was something in the

14 very brief original Chinese publication.

15      And so I believe we did a very thorough evaluation of

16 these studies.

17      And when we say that fluoride may be, it's like the humble

18 scientific expression that we're trying to extract information

19 and present it in a balanced way without raising eyebrows.

20 Q.    Dr. Grandjean, isn't it true that after Choi 2012 was

21 published, that the Harvard School of Public Health required

22 you to issue a press statement about that study that explained

23 publicly that the results of the study did not allow us to make

24 any judgment regarding the possible levels of risk of exposure

25 typical for water fluoridation in the United States; isn't that

1   true?

2   **A.**  Well, if you want the whole story, I was asked to meet

3   with a professor from Harvard's dental school.  He came to my

4   office and essentially threatened me.  He said that I was

5   endangering public health, and he demanded that I issue a

6   statement similar to what you're talking about now.

7       When I said that I would think it over, he went to the

8   deans of the medical school, the dental school and the School

9   of Public Health -- that is my boss -- without telling me.  And

10   the deans did not know what was going on.  They were just asked

11   to sign a statement saying, in agreement with CDC that

12   fluoridation is a cornerstone of modern public health.

13       And so this way the press office of Harvard School of

14   Public Health said to me:  We better issue a statement, because

15   the article we just published in a journal called *Harvard*

16   *Public Health*, has resulted in the largest number of letters

17   from readers, mainly dentists, that is fluoridation proponents,

18   including this professor colleague from Harvard's dental

19   school, who demanded that Harvard retract the results of my

20   study.

21       And I said:  Hey, my study, I can't retract that.  I can't

22   retract the conclusions.

23       But I was then presented with the wording that you're just

24   referring to.

25       So this is not my wording.  It is an attempt to calm of

1  the tempers of the fluoridation proponents in the U.S.

2  Q.   Now, you and Dr. Anna Choi both signed that statement; is

3  that correct, sir?

4  A.   I don't know how much Anna was involved in this.  I don't

5  remember.

6  Q.   You, sir, signed that statement; is that correct?

7  A.   As I said, it was a statement that the Harvard School of

8  Public Health press office wanted me to agree to.  And, you

9  know, this is several years ago.

10      I think we did a little bit of doctoring on the exact

11  wording so that it would not be provocative to the fluoridation

12  proponents and, likewise, still honest with regard to the

13  science.

14  Q.   And you signed that statement; is that correct, sir?

15  A.   I didn't sign it.  I may have said okay in an email.

16  Q.   Your name is on that statement; is that right, sir?

17  A.   I don't remember.  It was probably attributed to me

18  because that's what my superiors wanted to happen.

19  Q.   Okay.  Now, in 2015 you again collaborated with Dr. Choi;

20  is that right?

21  A.   Oh, you mean, the Sichuan study?

22  Q.   Yes.  And is it okay if I refer to that as Choi 2015.

23  A.   Okay.

24  Q.   Great.  And you were senior author on that paper with

25  Dr. Anna Choi; correct?

1  **A.**    Yeah.  Probably.  I don't recall.

2  **Q.**    And Dr. Anna Choi was first author; is that right?

3  **A.**    I think so.

4  **Q.**    And you conducted a pilot study of 51 first grade children

5  in China; is that right, sir?

6  **A.**    I think we've talked about this already today, so --

7  **Q.**    Okay.

8  **A.**    -- what do I have to confirm?  I don't understand.

9  **Q.**    You conducted a pilot study of 51 first grade children in

10  China; is that right, sir?  Is that what the Choi 2015 paper

11  reported on?

12  **A.**    But as I said, we already talked about this.  I explained,

13  we did this study because we wanted to figure out if what these

14  27 studies that we did -- looked at in our systematic review,

15  if they were wrong in some way.

16      So we did a western approach, collaborating with the best

17  people in China, including the president of the International

18  Society for Fluoride Research, who was also the chairman of the

19  PRC Commission on Endemic Disease, including fluoride poisoning

20  and in Sichuan --

21         **THE COURT:**  Dr. Grandjean, let her ask some

22  questions.  I know you've talked about this before, but to get

23  through this, she may ask some specific questions.

24      So if you could get to your specific questions,

25  Ms. Carfora, I appreciate it.

1          **MR. CONNETT:**  Your Honor, can I just briefly just

2   mention that right now we are at about 9:30 p.m. Danish time,

3   and I just want to be mindful -- just to let the Court know --

4   that it is getting a little bit late for Dr. Grandjean.

5          I don't know --

6          **THE COURT:**  We have been going a long time.  I was

7   going to ask you, Ms. Carfora, how much longer on cross do you

8   have?

9          **MS. CARFORA:**  I do have a little bit longer, Your

10  Honor.  I might have another 40 minutes.

11         **THE COURT:**  All right.

12         **THE WITNESS:**  Fourteen?

13         **THE COURT:**  No.  She said 40 minutes.

14         **MS. CARFORA:**  Forty.

15         **THE COURT:**  So, number one, we have been going two

16  hours and it's time for a break, for everybody to take a break.

17         The question for Mr. Grandjean is whether -- given the

18  lateness of your hour and knowing this is going to go to --

19  we're scheduled to go until 1:30 our time, which is 10:30, I

20  guess, your time -- you're nine hours ahead I think?

21         **THE WITNESS:**  Right.

22         **THE COURT:**  Can you stay with us until 10:30 or do

23  you need to adjourn earlier?

24         **THE WITNESS:**  I would rather stay with you, because

25  tomorrow at, you know, the same time I'm on an NIH panel, for

1  the National Institutes of Health, evaluating grant proposals

2  and I can't change that appointment.  I've done my evaluation

3  and the committee is meeting tomorrow.

4          THE COURT:  Right.  Well, we'll have to -- if for

5  some reason we can't finish today -- I'd like to get as much

6  done today.  Hopefully, we can get through today.

7      So in that regard, let's just take a 15-minute break so

8  everybody can catch a break, and we'll come back and do as much

9  as we can today.  Hopefully, try to finish you up.  If not,

10 we'll have to figure out another time.  All right?

11         MS. CARFORA:  Thank you.

12         THE COURT:  Back in 15 minutes.  Thank you.

13     (Whereupon there was a recess in the proceedings

14      from 12:26 p.m. until 12:42 p.m.)

15         THE COURT:  All right.  Welcome back everyone.

16         MS. CARFORA:  Thank you, Your Honor.

17     I'm going to try go through this.  I think I might be able

18 to -- you know, 10 or 15 more minutes.  Just have a few very

19 direct questions.

20         THE COURT:  All right.  Good.  Thank you.

21         THE CLERK:  I think the papers are shuffling, might

22 be loud again.

23         MS. CARFORA:  Yes.  I apologize for that.  I -- I

24 have been trying to mute it while I'm turning my papers.  And

25 I'm going to try very hard to be mindful of that going forward.

GRANDJEAN - CROSS / CARFORA

```
1    I apologize for that.
2              THE COURT:  Great.
3              THE CLERK:  Please come to order.
4              THE COURT:  All right.  You may continue,
5    Ms. Carfora.
6              MS. CARFORA:  Thank you.
7    BY MS. CARFORA
8    Q.   Dr. Grandjean, is it true that counsel, Mr. Connett, he
9    emailed you a Dropbox link that included 338 human and animal
10   studies in it?
11   A.   I don't remember the number, but, yes, I did receive some
12   literature from him to make sure that whatever search he had
13   done was in agreement with mine.
14   Q.   And, Dr. Grandjean, isn't it true that on August 12th you
15   received an email from Mr. Connett with a manuscript of the
16   UCSF study that we were talking about earlier today, the
17   Uyghurturk study?
18   A.   I don't recall.  It may be true.
19             MS. CARFORA:  Your Honor, can I refresh recollection,
20   please?
21             THE COURT:  Yes.
22             MS. CARFORA:  It's U-38.
23        (Document displayed.)
24   BY MS. CARFORA
25   Q.   You can see here this is dated Monday, August 12th.  And
```

 1   it's the urine manuscript.  Do you see that?

 2   A.   I see that.

 3   Q.   Okay.

 4         MS. CARFORA:  And can you clear the screen, please?

 5       (Document displayed)

 6   BY MS. CARFORA

 7   Q.   Now, isn't it true, Dr. Grandjean, when you wrote your

 8   supplemental expert report, which was three days later on

 9   August 15th, that the Uyghurturk study had not been published

10   yet; is that right?

11   A.   I think that's true.  And I believe I cited it and I said

12   that this is a study to be published.

13   Q.   Okay.  And in your trial declaration, did you cite to the

14   manuscript or did you cite to the final study, the final

15   published study?

16   A.   In my declaration now?

17   Q.   Yes.  In your trial declaration did you cite to the

18   manuscript or did you rely on the published study?

19   A.   I believe I relied on the published study.  It was

20   published in a very respectable journal, as you know.

21   Q.   Okay.  And did you at any time compare the draft

22   manuscript with the published version?  Did you do that,

23   Dr. Grandjean?

24   A.   I was not in charge of it as editor.  A colleague was in

25   charge.  So I didn't do that comparison.  I understand that

1  there was a change in one of the tables.

2  **Q.**  So prior to offering your testimony today, you have not

3  compared the final published version with the manuscript that

4  you relied on for forming your opinion in the report; is that

5  accurate?

6  **A.**  I see no reason to compare drafts and published versions

7  unless I know that there is a difference.

8      And you can see that the -- this was one of the figures

9  that Mr. Connett showed, that referred to the urine-fluoride

10 concentrations in pregnant women in America from fluoridated

11 communities in comparison with Canadian counterparts, and the

12 results are the same.  And that is based on the published paper

13 where I believe that the table that had some error in it had

14 been corrected.

15 **Q.**  And isn't it true, Dr. Grandjean, that the association

16 between higher levels of maternal urinary fluoride levels and

17 community water fluoridation was not a statistical --

18 statistically significant association?

19 **A.**  It may not have been statistically significant, because

20 this was a small study.

21     But I am referring to the experience over many decades,

22 and the conclusions from the World Health Organization, that

23 the urinary fluoride excretion, when adjusted for dilution, is

24 similar to the concentration in the drinking water when the

25 drinking water is a major source of fluoride intake.

```
 1        And that's what that -- that -- both the Canadian study
 2   and the one from California, that's what they are in accordance
 3   with.  So I rely on those as reliable data.
 4   Q.   So I just want to be clear.  Is the opinion you're
 5   offering today, is that based on this Uyghurturk study, which
 6   is the UCSF study, or is it based on some other information out
 7   of the World Health Organization?
 8             MR. CONNETT:  Compound.
 9             THE COURT:  Overruled.
10   A.   I rely -- I've done a comprehensive analysis of fluoride,
11   and I rely on the total evidence.
12        I pinpointed this particular study from UCSF.  I
13   pinpointed that because it is a study of American women, which,
14   apparently, is very important to the U.S. EPA.  Well, that's
15   fine.  Here are the data.  And they are in accordance with the
16   toxicokinetics of fluoride and the assessment of the World
17   Health Organization.
18   Q.   Dr. Grandjean, just very straightforward "yes" or "no."
19   Are you aware of whether the association in the Uyghurturk
20   study was a statistically significant association or not?  Are
21   you aware of that?
22   A.   I don't recall.  I read the paper, and it may be that it
23   wasn't statistically significant.  But just because a P value
24   was not below 0.05, it may still reflect this tendency that I
25   just referred to.  And, therefore, I'm looking at the average
```

1   data from that study.

2          **MS. CARFORA:**  Your Honor, permission to refresh

3   recollection.

4          **THE COURT:**  Go ahead.

5          **MS. CARFORA:**  U-42, please.  Page 5.  Bottom table.

6          **THE COURT:**  This is the UCSF study?

7          **MS. CARFORA:**  Yes, Your Honor.

8      (Document displayed)

9   **BY MS. CARFORA**

10  **Q.**   Does this refresh your recollection, Dr. Grandjean?

11  **A.**   That looks like a table from that study, that's correct.

12  **Q.**   And those are weak correlations; is that right?  0.22,

13  0.21?  These are weak correlations, sir?

14  **A.**   Yeah.

15  **Q.**   Okay.  And Dr. Grandjean, isn't it true --

16         **MS. CARFORA:**  Oh, you can clear the slide, please,

17  Mr. Hambrick.

18      Thank you.

19      (Document removed from display)

20  **BY MS. CARFORA**

21  **Q.**   Dr. Grandjean, isn't it true that in December 2019 you

22  published an update on fluoride that was largely based on the

23  work you did in this litigation; is that true?

24  **A.**   You can say that.

25  **Q.**   Is it true I can say that because it's true; "yes" or

1  "no"?

2  **A.**   I did much additional work, and I think there were five

3  reviewers who had opinions on my manuscript.  And I had to

4  respond to those reviewers and do, you know, various revisions.

5       So I put a lot of additional effort into that paper beyond

6  what I had done in regard to offering an opinion for this case.

7  **Q.**   In the 2019 Grandjean paper, that was published

8  *Environmental Health*; is that correct?

9  **A.**   That's correct.

10  **Q.**   And you are the editor-in-chief of that journal; is that

11  correct?

12  **A.**   I'm one of the editors-in-chief.  And in accordance with

13  the standard procedures of BMC and Springer Nature, the

14  publishers, I was not involved at all in the handling of the

15  submission.

16       I submitted it as an independent author and was, you know,

17  recused from being involved in any aspect of the editorial

18  handling.

19  **Q.**   And *Environmental Health* is a pay to publish journal; is

20  that correct?

21  **A.**   Say that again?

22  **Q.**   You have to pay *Environmental Health* in order to publish

23  in their journal; is that correct?

24  **A.**   Oh, as an editor, I am offered an honorarium by the

25  publisher.  This honorarium is paid to Harvard School of Public

1   Health, which then pays an editorial assistant to do much of

2   the base -- basic work on handling submissions.

3        I have the right, as editor, to submit one paper per year

4   without paying the page charge.

5   **Q.**   Now, Dr. Grandjean, I noticed on your C.V. that you listed

6   the International Society for Environmental Epidemiology as a

7   scientific society.  Is that a society that you belong to?

8   **A.**   I was on the steering committee for several years in the

9   past.

10  **Q.**   And can I refer to that as ISEE?  How do people refer to

11  that?

12  **A.**   That is correct.  You can.

13  **Q.**   ISEE, thank you.

14       In August of 2019 you sat on a symposium committee at the

15  2019 annual conference of the ISEE; is that correct?

16  **A.**   That is correct.  Another one.

17  **Q.**   And do you remember the dates of that conference?

18  **A.**   I couldn't participate myself, but some of my post docs

19  and other colleagues attended the conference and they were able

20  to get the abstracts and slides for me.

21       So I was very familiar with the reports on fluoride that

22  were given at that particular session at the annual ISEE

23  meeting.

24  **Q.**   Dr. Grandjean, you would be very interested in reviewing a

25  prospective cohort on fluoride, wouldn't you?

1    A.    What do you mean?  Which -- do you talk about MIREC or

2    about ELEMENT.

3    Q.    I'm talking about a new prospective cohort that's not --

4    I'm sorry, that's not MIREC or ELEMENT.

5         I'm talking about a new cohort that reports on urinary

6    fluoride for mothers and lower IQ or IQ in the offspring.  You

7    would be interested in reading something like that; is that

8    right?

9    A.    Of course.

10   Q.    Okay.  And you did actually receive an abstract at that

11   ISEE meeting, did you not, reporting a study out of Spain that

12   could not find a statistically significant association with

13   urinary fluoride levels from mothers and lower IQ in the

14   offspring?  You did see that abstract from the ISEE; is that

15   right?

16   A.    I've got all the abstracts, but I don't remember that one.

17   Q.    But that would be something you're very interested in; is

18   that right?

19   A.    Of course.

20   Q.    Because if that study did exist and it showed no

21   association, that would be an unexplained inconsistency between

22   the cohorts in different populations; is that correct?

23             MR. CONNETT:  Overbroad.  Assumes facts.

24             THE COURT:  Sustained.  Assumes too many facts in

25   evidence.

1        THE WITNESS:  My answer is no.

2        THE COURT:  Well, you didn't have to answer because I

3   sustained the objection.

4        THE WITNESS:  Okay.

5   BY MS. CARFORA

6   Q.   Dr. Grandjean, are you saying that the MIREC cohort and

7   the ELEMENT cohort, they tell us everything we need to know

8   about IQ and fluoride exposure?

9        MR. CONNETT:  Overbroad.

10       THE COURT:  Overruled.  You can answer it the way it

11  was phrased.  Go ahead.

12  A.   We are always interested in knowing more, but the fact

13  that we now have two thorough, well-conducted prospective

14  studies with individual fluoride exposure assessments by

15  reliable methods and using proper cognitive test methods, I

16  think we know a whole lot more than we did in 2012 when Anna

17  Choi and I conducted our systematic review and meta analysis.

18       And clearly if there are more studies, I would love to see

19  them because prospective studies are expensive.  They take

20  time.  And if there is a Spanish study -- I'm on the advisory

21  committee of the INMA prospective birth cohort studies in

22  Spain.

23       I haven't heard about this study, but I know the Spanish

24  studies well.  And if there is such a report, then I have

25  forgotten that abstract, if such an abstract exists.

**GRANDJEAN - CROSS / CARFORA**

```
 1        But you know very well I'm not relying on abstracts only.
 2   I am relying on full publications if at all possible.
 3   Q.   Dr. Grandjean, do you believe that if you saw that
 4   abstract, that it would refresh your memory?
 5   A.   It could be.  But, again, I want to see the full report.
 6   I'm not happy with just having an abstract.
 7            MS. CARFORA:  Your Honor, permission to refresh the
 8   witness's recollection.
 9            MR. CONNETT:  I'm going to object on hearsay and
10   lacks -- just hearsay.
11            THE COURT:  Overruled.  It's for refreshment purposes
12   only at this point.
13            MS. CARFORA:  Thank you.
14        Mr. Hambrick, let me get you the number.  It's U-41.
15        If you can zoom in there on the bottom -- I mean, the
16   highlighted portion that has the -- yes.  Thank you.
17        (Document displayed.)
18            MR. CONNETT:  At this point, Your Honor, it only
19   should be the title, because this is hearsay.  This is rank
20   hearsay.
21            THE COURT:  It's not being introduced.  So it's only
22   done to refresh recollection.  Objection overruled.
23   BY MS. CARFORA
24   Q.   Do you see, Dr. Grandjean, it says:
25            "Fluoridated water consumption in pregnancy and
```

GRANDJEAN - CROSS / CARFORA

```
1          neuropsychological development of children at 14
2          months and four years of age."
3              Are you familiar with Santa Marina, who is the lead author
4      there?
5      A.    No.  I'm familiar with Ballester and Sunyer.  Those are
6      the senior people in the INMA collaboration, where I am an
7      advisor.
8              I am not familiar with this study.  So, I mean, it looks
9      like a student paper.
10             And my question is -- because they have looked at all
11     sorts of parameters:  Mercury, lead, solvents, maternal alcohol
12     intake.  And so I would need to know that, you know, they took
13     into account other factors.
14             And just to indicate to you the quality of this abstract,
15     it says under "Methods."  "Fluorine levels in urine."
16             You don't have fluorine urine.  You have fluoride, which
17     is the iron.  If you have elemental fluoride, it would explode.
18             So I think that's a problem with this abstract, and you
19     can understand -- and you can ask Dr. Chang.  She does not rely
20     on abstracts.
21             I would not rely on this, but I am going to talk to my
22     colleagues, Jordi Sunyer and Faron Ballester, to see what they
23     are doing in regard to fluoride because I have not seen a full
24     report that was published after August 28th, 2019.  This is,
25     like, close to ten months by now.
```

1          **THE COURT:**  So Ms. Carfora, for purposes of -- you

2    said you're going to put this up for purposes of refreshment.

3    You can ask the refreshment recollection question, but that's

4    all you're supposed to use it for.

5          **MS. CARFORA:**  I understand.

6       Can you clear the slide, please.

7       (Document removed from display)

8    BY MS. CARFORA

9    **Q.**   So, Dr. Grandjean, does that refresh your memory as if you

10   were aware of this prospective cohort?

11   **A.**   I don't -- I still don't remember any details.  And I

12   didn't attend the meeting.

13   **Q.**   Thank you.

14      Did you -- but you did receive a booklet of the abstracts,

15   correct?  You testified to that a couple minutes ago?

16   **A.**   Right, I did.

17   **Q.**   Thank you.

18      Now, just very quickly.  You had one area in your

19   declaration where you talked about neurotoxic endpoints in

20   adults.  And you cited to the Shao study, Shao et al 2003.  Do

21   you recall that?

22   **A.**   Share?  How do you spell that?

23   **Q.**   I'm sorry.  I'm sure I'm butchering this pronouncement.

24   It's S-H-A-O.

25   **A.**   S-H-A-O.  I don't remember.

1          **MS. CARFORA:**  Can we bring up the declaration,

2    Paragraph 74?

3          (Document displayed.)

4    **BY MS. CARFORA**

5    **Q.**   Do you see here --

6          **MS. CARFORA:**  If you can highlight for me, Mr.

7    Hambrick, Shao 2003?

8          (Document highlighted.)

9    **A.**   Oh, Shao.  Okay.

10   **BY MS. CARFORA**

11   **Q.**   Okay.  And that was a -- that's an ecological

12   cross-sectional study design; is that correct?

13   **A.**   Yes.  Except that patients don't develop fluorosis

14   overnight.  This is a group of patients who have had sustained

15   overdoses of fluoride for a long time.  And so they -- the

16   study, as I recall, simply assessed the associated

17   neurobehavioral symptoms in these patients.

18   **Q.**   Now, Dr. Grandjean, this was -- just very simply, can you

19   tell me was this an ecological cross-sectional design study; is

20   that right?

21   **A.**   I wouldn't call it ecological because, I mean -- it's a

22   case control study rather where you have people with very clear

23   evidence of fluoride exposure overdoses compared to, you know,

24   similar adults who didn't have that history and not -- and no

25   fluorosis.  So it's -- the proper term is a case control study.

1    Q.    Okay.  Thank you.

2              MR. CONNETT:  You can clear the slide, please.

3         (Document removed from display)

4    BY MS. CARFORA

5    Q.    And you just mentioned, and I just want to clarify, the

6    study compared individuals suffering from fluoride poisoning in

7    endemic fluorosis area with healthy individuals from a

8    non-endemic region; is that correct?

9    A.    That's appropriate.  And I want to remind you that the

10   fluorosis similar to what the Danish cryolite workers were

11   suffering from, and they also had neurological symptoms; like,

12   headache and dissonance.  That sort of thing.

13   Q.    And it's not clear from reading that study, Dr. Grandjean,

14   whether the source of fluoride was from coal or from water; is

15   that right?

16   A.    That's what I say.  And the point is that if it came from

17   coal, then maybe the fluoride exposure was not clean.  Maybe

18   there were some additional, like, tar components or something.

19   We can't tell.

20        But it is in accordance with Rohan's finding in the

21   cryolite workers.  So I believe that it's very likely that this

22   is associated with the fluoride exposure, now that these people

23   had that heavy exposure that caused the fluorosis problem.

24   Q.    And can you tell me what the exposure was in the Rohan

25   study, what the exposure to fluoride was, at what level?

1    **A.**    I don't recall.

2    **Q.**    And do you recall what the exposure to cryolite workers

3    were in the 1980s when you were studying that?  Do you know

4    what the exposure level was?

5                **MR. CONNETT:**  Asked and answered.

6                **THE COURT:**  We did cover that.  If you can recall,

7    I'll let you answer that again.

8    **A.**    It was, like, 30 milligrams per day.  It was a calculated

9    dose.

10   **BY MS. CARFORA**

11   **Q.**    Okay.  And you also cited, sir, To Li 2016.; is that

12   right?

13               **MR. CONNETT:**  Your Honor, there are so many studies

14   at issue here that, I think, some of these questions may

15   benefit from specific context.

16               **THE COURT:**  Well, I mean, you can ask it the way you

17   want, but it's probably not the most efficient way unless you

18   give a little more context to help the memory.

19        But you can ask -- it's your question.  You can ask it any

20   way you want.

21               **MS. CARFORA:**  Okay.  Thank you, Your Honor.

22   **BY MS. CARFORA**

23   **Q.**    Dr. Grandjean, when we're referring to neurotoxic

24   endpoints in adults, you cited to the Li 2016 study; is that

25   correct?

 1   A.   I think I saw that when we looked at that page before, but

 2   I don't recall all of these -- I mean, I've cited hundreds of

 3   studies.  I don't recall the details on every single one of

 4   them.  I'm sorry.  I apologize.

 5         MS. CARFORA:  Mr. Hambrick, can you please put the

 6   declaration, Paragraph 74 again.  And let's just leave that up

 7   there and that will get us through the next couple of

 8   questions.

 9        It's U-25, Mr. Hambrick, paragraph -- declaration

10   Paragraph No. 74.

11        (Document displayed.)

12   BY MS. CARFORA

13   Q.   Okay.  You say here:

14        "Likewise, cognitive impairment in elderly

15        subjects was clearly elevated in a waterborne

16        fluorosis area, along with group assessment of

17        urine-fluoride concentrations failed to show a clear

18        effect."

19   Is that right?

20         MR. CONNETT:  Misstates the record.

21         MS. CARFORA:  I'm sorry.  I can't see --

22         THE COURT:  I'm not sure.  I can't -- can you

23   highlight what you're reading?  I'm having trouble.

24   BY MS. CARFORA

25   Q.   Dr. Grandjean, all I'm asking about is this Li study that

1  you cited here in your trial declaration.  I'd just like to

2  know if it's a cross-sectional design study?

3  **A.**   It's cross-sectional in the -- to the extent that the

4  exposure was assessed at the same time as a chemical

5  assessment, but the exposure had lasted for a long time.

6  **Q.**   Okay.  And this study reported no significant associations

7  between urinary fluoride concentrations and cognitive scores;

8  isn't that correct?

9         **MR. CONNETT:**  Overbroad.

10 **A.**   All I'm --

11         **THE COURT:**  Hold on.

12      That's not quite what it says.  Why don't you tailor your

13 question to what it says here.

14         **MS. CARFORA:**  Well, I mean, I -- Your Honor, I'm

15 actually asking what the study said, as opposed to what he

16 testified to.  So I can go ahead and clear this up.

17      I will let the witness know, so he can see in context, I'm

18 going to ask about the Sharma study next.  But if it's okay, we

19 can clear the screen and maybe that will resolve the confusion

20 here.

21         **THE COURT:**  Well, I don't know if that does.  I think

22 your question doesn't quite jive with what I'm reading.  That's

23 the problem.  It seemed broader than that.

24      It talks about a within-group assessment, as opposed to, I

25 guess, within the cognitively impaired group?  I guess that's

1   what it means.

2        You can ask whatever question you want, but I'm trying to

3   make sure we're all on the same page here.

4            MS. CARFORA:   I understand.

5        Mr. Hambrick, can you clear the slide, please?

6        (Document removed from display)

7   BY MS. CARFORA

8   Q.   Dr. Grandjean, the Li 2016 reported no significant

9   associations between the elderly subjects and urinary fluoride

10  concentrations; is that right -- I'm sorry.  Strike that.  Let

11  me try this one more time.

12       The Li 2016 reported no significant associations between

13  urinary fluoride concentrations and cognitive scores in the

14  elderly subjects; isn't that correct?

15           MR. CONNETT:   Overbroad.  Asked and answered.

16           THE COURT:   All right.

17  A.   I was assessing the weight of the evidence.  So when I

18  cited that study, I emphasized that there was no clear

19  association with a urinary fluoride.

20       I'm not looking only at evidence which for some reason

21  speaks in favor of fluoride being neurotoxic.  I'm also

22  emphasizing the weaknesses.  This is what I'm doing in this

23  sentence.

24       However, having said that, I would say one single urine

25  analysis, when we're talking about an effect that has built up

1    over many years in these people, the exposure assessment is

2    probably imprecise.  And, therefore, the fact that it is not

3    significant -- I think there was -- as far as I remember, there

4    was a trend, but it was not statistically significant.  It

5    doesn't bother me.  It doesn't detract from my overall

6    conclusion that fluoride is neurotoxic.

7         But the study at least showed that people who had a

8    definite high exposure over many years had neurological

9    symptoms, and that's what important to me.

10   BY MS. CARFORA

11   Q.   Okay.  And now the Sharma study.  Now, that was a survey

12   of the human population exposed to low, medium and high

13   fluoride concentrations in drinking water in India; is that

14   correct?

15   A.   I think so.  Again, I don't remember the details of all

16   the individual studies.  I did my best to provide you with a

17   balanced assessment of the strengths and weaknesses of the

18   studies.  And some of them I mentioned only briefly, especially

19   if they were not very weighty in regard to the contribution to

20   our assessment of fluoride neurotoxicity.

21   Q.   Okay.

22        MS. CARFORA:  Your Honor, request to -- permission to

23   recollect -- refresh recollection.

24        THE COURT:  Go ahead.

25        MS. CARFORA:  Mr. Hambrick, U-54, please.  Just first

1    page, just the summary.

2         (Document displayed)

3    **BY MS. CARFORA**

4    **Q.**    Okay.  Dr. Grandjean, so you see here that the populations

5    were exposed to low, medium and high fluoride concentrations in

6    drinking water in India.

7         Does that refresh your recollection?

8    **A.**    Now, I mean, I've seen the study.  I have been to India.

9    I have been in the areas where fluoride disease.  I know the

10   clinical appearance of fluoride -- fluorosis patients.  So it

11   doesn't surprise me that there were central nervous system

12   effects, because I've seen that myself in India.

13   **Q.**    Okay.  Thank you.

14        I'm just very -- all I want to get to is the exposure

15   levels here.

16        Now, subjects were personally interviewed and classified

17   from these low, medium and high fluoride villages; is that

18   correct?  And I'm just interested in the exposure assessment

19   here.

20   **A.**    I mean, that's what the paper says, so I -- I cannot

21   dispute that.

22   **Q.**    Okay.  And you agree that the low exposure was classified

23   as -- or less than 1 ppm; is that correct?

24   **A.**    I'm not here to challenge the authors of that assessment.

25   So this is what -- I can read.  So this is what it says.

1   Q.   So you agree, then, the low is classified less than 1 ppm?

2   A.   I can agree this is what it says in the abstract.

3   Q.   And you can agree then that the medium exposure level was

4   classified from 1 to 1.5 ppm; is that correct?

5   A.   I can read it just as well as you can.  So, I agree.

6   Q.   And do you agree that the high exposure classification was

7   1.5 to 6.4 ppm; is that correct?

8   A.   My answer is the same.

9   Q.   Okay.  And do you remember that there were no neurological

10   manifestations in children in the low and medium fluoride

11   villages; is that correct?

12        MR. CONNETT:  Overbroad.  Assumes facts.

13        THE COURT:  Well, he can base it on his memory, if he

14   has any memory.  Otherwise, we just read the abstract.

15   BY MS. CARFORA

16   Q.   Dr. Grandjean, do you remember --

17        THE COURT:  Are you asking whether he remembers

18   reading this or seeing this?  So that's a simple question,

19   "yes" or "no."

20        MS. CARFORA:  I would like to know if Dr. Grandjean

21   remembers that it was reported in this study that there were no

22   neurological manifestations in children in the low and medium

23   fluoride villages?

24        THE COURT:  All right.  That's a simple question.

25   Do you remember that that's what this report states?

1          **THE WITNESS:**  Okay.  I can see that my comment is

2     that I would rather rely on cognitive tests because they are

3     objective.  They are standardized.  And they are more sensitive

4     than some neurological symptomatology questionnaire that may

5     not have been fully standardized and may not have been

6     understood by the children.

7          So I would say the fact that they at least saw very clear

8     adverse effects in children exposed to water with a fluoride

9     concentration above 1.5 ppm, I think that is very much in

10    accordance with what we're talking about.  Namely, that

11    fluoride is a developmental neurotoxicant.

12         This study is not one where I would say:  Bingo, this

13    proves my point.  It's a -- it's a weak support.

14         **MS. CARFORA:**  Thank you.

15    I have no further questions, Your Honor.

16         **THE COURT:**  All right.  Any redirect?

17         **MR. CONNETT:**  Yes, Your Honor.  Probably about ten or

18    so minutes.

19         **THE COURT:**  Okay.

20                    <u>**REDIRECT EXAMINATION**</u>

21    BY MR. CONNETT

22    Q.   Thank you Dr. Grandjean.  I know it's getting late, so I'm

23    going to do my best here to move this along.

24         I want to go back to you had talked about following the

25    general approach that EPA has taken with respect to weight of

1    the evidence analyses.

2         Dr. Grandjean, prior to your work in this case, in the

3    course of your work sensitivity analysis epidemiologist and

4    environmental health researcher, have you ever had occasion to

5    read EPA risk assessments, EPA documents?

6    A.   I have.  And I must say I collaborated very closely with

7    EPA, with the EPA Water Office in 2001 when EPA issued their

8    report and on the reference dose for methylmercury, because at

9    the recommendations of the National Research Council it was

10   based on my work.

11   Q.   When EPA did that mercury reference dose analysis, did EPA

12   conduct a formal systematic review to do that assessment?

13   A.   No.

14   Q.   And throughout the course of your career, let's say up

15   until 2018, had -- had you seen EPA -- I mean, do you recall

16   any time where you saw an EPA document that in order to do the

17   weight of the evidence analysis, EPA did a formal systematic

18   review?

19   A.   Frankly, I don't remember having seen it.  I mean, I'm now

20   seeing these documents that Ms. Carfora presents and it's

21   totally new to me.

22   Q.   So you mentioned the general approach of the EPA.  Were

23   you referring, in part, to the fact that EPA throughout the

24   30-plus years of your environmental health research career has

25   been doing weight of the evidence analyses that don't require

1  formal systematic reviews?

2           **MS. CARFORA:**  Objection.  Leading.

3           **THE COURT:**  Overruled.

4  **A.**   You have to have the best available evidence.  I mean,

5  that is the key.  And then you conduct a weight of the evidence

6  review, as I've described before.

7  **BY MR. CONNETT**

8  **Q.**   So, and just to be clear.  When you talk about the general

9  approach that EPA has used, are you referring to EPA documents

10  that you've reviewed during the 30-plus years of your work as

11  an environmental health researcher?

12  **A.**   I am.  I mean, but I have to say the only one that I

13  really paid attention to was mercury because I was a key source

14  for EPA on that.

15  **Q.**   Okay.  Dr. Grandjean, I'd like to show you a document that

16  was shown to you earlier by counsel, which is EPA's final risk

17  evaluation rule that has been -- that is EPA Exhibit 544.

18       (Document displayed.)

19  **Q.**   Dr. Grandjean, can you see this document on the screen?

20  **A.**   I see it.

21  **Q.**   All right.

22       (Brief pause.)

23  **Q.**   Sorry.  I'm just looking to get to the right section here.

24  **A.**   We lost it.

25  **Q.**   Sorry.  I apologize.

1           **MR. CONNETT:**  I appreciate your patience, Your Honor.

2    It will be about ten more seconds here.

3           (Brief pause.)

4    **BY MR. CONNETT**

5    **Q.**   Okay.  I have the document.

6           (Document displayed.)

7    **Q.**   Dr. Grandjean, can you see this on the screen?

8    **A.**   I see it.

9    **Q.**   I'm directing you to a section of the risk evaluation

10   which is titled "Fit-for-Purpose Evaluations."  Do you see

11   that?

12   **A.**   Right.  And I'm now going to go to the next page, which is

13   Page 33740.  Again, this is EPA Exhibit 544.

14          And EPA states here as follows:

15              "The concept of fit-for-purpose risk evaluation

16          is further explained in the regulation as follows.

17          EPA will refine, as necessary, its evaluations for one

18          or more conditions of use in any risk evaluation and

19          when information and analysis are sufficient to make a

20          risk determination using assumptions, uncertainty

21          factors, and models or screening methodologies, EPA

22          may decide not to refine its analysis further."

23          Now, Dr. Grandjean, based on what you found with the --

24   your BMD analyses, do you need to do extensive refinement of

25   your -- of that data before you can confidentially conclude as

1   a scientist, that whatever that final BMD value is going to be,

2   it's going to be well below the fluoride exposures seen in

3   fluoridated areas?

4            **MS. CARFORA:**  Objection.  Leading.

5            **THE COURT:**  Overruled.

6   **A.**   As you know, Mr. Connett, I'm not a legal scholar.  But

7   the way I understand this wording -- and I am familiar with it.

8        The way I understood it is that my report, my initial

9   report, as reflected in my most recent declaration, should be

10  quite sufficient.

11       I have prepared my report and my assessment, my

12  declaration, my risk assessment.  I've prepared that on the

13  basis of the best available science.  I'm a scientist and not a

14  legal scholar, and I'm not an EPA risk assessor.

15       I've done the best that I can on the basis of the

16  available evidence and, to me, that evidence is convincing.  It

17  is very convincing.  And I would, therefore, hope that EPA and

18  the -- and, Your Honor, that you would interpret this wording

19  as -- so that it is the scientific evidence that determines

20  whether or not the fluoride is endangering the next

21  generation's intelligence and not some legal interpretation of

22  a particular wording.

23  **Q.**   Let me -- so right now, based on the BMD analysis that

24  you've already conducted, Dr. Grandjean, do you have a

25  reasonable degree of scientific certainty that whatever the

GRANDJEAN - REDIRECT / CONNETT

1    final BMD value ultimately proves to be, it will be below the

2    current exposure levels seen in fluoridated communities?

3            MS. CARFORA:  Objection.  Foundation.

4            THE COURT:  Overruled.

5    A.   As you well know, urinary fluoride levels are about

6    0.7 milligrams per liter.  The BMD and BMDL are going to be

7    about 0.3, 0.15.

8         Surface water fluoride is only about 0.1.  This is what

9    homo-sapiens was -- evolved in, not fluoridation water and not

10   high level fluoride from groundwater where there is fluoride

11   rich minerals.  We're talking about the whole order of

12   magnitude in difference.

13        And so, to me, the current exposure levels in America are

14   way too high.  We are, in my mind, definitely endangering the

15   next generation's intelligence.

16   Q.   Okay.  Now, I'm going to -- you were asked some questions

17   about your benchmark response that you used of one IQ point.

18   You were shown two EPA documents regarding that subject, and

19   I'm going to bring those up now.

20        I want to start first with EPA's National Air Lead

21   Standard that you were shown.  This has been marked as

22   Plaintiff's Exhibit 42.

23            MR. CONNETT:  And, Your Honor, I believe this is the

24   first time we are showing this in this case.  So at this point

25   in time I just wanted to identify that for the Court.  It is

1    pre-admitted though.

2              THE COURT:  Okay.

3        (Document displayed.)

4    BY MR. CONNETT

5    Q.   Dr. Grandjean, you had mentioned this document as

6    providing support for your use of a one IQ point benchmark

7    response.

8        So I just want to show some material from this document to

9    see if, in your view, it supports your selection of a one IQ

10   point benchmark response.  Okay?

11   A.   Okay.

12   Q.   Okay.  So I'm looking on Page 67000, and it states here in

13   the middle column that:

14            "The Clean Air Science Advisory Council advised

15            the EPA that, quote, a population loss of one to two

16            IQ points is highly significant from a public health

17            perspective, and that the primary lead standard should

18            be set so as to protect 99.5 percent of the population

19            from exceeding that IQ loss."

20        Let me ask you first, Dr. Grandjean, do you agree with

21   that assessment?

22   A.   I would prefer one IQ point, because having large studies

23   like we do for fluoride, we are able to see significant

24   associations associated with a loss of one IQ point.

25        And as I said before, I think all parents will agree with

1    me when I say an IQ loss of one point is sufficient to call it

2    adverse.  No parent would want their kids to have less

3    intelligence than their parents.

4        But, okay.  Here they say one to two IQ points, but they

5    also say that they want a protection of 99.5 percent of the

6    population.

7        But that would then mean that the BMDL is too high,

8    because that would require us to go more than two standard

9    deviations down, probably three or more.  And so the BMDL will

10   be lower.  The BMD will be higher, because it's one to two,

11   rather than one.  But the BMDL will be lower.

12       So I think overall we are in agreement.

13   **Q.**   Now, EPA also cited Plaintiff's Exhibit 43, which is the

14   perchlorate water standard.

15       I will go ahead and bring that up on the screen.

16       **THE COURT:**  Before you do that, that last point I'm

17   trying to understand.

18       You say that if the IQ -- if the BMR were set at two

19   points, the BMD would be lower or higher?

20       **THE WITNESS:**  Higher.  The BMD will be higher.

21       **THE COURT:**  Okay.

22       **THE WITNESS:**  So if the BMR is not one IQ point, but

23   two IQ points, you can see from the equation in my declaration

24   that that means that the BMD will be twice.  So we are now

25   talking about 0.3 instead of 0.15.

1          THE COURT:  So there is a linear relationship between

2    the BMR and BMD?

3          THE WITNESS:  Right.  So it's very simple.  But in my

4    mind 0.3 is much below 0.7.  So we're still talking about

5    current fluoride exposure levels in America being too high.

6    BY MR. CONNETT

7    Q.   So on that point, let me just be clear about this.

8          If you had used a BMR of two IQ points, are you saying

9    that human exposures in fluoridated areas are still above that

10   BMR?

11   A.   They are still above because the BMD would be about 0.3,

12   0.4.  But if we want to protect 99.5 percent of the population,

13   we've got to go -- you know, this is a -- we're talking about a

14   distribution here.  We've got to go below the BMDL.

15        I can't -- I can't quite calculate the exact number, but

16   that would be closer to what we already have had for one IQ

17   point.

18   Q.   Okay.  And now, Dr. Grandjean, I'm going to post on the

19   screen.

20          MR. CONNETT:  And, Your Honor, this is another

21   document that has been pre-admitted.  It's Plaintiff's

22   Exhibit 43.

23        I am sorry.  I'm going to look for this.

24        (Brief pause.)

25

GRANDJEAN - REDIRECT / CONNETT

1   BY MR. CONNETT

2   Q.   Well, maybe I'll ask it this way.  I apologize.

3        Doctor, if this perchlorate document, which is Plaintiff's

4   Exhibit 43, if it says that the loss of one IQ point is

5   associated you with the loss of -- in lifetime earnings of

6   $18,000, would that support your use of one IQ point as a

7   benchmark responses?

8             MS. CARFORA:   Your Honor, I object on relevance

9   grounds.  Costs and value of IQ points is not a risk factor

10  that can be considered here.

11            THE COURT:   Overruled.

12  A.   I'm familiar with these calculations that have been used

13  to support regulation of lead exposure in America, because IQ

14  decrements are costly to society.

15       What health economists have calculated in regard to the

16  value of one IQ point, I think those values are real.   I mean,

17  the value of a life is probably -- I mean, it may be a million

18  dollars.

19       But figure the loss of 40 IQ points, that will mean that

20  essentially you have no normal life left.  And so if you

21  divided the value of a life by 40, you have a value of one IQ

22  point.  That's another way of calculating this.

23       To me, the loss of one IQ point is an adverse effect.

24  Q.   And is your opinion on that supported by the fact that EPA

25  and others have been able to determine and estimate that the

1    loss of one IQ point is associated with the reduction of

2    earning potential?

3    **A.**   Absolutely, and education.

4    **Q.**   Now, you were asked about the dose-response -- sorry,

5    the -- your -- sorry -- strike that.

6        In your BMD analysis you were asked about the -- what you

7    did to sort of test the model for linearity.  I want to follow

8    up on that.

9        The Court has heard in this case from Dr. Howard Hu, who

10   testified that in the ELEMENT study they scrutinized the

11   dose-response relationship to determine whether it was a linear

12   relationship.

13       And Dr. Hu testified that they found that it was, in fact,

14   a mostly linear relationship, and it was fully linear at the

15   age four group.

16       Does that support your use, Dr. Grandjean, of the linear

17   model for your BMD analysis?

18   **A.**   Of course it does.  We did our own estimate using the

19   digitized data.  So we are in total agreement there.

20   **Q.**   And if I asked you with the MIREC study, the MIREC study,

21   if they scrutinized the dose-response relationship and

22   concluded that the dose-response was linear, does that give you

23   additional confidence, Dr. Grandjean, that you used the

24   appropriate model?

25           **MS. CARFORA:**  Objection.  Leading.

1          THE COURT:  Sustained.  We're getting -- now you're

2     feeding questions.

3          MR. CONNETT:  Sorry, Your Honor.  Sorry, your Honor.

4     BY MR. CONNETT

5     Q.   If the authors of the underlying studies that you rely

6     upon for your BMD analysis, if they themselves have scrutinized

7     the dose-response relationship, is that a relevant factor for

8     you in doing your benchmark dose analysis?

9     A.   I was very much aware that when we chose to look at the

10    linear approximation, but we also did -- as I explained to

11    Ms. Carfora before, we also did our own sensitivity analysis to

12    see if there was some deviation, and we didn't find any of any

13    importance.

14    Q.   Now, you were asked a question by counsel about a

15    statement in your 2006 review where you had mentioned that

16    there's about over a thousand chemicals that have shown to

17    cause -- that have been shown to cause neurotoxicity in

18    animals.

19         Dr. Grandjean, how many chemicals would you estimate have

20    over 50 epidemiological studies associating the chemical with

21    reduced IQ in human beings?

22         MS. CARFORA:  Objection.  Foundation.

23         THE COURT:  Overruled.  You can explain the basis of

24    your answer.

25    A.   So there are very few substances that have been studied to

1    the extent that fluoride has been studied.  I reckon that many

2    of them are, of course, cross-sectional.  But the overall

3    agreement is really stunning.

4        So you can identify weaknesses, imprecisions, but

5    basically the overall evidence is overwhelming.

6        I believe that -- as we concluded in our 2014 *Lancet*

7    paper, that fluoride is a human developmental neurotoxicant.

8    The two studies that we have discussed, Bashash and Green, are

9    two studies they could only say:  Hey, there's a linear

10   relationship here.  They could not determine threshold.  And

11   EPA has said thresholds cannot be observed.

12       The best we can do is to use the benchmark dose

13   calculation.  This is what we've done.  And we want American

14   children, pregnant women, to be exposed below that estimated

15   threshold, which is expressed by the benchmark dose.

16       That's why I did those tables.  And I strongly recommend

17   that we lower fluoride exposures in America so they are below

18   that benchmark dose level, because that is our best estimate of

19   where the threshold is, given that one IQ point is what we

20   consider an adverse effect.

21   **Q.**  And lastly, Doctor, I'm going to show you a study that --

22   the UCSF study.  I'm going to ask you one or two questions

23   about that study.  Okay?

24       **MS. CARFORA:**  Objection, Your Honor.  That study is

25   not in evidence.  So I'm not sure what the purpose would be of

 1   showing it before asking a question.

 2             MR. CONNETT:  Okay.  Well, it was shown, Your Honor.

 3   So I was just following up to put some context --

 4             THE COURT:  Why don't you ask the question?

 5   BY MR. CONNETT

 6   Q.   In the California study, Dr. Grandjean, do you recall if

 7   where the mothers were -- had their urine tested?  Were they in

 8   their -- were they in their home community or were they

 9   somewhere else?

10   A.   As far as I remember, they were in San Francisco.

11   Q.   Is San Francisco --

12   A.   They were at the hospital.

13   Q.   Is San Francisco a city that fluoridates its water?

14             MS. CARFORA:  Objection.  Foundation.

15             THE COURT:  Well, if he knows.  If he's read it

16   somewhere.

17   A.   I don't remember.  But at least they were away from their

18   residence.  So to relate the San Francisco urine-fluoride to

19   the residence water fluoride is associated with some

20   uncertainty.  And you also saw that this was not statistically

21   significant.

22   Q.   And so my question, Dr. Grandjean, then is:  Could that

23   fact help explain in this relatively small cohort the absence

24   of the statistically significant relationship between the water

25   fluoride concentration in the home community and urinary

1  fluoride levels.

2          **MS. CARFORA:**  Objection.  Leading.

3          **THE COURT:**  Overruled.

4  **A.**  I want to remind you that -- you know, as WHO was

5  concluded, about half of what appears in the urine represents

6  the past exposures because fluoride is retained in the

7  skeleton, which is continuously broken down and built up again.

8  So fluoride is released.  That is fluoride built in up to

9  several years ago.

10      And so part of the reviewing is really reflecting the

11  long-time residence, which may have been the same.  We actually

12  don't know that.

13      And so the current fluoride in urine partly reflects the

14  recent intake at the hospital in San Francisco and could,

15  therefore, be different from their home community.

16          **MR. CONNETT:**  Thank you, Dr. Grandjean.  I have no

17  further questions, Your Honor.

18          **THE COURT:**  All right.

19      Anything further on recross?

20          **MS. CARFORA:**  Nothing for me, your Honor.  Thank you.

21          **THE COURT:**  All right.  Great.

22      Well, that will then conclude your testimony,

23  Dr. Grandjean.  Thank you.

24          **THE WITNESS:**  Oh, my God.  Thank you.

25          **THE COURT:**  And you are free to go on and do the rest

1   of your work.  I appreciate your cooperation in appearing long

2   distance in this matter.

3          THE WITNESS:  Thank you for listening.

4          THE COURT:  All right.  So we will adjourn for today.

5   What is the order of witness tomorrow?

6          MR. CONNETT:  Your Honor, plaintiffs will begin with

7   finishing the redirect of Dr. Hu.  We expect that to be about

8   10 or 15 minutes.

9      And then the next witness will be Dr. Bruce Lanphear.

10         THE COURT:  And after that?

11         MR. CONNETT:  Dr. Kristina Thayer, from the EPA.

12     And to the extent that we -- we would probably go with

13   Casey Hannan, the representative of the CDC, after that.

14     And if we're finished with all those witnesses, the next

15   witness up will be Dr. Kathleen Thiessen.

16         THE COURT:  Angie, how much time on the clock do we

17   have?

18         THE CLERK:  Your Honor, plaintiffs have seven hours

19   37 minutes.

20         THE COURT:  That's remaining?

21         THE CLERK:  Remaining.

22     And defendants have eight hours and nine minutes

23   remaining.

24         THE COURT:  All right.  Please keep that in mind.  We

25   proceeded slower than you originally projected, and that's a

GRANDJEAN - REDIRECT / CONNETT

1   warning that you do have a limited number of hours.  So I would

2   keep in mind try to keep this focused.

3        And keep in mind, you know, you have submitted

4   declarations for a lot of these witnesses.  That was intended

5   to save time.

6        So in any event, we'll see you home at 8:30.

7             MR. CONNETT:  Thank you, Your Honor.

8             MS. CARFORA:  Thank you, Your Honor.

9             THE COURT:  Thank you.

10            THE CLERK:  Court is adjourned.

11       (Whereupon at 1:44 p.m. further proceedings

12        were adjourned until Wednesday, June 10, 2020

13        at 8:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

TUESDAY, JUNE 9, 2020 - Volume 2

**PLAINTIFF'S WITNESSES**                                    **PAGE   VOL.**


**GRANDJEAN, PHILLIPPE**
Direct Examination by Mr. Connett                            145    2
Cross-Examination by Ms. Carfora                            211    2
Redirect Examination by Mr. Connett                         308    2

_   _   _

<u>**CERTIFICATE OF REPORTER**</u>


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*Debra L. Pas*
_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, June 9, 2020