Volume 3

Pages 326 - 508

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

FOOD & WATER WATCH, INC., et al,  )
                                  )
                                  )
            Plaintiffs,           )
                                  )
  vs.                             ) No. C 17-2162 EMC
                                  )
U.S. ENVIRONMENTAL PROTECTION     )
AGENCY, et al,                    )
                                  )  San Francisco, California
            Defendants.           )  Wednesday
                                  )  June 10, 2020
                                  )  8:30 a.m.
_____)

**TRANSCRIPT OF REMOTE ZOOM BENCH TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          WATERS KRAUS & PAUL
                             222 North Pacific Coast Highway
                             Suite 1900
                             El Segundo, California 90245
                    BY:  **MICHAEL P. CONNETT, ESQ.**
                         **CHARLES ANDREW WATERS, ESQ.**


                             WATERS & KRAUS LLP
                             3141 Hood Street
                             Suite 700
                             Dallas, Texas 75219
                    By:  **KAY GUNDERSON REEVES, ESQ.**


        (APPEARANCES CONTINUED ON FOLLOWING PAGE)


*Reported By:*   *Debra L. Pas, CSR 11916, RPR, RMR, CRR*
               *Official Reporter - US District Court*
               *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

**For Plaintiffs:**          NIDEL AND NACE, PLLC
                             5335 Wisconsin Avenue, NW
                             Suite 440
                             Washington, DC 20015
                     BY:  **CHRISTOPHER THOMAS NIDEL, ESQ.**

**For Defendants:**          U.S. DEPARTMENT OF JUSTICE
                             Environmental Defense Section
                             601 D Street, NW
                             Room 8814
                             Washington, DC 20004
                     BY:  **DEBRA J. CARFORA, ESQ.**

                             U.S. DEPARTMENT OF JUSTICE
                             Environment & Natural Resources Div.
                             P.O. Box 7611
                             Washington, DC 20044
                     BY:  **BRANDON N. ADKINS. ESQ.**
                          **SIMI BHAT, ESQ.**
                          **JOHN THOMAS H. DO, ESQ.**

                             _   _   _

P R O C E E D I N G S

1

2   JUNE 10, 2020                                          8:30 A.M.

3                          ---oOo---

4          THE CLERK:  Court is now in session.  The Honorable

5   Edward M. Chen is presiding.

6      Calling Civil Action 17-2162, Food & Water Watch, Inc.

7   versus Environmental Protection Agency.

8      Counsel, please state your appearances for the record.

9          MR. WATERS:  Andy Waters for the plaintiffs.

10         THE COURT:  Good morning.

11         MR. CONNETT:  Good morning, Your Honor.  Michael

12   Connett for the plaintiffs.

13         THE COURT:  All right.  Good morning, counsel.

14         MR. NIDEL:  Good morning.  Chris Nidel for the

15   plaintiffs.

16         THE COURT:  All right.  Thank you, Mr. Nidel.

17         MS. CARFORA:  Good morning, Your Honor.  Debra

18   Carfora for EPA.

19         THE COURT:  All right.  Good morning, Ms. Carfora.

20         MR. ADKINS:  Good morning, Your Honor.  Brandon

21   Adkins for EPA.

22         THE COURT:  All right.  Thank you, Mr. Adkins.

23         MS. BHAT:  Good morning, Your Honor.  Simi Bhat for

24   EPA.

25         THE COURT:  Good morning, Ms. Bhat.

PROCEEDINGS

```
 1              MR. DO:  And John Do for EPA.  Good morning.

 2              THE COURT:  Good morning, Mr. Do.

 3              MS. REEVES:  Good morning, Your Honor.  It's Kay

 4    Reeves for the plaintiffs.

 5              THE COURT:  Okay.

 6         So we're going to resume this morning with the completion

 7    of Dr. Hu's testimony; is that right?

 8              MR. WATERS:  That's correct, Your Honor.

 9              THE COURT:  Okay.  Can we bring him into the well

10    there?

11              MR. WATERS:  That would be great.

12              THE COURT:  All right.

13         (Brief pause.)

14              THE COURT:  All right.  There is Dr. Hu.

15              THE WITNESS:  Good morning, Your Honor.

16              THE COURT:  You were able to fix your VPN problem or

17    whatever it was yesterday?

18              THE WITNESS:  Oh, gosh.  I don't consider myself a

19    techie by any means, but yesterday was particularly

20    frustrating.  So thank you for accommodating me.

21              THE COURT:  Certainly.

22         All right.  Just a reminder you are still under oath.

23         And we are now picking up with redirect; right?  Is that

24    where we are?

25              MR. WATERS:  Yes, sir.
```

1    **THE COURT:**  All right.  Go ahead, Mr. Waters.

2                          **HOWARD HU**,

3    called as a witness for the Plaintiff herein, having been

4    previously sworn, resumed the stand and testified further as

5    follows:

6                      **REDIRECT EXAMINATION**

7    **BY MR. WATERS**

8    **Q.**   Dr. Hu, how would you compare maternal plasma fluoride as

9    a biomarker to use for studies of neurodevelopment versus

10   maternal urinary-fluoride levels?

11   **A.**   Well, we were interested in maternal plasma fluoride

12   because that's the fraction of blood where fluoride might be

13   able to cross the placenta.

14       The problem was is that maternal -- well, any plasma level

15   tends to fluctuate even more during the day than urinary levels

16   of any metabolite.  So, you know, there is more measurement

17   error, if you will.

18   **Q.**   Does that mean it would be harder to detect or more

19   difficult to detect an association between prenatal fluoride

20   and IQ if you were to use plasma as the biomarker?

21   **A.**   Unfortunately, yes.

22   **Q.**   Would having less than three samples of urine per mother

23   introduce additional imprecisions in your exposure estimates?

24   **A.**   Yes.

25   **Q.**   And would that make it harder or easier to detect the

1  association between fluoride and IQ?

2  **A.**   Harder.

3  **Q.**   Would using non-fasting urine samples also introduce some

4  exposure imprecision?

5  **A.**   Somewhat, although that's less of a concern if you're

6  adjusting for creatinine.

7  **Q.**   Would it make it also harder to detect the association

8  between fluoride and IQ?

9  **A.**   A bit, yes.

10  **Q.**   Are you aware of any creatinine reference values that have

11  been established for pregnant women?

12  **A.**   No, no.   Sorry.

13  **Q.**   Is that a reason or does that help to explain why you used

14  the average creatinine values, creatinine values in the Mexico

15  City cohort instead of the WHO reference value that you were

16  asked about?

17  **A.**   Precisely.

18  **Q.**   If you had used the WHO reference value, would it have had

19  any effect on the relationship you found between prenatal

20  fluoride and adverse neurodevelopmental effects?

21  **A.**   Zero.

22  **Q.**   All right, sir.   In your 2017 study -- well, let me just

23  ask you if you could explain your answer with respect to why it

24  would be zero?

25  **A.**   Sure.   I mean, if we used some other population reference

1  value for adjusting for creatinine instead of the maternal

2  creatinine levels, that would not have changed the relative

3  position of each person's fluoride level or relative to each

4  other.

5      So, in fact, the relationship of incremental changes in

6  fluoride and IQ would not have changed.

7  **Q.**   Thank you, Doctor.

8      In your 2017 study you mentioned that lack of individual

9  information about iodine intake was a limitation.  Do you

10  recall that?

11  **A.**   Yes.

12  **Q.**   Now, Doctor, are all limitations created equal?  In other

13  words, are they all equally meaningful?

14  **A.**   Well, they all have somewhat different meanings.

15  **Q.**   Okay.  Do you consider the lack of individual information

16  on iodine to be an important limitation in the ELEMENT cohort

17  that you worked with?

18  **A.**   It was only a limitation in the sense we could not

19  evaluate's detain as a modifier of the effect.

20      In this case there is no reason to believe that iodine by

21  itself was a potential confounder.  Not having that information

22  does not change in any way the results of an interpretation of

23  the study.

24  **Q.**   Now, Doctor, did you exclude women with certain disease

25  states or disease circumstances from your study?

1  **A.**   Yes.

2  **Q.**   What effect, if any, would this have had on the variation

3  in creatinine in your cohort, if any?

4  **A.**   Well, if it excluded some of the subjects in whom you

5  worry about.  Creatinine is a potential, you know, thing that

6  could influence the results.  So, for instance, we excluded

7  women with any evidence of renal disease, which is an

8  important -- has an important impact on the secretion of

9  creatinine.

10  **Q.**   Do you have a response to the suggestion raised during

11  cross-examination that the factors that influence creatinine

12  may be the true cause of IQ loss seen in your study as opposed

13  to fluoride?

14  **A.**   Yes.

15         **MR. ADKINS:**  Objection.  Misstates testimony.

16         **THE COURT:**  Well, it doesn't matter whether that --

17  what the testimony was.  I'd like to know the answer to the

18  question.

19         **THE WITNESS:**  Thank you.

20  **A.**   Yes.  I don't believe that having creatinine -- I'm sorry.

21  Let me rephrase that.

22     I don't believe that creatinine is a potential confounder

23  for our study at all.  There are factors that influence

24  creatinine secretion.

25     And let me just point out that creatinine that goes into

1    urine, 80 percent of it is actually excreted passively, not

2    secreted.

3         So the secretion of creatinine may be influenced by

4    dramatic changes in must muscle mass or really poor nutrition,

5    but that's not what we would anticipate.

6         And as I mentioned in my testimony on Monday, there is no

7    evidence that creatinine is associated both with fluoride

8    exposure, as well as the neurobehavioral results that we were

9    looking at.

10   BY MR. WATERS

11   Q.    Are you aware, Doctor, of any peer-reviewed paper that has

12   set forth this concept as an explanation for your results?

13   A.    No.

14   Q.    Has anyone at the NIH expressed concern to you about the

15   use of creatinine adjusted urine to measure fluoride in the

16   cohort?

17   A.    No.

18   Q.    Yesterday counsel -- or I guess it was the day before

19   yesterday, counsel said that you based the average urinary

20   fluoride level in the ELEMENT cohort on results from 71 women.

21   Do you recall that?

22   A.    Yes.

23   Q.    All right.  I'm going to put on the screen here Table 1

24   from the Thomas 2016 study and ask you how many women

25   actually -- in actual fact, how many women was the average

```
 1   concentration based upon?

 2       If we can blow it up --

 3           MR. ADKINS:  Objection.  It's unclear whether this is

 4   being used to refresh your recollection or show an inconsistent

 5   statement.

 6           MR. WATERS:  This is being offered, Your Honor, to

 7   demonstrate that counsel may have misled the witness in

 8   testimony on Monday.

 9           THE COURT:  All right.  That's fine.

10       Could you again identify the exhibit?

11           MR. WATERS:  It's not -- it's not an exhibit, Your

12   Honor.  It is his paper, the -- excuse me, the Thomas paper

13   2016.

14           MR. ADKINS:  Your Honor, this isn't a Trial Exhibit

15   in this days and it's essentially being used as an exhibit now.

16           THE COURT:  Well it's already been brought up, I

17   believe.  Was it brought up -- was it not brought up in

18   cross-examination?

19           MR. WATERS:  Yes, Your Honor.

20           MR. ADKINS:  It was, Your Honor.  It was brought up

21   to refresh the witness's recollection.

22           THE COURT:  All right.  I'm going to allow it.

23   Overruled.

24       Go ahead.

25           MR. WATERS:  Very well.
```

1          (Document displayed.)

2     **BY MR. WATERS**

3     **Q.**   It may be a little bit difficult to read, but can you tell

4     us what the actual number of women was that was considered in

5     the cohort?

6     **A.**   515.

7     **Q.**   And what was the mean in terms of the fluoride levels?

8     **A.**   0.91 milligrams per liter.

9     **Q.**   All right.  Thank you.

10         And with respect to the Bashash 2017 study, what was the

11    mean in that -- with that research paper?

12    **A.**   I don't recall.  Just slightly different.

13              **THE COURT:**  You are looking at the Bashash study,

14    Dr. Hu?

15              **THE WITNESS:**  Yes.

16              **THE COURT:**  Okay.  Go ahead.

17    **A.**   0.90 milligrams per liter.

18    **BY MR. WATERS**

19    **Q.**   Thank you.  Thank you, Doctor.

20         Now, you were asked a question about the sensitivity

21    analysis in Bashash '17 where you controlled for childhood

22    urinary fluoride levels in a subset of the cohort.

23         Dr. Hu, in that sensitivity analysis was prenatal fluoride

24    still significantly associated with reduced IQ?

25    **A.**   It was associated with reduced IQ.  I think the

 1   significance value went down, but the -- and the effect

 2   estimate was slightly downwards as well.

 3   Q.   With respect to your ADHD study, is it unusual to find

 4   effects on some of the scales of CRS, but not on others?

 5   A.   Not at all.

 6   Q.   Does that finding reduce in any way your confidence in the

 7   study's overall findings that you did not find effects on all

 8   of the CRS scale?  And can you explain why or why not?

 9   A.   Sure.  Well, neurotoxicants all operate in a somewhat

10   different manner.  Some of them may be involved with cell death

11   and neuronal so-called life span.

12        Some are involved with the interference of synaptic

13   transmission.

14        These are all various mechanisms on how neurotoxicants can

15   effect cognition as well as behavior.

16        So there is no expectation that the same sorts of

17   behavioral outcomes would be affected by different

18   neurotoxicants.

19        What's important is testing the hypothesis looking at the

20   main measures and having a biological plausible reason for

21   doing so, which we did in this instance.

22   Q.   Thank you, Doctor.

23        Now, in your declaration you wrote that:

24        "The results of the ELEMENT study cohort" -- you

25        worked with all these years -- "support the conclusion

```
1            that fluoride is a developmental neurotoxicant at
2            levels of exposure seen in the general population in
3            water fluoridated communities."
4            Do you recall that language, Doctor?
5   A.    Yes.
6   Q.    Did any of the questions raised yesterday by -- or day
7   before yesterday by defense counsel lead you to doubt in any
8   way that conclusion?
9   A.    No.
10  Q.    Thank you, Doctor.
11            MR. WATERS:  No further questions, Your Honor.
12            THE COURT:  All right.  Any further recross?
13            MR. ADKINS:  Yes, Your Honor.  I have two questions.
14                     REDIRECT EXAMINATION
15  BY MR. ADKINS
16  Q.    So, Dr. Hu, you spoke about how variation in measurements
17  can tenuate or attenuate associations; correct?
18  A.    Yes.
19  Q.    And that's a concept referred to as bias toward the null;
20  correct?
21  A.    Correct.
22  Q.    And bias toward the null can attenuate inverse
23  associations; correct?
24  A.    Correct.
25  Q.    And bias toward the null can also attenuate positive
```

 1   associations; correct?

 2   **A.**   Of course.

 3   **Q.**   Okay.  No further questions.  Thank you very much, Dr. Hu.

 4            **THE COURT:**  All right.  Anything further on recross?

 5            **MR. WATERS:**  No, Your Honor.

 6            **THE COURT:**  All right.  Actually, I have a couple of

 7   questions for you, Dr. Hu.

 8        There were some inconsistencies noted with the results in

 9   Canada, the MIREC study, one of them being the boy/girl

10   differential I'm sure you're familiar with.

11            **THE WITNESS:**  Yes.

12            **THE COURT:**  Do you have a -- either an explanation or

13   observation, something to help the Court understand how can you

14   have such a differential -- does that impair the power of these

15   two studies, that they are not consistent in that regard?

16            **THE WITNESS:**  Yeah.  I don't think so at all.

17        First of all, the neurologic literature and

18   neurotoxicologic literature is clear that one could expect

19   gender differences in the neurodevelopmental trajectories of

20   boys and girls, as well as their vulnerability to various

21   insults, whether it's dietary insults or neurotoxicants.

22        And a lot that is related to how boys and girls have

23   different developmental trajectories and different influences

24   on the function of the neurologic system particularly as it

25   relates to endocrine sex hormone responses.

HU - REDIRECT / ADKINS

1      For that reason nowadays environmental epidemiologists,

2   like myself, are always looking for potential gender

3   differences in the response to neurotoxicants.

4      That being said, I have seen population differences

5   between Canadians and Mexicans.  It isn't surprising, because

6   these people differ for all sorts of different reasons.  They

7   differ in terms of diet.  They differ in terms of genetics.

8   They differ in terms of their social environment.

9      And since all of these things play out in terms of

10  neurobehavioral development and can contribute to the scatter,

11  the very scatter that was an issue that was part of this --

12  this trial, those differences could easily lead to differences

13  in how the genders respond to these neurotoxicants.

14      That's precisely why -- and, you know, in this situation I

15  am not providing an opinion on policy.  But that's precisely

16  why when someone -- when I am serving on committees that are

17  trying to deliberate on policy, we need to look at the whole

18  range of epidemiologic studies to understand the impacts,

19  potential impacts on different populations.

20      And that's also an integral part of the Bradford Hill

21  criteria, which is also cited during this trial as an important

22  tool for looking at all the evidence and coming to a

23  conclusion.

24          THE COURT:  Do you think in view of that comment that

25  there are enough studies?  There's now two prospective cohort

1  studies, at least that have been talked about at this trial.

2      Is that enough to reach a conclusion in light of what you

3  just said given the Bradford Hill -- the need for a large

4  range?  What's your view on that?

5          **THE WITNESS:**  Your Honor, respectfully, I decline to

6  offer an opinion on that.  As I've said early on, when I --

7  when counsel asked me to testify in this, that I would be

8  willing to testify on my research, but I really didn't want to

9  give any opinions regarding that sort of policy pronouncement

10  because I'm still actively doing research.

11      I don't want peer-review committees to see me as a biased

12  investigator.  We will publish results, whether they are

13  negative or positive.

14      The important thing is testing the hypothesis, and for

15  that reason, respectfully, Your Honor, I decline to give an

16  opinion.

17          **THE COURT:**  All right.  But you have expressed

18  confidence in the reliability of your study that does show an

19  association between exposure to fluoride and cognitive

20  development in young children?

21          **THE WITNESS:**  Yes.  Absolutely.

22          **THE COURT:**  All right.  Thank you.  Appreciate it.

23          **THE WITNESS:**  Thank you.

24          **THE COURT:**  Any other follow-up from counsel?  Give

25  you a chance to redirect after my questions.

```
 1            MR. WATERS:  No, Your Honor.

 2            THE COURT:  Okay.

 3            MR. ADKINS:  Not from defendants.  Thank you.

 4            THE COURT:  All right, Dr. Hu.  Thank you for your

 5   time.  I know you're very busy, but we really appreciate your

 6   appearing.

 7            THE WITNESS:  My pleasure, and thanks for the

 8   privilege.

 9            THE COURT:  Thank you.

10       (Witness excused.)

11            MR. CONNETT:  Your Honor, at this time plaintiffs

12   call Dr. Bruce Lanphear.

13            THE COURT:  All right.

14            THE CLERK:  If Dr. Lanphear could raise his hand?

15       Dr. Lanphear, if you could please unmute and start your

16   video.

17            THE WITNESS:  Good morning.

18            THE COURT:  All right.  Good morning, Mr. Lanphear.

19            THE WITNESS:  Good morning.

20            THE COURT:  Angie, could you administer the oath.

21            THE CLERK:  Please raise your right hand.

22                      BRUCE LANPHEAR,

23   called as a witness for the Plaintiff, having been duly sworn,

24   testified as follows:

25            THE WITNESS:  I do.
```

1      THE CLERK:  Thank you.

2                 **DIRECT EXAMINATION**

3   **BY MR. CONNETT**

4   **Q.**   Good morning, Doctor.

5   **A.**   Good morning.

6   **Q.**   Dr. Lanphear, I've seen you described as a children's

7   environmental health expert.  What does that mean, and what

8   qualifications do you have that make you an expert in this

9   field?

10  **A.**   Well, it's a relatively new discipline or field involved

11  over the last two to three decades.  And it's a -- it's

12  research and clinical expertise that brings together

13  epidemiology, exposure science, psychology, toxicology, and

14  some other related fields dependent upon what area you're

15  focused on.  If you're focused on the respiratory system, then

16  it could be respiratory physiology.

17      So it's really an interdisciplinary science and practice.

18  **Q.**   Now, on Monday the Court heard testimony from Dr. Joyce

19  Donohue at the EPA that you have done important research on

20  lead.

21      Can you briefly summarize for the Court the research that

22  you have done on lead and IQ?

23  **A.**   Yeah.  So early on in my research -- my focus is really on

24  preventing childhood lead poisoning.  The first study I did was

25  to identify what levels of lead in house dust were dangerous

**LANPHEAR - DIRECT  / CONNETT**

1   for children.  And that ultimately was used by the EPA to set

2   the residential standard.

3       At the same time we started to see blood lead levels come

4   down with the elimination of lead from gasoline paint and other

5   sources.

6       So there was a sense, a complacency almost about the

7   problem.  So at the time a blood lead level of --

8       (Court reporter clarification.)

9       **THE WITNESS:**  I'm sorry.  Thanks for the reminder.

10  **A.**   There was some complacency because only 5 percent of

11  children had a blood lead in excess of 10 microgram per

12  deciliter or were considered at the time lead poisoned.  And,

13  yet, nobody had asked whether there were effects below 10

14  microgram per deciliter.

15      So that's when I began to shift some of my work.  So the

16  first study we did was the NHANES, a national survey.  And we

17  showed that even at the lowest levels there were decrements in

18  reading and math.

19      And then we went on to do the Rochester lead study, and we

20  saw a similar pattern, decrements down to the lowest levels.

21      And then finally the pooled analysis, which was bringing

22  together seven cohorts from around the world, seven birth

23  cohorts, and we found the same pattern.

24      That ultimately lead the EPA in their lead max standard,

25  the air lead standard, to reduce the allowable levels, standard

LANPHEAR - DIRECT  / CONNETT

 1   actually, by about ten-fold.

 2   **Q.**   So you just mentioned the EPA's national air lead

 3   standard.  Has your research, Doctor, on lead influenced any

 4   other Government regulations or guidelines either in the United

 5   States or abroad?

 6   **A.**   Yes.  As I indicated, my first study was used as the

 7   benchmark for the EPA's residential dust lead standard.

 8        Germany used our study to lower the allowable level of

 9   lead in their country.

10        The World Health Organization.

11        The Centers For Disease Control in 2010 used it to revise

12   the level considered harmful, the level of lead considered

13   harmful in the United States.

14        Canada used it in lowering their water lead level.

15        Cal EPA used it to lower the levels of lead in soil and

16   dust that were considered acceptable.

17        I think those are the main ones that come to mind.

18   **Q.**   And the last one you said, was that Cal EPA?  As in the

19   California EPA?

20   **A.**   Yes.

21   **Q.**   Now, Dr. Lanphear, what is the American Academy of

22   Pediatrics?

23   **A.**   The American Academy of Pediatrics is a 60,000 person

24   organization run out of Chicago that represents pediatricians

25   and children across the United States, and to some extent in

**LANPHEAR - DIRECT  / CONNETT**

1    Canada.

2    **Q.**    Has the -- as AAP, is that the acronym for the

3    organization?

4    **A.**    Yes.

5    **Q.**    Has the AAP issued any guidelines on lead toxicity in

6    childhood?

7    **A.**    Yes.  They've issued guidelines over the past three or

8    four decades.  At least most recently in 2016.

9    **Q.**    Did you have any involvement in establishing the 2016

10   guidelines?

11   **A.**    Yes.  I was the lead author of that.

12   **Q.**    Now, Dr. Lanphear, in your declaration you note that EPA

13   has asked you to serve as an expert advisor to the agency on

14   several occasions; is that correct?

15   **A.**    Yes.

16   **Q.**    In your declaration you identify five science advisory

17   committees that you have served on for the EPA.  Have you been

18   invited by the EPA to serve on any additional committees?

19   **A.**    Yes.  Two others that came to mind that I forgotten.

20        One was -- I served as an expert on the Children's

21   Environmental Health Panel for the Commission for Environmental

22   Cooperation, and this reported directly to the Ministers of

23   Environment in Canada, United States and Mexico.

24        The other was to serve on the TSCA committee that was

25   convened in 2016.

**LANPHEAR - DIRECT  / CONNETT**

1  Q.   You say the TSCA committee, as in the Toxic Substances

2  Control Act?

3  A.   Yes.

4  Q.   That was a chemical safety advisory committee?

5  A.   Yes.

6  Q.   Has EPA ever funded your epidemiological research on

7  environmental contaminants?

8  A.   Yes.

9  Q.   Do you recall how you got your first EPA grant?

10 A.   The first one, EPA contacted me and asked me to serve as a

11 principal investigator for a study in Midvale, Utah.

12 Q.   So they -- would it -- had you applied for the grant, or

13 did they contact you sort of without an application?

14 A.   They contacted me directly.  I didn't apply, but because

15 of the work that I had already done on lead contaminated soil

16 and dust and so forth they contacted me.

17 Q.   Is it unusual for a federal agency to recruit a scientist

18 and offer funding in the absence of a request?

19 A.   Most -- mostly what I'm familiar with is that you submit

20 an application.  So I -- that's my understanding.

21 Q.   In addition to being funded by the Environmental

22 Protection Agency, your research has also been funded by the

23 National Institutes of Health; is that correct?

24 A.   Yes.

25 Q.   Now, Dr. Lanphear, have you received any compensation for

**LANPHEAR - DIRECT  / CONNETT**

1  the time that you have spent working on this case?

2  **A.**    No.

3  **Q.**    So why are you, a very busy doctor and researcher, why did

4  you agree to be part of this case?

5  **A.**    Well, I served on this case, and in other legal cases,

6  because it's part of my public service.  I'm hired by a

7  university to serve the community, to teach, to do research

8  that benefits the community or the public.  And in some cases

9  that requires being involved in legal cases like this one.

10 **Q.**    Now, the Court has heard already some discussion about

11 NIH-funded prospective birth cohort studies and EPA-funded

12 birth cohort studies.

13     Why is it that these federal agencies are funding birth

14 cohort studies to study the impact of environmental chemicals?

15 **A.**    Well, two reasons.  But what we've begun to learn is that

16 what happens during early childhood has a huge impact that

17 request carry forward over the entire life course.

18     And so when you have a child, for example, or a population

19 of children who have been exposed to a toxicant like lead, then

20 you see that compared to children with less exposure, their

21 cognitive ability is stunted.  They never meet their full

22 potential.

23     At the other end of the spectrum, for example, you can see

24 an accelerated decline in lead, based upon work by Howard Hu

25 and others.  And in theory -- this is the hypothetical part --

 1   those individuals with higher lead exposure and accelerated

 2   cognitive decline can meet the threshold for dementia sooner.

 3       So we know that much of what happens early in childhood

 4   has life-long implications.

 5       The other major reason is that because what we've learned

 6   is that the developing brain is particularly sensitive to toxic

 7   chemicals.  And that's for -- and that's for a variety of

 8   reasons, but, in part, because it's rapidly growing.

 9       And if you think, for example, about how we treat cancer

10   patients.  The chemotherapy, the poisons are given to the

11   patients to be metabolized by those rapidly growing cells.  And

12   in that case the purpose, of course, is to kill them.

13       But in this case we're allowing -- we've allowed children,

14   with their rapidly growing brains, to be exposed to toxins as

15   well.

16   **Q.**  I would like to ask you some questions about the research

17   that you have done on fluoride specifically.

18           **MR. CONNETT:**  Your Honor, at this time I'd like to

19   ask the witness some questions about the -- his NIH grant

20   application.

21       Would there be any objection to me showing the grant

22   application proposal?

23           **MR. ADKINS:**  Yes.  It's not an exhibit.  I mean, I

24   think if there is a foundation for how it could be used, then

25   we can approach that then.

**LANPHEAR - DIRECT  /  CONNETT**

1        But just showing the witness and leading him through

2    something is inappropriate at this stage.

3             THE COURT:  That's correct.  So you'll have to tell

4    me what the proper use is and what your purpose is.

5             MR. CONNETT:  Okay.  I'll just go with questions.

6             THE COURT:  Okay.

7    BY MR. CONNETT

8    Q.   Dr. Lanphear, when you applied for NIH funding to study

9    the effect of fluoride on IQ, did you have to set forth and

10   describe the methodology that you intended to use?

11   A.   Yes.

12   Q.   And as part of your -- the description of the methodology,

13   did you make it clear that you would be using urine as the

14   biomarker of exposure?

15   A.   Yes.

16   Q.   Did anyone at NIH ever express any concern whatsoever

17   about using urine as the biomarker to study fluoride's effects

18   on IQ?

19   A.   No.  But urine is considered right now the gold standard,

20   the ideal biomarker to use for measuring fluoride exposure.

21   Q.   And did anyone at the NIH ever express concern that

22   studying the neurological effects of water fluoridation in

23   Canada would not be relevant to understanding the effects of

24   water fluoridation in pregnancy?

25             MR. ADKINS:  Objection.  Leading.

1             **THE COURT:**  Overruled.

2  **A.**  That wasn't an issue.

3  **BY MR. CONNETT**

4  **Q.**  And, Doctor, when you, yourself, were designing and your

5  team was designing the study methodology, did you, yourself,

6  have an opinion as to whether this research in Canada would be

7  relevant to fluoridated communities in the United States?

8  **A.**  Yes, I did, and we did.

9  **Q.**  And what was your opinion at that time prior to doing any

10  of the analysis of any of the data?

11  **A.**  That the study, the birth cohort we had, the MIREC study,

12  was the best study out there to answer this question.  There

13  was no comparable study like it in the United States, in large

14  part because it was sufficiently large, to begin with.  We had

15  multiple measures of urine that we could tap into.  And we

16  had -- roughly half of our population lived in fluoridated

17  communities and the other half not.

18      So this was really -- we didn't design it this way when we

19  designed it ten years ago, but this was really a beautiful

20  opportunity to answer an important question.

21  **Q.**  So when you were designing that study then, was there

22  anything -- was there anything about the methodology or

23  anything about the fact that the study was based in Canada that

24  made you concerned or in any way doubt its relevance to the

25  United States?

**LANPHEAR - DIRECT  / CONNETT**

1  **A.**  No.

2  **Q.**  So we heard on Monday from Dr. Hu about the NIH review

3  process for grant applications.  Dr. Hu talked about how NIH

4  provides a score of -- a score for the application.

5     How did your proposal on fluoride and IQ score at the NIH?

6  **A.**  It was the highest score I've ever received on an NIH

7  grant.  It was in the top 5 percent -- it was actually in the

8  top 4 percent of all grants reviewed.

9  **Q.**  So what does that -- what does that score indicate as to,

10  first, the methodology that you set forth?

11  **A.**  It indicated that the reviewers thought the methodology

12  was rigorous, and they thought the important -- the question

13  was important.

14  **Q.**  When you say they thought the question was important,

15  would it be fair to say that the NIH thought this was research

16  that warranted prioritization?

17  **A.**  Yes.

18         **MR. ADKINS:**  Objection.  Hearsay.

19         **THE COURT:**  Overruled.

20  **BY MR. CONNETT**

21  **Q.**  Where did you -- so last year you published your study on

22  prenatal fluoride and IQ; is that correct?

23  **A.**  Yes.

24  **Q.**  Where did you publish that study?

25  **A.**  *JAMA Pediatrics*.

**LANPHEAR - DIRECT / CONNETT**

```
 1   Q.    Do you consider JAMA Pediatrics to be a good journal?

 2   A.    Absolutely.

 3   Q.    How would you characterize the peer review that JAMA

 4   Pediatrics did for your study?

 5              MR. ADKINS:  Objection.  Foundation.

 6              THE COURT:  Can you lay the foundation.

 7   BY MR. CONNETT

 8   Q.    Dr. Lanphear, as being the one who submitted the study to

 9   JAMA Pediatrics -- I'll withdraw it.

10         Dr. Lanphear, were you involved with and become familiar

11   with communications between your team and JAMA Pediatrics as

12   part of the -- prior to the publication of the study?

13   A.    Yes.

14   Q.    And did you become familiar with the peer-review process

15   that the study underwent?

16   A.    Yes.

17   Q.    How would you describe, Doctor, the peer-review process

18   that your study received?

19   A.    It was if not the motion rigorous peer-review process I've

20   ever been involved with, it was second only or on par with

21   the -- our 2003 Neurological Journal of Medicine study on lead

22   and IQ deficits.

23   Q.    So, Doctor, you did the study.  What did you find?  Did

24   you find an association between prenatal fluoride and IQ?  And

25   if so, can you summarize the findings?
```

**LANPHEAR - DIRECT / CONNETT**

1   A.   Yeah.  So what we found was that higher exposure to

2   fluoride during pregnancy, whether it was measured in maternal

3   urine, water fluoride or an estimate of fluoride intake in the

4   pregnant woman, was associated with diminished IQ scores in

5   children at three to four years of age.

6   Q.   So you found the association between prenatal fluoride and

7   IQ not just in urine, but in other metrics of fluoride

8   exposure?

9   A.   Yes.

10  Q.   Did you find that the association between prenatal

11  fluoride and IQ remained significant after controlling for

12  potential confounding factors?

13  A.   Yes.

14  Q.   Did you find a dose response relationship between prenatal

15  fluoride and IQ?

16  A.   Yes.

17  Q.   Did you do anything to examine whether that dose response

18  relationship is linear?

19  A.   Yes, we did.

20  Q.   And based on your analysis, did you make any conclusions

21  as to whether the dose response relationship is linear?

22  A.   It appears that the dose response is linear.

23  Q.   In your analysis did you find any evidence of a threshold

24  meaning any evidence that there was a level below which

25  prenatal fluoride did not have an association with IQ?

**LANPHEAR - DIRECT  / CONNETT**

1  A.   Well, to be sure, we didn't do any specific threshold

2  analysis for it; but because it's linear, it looks like there

3  is no apparent threshold.

4  Q.   How would you characterize the magnitude of association

5  between prenatal fluoride and IQ that you found in the MIREC

6  cohort?

7  A.   One way would be to compare it to lead.  And what we saw

8  in the MIREC study is comparable with about a 5-microgram per

9  deciliter increase in blood lead levels that we've observed in

10  children and has been observed across the world in children.

11  Q.   Is the 5-micrograms per deciliter lead level, is that

12  considered by public health agencies to be a dangerous level of

13  lead?

14  A.   Yes.

15          MR. ADKINS:  Objection.  Foundation.

16          THE COURT:  All right.  Why don't you go ahead and

17  elicit a foundation for that.

18  BY MR. CONNETT

19  Q.   Doctor, I take it you've become familiar in the 30-plus

20  years that you have been studying lead -- have you become

21  familiar with government guidelines and recommendations on lead

22  toxicity?

23  A.   I've only been doing the work for 26 years or 25 years.

24  Yes, I am familiar.

25  Q.   Have you become familiar, for example, with CDC guidelines

1    on lead toxicity?

2    **A.**    Yes.

3    **Q.**    Does the CDC consider 5 micrograms per deciliter to be

4    indicative of lead poisoning?

5    **A.**    That's often how it's defined, yes.

6              **THE COURT:**  I have a question just for clarification.

7        Dr. Lanphear, you say that there was a similarity

8    comparable to 5 microgram per milliliter in blood -- lead blood

9    levels.

10       What level of fluoride exposure was comparable to that

11   lead 5 micrograms?

12             **THE WITNESS:**  About 1 milligram per liter.  You see

13   about a five IQ point decrement across both of those ranges of

14   exposure, fluoride and lead.

15             **THE COURT:**  Okay.  Thank you.

16   **BY MR. CONNETT**

17   **Q.**    Now, EPA in this case is putting forth the suggestion that

18   the relationship between prenatal fluoride and IQ may be

19   explained by factors that could affect the concentration of

20   creatinine in the urine.

21       Doctor, can this possibility explain the results that you

22   found in the MIREC cohort?

23   **A.**    No.

24             **MR. ADKINS:**  Objection.  Leading.

25             **THE COURT:**  Overruled.

LANPHEAR - DIRECT  / CONNETT

1   BY MR. CONNETT

2   Q.   So in your 2019 study what was -- what adjustment method

3   did you use for your primary analysis to control for the

4   dilution of urine?

5   A.   We used two different methods, but we primarily relied on

6   specific gravity as a way to adjust for urine dilution.

7   Q.   So when you adjusted the urine by using the specific

8   gravity method, you still found the relationship between

9   prenatal fluoride and IQ; is that correct?

10  A.   That's correct.

11  Q.   And did you also do an analysis on creatinine adjusted

12  urine levels and IQ?

13  A.   Yes.

14  Q.   And did you also find an association between the

15  creatinine adjusted levels and IQ?

16  A.   Yes.

17  Q.   Doctor, in your study, your 2019 study, as well as in your

18  declaration, you cite an animal toxicology study by Phyllis

19  Mullenix published in 1995; is that correct?

20  A.   That's correct.

21  Q.   Okay, sir.  I'm going to show on the screen here a

22  response that EPA has provided to plaintiffs in this case.  I

23  would like to get your opinion on EPA's response.  Okay?

24  A.   Okay.

25        MR. ADKINS:  Objection.  There is -- it's not clear

 1   what counsel is using this document for.  If it's to refresh

 2   recollection, foundation hasn't been laid.

 3             MR. CONNETT:  Your Honor, this is an admission in the

 4   case.  It's in evidence.  It's part of the interrogatory

 5   response that has been entered into the record.

 6             THE COURT:  Overruled.  Go ahead.

 7        (Document displayed.)

 8   BY MR. CONNETT

 9   Q.   So, Doctor, can you see this document on the screen?

10   A.   Yes.

11   Q.   So this is plaintiff's designation number one.  It's an

12   interrogatory that we served on EPA.

13        We asked EPA to:

14             "Identify all primary studies that EPA is aware

15        of which demonstrate or support the neurological

16        safety of prenatal fluoride exposure."

17        Do you see that?

18   A.   Yes.

19   Q.   And EPA identified for us one study.  And the one study

20   that EPA identified is the Mullenix entitled "Neurotoxicity of

21   Sodium Fluoride in Rats."

22        Doctor, is this the same Mullenix study that you have

23   cited in your study and declaration?

24   A.   Yes.

25   Q.   Do you agree with the EPA that:

**LANPHEAR - DIRECT  / CONNETT**

1              "The Mullenix study demonstrates or supports the

2         absence of detectable adverse effects on the nervous

3         system following prenatal fluoride exposure"?

4    **A.**   I'm not a laboratory neurotoxicologist, but absolutely

5    not.  It actually was one -- well, maybe the first study that

6    really raised questions and showed that fluoride was

7    neurotoxic.

8    **Q.**   And the Mullenix study, did it specifically investigate

9    the impacts of prenatal fluoride exposure?

10   **A.**   Yes.

11   **Q.**   And did the Mullenix team itself conclude that their

12   findings supported the neurotoxicity of prenatal fluoride

13   exposure?

14   **A.**   Yes, I believe so.

15   **Q.**   Now, Doctor, I'd like to ask you some questions about your

16   most recent study, which is your study on the neurological

17   effects of fluoridated water in infant formula.  Okay?

18   **A.**   Yes.

19   **Q.**   What prompted you to do this study?  I mean, are there any

20   factors that suggest that infants would be more susceptible to

21   fluoride than older children or adults?

22   **A.**   Yes.

23          **MR. ADKINS:**  Objection.  Compound.  Leading.

24          **THE COURT:**  Overruled.

25

1   BY MR. CONNETT

2   Q.   Can you explain that, Doctor?  What are some of the

3   factors that made you, as a children's environmental health

4   expert, concerned about the possibility that infant fluoride

5   exposure could be harmful?

6   A.   Three things in particular.

7        First, the brain is still developing rapidly.  And so we

8   still have to worry about that unique vulnerability of the

9   developing brain.

10       Second, pound for pound children ingest more water, food.

11  And if that water or food is contaminated, they are going to

12  have a higher exposure, higher body burden from that exposure.

13       And, third, for bottle-fed infants their dominant source

14  of nutrients are from the formula.  And if that formula is made

15  with tap water, they can get extraordinarily high

16  concentrations of fluoride, much higher than older children or

17  adults would get.

18  Q.   Prior to your study that you published this year, had any

19  study ever -- had -- sorry, strike that.

20       Prior to your study, were there any studies that had ever

21  examined the IQs of children who were breastfed versus children

22  who were formula-fed?

23  A.   Not that I recall.

24  Q.   And I'm not referring here to specifically, like, studies

25  that are examining fluoridated water and IQ, but just in

1  general, studies that looked at IQs of children who were

2  breastfed versus formula-fed?

3  **A.**   Not that I recall specifically looking at that

4  distinction.

5  **Q.**   And did you in your study, Doctor, find an association

6  between exposure to fluoridated water in infant formula and IQ?

7  **A.**   Yes.

8  **Q.**   Did you find that that association remained after

9  controlling for potentially confounding factors?

10  **A.**   Yes, it did for the formula-fed infants.  But it's

11  important to know when we look at the Full Scale IQ, that that

12  association was dependent on two influential points.  And so

13  for the Full Scale IQ we did, in fact, see it, but with that

14  caveat.

15  **Q.**   Okay.  So did you -- is it fair to say that you found a

16  stronger effect of infant fluoride exposure on nonverbal IQ

17  than for verbal IQ?

18  **A.**   Yes, that's correct.

19  **Q.**   Is it unusual for a neurotoxicant to have a larger effect

20  on nonverbal IQ versus verbal IQ or vice-versa?

21  **A.**   It doesn't surprise me.  I'm not sure that I've ever seen

22  a systematic evaluation to compare the two.  But no, it's not.

23  That's been seen with lead, for example.

24  **Q.**   Now, has your -- subsequent to publishing some of your

25  studies from the MIREC cohort on fluoride, has your team

1    applied for additional research funding from the National

2    Institutes of Health to continue your research on fluoride and

3    neurodevelopment?

4    **A.**    Yes.

5    **Q.**    Has the NIH granted your application to continue your

6    research on fluoride and neurodevelopment?

7    **A.**    Yes, it has.

8    **Q.**    Now in your declaration you note that you were a member of

9    the Clean Air Science Advisory Committee for EPA's national air

10   lead standard; is that correct?

11   **A.**    Yes.

12   **Q.**    And this is the same national air lead standard that you

13   were talking about earlier; is that correct?

14   **A.**    Yes.

15            **MR. CONNETT:**  At this time, Your Honor, I'm going to

16   put on the screen Plaintiff's Exhibit 42, which has already

17   been pre-admitted and introduced in this case.

18            **THE COURT:**  Okay.

19            **MR. ADKINS:**  Objection.  It's leading, and there is

20   no reason offered for why counsel is going to show this

21   document.

22            **THE COURT:**  Well, what is the document?

23            **MR. CONNETT:**  This is the document that -- this is

24   the national air lead standard document, and it discusses the

25   work that the Clean Air Science Advisory Committee did when

1    Dr. Lanphear was a member of this committee.  It's already in

2    evidence, Your Honor.

3            THE COURT:  All right.  Overruled.

4        (Document displayed.)

5    BY MR. CONNETT

6    Q.   So, Doctor, can you see this document on your screen?

7    A.   Yes.

8    Q.   And I'm looking here as the middle column of this page,

9    and it talks about advice that the Clean Air Science Advisory

10   Committee gave to the EPA.  And I want to read a quote from it

11   and ask you a follow-up question.

12   A.   Okay.

13   Q.   It says here that your committee told the EPA that, quote:

14           "A population loss of one to two IQ points is

15       highly significant from a public health perspective

16       and the primary lead standard should be set so as to

17       protect 99.5 percent of the population from exceeding

18       that IQ loss."

19       Doctor, is that a correct representation of what your

20   committee told the EPA?

21   A.   Yes.

22   Q.   And do you agree with that, sir?

23   A.   Absolutely.

24   Q.   Now, is this advice that we see here, is it limited to the

25   lead standard or would it also be applicable to water

**LANPHEAR - DIRECT  / CONNETT**

1  fluoridation?

2  **A.**   It would be applicable to water fluoridation or other

3  neurotoxicants.

4  **Q.**   Dr. Lanphear, during the course of your public health

5  research, have you become familiar with an entity known as

6  Exponent?

7  **A.**   Yes.

8  **Q.**   And what -- through your public health research, what has

9  become your understanding of what Exponent does?

10         **MR. ADKINS:**  Objection.  Relevancy, and undisclosed

11  opinions.  It's out of the scope of Dr. Lanphear's testimony,

12  Your Honor.

13         **MR. CONNETT:**  Your Honor, Dr. Lanphear spoke at

14  length during his deposition about his understanding and views

15  on this entity.

16         **THE COURT:**  Overruled.  I already ruled on a similar

17  question with respect to the prior witnesses.

18      Go ahead.

19  **A.**   Could you repeat the question, Michael?

20  **BY MR. CONNETT**

21  **Q.**   Yes.  Through your public health research over the past

22  several decades, what -- what is your understanding of what

23  this entity Exponent does?

24  **A.**   So my work has been more impacted by Gradient, which is

25  another, what we epidemiologists finally called rented white

LANPHEAR - DIRECT  / CONNETT

1   coat industries.  They basically do what the various industries

2   that pay them want them to do.  And so we don't think very

3   highly of them.

4   **BY MR. CONNETT**

5   **Q.**   Does it surprise you, Doctor --

6              **THE COURT:**  We don't think very highly of which?

7              **THE WITNESS:**  These organizations, like Exponent and

8   Gradient, that cater to, in my experience, the chemical

9   industry and will basically try to create uncertainty about

10  science.

11             **THE COURT:**  All right.  Mr. Connett, you should lay a

12  greater foundation for his familiarity with Exponent, and he

13  mentioned Gradient.  I don't know what the basis is for his

14  views about Exponent.

15             **MR. CONNETT:**  Yes.

16  **BY MR. CONNETT**

17  **Q.**   Doctor, can you give us some examples of how you may have

18  become familiar with Exponent's work?

19  **A.**   Well, for example, I think it was about three or four

20  years ago I was interviewed about my experience with -- it was

21  actually Gradient, but it was for an investigative report that

22  David Heath was doing.  He was with the Center for Public

23  Integrity, I believe is what the organization was called.

24             **THE COURT:**  I'm sorry.  What was Exponent's

25  involvement in that, or was it involved?

**LANPHEAR - DIRECT / CONNETT**

1          THE WITNESS:  It was focused more on Gradient, but

2     David Heath, the investigative journalist, talked about both of

3     them in the context of the way they operate.

4          THE COURT:  All right.  So your information was from

5     a journalist in that regard?

6          THE WITNESS:  That's correct.

7       Well, and then more specifically with Gradient, it's been

8     my own experience in how they've, let's say, tried to dismiss

9     our research around lead.

10    BY MR. CONNETT

11    Q.   And, Doctor, there was a point in time in the early 2000s

12    where you were nominated to serve on a committee, an EPA

13    committee on lead and were then replaced.  Do you recall that?

14    A.   I think you may be talking about the Centers for Disease

15    Control.

16       I was on a U.S. EPA Children's Health Protection Science

17    and Research Work Group that was during the Clinton

18    Administration.  And then when George W. Bush was elected,

19    within two months they basically put an industry person as the

20    chair, somebody from Dow Chemical, and he sort of dismissed

21    about half of the committee, including myself.

22    Q.   And who --

23    A.   Go ahead.

24    Q.   Who were you replaced by?

25    A.   In that case I don't think we were replaced.  I think they

**LANPHEAR - DIRECT  / CONNETT**

1    just didn't want scientists to -- in my case, it was pretty

2    clear to me later on that it was because our studies were

3    showing that there was effects of lead on IQ at very low

4    levels.

5    **Q.**   During the course of your public health career, have you

6    spoken with colleagues about Exponent?

7    **A.**   Oh, yeah.

8    **Q.**   Would it be fair to say that Exponent is a well-known

9    entity within the public health field?

10   **A.**   Yes.

11   **Q.**   So does it surprise you, Doctor, that EPA has hired

12   Exponent's scientists in this case to address the neurotoxicity

13   of fluoridation chemicals?

14            **MR. ADKINS:**  Objection.  Foundation.

15            **THE COURT:**  Overruled.  Go ahead.

16   **A.**   It surprised and troubled me, and I've seen it in one

17   other case recently, in my work with the NRDC in Newark, New

18   Jersey, where they are trying to help resolve the problem of

19   lead contamination in the water.

20            They've also -- either the city or the state.  I can't

21   quite recall.  I think it was the city, recruited somebody

22   from -- I think it was Exponent, or Gradient.  They just seem

23   so interchangeable to me, I can't remember.

24            And basically they did there what they tried to do here.

25   It's basically to create uncertainty about the science, find

1    ways to dismiss this or elevate the limitations so that nothing

2    needs to be done.

3        You know, historically you can go back -- and David

4    Michaels has done this in his book -- and show how in every

5    major case they have been on the wrong side of science.

6    Q.   Now --

7            MR. ADKINS:  Your Honor, if I could just note that

8    we're now moving from a discussion of Exponent to what they did

9    here.  It's completely vague what the witness is testifying to,

10   and there is no foundation.

11           MR. CONNETT:  Well, let me ask the doctor about

12   something that Exponent has done in the case.

13   BY MR. CONNETT

14   Q.   Doctor, one of the Exponent scientists has testified in

15   this case that a loss of three to five IQ points is relatively

16   small because it's less than the standard deviation of 15 IQ

17   points.

18       Do you have any thoughts on this testimony?

19           MR. ADKINS:  Objection.  Misstates testimony.

20           THE COURT:  Even if that's not the testimony, you can

21   answer the hypothetical question.

22           THE WITNESS:  Thank you.

23   A.   It's absurd.  And I can give you some numbers to sort back

24   up that statement.

25       If we look at the impact at a six-year birth cohort of

**LANPHEAR - DIRECT  / CONNETT**

1    U.S. children of reducing the population mean IQ by five

2    points, what happens is you get a 57 percent increase in the

3    number of children who have an IQ below 70.  So it increases

4    from 6 million children who have an IQ below 70 to over

5    9 million children.  And there is a corresponding decrease.

6         So on a population level this is huge.  And if you then

7    begin to look at the impact on their life savings, on their

8    ability to function in society, on the need for societal

9    support for some of those individuals, we're talking about tens

10   of billions of dollars.

11        So that's just one toxic chemical, like lead, that can

12   increase the -- or decrease population mean IQ.

13        But we now know that there's other toxicants that can do

14   the same.  Not necessarily the same magnitude, but can also

15   reduce children's intellectual abilities.

16   **BY MR. CONNETT**

17   **Q.**   Are you aware of any neurotoxicant that produces an

18   average reduction of IQ in the realm of 15 IQ points or even 10

19   IQ points in the general population?

20   **A.**   No.

21   **Q.**   Doctor, at this time I'd like to show you another exhibit

22   that plaintiffs have already entered into evidence in this case

23   and that has been pre-admitted.

24        **MR. CONNETT:**  Your Honor, this is Plaintiff's

25   Exhibit 33.  May I show the witness?

LANPHEAR - DIRECT  / CONNETT

```
 1              THE COURT:  What is it?
 2              MR. CONNETT:  This is EPA's "Mercury Regulatory
 3  Impact Analysis."
 4              MR. ADKINS:  Just note my objection for the record,
 5  Your Honor.
 6              THE COURT:  All right.  Overruled.
 7        (Document displayed)
 8  BY MR. CONNETT
 9  Q.   Doctor, can you see this document on the screen?
10  A.   Yes.
11  Q.   I'm going to read you the statement that the EPA has made.
12       According to EPA, quote:
13            "Presence of exposure measurement error could
14            introduce a bias in the results, most likely towards
15            the null."
16       Do you agree, Doctor, that exposure measurement error most
17  likely -- if it causes a bias, will most likely be a bias
18  towards the null?
19  A.   Yes.
20              MR. CONNETT:  And lastly at this time, Your Honor I'd
21  like to put on the screen the EPA Exhibit 544, which was also
22  shown to Dr. Hu.  It's the risk evaluation rule.
23              THE COURT:  Okay.
24              MR. ADKINS:  Same objection, your Honor.
25              THE COURT:  All right.  Overruled.
```

LANPHEAR - DIRECT  / CONNETT

1          (Document displayed.)

2    BY MR. CONNETT

3    Q.    Doctor, can you see this document on the screen?

4    A.    Yes.

5    Q.    So this highlighted portion is how the EPA defines best

6    available science under the Toxic Substances Control Act.  I'd

7    just like to ask you a few questions about it.  Okay?

8    A.    Yes.

9    Q.    EPA states that:

10          "Best available science means science that is

11          reliable and unbiased."

12         Dr. Lanphear, would your studies on fluoride and IQ in the

13    MIREC cohort meet this definition?

14          MR. ADKINS:  Objection.  Calls for a legal

15    conclusion.

16          THE COURT:  Overruled.  And the answer is yes, I take

17    it?

18          THE WITNESS:  Yes.

19          THE COURT:  Thank you.

20    BY MR. CONNETT

21    Q.    And EPA explains here that:

22          "The best available science involves the use of

23          sound and objective practices."

24         Dr. Lanphear, did your studies of fluoride and IQ in the

25    MIREC cohort use sound and objective practices?

LANPHEAR - CROSS / ADKINS

1   A.   Absolutely.

2   Q.   So, Dr. Lanphear, do you believe that your studies of

3   fluoride and IQ are -- meet EPA's definition of "best available

4   science"?

5   A.   Yes.

6        MR. CONNETT:   At this time, Your Honor, plaintiffs

7   have no further questions.

8        THE COURT:   All right.   Thank you.

9        Cross.

10                    **CROSS-EXAMINATION**

11  BY MR. ADKINS

12  Q.   Good morning, Dr. Lanphear.   You've never conducted any

13  studies regarding fluoride exposure in populations based in the

14  United States; correct?

15  A.   That's correct.

16  Q.   And you're not an expert in prenatal development; correct?

17  A.   That's correct.

18  Q.   You're also not an expert in statistical analysis;

19  correct?

20  A.   Correct.

21  Q.   Now, between 2008 and 2011 the MIREC study recruited 2,001

22  pregnant women from ten cities across Canada; correct?

23  A.   Yes.

24  Q.   The MIREC study is not a random sample of the Canadian

25  population of pregnant women, correct?

LANPHEAR - CROSS / ADKINS

1  A.    That's correct.

2  Q.    So let's talk about how the MIREC study collected urine

3  samples.  The participants provided spot urine samples

4  throughout their pregnancy; correct?

5  A.    Yes.

6  Q.    The urine samples are a biomarker of fluoride exposure;

7  correct?

8  A.    The urine samples provide the opportunity to look at

9  biomarkers.  They are a medium, or a tissue, but they are not a

10 biomarker.

11 Q.    The more of any biomarker one can obtain, the better off

12 one is in terms of accurately measuring exposures; is that

13 correct?

14 A.    As a general rule, that probably is often true, but there

15 might be instances where it's not.  But generally true, yes.

16 Q.    So it's generally true that the more of any biomarker one

17 can obtain, the better off one is in terms of accurately

18 measuring exposure; is that correct?

19 A.    Generally true, yes.

20 Q.    And the MIREC study tried to collect urine samples in the

21 morning; correct?

22 A.    I think that was the -- as I recall, that was typically

23 what we tried to do.  Typically.

24 Q.    So is your answer yes?

25 A.    I believe so.  I'd have to go back and look at the

 1  protocols, but as I recall, that was what we did.

 2  **Q.**   Okay.  And it was possible that urine collection was

 3  performed at different times of the day to meet the needs of

 4  the participants; is that correct?

 5  **A.**   Yes.

 6  **Q.**   And you would have preferred that the urine samples were

 7  collected at a standard time; is that correct?

 8  **A.**   Yes.

 9  **Q.**   Are you familiar with the concept of a first void urine

10  sample?

11  **A.**   Yes.

12  **Q.**   A first void urine sample is an individual's first

13  urination of the day; correct?

14  **A.**   Yes.

15  **Q.**   And urine samples collected in the MIREC study were not

16  first void samples; is that correct?

17  **A.**   They were not necessarily first void samples.  That's

18  correct.

19  **Q.**   There were protocols in place to collect a first void

20  sample; is that correct?

21  **A.**   That's correct.

22  **Q.**   A second void sample is an individual's second urination

23  of the day; correct?

24  **A.**   We don't usually have a term set up for that, but that

25  makes sense, yeah.

1    **Q.**    And there weren't protocols in place then to collect a

2    second void sample in the MIREC study; is that correct?

3    **A.**    That's correct.

4    **Q.**    Now, the participants in the MIREC study were not

5    instructed to hold their urine in any way before providing a

6    sample for the MIREC study; is that correct?

7    **A.**    No.

8    **Q.**    A spot urine sample is subject to variation over the

9    course of the day and the influence of diet; is that correct?

10   **A.**    Diet and other things, yes.

11   **Q.**    And the intake of high fluoride foods or beverages

12   immediately before providing a urine sample can influence the

13   fluoride concentration in that sample; is that correct?

14   **A.**    It depends how immediate, but generally beforehand, yes.

15   **Q.**    Now, the participants in the MIREC study did not provide

16   samples after fasting; is that correct?

17   **A.**    That's correct.

18   **Q.**    And the participants were not asked about their food

19   consumption in the 24 hours before providing a sample; is that

20   correct?

21   **A.**    I don't recall.  I'd have to go back to the protocols to

22   be sure.

23   **Q.**    Okay.  So your team's analysis of the samples did not

24   control for fluoride that was ingested before the participants

25   provided a sample; is that correct?

**LANPHEAR - CROSS / ADKINS**

1  A.   That's correct.

2  Q.   Now, mothers undergo certain physiological changes

3  throughout the course of a pregnancy.  Do you agree with that?

4  A.   Yes.

5  Q.   And those physiological changes can affect the

6  interpretation of urinary fluoride concentrations in spot urine

7  samples; correct?

8  A.   Those changes would be reflected in the urinary fluoride

9  concentrations.

10 Q.   Of the 2,001 women who participated in the MIREC study,

11 1,566 women provided urine samples for all three trimesters; is

12 that correct?

13 A.   That's -- I believe that's correct.

14 Q.   An measuring a maternal urinary fluoride concentration at

15 multiple times over the course of a pregnancy provides a more

16 sensitive measurement compared to one that only uses one urine

17 sample; is that correct?

18 A.   That's correct.

19 Q.   And you agree that even serial maternal urinary spot

20 samples may not precisely represent fetal exposure throughout a

21 pregnancy; correct?

22 A.   That's correct.

23 Q.   Now, you stated in your declaration, Dr. Lanphear, that

24 the average creatinine adjusted urinary fluoride value for

25 pregnant women living in fluoridated areas in Canada was

1   .87 milligrams per liter; do you recall that?

2   A.   Yes.

3   Q.   Is that accurate, Dr. Lanphear?

4   A.   I'm pretty sure that's right, yeah.

5   Q.   Creatinine adjustment is used to account for urine

6   dilution; correct?

7   A.   It's one way to account for urine dilution, yes.

8   Q.   That's right.  In fact, MIREC used several -- well,

9   several ways to correct for urine dilution; correct?  I should

10  say -- strike the question.

11       Till 2018, your study of urine in the MIREC cohort, used

12  various ways to correct for urine dilution; correct?

13  A.   Correct.

14  Q.   There were two creatinine adjustment methodologies;

15  correct?

16  A.   Yes.

17  Q.   And there was the specific gravity methodology; correct?

18  A.   Yes.

19  Q.   So I want to focus on the method that resulted in that

20  value of .87 milligrams per liter.  Okay?

21  A.   All right.

22  Q.   Now, that methodology used a ratio of fluoride to

23  creatinine in spot urine samples multiplied by the average

24  creatinine level for each trimester in those samples; is that

25  correct?

1  A.   Yeah.  We took -- we took the trimester specific fluoride

2  value, adjusted by the trimester specific creatinine, and then

3  the average of all the trimesters to come up with our MUF, or

4  maternal urinary fluoride measure.

5  Q.   And that value that you multiplied the ratio of fluoride

6  to creatinine to, that's the maternal -- the average creatinine

7  urinary fluoride value, is that correct, for each trimester?

8  A.   Well, we focused primarily on specific gravity, but we

9  also provided it for creatinine.

10  Q.   And you conducted this calculation in Till 2018, which I'm

11  describing; is that right?

12  A.   I didn't.  The statisticians did, or Christine and Rivka

13  Green did, yes.

14  Q.   Fair enough.  So you and your coauthors in Till 2018

15  reported on this adjustment methodology; is that right?

16  A.   That's correct.

17  Q.   Okay.

18       MR. ADKINS:  Mr. Hambrick, could you please put up

19  U.S. demonstrative 01?

20       (Document displayed.)

21  BY MR. ADKINS

22  Q.   Dr. Lanphear, do you see this document?

23  A.   Yes.

24  Q.   Okay.  There is a formula in the center of this document,

25  MUF divided MUC times MUC average.  Do you see that?

1  A.   Yes.

2  Q.   Does that accurately reflect the formula that Till 2018

3  reported for this adjustment methodology that we have been

4  talking about?

5  A.   I'd have to put them side-by-side.  I think we used

6  different notations, but it looks roughly the same.

7  Q.   Would it help refresh your memory if I showed you that

8  publication, Till 2018?

9  A.   Yeah.  That would be good.

10       MR. ADKINS:  Your Honor, may I show the witness Till

11  2018?

12       THE COURT:  Yeah.

13       MR. ADKINS:  Okay.  Mr. Hambrick, could you please

14  put on the screen U-17, Page 3?

15       And if you could please zoom in to the lower half of the

16  first column on the left side.

17       (Document displayed)

18  BY MR. ADKINS

19  Q.   Dr. Lanphear, why don't you take a second to look at that,

20  and then I'll ask you the question again?

21  A.   Okay.  Which formula are you asking me about?

22  Q.   So I'm asking you whether the formula that was on that

23  document is accurate -- accurately reflects the second

24  creatinine method used in Till 2018?

25  A.   Okay.  Can you magnify that second one, please?

1          (Document enlarged))

2          (Brief pause.)

3   **A.**   That looks very comparable.

4   **Q.**   Okay.

5              MR. ADKINS:  Mr. Hambrick, could you please clear the

6   screen, and put up U.S. Demonstrative 1 again?

7          (Document displayed.)

8   **BY MR. ADKINS**

9   **Q.**   So this formula in U.S. Demonstrative 1 accurately

10  reflects a second creatinine method in Till 2018; is that

11  correct?

12  **A.**   Well, it uses different notations.  It generally looks the

13  same to me, or similar anyway in what it's trying to get at,

14  but it's not represented the same.

15  **Q.**   Sure.  So the variables, the abbreviations are different;

16  is that your testimony?

17              **MR. CONNETT:**  Overbroad.

18              **THE COURT:**  Overruled.

19  **A.**   Yes.

20  **BY MR. ADKINS**

21  **Q.**   Okay.  Now, the MUC average variable in this formula,

22  Dr. Lanphear, those -- the values that were plugged into this

23  formula, they weren't reported until 2018; correct?

24  **A.**   The values for the second formula you're talking about?

25  **Q.**   The values for -- let's be clear.  So I want to point you

**LANPHEAR - CROSS / ADKINS**

1  to MUC average.

2  **A.**   Yes.

3  **Q.**   Those, the values that were used in Till 2018 in

4  calculating adjusted urinary fluoride values using the second

5  creatinine methodology, those values weren't reported out in

6  Till 2018; correct?

7  **A.**   I'm not sure I understand the question.  What do you mean

8  "reported out"?

9  **Q.**   So MUC average reflects the average creatinine value in

10  the samples collected for each trimester; correct?

11  **A.**   Yes.

12  **Q.**   And so there would be a value for the first trimester

13  average creatinine value; correct?

14  **A.**   Yes.

15  **Q.**   And there would be a similar -- or a different value

16  presumably for the second trimester, correct?

17  **A.**   Yes.

18  **Q.**   And then a third value for the third trimester; correct?

19  **A.**   Yes.

20  **Q.**   Now, each of those three values was not reported in Till

21  2018; correct?

22  **A.**   That's correct.

23  **Q.**   And you agree that the average creatinine values would be

24  important to know when comparing the mean urinary fluoride

25  values in the MIREC cohort with the ELEMENT cohort; correct?

1    **A.**   Repeat the question, please?

2    **Q.**   You agree it would be helpful to know those values when

3    making a comparison of the mean creatinine adjusted urinary

4    fluoride values in the MIREC cohort with the ELEMENT cohort;

5    correct?

6    **A.**   I could see in some circumstances.  For example, if you

7    wanted to really drill down and understand about trimester

8    specific creatinine and fluoride metabolism; but for the

9    purpose of this paper, I don't think it was necessary of.

10   **Q.**   So your testimony is that it's not an important factor --

11           **MR. CONNETT:**  Overbroad.

12   **BY MR. ADKINS**

13   **Q.**   -- in making that comparison?

14       Excuse me.  Your testimony is that it's not an important

15   factor?

16           **THE COURT:**  Hold on.  I'm now lost.

17       What are you comparing?  Are you comparing the ultimate

18   conclusion of MIREC and ELEMENT in determining whether the MUC

19   averages needed to be compared in order to make that ultimate

20   comparison, or are you asking something else?  I'm lost.

21           **MR. ADKINS:**  Sure.  Thanks for letting me know.

22   **BY MR. ADKINS**

23   **Q.**   So in making a comparison between the mean -- the mean

24   urinary fluoride values in the ELEMENT study to the MIREC

25   study, the question is:  Would it be important to know what

**LANPHEAR - CROSS / ADKINS**

1  those average creatinine concentrations per trimester are in

2  each of the studies?

3             THE COURT:  For what purpose?  Important to know for

4  what purpose?  That's the question.  Your --

5             MR. ADKINS:  The average -- for whether those average

6  values can be compared.

7             THE COURT:  I guess I'm still lost.  I don't

8  understand the question.

9  BY MR. ADKINS

10  Q.   Dr. Lanphear, you've made a comparison of the mean urinary

11  fluoride values in the MIREC cohort to the ELEMENT cohort;

12  correct?

13  A.   Yes.

14  Q.   And that comparison involved using the formula that is

15  reflected on this screen to identify an average urinary

16  fluoride concentration in the MIREC cohort; correct?

17  A.   Yes.  We used the same approach that they used in the

18  ELEMENT so that we could compare the average urinary fluoride

19  adjusted for creatinine in both cohorts.

20  Q.   And the ELEMENT study used the same formula; correct?

21  A.   Well, again, we did several.  And we did -- we singled

22  this one out so that we could make a comparison.

23       One of the things that's happened -- and we learned this

24  from lead -- is that if you don't use a similar approach, it's

25  hard to compare across studies.

1          So we would not have used this approach that the ELEMENT

2     study used, except that we wanted to make it available for

3     other scientists to be able to compare the results.  We would

4     have focused on the specific gravity, for example.

5     Q.   That's a different question.  So my question was:  Did the

6     ELEMENT study also use this formula; is that correct?

7     A.   They used a formula -- can I go back to the paper, please?

8     Q.   Would you like to see Till 2018, Dr. Lanphear?

9     A.   Please.

10    Q.   Sure.

11          MR. ADKINS:  Mr. Hambrick, can you please put up

12    U-17?

13          (Document displayed.)

14    BY MR. ADKINS

15    Q.   So my question, Dr. Lanphear, is the ELEMENT study used

16    the same creatinine adjustment methodology that we've just

17    established the MIREC study used as one of the three adjustment

18    methodologies; is that correct?

19    A.   We had one in common, yes.

20    Q.   Okay.  And the ELEMENT studies reported the MUC average --

21    MUC average variable for each trimester; correct?

22    A.   I believe that's so.

23    Q.   And the Till 2018 study did not report those similar

24    values for the MIREC cohort; correct?

25    A.   That's correct.

 1   Q.   Till 2018 compared the adjusted urinary fluoride

 2   concentrations of women in fluoridated areas in the MIREC

 3   cohort with the same values in the ELEMENT cohort as reported

 4   in Thomas 2016; correct?

 5   A.   We compared them with the ELEMENT cohort.  I don't recall

 6   if it was the Thomas or the other one.  But, yeah, we did do

 7   the comparison.

 8   Q.   And at Paragraph 33 of your declaration, you stated that

 9   the Till 2018 study found that urinary fluoride levels in the

10   MIREC and ELEMENT cohort studies were, quote, essentially the

11   same, end quote; correct?

12   A.   For those in the MIREC study, the Canadian study, who

13   lived in fluoridated communities, that's correct.

14   Q.   And it's correct that you said they were essentially the

15   same; correct?

16   A.   Very comparable, yes.

17   Q.   Now, that wasn't how the authors in Till 2018 described

18   the can comparison though; correct?

19   A.   I think we -- we said something very similar.

20   Q.   In fact, that study stated that the urinary fluoride

21   values in the two cohorts, quote, fall within a similar range;

22   correct?

23   A.   That's essentially what I just said using different

24   terminology.

25   Q.   Now, the comparison that we're talking about now is

1  urinary fluoride concentrations; right?

2  A.   I've actually kind of forgot what we're talking about, to

3  tell you the truth.

4  Q.   The comparison of mean urinary fluoride concentrations in

5  the MIREC study to the ELEMENT study.  We're talking about

6  urinary fluoride concentrations; right?

7  A.   Are we still talking about trimester specific or overall?

8  I'm just kind of lost actually.

9  Q.   Sure.  I'm talking about -- so let's go back to what you

10  said in your declaration.

11      You said that the mean urinary fluoride value in the MIREC

12  cohort was .87 milligrams per liter?

13  A.   In the fluoridated communities, yes.  Correct.

14  Q.   Fluoridated communities.  And you say that that was

15  essentially saying the same for the same value identified in

16  the ELEMENT cohort; correct?

17  A.   That's correct.

18  Q.   So that's the comparison that I'm referring to now.

19  A.   Okay.

20  Q.   You understand?

21  A.   Yeah.

22  Q.   Okay.  So in that comparison we're talking about urinary

23  fluoride values; right?

24  A.   Yes.

25  Q.   Now, this is not -- we're not talking about a comparison

1   of fluoride exposure; correct?

2   A.   That's correct.

3   Q.   And you and your coauthors were unable to determine

4   whether people in communities with fluoridated water in Canada

5   had the same level of fluoride ingestion as those who consumed

6   fluoridated salt in the Mexico City cohort; is that correct?

7   A.   I don't think we tried to do that.

8   Q.   Okay.  Dr. Lanphear, this is the first time you and I have

9   spoke; right?

10   A.   No.  You sure look familiar.  Didn't we talk in

11   Bellingham?

12   Q.   That's right.  I took your deposition in Bellingham.  Do

13   you remember that?

14   A.   I do.

15   Q.   I took your deposition on September 25; right?

16   A.   I don't remember, but I'll take your word for it.

17   Q.   And there was a court reporter there?

18   A.   I'm sure.

19   Q.   I believe Mr. Connett was also there?

20   A.   Yes.

21   Q.   Okay.  And you were on the record -- you gave an oath to

22   tell the truth at that deposition; right?

23   A.   Yes, I did.

24   Q.   Okay.  I offered you an opportunity, in fact, to read your

25   transcript, and you declined that opportunity to read and sign

 1   your transcript; correct?

 2   **A.**   I believe that's true.

 3   **Q.**   Okay.

 4        **MR. ADKINS:**  Your Honor, I'd like to read in the

 5   witness's deposition transcript, Page 118, Lines 1 through 10.

 6        **MR. CONNETT:**  Your Honor, if I could take a second?

 7        **THE COURT:**  Yep.

 8        (Brief pause.)

 9        **MR. CONNETT:**  118, what were the lines again,

10   counsel?

11        **MR. ADKINS:**  1 through 10.

12        **MR. CONNETT:**  Your Honor, I actually -- I don't think

13   it's actual impeachment to what the witness just said.

14        I don't have any real objection to it being stated in the

15   record, but I don't think the witness disagreed with what is

16   about to be said.

17        **THE COURT:**  All right.  Well, then it won't have much

18   value, but I'll let you read it.

19   **BY MR. ADKINS**

20   **Q.**   (As read)

21        **"QUESTION:**  And -- well, let's go to what Till 2018

22        says.  Again, I'm quoting from the same paragraph.

23        Quote, this difference in fluoride source does not

24        permit a direct comparison of fluoride exposure among

25        the two populations because we were unable to

1          determine whether people in communities with

2          fluoridated water had the same level of fluoride

3          ingestion as those who consumed fluoridated salt in

4          Mexico.

5          Do you disagree with that statement?

6          "ANSWER:  No.  But there is a nuance that I'm trying

7          to respond to."

8          And I realize, Your Honor -- if I could just stop -- this

9   answer goes on, and I think in fairness I should finish this

10  paragraph.

11                  THE COURT:  Why don't you go ahead, finish.

12                  MR. ADKINS:  Yes.

13  BY MR. ADKINS

14  Q.   (As read)

15          "ANSWER:  No.  But there is a nuance that I'm trying

16          to respond to, that it's not a direct comparison of

17          two different populations getting their fluoride from

18          water.  That's clearly true.  But we can and did still

19          make a comparison of the fluoride exposures that they

20          both had in their urine, measured in their urine, and

21          in that case we found and concluded that the levels of

22          urinary fluoride in the ELEMENT study women were

23          comparable with the concentrations found in the MIREC

24          women who came from communities that fluoridated the

25          water."

1          THE COURT:  Okay.  Thank you.

2   BY MR. ADKINS

3   Q.   So, Dr. Lanphear, you could not compare fluoride exposure

4   between the cohorts; correct?

5          MR. CONNETT:  Overbroad.

6   A.   No, that's incorrect.  You're using --

7          THE COURT:  First of all, the objection is sustained.

8   So please rephrase the question.

9          MR. ADKINS:  I can strike the question, Your Honor.

10  BY MR. ADKINS

11  Q.   So, Dr. Lanphear, let's go to the Green 2019 study.  At

12  Paragraph 39 of your declaration you described three different

13  measures of fluoride exposure; correct?

14  A.   Yes.

15  Q.   One measure was urinary fluoride samples; is that right?

16  A.   Yes.

17  Q.   The second measure was water fluoride levels which matched

18  participant's postal codes with water treatment plant zones;

19  correct?

20  A.   Yes.

21  Q.   And a third measure was an estimate of daily fluoride

22  intake based on survey responses from mothers; correct?

23  A.   Yes.

24  Q.   Let's focus on the daily fluoride intake measure for a

25  moment.

1      That intake estimate, which is the third estimate we just

2   read, was based on survey responses of mothers regarding their

3   tap water and green and black tea consumption; correct?

4   A.   Those were the two main things I recall, yes.

5   Q.   You and your coauthors in Green 2019 did not confirm

6   whether the women who responded to that questionnaire

7   accurately reported their consumption of those beverages;

8   correct?

9   A.   Can you ask the question again to be sure I understood it?

10  Q.   Of course.  You and your coauthors of Green 2019 did not

11  confirm whether the women who responded to that questionnaire

12  accurately reported their consumption of those beverages;

13  correct?

14  A.   We relied on their report.  We did not go try to, let's

15  say, observe how much water they drank from the tap every day,

16  so we relied on their report.

17  Q.   You also didn't confirm whether they changed their

18  consumption habits after filling out the survey; correct?

19  A.   I recall we had two different surveys throughout

20  pregnancy, and we relied on those of.

21  Q.   And you didn't actually test the water consumed by the

22  mothers.  Do I understand that correctly?

23         MR. CONNETT:  Overbroad.

24  A.   We did not test --

25         THE COURT:  Objection overruled.  You can go ahead

 1   and answer it.

 2              THE WITNESS:  I'm sorry.

 3              THE COURT:  Go ahead.

 4   A.   We did not go into the homes to test the water for

 5   fluoride, that's correct.

 6   BY MR. ADKINS

 7   Q.   In the Green study there were 512 women who provided urine

 8   samples for all three trimesters, and two had offspring with IQ

 9   data; is that correct?

10   A.   That's correct.  There may be one other factor in there,

11   but yes.  We had 512 women who said they drank tap water and

12   who had three urine samples.

13   Q.   Now, the 512 women in the Green study overlapped

14   imperfectly with those considered and analyzed in the Till 2018

15   study; correct?

16   A.   We had several different analyses.  It wasn't limited to

17   one.  So I'm not sure that's a fair question or I can answer it

18   simply.

19   Q.   So the 512 women in the Green study were not the same

20   participants analyzed in the Till 2018 study; is that correct?

21   A.   Oh, that's correct, yes.

22        Well, most of the women in the Green study would have been

23   in the Till 2018 study.

24   Q.   Now, in the Green study you assessed the offspring's

25   intellectual abilities using the Wechsler Preschool and Primary

1   Scale of Intelligence, third edition; correct?

2   **A.**   That's correct.

3   **Q.**   And Green 2019 reported the Full Scale IQ results and the

4   performance in verbal IQ results; correct?

5   **A.**   Yes.

6   **Q.**   The performance and verbal IQ scores, they factor into the

7   overall Full Scale IQ score; is that correct?

8   **A.**   Yes.

9   **Q.**   Now, Green 2019 controlled for a number of covariates;

10  correct?

11  **A.**   Yes.

12  **Q.**   Green 2019 did not control for maternal IQ; correct?

13  **A.**   That's correct.

14  **Q.**   And that's an important covariate in your opinion,

15  correct?

16  **A.**   It is an important covariate, yes.

17  **Q.**   You would have liked to have been able to control for that

18  in your studies; correct?

19  **A.**   Yes.

20  **Q.**   Okay.  So let's talk about the results.

21       Green 2019 found a significant association between

22  adjusted maternal urinary fluoride concentrations and Full

23  Scale IQ of the male children, but not the female children;

24  correct?

25  **A.**   Yes.

1    Q.   Are you familiar with the concept of bias towards the

2    null?

3    A.   Yes.

4    Q.   In your declaration, in fact, you described this concept,

5    and you explain that limits in the exposure assessments of

6    these studies, the MIREC studies, would generally bias results

7    toward the null; is that correct?

8    A.   Well, this is a -- more of a general concept, not one

9    specific to the MIREC.  But the idea is that if you have

10   measurement error, that's going to create noise and make it

11   harder to find an association.

12        So, yes, that's the way I would frame it.

13   Q.   So in other words, the measurement error that's creating

14   noise would tend to attenuate an association; is that correct?

15   A.   Attenuate or eliminate it.  That is, it would not be

16   statistically significant.

17   Q.   All right.  And this concept would apply similarly if the

18   association were a positive association with the exposure; is

19   that correct?

20   A.   Yes.

21   Q.   And Green 2019 found a non-significant positive

22   association between maternal urinary fluoride and the girl's

23   Full Scale IQ scores; is that correct?

24   A.   From prenatal exposure, that's correct.

25   Q.   Now, you did not -- there were two other exposure

1  measurements we talked about; correct?

2  A.   Yes.

3  Q.   And you didn't identify a statistically significant sex

4  differential in the association between those two exposure

5  measurements, the non-maternal urinary fluoride and the outcome

6  variable, the IQ of the children; correct?

7  A.   That's correct.

8  Q.   And you're not aware of any other human study where a sex

9  differential was identified based on fluoride exposure?

10 A.   Well, actually, we're in the midst of doing a pooled

11 analysis with the ELEMENT study.  And when we pool the data, we

12 actually see some very similar results.

13 Q.   Has that study been published, Dr. Lanphear?

14 A.   No, it has not.

15 Q.   Has it been peer reviewed, Dr. Lanphear?

16 A.   No, it has not.

17 Q.   So you're not aware of any published human epidemiological

18 study that found a sex differential in fluoride exposure

19 between boys and girls; is that correct?

20 A.   I'm not aware of any other study that looked at it.

21 Q.   Okay.  So let's turn --

22 A.   Although I should say -- can I clarify that?

23          THE COURT:  Yeah.  Of course.

24 A.   So we're back to the -- it's not boys and girls, but one

25 of the reasons we looked at it, of course, was because of the

1   Mullenix study, and for a host of other reasons that's now

2   standard.

3       But, no, I'm not aware of any other study that's attempted

4   to look at this with fluoride.

5           THE COURT:   Could you clarify?   You said "because of

6   the Mullenix study."   Can you explain what you mean by that?

7           THE WITNESS:   Yeah.   So the Mullenix study, which

8   looked at over 500 rats, the one that was already referred to,

9   published in 1995 I think it was, they found that there were

10  greater effects on the male rats from prenatal exposure, but

11  greater effects on the female rats for postnatal exposure.

12      And so not only do we know from other studies of

13  neurotoxicants, like air pollution and autism or lead and

14  attention, that boys tend to be more vulnerable to these

15  neurotoxicants.

16      We also have this rat study that showed clearly -- a clear

17  difference between prenatal exposure impacting the males and

18  postnatal exposure impacting -- predominantly impacting the

19  females.

20          THE COURT:   Is there some neurobiological

21  explanation, at least on the rat side?   Has that been

22  explained?

23          THE WITNESS:   No explanation that I'm familiar with.

24      As I mentioned, we've seen it with lead, and there is some

25  evidence from the laboratory studies that Estradiol actually

**LANPHEAR - CROSS / ADKINS**

1     protects the cells and Estradiol is the primary estrogen in

2     human cells.

3           And so that might have some relevance as to why males are

4     more impacted with lead, but we don't know why that would be

5     true for fluoride.

6                 **THE COURT:**  Okay.  Thank you.

7                 **THE WITNESS:**  Yes, you're welcome.

8     **BY MR. ADKINS**

9     **Q.**   Okay.  Let's turn to your study of fluoride exposure

10    during infancy, Dr. Lanphear.  That study was published just

11    this year; correct?

12    **A.**   Yes.

13    **Q.**   And I'll refer to this study as Till 2020; is that okay?

14    **A.**   Yes.

15    **Q.**   Now, Till 2020 estimated infant fluoride exposure using

16    two measures; is that correct?

17    **A.**   I believe so, yes.

18    **Q.**   One measure was water fluoride concentration; is that

19    correct?

20    **A.**   Yes.

21    **Q.**   And one measure was infant fluoride intake; correct?

22    **A.**   Yes.

23    **Q.**   So the water fluoride concentrations were based on the

24    levels reported by water treatment plants in the zip codes of

25    the participating mothers; is that correct?

1    **A.**    Yes.

2    **Q.**    And the infant fluoride intake variable was -- or exposure

3    estimate was based on the average water fluoride concentration,

4    multiplied by the amount of time the mother reported not

5    exclusively breastfeeding the infant, and then dividing by a

6    daily consumption value of .8 liters per day; is that correct?

7    **A.**    That sounds right, yes.

8    **Q.**    Okay.  So the infant fluoride intake methodology has not

9    been used by other experts in your field as far as you know; is

10   that correct?

11   **A.**    Say again the question?  Which part?  Which measure?

12   **Q.**    The infant fluoride intake methodology.  So the second one

13   that we talked about with the complicated formula.

14   **A.**    I believe that's correct.

15   **Q.**    That methodology has not been confirmed in any other

16   separate studies; is that correct?

17   **A.**    I believe that's correct.

18   **Q.**    Till 2020 also did not test the water samples -- any water

19   samples to confirm the accuracy of either of these

20   measurements; is that correct?

21          **MR. CONNETT:**  Overbroad.

22   **A.**    That's correct --

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  I'm sorry.  Sorry.

25   **A.**    That's correct.  We relied on the results provided by the

```
 1    water treatment plant.

 2    BY MR. ADKINS

 3    Q.    Till 2020 also did not test the infant formula that was

 4    actually fed to the offspring in the study; is that correct?

 5    A.    That's correct.

 6    Q.    And you agree that some infant formulas have higher

 7    fluoride concentrations than others; correct?

 8    A.    Yes.

 9    Q.    Now the mothers may reconstitute infant formula using tap

10    water or bottled water; correct?

11    A.    That's correct.

12    Q.    Till 2020 also did not control for whether the mothers

13    reconstituted infant formula using tap water versus bottled

14    water; correct?

15              MR. CONNETT:  Overbroad.

16              THE COURT:  Overruled.  You can answer.

17    A.    That is correct.  We relied on inclusion criteria that

18    required the mothers to respond that they used tap water

19    themselves.

20         And if I might, I've got to plug in my computer.  I'm a

21    little on the low charge.  If I could take 20 seconds?

22              THE COURT:  Actually, we may -- we're actually past

23    our break time, if you want to take a 15-minute break.

24              THE WITNESS:  Yes.  Thank you.

25              THE COURT:  Why don't you do that and you can
```

LANPHEAR - CROSS / ADKINS

```
 1  recharge your computer?
 2           THE WITNESS:  Thank you.
 3           THE COURT:  All right.  We'll take a 15 minute break.
 4  Thank you.
 5           THE CLERK:  Court is in recess.
 6      (Whereupon there was a recess in the proceedings
 7       from 10:08 a.m. until 10:23 a.m.)
 8           THE COURT:  Why don't we begin?
 9      You were in the middle of an explanation about the
10  inclusion criteria being mother reporting tap water, I think
11  that was, Dr. Lanphear?
12           THE WITNESS:  Yes.  Thank you.
13           THE COURT:  All right.  Maybe you can elaborate on
14  that, and we can ask the next question.
15           THE WITNESS:  Well, I've forgotten the context,
16  but -- maybe if we could repeat the question as it was stated?
17           THE COURT:  I think the question was whether or not
18  you controlled for the fact that mothers could have used tap or
19  bottled water to reconstitute formula.
20      And then I think you said something to the effect that one
21  of the inclusion criteria was that the mother was to have
22  recorded tap water.
23      And I guess I would like to know is that using tap water
24  exclusively?
25           THE WITNESS:  Right, right.
```

1          So the -- we asked the question of the mothers during

2    pregnancy, twice during pregnancy, whether they drank tap

3    water, not specifically whether their infants drank tap water.

4    So we relied on the mothers drinking the tap water as an

5    indicator of whether they would likely use tap water for

6    formula.

7              THE COURT:  And you only included those who said they

8    -- so if somebody said "I drink bottled water," they weren't

9    included then?

10             THE WITNESS:  In that particular study, that's

11   correct.

12             THE COURT:  Okay.  Thank you.

13   BY MR. ADKINS

14   Q.   Dr. Lanphear, in Paragraph 57 of your declaration you

15   explain that there were 398 mother/child pairs that were part

16   of the Till 2020 analysis; correct?

17   A.   Yes.

18   Q.   And those 398 pairs were selected because they had

19   complete data for purposes of the study; correct?

20   A.   Correct.

21   Q.   The demographic characteristics of those 398 mothers with

22   complete data were substantially the same as the MIREC cohort;

23   correct?

24   A.   I believe that's correct, yes.

25   Q.   And you and your coauthors, however, did not examine

 1  whether there were any differences in the outcome measurements

 2  of those who were selected for the study and those who were

 3  from the larger MIREC cohort; correct?

 4  **A.**   And by "outcome measures" you mean?

 5  **Q.**   The IQ measures.  The cognitive effects.

 6  **A.**   We may have.  I would have to go back to the supplemental

 7  tables to look, but I believe we did actually.  I might be

 8  getting my two studies mixed up, but I think we did in the

 9  supplemental tables.

10        **MR. ADKINS:**  Your Honor, I would like to read in

11  Page 190, Lines 2 through 11 of the witness's deposition.

12        **THE COURT:**  All right.  Any objection?

13        **MR. CONNETT:**  What were the lines again, counsel?

14        **MR. ADKINS:**  Page 190, Lines 2 through 7.

15        **MR. CONNETT:**  Your Honor, I think there is one more

16  piece of foundation that would need to be laid, because this is

17  dealing with the in press study.  That is not the -- I think

18  the question just now was about the published study.

19      I don't know, Your Honor, if there is a difference, but I

20  do think there is one more piece of foundation that needs to be

21  laid.

22        **THE COURT:**  All right.  Why don't you lay that

23  foundation, Mr. Adkins?

24  **BY MR. ADKINS**

25  **Q.**   Dr. Lanphear, when I took your deposition in this case,

 1   Till 2020 was not yet published; correct?

 2   A.   That's correct.

 3   Q.   And at that deposition we talked about a publication --

 4   pre-publication version of the study; correct?

 5           MR. CONNETT:  Vague.

 6           THE COURT:  Overruled.  Go ahead.

 7   A.   We possibly did.  Likely did.

 8   BY MR. ADKINS

 9   Q.   Okay.  The pre-publication versus of Till 2020 also did

10   not examine whether there were differences in the developmental

11   outcomes between those who were selected for the study and

12   analysis and those who were not selected; correct?

13           MR. CONNETT:  Assumes fact with respect to the word

14   "also."  I have no objection otherwise.

15           THE COURT:  All right.  Strike the word "also."  You

16   can answer the question.

17   A.   Again, I would have to go back to the supplemental tables.

18   We typically do do some comparisons of baselines, but I -- I

19   might be getting the different studies mixed up, so I would

20   have to clarify.

21       But we typically do look at baseline comparisons for some

22   of the key measures or characteristics of the population that

23   was in the MIREC study, and of those we compared it to those

24   that were in our particular analysis.  So we would have done

25   the comparison, I would think.

LANPHEAR - CROSS / ADKINS

1   Q.    Did the pre-publication versus of Till 2020 report that

2   comparison?

3   A.    The pre-publication?  I'm not quite sure what we're

4   referring to in the pre-publication.

5           MR. CONNETT:  Your Honor, if -- could I maybe provide

6   a point of clarification that may facilitate this discussion?

7           THE COURT:  Okay.

8           MR. CONNETT:  The pre-publication version that was

9   available at the deposition was a -- was then -- there were

10  changes made to that version before it was ultimately

11  published.  So it's not the exact version that was ultimately

12  published.

13          THE COURT:  I gathered that.

14          MR. ADKINS:  Okay.  May I now read the deposition

15  lines?  Sufficient foundation?

16          THE COURT:  Go ahead.

17          MR. ADKINS:  Okay.

18  BY MR. ADKINS

19  Q.    (As read)

20          "QUESTION:  Did Till in press report whether there

21          were any differences in the developmental outcomes

22          between the subjects with and without complete data?

23          "ANSWER:  Well, a lot of the subjects without complete

24          data wouldn't have had their developmental outcomes

25          measured.  That was part of having complete data.

1   **"QUESTION:**  That was part of it, but for those who had

2   that data available?

3   **"ANSWER:**  No, we just did not examine them.  We just

4   left them to the side."

5     **THE COURT:**  Okay.

6 **BY MR. ADKINS**

7 **Q.** Now, Dr. Lanphear, Till 2020 measured the children

8 participants' intellectual abilities using the Wechsler

9 Preschool and Primary School of Intelligence, third edition;

10 correct?

11 **A.** Correct.

12 **Q.** And that was the same test that we talked about with

13 respect to the Green 2019 study; correct?

14 **A.** Correct.

15 **Q.** That test involves a Full Scale IQ that's comprised of

16 verbal and performance IQ scores; correct?

17 **A.** Correct.

18 **Q.** Now, in Paragraph 60 of your declaration you stated that

19 you found a decrease in Full Scale IQ among the children in the

20 formula-fed group for each .5 milligram per liter increase in

21 water fluoride concentration; is that correct?

22 **A.** Yes, that's how we reported it.

23 **Q.** And you also stated that results should be treated -- or

24 interpreted with caution; correct?

25 **A.** I believe that you're referring to the two influential

1    points, yes.

2    **Q.**   Well, exactly.  So that's because you removed two outliers

3    when you resubmitted this paper, which made the association

4    non-significant; correct?

5    **A.**   Well, no.  We didn't actually remove them when we

6    submitted the paper.  We included them in the analysis, and

7    then in that paper we showed what happens when you remove them

8    from the analysis.  So we did a sensitivity analysis, but we

9    included them.

10       It's not clear, when you have outliers, that they

11   necessarily should be concluded, and so we presented it both

12   ways.

13   **Q.**   And there were also no significant associations between

14   the water fluoride concentration exposure estimate and verbal

15   IQ scores for either the formula-fed or the breastfed group; is

16   that correct?

17   **A.**   That's correct.  It was only for the nonverbal IQ.

18            **THE COURT:**  Hold on for a second.

19       If you could explain the outlier?  These are particular

20   data points or what?

21            **THE WITNESS:**  Yes.  These would be data points.

22   Typically when we look at the scatters you've talked about,

23   sometimes there are children who, either because of their IQ or

24   fluoride or both, sort of fall far outside those -- those

25   bounds or those lines, and to be entirely careful we'll

1    sometimes remove those from the analysis.

2        There is some controversy about that, but the safest

3    approach is to present it both ways, which is what we did.  So

4    people can actually come to their own conclusions.

5            THE COURT:  And is there -- in the field is there

6    criteria by which one decides to remove them or not?

7            THE WITNESS:  Yes.  You can use different analytic

8    techniques to see whether they fall outside the bounds of the

9    statistical test, and that's what we did.

10            THE COURT:  So you used analytical -- presumably

11    objective analytical technique to determine whether to exclude

12    these particular points?

13            THE WITNESS:  That's correct.

14            THE COURT:  And are these analytical techniques

15    described in the paper or are they described somewhere?

16            THE WITNESS:  Yes.  They are described in the paper.

17            THE COURT:  And these are techniques using some

18    statistical type analysis?

19            THE WITNESS:  Yes.  They are very conventional.  They

20    are very standard.

21            THE COURT:  Okay.  Thank you.

22            THE WITNESS:  Thank you.

23    BY MR. ADKINS

24    Q.   So after removing those two outliers, Dr. Lanphear, there

25    was no statistically significant associations between water

LANPHEAR - CROSS / ADKINS

 1  fluoride concentration and IQ scores for both the breastfed and

 2  the formula-fed groups; is that correct?

 3  **A.**   For Full Scale IQ.

 4          **THE COURT:**  After removing, that's right?  After

 5  removing?

 6          **THE WITNESS:**  That's correct.

 7  **BY MR. ADKINS**

 8  **Q.**   All right.  Let's turn to the infant fluoride intake

 9  estimate.

10      Infant fluoride intake until 2020 was not significantly

11  associated with Full Scale IQ; is that correct?

12  **A.**   You know, I think -- could you bring that up?  I have so

13  many different results flowing through my head right now, I'm

14  getting them confused.

15  **Q.**   Would it help refresh your memory if I showed you Till

16  2020?

17  **A.**   Yes.  Thank you.

18          **MR. ADKINS:**  Your Honor, may I show the witness Till

19  2020?

20          **THE COURT:**  Yes.

21          **MR. ADKINS:**  Mr. Hambrick, can you please put on the

22  screen U-23?

23      And if you could zoom in on Section 3.3, please, the last

24  paragraph in the first column?

25      Thank you.

LANPHEAR - CROSS / ADKINS

1          (Document displayed.)

2     BY MR. ADKINS

3     Q.   Okay.  So infant fluoride intake, Dr. Lanphear, was not

4     significantly associated with Full Scale IQ; is that correct?

5     A.   That's correct.

6     Q.   And there was no significant association between infant

7     fluoride intake and verbal IQ; is that correct?

8     A.   That's correct.

9     Q.   And Till 2020 did not report any differences in cognitive

10    outcomes, significant or not, by sex; is that correct?

11    A.   We didn't see -- in this particular analysis we didn't see

12    sex differences, if that's what you're asking.

13    Q.   I asked whether Till 2020 reported any differences by sex,

14    significant or not.

15    A.   No.

16    Q.   Okay.  Thank you, Doctor.

17         So, Dr. Lanphear, let's switch gears quickly to your lead

18    research.  Counsel showed you a 2009 revision of the National

19    Ambient Air Quality Standard for lead.  And that rule-making

20    cited to your 2005 lead study; is that correct?

21    A.   I thought it was 2007, but what Mr. Connett showed.  But

22    if that's not -- if the date is not relevant, then I remember

23    what you're referring to.

24    Q.   You remember your 2005 lead study?

25    A.   Oh, I remember that.  I thought you were talking about --

**LANPHEAR - CROSS / ADKINS**

1    you said 2009, but I thought it was a 2007 EPA Federal

2    Register, but I could be incorrect about that.

3    **Q.**   I understand what you're saying.

4         Okay.  So by the time you published your 2005 lead study,

5    there were more studies of lead compared to fluoride studies

6    now; is that correct?

7              **MR. CONNETT:**  Overbroad.

8              **THE COURT:**  Overruled.

9    **A.**   By the time I published --

10             **THE COURT:**  Go ahead.

11   **A.**   By the -- I'm trying to clarify.  By the time I published

12   my 2005 study?

13   **BY MR. ADKINS**

14   **Q.**   Correct.

15   **A.**   There were more -- other lead studies than there were

16   fluoride studies?

17   **Q.**   Than there are fluoride studies today.

18   **A.**   I think a more fair comparison, because what we were

19   looking at -- yes, there were lots of other lead studies, but

20   there were only three lead studies that had specifically looked

21   at the impact below 10 microgram per deciliter.

22        So in that sense our study was really one of only three

23   that were asking a very specific question about lead.

24   **Q.**   And in the EPA rule-making that you were shown by counsel,

25   EPA drew from over 6,000 published studies by late 2006; is

1    that correct?

2    **A.**    Yes.  But those were not all lead and IQ.  They were

3    lead -- more lead broadly.

4    **Q.**    And by that time of the EPA's rule making, the body of

5    evidence regarding lead exposure consisted of hundreds of

6    epidemiologic studies conducted in the United States, Canada

7    and elsewhere; correct?

8    **A.**    Well, I think there's two different ways to answer that

9    question.

10          In terms of all the lead studies, absolutely, some looking

11   at coronary heart disease, some looking at ADHD, and some

12   looking at cognition.

13          When it came down to identifying the key indicators of IQ,

14   and particularly for children who had blood lead levels below

15   10 micrograms per deciliter, there were probably three to five

16   by that point.

17   **Q.**    Okay.  Dr. Lanphear, in your declaration you stated that

18   the converging results from the MIREC and ELEMENT cohorts

19   indicates that, quote, optimal, end quote, fluoride exposure

20   during fetal development is associated with diminished

21   intelligence; correct?

22   **A.**    Yes.

23   **Q.**    Are you familiar with the INMA birth cohort in Spain?

24   **A.**    I believe I know which one you're referring to, yes.

25   **Q.**    And that birth cohort collected urine samples from

```
 1    pregnant mothers; correct?

 2    A.    I believe so, yes.

 3    Q.    That cohort also conducted cognitive testing in the

 4    offspring, correct?

 5    A.    Yes.  If this is the same study out of Spain that we're

 6    referring, to, yes, they did.

 7    Q.    Well, I'm now referring to the birth cohort.  Not any

 8    particular study of the data from that cohort.

 9    A.    I'm generally familiar with the cohort.

10    Q.    And the data collected from that cohort would permit

11    researchers to control for various confounding factors;

12    correct?

13    A.    Yes.

14    Q.    You're a member of the International Society for

15    Environmental Epidemiology; correct?

16    A.    Yes.

17    Q.    And you attended the 31st conference of the International

18    Society for Environmental Epidemiology in the Netherlands last

19    year; correct?

20    A.    Correct.

21    Q.    You moderated a program at that conference; correct?

22    A.    Yes.

23    Q.    And Dr. Till, Christine Till, presented on your research

24    regarding infant fluoride exposure at that conference; correct?

25    A.    Yes.
```

1   Q.   Now, a study of fluoride exposure in pregnancy and

2   developmental effects on offspring in the INMA cohort in Spain

3   was also presented at that conference; correct?

4   A.   I don't -- I don't know.

5   Q.   Are you familiar with the study of the INMA birth cohort

6   of fluoride exposure during infancy?

7   A.   No.

8   Q.   Are you familiar with the study using INMA data from that

9   birth cohort measuring fluoride exposure and any developmental

10  effects?

11  A.   No.

12  Q.   Are you familiar with Jordi Sunyer, the scientist?

13  A.   Generally, yes.  I don't know him personally.

14  Q.   And Jordi Sunyer is a well-published environmental

15  epidemiologist; correct?

16  A.   Yes.

17  Q.   Dr. Lanphear, did you receive a booklet of abstracts when

18  you attended the conference in the Netherlands?

19  A.   I don't believe so.

20  Q.   You submitted an abstract yourself.  You submitted at

21  least one abstract yourself that was presented at the

22  conference in the Netherlands; is that correct?

23  A.   Correct.

24  Q.   And your testimony is you don't remember receiving a

25  booklet of the abstracts that were cumulatively submitted at

LANPHEAR - CROSS / ADKINS

1   that conference?

2   **A.**   No.  The -- they are pretty environmentally conscience.

3   I don't think there was a booklet.  I think it was just

4   electronic.

5   **Q.**   Do you recall reviewing an electronic booklet of the

6   abstracts that were submitted at the conference?

7   **A.**   I looked at it a couple times, yes.

8   **Q.**   Do you recall reviewing any abstracts regarding fluoride

9   exposure studies in that booklet?

10  **A.**   None other than Christine Till's.

11  **Q.**   Did you page through the booklet at all?

12  **A.**   I couldn't page through it because it was electronic.

13  **Q.**   Did you scroll through the booklet, Dr. Lanphear?

14  **A.**   I'm sure I did to find, you know, the two or three things

15  that I wanted to make sure I attended.

16  **Q.**   If there were a prospective birth cohort study that

17  measured fluoride exposure in maternal urine and cognitive

18  outcomes in the children using that INMA birth cohort data,

19  would you consider that to be an important factor to consider

20  in your opinion?

21  **A.**   Yeah.  Certainly, if it's -- when it's published.  As you

22  alluded to earlier, that it's not been published.  It's not

23  been peer reviewed.  You view it skeptically.

24       I don't know anything about the study.  I don't know how

25  they measured fluoride.  I don't know if they had one urine or

1    more.  So I -- I don't know how to give it any weight until I

2    either I review it, if I was asked to serve as a reviewer, or

3    it's been published.

4    **Q.**   In your initial report in this case you attached three

5    papers with your expert disclosure; do you recall that?

6    **A.**   No.  You'll have to refresh my memory.

7    **Q.**   Do you recall attaching Till 2018 with your expert report?

8    **A.**   It's likely, yes.

9    **Q.**   Do you recall attaching an unpublished manuscript of the

10   Green study to your expert report?

11   **A.**   "Expert report" meaning not this time, but last year?  Is

12   that what you're referring to?

13   **Q.**   Correct.

14   **A.**   I actually don't recall, but it would make sense that I

15   would do so.

16   **Q.**   And you attached the unpublished Till 2020 to your expert

17   report; correct?

18   **A.**   Okay.

19   **Q.**   And so it's your testimony that you were providing studies

20   to the Court that you think should be reviewed skeptically?

21   **A.**   Well, my understanding is -- I don't -- I didn't

22   participate in the INMA study, so I can't present that to you.

23   As far as, you know, as you said, it's an abstract.

24        I imagine we were trying to provide as much information as

25   we could to you before the deposition.  So I -- I guess we

LANPHEAR - CROSS / ADKINS

1  could have kept it hidden, but I don't know that that serves

2  anybody.

3  **Q.**    And you mentioned you aren't able to offer an opinion

4  today about whether such a study of fluoride exposure and

5  cognitive outcomes in the INMA birth cohort, whether --

6       (Court reporter clarification.)

7  **Q.**    So your testimony is that you would need to know a number

8  of other factors about such a hypothetical study of the INMA

9  birth cohort before you can offer an opinion, some of which are

10  how many measures of fluoride there were, how they measured

11  fluoride and other covariates; is that correct?

12  **A.**    Absolutely.

13  **Q.**    And would it -- would your -- is it your opinion that if

14  such a study took multiple measures of urinary fluoride, would

15  that be a positive or a negative factor in your view?

16  **A.**    Generally positive.

17  **Q.**    And if the -- if the study found associations between

18  urinary fluoride in areas where water is fluoridated versus

19  areas where water is not fluoridated, would that also be an

20  important factor in your view?

21  **A.**    If they found associations of what?

22  **Q.**    In maternal urinary fluoride concentrations.

23  **A.**    If they found that women who drank water that was

24  fluoridated had higher levels of maternal urinary fluoride?

25  **Q.**    Would that be an important factor for your consideration?

LANPHEAR - CROSS / ADKINS

1    A.   I -- that's -- that seems like it's already a confirmed

2    association.  I don't know why that would be important.

3         But I guess it would confirm what we already know and what

4    others -- I mean, that water fluoride or -- whether it's from a

5    private well or whether it's from community water fluoridation

6    is an important source of fluoride, yes.

7    Q.   And if a study like that didn't find an association, would

8    that also be important, in your view?

9    A.   If it was otherwise a well-done rigorous study, yeah, we

10   would have to try to understand why they came up with

11   discrepant findings.

12   Q.   If such a study used -- if in such a study the

13   participants were exposed to community water fluoridation

14   that's fluoridated at a concentration of 1 milligram per liter,

15   would that be an important factor, in your view?

16   A.   Possibly in several different ways.

17        I mean, one of the things I mentioned about the importance

18   of the MIREC study is that we had a range of exposure.  If

19   everybody is exposed to exactly the same level, you really

20   can't learn much from it.  So you want a range of exposure.

21   Q.   And if such a study found a positive association between

22   prenatal fluoride exposure and cognitive outcomes, would that

23   be an important factor, in your view?

24   A.   And what do you mean by "positive association"?

25   Q.   An increase in fluoride exposure led to an increase in IQ?

1   **A.**   Yes.  If it was otherwise a well-done study and comparable

2   with what we're trying to compare to, in this case the United

3   States, yes, one would want to look at it and try to understand

4   that study and why it came up with different -- hypothetically

5   speaking, different results.

6   **Q.**   I have no further questions, thank you very much

7   Dr. Lanphear.

8   **A.**   You're very welcome.

9          **THE COURT:**  All right, thank you.

10      Redirect.

11          **MR. CONNETT:**  Yes, Your Honor.

12                    <u>**REDIRECT EXAMINATION**</u>

13  **BY MR. CONNETT**

14  **Q.**   Dr. Lanphear, you were asked some questions about the time

15  at which you measured -- at which the urine samples were taken

16  in the MIREC cohort.

17      Dr. Lanphear, did you in your 2018 study analyze the

18  relationship between time of void and urinary fluoride

19  concentration?

20  **A.**   Yes.

21  **Q.**   Did you find a meaningful relationship between the time

22  that a mother gave the urine sample and the fluoride content in

23  the urine?

24  **A.**   No.  When we adjusted for either time since last void or

25  whether it was a morning void, it didn't change all of our

 1   results.

 2   **Q.**   What significance, if any, do you draw from that fact?

 3   **A.**   Well, while we certainly would acknowledge that we want to

 4   have a standardized way of collecting urine, that there is some

 5   value of getting a first morning void; that while theoretically

 6   it's important, it didn't have an overall impact on our

 7   results, on what we learned.  Because when we adjusted for it,

 8   it just didn't just appreciably change what we saw.

 9   **Q.**   Now, you were asked about whether you -- whether the

10   questionnaire that was given to the mothers as to how much

11   water they drank, whether that has been validated by other

12   studies.  Do you recall that line of questions?

13   **A.**   Vaguely, yes.

14   **Q.**   So did you find a significant relationship between the

15   amount of self-recorded beverage intake and urinary fluoride

16   level?

17   **A.**   Yes, we did.  And I think one of the things that's

18   important to know is we didn't rely on a validated instrument.

19   We validated the instrument.

20        And so while you can criticize it because there wasn't

21   already an existing instrument out there that had been

22   validated, we, in fact, validate it.  We showed with

23   maternal -- with mother's report and the fluoride measure that

24   those questions demonstrated exactly what we thought it should.

25        And that's the ultimate validation, is that we show what

1    it purports to test, whether that's IQ or whether that's

2    maternal urinary fluoride.

3    **Q.**    Just so I have that clear.  When you say -- you validated

4    in part -- am I correct in understanding your testimony.  You

5    validated it in part by the fact that you found a significant

6    correlation between how much water the mother reported drinking

7    and the amount of fluoride that you found in her urine; is that

8    correct?

9    **A.**    That's right.

10   **Q.**    Now, you were asked about -- you did not control for

11   maternal IQ in the Green 2019 study; correct?

12   **A.**    That's correct.

13   **Q.**    But you did control for maternal education; right?

14   **A.**    That's correct.  And that's a good surrogate for maternal

15   IQ.

16   **Q.**    And you were asked about the way that you measured the

17   water fluoride concentration in the MIREC study.  And you said

18   you didn't go into the mother's home and test the water from

19   her faucet.

20         So can you maybe just explain a little bit to the Court

21   how you did determine the fluoride concentration of that water

22   supply?

23   **A.**    Yeah.  The water treatment plants add fluoride to the

24   water in certain communities, in the fluoridated communities.

25   And as part of a routine, they test the amount of fluoride in

LANPHEAR - EXAMINATION / CONNETT

1    the water to verify that it's not excessive, because there have

2    been poisonings from adding too much fluoride in water.

3        And so they want to try to make sure it's not above what's

4    considered optimal.

5    **Q.**   So were you relying on just a general -- like, the water

6    municipality saying:  We add an average of X to the water, or

7    were you relying upon actually measured fluoride levels in that

8    community?

9    **A.**   It was based upon the actual measured fluoride levels from

10   that water plant that went to a specific postal code or zip

11   code.

12   **Q.**   How many -- in the fluoridated areas during the course of

13   the mother's pregnancy, could you give us some estimate as to

14   the number of measurements for each mother's water supply that

15   you relied upon?

16   **A.**   Well, we kept quarterly averages.  In some cases they were

17   based upon monthly tests, like in Vancouver, where we have no

18   water.  No fluoridation is added to water in British Columbia.

19       In other cases they were done much more routinely, daily

20   or weekly.  And then we took the average of those over each

21   quarter as a way to estimate the mother's intake.

22       And even though that's not the optimal biomarker, like

23   urinary fluoride is for the mother, it might give us a

24   really -- in fact, it did give us a good indication of fluoride

25   exposure because it was over such a long period of time.

**LANPHEAR - EXAMINATION / CONNETT**

1   Q.   Was your measurement of water fluoride, would you consider

2   it more robust than, say, the measurement from the Broadbent

3   study where they relied upon one reported average for each

4   community?

5   A.   Absolutely.  But not just because we had measures of

6   fluoride in the water.  We also looked at consumption of water

7   at the tap.  Whether the mother drank black tea, for example.

8        So we were able to individualize the estimated fluoride

9   intake.

10  Q.   Now, you were asked about the methods for estimating

11  fluoride exposure among infants, and counsel asked you about

12  the -- sorry, strike that.

13       You did not have data on the fluoride content of the

14  formula itself; is that correct?

15  A.   That's correct.

16  Q.   Would it be fair to say that the lack of that data would

17  have introduced some exposure imprecision into your exposure

18  estimates?

19  A.   Well, in some ways it would have enhanced it.  But by

20  having varying degrees of formula, different days, it could add

21  some imprecision as well.  I think it could go either way.

22  Q.   So you were asked questions about exposure.  And is it

23  fair to say, Doctor, that urinary fluoride levels are a form of

24  exposure, or are a metric of exposure?

25  A.   Yes.

LANPHEAR - EXAMINATION / CONNETT

1  Q.  And what matters more?  If we are concerned ultimately

2  about predicting whether a toxic effect is going to occur, what

3  matters more, the amount of a chemical that we ingest or the

4  amount of the chemical that is absorbed into the body and

5  enters circulation?

6          MR. ADKINS:  Objection.  Compound.

7          THE COURT:  Overruled.  You can answer the question.

8  A.  Well, it's -- in some ways it's a bit of a long question.

9      When we're looking at the brain as a target organ, what

10 probably matters most is what gets into the brain.  We don't

11 have a direct measure of that.  And so we rely on other

12 measures, like maternal urinary fluoride.

13     But -- but from the standpoint of trying to come up with

14 and estimate most accurately exposure, what we're looking for

15 are internal dosimeters, measures that we know the mother

16 ingested and that we can measure.  And in this case for things

17 like fluoride, which are not persistent chemicals, the urine is

18 considered the optimal way to measure that.

19 Q.  You were asked questions about apportioning the sources of

20 fluoride that each mother may have consumed, whether it was

21 from toothpaste or tea or food or whatnot.

22     Does the concentration of fluoride in urine reflect only

23 one source of fluoride that the mother consumes, or does it

24 reflect all sources of fluoride that the mother would consume?

25 A.  It's a measure of total exposure, from all those sources.

 1    A total cumulative exposure.

 2              THE COURT:  Let me ask -- sorry about that.

 3        Let me ask, Dr. Lanphear.  When you say "total cumulative

 4    exposure," it drew to my mind there was testimony in this case

 5    about some of the source of fluoride concentration found in

 6    urine is excreted through the skeletal system, sort of a

 7    cumulative effect over years.  Not just intake from the

 8    immediate past, but some residual indication of -- I don't

 9    know, some accumulation of fluoride in the body.  Meaning, the

10    skeletal system.

11        Is that something you're familiar with?  Does that sound

12    familiar?  Do you have any comment on that?

13              THE WITNESS:  Well, I'm very familiar with that.  And

14    lead, because lead is also stored in the bone.  The majority of

15    our lead in our bodies is stored in bone.

16        And because the mother -- the pregnant woman is trying to

17    transfer calcium to the fetus, if she doesn't have adequate

18    amounts in her diet of calcium, she will break down her bone in

19    order to give it to the fetus.

20        By breaking down the bone, it will release other things

21    that are stored, like fluoride.

22              THE COURT:  So you agree that fluoride is stored in

23    the bone?

24              THE WITNESS:  That's my understanding, yes.

25              THE COURT:  Is there a relationship between urinary

1    fluoride concentrations and plasma concentrations?  Is there a

2    direct correlation?

3        Do we know anything about -- the blood is what is

4    circulated through the brain prenatally presumably.  What do

5    you know or what does science know about the relationship

6    between urinary concentrations and plasma concentrations?  Is

7    there some correlation there that's been demonstrated?

8            THE WITNESS:  I believe so, but I would have to go

9    back and look at the data to be more confident about

10   articulating that.  But yes, that's my understanding.

11           THE COURT:  Okay.  And what about the ratio between

12   ingestion and urine concentrations?  We had heard some

13   testimony about -- that there being a fair close correlation.

14       If you are constantly exposed to .8 milligrams of water

15   and you drink that, you're likely to excrete something in the

16   same concentration range or some ratio that is maintained; is

17   that accurate?

18           THE WITNESS:  Certainly, there is no question that

19   there is an association between ingestion and how much is in

20   the urine.  In some cases women, of course, will not only get

21   fluoride from the water.  If she drinks black tea, that will

22   increase it.

23       So you can also, in this case, have cumulative impacts.

24   So it won't be a one-to-one because other things happen.

25       And in some cases if a mother goes on vacation, you have

1    to try to take those things into account.  But it's clearly a

2    direct relationship between ingestion and what's found in the

3    urine.

4            THE COURT:  So it's hard to predict from urine

5    concentrations alone, for instance, what the concentration in

6    water might be.  That varies depending on intake of various

7    other things?

8            THE WITNESS:  That's right.  I mean, you could

9    certainly look at it and say if a -- in Canada, for example.

10   If a woman has a level over 1 milligram per liter in urine,

11   she's more -- much more likely, significantly more likely to

12   live in a fluoridated community.  But she could live in British

13   Columbia and just drink a lot of black tea, or have had a

14   dental procedure the previous day.

15           THE COURT:  And is fluoride metabolized in a way so

16   that it wouldn't appear in urine?  I'm just sort of curious.

17   It comes in as fluoride.  Does it go out as fluoride?

18           THE WITNESS:  That's my understanding.  At least in

19   terms of how we measure it, that's true.

20           THE COURT:  Okay.  Thank you.

21   BY MR. CONNETT

22   Q.   Doctor, just two more questions.

23        You were asked what may be an abstract in conference

24   proceedings, and counsel suggested there may have been reported

25   a positive association between fluoride and IQ.

1      I just wanted to ask you:  Are you aware of any

2   toxicologic data, any animal data, any epidemiologic data that

3   provides to you any plausible basis or mechanism to believe

4   that fluoride exposure would increase IQ?

5   **A.**   None that I'm aware of.  But if -- if you're not careful

6   about how you do your analysis, you could have even concluded

7   that from the MIREC data.  Because the women who live in

8   fluoridated communities tended to have a higher education than

9   women, at least in our study, that lived in non-fluoridated

10  communities.

11     So generally speaking, that difference -- again, if we

12  hadn't done a careful study, you could have made some erroneous

13  inference.  So it's certainly possible.

14     I think the other thing to point out is that even our

15  pooled analysis of lead, even though overall we saw significant

16  reductions in IQ as blood lead levels increased, in one of

17  those seven studies there was actually a positive inflection;

18  that is, as blood lead levels got higher in our Mexico City

19  cohort, we saw IQ get higher.  It wasn't statistically

20  significant in the way Rick Horne, who is our chief

21  statistician, interprets that.  If it's not statistically

22  significant, it's essentially flat.

23     But we don't expect every single study of lead and IQ, or

24  tobacco and lung cancer, or fluoride and IQ to act in the same

25  way.  It will depend upon the characteristics of the

1   population, when they were exposed.

2       I mean, so we don't expect complete uniformity.

3   **Q.**   With that, you mentioned a study on lead that founded a

4   positive inflection, of increasing lead levels associated with

5   increasing IQ.  Do you ever recall the EPA suggesting that

6   maybe lead increases IQ?

7   **A.**   Nothing that I'm aware of.  Nothing I can recall.

8   **Q.**   And His Honor was asking you a question just a few minutes

9   ago about the relationship between fluoride in water and

10  fluoride in urine.

11      Dr. Lanphear, are you aware of any historic data that has

12  looked at the relationship between the concentration of

13  fluoride in water and the concentration of fluoride in cooled

14  urine samples from a community?

15  **A.**   I don't remember any study off the top of my head.

16  **Q.**   Okay.  But in your study, Doctor, in the 2018 Till study,

17  how you would characterize the relationship between water

18  fluoride content and urine fluoride content?

19          **MR. ADKINS:**  Objection.  This exceeds the scope of

20  cross-examination, Your Honor.

21          **THE COURT:**  I believe it does.

22          **MR. CONNETT:**  That's fine.  That's fine, Your Honor.

23  I'll withdraw that.

24  **BY MR. CONNETT**

25  **Q.**   Doctor, I'll just close in one question.

1      You have spent a large part of your career studying the

2 impact of lead on IQ.  And you were studying that back in the

3 days when the relationship between low levels of lead and IQ

4 were not fully clear.

5      Could you offer us any guidance as to how you see the

6 situation we find ourselves in today with -- looking at the

7 impact of potentially fluoridated water on IQ with how you --

8 with what happened with lead?

9           **MR. ADKINS:**  Same objection, and calls for an

10 assessment of risk.

11      Your Honor, has already ruled on this in our Motion in

12 Limine.

13           **THE COURT:**  Yeah, I'm going to sustain the objection.

14           **MR. CONNETT:**  Okay.  I have no further questions.

15 Your Honor.

16           **THE COURT:**  All right.

17           **MR. ADKINS:**  No further questions from EPA.

18           **THE COURT:**  All right.  Thank you.

19      I do have one more question, Dr. Lanphear, and this may

20 not be in your expertise, and please say so if it's not.

21      Can you think of any biomechanical reason why an increase

22 in exposure to fluoride would actually increase or enhance IQ?

23           **THE WITNESS:**  No.

24           **THE COURT:**  Okay.  Thank you.

25           **THE WITNESS:**  Thank you.

 1          THE COURT:  All right.  Thank you, Dr. Lanphear.  I

 2   appreciate your time.

 3      No further questions, right, counsel?

 4          MR. CONNETT:  No further questions.

 5          MR. ADKINS:  We have one question to follow up on

 6   that, if you wouldn't mind.

 7          THE COURT:  Go ahead.

 8                    <u>RECROSS EXAMINATION</u>

 9   BY MR. ADKINS

10   Q.   Dr. Lanphear, are you aware of any evidence of a

11   mechanistic effect for an inverse association of fluoride on

12   IQ?

13   A.   Why we would suspect that fluoride is neurotoxic and leads

14   to lower IQ?

15   Q.   No.  Whether -- you're not aware of any mechanistic effect

16   of fluoride on IQ that shows an inverse relationship?

17      So it's the other side of this question.

18          MR. CONNETT:  Vague.

19   A.   Well, I just -- I just rephrased what I understood to be

20   the other side of the question.

21          THE COURT:  I think he rephrased it properly.  So go

22   ahead and answer the question.

23          THE WITNESS:  Okay.

24   A.   Yes, there are some possible reasons.

25      First, from a very evolutionary perspective.  And this

1   fits very consistently with lead.  We did not evolve with high

2   concentrations of lead.  Even today blood lead levels of

3   children are 10 to 100 times higher than our pre-industrial

4   ancestors.

5        We've seen with a number of other synthetic chemicals that

6   when exposed, they are associated with neurotoxicity:  Air

7   pollution, PBDE-type flame retardants, mercury.  We did not

8   evolve with those or we did not evolve with those high

9   concentrations.

10       So the first thing I always think about is, from an

11  evolutionary perspective, did we evolve with fluoride at the

12  levels that we're being exposed to today?  And the answer is

13  no.  That gives me pause.

14       Second thing.  What do we know about fluoride?  It seems

15  to be associated with diminished thyroid hormone and pregnant

16  women in general.  Thyroid is critical for the developing

17  brain.  If you don't have thyroid, children's IQs are impacted,

18  negatively.

19       That probably is the most compelling mechanism.  And

20  that's something we'll be studying in our next NIH research.

21            MR. ADKINS:  No further questions.  Thank you.

22            THE COURT:  All right.  All right.  Thank you,

23  Dr. Lanphear.

24            THE WITNESS:  Thank you.

25            THE COURT:  Appreciate your testimony.

 1            (Witness excused.)

 2            **THE COURT:**  Okay.  Thank you, counsel.

 3        Next witness can be called.

 4            **MR. CONNETT:**  Yes, Your Honor.  At this time the

 5    plaintiffs call the 30(b)(6) representative of the Centers for

 6    Disease Control and Prevention.

 7            **THE COURT:**  All right.  And the name?

 8            **MR. CONNETT:**  Casey Hannan, the Director of the Oral

 9    Health Division.

10            **THE COURT:**  Okay.

11            **MR. CONNETT:**  And, your Honor, if I could.  If at any

12    time the sound or the video image is distracting, or if there's

13    glitches, if you could let me know and we can try and fix it to

14    make sure that the quality is good enough.  Okay?

15            **THE COURT:**  Yeah.  The sound has been good from my

16    perspective.

17        And the court reporter will let you know, because she's

18    the most important one in that regard.

19        Thank you.

20            **MR. CONNETT:**  The transcript is part of Appendix C to

21    the parties' pretrial statement.

22                         <u>**CASEY HANNAN**</u>,

23    called as a witness for the Plaintiffs herein, testified via

24    videotaped deposition played in open court, not reported.)

25            **THE COURT:**  Okay.

 1              MR. CONNETT:  At this time plaintiffs call

 2    Dr. Kristina Thayer.

 3         Sorry, I forgot to mention.  During this deposition

 4    Mr. Paul Anderson, who is on our technical staff, may assist if

 5    we need to use the deposition.

 6         So at this time would it be possible to promote

 7    Mr. Anderson, whose screen name, I think, might be Total Trial

 8    Services?

 9              THE CLERK:  Okay.  Promoted.

10         Now, Dr. Thayer, please raise your hand.

11              MS. CARFORA:  We are verifying right now, I think.

12    Dr. Thayer, she's a fact witness and wasn't permitted to listen

13    in, so we're just getting her connected now.

14              THE COURT:  All right.

15              MR. CONNETT:  While we're doing this, actually, Your

16    Honor, I was wondering maybe -- because we haven't done --

17    shown -- I want to see maybe if with Mr. Anderson, when he

18    shows a document on the screen, we just want to verify that it

19    would just be the document on the screen and not, you know, his

20    location.

21         (Document displayed)

22              THE COURT:  Okay.  There we go.  We have Dr. Thayer

23    on the screen.  Good morning or afternoon, wherever you are.

24         Okay.  Angie, if you could administer the oath, please?

25         (Brief pause.)

1          **MS. CARFORA:**  It looks like she might not be able to

2     hear us.  Let me figure out what's going on.

3          **THE CLERK:**  Dr. Thayer, can you hear us?

4        (No response.)

5          **THE CLERK:**  Dr. Thayer?

6          **THE COURT:**  You may have lost her there.

7          **THE CLERK:**  Dr. Thayer, can you hear me?  We cannot

8     hear you.  Can you please turn your audio on?

9          **THE COURT:**  I wonder if she's not connected

10    audio-wise.

11         **MS. CARFORA:**  We do have somebody on the phone with

12    her.  We're trying to work this out:

13         **THE COURT:**  Sometimes it's the setting.

14        (Brief pause.)

15         **MS. CARFORA:**  Your Honor, at this time it looks like

16    Dr. Thayer is going to try to reboot Zoom.  So I think she's

17    going to exit and try and reboot her connection.

18         **THE COURT:**  All right.  I wonder whether we ought to

19    just go ahead and take a little bit of an early break right

20    now.  We're about 20 minutes away, but we can go ahead and take

21    our break now.  Then the last session we'll go the full 90

22    minutes.  Give her a chance to kind of reboot and everything.

23         **MS. CARFORA:**  Sure.

24         **THE COURT:**  So we'll reconvene in 15 minutes.

25         **MR. CONNETT:**  Great.  Thank you, Your Honor.

```
 1              MS. CARFORA:  Thank you.

 2              THE CLERK:  Court is in recess.

 3         (Whereupon there was a recess in the proceedings

 4          from 11:3 a.m. until 11:50 a.m)

 5              THE COURT:  Okay.  Good as to see you, Dr. Thayer.

 6    Glad you made it.

 7              THE WITNESS:  Good to see and be heard.

 8              THE COURT:  Are we ready to resume?

 9              MR. CONNETT:  Plaintiffs are ready, Your Honor.

10              THE COURT:  Angie, if you could unmute and administer

11    the oath?

12                          KRISTINA THAYER,

13    called as a witness for the Plaintiff, having been duly sworn,

14    testified as follows:

15              THE WITNESS:  I do.

16              THE CLERK:  Thank you.

17                        DIRECT EXAMINATION

18    BY MR. CONNETT

19    Q.   Good afternoon, Dr. Thayer.

20    A.   And to you.

21    Q.   Dr. Thayer, where do you currently work?

22    A.   I work at the U.S. Environmental Protection Agency.

23    Q.   And what is your position with the EPA?

24    A.   I'm the Director of the Chemical and Pollutant Assessment

25    Division, referred to at CPAD.
```

THAYER - DIRECT / CONNETT

1    Q.   Is that within the IRIS division?

2    A.   So there was actually -- so this division lives within the

3    EPA's Office of Resource and Development.

4         Last fall we had a reorganization.  There used to be

5    something called the IRIS division.  I used to direct that.

6    Now that division is gone and we have CPAD, which continues to

7    produce IRIS risk assessments along with other assessment

8    products.

9    Q.   Got you.  EPA's mission is to protect human health and the

10   environment.  That's correct; right?

11   A.   Yes.

12   Q.   And the IRIS hazard assessments help to support this

13   mission; is that correct?

14   A.   The IRIS assessments include both hazard assessment, as

15   well as dose response.

16        And correct, these are considered core scientific

17   foundation for the decision-making within the agency.

18   Q.   And so the -- the IRIS hazard assessment and dose response

19   assessments are used not just by IRIS, but by many offices and

20   divisions within the EPA; is that correct?

21        MS. CARFORA:  Your Honor if I could -- Mr. Connett is

22   leading, and I appreciate it is his witness, but I do

23   appreciate that, you know, it's a fact witness.

24        I just want to make a record on this.  I don't know that

25   she has been -- I don't know that he's appropriately qualified

1   her as the witness that he needs to lead.

2        THE COURT:  All right.  I'm -- unless she's

3   qualified -- I've allowed a lot of leading, because they have

4   been expert witnesses, but we're going to go to more

5   traditional questions.

6        MR. CONNETT:  Well, your Honor, this is -- and I use

7   this term strictly in the legal sense.  But from a legal

8   standpoint, since the witness is an employee of the defendant,

9   I think that would traditionally be considered an adverse

10  witness.

11       THE COURT:  Well, I don't know.  It probably depends

12  on the nature of the testimony.

13     Do you have a response to that, Ms. Carfora, whether

14  Dr. Thayer is an adverse witness?

15       MS. CARFORA:  It's his case-in-chief, Your Honor, and

16  he has called her as a fact witness.  He subpoenaed her.  We

17  challenged the subpoena in discovery and lost.  It's his

18  witness, Your Honor.

19       THE COURT:  All right.  I'm going to allow some

20  leeway, but perhaps not as much as I allowed before.  So if you

21  would watch your questions, I'd appreciate it.

22     Thank you.

23  BY MR. CONNETT

24  Q.   So, Dr. Thayer, the IRIS hazard assessments are -- and

25  dose response assessments are not just used by IRIS; is that

THAYER - DIRECT / CONNETT

1   correct?

2   **A.**   Correct.  So IRIS produces those, but IRIS does not

3   regulate -- we don't have that function.  So we produce those

4   to help others make decisions.

5        But I think it's worth pointing out that within the

6   agency, other parts of the agency produce their own

7   assessments.  Because they are very tailored toward a very

8   specific decision-making context.

9   **Q.**   Prior to your current position --  strike that.

10       Prior to your position at the EPA, you worked at the

11  National Toxicology Program; correct?

12  **A.**   Correct.

13  **Q.**   And during your time at the NTP, you were the principal

14  author of the NTP's 2016 systematic review of the animal

15  studies of fluoride and learning and memory; is that correct?

16  **A.**   Yes.  I would say that I was a lead, along with Jean

17  Harry.  I provided all of the systematic review expertise, but

18  I am not an expert in animal neurotoxicity, but Jean is.  So I

19  would say we were co-leads.

20  **Q.**   And you have a PhD in biological sciences; correct?

21  **A.**   Correct.

22  **Q.**   Now, Dr. Thayer, is it correct that EPA considers a

23  subpopulation to be susceptible to a toxic agent if exposure

24  occurs during a period of sensitivity?

25           **MS. CARFORA:**  Objection.  Leading.

1           THE COURT:  I'll allow it.  You can go ahead and

2    answer.

3    A.   I would say that when EPA -- when the IRIS program is

4    thinking about driving toxicity values, we develop values that

5    are considered protected for the population, including

6    susceptible subpopulations, which, you know, developmental --

7           (Court reporter clarification due to audio

8            interference.)

9    A.   So developmental aged populations, infants, children,

10   would be one type of sensitive subpopulation that a toxicity

11   value should protect.

12   Q.   And if exposure occurs during a period of sensitivity,

13   does EPA consider that life stage to be a susceptible

14   subpopulation?

15   A.   Yes.  I guess I'm hesitating because I think typically,

16   unless we know something about the exposure context, we would

17   probably assume that there was developmental exposure, unless

18   there was something specific about the exposure.  For example,

19   it was only occupationally relevant.  And you might think about

20   pregnant women.

21          MR. CONNETT:  At this time, Your Honor, I would like

22   to introduce deposition testimony.

23          THE COURT:  Is this for impeachment purposes or what?

24          MR. CONNETT:  Yeah.

25          THE COURT:  Why don't you state what --

 1              MR. CONNETT:  It's Page 109, Lines 8 to 15.

 2              THE COURT:  Okay.  Let counsel take a look that.

 3              MS. CARFORA:  I have no objection right now, Your

 4    Honor.  Thank you.

 5              THE COURT:  All right.  Go ahead.

 6              MR. CONNETT:  Mr. Anderson, can you bring up

 7    Page 109, and Lines 8 through 15.

 8         (Document displayed)

 9    BY MR. CONNETT

10    Q.   And I will read it.  It starts by saying:

11         "QUESTION:  A population subgroup is susceptible if

12         exposure occurs during a period of sensitivity?

13         "ANSWER:  Yes.

14         "QUESTION:  And you would agree with that statement?

15         "ANSWER:  Yes."

16         You can take that off, Mr. Anderson.

17         (Document removed from display)

18    Q.   And, Dr. Thayer, is the developing brain more vulnerable

19    than the adult brain?

20    A.   Yes.

21    Q.   And is the brain more vulnerable to toxic agents during

22    the in utero period than during adulthood?

23    A.   Yes.

24    Q.   And is the brain more vulnerable to toxic agents during

25    infancy than during adulthood?

THAYER - DIRECT / CONNETT

1   **A.**   Yes.

2   **Q.**   And is one of the reasons why the brain during the fetal

3   and infant life stages, is one of the reasons why the brain is

4   more vulnerable during that time because the blood-brain

5   barrier is not yet fully developed?

6           **MS. CARFORA:**   Your Honor, I'm going to object to this

7   line of questioning because Dr. Thayer is a fact witness.

8   She's not being call as an expert witness.

9        And I'm not sure if he's asking her if these are facts

10  that she's -- or if he's questioning her as a witness.  And I'm

11  not sure that Dr. Thayer knows that either.

12          **THE COURT:**   All right.  What is the answer to that?

13  It sounds like you're getting into expert testimony.

14          **MR. CONNETT:**   Well, these are background principles

15  that EPA uses in risk assessment.

16          **THE COURT:**   Well, then you can ask about the

17  background principles, but you've asked it as an absolute

18  question as if she were an expert witness.

19          **MR. CONNETT:**   Well, Your Honor, I do think that these

20  are subject matters that come squarely within EPA risk

21  assessment, understanding the susceptibilities of early life

22  stages and why there are susceptibilities.  I think's within

23  Dr. Thayer's orbit in terms of the work that the IRIS division

24  does.

25          **THE COURT:**   Well, but you have to lay a foundation.

THAYER - DIRECT  / CONNETT

 1  If you're going to ask these questions about her opinion, then

 2  you're going to have to qualify her as a witness.  You're going

 3  to have to lay a foundation.

 4      If you want to ask her about how EPA considers it, that's

 5  a different question.  That's a fact question.

 6          **MR. CONNETT:**  Okay.

 7  **BY MR. CONNETT**

 8  **Q.**  Dr. Thayer, EPA has recognized that in the absence of the

 9  blood-brain barrier, toxic agents can freely enter the brain;

10  correct?

11  **A.**  More freely, yes.

12  **Q.**  And the EPA has also recognized that the neonatal stage of

13  life is a period of rapid development of the nervous system and

14  is considered a critical window of development; is that

15  correct?

16  **A.**  Correct.

17  **Q.**  And what does it mean to be a critical window of

18  development?

19          **MS. CARFORA:**  Objection.  Foundation.

20          **THE COURT:**  Lay a foundation.

21  **BY MR. CONNETT**

22  **Q.**  Well, what does EPA mean when it says that the neonatal

23  stage of life is a critical window of development?

24  **A.**  Well, critical window, in general, is when there is a lot

25  of maturation of the system.  The idea is that there is a lot

THAYER - DIRECT / CONNETT

1   of development happening and if there is a provocation or

2   insult during that critical window, then the effect may be more

3   permanent.

4   **Q.**   You would agree, Dr. Thayer, that we should pay careful

5   attention to human exposures to toxic agents that occur during

6   the first six months of life; right?

7            **MS. CARFORA:**  Objection.  Calls for an opinion.

8            **THE COURT:**  Sustained.  Rephrase it.

9   **BY MR. CONNETT**

10  **Q.**   Does EPA agree, Dr. Thayer, that we should be paying

11  carefully attention to human exposures to toxic agents that

12  occur occur during the first six months of life?

13  **A.**   Exposures during development are a concern, yes.

14  **Q.**   And EPA has recognized -- strike that.

15       Has EPA recognized that given the longer period of brain

16  development in humans, as compared to rodents, and the higher

17  importance of cognitive function in humans that it is

18  appropriate to consider that humans may be more sensitive than

19  rodents to the neurotoxic effects of environmental chemicals?

20  **A.**   I'm not sure I can answer that one in terms of the "more

21  toxic," the comparison between the species.

22           **MR. CONNETT:**  At this time, Your Honor, I would like

23  to show the witness Plaintiff's Exhibit No. 18.

24           **THE COURT:**  What is that?

25           **MR. CONNETT:**  This is an IRIS assessment of the -- of

THAYER - DIRECT / CONNETT

1    a chemical.

2              **THE COURT:**  Okay.

3              **MS. CARFORA:**  Mr. Connett, this is previously

4    admitted; correct?

5              **MR. CONNETT:**  Yes.  This is a pre-admitted document,

6    yes.

7              **THE COURT:**  Okay.

8              **MR. CONNETT:**  Mr. Anderson, can you put that on the

9    screen?

10        (Document displayed.)

11             **MR. CONNETT:**  And it's Page 6 of the PDF.

12   **BY MR. CONNETT**

13   **Q.**   So I'm going to read from this document here.  It says:

14             "Given the longer period of brain development in

15        humans, as compared to rodents, and the higher

16        importance of cognitive function, it is appropriate to

17        consider that humans may be more sensitive than

18        rodents in the absence of specific data."

19        The EPA has recognized this principle, correct,

20   Dr. Thayer?

21   **A.**   That's what -- what you're looking at here is an IRIS

22   assessment that's undergone peer review.  So, yes, that

23   statement is included in the document in the context of

24   application of an uncertainty factor.

25   **Q.**   Okay.

 1              MR. CONNETT:  You can take the screen down, Mr.

 2    Anderson.

 3         (Document removed from display)

 4    BY MR. CONNETT

 5    Q.   Now, Dr. Thayer, hazard and risk are distinct concepts; is

 6    that correct?

 7    A.   Correct.

 8    Q.   Am I correct in understanding that the hazard inquiry is

 9    focused on whether a chemical can cause an effect at some level

10    of exposure?

11    A.   Correct.

12    Q.   And by contrast, the risk inquiry is on whether at a given

13    dose or at a given exposure, whether that dose is unacceptably

14    close to the estimated hazard level; is that fair?

15              MS. CARFORA:  Objection.  There is no foundation for

16    this question.

17         Dr. Thayer has already testified that they do only two

18    parts of the risk assessment, hazard and dose response.  And

19    she has not -- she has said that they do not consider risk

20    portion of the -- of the risk assessment.

21              THE COURT:  Well, I'll allow counsel to try to lay a

22    foundation, if he can, on that.

23         So you can lay a foundation on the risk question.

24    BY MR. CONNETT

25    Q.   Dr. Thayer, when the IRIS division produces a hazard and

THAYER - DIRECT / CONNETT

1    dose response assessment, are you aware that other offices at

2    EPA will then take that data and compare it to human exposures

3    to make an assessment of risk?

4    **A.**   Yes.

5    **Q.**   And so --

6          **MR. WATERS:**   Then I'll return to my question, Your

7    Honor, at this time unless Your Honor believes that more

8    foundation is --

9          **THE COURT:**   You might ask her more about what her

10   experience is in that regard, so I know that there is a

11   foundation.

12   **BY MR. CONNETT**

13   **Q.**   Dr. Thayer, are you generally family with how EPA assesses

14   whether the comparison of hazard to exposure indicates a risk?

15   **A.**   Generally, but there is often a lot of specifics because

16   they are often to -- very targeted toward a specific

17   decision-making context.  And so those details would be beyond

18   my knowledge.

19   **Q.**   Okay.  Now, EPA recognizes that when doing a hazard

20   assessment, if there is consistency in findings across human

21   studies dealing with different populations, that this

22   consistency generally increases the confidence that a hazard

23   exists; is that correct?

24   **A.**   Correct.

25   **Q.**   And similarly, consistency in results across animal

THAYER - DIRECT / CONNETT

1 studies generally increases confidence that a hazard exists; is

2 that correct?

3 **A.**   At first glance.  But actually for this question and the

4 one you just asked me -- and both of those are in a sense what

5 we would do prior to evaluating a pattern of findings, so

6 consistency, is we would do an analysis of each study to look

7 for biases.

8      And so assuming that you're dealing with an evidence base

9 that doesn't have biases of concern, then you would have more

10 confidence with this thought consistent pattern.

11      It's also possible, though, that you may find consistent

12 patterns, but there may be a bias.  And so one example is that

13 in the context of an experimental animal study, we know through

14 empirical evidence that if there is not -- if there is not

15 randomization to treatment groups, then the bias tends to be --

16 you would tend to find a larger effect size.  So that's a

17 systematic source of bias.  You don't randomize.  You tend to

18 finalize your effect sizes.

19      So it's possible, in the context in a group of

20 experimental animal studies, you could find studies

21 consistently saying that there was an effect; but if none of

22 them are randomized, then you might -- you might have more

23 measured confidence.

24 **Q.**   And you would -- EPA recognizes that animal studies allow

25 you to draw causal inferences; correct?

 1  **A.**    Yes.  And they are experimental.  So that's...

 2  **Q.**    And even in the --

 3           **THE COURT:**  Wait a minute.  Could you explain that?

 4           **THE WITNESS:**  Yes.  So they are experimental in

 5  design.  So that means that specifically designed to

 6  pro-causality.  You control the dose.  You make sure that that

 7  exposure happens before you look at the end point.  So you have

 8  a lot of control over the experimental conditions.

 9           **THE COURT:**  All right.

10           **THE WITNESS:**  So it's easier to reach causal

11  conclusions.

12           **THE COURT:**  Thank you.

13       And you're saying that is common in animal studies?

14           **THE WITNESS:**  In an experimental study, where you, as

15  investigator, are administering the dose.  So you know exactly

16  how much the animals are getting.

17           **THE COURT:**  All right.

18           **THE WITNESS:**  So the experiment was designed whether

19  it's an animal study.  It could also be a human study.

20       So a lot of clinical studies in people also have this

21  randomization feature.

22       So it's an experimental study.  It can apply to animal

23  models or people.  You can have -- you don't typically deal

24  with experimental human studies in environmental health, but

25  you certainly do in clinical medicine.

1          THE COURT:  All right.  Thank you.

2   BY MR. CONNETT

3   Q.    And even in the complete absence of human data, EPA does

4   use animal data to establish reference doses to protect the

5   public; is that correct?

6   A.    Correct.

7   Q.    And, Dr. Thayer, based on your own review of the animal

8   literature on fluoride, you would agree that it's reasonable to

9   conclude that fluoride damages the brain at some level of

10  exposure; correct?

11          MS. CARFORA:  Objection.  Leading.

12          THE COURT:  I'll allow it.  Go ahead.

13  A.    Well, in the 2016 report we reached a conclusion of low to

14  moderate level of evidence for effects on learning and memory.

15          So I would say, in particular, it was stronger for animals

16  exposed in adulthood, looking at learning and memory task, in

17  terms of the moderate.

18          But I would say that moderate is typically a descriptor

19  that you would use when, yes, there is some -- some hazard

20  there.

21  BY MR. CONNETT

22  Q.    And you, yourself, agreed at your deposition that it's

23  reasonable to conclude that fluoride damages the brain at some

24  level of exposure; correct?

25  A.    Yes.

 1              MS. CARFORA:  Objection to -- objection to opinion

 2     testimony.

 3              THE COURT:  Overruled.  We're talking about animals.

 4     We're talking about animals -- or humans?

 5              MR. CONNETT:  Correct.

 6              THE COURT:  -- or humans?

 7         Okay.

 8     BY MR. CONNETT

 9     Q.   And based on the animal studies on fluoride neurotoxicity

10     that you have reviewed, you agree that the animal data supports

11     the biological plausibility of fluoride causing neurotoxic

12     effects in humans; correct?

13     A.   Yes.

14     Q.   Okay.  So I'd like to ask you a few questions about the

15     systematic review that you conducted, along with your

16     colleagues at the NTP back in 2016.  Okay?

17         You published the U.S. version of this review in 2016;

18     correct?

19     A.   Yes.

20     Q.   And in this review NTP excluded any animal study if it did

21     not specifically investigate some outward indication of

22     behavior, like learning and memory; is that correct?

23     A.   Correct.

24     Q.   And so -- so if -- if the study, if an animal study was --

25     was -- sorry, strike that.

1          If an animal study found adverse changes going on inside

2     the brain of fluoride-treated animals, but did not investigate

3     outward signs of behavior, those studies would have been

4     excluded by NTP's review; is that correct?

5     **A.**    That's correct, in part.   In the 2006 National Research

6     Council report, they had already synthesized, evaluated some of

7     those inside-the-brain studies and indicated that there was

8     evidence of something there that should be further

9     investigated.

10          So the reason why we did not include those is because we

11     were really trying to probe whether some of those observations

12     were used other than functional effects on the brain.

13     **Q.**    Well, functional effects on the brain or functional

14     effects on behavior?

15     **A.**    Functional effects on behavior.

16     **Q.**    Now, as you mentioned, despite excluding the

17     neuroanatomical and neurochemical studies, the NTP still

18     concluded that there is moderate evidence that fluoride impairs

19     learning and memory in adult rodents; is that correct?

20     **A.**    Yes.   And, in particular, at the -- at the higher exposure

21     levels.

22     **Q.**    And in your own terms moderate evidence of neurotoxicity

23     means we think there is something happening here, but we need

24     to do further research to clarify things; correct?

25     **A.**    Correct.

THAYER - DIRECT  / CONNETT

1   Q.   And, Dr. Thayer, you would agree that it is a reasonable

2   hypothesis that if fluoride can cause learning impairments in

3   adults, it will also -- it could also cause effects in the

4   fetus and the neonate; is that correct?

5            MS. CARFORA:  Objection.  He's calling for expert

6   testimony.

7            THE COURT:  All right.  Please rephrase.

8   BY MR. CONNETT

9   Q.   Does EPA consider it to be a reasonable hypothesis that if

10  a chemical agent can cause learning impairments in adult

11  organisms, that it can also cause learning impairments in the

12  more vulnerable fetus community?

13  A.   Yes.

14  Q.   Now, the major limitation that the NTP identified in the

15  animal data on fluoride and learning and memory is that the

16  studies did not rule out that fluoride's reported affects on

17  learning and memory could be the result of fluoride-causing

18  deficits in motor or sensory function; is that correct?

19  A.   Correct.  We felt like we could not completely tease apart

20  those different types of neurobehavioral outcomes.

21  Q.   But you would agree, Dr. Thayer, that both effects on

22  learning and memory, as well as effects on motor and sensory

23  system, that all of those effects are neurotoxic; correct?

24  A.   Correct.  And the context -- you're familiar with the

25  report.  You know this.

**THAYER - DIRECT / CONNETT**

1    We focused -- we split those apart in terms of the

2   learning and the memory because part of the analysis was

3   specifically trying to sort of explore some of the concerns

4   that had been raised about humans and IQ.

5   **Q.**   Now, as you've, I think, already mentioned, based on the

6   animal data that was available at the time the NTP completed

7   its review in 2016, the NTP had less confidence in the

8   developmental studies; is that correct?

9   **A.**   Correct.

10  **Q.**   And one of the main reasons for the NTP's lesser

11  confidence in the developmental studies is that there were much

12  fewer developmental studies at that time; correct?

13  **A.**   That's correct.  Also, there was a particular type of --

14  of bias in terms of the study evaluation that was applicable,

15  that we saw in the developmental studies that was not

16  applicable to the adult studies.

17      In particular, when you're doing a study looking at

18  developmental toxicity, whether it's narrow toxicity, any kind

19  of toxicity, you need to be vigilant that you control for

20  litter effects.

21      The idea is that animals in the same litter tend to

22  respond more similarly.  And control for litter effects can be

23  done statistically or can be done experimentally.

24      But we saw that there was sort of a lack of control for

25  litter effects in -- also in a smaller pool of studies looking

 1    at developmental exposure.

 2    Q.    And if studies published subsequent to the NTP review

 3    dosed animals prenatally and controlled for litter effects and

 4    still found developmental neurotoxicity, would that increase

 5    your confidence that fluoride is, in fact, a developmental

 6    neurotoxic?

 7              MS. CARFORA:   Objection.   Calls for an opinion.

 8    Calls for expert testimony.

 9              THE COURT:   Sustained.

10    BY MR. CONNETT

11    Q.    Now, you had mentioned the methodological limitation of

12    not controlling for litter effects.   And the NTP also

13    identified some other methodological limitations in the animal

14    studies; correct, Dr. Thayer?

15    A.    Correct.

16    Q.    And these limitations included sometimes a lack of

17    information on fluoride in the rodent trial?

18    A.    Correct.   Although I don't -- in terms of limitations, I

19    don't believe that -- those were more reporting.   They would

20    have been more nice to have, helpful.

21          But the lack of control for litter was a pretty

22    significant one in terms of how do you interpret the findings.

23    Q.    And just to be clear, of all the methodological

24    limitations that the NTP identified in that review, the NTP did

25    not identify systemic toxicity as reflected by body weight

THAYER - DIRECT / CONNETT

1  changes as being a possible explanation for fluoride's

2  neurotoxic effects; correct?

3  A.   I believe it was -- it's been a while.  You're asking me a

4  pretty detailed question that I haven't thought about in a few

5  years.

6       But I believe in quite a few of those studies, the

7  information was not reported.  Specifically, you would want to

8  know whether there was indication of systemic toxicity in the

9  dam, in the mother, and body weight is one.  But I believe that

10  in many cases it wasn't reported.

11  Q.   Right.  But if we were to open up the NTP review, is it

12  your testimony that we could find in there a discussion of

13  systemic toxicity being a possible cause of the reported

14  effects of fluoride on neurotoxicity?

15  A.   I honestly don't -- I don't know.  I don't know.  I -- if

16  it's there, it doesn't take up much space, I believe.

17  Q.   Okay.

18            THE COURT:  What is "systemic toxicity"?  When you

19  use that term, what does that mean?

20            THE WITNESS:  So it's not specific.  And so it's

21  sorts of affecting many parts of the body.

22       So, for example, if there is a certain amount of exposure

23  that's toxic, you expect to see body weight loss because a lot

24  of -- a lot of systems are being impacted.  So I would say it's

25  sort of -- it's not specific.

 1              THE COURT:  So it's referring to a phenomenon that

 2   is -- well, systemic, widespread?

 3              THE WITNESS:  Yes.  And what it does expressly in the

 4   context of a developmental exposure study is, let's say, the

 5   mom has systemic toxicity.  Mom is sick.

 6        So how do you now interpret findings on the offspring?  Is

 7   it because of the chemical, or is it because mom was sick?

 8        So typically when you're designing a study, if you see

 9   evidence of systemic toxicity in the mother, then it layers

10   your interpretation of the findings in the offspring.

11   BY MR. CONNETT

12   Q.   And by implication, Dr. Thayer, if you look at an animal

13   study, a series of animal studies, that do report body weight

14   and no reported changes in body weight are found at the doses

15   where impact on learning and memory is observed, does that

16   increase your confidence that the effect is a direct one?

17   A.   Yes.  You -- typically that would be expressed as you

18   ruled out indication of maternal systemic toxicity.

19   Q.   Now, the animal studies --

20              THE COURT:  Hold on a second.

21        So body weight would be an indication, in other words, of

22   systemic toxicity.

23              THE WITNESS:  It's a widely used indication, yes.

24              THE COURT:  Thank you.

25

 1  BY MR. CONNETT

 2  Q.   Now, the animal studies on fluoride neurotoxicity that the

 3  NTP reviewed generally used fluoride concentrations in water

 4  that exceed the concentration of fluoride added to water in

 5  fluoridation programs; is that correct?

 6  A.   Correct.

 7  Q.   And the concentration of fluoride added to water is .7

 8  parts per million; correct?

 9  A.   Correct.

10  Q.   And would you agree, Dr. Thayer, that .7 parts per million

11  of fluoride in the drinking water for rats and mice is not the

12  equivalent of .7 ppm fluoride in the drinking water of humans;

13  correct?

14          MS. CARFORA:  Objection to the form.

15          THE COURT:  Overruled, if you understand that

16  question.  If you don't, we'll have him rephrase it.

17  A.   I think it's generally accepted that a rodent would have

18  to be treated with a higher dose level of fluoride in drinking

19  water to model the human exposure.

20  BY MR. CONNETT

21  Q.   And you would agree that to determine the human equivalent

22  dose of a dose given to animals, that you need to consider

23  differences in toxicokinetics and differences in toxicodynamics

24  between the animals and humans; correct?

25  A.   Correct.

 1                MS. CARFORA:  Calls for expert testimony, your Honor.

 2                THE COURT:  Again, if you could phrase those in terms

 3      of either EPA practice or knowledge.

 4                MR. CONNETT:  Yes.

 5                THE COURT:  Her understanding that, that is.

 6      BY MR. CONNETT

 7      Q.   Dr. Thayer, the EPA recognizes that to determine the human

 8      equivalent dose of a dose given to animals, that you need to

 9      consider differences in both toxicokinetics and toxicodynamics

10      between animals and humans; is that correct?

11      A.   Correct.

12      Q.   Just to be clear, in the NTP's 2016 analysis the NTP did

13      not do that analysis; right?  The NTP did not seek to assess

14      the -- the difference in toxicokinetics and toxicodynamics

15      between rodents and humans; is that correct?

16      A.   That's correct.

17      Q.   As of today, Dr. Thayer, you would agree that there is a

18      lot of human data available on fluoride neurotoxicity; correct?

19      A.   Yes.  It's not a literature that I follow, but, yes, I'm

20      aware there's -- I've seen the literature.

21      Q.   And you would agree that prospective cohort studies are

22      the ideal study design to investigate the impact of

23      environmental chemicals on human health; right?

24                MS. CARFORA:  Objection.  Same issue.

25                THE COURT:  Sustained.

1    BY MR. CONNETT

2    Q.   Dr. Thayer, EPA recognizes that prospective cohort studies

3    are the ideal study design to investigate the impact of

4    environmental chemicals on human health; is that correct?

5    A.   They are often considered the most feasible and sort of

6    strongest observational study that you can have.

7    Epidemiologists in my group would still carefully evaluate

8    those studies for potential bias.

9              MR. CONNETT:  Your Honor, I'd like to introduce

10   deposition testimony.

11             THE COURT:  Is this for impeachment?

12             MR. CONNETT:  Yes.

13             THE COURT:  Why don't you identify?

14             MR. CONNETT:  It's Page 162, Line 25 to 163/9.

15             THE COURT:  All right.  Give counsel a chance to look

16   at it.

17       (Brief pause.)

18             MS. CARFORA:  I'm sorry.  Mr. Connett, what was the

19   line number?

20             MR. CONNETT:  162/25 to 163/9.

21             MS. CARFORA:  Your Honor, we object because it calls

22   for expert testimony.

23             THE COURT:  All right.  Let me bring it up here.

24             MS. CARFORA:  Also, object for foundation.

25             MR. CONNETT:  I'm sorry, Your Honor.  I apologize.  I

THAYER - DIRECT / CONNETT

 1  got the wrong lines.  It's 162/19 through 163/9.

 2          MS. CARFORA:  Same objection.

 3      (Brief pause.)

 4          THE COURT:  Well, you need to lay a foundation that's

 5  not based on expert opinion, but her knowledge of EPA

 6  practices, et cetera, et cetera.

 7  BY MR. CONNETT

 8  Q.   Based on your knowledge, Dr. Thayer, of how EPA considers

 9  epidemiological data when assessing hazard, have you -- have

10  you developed a familiarity with the types of study designs

11  that EPA finds to be most informative for assessing hazard?

12  A.   EPA actually doesn't have guidance on that.  Not that I'm

13  aware of.  Not specific guidance.

14      You will find in certain assessment products, certainly

15  from those from my program, that, you know, we outline how we

16  approach epidemiology studies in terms of the IRIS system.  But

17  that doesn't necessarily reflect all practices across the

18  agency.

19      So, again, I'm not aware of any EPA level guidance that

20  speaks to what you're asking.

21  BY MR. CONNETT

22  Q.   Fair enough.  Thank you for the clarification.

23      What about with IRIS?  When IRIS looks at epidemiological

24  data and -- would it give -- does it give greatest weight, all

25  else being equal, to prospective cohort studies?

**THAYER - DIRECT / CONNETT**

1  **A.**   Actually, it's -- it's not the best study design.  It

2  really, really is embedded in analysis of the bias, and then

3  looking across studies.

4      So it's typically not going to be the best study design,

5  the single study, especially within epidemiology because you

6  can have different strength and weaknesses within the study or

7  a cross study, give you a bigger picture than sort of just

8  certainly the study designed alone.

9      My -- the epidemiology in my group would not just say it's

10  the best study because it's reflective.  It certainly is a --

11  it's -- it's -- it's a study design for observational study,

12  but absent doing a full analysis to include the bias, it

13  would -- the interpretation would not be based on --

14      (Court reporter clarification due to audio

15       interference.)

16  **A.**   ...solely on study design.

17      It's also possible that you could have less ideal

18  observational studies, but you can make inferences about the

19  temporality of the exposure and the outcome, and they can also

20  be quiet informative.

21  **Q.**   So when you're looking at any particular prospective

22  cohort study, when EPA is looking at any particular prospective

23  cohort study, is it fair to say that EPA looks to things like:

24  Did they control for potential confounders?  Did they have

25  individual measurements of fluoride exposure?  Did they have

 1   blinded examinations?  Did they scrutinize the dose response

 2   relationship?

 3       Are those the kinds of factors that EPA would look to to

 4   assess the quality of any given prospective cohort study?

 5           MS. CARFORA:  Objection, your Honor.  This is a

 6   compound nature.  It's just one question, I understand, but

 7   give Dr. Thayer the opportunity to, you know, tease out

 8   anything from there that she thinks doesn't belong.

 9           THE COURT:  Yeah.  That is a compound question.  I

10   think you need to rephrase that.

11           MR. CONNETT:  You know, Your Honor, I'll move on.

12           THE COURT:  Okay.

13   BY MR. CONNETT

14   Q.   Dr. Thayer, EPA recognizes that archives of biological

15   samples, including urine, provide critical information on the

16   prenatal determinants of disease and dysfunction in childhood

17   and adulthood; correct?

18   A.   It's an important exposure metric to do the analysis, yes.

19           MR. CONNETT:  Your Honor, I have no further questions

20   at this time.

21           THE COURT:  All right.  Thank you.

22       Anything on cross?

23           MS. CARFORA:  Your Honor, nothing from us on cross,

24   but we are going to reserve the right to call Dr. Thayer back

25   to the stand on Friday.

 1          THE COURT:  All right.  Thank you.

 2          MS. CARFORA:  Thank you.

 3          THE COURT:  Dr. Thayer, you are excused, at least for

 4  today.  Thank you for participating.

 5          THE WITNESS:  Okay.  Thank you.

 6          THE COURT:  Appreciate it.

 7      (Witness excused.)

 8          THE COURT:  Okay.  We still have about an hour left.

 9  You may call your next witness for the plaintiffs.

10          MR. CONNETT:  Yes, Your Honor.  At this time

11  plaintiffs call Dr. Kathleen Thiessen.

12          THE COURT:  Okay.

13          THE CLERK:  I am promoting Dr. Thiessen into the

14  well.

15          MS. BHAT:  Good morning, Your Honor.  This is Simi

16  Bhat for EPA.

17      I would just like to flag that I think I'm on a little bit

18  of a delay here in my Zoom call.  So if the witness could be

19  instructed to just provide me a bit of time to object before

20  she commences her answer.

21          THE COURT:  All right.

22      Okay.  Good afternoon, Dr. Thiessen.

23          THE WITNESS:  Good afternoon.

24          THE COURT:  Good.  We can hear you.  Hopefully, you

25  can hear us; correct?

 1              THE WITNESS:  Yes.

 2              THE COURT:  So Ms. Bhat, from the EPA, apparently is

 3     having a little bit of delay in her receipt of audio and video,

 4     and so we want to make sure she has a chance to object to any

 5     question.

 6         So if you could just go at a slightly slower pace than

 7     normal, that will make sure that she has a chance.  And it

 8     will, also, make sure our court reporter has a chance write

 9     everything down.

10              THE WITNESS:  Yes, sir.

11              THE COURT:  Thank you.

12         Angie, if you could administer the oath, please.

13                          **KATHLEEN THIESSEN**,

14     called as a witness for the Plaintiff, having been duly sworn,

15     testified as follows:

16              THE WITNESS:  I do.

17              THE CLERK:  Thank you.

18              THE COURT:  All right, counsel.

19                          **DIRECT EXAMINATION**

20     BY MR. CONNETT

21     Q.   Good afternoon, Dr. Thiessen.

22     A.   Good afternoon.

23     Q.   What type of scientist are you, Dr. Thiessen?

24     A.   I'm a risk assessment professional.

25     Q.   And what is the Oak Ridge Center for Risk Analysis?

THIESSEN - DIRECT  / CONNETT

1   A.   We do a variety of human health risk assessments and

2   occasional environmental risk assessment.

3   Q.   And who are some of the clients that the Oak Ridge Center

4   for Risk Analysis serves?

5   A.   We serve a variety of government and private clients.  Our

6   government clients include the National Institute for

7   Occupational Safety and Health, the National Cancer Institute,

8   the Centers for Disease Control and Prevention.

9        They have included the EPA, although that's been a minor

10  one and not recently.  The National Research -- sorry, wrong

11  letters.  The Nuclear Regulatory Commission.  There are and

12  have been some others.

13  Q.   Dr. Thiessen, during your time working at the Oak Ridge

14  Center for Risk Analysis, have you done work for the Centers

15  for Disease Control and Prevention?

16  A.   Yes.

17  Q.   Can you describe for the Court some of the work that

18  you've done for the CDC?

19  A.   I did more than 15 years a series of projects involving

20  the International Atomic Energy Association.  I was kind of

21  CDC's person involved in these programs at the IAEA.

22  Q.   What is the IAEA?

23  A.   The International Atomic Energy Association -- I'm sorry,

24  Agency.  International Atomic Energy Agency.

25  Q.   Now, I -- I gather you do have a disagreement with one of

1   the policies that the CDC has promoted; is that correct?

2   A.    That's correct.

3   Q.    And what is that policy?

4   A.    The CDC recommends water fluoridation for the purpose of

5   preventing dental caries, and I disagreed with that.

6   Q.    Well, let's talk about some of your background in research

7   on fluoride.  Okay?

8   A.    Okay.

9   Q.    What is the first time, Dr. Thiessen, that you studied the

10  scientific literature on fluoride?

11  A.    In the 1980's, when I was an employee of Oak Ridge

12  National Laboratory, I was assigned to do a report for the EPA

13  on the health effects of hydrogen fluoride.  That turned out to

14  be hydrogen fluoride and related compounds.  And produced -- it

15  did result in an EPA report.

16  Q.    Now, in -- earlier today the Court has heard testimony

17  from the representative of the CDC saying that the National

18  Research Council's 2006 report on fluoride is the most

19  comprehensive review of fluoride toxicity ever done.

20        Are you familiar with that review, Dr. Thiessen?

21  A.    Yes, I am.

22  Q.    And how -- how are you familiar with that report?

23  A.    I was a member of the committee that wrote that report.

24  Q.    Did the NRC invite you to be a member of that committee?

25  A.    Yes.

**THIESSEN - DIRECT  / CONNETT**

1  Q.   And would it be fair to say that the NRC requires a high

2  level of relevant expertise among the scientists it invites to

3  author NRC's reports?

4  A.   Yes.  And being asked to be on a National Research Council

5  committee is an honor.

6  Q.   And at the time that the NRC invited you to be a member of

7  the committee, did you already have some concerns about the

8  potential impact of fluoridation on human health?

9  A.   Yes.

10  Q.   And by the time you finished working on the NRC report,

11  did you have any additional concerns about the potential impact

12  of fluoridation on human health?

13  A.   Yes.  Additional concerns and stronger concerns.

14  Q.   About how much of the NRC report do you estimate that you

15  wrote?

16  A.   Probably close to one-third of the it.

17  Q.   And did the NRC do an exposure assessment for fluoride?

18  A.   Yes.

19  Q.   And did you help write the exposure assessment?

20  A.   I wrote most of it.

21  Q.   Did the NRC have a section on fluoride's effects on

22  thyroid function and other endocrine effects?

23  A.   Yes.

24  Q.   And who wrote that section?

25  A.   I wrote nearly all of it.

THIESSEN - DIRECT  / CONNETT

1   Q.   Did you write the section on neurotoxicity?

2   A.   No.

3   Q.   Did the NRC report undergo a substantial peer review?

4   A.   Yes.  And there is a list of the peer reviewers in the

5   report.

6   Q.   And after completing your work on the NRC's 2006 review,

7   did the NRC invite you to serve on any additional NRC

8   committees?

9   A.   Yes.  I was invited to serve on one additional committee.

10  Q.   And did that committee review any review of fluoride?

11  A.   That committee reviewed several chemicals in the context

12  of air pollution, air contaminants on submarines, and one of

13  the contaminants in the list was hydrogen fluoride.

14  Q.   And did the NRC ask you to write some of the fluoride

15  section?

16  A.   I wrote a lot of the fluoride section, yes.

17  Q.   Now, Dr. Thiessen, you and I have communicated over the

18  years; correct?

19  A.   Yes.

20  Q.   How would you describe the nature of our communications?

21  A.   Mostly you have sent me papers from time to time.  I have

22  sent you papers from time to time.  We have discussed things on

23  occasion.  It's been a mutually beneficial association over the

24  years.

25  Q.   I see you have -- and I've been to your office before, so

THIESSEN - DIRECT  / CONNETT

1   I know.  But fair to say you have a lot of papers in your

2   office?

3   A.   Yes.

4   Q.   Fair to say that over the years you've collected quite a

5   few papers on fluoride?

6   A.   That's a fair statement, yes.

7   Q.   And I sent you some papers on fluoride as part of your

8   review in this case; correct?

9   A.   Yes.

10  Q.   And were you familiar with some of the papers that I sent

11  you in this case?

12  A.   Many of them I already knew about, yes.

13  Q.   Now, Dr. Thiessen, for your analysis in this case what

14  methodology did you use?

15  A.   Primarily I used EPA's Guidelines for Neurotoxicity Risk

16  Assessment.

17  Q.   And why did you use the Guidelines for Neurotoxicity Risk

18  Assessment?

19  A.   Because we were looking at a neurotoxicity endpoint and

20  that seemed to be the appropriate framework.

21  Q.   Is a risk assessment under the guidelines -- let me ask

22  you.  Did you conduct a formal systematic review in this case?

23  A.   I did not conduct something that would be considered a

24  formal systematic review, but a review under the Guidelines for

25  Neurotoxicity Risk Assessment is considered essentially the

 1  same thing, a sufficient review.

 2          **MR. CONNETT:**  Your Honor, at this time I'd like to

 3  show a demonstrative.

 4          **MS. BHAT:**  Your Honor, I've seen this demonstrative,

 5  and I am going to object to it as leading.  Nothing in this

 6  demonstrative, I think, has already been testified to by this

 7  witness.

 8          **MR. CONNETT:**  And, Your Honor, the demonstrative is

 9  simply asking for the definition of risk.

10          **THE COURT:**  Well, I -- this is a way to elicit

11  testimony from the witness?

12          **MR. CONNETT:**  It's just a way to facilitate -- I

13  mean, to make it -- I can go without the demonstrative.  I

14  thought it would be a way to make it clearer for the Court.

15          **THE COURT:**  Well, you can -- I think it's better

16  practice to elicit testimony.  If you want to put it up

17  afterwards in a summary or something, that might be more

18  appropriate.

19          **MR. CONNETT:**  Okay.

20  **BY MR. CONNETT**

21  **Q.**   Dr. Thiessen, I want to ask you as a risk assessment

22  scientist, what standard you used for assessing risk.  Because

23  ultimately this is a case about risk.

24          So let me ask you:  For a risk to exist at a given dose of

25  a chemical, for you to find there to be a risk, do you need, A,

 1  the dose to be unacceptably close to --

 2          MS. BHAT:  Objection, Your Honor.  I understand

 3  plaintiff's counsel is not finished with asking his question,

 4  but it seems to be quite a leading question.

 5          MR. CONNETT:  Your Honor, it's not a leading

 6  question.  I'm just going to give -- I'm going to ask -- I'm

 7  going to provide two definitions.  I'm going to ask the witness

 8  which definition of risk the scientist uses for her assessment.

 9          THE COURT:  Objection.  Relevance.  Go ahead.

10  BY MR. CONNETT

11  Q.   Dr. Thiessen, I'm going to give you two definitions of

12  risk, and I'm going to ask you which definition of risk you, as

13  a risk assessment scientist, uses.

14       The first definition is:  The dose must be unacceptably

15  close to the estimated hazard level.

16       The second is:  The dose must be demonstrated to cause the

17  hazard.

18       Which definition do you use?

19  A.   First one.  The dose -- if the dose is unacceptably close

20  to an exposure level that's been demonstrated to produce the

21  hazard, then that demonstrates a risk.

22  Q.   And have you had the opportunity during the course of your

23  career to read EPA risk assessments?

24  A.   Yes.

25  Q.   And in the EPA risk assessments you have read, what

1    standard of risk or what definition of risk has the EPA used?

2    A.    They've used the first one.

3    Q.    And have you had the opportunity, Dr. Thiessen, to read

4    some of EPA's draft risk evaluations under Section 6?

5    A.    Yes.

6    Q.    In the draft risk evaluations that you have read, what

7    standard of risk has EPA used?

8    A.    The first definition.  A dose or an exposure that's

9    unacceptably close to a level at which the hazard is seen.

10   Q.    So there's -- I'm going to show you --

11          MR. CONNETT:  Your Honor, at this time I'm going to

12   show the witness Plaintiff's Exhibit 47.  It has not been

13   pre-admitted, but at this time plaintiffs will admit it into

14   evidence.

15          THE COURT:  Is there an objection?

16          MS. BHAT:  One second, your Honor.  I'm just pulling

17   it up.

18       (Brief pause.)

19          MS. BHAT:  No objection, Your Honor.

20          THE COURT:  All right.  Go ahead.

21       (Trial Exhibit 47 received in evidence)

22   BY MR. CONNETT

23   Q.    Dr. Thiessen, I am --

24          THE COURT:  Can you explain for the record what this

25   is?

 1              **MR. CONNETT:**  Yes, Your Honor.  This is EPA's draft

 2    risk evaluation of Bromopropane.  And this is -- the chemical

 3    name is often cited as just BP.

 4              **THE COURT:**  Okay.

 5    **BY MR. CONNETT**

 6    **Q.**   Dr. Thiessen, I'm going to refer you here to Page 269.

 7    Can you see this on your screen?

 8        (Document displayed)

 9    **A.**   Yes.

10    **Q.**   So can you tell us briefly what this page is showing us?

11    **A.**   It's part of a table summarizing various conditions of use

12    and the risk determination corresponding to that condition of

13    use.

14    **Q.**   And for this condition of use, I see here that EPA found

15    it to present an unreasonable risk?

16    **A.**   That's what it says, yes.

17    **Q.**   And it's based on what -- what health effect is it based

18    on for non-cancer effects?

19    **A.**   It says:

20            "Developmental adverse effects resulting from

21        acute inhalation exposure and also cancer."

22    **Q.**   In the developmental effects it lists an MOE of 63 for

23    high end users; is that correct?

24    **A.**   That's what it says, yes.

25    **Q.**   And an MOE is a margin of exposure?

1    A.    Yes.

2    Q.    What does this -- so can you explain for the Court what

3    this 63 here represents?

4    A.    That's -- if you take the point of departure and divide it

5    by the anticipated human exposure, that calculation or that

6    quotient, it results in the MOE, the margin of exposure.

7          So basically it's saying that the human exposure is a

8    factor of 63 less than the point of departure.

9    Q.    And was the point of departure that EPA used for this case

10   derived from animal data?

11   A.    Yes.

12   Q.    Did EPA, in determining that this condition of use

13   presented a hazard, did it have any data in humans to show that

14   exposures of this magnitude presented this risk?

15   A.    No.

16   Q.    So am I correct in understanding that in this condition of

17   use EPA found there to be a risk in humans based on the fact

18   that human exposure was --  strike that.

19         In this condition of use the high end human exposure was

20   63 times less than the estimated hazard level in animals; is

21   that correct?

22   A.    Yes.  For an acute exposure.

23   Q.    Now, is that consistent, Dr. Thiessen, with the standard

24   of risk that we were talking about, that we were talking about

25   earlier?

 1   **A.**   That's -- yes, because it's less than the stated benchmark

 2   margin of exposure.   And the margin of exposure, the benchmark

 3   margin of exposure is supposed to account for the uncertainties

 4   in the available information.

 5       And the 63 is less than the benchmark margin of exposure

 6   of 100.   So that, according to how these things operate, is --

 7   it's -- if the MOE is less than the benchmark MOE, that

 8   constitutes or can constitute an unreasonable risk for humans.

 9   **Q.**   At any point in this risk evaluation --

10       **THE COURT:**   Now I am getting a little confused.

11       First of all, I would like clarification of what point of

12   departure?   Is that the hazard line?   What is the point of

13   departure?   How do you find that?

14       **THE WITNESS:**   The point of departure is the exposure

15   level associated with a hazard, where a hazard is actually

16   demonstrated.

17       **THE COURT:**   Okay.   What counsel earlier referred to

18   as the hazard line in lay terms sort of?

19       **THE WITNESS:**   Yes.

20       **THE COURT:**   Okay.   And then margin of exposure and

21   the number there, I -- I'm a little bit confused.   Could you

22   explain that, what 63 means?   63 times or is it 63 percent of

23   100?   I wasn't sure.

24       **THE WITNESS:**   No, no.   It's not percent.   The point

25   of departure divided by the expected human exposure under that

 1   condition of use equals 63.

 2            THE COURT:  All right.  So if a human is exposed by a

 3   fraction, 1/63rd of that point of departure --

 4            THE WITNESS:  Yes.

 5            THE COURT:  -- that's the margin of exposure?

 6            THE WITNESS:  Yes.

 7            THE COURT:  And what does the margin of exposure tell

 8   you?

 9            THE WITNESS:  That margin of exposure is compared

10   with the benchmark margin of exposure, which is based on

11   uncertainty factors.  In this case the benchmark margin of

12   exposure is 100.  63 is less than 100.

13        The way that is expected to work, if an exposure -- if a

14   margin of exposure is greater than a benchmark margin of

15   exposure, then it's anticipated that the human exposure is at

16   least a factor of 100 below the point of departure and,

17   therefore, probably does not -- does not pose a risk to the

18   humans.

19        But in this case it's less than the benchmark margin of

20   exposure.

21            THE COURT:  Okay.

22   BY MR. CONNETT

23   Q.  And the benchmark margin of exposure is basically just the

24   composite uncertainty factor; is that correct, Dr. Thiessen?

25   A.  Yes.

THIESSEN - DIRECT / CONNETT

1   Q.   And anywhere in this 406 page document that the EPA

2   produced here, is there any page which says:  Well, there can't

3   be a risk because we don't have any data in humans confirming

4   that a risk exists at this level of exposure?

5          MS. BHAT:   Objection, Your Honor.  Foundation.  We

6   don't know whether this witness has read all 406 pages of this

7   document.

8          THE COURT:   Why don't you ask her if she's familiar

9   with the entire document?

10  BY MR. CONNETT

11  Q.   Dr. Thiessen, are you familiar with this risk evaluation?

12  A.   Yes.  Although parts of it I have not read in detail.

13         MR. CONNETT:   I will rephrase the question, Your

14  Honor.

15  BY MR. CONNETT

16  Q.   Based on what you have seen in this document and what

17  you've read in this document, Dr. Thiessen, have you seen any

18  reference in here from EPA saying:  Well, this can't be a risk

19  at this level of human exposure because we don't have any human

20  data to confirm that an effect occurs at this dose?

21  A.   No.

22  Q.   Now, I want to go back to the standard of risk.

23         In this case, Dr. Thiessen, or in general when you are

24  considering whether fluoridation presents a risk of

25  neurotoxicity, I want to ask what standard you use.  Okay?

 1        I'll ask you -- I'm going to give you two different

 2   standards to use for risk.  Okay?  I want to ask you which one

 3   you use.

 4        Do you use, A, that the exposure to fluoride from

 5   fluoridated water is unacceptably close to the estimated hazard

 6   level; or, B, do you use the standard of exposures to fluoride

 7   from fluoridated water are demonstrated to cause the hazard?

 8        Which standard do you use, Dr. Thiessen?

 9             **MS. BHAT:**  Objection, your Honor.  Leading.

10             **THE COURT:**  Overruled.

11   **A.**   I use the first standard, which is that the exposures the

12   humans receive are unacceptably close to exposures at which

13   hazards have been demonstrated.

14   **BY MR. CONNETT**

15   **Q.**   Is that consistent with the standard that EPA generally

16   uses to assess risk?

17   **A.**   Yes.

18   **Q.**   Now, Dr. Thiessen, I want to ask you a hypothetical.

19   Okay?  I want you to assume that the collective evidence is

20   sufficient to prove that 1.5 milligrams of fluoride per liter

21   in water causes neurotoxicity.

22        And I want you to also assume that we don't yet have

23   sufficient direct evidence to prove that fluoride at

24   .7 milligrams per liter causes neurotoxicity.

25        Are you with me so far on those two assumptions?

THIESSEN - DIRECT  / CONNETT

1    A.    Yes.

2    Q.    Under this hypothetical, would that mean there is no risk

3    of neurotoxicity at .7 milligrams per liter?

4    A.    No, certainly not.

5    Q.    In the context of risk assessment, would the difference

6    between a hazard level of one point -- sorry.  I'll ask the

7    question again.

8          In the context of risk assessment, would the difference

9    between a hazard level of 1.5 milligrams per liter and an

10   exposure level of .7 milligrams per liter be considered a wide

11   margin or a small margin?

12             MS. BHAT:  Objection, Your honor.  Leading.

13             THE COURT:  Overruled.

14   A.    That's an extremely small margin.  It's just barely more

15   than a factor of two.

16   BY MR. CONNETT

17   Q.    Would this margin, Dr. Thiessen, be expected to protect

18   the full range of susceptibilities in the human population?

19   A.    No.  Certainly not.

20   Q.    What if we changed the hypothetical and made the hazard

21   level 2.5 parts per million.  Would that be a sufficiently

22   protective margin?

23   A.    That's about a factor of three and a half.  That is not a

24   sufficiently protective margin.

25   Q.    Dr. Thiessen, I want to ask you a few questions about the

1    guidelines of the neurotoxicity risk assessment.  What did the

2    guidelines say about prospective cohort studies?

3              THE COURT:  Before you launch, let me ask.

4        How do you determine what is a sufficiently protective

5    margin?  Twice is not?  Three and a half is not?  How do you

6    measure that?  How did you determine?

7              THE WITNESS:  One example would be the composite

8    uncertainty factor that is used to set EPA's benchmark margin

9    of exposure, or MOE.

10       And typically for that benchmark MOE there is a factor

11   of -- typically of ten for variation and susceptibility within

12   the human population.

13       There can be other factors for extrapolation from animals

14   to humans.  For -- to address for the length of a study.  To

15   address for or to allow for having a lowest observed effect,

16   adverse effect level rather than a no observed adverse effect

17   level.  And there is probably another one.

18       So there's several uncertainty factors are combined to

19   make a composite uncertainty factor.  Basically it allows for

20   what you don't know so that you -- you don't want the human

21   exposure within that range or that close to an exposure -- an

22   exposure level at which you know there will be an effect.  You

23   want a sufficient margin of safety between the observed hazard

24   level and the known human exposure level.

25             THE COURT:  So the more uncertainty factors, the

THIESSEN - DIRECT  / CONNETT

1   greater the margin you want?

2          THE WITNESS:  Right.  If you have greater certainty

3   about some things, you can use a smaller composite uncertainty

4   factor.

5          THE COURT:  And in deriving a determination of what

6   is sufficiently protective, I take it in the end it's kind of a

7   qualitative analysis?  I mean, you look at all these things.

8   There is not a formula or statistical model, or is there?

9          THE WITNESS:  Probably not a statistical model, but

10  EPA, in my reading, has procedures that they typically use.

11         And I -- I should say Michael asked about if you know you

12  have a hazard at 1.5 or 2.5 milligrams per liter, that would be

13  considered an observed adverse effect level.  It might or might

14  not be the lowest observed adverse effect level.

15         For setting a place at which exposure is safe, expected to

16  be safe, you need to know or estimate a no observed adverse

17  effect level.  And the typical way to estimate a no observed

18  adverse effect level from a lowest observed adverse effect

19  level is a factor of ten.

20         So the factor of two or three and a half that we've

21  already mentioned are considerably less than a factor of ten.

22  And it's not stated whether the 1.5 or 2.5 milligrams per liter

23  is, in fact, a lowest observed adverse effect level.

24         THE COURT:  All right.  Thank you.

25         THE WITNESS:  You're welcome.

THIESSEN - DIRECT  / CONNETT

```
 1   BY MR. CONNETT
 2   Q.   Dr. Thiessen, did the guidelines require consideration of
 3   -- sorry.  Strike that.
 4        Do the guidelines require consideration of a chemical's
 5   possible effect on thyroid function?
 6             MS. BHAT:  Objection, Your Honor.  Leading.
 7             THE COURT:  Overruled.
 8   A.   Yes.  The guidelines specifically mention endocrine
 9   function and thyroid function, because it is known that
10   adequate thyroid function is essential for proper development
11   of the nervous system.
12   BY MR. CONNETT
13   Q.   And, Dr. Thiessen, can you explain for the Court what the
14   NRC concluded about fluoride's effects on the thyroid gland and
15   what relevance this might have to the question of
16   neurotoxicity?
17   A.   The NRC report concluded that fluoride exposure can effect
18   thyroid function, typically to reduce thyroid function.  It
19   concluded that fluoride is an endocrine disrupter.  That was
20   more broadly than simply thyroid function.
21        But reduced thyroid function is well associated with
22   thyroid exposure, especially in individuals with iodine
23   deficiency, perhaps with some other susceptibility.
24        And we pointed out in the NRC report that this is
25   especially of concern for pregnant women because having reduced
```

THIESSEN - DIRECT  / CONNETT

1  thyroid function during pregnancy -- even if it's subclinical.

2  Even if it's not enough for the women's doctor to say:  Hey, I

3  think you have a thyroid problem.

4      But reduced thyroid function during pregnancy can or does

5  effect the proper neurodevelopment of the child.

6  Q.  Do fluoride's effects on the thyroid gland provide a

7  plausible mechanism for fluoride reducing IQ?

8  A.  Yes.

9  Q.  After the NRC released its report, have there been any

10  epidemiological studies that have examined the impact of

11  fluoridated water on thyroid health?

12  A.  There are two main ones that I'm aware of.  One is a 2015

13  study from England, Peckham et al, that found a higher rate of

14  individuals with hyperthyroidism in the parts of England that

15  are -- that have fluoridated water.

16      The second one is in Canada, a more recent one.  I think

17  that's Malen et al.  And that one found that in people with

18  iodine deficiency, there was a higher likelihood of high TSH,

19  high thyroid stimulating hormone, which is considered an

20  indicator of reduced thyroid function.

21  Q.  The findings of those two studies, would you consider them

22  or characterize them as being consistent with NRC's

23  conclusions?

24  A.  Yes.

25  Q.  Now, in the interests of time, I obviously cannot go

1    through all of your declarations, so I'm going to just focus on

2    a few parts of it.  Okay?

3        Dr. Thiessen, you did a hazard assessment in this case;

4    correct?

5    **A.**    Yes.

6    **Q.**    And in your view, having applied the Guidelines for

7    Neurotoxicity Risk Assessment, is there sufficient evidence

8    that neurotoxicity is a hazard of fluoride exposure; and if so,

9    can you explain it for the Court?

10   **A.**    Yes.  The overwhelming majority of the animal studies of

11   fluoride exposure demonstrate neurotoxicity as a result of

12   prenatal or other fairly early exposure in animals.

13       There are also a number of human cross-sectional studies,

14   which show neurotoxicity in the groups with higher -- higher

15   fluoride exposure.

16       There are also now several prospective cohort studies with

17   individual measures of exposure, either prenatally or

18   postnatally that also show reduced cognitive function or other

19   evidence of neurotoxicity in the offspring.

20   **Q.**    Now, how did you compare the quantum of evidence that is

21   now available for fluoride and neurotoxicity to other chemicals

22   that EPA has found to pose a neurotoxic hazard?

23           **MS. BHAT:**  Objection, Your Honor.  Foundation.

24           **THE COURT:**  Lay a foundation.

25

1    BY MR. CONNETT

2    Q.   Dr. Thiessen, in your analysis for this case, did you have

3    the opportunity to review any risk assessments that EPA has

4    conducted under the Guidelines for Neurotoxicity Risk

5    Assessment?

6    A.   Yes.

7    Q.   And in the risk assessments that you reviewed for this

8    case, how would you compare the quantum of evidence that was

9    sufficient for EPA to find a neurotoxic hazard versus the

10   quantum of evidence that is available today for fluoride?

11   A.   The amount of evidence for fluoride is considerably

12   larger.  Most of those other chemicals had little or no human

13   data at all.  And we have considerable human data for fluoride,

14   and we have a very large body of animal studies as well.

15   Q.   Did any of the chemicals that you reviewed as part of the

16   risk assessments that EPA has conducted under the guidelines,

17   did any of them have a prospective cohort study?

18   A.   No.

19   Q.   And what does -- what did the guidelines say about

20   prospective cohort studies in terms of estimating risk?

21   A.   A prospective cohort study can be used directly to

22   estimate risk.  It's sufficient right there.

23   Q.   And, Dr. Thiessen, what is a critical effect?

24   A.   The critical effect is defined as the adverse effect that

25   occurs at the lowest level of exposure.

THIESSEN - DIRECT  / CONNETT

1    Q.   In your analysts for this case did you take any steps to

2    determine if neurotoxicity is the critical Federal Circuit of

3    fluoride exposure?

4    A.   I compared what I looked at in this recent study with some

5    of my earlier studies.  And -- and in those earlier studies I

6    looked at other endpoints, other adverse health effects.  And

7    the exposures associated with the adverse health effects, the

8    exposures associated with neurotoxicity from fluoride are lower

9    and sometimes considerably blower than for most or all of the

10   other adverse health effects.

11   Q.   What does EPA currently consider the critical health

12   effect of fluoride exposure to be?

13   A.   Severe dental fluorosis.

14   Q.   And how do the doses that are associated with

15   neurotoxicity compare with the doses that EPA has estimated to

16   cause severe dental fluorosis?

17   A.   Considerably lower.

18   Q.   Now, in this case --

19           THE COURT:  Hold on.  Considerably lower than what?

20           THE WITNESS:  The doses associated with neurotoxicity

21   are considerably lower than the doses associated with severe

22   dental fluorosis.

23           THE COURT:  Oh, okay.

24   BY MR. CONNETT

25   Q.   Now, in your analysis for this case you derived reference

THIESSEN - DIRECT  / CONNETT

1   doses from animal data; is that correct?

2   A.   Yes.

3   Q.   Now, would human data be preferable to the animal data to

4   establish the reference dose for fluoride neurotoxicity today?

5   A.   Generally, yes.

6   Q.   And in light of the fact that we now have prospective

7   cohort studies, would you -- what would be more preferable to

8   you, the human prospective cohort studies or animal data to

9   establish the RfD?

10  A.   Generally, one would use the prospective cohort studies as

11  the primary the sources in the animal studies for support or

12  consistency check.

13  Q.   So the -- in your declaration you talk about the EPA's

14  assessment of methylmercury.

15  A.   Yes.

16  Q.   And did the EPA consider animal data when it established a

17  reference dose for methylmercury?

18  A.   It -- the EPA used a human study to set the reference

19  dose, but they also in that report described several animal

20  studies which they considered to be supportive of the definings

21  from the human study.

22  Q.   By considering reference doses from animal studies and

23  comparing that to the human data, does that do anything as to

24  the confidence or robustness for the risk determination?

25  A.   Certainly.  It increases the confidence in the risk -- in

THIESSEN - DIRECT / CONNETT

```
 1  the risk determination.  It demonstrates the robustness that
 2  you -- you see the same result whether you start with an animal
 3  study or a human study.
 4  Q.   Okay.
 5           MR. CONNETT:  At this time, Your Honor, I would like
 6  to show the witness a figure from her declaration.
 7           THE COURT:  Okay.  Any objection?  Which one is it?
 8           MR. CONNETT:  It is the figure on Page 55 of the
 9  declaration.
10           THE COURT:  All right.  Any objection?
11           MS. BHAT:  Is that PDF Page 55 or is that numbered
12  Page 55?
13           MR. CONNETT:  Numbered, numbered page.
14           MS. BHAT:  Numbered Page 55 of her declaration?
15           THE COURT:  Is that Paragraph 153, it looks like?
16           MR. CONNETT:  Yeah.  Right after 153, your Honor.
17           MS. BHAT:  Oh, is that numbered Page 56?
18           MR. CONNETT:  No.  It's numbered Page 55.
19           THE COURT:  Corresponds with Paragraph 153.  It's
20  between 153 and 154.
21           MS. BHAT:  I see that.  Yes.  No objection.
22           THE COURT:  All right.  Go ahead.
23      (Document displayed.)
24  BY MR. CONNETT
25  Q.   Dr. Thiessen, can you see this on the screen?
```

THIESSEN - DIRECT  / CONNETT

1    **A.**    Yes.

2    **Q.**    What do we -- can you tell us what this figure shows?

3    **A.**    It shows -- okay.  On the Y axis it shows fluoride intake

4    from fluoridated tap water in terms of milligrams per kilogram

5    of body weight per day.  And that would be the only source of

6    fluoride intake included in this graph.

7        And there are two sets of the bar graphs; one from EPA's

8    2000 report on water consumption rates, and one from EPA's 2019

9    report on water consumption rates.  In both cases these are

10   statistics for all ages, so the entire population, limited to

11   those who actually consumed community water or tap water from a

12   municipal source.

13       And it shows in each case, left and right, the main -- the

14   90th percentile, 95th and 99th percentiles.  The red lines

15   across the graph correspond to the range of RfDs, reference

16   doses that I calculated from animal studies, ranging from

17   .0007 milligrams per kilogram per day to .03 milligrams per

18   kilogram per day.  The least protective of the RfDs.

19       But even with the least protective RfD, it's clear that

20   for the -- for all ages of the population a little more than --

21   a little more than 5 percent of the population was expected to

22   exceed that RfD.

23       And if you look at the other RfDs, you will see that even

24   the mean fluoride intakes exceed those RfDs.

25   **Q.**    What animal study, Dr. Thiessen, is this -- is the highest

1   RfD that we see here of .03, what animal study is that based

2   on?

3   **A.**   I believe that's the McPherson study.

4   **Q.**   Okay.  Now, just to be clear, the fluoride exposures that

5   you have produced here, these are strictly from water, from

6   community water; right?

7   **A.**   That's correct.

8   **Q.**   They don't include toothpaste, tea or other sources; is

9   that correct?

10  **A.**   That's correct.

11  **Q.**   Okay.  Now, do these exposures that we see here include

12  commercial beverages that are made with fluoridated water?

13  **A.**   No.

14  **Q.**   Now, the exposure data that you're using is from the EPA?

15  **A.**   Yes.

16  **Q.**   And I see on the right side it says EPA 2019; is that

17  correct?

18  **A.**   That's correct.

19  **Q.**   How does EPA characterize this exposure data from 2019?

20  **A.**   They characterize it as the most scientifically sound and

21  up-to-date information available on water consumption in the

22  United States and suitable for use in risk assessments.

23  **Q.**   I'm now going to turn to the next figure, which is...

24       (Document displayed.)

25  **Q.**   Okay.  Dr. Thiessen, I am showing you the figure that is

THIESSEN - DIRECT  / CONNETT

1   on Page 63 of your declaration.  And can you explain for the

2   Court what we see in this figure?

3   **A.**   Okay.  It's similar to the previous figure, except now

4   it's limited to infants less than six months old and whose

5   water intake is primarily from infant formula, made up with --

6   made up with tap water, prepared with tap water.

7        So, again, on the Y axis is fluoride intake from

8   fluoridated tap water, milligrams per kilogram per day.  The

9   same set of RfDs on those red lines.

10       Now, the left said of bars is the -- is infants less than

11  six months old consuming tap water, presumably mostly in infant

12  formula, and that's from EPA 2000.

13       The remaining three are from EPA 2019.  The first one is

14  ages from birth to one month old.  Then from one month to three

15  months old, and then from three months to six months old.  And,

16  again, the means, 90th, 95th and 99th percentiles of estimated

17  exposures.

18  **Q.**   Again, just to be clear, the exposure data that we see

19  here is just from community water; is that correct?

20  **A.**   Just from community water, yes.

21  **Q.**   All of this exposure data is from the Environmental

22  Protection Agency; is that correct?

23  **A.**   That's correct.

24  **Q.**   And how does the EPA characterize the exposure data that

25  we see from the -- here, here and here, the three sets graphs

1    on the right?

2    **A.**   That's from the 2019 report, which EPA considers its most

3    scientifically sound and up-to-date information for use in risk

4    assessment.

5    **Q.**   Dr. Thiessen, what's EPA's current reference dose for

6    fluoride?

7    **A.**   .08 milligrams per kilogram per day from the water office,

8    Office of Water.

9    **Q.**   So that's right here?

10   **A.**   Yes.

11   **Q.**   So what do these exposures show in terms of whether

12   infants are being exposed --  strike that.

13       Based on this data here, what conclusions can you draw as

14   to whether infants are exceeding EPA's current reference dose

15   for fluoride?

16           **MS. BHAT:**  Objection, Your Honor.  This line of

17   questioning seems to relate to a stipulation that we have

18   regarding whether we would bring up other EPA standards, if you

19   recall.

20           **THE COURT:**  Yes, that's correct.

21           **MR. CONNETT:**  Understood.

22   **BY MR. CONNETT**

23   **Q.**   Dr. Thiessen, how would you characterize the extent to

24   which infant exposures to fluoridated water exceed the

25   estimated hazard levels from animals?

THIESSEN - DIRECT  / CONNETT

1   A.   The range of estimated RfDs for estimated hazard levels

2   from animals is indicated there.

3       For each of these groups or age groups the mean exposures

4   are well above even the least protective of the RfDs, which

5   means an awful lot of infants who are fed formula made with tap

6   water are exceeding what could possibly be considered a safe

7   level of exposure with respect to neurotoxicity.

8   Q.   So this .03 milligrams per kilogram per day reference

9   dose, this is from the McPherson study; right?

10  A.   Yes, I believe so.

11  Q.   So even if we used the McPherson study as the estimated no

12  effect level in animals, is it fair to say that you have still

13  have -- well, sorry, strike that.

14      Even if you use the McPherson study, what do the human

15  exposures tell us about whether there is a risk?

16  A.   The many human exposures, even the mean human exposures

17  for these age groups, are in excess of that safe level.  They

18  are not even within a factor of something below it.  They are

19  in excess of it.

20  Q.   Now, when human exposures exceed reference doses by this

21  magnitude, do you need to do a margin of exposure analysis to

22  determine if a risk exists?

23  A.   It's kind of obvious that a risk exists, even without

24  doing the margin of exposure analysis.

25  Q.   I forgot to ask, but you have identified here the 95th

 1  percentile human exposures.

 2        In EPA's risk evaluations under Section 6, how does EPA

 3  define highly exposed individuals?

 4            MS. BHAT:  Objection, Your Honor.  Foundation.

 5            THE COURT:  Lay the foundation for that.

 6  BY MR. CONNETT

 7  Q.   Dr. Thiessen, you have -- have you read some of EPA's risk

 8  evaluations under Section 6?

 9  A.   Yes.

10  Q.   And in reading those risk evaluations have you come across

11  information as to how EPA defines highly exposed individuals?

12  A.   Often they have selected a 95th percentile from their

13  estimated exposure distribution and used that to characterize

14  their highly exposed individual for a particular condition of

15  use.

16  Q.   Okay.  So I would like to talk now a little bit about

17  uncertainty factors.

18        During opening, counsel for EPA stated that you

19  indiscriminately applied default uncertainty factors; is that

20  correct?

21  A.   No.

22  Q.   And one of the uncertainty factors that you -- oh, and how

23  many uncertainty factors did you apply for the reference doses

24  that we have been looking at?

25  A.   Two.

 1   **Q.**   And two for the NOAEL based points of departure?

 2   **A.**   Two for the NOAEL based points of departure and three for

 3   the LOAEL based points of departure.

 4   **Q.**   You applied an uncertainty factor for intraspecies

 5   variability; is that correct?

 6   **A.**   That's correct.

 7   **Q.**   Now, what is the -- what uncertainty factor does EPA

 8   typically use for intraspecies variability?

 9   **A.**   Typically that's a factor of ten.

10        **MR. CONNETT:**  At this time, Your Honor, I would like

11   to show the witness what has been pre-admitted as Plaintiff's

12   Exhibit 20.

13        We have not shown this to the witness yet.

14        **THE COURT:**  All right.  Any objection?

15        **MS. BHAT:**  No, Your Honor.

16        **THE COURT:**  Thank you.

17        (Document displayed.)

18   **BY MR. CONNETT**

19   **Q.**   Dr. Thiessen, I am showing you the bottom of Page 517 of

20   this assessment of methanol.  And EPA states here that:

21        "The uncertainty factor of ten for intraspecies

22        variability is commonly considered to be appropriate

23        in the absence of convincing data to the contrary."

24        Is that consistent, Dr. Thiessen, with the risk

25   assessments that you have read from EPA?

1    A.    Yes.

2    Q.    And if someone was to testify in this Court that there is

3    convincing data to support using less than the default of ten

4    for fluoride, what would you say?

5    A.    I would disagree.

6    Q.    And why would you disagree?

7    A.    There would have to be convincing evidence that some

8    smaller factor was appropriate that would require studies in

9    not just a susceptible subpopulation, but the most susceptible

10   subpopulation.  I would require additional information that

11   sort in order to justify a smaller uncertainty factor.

12   Q.    Now, for your risk assessment in this case you used animal

13   studies where the exposure was prenatal; correct?

14   A.    Yes.

15   Q.    And that is a susceptible population --

16   A.    Yes.

17   Q.    -- is that correct?

18        Okay.  Now, in any of the animal studies that you based

19   your reference doses on, were there -- was there a coexisting

20   iodine deficiency?

21   A.    That's, I don't believe, stated for any of them.

22   Q.    In any of the studies did they expose the pups to fluoride

23   during the neonatal period?

24   A.    No.  The mothers were exposed to fluoride during the

25   neonatal period during the time that the pups were nursing.

**THIESSEN - DIRECT / CONNETT**

```
 1  The mammalian milk -- and that includes rat milk and probably
 2  mouse milk -- have very, very low concentrations of fluoride
 3  which was that essentially during the time that the animal pups
 4  were nursing, they had little or no -- approximately zero or
 5  very trivial fluoride exposure.
 6      So there is nothing in the animal studies that remotely
 7  corresponds to formula feeding of human infants with formula
 8  prepared with fluoridated tap water.
 9  Q.  So we were looking at that figure a few minutes ago which
10  showed human exposures among infants to fluoride?
11  A.  Yes.
12  Q.  As we sit here today, has a single animal study ever
13  attempted to assess the neurotoxic effects from infant
14  exposures to fluoride?
15  A.  Not that I am aware of.  No.
16  Q.  Now, in any of the studies that you used to base your
17  reference dose on, did the animals have kidney disease?
18  A.  No.
19  Q.  Did any of the studies that you base your reference dose
20  on have -- examine animals with calcium deficiency?
21  A.  No.
22  Q.  Did any of the animal studies that you base your reference
23  dose on examine the potential for genetic susceptibility?
24  A.  No.
25  Q.  So the animal studies that you based your reference on, do
```

1   they capture the full range of susceptibility in the human

2   population?

3   **A.**   No, they don't.

4   **Q.**   Now, have you had the opportunity to look at the

5   uncertainty factors that EPA has used in its Section 6 risk

6   evaluations?

7   **A.**   Yes.

8   **Q.**   How do they compare with the uncertainty factors that you

9   have used for your analysis?

10  **A.**   They are essentially comparable.

11  **Q.**   Now, there has been a suggestion in this case that we

12  don't need to use uncertainty factors or at least we don't --

13  we shouldn't use default uncertainty factors when assessing the

14  toxicologic data on fluoride.  Okay?  So I want to explore that

15  would you now.

16      Dr. Thiessen, are you aware of any EPA analysis where EPA

17  has attempted to extrapolate toxicologic findings on fluoride

18  in animals to assess risk in humans?

19  **A.**   Yes.

20  **Q.**   And what are you familiar with?

21  **A.**   There is a, I believe it's 2007 pesticide reregistration

22  for sodium fluoride, which includes margin of exposure.

23          **MS. BHAT:**  Objection, Your Honor.  This answer is

24  beyond the scope of the expert disclosure.

25          **MR. CONNETT:**  Your Honor, this is -- I'm about to --

 1    I can show an exhibit that is in evidence in this case.  So I

 2    would like to be able to ask this witness about the evidence in

 3    this case that's been admitted.

 4              THE COURT:  Well, the question is, does it exceed the

 5    scope of the disclosure.

 6         So even though there is an exhibit, that doesn't

 7    necessarily bootstrap you to go beyond the scope.

 8              MR. CONNETT:  Well, Your Honor, I believe it's within

 9    the scope of this -- of Dr. Thiessen's opinions because her

10    opinions are -- involve the appropriate uncertainty factors to

11    use when applying animal data on fluoride to humans.

12              THE COURT:  Well, why don't you make your proffer and

13    then show me where in -- in the disclosure, or we could find

14    something in that ballpark.

15              MR. CONNETT:  Yeah.  The declaration, Your Honor.

16    But I -- I should -- and in the expert -- Dr. Thiessen's expert

17    report -- I can forego.

18         I think to save time, Your Honor, and in the interests of

19    time, I'll just go ahead and move on.  Okay?

20              THE COURT:  Okay.

21    BY MR. CONNETT

22    Q.   The report that you were -- you had mentioned a pesticide

23    document; is that correct, Dr. Thiessen?

24    A.   Yes.

25              MS. BHAT:  Your Honor, is this the same document that

1    I have previously objected to?

2             THE COURT:  I don't know.  I'm not looking -- I'm not

3    even sure what document we're talking about at this point.

4             MS. BHAT:  Mr. Connett?

5             MR. CONNETT:  I wasn't referring to any particular

6    document.

7    BY MR. CONNETT

8    Q.   Dr. Thiessen, sodium fluoride, is that a chemical that we

9    add to drinking water?

10   A.   Yes.

11   Q.   Is that also a chemical that EPA regulates as a pesticide?

12   A.   Yes.

13   Q.   And is it the same exact chemical?

14   A.   Yes.

15   Q.   Okay.  So is it fair to say that sodium fluoride is a

16   pesticide that we add to water?

17   A.   Yes.  Although it's -- it's -- it has been used for a

18   pesticide for more than a hundred years.  It is added to water

19   not for that reason, but it is added to water.

20   Q.   Okay.  I'll move on.  Dr. Thiessen --

21            MS. BHAT:  Your Honor, I'm not entirely sure about

22   where we left the record regarding this exhibit that's beyond

23   the scope of the expert testifying, so I would just like to

24   move to strike any discussion.

25            THE COURT:  Well, I don't think there was a

 1  discussion, so there is nothing to strike.

 2          MS. BHAT:  All right, Your Honor.  Thank you.

 3          THE COURT:  Okay.

 4          MR. CONNETT:  So, Your Honor, I probably have about

 5  five minutes left and then that will be the end of our

 6  questioning.  I know we're reaching about 1:30 and that's the

 7  close time.

 8      Does Your Honor have a preference as to whether we --

 9          THE COURT:  Why don't you complete your five minutes,

10  and then we'll pick up with cross on, I guess, Friday morning.

11          MR. CONNETT:  Okay.

12          THE COURT:  Is that all right?

13  BY MR. CONNETT

14  Q.   Now, Dr. Thiessen, in your expert report and declaration

15  you talk about some findings from the NRC or discussion from

16  the NRC on neurological manifestations that have been

17  associated with fluoride exposure in humans; is that correct?

18  A.   Yes.

19  Q.   Can you explain for the Court what -- can you explain for

20  the Court the evidence or the reports that NRC looked at?

21  A.   NRC looked at reports certainly by Waldbott, and there's

22  also earlier ones by Rohan, reporting neurological things like

23  headaches and other sorts of things.  Rohan reported those in

24  cryolite workers way back.

25      And one interesting thing is that among workers who had

 1  quit their jobs because it was making them sick, many of them

 2  reported having these neurological problems during the time

 3  that they were employed.

 4      Dr. Waldbott, who is probably the nation's premier allergy

 5  specialist at the time reported these adverse responses to

 6  fluoride, including the neurological manifestations.  He's the

 7  same doctor who reported associations of lung disease in

 8  smoking and, also, penicillin allergy.

 9      And he actually ran, you can almost call them experiments

10  with his patients, noting what happened or didn't happen if

11  they did or didn't drink fluoridated water on a particular day

12  or for a period of time and the vast majority of cases without

13  the knowledge of the patient as to which was which.  And in

14  many cases the doctor was blinded to the current exposure also.

15      So it's -- it's a consistent set of evidence in that the

16  NRC report does -- does discuss that very briefly.

17  Q.  Did the --

18          MS. BHAT:  Your Honor, it would appear that some of

19  that answer is also beyond the scope of the expert disclosure.

20      To the extent that the NRC document reflects this

21  discussion, I believe it's still within the scope, but I think

22  beyond that would certainly be outside the scope.

23          THE COURT:  All right.  What was just testified to in

24  the NRC report, counsel?

25          MR. CONNETT:  Yes.  The NRC report talks about

1  neurological manifestations in case reports of sensitive

2  individuals.

3          THE COURT:  But did it talk about the -- this

4  particular study of the -- the experimental data?

5          MR. CONNETT:  Yes.  It cites -- NRC report cites

6  George Waldbott's case reports as the basis for its discussion.

7          THE COURT:  All right.  Unless I hear evidence to the

8  contrary, I'll allow it.

9  BY MR. CONNETT

10 Q.  Dr. Thiessen, did the NRC find Dr. Waldbott's case reports

11 to be credible?

12 A.  Yes.

13         THE COURT:  What period of time -- when was the

14 Waldbott report?  Were these the ones back from the '30s?

15         MR. CONNETT:  No.

16         THE WITNESS:  1950s.

17         THE COURT:  50's, okay.  Thank you.

18 BY MR. CONNETT

19 Q.  And Dr. Waldbott in his case reports identified -- did he

20 identify a number of neurological manifestations?

21 A.  Yes.

22 Q.  And was one of those neurological manifestations

23 headaches?

24 A.  Yes.

25 Q.  Did Dr. Waldbott's report indicate whether some

THIESSEN - DIRECT  / CONNETT

1  individuals are more sensitive to fluoride than others?

2  **A.**   Yes.

3  **Q.**   Now, I'll just conclude with a few final questions here.

4  Dr. Thiessen, are you a legal expert?

5  **A.**   No.

6  **Q.**   Are you an expert on the statutory interpretation of the

7  Toxic Substances Control Act?

8  **A.**   No.

9  **Q.**   Are you an expert on how manufacturers go about submitting

10  draft risk evaluations to the EPA?

11  **A.**   I've read several, but I'm not an expert on it.

12  **Q.**   Are you an expert on how the Court will go about reaching

13  its decision in this case?

14  **A.**   No.

15  **Q.**   Are you an expert on what EPA will do if the Court finds

16  there to be an unreasonable risk?

17  **A.**   No.

18         **MR. CONNETT:**  Your Honor, at this time plaintiffs

19  have no further questions.

20         **THE COURT:**  All right.  Then we will adjourn for the

21  day.

22     Thank you, Dr. Thiessen.  We will need you back to

23  complete your testimony when the government has a chance to ask

24  questions of you.

25         **THE WITNESS:**  Yes, sir.

THIESSEN - DIRECT / CONNETT

1          **THE COURT:**  And we will resume on Friday morning at

2   8:30, Pacific time.

3          **THE WITNESS:**  All right.

4          **THE COURT:**  And if you could plug in and be

5   available, we would appreciate that.

6          **THE WITNESS:**  I'll plan to do that.

7          **THE COURT:**  Great.  And that's what we'll do.

8      And then are you close to completing your -- actually,

9   what is the time left, Angie?  That will answer that question.

10         **THE CLERK:**  Your Honor, time remaining for plaintiffs

11  is 4 hours 35 minutes 25 seconds.

12     For defendant time remaining is 7 hours 7 minutes and 54

13  seconds.

14         **THE COURT:**  Okay.  I think we're on course to

15  completing this by Tuesday then.

16     Obviously, plaintiff will have to preserve -- use it's

17  time.  Remember, it includes closings and cross.

18     So we will resume -- oh, I need a list of -- are you going

19  to call further witnesses, Mr. Connett?

20         **MR. CONNETT:**  Your Honor, we are assessing at this

21  time whether we will be calling the NSF representative, which

22  we have as a videotaped deposition.  If we do not call that

23  witness, then we will -- we will be closing our case after

24  Dr. Thiessen finishes testifying.

25         **THE COURT:**  All right.  So then the government is

 1  prepared to start presenting its case on Friday?

 2          MS. CARFORA:  Yes, Your Honor.

 3          THE COURT:  And who will you call?

 4          MS. CARFORA:  We will likely call Joyce Donohue by

 5  video deposition.

 6      And then we will call Dr. Kris Thayer.  And then I expect

 7  we'll probably start with Dr. Joyce Tsuji.

 8          THE COURT:  All right.  So we might get to Dr. Tsuji

 9  on Friday possibly?

10          MS. CARFORA:  Possibly, yes.

11          THE COURT:  Okay.  Then we will adjourn until Friday

12  morning.

13          MS. CARFORA:  Your Honor, one question.  I don't know

14  for sure, but it is possible that we can be done presenting our

15  case on Monday.  And if that's the case, can we adjourn and

16  start closings on Tuesday morning?

17          THE COURT:  Yes.  Actually, it's Tuesday afternoon.

18          MS. CARFORA:  I'm sorry.

19          THE COURT:  Yeah.  I mean, if you close by Monday,

20  I'll allow both parties -- if we're close to the end of the

21  day, you know, that's fine.  If you close by then.

22      As long as we get done by Tuesday, it's what we -- our

23  main goal here.

24          MS. CARFORA:  Yes.

25          THE COURT:  All right.

1          **MS. CARFORA:**  Thank you.

2          **THE COURT:**  Thank you everyone.  Appreciate it.

3      (Whereupon at 1:36 p.m. further proceedings were

4       adjourned until Friday, June 12, 2020 at 8:30 a.m.)

# I N D E X

WEDNESDAY, JUNE 10, 2020 - Volume 3

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| | | |
| **HU, HOWARD** | | |
| (PREVIOUSLY SWORN) | 330 | 3 |
| Redirect Examination by Mr. Connett | 330 | 3 |
| Redirect Examination by Mr. Adkins | 338 | 3 |
| | | |
| **LANPHEAR, BRUCE** | | |
| (SWORN) | 342 | 3 |
| Direct Examination by Mr. Connett | 343 | 3 |
| Cross-Examination by Mr. Adkins | 372 | 3 |
| Redirect Examination by Mr. Connett | 418 | 3 |
| Recross-Examination by Mr. Adkins | 430 | 3 |
| | | |
| **HANNAN, CASEY** | | |
| VIDEOTAPED TESTIMONY | 432 | 3 |
| | | |
| **THAYER, KRISTINA** | | |
| (SWORN) | 435 | 3 |
| Direct Examination by Mr. Connett | 435 | 3 |
| | | |
| **THIESSEN, KATHLEEN** | | |
| (SWORN) | 464 | 3 |
| Direct Examination by Mr. Connett | 464 | 3 |

- - -

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 47 | | 472 | 3 |

— — —

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, June 10, 2020