Volume 4

Pages 509 - 708

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

FOOD & WATER WATCH, INC., et al,  )
                                   )
                                   )
              Plaintiffs,          )
                                   )
   vs.                             ) No. C 17-2162 EMC
                                   )
U.S. ENVIRONMENTAL PROTECTION      )
AGENCY, et al,                     )
                                   )  San Francisco, California
              Defendants.          )  Friday
                                   )  June 12, 2020
                                   )  8:30 a.m.
_____  )

__TRANSCRIPT OF REMOTE ZOOM BENCH TRIAL PROCEEDINGS__

__APPEARANCES__:

**For Plaintiffs:**          WATERS KRAUS & PAUL
                             222 North Pacific Coast Highway
                             Suite 1900
                             El Segundo, California 90245
                        BY:  **MICHAEL P. CONNETT, ESQ.**
                             **CHARLES ANDREW WATERS, ESQ.**


                             WATERS & KRAUS LLP
                             3141 Hood Street
                             Suite 700
                             Dallas, Texas 75219
                        By:  **KAY GUNDERSON REEVES, ESQ.**


         (APPEARANCES CONTINUED ON FOLLOWING PAGE)


*Reported By:*   ***Debra L. Pas, CSR 11916, RPR, RMR, CRR***
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

For Plaintiffs:           NIDEL AND NACE, PLLC
                          5335 Wisconsin Avenue, NW
                          Suite 440
                          Washington, DC 20015
                   BY:    **CHRISTOPHER THOMAS NIDEL, ESQ.**


For Defendants:           U.S. DEPARTMENT OF JUSTICE
                          Environmental Defense Section
                          601 D Street, NW
                          Room 8814
                          Washington, DC 20004
                   BY:    **DEBRA J. CARFORA, ESQ.**


                          U.S. DEPARTMENT OF JUSTICE
                          Environment & Natural Resources Div.
                          P.O. Box 7611
                          Washington, DC 20044
                   BY:    **BRANDON N. ADKINS. ESQ.**
                          **SIMI BHAT, ESQ.**
                          **JOHN THOMAS H. DO, ESQ.**

                              —   —   —

1                  **P R O C E E D I N G S**

2   **June 12, 2020**                                      **8:30 a.m.**

3                        ---oOo---

4         THE CLERK:  Court is now in session.  The Honorable

5   Edward M. Chen is presiding.

6      Calling Civil Action 17-2162, Food & Water Watch versus

7   Environmental Protection Agency.

8      Counsel, please state your appearances for the record,

9   beginning with plaintiff's counsel.

10        MR. WATERS:  Andy Waters for the plaintiffs.

11        THE COURT:  Good morning Mr. Waters.

12        MR. WATERS:  Good morning, Judge.

13        MR. CONNETT:  Good morning, Your Honor.  Michael

14   Connett for the plaintiffs.

15        THE COURT:  Good morning, Mr. Connett.

16        MR. NIDEL:  Good morning, Your Honor.  Chris Nidel on

17   behalf of the plaintiffs.

18        THE COURT:  Good morning, Mr. Nidel.

19        MS. CARFORA:  Good morning, Your Honor.  Debra

20   Carfora on behalf of EPA.

21        THE COURT:  Hi.  Good morning, Ms. Carfora.

22        MR. ADKINS:  Good morning, Your Honor.  Brandon

23   Adkins on behalf of EPA.

24        THE COURT:  All right.  Good morning, Mr. Adkins.

25        MS. BHAT:  Good morning.  Your Honor.  Simi Bhat on

PROCEEDINGS

 1 | behalf of EPA.

 2 |         THE COURT:  Good morning, Ms. Bhat.

 3 |         MR. DO:  Good morning, Your Honor.  John Do for the

 4 | defendants.

 5 |         THE COURT:  All right.  Good morning, Mr. Do.

 6 |         MS. CARFORA:  Your Honor, could I address one

 7 | technical issue?

 8 |         THE COURT:  Yeah.

 9 |         MS. CARFORA:  So we are getting messages that people

10 | cannot log on because we've exceeded the 100 person mark.  I'm

11 | not sure why anything would be different because I -- I know

12 | that we've had up to 300 people over the past couple of days.

13 | So I'm not sure why, for some reason today, would be different.

14 |     But I am noticing that the attendee list is maxed out at

15 | 101, and some of our experts are saying they can't get on.

16 |         MR. CONNETT:  And, Your Honor, we have just received

17 | a similar message as well.

18 |         THE COURT:  All right.  Angie, do you know why that

19 | is?

20 |         THE CLERK:  I do not, Your Honor.  I will ask our IT

21 | director, because I know that we did have the 500 participant

22 | webinar license.

23 |         THE COURT:  Now, we did switch over to Zoom.gov.

24 |         THE CLERK:  No.  That did not make a difference.

25 |         THE COURT:  We have been on Zoom.gov.

**PROCEEDINGS**

 1            THE CLERK:  That's correct.

 2            THE COURT:  So I'm wondering whether the license

 3    somehow -- something happened to it.

 4            THE CLERK:  I'm going to inquire about it right now.

 5            MR. CONNETT:  Your Honor, there are a few issues that

 6    we were hoping to address before we begin.  So maybe it would a

 7    good time while we figure out the license issue?

 8            THE COURT:  Okay.

 9            MR. CONNETT:  The first matter, Your Honor, is

10    counsel for defense had mentioned on Wednesday about if they

11    finish on Monday, doing closing arguments on Tuesday.  And that

12    does present a problem for us, Your Honor.

13            Namely, we do intend, depending on how the testimony comes

14    in, to call Dr. Grandjean for rebuttal.  But because of the

15    time zone difference, calling Dr. Grandjean at the end of the

16    day on Monday or at the start of trial on Tuesday would be

17    about 10:00 o'clock his time in the evening, and his office is

18    about an hour from his home.

19            So we've talked with Dr. Grandjean.  He would be available

20    first thing Wednesday morning.  If we wanted to start at 8:00,

21    he would be available, or 8:30.

22            So what we wanted to propose is we could -- if --

23    obviously, we do not yet know, Your Honor, if we will elect to

24    do rebuttal; but if we did elect to do so, if we could reserve

25    first thing Wednesday morning to do so.  I don't expect it will

**PROCEEDINGS**

1    go very long.  And then maybe take a break and reconvene later

2    in the morning to do closing.

3         **THE COURT:**  All right.  Any objection to that?

4         **MS. CARFORA:**  In principle, no, Your Honor.  I did --

5    I spoke with Mr. Connett last night, and he actually told me he

6    agreed with our proposal to adjourn on Monday and start closing

7    on Tuesday.  So this is the first I'm hearing this.

8         **MR. CONNETT:**  That's -- sorry.  That is correct, Your

9    Honor.  When I spoke with counsel yesterday, I was, again,

10   principle starting Tuesday starts fine.  And I -- it was after

11   that conversation last night, when I started to think through

12   the logistics, I realized that we are -- we are in a -- it

13   would be a bad situation for us to be able to call

14   Dr. Grandjean should we decide to do so.

15        So counsel is completely correct.  I said that I thought

16   Tuesday afternoon made sense for closing, but I failed to

17   appreciate during that conversation that we -- that there could

18   be a conflict for us.

19        **THE COURT:**  Well, all right.  I will -- in light of

20   the circumstances, if it gets too late, I will allow

21   Dr. Grandjean to appear first thing Wednesday, but the length

22   can't be such that it interfere with our ability to close on

23   Wednesday.  We do need to close on Wednesday.

24        **MR. CONNETT:**  And, Your Honor, based on the time that

25   we will probably have left at that point, I don't think we

**PROCEEDINGS**

 1   would have the ability --

 2              **THE COURT:**  I was going to say, that even assumes you

 3   have time.  But if so, that should take care, I would think, of

 4   itself.

 5        So let's go ahead and proceed on that basis.  We will take

 6   some break, but obviously you should prepare to give your

 7   closings on Wednesday either way.

 8              **MR. CONNETT:**  Your Honor, there was one other matter.

 9   EPA filed a motion last night regarding some testimony from

10   Dr. Thiessen.

11              **THE COURT:**  Yes.

12              **MR. CONNETT:**  I think it's a relatively

13   straightforward and simple matter.  I think it would probably

14   be best for EPA, I think for all parties concerned, to clarify

15   and resolve that now so that we certainly believe -- the

16   testimony that Dr. Thiessen provided on Wednesday was more than

17   adequately disclosed, and I think EPA should know that it was

18   disclosed so that they can cross-examine Dr. Thiessen on that

19   testimony today.

20              **THE COURT:**  All right.  Well, let me ask EPA for a

21   response.  It does seem to me that this is a matter for

22   cross-examination.  When somebody gets it wrong, if they have,

23   say, an error in their testimony, I'm sure that will be brought

24   up in cross.  So I'm not sure what we need to do here.

25        I think striking testimony is an extraordinary step,

**PROCEEDINGS**

 1   particularly when you have the medicine of cross-examination.

 2   And if that cross-examination is effective in both rebutting

 3   that fact and in impeaching the credibility of the witness, I'm

 4   not sure I understand why leaving it to cross is not

 5   sufficient.

 6        **MS. BHAT:**  Your Honor, that would be fine.  We could

 7   leave it to cross.  But, of course, we also would like some

 8   recognition that our experts would be able to speak about this

 9   issue.

10        **THE COURT:**  Well, I think that's fair.  Certainly, if

11   it's brought up on direct.

12        You know -- well, I mean, this is a very discrete -- this

13   question here is a very discreet fact, so I don't think we need

14   to worry about disclosures.  I mean, everybody has read the

15   reports, so there's not going to be any surprise.  So let's

16   just take it one step at a time.

17        Again, I'm not extremely sympathetic to the issue of

18   disclosure when it comes to stuff that everybody in the room,

19   except me probably, knows the stuff.

20        **MR. CONNETT:**  Your Honor, with respect to their

21   rebuttal, obviously, we'll have to wait to see what it might

22   be.

23        But I would note that there has been no rebuttal

24   opinion -- so there has been no expert opinion provided by any

25   EPA expert in this case regarding the case reports on fluoride

 1  and headaches and fluoride in other neurological

 2  manifestations.

 3      So I think that any such testimony on that point would

 4  raise a real disclosure problem because they have not done --

 5  they have not offered even the slightest semblance of an

 6  opinion on that issue.

 7          THE COURT:  Well, on the other hand, your witness has

 8  opened the door to a certain extent.  So I'm going to allow --

 9  it depends.  I mean, I'm going to judge that.

10      But, again, I am not in favor of excluding evidence in the

11  nature of this.  Because this is like an administrative

12  proceeding, and I think the Rules of Evidence -- not only

13  because it's a bench trial, but because of the nature of the

14  inquiry here is going to favor more evidence than less.

15      So with that.  Yeah.

16          MR. CONNETT:  Your Honor, one last thing.

17      On Wednesday I know I passed the witness and there was --

18  there was one question at the end that would probably take

19  about ten seconds, but I --

20          THE COURT:  That's fine.  Since cross hadn't started,

21  if you want to reopen and conclude before we pass the witness,

22  that's fine.

23          MR. CONNETT:  Thank you, Your Honor.

24          MS. BHAT:  Your Honor, if I may interject.  We did

25  notice that an exhibit was not moved into evidence and so I'm

**PROCEEDINGS**

 1   not sure if Mr. Connett is referring to that, but that, I

 2   think -- I would like to note that, for Mr. Connett and for

 3   your benefit.

 4            MR. CONNETT:  Which exhibit was that?  Sorry,

 5   counsel.

 6            MS. BHAT:  I believe that was Exhibit 27.  Let me

 7   check my notes.

 8            MR. CONNETT:  Was it the draft risk evaluation for

 9   the --

10            MS. BHAT:  It was a draft risk evaluation.  Oh, yes,

11   it was Exhibit 47.  It was noted in the transcript as having

12   been admitted, but not in the minute entry and it was never

13   moved for admission.

14            MR. CONNETT:  Thank you, counsel.  I appreciate that.

15       And, Your Honor, I -- at this time then plaintiffs would

16   seek to move to introduce that draft risk evaluation into

17   evidence in this case.

18            THE COURT:  All right.  Any objection?

19            MS. BHAT:  No objection, Your Honor.

20            THE COURT:  All right.  So admitted.  You can note

21   that, Angie.

22       (Trial Exhibit 47 received in evidence)

23            THE COURT:  All right.  Anything else?

24            MR. CONNETT:  Not from plaintiffs, Your Honor.

25            THE COURT:  Let me ask Angie whether we found

1    anything about the license?

2           THE CLERK:  Your Honor, I have not heard back from

3    our IT director, but I did send a time sensitive email to him.

4    I should be hearing back momentarily.

5           THE COURT:  All right.  Well, we're going to proceed.

6    You know, I know there has been a lot of interest in this case,

7    and there are people wanting to listen in.  And I don't know if

8    there is another mechanism by which we can do anything absent

9    the clarification of the licensing at this point.

10          THE CLERK:  Your Honor, I know that they can switch

11   that relatively quickly.

12          THE COURT:  All right.  Unless somebody else has a

13   technological temporary fix --

14         MS. CARFORA:  Well, your Honor, one proposal from our

15   side, is it possible to promote somebody to panelist?

16     I mean, one of our experts can't get in.  And we think

17   that -- you know, we would like to have her in so she can hear

18   the testimony.  So that's fairly important to us.

19     Is there any way we can maybe promote somebody to panelist

20   so that she can get in.  I'm looking -- it looks like the

21   attendance is still capped at 101.  So maybe that's an option.

22          THE COURT:  So your concern is one of your experts

23   wanted to listen in and cannot listen in.

24         MS. CARFORA:  That's right.  One of our experts who's

25   -- our expert who is specifically being offered as rebuttal to

**PROCEEDINGS**

```
 1   Dr. Thiessen cannot get in.
 2         And so if it's possible, maybe we can send her an email
 3   with a panelist invite, that she would be able to get access
 4   that way?
 5               THE COURT:  All right.  Angie, is that possible?
 6               THE CLERK:  Yes, Your Honor.
 7               MR. DO:  Your Honor, if I also may.  That would be a
 8   great solution, but for a greater number of folks, I don't know
 9   if we have tried the phone number, whether or not there's a cap
10   to listen via phone number.
11               THE COURT:  Do you know, Angie, whether people can
12   listen in by phone above the cap?
13               THE CLERK:  That I do not know.  I will find out.
14               MR. DO:  I'll give that a try, and I will report
15   back.
16               THE COURT:  All right.  Why don't you try that.
17               MR. CONNETT:  And I am receiving --
18               MS. CARFORA:  Your Honor --
19               MR. CONNETT:  Sorry.
20               MS. CARFORA:  Go ahead, Michael.
21               MR. CONNETT:  I am receiving a text right now, Your
22   Honor, from co-counsel Kay Reeves, and she is having difficulty
23   logging in.  I believe, though, that she does have a panelist
24   specific link.  So it's unclear why that --
25               THE CLERK:  She does have an invitation, Mr. Connett.
```

**PROCEEDINGS**

1          **THE COURT:**  And she can get in with the invitation,

2    right, as a panelist?

3          **THE CLERK:**  She should be able to by clicking the

4    link in her invite.

5          **THE COURT:**  All right.  So we'll have to get your

6    expert's number or contact information or --

7          **MS. CARFORA:**  I understand that we just emailed her

8    contact information over to Angie.

9          **THE COURT:**  Okay.  Once you get that, Angie, you can

10   send the invite to Dr. Tsuji.

11         **THE CLERK:**  Okay.

12         **THE COURT:**  And Mr. Do is trying the phone method.

13         **MS. BHAT:**  Your Honor, while we're waiting for the

14   technological issues to resolve, would it be appropriate at

15   this time for me to move to exclude the witness based on

16   similar grounds as before.  We would just like to make the

17   record clear about this so I can --

18         **THE COURT:**  To exclude which witness?

19         **MS. BHAT:**  Dr. Thiessen, the witness who is supposed

20   to be called.

21         **THE COURT:**  To exclude the witness from what?

22         **MS. BHAT:**  This is a *Daubert* motion, to --

23         **THE COURT:**  Oh, I thought you meant to exclude from

24   the courtroom.  You meant to renew your *Daubert*.

25         **MS. BHAT:**  Yes.

PROCEEDINGS

```
1              THE COURT:  Are you bringing a Daubert -- are you
2    renewing?  I can't remember.
3              MS. BHAT:  Yes.  Well, I think -- we are bringing a
4    Daubert against Dr. Thiessen.  We previously brought a Daubert
5    against Dr. Grandjean.
6         If this would be an appropriate time, I can bring you --
7    or bring this new Daubert against Dr. Thiessen.
8              THE COURT:  All right.  You want to make that motion
9    orally as opposed to a written motion?
10             MS. BHAT:  Yes, Your Honor.
11             THE COURT:  All right.  Why don't you go ahead and
12   make that motion?
13             MS. BHAT:  Your Honor, we would like to move to
14   exclude Dr. Thiessen for her failure to conduct a risk
15   evaluation according to the requirements of TSCA Section 6(b),
16   and for her failure to consider the anticaries health effects
17   of fluoride in her risk evaluation.
18             THE COURT:  All right.  Response?
19             MR. CONNETT:  Your Honor, similar argument as
20   plaintiff's made with respect to Dr. Grandjean.
21        The threshold for admissibility for an expert opinion does
22   not pivot on whether the expert has, according to EPA followed
23   a particular rule under the regulations.  There is nothing that
24   counsel has said that speaks to the reliability or lack thereof
25   of Dr. Thiessen's scientific opinions in this case.
```

PROCEEDINGS

```
 1          THE COURT:  What about the notion about failure to
 2   consider the health benefits?
 3          MR. CONNETT:  Well, it's just incorrect.
 4   Dr. Thiessen discussed at length in two reports the lack of
 5   benefit from swallowing fluoride.  So I don't know even how
 6   counsel could say that to this Court.
 7          THE COURT:  All right.  I will deny the *Daubert*
 8   motion similarly on the grounds that I previously denied the
 9   other motion.
10      I think the failure to comply with any specific
11   methodology is itself not necessarily grounds for exclusion,
12   provided that there is a sufficient basis in terms of
13   disclosure of methodology and bases in -- factual bases in
14   applying that methodology.
15      And I'm sure her testimony will be subject to vigorous
16   cross-examination, and there may be questions about some of the
17   accuracy of her methodology, but there is not a question about
18   the basic scientific reliability generally of the methodology
19   she employed.  There may be some questions about how it was
20   carried out, but not to the extent that is obvious enough to
21   question the basic level of reliability and conformity with
22   scientific standards so as to exclude her under *Daubert*.
23      So I'm going to deny that motion and await
24   cross-examination.  I think the critique will go to the weight
25   of the evidence.
```

PROCEEDINGS

 1        Thank you.

 2            **MS. BHAT:**  Thank you, Your Honor.

 3            **MR. DO:**  Your Honor, with regards to the phone, it

 4    did not work.  It said the meeting is full.

 5        However, we do note the attendees are starting to go up.

 6    So perhaps it's been resolved.

 7            **THE COURT:**  Oh, do you know, Angie?

 8            **THE CLERK:**  Yes, Your Honor.  The IT director just

 9    replaced our license with the 500.

10            **THE COURT:**  Okay.  All right.  Well, hopefully, not

11    too many people got discouraged from that.

12        What about Dr. Tsuji?

13            **MS. CARFORA:**  We are checking right now, Your Honor.

14            **THE COURT:**  It appears she can now join.  But maybe

15    you should let her know whether she comes in as a panelist or

16    just as an attendee able to observe.

17            **MS. CARFORA:**  We're going to give her a phone call

18    right now and let her know that she should have the option.  It

19    does look like the attendee list is growing, so she would have

20    the option of getting in either way, and we're letting her know

21    that right now.

22            **THE COURT:**  All right.

23        All right.  As soon as you let her know, we should

24    commence.

25            **MS. CARFORA:**  She is attempting to get in right now,

**PROCEEDINGS**

```
1    Your Honor.  Two more minutes please.

2              THE COURT:  Okay.

3         (Brief pause.)

4              MS. CARFORA:  Thank you, Your Honor.  Dr. Tsuji was

5    able to join, so we are all set.

6              THE CLERK:  If she could raise her hand?

7              MS. CARFORA:  She won't be testifying until later.

8    Did you want her to raise her hand?

9              THE COURT:  She doesn't need to at this point, as

10   long as she's listening in.

11        All right.  Ready to proceed?

12             THE CLERK:  Your Honor, we have Ms. Kay Reeves

13   joining us right now on the panel.

14             THE COURT:  Okay.  Great.  Thank you.  So we're

15   complete, and let's commence.  Who is going to conduct the

16   cross?

17             MR. CONNETT:  Your Honor, plaintiffs just have that

18   one last question.

19             THE COURT:  Oh, yeah.  The one last, that's right.

20   Go ahead.

21        Is Dr. Thiessen... I don't see her.  Oh, okay.  She needs

22   to be brought into the well.

23        (Brief pause.)

24             THE COURT:  Good morning, Dr. Thiessen.

25             THE WITNESS:  Good morning, Your Honor.
```

THIESSEN - CROSS / BHAT

```
 1              THE COURT:  Okay.  Mr. Connett, you still have the
 2    floor.
 3                        KATHLEEN THIESSEN,
 4    called as a witness for the Plaintiff herein, having been
 5    previously sworn, resumed the stand and testified further as
 6    follows:
 7                    DIRECT EXAMINATION RESUMED
 8    BY MR. CONNETT
 9    Q.   Good morning, Dr. Thiessen.
10         How many times in your initial expert report in this case
11    did you reference the Guidelines for Neurotoxicity Risk
12    Assessment?
13    A.   That was something like 76 times in about 69 pages of
14    text.
15    Q.   Thank you.
16              MR. CONNETT:  No further questions, Your Honor.
17              THE COURT:  All right.  Cross-examination.
18              MS. BHAT:  Thank you, Your Honor.
19                        CROSS-EXAMINATION
20              MS. BHAT:  Thank you, Your Honor.
21    BY MS. BHAT
22    Q.   Dr. Thiessen, between the adjournment of court on
23    Wednesday and right now did you speak to plaintiff's counsel
24    about your trial testimony?
25    A.   I spoke to plaintiff's counsel, yes.
```

**THIESSEN - CROSS / BHAT**

1    **Q.**   Was that about your trial testimony?

2    **A.**   It was about what I could expect today.

3    **Q.**   And did he provide you any facts or assumptions to speak

4    about today?

5    **A.**   No.

6    **Q.**   Dr. Thiessen, you testified on Wednesday about margin of

7    exposure and reference dose calculations.  Is it all right if I

8    refer to those as risk calculations?

9    **A.**   That might get into details of how EPA defines these

10   terms, but they are calculations used in the process of

11   characterizing or determining risk.

12   **Q.**   Will you understand me to mean margin of exposure and

13   reference dose calculations, as you call them, if I refer to

14   them as risk calculations?

15   **A.**   I'll understand what you're talking about, yes.

16   **Q.**   Thank you.

17       Now, Dr. Thiessen, it is possible to take data from any

18   animal toxicity study and plug it into a risk calculation;

19   correct?

20   **A.**   From any?  There are probably some where it would not be

21   possible.  But it is probably possible to select any of a

22   number of studies, sure.

23   **Q.**   It is best practice to evaluate the quality of scientific

24   studies before deciding whether to use them in a risk

25   calculation; correct?

**THIESSEN - CROSS / BHAT**

1  **A.**   Yes.

2  **Q.**   It is also best practice to define a set of criteria to

3  use to evaluate the quality of those studies before evaluating

4  those studies; correct?

5  **A.**   Yes.  There is an accepted set that one uses.  They are

6  not always formally spelled out.

7  **Q.**   And you did not define quality criteria before you

8  conducted your PubMed search for animal studies; correct?

9  **A.**   Now you're asking a different question.

10 **Q.**   Yes, I'm asking a different question.

11       You did not define quality criteria before you conducted

12 your PubMed search of animal studies for this case; correct?

13 **A.**   I did not define a specific set of quality criteria before

14 the search, no.

15 **Q.**   And your PubMed search was not as exhaustive a search as

16 EPA would do for TSCA backed risk evaluations, correct?

17 **A.**   I would hope that EPA would do a thorough search of the

18 literature, but I don't have -- but I don't have specific

19 examples of how thoroughly they have searched.  So I can't say.

20 **Q.**   You would agree that your PubMed search did not result in

21 an exhaustive list of animal toxicity studies on neurotoxicity

22 and neurodevelopment; correct?

23 **A.**   I said in my report that it was probably not an exhaustive

24 search, but it would be adequate to the purpose of

25 demonstrating that there was a neurotoxicity hazard.

1  Q.   Now, some of these that don't blind experimenters are not

2  considered quality studies; correct?

3          MR. CONNETT:  Overbroad.

4  A.   I'm sorry.  Could you repeat that?

5          THE COURT:  Please rephrase or repeat that.

6          MS. BHAT:  Yes.

7  BY MS. BHAT

8  Q.   Animal studies that don't blind experimenters are not

9  considered good quality studies; correct?

10  A.   That don't blind experimenters to what?

11  Q.   That don't blind experimenters as to outcome assessment,

12  for example.

13  A.   It's normally considered best practice to blind the

14  assessment, the outcome assessment.

15  Q.   Now, you based your risk calculations on ten animal

16  studies; correct?

17          MR. CONNETT:  Overbroad.

18          THE COURT:  Well, no.  I -- well, if you can answer

19  that question, go ahead.

20  A.   There were ten animal studies that I identified as good

21  examples for this purpose.  That does not mean they were the

22  only ones possible.

23  BY MS. BHAT

24  Q.   There is no mention of blinding as to outcome assessment

25  in some of the ten animal studies that you based your risk

```
 1   calculations on; correct?
 2   A.    It's been too long since I looked at them.
 3           MS. BHAT:  Your Honor, permission to show the
 4   witness's declaration?
 5           THE COURT:  All right.
 6           MS. BHAT:  245, Page 203.
 7           THE COURT:  Which exhibit number is this?
 8           MS. BHAT:  This is the witness's declaration.
 9           THE COURT:  Oh, the declaration.  And where, 203?
10           MS. BHAT:  Paragraph 203, yes.
11      (Document displayed)
12   BY MS. BHAT
13   Q.    Now, in this declaration, the first sentence that you --
14   you state that the points of departure that you used for the
15   RfDs and MOEs, which I have been calling risk calculations,
16   have methodological limitations including lack of blinding.
17      Did I read that correctly?
18   A.    You've read that correctly.  Not all of the studies
19   suffered from all of these limitations.
20   Q.    Do you recall how many of the ten studies that you based
21   your risk calculations on failed to mention blinding?
22   A.    I don't have that number right now.
23   Q.    Lack of mention to randomization to treatment group is
24   also an indication of poor quality in animal studies; correct?
25   A.    Repeat that, please.
```

THIESSEN - CROSS / BHAT

1  Q.   If there is no mention of randomization to treatment

2  group, that's an indication of poor quality in an animal study;

3  correct?

4  A.   It may simply be a -- an example of poor reporting as

5  opposed to poor carrying out of the study.

6  Q.   As the study does not mention randomization to treatment

7  group, you can't conclude either way whether it's poor quality

8  or they simply did it, but didn't mention it; correct?

9  A.   That's correct.

10  Q.   Now, did you not evaluate --

11        MS. BHAT:  Mr. Hambrick, you can close.  Thank you.

12     (Document removed from display)

13  BY MS. BHAT

14  Q.   You did not evaluate whether the ten studies that you used

15  for your risk calculations randomized to treatment groups;

16  correct?

17  A.   Some of them did.  I don't know whether all of them did.

18  Q.   One of the studies that you rely on for your risk

19  calculations is Wang 2018; correct?

20  A.   You'll have to show me the list.  The Chinese names tend

21  to run together.

22        MS. BHAT:  Mr. Hambrick, can you pull up the

23  witness's declaration again?  That's 245.  And I believe we're

24  looking at 42, Table 2 .

25     (Document displayed.)

1    BY MS. BHAT

2    **Q.**    One of the animal studies that you rely on for your risk

3    calculations is Wang 2018; correct?

4    **A.**    Yes.

5    **Q.**    This study mentions that pellets were randomly placed on

6    maze; correct?

7    **A.**    I'm sorry?  I couldn't understand something.

8    **Q.**    In discussing randomization, this study mentions that the

9    pellets were randomly placed on a maze; correct?

10   **A.**    You said "pallets"?  I don't understand your word.

11   **Q.**    Pellets.  Pellets as in -- pellets as --

12   **A.**    Oh, pellets.

13   **Q.**    -- in objects that were placed on a maze.

14   **A.**    Like rat chow pellets.

15   **Q.**    Yes.  So the question is:  Wang 2018 mentions

16   randomization in the context that pellets were randomly placed

17   on a maze; correct?

18   **A.**    I don't remember.

19          **MS. BHAT:**  Permission to refresh the witness's

20   recollection.

21          **THE COURT:**  All right.

22          **MS. BHAT:**  Mr. Hambrick, can we pull up T-53 on

23   Page 2, in the right column?  That's Paragraph 2.3.

24       (Document displayed)

25

 1   BY MS. BHAT

 2   Q.    Now, you see here in this middle -- in the middle of this

 3   paragraph?  Dr. Thiessen, can you see what's on your screen?

 4   A.    Yes.

 5   Q.    And does this refresh your recollection that Wang 2018

 6   mentions randomization in the context of pellets being randomly

 7   placed on a maze?

 8   A.    Yes.

 9   Q.    Can you recall any other mention of randomization in this

10   study?

11   A.    I don't remember.

12          MS. BHAT:  Mr. Hambrick, you can clear the screen.

13       (Document removed from display)

14   BY MS. BHAT

15   Q.    Do you recall how many of your ten animal studies

16   mentioned randomization outside the context of randomization

17   treatment group?

18   A.    I don't remember.

19   Q.    Now, another factor that the National Toxicology Program

20   considers in its quality assessments of animal studies is

21   whether those studies controlled for litter effects; correct?

22   A.    Yes.

23   Q.    Were you able to listen in yesterday when Dr. Thayer

24   testified about the importance of controlling for litter

25   effects?

 1   **A.**   Yes.

 2   **Q.**   Seven of the ten studies that you base your risk

 3   calculations on failed to mention that they controlled for

 4   litter effects; correct?

 5   **A.**   I don't have the number.

 6           **MS. BHAT:**   Permission to refresh with the

 7   declaration?

 8           **THE COURT:**   Go ahead.

 9           **MS. BHAT:**   T-45, Page 41, paragraph 122.

10       (Document displayed.)

11   **BY MS. BHAT**

12   **Q.**   Seven of the ten studies that you base your risk

13   calculations on failed to mention that they controlled for

14   litter effects; correct?

15   **A.**   That's what it says.  But three of them did, and that

16   still provides toxicity values, RfDs that show -- that show

17   that they -- the provided toxicity value that is not

18   protective.  I mean, that is still below what the exposures are

19   to humans.

20   **Q.**   Well, I do want to talk about your risk calculations, but

21   before that, let's talk about the three studies that you

22   mentioned do control for litter effects.

23       Those three studies are the two Bartos studies and

24   McPherson 2018; correct?

25   **A.**   I think so, yes.

1    Q.    Now, in your declaration you list the animals studies in

2    study in Bartos 2019 as female rats; correct?

3    A.    I don't remember right now.

4          MS. BHAT:  Can we go to Page 42 of this declaration?

5          (Document displayed.)

6    BY MS. BHAT

7    Q.    In this declaration you list the animals studied in Bartos

8    2019 as female rats; correct?

9    A.    Yes.

10   Q.    And you note that there was no level at which these female

11   rats failed to exhibit an adverse effect; correct?  That's in

12   the NOAEL column?

13   A.    That's correct.

14   Q.    Bartos 2019 also studies male rats; correct?

15   A.    Bartos which?

16   Q.    Bartos 2019 also studies male rats; correct?

17   A.    I don't remember:

18         MS. BHAT:  Permission to refresh?

19         THE COURT:  Okay.

20         MS. BHAT:  T-02, Bartos 2019.  In the right column,

21   middle paragraph.

22         (Document displayed.)

23   BY MS. BHAT

24   Q.    Bartos 2019 also studies male rats; correct?

25   A.    This is referring to male offspring of the female rats.

THIESSEN - CROSS / BHAT

1  Q.   Bartos 2019 also studies effects in male offspring;

2  correct?

3  A.   Yes.

4  Q.   And when you are referring to the effects on female rats

5  in Bartos 2019 in your declaration, those were female

6  offspring; correct?

7  A.   The way -- as stated in that table, that's the female

8  mothers of these offspring that were exposed during the

9  development, during the gestational development of the

10 offspring.

11 Q.   So in your declaration in Bartos 2019, what you're

12 referring to about the effects of learning and memory are not

13 actually on the offspring; is that correct?

14 A.   The effects -- it's a study of effects on the offspring of

15 exposing the mother during --

16 Q.   Well, that's -- well, in all ten of your animal studies it

17 was the female mother of the rats that were exposed to the

18 dose; correct?

19 A.   Yes.

20 Q.   But you only noted female rats for Bartos 2019; correct?

21 A.   Yes.

22 Q.   And so you were referring to female offspring when you

23 were referring to female rats in Bartos 2019; correct?

24 A.   That might be.  I don't remember specifically.

25 Q.   Now, Bartos 2019 found that male rats failed to exhibit an

```
 1   adverse effect at 10 milligrams per liter; correct?

 2            MR. CONNETT:  Overbroad.

 3            THE COURT:  Overruled.  You can ask.

 4            THE WITNESS:  You'll have to show me that paragraph

 5   again, please.

 6            MS. BHAT:  May we pull up 202 again?  Page 7, same

 7   paragraph; right column, middle paragraph.

 8       (Document displayed.)

 9   BY MS. BHAT

10   Q.   Bartos 2019 found that the male rats failed to exhibit an

11   adverse effect at 10 milligrams per liter; correct?

12   A.   That's what it says.

13   Q.   And that's correct, yes?

14            MR. CONNETT:  Overbroad.

15            THE COURT:  Overruled.

16       I'd like an explanation of the first part of that

17   sentence:

18            "Could observe a trend of greater response at

19        5 milligrams, whereas for the higher dose the response

20        was lesser or non-significant."

21       I'd like a comment on that and explanation of what that

22   means, Dr. Thiessen.

23            THE WITNESS:  I'm looking at it.  I don't remember

24   the details of the study sufficiently to give you the response

25   you would like to have.  And I apologize for that.
```

 1        (Brief pause.)

 2            **THE WITNESS:**  These, apparently, contradictory

 3   effects are seen sometimes, and I apologize that I cannot give

 4   you a proper explanation at this moment.

 5            **THE COURT:**  Okay.  But it does seem on its face

 6   contradictory to what one would think?

 7            **THE WITNESS:**  There are instances of dose response

 8   curves that are not -- not nice and neat.  They are either kind

 9   of U-shaped or they are super imposition of two dose response

10   curves, one for one mechanism and one for another mechanism, so

11   that the effect looks like a U-shaped dose response curve.  And

12   that can give seemly contradictory results.

13        One has to get into more of the details of what's going on

14   in the mechanisms and sometimes it's possible to figure that

15   out than and sometimes not.

16            **THE COURT:**  All right.  But as I understand that

17   sentence, it's almost an inverted U?  It's not a --

18            **THE WITNESS:**  Sometimes they are inverted Us, yes.

19            **THE COURT:**  Okay.

20            **MS. BHAT:**  You can clear the screen, Mr. Hambrick.

21        (Document removed from display)

22   **BY MS. BHAT**

23   **Q.**   Dr. Thiessen, you agree that Bartos 2019 does not show a

24   linear dose response trend; correct?

25   **A.**   For the females I believe it does, but I don't have the

**THIESSEN - CROSS / BHAT**

1    paper in front of me to know for certain.

2    **Q.**    You do agree that Bartos 2019 does not show a linear dose

3    response trend in the males; correct?

4    **A.**    That's what that paragraph indicated.

5    **Q.**    And that's correct?

6         (No response.)

7    **Q.**    Is that correct?

8    **A.**    That's what that paragraph indicated.

9    **Q.**    And do you understand that to be correct?

10   **A.**    I'd have to look at the paper again.

11   **Q.**    Now, in your declaration, in that table of animal studies,

12   you reported the results of McPherson in one line; correct?

13   **A.**    Yes.

14   **Q.**    That was Table 2 of your declaration; correct?

15   **A.**    Yes.

16   **Q.**    The results of nine different experiments on your

17   behavioral outcomes are reported in McPherson; correct?

18   **A.**    There are a number of experiments reported.  I don't

19   remember specifically if it's nine, but there are several, yes.

20         **MS. BHAT:**  Your Honor, permission to refresh

21   recollection.

22         **THE COURT:**  Yep.

23         **MS. BHAT:**  T-38, Page 3, first full paragraph.

24         **THE COURT:**  What are we looking at now?

25         (Document displayed.)

1          MS. BHAT:  McPherson 2018.

2          THE COURT:  Oh.

3  BY MS. BHAT

4  Q.   Dr. Thiessen, the results of nine different experiments on

5  the neurobehavioral outcomes are reported in McPherson;

6  correct?

7  A.   I've not had opportunity to count them.

8       (Brief pause.)

9  Q.   Just let me know when you're done counting.

10 A.   I think I'm counting eight.  But anyway, there are

11 several, yes.

12          MS. BHAT:  Mr. Hambrick, you can clear the screen.

13      (Document removed from display)

14 BY MS. BHAT

15 Q.   Bartos 2018, which is also in your table as one line,

16 reported the results of one experiment on neurobehavioral

17 outcomes; correct?

18 A.   I don't remember for certain.

19 Q.   Bartos 2019 reported the results of one experiment on

20 neurobehavioral outcomes; correct?

21 A.   I think that's correct, but I'm not certain.

22 Q.   You would agree if the animal studies that you base your

23 risk calculations on are unreliable, then your risk

24 calculations are also unreliable; correct?

25 A.   You're asking a conditional.  If a study is unreliable,

 1   then conclusions from it are probably unreliable, yes.

 2   Q.    Now, you make some criticisms of McPherson 2018.   Those

 3   criticisms are not criticisms that the National Toxicology

 4   Program would make of a quality of an animal study; correct?

 5             MR. CONNETT:   Overbroad.

 6             THE COURT:   Could you rephrase that?   I'm not sure I

 7   understood the question.

 8             MS. BHAT:   All right.

 9   BY MS. BHAT

10   Q.    The National Toxicology Program has a list of quality

11   criteria on which it judges animal studies; correct?

12   A.    Yes.

13   Q.    You make criticisms of McPherson 2018, but those

14   criticisms are not the same as any of the quality criteria that

15   the National Toxicology Program has; correct?

16   A.    I have not actually sat and made a comparison of those.

17   Sorry.

18   Q.    One of the criticisms that you make about McPherson 2018

19   is that it uses a particular strain of rats, Long-Evans hooded

20   rats; correct?

21   A.    Yes.

22   Q.    The National Toxicology Program does not consider it an

23   indication of poor quality for an animal study to use this

24   strain of rats; correct?

25   A.    I don't know that they list a specific strain in their

 1    list of criteria.  However, that strain is a different strain

 2    than was used in any of the other studies, which makes it right

 3    up front difficult to make a comparison, because that leaves

 4    open a very wide possibility that differences in results

 5    between McPherson's study and other studies is due, at least in

 6    part, to differences in the strain of rat used.

 7    **Q.**   Are you familiar with a 1998 study by Varner showing

 8    neurotoxic effects from fluoride in this strain of rats?

 9    **A.**   Yes.

10    **Q.**   One other criticism that you have of McPherson 2018 is

11    that it starts exposure on the sixth day of gestation; correct?

12    **A.**   Yes.

13    **Q.**   You read this criticism in an article by Spencer and

14    Limeback; correct?

15            **MR. CONNETT:**  Overbroad.

16    **A.**   It's in --

17            **THE COURT:**  Overruled.  Go ahead.

18    **A.**   I believe it's in their article, but that's not

19    necessarily where I came up with it.

20    **BY MS. BHAT**

21    **Q.**   You've read the article by Spencer and Limeback

22    criticizing McPherson; correct?

23    **A.**   Yes.

24    **Q.**   Neither Spencer nor Limeback is a toxicologist; correct?

25    **A.**   Dr. Limeback has made presentations at Society of

1    Toxicology meetings.

2    **Q.**    Spencer is not a toxicologist; correct?

3    **A.**    Correct.

4    **Q.**    And Dr. Limeback is not a toxicologist; correct?

5    **A.**    Not primarily, no.

6    **Q.**    Dr. Limeback is a dentist; correct?

7    **A.**    Dr. Limeback is a researcher and a dentist.

8    **Q.**    Now, back to this sixth day of gestation criticism,

9    McPherson 2018 is not the only one of the ten studies in your

10   chart that begin gestation on or after day six; correct?

11   **A.**    That began -- I believe you mean exposure after -- or

12   after day six of gestation.  That's correct.  Some of the other

13   ones started later also.

14   **Q.**    EPA recommends that for developmental neurotoxicity

15   studies exposure begins on the sixth day of gestation; correct?

16              **MR. CONNETT:**  Overbroad.

17   **A.**    I don't know.

18   **BY MS. BHAT**

19   **Q.**    Well, in your expert report you cited EPA's 1998 Health

20   Effects Test Guidelines; correct?

21   **A.**    Which guidelines are you -- the Guidelines for

22   Neurotoxicity Risk Assessment; is that what you're asking?

23   **Q.**    No.  I'm referring to EPA's 1998 Health Effects Test

24   Guidelines by OPPTS.

25   **A.**    Okay.

1   Q.   The developmental neurotoxicity study.

2   A.   Right.  I do not remember which day they suggest that

3   study should start, but a number of studies have started by

4   exposing the mother prior to mating and beginning of gestation.

5        So there is the possibility for effects to occur during

6   early gestation that would not be picked up by starting

7   exposures later in gestation.

8   Q.   Well, the gestation of rats is different from the

9   gestation of humans; correct?

10  A.   The -- I didn't catch your first word.

11  Q.   The gestation in rats is different than the gestation in

12  humans; correct?

13  A.   In what way are you referring to?

14  Q.   I am referring to the, quote/unquote, first trimester that

15  you talk about.

16       The first trimester in a rat is not similar to the first

17  trimester in a human in the sense that there is no fetus that

18  is attached; correct?

19  A.   There are some differences in the developmental stages

20  during gestation.  I don't remember all of the specifics at

21  this moment.

22  Q.   The other criticism that you have of McPherson is that the

23  offspring were breastfed; correct?

24  A.   That's a criticism that can be made of every animal study

25  of neurotoxicity of fluoride that I'm aware of.  There is no --

1    the pups are breastfed, nursed might be a better word, by their

2    mother.  So there's no equivalent in the animal studies to the

3    bottle feeding, formula feeding of human infants.

4    **Q.**   Now, another criticism that you make of McPherson is that

5    it only uses male offspring; correct?

6    **A.**   That's correct.

7    **Q.**   And you cite the results from only one gender and three

8    other studies in Table 2 your declaration; correct?

9    **A.**   In at least one case.  I don't remember all of them.  But

10   that -- ideally one would like to have both sexes in any of

11   these experiments.

12           **MS. BHAT:**  Your Honor, permission to refresh

13   recollection with the declaration.

14           **THE COURT:**  Permitted.

15           **MS. BHAT:**  T-45, Page 42, Table 2.

16      (Document displayed.)

17   **BY MS. BHAT**

18   **Q.**   Dr. Thiessen, you cite the results from only one gender

19   and three other studies in Table 2 of your declaration;

20   correct?

21   **A.**   Yes.

22   **Q.**   Now, before we move to your risk calculations, I would

23   like to mention couple of other studies in your direct

24   testimony that I would like to ask you about.

25           One of the studies that you had mentioned on Wednesday was

 1  authored by Malen; correct?

 2  A.   Yes.

 3           MS. BHAT:  Mr. Hambrick, you can clear the screen.

 4       (Document removed from display)

 5  BY MS. BHAT

 6  Q.   That study does not measure cognitive outcomes of any

 7  kind; correct?

 8  A.   That's correct.

 9  Q.   In that study Malen found that overall there was no

10  statistically significant association between urinary fluoride

11  and serum thyroid stimulating hormone; correct?

12  A.   For the population as a whole.

13       Now, she did find elevated thyroid stimulating hormone,

14  which is an indicator of low thyroid function.  She did find

15  that, associated with fluoride exposure in the part of the

16  population that was deficient in iodine.

17  Q.   Malen is a cross-sectional study; correct?

18  A.   I believe so, yes.

19  Q.   And the other study that you mentioned on thyroid was a

20  study by Peckham; correct?

21  A.   Yes.

22  Q.   And in this study hypothyroidism was assessed based on the

23  prevalence over a practice area; correct?

24  A.   Yes.

25  Q.   The study did not collect data from individuals about

1    hypothyroidism; correct?

2    **A.**    No.  That is data from individuals collected as -- as in

3    the records of the various practices.  This is most of the

4    country and England and most of the medical practices.  And

5    they have diagnoses of individual cases of hypothyroidism in

6    those records.

7    **Q.**    But the assessment was based on an ecological measure of

8    prevalence in a practice area; correct?

9    **A.**    That's -- the -- the practice areas were looked at.  So

10   that's -- that's an ecological variable, but the -- but it is

11   an individual variable in terms of the -- whether -- whether

12   any individuals had hypothyroidism or not.  That's an

13   individual variable.

14   **Q.**    There was no individual assessment of fluoride exposure;

15   correct?

16   **A.**    That's correct.

17   **Q.**    There were only three confounders adjusted for in this

18   study; correct?

19   **A.**    I don't remember specifically.

20          **MS. BHAT:**  Permission to refresh recollection.

21          **THE COURT:**  All right.

22          **MS. BHAT:**  T-66.  That's on Page 4, Table 2.

23       (Document displayed.)

24   **BY MS. BHAT**

25   **Q.**    I would like to draw your attention to the asterisk.

1          Now, there are only three confounders adjusted for in this

2     study; is that correct?

3     **A.**   I'm not certain that those are properly called

4     confounders.

5     **Q.**   But there are three of them that are controlled for in the

6     study; correct?

7     **A.**   There are things that they adjusted for, but that's not

8     the same as a confounder.

9     **Q.**   There are three categories that they adjusted their

10    results for in the study; correct?

11    **A.**   Yes.

12              **MS. BHAT:**   Mr. Hambrick, you can clear the screen.

13         (Document removed from display)

14    **BY MS. BHAT**

15    **Q.**   Now, back to our primary topic of investigation here.

16         You believe it's clear that fluoride causes the

17    blood-brain barrier; correct?

18    **A.**   Yes.

19    **Q.**   And you believe that neurodevelopmental effects are the

20    most sensitive endpoint of fluoride exposure; correct?

21    **A.**   They are very definitely a sensitive measure of -- a

22    sensitive effect of fluoride exposure, probably the most

23    sensitive.

24    **Q.**   And you believe you have good evidence to support that

25    conclusion?

**THIESSEN - CROSS / BHAT**

1  A.   Yes.

2  Q.   All of the prospective cohort studies on maternal urinary

3  fluoride and cognitive outcome show an adverse effect; correct?

4  A.   Yes.

5  Q.   And you believe that infants are a highly susceptible

6  subpopulation; correct?

7  A.   Yes.

8  Q.   And it's well established that fluoride does not break

9  down into metabolites; correct?

10  A.   It cannot.   It's -- it is as close to the elementary

11  substances as possible to get in that situation.

12  Q.   Now, metabolization and causing blood-brain barrier, that

13  falls within the general category of things you would call

14  toxicokinetic and toxicodynamic data; correct?

15  A.   Yes.

16  Q.   Uncertainty factors are adjusted for in light of

17  information about toxicokinetics and toxicodynamics; correct?

18  A.   Among other things, yes.

19  Q.   But you applied the default intra species uncertainty

20  factor of ten for all of your risk calculations; correct?

21  A.   For intraspecies, within human variations susceptibility,

22  yes.   I used a factor of ten.

23  Q.   Well, for intraspecies uncertainty, that factor is

24  adjusted for when you have information about toxicokinetic and

25  toxicodynamic data; correct?

THIESSEN - CROSS / BHAT

1   A.   Those terms are usually used more with respect to the

2   uncertainty factor applied for extrapolating from animal

3   studies to human studies, and not so much for the intrahuman

4   uncertainties and variabilities.  That has more to do with

5   uncertainties in -- variations in uncertainties for susceptible

6   subgroups within the human population and uncertainties about

7   whether those have been adequately characterized.

8   Q.   Well, I'll return to that uncertainty, but just to wrap up

9   about this toxicokinetic and toxicodynamic data.

10       You rely on a toxicological review of trimethylbenzenes;

11  correct?

12  A.   I looked at it, yes.

13  Q.   And this review concludes that one way that human

14  susceptibility varies is in the expression of enzymes involved

15  in metabolism, correct?

16  A.   That would matter for trimethylbenzenes in a way.  It does

17  not matter for fluoride.

18  Q.   Now, to return to other susceptibilities.  You applied the

19  intraspecies uncertainty factor of ten to -- even to

20  subpopulations that you consider highly susceptible; correct?

21  A.   Yes.

22  Q.   Now, reference doses should be applicable to susceptible

23  populations, but they don't need to be applicable to

24  hypersensitive individuals; correct?

25  A.   No.  Hypersensitive individuals would constitute one

1  susceptible subgroup of a population.

2  Q.   Well, you rely on EPA's review of reference doses and

3  reference concentrations in your report; correct?

4  A.   Yes.

5  Q.   And EPA recommends that reference doses don't necessarily

6  need to protect hypersensitive individuals; correct?

7  A.   That -- if -- if the study on which the reference dose is

8  being based includes those susceptible individuals or is based

9  on a study of those susceptible individuals then that would be

10 appropriate.  But if it's a general study, then it's -- it's

11 not going to be protective of a susceptible subset that

12 includes hypersensitive individuals.

13 Q.   And the animal studies that you base your risk

14 calculations on, they test the offspring of pregnant rats;

15 correct?

16 A.   Yes.

17 Q.   And you did not actually report margins of exposure,

18 reference doses, calculated from intake rates of pregnant

19 women; correct?

20 A.   We had -- I had intakes for adults that would have

21 included pregnant women, but I don't think I had them

22 separately.  There's not -- not necessarily a great difference

23 in water intake between pregnant women and women of

24 childbearing age generally.

25 Q.   We'll talk more about the water intake data that you

**THIESSEN - CROSS / BHAT**

1    looked at.

2        You did not do a thorough search for water intake data

3    when preparing your original report; correct?

4    **A.**   I used existing exposure information that I already had

5    that had already been -- already had the -- the water intake

6    data converted to fluoride exposures that I already had for the

7    relevant population subgroups.  And following EPA's example

8    in -- in some other risk evaluations there was no need to

9    reinvent wheels and do a -- an exhaustive search all over

10   again.

11   **Q.**   Now --

12   **A.**   It was already fit for the purpose of -- of demonstrating

13   what the risks would be at those levels of intake.

14   **Q.**   And you submitted three expert reports in this case;

15   correct?

16   **A.**   Yes.

17   **Q.**   It wasn't until your last expert report that you cited new

18   intake numbers from a 2019 EPA handbook; correct?

19   **A.**   Yes.

20   **Q.**   That was after plaintiff's counsel told you about chapter

21   three of the 2019 handbook; correct?

22   **A.**   Yes.  He said it had been brought up.  I ran the

23   calculations -- I looked at that one.  Then there was no

24   significant difference in the -- the levels of intake reported

25   and no significant difference in the -- no difference in the

1  outcomes of the risk -- of the risk determinations that

2  would -- that I made.

3  **Q.**   Chapter three of the 2019 handbook was published before

4  you submitted your first expert report in this case; correct?

5  **A.**   Yes.

6  **Q.**   Now, you talked about fit for purpose.  You didn't

7  actually analyze whether the intake rates you used, whether

8  the -- the 2019 intake rates were fit for purpose for your risk

9  evaluation; correct?

10  **A.**   I did not do any kind of a formal evaluation of that, but

11  there's not really any need.  There's -- they are perfectly

12  reasonable estimates of fluoride exposure that -- that I

13  already had and that included some population subgroups that

14  were not in the EPA 2019 report.

15  **Q.**   You did not evaluate the statistical reliability of the

16  intake rates that you based your risk calculations on?

17  **A.**   Statistical reliability is something that EPA dealt with

18  in the derivation of those intake rates in the 2019 report and

19  in the EPA 2000 report, which was the basis for the exposure

20  estimates that I used.

21       Given that EPA published both sets, and one other set in

22  between, as their -- well, the 2019 report says scientifically

23  sound and up to date.  The two earlier ones I think said

24  similar things.  But they were prepared for the purpose of risk

25  assessment.

1          EPA did the statistical evaluations, had the information

2     to do that with.  I did not have the information to do a

3     statistical evaluation of the whole dataset.  I used the

4     summary that -- in either case, I used the summary that EPA

5     provided.

6     **Q.**   Well, in the 2019 EPA handbook, EPA identifies the 95th

7     percentile numbers that you used for infants as less

8     statistically reliable; correct?

9     **A.**   There is that in some cases because of sample size issues,

10    certainly.

11    **Q.**   Now, your risk calculations are not based on outcomes of

12    IQ lost; correct?

13    **A.**   I'm sorry?

14    **Q.**   The studies that you base your risk calculations on, those

15    did not measure IQ loss; correct?

16    **A.**   No.  Those are animal studies and IQ is not -- not

17    measured specifically in animal studies.  That's a measure of

18    human cognitive abilities.

19    **Q.**   Those animal studies test learning and memory; correct?

20    **A.**   Yes.

21    **Q.**   And those learning and memory tests rely on observations

22    of those animals performing physical activity; correct?

23    **A.**   Yes.

24    **Q.**   The National Toxicology Program has cautioned for those

25    types of studies impaired motor function could effect the

THIESSEN - CROSS / BHAT

1  results that you see in those learning and memory tests, as

2  opposed to some sort of neurocognitive effect; correct?

3  **A.**   I'm aware of that, yes.  The motor sensory effects are

4  also neurotoxic effects.

5       Also, what could have been included was neuroanatomical

6  and neurochemical effects, some of which occurred at even lower

7  exposures.

8       So the learning and memory is only a subset of the

9  available information on neurotoxicity.

10  **Q.**   Regarding the human data, you did not thoroughly look at

11  the human data yourself; correct?

12  **A.**   It was my understanding that Dr. Grandjean was doing that,

13  so I did not specifically do that.

14  **Q.**   And you looked at Dr. Grandjean's report only briefly;

15  correct.

16            **THE COURT:**  At what time frame are we talking about?

17  **BY MS. BHAT**

18  **Q.**   At the time that you were forming your opinions in this

19  case, at the time that you were writing your expert reports in

20  this case, you had looked at Dr. Grandjean's report only

21  briefly; correct?

22  **A.**   At the time of the -- of my initial report, I think his

23  report was prepared about the same time.  So that would have

24  been only briefly, yes.

25  **Q.**   Did you read Dr. Grandjean's report when you developed

1    your opinions for your original report?

2    **A.**    I looked at it when it became available to me.   Whenever

3    that time frame was.

4    **Q.**    You received Dr. Grandjean's report on August 1st 2019;

5    correct?

6    **A.**    That may be.   I don't remember exactly.

7              **MS. BHAT:**   Permission to refresh recollection?

8              **THE COURT:**   Permitted.

9              **MS. BHAT:**   T-25.

10        (Document displayed.)

11   **BY MS. BHAT**

12   **Q.**    You received Dr. Grandjean's report on August 1st, 2019;

13   correct?

14   **A.**    Yes, apparently.

15   **Q.**    That was after you had submitted your original report for

16   this case; correct?

17   **A.**    Yes.

18   **Q.**    But you still concluded in your original report that

19   community water fluoridation poses a non-acceptable risk;

20   correct?

21             **MS. BHAT:**   You may clear the screen, Mr. Hambrick.

22        (Document removed from display)

23   **A.**    I concluded that it poses an unacceptable risk based on

24   the data available to me certainly, yes.

25

THIESSEN - CROSS / BHAT

```
 1   BY MS. BHAT

 2   Q.   You would agree that if there were a prospective cohort

 3   study that found no adverse effect between neurocognitive harm

 4   and an individual measurement of prenatal fluoride exposure,

 5   you would be interested in the results of that study; correct?

 6   A.   Yes.

 7   Q.   There is, in fact, a prospective birth cohort study in

 8   Spain that did not find any adverse associations between

 9   neurocognitive harm and individual measures of prenatal

10   fluoride exposure; correct?

11           MR. CONNETT:  Vague.

12           THE COURT:  Sorry.  What?

13           MR. CONNETT:  I will withdraw.

14   BY MS. BHAT

15   Q.   There is, in fact, a prospective birth cohort study in

16   Spain that did not find any adverse associations between

17   neurocognitive harm and individual measures of prenatal

18   neurotoxic effects; correct?

19           MR. CONNETT:  Assumes facts.

20           THE COURT:  You're asking if she's -- well, the

21   question is has she heard of such a study.  That's how I

22   interpret that question.

23       So go ahead and answer that.

24           THE WITNESS:  I have heard of that study this week in

25   the course of this, of watching this case.
```

1       I have not seen any actual information on that study.  To

2   the best of my knowledge, it has not yet been published in a

3   peer-reviewed journal.

4           **MS. BHAT:**  Your Honor, permission to show the

5   abstract of -- the published abstract of this study in the

6   *Journal of Environmental Epidemiology*?

7           **THE COURT:**  All right.

8           **MR. CONNETT:**  Well, I would object, Your Honor, on

9   hearsay.  It's not a document that the doctor has relied upon.

10  It's not a published paper.

11      It's a question mark as to whether an abstract of

12  proceeding is actually published for purposes of peer review.

13  It's not a material that the scientist has relied upon.

14      So what -- how is it a permissible item to cross-examine a

15  witness on?

16          **THE COURT:**  All right.  Ms. Bhat, your response?

17          **MS. BHAT:**  Your Honor, we believe we can show this

18  document to the witness even if it is hearsay for the purposes

19  of contradicting her prior statement regarding all prospective

20  cohort studies and what they have found, to confirm that she

21  would be interested in the study, which goes to bias.  And,

22  also, to determine whether she has, in fact, seen the abstract.

23          **THE COURT:**  Well, she's already said she hadn't seen

24  the abstract.  If you want to show it to her to refresh her

25  recollection.

 1          But substantially I'm going to sustain the objection.  The

 2     only purpose you can show it to her for is to refresh her

 3     recollection to see if she has seen it before.  If you want to

 4     do that.

 5          **MS. BHAT:**  Yes, Your Honor.  We would like to do

 6     that.

 7          But before we do, we also believe that this document falls

 8     within the residual hearsay exception, Rule 807, because it has

 9     sufficient indicia of trustworthiness.  It is highly probative

10     of the results of the cohort study on the exact issue we're

11     looking at in this case.

12          **THE COURT:**  Objection is still sustained.

13          Additionally, under 403.  This is a study she hadn't seen,

14     and to ask the witness to evaluate it without understanding the

15     full nature of the methodology and everything else is not fair

16     game at this point.

17          Sustained, but you can show it to her to refresh her

18     recollection for that purpose only.

19          **MS. BHAT:**  Okay.  Mr. Hambrick, can we please show

20     the study?  I believe it is U-42.

21          (Document displayed)

22          **MS. BHAT:**  Mr. Hambrick, can you clear the screen?

23     That's -- yes, that is correct.  Could you please scroll up a

24     bit?

25          I'm sorry.  You're not showing anything.  It's on my

 1   computer.  Okay.

 2       I can actually just show this exhibit, if I can have

 3   permission to show my screen.

 4           THE COURT:  Go ahead.

 5       (Document displayed.)

 6   BY MS. BHAT

 7   Q.   Dr. Thiessen, do you see the document in front you?

 8   A.   Yes.

 9   Q.   And have you -- are you aware of this study in Spain on

10   neurocognitive outcomes and prenatal exposure to fluoride?

11           THE COURT:  The proper question is whether this

12   refreshes her recollection as to whether she has seen the study

13   before.

14   BY MS. BHAT

15   Q.   Does this refresh your recollection as to whether you have

16   ever seen this study before?

17   A.   I have seen it only on the screen in this case this week.

18   I have not seen it in any other context.  I have not had an

19   opportunity to read it, let alone evaluate it.

20       And to the best of my knowledge it's not a peer-reviewed

21   publication at this point.

22           THE COURT:  All right.  Can you take the exhibit

23   down, please.

24       (Document removed from display)

25

THIESSEN - CROSS / BHAT

 1   BY MS. BHAT

 2   Q.    Your standard is that a chemical may be clearly safe,

 3   otherwise you must protect people from exposure to it; correct?

 4           MR. CONNETT:  Overbroad.

 5           THE COURT:  Well, she can answer that question.  It's

 6   a hypothetical question.

 7   A.    Hypothetically one should attempt to protect members of

 8   the public from exposure to chemicals that could cause them

 9   harm.

10           This is particularly important when the use of that

11   chemical is deliberate.  Meaning, the exposure of the human

12   population is deliberate.  Then, obviously, there should be

13   clear indication of safety before such things are done.

14   BY MS. BHAT

15   Q.    That's a standard that you apply in this case; correct?

16           MR. CONNETT:  Overbroad.

17           THE COURT:  Overruled.

18   A.    We're dealing with a condition of use which, by

19   definition, involves deliberate exposure of the public.  For

20   that to be acceptable should require demonstration of safety to

21   all members of the public, to all susceptible subgroups of the

22   public.

23   BY MS. BHAT

24   Q.    Your opinion is that EPA should ban fluoride without

25   understanding the full impact of its effects because it would

1    be in the interests of public safety; correct?

2              **MR. CONNETT:**  Overbroad.

3              **THE COURT:**  Overruled.

4    **A.**    The -- I've not ever said ban fluoride, because fluoride

5    does have legitimate uses that do not involve exposure of the

6    public in ways that are hazardous to the public.

7         I believe that we have sufficient information already as

8    to the full extent of the impact of water fluoridation on the

9    public, certainly enough to make decisions.

10        There could always be more information obtained, but that

11   means continuing to expose members of the public to levels that

12   we already know pose a risk.

13             **MS. BHAT:**  Your Honor, permission to read testimony

14   from the deposition for purposes of impeachment.

15             **THE COURT:**  Okay.  Which -- what pages?

16             **MS. BHAT:**  This is the 2019 deposition.  It's Pages

17   106/1 through 9.

18             **MR. CONNETT:**  My only concern here, Your Honor, is

19   that this is taken as part of a long discussion about Dr.

20   Thiessen's opinions and assessment of the science.

21        If counsel wants to take a snippet and make it seem that

22   that's the entirety of Dr. Thiessen's scientific work, fine.

23             **THE COURT:**  Well, you'll have a chance at redirect.

24   So unless there is any other objection, I'm going to allow

25   reading of it.

1          What page is that?

2                    MS. BHAT:  Page 106, Lines 1 through 6.

3                    THE COURT:  Go ahead.

4    BY MS. BHAT

5    Q.   So, Dr. Thiessen, this is the first time I've shown you

6    your deposition, so let me confirm.

7          On August 27th, 2019 you took a deposition in this case;

8    correct?

9    A.   Yes.

10   Q.   And you were under oath for that deposition; correct?

11   A.   Yes.

12   Q.   I'm reading Page 106, Lines 1 through 6 into the record:

13        "QUESTION:  Just so I understand, is your testimony

14        that EPA should just go ahead and ban fluoride without

15        understanding the full impact of the effects?"

16        MR. CONNETT:  Misstates testimony.

17        THE WITNESS:  That would be the action in the

18        interest of public safety."

19                    MS. BHAT:  Mr. Hambrick, you can clear the screen.

20        (Document removed from display)

21   BY MS. BHAT

22   Q.   Dr. Thiessen, your opinion is that causation is irrelevant

23   to determining unacceptable risk; correct?

24                    MR. CONNETT:  Assumes facts.  Misstates testimony.

25   Overbroad.

 1          THE COURT:  She can answer.

 2  **A.**    No.  Causation is not irrelevant, but causation cannot

 3  always be demonstrated.

 4          The guidelines, EPA's Guidelines for Neurotoxicity Risk

 5  Assessment indicate that association is sufficient; that

 6  causation is not always possible to demonstrate, and it's

 7  simply a -- takes a higher level of evidence and information,

 8  and association is sufficient to demonstrate that there is a

 9  hazard of the exposure.

10  **BY MS. BHAT**

11  **Q.**    Is an association -- is one association sufficient to

12  determine unreasonable risk?

13          **MR. CONNETT:**  Overbroad.  Incomplete hypothetical.

14          **THE COURT:**  I'm not sure I understand the question.

15  **BY MS. BHAT**

16  **Q.**    If you have results from one study showing an association

17  between an exposure and an outcome, is that sufficient to

18  determine that there is unreasonable risk of that exposure?

19          **MR. CONNETT:**   Incomplete hypothetical, Your Honor.

20          **THE COURT:**  Sustained.

21  **BY MS. BHAT**

22  **Q.**    Is it possible in your risk calculation to take the

23  results of one association between an exposure and an outcome

24  and come up with a benchmark margin of exposure that, when

25  compared with the margins of exposure from the intake rates of

THIESSEN - CROSS / BHAT

 1   the human population, that would show an unacceptable risk?

 2           MR. CONNETT:  Same objection.

 3       Also, I'm not even entirely sure what the question is.

 4   It's vague, ambiguous, overbroad, incomplete hypothetical.

 5           THE COURT:  I guess you're trying to ask, Ms. Bhat,

 6   whether it's possible that one study under any circumstance,

 7   including all circumstances, including reliability, can be the

 8   basis of a risk assessment?  Is that --

 9           MS. BHAT:  Yes, Your Honor.  And a risk evaluation

10   from which you can conclude unreasonable risk.

11           MR. CONNETT:  I would maintain the same objection,

12   Your Honor.  This is devoid of fact to understand the question.

13           THE COURT:  Objection overruled.  That's the way I

14   phrased it.

15       Dr. Thiessen can answer the question.  Can you imagine in

16   any circumstance where one study would be sufficient to produce

17   a risk evaluation?

18           THE WITNESS:  The EPA's Guidelines for Neurotoxicity

19   Risk Assessment indicate that one well-conducted study can be

20   sufficient.

21       For fluoride we have a number of animal studies.  We have

22   a very consistent set of human cross-sectional studies, and we

23   have several human prospective cohort studies.

24       So we are not dealing with one study.  We are dealing with

25   quite a body of evidence at this point.

1              THE COURT:  All right.  But you're saying that the

2    EPA says that one well-conducted study can be sufficient.

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.  Thank you.

5    BY MS. BHAT

6    Q.   Dr. Thiessen, you have reviewed TSCA draft risk

7    evaluations for your opinion in this case; correct?

8    A.   Yes.

9    Q.   And one of those draft risk evaluations is the draft NMP

10   risk evaluation; correct?

11   A.   Yes.

12   Q.   And in that draft NMP risk evaluation, EPA considered the

13   quality, consistency, relevance, coherence and biological

14   plausibility when weighing the scientific evidence; correct?

15   A.   That sounds correct.  I'm not certain without the document

16   in front me.

17             MS. BHAT:  Permission to refresh recollection.

18             THE COURT:  Permitted.

19             MS. BHAT:  This is Exhibit 49, which -- which has not

20   yet been admitted into evidence.  It is Plaintiff's Exhibit,

21   but I can ask the witness.

22        Mr. Hambrick, can you bring that back on the screen?

23        (Document displayed.)

24   BY MS. BHAT

25   Q.   Dr. Thiessen, do you recognize this document as EPA's

 1  draft risk evaluation for NMP?

 2  **A.**    Yes.

 3          **MS. BHAT:**  I would like to move Exhibit 49 into

 4  evidence.

 5          **THE COURT:**  Any objection?

 6          **MR. CONNETT:**  No objections, Your Honor.

 7          **THE COURT:**  Admitted.

 8      (Trial Exhibit 49 received in evidence)

 9          **MS. BHAT:**  Mr. Hambrick, can we go to Page 53 of this

10  exhibit?

11      Can you enlarge the bottom section, "Data Integration"?

12      (Document displayed)

13  **BY MS. BHAT**

14  **Q.**    In the draft NMP risk evaluation EPA considered quality,

15  consistency, relevance, coherence and biological plausibility

16  when weighing the scientific evidence; correct?

17  **A.**    That's what it says, yes.

18          **MS. BHAT:**  Mr. Hambrick, you may clear the screen.

19      (Document removed from display)

20  **BY MS. BHAT**

21  **Q.**    Now, you have testified that you are not an expert in

22  EPA's way of doing things; correct?

23  **A.**    I don't work for EPA.  I am not an expert in all details

24  of how they do things.

25  **Q.**    You're not an expert in how EPA uses the 1998 Guidelines

 1   for Neurotoxicity that you have been mentioning; correct?

 2   **A.**   I am able to read their guidelines and implement those in

 3   my own work, but I am not going to claim to be an expert in all

 4   details of how EPA operates.

 5   **Q.**   Dr. Thiessen, you are personal friends with plaintiff's

 6   counsel, Michael Connett; correct?

 7   **A.**   Yes.

 8   **Q.**   You're personal friends with plaintiff's counsel's mother

 9   and father, Ellen and Paul Connett; correct?

10   **A.**   Yes.

11   **Q.**   You know the Connetts through the Fluoride Action Network;

12   correct?

13   **A.**   I know them before the Fluoride Action Network was ever

14   started, I believe.

15   **Q.**   In 2006 you attended a meeting about fluoride that Paul

16   and Ellen Connett hosted in New York?

17   **A.**   Yes.

18   **Q.**   Paul Connett personally invited you to that meeting;

19   correct?

20   **A.**   I believe that's correct, yes.

21   **Q.**   It was the Fluoride Action Network that was sponsoring

22   that meeting; correct?

23   **A.**   Probably.  I don't remember specifically.

24   **Q.**   It was either the Fluoride Action Network or its

25   predecessor that sponsored the meeting; correct?

```
 1              MR. CONNETT:  Foundation.

 2              THE COURT:  Overruled.  If you know.

 3    A.   Paul Connett invited me.  The details of which

 4    organization I don't remember at this point.

 5    BY MS. BHAT

 6    Q.   Paul Connett is the head of the Fluoride Action Network;

 7    correct?

 8    A.   He has been.  I'm not certain if he currently is.  I think

 9    he's been trying to retire.

10    Q.   At the 2006 meeting you were interviewed by plaintiff's

11    counsel Michael Connett; correct?

12    A.   That may be.  I don't remember.  It was a long time ago.

13    Q.   You were a member of the Fluoride Action Network; correct?

14              MR. CONNETT:  Assumes facts.

15              THE COURT:  I'm sorry.  What was that?

16              MR. CONNETT:  I just said, it assumes facts.

17        It's all right.  I'll will withdraw the objection, Your

18    Honor.

19              THE COURT:  All right.  You can answer the question,

20    Dr. Thiessen.

21    A.   I don't think I've ever actually been a member of the

22    network.  I may be on some lists, but I -- I don't -- I don't

23    believe I have ever filled out an application form for

24    membership in that organization.

25
```

THIESSEN - CROSS / BHAT

```
 1   BY MS. BHAT
 2   Q.   You're on the mailing list of the Fluoride Action Network;
 3   correct?
 4   A.   I am on a mailing list.  That's not the same thing as a
 5   member necessarily.
 6   Q.   You sometimes consult for the Fluoride Action Network;
 7   correct?
 8   A.   They sometimes send me questions.
 9   Q.   And you sometimes answer those questions; correct?
10   A.   I sometimes answer those questions, but I do that for a
11   number of people and organizations.
12   Q.   You speak in videos produced by the Fluoride Action
13   Network; correct?
14   A.   I think I have been included in one or two, possibly more
15   than that.  I have been videotaped in interviews.  I have not
16   been involved in the production of final videos or films.
17   Q.   You have been videotaped in interviews for the Fluoride
18   Action Network; correct?
19   A.   At least one that the Fluoride -- Fluoride Action Network
20   or somebody connected to them made.  I was videotaped in an
21   interview.  I was not involved in the -- in the production of
22   whatever final product there was.
23   Q.   You received studies about fluoride from the Fluoride
24   Action Network; correct?
25   A.   I have.
```

THIESSEN - CROSS / BHAT

1    **Q.**   And some of the studies that you received from the

2    Fluoride Action Network, you relied upon for your opinion in

3    this case; correct?

4              **MR. CONNETT:**  Overbroad.

5              **THE COURT:**  Overruled.

6    **A.**   There is probably some overlap, but these were studies

7    that I often have had anyway or would have found in my

8    literature searches anyway.

9    **BY MS. BHAT**

10   **Q.**   You helped Paul Connett on his book *The Case Against*

11   *Fluoride*; correct?

12   **A.**   I reviewed some of the draft, but I -- I did not have a

13   significant role in helping him produce that book, I don't

14   recall.

15   **Q.**   You have advocated against water fluoridation for decades;

16   correct?

17   **A.**   I -- I'm not sure.  Decades would go back to 2000.  At

18   that time I was starting to -- to be aware that there were

19   problems and to -- to speak against it when I had the occasion.

20        But you need to remember that when I have spoken against

21   it, it's based on the evidence available to me.  And it's --

22   it's a matter of I, as a scientist, feeling responsible that if

23   I see a hazard to the public, I should contribute to making the

24   public or whatever authorities are involved aware of this

25   hazard.

1        But it's based on the evidence, and my interpretation of

2   the evidence is the foundation for any statements that I make

3   of hazard.  It's not -- not the other way around.

4        And early on, if you look at my 1988 report on fluoride

5   for the EPA, at that point I assumed that what we were told

6   about fluoride safety and benefits were correct.  I did not at

7   that point have information to the contrary, although I was

8   starting to -- even then to see information to the contrary.

9        But conclusions that I have scientific, and as said to the

10  public, are based on the scientific evidence available to me.

11  Q.   Now, you mentioned decades would be 2000.  In 1998 you

12  urged a school board in Florida to investigate fluoride;

13  correct?

14  A.   I did, yes.  I suggested that it needed more of a look

15  than it had had up to that point.

16  Q.   And in 2003 when you began your work for the NRC

17  committee, you had reservations about fluoride; correct?

18  A.   I did, yes.

19  Q.   You believe that the NRC strives to include scientists on

20  both sides of a debate and their committees; correct?

21  A.   The NRC tries to have a balanced committee on things when

22  there are differences of perspective.

23        But fundamentally the NRC requires a high level of

24  expertise in the -- the subject matter at hand, more than they

25  are looking for people with a variety of perspectives.

1    Q.   You attended a meeting of the NRC committee in which the

2    committee expressed an interest in finding one more person who

3    had reservations about fluoride; correct?

4    A.   That came up at the very first meeting, yes.

5    Q.   And you were one of the people on the committee who

6    already had reservations about fluoride; correct?

7    A.   Yes.

8    Q.   So it became evident to you that you were selected for the

9    committee, in part, because of your reservations about

10   fluoride; correct?

11   A.   It is my understanding that that was part of it, because

12   they were aware of me because I had expressed reservations.

13        But it was also because I had a lot of the relevant

14   background to do that kind of study, to participate in that

15   committee.  And I did have the experience of writing on

16   fluoride exposure and toxicity for the EPA prior to the NRC

17   putting together that committee.

18   Q.   Your expectation is that if a community stops fluoridating

19   over a few weeks or a few months, a lot of people will feel

20   wonderfully better and most of them will never know why;

21   correct?

22   A.   That sounds like something I said in the deposition last

23   year, yes.

24   Q.   Now, plaintiff's counsel has sent you scientific studies

25   on fluoride for this case; correct?

1  **A.**    Yes.  And it's my understanding he has sent the same ones

2  to you, to the defense counsel.

3  **Q.**    Plaintiff's counsel has sent you dozens of scientific

4  studies for your use in this case; correct?

5  **A.**    He has sent many, yes.

6  **Q.**    He has sent dozens of scientific studies for your use in

7  this case; correct?

8          **MR. CONNETT:**  Asked and answered.

9          **THE COURT:**  No, it has not been answered.  You can

10 answer the question.

11 **A.**    He has sent many studies.  I have not attempted to count

12 them in -- I've not attempted to count them, let alone in

13 dozens.  But he has sent many studies, yes.

14         **MS. BHAT:**  Permission to refresh recollection?

15         **THE COURT:**  Permitted.

16         **MS. BHAT:**  T-47, Page 16.

17         **THE COURT:**  This is -- what are we reading from?

18         **MS. BHAT:**  These are emails between the witness and

19 counsel.

20         **THE COURT:**  Okay.

21    (Document displayed.)

22 **BY MS. BHAT**

23 **Q.**    Dr. Thiessen, plaintiff's counsel sent to you a Dropbox

24 link to download studies on October 2nd, 2018; correct?

25 **A.**    It says October 1st, yes.

```
 1   Q.   Oh, October 1st.  Excuse me, yes.

 2        That Dropbox link contained dozens of studies; correct?

 3   A.   Probably numbers in the dozens, yes.

 4   Q.   You reviewed those studies before you conducted your

 5   PubMed search for your own opinions in this case; correct?

 6             MR. CONNETT:  Assumes facts.

 7             THE COURT:  What's that?

 8             MR. CONNETT:  Assumes facts.

 9             THE COURT:  Overruled.

10   A.   I probably was conducting my own search at around the same

11   time.  I certainly had many of the same papers already before

12   counsel made them available to me, and we -- we have mechanisms

13   here to acquire papers also.

14             MS. BHAT:  Mr. Hambrick, you may clear the screen.

15        (Document removed from display)

16   BY MS. BHAT

17   Q.   Dr. Thiessen, you reviewed the studies that plaintiff's

18   counsel sent you on October 1st, 2018 before you conducted your

19   PubMed search for your opinion in this case?

20   A.   Correct.

21             MR. CONNETT:  Overbroad.

22             THE COURT:  Overruled.

23   A.   They were probably roughly the same time.  I mean, my

24   review of studies occurred over months.  I -- I can't time it

25   more closely.
```

1    **BY MS. BHAT**

2    **Q.**    When did you conduct your PubMed search for your opinion

3    in this case?

4    **A.**    I've conducted a number of PubMed searches, some of which

5    have been used toward -- toward this case.

6        I don't remember specifically when I did the specific

7    searches specifically for this case.  It was probably later

8    than October, but -- October 2018.  But I would have -- it

9    would not -- I mean, a number of those studies I had all along

10   anyways, so it's...

11   **Q.**    Are you finished with your answer?

12   **A.**    Yes.

13   **Q.**    Just a few last topics.

14       You had mentioned some case reports on the standing -- on

15   headaches.  Case reports are a very weak forum of

16   epidemiological evidence; correct?

17   **A.**    They are a starting point for epidemiological things.

18   That's where some of the initial information comes in terms of

19   what to look for in epidemiological studies.

20       Also, some of the case reports that I referred to were, in

21   effect, experimental studies, not simply case reports.

22   **Q.**    By the first step you mean that case reports are enough to

23   establish a hypothesis; correct?

24   **A.**    That's one way to describe it, yes.

25   **Q.**    And now you mentioned that some of these case studies are

THIESSEN - CROSS / BHAT

1    somewhat experimental.  There were no control groups in those

2    case studies; correct?

3    **A.**   That is not a mechanism that has control groups.  That has

4    its own control.  Does the subject -- you've got the subject

5    with and without exposure to the substance, and you've got the

6    subject reporting symptoms or lack of symptoms.  And you see

7    whether that correlates with exposures or with no exposures.

8        So the -- in effect, the subject with no exposure is the

9    subject's own control for the experiment.

10   **Q.**   In that case about those reportings following exposure,

11   that's subject to the placebo effect; correct?

12   **A.**   No.

13   **Q.**   If the subjects are told about the purpose of the case

14   report, then their reports of symptoms following exposure,

15   that's subject to the placebo effect; correct?

16   **A.**   The subjects were not told of -- I mean, these

17   experimental studies happened before there was a case report.

18   The case report was based on the experimental study.

19       The subjects in some cases reported symptoms when they

20   were in one city and not in another city.  And they had no --

21   no information on what the difference was.

22       In some cases the subjects were sent home with several

23   bottles of water and told which bottle of water to drink on

24   which day.  The subject did not know what was in any of the

25   bottles of water.  The physician did not know what was in any

1   of the bottles of water.  Only the pharmacist who prepared the

2   bottles of water knew what was in which one.

3       And so then the subject was asked to report symptoms or

4   lack of symptoms on any given day, and eventually that was

5   compared to the days with respect to which bottle of water was

6   consumed on which day and whether or not that bottle of water

7   contained fluoride.

8       So there was no opportunity for a placebo effect.

9   **Q.**   Those subjects were self-reporting their symptoms;

10  correct?

11  **A.**   Some of them were objective sorts of symptoms observed on

12  a challenge in the doctor's office.  But the subjects would

13  have been in the doctor's office in the first place because of

14  symptoms.

15  **Q.**   The subjects told their doctors about their symptoms;

16  correct?

17  **A.**   Yes.

18  **Q.**   Now, just briefly, in your expert report you disclosed an

19  opinion about fluoride's anticaries effect; correct?

20  **A.**   Correct.

21  **Q.**   You did not conduct a systematic review regarding

22  fluoride's anticaries effects; correct?

23  **A.**   I have not, but there have been two big systematic reviews

24  in the last approximately 20 years.  There was no need for me

25  to conduct one.

1   Q.   Those systematic reviews were authored by York and
2   Cochrane; correct?
3   A.   Yes.
4   Q.   You did not search for studies regarding the efficacy of
5   water fluoridation following the Cochrane review; correct?
6   A.   I have looked at some that have occurred, been published
7   since the Cochrane review.  I did not specifically search for
8   them.
9       But, again, it's -- this is making use of information that
10  already exists that is sufficient without having to do an
11  exhaustive review on my own.
12  Q.   Well, isn't it true that in two subsequent systematic
13  reviews published after the Cochrane review, those systematic
14  reviews also concluded that water fluoridation effectively
15  controls dental decay?
16  A.   I'm aware that there were a couple.  I don't know
17  specifically know what's in them.
18      I think all of these systematic reviews of fluoride in
19  anticaries benefit -- well, certainly, York and Cochrane
20  pointed out in detail that most of the studies available were
21  at high risk of bias.  Most of these studies have not had
22  blinding of outcome assessment.
23      There has also been a failure in all of these studies to
24  look at alternative explanations for the findings reported.  In
25  some cases these are probably due to socioeconomic differences

 1   or other differences between communities being compared.  There

 2   are other mechanistic differences -- other mechanistic

 3   explanations that have not been adequately assessed.

 4   **Q.**   And you're talking about in the studies that you have

 5   actually read; correct?

 6   **A.**   In the studies that I have actually read and in the two

 7   big reviews of these, of such studies.

 8   **Q.**   You did not conduct a dose response assessment of

 9   fluoride's anticaries effects; correct?

10   **A.**   Not specifically, but I have looked at data, reported

11   data, published data, with respect to caries experience at

12   different water fluoride levels in -- within a -- the same

13   dataset, and basically that's -- that's within the noise level,

14   in comparison from the same dataset to the very clear dose

15   response seen for denial fluorosis.

16           **MS. BHAT:**  Your Honor, at this point I would like to

17   renew that *Daubert* motion that I made.  There was some

18   confusion about whether the witness had conducted some sort of

19   risk evaluation about the anticaries effects of -- the

20   anticaries health effects of fluoride.

21        So at this point I would again like to move to exclude

22   this witness for her failure to consider the anticaries effects

23   of fluoride in her risk evaluation.

24           **THE COURT:**  So your *Daubert* motion is with respect to

25   that opinion?

 1            **MS. BHAT:**  Yes, Your Honor.

 2            **THE COURT:**  All right.  Response.

 3            **MS. BHAT:**  Oh, excuse me, Your Honor.  It's with

 4    respect to her risk evaluation, her failure to consider this

 5    particular health effect in her risk evaluation as a whole.

 6            **THE COURT:**  Response.

 7            **MR. CONNETT:**  Your Honor, this goes to the --

 8    Dr. Thiessen did consider the anticaries effects of fluoride,

 9    as she has testified to.

10        I understand counsel believes that she didn't consider

11    this adequately, but I don't see anything in the record to

12    reflect that.

13        Dr. Thiessen has explained that there are two

14    comprehensive authoritative systematic reviews which found

15    significant methodological limitations in these studies.

16        And if you look at Dr. Thiessen's reports, she explains

17    the lack of benefit from ingestion which, according to

18    Dr. Thiessen's expert reports, is a significant consideration

19    when you're looking at whether adding a chemical to water that

20    200 million Americans ingest every day of their life, whether

21    the lack of benefit from ingestion speaks to the reasonableness

22    of this condition of use.  And in Dr. These's expert opinion,

23    it does speak to the reasonableness of the use.  Dr. Thiessen's

24    expert report explains that.

25        Counsel, I understand, disagrees, but she has considered

THIESSEN - CROSS / BHAT

```
 1   the issue.
 2              THE COURT:  All right.  I'm going to deny the *Daubert*
 3   motion.  Whatever limitations and shortcomings of her
 4   evaluation will go to the weight of the evidence.
 5              MS. BHAT:  Thank you, Your Honor.  I have no further
 6   questions at this time.
 7              THE COURT:  All right.
 8      Any redirect?
 9              MR. CONNETT:  Yes, Your Honor.  I wonder if we could
10   have -- if this would be a good time for a quick break?
11              THE COURT:  Okay.  How many longer will you have on
12   redirect?
13              MR. CONNETT:  I won't have very long, Your Honor.  I
14   think five to ten -- maybe ten minutes.
15              THE COURT:  Okay.
16              MR. CONNETT:  If I could check my notes.
17              THE COURT:  All right.  We'll take 15-minute break at
18   this point and then resume.
19              THE CLERK:  Court in recess.
20      (Whereupon there was a recess in the proceedings
21         from 10:14 a.m. until 10:31 a.m.)
22              THE CLERK:  Please come to order.  Court is now in
23   session.
24              THE COURT:  Mr. Connett.
25              MR. CONNETT:  Thank you, Your Honor.
```

<u>REDIRECT EXAMINATION</u>

**BY MR. CONNETT**

Q.   Dr. Thiessen, in your expert report and declaration did you characterize the animal data as perfect?

A.   No.

Q.   Did you recognize, Dr. Thiessen, that the animal studies on fluoride neurotoxicity have methodological limitations?

A.   Yes.

       **MR. CONNETT:**  At this time, Your Honor, I would like to show the witness a table that was shown during direct from her declaration, Table 2.

       **THE COURT:**  Okay.

   (Document displayed)

**BY MR. CONNETT**

Q.   Dr. Thiessen, can you see this on your screen?

A.   Yes.

Q.   You were asked some questions about the Bartos study and that you had identified the animal as female.  Do you remember that?

A.   Yes.

Q.   Dr. Thiessen, if there is a study where an effect is seen at lower levels at amongst one sex but not the other, in the field of risk assessment what do you put the emphasis on, which sex?

A.   You put the emphasis on the sex that were showing effects

1   at the lower doses.

2   **Q.**   Now, Dr. Thiessen, in your -- I'll take this document off

3   the screen right now.

4       (Document removed from display)

5   **Q.**   In your risk assessment in this case did you attempt to

6   determine which of these ten animal studies should be used to

7   set the reference dose?

8   **A.**   No.  I simply provided a range of lowest -- lowest

9   observed adverse effect levels and no observed adverse effect

10  levels.

11  **Q.**   What was the purpose for not selecting which particular

12  study and which particular reference dose to use?  What was

13  your purpose for not doing that?

14  **A.**   Basically to -- to demonstrate that a variety of studies

15  can support estimations of a reference dose and to provide the

16  range of reference doses that would be produced from these

17  studies.

18           **MR. CONNETT:**  At this time, Your Honor, I would like

19  to further explore that with the figure that accompanies the

20  table that counsel showed the witness?

21           **THE COURT:**  What do you mean a "figure"?

22           **MR. CONNETT:**  There a figure that provides additional

23  information about the table that counsel had discussed.

24           **THE COURT:**  Is this a figure from the declaration?

25           **MR. CONNETT:**  Yes.  It's on Page 43 of the

THIESSEN - EXAMINATION / CONNETT

1    declaration, Your Honor.

2            THE COURT:  Okay.

3        (Document displayed.)

4    BY MR. CONNETT

5    Q.   Dr. Thiessen, can you see this figure on the screen?

6    A.   Yes.

7    Q.   And can you briefly describe what this figure shows?

8    A.   That shows the -- kind of a summary of the effect levels

9    seen in those studies with the -- the closed symbols

10   representing either lowest observed adverse effect levels or

11   doses even higher, and the open symbols indicating levels at

12   which no observed adverse effect was seen.

13   Q.   And for the reference doses that you calculated, is it

14   correct to say that the range -- that the doses ranges went

15   from as low as 5 milligrams per liter, which we see here, to as

16   high as 45 milligrams per liter?

17   A.   Right.  Although those highest ones at 45 were not lowest

18   observed adverse effect levels, although we -- we treated

19   them -- I treated them as if they were in order to calculate

20   reference doses.  Here is what you would get if you treated

21   them as lowest observed adverse effect levels.

22   Q.   Okay.  So here we have at 45 milligrams per liter.  How

23   would you characterize the consistency of the results that we

24   see across the studies at this concentration?

25   A.   For the studies that included that concentration you

1    consistently get results.  You get adverse effects at that

2    level of exposure.

3    **Q.**   And are these -- are these the lowest levels that found

4    the effects in these studies, or are not?

5    **A.**   No.  As indicated on that graph, the -- the closed

6    triangles are the ones that correspond to the lowest observed

7    adverse effect levels.

8    **Q.**   Okay.  So I'm looking here at the Cui study.  Would this

9    mean that this was an adverse effect level at 45 milligrams per

10   liter.

11   **A.**   Right.

12   **Q.**   This was an adverse effect level at 23 milligrams per

13   liter.

14   **A.**   Right.

15   **Q.**   This was an adverse effect level at about 5 milligrams per

16   liter?

17   **A.**   Yes.

18   **Q.**   But for your reference dose calculations did you say that

19   you treated this concentration of 45 milligrams per liter as

20   the lowest observed adverse effect level?

21   **A.**   Not at the, but as a.  We treated it -- I treated it as if

22   it were a lowest observed adverse effect level.

23   **Q.**   So when we look at your range of reference doses that we

24   were looking at the other day, that range includes a reference

25   does which treats 45 milligrams per liter of fluoride in the

THIESSEN - EXAMINATION / CONNETT

1    water of rats as the lowest observed concentration where

2    learning and memory impairments have been found?

3    **A.**    Right.  We treated it as if it were a lowest observed

4    adverse effect level.

5    **Q.**    Now, this study here, this is McPherson?

6    **A.**    Yes.

7    **Q.**    And if Dr. Tsuji testified in this case that 20 milligrams

8    per liter, which we see here with the open triangle, if that is

9    an appropriate NOAEL to use for neurotoxicity risk assessment,

10   if that was Dr. Tsuji's testimony in this case, would that

11   support the range of reference doses that you have calculated

12   in this case?

13   **A.**    Yes.

14          **MR. CONNETT:**  At this time I'd like to show the

15   witness --

16          **THE COURT:**  Before you have go on, I'm not sure I

17   understand.

18       Could you explain how that shows how that's consistent?

19   It has an open triangle.  What does that mean?

20          **THE WITNESS:**  That's the symbol for a no observed

21   adverse effect level as reported in the studies.  Although, in

22   fact, there was one adverse effect seen at that level in the

23   McPherson study.

24          **THE COURT:**  All right.  But there is no lowest

25   observed adverse effect level, no closed triangle in that

```
 1   McPherson 2018 that I see?

 2             THE WITNESS:  That's correct.  In principle if they

 3   had used some higher doses, one expects probably to have seen

 4   the lowest observed adverse effect level.

 5        Actually, the 20 milligrams per liter is a lowest observed

 6   adverse effect level for one of the endpoints of that study.

 7             THE COURT:  So your point is that a higher dose was

 8   not examined?

 9             THE WITNESS:  That's correct.

10             THE COURT:  So we don't know where that triangle

11   might have been, in other words?

12             THE WITNESS:  No.  Except for the one effect where it

13   is at 20 milligrams per liter.

14             THE COURT:  Well, it says -- that's a no effect;

15   right?

16             THE WITNESS:  On the graph, yes.  And we treated it

17   as a no observed adverse effect level.  But there was one of

18   those several endpoints that did show an effect at that level

19   of exposure.

20             THE COURT:  All right.  But the study did not expose

21   levels that were higher than that?

22             THE WITNESS:  That's correct.

23             THE COURT:  Okay.

24   BY MR. CONNETT

25   Q.   And, Dr. Thiessen, you were asked about EPA's guidance
```

1    document on reference doses and reference concentrations in the

2    context of intraspecies uncertainty factors.

3        What does that guidance document from 2002, Dr. Thiessen,

4    say as to when it's permissible to deviate from the default

5    uncertainty factor of ten for intraspecies variability?

6    **A.**   It says that ordinarily the factor of ten should be used

7    for intraspecies uncertainty, variability and susceptibility,

8    unless you can make a convincing case to use some other number

9    for a particular situation.

10   **Q.**   And does that -- in the animal studies that you based your

11   reference doses on, did any of those animal studies expose the

12   newborn to the equivalent of infant formula for humans?

13   **A.**   No.

14   **Q.**   So would it be -- are you aware of whether EPA considers

15   infants to -- through the period of early infancy to be a

16   critical window of development for neurotoxicity?

17   **A.**   Yes.   That's in the guidelines.

18   **Q.**   So these reference doses that you have calculated, do

19   they -- do they -- I'll withdraw the question.

20       Now, you were asked some questions about EPA's water

21   intake data that you used, specifically the 2019 EPA report.

22   Counsel asked you some questions about the statistical

23   reliability of the 95th percentile figure.

24           **MR. CONNETT:**   At this time, Your Honor, I would like

25   to show the witness the document that counsel asked about,

 1   which is Plaintiff's Exhibit 26.

 2          THE COURT:  All right.

 3      (Document displayed.)

 4   BY MR. CONNETT

 5   Q.   Dr. Thiessen, I'm showing you Page 3-4 of the EPA 2019

 6   document.  And I see the table is titled "Recommended Values

 7   for Drinking Water Ingestion Rates."

 8      Is this, Dr. Thiessen, the drinking water ingestion rates

 9   that EPA now recommends that risk assessment scientists use?

10   A.   Yes.

11   Q.   And what does it tell you that the EPA in this table has

12   identified the 95th percentile value?

13   A.   Could you repeat that, please?

14   Q.   What significance do you draw from the fact that in these

15   recommended values that EPA has identified here, EPA identifies

16   the 95th percentile intake?

17   A.   Right.  And several of those numbers have a footnote

18   indicator beside them.  The footnote presumably is on the next

19   page, and it probably indicates that those were based on a

20   small sample size.

21   Q.   That is EPA recommending that the 95th percentile figure

22   be used for risk assessment?

23   A.   Right.  Those figures are in the table of recommended

24   values, yes.

25          MS. BHAT:  Your Honor, I have an object as to scope,

THIESSEN - EXAMINATION / CONNETT

```
 1    but I see that I have muted myself.  The question was outside
 2    the scope of cross.
 3              THE COURT:  Well, you'll have a chance to redirect or
 4    recross.  So objection overruled.
 5              MS. BHAT:  Also, Your Honor, I would like to note
 6    that that exhibit that was just shown to the witness has not
 7    actually been entered into evidence.
 8              MR. CONNETT:  Yes, Your Honor.  At this time
 9    plaintiffs would seek to admit -- no.
10        Counsel, that was a pre-admitted document, but at this --
11    so I just -- I want to identify for the Court that we have not
12    yet shown this document during trial, but it is a pre-admitted
13    document.
14              THE COURT:  So 26 was previously admitted; correct?
15              MS. BHAT:  Mr. Connett, what I show in my chart is
16    that the introduction to the handbook was previously admitted,
17    but chapter three was not previously admitted.
18              MR. CONNETT:  Okay.  Thank you.  Thank you, Your
19    Honor.  That's my mistake.  Apparently, we did not pre-admit
20    that.
21        But at this point, Your Honor, plaintiffs would seek to
22    introduce and admit Plaintiff's Exhibit 26.
23              THE COURT:  Any objection?
24              MS. BHAT:  No objection.
25              THE COURT:  All right.  Admitted.  Thank you.
```

THIESSEN - EXAMINATION / CONNETT

```
 1            (Trial Exhibit 26 received in evidence).
 2    BY MR. CONNETT
 3    Q.   Now, Dr. Thiessen, you were asked about Dr. Grandjean's
 4    reports in this case.  And in your declaration you discuss how
 5    you did not do a BMD analysis; is that correct?
 6    A.   Yes.
 7    Q.   And you --
 8              MS. BHAT:  Your Honor, this question is also outside
 9    the scope of my cross.
10              THE COURT:  I believe it is.  Objection sustained.
11    BY MR. CONNETT
12    Q.   I'd like to clarify something that was said earlier, and I
13    think there may have -- I just want to clarify something.
14         You were asked about Dr. Grandjean's work in this case.
15    And now in your own risk assessment in this case, Dr. Thiessen,
16    did you discuss the human epidemiological literature on
17    fluoride and neurotoxicity?
18    A.   Yes.
19    Q.   Did you discuss and consider the prospective cohort
20    studies?
21    A.   Yes.
22    Q.   Did you discuss and consider the studies from New Zealand,
23    including the Broadbent and Shannon studies?
24    A.   Yes.
25    Q.   Did you discuss and consider the cross-sectional studies
```

THIESSEN - EXAMINATION / CONNETT

1    from China?

2    **A.**    Yes.

3    **Q.**    Did you discuss and consider the case reports?

4    **A.**    Yes.

5    **Q.**    Now, lastly, in this case, Dr. Thiessen, did you use the

6    standard -- when assessing whether fluoridation chemicals

7    present a risk, did you use the standard that there needs to be

8    evidence of complete safety, or did you use the standard of

9    whether the doses produced by fluoridated water are

10   unacceptably close to the estimated hazard level?

11           **MS. BHAT:**  Objection, Your Honor.  Leading.

12           **THE COURT:**  Well, I'll allow it since she's an

13   expert.

14   **A.**    The latter.  The exposures to humans expected from

15   fluoridated water are unacceptably close to levels that have

16   been demonstrated to produce a hazard.

17           **MR. CONNETT:**  No further questions, Your Honor.

18           **THE COURT:**  All right.  Recross.

19           **MS. BHAT:**  No, Your Honor.

20           **THE COURT:**  All right.  Thank you, Dr. Thiessen.

21   That will conclude your testimony.

22           **THE WITNESS:**  Thank you.

23           **THE COURT:**  Thank you for your time.

24        (Witness excused.)

25           **THE COURT:**  All right.  Plaintiff's next witness.

```
 1          MR. CONNETT:  At this time, Your Honor, the
 2   plaintiffs rest their case.
 3          THE COURT:  Then the ball will shift to defendants to
 4   start their case, and you may begin by calling your first
 5   witness.
 6          MS. CARFORA:  Thank you, Your Honor.
 7      The EPA calls Dr. Kristina Thayer.  And she's not
 8   currently in the well because she's a fact witness.  So we are
 9   going to get her uploaded into the well very quickly here.
10          THE COURT:  All right.  Thank you.
11      (Brief pause.)
12          MS. CARFORA:  I believe Dr. Thayer is on.
13   Dr. Thayer, if you could raise your hand.
14          THE WITNESS:  Okay.
15      Yes.  There I am.  Can you hear me?
16          MS. CARFORA:  I can hear you.
17          THE WITNESS:  Yes, yes.
18          THE COURT:  It worked.  Well, welcome back.
19          THE WITNESS:  Thank you.
20          THE COURT:  Okay.  I think the oath has previously
21   been administered, correct, in this case?
22          THE CLERK:  Yes, it is has, Your Honor.
23          THE COURT:  All right.  So Dr. Thayer, just a
24   reminder you are still under oath.
25      And, Ms. Carfora, you can go ahead and commence your
```

1    direct.

2             **MS. CARFORA:**  Thank you, Your Honor.

3                     <u>**KRISTINA THAYER**</u>,

4    called as a witness for the Defendant herein, having been

5    previously sworn, resumed the stand and testified further as

6    follows:

7                     <u>**DIRECT EXAMINATION**</u>

8    **BY MS. CARFORA**

9    **Q.**   Good morning -- good afternoon, Dr. Thayer.  Thank you for

10   coming back.

11        Dr. Thayer, how long have you worked at EPA?

12   **A.**   Since January of 2017.

13   **Q.**   And I think we covered this the other day.  Just very

14   quickly, can you remind us what your current position is at

15   EPA?

16   **A.**   I'm the director of the Chemical and Pollutant Assessment

17   Division referred to at CPAD.  This division lives within EPA's

18   Office of Research and Development, the OID, and it produces

19   integrated risk information system, or IRIS, assessments, along

20   with provisional peer-reviewed toxicity value, or PPRTV,

21   assessments, along with a number of other sort of fit for

22   purpose or very tailored assessment products.

23             **THE COURT:**  You need to slow down.  We have a court

24   reporter.

25             **THE WITNESS:**  Okay.

**THAYER - DIRECT  / CARFORA**

1              **THE COURT:**  You're speaking too fast.  Thank you.

2  **BY MS. CARFORA**

3  **Q.**   Dr. Thayer, if I refer to the program as the IRIS program,

4  is that good?  Is that okay with you?

5  **A.**   That's fine.

6  **Q.**   And Dr. Thayer, have you held any other positions at EPA?

7  **A.**   Yes.  So prior to October 2019, I was the director of the

8  IRIS division.  But in 2019 OID underwent a reorganization.  So

9  the IRIS division went away, and instead the CPAD division was

10  created.

11       So IRIS assessments are still produced, but this new

12  division produces other assessment products in addition to

13  IRIS.

14  **Q.**   And, Dr. Thayer, before coming to EPA in 2017, what

15  position did you hold?

16  **A.**   I worked at the National Toxicology Program, and I was the

17  director of the Office of Health Assessment and Translation, or

18  OHAT.

19  **Q.**   So if I refer to that program as OHAT or NTP, you would

20  understand that that's what I'm talking about?

21  **A.**   Yes.

22  **Q.**   Thank you.

23       Dr. Thayer, what is the IRIS program?

24  **A.**   So the IRIS program produces human health assessments that

25  characterize what we know about the health effects stemming

**THAYER - DIRECT  / CARFORA**

1   from exposure to environmental chemicals.  They can provide a

2   key piece of the scientific foundation that underpins EPA's

3   decision-making with respect to protecting public health.

4        MS. CARFORA:  Your Honor, I forgot to mention at the

5   top, and so I want to mention very quickly, that we have

6   prepared a number of demonstratives, about 27 demonstratives

7   that are on a slide show.  And Mr. Hambrick is prepared to

8   bring those exhibits -- those demonstratives up as we speak

9   about them.

10       I did send that slide deck to plaintiff's counsel last

11   night and had not heard back from him whether he had any

12   objections.

13       I will note that the majority of the slides, about 22 of

14   the 27, are all demonstratives from existing exhibits.  But

15   there are a handful that we can set the foundation for.

16       THE COURT:  Any objections for use of demonstratives?

17       MR. CONNETT:  I have no objection right now.  I don't

18   expect I will.  But to the extent that there are questions

19   which indicate the need for an objection, I -- I reserve my

20   right at that time, Your Honor, if that's all right.

21       THE COURT:  All right.  So noted.

22       MS. CARFORA:  Thank you.

23   BY MS. CARFORA

24   Q.   And, Dr. Thayer, can we --

25       MS. CARFORA:  Mr. Hambrick, can we start with the

1    first slide?

2        (Document displayed)

3    **BY MS. CARFORA**

4    **Q.**   Dr. Thayer, can you tell us, are IRIS assessments risk

5    assessments?

6    **A.**   No.  So IRIS assessments cover two of the four components

7    of the risk assessment paradigm.

8    **Q.**   And can you explain for the Court what is the risk

9    assessment paradigm?

10   **A.**   So it was developed in 1983 in the National Research

11   Council report, risk assessment in the federal government

12   managing the process.  And on the schematic it refers to the --

13   the green squares.  So those are the four components:  Hazard

14   identification, dose response assessment, exposure assessment,

15   and risk characterization.

16       The IRIS program does the two that are shaded in green.

17   Hazard identification.  So does the chemical cause a hazard?

18   And dose response assessment.  If it does cause a hazard, at

19   what dose or exposure levels?

20       And the IRIS program uses this dose response analysis to

21   identify -- to develop toxicity values that are considered

22   protective for the human population.

23   **Q.**   And, Dr. Thayer, are you familiar with how other EPA

24   program and regional offices use IRIS assessments?

25   **A.**   Yes.

THAYER - DIRECT / CARFORA

1  Q.   Can you explain that for the Court, very quickly?

2  A.   So program offices are charged to help implement a variety

3  of environmental laws.  These laws typically have very specific

4  considerations with respect to certain sources of exposure or

5  exposure scenarios.

6        So the exposure assessment piece, not -- which is not

7  shaded in green, is typically the purview of a program office.

8  And they would compile the exposure assessment information in a

9  way that makes sense for their decision-making needs.

10       And then they can take advantage of an IRIS dose response

11 analysis, which helps characterize the hazard and the dose

12 levels where that hazard may become apparent.  And they can

13 bring those together to help characterize the risk.  So that's

14 that last green bubble.

15       And then the program offices, if there is -- if there are

16 risk characterizations of concern, then the blue box is the

17 risk management, is where other factors that fall outside of

18 the health and exposure assessment are considered to actually

19 inform decision-making.

20 Q.   Dr. Thayer, do you know if -- do all EPA programs rely on

21 IRIS assessments?

22 A.   No, not all do.  So OPPT, the Office of Pollution

23 Prevention and Toxics, which administers TSCA, the Toxic

24 Substances Control Act, does their own risk assessments.

25 Q.    And, Dr. Thayer, how does the IRIS program determine its

**THAYER - DIRECT  / CARFORA**

1   priorities?

2   **A.**    So there is an annual survey to program offices to

3   identify priority needs for IRIS assessment.

4        Currently we have 15 assessments that we're working on.

5   Those are posted on our website in an IRIS program outlook that

6   also includes key timelines in the assessment development

7   process.   It's updated about three times a year.

8   **Q.**    And does IRIS conduct toxicological reviews evaluating

9   neurotoxic risk?

10  **A.**    Yes.

11  **Q.**    And does the IRIS program work to ensure that it's staying

12  up to date with the latest state of the science for conducting

13  its assessments?

14  **A.**    Yes.

15  **Q.**    Dr. Thayer, are you familiar with EPA's Guidelines for

16  Neurotoxic Risk Assessment?

17  **A.**    Yes.

18  **Q.**    And can you tell the Court how are those guidelines used

19  by the IRIS program?

20  **A.**    They provide principles of assessing neurotoxicity that

21  are used by EPA assessment scientists.

22       It's also -- the guidance also is a vehicle to help

23  communicate those principles to agency decision-makers and the

24  public at large.

25  **Q.**    Dr. Thayer, in your experience utilizing the guidelines,

**THAYER - DIRECT / CARFORA**

1  are the guidelines intended to be employed uniformly across all

2  EPA programs?

3  **A.**   No.  So they are principles, which means that they provide

4  sufficient flexibility for any given assessment, which, again,

5  may be conducted for a variety of decision-making purposes.  So

6  the principles are high enough level that they can be deployed

7  in a way that matches the decision-making context.

8  **Q.**   Dr. Thayer, are you aware, when were the guidelines

9  established?

10  **A.**   1998.  And they reflect principles of assessing

11  neurotoxicity at that time.

12  **Q.**   Dr. Thayer, does the IRIS program use systematic review

13  methodologies?

14  **A.**   Yes.

15  **Q.**   And do the 19- -- in your experience working with the 1998

16  guidelines, do the 1998 guidelines set forth methodologies for

17  systematic review?

18  **A.**   No.  In 1998 the agency really wasn't deploying systematic

19  review.  It doesn't change -- it doesn't make the principles in

20  the 1998 guidelines invalid.

21       It's just that, as you'll learn through our discussion,

22  systematic reviews comes with a certain philosophy of

23  transparency and predefining the process that's not reflected

24  in the 1998 guidelines.

25  **Q.**   Dr. Thayer, could you tell us, what is the first component

THAYER - DIRECT / CARFORA

1    of an IRIS toxicological review?

2    **A.**   That would be hazard assessment, which is also referred to

3    as hazard identification.

4    **Q.**   And can you explain for the Court what is hazard

5    identification?

6    **A.**   It's the process of determining whether a stressor -- and

7    in the context of the IRIS program a chemical, environmental

8    chemical -- causes adverse health effects.

9    **Q.**   And why is hazard identification important?

10   **A.**   Well, if there is a hazard, then you want to know more

11   about the dose response.  So at what exposure are dose levels,

12   does a hazard become apparent.

13        And then that information would be used to try to develop

14   a toxicity value that's protective of population.  If no hazard

15   is indicated, then there would be no need to do dose response.

16   **Q.**   And what methodology does the IRIS program employ for

17   hazard identification?

18   **A.**   So we use systematic review methods.  The methods that we

19   use have been reviewed by the National Academy of Science.

20   They have been reviewed within the agency.  They have also been

21   reviewed by federal staff at other agencies.

22   **Q.**   And, Dr. Thayer, did you personally have a role in

23   implementing systematic review methodologies for use by the

24   IRIS program?

25   **A.**   Yes.

1    **Q.**   And what role did you have in implementing systematic

2    review methodologies in the IRIS program?

3    **A.**   Well, when I came on board in January 2017 I was charged

4    to make sure the IRIS program was fully implementing systematic

5    review.  So since that time, we've had a number of check-ins

6    with external bodies to get feedback.

7        For example, in September 2017 we presented our methods to

8    a scientific advisory board, Chemical Assessment Advisory

9    Committee, or CAAC, and received praise for what we were doing.

10       In February 2018 we had a two-day meeting with the

11   National Academy of Science, again, going through in detail

12   what our -- what our methods were.  That panel produced a

13   report in April 2018 that indicated the IRIS program had made

14   substantial progress in implementing systematic review.

15   **Q.**   And in your work as director of the IRIS program, do you

16   stay -- does the IRIS program stay current on systematic review

17   methodologies and advancements.

18   **A.**   Yes.  And for context, systematic review is a methodology.

19   And like any methodology, when you begin to apply it in

20   different areas, then there is going to somebody refinement.

21       So historically, systematic review was used to help bring

22   transparency to making decisions in healthcare.  And the type

23   of evidence that would have been considered was a lot of

24   clinical epidemiology.

25       So now that we're taking those methods and applying them

**THAYER - DIRECT / CARFORA**

1  to environmental health, which has different types of evidence,

2  there is a component of continued method refinement.  So it's

3  critically important that we stay current on systematic review.

4  **Q.**  And how does the IRIS program stay current on the

5  systematic review method?

6  **A.**  There is a variety of approaches.  So there's public

7  meetings.  We have collaborations with experts in systematic

8  review who do not work in environmental health.

9       We also have collaborations with agencies or other

10  entities within environmental health who are either

11  implementing systematic review or want to.

12       We also have a research portfolio to help develop and

13  refine specialized software applications that make the process

14  more efficient.

15       So for some examples, in 2018 and 2019 we sponsored two

16  public NAS workshops to help deal with announced pragmatic

17  approaches to consider mechanistic information and evidence

18  integration.  These were two areas that we needed some

19  refinement.

20       We also have collaborations with the National Toxicology

21  Program still, the European Food Safety Authority, the Agency

22  for Toxic Substances and Disease Registry, or ATSCR, which is

23  part of the CDC, and certain state environmental offices.  So a

24  lot of collaboration.

25       And then, in addition, EPA has a systematic review

1  committee.  There is a practice so that different parts of the

2  EPA who are implementing systematic review can keep in touch

3  and share their experiences.

4  Q.   So, Dr. Thayer, did you have any involvement in the

5  implementation of systematic review methodologies in the IRIS

6  program before you became director of the IRIS program?

7  A.   I was invited to participate in a number of public

8  meetings.  So the IRIS program has been working over a number

9  of years to implement systematic review, and that -- that

10  convenes in public meetings to understand the state of the

11  science.

12  Q.   And did you ever become aware of why the IRIS program was

13  interested in exploring the systematic review methodology?

14  A.   Yes.

15  Q.   And can you very quickly explain to the Court your

16  understanding of why the IRIS program was interested in that?

17  A.   Ins 2011 the National Research Council, or NRC, did the

18  review of a draft formaldehyde IRIS assessment.  And they came

19  back with a number of recommendations, in particular, to

20  improve transparency of the assessment, which entailed

21  systematic review.

22       So the EPA worked in consultation with NRC to try to

23  implement those recommendations from 2011.

24  Q.   And just very quickly, what do you mean by you worked in

25  consultation with the NRC?

1    **A.**   So Congress, I believe in 2012, actually directed the EPA

2    to implement the 2011 NRC recommendations, and also asked that

3    the NRC be apprised of the progress to date.

4         So there were a number of check-in points.  For example,

5    in 2014 the NRC reviewed the progress they had made up to that

6    point with respect to implementing systematic review.  Gave

7    feedback and suggested some additional areas of advancement for

8    the IRIS program.

9         In 2018 we had that two-day meeting with the National

10   Academy of Science panel that I mentioned earlier.

11   **Q.**   And do you know when the IRIS program first began

12   publishing toxicological reviews that incorporated systematic

13   review methodologies?

14   **A.**   I believe September of 2016 trimethylbenzene, an ammonium,

15   were the first ones to begin to incorporate aspects of

16   systematic review.  Not full implementation, but aspects.

17        In August of 2018 an assessment of RDX, royal demolition

18   explosive, would also -- also included systematic review.  Not

19   the full package, but elements it.

20   **Q.**   And, Dr. Thayer, just in your experience as director of

21   the IRIS program, would you say that a draft report or draft

22   toxicological review is a reliable source for describing the

23   methods that should be used in assessing risk or making risk

24   conclusions?

25        **MR. CONNETT:**  Your Honor, I'm going to object on

 1   overbreadth and vague.

 2           THE COURT:  Could you narrow that question?  That is

 3   a broad question.

 4   BY MS. CARFORA

 5   Q.   Dr. Thayer, in your experience, is it -- would it be -- is

 6   a draft toxicological report a reliable source for describing

 7   the methods used by the IRIS program?

 8           MR. CONNETT:  Your Honor, I'm going to object.

 9           THE COURT:  That's still -- I think it needs some

10   details for that question.  I'm not sure what it means.

11           MS. CARFORA:  Okay.  I'm going to come back to that.

12   Thank you.

13   BY MS. CARFORA

14   Q.   All right.  Dr. Thayer, are you familiar with the concept

15   of weight of the scientific evidence?

16   A.   Yes.  It's a process used to describe evidence synthesis

17   and integration.

18   Q.   Dr. Thayer, does the IRIS program publish drafts of their

19   toxicological reviews?

20   A.   Yes.

21   Q.   For what purpose?

22   A.   To get public comment and, also, to get external

23   scientific review.

24   Q.   And is it possible that once you receive public comment on

25   a draft toxicological review, that EPA would change or

 1   somehow -- change the draft before a final version is public?

 2   **A.**   Based on the public comments and the external scientific

 3   review, it often is the case that the draft is modified before

 4   finalization.

 5   **Q.**   If that's the case, would you say that relying on a draft

 6   toxicological review would be reliable for the purpose of

 7   identifying methodologies employed by the program?

 8           **MR. CONNETT:**   Sorry, Your Honor.   I missed that

 9   question.

10       Counsel, could you repeat that?   I apologize.

11           **THE COURT:**   Yeah.   I'm not sure.   That's a rather

12   vague question.   It's not tied to anything specific.

13           **MS. CARFORA:**   I understand.   Thank you.   Maybe I'll

14   try again later.

15   **BY MS. CARFORA**

16   **Q.**   Dr. Thayer, what is systematic review?

17   **A.**   Systematic review is a methodology for conducting a

18   literature-based assessment.   It's known for its transparency

19   and rigor that it brings to the process.

20       Really critical is this notion of predefining the methods

21   that are going to be used to identify studies.   To make

22   decisions about whether they are relevant or not, included or

23   excluded.   How you're going to critically appraise studies.

24   How you're going to look across studies to reach evidence

25   synthesis and integration conclusions.   And then how you're

1  going to describe and characterize your confidence in your

2  conclusions.

3  **Q.**    Dr. Thayer, when did you first become familiar with

4  systematic review?

5  **A.**    In 2012, when I was working in NTP OHAT.

6  **Q.**    And how did you become familiar?

7  **A.**    So at that time it was pretty clear that systematic review

8  had received a lot of positive feedback in terms of its

9  application in a healthcare context.  And it was really only a

10  matter of time until, in the environmental health community, we

11  were going to be asked to -- to implement it.

12      So NTP OHAT wanted to be at the front edge of that.  So we

13  developed a framework for systematic review that we considered

14  applicable to looking at environmental health questions that

15  included human evidence, evidence from experimental animal

16  studies, as well as evidence from studies in cells or in

17  tissues, referred to as in vitro studies.

18  **Q.**    And how was the OHAT systematic framework developed?

19  **A.**    In consultation with experts in systematic review, many of

20  which who did not work in environmental health.

21      Also, in consultation with experts who do environmental

22  health assessments, assessments that may or may not have

23  familiarity with systematic review.

24      And then we developed a framework and got feedback on that

25  framework from a scientific advisory body, from public comment,

 1  from taking that framework and trying to apply it to case
 2  studies, and then refining that approach.
 3  **Q.**   Dr. Thayer, what are the fundamental -- I'm sorry.  Is
 4  application of systematic review method always the same?
 5  **A.**   No.  So there's core pillars of the process that you
 6  always expect to see.  But the way that those pillars are
 7  actually operationalized, a specific question can differ.
 8  **Q.**   And can you tell us Dr. Thayer, what are these fundamental
 9  pillars that you're describing?
10  **A.**   You would start off with an explicit phase of trying to
11  make sure that you've characterized the question that you're
12  trying to address, referred to as scoping and problem
13  formulation, so that you can outline the objectives of the
14  review.  There may be key questions that you need to assemble
15  to address those objectives.
16  **Q.**   And what's the next step?
17  **A.**   The next step would be where you would develop a protocol,
18  which is the method document of record for the assessment.
19  **Q.**   And next?
20  **A.**   Next would be where you have your predefined approaches to
21  search the literature for potentially relevant studies.
22  **Q.**   And is there a next step?
23  **A.**   Yes.  So once you've searched the literature, then you
24  also have, again, predefined methods for how you're deciding
25  whether studies are relevant or not.  So whether they are

THAYER - DIRECT  / CARFORA

1  included or excluded.

2  **Q.**   Is there another step?

3  **A.**   Process of data extraction, which refers to the process of

4  summarizing the study designs and results from the studies that

5  are included.

6  **Q.**   And is there another step?

7  **A.**   Assessing the internal validity, which is referred to as

8  risk of bias in systematic review.  In essence, it's based on

9  the way the study was conducted.  Do you find the results

10  credible?

11  **Q.**   And is there another step?

12  **A.**   Then you would begin to synthesize patterns of findings

13  across studies and characterize your -- your confidence in the

14  conclusions based on evidence synthesis.

15  **Q.**   And is there another step?

16  **A.**   It would be to characterize your confidence in your

17  evidence synthesis and integration conclusions.

18  **Q.**   And finally -- oh, sorry.  You put those together.  Thank

19  you.

20       Dr. Thayer, you mentioned that you collaborate with other

21  agencies and parties interested in applying systematic review

22  in environmental health; is that correct?

23  **A.**   Yes.

24  **Q.**   Are you aware of any other regulatory agencies that have

25  integrated systematic review as a tool for reaching

THAYER - DIRECT  / CARFORA

1   evidence-based conclusions?

2   **A.**   Well, within the EPA the TSCA program has.  So they did

3   their own assessments using systematic review methodology.

4   There's also some state environmental health programs that use

5   systematic review.

6   **Q.**   And are you aware of any efforts by non-regulatory groups

7   that have integrated systematic review as a tool for reaching

8   evidence-based conclusions?

9   **A.**   Yes.  So, for example, the National Toxicology Program,

10   the European Food Safety Authority, the World Health

11   Organization.  Other -- other state departments are beginning

12   to use it.

13       I would also say that journal articles.  So increasingly

14   journals will not accept reviews unless they are done using

15   systematic review methods.

16       Systematic review is also a topic in a lot of professional

17   society meetings that are relevant to environmental health.

18   **Q.**   Dr. Thayer, what is the first step of systematic review?

19   **A.**   Problem formulation and protocol development.

20   **Q.**   And what happens during this step?

21   **A.**   So this is really where you begin to characterize, why are

22   you asking the question and, you know, to provide some of the

23   decision-making context in that problem formulation.  To

24   outline the scope and bounds of the assessment.

25       In the context of a regulatory environment like EPA,

1    it's -- it's incredibly helpful to have public feedback.  So

2    with the IRIS program, we develop a document referred to as an

3    IRIS assessment plan.  That's a document that actually conveys

4    our problem formulation.  Why are we doing the assessment?  How

5    have we scoped it?  What kind of evidence do we anticipate

6    needing to collect?

7          That IRIS assessment plan, or IAP, undergoes review within

8    the agency, because we need to, again, make sure that the way

9    that we're framing the assessment is actually going to be

10   helpful for the decision-making context.

11         That IAP get released for public comment.  It also gets

12   discussed at a public science meeting.  And then -- so that is

13   the why.

14         And then related to that we begin to develop the protocol,

15   which is the how.  How are you going to do the assessment?

16         And during those processes, you begin to identify

17   something referred to a PECO statement.

18   **Q.**   Dr. Thayer, what does PECO stand for?

19   **A.**   So the P refers to populations or participants.  The E

20   refers to exposure.  The C refers to comparators.  And the O

21   refers to outcomes.

22              **MS. CARFORA:**  Mr. Hambrick, can you put up U.S.

23   demonstrative No. 6, please.

24         (Document displayed.)

25

THAYER - DIRECT / CARFORA

1   BY MS. CARFORA

2   Q.   Dr. Thayer, are you familiar with this PECO statement?

3   A.   Yes.  This is the PECO statement that was used in the 2016

4   NTP systematic literature review on effects of fluoride on

5   learning and memory in animal, in animal models.

6   Q.   And how were you involved in that particular study?

7   A.   So I was co-lead.  I provided the systematic review

8   expertise.  I worked with NTP toxicologists with expertise in

9   neurotoxicity to help do the review.  In particular, Jean

10  Harry.

11  Q.   And how was this PECO statement formulated?

12  A.   There are a couple of inputs.  So one is around this time

13  the Australian National Health and Medical Research Council was

14  doing an analysis of the human evidence, looking at health

15  effects of fluoride in the context of water fluoridation.  And

16  there was interest at that time.  This idea of IQ effects

17  was -- was visible at that time.  People were aware of that.

18  And so the idea was to sort of see if an analysis of the animal

19  data may help inform some of the some interpretations of the

20  human evidence.

21       Relatedly, around that same time, but I think a little bit

22  after that, we had -- the NTP had a nomination from the

23  Fluoride Action Network to look at the health effects of

24  fluoride that included a focus on developmental neurotoxicity.

25       (Brief pause.)

THAYER - DIRECT  / CARFORA

1   **A.**   I can't hear.

2   **Q.**   That's because I was on mute.

3   **A.**   Not me.  Not me.

4   **Q.**   Doctor, if I refer to NTP 2016 report that you were just

5   talking about, if I refer to that as NTP 2016, will you

6   understand that?

7   **A.**   Yes.

8   **Q.**   Great.  Thank you.

9        And how did NTP 2016 define the research population?

10   **A.**   Non-human mammalian animal species of all ages.  So we

11   would have included things like rats, mice.  If we would have

12   found monkey studies, they would have been included.  If we

13   found fish studies, they would have been excluded.

14   **Q.**   And how did NTP define the specific exposure research

15   objective?

16   **A.**   So it would be fluoride at any concentration, and the

17   forms that were included would be those that are pertinent to

18   water fluoridation, as well as salts that may dissociate into

19   free fluoride forms.

20   **Q.**   And how did NTP 2016 refine the comparator?

21   **A.**   Animals exposed to vehicle only treatment.

22   **Q.**   And what is vehicle exposed control group?

23   **A.**   So "vehicle" just refers to what you're administrating the

24   test compound in.

25        So here, in this case, typically fluoride was administered

THAYER - DIRECT / CARFORA

1   in drinking water.  So the control animals would have just

2   drinking water.  And then the treated animals would have

3   drinking water plus some dose level of fluoride.

4   Q.   And how did NTP 2016 define the outcome of interest?

5   A.   Any neurobehavioral outcome, but there was a primary focus

6   on learning and memory, with secondary outcomes on -- in any

7   other neurobehavioral study that we found.

8   Q.   Why did NMP 2016 separate primary and secondary outcomes?

9   A.   So as you mentioned, at that time there were already

10  interest in understanding whether exposure could be related to

11  reduced IQ.  So we wanted to make sure that our analysis of the

12  animal neurobehavioral studies squarely focused on that, to

13  help complement that discussion.

14      But along the way we also wanted to make sure that we

15  weren't missing things.  So we wanted to catch a broad net to

16  see the extent of the information that would be available to

17  look at other neurobehavioral outcomes.

18  Q.   And once the PECO statement is complete, what happens

19  next?

20  A.   Then you begin to flesh out your protocol, which is,

21  again, the method document.  How are you going to approach the

22  review?

23  Q.   Why is it important to develop a protocol?

24  A.   That really sort of embodies the transparent in rigors.

25  So part of it is the transparency.  You make the methods

**THAYER - DIRECT / CARFORA**

 1   transparent.

 2         Again, in the context of a regulatory setting within the

 3   IRIS program, our protocols undergo review within the agency.

 4   They get released for public comment.  And this is done well in

 5   advance having a draft assessment.

 6         So the idea is, it's out there.  Everybody knows methods

 7   are going to be used.  Everybody has a chance to comment on

 8   that methodology before the assessment is actually done.  So

 9   that's a transparency.

10         And then -- then a lot of the methods have embedded within

11   them techniques to make sure that bias is minimized when

12   actually conducting the assessment.

13   **Q.**   And what is the next step of systematic review after

14   problem formulation and protocol development?

15   **A.**   So this is where you want to search for and select studies

16   for inclusion.

17   **Q.**   And what are the basic fundamental methodologies for

18   literature search in systematic review?

19   **A.**   So one is, you're going to look at more than one source.

20   So there are a number of databases that are widely used to look

21   at biomedical or human health literature.  PubMed, Scopus, Web

22   of Science, Embase, Toxnet before it went away in December.  So

23   you look at more than one database.

24         And then the idea is that you document with enough detail

25   that somebody could reuse your search strategies.  You also

**THAYER - DIRECT / CARFORA**

1   document the dates of that search.  If there were any updates.

2   You also document whether or not there were any restrictions?

3        So, for example, some groups -- not mine -- choose to

4   exclude non-English studies.  So those would be features of the

5   literature searches to be described.

6   **Q.**   And what are the basic fundamental methodologies for

7   selecting studies for inclusion in the systematic review?

8   **A.**   So -- so the PECO really frames the inclusion and

9   exclusion criteria.  A study has to meet all elements of that

10  PECO in order to be included.

11       And the actual process -- and this gets back to the rigor

12  piece of systematic review.  The actual process is that you

13  have two people independently looking at each study.  First at

14  the title and abstract level, and they are making independent

15  judgments; include, exclude.

16       And then what happens is either both of those people

17  decide include, or else they exclude, or there is a conflict

18  that gets resolved.

19       So, and then -- and then any study that is considered

20  relevant or it's unclear, based on just the title and abstract

21  content, moves onto another layer of review called full text

22  review, where you get the full text.  And then it's that same

23  process.  Two people independently assessing whether that full

24  text matches the PECO criteria.

25  **Q.**   And did NTP 2016 consider any endpoints to be beyond the

**THAYER - DIRECT / CARFORA**

1  scope of that systematic review?

2  **A.**   Yes.  So brain cellular findings.  Morphometric or

3  structural brain findings, as well as histological effects

4  would have been beyond the scope.

5  **Q.**   And why were those studies considered beyond the scope?

6  **A.**   Well, one reason is they were considered indirect.  So,

7  again, the focus here was looking at learning and memory.  So

8  those endpoints may tell you that the brain is a target of

9  fluoride, but they don't tell you if there is a functional

10  effect on learning and memory.

11  **Q.**   And was there a -- another reason why NTP 2016 decided to

12  exclude those studies?

13  **A.**   Yes.  Because in 2006 there was an NRC report entitled

14  "Fluoride in Drinking Water - Scientific Review of EPA

15  Standards" that included a survey of the different health

16  outcomes that were of concern for fluoride.  And there was a

17  section on the neurological effects.

18       That group that prepared that report indicated based on

19  the cellular, the morphometric and histology findings, that

20  there were indications that more work was needed to

21  characterize functional effects on the brain.

22       So what we wanted to do in our review is not duplicate

23  those conclusions, but to build them, build from them and

24  really probe the functional effects on learning and memory.

25       And what you're looking at here is Figure 4 from the

 1  NTP 2016 report, and you're looking at publications that are

 2  neurobehavioral.  And what you can see is that between 2006 to

 3  2015, which is about, you know, this time span of the NTP

 4  review, you can see that there became available quite a number

 5  of studies that looked at neurobehavior following fluoride

 6  treatment.

 7  **Q.**  Dr. Thayer, what is the next step of systematic review

 8  after the search for and selection of studies for inclusion or

 9  exclusion?

10  **A.**  Extracting the data from studies, which, again, refers to

11  the process of summarizing the study design and the results.

12  **Q.**  And what was the data extraction methodology used for NTP

13  2016?

14  **A.**  We used a specialized web-based software application

15  called the Health Assessment Workspace Collaborative.

16  **Q.**  And what types of data are extracted from selected

17  studies?

18  **A.**  Okay.  Data related to the study design and results.

19          **MS. CARFORA:**  And, Your Honor, I would like

20  permission to display EPA Trial Exhibit 553.  That's a

21  pre-admitted exhibit.

22          **THE COURT:**  All right.

23          **MR. CONNETT:**  No objection, Your Honor.

24          **THE COURT:**  Okay.

25      (Document displayed.)

THAYER - DIRECT  / CARFORA

1   BY MS. CARFORA

2   Q.   All right.  So here you're looking at Appendix 2 from the

3   2016 NTP report.  And this is a more detailed presentation of

4   what was extracted.

5        I won't torture you by reading this, but it would be

6   information about what form of fluoride.  What dose levels?

7   What vehicle was used?  How long was the exposure?  How old

8   were the animals when they were exposed?  What was the model

9   system?  Was it a rat?  Was it a mouse?  What was the strain?

10  What endpoints were assessed?

11       And then there would have been a quantitative summary of

12  the findings from those studies.

13       So within hawk, there is a structured -- we entered this

14  information in a structured web-based interface.  And what that

15  does is it allows the information to be downloadable in the

16  report.  So it makes it easier for people to reuse the results

17  of the extraction when it's collected in a structured way.

18  Q.   Thank you.

19            MS. CARFORA:  Mr. Hambrick, can you clear the slide,

20  please.

21       (Document removed from display)

22  BY MS. CARFORA

23  Q.   And, Dr. Thayer, what data extraction elements were

24  identified as relevant to the NTP 2016 systematic review?

25  A.   The -- I think I covered some of those.

THAYER - DIRECT / CARFORA

1    Q.    Yes.

2             MS. CARFORA:  Mr. Hambrick, can you display U.S.

3    demonstrative No. 14?

4        (Document displayed.)

5    BY MS. CARFORA

6    Q.    What is the next step of systematic review after data

7    extraction?

8    A.    This would be looking at the -- the quality or risk of

9    bias of individual studies.

10   Q.    Why is assessing the quality of the individual studies

11   important to systematic review?

12   A.    Well, ultimately you're going to be reaching conclusions

13   based on looking at patterns of findings across studies.  So

14   you need to understand the strength and weaknesses in that

15   evidence base.  And to do that you need to understand the

16   strength and the weaknesses of individual studies in that

17   evidence base.

18        I think it's also important to note that it is possible

19   that studies can be conducted to the highest feasible

20   standards, but there still may be important pieces of bias that

21   remain of concern.

22   Q.    What does risk -- when you're speaking of risk of bias,

23   what does that really refer to in this context?

24   A.    It's really more of a systematic deviation from the truth.

25   So one of the -- a couple of bias domains that have the most

1    empirical support would be if you don't randomize animals to

2    treatment group, or if they are not -- if there's not blinding

3    of researchers when the outcome is assessed, then those

4    practices lead to predictable effects.  They tend to increase

5    effect sizes.  So those would be two examples of bias.

6         Bias can work in both directions.  So sometimes the biases

7    can be biased toward not finding effects.  Biases toward the

8    null.  They may be biases that lead you to find larger effects.

9    Like the two examples I just presented, not randomizing and not

10   having blinding in the outcome assessment.

11        It's also possible that not all biases are created equal.

12   Sometimes there may be a bias that's indicated, but it really

13   doesn't undermine the credibility of the findings.

14        In other cases the bias may be very significant and

15   really -- and really call into question the credibility of the

16   findings.

17        Typically at the individual study level it's pretty hard

18   to tease out the specific effects of multiple biases.

19   **Q.**   And can you explain, what do you mean by across all bias

20   domains?

21   **A.**   So what you're looking at here is there are specific

22   domains of assessing bias that deal with different aspects of

23   implementing the study.

24        And so what you're seeing here is those bold headers,

25   like, "Selection Bias," "Confounding Bias," those would be

1   examples of bias domains.  Each bias domain gets probed by a

2   series of questions.  Those would be the number of questions.

3        The other thing to note from this picture, which is

4   actually a summary table of risk of bias tools used by NTP

5   OHAT.  If you look at the columns, you will see different types

6   of studies.  You will see experimental animal.  Human control

7   trials, which are a form of experimental study.  And then you

8   will see cohort, case control, cross sectional, and case

9   series, which are types of observation studies.  So they are

10  not experimental design.

11       And some domains -- for example, detection bias, which is

12  can we be confident in the exposure characterization, the

13  outcome assessment -- apply to all study designs.

14       In other cases the domain only applies to certain study

15  designs.  So selection bias, where we're talking about

16  considering whether or not there was randomization.  That is

17  really only pertinent to the experimental studies.

18  Experimental animal studies or the controlled human studies.

19       Confounding bias is really more pertinent to the

20  observational human studies.

21  Q.   Dr. Thayer, why did NTP think it was important to use a

22  tool like this?

23  A.   Well, again, it enhances the transparency; right?  This is

24  how we're going to assess the studies.  Having a tool like this

25  means that you can apply the same approach to all your studies.

THAYER - DIRECT / CARFORA

1        Also, the process of doing this -- and this is another

2    example of the rigor of systematic review -- is that you would

3    have two people independently evaluate risk of bias across

4    studies.  And then they'd look across their answers and then

5    resolve them as needed.

6        So if you're going to have multiple people evaluating risk

7    of bias, then having a tool and a structured approach for doing

8    that process helps give the different reviewers a common

9    framework.

10   **Q.**   And, Dr. Thayer, just -- are these risk of bias domains,

11   are they applied to the overall study?

12   **A.**   It really should be applied at the outcome level.  So, for

13   example, if I am looking at a study and it's measured

14   cardiovascular outcomes, it's also measuring neurological

15   outcomes.  And let's say the way that the neurological outcomes

16   were assessed were fine, but I may have one judgment about that

17   study.  But what happens if the way the cardiovascular outcomes

18   were assessed, I had concerns about that.

19       So it's possible within the same study to have different

20   decisions about bias based on the outcome.

21   **Q.**   Dr. Thayer, what methodology was utilized for NTP 2016 to

22   assess the credibility of the individual studies?

23   **A.**   So it would have been the NTP OHAT tool.  And so what

24   you're looking at now is just application of that table that we

25   just discussed, application of that table to a set of

1  hypothetical animal studies.

2      (Document displayed)

3      And so what you see are the risk of bias questions.  And

4  then you see judgments about those questions for each study.

5  It can be dark green, low risk of bias, which means good.  It

6  can also be definitely high risk of bias, means that there is

7  something really critically deficient within that specific --

8  how that part of the study was conducted.

9      And then as you can probably infer, light green means

10 there's something there, but it's not -- it's not giving me too

11 much hesitation.

12     Pink means there is something -- there is something there

13 that gives me some concern, but it's not a terminal flaw.

14     And so what you're seeing here is sort of a summary of the

15 risk of bias analyses, but in the actual assessment you would

16 have access to the rationales that underpin each of these

17 judgments.  So this is a summary figure.

18 Q.  Dr. Thayer, what is the next step of NTP's systematic

19 review process after assessing the quality and risk of bias of

20 the individual studies?

21 A.  Then we begin to synthesize the evidence and rate the

22 confidence in the body of the evidence.

23 Q.  And what do the confidence ratings reflect in the context

24 of the review?

25 A.  Your confidence that the pattern of finding reflects the

THAYER - DIRECT  / CARFORA

 1  true relationship between the exposure and the effect.

 2  **Q.**   And why is rating confidence in the body of evidence an

 3  important step in systematic review?

 4  **A.**   Well, it's -- it's inherently expert driven and

 5  subjective, the whole process of articulating your confidence.

 6       And so part of the transparency is to make those expert

 7  judgments clear along the way.  And what we're going to be

 8  walking through are structured frameworks to help guide that

 9  expert judgment process to make sure the judgments are

10  transparent.

11  **Q.**   And does NTP employ a specific methodology for rating the

12  confidence in a body of evidence?

13  **A.**   Yes.

14  **Q.**   Can you explain the methodology employed?

15  **A.**   It has a number of steps.  It's a structured process.

16       (Document displayed)

17       At the first step -- and I think it's important to note

18  that this process that we're going to be talking about is done

19  separately for human and animal studies.  It's also done

20  separately for different outcomes.

21       So in that -- if I was looking at an assessment that

22  included cardiovascular or neurological outcomes, I would run

23  through this process for the neurological outcomes separately

24  for human animals.

25       But the first step -- go ahead.

**THAYER - DIRECT / CARFORA**

1  **Q.**   Would you also look at different outcomes?  So your look

2  at endpoints would be neurological, is how I understand it, but

3  then there could be separate outcomes as well.

4      So do you have to do this process for the individual

5  outcomes as well?

6  **A.**   There is -- it depends.  Sometimes you might roll up a

7  number of outcomes into one analysis.

8      So in the NTP animal study, for example, there were

9  different specific behavioral tests to probe learning and

10  memory.  But we did this analysis looking across those

11  different tests.

12      It may be the case that for a certain kind of outcome,

13  that it may be inappropriate to roll them up, and you may want

14  to consider them separately.

15      But here we're looking -- we would have applied this

16  looking at the learning and memory studies of -- with fluoride.

17      But in the first step of this structured process, there

18  would be an initial confidence based on study design,

19  considering four factors.  The more of those factors that are

20  present in a study design, then the stronger the causal

21  inferences that can be drawn from that study.

22  **Q.**   And what has NTP identified as the key study design

23  features to create an initial confidence level?

24  **A.**   Controlled exposure, exposure prior to the outcome, having

25  individual outcome data, and having a comparison group.

1  **Q.**  And what happens after the initial confidence rating is

2  determined?

3  **A.**  Then you begin to think about factors that decrease your

4  confidence looking across studies.

5  **Q.**  And can you tell, who is the first property considered for

6  decrease in confidence?

7  **A.**  Risk of bias.  But at this point we're looking across

8  studies.

9      So if you remembered that we just looked at that colorful

10  map with pinks and reds and greens.  So that would be across

11  the body, having a sense of the bias elements.

12      If I looked at a figure like that and it was mostly some

13  shade of green, I wouldn't have much concern about risk of bias

14  in my evidence.

15      If I looked at that kind of figure and there was a lot of

16  pink and red, then I might have decreased confidence in that

17  body of evidence.

18  **Q.**  And what's the second property considered for decrease in

19  confidence?

20  **A.**  Unexplained inconsistency.  So now you're looking across

21  studies, and it's very natural to look at consistency of

22  patterns.

23      If you find indications of inconsistency, then you want to

24  see if there is a reason for it.  Were there different animal

25  models used?  Were there different test systems?  Are there

 1    different dose levels?

 2        And so you might identify plausible reasons for the

 3    inconsistency, and in that case you wouldn't downgrade.  But if

 4    you go through that process and it's unexplained -- this

 5    inconsistency, I don't know why it's there -- then that would

 6    decrease your confidence.

 7    Q.   And what's the third property considered for decreasing

 8    confidence?

 9    A.   It's indirectness.  So that's why the collection of

10    studies that you have at hand are not quite on target for your

11    question.

12        So, for example, if our question was learning and memory,

13    and let's say we would have included the brain morphology and

14    histology studies, then those would have been considered

15    indirect indicators of an effect on learning and memory.

16    Q.   And what's the next factor?

17    A.   So imprecision.  Now we're talking about your estimates,

18    your quantitative estimates.  And typically this is probed by

19    any estimate tends to come with confidence limits.  And when

20    those confidence limits are very wide, then it indicates that

21    the real value could be sort of any number of values.

22        And when you look across your body of evidence, if you

23    have failing narrow confidence limits, then that gives you more

24    confidence that you have a good grasp on what the numerical

25    effect size.  The imprecision would be if they are wide.  And

**THAYER - DIRECT / CARFORA**

1    if they are there, then you may choose to downgrade.

2    **Q.**   What's the final consideration?

3    **A.**   So publication bias.  This would be because of the

4    findings of the study.  It doesn't appear in the public domain.

5    So there's a few flavors of this that are pertinent to

6    environmental health.

7        On the one hand, there's the idea that it may be an

8    industry conducted study and effects were found, but it doesn't

9    appear in the public domain.

10       Another is -- and this is more really with journal

11   publication models and one of the academic literature.

12   Historically it's harder to publish negative studies.  So there

13   is some concern that if there are negative findings, they are

14   not appearing in published papers.

15       Publication bias is very difficult to assess if it's

16   present.  So in the context of the structure of framework that

17   we're describing, you really wouldn't downgrade unless you had

18   pretty clear indication that it was occurring, because it is so

19   hard to assess.

20   **Q.**   Now, once you considered all these factors for decrease in

21   confidence, what's the next step?

22   **A.**   Then you think about factors that can increase your

23   confidence.

24   **Q.**   And can you take us through those real quick?  What is the

25   first factor to consider?

1    A.    So a large magnitude of effect.  And this has to be

2    considered in the context of a specific outcome.  So what might

3    be a large magnitude of effect for weight loss, might be a very

4    different analysis than what would be a large magnitude of

5    effect on blood pressure.  So it's very specific to the

6    endpoint.

7         In the context of an epidemiology study, we're talking

8    about if the magnitude of effect is sufficiently large, that

9    it's not likely to have been accounted for by potential

10   confounding factors.

11   Q.    What's the next property?

12   A.    So dose response.  Typically this is the notion that as

13   you have increasing dose, you have increasing incidents or

14   severity of the adverse effect.

15   Q.    And the next factor?

16   A.    Residual confounding.  So this would be unaccounted for

17   confounding.  This is a little tricky to explain, so bear with

18   me.

19        So what you've done at this point is through the risk of

20   bias analysis, you have a sense of the confounding factors, and

21   you maybe have a sense of the direction of bias; bias toward

22   the null, bias away in the null.  So you consider that, along

23   with the pattern of findings, and sometimes that might give you

24   increased confidence.

25        So, for example, if I have identified a number of

THAYER - DIRECT / CARFORA

1   confounding factors in my analysis and the bias is toward null,

2   toward that finding, yet, across my studies I'm observing an

3   association, it might give you more confidence that there is an

4   association.

5       The flip of that is that maybe if the biases are away from

6   the null, toward finding something, but what I'm observing is

7   no association, you might have no confidence in that no

8   association finding.

9   Q.   What's the next factor?

10  A.   So consistency.  And here we're talking about across

11  animal models or species.  Across dissimilar populations in

12  particular human populations.  Across study design types.  So

13  if you're seeing the same signal coming from a variety of

14  mechanisms, then it gives you more confidence.

15  Q.   Dr. Thayer, is it possible that you can have consistency

16  across findings, but you could -- you would still choose not to

17  increase confidence?

18  A.   Yes.  In particular --

19  Q.   The -- go ahead.

20  A.   Could you --

21  Q.   Go ahead.

22  A.   In particular, if there is a bias concern.  So it's -- so

23  it's possible -- let's say -- let's take our animal model

24  approach.  So let's say I see a consistent pattern of effect in

25  my animal model, but none of the animal studies are randomized.

THAYER - DIRECT / CARFORA

1    And there was no blinding at outcome assessment.

2        So there may be a sort of a very consistent pattern, but

3    if you have a consistent underlying concern for the risk of

4    bias, you may -- it may measure your acceptance of that

5    consistent pattern.

6    Q.   And could the same be said for human studies?  If there is

7    a pattern of bias in human studies, would that impact how you

8    would increase confidence or whether you would increase

9    confidence?

10   A.   Yes, it can impact it.

11   Q.   In the pattern -- to identify those patterns, you would

12   identify that in the prior step where you did -- where you

13   considered risk of bias across the entire dataset for each

14   individual study; is that right?

15   A.   Yes.

16   Q.   And what is the other category?

17   A.   So that's really assessment specific.  So there may be

18   other reasons why you increase your confidence.

19       For example, if what you're observing is appearance of

20   rare outcomes, which you would not have expected to detect

21   statistically, that may be something that increases your

22   confidence.

23   Q.   And what happens after consideration of the factors,

24   upgrade in confidence is complete?

25   A.   Then we think about characterizing our confidence in the

1  body of evidence.  Everything from high to very low.

2  **Q.**   Dr. Thayer, were you involved in developing the

3  methodology?

4  **A.**   Yes.

5  **Q.**   And how was that methodology developed?

6  **A.**   This was based on guidance from the GRADE working group.

7  Grade is Grading Recommendations Assessment Development and

8  Evaluation.  It's a widely-used structure of framework for

9  reaching confidence or certainty evidence conclusions.  It's

10 used by over 100 organizations in 19 countries.

11 **Q.**   And what -- and did NTP determine confidence ratings for

12 the animal data?

13 **A.**   Yes.  They reached conclusion of low to moderate

14 confidence in the evidence for an effect of fluoride on

15 learning and memory in animals exposed in adulthood or during

16 development.

17 **Q.**   Was there a specific threshold level that NTP based its

18 results on?

19             **MR. CONNETT:**  Vague and ambiguous.  Overbroad.

20             **THE COURT:**  You can answer that question.  Overruled.

21 **A.**   It was contextualized in the context of points and parts

22 per million.  So contextualized in the context of what would be

23 pertinent to water fluoridation.

24 **BY MS. CARFORA**

25 **Q.**   Now, was NTP 2016 a dose response assessment?

1  **A.**   No.

2  **Q.**   So why did NTP make conclusions contextualized to a

3  specific dose?

4  **A.**   To help inform the discussions that were occurring -- that

5  are still occurring in terms of concern about water

6  fluoridation.

7  **Q.**   Now, you mentioned that the NTP findings were low to

8  moderate.  And I'm wondering, why did you land on a range of

9  confidence as opposed to, you know, one confidence level or the

10  other?

11  **A.**   We had more confidence in the studies with a goat

12  exposure.  In particular, those that use the Morris water maze.

13  That presented a moderate level of evidence.

14      And then our confidence was reduced in the -- the animals

15  that -- in the animal studies that had developmental exposure.

16  **Q.**   And did NTP 2016 identify factors that somehow decreased

17  confidence?

18  **A.**   Directness and risk of bias.

19  **Q.**   And can you explain what was the concern for directness?

20  **A.**   So with directness -- so these are neurobehavioral

21  studies.  The animals have to move in order to perform the

22  task.  So -- and this includes the analysis of learning and

23  memory.

24      And we saw some indications of effects on motor and

25  sensory function in animals.  And so it wasn't -- we weren't

1    able to completely tease apart whether some of the performance

2    on the learning and memory could have been because there was an

3    impact on motor and sensory function.  So that was considered a

4    form of indirectness.

5    **Q.**   And can you explain for the Court your concern for risk of

6    bias?

7    **A.**   So this was really related to the developmental exposure

8    studies.  So there was a failure to account for litter effects

9    in many of the studies that had developmental exposure.

10           **MS. CARFORA:**  And, Mr. Hambrick, can we bring up U.S.

11   demonstrative 22?

12       (Document displayed.)

13   **BY MS. CARFORA**

14   **Q.**   Dr. Thayer, are you familiar with this graphic.

15   **A.**   Yes.  This presents the risk of bias analysis in the

16   studies looking at developmental exposure to fluoride.

17       The issue I mentioned, the failure to account for litter,

18   effects is reflected in the:  Were there any other potential

19   effects to internal validity?

20       So you see that here there's a -- sort of a dark yellow,

21   which reflects a probably high risk of bias.

22   **Q.**   And, Dr. Thayer, did NTP 2016 report a chart like this for

23   each outcome test?

24   **A.**   Yes.

25   **Q.**   Now, what's the next step of systematic review after

1  rating the confidence in the body of evidence?

2  **A.**   Then we begin to translate those confidence ratings into

3  level of evidence of a health effect.

4  **Q.**   And can you explain for the Court the significance of the

5  descriptors on this next slide?

6      (Document displayed)

7  **A.**   So these descriptors, one sort of include your confidence

8  judgment, as well as what was the nature of the finding; toward

9  a health effect, or no health effect.

10      So if we look at the -- on the left, sort of the darker

11  blue inset panel, then you can see that it's in many cases a

12  direct translation.  High confidence in the body of evidence.

13  High level of evidence for health effect.

14      Low, low confidence in the body of evidence.  Low level of

15  evidence for health effect.

16      And then if there is very low or no evidence identified,

17  then that becomes inadequate.

18      But then on the right side, sort of the green, the green

19  inset, it's -- the conclusion here is no health effect.  And

20  because of the inherent challenges of demonstrating a negative,

21  we would not reach a judgment of evidence of no health effect

22  unless you were dealing with a body of evidence that you had

23  very high confidence in.  In all other circumstance there would

24  be -- the evidence would be considered inadequate to reach a

25  conclusion about no health effect.

THAYER - DIRECT / CARFORA

1  Q.   And, Dr. Thayer, do these descriptors, do they reflect
2  causality?
3  A.   Causality is embedded with them.  The principles of Sir
4  Austin Bradford Hill is part of the structured framework that
5  we just walked through.  Again, part of the NTP approach.  Part
6  of the GRADE approach.  It's also embedded in the IRIS program
7  approach.
8  Q.   Can you just explain for the Court who is Sir Austin
9  Bradford Hill?
10 A.   A British epidemiologist and statistician, who is very
11 famous for discovery the linkage between smoking and lung
12 cancer.  Also developed a set of nine considerations that have
13 been very helpful in terms of structuring the process of
14 reaching causal determinations.  They are widely -- again, they
15 are widely used in most structured frameworks.
16 Q.   So the Bradford Hill considerations are not specific to
17 systematic review; would you agree with that?
18 A.   Correct.  What systematic review does is takes these --
19 these considerations and gives you more detail about how to
20 operationalize them.  So they are not just phrases.  They come
21 with more methodology for how to think about them.
22       So that would be the difference between the considerations
23 and how -- what systematic review does with them.
24 Q.   Now, did NTP 2016 end up translating the confidence
25 ratings into a level of evidence of health effects?

THAYER - DIRECT  / CARFORA

1   **A.**    Yes.

2   **Q.**    What's the next step of systematic review after you reach

3   a level of evidence conclusion?

4   **A.**    Then you begin the process of integrating across your

5   lines of evidence, develop hazard identification conclusions.

6        So, again, the process we have been discussing would be

7   done separately for human studies and animal studies, but a

8   hazard identification would bring this together.

9   **Q.**    And what's the purpose of this evidence?  Well, you

10  just -- you just described the purpose.

11       What happens if one evidence stream, either human or

12  animal, has no studies?

13  **A.**    Then functionally it becomes low or inadequate in this

14  matrix.

15  **Q.**    Now, hazard identification can be based on animal data

16  alone; is that correct?

17  **A.**    Correct.  And, in fact, for many environmental chemicals

18  you don't have human evidence, or it's not suitable for

19  hazards.

20       So in many cases the hazard identification is done just on

21  animal studies.

22       And then other cases, like fluoride, is sort of a more --

23  less frequently you have very large evidence bases where you

24  have an abundance of human information, animal information,

25  mechanistic information.  So we have this for fluoride.  We

THAYER - DIRECT / CARFORA

 1   have this for arsenic.  We have this for methylmercury.  But

 2   those tends to be more exceptions.

 3        And in those cases the more human evidence you have, then

 4   oftentimes the hazard identification is really driven by that.

 5   And, you know, the animal information can help you

 6   contextualize or address some of the limitations that you might

 7   have in the human evidence for reaching causal conclusions.

 8        But then it's also possible that points can be reached

 9   where the conclusion of human hazard becomes subtle.

10        So, for example, the IRIS program is doing an analysis of

11   methylmercury.  It's going to be focused exclusively on the

12   human evidence.  It's a known human neurotoxicant.  The last

13   reference dose that we developed was based on human evidence.

14   There is no -- no value at this point for dose response

15   analysis in looking at the animal data and the mechanistic

16   data.

17   Q.   And did NTP 2016 reach a hazard conclusion?

18   A.   No.

19   Q.   And did you -- during your time working at NTP, did you

20   ever learn of a plan for NTP to actually reach a hazard

21   conclusion by storing the human data as well?

22        MR. CONNETT:  Your Honor, at this point I would just

23   like to make clear that if -- if EPA counsel intends to open

24   the door as to the NTP's draft monograph, that plaintiffs

25   intend to inquire about that.

1              THE COURT:  Plaintiffs what?

2              MR. CONNETT:  Plaintiffs will -- I mean, I would just

3      advise -- it sounds like counsel may be opening the door to

4      NTP's draft monograph that was the subject of a Motion in

5      Limine, and if counsel does, I believe plaintiffs would have

6      the right to inquire into the draft monograph's findings.

7              THE COURT:  Well, let's see where it takes us.  All

8      right?

9          Go ahead.

10     BY MS. CARFORA

11     Q.   Dr. Thayer, during your time working at NTP, did you ever

12     become aware of a plan for NTP to reach a hazard conclusion by

13     conducting a formal systematic review of the human evidence and

14     integrating it with NTP 2016?

15     A.   Yes.

16     Q.   And, to your knowledge, has NTP undertaken that?

17     A.   Yes.  A draft assessment was released last year and

18     underwent --

19     Q.   And -- I'm sorry?

20     A.   And underwent external peer review.

21     Q.   Do you have any knowledge of what organization

22     peer-reviewed the human systematic review?

23     A.   National Academy of Sciences, or the NAS.

24     Q.   And do you have any knowledge of whether the National

25     Academy of sciences made recommendations back to NTP?

THAYER - DIRECT / CARFORA

1  **A.**   They did.   There was a report.   I'm not familiar with that

2  report.   I browsed through the executive summary, but I'm not

3  very familiar with the report.   But, yes, the report was

4  released.

5  **Q.**   And since the peer review published by the National

6  Academy of Science, has the NTP concluded or reached hazard

7  identification conclusions based on an integration of the human

8  and the --

9       (Court reporter clarification.)

10 **Q.**   Since the National Academy of Science's peer-review

11 report, has NTP concluded or reached final hazard conclusions

12 with regard to fluoride exposure?

13 **A.**   No.

14 **Q.**   Now, did NTP 2016 reach any other conclusions?

15 **A.**   A number of conclusions about what were additional

16 research needs.   So the suggestion is sort of about additional

17 studies to probe the specificity of findings, in terms of

18 whether they were learning and memory specific, trying to tease

19 out the impact of potential effects on motor and sensory

20 function.

21       Also, more research to try to clarify the effect sizes and

22 also more research to try to clarify the effects that might be

23 happening at lower dose levels.

24 **Q.**   And are you aware if NTP ever took action to fill the data

25 gaps that were identified by the 2016 systematic review?

**THAYER - DIRECT / CARFORA**

1    **A.**    Yes.  An animal experiment was conducted.

2    **Q.**    And were you -- do you recall the name of the author or

3    coauthors that conducted those experiments?

4    **A.**    I believe the main author was Christopher McPherson, and

5    then working with the mentorship of Jean Harry.

6    **Q.**    Do you know Christopher McPherson personally?

7    **A.**    No.

8    **Q.**    Do you know Jean Harry personally?

9    **A.**    Yes.  And she worked with me closely on the 2016 NTP

10   report.

11   **Q.**    Have you read the conclusions from the report that was

12   done to fill the gaps?

13            **MR. CONNETT:**  Your Honor, at this point I'll object

14   to hearsay.  This is a fact witness.  She was not involved with

15   the study.

16        Counsel is now eliciting out-of-court statements that she

17   was not involved with, the study that she was not involved

18   with.

19            **MS. CARFORA:**  Your Honor, I'm just asking her if

20   she's aware of when the study was done.

21            **THE COURT:**  Well, I don't think that was your last

22   question.  You asked her whether the study was done, and she

23   can -- she did and can testify as to that.  But I think you

24   started to ask about conclusions.

25        Maybe you should rephrase the question and we will

 1   evaluate the objection.

 2           **MS. CARFORA:**  Sure.

 3   **BY MS. CARFORA**

 4   **Q.**  Dr. Thayer, did you read -- did you read the final study?

 5   **A.**  Yes.  Pretty quickly, but I did read it.

 6   **Q.**  And if I -- is it true -- what's the name that study?

 7           **MR. CONNETT:**  Your Honor, at this point we're just

 8   dealing with hearsay.

 9           **MS. CARFORA:**  Let me just -- I'll withdraw the

10   question.  I withdraw question.

11   **BY MS. CARFORA**

12   **Q.**  Let me just say, Doctor --

13           **THE COURT:**  Go ahead.

14           **MS. CARFORA:**  I'm sorry, Your Honor.

15   **BY MS. CARFORA**

16   **Q.**  Dr. Thayer, if I refer to that study of McPherson 2018,

17   will you know that's what I'm referring to?

18   **A.**  Yes.

19   **Q.**  Thank you.

20       And were you involved in any discussions related to the

21   design of McPherson 2018?

22   **A.**  Yes.

23   **Q.**  And that was while you were still working at NTP; is that

24   correct?

25   **A.**  Correct.

THAYER - DIRECT / CARFORA

1  Q.   And do you recall any discussions related to selection of
2  the animal models?
3  A.   Yes.  There were discussions about whether to use a rat, a
4  mouse.  I think ultimately a decision was reached to use a
5  mouse -- I mean, a rat model that's used in cognition study.
6       There were also discussions about how to approach a study
7  in terms of what sexes to look at.  The issue is, we saw some
8  indications that maybe males were a bit more sensitive in the
9  review, and we had that input.
10      We also had a pragmatic challenge of the logistics of
11 conducting the study that we wanted with males and females at
12 the same time.
13      So a decision was made to focus on the males, since it
14 seemed like they might have been more sensitive.
15 Q.   And, Dr. Thayer, do you recall any discussions related to
16 selection of which dose levels to use in that experiment?
17 A.   Yes.  There was a lot of discussion of that.
18      So part of it is that we -- again, one of the
19 recommendations was to try to test lower exposure levels, but
20 we had this challenge of being able to sort of design that in a
21 way where the control group actually had no fluoride.  So
22 there's background levels in water that would have to be
23 considered.  There's also levels of fluoride in the animal
24 diet.  And so that -- that was a challenge, I think, about how
25 to design a low dose study.

THAYER - DIRECT / CARFORA

1        Ultimately a decision was made to pick a 20 part per

2   million dose level to help align with the published literature

3   so that we could see if we could reproduce the effects that

4   were being reported.  And then a lower dose of 10 part per

5   million was used.

6        And the idea was that we would observe the findings and

7   then based on presumably identifying the more sensitive

8   endpoints, we -- additional analyses could be done to sort of

9   better probe the lower dose range and, also, include females.

10  Q.   Thank you, Dr. Thayer.  I'm going to transition now.

11       Once you've reached a hazard conclusion or a hazard

12  confidence, what's the next phase in the IRIS assessment?

13  A.   To do dose response analysis for the purposes of

14  identifying, in this case, a toxicity value referred to as a

15  reference dose that's considered protective of human health.

16  Q.   And is this when we begin to shift from hazard to risk?

17  A.   Yes.  The dose response is an input to characterizing

18  risk.

19  Q.   And so when you're doing a dose response, you actually are

20  characterizing the hazard then and it's just an input for the

21  next step, which is exposure?  Is that accurate?

22            MR. CONNETT:  Leading.

23            THE COURT:  Overruled.

24  A.   Yes.  You're characterizing the hazard and then you're

25  trying to characterize at what dose or exposure levels they

1    occurred at.  And then the risk is when you consider what

2    people are actually exposed to.

3    **BY MS. CARFORA**

4    Q.    And does the dose response assessment require systematic

5    review, another systematic review?

6    A.    No.  It builds on the systematic review that was done to

7    identify the hazard.

8    Q.    And how do you go about assessing the dose response?  How

9    does IRIS go about assessing a dose response?

10   A.    So for something like neurotoxicity, it's assumed that

11   there is a threshold dose response, which means there is some

12   level of exposure; that if you are exposed to the chemical, the

13   body can adapt or adjust with it or deal with it so that there

14   is no appearance of an adverse effect.

15         But then as the dose increases, the body has less ability

16   to deal with that stressor and you begin to see manifestations

17   of adversity.

18   Q.    Dr. Thayer, are you familiar with a reference dose?

19   A.    Yes.

20   Q.    What is a reference dose?

21   A.    So it's an estimate of the daily oral exposure level to

22   which the human population, including sensitive subgroups, can

23   be exposed to for a lifetime that's thought without risk of

24   deleterious effects.

25   Q.    And is -- does the IRIS program identify reference doses

THAYER - DIRECT / CARFORA

```
 1  as part of that -- as part of their products?
 2  A.   Yes.
 3  Q.   And how does the IRIS program go about defining a
 4  reference dose?
 5  A.   I think we have a schematic for this, or no?
 6  Q.   Sure.
 7           MS. CARFORA:   Mr. Hambrick, can you bring up U.S.
 8  demonstrative No. 27?
 9       (Document displayed.)
10  A.   So there would be analysis of the zone in the dose
11  response that is around where we think a threshold is happening
12  with the purposes of identifying something referred to as a
13  point of departure.
14  BY MS. CARFORA
15  Q.   And can you define "point of departure"?
16  A.   So it's a dose level that begins -- it's the starting
17  point for extrapolating to develop a reference dose.
18       So point of departure is identified and then a series of
19  factors to account for uncertainty and variability is applied
20  to that point of departure to establish the reference dose.
21  Q.   Okay.  Now, if we could just -- this is the threshold side
22  we're looking at.
23       Can you explain for the Court this population of varying
24  reserve capacity and how we can see from the chart what that
25  means?
```

**THAYER - DIRECT / CARFORA**

1    **A.**    Right.   So this is the notion that at some level of

2    exposure, the body is able to accommodate, to adapt to the

3    exposure.   And that would be -- there is no expectation of an

4    adverse effect, but as the dose goes up, you lose that reserve

5    capacity and that's where you begin to see the pink bubbles.

6         And then also layered into that schematic is that at each

7    exposure level you expect that there's going to be variation in

8    how a population responds.   Some people would be more

9    sensitive.   Some people would be less.   So there's going to be

10   variation of individual response.

11   **Q.**    So the point of departure -- is it accurate to say a point

12   of departure is a dose at which we begin to see a response?

13   **A.**    It's the dose where we begin the process of extrapolating,

14   to -- to achieve a reference dose.

15         **MS. CARFORA:**   And can we have the next slide, please?

16        (Document displayed.)

17   **BY MS. CARFORA**

18   **Q.**    Dr. Thayer, how does the IRIS program go about identifying

19   this point of departure?

20   **A.**    There are two basic methods.   One is it can be estimated

21   based on benchmark dose analysis.

22        Another is it can be based on administered doses.   So

23   doses that were actually administered in settings.   And that's

24   something referred to as NOAEL or LOAEL approach.

25   **Q.**    Now, what is the benchmark dose approach?

1   **A.**   So the benchmark dose approach starts with identifying a

2   benchmark response, which is a predetermined change in response

3   rate of an adverse effect.  And they --

4   **Q.**   Now --

5   **A.**   Go ahead.

6   **Q.**   Go ahead, Dr. Thayer.  I'm sorry.

7   **A.**   And then the benchmark dose is the calculated dose that

8   produces that predetermined change.

9   **Q.**   So this chart we're looking at here, it would be accurate

10  to say that the benchmark dose is equal to the point on which

11  the dose and the response meet on the dose response curve; is

12  that accurate?

13          **MR. CONNETT:**  Vague and ambiguous.

14          **THE COURT:**  Maybe you can rephrase that.

15  **BY MS. CARFORA**

16  **Q.**   On this chart the BMD is equal to the point on which the

17  BMR intersects with the dose response curve; is that right?

18  **A.**   Correct.

19  **Q.**   And can you explain for the Court, what is the benchmark

20  dose lower confidential level, or otherwise known as BMDL?

21  **A.**   So that's the level that's typically chosen as a point of

22  departure.  So the benchmark dose is a numerical estimate,

23  which means it has confidence limits around it to bound it.  It

24  has a lower confidence limit and it has an upper confidence

25  limit.

**THAYER - DIRECT / CARFORA**

1    So the BMDL is chosen because you can see that it results

2  in a smaller dose.  So if you use that as the -- as the point

3  of departure, then it's considered to be more public health

4  protective than if you use the upper bound.

5  **Q.**   Is there a specific way that the benchmark dose level is

6  calculated?

7  **A.**   A variety of mathematical models are applied to a given

8  dose-response curve, and then from those they are evaluated for

9  goodness of fit, and a model is selected.

10    And so I should say the benchmark dose approach is the

11  preferred method by EPA, but there are circumstances where it

12  can be conducted.  In those cases we would use the NOAEL or

13  LOAEL approach.

14       **MS. CARFORA:**  Mr. Hambrick, can we put up U.S.

15  demonstrative No. 29?

16    (Document displayed.)

17  **BY MS. CARFORA**

18  **Q.**   Can you explain, Dr. Thayer, exactly what this chart is,

19  at a high level?

20  **A.**   So what you're looking at here are two dose-response

21  curve; one for male rats and one for female rats.  Here is the

22  animal data.

23    And then for each of those, a variety of models is

24  applied.  And then a model is selected as being something, in

25  this case, that's considered to be the best fit for the

**THAYER - DIRECT / CARFORA**

 1    observed data.  And it's through this process that a specific

 2    model is selected from a benchmark dose analysis.

 3         And you can see here the different -- that two different

 4    models were picked for the two different dose-response curve.

 5    **Q.**   So how do you reconcile which model to use ultimately?

 6    **A.**   It's an expert judgment.  So I would not do this.  In my

 7    group, in the IRIS program there's about 40 scientists, most of

 8    whom have PhDs, and they have specific areas of expertise:

 9    Statistics, epidemiology, toxicology, pharmacokinetics.  And we

10    have a specific disciplinary work group of statisticians that

11    when we have a benchmark dose analysis that needs to be done,

12    that group does it.  That's what they do.  And they have a

13    process where it could be one person doing it, and it gets --

14    it gets QC'd by another person.  It could be that if you have a

15    really complex scenario, multiple people are working on it and

16    it gets QC'd.  But we have a special group of people who do

17    that.  And that's just to develop the draft approach.

18         And then in my division, prior to us releasing a draft

19    outside of division, it goes through a senior management review

20    where we also have additional expertise on dose response

21    analysis to review the work done by that expert group.

22    **Q.**   Dr. Thayer, are you aware of any IRIS assessment or BMD

23    analysis that's been done on the back of a napkin?

24    **A.**   No.

25    **Q.**   Now, Dr. Thayer, can you explain for the Court what is a

THAYER - DIRECT / CARFORA

1    NOAEL?

2    **A.**    Should we go back to that schematic?

3    **Q.**    Yeah.

4         **MS. CARFORA:**  If we can go back U.S. demonstrative

5    No. 28, please.  Oh, there.

6         (Document displayed)

7    **A.**    So it's the highest administered dose at which no

8    significant adverse effects are observed.  If a benchmark

9    dose -- if the benchmark dose approach wasn't appropriate, then

10   we would first -- then we would then try to find out whether or

11   not the POD could be based on the NOAEL.

12   **Q.**    And what is a LOAEL?

13   **A.**    That would be the lowest administered dose at which

14   significant effects were observed.  So the -- go ahead.

15   **Q.**    Is there any -- is there a relationship on this dose

16   response curve that we could -- help the Court understand the

17   distinction between the two?

18   **A.**    So the -- they are administered doses, so these were doses

19   actually used in the study.  And that study may have

20   administered doses and identified a dose level, the highest

21   dose level where nothing was found.  That would be the NOAEL.

22        They also may observe doses where adverse effects were

23   observed.  The lowest administered dose at which significant

24   adverse effects were observed would be the LOAEL.

25        And if we were using the NOAEL or LOAEL approach for a

1   point of departure, we would prefer to have a NOAEL.  But it's

2   possible that in a given experimental study, that there is no

3   dose level at which no observed effects were observed.  It may

4   only have LOAELs.

5          MS. CARFORA:  Can you clear the slide, Mr. Hambrick,

6   please?

7      (Document removed from display)

8   BY MS. CARFORA

9   Q.   Dr. Thayer, you mentioned earlier that the IRIS program

10  prefers the benchmark dose response over the NOAEL approach.

11  Can you explain that for the Court?

12  A.   So, again, the NOAEL/LOAEL approach, you're constrained to

13  the actual doses that were used in the study.  So you can't --

14  you can't speak to -- there's issues -- there could be issues

15  with the spacing.  How far apart are those dose levels?

16      The NOAEL/LOAEL approach does not take advantage of any

17  information about the shape of the dose response.  Whereas, the

18  benchmark dose approach does.

19  Q.   Dr. Thayer, once the point of departure is established,

20  how does IRIS then derive a reference dose from the point of

21  departure?

22  A.   By applying a series of factors to account for variability

23  and uncertainty.

24  Q.   And what are those uncertainty factors?

25  A.   So there would be --

THAYER - DIRECT / CARFORA

1  Q.   There -- Go ahead.

2  A.   Go ahead.

3       MS. CARFORA:  Mr. Hambrick, can you please put up

4  U.S. demonstrative 29, I think?  It's 30.

5       (Document displayed.)

6  A.   So there is one to account for extrapolating from animal

7  to human.  Another to account for human variability.  Another

8  to account for subchronic to chronic extrapolation.  LOAEL to

9  NOAEL extrapolation.  And if there is deficiencies in the

10 database, in terms of it may not have enough toxicity studies

11 to give a reassurance that many of the concerns, the health

12 concerns that we think about, would have been assessed.

13 Q.   Dr. Thayer, does the IRIS program apply all five of these

14 uncertainty factors as a matter of default?

15 A.   It explicitly considers each of them.  The actual numeric

16 value applied could be one, which means it was considered.  But

17 it actually has no functional significance on the dose level.

18      Default would be ten.  But it's possible in some cases

19 that you may have some information to use something different

20 than a ten, but not enough to go to a one, and so a three may

21 be applied.

22      But if you consider all these factors and if it's ten for

23 each of them, then you're reaching a point where there is so

24 much uncertainty in the evidence base that it's unlikely that a

25 reference value would be derived.

1   Q.   And, Dr. Thayer, does the IRIS program have a preference

2   in terms of the most relevant data stream for deriving RfDs?

3   A.   Humans would be the preference.  And you can see that

4   here, animal to human extrapolation.  If you had human

5   evidence, then you wouldn't even need that factor, if your dose

6   response was based on human evidence.

7   Q.   What if you had human evidence that was based directly on

8   the sub- -- susceptible subpopulation?  Would you need to apply

9   any of these additional uncertainty factors then?

10              MR. WATERS:  Overbroad.

11              THE COURT:  Overruled.

12   A.   So database deficiencies is an area where you begin to

13   explore whether you have enough information to characterize

14   concern for developmental exposures.  And so if you had nothing

15   there, then that would be a place where you might apply a

16   database deficiency factor.

17        But if you have information on your most vulnerable

18   population, then that may mitigate the need to apply an

19   uncertainty factor for that.

20   BY MS. CARFORA

21   Q.   Dr. Thayer, what happens once the IRIS program completes

22   the hazard assessment and the dose response piece?

23   A.   We produce toxicity assessments, which convey these

24   toxicity values.  For example, reference doses.  And they get

25   used by program offices, as well as states, you know, other

THAYER - DIRECT / CARFORA

```
 1   federal agencies, other international bodies.
 2   Q.   Dr. Thayer, when your responsibility is in -- in the NTP
 3   program and directing the IRIS program, do you interact with
 4   the scientific community on a regular basis?
 5   A.   Yes.
 6   Q.   Do you interact with scientific regulatory agencies?
 7   A.   Yes.
 8   Q.   Do you interact with non- -- or scientific groups that are
 9   not connected to regulatory agencies?
10   A.   Yes.
11   Q.   Do you keep up with the current state of the science for
12   addressing questions related to environmental health?
13   A.   Yes.
14   Q.   And are you aware of any existing methodology for
15   addressing questions related to environmental health that is
16   more current than systematic review?
17   A.   No.
18   Q.   And based on your interaction with the scientific
19   community, is the NTP's Office of Health Assessment and
20   Translation well regarded for advancing scientific
21   methodologies for supporting evidence-based decision-making?
22   A.   Yes.
23   Q.   Based on your interaction with the scientific community,
24   is the IRIS program well regarded for advancing scientific
25   methodologies for supporting evidence-based decision-making?
```

1    **A.**    I think so.  And I think we have the 2018 NAS report to

2    back that up.

3    **Q.**    And is systematic review intended to replace the

4    scientific judgment of the reviewer?

5    **A.**    Absolutely not.  So the systematic review process is

6    designed to make more transparent those expert judgments.

7    **Q.**    Are you aware of any existing methodology, other than

8    systematic review, that is more relevant for addressing

9    questions related to human health?

10          **MR. CONNETT:**  Overbroad.

11   **A.**    Environmental health.

12          **MR. CONNETT:**  Overbroad.

13          **THE COURT:**  Overruled.  You can answer the question.

14   **A.**    No.  Especially when coupled -- in my case, coupled with

15   consideration of EPA guidance and other materials.

16          **MS. CARFORA:**  Thank you, Dr. Thayer.  I have no more

17   questions for you, but I expect Mr. Connett will have some

18   questions.

19          **THE COURT:**  All right.  We should take a break at

20   this point.  So why don't we take our 15-minute break and then

21   resume with cross-examination.

22          **MR. CONNETT:**  Thank you, Your Honor.

23          **THE COURT:**  Thank you.

24      (Whereupon there was a recess in the proceedings

25        from 12:15 p.m. until 12:31 p.m.)

```
 1              THE CLERK:  Okay, everyone.  We will be going back on
 2   the record shortly.
 3        Shall we resume, Your Honor?
 4              THE COURT:  All right.
 5              THE CLERK:  Please come to order.  Court is now back
 6   in session.
 7              THE COURT:  All right.  Mr. Connett.
 8              MR. CONNETT:  Thank you, Your Honor.
 9                        CROSS-EXAMINATION
10   BY MR. CONNETT
11   Q.   Good afternoon, Dr. Thayer.
12   A.   Hi.
13   Q.   So I take it before today's testimony, you had an
14   opportunity to meet with counsel; is that correct?
15   A.   Correct.
16   Q.   And counsel went over with you some of the questions we're
17   going to ask you; correct?
18   A.   Correct.
19   Q.   Now, Dr. Thayer, when was the EPA formed?
20              MS. CARFORA:  Objection.  Foundation.
21   BY MR. CONNETT
22   Q.   Well, let me ask it.  Dr. Thayer, are you aware that the
23   EPA was formed in the early 1970's?
24   A.   Yes.
25   Q.   What year -- you talked today about the systematic review
```

1  methods that are being developed with the assistance of OHAT

2  and NAS is looking at these methods.

3      I want to ask you:  What year, Dr. Thayer, did EPA

4  complete its first risk assessment that uses the systematic

5  review method that you have outlined today for the Court?

6  **A.**   So, let's see.  So we have -- within the IRIS program we

7  have drafts under development.  We do not have finalized IRIS

8  assessments that use the full systematic review.

9      Across EPA we also have TSCA assessments in draft form

10 that use their systematic review methods.

11 **Q.**   Okay.  So I'm talking about a complete risk assessment.

12 Is there, as we sit here today in 2020, a completed risk

13 assessment that EPA has ever done which uses the methods that

14 you've outlined for the Court today?

15 **A.**   No.  And, in fact, as part of that NRC engagement dated

16 back from 2011, it was made exclusively clear that we should

17 stop producing assessments until it was fully developed, the

18 systematic review process.

19 **Q.**   So prior to beginning risk assessments or attempting risk

20 assessments that use the methods that you have outlined today

21 for the Court, EPA's risk assessments have used what's called

22 narrative reviews; is that correct?

23 **A.**   Correct.

24      **MS. CARFORA:**  Objection to scope.  It's too broad in

25 terms of just referring to EPA.

THAYER - CROSS / CONNETT

 1        Dr. Thayer has testified as to just one program that she

 2   directs.

 3            MR. CONNETT:   Your Honor, I believe the witness today

 4   has been testifying rather broadly to EPA.

 5            THE COURT:   Yeah.   Objection overruled.

 6   BY MR. CONNETT

 7   Q.   Dr. Thayer, as we sit here today in June of 2020,

 8   virtually every federal environmental regulation now in place

 9   in this country is based on risk assessments that did not use

10   systematic review; correct?

11   A.   Correct.

12   Q.   And these regulations have served for up to -- over 40

13   years to protect the health of Americans; correct?

14            MS. CARFORA:   Objection, Your Honor.   Dr. Thayer is

15   director of the IRIS program.   She testified that she is --

16   that program does not regulate.   And we were very specific in

17   our direct examination about the IRIS program and the NTP OHAT

18   program.

19        So I object, again, to the scope of Mr. Connett directing

20   his questions to the entirety of EPA.

21            THE COURT:   She can testify as to what her knowledge

22   -- based on her knowledge.

23        Overruled, to the extent she can.

24            THE WITNESS:   I'm sorry.   Can you repeat the

25   question.

THAYER - CROSS / CONNETT

1   BY MR. CONNETT

2   Q.   Do you believe -- and maybe you don't.  But do you believe

3   that the environmental regulations that the EPA has passed for

4   over 40 years have served to protect the health of Americans?

5   A.   I like to hope so, but I'm not obviously familiar with all

6   of the specific assessments.

7   Q.   Well, are you here today, Dr. Thayer, to say that we

8   should eliminate every single federal environmental regulation

9   that exists because they are not based on risk assessments that

10  use systematic review?

11  A.   No.  I would never maintain that.  I would argue that in

12  terms of looking at the rigor of an existing assessment, what I

13  would look at is the rigor of the external review.  So you can

14  be -- you can have not done a systematic review.  But if there

15  is a public comment process, if there is a rigorous external

16  review, then that increases your confidence in using that

17  assessment.

18       So I would say that you don't want to duplicate analyses,

19  you know, rigorous analyses that have been done in the past,

20  but that's not quite the same thing that if I saw a journal

21  publication that had a review, that I would feel comfortable

22  skipping over the systematic review if I was going to do an

23  assessment of that topic.

24  Q.   Now, the narrative reviews that formed the basis of the

25  regulations that exist today were weight of the evidence

THAYER - CROSS / CONNETT

1   analyses that relied on expert judgment to assess the best

2   available science.  Would that be a generally fair summary?

3   **A.**   Correct.  But if it would have been done, to my knowledge,

4   in a regulatory setting, then they would have included public

5   comment, external public review.  So it would have been sort of

6   a very rigorous external review of those assessments, so even

7   if they weren't systematic.

8   **Q.**   And I think you mentioned earlier, systematic review does

9   not eliminate the exercise of -- I'll ask the question again.

10      Systematic review does not eliminate the exercise of

11  expert judgment; is that correct?

12  **A.**   Correct.

13  **Q.**   So systematic review is unlike a computer, where you

14  insert data into a thousand-page table and it spits an answer

15  back out at you; is that correct?

16  **A.**   That's correct.  I think that would frighten people.

17  **Q.**   Now, is there room for practicality in systematic review?

18  **A.**   Yes.

19  **Q.**   And are you aware that in EPA's Section 6 risk evaluations

20  under TSCA, that EPA has taken what it calls a pragmatic

21  approach to systematic review?

22  **A.**   I've heard that.

23  **Q.**   And EPA has stated under Section 6 that it will maximize

24  the scientific and analytical efforts of other regulatory and

25  non-regulatory agencies by accepting for the most part the

THAYER - CROSS / CONNETT

```
 1   relevant scientific knowledge gathered and analyzed by others.
 2           MS. CARFORA:  Objection as to form.  The EPA didn't
 3   say anything in Section 6.
 4           THE COURT:  All right.  Maybe you should point to the
 5   actual language and show it to the witness.
 6           THE WITNESS:  Because this is not something I'm
 7   familiar with.
 8           MR. CONNETT:  Your Honor, I will, if I could, show
 9   the witness the NMP risk evaluation that was introduced earlier
10   this morning.
11           THE COURT:  All right.  It was already shown?
12           MR. CONNETT:  Yes.
13           THE COURT:  What exhibit is this?
14           MR. CONNETT:  Your Honor, this is Plaintiff's
15   Exhibit 47.
16       (Document displayed)
17           MR. CONNETT:  Sorry, Your Honor.  I meant -- I have
18   the wrong risk evaluation.
19       It should be 49.  That's the NMP risk evaluation, is 49.
20       (Document displayed.)
21   BY MR. CONNETT
22   Q.   Dr. Thayer, can you see the -- the document on the screen?
23   A.   Yes.
24   Q.   So I'm going to start here at the bottom of the Page 47,
25   and then I'm going to move on to the Page 48 in a second.
```

THAYER - CROSS / CONNETT

 1          It says here:

 2               "Using this pragmatic approach, EPA maximized the

 3          scientific and analytical efforts of other regulatory

 4          and non-regulatory agencies by accepting for the most

 5          part the relevant scientific knowledge gathered and

 6          analyzed by others, except for influential information

 7          sources that may impact the weight of the scientific

 8          evidence underlying EPA's risk findings."

 9          And I'll stop there, Dr. Thayer, and ask you:  Would you

10   agree that this is a sensible approach to take, a pragmatic

11   approach to systematic review?

12   A.   I can --

13               MS. CARFORA:  Objection to the extent -- objection to

14   the extent it calls for expert testimony.

15               THE COURT:  Overruled.  It's within her experience.

16   A.   I can agree that those are the words that are written

17   there, but I don't have any knowledge about how those concepts

18   were actually applied in this assessment.

19   BY MR. CONNETT

20   Q.   Well, fair.  I understand that.  But, you know, however

21   EPA may have applied it to that risk evaluation, do you think

22   this approach to risk assessment makes sense for EPA to do

23   today?

24               MS. CARFORA:  Objection.  Foundation.

25               THE COURT:  Overruled.

**THAYER - CROSS / CONNETT**

 1   **A.**   Yes.

 2   **BY MR. CONNETT**

 3   **Q.**   In 2017 the National Academy of Sciences actually made a

 4   similar recommendation; correct?

 5   **A.**   Can you be more specific?

 6   **Q.**   Yes.  I'm thinking of the 2017 report by the NAS which

 7   discussed the application of systematic review methods in the

 8   specific context of endocrine disrupting chemicals.

 9        And you're familiar with that report; correct?

10   **A.**   I've read that report.  Not familiar with the text that

11   you're talking about.  I'm sure it exists in that report, but

12   it's not in my mind right now.

13   **Q.**   Well, let me be -- I'll be more specific.  I appreciate

14   it's a long report, and I'm sure you don't memorize every

15   statement in that report.

16        But in the 2017 NAS report the NAS recommended to EPA

17   that, quote:

18             "It would be" --

19        Sorry.  I'll strike that.

20             **MS. CARFORA:**  Objection.  Hearsay.

21             **THE COURT:**  Hold on.  Sustained.

22             **MR. CONNETT:**  I apologize.

23   **BY MR. CONNETT**

24   **Q.**   In the NAS report, Dr. Thayer, do you recall the NAS

25   making any recommendations to EPA about building upon existing

THAYER - CROSS / CONNETT

 1  systematic reviews when doing a new systematic review?

 2  **A.**   Yes.

 3  **Q.**   NAS was basically recommending to EPA:  Hey, you don't

 4  have to reinvent the wheel.  You can work from and build from

 5  prior existing systematic reviews.

 6       Would that be a fair summary?

 7  **A.**   Yes.

 8  **Q.**   And EPA agrees with this approach; correct?

 9  **A.**   Certainly the IRIS program agrees with that approach.

10  **Q.**   And what ultimately is, Dr. Thayer, the greater priority

11  for the EPA?  To protect human health from urgent chemical

12  hazards, or to spend potentially years completing

13  methodologically superior systematic reviews?

14  **A.**   Do I have to answer that one?

15           **THE COURT:**  I'm not sure I understand that.  And that

16  sort of, in many ways, poses a false choice.  So I don't think

17  that's a fair question.

18           **MR. CONNETT:**  Understood.

19  **BY MR. CONNETT**

20  **Q.**   Now, with respect to BMDL, you were asked some questions

21  about that earlier.

22       Dr. Thayer, would you agree that where you have -- where

23  you are able to identify the BMD as being within the field of

24  observation, that that will generally give you greater

25  confidence in the BMD?

**THAYER - CROSS / CONNETT**

1    A.   Because you're not extrapolating beyond the observed data.

2    Q.   Yes.

3    A.   Yes.

4    Q.   Now, you talked about the peer-review process that BMDL

5    analysis undergo at EPA.

6         I took from your testimony that because BMDL is a very

7    technical exercise, that the people involved with quality

8    control of that work product are generally themselves highly

9    specialized in BMD.

10        Is that a fair summary of your testimony on that point?

11   A.   Yes.

12   Q.   So can we gather from that that short of a more high level

13   risk manager, who doesn't have a background in BMD or BMDL,

14   would not be the type of person reviewing the validity or

15   accuracy of a BMDL analysis?

16   A.   I would say it depends on the background of that risk

17   manager.  I would say that the expectation would be that that

18   person probably understands the principles, the EPA guidance

19   with respect to BMDL, but that may be a different level of

20   knowledge than somebody who is actually doing the analysis,

21   selecting the best model from a group of models.

22        (Brief pause.)

23   Q.   Lastly just a question of definition.  You were asked a

24   question about the definition of risk assessment, and I wanted

25   to follow up on that.

1          Dr. Thayer, you are familiar with the National Research

2     Council's 1994 book on risk assessment titled *Science and*

3     *Judgment in Risk Assessment*; correct?

4     **A.**   Uh-huh.

5     **Q.**   That is an authority in the field of risk assessment.  You

6     would agree with that; correct?

7     **A.**   Uh-huh.

8     **Q.**   Is that a "yes"?

9     **A.**   Yes.

10    **Q.**   And in that document, Dr. Thayer, the NRC defines risk

11    assessment as not necessarily encompassing all four steps of

12    the risk assessment; correct?

13    **A.**   Can you be a little bit more specific?

14    **Q.**   Well, in that 1994 document the NRC stated that:

15             "Risk assessment sometimes only consists of a

16        hazard assessment designed to evaluate the potential

17        of a substance to cause human health effects."

18        Correct?

19    **A.**   It's been a while since I looked at that.  I will accept

20    that --

21             **MR. CONNETT:**  Well, Your Honor, permission to refresh

22    the witness's recollection?

23             **THE COURT:**  All right.

24        (Document displayed.)

25

THAYER - CROSS / CONNETT

1    BY MR. CONNETT

2    **Q.**   Dr. Thayer, can you see the screen here?

3    **A.**   Yes.

4    **Q.**   This is Page 27 of the NRC's 1994 book, and this is

5    sometimes referred to as the blue book?

6    **A.**   Uh-huh.

7    **Q.**   And the NRC stated here that:

8            "Not every risk assessment encompasses all four

9            steps.  Risk assessment sometimes consists only of a

10           hazard assessment designed to evaluate the potential

11           of a substance to cause human health effects."

12           Did I read that correctly?

13   **A.**   You read that correctly.

14   **Q.**   And you would agree with that; right?

15   **A.**   Well, currently I'm -- you're speaking from the

16   perspective of what the IRIS assessments do.  So in the

17   constrains of how I conduct assessments now, right, then it's

18   really the hazard and the dose response analysis.

19       I do believe that there may be other entities that conduct

20   risk assessment in the way that we just read.

21           **MR. CONNETT:**  Your Honor, I have no further

22   questions.

23           **THE COURT:**  All right.  Any redirect?

24           **MS. CARFORA:**  I have one question.

25

THAYER - REDIRECT / CARFORA

1          <u>REDIRECT EXAMINATION</u>

2    **BY MS. CARFORA**

3    **Q.**    Dr. Thayer, have there been published toxicological

4    reviews that include part of the risk -- I'm sorry, about the

5    systematic review process that we described here today?

6    **A.**    Yes.

7              **MR. CONNETT:**  Your Honor, it's just unclear to me in

8    terms of what time frame, who.

9         Vague and ambiguous, I guess.

10             **THE COURT:**  Well, why don't you be a little more

11   specific about which toxicological reviews, or what time

12   period.

13             **MS. CARFORA:**  Well, your Honor, I'm trying to rebut

14   evidence that in the last 40 years since EPA existed that, you

15   know, EPA regularly hasn't used systematic review up til

16   recently.  And so I'm rebutting the broadness of the question.

17   **BY MS. CARFORA**

18   **Q.**    But if it's, you know, specific to -- Dr. Thayer, during

19   your time at IRIS since 2017, has the IRIS program published

20   toxicological reviews that include parts or portions of the

21   systematic review process that you discussed here today?

22   **A.**    Yes.  In August 2018 the RDX assessment included aspects

23   of systematic review.

24   **Q.**    Was there also a risk assessment that was done in 2016

25   that included some parts or portions of the systematic review

 1   process that you discussed here today?

 2   **A.**   Yes, there were two reports.

 3   **Q.**   No more questions.

 4        **MR. CONNETT:**  One quick follow up, Your Honor.

 5        **THE COURT:**  Okay.

 6                    <u>**RECROSS-EXAMINATION**</u>

 7   **BY MR. CONNETT**

 8   **Q.**   Just to be clear, Dr. Thayer, you have been at IRIS over

 9   three years; is that correct?

10   **A.**   Correct.

11   **Q.**   During your three years at IRIS, IRIS has published one

12   completed toxicological assessment; correct?

13   **A.**   Uh-huh.

14   **Q.**   And in that one completed toxicological assessment during

15   the three-plus years of your time at IRIS, it used some parts

16   of systematic review, but not all parts of systematic review;

17   is that correct?

18   **A.**   That's -- that's correct.

19        **MR. CONNETT:**  No further questions, Your Honor.

20        **THE COURT:**  It would be helpful for me to know what

21   in that -- in that one assessment what parts of systematic

22   review were used?

23        **THE WITNESS:**  More clarity on how the studies were

24   identified from the search.  More clarity on the screening

25   decision include, exclude.  More clarity on how the studies

THAYER — RECROSS / CONNETT

1  were evaluated for quality.

2      But the look and feel of that latter part would be

3  different than what we're deploying today.  They would have

4  been less developed in terms of use of structured frameworks to

5  reach confidence conclusions in the evidence.

6          THE COURT:  So the -- I don't know if you call them

7  pillars, but those principles were applied, but not in the same

8  way they would be applied under systematic review.

9          THE WITNESS:  Yes.  And, again, it's really probably

10 more -- I doubt the expert judgments would change.  It would be

11 the look and feel of how they were communicated that would

12 change.

13     It is -- I realize that these are not finalized, but the

14 IRIS program, pretty much everything that we started since

15 2017, has full systematic review, and we have published

16 protocols of these methods that have been out there.

17         THE COURT:  And the one that was completed, did it

18 use the predefined criteria?  Were they predefined or were they

19 sort of explained; what was included, what was concluded, the

20 weight given.

21         THE WITNESS:  Predefined.  And then referencing the

22 RDX one, because that's the one that was finalized after I came

23 to EPA.  The 2016 assessments, I'm not as familiar with those.

24         THE COURT:  Okay.

25         THE WITNESS:  So in terms of how predefined, there's

1    inclusion and exclusion criteria in the 2016.

2         THE COURT:  Now, I take it that's a major aspect of

3    systematic review.  Prior to the advent of systematic review,

4    there was -- that was one thing that was sort missing from the

5    normal risk assessment, is pre-definition.  Was that typical?

6    Am I right to assume that was sort of typical?

7         THE WITNESS:  Yes.  And having, I think, the clear

8    inclusion/exclusion criteria and then being able to communicate

9    at a level of:  We screen this many studies.  This many were

10   excluded.  This many were excluded.

11        So those sort of reporting features would have been --

12   would have been what expect now, and they might not appear in

13   prior assessments.

14        THE COURT:  Okay.  Thank you.

15        Anything else?  Any other questions?  Counsel?

16        MS. CARFORA:  Nothing from EPA.

17        MR. CONNETT:  No, Your Honor.

18        THE COURT:  All right.  Thank you, Dr. Thayer.  You

19   are excused.  Appreciate your time and your attendance.

20        THE WITNESS:  All right.  Have a good weekend.

21        THE COURT:  Thank you.  You, too.

22        (Witness excused.)

23        THE COURT:  All right.  Defendants may call its next

24   witness.

25        MR. CONNETT:  EPA calls Dr. Joyce Tsuji.

1          THE CLERK:  Dr. Tsuji, if you could raise your hand.

2      (Brief pause.)

3          THE COURT:  And if you could administer the oath,

4   please.

5                        **JOYCE TSUJI**,

6   called as a witness for the Defendant, having been duly sworn,

7   testified as follows:

8          THE WITNESS:  Yes, I do.

9          THE CLERK:  Thank you.

10         MR. ADKINS:  May I proceed?

11         THE COURT:  Yes, you may.  Thank you.

12                   **DIRECT EXAMINATION**

13  BY MR. ADKINS

14  Q.   Good afternoon, Dr. Tsuji.

15  A.   Good afternoon.

16  Q.   What are your qualifications as they pertain to this case?

17  A.   I'm a toxicologist, and I have a PhD focused in

18  environmental physiology with a post doc in quantitative

19  genetics.

20      Since 1992 I have been certified by the American Board of

21  Toxicology continuously, and in 2007 I was admitted as a fellow

22  of the Academy of Toxicological Sciences.

23  Q.   Dr. Tsuji, what is the study of toxicology?

24  A.   Toxicology is the study of the effects of chemicals,

25  depending on the nature and magnitude of their exposures or

TSUJI - DIRECT  / ADKINS

 1  doses and individual conditions.

 2  Q.   Where are you employed?

 3  A.   I'm employed with Exponent.

 4  Q.   What kind of clients have you helped throughout your

 5  career?

 6  A.   I have worked for industry, government, including EPA,

 7  non-governmental, non-profit organizations and private

 8  citizens.

 9  Q.   Okay.  Have you published any studies on fluoride, Dr.

10  Tsuji?

11  A.   I haven't done any testing of fluoride toxicity, but I

12  have reviewed the fluoride literature as part of a committee in

13  2008, 2009 with Dr. Thiessen on  -- that included fluoride.

14       And I have consulted on health effects of fluoride in

15  drinking water at mining sites and in communities with

16  semiconductor industries emitting hydrogen fluoride.

17  Q.   What was the committee that you just mentioned?  Is there

18  a name for that committee?

19  A.   It was the National Academy of Sciences committee.

20  Q.   I want --

21  A.   I'm sorry.

22  Q.   Go ahead.  Please explain.

23  A.   It was to -- I think Dr. Thiessen described it.  It was to

24  come up with -- review of the toxicology literature, as well as

25  derive health-based limits for air in submarines.

 1    Q.    Why should the Court listen to your opinion today

 2    regarding fluoride?

 3    A.    Well, I have 30 years of experience on a wide variety of

 4    projects, including and -- and research including investigating

 5    the neurotoxicity of metals and other chemicals.

 6         I have -- I'm often asked to serve on expert committees

 7    for the National Academy of Sciences and other organizations

 8    that are sponsored by EPA, NASA, the DOD, FDA, and other

 9    groups, such as Komen for the Cure.

10         Also, as part of my committee work and as part of my

11    publications, I have conducted systematic reviews of chemical

12    effects, and for this case I conducted a systematic review of

13    the animal neurotoxicity literature on fluoride.

14    Q.    Dr. Tsuji, you prepared and signed a trial declaration

15    summarizing the opinions you're offering in this case; is that

16    correct?

17    A.    Yes, that's true.

18              MR. ADKINS:  Your Honor, may I show the witness her

19    trial declaration ECF No. 199?

20              THE COURT:  Any objection?

21              MR. CONNETT:  No, Your Honor.

22              THE COURT:  You may.

23              MR. ADKINS:  Mr. Hambrick, could you please show

24    U-71?

25         (Document displayed.)

**TSUJI - DIRECT / ADKINS**

```
 1    BY MR. ADKINS
 2    Q.    Dr. Tsuji, can you see the first page of your trial
 3    declaration?
 4    A.    Yes.
 5    Q.    You recognize this as the declaration you submitted in
 6    this case?
 7    A.    Yes, I do.
 8          MR. ADKINS:  Mr. Hambrick, could you please show the
 9    witness Page 39?
10        (Document displayed.)
11    BY MR. ADKINS
12    Q.    Dr. Tsuji, is this your signature?
13    A.    Yes, it is.
14          MR. ADKINS:  Your Honor, I move to admit Dr. Tsuji's
15    trial declaration into evidence.
16          MR. CONNETT:  No objection, Your Honor.
17          THE COURT:  All right.  So admitted.
18        (Trial Exhibit, ECF No. 199 received in evidence)
19    BY MR. ADKINS
20    Q.    Dr. Tsuji, if you could please explain, what you were you
21    asked to do in this case?
22    A.    I was asked to provide an expert toxicology opinion on the
23    potential for neurotoxicity of fluoride at the community water
24    exposure level of .7 milligram per liter.
25        I was also asked to respond to plaintiff expert's opinions
```

1  regarding specifically the experimental animal data, which were

2  alleged to show neuro -- or to support neurotoxicity in humans

3  at the community water fluoridation level.

4  Q.   Could you please summarize for the Court what you did to

5  respond to those requests?

6  A.   Yes.  I looked at the literature and found that the 2016

7  NTP systematic review was the most complete summary of the

8  literature at that time.  And, therefore, I used that as a

9  starting point and then updated the literature up to 2019, when

10  I conducted my work, using their criteria to search the

11  literature and PubMed, National Library of Medicine, using

12  their predefined search criteria, as well as using their

13  criteria for evaluating studies for inclusion and, also, for

14  risk of bias and essentially evaluating study quality.

15  Q.   You said the NTP.  Is that the National Toxicology

16  Program?

17  A.   Yes, that's true.

18  Q.   Are you familiar with that agency?

19  A.   Yes.

20  Q.   Is it a reputable organization, in your opinion?

21  A.   Yes.  Very much so in toxicology.

22  Q.   Now, Dr. Tsuji, did you -- in updating NTP's systematic

23  review, did you conduct yourself a systematic review of more

24  recent studies published since NTP's systematic review?

25  A.   Yes.  I used the systematic review methods.

1  Q.    And why did you use those methods?

2  A.    Well, in this case I found that the plaintiff's experts

3  did not use systematic review methods.  They appear to be

4  basing their conclusions on the number of studies that found

5  positive results using more narrative review, but not even

6  evaluating the quality of the individual studies.

7  Q.    In your declaration you describe that you conducted a

8  critical analysis of the toxicological studies of effects on

9  learning and memory; is that correct?

10  A.    Yes.  That was the focus.

11  Q.    And can you please summarize for the Court what your

12  analysis -- your critical analysis of those studies showed?

13  A.    Well, overall it was a very surprising finding to see that

14  most of the -- the vast majority of the literature is of very

15  poor quality.  I've never seen such a chemical with such

16  quantity of poor quality studies.

17       And I think because of this NTP in 2016, I -- who

18  identified a lot of these issues even then, designed their own

19  study and then published that in 2018, specifically to address

20  a lot of the poor quality issues of the other studies.

21       So my findings were that even with the additional

22  literature, and certainly with NTP's study results, the animal

23  literature are inadequate to inform us on conclusions of

24  alleged risk of fluoride neurotoxicity at .7 milligram per

25  liter.

TSUJI - DIRECT / ADKINS

1  Q.   And you -- you testified earlier that you also considered

2  the opinions offered by Dr. Thiessen and Grandjean in this

3  case.  Did your critical analysis lead you to develop any

4  opinions with respect to their work?

5  A.   Yes.  Their work appeared to be based on the quantity of

6  studies with positive results.  I think Dr. Thiessen was very

7  struck by the number of positive cross-sectional studies.  It

8  seemed like the -- because they were positive, that must mean

9  they are all true.

10      For the animal studies, similarly she seemed to have very

11 little knowledge of the problems with these studies, and none

12 of that was reflected in her reports.

13 Q.   Now, let's shift focus to -- well, let's focus on the

14 National Toxicology Program's 2016 systematic review.  Could

15 you summarize, Dr. Tsuji, what that review concluded?  What the

16 National Toxicology Program concluded from that review?

17 A.   So from their review they concluded that very few studies

18 had been conducted at relevant water exposure levels for the

19 .7 milligram per liter community fluoridation level.

20      Also, that they were very concerned about serious risk of

21 bias issues in these studies because of the poor methodology

22 and the inability of the methods and the tests used to really

23 conclude whether the effects were really caused by direct

24 effects on learning and memory, or other confounding factors,

25 or other potential effects on other systems.

 1        And third, they concluded that the studies were -- the

 2   overall evidence in animals was insufficient to inform us on

 3   the magnitude effects or even points of departure or risk

 4   assessment.

 5   **Q.**   In your experience, have you seen any other chemicals that

 6   had the extent of bias that the NTP identified in its

 7   systematic review?

 8   **A.**   No.  It's quite unique.

 9   **Q.**   Did plaintiff's experts, Drs. Thiessen or Grandjean,

10   acknowledge the unusual nature of the toxicology literature on

11   fluoride?

12             **MR. CONNETT:**  Overbroad.

13   **A.**   I certainly didn't hear them discuss anything about the

14   poor quality of the studies to any extent.

15        I think Dr. Thiessen did acknowledge that the studies had

16   deficiencies, but there seemed to be no effect of -- or

17   synthesis of that evidence or what it might mean.

18             **MR. ADKINS:**  Your Honor, may I show the witness

19   Exhibit C from her declaration?

20             **THE COURT:**  Any objection?

21             **MR. CONNETT:**  Counsel, what is Exhibit C?  Could you

22   remind me?

23             **MR. ADKINS:**  It's in evidence.  It's from Dr. Tsuji's

24   trial declaration.

25             **THE COURT:**  What is it?

 1              **MR. ADKINS:**  It's a table of recent developmental

 2    animal toxicology studies.

 3              **MR. CONNETT:**  No objection.

 4              **THE COURT:**  Okay.

 5         (Document displayed.)

 6    **BY MR. ADKINS**

 7    **Q.**   Dr. Tsuji, this table spans across two pages; correct?

 8    **A.**   Yes.

 9    **Q.**   Okay.

10              **MR. ADKINS:**  Mr. Hambrick, could you show us the

11    second page as we will?

12         (Document displayed.)

13              **MR. ADKINS:**  Okay.  Thank you.

14    **BY MR. ADKINS**

15    **Q.**   No, Dr. Tsuji, what is this?

16    **A.**   So this table summarizes the results of our evaluation of

17    studies using the criteria developed by NTP 2016 and which are

18    very consistent with what you might -- certainly would want to

19    consider in evaluating developmental neurotoxicity studies in

20    animals.  They could have some additional criteria, but those

21    are the main ones.

22         So the shaded portions are studies that had a high risk of

23    bias, according to having three or more serious risk of bias

24    issues.  This was what NTP had done in 2016.  And the white

25    area are studies that had two or less areas with high -- with

TSUJI - DIRECT   / ADKINS

1    risk of bias issues.

2        But because some of these are very serious, like lack of

3    correction for litter effects, just because they only have one

4    high risk of bias issue doesn't mean that the study itself

5    doesn't have high risk of bias.

6    Q.   Now, the --

7    A.   But for this -- I'm sorry.

8    Q.   I see McPherson 2018 listed as study number one in this

9    chart.  In your declaration you describe McPherson 2018 as:

10            "The best conducted recent developmental

11       neurotoxicity study on fluoride."

12       Why is that?

13   A.   Yes.  It is because NTP designed it specifically to

14   address the many tests that have been conducted on fluoride,

15   and the poor methods that have been used in many of these

16   tests, and to do a much more thorough job.  And, also, to

17   include exposure levels that would be relevant for community

18   water fluoridation.

19   Q.   Are those the treatment groups you're describing?

20   A.   Yes.  They also included a low dietary fluoride group.

21   Q.   Can you please explain what treatment groups McPherson

22   2018 used?

23   A.   So for water they used 0, 10 milligram per liter and

24   20 milligram per liter of fluoride.

25   Q.   And why did McPherson 2018 select those doses?

TSUJI - DIRECT / ADKINS

1   A.   Because they are -- they tend to overestimate -- well,

2   they do overestimate community fluoride levels.

3        And I should mention that my declaration, there is an

4   error in a paragraph.  I can't remember the number.  Is it 42?

5   Where NTP -- it produces numbers that indicate that NTP's

6   20 milligram per liter is closer to a human equivalent

7   fluoridation level than it really.

8        Actually, that is an error because I used NTP's correction

9   for body weight, and they had an error in it I discovered since

10  my declaration.  So actually the numbers are much lower.

11       Also, McPherson notes that even if he used the five times

12  greater for animals versus humans, if you divide 20 by five you

13  get 4 milligram per liter, which is high for the .7 milligram

14  per liter goal right now.

15  Q.   What is the relevancy of error in NTP's calculation with

16  respect to the equivalency to human doses of fluoride?

17  A.   Well, the doses they used in humans are certainly much

18  higher than what is currently -- what people are currently

19  being exposed to in communities.

20  Q.   How many tests did McPherson 2018 perform?

21  A.   They performed nine separate neurobehavioral tests.  They

22  also conducted clinical tests of the animals; fluoride levels

23  in blood, urine, brain.  They looked at histopathology of the

24  brain and other organs and, also, had looked at thyroid

25  hormone.

TSUJI - DIRECT / ADKINS

1   Q.   What were the overall conclusions of those tests?

2   A.   Overall the neurobehavioral tests did not indicate effects

3   on learning and memory.

4   Q.   Did McPherson make any conclusions regarding dental

5   fluorosis in the rats studied in that test?

6   A.   Yes.  That 20 milligram per liter, they did see

7   discoloration of the teeth.  So the rats were starting to

8   experience that.

9   Q.   And what's the significance, if any, of that finding?

10  A.   It would suggest that in rats -- the study would suggest

11  that in the rats dental fluorosis is a more sensitive endpoint

12  than effects on learning and memory.

13  Q.   Okay.  Dr. Tsuji, I want to now talk about Dr. Thiessen's

14  points of departures and her reference dose calculations.

15        And we can keep Appendix C up because I think this may be

16  helpful.

17        What studies did Dr. Thiessen use to identify points of

18  departure for reference doses?

19  A.   She used all of these studies.  I think with the exception

20  of Zhu et al 2017, because it had one dose.  Ge, G-E -- I'm

21  sorry -- I can't pronounce Chinese names, 2018 -- and Sudhakar,

22  it's an Indian study, 2018, wasn't referenced in her report.

23        And she had Jang et al, 2014, an earlier study.

24  Q.   And that study Jang et al 2014 is not reflected in this

25  appendix; correct?

1  A.   No, because it was reviewed in 2016 by NTP.

2  Q.   Now, are the studies that Dr. Thiessen identified reliable

3  for determining points of departure for a risk assessment, in

4  your opinion?

5  A.   I -- the vast majority of them are -- have serious issues

6  for being confident about magnitude of effect or points of

7  departure, as NTP stated.  So even with the more recent

8  literature, I don't think that that opinion has changed much.

9       McPherson et al 2018 calls into question a lot of the

10  earlier findings of positive effects when you use better study

11  methods and larger animal sizes and groups and conduct the

12  tests as they should be.

13  Q.   Dr. Tsuji, did you hear Dr. Thiessen's testimony in this

14  case?

15  A.   Yes.

16  Q.   And you recall there was some discussion of the Bartos

17  studies?

18  A.   Yes.

19  Q.   Those are reflected in Lines 2 and 3 of your table; is

20  that correct?

21  A.   That's correct.

22  Q.   Are those studies reliable for identifying points of

23  departure for a reference dose?

24  A.   If that's all you had, you -- I don't know, but I -- they

25  certainly have issues because the findings are -- were

 1   inconsistent.

 2        Bartos 2018 had small animals number per group compared to

 3   McPherson.  Their control for litter effects, at least they did

 4   some, but it wasn't complete, as complete as McPherson.  There

 5   was no investigator blinding to the outcome mentioned in doing

 6   the testing.

 7        Also, the inconsistencies of the results call into

 8   question whether the findings are chance.

 9        Also, the control group was not behaving as one might

10   expect, which NTP 2016 indicated is a -- another risk of bias

11   issue.  And some of those appear to be because the control

12   group is changing in its behavior.

13   **Q.**   Dr. Tsuji, did you hear the Court's question to

14   Dr. Thiessen about one of the findings in Bartos 2019?

15   **A.**   Yes.

16   **Q.**   Are you able to offer an answer to the Court's question on

17   that provision of Bartos 2019?

18   **A.**   Yes.

19        **MR. ADKINS:**  Your Honor, may I show the witness

20   Bartos 2019 and take us back to that paragraph that we were

21   talking about earlier with Dr. Thiessen?

22        **THE COURT:**  Any objection?

23        **MR. CONNETT:**  No objection, Your Honor.

24        **THE COURT:**  Go ahead.

25        **MR. ADKINS:**  Mr. Hambrick, can you please pull up

 1    Bartos 2019 internal reference U-81?

 2        And show the witness Page 7, please?  If you could focus

 3    in on the right side, "It is important to highlight."

 4        (Document displayed)

 5    **BY MR. ADKINS**

 6    **Q.**   Okay.  So, Dr. Tsuji, the Court had a question about the

 7    first sentence in this paragraph and what it meant.  Could you

 8    help us out here?

 9    **A.**   Yes.  So the results don't make any sense.  So when we see

10    this, we start wondering:  Is there some kind of internal

11    problem with the study?  Because what we have here is the

12    animals are -- you see a difference between the 5 milligram per

13    liter, the low dose treatment group, and the control.  But you

14    don't see any statistically significant effect when you get

15    higher, which doesn't make any sense.  That is not dose

16    response.

17        And one can decide and make up some post hoc reasons why

18    that might be adverse or consistent with some kind of effect,

19    but it is very troubling.

20        And one needs to then consider, given the small animals,

21    numbers in each group, that multiple testing or -- where the

22    statistics -- or the blinding, randomization, how they did the

23    study, it just calls into question that something else might be

24    going on and needs to be investigated.

25            **MR. ADKINS:**  Your Honor, I'll move on, unless you

TSUJI - DIRECT / ADKINS

 1    have any further questions about this study.

 2              **THE COURT:**  No.

 3              **MR. ADKINS:**  Thank you.

 4    **BY MR. ADKINS**

 5    **Q.**   Dr. Tsuji, did you also hear Dr. Thiessen's testimony

 6    regarding the application of uncertainty factors?

 7    **A.**   Yes.

 8    **Q.**   And you're familiar with her trial declaration submitted

 9    in this case also discussing uncertainty factors; is that

10    right?

11    **A.**   Yes.

12    **Q.**   And what's your -- could you please summarize for the

13    Court your opinion of Dr. Thiessen's application of uncertainty

14    factors in this case?

15              **MR. CONNETT:**  Your Honor, if I could, I think we may

16    have a disclosure issue here in that Dr. Tsuji, in her

17    deposition in this case, expressed -- I don't know if the

18    allowance of rebuttal makes that a moot point, but there are

19    disclosure issues if we're going to get into details on

20    uncertainty factors.

21         But if it's fair game for rebuttal, then I'll withdraw the

22    concern.

23              **THE COURT:**  It will be fair game for rebuttal.

24              **MR. ADKINS:**  I can just clarify that I'm not asking

25    what Dr. Tsuji would do herself, but offering -- she has

1  offered an opinion and disclosed an opinion on Dr. Thiessen's

2  application of uncertainty factors.

3          **THE COURT:**  Yep.  Go ahead.

4  **A.**   Yes.  I didn't do the analysis to actually recommend

5  uncertainty factors.  But my concern was that there was --

6  there seemed to be no critical scientific evaluation to

7  determine for this chemical specifically which -- how big

8  should they be based on these studies.

9          And I have been through that on a number of National

10  Academy committees when we come up with exposure levels.  And

11  one should, for each chemical, do a very specific evaluation of

12  the uncertainty, if you have information.

13  **BY MR. ADKINS**

14  **Q.**   Dr. Tsuji, based on your review of the National Toxicology

15  Program's 2016 systematic review, your systematic review of the

16  more recent literature published since the NTP's systematic

17  review, and your review of the reports offered by Drs. Thiessen

18  and Grandjean, what is your overall opinion of the

19  neurotoxicity of fluoride?

20  **A.**   Well, from what we can see of the animal studies, if there

21  are effects, the most consistent evidence indicates that they

22  are above 20 milligram per liter.  It's unclear how much above

23  20 milligram per liter because we don't have well-conducted

24  tests that -- above 20 milligram per liter.  And we have a

25  NOAEL at 20 milligram per liter at a very well-conducted suite

1    of studies.

2        Above 20 milligram per liter the animals start having

3    various other effects, like loss of body weight.  Also, some

4    studies indicate the animals stop drinking the water.  It could

5    be that they don't like the taste of the water or the sodium in

6    the water, because it's sodium fluoride that they are given.

7        It could be sodium is interacting with them, their

8    physiology somehow, or fluoride is interacting with their

9    physiology.  But then you're wondering, is that really a true

10   direct effect learning and memory?

11       So we have these problems with the animal studies that I'm

12   not sure if we can relate what's happening in them to humans.

13       And, also, as a result of the -- the evidence published

14   since the 2016 review, as well as the 2016 review, the evidence

15   in animals is inadequate to inform our conclusions on

16   neurotoxicity in humans at .7 milligram per liter.

17           MR. ADKINS:  I'll pass the witness, Your Honor.

18           THE COURT:  I don't think she fully answered your

19   question, because you asked about in light -- did you not ask

20   about in light of the human studies, or were you only asking

21   about the animal studies?

22           MR. ADKINS:  Only with respect to the animal studies.

23           THE COURT:  Okay.  I misheard your question.

24       Okay.  Fine.  Thank you.

25           MR. ADKINS:  Well, I should say, to clarify I asked

 1  about neurotoxicity of fluoride, and Dr. Tsuji is a

 2  toxicologist who focused on the experimental animal studies.

 3       She also relied, in part, on Dr. Chang's opinion regarding

 4  the human epidemiological studies, as she states in her trial

 5  declaration.

 6            THE COURT:  All right.  That's going to be the

 7  subject of Dr. Chang's testimony, I take it.  That's more

 8  essentially --

 9            MR. ADKINS:  That's correct.

10            THE COURT:  Okay.  Thank you.

11            MR. CONNETT:  Your Honor, we have about, I guess, a

12  little bit more than six minutes left in the day.  Would you

13  like us --

14            THE COURT:  You've got seven minutes left.  No, no,

15  no --

16            MR. ADKINS:  I'm sorry.

17            THE COURT:  He meant today before we adjourn.

18            MR. ADKINS:  I appreciate that.  I thought the trial

19  day went until 2:00 o'clock Pacific, but maybe I was mistaken.

20            THE COURT:  It's -- no, it's til 1:30 Pacific, but

21  I'd like to -- we lost some time this morning.  I'd like to

22  utilize it as much as we can today.

23       So go ahead and commence with your cross, please.

24            MR. CONNETT:  Okay.

25

1              <u>CROSS-EXAMINATION</u>

2    **BY MR. CONNETT**

3    **Q.**   Good afternoon, Doctor.

4    **A.**   Good afternoon.

5    **Q.**   As counsel mentioned, prior to this case you had not

6    conducted any studies on fluoride; correct?

7    **A.**   I had not done any toxicity testing of fluoride, but I

8    have certainly looked at the health risks of fluoride, and I

9    had reviewed the literature on fluoride toxicity.

10   **Q.**   And you did not consider yourself, prior to this case, to

11   be an expert on fluoride neurotoxicity; correct?

12   **A.**   No.  Prior to this case in 2008, 2009 neurotoxicity of

13   fluoride was not considered to be a key endpoint in our NAS

14   committee.

15   **Q.**   But just to be clear -- I'm not sure.  Maybe you answered

16   my question, but my question was:  Prior to this case you did

17   not consider yourself an expert on fluoride neurotoxicity;

18   correct?

19   **A.**   That's true.  Because of the lack of -- when I was

20   involved with that committee and with my other projects working

21   on fluoride, there wasn't sufficient evidence that would inform

22   us on neurotoxicity compared to the other endpoints.

23   **Q.**   So are you saying that you couldn't be an expert on

24   fluoride neurotoxicity because the panel that you worked on in

25   2009 didn't really investigate that?

1   **A.**    Yes.  We didn't really consider the neurotoxicity

2   literature, because there wasn't sufficient evidence to

3   conclude that it really was a key endpoint compared to the

4   other health effects of fluoride.

5   **Q.**    So in 2018 when EPA approached you to serve as an expert

6   in this case, you agree with me that you were not an expert on

7   fluoride neurotoxicity at that time; correct?

8   **A.**    Yes.

9   **Q.**    You started working for Exponent in 1998; correct?

10  **A.**    Yes.

11  **Q.**    Exponent is a for-profit corporation; correct?

12  **A.**    Yes.

13  **Q.**    How much did Exponent pay you in 2019?

14  **A.**    I don't know off the top of my head.  And that's company

15  confidential information.

16  **Q.**    So are you telling me that you cannot provide to the Court

17  how much money Exponent pays you?

18  **A.**    No, I cannot.

19           **THE COURT:**  Well, I'm going to allow you to submit

20  that information under seal.  I understand the sensitivity of

21  that information, but it is relevant information needed for

22  this Court's assessment.

23       So I will allow you to submit a declaration so stating

24  under seal.

25

1   BY MR. CONNETT

2   Q.   Now, at the time of your deposition in this case,

3   Dr. Tsuji, you had already -- your team, the team that worked

4   on your report, had already billed EPA over $100,000; is that

5   correct?

6   A.   Yes.

7   Q.   And that was back in August of last year.  So I assume

8   you've billed EPA some more since then; is that correct?

9   A.   Yes, I have.

10  Q.   What's the current bill for your report?  Not Dr. Chang's

11  report, but your report?

12  A.   You mean, my report?  We have had several reports in this

13  case.  Or do you mean by work to date?

14  Q.   Sorry.  Thank you for the clarification.  Yes, your work

15  to date.

16  A.   Probably about 200,000.

17  Q.   Now, arsenic is one of the key chemicals, Dr. Tsuji, that

18  you have worked on during your time at Exponent; correct?

19  A.   I'm sorry.  During my time what?

20  Q.   At Exponent.

21  A.   At Exponent.  Well, let's see.  Let me think back.  I have

22  had a lot of projects.  It's one of the -- it's one of the main

23  ones, but there are certainly a lot of others.  They are

24  probably -- it's probably half of my publications over the last

25  25 years.

TSUJI - CROSS / CONNETT

1   Q.   And most of your work on arsenic has been funded by

2   industry; correct?

3           MR. ADKINS:  Objection.  Vague.

4   A.   Most of my work --

5           THE COURT:  Overruled.  You can answer, if you know.

6           THE WITNESS:  Oh, sorry.

7   A.   Most of my work has been funded by my personal time.

8       I'm sorry.  Did you say my publications, or do you mean my

9   projects, project work?

10  BY MR. CONNETT

11  Q.   Most of your projects --

12  A.   Okay.

13  Q.   -- have been funded by industry; correct?

14  A.   Yeah.  I'd say most when you -- I don't know the

15  percentage, but I do have a lot of government projects as well.

16  Q.   And your work on arsenic has been funded in part by mining

17  companies that release arsenic into the environment; correct?

18  A.   My work has been funded by --

19          MR. ADKINS:  Objection.  Foundation.  Excuse me.

20          THE COURT:  Well, why don't you break it down?  Has

21  it been funded by mining companies?

22  BY MR. CONNETT

23  Q.   Dr. Tsuji, some of your work on arsenic has been funded by

24  mining companies; correct?

25  A.   Yes.  For example, I have been funded to conduct health

TSUJI - CROSS / CONNETT

1    risk assessments of metals, and I have been funded to develop

2    lead poisoning prevention programs in communities and

3    biomonitoring programs.

4    Q.   And the mining companies that have retained you to work on

5    arsenic are companies that have faced liabilities for releasing

6    arsenic into the environment; correct?

7    A.   Yes --

8           MR. ADKINS:   Foundation.

9           THE COURT:   If you know.   If she knows.

10   A.   Yeah.   I don't know the extent of the liabilities, but I

11   know they do have to conduct risk assessments and clean up the

12   environment when they have releases that are determined by the

13   regulators that have to be taken care of.

14   Q.   And in addition to the mining companies, you have also

15   been retained by smelting companies for your work on arsenic;

16   correct?

17   A.   Yes.   You know, some companies they mine and smelt, so I

18   include both.

19   Q.   And in addition to your work for the smelting companies

20   and the mining companies, your work on arsenic has also been

21   funded by companies that make arsenic containing treated wood;

22   correct?

23   A.   Yes.   Some work, not a large part.

24   Q.   And I am looking here at a 2019 report that you did on

25   cancer --

 1   **A.**    It's a publication?

 2   **Q.**    Yes.

 3          **MR. ADKINS:**  Please wait for the question, Dr. Tsuji.

 4          **THE WITNESS:**  I'm sorry.

 5          **MR. CONNETT:**  Your Honor, if I could, we've now

 6   reached 1:30, and I must say we -- this is what we consider to

 7   be the end of the day.

 8        I at this point am -- at this point I would ask if we

 9   could go into recess.  I was not prepared to go until 2:00 p.m.

10   today.  We have covered a lot of material today, and I would

11   just ask the Court if we could recess.

12          **THE COURT:**  All right.  Well, we had reached the 1:30

13   point, so I will recess for the day.  We'll continue with cross

14   on Monday at 8:30.  So we will continue at that point.

15        And so, Dr. Tsuji, I hope you are available Monday

16   morning.

17          **THE WITNESS:**  Yes.  Thank you.  I kept any calendar

18   clear, just in case.

19          **THE COURT:**  Great.  Thank you.  Thank you.

20        So I just need a -- well, number one, I'd like to hear

21   from Angie what our time expiration looks like.

22          **THE CLERK:**  Your Honor, plaintiffs have 3 hours

23   54 minutes and 10 seconds.

24          **MR. CONNETT:**  Angie, if I could.  Does that time

25   estimate include -- we had sent to the Court the allocation of

1    time for the video depositions of Mister --

2            THE CLERK:  It includes the depositions as well.

3    That have been played.

4            MR. CONNETT:  Okay.

5            THE COURT:  It's your absolute time left, however you

6    use it.

7            MR. CONNETT:  Because we had -- for the CDC

8    deposition and the deposition of Joyce Donohue, a portion of

9    the designations were from EPA.  Has that been allocated out of

10   our time?

11           THE CLERK:  No.

12           THE COURT:  Okay.

13           MR. CONNETT:  Your Honor, we have an agreement by the

14   parties -- the parties have an agreement that the designations

15   allocated to any given party would be the time spent playing

16   those designations would count against that party.

17           THE COURT:  Yeah.

18           MR. CONNETT:  So, Angie, I'll go ahead and send that

19   email to you so you have that time allocation.

20           THE COURT:  All right.  In other words, you're going

21   to play the whole deposition, but some of it will be charged to

22   one party and some of it will be charged to the other.  You

23   want to make sure we charge the right party the right amount.

24           MR. CONNETT:  Yes, Your Honor.

25           THE COURT:  But your base to start with is 3 hours

 1   54 minutes and 10 seconds.

 2        And for the defendants, Angie?

 3             THE CLERK:  Time remaining for defendants are

 4   3 hours 50 minutes and 24 seconds.

 5             THE COURT:  All right.  Almost equal there.

 6        All right.  Good.  Well, hopefully that -- we're on track

 7   to be able to complete.  If everybody uses all their time,

 8   we'll be able to complete this testimony by Tuesday.

 9        So, and then if I could get the order of witnesses, or at

10   least the witnesses that the government intends to call on

11   Monday.

12             MS. CARFORA:  It will be Joyce Donohue via

13   deposition, and then I believe Ellen Chang, and then Tala

14   Henry.

15             THE COURT:  Okay.  And that will -- if you get

16   through those, that will complete the government's case?

17             MS. CARFORA:  Yeah, Your Honor.  There's also -- we

18   also have some depositions to read into the record from

19   plaintiff's standing declarants.

20             THE COURT:  Okay.

21             MS. CARFORA:  So that will be at some point Monday,

22   too, where it feels appropriate.

23             MR. CONNETT:  Your Honor?

24             THE COURT:  Yep.

25             MR. CONNETT:  On the point of the standing witness

1   depositions, since they are just going to be read, we do have

2   those designations identified in the written discovery,

3   Appendix C to the joint pretrial statement.  And I'm fine -- I

4   mean, EPA ultimately has considerably more designations than we

5   do from that.

6       I have no objection to just entering that testimony into

7   the record without reading it.  I'm not quite sure what reading

8   it into the record does, since it's not the witness.  There is

9   nothing about credibility, body language, demeanor or anything

10  like that.

11      So I'm fine with allowing EPA to just have that entered

12  into the record and ours entered into the record as well

13  without reading.

14          THE COURT:  Well, are these already -- have they

15  already been designated as exhibits?

16          MR. CONNETT:  Yes, your Honor.  They are part of

17  Appendix C, which is the written discovery material that is

18  attached to the pretrial statement.

19          THE COURT:  And how much time does the government

20  expect on the -- well, what's your response?

21          MS. CARFORA:  We would like to read the -- read them

22  into the record, and we expect that will take about 30 minutes.

23          THE COURT:  All right.  I mean, if that's how they

24  want to use their time, that's -- they can use their time that

25  way.  You know, that's fine.

1          **MR. CONNETT:**  And for plaintiffs, Your Honor, is it

2   okay if we can just rest on the designations that we've entered

3   into Appendix C without reading it during the trial?

4          **THE COURT:**  It's in evidence.  That's why I asked the

5   question.  It's already in evidence; correct?

6          **MR. CONNETT:**  Yes.

7          **THE COURT:**  And the parties are stipulating that it

8   is admissible as evidence.

9          **MS. CARFORA:**  Well, I don't know about that.  I mean,

10   I'm a little confused.

11       I don't know that it's in evidence.  It's attached to

12   Appendix C of the joint pretrial statement, but I don't know

13   that the joint pretrial statement is evidence at trial.

14       I mean, it's part of the record, you know, that the Court

15   requested for pretrial material, but I don't know that it's

16   actually in evidence.

17          **THE COURT:**  Well, my question, was there a

18   stipulation that the exhibits, these particular exhibits, would

19   be admissible as evidence?

20          **MR. CONNETT:**  It's been my understanding, Your Honor,

21   that the -- what is in Appendix C, which we have entered, which

22   includes interrogatory responses and other materials, is part

23   of the -- the record.  And if it's not, then plaintiffs would

24   certainly seek to introduce certainly all of our interrogatory

25   responses that we have identified in Appendix C as evidence.

1      Because I just -- and I -- maybe I incorrectly assumed

2  this, Your Honor, but I thought all the interrogatory responses

3  that we identified, they are in evidence.

4          THE COURT:  Well, I thought the parties had reached

5  an understanding.  You know, if there is some dispute as to

6  whether an understanding was reached, I guess I'm going to have

7  to have the parties direct me to where the differences are.

8          MS. CARFORA:  I guess -- I'm just trying to just

9  clarify for -- I'm not sure I'm 100 percent following.

10     Mr. Connett, are you suggesting that what was attached

11 with Appendix C should be just automatically moved into the

12 trial record here as evidence?

13          MR. CONNETT:  Yes.

14          THE COURT:  Okay.  Well, I guess that's the question.

15          MS. CARFORA:  Your Honor, is it okay if we take that

16 under advisement and let the Court know our position on that on

17 Monday?

18          THE COURT:  Why don't you all see if you can reach a

19 stipulation on that.  I thought there was a stipulation, but

20 frankly I didn't look at it to that level of degree.

21     But I would rather make this clear.  We've got to go one

22 way or the other on this.  I assume that the plaintiffs are not

23 intending to call as a live witness -- live witnesses the

24 declarants; is that right?

25          MR. CONNETT:  That is correct, Your Honor.

1      **THE COURT:**  So why don't you see if you can reach a

2  stipulation, and that might obviate your need.  I mean, you can

3  use your time as you want.  If you need to read it for emphasis

4  to make sure I hear it, you can do that.  Otherwise, if you

5  stipulate that it be in the record, that might obviate the

6  necessity for doing that.

7      **MS. CARFORA:**  I understand.

8      **THE COURT:**  I will leave it up to you, but meanwhile

9  we will plan to hear the testimony as you have laid out on

10  Monday.

11      **MR. CONNETT:**  Your Honor?

12      **MS. CARFORA:**  Okay.  Thank you.

13      **MR. CONNETT:**  Your Honor, could I have one further

14  point of clarification?

15      **THE COURT:**  Yep.

16      **MR. CONNETT:**  Counsel, it's been my understanding

17  throughout this litigation that the declarations that the

18  plaintiffs -- all the experts in this case have written are in

19  evidence in this case and part of their testimony.

20      **THE COURT:**  That I assume, because that was the whole

21  idea.  We were supposed to minimize your need for direct, and

22  we were going to spend most of your time on cross.  That one I

23  do recall, and I assume that's how it was submitted.

24      So I am going to treat all of the expert declarations

25  as -- really in lieu of direct testimony.  Of course, now it's

**TSUJI - CROSS / CONNETT**

1    been supplemented, but it is in evidence.

2              **MR. CONNETT:**  Thank you, Your Honor.

3              **THE COURT:**  Okay.  All right.  Have a great weekend

4    everyone.  See you on Monday.

5              **THE CLERK:**  Court is in recess.

6         (Whereupon at 1:40 p.m. further proceedings were

7          adjourned until Monday, June 15, 2019 at 8:30 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

FRIDAY, JUNE 12, 2020 - Volume 4

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| | | |
| **THIESSEN, KATHLEEN** | | |
| (PREVIOUSLY SWORN) | 526 | 4 |
| Direct Examination Resumed by Mr. Connett | 526 | 4 |
| Cross-Examination by Ms. Bhat | 526 | 4 |
| Redirect Examination by Mr. Connett | 583 | 4 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| | | |
| **THAYER, KRISTINA** | | |
| (PREVIOUSLY SWORN) | 595 | 4 |
| Direct Examination by Ms. Carfora | 595 | 4 |
| Cross-Examination by Mr. Connett | 660 | 4 |
| Redirect Examination by Ms. Carfora | 672 | 4 |
| Recross-Examination by Mr. Connett | 673 | 4 |
| | | |
| **TSUJI, JOYCE** | | |
| (SWORN) | 676 | 4 |
| Direct Examination by Mr. Adkins | 676 | 4 |
| Cross-Examination by Mr. Connett | 695 | 4 |

-   -   -

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 26 | | 592 | 4 |
| 47 | | 518 | 4 |
| 49 | | 567 | 4 |
| ECF No. 199 | | 679 | 4 |

—   —   —

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, June 12, 2020