Volume 5

Pages 709 - 906

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

FOOD & WATER WATCH, INC., et al,    )
                                    )
                                    )
            Plaintiffs,             )
                                    )
   vs.                              ) No. C 17-2162 EMC
                                    )
U.S. ENVIRONMENTAL PROTECTION       )
AGENCY, et al,                      )
                                    )  San Francisco, California
            Defendants.             )  Monday
                                    )  June 15, 2020
                                    )  8:30 a.m.
_____)

**TRANSCRIPT OF REMOTE ZOOM BENCH TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          WATERS KRAUS & PAUL
                             222 North Pacific Coast Highway
                             Suite 1900
                             El Segundo, California 90245
                   BY:  **MICHAEL P. CONNETT, ESQ.**
                        **CHARLES ANDREW WATERS, ESQ.**


                             WATERS & KRAUS LLP
                             3141 Hood Street
                             Suite 700
                             Dallas, Texas 75219
                   By:  **KAY GUNDERSON REEVES, ESQ.**


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)


*Reported By:*   **Debra L. Pas, CSR 11916, RPR, RMR, CRR**
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**


**For Plaintiffs:**          NIDEL AND NACE, PLLC
                             5335 Wisconsin Avenue, NW
                             Suite 440
                             Washington, DC 20015
                   BY:  **CHRISTOPHER THOMAS NIDEL, ESQ.**




**For Defendants:**          U.S. DEPARTMENT OF JUSTICE
                             Environmental Defense Section
                             601 D Street, NW
                             Room 8814
                             Washington, DC 20004
                   BY:  **DEBRA J. CARFORA, ESQ.**


                             U.S. DEPARTMENT OF JUSTICE
                             Environment & Natural Resources Div.
                             P.O. Box 7611
                             Washington, DC 20044
                   BY:  **BRANDON N. ADKINS. ESQ.**
                        **SIMI BHAT, ESQ.**
                        **JOHN THOMAS H. DO, ESQ.**

                             —   —   —

PROCEEDINGS

```
 1                  P R O C E E D I N G S

 2   JUNE 15, 2020                              8:30 A.M.

 3                       ---oOo---

 4          THE CLERK:  Court is now in session.  The Honorable

 5   Edward M. Chen is presiding.

 6       Calling Civil Action 17-2162, Food & Water Watch versus

 7   Environmental Protection Agency.

 8       Counsel, please state your appearances for the record,

 9   beginning with plaintiff's counsel.

10          MR. WATERS:  Andy Waters for the plaintiffs.

11          THE COURT:  All right.  Good morning, Mr. Waters.

12          MR. WATERS:  Good morning.

13          MR. CONNETT:  Good morning, Your Honor.  Michael

14   Connett for the plaintiffs.

15          THE COURT:  Good morning, Mr. Connett.

16          MS. REEVES:  Good morning, Your Honor.  It's Kay

17   Reeves again for the plaintiffs.

18          THE COURT:  All right.  Thank you, Ms. Reeves.

19          MR. NIDEL:  Good morning, Your Honor.  Chris Nidel

20   for the plaintiffs.

21          THE COURT:  All right.  Good morning, Mr. Nidel.

22          MS. CARFORA:  Good morning, Your Honor.  Debra

23   Carfora on behalf of EPA.

24          THE COURT:  Good morning, Ms. Carfora.

25          MR. ADKINS:  Good morning.  Brandon Adkins for EPA.
```

1        **THE COURT:**  All right. good morning, Mr. Adkins.

2        **MS. BHAT:**  Good morning, Your Honor.  Simi Bhat for

3    EPA.

4        **THE COURT:**  All right.  Good morning, Ms. Bhat.

5        **MR. DO:**  Good morning, Your Honor.  John Do for EPA.

6        **THE COURT:**  Good morning, Mr. Do.

7    Hope you all had a great weekend, safe weekend.

8    All right.  So we are now about to, as I recall, commence

9    cross of Dr. Tsuji; is that right?

10       **MR. CONNETT:**  That's correct, your Honor.

11       **THE COURT:**  All right.  If we could bring Dr. Tsuji

12   back.

13       **MR. ADKINS:**  Sorry, Your Honor.  On Friday the Court

14   permitted Dr. Tsuji to submit a declaration under seal to

15   respond to a question from counsel regarding how much she was

16   paid in 2019.

17   We're prepared to do that, but before we do I wonder if

18   the Court would permit me to state an objection on the record

19   to that declaration.

20       **THE COURT:**  Sure.

21       **MR. ADKINS:**  Thank you.

22   So Dr. Tsuji disclosed in her expert report, consistent

23   with Rule 26(a), the hourly rate by which Exponent would be

24   compensated for Dr. Tsuji's work on this case.

25   Dr. Tsuji also testified on Friday, as you'll recall, with

1   respect to the total amount that her employer billed EPA for

2   her work to date, and there has been no foundation for how

3   Dr. Tsuji's income in 2019 from Exponent is relevant.

4           THE COURT:  All right.  Thank you.  Objection

5   overruled.

6       Thank you.

7           MR. ADKINS:  Thank you.

8           THE COURT:  All right.  Are we prepared -- first of

9   all, good morning Dr. Tsuji.

10          THE WITNESS:  Good morning, your Honor.

11          THE COURT:  All right.  So, Mr. Connett, are you

12  prepared to commence your cross?

13          MR. CONNETT:  Yes, Your Honor.

14          THE COURT:  All right.  Why don't we go ahead and get

15  started.

16      Just a reminder, Dr. Tsuji, you still are under oath.

17          THE WITNESS:  Yes, thank you.

18                          **JOYCE TSUJI**,

19  called as a witness for the Defendant herein, having been

20  previously sworn, resumed the stand and testified further as

21  follows:

22                      **CROSS-EXAMINATION**

23  BY MR. CONNETT

24  Q.   Good morning, doctor.

25  A.   Good morning.

1    Q.   Dr. Tsuji, you have never published a single peer-reviewed

2    paper on fluoride in your life; correct?

3    A.   I have published a report with colleagues of the National

4    Academy of Sciences committee that included a chapter on

5    fluoride.  So I'm a coauthor of that.  That was peer reviewed

6    extensively.  In fact, more than a journal article would be

7    peer reviewed.

8    Q.   Okay.  Fair point.  So besides the NRC committee report

9    for which you were a committee member, you have never published

10   a peer-reviewed paper in your life; correct?  On fluoride.

11   A.   Thank you for that addition.

12        Yes.  Except for that published NAS NRC report, not in a

13   peer-reviewed journal.

14   Q.   And in that NRC committee report, it was Dr. Kathleen

15   Thiessen and Dr. John Morris who were the committee members who

16   wrote the chapter on fluoride; correct?

17   A.   Yes, but the committee must review that and comment on the

18   chapter, and all chapters in that report.

19   Q.   Now, on Friday, Dr. Tsuji, you spoke quite critically of

20   the current research on fluoride neurotoxicity.  So let's start

21   today by talking about a few things that we may agree upon.

22   Okay?

23   A.   Okay.

24   Q.   Dr. Tsuji, you agree that the brain is more likely to be

25   harmed by neurotoxicants when the brain does not have the

1    protection of the blood-brain barrier; correct?

2    **A.**    Yes.  That's a general principle of neurotoxicity risk

3    assessment, and it -- it is considered more vulnerable because

4    it would get more exposure.  Whether an animal would have more

5    effects would really depend on the toxicity of that chemical,

6    which is very chemical specific.

7    **Q.**    Now, Dr. Tsuji, you also agree that the collective data

8    today provide a basis for reasonable scientists to be concerned

9    about the potential for prenatal exposure to fluoride to cause

10   neurotoxic effects at some dose; correct.

11            **MR. ADKINS:**  Objection.  Overbroad.

12            **THE COURT:**  Overruled.

13   **A.**    There's a lot in there.  Certainly, there is enough

14   literature for us to be concerned and look at this literature

15   base more critically and not just ignore it.  We need to look

16   at this literature, and we need to consider it as we have done

17   in this case.

18   **BY MR. CONNETT**

19   **Q.**    And consistent with that, you agree that the collective

20   data today certainly provides information of a potential

21   association between fluoridated water and neurotoxicity, and

22   you believe the EPA should seriously consider this data;

23   correct?

24   **A.**    Yes.

25            **MR. ADKINS:**  Objection.  Foundation.

1              THE COURT:  Overruled.  If she has such an opinion.

2              MR. CONNETT:  And the witness just answered.

3    A.    Yeah.  I agree that EPA should continue to, and NTP should

4    consider this information and --

5    BY MR. CONNETT

6    Q.    Doctor --

7              THE COURT:  Let her finish.  You can finish,

8    Dr. Tsuji.

9    A.    Sorry.  I'm sorry.  Let me raise my volume.  There is some

10   blowing going on outside, leaf blowing.  Sorry.  Just a minute

11   here.  Maybe I can hear better.  Hopefully, you're not hearing

12   distracting noise.

13        Sorry.  Would you ask your question again?  It was kind of

14   long.

15   BY MR. CONNETT

16   Q.    I asked the same question at your deposition, so I will

17   repeat it again here.

18        You agree, Doctor, that the collective data today

19   certainly provides information of a potential association

20   between fluoridated water and neurotoxicity and in your view

21   the EPA should be seriously considering this data; correct?

22             MR. ADKINS:  Objection.  Foundation.

23   A.    They should --

24             THE COURT:  Overruled.

25   A.    -- consider and examine what it means in terms of dose

 1  response and at what doses there might be concerns.

 2  **BY MR. CONNETT**

 3  **Q.**    And, Doctor, based on the currently available data, you

 4  agree that there is a suggestion that formula-fed infants may

 5  be at greater risk of suffering fluoride neurotoxicity than the

 6  general population; correct?

 7  **A.**    Well, what we have there is we have -- the literature

 8  suggests it, just because they are receiving the most exposure

 9  and, therefore, I agree that early life stages are the

10  appropriate focus and, as you noted before, the developing

11  brain.

12      Also, we have studies which are not entirely clear.  Some

13  studies show effects.  A recent study looking at the Canadian

14  population, a small subset, indicates that there might be

15  potentially greater effects.

16      But, again, this evidence is still forming and I think it

17  needs to be looked at critically.

18  **Q.**    And, Dr. Tsuji, you, yourself, agree that it is reasonable

19  today to recommend that infants not drink formula made with

20  fluoridated water; correct?

21          **MR. ADKINS:**  Objection.  Foundation.

22          **THE COURT:**  Overruled.

23  **A.**    Well, the CDC has recommended that infants -- that tap

24  water with fluoride not be used for infants because the

25  exposure exceeds the reference dose for dental fluorosis and

1  there is no benefit to the infants.

2  **BY MR. CONNETT**

3  **Q.**  And you, yourself, at your deposition agreed that this is

4  a reasonable recommendation, that infants not drink fluoridated

5  water; correct?

6  **A.**  Yes.

7  **Q.**  Now, Dr. Tsuji --

8          **THE COURT:**  Hold on.  Let me ask a question.

9      And that's because of the risk of fluorosis?

10          **THE WITNESS:**  Yes.  The -- if you do the extreme

11  calculations for an infant, you will get to levels that already

12  surpass EPA's reference dose that is based on dental fluorosis.

13          **THE COURT:**  That's because of the cumulative effect

14  of drinking, for instance, formula every day consistently; is

15  that the idea?

16          **THE WITNESS:**  Right.  If -- well, it is if you were

17  to that.

18      Now, at the highest percentiles that Dr. Thiessen was

19  showing, I don't think that is possible based on the survey

20  data because it's based on a fluid intake per body weight.  And

21  an infant that continues in a short-term survey, a day or two,

22  an infant that keeps drinking at that level grows.  They go

23  through a growth spurt and suddenly they are not drinking at

24  that fluid intake for body weight because their body weight is

25  now bigger.

1         So that's why the regulatory authorities, the FDA, the

2    EPA, they tend to use a 90th percentile or lower; not 95th,

3    99th percentiles in short-term survey data because they are

4    unreasonable.  They can't be sustained.

5              THE COURT:  Okay.  Thank you.

6    BY MR. CONNETT

7    Q.   Now, Dr. Tsuji, for this case three other Exponent

8    scientists helped you do your expert report; correct?

9    A.   Yes.

10   Q.   So let's talk now about what your Exponent team did.

11   First, Dr. Tsuji, you are a risk assessment scientist; correct?

12   A.   I do risk assessment, but I'm a toxicologist.

13   Q.   And you consider yourself to have expertise in risk

14   assessment; correct?

15   A.   Yes.

16   Q.   But you did not conduct a risk assessment in this case;

17   right?

18   A.   That was not what I was asked to do.

19   Q.   The first step of a risk assessment is a hazard

20   assessment; correct?

21             MR. ADKINS:  Objection.  Foundation.

22             THE COURT:  Overruled.  She indicates that she is

23   familiar with risk assessment.

24   A.   Well, according to the Superfund guidelines, the first

25   step is called hazard identification.

1  BY MR. CONNETT

2  Q.   But you did not do a hazard assessment in this case;

3  correct?

4  A.   I -- that is not what exactly I was asked to do.  I was

5  evaluating the evidence that would support whether there is a

6  potential concern for neurotoxicity based on the animal data at

7  low community water fluoridation levels of .7 milligram per

8  liter.

9  Q.   And just to be clear, Dr. Tsuji, you agreed at your

10 deposition that you did not do a hazard assessment; correct?

11 A.   I did not do a hazard assessment, but I certainly

12 responded to plaintiff's various opinions regarding hazard,

13 regarding alleged neurotoxic effects based on animal studies.

14 Q.   And, Dr. Tsuji, you do not dispute that neurotoxicity is a

15 hazard of fluoride exposure; correct?

16 A.   Yes.  At high enough levels.  And, unfortunately, the

17 mechanistic data are just not good enough for us to really

18 understand how it's causing these deficiencies that -- in tests

19 at high doses, very high doses.

20      But it -- it could be direct or it could also be indirect

21 because it's affecting other systems of the body or because,

22 certainly in animal studies, they may not like the taste of the

23 water or they are not drinking enough and, therefore, they

24 don't eat enough.  There is nutritional effects.

25      There could be some other interaction.  We don't exactly

1  now how it's caused at these higher doses and that's the

2  limitation of the animal studies.

3        Fortunately, we do have a well-conducted animal study,

4  actually a suite of studies, nine different tests and, also,

5  histopathological evaluation of the brain that wasn't showing

6  effects, but it -- its top dose was 20 milligram per liter,

7  which is still well above community fluoridation levels, but we

8  don't have any testing above that by a study that used

9  well-conducted methods like the National Toxicology Program

10  used.

11  **Q.**   Dr. Tsuji, on Wednesday of last week the Court heard

12  testimony from Dr. Kristina Thayer, and Dr. Kristina Thayer

13  testified in her opinion that the current animal data on

14  fluoride neurotoxicity supports the biological plausibility of

15  fluoride causing neurotoxic effects in human beings.

16        Do you agree with Dr. Thayer on that?

17  **A.**   I would say at some dose, yes.  At -- at an extremely high

18  or whatever, much higher than .7 that is -- it's plausible

19  based on studies.

20        Again, how that is happening and whether that's a direct

21  effect or an indirect effect, I think what we need to find out

22  more how fluoride -- what fluoride is doing at these very high

23  doses.

24        But that isn't really relevant for low doses at the .7

25  milligram per liter.

 1   **Q.**   You agree, Dr. Tsuji, that a weight of the evidence

 2   assessment should place greatest weight on the studies that use

 3   the most reliable methodologies; correct?

 4   **A.**   Yes.  But you should also consider the entire body of

 5   literature.  Even in poorly conducted studies one should at

 6   least take a look what those studies might mean because you can

 7   still glean some evidence from them, and if you're going to

 8   just pick one study and not consider the body of evidence.

 9        And EPA has now moved towards considering more of the

10   totality of the evidence, but, of course, focusing on studies

11   that are well conducted.

12   **Q.**   And in your view, Dr. Tsuji, when well-conducted human

13   studies are available, those human studies are more relevant to

14   assessing risks in human beings than well-conducted animal

15   studies; correct.

16        **MR. ADKINS:**  Objection.  Scope.

17        **THE COURT:**  Overruled.

18   **A.**   It would depend on the particular chemical.  Just because

19   studies are well conducted doesn't mean the human studies were

20   in an appropriate population, for example, or it's possible

21   that the animal studies were able to get at some nuances that

22   you can't test in a human study.

23        So it's hard for me to really answer that question.

24   **BY MR. CONNETT**

25   **Q.**   Okay.  Now, in this case you and your Exponent team

TSUJI - CROSS / CONNETT

1  focused primarily on the animal data; correct?

2  **A.**   Yes.

3  **Q.**   And you recognize, Dr. Tsuji, that there is a distinction

4  between using animal data to assess risk in humans versus using

5  animal data to reach causal determinations in humans; correct?

6         **MR. ADKINS:**   Objection.   Can we get some definition

7  of these terms?

8         **THE COURT:**   Yeah.   I think that's -- that's too

9  vague.

10 **BY MR. CONNETT**

11 **Q.**   Well, at your deposition, Dr. Tsuji, you stated that there

12 is a difference between using animal data to assess risk in

13 humans than using animal data to assess causation in humans.

14 What did you mean by that?

15 **A.**   Well, thinking back, at that time I think I was thinking

16 that you have a situation where chemical -- with very little

17 data at all.   Maybe you only had one or two animal studies.

18 They are not all that well conducted, but that's all you have.

19      You can use that to conduct -- to develop a reference dose

20 or a toxicity factor and then conduct a risk assessment.   That

21 would be different than being able to determine causation.   In

22 fact, you probably couldn't do that with so few or poor

23 evidence like that.

24 **Q.**   Now, in this case, Dr. Tsuji, based on your assessment of

25 the animal literature, you have concluded that there is

1    insufficient evidence to show that .7 parts per million

2    fluoride in water causes neurotoxicity in humans; correct?

3    A.    That was my opinion based on  -- primarily based on the

4    experimental animal data and how it might be a little in formus

5    at those levels at .7.

6    Q.    Dr. Tsuji, I've gone through your publication history that

7    you have identified in your C.V. and I did not find a single

8    paper where you focused on animal data to make an assessment of

9    causation in human beings.

10        Did I miss something?  And if so, can you tell me what

11   study I should look at that you've done on that?

12   A.    The 2019 arsenic -- I think it's called -- I can't

13   remember the -- it was the -- published in *Critical Reviews in*

14   *Toxicology*.  It looked at the evidence for carcinogenicity of

15   arsenic in humans, animals and in vitro.  And it tried to

16   evaluate, where do we see consistency of evidence on where

17   toxicity and carcinogenicity might occur.  And for that

18   chemical we're able to show consistent mechanisms and

19   consistent animal results and also human epidemiological

20   results at certain doses.

21   Q.    And in that paper, Dr. Tsuji, you had a pretty extensive

22   discussion of the human epidemiological data; correct?

23   A.    It included that, yes.

24   Q.    So I'm asking you, Dr. Tsuji:  Can you point me to a

25   single publication that you've ever authored in your entire

1  life where the focus of your analysis was animal data and the

2  purpose of your analysis was to assess causation in human

3  beings?

4          **MR. ADKINS:**  Objection.  Scope.

5          **THE COURT:**  Overruled.

6  **A.**   I often sit on National Academy of Sciences panels where

7  we have to look at animal data and come up with conclusions.

8  And our reports are published.  I've done that many times.

9  **BY MR. CONNETT**

10 **Q.**   I'm asking for your own publication history, Dr. Tsuji, a

11 paper in a peer-reviewed journal that I could go on to PubMed

12 and find.

13         Can you identify for me a single paper you've ever

14 published in your entire career where you focused on the animal

15 data to make a determination of causation in human beings?

16 **A.**   I think the majority of my papers focus on chemicals where

17 you have a considerable amount of human data to assess the

18 toxicity.  Like metals, many metals.

19         The metals exposure assessment paper, the copper -- like

20 20- -- the collaboration I did in -- I think recently.  It's

21 published maybe this year on copper, included extensive

22 sections on animal data that I had to review and help our other

23 staff understand.

24         There is a paper on metal, metal framework.  EPA's metal

25 risk assessment framework -- or maybe it's the National Academy

TSUJI - CROSS / CONNETT

1    of Sciences metal framework.  I think that has some animal

2    data.

3        And certainly bioavailability is -- the test methods are

4    in animals.

5        I'd have to look at my resume and go back and examine each

6    paper.

7    **Q.**  So as you sit here today, Dr. Tsuji, is it correct to say

8    that you cannot identify for me a single paper where -- that

9    you published where you focused on the animal data, not the

10   epidemiological data, but the animal data to make a conclusion

11   of causation in human beings?

12       **MR. ADKINS:**  Objection.  Asked and answered.

13   Misstates testimony.

14       **THE COURT:**  Overruled.

15   **BY MR. CONNETT**

16   **Q.**  If you can't identify one for me, but if you can just

17   clarify that you cannot identify one for me as you sit here

18   today here today?

19       **MR. ADKINS:**  Same objections.

20       **THE COURT:**  Overruled.

21   **A.**  First of all, my papers go -- I don't think they always

22   look at causation.  They look at the evidence available.  Some

23   of them have to be risk assessment.

24       They consider animal studies, and I've just listed you

25   some examples.  Even in the -- in the National Academy of

**TSUJI - CROSS / CONNETT**

1    Sciences committees, in fact, I just had one on topical pain

2    creams.  I had to look at several drugs, and much of the

3    evidence was in animals.  That has just been recently

4    published.  It is peer reviewed.  And I wrote sections that

5    reviewed the animal evidence --

6    **Q.**   Okay.

7    **A.**   -- for safety and efficacy of drugs.

8    **Q.**   Thank you, Dr. Tsuji.  Let's move on.

9         In 2015 you published a paper where you assessed whether

10   EPA's reference dose for arsenic was protective against arsenic

11   neurotoxicity; correct?

12   **A.**   I'm sorry.  Did you say 2015?

13   **Q.**   Yes.

14   **A.**   Yes.

15   **Q.**   And this study was funded by the Electric Power Research

16   Institute and the Arsenic Science Task Force; correct?

17   **A.**   In part.  Most of it was funded by at the time myself and

18   my colleagues.

19   **Q.**   And Ellen Chang was coauthor of that report; correct?

20   **A.**   Yes.  And it included an extensive systematic review of

21   the available data for assessing whether arsenic is a

22   neurobehavioral toxicant.

23   **Q.**   And in that paper you concluded that EPA's reference dose

24   was protective against neurotoxicity; correct?

25   **A.**   Well, yes.  After it did an evaluation of the quality of

TSUJI - CROSS / CONNETT

1   the literature and the evidence in various populations, it did

2   a worst case kind of screening analysis of, okay, let's take

3   the study that shows the most dose response, even though it's

4   not in the U.S., even though it has problems with extrapolation

5   for the U.S., and just see is it going to be high enough of a

6   risk to warrant reevaluating the current EPA reference dose.

7        We found under those worst case assumptions that that was

8   not the case; that the reference dose, which is based on other

9   effects of arsenic, was still protective.

10  **Q.**   Now, if the Court was to access that paper and search for

11  the words "worst case," those words will not be found anywhere

12  in that report, will they?

13             **MR. ADKINS:**   Objection.   Foundation.

14  **A.**   No, but if you carefully --

15             **THE COURT:**   Overruled.

16  **A.**   -- read the report, it discusses the available evidence,

17  and it notes that in many cases we are making these assumptions

18  which are violated actually by the actual scientific evidence.

19  So the end result is what we did was worst case.

20  **BY MR. CONNETT**

21  **Q.**   Now, in that assessment, Doctor, you -- you scanned the

22  literature, as you talked about, and you identified a study,

23  the Hamadani 2011 study, that you determined was of

24  sufficiently good quality to permit the derivation of a

25  reference dose; correct?

1   **A.**   Well, I don't know if it was sufficient good quality.  It

2   was the best of the available studies.  There was another

3   study, I think, that is a bit more well-conducted study because

4   it better corrected for maternal IQ.  It was at lower doses,

5   even though it was a Bangladesh.  But it used blood.  And

6   they -- that's a very uncertain measure because it's very

7   confounded by nutritional deficiencies and folate deficiencies,

8   especially in that population.

9        We also identified a U.S. study that was -- tested IQ,

10  more in -- I'm sorry, in children.  This is more relevant for

11  the U.S. population.  Was -- fortunately, they didn't find a

12  dose response.

13       So although it was also well conducted, it was not

14  sufficient to be able to -- to calculate a dose response

15  because there was no drop in IQ with increasing arsenic dose in

16  the end.

17  **Q.**   Now, Dr. Tsuji, you remember I took your deposition last

18  August in Washington D.C.?

19  **A.**   It was in September.

20  **Q.**   September, thank you.

21       And you remember you took the same oath you took on Friday

22  to tell the truth, the whole truth and nothing but the truth?

23  **A.**   Yes.

24            **MR. CONNETT:**  At this time, Your Honor, I would like

25  to introduce deposition testimony for impeachment.

 1             THE COURT:  What page and cite?

 2             MR. CONNETT:  372, Lines 12 through 17.

 3             THE COURT:  All right.  Any objection?

 4             MR. ADKINS:  One moment, your Honor.

 5        (Brief pause.)

 6             MR. ADKINS:  No objection.

 7        I should say, counsel, will you complete the answer or are

 8   you just planning to read Line 17?

 9             MR. CONNETT:  Line 17.  You're welcome, counsel, to

10   further explore that in your redirect.

11             MR. ADKINS:  I think you should read the entire

12   answer.

13             THE COURT:  Yeah.  If there's more to it now, I don't

14   want to wait for redirect.  Just read -- what do you suggest,

15   Mr. Adkins?

16             MR. ADKINS:  I think counsel should read Line 12,

17   Page 372 to the conclusion of the witness's answer, Line 7,

18   Page 373.  It's an extra 20 lines.

19             MR. CONNETT:  That's fine, Your Honor.

20             THE COURT:  All right.  Go ahead and read it.

21             MR. CONNETT:  Mr. Dixon, can you put the deposition

22   up on the screen.

23        (Document displayed.)

24   BY MR. CONNETT

25   Q.   So the question was:

**TSUJI - CROSS / CONNETT**

1    **"QUESTION:**  You certainly found that the Hamadani

2    study was of sufficient methodological quality to

3    permit the derivation of an RfD; correct?

4    **"ANSWER:**  Yes, and we were also trying to update an

5    evaluation that was done by the State of California

6    that used an older study of the Wasserman study that

7    was done in blood, but it was an older Wasserman study

8    that did -- that did find an association between

9    arsenic and water and IQ.

10        "But the newer study did not find any -- when

11    looking at lower doses, did not -- and correcting for

12    all these confounders better, did not find an

13    association between arsenic and water and IQ."

14    Thank you, Mr. Dixon.

15    (Document removed from display)

16   **BY MR. CONNETT**

17   **Q.**   Now, Doctor, the Hamadani study investigated exposures to

18   arsenic in Bangladesh that substantially exceed the exposures

19   to arsenic in the U.S. population; correct?

20   **A.**   Yes.

21   **Q.**   And the Hamadani study estimated prenatal arsenic exposure

22   by taking two urine samples from the mother during pregnancy;

23   correct?

24   **A.**   Yes.

25   **Q.**   And --

1    A.    When you have that high of an arsenic exposure, there is

2    less uncertainty compared to a U.S. population at lower

3    exposures.  And people in the U.S. don't drink water all the

4    time, tap water.  They might drink other beverages.

5         But in Bangladesh they have only one source of water for

6    cooking and everything.  So it's more consent.  These

7    measurements are more consistent in Bangladesh than you might

8    expect.  I know you're going to compare this to fluoride, but I

9    think there is less uncertainty.

10        And, also, Hamadani did not find an association with

11   maternal arsenic, urinary arsenic.  The association was between

12   concurrent urinary arsenic in the children and the IQ testing.

13   And only in girls who also were suffering from poor growth.

14   Q.    Okay.

15             MR. CONNETT:  Your Honor, now I'd like to introduce

16   the --

17   BY MR. CONNETT

18   Q.    Dr. Tsuji, did you just state that the Hamadani study did

19   not find a relationship between prenatal arsenic exposure and

20   reduced IQ in girls?

21   A.    They did find -- I should correct that.  They did find an

22   association, but it was not as strong as concurrent urinary

23   arsenic in the child at the time of the testing.  And that's

24   why we used that association, because it was stronger.

25   Q.    And the -- the Hamadani study did not use first morning

 1  voids or 24-hour samples for the urine; correct?

 2  **A.**   It did not.  But, again, I think there is less -- there is

 3  less uncertainty in that type of population where they are

 4  really dependent on their water source, and the exposures are

 5  high.

 6  **Q.**   Now, Dr. Tsuji, at your deposition you agreed that the

 7  MIREC study in Canada on fluoride and IQ is as equally suitable

 8  to the derivation of an RfD as the Hamadani study; correct?

 9           **MR. ADKINS:**  Objection to the form of the question.

10  This seems like a question that's trying to test the witness's

11  memory of what she said at her deposition.

12           **THE COURT:**  Overruled.  It's a fair question.

13  **A.**   I'm not exactly sure how you asked that or how I phrased

14  my answer at my deposition.

15       But the MIREC study and the one in Mexico -- it's probably

16  the MIREC study as well.  Those two are more well conducted

17  than the other studies of -- epidemiological studies of

18  fluoride, but they are not without uncertainty and problems

19  with being able to make causative conclusions.  And I think

20  Dr. Chang will talk more about that later.

21       The maternal urinary fluoride, again, has some

22  uncertainties and there are potential confounders probably that

23  need -- also need to be explored.  They also didn't have first

24  morning voids.

25       Studies I've conducted on urinary biomonitoring, I have

**TSUJI - CROSS / CONNETT**

1   obtained two first morning voids because it's so much more

2   reliable and you don't need to rely as heavily on creatinine

3   correction or specific gravity correction.

4          **MR. CONNETT:**  Your Honor, would the Court -- could

5   the Court admonish the witness to answer the questions that I'm

6   asking?

7       I know that there's a lot to talk about in this case, and

8   counsel is going to have an lot of opportunity to follow up.

9          **THE COURT:**  That is a fair point.

10      Dr. Tsuji, I'd like you to answer the question.  I'll give

11  you a chance to explain, but the question that was just asked

12  comparing the suitability of the MIREC study to the Hamadani

13  study, I don't think you answered that and I'd like you to

14  answer that.

15         **THE WITNESS:**  Okay.

16  **BY MR. CONNETT**

17  **Q.**   With that, I'll, ask the question again.  Dr. Tsuji, do

18  you agree -- sorry, strike that.

19      Dr. Tsuji, you agree that the MIREC study in Canada is as

20  equally suitable to the derivation of an RfD as the Hamadani

21  study; correct?

22  **A.**   Yes.  It could be used for that purpose.

23  **Q.**   Now, also, Dr. Tsuji, you agreed that the MIREC study in

24  Canada investigated exposure levels that are far more

25  applicable to the U.S. population than the Hamadani study did;

1  correct?

2  **A.**    The exposures were more applicable, but whether the

3  measure is -- how reliable that measure is is, I think, another

4  question.

5  **Q.**    Yet, neither you nor Dr. Chang in this case attempted to

6  derive a reference dose from the MIREC study; correct?

7  **A.**    Well, reference -- deriving a reference dose using default

8  assumptions and things of that nature that we've seen by

9  plaintiff's experts is not part of a scientific evaluation of

10  study quality and weight of the evidence.

11  **Q.**    Dr. Tsuji --

12  **A.**    I did not do that.

13  **Q.**    So just to be clear, you did not do -- what you did in

14  your arsenic paper with Hamadani, you didn't do it here when

15  you looked at the data on fluoride; correct?

16  **A.**    I did not do a worst case analysis like I did with the

17  arsenic study, yeah.  Yes, that's correct.

18  **Q.**    And in your arsenic analysis, in calculating the RfD you

19  used one IQ point as the effect of concern for your dose

20  response analysis; correct?

21  **A.**    Yes.

22  **Q.**    And your decision to use one IQ point as the effect of

23  concern was based on a document from the United States

24  Environmental Protection Agency; correct?

25  **A.**    Yes.  And also because we were repeating what the State of

1    California had done earlier, and they used one IQ point.

2    **Q.**   Okay.  Dr. Tsuji, in your assessment for this case neither

3    you nor Dr. Chang considered human case reports of fluoride

4    hypersensitivity; did you?

5              **MR. ADKINS:**  Objection.  Foundation.

6              **THE COURT:**  Overruled.

7    **A.**   I'm sorry.  I didn't quite catch the last part of your

8    question.

9    **BY MR. CONNETT**

10   **Q.**   Neither you nor Dr. Chang considered human case reports of

11   fluoride hyper sensitivity in this case, did you?

12   **A.**   I remember seeing them, but case reports are just not part

13   of the reliable evidence.  And there is -- if there was no

14   other evidence to consider, then one might look at that.

15        But looking at headache, a headache can be neurological.

16   It could be change in blood flow to the brain or dilation of

17   capillaries to the brain.

18        There is lots of different issues with some of these case

19   studies, and also the matter of dose.

20   **Q.**   Now, Doctor, earlier this morning you talked about the

21   extensive peer review that the 2009 NRC report that you

22   coauthored underwent.  Do you recall that testimony?

23   **A.**   Yes.

24   **Q.**   And that chapter on fluoride that the NRC published with

25   your name on it --

TSUJI - CROSS / CONNETT

1   **A.**   And Dr. Thiessen's.

2   **Q.**   Right.  With your name on it, discusses fluoride causing

3   hypersensitive reactions in some individuals; correct?

4   **A.**   I think it does mention that, yes.

5   **Q.**   And, in fact, that NRC report with your name on it

6   discusses the case reports of Dr. George Waldbott; doesn't it?

7   **A.**   Not extensively.  And that's the limit to which it really

8   talks about neurotoxicity essentially.

9       And the committee, and apparently Dr. Thiessen at that

10  time, didn't think the evidence was sufficient to have much

11  more of a discussion than that.

12  **Q.**   Doctor, did I just ask you about the NRC's assessment of

13  neurotoxicity?

14      I asked you about:  Did the NRC report discuss George

15  Waldbott's case reports of fluoride hypersensitivity?  Is the

16  answer "yes" or the answer "no"?

17          **THE COURT:**  Well, she answered the question.  She had

18  a fair chance to respond.  Let's move on.

19  **BY MR. CONNETT**

20  **Q.**   And, Doctor, in that chapter in the NRC report it talks --

21  it identifies the dose that has been associated with fluoride

22  hypersensitivity in human beings; doesn't it?

23  **A.**   It might.  I haven't -- I haven't -- I don't recall

24  looking at that recently, so it might.

25      But, again, it's a very minor part of the report, so I

```
 1    don't have a good recollection of it.

 2              MR. CONNETT:  Your Honor, permission to refresh the

 3    witness's recollection.

 4              THE COURT:  All right.

 5              MR. CONNETT:  Mr. Dixon, can you put up the 2009 NRC

 6    Chapter, Page 79?

 7         (Document displayed.)

 8    BY MR. CONNETT

 9    Q.   I'm going to read this here, Doctor.  It says:

10              "Few experimental studies involving human

11         exposure to hydrogen fluoride or inhaled fluorides are

12         available.  Experimental studies in case reports

13         involving ingestion of the fluoride have reported

14         anti-thyroid effects (.03 to .14 milligrams per

15         kilogram per day for 20 to 245 days) and

16         hypersensitivity or reduced tolerance to fluoride

17         (.02 milligrams per kilogram per day) for short-term

18         exposures."

19         Did I read that correctly, Doctor?

20    A.   Yes.

21    Q.   And two of the citations there are Waldbott, 1956 and

22    1958; correct?

23    A.   Yes.

24              MR. CONNETT:  Thank you, Mr. Dixon.  You can take

25    that down.
```

TSUJI - CROSS / CONNETT

```
 1        (Document removed from display)

 2             THE COURT:  Is this in evidence?  The report in

 3    evidence?

 4             MR. CONNETT:  No, it is not, your Honor.

 5             THE COURT:  Okay.  You just introduced it to refresh

 6    recollection.  It is not in evidence.  So I'm going to note

 7    that.

 8             MR. CONNETT:  Okay.

 9    BY MR. CONNETT

10    Q.   Doctor, just to be certain.  According to the NRC in 2009

11    in that report, hypersensitive reactions to fluoride have been

12    reported in case reports at doses of .02 milligrams per

13    kilogram per day; correct?

14    A.   It's true, but the committee didn't consider it sufficient

15    evidence to develop a value for protecting submariners.

16    Q.   And that's a dose, Doctor, that many people can ingest

17    just from drinking fluoridated water; right?

18             MR. ADKINS:  Objection.  Vague.

19             THE COURT:  Rephrase.

20    BY MR. CONNETT

21    Q.   A dose of .02 milligrams per kilogram per day is a dose

22    that many people can ingest just from drinking the fluoride in

23    their water; correct?

24    A.   It's possible.  I'd have to calculate it, but it -- it

25    would depend on how much water you drink and things of that
```

 1   issue.

 2        And also these case reports, I think the committee thought

 3   were not very reliable about dose.

 4   Q.   Doctor, earlier you mentioned that infants can ingest more

 5   fluoride from water than the EPA's reference dose; correct?

 6   A.   Yes.

 7   Q.   And what does that tell you as to whether human beings can

 8   ingest more fluoride than .02 milligrams per kilogram per day

 9   from the water?

10   A.   Yes.  It would because the EPA's proposed reference dose,

11   I think, is .08, so.  But that is an adult.  And there is sort

12   of an intake body weight conversion that's a little different.

13        And, again, it's a case report.  So I'm not sure if I

14   would use the case report to develop conclusions.  Certainly

15   ones published in 1958.

16   Q.   And among the reactions that Dr. Waldbott identified and

17   documented in his case reports, those reactions included

18   headaches; correct?

19             MR. ADKINS:  Objection.  Foundation.

20             THE COURT:  If she knows, she can answer.  Overruled.

21   BY MR. CONNETT

22   Q.   Go ahead.

23   A.   I have not looked at those studies recently.

24   Q.   You had mentioned headaches at the beginning of this

25   discussion.  What were you referring to there?

1    **A.**   I was referring to Dr. Thiessen's testimony.

2    **Q.**   Now, in your review for this case, Dr. Tsuji, you tried to

3    sort of recreate the NTP's 2016 --

4        (Court reporter clarification due to audio

5         interference.)

6    **Q.**   In your review for this case, you and the Exponent team

7    tried to recreate the NTP's 2016 analysis using more updated

8    literature; correct?

9    **A.**   Yes.  We updated their analysis using their systematic

10   review methods.

11   **Q.**   Now, Dr. Thayer explained last week that the NTP excluded

12   all animal studies that found adverse effects inside the brain

13   if the study did not also measure some outward manifestation of

14   behavior, like learning decrements.

15       And, Dr. Tsuji, you followed this same approach in your

16   review; correct?

17   **A.**   Yes, because those studies at this point are not

18   sufficiently informative to answer questions about whether the

19   animal studies would support effects at .7 in humans.  And the

20   animal functional testing were much more informative.  At least

21   we could understand if there were actual effects.

22   **Q.**   Dr. Tsuji, you understand that the substantial majority of

23   animal studies on fluoride neurotoxicity have focused on the

24   changes going on inside the brain and have not focused on the

25   outward manifestations of behavior; correct?

 1   **A.**   Yes.   These studies are much easier to conduct, so there

 2   are more of them.   But they also suffer, in fact, maybe more

 3   so, various study problems, like, lack of investigator

 4   blinding, randomization, high doses, when it's unclear if the

 5   animals were tested at the different times, which would change

 6   different neurochemical levels.

 7        So there are lots of issues with those studies.   And we

 8   don't have a consistent evidence of a mechanism like some of

 9   the other chemicals.   So at this point they are just not as

10   informative as looking at the functional animal testing.

11   **Q.**   Now, Doctor, you focused your review on the learning and

12   memory studies in this case; correct?

13   **A.**   Yes.

14   **Q.**   And in your deposition you stated that you only, at most,

15   skimmed studies that dealt with the changes going on inside the

16   brain; correct?

17            **MR. ADKINS:**  Objection to the form of the question.

18            **THE COURT:**  Overruled.

19   **A.**   I skimmed a lot of them.   Some of them I looked at in more

20   detail -- I'm sorry.

21   **BY MR. CONNETT**

22   **Q.**   I just want to be clear, Doctor, because we've heard a lot

23   about the importance of systematic review.

24        And are you prepared to provide expert testimony to this

25   Court on a body of literature that you hadn't reviewed before

TSUJI - CROSS / CONNETT

1  you were retained in this case and that, at most, you skimmed

2  as part of your review in this case?

3          **MR. ADKINS:**  Objection.  Argumentative.

4  **A.**  I looked at --

5          **THE COURT:**  Hold on.  Hold on.  You misstated her

6  testimony.  She said she skimmed some and looked at others.

7      So your question is overbroad.  Rephrase it.

8          **MR. CONNETT:**  Thank you, Your Honor.

9  **BY MR. CONNETT**

10 **Q.**  Do you feel, Dr. Tsuji, that you are qualified to provide

11 expert testimony on the full extent of the animal literature

12 dealing with changes going on inside of the brains of the

13 animals?

14 **A.**  I relied on the findings of previous reviews, 2006, a

15 review in 2009 that was set aside, and I've looked at some of

16 that literature as part of my professional consulting work on

17 projects.

18     I also have looked at the conclusions of NTP and other

19 organizations, NAS more recently, about --

20         **THE COURT:**  Hold on, Dr. Tsuji.  You're not answering

21 the question.

22     I think the question was specific about your expertise in

23 this case, about those studies that only looked within the

24 brain and not the outward behavioral manifestations in animals.

25     Are you in a position to give expert testimony on those

1  studies?

2          THE WITNESS:  That was not the focus of my review,

3  and I think they have -- because they have been reviewed by

4  other authoritative bodies and not been found to be conclusive.

5  So I set them aside.  Although I looked at some of those

6  studies, particularly ones that also had functional testing, if

7  there were any consistencies there.

8       So my focus is -- correct.  My focus was on a systematic

9  review of the functional experimental animal testing,

10  particularly for learning and memory, because that was more

11  informative.

12          THE COURT:  Okay.  Thank you.

13  BY MR. CONNETT

14  Q.  Earlier in this case the Court heard testimony from the

15  representative of the CDC who testified that the CDC accepts

16  the NRC's summary of the hazard with respect to the changes

17  that go on inside the brain of fluoride-treated animals.

18       Do you -- do you agree with the CDC on that?  Do you also

19  accept the NRC's findings on the hazard?

20  A.  Well, certainly it -- again, it speaks to potential and

21  hazard, which is, could it cause it at any dose?

22       But none of the authorities that reviewed it have

23  concluded how exactly it's causing those effects.  But

24  certainly it does note a hazard.

25          MR. CONNETT:  Your Honor, at this point could I show

```
 1   a figure from Dr. Thiessen's expert declaration?

 2          THE COURT:  Well, maybe you can be a little bit more

 3   specific so counsel can respond.

 4          MR. CONNETT:  Yes.  It's the figure that has been

 5   previously discussed.  It's Page 43 of Dr. Thiessen's

 6   declaration.

 7          THE COURT:  Page?  What page?

 8          MR. CONNETT:  43, Your Honor.

 9          THE COURT:  43 of the declaration.  I don't see --

10   maybe 42?

11          MR. CONNETT:  Yes.  I was going by the PDF

12   pagination.  42.

13          THE COURT:  All right.  Any objection?

14          MR. ADKINS:  I think if there is a foundation that

15   the witness looked at this, which shouldn't be an issue, I have

16   no objection.

17          THE COURT:  All right.  Why don't you lay that

18   foundation?

19   BY MR. CONNETT

20   Q.   Dr. Tsuji, I understand that you have --

21        (Court reporter clarification due to audio

22         interference.)

23          THE COURT:  Hold on.

24        Mr. Adkins, for some reason your microphone is very

25   sensitive.  Every time you move a paper, it obstructs.
```

TSUJI - CROSS / CONNETT

```
 1        And you might even want to mute.  And when you want to
 2   object, you can hold down the space bar without having to go to
 3   that lower corner.  If you just hold down the space bar, that
 4   will automatically unmute you to make your objection.
 5        But if you need to shuffle papers, I would go to mute.
 6        MR. ADKINS:  I have been doing my best for that.  I
 7   just jostled a little bit and missed it.  But I'll do a better
 8   job.  Thank you.
 9        THE COURT:  If it continues to be a problem, I'm
10   going to ask you to mute and then you can unmute by pressing
11   the space bar.  I assume you have a space bar.  That
12   effectively unmutes it as long as you hold that space bar down.
13   Okay?
14        All right.  Why don't you reask the question?
15   BY MR. CONNETT
16   Q.   Dr. Tsuji, I understand you have reviewed Dr. Thiessen's
17   declaration in this case?
18   A.   Yes.
19        (Document displayed.)
20   Q.   Now I've just put on the screen a figure from
21   Dr. Thiessen's report.  It's Page -- can you see that on your
22   screen?
23   A.   Yes.
24   Q.   Now, I'm looking at the solid boxes that we see at the 45
25   milligram per liter concentration.  Dr. Thiessen explained that
```

TSUJI - CROSS / CONNETT

1  each of these studies found adverse effects at this

2  concentration.

3      Dr. Tsuji, you agree that the animal studies are almost

4  unanimous in finding neurotoxic effects at 45 parts per

5  million; correct?

6  **A.**   Yes.  And many of them also find weight loss or lack of

7  weight gain.

8  **Q.**   In fact, Dr. Tsuji, you find the evidence of harm at 45

9  parts per million to be so clear that you did not think it was

10  even necessary for the McPherson study to test the rats at this

11  concentration; correct?

12  **A.**   Well, I had concerns that it would not be possible to

13  really test whether learning and memory was happening or

14  something else was happening to the rats because it was getting

15  too high and causing other -- either other toxic effects,

16  systemic effects, or the rats don't like drinking that much

17  sodium, or the taste of the water, or something of that nature.

18      I also find the McPherson study should actually be

19  replicated nine times because they tested nine different tests,

20  and so they are not just one study.

21  **Q.**   Let me then ask you the same question I asked you at your

22  deposition.

23      Dr. Tsuji, do you think the McPherson study, which I'm

24  pointing to here with the pointer.  Do you think that McPherson

25  study should have also tested fluoride at a concentration of

1  about 45 parts per million?

2  **A.**   It would have been nice because then we have -- we'd a

3  well-conducted study that looked at that level.  But, again, I

4  would hope that they would measure a lot of clinical chemistry

5  and body weight and food intake and water intake.

6      I think at 20 -- getting much above 20, that's where we

7  start seeing animals having these effects.  So I'm not sure how

8  helpful it would be to go all the way up to 45, but it would

9  have been nice to have a dose above 20.

10         **MR. CONNETT:**  Your Honor, at this time I'd like to

11 introduce impeachment testimony.  And the page is 291, Lines 6

12 to 20.

13         **THE COURT:**  Any objection?

14         **MR. ADKINS:**  I think the witness's answer extends

15 onto Page 292, Line 4.

16     So my objection is that this would be an incomplete

17 answer.

18         **THE COURT:**  All right.  Why don't you read the whole

19 thing?

20         **MR. CONNETT:**  Okay.  Mr. Dixon, can you put it up on

21 the screen?

22     (Document displayed.)

23 **BY MR. CONNETT**

24 **Q.**   (As read)

25     "QUESTION:  Would you agree that the McPherson study

TSUJI - CROSS / CONNETT

1     would be more informative on the relationship between

2     fluoride and learning and memory impairments if it had

3     included a dose group of, say, 40 ppm or 45 ppm?

4     "ANSWER:  I think at that point it's fairly clear in

5     animal literature you're going to have effects.  I

6     think they thought they might have effects at 20.  I

7     don't know what they would have thought, but they

8     think -- from what I can see in hindsight, it appears

9     that based on the limitations they had, they were

10    trying to pinpoint where a NOAEL would be, not

11    reconfirm where I think we already know that animals

12    lose weight and have problems.

13        "So given their limitations, it's probably what

14    they did was about as best as you could do.  Now, in

15    hindsight you could always design further studies to

16    investigate other doses."

17        MR. CONNETT:  Thank you, Mr. Dixon.  You can take

18  that down.

19        (Document removed from display)

20  BY MR. CONNETT

21  Q.   Dr. Tsuji, you agree that animal studies have generally

22  been consistent in finding neurotoxic effects in rats exposed

23  to more than 20 parts per million fluoride; correct?

24  A.   Well, it's not clear -- and the NTP has commented on this

25  extensively.  It's not clear if those are direct or indirect

1  effects, but yes, you see more consistent effects in the

2  neurobehavioral testing.

3  **Q.**   Now, Dr. Tsuji, you agree that with the exception of

4  dental fluorosis, if EPA were doing a risk assessment on

5  fluoride neurotoxicity and just looking at the animal data,

6  20's parts per million would be a reasonable NOAEL; correct?

7           **MR. ADKINS:**  Objection, foundation.

8           **THE COURT:**  Overruled.

9  **A.**   Well, given what they have right now they could use that.

10 In a perfect world it would have been better to have a

11 well-conducted study testing doses above 20 to pinpoint where

12 you're going to have an effect level and where that NOAEL

13 effect level really lies.

14 **BY MR. CONNETT**

15 **Q.**   Just to be clear, at your deposition you agreed that 20

16 parts per million is a reasonable NOAEL to use if you're just

17 looking at the animal data; correct?

18 **A.**   With what you had right now, yes.  If that's all you have

19 right now.

20 **Q.**   Now, Dr. Tsuji, at this concentration of 20 parts per

21 million the McPherson study found an increase in pain

22 sensitivity; correct?

23 **A.**   It found that effect and many assume that any difference

24 from the control is an adverse effect.  However, you have to

25 look at the body of literature on whether it makes sense.

1        When you do a lot of different tests, like McPherson did,

2    there is always a chance that somewhere you're going to have

3    positive findings in some test or another.  And I can give you

4    some examples, even in that study.  But that really don't make

5    sense and are chance.

6        Now, you also have to look at the body of literature on

7    fluoride, which shows that in animals at the higher doses, on

8    that hot plate latency test they have a decreased pain

9    sensation.  So that makes you wonder whether -- and there's

10   other tests that showed more depressive effects.

11       So that makes you wonder whether that increase -- or

12   decrease latency on the hot plate really is random or is it an

13   effect.

14   Q.   Well, Dr. Tsuji, you have stated that you would find any

15   adverse effect from any of the tests conducted in the McPherson

16   study to be a meaningful result; correct?

17   A.   I think if the -- if they concluded it was an adverse

18   effect, that would be meaningful.

19   Q.   Okay.

20            MR. CONNETT:  Your Honor, I would like to introduce

21   impeachment testimony Page 152, Lines 4 to 15.

22            THE COURT:  All right.  Any objection?

23            MR. ADKINS:  What was the page again, counsel?

24            MR. CONNETT:  152, Lines 4 to 15.

25       (Brief pause.)

```
 1              MR. ADKINS:  Yes, I do object.
 2         One, it's an incomplete explanation of the witness's
 3    answer.
 4         And, two, it's not an inconsistent statement.
 5              THE COURT:  This is Page 152?
 6              MR. CONNETT:  Correct.
 7              THE COURT:  At line -- hold on.  What line?
 8              MR. CONNETT:  4 to 15 your Honor.
 9              THE COURT:  4 to 15?
10              MR. CONNETT:  Yes.
11         (Brief pause.)
12              THE COURT:  Well, I would read the complete answer.
13              MR. CONNETT:  Okay.  Will do, your Honor.
14         Mr. Dixon, can you put Page 152 on the screen?
15         (Document displayed.)
16    BY MR. CONNETT
17    Q.   (As read)
18         "QUESTION:  So if McPherson's study had found an
19         effect in one of those studies, would you find that to
20         be significant?
21         "ANSWER:  In what way?
22         "QUESTION:  In that it would be a meaningful result
23         for you or not?
24         "ANSWER:  I would find any results of McPherson to be
25         meaningful because they -- the study was planned to
```

1          identify all the deficiencies that were noted by NTP

2          2016, of which there were many.  And, therefore, the

3          way that McPherson, et al conducted their study was

4          much more robust and of higher quality than many of

5          the other studies -- I guess all the other studies in

6          the literature.  And as a result, I really was

7          interested in what they were finding in their studies

8          because they addressed many of the same tests that

9          were run in the literature."

10              MR. CONNETT:  Mr. Dixon, you can take that down.

11          (Document removed from display)

12     BY MR. CONNETT

13     Q.   And, Dr. Tsuji, other studies before McPherson had also

14     found an increase in pain sensitivity from fluoride exposure;

15     correct?

16     A.   I remember a test on a hot plate in which they had a

17     decreased -- I mean, they had a -- it seemed like decreased,

18     the opposite effect.

19              MR. CONNETT:  Your Honor, at this time we would like

20     to introduce impeachment testimony, Page 315, Lines 2 to 6.

21              THE COURT:  All right.  Give counsel a chance to

22     look.

23              MR. ADKINS:  No objection.

24              THE COURT:  All right.  Go ahead.

25

1   BY MR. CONNETT

2   Q.   (As read)

3        "QUESTION:   And this was not the first study on

4        animals to find that fluoride increases pain

5        sensitivity; correct?

6        "ANSWER:   There are other studies out there, yes."

7   A.   Now, since then I  --

8   Q.   There is no question pending, Doctor.

9        THE COURT:   All right.   Given the nature of this, I'm

10  going to let her explain.

11       Go ahead.

12  A.   At the time I thought that the result I was remembering

13  was the same as McPherson.   But when I went back and looked

14  after my deposition, I found it was the opposite and there were

15  other studies that integrated higher fluoride exposure causes

16  more depressive effects.

17  BY MR. CONNETT

18  Q.   Now, the statistical --

19       THE COURT:   Let me ask a question.

20       Are you saying there are no studies that were consistent

21  with McPherson?   You said there were some that were

22  inconsistent.   Were there any studies that were consistent with

23  respect to sensitivity to pain?

24       THE WITNESS:   I looked at that.   The one I found --

25  and, also, McPherson found one aspect of the water maze where

**TSUJI - CROSS / CONNETT**

1   the rats swam faster.  They didn't necessarily perform worse,

2   but they swam faster, but it was statistically significant.

3        What I could find was that the opposite happened in higher

4   doses in other studies; that rats stayed longer on the hot

5   plate and they didn't swim directly to the platform.  They swam

6   more erratically.

7   **BY MR. CONNETT**

8   **Q.**   All right.  But you didn't see any other studies that were

9   consistent with the effect found in McPherson?

10  **A.**   Not from my quick look afterwards.

11            **THE COURT:**  All right.  Thank you.

12  **BY MR. CONNETT**

13  **Q.**   Now, Dr. Tsuji, the statistical odds that the increase in

14  pain sensitivity reported in McPherson was just a fluke chance

15  are less than .5 percent; correct?

16  **A.**   Yes.  But that percent, chance of finding that .5 percent

17  gets higher if you do more tests.  Although they did do some

18  proper statistics to try to eliminate that, but you can't

19  completely eliminate it.

20        And I mentioned also in my deposition, it's not exactly at

21  the same place, but it's a few -- maybe a page later I refer

22  again to noting that when you do that many tests, there is a

23  possibility you're going to find results that are chance or

24  not -- not exactly an adverse effect.  But just because you've

25  just have been doing so many tests, you can have these chance

 1   results.

 2   Q.   Dr. Tsuji, you claim to have conducted a systematic review

 3   in this case; correct?

 4   A.   Yes.

 5   Q.   And as the Court heard on Friday, one of the main goals of

 6   systematic review is to promote transparency; do you understand

 7   that?

 8   A.   Yes.  That's one of the goals.  There are other goals,

 9   too.

10   Q.   Yet, in your expert report, despite finding the McPherson

11   study to be such an important study, you never once even

12   disclosed that the McPherson study found an increase in pain

13   sensitivity; did you?

14   A.   I was focusing on the overall results that would inform us

15   about learning and memory.

16   Q.   And the -- of all the learning and memory studies that you

17   identified in your systematic review, every published paper

18   which you found which did not find an effect on learning and

19   memory was also identified by Dr. Thiessen in her expert

20   report; correct?

21   A.   Yes.

22   Q.   And --

23   A.   But she didn't discuss all the tests of the McPherson

24   study.  So, therefore, they weren't really covered in her

25   report.

**TSUJI - CROSS / CONNETT**

1   Q.   Right.  But, Doctor, you just testified that you,

2   yourself, in your expert report never even discussed or

3   disclosed the increase in pain sensitivity in that study; did

4   you?

5   A.   That was one test that wasn't measuring learning and

6   memory.

7   Q.   So you criticized Dr. Thiessen for not discussing the pain

8   sensitivity findings, but you, yourself, didn't discuss it; is

9   that correct?

10  A.   No.  I criticize her for not discussing the learning and

11  memory studies in her report.

12  Q.   Well, she did discuss the absence of the learning effect

13  in her report; correct?

14  A.   Yes.  But she doesn't talk about what the nature of the

15  study was, how well it was conducted, the number of animals,

16  the investigator blinding, the randomization, the different

17  aspects, especially the Morris water maze test, which is the

18  best test in animals for assessing learning and memory, it's

19  generally considered.

20       The Morris water maze test that was done by McPherson

21  looked at a number of different aspects, many of which are not

22  even investigated or reported on by the other studies in the

23  literature.

24  Q.   Now, the McPherson study also found that the rats in the

25  20 ppm group swam faster than the controls; correct?

1    **A.**    Yes, but they also swam directly to the platform.   There

2    was no difference in the path they took, and they identified

3    the right path -- platform.

4         The probe test also indicated that there was no difference

5    from controls in the time they spent in the goal quadrant where

6    they should be.   So there was -- McPherson concluded that it

7    was -- there was no adverse effect on learning and memory.

8    **Q.**    But just to be clear, "yes" or "no," did the rats in the

9    20 ppm group swim faster than the control rats?

10   **A.**    The rate that they got to the goal platform, where they

11   should be, was statistically faster than the controls.

12   **Q.**    And yet they traveled the same distance; correct?

13   **A.**    Yes.

14   **Q.**    So they got there quicker, but they traveled the same

15   distance?

16   **A.**    Yes.

17   **Q.**    And that's indicative of swimming faster; correct?

18   **A.**    Yes.

19   **Q.**    And as a general rule, hyperactive animals tend to swim

20   faster than healthy animals; correct?

21           **MR. ADKINS:**   Objection.   Foundation.

22           **THE COURT:**   Overruled.

23   **A.**    Hyperactive animals tend to swim erratically.   They

24   will -- and it interferes with their ability to get quickly to

25   the goal.

1    BY MR. CONNETT

2    Q.   In your declaration and today you've talked about body

3    weight changes are often observed in fluoride-treated animals.

4         But you do not provide in your report, in your declaration

5    any actual data to permit this Court to see how frequent or

6    infrequent those body weight changes are; do you?

7    A.   I didn't summarize it in my report because the problem

8    with that is many of the -- many of the studies did not even

9    report the health of the animal.  The body weight of the

10   animal.  So we don't know if they lost weight or not.

11        Studies that report on body weight often find reduced body

12   weight compared to the controls when you look at these higher

13   exposure concentrations.  Also, body weight is a very gross

14   measure of health.

15   Q.   But nowhere in your report or in your declaration did you

16   isolate out all the studies that have reported on body weight

17   to show how frequent or infrequent those body weight changes

18   are; did you?

19   A.   Actually, I do report a number of studies that showed

20   these body weight changes.  If you go through my report, again

21   I didn't itemize them in one list, but I note in several places

22   studies that reported this.

23        But most of the studies -- many of the studies do not

24   report body weight, and that is really concerning.

25   Q.   It's correct to say that you did not systematically assess

 1   body weight changes in the animal literature; correct?

 2   A.    I looked at the new -- the updated literature that I did

 3   the review on.

 4   Q.    Now, at no point in your expert report or your declaration

 5   do you ever address what the EPA says about interpreting body

 6   weight changes in neurotoxicity studies; correct?

 7   A.    EPA has very -- some general guidelines, which,

 8   unfortunately, I think are outdated.  That was published in

 9   1998.  And subsequent authorities consider changes in the

10   health of the animals, which is grossly reflected by these body

11   weight reductions.  And in some extreme cases complete loss of

12   litters.  And that you really have to be concerned about in

13   toxicity testing.  Not even just for neurotoxicity, but in

14   general for developmental studies or even ordinary toxicity

15   studies of animals.

16   Q.    Okay.  So this is a simple "yes" or "no" question.

17         At any point in the trial declaration that you have

18   submitted to this Court, do you ever discuss what the EPA says

19   about body weight changes and neurotoxicity studies and your

20   assessment of it?  Nowhere in your declaration can there be

21   found a discussion on that; correct?

22   A.    I do not cite the 1998 guidelines.  I'm basing it on the

23   scientific literature and my experience in conducting toxicity

24   studies.

25   Q.    Now, Dr. Tsuji, at your deposition and today you've

**TSUJI - CROSS / CONNETT**

 1  acknowledged that drinking fluoridated water during infancy

 2  causes dental fluorosis; correct?

 3  A.   Yes.

 4  Q.   And are you aware, Dr. Tsuji, that many children living in

 5  fluoridated areas today do, in fact, have mild dental

 6  fluorosis?

 7  A.   I'm not an expert on the prevalence of dental fluorosis.

 8  Q.   Now, the rats in the 20 ppm group in the McPherson study,

 9  they had mild dental fluorosis on their teeth; correct?

10  A.   Yes.

11  Q.   And, Dr. Tsuji, you would certainly expect that human

12  infants drinking formula with 20 parts per million fluoride

13  would develop much more severe fluorosis than just mild

14  fluorosis; correct?

15  A.   Oh, surely.  20 milligram per liter for humans is a much

16  higher number than for rats.  You have to take into account, of

17  course, that human equivalency is going to result in a lower

18  level, as I noted.  One way might be the five times, which

19  would be about 4 milligram per liter.

20  Q.   All right.  And that five times factor that you just

21  identified, Dr. Tsuji, that reflects differences in

22  toxicokinetics between rats and humans, where rats require more

23  fluoride to ingest to get the same concentrations of fluoride

24  in the blood; correct?

25  A.   Yes.  That's what that is based on.

1  **Q.**   But that factor, Dr. Tsuji, of toxicokinetics, that does

2  not encompass or incorporate differences in toxicodynamics;

3  correct?

4  **A.**   Well, when you do a -- if you were to do some more precise

5  calculations, you would have to investigate that.  And for

6  fluoride you would have to consider whether it's metabolized or

7  not.  It's a fairly simple ion, so you don't have to worry

8  about that complication and that difference in humans.

9  **Q.**   Well, Dr. Tsuji --

10  **A.**   But, yes, there may be some things that are not included

11  in that comparison of serum levels.

12           **THE COURT:**  Hold on.

13       Counsel, maybe you can elicit from the witness for the

14  Court's benefit the difference between toxicokinetics and

15  toxicodynamics, because you're all speaking in inside ballpark

16  language.

17  **BY MR. CONNETT**

18  **Q.**   Dr. Tsuji, I'll try to give you my summary and you tell me

19  if this is generally correct.

20       Toxicokinetics refers to the absorption and distribution

21  of a chemical through the body and gives you a sense of how

22  much of the chemical will get to the target site of interest.

23       Would that be a fair summary?

24  **A.**   Yes.  Has to do with absorption and distribution,

25  elimination, things of that nature.

1  Q.   Okay.  Toxicodynamics, on the other hand, refers to the

2  level of the chemical at the target site that actually can

3  produce the effect; correct?

4  A.   Yes.  It also has to do with things like differences in

5  receptor binding or metabolism into other types of metabolites

6  and things like that.

7  Q.   And you agree, Dr. Tsuji, that in addition to accounting

8  for the differences in toxicokinetics between rats and humans

9  on fluoride, we also need to account for the differences in

10  toxicodynamics; correct?

11  A.   If one were doing a risk assessment, yes.  And also, I

12  guess, in considering effects.

13  Q.   And EPA, when they adjust for the difference in

14  toxicodynamics between rats and humans, EPA uses a factor, an

15  uncertainty factor of three; correct?

16  A.   That's the standard default factor.

17  Q.   So I want to repeat where we have been.

18       You start with 20 ppm in McPherson.  That's the rat level.

19  To account for toxicokinetics, you divide by five, which gets

20  you down to four parts per million.  And then to account for

21  toxicodynamics, you divide by another three, which gets you

22  down to about 1.3 ppm.

23       Is that correct, Dr. Tsuji?

24  A.   Yes.  The other way that it's done, of course, is using

25  the body weight, the three-quarter body weight assumption,

```
 1   which gets you to a different number, but somewhat similar.
 2   Q.   Okay.  Now, the McPherson study was a single generation
 3   study; correct?
 4   A.   Yes.
 5   Q.   And the NTP, the National Toxicology Program has issued
 6   guidance on testing developmental neurotoxicity in single
 7   generation studies; correct?
 8   A.   Well, that guidance you're referring to also includes
 9   collecting information of use for a cancer bioassay, and that
10   becomes important in what species you select.
11   Q.   Okay.  Now in that guidance the NTP identified Sprague
12   Dawley rats as the preferred species to use --
13        (Court reporter clarification.)
14            MR. CONNETT:  Your Honor, I'll move on because we're
15   running short on time here.
16   BY MR. ADKINS
17   Q.   Dr. Tsuji, in your expert report in this case you relied
18   upon OECD's guidelines for developmental neurotoxicity studies;
19   correct.
20   A.   That's one of them.
21            MR. CONNETT:  And for the benefit of the court
22   reporter, OECD is Organization for Economic Cooperation and
23   Development.
24   BY MR. CONNETT
25   Q.   That's correct Dr. Tsuji; right?
```

TSUJI - CROSS / CONNETT

1  **A.**    Yes.  In the European guidance.

2  **Q.**    And the OECD guidelines recognized that different strains

3  of rats may have differing performance attributes; correct?

4  **A.**    That's a general statement, yes.

5  **Q.**    And the OECD guidelines also state that at a minimum the

6  dosing should begin at gestational day six; correct?

7  **A.**    Yes.

8  **Q.**    So to be clear, the OECD guidelines don't recommend

9  against dosing from day zero of gestation, do they?

10  **A.**    No, they don't.

11  **Q.**    The OECD guidelines state that consideration should

12  actually be given to dosing the animals at day zero of

13  gestation; correct?

14  **A.**    I think the statement about the six, gestation day six is

15  most consistent, however, with all the other guidelines.  I

16  can't exactly remember what they say about dosing earlier.

17  **Q.**    Well --

18  **A.**    I'd have to look at that.

19          **MR. CONNETT:**  Your Honor, we'd like to introduce

20  impeachment testimony, Page 301.

21          **THE COURT:**  All right.  Line?

22          **MR. CONNETT:**  Lines 5 to 17.

23      (Brief pause.)

24          **THE COURT:**  Any objection?

25          **MR. ADKINS:**  Yes, Your Honor.

1      First, I think the witness's testimony was that she

2  doesn't recall.  So if this is being used to refresh, I think

3  the OECD guidelines would be a more appropriate document.

4      And then, second of all, this is, again, an incomplete

5  quotation from the witness's answer.  And it should be extended

6  to 302, Line 1.

7          THE COURT:  All right.  Overruled, but I want the

8  whole section to be read.

9      Go ahead.

10     (Document displayed.)

11 BY MR. CONNETT

12 Q.  (As read)

13     "QUESTION:  And OECD states dosing may begin from the

14     initiation of pregnancy, gestational day zero,

15     although consideration should be given to the

16     potential of the test substance to cause

17     preimplantation loss.  Did I read that correctly?

18     "ANSWER:  Yes.

19     "QUESTION:  So what OECD is saying here is if you have

20     reason to know that starting treatment at gestational

21     day zero won't cause preimplantation loss, go ahead

22     and start the treatment at gestational day zero;

23     right?

24     "ANSWER:  Yes.  They say 'may begin.'  They also note

25     that in many times that it may be impractical when you

TSUJI - CROSS / CONNETT

```
 1        have these laboratory time-mated animals to begin

 2        dosing at gestation day zero, and that's what

 3        McPherson, et al used."

 4             MR. CONNETT:  Thank you, Mr. Dixon.

 5        (Document removed from display)

 6   BY MR. CONNETT

 7   Q.   Now, Dr. Tsuji, prior to the McPherson study, a number of

 8   the fluoride studies had started the exposure at gestational

 9   day zero; correct?

10   A.   Yes.

11   Q.   And in those studies there were no reported issues with

12   preimplantation loss; correct?

13   A.   I -- I think unless you get too high maybe.  But, yes.  In

14   general, fluoride is not a reproductive toxicant.

15   Q.   Dr. Tsuji, you're familiar with the Mullenix study from

16   1995; correct?

17   A.   I haven't read it recently, but yes, at one point I did

18   read it.

19   Q.   And the Mullenix study found neurotoxic effects from

20   prenatal fluoride exposure; correct?

21   A.   Yes.  In -- in the males.  When the mothers were injected

22   with bolus doses.

23   Q.   And you would agree that the Mullenix study found the sex

24   specific effect where the males were more susceptible when

25   exposed in utero than the females; correct?
```

**TSUJI - REDIRECT / ADKINS**

1   A.   Yes.

2   Q.   And it's not uncommon in neurotoxicity research to find

3   sex specific effects, is it?

4          MR. ADKINS:  Objection.  Scope.

5          THE COURT:  Why don't you narrow that question?

6   BY MR. CONNETT

7   Q.   Dr. Tsuji, you're familiar with your research on arsenic

8   and lead and other neurotoxicants that sex specific effects are

9   often identified in the literature; correct?

10  A.   Yes.  What's causing it differs.  For example, in arsenic,

11  there is a suggestion that it is more likely cultural practices

12  and not giving girls sufficient nutrition, because they also

13  were lower body mass and had growth problems compared to the

14  boys.

15         MR. CONNETT:  Thank you, Your Honor.  I have no

16  further questions at this time.

17         THE COURT:  All right.  Thank you.

18     Any redirect?

19         MR. ADKINS:  Yes, Your Honor.

20                  <u>**REDIRECT EXAMINATION**</u>

21  BY MR. ADKINS

22  Q.   Dr. Tsuji, you testified that your arsenic 2015 study was

23  a worst case analysis.  Can you please explain what you meant

24  by that?

25  A.   Yes.  We made many assumptions against, really, what the

1  scientific evidence would say just so we could extrapolate the

2  dose response that Hamadani, et al reported in Bangladesh in

3  girls to what it might mean at a one IQ point loss for a

4  reference dose.

5      And so, for example, it's not clear that really is a dose

6  response that is caused by arsenic in that population because

7  of the nutritional problems I talked about.  We made

8  assumptions about you could extrapolate the testing that --

9  type of testing that was done to the U.S. population.

10      They didn't have complete correction for maternal IQ.  I

11  think that is also the case in some of the fluoride studies.

12      They -- there were other things that we just used a

13  default rather than -- for this first go-around we just

14  thought, okay, let's make a very conservative worst case

15  extrapolation and see what that means.

16      As I said, we could have tried using the U.S. data, but

17  the best conducted U.S. study did not indicate a dose response

18  for IQ and arsenic.

19  **Q.**   Dr. Tsuji, you were also shown Page 42 of Dr. Thiessen's

20  declaration in this case.  Do you recall that?

21  **A.**   Yes.

22          **MR. ADKINS:**  Your Honor, may we go back to that page,

23  Page 42 of Dr. Thiessen's declaration?

24          **THE COURT:**  Yes.

25          **MR. ADKINS:**  Okay.  Mr. Hambrick, can you please put

 1   T-45 on the screen, PDF Page 43?

 2       (Document displayed.)

 3   **BY MR. ADKINS**

 4   **Q.**   Dr. Tsuji, I understood your testimony to be that there

 5   were near unanimous effects at the 45 milligram per liter dose;

 6   is that correct?

 7   **A.**   Yes.

 8   **Q.**   And you testified that you also saw effects on body and

 9   weight gain at those doses; is that right?

10   **A.**   Yeah.  In studies that report body weight gain, you often

11   see that.  There are a few studies.  I think the Donna Pace

12   (phonetic spelling) used 50 and didn't find, but that was a --

13   it was a U.S. study, an older study.  Interestingly enough,

14   they didn't find body weight gain -- or body weight problems.

15       So, but a lot of these studies that are conducted in other

16   countries, they are finding these effects.

17   **Q.**   And could you just explain for us, what do you mean when

18   there was an effect on body and weight gain?

19   **A.**   The animals did not grow as fast.  In some of the studies

20   they actually measured the water intake.  The animals were not

21   drinking enough water.

22       One of the studies noted that, actually, at a very low

23   dose, 22.6.  And so I think there is a problem with that study.

24   Maybe they didn't measure the fluoride concentration accurately

25   or the dietary concentration.

1          But the mother rats in the highest dose group at 22.6

2     milligram per liter weren't drinking enough water such that

3     many of the litters had pups that starved because they weren't

4     getting enough milk.

5     **Q.**   And so what is -- what is your overall conclusion with

6     respect to the meaning behind these effects on weight gain as

7     it relates to your opinion in this case?

8     **A.**   Well, it's well known that insufficient nutrition in

9     animals and in humans can effect a lot of your body systems,

10    including neurodevelopment.

11         So when you have that effect going on, as you get higher

12    in doses in the animals -- and, again, we don't very

13    well-conducted studies above 20 milligram per liter -- then it

14    becomes even harder to use animal data at those levels to make

15    any conclusions about effects in humans at much lower doses.

16    **Q.**   Dr. Tsuji, you also spoke of the Mullenix study.  Do you

17    recall that?

18    **A.**   Yes.

19    **Q.**   And you used a term bolus dosing.  Can you please explain

20    what you mean by that?

21    **A.**   Yes.  The mothers were injected at certain points in

22    gestation with large doses of fluoride.  And although on a

23    milligram per day basis it might be similar to what they -- an

24    animal might drink from fluoride, being injected all at once

25    into the body means that a lot more fluoride is -- a lot more

1  concentrated fluoride is in the body at a time.  And,

2  therefore, it can cause effects, including on the developing

3  fetus.

4  **Q.**   Do you recall what the dose was in the Mullenix study?

5  **A.**   I don't recall off the top of my head.  I'm sorry.

6  **Q.**   Do you recall whether the dose in the Mullenix study was

7  relevant to fluoride exposures in the U.S. population?

8          **MR. CONNETT:**  Leading.

9          **THE COURT:**  Overruled.

10 **A.**   I remember it was -- it was high.  And afterwards the pups

11 were given doses that were really high.  At the top dose, at

12 175 -- in fact, I think they only used females at the higher

13 doses, maybe because there were insufficient male pups that

14 survived.  But at 175 all of the animals died of dehydration

15 because they weren't drinking the water.

16 **Q.**   Dr. Tsuji, before your work on this case had you ever

17 taken any scientific position on the safety of community water

18 fluoridation?

19 **A.**   No, I don't think so.

20 **Q.**   And before your work on this case had you ever taken any

21 scientific position on the potential hazards of community water

22 fluoridation?

23         **MR. CONNETT:**  Your Honor, this is beyond the scope.

24         **THE COURT:**  I will allow it.  Overruled.

25 **A.**   No.

1  BY MR. ADKINS

2  **Q.**   Do you think this makes you more or less qualified to

3  offer the kind of opinions on the state of the toxicological

4  literature regarding fluoride that you offered in your

5  testimony in this case?

6  **A.**   Well, I really haven't considered the benefits or those

7  other issues.   I just looked at the toxicology literature.   I

8  tried to just concern myself with what the science is and

9  what -- what it's saying and what we can make of it,

10  particularly with respect to the experimental animal studies.

11            **MR. ADKINS:**  Your Honor, would you permit a brief

12  indulgence while I confer with my colleague?

13            **THE COURT:**  Okay.

14       (Discussion held off the record between defense

15        counsel.)

16            **MR. ADKINS:**  Your Honor, we pass the witness.   Thank

17  you.

18            **THE COURT:**  All right.   Thank you.

19       Anything on recross?

20            **MR. CONNETT:**  Yes.   Briefly, your Honor.

21            **THE COURT:**  Okay.

22            **MR. CONNETT:**  I'm going to call up the same figure

23  from the Thiessen declaration, your Honor.

24       (Document displayed.)

25

1                          <u>RECROSS-EXAMINATION</u>

2    **BY MR. CONNETT**

3    **Q.**   Okay.  Dr. Tsuji, can you see this figure again on your

4    screen?

5    **A.**   Yes.

6    **Q.**   So counsel was asking you some broad questions about body

7    weight changes, and I just want to be clear.

8         In these ten studies, Dr. Tsuji, that we are looking at

9    here, none of these studies found body weight changes in the

10   animals at the lowest doses; correct?

11   **A.**   Not at the lower doses.  Let me see.

12        Yeah, I think they started in Jiang at the 22.6.

13   **Q.**   In fact, Dr. Tsuji, there are -- six of these ten studies

14   reported body weight; correct?

15   **A.**   I don't recall off the top of my head, but I believe so.

16   **Q.**   Now, do you have any reason to disagree with what

17   Dr. Thiessen said; that of the six studies of these ten that

18   we're looking at that reported body weight changes, only one

19   study found an effect on body weight?  Do you have any reason

20   to disagree with that observation?

21   **A.**   I thought -- I'd have to go back and look, but I thought

22   Sun found some effects.  I'd have to go look.

23   **Q.**   Do you have any reason to disagree with what Dr. Thiessen

24   said, which is of the six studies that reported body weight

25   changes in the studies that we're actually looking at on this

```
 1    screen, only one study found an effect on body weight, and in

 2    that study it was only at the highest level?  Do you have any

 3    basis to disagree with that?

 4              MR. ADKINS:  Objection.  Objection.  Asked and

 5    answered.  If counsel wishes to refresh the witness's

 6    recollection, he's welcome to do so.

 7              THE COURT:  Overruled.  It's not been answered.

 8    A.    That is not quite correct.  So in Jiang, they had body

 9    weight problems beginning at 22.6.  And then I think they had

10    body weight problems at the higher dose as well.

11          And I think they had body weight problems -- they had body

12    weight problems at three doses I thought.

13    BY MR. CONNETT

14    Q.    So you're pointing --

15    A.    The dose in between as well that they had body weight

16    problems.

17    Q.    So you're pointing to one study here, the Jiang 2014 study

18    that we see on the right.  You're saying that body weight

19    changes were observed, as you noted in your report, at 23 parts

20    per million; correct?

21    A.    Yes.

22    Q.    Can you point me, Dr. Tsuji, to any other study here in

23    this figure that we're looking at, where they found any body

24    weight changes at all?

25    A.    Well, I think as you noted, that two of them didn't report
```

 1    on body weight.  And the others, like McPherson and the Bartos

 2    studies, are at low doses.

 3          I'd have to go back and look, but I thought there might

 4    have been some issues in some of the others.  But Chen and

 5    Wang, and Cui especially is a poorly-conducted study.  You

 6    know, I'd have to go look at that issue.

 7          And there were other studies --

 8              MR. CONNETT:  Your Honor --

 9    A.    -- that had body weight problems.

10              THE COURT:  All right.  Well, I got the answer.  Go

11    ahead.

12    BY MR. CONNETT

13    Q.    So lastly, Dr. Tsuji, you have been talking about the word

14    "taste" and how water tastes for the rats.

15          I looked at the NTP's 2016 report.  I searched for the

16    word "taste."  I didn't find it.

17          Why don't you think the NTP talked about this word "taste"

18    in their analysis of the literature?

19              MR. ADKINS:  Objection.  Exceeds the scope of

20    redirect.

21              THE COURT:  That's true.  Overruled -- sustained.

22              MR. CONNETT:  No further questions, your Honor.

23              THE COURT:  All right.  Thank you.

24          Anything on redirect?

25              MR. ADKINS:  None, your Honor.  Thank you.

PROCEEDINGS

```
1              THE COURT:  All right.  That will conclude your

2    testimony, Dr. Tsuji.  Thank you for your cooperation and for

3    appearing.

4              THE WITNESS:  Thank you.

5         (Witness excused.)

6              THE COURT:  So that takes us right to the

7    10:00 o'clock hour.  We'll go ahead and take our first

8    15-minute break.

9              MR. ADKINS:  Thank you.

10             THE COURT:  Thank you.

11             MR. CONNETT:  Thank you, Your Honor.

12             THE CLERK:  Court is in recess.

13        (Whereupon there was a recess in the proceedings

14          from 10:02 a.m. until 10:18 a.m.)

15             THE CLERK:  Court is now in session.  Please come to

16   order.

17             THE COURT:  All right.  Welcome back everyone.  We're

18   going to resume with the Government's case, and you may call

19   your next witness.

20             MS. BHAT:  Yes, Your Honor.  Again, this is Simi

21   Bhat.

22        Before we begin, we understand that plaintiff's counsel

23   has an objection with one of the lines of inquiry that we are

24   planning to explore with this witness, and we just wanted to

25   address it up front.
```

PROCEEDINGS

1          THE COURT:  Okay.

2          MS. BHAT:  Let me explain.  As Your Honor knows,

3     Dr. Grandjean has testified in this case that he is an expert

4     on fluoride literature; that he's very familiar with the

5     literature and that is why he didn't need to conduct a

6     systematic review of the literature.

7          He further testified that he was very familiar with the

8     reports presented at the 2019 conference of the International

9     Society of Environmental Epidemiology.

10         As you know, your Honor, we have been exploring with

11    plaintiff's witnesses whether they were aware of another report

12    in that, presented at that conference on fluoride and

13    neurodevelopment that they did not discuss in their report.

14         Now, our witness has looked at that abstract book very

15    recently and has looked at that abstract, and she can testify

16    to the contents of that abstract.  And her testimony serves as

17    a rebuttal to the testimony that we have heard from plaintiff's

18    witnesses about their familiarity with the literature, the

19    value of the search that they did, and the value of their

20    familiarity with the literature.

21         Not only that, but it rebuts, I think, a central question

22    in this case, which is:  Do all of the prospective cohort

23    studies actually show an adverse association with

24    neurodevelopmental?

25         So this is a study that we would like to explore with this

 1   witness who has knowledge of it.

 2        THE COURT:  What is the timing of it?  Remind me when

 3   the abstract was released.

 4        MS. BHAT:  So the conference was in late August of

 5   2019, which was after our witness submitted her expert report

 6   on August 1st.  And it was -- we were included in a collection

 7   published by the journal of the International Society of

 8   Environmental Epidemiology in October.

 9        We only very recently became aware of the booklet of

10   abstracts, because you cannot actually find it on PubMed

11   because it is a collection of abstracts from a conference.

12        So the searches that our expert did back on August 1st on

13   PubMed for fluoride wouldn't have yielded this abstract

14   because, well, it didn't exist back then, and also because

15   using that search protocol you can't just bring it up.  So she

16   can attest that she only last week read this abstract from this

17   conference book.

18        Whereas, plaintiff's witnesses have attested that they

19   attended the conference, received the abstract book or were

20   given the abstract book around late August and we just haven't

21   heard about it until then -- until now.

22        THE COURT:  All right.  Response.

23        MR. CONNETT:  Yes, Your Honor.

24        On one hand, they seem to be wanting to attack plaintiff's

25   experts for not knowing about the abstract, while their own

1   experts had no idea about it until last week apparently.

2        Your Honor, this is -- the abstract came out August of

3   last year.  They had ample time to supplement their reports.

4   In fact, I didn't depose doctors -- well, they had ample time

5   to supplement.

6        The first time, your Honor, the first time that plaintiffs

7   heard from defense counsel that their experts intend to offer

8   opinions on this abstract was on Sunday afternoon at 2:00 p.m.

9   First time in this entire litigation.  Literally on the eve of

10  their expert taking the stand.

11       This is the quintessential trial by surprise.  I mean,

12  they had ample opportunity to make it part of their expert

13  disclosure, supplement their reports.  And we would have had

14  the opportunity in due course to respond.

15       Now, to the extent, your Honor, that you want the expert

16  to testify on this, then I think under Rule 37 -- because this

17  is sanctionable conduct.

18       To the extent that the -- Dr. Chang is permitted to

19  testify on this, we would ask, as a matter of fairness, as a

20  matter of right, to be able to increase our time for

21  cross-examination in this case and for rebuttal.  We would ask,

22  Your Honor, for two additional hours to plaintiff's time,

23  because we are not -- we already have a lot of material, Your

24  Honor, to cover with respect to the disclosed opinions, and now

25  we are going to have to both discover and cross-examine

1    Dr. Chang on these undisclosed opinions in the context of a

2    trial where time is a premium.

3        So this abstract, which is, I think, surprising that the

4    EPA would try to rest its case on an unpublished abstract, but

5    if that's the choice that they want to make, we're fine with

6    it, but we would ask that we have the opportunity to carefully

7    vet, carefully cross-examine Exponent scientist who now wants

8    to use this abstract for the basis of her opinion.

9        So that would be our position, Your Honor.  We think it

10   is -- we think they have violated their obligations under Rule

11   37.  We think we are prejudiced by this because we have not had

12   time to prepare this case to address this abstract.

13       But if Your honor wants to hear about it, we believe we

14   should be able to explore the foundation, as well as explore

15   the expert's opinions in full so that Your Honor is able to vet

16   the merits of this abstract.  Because we believe when you vet

17   the merits of this abstract, you are going to find that it is

18   woefully lacking.

19           THE COURT:  And are you also proposing a rebuttal

20   from one of your -- who would provide the rebuttal?

21           MR. CONNETT:  Depending on what Dr. Chang says, it

22   would be one of -- either Dr. Hu, Dr. Lanphear, Dr. Grandjean.

23   And we would have to wait to see what Dr. Chang says.

24       We are prepared to provide that rebuttal testimony, Your

25   Honor.  We are absolutely prepared.  And we are prepared to

```
 1   vigorously cross-examine Dr. Chang on this poorly-conducted

 2   abstract.

 3           THE COURT:  All right.  When did you become aware of

 4   this abstract?

 5           MR. CONNETT:  Last week.

 6           THE COURT:  So none of your witnesses had seen this

 7   abstract or was aware of it?

 8           MR. CONNETT:  As explained in the testimony, Your

 9   Honor.  These conference proceedings have, like, hundreds of

10   abstracts.  So it's not like it's, like, a five-page document.

11   They are very lengthy materials.

12       So that's plaintiff's position, Your Honor.  We would ask

13   for two additional hours for plaintiff's case, so that at the

14   end of the day this case is decided on the facts, decided on

15   the science, rather than a surprise, a tactic that EPA is using

16   at the last minute to slip under the door a very poor --

17           THE COURT:  I understand your point.

18       Ms. Bhat, why wasn't this disclosed earlier?  Just because

19   -- your side wasn't aware of this until just recently?

20           MS. BHAT:  Yes, Your Honor.  That's correct.  We

21   hadn't seen the abstract book from this conference until just

22   last week.

23           THE COURT:  What is the current status you mentioned

24   about publication?

25           MS. BHAT:  Well, your Honor, our witness can attest
```

**PROCEEDINGS**

1  to this.  She has been in contact with the authors of the

2  study, and they have said that they are submitting this paper

3  for publication within the next two or three months.  So

4  publication is not immediately imminent.  It's not going to

5  come during the course of the trial.

6      But she has been in correspondence with the authors.  They

7  have said that the findings of the final paper will be

8  substantially similar to the abstract.  And that is the status

9  of the study right now.

10     **THE COURT:**  Has there -- so submitted for

11 publication, that means there has not been a peer-review

12 process yet.

13     **MS. BHAT:**  I don't think that there has been a

14 peer-review process in a journal.

15     But as Dr. Grandjean has attested, there is a steering

16 committee for cohorts, and so I do believe that they receive

17 feedback during the course of their investigations.

18     **THE COURT:**  All right.  But it's not gone through the

19 publication peer-review process.

20     **MS. BHAT:**  It is not a peer-reviewed abstract, Your

21 Honor.

22     And I would point out that plaintiff's experts rely on

23 multiple conference abstracts or other abstracts that were not

24 peer reviewed.

25     **THE COURT:**  I understand.  I understand the tit for

**PROCEEDINGS**

 1  tat, but, frankly, we're -- this case, as I said at the outset,

 2  centers a lot on the studies, the MIREC and the ELEMENT

 3  studies.  And now you're introducing a study that has not been

 4  published, not been submitted, not been peer reviewed.

 5      On the other hand, in the interests of absorbing all the

 6  scientific information available, I'm going to allow the

 7  examination, but I am going to give plaintiffs time to cross on

 8  this.  And that time to cross on this subject will not be

 9  counted, within reason.  If you go on and on and on, I'm going

10  to cut you off.  But the time you spend on cross on this

11  particular topic, we won't count that time.

12      And I will allow -- I don't think you're going to need two

13  hours of rebuttal testimony on one study, but I will allow a

14  short rebuttal from one of your witnesses.  But I am determined

15  to complete this trial by Wednesday.

16      So I am going to allow the testimony, but I'm going to

17  also allow extended time for cross-examination and for

18  rebuttal.

19          MR. CONNETT:  Your Honor, if I could.  I came today,

20  I have been preparing for this witness to address her disclosed

21  opinions in case.

22      Would your Honor permit us to do the cross-examination of

23  Dr. Chang tomorrow afternoon?  I don't think it's going to be

24  that long.  But could we do it tomorrow so that we have the

25  actual ability to prepare to address this abstract?

PROCEEDINGS

```
 1        And I would add in there, Your Honor, counsel has just
 2   represented to the Court that Dr. Chang has been communicating
 3   with the authors.  We would ask that those communications be
 4   immediately produced.  They are within the scope of expert
 5   discovery in this case, Your Honor.
 6        In this case we have had an expert disclosure requirement
 7   that any and all communications with third party persons
 8   regarding the subject matter of their testimony is
 9   discoverable.  So we would ask that all of these communications
10   be produced immediately this afternoon so that we can review
11   them and cross-examine Dr. Chang tomorrow afternoon.
12            THE COURT:  All right.  Response.
13            MS. BHAT:  Yes, Your Honor.  That's fine.  We can
14   produce these emails.
15        I can confer with my co-counsel about the scheduling.  If
16   Mr. Connett is suggesting that we simply push this witness
17   until later, then I can confer with my co-counsel as to whether
18   we can call another witness right now.
19            THE COURT:  I think the suggestion is to allow him to
20   complete his cross on this particular subject tomorrow rather
21   than today because -- my guess is that -- well, it may be moot
22   anyway because I don't know if we're going to complete
23   Dr. Chang's testimony today.
24        So your request is to be able to segment and reserve the
25   cross until tomorrow.  Hopefully, she's available sometime
```

1    tomorrow.  We can fit her in, if necessary, between witnesses

2    or whatever.

3              **MS. BHAT:**  Yes, your Honor.  We can confer with the

4    witness as to whether she's available tomorrow afternoon.

5         But my understanding was that court would reconvene on

6    Wednesday for Dr. Grandjean because of his time difference.

7              **THE COURT:**  We're going to do that.  But what counsel

8    is asking for is to complete the cross of Dr. Chang tomorrow

9    instead of today if -- otherwise it would have been completed

10   today.

11             **MS. BHAT:**  Yes.  I think that should be fine.  I

12   think once we bring Dr. Chang on, we can confirm with her that

13   she's available tomorrow afternoon.

14        And to be clear, my redirect on this subject would also be

15   tomorrow afternoon then.

16             **THE COURT:**  Yeah.  You'll have a chance to redirect

17   on this subject.  I mean, we may have to break out this

18   subject, or we may not have to because in the normal course of

19   things it may take more time than we thought anyway.

20        So let's proceed.  I will say that with respect to

21   rebuttal, Mr. Connett, if your -- whoever is going to testify

22   on rebuttal also has communications, for instance, with the

23   authors, you are also subject to the same disclosure.

24             **MR. CONNETT:**  Certainly, your Honor.

25             **THE COURT:**  All right?

PROCEEDINGS

```
1        All right.  So let's move on.  And the government may call
2   its next witness.
3            MR. CONNETT:  Your Honor, just very briefly.  I
4   apologize.
5        For purposes of clarity because -- could we get maybe a
6   commitment from defense counsel that they will produce these
7   communications by 3:00 p.m. today or some time so that we have
8   the ability to actually review and prepare for tomorrow?
9            THE COURT:  Yeah.  All right.  Let's put a -- so
10  there is no misunderstanding.  Is 3:00 p.m. okay?
11           MS. BHAT:  Your Honor, I think it should be depending
12  on when we complete trial.  Can we say two hours after trial?
13  I think that would give us ample time.
14           THE COURT:  Yeah, that's fine.  We're not going past
15  1:30 today.  I'm not intending to.
16           MS. BHAT:  Okay.
17           THE COURT:  All right.  Go ahead and call your next
18  witness.
19           MS. BHAT:  The government calls Dr. Ellen Chang.
20       (Brief pause.)
21           THE COURT:  Good afternoon or morning, wherever you
22  are, Dr. Chang.
23           THE WITNESS:  Good morning.
24           THE COURT:  Angie, if you could administer the oath.
25           THE CLERK:  Please raise your right hand.
```

1                          **ELLEN CHANG**,

2    called as a witness for the Defendant, having been duly sworn,

3    testified as follows:

4              **THE WITNESS:**  Yes, I do.

5              **THE CLERK:**  Thank you.

6              **THE COURT:**  You may proceed.

7              **MS. BHAT:**  Thank you, Your Honor.

8                     <u>**DIRECT EXAMINATION**</u>

9    **BY MS. BHAT**

10   **Q.**    Dr. Chang, you are an epidemiologist; correct?

11   **A.**    Yes.

12   **Q.**    Briefly, can you explain what epidemiology means?

13   **A.**    Yes.  Sure.  It's the scientific study of the causes and

14   patterns of diseases in populations, especially human

15   populations.

16   **Q.**    What are your qualifications to speak to the Court about

17   epidemiology?

18   **A.**    I have a doctorate degree in epidemiology with a minor in

19   biostatistics from the Harvard School of Public Health.

20        I also completed a post doctoral fellowship in medical

21   epidemiology and biostatistics at the Karolinska Institute in

22   Stockholm Sweden.

23        I previously held jobs as a research scientist at the

24   Cancer Prevention Institute of California, which is a

25   non-profit cancer research center.  That was affiliated with

1    Stanford.

2         I also had an adjunct faculty appointment at the Stanford

3    University School of Medicine at that time, and I was the chief

4    epidemiology at the Asian Liver Center at Stanford, where we

5    worked on liver cancer and Hepatitis B awareness and

6    prevention.

7         Right now I am a principal scientist at Exponent, as an

8    epidemiologist in the Center for Health Sciences.

9         I'm also a visiting professor at the Sun Yat-sen

10   University Cancer Center in Guangzhou, China.  And I am a

11   member of the Stanford Cancer Institute.

12   Q.   I understand that you're currently working for Exponent;

13   correct?

14   A.   That's right.

15   Q.   What kind of clients have you had at Exponent?

16   A.   I have had a variety of clients at Exponent, including

17   clients who are in industry, government, private clients, such

18   as schools and universities.

19        Most of the work that I do is in secondary research, so

20   I've performed systematic literature reviews.  I've helped with

21   proactive safety development work, including some primary

22   research, primary research studies and data analysis.  I've

23   also done some secondary data analysis of some -- I guess,

24   original data analysis of some existing datasets.

25        I also do some litigation support.

1          I also continue to do academic research that's separate

2     from Exponent, but it's supported by Exponent.  So I continue

3     to publish original epidemiological research with my colleagues

4     at other institutions.

5     **Q.**   Have you published any studies specifically on fluoride?

6     **A.**   No.

7     **Q.**   Can you still evaluate the scientific evidence on fluoride

8     having not written any studies on fluoride?

9     **A.**   Yes.  The epidemiological methods that are applied to

10    research on fluoride in humans are the same as across

11    epidemiology in general.  So we use the same standard

12    considerations about the methodological strengths and

13    limitations of epidemiological studies.

14         And, also, we use the same standard considerations

15    regarding the overall weight of the epidemiological evidence,

16    regardless of the exposure and the health outcome at issue, as

17    long as it's sort of chronic exposure or chronic health

18    outcome, as opposed to infectious disease where the methods are

19    different.

20    **Q.**   What was your expertise as applied to this case?

21    **A.**   My expertise includes epidemiology, including specifically

22    environmental and nutritional epidemiology, and biostatistics.

23         I have expertise in systematic literature review, and meta

24    analysis and synthesis of evidence, including reviews of the

25    epidemiology of fluoride and other environmental exposures with

1   respect to neurodevelopmental outcomes and neurotoxicity.

2       I have published several prior systematic reviews of the

3   literature on neurodevelopmental outcomes with respect to other

4   exposures.

5       I'm also familiar in this matter with the epidemiological

6   literature on fluoride's potential impact, if any, on the

7   thyroid as it may relate to potential neurotoxic effects.

8   Q.   What were you are asked to do in this case?

9   A.   At the beginning I was asked to take a look at the

10  epidemiological literature on fluoride exposure and

11  neurodevelopmental outcomes and summarize what I found.  And

12  then I was also asked to respond to the plaintiff's expert

13  opinions when those were released.

14  Q.   Were you asked to complete a systematic review?

15  A.   No.  I wasn't asked to do that per se.

16  Q.   Why did you choose to do that?

17  A.   I chose to do a systematic literature review because that

18  would be the standard approach in epidemiology to identifying a

19  human health hazard.

20      A systematic literature review aims to integrate all of

21  the relevant scientific evidence on a topic using methods that

22  are objective, comprehensive, transparent and reproducible.

23      There are essential components of any systematic

24  literature review.  These include explicit specification of the

25  research question at issue, use of a wide-ranging and clearly

1    documented search strategy, uniform application of literature

2    search criteria, rigorous critical assessment of the methodical

3    quality and results of the relevant literature based on

4    standard well-accepted considerations.  So I thought that all

5    of these methods were conducive to generating, you know, a

6    valid and, again, transparent and reproducible opinion on the

7    question that I was asked to address.

8    Q.    Thank you, Dr. Chang.

9          I would like to talk to you about your systematic review

10   process, but before that, I noticed that you used the word

11   "hazard."

12         Can you tell me what you, as a epidemiologist understand

13   "hazard" to mean?

14   A.    Sure.  I understand "hazard" to mean basically the

15   equivalent of a causal effect.  So as an epidemiologist, I use

16   hazard identification and causal assessment basically

17   interchangeably.  So identifying a hazard to me means

18   identifying a cause of a human health effect.

19   Q.    So do you understand your work in this case to be

20   inclusive of or somewhat equivalent to a hazard assessment as

21   an epidemiologist would do one?

22   A.    Yes.

23   Q.    Now, I'd like to turn to your systematic review process.

24   You have detailed systematic review generally, but how did you

25   do your systematic review for this case?

 1    **A.**    So before I read studies, I defined the scientific

 2    hypothesis at issue using the same process as, I think,

 3    Dr. Thayer discussed on Friday.  She referred to this PECO

 4    statement, where P stands for defining the relevant study

 5    populations.  E refers to defining the exposure of interest.

 6    C refers to defining the comparison groups of interest.  And

 7    O refers to defining the health outcomes of interest.

 8        So I specified *a priori* what the scientific hypothesis at

 9    issue was for this matter by defining the population at

10    interest to be humans, particularly involving

11    neurodevelopmental exposure.  So developmental exposure that

12    would be any type of an early life up to adulthood.  I wanted

13    to look specifically at exposure to fluoride.

14        For the comparison population I defined that as consisting

15    of any populations with lower, as compared with higher,

16    exposure to fluoride.

17        And for the outcome I was particularly interested in

18    neurological outcomes defined pretty broadly as including

19    cognitive behavior and other neuropsychology endpoints at any

20    age.

21        I also developed a pre-determined set of search terms

22    following this hypothesis and identified the literature

23    database or databases where I would search for potentially

24    relevant articles.

25        And I identified a pre-determined set of standard criteria

1  for evaluating the strengths and limitations of any given

2  epidemiological study.  Those are referenced in my report and,

3  I think, in my declaration.

4  **Q.**   Would it help you to illustrate what you're talking about

5  if we showed that report?

6  **A.**   Sure.

7           **MS. BHAT:**  Your Honor, we've marked a demonstrative

8  that is a table from Dr. Chang's report.  Permission to show

9  that now.

10          **THE COURT:**  All right.  No objection, I assume.

11          **MR. WATERS:**  No objection.

12     (Document displayed.)

13  **BY MS. BHAT**

14  **Q.**   Okay.

15  **A.**   So this is a table.  This is from my report.  And the --

16  this is kind of the standard Excel spreadsheet that I always

17  use for systematic literature reviews.  And this outlines -- I

18  hope everyone can see it.  It outlines the categories that I

19  considered in evaluating the methods and the strengths and

20  limitations of each study.

21      So green, the headings that are coated with green are the

22  categories that I considered -- especially to determine

23  relevance to U.S. population.  So those include the country

24  where each study was conducted, description of the study

25  population, and then also the levels of fluoride exposure at

 1   issue.

 2        To evaluate the quality and the validity of the data

 3   collected, in any given study I looked at the exposure

 4   assessment and the outcome assessment methods.

 5        Purple highlights the column listing the confounders in

 6   any study that were adjusted for or considered.

 7        So confounding refers to a systematic bias or a spurious

 8   association due to the presence of a third factor that is not

 9   the exposure, not the outcome, and is -- but is associated with

10   both of them and is not on the causal pathway between the two.

11        So as a sort of simple example.  If one is studying the

12   association between gray hair and heart disease, then one might

13   find them to be associated, but in this case age would be a

14   confounder.

15        So older age is associated with a higher prevalence of

16   gray hair.  It's also associated with a higher risk of heart

17   disease.  And so if you don't properly adjust for age, then one

18   will find that gray hair and heart disease are positively

19   associated.  But it's not a causal association.  It's due to

20   confounding by age.

21        So going back to this table, in the purple column I

22   listed, you know, all the various confounders that were

23   considered by each study.

24        Blue highlights the results section, where you see the key

25   findings in each study.

1         And then also I used those results, you know, the variance

2    of various statistical results, as well as N, which refers to

3    the number of subjects in each study.  I used those to evaluate

4    statistical robustness.

5         Yellow overlaps with the green for the study population.

6    At the bottom of each study population row I tried to include

7    any information on study participation so that I could evaluate

8    selection bias.

9         And then finally the orange column shown in this table

10   highlights study design, which is, again, a standard

11   epidemiological consideration for the potential validity and

12   strengths and limitations of any study.

13   Q.   Thank you.

14   A.   I also wanted to mention that as part of my systematic

15   literature review, in addition to identifying sort of standard

16   considerations for evaluating each individual study, I also

17   identified a standard framework in advance.  Specifically the

18   Hill guidelines for assessing the overall body of literature.

19   Q.   Thank you.

20        MS. BHAT:  Mr. Hambrick, you can clear the screen?

21   (Document removed from display)

22   BY MS. BHAT

23   Q.   Dr. Chang, do you understand the Hill guidelines to be a

24   checklist?

25   A.   No.  I mean, they are specifically not intended to be used

1  in the checklist fashion, where that would -- so actually going

2  back.

3      The Hill guidelines, I think we've talked about them or

4  other people have talked about them at some length in this

5  trial.  But it's a set of guidelines, a standard framework used

6  by epidemiologists to decide whether a statistical association

7  is causal or potentially due to non-causal factors, like,

8  confounding, bias or chance.

9      And the nine factors are strength, consistency,

10  specificity, temporality, biological gradient, plausibility,

11  analogy, coherence and experiment.

12      But just as Sir Austin Bradford Hill said, and any

13  epidemiologist would say, you're not supposed to just go

14  through and sort of check off:  Strength, yes.  Consistency,

15  yes.  Specificity, yes.  One must, you know, consider each

16  characteristic in depth and, you know, there are nuances to

17  each of these considerations, some of them weighing more than

18  others.

19      And so I came to a conclusion on each of the

20  considerations listed by Sir Austin Bradford Hill, and I also

21  came to an overall conclusion about causality.

22  Q.  Can you summarize your conclusions?

23  A.  Sure.  So my overall conclusion, based on my systematic

24  literature review, considering the results and the strengths

25  and limitations of each study, along with the overall weight of

1  the scientific evidence in accordance with the Hill guidelines,

2  is that it has not been established that neurodevelopmental

3  toxicity is caused by fluoridated water, especially in the

4  range of 0.7 milligram per liter.  And with regard to some of

5  the individual considerations, I found that the evidence is not

6  consistent.

7      The associations that have been found statistically are

8  not strong enough to exclude confounding bias or chance as

9  reasonable explanations for the observations.

10     With regard to biological gradient, it has not been well

11  quantified in most of the available studies.  So in general,

12  rigorous epidemiological evidence to support a causal

13  hypothesis currently is sparse.

14  **Q.**  So would you, as an epidemiologist, say that there is no

15  hazard of neurodevelopmental toxicity given exposure to water

16  fluoridation in a range of .7 milligrams per liter?

17         **MR. CONNETT:**  Leading.

18         **THE COURT:**  Overruled.

19  **A.**  I wouldn't say that there is no hazard.  I would say that

20  a hazard has not been established by the available evidence.

21  **BY MS. BHAT**

22  **Q.**  Well, I think that we're a little tight on time, so let me

23  get to the heart of the matter.

24     Dr. Chang, I believe that you stated in your declaration

25  that there were some studies that were more informative and

1    some studies that were less informative.  So can you explain

2    why some studies were less informative?

3    **A.**    Sure.  So overall I looked at, I think, 92 studies that

4    were summarized in my report.  36 of those studies had been

5    included in prior meta analyses published by Duan, Tang and

6    Choi.  And 56 of the studies had not previously been included

7    in meta analyses.  So 92 total.  The vast majority of these

8    studies were of very poor study design in terms of just

9    standard epidemiological consideration.

10        So almost all of them are cross-sectional, meaning that

11   the exposures and the outcomes were assessed at the same time,

12   thereby preventing any identification of which one came first,

13   the exposure or the health outcome.

14        There is the consideration that in some of the studies,

15   despite the fact that they were cross-sectional, the children

16   who were assessed had been living in certain communities, you

17   know, since birth.  And so in those cases, although the studies

18   were cross-sectional, they were really most likely assessing,

19   you know, exposure that came before the health outcome.

20        Many of the studies were ecological in design.  Meaning,

21   that exposures and outcomes were assessed only at the group

22   level.  So at the -- you know, at the level of village average

23   fluoride levels in drinking water.  And so in ecological

24   studies, you can't make inferences, valid inferences, about

25   individual level exposures.  And so the average for a group

 1   cannot be said to apply to any, really, individual within that

 2   group.

 3        So ecological studies are well known to be -- you know, to

 4   yield spurious associations that are not found at the

 5   individual level and vice-versa.  Sometimes you can't find

 6   anything at the ecological level that does exist at the

 7   individual level.

 8        Almost all the studies had poor control for confounding.

 9   They adjusted maybe for age and sex, but almost nothing else,

10   like socioeconomic status, diet.  And given that are there many

11   potential influences on neurodevelopmental outcomes, as well as

12   many potential influences on place of residence, which is a

13   major determinant of drinking water exposure, there are many

14   potential confounders of this association.

15        And then most studies didn't report any information on

16   potential for selection bias.  They didn't report participation

17   rates.

18        So, you know, out of the 92 studies I would say there were

19   on the order of approximately a dozen relatively better

20   designed studies.

21   Q.   Did you disregard the less informative studies?

22   A.   No.  I mean, I described all of them in my report.  They

23   are all cited, and I took them all into consideration.

24        It's just that, you know, a lot of them carried less

25   weight in my review, but I also mentioned them in the causal

CHANG - DIRECT  / BHAT

1    analysis that's described in my report and in my declaration.

2    **Q.**   How would you describe the studies that you weighed more

3    heavily?

4    **A.**   There are -- there were ten that I considered to

5    contribute relatively more weight to my analysis, my causal

6    analysis of hazard.

7          So as I mentioned, these were better designed studies.

8    None of them were purely ecological studies.  They all had

9    individual level information on exposure.  They all had

10   information on multiple confounders.  And they also pertained

11   to lower levels of fluoride.  So none of them are conducted in

12   so-called fluorosis endemic areas.

13         In other studies, you know, where they were described as

14   having been conducted in areas where dental fluorosis is

15   endemic, those I considered to not be as relevant to the U.S.

16   population.

17         Among the ten studies that I -- the ten more heavily rated

18   studies, I also considered them to be more relevant to the U.S.

19   based on socioeconomic and cultural considerations.

20   **Q.**   The Court has heard a lot about the Canada and Mexico City

21   cohort studies.  So I'd like to ask you about the other studies

22   that you weighed more heavily.  Can you describe those?

23   **A.**   Sure.  So there were ten studies, but they were conducted

24   in six independent study populations.  And so two of them are

25   the Canada cohort, which I'll try to refer to consistently as

 1  the Canada cohort or Canada birth cohort.  There is also a

 2  Canadian cross-sectional study.

 3       The other study that I won't talk about right now is the

 4  Mexico City cohort study.

 5       So among the other four, there were two prospective cohort

 6  studies that were conducted in New Zealand.  We've heard a

 7  little bit about those.  One was conducted in Christchurch, New

 8  Zealand.  It's a prospective birth cohort of children followed

 9  from birth up to age six to seven years.  The main exposure of

10  interest was individual level duration of residents in a

11  community with fluoridated public water based on residential

12  addresses that were updated over time.

13       And then the outcomes of interest were conduct disorder

14  and behavioral problems at ages six to seven.  And then there

15  was a second analysis of IQ that was conducted at eight years

16  of age.  And that study found no significant association

17  between the measure of fluoride exposure and any of the outcome

18  measurements at issue.

19       There was also a prospective cohort study of children in

20  Dunedin, who were identified as having been born in one year.

21  They were followed from age three up to 38 years, so into

22  adulthood.

23       The main exposures of interest were residence in an area

24  with community water fluoridation.  So that's an ecological

25  variable.  They also had individual level survey data on use of

1  fluoride tablets and use of fluoridated toothpaste in that

2  study.

3      And the outcomes were IQ at ages 7, 9, 11, 13 and 38

4  years.

5      That study did not find any significant association

6  between any of the fluoride exposure measures and child IQ.

7      In the adults they actually found a statistically

8  significant association between community water fluoridation

9  and higher or better IQ in adults, but they didn't find an

10  association with use of fluoride tablets or toothpaste.

11      There are two more of these more relevant studies.  One

12  was conducted in Boston.  It's a cross-sectional study of

13  children at a pediatric dental practice.  It had various

14  measures of fluoride exposure, including dental fluorosis

15  score.  Living in an area with community water fluoridation.

16  Use of fluoridated toothpaste.  Receiving fluoride

17  supplementation.  And receiving infant formula with fluoridated

18  water.  So all of these measures were taken into account to

19  define a fluoride exposure index.

20      And then the outcomes were measures of child behavioral

21  problems at ages 7 to 11 years.  And this Boston study found no

22  significant associations.

23      And then finally the Canadian cross-sectional study.  It's

24  called the Canadian Health Measures Study.  That was a

25  cross-sectional study of nationally representative children,

 1  aged 3 to 12 years across Canada at two time points, 2009 to

 2  '11 and 2012 to '13.

 3       The exposure in this study was child's urinary fluoride

 4  level.

 5       And the outcomes were parent reported diagnosis of any

 6  learning disability, ADHD, ADD, dyslexia or other.

 7       And this study found no significant association between a

 8  parent reported diagnosis of any of these outcomes and

 9  children's urinary fluoride levels after they adjusted for

10  either creatinine or specific gravity.

11       Before adjustment for urinary dilution they did find a

12  borderline statistical -- statistically significant association

13  between fluoride exposure and a higher risk of any learning

14  disability, but that association was weaker and it did not

15  persist after adjustment for urinary dilution.

16  **Q.**   Dr. Chang, did some of these studies consider infants that

17  were formula-fed?

18  **A.**   Yes.  As I mentioned in the Boston study, that's by

19  Morgan, et al, is the citation.  I think it's 1998.  They had

20  information on receipt of infant formula with fluoridated

21  water.  So that was one of the measures that they used in their

22  fluoride exposure index.

23       And then the Dunedin cohort, which -- study which was by

24  Broadbent, et al, that study, they looked at the association

25  between infant formula and IQ and found that breastfed infants

1    had an association with higher IQ.

2         They also looked at whether there was an interaction.  So

3    they looked at whether fluoride exposure varied between

4    breastfed and formula-fed infants and they did not find a

5    significant interaction.

6    **Q.**   Now, you had discussed studies in two different New

7    Zealand populations, and Dr. Grandjean had also referred to the

8    New Zealand studies.

9         Was Dr. Grandjean correct to suggest that the New Zealand

10   studies are of lesser quality because they did not control for

11   tea consumption?

12   **A.**   I mean, I think he was pointing out that tea was a

13   potential confounder of the association or the lack of

14   association in that study.  And it could -- he also suggested

15   that could -- it could result in exposure misclassification.

16        But I think that assumes that -- so I'm trying to

17   illustrate here.  These would be the children -- I mean, you

18   know, first of all, it would have to be the children who are

19   drinking tea, rather than adults.  I don't know about child

20   consumption of black tea, but I know it's, you know, quite

21   bitter.  But the -- he was suggesting that the tea consumption

22   in the non-fluoridated population could raise the fluoride

23   level exposure up to that in the fluoridated population.  But I

24   think there is no reason to believe that tea consumption would

25   be higher in the non-fluoridated community.

 1          So if on average they both consume the same amount of tea,

 2    or specifically black tea, then that would actually increase

 3    the exposure level in both groups.  And so that would preserve

 4    the exposure difference between the two groups, the fluoridated

 5    and the non-fluoridated group.

 6          So I think that tea could -- you know, black tea

 7    consumption -- again, I don't know -- you know, my -- my kids

 8    won't drink black tea.  I don't know how big an issue it is

 9    among children.  It is a potential confounder, I think.  I

10    don't think that it would invalidate the study by any means.

11          And, you know, there are other studies that haven't

12    controlled for tea.  I think in the Mexico City study, I don't

13    believe they controlled for tea intake.  I don't think that

14    that invalidates the Mexico City study.

15    Q.   Well, since you brought up the Mexico City study, and you

16    previously discussed the Canada cohort study, how would you

17    judge the quality of the Mexico City and Canadian cohort

18    studies?

19    A.   I think that they are of higher quality than the other

20    studies that are available at present.

21          So as I think Dr. Hu testified the other day, he

22    mentioned, you know, there is no such thing as a perfect

23    epidemiological study.  I agree with that.

24          For any observational epidemiological study there are some

25    potential limitations, and so I don't expect any study to be

1    perfect.  The Mexico City and Canadian cohort studies are

2    methodologically well designed.

3         In particular, both of them measured urinary fluoride at

4    the individual level among mothers before birth.  And so they

5    had prenatal specific measurement of potential fluoride

6    exposure which the other -- the other studies did not

7    specifically measure prenatal exposure.

8         To the extent that, you know, mothers and children resided

9    in a fluoridated community and didn't relocate between

10   pregnancy and birth in early childhood, then that would still

11   capture some prenatal exposure.

12        But the Mexico City and Canadian cohort studies

13   specifically looked at prenatal exposure using this -- you

14   know, this quantifiable specific exposure metric.

15        It does have limitations.  Urinary fluoride does have some

16   exposure measurement problems, but those studies were better

17   for that reason.  And they also -- you know, they had

18   information on -- on a range of confounders.

19   Q.   Well, since you brought up urinary fluoride.

20   Dr. Grandjean made a statement about the World Health

21   Organization, and I believe he said that the World Health

22   Organization has said that urinary fluoride is a good long-term

23   indicator of fluoride exposure.  Is that correct?

24   A.   I have not seen where -- I have not seen where the World

25   Health Organization or any other health organization identified

 1  urinary fluoride as an indicator of long-term or lifetime

 2  exposure.

 3       Specifically, I looked at some of the World Health

 4  Organization documentation.  For example, they have a report on

 5  fluoride from 1984 where they discussed biomarkers for fluoride

 6  exposure.  They specifically classified urinary plasma and

 7  saliva fluoride as indicators of contemporary exposure.  That

 8  is, short-term exposure.  And then they separately classified

 9  bone and dental, so tooth, fluoride as indicators of historical

10  or long-term exposure.  So there they, you know, specifically

11  identify urinary fluoride as short term.

12       I think Dr. Grandjean mentioned that urinary fluoride does

13  contain some fluoride that comes from bone, which is correct.

14  You know, there is some breakdown of bone, and then fluoride

15  gets released and enters the urine, but it's -- you know, there

16  are these sort of biomonitoring studies that have looked at

17  urinary fluoride levels in individual people, within

18  individuals repeated throughout the day, and they -- you know,

19  these levels fluctuate throughout the day as people eat or

20  drink.  You know, they clearly reflect -- to a large extent,

21  they reflect recent intake.

22  **Q.**  Thank you for that explanation of urinary fluoride,

23  Dr. Chang.

24       To return to your analysis under the Hill guidelines, can

25  you consider -- if you're applying the Hill guidelines, can you

1    consider just one study in isolation from the others?

2    **A.**    No.   I mean, the Hill guidelines specifically are intended

3    for evaluation of the overall body of literature, the overall

4    body of evidence.   It's impossible, for instance,  to consider

5    consistency across studies or across study populations based on

6    one study only.

7         And so, you know, consistency particularly is important

8    for evaluating whether an association might be due to chance,

9    because any one study might find a statistically significant

10   association just due to chance alone.   But if it's repeated

11   again and again across multiple study populations, then it's --

12   you know, it becomes unlikely to be due to chance.

13   **Q.**   What were your findings on consistency here?

14   **A.**    You know, with regard to consistency, focusing in

15   especially on the ten more informative studies, there were

16   inconsistencies in findings among those.

17        So as I mentioned before, in the New Zealand -- in the two

18   New Zealand studies, as well as in the Boston study and in the

19   Canadian cross-sectional study, fluoride exposure was not

20   associated with neurodevelopmental outcomes.   Whereas, in the

21   Mexico City and Canadian cohort studies there were some,

22   certainly, adverse associations.   And then there were some

23   non-significant associations depending on the outcome and the

24   exposure metric and the subgroup of interest in those Canadian

25   and Mexico City cohort studies, which are of high quality.

 1          And then between those two higher quality studies, there

 2     were also some potential inconsistencies.  So in the Canadian

 3     cohort study, there was an adverse association between maternal

 4     urinary fluoride and IQ among boys, but not among girls.  And

 5     in girls there was even a suggestion, although it was

 6     statistically non-significant, that fluoride was associated

 7     with higher IQ.

 8          And then this gender discrepancy was not found in the

 9     Mexico City study.  You know, we've heard some testimony that

10     there can be real gender differences.  I think, you know,

11     sometimes it's true.  Sometimes, you know, as Dr. Tsuji

12     mentioned, it's due to cultural practices that differ between

13     genders.  But in any case, these could be real, but then we

14     don't know why it's inconsistent between the two studies.  And

15     so that's, you know, a source of uncertainty that needs to be

16     resolved.

17          So, yeah, there are these two studies that have some

18     consistency between them.  And then four additional studies

19     that are more relevant and better conducted that did not find

20     significant associations.

21     Q.   Now, you spoke earlier about biological gradient in the

22     context of the Hill guidelines.  Can you explain what

23     biological gradient is and why that's important in your

24     consideration under the Hill guidelines?

25     A.   Sure.  So biological gradient refers to a dose response

1  trend that is increasing risk of a health outcome with
2  increasing exposure.

3      And so if one detects a dose response trend or biological
4  gradient, then that comports with the broad toxicological
5  principle that Dr. Grandjean referred to as a principle of
6  paracelsus; that the dose makes the poison.  So in general, the
7  higher the dose, the more poisonous the toxin.

8      So when you see a positive dose response trend or a
9  positive biological gradient, it can lend evidence to support a
10  causal effect.

11      Before I mentioned that, you know, there were not a lot of
12  studies that evaluated a biological gradient because they
13  compared only high versus low exposure or yes versus no groups
14  for fluoride exposure.

15      Among the ten more informative studies, the two birth
16  cohort studies in Canada and Mexico City both looked at dose
17  response trends with urinary fluoride.

18      The Canadian cross-sectional study also looked at child
19  urinary fluoride.  And so the Canadian cross-sectional study
20  did not find a biological gradient.  They didn't find a
21  significant trend in learning disabilities with urinary
22  fluoride adjusted for hydration.

23      Both the Mexico City and Canadian cohort studies did find
24  some significant positive trends, but as I mentioned in my
25  declaration, and in my report, these were susceptible to the

1    influence of outliers.  So I think we have some figures

2    indicating the outlier influence.

3    **Q.**    Yes.

4            **MS. BHAT:**  Mr. Hambrick, can you please pull that up?

5        Excuse me, your Honor.  May I have permission to show

6    Dr. Chang's declaration?

7            **THE COURT:**  Which portion?

8            **MS. BHAT:**  It is on Page 55 of her declaration, the

9    figures there.  And we will also after that be showing the

10   figures on Page 59.

11           **THE COURT:**  All right.  No objection, I assume?

12           **MR. CONNETT:**  Sorry, your Honor.  What page again,

13   counsel?

14           **MS. BHAT:**  Page 55.

15           **MR. CONNETT:**  Of the declaration?

16           **MS. BHAT:**  Right.

17           **MR. CONNETT:**  No objection, your Honor.

18           **THE COURT:**  All right.

19       (Document displayed.)

20   **A.**    So in this figure, this shows a figure from the

21   supplemental material for one of the Mexico City analyses.

22   This one is looking at measures of ADHD.

23       So in the top row -- it's very small, I think we can Zoom

24   in -- we can see the results that the authors reported with

25   three influential outliers included in the analysis.

CHANG - DIRECT / BHAT

 1        And then on the bottom from their figure we can see the

 2   same results without three influential outliers.

 3        So the point of this figure is -- is mostly to show two

 4   things.  One is that just three observations among, you know,

 5   several hundred children can result in a change from a

 6   monotonic, pretty much linear dose response biological gradient

 7   at the bottom.  Once again included, those three influential

 8   outliers can really pull the entire curve down until it's not

 9   linear any more.  Now it's this inverse U-shaped curve.

10        So this is to indicate that when we're talking about this

11   type of regression analysis, outliers, just a small number of

12   observations can have an outsized influence.

13        Another thing that these figures influence -- indicate is

14   that there is a lot of individual scatter around the average,

15   which is shown by the regression lines.  And this has come up a

16   bit prior, in prior testimony in this trial.  I don't have some

17   kind of a scatter plot test or some kind of an eyeballing test

18   that ignores statistical significance or regression.  I use

19   regression all the time.

20        I just am trying to point out that, you know, there are

21   these averages which are shown by the black line.  But there is

22   a substantial amount of individual -- individual level

23   variation in the relationship between fluoride and

24   neurodevelopmental outcomes.  And that's indicated in the

25   scatter.

1        So, you know, summarizing results in terms of these simple

2   linear averages is in many cases an over simplification of

3   exactly what's going on in these individual children.

4        And then in the next figure from my declaration, which

5   illustrates the results from the Canadian study -- I'll wait

6   til we get there.

7        (Document displayed.)

8   **A.**    Okay.  So here in the top figure, we can see Figure 3,

9   which is the original from the author's paper.  And then at the

10  bottom I have removed the regression lines, just so we can see

11  what the scatter looks like without the regression lines just

12  as a comparison.  Because I think -- again, I trust in

13  statistics, but I think, you know, the human eye tends to be

14  drawn to lines that lead to a certain point.  And so without

15  the lines, I think sometimes we can -- we can better appreciate

16  the scatter of the individual points around those regression

17  lines.

18       I also, you know, want to mention that there are some

19  potential outliers here that could be having an influence on

20  the results.  So you know judging from -- if you use the

21  criterion of, say, 3.5 standard deviations away from the mean.

22  In the boys at the bottom you can see a couple of IQ results

23  that are very low.  The lower one, in particular, appears to be

24  more than 3.5 standard deviations away from the mean.  And that

25  point would draw the trend downwards in boys.

1          In girls there's a couple of higher IQ points with higher

2    maternal urinary fluoride.  I don't think those are outliers,

3    but they also tend to draw the trend upward in the girls.

4          Also, you know, just looking to the very right-hand side

5    of the figure at those high maternal urinary fluoride levels, I

6    think the very highest ones also appear, based on the reported

7    data, to be more than three-and-a-half standard deviations away

8    from the mean.  And those are boys with higher fluoride and

9    lower IQ.  So those would be pulling the trend downward.

10         So, you know, there's some potential influence of small

11   number of results, as illustrated in these figures.

12   **Q.**   Thank you.

13              **MS. BHAT:**  Mr. Hambrick, you may clear the screen.

14        (Document removed from display)

15   **BY MS. BHAT**

16   **Q.**   Now, Dr. Chang, have you listened to or read the testimony

17   of Drs. Grandjean, Hu, Lanphear and Thiessen in this case?

18   **A.**   Yes.

19   **Q.**   And did you read or hear plaintiff's experts testify that

20   all prospective birth cohort studies measuring urinary fluoride

21   levels and cognitive outcomes show an adverse relationship?

22   **A.**   Yes.

23   **Q.**   Did you also hear Dr. -- or read Dr. Grandjean testify

24   that he was very familiar with the reports on fluoride that

25   were given at the 2019 conference of the International Society

1  for Environmental Epidemiology?

2         **MR. CONNETT:**  Misstates testimony.  Overbroad.

3         **THE COURT:**  Rephrase that, please.

4         **MS. BHAT:**  Yes.

5  **BY MS. BHAT**

6  **Q.**   Dr. Chang, did you reach or hear Dr. Grandjean testify

7  regarding the 2019 conference of the International Society for

8  Environmental Epidemiology?

9  **A.**   Yes.

10 **Q.**   Did you read or hear Dr. Grandjean testify that he is very

11 familiar with the reports on fluoride at that -- that were

12 given at that conference?

13        **MR. CONNETT:**  Leading.  Misstates testimony.

14 Overbroad.

15        **THE COURT:**  Sustained.  Please rephrase.

16 **BY MS. BHAT**

17 **Q.**   Dr. Chang, did you read or hear Dr. Grandjean testify as

18 to an abstract book that was distributed at that conference?

19 **A.**   Umm, the abstract book.  I don't remember exactly -- you

20 know, I remember some going back and forth about the abstract

21 booklet or the electronic document.

22     I do remember -- I think Dr. Grandjean specifically was

23 asked if he was familiar with the -- with the fluoride studies

24 that were presented at that conference.  I think he did say

25 very familiar, but I'd have to go back and look at the

1   transcript.

2   **Q.**   Did Dr. Grandjean discuss all of the reports on fluoride

3   that were given at that conference?

4           **MR. CONNETT:**  Overbroad.

5           **THE COURT:**  Overruled.

6   **A.**   I think he eventually discussed some of them, but I think

7   early on, no.  I mean, in his report and in his declaration I

8   didn't see where he discussed all of them.

9   **BY MS. BHAT**

10  **Q.**   What do you mean by he didn't discuss all of them?

11  **A.**   So I'm -- I, for instance, am familiar with one abstract

12  that is a report from Loreto Santa Marina, et al.  And it's --

13  it discusses maternal prenatal urinary fluoride that was

14  measured prenatally twice in mothers, and then it measured two

15  neurodevelopmental outcomes.

16       So in children at 14 months of age they used the Bayley

17  scales of infant development to measure neurodevelopmental

18  outcomes, which are the -- you know, the Bayley scales were

19  also used in the Canadian cohort.

20       And then about four years of age in the -- in this cohort

21  they evaluated the McCarthy scales, the cognitive scales, which

22  were also used in the Mexico City cohort study.

23       So I am -- I am familiar with the Santa Marina study.  I

24  mean, I think Dr. Grandjean was asked about it, and so he did

25  sort of discuss it eventually in his testimony, but he

1    indicated that he was not -- that he was not knowledgeable

2    about this particular study.

3         And so, yeah, I've done -- I mean, from the abstract

4    itself, it's quite limited in its description.  But the cohort,

5    the INMA, I-N-M-A, cohort that's set in Spain, there are

6    hundreds of studies that have been published based on that

7    cohort.  So it is possible to do some reading about the -- the

8    general methods and the findings, as well as the authors of

9    that cohort in general.

10        MR. CONNETT:  Your Honor, at this point we do have an

11   objection on 703 grounds in terms of whether it is -- this

12   expert or this scientist can even talk about a study if there

13   is not -- if it's not a reliable type of things that scientists

14   would rely on, an unpublished abstract.  So at this point, Your

15   Honor, we would object on 703 grounds.

16        THE COURT:  All right.  Then I'm going to allow the

17   government to conduct a voir dire to establish the 703 ground.

18   You're basically objecting to grounds of *Daubert*?

19        MR. CONNETT:  *Daubert* and, also, you know, experts

20   can only testify to matters that experts can reasonably rely

21   upon in the field.  And so --

22        THE COURT:  I'm going to allow Ms. Bhat to go ahead

23   and lay that foundation.

24   BY MS. BHAT

25   Q.   Dr. Chang, do you rely on abstracts in your work?

1    A.   I mean, I've -- I cited some abstracts in my report and in

2    my declaration, as did the plaintiff's experts.  You know, I

3    prefer to have full-length, you know, peer-reviewed scientific

4    journal publications, but I will take a look abstracts,

5    especially because they do actually go through a review process

6    to be accepted into conferences.  And so not all abstracts get

7    accepted to a given conference.

8         So there is a quality review before they get, you know,

9    accepted as a poster or accepted as a presentation at any given

10   conference.  It is not a formal peer-review process, but it's

11   not as if they allow in any kind of -- any study.

12        Whenever possible, for an abstract I do want to do some

13   background research on whether the -- whether I can learn

14   anything else about the study population that's being

15   described.

16        MR. CONNETT:  Your Honor, we would maintain our

17   objection.

18        THE COURT:  Well, I need to hear more.  I mean, the

19   witness has said she cited some abstracts, but I've not heard

20   any testimony about when she would accept it, what criteria she

21   would apply.  So I'd like to hear more about that.

22        MS. BHAT:  Yes.

23   BY MS. BHAT

24   Q.   Dr. Chang, when -- what criteria would you apply in

25   deciding whether to consider an abstract in your analysts?

1    **A.**    If there -- you know, if the methods that are described --

2    I mean, in general I would take it into consideration.  If the

3    methods described are, you know, epidemiologically sound, and

4    if I can find out that the abstract, you know, describes a --

5    an existing study that has been well conducted and well vetted

6    and well published, then I would be more likely to -- you know,

7    to believe that the results have validity.

8        So, for instance, in my report I included an abstract from

9    the Mexico City study, Thomas, et al 2018 that was -- that I

10   found in the *Fluoride Journal* online.  It hasn't been published

11   yet, but there is an abstract from the cohort.  But because I

12   knew about the Mexico City cohort study and find it to be

13   overall a well-conducted study, I was willing to include that.

14       The same thing.  There was an abstract that I included

15   from Green, et al that was presented at a conference in June

16   2019.  And, again, because I knew about the Canadian birth

17   cohort study, I included that study in my review.

18       There is another abstract that I included by Spittle, et

19   al that I found on the *Fluoride Journal* website.  That

20   abstract, again, you know, it didn't contain a lot of

21   information, but it referred back to the Dunedin cohort study

22   that was described in more detail, both in an earlier

23   publication by Shannon, et al and in other studies conducted in

24   the Dunedin cohort.  I understand that Dr. Lanphear himself has

25   conducted some research in that cohort.

1      So as long as -- you know, getting back to this situation

2   with this abstract from the Spanish cohort, I looked -- when I

3   first saw it, you know, I wasn't familiar with the name of this

4   cohort.  But then when I looked on the website, I've read many

5   studies from this cohort before.  I'm familiar with some of the

6   investigators.  I think Dr. Sunyer or Sunyer was spoken about

7   at the trial the other day.  He's a well-respected and renowned

8   epidemiologist.

9      This cohort has yielded 500-something publications that

10   are listed on its website, including some high impact

11   publications.

12      I myself have cited this, results from this cohort in my

13   previous work on other topics.

14      You know, I think the -- Dr. Lanphear and Dr. Grandjean

15   pointed out that -- I think Dr. Grandjean is even on the

16   steering committee or advisory committee as cohort.

17      So, you know, this is not an unknown quantity.  I think

18   based on other publications and other information about this

19   cohort, it's a -- it's a well-conducted study.

20           THE COURT:  Can you explain what "this cohort" is and

21   what studies -- what are these publications?  Are they on

22   fluoride or something else?  What are they?

23           THE WITNESS:  Sure.  So by "this cohort" I'm

24   referring to the INMA, I-N-M-A cohort of -- you know, it's a

25   birth cohort.  They recruited pregnant women and then they

1    followed them forward over time, taking urine samples twice

2    during pregnancy.  They also collected, I think, blood.  They

3    collected other biospecimens during pregnancy.  And then they

4    assessed neurological outcomes at 14 months and four to five

5    years of age.  Presumably they will keep following them over

6    time and maybe evaluate IQ over time.

7         And in terms of prior publications, I did see one, one

8    prior publication that is on fluoride.  In particular, they

9    were looking -- in that cohort, in the INMA cohort, they were

10   looking at drinking water fluoride levels in the cohort among,

11   I think 5-, 600 pregnant women.  And then they looked at water

12   consumption habits.  But they didn't connect that to

13   neurodevelopmental outcome.  So that's a previously published

14   peer-reviewed paper.

15        In terms of other publications that I've looked at from

16   this cohort, they are on complete different topics.  There are

17   on, you know, exposures like BPA or phthalates or air

18   pollution.

19        I did see one paper, full-length paper on prenatal

20   phthalate levels in maternal urine.  So analogous to fluoride.

21   Then neuropsychology or neurodevelopmental outcomes, where they

22   analyzed the same two outcomes that were analyzed in the

23   abstract, so the one at 14 months and the one at four years.

24   And that's a peer-reviewed published article as well.

25        So that's what I mean by other publications from this

1    cohort.

2           THE COURT:  So this same group of recruited pregnant

3    mothers and their offspring were studied for various purposes.

4           THE WITNESS:  Yes.  That's typical of a cohort study.

5    You know, the MIREC and ELEMENT cohort studies have also looked

6    at other exposures and other health outcomes.

7           THE COURT:  And so your assessment is that there is

8    some credibility to the cohort selection then and their

9    tracking; is that what you're saying?

10          THE WITNESS:  I would say there's credibility to the

11   cohort conduct overall.  It's a well-designed cohort.

12       I mean, it has basically the same design features as the

13   Mexico City and Canadian cohorts.  They had mothers with urine

14   collected at multiple times during pregnancy.  They had

15   information -- this is information that I'm getting from prior

16   publications.  They had information on a large number of

17   potential confounders.

18       They assessed these, you know, standard neurodevelopmental

19   outcomes.  So they used the Bayley scales, which I mentioned,

20   in infants.  That Bayley scales measure was also used in the

21   Canadian cohort.  So it's very comparable.  And then at four

22   years of age they used the McCarthy scales.

23       They looked at all of these domains; verbal, memory,

24   motor.  There's a few others.  They also looked at the general

25   cognitive index, which is like the overall cognitive score for

1   the McCarthy scales.  And the McCarthy scales were also

2   measured in the Mexico City cohort study.

3        So, and then in terms of the publications that I've seen

4   elsewhere on this cohort, you know, they -- they are looking at

5   a wide range of environmental exposures, looking for potential

6   influences on health.

7        I mean, even the name of the cohort.  I-N-M-A in Spanish

8   stands for, you know, something like research on children's

9   health with respect to the environment.  So it's looking at all

10  these different environmental.

11            THE COURT:  Do you know if the investigators for this

12  fluoride study had published with some of the -- part of the --

13  any of the 500 publications yielded by this INMA cohort study

14  previously?

15            THE WITNESS:  Yes, yes.  Many of them.

16       So the first author, for example, Santa Marina, she has

17  70 or 80 publications that I found.  They are not all from this

18  cohort, but -- actually, I think most of them are from this

19  cohort.  The senior author -- Ibarluzea, has dozens, you know,

20  maybe -- maybe hundreds.  He has dozens of publications as

21  well.

22       Dr. Sunyer, or Sunyer, who was discussed in prior

23  testimony, I think he has more than 500 publications, including

24  many from this cohort.

25            THE COURT:  All right.  But on topics other than

1   fluoride exposure and neurotoxicity?

2          THE WITNESS:  That's correct.  On topics other than

3   that specific exposure.  Although I think Santa Marina, I think

4   she was a coauthor of that paper that I mentioned.  Both she

5   and the senior author, Ibarluzea are coauthors of the prior

6   publication on fluoride in this cohort.

7          THE COURT:  All right.  So other than the integrity

8   of the cohort, what were you able to discern to give you --

9   well, I assume you're saying that you could place some reliance

10  on the abstract?  I guess I didn't hear that, whether you are

11  or not.

12         THE WITNESS:  Yes, I think so.  I mean I'd love to

13  see more.  I'd like to see the full-length peer reviewed

14  publication, but yes.  I think this is a reliable cohort in

15  general and with reliable investigators, and for that reason I

16  am willing too, you know, consider.

17         THE COURT:  What about the methodology?  How much was

18  disclosed or described and what's your assessment of the

19  methodology?

20         THE WITNESS:  It seems very comparable to what was

21  described in the Mexico City and Canadian cohorts.  So what was

22  disclosed is specifically that urinary fluoride -- oh, I do

23  want to mention.

24      Dr. Grandjean pointed out that in some places, at least in

25  this abstract, they said fluorine or fluoridated water, but

 1   then elsewhere they said fluoride and fluoridated.  You know,

 2   these are -- I think there are probably some English

 3   translation issues, but they move back and forth between the

 4   words fluoride and fluorine.  And given that this is a

 5   well-established cohort, I am going with -- you know, it's

 6   clear to me that they mean fluoride.  They say fluoridated

 7   drinking areas.  Fluoride levels in maternal urine.  So I just

 8   want to make that qualification.  Because some places in the

 9   abstract they say fluorine.

10        So they said they measured fluoride levels of the urine of

11   pregnant women.  I think there were 400 -- 400-something, 438

12   mothers.  They measured it in the first and third trimesters of

13   pregnancy.  So that's comparable to the Mexico City and

14   Canadian cohorts, although those cohorts had first, second and

15   third.

16        And then in terms of the outcomes, they are exactly the

17   same as I mentioned as some of the neurodevelopmental outcomes

18   that were measured in the Canadian cohort and in the Mexico

19   City cohort.

20        And then it says -- you know, they don't -- they do not

21   mention what confounders they adjusted for.  Because presumably

22   they run up against word count limits.  But they do say they

23   use multi-variate linear regression models.  So they did adjust

24   for confounders.

25        And then in prior publications we can see that they

CHANG - DIRECT / BHAT

1     collected information on a large array of confounders.  And, I

2     mean, any reasonable epidemiologist would not publish, you

3     know, dozens of papers where they adjust for confounders and

4     then suddenly, you know, decide not to adjust for them here.

5              THE COURT:  All right.  So at this point you don't

6     know what confounders were adjusted for?

7              THE WITNESS:  Right.  I just know what they collected

8     information on in this cohort.

9              THE COURT:  All right.  And in your view that is

10    sufficient for you, as an expert, to rely upon even though you

11    don't have that information?

12             THE WITNESS:  It is because I know what they

13    collected, and there is no reason why they wouldn't use that

14    information if they have it.

15             THE COURT:  What -- what's an example of what they

16    collected?

17             THE WITNESS:  They had information on, I think,

18    mothers smoking.  They had information on socioeconomic status.

19    Mother's education, parental education.  They had -- let's see.

20    What else did they have information on?

21         They had family structure.  Daycare attendance.  They had

22    information on breastfeeding and formula feeding.  Birth

23    weight.  Gestational age.  All those sort of factors.

24         I think they had maternal IQ, which actually the Canadian

25    and Mexico City studies did not.

1          THE COURT:  And you know this from the abstract or

2   from other information?

3          THE WITNESS:  I know this from other publications.

4   But if, again, they had this information in the cohort, no --

5   in my opinion, no reasonable epidemiologist would just ignore

6   all these potential confounders and just sort of jettison them

7   and say:  Well, you know, in this one abstract I'm not going to

8   adjust for anything.

9          THE COURT:  Were there any confounders that you think

10  that you didn't see that they had -- well, were there any

11  confounders that they didn't have information on from what you

12  could tell?

13         THE WITNESS:  Yes.  But that's true for -- that's

14  always true for epidemiologists.

15         THE COURT:  And what were some of those?

16         THE WITNESS:  They didn't have tea intake.  They

17  didn't have a detailed dietary questionnaire.

18     I don't think they collected a HOME score, H-O-M-E score,

19  that measures quality of the home environment in children.  I

20  think the Mexico City study had it and the Canadian study

21  didn't, but I don't -- I don't remember exactly.

22     I mean, you know, these are also things -- the Canadian

23  study had tea intake.  The Mexico City study did not.  Neither

24  of them did, as far as I could tell, like, a dietary food

25  frequency questionnaire.

1      So, you know, I don't think that these, I guess, limit the

2  Spanish cohort relative to the other two.

3          **THE COURT:**  All right.  Thank you.

4      Mr. Connett, if you have any voir dire questions with

5  respect to your 703 motion, you can ask them.

6          **MR. CONNETT:**  I guess, Dr. Chang, what's your

7  criteria for when you assume things exist when you don't know

8  if they exist?

9      What confounders are you prepared to assume they

10  controlled for?  What tests do you have to determine of the

11  covariates this cohort has collected, how do you assume without

12  knowing which of those covariates they tested for?

13          **THE WITNESS:**  Sure.  I don't -- I'm not going to

14  assume that they actually went in and adjusted for anything.

15  I assume that they had the information because it's published

16  in a peer-reviewed paper.

17      So I know that in a -- in a prior cohort study, I

18  mentioned this, of this cohort where they looked at urinary

19  phthalates and then they looked at the same two

20  neurodevelopmental outcomes.  This is in a published paper.

21  They listed some of the covariates that they collected and they

22  included, you know, just what I mentioned.  Like, maternal

23  smoking, maternal education, maternal IQ, breastfeeding, body

24  mass index, family structure, birth weight, gestational age.

25  All these things are listed out.

 1          I don't think it's an assumption that they have this data.

 2     The fact that they have the data is published.  And then

 3     whether they can (audio interference) for all these factors, I

 4     don't know.  I'm willing to assume that they considered them,

 5     because any reasonable epidemiologist would do that.

 6          MR. CONNETT:  What's the difference between

 7     considering that you have covariate data available and actually

 8     controlling for that covariate data?

 9          THE WITNESS:  So when you construct a multi-variate

10     model, you can test -- you can include covariates in a model

11     and test them to see if they are confounders.  But if they

12     don't have any important influence on the results, then you can

13     leave them out.  And so that would be considering, but not

14     actually adjusting in the final model.

15          So you might see in the Methods section of the paper,

16     like, we -- we considered, I don't know, maternal body mass

17     index.  But including it in the model and excluding it from the

18     model made no difference at all, and so we did not include it

19     in the model.  That would be considering but not controlling.

20          MR. CONNETT:  And, Dr. Chang, do you recognize that

21     with cohorts like this, you have students come in who are given

22     access to data that they can do some preliminary analyses on.

23          THE WITNESS:  Yes.  And I saw that Dr. Grandjean

24     thought that maybe Dr. Santa Marina was a student.  So I looked

25     into that.  She's listed as a researcher.  She has publications

 1  going back to the 1990's.  She has over 70 publications.  So,
 2  yeah, I did want to look into that.
 3          MR. CONNETT:  Is it your testimony though that when
 4  someone comes in and does a preliminary analysis of a cohort,
 5  that they just always use and they always consider every
 6  covariate available in the dataset?
 7      Do you recognize, Dr. Chang, that sometimes you don't do
 8  the full analysis?  You do a preliminary analysis on some
 9  factors?
10          THE WITNESS:  I do recognize that.  I think it would
11  be unlikely for a confounded result to be signed off on by all
12  of these authors for a publicly presented abstract.
13      In my experience, yes, sometimes students will come in and
14  do, like, a quick and dirty run.  But if you're going to
15  present at an international conference, you want to have some
16  confidence in those results that are going to be looked at by
17  peers in the scientific community.
18      So I don't have experience with -- I've never seen a
19  situation where a student ran a preliminary analysis, got all
20  of the coauthors to sign off on that, and presented at a
21  conference without having it, you know, be scientifically
22  vetted.
23          MR. CONNETT:  Is there a guidebook out there for
24  epidemiologists like yourself which tells you how to infer
25  which covariates that were available were controlled for?

1      **THE WITNESS:**  I don't think there is any way to refer

2    which ones were controlled for.  I do think it's reasonable to

3    infer which ones were available, because that's published.

4        And so, you know, it's not a guidebook.  I'm referring to

5    a published paper.

6      **MS. BHAT:**  Your Honor, there have been a lot of

7    questions on voir dire, and I think maybe we are approaching

8    cross-examination territory on this.

9      **THE COURT:**  I'm going to ask you to wrap it up,

10   Mr. Connett.

11     **MR. CONNETT:**  Your Honor, I have no more voir dire at

12   this point.

13     **THE COURT:**  All right.  I still have a couple

14   questions.

15       So just to clarify, Dr. Chang, you are saying that you can

16   and are relying on this Spanish study, even though you don't

17   know which covariates were adjusted for; but you're making

18   certain assumptions that there was consideration given to

19   covariates and whether to adjust for them?

20     **THE WITNESS:**  In terms of relying on, I mean, I

21   guess, you know, I don't know exactly what that -- what that

22   entails.

23     **THE COURT:**  Would you have included this in your ten

24   study survey if the only thing you have is what you have now?

25     **THE WITNESS:**  If it -- if I had found it using the

 1  same search criteria, then, yes, I would have included it.

 2          THE COURT:  Right.  Even though it's only an abstract

 3  and you don't know -- have any information about the actual

 4  covariate adjustments?

 5          THE WITNESS:  Yes.  I mean, I used that -- I did

 6  that, the same thing for other abstracts where I had

 7  information on the cohort, on the underlying cohort.

 8          THE COURT:  So information on the cohort is enough to

 9  get into that league of ten?

10          THE WITNESS:  Yes.  So I've conducted -- you know,

11  I've been on a steering committee of a prospective cohort

12  study, the California Teachers Study.  I just am familiar

13  with -- I've worked on the Nurses Health Study at Harvard, the

14  Health Professionals Follow-up Study at Harvard.  I know how

15  these -- you know, these large well-established cohorts work.

16  You can't just publish anything from these cohorts.

17          THE COURT:  I guess my question is:  You talked

18  about -- you showed a table, an extensive table for each and

19  you listed, you know, various factors and when did they adjust

20  for cohorts.

21      I take it there would be a blank in some of those columns

22  just because you don't assume things.  You have to read about

23  it; right?

24          THE WITNESS:  I would put something like "not

25  reported."  And then I would say:  In that prior study here are

1   some of the things that were listed.

2           THE COURT:  Okay.  And are there any of the ten, I

3   don't recall now, where there was not direct information on

4   covariates?

5           THE WITNESS:  Yes, there was.  One of the Dunedin

6   publications, the -- sorry, the Spittle abstract, which I

7   identified from the *Fluoride Journal* website is just an

8   abstract.  It's based on the Dunedin cohort that is described

9   in Shannon, et al, which I also included and it's also

10  described in other publications.

11          And so, yes, in that one in the column for confounders, I

12  put "not reported.  Assume similar to Shannon, et all."

13          So this one is a little bit different because Shannon,

14  et al in the same cohort actually conducted a study of fluoride

15  and neurodevelopmental outcomes.  So unlike the Spanish cohort,

16  they had a prior published full-length paper of the exposure

17  and the outcome.  So there I could see what they controlled

18  for.

19          In the Spanish cohort, I have publications on other

20  exposures and neurodevelopmental outcomes.  And there I know

21  what data they have, but I don't know exactly how they would

22  construct their model.

23          THE COURT:  All right.  So you have to draw some

24  additional inferences here that you didn't have to draw in the

25  other study?

 1          THE WITNESS:  To some -- well, I don't -- yeah, to

 2   some extent.  But to me, having the information is -- on

 3   confounders is the most important thing.  I mean, if you have

 4   that information, as an epidemiologist, you will use it.

 5          THE COURT:  All right.  And I take it, though, that

 6   if you included this as the 11th study in your table of 10,

 7   this would rank near the bottom because of that lack of

 8   information; is that a fair assumption?

 9          THE WITNESS:  No, because it's a prospective cohort

10   study that I can read about in terms of the methods.  Because

11   it's so well published, I know that the design basically is

12   almost -- you know, in terms of the overall design, prospective

13   birth cohort study, prenatal maternal urine, data on numerous

14   confounders, standard neurodevelopmental outcomes, I would

15   actually put the cohort itself on par with the Mexico City and

16   Canadian studies.

17       The fact that it's an abstract does detract from, I guess,

18   the confidence that I have in the results.  You know, whether

19   they will change, whether they will stand up to peer review, I

20   don't know.  But in terms of the validity of the data, the

21   validity of the way this cohort is conducted, I have the same

22   amount of confidence as I do in the Canadian cohort and in the

23   Mexico City cohort.

24          THE COURT:  You have that confidence based on the

25   cohort composition?

1          **THE WITNESS:**  Correct.

2          **THE COURT:**  I take it not on the ultimate study

3   design, because you don't have enough facts yet about the

4   Spanish study.  Am I assuming that or am I misstating you?

5          **THE WITNESS:**  I think we do have enough facts about

6   the Spanish study, the cohort, the INMA cohort.  I think it's a

7   good cohort.

8       For the specific analysis of urinary fluoride and

9   neurodevelopment in the cohort, you know, I think they are

10  informative, but I -- I do want to wait and see a full-length

11  paper.

12         **THE COURT:**  Thank you.

13      All right.  I'm going to deny the notion exclude and the

14  *Daubert* motion.  I think what we've heard goes to the weight of

15  this testimony, and I'm going to consider it in that regard.

16      Thank you.

17         **MR. CONNETT:**  Thank you, Your Honor.

18         **MS. BHAT:**  Thank you, Your Honor.

19  BY MS. BHAT

20  **Q.**   Dr. Chang, can you tell us more about the particular

21  findings of this analysis that you saw in this abstract

22  regarding cognitive outcomes and urinary fluoride?

23  **A.**   Sure.  So briefly, the authors found no significant

24  association between maternal prenatal urinary fluoride levels

25  and infant neurodevelopment using the Bayley scales at 14

CHANG - DIRECT / BHAT

1    months.

2        And then at four years they found actually a beneficial --

3    what they called beneficial effect -- or, I'm sorry.  I won't

4    say "effect."  They found a beneficial association between

5    maternal prenatal urinary fluoride and the McCarthy measures of

6    cognitive effects in four-year-olds.

7        So the authors -- just to summarize simply, they found no

8    association with neurodevelopment at 14 months and then, I

9    guess, a beneficial association at four years.

10   Q.   How do the mean fluoride levels in that Spanish analysis

11   compare with those described in the Canadian cohort studies?

12   A.   They were -- the averages were comparable.  So in the

13   Canadian cohort and in the Spanish cohort for mothers who lived

14   in fluoridated areas, the mean urinary fluoride level was

15   around .8 milligrams per liter.

16       And then -- but -- in both actually, the Canadian cohort

17   study and in the Spanish study, the mean maternal prenatal

18   urinary level of fluoride in mothers who lived in the

19   non-fluoridated areas was in the range of .4, .45 milligrams

20   per liter.  So there were -- the averages were comparable

21   between the two.

22   Q.   Dr. Chang, I believe we have covered this with the judge,

23   but I think that might have been before you took the stand.

24       Did you find this abstract during your systematic review

25   for this case?

1   A.   No, I didn't.

2   Q.   And when was this abstract presented at the conference

3   relative to when you submitted your expert report?

4   A.   To my knowledge, it was included -- it was presented at

5   the conference in August 2019.  Late August.  It was after I

6   submitted my report.  And then -- I'm sorry.  Did you ask when

7   I saw it?

8   Q.   No.  But I can ask, when did you see it?

9   A.   Okay.  So, yes.  So it -- it came out after I submitted my

10  report.  And then I saw it for the first time sometime last

11  week.

12  Q.   How would someone find out about this abstract from this

13  conference?

14  A.   So the way that I looked it up online was I went to the

15  conference website, and I looked at the 2019 program or the

16  electronic booklet of abstracts, and I found it there.

17       Otherwise, you could find it from attending the

18  conference, from receiving the book of abstracts or the

19  booklet, electronic booklet of abstracts from the conference,

20  having a colleague tell you about it, if that colleague

21  attended the conference.  Those are the ways I can think of.

22  Q.   Are any of plaintiff's experts affiliated with the

23  conference?

24            MR. CONNETT:  Foundation, Your Honor.  And hearsay.

25            THE COURT:  All right.  Sustained.  You can lay a

 1    foundation.

 2    **BY MS. BHAT**

 3    **Q.**   Are you aware of whether any of plaintiff's experts are

 4    affiliated with the conference?

 5            **MR. CONNETT:**  Your Honor, I'm going to object.  I

 6    think the only foundation -- obviously, counsel can explore,

 7    but I believe the only foundation for this will be hearsay.

 8            **THE COURT:**  You'll have to lay a foundation before

 9    you ask the question.

10            **MS. BHAT:**  I will withdraw the question.

11            **THE COURT:**  Okay.

12    **BY MS. BHAT**

13    **Q.**   Dr. Chang, at this point I think I would like to just move

14    on from this abstract, I think we covered it in detail, to the

15    rest of your opinion.

16            Now, we've heard something about headaches and

17    epidemiological evidence, or at least human evidence, on

18    headaches from plaintiff's experts.  Can you tell me, what is

19    your response to Dr. Grandjean and Dr. Thiessen's discussion

20    about fluoride and headaches?

21    **A.**   Sure.  Particularly, I think Dr. Thiessen talked about the

22    Waldbott and Petraborg studies, or specifically their case

23    reports.

24            So these are -- the Waldbott 1956 case series and the

25    Petraborg 1974 case series are identified in the National

1    Academy of Sciences 2006 review on fluoride.  They are

2    identified as case reports.

3        So in case reports -- in epidemiology case reports are not

4    accepted, not an acceptable basis for providing information

5    about causation, because they have no comparison group.  So

6    case reports and case series cannot demonstrate statistical

7    associations, much less causal effects because of this lack of

8    inappropriate comparison group.  So they have an exposed

9    disease group, but they don't have, you know, unexposed

10   diseased, unexposed non-diseased or exposed non-diseased.

11       So in the Waldbott and the Petraborg -- Waldbott 1956 and

12   Petraborg 1974 case series, these were patients who came in,

13   you know, reporting that they had headaches, gastrointestinal

14   problems, nasal symptoms, backache, nerve problems.

15       They also reported, you know, that they -- in some cases

16   they reported, well, once I switched to spring water, their

17   symptoms went away, or they were recommended by the doctor to

18   switch to spring water and then the symptoms went away.  The

19   self-reported symptoms went away.

20       Dr. Thiessen described these as experimental blinded

21   studies, but Waldbott, for instance, describes a patient who

22   came in and the doctor told her to switch to spring water.  And

23   so she knew that she was changing her exposure.  You know, she

24   didn't know that it was necessarily unfluoridated water, but

25   she knew she was doing something different.  And then she came

1    in and said that the symptoms went away.

2         So these are not -- those are at most single-blinded

3    studies, but the investigator is not blinded.  And it's been

4    widely shown that single-blinded studies are also susceptible

5    to bias.  And they are also susceptible to the placebo effect,

6    where simply changing one's lifestyle or changing one's habits

7    may result in a change in self-reported subjective symptoms.

8         There are two other studies that have been mentioned --

9    oh, I'm sorry.  I also looked at Waldbott 1958, which was

10   mentioned this morning.  That one does have some patients who

11   came in -- as Dr. Thiessen said, she said there were some

12   patients who had symptoms.  They were -- they were complaining

13   of symptoms.  Only one of them in the Waldbott 1958 mentions

14   headache.

15        But they came in and then the doctor gave them blinded --

16   he gave them blinded fluoridated water, although single

17   blinded.  So he knew about it.  And then the patient

18   immediately complained of allergic symptoms.  But the doctor

19   did not test the patients with, you know, normal --

20   unfluoridated water.  The doctor did not report on any cases

21   that he tested that did not experience symptoms.  He didn't

22   report on use of fluoridated water and people without any

23   symptoms.  And so these are not a valid basis for causation.

24        And then -- sorry.  Just getting back to another couple of

25   studies of headache that have been discussed.

1          Sharma 2009 is an ecological cross-sectional study

2     conducted in India.  It evaluated current self-reported

3     symptoms in children, ages 12 to 18, and in adults ages over

4     18.  So other than that stratification, under or over 18, they

5     didn't adjust for age.  They adjusted for sex by stratifying

6     between males and females, and that's it.

7          So comparing people living in different villages, their

8     self-reported headache, barely adjustment for confounders.

9     They actually found no difference in headache among children or

10    adults between the medium fluoride villages, which are 1 to 1.5

11    milligrams per liter, and the low fluoride villages, which were

12    below 1.

13         They did find significantly higher headache --

14    self-reported headache in the high fluoride villages, but with

15    the ecological cross-sectional design, virtually no control for

16    confounding, and the self-reported symptoms, the study just is

17    not that informative about causation.

18         And then the Roholm study from 1937 of cryolite workers,

19    they remember working at this factory that processed cryolite,

20    which is sodium, aluminum hexafluoride.  These workers were

21    found to have hundreds or thousands of parts per million of

22    fluoride in their bones and teeth.  Some of them had severe

23    skeletal fluorosis.  Even then in the 68 current cryolite

24    workers, two of them, or 3 percent, reported headache.

25         And so there's no comparison with unexposed workers.  You

 1    know, there is some normal prevalence of headache even in the

 2    unexposed population.  So there was no comparison there.

 3         They also had 127 former cryolite workers.  And in the

 4    former workers there was a higher prevalence of self-reported

 5    headache.  Think 41, 48 percent in those workers.  But in

 6    general, those former workers had more self-reported symptoms

 7    in general, and that might be due to a healthy worker effect

 8    where, you know, unhealthy people quit working.

 9         But, you know, this -- again, this comparison had no

10    adjustment for age, other confounders, other health conditions.

11    There is no comparison group of unexposed workers who are

12    working and were no longer working.  So, again, this is not

13    informative about effects of fluoride exposure, especially, you

14    know, from community drinking water.

15         Those are the ones that I remember or recall.  The studies

16    of headache that I remember.  I don't know if there were

17    others.

18         I know there was some discussion of hypersensitivity or

19    allergy.  For instance, in the Waldbott case reports, he talked

20    about allergy.  I know subsequently the American Academy For

21    Allergy, I think in 1971, investigated, you know, the Waldbott

22    case reports and other reports of allergy, and they found --

23    their conclusion was that there was no evidence for allergy to

24    fluoride at drinking water levels.

25    Q.   Dr. Chang, we also heard some discussion from plaintiff's

 1   experts about fluoride and thyroid.  Can you please respond to

 2   plaintiff's experts' characterization of epidemiological

 3   evidence on fluoride and thyroid?

 4          MR. CONNETT:  Your Honor, we have a foundation

 5   challenge to this in that Dr. Chang didn't review or discuss

 6   any single paper on thyroid in her expert -- in her, I think,

 7   90-page expert report in this case.

 8          THE COURT:  All right.  Well, if there has been no

 9   prior disclosure of that, then I'm not -- I don't see how she

10   can testify.

11          MS. BHAT:  Your Honor, I believe plaintiffs have said

12   that there was discussion about thyroid in the NRC report.  I

13   think that's what they were relying on.

14      Also, I believe that Dr. Chang did discuss (audio

15   interference) and by Peckham in her -- in her report.  I have

16   her references here.

17          THE COURT:  These were specifically on thyroid?

18          MS. BHAT:  Yes.  Peckham, the title is "Are fluoride

19   levels in drinking water associated with hypothyroidism

20   prevalence in England?"

21          MR. CONNETT:  Is this from the expert report?

22          MS. BHAT:  I'm looking at her reference list, which

23   is, I believe, the same in her expert report as in her

24   declaration.

25          MR. CONNETT:  Your Honor, the only discussion of

 1   Peckham in the expert report is simply a citation to EPA's

 2   denial of plaintiff's petition.  There is absolutely zero

 3   critical analysis of that paper.  Zero.

 4           THE COURT:  All right.  Is there anything in her

 5   direct testimony in her declaration about this, trial

 6   declaration?

 7           MS. BHAT:  About thyroid?

 8           THE COURT:  Yes.

 9           MS. BHAT:  Yes.  Dr. Chang has expressed that she is

10   an expert in fluoride and thyroid as it relates to

11   neurocognitive outcomes.

12           THE COURT:  But, I mean, anything here -- you were to

13   ask her some questions specifically, not just about her

14   expertise.  Is there any paragraph, set of paragraphs that

15   addresses this in her trial declaration?

16           MS. BHAT:  In her declaration, no, I don't believe

17   so.  But we're still on direct testimony here.

18           THE COURT:  Well, direct testimony was designed to

19   elicit highlights from the direct testimony.  The direct

20   testimony actually is the declaration filed.  And so if it's

21   not in there, that's frankly outside the scope of the direct.

22           MS. BHAT:  All right, Your Honor.  We can withdraw.

23           THE COURT:  Okay.  Thank you.

24   BY MS. BHAT

25   Q.   Dr. Chang, I believe that you've summarized your

1   conclusions based on your systematic review before and so I

2   just wanted to close by asking you:  How do the results from

3   the Spain abstract affect your conclusions based on your

4   systematic review, if at all?

5   **A.**   They don't change my conclusions.  So my conclusion

6   remains that there is not sufficient evidence based on what I

7   saw in my systematic review literature review to conclude that

8   neurodevelopmental harm is caused by fluoride at community

9   drinking water levels.

10      So you know this -- the study in Spain does not change

11  that conclusion.  I guess it -- it gives me -- it lends maybe

12  further -- it lends further weight to it.  I think it -- it

13  reinforces that conclusion.

14          **MS. BHAT:**  Thank you, Your Honor.  No further

15  questions at this time.

16          **THE COURT:**  All right.  Well, we're right at our

17  time.  Good timing for our 15-minute break, and we will resume

18  in 15 minutes to commence with cross.  So we'll see you then.

19          **MR. CONNETT:**  Thank you, Your Honor.

20          **MS. BHAT:**  Thank you.

21          **THE CLERK:**  Court is in recess.

22      (Whereupon there was a recess in the proceedings

23       from 12:08 p.m. until 12:32 p.m.)

24          **THE COURT:**  All right.  Good afternoon.  Ready to

25  resume?

 1           MR. CONNETT:  Yes, Your Honor.

 2           THE COURT:  Okay.  You may commence your cross.

 3                      <u>CROSS-EXAMINATION</u>

 4   BY MR. CONNETT

 5   Q.   Good afternoon, Dr. Chang.

 6   A.   Good morning, Mr. Connett.

 7   Q.   Dr. Chang, you are not a risk assessment scientist;

 8   correct?

 9   A.   That's right.

10   Q.   And prior to this case you, by your own admission, were

11   not an expert on fluoride in human health; correct?

12   A.   Yes, that's right.

13   Q.   And by your own admission, you were not an expert on

14   fluoride neurotoxicity; correct?

15   A.   That's right.  I had not systematically reviewed the

16   literature on fluoride and neurotoxicity.

17   Q.   And by your own admission, you were not an expert on how

18   fluoride effects the thyroid gland; correct?

19   A.   Well, except as mentioned in my declaration, to the extent

20   that it's reflected in neurodevelopmental outcomes.  I hadn't

21   looked specifically at thyroid as a separate effect from

22   neurodevelopment.

23   Q.   Just to be clear, prior to you being retained by the EPA

24   in this case, you, by your own admission, were not an expert on

25   how fluoride affects the thyroid gland; correct?

 1   A.   That's right.  Yeah, prior to my retention.

 2   Q.   And if one were to look at your C.V., Dr. Chang, the word

 3   "fluoride" is nowhere to be found; correct?

 4   A.   I think that's right.

 5   Q.   You started at Exponent in 2012?

 6   A.   Yes.

 7   Q.   How much did Exponent pay you in 2019?

 8              MS. BHAT:  Objection, Your Honor.  Relevance.

 9              THE COURT:  All right.  Same issue.  I'm going to

10   overrule the objection, but if Dr. Chang wishes, she can submit

11   that information by -- via sealed declaration.

12   BY MR. CONNETT

13   Q.   Now, Dr. Tsuji testified earlier on Friday that she has

14   billed $200,000 for her work on this case.

15        Dr. Chang, how much have you billed EPA for your work so

16   far?

17              MS. BHAT:  Objection, Your Honor.  Foundation.

18              THE COURT:  Well, I think foundation is obvious, so

19   overruled.

20   A.   Okay.  So I -- for Dr. Tsuji, my understanding is that the

21   invoices from Exponent cover not only her work, but, you know,

22   the team's -- like, if there are other people who worked on

23   hers.  So I think the total was for everybody.

24        But for my -- for my scope -- well, I looked at this on

25   Saturday and at the time it looked like it was 148 or -9,000.

1   Q.   So to date, Exponent has billed EPA about $350,000 for its

2   collective work on the case?

3   A.   Umm, I mean, based on -- if that's correct for Dr. Tsuji,

4   then that would be.  I don't know if it's all billed, but it

5   would be somewhere around that range.

6   Q.   Dr. Chang, the only reference to EPA, the Environmental

7   Protection Agency, the defendant in this case, the only

8   reference to EPA in your C.V. is to a critique that you

9   published of EPA's risk assessment of asbestos; correct?

10  A.   In my C.V.?  That's probably -- that could be -- I mean, I

11  think that could be correct, yes.

12  Q.   And your critique of EPA's risk assessment of asbestos was

13  funded by W.R. Grace; right?

14  A.   So I was a coauthor on that critique, and I wasn't

15  responsible for the -- the sort of project management or

16  contracting.  I think that's right, but I never interacted with

17  the client on that one, so I don't recall.

18  Q.   Well, do you know enough to know that W.R. Grace is a

19  company that has faced substantial liabilities for asbestos?

20  A.   That's my understanding.  I don't know what

21  "substantial" -- it is my understanding that they were involved

22  in -- they have some liability for asbestos exposure, yes.

23  Q.   And you have served as an expert yourself, a defense

24  expert, in asbestos litigation; correct?

25  A.   Not on the topic of asbestos per se.  So I have two

1   depositions that we discussed at my deposition in this matter

2   where the overall matter pertained to asbestos, or my

3   understanding was that the overall matter pertained to

4   asbestos, but my scope was pertained to epidemiology methods,

5   not to asbestos per se.

6        And otherwise I -- you know, I haven't been involved in --

7   as a retained expert in asbestos litigation.

8   Q.   Now, in addition to being paid to criticize EPA's risk

9   assessment on asbestos, you, Dr. Chang, were paid by a

10  pesticide manufacturer named Syngenta to give a presentation to

11  an EPA science advisory board; correct?

12            MS. BHAT:   Objection, Your Honor.   Misstates

13  testimony.   It's compound and lacks foundation.

14            THE COURT:   Overruled.

15  A.   So just to clarify.   I'm not directly paid for any of this

16  work.   So if I don't work on any particular project, I'll just

17  work on something else.

18       But -- but it is correct that I was retained by Syngenta

19  to go speak in front of an EPA science advisory board.

20  BY MR. CONNETT

21  Q.   Concerning a pesticide that Syngenta had an interest in;

22  correct?

23  A.   Yeah.   It was concerning a pesticide.   I don't think

24  Syngenta manufactured that pesticide, but they had some kind of

25  reason to be interested in it.

1    Q.   And, Dr. Chang, that's the only presentation that you have

2    ever given to an EPA science advisory board, correct?

3    A.   Yes, I think so.

4    Q.   And you, yourself, Dr. Chang, never served on an EPA

5    science advisory board; correct?

6    A.   No, not in particular.  Last summer I was part of an

7    expert panel on, you know, assessing potential thresholds for

8    carcinogenicity, and this was a panel at the toxicology forum

9    in D.C.  And there was an EPA scientist also on the expert

10   panel, but I don't know who, honestly, assembled that panel.

11   It was with the EPA, but I don't think it was an EPA expert

12   panel per se.

13   Q.   Well, let me maybe define it differently.  Dr. Chang, are

14   you aware of ever having served as an expert on an EPA science

15   advisory board?

16   A.   No.

17   Q.   Now, in all the litigation work you've done so far during

18   your time at Exponent, you've never once testified on behalf of

19   plaintiffs; correct?

20   A.   No, not yet.

21   Q.   And in 2009 you gave a presentation to an entity called

22   the Defense Research Institute; correct?

23   A.   In -- sorry.  What was the date?

24   Q.   Thank you.  I will repeat the question.

25        In 2019 you gave a presentation to the Defense Research

1    Institute; correct?

2    **A.**    I think that's right.  I mean, I gave a webinar that was

3    sponsored by the Defense Research Institute.  It was -- it was

4    a webinar, so it wasn't presenting to -- you know, some of the

5    people who joined were from that institute, and some people

6    were students and post docs and others.

7    **Q.**    And the Defense Research Institute is an organization of

8    defense attorneys including toxic tort and product liability

9    attorneys; correct?

10   **A.**    I think that's correct.  I think there are -- I don't know

11   exactly what -- whom -- who comprises their membership, but I

12   know that there are some such attorneys among the members, yes.

13   **Q.**    Now, during your time -- and you alluded to this earlier,

14   but during your time at Exponent, you have published a number

15   of systematic reviews on the relationship between toxic

16   chemicals and human health; correct?

17   **A.**    Yes, that's correct.

18            **MR. CONNETT:**  Your Honor, at this time I would like

19   to show the witness a table that we discussed extensively

20   during her deposition.

21            **MS. BHAT:**  Objection, Your Honor.

22            **THE COURT:**  What is this?

23            **MR. CONNETT:**  It's a demonstrative, Your Honor.

24            **THE COURT:**  What's the objection?

25            **MS. BHAT:**  Your Honor, this table was shown to this

 1   witness at her deposition and she described it as being

 2   misleading.

 3        There is a question mark at the bottom of the

 4   demonstrative, which I believe plaintiff's counsel understands

 5   to reduce the misleading nature of the exhibit.

 6        But in addition to that, there are several misleading

 7   facts within the table, and this demonstrative is just not

 8   necessary to elicit testimony.

 9        **MR. CONNETT:**  Your Honor, this demonstrative is --

10   will greatly facilitate the testimony.  And the witness at her

11   deposition confirmed, confirmed the accuracy of everything in

12   here.

13        So to the extent that it -- to the extent that the witness

14   needs to clarify anything, the witness can do that now.  But

15   the idea that we can't show a demonstrative to facilitate a

16   discussion of her 12 systematic reviews, there is no reason for

17   it, Your Honor.

18        **THE COURT:**  All right.  I'll allow it, with the

19   clarification that this is not in evidence.  It is only used to

20   facilitate testimony and you will give the witness the full

21   chance to explain or take issue with this table.

22        **MR. CONNETT:**  Understood, Your Honor.

23        Now, I'm going to try something that I haven't yet tried

24   in this case, which is to use this Elmo.

25        (Document displayed.)

1  BY MR. CONNETT

2  Q.   Dr. Chang, can you see this on your screen?

3  A.   Yes.  I'm on a laptop, so it's a little bit small, but...

4  Yes, I can see it.

5  Q.   Okay.

6       (Document enlarged))

7  Q.   Is that better?

8  A.   Not really.  I can see it.

9  Q.   Okay.  So you remember us talking about this table at your

10 deposition; right?

11 A.   Yes, I do.

12 Q.   And at your deposition you confirmed that this table

13 correctly identifies the year of publication of the systematic

14 reviews you've done at Exponent; correct?

15 A.   Yes.  That's right.

16 Q.   And at your deposition you confirmed that this table

17 correctly identifies the chemicals that you have studied in

18 these systematic reviews; correct?

19       MS. BHAT:  Objection, Your Honor, to form.  The

20 witness, if she has knowledge of the -- any of these facts, she

21 has knowledge now as well as in her deposition.  So it's

22 unclear why the questions are phrased this way.

23       THE COURT:  Why don't you rephrase the question?  I'm

24 not sure I understand the objection.

25       Ask the question begin.

1  BY MR. CONNETT

2  Q.   Dr. Chang, you agree that this table accurately sets forth

3  the chemicals that you have studied in your systematic reviews

4  at Exponent; correct?

5  A.   I think that's -- I think that's correct.

6  Q.   And, Dr. Chang, you agree, with the exception of this typo

7  that you pointed out to me -- it should be "prostate" cancer,

8  not "prostrate" cancer.  But you agree with me that this column

9  accurately sets forth the health endpoints that you have

10  studied in your systematic reviews; correct?

11  A.   I think -- yes, I think that's correct.

12  Q.   And, Dr. Chang, you would agree that this column entitled

13  "Industry Sponsor" correctly identifies the industrial groups

14  and companies that have sponsored your systematic reviews;

15  correct?

16  A.   So I think as we discussed during my deposition, I wasn't

17  sure who comprises the Arsenic Science Task Force or the

18  Manganese Interest Group.  I don't know if those are industry

19  entities.  I don't know who makes up the membership.

20       The Electric Power Research Institute is not, to my

21  understanding, an industry sponsor.  I think it's some kind of

22  joint group that involves government non-profit and industry

23  stake holders.  I'm not exactly sure again.

24  Q.   Okay.

25  A.   I think, you know, in terms of who provided funding for at

 1   least part of the work, you know, it's my understanding that

 2   that is correct.

 3   Q.   Okay.  So let's now -- I want to start by talking about a

 4   couple of these.

 5        Dr. Chang, you have published three systematic reviews on

 6   Agent Orange that were funded by Dow and Monsanto; correct?

 7   A.   That's right.  I'm the first author on two of them.  And

 8   then Dr. Goodman, Michael Goodman, is the first author on the

 9   diabetes one.

10   Q.   And in these three systematic reviews that --

11        MS. BHAT:  Objection, Your Honor.  I see that this

12   demonstrative is being marked up, but I would like to make it

13   clear for the record that the witness is not doing these

14   markings.

15        THE COURT:  That's fine.  It's not in evidence

16   anyway.  So I'm not sure what difference it makes.

17        So for now, objection overruled.

18   BY MR. CONNETT

19   Q.   Dr. Chang, in these three systematic reviews that you did

20   on -- on Agent Orange, you concluded that the evidence was

21   insufficient to establish a causal relationship between Agent

22   Orange and each of the health effects at issue; correct?

23   A.   I think that our concluding paragraphs, you know, were

24   more nuanced than just, you know, insufficient.

25        I think, you know, in the diabetes one, I know we looked

1    at studies that specifically had serum, dioxin measures.  It

2    was actually a meta analysis.  And then in that study, in the

3    analysis, we found that -- I think, as I remember, no

4    significant association between serum dioxin and diabetes.

5        So it wasn't that we had done some kind of systematic

6    literature review and concluded against a causal effect.  I

7    think it was that we had done this meta analysis looking for --

8    systematically looking for all the studies that had serum

9    dioxin data, and then doing a meta analysis, and then finding

10   that, you know, based on what we thought was the best available

11   evidence, we didn't see an association.

12       For the other two, I think, for lymphoid cancers and

13   prostate cancer, as I remember -- I don't have the papers right

14   in front of me, but as I remember we concluded, you know, to

15   date the epidemiological evidence is not sufficient to support

16   a causal effect on -- of Agent Orange or dioxin on these

17   specific cancers, and that conclusion is consistent with what

18   the International Agency for Research on Cancer, that is part

19   of the World Health Organization, that it's the same conclusion

20   as what that agency has concluded.

21       For the lymphoid cancers, I think there were some

22   differences in our conclusions on the different types of

23   lymphoid cancers.  So non-Hodgkin lymphoma, Hodgkin lymphoma

24   and multiple myeloma.  But I don't remember exactly what we

25   concluded.

1     I mean, it was that there was not sufficient evidence to

2     conclude in favor of causality, again, consistent with what

3     IARC, the International Agency for Research on Cancer, had

4     concluded.

5     **Q.**   Well, I'll go ahead and ask you a question I asked you at

6     your deposition and see what your response is now.

7             **MS. BHAT:**  Objection, Your Honor, to form.  I would

8     just -- I don't understand the preface for that question.

9             **MR. CONNETT:**  Well, I'll start over, Your Honor.

10            **THE COURT:**  Just ask the question.

11    **BY MR. CONNETT**

12    **Q.**   For each of these 12 systematic reviews that you did at

13    Exponent on these chemicals and on behalf of these companies,

14    you concluded, Dr. Chang, that there was insufficient evidence

15    to establish causation for the exposure levels of interest in

16    the population; correct?

17    **A.**   For the exposure levels of interest.  I think that is what

18    my coauthors and I concluded.

19        For pesticides, you know, that's not a really

20    informative -- it's not a chemical.  So it's -- you know, it's

21    a broad diverse array of exposures.  And I don't think we would

22    have reached a conclusion on a causal effect of pesticides

23    per se, just because it's not a specific exposure.

24        But otherwise, to my recollection, you know, that's

25    broadly correct.  With the caveat that we had, you know, sort

1    of a more nuanced way of making these conclusions and comparing

2    them with what health and regulatory agencies also had

3    concluded.

4            MR. CONNETT:  Your Honor, at this time I would like

5    to introduce deposition testimony for impeachment.

6            THE COURT:  Okay.  Identify what it is.

7            MR. CONNETT:  It's Page 100, Lines 13 to 22.

8            THE COURT:  Any objection?

9            MS. BHAT:  This doesn't appear to be inconsistent

10   with what the witness has attested to.  So I do have an

11   objection.

12           THE COURT:  Okay.  Let me find it.  What page?

13           MR. CONNETT:  Page 100, Your Honor.  It's Lines 13 to

14   22.

15           THE COURT:  Go ahead and read it.

16           MR. CONNETT:  Mr. Anderson, can you put it on the

17   screen?

18       (Document displayed.)

19   BY MR. CONNETT

20   Q.   (As read)

21       "QUESTION:  For each of these 12 systematic reviews

22       for the exposure levels of interest in the population,

23       am I correct in understanding that you concluded in

24       each instance that there was not sufficient evidence

25       to establish a causal connection?

1      **ANSWER:**  That is correct.  Although, the main point

2      of the Arsenic in Developmental Neurotoxicity paper

3      was not about causality.  So that wasn't the

4      conclusion of the paper."

5          **MR. CONNETT:**  You can remove that.

6      (Document removed from display)

7  **BY MR. CONNETT**

8  **Q.**   Dr. Chang, I'd like to go back here to this table.

9      (Document displayed.)

10 **Q.**   And for the Agent -- your conclusions on Agent Orange are

11 actually at odds with what the U.S. Department of Veterans

12 Affairs says; correct?

13 **A.**   No, that's not correct.

14 **Q.**   Are you aware, Dr. Chang, that if you go to the U.S.

15 Department of Veteran's Affairs website, they say that each and

16 every one of these conditions is caused by Agent Orange?

17 **A.**   No, they don't say that.

18          **MR. CONNETT:**  Your Honor, at this time I'd like to

19 show the witness the current website of the U.S. Department of

20 Veteran Affairs.

21          **MS. BHAT:**  Objection, Your Honor.  Hearsay.

22          **THE COURT:**  Well, this is straight from the

23 governmental website?

24          **MR. CONNETT:**  Yes, it is, Your Honor.

25          **THE COURT:**  Okay.  Objection overruled.

 1          (Document displayed.)

 2     **BY MR. CONNETT**

 3     **Q.**   Dr. Chang, can you see this website on your screen?

 4     **A.**   Yes.

 5     **Q.**   It says "U.S. Department of Veteran Affairs" at the top?

 6     **A.**   Yes.

 7     **Q.**   And you see that the title of the page is "Disease Related

 8     to Agent Orange"?

 9     **A.**   Yes.

10     **Q.**   And you see the section here that says:

11              "Cancers we believe are caused by contact with

12          Agent Orange"?

13     **A.**   Yes.

14     **Q.**   And you see that one of the cancers listed is prostate

15     cancer?

16     **A.**   I see that.

17     **Q.**   And that's one of the cancers that you found insufficient

18     evidence of causation on; right?

19     **A.**   So this -- the Agent Orange designation by the VA actually

20     does not pertain to causation.  And if you go and look at the

21     charge of the committee of the National Academy of Sciences

22     that is charged with evaluating health connections with Agent

23     Orange, they are not charged with evaluating causality.  They

24     specifically are charged with evaluating statistical

25     associations with Agent Orange.  And then these conditions are

CHANG - DIRECT / CONNETT

1  specifically laid out as associated with potentially Agent

2  Orange or dioxin exposure.

3      But it's very clear when you look beneath the surface of

4  this headline, that when you look at the scientific basis, they

5  are not concluding that these are causal effects.  They are

6  concluding that they are health conditions for which veterans

7  who served in the Vietnam war and can prove a service

8  connection, they can receive compensation if they develop these

9  diseases.  But these -- that's not the same thing as causation.

10  Q.  But you would agree with me, Doctor, that the U.S.

11  Department of Veteran Affairs, when it sets forth this website,

12  it uses the word "cause;" right?

13  A.  I can -- I can see that, yes.  But I understand the

14  scientific basis for those words as well.

15  Q.  Right.  And the U.S. Department of Veteran Affairs says

16  that:

17      "Other illnesses that we believe are caused by

18      contact with Agent Orange include diabetes mellitus,

19      Type 2."

20      Correct?

21  A.  I can see that.  And then they also have a specific, you

22  know, I don't know, hundreds of pages report.  It's hundreds of

23  pages, scientific reports that come out every couple of years,

24  where they describe the scientific basis for these conclusions.

25  And it's, again, very clear that they are looking at

1    associations.

2    **Q.**    And to be clear, you didn't find sufficient causation with

3    Agent Orange and diabetes mellitus; correct?

4              **MS. BHAT:**  Objection, Your Honor.  Asked and

5    answered.

6              **THE COURT:**  Overruled.

7    **A.**    Yes.  We found some statistical associations, and then we

8    concluded that they were not -- actually, with the serum dioxin

9    we didn't -- we didn't find, like, a -- we did not find a

10   positive biological gradient for serum dioxin, and so we

11   concluded that those results of the meta analysis did not

12   support a causal effect.

13   **BY MR. CONNETT**

14   **Q.**    Now, you have also published two systematic reviews on

15   perfluorinated chemicals that were funded by 3M; correct?

16   **A.**    That's correct.

17   **Q.**    And 3M was the manufacturer of some of these

18   perfluorinated chemicals?

19   **A.**    That's correct.

20   **Q.**    And 3M was sued by the State of Minnesota for the harm

21   caused by these chemicals?

22   **A.**    I don't know exactly what they were sued for.  They were

23   sued for State of Minnesota, et al -- sued by the State of

24   Minnesota, et al, and so there were some other parties

25   involved, I believe.  But I don't remember the exact sort of

 1   scope of the litigation, if it was for harm or potential harm.

 2   Q.   And you were --

 3   A.   Environmental, environmental effects.  I don't recall.

 4   Q.   And you were the epidemiologist that 3M retained to defend

 5   itself in this litigation; right?

 6   A.   I was an epidemiologist retained by 3M.  I don't know if

 7   they retained other epidemiologists.

 8   Q.   And Dr. Phillipe Grandjean was the expert that the State

 9   of Minnesota retained to represent the State; correct?

10   A.   That's my understanding.  I don't know if he represent --

11   excuse me, represented the State and other parties, but he was

12   retained in that litigation as well.

13   Q.   And are you aware that 3M ended up paying $850 million to

14   the state of Minnesota for the harm caused by those chemicals?

15          MS. BHAT:  Objection, Your Honor.  Assumes facts that

16   are not in evidence.

17          THE COURT:  Sustained.

18   BY MR. CONNETT

19   Q.   Now, Monsanto funded the systematic review that you did on

20   glyphosate; correct?

21   A.   Yes.

22   Q.   And Monsanto -- glyphosate is the active ingredient in

23   Monsanto's pesticide Roundup?

24   A.   I believe that's true, yes.

25   Q.   Okay.  And your systematic review looked at the

1  relationship between glyphosate and cancers of the lymphatic

2  system?

3  **A.**    Yes.   This was a meta analysis and a systematic review.

4  **Q.**    Okay.   And although you found a significant association

5  between glyphosate and cancer, you concluded that there was

6  insufficient evidence to determine if it was causal; correct?

7  **A.**    No.   It was -- it was more specific than that.   So we

8  found -- we did this meta analysis of existing epidemiologic

9  studies of glyphosate used and various lymphoid cancers,

10 including leukemias, different non-Hodgkin lymphomas, multiple

11 myeloma and Hodgkin lymphoma.   And in the meta analysis we

12 found a statistically significant association specifically

13 between the use of glyphosate and risk of B-cell lymphoma,

14 which is a type of non-Hodgkin lymphoma.   However, the

15 association with other cancer types that we evaluated was not

16 statistically significant.

17      However, we pointed out that the meta analysis that we did

18 was mainly to update and to provide an alternative analysis to

19 other meta analyses that had been published.   Mainly, we

20 focused on the fact that, in particular, exposure assessment in

21 these studies was very poor.   By and large, it was looking at

22 ever-never exposure or ever-never use of glyphosate, which is a

23 very crude exposure metric.

24      And so based on that evidence, that we concluded,

25 consistent with other health and regulatory agencies, that the

CHANG - DIRECT / CONNETT

1   epidemiologic evidence was not sufficient to establish a causal

2   effect of glyphosate on lymphohematopoietic cancers.

3        I don't remember the timing of that review relative to the

4   IARC conclusion.  But IARC also concluded that the evidence in

5   humans was not sufficient to establish causation.  And so, you

6   know, they -- they classified this as -- they classified

7   glyphosate below their category for a known carcinogen.

8   Q.   Right.  IARC classifies glyphosate as a probable human

9   carcinogen; correct?

10  A.   That's right.  Group 2A.

11  Q.   Now, during the peer-review process for this systematic

12  review that you did for Monsanto, your analysis was criticized

13  as appearing to be agenda driven; correct?

14  A.   My --

15            MS. BHAT:  Objection, Your Honor.  Vague.

16            THE COURT:  Let's be more specific.

17  BY MR. CONNETT

18  Q.   Well, you became aware of peer-review comments that were

19  made about this paper during the peer-review process, correct,

20  Dr. Chang?

21  A.   That's correct.

22  Q.   And one of the peer reviewers characterized your analysis

23  as agenda driven; correct?

24  A.   That is how I think -- one of the peer reviewers, I

25  remember, wrote something about -- did use that phrase.  I

 1  don't remember exactly what he or she wrote.

 2  **Q.**   And that peer reviewer characterized your causality

 3  analysis as devolving into a laundry list of every possible

 4  cause of bias or imprecision; correct?

 5  **A.**   I don't remember exactly, but that sounds -- I mean, I'll

 6  believe that that's correct.

 7            **MR. CONNETT:**   Your Honor, permission to refresh the

 8  witness's recollection.

 9            **THE COURT:**   All right.   With what though?

10            **MR. CONNETT:**   The peer-review comments.

11            **THE COURT:**   Okay.

12            **MR. CONNETT:**   Paul, can you put up the peer-review

13  comments?

14       You can go just for the second one.

15       (Document displayed.)

16  **BY MR. CONNETT**

17  **Q.**   So the peer reviewer here states:

18            "Despite the fact that the authors deemed the

19       meta analysis worth conducting, the discussion

20       devolves into a laundry list of every possible cause

21       of bias or imprecision of estimates in epidemiological

22       studies."

23       Did I read that right?

24            **MS. BHAT:**   Objection, Your Honor.   This is for

25  refreshment purposes.   It is not in evidence, and I'm not sure

 1  why plaintiff's counsel is reading from it.

 2          THE COURT:  That's correct.  You've done that several

 3  times, counsel.  To tell you the truth.  To refresh her

 4  recollection, you should show it to the witness, not comment on

 5  it, and then ask the witness whether that refreshes her

 6  recollection.  And not read it from.

 7          MR. CONNETT:  Sorry, Your Honor.  I apologize for

 8  that.

 9  BY MR. CONNETT

10  Q.   Dr. Chang, does that refresh your recollection as to the

11  comments you received during the peer-review process?

12  A.   That refreshes my memory as to comments that we received

13  from one peer reviewer during the process of peer review.

14  Q.   Okay.  And as a result of thousands of lawsuits that have

15  been brought regarding Roundup, emails between you and a

16  Monsanto toxicologist have been released; correct?

17          MS. BHAT:  Objection, Your Honor.  Assumes facts that

18  are not in evidence, and discusses hearsay, and is irrelevant.

19          THE COURT:  Overruled.

20  A.   That's correct.

21  BY MR. CONNETT

22  Q.   And these emails showed that you shared a draft of your

23  systematic review on glyphosate with Monsanto prior to

24  submitting it for publication; correct?

25  A.   Yes.  I shared the draft with this toxicologist.  And I

1    think she shared it with one other person maybe, a coworker.

2    Q.   And you also shared the draft with two consultants that do

3    work for Monsanto; correct?

4    A.   I don't know exactly what those -- the other two people do

5    that we shared it with.  I think we discussed this in my

6    deposition.

7         So I also shared the draft with Dr. Thomas Sorahan, who I

8    believe is a professor of epidemiology in the UK, who is

9    knowledgeable about glyphosate.

10        And then I also shared the draft with Dr. John Acquavella,

11   who is another epidemiologist who's knowledgeable about

12   glyphosate and had performed epidemiologic studies of

13   glyphosate in the past.

14        And so I don't know if they are, you know, consultants for

15   Monsanto.  I don't know what their status is.

16   Q.   Now, just to go back to this table, to wrap up this table

17   here.  The other systematic reviews that you published during

18   your time at Exponent have been funded by the American

19   Petroleum Institute; correct?

20   A.   I think that's right.

21   Q.   American Chemistry Council?

22   A.   Yes.  That's my understanding of that one.

23   Q.   Arsenic Science Task Force?

24   A.   And the Electric Power Research Institute.

25        And Dr. Tsuji, I think, was talking about this paper

CHANG - DIRECT / CONNETT

1   earlier today and said that, you know -- I mean, this is true,

2   actually, for several of these papers.  A lot of the time that

3   went into these papers was just on our own time, unfunded as

4   well.

5   **Q.**   Okay.  And another one of the systematic reviews was

6   funded by Crop Life America?

7   **A.**   Yes, it appears is that way.

8   **Q.**   And another was funded by Syngenta?

9   **A.**   That's right.

10  **Q.**   American Petroleum Institute is a trade association that

11  represents all aspect of America's oil and gas industry?

12  **A.**   If that's from their website, then I'm -- it's probably

13  accurate.

14  **Q.**   Well, if you testified to that at your deposition, would

15  you agree with it?

16  **A.**   I think so.  I --

17          **MS. BHAT:**  Objection, Your Honor.  Form.

18          **THE WITNESS:**  I think --

19          **THE COURT:**  Hold on.

20      I'm going to overrule the objection.  She can testify as

21  to her knowledge.

22  **A.**   I think during my deposition I probably said that sounds

23  accurate, but I -- I think I -- what did I do?  I might have

24  looked at the paper to see if there was a description, and then

25  confirmed that that was correct.  I'm not disputing that

1   description.

2   **BY MR. CONNETT**

3   **Q.**   Okay.  And Crop Life America is a trade association that

4   represents pesticide manufacturers; correct?

5   **A.**   I'm not sure if that's all they represent.  I know that

6   there are some companies that manufacturer pesticides and other

7   chemicals that are members of that group.

8   **Q.**   And Syngenta, as we've already discussed, manufacturers

9   pesticides; right?

10  **A.**   Yes.  I'm not sure, again, if that's all they manufacture,

11  but that's one of the things that they make.

12  **Q.**   Okay.  And, Dr. Chang, you can't recall how much Exponent

13  billed for these systematic reviews; is that correct?

14  **A.**   It's not necessarily that I don't recall.  In some cases I

15  never knew.  But I don't -- I don't know the total.  There is

16  no way for me to figure it out in some of these instances.

17      I think during my deposition we specifically -- so we

18  talked about how I wasn't the project manager on several of

19  them, and so I never saw the sort of billing or invoices.

20      And then on the one that I knew about, which was the

21  glyphosate review, I noted that -- I did have a better sense of

22  the time that went into that one, because it was primarily my

23  time.  And I think -- I don't remember the numbers, but you

24  asked if it was, like, some number; and I said no, it was

25  definitely below whatever number you asked about.  Like, I

 1    don't know, hundreds of thousands of dollars.  It was not -- if

 2    I remember, it was not anywhere near that amount.

 3    **Q.**   Now, Dr. Chang, you defined insufficient evidence of

 4    causation as, quote, not enough compelling evidence to reach a

 5    definitive conclusion one way or the other; is that correct?

 6    **A.**   Yeah.  That's one way I would define it.

 7    **Q.**   And that's the way you defined it; right?

 8    **A.**   Sure.

 9    **Q.**   Now, you recognize, Dr. Chang, that the causation standard

10    that you use is different than the risk standard that is used

11    in risk assessment; correct?

12    **A.**   I mean, as we discussed earlier, I'm not a risk assessment

13    scientist.  That's not one of my fields of expertise.

14        I broadly have a general understanding that the standards

15    differ, but I don't have an expert understanding of risk

16    assessment standards.

17    **Q.**   So at your deposition you testified that a risk assessment

18    is not an assessment of causation.  What did you mean by that,

19    Dr. Chang?

20            **MS. BHAT:**  Objection, Your Honor.  Assumes facts that

21    are not in evidence.

22            **THE COURT:**  Just ask the question instead of citing

23    the deposition testimony.

24    **BY MR. CONNETT**

25    **Q.**   Why in your view, Dr. Chang, would a risk assessment not

**CHANG - DIRECT / CONNETT**

1  be an assessment of causation?

2  **A.**   An risk assessment  is a -- in general, it's a theoretical

3  calculation of potential quantitative risk to a given

4  population, usually humans.  And it -- it assumes a specific

5  dose response relationship between a given exposure and a given

6  outcome.  And then in the risk assessment process, you know,

7  certain assumptions are applied.  Certain -- uncertainties are

8  identified.  And it's used to quantify theoretical potential

9  risk based on a model that, in effect, assumes causality.

10      But risk assessment is different from an epidemiologic

11  study in which original data are collected and, you know,

12  health -- exposures and health outcomes are observed.

13      So I guess a critical distinction between risk assessment

14  and epidemiology is that risk assessment is theoretical and

15  based on models.  It can even be used to extrapolate from

16  animals to humans, assuming that a hazard is present.  So

17  assuming that causation is established.

18      Whereas, epidemiology and hazard identification in general

19  are used to assess whether that hazard is present, whether a

20  causal relationship has been established.

21  **Q.**   Okay.  So let's talk about the work that you did in this

22  case.  I think, as you mentioned earlier, Dr. Chang, you did

23  receive help from a team of Exponent scientists; correct?

24  **A.**   Yes.  I think I mentioned that there were three other

25  scientists who helped on this project.

1  Q.   And you did not do a risk assessment; correct?

2  A.   That's correct.

3  Q.   You did not use EPA's Guidelines for Neurotoxicity Risk

4  Assessment to assess whether neurotoxicity is a hazard of

5  fluoride exposure; correct?

6  A.   My understanding of those guidelines is that they are for

7  risk assessment, rather than for epidemiology.

8       So that's correct.  I did not use those -- those risk

9  assessment guidelines.

10 Q.   And you and the Exponent team used basically the same

11 method that you have been using in your published systematic

12 reviews that we were talking about earlier; correct?

13 A.   That's correct.

14 Q.   And as with Agent Orange and the perfluorinated chemicals

15 and the organophosphorus insecticides and particulate matter

16 and manganese, in this case you did not find sufficient

17 evidence of causation between fluoridated water and

18 neurotoxicity; correct?

19 A.   It's correct that I did not find sufficient evidence to

20 establish a causal effect of fluoridated drinking water on

21 neurotoxicity in humans.

22      I do want to sort of -- you know, I understand that you're

23 trying to not be too wordy, I guess.  But with the -- with

24 the -- when you said as with manganese, Agent Orange and going

25 on and on, you know, I do think that those exposures can cause

CHANG - DIRECT / CONNETT

1    certain adverse health outcomes.

2        So, you know, where we found that causation had not been

3    established, it was with respect to specific human health

4    outcomes, and in some of those cases at specific levels of

5    exposure.

6    Q.   Now, in this case, Dr. Chang, you did not set out to

7    determine or estimate the level at which fluoride may cause

8    neurotoxicity; correct?

9    A.   That's correct.

10   Q.   So let's start with your systematic review of the

11   literature.  You found a number of studies that reported

12   significant associations between fluoride and adverse

13   neurodevelopmental effects that Dr. Grandjean did not discuss

14   in his report; is that correct?

15   A.   Yes.  I believe that's correct.  Yes, that is correct.

16   Q.   But these studies, which report adverse associations

17   between fluoride and neurodevelopment, which Dr. Grandjean did

18   not discuss, they carry very little weight in your own

19   assessment; correct?

20   A.   Very little -- yeah.  I mean, they informed my assessment,

21   but they carry lesser weight.

22   Q.   They carried little weight in your assessment; correct?

23   A.   I --

24       MS. BHAT:   Objection, Your Honor.  Asked and

25   answered.

1    **THE COURT:**  Overruled.  She can answer.

2    **A.**   I think they did carry little weight.  I think before when

3    you asked:  It was very little weight?  I -- you know, I'm

4    hesitant to use the word "very" just in a scientific context.

5    **BY MR. CONNETT**

6    **Q.**   And Dr. Chang, you also found four studies that did not

7    find significant associations between fluoride and

8    neurodevelopment that Dr. Grandjean did not discuss; correct?

9    **A.**   I haven't counted them up.  I remember I was asked about

10   this during the deposition when you called them no effect

11   studies, or Dr. Grandjean had called them no effect studies.  I

12   don't remember the total number.

13   **Q.**   Okay.  Well, let me ask you about the He exposure 2010

14   study.  I might be mispronouncing it.  It's H-E.  You gave that

15   study little weight, correct, Dr. Chang?

16   **A.**   Umm, I'm just going to look at -- I'm looking at my table,

17   which is printed out, just so I can refresh my recollection.

18       I'm sorry.  The question was whether I gave it little

19   weight?

20   **Q.**   Yes.

21   **A.**   Yes.  This is an ecological cross-sectional study

22   described based, on an abstract that I found cited in another

23   study.

24       Yes, this was a very weak, weak study design.  No

25   adjustment for confounders.  Yes, I did not give that much -- I

1    gave that little weight.

2    **Q.**   In fact, if the -- can you -- what's the proper

3    pronunciation?  Could you remind me?

4    **A.**   It's He.  Just, you know, I think He.

5    **Q.**   In the He study, the 2010 study, if that did not exist,

6    that would have no effect -- its absence would have no effect

7    on your opinions in this case; correct?

8    **A.**   It's hard for me to unsee it, but, you know, I don't think

9    it would carry -- I don't think it would make a meaningful

10   difference.

11           **MR. CONNETT:**  Okay.  Your Honor, at this point I

12   would like to introduce impeachment testimony.

13           **THE COURT:**  Okay.  You've got to -- do you have a

14   cite?

15           **MR. CONNETT:**  Yes.  It's page 270, Line 22, to 271,

16   Line 7.

17           **MS. BHAT:**  Excuse me.  I didn't quite catch the page

18   number.

19           **MR. CONNETT:**  270, Line 22 to 271, Line 7.

20           **MS. BHAT:**  I believe that you're cutting off part of

21   the question.

22           **THE COURT:**  I think you can start at Line 22.

23           **MS. BHAT:**  And I believe that we're asking about a

24   different study as well.

25           **THE COURT:**  Is that a different study, the Kang 2011

 1   study?  Is that the same as the He study?

 2            MR. CONNETT:  Actually, Your Honor, if that's the

 3   case, let me just...

 4        (Brief pause.)

 5            MR. CONNETT:  Sorry, Your Honor.  I did make a

 6   mistake with the page lines.  It's -- why don't we cover both

 7   of these -- well, before we proceed with this, Your Honor,

 8   maybe I'll ask just a few more questions.

 9            THE COURT:  Okay.

10   BY MR. CONNETT

11   Q.   So, Dr. Chang, you also -- one of the studies you included

12   in your review that did not find an association between

13   fluoride and neurodevelopment was the study by Kang 2011;

14   correct?

15   A.   That's right.

16   Q.   And you also gave the Kang 2011 study little weight;

17   correct?

18   A.   That's right.  Relatively little.  It's -- you know, it's

19   better designed, actually, than the He study because they --

20   you know, they had a number of confounders that they considered

21   in the analysis, but ultimately in my causal analysis I did not

22   give this one much weight.

23   Q.   And if the Kang 2011 study did not exist, its absence

24   would have no effects on your opinions in this case; correct?

25   A.   I mean, as expressed in my -- my overall opinions, I think

CHANG - DIRECT / CONNETT

1   that is true in terms of, you know, giving more weight to those

2   other ten studies, and my opinion regarding the epidemiologic

3   evidence of neurodevelopmental harm being caused by fluoride or

4   drinking water fluoride in the range of .7 milligrams per

5   liter.

6       I mean, I do have an opinion that this is -- you know, the

7   study is relatively better designed than some of the other

8   studies, you know, just based on the restrictions and the

9   confounder data.  But in general, it would not influence those

10  overall opinions.

11  **Q.**   Okay.  And let me return now to the question I asked you

12  earlier about the He 2010 study.

13      If that study did not exist, it would have no effect on

14  your overall opinions in this case; correct?

15  **A.**   Again, it would not effect my overall opinions about

16  causation.

17  **Q.**   Okay.

18  **A.**   That's correct.

19  **Q.**   Now, another study that you discussed that did not find an

20  association between fluoride and neurotoxic effects was the

21  2018 study by Perrott.  And I'll spell it, P-E-R-R-O-T-T.

22      That's correct, right, Dr. Chang?

23  **A.**   Yes.  I also discussed this study in my review.

24  **Q.**   And you gave the Perrott 2018 study little weight;

25  correct?

1   **A.**   That is correct.   This is an ecological cross-sectional

2   study.   And based on that design, I gave it little weight in my

3   causal analysis.

4   **Q.**   And you also did not give a lot of weight to the Spittle

5   abstract from 1998; correct?

6   **A.**   It's correct that I gave this relatively little weight in

7   my causal analysis.   I did include it among my ten more

8   informative studies because it met the criteria that I had set

9   for considering a study to be more informative based on study

10  design.   This is a prospective cohort study based on having

11  individual raw data.   But this was only an abstract.

12       And although this -- I mentioned it earlier, actually.

13  Although this study, the specific association in the same

14  cohort was analyzed and reported in a -- they looked at a

15  different outcome at a different age, but in a prior

16  full-length publication.   Therefore, I felt like, you know, I

17  do have relevant information on this cohort.   The fact that it

18  is an abstract gave me less information with which to assess

19  this particular analysis.

20       And so among the ten studies, you know, this one did carry

21  relatively little weight in my assessment.

22  **Q.**   Okay.   Now, in your expert report in this case, you

23  identified what you called the ten most relevant studies to

24  your causal analysis; correct?

25  **A.**   Correct.

1          MR. CONNETT:  I'm going to go ahead, Your Honor, at

2    this point and, if I could, show the witness a table I've put

3    together which lists the ten most relevant studies that she

4    identified in her report.

5          THE COURT:  Is it a demonstrative?

6          MR. CONNETT:  It is a demonstrative.

7          THE COURT:  Based on the declaration?

8          MR. CONNETT:  Based on her expert report and the

9    declaration.

10          THE COURT:  Have you shared this with counsel?

11          MR. CONNETT:  This demonstrative I have not.  But

12   it's very straightforward Your Honor.  It's just a table that

13   lists the papers that she has identified.

14          THE COURT:  Well, why don't you put it up and let

15   counsel see if she objects.  This is not evidence.  This is

16   just for demonstrative purposes.

17          MR. CONNETT:  Correct Your Honor.

18          THE COURT:  All right.

19        (Document displayed.)

20   BY MR. CONNETT

21   Q.   Can you see that?

22   A.   I'm having a little bit of trouble seeing it.

23        And I also have to cross reference it with the declaration

24   and the years and the cohort names in the declaration, so?

25          MR. CONNETT:  Your Honor, could I just ask the

1    witness.  I think the witness knows these studies very well.

2    I think that would go a little quicker.

3              THE COURT:  Well, why don't you ask the preliminary

4    question of whether this is accurate.

5    BY MR. CONNETT

6    Q.   Dr. Chang, these ten studies that you see here, these are

7    the ten studies that you identified as the most relevant

8    studies for your causal analysis, with the exception -- which

9    I'll point out here -- that when you did your causal analysis

10   in 2019, Till, which is now 2020, was then in press and Green,

11   which is now 2019, was then in press; correct?

12   A.   No.  Till was in review.  It was not in press at the time

13   that I looked at it.  So it was a manuscript that had been

14   submitted, but it had not been accepted for publication when I

15   looked at it.

16   Q.   Got you.  So I'll go ahead and put "in review."  Okay?

17        But other than that, Dr. Chang, those are -- these studies

18   that we see here on this table were the ten most relevant

19   studies to your causal analysis; correct?

20   A.   I just want to also mention Green.  So the Green, et al --

21   when I reviewed that full-length manuscript that was in press,

22   I also received and reviewed from a colleague who had attended

23   a conference, I received an abstract that I included on the

24   Green analysis.  And so I -- I -- in my table I called it

25   "Green 2019" and "in press."

1          The 2019 actually refers to an abstract.  So, like, a

2     conference abstract on the same cohort, MIREC.

3          So I don't know how to make this clearer.  You could add

4     "plus abstract" after "Green 2019 in press."  Because there was

5     the full-length in press manuscript, plus an abstract.

6     Q.   Okay.  Thank you for that.

7          Now, you recognized, Dr. Chang, that there is a difference

8     between relevance and reliability; correct?

9     A.   Yes.

10    Q.   And you agree, Dr. Chang, that the Canadian MIREC studies

11    and the Mexico City ELEMENT studies are the most reliable

12    studies to date on fluoride and neurodevelopment; correct?

13    A.   I think because they look at prenatal fluoride exposure,

14    they are more -- see, I -- I wouldn't say that the other ones

15    are unreliable.  It's that the MIREC and ELEMENT cohort studies

16    are better conducted.  They -- they assess a wider range of

17    exposure windows or potential exposure windows.  And that makes

18    them more informative.

19         But as far as reliability goes, for me that pertains to

20    validity in terms of whether the data, the underlying data are

21    valid.

22         So for looking at associations with childhood exposure,

23    for example, I don't think that the other ones are less

24    reliable.  But the other ones don't look specifically at

25    prenatal exposure, and that is a limitation relative to MIREC

 1    and ELEMENT.

 2              MR. CONNETT:  Your Honor, at this time I would like

 3    to read impeachment testimony into the record.

 4              THE COURT:  Okay.  Identify the pages.

 5              MR. CONNETT:  It's 208, Line 16 to 210, Line 2.

 6              THE COURT:  I'll give counsel a chance to look.

 7              MS. BHAT:  208/16 to 209/2?

 8              MR. CONNETT:  210/2.

 9              MS. BHAT:  210/2.

10         (Brief pause.)

11              MS. BHAT:  No objection, Your Honor.

12              THE COURT:  Okay.  Go ahead and read it.

13              MR. CONNETT:  Paul?

14         (Document displayed.)

15    BY MR. CONNETT

16    Q.   (As read)

17         "QUESTION:  Okay.  So of these ten most relevant

18         studies, which do you find to be the most reliable

19         studies from a methodological standpoint?

20         "ANSWER:  I think they are all more reliable, for

21         example, than the ecological cross-sectional studies

22         from non-western populations.  Just methodologically

23         even, they are better.

24         "QUESTION:  Uh-huh.

25         "ANSWER:  Among these ten, I would say that the

1    prospective cohort studies are, in general, more

2    rigorous in design than those that are not.  And then

3    among the prospective cohort studies, I would say that

4    those that adjusted for multiple confounders and had

5    individual level measures of exposure are relatively

6    better than those that lack those elements.

7    "QUESTION:  Okay.  So of the ten studies, which study

8    do you -- which single -- do you have -- which single

9    study do you find to be the most rigorous from a

10   methodological standpoint?

11   "ANSWER:  Of these ten, I think that the methods are

12   quite comparable among the Bashash studies --

13   "QUESTION:  Uh-huh.

14   "ANSWER:  -- the Green and Till studies.  So Thomas

15   is, I believe, an abstract, but it's -- it's related

16   to the Bashash studies.  Those are the ones.  So

17   Bashash -- the last five that are listed, those are

18   the Bashash, et al 2017 and '18.  The Thomas, et al

19   study under the reasonable assumption that the methods

20   described in that abstract are the same as used in the

21   full-length papers.  And then the Green, et al, and

22   the Till, et al studies, I think, are relatively more

23   rigorous than the other five."

24        MR. CONNETT:  Thank you, Paul.

25   (Document removed from display)

1    BY MR. CONNETT

2    Q.    So, Dr. Chang, you agree that the ELEMENT -- the three

3    ELEMENT studies -- I'll bring back the table here.  I'll start

4    again.

5          (Document displayed.)

6    Q.    Dr. Chang, based on your testimony there, you agree that

7    the three ELEMENT studies that you identified as being most

8    relevant, as well as the MIREC studies that you identified as

9    being most relevant, that these are the five most rigorous

10   studies that you evaluated in your causal assessment; correct?

11   A.    Yeah.  I think they are the most -- they are more

12   rigorous.  They are the most rigorous two study populations,

13   five analyses, yes.

14         Actually, the MIREC one we can count as two maybe, the

15   Green 2019 full-length paper and then the abstract.  But, yeah.

16   Those -- those two cohort studies are more rigorously

17   conducted.

18   Q.    And you agree that the Broadbent study is a weaker study

19   than the ELEMENT and MIREC studies; right?

20   A.    For looking for neurodevelopmental effects or potential

21   neurodevelopmental effects of fluoride exposure, I would say

22   yes.  They don't have maternal prenatal exposure.

23   Q.    And you agree that the Shannon study is a weaker study

24   than the ELEMENT and MIREC studies; correct?

25   A.    For the same reason; correct.

1   Q.   And you agree that the Morgan study is a weaker study than

2   the ELEMENT and MIREC studies; right?

3   A.   That's correct.

4          MR. CONNETT:   Your Honor, at this point we're at

5   1:22.  I'm probably going to run a little bit over 1:30?  Does

6   Your Honor have a preference as to how to proceed.

7          THE COURT:   Yeah.  Just keep going.

8   BY MR. CONNETT

9   Q.   Now, Dr. Chang, in your initial expert report you express

10  the opinion in your strength analysis under Bradford Hill, that

11  the magnitude of effect seen in the ELEMENT and MIREC studies

12  is relatively small and doesn't provide much confidence for a

13  causal inference because a three to five-point loss in IQ is

14  well below the standard deviation of 15 points; correct?

15         MS. BHAT:   Objection, Your Honor, as to form.

16         THE COURT:   Overruled.  You can answer the question.

17  A.   As I discussed in my deposition and report and

18  declaration, it is relatively small, specifically compared with

19  the standard deviation.

20       Making that purely statistical comparison, yes, the mean

21  change is smaller.  I mean, it's just objectively true, that

22  the mean change of three to five is smaller than a standard

23  deviation of 15.  That is correct.

24  BY MR. CONNETT

25  Q.   And it is also objectively true, Dr. Chang, that in doing

1  your causal analysis in this case, you did not look to find out

2  what the magnitude of effect is for other known neurotoxicants

3  in IQ loss; correct?

4  **A.**   I did not systematically try to go and identify the

5  quantitative dose response relationship between other

6  neurotoxicants and IQ in children as part of this review.

7  **Q.**   And, Dr. Chang, you are not aware of a single chemical

8  that causes loss of 15 IQ points at exposure levels of interest

9  to the population; correct?

10  **A.**   There is a -- I would say there is some nuance to that.

11  So part of the reason why I have trouble with a lot of the

12  available epidemiologic studies of fluoride is because many of

13  them, in fact, purport to find an IQ deficit of 15 points or

14  around 15 points or more between villages with different

15  drinking water exposure levels.  So I'm -- I'm just looking at

16  my table (indicating).

17       So, for instance, Evand, et al that I reviewed in India

18  found that mean IQ differed by 40 points between villages with

19  less than 1.2 ppm and 1.2 to two ppm of drinking water

20  fluoride.

21       And then Dong, et al 2018 --

22            **MR. CONNETT:**   Your Honor, at this point this is just

23  not responsive.  I was asked about other chemicals.  I was

24  asking if she was aware of other chemicals.  We don't have much

25  time --

1      THE COURT:  All right.  All right.  Why don't you

2    answer that question, Dr. Chang.  You can -- your attorney can

3    bring out other stuff on redirect.

4        But the question is:  Chemicals other than fluoride -- as

5    I understand the question, are you aware of any chemical that

6    is known to cause a 15-point or more loss in IQ.

7      THE WITNESS:  Even that question I feel like is

8    lacking in consideration of dose.

9        So any other chemical, you know, maybe at an extreme dose,

10   but I -- I haven't -- as I mentioned before, I haven't

11   systematically reviewed the literature on other chemical

12   agents.

13      THE COURT:  The question is:  As you sit here today,

14   are you aware of any study, first, regardless of dose?

15      THE WITNESS:  I haven't looked for them.  No, I'm not

16   aware.

17      THE COURT:  Okay.  Thank you.

18   BY MR. CONNETT

19   Q.   Now, with respect to consistency, Dr. Chang, one of the

20   points you make to -- that in your view shows inconsistency in

21   the literature is that the MIREC study found a sex specific

22   association with prenatal exposure, but the ELEMENT study did

23   not; correct?

24   A.   I mean, that's an inconsistency between the two cohorts

25   that I would like to see resolved.

1    Q.   Now, Dr. Chang, in light of your reliance on abstracts,

2    are you familiar with the abstract that was published in

3    February of this year which did a pooled analysis of sex

4    specific effects in the ELEMENT and MIREC studies?

5    A.   I'm not.  But that does not -- you know, pooling results

6    from the same two studies is not an evaluation of consistency.

7    You need a third study, an independent study to evaluate

8    consistency.  But I'm not aware of that abstract, no.

9    Q.   Are you aware that in that abstract they -- in that

10   analysis they found a sex specific effect on performance IQ in

11   the ELEMENT cohort?

12            MS. BHAT:  Objection, Your Honor.  The witness has

13   already testified that she is not aware of this abstract.

14            THE COURT:  Sustained.

15   BY MR. CONNETT

16   Q.   Well, Dr. Chang, in light of your reliance on abstracts,

17   is that a kind of abstract that you would want to review and

18   consider before making your opinions in this case?

19   A.   Sure, I would be interested in it.

20   Q.   Dr. Chang, you would agree with it comes to consistency

21   that the vast majority of studies, the human studies that you

22   have looked at, while I recognize you find many methodological

23   limitations in them, you would agree that the vast majority of

24   the human studies do report associations between elevated

25   fluoride exposure and adverse neurodevelopmental effects;

1    correct?

2    **A.**    In terms of the human studies that I looked at, I mean,

3    you know, ignoring the major methodological limitations in

4    those studies.  I mean, I have a hard time making conclusions

5    based on really poor quality studies.

6        But ignoring the fact that I just don't believe in those

7    studies, yes, the majority find a statistical association, but

8    what that association means is completely unclear.

9    **Q.**    Okay.  Now, in your assessment of biological plausibility,

10   you make no mention of the National Research Council's findings

11   on neuroanatomical and neurochemical effects; correct?

12   **A.**    That's correct.

13   **Q.**    Now, in this case the Court has heard testimony from

14   Dr. Kristina Thayer.  And Dr. Kristina Thayer testified that

15   she believes the animal data supports the biological

16   plausibility of fluoride causing neurotoxic effects in humans.

17       Do you agree with Dr. Thayer, or do you disagree with

18   Dr. Thayer?

19   **A.**    I think Dr. Thayer is a toxicologist, so I wouldn't be

20   expressing expert opinions as a toxicologist.

21       I do think that there can be mechanistic data from

22   toxicology that support exposure.  You know, a complete route

23   of exposure for a chemical, whether that's through the

24   blood-brain barrier or through the placental barrier or

25   transfer by breast milk, something like that.  Evidence of

1  exposure can be supportive of a biological effect.  However, in

2  the end, beyond exposure, we still need to look for health

3  effects.

4      And so my understanding is based on the -- you know, based

5  on Dr. Tsuji's review and the NTP review, National Toxicology

6  Program review, my understanding is that the evidence for an

7  actual effect, a health effect in terms of a neurodevelopmental

8  outcome in animals, that data -- those data are limited.

9      And so you can have mechanistic data that are supportive,

10  but then in the end, you know, beyond mechanism when you're

11  looking for health effects, which is more than just exposure,

12  it's the connection between exposure and health effects, those

13  data I think, are the -- are not compelling.

14  Q.   Just to be clear, Dr. Chang, in your Bradford Hill

15  analysis in this case you did an assessment of biological

16  plausibility, and you concluded that there is -- that the

17  biological plausibility factor does not support a causal

18  determination; correct?

19  A.   I concluded that based on my review of Dr. Tsuji's report.

20  I'm just going to -- I'm looking at my report, just to look at

21  the exact language.

22  Q.   Well, if you don't know, Dr. Chang, I don't have all the

23  time to reread your expert report.  So I'll move on.

24  A.   Okay.  But I mean, my understanding -- my recollection is

25  that I -- I relied on the experimental animal evidence from the

 1    NTP review, Dr. Tsuji's review, as well as the McPherson NTP

 2    suite of studies that were subsequently conducted.  And those

 3    combined sources of information did not support an effect of

 4    fluoride at these levels, .7 milligrams per liter on animals,

 5    in terms of developmental neurotoxicity.

 6    Q.    "Yes" or "no" -- and I'm not limiting this question to

 7    .7 parts per million fluoride in human beings.

 8          "Yes" or "no."  Do you agree with Dr. Kristina Thayer that

 9    the animal data supports the biological plausibility of

10    fluoride causing neurotoxic effects in humans?

11    A.    I -- I -- based on the animal data that I described and

12    considered in my report -- whether it -- you know, whether I

13    agree with Dr. Thayer, I don't remember all of her testimony.

14    So I don't know the context of where she said that in reference

15    to which data.

16    Q.    It was her --

17    A.    Was she talking about --

18    Q.    It was her assessment of the animal literature.

19    A.    Overall?

20    Q.    Correct.

21    A.    Okay.  So I -- I do think that based on  -- this is also,

22    I think, consistent with Dr. Tsuji's testimony; that overall

23    the animal literature do support some kind of neurotoxic injury

24    at a high level of exposure.  But that interpretation of those

25    studies is confounded or it's limited by the fact that those

1   animals also have some kind of other, you know, systemic

2   effects going on, other health effects affecting them that

3   could, in turn, influence their neurodevelopmental outcomes.

4        And so, yeah.  I'm not -- I'm not going to disagree with

5   Dr. Thayer, but I think that the interpretation of the animal

6   data is -- is problematic at those high levels of exposure and

7   that, therefore, you know, they don't disprove biological

8   plausibility per se.

9        They could be maybe interpreted as indicating some kind of

10  indirect neurological effect at the high doses, but it's

11  basically difficult to evaluate.

12  **Q.**   Okay.  Now, in your expert report, Dr. Chang, you

13  discussed coherence, right, as part of your Bradford Hill

14  analysis?

15  **A.**   Yes.

16  **Q.**   And you talk about how the -- the idea -- the relationship

17  between fluoridation and IQ is incoherent with this so-called

18  Flynn effect; right?

19  **A.**   I do discuss that.  I also say that this is, you know --

20  you know, I mean, I considered -- I considered it and, you

21  know, numerous explanations have been provided for the Flynn

22  effect, and it can't be attributed with certainty to anything.

23       And so I -- I did consider coherence, because it's one of

24  the nine Bradford Hill considerations, and so I didn't want to

25  dismiss it.  But, you know, this comparison with the so-called

1   Flynn effect is not an important consideration in my causal

2   analysis.   And I think I discussed that in my deposition as

3   well.

4   **Q.**   You did.  But in your expert declaration nowhere is there

5   to be found in your Coherence section a statement where you

6   disclose, oh, the Flynn effect is not an important

7   consideration; is there?

8   **A.**   I think it's in my deposition.

9   **Q.**   But I'm asking about the trial declaration that you signed

10  under oath and submitted to this Court.

11  **A.**   Umm, I don't know if -- I know it doesn't say, oh, it's

12  not important.   I mean, it -- I think it contains the same

13  words as in my report.

14  **Q.**   Did you tell the Court in your declaration that the Flynn

15  effect is not an important consideration?

16  **A.**   I think I used this -- the same wording.  You know:

17         "Numerous explanations have been provided for

18      this observed trend in the U.S. and other Western

19      society and the pattern cannot be attributed with

20      certainty to a beneficial effect of artificial

21      drinking water fluoridation."

22  **Q.**   What's the last sentence in that Coherence section?

23  **A.**   (As read)

24         "Nevertheless, these observed gains in child IQ

25      over time in the U.S. are not coherent with an adverse

1      causal effect of artificial drinking water,

2      fluoridation on neurodevelopmental outcomes."

3      So here I'm -- you know, I considered coherence.  It

4   doesn't support, in my opinion, a causal effect, but it's not

5   important.

6   Q.   Now, in your assessment of coherence, Dr. Chang, you

7   didn't consider the studies that have reported reduced IQ

8   scores among formula-fed infants; correct?

9   A.   Not in that Coherence section, no.

10  Q.   And you also didn't consider the studies that have

11  reported reduced index among people with kidney disease;

12  correct?

13  A.   I think not in that section.  Although I mentioned it as a

14  potential confounder.

15  Q.   And you also didn't consider, Dr. Chang, the numerous

16  studies that have found that boys have a higher prevalence of

17  neurodevelopmental disorders than girls; correct?

18           MS. BHAT:  Objection, Your Honor.  It's unclear what

19  counsel is asking about.  If she considered it for her opinion

20  overall or are we still talking about just the Coherence

21  section?

22           THE COURT:  Why don't you clarify?

23           MR. CONNETT:  Will do.  Will do.

24  BY MR. CONNETT

25  Q.   Dr. Chang, and my questions, these past few questions have

1     all been in the context of your analysis of coherence in your

2     Bradford Hill causality assessment.

3          And in your assessment of coherence, Dr. Chang, you did

4     not consider the numerous studies that have found that boys

5     have a higher prevalence of neurodevelopmental disorders than

6     girls, did you?

7     **A.**   I didn't write about it in that section.  I did consider

8     it throughout my report.

9     **Q.**   Now, Dr. Chang, I'm going to close here with just one

10    question about the Bradford Hill -- the Bradford Hill

11    presentation that was published as a paper in 1965, and I know

12    that you are very familiar with that report; correct?

13    **A.**   I'm familiar with it.  Yes.

14    **Q.**   You relied on it in this case, as well as all of your

15    systematic reviews that you've published; correct?

16    **A.**   I think that's correct.

17    **Q.**   And find Sir Austin Bradford Hill to be a very reliable

18    authority in your field; correct?

19    **A.**   I mean, I haven't -- I haven't looked at everything that

20    he's ever published.  He's reliable in terms of these

21    guidelines for assessing association versus causation.

22          I do think he's reliable -- you know, he also was one of

23    the -- he's credited for being one of the first to develop

24    randomization controlled studies, randomization controlled

25    trials.  That's an important development.

CHANG - DIRECT / CONNETT

1          So, I mean, I think he -- you know, he's done some -- he's

2     done some noteworthy things in our field certainly.

3     **Q.**    Right.  And the 1965 paper, in particular, is a document

4     that you rely upon for your work; correct?

5     **A.**    Yes.

6     **Q.**    Okay.

7              **MR. CONNETT:**  At this time, Your Honor I would like

8     to ask the witness about a statement in the 1965 Bradford Hill

9     paper.

10             **THE COURT:**  Okay.

11             **MR. CONNETT:**  Any objections?

12             **MS. BHAT:**  No objections.

13             **THE COURT:**  Go ahead.

14             **MR. CONNETT:**  Paul, can you put the document on the

15    screen?

16         Paul, if you could just highlight the last paragraph?

17         (Document displayed.)

18    **BY MR. CONNETT**

19    **Q.**    Dr. Chang, I'm going to read you this paragraph from Sir

20    Austin Bradford Hill and ask you if you agree witness or not.

21              "All scientific work is incomplete - whether it

22         be observational or experimental.  All scientific work

23         is liable to be upset or modified by advancing

24         knowledge.  That does not confer upon us a freedom to

25         ignore the knowledge we already have, or to postpone

 1          the action that it appears to demand at any given

 2          time."

 3          Dr. Chang, do you --

 4               **MS. BHAT:**  Objection, Your Honor.  I think this is

 5     another instance where I believe counsel is attempting to

 6     refresh her recollection as to the particular language in the

 7     article, which is fine,but reading it into the record is

 8     problematic.

 9               **MR. CONNETT:**  Your Honor, this is --

10               **THE COURT:**  Overruled.  Overruled.  Ask the question.

11     **BY MR. CONNETT**

12     **Q.**  Dr. Chang, do you agree with Sir Austin Bradford Hill with

13     respect to this statement?

14     **A.**  Overall I agree that scientific work is incomplete; that

15     findings can be changed over time as we get more knowledge.

16          I agree that we shouldn't ignore the knowledge that we

17     already have.  This is why -- actually, this is the main reason

18     why I included abstracts in studies that I found on the

19     *Fluoride Journal* website.  If I knew about them, I didn't want

20     to ignore them.

21          And regarding postponing the action that it appears to

22     demand at a given time.  Here, you know, I also wouldn't

23     disagree.  It's just in this particular context, you know, I

24     don't have an expert opinion on the action that our knowledge

25     appears to demand.

1        But otherwise, I mean, in general I -- I do agree with

2   these statements, and I've tried to follow these -- these --

3   this guidance in my consideration of the evidence.

4   **Q.**   Thank you, Dr. Chang.

5            **MR. CONNETT:**  And, Your Honor, at this point in time

6   I have no further questions.

7            **THE COURT:**  All right.  Well, this allows -- I'm

8   giving you a chance tomorrow to now cross on the Spanish study.

9   So, actually, you'll start off with that and we will go to

10  redirect.

11           **MR. CONNETT:**  Yes, Your Honor.

12           **THE COURT:**  All right.  We will convene at 8:30

13  tomorrow.

14       Dr. Chang, hopefully, you are available to complete your

15  testimony tomorrow morning.

16           **THE WITNESS:**  Yes.  Thank you, Your Honor I will be.

17           **THE COURT:**  Thank you.

18           **MR. CONNETT:**  Your Honor, 8:30 tomorrow or 1:00

19  o'clock?

20           **THE COURT:**  Oh, you're right.  You're right.

21           **THE WITNESS:**  I'm available any time tomorrow.

22           **THE COURT:**  Okay.  We start at -- is it 1:00 o'clock,

23  Angie?

24           **THE CLERK:**  It's 1, 30 Your Honor.

25           **THE COURT:**  1:30 tomorrow, because I have a

 1    proceeding in the morning.  So we will commence at 1:30

 2    tomorrow.  Tomorrow is a change in schedule.  Thank you.

 3          MR. CONNETT:  Your Honor, could I -- in light of the

 4    circumstances here with respect to this newly disclosed opinion

 5    on the abstract, plaintiffs would ask the Court's indulgence

 6    to -- we would ask if we could have the closing now on Friday

 7    morning, because right now we are going to be in a situation

 8    where we are going to be spending substantial time preparing

 9    for something that we were not anticipating, as well as the

10    rebuttal.

11          And I know that we do have the Friday -- we did have -- I

12    believe that Friday was part of the initial schedule.  And just

13    to ensure that we give the Court the best summary of our case

14    as possible, we would ask the Court's leave to allow us to do

15    the closing on Friday morning.

16          THE COURT:  No.  I'm going to proceed.  I mean, I

17    understand this new development, but it is confined.  It is

18    restricted.  You have access to the abstract.  You're going to

19    have plenty of time -- I've given you plenty of time to cross

20    and put on a rebuttal.  So we're going to proceed.

21          I have another proceeding now Friday morning.  So we're

22    going to close on Wednesday.

23          MR. CONNETT:  Okay.

24          MS. CARFORA:  Your Honor, one point of clarification.

25    I'm sorry to drag on the day.

1     This morning we said that EPA would disclose to plaintiffs

2  by, I think, two hours after the end of the proceedings today

3  communications, if they exist, between Dr. Chang and the

4  authors of the INMA cohort.

5     And I'm just wondering if we can get some kind of

6  commitment from Mr. Connett if, in fact, he's going to put on

7  rebuttal testimony and if, in fact, his experts intend to

8  communicate with those authors, at what point might we, EPA,

9  see that document, hopefully, before we do any -- put on any

10  rebuttal evidence on that issue.

11          THE COURT:  All right.  Mr. Connett?

12          MR. CONNETT:  Yes, Your Honor.  Well, we are

13  obviously going to still assess whether we're going to put on

14  rebuttal testimony in this.  I do expect that we will.

15     But we certainly will disclose communications, if we have

16  them, if the experts had them.  But I would ask that we could

17  do that, Your Honor, by tomorrow towards -- in the afternoon,

18  which would be basically the same situation that we face

19  ourselves right now, that we will be receiving the

20  communications from Dr. Chang today in advance of our cross

21  tomorrow.

22          THE COURT:  All right.  Do you anticipate -- when do

23  you anticipate putting on that rebuttal?

24          MR. CONNETT:  Wednesday morning.

25          THE COURT:  All right.  So by, let's say, 3:00

1    o'clock tomorrow if you -- if there are any communications

2    between your rebuttal witness and the authors of the study, you

3    should disclose those to the government.

4              MR. CONNETT:  Will do, Your Honor.

5              THE COURT:  Okay.

6              MS. CARFORA:  Can we just very quickly clarify the

7    schedule?  I just want to make sure I understand.

8         Tomorrow we intend to call our next witness, we only have

9    one witness left.  So I think at 1:30 tomorrow afternoon we

10   will call our last witness.  We will call our fact witness,

11   which is about six minutes of testimony.

12        And at that point I understand we are going to adjourn

13   until Wednesday morning, at which time Mr. Connett will put on

14   his rebuttal.

15        I just want to make sure, is that what everyone's

16   understanding is of the schedule?

17             THE COURT:  Let me make sure.  Mr. Connett still

18   has -- I'm giving him time to do cross on the Spanish study.

19   That could change.  I don't know how long that will take.

20   Hopefully, that won't take too long.

21        And if you have any redirect on that particular subject,

22   I'll allow that.  But it's a very subject limited examination.

23        Then you will be asked to put on your next witness, which

24   you say will be short?

25             MS. CARFORA:  We have a six-minute deposition video

 1   to show.

 2          THE COURT:  All right.

 3          MR. CONNETT:  To be clear, I think there may have

 4   been a miscommunication.

 5       The EPA does have, Your Honor, Dr. Tala Henry, which could

 6   be -- I think might be a longer examination.

 7          THE COURT:  Oh, what about Dr. Henry?

 8          MS. CARFORA:  I'm sorry.  Yes, we have two witnesses.

 9   One is our fact witness, and then Dr. Henry.  I expect direct

10   of Dr. Henry to be an hour or less.

11          THE COURT:  All right.  And then cross.

12          MR. CONNETT:  Cross, I would expect to be an hour,

13   Your Honor.

14          THE COURT:  All right.  Well, that's going to

15   probably take us through the end of tomorrow, which would be

16   just right because then if there are any rebuttal witnesses

17   first thing Wednesday morning, the plaintiffs will produce

18   that, and then we'll have argument right after that rebuttal.

19   Okay?

20          MS. CARFORA:  Perfect.  Thank you.

21          THE COURT:  Great.  Thank you.  See you tomorrow.

22          THE CLERK:  Court is in recess.

23       (Whereupon at 1:48 p.m. further proceedings were

24        adjourned until Tuesday, June 16, 2020, 2019 at

25        1:30 p.m.)

**I N D E X**

MONDAY, JUNE 15, 2020 - Volume 5

**DEFENDANT'S WITNESSES**                                    **PAGE**   **VOL.**


**TSUJI, JOYCE**
(PREVIOUSLY SWORN)                                            713      5
Cross-Examination by Mr. Connett                              713      5
Redirect Examination by Mr. Adkins                            768      5
Recross-Examination by Mr. Connett                            774      5


**CHANG, ELLEN**
(SWORN)                                                       788      5
Direct Examination by Ms. Bhat                                788      5
Voir Dire by Mr. Connett                                      829      5
Cross-Examination by Mr. Connett                              847      5

-   -   -

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, June 15, 2020