Volume 6

Pages 907 - 1027

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

FOOD & WATER WATCH, INC., et al,     )
                                     )
                                     )
            Plaintiffs,              )
                                     )
   vs.                               ) No. C 17-2162 EMC
                                     )
U.S. ENVIRONMENTAL PROTECTION        )
AGENCY, et al,                       )
                                     )  San Francisco, California
            Defendants.              )  Tuesday
                                     )  June 16, 2020
_____)  1:30 p.m.

**TRANSCRIPT OF REMOTE ZOOM BENCH TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**           WATERS KRAUS & PAUL
                              222 North Pacific Coast Highway
                              Suite 1900
                              El Segundo, California 90245
                        BY:   **MICHAEL P. CONNETT, ESQ.**
                              **CHARLES ANDREW WATERS, ESQ.**


                              WATERS & KRAUS LLP
                              3141 Hood Street
                              Suite 700
                              Dallas, Texas 75219
                        By:   **KAY GUNDERSON REEVES, ESQ.**


            (APPEARANCES CONTINUED ON FOLLOWING PAGE)


*Reported By:*   **Debra L. Pas, CSR 11916, RPR, RMR, CRR**
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

**For Plaintiffs:**          NIDEL AND NACE, PLLC
                            5335 Wisconsin Avenue, NW
                            Suite 440
                            Washington, DC 20015
                    BY:  **CHRISTOPHER THOMAS NIDEL, ESQ.**

**For Defendants:**          U.S. DEPARTMENT OF JUSTICE
                            Environmental Defense Section
                            601 D Street, NW
                            Room 8814
                            Washington, DC 20004
                    BY:  **DEBRA J. CARFORA, ESQ.**

                            U.S. DEPARTMENT OF JUSTICE
                            Environment & Natural Resources Div.
                            P.O. Box 7611
                            Washington, DC 20044
                    BY:  **BRANDON N. ADKINS. ESQ.**
                         **SIMI BHAT, ESQ.**
                         **JOHN THOMAS H. DO, ESQ.**

                            —   —   —

```
 1              P R O C E E D I N G S

 2  JUNE 16, 2020                                1:31 P.M.

 3                     ---oOo---

 4        THE CLERK:  Court is now in session.  The Honorable

 5  Edward M. Chen is presiding.

 6     Calling Civil Action 17-2162, Food & Water Watch versus

 7  Environmental Protection Agency.

 8     Counsel, please state your appearances for the record

 9  beginning with plaintiff's counsel.

10        MR. WATERS:  Andy Waters for the plaintiffs.

11        THE COURT:  All right.  Good afternoon, Mr. Waters.

12        MR. WATERS:  Good morning judge -- or afternoon, yes.

13        THE COURT:  Yes, afternoon.

14        MR. CONNETT:  Good afternoon, Your Honor.  Michael

15  contaminant for the plaintiffs.

16        THE COURT:  All right.  Thank you, Mr. Connett.

17        MS. REEVES:  Good afternoon, Your Honor.  It's Kay

18  Reeves for the plaintiffs.

19        THE COURT:  Hello, Ms. Reeves.

20        MR. NIDEL:  Good afternoon, Your Honor.  Chris Nidel

21  for the plaintiffs.

22        THE COURT:  All right.  Good afternoon, Mr. Nidel.

23        MS. CARFORA:  Good afternoon, Your Honor.  Debra

24  Carfora for EPA.

25        THE COURT:  Hello, Ms. Carfora.
```

PROCEEDINGS

```
 1              MR. ADKINS:  Good afternoon, Your Honor.  Brandon
 2  Adkins for EPA.
 3              THE COURT:  All right.  Thank you, Mr. Adkins.
 4              MS. BHAT:  Good afternoon, Your Honor.  Simi Bhat for
 5  EPA.
 6              THE COURT:  All right.  Good afternoon, Ms. Bhat.
 7              MR. DO:  And John Do for EPA, good afternoon.
 8              THE COURT:  Good afternoon, Mr. Do.
 9       Okay.  We are in the process of further cross of
10  Dr. Chang; right?
11              MR. CONNETT:  Yes, Your Honor.
12       In light of the stipulation that was just filed to
13  withdraw Dr. Chang's testimony on the Spanish abstract,
14  plaintiffs have no further cross-examination at this time.
15              THE COURT:  All right.
16       All right.  Then any redirect?
17              MS. BHAT:  Yes, Your Honor.  There is a brief
18  redirect.
19              THE COURT:  All right.  If we could call Dr. Chang
20  back.
21              THE CLERK:  I am promoting Dr. Chang into the virtual
22  well.
23              THE COURT:  Good afternoon, Dr. Chang.  Welcome.
24              THE WITNESS:  Good afternoon.  Thank you.
25              THE COURT:  We're going to resume with the
```

CHANG - REDIRECT / BHAT

1    government's redirect.

2              **MS. BHAT:**  Thank you, your Honor.

3                        **ELLEN CHANG**,

4    called as a witness for the Defendant herein, having been

5    previously sworn, resumed the stand and testified further as

6    follows:

7                     **REDIRECT EXAMINATION**

8    BY MS. BHAT

9    **Q.**   Dr. Chang, have you ever provided an opinion to a client

10   that was adverse to the client's interests?

11   **A.**   Yes, several times.

12   **Q.**   Can you please elaborate?

13   **A.**   Sure.  So in some cases -- I can't go into too many

14   details, but sort of generally, you know, I was asked to do a

15   literature review on a given topic, sometimes in the context of

16   litigation.  And then I came back with, you know, a scientific

17   opinion that was not favorable to, I think, their case.  And

18   then in those cases -- in some of those cases, actually, you

19   know, the client said thank you and we didn't proceed any

20   further.

21        In a couple of the case, my initial opinion was sort of,

22   you know, counter to their position, and so something that I

23   appreciated was that they continued working with me, but we

24   just changed the scope of what I was working on.  So, you know,

25   I didn't address the part --

CHANG - REDIRECT / BHAT

1          (Court reporter clarification due to audio

2           interference.)

3   **A.**    I don't remember exactly what I said.  We changed the

4   scope and then continued working on a different scope.

5   **Q.**    Thank you.

6          I believe that opposing counsel asked you about a

7   systematic review on dioxin.  Do you recall that?

8   **A.**    Yes.  I published three.

9   **Q.**    And in -- were any of your -- can you describe the

10  relation between -- the causal conclusion in that systematic

11  review with the conclusion of the International Agency for

12  Research on Cancer?

13  **A.**    I yes.  So the International Agency for Research on Cancer

14  has classified 1378, you know, tetrachlorodibenzo.  I don't

15  know exactly what it is, but it's TCDD.  It's a certain dioxin.

16  It has classified it has a Group 1 human carcinogen for certain

17  types of cancer, in particular for lung cancer.

18         Our review pertained to lymphoid malignancies, prostate

19  cancer and diabetes, which is not addressed by the

20  International Agency for Research on Cancer.  And that agency

21  has not concluded that dioxin causes malignancies or prostate

22  cancer.  So our conclusion is consistent with that of IARC.

23         I think another thing actually that I didn't mention

24  yesterday, I sort of wanted to mention, is in the table of

25  systematic reviews where the funding agencies were listed, all

 1    of those have been disclosed.

 2        So, you know, when we publish the papers, the declaration

 3    of interest was published along with the paper, including the

 4    funding source.

 5    Q.   I believe opposing counsel also asked you about glyphosate

 6    and your causal conclusion on glyphosate and

 7    lymphohematopoietic cancers.  My apologies for butchering that.

 8        Was that conclusion also consistent with the conclusion of

 9    the International Agency for Research on Cancer?

10    A.   Yes.  So IARC has classified glyphosate as a Group 2A

11    probable human carcinogen, as Mr. Connett and I discussed

12    yesterday.

13        In particular, they have classified it in that category

14    based on sufficient evidence of carcinogenicity in animals, but

15    I think they -- they call it limited evidence in humans, and

16    our review pertained to humans in particular.  And we agreed

17    with IARC that the -- the evidence humans is limited.

18    Q.   I believe that you also a conclusion, a causal conclusion

19    regarding perfluorinated chemicals.

20        Was that also consistent with the conclusion of the

21    International Agency for Research on Cancer and the Health

22    Council of the Netherlands?

23    A.   Yes.  We published a review in 2016 of perfluorinated

24    chemicals, in particular, PFOA, and PFOS.  The -- IARC

25    evaluated the potential human carcinogenicity of PFOA and

CHANG - REDIRECT / BHAT

1    classified it was a Group 2B possible human carcinogen based on

2    limited evidence, I believe, in both animals and in humans.

3    And that is consistent with our findings.

4         And then the Health Council of the Netherlands, I think

5    in -- the IARC review, I believe, was in 2016.  The Health

6    Council of the Netherlands review, I think, was a little bit

7    before that, and they -- they classified it I think as Group 3

8    human carcinogen, which means that there was insufficient

9    evidence to determine its potential carcinogenicity.  That was

10   for PFOA.

11   Q.   And, Doctor, are you aware of any contemporaneous

12   conclusions from independent health agencies that disagree with

13   your causal conclusion in your systematic reviews?

14            MR. CONNETT:  Overbroad.

15            THE COURT:  Overruled.

16   A.   I'm not aware of any, any disagreement from health or

17   regulatory agencies.

18   BY MS. BHAT

19   Q.   Now, you were speaking yesterday with opposing counsel

20   about the methodological rigor of the Mexico City and Canadian

21   cohort studies.

22        I wanted to ask you, you know, given your agreement about

23   their methodological rigor, why are those Mexico City and

24   Canadian cohort studies not sufficient to conclude that

25   community water fluoridation in the United States causes

1  neurodevelopmental toxicity?

2  **A.**    Sure.  I think, you know, Dr. Hu mentioned this to some

3  extent.  As he said, no observational epidemiological study is

4  perfect.  Every such study has some limitations.

5       So, for instance, as Dr. Hu mentioned, measuring urinary

6  fluoride during pregnancy in a -- I think they collected the

7  second void of the morning.  It's not ideal.  It's not a

8  fasting first morning urine.  It's not a 24-hour urine.  Those

9  are better for measuring fluctuating biomarkers, but on the

10 other hand it's a trade-off.  So if they had tried to collect

11 first morning or 24-hour urine, they would have had probably

12 lower participation, which could lead to selection bias.

13       So there is this trade-off between, you know, a better,

14 more precise, more accurate exposure and potential selection

15 bias for non-participation.

16       You know, likewise, in the Canadian study they collected

17 spot urine.  So -- so urine at any time of the day, which is --

18 you know, it's convenient.  It's doable, feasible.  It's also,

19 you know, not -- not ideal.

20       Likewise, each study controlled for a range of confounders

21 or potential confounders.  They collected a lot of information,

22 but the reality is that, you know, no epidemiological study can

23 control for all confounders.

24       And so another issue is that even when you collect data on

25 potential confounders, the way in which you collect the data or

1    the way in which you classify it in a statistical analysis can

2    result in residual confounding.

3        So, for instance, one of the studies -- I can't -- one of

4    them classified maternal smoking as, I think, current, former

5    or never.  And so that may be insufficient to capture the

6    effect of smoking on neurodevelopmental outcomes.

7        Also, classifying education.  I think the Mexico City

8    study might have classified maternal education as high school

9    and below or above high school.  That kind of classification,

10   again, is relatively crude and it may not fully capture, you

11   know, confounding by maternal education or socioeconomic

12   status.

13       So, you know, with two studies that are relatively

14   rigorous and then the other studies, the other four studies I

15   mentioned that are, I think -- they don't rise to the level of

16   the Mexico City and the Canadian cohort studies, but they are

17   still informative studies.  Those other four did not find

18   significant associations.

19       I think with the two prospective birth cohort studies that

20   did find adverse associations, you know, there is some

21   inconsistency.  I think it's not enough to -- to reach a

22   conclusion that neurodevelopmental harm is caused by fluoride

23   exposure at .7 milligrams per liter.

24       You know, even a couple more studies, a couple more

25   prospective cohort studies would contribute substantially more

1   evidence on this topic.  I think it's too sparse right now.

2          THE COURT:  Can I ask a question?

3       You mentioned lack of precision, for instance, in the

4   collection of urine.  And I heard testimony about adjusting for

5   creatinine and specific gravity.

6       Is there any reason to suspect or believe that, let's say,

7   fasting first morning void or 24-hour collection versus spot

8   would tend to increase or decrease any association found?

9       We've heard the general rule that imprecision tends

10  towards the null.  Is there something about the collection of

11  urine that you saw that would exaggerate the association?

12         THE WITNESS:  There is no information that I saw that

13  can address whether it would exaggerate or underestimate the

14  association.

15      So I think, as I mentioned yesterday, you know, bias in an

16  estimate due to exposure error, measurement error gets pretty

17  complicated when you have a continuous exposure, one that goes

18  from zero up to any level.  You know, it's not a yes/no

19  exposure, which is what we've with urinary fluoride.

20      And then we have also a continuous health outcome.  And

21  then we have a lot of potential confounders.

22      So unless, you know, we have a yes/no, exposure and it's

23  classified with error that's completely random, then the

24  resulting effect on the association can go either up or down.

25      And so let me -- let me try to think of an example.  So

 1    let's say -- I mean, this is just sort of a general example.

 2        Let's say women who are -- mothers who were working, you

 3    know, employed, actively employed during their pregnancy had to

 4    go to work early, so they tended to give first morning urine.

 5    Whereas, mothers who were not working because they are

 6    unemployed during their pregnancy provided it later in the day.

 7    Then the mothers who were working would have a more accurate

 8    and more precise measurement of fluoride in their urine.

 9        And then, let's say, mother's employment is also related

10    to neurodevelopmental outcomes.

11        That could result in -- in a bias in the estimate toward,

12    you know -- you know, it could -- it could exaggerate an

13    association if the -- the more error prone measurement in the

14    mothers who are not working leads to, you know, an adverse

15    association in that group.  Whereas, the mothers who are better

16    educated and are working, you know, if there's a better

17    neurological -- better neurodevelopmental outcome in that

18    group, you could get bias, you know, toward an over estimated

19    association.  But without data, it's hard to evaluate that type

20    of scenario.

21            THE COURT:  But you didn't see anything that

22    suggested that here.  You don't have enough information one way

23    or the other with respect to this study?

24            THE WITNESS:  Unfortunately, no.  I think we don't

25    know to what degree exposure is mismeasured.  Because if we

1    did, we would correct it.

2        And so we don't know how much error is present, you know,

3    in the measured level compared to what it truly should be.

4            THE COURT:  What about the fact that two different

5    studies use two different methods of collection as you mention.

6    One was second void and the other was spot; correct?  Is that

7    what you said?

8            THE WITNESS:  That's correct.

9            THE COURT:  Okay.  So even given the two different

10   methodologies in collection, an association was found -- some

11   association was found in each.  Is that -- does that tell you

12   anything?

13           THE WITNESS:  Not necessarily.  I think a lot of the

14   potential errors in both of the studies are subtle.  And so I

15   don't see, for instance, one glaring problem that was present

16   in one versus the other or, you know, some -- one glaring

17   problem that affects both of them.

18       But I think, you know, both of the studies had some

19   measurement error inevitably in the exposure.  They may have

20   had some selection bias because they both had to exclude many

21   subjects who did not provide sufficient data.

22       As I mentioned, every observational epidemiologic study

23   has some confounding.  And so I think it's too hard to say, you

24   know, whether the -- the presence of a statistically

25   significant association in both studies is due to real causal

1    consistency or similar biases between the two or chance.

2         THE COURT:  So let's take selection bias for a

3    moment.  You gave an example insufficient data.  They didn't

4    get enough samples or whatever it was, and they are obviously

5    excluded from the study; correct?

6         THE WITNESS:  They are either excluded from the

7    entire study or they didn't provide enough data for this

8    particular analysis, but they -- you know, they could be

9    included in a study of different health outcomes, for instance.

10        THE COURT:  All right.  So the same question:  Is

11   there anything that you saw that would give reason to suspect

12   or believe that that selection would have been biased either

13   toward or away from the null?

14        THE WITNESS:  As I remember, I don't think that the

15   published studies provided data on the women who were in the

16   cohorts, but didn't contribute enough data to be included in

17   the analyses.  So I don't think I saw anything in the

18   publications that would provide information on potential

19   selection bias.

20        THE COURT:  You can't tell one way or the other given

21   the limited data?

22        THE WITNESS:  Yeah.

23        THE COURT:  And another example, education.

24   Bifurcating the education decision, I forget whether that was

25   done in these studies or not, as just between a more -- high

 1  school or above or no high school.

 2       Any reason *a priori* to believe that that tended to bias --

 3  that uncertainty tended to lead to exaggeration or

 4  underestimating.

 5            **THE WITNESS:**  I would say it's pretty theoretical

 6  which direction it would go in.

 7       I think it would likely lead to some residual confounding,

 8  because there is still a lot of granularity, I would say, in

 9  education that is missed by that classification.

10       But how it affects the estimates, you know, given the web

11  of variables that are related to each other, I think it's hard

12  to say.

13       I mean, you know, I guess when we think about smoking, for

14  instance, and lung cancer.  If we classify it as ever versus

15  never smoking, that's a very crude classification; right?  But

16  we will see a difference between ever smokers and never

17  smokers.  But whether that is overestimated or underestimated

18  compared with, you know, if with really classify ever smoking

19  carefully into packs, you know, cigarettes a day, duration of

20  smoking, age at starting to smoke, age at stopping smoking, the

21  time since last smoking, I think it's hard to say.

22            **THE COURT:**  Well, there is some errors, like, failure

23  to take into account the litter effects in animals, and there's

24  other ones.  You can kind of see which way that's going to go.

25       Did you see anything in the Mexico or Canada study that

1   jumped out at you as to, you know, factors -- potentially

2   confounding factors that were not taken into account or

3   measurement imprecisions that were done that would lead you to

4   think, with reason, that was going to exaggerate, lead to an

5   exaggeration of the association?

6          THE WITNESS:  I would say it's too speculative on my

7   part without the raw data, for instance, to estimate how

8   certain variables would be related to fluoride exposure and how

9   they would be related -- I mean, how they would be related to

10  neurodevelopment we probably know from our studies.

11      So, for example, maternal education or maternal IQ, for

12  instance.  Higher IQ in the mother is related to, you know,

13  better neurological, neurodevelopmental outcomes in the child.

14      But how that might be related to urinary fluoride level or

15  error in measurement of urinary fluoride, I -- I don't know.

16         THE COURT:  All right.  So to determine the

17  confounding effect you would need to know some of the

18  additional pieces of information?

19         THE WITNESS:  Correct.  You need to know the

20  direction of association with both the exposure and the

21  outcome.  And potentially with -- with modifiers, if are there

22  any.

23         THE COURT:  All right.  Thank you.

24         THE WITNESS:  You're welcome.

25         MS. BHAT:  And, Your Honor, I just have one last

 1  question.

 2  **BY MS. BHAT**

 3  **Q.**   Dr. Chang, were you aware of any decisions by an

 4  independent health agency finding causation based on two

 5  observational epidemiology studies?

 6          **MR. CONNETT:**  Overbroad.

 7          **THE COURT:**  Yeah.  Why don't you be a little more

 8  precise?  That seems -- maybe you can ask -- can you rephrase

 9  that?  Let me listen to it again.

10          **MS. BHAT:**  Yes.  I will try.

11  **BY MS. BHAT**

12  **Q.**   Dr. Chang, given two observational epidemiological

13  studies, such as the American Element Cohort Studies, are you

14  aware of any decisions by an independent health agency finding

15  causation based on two such observational epidemiological

16  studies?

17          **MR. CONNETT:**  Your Honor, I'm going to object again,

18  both on being overbroad and an incomplete hypothetical.

19          **THE COURT:**  Yeah.  I don't think there is enough

20  there.  Obviously, the answer may depend on the quality of

21  those studies.

22      So I think that hypothetical is not helpful.  It's -- it

23  is overbroad.

24          **MS. BHAT:**  Can I ask it with -- regardless of

25  quality?  Would that make it less...

1      THE COURT:  Well, I'm not sure how helpful that
2  answer.  I guess.  If the answer is:  Has there ever been a
3  finding -- and you use the word "causation" as opposed to "risk
4  assessment."  So you are intending to use the word "causation"
5  there?
6      MS. BHAT:  Yes.  I'm intending to use the word
7  "causation."
8      THE COURT:  The question is whether any agency has
9  ever found causation based on nothing more than two studies,
10  epidemiological studies?  That excludes animal studies and
11  other extrapolations, or what's...
12      MS. BHAT:  Yes, yes, excluding animal studies.
13      THE COURT:  So just based on two epidemiological
14  studies, regardless of how well those were conducted?
15      MS. BHAT:  Yes, that's the question.
16      THE COURT:  Okay.  That's a precise question.  Go
17  ahead.
18      THE WITNESS:  Can I answer that, your Honor?
19      THE COURT:  Yes.
20      THE WITNESS:  I'm not aware of any.
21      MS. BHAT:  Okay.  Thank you, Your Honor.  No further
22  questions at this time.
23      THE COURT:  Okay.  Thank you.
24    Anything on recross?
25      MR. CONNETT:  No, Your Honor.

```
 1              THE COURT:  All right.  Thank you, Dr. Chang.  Thank
 2      you for your time.  Thank you for coming back for a second day.
 3      Appreciate it.
 4              THE WITNESS:  Thank you, Your Honor.  It's an honor.
 5         (Witness excused.)
 6              THE COURT:  Okay.  So we will proceed to next
 7      witness, government's next witness.
 8              MS. CARFORA:  Yes, Your Honor.  Thank you.  EPA calls
 9      Dr. Tala Henry.
10              THE COURT:  That's right.  I meant the -- you have
11      another witness after this; is that right?
12              MS. CARFORA:  We have one deposition to play.  It's
13      about six minutes, your Honor.
14              THE COURT:  Okay.  All right.  Thank you.
15              THE CLERK:  All right.  I'll promote what I think is
16      Dr. Henry into the well.
17              THE COURT:  All right.  I think we can see you Dr.
18      Henry.
19              THE WITNESS:  All right.
20              THE COURT:  Thank you.
21         All right, Angie.  Administer the oath.
22                          TALA HENRY,
23      called as a witness for the Defendant, having been duly sworn,
24      testified as follows:
25              THE WITNESS:  I do.
```

HENRY - DIRECT / CARFORA

1          THE CLERK:  Thank you.

2                    **DIRECT EXAMINATION**

3    BY MS. CARFORA

4    Q.   Good afternoon, Dr. Henry.  Can you please state your name

5    for the record.

6    A.   Tala Henry.

7    Q.   And can you state the name of your employer?

8    A.   The U.S. Environmental Protection Agency.

9    Q.   And, Dr. Henry, how long have you worked at EPA?

10   A.   Over 25 years.

11   Q.   What's your highest level of education?

12   A.   I have a PhD in pharmacology from the University of

13   Minnesota.

14   Q.   Dr. Henry, what is your current position at EPA?

15   A.   I am the deputy office director of the Office of Pollution

16   Prevention and Toxics.  Also called OPPT, I'm sure, henceforth.

17   And OPPT's primary mission is to administer the Toxic

18   Substances Control Act, which is called TSCA, and the Pollution

19   Prevention Act, among other things.

20   Q.   Dr. Henry, have you held any other positions at EPA?

21   A.   Yes, several.  Prior to becoming the deputy office

22   director, I was the director of the Risk Assessment Division

23   within OPPT.  And prior to that I was the director of the

24   National Program Chemicals Division, which does more risk

25   assessment activities.  That division is also in OPPT.  And I

1  have been a staff toxicologist in a number of other program

2  offices across EPA.

3  **Q.**   And I see here from your C.V. that you were a member of

4  EPA's Risk Assessment Forum from 2009 to 2017.  Can you explain

5  for the Court what that was?

6  **A.**   Sure the Risk Assessment Forum is a standing committee of

7  senior science experts at EPA who convene to address complex or

8  challenging science issues related to risk assessment, and to

9  promote adoption of these consensus approaches through

10 agency-wide guidance.

11 **Q.**   Now, is that a committee that you have to be appointed the

12 to?

13 **A.**   Yes.  You're nominated by your program office, and then

14 your selection is made on your experience and your underlying

15 scientific credentials by the Risk Assessment Forum steering

16 committee and three other senior EPA managers.

17 **Q.**   And how does the Risk Assessment Forum communicate its

18 findings within or outside the agency?

19 **A.**   I think probably the number one most known way, a forum

20 product, if you will, are the various guidelines for different

21 kinds of toxicity risk assessments, such as the Guidelines for

22 Neurotoxicity Risk Assessment.  There is one for cancer and

23 reproduction and development and so forth.

24      In addition, sometimes there are technical white papers

25 that are published on particular topics related to risk

1   assessment and the methods to conduct it.

2        Also, the Risk Assessment Forum often convenes expert

3   workshops and publishes out proceedings and recommendations

4   from those.

5   **Q.**   I note from your C.V., Dr. Henry, that you've written

6   articles in the area of assessing the relevance for studies for

7   regulatory decision-making; is that correct?

8   **A.**   That's correct.  Most recently I was on the steering

9   committee and a participant in the Society of Environmental

10  Toxicology and Chemistry workshop that was on that very topic.

11  It's increasing the utility of toxicology data for regulatory

12  decision-making.  There were a number of papers published, and

13  I was coauthor on two of them.

14  **Q.**   I also noticed from your C.V. that you also published

15  papers on risk assessment; is that correct?

16  **A.**   I've published several papers on the data and methods that

17  are used in risk assessments, by certain types of data or

18  models.

19  **Q.**   Dr. Henry, it's true that -- have you been involved in

20  risk assessments at EPA?

21  **A.**   Yes, indeed.

22  **Q.**   And how many years would you estimate to have been

23  involved in -- in risk assessment in the regulatory context?

24  **A.**   As I mentioned, I have been with EPA for about 25 years.

25  I would say 21 of those I have been conducting one or another

1    type of risk assessment in a variety of program office.  The

2    other four I spent as a, you know, laboratory research

3    scientist in the Office of Research and Development.

4    **Q.**    And if you had to estimate, how many risk assessments do

5    you think you have been involved with in EPA?

6    **A.**    All together, I don't have an exact count, but it has to

7    be hundreds.  And they -- a wide variety of different types,

8    ranging from site specific risk assessments for cleanups at

9    RCRA and Superfund sites, to during my tenure in the Office of

10   Water I developed ambient water quality criteria for human

11   health and aquatic life under the Clean Water Act.  These are

12   water quality criteria, but it's a form of a risk assessment.

13   And then finally in OPPT I have been conducting a variety of

14   types of risk assessments under TSCA.

15   **Q.**    Can you just very quickly explain, when you say a variety

16   type of risk assessments under TSCA, what do you mean by that?

17   **A.**    Okay.  So in the TSCA world there are sort of -- we divide

18   our chemical universe into new chemicals.  Those are chemicals

19   that have not yet been commercialized, and then existing

20   chemicals are those that are already out there in the world of

21   commerce.

22        So I have been involved in conducting these new chemical

23   risk assessments, which have to be, according to statute,

24   completed within 90 days.  So you can well imagine -- and there

25   are no data requirements for companies to submit a

1  pre-manufacture notice to do that.  So you can well imagine

2  that we're using different types of methods and models and so

3  forth for that type assessment.

4       Also, while I was the director of the Risk Assessment

5  Division, we conducted some, what I'll call limited scope risk

6  assessments prior to TSCA being amended.  And by "limited

7  scope" I mean they were focused on one or a few conditions of

8  use.

9       And then when TSCA was amended in 2016, starting then, we

10  have been conducting much more comprehensive risk assessments.

11  And by "comprehensive" I mean generally assessing many, many

12  more uses.

13  **Q.**  Now, you noted that you have been involved in management

14  for many years at EPA.  I'm wondering, of the hundreds of risk

15  assessments you may have been involved with, how many of those

16  do you think or could you estimate that you participated in the

17  primary scientific work?

18  **A.**  Again, I don't think I can without going back and tallying

19  it up.

20       But obviously when I was a staff scientist, I was involved

21  in the -- you know, the actual technical work.  But certainly

22  as my position changed to one of a science manager, it evolved

23  into more of, you know, guiding and directing the approaches

24  taken to a risk assessment.

25       And, of course, so as both division director of the Risk

1   Assessment Division and the deputy office director, I provide

2   technical oversight and policy oversight to the ongoing risk

3   assessments now.

4   **Q.**   Can you tell us real quick what do you mean by a

5   "technical oversight"?

6   **A.**   Oh, I have been there since, you know, being a

7   toxicologist, as well as having been involved for a long time

8   in risk assessment.  When I read these risk assessments, I'm

9   looking to see that appropriate methods are applied; that there

10  is clarity and completeness to the data considered and the

11  analyses conducted.

12       But then as far as sort a more policy review, which I also

13  need to do, is I'm looking for concordance of the assessment

14  with the established EPA risk assessment practices and

15  guidelines, as well as any science policy that might go along

16  with those, either at the agency level or the OPPT level.

17  **Q.**   Now, Dr. Henry, other than your risk assessment, your

18  experience with the Risk Assessment Forum, have you

19  participated in developing risk assessment principles outside

20  of EPA?

21  **A.**   Yes.  I think probably the most notable example is my

22  involvement for over ten years, at least, in the Organization

23  for Economic Cooperation and Development, the OECD, Chemical

24  Safety Program.  So within that realm.

25       I have been involved primarily, but not exclusively, in

1    the working party for hazard assessment, and I've actually

2    chaired that group for the last four years.  What that group

3    does, often in collaboration with the working party on exposure

4    assessment, is we develop various tools and models and

5    approaches for conducting risk assessments.

6        And we also have a cross-over at times with the test

7    guideline program that was brought up yesterday relative to the

8    testing scheme that was used in some study or another.

9        But it's these OECD test guidelines is also part of the

10   OECD chemical safety program.  And it's 37 countries

11   internationally that come together to try to find consensus on

12   approaches to conducting testing, toxicity testing, and how to

13   apply that in risk assessment.

14   Q.   Now, other than the Risk Assessment Forum, which I think

15   you testified to it covers kind of risk assessment policy for

16   the agency as a whole, have you had other experience

17   participating or developing risk assessment principles within

18   EPA programs?

19   A.   Well, certainly most recently there is the TSCA.  So I was

20   involved in development of the risk evaluation rule and, of

21   course, implementing the amendments to TSCA since 2016.

22   Q.   Now, in your work implementing amended TSCA, what is your

23   understanding of whether risk assessment is an actual

24   requirement under the statute?

25   A.   Well, Section -- my understanding is Section 6A, which is

1   the section of TSCA that provides the authority to take

2   regulatory action, to omit or otherwise limit, and five other

3   options under there.

4       Before you can do that, you need to have an unreasonable

5   risk determination.  And this whole new section of TSCA,

6   Section 64, is all about conducting risk evaluations on

7   existing chemicals as the foundational basis for getting to

8   whether or not that unreasonable risk is there, and if so, to

9   direct you to Section 6A to conduct a risk assessment.

10  Q.  Now, you mentioned the risk evaluation rule.  Can you very

11  quickly tell us what that is?

12  A.  Congress directed -- in part of the statute to the

13  amendments, directed EPA to establish the processes and

14  procedures for conducting these risk evaluations by rule.  And

15  so -- and they also instructed us to do this within one year of

16  enactment, which in our world of rulemaking is quite an

17  miracle.  But we did, in fact, propose, take public comment and

18  finalize that rule on the one-year anniversary of the TSCA

19  amendments being passed.

20  Q.  Dr. Henry, if I refer to that as the risk evaluation rule,

21  is that okay with you?

22  A.  That would be perfect.  That's what I call it.

23  Q.  Great.  Now, Dr. Henry, we're talking about risk

24  assessment and -- and under TSCA you were talking about risk

25  evaluation.  So I want to ask you:  Is there a difference

1  between risk assessment and risk evaluation?

2  **A.**   Yes.  So risk assessment, we heard some words about that,

3  but just to refresh memory, including my own.  Back in 1983 the

4  National Research Council of the National Academies of Sciences

5  established what we refer to in the risk assessment realm, the

6  risk assessment paradigm.  They outlined these four steps that

7  constitute a risk assessment:  The hazard identification, the

8  dose response analysis and exposure assessment, and then you

9  integrate those two pieces into a risk characterization.  So

10  that's a risk assessment.

11      What TSCA added on top of that is this unreasonable risk

12  finding.  So they -- TSCA adds the risk determination.  So

13  simply put, a risk evaluation under TSCA is a risk assessment,

14  plus a risk determination.

15  **Q.**   Dr. Henry, what was your assignment for this litigation?

16  **A.**   I was to act as an expert resource on risk assessment

17  generally, risk assessment as conducted under TSCA and, also,

18  just provide information about how we've gone about

19  implementing the 2016 amendments to TSCA.

20  **Q.**   And how did you go about completing your assignment?

21  **A.**   Well, specifically relative to this case, typically what

22  would happen is I would receive an expert plaintiff report.  I

23  would read through that.  In doing so identify if there were

24  areas or parts of it that I needed to consult with other EPA,

25  my staff or other experts.

1     Sometimes, time permitting, I might go and find some of

2  the underlying cited articles.  Upon completing that, and if I

3  consulted with someone else, then I would formulate my summary

4  of opinions.

5  **Q.**   Would you say that this was consistent with how you review

6  scientific products offered to you in your capacity as deputy

7  director of programs within OPPT?

8  **A.**   Yes, similarly.  Although this one was a much -- these

9  reports were far more limited than what we typically do under

10 TSCA.

11 **Q.**   Now in your review -- did you review Dr. Thiessen's expert

12 report?

13 **A.**   Yes.  I think there were three -- two.

14 **Q.**   In your review of Dr. Thiessen's expert reports, did you

15 rely on the expertise of individuals within your program

16 office?

17 **A.**   A couple of people to a limited extent, yes.

18 **Q.**   And can you explain for us why?

19 **A.**   Well, so our office has a senior science advisor, you

20 know, for the whole office.  And then, of course, my old

21 division, the Risk Assessment Division, has lots of different

22 scientific experts that are toxicologists, epidemiologists,

23 exposure science experts, et cetera.

24     So, you know, just typically the way I work is to go

25 through something, contemplate to myself if I think I can

 1  address it or if I need, you know, somebody that adds a little

 2  deeper understanding on one of the particular issues or

 3  modeling or something.  And then just as a general matter, I

 4  tend to like to have another senior scientist, so to

 5  corroborate or review my work or my thinking.

 6  **Q.**   In other words, the people that you relied on in forming

 7  your opinions, are those people that you would generally rely

 8  on in performing your everyday duties?

 9  **A.**   Yes, yes.  Absolutely.

10  **Q.**   Do you need to pick up a pen, Doctor?

11  **A.**   I dropped something.

12  **Q.**   Did you review Dr. Grandjean's expert report?

13  **A.**   Yes.  There were two, as I recall.

14  **Q.**   And in your review of Dr. Grandjean's expert reports, did

15  you rely on the expertise of individuals within your program

16  office?

17  **A.**   Yes.  Quite similar, as I described.  Again, if there was

18  an area that I thought somebody might have a deeper knowledge,

19  I might consult with them.  And then, of course, I do like to

20  have someone else review my work.

21  **Q.**   Now, Dr. Henry, before we get into your opinion, I'm going

22  to ask you a few questions about the terminology and concepts I

23  think that you're going to be using in your testimony today.

24       So can you tell us, what is the -- or what is your

25  understanding of the risk standard applied by TSCA?

**HENRY - DIRECT / CARFORA**

1    **A.**    It's whether or not an unreasonable risk is presented

2    under the conditions of use.

3    **Q.**    Now, is unreasonable risk defined by the statute?

4    **A.**    No, it is not.

5    **Q.**    And did EPA codify a definition of unreasonable risk?

6    **A.**    No, we -- we did not.  And we did -- when we proposed the

7    risk evaluation rule, we solicited comment on whether or not we

8    should.  And overwhelmingly, people felt we probably should

9    not, having not implemented or run the process thus far.

10        Nonetheless, we did include into the rule some things that

11   we would likely consider making, moving from the risk

12   assessment into the risk evaluation.  Things to consider in

13   making the unreasonable finding.

14   **Q.**    And can you -- off the top of your head, can you tell us

15   what some of those factors might be?

16   **A.**    We'll see.  Certainly, of course, you know, filing the

17   risk assessment paradigm and the things that you consider in a

18   risk assessment, we would consider the hazards of the chemical.

19        We would also consider, you know, the nature and magnitude

20   and that sort of thing of the exposure.

21        Certainly, the population that we assess or to which risk

22   may or may not be posed.  And specifically including

23   susceptible subpopulations, as required by TSCA.

24        Also, the severity of the hazard.  So there's -- you know,

25   there's things that present extreme hazards, such as, even

 1   death.  And certain -- and then other hazards that are nowhere

 2   near as severe and might be reversible and things like that.

 3        And then finally, of course, you have to always consider

 4   uncertainties associated with the overall assessment, but also

 5   each of the pieces that I just described.

 6   **Q.**   Now, is that an exclusive list of factors that OPPT might

 7   consider in making an unreasonable risk determination?

 8   **A.**   No, not necessarily.  We were -- we were clear that this

 9   was a -- these are some of the things, but not necessarily

10   limited to.

11        Again, it just kind of goes to the fact that you can't

12   predict for any given chemical all the various things that

13   would come up.

14        So under TSCA, you know, we have to move on and do these

15   assessments.  Every chemical has inherently different

16   characteristics and toxicities.  But also every chemical thus

17   far in our experience, I think we're up to about 23 now that

18   we're working on, has different underlying datasets.  It has

19   different amounts and types of toxicity data.  It has different

20   amounts and types of exposure data and so forth.

21        So we didn't think that, you know, we could say for sure

22   today written down that this is the only thing we'll ever

23   consider.  We did not.

24   **Q.**   I know you discussed already the difference between risk

25   assessment and risk evaluation.  But other than this specific

1  components of the risk evaluation process, are you aware in

2  your experience of any other requirements for reaching a risk

3  determination under TSCA as it's amended?

4  **A.**   Yes.  So TSCA Section 26 indicates that EPA, in making any

5  decision based on science, needs to ensure that it's the best

6  available science.

7      And furthermore, in making decisions we need to use a

8  weight of the scientific evidence.

9  **Q.**   Now, in your experience implementing TSCA, are you aware

10  if TSCA defined either of those terms, "weight of the

11  scientific evidence" or "best available science" in the

12  statute?

13  **A.**   Not specifically.

14  **Q.**   Well, can you explain just in very simple terms what is

15  meant by "best available science"?

16  **A.**   When EPA wrote the risk evaluation rule, we defined it --

17  or EPA defined it as science which is reliable and unbiased.

18  And then the statute spoke to several considerations that we

19  should take in determining that, and so those were also

20  included in the risk evaluation rule as well.

21  **Q.**   Dr. Henry, have you read the MIREC cohort study, the Green

22  2019 study that we have been talking about this past week or

23  so?

24  **A.**   I have read the journal article.

25  **Q.**   Have you read the ELEMENT cohort or the Bashash 2017

 1  article that we have been talking about?

 2  **A.**   I've read the journal article, yes.

 3  **Q.**   Dr. Henry, have you listened to all of the testimony over

 4  the past six or seven days?

 5  **A.**   Yes, I have.

 6  **Q.**   In your opinion, are the ELEMENT and MIREC cohort studies,

 7  can they be considered the best available science?

 8            **MR. CONNETT:**  Foundation, your Honor.

 9            **THE COURT:**  Overruled.

10  **A.**   Well, I kind of appreciated listening to all the

11  testimony.  These two studies were not part of the original

12  petition, so this was the most in-depth discussion I've heard

13  about them.

14        And basically having listened, I -- I don't think I could

15  answer that question today, because what I heard were a lot of

16  outstanding questions to my mind.  And my staff, I'm pretty

17  sure would attest to you, that I always have a lot of

18  questions.  So I just felt like there were still a lot of

19  questions, and this kind of goes to this whole uncertainty that

20  we have to consider in making an unreasonable risk finding

21  under TSCA.

22        So I heard, you know, lots of testimony about the sources

23  of fluoride.  You know, one cohort has the source being the

24  drinking water.  Another has it being salt.  Food was talked

25  about and the relative importance of that, or not.  I didn't

1    get a really clear, crystal clear understanding about if and

2    how that might be important.

3          But as I think about it in a regulatory context, if I'm

4    being asked to eliminate one particular source of exposure, I

5    think drafting the rule-making, I would be expected to consider

6    the possibility of other sources as well.

7          Because TSCA, just eliminating something, is only one

8    possible choice under the -- under 6A for mitigating risks.

9    There is also the consideration of if you could lower the

10   amount.  So is there a place where, you know, one effect versus

11   the other, which is the risk of dental caries comes in.

12   Shouldn't those -- I might have to weigh those among one

13   another.

14         I heard a lot about how people are measuring this

15   exposure.  Again, people have been trying to make correlations

16   with the water intake and the urine.  And we saw that there is

17   measurements of urine, measurements of plasma or serum.  I

18   think one of them even talked about amniotic fluid.

19         So it seems that several of the experts testified that

20   urine is a measure, but is it the best?  I -- I would want to

21   have that question further explored, given new studies about

22   the difference between urine and plasma have just come out.

23         We also talked about or heard a lot about timing.  And I

24   know that the judge just had a back-and-forth with Dr. Chang

25   about this, but it still seems as though this timing, whether

 1    you do it in what trimester and when you -- what time of day

 2    and some of that could make a difference.  I would want to get

 3    my team of experts to help me really understand what those

 4    uncertainties are and whether or not they might make these

 5    differences.

 6         And we talked about -- I heard a lot about correction

 7    methods.  So you have one cohort correcting -- well, first of

 8    all, there is a paper, an earlier paper in the dissertation

 9    where there was no correction.  And then we found one result.

10    And when we corrected with creatinine, the result changed all

11    together.  But it makes me have some questions that are --

12    there must be some uncertainties there.

13         And then the newest study corrected by yet another

14    measure, specific gravity, which was also the correction method

15    used in that very recent University of California study.

16         So I don't -- I'm not at all certain on what's the best

17    method of correction right now.

18         And it seemed to me that the experts themselves might also

19    have these similar questions because I think I heard

20    Dr. Lanphear, if I recollect correctly, that they are indeed

21    going to go back into that Canadian database and try to find

22    data to make further corrections, hopefully, so that maybe we

23    can compare across the cohorts more directly.

24         I think that -- there's a lot of questions in my mind, and

25    I think that they are there because there are still

 1   uncertainties around specific aspects of these studies.

 2       Again -- well, I can't really answer that here today.  I

 3   just want to point out that I would never make that

 4   determination all by myself.  I would do this with, you know, a

 5   team of experts who are versed in the risk evaluation that we

 6   would conduct, the EPA would conduct under TSCA.  So I would

 7   have the benefit of this full body of information, and I have

 8   the opportunity to ask all these questions and get them

 9   clarified.

10   Q.   Dr. Henry, can you explain what is the term "weight of the

11   scientific evidence" specific to TSCA risk evaluation?

12   A.   I don't think I can recall the exact notation we put into

13   the rule-making.  Just generally speaking, the "weight of the

14   evidence" means the confidence or the inference that you can

15   make from a body of data.  It's usually based on -- a lot of

16   EPA guidance is that we need to be comprehensive in identifying

17   it, but it has a lot to do with evaluating its quality and

18   presenting it transparently.

19   Q.   I'm sorry.  I --

20   A.   Sorry.  We did refer in the rule to some words from the

21   Institute of Medicine.  We rely on that definition.

22       I think Kris Thayer's testimony may have had that in

23   there.

24   Q.   Dr. Henry, I apologize.  I didn't ask a very good

25   question.

 1          My question that I meant to ask you was:  Is the term
 2     "weight of the scientific," is it specific to TSCA risk
 3     evaluations?
 4     A.   Oh, no, no, no.  It's well and long established in risk
 5     evaluation for sure.  I understand it's actually derived from
 6     the law.  But it's a -- that concept has been pervasive in EPA
 7     guidance for a long time.
 8     Q.   Now, is there a specific method that you're aware of for
 9     weighing the scientific evidence?
10     A.   Well, systematic review is a state of the science method
11     that aims to basically increase the rigor and objectivity of
12     conducting a weight of the evidence analysis.
13     Q.   Now, in your experience implementing amended TSCA, is it
14     your opinion that the systematic review approach is required
15     for regulatory decision-making under Section 6?
16     A.   In the risk evaluation rule we defined "weight of
17     evidence," and it does include to use a systematic review
18     method for doing all the things I said were included and that
19     Dr. Thayer laid out as part of her analysis of systematic
20     review.
21              MS. CARFORA:  Your Honor, I'd like permission to put
22     on the screen Trial Exhibit 544.  It's a Trial Exhibit.  It is
23     in evidence.
24              THE COURT:  What is it?
25              MS. CARFORA:  It is the risk evaluation rule.

```
 1              MR. CONNETT:  No objection.

 2              THE COURT:  Okay.  Go ahead.

 3              MS. CARFORA:  Mr. Hambrick, if we can put up

 4    Exhibit 544, Page 23, third column middle?

 5         (Document displayed)

 6    BY MS. CARFORA

 7    Q.   Dr. Henry, if you could just read for us the definition of

 8    "weight of the scientific evidence" in the risk evaluation

 9    rule?

10    A.   So EPA indicates that:

11              "Weight of the scientific evidence means a

12         systematic review method, applied in a manner suited

13         to the nature of the evidence or decision, that uses a

14         pre-established protocol to comprehensively,

15         objectively, transparently, and consistently identify

16         and evaluate each stream of evidence, including

17         strengths, limitations, and relevance of each study

18         and to integrate evidence as necessary and appropriate

19         based upon strengths, limitations, and relevance."

20         Long winded, I know.

21    Q.   I was on mute.

22         That term "stream of evidence," can you quickly tell us

23    what that refers to?

24    A.   So you heard Dr. Thayer on Friday describe it, because

25    her -- as, like, human data, animal data, mechanistic data,
```

HENRY - DIRECT / CARFORA

 1  cellular data, and that applies in her program because she does

 2  hazard assessments.  You know, you heard her talk about they do

 3  hazard identification and dose response collectively.  I call

 4  those hazard assessment.

 5      But within TSCA, it also applies because in Section 64 it

 6  tells us that we have to use a -- the weight of the scientific

 7  evidence, not just for hazard, but also to evaluate exposure

 8  data.

 9      So for us in TSCA, it means the exact same thing as it

10  does in the IRIS program with regard to the hazard data.  So it

11  could be evaluated in the human data, the animal data, the kind

12  of cellular, mechanistic data.

13      Also, in our world applies to doing the same thing for

14  exposure data.  So exposure data can also vary.  It might be

15  measured in air, water, out in the world.  It might be modeled

16  based on predictions or certain scenarios in industry or

17  whatever.  So we need to do it for both parts, to get to a

18  weight of evidence for both.

19          MS. CARFORA:  Mr. Hambrick, please clear the screen.

20      (Document removed from display)

21  BY MS. CARFORA

22  Q.   Dr. Henry, does OPPT rely on IRIS systematic review

23  methods for the TSCA risk evaluations?

24  A.   So, again, we're both using the generalized approach to

25  systematic review, which you heard Dr. Thayer testify that it

1  started out in the clinical medicine realm, and then National

2  Toxicology Program were the leaders in bringing these

3  approaches, the systematic approach, over into evaluating

4  toxicology type information.  So we are both using that general

5  framework with the various steps about data collection, data

6  screening, having a predefined question, all those things.

7       The general steps that have been established in the

8  literature and elsewhere, we are using them.  But because we're

9  doing it on different types of data in order to fulfill the

10  TSCA requirements for both hazard and exposure, we're doing

11  certain things slightly differently.

12       So, again, the general principles and the framework of

13  steps are the same in both, but in TSCA we make some

14  adjustments.

15  Q.   So did OPPT develop a systematic review method that's used

16  just for TSCA risk evaluation process?

17  A.   Yes.  In 2018 we published a document.  The "Application

18  of Systematic Review in Developing TSCA Risk Evaluations" I

19  think is the title.

20  Q.   And you said that was in 2018; is that correct?

21  A.   Yes.

22  Q.   And is that guidance available?  The "Application of

23  Systematic Review in TSCA Risk Evaluations," is that available

24  to the general public?

25  A.   Yes.  We put it out in May of 2018, and we also put out at

HENRY - DIRECT / CARFORA

1    that very same time the scoped or ten -- the first ten

2    chemicals to be assessed under TSCA.  And within those scopes

3    it's basically a demonstration on how we applied that method to

4    ten real risk evaluations.

5        So the scope is essentially that first step that defines

6    the question.  But with each and every one of those ten scopes,

7    there were supplemental files that showed our literature search

8    strategy, what criteria that we used to screen things that were

9    relevant on topic versus not, and the resulting full-fledged

10   bibliographies, which were sizeable for some of those

11   chemicals.

12   Q.   Now, in a nutshell can you describe, very quickly, how

13   systematic review and weight of the scientific evidence, how

14   those two concepts fit together?

15   A.   Sure.  For us under TSCA, since the law tells us that we

16   need to base things on best available science and the weight of

17   evidence, OPPT is using systematic review, a state of the

18   science approach, to demonstrate that our risk evaluations and

19   our risk determinations are based on best available science,

20   and that we can roll back that best available science into a

21   rigorous and objective weight of the evidence.

22   Q.   Now, you've heard all the testimony this week about the

23   ELEMENT and MIREC cohort studies.  Dr. Henry, in your opinion,

24   are these studies enough to understand the full weight of the

25   evidence regarding potential risk to fluoride -- or potential

HENRY - DIRECT / CARFORA

1    risk from fluoride exposure?

2         **MR. CONNETT:**  Objection in terms of vague and

3    ambiguous, and overbroad.

4         **MS. CARFORA:**  Let me try to be more specific.

5         **THE COURT:**  Rephrase.  You say "to understand the

6    full weight of evidence."  I'm not sure what that means.

7         **THE WITNESS:**  May I take a drink of water?

8         **THE COURT:**  Yes.

9    **BY MS. CARFORA**

10   **Q.**   Dr. Henry, in your opinion, could you base a risk

11   determination solely on the ELEMENT and MIREC cohort studies?

12   **A.**   From everything that I've seen, read and heard, certainly

13   not alone.

14        So we've heard -- you know, we've heard there exists

15   different data streams.  So in other words, there's human data

16   about fluoride potential and -- to cause neuro effects.  We've

17   also heard there is animal data.  So there is that.  So,

18   certainly, we could not exclusively do that.

19        First and foremost, I would need my team to go through

20   this -- this systematic way of evaluating the full body.  I

21   mean, Dr. Chang pointed out that although -- that there are

22   ten -- at least ten more useful studies.  I surely would want

23   my team to look at those, because I think it's agreed by her

24   and some other folks that they can provide insights and

25   potentially -- I mean, I look at it as maybe some of those can

 1  help reveal or inform some of these uncertainties that we still

 2  have.  So, again, you want that whole body of evidence.

 3      Certainly, the animal data, because it exists, we need to

 4  also probably look at that.

 5      And another point that I personally have observed going on

 6  here, and I'm not quite sure what to make of it, but this

 7  entire petition, as well as this -- this whole case has been

 8  looking at just one hazard a potential for neurotoxicity.  And

 9  that is just not how IRIS assessments, which are hazard

10  assessments only, or TSCA risk evaluation risk assessments are

11  formulated.

12      The first step of hazard identification is to go out and

13  look for all the potential hazards that this chemical might

14  have.  I mean, the 2006 NRC report has hazards in different

15  chapters, and we do know there are adverse effects on other

16  organ systems, like, teeth and bones and so forth.

17      So if we were doing this risk assessment at EPA, we would

18  be looking at all of the potential hazards because when you're

19  going to go regulate, you -- we need to know that we're going

20  to regulate in a national regulation.  We need to consider all

21  of the hazards, all of the populations.  That's how we do it.

22  Q.  Dr. Henry, do you recall receiving a petition from the

23  plaintiffs in this case under Section 21 of TSCA?

24  A.  Yes.  Late in 2016.

25  Q.  And what action did the plaintiffs request in the

1  petition?

2  **A.**    I'm paraphrasing, but they asked EPA to exercise our

3  authority under Section 6 to prohibit the meaningful addition

4  of fluoride chemicals, not specifying the exact ones, to U.S.

5  drinking water.

6  **Q.**    And did you participate in forming EPA's response to the

7  plaintiff's Section 21 petition?

8  **A.**    I, along with a team of various scientific and policy

9  experts, drafted the response.  Also, our colleagues in the

10  Office of General Counsel were involved as well.

11  **Q.**    Dr. Henry, did you read the petition?

12  **A.**    Yes.

13  **Q.**    When was the last time you read the petition?

14  **A.**    Within the past week, many times.

15  **Q.**    Dr. Henry, do you recall whether the studies cited in the

16  petition all measured the same endpoint?

17  **A.**    Oh, certainly not.  I mean, there were human data that

18  measured a variety of different learning and memory and IQ type

19  things.  There was animal data that measured lots of different

20  things.  There was data -- there was a lot of different kinds

21  of data and measuring different endpoints.

22  **Q.**    Did the petition cite to any studies from Western

23  populations?

24  **A.**    Yes.  At that time it mentioned two, the Malen and Till

25  that we've heard a little bit about, which, if I recall, is the

HENRY - DIRECT / CARFORA

1    one that's looking at ADHD.

2         And then also I cited that Peckham study, which is

3    actually looking at associations with thyroid hormone levels.

4    **Q.**   Dr. Henry, did the petition identify any susceptible

5    subpopulations of concern?

6    **A.**   Yes.  They have a list of several that they were asserting

7    were susceptible subpopulations.

8    **Q.**   Do you recall, Dr. Henry, did the petition identify

9    pregnant women as a susceptible subpopulation of concern?

10   **A.**   As I recall, it did not specifically call out that

11   subpopulation.

12   **Q.**   Dr. Henry, would it help you to remember if I showed you

13   the petition -- yes, the petition?

14   **A.**   Yes, yes.

15             **MS. CARFORA:**  Your Honor, permission to put up Trial

16   Exhibit 515, which is an admitted exhibit in this case.

17             **THE COURT:**  Any objection?

18             **MR. CONNETT:**  No objection, your Honor.

19             **THE COURT:**  Go ahead.

20             **MS. CARFORA:**  Mr. Hambrick, if you could put up EPA

21   Trial Exhibit 515, Page 18.

22        (Document displayed)

23   **BY MS. CARFORA**

24   **Q.**   Dr. Henry, does this help refresh your memory as to

25   whether the petition identified pregnant women as a susceptible

 1   subpopulation?

 2   A.    This is not the paragraph.

 3   Q.    All right.  It's Page 18.

 4           MS. CARFORA:  I'm sorry, Mr. Hambrick.  You're -- I

 5   had the PDF page wrong.

 6       There we go.

 7       (Document displayed.)

 8   BY MS. CARFORA

 9   Q.    How about this time, Dr. Henry?  Does this help your

10   recollection?

11   A.    Yes.  And let me just move around my little panel of

12   pictures here.

13       Yes.  It includes infants, the elderly individuals with

14   nutrient deficiencies, kidney disease, and some genetic

15   polymorphisms.  But I don't see specifically pregnant women

16   there.

17           MS. CARFORA:  Can you clear the screen, Mr. Hambrick?

18       (Document removed from display)

19   BY MS. CARFORA

20   Q.    Dr. Henry, do you recall whether the petition also

21   referenced the beneficial health effects of fluoride?

22   A.    Yes.  The plaintiffs -- or the petitioners, sorry, brought

23   a health benefits discussion into their argument around

24   unreasonable risk.

25           MR. CONNETT:  Your Honor, I'm going to object to this

 1  line of inquiry as just irrelevant to the case.

 2          THE COURT:  Well, I mean --

 3          MS. CARFORA:  Your Honor --

 4          THE COURT:  I don't know.  I mean, it's in the

 5  petition.  You can make whatever legal arguments.  I'm not sure

 6  what we're getting out of this.

 7          MS. CARFORA:  I'll move along, your Honor.  I'd just

 8  like to make a record on one other issue.

 9          THE COURT:  Okay.

10          MS. CARFORA:  I'll movie along.

11  BY MS. CARFORA

12  Q.   Dr. Henry, did you consider the petition to be a risk

13  assessment?

14  A.   Not one -- there were missing components and, also,

15  certainly the requirements of TSCA were not met, so no.

16  Q.   Is it your testimony that any Section 21 petition must be

17  conducted or documented exactly the same way OPPT documents its

18  risk evaluations?

19  A.   Doesn't need to be documented exactly the same way.  But

20  the -- the requisite components, as outlined in TSCA, need to

21  be there.  And given that we have only 90 days to respond to a

22  petition, in order for EPA to get to that, to get to that

23  finding of unreasonable risk, one would have to expect that

24  there is a demonstration of that best available science.  There

25  needs to be information in some sort of context of how the data

1  presented in support are best available.  And then also it

2  needs to be integrated somehow into some semblance of a weight

3  of evidence -- a finding.

4      So, again, I think the fact that TSCA gives us three years

5  to conduct a risk evaluation and only 90 days to respond to a

6  petition, I would interpret that to mean that what comes in as

7  a petition asking for a rule-making under Section 6A needs to

8  for sure have all of the tenets of a TSCA risk evaluation, in

9  their document anyway, that would allow EPA to, in that 90

10 days, make that determination.

11     I think this is also quite consistent with TSCA mandating

12 that EPA follow up and publish within one year of enactment a

13 guidance to assist interested parties to develop a draft risk

14 evaluation.

15 **Q.**   Dr. Henry, did EPA publish guidance to assist interested

16 persons in drafting a risk evaluation?

17 **A.**   Yes.  We signed it the very -- one year after enactment.

18 **Q.**   Is that guidance available to the general public?

19 **A.**   Yes, it is.

20 **Q.**   Dr. Henry, what was EPA's response to the petition?

21 **A.**   After carefully consideration, we denied the petition

22 because we did not feel that the petition laid out a reasonable

23 basis to conclude that unreasonable risk was posed by

24 fluoridation chemicals added to drinking water at .7 milligrams

25 per liter.

HENRY - DIRECT / CARFORA

1   Q.   And did you agree with EPA's conclusions?

2   A.   Yes, I did.

3   Q.   Now, forming your opinions -- well, you already testified

4   that you did review Dr. Thiessen's expert reports consistent

5   with how you review information at EPA; is that right?

6   A.   That's right.

7   Q.   And in forming your opinions, did you also review

8   Dr. Grandjean's expert reports consistent with how you would

9   review such information at EPA?

10  A.   Yes.

11  Q.   And in forming your opinions, did you review Dr. Tsuji's

12  expert reports consistent with how you would review such

13  information at EPA?

14  A.   Yes.  Although they were -- it was a very specific -- it

15  was a different kind of report, but yes.

16  Q.   And in forming your opinions, did you review Dr. Chang's

17  expert reports consistent with how you would review information

18  at EPA?

19  A.   Yes.

20  Q.   And did you ultimately arrive at an opinion regarding the

21  credibility of Dr. Thiessen's conclusions regarding the risk of

22  exposure to fluoridation chemicals?

23  A.   Yes.  I -- I found -- you want to know what they are?

24  Q.   Yes.  What did you conclude with respect to

25  Dr. Thiessen's --

HENRY - DIRECT  / CARFORA

 1   **A.**   I concluded that they just were not -- for various

 2   specific reasons, were not a reliable source on which I could

 3   make a conclusion of unreasonable --

 4   **Q.**   And did you -- did you explain the basis for that opinion

 5   in your trial declaration?

 6   **A.**   Yes.

 7   **Q.**   And did you arrive at an opinion regarding the credibility

 8   of Dr. Grandjean's conclusions regarding the risk of exposure

 9   to fluoridation chemicals?

10   **A.**   Yes.  Likewise, I felt that those reports were not a

11   reliable source for a variety of reasons to make a conclusion

12   on.

13   **Q.**   And, Dr. Henry, did you explain the basis for your

14   opinions in your trial declaration?

15   **A.**   Yes.

16   **Q.**   Dr. Henry, I have one last question for you.  In your time

17   at -- in your 25 years at EPA and considering your time

18   implementing the TSCA amendments, are you or have you become

19   aware of any reason why United States Environmental Protection

20   Agency would have an interest in denying or hiding a potential

21   risk or hazard from exposure to fluoride?

22            **MR. CONNETT:**  Overbroad, and vague and ambiguous.

23            **THE COURT:**  Overruled.

24   **A.**   No, not to my -- no.

25            **MS. CARFORA:**  I have no more questions for this

 1  witness.

 2          THE COURT:  All right.  Why don't weapon take a break

 3  at this point before we resume our cross.  Take a 15-minute

 4  break.

 5          MR. CONNETT:  Thank you, Your Honor.

 6          MS. CARFORA:  Thank you, Your Honor

 7          THE CLERK:  Court is in recess.

 8      (Whereupon there was a recess in the proceedings

 9       from 2:52 p.m. until 3:05 p.m.)

10          THE CLERK:  Please come to order.  Court is now in

11  session.

12          THE COURT:  Welcome back, everyone.

13      Mr. Connett you have the floor.

14          MR. CONNETT:  Thank you, Your Honor.  Just as a

15  matter of some housekeeping notes, our -- when we raise

16  housekeeping issues, Your Honor, do they count against our

17  time?

18          THE COURT:  Well, I guess it depends on what it is.

19          MR. CONNETT:  Because I do want to raise just a few

20  issues, Your Honor, but I also am very mindful that my time is

21  very limited now.  So I -- I -- the --

22          THE COURT:  All right.  I won't count it.  If it's

23  short, we won't count it.  So go ahead and raise your

24  housekeeping issues.

25          MR. CONNETT:  Thank you, your Honor.

 1          The first is I wanted to clarify whether our current time

 2     allocation includes the reallocation of deposition time.

 3               THE COURT:  Angie?

 4               THE CLERK:  It does not, your Honor.

 5               THE COURT:  Okay.  So then based -- Angie, based on

 6     the estimates that we sent last week, I think that would then

 7     give us about ten more minutes from what we had, I think, the

 8     count from yesterday, which I understand was an hour and ten

 9     minutes.

10          The other issue, Your Honor, is we had the evidentiary --

11     the pretrial evidentiary hearing on June 5th, and we had

12     brought to Your Honor's attention our concerns with Dr. Henry's

13     undisclosed BMD opinions.  And at that time Your Honor had

14     indicated that in light of the sort of undisclosed nature of

15     those opinions, we would have an extra 30 minutes to explore

16     those opinions.

17          So I want to just clarify if we can do that.  I don't

18     expect, Your Honor, that it would be 30 minutes.  It may be 15

19     minutes, but I just wanted to get some clarity on that.

20               THE COURT:  All right.  So these are the -- not

21     testified to today, but in the trial declaration, is what

22     you're talking about.

23               MR. CONNETT:  Correct.

24               THE COURT:  But you want to cross.  Unfortunately,

25     I'm actually in the courthouse.  I don't have all my other

 1   notes with me.

 2       But you say that I issued a ruling or indicated on

 3   June 5th that I would allow extra time to explore the

 4   previously undisclosed BMD opinion?

 5           MR. CONNETT:  Yes, Your Honor.

 6           MS. CARFORA:  Yes, Your Honor.

 7           THE COURT:  Okay.  Well, why don't we do this?  I'll

 8   just -- so how much time is left anyway at this point?

 9           MR. CONNETT:  So --

10           THE CLERK:  Your Honor, plaintiff has -- I added ten

11   minutes, so with that addition it's 1 hour and 20 minutes and

12   16 seconds for plaintiff.  And defendant has 1 hour 4 minutes

13   and 12 seconds.

14           THE COURT:  Okay.  How long do you expect cross to

15   go, if you include the BMD stuff?

16           MR. CONNETT:  So cross without BMD, Your Honor, would

17   be about 45 minutes.  And then with BMD, I think it would be 15

18   to 20 minutes.

19           THE COURT:  Okay.  Well, let's do this.  I'll add

20   another 20 minutes.  So we'll reset your clock at an hour 40.

21   How is that?

22           MR. CONNETT:  Thank you, Your Honor.  That's

23   wonderful.

24       And I am a little paranoid about running over my time

25   today because I do want to make sure I have the 30 minutes for

HENRY - CROSS / CONNETT

```
 1   closing.  If there is a way -- I don't know if there is a way
 2   to -- what would have right now?  We would have --
 3             MR. WATERS:  We have an hour 40.
 4             MR. CONNETT:  So we would have an hour and 10 minutes
 5   today, hour and ten 10 today.  Okay.  So --
 6             MR. WATERS:  I'll clock it.
 7             MR. CONNETT:  Okay.  Thank you, Your Honor.  We are
 8   ready to proceed.
 9             THE COURT:  Okay.  Go ahead.  Thank you.
10                        CROSS-EXAMINATION
11   BY MR. CONNETT
12   Q.   Good afternoon, Dr. Henry.
13   A.   Good afternoon.
14   Q.   Now, by your own admission you are not an expert on
15   fluoride toxicology; correct?
16   A.   Correct.
17   Q.   And you are not an expert on fluoride neurotoxicity;
18   correct?
19   A.   Correct.
20   Q.   And in the course of your career you have never conducted
21   or published a study on fluoride; correct?
22   A.   Correct.
23   Q.   Prior to this case, you had never once reviewed the
24   scientific literature on fluoride; correct?
25   A.   Correct.
```

1   Q.   And prior to the work that you have done on the petition

2   and this case, you had never been involved at the EPA in any

3   fluoride-related projects, regulatory actions, or risk

4   assessments; correct?

5   A.   Correct.

6   Q.   And at the time of your deposition, Dr. Henry, you did not

7   know how many Americans have fluoridation chemicals added to

8   their drinking water; correct?

9   A.   I probably did not.

10  Q.   And, in fact, you said that you would be completely

11  guessing as to whether it's 1 million people or over

12  200 million people; correct?

13  A.   Correct.

14  Q.   So you have been -- today there has been some questions

15  about your assessment of plaintiff's expert's reports.  So I'd

16  like to --

17  A.   Can I -- I'm having a hard time hearing you.

18          THE COURT:  Okay.

19          THE WITNESS:  Is there a volume thing I should be

20  looking at?

21          THE COURT:  You have a volume on your -- on your end.

22  I'm not having any problem hearing anybody myself.  So maybe

23  it's your computer.

24          THE WITNESS:  I have it at a hundred.

25          THE COURT:  Well, it can't go much further.  Maybe

**HENRY - CROSS / CONNETT**

1    just get a little --

2              **THE WITNESS:**  Get a little closer?

3              **THE COURT:**  Get a little closer, and Mr. Connett can

4    speak up.

5    **BY MR. CONNETT**

6    **Q.**   Is this better, Dr. Henry?

7    **A.**   Yes.

8    **Q.**   Would you agree, Dr. Henry, that before you can have a

9    credible opinion about a report, you need to first read it?

10   **A.**   Yes.

11   **Q.**   Okay.  Now, if an expert report contains 76 references to

12   the Guidelines for Neurotoxicity Risk Assessment in just 69

13   pages of text, do you think that someone who actually has read

14   the report would know that the report discusses the guidelines?

15   **A.**   Yes.

16   **Q.**   But, Dr. Henry, at your deposition you had -- you had no

17   idea that Dr. Thiessen's report had discussed the guidelines,

18   did you?

19   **A.**   I don't recall specifically what context.

20   **Q.**   Well, let me ask you, Dr. Henry.  At the time I took your

21   deposition, did you know that Dr. Thiessen had discussed

22   Guidelines for Neurotoxicity Risk Assessment in her report?

23   **A.**   I don't recall, but -- what I said at the deposition at

24   that time, but she has cited it.

25   **Q.**   And I understand that you don't recall what you said at

 1  the deposition.

 2      I'm asking you a separate question, which is:  At the time

 3  of your deposition, did you know that Dr. Thiessen had

 4  discussed the guidelines in her report?

 5          MS. CARFORA:  Asked and answered.

 6          THE COURT:  Overruled.

 7  A.   Again, I don't think I can recall, but, I mean, I have

 8  read it multiple times.  She definitely refers to the neurotox

 9  guidelines.

10          MR. CONNETT:  Your Honor, at this time I'm going to

11  introduce impeachment testimony.

12          THE COURT:  Okay.  Give me the page.

13          MR. CONNETT:  Page 260, Line 18 to Page 261, Line 2.

14          THE COURT:  Any objection?

15          MS. CARFORA:  One minute, Your Honor, please.

16      (Brief pause.)

17          MS. CARFORA:  Mr. Connett, 260, you said?

18          MR. CONNETT:  260, Line 18 to 261, Line 2.

19      And, Your Honor, we have two additional excerpts that we

20  would read after this, which say the same thing.  We would

21  prefer to read all three excerpts into the record.

22          THE COURT:  Well, then identify them.  Go ahead and

23  identify them.

24          MR. CONNETT:  The other ones are 261, Line 5 to 15,

25  and Page 263, Line 12 to 20.

HENRY - CROSS / CONNETT

```
 1          (Brief pause.)

 2               MS. CARFORA:  No objection, Your Honor.

 3               THE COURT:  Go ahead.

 4               MR. CONNETT:  Mr. Anderson, can you put Page 260?

 5          (Document displayed.)

 6    BY MS. CARFORA

 7    Q.   (As read)

 8          "QUESTION:  And I know that as part of your rebuttal

 9          report, you do not discuss Dr. Thiessen's analysis of

10          these guidelines; right?

11          "ANSWER:  I don't recall that she discussed these

12          guidelines specifically."

13               MR. CONNETT:  You can take that down, Mr. Anderson.

14          If you can put Page 261, Lines 5 to 15?

15          (Document displayed.)

16    BY MR. CONNETT

17    Q.   (As read)

18          "QUESTION:  So, obviously, you don't have any

19          opinions" --

20               MS. CARFORA:  I'm sorry.  I'm sorry, Mr. Connett, and

21    I'm sorry to interrupt you.

22          There is an objection in here, and I do object.  I

23    maintain that objection for reading this into the record.

24               THE COURT:  What's the basis of the objection?

25               MS. CARFORA:  It mischaracterizes her testimony.  And
```

 1   I can explain that further, if Your Honor wants, but...

 2          THE COURT:  Well, let me read the -- let's see.

 3      (Brief pause.)

 4          THE COURT:  Well, you can -- I can read it for that

 5   context.  The point that counsel is trying to make is the very

 6   last part of that sentence.

 7          MR. CONNETT:  Correct.

 8          THE COURT:  Not so much the answer to -- the question

 9   to the answer -- the answer to the question?

10          MR. CONNETT:  Correct.  It's the last statement right

11   there, which is pretty clear, and it will be further confirmed,

12   Your Honor, within the next passage.

13          THE COURT:  So objection overruled.  I'm going to

14   ignore the -- whatever implications are of the other parts of

15   the answer or non-answer, but go ahead and read it.

16   BY MR. CONNETT

17   Q.   (As read)

18       "QUESTION:  So, obviously, you don't have any opinions

19        as to Dr. Thiessen's analysis or application of the

20        1998 guidelines; correct?

21       "ANSWER:  I guess I would like to know better what

22        aspect of her analysis, because I didn't believe -- I

23        mean, she conducted what I guess she called risk

24        assessments according to TSCA Section 5 guidance, not

25        the neurotox guidelines as I could tell."

 1              MR. CONNETT:  Mr. Anderson, can you now put up on the

 2     screen Page 263, Lines 12 to 20?

 3          (Document displayed.)

 4     BY MR. CONNETT

 5     Q.   (As read)

 6          "QUESTION:  And if I have mischaracterized your

 7          testimony, please educate me.

 8          "ANSWER:  I don't recall any specific aspect about her

 9          discussion of the neurotoxicity guidelines for risk

10          assessment.

11          "QUESTION:  Okay.  And you understand, Dr. Henry, that

12          today is our opportunity to understand your opinions

13          in this case?

14          "ANSWER:  Yes."

15              MR. CONNETT:  Thank you, Mr. Anderson.

16          (Document removed from display)

17              MR. CONNETT:  Okay.  At this time, Your Honor, I

18     would like to show the witness a page from Dr. Thiessen's

19     expert report.

20              MS. CARFORA:  I object to that as hearsay, because

21     the expert reports are not in evidence.

22              THE COURT:  What's the purpose?

23              MR. CONNETT:  The purpose is directly to the

24     credibility of the witness's assessment of the report, because

25     it shows very clearly, right from the outset of the report,

```
1    that the neurotoxicity guidelines are specifically mentioned

2    right in a very, very prominent way.  And I think it does go to

3    the -- to the credibility.

4           THE COURT:  Objection overruled.  Go ahead.

5    BY MR. CONNETT

6           MR. CONNETT:  Mr. Anderson, can you put

7    Dr. Thiessen's report on the screen?

8        And can you go to Page 4?  Can you highlight that?

9        (Document displayed.)

10   BY MR. CONNETT

11   Q.   Dr. Henry, what does -- can you just read what that

12   section heading says?

13   A.   (As read)

14          "Based on the hazard identification" --

15   Q.   Sorry.  Can you read what the section heading says?

16   A.   "Summary of opinions."

17   Q.   And can you read what the first opinion says in

18   Dr. Thiessen's expert report?

19          MS. CARFORA:  Objection.  Are we reading this into

20   evidence?

21          MR. CONNETT:  It's a report, Your Honor, that this --

22   that this expert has -- is offering an opinion on in this case,

23   specifically on the credibility of the opinion -- sorry the

24   credibility of the report.  I think we're allowed to --

25          THE COURT:  Objection overruled.  Let's more forward.
```

 1    BY MR. CONNETT

 2    Q.   Dr. Henry, can you read what Dr. Thiessen's first

 3    identified opinion is in her expert report?

 4    A.   (As read)

 5              "Based on the hazard identification principles

 6         set forth in the EPA's guidelines for neurotoxicity

 7         risk assessment, there is sufficient evidence to

 8         conclude that neurotoxicity is a hazard of fluoride

 9         exposure."

10    Q.   Okay.

11              MR. CONNETT:   Thank you, Mr. Anderson.   You can take

12    that down.

13         (Document removed from display)

14    BY MR. CONNETT

15    Q.   Now, at your deposition, Dr. Henry, you also did not know

16    that Dr. Thiessen did a margin of exposure analysis, did you?

17    A.   Again, I don't recall the context in which that question,

18    but she did, and I know she did.   She also did an RfD analysis

19    as well.

20    Q.   Correct.   So I'll ask the question:   Dr. Henry, at the

21    time I took your deposition, did you know that Dr. Thiessen had

22    done a margin of exposure analysis?

23    A.   Yes, I did.

24    Q.   Okay.

25              MR. CONNETT:   Your Honor, impeachment.   Page 335,

```
 1    Lines 3 to 6.

 2              THE COURT:  Okay.  Go ahead and put it up.

 3        (Document displayed.)

 4    BY MR. CONNETT

 5    Q.   (As read)

 6        "QUESTION:  But Dr. Thiessen also used an MOE

 7        analysis; correct?

 8        "ANSWER:  Sitting here at this moment, I don't

 9        recall."

10              MR. CONNETT:  Thank you Mr. Anderson.

11        (Document removed from display)

12    BY MR. CONNETT

13    Q.   So MOE, Dr. Henry, you would agree with me that that is

14    the acronym for margin of exposure; right?

15    A.   Yes.

16    Q.   Now, with respect to Dr. Grandjean's report, one of the

17    criticisms that you offered is that he did not subject his

18    expert report to public notice and comment; correct?

19    A.   That's a fact.

20    Q.   And that was one of your criticisms that you had offered

21    of Dr. Grandjean's report; right?

22    A.   That's possible for sure.

23    Q.   Well, okay.  It's possible, but I want to know --

24    A.   I don't recall the exact words.  Do you have something to

25    refresh?
```

**HENRY - CROSS / CONNETT**

1   Q.   Well, I'm -- so I'm asking:  Do you know whether in last

2   summer when you -- when you offered expert opinions, do you

3   know whether one of your expert opinions was that

4   Dr. Grandjean's report was flawed, in part, because he had not

5   subjected his report to public notice and comment?

6   A.   You're asking about what I said last summer or what --

7   Q.   Yes.  That's what I'm asking you.

8   A.   It's possible that I did.  And it -- it would be a

9   criticism for a report to support an unreasonable risk finding

10  under TSCA, because TSCA does, in fact, require the peer review

11  be taken.

12  Q.   Okay.  But, Dr. Henry, when I asked you at your deposition

13  to explain for me how it is that a private citizen like

14  Dr. Grandjean could submit his report for public notice and

15  comment, you did not have an explanation; correct?

16  A.   At the time of my deposition we're back at again?

17  Q.   Yes.

18  A.   I believe somewhere in that sometime -- in the time that

19  we discussed that, that we -- we talked about the third-party

20  guidance as being a way that someone who would follow to submit

21  to EPA a draft risk evaluation, which then, if EPA were to

22  make -- you know, find it to be sufficient, could certainly

23  facilitate that process.

24        MR. CONNETT:  Your Honor, at this time I have

25  impeachment testimony.

 1              THE COURT:  Go ahead.

 2              MR. CONNETT:  It's Page 365, Line 19 to Page 366,

 3     Line 9.

 4              MS. CARFORA:  I would just like one moment to catch

 5     up with you.

 6          I'm sorry.  Mr. Connett, did you say Line 9/366?

 7              MR. CONNETT:  365, Line 19 to 366, Line 9.

 8              MS. CARFORA:  Okay.  No -- I mean, no objection.

 9              THE COURT:  Go ahead.

10              MR. CONNETT:  Paul?

11          (Document displayed.)

12     BY MR. CONNETT

13     Q.   (As read)

14          "QUESTION:  So I'm asking you specifically in the

15          context of Section 21 *de novo* proceedings in federal

16          court.  Can you identify for me a mechanism by which

17          an expert can have their opinions subject to public

18          notice and comment?  If the answer is no, you can just

19          say no.

20          "ANSWER:  No."

21              MR. CONNETT:  Thank you, Paul.

22          (Document removed from display)

23     BY MR. CONNETT

24     Q.   Now, Dr. Henry, in a situation where there is an abstract

25     and the abstract does not provide any details about whether any

**HENRY - CROSS / CONNETT**

1  potentially confounding factors were controlled for, is it good

2  scientific practice to simply assume that the authors

3  controlled for the potentially confounding factors?

4  **A.**   Is it good scientific practice to assume?

5  **Q.**   Yes.

6  **A.**   No, I wouldn't say that.

7  **Q.**   Now, I'd like to shift towards the risk evaluation rule

8  that was discussed earlier.

9        And, Dr. Henry, in that rule the EPA recognized that

10  weight of the evidence analyses under Section 6 may be, quote,

11  fit for purpose; correct?

12  **A.**   Correct.

13  **Q.**   And the fit for purpose concept reflects EPA's recognition

14  that different weight of scientific evidence review methods may

15  be appropriate with different information; correct?

16  **A.**   I think different weight of evidence analyses, yes.

17  **Q.**   And under this fit for purpose concept, when information

18  and analysis are sufficient to make a risk determination, EPA

19  may decide not to refine its analysis further; correct?

20  **A.**   That is what is stated in the rule.

21  **Q.**   So EPA recognizes that if it has evidence that -- that

22  allows the agency to conduct the comparison of exposure to

23  toxicity based on a fairly straightforward and simple method,

24  it can stop there and need not do further refinement; correct?

25  **A.**   Correct.  But that is not at all the case here that we're

**HENRY - CROSS / CONNETT**

1   talking about.

2          **MR. CONNETT:**  Your Honor, move to strike the

3   nonresponsive portion.

4          **THE COURT:**  Overruled.  I'll let it stand.

5          **MR. CONNETT:**  Okay.

6   **BY MR. CONNETT**

7   **Q.**   So on Friday there was testimony about how EPA has so far

8   been taking a pragmatic approach to systematic review in its

9   risk evaluations under Section 6; and that is correct,

10  Dr. Henry, right?

11  **A.**   I don't recall that testimony.  Can you refresh my memory?

12  **Q.**   So I -- and I apologize.  It was a poorly-phrased

13  question.  I'll rephrase it.

14          Dr. Henry, is it correct that the EPA has been taking a

15  pragmatic approach to systematic review under its Section 6

16  risk evaluations?

17  **A.**   I think we're taking a fairly robust approach.  On

18  pragmatic, I guess you can -- it needs a little context, in my

19  view.

20          Pragmatic in the sense that basically everything that --

21  that we have put out, each piece of each risk evaluation we've

22  put out for public comment, and certainly our draft risk

23  evaluations we've put out, not only for public comment but for

24  peer review, and by and large I think if I had to weigh one

25  side or another, we get asked to provide more transparency and

HENRY - CROSS / CONNETT

1  more evaluation descriptions.

2       So in being pragmatic, I think that we are applying a

3  robust systematic review method in order to demonstrate that in

4  the end, our risk evaluations, when they are completed, and our

5  risk determinations on which they are based are, in fact, based

6  on best available science and a robust and objective weight of

7  evidence.

8  Q.   So one of the criticisms you offered in this case is with

9  respect to Dr. Thiessen's report.  You criticized her reliance

10  on the National Research Council's 2006 report with respect to

11  exposure data; right?

12  A.   2006 NRC?  Yes.

13  Q.   You agree, Dr. Henry, that the NRC is an authoritative

14  institution for scientific reviews; right?

15  A.   Yes.

16  Q.   And you agree that the NRC's 2006 report provided a

17  comprehensive review of exposure to fluoride in the U.S.,

18  correct?

19  A.   I really can't attest to that.  I didn't evaluate that

20  report in depth, but it was -- there was a chapter on exposure.

21  And I don't recall exactly what dates were inclusive to it,

22  but, clearly, that report was published in 2006.  So that was

23  awhile ago.

24       MR. CONNETT:  Your Honor, impeachment.  Page 325, 1

25  through 5.

```
 1            THE COURT:  Okay.  Any objection?

 2       (Brief pause.)

 3            MS. CARFORA:  No objection.

 4            THE COURT:  Go ahead.

 5       (Document displayed.)

 6  BY MR. CONNETT

 7  Q.   (As read)

 8       "QUESTION:  Do you know that the NRC did a

 9       comprehensive review of exposure to fluoride in the

10       United States?

11       "ANSWER:  I don't recall the year, but I'm aware."

12            MR. CONNETT:  Thank you, Paul.

13       (Document removed from display)

14  BY MR. CONNETT

15  Q.   And, Dr. Henry, you agree that an NRC review of exposure

16  to a chemical is the type of material that qualifies as best

17  available science; right?

18  A.   I don't think that necessarily by a blanket statement I

19  could agree with that.

20            MR. CONNETT:  Your Honor, impeachment.  Page 328, 1

21  through 5.

22            THE COURT:  Okay.

23            MS. CARFORA:  328.  No objection.

24            THE COURT:  Go ahead.

25       (Document displayed.)
```

 1   BY MR. CONNETT

 2   Q.   (As read)

 3       "QUESTION:  Would you say that the NRC review of the

 4       exposure to a chemical substance is the type of

 5       material that qualifies as best available science?

 6       "ANSWER:  Yes."

 7       And, Dr. Henry --

 8           MR. CONNETT:  Paul, thank you.  You can take that

 9   down.

10       (Document removed from display)

11   BY MR. CONNETT

12   Q.   Dr. Henry, you were not aware of any data published

13   subsequent to the NRC report which contradicts NRC's exposure

14   estimates; correct?

15   A.   There has been an additional, more comprehensive, updated

16   literature search and calculations of exposures since 2006.

17   Q.   Right.  But my question is:  You're not aware of any data

18   on water intake published subsequent to the NRC report which

19   contradicts NRC's estimates; right?

20   A.   Well, exposure data is like a continuous measurement.  So

21   it's not a contradiction.  It's a different dataset over time.

22           MR. CONNETT:  Your Honor, impeachment.

23           THE COURT:  All right.

24           MR. CONNETT:  327, Lines 18 to 21.

25           THE COURT:  What page?

1           MR. CONNETT:  327, Lines 18 to 21.

2           THE COURT:  Okay.

3           MS. CARFORA:  No objection.

4           THE COURT:  Go ahead.

5       (Document displayed.)

6   BY MR. CONNETT

7   Q.   (As read)

8       "QUESTION:  Are you aware of any published data

9       subsequent to the NRC review that contradicts NRC's

10      estimates as to exposure to fluoride?

11      "ANSWER:  No, I am not."

12          MR. CONNETT:  Thank you, Paul.

13      (Document removed from display)

14  BY MR. CONNETT

15  Q.   Now, as you mentioned, Dr. Henry, there has been a

16  subsequent report in 2019 by the EPA, where EPA provided sort

17  of a comprehensive review of water intake data; right?

18  A.   Yes.

19  Q.   And in that review, EPA identified water intake data that

20  it characterized as the most scientifically sound and

21  up-to-date data to use for risk assessment; correct?

22  A.   I -- those are probably the words in the *Exposure Factors*

23  handbook, based on that recent analysis.

24  Q.   And would you agree that using a pragmatic approach to

25  systematic review under Section 6, that data that the EPA has

**HENRY - CROSS / CONNETT**

1  characterized as recently as 2019 as the most scientifically

2  sound and up-to-date data to use for risk assessment, that that

3  would be appropriate data to use for risk evaluation?

4  **A.**   I think it's potentially, but I think that as a matter of

5  course, under TSCA we would still look and search to see if

6  there was anything newer.

7  **Q.**   Okay.

8  **A.**   And especially because, you know, again, that *Exposure*

9  *Factors* handbook has a wide array of types data.  Certainly,

10  EPA, including OPPT, looks to it to find information and, you

11  know, especially that one which is based on a systematic review

12  of all of the various most up-to-date information.

13       Sure, but I think that, again, we probably, more than

14  likely, just take a quick look to see if there is anything

15  newer.

16  **Q.**   Okay.  Now two weeks before I took your deposition, you

17  had re-read EPA's Guidelines for Neurotoxicity Risk Assessment;

18  correct?

19  **A.**   I don't recall if I said exactly two weeks, but it's

20  possible it's there.

21  **Q.**   Well, you would agree with me that you had re-read those

22  guidelines shortly before your deposition; correct?

23  **A.**   If that's what I said, then that is true.

24  **Q.**   Well, I understand, and in normal conversations I probably

25  wouldn't inquire any further.

**HENRY - CROSS / CONNETT**

1    But do you -- did you or did you not, Dr. Henry, re-read

2    those guidelines last summer?

3    **A.**   As I recall, yes, I did.

4    **Q.**   Okay.  And you agree, Dr. Henry, that the Guidelines for

5    Neurotoxicity Risk Assessment can be used for risk evaluations

6    under TSCA; correct?

7    **A.**   They serve as a guideline on how to conduct a risk

8    assessment generally.  TSCA does put some additional context

9    around that.

10   **Q.**   But they can be -- in the risk evaluation -- I understand

11   that the risk evaluation rule provides additional

12   considerations, but the -- you recognize, and EPA recognizes,

13   that the Guidelines for Neurotoxicity Risk Assessment can be

14   used as part of a risk evaluation under Section 6; correct?

15   **A.**   All of the Risk Assessment Forum guidelines are there to

16   guide EPA risk assessors on the general principles and

17   processes for conducting the various types and considerations

18   that assessors should think about in doing so.

19       But each and every one of those guidelines are very, very

20   clear that they are not, you know, rules in themselves and that

21   they are there as a guide to be implemented within other

22   contexts.

23       And they also, because they were developed to try and not

24   be so specific as to become out-of-date a very short period of

25   time, they -- again, they don't tend to be overly prescriptive.

1   Q.   Now, you agree, Dr. Henry, that the criteria identified in

2   the Guidelines for Neurotoxicity Risk Assessment are very

3   similar, if not the same, as the kinds of criteria that you use

4   in conducting a systematic review and evaluating literature;

5   correct?

6   A.   I think I need to know better what criteria you're

7   referring to to answer.

8   Q.   Well, I am directly quoting your deposition.  So I'm just

9   asking:  Do you agree with that statement or not?

10  A.   I think that there are certain criteria in the neurotox

11  guidelines which have to do with consistency and validity and

12  some of those things.  So those are the kinds of considerations

13  for a weight of evidence, but they aren't -- that guidance does

14  not provide very specific, what is considered study evaluation

15  criteria.

16          MR. CONNETT:  Your Honor, at this time I have

17  impeachment.  Page 253, Lines 3 to 12.

18          THE COURT:  Any objection?

19      (Brief pause.)

20          MS. CARFORA:  Mr. Connett, 253 starts in the --

21  Line 3 starts in the middle of a question, or maybe I'm in the

22  wrong place.

23          MR. CONNETT:  Well, right.  I'm fine with -- so I'm

24  fine -- it's just a little bit of a stumble to start the

25  question, but I can read the whole question if that's

```
 1   important.

 2              THE COURT:  All right.  Go ahead.

 3              MR. CONNETT:  Paul, can you put up 252, Line 21?

 4        (Document displayed.)

 5   BY MR. CONNETT

 6   Q.   (As read)

 7        "QUESTION:  Now, do these guidelines -- and I know I

 8        haven't given you the full document, so it's going to

 9        go on your recollection, but do these guidelines

10        require any systematic review procedure?

11        "ANSWER:  There is a whole chapter on various things

12        to consider, particularly -- this particular guideline

13        has a lot of information for evaluating studies and

14        many, many of those are very similar, if not the same,

15        as the kinds of criteria that you use in conducting a

16        systematic review and evaluating literature under that

17        umbrella."

18              MR. CONNETT:  Thank you, Paul.

19        (Document removed from display)

20   BY MR. CONNETT

21   Q.   And, Dr. Henry, you would agree that the predefined

22   factors set forth in the guidelines are very much the same

23   things you do in what we call a systematic review; correct?

24   A.   Not today.

25   Q.   But you did at your deposition?
```

1    **A.**   Similar in concept, but in the specific detail around some

2    of the evaluation criteria in particular, to get at bias and so

3    forth.   The neurotox guidelines, as I mentioned, tried not to

4    than too prescriptive so they would, you know, last, if you

5    will.

6         So, again, evolving science and practice in risk

7    assessment of -- landed in a place where the actual practice

8    that we're using is much more specific.

9              **MR. CONNETT:**  Your Honor, I do have impeachment here

10   again.   It's Page 253, Lines 15 to 254, Line 2.

11             **THE COURT:**  Any objection?

12             **MS. CARFORA:**  No objection.

13             **THE COURT:**  Go ahead.

14        (Document displayed.)

15   **BY MR. CONNETT**

16   **Q.**   (As read)

17        "QUESTION:  Do these guidelines require a systematic

18        review method?

19        "ANSWER:  At the time that this guideline was

20        published, what was in this guideline, from what I

21        read, particularly under Hazard, are very much the

22        same things you do in what we call a systematic review

23        today."

24             **MR. CONNETT:**  Thank you, Paul.

25        (Document removed from display)

1    BY MR. CONNETT

2    Q.    And, Dr. Henry, do you agree that if one follows the

3    guidelines, they will have effectively done a systematic

4    review; right?

5    A.    If they document and show the actual work has been

6    conducted and that those criteria have specifically been

7    applied in evaluating individual studies.

8    Q.    Okay.  Now, for you, Dr. Henry, it is very important that

9    citizens in Section 21 proceedings do everything the way that

10   EPA does; right?

11   A.    I thought I talked about there earlier, but no.  Again,

12   you don't have to have exactly the same format and, you know,

13   tables and sections and form per se, but the requisite

14   scientific basis needs to be there, and certainly -- so, again,

15   some demonstration that's complete, clear, transparent, around

16   whether or not the data and studies being used are best

17   available science needs to be there and, also, some kind of

18   integrative weight of evidence.

19        If a Section 21 petition comes to EPA and within 90 days a

20   risk determination is to be made, I would expect that it needs

21   to be pretty robust around all of these other requirements to

22   get there.

23   Q.    Okay.  Now, I'd like to talk briefly, Dr. Henry, about

24   what you did in this case and how it stacks up to the way EPA

25   does things under Section 6.

1          Now, you were talking earlier that you were one of the

2    primary authors of EPA's response to plaintiff's petition;

3    correct?

4    **A.**   I was a primary -- yes, primarily involved on the team,

5    yes.

6              **MR. CONNETT:**  At this time, Your Honor, I would like

7    to show the witness a statement from that petition response.

8              **THE COURT:**  Any objection?

9              **MS. CARFORA:**  No objection, Your Honor.

10             **MR. CONNETT:**  Paul, can you put on the screen Page 10

11   of the PDF -- sorry, it's not Page 10.  Sorry.  This is a --

12   this is EPA's Exhibit 514, and it's Page 11881.

13         (Document displayed)

14   **BY MR. CONNETT**

15   **Q.**   So here, Dr. Henry, EPA wrote:

16             "After careful consideration EPA denied the TSCA

17         Section 21 petition, primarily because EPA concluded

18         that the petition has not set forth a scientifically

19         defensible basis to conclude that any persons have

20         suffered neurotoxic harm as a result of exposure to

21         fluoride in the U.S. through the purposeful addition

22         of fluoridation chemicals to drinking water."

23         Did I read that correctly?

24   **A.**   Hold on.  I've got to move my little box.

25         Yes.

```
 1              MR. CONNETT:  Paul, you can put that down.

 2         (Document removed from display)

 3   BY MR. CONNETT

 4   Q.   And consistent with the EPA's response to the plaintiff's

 5   petition, in your expert report in this case you concluded

 6   that:

 7              "Fluoridation does not present a risk of

 8         neurotoxicity because there is insufficient evidence

 9         to conclude that fluoridation causes neurotoxicity at

10         the concentration of .7 milligrams her liter."

11         Correct?

12   A.   Again, I -- I don't know exactly what you're reading from,

13   but that sounds pretty close to one of my declaration

14   conclusions.

15   Q.   Do you stand by that opinion, Dr. Henry?

16   A.   Yes.

17   Q.   Okay.  So you used a causation standard for assessing

18   risk; right?

19   A.   No, not necessarily.

20   Q.   Well, your own -- your own expert report, Dr. Henry, when

21   you talk about whether we met our burden, you specifically say:

22              "We haven't shown that fluoridation causes

23         neurotoxicity at .7 milligrams per liter."

24         Right?

25   A.   Yes.
```

1  **Q.**   So you used a causation standard?

2  **A.**   That's what we wrote -- that's what I wrote, yes.

3  **Q.**   But, Dr. Henry, to be clear -- and the Court has the draft

4  risk evaluations in evidence in this case, so the Court can

5  review those risk evaluations.

6        EPA has never once in any of its risk evaluations to date

7  under Section 6 used a causation standard, has it?

8  **A.**   No.  You don't have to show absolute causation.

9  **Q.**   That's what you held the plaintiffs to in this case.  You

10  held the plaintiffs to a standard that EPA has never once held

11  any other chemical under Section 6; right?

12            **MS. CARFORA:**  Objection, broad.  Overbroad.

13            **THE COURT:**  Overruled.

14  **A.**   Can you repeat the question?

15  **BY MR. CONNETT**

16  **Q.**   You held the plaintiffs to a burden of proof that EPA has

17  not held a single chemical under Section 6 before; correct?

18  **A.**   By the words on the page, I guess that's -- that's true,

19  but it was really my -- my opinion was based mostly on the

20  methodological problems.

21  **Q.**   I want to talk about one risk evaluation that EPA has

22  done, the NMP risk evaluation.  I know it's draft form, but I

23  assume you're familiar with that.

24        You're familiar with the NMP risk evaluation, Dr. Henry?

25  **A.**   Yes.

**HENRY - CROSS / CONNETT**

1  Q.   In that risk evaluation EPA found that some conditions of

2  use presented unreasonable risks to human health; correct?

3  A.   Correct.

4  Q.   And in that evaluation EPA selected reproductive health

5  problems as the critical health point -- health endpoint for

6  chronic exposure; correct?

7  A.   Again, I'd have to have a refreshment.  Again, we --

8  typically, EPA will consider all of the potential hazards, so I

9  can't speak without consulting the document.  It's not the

10  only -- I don't believe it's the only hazard that was

11  considered.

12  Q.   But for what you selected as the critical endpoint in your

13  unreasonable risk determination, that critical endpoint is

14  identified as reproductive problems; correct?

15  A.   So, again, under TSCA risk evaluations, we don't typically

16  assess just one hazard or toxicity endpoint.  We do the hazard

17  assessment to broadly look for a variety.

18       And so, again, without -- without being able to consult

19  back to the table of all of the different PODs that may have

20  been brought forward, I can't recall.  These are very extensive

21  risk evaluations.

22       And so I do know that reproductive or developmental is one

23  of the toxicity endpoints evaluated, but I do not know that it,

24  sitting here today, it is the only one.

25  Q.   Okay.  Fair enough.  I understand.  It's a long document,

1    and I won't hold you to every detail in it.

2         But fair to say, Dr. Henry, that EPA did not require

3    evidence showing that human exposures to NMP under the

4    conditions of use caused adverse effects on human health;

5    correct?

6    A.    No.   And I don't believe there was human data for that

7    chemical.

8    Q.    Right.   EPA had no human data on the critical endpoint in

9    the U.S.   It had no human data in Canada.   It had no human data

10   in Mexico.   It had no human data in China.   It had no human

11   data at high levels.   It had no human data at low levels;

12   correct?

13             MS. CARFORA:   Objection.   Compound.

14             THE COURT:   Overruled.

15   A.    My recollection here today is that NMP did not include

16   human data as data used for making the risk characterization or

17   risk determination.

18   BY MR. CONNETT

19   Q.    Now, based on the animal studies that the EPA reviewed,

20   EPA, for the chronic health endpoint, calculated a BMDL of the

21   dose associated with some -- with some effects in the animals;

22   correct?

23   A.    Can you repeat that?

24             MR. CONNETT:   Well, Your Honor at this point may I

25   have permission to show the witness Plaintiff's Exhibit 49,

HENRY - CROSS / CONNETT

```
 1   which is already in evidence?
 2          THE COURT:  What is it?
 3          MR. CONNETT:  It's the risk evaluation for NMP.
 4          THE COURT:  Well --
 5          MS. CARFORA:  Well, my only concern is is there a
 6   question pending?  And are you using the document for something
 7   related to the question that I believe is pending.
 8          MR. CONNETT:  I can just withdraw the question and
 9   start again.
10          THE COURT:  And so you are intending to then publish
11   it and ask questions about it?
12          MR. CONNETT:  Correct, Your Honor.  It's in evidence.
13          THE COURT:  Okay.
14          MR. CONNETT:  Is there an objection?
15          MS. CARFORA:  No objection.
16          THE COURT:  Go ahead.
17      (Document displayed.)
18   BY MR. CONNETT
19   Q.   So, Dr. Henry, I'm showing you Page 204 of the NMP risk
20   evaluation.  And you see the table here is called "Summary of
21   Derivation of the PODs for Reproductive and Developmental
22   Effects Following Chronic Exposure to NMP"?
23   A.   Yes.  What I'm not clear about, without seeing the other
24   tables, is whether this is the table of all of the PODs that
25   were derived from the full body of reproductive and
```

1  developmental studies, or if this is the table which slims it

2  down to what's going to be carried forward into the risk

3  estimation.

4  **Q.**   Okay.  So since you can't recall that, I will not ask

5  further questions.

6  **A.**   I mean, every risk evaluation shows, like, a full table of

7  acceptable high quality studies and what the PODs would be, and

8  on the basis of that is where a judgment is made on which ones

9  we'll take forward to the multiple exposure scenario.

10      Unlike an IRIS assessment -- well, and they've changed

11  also.  It used to be you that would take this body and evidence

12  and you would trim it down and pick one critical endpoint and

13  study and carry it all through.  But, again, because --

14  especially under TSCA, there are so very many different

15  exposure scenarios associated with the variety of conditions of

16  use, we for sure don't do that.

17      You could use a different study with a different POD for a

18  different exposure scenario.  So I saw that table, that I know

19  there is a corresponding table where they pull all the PODs

20  that are carried forward to doing the risk assessment.  I just

21  can't tell without the broader context whether this the more

22  comprehensive table of PODs or those used in specific exposure

23  scenarios.

24  **Q.**   Understood.  Okay.  I'm going to show you now another page

25  from the document, which is Page 312.  This, again, is

**HENRY - CROSS / CONNETT**

 1   Plaintiff's Exhibit 49.

 2        (Document displayed.)

 3   **BY MR. CONNETT**

 4   **Q.**   And here, Dr. Henry, this shows one of the conditions of

 5   use for which EPA made an unreasonable risk determination;

 6   correct?

 7   **A.**   Yes, by workers.

 8   **Q.**   All right.  And the driver of the risk here is

 9   reproductive effects; correct?

10   **A.**   Yes.

11   **Q.**   And the -- the margin of exposure, the actual margin of

12   exposure is identified here as 25; correct?

13   **A.**   Yes.  That's the risk estimate.

14   **Q.**   And these are highly exposed workers.  This is the high

15   end scenario for workers; correct?

16   **A.**   Correct.

17   **Q.**   Okay.  And so what this 25 means, Dr. Henry -- and tell me

18   if I get this incorrect -- this means that highly exposed

19   workers under this condition of use received 1/25th the point

20   of departure from the animal data; correct?

21   **A.**   I have not heard it expressed in that manner, so I'd have

22   to do some math.

23        Yes.  It's a simple division equation of comparing the

24   exposure estimate to the POD.  So I guess I never heard it

25   expressed quite that way, but yes.

**HENRY - CROSS / CONNETT**

1  Q.   So with that -- that margin, that margin from the point of

2  departure from animal data to human exposure, although it

3  was -- although human exposure was 25 times less than the

4  animal point of departure, EPA found that to present an

5  unreasonable risk; correct?

6  A.   Yes, because the benchmark MOE was 30.

7  Q.   Okay.  Now, in this case neither you nor Dr. Tsuji nor

8  Dr. Chang made any attempt to estimate what the hazard level is

9  for fluoride neurotoxicity; correct?

10 A.   No, none of us conducted or attempted a risk evaluation.

11 Q.   And neither you nor Dr. Tsuji nor Dr. Chang made any

12 attempt to determine what the acceptable margin would be

13 between the estimated hazard level for fluoride and the human

14 exposure level to fluoride under the conditions of use for

15 fluoridation; correct?

16 A.   Again, none of us have conducted an actual risk

17 evaluation.

18 Q.   Okay.

19 A.   We did look at a lot of data, the spread of data that was

20 of quality around where -- the neighborhood of the PODs.

21 Q.   Okay.  So now I'd like to talk a little bit about

22 uncertainty factors.  And in the NMP risk evaluation, EPA used

23 developmental toxicity as the critical health endpoint for

24 acute exposure; correct?

25 A.   I believe so.

1  Q.   And --

2  A.   But I -- I don't recall if -- I don't believe it was

3  developmental neurotoxicity.  I believe it was regular

4  developmental, but I don't recall the exact effects, what is

5  the difference, which could relate to uncertainty factors.

6  Q.   So, Dr. Henry, in -- for the -- for your point of

7  departure for the developmental toxicity, EPA selected animal

8  data that -- where the -- where the rats had been exposed

9  during pregnancy; correct?

10 A.   I'd have to again see what kind of study was actually

11 conducted, but if it was an OECD Guideline 422 or a 414, that

12 would be correct.

13 Q.   Right.  But you'd agree that if the concern is about

14 developmental toxicity during the in utero period, that you

15 would obviously use animal studies where the exposure occurred

16 in utero; right?

17 A.   That would be optimal.  You'd have an actual study

18 designed to detect developmental toxicity.

19 Q.   So I'm going to show you Page 202 of the NMP risk

20 evaluation.  And you see this Table 310 is titled "Summary of

21 Derivation of the PODs for Fetal Resorptions and Fetal

22 Mortality Following Acute Exposure to NMP."  Do you see that?

23 A.   Yes.

24 Q.   And so the endpoint here for the acute exposures is fetal

25 resorptions and fetal mortality; right?

HENRY - CROSS / CONNETT

1    **A.**   Yes.  It clarifies.

2    **Q.**   And, obviously, fetal resorptions and fetal mortality can

3    only be studied if there is exposure during the utero period;

4    right?

5    **A.**   That's correct.  And these tests are designed to go in

6    after the fact and count.

7        But you can actually go in and count resorptions because

8    it leaves a mark in the uterus, and then mortality would be

9    where you find an actual dead fetus.

10   **Q.**   Right.  And so you would agree with me, Dr. Henry, that

11   the population studied in these animal studies -- namely, the

12   pregnant mom and the offspring -- that those studies were

13   dealing with the most susceptible population for this endpoint;

14   correct.

15   **A.**   Can you restate that?

16   **Q.**   You would agree that if the concern is developmental

17   toxicity and the studies are actually investigating animals

18   exposed in utero, that these animal studies would be capturing,

19   in terms of life stage, the most susceptible population;

20   correct?

21   **A.**   Yes.  That's the developmental toxicity test is meant to

22   measure.

23   **Q.**   And EPA, when it determined what uncertainty factor to

24   apply, it applied an uncertainty factor of ten to account for

25   intraspecies variables; correct?

HENRY - CROSS / CONNETT

1    A.    Human intraspecies, yes.

2    Q.    So the animal data was focused on the most susceptible

3    life stage, and EPA applied an uncertainty factor of ten to

4    account for human-to-human variation; correct?

5    A.    Correct.

6    Q.    Now, we were talking -- in your declaration you rely upon

7    and talk about the NRC's 1994 blue book; right?

8    A.    '94?

9    Q.    Yeah.  The 1994 NRC book on risk assessment.

10   A.    What's the title?  I don't remember one called the blue

11   book.

12   Q.    It's science and -- let's see.

13   A.    That's the silver book.

14   Q.    Sorry, the silver book.  Thank you.

15         The 1994 NRC book entitled *Science and Judgment in Risk*

16   *Assessment*.

17   A.    All right.  That's the silver book.  I didn't know it was

18   called the blue book.

19   Q.    So I'll just -- we'll just refer to it as the 1994 NRC

20   report.  Does that make sense?

21   A.    Yes.  Thank you.

22   Q.    And in that report the NRC talked about the importance of

23   using -- of being consistent in how we apply inference

24   guidelines or defaults in risk assessment; right?

25   A.    I suppose it did.  There has been a lot of NRC reports

**HENRY - CROSS / CONNETT**

1  around application of uncertainty factors.  This is a -- a

2  subject of much debate and suggestion in the world of risk

3  assessment.

4  **Q.**  And in that NRC report NRC stated that:

5          "Without applying these default factors

6      consistently, risk assessments might be manipulated on

7      an ad hoc basis according whether regulating a

8      substance is thought to be politically feasible."

9      Correct?

10 **A.**  I don't recall the report.  If you have the words in front

11 of you, I would appreciate seeing that that's exactly what they

12 were saying.

13         **MR. CONNETT:**  Your Honor, may I refresh the witness's

14 recollection?

15         **THE COURT:**  Yes.

16     (Document displayed.)

17 **BY MR. CONNETT**

18 **Q.**  And, Dr. Henry, can you see this on your screen?

19 **A.**  Yeah.  If I recall, this -- in this time period, you can

20 see they are talking about the '83, that there -- one of the

21 mean crux of this particular NRC report, because there have

22 been several on the topic, was that while agencies across the

23 government were utilizing risk assessment methods and following

24 the paradigm, that there was a little -- quite a bit of

25 variation on how everybody was doing it.

1    So they were calling essentially for some kind of

2    agreement or some kind of guidance around what should be sort

3    of the standard or default approach.  There has definitely been

4    subsequent NRC reports about trying to get away from using

5    these default uncertainty factors, however.

6    **Q.**   Do you agree, though, with this principle we see here

7    written on the page?

8        **MS. CARFORA:**  Objection.  Just to --

9        **MR. CONNETT:**  Your Honor, I will withdraw the

10   question.  I'll withdraw the question.

11       **MS. CARFORA:**   Thank you.

12   **BY MR. CONNETT**

13   **Q.**   So let's then -- I know that's a 1994 report.  So I'd like

14   to ask you now about the 2009 report that the NRC wrote on risk

15   assessment.  And you're familiar with that report; correct?

16   **A.**   The silver book, yes.

17   **Q.**   And would you agree that the NRC's 2009 report on risk

18   assessment is an authoritative report in the field; correct?

19   **A.**   Well, it was commissioned by EPA to give us advice on

20   areas in which to improve our risk assessment.

21       So, again, the way that often these work is that a federal

22   agency will charge the NRC to give them advice and

23   recommendations, and then a contract is set up, and then they

24   convene people to give us advice.

25   **Q.**   Now, I'm going to summarize what I understand to be one of

1   the recommendations of the NRC 2009 report, and I want to ask

2   you if you think it's a correct summary.  Okay?

3   **A.**   Of the 2009?

4   **Q.**   Correct.

5       Okay.  Because of the effort that EPA has invested in

6   selecting its current defaults and the consistency that

7   defaults confer on the risk assessment process, the use of an

8   alternative to the default in specific cases faces a

9   substantial hurdle and should be supported by specific theory

10  and evidence.  The committee recommends that EPA adopt an

11  alternative assumption in place of a default when it determines

12  that the alternative is clearly superior; that is, that it's

13  plausibility clearly exceeds the plausibility of the default.

14      Dr. Henry, would you agree that that's one of the

15  recommendations that the NRC made to the EPA in 2009?

16          **MS. CARFORA:**  Your Honor, I object as hearsay,

17  because he just read that entire paragraph into the record.

18  I would --

19          **THE COURT:**  It's not hearsay because it's not

20  evidence until she says "yes" or "no."

21          **MS. CARFORA:**  Well, I appreciate that, but he just

22  read out of -- he just read out of the document to the witness.

23      So it's in the record now and the document doesn't --

24          **THE COURT:**  It's not --

25          **MS. CARFORA:**  The witness doesn't have the document

```
 1   in front of her.
 2            THE COURT:  It's part of the question, so it's not in
 3   evidence my book.
 4        Objection overruled.  She can answer.
 5   A.   Can you restate it?  Sorry.
 6   BY MR. CONNETT
 7   Q.   So I mean, Dr. Henry, first off, you agree that the NRC's
 8   2009 report is the -- is one of the seminal NRC reports on risk
 9   assessment that you, yourself, have cited throughout this
10   litigation; correct?
11   A.   Yes.
12   Q.   Okay.
13   A.   It is advice to EPA on how to improve risk assessment
14   efforts.
15   Q.   And isn't it true, Dr. Henry, that the NRC recommended
16   that the use of alternatives to a default in any given risk
17   assessment should be supported by specific theory and evidence;
18   correct?
19   A.   I would say it slightly different; that they were
20   encouraging us.  This is one of the areas that they
21   specifically were asked to examine, and they did a lot of words
22   to encourage us to find ways to get off of these defaults.
23   Q.   But the committee recommended --
24   A.   But you do have to support them.
25   Q.   Right.  And would you agree that the NRC concluded that
```

1   the use of an alternative to a default in any given risk

2   assessment must be shown to be clearly superior to the default?

3   A.    Again, I don't know about that word "superior" word seeing

4   the words.

5        But again, of course, we would want to have an explanation

6   or a rationale.  We are encouraged on the one hand to move away

7   from defaults.  However, science limited -- is limited in some

8   of these areas of uncertainty, so we have to find tools and

9   methods and scientific underpinnings to move off of default.

10  That is the current state of practice.

11  Q.    Okay.  So I only have a few minutes left here, and I don't

12  want to go one minute over.  So we are, what, we're about 59

13  minutes in.  So I have 10 minutes left here.

14       Let's talk about benchmark dose analysis.  In critiquing

15  Dr. Grandjean's calculations in this case you relied upon EPA's

16  benchmark dose technical guidance; correct?

17  A.    Yes.

18  Q.    One of your main criticisms of Dr. Grandjean's BMD

19  analysis is that he didn't provide enough information for you

20  to assess his analysis; right?

21  A.    Correct.

22  Q.    But neither you nor anybody at the EPA ever asked

23  Dr. Grandjean to provide additional information to show what he

24  did and how he did his analysis; correct?

25  A.    No.  I didn't even know that was an option.

**HENRY - CROSS / CONNETT**

1  Q.    Okay.  You never talked with the attorneys to ask whether

2  you might be able to get additional data?

3  A.    Well, my recollection is that we had a very short

4  turnaround on reviewing these in general.

5        Again, I guess my expectation is if you're providing me

6  with something that is supposed to be the basis of making this

7  determination, that it needs to have -- it needs to be it --

8  it.

9  Q.    Well, Dr. Henry, didn't Dr. Grandjean and his BMD analysis

10  identify the published studies that he was relying upon?

11  A.    He did.

12  Q.    And --

13  A.    I believe in -- again, there were two different reports

14  with two -- the two different studies that have been discussed

15  at length here in the last week.

16        One -- I have a recollection that -- that it wasn't

17  even -- one of the two was not yet published in the scientific

18  literature at that time.

19        The first report didn't have the Canada study at all.  It

20  only had ELEMENT.  And I don't know for sure, in my

21  recollection here, exactly how much of that information.

22        But, again, I guess I just never thought it was up to me

23  to go and find the data.

24  Q.    Fair enough.

25  A.    In an EPA risk assessment it's always provided.

HENRY - CROSS / CONNETT

1   **Q.**   Fair enough.

2   **A.**   But because, again, this is a --

3         **MR. CONNETT:**  Your Honor, at this point I think the

4   witness is going on a little bit beyond --

5         **THE COURT:**  Yeah.  Let's go to the next question.

6   BY MR. CONNETT

7   **Q.**   So, Dr. Henry, is it fair to say that the EPA has access

8   to studies that are published in the open literature?

9   **A.**   Yes.

10  **Q.**   And you mentioned the ELEMENT study that Dr. Grandjean

11  relied upon.  That's Bashash 2017; correct?

12  **A.**   Correct.

13  **Q.**   Dr. Grandjean, in his benchmark dose analysis, talked

14  about extracting the data points from the scatter plot;

15  correct?

16  **A.**   I believe the word was digitizing.

17  **Q.**   And did EPA at any point in this litigation attempt to do

18  that?

19  **A.**   With that dataset to recreate his analysis?

20  **Q.**   Yes.

21  **A.**   No.

22  **Q.**   Okay.  I take it that that is something that the EPA has

23  the ability to do?

24  **A.**   What?  Go to the journal and digitize the data?

25  **Q.**   Correct.

1    A.    Yes.

2    Q.    And I take it that EPA also has the ability to take

3    coefficients and do a BMR analysis of coefficient regressions

4    in published papers; right?

5    A.    Can you restate that?

6    Q.    Well, I'll move on.

7    A.    You need the data to get the coefficients.

8    Q.    Now, the BMD guidance that you rely upon, the EPA BMD

9    guidance, that is not a document that is binding on EPA or any

10   regulated entity; correct?

11   A.    None of the EPA guidelines are binding.

12   Q.    Okay.  And the BMD guidance specifically says that it's

13   not designed to replace the expert judgments of toxicologists

14   and others who addressed the hazard characterization issues in

15   risk assessment; right?

16   A.    I'll take your word for it, but it sounds like something

17   we would say.

18   Q.    And the guidelines -- the guidance that you're relying

19   upon, the BMD guidance, recognizes that expert evaluation and

20   judgments on issues such as study quality and toxicological

21   significance are beyond the scope of the guidance; right?

22   A.    Yes.

23   Q.    Okay.  And, Dr. Henry, you have no opinion on

24   Dr. Grandjean's use of one IQ point for his BMR; correct?

25   A.    I have no opinion?

1    **Q.**   Correct.

2    **A.**   Here today?

3    **Q.**   I'm asking:  Do you have an opinion on Dr. Grandjean's use

4    of one IQ point for his benchmark response?

5    **A.**   I believe that I don't think that he well justified and

6    provided the strong basis for doing so.

7             **MR. CONNETT:**  Your Honor, I have an impeachment.  On

8    Page 358, Line 18 to Page 359, Line 1.  And this will be my --

9    the last question for the exam.

10            **THE COURT:**  Any objection?

11            **MS. CARFORA:**  Can you tell me -- you said 358?  What

12   was the line?  I'm sorry.

13            **MR. CONNETT:**  18, to 359/1.

14            **MS. CARFORA:**  I object because it's a different

15   question than what you just posed.

16       If you want to ask her the same question and see what she

17   says, go ahead, but what you just asked her is a different

18   question.

19            **MR. CONNETT:**  Your Honor, can --

20            **THE COURT:**  Why don't you put it up so I can see it,

21   what you asked, because I don't have it with me here.

22       (Document displayed.)

23            **THE COURT:**  Scroll down?  Oh, I see.

24       Well, it's close enough.  Go ahead and read it.

25

1   BY MR. CONNETT

2   **Q.**   (As read)

3         **"QUESTION:**  So do you have any opinions, one way or

4         the other, as to whether a loss of one IQ point is

5         suitable for use as a BMR, benchmark response?

6         **"ANSWER:**  No, I don't have an opinion."

7              **MR. CONNETT:**  And, Your Honor, at this time

8   plaintiffs have no further questions.

9              **THE COURT:**  All right.  Anything on redirect?

10             **MS. CARFORA:**  Yes, Your Honor.  Can I get a two or

11  three-minute recess, please?

12             **THE COURT:**  Okay.  Three minutes.

13             **MS. CARFORA:**  Thank you.

14             **THE CLERK:**  Court is in recess.

15        (Whereupon there was a recess in the proceedings

16         from 4:16 p.m. until 4:20 p.m.)

17             **THE CLERK:**  Court is now in session.

18             **THE COURT:**  All right.  Ms. Carfora, you may resume.

19             **MS. CARFORA:**  Yes.  Thank you, Your Honor.

20        I'm sorry, I -- I do not see Dr. Henry.  Is she on the --

21  on everybody else's screen?

22             **THE WITNESS:**  Hi, can you hear me?

23        It never happened a single time last week, but this week

24  Zoom keeps cutting me off and disappearing from my computer.

25  So I just came all the way back in.  I had to dial mode and

```
 1   call back in.
 2           THE CLERK:  Okay.  I just promoted her as a panelist
 3   again.  I'm not sure what happened because Zoom has been doing
 4   this randomly.
 5           THE WITNESS:  I know.  It's just suddenly this week.
 6   This is, like, the fifth time I have had to download it.
 7       Here I am.  I'm back.
 8           MS. CARFORA:  Thank you.
 9           THE COURT:  Go ahead, Ms. Carfora.
10                   REDIRECT EXAMINATION
11   BY MS. CARFORA
12   Q.   Dr. Henry, did you read Dr. Thiessen's -- all three of
13   Dr. Thiessen's expert reports?
14   A.   Yes.  Multiple times.
15   Q.   In the first report that Dr. Thiessen wrote that
16   Mr. Connett was referring to, in your opinion, did Dr. Thiessen
17   discuss risk assessment guidelines or did she just cite to
18   them?
19   A.   My recollection is she cited to them.  She also cited to
20   our Section 5, the way -- our methodologies for conducting
21   those.  So it was kind of intermingled.  In particular, in the
22   MOE analysis she was referring multiple times to that.  So I
23   found that confusing or puzzling.
24   Q.   And in your opinion, did Dr. Thiessen document her
25   scientific justification or analysis offered for her expert
```

1    opinion?

2            MR. CONNETT:  Your Honor, this is actually beyond the

3    scope.

4            THE COURT:  I believe it is, on this point.

5            MS. CARFORA:  Well, if I could, Your Honor -- I don't

6    want you -- he showed her the report and he asked her questions

7    about the report.  He specifically asked her about discussions,

8    not about citing.  And he specifically asked her about whether

9    the -- if somebody followed the guidelines, whether or not --

10           THE COURT:  I'll let you ask it, if it's along the

11   lines of the guidelines.  But your last question, seemed to me,

12   was broader than that.

13           MS. CARFORA:  Thank you for the clarification.  I

14   appreciate that.

15   BY MS. CARFORA

16   Q.   Dr. Henry, did Dr. Thiessen document and show her work in

17   the analysis offered in her expert report consistent with the

18   1998 guidelines for neurotoxicity?

19   A.   So, again, the guidelines are guidelines.  They tell you

20   the things that you should, in fact, include.  And strengths

21   and limitations and uncertainties, and all of those long lists

22   of great things we like to have, are included in those lists.

23   And, no, I did not find those elements to be present.

24   Q.   Dr. Henry, in your opinion, did Dr. Thiessen cite or apply

25   the principles and practices from the 1998 guidelines?

HENRY - EXAMINATION / CARFORA

1    A.    The generalized, like, steps of the guidelines were there.

2    But, again, it was a little bit intermingled in some areas with

3    the TSCA Section 5.  So I found that to be unclear and

4    confusing.

5    Q.    And, Dr. Henry, do you know if -- did Dr. Thiessen cite or

6    apply any of the principles and procedures based on the

7    Guidance for Interested Persons under TSCA?

8    A.    I don't recall that guidance being cited.

9    Q.    And do you recall whether Dr. Thiessen cited to the

10   application of systematic review for TSCA?

11   A.    I don't believe she did.

12   Q.    And do you recall whether those guidelines were available

13   to her at the time she submitted her expert report in this

14   case?

15   A.    The -- the Guidance for Interested Parties, again, was

16   mandated to be published in June of 2017.  So, certainly, that

17   was available.

18         The application of systematic review in TSCA risk

19   evaluations was published, I believe, it was May of 2018.  So

20   about a year before these reports started to come to us.

21   Q.    Do you recall any discussion in the guidance for

22   interested -- Guidance for Interested Persons in how an

23   interested person, submitting a draft risk evaluation to EPA,

24   might go about having that draft risk evaluation peer reviewed?

25   A.    I don't recall that specific element.  It definitely

HENRY - EXAMINATION / CARFORA

1    outlined the various methods and approaches and the things that

2    need be included to be considered equivalent to TSCA.  I don't

3    recall the public comment.

4         But, certainly, if we received one, since EPA is the

5    entity -- or in this case the judge -- is to make a risk

6    determination, and we must subject a draft for risk evaluation

7    to a public comment period.

8         So I -- I just don't recall if there is a specific section

9    on that, but that would be my expectation.

10   **Q.**   Dr. Henry, would it help refresh your recollection if I

11   showed you the Guidance to Interested Persons?

12   **A.**   Yes, it would.

13            **MS. CARFORA:**  Your Honor, this is an exhibit that is

14   in evidence.  May I have permission to show the witness Trial

15   Exhibit 538?

16            **THE COURT:**  All right.  No objection?

17            **MR. CONNETT:**  No objections, Your Honor.

18            **THE COURT:**  Go ahead.

19            **MS. CARFORA:**  Mr. Hambrick, Trial Exhibit 538,

20   Page 11, and the middle of the page there just before Section

21   3.2.

22        Mr. Hambrick, can you also do the paragraph above that as

23   well?

24        (Document displayed.)

25

1    BY MS. CARFORA

2    Q.    Dr. Henry, have you had a chance to read this?

3    A.    Yes.

4          MS. CARFORA:   Can you clear the screen, Mr. Hambrick?

5          (Document removed from display)

6    BY MS. CARFORA

7    Q.    Dr. Henry, does that refresh your recollection as to how

8    an interested party could have their draft risk evaluations

9    peer reviewed?

10   A.    Yes.   It says that we do not expect them to have them peer

11   reviewed prior to submission; that if we took up their data

12   analysis and evaluations, that it would become part of the EPA

13   document that would get peer reviewed then.   Because peer

14   review is, again, required under TSCA for a draft risk

15   evaluation.

16   Q.    Dr. Henry, can you explain for the Court the concept of

17   fit for purpose as it's included in the draft risk evaluation

18   rule?

19   A.    Well, again, fit for purpose can mean many different

20   things.   I mean, it's easier to say in an example, but

21   essentially for the purpose we still have to get to the same

22   risk evaluation -- risk determination decision point.

23         But if the data and the methods that you have available --

24   this goes back to a basic principle risk assessment that you

25   do -- sometimes it's an iterative process.   If you have, you

1  know, data and information available that uses that

2  sophisticated methods, you rely on those and not keep refining

3  if you're comfortable regarding the uncertainties and the

4  conclusions.

5       But as things get more complicated or if -- especially for

6  something you're going to rely on for regulation, the bar is

7  much higher; that you need to make sure the data is all the

8  things I talked about earlier.

9       So it just depends on the data.  We -- we -- for example,

10 in our risk evaluation exposure scenarios or exposure pathways

11 may be conducted at a higher level of detail and complexity

12 than others.

13 **BY MS. CARFORA**

14 **Q.**  Thank you.

15      Dr. Henry, I just want to clarify.  Is it your testimony

16 that the NRC 2006 was an unreliable source of information for

17 understanding exposure to fluoride?

18           **MR. CONNETT:**  Misstates testimony, and leading.

19           **THE COURT:**  Sustained.  Rephrase the question.

20 **BY MS. CARFORA**

21 **Q.**  Dr. Henry, can you clarify for the Court your criticism of

22 Dr. Thiessen's reliance on the NRC 2006 report for exposure

23 data?

24 **A.**  It was not so much a criticism on the relying on that, but

25 that it was -- it's been quite a few years since then and

1   that to ensure or meet the best available, that there should at

2   least have been an attempt to look for newer information.  If

3   it didn't exist, it didn't exist.  You could have, you know,

4   argued that was the best.

5       But there was nothing in the original reports to indicate

6   that any attempt was made to find up-to-date best available

7   information.

8   Q.   Dr. Henry, is causation relevant to a hazard

9   identification?

10  A.   It's definitely a consideration.  The neurotox guidelines

11  do talk about that.  The more you can try to establish that,

12  the better.  It adds confidence to your hazard assessment.

13  Q.   And so can you clarify, was it your position in this

14  litigation that plaintiffs had to prove causation?

15  A.   No.

16  Q.   And is your -- does the basis of your opinion in any way

17  rest on whether plaintiffs proved causation?

18          MR. CONNETT:  Leading.

19          THE COURT:  Overruled.

20      (Brief pause.)

21  BY MS. CARFORA

22  Q.   And you also mentioned in your direct -- in your cross

23  testimony that your critiques were based on methodology

24  approaches.  Can you just clarify that very quickly?

25  A.   My critiques were based on several different types of

1   limitations in the methods that were applied and/or

2   documentation or justifying how they were applied or why they

3   were applied.  So assumptions weren't necessarily always

4   explained.

5       Justification for selection of studies, for example,

6   usually is based on a quality assessment, and I didn't see that

7   kind of thing in there.

8   **Q.**   And can you explain why that's important here?  Isn't that

9   just form over substance?

10  **A.**   No.  I mean, this gets to that determination of best

11  available science, and that is which is reliable, which means

12  you need to do a quality evaluation, and unbiased.

13      So again, you know, Dr. Thiessen or Dr. Grandjean may have

14  thought those were the best studies, but without providing an

15  external reader, such as myself, an analysis to show that they

16  evaluated against some sort of criteria or such, how would I be

17  convinced?

18      Again, I -- earlier I said I'm a person with a lot of

19  questions, so I want to know.  And this is just the -- this

20  kind of, you know, demonstration that the best available

21  science was determined by some method, and then used in a risk

22  evaluation to get to that risk determination, is -- it's what

23  our stakeholders demand.

24  **Q.**   And who are your stakeholders?

25  **A.**   Well, we have had a lot of scrutiny from Congress around

HENRY - EXAMINATION / CARFORA

1    TSCA lately.  So Congress certainly.

2         Stakeholders from the non-governmental organizations are

3    also quite vocal.  Industry is a stakeholder obviously.  And,

4    again, we're federal civil servants, so the American public.

5         Again I mentioned, I think I mentioned, but every time we

6    go to public comment and peer review, we get lots and lots of

7    input.  I mean I think, I hope, it's partly because we're

8    putting together a new program, but I would say that what they

9    mostly demand is more documentation and more justification.  So

10   this is why we're using the methods we do to demonstrate that

11   the TSCA requirements are being met.

12   Q.   And, Dr. Henry, if a database includes human data -- I'm

13   sorry.  Yes.  If a database includes human data, does that mean

14   we should just ignore the animal data?

15   A.   Not necessarily.  Again, you have to do this data

16   evaluation for quality and weight of evidence.  So you might --

17   there are risk assessments that only use human data.  Typically

18   it's a lot more than two cohorts, but there is also those that

19   include both.  And then there are those that include only

20   animal data.

21   Q.   Now, you spoke a little bit about uncertainty factors.

22   And I'd like to know, Dr. Henry, are uncertainty factors

23   applied generally to a database or are they applied to

24   individual studies?

25   A.   To individual studies.

HENRY - EXAMINATION / CARFORA

1    Q.   And how does OPPT go about determining uncertainty

2    factors?

3    A.   So the generalized process here is to go through this data

4    gathering, data evaluation, looking at the data.  You want to

5    look at the highest quality data.  And then you have to

6    essentially take each study and under -- and go through the

7    process of the four uncertainty factors and whether or not they

8    need be applied or based on that study and what exposure

9    scenario it's going to be applied to.

10   Q.   And, Dr. Henry, did -- did EPA actually make a finding of

11   unreasonable risk in the draft NMP risk evaluation?

12   A.   It's a draft, so it is not the final agency conclusion,

13   because it is a draft.  We develop a draft and then because

14   TSCA says that a risk determination is part of the risk

15   evaluation, and a draft risk evaluation needs to be peer

16   reviewed, so that whole package, the draft risk evaluation goes

17   out for a public comment and peer review.  So at this time, at

18   this day, that is not a final determination.  It's a draft.

19   Q.   And is it just the final determination that goes out for

20   peer review or is it everything in the draft that gets peer

21   reviewed?

22   A.   Everything.  Mostly the peer review is a scientific peer

23   review, and so it -- it is -- the scientific peer review is

24   limited to a risk assessment part, but that doesn't mean that

25   people don't opine on the other part.

HENRY - EXAMINATION / CARFORA

1   Q.   So is it -- so is it true that both the final

2   determination and all of the methodologies and approaches used

3   in that determination could change after peer review?

4           MR. CONNETT:  Leading.

5   A.   Yes.  So if, for example, peer reviewers identify another

6   piece of data that we somehow missed, or if they recommend, for

7   example, a different modeling approach, or what often happens

8   at these peer reviews is a lot of deliberation around

9   particular studies and around uncertainty factors.

10          So things can change after peer review, all the way from

11  the data used to support the final risk evaluation, all the way

12  through the dose response modeling could change.  The study we

13  used could change.  Any number of things could change.

14  Exposure could change.  And so then, therefore, the risk could

15  change.

16  Q.   Dr. Henry, are you familiar with the Bradford Hill

17  criteria?

18  A.   Yes.

19  Q.   And are the Bradford Hill criteria considerations in the

20  OPPT application of systematic review document?

21          MR. CONNETT:  Your Honor, at this point we're beyond

22  the scope.

23          THE COURT:  I believe so.  There was no discussion of

24  that in the cross.

25          MS. CARFORA:  There was discussion of causation, Your

1 Honor.  This goes directly to causation.

2          THE COURT:  Well, maybe make a proffer.  How does

3 this relate to causation?

4          MS. CARFORA:  Well, the testimony in this trial to

5 date has been that the Bradford Hill criteria are the -- nine

6 criteria that are considered in determine -- in weighing

7 association as it relates to causation.

8          MR. CONNETT:  The question -- the issue on cross,

9 Your Honor, was just whether causation is required.  And so,

10 you know, I think that's where the scope would be proper.

11          THE COURT:  All right.  That's correct.  It was

12 about, at least an implicit assertion by the plaintiffs that

13 Dr. Henry applied a causation analysis when that is not

14 required under TSCA.  It didn't get into whether or not the

15 causation analysis itself was substantively correct.

16      Beyond the scope.

17      (Brief pause.)

18          MS. CARFORA:  I have no further questions, Your

19 Honor.

20          THE COURT:  All right.  Anything further on recross?

21          MR. CONNETT:  One question, Your Honor.

22                    **RECROSS-EXAMINATION**

23 BY MR. CONNETT

24 Q.   Dr. Henry, of the 69 pages in Dr. Thiessen's expert

25 report, how many of those pages discuss Section 5?

 1   **A.**  Without actually pulling up the report and counting, I

 2   could not say.

 3        But her margin of exposure analysis speaks to it quite

 4   heavily as the front methodology, and then also in the tables

 5   of the MOES there's reference to MOEs typically derived for

 6   those types.  And then she cites to four or six different PMN

 7   risk determinations -- PMNs being new chemical

 8   determinations -- in several places.

 9   **Q.**  Okay.  Dr. Henry, is it more -- sorry, strike that.

10        Was it more or less than five pages of the 69 page report

11   where Dr. Thiessen discussed Section 5?

12            **MS. CARFORA:**  Objection, Your Honor.  I think this is

13   unfair to the witness, and I think he's asked it --

14            **THE COURT:**  Hold on.  If she can remember.  But,

15   frankly, this question is not helpful to the Court.  If you

16   want to spend your time on this question, you can do it, but

17   it's not helpful to me.

18            **MR. CONNETT:**  Okay --

19   **A.**  As I recall --

20            **MR. CONNETT:**  Your Honor, I will withdraw the

21   question.

22            **THE COURT:**  All right.  Conclude?

23            **MR. CONNETT:**  Yes.  Yes, Your Honor.

24            **THE COURT:**  Anything further on redirect?

25            **MS. CARFORA:**  No, Your Honor.  Thank you.

PROCEEDINGS

```
 1              THE COURT:  All right.  Dr. Henry, thank you for your
 2   testimony.  You will be excused.  Appreciate your time.
 3              THE WITNESS:  Thank you, Your Honor.
 4         (Witness excused.)
 5              THE COURT:  All right.  So next witness.
 6          MS. CARFORA:  EPA calls Joyce Donohue.
 7         Mr. Hambrick, if we can get that six-minute deposition
 8   video up, that would be great.
 9              THE COURT:  Okay.
10                        JOYCE DONOHUE,
11   called as a witness for the Defendant herein,
12   testified via videotaped deposition played in open court.)
13         (Time noted:  4:43 p.m. to 4:50 p.m.)
14              THE COURT:  All right.  Anything further in that
15   regard?
16          MS. CARFORA:  No.  I would -- nothing further with
17   Dr. Donohue.
18         I would inquire to the Court, I was under the impression
19   the schedule was until 4:30 Pacific time today.  We only
20   have -- we have about 15 minutes of deposition testimony that
21   we wanted to read into the record; but other than that, I
22   believe we'll probably rest.
23              THE COURT:  Actually, I think we said until 5:30.
24   Right, Angie?
25              THE CLERK:  Yes, Your Honor.
```

1    **THE COURT:**  So if you want to take the next 15

2    minutes to read that testimony, this is the time to do it.

3    **MS. CARFORA:**  Thank you.

4    **MR. DO:**  Your Honor, if we could just have a time

5    check.

6    **THE COURT:**  What's that?

7    **MR. DO:**  Could we get a time check so that -- we want

8    to make sure we reserve time for any possible rebuttal

9    witnesses.

10   **THE COURT:**  Okay.  Angie, what are we showing on the

11   clock?

12   **THE CLERK:**  Your Honor, plaintiff has 32 minutes and

13   30 seconds remaining.

14   Defendant has 44 minutes and 1 second remaining.  That

15   does not include the deposition testimony that was just

16   presented, the 6 minutes.

17   **MR. DO:**  Much appreciated.

18   Your Honor, if we could inquire whether or not there will

19   be any rebuttal witnesses that will be helpful in terms of

20   gauging whether or not we --

21   **THE COURT:**  Mr. Connett, are you planning a rebuttal

22   witness tomorrow?

23   **MR. CONNETT:**  Your Honor, we are still considering

24   that.  I can say that if we have rebuttal, it will be very

25   short.

PROCEEDINGS

```
 1              THE COURT:  Okay.
 2              MR. DO:  In that case, I think we can go ahead and
 3    spend just be about 10, 15 minutes of the Court's time now.
 4              THE COURT:  All right.
 5              MR. DO:  By deposition designations we will be
 6    calling now Audrey Adams on behalf of her son Kyle Adams.
 7              THE COURT:  Okay.
 8              MR. DO:  And if the Court will allow, I and Ms. Bhat
 9    will be doing the questions and answering of that.
10              THE COURT:  All right.  That sounds good.
11         Sorry, Ms. Carfora.
12              MR. CONNETT:  Your Honor, could I just clarify --
13    sorry.
14         I wanted to clarify one thing, Your Honor, just so it's
15    clear.  And that is that plaintiffs have designated from these
16    depositions, but we are electing not to read it -- read it out
17    loud.  We have it in the Appendix C.
18              THE COURT:  Okay.  How much of that is in the
19    appendix?
20              MR. CONNETT:  All of our designations are in the
21    appendix, Your Honor.
22              THE COURT:  Was there a stipulation?
23              MR. CONNETT:  Yes.  We have the stipulation that
24    everything in Appendix C is in evidence.
25              THE COURT:  Okay.
```

PROCEEDINGS

```
1              MR. DO:  Yes, Your Honor, that stipulation is still

2    pending.

3         And in light of the fact that plaintiffs may be calling a

4    rebuttal witness, I think we'll forego reading this into the

5    record.  However, if there is time tomorrow, if the Court will

6    permit calling witnesses out of order, we may renew our request

7    to do so.

8              THE COURT:  What you're proposing to do is to read

9    excerpts from deposition excerpts that have already been

10   admitted; is that right?

11             MR. DO:  Yes, Your Honor.  As you may recall, you

12   (audio interference) for the sake of emphasis, for the parties

13   to read into the record if desired.

14             THE COURT:  So that's up to you whether you want it

15   emphasized or not.  Up to you.  You know, I don't know how much

16   time you want to use on closings and stuff.  I mean, that's --

17             MR. DO:  If you don't mind, Your Honor, we would like

18   to make that decision after the possible rebuttal testimony of

19   tomorrow, if you don't mind.

20             THE COURT:  All right.  Any objection?

21             MR. CONNETT:  No, Your Honor.

22             THE COURT:  All right.  So, and that will conclude

23   your case then; right?  The only thing left are these excerpts?

24             MR. DO:  That's right Your Honor.

25             THE COURT:  And the cross of the rebuttal.
```

1    MR. DO:  That's correct, Your Honor.

2    THE COURT:  All right.  At most, it will be one short

3  witness for rebuttal tomorrow; correct?

4    MR. CONNETT:  I believe so, Your Honor.  But if we

5  had more than one witness, it was -- it's going to be very

6  short, if we have anything.  I don't know yet if we are.

7    THE COURT:  Okay.  Well, you are constrained by your

8  own clock there.

9    MR. CONNETT:  Very much so.

10    THE COURT:  That is the beauty of this process.

11    So I leave the judgment to you, but you should count on

12  making your closings tomorrow, and we'll resume at 8:30.

13    MR. CONNETT:  Your Honor --

14    MR. DO:  Your Honor, one more housekeeping matter.

15    So we have been doing disclosures to each side on a daily

16  basis with regards to who the witnesses will be and also, of

17  course, any exhibits that will be shown, et cetera.

18    Could we get assurances from Mr. Connett with regards to,

19  again, the identity and, also, subject matter of the rebuttal

20  so that we can prepare accordingly.

21    THE COURT:  That's fair.  You should do that within

22  the next hour.

23    MR. CONNETT:  Well, Your Honor, also two points of

24  clarification.

25    One is for closing, would we have the option of, say,

PROCEEDINGS

```
1  using our first 25 minutes or so for our -- for closing and
2  then reserving the remainder for a rebuttal?
3        THE COURT:  Yeah.  No, you can do a rebuttal.
4        MR. CONNETT:  And the other question, Your Honor,
5  that we had is:  Do you intend -- do you envision us filing,
6  like, post trial briefing for findings of fact, things that
7  sort.
8        THE COURT:  I'm going to talk about that tomorrow, I
9  think, after I hear your closings.  But I am inclined to
10 explore several things with you all, and one of those would be
11 revised proposed findings of fact and conclusions of law in
12 view of the evidence.
13      In particular, it would be helpful to have cites, rather
14 than having my staff and I try to hunt through every transcript
15 and every document.
16      So you should be prepared to talk about that.  I won't be
17 charging it to you in terms of where we go from here.  That
18 will be my time.
19      I do want to take some time to talk about where we go from
20 here, and I also want to explore all the possible alternatives
21 here.  All right?
22      MR. CONNETT:  Thank you, Your Honor.
23      MR. DO:  Thank you, Your Honor.
24      THE COURT:  Okay.  So we'll see you 8:30 tomorrow
25 morning.
```

PROCEEDINGS

1           MR. CONNETT:  Thank you.

2           MR. DO:  Thank you.

3           THE CLERK:  Court is adjourned.

4       (Whereupon at 4:57 p.m. further proceedings

5        were adjourned until Wednesday, June 17, 2019

6        at 8:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **I N D E X**

TUESDAY, JUNE 16, 2020 - Volume 6

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| | | |
| **CHANG, ELLEN** | | |
| (PREVIOUSLY SWORN) | 911 | 6 |
| Redirect Examination by Ms. Bhat | 911 | 6 |
| | | |
| | | |
| **HENRY, TALA** | | |
| (SWORN) | 925 | 6 |
| Direct Examination by Ms. Carfora | 926 | 6 |
| Cross-Examination by Mr. Connett | 961 | 6 |
| Redirect Examination by Ms. Carfora | 1007 | 6 |
| Recross-Examination by Mr. Connett | 1018 | 6 |
| | | |
| **DONOHUE, JOYCE** | | |
| VIDEOTAPED TESTIMONY | 1020 | 6 |

- - -

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, June 16, 2020