Volume 7

Pages 1028 - 1154

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

FOOD & WATER WATCH, INC., et al,      )
                                      )
                                      )
            Plaintiffs,               )
                                      )
   vs.                                ) No. C 17-2162 EMC
                                      )
U.S. ENVIRONMENTAL PROTECTION         )
AGENCY, et al,                        )
                                      )  San Francisco, California
            Defendants.               )  Wednesday
                                      )  June 17
_____)  8:30 a.m.

**TRANSCRIPT OF REMOTE ZOOM BENCH TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**            WATERS KRAUS & PAUL
                              222 North Pacific Coast Highway
                              Suite 1900
                              El Segundo, California 90245
                    BY:  **MICHAEL P. CONNETT, ESQ.**
                         **CHARLES ANDREW WATERS, ESQ.**


                              WATERS & KRAUS LLP
                              3141 Hood Street
                              Suite 700
                              Dallas, Texas 75219
                    By:  **KAY GUNDERSON REEVES, ESQ.**


            (APPEARANCES CONTINUED ON FOLLOWING PAGE)


*Reported By:*   **Debra L. Pas, CSR 11916, RPR, RMR, CRR**
               *Official Reporter - US District Court*
               *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

For Plaintiffs:          NIDEL AND NACE, PLLC
                         5335 Wisconsin Avenue, NW
                         Suite 440
                         Washington, DC 20015
                  BY:  **CHRISTOPHER THOMAS NIDEL, ESQ.**

For Defendants:          U.S. DEPARTMENT OF JUSTICE
                         Environmental Defense Section
                         601 D Street, NW
                         Room 8814
                         Washington, DC 20004
                  BY:  **DEBRA J. CARFORA, ESQ.**

                         U.S. DEPARTMENT OF JUSTICE
                         Environment & Natural Resources Div.
                         P.O. Box 7611
                         Washington, DC 20044
                  BY:  **BRANDON N. ADKINS. ESQ.**
                       **SIMI BHAT, ESQ.**
                       **JOHN THOMAS H. DO, ESQ.**

                         _   _   _

1          P R O C E E D I N G S

2    JUNE 17, 2020                                    8:30 a.m.

3                         ---oOo---

4         THE CLERK:  Court is now in session.  The Honorable

5    M. Chen is presiding.

6       Calling Civil Action 17-2162, Food & Water Watch versus

7    Environmental Protection Agency.

8       Counsel, please state your appearances for the record,

9    beginning with plaintiff's counsel.

10         MR. WATERS:  Andy Waters for the plaintiff.

11         THE COURT:  Good morning, Mr. Waters.

12         MR. WATERS:  Good morning Judge.

13         MR. CONNETT:  Good morning, Your Honor.  Michael

14    Connett for the plaintiffs.

15         THE COURT:  All right.  Good morning, Mr. Connett.

16         MR. NIDEL:  Good morning, Your Honor.  Chris Nidel

17    for the plaintiffs.

18         THE COURT:  Thank you, Mr. Nidel.

19         MS. CARFORA:  Good morning, Your Honor.  Debra

20    Carfora for EPA.

21         THE COURT:  All right.  Good morning, Ms. Carfora.

22         MR. ADKINS:  Good morning, Your Honor.  Brandon

23    Adkins for EPA.

24         THE COURT:  All right.  Thank you, Mr. Adkins.

25         MS. BHAT:  Good morning, Your Honor.  Simi Bhat for

**PROCEEDINGS**

1   EPA.

2          THE COURT:  Good morning, Ms. Bhat.

3          MR. DO:  John Do for EPA.  Good morning, your Honor.

4          THE COURT:  All right.  Good morning, Mr. Do.

5          THE CLERK:  Your Honor, I am promoting Kay Reeves

6   into the well.

7          THE COURT:  Okay.

8          THE CLERK:  Ms. Reeves, please state your appearance

9   for the record.

10         MS. REEVES:  Yes.  I don't quite have my video.  Good

11  morning, I'm here for the plaintiffs, your Honor.

12         THE COURT:  All right.  Good morning, Ms. Reeves.

13     Okay.  What has the plaintiff decided with respect to

14  rebuttal?

15         MR. CONNETT:  Your Honor, we have one rebuttal

16  witness, Dr. Kathleen Thiessen.

17     We also have one document that was not pre-admitted.

18  There is no objections to the document that we seek to admit at

19  this time, which is Plaintiff's Exhibit 32.

20         THE COURT:  All right.  No objection?

21         MS. BHAT:  One second, your Honor.  Let me see what

22  that is.

23     (Brief pause.)

24         MS. BHAT:  Your Honor, I'm not sure if this exhibit

25  was ever discussed in testimony.

PROCEEDINGS

1          MR. CONNETT:  Your Honor, during Dr. Thayer's

2     testimony on Friday, there was a discussion about the use of

3     animal data in risk assessment where there is an applicable

4     human study that allows for a BMDL.

5        This mercury document show that the agency does consider

6     animal data, including reference dose derivations from animal

7     data to increase the confidence in the risk determination.

8          THE COURT:  Well, but it wasn't -- it wasn't brought

9     up during examination or cross; correct?

10         MR. CONNETT:  Well, Dr. Thayer did specifically

11     discuss the mercury assessment.  And so we think that this

12     document provides context for understanding how EPA has used

13     animal data to increase the confidence in the risk

14     characterization.

15         THE COURT:  All right.  Is there an objection?

16         MS. BHAT:  Your Honor, we're just not sure that it's

17     necessary to have this as an exhibit if it was never actually

18     discussed.

19        I mean, the appropriate time to have brought this up would

20     have been during the cross-examination of Dr. Thayer.

21         MR. CONNETT:  There is no objection, your Honor, to

22     this document.  So there is no -- there was no relevance

23     objection to this document.

24        The way we have been proceeding with the litigation, you

25     know, with the pre-admission of documents, I think it's

PROCEEDINGS

```
1    consistent with how we have approached exhibits in this case.
2            THE COURT:  All right.  So just to be clear, there is
3    or is not a formal objection to this?
4            MS. BHAT:  Your Honor, it is an EPA document.  It is
5    authentic, we agree.
6        It's just that it doesn't -- without any context of
7    questioning Dr. Thayer about this document, we're not sure how
8    it's useful to the Court's decision-making.
9            THE COURT:  All right.  I'm going to admit it.
10   However, I don't think it has much probative value, frankly.
11   It would have been more valuable to have some question and
12   answer about it.  But as it just sits there as a document, I
13   guess you can make whatever points you want to make.
14       I'll admit it, but I'll indicate that its probative value
15   is probably minimal.
16           MR. CONNETT:  Thank you, Your Honor.
17       (Trial Exhibit 32 received in evidence)
18           THE COURT:  All right.  Do you want to call
19   Dr. Thiessen then?
20           MR. CONNETT:  Yes, Your Honor.
21           THE COURT:  Okay.
22           THE CLERK:  Dr. Thiessen is being promoted into the
23   virtual well.
24           THE COURT:  Okay.
25       (Brief pause.)
```

THIESSEN - DIRECT  / CONNETT

1    THE COURT:  Good morning, Dr. Thiessen.

2    THE WITNESS:  Good morning, your Honor.

3    THE COURT:  All right, Mr. Connett.  Go ahead.

4                    KATHLEEN THIESSEN,

5    called as a witness for the Plaintiff herein, having been

6    previously sworn, resumed the stand and testified further as

7    follows:

8                    DIRECT EXAMINATION

9    BY MR. CONNETT

10   Q.   Dr. Thiessen, on Monday Dr. Chang stated that

11   hypersensitivity to fluoride has not been documented in

12   double-blinded studies; is that correct?

13   A.   That is false --

14        MS. BHAT:  Objection, Your Honor.  Scope.

15        THE COURT:  Overruled.

16        MS. BHAT:  Objection.  Your Honor, let me please

17   explain.

18        I don't believe that Dr. Thiessen has ever discussed the

19   studies that Mr. Connett is referring to in her disclosures.

20        MR. CONNETT:  Your Honor, these studies were

21   discussed at length during Dr. Thiessen's direct examination.

22   They are cited in her expert report, and they are cited in her

23   expert declaration.

24        If there was a scope objection, it should have been raised

25   during her direct exam.

THIESSEN - DIRECT / CONNETT

1    **THE COURT:**  All right.  Overruled.

2    **MS. BHAT:**  Your Honor, I did raise a scope objection

3    during the direct exam and what I was told is that these

4    studies were discussed in NRC 2006, which the witness did cite

5    to in her expert report.

6       However, it has come to light that the NRC document that

7    Mr. Connett was referring to was actually NRC 2009, and that

8    document was not discussed by this witness in this context.

9    **THE COURT:**  All right.  What about that?

10   **MR. CONNETT:**  Well, first off, counsel has

11   misrepresented to this Court the NRC 2006 document in their

12   brief last week.

13      The NRC report cites Dr. George Waldbott's 1978 book,

14   where Dr. Waldbott summarizes the case reports that he

15   published in the 1950's and 1960's.

16      Counsel took that -- Dr. Thiessen's statement, that there

17   were case reports from the 1950's, looked at the NRC report and

18   didn't find a specific reference in the neurotoxicity section

19   to the 1950's case reports, but failed to disclose to your

20   Honor that the neurotoxicity section specifically cites to

21   Dr. Waldbott's 1978 book, which is a summary of all of his case

22   reports.

23      So I would ask that -- I think counsel is making a long

24   objection.  I think it's taking up my time, and I would -- I

25   believe this objection is completely without merit.

 1              THE COURT:  All right.  Objection overruled.  The

 2   defense has enough familiarity.  You can -- you're not

 3   prejudiced.  You can examine on cross.

 4        Go ahead.

 5   BY MR. CONNETT

 6   Q.    Dr. Thiessen, was Dr. Chang correct that there have not

 7   been double-blinded studies showing hypersensitivity to

 8   fluoride?

 9   A.    That is false.

10   Q.    Have headaches been reported as a symptom of fluoride

11   exposure in double-blinded studies?

12   A.    Yes.

13   Q.    Dr. Chang mentioned a 1971 position paper by the American

14   Academy of Allergy.  Was the NRC aware of this position paper

15   when it issued its reports on fluoride in 2006 and 2009?

16   A.    Yes.

17   Q.    Did the NRC find that the studies on fluoride

18   hypersensitivity to be credible?

19   A.    Yes.

20              MS. BHAT:  Objection, your Honor.  Can we be specific

21   about which NRC document we are discussing?

22              THE COURT:  Please clarify.

23   BY MR. CONNETT

24   Q.    Did the NRC in both its 2006 and 2009 reports find the

25   studies on fluoride hypersensitivity to be credible?

THIESSEN - DIRECT  / CONNETT

1    **A.**    Yes.

2    **Q.**    Dr. Tsuji testified on Monday that she was not sure

3    whether adults can ingest a dose of .02 milligrams per kilogram

4    per day from drinking fluoridated water.

5         Dr. Thiessen, can adults exceed --

6              **MS. BHAT:**  Objection.  Misstates testimony.

7              **MR. CONNETT:**  Your Honor, let me --

8              **THE COURT:**  You can ask -- hold on.  Hold on.

9         Ask the question without -- you don't need to reference --

10   incorporate into your question every single -- you've done this

11   a lot.  Did you testify X, Y?  Just ask the question.

12             **MR. CONNETT:**  Understood, Your Honor.  Thank you.

13   **BY MR. CONNETT**

14   **Q.**    Dr. Thiessen, can adults exceed .02 milligrams per

15   kilogram per day of fluoride from drinking fluoridated water?

16   **A.**    Yes.

17   **Q.**    Now, you're familiar with the Mullenix study; correct?

18   **A.**    Yes.

19   **Q.**    Were there any body weight changes or signs of systemic

20   toxicity in the prenatally exposed animals in the Mullenix

21   study?

22   **A.**    No.

23             **MR. CONNETT:**  That's all the questions we have, your

24   Honor.

25             **THE COURT:**  All right.  Cross.

1          **MS. BHAT:**  Thank you, your Honor.

2                      **CROSS-EXAMINATION**

3    **BY MS. BHAT**

4    **Q.**   Dr. Thiessen, in NRC 2006 the NRC stated that there was

5    not robust evidence of any hypersensitivity to fluoride;

6    correct?

7    **A.**   I believe it's not robust, but there is evidence.

8    **Q.**   In fact, and it's a not robust statement that was

9    referring specifically to the gastrointestinal

10   hypersensitivity; correct?

11   **A.**   Those studies are discussed both with respect to

12   gastrointestinal sensitivity and neurological things.

13   **Q.**   But in the context of hypersensitivity, that was the

14   reference to gastrointestinal hypersensitivity; correct?

15   **A.**   I don't remember exactly.

16          **MS. BHAT:**  Mr. Hambrick, can we pull up Exhibit 13,

17   Page 318.

18      Permission to refresh.  Excuse me, your Honor.

19          **THE COURT:**  Go ahead.

20          **MS. BHAT:**  Exhibit 13, Page 318.

21      (Document displayed.)

22          **MS. BHAT:**  Mr. Hambrick, can you go to Page 297 --

23   I'm sorry, Mr. Hambrick.  You were on the right page.  I just

24   missed it.  Okay.

25      Can you blow up the bottom half, the "Findings" part of

**THIESSEN - CROSS / BHAT**

1    the page?

2        (Document enlarged))

3    **BY MS. BHAT**

4    **Q.**   Dr. Thiessen, this discussion of robust data, that relates

5    specifically to gastrointestinal effects; correct?

6    **A.**   This particular discussion, yes.

7            **MS. BHAT:**   Thank you, Mr. Hambrick.   You may close

8    the screen.

9        (Document removed from display)

10   **BY MS. BHAT**

11   **Q.**   Now, Dr. Thiessen, in NRC 2009 the -- is it true that the

12   NRC in 2009 concluded that the -- concluded that there were

13   experimental studies on anti-thyroid effects referencing

14   Galletti, Galletti and Joyet; is that true?

15   **A.**   Yes.

16   **Q.**   And isn't it true that in Galletti there was actually a

17   beneficial association between fluoride exposure and potential

18   hypothyroidism; correct?

19           **MR. CONNETT:**   Vague and ambiguous.

20           **THE COURT:**   Overruled.

21   **A.**   My memory is that the Galletti and Joyet study looked at

22   use of effectiveness of fluoride in treating hyperthyroidism by

23   reducing the thyroid activity in hyperthyroid individuals.

24   Beyond that, I don't remember any details right now.

25   **Q.**   And that study described it as a beneficial effect;

1    correct?

2    **A.**    In treating hyperthyroidism that could be considered a

3    beneficial effect, yes.

4    **Q.**    Now, Dr. Thiessen, isn't it true that even a

5    well-conducted study can yield false positives?

6    **A.**    That happens sometimes, yes.

7    **Q.**    And isn't it true that even a well-conducted study can

8    yield false negatives?

9    **A.**    It happens sometimes, yes.

10   **Q.**    You cannot evaluate consistency on a basis of one data

11   point; correct?

12   **A.**    Consistency, by definition, requires more than one data

13   point.

14   **Q.**    The EPA guidelines that you cite rely -- require that you

15   consider consistency across studies; correct?

16   **A.**    I believe that's in there, yes.

17   **Q.**    The EPA guidelines on which you rely also require you to

18   consider non-positive data; correct?

19   **A.**    Yes.

20   **Q.**    The EPA guidelines on which you rely also require you to

21   consider significant data gaps; correct?

22         **MR. CONNETT:**  Your Honor, at this point we're beyond

23   the scope of rebuttal.

24         **THE COURT:**  Sustained.

25

1    BY MS. BHAT

2    Q.   Dr. Thiessen, you were discussing the Mullenix study.

3    That was just one study; correct?

4    A.   One study, yes.

5    Q.   And you reviewed over 100 animal studies; correct?

6    A.   Yes.

7    Q.   And no other studies that you reviewed found gender

8    specific effects indicating sensitivity in male rats; correct?

9    A.   That is probably not correct.

10   Q.   No other animal study that you reviewed indicated that

11   males had a more sensitive effect than female offspring;

12   correct?

13           MR. CONNETT:   Your Honor, at this point we're beyond

14   the scope.

15           THE COURT:   Well, I'm going to allow this question to

16   be finished.

17   A.   There were other studies that reported gender differences.

18   I don't have the details in front of me right now.

19   BY MS. BHAT

20   Q.   The other study that reported -- the only other study that

21   reported gender differences was Bartos 2019; correct?

22   A.   That one did report gender differences.

23   Q.   That was the only other study; correct?

24   A.   I -- that I don't know at the moment.

25   Q.   You do not know.

1       Bartos 2019 showed more adverse effect in female offspring

2  than in male offspring; correct?

3  **A.**    Yes.  But the Mullenix study and the Bartos study were

4  designed differently, and so there could -- could reasonably be

5  differences expected.

6  **Q.**    Now, when you're assessing the Mullenix study, are you

7  applying a weight of the evidence approach?

8           **MR. CONNETT:**  Your Honor, this is beyond the scope.

9  It was a simple question about the Mullenix study.  It was just

10  about whether there were body weight changes.  That's it.

11          **THE COURT:**  Overruled.

12  **A.**    Could you repeat the question, please.

13  **BY MS. BHAT**

14  **Q.**    When you are evaluating the Mullenix study, are you

15  applying a weight of the evidence approach?

16  **A.**    Yes.

17  **Q.**    Now, weight of the evidence approach requires that you

18  consider significant data gaps; correct?

19  **A.**    When one is looking at a big picture.  When one is looking

20  at one study, the criteria have to be different.

21  **Q.**    Well, you cannot be looking at just one study and be using

22  a weight of the evidence approach; correct?

23          **MR. CONNETT:**  Your Honor, at this point it is -- this

24  is beyond the scope.

25          **THE COURT:**  Sustained.

PROCEEDINGS

```
 1              MS. BHAT:  Your Honor, I have no further questions at

 2     this time.

 3              THE COURT:  All right.  Anything on redirect?

 4              MR. CONNETT:  No, Your Honor.

 5              THE COURT:  All right.  Thank you.

 6          (Witness excused.)

 7              THE COURT:  Any further witnesses?

 8              MR. CONNETT:  Not from plaintiffs, your Honor.

 9              THE COURT:  All right.  Then both sides rest?

10              MR. CONNETT:  Yes.  For plaintiffs.

11              THE COURT:  And EPA?

12              MS. BHAT:  Excuse me.  Can we please confer?  There

13     was some suggestion that we might be reading from those

14     deposition transcripts, and I just wanted to doublecheck with

15     my colleagues.

16              THE COURT:  All right.

17              MS. BHAT:  Actually, they can just hop on and let me

18     know.

19              MS. CARFORA:  Your Honor, EPA rests.

20              THE COURT:  All right.  Both sides rest.

21          Let's see.  Angie, what, does the clock show?

22              THE CLERK:  Okay, your Honor.  Plaintiffs have 30

23     minutes and 36 seconds remaining.

24          Defendants have 30 minutes and 11 seconds remaining.

25              THE COURT:  All right.  What I'm going to do is give
```

PROCEEDINGS

1   each side 40 minutes, because I may ask questions and I'm going

2   to count that on my time and not yours.  So I don't want you to

3   speed talk.  You know, it's important enough, so I want to give

4   you 40 minutes.  And if I end up asking a lot more questions, I

5   may give you more, but I want you to assume 40 minutes.

6              MR. CONNETT:  Thank you, Your Honor.

7              THE COURT:  So are you prepared to start now or would

8   you like a 10-minute break?

9              MR. CONNETT:  If the Court would indulge us, a

10  10-minute break would be great, but we're prepared to start now

11  as well.

12             THE COURT:  Well, I'll tell you what.  I'll give you

13  a 10-minute break because I want you to be organized, and we'll

14  have enough time to complete this morning.

15       And after conclusion of your closings, I do want to

16  discuss with you sort of where we go from here, because I have

17  some questions generally about that, but we'll get there.  But

18  my main goal is to complete today, and we will be able to do

19  that.

20       So we will take a 10-minute break.

21             MR. CONNETT:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23             THE CLERK:  Court is in recess.

24       (Whereupon there was a recess in the proceedings

25        from 8:48 a.m. until 9:00 a.m.)

1        THE CLERK:  We will resume.  Court is back in

2   session.  Please come to order.

3        THE COURT:  All right, counsel.  We've to the closing

4   arguments, and the plaintiffs can proceed.

5                     **CLOSING ARGUMENT**

6        MR. CONNETT:  Thank you, Your Honor.

7        May it please the Court.  On behalf of the plaintiffs I

8   wish to begin today by expressing our immense gratitude for

9   having had an opportunity to present our case in court, and in

10  so doing to give voice to those who have too often been

11  voiceless, and to hold accountable an agency that, at least on

12  this particular issue, has failed to responsibly carry out its

13  duties to protect this nation from harm.

14       In most cases closings are about argument, but today, Your

15  Honor, I'm not going to argue that much.  Because the

16  undisputed facts in this case speak for themselves.

17       So I begin, Your Honor, by addressing a simple yet

18  fundamental question to this case.  What is a risk?  What is

19  the standard that EPA uses to determine when a risk exists?

20       First off, we know that TSCA commands that the EPA protect

21  not just the general public, but susceptible subpopulations as

22  well, including pregnant mothers and bottle-fed infants.

23       The statute makes clear that if there is one unreasonable

24  risk to one susceptible subpopulation, EPA must take regulatory

25  action to protect from harm.

**CLOSING ARGUMENT / CONNETT**

1    So what is a risk?  As Dr. Thiessen explained to Your

2  Honor, a risk exists if the human exposure level is

3  unacceptably close to the estimated hazard level.  EPA has not

4  and does not require data demonstrating that human exposures

5  under the condition of use cause the hazard.

6    Now, Your Honor, this standard is not in dispute.  Indeed,

7  it is an undisputed fact in this case, undisputed fact No. 16,

8  that EPA does not require that human exposure levels exceed a

9  known adverse effect level to make a finding of risk.

10    But despite this, Dr. Tala Henry admitted yesterday in no

11  uncertain terms that EPA has from day one of this litigation

12  used the wrong standard.  They used the wrong standard of risk

13  to assess the plaintiff's evidence.

14    Now, each and every one -- as Dr. Tala Henry talked about

15  yesterday, each and every one of EPA's experts in this case

16  used a causation standard to assess the evidence, not a risk

17  standard.

18    Now, causation is relevant, your Honor, to a risk finding,

19  but it is not and never has been a pre-requisite to a finding

20  of risk.

21    So now I'll talk about the experts that your Honor has

22  heard from in this case.  The three experts that EPA called to

23  the stand to discuss fluoride were not actually experts on

24  fluoride prior to this litigation.  But as you heard, Your

25  Honor, EPA does have experts on fluoride at the agency,

1   including Dr. Kristina Thayer.

2        Now, EPA did call Dr. Thayer as a fact witness to discuss

3   the process of systematic review, but EPA avoided asking

4   Dr. Thayer the obvious.  They avoided asking Dr. Thayer for her

5   assessment of the fluoride literature.

6        It was the plaintiff's, Your Honor, not the EPA, who asked

7   this question.  And Dr. Thayer agreed that fluoride damages the

8   brain and that the animal data supports the biological

9   plausibility of fluoride causing neurotoxic effects in animals.

10       So why did EPA go outside the agency and higher experts

11  from Exponent?  I submit, Your Honor that the answer to this

12  question is obvious and needs no further comment from me.

13       Although plaintiffs are citizen groups and without the

14  resources of the EPA, we brought before your Honor world-class

15  experts of the highest caliber.  Experts who have devoted their

16  professional lives to understanding the impact of environmental

17  chemicals on human health.  Experts who EPA has consistently

18  relied upon for protecting this nation from harm.  This

19  includes Dr. Howard Hu.  This includes Dr. Bruce Lanphear.  And

20  Phillipe Grandjean.  And Dr. Kathleen Thiessen.

21       And as you heard, Your Honor, there is no substitute for

22  expert judgment.  No matter now many thousands of pages a

23  systematic review may be, at the end of the day the

24  determination of risk will always come down to expert judgment.

25       And as you have heard throughout this trial, EPA's own

CLOSING ARGUMENT / CONNETT

1  actions show that the agency trusts the expert judgment of

2  plaintiff's experts.

3       EPA has based its regulations on the major neurotoxicants,

4  lead and mercury, on the research of plaintiff's experts.  EPA

5  has awarded plaintiff's experts tens of millions of dollars in

6  research funding.

7       EPA contracted with Dr. Thiessen to write the agency's

8  health assessment on fluorides.

9       And EPA has repeatedly invited plaintiff's experts to

10  serve on its science advisory boards, including as recently as

11  two weeks ago.

12       By contrast, Your Honor, the record in this case is devoid

13  of any evidence showing EPA has ever once relied on the expert

14  judgment of the Exponent scientists it retained.  Not a single

15  solitary example.

16       So I'll talk now about the methods, the methods that

17  plaintiff's experts used to assess the evidence in this case.

18       The TSCA statute commands that EPA base its decisions on

19  the best available science, and we brought that science before

20  your Honor.  Dr. Hu and Dr. Lanphear explained how their NIH

21  funded cohort studies easily satisfied EPA's definition of best

22  available science.  This is not even in dispute.

23       Dr. Chang has admitted that these studies are the best,

24  most rigorous studies ever done on fluoride and

25  neurodevelopment.

1    The methodology used by Drs. Hu and Lanphear underwent

2  extensive vetting.  Before they even did the studies, they

3  underwent extensive vetting by the NIH specialist committees.

4  And then after they did the studies and got the results, you

5  heard testimony that they submitted these -- these studies to

6  world-class leading scientific journalists, who then did

7  another round of extensive peer review.

8    And as you heard, Your Honor, the -- on the MIREC and

9  ELEMENT studies had extensive control for potential

10  confounders.  And unlike the much cruder studies from

11  New Zealand, the NIH studies had individual measurements of

12  fluoride during the critical window of development, the

13  prenatal period, just as recommended by the Faroes statement

14  back in 2007.

15    In addition, the examinations were fully blinded,

16  eliminating the potential for examiner bias, and the studies

17  investigated so-called optimal levels of fluoride exposure that

18  are added to drinking water here in the United States.

19    So in addition to providing the best available science,

20  Dr. Grandjean conducted an extensive weight of the evidence

21  analysis in which he focused and he gave greatest weight to the

22  best available science.  And as Dr. Thayer explained on Friday,

23  this is the approach that EPA has used since its inception to

24  assess the risk of environmental chemicals, a weight of the

25  evidence analysis that focuses on the best available science.

1          Additionally, both Dr. Grandjean and Dr. Thiessen
2    conducted the functional equivalent of a systematic review.
3    For Dr. Grandjean, he built upon the systematic review that he
4    had published in 2012.  In addition, he fully considered the
5    systematic review conducted by Dr. Chang in this case.
6          And as Dr. Thayer explained on Friday, it is not a
7    recommended practice that even EPA agrees with that when you
8    are doing a systematic review, you can and should build upon
9    existing systematic reviews.
10         Dr. Thiessen, meanwhile, conducted a risk assessment under
11   the Guidelines for Neurotoxicity Risk Assessment, which
12   Dr. Henry explained yesterday is the effective equivalent of a
13   systematic review.
14         So, Your Honor, you've heard this concept at points
15   throughout this case of fit for purpose.  This is a concept
16   that EPA specifically discusses in the risk evaluation rule.
17   It's a concept that recognizes that a risk evaluation under
18   TSCA is not a straightjacket.  EPA recognizes that there is
19   room for practicality.  There is room for flexibility.  There
20   is room for common sense.
21         This recognition is embodied in this concept of fit for
22   purpose.  And both Dr. Grandjean and Dr. Thiessen conducted fit
23   for purpose assessments in this case, and there has been no
24   demonstration to the contrary.
25         So now, Your Honor, I will turn to the evidence.

CLOSING ARGUMENT / CONNETT

1    At the beginning of this case I said that there were three

2    key questions that need to be answered:

3    Is there a hazard?  Is there a risk?  And is the risk

4    unreasonable?

5    The undisputed evidence in this case, we submit,

6    demonstrates that the answer to all three of these questions is

7    yes.

8    First, it is undisputed that fluoride passes through the

9    placenta and gets into the fetal brain.  This means that when a

10   pregnant mother drinks a glass of fluoridated water, the

11   fluoride in the water will have access to the child, including

12   the brain.

13   It is also undisputed that, unlike older children and

14   healthy adults, a young child does not have the protection of

15   the blood-brain barrier in utero and in early infancy.  In

16   fact, as you can see in this undisputed fact in the case, the

17   blood-brain barrier is not fully developed until six months

18   after birth.  And because of this, Dr. Thayer explained on

19   Wednesday that the EPA recognizes we need to pay special

20   attention to chemical exposures that occur during the first six

21   months of life.

22   Yet, Your Honor, that is precisely what happens when we

23   add fluoridation chemicals to drinking water.  It is

24   undisputed, undisputed that babies who are bottle fed with

25   fluoridated water receive the highest doses by far of any age

CLOSING ARGUMENT / CONNETT

1    group in the population.  At the moment of their greatest

2    vulnerability, we are exposing infants, often from the poorest

3    and most disadvantaged communities, to a very high burden of

4    fluoride.

5         Now, there is no dispute in this case, Your Honor, that

6    fluoride damages the brain.  The NRC made this finding as far

7    back as 2006.  And the CDC representative in this case, Casey

8    Hannan, who you heard from, testified that the CDC agrees with

9    with the NRC's summary of the hazard, including the NRC's

10   summary of the neurotoxic hazard.

11        And here you can see, Your Honor, the finding of the NRC,

12   that:

13             "It is apparent that fluorides have the ability

14        to interfere with the functions of the brain."

15        Now, at that point, Your Honor, they were focusing on the

16   neurochemical and neuroanatomical effects because there was not

17   many learning and memory studies then available, but many such

18   studies have since become available.

19        Now, while EPA's experts in this case have criticized the

20   methods of many of the studies, it is important to keep in mind

21   what they do not dispute.  No one came before your Honor to say

22   that fluoride is not a neurotoxicant.  So the question of

23   hazard really is not in dispute in this case.

24        Here you can see testimony from Dr. Joyce Tsuji.  I asked

25   her:

1    "QUESTION:  You do not dispute that neurotoxicity is a

2    hazard of fluoride exposure; correct?"

3    And her answer was:

4    "ANSWER:  Yes, at high enough levels."

5    But what EPA didn't do is they never even attempted, never

6    once attempted to determine, but what are those levels?  They

7    never attempted to provide to Your Honor an estimate as to what

8    the levels are that are causing these neurotoxic effects.

9    The record is devoid of any EPA expert in this case making

10    any attempt to do that.  But importantly, they do not dispute

11    that fluoride will damage the brain at a certain dose.

12          THE COURT:  And my understanding is that they didn't

13    do so because the levels that -- that all of these studies that

14    you're talking about show involve levels well above the

15    exposure levels of humans in the United States.  I think that's

16    the EPA's position; right?

17          MR. CONNETT:  Well, that -- the problem with that

18    position, Your Honor, is even -- Dr. Joyce Tsuji testified on

19    Monday that she accepts that 20 parts per million in the water

20    of rats is effectively the equivalent of 1.3 parts per million

21    in the water of humans.

22    And, your Honor, it's a well-accepted principle in --

23          MS. BHAT:  Objection, your Honor.  That misstates

24    testimony.

25          THE COURT:  That's all right.  I have the evidence.

```
 1        I'm not going to take objections over mischaracterizations
 2   of evidence.  You can argue in your counter argument.
 3            MR. CONNETT:  And Your Honor, it's a -- as
 4   Dr. Thiessen explains in her declaration, it's absolutely
 5   standard practice for EPA, when interpreting animal data, to do
 6   an analysis of -- for calculating the human equivalent dose.
 7        And so for fluoride specifically we know that rats need
 8   more fluoride in their water to obtain the same level of
 9   fluoride in their blood.  That's a toxicokinetic difference.
10            THE COURT:  I understand that, but 1.3 is still well
11   above -- isn't that well above the exposure levels in the
12   United States?
13            MR. CONNETT:  Not at all, your Honor.  And that is
14   only -- just to put this in context.  That 1.3 figure, Your
15   Honor, that's just -- that's just providing you where you've --
16   you've done an analysis for interspecies differences.  You
17   still need to -- under EPA risk assessment you still need to
18   provide a factor to assess, to account for human-to-human
19   differences.
20        So going from 20 to 1.3, Your Honor, all that is doing is
21   its getting you -- it's adjusting for interspecies differences.
22   Interspecies differences.
23        Then you also need to do an adjustment for human-to-human
24   differences.  And as we've talked about throughout this case,
25   EPA almost always uses an adjustment of 10.  So if you put the
```

1    adjustment of 10 to that 1.3 figure, you're down to .13.

2         So it's -- it's important when looking at animal data,

3    that you -- we can't treat the water fluoride level in rats as

4    equivalent to the water fluoride levels in humans.  They are

5    very -- you need to dose the animals at substantially higher

6    levels.

7         And, also, you need to account for the fact that you have

8    much fewer rats, much fewer animals.  You know, with

9    fluoridated water you have 200 million people drinking it.

10        So the EPA, Your Honor, it is standard practice for the

11   EPA to -- to make adjustments to the animal data to account for

12   the differences in susceptibility between rodents and humans.

13        And so in terms of this hazard assessment, Your Honor, we

14   have, as you've heard throughout this case, four high quality

15   prospective cohort studies.  Each of them have found

16   significant associations between early life fluoride exposures

17   and large reductions in IQ on the magnitude of up to five

18   points, when you go from zero to one million gram per liter of

19   fluoride in the urine.  That's a very large effect size that

20   rivals the effect of lead.

21        And under EPA's Guidelines for Neurotoxicity Risk

22   Assessment, the -- the NIH studies are actually sufficient,

23   Your Honor, by themselves.  And, clearly, we have a lot of

24   other data biased the NIH studies, but the EPA's guidelines

25   recognize that sufficient evidence of a neurotoxic hazard can

1   be demonstrated by cohort studies which associate the chemical

2   with a neurotoxic effect.  And we certainly have that here in

3   the fluoride database.

4        And you heard from EPA staff scientist Dr. Joyce Donohue

5   from the Office of Water.  She confirmed the obvious, that

6   these are well-conducted studies, but she also said that these

7   studies warrant a reassessment of all existing fluoride

8   standards.

9        And, you know, Dr. Donohue has focused her work at EPA on

10  the dental and skeletal effects.  So the neurotoxicity subject

11  is a bit beyond what she has focused on, but she recognizes

12  that these are high quality studies that warrant a reassessment

13  of the current framework for regulating fluoride.

14       So that brings us to the second question, Your Honor, is

15  the risk question.  Do fluoridation chemicals in water present

16  a risk of this hazard?

17       And to answer this, I think we again should look for

18  guidance from EPA's Guidelines for Neurotoxicity Risk

19  Assessment.  And these guidelines specifically state that:

20            "Prospective cohort studies allow the direct

21       estimate of risks attributed a particular exposure."

22       Again:

23            "Allows the direct estimate of risks attributed

24       to a particular exposure."

25       So we have the proper studies, Your Honor, to make a

1    finding of risk according to EPA's own guidelines.  And this

2    would be, I think, Page 17, Your Honor, of the guidelines,

3    which are in evidence as Plaintiff's Exhibit 17.

4        And Dr. Grandjean, as you've heard, he did a BMD analysis

5    to take those prospective cohort studies and to assess the risk

6    from those studies.

7        And this figure, which was discussed during

8    Dr. Grandjean's testimony, shows that pregnant women living in

9    fluoridated areas of both the United States and Canada

10   substantially exceed -- if you just look at the mean levels,

11   Your Honor, the average levels, these average levels

12   substantially exceed the BMDL for a one point loss of IQ.

13       And when you start to consider the upper range of

14   exposures, which TSCA commands that we do -- TSCA commands that

15   we don't just look at the average.  TSCA commands that we look

16   at highly exposed people.  If you look at the highly exposed

17   people in fluoridated areas, you are going to see a very large

18   differential there.

19       And we don't just -- even though the human data, there is

20   no dispute in this case, Your Honor, that the human data is the

21   appropriate data to derive the point of departure.  To derive

22   the reference dose.  To derive your risk calculations.  But

23   that does not mean that the animal data is irrelevant.

24       EPA has recognized that it -- even where you have high

25   quality human studies, it's still relevant to consider the

1    animal data, to derive references doses from the animal data

2    because if it's consistent with what the human data shows, it

3    adds robustness and confidence to the conclusions.

4        And as Dr. Thiessen explains, Your Honor, the animal data,

5    when you calculate the full range of RfDs that can be justified

6    from the data, human exposures from fluoridated water exceed

7    the entire range.  Even the least protective reference dose.

8        Dr. Thiessen, as one of her points of departure, used the

9    McPherson study.  And when you use the McPherson study as the

10   point of departure and apply standard EPA adjustments, you get

11   a reference dose that is well exceeded by the exposures to

12   fluoridated water.

13       So the animal data and the human data are consistent in

14   indicating and showing a risk.

15       And that brings us lastly, Your Honor, to the question of

16   whether this risk is unreasonable.  And as I noted at the

17   beginning of this case --

18       **THE COURT:**  Before you get to that, let me ask you

19   about the McPherson study, because a lot was made by the EPA

20   that the negative findings of the McPherson study post the --

21   you know, the systematic review.

22       Why shouldn't -- why isn't that significant?  That is --

23   you would agree, just as they would agree, that the best

24   studies are the MIREC and the ELEMENT studies on the human

25   side.

1    Wouldn't you agree that the McPherson study is the best

2  available evidence on the animal side?

3         MR. CONNETT:  I think it is a -- it is a well-done

4  study.  It has significant limitations.

5    But I think, Your Honor, a key point here is this.

6  They -- they max their dose at 20 parts per million.

7    And I asked Dr. Tsuji:  Shouldn't they have dosed the

8  animals at 40 parts per million or 45 parts per million?

9    And Dr. Tsuji said it wasn't necessary because we know you

10  see effects up in that range.

11    And so the -- I think that's an important context to put

12  it in.  It had a lower dose.  And there is no dispute that if

13  you go beyond -- in this case there is no dispute.  If you

14  start going down 20 parts per million, you're seeing effects.

15    So McPherson doesn't do anything to contradict that.  And,

16  also --

17         THE COURT:  I thought McPherson found at the maximum

18  they tested, which was 20 parts per million, there were no

19  associations except for pain sensitivity.

20         MR. CONNETT:  Yes, Your Honor.  At 20 parts per

21  million in the McPherson study there was an increase in pain

22  sensitivity, which is a neurotoxic effect.  So 20 ppm would be

23  a LOAEL for pain sensitivity.

24    They also found that the rats swam faster.  And while it's

25  not dispositive of hyperactivity, it's certainly not a clean

 1   result.  It's not a -- this is not a clean bill of health

 2   study.  You have increase in pain sensitivity.  You have rats

 3   swimming faster.  So it's not a clean bill of health from the

 4   McPherson study.

 5          THE COURT:  Well, but no -- no association with

 6   respect to the critical endpoints of learning and memory.

 7   Isn't that significant?  I mean, you can't just ignore that.

 8       I know it's not a clean bill of health, but you're looking

 9   at an indicator that may not have much association or effect

10   with respect to learning and memory, which is the key here.

11          MR. CONNETT:  Well, a few things, Your Honor, about

12   this.

13       First is, the McPherson study, as with all animal studies

14   to date, did not expose the neonates to fluoride.  Okay?  So

15   there is not a single animal study, as we sit here today, that

16   has ever attempted to assess the neurological effects of a

17   critical window of development.

18       In humans we have -- we have many -- we have many infants

19   who are drinking fluoridated water from day one all the way

20   through infancy.  That is a critical window of development.

21   EPA recognizes that.  But we have no animal data to assess the

22   neurological effects of that, including McPherson.

23       Secondly, the McPherson study did not have any exposure

24   during the first six days of gestation.  Your Honor, that's

25   about one-third of the gestational period.

1    And the OECD guidelines say, if you can expose the rats

2    from day zero, do it if you can.  They are not saying don't.

3    They are saying if you don't have pre-implantation loss at day

4    zero, dose them at day zero.  But McPherson did not do that.

5         **THE COURT:**  But exposure at day six is also an

6    accepted protocol; is it not?

7         **MR. CONNETT:**  It is an accepted protocol, Your Honor.

8    It's not as sensitive a protocol as you could have.

9         So what's important here, Your Honor, is that the study is

10   ultimately not reflecting the full range of susceptibility.

11        So you can't take from McPherson, you can't have any

12   confident conclusion that the study is capturing what we see in

13   humans, which is full pregnancy exposure, full infancy

14   exposures.  It's not there in McPherson.

15        And, Your Honor in Dr. Thiessen's risk calculations, she

16   treated the 45 part per million concentration, which Dr. Tsuji

17   accepts is a neurotoxic level.  She treated that concentration

18   as a lowest observed adverse effect level.

19        And even if you treat 45 parts per million as a lowest

20   observed adverse effect level, your reference dose is still

21   well below human exposures.

22        **THE COURT:**  When you apply the uncertainty factors,

23   et cetera, et cetera?

24        **MR. CONNETT:**  Correct.

25        **THE COURT:**  But you would agree that you start with

CLOSING ARGUMENT / CONNETT

1   the NTP -- was it the NTP study that gave only low level of --

2   I forget the term, confidence about effect with respect to

3   infant animals, young animals?  And then you add to that

4   McPherson, at least when you look at it on that basis, it

5   appears to me that the animal studies are not very helpful.

6        MR. CONNETT:  Your Honor, I think what's -- as

7   Dr. Thayer testified last week, she said:  It's a reasonable

8   hypothesis if the -- if you're seeing learning impairments in

9   the adult treated rats, it's a reasonable hypothesis that you

10  would also see the learning impairments in the developmental

11  studies.

12       So we can take from the moderate confidence finding that

13  the NTP had in the adult studies, you can impute from that into

14  the developmental studies that if you had the well-conducted

15  studies, you're going to find an effect as well.

16       THE COURT:  Well, that's what I found sort of

17  curious.  Why did they have different confidence levels?  I

18  mean, based on the -- their review of the literature, you have

19  kind of an inverse relationship.

20       MR. CONNETT:  Right.  And I think the reason that

21  Dr. Thayer has provided is that at the time that the NTP did

22  its review in 2016, there were very few developmental studies

23  available.  Certainly, few at the -- in the dose range of

24  greatest interest.

25       So in part, Your Honor, that was why the NTP had lower

1  confidence in the developmental studies, as well as the issue

2  of not controlling for litter effects, which is, as you have

3  noted, a methodological limitation.

4      But I don't think we can or should divorce the moderate

5  confidence in the adult studies from our assessment of the

6  developmental studies.  It makes no biological sense that you

7  would find learning impairments in adult animals, but not find

8  it in the developmental studies.

9      **THE COURT:**  So the low level of confidence is due to

10  the nature of the number of studies and the quality of studies

11  and the limitations, not necessarily reflective of the real

12  world.

13      **MR. CONNETT:**  I believe so, Your Honor.  I believe

14  that's what the evidence suggests.

15      Again, Dr. Thayer said on Wednesday that it's a reasonable

16  hypothesis that if the -- if you're seeing the effects in the

17  adults, you're going to see it in the fetal and neonatal

18  exposures.

19      And there is no dispute in this case that the developing

20  brain is the most susceptible to environmental toxicants.  It

21  would be the *a priori* expectation that an animal exposed in

22  early life will suffer greater effects than animals exposed

23  during adulthood.

24      **THE COURT:**  Okay.

25      **MR. CONNETT:**  So now to this question of unreasonable

1   risk.

2       And I believe the evidence, Your Honor, in this case --

3   and you've heard from Dr. Hu, you've heard from Dr. Lanphear

4   and Dr. Grandjean -- is that the situation with fluoridated

5   water today is analogous to the situation this nation once

6   faced with leaded gasoline.  There, as here, we have a

7   widespread dispersal of a neurotoxicant, which results in

8   exposure to an enormous amount of people, including the most

9   vulnerable.

10      It's an undisputed fact in this case that approximately

11  200 million people live in communities where fluoridation

12  chemicals are added to water, and many more drink processed

13  beverages that have been contaminated with fluoridation

14  chemicals.

15      To put this number in context, Your Honor, the EPA has

16  found unreasonable risks under Section 6 where the conditions

17  of use impact less than 2,000 people.

18      Because of the widespread reach of fluoridation, you have

19  millions of susceptible people being exposed on a daily basis,

20  including 2 million pregnant mothers, over 400,000 exclusively

21  formula-fed babies.

22      Your Honor, these are children -- and most of them are in

23  lower income, more disadvantaged communities.  Children who

24  from day one of their life, their only sustenance is infant

25  formula, and that infant formula is reconstituted with the tap

 1  water.  These are children who are being placed at a much

 2  higher risk of harm, and their interests should be considered

 3  by the EPA.

 4       Now, as we have -- you know, plaintiffs do not need to

 5  prove causation at .7 parts per million to prevail in this

 6  case.  That's not the standard that EPA has ever used, as

 7  Dr. Tala Henry admitted yesterday.  But what makes this case so

 8  compelling, Your Honor, is that the evidence actually supports

 9  this conclusion.

10       Dr. Grandjean explained this in his testimony.  The

11  Bradford Hill factors support a finding of causation, rather

12  than detract from it.

13       And we have had -- you know, all risk assessments, Your

14  Honor, have uncertainties.  Every single one.  I don't think

15  there is a single risk assessment in the history of this world

16  where you don't have some uncertainties.

17       There are not the exception.  They are the rule.

18  Uncertainties do not preclude a finding of risk.  If they did,

19  I don't think the EPA would have made many risk determinations

20  with the chemicals it has assessed so far under Section 6.

21       Exponent scientists that have been in this litigation have

22  identified for Your Honor a long list of possible reasons to

23  possibly explain the findings.

24       But I think Your Honor's exchange with Dr. Ellen Chang

25  yesterday was notable and important.  Dr. Chang was unable to

1    identify for this Court any reason why the MIREC or ELEMENT

2    studies would have -- why those results would have been biased

3    towards showing an effect.

4         The EPA, Your Honor, has not identified for you any cogent

5    explanation that can explain the consistent results that we see

6    across the human studies, across multiple populations, multiple

7    study designs, both strong and weak.

8         Your Honor, we would submit what we submitted at the

9    beginning of this case.  The most likely explanation for the

10   consistent results in both animal and human studies is that

11   fluoride is a neurotoxicant that reduces IQ, including at the

12   levels added to community water supplies in the United States.

13   And this effect is strong enough to be detected, even in

14   studies with weak study designs.

15        So, Your Honor, I believe the preponderance of evidence in

16   this case has demonstrated that fluoridation chemicals present

17   an unreasonable risk of harm.

18        And we thank you again for giving us an opportunity to

19   present the evidence in this case.

20        **THE COURT:**  Thank you Mr. Connett.

21        If I can hear from the government please.

22        **MS. CARFORA:**  Thank you, Your Honor.  I will begin

23   when you're ready.

24        **THE COURT:**  I'm ready.

25

CLOSING ARGUMENT / CARFORA

1          **CLOSING ARGUMENT**

2          **MS. CARFORA:**  Thank you, Your Honor.

3       The questions presented to this Court by plaintiffs, both

4    in their opening statement and here again during closing, are

5    overbroad and too simplistic.

6       I'd like to clarify the actual questions before this Court

7    and explain how the evidence presented fails to provide any of

8    the answers necessary for the Court to find for plaintiffs in

9    this litigation.

10       But before I do that, I'd like to point out one separate

11   and independent reason why the Court must deny plaintiff's

12   claim.

13       First, plaintiffs before this Court do not have standing

14   to complain of developmental neurotoxicity.  While plaintiffs

15   allege fluoride to be a neurotoxicant, the testimony offered to

16   this Court focused on one specific outcome:  IQ deficits or

17   cognitive effects in young children exposed to fluoride

18   in utero and in infancy.

19       Putting aside the fact that the answer of how much of the

20   mother's internal fluoride exposure can be attributed solely to

21   community water fluoridation, none of these plaintiffs are or

22   were pregnant or alleged future plans for pregnancy.  None have

23   infants or even small children.  And none of these plaintiffs

24   complain of a concrete reasonable fear of cognitive deficits.

25       Instead, they complain of self-reported headaches, which

CLOSING ARGUMENT / CARFORA

1    they admit have a long list of other causes.

2         Now, concerning headaches.  Plaintiffs make fleeting

3    references to the following studies.

4         Roholm from 1939, which discusses occupationally exposed

5    workers at an order of magnitude of 30 milligrams per day.

6         Two case studies.  Waldbott from 1956 and Petraborg from

7    1974, with no comparison groups, no blinding of doctors, and no

8    evidence of even a statistical association between fluoride at

9    any dose and headaches.

10        And, finally, a study that plaintiff's own experts call

11   weak, a study out of India documenting self-reported headaches

12   in exposure groups much higher than those relevant to community

13   water fluoridation programs in the United States.

14        Plaintiffs have not established standing based on the harm

15   presented in their Complaint and the Court must deny

16   plaintiff's claim and find for EPA.

17        Now, I talked about the second --

18        **THE COURT:**  Let me ask you -- before you go on to

19   that, let me ask you:  I'm hearing sort of two arguments with

20   respect to standing.

21        One is there isn't sufficient evidence that the complained

22   of symptoms are related or caused by common levels of fluoride

23   exposure.  So in other words, they are -- there is no harm, no

24   causal related harm.

25        Your second argument is that even -- I take it even if

1    there were, the kind of harm complained of here is not the kind

2    of harm that underpins plaintiff's case, even though they are

3    both neurologically related, if there is such a harm, and both

4    involve the question of neurotoxicity.

5        Do I understand that correctly?

6        **MS. CARFORA:**  Yes.  In terms of the actual harm

7    complained of, a constitutional standing requires a showing of

8    harm that's -- that's not speculative.

9        And what we have here, the harm complained of, the only

10   harm which is headaches, self-reported headaches, is

11   speculative based on the information that's in the -- in the

12   record now.

13       **THE COURT:**  Well, that's the standard.

14   Non-speculative.

15       I don't have to find as a matter of fact, more likely than

16   not, preponderance of the evidence, that harm actually was

17   causally related.  I just have to find it was something above

18   speculation, for standing purposes.

19       **MS. CARFORA:**  That's right.  Yes, Your Honor.

20       **THE COURT:**  And then the second one.  What about --

21   maybe you can explain your second argument.

22       If somebody complains of toxicity and they have stomach

23   problems, does that preclude them from pursuing claims that are

24   based on studies that show other health problems?  Is there any

25   law or precedent on that point?  Remind me.

1           MS. CARFORA:  I'm sorry, Your Honor.  That is the

2     zone of interest argument, in terms of what is within the zone

3     of interest between a TSCA petitioner bringing -- bringing

4     their petition before the Court.

5           Under TSCA a petitioner has the right to have their

6     petition reviewed under Section 21.  And here the harms

7     complained of are not supported by the harms alleged in the

8     petition.

9           And so plaintiffs in this matter do not come within the

10    zone of interest of TSCA to have standing before this Court.

11          THE COURT:  So it is a -- the standing question is a

12    statutory question then, a zone of interest analysis under

13    TSCA?

14          MS. CARFORA:  Yes, Your Honor.

15          THE COURT:  Okay.  And remind me, I know we went over

16    this before, but are there cases -- not a lot of TSCA cases,

17    but are there cases that are particularly instructive on this

18    standing question, you know, how one defines zone of interest

19    when it's the same alleged neurotoxin, same alleged idea that

20    it's the neurological aspect of impairment, but different

21    manifestations, different parts of the body?

22          Is there any guidance there in the case law?

23          MS. CARFORA:  Your Honor, I believe there is.  And we

24    did cite to that case law in our summary judgment motion, as

25    Your Honor is aware.  And, unfortunately, standing here right

 1   now I am not prepared.

 2          **THE COURT:**  I may ask the parties to take a second

 3   look at that and see if there is any new case development in

 4   that area.

 5          Go ahead.  Thank you.

 6          **MS. CARFORA:**  Thank you.

 7          Your Honor, there are -- moving on to our second point

 8   here, there are four questions that are critical to the Court's

 9   determination, and plaintiffs have failed to answer any of

10   them.

11          First question is:  Is neurotoxicity a hazard of community

12   water fluoridation?

13          Second question:  What is the internal dose of persons

14   exposed to community water fluoridation programs in the United

15   States?

16          The third question:  Is there any risk posed to persons in

17   the United States from the practice of community water

18   fluoridation programs?

19          And the last question:  If there is a risk, is that risk

20   an unreasonable one?

21          Turning to the first question:  Is neurotoxicity a hazard

22   of water fluoridation?  Now, in applying the definition of

23   "hazard" in it's most simplistic form, plaintiffs insist that

24   modern scientific standard and the otherwise rigor required by

25   TSCA should be relaxed because in their view the

**CLOSING ARGUMENT / CARFORA**

1    neurodevelopmental hazards of fluoride exposure are obvious.

2        But glossing over the scientific process of evaluating all

3    of the reasonably available scientific evidence in a manner

4    suitable to understand and interpret the existing database for

5    fluoride is plaintiff's most critical error.

6        In other words, a hazard identification goes beyond merely

7    identifying whether a hazard exists at any level.  It requires

8    a full understanding of the strengths, limitations and

9    weaknesses across each individual study and across the database

10   as a whole.

11       The rigor of the hazard identification process is also

12   critical to carry forward each subsequent component of risk

13   assessment.

14       Now, as Dr. Hu explained to the Court, quote:

15           "When I am serving on committees that are trying

16       to deliberate on policy, we need to look at the whole

17       range of epidemiological studies to understand the

18       impacts, potential impacts, on different populations.

19       And that's also an integral part of the Bradford Hill

20       criteria, which is also cited during this trial as an

21       important tool for looking at all of the evidence and

22       coming to a conclusion."

23           **THE COURT:**  Let me ask -- hold on.

24       You framed it one way.  The plaintiffs have framed it

25   another way.  They are taking it sort of step-by-step.  You

**CLOSING ARGUMENT / CARFORA**

1    start with the broadest question.  Is it even possible that

2    fluoride does something to the neurological system in an

3    adverse way?  If the answer is no, you don't even get to what

4    level, et cetera.  Only then, if the answer is yes, do you then

5    start looking at levels, for instance, to get to the ultimate

6    question.

7         Your framing kind of gets to the ultimate question, step

8    one.  So I don't know -- in the end I don't know what

9    difference it is because you don't even get to your question if

10   there is no hazard to start with, nor do you get to your

11   question if you find that there is not much exposure.

12        So I -- frankly, I'm not sure that framing this is

13   helpful.  What you've posed, number one, is almost the ultimate

14   question.  You're one step away.  And that's the question

15   whether -- is that an unreasonable risk of hazard.

16        So I don't want to interfere with your presentation.  I

17   know you have a presentation.  But I'm letting you know in my

18   mind the critical question to me -- I don't think it's much

19   disputed that fluoride can be a hazard.  I don't think anybody

20   disputes that.  At some level it's a hazard, a neurological

21   hazard.

22        The question ultimately is this one:  At the community

23   water fluoridation levels at the .7, or around there, and given

24   the way it's used and exposed and consumed by bottle,

25   et cetera, et cetera, does it present an unreasonable risk?

1      So if you can concentrate your -- I know you're going to

2   get there, but that's the critical question to me.

3          **MS. CARFORA:**  I understand, Your Honor and I'm hoping

4   to -- I'm hoping to pinpoint that for you over the next couple

5   of minutes.

6          **THE COURT:**  All right.  Go ahead.

7      Thank you.

8          **MS. CARFORA:**  Interpretation of the database

9   available for each possible hazard requires professional

10  judgment by a group of experts who understand the application

11  of scientific principles across a number of disciplines.

12     Let me interrupt myself, Your Honor.  I am going to get to

13  your question.  I'm just not going to jump there right this

14  second, unless the Court would rather --

15         **THE COURT:**  No, no.

16         **MS. CARFORA:**  Thank you.

17     In this case, plaintiffs criticize EPA for hiring a

18  toxicologist and an epidemiologist whose backgrounds on

19  fluoride are not as robust as plaintiff's own experts.

20     But you don't have to be an expert in fluoride to speak to

21  the application of toxicological and epidemiological

22  principles.  Using that standard, EPA would itself lack the

23  expertise to assess the toxicity of the 80,000 chemical

24  substances currently in commerce.

25     And let me stop here for a second and just speak to some

1    of the aspersions cast by plaintiff's counsel in his closing

2    statement.

3        I'd like to stop and remind everyone that TSCA commands

4    that EPA assess all of the existing 80,000 chemicals in --

5    currently in commerce.  And TSCA creates a pipeline and a

6    prioritization process for EPA to be able to do that.

7        And what EPA says said in its Guidance to Interested

8    Persons was that we welcome the public's help in trying to

9    assess all of these chemicals, and what we ask from the public

10   is that they present to us draft risk evaluations that meet the

11   same scientific rigor that EPA would conduct under TSCA.  And

12   to assist the public in doing that it is issued Guidance to

13   Interested Persons.  And not one of plaintiff's experts have

14   cited to that or even acknowledged its existence.  And

15   plaintiffs have not -- Mr. Connett has not mentioned Guidance

16   to Interested Persons once.

17       EPA welcomes the help of the public that meets the

18   scientific rigor necessary to reach public policy decisions.

19       And I'll move on.  And as Dr. Hu pointed out for the

20   Court, subject matter researchers also must avoid the

21   appearance of bias.

22       More specifically, EPA was careful and deliberate in

23   finding and presenting to this Court an interpretation of the

24   toxicological and epidemiological database for fluoride that

25   has not been tainted by decades of advocacy for or against

 1    community water fluoridation.

 2        For example, plaintiffs stated in their opening that the

 3    only risk assessment in this case was produced by Dr. Thiessen.

 4    Dr. Thiessen has advocated against water fluoridation since at

 5    least 1998.  And she has appeared in public meetings and

 6    debates on behalf of the Fluoride Action Network and through

 7    her advocacy has -- clearly has an interest in the outcome of

 8    this litigation.

 9        And, for example, take plaintiff's expert, Dr. Grandjean,

10    who in 2014 wrote that:

11            "Fluoride is a known developmental neurotoxicant

12        based on weak evidence."

13        And who would rather accuse Harvard deans and the World

14    Health Organization of misconduct than accept any scientific

15    criticism of his own work.

16        And rather than focus on the scientific merit of the

17    systematic reviews completed by Dr. Tsuji and Dr. Chang,

18    plaintiffs accuse them of being hired white coats, who reached

19    conclusions based on the interests of their clients.

20        But I ask this Court to consider, very simply, what

21    interest does the United States Environmental Protection Agency

22    have in denying the existence of a hazard or a risk?

23        As plaintiffs pointed out, EPA's mission is to protect the

24    public health.  And consistent with that mission, the truth is,

25    if EPA found there was an unreasonable risk from community

CLOSING ARGUMENT / CARFORA

1    water fluoridation, it would take action to eliminate that

2    risk.

3         Now, more to the Court's point.  There are many studies

4    that evaluate associations between fluoride in drinking water

5    and IQ in children.  No studies evaluating IQ were conducted in

6    the United States.

7         And generalizing the results to the U.S. population can be

8    difficult.  Many studies were conducted in areas with fluoride

9    drinking water concentrations that are much higher than

10   drinking water fluoride concentrations in the United States.

11   But that difficulty exists for other reasons, too.

12        As Dr. Hu also reminded this Court:

13             "Populations differ for all sorts of reasons.

14        They differ in terms of diet, in terms of genetics, in

15        terms of their social environment, all of which can

16        easily lead to differences in how populations respond

17        to neurotoxicants."

18        And when focusing on studies with exposures in ranges

19   typically found in the water distribution systems in the United

20   States, studies that could be evaluated for dose response

21   effects, those studies are inconsistent and, therefore,

22   unclear.

23        Despite there being a number of studies evaluating

24   associations between fluoride in drinking water and IQ in

25   children, including fluoride exposures with concentrations

1    below 1.5 milligrams per liter, plaintiffs focused solely on

2    the ELEMENT and MIREC cohort studies.

3        As we explained in the beginning of this trial, the

4    ELEMENT and MIREC cohort studies are among the best conducted

5    human studies to date.  But they are relatively recent, and

6    there are inconsistencies within and across those studies.

7        For example, the ELEMENT study did not find a difference

8    by sex and IQ results, but the MIREC study did.  That

9    discrepancy remains unexplained.

10       The ELEMENT study concluded that there was no clear

11   association between IQ scores and maternal urinary fluoride

12   below .8 milligrams per liter.  But no apparent threshold was

13   identified in the MIREC study.

14       There was no significant association identified between

15   blood plasma and IQ in the ELEMENT cohort, which raises further

16   questions about what the proper measure of fluoride exposure is

17   telling us, urine versus blood.

18       In both cohorts the relationships observed between IQ and

19   maternal urinary fluoride were weak, albeit significant.

20       Now, a hazard also includes a dose response analysis.  So

21   the hazard assessment includes both the hazard identification

22   and the dose response.

23       And the dose response assessment characterizes now this

24   dose level where a potential hazard may become apparent.  In

25   other words, it answers the question before us now:  At what

1    exposure does a hazard become apparent through a manifestation

2    of effects?

3        The dose response assessment builds upon the systematic

4    review that was done in the hazard I.D. by documenting the

5    justifications and the limitations for the key study or studies

6    being used to identify a dose response and to extrapolate to a

7    protective reference dose.

8        Now, as Dr. Thayer explained, the preferred method for

9    calculating a reference dose is the benchmark dose approach.

10   Dr. Thayer explained that this is because the NOAEL/LOAEL

11   approach is constrained to the experimental doses, rather than

12   the shape of the dose response curve.

13       Now, what Dr. Thiessen did is she derived a range of

14   reference values based on the NOAEL/LOAEL approach as applied

15   to certain animal data, but Dr. Thiessen's approach was

16   critically flawed in three ways.

17       First, as the Court has already recognized, Dr. Thiessen

18   used unreliable data to extract points of departure.  The

19   National Toxicity Program's systematic review found extensive

20   bias in the experimental animal literature.  And not just

21   because there were too few of them, but what Dr. Thayer

22   testified to was systematic bias across the studies and

23   indirectness in the results.

24       And the NTP -- and Dr. Tsuji's update of the NTP review

25   confirmed that the bias continued in the more recent studies

 1   with the exception of NTP's McPherson 2018.

 2        Now, that study, of course, as you've already recognized,

 3   did not find effects on learning and memory with increased

 4   fluoride exposures at doses that exceed the general population.

 5        And to just expand a little bit on what you were talking

 6   about with Mr. Connett.  McPherson 2018 found a NOAEL at the 20

 7   milligrams per liter.  Now, this 1.3 ppm that plaintiff's

 8   counsel was referring to was actually after -- in the testimony

 9   it was actually after he had applied a number of factors to

10   that number to get it down to 1.3.  But above the 20 milligrams

11   per liter, we actually don't -- we don't know where the effects

12   start to show.

13        Now, what Dr. Tsuji testified to was above 20 milligrams

14   per liter, we start to see systemic toxicity in the animals;

15   that the animals start losing body weight.  And she said she

16   didn't know if that was because they didn't like the taste of

17   the water or, you know, they didn't like the taste of the food.

18   But because there was systemic toxicity in the rats, you

19   couldn't really tell what was going on with -- from exposure to

20   fluoride above that level.

21        Now, the second --

22        THE COURT:  Can you comment on Mr. Connett's

23   statement that Dr. Thiessen derived her -- I don't remember if

24   it was point of departure or reference dose, based on the

25   McPherson study?  Do you take issue with that?

1          MS. CARFORA:  Well, the problem is, Your Honor, as I

2     remember it, what Dr. Thiessen -- Dr. Thiessen did not identify

3     specific studies.

4          What Dr. Thiessen did was identify, I think it was four

5     LOAELs and two NOAELs.  And those LOAELs and NOAELs were

6     derived from, you know, so a narrative review included in her

7     report and her declaration that grouped a handful of studies

8     together.

9          So she said at .5 -- you know, at 5 milligrams per liter

10    these studies all found a NOAEL or LOAEL.

11         At 20 milligrams per liter these studies found a

12    NOAEL/LOAEL.  She wasn't specific to a study.

13         Now, what plaintiffs have extracted throughout this trial

14    is that they should focus on McPherson, and rightfully so.  The

15    problem is there is no individual interpretation of the

16    McPherson study that Dr. Thiessen did.  There is no

17    justification, scientific justification offered.  I'm not

18    saying that one might not exist.  I'm saying none was offered.

19         And without having some scientific justification being

20    offered, it's impossible to know whether the McPherson study

21    really is or is not appropriate for that particular purpose.

22         THE COURT:  Well, let me ask you kind of a basic

23    question to make sure I get this.

24         If a study doesn't show any association effect, at least

25    with respect to memory and learning, the more direct

CLOSING ARGUMENT / CARFORA

1  endpoints -- putting aside pain sensitivity for a second --

2  that would mean there is no LOAEL; right?  It's only a NOAEL.

3  If you only test up to a certain level and you don't see

4  anything, you only get a NOAEL.

5          MS. CARFORA:  That's right.

6          THE COURT:  And you don't know where the LOAEL would

7  begin.

8          MS. CARFORA:  That's correct.

9          THE COURT:  So how does one use such a study to

10  calculate any kind of point of departure?

11          MS. CARFORA:  Well, and this -- this is exactly the

12  point, Your Honor, is that what you do is you have look across

13  all of the studies.

14      So you have to understand:  Is this my key study?  Why is

15  this my key study?  What are the limitations in this study?

16  And is there anything else in the database that fills those

17  data gaps for me?  Is there anything else in the database that

18  I can go back to?

19      And what's -- the studies that fill those data gaps, what

20  are the qualities of those studies?  What are the limitations

21  in those studies?  How do I fill those data gaps?

22      This is exactly the point as to why it's not

23  straightforward.  It's exactly the point why systematic review

24  is necessary.

25      You have to have an understanding of all of the studies in

CLOSING ARGUMENT / CARFORA

1   the database to be able to know if you have data gaps, how to

2   close those gaps, and whether you have the information or not.

3        But more to the point here, what's so interesting about

4   what you're saying is that NTP's 2016 systematic review

5   identified all these gaps; right?  Just what the Court is

6   talking about.  It identified all of these gaps.

7        And you heard Dr. Thayer talking about:  NTP said let's

8   design a study that tries to address all of these gaps.  Let's

9   design a study the best we can to get towards those low dose

10  levels that we're so interested in and try to correct for the

11  bias and indirectness we're seeing across the database.

12       And NTP did that.  And they did that with people who have

13  expertise in animal neurotoxicity.  And they went out and they

14  designed the study the best they could, a suite of studies I

15  think we heard.  I think the number might have been nine.  And

16  based on that study they found no effects.

17       And so the question becomes, quite honestly, is this --

18  this study might be the best study, but is it appropriate for

19  deriving an RfD.  And we need to understand the entire database

20  to be able to answer that question.

21       THE COURT:  And so the EPA's position, as I

22  understand it, is that, yes, in order to derive a point of

23  departure, you have to kind of look at all of the studies to

24  determine where some of the LOAELs and NOAELs are, but you give

25  different weight to different studies in making that

1    determination depending on their degree of reliability?

2           MS. CARFORA:  That's right.  You have to

3    understand -- yes.

4           THE COURT:  And that in this case the most reliable

5    standout would be the McPherson study.  The other studies,

6    which were rated by the NTP as sort of low confidence.

7           MS. CARFORA:  Well, I think, Your Honor, even that

8    question remains unanswered.

9        I think the question is, you know, if -- like Dr. Tsuji

10   testified to.  It is the best existing study right now.

11       But the question is:  Is it enough?  Is it enough to close

12   those data gaps?  Is it enough to get it to tell us, you know,

13   if there is a NOAEL, what is the level where we actually start

14   to see exposures?

15       You know --

16          THE COURT:  Let me ask you, the ratings of the NTP,

17   as I recall, there were four classification from, like, very

18   low or -- the very bottom, I think it was very low or

19   something, then low, and then moderate, and then high or

20   something like that.

21          MS. CARFORA:  I think that's right, Your Honor.

22          THE COURT:  All right.  So with respect to the infant

23   studies, it wasn't the very bottom.  It was low, but it wasn't

24   worthless.  I mean, those studies had some value.  It just was

25   low.  It was, like, the third out of four categories; right?

1    **MS. CARFORA:**  It's another great point you're making,

2    Your Honor, because I think that what NTP said, and what EPA

3    would say, is all you need is one study to get above that very

4    low threshold.  One well-designed study, I think is what we

5    would say -- what EPA would say, and NTP, to get above that low

6    threshold.

7        So if you're going to say -- and remember, Dr. Thayer

8    explained for us.  If you're going to say that there is no

9    evidence whatsoever, you know, you would have to -- you would

10   have to be able to prove that there is nothing out there that

11   shows a potential risk.

12       **THE COURT:**  Where would I find the criteria that the

13   NTP uses?  Is it in the report where they define what those

14   are?

15       **MS. CARFORA:**  Yes, Your Honor, it is.  And it's in

16   evidence.

17       And I can't believe I -- I hope I get this right.  I can't

18   believe -- I might know.  It's EPA's Trial Exhibit 518, which

19   is the -- no.  Which is the OHAT handbook.  OHAT is the NTP

20   program.  And in that handbook for systematic review I do

21   believe that they talk about the different levels of -- levels

22   of evidence.

23       And I would expect that it is true that also in EPA

24   Exhibit 553, which is the NTP 2016 report itself, I'm sure that

25   they also describe the levels of evidence in there.

1    **THE COURT:**  And what about the dialogue I had with

2    Mr. Connett about that it seems counterintuitive that you would

3    find an effect in adult rats, but not in infant rats, given the

4    developmental stage, the window and all that.

5    Is that explained simply by the quality of the research

6    and availability of the research and not that it is likely

7    there are effects on adults, but none in infants?

8    And, in fact, the -- it's a compound question, but the

9    fact that there is a higher level, moderate level of confidence

10   with respect to the effect on adult rats, wouldn't that imply

11   that if you have the same quality of studies, you would have --

12   you would find effect on infant rats?

13   I mean, how many could it be -- how could it not be?

14   **MS. CARFORA:**  If I could clarify the Court's

15   question, just so I'm -- I make sure I understand what you're

16   asking.

17   **THE COURT:**  I think -- what I'm asking is:  The fact

18   that the NTP 2016 study showed -- found a moderate level of, I

19   guess, confidence, whatever it is, in the adult rat studies,

20   animal studies, from that shouldn't one infer that there is

21   likely an impact on infant rats?

22   And the only reason why the NTP rated it as low level of

23   confidence was there just wasn't very many good studies out

24   there.  Not that it doesn't exist.  The phenomenon doesn't

25   exist.  It's just the quality of studies weren't very good.

1      MS. CARFORA:  Well, let me take a step back.  There's
2  a couple things.
3      I think it's factually inaccurate to say that the reason
4  why NTP found a low level of evidence in animals exposed during
5  development was just because there was a low number of studies.
6  I don't believe that to be factually correct.
7      I mean, I think Kris Thayer said the problem was in that
8  -- in the developmental studies specific was indirectness.
9  They couldn't -- they didn't know whether, you know, changes in
10  the animal's motor and sensory functions were causing the delay
11  in cognitive effects.  And they -- it was too indirect, and
12  they couldn't make that cause there.
13      But, you know, I think that --
14      THE COURT:  Well, also, many were hampered by the --
15  not taking into account the litter effect; right?  That
16  affected a number of those studies.
17      MS. CARFORA:  Well, yes.  And that was a bias; right?
18  That was a different --
19      THE COURT:  Right.
20      MS. CARFORA:  -- a different reason.  That was the
21  bias, the systematic bias across all the studies that showed
22  the lack of blinding.
23      But there was also the second factor, which was
24  indirectness.
25      So I mean, I think the question is:  Can't we assume, you

 1    know, that if -- if there is moderate level at -- for adults,

 2    that there would be a moderate level for infants.

 3         And I think quite honestly, Your Honor, the answer is if

 4    we could assume that, then NTP would have assumed that, but

 5    they didn't.  They very specifically made the distinction, and

 6    they were careful about that.

 7         And I'm not -- you know, I'm not a toxicologist, but I

 8    think -- you know, if I could just take this question and take

 9    this discussion kind of to the next level.  Because I think the

10    bigger issue is, you know, I -- I don't think anyone could

11    dispute that there is a hazard at some level.  But the question

12    now becomes for everyone, is that level anywhere relevant to

13    community water fluoridations and exposure in the United

14    States?

15         And this is where we start -- this is where we're in, the

16    second piece of this hazard assessment, which is the dose

17    response.  And this is -- and this is what we used the

18    systematic review for so specifically here, which is now we

19    need to be able to see, is there any indication that the dose

20    is any -- you know, the hazardous dose is anywhere near what's

21    being exposed.  And we have to look at these studies.

22         And what Your Honor -- you know, I think Your Honor is

23    correctly focused on McPherson, but I think even McPherson

24    still leaves questions.

25         And more to the point, nobody has got in -- what

 1   Dr. Thiessen offered was a scientifically or methodologically

 2   inferior process to the BMD process; right?

 3        So I think what would happen is you would have some

 4   experts, people who have expertise in rat neurotoxicity and

 5   toxicodynamics, and all of those torts of things.  They would

 6   go into McPherson and try to fit the McPherson, you know, study

 7   with their BMD models, and they might do that.

 8        Or they might decide, through systematic review, that the

 9   human evidence is more relevant, because what we have heard

10   testimony on is if there is an abundance of human evidence, the

11   human evidence is more relevant.  And you can rely on the

12   animal database where you need to try to close some of those

13   gaps, but given the human database that we have for fluoride,

14   it's more relevant and I think methodologically more

15   appropriate to look at the human studies, and look -- look --

16   start there in terms of trying to find --

17        **THE COURT:**  I agree.  But why don't we focus on the

18   human studies, if you could.

19        **MS. CARFORA:**  Sure.  And I'll -- if it's okay with

20   Your Honor, I would like to keep going through.  I'm definitely

21   going to get there.

22        **THE COURT:**  Okay.

23        **MS. CARFORA:**  If you would bear with me.

24        **THE COURT:**  Okay.

25        **MS. CARFORA:**  So Dr. Grandjean also derived a range

1    of reference values using a BMD analysis applied to Bashash

2    2018 and Green 2019.

3         But Dr. Grandjean's testimony vacillated between being

4    able to conduct a BMD calculation on the back of an envelope,

5    to having to rely on a world expert on benchmark dose to do the

6    calculation for him.

7         But nevertheless, the most telling -- the most telling

8    thing about the level of confidence one could have in the

9    offered BMD was Dr. Grandjean's testimony that once he can gain

10   access to the raw data from both the ELEMENT and MIREC study,

11   he can, quote, calculate the real benchmark dose.

12        But even more fatal than that is the inability for anyone

13   to critically assess or replicate the calculations due to the

14   glaring lack of transparency in both his declaration and live

15   testimony.  And these critical flaws carry forward through the

16   remainder of Dr. Grandjean's analysis and further discredits

17   the reliability of his ultimate conclusions.

18        And I'm going to go into those studies now.

19        The next question then before the Court is:  What is -- we

20   need to understand what is the internal dose of persons exposed

21   to community water fluoridation programs in the United States?

22        Plaintiffs submit that maternal urinary fluoride is the

23   proper metric for measuring fetal exposure.  And the Court

24   heard a lot of testimony comparing neurotoxic effects of lead

25   exposure to the potential neurotoxic effects of fluoride

 1    exposure.

 2         But to compare the well and long-established impact of

 3    lead on IQ, and studies that have quantified the blood lead IQ

 4    relationships over multiple populations, to the more limited

 5    evidence base for fluoride is just simply not justified.

 6         The relationship between --

 7              THE COURT:  Can I back up just for a second here,

 8    going back to Dr. Grandjean and lack of transparency.

 9              MS. CARFORA:  Yes.

10              THE COURT:  My recollection is that he had to

11    digitize from the scatter points, right, all points of data?

12              MS. CARFORA:  For one study that was published at the

13    time he conducted his report.

14              THE COURT:  Right, right.  Did the EPA ever attempt

15    to replicate that on its own?  Did it have any of its experts

16    try to do that and see whether they came out with different

17    results?

18              MS. CARFORA:  We did not, Your Honor.

19              THE COURT:  Did the EPA have access one way or the

20    another through discovery to those data points, the raw numbers

21    that fit into the BMD calculation?  Not the back of the

22    envelope, but the ones he had his colleague perform?  Was there

23    any discovery on that?

24              MS. CARFORA:  So there is no raw data available.  The

25    Bashash 2017 study clearly was published before -- before

1    expert discovery started.  And so there was access -- there was

2    access to Bashash 2017.

3         But from EPA's perspective, we never -- EPA never got to

4    the dose response assessment because we never got past the

5    hazard assessment question.

6              THE COURT:  I'm asking -- the question I'm asking in

7    discovery --

8              MS. CARFORA:  I understand, Your Honor.

9              THE COURT:  And --

10             MS. CARFORA:  I understand.  I'm sorry.

11             THE COURT:  You had a chance to depose.  You had a

12   chance to subpoena or request documents.

13        Did you ever request that Dr. Grandjean produce the

14   digital results of that scatter plot so you could run it?

15   Without having to digitize it yourself, have your experts run

16   it and see whether his -- his calculations or his associate's

17   calculations were verifiable or not?

18             MS. CARFORA:  We did not.  And the Green -- the Green

19   2017, Your Honor -- I'm sorry, 2019 study, that was not -- that

20   was not published -- it was published toward the end of expert

21   discovery.  It was actually published the night before

22   Dr. Henry was deposed.  And so we -- we were in the middle of

23   expert discovery at that point.

24        And Dr. Grandjean, when he -- his second supplemental

25   expert report was based on the manuscript, not the published

1    version.  And so -- so that study wasn't even published while

2    we were still going through expert discovery.

3             THE COURT:  I mean, you have had time.  I guess, my

4    point is, if you're making a transparency point, I think the

5    obvious comeback to that is that what he did, his methodology

6    and his source of information were transparent through his

7    declaration.  Whether -- and provided ample opportunity for

8    subpoenaing documents and conducting cross-examination,

9    conducting a parallel calculation to impeach his calculation.

10        So, frankly, I'm not as concerned about transparency in

11   that -- as to that particular issue.

12        But go on.

13            MS. CARFORA:  Let me respond.

14        That's what I was getting to.  When you say that we should

15   have or maybe we should have requested the information and run

16   the calculations ourselves, I mean, that's what I was trying to

17   get at just a couple minutes ago when I was trying to say EPA

18   never got there.  They never get to the dose response because

19   without the systematic review, you know -- quite frankly, if

20   EPA would have run the data or run -- it would have given

21   credibility to using that study in the first place.

22        And the point is, there is really no credibility for using

23   that study without having the systematic review.  Without

24   knowing whether that is the key study, there is no point in

25   doing that exercise --

1              **THE COURT:**  Well, there is a point in litigation.  If

2    you know the other side is going to rely on somebody's study

3    and analysis to derive a critical component of the risk

4    evaluation, you have the opportunity to examine that, without

5    making any concession.

6         You say, well, we didn't want to make a concession that

7    these studies were reliable, and you don't have to.  You just

8    -- all you need to do is say his studies are hogwash or his

9    calculation was wrong.  Here is the error.  Here is what we

10   came up with.  That doesn't admit anything.

11        In any event, let's move on.  I'm not -- let's go on to

12   the next point.

13             **MS. CARFORA:**  The relationship between blood lead and

14   IQ decrements has been studied for many years and has a very

15   large body of data underlying the blood lead IQ relationship.

16        For example, there have been numerous cohort studies of

17   population groups from cities across the United States, as well

18   as in other Western countries.

19        And while the relationship between the urinary fluoride

20   and IQ are recent -- recently described by Bashash 2017 and

21   Green 2019, using small non-U.S. populations at one point in

22   time, the generalizability to even the full Mexican and

23   Canadian populations are unknown, but unquestionably do not

24   approach the generalizability of evidence base for blood lead

25   and IQ relationships in the U.S. population over time.

CLOSING ARGUMENT / CARFORA

1    Now, currently the variability and uncertainty associated

2    with the urine-fluoride IQ relationship is largely unknown due

3    to so few studies being available.  And Bashash 2017 and Green

4    2019 actually highlight the large variability associated with

5    the use of urine as a measure of fluoride exposure.

6        For example, measures of fluoride in urine is a short-term

7    measurement of exposure that is highly variable due to a number

8    of factors, including the time of sampling, hydration state,

9    and the methods used to correct for hydration.

10        Additionally, measures of fluoride in urine are also

11    subject to confounding, which is why we need more than these

12    two cohorts to understand the true nature and the uncertainty

13    in using urine as an exposure metric.

14        And Dr. Lanphear and Dr. Hu highlighted this variability

15    in their testimony.

16        First, Dr. Lanphear testified that:

17            "It's hard to predict water concentrations from

18            urinary fluoride alone and that other sources factor

19            into the concentration observed in urine."

20        Dr. Hu testified that:

21            "Whether the source of fluoride exposure is from

22            salt or water could affect the concentration of

23            fluoride observed in a spot urine sample."

24        Now, that's important, Your Honor, because we know that

25    Mexico fluoridates their salt, not their water.

**CLOSING ARGUMENT / CARFORA**

1       Now, given all of the uncertainty and variability, we

2   simply do not know enough about the urine-fluoride IQ

3   relationship to determine whether the MIREC and ELEMENT cohorts

4   provide the best available methodology for estimating the

5   internal dose from exposure to community water fluoridation,

6   and as a result, this question remains unanswered.

7       I'll move on to the next question, which is:  Is there any

8   risk posed to persons in the United States from the practice of

9   community water fluoridation?

10      Despite the current variability and uncertainty in using

11  maternal urinary fluoride as a reliable exposure metric in the

12  MIREC and ELEMENT populations, Dr. Grandjean doubles down on

13  that uncertainty by comparing his BMDL to maternal

14  urine-fluoride concentrations found in pregnant women in

15  Northern California.  This was the UCSF study the Court heard

16  about.

17      Now, although testifying via declaration that the

18  comparison of maternal urine-fluoride concentrations reported

19  in the UCSF study to the Green study concentrations was, quote,

20  ultimately the most important consideration, Dr. Grandjean

21  testified that he never even compared the final published

22  version, peer-reviewed published version of the study, with the

23  manuscript that he relied on in forming his opinion that the

24  association reported in the US -- and he testified that the

25  association reported in the UCSF study was weak, statistically

1  non-significant, and not even indicative of true maternal

2  urine-fluoride levels of the California women studied.

3      Now, hazy BMD lines and weak associations simply do not

4  rise to the level of best available science for the purpose of

5  justifying EPA regulation.

6          THE COURT:  Hold on.  Let me ask you some questions

7  right there.

8      You criticize his reliance on the draft and not the final

9  study.  Remind me, the final published version came out with

10  different numbers?

11      (Brief pause.)

12          MS. CARFORA:  Your Honor, I don't have that

13  information standing here right now.

14      But the concern is that Dr. Grandjean couldn't tell us

15  that either.  So the problem is, he offered an opinion in this

16  case.  It was based on a manuscript, an unpublished manuscript

17  that he disclosed to EPA five days before his -- his deposition

18  in this case.

19      And, no, he never even confirmed -- he offered a

20  declaration based on the published version of that report, even

21  though that was published after expert discovery was closed,

22  and he never -- he couldn't testify that he compared those two

23  studies.

24      So we don't know, standing here right now, whether there

25  were any differences in the manuscript or the published

CLOSING ARGUMENT / CARFORA

1    version.

2         **THE COURT:**  Well, that may go to his credibility and

3    what you might call lack of rigor.

4         But the material question, seems to me, the substantive

5    question is:  Did he rely on an erroneous number?  Was it

6    corrected in final?  Which is something you would have access

7    to and could have crossed him on.  It would be useful to know

8    if -- if, in fact, he relied on a number that was materially

9    changed as a result of -- between going from draft to final,

10   and he relied on a number that was outdated, that would be

11   significant.

12        **MS. CARFORA:**  Well, two points, Your Honor.  I did

13   cross examine him on that.  I did ask him if he compared it,

14   and he said, no, he didn't compare it.

15        So there is that point, but I --

16        **THE COURT:**  But does the EPA have information to show

17   that that final number was different?

18        **MS. CARFORA:**  I don't have that information standing

19   here right now.

20        **THE COURT:**  All right.  Then let me ask you --

21   actually, I'm trying to remember now the testimony about the

22   weak correlation.

23        The correlation was between what?  What was the

24   correlation that was weak?

25        **MS. CARFORA:**  The correlation between maternal

1    urinary fluoride concentrations and community water.  I believe

2    it was -- and the community water measurements that they --

3    that they were comparing that to.

4           THE COURT:  Community water measurements of their --

5    I'm trying to remember now, of their home?

6           MS. CARFORA:  It was -- I believe it was -- if I

7    don't have the number wrong, I think it was 51 women who were

8    giving birth in San Francisco.  They were not from

9    San Francisco, but they were in San Francisco overnight.

10   San Francisco fluoridates water.  So they had drank water in

11   San Francisco and had given a urine sample.

12      And this study was comparing the urine samples from just

13   those 51 women from all parts of the Bay Area against water

14   community -- community water fluoridation in San Francisco.

15      So it wasn't even indicative of where these women actually

16   lived.  It was indicative of just comparing their maternal

17   urinary fluoride to -- that's not true actually.

18      They did compare -- they compared their maternal urinary

19   fluoride to the -- the reported community water concentrations

20   of where they lived, where they reported they lived.

21          THE COURT:  Where they lived.

22          MS. CARFORA:  They did.

23          THE COURT:  And some --

24          MS. CARFORA:  They did.

25          THE COURT:  And some came from non-fluoridated areas;

CLOSING ARGUMENT / CARFORA

1    is that right?

2         **MS. CARFORA:**  Well, I don't think we know that

3    information.

4         What Dr. Grandjean -- I believe what he testified, though,

5    that it wasn't indicative -- the water fluoride concentrations

6    of those women wasn't indicative of where they lived because

7    they were in San Francisco the night before and had been

8    drinking water in San Francisco, which we know does fluoridate

9    water.

10        **THE COURT:**  Does the EPA have information to suggest

11   that the median levels found and the distribution of the levels

12   found in these 52 women -- 51 women were not accurate?  Were

13   not reflective of other fluoridated communities?

14        **MS. CARFORA:**  Well, I mean, I think -- I mean, I

15   think it's -- the point is that their urine samples -- as

16   Dr. Lanphear and Dr. Hu testified, your urine sample was going

17   to be indicative of, you know, your most recent intake.  So the

18   idea is their most recent intake was in San Francisco.

19        And so you're comparing, you know, their most recent

20   intake in San Francisco to their community water fluoride

21   concentrations in their homes.  And so that's the logical leap

22   in understanding that it's not indicative because urine samples

23   is such a short-term measurement.

24        **THE COURT:**  Well, short-term measurement, and the

25   most recent exposure was in San Francisco.

CLOSING ARGUMENT / CARFORA

1    It seemed to me the question is whether San Francisco

2    fluoridation -- community fluoridation levels are consistent

3    with what we see throughout the country?  Is there anything

4    unique about San Francisco fluoridation level?

5         **MS. CARFORA:**  Not that I understand, but I do -- I

6    think the -- I think the Court is raising the right question,

7    is -- can we assume -- or should we assume that these 51 women

8    are -- represent the entire United States?  And I think quite

9    clearly the answer to that is no.

10        I mean, I believe there was testimony by Dr. Lanphear and

11   Dr. Hu that even the ELEMENT -- you know, Mexico City itself is

12   not indicative of all of Mexico in terms of intake or maternal

13   urinary fluoride.

14        And the same in Canada.  I mean, the study in Canada, the

15   MIREC cohort is a big cohort, and it covered a number of

16   cities.  But I think there was testimony that even -- even

17   those maternal urinary fluoride concentrations are specific to

18   that population, and not to the -- to all of Canada.

19        Now, can you do that?  Maybe.  But the question is should

20   you.

21        And I think, you know, the question of saying should you

22   use one study out of California with 51 women who are about to

23   give birth in a city drinking water that's different than the

24   water that they are intaking at home, should you use that as a

25   way to generalize maternal urinary fluoride concentrations

 1    across the United States.  And with --

 2              THE COURT:  Did the EPA introduce any evidence to

 3    suggest that was not a good representative -- in other words,

 4    if there are sort of national standards and you know the

 5    distribution from the EPA exposure, that big table, right, from

 6    2019?

 7              MS. CARFORA:  Yes.

 8              THE COURT:  Is there anything -- when you compare the

 9    San Francisco concentrations -- and I don't remember if they

10    are at .07 or what -- whether that puts them outside that

11    range?  Where does San Francisco fall in that big national

12    study?

13              MS. CARFORA:  Well, Your Honor, I have an answer for

14    you, but I'm not sure it's in evidence.  And so --

15              THE COURT:  Well, that's something -- if it was

16    outside, that would have been useful information because you

17    could have impeached the value of the UCSF study in terms of

18    it's generalization and its reliance and --

19              MS. CARFORA:  Your Honor, I think that --

20              THE COURT:  -- and Dr. Grandjean's reliance on that

21    by showing that he relied on a particular study that was not

22    representative or was outside the mainstream of that -- of the

23    study that the EPA did.  I didn't hear that.

24              MS. CARFORA:  Well, first, I think that Grandjean

25    impeached himself by suggesting that it was a weak correlation

 1    and that it wasn't indicative.

 2         In fact, what Dr. Grandjean said when we pointed out it

 3    was a weak correlation, what he says is:  Well, I just cited to

 4    the UCSF study because it seemed important to EPA.  What I was

 5    using was the World Health Organization's, you know,

 6    measurement.

 7         So, you know, I think that -- the study has been impeached

 8    and, you know, we -- again, you know, the -- we talked about --

 9    you heard testimony from the CDC about NHANES.  And NHANES is

10    the entity in the government that takes all of these

11    measurements, and it takes the measurement across the entire

12    U.S. population.

13         And there is no evidence in this trial by anyone as to

14    whether those -- and for what years those urinary fluoride

15    concentrations exist; if they exist, for what years; and what

16    those numbers are.

17         But, surely, the NHANES data would be a much more

18    appropriate and reasonable measurement than 51 pregnant women

19    in San Francisco in terms of generalizing that information to

20    the United States.

21              THE COURT:  The NHANES is the -- is the intake

22    measurement, the amount -- the concentration of fluoride in

23    community water; right?

24              MS. CARFORA:  No.  The NHANES actually does go out

25    and test biomeasurements of fluoride -- of a lot of things, but

 1    it does do it for fluoride as well.

 2              THE COURT:  Urinary measurements?

 3         MS. CARFORA:  So there's some dispute about whether

 4    NHANES actually has reported the data yet.  Again, that's why I

 5    want to be very, very careful here.

 6         But it is -- urinary fluoride is something that the NHANES

 7    could do for the entire country.

 8              THE COURT:  But what the -- the table we saw was with

 9    fluoridation levels of community water, wasn't it?  Did I get

10    that wrong?

11         MS. CARFORA:  That's right.  No, that was EPA's

12    Exposure Factors handbook, which was a systematic review of the

13    available evidence on intake, on water intake across different

14    subpopulations and at different percentiles.

15         Now that intake, that exposure, is different from dose.

16    So the -- you know, the intake is the exposure and the urinary

17    fluoride is the internal dose.

18              THE COURT:  Okay.  All right.  Go ahead.

19         MS. CARFORA:  We did hear a lot of testimony from

20    Dr. Grandjean that on his chart he included a hazy BMD line.

21    And I submit that a hazy BMD line and weak associations do not

22    rise to the level of best available science for the purposes of

23    justifying EPA regulation.

24         Now, the final question before the Court is:  If there is

25    a risk, is the risk an unreasonable one?

CLOSING ARGUMENT / CARFORA

1      And plaintiffs argue that the purported risk of community

2  water fluoridation is unreasonable, in part, on the potential

3  extent and magnitude of exposure to fluoridation chemicals.

4  And it is true that these are factors EPA has said it would

5  consider in finding -- in making a finding of unreasonable

6  risk.

7      But before EPA or the Court ever gets to these

8  considerations, plaintiffs must first set forth a

9  scientifically defensible basis to conclude that any persons

10  are at risk of neurotoxic harm as a result of exposure to

11  community water fluoridation.

12      In this forum that means that plaintiffs need to show that

13  it's more likely than not that fluoride causes

14  neurodevelopmental harm at a dose experienced from exposure to

15  community water fluoridation programs.

16      The fact that a purported risk relates to a large

17  population is not a basis to relax otherwise applicable

18  scientific standards in evaluating the evidence of that

19  purported risk.

20      Now, I want to back up for a moment and verify that, yes,

21  in fact, I said plaintiffs need to show that it's more likely

22  than not that fluoride causes neurodevelopmental harm.  And I

23  have no wish nor the skill to embark upon a philosophical

24  discussion on the meaning of causation.

25      The cause of an illness may be imminent and direct, or it

1  may be remote and indirect underlying the observed association.

2  But the aim of hazard assessment is to understand the factors

3  of the association before deciding that the most likely

4  interpretation of the association is causation.

5          THE COURT:  Where does this --

6          MS. CARFORA:  Causation --

7          THE COURT:  What is the source of the more likely

8  than not causation?  Where does that come from?

9          MS. CARFORA:  More likely than not is the

10  preponderance of the evidence standard.

11          THE COURT:  And where does that come from?  What

12  regulation?  What statute?

13          MS. CARFORA:  The preponderance of the evidence is

14  the standard under Section 21, for the Court's review, of

15  whether there is unreasonable risk.

16          THE COURT:  All right.  And what about causation?

17  Where does causation -- what's the statutory or regulatory

18  basis on that?

19          MS. CARFORA:  Well, as I was explaining, causation is

20  a factor in considering -- I mean, causation is considered as

21  part of the risk assessment process.  Meaning, if you have an

22  association, the whole point of risk assessment and looking at

23  these associations is to determine what's your confidence in

24  the association so that the most likely -- the more likely --

25  the more likely interpretation of that is actual cause.  So

 1    this -- this reflects the confidence in the database itself.

 2         I mean, what I'm getting at is causation itself is not a

 3    standard.  Causation is not a standard.  It's not a standard

 4    here.  But causation is a consideration that has to be part of

 5    any unreasonable risk determination, either by EPA or the

 6    Court.

 7         So in other words --

 8              THE COURT:  There's two ways causation, I understand,

 9    comes into this.

10         One is whether there is a biological or mechanistic

11    plausibility.  Because if there isn't, it -- and you -- you

12    know, you would give less weight to it.  But if there is, that

13    sort of maybe conforms or corroborates a statistical

14    association.

15         Number two, causation is statistically -- I would think is

16    something where the association is so strong and the

17    confounders are so confidently eliminated that you can't come

18    to any other conclusion that there is a causal relationship.

19    It is a degree.  It is a -- it is at one end of the spectrum of

20    association.

21              MS. CARFORA:  Yes, yes.

22              THE COURT:  So I understand that, but if -- the

23    standard is a lower standard under TSCA.  It's association, not

24    causation.  I understand if you prove causation, then -- then

25    *a fortiori* you've shown association, but not vice-versa.

 1              MS. CARFORA:  I don't think I hundred percent agree

 2     with you, Your Honor.  It's exactly the point I'm trying to

 3     make, is that it's a matter of degree.

 4         But nowhere does TSCA -- the only standard provided in

 5     TSCA is unreasonable risk.  TSCA doesn't talk about causation

 6     or association.  It talks about unreasonable risk.  And then it

 7     says how you go about finding unreasonable risk is you do a

 8     risk evaluation.  And it defines a risk evaluation, and it

 9     defines a risk evaluation of all of the steps of risk

10     assessment, plus a risk determination.

11         And what I'm suggesting is that causation, the Bradford

12     Hill factors, those are considerations in the risk assessment

13     process.

14         So there is, you're correct, no statutory place in TSCA

15     that requires causation.  And there is no statutory place that

16     talks about association either.

17         What's required under TSCA to make a finding of

18     unreasonable risk is a risk evaluation.  It's a risk assessment

19     that's included as part of that process, and as part of the

20     risk assessment process is a consideration of causation.

21         You heard Dr. Thayer testify that the Bradford Hill

22     criterias are built into systematic review.  They are --

23     systematic review is the functional application of the words

24     the Bradford Hill criteria say.  That's what Dr. Thayer

25     describes, systematic review.

 1          And so there can be no real true dispute that causation as

 2     a factor is part of risk assessment, risk evaluation and -- and

 3     important to finding -- making a finding of unreasonable risk

 4     under TSCA.

 5          **THE COURT:**  Here is the bottom line question.  Under

 6     Section 21 of TSCA, can the Court find an unreasonable risk

 7     without finding causation?

 8          **MS. CARFORA:**  Yes.

 9          **THE COURT:**  But causation is a factor.  But it is

10     possible to find an unreasonable risk even without causation?

11          **MS. CARFORA:**  Yes.  And I -- I'll tell you, the risk

12     evaluation process is about interpreting the confidence in the

13     association.  It's about determining the degree of causation.

14     That's what risk evaluation is about.

15          **THE COURT:**  Well, confidence of association and one

16     end of confidence, the very strong end would be causation.

17     Once you've got there, you -- you've pretty much eliminated, at

18     least in the analysis, confounding problems, imprecision

19     problems, enough to find causation.

20          I mean, to me, association is a spectrum.  There's very

21     weak association, no association, moderate, very strong

22     association.  And the more and more that statistical strength

23     is, the closer you get to causation.

24          Is that construct wrong?  That spectrum concept?

25          **MS. CARFORA:**  I think that's right.  But I think

 1    that -- I mean, I think we're defining -- we're defining

 2    causation in some concrete terms here.  And I think in the

 3    process of risk evaluation, in the process of risk assessment,

 4    the Court was right to say that causation is a matter of

 5    degree; that at the end of the day, you know, you have the risk

 6    assessment process, but then you have this separate risk

 7    determination step.

 8        And in that risk determination step there has to be

 9    consideration of is the likely interpretation of this observed

10    association I'm seeing, is that -- does the likely

11    interpretation of that reach some level of causation?

12        And if you can't say that you -- you can't likely -- you

13    can't interpret the association anywhere near causation, then

14    you have a lot of uncertainty and you can't find a finding of

15    unreasonable risk.  You can't regulate on something you don't

16    think is a true association, on something that you don't think

17    is really causing the observed association.

18        And in that sense it's not a concrete term.  It is a level

19    of degree.  And we think it's absolutely relevant to the risk

20    evaluation process.

21            THE COURT:  And have there been prior -- I think we

22    talked about this or you all talked about this in the trial.

23    Have there been prior EPA risk evaluations that found an

24    unreasonable risk, but not necessarily causation?

25            MS. CARFORA:  Your Honor, there are no -- let me back

1    up.

2         There is one published risk evaluation under the amended

3    TSCA.  There are no others.

4         Now, I believe -- I believe it is correct to say that the

5    one published risk determination under amended TSCA is for

6    1-BP.  And that 1-BP -- the basis of the agency's unreasonable

7    risk finding was based on methodologies applied before the

8    statute was amended.

9         So on pre-amendments, EPA conducted a risk assessment for

10   1-BP.  When the statute was amended, there was a provision in

11   the statute that allowed EPA to grandfather in whatever risk

12   assessments it had ongoing at the time.

13        And so 1-BP -- the risk assessment for 1-BP was finished,

14   and the risk assessment was published.  And since that time,

15   this statute -- since that time EPA has not yet published one

16   final risk determination.

17             THE COURT:  Okay.  The 1-BP, did it find causation

18   expressly?

19             MS. CARFORA:  I'm sorry.  That -- it's

20   methylmercury -- no, methylene chloride, not 1-BP.  So that was

21   the one that was issued.  So I apologize for that.

22             THE COURT:  Okay.

23             MS. CARFORA:  And there is -- there is A 6A rule.  So

24   I imagine, I have to assume that they did find unreasonable

25   risk, but I do not know if it was based on causation.  And

 1   we'll try to get that information for the Court right now.

 2          THE COURT:  And prior to that, prior to TSCA -- or

 3   TSCA amendment, were EPA risk evaluations, were there any that

 4   found unreasonable risk without causation -- an express finding

 5   of causation?

 6          MS. CARFORA:  So, Your Honor, let me back up and

 7   answer your previous question.

 8      So for -- for the MC determination that we were just

 9   talking about, it did -- EPA found that it caused acute

10   toxicity.  It caused death.  So it did -- EPA did make a

11   finding that it caused death for that determination.

12      Prior to -- you know the difference between -- one of the

13   big differences between amended TSCA and post amendments was

14   that there was no risk evaluation requirement in the post

15   amendments.  And so that process is very different, and that --

16          THE COURT:  Pre-amendment.  You mean pre-amendment.

17          MS. CARFORA:  Thank you.  Yes, thank you.

18      The pre-amendments did not have a risk evaluation

19   requirement.  And so in the pre-amendments, I believe, it's

20   accurate to say that TSCA relied -- the TSCA program relied on

21   just the existing agency guidance at the time to conduct risk

22   assessments under the policies and procedures available and

23   current in the agency.

24          THE COURT:  And did those existing agency guidance

25   require causation in order to regulate?

1        **MS. CARFORA:**  I would say -- I think I can fairly say

2    no.

3        **THE COURT:**  So your position is -- is it your

4    position that amendments to TSCA effectuated a change in that

5    standard?

6        **MS. CARFORA:**  I'm not saying -- what I'm suggesting

7    is that causation is very relevant to a risk determination.

8    I'm saying that if you're considering unreasonable risk, the

9    statute is very flexible in terms of what you should be

10   considering.  And I'm suggesting that making a finding of

11   unreasonable risk based on a weak association or an association

12   that doesn't rise anywhere near the level of causation would be

13   inappropriate.

14       I'm not suggesting that a risk determination or that

15   amended TSCA requires causation.  I'm not suggesting that.

16       **THE COURT:**  But you are suggesting it has to reach

17   the level of, quote, anywhere near causation in order to

18   constitute an unreasonable risk.

19       **MS. CARFORA:**  Well --

20       **THE COURT:**  I'm just using your words.

21       **MS. CARFORA:**  Appreciate that.  Thank you.

22       And again, it's -- you know, EPA hasn't -- hasn't

23   completed any risk assessments.  It said it's going to be very

24   flexible about how it determines risk.

25       And so one of these issues is uncertainty and variability

1    in the data.  That's a key issue that EPA has expressly said

2    that it would consider.  The more uncertainty and variability

3    you have in the data, you know, the -- the harder it is to have

4    confidence in the association itself.

5        **THE COURT:**  That I understand.  You may not even get

6    to a sufficient association if you have too much uncertainty

7    and variability, but that's irrespective of causation.

8        **MS. CARFORA:**  Well, I mean, I think that's the

9    question; right?  I mean, I'm suggesting that -- that's what

10   I'm suggesting, is there's no hard and fast definition for

11   causation here.

12       I mean, what I'm suggesting is I think -- I feel as if

13   plaintiffs have conflated this causation conversation.  We

14   are -- EPA has produced, and we asked our experts to produce,

15   an evaluation of -- to measure the association, to measure our

16   confidence in the association.

17       And that -- that process of measuring confidence in the

18   association, we've used the term "causation" to -- you know, to

19   describe that process in measuring confidence.

20       And I think that the -- the reason why we have done that

21   is because the process of risk assessment is the process of

22   determining, you know, how likely is it that the proper

23   interpretation here is that exposure -- this chemical is

24   causing that effect.

25       I mean, that is the definition of hazard assessment, is

CLOSING ARGUMENT / CARFORA

```
 1   answering --
 2          THE COURT:  Where does that come from?  Where does
 3   that come from?
 4          MS. CARFORA:  Well, if the.
 5      (Brief pause.)
 6          MS. CARFORA:  I apologize.  I'm trying to think if
 7   it's in evidence or not.  If you can give me one moment on
 8   that.
 9          THE COURT:  I'm particularly interested if there is a
10   statute or regulation that says that.  I'm not sure what you
11   mean by evidence.
12      You're saying hazard assessment by definition
13   incorporates -- requires causation.
14          MS. CARFORA:  Yes, Your Honor.  I'm going to grab
15   Dr. Henry's trial declaration.
16      (Brief pause.)
17          MS. CARFORA:  Starting at Paragraph 99 all the way
18   through Paragraph 105 Dr. Henry describes hazard assessment.
19   And I'll start at Paragraph 100:
20          "Hazard assessment, also called effects
21       assessments in some EPA guidance documents, identifies
22       the type of adverse health or environmental effects or
23       hazards that can be caused by exposure to the chemical
24       substance in question and characterizes the quality
25       and weight of evidence supporting this
```

 1          identification."

 2     She goes on:

 3          "The principles of" --

 4     **THE COURT:**  Let me stop you right there.

 5     Paragraph 100 says "that can be caused" not "is caused" or

 6 "more likely than not caused."  She just says "can be caused."

 7     **MS. CARFORA:**  Well, I mean, I -- you know, I -- I

 8 maintain that, you know, the risk assessment process is about

 9 determining our confidence in the association, and that that is

10 specifically relevant to causation.

11     And I think, you know, as Dr. Thayer testified to, the

12 Bradford Hill criteria and the criteria for causation are built

13 into the systematic review.  They are the functional --

14 systematic review is the functional application of the Bradford

15 Hill criteria, which is the criteria for causation.

16     And that's what we're looking at.  And that's when -- when

17 NTP defines, you know, low, moderate, or -- or high, it's

18 looking at the level of evidence towards causation.

19     I mean, that's what systematic review is.  It's a level of

20 evidence of how likely it is that the chemical substance you're

21 assessing can cause an effect.  And that's what systematic

22 review is.  And I maintain that that's what risk assessment is.

23     And if -- you can go through the risk assessment process.

24 You can go through that whole process; right?  You can do it on

25 weak data.  But the question at the end of the day is:  Is the

1   data I relied on strong enough to regulate on?  That's the

2   question.

3        So, you know, when we're looking at -- and this is what we

4   get to.  This is where we have to separate kind of risk

5   assessment pre-amendment and post amendments where you're

6   looking at the risk determination step, where the risk

7   determination step gives the agency the ability to consider

8   those things now.  To consider the uncertainties.  To consider

9   all these factors that ultimately lead to that question of

10  causation as a matter of degree.

11       **THE COURT:**  All right.  Go ahead.  Why don't you

12  finish up?

13       **MS. CARFORA:**  The Court heard a lot about the

14  applicable scientific standards and methodologies for

15  supporting evidence-based decision-making in environmental

16  public health.

17       Dr. Kris Thayer, who has been responsible for leading not

18  one, but two United States government program offices

19  recognized around the globe for advancing state of the science

20  for supporting evidence-based decisions making --

21  evidence-based decisions in environmental public health, laid

22  out for the Court the most current and relevant methodology for

23  addressing hazard and risk questions.

24       Systematic review is a methodically detailed process

25  designed to ensure objectivity, transparency, clarity,

CLOSING ARGUMENT / CARFORA

1    reproducibility and utility for risk managers.

2         Dr. Thayer explained the meticulous process of taking a

3    deep dive into each individual study and teasing out the trends

4    related to a number of different biases, domains, within a

5    group of -- with a group of specialized experts across

6    different scientific disciplines so that they can ensure that

7    they are identifying the best possible study or studies to use

8    in subsequent steps in the risk assessment, including the dose

9    response assessment.

10        Now, plaintiffs concede, as they must, that they did not

11   present to the Court a systematic review.  Or in other words,

12   they admit that the information presented to the Court does not

13   represent the current state of the science to support

14   regulatory decision-making.  Instead, they asked the Court to

15   believe that systematic review puts form over substance and

16   slows the protection of human health.

17        But just important as protecting the human -- protecting

18   the public health is EPA's responsibility to preserve and

19   promote scientific integrity in regulatory decision-making.

20        In fact, the EPA's ability to pursue its mission, to

21   protect public health in the environment, depends upon the

22   public's ability to trust the science and the scientific

23   process that informs public policy decision.

24        And just as this Court cannot make the best decision

25   unless it has confidence in the integrity of the science on

1    which it relies, risk assessment and systematic review are the

2    compasses guiding EPA's health and environmental protection

3    decisions; but more specifically, and more relevant here, TSCA

4    demands that those processes be followed prior to granting EPA

5    authority for regulating chemical substances and commerce.

6        Now, plaintiffs want to sweep these issues of scientific

7    integrity away.  They say the Court can make a decision under

8    Section 21 of TSCA divorced of the considerations required by

9    EPA under Section 6.  And putting aside that question as a

10   matter of law, I ask the Court as a matter of practicality to

11   consider that if it does make a finding of unreasonable risk,

12   EPA would be required to regulate.  Yes, in some manner, but

13   nonetheless, regulate the American people solely on the basis

14   of what has been presented to this Court.

15       And as you heard from Dr. Henry, EPA's regulations must be

16   supported through the demonstration of clear and transparent

17   scientific judgment, carried forward through each component of

18   a risk assessment process.

19       And in the absence of an integrated risk characterization

20   that explains all of the key findings, assumptions, limitations

21   and uncertainties in the database, EPA simply does not have the

22   information necessary to reach an informed policy decision

23   concerning the practice of community water fluoridation in the

24   United States.

25       And I will close, Your Honor, by noting that in 2015 the

CLOSING ARGUMENT / CARFORA

1    National Toxicity Program began the process of evaluating the

2    evidence that exposure to fluoride is associated with

3    neurodevelopmental or cognitive effects.  This review was

4    initiated in part in response to a nomination from the Fluoride

5    Action Network, a plaintiff in this case.  And maybe the

6    Fluoride Action Network didn't like NTP's initial findings of a

7    low level of evidence to support neurodevelopmental effects in

8    animals exposed to fluoride during development.

9         But because before the NTP could undertake similar

10   evaluation of the human evidence necessary to reach just a

11   hazard conclusion, the Fluoride Action Network and other

12   plaintiffs petitioned EPA to ban the practice of water

13   fluoridation, otherwise ignoring all of the other risk

14   assessment components and jumping directly to unreasonable

15   risk.  And they did so without Bashash 2017 or McPherson '18 or

16   Green 2019 in tow.  Which brings us to the present day, and

17   throughout this Zoom trial with a handful of lawyers and

18   experts arguing and interpreting rapidly advancing science.

19        In fact, simultaneous with this trial the NTP, in

20   consultation with the National Academy of Sciences, is

21   completing a systematic review, integrating the available

22   animal and human data to reach hazard conclusions in a manner

23   that is consistent with the state of the science for reaching

24   such conclusions.

25        And Dr. Hu and Dr. Lanphear, they continue their research

1    to close the data gaps and answer outstanding questions.

2         But despite all of that, plaintiffs are trying to convince

3    this Court that fluoride's neurotoxicity is so obvious that

4    none of this needs to be done.  And in the backdrop of the NTP

5    yet to complete even a hazard conclusion, plaintiffs are asking

6    this Court to conclude that it's more likely than not that the

7    practice of community water fluoridation poses an unreasonable

8    risk of neurotoxic harm.

9         EPA asks the Court to let the science advance.  To first

10   verify urine as a appropriate measure of exposure.

11        Second, apply the science to specific U.S. populations.

12        Third, conduct additional analysis to better describe and

13   understand the variability and uncertainty in the database.

14        And fourth, to reproduce the validity of exposure

15   measurements within different Western populations.

16        There is simply too much uncertainty and variability in

17   the existing database for the Court to make a finding of

18   unreasonable risk.  The Court should deny plaintiff's claim and

19   find for EPA.

20        **THE COURT:**  Let me ask you --

21        **MS. CARFORA:**  Thank you, Your Honor.

22        **THE COURT:**  Let me -- thank you, Ms. Carfora.

23   Let me ask you.  The NTP review, that's -- that's the one

24   where there was the draft monograph that had been circulated?

25        **MS. CARFORA:**  Yes, Your Honor.

1          THE COURT:  And that is -- had been out for review

2     and comment; is that right?

3          MS. CARFORA:  Yes, Your Honor.  The draft was

4     published in late October.  It was put out -- let me put it

5     this way.  It was not published.  It was put out for peer

6     review.  It went to a National Academy of Sciences peer-review

7     committee.

8          The National Academy of Sciences posted and published the

9     draft NTP monograph on its website in preparation for the

10    public meeting.  The public meeting happened in mid November, I

11    believe.  And the National Academy of Sciences finished their

12    peer review and sent the draft back to NTP with a number of

13    comments.  And that -- I believe that was February, that the

14    peer review -- actually, the NAS actually published a

15    peer-review report that described its peer review, and it sent

16    that report back to NTP.  And NTP has yet to complete or

17    publish a final -- its final hazard conclusions on fluoride,

18    specifically addressing this issue that's before the Court.

19         THE COURT:  So the National Academy published its

20    peer-reviewed comments in February?

21         MS. CARFORA:  Yes, Your Honor.

22         THE COURT:  And now the last step is awaiting NTP

23    finalization after receiving those reports?

24         MS. CARFORA:  Yes, Your Honor.

25         THE COURT:  And your chart looked like you were

**REBUTTAL ARGUMENT / CONNETT**

1    forecasting a fall 2020 completion?  Do you have any

2    information?

3         **MS. CARFORA:**  I have not been -- I have not gotten

4    any information since we have been in the COVID-19.  I mean, I

5    did -- I don't know.

6         **THE COURT:**  Okay.

7         All right.  Since Mr. Connett has the burden, I'm going to

8    give him five minutes of rebuttal, if you want a short

9    rebuttal, if you have anything to add or comments.

10        **MR. CONNETT:**  Thank you, Your Honor.

11                     **REBUTTAL ARGUMENT**

12        **MR. CONNETT:**  First, with respect to

13   hypersensitivity, I would just repeat that the National

14   Research Council in both 2006 and 2009 found that the case

15   reports, which included double-blind studies, were credible and

16   the symptoms reported in these studies included headaches.

17        I would also note that counsel in their PowerPoint slide

18   cited, I think, four studies, which is certainly not the extent

19   of the studies that the NRC relied upon.

20        In terms of generalizability, Your Honor, as I think has

21   been sort of endemic to EPA's positions in this case, EPA seems

22   to have a double standard.  It says we can't rely on studies

23   from Canada and Mexico and, yet, its own experts rely on

24   studies from New Zealand, Canada.  And, apparently, they wanted

25   to rely on a study from Spain.  I don't recall any discussion

REBUTTAL ARGUMENT / CONNETT

 1    from EPA as to whether those studies are generalizable to the

 2    U.S. population.

 3         With respect to animal data, I would reiterate and

 4    emphasize, I think, a very central fact in this case.

 5    Dr. Kristina Thayer, who is the single -- the one scientist at

 6    EPA with the greatest knowledge base on the neurotoxicity

 7    literature, she testified in this case that the animal data

 8    supports the biological plausibility of fluoride-causing

 9    neurotoxic effects in human beings.  That is a critical fact.

10    And it's a critical fact when we are assessing the

11    epidemiological data.

12         With respect to the McPherson study.  Counsel misspoke and

13    said that Dr. Thiessen did not rely on the McPherson study

14    specifically for point of departure.  That is false.

15    Dr. Thiessen specifically relied on the McPherson study for one

16    of her points of departure.  So counsel misspoke.

17              THE COURT:  Remind me.  How do you derive a point of

18    departure where there is no LOAEL?

19              MR. CONNETT:  Well, it's a situation -- well, first

20    off, the EPA uses NOAELs, Your Honor, all the time for it's

21    points of departure for risk assessment.  It's a standard point

22    of departure to use.

23         Here, because the McPherson study did not use the higher

24    doses -- and Dr. Tsuji testified that she didn't think they

25    needed to use the higher doses.  Here, as counsel, I think,

**REBUTTAL ARGUMENT / CONNETT**

1    correctly stated, you can look to the broader literature, look

2    to the dose response that you see in the broader literature,

3    and say:  We're clearly seeing affects above 20 ppm.  McPherson

4    didn't find an effect on learning and memory at 20 ppm.  It's a

5    reasonable point to use for the assessment.

6         I would agree --

7              **THE COURT:**  So it looks at -- you look at broader

8    literature in order to give it -- you can't just look at the

9    one study with no effect.

10             **MR. CONNETT:**  Yes.  For instance, Your Honor, if you

11   only had one animal study on fluoride neurotox -- that was

12   it -- and you didn't find any effect at all, then you're not

13   going to -- you're not going to be doing a risk -- you know,

14   you're not going to be creating a -- using that as a point of

15   departure.

16        It's only when you have a credible basis that this

17   compound causes neurotoxicity, that you would be using

18   McPherson in this way.  Because we clearly have animal data

19   showing neurotoxic effects.

20        Now, I would also note in terms of the concentration that

21   McPherson used, the rats, remember, Your Honor, only had mild

22   fluorosis.  And in this country in fluoridated areas you have

23   about 40 percent of children who have at least mild fluorosis.

24   I think that's an important fact to keep in mind when

25   considering the relevance to the United States population.

1    With respect to -- counsel made a point about the number

2 of studies on lead and IQ that were available to the EPA in

3 2008 when EPA issued the lead standard.  Counsel put on the

4 screen a reference to 6,000 studies.

5    But if Your Honor may remember, they asked Dr. Lanphear

6 about that on the stand.  And Dr. Lanphear made a very

7 important point.  He said:  Yes, there was a ton of studies on

8 lead.

9    But at that time there were only three epidemiological

10 studies on lead and IQ at concentrations below 10 micrograms

11 per deciliter.  So at the concentrations of interest at that

12 time, there were not many epidemiological studies available.

13    Now, with respect to the UCSF study, first off, we don't

14 need to guess.  We don't need to speculate.  There is no

15 material change between the draft manuscript and the final

16 paper.  No material change whatsoever.  No need to speculate.

17 The data is there.

18    Now, counsel mentioned a weak correlation between water

19 fluoride and urine-fluoride in that relatively small cohort.

20 Correct, there was a weak correlation.  There is a very

21 plausible reason for that.

22    The fact of the matter is if you're leaving your home,

23 say, in a non-fluoridated community and you're going to

24 San Francisco for a day or two, you're drinking some

25 fluoridated water during that day or two, that's going to

1    obscure, Your Honor, the relationship between your home water

2    fluoride level and your urine-fluoride level.

3         But the key fact of that study, Your Honor, is when you

4    look at the urine-fluoride range in the women who came from the

5    fluoridated areas, it's squarely in the range that we see in

6    Canada.

7         And as Dr. Grandjean explained, it is biologically

8    impossible for the average urinary fluoride levels among women

9    who actually drink fluoridated water to be below the BMDL.  The

10   BMDL is about .15.  And if you're drinking fluoridated water,

11   we already well know that the concentrations in urine are going

12   to be right around, you know, given or take, the level in the

13   water.

14        THE COURT:  Is there any evidence about the level of

15   fluoridation in San Francisco water compared to the NHANES

16   table?

17        MR. CONNETT:  Yes.  The level in San Francisco is

18   .7 parts per million.

19        Now, NHANES is an important point, Your Honor.  So I want

20   to make one thing emphatically clear, because the record in

21   this case is uncontested and undisputed on this point.

22        The Centers for Disease Control has never, ever, ever

23   issued or published any urinary fluoride data for any

24   population for any age group.  EPA knows that.  We deposed the

25   CDC in this case.  They said they have never published any

 1    urinary fluoride data.

 2         What they did have, Your Honor, is in 2015 and '16 the CDC

 3    collected some urinary fluoride data, but they have not yet

 4    released it.  And in the population that they collected the

 5    urinary fluoride data was, it was for children 3 to 19.

 6         There is -- counsel -- EPA right now today could not say

 7    truthfully that the CDC has ever collected urinary fluoride

 8    data for pregnant women in this country.

 9         **THE COURT:**  What about my question about the level

10    of -- I take it your position is that the .7 parts per million

11    is common throughout the country?

12         **MR. CONNETT:**  Absolutely, Your Honor.  There are

13    still -- interestingly, there are still some areas where they

14    haven't yet adjusted downwards to meet the recommendation from

15    2015, where the CDC and others recommended we lower the levels

16    from upwards of 1.2 ppm down to .7.  Some communities are

17    lagging behind on that.  But absolutely, the target

18    concentration is .7.

19         I would also note that the CDC allows water municipalities

20    to have a range of up to about 1 part per million because they

21    recognize it's somewhat difficult to keep it precisely at .7 on

22    any given day.

23         Now, with respect to -- counsel mentioned that one of the

24    risk evaluations that EPA did, I think it was for methylene

25    chloride, found causation.  I think she mentioned death and

**PROCEEDINGS**

1    acute toxicity.  I strongly suspect, and I believe the record

2    will show, that's causation at a very high level.

3          I think Your Honor's question was about causation under

4    the conditions of use.  I don't believe under the conditions of

5    use in that risk evaluation human beings were dying.  So I

6    think that we need to distinguish what we're referring to there

7    with the causation.

8          And, Your Honor, that's all the comments I have.  I

9    appreciate your opportunity to provide a rebuttal.

10              **THE COURT:**  All right, thank you.

11          All right.  Here is what -- I want to talk to the parties

12    about -- and I appreciate your closings and your presentations.

13          I had previously determined that the evidence in this

14    case, given *de novo* review, given the comments in the

15    legislative history, were not confined to the administrative

16    record.  And, obviously, we've gone well beyond the

17    administrative record because so much has changed since that

18    record, that petition was filed with the EPA.  And I think that

19    timeline that Ms. Carfora shows that.

20          There have been two significant series of studies,

21    prospective cohort studies, which everybody agrees is the best

22    methodology.  Everybody agrees that these were rigorous

23    studies.  I think everybody agrees that these studies would be

24    part of the best available scientific evidence.

25          You also have the UCSF study, which provides one -- and I

PROCEEDINGS

1  know it's disputed, but one potential link or brick in the

2  generalizability of the Canadian and the Mexico studies.  These

3  are significant developments.

4      I had also ruled initially that I wasn't going to extend

5  the trial date and allow discovery into the NTP then draft

6  monograph.  There was a motion initially, I think, by the

7  government to -- to allow -- to not allow its inclusion?  I

8  can't remember which way it went to.  To exclude it; right?

9          **MS. CARFORA:**  No.  To include it, but to have expert

10 discovery on its interpretation.

11         **THE COURT:**  Right.  But there was later, I think, a

12 Motion in Limine after that.

13     In any event, the parties came to an agreement not to

14 introduce it, for whatever reason.  So it's fine.  So it hasn't

15 come in.

16     But the Court is aware that this is a significant study.

17 It's coming from the NTP.  And they are using methodology, it

18 appears -- and I haven't seen the peer review.  I haven't seen

19 the National Academy of Sciences peer-review comments.  But it

20 is obviously an important piece of evidence, whether you agree

21 with it or not, how reliable ultimately it is.  And that seems

22 to be forthcoming perhaps any day.

23     But the main consideration I have is I have sat here now

24 for two weeks listening to the expert testimony, reading the

25 documents.  And it occurs to me, more than ever now having

1    actually experienced and heard the evidence, that what is

2    before this Court is an entirely different body of evidence --

3    not entirely, but a substantially different body of evidence

4    that was presented to the EPA.

5        It also occurs to me that -- pursuant to the colloquy I

6    had with Ms. Carfora, that the EPA appears to have applied a

7    standard of causation which, from my read of TSCA, is not

8    accurate.  Is not a proper -- is not a proper application.

9    It's not the proper standard.

10       I understand that it's part of the spectrum and it informs

11   the consideration, but the -- but it appears that the EPA

12   operated on a standard of causation and not allowing for

13   association, perhaps even a strong association or a

14   sufficiently strong association, to find an unreasonable risk

15   that might be short of an actual finding of more likely than

16   not causation.

17       All this counsels to me to pause for a moment and say, you

18   know, why are we here?  Doesn't it make sense to have the

19   agency take a second look?  Take a look now that the evidence

20   has been produced by both sides, and maybe it can be refined.

21   And it's going to be informed, hopefully, soon by the NTP.

22   There may be some other things.  There is the pooled study that

23   Dr. Lanphear is hoping to -- I don't know how long that's going

24   to be.  And you've got the Spain study that is not in published

25   form, not been peer reviewed yet.  But who knows?  I don't know

PROCEEDINGS

 1   how long that takes.

 2        But the point is, what was presented to the EPA was a

 3   very, very different record than what I have now.  And although

 4   the Section 21 of TSCA confers upon the Court the power to act

 5   in the face of inaction by the EPA if the proper findings are

 6   made, as you can see, this is an enormous task.  It is a task

 7   that this Court may well have to undertake, if necessary.

 8        But I have to say, it seems to me, that even if there is

 9   no formal doctrine of administrative exhaustion, and I don't

10   see anything in the TSCA that requires it, other than having

11   petition and going through the process, it -- I don't know if

12   it contemplated a situation where the record before the Court

13   under a Section 21 petition is very, very different and has

14   evolved substantially differently than what was presented.

15        And so my question to the parties is whether it makes

16   sense for you to discuss possibilities of either an amended

17   petition and reconsideration by the EPA or, if necessary, start

18   a new petition, since it's a fairly rapid process, and to hold

19   my decision and my adjudication of this in abeyance and give

20   the agency a chance to relook.  And, hopefully, relook at it

21   under the proper standard of review.

22        I know I'm springing this on you, so I don't expect you

23   to -- and I know you're going to have some initial reactions.

24   Mr. Connett is distrustful of the EPA, et cetera.  So I can

25   predict that.

1    But I ask you to -- you can comment now, but I'd like you

2  to think about that, and whether there is a way to allow the

3  agency, and really at the urging of the Court, to take a second

4  look.

5    Because there is serious evidence here.  There is no doubt

6  that these two studies from Canada and Mexico raise serious

7  questions.  And the witness -- Dr. Donohue, I guess; right?  I

8  know it's only one line out of a deposition, but her comment

9  about:  Well, it may be an appropriate time to reassess and

10  revive, to relook at this whole question.

11    And I -- you know, and this is coming from somebody who

12  knows her stuff.

13         **MS. CARFORA:**  Your Honor, if I may?

14         **THE COURT:**  Yeah.

15         **MS. CARFORA:**  I don't want to harp on, you know, this

16  difference in statutes.  But Joyce Donohue works in the Office

17  of Water, and that is a different program under a different

18  statute.  And that's -- you know --

19         **THE COURT:**  All right.  I'm not relying just on Joyce

20  Donohue.

21         **MS. CARFORA:**  I understand.  I understand.

22         **THE COURT:**  She expressed a sentiment that it seems

23  so obvious.

24         **MS. CARFORA:**  I understand.  And you should know that

25  the Safe Drinking Water Act requires EPA to review their

**PROCEEDINGS**

 1    standards every six years.

 2         So I believe -- I'm sure my colleagues will correct me if

 3    I'm wrong, but I believe the last one was 2016.  So the Office

 4    of Water under EPA, under the Safe Drinking Water Act, is

 5    required to review their statutory standards in 2022.  So

 6    that's -- that's the Safe Drinking Water Act.

 7         But I -- I want -- I anticipated this question, Your

 8    Honor.  And it's something that I have been talking to my

 9    client about, not just over the past couple of days.  It's

10    something that actually Mr. Connett and I have been discussing

11    since January, to find out if there was a place to go here.

12         And I just want to express to the Court, I very much

13    appreciate, you know, the issue with fluoride that we're

14    dealing with here.

15         But above and beyond that, the agency has other interests

16    here.  Because amended TSCA is a brand new statute.  This is a

17    case of first impression.  And there's a lot of implications in

18    terms of implementing the statute, quite frankly.  So above and

19    beyond fluoride, there's a lot -- there's many more

20    considerations that the agency has to take here.  And so that's

21    a concern.

22         And the other issue is that in our conversations with

23    Mr. Connett beginning probably early January, and then also

24    very early on, the problem is that we have not been able to

25    identify a statutory mechanism that would suggest the approach

PROCEEDINGS

```
 1   the Court is suggesting.  In other words --

 2            THE COURT:  Well, you mean a reconsideration or

 3   whatever?  There is no such thing as a petition for rehearing

 4   before the agency?

 5            MS. CARFORA:  No.  Not within -- you know, if the

 6   agency denies the petition, there is 90 days to file and get

 7   judicial review.  So there is no -- you know, there is no

 8   mechanism in the statute for that at this time.

 9            THE COURT:  Well, there is always -- if there is no

10   other such mechanism, you can always file a new petition;

11   right?  There is nothing prohibiting that.  You can file a new

12   petition.

13        I don't know what the doctrines of res judicata and

14   collateral estoppel are in the administrative field, but this

15   would be based on wholly different new evidence.  So I -- worse

16   comes to worse, if people can't find a way to do it more

17   efficiently, I mean, that's an alternative, too.

18        And, frankly, we do have the issue of standing here.  I

19   mean, the last thing I want to do is go through a detailed

20   analysis into the substance of this.  And if I find standing

21   and get to the merits of this one way or the other and then,

22   you know, have the work completely thrown out because of

23   standing.  Seems to me that's another reason to consider a

24   petition.

25        Frankly, I don't know.  You know, seems to me that it's
```

PROCEEDINGS

```
 1  obvious who would have standing, where there wouldn't be a
 2  question.
 3       And so at the end, it could save a lot of heartache and a
 4  lot of headache if we do kind of a reboot.  It's not just a
 5  reboot for that purpose.  It's because there has been evolving
 6  scientific evidence in the last three years now -- four years,
 7  almost four years.
 8       MR. CONNETT:  Your Honor, we certainly appreciate the
 9  Court's guidance and input on this.  And we certainly want to
10  give this, you know, due consideration.  And I'm certainly
11  happy to speak with counsel and see where we may have potential
12  agreements.
13       I would -- as you picked up on, I -- you know, plaintiffs
14  have been frustrated over the years with EPA's -- really, Your
15  Honor, it has dragged it's feet for a long, long time.  The NRC
16  concluded in 2006 that the current safety standard is outdated
17  and unsafe, and EPA still has not done anything to lower that
18  standard.
19       So we are in a situation where the EPA has sort of made a
20  political decision not to do anything.  And that is precisely
21  why plaintiff brought this petition in the first place.
22       THE COURT:  Well, I understand your feelings about
23  that.  I'm not going to say one way or the other whether that
24  has validity or not.
25       But what's different is not only the state of the
```

1    scientific evidence, but the posture of this case.  We have a

2    live case.  I have a Section 21 case right now.  And if I, as a

3    matter of case management say, all right, I'm going to take

4    this under submission for now, but I want you all to do -- you

5    know, go back to the administrative process.  That doesn't mean

6    this case goes away.  I still have this case.  I could rule on

7    this case.  And I'm sure the EPA would be aware of that.

8         As well as the plaintiff would be aware that if I rule on

9    this case, I might not come out in your favor.  I mean, you all

10   don't know which way I'm going to come out at this point.

11        So just as a matter of -- of procedural context, we would

12   still be in litigation.  I'm not dismissing this case.  I would

13   probably just take it under submission or put a pause on it.  A

14   stay maybe and say:  Go back to the EPA through one mechanism

15   or another.

16        Now, if that doesn't resolve it, I guess you're back here

17   again.  Whether it's on a new petition or we just revive this.

18   You know, there's all sorts of procedural things that we could

19   do.

20        But my main point is that, really, I would hope that the

21   agency would take a serious look, apply the proper standard,

22   and look at this new evidence.  And there is going to be more

23   stuff coming out in the next couple months.  I don't know which

24   way it's going to go.

25        But I do think that that makes sense, given the

1  seriousness and the consequential impact of whatever we do,

2  whatever the EPA does.

3      I understand it's just a threshold showing and it would

4  kick in rule-making if plaintiffs were to prevail, so it

5  doesn't end the inquiry.  But it's still a significant issue on

6  all sides, you know, for reasons stated by both.

7      I'm aware the EPA -- there is a lot of pressure.  The

8  prioritization of the chemicals and everything else.  That's

9  why Section 21 allowed for some breathing space when you get

10 into rule-making and all that.

11     But, you know, it's not like we're starting fresh here.

12 There are people, it's not like they don't know anything about

13 this issue.  It's not like coming out of the blue.  The record

14 in this case is now public.  The studies, the deposition -- you

15 know, all the stuff.  The body of evidence is there.  It's

16 growing, but, I mean, it's not like we're starting from

17 nowhere.

18     So that's why it occurred to me.

19         **MR. NIDEL:**  Your Honor, this is Chris Nidel.  I just

20 had a question related to your recommendation.

21         **THE COURT:**  Yeah.

22         **MR. NIDEL:**  Would there be -- would you envision some

23 limited discovery on any new additional studies or available

24 information that comes out?

25         **THE COURT:**  You mean, if it came back to court?

1      **MR. NIDEL:** So, for example, if NTP came out with

2 their assessment, their final assessment, and, you know, for --

3 for some of the reasons that have been stated, plaintiffs were

4 skeptical of some of those -- some of the bases or some of

5 those conclusions, or just wanted to get discovery from NTP on

6 how that evaluation was done and what was considered, would

7 that be a tool that might be available to us?

8      **THE COURT:** All right.  What's the government's

9 response to that?

10      **MS. CARFORA:** Your Honor, I'm not insensitive to any

11 of this.  So, you know, the problem is that they are very --

12 there are very specific statutory limitations on the authority

13 that EPA has here, and there are very specific limitations on

14 the authority that the Court has here.

15      And regardless of whether we have more -- we have more

16 discovery and we have more trial, at the end of the day, unless

17 plaintiffs can produce to this Court a risk evaluation that

18 meets the scientific standards and the rigors of that required

19 under TSCA, the agency does not have the resources or the

20 ability to conduct a risk evaluation for fluoride outside of

21 the prioritization process.  And that's -- there is some very

22 specific legal limitations that we think drive that.

23      **THE COURT:** Well, are you saying that if somebody --

24 let's say somebody else filed a petition.  Are you saying that

25 that is going to be denied for lack of resources?  That the EPA

 1   could not comply with the statute and render a -- I mean, there

 2   would be inaction, is what you're telling me, and the 90 days

 3   would run?

 4           **MS. CARFORA:**  No.  I'm not suggesting that at all.

 5   And I want to try to be, you know, very clear.

 6       EPA only has 90 days to review a petition under the

 7   statute.  That's the legal limitation.  They have 90 days.

 8       The position we've taken in this litigation is that -- and

 9   this is consistent with the guidance that we've put out, that

10   EPA has put out to the public, which is we welcome the public's

11   health -- help, in helping us, in helping EPA evaluate these

12   chemicals, but there is specific guidance in that interested

13   persons should follow that guidance and produce to EPA an

14   evaluation that meets the same rigor and statutory standards

15   required by Congress -- required by the statute.  And that that

16   would be necessary.  That would be the level of evidence

17   necessary for EPA to be able to reach a determination of

18   unreasonable risk within the 90 days that it has to review a

19   petition.

20       In other words, the risk evaluation rule and Section 6B

21   gives EPA up to three and a half years to do an evaluation.

22   There is no way EPA could do a risk evaluation within the 90

23   days it would take for -- that they have to review a petition.

24       And so the position of the agency has been, and continues

25   to be, give us the information we need that meets the statutory

**PROCEEDINGS**

1    standards so that we can make a risk determination within the

2    90 days provided under Section 21.

3         And so we would never in any case pre-determine any

4    decision on a petition or any other decision EPA might make.

5    They don't make any pre-determinations.  They have to be able

6    to -- within the statutory limitations, be able to make their

7    finding based on the information that's submitted in the

8    petition.

9              THE COURT:  So you're saying that if the petition --

10   let's say a new petition or amended petition, whatever you want

11   to call it, is filed and in the view of the EPA procedurally it

12   doesn't meet the rigors of a risk evaluation with all the

13   elements.  I guess you're suggesting systematic review being

14   part of that?  I assume that's what you're saying?

15             MS. CARFORA:  So I'm trying to be very -- trying to

16   be very clear.

17        The position of EPA is that the petition has to meet the

18   best available science and weight of the scientific evidence

19   requirements of the statute.  EPA believes and has codified a

20   definition for weight of the scientific evidence.

21        And so -- I'm not saying that petition has to do that.

22   The EPA might require that.

23        What Dr. Henry actually testified to the other day is that

24   all the right pieces would have to be in all the right places

25   for EPA to be able to have the information it needed to make a

PROCEEDINGS

1   decision within 90 days.  And that doesn't mean that it has to

2   follow exactly EPA's procedure, but it means that all the right

3   information has to be in all the right places.

4           THE COURT:  Well, all right.  That is something that

5   you have the advantage of being able to meet-and-confer in

6   advance knowing the record as it is.  You can have a

7   meet-and-confer to see if any new petition or amended petition,

8   or whatever it's called, is sufficient to trigger a

9   substantive -- a meaningful substantive review.

10      True, it has to be done within 90 days.  I guess there is

11  no way to -- there is no statutory way to extend that; is that

12  correct?

13          MS. CARFORA:  That's correct.

14          THE COURT:  All right.

15          MS. CARFORA:  That's one of the limitation that we

16  have.

17          THE COURT:  But rather than being hit by a petition

18  out of the blue, you all are in this case.  You all are

19  communicating.  You certainly can have some communication about

20  what it takes to trigger a meaningful substantive review,

21  because I think that's what we're all after.  Not just some

22  procedural ruling by the EPA saying:  Well, we don't really

23  have time to deal with this because you didn't do it in this

24  form and, therefore, we are going to deny that.  That's not

25  going to be very helpful.  That's not what I'm hoping for.  I'm

1    hoping for a substantive review.

2        And I think, you know, you can meet-and-confer and see if

3    you can come up with something that -- I won't call it

4    pre-clearance, but something sort of pre-cleared by the EPA so

5    you know it's not just going to be kicked out on procedural

6    grounds.  It will be whatever the form is sufficient to trigger

7    substantive review.

8        I mean, it seems to me that, you know, the better minds in

9    the legal field, including yours, all of you, should be able to

10   figure that out.

11           **MR. CONNETT:**  Your Honor, on behalf of plaintiffs, I

12   am happy to speak with EPA to discuss some of these

13   possibilities.

14       I would note for the Court a concern that I have, just

15   thinking about this now.  And that is that as you may imagine,

16   this has been a pretty -- for citizen groups has been, I think

17   fair to say, a massive undertaking.  We have spent now about

18   four years.

19       And the concern I have is if we -- you know, the idea of

20   starting a new petition, the resources and time involved with

21   that is something that may be prohibitive for the citizen

22   groups.

23       So, you know, we certainly believe we have presented

24   sufficient evidence to demonstrate a risk under the proper

25   standard under Section 6.

1        So that is our -- that's my main concern, Your Honor, as I

2   think through this out loud.

3        The -- so I just want to just put that out there for the

4   Court.  That's my main concern, thinking about this.

5        Another thing, thinking out loud here, is to the extent

6   that this was to be stayed in some degree, in some fashion, we

7   would certainly want to see EPA do something now to help begin

8   trying to protect the public.  For example, starting to warn

9   people, pregnant mothers, about the risk that we now see here

10  in the science.

11       Because EPA has done absolutely nothing.  And, you know,

12  it's -- you know, as we saw in the Bradford Hill statement,

13  Your Honor, you know, we can't ignore the evidence that we have

14  in front of us.  And for so long the EPA has done nothing.

15  They've done nothing to protect the public from the risks.

16       And we could do a risk evaluation that lasts another four

17  years.  And in the meantime, you have hundreds of millions of

18  people who are experiencing this risk.

19       And the statute, the Toxic Substances Control Act, was

20  designed -- was designed for the precise purpose of not having

21  to expose people for risks.  Just, you know, so you wait for

22  the final proof, to the final causation.  Congress amended

23  TSCA --

24            **THE COURT:**  It does require, before a regulatory

25  action is mandated, a finding of unreasonable risk, even if not

```
 1   causation.

 2        And so what you're asking for is almost -- I don't know if

 3   you're asking for the Court to order something or you're saying

 4   that's something that you'd like the EPA to do.

 5        MR. CONNETT:  Yes, Your Honor.  It's what gives me

 6   apprehension about any process that would conceivably extend

 7   this by potentially years, is that we are back to the situation

 8   where we have a clearly identifiable --

 9        THE COURT:  I don't know about years.  I didn't say

10   this case was going away.  This case has been tried.  I have

11   the record and if I have to, I will rule on it.

12        But I'm thinking months, not years.  Because for you to

13   re-craft -- and I understand the resource issue.  But, frankly,

14   you've devoted so much -- so many resources into this case, and

15   you've got a lot there.  You may have to do a little -- may

16   have to do some work.  I don't know how much more.  But if you

17   can get it in a form that is sufficient to trigger substantive

18   review, you know that once you do file it, there is a 90-day

19   clock on it and, you know, then we'll see where we're at.

20        So however long it takes you to re-craft --

21   meet-and-confer and then re-craft something.  You file it.

22   It's a matter of months, not years.  And if it comes back here,

23   in whatever form it comes back, we've already tried this case,

24   you know, and -- so you wouldn't be starting from scratch.

25   It's not like starting all over again, I wouldn't think.
```

1    Now, you know, if you file a new action based on a new

2  petition, we have to figure out whether we consolidate.  I'm

3  not going to forecast every procedural nuance.  But I don't

4  anticipate that I will be sitting on this for years if there is

5  no resolution.

6         MR. CONNETT:  Understood, Your Honor.  I'd like --

7         THE COURT:  Go ahead.

8         MR. CONNETT:  I was going to ask for any guidance

9  from the Court in terms of -- I'm happy to, like, begin a

10  meet-and-confer process immediately with Ms. Carfora and DOJ

11  counsel to just start discussing this; right?

12    Any guidance from the Court as to whether -- you know, in

13  terms of meeting back up with the Court to discuss this

14  further, kind of that sort of time frame?

15         THE COURT:  Yeah.  My plan would to be ask you to

16  meet-and-confer, to see if you can figure out a procedural, you

17  know, mechanism and a process that would effectuate what I'm

18  talking about.

19    And then I'd like to have a further status conference to

20  see where we're at.  I don't know how many -- you know, sort

21  of I leave it to you whether that's three weeks out, you know,

22  two weeks?  Four weeks?  Five weeks?  You know, whatever you

23  think.  Six weeks?  Two months?  You know...

24         MR. CONNETT:  For plaintiff's position, it would be

25  the earlier.  So we -- would, if it's two weeks or three weeks,

1    that would be our preference.

2              **MS. CARFORA:**  We request at least 30 days, Your

3    Honor.

4              **THE COURT:**  All right.  Well, I think that's a fair

5    request, because it's a big ask.  I understand that.  And there

6    are limitations on both sides.  There's resource issues,

7    frankly, on both sides.  You've got EPA with all its

8    priorities, statutory priorities, and everything that's going

9    on.  You've got citizen plaintiffs with limited resources, and

10   so I understand that.

11        And, yet, I'm trying to think of what the most coherent

12   way to approach this overall problem is, and it just seems to

13   me this -- that makes sense.

14        So why don't I -- Angie, why don't we set a come-back

15   status conference in 30 days?  And then if I can ask you, just

16   send me a joint statement, a brief update as to whether you

17   are, you know, five days before.

18             **MR. CONNETT:**  Will do, Your Honor.

19             **THE COURT:**  Okay.

20             **MR. CONNETT:**  Your Honor, in terms of post trial

21   briefing with respect to findings of fact or briefing on

22   standing, what is your -- what is the Court's preference on

23   that?

24             **THE COURT:**  Well, I would like to have that.  I'm

25   hesitant to impose on counsel, you know, to do two things at

1    once.  But since it is fresh in your minds, fresh in our minds

2    and, you know, there is a likelihood I'm going to have to rule

3    one way or the other.  I mean, that is a possibility.

4         And what I said initially about having findings of fact

5    that's keyed to some document cites, some exhibits, that's very

6    helpful.  Otherwise, this is -- even though it's only been a

7    two-week trial, there is a lot here.  So I would like that.

8         You know, normally I would ask a for that in a couple

9    weeks, but I'm not going to do that.  I'll give you some more

10   time.  I would say within the same 30-day period, if you could

11   do that?

12         MS. CARFORA:  Your Honor, we would actually request

13   60 days for that, and here is why.

14         We're going to meet-and-confer and have this process.

15   We're happy to do that.  But the agency does have a number of

16   risk evaluations that are being finalized right now and being

17   published, and the program is very taxed right now.

18         And, you know, I just -- I think 30 days to do both post

19   trial briefing and have the type of conversations we need to

20   have within the agency and with DOJ around some potential

21   alternatives here is just going to take a little bit more time

22   for us.

23         And so if -- if we want to confer in 30 days and have 60

24   days for post trial briefing, or the other way around, but I --

25   I don't think we can do both in 30 days.

PROCEEDINGS

1          **MR. CONNETT:**  Could we ask for 45 days, Your Honor?

2          **THE COURT:**  Let me tell you, I have one very

3    practical limitation, and that is my staff that's been working

4    with me on this case, there is -- as you know, there's always a

5    turnover.  And the last thing I want is to get findings of fact

6    and have somebody new who has never heard this case.  I don't

7    think it would be to your benefit or to mine.

8          So, if anything, that's going to be a priority.  I would

9    rather give you more time to talk about the resolution.  I do

10   need those findings of fact and conclusions of law.  I can give

11   you --

12         **MR. CONNETT:**  From plaintiff's perspective, we can

13   get those to you next -- we can get them as soon as you want

14   them.  Obviously, at the same time as EPA does, but we have no

15   concern about getting them to you whenever you want them.

16         **THE COURT:**  I will need them by July 27th.  That

17   gives you the weekend, but I will need those by the 27th.

18         **MS. CARFORA:**  And can you -- I'm sorry.  It's not

19   post trial briefing.  It's just an update on the --

20         **THE COURT:**  Yeah, I don't need -- I've heard your

21   argument.  I don't think I need any more sort of argumentation.

22   Actually, if you could take whatever -- and you don't have to

23   change your actual findings of fact because you've already

24   submitted those, but update those to what the evidence

25   conformed to.  Really, the citation that's helpful.

PROCEEDINGS

```
 1          MR. CONNETT:  And, Your Honor, on the briefing.
 2   Plaintiffs would like to, with the Court's permission, submit a
 3   brief on standing, because we do believe that there is
 4   additional case law that we haven't yet addressed, and we
 5   believe we can provide the Court a very helpful analysis of the
 6   evidence.
 7          THE COURT:  That is the one issue that I was going to
 8   ask.  I started to ask Ms. Carfora some of those questions.
 9          So I would like to give the parties a chance to re-brief
10   the standing issue, now that we have the record and.  So
11   that -- I don't need, you know, 50 pages.  I need maybe 10 to
12   15 pages at most on the standing question.  Because you've
13   already briefed that to a certain extent.  I will re-look at
14   that.
15          But, yes, if you could submit briefing on standing.  And
16   you can do cross briefs on that.  I don't need, you know, sets
17   of three briefs.  You can cross brief that, let's say, in 14
18   days?  That's a legal question; right?  So it shouldn't be that
19   hard.  Largely a legal question.
20          MR. CONNETT:  And with respect to systematic review,
21   would Your Honor want any additional briefing on that?
22          THE COURT:  I don't need any more briefing on that.
23          MS. CARFORA:  Your Honor, the standing brief, 14 days
24   from today?
25          THE COURT:  Yeah.
```

PROCEEDINGS

```
 1              MR. CONNETT:  And the findings of fact, Your Honor,
 2    did you say July 27th?
 3              THE COURT:  Yeah.
 4              MS. CARFORA:  I don't think we actually set a date
 5    for the status conference.
 6              THE COURT:  Angie was going to give me a status
 7    conference date.
 8         Do you want it more than 30 days, since you'll have to be
 9    working on this.  Like, 45 days?
10              MS. CARFORA:  Yes.  That would be great.  Thank you.
11              THE COURT:  Angie, 45 days out.
12              THE CLERK:  Your Honor, July 30th.
13              MS. CARFORA:  Your Honor, that's not very --
14              THE COURT:  Let's go a little longer than that.  How
15    about the week after that?
16              MR. CONNETT:  Oh --
17              THE CLERK:  August 6th at 10:30.
18              THE COURT:  Okay.  All right.
19              MS. CARFORA:  Can I --
20              THE COURT:  Yes.
21              MS. CARFORA:  I assume, Your Honor, because we're
22    just so good at it at this point, we can do that either via
23    teleconference or Zoom?
24              THE COURT:  Yeah.  Yeah.  We're not -- highly
25    unlikely we'll have any live civil hearings for awhile.  So
```

PROCEEDINGS

 1   we'll do this by Zoom again.

 2              **MS. CARFORA:**  Great.

 3         **THE COURT:**  We'll send out a notice for that.

 4         **MR. CONNETT:**  I might be on vacation, Your Honor, so

 5   I might be in a little bit more informal place, but that works.

 6         **THE COURT:**  I understand.  Well, if you're going to

 7   do that, I'll take off my robe and my tie because it's been

 8   killing me.

 9         All right.  So let's do that.  And at this point the

10   record for the trial is closed.  It's completed.  And subject

11   to receiving your proposed findings of fact and conclusions of

12   law, I will await to take it under submission.  But so that's

13   the state of the record at this point.

14         So let me thank the parties.  I know both of you have

15   worked very hard, and this is a complicated issue.  And I have

16   found that the presentations have been informative and very

17   helpful.  So thank you.

18         **MR. CONNETT:**  Thank you, Your Honor.

19         **MS. CARFORA:**  Thank you.

20         And we thank -- can we thank Angie for how wonderful she

21   was figuring out the Zoom so quickly and making everything run

22   so incredibly smoothly.

23         **THE COURT:**  I will join in that thanks.  I see you're

24   smiling.

25         **THE CLERK:**  You're very welcome.

PROCEEDINGS

1          **THE COURT:**  She's done a terrific job.  Especially

2     this is our first time out doing this and, I think it worked

3     well.

4          I also want to thank our IT staff.  Buz, who you met a

5     couple times, really was instrumental in making sure this

6     worked.  But I think this shows that the process, not ideal,

7     but, you know, on these -- in these difficult times at least we

8     can still do court business.  So thank you for your -- your

9     flexibility as well.  I appreciate it.

10         **MS. CARFORA:**  Thank you.

11         **MR. CONNETT:**  Thank you, Your Honor.

12         **THE COURT:**  Thank you.

13         **THE CLERK:**  Court is adjourned.

14         (Proceedings adjourned.)

## I N D E X

WEDNESDAY, JUNE 17, 2020 - Volume 7

|                                        | **PAGE** | **VOL.** |
|----------------------------------------|----------|----------|
| Closing Argument by Mr. Connett        | 1045     | 7        |
| Closing Argument by Ms. Carfora        | 1067     | 7        |
| Rebuttal Argument by Mr. Connett       | 1123     | 7        |

| **PLAINTIFF'S REBUTTAL WITNESSES**     | **PAGE** | **VOL.** |
|----------------------------------------|----------|----------|
| **THIESSEN, KATHLEEN**                 |          |          |
| (PREVIOUSLY SWORN)                     | 1034     | 7        |
| Direct Examination by Mr. Connett      | 1034     | 7        |
| Cross-Examination by Ms. Bhat          | 1038     | 7        |

- - -

## E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|--------------------|----------|----------|----------|
| 32                 |          | 1033     | 7        |

— — —

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, June 17, 2020