C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
KAY GUNDERSON REEVES, ESQ., *Pro Hac Vice*
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, et al., | Civ. No. 17-CV-02162-EMC |
| Plaintiffs, | **PLAINTIFFS' SUPPLEMENTAL BRIEFING ON STANDING** |
| vs. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al. | |
| Defendants. | |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................................1

II.   PLAINTIFFS FALL WITHIN THE ZONE OF INTERESTS OF SECTION 21 .............................1

III.  PLAINTIFFS HAVE ARTICLE III STANDING BASED ON THE CREDIBLE THREAT
THAT FLUORIDATION POSES TO THEIR HEALTH.................................................................2

A.    Plaintiffs Do Not Need to Prove Causation, or Demonstrate a Quantitative Risk, to Establish an
Injury for Article III Standing: A Credible, Qualitative Threat Is Sufficient....................................2

B.    Plaintiffs Are Suffering an Economic Injury Based on the Credible (Non-Speculative) Threat of
Neurological Injuries from Fluoridated Water .................................................................................5

1.    It Is Undisputed that Plaintiffs Are Suffering an Economic Injury................................................5

2.    It Is Undisputed that Fluoride Is a Neurotoxicant, and Abundant Evidence Demonstrates a
Risk of Neurotoxicity at the Levels Added to Drinking Water .......................................................5

3.    Fluoridated Water Poses a Credible Threat to Julie Simms ..........................................................7

4.    Fluoridated Water Poses a Credible Threat to Kyle Adams...........................................................9

5.    Fluoridated Water Poses a Credible Threat to Kristin Lavelle.....................................................10

IV.   PLAINTIFFS ALSO HAVE ARTICLE III STANDING BASED ON EPA'S ATTEMPT TO
DEPRIVE THEM OF THEIR PROCEDURAL RIGHT TO A *DE NOVO* TRIAL ..............................11

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Animal Welfare Institute v. Kreps*,

4
    561 F.2d 1002 (D.C. Cir. 1977), *cert. denied* 434 U.S. 1013 (1978) ....................................12

*Association of Community Organizations for Reform Now v. Fowler*,

5
    178 F.3d 350 (5th Cir. 1999) ..........................................................................................3

6

*Association of Data Processing Service Organizations, Inc. v. Camp*,

7
    397 U.S. 150 (1970) ........................................................................................................3

8

*Basel Action Network v. E.P.A.*,
    No. 11-cv-6185-EMC 2012 WL 2279248 (N.D. Cal June 18, 2012) ................................13

9

*Bassett v. ABM Parking Services, Inc.*,

10
    883 F.3d 776 (9th Cir. 2018) ...................................................................................12, 13

11

*Baur v. Veneman*,
    352 F.3d 625 (2dCir. 2003) ............................................................................................3

12

*Bennett v. Spear*,

13
    520 U.S. 154 (1997) ....................................................................................................1,

14

*Campbell v. Facebook, Inc.*,
    951 F.3d 1106 (9th Cir. 2020) .......................................................................................12

15

*Central Delta Water Agency v. U.S.*,

16
    306 F.3d 938 (9th Cir. 2002) ..........................................................................................3

17

*Conservation Council of North Carolina v. Costanzo*,
    505 F.2d 498 (4th Cir.1974) ...........................................................................................3

18

*Council of Ins. Agents & Brokers v. Molasky-Arman*,

19
    522 F.3d 925 (9th Cir. 2008) ..........................................................................................3

20

*Covington v. Jefferson Cnty.*,
    358 F.3d 626 (9th Cir. 2004) ..........................................................................................3

21

*Ecological Rights Foundation v. Pacific Lumber Co.*,

22
    230 F.3d 1141 (9th Cir. 2000) ........................................................................................3

23

*Environmental Defense Fund v. Thomas*,
    657 F.Supp. 302 (D.D.C. 1987)....................................................................................13

24

*Food & Water Watch et al. v. U.S. Environmental Protection Agency*,
    302 F.Supp.3d 1058 (N.D. Cal. 2018)...........................................................................13

25

*Friends of the Earth, Inc. v. Laidlaw Env'l Servs. (TOC), Inc.*,

26
    528 U.S. 167 (2000)…………….....................................................................................3

27

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,

28
    204 F.3d 149 (4th Cir. 2000) ..........................................................................................2

*Hall v. Norton,*
266 F.3d 969 (9th Cir.2001) ........................................................................................3

*Hernandez v. Monsanto Company,*
No. 16-cv-1988-DMG, 2016 WL 6822311 (C.D.Cal. July 12, 2016) ......................13

*In re Paoli R.R. Yard PCB Litigation,*
916 F.2d 829 (3d Cir. 1990) ....................................................................................13

*Kirola v. City and County of San Francisco,*
860 F.3d 1164 (9th Cir. 2017) ...................................................................................3

*LaFleur v. Whitman,*
300 F.3d 256 (2d Cir. 2002) ..................................................................................3, 5

*Linda R.S. v. Richard D.,*
410 U.S. 614 (1973) .................................................................................................12

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) .................................................................................................12

*Massachusetts v. E.P.A.,*
549 U.S. 497 (2007) .................................................................................................12

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) ...................................................................................................5

*Natural Resources Defense Council v. Jewell,*
749 F.3d 776 (9th Cir. 2014) ...................................................................................12

*Natural Resources Defense Council v. United States Environmental Protection Agency,*
735 F.3d 873 (9th Cir. 2013) .............................................................................3, 4, 5

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
402 F.3d 846 (9th Cir. 2005) .....................................................................................3

*Patchak v. Salazar,*
632 F.3d 702 (D.C. Cir. 2011) .................................................................................12

*Pierce v. S. Pac. Transp. Co.,*
823 F.2d 1366 (9th Cir. 1987) ...................................................................................7

*Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.,*
913 F.2d 64 (3d Cir. 1990) ........................................................................................3

*Raduga USA Corp. v. U.S. Dept. of State,*
440 F.Supp.2d 1140 (S.D.Cal. 2005) ......................................................................12

*Robins v. Spokeo, Inc.,*
867 F.3d 1108 (9th Cir. 2017) ...........................................................................12, 13

*Safer Chemicals, Healthy Families v. U.S. Environmental Protection Agency,*
943 F.3d 397 (9th Cir. 2019) .....................................................................................3

*Saladin v. City of Milledgeville,*
812 F.2d 687 (11th Cir. 1987) ...................................................................................3

*San Luis & Delta-Mendota Water Authority v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ...................................................................................... 3

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) .................................................................................................... 12

*Skyline Wesleyan Church v. California Dep't of Managed Health Care*,
  959 F.3d 341 (9th Cir. 2020) ...................................................................................... 7

*Spokeo, Inc. v. Robins*,
  ___ U.S. ___, 136 S.Ct. 1540 (2016) .................................................................... 3, 12

*United States v. Students Challenging Regulatory Agency (SCRAP)*,
  412 U.S. 669 (1973) ...................................................................................................... 3

*Van Patten v. Vertical Fitness Grp.*,
  847 F.3d 1037 (9th Cir. 2017) ................................................................................ 12, 13

*Warth v. Seldin*
  422 U.S. 490 (1975) .................................................................................................. 3, 12

*Washington Environmental Council v. Bellon*
  732 F.3d 1131 (9th Cir. 2013) .................................................................................... 7

*Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) .................................................................................................... 12

**Statutes**

15 United States Code § 2620(a) ...................................................................................... 1

15 United States Code § 2620(b)(4) .................................................................................. 1

16 United States Code § 1540(g) ...................................................................................... 1

33 United States Code § 1365 ............................................................................................ 2

**Other Authorities**

Restatement (2d) of Torts §§ 388, 402A ........................................................................ 13

## I.      INTRODUCTION

Pursuant to this Court's June 17 request, Plaintiffs hereby submit supplemental briefing on the issue of standing.  As this Court ruled in December, the Plaintiffs' claims fall squarely within the zone of interests protected by Section 21 of TSCA. Plaintiffs also have Article III standing because they are suffering economic injuries in order to protect against the credible threat of neurological injuries from fluoridation chemicals, including IQ loss, headaches, pain sensitivity, and dementia. In addition, EPA's attempt to deprive Plaintiffs of their statutory right to obtain this Court's oversight in the instant *de novo* proceeding is a "procedural harm" sufficient to constitute an independent and separate grounds for Article III standing.

## II.     PLAINTIFFS FALL WITHIN THE ZONE OF INTERESTS OF SECTION 21

During closing argument, EPA's counsel reasserted a standing argument that this Court rejected when ruling on summary judgment—that Plaintiffs only have standing if their actual or threatened injuries fall within the zone of interest of their citizen's *petition.* 6/17 Tr. 1069:20-1070:23.[1]  But the "zone of interest" test asks whether the plaintiff's interest is one intended to be protected by a *statute*, not any "interests" that may be described in the substance of a citizen's petition or complaint filed pursuant to that statute.[2]  As this Court previously recognized, since Section 21 of TSCA allows "any person" to petition EPA to initiate a rulemaking under Section 6(a) and any unsuccessful "petitioner" to "commence a civil action" to compel the EPA to initiate that rulemaking, the petitioning Plaintiffs here fall within the Section 21 zone of interest.[3]  As the Supreme Court has previously noted when construing the citizen suit provision in the Endangered Species Act (which, like TSCA, allows "any person" to sue to enjoin the conduct of persons alleged to be violating the Act), such broad language is "an authorization of remarkable breadth" that should be taken at face value:[4]

> Our readiness to take the term "any person" at face value is greatly augmented by two interrelated considerations: that the overall subject matter of this legislation is the environment (a matter in which it is common to think all persons have an interest) and that the obvious purpose of the particular provision in question is to encourage enforcement by so-called "private attorneys

---

[1] Order on Motion for Summary Judgment (ECF No. 156) at 6.

[2] *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) ("'[T]he zone-of-interests analysis . . . asks whether 'this particular class of persons ha[s] a right to sue under this substantive statute.'").

[3] 15 U.S.C. § 2620(a), (b) (4); Order on Motion for Summary Judgment (ECF No. 156) at 5.

[4] *Bennett v. Spear,* 520 U.S. 154, 164 (1997) (construing 16 U.S.C. § 1540(g)).

1

general" . . . .[5]

Consistent with this, an *en banc* panel of the Fourth Circuit held that similar (albeit more restrictive) language in the citizen suit provision of the Clean Water Act permits standing to the full extent of Article III, thus eliminating any need for a "zone of interest" inquiry.[6] Plaintiffs have found no case denying standing to unsuccessful TSCA petitioners based on a "zone of interests" analysis.

Even assuming, *arguendo,* that the Plaintiffs' injuries *do* have to fall within the scope of the injuries plead in the petition or the complaint, Plaintiffs satisfy this requirement.  As this Court has recognized, both the complaint and the petition sought a rulemaking to prohibit the addition of fluoride to drinking water in the interest of preventing "neurotoxic risks of fluoride,"[7] including "neurological symptoms." EPA Ex. 515 at 008. The headaches, pain sensitivity, and increased risk of dementia complained of by the Plaintiffs *are* all neurological injuries. Thiessen Dec. ¶¶ 181-5 & Grandjean Dec. ¶ 74 (dementia/cognitive decline); Grandjean Dec. ¶¶ 59, 74 & Thiessen Dec. ¶ 61 (headache); Thiessen Dec. ¶ 7 & Tsuji Dec. ¶ 94 (pain sensitivity); Lavelle Dec. ¶¶ 5-10; Adams Dec. ¶¶ 3-18; Simms Dec. ¶¶ 4-15.  Moreover, Plaintiff Kristin Lavelle has sustained economic injury in a specific attempt to protect her son Neal from the IQ deficits and other neurodevelopmental harms associated with fluoride in drinking water. Lavelle Dec. ¶¶ 3-4, 10-13 and Exhibits A-D.  Thus, even if, as EPA contends, at least one Plaintiff has to suffer a non-speculative injury "focused on . . . IQ deficits or cognitive effects," *see* 6/17 Tr. 1067:15-18, Lavelle's expenditure of money to prevent her son Neal from suffering just such injuries satisfies that test.

## III.   PLAINTIFFS HAVE ARTICLE III STANDING BASED ON THE CREDIBLE THREAT THAT FLUORIDATION POSES TO THEIR HEALTH

### A.   Plaintiffs Do Not Need to Prove Causation, or Demonstrate a Quantitative Risk, to Establish an Injury for Article III Standing: A Credible, Qualitative Threat Is Sufficient

In its pre-trial briefing, EPA misstated Plaintiffs' burden on standing in multiple material respects. EPA asserted that Plaintiffs must prove that their exposure to fluoride "caused" them to suffer a neurological injury. This is not so. Indeed, causation is not even the Plaintiffs' burden on the merits of

---

[5] *Bennett,* 520 U.S. at 164-5.

[6] *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000) (*en banc*) (construing 33 U.S.C. § 1365 and holding that "if a Clean Water Act plaintiff meets the constitutional requirements for standing, then he *ipso facto* satisfies the statutory threshold as well").

[7] Order on Motion for Summary Judgment (ECF No. 156) at 6.

their Section 21 claim, as Dr. Tala Henry admitted at trial. 6/16 Tr. 986:20-987:18. Since the standing inquiry "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal,"[8] Plaintiffs' burden for establishing standing is *less* than its burden of prevailing on the merits.  As EPA conceded at trial, a plaintiff will have Article III standing under TSCA if his or her injuries are "non-speculative." 6/17 Tr. 1069:6-19. Further, as the Ninth Circuit and other federal appellate courts have made clear, an injury exists under Article III if there is a *credible threat* that an injury may occur, as will now be addressed.

The Ninth Circuit has repeatedly recognized that a "credible threat" of an injury is sufficiently concrete to constitute an injury-in-fact under Article III.[9] The degree of risk sufficient to support standing "is qualitative, not quantitative, in nature."[10] And the qualitative bar is modest: "'The basic idea that comes out in numerous cases is that an *identifiable trifle* is enough to fight out a question of principle.'"[11] Thus, a "threatened injury" or a "risk of real harm" is sufficiently concrete,[12] as is an injury that is purely aesthetic or "minimal" in significance.[13]

---

[8] *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970); *Kirola v. City and County of San Francisco*, 860 F.3d 1164, 1175 (9th Cir. 2017); *Ecological Rights Foundation v. Pacific Lumber Co*., 230 F.3d 1141, 1151-2 (9th Cir. 2000).

[9] *Natural Resources Defense Council v. United States Environmental Protection Agency*, 735 F.3d 873, 875-6, 878 (9th Cir. 2013); *see also San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 645 (9th Cir. 2014) ("'[A] credible threat of harm is sufficient to constitute actual injury for standing purposes, whether or not a statutory violation has occurred.'"); *Covington v. Jefferson Cnty.*, 358 F.3d 626, 641 (9th Cir. 2004) ("A credible threat of risks to [plaintiffs'] home yields a loss of enjoyment of property. That is enough for injury in fact . . . ."); *Central Delta Water Agency v. U.S*., 306 F.3d 938, 950 (9th Cir. 2002); ("[A] credible threat of harm is sufficient to constitute actual injury for standing purposes . . . ."); *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001) ("[E]vidence of a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of injuries to cognizable interests that may confer standing.").

[10] *Baur v. Veneman*, 352 F.3d 625, 637 (2dCir. 2003); *Association of Community Organizations for Reform Now v. Fowler*, 178 F.3d 350, 357–58 (5th Cir. 1999); *Saladin v. City of Milledgeville*, 812 F.2d 687, 691 (11th Cir. 1987).

[11] *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008) (quoting *United States v. Students Challenging Regulatory Agency (SCRAP)*, 412 U.S. 669, 689, n. 14 (1973)); *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002); *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc*., 913 F.2d 64, 71 (3d Cir. 1990) (identifiable trifle sufficient); *Conservation Council of North Carolina v. Costanzo*, 505 F.2d 498, 501 (4th Cir. 1974) (same).

[12] *Safer Chemicals, Healthy Families v. U.S. Environmental Protection Agency*, 943 F.3d 397, 411 (9th Cir. 2019); *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S.Ct. 1540, 1549 (2016) (citing cases).

[13] *Pacific Lumber Co*., 230 F.3d at 1149 (9th Cir. 2000); *see also Friends of the Earth v. Laidlaw Env'l Servs. (TOC), Inc.*, 528 U.S. 167, 181-82 (2000) (finding standing where organization member refrained from swimming because water "looked and smelled polluted"); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859–60 (9th Cir. 2005) (stating that an injury exists if plaintiffs can credibly show that their future life will be less enjoyable if an area remains or becomes environmentally degraded).

The Ninth Circuit relied on this "credible threat" analysis in a 2013 decision in which the Natural Resources Defense Council ("NRDC") challenged EPA's finding that pesticides containing nanosilver (tiny particles of silver that suppress the growth of microbes in textiles) could be conditionally registered under FIFRA because they did not cause any unreasonable adverse effects to human health or the environment.[14] As here, EPA argued that the injuries asserted were too speculative, but the Ninth Circuit disagreed. The court explained that due to the "ubiquity" of textiles and the lack of information about nanosilver pesticide use on them, it was "nearly impossible for NRDC members to eliminate [pesticide]-treated textiles from their children's lives."[15] The Ninth Circuit thus held that the plaintiffs had standing because "NRDC has shown a 'credible threat' that its members' children will be exposed to [the pesticide] as a consequence of the EPA's conditional registration decision."[16] Notably, in its analysis of the standing evidence, the Ninth Circuit neither considered nor demanded expert scientific evidence establishing the health risks that children would face at expected exposure levels.

As in *NRDC*, it is also "nearly impossible" for the Plaintiffs here to eliminate their exposure to fluoridated water because many processed beverages and foods are made with fluoridated water and there are no labeling requirements to indicate the fluoride content of any given product. Grandjean Dec. ¶ 156; 6/9 Tr. 176:23-177:7 (Grandjean); Thiessen Dec. ¶¶ 155 & 219; Pls' Ex. 53 ¶ 15 (Lavelle Dec.); Pls' Ex. 55 ¶ 13 (Staudenmaier Dec.). Thus, as in *NRDC*, Plaintiffs face a credible threat of ongoing exposure to fluoridated water through processed beverages and foods.[17]

The Ninth Circuit's standing analysis in *NRDC* is consistent with the standing analysis in other federal cases involving exposures to environmental toxicants. In *LaFleur v. Whitman*,[18] the plaintiff lived and worked within blocks of a facility that had been approved to emit increased sulfur dioxide (SO2) emissions into the plaintiff's neighborhood.  Though evidence established that the SO2 emissions *would be well within federal air quality standards*, the *LaFleur* court nonetheless held that the plaintiff had

---

[14] *NRDC,* 735 F.3d at 875-6, 878 (citing cases).

[15] *Id.* at 878.

[16] *Id.*

[17] Urinary fluoride tests confirm that Brenda Staudenmaier often has elevated levels of fluoride in her urine, which is consistent with exposure to fluoridated water via processed beverages. Pls' Ex. 55 ¶ 13 (Staudenmaier Dec.); Grandjean Dec. ¶ 156.

[18] 300 F.3d 256, 271 (2d Cir. 2002).

standing, focusing—as did the *NRDC* court—on the likelihood of the unwanted additional exposure:

> Petitioner's likely exposure to additional $SO_2$ in the air where she works is certainly an "injury-in-fact" sufficient to confer standing. . . . Actual exposure to increased levels of SO2 at one's workplace is certainly something more than an "identifiable trifle," *even if the ambient level of air pollution does not exceed the NAAQS*.[19]

Again, as in *NRDC*, the *LaFleur* court did not require evidence establishing that specific health risks existed at specific levels of exposure. A similar analysis can be found in *New York Public Interest Research Group v. Whitman*.[20] There, the Second Circuit held that exposure to polluted air is sufficient to establish standing even in the absence of evidence demonstrating excess exposure or harm.[21]

### B.   Plaintiffs Are Suffering an Economic Injury Based on the Credible (Non-Speculative) Threat of Neurological Injuries from Fluoridated Water

### 1.   It Is Undisputed that Plaintiffs Are Suffering an Economic Injury

The Supreme Court has held that economic costs incurred to avoid a credible risk of harm constitute an injury-in-fact for Article III.[22] Here, it is undisputed that Plaintiffs have suffered economic injury to protect themselves from the risks posed by fluoridated water. Pls' Ex. 52 ¶ 10 (Food & Water Watch Dec.); Pls' Ex. 53 ¶¶ 10-14, 16 & Exhibits A-D (Lavelle Dec.); Pls' Ex. 54 ¶¶ 16-20 & Exhibits G, H & K (Simms Dec.); Pls' Ex. 55 ¶¶ 7, 12, 14 & Exhibits A-B (Staudenmaier Dec.); Pls' Ex. 56 ¶¶ 18-19 & Exhibit G (Adams Dec.); Pls' Ex. 57 ¶¶ 7-8 (Trader Dec.). This economic injury long predates the filing of this lawsuit and reflects the genuine nature of Plaintiffs' concerns. *See, e.g.*, Pls' Ex. 53 at 008-052 (showing expenses for bottled water and filtration devices dating back to 2013); Pls' Ex. 54 at 021 (showing expense for water filtration device from 2014); Pls' Ex. 56 at 067 (showing expenses for bottled water dating back to January 2016).

### 2.   It Is Undisputed that Fluoride Is a Neurotoxicant, and Abundant Evidence Demonstrates a Risk of Neurotoxicity at the Levels Added to Drinking Water

Plaintiffs have introduced abundant evidence—much of which is uncontroverted—that fluoride is

---

[19] *LaFleur*, 300 F.3d at 270-271 (emphasis added).
[20] 321 F.3d 316 (2d Cir. 2003).
[21] *Id*. at 325-26.
[22] *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-154 (2010).

a neurotoxicant and is associated with adverse neurotoxic effects at the concentration (0.7 mg/L) added to drinking water. As to *hazard*, the National Research Council (NRC) concluded in 2006 that "fluoride interferes with the functions of the brain and body by both direct and indirect means." Pls' Ex. 13 at 222. The Centers for Disease Control (CDC) agrees with the NRC on this finding as well as the NRC's more specific findings on fluoride neurotoxicity. ECF No. 232 (2d. Am. App. C - Hannan) at 12:21-24; 15:18-19:26. The Director of EPA's Integrated Risk Information System (IRIS), Dr. Kristina Thayer, agrees that fluoride damages the brain in animal studies, and that the animal data supports the biological plausibility of fluoride causing neurotoxic effects in humans. 6/10 Tr. 449:18-25, 450:9-13. Even EPA's litigation expert, Dr. Joyce Tsuji, agrees that fluoride is a neurotoxicant at some level. 6/15 Tr. 720:14-16.

As to *risk*, the prospective cohort studies funded by the National Institutes of Health (NIH) have each found significant associations between "optimal" exposures to fluoride and adverse neurotoxic effects. Hu Dec. ¶ 13; Lanphear Dec. ¶¶ 14-15. It is undisputed that the NIH-funded studies are well conducted and, indeed, the most rigorous studies to date on fluoride neurotoxicity. 6/15 Tr. 886:6-13 (Chang); ECF No. 232 (2d Am. App. C - Donohue) at 31:16-25; 36:5-17. Further, an assessment of the epidemiological literature under the Bradford Hill guidelines *supports a causal relationship* between fluoridated water and neurotoxicity (Grandjean Dec. ¶¶ 111 & 125; 6/9 Tr. 209:19-210:14), and a benchmark dose (BMD) analysis shows that the levels of fluoride associated with IQ loss are substantially exceeded among pregnant women living in fluoridated communities. Grandjean Dec. ¶¶ 143-147. Moreover, human exposure to fluoride from fluoridated water exceeds the full range of reference doses (including the *least protective*) that can be derived from the animal data, which adds confidence to the BMD analysis. Thiessen Dec. ¶¶ 154 & 174.  Finally, a "margin of exposure" analysis—which is EPA's preferred method for assessing non-cancer risk under TSCA—produces the same result as the RfD analysis, including for adults and the elderly.  *Id.* ¶¶ 114, 191-192, 194 & 200-201. Based on EPA's standard methods for assessing risk, therefore, a risk of neurotoxicity clearly exists from the consumption of fluoridated water. Grandjean Dec. ¶¶ 144-145; Thiessen Dec. ¶ 201. The Plaintiffs have thus introduced more than sufficient evidence (*particularly for standing purposes*) to demonstrate both that fluoride can damage the brain, and that this hazard is a risk at the levels of fluoride added to drinking water.

### 3.     Fluoridated Water Poses a Credible Threat to Julie Simms

At the age of 14, San Francisco resident Julie Simms began suffering from headaches on a regular basis. Pls' Ex. 54 ¶¶ 3-4 (Simms Dec.).  Julie was a believer in the safety of fluoride (and would vote to add it to the water in Newport Beach as an adult) and thus had no inclination to suspect fluoride as a trigger of her headaches.  Simms Dec. ¶ 8 & Exhibits A-C.  As she moved between cities, Julie would experience severe and regular headaches in those she would later learn fluoridated their water (San Francisco, Palo Alto, Seattle), but lived virtually headache-free in those that did not (Chico and Newport Beach, California, and the Tottori prefecture in Japan). *Id*. ¶¶ 5-10, 13. Julie's headaches became so severe that she sought medical help for them in 1994, when she was officially diagnosed with migraines. *Id.* ¶ 6.  After spending several years in non-fluoridated Newport Beach (where she was free of her migraines), Julie relocated to San Francisco in 1998, only to have the migraines return, occurring up to 20 times each year, and bringing with them nausea and vomiting, causing her to lose about two workdays each month. *Id.* ¶¶ 7, 9.  A move to fluoridated Seattle in 2001 brought daily low-grade migraines (pain level of 2-3 on a scale of 1-10), with spikes to a pain level of 9-10 several times each month, and with some migraines lasting up to 10 days. *Id.* ¶ 10; ECF No. 232 (2d Am. App. C - Simms) at 52:16-53:28.  Julie tried (and paid for) "every remedy [she] could think of"—both prescription medications and over-the-counter treatments, dietary changes, acupuncture, vitamins, meditation, increasing and decreasing sleep, exercise, and obtaining an MRI—but did not get relief. Simms Dec. ¶¶ 11-12.

After taking a friend's suggestion to switch to non-fluoridated water in 2013, Julie experienced significant relief in three days, a development she reported to her doctor. *Id.* ¶ 13 and Ex. E.  Since then, Julie has continued to restrict her exposure to fluoride, and her daily headaches have *never* returned. ECF No. 232 (2d Am. App. C - Simms) at 55:25-56:9; 58:19-28. Julie still experiences occasional migraines, but they are not as frequent nor as debilitating as they once were—as evident by the fact that Julie no longer uses any medication to treat them.[23] *Id.* at 51:10-15; 57:17-58:18.

---

[23] Julie has identified other triggers of headaches besides fluoride, thus suggesting a heightened sensitivity to headaches in general. Contrary to what EPA implies, this does *not* provide a basis to shield the Agency from its responsibilities under the law, much like a tortfeasor "takes his victim as he finds him." *Pierce v. S. Pac. Transp. Co.*, 823 F.2d 1366, 1372 n.2 (9th Cir. 1987) (discussing "eggshell plaintiff" rule). Moreover, standing does not require "the defendant's action to be the sole source of injury." *Washington Environmental Council v. Bellon*, 732 F.3d 1131, 1142 (9th Cir. 2013); *Skyline Wesleyan Church v. California Dep't of Managed Health Care*, 959 F.3d 341, 351 (9th Cir. 2020) (same).

The temporal pattern of Julie's headaches strongly supports fluoride being a trigger, and is consistent with blinded studies of fluoride hypersensitivity that the National Research Council (NRC) has found to be credible. The studies of fluoride hypersensitivity, which include "double-blinded" studies, have reported various neurological manifestations, including headaches. 6/10 Tr. 501:14-502:14, 503:19-24 (Thiessen); 6/17 Tr. 1036:6-12 (Thiessen); Thiessen Dec. ⁋ 61; Pls' Ex. 13 at 208-9 (NRC 2006 report referencing Waldbott's experiments under "blind" conditions).[24]  The studies on hypersensitivity include studies by Dr. George Waldbott, who repeatedly found neurological manifestations from fluoride exposure under circumstances in which both the doctor (in some instances) and the patients were blinded to the fluoride content of their water. 6/10 Tr. 501:14-503:12 (Thiessen). Both the 2006 and 2009 NRC reports found the studies on fluoride hypersensitivity to be credible. 6/17 Tr. 1036:24-1037:1 (Thiessen).[25] Dr. Tsuji served with Dr. Thiessen on the committee that would ultimately publish the 2009 NRC report; Dr. Tsuji had a chance to review and comment upon all chapters and described the report as "extensively peer-reviewed."   6/15 Tr. 714:1-18; 736:20-737:7 (Tsuji). The NRC's 2009 report noted that hypersensitive reactions to fluoride occur at exposures as low as 0.02 mg/kg/day. 6/15 Tr. 738:5-23; 739:10-15 (Tsuji).  A dose of 0.02 mg/kg/day is exceeded by many adults just from drinking fluoridated water.  6/17 Tr. 1037:14-16 (Thiessen); Thiessen Dec. ¶ 153 & figure.

Dr. Grandjean also discussed the association between fluoride and headaches, identifying them as one of a number of "neurological symptoms." Grandjean Dec. ⁋ 74; 6/9 Tr. 206:5-21. In addition to discussing the Waldbott studies, Dr. Grandjean cited a 1937 study by Roholm, which found a "marked frequency of nervous disorders after employment [at a facility using cryolite, or aluminum sodium fluoride]," including headaches. Grandjean Dec. ⁋⁋ 58-9; 6/9 Tr. 206:22-207:17; 300:5-12; *see also* 6/10 Tr. 501:19-24 (Thiessen).  Further, a 2009 study by Sharma found an "[e]xcess occurrence of neurological symptoms in both adults and children in waterborne fluorosis areas, with headaches being the primary manifestation." Grandjean Dec. ⁋ 74; 6/9 Tr. 308:7-11; 305:11-15; 307: 3-5. While the relationship between fluoride and adult headaches in the Sharma study was most apparent at concentrations exceeding

---

[24] The NRC's 2006 report cites Dr. Waldbott's 1978 book, which summarizes his and others' studies on fluoride hypersensitivity. Pls' Ex. 13 at 208.

[25] As a member of the NRC committees responsible for the 2006 and 2009 reports, Dr. Thiessen was well-aware of their contents. 6/10 Tr. 467:14-468:16 (Thiessen).

1.5 mg/L, the difference between 1.5 and 0.7 mg/L is "an extremely small margin" from a risk assessment perspective. 6/10 Tr. 479:8-19 (Thiessen).

Taken together, this evidence is more than sufficient to establish a credible basis for Julie Simms's concern about the effects of fluoridated water on her health. As discussed above, Julie's own experience demonstrates a close temporal proximity between cessation of fluoridated water and cessation of her daily headaches, and shows that (unbeknownst to her at the time) the frequency of her previous headaches aligned closely with the fluoridation status of the areas in which she had lived. These observations are consistent with and further buttressed by credible double-blinded studies showing that hypersensitive reactions, including headaches, occur at doses that people can ingest from drinking fluoridated water.

### 4.    Fluoridated Water Poses a Credible Threat to Kyle Adams

Plaintiff Kyle Adams has suffered intensification of pain following exposure to fluoridated water. Pls' Ex. 56 at 010-025. In about 1999, Kyle Adams began to suffer constant pain, especially in his extremities and the back of his head, pain that was in addition to headaches so severe he had to be sent home from school on numerous occasions. Adams Dec. ⁋ 4. When his mother, Audrey, provided him with filtered, non-fluoridated water to drink, he found significant relief within days. *Id.* ⁋ 7.

Kyle's two treating doctors (Dr. Charles Butler and Dr. Nooshin Darvish) have advised him to avoid fluoride exposure. Dr. Butler opined that such exposures "will cause . . . neck pain," and identified fluoride as an "intolerance" or "allerg[y]" for Kyle that is associated with "extreme pain."  Pls' Ex. 56 (Adams Dec.) at 010 & 012. Dr. Darvish stated that "[u]pon exposure to fluoride," Kyle "immediately presents with headaches, body aches" requiring "a great deal of dietary and lifestyle changes" from both he and Audrey.  *Id.* at 025.

Increased sensitivity to pain is a neurotoxic effect. Thiessen ⁋ 79. This neurotoxic endpoint was identified in the National Toxicology Program's animal study (McPherson 2018), which—according to EPA's own experts—is the most reliable animal study on fluoride neurotoxicity ever conducted. Thiessen Dec. ⁋ 79; Tsuji Dec. ¶ 94. Dr. Tsuji agreed that the McPherson study showed significantly shorter "response latencies . . . indicative of hyperanalgesia (higher pain sensitivity)," that the chance that this finding was a fluke was less than 0.5%, and that she "would find any results of McPherson to be meaningful." Tsuji ⁋ 94; 6/15 Tr. 752:18-753:9; 755:13-16 (Tsuji).  Dr. Tsuji also agreed that the 20 mg/L

fluoride concentration used in the McPherson study is the approximate equivalent of 1.3 mg/L in human beings. 6/15 Tr. 763:18-24 (Tsuji). A hazard finding at 1.3 mg/L provides no safety margin for humans exposed at the slightly lower concentration of 0.7 mg/L. 6/10 Tr. 479:8-19 (Thiessen). Indeed, this 1.3 mg/L figure does not include the 10-fold adjustment for human-to-human (i.e., *intra*-species) variability that EPA uses in most of its risk assessments, including its risk evaluations under Section 6. Thiessen Dec. ¶¶ 133-136, 211; 6/16 Tr. 995:10-996:5 (Henry); Pls' Ex. 47 at 192; Pls' Ex. 49 at 203 & 206.

The advice and observations from Kyle's own treating doctors, along with the increased pain sensitivity reported in the NTP's animal study, provide a credible, non-speculative basis for the conclusion that fluoridated water presents a risk to Kyle.

### 5. Fluoridated Water Poses a Credible Threat to Kristin Lavelle

Finally, Plaintiff Kristin Lavelle—a health professional who works for the San Francisco Department of Public Health—has a credible fear that her present and future exposure to fluoridated water may increase her risk of developing Alzheimer's Disease or dementia in her later years. Pls' Ex. 53 ¶¶ 2, 5-7 (Lavelle Dec.). More than 15 years ago, Kristin became aware of the hazards of fluoride exposure, particularly as expressed in the NRC's 2006 report. *Id.* ¶¶ 3-4. Kristin's discovery of studies linking fluoride exposure to dementia and Alzheimer's Disease caused her to fear for her own future mental health. *Id.* ¶¶ 4-9. Kristin's research also taught her that, once consumed, fluoride bioaccumulates in bone and re-enters the bloodstream at an increasing rate as the bones begin to break down during the post-menopausal years. *Id.* ¶ 9. Because of this, the risk of fluoride causing neurologic effects during the elderly years is dependent upon how much fluoride accumulates in the bone *throughout the duration of one's life*. Thiessen Dec. ¶ 185. In order to protect against fluoride's risks during her elderly years, therefore, Kristin has taken steps to limit her *current* exposures as it is not sufficient to wait until the post-menopausal years to begin taking protective action. Lavelle Dec. ¶¶ 3, 10-16 and Exhibits A-D.

Available literature supports Kristin's concerns that the elderly have increased susceptibility to fluoride's neurotoxic effects. First, the EPA recognizes that the elderly stage of life is a "critical period[] for exposure" for neurotoxicants, and that the elderly population's sensitivity stems from the "limited ability of the [elderly person's] nervous system to regenerate or compensate to neurotoxic insult." Pls' Ex.

17 at 65.[26] Second, the NTP's 2016 study found moderate evidence establishing that fluoride impairs learning and memory in *adult* rodents.  6/10 Tr. 451:16-25 (Thayer). Moderate evidence is a descriptor that is generally used when the evidence is sufficient to show a hazard.  6/10 Tr. 449:18-20 (Thayer). Third, the NRC's 2006 report described a number of changes that have been observed in the brains of fluoride-treated animals that parallel the changes seen in the brains of humans with dementia. Pls' Ex. 13 at 222. These changes include reduction in the number of acetylcholine receptors reported in areas of the brain most important for mental stability and retrieval of memories; increased production of free radicals; substantial enhancement of reactive microglia; the presence of stained intracellular neurofilaments; and the presence of IgM. *Id.* at 222. The NRC noted that the "magnitude of the changes was large and consistent among the studies" and "are related to signs of dementia in humans." *Id.* The CDC agrees with the NRC on each of these findings.  ECF No. 232 (2d Am. App. C – Hannan) at 12:21-24; 15:18-19:26.

Consistent with the NRC's findings, a 2019 study by Cao and others found that certain mice developed neuropathological lesions like those associated with Alzheimer's after just three months' exposure to fluoride; the lesions were more severe, and appeared earlier, than lesions seen in the control mice. Thiessen Dec. ¶ 182. Further, in a large study by Russ following most persons born in Scotland in 1921, relatively low levels of fluoride were associated with an increased prevalence of dementia in the population of those over 60. *Id.* ¶ 183.  Consistent with the Scottish study, a 2016 study by Li of persons in an endemic fluorosis area of China reported a very high rate of cognitive impairment (81.1%), while Shao's 2003 study found that adult fluorosis patients had deficits in language fluency, recognition, associative learning, and working memory as compared to controls. *Id.* ¶ 183; Grandjean Dec. ¶ 74.

Kristin's fear of developing dementia or cognitive decline later in life, and her expenditure of money to reduce that risk by minimizing her current intake (and accumulation) of fluoride, are injuries-in-fact that support Article III standing as they are based on a credible threat that requires present action to prevent.

## IV.   PLAINTIFFS ALSO HAVE ARTICLE III STANDING BASED ON EPA'S ATTEMPT TO DEPRIVE THEM OF THEIR PROCEDURAL RIGHT TO A *DE NOVO* TRIAL

While Congress cannot "confer jurisdiction on Art. III federal courts to render advisory

---

[26] The elderly brain is also more vulnerable because the blood-brain barrier becomes more permeable in old age, and the kidneys are less able to clear fluoride from the blood. Thiessen Dec. ¶ 184.

opinions,"[27] it *can* "enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."[28]  In those situations, "the violation of a procedural right granted by statute can be sufficient . . . to constitute injury in fact" and "a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified."[29] This is consistent with "the trend . . . toward enlargement of the class of people who may protest administrative action."[30]  Since procedural rights "are special," a plaintiff who has been accorded one "to protect his concrete interests can assert that right without meeting all the normal standards" of individualized harm.[31] Thus, "[a] finding that Congress has expressly, 'or by clear implication,' conferred standing on appellants would . . . obviate the other inquiries.'"[32] More specifically, "a litigant to whom Congress has 'accorded a procedural right to protect his concrete interests[]'. . . *here, the right to challenge agency action unlawfully withheld* . . . 'can assert that right without meeting all the normal standards for redressability and immediacy.'"[33]

The Supreme Court has examined both the "history and the judgment of Congress" when determining whether a statutory violation inflicts a concrete, *de facto* injury.[34] Just as the existence of common law actions to remedy invasions of privacy supported the Ninth Circuit's conclusion that

---

[27] *Sierra Club v. Morton*, 405 U.S. 727, 732 & n. 3 (1972).

[28] *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 & n. 3 (1973) (noting that the requirement that federal plaintiffs prove some threatened or actual injury to establish standing is a rule that applies "in the absence of a statute expressly conferring standing"). *See also Spokeo, Inc. v. Robins*, __ U.S. __, 136 S.Ct. 1540, 1549 (2016) ("[T]he violation of a procedural right granted by statute *can be sufficient* in some circumstances to constitute injury in fact. . . . [A] plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified."); *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1118 (9th Cir. 2017) ("Supreme Court cases recognize that . . . statutorily recognized harms alone may confer standing.").

[29] *Spokeo,* 136 S.Ct. at 1549 (emphasis in original); *Bassett v. ABM Parking Services, Inc.*, 883 F.3d 776, 782 (9th Cir. 2018) (noting "the Supreme Court . . . recognized that *some* statutory violations, alone, do establish concrete harm"); *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117 (9th Cir. 2020); *Van Patten v. Vertical Fitness Grp.*, 847 F.3d 1037, 1042 (9th Cir. 2017).

[30] *Camp*, 397 U.S. at 154; *Patchak v. Salazar*, 632 F.3d 702, 705 (D.C. Cir. 2011), *aff'd Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (same; quoting *Camp*); *Raduga USA Corp. v. U.S. Dept. of State*, 440 F.Supp.2d 1140, 1148 (S.D. Cal. 2005) (same).

[31] *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573, n. 7 (1992) (emphasis added); *Natural Resources Defense Council v. Jewell*, 749 F.3d 776, 782 (9th Cir. 2014) (following *Lujan*).

[32] *Animal Welfare Institute v. Kreps*, 561 F.2d 1002, 1004-5, (D.C. Cir. 1977), *cert. denied* 434 U.S. 1013 (1978) (quoting *Warth v. Seldin*, 522 U.S. at 501).  The *Krebs* court also found that the harm would be redressable by the remedy sought, but this is expressly an alternate basis for standing.  *Kreps*, 561 F.2d at 1006 (emphasis added).

[33] *Massachusetts v. E.P.A.*, 549 U.S. 497, 517–18 (2007) (emphasis added). Though the standing inquiry is more deferential when states are the plaintiffs, the *Massachusetts* court had not yet applied that deferential standard when making the above-quoted statement.

[34] *Spokeo,* 136 S.Ct. at 1543; *Van Patten*, 847 F.3d at 1042–43.

PLAINTIFFS' SUPPLEMENTAL BRIEFING ON STANDING

violations of the Telephone Consumer Protection Act of 1991 constituted, without more, a "legally cognizable injur[y]," so should the historical existence of tort actions to remedy injuries caused by environmental toxicants support the conclusion that depriving plaintiffs of their statutory right to a *de novo* proceeding under TSCA Section 21 would also constitute such an injury.[35]  As for Congress, it specifically intended that TSCA would "protect the public from chemicals that pose an unreasonable risk to health and the environment," a goal furthered by the citizen petition process, which Congress "considered a powerful tool in forcing the EPA's hand in that regard."[36] To demonstrate its "solicitousness" towards citizen petitioners, "Congress designed section 21 to promote citizen participation in the rulemaking process," including by giving citizens the right to a *de novo* proceeding when EPA denies a petition.[37] "Congress is well positioned to identify intangible harms that meet minimum Article III requirements."[38] Plaintiffs respectfully contend that deprivation of Section 21's right to a *de novo* trial is the type of procedural harm that establishes an injury-in-fact, and thereby provides an alternate basis for Plaintiffs' standing here.

July 1, 2020                                    Respectfully submitted,

                                                */s/ Kay Gunderson Reeves*
                                                KAY GUNDERSON REEVES
                                                Attorney for Plaintiffs

---

[35] *Van Patten,* 847 F.3d at 1043.  *See also* Restatement (2d) of Torts §§388, 402A; *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829 (3d Cir. 1990) (reversing dismissal of medical monitoring claim for residents living near PCB-contaminated railyard); *Hernandez v. Monsanto Company*, No. 16-cv-1988-DMG, 2016 WL 6822311, at *1 (C.D. Cal. July 12, 2016) (denying motion to dismiss personal injury claims brought by plaintiffs environmentally exposed to glyphosate).

[36] *Food & Water Watch v. U.S. Environmental Protection Agency*, 302 F.Supp.3d 1058, 1066 (N.D. Cal. 2018).

[37] *Environmental Defense Fund v. Thomas*, 657 F.Supp. 302, 307 (D.D.C. 1987) (emphasis added); *Basel Action Network v. E.P.A*., No. 11-cv-6185-EMC, 2012 WL 2279248, at *8 (N.D. Cal. June 18, 2012) (quoting *Thomas*).

[38] *Spokeo*, 136 S.Ct. at 1549; *Bassett*, 883 F.3d at 781.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing was served by Notice of Electronic Filing this 1st day of July, 2020, upon all ECF registered counsel of record using the Court's CM/ECF system.

                    */s/ Michael Connett*
                    MICHAEL CONNETT

PLAINTIFFS' SUPPLEMENTAL BRIEFING ON STANDING