DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
SIMI BHAT
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Case No. 17-CV-02162 EMC <br><br> **DEFENDANTS' POST-TRIAL BRIEF REGARDING STANDING** <br><br> Trial: June 8-17, 2020 |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

STANDARD OF REVIEW ................................................................................................. 3

ARGUMENT ...................................................................................................................... 3

I.    PLAINTIFFS LACK CONSTITUTIONAL STANDING. ................................... 3

      A.    Plaintiffs have not proven that they suffer the injury of headaches from community water fluoridation or that their proposed remedy is likely to redress their headaches. .................................................................................................. 4

      B.    Any other injuries to adults that Plaintiffs may allege are not cognizable. ............ 9

      C.    Plaintiffs' residual theories of standing are deficient. .......................................... 10

II.   PLAINTIFFS DO NOT FALL WITHIN THE ZONE OF INTERESTS. ......................... 11

CONCLUSION.................................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Alaska Survival v. Surface Transp.*,
   705 F.3d 1073 (9th Cir. 2013) .................................................................. 13

*Baur v. Veneman*,
   352 F.3d 625 (2d Cir. 2003) .......................................................... 11, 12

*Carrico v. City & Cty. of San Francisco*,
   656 F.3d 1002 (9th Cir. 2011) ...................................................... 3

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .................................................................... 11

*Corrosion Proof Fittings v. E.P.A.*,
   947 F.2d 1201 (5th Cir. 1991) ...................................................... 11

*Ctr. for Law & Educ. v. Dep't of Educ.*,
   396 F.3d 1152 .............................................................................. 10

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752, (2004) .................................................................... 14

*Fed. Election Comm'n v. Akins*,
   524 U.S. 11 (1998) ........................................................................ 10

*Fla. Audubon Soc'y v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) ........................................................ 10

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ...................................................................... 14

*Food & Water Watch, Inc. v. EPA*,
   302 F. Supp. 3d 1058 (N.D. Cal. 2018) ........................................ 14

*Freeman v. Quicken Loans, Inc.*,
   132 S. Ct. 2034 (2012) .................................................................. 13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000) ............................................................ 3, 4, 11

*Gest v. Bradbury,*
   443 F.3d 1177 (9th Cir. 2006) ................................................................ 3, 4

*Hein v. Freedom From Religion Found., Inc.,*
   551 U.S. 587 (2007) .................................................................................. 10

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) .................................................................................. 11

*Kirola v. City & Cty. of San Francisco,*
   860 F.3d 1164 (9th Cir. 2017) .................................................................... 4

*Lexmark Int'l Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) ...................................................................... 3, 12, 13

*Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ...................................................................................... 4

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .......................................................................... 3, 4, 6, 9

*Maracich* v. *Spears,*
   133 S. Ct. 2191 (2013) .............................................................................. 13

*McCormack v. Hiedeman,*
   694 F.3d 1004 (9th Cir. 2012) .................................................................. 12

*McInnis-Misenor v. Me. Med. Ctr.,*
   211 F. Supp. 2d 256 (D. Me. 2002),
   *aff'd sub nom.,* 319 F.3d 63 (1st Cir. 2003) .......................................... 12

*Mossville Envtl. Action Now v. EPA,*
   370 F.3d 1232 (D.C. Cir. 2004) ................................................................ 15

*Nat. Res. Def. Council v. EPA,*
   735 F.3d 873 (9th Cir. 2013) .................................................................... 12

*Nguyen v. Chater,*
   100 F.3d 1462 (9th Cir. 1996) .................................................................... 5

*Northside Sanitary Landfill, Inc. v. Thomas,*
   849 F.2d 1516 (D.C. Cir. 1988) ................................................................ 15

*Pennsylvania v. New Jersey,*
   426 U.S. 660 (1976) .................................................................................. 11

iv

*Price v. Stevedoring Servs. of Am., Inc.,*
  697 F.3d 820 (9th Cir. 2012)........................................................................................... 14

*Riva v. Pepsico, Inc.,*
  82 F. Supp. 3d 1045 (N.D. Cal. 2015) .............................................................................. 10

*San Diego Cty. Gun Rights Comm. v. Reno,*
  98 F.3d 1121 (9th Cir. 1996)............................................................................................... 4

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .......................................................................................................... 14

*Thomas v. Mundell,*
  572 F.3d 756 (9th Cir. 2009).............................................................................................. 10

*Tobeler v. Colvin,*
  749 F. 3d 830 (9th Cir. 2014).............................................................................................. 5

*U.S. Dep't of Energy v. Ohio,*
  503 U.S. 607 (1992) .......................................................................................................... 14

*United States v. $133,420.00 in U.S. Currency,*
  672 F.3d 629 (9th Cir. 2012)............................................................................................... 3

*United States v. Hays,*
  515 U.S. 737 (1995) ............................................................................................................ 3

*Wash. Envtl. Council v. Bellon,*
  732 F.3d 1131 (9th Cir. 2013).............................................................................................. 5

*Washington v. Barr,*
  925 F.3d 109 (2d Cir. 2019)............................................................................................... 14

*Yates v. United States,*
  135 S. Ct. 1074 (2015) ...................................................................................................... 13

**United States Code**

15 U.S.C. § 2620............................................................................................................................ 1

15 U.S.C. § 2620(a)...................................................................................................................... 13

15 U.S.C. § 2620(b)....................................................................................................................... 1

15 U.S.C. § 2620(b)(1) ...................................................................................................... 13, 14

15 U.S.C. § 2620(b)(3) ........................................................................................................... 14

15 U.S.C. § 2620(b)(4)(A) ..................................................................................................... 13

15 U.S.C. § 2620(b)(4)(B) ..................................................................................................... 14

Defendants' Post-trial Brief on Standing
Case No. 17-cv-02162 EMC

# INTRODUCTION

Plaintiffs failed to demonstrate at trial that they have constitutional standing and that their claim falls within the zone of interests of the Toxic Substances Control Act ("TSCA"). 15 U.S.C. § 2620(b). Plaintiffs content that the best evidence of standing is the self-reported headaches of their declarants. But the evidence Plaintiffs offered on headaches at trial was, by their own expert's description, "weak" and unrelated to fluoride levels in community water fluoridation programs. Tr., Mot. Summ. J. 5:1-10 (Nov. 15, 2019); Trial Transcript ("Tr.") 308:1-13. Nor is Plaintiffs' passing reference to headaches in their administrative petition a sufficient basis to confer this Court with jurisdiction to address the neurodevelopmental harm that Plaintiffs attempted to prove at trial. None of Plaintiffs' standing declarants are pregnant, planning to become pregnant, or in guardianship of infants. Plaintiffs lack standing, and their case must be dismissed.

# BACKGROUND

As this Court is well aware, fluoride is a common, naturally occurring substance. In the United States, some communities add fluoridation chemicals to drinking water to reach 0.7 milligrams per liter (mg/L), the recommended optimal concentration for reducing tooth decay. US Ex. 516.

Despite these positive health effects, on November 23, 2016, a group led by Fluoride Action Network petitioned EPA to ban the addition of fluoridation chemicals to water. US Ex. 515. According to their petition, "neurotoxicity is a hazard of fluoride exposure" which presents the risks of loss of Intelligence Quotient (IQ) points and the onset of Attention Deficient Hyperactivity Disorder (ADHD). US Ex. 515.0002, 515.0008, 515.0010. In particular, the petition identifies the subpopulations of infants, young children, and the elderly as being susceptible to fluoride's alleged effects. US Ex. 515.0002.

EPA denied the petition because it did not set forth the necessary facts to provide a basis to initiate the requested rulemaking as required by TSCA. US Ex. 514 15 U.S.C. § 2620. EPA concluded that "[t]he petition has not set forth a scientifically defensible basis to conclude that any persons have suffered neurotoxic harm" from water fluoridation. US Ex. 514.004.

Following the petition denial, a smaller group of organizations and individuals filed this action on April 18, 2017. ECF No. 1. Plaintiffs stipulated that they would "*rely exclusively* on the

declarations attached [to ECF No. 100] to establish the factual basis" for standing. ECF No. 100 ¶ 1 (emphasis added). Though the petition claimed that neurotoxic harm was a hazard of fluoride, the Plaintiffs in this action have not identified a single individual Plaintiff or member of a Plaintiff organization who can credibly fear the neurotoxic harms of reduced IQ or ADHD. Not a single declarant is a member of the alleged susceptible subpopulations. None has infants or young children of any age of concern. It is undisputed no standing declarant is pregnant, expects to be pregnant, or even expressed a desire to become pregnant. None is elderly. In denying the parties' summary judgment motions, the Court found that Plaintiffs' declarations "r[o]se above the purely speculative, albeit perhaps barely" for standing at summary judgment. ECF No. 156 at 9.

Subsequent to the petition and the Complaint, studies from two birth cohorts emerged regarding the relationship between urinary fluoride levels and neurodevelopmental effects on IQ and ADHD behavior. The Canadian MIREC and Mexico City ELEMENT cohort studies were the foundation of Plaintiffs' case at trial and all four of Plaintiffs' experts focused on developmental exposure. Dr. Hu summarized his opinion that "the ELEMENT prospective cohort studies are consistent with and support the conclusion that fluoride is a *developmental* neurotoxicant." Hu Decl., ECF No. 198-1, ¶ 13(emphasis added). Dr. Lanphear similarly concluded that the MIREC studies "indicate that exposure to 'optimal' levels of fluoride *during fetal development* is associated with diminished intelligence in childhood" and "suggest[] that susceptibility to fluoride's adverse neurological effects may extend into *infancy.*" Lanphear Decl., ECF No. 198-2, ¶¶ 14-15 (emphasis added). Dr. Grandjean relied exclusively on these cohort studies for his risk calculations. Grandjean Decl., ECF No. 198-3, ¶¶ 136-143. Finally, Dr. Thiessen relied on prenatal animal studies for her risk calculations. Thiessen Decl., ECF No. 202-1, ¶ 118. EPA's experts, on the other hand, reached different conclusions from Plaintiffs after conducting systematic reviews and examining the weight of scientific evidence. Chang Decl., ECF No. 200, ¶ 13; Tr. 636:7-643:23 (summarizing NTP 2016); Tsuji Decl., ECF No. 199, ¶¶148-152.

At trial, the standing declarations were admitted into evidence, ECF No. 218, and, pursuant to stipulation, ECF No. 100, no additional factual basis of standing was presented. The Court

closed the record and requested briefing on standing given the undisputed fact that no Plaintiff can be personally concerned about fluoride exposure to a developing fetus or infant. Tr. 1136:1.

### STANDARD OF REVIEW

At trial, Plaintiffs bear the burden to demonstrate all elements of standing by the same standard that applied to all other elements of their case—preponderance of the evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (standing is an "indispensable part of the plaintiff's case" and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"); *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (factual predicate of standing must be proven at trial); *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 683 (9th Cir. 2012) (facts must be proven by preponderance of the evidence). Unsupported, conclusory, and self-serving allegations of standing declarants are never enough to prove standing. *U.S. Currency*, 672 F.3d at 638; *Carrico v. San Francisco*, 656 F.3d 1002, 1006 (9th Cir. 2011).

Plaintiffs must also establish by the preponderance standard that they fall within TSCA's zone of interests. *Lexmark Int'l Inc. v. Static Control Components*, 572 U.S. 118, 129 (2014).

### ARGUMENT

### I.     PLAINTIFFS LACK CONSTITUTIONAL STANDING.

Federal courts do not freely dispense advice; they resolve actual controversies. U.S. Const. art. III. And cases must be brought by the injured, not their advocates. Having a "special interest in the subject" is not an adequate basis to invoke federal jurisdiction. *Lujan*, 504 U.S. at 563. A plaintiff must show that the action it challenges "directly" affects it. *Id.*; *United States v. Hays*, 515 U.S. 737, 745 (1995). The doctrine of standing "functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 191 (2000).

The Supreme Court has enumerated three elements of standing, which build upon each other to ensure that the remedy crafted by the federal courts is "likely" to redress the particular injury that the challenged action has inflicted on plaintiffs. Plaintiffs must prove that they have

3

suffered (1) injury-in-fact; (2) traceable to the challenged action; and (3) redressable by the federal courts. *Lujan*, 504 U.S. at 563.

The first requirement, of "injury-in-fact," is satisfied only by "concrete," "particularized," "actual," and "imminent" harm. *Laidlaw,* 528 U.S. at 180–81. This requirement "cannot be met where there is no showing of any real or immediate threat" to the plaintiffs. *Los Angeles v. Lyons*, 461 U.S. 95, 101(1983). Plaintiffs must demonstrate a "realistic threat" of injury that is particular to their exposure. *Id*. at 184. Any person can fear any harm, and fear alone is insufficient to confer standing. *Lyons*, 461 U.S. at 111.  Because Plaintiffs here seek prospective relief, they must also demonstrate that their injury will likely reoccur in the future. *Id.* at 103; *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996).

The second and third elements of standing require Plaintiffs to prove that their injury is "fairly traceable" to the challenged action, and that it is "likely" that a remedy selected by the court would redress the claimed injury. *Laidlaw Envtl. Servs., Inc.*, 528 U.S. at 180–81; *Kirola v. City and County of San Francisco*, 860 F.3d 1164, 1174 (9th Cir. 2017). Plaintiffs seeking an injunction need to prove at trial that without an injunction against the challenged action, it is "likel[y]" they will be harmed. *Gest*, 443 F.3d at 1182; *see Lyons*, 461 U.S. at 111 (plaintiffs seeking equitable relief must demonstrate a "likelihood of substantial and immediate harm"). In sum, if a federal court is to expend its scarce resources to resolve a case, it must be likely that the remedy sought is likely to redress a real injury particular to the plaintiffs.

Plaintiffs have not proven that they have a personal, concrete interest in disputing EPA's denial of their petition. Rather, they have made vague allegations of injury without regard to the specific circumstances of their declarants and the evidence, and have failed to establish that their alleged injuries are traced to EPA's action or would be redressed if the Court grants relief. Plaintiffs' meager attempts to show standing at trial lack the necessary particularity and fall far short of fulfilling constitutional requirements.

**A. Plaintiffs have not proven that they suffer the possible headaches traceable to water fluoridation or that their proposed remedy is likely to redress their headaches.**

Plaintiffs admit that their "best example" of cognizable injury is self-reported headaches. Tr., Mot. Summ. J. 5:1-10 (Nov. 15, 2019). Julie Simms, a standing declarant, claims to suffer

headaches due to fluoridated drinking water. Simms Decl., ECF No. 100-6, ¶ 13. However, Ms. Simms admits to having at least twenty-four different headache "triggers," including wheat, sugar, dairy, cheese, aspirin, gas fumes, perfume, heat, bath soap, red wine, mold, and stress. Dep. Designations, ECF No. 237, at 45-50. Another standing declarant, Audrey Adams, believes that her adult son suffers headaches after showering with fluoridated water. Adams Decl., ECF No. 100-7, ¶ 11. She contends that her son has vaccine-induced autism, and that he has many sensitivities, including allergies to food and other chemicals, that exacerbate problems stemming from his autism. Dep. Designations, ECF No. 237, at 60-61, 63-64. Ms. Adams concedes that there are multiple possible causes of her son's headaches, and that the time, temperature, and pressure of his showers affect his headaches. Adams Decl., ¶¶ 11, 14, ECF No. 100-7, at 4-5. Ms. Simms and Mr. Adams have never been medically tested for a fluoride allergy, and their headaches are self-reported. Dep. Designations, ECF No. 237, at 51-52; Dep. Designations, ECF No. 237, at 66.

Because Ms. Simms' and Mr. Adams' claimed headaches have multiple possible causes, Plaintiffs needed to prove by preponderance of the evidence that they do, in fact, suffer injury in the form of headaches from exposure to fluoridated water. *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1141–42 (9th Cir. 2013) (standing demonstration is weak when there are multiple potential causes of injury). They did not meet this burden at trial. They adduced no new evidence to isolate fluoridated drinking water as a source of Ms. Simms and Mr. Adams' headaches. This Court has already decided that these untested, self-reported claims of headaches are not persuasive evidence of standing. Summ. J. Order, ECF No. 156 at 9.[1] Moreover, Plaintiffs have not shown that their headaches are fairly traceable to community water fluoridation. Plaintiffs cite dated case reports and a single study at high exposure levels to support their theory. In their direct testimony declarations, Plaintiffs' experts made, in total, three passing references to headaches: (1) case

---

[1] Though declarants cite to doctor's and non-medical professional's notes of the self-reported headaches, these notes can be only used to prove the facts of their self-reporting. The standing declarants are fact witnesses, and the stipulation allowing the declarations specifically stated that the declarations could be used only to establish the "factual" basis of standing. ECF No. 100 at 1-2, ¶¶ 1-3, 7. Fact witnesses cannot offer any medical diagnoses; and there are no expert medical diagnoses in evidence. *Tobeler v. Colvin*, 749 F. 3d 830, 833-34 (9th Cir. 2014); *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

5

reports in the National Research Council (NRC) 2006 report; (2) case reports of occupational exposure; and (3) an epidemiological study on highly exposed populations in India. Thiessen Decl. ¶ 61; Grandjean Decl. ¶¶ 59, 74. None of the documents indicates that exposure to the levels of fluoride in artificially fluoridated water is fairly traceable to headaches. And neither individually nor collectively do the documents establish injury or causation by a preponderance of the evidence.

First, the old case reports documented in NRC 2006 are not sufficient evidence to link headaches and exposure to artificially fluoridated water. Plaintiffs' risk assessment expert, Dr. Thiessen, conceded that case reports can do no more than "hypothesi[ze]" a connection between an exposure and an effect. Tr. 576:22-24. A "hypothesis" is insufficient for standing. *Lujan*, 504 U.S. at 560. Though Dr. Thiessen attempted on rebuttal to recast these case reports as "double-blinded experiments," her characterization in rebuttal testimony is refuted by the very document on which she purports to rely, her prior testimony, and the testimony of EPA's expert epidemiologist, Dr. Chang.

In NRC 2006, headaches are mentioned only once, as a finding in "case reports" by Petraborg in 1977. Pltf. Ex. 13, p. 270. Dr. Thiessen herself described the studies in NRC 2006 as "case reports" as documented by the NRC. Tr. 503:19-24. EPA's expert, epidemiologist Dr. Chang, also described the "case reports" in which headaches are mentioned and confirmed there was no blinding in the 1977 Petraborg case reports cited by NRC 2006. Tr. 839:16-23. Only after speaking with Plaintiffs' counsel did Dr. Thiessen change her description of the reports in NRC 2006 to "double-blinded experiments." Tr. 1036:6-12; 526:22-527:2. Plaintiffs' counsel prefaced Dr. Thiessen's rebuttal testimony with a reference to Waldbott 1958, though NRC 2006 does not contain any description of any symptoms from Waldbott 1958, and Waldbott 1958 is not itself a reference in NRC 2006.[2] Tr. 1034:14-35:25. In any case, Dr. Chang attested that Waldbott also

---

[2] In response to EPA's objections to expert testimony as beyond the scope of disclosures, reasserted by written motion, ECF No. 228, Plaintiffs' counsel represented that the studies, as well as the "neurological manifestations" discussed by the expert, were described in NRC 2006. Tr. 502:18-503:2. Because the only mention of headaches in NRC 2006 is to case reports by Petraborg, if Plaintiffs' counsel and expert were not simply misremembering the author of the case reports, then they exceeded the scope of disclosures, and EPA was prejudiced in its inability to cross-examine Plaintiffs' expert with the undisclosed document.

wrote case reports in 1958 in which the doctor provided fluoridated water to patients, but the doctor was not blinded as to the fluoridation of the water, he did not test patients with water that was not fluoridated, and he did not report on patients who exhibited no symptoms. Tr. 841:8-23. Studies that fail to blind investigators are highly susceptible to bias, and without a control group or even a record of results from all cases, Waldbott 1958 is not a "valid basis" to conclude that headaches are traceable to fluoridated water. Tr. 840:20-841:23.

In addition to failing to demonstrate that the case reports in NRC 2006 were actually "double-blinded experiments," Plaintiffs never identified the concentration of fluoride at which headaches were reported, the characteristics of the studied population, or even the prevalence of the symptoms compared with a control population. Moreover, the American Academy of Allergy found in 1971, after Waldbott 1958,  that no symptoms reported in any blinded experiments were caused by allergies to fluoride in the water. Pltf. Ex. 13, p. 293; Tr. 843:20-24. Thus, the case reports cited by Dr. Thiessen provide no basis to conclude that the Ms. Simms's headaches are traceable to her exposure to fluoride in the levels present in artificially fluoridated drinking water in the United States. Additionally, Plaintiffs presented no studies concerning showering and headaches. Therefore, these case reports provide no basis to conclude that Mr. Adams's headaches are traceable to showering with fluoridated water.

The only other case reports cited by Plaintiffs concern industrial occupational exposures to fluoride at very high levels. Tr. 300:13-301:9. Plaintiffs' epidemiologist, Dr. Grandjean, conceded that the workers described in the Roholm case reports were exposed to fluoride in the range of 30 mg/day, not even close to the intake rates of fluoride in drinking water as calculated by Dr. Thiessen, and the workers were simultaneously exposed to tar and other contaminants. Tr. 300:5-301:9; Thiessen Decl., Tbl. 7, ECF No. 202-1 at 75 (applying 70 kg body weight for adults from NRC 2006, Pltf.  Ex. 13 at 23, would yield intake rates of .77 mg/day for average adults). These case reports also provide no basis to conclude that exposure to community fluoridated water will lead to headaches.

The last headache study Plaintiffs' experts cited in passing was conducted by Sharma in villages in India. Dr. Grandjean described this study as "weak" because of its poor design, and he

expressed doubt that the questionnaire administered to the study participants was standardized or even understandable. Tr. 308:1-13. EPA's epidemiology expert, Dr. Chang, concurred that this study was weak because the health effects studied were self-reported and not diagnosed by medical professionals, the study had virtually no control for confounding factors, and it lacked individual measurements of fluoride exposure. Tr. 843:1-17. She further explained that this study was "cross-sectional," meaning that information on village-wide fluoride exposure and symptoms were collected at the same time, and because no time elapses between exposure and outcome, cross-sectional studies cannot prove that an exposure causes an outcome. *Id.*; Chang Trial Decl. ¶ 121. Dr. Chang's testimony on Sharma is uncontested, and, indeed, supported, by Plaintiffs' expert. Plaintiffs cannot reasonably dispute that the Sharma study is uninformative.

In addition, Plaintiffs conceded that the only clear adverse effects shown in Sharma were in children exposed to concentrations of fluoride above 1.5 ppm, which is more than double the levels in the United States. Tr. 307:20-308:13. There was no difference in headaches among children or adults in the low fluoride villages, which were below 1 ppm and the medium fluoride villages, which were between 1-1.5 ppm. Tr. 842:1-17. The results of this study undermine Plaintiffs' claims that their declarants' headaches are connected to community water fluoridation.

It is notable that Plaintiffs failed to establish the intake of fluoridated water of Ms. Simms or Mr. Adams with any specificity such that their circumstances could be compared to the concentrations in any study discussed at trial. There is also no evidence in the record even suggesting that the remedy sought here—EPA action on the alleged unreasonable risk of neurotoxic harm of fluoridated water—would redress the headaches claimed to be suffered by Mr. Adams and Ms. Simms. As previously noted, Mr. Adams and Ms. Simms purportedly have many claimed headache triggers in addition to fluoride, and suffer from headaches (sometimes also described as pain to her son's head by Ms. Adams) notwithstanding their avoidance of fluoridated water. Dep. Designations, ECF No. 237, at 45-50, 57; Adams Decl., ECF No. 100-7, ¶¶ 11, 14; Dep. Designations, ECF No. 237, at 60-61, 67-68. Plaintiffs have never even attempted to prove redressability, or asserted that EPA action on the particular concentration of fluoride that they claim presents an unreasonable risk would also alleviate Mr. Adams' or Ms. Simms' headaches.

**B.  Any other injuries to adults that Plaintiffs may allege are not cognizable.**

At trial, Plaintiffs made fleeting references to other potential health impacts in adults, such pain sensitivity and cognitive functioning in the elderly. Plaintiffs did not prove by preponderance of the evidence that these purported effects confer standing.

The scant evidence presented at trial regarding pain sensitivity also cannot provide the basis for Plaintiffs' standing. Although Dr. Thiessen claimed that the McPherson 2018 animal study found "increase in pain sensitivity" in rats, but actually rats exposed to fluoride take longer to react to heat than a control group. *Compare* Thiessen Decl. ¶ 79 *with* Tsuji Decl. ¶ 94 *and* Tr. 751:1-13; 753:13-18; 754:12-16. If anything, this result would suggest that fluoride exposure dulls pain. In any event, McPherson 2018 was a set of *animal* studies examining learning and memory due to *developmental* exposure to *ingesting* fluoride.  It provides no explanation for the pain or headaches that Ms. Adams' disabled adult son purports to suffer with "skin contact" to shower water. Adams Decl. ¶¶ 11, 16; *see also Riva v. Pepsico, Inc.*, 82 F. Supp. 3d 1045, 1061 (N.D. Cal. 2015) (animal studies may not readily translate to human effects for standing).

Finally, Plaintiffs previously made the sweeping argument that Plaintiffs have standing because their declarants will all presumably become elderly someday, which would increase their susceptibility to the neurotoxic harms of fluoride exposure. Tr. Mot. Summ. J. 20:5-21:19. The Court correctly questioned whether "anyone has standing" because "[a]nybody [is] going to be elderly." *Id.* at 20:23-24. Such a generalized grievance, which is not particular to any declarant's circumstances, cannot support standing. *See Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23 (1998); *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009). In any event, not even Plaintiffs' own epidemiologist would testify to any human studies on the stand on this alleged harm.  And animal studies were of such little import that none of Plaintiffs' experts testified to them on the stand either. *Riva*, 82 F. Supp. 3d at 1061(animal studies may not readily translate to human effects for standing). Instead, Plaintiffs' expert, Dr. Grandjean, disclaimed providing an opinion on adults, Tr. 226:9-11, and conceded that the occupational evidence on adults "does not allow any detailed consideration of [neurotoxic harm's] dependence on dose, timing, and duration." Grandjean Decl. ¶ 64; *see also* Tr. 298:17-

9

300:12 (discussing Shao 2003), 304:8-305:9 (Li 2016 showing no association).  Plaintiffs did not present any evidence on how, to what degree, and with what consequences, fluoride exposure would cause neurotoxic harms to their future elderly declarants. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) ("we routinely refuse to permit such predictive assumptions to establish standing"). Thus, Plaintiffs have not proven that community water fluoridation gives rise to a realistic threat of harm when the declarants age sometime in the future. The Court should reject Plaintiffs' attempt to "dress up" "hypothesized, non-imminent injuries" as "increased risk of future injury." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161(D.C. Cir. 2005).

In sum, Plaintiffs have failed to show that any declarant suffers an immediate risk of injury from subsequent exposure to fluoridated drinking water at their present stage in life.

## C. Plaintiffs' residual or derivative theories of standing are deficient.

Plaintiffs' standing is premised entirely on injuries to their individual declarants. Because their members lack standing, as explained here, so too do the organizations. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). Any vague "loss of enjoyment" of tap water and any costs Plaintiffs have incurred to avoid fluoridated water have been caused by their own unsubstantiated concerns. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976); *Cf. Laidlaw Envtl. Servs., Inc.*, 528 U.S. at 176 (finding standing at summary judgment due to the release of mercury, an undisputed "extremely toxic pollutant"). Plaintiffs' self-inflicted injuries are no basis for standing.

In attempting to salvage the shortcomings of their claim of standing, Plaintiffs cite two additional cases in their trial brief, but both are inapposite. In *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003), the Second Circuit considered whether the meat-consuming plaintiffs in that case met the lower burden of demonstrating standing at the pleading stage by alleging injury from consumption of downed livestock that the agency allowed to be sold as food. There was no dispute in *Baur* that plaintiffs fell within the group of people who would be harmed by the agency's decision because plaintiffs consumed meat. Further, there was also no dispute about "two critical factors" underpinning the standing inquiry– the agency itself recognized a hazard, and the hazard arose from an established agency policy. *Id*. at 628. Unlike in *Baur*, Plaintiffs and their declarants

do not fall within the parts of the population to which Plaintiffs alleged harm, or to which Plaintiffs presented evidence at trial. No Plaintiff or standing declarant is pregnant, planning to become pregnant, or a guardian of an infant, and no Plaintiff or standing declarant is a member of the group of "susceptible subpopulations" that Plaintiffs identified in their petition or Complaint. And even if *Baur* were controlling, which it is not, the two critical factors alleged in that case are missing here. EPA has not recognized that neurotoxicity is a hazard of community water fluoridation. Instead, NTP 2016 found the evidence "low" so far and has a hazard conclusion pending. Tr. 636:7-643:23. And, there is no federal mandate to fluoridate water. More instructively, *Baur* recognizes that, while mere allegations are sufficient at the pleading stage, more is needed as the case proceeds. *Id.* at 631. *Baur* further acknowledges that, while plaintiffs may have constitutional standing, the "zone-of-interests" test further limits jurisdiction, *id.* at 636, and Plaintiffs here have failed to fulfill those requirements as well.

Plaintiffs also cite *Natural Resources Defense Council v. U.S. Environmental Protection Agency*, 735 F.3d 873, 878 (9th Cir. 2013). In that case, unlike here, there was no dispute that plaintiffs were guardians of small children, and there was *no dispute* that the level of exposure of a new chemical to small children would result in too high of a risk as originally *calculated by the agency itself*. Again, the characteristics of Plaintiffs and their declarants here do not match the characteristics of the subpopulations to which Plaintiffs allege harm or attempted to prove harm. Further, Plaintiffs themselves dispute that there is a single level of exposure common to all members of the population. Plaintiffs have failed to prove the exposure levels of their standing declarants with any particularity, connect such particular exposure levels with the specific harms complained of by the declarants, and demonstrate that the remedy would redress those harms.

Neither *Baur* nor *NRDC* excuses Plaintiffs' failure to identify a declarant who has a realistic interest in avoiding prenatal or infant exposure. Rather, these cases confirm well-established law that jurisdiction depends on the particular circumstances of the plaintiffs, and when the harm alleged is to pregnant women or parents of young of a certain age, plaintiffs themselves must fall within those categories. *See NRDC,* 735 F.3d at 879; *McCormack v. Hiedeman*, 694 F.3d

1004, 1023 (9th Cir. 2012); *McInnis-Misenor v. Me. Med. Ctr.,* 211 F. Supp. 2d 256, 260 (D. Me. 2002); *aff'd sub nom.*, 319 F.3d 63 (1st Cir. 2003).

## II.      PLAINTIFFS DO NOT FALL WITHIN THE ZONE OF INTERESTS.

Even if Plaintiffs have constitutional standing, they must also fall within the zone of interests to bring a claim under TSCA as set by Congress. *Lexmark*, 572 U.S. at 127, 129 (test "applies to all statutorily created causes of action"). Determining whether a case falls within the zone of interests entails "traditional principles of statutory interpretation" on "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127-28. Because Plaintiffs claim to suffer from harms not presented in their administrative petition to EPA, this case falls outside of TSCA's zone of interests.

In TSCA, Congress required that a party petition EPA to take action on an alleged unreasonable risk prior to seeking judicial review. 15 U.S.C. § 2620(a). The administrative petition must "set forth the facts which it is claimed establish that it is necessary" to initiate the desired rulemaking. *Id.* § 2620(b)(1). If EPA denies the petition, only "petitioner[s]" may bring suit, and the only basis for their suit is the petition itself. The term "petitioner" must be read in "the broader context" of the regulatory framework as a whole, *Yates v. United States*, 135 S. Ct. 1074, 1081-82 (2015), considering "neighboring words with which it is associated," *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2042 (2012), "to avoid giving [a provision] unintended breadth," *Maracich* v. *Spears*, 133 S. Ct. 2191, 2201 (2013).  *See e.g., Corrosion Proof Fittings v. E.P.A.*, 947 F.2d 1201, 1209 (5th Cir. 1991) (TSCA's reference to "national economy" precluded foreigners from being with zone of interests as "persons"). Under TSCA, "the *petitioner* may commence a civil action . . . to compel [EPA] to initiate a rulemaking proceeding *as requested in the petition*." 15 U.S.C. § 2620(b)(4)(A) (emphasis added). *Lexmark* counsels the zone of interest test questions not only *who* may bring a claim, but *what* claim can be brought and *when*. 572 U.S. at 127-28.  It follows that if petitioners do not suffer the unreasonable risk presented to EPA, then they do not have a cause of action to challenge EPA's denial of their petition in court.

12

1   Here, the entirety of Plaintiffs' petition concerned fluoride's alleged neurotoxicity. US Ex.

2   515.0002 ("neurotoxicity is a hazard of fluoride exposure"); US Ex. 515.0002, 515.0008, 515.0010

3   (discussing IQ loss and ADHD); US Ex. 515.0002 (citing infants, young children, and the elderly).

4   As the Court recognized, it is "obvious who would have standing" and fall within the zone of

5   interests:  pregnant women and potentially the parents of infants. Tr. 1135:25-36:2. No Plaintiff or

6   standing declarant has these characteristics. Nor is any Plaintiff a member of any of the susceptible

7   subpopulations like the elderly or those with iodine deficiencies as identified in the petition.

8   Despite the claims in the petition, Plaintiffs have not proffered even a single member who could

9   allege a credible fear of the neurotoxic harms of IQ loss or ADHD due to their exposure to

10   community water fluoridation.

11   Plaintiffs agree that they must show an unreasonable risk of neurotoxic harm, but seem to

12   contend that they can seek judicial review regarding the purportedly unreasonable risk of neurotoxic

13   harm without demonstrating any such risk to themselves. This argument has no basis in TSCA. Only

14   those at risk may sue the federal government for redress. *Summers v. Earth Island Inst.*, 555 U.S. 488,

15   495-96 (2009).  In other words, petitioners cannot claim one harm to EPA, then turn to the courts,

16   claiming that they suffer other harms never presented to EPA. Allowing any Plaintiff to do so here

17   would create an end-run around the administrative procedure that Congress established. Further, the

18   only relief Congress made available is for courts "to initiate a rulemaking proceeding as requested in

19   the petition"—based on the harm shown in the petition. 15 U.S.C. § 2620(b)(4)(B). In interpreting

20   TSCA, "the court must be guided to a degree by common sense as to the manner in which Congress

21   is likely to delegate a policy decision of such … magnitude to an administrative agency" and read

22   TSCA as a "harmonious," "coherent regulatory scheme."   *Food & Drug Admin. v. Brown &*

23   *Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000). There is no logical rationale for allowing

24   people who do not suffer the harm presented in the petition to demand that EPA conduct a rulemaking

25   to address that harm. To hold otherwise would deprive the agency its ability to "utilize their expertise,

26   correct mistakes, and avoid unnecessary judicial intervention." *Alaska Survival v. Surface Transp.*,

27   705 F.3d 1073, 1080 (9th Cir. 2013); *see Washington v. Barr*, 925 F.3d 109, 116 (2d Cir. 2019).

28

Defendants' Post-trial Brief on Standing
Case No. 17-cv-02162 EMC

Plaintiffs' attempt to define neurotoxic harms to encompass any perceived impact or symptom on the brain and nervous system would eviscerate the requirement that the petition "set forth the facts which it is claimed establish that it is necessary" to initiate the desired rulemaking. 15 U.S.C. § 2620(b)(1). These facts will "frame" any case Plaintiffs may bring. *Food & Water Watch, Inc. v. EPA,* 302 F. Supp. 3d 1058, 1069–70 (N.D. Cal. 2018). The petition *never* mentions headaches as a potential injury, not even once, in the body of the text or even in the more than 300 named references. Physical pain is similarly not named. Plaintiffs did attach to the petition the Sharma study, which discussed self-reported headaches among multiple alleged symptoms of fluoride exposure. Attaching one study, among over 300 others documents, without any commentary or naming "headaches" as a potential harm is wholly insufficient to bring Plaintiffs claim within TSCA's zone of interest. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65, (2004) (A bedrock of administrative law is "alert[ing] the agency to the [parties'] position and contentions in order to allow the agency to give the issue meaningful consideration."); *see e.g., Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1238 (D.C. Cir. 2004); *Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d 1516, 1519 (D.C. Cir. 1988). EPA cannot be expected to scour every attachment to identify every risk not mentioned in a petition or otherwise divine the petitioners' intent, particularly given the relatively short response deadline. 15 U.S.C. § 2620(b)(3). Plaintiffs do not fall within the zone of interests because the harm they allege, headaches, is divorced from the harm Plaintiffs named in their petition and attempted to prove at trial. The petition concerns neurotoxic harm, and Plaintiffs' risk calculations concern prenatal exposure. Plaintiffs never attempted to prove an unreasonable risk of headaches for adults in the petition or for their declarants at trial. *See supra* 1-2 (summarizing Plaintiffs' focus on prenatal/developmental exposure).

Unlike other environmental statutes, and contrary to Plaintiffs' argument that TSCA's zone of interest is commensurate with Article III standing, TSCA provides a limited, specific means to bring the type of claim at issue in this case.  Any TSCA Section 21 claim must be preceded by an administrative petition and be bound to the claimed harms in that petition. But if there is any ambiguity or doubt as to whether Plaintiffs' claim falls within TSCA's zone of interests, the Court should accept the more limited construction. The statutory interpretation

question at issue here concerns the scope of potential lawsuits against the United States, and in such instances, the statute must be "construed strictly in favor of the sovereign." *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992). Further, "given the specialized experience[,] investigations and information available to the agency, and [] the value of uniformity in its administrative and judicial understandings of what a national law requires," the Court should defer to EPA's reading of the zone of interests to require administrative exhaustion to allow the agency to consider the harms in the first instance. *Price v. Stevedoring Servs. of Am., Inc.,* 697 F.3d 820, 832 (9th Cir. 2012).

## CONCLUSION

For the forgoing reasons, and based on the lack of evidence at trial, the Court should dismiss for lack of standing or otherwise enter judgment in favor of EPA.


Date: July 1, 2020


<div style="margin-left:40%">

Respectfully Submitted,

*/s/ John Thomas H. Do*
DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
SIMI BHAT
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of July, 2020, a true and correct copy of the foregoing brief was filed electronically with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/John Thomas H. Do*

United States Department of Justice